Marx, on his own initiative, decided to hold up the process of completing execution of the First 2009 Tax Allocation Agreement after DeBrunner had signed the agreement:

> Some time in that early October timeframe, there was a first pass made at tax calculations. And it was at that point that we realized that . . . this is going to result in a very large payment down to ResCap that would be characterized [   ] it would be a capital contribution. And knowing all the focus that had been on the capital structure of ResCap over the prior year, I thought, gee, you know, this is not something that we've really vetted with our senior management on this side. And my senses went off and said I'm not sure we should be doing this. . . .
>
> . . .
>
> It was kind of a late realization that, of you know what? We're putting something in place here that probably is beyond our authority to make decisions. And that's when we raised the issue with Jim Mackey. As you can see through the tone of the e-mails, this was news to him. . . . So, there was, in my view, certainly a kind of overstepping on our part in tax of moving this thing along on the [AFI] side. You know, we saw the governance going on on the ResCap side. We weren't doing the same thing on the [AFI] side.[1701]

Although Marx believed that the First 2009 Tax Allocation Agreement was not binding because it had not been fully executed, he never sought legal advice on the issue.[1702] Marx testified that, based on this belief that the agreement was not binding, the copies that had been partially executed were discarded.[1703]

On October 18, 2010, Marx sent Young and Hamzehpour an e-mail, with Mackey copied, explaining AFI's current thinking that it may propose "changes to the tax allocation agreement recently approved by the ResCap Board (but not yet executed)."[1704] Marx testified that he probably called Young regarding holding off on signing the First 2009 Tax Allocation

---

[1701] Int. of W. Marx, Apr. 18, 2013, at 60:5–61:14, 126:2–126:25; *see also id.* at 75:1–75:12 ("I simply didn't consider the ramifications of putting an agreement in place that could compel very large capital contributions when that's something the board was very focused on.").

[1702] *See id.* at 144:1–144:13.

[1703] *See id.* at 141:8–141:20 ("My recollection is once they were retrieved from their trip to Minneapolis, they were discarded. We didn't believe them to be effective because they weren't executed. They weren't going to be the final agreement. They were not retained.").

[1704] E-mail from W. Marx (Oct. 18, 2010) [ALLY_0424659].

Agreement shortly before sending the October 18, 2010 e-mail.[1705] In the e-mail, Marx explained the reason for the potential modification as follows: "The proposed agreement was initially drafted and proposed under a previous [AFI] senior financial management team. In light of the potentially large capital contributions that could result under such an agreement, I have requested review and approval by [AFI's] current senior leadership."[1706] It appears that Marx was referring to Mackey becoming AFI's Interim Chief Financial Officer effective on April 2, 2010.[1707] Mackey then sent an e-mail to Young on the same day (October 18, 2010) stating "Jim, we should discuss. None of this has been discussed at the [AFI] level[,] so I think there needs to be a ton of socialization."[1708] Young replied on the same day:

> Agreed, if not discussed at [AFI], should get clear at that level. Since all tax benefits will ultimately belong to [AFI], this is more about how to managerially show the tax impacts on the legal entity of ResCap LLC. ResCap board would only be concerned if cash was being extracted from LLC in an "unfair" way via the tax allocation agreement . . . but I don't see that happening.[1709]

During interviews with the Examiner's Professionals, Young was asked about the events surrounding his receipt of the execution copy of the First 2009 Tax Allocation Agreement and any communications he had with AFI or with ResCap directors, officers, and counsel regarding AFI's desire to modify the terms of the agreement.[1710] His recollection of these events was limited.[1711] Young did not have any recollection of the timeline with respect to when he received the execution copy of the First 2009 Tax Allocation Agreement as compared to when he was contacted by AFI officers and told not to execute the agreement.[1712] In fact, Young initially could not even recall whether he ever signed the First 2009 Tax Allocation Agreement.[1713] Thereafter, at a follow-up interview on April 22, 2013, he believed that he never signed the First 2009 Tax Allocation Agreement.[1714]

---

[1705] *See* Int. of W. Marx, Apr. 18, 2013, at 94:10–95:17 ("And there probably had been a phone call saying, 'Hold on. We've got some issues at our end.' And then I imagine this was a follow-up email . . . .").

[1706] E-mail from W. Marx (Oct. 18, 2010) [ALLY_0424659].

[1707] *See* Minutes of a Regular Meeting of the Board of Directors of GMAC Inc., Apr. 30, 2010, at ALLY_PEO_0017627 [ALLY_PEO_0017568] (appointing Mackey as Interim Chief Financial Officer, effective as of April 2, 2010); Int. of W. Marx, Apr. 18, 2013, at 98:8–23.

[1708] E-mail from J. Mackey (Oct. 18, 2010), at EXAM20317195 [EXAM20317195].

[1709] E-mail from J. Young (Oct. 18, 2010), at EXAM20317195 [EXAM20317195].

[1710] *See* Int. of J. Young, Apr. 22, 2013, at 101:4-104:23; *see also* Int. of J. Young, Mar. 15, 2013, at 37:8-22.

[1711] *See* Int. of J. Young, Apr. 22, 2013, at 101:4-104:23; *see also* Int. of J. Young, Mar. 15, 2013, at 37:8-22.

[1712] *See* Int. of J. Young, Apr. 22, 2013, at 101:4-104:23.

[1713] *See* Int. of J. Young, Mar. 15, 2013, at 37:8-22.

[1714] *See* Int. of J. Young, Apr. 22, 2013, at 146:19–147:4.

Young testified that he believed that the August 6, 2010 ResCap Board resolution provided him with discretion not to sign the First Tax Allocation Agreement if in reviewing the final document "there was something amiss."[1715] Young's decision not to sign the agreement was largely influenced by a high-ranking AFI officer, perhaps Mackey, informing Young that the agreement had not been properly vetted or approved within AFI.[1716] Young apparently never considered signing the agreement after being told this:

> I found out that [AFI] had not gone through the proper level of governance from their perspective. . . . [A]lthough I don't know their governance process . . . I was informed that whoever signed the documents didn't have the authority to do so. And, as you know, of course I'm not going to enter into a transaction where it's not going to stand up.[1717]

He testified that he "had no reason to believe that what [he] was being told was not true,"[1718] and that he "took [AFI's] word that they understood their governance and that they were being honest and truthful of which [he] never had a reason to doubt."[1719]

Furthermore, Young testified that he was concerned that compelling AFI to follow through on the terms of the First 2009 Tax Allocation Agreement would have harmed ResCap's relationship with AFI, which he viewed as important because of ResCap's reliance on AFI for its capital needs:

> [S]omewhere along the line before these agreements were executed, we learned that our counterparty hadn't vetted it. And this counterparty by the way is very important to us. They were providing capital and liquidity to separate transactions for a long period of time where we couldn't go to third parties. Very important for us. And the fact that they hadn't gone through their process, certainly as a businessperson at that time, given the importance of this counterparty, *we weren't going to talk about a short-term forcing them into a transaction that could ultimately turn off our ability to do further transactions with them*.[1720]

---

[1715] Int. of J. Young, Apr. 22, 2013, at 92:6-20.

[1716] *See id.* at 10:14-11:10, 97:11-21, 160:14-162:13.

[1717] *Id.* at 97:13-21.

[1718] *Id.* at 98:5-15.

[1719] *Id.* at 162:9-13.

[1720] *Id.* at 160:18-161:10 (emphasis added).

Young, however, testified that AFI never told him that if ResCap were to pursue a course of trying to hold AFI to the terms of the First 2009 Tax Allocation Agreement, there would be negative consequences for ResCap in its ongoing relationship with AFI.[1721]

In addition, Young testified that he did not intend for the First 2009 Tax Allocation Agreement to be binding until he signed the agreement and that he did not believe that anyone on the ResCap side intended for ResCap to be bound by the agreement until it was signed by a ResCap officer.[1722] Although he could not recall any specific discussions he had as to whether the agreement would have been enforceable had he signed it, he believes that he may have discussed this issue with Tammy Hamzehpour, ResCap's General Counsel at the time.[1723]

After AFI informed Young and Hamzehpour that it may propose a new tax allocation agreement in place of the First 2009 Tax Allocation Agreement, Marx called Young on November 1, 2010 and explained in more detail why AFI was proposing changes to the tax allocation agreement and what the monetary impact would be to ResCap:

> I shared with him the reason why we stopped the execution of the draft agreements, i.e., they would have compelled large capital contributions to ResCap on the order of hundreds of millions for 2009 and 2010 tax years, versus a cash payment to [AFI] of $6m if we removed the beneficial language with respect to NOL's, capital losses and foreign tax credits. He understood the reason and did not think changing the draft agreements was disadvantageous to ResCap. Jim's view was that we need to move ahead and present a revised, stand-alone agreement to the ResCap Board for approval and than an executed agreement would be required to allow remittance of funds. I plan to eliminate the clauses in question and start the Board review process.[1724]

The Investigation has uncovered no evidence that Young vetted the issue of the proposed changes in the tax allocation arrangement and the monetary impact to ResCap with anyone else on the ResCap Board or in ResCap senior management prior to telling Mackey and Marx that he did not see anything unfair with the changes AFI was proposing and suggesting that

---

[1721] *See id.* at 173:16–22. ("[Q:] Did anyone at [AFI] ever suggest in words or substance to you that if ResCap sought to enforce the [First 2009 Tax Allocation Agreement], that there would be consequences to doing so? [A:] No discussion like that ever occurred.").

[1722] *See id.* at 209:20–210:10.

[1723] *See id.* at 98:5–20.

[1724] E-mail from W. Marx (Nov. 2, 2010), at ALLY_0424660 [ALLY_0424660]. Despite Marx's characterization of the payments that AFI would owe to ResCap under the First 2009 Tax Allocation Agreement as "capital contributions," payments under tax allocation agreements should not be considered capital contributions and dividends. *See* Int. of J. Young, Apr. 22, 2013, at 137:25–139:11.

AFI move forward with preparing a new agreement to present to the ResCap Board. Young immediately accepted AFI's explanation of the proposed changes as reasonable.[1725]

At a November 5, 2010 ResCap Board meeting, Young presented and discussed AFI's proposed draft of the Second 2009 Tax Allocation Agreement, which removed ResCap's right under the First 2009 Tax Allocation Agreement to receive compensation from AFI for AFI's use of ResCap tax benefits.[1726] Marx had discussed AFI's proposal with Young on November 1, 2010 and had sent a copy of the draft agreement to Tammy Hamzehpour, ResCap's General Counsel, on November 3, 2010.[1727] The ResCap Board discussed the Second 2009 Tax Allocation Agreement again on December 9, 2010, and the Independent Directors later discussed it with their counsel, Morrison Cohen.[1728]

Young testified that he has no specific recollection of speaking to anyone on the ResCap Board about why he did not sign the agreement or what was said if, in fact, he did discuss the agreement with the Board.[1729] Furthermore, he could not recall ever quantifying for the ResCap Board the amount that ResCap might have been owed under the First 2009 Tax Allocation Agreement.[1730] Similarly, West testified that the ResCap Board's discussions regarding the Second 2009 Tax Allocation Agreement were in the context of abstract concepts of reasonableness, with no specific discussions on the estimated monetary impact to ResCap of accepting the new agreement.[1731] West also could not recall the ResCap Board ever asking whether the First 2009 Tax Allocation Agreement had been signed by a ResCap officer and, if not, why it had not been signed.[1732]

---

[1725] *See* Int. of W. Marx, Apr. 18, 2013, at 100:10–101:7 ("[T]his was not—this back and forth was never really adversarial. As soon as it came up, Jim was—Jim Young . . . was like, 'Oh yeah, we're not trying to do something here that we didn't intend to do, so if we need to put the breaks [sic] on and, you know, and he's a very reasonable person . . . .'"); *see also id.* at 130:23–131:12 ("[A]s soon as we brought up our issue with the first agreement, Jim [Young] was like, 'Oh yeah, I see that. You know, that's okay. If we need to have some further discussion, let's do it.' You know he got it. . . . And you know, there was no coaching, cajoling, convincing.").

[1726] *See* Draft Second 2009 Tax Allocation Agreement, at RC40016933 [RC40016871] (deleting part of Section 1.03D from the First 2009 Tax Allocation Agreement); *see also* Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Nov. 5, 2010, at RC40018848 [RC40018729]; E-mail from T. Hamzehpour (Nov. 10, 2010), at EXAM10432502–03 [EXAM10432501] ("We discussed [the draft Second 2009 Tax Allocation Agreement] with ResCap's independent directors on Nov 5.")

[1727] *See* E-mail from W. Marx (Nov. 3, 2010), at EXAM10432503–04 [EXAM10432501].

[1728] *See* E-mail from T. Hamzehpour (Dec. 16, 2010), at EXAM10432502 [EXAM10432501].

[1729] *See* Int. of J. Young, Apr. 22, 2013, at 146:20–147:16.

[1730] *See id.* at 148:2–149:18.

[1731] *See* Int. of P. West, Apr. 16, 2013, at 23:2–12, 80:8–81:23.

[1732] *See id.* at 18:24–19:3.

Morrison Cohen sent comments on the Second 2009 Tax Allocation Agreement to ResCap on December 16, 2010:

> First, seems very unfair. If Rescap earns profit but [GMAC Mortgage Group LLC/AFI] has losses and no tax is ultimately due, then Rescap still must pay [GMAC Mortgage Group LLC/ AFI] the hypothetical tax on Rescap's profit. However, if [GMAC Mortgage Group LLC/AFI] earns profit but Rescap has losses and no tax is ultimately due, then [GMAC Mortgage Group LLC/AFI] need not pay Rescap the hypothetical tax on [GMAC Mortgage Group LLC/AFI's] profit. . . . Second, [Marx's] cover email suggests that as a consolation prize the losses used up by [AFI] can reduce future income of Rescap. Nice thought but I really don't see that spelled out in the agreement. If anything, the key definition in section 1.03(D) seems to be an annual calculation due to the phrase "for any taxable year[,]" and it has no reference to past losses.[1733]

Hamzehpour forwarded Morrison Cohen's comments to AFI on December 16, 2010,[1734] and then ResCap, AFI, and Morrison Cohen discussed the proposed Second 2009 Tax Allocation Agreement on a December 21, 2010 conference call.[1735] Marx summarized the discussion as follows:

> First, regarding fairness, they pressed [AFI] fairly hard about [AFI] not being consistent with all companies in the group . . . . My response was that there is no obligation for [AFI] to pay its subsidiaries in advance of stand-alone use of the attributes . . . and that [AFI] senior management was unlikely to agree to a tax allocation regime that could compel random capital contributions. I also made the point that where we do pay currently for attributes that would otherwise not be utilized by the subsidiary on a stand-alone basis, we do so because of regulatory requirements, and ResCap has no such regulatory requirement. However, even absent regulatory requirements, it is the parent company's prerogative to decide whether or not to sprinkle benefits on one subsidiary and not another. Finally, we (Jim Young was very supportive) drove home the point that keeping ResCap in the same position it would have been in on a

---

[1733] E-mail from M. Connolly (Dec. 16, 2010), at EXAM10432518 [EXAM10432517].

[1734] *See* E-mail from T. Hamzehpour (Dec. 16, 2010), at EXAM10432501–02 [EXAM10432501].

[1735] *See* Conference call invitation from T. Hamzehpour [EXAM10902438]; *see also* E-mail from W. Marx (Dec. 20, 2010), at EXAM10432501 [EXAM10432501].

stand-alone basis is as fair as anyone could demand, and this
agreement does that. . . . They took several runs at the fairness
point. I was thinking they were going to escalate the issue. Then
Michael Connelly [sic] basically threw in the towel, saying there
was enough support for our proposal and that it was not an
unreasonable business position to go straight stand-alone. It was
a pretty abrupt ending, but with the right result. They are going
to propose language on the loss attributes, but otherwise will tell
the Board that the agreement is reasonable.[1736]

Young was supportive of AFI's position on the conference call in that he agreed that a
strict stand-alone agreement was fair between the parties.[1737]

The Independent Directors believed that language Morrison Cohen drafted addressed the
fairness concerns that Morrison Cohen previously raised and relied on its outside counsel in
considering the approval of the Second 2009 Tax Allocation Agreement.[1738] In fact, as stated
in Marx's summary of the December 21, 2010 conference call, Morrison Cohen's comment
that was eventually incorporated into the Second 2009 Tax Allocation Agreement merely
clarified ResCap's ability to use carryovers of tax benefits as an offset in calculating its stand-
alone tax liability in future years. The clarifying language did not address the fairness point as
the parties on the conference call agreed to leave the tax allocation provisions as drafted by
AFI.[1739] In addition, the tax attorney at Morrison Cohen who reviewed the Second 2009 Tax
Allocation Agreement, Isaac Grossman, knew that ResCap had been generating substantial tax
losses but was not aware that ResCap was also generating excess inclusion income, which
cannot be offset by tax losses.[1740] One of the Independent Directors, Pamela West, does not
recall the issue of excess inclusion income or that ResCap would owe cash payments to AFI
under the Second 2009 Tax Allocation Agreement being presented to the ResCap Board at
meetings or to her at any time.[1741] In fact, West was not aware that ResCap has been making
payments to AFI on account of taxes on excess inclusion income under the Second 2009 Tax
Allocation Agreement.[1742] Yet on November 1, 2010, Marx had told Young that ResCap
would owe $6 million to AFI for the 2009 tax year under the Second 2009 Tax Allocation
Agreement.[1743]

---

[1736] E-mail from W. Marx (Dec. 22, 2010), at 1 [ALLY_0424667].

[1737] *See* Int. of W. Marx, Apr. 18, 2013, at 130:7–22.

[1738] *See* Int. of P. West, Apr. 16, 2013, at 66:6–19, 81:11–84:23, 87:20–91:24, 100:20–103:1.

[1739] *See* E-mail from W. Marx (Dec. 22, 2010), at 1 [ALLY_0424667].

[1740] *See* Int. of I. Grossman, Apr. 16, 2013, at 6:18–9:12, 25:6–28:9.

[1741] *See* Int. of P. West, Apr. 16, 2013, at 25:7–25:14, 66:20–67:4, 95:9–98:8.

[1742] *See id.* at 95:9–98:8 ("[Q:] Are you aware that ResCap has had to make any payments under the [Second 2009 Tax Allocation Agreement]? [A:] Not that I'm aware. [Q:] You laughed there and is that because of the financial condition that ResCap was in at the time? [A:] Yes.").

[1743] *See* E-mail from W. Marx (Nov. 2, 2010), at ALLY_0424660 [ALLY_0424660].

The Second 2009 Tax Allocation Agreement was approved by the ResCap Board on December 22, 2010, subject to inclusion of the language to be provided by Morrison Cohen.[1744] On January 24, 2011, Morrison Cohen provided such language to clarify that ResCap would be entitled to factor in its ability to use carryover NOLs, capital losses, and foreign tax credits when ResCap's stand-alone tax liability was determined for each tax year under the agreement, but no edits were provided to address Morrison Cohen's previous comments as to why the agreement seemed "very unfair."[1745] The Second 2009 Tax Allocation Agreement was fully executed on January 26, 2011.[1746]

The Investigation has not uncovered any documents indicating that ResCap requested or received a fairness opinion on the Second 2009 Tax Allocation Agreement or considered the requirements in the 2006 Amended Operating Agreement that the tax allocation agreement had to "provide for two-way sharing payments."[1747]

On multiple occasions during his interview, Young stated his belief that a tax allocation agreement has only two purposes—(1) to be used as an accounting tool to assist readers of financial statements so they can understand financial results and (2) to be used to ensure that a subsidiary that is not a taxpayer pays cash to its parent that is responsible for paying taxes on income related to the subsidiary's operations—but is not intended to "transfer value" or be a vehicle through which a subsidiary compels capital contributions from its parent.[1748] Based on Young's understanding of the purpose of a tax allocation agreement, Young viewed the favorable payment provision to ResCap in the First 2009 Tax Allocation Agreement as a "windfall," because it was better than stand-alone treatment.[1749] Young testified that, although he could not remember his specific discussions with the ResCap Board at meetings regarding the Second 2009 Tax Allocation Agreement, he believed that he presented to the Board his understanding of the general purposes of a tax allocation agreement along the lines stated above.[1750]

### c. Provisions Of The Tax Allocation Agreements And Their Impact On ResCap

#### (1) Implemented 2005 Tax Allocation Agreement And Other 2005 Tax Allocation Agreement

The Implemented 2005 Tax Allocation Agreement was favorable to ResCap in some respects but unfavorable to ResCap in other respects because of certain terms rarely seen in

---

[1744] *See* Minutes of Special Meeting of Board of Directors of Residential Capital, LLC, Dec. 22, 2010, at RC40018862 [RC40018729].

[1745] *See* E-mail from M. Connolly (Jan. 24, 2011), at 1 [ALLY_0424649]; *see also* E-mail from I. Grossman (Dec. 21, 2010), at 2 [ALLY_0424649].

[1746] Second 2009 Tax Allocation Agreement, at 6 [RC00028796].

[1747] 2006 Amended Operating Agreement, § 2(b)(iii) [ALLY_0041818].

[1748] *See* Int. of J. Young, Apr. 22, 2013, at 62:15–64:18, 77:5–78:2, 82:2–83:23, 139:18–140:16, 172:22–173:15.

[1749] *See id*. at 76:10–16.

[1750] *See id*. at 149:19–150:11, 203:5–204:15.

tax allocation agreements. As to the favorable aspects, the Implemented 2005 Tax Allocation Agreement provided for two-way sharing payments. That provision provides for the possibility that ResCap would make payments to AFI or AFI would make payments to ResCap in a particular tax year, depending, in part, on ResCap's tax position for the year.[1751] Two-way sharing was required by the 2005 Operating Agreement.[1752] Furthermore, when determining the amount of compensation to which ResCap was entitled when GM and AFI used ResCap's NOLs, the parties followed the allocation rules under section 1.1502-21 of the Treasury Regulations (and followed similar rules in the Treasury Regulations with respect to other tax benefits), instead of a "but for" concept typically found in tax allocation agreements.[1753] Simply put, in a typical tax allocation agreement, a parent corporation is not considered to have begun using a subsidiary's NOLs in a tax year unless all the NOLs the parent receives from its other subsidiaries were insufficient to shield the parent from having net income in that tax year. In contrast, section 1.1502-21 of the Treasury Regulations generally allocates use of the consolidated NOL of a consolidated group for any tax year among all of the members of the consolidated group that had NOLs for such tax year in the proportion that each member's separate NOL bears to the sum of all member's NOLs for such year.[1754] Thus, the Implemented 2005 Tax Allocation Agreement was more favorable to ResCap than a typical tax allocation agreement because ResCap would be entitled to some compensation, for instance, even if GM had to carry forward a larger amount of consolidated NOL than the amount of the separate NOL that ResCap and its subsidiaries generated in the tax year.

The Implemented 2005 Tax Allocation Agreement was unfavorable to ResCap in that it required both GM and AFI to be able to use ResCap tax benefits before ResCap would be entitled to compensation for use of its tax benefits.[1755] ResCap was required under the Implemented 2005 Tax Allocation Agreement to pay to AFI the amount of ResCap's stand-alone tax liability that

---

[1751] *See* Implemented 2005 Tax Allocation Agreement, §§ 1.03F, 3.03 [ALLY_0178779].

[1752] *See* 2005 Operating Agreement, § 2(b)(iii) [MELZER.004869].

[1753] *See* E-mail from J. Aretakis (Jan. 4, 2006), at EXAM10170854 [EXAM10170853] (GM's use of ResCap's NOLs under the Implemented 2005 Tax Allocation Agreement is "governed by Treasury Regulations that mandate the allocation of a consolidated net operating loss carryforward to individual members [of a consolidated group] upon deconsolidation."); *see also* Memorandum, AFI-ResCap Tax Sharing, dated Mar. 20, 2013, at 2 ("The initial allocations limited ResCap's benefit for 2005 losses to the amount of those losses treated as absorbed by taxable income of non-ResCap entities on the 2005 GM consolidated return. ResCap was left with loss carryforwards to the extent it was allocated consolidated net operating loss under Treas. Reg. §1.1502-21."); Memorandum, AFI-ResCap Tax Sharing, dated Mar. 12, 2013, at 5 ("The initial tax allocation calculations interpreted the [Implemented 2005 Tax Allocation Agreement] in accordance with the principles of Section 1.1502-21 of the Treasury regulations . . . ."); Description of 2005 and 2006 Tax Allocation to ResCap, prepared by W. Marx, dated Nov. 27, 2012, at ALLY_0338094 [ALLY_0338094] ("add back to taxable income . . . for the consolidated net operating loss carry forward [sic] allocable to ResCap under Treasury Regulations").

[1754] *See* Treas. Reg. § 1.1502–21(b)(2)(iv)(B).

[1755] *See* Implemented 2005 Tax Allocation Agreement, § 1.03F [ALLY_0178779].

ResCap generated in a tax year.[1756] In determining the amount of compensation ResCap would receive when ResCap generated net tax benefits for a tax year, the Implemented 2005 Tax Allocation Agreement would ignore ResCap's net tax refund position on a stand-alone basis and instead look to use by ResCap's owners.[1757] Tax sharing arrangements in which a subsidiary is compensated by a parent based on the parent's use, not the subsidiary's stand-alone tax position, are common. It is unusual, however, for a tax allocation agreement to require use by both a direct parent and indirect parent before the subsidiary can receive compensation. In contrast, the operative provision in the Other 2005 Tax Allocation Agreement required only that AFI use ResCap's tax benefits for ResCap to receive compensation—a more standard construction.[1758]

The Implemented 2005 Tax Allocation Agreement was in effect from March 2005 through November 30, 2006, the period when ResCap was a corporation within the GM consolidated group. In 2005, ResCap generated $779.7 million in taxable income on a stand-alone basis as a separate ResCap sub-group within the GM consolidated group.[1759] Using a 35% federal income tax rate and applying $0.1 million in tax credits also generated by ResCap, this equated to a $272.8 million stand-alone tax liability.[1760] GM, however, had to carry forward consolidated NOLs and consolidated charitable contribution deductions, and $204.8 million of the consolidated NOL carryover and $8.5 million of the consolidated charitable contribution deduction carryover were allocable to individual members of the ResCap sub-group under section 1.1502-21 of the Treasury Regulations.[1761] This translates to $74.7 million in potential tax savings (applying a 35% federal income tax rate) generated by ResCap in 2005 that GM could not use on a current basis.[1762] Pursuant to the terms of the Implemented 2005 Tax Allocation Agreement, this $74.7 million in potential tax savings that GM could not currently use was added to ResCap's $272.8 million stand-alone tax liability to determine the total of $347.5 million that ResCap owed to AFI.[1763] Accordingly, AFI billed ResCap $347.5 million in respect of obligations under the Implemented 2005 Tax Allocation Agreement for 2005.[1764]

---

[1756] *See id.* §§ 1.03F, 3.03.

[1757] *See id.* § 1.03F.

[1758] *See* Other 2005 Tax Allocation Agreement, § 1.03E [MELZER.009035].

[1759] Allocation of 2005 Tax Liability Analysis, prepared by AFI, at cell H-11 [ALLY_0338098].

[1760] *Id.* at cells H-27, H-29, H-30, H-36 [ALLY_0338098].

[1761] *See* Description of 2005 and 2006 Tax Allocation to ResCap, prepared by W. Marx, dated Nov. 27, 2012, at ALLY_0338094 [ALLY_0338094] ("$8,488,654 for the consolidated limitation on charitable contributions calculated by GM under Treasury Regulations" and "$204,838,050 for the consolidated net operating loss carry forward [sic] allocable to ResCap under Treasury Regulations").

[1762] Allocation of 2005 Tax Liability Analysis, prepared by AFI, at cells G-12, G-20, G-25, G-36 [ALLY_0338098].

[1763] *Id.* at cells E-36, F-36, G-36, H-36.

[1764] *Id.* at cells E-37, F-37, E-38, F-38, G-38.

ResCap paid to AFI $210.5 million of the bill by March 31, 2006.[1765] But before ResCap paid the remainder of the bill, ResCap contested the $74.7 million portion of the bill regarding amounts of ResCap tax benefits that GM was not able to use currently.[1766]

Around April 2006, Thomas Melzer, one of the Independent Directors, questioned the provision in the Implemented 2005 Tax Allocation Agreement requiring both GM and AFI to use ResCap's tax benefits for ResCap to receive compensation.[1767] Melzer had noticed that ResCap had an income tax receivable on its books that had built up to more than $300 million. This receivable related to tax benefits generated by ResCap and its subsidiaries from 2001 through 2005 that had not yet been used by GM and AFI under the Implemented 2005 Tax Allocation Agreement (and previous tax allocation agreements between AFI and the entities that were transferred to ResCap in March 2005), and, thus, for which ResCap had not yet received compensation.[1768] Melzer thought the requirement that GM and AFI had to be able to use the tax benefits before ResCap would be entitled to compensation was "very peculiar" and that it was "inconsistent with the spirit of what had been disclosed in [registration statements filed with the SEC] with respect to how the tax sharing agreement was described."[1769] The income tax receivable was in the amount of $346.4 million as of December 31, 2005.[1770] GM agreed to convert the receivable to cash and paid $346.4 million to ResCap in June 2006, in part because of the pending sale of 51% of AFI to Cerberus.[1771] This settlement resulted in ResCap paying to AFI its stand-alone tax liability of $272.8 million for its 2005 tax year, instead of the $347.5 that was

---

[1765] *Id.* at cells E-37, G-37.

[1766] *Id.* at cells E-39, F-39.

[1767] *See* Int. of T. Melzer, Oct. 10, 2012, at 147:7–152:22.

[1768] *See id.* at 149:2–150:14; *see also* Residential Capital, LLC, Annual Report (Form 10-K) (Mar. 13, 2007), at 133–134 [ALLY_0338091] (describing the tax receivable as a result of ResCap's 2004 and 2005 NOLs, charitable contribution deductions, and foreign tax credits that had not been used by GM but instead were carried forward by GM).

[1769] *See* Int. of T. Melzer, Oct. 10, 2012, at 149:21–150:25.

[1770] The $346.4 million income tax receivable was comprised of potential tax savings that ResCap and its subsidiaries generated from 2001 through 2005 but that GM could not yet use. *See* ResCap's GM Intercompany Receivable as of 6/30/06 [ALLY_0434980].

[1771] *See* Residential Capital, LLC, Annual Report (Form 10-K) (Mar. 13, 2007), at 133–134 [ALLY_0338091]; *see also* Memorandum, AFI-ResCap Tax Sharing, dated Mar. 12, 2013, at 5 ("Because of the pending sale of [AFI] at that time, the parties all felt it was appropriate to make a payment to ResCap to settle the intercompany receivable in respect of the tax losses generated by the ResCap business.").

originally billed by AFI and required under the Implemented 2005 Tax Allocation Agreement.[1772] ResCap's 2005 federal income tax position and related payments to AFI are summarized in Exhibit V.D.2.c(1)—1, below.

EXHIBIT V.D.2.c(1)—1
**ResCap's Federal Income Tax Position**
2005 Tax Year

|  | ResCap Taxable Income | ResCap Tax Credits | ResCap Stand-Alone Tax Liability | GM Consolidated NOL Carryover Allocable to ResCap | GM Charitable Contribution Deduction Carryover Allocable to ResCap | Amount Originally Billed by AFI to ResCap | Final Net Payment by ResCap to AFI |
|---|---|---|---|---|---|---|---|
| Income/Loss | $ 779,719,198 | N/A | N/A | $ 204,838,050 | $ 8,488,654 | N/A | N/A |
| Tax-effective (at 35%) | $ 272,901,720 | $ (124,822) | $ 272,776,898 | $ 71,693,317 | $ 2,971,029 | $ 347,441,244 | $ 272,776,898 |

*Source: Allocation of 2005 Tax Liability Analysis, prepared by AFI, at cells E-36, F-36, H-11, H-27, H-29, H-30, H-36, [ALLY_0338098]; Description of 2005 and 2006 Tax Allocation to ResCap, prepared by W. Marx, dated Nov. 27, 2012, at ALLY_0338094 [ALLY_0338094].*

ResCap generated $515 million in losses in its short tax year ended November 30, 2006.[1773] It also had $231.2 million in excess inclusion income,[1774] which is a type of income that cannot be offset by losses.[1775] These losses and excess inclusion income netted to a $283.8 million net loss that ResCap could use on a stand-alone basis by carrying the losses back to 2005 to offset its income from that year. Applying the 35% federal income tax rate, this $283.8 million net loss translated to $99.3 million in potential tax savings for the GM consolidated group. In addition, ResCap generated another tax benefit for GM—$1.7 million in foreign tax credits, which reduce tax liability dollar-for-dollar. Accordingly, ResCap generated a total of $101 million in potential tax savings to GM in 2006.[1776]

AFI, however, paid ResCap $85.9 million for ResCap's tax benefits generated in the tax year ending November 30, 2006.[1777] The payment was based on estimates of ResCap's tax attributes and GM's and AFI's use of the tax attributes as of the completion of the final closing balance sheet of AFI in connection with the Cerberus transaction.[1778] The parties to the

---

[1772] *Cf.* Description of 2005 and 2006 Tax Allocation to ResCap, prepared by W. Marx, dated Nov. 27, 2012, at ALLY_0338094 [ALLY_0338094] ("Thus, ResCap received full benefit for its 2005 NOL's and charitable contributions despite language in the tax allocation agreement that would have limited the current benefit.").

[1773] Reconciliation of Taxable Income through November 30, 2006 Analysis, prepared by AFI, at cell J-11 [ALLY_0338099].

[1774] ResCap Consolidated 2006 Tax True-up and Carryback Refund Analysis, prepared by AFI [ALLY_0424686].

[1775] *See* I.R.C. § 860E(a); *see also* Treas. Reg. § 1.860E–1(a)(1).

[1776] GMAC Mortgage Group, Inc. and Subsidiaries' Liability for 2006 U.S. Federal Income Tax Year Ended November 30, 2006, prepared by AFI, at tab MTG GROUP, cell O-36 [ALLY_0208453].

[1777] Reconciliation of Taxable Income through November 30, 2006 Analysis, prepared by AFI, at cell L-15 [ALLY_0338099]; *see also* Description of 2005 and 2006 Tax Allocation to ResCap, prepared by W. Marx, dated Nov. 27, 2012, at ALLY_0338095–96 [ALLY_0338094].

[1778] *See* Description of 2005 and 2006 Tax Allocation to ResCap, prepared by W. Marx, dated Nov. 27, 2012, at ALLY_0338094–96 [ALLY_0338094].

Implemented 2005 Tax Allocation Agreement later updated the calculation of the tax benefit generated by ResCap when the 2006 GM consolidated federal income tax return was prepared in mid-2007, but AFI made no additional payments to ResCap on account of an increased tax benefit reflected in the updated calculation.[1779]

In addition, when AFI and ResCap first estimated the amount of tax attributes that ResCap had generated, the parties believed that GM would have to carry forward consolidated NOLs and consolidated capital losses from 2006 and that ResCap's allocable share of these loss carryovers was estimated to be $78.6 million.[1780] Applying the 35% federal income tax rate, this $78.6 million portion of GM's loss carryover represented $27.5 million of the total $101 million potential tax savings generated by ResCap that the parties originally believed that GM could not use in 2006. During the Investigation, the Examiner's Professionals spoke with GM's tax staff, who stated that GM has used all of its 2006 losses, including any losses it inherited from ResCap in 2006 upon ResCap's conversion to a disregarded entity.[1781] Consequently, GM and AFI have used all of the $101 million in tax savings generated by ResCap.

The Implemented 2005 Tax Allocation Agreement provided that it would terminate when ResCap Group left the GM consolidated group but would "continue to apply to all years and that part of a year ending prior to the date of termination."[1782] Upon ResCap's conversion to a disregarded entity, ResCap was severed from the GM consolidated group, the Implemented 2005 Tax Allocation Agreement terminated, and ResCap's unused 2006 losses were inherited by GM via ResCap's deemed liquidation under federal tax law. Nevertheless, the termination clause of the Implemented 2005 Tax Allocation Agreement provided that ResCap would still be entitled to compensation under the agreement for tax benefits generated by ResCap and used by GM at any time, even after the agreement terminated (presumably as long as AFI could also use the tax benefits before it left the GM consolidated group, which is not at issue). NOLs can be carried forward for twenty years; whereas, capital losses can be carried forward for five years.[1783] Now that GM tax staff has confirmed that GM has used all of the 2006 ResCap tax benefits, ResCap should be entitled to $15.1 million in additional compensation from AFI under the Implemented 2005 Tax Allocation Agreement. In addition, the Examiner notes that ResCap also would have been entitled to the additional $15.1 million under the Other 2005 Tax Allocation Agreement, where use by GM was not a prerequisite to ResCap receiving compensation.

---

[1779] *See id.* at ALLY_0338095–96.

[1780] Reconciliation of Taxable Income through November 30, 2006 Analysis, prepared by AFI, at cell J-14 [ALLY_0338099]; *see also* Description of 2005 and 2006 Tax Allocation to ResCap, prepared by W. Marx, dated Nov. 27, 2012, at ALLY_0338095 [ALLY_0338094] ("This was an estimate based on how much of ResCap's losses would not generate a current year benefit to the GM Group and thus not be paid to ResCap under the allocation agreement."). Moreover, AFI's ability to use all of ResCap's tax benefits does not appear to have been in doubt under the documents calculating the amount owed to ResCap for its tax year ending November 30, 2006 under the Implemented 2005 Tax Allocation Agreement.

[1781] Conference call with GM's tax staff and internal counsel (Apr. 17, 2013).

[1782] Implemented 2005 Tax Allocation Agreement, § 6.08 [ALLY_0178779].

[1783] I.R.C. §§ 172(b)(1)(A)(ii), 1212(a)(1)(B).

ResCap's federal income tax position for the tax year ending November 30, 2006 and related payments under the Implemented 2005 Tax Allocation Agreement are summarized in Exhibit V.D.2.c(1)—2 below.

EXHIBIT V.D.2.c(1)—2
**ResCap's Federal Income Tax Position**
Tax Year Beginning January 1, 2006, Ending November 30, 2006

|  | ResCap Taxable Loss | ResCap Excess Inclusion Income | ResCap Tax Credits | ResCap Stand-Alone Tax Liability (Refund) | GM Consolidated Loss Carryover Allocable to ResCap | Final Net Payment by AFI to ResCap |
|---|---|---|---|---|---|---|
| Income/Loss | $ (514,967,148) | $ 231,238,744 | N/A | N/A | $ 78,568,397 | N/A |
| Tax-effective (at 35%) | $ (180,238,502) | $ 80,933,560 | $ (1,650,000) | $ (100,954,942) | $ 27,498,939 | $ 85,899,495 |

*Source: Reconciliation of Taxable Income through November 30, 2006 Analysis, prepared by AFI, at cells J-11, J-14, L-11, L-14, L-15 [ALLY_0338099]; ResCap Consolidated 2006 Tax True-up and Carryback Refund Analysis, prepared by AFI [ALLY_0424686]; GMAC Mortgage Group, Inc. and Subsidiaries' Liability for 2006 U.S. Federal Income Tax Year Ended November 30, 2006, prepared by AFI, at tab MTG GROUP, cell O-36 [ALLY_0208453]; see also Description of 2005 and 2006 Tax Allocation to ResCap, prepared by W. Marx, dated Nov. 27, 2012, at ALLY_0338095–96 [ALLY_0338094].*

### (2) 2006 Tax Allocation Agreement

The 2006 Tax Allocation Agreement applied to income taxes imposed only by state and local jurisdictions that did not treat ResCap as a disregarded entity and that taxed ResCap and AFI on a combined or unitary basis.[1784] This tax allocation agreement was the only one in effect from December 1, 2006 through June 30, 2009. ResCap paid a total of $1.2 million to AFI under the 2006 Tax Allocation Agreement.[1785]

It is not clear whether the tax allocation agreement required to be in place under section 2(b)(iii) of the 2006 Amended Operating Agreement must apply to federal income taxes or state and local income taxes, or both.

ResCap did not have to make payments in respect of federal income taxes on any income it generated from December 1, 2006 through June 30, 2009 because it was not a taxpayer under federal tax law and it was not subject to a tax allocation agreement covering federal income taxes. ResCap likewise had no right to receive compensation for any tax benefits that it generated during this period. As it turned out, ResCap generated substantial tax benefits that

---

[1784] *See* 2006 Tax Allocation Agreement, at ALLY_0178791 [ALLY_0178779]. Although the 2006 Tax Allocation Agreement makes some passing references to a few federal tax concepts, such as the IRS and the Internal Revenue Code, the agreement apparently did not apply with respect to federal income taxes. It was intended to apply with respect to income taxes in only those state and local jurisdictions that did not treat ResCap as a disregarded entity. *See* Letter from W. Marx to J. Young (Nov. 13, 2008), at ALLY_0178792 [ALLY_0178779] ("[T]his agreement is effective only with respect to those very few jurisdictions that treat ResCap as a taxable entity and only where ResCap would file a combined or unitary return with [AFI].").

[1785] Residential Capital, LLC Tax Payment Detail Analysis, prepared by AFI, at tab Tax Payment Support, cells F-8, F-9, F-10, F-11[ALLY_PEO_0079528] ($0.1 million for AFI's tax year ending December 31, 2006, $0.9 million for AFI's 2007 tax year, $0.1 million for AFI's 2008 tax year, and less than $0.1 million for AFI's tax year ending June 30, 2009); *see also* Residential Capital, LLC U.S. Federal, State, and Local Tax Allocations Analysis, prepared by AFI, at cells N-10, N-12, N-14, N-16 [ALLY_PEO_0079527].

passed through to GM and Cerberus during this period, which amounts are summarized in Exhibit V.D.2.c(2), below. ResCap also generated $28.6 million in excess inclusion income in 2008 that GM and Cerberus had to recognize.[1786]

---

EXHIBIT V.D.2.c(2)
**ResCap's Federal Income Tax Attributes**
December 1, 2006 – June 30, 2009

| | ResCap Ordinary Income/(Loss) | | ResCap Capital Gain/(Loss) | | ResCap Foreign Tax Credits | |
|---|---|---|---|---|---|---|
| December 1, 2006 – December 31, 2006 | $ | (204,028,712) | $ | 3,323,011 | $ | (1,418,270) |
| January 1, 2007 – December 31, 2007 | | (5,659,030,998) | | (489,363,299) | | (783,372) |
| January 1, 2008 – December 31, 2008 | | 3,133,426,930 | | (49,951,683) | | (411,244) |
| January 1, 2009 – June 30, 2009 | | (1,904,184,692) | | (453,496,439) | | (72,633) |
| Total | $ | (4,633,817,472) | $ | (989,488,410) | $ | (2,685,519) |
| Tax-effective [(1)] | $ | (1,621,836,115) | $ | (346,320,944) | $ | (2,685,519) |

*[(1)] Calculated at 35% for ordinary income/loss and capital gain/loss. The foreign tax credits are already tax-effective amounts because tax credits reduce tax liability on a dollar-for-dollar basis.*
*Source: GMAC LLC, U.S. Return of Partnership Income (I.R.S. Form 1065) for Tax Year Ending Dec. 31, 2006, at ALLY_0176462 [ALLY_0176426]; GMAC LLC, U.S. Return of Partnership Income (I.R.S. Form 1065) for Calendar Year 2007, at ALLY_0172570 [ALLY_0172540]; GMAC LLC, U.S. Return of Partnership Income (I.R.S. Form 1065) for Calendar Year 2008, at ALLY_0391272– 86 [ALLY_0390037]; GMAC LLC, U.S. Return of Partnership Income (I.R.S. Form 1065) for Tax Year Ending June 30, 2009, at ALLY_0175879–89 [ALLY_0175031].*

---

### (3) First 2009 Tax Allocation Agreement And Second 2009 Tax Allocation Agreement

At first glance, the Second 2009 Tax Allocation Agreement, which has ostensibly been in effect since November 1, 2009, appears to be a pure stand-alone agreement in that ResCap is obligated to pay to AFI its hypothetical separate tax liability each year.[1787] A closer look, however, reveals that the agreement is significantly worse for ResCap than a pure stand-alone agreement because there is nothing in the agreement that would require AFI to make a payment to ResCap of a refund that ResCap might be entitled to on a stand-alone basis.[1788] In fact, there is no provision in the Second 2009 Tax Allocation Agreement that permits any possibility of

---

[1786] *See* GMAC LLC, U.S. Return of Partnership Income (I.R.S. Form 1065) for Calendar Year 2008, at ALLY_03900052, –083, –114[ALLY_0390037].

[1787] Second 2009 Tax Allocation Agreement, §§ 1.03D, 2.03 [RC40016871].

[1788] *See id.*

payments being made to ResCap.[1789] ResCap could only take into account the tax benefits it generates as carryovers in calculating its positive tax liability on a stand-alone basis for a future year.[1790]

The Second 2009 Tax Allocation Agreement does not meet the requirement of the 2006 Amended Operating Agreement that it "shall provide for two-way sharing payments based on the separately calculated tax liability or benefit of ResCap."[1791] Nor does the Second 2009 Tax Allocation Agreement meet the standard set by the ResCap Board when it approved the First 2009 Tax Allocation Agreement—that the agreement be "on terms not more disadvantageous in any material respect to the holders of [ResCap's] notes than those existing tax allocation agreement(s) [it is] intended to replace[.]"[1792] First, the 2006 Tax Allocation Agreement, which was a pure stand-alone agreement, explicitly provided that ResCap would be paid by AFI if ResCap generated a net tax benefit for a tax year.[1793] Second, the more appropriate comparison is between the Second 2009 Tax Allocation Agreement and having no tax allocation agreement in place for federal income tax purposes because there had been no such tax allocation agreement in place since the Implemented 2005 Tax Allocation Agreement terminated on November 30, 2006. Viewed from this perspective, the Second 2009 Tax Allocation Agreement was certain to be more disadvantageous to ResCap than leaving ResCap alone as a disregarded entity that had no obligation to make any payments on account of federal income taxes.

---

[1789] *See id.* Marx and Young each testified that he believed the agreement provided for the possibility that ResCap could receive a payment from AFI if ResCap were in a position of having NOLs that it could carry back to a previous tax year in which it had income. *See* Int. of W. Marx, Apr. 18, 2013, at 134:3–136:7; Int. of J. Young, Apr. 22, 2013, at 205:5–206:11. The agreement, however, does not provide for this treatment. ResCap can use NOLs only as carryovers in reducing the amount of its positive stand-alone tax liability in future years. *See* Second 2009 Tax Allocation Agreement, § 1.03D [RC40016871] ("For the avoidance of doubt, any [tax benefits] that are generated by the ResCap Group in any taxable period (to the extent not previously utilized pursuant to this sentence in prior periods) shall be taken into account and treated as available and unutilized in determining the Separate ResCap Group Tax Liability for any subsequent periods . . . ."). Furthermore, the reference to a carryback in section 5.02 of the agreement does not appear to allow ResCap to receive compensation for NOLs that it could carry back to a previous year under federal tax law if it were a taxpayer because section 5.02 applies to only a "change or adjustment to any item relating to the computation of payments" under the agreement, and NOL carrybacks would not generally be considered "changes" or "adjustments." *Id.* § 5.02.

[1790] *See* Second 2009 Tax Allocation Agreement, § 1.03D [RC40016871] ("For the avoidance of doubt, any [tax benefits] that are generated by the ResCap Group in any taxable period (to the extent not previously utilized pursuant to this sentence in prior periods) shall be taken into account and treated as available and unutilized in determining the Separate ResCap Group Tax Liability for any subsequent periods . . . .").

[1791] 2006 Amended Operating Agreement, § 2(b)(iii) [ALLY_0041818].

[1792] Minutes of a Regular Meeting of the Board of Directors of Residential Capital, LLC, Aug. 6, 2010, at RC40018822 [RC40018729].

[1793] 2006 Tax Allocation Agreement, § 3.03 [ALLY_0178779] ("In the event the Separate ResCap Group Tax Liability is a refund, [AFI] shall pay ResCap, or such other payee as may be required under the law.").

ResCap generated $1.44 billion in ordinary losses and $1.63 billion in capital losses between November 1, 2009 and through December 31, 2012 (including projections for the 2012 calendar year as of September 30, 2012).[1794] These ResCap losses are summarized in more detail in Exhibit V.D.2.c(3)—1, below.[1795]

EXHIBIT V.D.2.c(3)—1
**ResCap's Federal Income Tax Attributes**
November 2, 2009 – December 31, 2012

|  | ResCap Ordinary Income/(Loss) | | ResCap Capital Gain/(Loss) | |
|---|---|---|---|---|
| November 2, 2009 – December 31, 2009 | $ | (627,775,696) | $ | (6,712,990) |
| January 1, 2010 – December 31, 2010 | | 78,057,191 | | (1,360,661,391) |
| January 1, 2011 – December 31, 2011 | | (334,734,368) | | (9,068,589) |
| January 1, 2012 – December 31, 2012 [(1)] | | (559,600,000) | | (253,000,000) |
| Total | $ | (1,444,052,873) | $ | (1,629,442,970) |
| Tax-effective total (at 35%) | $ | (505,418,506) | $ | (570,305,040) |

[(1)] *Projected as of September 30, 2012.*
Source: *Ordinary & Capital Losses Generated by ResCap Companies Analysis, prepared by AFI [ALLY_0424653]; cf. ResCap Consolidation, Pro Forma U.S. Corporation Income Tax Return (I.R.S. Form 1120) for Tax Year Ending Dec. 31, 2009, at ALLY_0337325 [ALLY_0337325]; 2009 ResCap Reconciliation of Book Income to Tax Return Analysis, prepared by AFI, at tab Summary, cells I-19, J-19 [ALLY_0337324]; ResCap Consolidation, Pro Forma U.S. Corporation Income Tax Return (I.R.S. Form 1120) for Calendar Year 2010, at ALLY_0337040 [ALLY_0337039]; 2010 ResCap Reconciliation of Book Income to Tax Return Analysis, prepared by AFI, at tab Summary, cells I-18, J-18 [ALLY_0337158]; ResCap Consolidation, Pro Forma U.S. Corporation Income Tax Return (I.R.S. Form 1120) for Calendar Year 2011, at ALLY_0336318 [ALLY_0336317]; 2011 ResCap Reconciliation of Book Income to Tax Return Analysis, prepared by AFI, at tab Summary, cells I-19, J-19 [ALLY_0337157].*

These ordinary losses and capital losses flowed up to AFI for use within its consolidated group under federal tax law. Nevertheless, under the Second 2009 Tax Allocation Agreement, ResCap was not entitled to compensation for AFI's use of those substantial tax benefits.

---

[1794] *See* Ordinary & Capital Losses Generated by ResCap Companies Analysis, prepared by AFI [ALLY_0424653].

[1795] *See id.*; *cf.* ResCap Consolidation, Pro Forma U.S. Corporation Income Tax Return (I.R.S. Form 1120) for Tax Year Ending Dec. 31, 2009, at ALLY_0337325 [ALLY_0337325]; 2009 ResCap Reconciliation of Book Income to Tax Return Analysis, prepared by AFI, at tab Summary, cells I-19, J-19 [ALLY_0337324] (showing $(604.3 million) ordinary loss (after netting out excess inclusion income) and $(6.7 million) capital loss); ResCap Consolidation, Pro Forma U.S. Corporation Income Tax Return (I.R.S. Form 1120) for Calendar Year 2010, at ALLY_0337040 [ALLY_0337039]; 2010 ResCap Reconciliation of Book Income to Tax Return Analysis, prepared by AFI, at tab Summary, cells I-18, J-18 [ALLY_0337158] (showing $125.2 million ordinary income (after netting out excess inclusion income) and $(1.4 billion) capital loss); ResCap Consolidation, Pro Forma U.S. Corporation Income Tax Return (I.R.S. Form 1120) for Calendar Year 2011, at ALLY_0336318 [ALLY_0336317]; 2011 ResCap Reconciliation of Book Income to Tax Return Analysis, prepared by AFI, at tab Summary, cells I-19, J-19 [ALLY_0337157] (showing $(293.6 million) ordinary loss (after netting out excess inclusion income) and $(9.07 million) capital loss).

ResCap also generated $83 million in excess inclusion income from November 2, 2009 to December 31, 2011,[1796] on which ResCap paid $29 million to AFI (after applying a 35% federal income tax rate).[1797] Furthermore, AFI billed ResCap an additional $3 million in tax on excess inclusion income that was generated from July 1, 2009 to November 1, 2009, which was before the Second 2009 Tax Allocation Agreement's effective date.[1798] ResCap was also projected to generate $50.6 million of excess inclusion income for the 2012 year as of September 30, 2012,[1799] which would obligate it to pay $17.7 million to AFI under the Second 2009 Tax Allocation Agreement (at a 35% federal income tax rate). In contrast, ResCap would not have had to make any payments on account of excess inclusion income had it not entered into the Second 2009 Tax Allocation Agreement. If ResCap was left without a tax allocation agreement regarding federal income taxes, ResCap would not have been responsible for any tax liability as a disregarded entity. The excess inclusion income generated by and payments made by ResCap under the Second 2009 Tax Allocation Agreement are summarized in Exhibit V.D.2.c(3)—2, below.[1800]

---

[1796] *See* Ordinary & Capital Losses Generated by ResCap Companies Analysis, prepared by AFI [ALLY_0424653]; *see also* Residential Capital, LLC Tax Payment Detail Analysis, prepared by AFI, at tab Federal Breakout, cells E-21, F-31, F-45 [ALLY_PEO_0079528].

[1797] *See* Residential Capital, LLC Tax Payment Detail Analysis, prepared by AFI, at tab Tax Payment Support, cells D-12, D-13, D-14, D-16 [ALLY_PEO_0079528].

[1798] *See id.* at cell D-12 & tab Federal Breakout, cell F-21 [ALLY_PEO_0079528] (showing that ResCap was billed $6.144 million based on $17.6 million excess inclusion income from July 1, 2009 to December 1, 2009, instead of $2.8 million, which would apply the 35% federal income tax rate to $7.9 million of ResCap excess inclusion income from November 2, 2009 to December 31, 2009); *see also* Ordinary & Capital Losses Generated by ResCap Companies Analysis, prepared by AFI [ALLY_0424653] (showing that $9.6 million of ResCap excess inclusion income related to July 1, 2009 to November 1, 2009 and that $7.9 million of ResCap excess inclusion income related to November 2, 2009 to December 31, 2009).

[1799] *See* Ordinary & Capital Losses Generated by ResCap Companies Analysis, prepared by AFI [ALLY_0424653].

[1800] *See id.*; *see also* Residential Capital, LLC Tax Payment Detail Analysis, prepared by AFI, at tab Tax Payment Support, cells D-12, D-13, D-14, D-16[ALLY_PEO_0079528]; *cf.* ResCap Consolidation, Pro Forma U.S. Corporation Income Tax Return (I.R.S. Form 1120) for Tax Year Ending Dec. 31, 2009, at ALLY_0337325 [ALLY_0337325]; 2009 ResCap Reconciliation of Book Income to Tax Return Analysis, prepared by AFI, at tab Summary, cells I-19, J-19 [ALLY_0337324] (showing $(604.3 million) ordinary loss (after netting out excess inclusion income) and $(6.7 million) capital loss); ResCap Consolidation, Pro Forma U.S. Corporation Income Tax Return (I.R.S. Form 1120) for Calendar Year 2010, at ALLY_0337040 [ALLY_0337039]; 2010 ResCap Reconciliation of Book Income to Tax Return Analysis, prepared by AFI, at tab Summary, cells I-18, J-18 [ALLY_0337158] (showing $125.2 million ordinary income (after netting out excess inclusion income) and $(1.4 billion) capital loss); ResCap Consolidation, Pro Forma U.S. Corporation Income Tax Return (I.R.S. Form 1120) for Calendar Year 2011, at ALLY_0336318 [ALLY_0336317]; 2011 ResCap Reconciliation of Book Income to Tax Return Analysis, prepared by AFI, at tab Summary, cells I-19, J-19 [ALLY_0337157] (showing $(293.6 million) ordinary loss (after netting out excess inclusion income) and $(9.06 million) capital loss).

EXHIBIT V.D.2.c(3)—2
**ResCap's Payments to AFI Under Second 2009 Tax Allocation Agreement in Respect of Federal Income Tax Liabilities**
July 1, 2009 – December 31, 2012

|  | ResCap Excess Inclusion Income | | ResCap Payments to AFI [1] | |
|---|---|---|---|---|
| July 1, 2009 – November 1, 2009 | $ | 9,673,867 | $ | 3,364,353 |
| November 2, 2009 – December 31, 2009 |  | 7,942,752 |  | 2,779,963 |
| January 1, 2010 – December 31, 2010 |  | 33,523,248 |  | 11,733,137 |
| January 1, 2011 – December 31, 2011 |  | 41,102,833 |  | 14,385,992 |
| January 1, 2012 – December 31, 2012 [2] |  | 50,600,000 |  | 17,710,000 |
| Total | $ | 142,842,700 | $ | 49,973,445 |

*[1] Applying 35% tax rate on excess inclusion income. There is an insignificant difference between the amount paid by ResCap and the amount of tax calculated at a 35% rate on the excess inclusion income for the July 1, 2009 – November 1, 2009 period.*
*[2] Projected as of September 30, 2012.*
*Source: Ordinary & Capital Losses Generated by ResCap Companies Analysis, prepared by AFI [ALLY_0424653], see also Residential Capital, LLC Tax Payment Detail Analysis, prepared by AFI, at tab Tax Payment Support, cells D-12, D-13, D-14, [ALLY_PEO_0079528]; cf. ResCap Consolidation, Pro Forma U.S. Corporation Income Tax Return (I.R.S. Form 1120) for Tax Year Ending Dec. 31, 2009, at ALLY_0337325 [ALLY_0337325]; 2009 ResCap Reconciliation of Book Income to Tax Return Analysis, prepared by AFI, at tab Summary, cells I-19, J-19 [ALLY_0337324]; ResCap Consolidation, Pro Forma U.S. Corporation Income Tax Return (I.R.S. Form 1120) for Calendar Year 2010, at ALLY_0337040 [ALLY_0337039]; 2010 ResCap Reconciliation of Book Income to Tax Return Analysis, prepared by AFI, at tab Summary, cells I-18, J-18 [ALLY_0337158]; ResCap Consolidation, Pro Forma U.S. Corporation Income Tax Return (I.R.S. Form 1120) for Calendar Year 2011, at ALLY_0336318 [ALLY_0336317]; 2011 ResCap Reconciliation of Book Income to Tax Return Analysis, prepared by AFI, at tab Summary, cells I-19, J-19 [ALLY_0337157].*

If ResCap and AFI had followed the First 2009 Tax Allocation Agreement, which the ResCap Board approved on August 6, 2010, AFI would have to pay ResCap for use of its tax benefits, regardless of whether ResCap could use its tax benefits on a stand-alone basis.[1801] This provision in the First 2009 Tax Allocation Agreement differs from stand-alone treatment for ResCap. This provision can only be beneficial to ResCap; that is, it may allow ResCap to monetize its tax benefits either earlier than if it had filed as a stand-alone taxpayer or, in some cases where the tax benefits would have expired and been permanently lost, where it would not have been able to monetize the tax benefits at all if it had filed as a stand-alone taxpayer.[1802]

It does not appear that AFI used any of ResCap's tax benefits generated since November 1, 2009 on a "but for" basis through the 2012 tax year.[1803] ResCap and AFI, however, had interpreted use to be based on the allocation principles provided in section 1.1502-21 of the

---

[1801] *See* First 2009 Tax Allocation Agreement, § 1.03D [RC40016362].

[1802] *See* Joint ResCap-AFI Tax Memorandum to ResCap Board, at RC40016377 [RC40016362].

[1803] *See* Ally Federal Tax Benefit from ResCap Losses, July 1, 2009 through December 31, 2012, prepared by AFI, at ALLY_0424652 [ALLY_0424651]. For an explanation of how use of tax benefits is determined on a "but for" basis, see Section V.D.2.c(1).

Treasury Regulations under the Implemented 2005 Tax Allocation Agreement,[1804] so it would make sense that the parties would apply the same interpretation under the First 2009 Tax Allocation Agreement, if it were in effect. The Investigation has not uncovered any information on the amount of ResCap's tax benefits that were used by AFI under the principles of section 1.1502-21 of the Treasury Regulations because ResCap and AFI have been following the Second 2009 Tax Allocation Agreement instead of the First 2009 Tax Allocation Agreement.

Nevertheless, AFI's current projections indicate that AFI considers it likely that it will start using ResCap's tax benefits in 2013, even on a "but for" basis.[1805] First, AFI expects to have used almost all of its NOLs and capital losses from subsidiaries other than ResCap and its subsidiaries by the end of 2012.[1806] Based on this expectation, any use of tax benefits by AFI in 2013 is likely to be attributable to ResCap's tax benefits. Second, AFI recently recorded $1.33 billion in income on its books for the fiscal year ended December 31, 2012 to

---

[1804] *See* E-mail from J. Aretakis (Jan. 4, 2006), at EXAM10170854 [EXAM10170853] (GM's use of ResCap's NOLs under the Implemented 2005 Tax Allocation Agreement is "governed by Treasury Regulations that mandate the allocation of a consolidated net operating loss carryforward to individual members [of a consolidated group] upon deconsolidation."); *see also* Memorandum, AFI-ResCap Tax Sharing, dated Mar. 20, 2013, at 2 ("The initial allocations limited ResCap's benefit for 2005 losses to the amount of those losses treated as absorbed by taxable income of non-ResCap entities on the 2005 GM consolidated return. ResCap was left with loss carryforwards to the extent it was allocated consolidated net operating loss under Treas. Reg. §1.1502-21."); Memorandum, AFI-ResCap Tax Sharing, dated Mar. 12, 2013, at 5 ("The initial tax allocation calculations interpreted the [Implemented 2005 Tax Allocation Agreement] in accordance with the principles of Section 1.1502-21 of the Treasury regulations . . . ."); Description of 2005 and 2006 Tax Allocation to ResCap, prepared by W. Marx, dated Nov. 27, 2012, at ALLY_0338094 [ALLY_0338094] ("add back to taxable income . . . for the consolidated net operating loss carry forward [sic] allocable to ResCap under Treasury Regulations").

[1805] For an explanation of how use of tax benefits is determined on a "but for" basis, see Section V.D.2.c(1).

[1806] *See* Ally Federal Tax Benefit from ResCap Losses, July 1, 2009 through December 31, 2012, prepared by AFI, at ALLY_0424652 [ALLY_0424651].

reflect a release of its deferred tax asset valuation allowance.[1807] Consistent with the conservatism principle of GAAP with regard to asset realization, accounting rules generally require a thorough analysis of the likelihood of the realization of tax assets.[1808] A company must reduce its deferred tax assets "by a valuation allowance if, based on the weight of available evidence, it is more likely than not (a likelihood of more than 50 percent) that some portion or all of the deferred tax assets will not be realized."[1809] The determination requires the company to assess "the weight of all available evidence, both positive and negative, with greater weight placed on information that is objectively verifiable,"[1810] and "there is a basic requirement to reduce the measurement of deferred tax assets not expected to be realized."[1811] Deferred tax assets typically consist of tax benefits that are required to be recognized later under income tax law than under GAAP for financial reporting purposes, which include items such as NOL carryovers and capital loss carryovers. Since AFI has already used almost all of its NOLs and capital losses from subsidiaries other than ResCap, most, if not almost all, of the deferred tax asset valuation allowance that AFI released probably relates to ResCap NOL carryovers and capital loss carryovers. Accordingly, the release suggests that AFI considers it more likely than not that it will realize about $1.33 billion in tax savings generated by ResCap in the near future.

---

[1807] *See* ALLY FINANCIAL INC., 4Q EARNINGS REVIEW (Feb. 5, 2013), at 10, http://phx.corporate-ir.net/External.File?item=UGFyZW50SUQ9MTcwNDI4fENoaWxkSUQ9LTF8VHlwZT0z&t=1; *see also* AFI, Press Release, *Ally Financial Reports Preliminary Fourth Quarter and Full Year 2012 Financial Results* (Feb. 5, 2013), http://media.ally.com/2013-02-05-Ally-Financial-Reports-Preliminary-Fourth-Quarter-and-Full-Year-2012-Financial-Results.

[1808] "The accounting for income taxes under ASC 740 is sometimes very specific and can be complex. An entity's primary objective in accounting for income taxes under ASC 740 is to reflect its after-tax financial position in its balance sheet. To accomplish this objective, an entity employs the balance sheet model for recording current and deferred taxes." DELOITTE & TOUCHE LLP, A ROADMAP TO ACCOUNTING FOR INCOME TAXES § 1.01 (2011).

[1809] ACCOUNTING STANDARDS CODIFICATION § 740-10-30-5(e) (Fin. Accounting Standards Bd. 2013).

[1810] DELOITTE & TOUCHE LLP, A ROADMAP TO ACCOUNTING FOR INCOME TAXES § 4.120 (2011).

[1811] ACCOUNTING STANDARDS CODIFICATION § 740-10-30-16 (Fin. Accounting Standards Bd. 2013).

Moreover, it appears that AFI will have a total of $5.056 billion in ResCap losses available for use as of the end of the tax year in which the Chapter 11 Cases conclude, which translates to $1.77 billion in potential tax savings (applying a 35% federal income tax rate), based on information in the tax basis balance sheet for ResCap as of December 31, 2012 and the expected total amount of asset recoveries for the creditors as laid out in a waterfall analysis prepared by FTI.[1812] AFI's counsel reported to the Examiner's Professionals that AFI expects to use "by the end of 2014 a substantial portion of the losses generated by ResCap's operations that will not have been offset by [cancellation of debt income]."[1813] Consequently, it appears that AFI may eventually use all of the $1.77 billion in tax savings generated by ResCap. AFI's use of the $1.77 billion in tax savings would trigger an AFI obligation to pay to ResCap that amount for such use if the First 2009 Tax Allocation Agreement were in effect.

---

[1812] ResCap has total tax liabilities in the amount of $10.154 billion and a total tax basis in its assets of $11.387 billion as of December 31, 2012. *See* Residential Capital, LLC Tax Basis Balance Sheet as of December 31, 2012 [ALLY_PEO_0094436]. In addition, according to the mid-range of FTI's waterfall analysis, the total recovery for the creditors is expected to be $6.233 billion. *See* Draft Hypothetical Waterfall Analysis, prepared by FTI, dated Aug. 16, 2012, at EXAM00176584 [EXAM00176577]. Furthermore, ResCap generated $1.444 billion in NOLs and $1.629 billion in capital losses from November 2, 2009 to December 31, 2012. *See* Ordinary & Capital Losses Generated by ResCap Companies Analysis, prepared by AFI [ALLY_0424653]. Based on these numbers, the $1.77 billion in ResCap benefits available for AFI's use is calculated as follows:

Expected amount of cancellation of debt income (in millions)

| | |
|---|---|
| ResCap tax liabilities | $ 10,154 |
| Less creditors' expected recovery* | – 6,233 |
| | $  3,921* |

Amount of built-in losses expected to be realized by ResCap during the Chapter 11 Cases (in millions)

| | |
|---|---|
| Creditors' expected recovery | $   6,233 |
| Less assumed contribution by AFI to creditors' recovery | –    750 |
| Less tax basis in ResCap assets | – 11,387 |
| | $  -5,904 |

Amount of ResCap tax benefits available for AFI's use (in millions)

| | |
|---|---|
| ResCap NOLs generated (11/2/2009 – 12/31/2012) | $  1,444 |
| ResCap capital losses generated (11/2/2009 – 12/31/2012) | +  1,629 |
| ResCap losses to be realized during Chapter 11 cases | +  5,904 |
| Less expected amount of cancellation of debt income | –  3,921 |
| | $  5,056 |
| Federal income tax rate | ×     35% |
| | $  1,770 |

* The $6.233 million estimate of the creditors' expected recovery in the above calculation assumes that AFI contributes $750 million towards the creditors' recovery. Any additional amount that AFI contributes towards the recovery would reduce cancellation of debt income on a dollar-for-dollar basis.

[1813] Memorandum, AFI-ResCap Tax Sharing, dated Mar. 12, 2013, at 2.

3. *ResCap's Conversion To A Disregarded Limited Liability Company And Payment Of LLC Conversion Dividend*

   a. *ResCap's Conversion To A Limited Liability Company And Change In Tax Classification To A Disregarded Entity*

As discussed in Section V.D.2.a, ResCap converted from a corporation to a limited liability company effective October 24, 2006,[1814] and elected to be treated as a disregarded entity for federal income tax purposes effective November 21, 2006.[1815] The change in classification of ResCap to a disregarded entity was required by Cerberus as a condition to its acquisition of AFI.[1816] Moreover, becoming a disregarded entity provided ResCap with the potential for relief from future federal income tax liabilities to the extent that ResCap were to generate income.

In connection with ResCap's conversion from a corporation to a disregarded entity on November 21, 2006, ResCap paid a $575 million installment of the LLC Conversion Dividend to AFI on November 28, 2006, which amount was tied to the estimated increase in equity ResCap received by eliminating all tax assets accounts and tax liabilities accounts from its balance sheet.[1817]

   b. *LLC Conversion Dividend*

The declaration of the LLC Conversion Dividend appears to have been driven by a desire of GM to receive a dividend from ResCap prior to GM completing its sale of 51% of AFI to Cerberus, at which time there was insufficient dividend capacity at ResCap for a standard dividend based on restrictions in the 2005 Operating Agreement. During the middle of 2006, numerous attempts were made by ResCap's staff and officers to track ResCap's dividend capacity under the restrictions in the 2005 Operating Agreement.[1818] ResCap first had considered during June and July 2006 a request by GM that it declare a $250 million dividend

---

[1814] Certificate of Conversion to Limited Liability Company of Residential Capital Corporation to Residential Capital, LLC, dated Oct. 24, 2006 [ALLY_0003761].

[1815] *See* Memorandum, Final Tax Liabilities Allocated from GM, dated Jan. 25, 2008, at ALLY_0208456 [ALLY_0208456].

[1816] *But see* Residential Capital, LLC Rating Agency Review Presentation, dated Nov. 2006, at 4 [EXAM10124762] (stating that Cerberus provided numerous benefits to ResCap in connection with Cerberus's purchase of 51% of AFI).

[1817] Residential Capital, LLC, Annual Report (Form 10-K) (Mar. 13, 2007), at 80.

[1818] *See, e.g.*, ResCap Presentation on Dividend Restrictions [EXAM10129727] (attached to E-mail from D. Olson (July 21, 2006) [EXAM10129726]); Dividend Capacity Analysis, prepared by ResCap, dated June 14, 2006 [EXAM11332217] (attached to E-mail from T. Rowe (June 14, 2006) [EXAM11332216]); E-mail from D. Olson (June 13, 2006) [EXAM11241506]; E-mail from T. Rowe (June 14, 2006) [EXAM11241506]; GMAC Dividend and Sub Debt Balance Analysis, prepared by ResCap, dated June 12, 2006 [EXAM11335577] (attached to E-mail from J. Malloy (June 12, 2006) [EXAM11335576]).

"in conjunction with the second quarter gain on the sale of ResCap's interest in WL Homes."[1819] This proposed dividend was not related to the conversion, and the ResCap Board decided to delegate to its executive committee the authority to declare the dividend.[1820] There is no evidence, however, that such a dividend was ever authorized or made.

By August 30, 2006, ResCap began to consider a dividend based on the amount of net deferred tax liabilities that were expected to be released upon its conversion to a disregarded entity.[1821] ResCap officers worked on creating a report to the ResCap Board regarding the LLC Conversion Dividend from around September 25, 2006 to October 19, 2006,[1822] when James Giertz, ResCap's Chief Financial Officer at the time, presented the report at a Special Meeting of the ResCap Board.[1823] At that October 19, 2006 meeting, the ResCap Board discussed a "dividend equal to the estimated amount of net deferred tax liability released in connection with the conversion of [ResCap] to a limited liability company . . . ."[1824] The ResCap Board and ResCap officers also discussed at the meeting the need to amend the 2005 Operating Agreement to permit the LLC Conversion Dividend and to establish a comprehensive ResCap dividend strategy.[1825] Giertz recommended that the ResCap Board delegate the decision to declare the LLC Conversion Dividend to the ResCap Board's Executive Committee;[1826] the ResCap Board deferred its decision to a future meeting.[1827]

ResCap prepared a Rating Agency Review presentation in November 2006 in which it was stated that the LLC Conversion Dividend, which was estimated as of September 30, 2006 would be

---

[1819] Minutes of a Regular Meeting of the Board of Directors of Residential Capital Corporation, June 22, 2006, at RC40006797 [RC40006748]; *see also* E-mail from C. Quenneville (July 21, 2006), at EXAM11340616 [EXAM11340616] (providing comments on the draft report to the ResCap Board in support of declaring a $250 million dividend).

[1820] *See* Minutes of a Special Meeting of the Board of Directors of Residential Capital Corporation, July 24, 2006, at RC40006800 [RC40006748].

[1821] *See* E-mail from D. Schaeffer (Aug. 30, 2006), at EXAM10163555 [EXAM10163554] (asking whether ResCap's dividend plans should continue to exclude an "incremental assumed dividend" relating to an estimated $450 million in net deferred tax liabilities that would become income upon conversion).

[1822] *See* Minutes of a Special Meeting of the Board of Directors of Residential Capital Corporation, Oct. 19, 2006, at RC40006814–15 [RC40006748]; E-mail from D. Marple (Oct. 3, 2006) [EXAM10259033] (describing the LLC Conversion Dividend as "a waiver of essentially 'found money' in ResCap's pocket" and attaching a draft report to the ResCap Board on the LLC Conversion Dividend for review and comment); E-mail from D. Marple (Sept. 25, 2006) [EXAM10250748] (attaching the initial draft of the report to the ResCap Board on the LLC Conversion Dividend for review and comment).

[1823] *See* Minutes of a Special Meeting of the Board of Directors of Residential Capital Corporation, Oct. 19, 2006, at RC40006814 [RC40006748].

[1824] *Id.*

[1825] *See id.* at RC40006814–15.

[1826] *See id.* at RC40006814.

[1827] *See id.* at RC40006815.

in the amount of $570 million, would have "[n]o impact to ResCap's capital position—net effect to ResCap of making this dividend is primarily timing of the cash outflow."[1828] The Examiner assumes that this was intended to mean that the LLC Conversion Dividend was viewed as an acceleration of the payment of future tax obligations that ResCap would have had to pay as a corporate taxpayer had it not converted to a disregarded entity. Moreover, the Examiner notes that ResCap's conversion to a disregarded entity did not have to result in ResCap's net equity increasing. AFI and ResCap were free to agree to enter into a new tax allocation agreement covering federal income taxes or to provide in ResCap's operating agreement that ResCap would have stand-alone federal income tax liability responsibilities. This arrangement is not unusual between pass-through entities. Had AFI and ResCap taken this course, ResCap's net tax liabilities would have stayed on its books, its net equity would not have increased, and GM would have lost its ability to justify the LLC Conversion Dividend as having no impact on ResCap's equity when combined with the effects of the conversion.

At the November 20, 2006 Special Meeting of the ResCap Board, Giertz presented another report, in which he recommended that the ResCap Board amend the 2005 Operating Agreement to exclude the LLC Conversion Dividend from the formula restrictions for calculating ordinary dividend capacity and delegate the decision to declare the LLC Conversion Dividend to the Board's Executive Committee.[1829] Although it appears that ResCap had the requisite liquidity to declare the LLC Conversion Dividend, the 2005 Operating Agreement contained a restriction that limited authority to declare dividends based on the amount of ResCap's "Cumulative Net Income" as reported in its last quarterly financial statements.[1830] The proposal to amend the 2005 Operating Agreement to provide special treatment for the LLC Conversion Dividend suggests that the LLC Conversion Dividend could not comply with the usual standards for ResCap dividends.[1831] Nevertheless, the ResCap Board unanimously agreed to "permit the LLC Tax Dividend and not subject it to the dividend restrictions contained in the Operating Agreement . . . ."[1832] The ResCap Board delegated the authority to declare the LLC Conversion Dividend to its executive committee.[1833] The Independent Directors were not members of the

---

[1828] Residential Capital, LLC Rating Agency Review Presentation, dated Nov. 2006, at 9 [EXAM10124762].

[1829] *See* Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Nov. 20, 2006, at RC40006837 [RC40006748].

[1830] *See* Residential Capital, LLC Presentation to the Board of Directors Regarding Capital Budgeting Considerations, dated Oct. 9, 2006, at MELZER.002825, −27, −32 [MELZER.002821] (showing sufficient liquidity to pay a $450 million LLC Conversion Dividend but stating that a waiver of dividend restrictions in the 2005 Operating Agreement would be required to declare the LLC Conversion Dividend); *see also* 2005 Operating Agreement [MELZER.004869] (defining "Cumulative Net Income" as the "net income of ResCap . . . for the period beginning with the first date of the first fiscal quarter beginning after the date of this Agreement and ending on the last day of the fiscal quarter ending immediately preceding the date as of which a determination of Cumulative Net Income is required").

[1831] *Compare* 2006 Amended Operating Agreement, § 2(d)(ii) [ALLY_0041818], *with* 2005 Operating Agreement, § 2(d)(ii) [MELZER.004869].

[1832] Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Nov. 20, 2006, at RC40006837 [RC40006748].

[1833] *See id.*

executive committee.[1834] In addition, the ResCap Board authorized its executive committee to declare the LLC Conversion Dividend in an amount "equal to the estimated net increase in equity resulting from the release of all tax-related accounts" of ResCap, as opposed to basing the size of the LLC Conversion Dividend on the increase in equity attributable to the release of only the net deferred tax liabilities that was previously proposed and discussed at the October 19, 2006 ResCap Board meeting.[1835] This change in the breadth of accounts to be released and taken into account in sizing the LLC Conversion Dividend decreased the authorized amount of the LLC Conversion Dividend because ResCap had net current tax assets, not net current tax liabilities, upon its conversion to a disregarded entity.

On November 27, 2006, Giertz presented a report at a Special Meeting of the Executive Committee, which stated that "[m]anagement's most recent estimate of the Released Amount is $570 million as of September 30, 2006."[1836] The Executive Committee unanimously declared the LLC Conversion Dividend and allowed it to be paid in one or more installments.[1837]

ResCap paid the first installment of the LLC Conversion Dividend in the amount of $575 million on November 28, 2006.[1838] In January 2007, ResCap began to calculate more precisely the amount of the increase in net equity that resulted from the release of all tax-related accounts upon its conversion to a disregarded entity.[1839] It became apparent that the $575 million first installment was larger than the actual net equity increase amount and, accordingly, AFI would have to make a capital contribution to ResCap to true-up the LLC Conversion Dividend.[1840] Young, ResCap's Chief Accounting Officer at the time, recommended that ResCap "hold off on any action until we are completely settled with the audit and Cerberus."[1841] Sanjiv Khattri, AFI's Chief Financial Officer at the time, agreed that ResCap should "hold of [sic] until numbers settle down."[1842]

---

[1834] *See* Minutes of a Special Meeting of the Executive Committee of the Board of Directors of Residential Capital, LLC, Nov. 27, 2006, at RC40006418 [RC40006402] (no Independent Directors present).

[1835] *Compare* Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Nov. 20, 2006, at RC40006837 [RC40006748], *with* Minutes of a Special Meeting of the Board of Directors of Residential Capital Corporation, Oct. 19, 2006, at RC40006814 [RC40006748].

[1836] Report to the Executive Committee of the Board of Directors, Residential Capital, LLC, prepared by J. Giertz, dated Nov. 27, 2006 [RC40013153].

[1837] *See* Minutes of a Special Meeting of the Executive Committee of the Board of Directors of Residential Capital, LLC, Nov. 27, 2006, at RC40006418 [RC40006402].

[1838] *See* E-mail from J. Malloy (Nov. 28, 2006) [EXAM10167986].

[1839] *See* E-mail from J. Young (Jan. 22, 2007), at EXAM11474370 [EXAM11474370]; *see also* E-mail from S. Khattri (Jan. 22, 2007), at EXAM11474371 [EXAM11474370].

[1840] *See* E-mail from S. Khattri (Jan. 22, 2007), at EXAM11474370 [EXAM11474370]; E-mail from J. Young (Jan. 22, 2007), at EXAM11474370 [EXAM11474370].

[1841] E-mail from J. Young (Jan. 22, 2007), at EXAM11474370 [EXAM11474370].

[1842] E-mail from S. Khattri (Jan. 22, 2007), at EXAM11474370 [EXAM11474370].

ResCap eventually determined that the increase in equity resulting from the release of all tax-related accounts was $420.1 million.[1843] Consequently, ResCap stated in its annual report for 2006 that it expected to receive a capital contribution of $154.9 million for reimbursement of the overpayment.[1844] It is unclear, however, whether AFI ever made a capital contribution to ResCap to correct ResCap's overpayment. While ResCap received $2 billion in cash capital contributions in 2007, there is no evidence that any of those capital contributions related to truing down the LLC Conversion Dividend.[1845]

Around the same time that the ResCap Board considered and approved the LLC Conversion Dividend, ResCap also received pressure from GM to declare a $600 million dividend.[1846] Thomas Melzer, one of the Independent Directors, raised concerns about the combined effect that the LLC Conversion Dividend and the $600 million dividend would have on ResCap's liquidity.[1847] Despite his concerns, Melzer initially was doubtful that the Independent Directors could block the $600 million dividend from being approved by the ResCap Board, which apparently was not a decision over which the Independent Directors had a veto.[1848] In an e-mail from Melzer to Thomas Jacob, the other Independent Director, on the morning of a day on which the ResCap Board was meeting to consider, among other things, both the LLC Conversion Dividend and the $600 million dividend, Melzer expressed his concerns: "I explained [to David Walker at AFI] that circumstances, not their intent, put us in a situation where we had no leverage when approval is sought for the $600 million dividend in December. I also reiterated our concern about liquidity. . . . [Walker] also said they did not

--------------------------------------------------

[1843] *See* Residential Capital, LLC, Annual Report (Form 10-K) (Mar. 13, 2007), at 80, 116.

[1844] *See id.* at 80. ResCap also reported a $433.4 million non-cash deemed dividend in connection with its conversion to a disregarded entity. *See* Residential Capital, LLC, Annual Report (Form 10-K) (Mar. 13, 2007), at 62, 134. The non-cash deemed dividend appears to relate to contingent tax assets and liabilities being treated as assumed by GM upon the conversion, in similar fashion to intercompany accounts being forgiven, and written off as deemed dividends and capital contributions by ResCap on its books. The Examiner's Professionals have noted that while the disclosures to the ResCap Board of the accounting treatment of the conversion and the actual reporting in the 10-K were not entirely accurate, there is no indication that they were intentionally false or misleading. Moreover, there is no economic harm to ResCap or its creditors resulting from this accounting treatment.

[1845] *See* Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2008), at 49.

[1846] *See* Minutes of a Special Meeting of the Board of Directors of Residential Capital Corporation (Oct. 19, 2006), at RC40006816 [RC40006748] (stating that David Walker presented to the ResCap Board a proposal for a $600 million dividend based on projections that ResCap would have $8.6 billion in equity at year end and management's belief that $8 billion in equity would suffice); Residential Capital, LLC Presentation to the Board of Directors Regarding Capital Budgeting Considerations, dated Oct. 9, 2006, at MELZER.002832 [MELZER.002821] (presenting plans for paying both a $450 million LLC Conversion Dividend and a $600 million dividend in late 2006).

[1847] *See* Int. of T. Melzer, Mar. 22, 2013, at 123:10–127:19; *cf.* Residential Capital, LLC Presentation to the Board of Directors Regarding Capital Budgeting Considerations, dated Oct. 9, 2006, at MELZER.002832 [MELZER.002821] (showing projections of insufficient liquidity to pay both a $450 million LLC Conversion Dividend and a $600 million dividend in late 2006).

[1848] *See* Int. of T. Melzer, Mar. 22, 2013, at 125:2–126:7.

want a 7–2 vote on this action, with the two of us dissenting."[1849] At the meeting later that day, the ResCap Board decided to defer consideration of the $600 million dividend.[1850] And in December 2006, the ResCap Board again deferred a decision on the $600 million dividend.[1851] The Investigation has not uncovered any evidence that the ResCap Board ever reconsidered the $600 million dividend, and it does not appear that the $600 million dividend was ever declared or paid.[1852]

## E. FINANCINGS

### 1. *Resort Finance Facility*

The fourth quarter of 2007 ended not only with (1) a reduction in ResCap's workforce by 25%;[1853] (2) ResCap's debt rating falling to below investment grade;[1854] and (3) contributions by AFI to ResCap of ResCap bonds in excess of $700 million for the quarter,[1855] but also with a pressing need to address liquidity shortages and pending debt maturities.[1856] One of the first steps taken was to have RFC enter into the Resort Finance Facility with AFI on February 21, 2008. The Resort Finance Facility was intended to be a bridge financing while ResCap searched for a third party to purchase its Resort Finance business.[1857] According to Sanjiv Khattri, CFO of ResCap, when the Resort Finance Facility was entered into, there were already discussions of a sale of the Resort Finance business to a third party.[1858] The Resort

---

[1849] Email from T. Melzer (Oct. 19, 2006) [MELZER.004954].

[1850] *See* Minutes of a Special Meeting of the Board of Directors of Residential Capital Corporation, Oct. 19, 2006, at RC40006816 [RC40006748].

[1851] *See* Minutes of a Regular Meeting of Board of Directors of Residential Capital, LLC, Dec. 12, 2006, at RC40006860 [RC40006748].

[1852] *See* Int. of T. Melzer, Mar. 22, 2013, at 120:22–123:9, 125:8–127:13.

[1853] Residential Capital, LLC, Current Report (Form 8-K) (Oct. 17, 2007), at 6.

[1854] *E.g.* Moody's Investors Service, Rating Action, Moody's Downgrades ResCap to Ba1, From Baa3; Ratings Remain on Review Down (Aug. 16, 2007), S&P, Research Update: Residential Capital LLC Ratings Off Watch Neg, Lowered to 'BB+/B' From 'BBB-/A-3'; Outlook Neg (Nov. 1, 2007); Fitch Ratings, Amend: Fitch Lowers Countrywide IDR to 'BBB+' & ResCap to 'BB+'; Indymac on Watch Negative (Aug. 16, 2007).

[1855] Memorandum, ResCap: Significant Capital Contributions and Related-Party Transactions, dated June 9, 2009, at 1 [ALLY_0240180].

[1856] *See* Minutes of a Regular Meeting of the Board of Directors of Residential Capital, LLC, Dec. 7, 2007, at RC40005645 [RC40005558] (S. Khattri discussed actual October 2007 $524 million loss driven by collapse of the real estate market, including tight credit and falling home prices and a potential $800 million downside risk in the fourth quarter); *see also* Minutes of a Regular Meeting of the Board of Directors of Residential Capital, LLC, Dec. 20, 2007, at RC40005649 [RC40005558] (S. Khattri discussed ResCap's liquidity position and said that primary 2008 first quarter objectives included, among other things, assessing the $5.4 billion TNW financial covenant and restructuring funding facilities and revolving lines of credit to meet ResCap's prospective needs).

[1857] E-mail from S. Khattri (Feb. 12, 2008) [EXAM11309438].

[1858] Int. of S. Khattri, Oct. 25, 2012, at 250:11–14.

Finance Facility was a $750 million non-recourse borrowing base facility with repayment to be made solely from collections on the collateral, which consisted of certain loans made by RFC to developers in connection with resort financing transactions. These loans included (1) certain eligible developer loans (subject to an advance rate of 90%); (2) certain construction loans (subject to an advance rate of 75%); and (3) certain loans extended to finance the sale of time shares (subject to an advance rate of 50%).[1859] ResCap provided a limited guarantee in connection with the Resort Finance Facility.[1860]

The Resort Finance Facility was approved by the ResCap Board at a meeting held on February 15, 2008[1861] and by RFC's board on February 19, 2008.[1862]

Bear Stearns issued a fairness opinion to ResCap with respect to the Resort Finance Facility, concluding that "the financial terms and conditions of the Resort Finance Facility, taken as a whole, are no less favorable to RFC, from a capital markets point of view, than the financial terms and conditions that would be expected to be obtained in a comparable financing with an unaffiliated third party on an arm's-length basis."[1863]

The Resort Finance Facility contained representations and warranties,[1864] closing conditions,[1865] covenants,[1866] events of default,[1867] and indemnification provisions[1868] that were standard for facilities of comparable size and nature (and would have been typical for a syndicated credit facility with unaffiliated lenders). Certain of the provisions, however, exemplified an affiliate transaction and were more favorable to the Resort Facility Borrower (RFC) — namely, (1) the negative covenants did not contain limitations on debt incurrence, dividend payments or affiliate transactions;[1869] (2) there were no financial covenants; and (3) there was no upfront fee payable to AFI. Moreover, it would have been highly unusual for a single lender to provide a lending commitment of this size.

---

[1859] Resort Finance Agreement, § 1.1 [ALLY_0116311] (definition of "Borrowing Base").

[1860] Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2008), Ex.10.13, at 275.

[1861] ResCap Secretary's Certificate dated Feb. 19, 2008, at ALLY_0116488, Exhibit C [ALLY_0116462].

[1862] Action by Written Consent of the Board of Directors of Residential Funding Company, LLC, dated Feb. 19, 2008, at ALLY_0116456–59 [ALLY_0116429].

[1863] Opinion Letter from Bear Stearns to the Board of Directors of ResCap (Feb. 20, 2008) [ALLY_0116519].

[1864] Resort Finance Agreement, § 3 [ALLY_0116311].

[1865] *Id.* § 4.

[1866] *Id.* §§ 5–6.

[1867] *Id.* § 7.

[1868] *Id.* §§ 2.16, 9.5.

[1869] *See id.* § 6.

Upon the consummation of the Resort Finance Sale, the obligations of RFC under the Resort Finance Facility were transferred to, and assumed by, GMAC CF.[1870] In its 10-Q for the period ending March 31, 2009, ResCap reported that the Resort Finance Facility had been paid in full.[1871]

See Appendix V.E.1 for more details on the terms of the Resort Finance Facility.

## 2. Secured MSR Facility

Shortly after closing the Resort Finance Facility, the Secured MSR Facility Borrowers (RFC and GMAC Mortgage), entered into the Secured MSR Facility with AFI, as lender, on April 18, 2008, which provided additional liquidity.[1872] The Secured MSR Facility was initially a $750 million borrowing base facility[1873] (increased to $1.2 billion on June 2, 2008),[1874] and was guaranteed on a full recourse basis by ResCap.[1875] The Secured MSR Facility Collateral served as the borrowing base and included: (1) certain MSRs and the related Servicing Contracts; (2) certain pledged Fannie Mae, Freddie Mac and Ginnie Mae securities; and (3) certain pledged U.S. treasury securities.[1876]

On April 1, 2008, prior to entering into the Secured MSR Facility, ResCap received a draft term sheet from Barclays that contemplated providing RFC with a facility to be secured by non-GSE MSRs.[1877] When sending the term sheet, Joseph O'Doherty of Barclays noted that the bank was eager to play a role in ResCap's restructuring efforts and wanted to work with ResCap and its advisors to get the best outcome possible.[1878] However, ResCap's liquidity needs were imminent and several months of negotiations could have been required to complete and syndicate a facility with Barclays,[1879] leading to the proposal that AFI provide

---

[1870] Asset Purchase Agreement between Residential Funding Company, LLC, GMAC Residential Funding of Canada Limited, and GMAC Commercial Finance LLC, dated July 2, 2008, § 2.2(b) [RC00024026].

[1871] Residential Capital, LLC, Quarterly Report (Form 10-Q) (May 11, 2009), at 56.

[1872] Secured MSR Loan Agreement [RC00024114].

[1873] *Id.* §§ 2.01–2.04, Sched. I (definition of Commitment Amount).

[1874] Amendment No. 3 to the Secured MSR Facility, dated June 2, 2008, § 1(b) [RC00037692].

[1875] Guarantee by Residential Capital, LLC, in favor of GMAC LLC as lender pursuant to the Secured MSR Facility, dated Apr. 18, 2008, § 3 [RC00037568].

[1876] Secured MSR Loan Agreement, § 4.01 [RC00024114].

[1877] Draft MSR Facility Summary of Indicative Terms and Conditions, dated Apr. 1, 2008 [EXAM10809952].

[1878] E-mail from J. O'Doherty to J. Peterson (Apr. 1, 2008) [EXAM10809950].

[1879] Minutes of a Meeting of the Special Committee of the Independent Directors of the Board of Residential Capital, LLC, Apr. 9, 2008, at RC40006626–27 [RC40006611].

the Secured MSR Facility as a bridge to the Barclays facility.[1880] In support of this timing issue, Morgan Stanley, in its April 14, 2008 discussion materials regarding the proposed facility, noted that several months could have been required to close, because a syndication of the loan and the obtaining of consents would have been necessary.[1881] Time was of the essence, as Jim Young (ResCap CFO) reported to the ResCap Board on April 14, 2008 that the Secured MSR Facility was needed to support Servicing Advances to be funded on April 17, 2008.[1882]

In considering the proposal for the Secured MSR Facility, the Independent Directors (then Thomas Jacob and Thomas Melzer) expressed concern over pricing terms, namely the proposed LIBOR + 300 bps interest rate, the 20 bps non-use fee and the 50% advance rate.[1883] Ultimately, most of these concerns were addressed to the satisfaction of the ResCap Board, including the Independent Directors (the pricing was reduced to LIBOR + 200 bps and the non-use fee was eliminated), who approved the Secured MSR Facility (including the ResCap guarantee) on April 14, 2008.[1884] The boards of RFC[1885] and GMAC Mortgage[1886] approved the Secured MSR Facility on April 15, 2008.

However, the advance rates remained at 50% when the Secured MSR Facility closed (which addressed the concern that a higher advance rate could impede the contemplated Barclays refinancing, because ResCap did not want to be "in excess of where [Barclays] would refinance the facility").[1887]

---

[1880] *Id.* at RC40006627 (statement from William Casey (ResCap Treasurer) that "the proposed funding facility from GMAC would provide ResCap with bridge financing while the Barclays facility is being finalized") [RC40006611]. *See also* Draft Indicative Terms and Conditions of the Debt Facility, dated Apr. 7, 2008 [EXAM10277333]; Draft Indicative Summary of Terms and Conditions of the Debt Facility, dated Apr. 9, 2008 [EXAM10807536].

[1881] Morgan Stanley Project Duvall Presentation, dated Apr. 14, 2008, at 3 [EXAM10279337].

[1882] Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Apr. 14, 2008, at RC40005713–15 [RC40005652].

[1883] E-mail from J. Jones (Apr. 13, 2008) [EXAM10399601].

[1884] Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Apr. 14, 2008, at RC40005714 [RC40005652].

[1885] Action by Written Consent of the Board of Directors of Residential Funding Company, LLC, dated Apr. 15, 2008, at ALLY_0131194–96 [ALLY_0131157].

[1886] Action by Written Consent of the Board of Directors of GMAC Mortgage, LLC, dated Apr. 15, 2008, at ALLY_0131229–31 [ALLY_0131201].

[1887] E-mail from J. Jones (Apr. 13, 2008) [EXAM10399601].

Morgan Stanley viewed the terms of the Secured MSR Facility favorably, concluding that: (1) the Secured MSR Facility provided materially better economic terms than the proposed Barclays facility and existing facilities; (2) as a result of negotiations between AFI and ResCap, the Secured MSR Facility was materially more favorable to ResCap than the initial AFI proposal; and (3) based on market observations and informal discussion, the Secured MSR Facility was more attractive in all material respects than facilities that were available in the then current marketplace.[1888] The economic terms were generally in line with those then in place between ResCap and Citibank and Natixis, which provided facilities secured by GSE MSRs. However, unlike the Citibank and Natixis facilities, the Secured MSR Facility did not require the Secured MSR Facility Borrowers to pay either a use fee or a non-use fee.[1889]

The Secured MSR Facility contained representations and warranties,[1890] covenants,[1891] events of default[1892] and indemnification provisions[1893] that were standard for facilities of comparable size and nature (and would have been typical for a syndicated credit facility with unaffiliated lenders). However, certain of the provisions exemplified an affiliate transaction and were more favorable to the Secured MSR Facility Borrowers — namely (1) lien searches were a post-closing requirement (typically they are required to be delivered as a condition to closing);[1894] (2) the negative covenants did not contain limitations on debt incurrence, dividend payments, affiliate transactions, or mergers/asset sales;[1895] and (3) as noted by Morgan Stanley, no fees were stated to be payable by the Secured MSR Facility Borrowers. Moreover, it would have been highly unusual for a single lender to provide a lending commitment of this size.

On June 2, 2008 (within three weeks from the closing of the Secured MSR Facility), the Secured MSR Facility was amended to increase the facility size from $750 million to $1.2 billion and the advance rate was increased from 50% to 85% giving ResCap access to more liquidity.[1896]

---

[1888] Morgan Stanley Project Duvall Presentation, dated Apr. 14, 2008, at 3–4 [EXAM10279337]. At the time ResCap engaged Morgan Stanley to provide advice in connection with certain potential strategic transactions, it was revealed that a Morgan Stanley officer was also a member of the AFI Board. Morgan Stanley Engagement Letter from D. Ammann to J. Jones (Feb. 13, 2008), at 3–4 [MELZER.008816] (attached to E-mail from T. Hamzehpour to T. Jacob and T. Melzer (Mar. 20, 2008) [MELZER.008815]). Section V.A.1.b(1) provides more information regarding this potential conflict.

[1889] *Id.* at 5.

[1890] Secured MSR Loan Agreement, § 6.01 [RC00024114].

[1891] *Id.* Art. VII.

[1892] *Id.* § 8.01.

[1893] *Id.* Art. X.

[1894] *Id.* § 7.01(r).

[1895] *See id.* § 7.02.

[1896] Amendment No. 3 to the Secured MSR Facility, dated June 2, 2008, at RC40006474 [RC40006437].

In its April 14, 2008 presentation, Morgan Stanley noted that lending against MSRs had generally been viewed by lenders as a "loss leader," was undertaken to secure future securitizations and other business, and that diminished prospects for such business had reduced the appetite to lend against MSRs.[1897] As a result, the advance rates on MSR facilities were trending lower and the costs were rising.[1898]

Ultimately, the search for a lender to refinance the Secured MSR Facility proved futile. Morgan Stanley pointed out that JPMorgan, Citibank and Bank of America were not interested in lending against non‑GSE assets at acceptable rates.[1899] Arranging a takeout facility for the Secured MSR Facility proved even more difficult after the advance rate under the Secured MSR Facility was raised to 85%. Barclays indicated that it would be comfortable with only up to a 60% advance rate.[1900] In addition, Barclays appeared to be growing concerned with its overall exposure to both ResCap and AFI. Jerry Lombardo, a GMAC CF employee at the time (hired to perform diagnostic work at ResCap relating to liquidity forecasting), commented that he thought Barclays's lending commitment to AFI would have to be reduced one for one in order to convince Barclays to participate in an MSR facility with ResCap.[1901] John Peterson, then ResCap's Assistant Treasurer, commented that ResCap continued to be challenged to find new outside financing alternatives for MSRs and he hypothesized that it might be due to AFI's risk profile.[1902] Despite this challenge, Peterson noted that ResCap was pursuing sources for outside financing (Barclays and other banks as well as banks through Cerberus, but also commented that Royal Bank of Canada and Calyon Securities (USA), Inc. (n/k/a Credit Agricole Securities (USA), Inc.) would "certainly not be interested").[1903] After June 2008, there was no evidence of a renewed search for a third party to refinance the Secured MSR Facility.

Since the Secured MSR Facility was designed to be a bridge to the Barclays facility, it had a short term maturity. The initial maturity date was the earlier of October 17, 2008 (six months after the April 18, 2008 closing) and the receipt by the Secured MSR Facility Borrowers of a commitment from a third party lender for a replacement facility.[1904] The

---

[1897] Morgan Stanley Project Duvall Presentation, dated Apr. 14, 2008, at 3 [EXAM10279337].

[1898] *Id.* at 4.

[1899] *Id.* at 3.

[1900] E-mail from J. Peterson (June 12, 2008) [EXAM10172519].

[1901] E-mail from J. Lombardo (May 3, 2008) [EXAM10844051].

[1902] E-mail from J. Peterson (June 12, 2008) [EXAM10172519].

[1903] *Id.*

[1904] Secured MSR Facility, Sched. I [RC00024114] (definition of "Loan Repayment Date").

maturity date of the Secured MSR Facility was ultimately extended repeatedly for short periods: from October 17, 2008 to May 1, 2009;[1905] from May 1, 2009 to June 30, 2009;[1906] from June 30, 2009 to July 31, 2009;[1907] from July 31, 2009 to September 30, 2009;[1908] from September 30, 2009 to November 30, 2009;[1909] and from November 30, 2009 to December 31, 2009.[1910]

As summarized in the table below, AFI forgave indebtedness under the Secured MSR Facility in an aggregate amount of over $1.1 billion from inception until the facility was terminated on December 30, 2009, when all remaining outstanding indebtedness thereunder (including accrued and unpaid interest) was forgiven.[1911] These debt forgiveness steps were generally taken to enable ResCap to remain in compliance with its TNW covenants.[1912]

---

[1905] Amendment No. 6 to the Secured MSR Facility, dated Oct. 17, 2008, § 2(d) [ALLY_0238920].

[1906] Amendment No. 8 to the Secured MSR Facility, dated Mar. 18, 2009, § 1(d) [GOLDIN00003753].

[1907] Amendment No. 11 to the Secured MSR Facility, dated June 30, 2009, § 2(a) [RC00033704].

[1908] Amendment No. 12 to the Secured MSR Facility, dated July 31, 2009, § 2(c) [ALLY_0130416].

[1909] Amendment No. 13 to the Secured MSR Facility, dated Sept. 22, 2009, § 2(a) [ALLY_0130424].

[1910] Amendment No. 14 to the Secured MSR Facility, dated Nov. 30, 2009, § 2(a) [GOLDIN00097683].

[1911] Letter from GMAC Inc. Re: Forgiveness of Certain Indebtedness and Termination of MSR Facility (Dec. 30, 2009), at 1–3 [ALLY_0353025].

[1912] *See* Minutes of a Special Meeting of the Board of Residential Capital, LLC, Oct. 1, 2008, at RC40005875 (statement from J. Young that "on September 30, 2008, ResCap received a $400 million contribution from GMAC in the form of debt forgiveness, which satisfied the TNW covenant requirement and immediate cash needs" and that as currently forecasted, "ResCap will drop below the required TNW level in December 2008") [RC40005652]; *see also* Minutes of a Special Meeting of the Board of Residential Capital, LLC, Oct. 23, 2008, at RC40005890 (statement from J. Young that ResCap's expected loss for October is "approximately $650 million and as equity at September 30 was $350 million, a large capital injection will be needed in order to maintain compliance with [TNW] covenants") [RC40005652].

EXHIBIT V.E.2
**Secured MSR Facility – Debt Forgiveness**
*($ in Millions)*

| Date | | Amount |
|---|---|---|
| September 2008 | $ | 101.5 |
| October 2008 | | 238.9 |
| November 2008 | | 451.5 |
| November 2009 | | 52.4 |
| December 2009 | | 262.7 |
| Total: | $ | 1,107.0 |

*Source: Capital Contributions to ResCap Legal Entity as of Jan. 31, 2012 [ALLY_PEO_0075634].*

See Appendix V.E.2 for more details on the terms of the Secured MSR Facility.

### 3. Secured Revolver Facility

Neither the Resort Finance Facility nor the Secured MSR Facility fully addressed ResCap's liquidity needs. With looming credit maturities (as more particularly described below) and stress on ResCap's capital needs, on April 21, 2008, the ResCap Board approved the bond exchange[1913] pursuant to which the Senior Secured Notes and Junior Secured Notes were issued. Then, on June 1, 2008, the ResCap Board approved a new credit facility with the Secured Revolver Facility Borrowers (RFC and GMAC Mortgage), ResCap and various ResCap Subsidiaries, as guarantors, and AFI, as lender, to be evidenced by the Secured Revolver Loan Agreement.[1914] A separate approval of the Secured Revolver Facility was provided by the Executive Committee of the ResCap Board on June 2, 2008.[1915] When the ResCap Board approved the Secured Revolver Facility, Edward Smith was the only Independent Director on the ResCap Board despite the 2006 Amended Operating Agreement requiring ResCap to have two Independent Directors at all times.[1916] The Secured Revolver Facility was approved by the boards of RFC[1917] and GMAC Mortgage[1918] on June 3, 2008.

[1913] Minutes of Meeting of the Board of Directors of Residential Capital, LLC, Apr. 21, 2008 at RC40005727–32 [RC40005652].

[1914] Minutes of Meeting of the Board of Directors of Residential Capital, LLC, June 1, 2008 at RC40005754–60 [RC40005652].

[1915] Unanimous Written Consent of the Executive Committee of the Board of Directors of Residential Capital, LLC, June 2, 2008, at RC40006443–49 [RC40006437].

[1916] The fact that only one Independent Director approved the Secured Revolver Facility does not have a bearing on whether the Secured Revolver Facility was duly authorized by ResCap. The 2006 Amended Operating Agreement barred material affiliate transactions not on arm's-length terms or for fair value; since the Secured Revolver Facility generally contained terms typical for a credit facility with unaffiliated lenders (as further described in this Section), it would not have required Independent Director approval. *See* 2006 Amended Operating Agreement, § 2(f)(i) [ALLY_0041818].

[1917] Action by Written Consent of the Board of Directors of Residential Funding Company, LLC, dated June 3, 2008 [ALLY_0045029].

[1918] Action by Written Consent of the Board of Directors of GMAC Mortgage, LLC, dated June 3, 2008 [ALLY_0045069].

On the horizon was the maturity of certain ResCap bonds, with more than $3 billion coming due between 2008 and 2009.[1919] In addition, certain credit facilities to which ResCap, RFC, and other ResCap Subsidiaries were party were maturing and needed to be renewed or refinanced.[1920] Two such facilities were: (1) the JPMorgan 364-Day Facility, an unsecured facility in the amount of $875 million,[1921] which had a scheduled maturity date of June 9, 2008;[1922] and (2) the JPMorgan 2005 Term Loan Facility in the amount of $1.75 billion,[1923] which had a scheduled maturity date of July 28, 2008.[1924]

During an April 18, 2008 ResCap Board meeting, Samuel Ramsey, AFI Chief Risk Officer at the time, in addressing the looming credit facility maturities, provided an overview of ResCap's overall debt restructuring aimed at injecting $3.5 billion of new liquidity, which plan included the structural precursor to the Secured Revolver Facility.[1925] The original structure, as described in the minutes of this board meeting, contemplated a $1.75 billion two-year facility, secured on a first lien basis, to be provided by certain of ResCap's existing bank lenders, led by JPMorgan and Citibank.[1926] This facility was intended to replace $1.75 billion of liquidity[1927] represented, collectively, by the JPMorgan 364-Day Facility and a JPMorgan unsecured $875 million Three-Year Competitive Advance and Revolving Credit Facility[1928] with a scheduled termination date of June 9, 2010.[1929] In addition, it was contemplated that AFI would provide a new $1.75 billion term loan to be secured on a second lien basis (junior to the two-year bank facility) and ranking *pari passu* with the liens securing the proposed Senior Secured Notes;[1930] thus, the new $1.75 billion second lien term loan to be provided by AFI would effectively replace the JPMorgan 2005 Term Loan Facility.[1931]

[1919] Confidential Offering Memorandum and Consent Solicitation Statement, dated May 5, 2008 [ALLY_0103305].

[1920] *See* Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Apr. 20, 2008, at RC40005723 [RC40005652].

[1921] JPMorgan 364-Day Facility, Sched. I [EXAM00344999].

[1922] *Id.* § 1.1 (definition of "Termination Date").

[1923] JP Morgan 2005 Term Loan Facility, Sched. I [EXAM00345163].

[1924] *Id.* § 1.1 (definition of "Maturity Date").

[1925] Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Apr. 18, 2008, at RC40005719-20 [RC40005652].

[1926] *Id.* at RC40005719.

[1927] *See id.* at RC40005719.

[1928] Three Year Competitive Advance and Revolving Credit Facility among Residential Capital, LLC, the several lenders from time to time parties thereto, the documentation agents named therein, Citibank, N.A., and JPMorgan Chase Bank, N.A., dated June 11, 2007, Sched. I [EXAM00345072].

[1929] *Id.* § 1.1 (definition of "Termination Date").

[1930] Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Apr. 18, 2008, at RC40005720 [RC40005652].

[1931] *Id.* at RC40005719–22.

During the same April 18, 2008 ResCap Board meeting, Ramsey also stated that AFI's management was considering a structural change whereby AFI would replace the bank syndicate on the proposed $1.75 billion two-year facility and provide a $3.5 billion facility on its own, with all of AFI's exposure secured by a first priority lien position ahead of the proposed Senior Secured Notes and the Junior Secured Notes.[1932] Such a structure would be "less complex and would allow ResCap to liquidate assets and repay the loan in a more attractive manner."[1933] At a subsequent meeting of the ResCap Board held on April 20, 2008, it was reported that the new $3.5 billion credit facility would in fact be provided solely by AFI.[1934] In addition, Ramsey stated that as part of the transaction, AFI would obtain from ResCap's existing third party lenders a $1 billion fixed-rate, two-year unsecured term loan.[1935] The banks had agreed to swap ResCap credit risk for AFI credit risk.

On the closing date of the Secured Revolver Facility, (1) AFI converted approximately $1.3 billion of term loans outstanding under the JPMorgan 2005 Term Loan Facility that it had obtained via assignment into an equivalent amount of Secured Revolver Facility Term Loans;[1936] and (2) the Secured Revolver Facility Borrowers borrowed (a) approximately $450 million of Secured Revolver Facility Revolver Loans to repay the remaining principal amount of term loans under the JPMorgan 2005 Term Loan Facility;[1937] and (b) $1.75 billion of Secured Revolver Facility Revolver Loans to pay the cash portion of the ResCap tender and bond exchange.[1938]

It was this proposed shift in AFI's status from second lien lender to sole first lien lender that factored into the decision of Jacob and Melzer to resign as Independent Directors, effective as of April 20, 2008. As Jacob noted, "asking us to approve a related party transaction of this magnitude, which allowed them to leapfrog over other unsecured creditors, was something that we felt that if we approved, it would be a serious violation of the ResCap operating agreement."[1939] Melzer similarly commented that "I just wasn't willing to be in a position where all of a sudden GMAC would be putting itself in a senior position to all the unsecured creditors at ResCap."[1940] For further detail regarding the resignations of Jacob and Melzer see Section IV.A.1.

_____

[1932] *Id.* at RC40005721.

[1933] *Id.* at RC40005721. *See also* Int. of L. Hall, Nov. 29, 2012, 130:3-5 ("it made a lot more sense for GMAC to do the entire facility, which gave more flexibility to ResCap, better pricing, better terms . . .").

[1934] Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Apr. 20, 2008, at RC40005723–25 [RC40005652].

[1935] *Id.* at RC40005723.

[1936] Secured Revolver Loan Agreement, § 2.01(c) [RC00024234].

[1937] Residential Capital, LLC, Current Report (Form 8-K) (June 9, 2008), at Item 1.01.

[1938] E-mail from J. Brooke (June 6, 2008) [CCM00145708].

[1939] Examiner's Interview of T. Jacob, Nov. 7, 2012, at 216:19–216:24.

[1940] Examiner's Interview of T. Melzer, Oct. 10, 2012, at 160:17–160:21.

Though Independent Directors Jacobs and Melzer had expressed concern with the $3.5 billion facility being proposed by AFI,[1941] Daniel Ammann and Jon Pruzan, representatives from Morgan Stanley,[1942] noted at the ResCap Board meeting on June 1, 2008, that it was the most viable option for ResCap at that time.[1943] Comparing the facility being proposed by AFI to that being proposed by the banks, they stated that "the fees and advance rates between the two were similar; that [AFI] was willing to provide a full $3.5 billion, whereas the bank syndicate had offered only $1.75 billion; that the [AFI] covenant structure was more favorable to [ResCap] than that proposed by the bank syndicate."[1944] In addition, Ammann and Pruzan concluded that ResCap would not have been able at that time to obtain a comparable secured facility in the market absent AFI's willingness to provide it.[1945]

Proceeds from Secured Revolver Facility Loans were to be used to repay existing indebtedness of ResCap and for working capital purposes.[1946] In connection with the closing of the Secured Revolver Facility and as part of ResCap's debt restructuring, on or about June 5, 2008, AFI acquired, via assignment,[1947] $1.293 billion of ResCap's outstanding term loans under the JPMorgan 2005 Term Loan Facility; the remainder of the amounts outstanding under the JPMorgan 2005 Term Loan Facility (approximately $450 million) was repaid with proceeds of a Secured Revolver Facility Revolver Loan.[1948] The $1.293 billion loan owed by ResCap under the JPMorgan 2005 Term Loan Facility and acquired by AFI was, pursuant to the terms of the Secured Revolver Loan Agreement, converted into a Secured Revolver Facility Term Loan (due July 28, 2008) and, as such, became a direct secured obligation of the Secured Revolver Facility Borrowers.[1949] Indeed, ResCap was absolved of all direct liability under the assigned and converted term loan under the JPMorgan 2005 Term Loan Facility.[1950]

---

[1941] Jacob and Melzer, through their counsel, Bryan Cave, proposed revisions to certain April 2008 ResCap Board meeting minutes (which were never adopted). *See, e.g.*, Draft Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Apr. 18, 2008, at RC40008507–10 [RC40008489] (indicating concern with Secured Revolver Facility).

[1942] Although the Secured Revolver Facility was ultimately approved by independent director Smith, there is nothing in the record that shows Smith was informed about the Morgan Stanley conflict discussed in Section V.A.1.

[1943] *See* Minutes of a Meeting of the Board of Residential Capital, LLC, June 1, 2008, at RC40005753 [RC40005652].

[1944] Minutes of a Meeting of the Board of Residential Capital, LLC, June 1, 2008, at RC40005753 [RC40005652].

[1945] *Id.*

[1946] GMAC LLC, Current Report (Form 8-K) (June 9, 2008), Item 8.01.

[1947] Master Assignment and Assumption among Residential Capital LLC, JPMorgan, and Citibank, dated June 5, 2008 [ALLY_0043831].

[1948] GMAC LLC, Current Report (Form 8-K) (June 9, 2008), Item 8.01.

[1949] Secured Revolver Loan Agreement, § 2.01(c) [RC00024234].

[1950] *Id.* § 2.01(d).

Simultaneously with the closing of the Secured Revolver Facility, ResCap consummated a tender and bond exchange, pursuant to which approximately $8.6 billion in unsecured ResCap notes maturing between 2008 and 2015 were exchanged for approximately $5.6 billion of Senior Secured Notes and Junior Secured Notes.[1951] On or about June 6, 2008, a borrowing of a Secured Revolver Facility Revolver Loan in the amount of $1.75 billion was made to fund the cash portion of this ResCap tender and bond exchange.[1952] As a result, the Secured Revolver Facility was fully drawn in the amount of $3.5 billion as of June 6, 2008, with the proceeds having been used to exchange direct unsecured ResCap obligations owed to unaffiliated third parties (represented by the JPMorgan 2005 Term Loan Facility that was assigned and repaid and by the ResCap bonds tendered and/or exchanged) for direct secured obligations of the Secured Revolver Facility Borrowers owed to AFI. According to ResCap's Form 10-Q for the period ending September 30, 2008, the $1.293 billion Secured Revolver Facility Term Loan that came due on July 28, 2008 was repaid through a Secured Revolver Facility Revolver Loan.[1953] Repayment in this manner was likely not possible, as there was insufficient availability under the Secured Revolver Facility to fund a draw of that size (the facility was capped at $3.5 billion)—it is more likely that the outstanding Secured Revolver Facility Term Loan was simply converted into a Secured Revolver Facility Revolver Loan.

The total commitment under the Secured Revolver Facility was eventually reduced to $3.1 billion in December 2008.[1954] Notably, it appears that AFI, rather than ResCap, requested the permanent reduction of the commitment under the Secured Revolver Facility. In a November 26, 2008 e-mail from Jerry Lombardo to Terry Farley and Melissa White, Lombardo noted that "today [AFI] requested and ResCap (Tom Marano and I) agreed to permanently reduce the Revolver by $500M as of today."[1955] A commitment reduction request procedure such as this would not have been typical for a credit facility among unaffiliated parties. It is normally the borrower, not the lender, that has the right to seek commitment reductions. In fact, the above-referenced e-mail from Lombardo referenced Section 2.10(b) of the Secured Revolver Loan Agreement,[1956] the provision pursuant to which the Secured Revolver Facility Borrowers could voluntarily reduce the lending commitment.

The collateral securing the Secured Revolver Facility included all the then unencumbered assets of the Secured Revolver Facility Borrowers and Secured Revolver Facility Guarantors, including, among other assets, accounts, chattel paper, commercial tort claims, certain deposit and securities accounts, intellectual property, investment property, specific pledged shares and

---

[1951] Memorandum, GMAC ResCap Significant Transaction #1028, at EXAM00220282 [EXAM00220281].

[1952] E-mail from J. Brooke (June 6, 2008) [CCM00145708].

[1953] *See* Residential Capital, LLC, Quarterly Report (Form 10-Q) (Nov. 10, 2008), at 78.

[1954] Amendment No. 4 to the Secured Revolver Loan Agreement, dated Dec. 12, 2008, § 2.01(k) [ALLY_0051551].

[1955] Email from J. Lombardo (Nov. 26, 2008) [EXAM10845441].

[1956] *Id.*

equity interests and specific pledged promissory notes.[1957] The Secured Revolver Facility, the Senior Secured Notes and the Junior Secured Notes shared liens on the same collateral, with the Secured Revolver Facility having a first lien priority position ahead of both the Senior Secured Notes and the Junior Secured Notes.[1958] The lien priority arrangements and other intercreditor rights governing the Secured Revolver Facility, the Senior Secured Notes and the Junior Secured Notes were governed by the Intercreditor Agreement.

The Secured Revolver Facility contained representations and warranties,[1959] covenants,[1960] events of default[1961] and indemnification provisions[1962] that were standard for facilities of comparable size and nature (and would have been typical for a syndicated credit facility with unaffiliated lenders). However, certain of the provisions exemplified an affiliate transaction and were more favorable to the Secured Revolver Facility Borrowers — namely (1) the negative covenant on debt incurrence not only provided the Secured Revolver Facility Borrowers with a sizable basket of $500 million, but also provided a very broad exception for "debt incurred in the ordinary course of business through financing, securitization and hedging activities";[1963] (2) the negative covenant regarding lien incurrence only applied to liens on the First Priority Collateral (as opposed to other assets of the Secured Revolver Facility Borrowers and Secured Revolver Facility Guarantors);[1964] (3) a non-traditional and broader set of exceptions to the covenant limiting affiliate transactions (e.g., any transaction between ResCap and any of its Subsidiaries was permitted);[1965] and (4) no ongoing commitment or facility fees were stated to be payable by the Secured Revolver Facility Borrowers (whereas a typical third party credit facility would likely have required payment of either a commitment or facility fee). Moreover, it would have been extremely unusual for a single lender to provide a lending commitment of this size.

In addition, while the Secured Revolver Facility Borrowers were required to make mandatory prepayments in connection with net cash proceeds from certain collateral dispositions,[1966] mandatory prepayment was only required to prepay the Secured Revolver Facility Loans to the extent the amount of such net cash proceeds exceeded retained proceeds (an agreed upon threshold of up to $450 million) or were not otherwise used to acquire

---

[1957] First Priority Security Agreement, § 2 [RC00038119]; *see also* Appendix V.E.3.g.

[1958] Intercreditor Agreement, § 2.1(a) [ALLY_0066819].

[1959] Secured Revolver Loan Agreement, § 6.01 [RC00024234].

[1960] *Id.* Art. VII.

[1961] *Id.* § 8.01.

[1962] *Id.* Art. X.

[1963] *Id.* § 7.02(f).

[1964] *Id.* § 7.02(h).

[1965] *Id.* § 7.02(l).

[1966] *Id.* § 2.08(c).

additional First Priority Collateral.[1967] Further, such mandatory prepayments, to the extent they were applied to Secured Revolver Facility Revolver Loans, did not automatically reduce AFI's commitment to make Secured Revolver Facility Revolver Loans. Although the inclusion of a mandatory prepayment provision was typical for secured syndicated credit facilities, the described exceptions were more favorable to the Secured Revolver Facility Borrowers than would be expected in connection with a loan provided by an unaffiliated lender.

On June 4, 2008, AFI sold to GM and Cerberus a $750 million first loss participation interest in the Secured Revolver Facility which was subsequently contributed by them to AFI on December 29, 2008, in exchange for equity in AFI.[1968]

The Secured Revolver Loan Agreement was amended and restated by the A&R Secured Revolver Loan Agreement.[1969]

See Appendix V.E.3 for more details on the terms of the Secured Revolver Facility.

### 4. Servicing Advance Factoring Facility

ResCap sought additional financing options shortly after the closing of the Secured Revolver Facility and looked to monetize certain non-GSE related Servicing Advances. Unlike other credit facilities entered into with AFI, the Servicing Advance Factoring Facility (which was entered into with GMAC CF) was structured as a "true sale" of receivables and not as a financing, which was required by AFI.[1970] In the event ResCap filed for bankruptcy and a bankruptcy court held that the transfer of the Servicing Advances to GMAC CF under the Servicing Advance Factoring Agreement was a "true sale" and not a secured financing, the purchased Servicing Advances would be deemed assets of GMAC CF and not part of ResCap's bankruptcy estate, unless clawed back as a fraudulent transfer, nor would the purchased Servicing Advances be subject to preference claims.[1971] Thus, GMAC CF would have been in a better position, as a purchaser of assets, than a secured creditor. Nonetheless,

---

[1967] *See id.*

[1968] Memorandum, ResCap: Significant Capital Contributions and Related-Party Transactions, dated June 9, 2009, at ALLY_0240183 [ALLY_0240180]; Participation Agreement between GMAC LLC, General Motors Corporation and Cerberus ResCap Financing LLC, dated as of June 4, 2008 [ALLY_0043807].

[1969] A&R Secured Revolver Loan Agreement [ALLY_0066146].

[1970] Minutes of Meeting of the Board of Directors of Residential Capital, LLC, June 1, 2008 at RC40005752 (De Molina stated that AFI could commit to the "GMAC Factoring Facility so long as it could be structured as a 'true sale' rather than as a financing") [RC40005652].

[1971] *See* 6 PETER J. LAHNY IV, DEBTOR-CREDITOR LAW § 41.01 (2013) (explaining that the "transaction must be structured as a 'true sale' because if a court should find that the transaction was a disguised secured loan, the assets will be drawn back into the originator's bankruptcy estate").

GMAC CF was reluctant[1972] to enter into the Servicing Advance Factoring Agreement; after tense negotiations (as further described below), the deal was sized at $600 million with an advance rate of 85%.[1973] The sale of the Servicing Advances at a 15% discount rate provided the Servicing Advance Factoring Sellers (RFC and GMAC Mortgage) with greater liquidity than they would have had if they borrowed against the same assets under the Secured Revolver Facility.[1974]

On June 17, 2008, concurrently with the execution of the Servicing Advance Factoring Agreement, AFI, as lender agent under the Secured Revolver Loan Agreement and the First Priority Collateral Agent, entered into a release agreement with respect to the subject Servicing Advances[1975] with GMAC CF and the Servicing Advance Factoring Sellers, which provided that upon the purchase by GMAC CF of any Servicing Advances, AFI and the First Priority Collateral Agent agreed to an automatic release of all liens and security interests on the purchased Servicing Advances, which served as collateral securing the Secured Revolver Facility, the Senior Secured Notes and the Junior Secured Notes. The sale of Servicing Advances to AFI and/or one of its Affiliates (other than ResCap, ResCap Subsidiaries and Old GMAC Bank) was explicitly permitted under the Secured Revolver Facility[1976] and under the terms of the Intercreditor Agreement—if the lien on any collateral securing the Secured Revolver Facility was released by the First Priority Collateral Agent in connection with a transaction permitted under the Secured Revolver Loan Agreement, then the lien on such collateral securing the Senior Secured Notes and the Junior Secured Notes was automatically released.[1977]

The initial determination of the discount rate under the Servicing Advance Facility Agreement was an issue of contention. In an e-mail exchange, dated June 13, 2008, from Ken Fick (FTI)[1978] to Lombardo and Peterson,[1979] Fick informed Lombardo and

---

[1972] According to Linda Voss (GMAC CF Chief Operating Officer and CFO), GMAC CF would not have ever entered into this transaction with a third party. Int. of L. Voss, Dec. 13, 2012, at 102:15–16.

[1973] Servicing Advance Factoring Agreement, § 2(a)(3) [ALLY_0041874] (providing for an 85% advance rate for each type of Servicing Advance that, subject to agreement among the parties, could be adjusted to reflect the FMV).

[1974] Under the Secured Revolver Facility, the discount rate used to determine collateral value with respect to Servicing Advances varied from 70–80%. *See* Table V.E.3.b.

[1975] Release Agreement with respect to the Servicer Advance receivables, dated June 17, 2008 (ALLY_0118954).

[1976] Secured Revolver Loan Agreement, §§ 7.02(l)(iii), 7.02(r) [RC00024234].

[1977] Intercreditor Agreement, § 5.1(a) [ALLY_0066819].

[1978] FTI had been retained by ResCap since April 2008 to perform certain limited financial consulting procedures in connection with liquidity reporting. *See* ResCap Liquidity & Financial Forecast Report to Lenders by FTI Consulting, Inc., at 3 [ALLY_0319759]; *see also* E-mail from J. Lombardo to K. Fick (June 5, 2008) [EXAM10839158] (requesting Fick to assist with diligence and to provide business metrics to GMAC CF in connection with the Servicing Advance Factoring Facility).

[1979] E-mails between K. Fick and J. Peterson/J. Lombardo (June 13, 2008), at 1–2 [EXAM10306497].

Peterson that GMAC CF wanted to increase the discount rate from 5% (as provided in the Term Sheet)[1980] to approximately 20%. Fick pointed out that "to get $600M we need to sell $750M in Servicing Advances." Fick advised that Tony Renzi (ResCap Director) was following up with Marano (ResCap CEO) to "get guidance [regarding] the very steep price [a 20% discount rate] would cost."[1981] Lombardo thought the 20% discount rate was "nuts" and wanted to know whether Marano and Young were aware of the 20% discount.[1982]

Bill Hall, GMAC CF President and CEO at the time, added some color on the struggles GMAC CF had with the Servicing Advances. He referred to them as an "unattractive asset"[1983] to finance because Servicing Advances did not accrue or pay interest or have a maturity date.[1984] It was clear from contemporaneous e-mails and documents that GMAC CF had difficulty getting comfortable with the risk profile for the Servicing Advances and was not getting a complete, accurate picture of the assets. At one point ResCap told GMAC CF that the Servicing Advances to be sold were triple-A securities with a two-month average life.[1985] That was not the case, however, as approximately 50% of the Servicing Advances related to loans in foreclosure.[1986] Due to the short time available to close the transaction and the inability of ResCap to provide sufficient and complete information, GMAC CF had to rely on whatever information was provided, including a delinquent roll rate analysis, limited and "spotty" aging information, and information from Barclays relating to GSE Servicing Advances (as opposed to the non-GSE Servicing Advances at issue under the Servicing Advance Factoring Facility) that were part of a Barclays facility covering 2005-2007.[1987] The cost of funds and the time value of money associated with funding purchases of Servicing Advances under the Servicing Advance Factoring Facility were other factors driving the discount rate, along with the expected loss rate and repayment period for purchased Servicing Advances.[1988] As part of its analysis, GMAC CF started with the information provided by ResCap and prepared a model that included what GMAC CF thought the repayment history on the Servicing Advances would be and modeled in a loss rate of 2%, and from that information GMAC CF came up with a 20% discount rate.[1989]

---

[1980] Special Board Meeting, Receivables Factoring Facility Terms and Conditions, May 31, 2008, at RC40008283–84 [RC40008218].

[1981] E-mail from K. Fick (June 13, 2008), at 1–2 [EXAM10306497].

[1982] E-mails between K. Fick and J. Peterson/J. Lombardo (June 13, 2008), at 1–2 [EXAM10306497].

[1983] Int. of B. Hall, Dec. 13, 2012, at 132:16–132:17.

[1984] *Id.* at 132:18–132:20.

[1985] *Id.* at 133:17–20.

[1986] *Id.* at 136:12–16.

[1987] *See* Int. of L. Voss, Dec. 13, 2012, at 94:9–102:12.

[1988] Examiner's Interview of Bill Hall, Dec. 13, 2012, at 137:13–17, 140:4–6, 141:3–11.

[1989] *Id.* at 141:20–142:4.

In an e-mail exchange dated July 15, 2008, between Lombardo and Renzi, Lombardo discussed the next Servicing Advance sale to GMAC CF under the Servicing Advance Factoring Agreement.[1990] Lombardo referenced a meeting with Young and Marano and stated that he and Rory Bluhm (AFI Treasury Department, Director of Structured Funding and Operations) were putting together "an analysis of the turn times because this facility is very expensive to ResCap."[1991] Renzi agreed that the facility was very expensive and recalled negotiating the discount rate down from GMAC CF's original 21% to 15%.[1992] As Renzi noted, the Servicing Advance Factoring Agreement permitted discount adjustments based on the facts of the underlying receivable turn rates.[1993]

On July 18, 2008, a month after the Servicing Advance Factoring Agreement had closed, Morgan Stanley delivered a fairness opinion with respect to the Servicing Advance Factoring Facility,[1994] as was required for affiliate transactions in an amount greater than $500 million.[1995] Delivery of the opinion was delayed because GMAC CF was not able to explain to Morgan Stanley's satisfaction the duration calculations ResCap had provided to GMAC CF during negotiation of the facility and which GMAC CF had accepted. After the facility closed, ResCap was able to locate additional data relating to the calculations, which Renzi and Young agreed would be shared with GMAC CF and Morgan Stanley.[1996] The Morgan Stanley opinion concluded that the purchase price for the initial purchase of receivables, consummated on July 17, 2008,[1997] and the subsequent purchase of receivables contemplated to occur on July 18, 2008[1998] (the date the opinion was issued) were fair to RFC from a financial point of view.[1999]

---

[1990] E-mails between T. Renzi and J. Lombardo (July 15, 2008) [EXAM10842763].

[1991] E-mail from J. Lombardo (July 15, 2008) [EXAM10842763].

[1992] E-mail from T. Renzi (July 15, 2008) [EXAM10842763].

[1993] *Id.; see also* Servicing Advance Factoring Agreement, § 2(a)(3) [ALLY_0041874] (providing that the purchase price for the Servicing Advances could be adjusted to reflect factors, if any, agreed to by GMAC CF and the Servicing Advance Factoring Sellers that would result in a price that reflected the FMV of the Servicing Advances to be purchased); see *also* Servicing Advance Factoring Agreement, § 2(a)(4) [ALLY_0041874] (providing that any such adjustments applied by the Servicing Advance Factoring Sellers had to be verified by the Purchaser).

[1994] Opinion Letter from Morgan Stanley to the Board of Directors of ResCap (July 18, 2008) [EXAM00126523].

[1995] Senior Secured Notes Indenture, § 4.11(a)(3) [RC00024456]; Junior Secured Notes Indenture, § 4.11(a)(3) [RC00024572]; Secured Revolver Loan Agreement, § 7.02(l)(iii) [RC00024234] (requiring delivery of an opinion by a nationally recognized investment banking, accounting or appraisal firm stating the transaction is fair from a financial point of view with respect to affiliate transactions involving aggregate consideration greater than $500 million).

[1996] E-mail between J. Young and T. Renzi (June 27, 2008) [EXAM10172133].

[1997] *See* GMAC Commercial Factoring Schedule, prepared by ResCap, dated June 24, 2008 [EXAM00237715] (Column B at second tab, for description of projected sale of receivables).

[1998] *See id.* (Column AB at second tab) (describing projected sale of receivables).

[1999] Opinion Letter from Morgan Stanley to the Board of Directors of ResCap (July 18, 2008), at EXAM00126528 [EXAM00126523].

Due to lingering unanswered questions about the Servicing Advances, the Secura Group, a financial advisory consulting firm, was engaged by GMAC CF[2000] after the closing of the Servicing Advance Factoring Facility to conduct an independent review of the Servicing Advances.[2001] The Secura Group delivered a written report to AFI dated December 2008. According to AFI, the Secura Group had a difficult time gathering information from ResCap and had to use assorted pieces of data to construct its analysis.[2002] AFI concluded that the Secura Group analysis fell short of "providing a clear answer as to the true estimated recovery period and loss rate for [GMAC CF's] servicing advances."[2003]

Despite the reluctance of GMAC CF to enter into the Servicing Advance Factoring Facility, GMAC CF received in the first year about 72% of the amounts it spent to purchase the Servicing Advances hereunder[2004] and ultimately made a profit of $25 million on the transaction.[2005]

The Servicing Advance Factoring Facility contained provisions commonly found in receivables factoring transactions, including (1) the obligation of the Servicing Advance Factoring Sellers to repurchase receivables upon a breach of a representation pertaining to a purchased receivable;[2006] and (2) suspension of GMAC CF's obligation to purchase additional receivables until such breach was cured or the related receivables were repurchased.[2007]

The Servicing Advance Factoring Facility contained other representations and warranties,[2008] covenants,[2009] termination events[2010] and indemnification provisions[2011] standard for receivable factoring transactions between unaffiliated parties. GMAC CF and the Servicing Advance Factoring Sellers intended the sale of the receivables to constitute an

---

[2000] Although the Secura Group was engaged by AFI, it was chosen by ResCap. Int. of B. Hall, Dec. 13, 2012, at 170:11–15.

[2001] Memorandum, Response to September 2008 Servicing Advance Review Conducted by the Secura Group [CCM00172188].

[2002] *Id.*

[2003] *Id.* at CCM00172190.

[2004] Examiner's Interview of Bill Hall, Dec. 13, 2012, at 142:14–15.

[2005] *Id.* at 158:11–12.

[2006] Servicing Advance Factoring Agreement, § 6(a) [ALLY_0041874].

[2007] *Id.* § 6(c).

[2008] *Id.* § 5.

[2009] *Id.* § 7.

[2010] *Id.* § 8.

[2011] *Id.* § 2(k).

absolute sale and not a loan.[2012] Orrick, Herrington & Sutcliffe LLP, counsel to the Servicing Advance Factoring Sellers, delivered customary "true sale" opinion letters for each Servicing Advance Factoring Seller,[2013] limited by standard qualifications relating to uncertain outcomes in cases of bankruptcy and insolvency.[2014]

The Servicing Advance Factoring Facility was discussed at the ResCap Board meeting held on June 1, 2008,[2015] and approved by (1) the Unanimous Written Consent of the Executive Committee of the ResCap Board on June 2, 2008;[2016] (2) the boards of RFC[2017] and GMAC Mortgage[2018] on June 3, 2008; and (3) the Unanimous Written Consent of the ResCap Board on June 17, 2008.[2019]

The Servicing Advance Factoring Facility was terminated on June 16, 2009.[2020]

See Appendix V.E.4 for more details on the terms of the Servicing Advance Factoring Facility.

*5. Initial Line Of Credit Facility*

Despite having recently closed the bond exchange and the Secured Revolver Facility and having received the benefit of certain debt forgiveness by AFI,[2021] during the last quarter of

---

[2012] *Id.* § 9.

[2013] Opinion Letter from Orrick, Herrington & Sutcliffe LLP to RFC, GMAC Mortgage and GMAC CF for RFC (June 17, 2008), at ALLY_0078815 [ALLY_0078491]; Opinion Letter from Orrick, Herrington & Sutcliffe LLP to RFC, GMAC Mortgage and GMAC CF for GMAC Mortgage (June 17, 2008), at ALLY_0078840 [ALLY_0078491].

[2014] Opinion Letter from Orrick, Herrington & Sutcliffe LLP to RFC, GMAC Mortgage and GMAC CF for RFC (June 17, 2008), at ALLY_0078816–20 [ALLY_0078491]; Opinion Letter from Orrick, Herrington & Sutcliffe LLP to RFC, GMAC Mortgage and GMAC CF for GMAC Mortgage (June 17, 2008), at ALLY_0078841–45 [ALLY_0078491].

[2015] Minutes of Meeting of the Board of Directors of ResCap, June 1, 2008, at RC40005749–60 [RC40005652].

[2016] Unanimous Written Consent of the Executive Committee of the Board of Directors of Residential Capital, LLC, June 2, 2008, at RC40006443, 50–51, 79–85 [RC40006437].

[2017] Action by Written Consent of the Board of Directors of Residential Funding Company, LLC, June 3, 2008, at ALLY_0042590–92 [ALLY_0042553].

[2018] Action by Written Consent of the Board of Directors of GMAC Mortgage, LLC, June 3, 2008, at ALLY_0042514–16 [ALLY_0042484].

[2019] Unanimous Written Consent of the Board of Directors of Residential Capital, LLC, June 17, 2008, at RC40005787–97 [RC40005652].

[2020] Residential Capital, LLC, Consolidated Financial Statements for the Years Ended December 31, 2009 and 2008 (Feb. 26, 2010), at 99 [EXAM00124455].

[2021] *See* Exhibit V.E.2.

2008, ResCap's liquidity needs continued to exceed its available cash.[2022] Normally having in place a first lien secured credit facility and second and third lien secured bonds, each with a blanket lien security package, would be an impediment to putting in place a new significant secured credit facility. However, because of the favorable permitted lien and collateral release provisions set forth in the Secured Revolver Loan Agreement, the Senior Secured Notes Indenture, the Junior Secured Notes Indenture and the Intercreditor Agreement, the Initial Line of Credit Borrowers (PATI and RAHI) were able to enter into the Initial Line of Credit Facility on November 20, 2008, with AFI, as lender, in the amount of $430 million, which facility was guaranteed on a full recourse basis by ResCap. Draws under the Initial Line of Credit Facility were only available if ResCap's liquidity fell below a certain level.[2023] Although the Secured MSR Facility Borrowers[2024] and Secured Revolver Facility Borrowers[2025] were required to make a solvency representation, the Initial Line of Credit Borrowers were never required to do so under the terms of the Initial Line of Credit Agreement.

As a result of failed efforts to find unaffiliated lenders (as described below), it became evident that AFI was the lender of last resort for the Initial Line of Credit Facility. In an e-mail from Erik Graber of Goldin Associates to Lombardo and Melissa White (Assistant Treasurer of various ResCap Affiliates) dated December 16, 2008,[2026] Graber asked (presumably, in connection with the preparation of a fairness opinion in anticipation of an increase to the

--------------------------------------------------

[2022] Minutes of a Special Meeting of the Board of Residential Capital, LLC, Nov. 12, 2008, at RC40005906 [RC40005652]. Young and Lombardo discussed the availability of funds under the Secured Revolver Facility. Young said that ResCap would not draw against the revolving facility as there was insufficient collateral available to support further advances and Marano said the bond exchange transaction had not generated cash for ResCap. Lombardo said that based on forecast projections, on December 17, 2008, ResCap would be required to borrow under the Initial Line of Credit Facility that the AFI Board had had recently approved as part of a ResCap support package. *Id.*

[2023] Initial Line of Credit Agreement, § 2.03(a) [ALLY_0023145]. The Initial Line of Credit Borrowers could request loans only if, on the proposed funding date and after giving effect to such loans, either or both of the following liquidity tests were met: (1) unrestricted ResCap liquidity was less than $250 million and/or (2) ResCap consolidated liquidity was less than $750 million. *Id.*; *see also* Appendix V.E.5.c.

[2024] Secured MSR Loan Agreement, § 6.01(h) [RC00024114] (providing that other than as explicitly set forth in the Seventh Amendment to the Secured MSR Loan Agreement, dated December 10, 2008, the Secured MSR Facility Borrowers were always required to make a solvency representation). *See* Appendix V.E.2.e.(7) (detailing the solvency representation).

[2025] Secured Revolver Loan Agreement, § 6.01(h) [RC00024234] (explaining that other than as explicitly set forth in the Fourth and Fifth Amendments to the Secured Revolver Loan Agreement, dated December 12, 2008 and December 31, 2008, respectively, the Secured Revolver Facility Borrowers were always required to make a solvency representation). See Appendices V.E.3.i.(5) and V.E.3.i.(6) for more detail regarding the solvency representation.

[2026] E-mails between E. Graber and J. Lombardo (Dec. 16, 2008) [EXAM10178557].

Initial Line of Credit Facility)[2027] about ResCap's efforts to seek alternative lenders for the Initial Line of Credit Facility.[2028] In response, Lombardo stated that there were no external third party lenders with the liquidity or desire to finance the assets pledged to secure the Initial Line of Credit Facility given the "current extraordinary tightness in the financial markets coupled with [ResCap's] corporate rating, the level of [ResCap's] [TNW] (below $500M) and the classification of assets."[2029] Lombardo also stated that ResCap had no other alternative, and that since the second quarter of 2008, ResCap had been in discussions with no fewer than fifteen banks around the world.[2030]

Since a blanket lien on all assets was provided to secure the Secured Revolver Facility, the Senior Secured Notes, and the Junior Secured Notes, certain collateral had to be released in order to have such collateral available to secure the Initial Line of Credit Facility. To do so, on November 20, 2008, (1) the Secured Revolver Facility Borrowers executed a Request for Collateral Release;[2031] (2) AFI, as the lender agent, executed a Consent and Direction to Release Collateral;[2032] and (3) the First Priority Collateral Agent, the Second Priority Collateral Agent and the Third Priority Collateral Agent executed a Partial Release of Collateral.[2033] The relatively liberal collateral release provisions set forth in the Secured Revolver Loan Agreement,[2034] the Senior Secured Notes Indenture,[2035] the Junior Secured

---

[2027] Opinion Letter from Goldin Associates to the Committee of the Independent Members of the Board of Directors of ResCap (Dec. 22, 2008) [GOLDIN00125814]. The anticipated increase to the Initial Line of Credit Facility would have resulted in a lending facility with a total commitment amount in excess of $5 million, thus triggering the provisions under the Senior Secured Notes Indenture and the Junior Secured Notes Indenture requiring delivery of a fairness opinion. *See* Senior Secured Notes Indenture, § 4.11(a)(3) [RC00024456]; Junior Secured Notes Indenture, § 4.11(a)(3) [RC00024572]; Secured Revolver Loan Agreement, § 7.02(i)(iii) [RC00024234] (requiring delivery of an opinion by a nationally recognized investment banking, accounting or appraisal firm stating the transaction is fair from a financial point of view with respect to affiliate transactions involving aggregate consideration greater than $500 million).

[2028] E-mails between E. Graber and J. Lombardo (Dec. 16, 2008) [EXAM10178557].

[2029] *Id.*

[2030] *Id.*

[2031] Request for Collateral Release, dated Nov. 20, 2008 [ALLY_0054102]. The collateral released (which became the initial collateral under the Initial Line of Credit Facility) included certain pledged shares and equity interests, certain pledged promissory notes, certain deposit and securities accounts and all accounts, chattel paper, general intangibles and other assets relating to the foregoing pledged assets.

[2032] Consent and Direction to Release Collateral, dated Nov. 20, 2008 [ALLY_0054408].

[2033] Partial Release of Collateral, dated Nov. 20, 2008 [ALLY_0054713].

[2034] Secured Revolver Loan Agreement, § 12.11 [RC00024234].

[2035] Senior Secured Notes Indenture, § 8.04(a) [RC00024456].

Notes Indenture[2036] and the Intercreditor Agreement[2037] made the movement of this collateral securing the Secured Revolver Facility, the Senior Secured Notes and the Junior Secured Notes possible.[2038]

Under the terms of the Secured Revolver Loan Agreement, there were restrictions imposed on the disposition and transfer of certain collateral designated as "Primary Collateral."[2039] "Primary Collateral" included only a portion of the collateral covered by the blanket lien granted under the related security documents. As a result, the disposition of non-Primary Collateral did not trigger the collateral disposition restrictions set forth in the Secured Revolver Loan Agreement, the Senior Secured Notes Indenture, and the Junior Secured Notes Indenture, allowing the Secured Revolver Facility Borrowers and the Secured Revolver Facility Guarantors to freely elect to have the lien on the non-Primary Collateral[2040] released and re-encumbered under other permitted credit facilities, such as the Line of Credit Facilities, without the consent of the holders of either the Senior Secured Notes or the Junior Secured Notes.

Pursuant to the Intercreditor Agreement, if the lien on collateral securing the Secured Revolver Facility was released by the First Priority Collateral Agent in connection with a transaction permitted under the Secured Revolver Loan Agreement, then the lien on such collateral securing the Senior Secured Notes and the Junior Secured Notes would be automatically released.[2041]

---

[2036] Junior Secured Notes Indenture, § 8.04(a) [RC00037197].

[2037] Intercreditor Agreement, § 5.1(a) [ALLY_0066819].

[2038] The definition of "Collateral Disposition" set forth in the Secured Revolver Loan Agreement was limited to the disposition or transfer of only "Primary Collateral" and the lien covenant in the Secured Revolver Loan Agreement permitted liens on financing assets securing "Permitted Funding Indebtedness". The term "Permitted Funding Indebtedness" was very broad and included, among other things, indebtedness incurred in the ordinary course through financings, including customary lines of credit, and included other indebtedness on terms at least as favorable to ResCap or its applicable Subsidiary that would be available on an arm's-length basis. Secured Revolver Loan Agreement, Sched. 1.01 [RC00024234].

[2039] *Id.* (definition of "Primary Collateral").

[2040] Int. of L. Hall, Nov. 29, 2012, 114:25 (discussing the Secured Revolver Facility and making a distinction between "Primary Collateral" and non-Primary Collateral by stating that "the blanket lien had no restrictions").

[2041] Intercreditor Agreement, § 5.1(a) [ALLY_0066819].

In fact, in an October 24, 2008 e-mail from Dave Miller of Elliott Management Corporation to Lenard Tessler (Managing Director of Cerberus), Miller refers to the security interest held by the holders of the Senior Secured Notes as "almost completely illusory,"[2042] and stated that ResCap had the ability to free up collateral to be re-encumbered to generate liquidity to "denude the 2nd lien bondholders of their security interests."[2043] Collateral was released from the liens securing the Secured Revolver Facility, the Senior Secured Notes and the Junior Secured Notes and re-encumbered as collateral securing the Line of Credit Facilities on at least six different occasions.[2044]

The Initial Line of Credit Facility contained representations and warranties,[2045] covenants,[2046] events of default,[2047] and indemnification provisions[2048] that were standard for facilities of comparable size and nature (and would have been typical for a syndicated credit facility with unaffiliated lenders). However, the Initial Line of Credit Borrowers were not required at closing to, nor did they ever, make a solvency representation. The provisions of the Initial Line of Credit Facility that exemplified an affiliate transaction more favorable to the Initial Line of Credit Borrowers than would have been obtained in a syndicated credit facility with unaffiliated lenders were the same as those provided to the Secured Revolver Facility Borrowers under the Secured Revolver Facility;[2049] in addition, the Initial Line of Credit Borrowers were never required to pay an upfront fee when the facility closed (whereas an upfront fee was payable at the closing of the Secured Revolver Facility). Moreover, it would have been extremely unlikely for a single lender to provide a facility of this size.

---

[2042] E-mail from D. Miller (Oct. 24, 2008) [CCM00393464].

[2043] *Id.*

[2044] Partial Release of Collateral, dated Nov. 20, 2008 [ALLY_0054713]; Partial Release of Collateral, dated May 19, 2009 [ALLY_0057631]; Partial Release of Collateral, dated June 5, 2009 [ALLY_0057873]; Partial Release of Collateral, dated Nov. 9, 2009 [ALLY_0065802]; Partial Release of Collateral, dated Dec. 16, 2009 [ALLY_0066099]; Partial Release of Collateral, dated May 14, 2010 [ALLY_0070276]. In connection with a later collateral release from the Secured Revolver Facility on May 14, 2010, ResCap obtained a fairness opinion from Goldin Associates, dated May 13, 2010, stating that the "terms upon which [ResCap] will add the Additional Collateral to the Collateral as security under the [A&R Line of Credit Agreement], are fair to [ResCap] and to its creditors (other than [AFI]), from a financial point of view." Opinion Letter from Goldin Associates to the Committee of the Independent Members of the Board of Directors of ResCap (May 13, 2010), at GOLDIN00125805 [GOLDIN00125802].

[2045] Initial Line of Credit Agreement, § 6.01 [ALLY_0023145].

[2046] *Id.* Art. VII.

[2047] *Id.* § 8.01.

[2048] *Id.* Art. X.

[2049] *See* Section V.E.3.

On November 20, 2008, the Initial Line of Credit Facility was approved by the ResCap Board[2050] and the boards of PATI[2051] and RAHI.[2052] The Initial Line of Credit Facility was amended and restated in December 2009 by the A&R Line of Credit Facility.

See Appendix V.E.5 for more details on the terms of the Initial Line of Credit Agreement.

### 6. ResMor Loan Facility

On November 20, 2008, the closing date of the Initial Line of Credit Facility, the ResMor Facility Borrower (GMAC Canada) entered into the ResMor Loan Facility with AFI in the principal amount of CDN $82 million. Also, on the same day, GMAC Canada, as seller, and AFI, as purchaser, entered into a purchase agreement pursuant to which AFI agreed, subject to the satisfaction of conditions precedent, to purchase from GMAC Canada the stock of 1020491 Alberta Ltd. and ResMor.[2053]

The principal amount of the ResMor Loan was intended to be repaid upon the closing of the ResMor Sale by setting off the purchase price against such principal amount[2054] and in fact, on January 1, 2009, the ResMor Sale closed and the ResMor Loan was repaid in the manner so contemplated.[2055] The ResMor Loan Facility provided that the loan proceeds were to be used to repay existing debt due to ResCap or any of its Subsidiaries.[2056] Ultimately, the loan proceeds were used to repay (1) intercompany debt owed by GMAC Canada to its direct parent, GMAC RFC International Holdings Cooperatief U.A.;[2057] and (2) immediately

---

[2050] Action by Written Consent of the Board of Directors of Residential Capital, LLC, dated Nov. 20, 2008, at RC40005928–38 [RC40005652].

[2051] Action by Written Consent of the Board of Directors of Passive Asset Transactions, LLC, dated Nov. 20, 2008 [ALLY_0051116].

[2052] Action by Written Consent of the Board of Directors of RFC Asset Holdings II, LLC, dated Nov. 20, 2008 [ALLY_0051015].

[2053] Share Purchase Agreement, between GMAC Residential Funding of Canada, Limited and GMAC LLC, dated Nov. 20, 2008 [RC00025358].

[2054] ResMor Loan Agreement, § 2.2 [RC00025269].

[2055] Residential Capital, LLC, Quarterly Report (Form 10-Q) (May 11, 2009), at 56 (reporting outstanding advance under the ResMor Loan Facility was settled as consideration given for the completed ResMor Sale); *see also* Payout and Release Letter from GMAC LLC to GMAC Residential Funding of Canada, Limited, dated Jan. 1, 2009 [ALLY_0127021] (evidencing termination of the facility).

[2056] ResMor Loan Agreement, § 6.1.2 [RC00025269].

[2057] Memorandum, GMAC ResCap Significant Transaction Memo, General Information and Transaction Description (Part I) #1144, at EXAM0020432–34 [EXAM00220430]; E-mail from S. Bashmakov (Nov. 20, 2008) [EXAM10843968].

thereafter, intercompany debt owed by GMAC RFC International Holdings Cooperatief U.A. to ResCap.[2058] AFI's recourse against GMAC Canada to recover the principal amount of the ResMor Loan was limited solely to AFI's right to foreclose on the shares pledged to secure the ResMor Loan Facility.[2059]

On November 20, 2008, the ResMor Sale and the ResMor Loan Facility were approved by the (1) ResCap Board;[2060] and (2) the ResMor board.[2061] On December 2, 2008, Goldin Associates delivered a presentation to the Independent Directors regarding the ResMor Sale,[2062] and on December 3, 2008, Goldin Associates rendered a fairness opinion with respect thereto, stating that the ResMor Sale was fair, from a financial point of view, to ResCap and its creditors (other than AFI).[2063]

The ResMor Facility contained very basic representations and warranties[2064] and covenants (but no financial covenants, which was not atypical given the short term nature and purpose of the ResMor Facility).[2065] The events of default[2066] were standard for facilities of comparable size and nature (and would have been typical for a syndicated credit facility with unaffiliated lenders).

The ResMor Loan Facility had a maturity date of the earlier of the closing of the ResMor Sale and December 22, 2008, or such earlier date as AFI and GMAC Canada agreed.[2067] The ResCap Board, as part of the written consent dated November 20, 2008, contemplated a process to repay the ResMor Loan Facility (and prevent the collateral from being foreclosed upon) if a default occurred and the ResMor Sale had not yet closed.[2068] Although

---

[2058] E-mail from S. Bashmakov (Nov. 20, 2008) [EXAM10843968].

[2059] ResMor Loan Agreement, § 5.1 [RC00025269].

[2060] Action by Written Consent of the Board of Directors of Residential Capital, LLC, dated Nov. 20, 2008, at RC40005913–27 [RC40005652].

[2061] Resolutions of the Directors of GMAC Residential Funding of Canada, Limited, dated Nov. 20, 2008, at ALLY_0126674–76 [ALLY_0126650].

[2062] Presentation to the Committee of Independent Members of the Board of Directors of Residential Capital, LLC, Regarding The Purchase of ResMor Trust Company by GMAC, LLC (Dec. 2, 2008) [GOLDIN00129056].

[2063] Opinion Letter from Goldin Associates to the Committee of the Independent Members of the Board of Directors of ResCap (Dec. 3, 2008) [RC00027945].

[2064] ResMor Loan Agreement, § 4.2 [RC00025269].

[2065] *Id.* § 6.

[2066] *Id.* § 8.1.

[2067] *Id.* § 1.1 (definition of "Maturity Date").

[2068] Action by Written Consent of the Board of Directors of Residential Capital, LLC, dated Nov. 20, 2008, at RC40005914 [RC40005652].

December 22, 2008 passed without consummation of the ResMor Sale (which technically constituted an event of default under the ResMor Loan Facility), by January 1, 2009 (a matter of 10 days) the ResMor Sale had occurred and the ResMor Loan was repaid.

See Appendix V.E.6 for more details on the terms of the ResMor Loan Facility and Section V.F.4.f for more details on the ResMor Sale.

### 7.  Second Line Of Credit Facility

In an effort to raise additional cash, asset sales were consummated (e.g., the ResMor Sale, which closed in January 2009) and the US/UK Broker-Dealer Sale.[2069] In addition, AFI continued to contribute RescCap bonds to RescCap to ensure RescCap's compliance with its TNW covenants.[2070] Approximately fifteen days after the Initial Line of Credit Facility closed, Lombardo advised the RescCap Board that RescCap wished to extend and increase the Initial Line of Credit Facility.[2071] A draft term sheet, dated December 5, 2008, contemplated a $400 million increase to the Initial Line of Credit Facility.[2072] Goldin Associates delivered a fairness opinion, dated December 22, 2008, in anticipation of the increase to the commitment amount under the Initial Line of Credit Facility.[2073] Although the Initial Line of Credit Facility was amended on numerous occasions to add collateral and to extend the maturity date, the Initial Line of Credit commitment amount was never increased. Instead, on June 1, 2009, AFI provided the Second Line of Credit Borrowers (PATI and RAHI), with the Second Line of Credit Facility, a new, separate,[2074] secured credit facility in the initial amount of $370 million on substantially similar terms to the Initial Line of Credit Facility (including, among other things, the Second Line of Credit Borrowers were not required to make a solvency representation or pay an upfront fee or ongoing commitment or facility fees).

---

[2069] See Section V.F.4.f for discussion of the ResMor Sale and Section V.F.4.g for discussion of the US/UK Broker-Dealer Sale.

[2070] Materials of a Meeting of the GMAC Board of Directors, May 28, 2009, at ALLY_0239887 [ALLY_0239885].

[2071] Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Dec. 5, 2008, at RC40005941 [RC40005652] (Lombardo discussed RescCap's liquidity drain for the period December 2, 2008 through December 31, 2008).

[2072] Draft Terms and Conditions for the Initial Line of Credit Agreement, dated Dec. 5, 2008 [ALLY_0239167].

[2073] Opinion Letter from Goldin Associates to the Committee of the Independent Members of the Board of Directors of RescCap (Dec. 22, 2008) [GOLDIN00125814].

[2074] Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, May 28, 2009, at RC40006154 [RC40005949] (engaging in discussion with members of AFI management and advisors from Morrison Cohen with respect to the optimal structure and terms of the proposed increase in funding capacity).

Although the Line of Credit Facilities remained separate until December 30, 2009 (when they were combined into the A&R Line of Credit Facility), they served as parallel liquidity sources. The Line of Credit Facilities were secured by the same collateral[2075] and had the same advance rates. Borrowing requests and availability under both Line of Credit Facilities were permitted only when ResCap's liquidity fell below the same threshold levels.[2076] Second Line of Credit Loans were available to the Second Line of Credit Borrowers only after the Initial Line of Credit Facility was fully drawn.[2077] On June 12, 2009, the Second Line of Credit Facility was increased from $370 million to $470 million[2078] giving the Second Line of Credit Borrowers the ability to borrow up to a total of $900 million under the combined Line of Credit Facilities.

In connection with the Second Line of Credit Facility, on June 25, 2009, a fairness opinion was delivered by Goldin Associates concluding that the terms of the transaction documents "are fair to [ResCap] and its creditors (other than [AFI]), from a financial point of view."[2079] Goldin Associates also provided a favorable fairness opinion, dated September 17, 2009, with respect to an amendment to the Second Line of Credit Agreement relating to increasing the size of the Second Line of Credit Facility.[2080]

The Second Line of Credit Facility mirrored the Initial Line of Credit Facility, containing representations and warranties,[2081] covenants,[2082] events of default[2083] and indemnification provisions[2084] that were standard for facilities of comparable size and nature (and would have been typical for a syndicated credit facility with unaffiliated lenders). The provisions of the Second Line of Credit Facility that exemplified an affiliate transaction more favorable to the Second Line of Credit Borrowers than would have been obtained in a third party financing were the same as those provided to the Initial Line of Credit Borrowers under the Initial Line of Credit Facility.[2085]

_____

[2075] The collateral also secured the obligations under the Secured MSR Facility, the Master Netting Agreement and other derivative transactions with GMAC IM as a counterparty.

[2076] Initial Line of Credit Agreement, § 2.03(a) [ALLY_0023145]; Second Line of Credit Agreement, § 2.03(a) [ALLY_0023953].

[2077] Second Line of Credit Agreement, Art. V [ALLY_0023953].

[2078] Amendment No.1 to the Second Line of Credit Agreement, dated June 12, 2009, § 2.2(a) [ALLY_0026615].

[2079] Opinion Letter from Goldin Associates to the Committee of the Independent Members of the Board of Directors of ResCap (June 25, 2009), at GOLDIN00125801 [GOLDIN00125798].

[2080] Opinion Letter from Goldin Associates to the Committee of the Independent Members of the Board of Directors of ResCap (Sept. 17, 2009) [GOLDIN00125793].

[2081] Second Line of Credit Agreement, § 6.01 [ALLY_0023953].

[2082] *Id.* Art. VII.

[2083] *Id.* § 8.01.

[2084] *Id.* § 10.01.

[2085] *See* Section V.E.5.

In order to meet ResCap's continuing liquidity needs, AFI and ResCap intended to increase the amount that could be drawn under both Line of Credit Facilities and eventually planned to combine them.[2086] Goldin Associates delivered a favorable fairness opinion, dated November 19, 2009, in connection with proposed amendments to the Line of Credit Facilities, which would increase the cumulative commitment amount available to ResCap under those facilities up to an additional $500 million.[2087] On December 21, 2009, just before the consolidation of the Line of Credit Facilities on December 30, 2009, the size of the Second Line of Credit Facility was increased from $470 million to $670 million.[2088]

The Second Line of Credit Facility was approved by the boards of PATI[2089] and RAHI[2090] on May 30, 2009, and by the ResCap Board on May 31, 2009.[2091]

See Appendix V.E.7 for more details on the terms of the Second Line of Credit Facility.

### 8. Amended And Restated Credit Facilities

On December 30, 2009, the Line of Credit Facilities were combined into one agreement[2092] and the Secured Revolver Loan Agreement was amended and restated.[2093] The Secured Revolver Loan Agreement was modified to convert $1.55 billion of Secured Revolver Facility Revolver Loans into Secured Revolver Facility Term Loans, eliminating the ability of the Secured Revolver Facility Borrowers to draw any new loans under the Secured Revolver Facility.

Under the A&R Line of Credit Agreement, RAHI and PATI assigned their obligations as "Borrowers" under the Line of Credit Facilities to RFC and GMAC Mortgage (previously, RFC and GMAC Mortgage were "Guarantors" under the Line of Credit Facilities). At closing and upon any draws under the A&R Line of Credit Facility, the A&R Line of Credit Borrowers (new borrowers, GMAC Mortgage and RFC) were required to make a solvency

---

[2086] Presentation to The Committee of Independent Members of the Board of Directors of ResCap regarding the June 1, 2009 Secured Line of Credit with GMAC (June 24, 2009), at 4 [GOLDIN00128957].

[2087] Opinion Letter from Goldin Associates to the Committee of the Independent Members of the Board of Directors of ResCap (Nov. 19, 2009) [GOLDIN00125789]

[2088] Amendment No.10 to the Second Line of Credit Agreement, dated Dec. 21, 2009, § 2.1(a) [ALLY_0077250].

[2089] Action by Written Consent of the Board of Directors of Passive Asset Transactions, LLC, dated May 30, 2009 [ALLY_0056164].

[2090] Action by Written Consent of the Board of Directors of RFC Asset Holdings II, LLC, dated May 30, 2009 [ALLY_0056122].

[2091] Action by Written Consent of the Board of Directors of Residential Capital, LLC, dated May 31, 2009, at RC40006156–69 [RC40005949].

[2092] A&R Line of Credit Agreement [ALLY_0240633].

[2093] A&R Secured Revolver Loan Agreement [ALLY_0066146].

representation,[2094] something which had never been required previously under the Line of Credit Facilities. The solvency representation made under the A&R Line of Credit Agreement[2095] was in substance identical to the solvency representation made under the A&R Secured Revolver Loan Agreement;[2096] however, the term "Solvent," as used in the solvency representation set forth in the A&R Line of Credit Agreement, was never defined.[2097]

Under the A&R Line of Credit Facility, (1) a new negative covenant requiring maintenance of Consolidated Liquidity (cash and cash equivalents of ResCap on a consolidated basis, excluding cash and cash equivalents of Ally Bank) thresholds[2098] was added that mirrored the liquidity maintenance covenant under the Secured Revolver Facility;[2099] and (2) the interest rate margin under the A&R Line of Credit Agreement was decreased to 2.75%[2100] (interest had accrued at 3.50% under the Line of Credit Facilities).[2101] When the A&R Line of Credit Facility was first entered into, the discount factors used to determine the collateral "value" (for borrowing base purposes) were not changed from discount factors set forth in the Line of Credit Facilities.[2102] However, the amendment and restatement provided AFI the ability to modify the discount factors in its reasonable discretion taking into account estimated collections, market value, legal risks, cost of recovery and other matters customarily considered by commercial lenders when determining advance rates.[2103]

The A&R Line of Credit Agreement contained representations and warranties,[2104] covenants,[2105] events of default[2106] and indemnification provisions[2107] that were standard for

---

[2094] A&R Line of Credit Agreement, § 6.01(h) [ALLY_0240633].

[2095] *Id*.

[2096] A&R Secured Revolver Loan Agreement, § 6.01(h) [ALLY_0066146].

[2097] *See* A&R Line of Credit Agreement, Sched. 1.01 [ALLY_0240633].

[2098] A&R Line of Credit Agreement, § 7.02(i) [ALLY_0240633].

[2099] Secured Revolver Loan Agreement, § 7.02(i) [RC00024234]; A&R Secured Revolver Loan Agreement, § 7.02(i) [ALLY_0066146].

[2100] A&R Line of Credit Agreement, Sched. 1.01 [ALLY_0240633] (definition of "Applicable Margin").

[2101] Initial Line of Credit Agreement, Sched. 1.01 [ALLY_0023207] (definition of "Applicable Margin"); Second Line of Credit Agreement, Sched. 1.01 [ALLY_0023953] (definition of "Applicable Margin").

[2102] *Compare* A&R Line of Credit Agreement, Sched. 2.04 [ALLY_0240633], *with* Second Line of Credit Agreement, Sched. 2.04 [ALLY_0023953], *and* Initial Line of Credit Agreement, Sched. 2.04 [ALLY_0023241].

[2103] A&R Line of Credit Agreement, Sched. 2.04, § 4 [ALLY_0240633].

[2104] *Id.* § 6.01.

[2105] *Id.* Art. VII.

[2106] *Id.* § 8.01.

[2107] *Id.* § 10.01.

facilities of comparable size and nature (and would have been typical for a syndicated credit facility with unaffiliated lenders). Provisions exemplifying an affiliate transaction that were more favorable to the A&R Line of Credit Borrowers, were the same as those provided under the Line of Credit Facilities.[2108]

The A&R Line of Credit Agreement was amended on December 23, 2010, to, among other things, add a $500 million unsecured swingline facility.[2109] In an e-mail from Joe Ruhlin (ResCap treasury executive and AFI treasury managing director), dated December 18, 2010, Ruhlin expressed concern with the TNW of RFC and stated "if [swingline] were really unsecured, it would be easy to allocate the debt to [GMAC Mortgage] or [ResCap], but with it being secured, we have the same [RFC] TNW problem."[2110] Ultimately, the swingline facility was made available solely to GMAC Mortgage.[2111] ResCap received favorable fairness opinions from Goldin Associates, one dated December 21, 2010[2112] and another dated January 4, 2011,[2113] in connection with the addition of the swingline facility. Ultimately, the unsecured swingline facility became secured under the A&R Line of Credit Agreement.[2114] The swingline was never drawn[2115] and pursuant to an amendment thereto dated, April 10, 2012, the swingline facility was terminated.[2116]

---

[2108] *See* Sections V.E.5, V.E.7.

[2109] Amend. No.4 to the A&R Line of Credit Agreement, dated Dec. 23, 2010 [RC00025467].

[2110] E-mail from J. Ruhlin (Dec. 18, 2010) [EXAM10307775].

[2111] Amend. No.4 to the A&R Line of Credit Agreement, dated Dec. 23, 2010, § 2.2 [RC00025467].

[2112] Opinion Letter from Goldin Associates to the Committee of the Independent Members of the Board of Directors of ResCap (Dec. 21, 2010) [GOLDIN00125810].

[2113] Opinion Letter from Goldin Associates to the Committee of the Independent Members of the Board of Directors of ResCap (Jan. 4, 2011) [GOLDIN00125824].

[2114] *See* Amend. No.7 to the A&R Line of Credit Agreement, dated Sept. 29, 2011 [RC00025831].

[2115] First Day Affidavit, at 26.

[2116] *See* Amend. No. 7 to the A&R Line of Credit Agreement, dated Apr. 10, 2012 [RC00026655].

The A&R Secured Revolver Loan Agreement[2117] and the A&R Line of Credit Facility[2118] were approved by the ResCap Board on December 29, 2009, and by the GMAC Mortgage[2119] and RFC[2120] boards on December 30, 2009.

On the Petition Date, an aggregate amount of $747 million under the A&R Secured Revolver Loan Agreement[2121] and $380 million under the A&R Line of Credit Facility[2122] remained outstanding.

See Appendix V.E.3 for more details on the terms of the A&R Secured Revolver Loan Agreement and Appendix V.E.8 for more details on the terms of the A&R Line of Credit Agreement.

### 9. BMMZ Repo Facility

On May 14, 2010, GMAC Mortgage and RFC each entered into separate financing agreements with Citibank[2123] and Goldman Sachs[2124] that took the form of mortgage loan repurchase facilities with an initial aggregate commitment of $300 million.[2125] ResCap

---

[2117] Action by Written Consent of the Board of Directors of Residential Capital, LLC, dated Dec. 29, 2009 [ALLY_0067456].

[2118] Action by Written Consent of the Board of Directors of Residential Capital, LLC, dated Dec. 29, 2009 [ALLY_0072506].

[2119] Action by Written Consent of the Board of Directors of GMAC Mortgage, LLC, dated Dec. 30, 2009, at ALLY_72337–48 [ALLY_0072327] (with respect to the A&R Line of Credit Facility); Action by Written Consent of the Board of Directors of GMAC Mortgage, LLC, dated Dec. 30, 2009, at ALLY_0067179–90 [ALLY_0067164] (with respect to the A&R Secured Revolver Loan Agreement).

[2120] Action by Written Consent of the Board of Directors of Residential Funding Company, LLC, dated Dec. 30, 2009, at ALLY_0067256–66 [ALLY_0067164] (with respect to the A&R Secured Revolver Loan Agreement); Action by Written Consent of the Board of Directors of Residential Funding Company, LLC, dated Dec. 30, 2009, at ALLY_0072387–97 [ALLY_0072327] (with respect to the A&R Line of Credit Facility).

[2121] First Day Affidavit, at 26.

[2122] *Id.*

[2123] Master Repurchase Agreement by and among Citibank, N.A., and GMAC Mortgage, LLC, Residential Funding Company, LLC, and Residential Capital, LLC, dated May 14, 2010 [GOLDIN00026092].

[2124] Master Repurchase Agreement by and among Goldman Sachs Mortgage Company, and GMAC Mortgage, LLC, Residential Funding Company, LLC, and Residential Capital, LLC, dated May 14, 2010 [RC00068945].

[2125] Goldin Associates Presentation to the Committee of Independent Members of the Board of Directors of ResCap Regarding Proposed Master Repurchase Facility between GMAC Mortgage, LLC and Residential Funding Company, LLC and BMMZ Holdings LLC, dated Dec. 20, 2011, at GOLDIN00129245 [GOLDIN00129238].

guaranteed the obligations of GMAC Mortgage and RFC under those repo facilities.[2126] Each of these two facilities had an initial expiration date of December 20, 2011[2127] (which were subsequently extended to January 19, 2011)[2128] and ResCap needed to either extend or refinance such facilities before they expired. Citibank expressed an interest in amending and extending its expiring repo facility in an amount large enough to also cover the then existing commitment of Goldman Sachs under its expiring facility.[2129] In connection with Citibank's repo facility proposal, Citibank required that (1) an existing MSR facility provided by Citibank not be extended beyond its March 2012 termination date; (2) there be a reduction in the size of such MSR facility from $500 million to $200 million; and (3) such MSR facility be repaid in full in four consecutive monthly payments of $50 million.[2130] The terms of the proposed Citibank repo facility were substantially similar to the terms of the expiring Citibank facility, but with proposed advance rates of 50%[2131] and a commitment fee of 75 bps ($1.875 million).[2132]

AFI proposed to ResCap a new mortgage loan repo facility to be provided by one of its Subsidiaries, BMMZ, on substantially the same terms as proposed by Citibank, but with some advantages, including (1) no commitment fee; (2) more favorable advance rates; and (3) no aggressive amortization schedule.[2133]

Goldin Associates was engaged to provide an analysis of the terms of the Citibank proposal and the terms of the BMMZ Repo Facility, and to provide a fairness opinion. Goldin Associates concluded that the BMMZ Repo Facility contained terms that were at least as favorable to ResCap and its creditors (other than AFI) as those that could reasonably be obtained by ResCap from an unaffiliated third party lender.[2134]

---

[2126] Master Guarantee of Residential Capital, LLC, in favor of Citigroup Global Markets Realty Corp., dated May 14, 2010, § 1 [GOLDIN00116743]; Master Guarantee of Residential Capital, LLC, in favor of Goldman Sachs Mortgage Company, dated May 14, 2010, § 1 [GOLDIN00035792].

[2127] Master Repurchase Agreement by and among Goldman Sachs Mortgage Company, and GMAC Mortgage, LLC, Residential Funding Company, LLC, and Residential Capital, LLC, dated May 14, 2010, § 34 [RC00068945]; Master Repurchase Agreement by and among Citibank, N.A., and GMAC Mortgage, LLC, Residential Funding Company, LLC, and Residential Capital, LLC, dated May 14, 2010, § 34 [GOLDIN00026092].

[2128] Goldin Associates Presentation to the Committee of Independent Members of the Board of Directors of ResCap Regarding Proposed Master Repurchase Facility between GMAC Mortgage, LLC and Residential Funding Company, LLC and BMMZ Holdings LLC, dated Dec. 20, 2011, at GOLDIN00129245 [GOLDIN00129238].

[2129] *Id.* at GOLDIN00129247.

[2130] *Id.*

[2131] *Id.* (the reference to the 50% advance rate was bracketed in the presentation materials and most likely indicated the advance rate was to be discussed).

[2132] *Id.*

[2133] *See id.* at GOLDIN00129249.

[2134] *Id.* at GOLDIN00129255.

The BMMZ Repo Facility was approved by the GMAC Mortgage and RFC boards, on December 20, 2011,[2135] and the ResCap Board on December 15, 2011.[2136] The BMMZ Repo Facility closed on December 21, 2011 and the initial funding thereunder was in the aggregate amount of $250 million (the entire facility commitment amount) against mortgage loans sold by GMAC Mortgage and RFC to BMMZ with an aggregate unpaid balance of approximately $932.5 million and an aggregate market value of approximately $498.7 million.[2137] Shortly after the closing of the BMMZ Repo Facility, BMMZ executed a default waiver on January 30, 2012,[2138] pursuant to which it waived the event of default under the BMMZ Repo Facility for the failure of ResCap to be in compliance with the TNW covenant for the period ending December 31, 2011.

The BMMZ Repo Facility contained closing conditions,[2139] representations and warranties,[2140] events of default[2141] and indemnification provisions[2142] that are generally customary for a repo facility. Events of default included failure to make payments,[2143] failure to remit payments under the purchased mortgage loans to the collection accounts,[2144] breaches of representations and warranties,[2145] bankruptcy,[2146] and cross-defaults to the A&R Line of Credit Agreement.[2147] Upon the occurrence of an event of default, the BMMZ Repo Sellers (RFC and GMAC Mortgage) were obligated to repurchase the purchased mortgage loans.[2148] The parties intended that the sale by the BMMZ Repo Sellers of the mortgage loans to BMMZ constitute sales and purchases and not loans, but the BMMZ Master Repo Agreement contained customary re-characterization provisions pursuant to which the BMMZ Repo

---

[2135] Action by Written Consent of the Board of Directors of GMAC Mortgage, LLC, dated Dec. 20, 2011, at ALLY_0139938–44 [ALLY_0139910]; Action by Written Consent of the Board of Directors of Residential Funding Company, LLC, dated Dec. 20, 2011, at ALLY _0139991–97 [ALLY _0139949].

[2136] Certificate of Assistant Secretary of Residential Capital, LLC, dated Dec. 19, 2011, attaching an excerpt from a Special Meeting of the Board of Directors of Residential Capital, LLC, held on Dec. 15, 2011, at ALLY_0140033–36 [ALLY_0140002].

[2137] Request/Confirmation from RFC to BMMZ, dated Dec. 22, 2011 [ALLY_0006232]; Request/Confirmation from GMAC Mortgage to BMMZ, dated Dec. 22, 2011 [ALLY_0006228].

[2138] Waiver of Default under BMMZ Master Repo Agreement, dated Jan. 30, 2012 [ALLY_0140092].

[2139] BMMZ Master Repo Agreement, § 3 [ALLY_0005646].

[2140] *Id.* § 10.

[2141] *Id.* § 11.

[2142] *Id.* § 30.

[2143] *Id.* § 11(A)(1).

[2144] *Id.* § 11(A)(2).

[2145] *Id.* § 11(D).

[2146] *Id.* § 11(I).

[2147] *Id.* § 11(M).

[2148] *Id.* § 11(R)(iii).

Sellers granted liens on the purchased mortgage loans to BMMZ in case the transactions were deemed to be loans.[2149] Dorsey & Whitney LLC, as counsel to the BMMZ Repo Sellers and to ResCap, delivered a customary opinion relating to the treatment of the transactions as a "repurchase agreement" under the Bankruptcy Code, with standard qualifications.[2150]

The BMMZ Repo Facility terminated on May 16, 2012,[2151] in connection with the transactions consummated under the Barclays DIP Financing Agreement.

See Appendix V.E.9 for more details on the terms of the BMMZ Repo Facility.

*10. Conclusion*

Based upon the above facts, the Examiner believes certain of the foregoing Related Party Transactions implicate potential claims, as discussed in more detail in Section VIII.

## F. PREPETITION ASSET SALES

*1. Overview*

This section addresses the following sales of assets to affiliates of ResCap:[2152]

- Health Capital Sale by RFC to GMAC CF in August 2007;

- June 2008 Model Home Sale by GMAC MHF to Cerberus;

- Resort Finance Sale by RFC and GMAC Canada to GMAC CF in July 2008;

- Excess Servicing Rights Sales by GMAC Mortgage to Cerberus in July 2008;

- September 2008 Model Home Sale by DOA Holding Properties, LLC to Cerberus;

- ResMor Sale by GMAC Canada to AFI in January 2009; and

- US/UK Broker-Dealer Sale by RFC to AFI in May 2009.

---

[2149] *Id.* § 6.

[2150] Opinion Letter from Dorsey & Whitney LLC to BMMZ (Dec. 21, 2011) [ALLY_0140078].

[2151] Payoff Letter from BMMZ Holdings LLC to Residential Funding Company, LLC, GMAC Mortgage, LLC and Barclays Bank PLC (May 16, 2012) [ALLY_0140096].

[2152] The Examiner's Professionals reviewed relevant information regarding the April 2010 sale by ResCap of its European mortgage asset and businesses to affiliates of Fortress and the sale of the data center to AFI in May 2012, because these two sales were identified by the Committee. However, these transactions are not addressed in this Report because the Fortress sale was not to an affiliate, and the data center sale was for an immaterial amount (approximately $6 million).

## 2. *Liquidity Concerns*

RFC, GMAC Canada, and GMAC Mortgage, each wholly owned subsidiaries of ResCap, and their affiliate sellers entered into the Prepetition Asset Sales with various affiliates in large part to address the liquidity issues ResCap faced as a result of difficulties in the mortgage industry and capital markets. Because the Prepetition Asset Sales occurred while ResCap was financially distressed within the meaning of applicable fraudulent transfer laws, the Examiner evaluated whether RFC, GMAC Canada, GMAC Mortgage, and their affiliate sellers received reasonably equivalent value in these transactions.

## 3. *Reasonably Equivalent Value*

The Examiner addressed three fundamental questions regarding REV as it relates to the Prepetition Asset Sales:

> 1. What was the form and value of the property transferred by Debtor(s)?
>
> 2. Did the Debtor(s) receive value in exchange for the property transferred, and, if so, in what form and amount?
>
> 3. Was the value received by Debtor(s) reasonably equivalent in exchange for the property transferred?

REV suggests a comparison of the property transferred from a debtor with the value actually received by a debtor. REV is not susceptible to simple formulation; rather, an analysis of REV begins with a range of values. Moreover, an assessment of REV is guided by its purpose—to protect against the unjust diminution of the bankruptcy estate.

REV may not be synonymous with Fair Market Value, although the latter may be an important factor in determining whether a debtor received REV. Ultimately, an assessment of REV requires a consideration of the totality of the circumstances in addition to a value comparison, including earmarks of an arm's-length transaction, good faith, and the degree of difference between the market value of property transferred and the value received by the debtor.

As set forth in the discussion and analysis below, the Examiner concludes that the evidence supports the proposition that RFC, GMAC Canada, GMAC Mortgage and their affiliate sellers received reasonably equivalent value in each of the Prepetition Asset Sales with the possible exception of the June 2008 Model Home Sale to a Cerberus subsidiary. With respect to the June 2008 Model Home Sale, the Examiner's Financial Advisors conclude that RFC received at least $30 million less than Fair Market Value. However, while a close question, the Examiner concludes it is more likely than not that a constructive fraudulent transfer claim against Cerberus would not succeed under prevailing law, because it is more likely than not that a court would find the value received by RFC as the equity owner of GMAC MHF, and GMAC MHF, in the June 2008 Model Home Sale to constitute reasonable equivalent value based on the totality of the circumstances.

### 4. Summaries Of The Prepetition Asset Sales

#### a. Health Capital Sale By RFC To GMAC CF In August 2007

Pursuant to an Asset Purchase Agreement dated August 27, 2007,[2153] RFC and Equity Investments II, LLC, each wholly owned subsidiaries of ResCap, sold substantially all of the assets and operations comprising Health Capital to GMAC CF for $900.5 million.

Because of ResCap's liquidity needs, the transaction was executed within a relatively short time frame. On August 17, 2007, ten days before any binding agreement had been reached[2154] and four days prior to the ResCap Board's approval of the transaction,[2155] RFC received an initial deposit of $775 million toward the final purchase price.[2156] After executing an Asset Purchase Agreement and closing the transaction on August 27, 2007,[2157] the purchase price was increased by $125.5 million to a total of $900.5 million based on an independent valuation performed by Houlihan Lokey.[2158] Based on Health Capital's net book value of $876.8 million as of closing, ResCap recognized a capital contribution from AFI of $23.7 million as a result of the sale.[2159]

As set forth in the discussion and analysis below and based on the totality of the circumstances, the Examiner concludes that the evidence supports the proposition that RFC received reasonably equivalent value in the Health Capital Sale.

##### (1) Overview Of Health Capital

Health Capital, headquartered in Dallas, Texas, was formed in 2001 as a division of RFC and provided capital solutions to the middle-market healthcare industry, primarily through asset-based, cash flow, or real estate loans.[2160] Health Capital customers included hospitals, home health agencies, nursing homes, dental practices, physician associations, durable medical

---

[2153] Asset Purchase Agreement between RFC, Equity Investments II, LLC and GMAC CF, dated Aug. 27, 2007 [ALLY_0021813].

[2154] *Id.*

[2155] Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Aug. 21, 2007, at RC40005615–18 [RC40005558].

[2156] Letter from D. Walker to G. Schultz and W. Casey (Aug. 17, 2007) [ALLY_0022003].

[2157] Asset Purchase Agreement between RFC, Equity Investments II, LLC and GMAC CF, dated Aug. 27, 2007 [ALLY_0021813].

[2158] Health Capital Valuation Analysis, prepared by Houlihan Lokey, dated Sept. 28, 2007, at ALLY_0031286 [ALLY_0031246].

[2159] Residential Capital, LLC, Quarterly Report (Form 10-Q) (Nov. 8, 2007), at 21.

[2160] Health Capital Valuation Analysis, prepared by Houlihan Lokey, dated Sept. 28, 2007, at ALLY_0031257–262 [ALLY_0031246]; Health Capital Business Overview, dated Aug. 17, 2007, at 2 [ALLY_PEO_0028626].

equipment manufacturers, and rehabilitation centers. Health Capital was one of five business units consolidated within the BCG division of RFC and accounted for approximately 11% of BCG's loan portfolio in August 2007.[2161]

Health Capital's earning assets grew from $335.6 million to $768.6 million from 2003 to 2006 and, as of the closing date of the Health Capital Sale, Health Capital had a net book value of $876.8 million.[2162] Health Capital's pre-tax net income grew from $1.2 million in 2002 to $23.6 million in 2006, and was forecasted to reach $26.5 million in 2007.[2163] Health Capital had a total of twenty-one employees, thirty-six customers, and fifty-eight loans outstanding with an average balance of $15.1 million (876.8 million net book value / 58 loans = $15.1 million) as of August 2007.[2164]

Despite its significant growth, Health Capital anticipated "significant pressure on margins due to increased competition in the industry and due to increasing ResCap funding costs."[2165] Following the downgrade of ResCap's debt to below investment grade on August 16, 2007, Health Capital's concerns regarding its access to affordable capital heightened.[2166]

When interviewed, Khattri noted that the sale of Health Capital had been discussed for some time prior to the transaction because it was considered a non-core asset for ResCap and there was a desire to "beef up" ResCap's liquidity.[2167] Bill Hall, CEO of GMAC CF, noted that he met with the Health Capital executive leadership team in spring 2007 to discuss "whether it made sense to do any type of business combination, marshal resources, pool resources."[2168] Hall continued, however, that:

> [A]t that meeting, it was collectively decided that we did not think that made sense for a whole number of reasons . . . . We thought that was the end of it, but in the early summer of '07, my recollection is I got a call from [Khattri] . . . and he was

---

[2161] Health Capital Business Overview, dated Aug. 17, 2007, at 2 [ALLY_PEO_0028626].

[2162] Appendix V.F.4.a(1); Residential Capital, LLC, Quarterly Report (Form 10-Q) (Nov. 8, 2007), at 20–21.

[2163] Notice of a Special Telephonic Meeting of the Board of Directors of Residential Capital, LLC, dated Aug. 20, 2007, at RC00016863 [RC00016856].

[2164] Draft Proposed Acquisition by GMAC CF of ResCap's Health Capital Business [ALLY_PEO_0028625]; Residential Capital, LLC, Quarterly Report (Form 10-Q) (Nov. 8, 2007), at 20–21. *See* Appendix V.F.4.a(1) (summarizing Health Capital's historical financial statements).

[2165] Notice of a Special Telephonic Meeting of the Board of Directors of Residential Capital, LLC, dated Aug. 20, 2007, at RC00016860 [RC00016856].

[2166] *Id.*; Notice of a Special Telephonic Meeting of the Board of Directors of GMAC, LLC, dated Aug. 20, 2007, at ALLY_PEO_0004039 [ALLY_PEO_0004035].

[2167] Int. of S. Khattri, Oct. 25, 2012, at 213:12–213:15.

[2168] Int. of B. Hall, Dec. 13, 2012, at 22:19–23:1.

very clear, as was Eric Feldstein in his instructions, "For a variety of reasons, we'd like you to purchase the Healthcare business, and we need you to do it extraordinarily quickly. We're trying to assist ResCap with a . . . liquidity issue and we think this is a good way to do it. So, we need you to [do] something, even if it's staged, but do something very quickly. And your instructions are, do a deal that's commercially supportable, but favors ResCap in each and every way possible." It was not to be structured as a deal that I would love to do. It was structured as a deal that I could—if I had to support—to Ally bondholders. So that's exactly what we tried to do.[2169]

### (2) Summary Of Transaction And Process

The following diagram summarizes the value exchanged between RFC and GMAC CF in the Health Capital Sale.



EXHIBIT V.F.4.a(2)
**Health Capital Sale Transaction Diagram**

Source: Asset Purchase Agreement between RFC, Equity Investments II, LLC and GMAC CF, dated Aug. 27, 2007 [ALLY_0021813]; Letter from D. Walker to G. Schultz and W. Casey (Aug. 17, 2007) [ALLY_0022003]; Health Capital Valuation Analysis, prepared by Houlihan Lokey, dated Sept. 28, 2007 [ALLY_0031246]; Residential Capital, LLC, Quarterly Report (Form 10-Q) (Nov. 8, 2007), at 21; Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Aug. 21, 2007, at RC40005616 [RC40005558].

---

[2169] Int. of B. Hall, Dec. 13, 2012, at 23:21–24:21.

AFI paid RFC a deposit of $775 million on August 17, 2007, before any binding obligation to buy the assets had been made.[2170] David Walker noted that the purpose of the advance payment was to get cash to ResCap as quickly as possible.[2171]

The ResCap Board adopted a resolution on August 21, 2007, six days prior to closing, stating that the ResCap Board saw no objection to the sale of Health Capital to "[AFI], [GMAC CF], or other affiliate" on "terms and conditions that are no less favorable to ResCap than terms and conditions prevailing for comparable transactions with non-affiliates."[2172] The ResCap August 21, 2007 board minutes also recite Khattri's statements that the transaction was being structured to be in compliance with the 2006 Amended Operating Agreement and that the mechanics ensured a fair purchase price to ResCap.[2173]

The materials sent to the ResCap Board on August 20, 2007, one day before the board meeting, provided some rationale for the sale, including that: (1) Health Capital's products and services were "more closely aligned with GMAC CF's lending business than ResCap's core consumer mortgage business"; (2) potential funding efficiencies could result from pooling the assets; and (3) there would be better access to capital for Health Capital than if it remained within ResCap.[2174] The materials also noted that the transaction was "structured to provide protection and benefit to ResCap bondholders," reciting that: (1) "ResCap bondholders benefit from the incremental liquidity generated by the sale at a time when ResCap's liquidity is under significant strain" and (2) "[t]ransaction mechanics . . . ensure a fair purchase price."[2175] The materials further note that "[d]espite the significant growth and favorable loss history at [Health Capital], the company anticipates significant pressure on margins due to increased competition in the industry and due to increasing ResCap funding costs."[2176] Additionally, the materials noted that: (1) "[c]oncern has heightened about the long-term value of the franchise following the recent ResCap downgrade to non-investment grade"; (2) "[i]mpaired access to funding will hinder future growth prospects"; (3) the "[h]igher cost

---

[2170] Letter from D. Walker to G. Schultz and W. Casey (Aug. 17, 2007) [ALLY_0022003].

[2171] Int. of D. Walker, Nov. 28, 2012, at 199:14–205:06.

[2172] Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Aug. 21, 2007, at RC40005616 [RC40005558]. In addition to approving the Health Capital Sale, Alvaro de Molina was appointed to the ResCap board at this meeting and attended the meeting.

[2173] Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Aug. 21, 2007, at RC40005616 [RC40005558].

[2174] Notice of a Special Telephonic Meeting of the Board of Directors of Residential Capital, LLC, dated Aug. 20, 2007, at RC00016858 [RC00016856]; *see* Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Aug. 21, 2007, at RC40005616 [RC40005558].

[2175] Notice of a Special Telephonic Meeting of the Board of Directors of Residential Capital, LLC, dated Aug. 20, 2007, at RC00016858 [RC00016856].

[2176] *Id.* at RC00016860.

of funds will erode profit margins"; and (4) "there is a need to preserve ResCap's scarce capital and liquidity to support the core real estate finance franchise, which is under distress in the current industry environment."[2177]

Substantially the same materials were sent to the AFI Board on August 22, 2007 for its August 22 meeting.[2178] These materials had been circulated for comment on August 17, 2007, prior to ResCap's and AFI's board meetings, to persons at AFI, GMAC CF, and ResCap. In response, George Triebenbacher replied to Linda Voss, Bill Hall, and Kevin Boland, all associated with GMAC CF, that:

> I've read this … not sure where we can add value other than beefing up the "rationale for sale" section. Do you want to have a call to discuss it? 61% of portfolio are cf loans, avg libor margin around 4.50%, huge growth in NI … scarey [sic].[2179]

When asked about this e-mail, Voss stated:

> Well I think whenever you see a significant growth in net income and growth in a portfolio there is just not a lot of experience there. You wonder well how is it that they were able to grow so quickly. Where did the assets come from? The 61 percent cash flow loans are the riskier side of loans. Average LIBOR margin about 450 so, you know, not great compared to the risk of the assets. So I think, because I said earlier, we all looked at the portfolio and it didn't look like the types of assets that we originated. They were still commercial loans, but they weren't structured the way we would structure them, priced the way we would price them for the risk and size was in particular on those three larger exposures was larger than we would have felt comfortable holding. So thinking that this was coming in and we'd have to start to manage it we all had concerns about how it was going to perform.[2180]

Voss also noted that GMAC CF did not do extensive due diligence prior to closing, nor were they asked to.[2181] GMAC CF was not "thrilled" to be getting the assets, but GMAC CF was asked to execute the transaction and accepted that the assets were going to come onto its balance sheet.[2182]

---

[2177] *Id.*

[2178] Notice of a Special Telephonic Meeting of Board of Directors of GMAC, LLC, dated Aug. 20, 2007, at ALLY_0033522–28 [ALLY_0033520].

[2179] E-mail from G. Triebenbacher (Aug. 18, 2007) [ALLY_0110156].

[2180] Int. of L. Voss, Dec. 13, 2012, at 26:5–26:24.

[2181] *Id.* at 14:6–14:9.

[2182] *Id.* at 17:14–17:22.

The AFI Board adopted on August 22, 2007, a resolution similar to the resolution adopted by the ResCap Board, stating that the Board had no objection to the acquisition of Health Capital by AFI, GMAC CF, or an affiliate "on terms and conditions that are no less favorable to the acquiring entity than terms and conditions prevailing for comparable transactions with non-affiliates."[2183] The board of directors of each of RFC,[2184] Equity Investments II, LLC,[2185] and GMAC CF[2186] approved the transaction by August 22, 2007 by written consent.

ResCap engaged Houlihan Lokey on August 24, 2007 to perform an independent valuation of Health Capital post-closing, in accordance with the terms of the Asset Purchase Agreement, which would determine the final purchase.[2187]

The Asset Purchase Agreement was executed and the transaction closed on August 27, 2007.[2188] ResCap was represented by Mayer Brown, but it does not appear that GMAC CF was represented by outside counsel. In subsequent transactions involving ResCap entities, however, Mayer Brown acted for AFI and its non-ResCap affiliates. The initial drafts of the Asset Purchase Agreement contemplated that the $775 million deposit was subject to both upward and downward adjustment; the executed agreement contained only an upward adjustment feature.[2189]

Houlihan Lokey submitted its valuation report on September 28, 2007, resulting in a $125.5 million increase from the pre-closing deposit of $775 million for a total purchase price of $900.5 million.[2190] There does not appear to have been any independent financial advisors to any of the parties nor was any fairness opinion delivered in connection with the transaction.

---

[2183] Minutes of a Special Meeting of the Board of Directors of GMAC, LLC, Aug. 22, 2007, at ALLY_PEO_0000947 [ALLY_PEO_0000860].

[2184] Unanimous Written Consent of the Board of Directors of Residential Funding Company, LLC, dated Aug. 22, 2007, at ALLY_0021951–54 [ALLY_0021922].

[2185] Unanimous Written Consent of the Board of Directors of Equity Investments II, LLC, dated Aug. 21, 2007, at ALLY_0021972–74 [ALLY_0021955].

[2186] Unanimous Consent to Action of the Board of Directors of GMAC Commercial Finance LLC, dated Aug. 22, 2007, at ALLY_PEO_0001793–99 [ALLY_PEO_0001781].

[2187] Letter Agreement between Houlihan Lokey and ResCap, dated Aug. 24, 2007 [ALLY_0021806].

[2188] Asset Purchase Agreement between RFC, Equity Investments II, LLC and GMAC CF, dated Aug. 27, 2007 [ALLY_0021813].

[2189] *See* Draft Asset Purchase Agreement between RFC, Equity Investments II, LLC, and GMAC CF, dated Aug. 20, 2007, at ALLY_0096829 [ALLY_0096810]. In the Resort Finance deal the deposit was subject to adjustment both ways and in fact the final valuation resulted in ResCap returning a substantial portion of the deposit.

[2190] Health Capital Valuation Analysis, prepared by Houlihan Lokey, dated Sept. 28, 2007, at ALLY_0031286 [ALLY_0031246].

The parties had fifteen days upon receipt of the valuation by Houlihan Lokey to give notice of any objections, which period would have expired after September 30, 2007.[2191] In an e-mail dated September 26, 2007, Khattri proposed accepting the $900.5 million valuation without objection and stated that GMAC CF would like to pay the $125.5 million post-closing adjustment to ResCap so that all outstanding issues could be finalized before quarter end, and requested that management at GMAC CF support this recommendation.[2192]

However, because GMAC CF management believed they were doing this transaction at the request of AFI, Hall replied:

> My understanding is that our team is not being asked to opine on the HL valuation process or outcome, so I'm not sure why this was directed my way. We are of course happy to deal with any administrative details as they arise in the closing of the transaction.[2193]

In a subsequent e-mail Hall stated:

> My instructions from Eric [Feldstein] have been quite clear in that I (nor members of our management team) am not being asked to opine on the valuation for a number of reasons. If the Board wishes to direct me, in my capacity as President of CFG, to accept or dispute the valuation, I would of course comply.[2194]

When Voss was asked about the Houlihan Lokey valuation report, she noted that she was not involved in the review of the report but that the report did not go into the level of detail that GMAC CF would normally have done if it were making a purchase. She noted that she would have been more involved with the transaction had it been with a third party and that "[i]f we would have looked into it the purchase price would have definitely been lower and so it would have been detrimental to ResCap which effectively would decrease the amount of cash that they were able to get from the transaction."[2195] Likewise, Hall felt the Houlihan Lokey valuation was flawed. He noted that the valuation did not look at the underlying credit quality of each individual loan, which was something that he felt was an "obvious" thing to do.[2196]

---

[2191] *See* Asset Purchase Agreement between RFC, Equity Investments II, LLC and GMAC CF, dated Aug. 27, 2007, § 2.6(b)(iii) [ALLY_0021813].

[2192] E-mail from S. Khattri (Sept. 26, 2007) [ALLY_0110345].

[2193] E-mail from B. Hall (Sept. 27, 2007) at ALLY_0110540 [ALLY_0110539].

[2194] *Id.* at ALLY_0110539.

[2195] Int. of L. Voss, Dec. 13, 2012, at 39:14–42:21.

[2196] Int. of B. Hall, Dec. 13, 2012, at 44:19–25.

Ultimately, no objections were submitted by either party and the $125.5 million true-up payment was made prior to quarter end.[2197] The transaction was reported in ResCap's SEC filings for the quarter ended September 30, 2007 as follows:

> On August 27, 2007, Residential Funding Company, LLC ("RFC") and Equity Investments II, LLC, each wholly owned subsidiaries of the Company, sold substantially all of the assets and operations comprising their healthcare finance business to GMAC Commercial Finance LLC, a wholly owned subsidiary of [AFI], pursuant to an asset purchase agreement. The Company received $900.5 million, which represents the fair value of the business as valued by an independent third-party valuation. Net book value totaling $876.8 million was transferred as part of the sale resulting in a capital contribution from [AFI] of $23.7 million.[2198]

In the same filing, ResCap described its sources of liquidity, noting:

> In the quarter, we received a capital contribution from [AFI] of $1.0 billion. In addition, our wholly owned subsidiaries, Residential Funding Company, LLC ("RFC") and Equity Investments II, LLC, sold substantially all of the assets and operations comprising their healthcare finance business to GMAC Commercial Finance LLC, a wholly owned subsidiary of [AFI], for which we received $900.5 million.[2199]

### (3) Third-Party Conclusion Of Value

The ResCap Board minutes dated August 21, 2007 reflect two possible candidates to act as the valuation agent for the transaction and note that neither had any conflict of interest.[2200] The two Independent Directors, Thomas Jacob and Thomas Melzer, agreed to give their recommendation regarding the valuation agent by the next day.[2201] Though no evidence of their recommendation was located, ResCap appointed Houlihan Lokey as the valuation agent by an engagement letter dated August 24, 2007.[2202]

_____

[2197] Request for Wire Transfer, dated Sept. 28, 2007, at ALLY_0030372 [ALLY_0030363].

[2198] Residential Capital, LLC, Quarterly Report (Form 10-Q) (Nov. 8, 2007), at 20–21.

[2199] *Id.* at 33.

[2200] *See* Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Aug. 21, 2007, at RC40005616 [RC40005558].

[2201] *See id.*

[2202] Letter Agreement between Houlihan Lokey and ResCap, dated Aug. 24, 2007 [ALLY_0021806].

On September 28, 2007, Houlihan Lokey submitted its valuation report that concluded a FMV purchase price of $900.5 million.[2203] Appendix V.F.4(a)(3) contains an overview of Houlihan Lokey's conclusion of value and key assumptions.

In summary, Houlihan Lokey developed a range of equity values based on three valuation methods: (1) the Guideline Publicly Traded Company Method; (2) the Guideline M&A Method under the Market Approach; and (3) the DCF Method. Houlihan Lokey then weighted each method equally in calculating that the market value of equity, which, after adding cash and cash equivalents, ranged from $128.7 million to $153.7 million.

Houlihan Lokey added $759.3 million in imputed debt to their equity conclusion to calculate a range of MVIC of between $888 million and $913 million. Houlihan Lokey selected the midpoint, or $900.5 million, as its conclusion of the market value of Health Capital's invested capital, implying a multiple of enterprise value to adjusted total assets of 1.03.[2204] Health Capital's net book value totaled $876.8 million as of the transaction closing, resulting in a capital contribution from AFI of $23.7 million to achieve the $900.5 million purchase price.[2205]

The Examiner's Financial Advisors reviewed and analyzed Houlihan Lokey's valuation to assess whether FMV was reasonably determined.

### (4) Analysis Of Third-Party Conclusion Of Fair Market Value

Houlihan Lokey employed three commonly used valuation methodologies for valuing the equity of Health Capital: (1) the Guideline Publicly Traded Company Method under the Market Approach; (2) the Guideline M&A Method under the Market Approach; and (3) the DCF Method under the Income Approach.

Health Capital was not a separate legal or accounting entity and, as such, did not have a reliable stand-alone balance sheet or income statement. Houlihan Lokey's approach required adjustment to certain equity-related measures such as book value of equity and net income. Houlihan Lokey used management's calculation of economic capital as a proxy for book value of equity (approximately 14% of average assets for the LTM), and estimated debt by subtracting this amount from total assets. Houlihan Lokey estimated net income by making assumptions about interest rates on debt. The Examiner's Financial Advisors consider Houlihan Lokey's approach to be reasonable given the goal of valuing assets rather than equity.

---

[2203] Health Capital Valuation Analysis, prepared by Houlihan Lokey, dated Sept. 28, 2007 [ALLY_0031246].

[2204] *Id.* at ALLY_0031286.

[2205] Residential Capital, LLC, Quarterly Report (Form 10-Q) (Nov. 8, 2007), at 20–21.

### (a) Guideline Publicly Traded Company Method

The Guideline Publicly Traded Company Method used by Houlihan Lokey considered three multiples: LTM P/E, Forward P/E, and P/TBVE. These multiples are commonly considered when completing a valuation of a financial services company such as Health Capital.

Houlihan Lokey selected six guideline companies for consideration in applying the Guideline Publicly Traded Company Method. Matt St. Charles, an AFI manager involved in the review and coordination of Houlihan Lokey's valuation analysis, expressed his opinion in internal correspondence that one of Houlihan Lokey's selected comparable companies, Financial Federal Corporation, was not a relevant comparable for valuation purposes.[2206] Financial Federal Corporation had higher multiples than the other five comparable companies selected by Houlihan Lokey.[2207]

Houlihan Lokey's selected multiple ranges for LTM P/E and P/TBVE were approximately 80% to 90% of the median of the guideline company multiples, while their range for the Forward P/E was approximately 100% to 110% of the median.[2208]

### (b) Guideline M&A Method

The Guideline M&A Method employed by Houlihan Lokey considered thirteen transactions with the earliest announced transaction dating back to April 19, 1999, approximately eight years prior to the valuation date. Six of the transactions occurred more than five years prior to the valuation date and eight occurred more than three years prior.

St. Charles expressed his opinion in internal correspondence that transactions prior to 2004 may not be relevant for valuation purposes.[2209] The Guideline M&A Method is often cited in valuation literature generally to be more relevant when there are observable transactions that occur close to the valuation date. In Houlihan Lokey's guideline transaction study, the older transactions generally had higher multiples than the more recent transactions considered. Houlihan Lokey selected a multiple range of 1.10x to 1.25x book value of equity, which was less than the mean of 1.41x or the median of 1.35x.

---

[2206] E-mail from M. St. Charles to S. Khattri (Sept. 21, 2007), at ALLY_0030393 [ALLY_0030363].

[2207] *See* Health Capital Valuation Analysis, prepared by Houlihan Lokey, dated Sept. 28, 2007, at ALLY_0031290, 307 [ALLY_0031246]. The GMAC manager further noted that Financial Federal Corp. specialized in lending to small/medium businesses in road and infrastructure construction, road transportation, and waste disposal industries and that these industries had experienced strong growth over the prior 12 months, which may explain their higher multiples. E-mail from M. St. Charles to S. Khattri (Sept. 21, 2007), at ALLY_0030393 [ALLY_0030363].

[2208] *See* Health Capital Valuation Analysis, prepared by Houlihan Lokey, dated Sept. 28, 2007, at ALLY_0031292 [ALLY_0031246].

[2209] E-mail from M. St. Charles to S. Khattri (Sept. 21, 2007), at ALLY_0030393 [ALLY_0030363].

Houlihan Lokey's selected range was more in line with the recent transactions than the older transactions. It appears Houlihan Lokey placed more reliance on the recent transactions, but did not describe this conclusion in its report. Houlihan Lokey also determined that the LTM P/E multiple calculated was not meaningful and, therefore, did not select a range of relevant multiples for this metric. Valuation multiples of earnings are often considered not meaningful when the earnings metric is negative for an acquired or public company.

Houlihan Lokey did not provide an explanation for its determination that the LTM P/E multiple was not meaningful. The low end of the range was 13.2x earnings, which would imply a value of $186.5 million when applied to Houlihan Lokey's representative level of LTM net income of $14.129 million. Therefore, any selected LTM P/E multiple within the observed range would have led to a higher indicated equity value than any of Houlihan Lokey's other indications.[2210]

### (c) DCF Method

Houlihan Lokey's final valuation was from the DCF Method under the Income Approach. Houlihan Lokey used management's projections through the fiscal year ending December 31, 2010, making adjustments for items such as loan loss provisions, cost of funding, and expense allocations to calculate cash flow to equity holders in each year. The loan loss provision, in particular, was historically above 2%; however, Houlihan Lokey adjusted the provision to equal 2%, which had the effect of increasing the valuation. St. Charles suggested in internal correspondence that had the provision been lowered even further to 1.5%, in line with some of the selected guideline companies, Houlihan Lokey's analysis would have resulted in a higher valuation.[2211]

In her interview, Voss stated that the funding costs assumed in the projected net income were low (e.g., at LIBOR plus 150 bps, instead of LIBOR plus 200 bps or higher), and that if Houlihan Lokey had used higher funding costs, then the net income would have been lower and the price could have reduced from $900.5 million to $820 million. She explained, however, that GMAC CF did not believe it was appropriate to raise that issue because any resulting change would have benefited GMAC CF to the detriment of ResCap or perhaps even AFI. Other than making certain that no one could say that GMAC CF paid too little, Voss explained that GMAC CF really did not spend a lot time trying to quantify the transaction.[2212]

---

[2210] *See generally* Health Capital Valuation Analysis, prepared by Houlihan Lokey, dated Sept. 28, 2007 [ALLY_0031246].

[2211] E-mail from M. St. Charles to S. Khattri (Sept. 21, 2007), at ALLY_0030393 [ALLY_0030363].

[2212] *See* Int. of L. Voss, Dec.13, 2012, at 46:3–48:8.

The NPV of Houlihan Lokey's projected cash flows from the valuation date through 2010 was less than one million dollars. Therefore, almost all of Health Capital's value in Houlihan Lokey's DCF was derived from its assumptions about the residual value, or the value generated by the business into perpetuity after the discrete four-year projection period. Houlihan Lokey chose to apply a residual multiple in its residual value calculation, as opposed to the capitalization of cash flow methodology (this method is discussed below). Houlihan Lokey's selection of 9.0x net income in 2010 resulted in a residual value of approximately $197 million, which when discounted to its present value equivalent was approximately $127 million.[2213] Houlihan Lokey did not identify the rationale for the selection of this multiple.[2214]

Houlihan Lokey's method for calculating residual value may have resulted in a higher value than would have been obtained using a capitalization of cash flows, an alternative and theoretically preferable method according to many valuation authorities. The capitalization of cash flows formula calculates present value as:

$$\text{Value} = (CF \times (1+g)) / (k-g)^{[2215]}$$

Assuming zero long-term growth in this formula would produce a residual value of approximately C$156 million (i.e., projected 2010 net income as adjusted by Houlihan Lokey of approximately C$22 million, divided by Houlihan Lokey's 14% discount rate). This methodology therefore would result in a lower value than Houlihan Lokey's residual value calculation of approximately $197 million. The Examiner's Financial Advisors determined that a higher long-term growth assumption would add little to the value calculated by the capitalization formula after considering that cash flow would be reduced for funding of asset growth.

### (d) Discount Rate

The discount rate selected by Houlihan Lokey of 14% was based on the MCAPM using guideline company observations such as a levered beta.

Houlihan Lokey selected a levered beta of 1.03, meaning that Houlihan Lokey assessed Health Capital to be slightly more risky than the overall market (a beta of 1.0 represents the risk of the market). The observed betas calculated by Houlihan Lokey for the six guideline companies ranged from 0.72 to 1.61.

---

[2213] *See generally* Health Capital Valuation Analysis, prepared by Houlihan Lokey, dated Sept. 28, 2007 [ALLY_0031246].

[2214] *Id.*

[2215] In the formula, "CF" stands for normalized cash flow in the base year, "g" stands for the long-term growth rate, and "k" stands for the discount rate.

The size premium, which is an additional risk premium used to account for the fact that investments in smaller companies are considered to require a greater return on investment, was based on a commonly cited study by Ibbotson Associates in the Stocks Bonds Bills and Inflation 2007 yearbook. The premium selected by Houlihan Lokey was 2.7%, which is the premium suggested by Ibbotson Associates for companies with a market capitalization between $315 million and $627 million. Houlihan Lokey's range of equity value from their DCF, however, was $120 million to $160 million.[2216] Generally, companies with higher market capitalizations have lower size premiums. Had a higher premium been selected by Houlihan Lokey, the resulting range of equity value would have been lower.

### (e) Premiums And Discounts

Customary valuation procedures make use of premiums and discounts related to the ownership characteristics of an equity interest for such matters as control (or lack of control) and lack of marketability. Houlihan Lokey did not apply any discounts or premiums in their analysis, although their analysis presumes that their conclusions of value were on a controlling interest basis.[2217] Of the three methods used by Houlihan Lokey, only one (i.e., the Guideline Publicly Traded Company Method) would ordinarily call for a control premium.

Control premiums are often quantified by reference to premiums paid in control transactions involving comparable publicly traded companies. Data published by Factset indicated that the median control premium paid in transactions during this time period involving financial services companies was approximately 20%.[2218] While such an adjustment would be a material percentage of the value of equity, the adjustment would be much smaller as a percentage of assets, as equity in the commercial finance industry represents a relatively small share of assets. Also, this adjustment would apply to only one of the methods used by Houlihan Lokey to which they gave 33.3% weight.

On the other hand, a discount for lack of marketability, which Houlihan Lokey also did not use, would apply to all three methods. Privately held entities, including divisions of public companies, generally sell at a discount relative to similar publicly traded entities.

---

[2216] *See* Health Capital Valuation Analysis, prepared by Houlihan Lokey, dated Sept. 28, 2007 [ALLY_0031246].

[2217] *See id.*

[2218] FACTSET MERGERSTAT, CONTROL PREMIUM STUDY (Q4 2007), at 20.

### (f)  Overall Assessment Of Third-Party Conclusion Of Value

Based upon the foregoing, several aspects of Houlihan Lokey's valuation analysis could merit adjustment. However, on balance these adjustments would have a downward effect on value, rather than indicating that the purchase price paid by GMAC CF to RFC was insufficient. Houlihan Lokey concluded that the value of Health Capital's assets approximated book value, which conclusion can also be corroborated by other valuation indicators.

The Examiner's Financial Advisors' review of market pricing of commercial finance companies at the time of the transaction corroborates Houlihan Lokey's analysis that equity shares generally traded at an average of approximately 120% of the book value of tangible equity. Multiples at this level indicate only a small premium over the book value of the assets (the ratio indicates a premium over equity, which comprises a relatively small portion of the capital structure of commercial finance companies that are funded largely with debt). The Examiner's Financial Advisors found that the average market-to-book ratio had little sensitivity to the choice of guideline companies; a broader set of publicly-traded finance companies than selected by Houlihan Lokey produced a similar ratio.

The Examiner's Financial Advisors' review of the financial disclosures of the guideline companies showed that the estimated fair value of financial assets, which were primarily loans as is the case with Health Capital, was similar to their carrying value at the end of 2007.[2219] This pattern would support an expectation of a valuation close to book value for the case at hand in the absence of evidence that the loan portfolio of Health Capital was of unusually poor quality. Statistics cited by Houlihan Lokey indicated that the loan portfolio had not experienced a loss since 2001, that the weighted-average credit score for Health Capital's portfolio was between 2 and 3 (based on management's credit scoring system for which 1 represented the highest quality credit on a scale of 1 to 5), and that only approximately 3% of the portfolio was rated 4 or higher.[2220]

### (5)  Conclusion Regarding Reasonably Equivalent Value

Based upon the above discussion and analysis of the Health Capital Sale and the totality of the circumstances, including but not limited to Houlihan Lokey's valuation and other market indicators, the Examiner concludes that the evidence supports the proposition that RFC received reasonably equivalent value in the Health Capital Sale.

---

[2219] *See generally* Financial Federal Corporation, Annual Report (Form 10-K) (Sept. 24, 2007); CapitalSource Inc., Annual Report (Form 10-K) (Feb. 28, 2008); CIT Group Inc., Annual Report (Form 10-K) (Feb. 29, 2008); Marlin Business Services Corp., Annual Report (Form 10-K) (Mar. 5, 2008); NewStar Financial, Inc., Annual Report (Form 10-K) (Mar. 10, 2008); Resource Capital Corp., Annual Report (Form 10-K) (Mar. 17, 2008).

[2220] *See generally* Health Capital Valuation Analysis, prepared by Houlihan Lokey, dated Sept. 28, 2007 [ALLY_0031246].

### b.   *June 2008 Model Home Sale By GMAC MHF To Cerberus*

Pursuant to a Purchase Agreement dated June 6, 2008 (the "June 2008 Model Home Purchase Agreement"),[2221] on June 9, 2008, GMAC MHF, a direct wholly owned subsidiary of RFC and indirect wholly owned subsidiary of ResCap, sold 1,614 model homes and 127 lots to CMH, an affiliate of Cerberus, for $230 million plus Class B Junior Preferred Shares in CMH with a beginning basis of $227.8 million (i.e., $457.8 million net carrying value before valuation reserves less $230 million in cash consideration received).[2222] The Class B Junior Preferred Shares were entitled to a 20% preferred return; however, redemption was contingent upon the full redemption of the Class A Senior Preferred Shares, which provided Cerberus with the greater of a 20% preferred return on its capital investment or $46 million.[2223]

As set forth in the discussion and analysis below, with respect to the June 2008 Model Home Sale, the Examiner's Financial Advisors conclude that RFC received at least $30 million less than Fair Market Value. While a close question, the Examiner concludes it is more likely than not that a constructive fraudulent transfer claim against Cerberus would not succeed under prevailing law, because it is more likely than not that a court would find the value received by RFC, as the equity owner of GMAC MHF, and GMAC MHF in the June 2008 Model Home Sale to constitute reasonably equivalent value based on the totality of the circumstances. Relevant factors, including the degree of the deficiency relative to the total transaction value of $406.9 million ($457.8 million net carrying value less valuation reserves of $50.9 million), the prevailing market conditions for sales and financings of assets of this nature, and the intangible benefits derived by RFC and ResCap from the immediate liquidity infusion as a result of the sale.

### (1) *Overview Of GMAC Model Home Finance*

GMAC MHF provided homebuilders with model home finance through one of two types of programs: either the model home program or the net lease lot program. Under the model home program, GMAC MHF acquired model homes and categorized them into discrete portfolios under a lease to a single builder, each of which was governed by a master servicing and rental agreement ("MSRA"). GMAC MHF purchased the completed model homes from the builder at 85% to 95% of the agreed upon value (i.e., the cash at closing ("CAC")) and

---

[2221] Purchase Agreement among ResCap, GMAC Model Home Finance I, LLC and CMH, dated June 6, 2008 [RC00025149].

[2222] Draft Cerberus Real Estate Capital Management, LLC Presentation, dated June 2008, at CERB03308788 [CERB033086]; Memorandum, Divestiture of Model Home Assets to Cerberus, dated June 10, 2009, at ALLY_0237920 [ALLY_0237920]; *see* Residential Capital, LLC, Current Report (Form 8-K) (June 9, 2008), Item 1.01.

[2223] Draft Cerberus Real Estate Capital Management, LLC Presentation, dated June 2008, at CERB033087 [CERB033086]. As discussed further below, ResCap had accrued an impairment of approximately $50.9 million against the book value of these model homes.

then leased the home back to the homebuilder for a period of 12 to 48 months.[2224] The homebuilder had the option to market and sell the model homes at any time during the lease period, although GMAC MHF retained the right to block any sale that would result in net proceeds below its basis. GMAC MHF's cash flows under this program were generated from monthly lease payments from the homebuilders, who also covered all carrying costs (e.g., real estate taxes and insurance), as well as from proceeds upon final disposition of the home.[2225]

GMAC MHF purchased finished lots instead of the finished model homes from homebuilders under the net lease lot program. GMAC MHF purchased the lot at 85% of the appraised value, or otherwise agreed upon value once the construction of the model home was completed.[2226] In the event subsequent construction costs to complete the model home plus GMAC MHF's accrued basis were greater than 85% of the agreed upon value, the homebuilder had the right to require GMAC MHF to reimburse them for the full amount of the cost.[2227] However, if the homebuilder exercised this right, it would typically result in the increase in the monthly rent payment for all homes within that MSRA. Also, if the homebuilder did not complete the model home within the "12-month period following [GMAC MHF's] purchase of the lot, [GMAC MHF] had the right to 'put' the lot back to the homebuilder at the price [GMAC MHF] paid for the lot, plus any accrued interest from the date of purchase to the date of the 'put.'"[2228]

### (2) Summary Of Transaction And Process

Pursuant to the June 2008 Model Home Purchase Agreement, on June 9, 2008, GMAC MHF, a direct wholly owned subsidiary of RFC and indirect wholly owned subsidiary of ResCap, sold certain model home assets to CMH, an affiliate of Cerberus.[2229]

The subject assets consisted of 1,614 model homes located in 72 metropolitan statistical areas throughout the United States and 127 lots located in Phoenix, Arizona, and had a book value at the transaction date of approximately $479.2 million and a related liability of $21.4 million, for a net book value before valuation reserves of approximately $457.8 million.[2230] RFC received consideration consisting of $230 million cash and Class B Junior Preferred

---

[2224] Draft Cerberus Investment Overview, CMH, dated June 6, 2008, at CERB032934 [CERB032933]. *See* Letter from Houlihan Lokey to Peter Rumbold (Aug. 28, 2008), at CERB013935 [CERB013934].

[2225] Draft Cerberus Investment Overview, CMH, dated June 6, 2008, at CERB032934 [CERB032933].

[2226] *Id.*

[2227] *Id*.

[2228] *Id.*

[2229] Purchase Agreement among ResCap, GMAC Model Home Finance I, LLC and CMH, dated June 6, 2008 [RC00025149].

[2230] Draft Cerberus Real Estate Capital Management, LLC Presentation, dated June 2008 [CERB033086]; Memorandum, Divestiture of Model Home Assets to Cerberus, dated June 10, 2009, at ALLY_0237920 [ALLY_0237920].

Shares in CMH with a beginning basis of $227.8 million (i.e., $457.8 million net carrying value prior to valuation reserves less $230 million in cash consideration received) in exchange for transferring these assets to CMH.[2231] The Class B Junior Preferred Shares were entitled to a 20% preferred return, but redemption was contingent upon the full redemption of the Class A Senior Preferred Shares.[2232]

The Class A Senior Preferred Shares were held by a Cerberus affiliate (Cerberus ResCap Asset Investors, LLC, or "CRAI") , had a beginning basis of $230 million and were entitled to the greater of either (1) a minimum 20% return on the $230 million (i.e., $46 million) or (2) a 20% preferred return per annum on its capital account.[2233] Another Cerberus affiliate (Cerberus ResCap Financing, LLC, or "CRF") entered into a term loan with CMH in a principal amount equal to the $230 million for the purpose of funding CMH's payment of the cash consideration and a revolving loan facility with CMH of up to $10 million in aggregate principal amount for the purpose of providing funding for the ongoing operations of CHM (together, the "CMH Loans"). The CMH Loans bore interest at a rate of 15% per annum and compounded quarterly to the extent not paid in cash. The CMH Loans had a maturity date of June 30, 2013 and were secured by a pledge on all of the assets of CMH.

The 15% interest on the $230 million term loan was subsumed within the 20% minimum return guaranteed to Cerberus as holder of the Class A Senior Preferred Shares. As specified in the amended and restated limited liability company agreement of CMH between GMAC MHF and Cerberus (the "CMH LLC Agreement"):[2234]

> "Class A Senior Unreturned Preferred Capital" means, with respect to the outstanding Class A Senior Preferred Units, an aggregate amount initially equal to the sum of (i) 10,000 and (ii) all amounts contributed to [CMH] by the Class A Senior Preferred Members on or after the Closing to fund expenses associated with the Transferred Assets and their operation, maintenance, development or disposition, and increased by a preferred return equal to the difference between (A) the greater of (I) 20% of the Cash Amount [i.e., $230 million * 20% = $46 million] and (II) a 20% per annum return (calculated on a daily basis) on the aggregate amount of the Cash Amount and the

---

[2231] Draft Cerberus Real Estate Capital Management, LLC Presentation, dated June 2008, at CERB033087–88 [CERB033086]; Memorandum, Divestiture of Model Home Assets to Cerberus, dated June 10, 2009, at ALLY_0237920 [ALLY_0237920].

[2232] Draft Cerberus Real Estate Capital Management, LLC Presentation, dated June 2008, at CERB033087 [CERB033086]. As discussed further below, ResCap had accrued a valuation reserve of approximately $50.9 million against the book value of these model homes.

[2233] Amended and Restated Limited Liability Company Agreement of CMH, dated June 6, 2008 [CERB000423].

[2234] *Id.*

amounts specified in the foregoing clauses (i) and (ii) (provided, that, solely for the purposes of this clause (II), the Cash Amount shall be adjusted, subject to Section 6.02(b)(iii), from time to time, such that any repayment of principal of any [CMH] Loan shall be deemed to reduce the Cash Amount effective as of the date of such repayment and any additional borrowings under the Loan Agreement shall be deemed to increase the Cash Amount effective as of the date of such borrowing), compounded annually, and (B) the aggregate amount of interest paid by [CMH] to the Lender in respect of the [CMH] Loans (it being understood that any amounts distributed pursuant to Section 5.02(a)(i) with respect to such Class A Senior Preferred Units decreases the amount of Class A Senior Unreturned Preferred Capital by a corresponding amount).[2235]

The CMH LLC Agreement identified CRAI, a wholly owned subsidiary of Cerberus, as the Class A Senior Preferred Member,[2236] GMAC MHF as the Class B Junior Preferred Member,[2237] and Cerberus as the manager. CRAI was also identified as the sole holder of Common Unit Shares in CMH.

The purpose of CMH, according to the CMH LLC Agreement, was to acquire the model home assets pursuant to the June 2008 Model Home Purchase Agreement, dispose of them, and distribute and reinvest distributable cash in accordance with the CMH LLC Agreement.[2238] In furtherance of this purpose, the CMH LLC Agreement states:

[CMH] shall use commercially reasonable efforts to conduct an orderly sale of the Transferred Assets in arm's-length transactions through nationally recognized brokers to be retained by [CMH]. The sale of the Transferred Assets shall be conducted through an auction process or such other process as shall be recommended by such nationally recognized brokers. . . . Notwithstanding anything to the contrary in this Agreement, the terms and conditions of any sales of the Transferred Assets shall be subject to the prior approval of the Manager, which approval shall not be unreasonably withheld.[2239]

---

[2235] *Id.* at § 1.01.

[2236] *Id.*

[2237] *Id.*

[2238] *Id.* at § 2.05(a).

[2239] *Id.* at § 2.05(b).

After repayment of the CMH Loans to Cerberus, distributions of distributable cash were to be made as follows:

> [F]irst, 100% to the Class A Senior Preferred Members, pro rata to each Class A Senior Preferred Member in accordance with the percentage of Class A Senior Preferred Units held by each Class A Senior Preferred Member, until the Class A Senior Unreturned Preferred Capital of each such Class A Senior Preferred Member is zero;
>
> [S]econd, 100% to the Class B Junior Preferred Members, pro rata to each Class B Junior Preferred Member in accordance with the percentage of Class B Junior Preferred Units held by each Class B Junior Preferred Member, until the Class B Junior Unreturned Preferred Capital of each such Class B Junior Preferred Member is zero;
>
> [T]hird, subject to Section 5.02(e), 100% to the Class B Junior Preferred Members, pro rata to each Class B Junior Preferred Member in accordance with the percentage of Class B Junior Preferred Units held by each such Class B Junior Preferred Member, until the Class B Junior Preferred Member Reimbursable Costs is zero; and
>
> [F]ourth, 100% to the Common Unit Members, pro rata to each Common Unit Member in accordance with the percentage of Common Units held by each such Common Unit Member.[2240]

---

[2240] *Id.* at § 5.02(a).

The following diagram summarizes the value exchanged between RFC and GMAC CF in the June 2008 Model Home Sale.

EXHIBIT V.F.4.b(2)
**June 2008 Model Home Sale Transaction Diagram**

☐ Parties to the June 2008 Model Home Purchase Agreement



① **Background**:
Concurrent with the June 2008 Model Home Purchase Agreement, GMAC MHF, Cerberus, and CRAI entered into the CMH LLC Agreement, with Cerberus as manager

Residential Capital, LLC ("ResCap")

100% (indirectly)

Residential Funding Company, LLC ("RFC")

Seller: | 100%

② $230 million cash at closing ("Cash Amount") plus Class B Units

GMAC Model Home Finance I, LLC ("GMAC MHF")

⑤ **See below.

① 100% Class B Junior Preferred Units ($227.8 million)[1]

100%

Subsidiary Assets Sold:

GMAC Model Home Finance, LLC

LENOne, LLC

GMCMTH, LLC

KBOne, LLC

② $457.8 million NBV in model homes, option lots, lending receivables, and other real estate

⑤ **Second priority distribution of Class B Junior Preferred Unreturned Capital equal to $227.8 million and increased by a preferred return equal to 20% per annum (calculated on a daily basis) compounded annually. Distributions to Class B Junior Preferred Units are made only after the Class A Senior Preferred capital account is zeroed out, and until the Class B capital account is zero

Cerberus Capital Management, L.P. ("Cerberus")

100% | 100%

Cerberus ResCap Financing LLC ("CRF")

Cerberus ResCap Assets Investors LLC ("CRAI")

① $230 million term loan at 15% compounded quarterly and $10 million revolving credit facility

① 100% Class A Senior Preferred Units and Common Units (100% of voting rights)

① $10,000 capital contribution

Purchaser: CMH Holdings LLC ("CMH")

④ First priority distribution of Class A Senior Preferred Unreturned Capital equal to the sum of (i) $10,000 capital contribution and (ii) any additional amounts contributed to CMH after the Closing, and increased by a preferred return equal to the difference between (A) the greater of (I) 20% of the Cash Amount and (II) a 20% per annum return (calculated on a daily basis) on the aggregate amount of the Cash Amount and (B) the aggregate amount of interest paid by CMH to CRF in respect of the Loans. Distributions to Class A Senior Preferred Units are made only after repayment of the Loans, and until the Class A capital account is zero

⑥ Third priority distribution to Common Units after repayment of the Loans and Class A Senior Preferred and Class B Junior Preferred capital accounts are zero

[1] $227.8 million capital account = $457.8 million NBV in assets sold less $230.0 million cash at closing.

*Source: Purchase Agreement among ResCap, GMAC MHF, and CMH, dated June 6, 2008 [RC00025149]; Amended and Restated Limited Liability Company Agreement of CMH, dated June 6, 2008 [CERB000423]; Memorandum, Divestiture of Model Home Assets to Cerberus, dated June 10, 2009 [ALLY_0237920].*

Cerberus viewed the transaction as offering an attractive risk/reward profile, with downside risk mitigated because Cerberus's basis of $230 million represented a substantial discount to its assessment of the underwritten, fair market, and book value of the assets.[2241] Cerberus analyzed over a thousand recent closings, pending contracts, offers, and third-party listings related to the model home portfolio to verify market pricing. Cerberus had also been monitoring and valuing AFI's entire model home portfolio on a monthly basis as part of its normal asset management practices.[2242] The model home assets were to be sold on an orderly basis in arm's-length transactions through an auction process following the sale to CMH.[2243]

The transaction was approved by the ResCap Board on June 1, 2008,[2244] subject to the receipt, review, and approval of, ResCap's executive committee of final versions of the underlying commitment letter and term sheet that were presented to the ResCap Board. On June 9, 2008,[2245] the ResCap Board subsequently resolved that the transaction was completed on terms not materially less favorable to ResCap and its relevant subsidiaries (i.e., RFC and GMAC MHF) than those that could reasonably have been obtained in a comparable arm's-length transaction by ResCap or such subsidiaries with an unaffiliated party.

Pursuant to the 2006 Amended Operating Agreement, ResCap was required to have at least two Independent Directors at all times and AFI was obligated to fill any vacancy as promptly as practical.[2246] At the time that ResCap approved the transaction there was only one Independent Director on the ResCap Board.[2247]

The transaction appears to have moved quickly with only four business days elapsing between the execution of Cerberus's underlying commitment letter on June 2, 2008[2248] and the consummation of the transaction on June 9, 2008. The commitment letter stated that Cerberus had not completed its diligence on the proposed assets as of June 2, 2008.[2249]

---

[2241] *See* Draft Cerberus Investment Overview, CMH, dated June 6, 2008 [CERB032933].

[2242] Draft Cerberus Real Estate Capital Management, LLC Presentation, dated June 2008 [CERB033086].

[2243] Residential Capital, LLC, Current Report (Form 8-K) (June 3, 2008), at 4.

[2244] Minutes of a Meeting of the Board of Directors of Residential Capital, LLC, June 1, 2008, at RC40005749–60 [RC40005652].

[2245] Unanimous Written Consent of the Board of Directors of Residential Capital, LLC, dated June 9, 2008, at RC40005772–80 [RC40005652].

[2246] *See* 2006 Amended Operating Agreement, § 2(f).

[2247] The only Independent Director at the time of approval was Edward Smith, who had been appointed earlier in May. Karin Hirtler-Garvey was added as an additional Independent Director on June 13, 2008. *See* Section IV.A.

[2248] Letter from Cerberus to ResCap (June 2, 2008), at EXAM31326394–98 [EXAM31326384].

[2249] *Id.*

The ResCap Board authorized and approved the issuance of a waiver on June 13, 2008, retroactively to have effect on and as of June 9, 2008, of the "Investment in Affiliates Covenants" contained in the 2006 Amended Operating Agreement in respect of ResCap's investment in CMH as a material component of the transaction.[2250] The covenant prohibited ResCap from making an investment in any AFI affiliate.[2251] Separate Independent Director approval was not needed to waive this covenant.[2252]

ResCap accounted for the transaction as a financing and consolidated CMH into ResCap with a minority interest recognized on the balance sheet, although the transaction was structured as a sale in form.[2253]

In connection with the transaction, ResCap entered into a servicing agreement with CMH pursuant to which ResCap agreed to provide, at CMH's request, all services provided by ResCap and its subsidiaries with respect to the subject assets prior to CMH's acquisition of such assets (including ownership, operation, maintenance and disposition-related services).

### (3) Lack Of Third-Party Conclusion Of Value Or Fairness Opinion

Neither of the parties appears to have engaged independent financial advisors to perform valuations or opine on the fairness of the transaction.

### (4) Reasonably Equivalent Value Analysis

The primary issue for REV purposes is the Fair Market Value of the Class B Junior Preferred Shares, which is directly affected by the 20% minimum preferred return guaranteed to Cerberus as holder of the Class A Senior Preferred Shares.

The Class A Senior Unreturned Preferred Capital, as defined in the CMH LLC Agreement, included a 20% per annum preferred return on its $230 million basis plus any subsequent capital contributions, with a minimum guaranteed payment of $46 million.[2254] The Class B Junior Unreturned Preferred Capital, as defined in the CMH LLC Agreement,[2255] also included a

---

[2250] Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, June 13, 2008, at RC40005781–86 [RC40005652].

[2251] See 2006 Amended Operating Agreement, § 2(a).

[2252] See id. at § 2.

[2253] Minutes of a Meeting of the Audit Committee of Residential Capital, LLC, July 28, 2008, at RC40015179–210 [RC40015158].

[2254] Amended and Restated Limited Liability Company Agreement of CMH, dated June 6, 2008, § 1.01 [CERB000423].

[2255] Id.

20% per annum preferred return on its $227.8 million basis. However, based upon the priority of distributions, the value of the Class B Junior Unreturned Preferred Capital was contingent upon the proceeds from the sales of model home assets by CMH first satisfying the CMH Loans from Cerberus and the 20% preferred return on the Class A Senior Preferred Units, as defined in the CMH LLC Agreement,[2256] also held by Cerberus.[2257]

Assuming a one-year time frame to dispose of the model homes (for demonstrative purposes), the Class B Junior Preferred Members[2258] would not receive a distribution until Cerberus had been repaid the $230 million term loan and any amount outstanding on the $10 million facility and, as the Class A Senior Preferred Member,[2259] had been paid the greater of its 20% preferred return, or $46 million (i.e., $230 million * 20%). The one-year time-frame to dispose of the model homes implies a monthly run rate of approximately $33.9 million in sales based on estimated proceeds of $406.9 million.[2260] This assumption is corroborated by the actual sales of model homes reported by CMH over the five-month period following the transaction, in which $38.5 million in sales proceeds were generated on average each month, plus an additional $1.5 million on average in monthly proceeds from lease payments.[2261] Further, by December 31, 2008, CMH had sold 1,022 model homes generating aggregate proceeds of $234 million and had another 158 homes under contract to be sold.[2262] By March 31, 2009, CMH had sold a total of 1,228 model homes (or 76% of the total), an additional 53 were under contract to be sold, and Cerberus had received a full return of its capital plus interest and its preferred return totaling approximately $276 million (i.e., $230 million loan plus $46 million interest and preferred return).[2263] CMH repaid the $230 million principal by February 2, 2009,[2264] which, together with the $46 million preferred return, equates to an annualized return of 32% on Cerberus's investment of $230 million.[2265]

---

[2256] *Id.*

[2257] Memorandum, Divestiture of Model Home Assets to Cerberus, dated June 10, 2009, at ALLY_0237920 [ALLY_0237920].

[2258] Amended and Restated Limited Liability Company Agreement of CMH, dated June 6, 2008, § 1.01 [CERB000423].

[2259] *Id.*

[2260] *See* Ex. V.F.4(b)(4)–1.

[2261] *See* GMAC Model Home I Funding and Proceeds from Sale, dated Nov. 17, 2008 [CERB024371].

[2262] Draft Investor Letter from Cerberus Institutional Real Estate Partners, L.P. (Feb. 2009), at CCM00214549 [CCM00214545].

[2263] Investor Letter from Cerberus Institutional Real Estate Partners, L.P. (Mar. 31, 2009), at CCM00215547 [CCM00215539]; CMH Consolidating GAAP Balance Sheet as of March 31, 2009 [CERB041100] (showing that the balance remaining on the $230 million loan and $46 million interest due to Cerberus is zero).

[2264] CMH Loan Repayment Schedule [EXAM00345879].

[2265] Draft Cerberus Investment Overview, CMH, dated June 6, 2008, at CERB032935 [CERB032933] (projecting an IRR of 25.6% on Cerberus's investment in CMH).

By June 2008, the housing and capital markets were experiencing the impact of the subprime mortgage crisis, which resulted in a general and prolonged depreciation of home values across the country. As discussed in further detail below, at the time of this transaction with Cerberus, RFC had already accrued a $50.9 million valuation reserve associated with the $457.8 million model home net assets (approximately $22 million of which related to the model homes comprising the $227.8 million basis of Class B Junior Preferred Shares). Although RFC released the valuation reserve as a result of the transaction, it reflects RFC's belief that the full $457.8 million was unlikely to be recovered. An internal forecast prepared by RFC as of June 19, 2008[2266] projected declining home prices through the remainder of 2008 and 2009, with only modest recovery beginning in 2010,[2267] the period over which CMH planned to dispose of the model home assets. Similarly, a contemporaneous analysis prepared by Cerberus as of June 11, 2008 projected weighted-average annual home declines for the portfolio of model home assets acquired by CMH of 17.5%, 9.8%, and 3.8% in 2008, 2009, and 2010, respectively.[2268]

For demonstrative purposes, assuming RFC's net carrying value of model home assets less valuation reserves (i.e., $406.9 million) was a reasonable estimate of the Fair Market Value of the assets at the closing date, the proceeds to the Class B Junior Preferred Members after a one-year disposal period would be limited to approximately $130.9 million, as summarized in the table below.

EXHIBIT V.F.4.b(4)—1
**Proceeds to Class B Junior Preferred Members After One Year (Demonstrative)**
*($ in Millions)*

| | | |
|---|---|---:|
| Net asset value (book) of model homes | $ | 457.8 |
| *Less:* ResCap valuation reserve | | 50.9 |
| Estimated proceeds from sale of model homes | | 406.9 |
| *Less:* Repayment of term loan to Cerberus | | 230.0 |
| *Less:* 20% preferred return to Cerberus | | 46.0 |
| Residual proceeds available to Class B Junior Preferred Members | $ | 130.9 |

*Source: Purchase Agreement among ResCap, GMAC MHF, and CMH, dated June 6, 2008 [RC00025149]; Amended and Restated Limited Liability Company Agreement of CMH, dated June 6, 2008 [CERB000423]; Memorandum, Divestiture of Model Home Assets to Cerberus, dated June 10, 2009 [ALLY_0237920].*

_____

[2266] *See* E-mail from J. Morris (June 21, 2008) [CERB026886].

[2267] *See* Model Home Portfolio Financial Model, dated May 31, 2008 [CERB026887].

[2268] Draft Cerberus Investment Overview, CMH, dated June 6, 2008, at CERB032935 [CERB032933].

Over the same period, the Class B Junior Unreturned Preferred Capital account would have appreciated by 20% from $227.8 million to $273.4 million; however, the proceeds from the asset disposals would fall short of satisfying this full amount by approximately $142.5 million, as summarized in the table below.

EXHIBIT V.F.4.b(4)—2
**Class B Junior Unreturned Capital Account Appreciation (Demonstrative)**
*($ in Millions)*

| | | |
|---|---|---:|
| Beginning basis of Class B Junior Preferred Shares | $ | 227.8 |
| *Plus:* 20% preferred return | | 45.6 |
| Ending basis (after one year) | | 273.4 |
| *Less:* Residual proceeds (from above) | | 130.9 |
| Remaining Class B Junior Unreturned Preferred Capital | $ | 142.5 |

Source: Purchase Agreement among ResCap, GMAC MHF, and CMH, dated June 6, 2008 [RC00025149]; Amended and Restated Limited
  Liability Company Agreement of CMH, dated June 6, 2008 [CERB000423]; Memorandum, Divestiture of Model Home Assets to
  Cerberus, dated June 10, 2009 [ALLY_0237920].

Under the above scenario, the Class B Junior Preferred Members would receive proceeds of $130.9 million, which is nearly $100 million less than the beginning basis in CMH of $227.8 million. This result is attributable in roughly equal parts to the assumed reduction in market values versus the original transaction value (i.e., $50.9 million) and the 20% preferred return to Cerberus (i.e., $46 million). This demonstrative analysis is corroborated by the cash flow forecast prepared by Cerberus as of June 11, 2008, in which Cerberus estimated that nominal proceeds from the sale of model homes and lot options, net of transaction costs, plus rental income, would be $436.7 million.[2269] After repayment of the $230.0 million loan and $46.0 million preferred return to the Class A Senior Preferred Units, Cerberus estimated residual proceeds available to the Class B Junior Preferred Units would be $160.7 million (i.e., $436.7 million less $276.0 million total return to Cerberus) before discounting to present value.

Hindsight further corroborates the above scenario. CMH's remaining assets as of March 31, 2009, the point by which Cerberus had received its $276 million, totaled $131.3 million, comprised of $120 million in CMH's portfolio of model homes and $10.8 million in cash.[2270] RFC would receive nearly $100 million less than its beginning basis in CMH assuming a 100% recovery of these remaining assets, which was unlikely given forecasted market conditions.

The relevant comparison, however, is the value of the proceeds RFC would have received had it disposed of the model home assets itself compared to the value of the $230 million cash at closing and interest in Class B Junior Preferred Shares of CMH. With the assumption that

---

[2269] *Id.*

[2270] CMH Consolidating GAAP Balance Sheet as of March 31, 2009, at CERB041100–104 [CERB041100].

GMAC MHF and CMH could dispose of the assets equally[2271] and that RFC and ResCap did not need an immediate cash infusion, the primary valuation issue under these disposal scenarios is the 20% preferred return to Cerberus in exchange for $230 million in cash at closing. Holding all else equal in the above disposal scenarios, had GMAC MHF liquidated the assets itself, the proceeds to RFC would have been approximately $46 million higher on an undiscounted basis—or the amount of the preferred return to the Class A Senior Preferred Members.

This $46 million difference alone is insufficient in analyzing whether RFC received REV. An immediate cash need was, in fact, a key driver of this transaction given ResCap's liquidity position in mid-2008, as described in Section VI. Inasmuch as this sale was accounted for by RFC as a financing transaction, rather than a true sale, the primary issue becomes whether the 20% minimum preferred return to Cerberus was comparable to the cost of financing ResCap may have otherwise been able to obtain on a $230 million loan as of June 2008.

The CMH Loans bore interest at 15% per annum compounded quarterly. Holding all else equal in the above scenario in which all model home assets are sold ratably over one year, CMH would have repaid the $230 million term loan to CRF in approximately seven months and paid a total of approximately $11.9 million in interest. However, CMH would still owe CRAI an additional $34.1 million to satisfy the 20%, or $46 million, minimum preferred return to the Class A Senior Preferred Members. In other words, CMH's financing costs would have been $34.1 million less, and its proceeds from the disposition of model home assets $34.1 million greater, had CMH only been obligated to pay the 15% interest per the terms of the $230 million term loan from CRF.

During the June 1, 2008 ResCap Board meeting, Marano commented that the 20% return was comparable to DIP financing rates.[2272] No basis or analysis was discussed during the meeting or provided in Marano's interview, however, to substantiate this position. While a comparison to DIP financing rates is of questionable relevance, in a presentation to the Independent Directors dated December 19, 2008 (related to a separate transaction), Goldin Associates reported that "[DIP] loans originated since June 2008 had mean pricing of LIBOR

---

[2271] One could argue either that Cerberus and its affiliates, as over-secured lenders and underwater common equity holders of CMH, could have had the incentive to liquidate these properties quickly at discounted prices, or that the additional liquidity provided by the $230 million CMH Loans and the involvement of Cerberus as an investor could have allowed a more orderly and thorough marketing process to maximize the value of the model home assets. Regardless, no direct evidence of either has been identified in the Investigation, and ResCap continued to provide ownership, operation, maintenance and disposition-related services. Thus, an assumption that there would have been no difference in disposition results is appropriate.

[2272] Minutes of a Meeting of Board of Directors of Residential Capital, LLC, June 1, 2008, at RC40005752 [RC40005652].

plus 498 bps and additional fees."[2273] The 22 DIP loans reflected in Goldin Associates' analysis ranged in amount from $30 million to $1.185 billion (with an average of $260 million), with spreads over LIBOR ranging from 150 bps to 750 bps, and fees ranging from 25 bps to 275 bps. The Examiner's Financial Advisors' review of market DIP rates during this time corroborates Goldin Associates' analysis.

During 2008, the 12-month LIBOR ranged from approximately 2.0% to 4.2% with an average of approximately 3.1%.[2274] Utilizing the 2008 average 12-month LIBOR and the ranges reflected in Goldin Associates' DIP analysis implies a range of DIP financing rates (including fees) of 4.85%[2275] to 13.35%[2276] with an average of 9.58%.[2277] By comparison, ResCap's short-term and long-term borrowings from AFI for the year ended December 31, 2008 each bore interest at 4.2%.[2278]

Assuming, arguendo, that comparison to DIP financing is relevant and that CMH could have obtained financing at a rate of 10% (comparable to the average DIP rate over the relevant period), CMH would have repaid the $230 million within approximately seven months and paid approximately $7.7 million in financing costs, or $38.3 million less than the 20%, or $46.0 million guaranteed minimum return to Cerberus and its affiliates (assuming a one-year disposal period and holding all else equal in the above scenario). In other words, had CMH obtained a DIP financing-based interest rate on the $230 million loan, the undiscounted consideration CMH received could have been approximately $38.3 million greater.

Had CMH been able to obtain $230 million in financing at 4.2% (i.e., ResCap's rate for AFI borrowings over this period), CMH would have paid only $3.2 million in financing costs in the above scenario, or $42.8 million less than the $46.0 million.

Actual subsequent financial results indicate that CMH paid Cerberus and its affiliates approximately $11.2 million in interest on the $230 million term loan, or $34.8 million less than it otherwise would have paid, but for the $46 million, 20% preferred return guaranteed to Cerberus.[2279] Had CMH even paid 20% interest per annum compounded quarterly on the $230 million term loan, rather than the 20% minimum preferred return of $46 million, CMH's financing costs would have been $30 million less.

---

[2273] Draft Goldin Associates Presentation to the Committee of Independent Members of the Board of Directors of Residential Capital Regarding Proposed Amendment to the Secured Line of Credit with GMAC, LLC, dated Dec. 19, 2008, at 17 [GOLDIN00127127].

[2274] US DOLLAR LIBOR RATES 2008, http://www.global-rates.com/interest-rates/libor/american-dollar/2008.aspx.

[2275] 3.1% LIBOR plus 150 bps spread and 25 bps fees.

[2276] 3.1% LIBOR plus 750 bps spread and 150 bps fees.

[2277] 3.1% LIBOR plus 498 bps spread and 275 bps fees.

[2278] Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2009), at 154.

[2279] CMH Loan Repayment Schedule [EXAM00345879].

This transaction was in form a sale and in substance a financing. However, Cerberus expected to earn not only a financing rate of return but a significant preferred return despite investing only $10,000 in equity above the $230 million CMH Loans. In an investment summary prepared as of June 11, 2008, immediately following the closing of the transaction, Cerberus projected an IRR on its investment in CMH of 25.6%.[2280] However, according to Cerberus's analysis:

> Cerberus'[s] expected IRR is greater than 20% due to assumed sales pace in the Cerberus projection, which is much slower than the historical sales pace. Therefore, Cerberus'[s] IRR may actually be much higher if the sales pace exceeds the forecasted sales pace in the Cerberus'[s] analysis.[2281]

The September 2008 Model Home Sale process could be considered an indicator of required returns from investors on model home assets. On July 10, 2008 (approximately one month after the June 2008 Model Home Sale), Young asked Brian Murray, managing director at ResCap, for his view of the IRR implied by Cerberus's bid, to which Murray responded, "I do not believe we would be able to get bids with an IRR much lower than 20%."[2282] Murray's assessment apparently was premised on "two large bids in process in which Lennar will be buying back their models (in the CMH) at an IRR in 20% range, and Jack Buck . . . looking to buy us out (ResCap) in the same 20% IRR range."[2283] Young responded, "[t]his would leave me to believe that their bid is in the fair value range for a bulk sale. Then our decision is do we take the cash now or run it out over two years, or some combination of both, if possible."[2284] Young forwarded Murray's analysis to Marano and Weintraub on the same day, commenting:

> Bottom line, this analysis indicates it would take us around 2 years to sell off the model homes at a cash npv of approx. 15% higher than [Cerberus's] bid. However, the NPV is discounted at 10% which is low to me. I've asked the team to run at a yield to [Cerberus]—it looks like will be around 20% which doesn't seem out of line.[2285]

---

[2280] Draft Cerberus Investment Overview, CMH, dated June 6, 2008, at CERB032941 [CERB032933].

[2281] *Id*. at CERB032936.

[2282] E-mail from B. Murray to J. Young (July 10, 2008) [EXAM10399483].

[2283] *Id.*

[2284] E-mail from J. Young to B. Murray (July 10, 2008) [EXAM10399483].

[2285] E-mail from J. Young to T. Marano and J. Weintraub (July 10, 2008) [EXAM12115217].

However, these transactions required potential investors to commit funds to purchasing the model homes at their Fair Market Value and assume the full risk of subsequent changes in value. By comparison, Cerberus advanced only 50% of the net book value of the model home assets (before valuation reserves) in the form of $230 million in secured CMH Loans, on which it was guaranteed a minimum 20% return. As such, the 20% IRR described in Young's e-mails is not consistent with the economics of the transaction structure in the June 2008 Model Home Sale.

An inquiry into REV should also consider other intangible or nonfinancial consideration received by the transferor in evaluating the import of any potential deficiency in Fair Market Value identified. As discussed in Section V.E, RFC's parent, ResCap, was experiencing reduced availability in third-party financing at the time of the June 2008 Model Home Sale. Further, ResCap's worsening liquidity, as described in Section VI, was a key driver of this transaction.

### (5) Conclusion Regarding Reasonably Equivalent Value

With respect to the June 2008 Model Home Sales, the Examiner's Financial Advisors conclude that RFC received at least $30.0 million less than Fair Market Value, considering the differential between the cost of financing CMH may have been able to obtain under different financing scenarios (i.e., between 4.2% and 20% per annum) and the $46 million return guaranteed to Cerberus.

However, based on the above discussion and analysis and the totality of the circumstances, while a close question, the Examiner concludes it is more likely than not that a court would find the value received by RFC, constitute reasonably equivalent value. Relevant considerations include but are not limited to the degree of the deficiency relative to the total transaction value of $406.9 million (net of valuation reserves), the prevailing market conditions for sales and financings of assets of this nature, and the intangible benefits derived by RFC and ResCap from the immediate liquidity infusion as a result of the sale.

### c. Resort Finance Sale By RFC And GMAC Canada To GMAC CF In July 2008

Pursuant to an Asset Purchase Agreement dated July 2, 2008[2286] (the "RF Asset Purchase Agreement") on July 31, 2008, RFC and GMAC Canada, each an indirect wholly owned subsidiary of ResCap, sold substantially all of Resort Finance, including the equity of RFC Resort Funding, LLC, to GMAC CF for cash consideration of $96.1 million plus the assumption of $1.125 billion of debt. GMAC FS paid RFC a deposit of $250 million on June 3, 2008 before GMAC CF had entered into any binding obligation to buy the Resort Finance assets[2287] RFC returned $153.9 million of the deposit to GMAC FS upon closing.[2288]

---

[2286] Asset Purchase Agreement between RFC, LLC, GMAC Canada, and GMAC CF, dated July 2, 2008 [RC00024026].

[2287] Letter from R. Hull to T. Marshall (June 3, 2008) [ALLY_0100979].

[2288] GMAC Canada's audited financial statements disclose that GMAC Canada sold construction finance loans in the Resort Finance Sale for $24.6 million and recorded no gain or loss on the sale. *See* GMAC Residential Funding of Canada, Limited Non-Consolidated Financial Statements, dated Dec. 31, 2008, at EXAM00233417 [EXAM00233396]; *see also* First Amendment to APA [ALLY_0130062].

Houlihan Lokey was engaged to value Resort Finance and, on July 24, 2008, submitted its valuation conclusion of $74.6 million, the mid-point of its concluded range of value between $50.7 million and $98.6 million.[2289] The RF Asset Purchase Agreement was amended by the First Amendment dated as of July 26, 2008 (the "First Amendment"), which set the purchase price at $96.1 million, near the high end of the Houlihan Lokey range.[2290] The First Amendment further provided that, in the event that Resort Finance was resold within three years of the closing, the sellers would receive a portion of any profit on the sale.[2291] ResCap unsuccessfully marketed Resort Finance to potential buyers during the fourth quarter of 2007 and the first two quarters of 2008. Immediately following the Resort Finance Sale, GMAC CF continued the effort to market and sell Resort Finance to a third party,[2292] which it was finally able to do during the third quarter of 2010, albeit at a loss.[2293]

As set forth in the discussion and analysis below and based on the totality of the circumstances, the Examiner concludes that the evidence supports the proposition that RFC and GMAC Canada received reasonably equivalent value in the Resort Finance Sale. The Resort Finance Sale purchase price was later increased by $15 million from $96.1 million to $111.1 million, according to ResCap's Form 10-K for 2008.

### (1) Overview Of Resort Finance

Resort Finance was one of five business units consolidated within RFC's BCG division and provided real estate finance solutions to middle-market resort developers to, inter alia, finance acquisitions, develop timeshare properties, and meet working capital needs to grow their business. "The company's capital solutions ranged from acquisition, development, and construction loans ('AD&C Loans') to working capital lines of credit secured by timeshare receivables ('Receivables Loans')."[2294]

---

[2289] *See* Houlihan Lokey Valuation Analysis of Resort Finance as of June 30, 2008, dated July 24, 2008, at 3 [ALLY_0102229].

[2290] *See id.*

[2291] First Amendment to APA [ALLY_0130062].

[2292] *See, e.g.*, E-mail from B. Hall to S. Ramsey (June 24, 2008) [ALLY_0113803]; E-mail from D. Baker (July 20, 2008) [ALLY_0114077]; E-mail from L. Voss to B. Hall (June 6, 2008) [ALLY_0112625]; Int. of L. Voss, Dec. 13, 2012, at 76:7–20.

[2293] Int. of L. Voss, Dec. 13, 2012 at 77:5–78:17.

[2294] Houlihan Lokey Valuation Analysis of Resort Finance as of June 30, 2008, dated July 24, 2008, at 8 [ALLY_0102229].

Appendix V.F.4.c(1) provides Resort Finance's historical financial statements. Resort Finance experienced strong organic growth in commitments and loans outstanding since its inception in 2002, as summarized in the following table.[2295]

EXHIBIT V.F.4.c(1)
**Resort Finance Organic Growth in Commitments and Loans Outstanding**
*($ in Millions)*

|                   | 2002    | 2003    | 2004      | 2005      | 2006      | 2007 YTD  | CAGR |
|-------------------|---------|---------|-----------|-----------|-----------|-----------|------|
| Commitments       | $ 340.0 | $ 758.5 | $ 1,249.2 | $ 1,453.5 | $ 1,798.4 | $ 2,182.6 | 52%  |
| Loans outstanding | 36.7    | 364.3   | 683.4     | 692.0     | 1,142.8   | 1,385.4   | 136% |

*Source: Memorandum, GMAC Resort Finance, prepared by Bear Stearns, dated Dec. 2007 [HL2929].*

Resort Finance grew its pre-tax income from $0.3 million to $36.6 million, and its pre-tax return on average earning assets grew from 0.2% to 3.9%, from 2003 (its first full year of operations) through September 2007.

### (2) Summary Of Transaction And Process

ResCap began marketing Resort Finance to potential third-party buyers beginning in the fourth quarter of 2007 and engaged Bear Stearns to handle the process.[2296] Bear Stearns reported to ResCap in a January 13, 2008 presentation that marketing efforts began in mid-November 2007, forty-four teaser letters were sent out, eleven confidentiality agreements were executed and confidential information memoranda disseminated, and six initial proposal letters were received, all from strategic buyers.[2297] The initial proposals ranged from 87.00% to 99.75% of the outstanding unpaid balance ("UPB") of Resort Finance's portfolio of loans.[2298] On February 21, 2008, RFC entered into the $750 million Resort Finance Facility with AFI to obtain bridge financing while ResCap searched for a third party to purchase Resort Finance, as discussed in Section V.E.1. ResCap Board minutes from early 2008 indicate that ResCap was still expecting to close a sale in the second quarter of 2008,[2299] although no agreement with any third party was ever reached.

Thereafter, the concept of selling Resort Finance to an affiliate seemed to move quickly. Young noted in an e-mail to Marano and Jones on May 23, 2008 that, "with the fading asset sales and other situations" there is a need for ResCap to raise $650 million to $1 billion in short

---

[2295] *Id.* at HL2937. Memorandum, GMAC Resort Finance, prepared by Bear Stearns, dated Dec. 2007, at HL2935 [HL2929].

[2296] Engagement Letter from Bear Stearns to ResCap (Jan. 22, 2008) [ALLY_0113551].

[2297] Bear Stearns Presentation Regarding Project Time Off Preliminary Indications of Interest, dated Jan. 13, 2008, at 1 [ALLY_0030327].

[2298] *Id.* at 2.

[2299] *See* Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Mar. 17, 2008, at RC40005667 [RC40005652].

term cash to be comfortable with its cash situation and have the option to hold certain assets to increase value realization over time.[2300] Young noted that ResCap and AFI needed to decide quickly on actions.[2301] One of the items proposed was to sell Resort Finance to a related party for $250 million before a "haircut."[2302]

GMAC FS paid RFC a deposit of $250 million on June 3, 2008, before GMAC CF had entered any binding obligation to purchase Resort Finance.[2303] The RF Asset Purchase Agreement established that the purchase price was to be based on the Fair Market Value of the assets as of June 30, 2008, as determined by an independent valuation.[2304]

The ResCap Board approved, on June 1, 2008, the company or its subsidiaries entering into a sale transaction with affiliates, subject to subsequent executive committee approval or ratification.[2305] The executive committee approved and ratified, on June 2, 2008, the resolutions adopted by the ResCap Board on June 1.[2306] The Board of Directors of RFC, one of the sellers,[2307] authorized the transaction, along with other affiliate transactions, in a general resolution on June 3, 2008.[2308]

Pursuant to the 2006 Amended Operating Agreement, ResCap was required to have at least two Independent Directors at all times and AFI was obligated to fill any vacancy as promptly as practical.[2309] At the time that ResCap approved the transaction there was only one

---

[2300] E-mail from J. Young (May 23, 2008) [EXAM10175040].

[2301] *Id*.

[2302] *Id*.

[2303] Letter from R. Hull to T. Marshall (June 3, 2008) [ALLY_0100979].

[2304] *See* Asset Purchase Agreement between RFC, GMAC Canada, and GMAC CF, dated July 2, 2008, § 2.6(b)(i) [RC00024026].

[2305] Minutes of a Meeting of Board of Directors of Residential Capital, LLC, June 1, 2008, at RC40005755 [RC40005652].

[2306] Unanimous Written Consent of the Executive Committee of the Board of Directors of Residential Capital, LLC, dated June 2, 2008, at RC40006443–87 [RC40006437]. The Examiner's Counsel notes that the version of this written consent review was signed by two of the three members of the executive committee, however, under the ResCap LLC Agreement in effect at the time, written consents of the ResCap Board were not required to be signed by all directors.

[2307] Minutes, if they exist, approving the execution of the agreement by GMAC Canada, one of the two sellers, have not been produced for review.

[2308] Action by Written Consent of the Board of Directors of Residential Funding Company, LLC, dated June 3, 2008, at ALLY_01187968–34 [ALLY_0118759].

[2309] *See* 2006 Amended Operating Agreement, § 2(f).

Independent Director on the ResCap Board.[2310] Independent Director approval of a transaction like this sale was not required under the 2006 Amended Operating Agreement. However, under the 2006 Amended Operating Agreement, any material affiliate transaction was required to be "on terms and conditions that are consistent with those that parties at arm's-length would agree to and for fair value,"[2311] absent a waiver by the Independent Directors.[2312] Based on a review of the RF Asset Purchase Agreement and the negotiations that took place, the terms generally appear to be at arm's-length; value is discussed below.

The transaction was approved prior to the execution of the Junior Secured Notes Indenture and the Senior Secured Notes Indenture, but the agreement was signed after execution of those indentures. Thus, the affiliate transactions covenant in the June 2008 Indentures (section 4.11 thereof) was applicable to the sale. However, because the final purchase price was under $500 million, no fairness opinion was required to be delivered to the trustee for these indentures and, because the final purchase price was under $250 million, no certification from an officer of ResCap was required to be delivered to the trustee pursuant to this covenant. However, because the consideration was in excess of $10 million, the transaction was still required to be on terms not materially less favorable than those that could reasonably be obtained in a comparable arm's-length transaction with an unaffiliated party.[2313] The Morgan Stanley fairness opinion permitted a copy of the fairness opinion to be delivered to the trustee under these Indentures.[2314] The Quarterly Report on Form 10-Q for the quarterly period ended June 30, 2008 filed by ResCap, noted "[t]he Resort Finance assets were not part of the primary collateral securing the senior secured credit facility or the notes issued in the Company's private exchange offers."[2315]

The June 2, 2008 Current Report on Form 8-K filed by ResCap noted:

> ResCap believes that each of the transactions described above complies with the proposed indentures governing the new notes being offered in ResCap's private exchange offers as if such indentures were in effect and governing such transactions. The consummation of each of the transactions described above is

---

[2310] Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, June 13, 2008, at RC40005781–86 [RC40005652]. The only Independent Director at the time of approval was Edward Smith who had been appointed earlier in May. Karin Hirtler-Garvey was added as an additional Independent Director on June 13, 2008. *See* Section IV.A.

[2311] 2006 Amended Operating Agreement, § 2(b).

[2312] *Id*. § 8.

[2313] June 2008 Indentures, §4.11 [GOLDIN00000019; ALLY_0122066].

[2314] Opinion Letter from Morgan Stanley to the Board of Directors of ResCap (July 30, 2008), at RC00028117 [RC00028114].

[2315] Residential Capital, LLC, Quarterly Report (Form 10-Q) (Aug. 8, 2008), at 39.

> subject to a number of conditions; accordingly, there is no
> assurance that all of the transactions will be consummated or
> that they will be consummated within the timeframes described
> above.[2316]

The Board of Directors of GMAC CF, subsequently approved the transaction on June 23, 2008.[2317] The GMAC CF board minutes refer to a May 31, 2008 meeting of the AFI Board, and recite that "[AFI] has decided that [Resort Finance] should be acquired by [GMAC CF] and has directed [GMAC CF] to enter into an asset purchase agreement with RFC for the purchase of the Business."[2318]

The parties executed the RF Asset Purchase Agreement on July 2, 2008 and closed the sale on July 31, 2008.[2319]

The transaction appears to have been negotiated by both sides.[2320] There were multiple drafts of the RF Asset Purchase Agreement exchanged between counsel. The first draft distributed by AFI did not contain a downward adjustment of the deposit, which would have been consistent with the structure of the Health Capital Sale between the same parties executed in August 2007.[2321] The two-way adjustment was added later. Skadden, acting for the sellers, tried to eliminate the downward adjustment on the deposit and to obtain better terms for RFC on the post-closing indemnities.[2322]

In response to a series of e-mails on the status of negotiations,[2323] Richard Kent, in-house counsel at AFI, wrote to persons at AFI, GMAC CF, and Mayer Brown (purchaser's counsel):

> I apologize if I seem to be picking on [Voss]. I'm not picking on
> [Voss], she is only doing her job. Likewise the [sic] ResCap and

---

[2316] Residential Capital, LLC, Current Report (Form 8-K) (June 3, 2008), at 5 (referencing the Resort Finance Sale).

[2317] Minutes of a Special Meeting of Board of Directors of GMAC Commercial Finance LLC, June 23, 2008, at ALLY_PEO_0001822 [ALLY_PEO_0001813].

[2318] The minutes for this meeting, if it did take place, have not been produced for review.

[2319] Asset Purchase Agreement between RFC, GMAC Canada, and GMAC CF, dated July 2, 2008 [RC00024026]; *see also* Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2009), at 90.

[2320] *See, e.g.*, E-mail from E. Raymond (June 1, 2008) [ALLY_0111575]; E-mail from L. Voss (June 16, 2008) [ALLY_0113450]; E-mail from R. Kent (June 16, 2008) [ALLY_0113453]; E-mail from A. Land (July 30, 2008) [ALLY_0114354].

[2321] *See* Draft Asset Purchase Agreement between RFC, GMAC Canada, and GMAC CF, dated June 9, 2008, at ALLY_0108962 [ALLY_0108960].

[2322] *See* Draft Asset Purchase Agreement between RFC, GMAC Canada, and GMAC CF, dated June 9, 2008 [ALLY_0108960].

[2323] E-mail from R. Kent (June 16, 2008) [ALLY_0113453].

their lawyers are only doing their jobs. Maybe my e-mail should
have been addressed to Melissa. I suggested that a list be
developed and Melissa and I would arbitrate. In any event [AFI]
needs to address these business issues. What I'm disappointed with
is ResCap renegotiating [sic] issues they have agreed too [sic] and
wasting money on lawyers negotiating a deal that was suppose
[sic] to be market driven. My response was to say that their
demands are not market. I instructed Mayer Brown to draft a
middle of the road agreement. We have already done this once
with Health Capital. It was done in record time with not all of this
difficulty. Sorry for the frustration."

In response to Kent's e-mail, Robert Hull, the CFO of AFI noted "[t]he ResCap group is not
making this easy."[2324]

Even before the RF Asset Purchase Agreement was signed, GMAC CF was preparing to
resell the Resort Finance as soon as possible[2325] and was evaluating financial advisors to assist in
the process.[2326] In an e-mail dated June 6, 2008, Voss expressed the desire to retain Bear Stearns
(then under JP Morgan ownership) to continue marketing Resort Finance to third parties on
AFI's behalf. She further commented that, "[a]t this point, the sale of [Resort Finance] will
continue to be pursued, but [AFI] doesn't think it is likely that this will occur in the next 6 to 12
months."[2327] ResCap's STM noted, "[a]s of the date of the transaction, the ultimate intention at
the corporate level is to sell the Resort Finance to a third party and, essentially, monetize the
business as quickly as possible. This directive was made at the AFI corporate level."[2328] Voss
confirmed in her interview that the intent of GMAC CF upon acquiring Resort Finance was
immediately to begin the process of selling it to a third party.[2329] She explained that the only
reason GMAC CF purchased Resort Finance to immediately turn it around, rather than let
ResCap market and sell the business, was because ResCap needed cash.[2330] Voss stated that
Resort Finance was completely different from GMAC CF's business and that GMAC CF did
even less due diligence on Resort Finance than it did on Health Capital.[2331]

---

[2324] E-mail from R. Hull (July 17, 2008) [ALLY_0113453].

[2325] E-mail from B. Hall to S. Ramsey (June 24, 2008) [ALLY_0113803].

[2326] E-mail from D. Baker (July 20, 2008) [ALLY_0114077].

[2327] E-mail from L. Voss to B. Hall (June 6, 2008) [ALLY_0112625].

[2328] ResCap STM, Resort Finance Sale to GMAC CF, at EXAM00220238 [EXAM00220235].

[2329] Int. of L. Voss, Dec.13, 2012, at 76:7–20.

[2330] *Id.* at 76:21–77:4.

[2331] *Id.* at 60:8–19.

As noted above the RF Asset Purchase Agreement established the purchase price was to be based on the Fair Market Value of the assets as of June 30, 2008 as determined by an independent valuation.[2332] The parties agreed to engage Houlihan Lokey as the valuation expert on July 2, 2008.[2333] On July 24, 2008, Houlihan Lokey submitted its valuation conclusion of $74.6 million, the mid-point of its concluded range of value between $50.7 million, and $98.6 million.[2334] However, rather than base the purchase price on Houlihan Lokey's conclusion, the parties executed the First Amendment, which set the purchase price at $96.1 million, near the high end of the Houlihan Lokey range.[2335] The First Amendment further provided that in the event that Resort Finance was resold within three years of the closing, the sellers would receive a portion of any profit on the sale.[2336] This upside sharing arrangement appears to have arisen as a compromise, with the parties agreeing not to use the Houlihan Lokey valuation directly to establish the price and instead agreeing to a purchase price of $96.1 million and the sharing arrangement.[2337]

Hall stated in his interview that he was asked to support taking the higher end of the range of the Houlihan Lokey valuation, which he did agree to do in the spirit of GMAC CF trying to "do the right thing as much as we could for our sister company."[2338] Hall also noted that they included the upside sharing arrangement but that they "laughed about it, because we knew there wasn't any chance of that manifesting itself."[2339]

Voss, CFO and COO of GMAC CF, stated in her interview that "[w]e spent several days negotiating that [profit-sharing clause] into our agreement because the [ResCap] folks felt that it was worth more than what it sold for."[2340] Voss continued:

> And we're—we said fine, "If you think it's worth more, we're happy to put this in the agreement." You know, I wasn't real thrilled spending the days negotiating that profit-sharing

---

[2332] *See* Asset Purchase Agreement between RFC, GMAC Canada, and GMAC CF, dated July 2, 2008, § 2.6(b)(i) [RC00024026].

[2333] *See* Agreement with respect to Valuation Expert, dated July 2, 2008 [ALLY_0113933].

[2334] *See* Houlihan Lokey Valuation Analysis of Resort Finance as of June 30, 2008, dated July 24, 2008, at 3 [ALLY_0102229].

[2335] *See id.*

[2336] First Amendment to APA [ALLY_0130062].

[2337] *See* E-mail from L. Voss (July 25, 2008) [ALLY_0114323] (discussing ResCap having objections to the valuation and then discussing the terms of the upside sharing arrangement, which terms were reflected in the terms of the First Amendment).

[2338] Int. of B. Hall, Dec. 13, 2012, at 89:4–8.

[2339] *Id*. at 89:15–17.

[2340] Int. of L. Voss, Dec.13, 2012, at 77:15–18.

agreement because they're hard to structure. But, you know, we did it because that's what they wanted. And, so, if there would have been any upside, [ResCap] would have gotten it. And because it needed to be a true sale, we [i.e., GMAC CF] couldn't build any—in any downside protection for us. So, it was extremely one sided to—so, there's no way that deal could have been a bad deal for ResCap.[2341]

Although the First Amendment including the profit-sharing clause was adopted, Voss expressed her doubts that any deferred purchase price would be payable to ResCap:

We felt that it was extremely overvalued when we bought it. The purchase document did include a mechanism, whereby, if we sold it for—if we sold it externally for more than we bought it from Resort, that ResCap would get, you know, some portion of the upside . . . So, we bought it at 82 percent and we sold it at around 65 percent. So, during the period of time [GMAC CF] owned it, we lost about $340 million.[2342]

The First Amendment calculated the $96.1 million purchase price by employing an Asset-Based Approach approach, as depicted in the following table:[2343]

EXHIBIT V.F.4.c(2)—1
**Purchase Price Calculation per the First Amendment**
*($ in Millions)*

| | | |
|---|---|---:|
| Total assets | $ | 1,488.9 |
| *Less:* Cash & cash equivalents | | 1.4 |
| Assets excluding cash & cash equivalents | | 1,487.5 |
| | | |
| 82% mark of assets excluding cash & cash equivalents | | 1,219.8 |
| *Plus:* Cash & cash equivalents | | 1.4 |
| *Less:* GMAC Facility | | 750.0 |
| *Less:* Deutsche Bank Facility | | 375.0 |
| Purchase price at closing, rounded | $ | 96.1 |

*Source: First Amendment to APA [ALLY_0130062].*

---

[2341] *Id*. at 77:18–78:6.

[2342] *Id*. at 77:9–15, 78:14–17.

[2343] First Amendment to APA, at Ex. A [ALLY_0130062].

As a result of the purchase price established by the First Amendment, RFC returned $153.9 million of the $250 million deposit, netting $96.1 million. However, ResCap later announced in its public filings a total transaction value of $111.1 million, stating, "[t]his purchase price represents the net asset value of the business, appraised by a third-party."[2344] The revised number reported in ResCap's public filings modified the $96.1 million cash purchase price for an unspecified $15 million error in the Houlihan Lokey report after it was reviewed by ResCap and AFI management.[2345] ResCap's auditors noted in their workpapers that the $15 million adjustment was made for "liabilities mistakenly left out of third party valuation."[2346]

The First Amendment does not explicitly attribute the calculation of the $96.1 million based on the 82% mark to Houlihan Lokey, though the public filings continued to refer to a third-party valuation. If the calculation was indeed intended to be derived based on Houlihan Lokey's Asset-Based Approach, which is where the 82% mark appears to originate,[2347] then there appear to be two errors—not just one—in the purchase price calculation used in the First Amendment. Taking both errors into consideration would have resulted in a modified purchase price of $108.3 million, rather than $111.1 million (see discussion below for further detail).

Morgan Stanley delivered a fairness opinion dated July 30, 2008 to the ResCap Board that the transaction at $96.1 million was fair from a financial point of view to the sellers. The fairness opinion disclosed that Robert Scully, a member of the Office of the Chairman and a Managing Director of Morgan Stanley, was serving as a member of the AFI Board, bringing into question Morgan Stanley's independence relative to this transaction.[2348] There do not appear to have been any independent financial advisors to any of the parties.

---

[2344] Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2009), at 16.

[2345] *See* ResCap STM, Resort Finance True-Up SOPA, at EXAM00220464 [EXAM00220463].

[2346] Resort Finance Net Assets, dated June 30, 2008 [PWC09192]. Had the $15 million in liabilities been included in the calculation per the First Amendment, the purchase price would have been $15 million lower (i.e., $96.1 million less $15 million). However, the purchase price was set at $96.1 million, and that is what ResCap received. Afterward, it appears that ResCap discovered it still had the $15 million in liabilities on its books and that AFI either assumed the debt or paid ResCap an addition $15 million, thus creating the $15 million gain that increased total consideration from $96.1 million to $111.1 million per ResCap's SEC filings. Documentation confirming that RFC received the additional $15 million in consideration was not produced for review in the Investigation.

[2347] *See* Houlihan Lokey Valuation Analysis of Resort Finance as of June 30, 2008, dated July 24, 2008, at 34 [ALLY_0102229].

[2348] Opinion Letter from Morgan Stanley to the Board of Directors of ResCap (July 30, 2008) [RC00028114].

The following diagram summarizes the value exchanged between RFC and GMAC CF in the Resort Finance Sale.



EXHIBIT V.F.4.c(2)—2
**Resort Finance Sale Transaction Diagram**

Source: Asset Purchase Agreement between RFC, LLC, GMAC Canada, and GMAC CF, dated July 2, 2008 [RC00024026]; First Amendment to APA [ALLY_0130062]; Houlihan Lokey Valuation Analysis of Resort Finance as of June 30, 2008, dated July 24, 2008 [ALLY_0102229]; Minutes of a Meeting of the Board of Directors of Residential Capital, LLC, June 1, 2008 [RC40005652]; Letter from R. Hull to T. Marshall (June 3, 2008) [ALLY_0100979].

### (3) Third-Party Conclusion Of Value

Although Houlihan Lokey's conclusion of value was not ultimately adopted, it appears from ResCap's SEC filings and the calculation of the purchase price under the First Amendment that Houlihan Lokey's Asset-Based Approach was considered in establishing the 82% mark used in the calculation of the $96.1 million purchase price.

Appendix V.F.4.c(3) provides a summary of Houlihan Lokey's conclusion of value and key assumptions. In summary, Houlihan Lokey developed a range of Fair Market Value for the net transferred assets (assets less assumed obligations) based on two approaches: the Guideline Publicly Traded Company Method under the Market Approach and the Adjusted Book Value Method under the Asset-Based Approach.

Houlihan Lokey calculated a range of enterprise values for each approach employed and then averaged the low and high values from each approach to determine a range of $1.174 billion to $1.222 billion. After adding cash of $1.4 million, and subtracting obligations of $375.0 million related to a Deutsche Bank facility and $750.0 million related to an AFI facility, the resulting range of value for the net transferred assets was $50.7 million to $98.6 million. Houlihan Lokey selected the midpoint, or $74.6 million, as its conclusion of the Fair Market Value of the net transferred assets of the Resort Finance business.[2349] Resort Finance's net book value totaled $349.2 million as of the valuation date, implying a 0.21x book value multiple to Houlihan Lokey's concluded Fair Market Value.

### (4) Analysis Of Third-Party Conclusion Of Fair Market Value

As discussed in greater detail below, the Examiner's Financial Advisors consider Houlihan Lokey's Adjusted Book Value Method, upon which the 82% mark appears to have been based, to be a reliable indicator of the Fair Market Value of Resort Finance. The Examiner's Financial Advisors do not consider Houlihan Lokey's Guideline Publicly Traded Company Method to be a reliable indicator of Fair Market Value.

### (a) Guideline Publicly Traded Company Method

The Guideline Publicly Traded Company Method used by Houlihan Lokey considered three multiples: Annualized P/E,[2350] P/NBV, and EV/TA. Although the Annualized P/E and P/NBV multiples are commonly considered when valuing a financial services company such as Resort Finance, the use of an EV multiple, such as EV/TA, is questionable. When valuing

---

[2349] *See* Houlihan Lokey Valuation Analysis of Resort Finance as of June 30, 2008, dated July 24, 2008, at 3 [ALLY_0102229].

[2350] Or "Net Income." Houlihan Lokey annualized the net income for the six months year-to-date for the period ending June 30, 2008. *See* Houlihan Lokey Valuation Analysis of Resort Finance as of June 30, 2008, dated July 24, 2008, at 30 [ALLY_0102229].

the equity of financial firms, analysts generally employ methods that directly measure equity value, such as through the P/E and P/NBV multiples, rather than trying to define and quantify EV, such as through the EV/TA multiple. Debt funding is an integral part of the business operations of such companies, which is a key justification for preferring equity multiples over EV multiples.

Houlihan Lokey selected four guideline companies in applying the Guideline Publicly Traded Company Method and selected multiples near and in some cases below the lowest data point of the indicated range.[2351] Houlihan Lokey did perform a "risk ranking" analysis whereby it compared Resort Finance to the guideline companies based on different financial measures, including: interest income; net interest margin to total assets; selling, general, and administrative ("SGA") costs to interest income; SGA to interest income; SGA to total assets; net income to return on assets; net income to return on equity; loan loss percentage; and net income to net income margin. Resort Finance ranked at, or second to, the worst in eight of the nine categories.[2352]

Houlihan Lokey selected a range of Annualized P/E multiples of 7.0x to 8.0x, which was lower than the observed range of the LTM P/E multiples of the guideline companies.[2353] Additionally, Houlihan Lokey used an annualized[2354] net income of $12.3 million for the period ended June 30, 2008 despite higher LTM net income of $19.2 million for the same period ended. Houlihan Lokey did not explain why it used the lower annualized income, which is also inconsistent with the measure utilized for the guideline companies. Houlihan Lokey and Morgan Stanley both noted in their respective reports that cash flow projections (against which annualized and LTM earnings could have been compared) were not available for the Resort Finance business.[2355]

Houlihan Lokey also selected a range of P/NBV of 0.2x to 0.3x. In correspondence with AFI, representatives of Houlihan Lokey were reluctant to support a valuation conclusion at the upper end of the overall concluded range because of where they "[thought] the assets would sell" and the previous "long and failed effort to sell this asset [i.e., by Bear Stearns]."[2356] Houlihan

---

[2351] Houlihan Lokey Valuation Analysis of Resort Finance as of June 30, 2008, dated July 24, 2008, at 28 [ALLY_0102229].

[2352] *See id.* at 32

[2353] *Id.* at 28 [ALLY_0102229]. The lowest observed LTM P/E multiple was 10.6x for NewStar Financial, Inc. The range of LTM multiples was 10.6x to 12.3x. *Id.* at 31

[2354] Houlihan Lokey Valuation Analysis of Resort Finance as of June 30, 2008, dated July 24, 2008, at 28 [ALLY_0102229] ("assuming the same level of earnings for the remaining six months of 2008").

[2355] *See* Houlihan Lokey Valuation Analysis of Resort Finance as of June 30, 2008, dated July 24, 2008, at 5 [ALLY_0102229]; Opinion Letter from Morgan Stanley to the Board of Directors of ResCap, dated July 30, 2008, at RC00028115 [RC00028114].

[2356] E-mail from R. Hull (July 25, 2008) [EXAM10171978].

Lokey selected low and high multiples of P/NBV that were both below the lowest observed multiple among the set of guideline companies—approximately 51% and 77% of the lowest observed multiples.[2357] Similarly, Houlihan Lokey selected a range of Annualized P/E multiples that was below the lowest estimate of the guideline group of companies. Houlihan Lokey concluded upon a range of Annualized P/E multiples of 7.0x to 8.0x, or 66% and 75% of the lowest meaningful LTM P/E multiple estimates.[2358]

In the Examiner's Financial Advisors' experience, when the subject company's financial position or performance appears to justify selected multiples below the observed range, as is the case in Houlihan Lokey's analysis of Resort Finance, the reliability of the Guideline Publicly Traded Company Method as an indicator of Fair Market Value must be assessed. In such situations, the question arises as to how much lower than the observed range would be appropriate as a reliable measure of value. In support of its selection of multiples relative to the observed range, Houlihan Lokey noted, "[w]e generally selected capitalization multiples near the bottom of the range due to, among other things, lower margins, higher customer and industry concentration, smaller size, and uncertain future prospects."[2359]

These factors, when taken together with the other weakness in Houlihan Lokey's market multiple analyses noted above, indicate that the Guideline Publicly Traded Company Method (to which Houlihan Lokey applied a 50% weight) is not a reliable indicator of the Fair Market Value of Resort Finance. The Examiner's Financial Advisors instead considered Houlihan Lokey's Asset-Based Approach (discussed immediately below) to be a reliable indicator of Fair Market Value.

### (b) Asset-Based Approach

Houlihan Lokey used the Adjusted Book Value Method under the Asset-Based Approach to value Resort Finance's assets. The Adjusted Book Value Method is a commonly applied method when valuing financial companies.

---

[2357] CIT's LTM P/NBV was 0.39x and had the lowest P/NBV of the selected comparable set of companies. Houlihan Lokey Valuation Analysis of Resort Finance as of June 30, 2008, dated July 24, 2008, at 32 [ALLY_0102229].

[2358] NewStar's LTM P/E was 10.6x and had the lowest P/E of the selected comparable set of companies. Houlihan Lokey did not compute CIT's P/E estimate and it was determined as not meaningful. Houlihan Lokey Valuation Analysis of Resort Finance as of June 30, 2008, dated July 24, 2008, at 32 [ALLY_0102229].

[2359] Houlihan Lokey Valuation Analysis of Resort Finance as of June 30, 2008, dated July 24, 2008, at 28 [ALLY_0102229].

To value Resort Finance's portfolio of loans, Houlihan Lokey considered the "nature and terms of each loan, the borrowers' credit profiles, and the level of collateral as compared to the principal amount and lack of marketability of the investment" in order to determine the Fair Market Value of the loans.[2360]

Houlihan Lokey sampled 88.4% of Resort Finance's AD&C Loans and Receivables Loans and concluded on an aggregate mark to Fair Market Value of between 81.2% and 83.2% of the UPB.[2361] In analyzing the Fair Market Value of the loans, Houlihan Lokey also considered the following: a DCF analysis of the loans using appropriate risk adjusted returns; market spreads, yields, and credit statistics for comparable debt instruments; and the prepayment expectations for the loans.

Contemporaneous to Houlihan Lokey's determination of the value-to-par multiples range of 81.2% to 83.2% (with a mid-point of 82.2%) for the loans, on May 16, 2008 Morgan Stanley presented an analysis to the ResCap Board of the estimated recovery of ResCap's portfolio of assets under two premises: an orderly liquidation and a rapid liquidation.[2362] Morgan Stanley estimated the recovery of the Resort Finance assets to range between 70.0% and 80.0% of the gross carrying value on an orderly liquidation basis and 50.0% to 70.0% of the gross carrying value on a rapid liquidation basis.[2363] Morgan Stanley's analysis under the orderly liquidation premise of value corroborates Houlihan Lokey's conclusion of an estimated recovery of the Resort Finance business assets of between 81.2% and 83.2% based on its Adjusted Book Value Method.

Using the Adjusted Book Value Method, Houlihan Lokey determined a range of enterprise value between $1.225 billion and $1.226 billion higher than its range using the Guideline Publicly Traded Company Method of $1.123 billion to $1.188 billion.

### (c) Premiums And Discounts

Customary valuation procedures use premiums and discounts related to the ownership characteristics of an equity interest for such matters as control (or lack of control) and lack of marketability. Houlihan Lokey did not apply any discounts or premiums in their analysis, though their analysis presumes that their conclusions of value were on a controlling interest basis. Houlihan Lokey used only one valuation method (i.e., the Guideline Publicly Traded Company Method, to which 50% weight was applied) that would ordinarily call for a control premium.

---

[2360] *Id.* at 33.

[2361] *See id.* at 34–35.

[2362] Morgan Stanley Project Duvall Board of Directors Presentation, dated May 16, 2008 [CCM00012048].

[2363] Morgan Stanley Project Duvall Board of Directors Presentation, dated May 16, 2008, at 15–16 [CCM00012048].

Based on the determination that the Guideline Publicly Traded Company Method is not a reliable indicator of the Fair Market Value of Resort Finance, the issue of premiums and discounts does not have an impact on the Fair Market Value assessments herein.

### (d) Overall Assessment Of Third-Party Conclusion Of Value

As discussed above, Houlihan Lokey's Adjusted Book Value Method concluded on a range of enterprise values between $1.225 billion and $1.225 billion. The Examiner's Financial Advisors considered the impact on Houlihan Lokey's conclusion of applying 100% weight to this approach, which resulted in a range of equity value of $101.7 million to $132.2 million, with a mid-point of $116.9 million, as summarized in the table below:

EXHIBIT V.F.4.c(4)(d)—1
**Modified Conclusion of Value Based on Houlihan Lokey's Asset-Based Approach**
*($ in Millions)*

|  | Low | | High | |
|---|---|---|---|---|
| Concluded EV from operations | $ | 1,225.3 | $ | 1,255.8 |
| *Plus:* Cash & cash equivalents | | 1.4 | | 1.4 |
| *Less:* GMAC Facility | | 750.0 | | 750.0 |
| *Less:* Deutsche Bank Facility | | 375.0 | | 375.0 |
| Indicated range of value | | 101.7 | | 132.2 |
| Concluded value (mid-point) | $ | 116.9 | | |

*Source: Houlihan Lokey Valuation Analysis of Resort Finance as of June 30, 2008, dated July 24, 2008 [ALLY_0102229].*

Houlihan Lokey's range of concluded enterprise value from operations of $1.225 billion to $1.256 billion reflected in the table above was calculated based on Houlihan Lokey's determination of a range of low to high value-to-par multiples, stated as a percentage. Although Houlihan Lokey analyzed each component of the Resort Finance portfolio separately, in the aggregate, the mark to Fair Market Value ranged from 81.2% to 83.2% across the entire portfolio,[2364] with a mid-point of 82.2%. In Houlihan Lokey's analysis, this range was applied to the gross carrying amount of the Resort Finance portfolio prior to the deduction of valuation reserves. In the purchase price calculation for the First Amendment however, the 82% mark, which apparently corresponds to the mid-point of Houlihan Lokey's Adjusted Book Value Method (i.e., 82.2%), was applied to the net carrying value of the portfolio (i.e., net of valuation reserves). Correcting this apparent error would result in would be an increase to the purchase price calculated in the First Amendment. This increase would partially be offset, however, by the deduction of the approximately $15 million in liabilities excluded in error, as described previously. The net result of these two adjustments to the calculation contained within the First Amendment is a purchase price of $108.3 million (as summarized in the table below), which is not materially different from the actual $111.1 million adjusted purchase price (or the $116.9 million calculated in the table above).

---

[2364] Houlihan Lokey Valuation Analysis of Resort Finance as of June 30, 2008, dated July 24, 2008, at 34 [ALLY_0102229].

EXHIBIT V.F.4.c(4)(d)—2
**Correction of Purchase Price Calculation per the First Amendment**
*($ in Millions)*

|  | Carrying Value | | Mark | Adj. Value | |
|---|---|---|---|---|---|
| Loan portfolio | $ | 1,490.7 | 82% | $ | 1,222.4 |
| Interest receivable | | 13.0 | 82% | | 10.7 |
| Other receivables | | 13.0 | 82% | | 10.7 |
| Other assets | | 3.6 | 82% | | 3.0 |
| Other liabilities | | (14.7) | 100% | | (14.7) |
| Concluded Enterprise Value from operations | | | | | 1,232.0 |
| *Plus:* Cash & cash equivalents | | | | | 1.4 |
| *Less:* GMAC Facility | | | | | 750.0 |
| *Less:* Deutsche Bank Facility | | | | | 375.0 |
| Concluded value | | | | $ | 108.3 |

*Source: Resort Finance Net Assets, dated June 30, 2008 [PWC09192].*

### (5) Conclusion Regarding Reasonably Equivalent Value

Based on the above discussion and analysis and the totality of the circumstances including but not limited to Houlihan Lokey's valuation and potential adjustments thereto, the First Amendment, Morgan Stanley's fairness opinion, Bear Stearns' failed sale attempt, Morgan Stanley's orderly liquidation analysis, the $15 million post-closing correction of the purchase price, and other potential adjustments to the calculation of the purchase price reflected in the First Amendment the Examiner concludes that the evidence supports the proposition that RFC and GMAC Canada received reasonably equivalent value in the Resort Finance Sale.

### d. Excess Servicing Rights Sales By GMAC Mortgage To Cerberus In July 2008

Following two auctions, on July 14 and 15, 2008, GMAC Mortgage, a wholly owned subsidiary of ResCap, agreed to sell Cerberus (the highest bidder in each auction) certain excess servicing rights on two populations of loans consisting of $13.8 billion in unpaid principal balance of Freddie Mac loans and $24.8 billion in unpaid principal balance of Fannie Mae loans, capturing $591.2 and $981.9 million of notional interest-only securities, respectively. The sales closed on July 30, 2008 and GMAC Mortgage received net cash proceeds of $175.1 million.[2365]

---

[2365] Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2009), at 90. ResCap received approximately $282 million in cash receipts from the sales. *See* Residential Capital, LLC, Current Report (Form 8-K) (Aug. 5, 2008) (referencing the $105.3 million and $176.7 million in proceeds from the two sales). The difference between the $282 million in cash receipts and $175.1 million in net proceeds relates ResCap's repayment of a Citibank MSR facility, for which ResCap's excess servicing rights were collateral. *See* ResCap Daily Liquidity Rollforward (July 31, 2008) [CERB007342] (referencing the pay down of the Citi MSR facility); Memorandum, Pentalpha Capital, LLC Loan Sale Review, dated July 16, 2008, at RC40006641 [RC40006611] (referencing estimated proceeds of $166 million).

Pentalpha was engaged to provide oversight of the auction process, and to review bid levels and the overall economics of the transaction.[2366] Pentalpha opined that "the ResCap sales team used commercially reasonable efforts to solicit the interest of the most likely buyers for this particular asset type" and that "the auction of the two excess interest strip securities was conducted in a fair and equitable fashion and in line with the stated objective of achieving the highest and best price for the assets, taking into consideration the market conditions under which the auction was held."[2367]

As set forth in the discussion and analysis below, and based on the totality of the circumstances, the Examiner concludes that the evidence supports the proposition that GMAC Mortgage received reasonably equivalent value in the Excess Servicing Rights Sales.

### (1) Overview Of Excess Servicing Fees And GMAC Mortgage

#### (a) Excess Servicing Rights

Mortgage servicing rights arise from a contractual agreement to service a mortgage, which commonly entails collecting monthly mortgage payments, setting aside taxes and insurance premiums in escrow, and forwarding interest and principal to the mortgage lender. The servicer receives a fee normally calculated as a per annum percentage of the outstanding balance payable monthly in return for providing these administrative services.[2368]

After deducting the required mortgage servicing fee from the borrower note rate, additional interest in excess of the pass-through rate required by the investor may remain. This additional amount of interest is considered an "excess servicing fee" (or "excess servicing rights") and is often retained by the holder of the base MSR. Excess servicing rights are a form of cash flow associated with future interest only ("I/O") income (i.e., it does not include ancillary income, such as float and late fees).[2369]

The market has different avenues for securitizing this excess I/O, including Fannie Mae strips and Freddie Mac strips. Nearly every large mortgage servicer has issued excess I/O strips in the past, including Citibank, Wells Fargo, Bank of America, Chase, and PHH Mortgage; however, such securitizations are less frequent because of the need to accumulate sufficient amounts to make the transaction costs viable.[2370]

---

[2366] Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, July 11, 2008, at RC40005805–6 [RC40005652].

[2367] Memorandum, Pentalpha Capital, LLC Loan Sale Review, dated July 16, 2008, at RC40006640 [RC40006611].

[2368] STM, Excess Servicing Right Sale to Cerberus, at EXAM00220388 [EXAM00220386].

[2369] Ally Bank Excess Servicing Transaction Presentation, at 2 [ALLY_PEO_0065951].

[2370] *Id.*

### (b) GMAC Mortgage Excess Servicing Rights

GMAC Mortgage transferred portfolios of mortgage loans in its normal course of business to Fannie Mae and Freddie Mac in standard securitization structures.[2371] "[GMAC Mortgage] acted as a servicer of the mortgage loans" under the terms of these transfers and:

> was entitled to retain a portion of the collections on each mortgage loan as its servicing fee. The servicing fee had two components: a minimum servicing fee, which equaled [25 bps] per annum on the outstanding balance of the mortgage loan; and the balance of the servicing fee, which constituted an "excess servicing fee.[2372]

"[GMAC Mortgage]'s rights to receive servicing fees were contractual rights to receive specified amounts from collections on the mortgage loans. By agreeing to reduce its servicing fees (in the amount of the excess servicing fee)," and retain only its minimum servicing fee, "GMAC Mortgage reduced its contractual claim relating to" the cash flows from excess servicing fees, which made "it possible for the corresponding portion of those cash flows to instead be used for [distribution] on the [excess I/O] strips."[2373]

### (2) Summary Of Transaction And Process

ResCap entered into a Master Agreement with Pentalpha on June 24, 2008, in which Pentalpha agreed to assist ResCap with addressing its liquidity needs through auctions of certain assets.[2374] ResCap later engaged Pentalpha on July 14, 2008 specifically to provide oversight of the auction for the Fannie Mae and Freddie Mac stripped I/O certificates held by GMAC Mortgage, and to review bid levels and the overall economics of the transaction.[2375]

---

[2371] STM, Excess Service Right Sale to Cerberus, at EXAM00220388 [EXAM00220386].

[2372] *Id.*

[2373] *Id*.

[2374] *See* E-mail from T. Dwyer (July 13, 2008) [CERB014452]; Draft Incorporation of Master Agreement between ResCap and Pentalpha Capital, LLC [CERB014453].

[2375] Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, July 11, 2008, at RC40005805–6 [RC40005652]. At the board meeting Weintraub noted that the transaction was part of ResCap's $650 million "as is/where is" auction. *Id.* at RC40005805. This may have been a misstatement as the transaction is subsequently reported in ResCap's SEC filings as forming part of a standalone $300 million commitment by Cerberus to purchase certain mortgage-related assets from ResCap. Residential Capital, LLC, Current Report (Form 8-K) (Aug. 5, 2008), at Item 1.01.

ResCap considered the securities to be "relatively unique in nature," and determined that it would not likely benefit from a broad marketing effort of the I/O certificates.[2376] ResCap's trading personnel elected to solicit bids from five potential investors: Freddie Mac, Fannie Mae, Lehman, Goldman Sachs, and Cerberus, because these institutions were considered to be the most likely buyers of this particular asset type. Pentalpha was of the opinion that despite the relatively small number of institutions, the inclusion of the Wall Street broker-dealers (Lehman and Goldman Sachs) effectively enhanced the distribution leverage. Further, Pentalpha offered the view that in addition to bidding for their own investment portfolio, these investment banking firms would also likely be motivated to bid for these assets if they believed their clients, of which ResCap might not be aware, would subsequently show interest.[2377]

ResCap provided collateral tapes containing detailed loan-level information to the prospective bidders on Wednesday, July 9, 2008, along with instructions to submit bids by the market close on Friday, July 11, 2008. Pentalpha reviewed the collateral tapes and deemed them to contain sufficient detail for the purpose of collateral analysis by sophisticated investors. Pentalpha also considered the due diligence period of three days to be an adequate timeframe for the formulation of bids.[2378]

ResCap received four initial bids on Friday, July 11, 2008 for the Fannie Mae assets. However, each bid was below the levels anticipated by ResCap trading personnel, and the auction accordingly was cancelled on Monday, July 14, 2008. Cerberus and Goldman Sachs submitted refreshed bids on July 15, 2008, and ResCap reopened the auction and executed the trade with the highest bidder, Cerberus. Pentalpha noted that while the process disadvantaged Cerberus, which also submitted the highest initial bid, the bids from the second round were more than $3 million closer to the pre-bid expectations (albeit revised downward).[2379]

In the case of the Freddie Mac assets, ResCap received four initial bids on Monday, July 14, 2008. Cerberus and Goldman Sachs were again the two highest bidders and were both invited to submit a second, final bid. Both bidders increased their bids from the first round, but Cerberus's final bid was the highest and was deemed acceptable because of its close proximity to pre-bid expectations.[2380]

---

[2376] Memorandum, Pentalpha Capital, LLC Loan Sale Review, dated July 16, 2008, at RC40006638 [RC40006611].

[2377] Id.

[2378] Id. at RC40006638, 40.

[2379] Id. at RC40006638–39.

[2380] Id. at RC40006639.

The ResCap Board created the Special Committee of Independent Directors on July 14, 2008, the same day as the auctions, to make certain decisions regarding transactions with affiliates of ResCap.[2381] On the day it was created, the Special Committee of Independent Directors recommended approval of the auctions, even though the Fannie Mae auction had not yet concluded, and a reserve position was later approved by the ResCap Board by written consent.[2382] Considerable discussion reportedly transpired regarding the establishment of a reserve position and monitoring of the auction process to ensure the transaction was reasonably priced and consistent with market terms based on similar transactions. The ResCap Board's written consent resolved that: (1) if the reserve position was met; (2) if Cerberus's bid was the highest received in the auction; and (3) if at least one other bona fide bid was received from a non-affiliated party, then the sale of the excess servicing rights by GMAC Mortgage to Cerberus (as the highest bidder) would be deemed authorized and approved. The ResCap Board further resolved that, after review and discussion of the recommendation of the Special Committee of Independent Directors, any sale to Cerberus pursuant to the auction process, and in accordance with the foregoing stipulations, would be deemed to have been completed on terms not materially less favorable to ResCap and its relevant subsidiaries than those that could reasonably have been obtained in a comparable arm's-length transaction by ResCap or such subsidiary with an unaffiliated party.[2383]

The Special Committee of Independent Directors later reviewed the results of the auctions including the memorandum containing Pentalpha's opinions and ratified its previous recommendation that the ResCap Board approve the sale to Cerberus in these circumstances.[2384] The ResCap Board subsequently resolved on July 30, 2008, that, based upon such ratification and further recommendation by the Special Committee of Independent Directors, the sale of assets to Cerberus be authorized and approved.[2385]

GMAC Mortgage, Ally Securities (acting as an intermediary on the Fannie Mae Sale),[2386] and Cerberus executed Purchase Agreements on the same day, July 30, 2008,[2387] for the

---

[2381] Unanimous Written Consent of the Board of Directors of Residential Capital, LLC, dated July 14, 2008, at RC00017276 [RC00017276].

[2382] *Id.* at RC00017279.

[2383] *Id.*

[2384] Unanimous Written Consent of the Special Committee of Independent Directors of Residential Capital, LLC, dated July 25, 2008, at RC40006633–41 [RC40006611].

[2385] Written Consent of the Board of Directors of Residential Capital, LLC, dated July 30, 2008 [RC00017286].

[2386] Purchase Agreement between GMAC Mortgage and RFS, dated July 30, 2008 [EXAM31874759]; *see also* Letter from Mayer Brown to GMAC Mortgage (July 30, 2008) [PWC11075]; Letter from Fannie Mae to GMAC Mortgage (July 24, 2008) [PWC11032].

[2387] Residential Capital, LLC, Quarterly Report (Form 10-Q) (Nov. 10, 2008), at Ex. 10.2, Ex. 10.3.

excess servicing rights on the two populations of loans consisting of $13.8 billion in unpaid principal balance of Freddie Mac loans and $24.8 billion in unpaid principal balance of Fannie Mae loans, capturing $591.2 million and $981.9 million of notional interest-only securities, respectively. The sales closed on July 30, 2008 and GMAC Mortgage received net cash proceeds of $175.1 million after paying an associated obligation to Citibank.[2388]

Cerberus previously had executed a commitment letter on June 2, 2008 to purchase certain assets identified by ResCap for consideration consisting of $300 million in net cash proceeds.[2389] The Excess Servicing Rights Sales, together with Cerberus's firm bid in the September 2008 Model Home Sale, satisfied Cerberus's obligations under its $300 million commitment letter.[2390]

### (3) Summary Of FMV Indicia

As discussed in Section III, at the time of this auction, Wall Street firms were already experiencing the economic turmoil that would eventually lead to Fannie Mae and Freddie Mac being placed into conservatorship, Lehman filing bankruptcy, and Goldman Sachs receiving a $5 billion cash infusion from Berkshire Hathaway, in September 2008. Given this context, many Wall Street firms likely would have had little, if any, appetite to bid for the excess servicing right I/O strips without having identified a buyer.

After the failure of the first auction of the Fannie Mae I/O strips on July 14, 2008, when the reserve level was not achieved, the subsequent auction successfully increased the transaction price relative to pre-bid expectations (albeit revised downward). The second round of bidding on the Freddie Mac I/O strips resulted in an absolute price increase over the first round of bidding. Finally, there were multiple independent bidders and Cerberus competed with Goldman Sachs in the final pricing of both auctions.

### (4) Conclusion Regarding Reasonably Equivalent Value

Based on the above discussion and analysis and based on the totality of the circumstances, including the nature of the auctions, Pentalpha's memorandum, and market conditions at the time of the auctions, the Examiner concludes that the evidence supports the proposition that GMAC Mortgage received reasonably equivalent value in the Excess Servicing Rights Sales.

---

[2388] Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2009), at 90.

[2389] Letter from Cerberus to ResCap (June 2, 2008), at EXAM31326401 [EXAM31326384].

[2390] Letter from Cerberus to ResCap (Aug. 1, 2008) [EXAM10283374].

     *e.  September 2008 Model Home Sale By DOA Holding Properties, LLC To Cerberus*

     *(1) Overview Of September 2008 Model Home Sale*

Following an auction, on September 30, 2008, DOA Holding Properties, LLC, a direct wholly owned subsidiary of RFC ("DOA Holding"), sold two pools of model home assets to MHPool Holdings LLC, an affiliate of Cerberus,[2391] for net cash proceeds of $59.2 million.[2392] Mark Neporent, COO and General Counsel of Cerberus, explained that these model homes were not included in the June 2008 Model Home Sale because ResCap had not yet identified them at the time of that transaction.[2393] The September 2008 Model Home Sale, together with the Excess Servicing Rights Sales entered into between GMAC Mortgage and Cerberus, satisfied a commitment by Cerberus to purchase assets from ResCap or its subsidiaries for net cash proceeds of $300 million.[2394]

As set forth in the discussion and analysis below and based on the totality of the circumstances, the Examiner concludes that the evidence supports the proposition that RFC as the equity owner of DOA Holding, and DOA Holding, received reasonably equivalent value in the September 2008 Model Home Sale.

     *(2) Summary Of Transaction And Process*

Cerberus executed a commitment letter on June 2, 2008, to purchase certain assets from ResCap for "consideration consisting of $300 million in net cash proceeds."[2395] In partial fulfillment of this commitment, on July 25, 2008, Cerberus submitted a firm bid to purchase four pools of model home assets, comprising 487 model homes and first mortgage loans secured by another 208 model homes, for $125 million, subject to an auction process.[2396] The stated purpose of Cerberus's July 25, 2008 letter was to "(i) identify the assets that are to be the subject of the Firm Bids, (ii) confirm the terms, conditions and procedures for the Auction, and (iii) set forth the terms and conditions of the Firm Bids."[2397] The auction was to be commenced and completed as soon as reasonably practicable and conducted in an arm's-

---

[2391] Purchase Agreement among ResCap, DOA Holding Properties, LLC, DOA Properties IIIB (KB Models), LLC and MHPool Holdings LLC, dated Sept. 30, 2008 [CERB000010].

[2392] Seller's Certificate, dated Sept. 30, 2008 [CERB000184].

[2393] Int. of M. Neporent, Feb. 6, 2013, at 118:3–120:19.

[2394] Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2009), at 90; Draft Letter from Cerberus to ResCap (Aug. 1, 2008) [EXAM10144390].

[2395] Letter from Cerberus to ResCap (June 2, 2008), at EXAM31326401–04 [EXAM31326384].

[2396] Letter from Cerberus to ResCap (July 25, 2008) [CERB000001]; Letter from Cerberus to Investors (undated), at CERB033227 [CERB033224].

[2397] Letter from Cerberus to ResCap (July 25, 2008), at CERB000001 [CERB000001].

length transaction through the retention of Houlihan Lokey or another nationally recognized broker. Cerberus also retained the right to withdraw its firm bid on any of the pools in the event that more than 25% of the pool had been sold prior to the conclusion of the auction.[2398]

Cerberus and ResCap amended the $300 million commitment letter on August 1, 2008, agreeing that Cerberus's obligations therein had been satisfied fully through: (1) Cerberus's participation in the Excess Servicing Rights Sales that closed the day before on July 30, 2008; and (2) Cerberus's $125 million firm bid to purchase the four pools of model homes assets.[2399]

As of August 6, 2008, Houlihan Lokey, acting as financial advisor to RFC, had begun to contact other potential investors regarding the auction of the four pools of model home assets.[2400] By August 15, 2008, Houlihan Lokey had contacted fifty-four potential investors, fifteen of whom (including Cerberus) had executed confidentiality agreements and been provided data room access to analyze the four pools of model home assets.[2401] Houlihan Lokey expected to receive preliminary bid proposals by August 28, 2008, complete the auction by September 30, 2008, and close the transaction by October 15, 2008.[2402]

The Special Committee of Independent Directors convened a telephonic meeting on September 23, 2008, to discuss and compare the bids from Cerberus and the only other bidder in the auction whose overall preliminary bid exceeded Cerberus's—Dubose Model Homes USA ("Dubose").[2403] The Independent Directors were provided a bid comparison sheet indicating that Dubose's bid exceeded Cerberus's bid by approximately $5.4 million.[2404] Young and Hamzehpour noted, however, that Cerberus's bid expired on September 30, 2008, that Cerberus was unlikely to extend the deadline, and that Dubose had indicated its final bid could not be submitted until October 6, 2008.[2405] Young emphasized the importance of closing the sale by no later than October 15, 2008, which Cerberus had committed to do, and stated his concern that the time frame required by Dubose instead would result in a closing at the end of October.[2406]

---

[2398] Letter from Cerberus to ResCap (July 25, 2008) [CERB000001].

[2399] Letter from Cerberus to ResCap (Aug. 1, 2008) [EXAM10283374].

[2400] Houlihan Lokey Presentation Regarding RFC Model Home Sale Process Update, dated Aug. 15, 2008, at 4 [CERB022285].

[2401] *Id.* at 1–3.

[2402] *Id.* at 4.

[2403] Minutes of a Meeting of the Special Committee of the Independent Directors of the Board of Residential Capital, LLC, Sept. 23, 2008, at RC40006676–77 [RC40006611].

[2404] RFC Model Home Portfolio Bid Summary, dated Sept. 23, 2008 [CCM00519193].

[2405] Minutes of a Meeting of the Special Committee of the Independent Directors of the Board of Residential Capital, LLC, Sept. 23, 2008, at RC40006676 [RC40006611].

[2406] *Id.*

After this discussion, the Special Committee of Independent Directors requested that RFC approach Dubose to determine if it would submit a firm bid without a financing contingency by September 29, 2008, and be prepared to close by October 15, 2008, if its bid was accepted. This would allow time to accept Cerberus's bid prior to its September 30, 2008 expiration if the Special Committee of Independent Directors deemed Dubose's bid to be inadequate.[2407]

The Special Committee of Independent Directors convened another telephonic meeting two days later on September 25, 2008 to obtain an update on Hamzehpour's discussion with Dubose. Hamzehpour reported that Dubose would be unable to submit a firm bid prior to September 30, 2008. The Special Committee of Independent Directors then authorized Hamzehpour to pursue the sale of model homes (i.e., all four pools of model home assets) to Cerberus in accordance with the terms previously presented.[2408]

In a letter dated September 25, 2008, Cerberus acknowledged its understanding that it was the winning bidder on all four pools and that, with respect to pools 1 and 2, it intended to work with ResCap in good faith to close the transaction by September 30, 2008.[2409] Cerberus also noted, however, that more than 25% of the assets in pools 3 and 4 had been the subject of a sale and, in accordance with its July 25, 2008 firm bid, executed its right to withdraw its bids on pools 3 and 4.[2410]

On September 30, 2008, DOA Holding and DOA Properties IIIB (KB Models), LLC, each a wholly owned subsidiary of RFC, and ResCap executed a purchase agreement with MHPool Holdings LLC, an affiliate of Cerberus,[2411] for the sale of approximately 487 model homes in exchange for cash consideration consisting of approximately $80 million (corresponding to Cerberus's July 25, 2008 firm bid on pools 1 and 2). The purchase price was subject to certain adjustments, primarily relating to the sales of homes in the ordinary course after June 30, 2008, resulting in a net purchase price of $59.2 million.[2412] The diagram below provides a summary of the assets and value exchanged in the September 2008 Model Home Sale.

---

[2407] Id.

[2408] Minutes of a Telephonic Meeting of the Independent Committee of the Board of Directors of Residential Capital, LLC, Sept. 25, 2008, at RC40006678–83 [RC40006611].

[2409] Letter from Cerberus to ResCap (Sept. 25, 2008) [CERB000009].

[2410] Id.

[2411] Purchase Agreement among ResCap, DOA Holdings Properties, LLC, DOA Properties IIIB (KB Models), LLC and MHPool Holdings LLC, dated Sept. 30, 2008 [CERB000010].

[2412] Seller's Certificate, dated Sept. 30, 2008 [CERB000184]; Letter from Cerberus to ResCap (July 25, 2008) [CERB000001].

EXHIBIT V.F.4.e(2)
**September 2008 Model Home Sale Transaction**



Source: Purchase Agreement among ResCap, DOA Holdings Properties, LLC, DOA Properties IIIB (KB Models), LLC, and MHPool Holdings LLC, dated Sept. 30, 2008 [CERB000010]; Seller's Certificate, dated Sept. 30, 2008 [CERB000184]; Letter from Houlihan Lokey to Peter Rumbold (Aug. 28, 2008) [CERB013934].

### (3) Summary Of FMV Indicia

As noted previously, on July 10, 2008 Young asked Brian Murray, managing director at ResCap, for his view of the IRR implied by Cerberus's bid, to which Murray responded, "I do not believe we would be able to get bids with an IRR much lower than 20%."[2413] Murray's assessment apparently was premised on "two large bids in process in which Lennar will be buying back their models (in the CMH) at an IRR in 20% range, and Jack Buck . . . looking to buy us out (ResCap) in the same 20% IRR range."[2414] Young responded, "[t]his would leave me to believe that their bid is in the fair value range for a bulk sale. Then our decision is do we take the cash now or run it out over two years, or some combination of both, if possible."[2415] Young forwarded Murray's analysis to Marano and Weintraub on the same day, commenting:

> Bottom line, this analysis indicates it would take us around 2 years to sell off the model homes at a cash [NPV] of approx. 15% higher than [Cerberus's] bid. However, the NPV is discounted at 10% which is low to me. I've asked the team to run at a yield to [Cerberus] – it looks like will be around 20% which doesn't seem out of line.[2416]

Young's observation is corroborated by the fact that through the arm's-length auction process conducted by Houlihan Lokey, which included non-affiliate bidders, only one preliminary bid and no firm bids exceeded Cerberus's firm bid.

### (4) Conclusion Regarding Reasonably Equivalent Value

Based on the above discussion and analysis and the totality of the circumstances, including but not limited to an auction process that included non-affiliate bidders and was conducted by a nationally recognized broker in an arm's-length manner, the degree of differential between the bids received, and the temporal and contingent factors surrounding such bids, the Examiner concludes that the evidence supports the proposition that RFC as the equity owner of DOA Holding, DOA Holding, received reasonably equivalent value in the September 2008 Model Home Sale.

### f. ResMor Sale By GMAC Canada To AFI In January 2009

On January 1, 2009, AFI acquired from GMAC Canada, a wholly owned subsidiary of RFC, all of the outstanding shares in ResMor for C$82 million (approximately $67 million as of

---

[2413] E-mail from B. Murray to J. Young (July 10, 2008) [EXAM10399483].

[2414] *Id.*

[2415] E-mail from J. Young to B. Murray (July 10, 2008) [EXAM10399483].

[2416] E-mail from J. Young to T. Marano and J. Weintraub (July 10, 2008) [EXAM12115217].

December 31, 2008). ResMor had been acquired by GMAC Canada from a third party only one year earlier in November 2007 for C\$53.8 million.[2417] GMAC Canada invested another C\$25 million in the company in December 2007, bringing its total investment in ResMor to C\$78.5 million through the end of 2007.[2418]

Prior to closing, Goldin Associates delivered a fairness opinion dated December 3, 2008, to the Special Committee of Independent Directors indicating that the consideration to be received in the transaction was fair from a financial point of view to ResCap and its creditors (other than AFI).[2419] On December 4, 2008, Sandler O'Neill delivered a fairness opinion to the AFI Board that the consideration to be paid in the transaction was fair to AFI from a financial point of view.[2420]

As set forth in the discussion and analysis below and based on the totality of the circumstances, the Examiner concludes that the evidence supports the proposition that RFC as the equity owner of GMAC Canada, and GMAC Canada, received reasonably equivalent value in the ResMor Sale.

### (1) Overview Of ResMor

ResMor's principal business involved the origination, sale, and administration of mortgage loans through a federally chartered Canadian trust company whose operations were regulated by Canada's Office of the Superintendent of Financial Institutions. The mortgage loans were sold to investor-clients either directly or through securitization programs. ResMor also serviced the majority of mortgage loans sold to investor clients.[2421]

ResMor was also an approved lender for credit insurance by the Canada Mortgage and Housing Corporation and Genworth Financial Mortgage Insurance Company Canada, and an approved issuer of National Housing Act mortgage-backed securities. ResMor was headquartered in Calgary with an office in Toronto, and operated in all of the Canadian

---

[2417] Draft Goldin Associates Presentation to the Committee of Independent Members of the Board of Directors of Residential Capital, LLC Regarding the Purchase of ResMor Trust Company by GMAC, LLC, dated Dec. 2, 2008, at 10 [GOLDIN00127218].

[2418] *See id.*

[2419] Opinion Letter from Goldin Associates to the Committee of Independent Members of the Board of Directors of ResCap (Dec. 3, 2008) [RC00027945].

[2420] Opinion Letter from Sandler O'Neill & Partners, L.P. to the Board of Directors of GMAC, LLC (Dec. 4, 2008) [SOP0000653].

[2421] ResCap STM, ResMor Sale to AFI, at EXAM00220432 [EXAM00220430].

provinces except Quebec.[2422] Although ResMor had approximately 260 employees (i.e., 100 in loan servicing, sixty-five in underwriting, fifty administrative, thirty in information technology, and fifteen in marketing/production), it relied upon ResCap for staffing assistance.[2423]

ResMor held approximately C$425 million in HFI and HFS loans and serviced approximately C$5.9 billion in mortgage loans at the time of its sale to AFI.[2424] ResMor's revenue consisted of origination gains on the sale of residential mortgage loans, interest and other income from loans held until maturity, and servicing revenue from loans under administration.[2425] The table below provides a summary of ResMor's historical income statement leading up to the sale.[2426]

EXHIBIT V.F.4.f(1)
**ResMor Historical Income Statement**
*(C$ in Millions)*

|  | 12/31/2006 | 12/31/2007 | YTD 10/31/2008 |
|---|---|---|---|
| Originations | $ 1,394.4 | $ 2,228.2 | $ 1,799.2 |
| Mortgage loans sold | 1,508.5 | 2,075.2 | 1,886.9 |
| Net interest income | $     4.2 | $     5.1 | $     2.4 |
| Mortgage banking revenue | 16.8 | 27.0 | 43.9 |
| Other revenue | 1.3 | 2.0 | 2.1 |
| Total revenue | $    22.3 | $    34.1 | $    48.4 |
| Total expenses | 19.5 | 26.8 | 25.1 |
| Income before taxes | $     2.9 | $     7.3 | $    23.3 |

*Source: Draft Goldin Associates Presentation to the Committee of Independent Members of the Board of Directors of Residential Capital, LLC Regarding the Purchase of ResMor Trust Company by GMAC, LLC, dated Dec. 2, 2008 [GOLDIN00127218].*

ResMor had no branch network. It relied on brokered customer deposits that were insured by the Canada Deposit Insurance Corporation, to fund its business. Its growth was both fueled and limited by its access to equity capital. ResMor's equity grew from C$25 million on December 31, 2006, to C$71 million on October 31, 2008, because of growth in earnings and a C$25 million investment from ResCap in December 2007.[2427]

---

[2422] Draft Presentation to the Committee of Independent Members of the Board of Directors of Residential Capital, LLC Regarding the Purchase of ResMor Trust Company by GMAC, LLC, dated Dec. 2, 2008, at 9 [GOLDIN00127218].

[2423] *Id.*

[2424] *Id.*

[2425] *Id.*

[2426] *Id.* at 13.

[2427] *Id.* at 9.

Before the sale to AFI, credit concerns about ResCap and AFI led counterparties to terminate ResMor's repurchase and swap lines of credit, thereby limiting ResMor's ability to hedge pipeline and inventory exposure. In response, as of October 31, 2008, ResMor had built a relatively large excess cash balance of C$282.5 million (or, cash on hand less C$75 million).[2428] Because ResMor's growth was limited by its capital ratio constraints, equity capital that could have been used to support growth in mortgage loan assets was instead being used to support excess cash balances.[2429] The resulting negative spread on excess cash balances was becoming a drag on ResMor's earnings.[2430]

### (2) Summary Of Transaction And Process

The idea of selling ResMor to AFI was suggested as early as August 2008 by Jerry Lombardo.[2431] The transaction was discussed by the ResCap Board at various board or committee meetings as early as October 10, 2008.[2432] Following the ResCap Board meeting on October 10, 2008, the Independent Directors held a telephonic meeting with their counsel, Morrison Cohen, to discuss the proposed sale of ResMor to an affiliate.[2433] The Independent Directors held another telephonic meeting on November 3, 2008, to discuss the proposed sale and agreed that Morrison Cohen would continue its discussions with various parties regarding a fairness opinion.[2434]

Materials prepared for the October 28, 2008 ResCap Board meeting stated that "book value is solid, therefore would not sell for anything less than book value," went on to state that "our valuation work supports a range of 1.2x to 1.7x tangible book or C$80 to C$120 million" and also noted that AFI has offered C$82 million in cash.[2435] Materials prepared for the AFI Board dated October 31, 2008 indicated that C$82 million was 1.15x book value as of September 30, 2008 and that certain publicly traded guideline companies traded in a range of 1.0x to 1.1x tangible book value.[2436]

---

[2428] *Id.* at 10.

[2429] *Id.* at 10, 14.

[2430] *Id.* at 10.

[2431] *See* E-mail from J. Lombardo to S. Ramsey (Aug. 11, 2008) [EXAM10176312] (discussing possible sale of ResMor to AFI).

[2432] *See* Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Oct. 10, 2008, at RC40005881 [RC40005652].

[2433] Minutes of a Telephonic Meeting of the Independent Committee of the Board of Directors of Residential Capital, LLC, Oct. 10, 2008, at RC40006686 [RC40006611].

[2434] Minutes of a Telephonic Meeting of the Independent Committee of the Board of Directors of Residential Capital, LLC, Nov. 3, 2008, at RC40006691 [RC40006611].

[2435] ResCap ResMor Trust Valuation Analysis Presentation, dated Oct. 28, 2008, at RC00018978 [RC00018958].

[2436] *See* Board Meeting, ResCap Support Actions, dated Oct. 31, 2008, at 2 [ALLY_0230517].

Sandler O'Neill was retained on October 20, 2008 by AFI to prepare a fairness opinion.[2437] Once a decision was made to proceed with the sale to AFI, the transaction moved quickly. Minutes for the November 12, 2008, ResCap Board meeting reflect that AFI was willing to close as quickly as November 14, 2008,[2438] and a draft term sheet was prepared by November 13, 2008.[2439]

At least two other potential buyers were contacted about acquiring ResMor. Before approving the transaction, inquiry was made to find out whether they were still interested in acquiring ResMor. One potential buyer was not responsive, while the other needed to raise funding for the transaction and could not close in a timely manner.[2440]

Although no third-party valuation was performed for this transaction, as was the case in certain other sales to AFI Affiliates, the Special Committee of Independent Directors did retain Goldin Associates on November 17, 2008 to prepare a fairness opinion on the proposed sale of ResMor to AFI.[2441]

The transaction was approved by the ResCap Board on November 20, 2008, by written consent, which noted that the Special Committee of Independent Directors (established on July 14, 2008, to review and approve affiliate transactions over $10 million) had approved the transaction.[2442] No separate minutes for the Special Committee of Independent Directors approving this transaction were located in the Investigation.

On the same day as the ResCap Board's approval, GMAC Canada, a wholly owned subsidiary of RFC, entered into an agreement to sell all of the outstanding shares of 1020491 Alberta Ltd ("Alberta Ltd") and all of its shares of ResMor to AFI for C$82 million (approximately US$67 million as of December 31, 2008).[2443] Alberta Ltd owned the other outstanding shares of ResMor, so the purchaser acquired 100% of ResMor and 100% of

---

[2437] Letter from Sandler O'Neill & Partners, L.P. to AFI Board (Oct. 20, 2008) [SOP0000579].

[2438] Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Nov. 12, 2008, at 2 [RC00017340].

[2439] Non-Binding Offer to Acquire ResMor Trust Company, Indicative Summary of Terms, dated Nov. 13, 2008 [CCM00015169].

[2440] Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Nov. 15, 2008, at RC40005911 [RC40005652].

[2441] Engagement Letter from Goldin Associates to the Committee of the Independent Members of the Board of Directors of ResCap (Nov. 17, 2008) [EXAM00233501].

[2442] Action by Written Consent of the Board of Directors of Residential Capital, LLC, dated Nov. 20, 2008, at RC40005913–27 [RC40005652].

[2443] Share Purchase Agreement between GMAC Canada and GMAC, LLC, dated Nov. 20, 2008 [RC00025358].

ResMor Trust Company, a wholly owned subsidiary of ResMor.[2444] Concurrent with the execution of the Share Purchase Agreement, GMAC Canada and AFI also entered into the ResMor Loan Agreement, whereby GMAC Canada received proceeds of C$82 million.[2445]

On December 2, 2008, Goldin Associates presented its valuation analysis to the Special Committee of Independent Directors[2446] and, on December 3, 2008, it issued its fairness opinion indicating that the consideration to be received in the transaction was fair from a financial point of view to ResCap and its creditors (other than AFI).[2447] On December 4, 2008, Sandler O'Neill delivered a fairness opinion to the AFI Board indicating that the consideration to be paid in the transaction was fair to AFI from a financial point of view.[2448]

The transaction closed on January 1, 2009. The purchase price of C$82 million was paid via forgiveness of debt under the ResMor Loan Agreement. The purchase price was not adjusted post-closing, though early drafts of the share purchase agreement provided for such an adjustment feature.[2449]

---

[2444] Share Purchase Agreement between GMAC Canada and GMAC, LLC, dated Nov. 20, 2008, at RC00025364 [RC00025358].

[2445] Loan Agreement between GMAC Canada and GMAC, LLC, dated Nov. 20, 2008 [ALLY_0149086].

[2446] *See* Draft Goldin Associates Presentation to the Committee of Independent Members of the Board of Directors of Residential Capital, LLC Regarding the Purchase of ResMor Trust Company by GMAC, LLC, dated Dec. 2, 2008 [GOLDIN00127218].

[2447] Opinion Letter from Goldin Associates to the Committee of Independent Members of the Board of Directors of ResCap (Dec. 3, 2008) [RC00027945].

[2448] Opinion Letter from Sandler O'Neill & Partners, L.P. to the Board of Directors of GMAC, LLC (Dec. 4, 2008) [SOP0000653].

[2449] *See* Draft Share Purchase Agreement between GMAC Canada and GMAC, LLC, dated Nov. 13, 2008 [GOLDIN00093530].

The diagram below provides a summary of the value exchanged between GMAC Canada and AFI in the ResMor Sale.



EXHIBIT V.F.4.f(2)
**ResMor Sale Transaction Diagram**

*Source: Share Purchase Agreement between GMAC Canada and GMAC, LLC, dated Nov. 20, 2008 [RC00025358]; Draft Goldin Associates Presentation to the Committee of Independent Members of the Board of Directors of Residential Capital, LLC Regarding the Purchase of ResMor Trust Company by GMAC, LLC, dated Dec. 2, 2008 [GOLDIN00127218]; .*

Under the June 2008 Indentures, the transaction was required to be on an arm's-length basis. The November 20, 2008 ResCap Board Written Consent included a resolution that the transaction was on terms that are not materially less favorable to the company and its relevant subsidiaries than those that could reasonably have been obtained in an arm's-length transaction by the company or such subsidiaries with an unaffiliated third party (which is the standard in the June 2008 Indentures).[2450]

---

[2450] Written Consent of the Board of Directors of Residential Capital, LLC, dated Nov. 20, 2008, at RC40005913–27 [RC40005652].

### (3) Internal ResCap Valuation Analysis

The internal analysis presented to the ResCap Board dated October 28, 2008, contained an Income Approach (using the DCF Method) and a Market Approach (using the Guideline Publicly Traded Company Method) in deriving a range of equity values.[2451] The analysis in the presentation was high-level in nature and did not present significant detail. ResCap's DCF Method under the Income Approach used projections from 2009 through 2013 and applied a discount rate of between 15% and 20%. The presentation did not disclose the residual period or discount rate calculation. The range of equity value was estimated at C$84.8 million to C$126.0 million.

There are two key differences between this internal analysis and the valuation analysis prepared by Goldin Associates (which will be discussed in detail below); namely, (1) ResCap's internal analysis did not assume cash flows over the discrete projection period would be reinvested in the business to fund more loans, as Goldin Associates assumed; and (2) ResCap applied a higher discount rate than Goldin Associates. These two inputs account for much of the difference between ResCap's preliminary analysis of a valuation range between C$84.8 million and C$126.0 million, and Goldin Associates' opinion of a valuation range between C$74.8 million and C$89.1 million.

ResCap's Guideline Publicly Traded Company Method under the Market Approach was based on five companies: Home Capital Group, Equitable Group, Xceed Mortgage Corporation, Bank of Nova Scotia, and Royal Bank of Canada. The analysis equally weighted four multiples: P/NBV, P/TBVE, 2008 Forward P/E, and 2009 Forward P/E. Based on the low and high end of the range of these multiples, the analysis resulted in a wide range of value of between C$38.1 million and C$157.8 million.

The Examiner's Financial Advisors do not view the inclusion of Bank of Nova Scotia and Royal Bank of Canada in the guideline group as appropriate given the relatively smaller size and narrower scope of ResMor. Excluding Bank of Nova Scotia and Royal Bank of Canada results in lower mean and median multiples for the guideline group. In addition, the wide range of value indications somewhat limits the usefulness of the Guideline Publicly Traded Company Method in assessing the question of whether RFC as the equity owner of GMAC Canada, and GMAC Canada obtained REV in the ResMor Sale.

### (4) Summary Of Third-Party Indicia Of Value

The Examiner's Financial Advisors reviewed and analyzed the valuations underlying the fairness opinions by Goldin Associates and Sandler O'Neill to gauge their utility as indicia of Fair Market Value.

---

[2451] Notice of a Special Meeting of the Board of Directors of Residential Capital, LLC, dated Oct. 28, 2008, at RC40008766–77 [RC40008754].

### (a) Third-Party Conclusion Of Value

In preparing its fairness opinion, Goldin Associates conducted various valuation analyses. It did not, however, arrive at an independent conclusion of value. Appendix V.F.4.f(4)(a) provides a summary of the ResMor valuation analysis performed by Goldin Associates in developing its fairness opinion. In summary, Goldin Associates ultimately relied upon three valuation methodologies: (1) DCF Method under the Income Approach; (2) Guideline Publicly Traded Company Method (placing weight on two different multiples under this methodology) under the Market Approach; and (3) Guideline M&A Method under the Market Approach, the results of which are summarized in the following table.[2452] Goldin Associates also performed an analysis under the Asset-Based Approach, on which it ultimately did not rely, as discussed further below.

EXHIBIT V.F.4.f(4)(a)
**Goldin Associates Valuation Methodologies**
*(C$ in Millions)*

|  | Weight | Low | | High | |
|---|---|---|---|---|---|
| Income Approach: | | | | | |
| DCF Method | 40% | $ | 75.7 | $ | 85.8 |
| Guideline Publicly Traded Company Method: | | | | | |
| P/TBVE Multiple | 20% | | 69.1 | | 85.3 |
| LTM P/E Multiple | 20% | | 81.8 | | 98.0 |
| Guideline M&A Method | 20% | | 71.6 | | 90.7 |
| Value range | | $ | 74.8 | $ | 89.1 |

*Source: Draft Goldin Associates Presentation to the Committee of Independent Members of the Board of Directors of Residential Capital, LLC Regarding the Purchase of ResMor Trust Company by GMAC, LLC, dated Dec. 2, 2008 [GOLDIN00127218].*

Goldin Associates concluded that the C$82 million proposed purchase price for ResMor was within the range of value implied by the various valuation methodologies and, therefore, fair to ResCap and its creditors (other than AFI).

### (b) DCF Method

Goldin Associates used management's financial projections to develop a DCF analysis. Goldin Associates described making various adjustments to management's financial projections for 2008 through 2013, as follows:

1. Business lines
Only the mortgage business projections were used. Automotive and commercial lines of business were omitted because they do not presently exist

---

[2452] *See* Draft Presentation to the Committee of Independent Members of the Board of Directors of Residential Capital, LLC Regarding the Purchase of ResMor Trust Company by GMAC, LLC, dated Dec. 2, 2008, at 26 [GOLDIN00127218].

2. Funding channels
Removed direct to consumer funding source because the company does not
presently utilize such a source and because of required capital expenditures to
effectuate
3. Mortgage origination growth
Gradually lowered the growth rate to approach historical industry averages . . .
4. [GMAC Canada] conduit activity
Added C$2 million to revenue in 2009 and 2010 to reflect [GMAC Canada]
payments to ResMor for servicing of ongoing conduit activities.[2453]

From 2009 through 2013, the projected annual free cash flow to equity was assumed to
be zero because 100% of the net income was assumed to be reinvested in regulatory capital. In
the residual period, the assumed reinvestment rate was 33.6%. This rate was derived by taking
the assumed long term growth rate in net income of 4.9% and dividing that by the ROE of
14.4% as projected in 2013. The 2013 ROE was calculated by dividing the 2013 projected net
income of C$16.5 million by the projected 2013 book value of equity of C$114.5 million. This
ratio of 33.6% (4.9% / 14.4%) represented the reinvestment rate, and 66.4% (100.0% - 33.6%)
was the estimated payout ratio.

Using these DCF assumptions, 100% of the value conclusion was derived from the
indicated value in the residual period. The residual period value was calculated using three
different approaches: (1) a capitalization of cash flow using a perpetual growth rate of
4.9%;[2454] (2) a P/E exit multiple of 8.4x; and (3) a P/NBV exit multiple of 1.2x. The total
equity values derived from the DCF Method using these three residual period calculations
ranged from C$75.7 million to C$85.8 million.[2455]

The source for the 4.9% perpetual growth rate used in the residual value calculation was
the "IMF World Economic Outlook Oct 2008." The perpetual growth rates implied by the P/E
and P/NBV exit multiples were 4.0% and 3.9%, respectively. The Examiner's Financial
Advisors view these perpetual growth rates in the residual period to be within the range that an
appraiser would apply in the valuation of a business of this type that is a going concern.

---

[2453] *Id.* at 16.

[2454] The general model for capitalization of cash flows is $(CF \times (1+g))/k-g$ where CF is the base year cash flow, g
is the long-term growth rate, and k is the discount rate.

[2455] Draft Presentation to the Committee of Independent Members of the Board of Directors of Residential
Capital, LLC Regarding the Purchase of ResMor Trust Company by GMAC, LLC, dated Dec. 2, 2008, at 18
[GOLDIN00127218].

The selected P/E exit multiple of 8.4x was similar to the mean LTM P/E multiple of 8.5x estimated in the Guideline Publicly Traded Company Method. The selected P/NBV exit multiple of 1.2x was equal to the mean P/NBV multiple estimated in the Guideline Publicly Traded Company Method. This approach assumes that market multiples will not change over the discrete projection period.

### (c) Discount Rate

The discount rate of 12.2% selected by Goldin Associates was a cost of equity based on a MCAPM using guideline company observations, such as a levered beta. Goldin Associates selected a levered beta of 0.67, which means that they assessed the volatility of ResMor's stock to be positively correlated with, but lower than, the overall market (which has as a beta of 1.0). The observed betas for the six guideline companies ranged from 0.40 to 1.04. The size premium, which was an additional risk premium used to account for the fact that investments in smaller companies are considered to require a greater return on investment, was based on a commonly cited study by Ibbotson Associates in the Stocks Bonds Bills and Inflation 2007 yearbook. The size premium selected by Goldin Associates was 3.0% and described in the report as the "Micro-Cap Size Premium." Goldin Associates' range of equity value from their DCF Method was C$75.7 million to C$85.8 million.[2456]

In reviewing the Ibbotson 2007 publication cited by Goldin Associates, it appears that the size premium for the "micro-cap" companies was 3.88% (rather than 3.0% used by Goldin Associates). However, Ibbotson's 2008 edition was available when Goldin Associates did its analysis and indicated a 3.65% micro-cap premium. If the 3.88% size premium were used, the discount rate would have been 13.12% (rather than 12.2% as calculated). Using this higher discount rate, the range of equity value from the DCF Method would decrease to a range of C$72.6 million to C$73.6 million. Given the equity value of ResMor, however, some appraisers might apply the size premium equating to the 10th decile, which would be 6.27%, or even the 10b decile, which would be 9.68%. If the analysis were to use these higher size premiums, the discount rate would be higher and, thus, the equity value would be lower still.

---

[2456] Draft Goldin Associates Presentation to the Committee of Independent Members of the Board of Directors of Residential Capital, LLC Regarding the Purchase of ResMor Trust Company by GMAC, LLC, dated Dec. 2, 2008, at 17–18 [GOLDIN00127218].

On the other hand, the unsourced 8.56% premium over the 10-year Canadian government bonds used by Goldin Associates is higher than the benchmark's commonly cited for U.S. equity risk premiums. For instance, the 2008 Ibbotson publication recommended a U.S. equity risk premium in a range of 6.2% to 7.1% over 20-year Treasuries.[2457] The Examiner's Financial Advisors do not believe that a Canadian equity risk premium would be materially different from a U.S. premium. The use of an equity risk premium of 6.5% and the 2008 micro-cap companies size premium (3.65%) would have a combined effect of reducing the discount rate and increasing value. However, the Examiner's Financial Advisors further note that Goldin Associates' selection of a beta (0.67) is unusually low for levered equity of financial services companies. A higher beta would result in a higher discount rate and lower value. Even assuming these possible adjustments to the size premium, equity risk premium, and beta were made, Goldin Associates' 12.2% discount rate likely falls within a reasonable range.

### (d) Guideline Publicly Traded Company Method

The Guideline Publicly Traded Company Method used by Goldin Associates considered four multiples: P/NBV, P/TBVE, LTM P/E, and Forward P/E. These multiples are commonly considered when valuing a financial services company such as ResMor. Goldin Associates calculated the four multiples using both (1) the stock prices as of November 19, 2008; and (2) the average stock price over a 30-day period.

Goldin Associates selected six guideline companies for consideration in applying the Guideline Publicly Traded Company Method. Based on the mean of the four multiples and the six guideline companies, Goldin Associates derived the following value ranges: P/NBV multiples were C\$71.1 million to C\$85.3 million; P/TBVE multiples were C\$69.1 million to C\$82.9 million; LTM P/E multiples were C\$81.8 million to C\$98.0 million; and Forward P/E multiples were considered to be not meaningful because of the depressed level of earnings projected in 2009.[2458]

---

[2457] The Examiner's Financial Advisors also considered the following sources, among others, of equity risk premium: BRADFORD CORNELL, THE EQUITY RISK PREMIUM (1999), SHANNON P. PRATT & ROGER J. GRABOWSKI, COST OF CAPITAL: APPLICATIONS AND EXAMPLES 89113 (3rd ed. 2008); SHANNON P. PRATT & ROGER J. GRABOWSKI, COST OF CAPITAL: APPLICATIONS AND EXAMPLES 117145 (4th ed. 2010); TIM KOLLER ET AL., VALUATION: MEASURING AND MANAGING THE VALUE OF COMPANIES 297306 (3rd ed. 2005); TOM COPELAND ET AL., VALUATION: MEASURING AND MANAGING THE VALUE OF COMPANIES 238245 (4th ed. 2010); and Pablo Fernandez, *The Market Risk Premium Used in 2008 by Professors: A Survey With 1,400 Answers* (IESE Bus. Sch., Working Paper, 2009), *available at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1344209.

[2458] Draft Goldin Associates Presentation to the Committee of Independent Members of the Board of Directors of Residential Capital, LLC Regarding the Purchase of ResMor Trust Company by GMAC, LLC, dated Dec. 2, 2008, at 21 [GOLDIN00127218].

The Examiner's Financial Advisors view the guideline companies selected by Goldin Associates as a reasonable group of companies to use as the basis for analysis. The Examiner's Financial Advisors performed a search for guideline companies and identified a group that included some of the same companies used by Goldin Associates as well as certain additional companies. In general, the mean and median multiples observed by Goldin Associates were similar to the mean and median multiples from the Examiner's Financial Advisors' group of guideline companies.

For each of the six guideline companies used by Goldin Associates, the 30-day average stock price was higher than the stock price as of November 19, 2008. This would imply that the share prices, and therefore the trading multiples, for each of these guideline companies had been generally declining over this timeframe. This trend would suggest that the estimated values for ResMor using the 30-day average stock prices, which resulted in higher indications of equity values, were less current than the value indications that were derived from the stock prices as of November 19, 2008. The Examiner's Financial Advisors adjusted the Goldin Associates analysis by substituting the market prices as of January 1, 2009 (i.e., the actual closing date), and the results were slightly lower than the value indications from the fairness opinion. The P/NBV multiples decline from a range of 1.0x to 1.2x to a range of 0.9x to 1.0x, while the LTM P/E multiples decline from a range of 7.1x to 8.5x to a range of 6.3x to 6.7x. These lower multiples translate to declines in the range of equity value from C$71.4 million to C$98.0 million to a range of C$64.6 million to C$77.6 million.

It may be difficult, however, to make a meaningful comparison of the P/NBV multiples between ResMor and the guideline companies because the book value of ResMor was adjusted upwards to reflect the purchase price at the time of its acquisition in 2007 by GMAC Canada, while certain assets of the guideline companies may be stated at historical cost less reserves. As such, the guideline company multiples could be higher than ones appropriately applicable to ResMor.

In addition, when GMAC Canada acquired ResMor on November 1, 2007, the purchase price of C$53.8 million was 1.94x NBV.[2459] On that date, these guideline companies traded at an average of 2.4x book value. Therefore, the transaction multiple for ResMor was 19% lower than the average of the guideline group of companies. Applying this 19% discount to the average guideline company P/NBV multiple of 1.0x as of the valuation date would result in a multiple of 0.81x book value and an indicated value of C$57.6 million.

### (e) Guideline M&A Method

The Guideline M&A Method employed by Goldin Associates considered eight transactions. The dates of the transactions ranged from June 27, 2002 to February 22, 2008. Goldin Associates relied on the P/NBV multiples in deriving a range of indicated equity

---

[2459] Notice of a Special Meeting of the Board of Directors of Residential Capital, LLC, dated Oct. 28, 2008, at RC40008767 [RC40008754].

values in the Guideline M&A Method. The Examiner's Financial Advisors have not identified an explanation for Goldin Associates' failure to consider earnings multiples because Goldin Associates used them for the guideline public companies. If the mean or median LTM P/E multiples were used, the resulting value from the Guideline M&A Method would be higher than the indication from using mean or median P/NBV multiples. Based on the eight transactions, the mean and median P/NBV multiples were 1.3x and 1.0x, respectively. The indicated range of equity values derived from the Guideline M&A Method was C$71.6 million to C$90.7 million.[2460]

Two common issues that generally arise when applying the Guideline M&A Method are the availability of a sufficient number of transactions contemporaneous to the valuation date and the comparability of the subject companies from the available transactions to the target company. Only one potentially comparable transaction in Goldin Associates' search results closed after November 2007, when GMAC Canada originally acquired ResMor. The acquisition of ResMor was completed at 1.9x NBV. Given the NBV of C$71.1 million as of October 31, 2008, the value of ResMor would be approximately C$135.1 million if the 1.9x book value were applied. Given the pace of change in the financial services industry in 2008, however, especially in the months leading up to the valuation date, the Guideline M&A Method most likely would provide a less reliable indication of value for ResMor compared to other methods.

#### (f)  Asset-Based Approach

Goldin Associates also utilized the Adjusted Book Value Method under the Asset-Based Approach but did not ultimately rely on it. The Adjusted Book Value Method employed by Goldin Associates adjusted the book values of ResMor's assets and liabilities as of October 31, 2008 based on a range of low and high recovery estimates. In the Goldin Associates analysis, the following asset line items had a range of recovery estimates other than 100%: (1) HFS mortgage loans had a low recovery estimate of 97.7% and a high recovery estimate of 102.4%; (2) HFI mortgage loans had a low recovery estimate of 97.7% and a high recovery estimate of 102.4%; (3) retained interests had a low recovery estimate of 98.4% and a high recovery estimate of 101.6%; and (4) "[o]ther assets" had a low recovery estimate of 85.0% and a high recovery estimate of 95.0%.[2461] Goldin Associates noted that "estimates of recovery value are made by utilizing varying assumptions regarding discount rates, prepayment rates and other assumptions used by ResMor management."[2462]

---

[2460] Draft Goldin Associates Presentation to the Committee of Independent Members of the Board of Directors of Residential Capital, LLC Regarding the Purchase of ResMor Trust Company by GMAC, LLC, dated Dec. 2, 2008, at 23 [GOLDIN00127218].

[2461] *Id.* at 24.

[2462] *Id.*

In addition, Goldin Associates included unallocated 2008 net operating expenses that reduced the adjusted book values by C$4.5 million. In a footnote, Goldin Associates explained that this amount represented the after-tax expenses that GMAC Canada incurred in supporting ResMor business activities. There was no assumption of wind-down expenses because the business was assumed to be a going concern. Goldin Associates does not appear to have considered any goodwill or other intangible value not reflected on the balance sheet. Based on this analysis, the range of adjusted book values was between C$51.6 million and C$76.9 million.

Goldin Associates did not apply any weight to the Adjusted Book Value Method in deriving its concluded range of equity values.

### (g) Premiums And Discounts

GMAC Canada's interest in ResMor was a 100% controlling, closely-held interest. Consideration of the perceived value of these attributes can be quantified by an appraiser through certain premiums and discounts. For example, the Guideline Publicly Traded Company Method is often considered to provide an indication of value on a marketable, minority basis in that the market price is based on small blocks of stock traded in liquid markets. Therefore, a premium for control and a discount for lack of marketability may be warranted when applying public company valuation multiples to a 100% controlling, closely-held interest. Discounts for lack of marketability may similarly be applicable in a DCF Method or a Guideline M&A Method. Goldin Associates did not apply any discounts or premiums in their analysis. If Goldin Associates had applied a marketability discount for the closely held interest, the indicated value would have been lower.

### (h) Sandler O'Neill Fairness Opinion

AFI retained Sandler O'Neill to render a fairness opinion in connection with the ResMor Sale. As with Goldin Associates, Sandler O'Neill performed various valuation analyses to arrive at its fairness opinion from AFI's perspective. It did not arrive at an independent conclusion of value.[2463]

Sandler O'Neill employed a different approach than Goldin Associates to the valuation of ResMor because their objective was to determine whether the transaction was fair to AFI. Based on its analysis, Sandler O'Neill indicated that the ResMor Sale would create a significant benefit to the cost of funds of AFI's Canadian auto financing business.[2464] The valuation model projected the cost of funds benefit annually from 2009 through 2014.[2465]

_____

[2463] *See* Sandler O'Neill Fairness Opinion Materials Prepared for Project Cub, dated Dec. 4, 2008 [SOP0000652].

[2464] *Id*. at 11.

[2465] *Id.*

After deducting expenses and taxes, Sandler O'Neill calculated the annual net savings and incremental free cash flows resulting from the impact of owning ResMor on AFI's automotive financing business.[2466]

Sandler O'Neill assumed a range of value for the existing business between C$65.0 million to C$75.0 million but presented no supporting analysis.[2467] In concluding on the range of value for ResMor from the perspective of AFI, Sandler O'Neill added the value of the existing ResMor business to the value of the incremental savings in the cost of funds.

Based on the Sandler O'Neill analysis, the total value of ResMor to AFI was a broad range of C$69.1 million and C$308.4 million.[2468] This valuation was predicated on a significant amount of financial synergies, namely savings from cost of funds. Even if this incremental value could be realized through acquiring ResMor, it is questionable that a buyer such as AFI would pay the shareholders of ResMor the value of such synergies.

When evaluating the transaction for the benefit of AFI shareholders, the premise of value employed by Sandler O'Neill most resembled an investment value from the perspective of a specific buyer. Sandler O'Neill concluded on an extremely broad range of equity values for alternative assumptions about the magnitude of low cost funding that AFI could realize through ResMor. However, albeit unsupported, their valuation for ResMor's existing business as of the transaction date was lower than the valuation by Goldin Associates.

---

[2466] *Id.* at 11, 16.

[2467] *Id.* at 17.

[2468] *Id*.

## (i) Overall Assessment Of Fair Market Value Indicia

GMAC Canada acquired ResMor in November 2007 for C$53.8 million[2469] and subsequently invested C$25.0 million in the company in December 2007,[2470] bringing the total investment to C$78.8 million through the end of 2007. ResMor was expected to record earnings in 2008 of C$16.5 million and incur operating expenses of C$10 million that were excluded from the ResMor financials but recognized at GMAC Canada.[2471] As a result, GMAC Canada's net investment in ResMor as of the closing of the ResMor Sale was approximately C$85.3 million, as summarized in the table below.

EXHIBIT V.F.4.f(4)(i)
**Summary of GMAC Canada Investment in ResMor**
*(C$ in Millions)*

| | | |
|---|---|---|
| Value paid in November 2007 | $ | 53.8 |
| Capital contribution in December 2007 | | 25.0 |
| 2008 earnings (forecast) | | 16.5 |
| 2008 GMAC Canada operating expense (forecast) | | (10.0) |
| Projected GMAC Canada investment through 2008 | $ | 85.3 |

*Source: Draft Goldin Associates Presentation to the Committee of Independent Members of the Board of Directors of Residential Capital, LLC Regarding the Purchase of ResMor Trust Company by GMAC, LLC, dated Dec. 2, 2008 [GOLDIN00127218]; Notice of a Special Meeting of the Board of Directors of Residential Capital, LLC, dated Oct. 28, 2008 [RC40008754].*

The Examiner's Financial Advisors considered the change in stock price for the guideline public companies as identified by Goldin Associates and Sandler O'Neill between November 1, 2007, when GMAC Canada acquired ResMor, and December 31, 2008, immediately prior to the closing of the ResMor Sale. Over that timeframe, shares of most of the companies declined by more than 50%. If this level of decline were applied to GMAC Canada's total investment in ResMor, the resulting value would be less than half of the C$85.3 million noted above.

Additionally, the Examiner's Financial Advisors analyzed the change in stock prices and trading multiples between the transaction close date of January 1, 2009, and the date that the market information was obtained in the Goldin Associates fairness opinion (i.e., November 19, 2008). Overall, the trading multiples were lower as of January 1, 2009, and would result in equity values that were approximately 10% to 20% lower than the indicated value range concluded by Goldin Associates.

---

[2469] Draft Goldin Associates Presentation to the Committee of Independent Members of the Board of Directors of Residential Capital, LLC Regarding the Purchase of ResMor Trust Company by GMAC, LLC, dated Dec. 2, 2008, at 10 [GOLDIN00127218].

[2470] *Id.*

[2471] Notice of a Special Meeting of the Board of Directors of Residential Capital, LLC, dated Oct. 28, 2008, at RC40008771 [RC40008754].

### (5) Conclusion Regarding Reasonably Equivalent Value

Based upon the above discussion and analysis and the totality of the circumstances, including but not limited to the fairness opinions by Goldin Associates and Sandler O'Neill, the GMAC Canada investment in ResMor in the year before this transaction with AFI, and other market indicators, the Examiner concludes that the evidence supports the proposition that RFC, as the equity owner of GMAC Canada, and GMAC Canada received reasonably equivalent value in the ResMor Sale.

### g.  US/UK Broker-Dealer Sale By RFC To AFI In May 2009

Pursuant to a Membership Interest and Share Purchase Agreement dated March 31, 2009, on May 1, 2009,[2472] RFC sold its interests in Ally Securities and RFCIL to AFI for $42.3 million and $18.1 million, respectively (i.e., $60.4 million total).[2473] RFCIL owned all of the outstanding share capital of RFSCIL, a broker-dealer registered with the Financial Services Authority in the United Kingdom, so AFI acquired 100% of ResCap's U.K. broker-dealer business in addition to ResCap's U.S. broker-dealer business, Ally Securities.[2474] With respect to the Ally Securities interests, on April 30, 2009, AFI also paid to RFC an amount equal to the entire outstanding principal due and payable under the existing $50 million subordinated loan between RFC and Ally Securities.[2475]

Prior to closing, Goldin Associates delivered a fairness opinion dated March 20, 2009, to the Special Committee of Independent Directors indicating that the consideration to be received by ResCap in connection with the transaction was fair from a financial point of view to ResCap and its creditors (other than AFI).[2476]

As set forth in the discussion and analysis below and based on the totality of the circumstances, the Examiner concludes that the evidence supports the proposition that RFC received reasonably equivalent value in the US/UK Broker-Dealer Sale.

---

[2472] Membership Interest and Share Purchase Agreement between RFC and GMAC, LLC, dated Mar. 31, 2009 [RC00026472]; Residential Capital, LLC, Quarterly Report (Form 10-Q) (Aug. 7, 2009), at 64.

[2473] Residential Capital, LLC, Quarterly Report (Form 10-Q) (Aug. 7, 2009), at 64.

[2474] Membership Interest and Share Purchase Agreement between RFC and GMAC, LLC, dated Mar. 31, 2009 [RC00026472].

[2475] Residential Capital, LLC, Quarterly Report (Form 10-Q) (Aug. 7, 2009), at 64.

[2476] Opinion Letter from Goldin Associates to the Committee of the Independent Members of the Board of Directors of ResCap (Mar. 20, 2009) [RC00027931].

### (1) Overview Of Ally Securities And RFCIL

#### (a) Ally Securities

Founded in 1990, Ally Securities was a registered broker-dealer under the Exchange Act, headquartered in Bethesda, Maryland. Ally Securities underwrote, distributed, and provided capital market liquidity for MBS and RMBS sold by its affiliate entities to institutional investors and financial institutions. It also traded MBS, RMBS, and other fixed income securities with brokers, dealers, and institutional investors for its proprietary account.[2477]

Ally Securities "[u]nderwrote a significant portion of ResCap's securitization activity (over \$100 billion, and \$65 billion since 2005)," and "also loaned funds to ResCap on a short-term basis."[2478] "[Ally Securities] competed with larger Wall Street broker-dealers that engaged in capital markets activity and market making of residential [MBS] and whole loans."[2479]

At the time of the transaction, Ally Securities was largely inactive because of various factors, including economic and financial conditions, ResCap's financial and operational circumstances, and its clearing capabilities as a broker-dealer being inhibited by State Street's credit concerns. Its assets consisted primarily of liquid agency RMBS and cash, and its activities were concentrated on acting as an agent or broker on sales of ResCap's Principal Investment Activity ("PIA") inventory and opportunistically evaluating bids on its own inventory.[2480] Ally Securities' headcount had declined from approximately sixty in 2007 to only fourteen as of March 2009, including three in senior management, two traders, three sales professionals, and two restructuring professionals, among others. ResCap provided Ally Securities with additional administrative and trading personnel, as well as with various administrative services, including equipment rental, data processing, maintenance, and other corporate services.[2481]

---

[2477] Draft Goldin Associates Presentation to the Committee of Independent Members of the Board of Directors of Residential Capital Regarding the Purchase of Residential Funding Securities, LLC and RFC Investments Limited by GMAC, LLC, dated Mar. 18, 2009, at 11 [GOLDIN00132386].

[2478] *Id.*

[2479] *Id.* at 16.

[2480] *Id.* at 11.

[2481] *Id.* at 12.

Appendix V.F.4.g(1)(a) provides the historical financial statements of Ally Securities. From December 31, 2005 to February 28, 2009, Ally Securities' total assets and total equity declined 83% and 51%, respectively, as depicted in the following table.[2482]

EXHIBIT V.F.4.g(1)(a)—1
**Ally Securities Total Assets and Total Equity**
*($ in Millions)*

|  | 12/31/2005 | 12/31/2006 | 12/31/2007 | 12/31/2008 | 2/28/2009 | Decline |
|---|---|---|---|---|---|---|
| Total assets | $   550.9 | $   1,441.9 | $   285.9 | $   96.8 | $   95.8 | (83%) |
| Total equity | 89.8 | 96.1 | 68.4 | 46.0 | 44.2 | (51%) |

*Source: Draft Goldin Associates Presentation to the Committee of Independent Members of the Board of Directors of Residential Capital Regarding the Purchase of Residential Funding Securities, LLC and RFC Investments Limited by GMAC, LLC, dated Mar. 18, 2009 [GOLDIN00132386].*

Similarly, over the same period, Ally Securities' operating results show a dramatic decline in underwriting activity, net interest income, and net income (loss), as depicted in the following table.[2483]

EXHIBIT V.F.4.g(1)(a)—2
**Ally Securities Operating Results**
*($ in Millions)*

|  | 12/31/2005 | 12/31/2006 | 12/31/2007 | 12/31/2008 | 2/28/2009 | Decline |
|---|---|---|---|---|---|---|
| Underwriting activity[(1)] | $   14,300.0 | $   13,500.0 | $   10,300.0 | $   - | $   - | (100%) |
| Net interest income | 11.9 | 3.3 | 4.0 | 5.7 | 1.1 | (91%) |
| Net income (loss) | 4.1 | 6.5 | (30.3) | (23.4) | (1.8) | (144%) |

*[(1)] For ResCap and affiliates.*
*Source: Draft Goldin Associates Presentation to the Committee of Independent Members of the Board of Directors of Residential Capital Regarding the Purchase of Residential Funding Securities, LLC and RFC Investments Limited by GMAC, LLC, dated Mar. 18, 2009 [GOLDIN00132386].*

### (b) RFCIL And RFSCIL

RFCIL supported ResCap's business activities, including those of Ally Securities, through RFSCIL, its wholly owned UK-broker-dealer subsidiary. Founded in London in 1997, RFSCIL supported Ally Securities' activities in Europe and comprised 100% of the assets and liabilities of RFCIL. RFSCIL had five employees, including two in senior management and three investment advisors. [2484]

Historically, RFSCIL placed securities sold by ResCap to institutional investors and financial institutions in Europe and did not trade securities for its proprietary account or provide advisory services. With the help of its affiliates, RFSCIL served as a "one-stop shop" for

---

[2482] *See id.* at 13.

[2483] *See id.* at 14.

[2484] *Id.* at 25.

European investors and, at the peak of its activity in 2006, placed an annual volume of securities totaling $10 billion. RFSCIL competed with larger European broker-dealers that engaged in capital markets activity and market making of residential MBS and whole loans.[2485]

At the time of the transaction, RFSCIL was largely inactive because of various factors, including economic and financial conditions and ResCap's financial and operational circumstances. Its assets consisted primarily of cash and other short-term investments, and its activities were concentrated on acting as the international agent or broker on sales of ResCap's PIA inventory.[2486]

Appendix V.F.4.g(1)(b) provides the historical financial statements of RFSCIL. From December 31, 2005 to February 28, 2009, RFSCIL's total assets and total equity increased 39% and 34%, respectively, as depicted in the following table.[2487]

EXHIBIT V.F.4.g(1)(b)—1
**RFSCIL Total Assets and Total Equity**
*($ in Millions)*

|  | 12/31/2005 | 12/31/2006 | 12/31/2007 | 12/31/2008 | 2/28/2009 | Increase |
|---|---|---|---|---|---|---|
| Total assets | $    15.0 | $    24.9 | $    29.4 | $    21.3 | $    20.8 | 39% |
| Total equity | 12.7 | 19.7 | 23.9 | 17.5 | 17.0 | 34% |

*Source: Draft Goldin Associates Presentation to the Committee of Independent Members of the Board of Directors of Residential Capital Regarding the Purchase of Residential Funding Securities, LLC and RFC Investments Limited by GMAC, LLC, dated Mar. 18, 2009 [GOLDIN00132386].*

However, over the same period, RFSCIL's operating results show a dramatic decline in net interest income and net income (loss), as depicted in the following table.[2488]

EXHIBIT V.F.4.g(1)(b)—2
**RFSCIL Operating Results**
*($ in Millions)*

|  | 12/31/2005 | 12/31/2006 | 12/31/2007 | 12/31/2008 | 2/28/2009 | Increase |
|---|---|---|---|---|---|---|
| Net interest income | $    5.5 | $    11.0 | $    7.8 | $    2.3 | $    0.1 | (99%) |
| Net income (loss) | 1.7 | 4.9 | 3.8 | 0.1 | (0.2) | (112%) |

*Source: Draft Goldin Associates Presentation to the Committee of Independent Members of the Board of Directors of Residential Capital Regarding the Purchase of Residential Funding Securities, LLC and RFC Investments Limited by GMAC, LLC, dated Mar. 18, 2009 [GOLDIN00132386].*

### (2) Summary Of Transaction And Process

As previously noted, ResCap's US/UK broker-dealers had been largely inactive in the year before the sale to AFI. Jones, CEO of ResCap from June 2007 to July 2008, recalled having considered closing ResCap's broker-dealer operations because any value was "primarily the

---

[2485] *Id.* at 25, 28.

[2486] *Id.* at 25.

[2487] *Id.* at 26.

[2488] *See id.* at 27.

employee capabilities" and "it wasn't at all clear that we were going to be able to deliver the employees to whoever the purchaser was."[2489] Jones further recalled that "as Marano came on with some amount of expertise in that area" there was an ongoing dialogue about whether the broker-dealers should be moved to AFI and how else they could be used.[2490]

On October 10, 2008, the ResCap Board discussed the possibility of selling its US/UK broker-dealers to AFI, including the need to obtain a fairness opinion should the negotiations with AFI proceed.[2491] On October 28, 2008, Robert Cole presented the ResCap Board with an overview of the proposed sale and estimated total proceeds of $118 million.[2492] Marano reported to the ResCap Board on November 3, 2008, that management was proceeding with the transaction negotiations with AFI.[2493] On November 12, 2008, Goldin Associates was engaged by the Special Committee of Independent Directors to render an opinion on the fairness to ResCap and its creditors of the proposed sale of the Ally Securities interests.[2494] The engagement letter was silent regarding a fairness opinion on the proposed sale of the RFCIL interests although Goldin Associates ultimately prepared a fairness opinion for the sale of those interests as well. From November 12, 2008 until March 1, 2009, however, the ResCap Board postponed further discussions on the potential sale.

On March 1, 2009,[2495] the ResCap Board resumed its deliberations regarding the US/UK Broker-Dealer Sale and heard a report from Robert Conway on the terms proposed by AFI. AFI offered to purchase Ally Securities for 1.0x book value as of February 28, 2009, less $500,000, plus payment of the $50 million loan due to RFC, and offered to purchase RFCIL for 1.0x book value as of February 28, 2009.[2496] Immediately following the meeting, the Independent Directors convened with their counsel, Morrison Cohen, to discuss the proposal.[2497] Goldin Associates presented its valuation analysis to the Special Committee of

---

[2489] Int. of J. Jones, Nov. 30, 2012, at 111:10–112:1.

[2490] *Id.* at 112:12–114:4.

[2491] Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Oct. 10, 2008, at RC40005881 [RC40005652].

[2492] Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Oct. 28, 2008, at RC40005896 [RC40005652].

[2493] Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Nov. 3, 2008, at RC40005900 [RC40005652].

[2494] Letter from Goldin Associates to the Committee of the Independent Members of the Board of Directors of ResCap (Nov. 12, 2008) [EXAM00233465].

[2495] Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Mar. 1, 2009, at RC40006068–70 [RC40005949].

[2496] Notice of a Special Meeting of the Board of Directors of Residential Capital, LLC, dated Mar. 1, 2009 at RC40011117–19 [RC40011115].

[2497] Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Mar. 1, 2009, at RC40006070 [RC40005949].

Independent Directors on March 18, 2009,[2498] and issued its opinion on March 20, 2009, that the consideration to be received in connection with the US/UK Broker Dealer Sale was fair from a financial point of view to ResCap and its creditors (other than AFI).[2499]

On March 23, 2009, Marano informed the ResCap Board that the Special Committee of Independent Directors had completed its review and approved the US/UK Broker-Dealer Sale.[2500] On March 25, 2009, the ResCap Board acted on the recommendation of the Special Committee of Independent Directors and signed a written consent and authorization for ResCap executives to carry out the transaction.[2501] The term sheets attached as Exhibit A and B to the authorization signed by the ResCap Board, however, were outdated and did not include the $500,000 reduction to the net book value of Ally Securities as of February 28, 2009 in the determination of the purchase price.[2502] This omission may have been a clerical error, as the presentation by Goldin Associates to the Special Committee of Independent Directors, which led to their recommendation to the ResCap Board to pursue the sale, included the updated terms—including the $500,000 reduction to Ally Securities' net book value.

The ResCap Board resolved that, based upon its review and consideration of the Special Committee of Independent Directors, the aggregate consideration was fair from a financial point of view to ResCap, and that the terms of the transaction were not materially less favorable to ResCap than those that could reasonably have been obtained in a comparable arm's-length transaction between ResCap and an unaffiliated party.[2503]

Once a decision was made to proceed with the US/UK Broker-Dealer Sale to AFI, the transaction moved quickly. RFC and AFI executed a Membership Interest and Share Purchase Agreement on March 31, 2009, and closed the sale approximately one month later on May 1, 2009.[2504]

---

[2498] Draft Goldin Associates Presentation to the Committee of Independent Members of the Board of Directors of Residential Capital Regarding the Purchase of Residential Funding Securities, LLC and RFC Investments Limited by GMAC, LLC, dated Mar. 18, 2009 [GOLDIN00132386].

[2499] Opinion Letter from Goldin Associates to the Committee of the Independent Members of the Board of Directors of ResCap (Mar. 20, 2009) [RC00027931].

[2500] Minutes of Special Meeting of Board of Residential Capital, LLC, Mar. 23, 2009, at RC40006091–93 [RC40005949].

[2501] Written Consent of the Board of Directors of Residential Capital, LLC, dated Mar. 25, 2009, at RC40006094–108 [RC40005949].

[2502] Ex. A and B to the Written Consent of the Board of Directors of Residential Capital, LLC, dated Mar. 25, 2009, at RC40006103–04 [RC40005949].

[2503] Written Consent of the Board of Directors of Residential Capital, LLC, dated Mar. 25, 2009, at RC00021244 [RC00021236].

[2504] Membership Interest and Share Purchase Agreement between RFC and GMAC, LLC, dated Mar. 31, 2009 [RC00026472]; Residential Capital, LLC, Quarterly Report (Form 10-Q) (Aug. 7, 2009), at 63.

RFC received cash consideration of $42.3 million and $18.1 million for the interests in Ally Securities and RFCIL, respectively. In addition, with respect to the Ally Securities interests, AFI paid to RFC an amount equal to the entire outstanding principal due and payable under the existing $50 million subordinated loan between RFC and Ally Securities.[2505]

The following diagram summarizes the value exchanged between RFC and AFI in the US/UK Broker-Dealer Sale.



EXHIBIT V.F.4.g(2)
**US/UK Broker-Dealer Sale Transaction Diagram**

*Source: Membership Interest and Share Purchase Agreement between RFC and GMAC, LLC, dated Mar. 31, 2009 [RC00026472]; Residential Capital, LLC, Quarterly Report (Form 10-Q) (Aug. 7, 2009), at 64.*

### (3) Third-Party Conclusion Of Value

As previously noted, on March 20, 2009, Goldin Associates opined that the proposed transaction terms set forth in the March 13, 2009 draft of the purchase agreement were fair from a financial point of view to ResCap and its creditors.[2506] Appendices V.F.4.g(4)(a) and V.F.4.g(4)(b) provide a summary of the Ally Securities and RFCIL/RFSCIL valuation analyses performed by Goldin Associates.

[2505] Residential Capital, LLC, Quarterly Report (Form 10-Q) (Aug. 7, 2009), at 64.

[2506] Opinion Letter from Goldin Associates to the Committee of the Independent Members of the Board of Directors of ResCap (Mar. 20, 2009) [RC00027931].

Based on Goldin Associates' assessment that both Ally Securities and RFCIL had limited ability to continue as independent going concerns, the Adjusted Book Value Method under the Asset-Based Approach was determined to be the most appropriate indicator for determining the transaction's fairness.[2507] Goldin Associates noted in its March 18, 2009 presentation to the Special Committee of Independent Directors that the "net asset value represent[ed] a floor on a range of values," and that it did not take into account the future value of Ally Securities or RFCIL to AFI.[2508]

### (4) Analysis Of Third-Party Fairness Opinion

Goldin Associates expressed no opinion on what value could actually be received by RFC in an open market sale of its interests. Rather, its opinion was limited to the fairness of the proposed transaction, from a financial point of view, to ResCap and its creditors (other than AFI).[2509]

According to the Goldin Associates presentation to the Special Committee of Independent Directors on March 18, 2008, Ally Securities and RFCIL each had limited ability to continue as an independent going concern in the then-current market, and was best valued at its liquidation or net asset value of 0.97x book value.[2510] Goldin Associates specifically concluded with regard to Ally Securities that ResCap's interest in Ally Securities was illiquid and marketable to only a very limited group of investors, and that the range of implied valuation multiples of 0.74x to 1.07x, arguably, should be reduced because of the illiquidity and lack of marketability of the Ally Securities interests.[2511]

---

[2507] Draft Goldin Associates Presentation to the Committee of Independent Members of the Board of Directors of Residential Capital Regarding the Purchase of Residential Funding Securities, LLC and RFC Investments Limited by GMAC, LLC, dated Mar. 18, 2009, at 21, 33 [GOLDIN00132386].

[2508] *Id.*

[2509] *See* Opinion Letter from Goldin Associates to the Committee of the Independent Members of the Board of Directors of ResCap (Mar. 20, 2009) [RC00027931].

[2510] *See* Draft Goldin Associates Presentation to the Committee of Independent Members of the Board of Directors of Residential Capital Regarding the Purchase of Residential Funding Securities, LLC and RFC Investments Limited by GMAC, LLC, dated Mar. 18, 2009, at 21, 33 [GOLDIN00132386].

[2511] *Id. at 22.*

*(a) Goldin Associates Valuation Analysis Of Ally Securities*

Appendix V.F.4.g(4)(a) provides a summary of the Ally Securities valuation analysis performed by Goldin Associates. In summary, Goldin Associates employed three valuation methodologies in forming its fairness opinion: (1) the Guideline Publicly Traded Company Method under the Market Approach; (2) the Guideline M&A Method under the Market Approach; and (3) the Adjusted Book Value Method under the Asset-Based Approach, the results of which are summarized in the following table.[2512]

---

EXHIBIT V.F.4.g(4)(a)
**Goldin Associates Valuation Analysis of Ally Securities**
*($ in Millions)*

| | Weight | Low | | High | |
|---|---|---|---|---|---|
| Guideline Publicly Traded Company Method | 25% | $ | 32.7 | $ | 48.5 |
| Guideline M&A Method | 5% | | 70.7 | | 79.5 |
| Adjusted Book Value Method | 70% | | 42.6 | | 42.6 |
| | | | | | |
| Range of indicated value | | $ | 41.5 | $ | 45.9 |

*Source: Draft Goldin Associates Presentation to the Committee of Independent Members of the Board of Directors of Residential Capital Regarding the Purchase of Residential Funding Securities, LLC and RFC Investments Limited by GMAC, LLC, dated Mar. 18, 2009 [GOLDIN00132386].*

---

*(i) Guideline Publicly Traded Company Method*

The Guideline Publicly Traded Company Method used by Goldin Associates considered two multiples: P/NBV and P/TBVE. These multiples are commonly considered when completing a valuation of a financial services company such as Ally Securities. However, given the lack of any significant operational activity at the time of the valuation analysis, the Examiner's Financial Advisors view the relevance of this method for a valuation of Ally Securities as questionable. The Guideline Publicly Traded Company Method is generally not meaningful in determining the value of an entity with minimal operating activities.

Goldin Associates selected ten guideline companies for consideration in applying the Guideline Publicly Traded Company Method. Based on these ten guideline companies, Goldin Associates calculated the mean P/NBV multiple to be 0.90x and the median P/NBV multiple to be 0.74x. The mean P/TBVE multiple was 1.10x, and the median P/TBVE multiple was 0.80x. Given these indications, the range of multiples was between 0.74x and 1.10x, with a resulting range in equity value of between $32.7 million and $48.6 million.[2513]

---

[2512] *Id.* at 21.

[2513] *Id.* at 13, 16–17.

### (ii) Guideline M&A Method

The Guideline M&A Method employed by Goldin Associates considered eight transactions. The dates of the transactions ranged from June 2, 2003 (earliest) to July 1, 2008 (most recent). Goldin Associates relied on the P/NBV multiples in deriving a range of indicated values. Based on the eight transactions, the mean P/NBV multiple was 1.80x, and the median P/NBV multiple was 1.60x. Using this range of multiples, the indicated range of equity values derived from the Guideline M&A Method was between $70.7 million and $79.5 million.[2514]

As with the Guideline Publicly Traded Company Method, given the lack of any significant operational activity at the time of the valuation analysis, the Examiner's Financial Advisors view the relevance of the Guideline M&A Method for a valuation of Ally Securities as questionable. The Guideline M&A Method is generally not meaningful in determining the value of entity with minimal operating activities.

### (iii) Adjusted Book Value Method

The Adjusted Book Value Method employed by Goldin Associates under the Asset-Based Approach adjusted the book values of Ally Securities' assets and liabilities as of February 28, 2009 based on recovery estimates. In the Goldin Associates analysis, cash and cash equivalents and trading securities comprised the preponderance of the assets (i.e., $85.1 million out of $95.8 million in total assets) and were valued at 100% of book value. "Securities owned, not readily marketable – non-agency" comprised approximately $10.7 million of the $95.8 million in total assets and were valued at 90% of book value. Goldin Associates noted that, "estimates of recovery are made by utilizing varying assumptions regarding default rates, loss severities and other assumptions." In addition, Goldin Associates deducted total wind-down expenses, professional fees, and occupancy costs of $0.5 million from the adjusted asset value. Based on this analysis, the net proceeds from liquidation of assets were estimated to be $42.6 million. Comparing this to the book value of $44.2 million indicates that the expected proceeds would be $1.5 million lower than book value of equity and implies a P/NBV multiple of 0.97x.[2515]

In the case of Ally Securities, where there was no significant operational activity, the Examiner's Financial Advisors view the Adjusted Book Value Method as the most appropriate valuation method.

---

[2514] *Id.* at 13, 18–19.

[2515] *Id.* at 20.

#### (b) Goldin Associates Valuation Of RFCIL/RFSCIL

Appendix V.F.4.g(4)(b) provides a summary of the RFCIL/RFSCIL valuation analysis performed by Goldin Associates. In summary, Goldin Associates employed three valuation methodologies in forming its fairness opinion: (1) the Guideline Publicly Traded Company Method under the Market Approach; (2) the Guideline M&A Method under the Market Approach; and (3) the Adjusted Book Value Method under the Asset-Based Approach, the results of which are summarized in the following table:[2516]

EXHIBIT V.F.4.g(4)(b)
**Goldin Associates Valuation of RFCIL/RFSCIL**
*($ in Millions)*

|  | Weight | Low | | High |
|---|---|---|---|---|
| Guideline Publicly Traded Company Method | 25% | $ | 13.0 | $ | 19.1 |
| Guideline M&A Method | 5% | | 39.7 | | 40.6 |
| Adjusted Book Value Method | 70% | | 16.5 | | 16.5 |
| Range of indicated value | | $ | 16.8 | $ | 18.4 |

*Source: Draft Goldin Associates Presentation to the Committee of Independent Members of the Board of Directors of Residential Capital Regarding the Purchase of Residential Funding Securities, LLC and RFC Investments Limited by GMAC, LLC, dated Mar. 18, 2009 [GOLDIN00132386].*

#### (i) Guideline Publicly Traded Company Method

The Guideline Publicly Traded Company Method used by Goldin Associates considered two multiples: P/NBV and P/TBVE. These multiples are commonly considered when completing a valuation of a financial services company such as RFCIL. However, given the lack of any significant operational activity at the time of the valuation analysis, the Examiner's Financial Advisors view the relevance of this method for a valuation of RFCIL as questionable; the Guideline Publicly Traded Company Method is generally not meaningful in determining the value of an entity with minimal operating activities.

Goldin Associates selected eleven guideline companies for consideration in applying the Guideline Publicly Traded Company Method. Based on these eleven guideline companies, Goldin Associates calculated the mean P/NBV multiple to be 0.77x and the median P/NBV multiple to be 0.92x. The mean P/TBVE multiple was 1.03x, and the median P/TBVE multiple was 1.12x. Given these indications, the range of multiples was between 0.77x and 1.12x, and the resulting range in value was $13.1 million to $19.0 million.[2517]

#### (ii) Guideline M&A Method

The Guideline M&A Method employed by Goldin Associates considered three transactions. The dates of the transactions range from April 13, 2005 (earliest) to May 23, 2008 (most recent).

---

[2516] *Id.* at 33.

[2517] *Id.* at 26, 29.

Goldin Associates relied on the P/NBV multiples in deriving a range of indicated values. Based on the three transactions, the mean P/NBV multiple was 2.34x and the median P/NBV multiple was 2.39x. Using this range of multiples, the indicated range of equity values derived from the Guideline M&A Method was between $39.7 million and $40.6 million.[2518]

As with the Guideline Publicly Traded Company Method, given the lack of any significant operational activity at the time of the valuation analysis, the Examiner's Financial Advisors view the relevance of the Guideline M&A Method for a valuation of RFCIL as questionable. The Guideline M&A Method is generally not meaningful in determining the value of an entity with minimal operating activities.

### (iii) Adjusted Book Value Method

The Adjusted Book Value Method employed by Goldin Associates under the Asset-Based Approach adjusted the book value of RFCIL's assets and liabilities as of February 28, 2009 based on recovery estimates. In the Goldin Associates analysis, cash and short-term deposits comprised the preponderance of the assets and were valued at 100% of book value. Prepaid expenses, accounts receivable and fixed assets were insignificant in amount and were valued at 0% to 50% of book value due to liquidation costs. In addition, Goldin Associates deducted total wind-down expenses of $0.5 million. Based on this analysis, the net proceeds from liquidation of assets were estimated to be $16.5 million. Comparing this to the book value of approximately $17.0 million indicates that the expected proceeds would be $0.5 million lower than the book value of equity and implies a P/NBV of 0.97x.[2519]

### (iv) Premiums And Discounts

RFC's interests in Ally Securities and RFCIL were 100% controlling, closely-held interests. Consideration of the perceived value of these attributes relative to guideline indications can be quantified by an appraiser through certain premiums (i.e. control) and discounts (i.e. lack of marketability for a closely held interest). Goldin Associates did not apply any discounts or premiums in their analysis.

The lack of any significant operational activity at the time of the transaction would most likely decrease the valuation multiple that would be paid by a market participant interested in acquiring the US/UK broker-dealers. Therefore, for both Ally Securities and RFCIL, a buyer would likely apply a discount to any trading multiples observed in the Guideline Publicly Traded Company Method and Guideline M&A Method. If such a discount were applied, the equity value resulting from such analysis would be lower.

---

[2518] *Id.* at 33.

[2519] *Id.* at 32.

### *(c) Overall Assessment Of Fair Market Value Indicia*

In summary, the Examiner's Financial Advisors consider the Adjusted Book Value Method to be a reliable indicator of the Fair Market Value of Ally Securities and RFCIL, while the Guideline Publicly Traded Company Method and the Guideline M&A Method have limited relevance for companies with minimal operating activity. The assets of these entities were principally carried on the balance sheets at fair value. Under the circumstances, the Examiner's Financial Advisors consider the valuation of the assets of the US/UK broker-dealers at approximately book value to be appropriate, if not somewhat optimistic. Given the state of the financial services industry and capital markets in early 2009, and the resulting limitations on the operations of Ally Securities and RFCIL, their recent trend of operating losses was not likely to abate. Further, a discount for lack of marketability could be appropriate in light of market conditions at the time when valuing a portfolio of mortgage-backed securities and asset-backed securities.

As described in Section VIII, Third-Party Claimants assert that Ally Securities is directly liable for false statements in the RMBS Offering Documents. These parties allege that Ally Securities enabled the Debtors' fraudulent conduct by providing critical underwriting services in connection with the securitizations, including by reviewing, marketing and distributing false and misleading RMBS Offering Documents. Plaintiffs have asserted several causes of action against Ally Securities, including claims based on (1) federal and state securities law; (2) common-law fraud, fraudulent inducement, and aiding and abetting fraud; and (3) negligent misrepresentation. The consideration received by RFC in the US/UK Broker-Dealer Sale was not adjusted to account for any contingent liability related to potential third-party claims.

### *(5) Conclusion Regarding Reasonably Equivalent Value*

Based upon the above discussion and analysis and the totality of the circumstances, including but not limited to the Goldin Associates valuation analyses and fairness opinion and prevailing market conditions, the Examiner concludes that the evidence supports the proposition that RFC received reasonably equivalent value in the US/UK Broker-Dealer Sale.

## G. MITCHELL BOND TRANSACTION

### 1. Posting Of Bond In Mitchell Litigation

As part of the Investigation, the Examiner reviewed ResCap's posting of two litigation bonds in connection with the Mitchell case. The Mitchell bond posting was identified as a "Specified Transaction" in the Committee Rule 2004 Motion,[2520] and the scope of the Investigation was guided in part by the Bankruptcy Court's observation that the Committee Rule 2004 Motion "sets the appropriate scope parameter."[2521] Accordingly, the Examiner presents the following review and analysis of the Mitchell bond posting.

#### a. Procedural Background And Trial

The Mitchell Plaintiffs filed a putative class action lawsuit on July 29, 2003 in state court in Kansas City, Missouri against the Mitchell Defendants—including Debtors RFC and Homecomings Financial (a subsidiary of RFC)[2522]—alleging violations of the MSMLA, which places limits on the amount of closing costs and fees that second mortgage lenders may charge loan consumers in Missouri.[2523] The Debtors' potential liability arises from 248 second mortgage loans originated by Mortgage Capital Resource Corporation and assigned to RFC. The Mitchell Plaintiffs asserted that the Mitchell Defendants were strictly liable as assignee mortgagees pursuant to the assignee provisions of HOEPA.[2524] The trial court certified a class consisting of all individuals who obtained a second mortgage loan on Missouri real property from Mortgage Capital Resource Corporation on or after July 29, 1997.[2525]

---

[2520] Committee Rule 2004 Motion, Ex. B, at 6.

[2521] Examiner Memorandum Opinion, at 6 n.4.

[2522] No other ResCap entities are Mitchell Defendants. The other Mitchell Defendants are Household Finance Corp. III and Wachovia Equity Servicing.

[2523] MO. REV. STAT. §§ 408.231–241. The Mitchell Plaintiffs' claims of direct liability were brought under Missouri's Second Mortgage Loan Act, a consumer protection law enacted in 1979 that was "designed to regulate the business of making high interest second mortgage loans on residential real estate." Mitchell Appeal Decision, at 486 (quoting *Avila v. Cmty. Bank of Va.*, 143 S.W.3d 1, 4 (Mo. Ct. App. 2003)).

[2524] 15 U.S.C. § 1641. The Mitchell Plaintiffs' claims of assignee liability are based HOEPA, a federal law enacted in 1994 that "provides that assignees of HOEPA (high interest) loans 'are derivatively liable' for the conduct of the assignor . . . ." Mitchell Appeal Decision, at 487 (quoting *Schwartz v. Bann–Cor Mortg.*, 197 S.W.3d 168, 179 (Mo. Ct. App. 2006)). In enacting HOEPA, Congress "intended to place the increased burden of inquiring into the legitimacy of the lending practices engaged in by the original lender upon the assignees of HOEPA loans." *Id.* at 487 (quoting *Bryant v. Mortg. Capital Res. Corp.*, 197 F. Supp. 2d 1357, 1365 (N.D. Ga. 2002)).

[2525] Mitchell Appeal Decision.

The case was tried in circuit court in Kansas City, Missouri from December 3, 2007 through January 4, 2008.[2526] At the close of the Mitchell Plaintiffs' case, the court directed a partial verdict for the Mitchell Plaintiffs, holding: (1) Mortgage Capital Resource Corporation violated the MSMLA by charging illegal closing fees; and (2) the Mitchell Defendants, as assignee mortgagees, were strictly liable for such violations.[2527] The jury assessed damages, including compensatory and punitive damages, of $99,651,115 against RFC and $706,042 against Homecomings Financial.[2528]

On October 14, 2008, RFC filed a Notice of Appeal to the Missouri Court of Appeals.[2529] On October 24, 2008, the circuit court issued an order requiring each of the Mitchell Defendants to post supersedeas bonds—including post-judgment interest at nine percent per annum over a three year anticipated appeal period—by November 3, 2008 to stay execution of the judgment.[2530] RFC was required to post a bond in the amount of $126,556,917,[2531] and Homecomings Financial was required to post a bond in the amount of $896,674.[2532]

---

[2526] Mitchell Trial Order.

[2527] Mitchell Appeal Decision, at 486.

[2528] *See* Amended Order, dated Oct. 24, 2008 [EXAM10537447]. Approximately one month after the damages verdict, on February 14, 2008, William Solomon, General Counsel of AFI, presented a legal report to the AFI Board which described the damages assessed against ResCap entities in the Mitchell litigation and noted, among other things, that "ResCap is submitting a claim for possible reimbursement under an old Integrated Risk insurance policy acquired for the 2000–2003 time period (subject to a $5 million deductible)." *See* Legal Report to the Board of Directors of GMAC LLC, dated Feb. 14, 2008, at ALLY_PEO_0004558 [ALLY_PEO_0004442]. As explained in a June 24, 2010 presentation to the AFI Board, AFI has numerous insurance programs, the largest of which is the "Management Liability Blend." *See* Ally Financial Corporate Insurance Update, dated June 24, 2010, at ALLY_0262858 [ALLY_0262724]. The Management Liability Blend includes an "Errors & Omissions" policy that provides coverage with a $100 million limit and a $25 million deductible in the "event that third parties allege negligence for services rendered or failed to be rendered by Ally." *See id.* at ALLY_0262858. The presentation also notes that "[o]ne of Ally's most significant claims is from 2003 (Mitchell) involving ResCap and is currently on appeal and bonded for $127M." *See id.* at ALLY_0262862 [ALLY_0262724]. In light of the Examiner's conclusions regarding the Mitchell bond posting, the Examiner determined it was not an effective use of Estate resources to investigate the results of ResCap's insurance claim.

[2529] Residential Capital, LLC, Quarterly Report (Form 10-Q/A) (Aug. 25, 2009), at 104.

[2530] Amended Order, dated Oct. 24, 2008 [EXAM10537447].

[2531] Order Approving the Amount of Supersedeas Bond, dated Nov. 3, 2008, at EXAM10278908 [EXAM10278905].

[2532] Order Approving the Amount of Supersedeas Bond, dated Nov. 3, 2008, at EXAM10278916 [EXAM10278913].

### b. ResCap/AFI Bond Posting Procedure And Approval

On October 10, 2008, Thomas Marano, CEO of ResCap, gave a presentation to the AFI Board explaining that, absent a cash infusion, "ResCap is forecast to deplete its liquidity on November 17, 2008."[2533] In connection with that presentation, William Solomon, General Counsel of AFI, addressed questions from board members regarding the bond posting in the Mitchell litigation.[2534]

At special meetings held on October 16 and 17, 2008, ResCap's General Counsel Tammy Hamzehpour updated the ResCap Board on matters relating to the Mitchell litigation, including the supersedeas bond. The ResCap Board discussed the "consequences of not posting the bond," including the possibility that non-payment would "result ultimately in a default under numerous credit facilities."[2535] The minutes reflect that Marano and Timothy Pohl of Skadden participated in the discussion on October 16, 2008.[2536] On October 17, 2008, at a special meeting of the AFI Board, Marano noted that the bond posting in the Mitchell litigation would result in a "significant outflow of cash in October 2008" for ResCap.[2537]

On October 28, 2008, the ResCap Board met and "discussed key components of the [ResCap] liquidity drain . . . such as the collateral posting in the Mitchell litigation . . . ."[2538] In connection with that discussion, ResCap Treasurer Jerry Lombardo stated that "important events are in process that will provide significant upside and runway to meet the Company's near-term cash and capital needs."[2539] The ResCap Board held another meeting to review ResCap's liquidity balance on October 30, 2008. At that meeting, the ResCap Board discussed "various transactions and options that would provide sufficient liquidity," including "the possibility of [AFI] posting the bond required in the Mitchell litigation on ResCap's behalf."[2540]

---

[2533] *See* Project Scout Discussion Materials to GMAC Board, dated Oct. 10, 2008, at ALLY_PEO_0003777 [ALLY_PEO_0003752]; Minutes of a Special Meeting of the Board of GMAC LLC, Oct. 10, 2008, at ALLY_PEO_0001297 [ALLY_PEO_0001009].

[2534] Minutes of a Special Meeting of the Board of GMAC LLC, Oct. 10, 2008, at ALLY_PEO_0001297 [ALLY_PEO_0001009].

[2535] Minutes of a Special Meeting of the Board of Residential Capital, LLC, Oct. 16, 2008, at RC40005882 [RC40005652]; Minutes of a Special Meeting of the Board of Residential Capital, LLC, Oct. 17, 2008, at RC40005884 [RC40005652].

[2536] Minutes of a Special Meeting of the Board of Residential Capital, LLC, Oct. 16, 2008, at RC40005882 [RC40005652].

[2537] Minutes of a Special Meeting of the Board of GMAC LLC, Oct. 17, 2008, at ALLY_PEO_0001299 [ALLY_PEO_0001009].

[2538] Minutes of a Special Meeting of the Board of Residential Capital, LLC, Oct. 28, 2008, at RC40005894 [RC40005652].

[2539] *Id.*

[2540] Minutes of a Special Meeting of the Board of Residential Capital, LLC, Oct. 30, 2008, at RC40005897 [RC40005652].

On October 31, 2008, Marano gave a presentation to the AFI Board regarding the expected liquidity drain at ResCap for November 2008, including the bond posting in the Mitchell litigation.[2541] The presentation noted that ResCap's liquidity balance as of October 31, 2008 was approximately $534 million, and projected a negative liquidity balance by mid-November 2011.[2542] During the presentation, the AFI Board and Marano discussed "the level of support that would provide sufficient cash runway and avoid a bankruptcy filing by ResCap."[2543] Although the minutes reflect consideration by the AFI Board of various transactions meant to allow ResCap to remain in compliance with certain TNW covenants, the AFI Board did not specifically authorize posting the Mitchell supersedeas bond on ResCap's behalf. The AFI Board resolved to provide "capital contributions to ResCap in an amount necessary to . . . exceed the [TNW] covenants by $100 million . . . up to, and not to exceed under any circumstances, $931 million."[2544]

On November 3, 2008, ResCap posted collateral to secure two supersedeas bonds in the Mitchell litigation in the aggregate amount of $127,453,591—one bond for RFC in the amount of $126,556,917 and one bond for Homecomings Financial in the amount of $896,674.[2545] The bonds were fully collateralized by cash on deposit in a bank account.[2546]

On November 11, 2008, the AFI Board again met to discuss ResCap's liquidity concerns. At that meeting, AFI VP of Finance Tazewell Rowe reported that ResCap was "projecting negative cash balances" beginning November 17, 2008, and needed cash support to meet operating needs and equity support to maintain compliance with certain consolidated TNW financial covenants.[2547] Marano informed the AFI Board that additional support from AFI, including in the form of AFI providing collateral for the Mitchell litigation bond, "would provide ResCap with sufficient runway until the bond exchange [was] successfully closed and the matters associated with the bank holding company initiative completed."[2548]

---

[2541] Minutes of a Special Meeting of the Board of GMAC LLC, Oct. 31, 2008, at ALLY_PEO_0001307 [ALLY_PEO_0001009].

[2542] Key Components of Liquidity Drain, dated Oct. 30, 2008, at ALLY_0259009 [ALLY_0259003].

[2543] Minutes of a Special Meeting of the Board of GMAC LLC, Oct. 31, 2008, at ALLY_PEO_0001307 [ALLY_PEO_0001009].

[2544] *Id.*

[2545] *See* Order Approving the Amount of Supersedeas Bond, dated Nov. 3, 2008, at EXAM10278908 [EXAM10278905]; Order Approving the Amount of Supersedeas Bond, dated Nov. 3, 2008, at EXAM10278916 [EXAM10278913]; s*ee also* Legal Matters Update to the Residential Capital, LLC Audit Committee, dated Dec. 11, 2009, at RC40018301 [RC40018295]; E-mail from M. Riskey (Nov. 18, 2008) [EXAM10278903].

[2546] Legal Matters Update to the Residential Capital, LLC Audit Committee, dated Dec. 11, 2009, at RC40018301 [RC40018295].

[2547] Minutes of a Special Meeting of the Board of GMAC LLC, Nov. 11, 2008, at ALLY_PEO_0001313 [ALLY_PEO_0001009].

[2548] *Id.*

Following deliberations, the AFI Board unanimously resolved to restructure the bond posting in the Mitchell litigation "with [AFI] replacing ResCap's $100 million with the surety provider."[2549] ResCap would retain first loss position of approximately $27 million, but would obtain cash inflow of $100 million.[2550] On the next day, November 12, 2008, the ResCap Board approved the support offer, including the support in connection with the Mitchell litigation bond.[2551]

### c. Appeal Decision

On November 23, 2010, the Missouri Court of Appeals reversed the $99 million punitive damages award and remanded the case for a new trial as to punitive damages.[2552] At the initial trial, the jury had been instructed to award punitive damages if either of the following conditions were met: (1) the Mitchell Defendants were liable as assignees for the actions of the mortgage loan originator (which liability the Mitchell Appeal Decision explains could only be assigned pursuant to HOEPA); or (2) the Mitchell Defendants "were liable for their own culpability in their own acts violating the MSMLA."[2553] As explained in the Mitchell Appeal Decision, "to the extent Defendants' liability depends on [the first condition] HOEPA assignee liability, it is subject to the cap within 15 U.S.C. § 1641(d)(2) . . . . Consequently, the

---

[2549] *Id.*

[2550] Minutes of a Special Meeting of the Board of GMAC LLC, Nov. 11, 2008, at ALLY_PEO_0001313 [ALLY_PEO_0001009]. Alvaro de Molina, AFI's CEO at the time, explained that ResCap expected to win the appeal and that the $27 million first loss position represented the legal team's expectation of ResCap's approximate "maximum exposure." *See* Int. of A. de Molina, Nov. 20, 2012, at 175:19–177:17. Therefore, the $27 million exposure risk remained with ResCap and AFI took the "ResCap credit risk and put up the liquidity for the collateral." *See id.* at 175:19–177:17.

[2551] Minutes of a Special Meeting of the Board of Residential Capital, LLC, Nov. 12, 2008, at RC40005906 [RC40005652]. The ResCap Board directed delivery of, among other things, a "Letter Agreement regarding litigation bonds related to the Mitchell case" in connection with its November 20, 2008 consent to the Initial Line of Credit Security Agreement. *See* Unanimous Written Consent of the Board of Directors of Residential Capital, LLC, dated Nov. 20, 2008, at RC40005928 [RC40005652]. The Letter Agreement memorialized the terms of AFI's support offer with respect to the Mitchell litigation bonds, including the requirement that any payments to be made would come from ResCap's "first loss" collateral prior to any payment from AFI's "second loss" collateral. *See* Letter Agreement Re: Litigation Bonds Relating to the Mitchell Case (Mayer Brown Draft), dated Nov. 16, 2008 [EXAM12079400]. Examiner's Professionals requested production of an executed copy of the Letter Agreement from the Debtors and AFI. Neither party was able to recover an executed copy of the Letter Agreement.

[2552] Mitchell Appeal Decision, at 484.

[2553] *Id.* at 513.

jury could not properly be instructed to award punitive damages based on assignee liability."[2554] Because it was "impossible to ascertain" the basis upon which the jury awarded punitive damages, the punitive damages award was reversed and remanded for retrial.[2555]

### d. Disposition Of Bond And Settlement Of Mitchell Litigation

Upon remand of the Mitchell litigation to the trial court, ResCap "paid $12.8 million in compensatory damages (including interest and attorneys' fees)."[2556]

On November 7, 2011, the Mitchell Plaintiffs, RFC and Homecomings Financial entered into a "Stipulation to Release of RFC Defendants' Supersedeas Bonds and Approval of Substitute Bond," which permitted the discharge and release of the supersedeas bonds that had previously been posted in the aggregate amount of $127,453,591 and the substitution of a new bond in the amount of $2 million.[2557]

On November 14, 2011, approximately $112 million in "funds previously required to be held as bond for the Mitchell case" were released to ResCap.[2558]

In advance of receiving the funds, on November 3, 2011, Todd Stitt, a Director in Global Funding and Liquidity at AFI, noted that the funds would be "unencumbered cash coming back to Rescap and is simply a return of cash paid/expense that was recognized from 2008."[2559] Lombardo responded and explained, "the cash . . . will not be unencumbered because a) it is covered under the blanket lien, and b) we will use that cash to repay the like amount on the LOC with [AFI], unless less than this amount is O/S."[2560] In other words, to the extent there was an outstanding balance on the A&R Line of Credit Facility, according to Lombardo, ResCap would use the $112 million in Mitchell bond funds to pay down the outstanding balance. In a November 16, 2011 presentation to the ResCap Board, the $112 million in Mitchell bond funds was shown as decreasing ResCap's projected liquidity "need" for June 2012, suggesting that ResCap retained the funds for its own purposes.[2561]

---

[2554] *Id.* at 514. Although HOEPA creates assignee liability for purchasers of second mortgage loans, the consumer's damages against the assignee are capped at the sum of: (1) the amount still owed by the consumer; and (2) the amount paid by the consumer "in connection with the transaction." *Id.* at 513 (quoting 15 U.S.C. § 1641(d)(2)).

[2555] *Id.* at 514.

[2556] Residential Capital, LLC Consolidated Financial Statements for the Years Ended December 31, 2011 and 2010, at RC40034930 [RC40034857].

[2557] Stipulation to Release of RFC Defendants' Supersedeas Bonds and Approval of Substitute Bond, dated Nov. 7, 2011, at EXAM00229991 [EXAM00229991].

[2558] *See* ResCap Liquidity Update, dated Nov. 16, 2011, at RC40019986 [RC40019983]; E-mail from T. Stitt (Nov. 15, 2011) [EXAM10916320].

[2559] E-mail from T. Stitt (Nov. 3, 2011) [EXAM10922744].

[2560] E-mail from J. Lombardo (Nov. 3, 2011) [EXAM10922744].

[2561] ResCap Liquidity Update, dated Nov. 16, 2011, at RC40019986 [RC40019983]. The Mitchell bond funds were also omitted from the list of projected cash outflows for the remainder of 2011. *See id.*

The Examiner's Financial Advisors reviewed the books and records of ResCap for November and December 2011 to determine whether any of the Mitchell bond funds were returned to AFI. On November 14, 2011, the day ResCap received the $112 million in Mitchell bond funds, ResCap borrowed approximately $217 million under the A&R Line of Credit Facility, increasing its borrowings under that facility from approximately $452 million to approximately $669 million.[2562] From November 15, 2011 through November 21, 2011, ResCap made incremental draws of approximately $184 million under the A&R Line of Credit Facility.[2563] The first paydown by ResCap on the A&R Line of Credit Facility subsequent to the inflow of the Mitchell bond funds occurred on November 22, 2011 in the amount of $143 million.[2564] The Examiner concludes that the evidence supports the proposition that ResCap did not directly transfer any of the returned Mitchell bond funds to AFI.[2565]

In February 2012, "RFC entered into an agreement in principle . . . to settle all of plaintiffs' remaining claims, including plaintiffs' already-awarded attorneys' fees on appeal, for a total of $17.3 million."[2566] The settlement agreement was preliminarily approved on April 16, 2012.[2567] The hearing on final approval of the proposed settlement was scheduled for May 18, 2012.[2568] However, on May 14, 2012, the Petition Date occurred and the automatic stay of litigation against the Debtors went into effect. Accordingly, the hearing for final approval of the Mitchell settlement was continued indefinitely.[2569]

### e.  Conclusion

Based on the foregoing, the Examiner concludes that the only Causes of Action implicated by the Mitchell bond transactions would be potential avoidance actions arising from payments made by ResCap under the A&R Line of Credit Facility. An analysis of these claims is provided in Section VII.F.

---

[2562] *See* ResCap Liquid Cash Rollforward, dated Dec. 1, 2011 [EXAM00114709]; Ally Affiliate Debt Journals, dated 2008 through 2012 [EXAM00338635]. According to James Whitlinger, CFO of ResCap, ResCap intended to draw approximately $330 million from the A&R Line of Credit Facility on November 14, 2011 but, after receiving the funds from the release of the Mitchell bond, only needed to borrow approximately $217 million. Teleconference with J. Whitlinger, CFO of ResCap (April 18, 2013).

[2563] Ally Affiliate Debt Journals, dated 2008 through 2012 [EXAM00338635].

[2564] *See id.*

[2565] The Debtors maintained an outstanding balance on the A&R Line of Credit Facility on all dates through February 14, 2012, on which date the Debtors had no amounts outstanding. *See* ResCap Liquid Cash Rollforward, dated Apr. 2, 2012 [EXAM00114713].

[2566] Residential Capital, LLC Consolidated Financial Statements for the Years Ended December 31, 2011 and 2010, at RC40034930 [RC40034857].

[2567] Ally Financial Inc., Quarterly Report (Form 10-Q) (Apr. 27, 2012), at 72.

[2568] *Id.*

[2569] *See Mitchell Case*, WALTERS, BENDER, STROHBEHN & VAUGHAN, P.C., http://www.wbsvlaw.com/wbsv-cases/mitchell-case.

## H.  SHARED SERVICES

### 1.  *Background*

ResCap, AFI, and Old GMAC Bank/Ally Bank provided various financial, operational, and administrative services ("Shared Services")[2570] to each other to varying degrees after ResCap's formation in 2005.[2571] The Examiner evaluated the processes used by ResCap, AFI, and Old GMAC Bank/Ally Bank for the provision of Shared Services and the allocation of related costs, and the extent to which ResCap received adequate consideration for Shared Services by and among ResCap, AFI, and Old GMAC Bank/Ally Bank. The Examiner analyzed Shared Services over two prepetition time periods: (1) ResCap's formation in April 2005 through December 2008; and (2) January 2009 through the Petition Date. The Examiner also considered postpetition activities with regard to Shared Services.

### 2.  *April 2005 Through December 2008*

The ResCap corporate group generally functioned independently within a decentralized AFI corporate structure during the earlier portion of this time period.[2572] However, in 2007,[2573] and again in 2008,[2574] there were concentrated efforts to increase efficiency by centralizing functions. Shared Services by and among ResCap, AFI, and Old GMAC Bank/Ally Bank were not evidenced by written agreements during this period, with the exception of services provided by Ally Bank to its affiliates.[2575] Rather, Shared Services were provided on an informal, undocumented basis.[2576]

---

[2570] The scope and nature of Shared Services changed over time, as described in this section.

[2571] First Day Affidavit, at 82. *See also,* Int. of C. Dondzila, Sept. 27, 2012, at 42:16–43:10 ("a majority of the accounting activities related to bank business activities were actually performed by ResCap employees."); E-mail from B. Yastine (Dec. 1, 2011) [ALLY_0304495] (noting the "operational entanglement" of ResCap and Ally Bank).

[2572] *See* Memorandum, GMAC Global Functions, Mar. 15, 2007 [EXAM10063058].

[2573] *See id.* (announcing that "staff functions . . . [would] be realigned into strong global functions" in areas including finance, information technology, communications, human resources, and legal).

[2574] *See* Int. of T. Hamzehpour, Oct. 5, 2012, at 67:16-24 (discussing 2008 effort led by de Molina to further eliminate duplication and centralize "global functions").

[2575] Ally Bank executed Administrative Service Agreements with affiliates to comply with regulatory requirements regarding the provision of services to affiliates for fair value. *See e.g.,* Administrative Services Agreement by and between Residential Funding Company, LLC and GMAC Bank, dated Oct. 31, 2006 [ALLY_0017710]; Administrative Services and Facilities Agreement by and between GMAC Mortgage, LLC and GMAC Bank, et al., dated Nov. 22, 2006 [RC00028357].

[2576] Declaration of James Whitlinger, Chief Financial Officer of Residential Capital, LLC, in Further Support of Entry of Final Orders for Specific "First Day" Motions [Docket No. 257] at 3. *See also* Declaration of Philip Marc Scheipe in Support of AFI's Submission Regarding the Shares Services Agreement [Docket No. 1299] (where Scheipe asserts that some of the shared services historically were provided on a formally documented basis while others were provided on an informal, undocumented basis).

ResCap reported in its Annual Report (Form 10-K) for 2008 that it paid management fees to AFI for finance, information technology, communications, corporate marketing, procurement, and services related to facilities, and that ResCap received fees from AFI for "risk management" services provided by ResCap in the amounts summarized in the table below.[2577] The amounts paid and received by ResCap encompassed its subsidiaries, which during this period included Old GMAC Bank/Ally Bank.

EXHIBIT V.H.2
**Shared Services Activity**
2006 – 2008
*($ in Millions)*

|  | 2006 | | 2007 | | 2008 | |
|---|---|---|---|---|---|---|
| Management fees paid by ResCap to AFI | $ | 27.5 | $ | 42.5 | $ | 66.9 |
| Less: Risk management fees paid by AFI to ResCap | | 6.4 | | 19.4 | | - |
| Net Shared Services fees paid by ResCap to AFI | $ | 21.1 | $ | 23.1 | $ | 66.9 |

*Source: Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2009), at 206.*

These disclosures do not indicate how ResCap and AFI allocated these costs. Documents produced during the Investigation are likewise uninformative. The Debtors and AFI advised the Examiner's Professionals that only limited information exists regarding the processes and allocation methodology used for Shared Services during this period for various reasons, including personnel turnover and a lack of institutional knowledge from those years.[2578] Accordingly, the available evidence does not support a finding with regard to the consideration exchanged for Shared Services during this period.

### 3. January 2009 Through May 14, 2012

In January 2009, AFI completed the 2009 Bank Transaction and the acquisition of ResMor.[2579] The scope of Shared Services between ResCap and AFI expanded during 2009 as functional service areas and departments were consolidated and centralized at AFI.[2580] Shared Services tracking and reporting improved because of this consolidation. ResCap, AFI, and Ally Bank agreed to classify two basic categories of costs for Shared Services: (1) costs arising from services "directly benefitting another domestic or foreign [business] unit,"[2581] including rent,

---

[2577] Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2009), at 206.

[2578] Meeting with Debtors and FTI, Financial Advisor to the Debtors, in Fort Washington, PA (Mar. 25, 2013).

[2579] *See* Sections V.A. and V.F.

[2580] Int. of C. Dondzila, Sept. 27, 2012, at 51:7–53:25, 64:23–65:22; Int. of T. Hamzehpour, Oct. 5, 2012, at 64:7–65:9.

[2581] An activity was generally considered to provide a benefit if the beneficiary of the service would be willing to pay a third party to perform the same or similar activity, or if the beneficiary would have performed the same or similar activity for itself. Meeting with AFI and Ally Bank, and Kirkland & Ellis, in Detroit, MI (Oct. 23, 2012); *see also* Ally Financial, Inc., ResCap Intercompany Activity with AFI (Sept. 24, 2012), at ALLY_0182794 [ALLY_0182793].

marketing, certain information technology, and certain legal costs[2582] ("Direct Benefit Costs"); and (2) costs expended "to protect the shareholders' investment or to facilitate compliance with reporting or regulatory requirements for the benefit of the shareholder" ("Stewardship Costs").[2583] Shared Services cost allocations were often settled through intercompany accounts, with certain Direct Benefit Costs settled on a cash basis, such as rent and some legal costs.[2584]

### a. Cost Of Shared Services Provided By AFI To ResCap

Because of AFI's acquisition of Ally Bank and ResMor in January 2009, AFI no longer charged ResCap for Direct Benefit Costs related to those entities. Also, AFI decided in 2009 that it would not charge ResCap for Stewardship Costs allocable to the mortgage segment.[2585] This decision was not made until December 2009, at which time AFI forgave the outstanding payable from ResCap in the amount of $195 million related to those allocable Stewardship Costs.[2586] AFI determined that it would allocate Stewardship Costs to ResCap thereafter for internal managerial reporting purposes only.[2587] In communicating these changes to AFI personnel, Paul Grande, senior director of financial planning and analysis at ResCap, explained:

> During this year[']s plan process it was decided that the [AFI] Global Function charges would no longer be charged 100% to the ResCap legal entity. Instead, the Direct Benefit charges would be calculated as if [AFI] would separately charge ResCap, Ally Bank and ResMor Bank. Then only the ResCap LLC amount will be charged and settled with ResCap LLC. [. . .] Stewardship charges in total will be charged on a managerial basis only.[2588]

---

[2582] Meeting with Debtors and FTI, Financial Advisor to the Debtors, in Fort Washington, PA (Mar. 25, 2013).

[2583] Meeting with AFI and Ally Bank, in Detroit, MI (Oct. 24, 2012). *See also* Ally Financial, Inc., ResCap Intercompany Activity with AFI (Sept. 24, 2012), at ALLY_0182794 [ALLY_0182793].

[2584] Meeting with Debtors and FTI, Financial Advisor to the Debtors, in Fort Washington, PA (Mar. 25, 2013).

[2585] E-mail from P. Grande (Dec. 2, 2009), at ALLY_0182846 [ALLY_0182793].

[2586] Residential Capital, LLC Consolidated Financial Statements for the Years Ended December 31, 2009 and 2008 (Feb. 26, 2010), at EXAM00124502 [EXAM00124455]. *See also* Ally Financial, Inc., ResCap Intercompany Activity with AFI (Sept. 24, 2012), at ALLY_0182794 [ALLY_0182793] and E-mail from P. Grande (Dec. 2, 2009), at ALLY_0182846 [ALLY_0182793].

[2587] E-mail from P. Grande (Dec. 11, 2009), at ALLY_0182847 [ALLY_0182793].

[2588] *Id.*

The management fees charged to ResCap by AFI for Shared Services increased in 2009 and 2010 as reflected in the table below. Much of the increase resulted from the further centralization of corporate services and functions, as reflected in the table below. The net amount of Shared Services fees paid by ResCap to AFI represented the Direct Benefit Costs allocated by AFI to ResCap.[2589] This increase in management fees was offset, however, by the decrease in ResCap's total compensation and benefits expense because of the transfer of departments and employees to AFI.

EXHIBIT V.H.3—1
**Shared Services Activity**
2008 – 2011
*($ in Millions)*

|  | 2008 | 2009 | 2010 | 2011 |
|---|---|---|---|---|
| Management fees paid by ResCap to AFI | $ 66.9 [(1)] | $ 284.6 | $ 93.3 | $ 67.7 |
| Less: Forgiveness of Stewardship Costs allocation | - | 195.0 | - | - |
| Risk management fees paid by AFI to ResCap | - | - | - | - |
| Net Shared Services fees paid by ResCap to AFI | $ 66.9 | $ 89.6 | $ 93.3 | $ 67.7 |
| | | | | |
| ResCap compensation and benefits expense | $ 791.3 | $ 344.0 | $ 261.8 | $ 319.6 |

[(1)] *2008 Management Fees Paid by ResCap to AFI of $66.9 million include the cost of Shared Services rendered by AFI to ResCap for the benefit of Ally Bank and ResMor, both of which were acquired by AFI in January 2009.*
*Source: Residential Capital, LLC Consolidated Financial Statements for the Years Ended December 31, 2009 and 2008 (Feb. 26, 2010) [EXAM00124455]; Residential Capital, LLC Consolidated Financial Statements for the Years Ended December 31, 2011 and 2010 (Mar. 28, 2012) [EXAM00122651].*

---

[2589] *See* Project Bounce, Shared Services UCC Requests [EXAM00219984].

In preparing for ResCap's chapter 11 filing (as further described below), ResCap and AFI analyzed both the Direct Benefit Costs and Stewardship Costs allocated for managerial reporting purposes on a monthly basis, breaking down the allocation by functional area in 2011 through April 2012 (the "Prepetition Shared Services Analysis"). The Examiner's Financial Advisors analyzed the Debtors' records of Stewardship Costs charged to the mortgage segment for the benefit of ResCap and Ally Bank, and the Direct Benefit Costs allocated to ResCap for cash settlement.[2590] The table below summarizes the percentage of total Shared Services Costs allocated by AFI to the mortgage segment for the benefit of ResCap and Ally Bank that were charged to ResCap under the Prepetition Shared Services Analysis.

EXHIBIT V.H.3—2
**Portion of Mortgage Segment Shared Services Costs Allocated to ResCap**
*($ in Millions)*

|  | 2010 | 2011 | Apr. 2012 |
|---|---|---|---|
| Total Shared Services costs allocated by AFI to mortgage segment | $ 322.8 | $ 283.9 | $ 97.8 |
| Portion of total Shared Services costs allocated to ResCap | 92.0 [(1)] | 67.7 | 38.3 |
| Percentage of total Shared Services costs allocated to ResCap | 28.5% | 23.8% | 39.2% |

*[(1)] The $92.0 million of total Shared Services costs allocated to ResCap in 2010 per this source is $1.3 million less than the $93.3 million reported in ResCap's audited financial statements. See Residential Capital, LLC Consolidated Financial Statements for the Years Ended December 31, 2011 and 2010 (Mar. 28, 2012) [EXAM00122651].*
*Source: Project Bounce, Shared Services UCC Requests [EXAM00219984].*

The balance of the total Shared Services Costs allocated by AFI to the mortgage segment primarily represented Stewardship Costs and costs associated with ResMor and Ally Bank. These balances total approximately $230.8 million for 2010 and $216.2 million for 2011.

### b. Cost Of Shared Services Provided By ResCap To Ally Bank

Regulations applicable to Ally Bank required that transactions with affiliates be on terms at least as favorable to Ally Bank as those applicable to nonaffiliated companies.[2591] Because ResCap determined that the process of documenting the terms of comparable transactions with nonaffiliated companies was difficult, it historically rendered services to Ally Bank at no

---

[2590] *Id.*

[2591] Federal Reserve Act, section 23B, "Restrictions on Transactions with Affiliates," as implemented by Regulation W, requires that "A member bank and its subsidiaries may engage in [transactions involving the payment of money or the furnishing of services to an affiliate under contract, lease, or otherwise] only – (A) on terms and under circumstances, including credit standards, that are substantially the same, or at least as favorable to such bank or its subsidiary, as those prevailing at the time for comparable transactions with or involving other nonaffiliated companies, or (B) in the absence of comparable transactions, on terms and under circumstances, including credit standards, that in good faith would be offered to, or would apply to, nonaffiliated companies." 12 U.S.C. 371c – 1(a)(1).

cost.[2592] Prior to the 2009 Bank Transaction, this arrangement did not affect ResCap's overall financial results because AFI's entire mortgage segment was consolidated within ResCap. ResCap's financial statements during the period 2009 through 2011 noted the following:

> [ResCap] provides office facilities and a wide range of administrative services, including legal, risk, capital markets, finance and accounting, and information technology support to Ally Bank under an administrative services agreement.[2593] No fees were collected during the year . . . for these facilities and services. . . . [ResCap] contracts with Ally Bank to provide document custody services including, certifications, releases, reinstatements and file maintenance.[2594]

The Examiner's Financial Advisors analyzed various data prepared in connection with the Prepetition Shared Services Analysis, as described below. While not comprehensive, the review supports the Debtors' contention that the value of uncompensated Shared Services rendered by ResCap to Ally Bank was significantly less than the unallocated Stewardship Costs not charged by AFI to ResCap from 2009 to 2011.[2595]

### c. Statements Of Work And Negotiations Of Shared Services In Preparation For ResCap's Filing

ResCap and AFI commenced a joint effort in 2011—the Prepetition Shared Services Analysis—to document the services each company provided to the other or its Affiliates in preparation for ResCap's bankruptcy filing.[2596] ResCap appointed groups of employees who were knowledgeable regarding each functional service area.[2597] These designated ResCap employees engaged in frequent conversations and met on several occasions with their

---

[2592] *See, e.g.,* Memorandum, Administrative Services Agreement Between GMAC Mortgage and GMAC Bank (Aug. 1, 2007) [ALLY_0017837] (referencing statement that "[a]ll services provided under this agreement are at no charge to the Bank.").

[2593] *See, e.g.,* Administrative Services Agreement by and between Residential Funding Company, LLC and GMAC Bank, dated Oct. 31, 2006 [ALLY_0017710]; and Administrative Services Agreement by and between GMAC Mortgage, LLC and GMAC Bank, dated Nov. 22, 2006; ResCap, LLC Quarterly Report (Form 10-Q) (May 11, 2009), at 558.

[2594] Residential Capital, LLC Consolidated Financial Statements for the Years Ended December 31, 2009 and 2008, at EXAM00124556 [EXAM00124455].

[2595] Meeting with FTI, Financial Advisor to the Debtors, in Fort Washington, PA (Mar. 25, 2013). Whitlinger explained that the uncompensated Shared Services provided by AFI and Ally Bank to ResCap were in excess of those provided by ResCap to Ally Bank.

[2596] Declaration of James Whitlinger, Chief Financial Officer of Residential Capital, LLC, in Further Support of Entry of Final Orders for Specific "First Day" Motions [Docket No. 257] at 3; Meeting with FTI, Financial Advisor to the Debtors, in Fort Washington, PA (Mar. 25, 2013).

[2597] Declaration of James Whitlinger, Chief Financial Officer of Residential Capital, LLC, in Further Support of Entry of Final Orders for Specific "First Day" Motions [Docket No. 257] at 3.

counterparts at AFI and with ResCap's counsel, Morrison & Foerster, resulting in the production of over fifty detailed descriptions, or "Statements of Work" ("SOW"),[2598] regarding the identified Shared Services.[2599]

ResCap analyzed the SOW during the bankruptcy planning process to determine which services were essential for continued operations during its bankruptcy and sale process. ResCap engaged in negotiations with AFI over the course of several months to eliminate services deemed unnecessary.[2600] This process ultimately resulted in a significant reduction in the services the two companies provided to each other.[2601] Whitlinger explained:

> [W]hen negotiations began between the companies, AFI was seeking compensation for shared services in an amount of approximately $300 million annually, which reflected the

---

[2598] *See, e.g.,* Affiliate Statement of Work for Accounting to Master Services Agreement Dated August 1, 2011 [ALLY_PEO_0030748]; Affiliate Statement of Work for Capital Markets to Master Services Agreement Between Ally Bank and Residential Capital, LLC, dated August 1, 2011 [ALLY_PEO_0030703].

[2599] Declaration of James Whitlinger, Chief Financial Officer of Residential Capital, LLC, in Further Support of Entry of Final Orders for Specific "First Day" Motions [Docket No. 257] at 3; Meeting with FTI, Financial Advisor to the Debtors, in Fort Washington, PA (Mar. 25, 2013). *See also* Int. of C. Dondzila, Nov. 9, 2012, at 214:18–215:6. To determine the cost of each of the Shared Services, the designated groups of employees conducted personnel surveys in each functional area to determine the percentage of time each employee typically spent performing work on certain tasks for the benefit of ResCap, AFI, or their various affiliates, including Ally Bank. These percentages were applied to the functional costs (e.g., salaries plus overhead) to determine the pricing basis for the tasks identified within each SOW. *See* Declaration of James Whitlinger, Chief Financial Officer of Residential Capital, LLC, in Further Support of Entry of Final Orders for Specific "First Day" Motions [Docket No. 257] at 4; Meeting with FTI, Financial Advisor to the Debtors, in Fort Washington, PA (Mar. 25, 2013).

[2600] AFI provided a number of cost allocation templates for various shared services that ResCap and AFI identified and negotiated, which illustrate the results of the efforts described above. For example, the cost allocation template for human resources included, among other data, the following: (1) identification of the various functional areas (e.g., benefits administration, compensation, employee relations, staffing administration); (2) description of the service provided; (3) identification of the entity providing the service (i.e., either ResCap or AFI); (4) identification of the entity receiving the service (i.e., either ResCap, AFI, or Ally Bank); (5) identification of any SOW, existing contract, or formal agreement, whether intercompany or with third parties; (6) the allocation methodology employed (e.g., time studies); and (7) the total expense allocation on a monthly or per annum basis for each service. *See, e.g.,* Shared Services Analysis Cost Allocation Template, Human Resources [ALLY_0021129]; Shared Services Analysis Cost Allocation Template, ITG [ALLY_0021111]; and Shared Services Analysis Cost Allocation Template, Legal [ALLY_0021136].

[2601] Meeting with FTI, Financial Advisor to the Debtors, in Fort Washington, PA (Mar. 25, 2013); Declaration of James Whitlinger, Chief Financial Officer of Residential Capital, LLC, in Further Support of Entry of Final Orders for Specific "First Day" Motions [Docket No. 257] at 2–4 (Whitlinger further indicates that negotiations resulted in a total of 31 SOWs for which AFI provided services to ResCap, and a total of 20 SOWs for which ResCap provided services to AFI). *See also* Project Bounce, Shared Services UCC Requests [EXAM00219984] (indicating that services negotiated out included those related to Bank Holding Company status, information technology projects related to the general ledger and Basel compliance, and general accounting services).

> approximate annual cost of "shared services" for the total mortgage operations over the last several years prior to the filing. As a result of the intensive and thorough negotiations that occurred between the two companies, the final cost to ResCap for services provided by AFI [. . .] was reduced to $123 million – a significant reduction reflecting the provision of services that are absolutely necessary to the functioning of ResCap and its subsidiaries as debtors in possession.[2602]

The approximately $300 million in Shared Services to which Whitlinger referred above includes Stewardship Costs and Direct Benefit Costs for the mortgage segment—ResCap, Ally Bank and ResMor. The "final cost" of $123 million represented an increase of approximately $55.3 million (or approximately 82%) from the 2011 Direct Benefit Costs ($67.7 million) paid by ResCap to AFI. This differential reflects postpetition several structural and philosophical changes, including: (1) ResCap discontinued receiving certain Shared Services; (2) AFI absorbed the costs for services previously provided by ResCap to Ally Bank under the Administrative Services Agreement; (3) AFI transferred certain shared employees and functions to ResCap to enhance corporate separateness; (4) and AFI began charging ResCap for certain previously unallocated Stewardship Costs. The 82% increase in the cost of Shared Services to ResCap when negotiated on a stand-alone basis supports the notion that ResCap was receiving a prepetition net benefit relative to AFI and Ally Bank.

The Examiner's Financial Advisors analyzed the cost allocation templates prepared through the Prepetition Shared Services Analysis that documented the nature and cost of services related to six functional areas: information technology, human resources, treasury, compliance, supply chain, and legal.[2603] The Examiner's Financial Advisors noted that, for each functional area, the scope and cost of Shared Services provided by AFI for the benefit of ResCap exceeded the scope and cost of Shared Services provided by ResCap for the Benefit of AFI and Ally Bank.

---

[2602] Declaration of James Whitlinger, Chief Financial Officer of Residential Capital, LLC, in Further Support of Entry of Final Orders for Specific "First Day" Motions [Docket No. 257] at 5.

[2603] *See* Shared Services Analysis Cost Allocation Template, ITG [ALLY_0021111]; Shared Services Analysis Cost Allocation Template, Human Resources [ALLY_0021129]; Shared Services Analysis Cost Allocation Template, Treasury [ALLY_0004788]; Shared Services Analysis Cost Allocation Template, Compliance [ALLY_0004799]; Shared Services Analysis Cost Allocation Template, Supply Chain [ALLY_0004800]; and Shared Services Analysis Cost Allocation Template, Legal [ALLY_0021136]).

*4. Postpetition*

ResCap's and AFI's Shared Services analyses and negotiations culminated in the drafting of the Shared Services Agreement, which the Bankruptcy Court approved, authorized, and directed ResCap to execute on June 15, 2012, retroactive to the Petition Date.[2604]

The Shared Services Agreement included various schedules detailing the functional areas and services to be provided by either ResCap or AFI under the various SOW and the estimated monthly variable or fixed cost for each service.[2605] The services identified included, among other things:

> (i) information technology services; (ii) employee benefits administration and other human resources functions; (iii) accounting, tax and internal audit services; (iv) treasury and collateral management; (v) risk management functions; (vi) supply chain management, including procurement of goods and services from third parties; (vii) government and regulatory relations and compliance services; (viii) facilities management services; (ix) marketing services; and (x) capital markets services relating to managing the value of certain of the Debtors' loan servicing rights.[2606]

The total monthly cost to ResCap for postpetition services provided by AFI was estimated to be $10.2 million, while the total monthly cost to AFI for services provided by ResCap postpetition was estimated to be $4.4 million. The resulting estimated monthly net cash settlement of $5.8 million would be payable by ResCap to AFI.[2607] The monthly cost of postpetition Shared Services that ResCap agreed to provide to Ally Bank was $3 million[2608] or approximately $36 million per year.

---

[2604] *See* Final Order Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing Residential Capital, LLC to Enter Into a Shared Services Agreement with Ally Financial Inc. *Nunc Pro Tunc* to the Petition Date for the Continued Receipt and Provision of Shared Services Necessary for the Operation of the Debtors' Businesses [Docket No. 387].

[2605] *Id.* Ex. A.

[2606] First Day Affidavit, at 84. The description of Shared Services evolved over time.

[2607] Final Order Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing Residential Capital, LLC to Enter Into a Shared Services Agreement with Ally Financial Inc. *Nunc Pro Tunc* to the Petition Date for the Continued Receipt and Provision of Shared Services Necessary for the Operation of the Debtors' Businesses, at Exhibit A [Docket No. 387].

[2608] *Id.* Schedule C-2 to the Shared Services Agreement estimated the monthly cost for information technology, capital markets, human resources, risk management, legal, accounting, finance, and consumer lending services rendered by ResCap to Ally Bank to be approximately $3 million.

### 5. AFI Proof Of Claim

AFI filed a proof of claim related to "shared services" in ResCap's Chapter 11 Cases, asserting that "[b]efore the Petition Date, the Debtors did not satisfy certain amounts owed to [AFI] or third-party vendors for various shared services provided by [AFI] for or on behalf of the Debtors."[2609] AFI enumerated sixteen claims for "unreimbursed costs, expenses, or losses that it has incurred in relation to prepetition shared services" totaling approximately $169.1 million, plus one additional claim for an unliquidated amount.[2610] The four largest claims accounted for $168.2 million of the total and included the following:

- Up to $98 million on account of pension underfunding for the Employees' Retirement Plan for GMAC Mortgage Group, LLC, which represents the amount of underfunding allocable to ResCap.

- Approximately $49 million on account of cash payments made or to be made by AFI to certain of the Debtors' employees for delayed compensation pursuant to the Troubled Asset Relief Program under the Emergency Economic Stabilization Act of 2008 earned by Debtors' employees before the Petition Date.

- $15.8 million on account of ResCap's portion of shared insurance coverage premiums, which were paid by AFI before the Petition Date.

- $5.4 million on account of ResCap's allocable share of prepetition expenditures by AFI in relation to the construction of a mortgage information warehouse . . . in order to comply with the Basel Accords.[2611]

Despite the characterization of this proof of claim as being related to "shared services," it appears that the vast majority of the amount relates to discrete compensation and benefit claims rather than the allocable service charges that were the subject of the Examiner's inquiry. The Examiner's Professionals have not investigated the status of any amounts paid or objections filed by ResCap in regard to AFI's proof of claim.

### 6. Conclusion

For the period of April 2005 through December 2008, the available evidence does not permit a conclusion to be formed with regard to the consideration exchanged for Shared Services.

For the period of January 2009 through the Petition Date, when considering the excess of unallocated Stewardship Costs over the likely amounts that remained uncompensated to ResCap under the Administrative Services Agreement with Ally Bank, the Examiner concludes that the evidence supports the proposition that ResCap received adequate consideration for Shared Services by and among ResCap, AFI, and Ally Bank.

---

[2609] Addendum to Proof of Claim of Ally (Nov. 6, 2012), at 16 [Claim No. 3974].

[2610] *Id.* at 16–19.

[2611] *Id.* at 16.

## VI. EXAMINER'S ASSESSMENT OF RESCAP'S FINANCIAL CONDITION

Several of the causes of action analyzed in this Report require the Examiner to assess whether ResCap (or, in some instances, RFC and GMAC Mortgage) was insolvent or in financial distress as prescribed by the applicable Bankruptcy Code provisions and analogous state-law statutes at various relevant times preceding the commencement of the Debtors' bankruptcy cases. This Section contains the Examiner's analysis and conclusions on these issues.

## A. GENERAL INTRODUCTION TO ANALYSIS OF A DEBTOR'S FINANCIAL CONDITION

Section VII includes a comprehensive analysis and evaluation of the principal claims that could be asserted on behalf of the Debtors' bankruptcy estates against AFI, Cerberus, and their respective affiliates. In addition to being a necessary element of certain claims (such as constructive fraudulent transfer, preference, or breach of fiduciary duties while insolvent), ResCap's financial condition over time is relevant to the Examiner's assessment of other significant issues, claims, and potential remedies.

For a constructive fraudulent transfer claim to succeed, a plaintiff must show—in addition to establishing the absence of reasonably equivalent value—that the relevant debtor was financially impaired (as defined in any of three separate statutory tests), or became so, at the time of the challenged transfer. The three disjunctive tests of financial distress focus respectively on: (1) whether the sum of the debtor's debts (including its contingent and/or unliquidated liabilities) is greater than all of the debtor's assets, at a fair valuation (the Balance Sheet Test); (2) whether the debtor was left with "unreasonably small capital [or assets]" to carry on its business (the "inadequate capital" test); or (3) whether the debtor intended or believed that it was or would become unable to pay its debts as they became due (the "inability to pay" test).[1]

Claims to avoid preferences under section 547 of the Bankruptcy Code and claims to avoid "insider preferences" under section 5(b) of the UFTA (as enacted in various relevant states) require a demonstration of insolvency pursuant to the Balance Sheet Test. Claims based on breaches of fiduciary duty while insolvent look to state law to determine the relevant measure of financial distress.

This Section examines the financial condition of ResCap (and, as appropriate, RFC and GMAC Mortgage) at various relevant times by reference to the applicable legal tests for financial distress under the Balance Sheet Test, inadequate capital test, and inability to pay test. Section VII discusses the applicable tests for financial impairment as to each type of claim analyzed.

---

[1]  *MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co.*, 910 F. Supp. 913, 936, 943 (S.D.N.Y. 1995).

## B. BALANCE SHEET TEST

### 1. Introduction

The first of the three disjunctive tests of financial distress for a constructive fraudulent transfer analysis seeks to determine the insolvency of the debtor through what is commonly known as the Balance Sheet Test.[2] The Balance Sheet Test is the exclusive manner of assessing a debtor's financial condition in avoidable preference litigation.[3]

In the Bankruptcy Code, "insolvent" is defined as a "financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation . . . ."[4] Section 2 of the UFCA states that "[a] person is insolvent when the present fair salable value of his assets is less than the amount that will be required to pay his probable liability on his existing debts as they become absolute and matured."[5] The UFTA states that "[a] debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets, at a fair valuation."[6] The UFCA, in effect in New York, predates the Bankruptcy Code's and the UFTA's definition of insolvency. The UFTA's definition of insolvency is generally patterned on the definition in the Bankruptcy Code. Although authorities have acknowledged that the Balance Sheet Tests for financial distress under the UFCA, the Bankruptcy Code, and the UFTA differ slightly,[7] there is general agreement that the similarities between the three statutes justify a substantially similar analysis.[8]

---

[2]  11 U.S.C. § 548(a)(1)(B)(ii).

[3]  *Id.* § 547(b)(3).

[4]  *Id.* § 101(32)(A).

[5]  UFCA § 2(1); N.Y. DEBT. & CRED. LAW § 271.

[6]  UFTA § (2)(a).

[7]  *See, e.g.*, *Bay Plastics, Inc.* v. *BT Commercial Corp.* (*In re Bay Plastics, Inc.*), 187 B.R. 315, 328 n.22 (Bankr. C.D. Cal. 1995) (noting slightly different definitions of insolvency under the Bankruptcy Code, the UFCA, and the UFTA).

[8]  *See, e.g.*, *Sharp Int'l Corp. v. State St. Bank & Trust Co.*(*In re Sharp Int'l Corp.*), 403 F.3d 43, 55 (2d Cir. 2005) (noting "New York's policy in favor of national uniformity in UFCA law") (citing *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 634 n.8 (2d Cir.1995) ("In order to promote a uniform national interpretation of the UFCA, both this Circuit and the courts of New York have encouraged recourse to the case law of other jurisdictions.") (citation omitted)); *Nisselson v. Empyrean Inv. Fund, L.P.* (*In re MarketXT Holdings Corp.*), 376 B.R. 390, 420 n.42 (Bankr. S.D.N.Y. 2007) ("[T]here is no dispute that Federal and State law are virtually identical as to their requirements for proving a constructive fraudulent conveyance."); *Moody v. Sec. Pac. Bus. Credit, Inc*., 971 F.2d 1056, 1068 (3d Cir. 1992) ("The fraudulent conveyance provisions of the Bankruptcy Code are modeled on the UFCA, and uniform interpretation of the two statutes is essential to promote commerce nationally. . . . [A]lthough the UFCA's 'present fair salable value' language differs from the Bankruptcy Code's 'fair valuation' requirement . . . we find the bankruptcy cases instructive on the proper valuation standard here." (citation omitted)); *Kaler v. Red River Commodities, Inc.* (*In re Sun Valley Prods., Inc.*), 328 B.R. 147, 155 (Bankr. D.N.D. 2005) ("The language of UFTA and section 548 are nearly identical . . . . Considering the similarities in purpose and language, many courts have concluded that the UFTA and section 548 are *in pari materia*, and that the same analysis applies under both laws. The Court finds the reasoning behind these cases persuasive and will analyze the transfer at issue only under the purview of section 548." (citation omitted)).

## 2. *Methodology*

The basic methodology for assessing whether a debtor is insolvent is generally well established in the law and the relevant valuation literature. The following steps are performed to ensure both the relevance and reliability of the valuation analysis: (1) define the legal interest to be valued; (2) identify ownership interest characteristics (such as controlling, marketable, etc.); (3) select a relevant date (usually the transfer date); (4) determine the purpose of the valuation (avoidance action, breach of duty, etc.); (5) identify the applicable standard of value; (6) identify the applicable premise of value; (7) select the applicable valuation approaches (for example, the Market Approach, Asset-Based Approach, and/or Income Approach, etc.); (8) reach a conclusion on value, making appropriate adjustments for control or lack of control, marketability, etc.; and (9) cross-validate valuation results.[9] The determination of the appropriate standard of value, premise of value, and valuation approaches are discussed in greater detail in the following Sections.

### a. *Standard Of Value*

The Bankruptcy Code provides that an insolvency determination should compare the debts of the debtor with its property at a "fair valuation." The UFCA and UFTA are substantially similar in this regard. The Bankruptcy Code does not define a "fair valuation." Although the standard of Fair Market Value is specifically mentioned in section 522(a)(2) of the Bankruptcy Code, it is not specifically used in the definition of insolvency under section 101(32). The conventional use of Fair Market Value in an insolvency determination has been developed by courts, which have maintained the flexibility to vary from that standard of value in appropriate circumstances. There is a strong practice among courts and valuation experts to embrace a Fair Market Value standard when assessing "fair valuation" under the Bankruptcy Code or the UFTA. Although the UFCA uses the term "fair salable value" as opposed to "fair valuation," courts have stated that "fair salable value" means "that value which can be obtained if the assets are liquidated with reasonable promptness in an arm's-length transaction in an existing and not theoretical market."[10] Thus, authorities generally conclude that a "fair valuation" and "fair salable value" both mean Fair Market Value, absent circumstances to justify any deviation. Fair Market Value is defined as:

> [T]he price, expressed in terms of cash equivalents, at which property would change hands between a hypothetical willing and able buyer and a hypothetical willing and able seller, acting

---

[9] Assoc. of Insolvency & Restructuring Advisors, Certification in Distressed Business Valuation Study Course Part 2: Advanced Business Valuation 3–9 (Sept. 22, 2010); *see also* Shannon P. Pratt with Alina V. Niculita, Valuing A Business: The Analysis and Appraisal of Closely Held Companies 30–31 (5th ed. 2008).

[10] *United States v. Gleneagles Inv. Co.*, 565 F. Supp. 556, 578 (M.D. Pa. 1983), *aff'd sub nom. United States v. Tabor Court Realty Corp.,* 803 F.2d 1288 (3d Cir. 1986).

at arm's length in an open and unrestricted market, when neither is under compulsion to buy or sell and when both have reasonable knowledge of the relevant facts.[11]

### b. Premise Of Value

Valuation theory includes two operational premises of value that are regularly recognized by bankruptcy courts: going concern value and liquidation value. These premises are defined as follows:

- *Going concern value* is defined as "the value of a business enterprise that is expected to continue to operate into the future. The intangible elements of [g]oing [c]oncern [v]alue result from factors such as having a trained work force, an operational plant, and the necessary licenses, systems, and procedures in place."[12]

- *Liquidation value* is defined as "the net amount that would be realized if the business is terminated and the assets are sold piecemeal. Liquidation can be either 'orderly' or 'forced.'"[13]

Where liquidation is not clearly imminent on the date of the challenged transfer, it is generally accepted that assets should be valued under a going concern basis or "determined by the fair market price of the debtor's assets that could be obtained if sold in a prudent manner within a reasonable period of time to pay the debtor's debts."[14]

---

[11] INTERNATIONAL GLOSSARY OF BUSINESS VALUATION TERMS, Statement on Standards for Valuation Services No. 1 app. B, at 44 (Am. Inst. of Certified Pub. Accountants 2007), http://www.aicpa.org/InterestAreas/ForensicAndValuation/DownloadableDocuments/SSVS_Full_Version.pdf.

[12] *Id.* at 45.

[13] *Id.* at 46.

[14] *Lawson v. Ford Motor Co.* (*In re Roblin Indus., Inc.*), 78 F.3d 30, 35 (2d Cir. 1996).

### c. Valuation Approaches

Three valuation approaches are commonly used in assessing insolvency: the Market Approach, the Asset-Based Approach, and the Income Approach.[15] Numerous valuation methods can be applied under each of these three approaches.[16] The appropriate use of any of these valuation methods depends on the circumstances of the valuation and the reasoned judgment of the valuation expert.[17] Once the valuation is performed, the resulting Fair Market Value of invested capital[18] (or assets) is compared to a company's debts (or liabilities) with the result indicating whether a debtor is insolvent under the Balance Sheet Test as of the valuation date.[19]

### (1) Market Approach

The Market Approach indicates the Fair Market Value of a company based on its market capitalization (if publicly traded) or a comparison of the subject company to similar publicly traded companies and transactions in its industry.[20] The Market Approach can be applied through a number of different methods including the Guideline Publicly Traded Company Method, the Guideline M&A Method, and the Observable Market Value Method.

### (a) Guideline Publicly Traded Company Method

The Guideline Publicly Traded Company Method provides an indication of the Fair Market Value of a business by developing valuation multiples based on prices at which securities of similar companies are trading in a public market.[21] These market-based multiples are then applied to the operating results of the subject business, resulting in an estimate of the Fair Market Value of invested capital or equity (depending on the nature of the multiple

---

[15] SHANNON P. PRATT WITH ALINA V. NICULITA, VALUING A BUSINESS: THE ANALYSIS AND APPRAISAL OF CLOSELY HELD COMPANIES 62 (5th ed. 2008).

[16] For example, the DCF Method is a method under the Income Approach, the Guideline Publicly Traded Company Method is a method under the Market Approach, and the Adjusted Book Value Method is a method under the Asset-Based Approach.

[17] Statutory Comm. of Unsecured Creditors ex rel. Iridium Operating LLC v. Motorola, Inc. (In re Iridium Operating LLC), 373 B.R. 283, 351 (Bankr. S.D.N.Y. 2007) (noting that certain valuation methods may be preferred in certain circumstances).

[18] Invested capital is defined as the sum of equity and interest-bearing debt in a business. INTERNATIONAL GLOSSARY OF BUSINESS VALUATION TERMS, Statement on Standards for Valuation Services No. 1 app. B, at 45 (Am. Inst. of Certified Pub. Accountants 2007), http://www.aicpa.org/InterestAreas/ForensicAndValuation/DownloadableDocuments/SSVS_Full_Version.pdf.

[19] Section VI.B.5 discusses the treatment of contingent or unliquidated liabilities for purposes of the Balance Sheet Test.

[20] SHANNON P. PRATT WITH ALINA V. NICULITA, VALUING A BUSINESS: THE ANALYSIS AND APPRAISAL OF CLOSELY HELD COMPANIES 265, 310 (5th ed. 2008).

[21] Id. at 265.

applied) on a marketable, minority basis. A premium for control, if applicable, is then applied to the equity to indicate the Fair Market Value of equity of the subject business on a marketable, controlling basis.[22] The Fair Market Value of debt is added to derive the Fair Market Value of invested capital.

The Guideline Publicly Traded Company Method is also known as the "Comparable Company" approach for its direct reliance on a set of comparable companies to estimate the market value of the subject company, or as the "Market Multiple" approach for its direct reliance on the selection of an appropriate range of risk-adjusted multiples based upon revenues, earnings, or some other appropriate measure under the circumstances to determine the value of a business.[23]

### (b) Guideline M&A Method

The Guideline M&A Method estimates the Fair Market Value of a business based on exchange prices in actual transactions for controlling interests in similar companies.[24] This process involves comparison and correlation of the subject business with similar companies acquired within a reasonable time of the valuation date. Considerations such as location, time of sale, operating characteristics, and conditions of sale are analyzed for the guideline companies. This variation of the Market Approach results in an indicated Fair Market Value of the subject business on a marketable, controlling basis.[25]

### (c) Observable Market Value Method

The Observable Market Value Method relies on the use of the quoted market prices of the equity and/or debt securities of the subject company trading in active, well-informed, and efficient markets. For purposes of the Balance Sheet Test, this method assumes that the combined market value of the company's debt and equity is a proxy for the Fair Market Value of the company's assets, net of non-debt current liabilities.[26]

For equity, the quoted market price per share is multiplied by the number of equity shares outstanding to yield the Fair Market Value of the equity of a business on a marketable, minority basis. A premium for control, if applicable, is then applied to indicate the Fair Market Value of the equity of a business on a marketable, controlling basis.[27] For debt, the

---

[22] *Id.* at 265–269.

[23] *Lids Corp. v. Marathon Inv. Partners, L.P.* (*In re Lids Corp.*), 281 B.R. 535, 540, 542–543 (Bankr. D. Del. 2002).

[24] SHANNON P. PRATT WITH ALINA V. NICULITA, VALUING A BUSINESS: THE ANALYSIS AND APPRAISAL OF CLOSELY HELD COMPANIES 310 (5th ed. 2008).

[25] *Id.* at 311.

[26] The sum of the interest-bearing debt and equity of a company (i.e., invested capital) is equivalent to the total assets of a company, net of non-debt current liabilities.

[27] This represents the value of the equity component of a company's overall capital structure and is not necessarily indicative of solvency.

quoted market price is multiplied by the face value of debt to yield the Fair Market Value of debt. The equity and debt values are combined to arrive at the indicated Fair Market Value of invested capital of the business on a marketable, controlling basis.

The Observable Market Value Method, also known as the "Market Capitalization Method" or the "Stock and Debt" method, [28] focuses on a "company's stock price [as] an 'ideal datapoint' for determining value."[29] This method can be advantageous because it is "untainted by hindsight or post-hoc litigation interests."[30] Moreover, recognizing that individual equity prices represent a minority equity interest in the company, a control premium adjustment may be necessary.[31] The application of a control premium, when warranted, results in the Fair Market Value of an entity on a controlling basis exceeding the Fair Market Value of an entity on a non-controlling or minority basis. The Observable Market Value Method may not be appropriate in circumstances where markets are illiquid, inefficient, or where events drive market prices away from the economic fundamentals of the business.[32]

### (2) Asset-Based Approach

The Asset-Based Approach indicates the Fair Market Value of a business by adjusting the assets and liabilities of the subject company to their market value equivalents.[33] The Asset-Based Approach is based on the summation of the individual values of the underlying assets, properties, and/or business units of a company. This approach can be performed using the "Adjusted Book Value Method,"[34] which involves examining the book value of a company's

---

[28] BRADFORD CORNELL, CORPORATE VALUATION 34 (1993).

[29] *Statutory Comm. of Unsecured Creditors ex rel. Iridium Operating LLC v. Motorola, Inc.* (*In re Iridium Operating LLC*), 373 B.R. 283, 291 (Bankr. S.D.N.Y. 2007) ("[P]ublic markets constitute a better guide to fair value than the opinions of hired litigation experts whose valuation work is performed after the fact and from an advocate's point of view." (citing *VFB LLC v. Campbell Soup Co.*, 482 F.3d 624 (3d Cir. 2007))).

[30] *In re Iridium,* 373 B.R. at 346 (citing *VFB LLC v. Campbell Soup Co.*, Civ.A.02-137 KAJ, 2005 WL 2234606, at *22 (D. Del. Sept. 13, 2005), *aff'd*, 482 F.3d 624 (3d Cir. 2007)).

[31] ACCOUNTING STANDARDS CODIFICATION 350-20-35-23 (FASB 2013).

[32] *In re Emerging Comm'cns, Inc. Shareholders Litig.*, No. Civ.A 16415, 2004 WL 1305745, at *23 (Del. Ch. June. 4, 2004) (noting that under Delaware law, "the market price of shares is not always indicative of value," and rejecting defendant's argument that the market price of its stock corroborated the fair value of defendant, in part because defendant's expert testified that "markets occasionally make errors, . . . it is possible for a stock that trades even in an efficient market to be mispriced, especially in the short run, . . . [and] the market may be inefficient if material information is withheld from it" (internal citations omitted)).

[33] For purposes of the Balance Sheet Test, it is only necessary to estimate the Fair Market Value of the total assets when applying the Asset-Based Approach. The Fair Market Value of the total assets is then compared to the face value of the total liabilities to assess insolvency. Total liabilities include interest-bearing liabilities, non-interest bearing liabilities (i.e., payables, accrued expenses, and other current and non-current liabilities, etc.), and contingent and/or unliquidated liabilities.

[34] SHANNON P. PRATT WITH ALINA V. NICULITA, VALUING A BUSINESS: ANALYSIS AND APPRAISAL OF CLOSELY HELD COMPANIES 352 (5th ed. 2008).

assets and liabilities and making adjustments to reflect market value. The book value is generally the accounting value of a company's assets and liabilities as determined under GAAP, which is then subjected to adjustments to reflect market value.[35] One should also consider any off-balance sheet assets or liabilities when applying the Adjusted Book Value Method to estimate the Fair Market Value of a business, as discussed in Section VI.B.5. Courts caution that accounting values may not be reflective of Fair Market Value, and, in particular, certain assets and liabilities may not be listed on the balance sheet because GAAP limits inclusion on the balance sheet to known and quantifiable assets and liabilities.[36]

### (3) Income Approach

The Income Approach indicates the Fair Market Value of a business based on the value of the cash flows the business can be expected to generate in the future.[37] This analysis is commonly performed using the DCF Method, which discounts a projection of a company's future cash flows to present value at an appropriate discount rate.[38] Typically, the DCF Method has three basic components: (1) an estimation of projected net cash flows that the firm will generate over a relevant and discrete period; (2) a terminal or residual value equal to the future value, as of the end of the projection period, of the firm's net cash flows beyond the projection period; and (3) a cost of capital with which to discount to a present value both the projected net cash flows and the estimated terminal or residual value.[39]

Contemporaneous projections should be considered for their reasonableness and whether they were prudently prepared when applying the Income Approach.[40] The Examiner's Financial Advisors reviewed various sets of ResCap's projections prepared from 2006 through 2010 and did not find these projections to be reliable for purposes of assessing insolvency for several reasons, including: (1) ResCap's historical inability to meet its annual budgets and financial projections; (2) ResCap management's commentary regarding the difficulty of forecasting the performance of key assets of its business;[41] and (3) the significant uncertainty

---

[35] *Lids Corp. v. Marathon Inv. Partners, L.P.* (*In re Lids Corp.*), 281 B.R. 535, 540, 542–43 (Bankr. D. Del. 2002).

[36] *Trans World Airlines, Inc. v. Travellers Int'l AG.* (*In re Trans World Airlines, Inc.*), 180 B.R. 389, 405 n.22 (Bankr. D. Del. 1994) (noting that "the balance sheet is merely a starting point for the analysis"), *aff'd*, 134 F.3d 188 (3d Cir. 1998).

[37] SHANNON P. PRATT WITH ALINA V. NICULITA, VALUING A BUSINESS: ANALYSIS AND APPRAISAL OF CLOSELY HELD COMPANIES 175–76 (5th ed. 2008).

[38] *MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co.*, 910 F. Supp. 913, 925 (S.D.N.Y. 1995).

[39] *Id.*; *see also* SHANNON P. PRATT WITH ALINA V. NICULITA, VALUING A BUSINESS: ANALYSIS AND APPRAISAL OF CLOSELY HELD COMPANIES 174–76 (5th ed. 2008).

[40] *Statutory Comm. of Unsecured Creditors ex rel. Iridium Operating LLC v. Motorola, Inc.* (*In re Iridium Operating LLC*), 373 B.R. 283, 345 (Bankr. S.D.N.Y. 2007) (citation omitted).

[41] *See, e.g.*, E-mails between D. Applegate, E. Feldstein, and S. Khattri (Jan. 27–28, 2007) [EXAM10163216]; Residential Capital, LLC, Quarterly Report (Form 10-Q) (May 7, 2008), at 85; Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2009), at 39; Residential Capital, LLC, Quarterly Report (Form 10-Q) (May 11, 2009), at 28–29.

and volatility in the mortgage industry during the relevant time period.[42] The Examiner's Financial Advisors did not consider the Income Approach to be reliable for purposes of evaluating ResCap's insolvency for these reasons.

### d. Retrojection And Projection

Recognizing that evidence of insolvency at the time of a transfer or obligation may be sparse,[43] some courts have accepted evidence of insolvency from dates *before* or *after* the stated transfer as indicative of insolvency as of a separate date.[44] A plaintiff must prove a debtor's insolvency at the beginning or end of a specified time period. Employing retrojection or projection, a court may find that the debtor was insolvent during the time period between

---

[42] *See* Section VI.C.4.a.

[43] *Killips v. Schropp* (*In re Prime Realty, Inc.*), 380 B.R. 529, 535 (B.A.P. 8th Cir. 2007) ("[A] plaintiff may establish that the debtor was insolvent when it made the transfers in question if the plaintiff can establish both that the debtor was insolvent shortly after making the transfers and that the debtor's financial condition did not substantially change in the interim."); *Weaver v. Kellogg*, 216 B.R. 563, 576 (Bankr. S.D. Tex. 1997) (citing David G. EPSTEIN ET AL., BANKRUPTCY § 6–49 (1992)); *N.Y. Credit Men's Adjustment Bureau, Inc. v. Adler*, 2 B.R. 752, 756 n.5 (Bankr. S.D.N.Y. 1980) ("[Retrojection] has been often employed and often approved. Indeed, it provides the only reliable means of determining solvency when the basic data normally available, such as books and inventory, are incomplete or missing."); *Dahar v. Jackson* (*In re Jackson*), 318 B.R. 5, 16 (Bankr. D.N.H. 2004) ("Insolvency is not always susceptible to direct proof and frequently must be determined by proof of other facts or factors from which the ultimate fact of insolvency on the transfer dates must be inferred or presumed." (quoting *Hassan v. Middlesex Cnty. Nat'l Bank* (*In re Mystic Pipe & Supply Corp.*), 333 F.2d 838, 840 (1st Cir. 1964) (citation omitted))); *see Daneman v. Stanley* (*In re Stanley*), 384 B.R. 788, 807 (Bankr. S.D. Ohio 2008) ("A retrojection analysis begins with a debtor's financial condition at a certain point in time (typically the petition date) and extrapolates back in time in an attempt to show that the debtor must have been insolvent at some earlier relevant time (e.g., the date of an alleged fraudulent transfer)."); *Wash. Bancorporation v. Hodges* (*In re Wash. Bancorporation*), 180 B.R. 330, 334 (Bankr. D.D.C. 1995).

[44] *Bruno Mach. Corp. v. Troy Die Cutting Co.* (*In re Bruno Mach. Corp.*), 435 B.R. 819, 838 (Bankr. N.D.N.Y. 2010) ("Because of the 'difficulty in valuing the assets and liabilities of a debtor on the exact date of a preferential transfer,' courts use 'the well-established bankruptcy principles of retrojection and projection, which provide for the use of evidence of insolvency on a date before and after the preference date as competent evidence of the debtor's insolvency on the preference date.'" (quoting *Coated Sales, Inc. v. Glantz* (*In re Coated Sales, Inc.*), 144 B.R. 663, 666 (Bankr. S.D.N.Y. 1992))); *Daneman v. Stanley* (*In re Stanley*), 384 B.R. 788, 807 (Bankr. S.D. Ohio 2008) ("As its name suggests, retrojection is the inverse of projection.").

two valuation dates, or within a reasonable time period prior or subsequent to a valuation date,[45] providing there are no intervening events that could have led to the insolvency.[46]

### 3. Summary Of Examiner's Conclusions

The Examiner concludes that the evidence supports the proposition that ResCap was balance sheet solvent on May 4, 2005, the date that AFI announced the capitalization of ResCap,[47] and was balance sheet insolvent from December 31, 2007 through the Petition Date.[48] The Examiner's conclusions are based on the results of the Balance Sheet Test prepared by the Examiner's Financial Advisors and consideration of the contemporaneous facts and circumstances underlying the changes in ResCap's financial condition from 2005 through the Petition Date, as described herein.

The Examiner's Financial Advisors estimated the Fair Market Value of ResCap using a Market Approach and an Asset-Based Approach under a going concern premise of value.[49] The Examiner's Financial Advisors employed the Market Approach using the Guideline Publicly Traded Company Method to value ResCap's equity and the Observable Market Value

---

[45] *In re Stanley,* 384 B.R. at 807 (noting that "[r]etrojection can be used to go back days, weeks or even several months in time," but holding that the use of "retrojection to go back nearly two years in time stretches retrojection analysis past its breaking point"); *Silagy v. Gagnon (In re Gabor),* 280 B.R. 149, 160 (Bankr. N.D. Ohio 2002) (concluding that debtor was insolvent based upon amounts set forth in bankruptcy petition that was filed six months after the transfer and there had been "little change in debtor's income and life for several years"); Weaver, 216 B.R. at 576 ("Plaintiff may be able to prove insolvency at earlier periods through the process of 'retrojection,' i.e. 'showing that the debtor was insolvent a reasonable time . . . after the transfer and that the debtor's financial condition did not materially change during the intervening period.'" (internal citations omitted)); Mancuso v. T. Ishida USA, Inc. (In re Sullivan), 161 B.R. 776, 783–84 (Bankr. N.D. Tex. 1993) ("The Court finds itself . . . with credible evidence that [debtor] was hugely insolvent both six months before and six months after the transaction in question. 'Where there is clear proof of insolvency on a given date and no subsequent financial change, the courts are prone to find that the Debtor was also insolvent on the earlier date at issue. Furthermore, the usual presumption is that a known condition will continue to exist under similar circumstances for a reasonable time.") (quoting *Kleinfeld v. Nacol* (*In re Nacol*), 36 B.R. 566, 568 (Bankr. M.D. Fla. 1983))). *But see War Eagle Floats, Inc. v. Travis* (*In re War Eagle Floats*), 104 B.R. 398, 400 ("Six months is simply too long a period considering the strict requirements of § 548(a)(2) specifically necessitating evidence of insolvency on the date of the transfer at issue.").

[46] *Pryor v. Tiffen* (*In re TC Liquidations LLC*), 463 B.R. 257, 274–75 (Bankr. E.D.N.Y. 2011); *McColley v. Navaro Gem Ltd.* (*In re Candor Diamond Corp.*), 68 B.R. 588, 594 n.5 (Bankr. S.D.N.Y. 1986) (discussing the use of "retrojection by which a later finding of insolvency is read into an earlier period if there is evidence that there was no change in financial condition") (citing *Braunstein v. Mass. Bank & Trust Co.*, 443 F.2d 1281, 1284 (1st Cir. 1971)).

[47] General Motors Acceptance Corporation, Current Report (Form 8-K) (May 4, 2005), Ex. 99.1.

[48] The Examiner's conclusion that ResCap was balance sheet solvent on May 4, 2005 also pertains to RFC and GMAC Mortgage.

[49] The Income Approach was considered but not applied for reasons discussed herein.

Method to value ResCap's interest-bearing debt.[50] These values were then combined to yield the Fair Market Value of ResCap's invested capital under the Market Approach. The Examiner's Financial Advisors also employed the Asset-Based Approach using the Adjusted Book Value Method to estimate the Fair Market Value of ResCap's assets. The Examiner's Financial Advisors performed the valuation analyses on a quarterly basis from December 31, 2005 through December 31, 2011.[51]

Under the Market Approach, ResCap's total interest-bearing debt was subtracted from the Fair Market Value of ResCap's invested capital to determine the Fair Market Value surplus/(deficit).[52] Under the Asset-Based Approach, ResCap's total liabilities were subtracted from the Fair Market Value of ResCap's total assets to determine the Fair Market Value surplus/(deficit).[53]

The valuation analysis shows a Fair Market Value deficit indicating insolvency under the Balance Sheet Test as of December 31, 2007, and remaining as of each quarterly measurement date through the end of 2011.[54] The following exhibits summarize the results of the Balance Sheet Test for ResCap.

---

[50] The Guideline M&A Method was also considered but not applied because of the lack of a sufficient number of timely transactions as of the quarterly measurement dates, most notably from 2007 through 2009. It is common to consider transactions occurring within the prior one to three years when applying the Guideline M&A Method. However, given the volatility in the mortgage industry from 2007 through 2009, the use of more timely transactions in the Guideline M&A Method was deemed necessary to arrive at reliable indications of value as of each measurement date. Because there were few such transactions, the Examiner's Financial Advisors deemed the Guideline M&A Method to be less reliable than the other methods utilized herein.

[51] The Examiner's Financial Advisors selected quarterly measurement dates due in part to the availability of necessary financial information.

[52] The Examiner's Financial Advisors' application of the Market Approach estimates the Fair Market Value of ResCap's invested capital, which equals the Fair Market Value of assets net of non-interest-bearing liabilities. Therefore, to assess ResCap's insolvency under the Market Approach, only interest-bearing debt is subtracted from the Fair Market Value of invested capital.

[53] The Examiner's Financial Advisors' application of the Asset-Based Approach estimates ResCap's total asset value. Therefore, to assess ResCap's insolvency under the Asset-Based Approach, total liabilities are subtracted. Total liabilities include interest-bearing liabilities, non-interest bearing liabilities (i.e., payables, accrued expenses, and other current and non-current liabilities, etc.), and contingent and/or unliquidated liabilities.

[54] ResCap was a "disregarded entity" for federal income tax purposes subsequent to November 2006. Under a Fair Market Value standard, the Examiner's Financial Advisors assumed that tax obligations, if any, would be paid at either the ResCap level or at the acquirer level. Accordingly, the Examiner's Financial Advisors did not assign any incremental value to the tax status of ResCap for purposes of assessing financial distress in these circumstances.

EXHIBIT VI.B.3—1
**Concluded Fair Market Value Surplus / (Deficit) of ResCap [1]**
2005 – 2011
*($ in Millions)*



[1] *The Examiner's Financial Advisors placed full weight on the Market Approach from Dec. 31, 2005 through Jun. 30, 2007. The Market Approach and Asset-Based Approach were weighted equally from Sep. 30, 2007 through Dec. 31, 2009. The Examiner's Financial Advisors placed full weight on the Asset-Based Approach for all quarterly measurement dates subsequent to Dec. 31, 2009. These weightings were applied for the reasons described herein.*
*Source: Appendix VI.B.3.*

EXHIBIT VI.B.3—2
**Concluded Fair Market Value Surplus / (Deficit) of ResCap**
2005 – 2011
*($ in Millions)*

| | Market Approach | | Asset-Based Approach | | Concluded Fair Market | |
| | Fair Market Value Surplus / (Deficit) | Weight | Fair Market Value Surplus / (Deficit) | Weight | Value Surplus / (Deficit) | Balance Sheet Test Conclusion |
|---|---|---|---|---|---|---|
| 12/31/05 | $ 12,602.0 | 100% | $ 7,464.0 | 0% | $ 12,602.0 | Solvent |
| 03/31/06 | 13,126.1 | 100% | 7,763.5 | 0% | 13,126.1 | Solvent |
| 06/30/06 | 14,590.6 | 100% | 8,404.3 | 0% | 14,590.6 | Solvent |
| 09/30/06 | 13,199.7 | 100% | 8,375.9 | 0% | 13,199.7 | Solvent |
| 12/31/06 | 13,235.3 | 100% | 7,622.1 | 0% | 13,235.3 | Solvent |
| 03/31/07 | 9,706.6 | 100% | 7,173.9 | 0% | 9,706.6 | Solvent |
| 06/30/07 | 10,145.3 | 100% | 7,507.4 | 0% | 10,145.3 | Solvent |
| 09/30/07 | 2,429.6 | 50% | 1,273.8 | 50% | 1,851.7 | Solvent |
| 12/31/07 | (3,760.5) | 50% | 111.8 | 50% | (1,824.4) | Insolvent |
| 03/31/08 | (5,921.7) | 50% | (1,994.9) | 50% | (3,958.3) | Insolvent |
| 06/30/08 | (5,752.0) | 50% | (3,742.1) | 50% | (4,747.1) | Insolvent |
| 09/30/08 | (10,066.3) | 50% | (4,828.8) | 50% | (7,447.6) | Insolvent |
| 12/31/08 | (7,499.4) | 50% | (4,397.3) | 50% | (5,948.4) | Insolvent |
| 03/31/09 | (4,575.5) | 50% | (1,102.5) | 50% | (2,839.0) | Insolvent |
| 06/30/09 | (2,056.8) | 50% | (1,164.7) | 50% | (1,610.7) | Insolvent |
| 09/30/09 | (1,715.4) | 50% | (1,563.6) | 50% | (1,639.5) | Insolvent |
| 12/31/09 | (1,250.5) | 50% | (687.7) | 50% | (969.1) | Insolvent |
| 03/31/10 | (34.8) | 0% | (1,628.0) | 100% | (1,628.0) | Insolvent |
| 06/30/10 | 230.7 | 0% | (1,617.5) | 100% | (1,617.5) | Insolvent |
| 09/30/10 | 447.2 | 0% | (2,544.3) | 100% | (2,544.3) | Insolvent |
| 12/31/10 | 599.6 | 0% | (2,457.7) | 100% | (2,457.7) | Insolvent |
| 03/31/11 | 633.3 | 0% | (2,260.4) | 100% | (2,260.4) | Insolvent |
| 06/30/11 | 460.1 | 0% | (3,587.5) | 100% | (3,587.5) | Insolvent |
| 09/30/11 | (791.8) | 0% | (4,572.3) | 100% | (4,572.3) | Insolvent |
| 12/31/11 | (1,465.1) | 0% | (4,498.1) | 100% | (4,498.1) | Insolvent |

*Source: Appendix VI.B.3.*

The Examiner's Financial Advisors used their professional judgment to select appropriate weightings for each valuation approach in assessing ResCap's insolvency. Authoritative valuation literature states "there are no scientific formulas or specific rules to use with regard to the weighting of the results of two or more valuation methods" and the final value conclusion should be "derived from the analyst's reasoning and judgment of all the factors considered and from the impartial weighting of all of the market-derived valuation evidence."[55]

The Examiner's Financial Advisors determined that the Asset-Based Approach was not a reliable indicator of the value of ResCap for the period from December 31, 2005 through June 30, 2007, because ResCap was deemed to have intangible value associated with its business model not reflected on the balance sheet. This intangible value was not captured in the

---

[55] SHANNON P. PRATT WITH ALINA V. NICULITA, VALUING A BUSINESS: THE ANALYSIS AND APPRAISAL OF CLOSELY HELD COMPANIES 477–78 (5th ed. 2008).

Examiner's Financial Advisors' application of the Asset-Based Approach. For this reason, the Examiner's Financial Advisors placed full weight on the results of the Market Approach, and no weight was given to the results of the Asset-Based Approach from December 31, 2005 through June 30, 2007.

The Examiner's Financial Advisors equally weighted the results of the Market Approach and the Asset-Based Approach to assess ResCap's insolvency for the period from September 30, 2007 through December 31, 2009. As described in Section III, there was a severe dislocation in the capital markets in August 2007 which had a dramatic effect on the mortgage industry. Many mortgage companies did not survive this market dislocation and consequently filed for bankruptcy relief.[56] In August 2007, credit analysts noted the distressed trading levels of ResCap's securities and indicated that ResCap's business model was no longer viable.[57] Indeed, ResCap wrote off the entirety of its acquired intangible assets during the third quarter of 2007.[58] Additionally, ResCap was dependent on financial support (capital contributions and debt forgiveness) from AFI during this period.

The Examiner's Financial Advisors did not consider the Market Approach to be a reliable indicator of the value of ResCap after December 31, 2009, because of the impact of TARP funds received by AFI on the market prices of ResCap's public debt. As discussed in Section VI.B.4.a(3), the receipt of TARP funding by AFI had a significant upward impact on the pricing of ResCap's debt securities, particularly in early 2010. As shown in Exhibit VI.B.4.a(3)—2, immediately following each round of TARP funding to AFI, the pricing of ResCap's debt securities increased dramatically. After receiving the third round of TARP funding in the amount of $3.8 billion on December 30, 2009, Carpenter stated, "[t]hese decisive balance sheet actions and resulting capital infusions are intended to minimize the impact on [AFI] and Ally Bank of any significant future losses related to ResCap's legacy mortgage business."[59] Following Carpenter's statement, analysts commented that the U.S. Treasury "pumped in another $3.8 billion into [AFI] largely so that [AFI] could support ResCap, which is ring-fenced off from [AFI] and lacks a compelling ongoing business model" and added that "[w]e are at a loss for words over the complete lack of logic behind using tax dollars to support ResCap."[60] The Examiner's Financial Advisors deemed the market prices of ResCap's debt securities to be an unreliable proxy for determining the value of ResCap after December 31, 2009, because of the cumulative influence of AFI's receipt of TARP funds on

---

[56] *See* Section VI.B.4.a(1)(a)(iv) (discussing the bankruptcies of certain mortgage companies).

[57] KABIR CAPRIHAN & MONICA PAREKH, JPMORGAN, COUNTRYWIDE AND RESIDENTIAL CAPITAL CORP RECOVERY, LIQUIDITY, BALANCE SHEET BURN, ETC. 1, 10 (Aug. 21, 2007).

[58] The intangible asset value on ResCap's balance sheet reflected acquired intangible assets and did not reflect the value of non-acquired intangible assets, if any. A write-off of all acquired intangible value may suggest that the value of any non-acquired intangible assets of ResCap (or the specific ResCap reporting unit) was similarly impaired.

[59] *GMAC to Receive $3.8 Bln. in Third Bailout by U.S. Treasury*, RTT NEWS, (Dec. 30, 2009), http://www.rttnews.com/1168552/gmac-to-receive-3-8-bln-in-third-bailout-by-u-s-treasury.aspx.

[60] *See* Karen Brettell, *US CREDIT–ResCap Rallies on Capital Support, Risks Remain*, REUTERS, (Jan. 4, 2010), (quoting CreditSight analysts Adam Steer and David Hendler), http://www.reuters.com/article/2010/01/04/markets-credit-idUSN0457155120100104.

the market prices of ResCap public debt. Accordingly, the Examiner's Financial Advisors placed full weight on the results of the Asset-Based Approach from March 31, 2010 through the Petition Date.

### 4. Application Of The Balance Sheet Test

The Examiner's Financial Advisors performed a Balance Sheet Test of ResCap's insolvency at the end of each quarter from December 31, 2005 through December 31, 2011. The standard of value applied in the application of the Balance Sheet Test was Fair Market Value, which was estimated on a non-marketable, controlling basis. Appropriate discounts or premiums were considered and applied, as appropriate, for each valuation approach. The Fair Market Value of ResCap was estimated under a going concern premise of value. The Examiner's Financial Advisors used two generally accepted valuation approaches to assess ResCap's insolvency: (1) the Market Approach; and (2) the Asset-Based Approach.

#### a. Market Approach

The Examiner's Financial Advisors used two market-based valuation methodologies to estimate the Fair Market Value of ResCap's invested capital. The Guideline Publicly Traded Company Method was used to estimate the Fair Market Value of ResCap's equity because ResCap's equity was not publicly traded. A significant portion of ResCap's interest-bearing debt, however, was traded in the secondary market where transaction prices could be observed. This allowed for the application of the Observable Market Value Method to value ResCap's interest-bearing debt. The estimated Fair Market Value of ResCap's equity and interest-bearing debt were summed to arrive at the Fair Market Value of ResCap's invested capital.

##### (1) Valuation Of The Equity Of ResCap

The Guideline Publicly Traded Company Method was used to estimate the Fair Market Value of ResCap's equity based on a comparison of ResCap to guideline publicly traded companies with similar characteristics. Once the guideline companies were identified, valuation multiples of the publicly traded companies were then determined. These valuation multiples were then applied to ResCap's financial metrics to indicate the value of ResCap's equity on a marketable, minority basis. A private company discount and a control premium were applied, to the extent warranted, to arrive at the Fair Market Value of ResCap's equity on a non-marketable, controlling basis.

###### (a) Selection Of Guideline Companies

The first step in the application of the Guideline Publicly Traded Company Method is the selection of guideline publicly traded companies. The Examiner's Financial Advisors identified and considered publicly traded companies whose businesses were comprised principally of residential mortgage operations and assets. The following provides the framework for the selection process and descriptions of the guideline companies.

The Examiner's Financial Advisors reviewed analyst and industry reports, and used the Capital IQ database, to gather information about companies operating in the mortgage industry during the period from 2005 through 2011. The Examiner's Financial Advisors reviewed ResCap analyst reports from HSBC,[61] Bear Stearns,[62] and JPMorgan,[63] which identified companies with similarities to ResCap during that time frame. The Examiner's Financial Advisors also reviewed mortgage finance industry reports from Bear Stearns,[64] Fox-Pitt,[65] Credit Suisse,[66] and Sterne Agee,[67] which also identified numerous companies

---

[61] VAN HESSER & DAPHNE FENG, HSBC, RESIDENTIAL CAPITAL, LLC LOOKING FOR SOMEONE TO TAKE THE OTHER SIDE OF THE TRADE (Nov. 20, 2007); VAN HESSER & DAPHNE FENG, HSBC, RESIDENTIAL CAPITAL CORP. DOWNGRADE RISK HAS RISEN TO MORE LIKELY THAN NOT (July 19, 2007); VAN HESSER & DAPHNE FENG, HSBC, RESIDENTIAL CAPITAL CORP: SCRUBBED, BUT HOW CLEAN? (Mar. 14, 2007); VAN HESSER & DAPHNE FENG, HSBC, RESIDENTIAL CAPITAL CORP. RELIEF RALLY AHEAD? (Feb. 23, 2007); VAN HESSER & DAPHNE FENG, HSBC, RESIDENTIAL CAPITAL CORP RESCAP GETS THE GREEN LIGHT (Nov. 17, 2006); VAN HESSER & DAPHNE FENG, HSBC, RESIDENTIAL CAPITAL CORPORATION PROFITABLE, BUT DISAPPOINTING Q3 HIGHLIGHTS HEADWINDS (Oct. 25, 2006); VAN HESSER & DAPHNE FENG, HSBC, COUNTRYWIDE FINANCIAL AND RESIDENTIAL CAPITAL CORP MORTGAGE NAMES LANDING SOFTLY IN A MANAGEABLE ENVIRONMENT (Aug. 2, 2006); VAN HESSER & DAPHNE FENG, HSBC, RESIDENTIAL CAPITAL CORP. BOUNCEBACK (Apr. 20, 2006).

[62] IAN JAFFE & MICHAEL SCHALLER, BEAR STEARNS, RESIDENTIAL CAPITAL, LLC 2Q07 PRELIMINARY EARNINGS REVIEW (Aug. 1, 2007); IAN JAFFE & MICHAEL SCHALLER, BEAR STEARNS, RESIDENTIAL CAPITAL, LLC 2Q07 PREVIEW AND INTERMEDIATE-TERM OUTLOOK (July 30, 2007); IAN JAFFE & MICHAEL SCHALLER, BEAR STEARNS, RESIDENTIAL CAPITAL, LLC 1Q07 PRELIMINARY EARNINGS REVIEW (May 3, 2007); IAN JAFFE & MICHAEL SCHALLER, BEAR STEARNS, RESIDENTIAL CAPITAL, LLC FIGHTING THE SUBPRIME CREDIT HEADWINDS . . . TIME HORIZON IS KEY (Mar. 6, 2007).

[63] KABIR CAPRIHAN & MONICA PAREKH, JPMORGAN, COUNTRYWIDE AND RESIDENTIAL CAPITAL CORP RECOVERY, LIQUIDITY, BALANCE SHEET BURN, ETC. (Aug. 21, 2007).

[64] SCOTT COREN ET AL., BEAR STEARNS, MORTGAGE FINANCE SUB-PRIME ABS SPREAD MONITOR FOURTH QUARTER 2006 (Jan. 1, 2007); SCOTT COREN ET AL., BEAR STEARNS, MORTGAGE FINANCE SUB-PRIME ABS SPREAD MONITOR FOURTH QUARTER 2005 (Mar. 22, 2006).

[65] EDWIN GROSHANS & MATTHEW HOWLETT, FOX-PITT, US MORTGAGE FINANCE THE YEAR OF THE CLEANSING HEADWINDS (Dec. 21, 2006).

[66] MOSHE ORENBUCH & RAJAT BHU, CREDIT SUISSE, MORTGAGE FINANCE WEAK JOB MARKET COMPOUNDS HOUSING PROBLEMS (Jan. 9, 2009); MOSHE ORENBUCH & RAJAT BHU, CREDIT SUISSE, MORTGAGE FINANCE HOME PRICES; INVENTORY AND CREDIT CRUNCH DRIVE SECTOR SLOWDOWN (Sept. 10, 2008); MOSHE ORENBUCH & RAJAT BHU, CREDIT SUISSE, MORTGAGE FINANCE GSE TRAVAILS; HOME PRICES WEIGH ON OUTLOOK (July 16, 2008); MOSHE ORENBUCH, CREDIT SUISSE, MORTGAGE FINANCE INVENTORY OVERHANG PUSHES DOWN PRICES (June 5, 2008); MOSHE ORENBUCH, CREDIT SUISSE, MORTGAGE FINANCE: HOUSING STRUGGLES TO GAIN TRACTION (Apr. 11, 2008).

[67] JAMES ACKOR, STERNE AGEE, MORTGAGE FINANCE: EXPECTING DECENT 4Q08 RESULTS DESPITE A SOMEWHAT CHALLENGING OPERATING ENVIRONMENT—SEQUENTIAL EPS AND DPS GROWTH EXPECTED TO RESUME IN 1Q09 (Jan. 7, 2009); JAMES ACKOR, STERNE AGEE, MORTGAGE FINANCE: DEBT MARKET FEARS DRIVING HISTORIC DISCONNECT BETWEEN AGENCY MORTGAGE REIT PROFITABILITY AND STOCK VALUATIONS—POTENTIAL RETURNS COMPELLING (Nov. 25, 2008); JAMES ACKOR, STERNE AGEE, MORTGAGE FINANCE: AGENCY MORTGAGE REITS—CHOPPY EARNINGS SEASON EXPECTED—SLIGHT BIAS TOWARD DOWNSIDE SURPRISES—EXPECTED RETURNS AND VALUATIONS REMAIN ATTRACTIVE (Oct. 20, 2008).

operating in the mortgage industry. Finally, the Examiner's Financial Advisors performed numerous queries against the Capital IQ database to identify guideline companies that operated in the same or similar lines of business as ResCap.

Based on this screening process, the Examiner's Financial Advisors selected Countrywide, IndyMac, and WaMu as ResCap Guideline Companies. The Examiner's Financial Advisors chose these companies because of the similarities to ResCap in their business operations, relative size, and exposure to prevailing industry conditions. The following is a brief description of each of the ResCap Guideline Companies.

### (i) Countrywide

Countrywide was a holding company engaged in mortgage lending and other finance-related businesses, including mortgage banking, retail banking and mortgage warehouse lending, securities dealing, insurance underwriting, and international mortgage loan processing and subservicing through its subsidiaries.[68] Countrywide managed its business through five segments: (1) mortgage banking; (2) banking; (3) capital markets; (4) insurance; and (5) global operations.[69] The mortgage banking segment, the core of Countrywide's business, originated, purchased, securitized, and serviced mortgage loans.[70] Countrywide originated and purchased prime mortgage loans, prime home equity loans, non-prime mortgage loans, and commercial real estate loans.[71] The majority of loan production consisted of prime mortgage loans, which were prime credit quality first-lien mortgage loans secured by single-family residences.[72] The banking segment operated a federally-chartered bank that invested in mortgage loans and home equity lines of credit primarily sourced through the company's mortgage banking operation.[73] The banking segment also provided short-term secured financing to mortgage lenders through a non-depository lending company.[74] The capital markets segment operated an institutional broker-dealer that specialized in trading and underwriting mortgage-backed securities.[75] During 2004, this segment began originating HFS loans secured by commercial real estate.[76] This segment also managed acquisition and disposition of mortgage loans on behalf of Countrywide Home Loans, Countrywide's primary mortgage banking subsidiary.[77] The insurance segment offered property, casualty, life, and

---

[68] Countrywide Financial Corporation, Annual Report (Form 10-K) (Mar. 1, 2006), at 1.

[69] *Id.*

[70] *Id.*

[71] *Id.* at 2.

[72] This includes loans secured by one-to-four dwelling unit residential real estate. *Id.*

[73] *Id.* at 1.

[74] *Id.*

[75] *Id.*

[76] *Id.*

[77] *Id.*

credit insurance as an underwriter and as an independent agent, and also provided reinsurance coverage to primary mortgage insurers.[78] Countrywide became a subsidiary of Bank of America on July 1, 2008, and continues to operate as such.[79]

Countrywide was selected as a guideline company because of its similar operations, significant percentage of mortgage related assets, and reliance on the sale of mortgage-backed securities. Countrywide was used as a guideline company from December 31, 2005 through March 31, 2008.

### (ii) IndyMac

IndyMac was the holding company for IndyMac Bank, F.S.B., a hybrid thrift/mortgage bank.[80] IndyMac provided financing for the acquisition, development, and improvement of single-family homes.[81] IndyMac also provided financing secured by single-family homes and other banking products.[82] IndyMac's banking business model was based on two segments: mortgage banking and thrift.[83] Mortgage banking involved the origination and trading of mortgage loans and related assets, and the servicing of those loans.[84] The product lines included ARMs, hybrid ARMs, option ARMs offering borrowers multiple payment options, fixed-rate mortgages, both conforming and non-conforming, construction-to-permanent loans, subprime mortgages, and reverse mortgages.[85] The thrift segment principally invested in single-family residential mortgage loans (predominantly prime ARMs, including hybrid ARMs), construction financing for single-family residences or lots provided directly to individual consumers, builder construction financing facilities for larger residential subdivision loans, home equity lines of credit, and mortgage-backed securities.[86] IndyMac also had a warehouse lending business that provided short-term revolving warehouse lending facilities to small-to-medium sized mortgage bankers and brokers to finance mortgage loans.[87] IndyMac filed for relief under chapter 7 of the Bankruptcy Code on July 31, 2008.[88]

---

[78] *Id.*

[79] Bank of America Corporation, Annual Report (Form 10-K) (Feb. 27, 2009), at 17.

[80] IndyMac Bancorp, Inc., Annual Report (Form 10-K) (Mar. 1, 2006), at 4.

[81] *Id.*

[82] *Id.*

[83] *Id.* at 5.

[84] *Id.*

[85] *Id.* at 6.

[86] *Id.* at 9.

[87] *Id.*

[88] IndyMac Bancorp, Inc., Current Report (Form 8-K) (July 31, 2008), at 2.

IndyMac was selected as a guideline company because of its similar operations, significant percentage of mortgage-related assets, and the high percentage of its loans sold into securitizations. IndyMac was used as a guideline company from December 31, 2005 through March 31, 2008.

### (iii) WaMu

WaMu was a retailer of financial services to consumers and small businesses.[89] WaMu's earnings were primarily driven by lending to consumers, deposit-taking activities that generated net interest income, and activities that generated non-interest income, including the sale and servicing of loans and providing fee-based services to its customers.[90]

WaMu had four operating segments: (1) the retail banking and financial services group; (2) home loans group; (3) card services group; and (4) the commercial group.[91] The retail banking and financial services group offered a comprehensive line of deposit and other retail banking products and services to consumers and small businesses, originated, managed and serviced home equity loans and lines of credit, and provided investment advisory and brokerage services.[92] The home loans group originated and serviced home loans, bought and sold home loans in the secondary market, and sold insurance.[93] The card services group originated and serviced credit card loans and provided other cardholder services.[94] The commercial group provided financing to developers and investors for the acquisition or construction of multi-family dwellings and other commercial properties, originated and serviced multi-family and other commercial real estate loans, provided financing and other banking services to mortgage bankers for the origination of residential mortgage loans, and originated and serviced home loans made to subprime borrowers.[95]

WaMu sold substantially all assets of its principal operating subsidiary, Washington Mutual Bank, to JPMorgan Chase on September 25, 2008.[96] WaMu filed for relief under chapter 11 of the Bankruptcy Code on September 26, 2008.

---

[89]   Washington Mutual, Inc., Annual Report (Form 10-K) (Mar. 15, 2006), at 1.

[90]   *Id.*

[91]   *Id.* at 38.

[92]   *Id.*

[93]   *Id.* at 39.

[94]   *Id.* at 40.

[95]   *Id.*

[96]   Decl. of Stewart M. Landefeld in Supp. of the Debtors' Chapter 11 Pets. and First Day Mots., *In re Wash. Mut., Inc.,* Case No. 08-12229, Docket No. 13, at 12.

WaMu was selected as a guideline company because of its similar operations,[97] significant percentage of mortgage-related assets, and reliance on securitizing loans. WaMu was used as a guideline company from December 31, 2005 through June 30, 2008.

### (iv) Bankruptcies Of Other Mortgage Companies

The Examiner's Financial Advisors examined companies within the mortgage industry subject to the same adverse market conditions affecting ResCap in 2007, including a volatile interest rate environment, competitive mortgage pricing, declining housing appreciation, and tightening liquidity. Many of these companies did not survive the collapse of the mortgage industry and consequently filed for bankruptcy relief. The reasons for failure cited in the bankruptcy filings of New Century, American Home, Aegis, First Magnus, and Delta Financial provide additional context for ResCap's decline in equity value during the second half of 2007, as discussed herein.

New Century announced that it would be restating its financials in February 2007 and stopped accepting loan applications on March 8, 2007.[98] New Century filed for relief under chapter 11 of the Bankruptcy Code on April 2, 2007, after a spike in margin calls. Aegis ceased all mortgage origination activity as of August 3, 2007.[99] American Home filed for bankruptcy relief on August 6, 2007[100] and First Magnus ceased operations on August 16, 2007.[101] They were each unable to meet margin calls and lost access to essential lines of credit. American Home's CEO, Michael Strauss, stated that "the markets for these assets (mortgage-backed securities and mortgage loan holdings) have been disrupted to the point of dysfunction."[102]

Delta Financial received a small loan that helped it meet margin calls in the third quarter of 2007. However, after a failed attempt to securitize $900 million in loans, it too could not secure additional funding to support its business. Delta Financial filed for relief under chapter 11 of the Bankruptcy Code on December 17, 2007.[103]

---

[97] While WaMu did offer services such as retail banking and card services, the vast majority of its balance sheet was comprised of mortgage-related assets. *See* Washington Mutual, Inc., Annual Report (Form 10-K) (Mar. 15, 2006), at 168–172.

[98] Decl. of Monika L. McCarthy in Supp. of Chapter 11 Pets. and First Day Relief, *In re New Century TRS Holdings, Inc.,* Case No. 07-10416, Docket No. 2, at 10–14.

[99] Decl. of Edward S. Robertson, Executive VP and CFO of the Debtors, in Supp. of First Day Mots. *In re Aegis Mortg. Corp.,* Case No. 07-11119, Docket No. 3, at 3.

[100] *See* Decl. of Michael Strauss in Supp. of the Debtors' Chapter 11 Pets. and First Day Relief, *In re Am. Home Mortg. Holdings, Inc.,* Case No. 07-11047, Docket No. 2, at 2.

[101] Decl. of Gurpreet S. Jaggi in Supp. of Debtor's Chapter 11 Pet. and First Day Motions, *In re First Magnus Fin. Corp.,* Case No. 07-01578, Docket No. 6, at 9.

[102] Decl. of Michael Strauss in Supp. of the Debtors' Chapter 11 Pet. and First Day Relief, *In re Am. Home Mortg. Holdings, Inc.,* Case No. 07-11047, Docket No. 2, at 10.

[103] Aff. of Hugh Miller in Supp. of Chapter 11 Pets. and First Day Relief, *In re Delta Fin. Corp.,* Case No. 07-11880, Docket No. 3, at 2.

### (b) Calculation Of Market Multiples

The Guideline Publicly Traded Company Method entails the calculation of valuation multiples based on publicly traded guideline companies that are then applied to a subject company's relevant metrics. The Examiner's Financial Advisors calculated the ratio of MVE to reported net book value of equity (commonly referred to as price-to-book or P/NBV).[104] The book value of equity and, correspondingly, book value multiples, are useful measures for determining the Fair Market Value of equity for companies comprised of financial assets.[105] The book value of equity for financial institutions is "much more likely to track the market value of equity invested in existing assets" and leads to stronger relationships between price-to-book ratios and returns on equity.[106] Book value multiples are useful and widely used measures for valuing financial concerns.[107]

Commonly used invested capital multiples such as "invested capital to EBITDA" and "invested capital to revenue" are generally not applicable to the valuation of financial companies, because "[w]ith a financial service firm, debt takes a different connotation. Rather than view debt as a source of capital, most financial firms view it as a raw material."[108] Further, the Examiner's Financial Advisors considered a price-to-earnings multiple but did not apply it because of ResCap's negative earnings for the majority of the quarterly measurement dates.[109]

After calculating the P/NBV multiples for the ResCap Guideline Companies, appropriate multiples were selected by evaluating factors such as the size, growth, and profitability of ResCap relative to the ResCap Guideline Companies. Based on an evaluation of these factors, the average P/NBV multiple of the ResCap Guideline Companies at each quarter was selected and applied in the valuation of ResCap's equity from December 31, 2005 through June 30, 2008. The following table details the selected P/NBV multiples for the ResCap Guideline Companies applied in the valuation of ResCap's equity under the Guideline Publicly Traded Company Method from December 31, 2005 through June 30, 2008.

---

[104] The Examiner's Financial Advisors also considered the use of a P/TBVE multiple for valuing ResCap's equity. Ultimately, the P/NBV multiple was selected because of the availability of industry P/NBV multiples from Ibbotson Associates which served as a basis for valuing ResCap's equity subsequent to June 2008 (Ibbotson Associates does not provide industry P/TBVE multiples in its quarterly publications). The use of a P/TBVE multiple would not, however, change the Examiner's conclusions with respect to the Balance Sheet Test for ResCap.

[105] ASWATH DAMODARAN, INVESTMENT VALUATION: TOOLS AND TECHNIQUES FOR DETERMINING THE VALUE OF ANY ASSET 579 (2d ed. 2002).

[106] *Id.* at 599.

[107] *Id.* at 596.

[108] *Id.* at 576.

[109] Applying a market multiple to a negative income stream generally does not produce a meaningful value. Market multiples inherently contain a perpetuity assumption (i.e., going concern value). Applying a market multiple to a negative income stream implicitly assumes that the business will continue to produce negative income into perpetuity. Investors would liquidate the business before incurring losses into perpetuity.

EXHIBIT VI.B.4.a(1)(b)

**ResCap Guideline Companies**
**Calculation of P/NBV Multiples**
December 31, 2005 – June 30, 2008
*($ in Millions)*

| | Countrywide [1] | | | IndyMac [2] | | | WaMu [3] | | | Average |
|---|---|---|---|---|---|---|---|---|---|---|
| | MVE | Book Equity | P/NBV | MVE | Book Equity | P/NBV | MVE | Book Equity | P/NBV | P/NBV |
| 12/31/05 | $ 20,515 | $ 12,816 | 1.60x | $ 2,507 | $ 1,526 | 1.64x | $ 42,974 | $ 27,616 | 1.56x | 1.60x |
| 03/31/06 | 22,196 | 13,506 | 1.64x | 2,691 | 1,644 | 1.64x | 40,609 | 26,156 | 1.55x | 1.61x |
| 06/30/06 | 23,257 | 14,297 | 1.63x | 3,146 | 1,804 | 1.74x | 43,615 | 26,131 | 1.67x | 1.68x |
| 09/30/06 | 21,611 | 15,099 | 1.43x | 2,917 | 1,938 | 1.51x | 40,823 | 26,458 | 1.54x | 1.49x |
| 12/31/06 | 24,841 | 14,318 | 1.73x | 3,297 | 2,028 | 1.63x | 42,691 | 26,969 | 1.58x | 1.65x |
| 03/31/07 | 19,888 | 14,818 | 1.34x | 2,358 | 2,055 | 1.15x | 35,620 | 24,578 | 1.45x | 1.31x |
| 06/30/07 | 20,873 | 14,386 | 1.45x | 2,149 | 2,050 | 1.05x | 37,085 | 24,210 | 1.53x | 1.34x |
| 09/30/07 | 10,957 | 15,252 | 0.72x | 1,817 | 1,871 | 0.97x | 30,466 | 23,941 | 1.27x | 0.99x |
| 12/31/07 | 5,171 | 14,656 | 0.35x | 481 | 1,344 | 0.36x | 11,746 | 24,584 | 0.48x | 0.40x |
| 03/31/08 | 3,193 | 13,155 | 0.24x | 436 | 959 | 0.45x | 9,029 | 22,449 | 0.40x | 0.37x |
| 06/30/08 | N/A | N/A | N/A | N/A | N/A | N/A | 8,378 | 26,086 | 0.32x | 0.32x |

[1] *Purchased by Bank of America on Jul. 1, 2008. See Bank of America Corporation, Annual Report (Form 10-K) (Feb. 27, 2009), at 17.*

[2] *Filed for chapter 7 on Jul. 31, 2008. See IndyMac Bancorp, Inc. Current Report (Form 8-K) (Jul. 31, 2008), at 2.*

[3] *Filed for chapter 11 on Sep. 26, 2008. See Declaration of Stewart M. Landerfeld in Support of the Debtors' Chapter 11 Petitions and First Day Motions, In re Wash. Mutual, Inc., [Case No. 08-12229; Docket No. 13] at 12.*

*Source: Appendix VI.B.4.a(4).*

The Examiner's Financial Advisors considered the median P/NBV multiples for the overall financial services industry within Standard Industrial Classification ("SIC") Code 6,[110] as published by Ibbotson Associates[111] for periods subsequent to June 30, 2008. This information was analyzed because the ResCap Guideline Companies had either filed for bankruptcy relief or been acquired by September 30, 2008, making the continued use of the ResCap Guideline Companies from September 30, 2008 through the Petition Date impossible. The Examiner's Financial Advisors compared the average P/NBV multiple for the ResCap Guideline Companies to the overall financial services industry multiple as of each quarterly date from December 31, 2005 through June 30, 2008. Based on this analysis, it was estimated that the average P/NBV multiples of the ResCap Guideline Companies were approximately 70% of the P/NBV multiples

---

[110] This includes companies operating primarily in the fields of finance, insurance, and real estate. Finance includes depository institutions, nondepository credit institutions, and broker dealers. Insurance covers carriers, agents, and brokers. Real estate includes owners, lessors, agents, and developers. IBBOTSON ASSOCS., STATISTICS FOR STANDARD INDUSTRIAL CLASSIFICATION SYS. CODE 6, FINANCE, INSURANCE, AND REAL ESTATE 1 (DEC. 2005). SIC Code 6 was deemed appropriate because it encompassed the ResCap Guideline Companies (prior to their acquisition/bankruptcy filings) and was comprised of hundreds of companies, thus serving as a benchmark for the prevailing economic conditions in the financial services industry.

[111] "The *Ibbotson Cost of Capital Yearbook* is a comprehensive source of industry-level financial data. The yearbook presents statistics critical in applying the income and market approaches to business valuation. Cost of equity, cost of capital, capital structure ratios, growth rates, industry multiples, and other useful financial data are presented for more than 300 industries . . . . This book is an excellent resource for industry analysis and is a useful tool for obtaining comparable market data applicable to privately held company valuation." SHANNON P. PRATT & ROGER J. GRABOWSKI, COST OF CAPITAL: APPLICATIONS AND EXAMPLES 440 (4th ed. 2010).

of the overall industry during this period. Therefore, the Examiner's Financial Advisors applied that percentage to the overall industry P/NBV multiples from March 31, 2009 through December 31, 2011,[112] to estimate an appropriate P/NBV multiple for ResCap's equity.[113] This approach is supported by authoritative valuation literature, which discusses the use of a peer group average multiple, as adjusted for differences, when a lack of financial information (in this case the absence of guideline companies after June 30, 2008) prevents using guideline company multiples in a relative valuation (i.e. Market Approach).[114]

The Examiner's Financial Advisors also considered three bids to purchase ResCap's assets or stock presented in October 2010 in assessing the reasonableness of the selected valuation multiples for 2010 and 2011. AFI's financial advisors believed that acceptance of any of the bids would result in equity losses to ResCap ranging from approximately $23 million to $650 million.[115] Additionally, none of the buyers were willing to assume ResCap's contingent or unliquidated liabilities for representation and warranty claims, absent a cap or indemnification from AFI.[116] The Examiner's Financial Advisors considered these bids to be informative with respect to the proposed purchase prices relative to book value and the significant risks perceived by market participants regarding ResCap's contingent and/or unliquidated liabilities for representation and warranty-related claims.[117]

### (c) Control Premium

A control premium is an amount by which the pro rata value of a controlling interest exceeds the pro rata value of a non-controlling interest in a business enterprise. This premium or upward adjustment reflects the right and power of control, a property interest.[118] The Guideline Publicly Traded Company Method derives value indications from trading prices of minority equity interests in a liquid market and indicates value on a marketable, minority

---

[112] The Examiner's Financial Advisors applied the relative multiple percentage of 31.8% as of June 30, 2008 for the September 30, 2008 and December 31, 2008 measurement dates to reflect continuing deterioration in the mortgage industry during the second half of 2008.

[113] The Examiner's Financial Advisors recognize the limitations of this estimation method. However, the application and results were deemed reasonable for purposes of evaluating ResCap's insolvency.

[114] ASWATH DAMODARAN, DAMODARAN ON VALUATION: SECURITY ANALYSIS FOR INVESTMENT AND CORPORATE FINANCE 17 (2d ed. 2006).

[115] Mortgage Strategic Alternatives Presentation, dated Oct. 29, 2010, at ALLY_0263412 [ALLY_0263337].

[116] Contemporaneous documents indicate that Ocwen and Centerbridge were unwilling to assume any exposure for contingent or unliquidated liabilities related to representation and warranty claims. Fortress was apparently willing to discuss assuming some exposure for such claims, subject to a cap. *Id.* at ALLY_0263416.

[117] According to internal documents, Fortress bid $500 million for a 51% equity interest with a corresponding book value of $740 million, which implied a P/NBV multiple of 0.68. *Id.* at ALLY_0263412. This implied bid multiple served to cross-validate the selected P/NBV multiples for the late 2010 and early 2011 measurement dates.

[118] SHANNON P. PRATT, BUSINESS VALUATION: DISCOUNTS AND PREMIUMS 16, 32 (2d ed. 2009).

basis. A control premium is then applied, when warranted, to estimate the value of equity on a controlling basis. For purposes of assessing ResCap's insolvency, a 100% controlling basis was assumed.

The Examiner's Financial Advisors reviewed observed equity transaction control premiums paid in the "Banking & Finance" and the "Brokerage, Investment & Management Consulting" industries for the years 2006 through 2011 as published by Mergerstat.[119] This information provided a wide range of annual average transaction premiums, generally ranging from 18% to 67%.[120] The Examiner's Financial Advisors also considered the volatility in the mortgage industry and the market's concerns about the viability of ResCap's business model.[121] These are relevant facts that a buyer would consider in deciding whether a premium for a controlling equity interest in ResCap was warranted. In addition, the acquisition of one of ResCap's Guideline Companies, Countrywide, by Bank of America in July of 2008 implied a negative control premium because of the distressed nature of Countrywide and the mortgage industry in 2008.[122] The Examiner's Financial Advisors selected and applied an equity control premium of 10% in the valuation of the equity of ResCap at each quarterly measurement date from December 31, 2005 through June 30, 2007. The Examiner's Financial Advisors concluded that a control premium would not be warranted for ResCap from September 30, 2007 through the Petition Date because of prevailing conditions in the mortgage industry.

### (d) Private Company Discount

As a private company, ResCap did not have publicly traded stock. A controlling interest in a private company may sell at a discount to a controlling interest in a publicly traded company for various reasons. A private company generally has limited access to financial markets, may have less financial transparency, and may incur additional costs to function on a stand-alone basis once separate from its current owner. There may also be less knowledge about the business among potential investors, including a more limited number of potential buyers and an inherently less competitive "bidding" process.[123]

---

[119] It is well recognized that the equity control premiums published by Mergerstat likely include a "synergistic" component in addition to a "financial control" component, as the transactions include both strategic and financial buyers. Therefore, the transaction premiums published in Mergerstat are generally considered to overstate the value of "financial control". *Id.* at 64.

[120] FACTSET MERGERSTAT, 2012 MERGERSTAT REVIEW 81 (Bus. Valuation Res. LLC ed., 2012); FACTSET MERGERSTAT, 2011 MERGERSTAT REVIEW 81 (Bus. Valuation LLC Res. ed., 2011).

[121] KABIR CAPRIHAN & MONICA PAREKH, JPMORGAN, COUNTRYWIDE AND RESIDENTIAL CAPITAL CORP RECOVERY, LIQUIDITY, BALANCE SHEET BURN, ETC. 1 (Aug. 21, 2007).

[122] Based on transaction details provided by Capital IQ, the control premium paid by Bank of America was negative 7.4% one day prior to announcement, negative 14.8% one week prior to announcement and negative 31.9% one month prior to announcement.

[123] Kathleen Fuller et al., *What Do Returns to Acquiring Firms Tell Us? Evidence From Firms that Make Many Acquisitions,* 57 J. FIN. 1763, 1784 (Aug. 2002); SHANNON P. PRATT, VALUING A BUSINESS: THE ANALYSIS AND APPRAISAL OF CLOSELY HELD COMPANIES 443–45 (5th ed. 2008).

Empirical evidence indicates that controlling interests in stand-alone private companies (and divisions of larger public companies) tend to sell at a discount to the values observed in control transactions involving similar publicly traded companies.[124] Estimated average discounts tend to range from 0% to 30%. Evidence suggests that discounts are related to size and other characteristics, with smaller and lower growth privately held companies selling for higher discounts.[125] Other evidence suggests that the observed discounts may be exaggerated to the extent that they include depressed prices for businesses sold by financially troubled parent companies.[126] The Examiner's Financial Advisors considered the facts and circumstances, including that ResCap was an SEC registrant with publicly available audited financial statements through the second quarter of 2009,[127] and determined that a relatively low discount was appropriate. The Examiner's Financial Advisors applied a 5% private company discount to the controlling equity interest in ResCap at each quarterly measurement date.

### (e) Indicated Value Of The Equity Of ResCap

The Examiner's Financial Advisors selected the appropriate P/NBV multiples and applied them to ResCap's reported book value to arrive at the indicated value of ResCap's equity on a marketable, minority basis. The Examiner's Financial Advisors then applied a control premium and private company discount, as applicable, to arrive at the indicated value of ResCap's equity on a non-marketable, controlling basis. The following table summarizes the estimated Fair Market Value of ResCap's equity on a quarterly basis from December 31, 2005 through December 31, 2011.

---

[124] *See, e.g.*, John Koeplin et al., *The Private Company Discount*, J. OF APPLIED CORP. FIN. (Winter 2000); Micah S. Officer, *The Price of Corporate Liquidity: Acquisition Discounts for Unlisted Targets*, 83 J. OF FIN. ECON. 571 (2007); Jean-Francois L'Her et al., *A New Examination of the Private Company Discount: The Acquisition Approach*, J. PRIVATE EQUITY (Summer 2003).

[125] Jean-Francois L'Her et al., *A New Examination of the Private Company Discount: The Acquisition Approach,* J. PRIVATE EQUITY (Summer 2003), at 54.

[126] Micah S. Officer, *The Price of Corporate Liquidity: Acquisition Discounts for Unlisted Targets,* 83 J. FIN. ECON. 571, 596–97 (2007).

[127] ResCap filed financial statements with the SEC through the second quarter of 2009. Subsequently, audited financials were available to holders of notes, prospective investors, and securities analysts at https://www.rescapholdings.com.

EXHIBIT VI.B.4.a(1)(e)
**ResCap Fair Market Value of Equity** [1]
December 31, 2005 – December 31, 2011
*($ in Millions)*

| | [A]<br>ResCap<br>Book Equity | [B]<br>Selected<br>P/NBV<br>Multiple | [C] = [A] × [B]<br>Fair Market<br>Value of ResCap<br>Equity<br>(Marketable,<br>Minority Basis) | [D] [2]<br>Control Premium | [E] = [C] + [D]<br>Fair Market<br>Value of ResCap<br>Equity<br>(Marketable,<br>Controlling Basis) | [F] = [E] × -5%<br>Private Company<br>Discount of 5% | [G] = [E] + [F]<br>Fair Market Value of<br>ResCap Equity (Non-<br>Marketable,<br>Controlling Basis) [1] |
|---|---|---|---|---|---|---|---|
| 12/31/05 | $ 7,464.0 | 1.60x | $ 11,941.3 | $ 1,194.1 | $ 13,135.4 | ($656.8) | $ 12,478.7 |
| 03/31/06 | 7,763.5 | 1.61x | 12,507.7 | 1,250.8 | 13,758.5 | (687.9) | 13,070.6 |
| 06/30/06 | 8,404.3 | 1.68x | 14,118.2 | 1,411.8 | 15,530.0 | (776.5) | 14,753.5 |
| 09/30/06 | 8,375.9 | 1.49x | 12,505.8 | 1,250.6 | 13,756.4 | (687.8) | 13,068.6 |
| 12/31/06 | 7,622.1 | 1.65x | 12,560.5 | 1,256.0 | 13,816.5 | (690.8) | 13,125.7 |
| 03/31/07 | 7,173.9 | 1.31x | 9,419.4 | 941.9 | 10,361.3 | (518.1) | 9,843.3 |
| 06/30/07 | 7,507.4 | 1.34x | 10,086.7 | 1,008.7 | 11,095.4 | (554.8) | 10,540.6 |
| 09/30/07 | 6,171.6 | 0.99x | 6,093.6 | 0.0 | 6,093.6 | (304.7) | 5,788.9 |
| 12/31/07 | 6,030.1 | 0.40x | 2,389.5 | 0.0 | 2,389.5 | (119.5) | 2,270.0 |
| 03/31/08 | 5,732.9 | 0.37x | 2,100.5 | 0.0 | 2,100.5 | (105.0) | 1,995.5 |
| 06/30/08 | 4,067.5 | 0.32x | 1,306.3 | 0.0 | 1,306.3 | (65.3) | 1,241.0 |
| 09/30/08 | 2,315.4 | 0.32x | 751.0 | 0.0 | 751.0 | (37.5) | 713.4 |
| 12/31/08 | 2,187.4 | 0.40x | 869.4 | 0.0 | 869.4 | (43.5) | 825.9 |
| 03/31/09 | 1,050.0 | 0.62x | 646.8 | 0.0 | 646.8 | (32.3) | 614.5 |
| 06/30/09 | 1,050.0 | 0.53x | 558.6 | 0.0 | 558.6 | (27.9) | 530.7 |
| 09/30/09 | 408.8 | 0.57x | 231.8 | 0.0 | 231.8 | (11.6) | 220.2 |
| 12/31/09 | 275.0 | 0.60x | 165.6 | 0.0 | 165.6 | (8.3) | 157.3 |
| 03/31/10 | 425.7 | 0.67x | 286.0 | 0.0 | 286.0 | (14.3) | 271.7 |
| 06/30/10 | 793.5 | 0.64x | 505.4 | 0.0 | 505.4 | (25.3) | 480.2 |
| 09/30/10 | 858.5 | 0.62x | 534.8 | 0.0 | 534.8 | (26.7) | 508.1 |
| 12/31/10 | 846.2 | 0.71x | 604.2 | 0.0 | 604.2 | (30.2) | 574.0 |
| 03/31/11 | 884.2 | 0.70x | 619.0 | 0.0 | 619.0 | (30.9) | 588.0 |
| 06/30/11 | 772.1 | 0.68x | 524.2 | 0.0 | 524.2 | (26.2) | 498.0 |
| 09/30/11 | 331.1 | 0.59x | 194.7 | 0.0 | 194.7 | (9.7) | 184.9 |
| 12/31/11 | 92.4 | 0.64x | 58.8 | 0.0 | 58.8 | (2.9) | 55.9 |

[1] *This section details the value of the equity component of ResCap's overall capital structure and is not indicative of solvency, as described herein.*

[2] *A control premium of 10% was applied in the valuation of ResCap's equity at each quarterly measurement date from Dec. 31, 2005 through Jun. 30, 2007. A control premium was not warranted for ResCap from Sep. 30, 2007 through the Petition Date for reasons described herein.*

*Source: Appendix VI.B.4.a(4).*

    The results of the Guideline Publicly Traded Company Method using the P/NBV multiple imply a positive market value of equity for ResCap. It is not appropriate to consider this positive value of equity as an indication of solvency. Under the Balance Sheet Test, the Fair Market Value of equity is combined with the Fair Market Value of debt to determine the Fair Market Value of invested capital. The face value of debt is then deducted from the Fair Market Value of invested capital, with a surplus indicating solvency and a deficit indicating insolvency as of the measurement date.[128]

---

[128] A determination that ResCap was insolvent implies that ResCap's equity had little to no value as of the specific measurement date. Equity for insolvent companies transacts at positive values for numerous reasons, including the option value inherent in the security, speculation, and/or lack of market transparency.

Further, despite the condition of the mortgage markets, ResCap's book value of equity remained positive throughout the credit crisis. This was largely because of ongoing capital support from AFI. The Examiner's Financial Advisors found that ResCap's book value of equity was not necessarily reflective of either the Fair Market Value of ResCap's equity or its solvency over the relevant time period.

### (2) Valuation Of The Interest-Bearing Debt Of ResCap

The Examiner's Financial Advisors used the Observable Market Value Method to value ResCap's interest-bearing debt. This method is applicable when the securities of a company are actively traded in an efficient market and relies on the premise that the market prices of the subject securities incorporate the future expectations of market participants with regard to the underlying value of the subject company.[129]

The Examiner's Financial Advisors analyzed and priced ResCap's interest-bearing debt based on the following five categories:[130]

(1) *Parent/Affiliate Borrowings*: Priced at estimated fair value per ResCap's annual Statement of Financial Accounting Standards ("SFAS") 107 disclosure. In each of ResCap's disclosures from 2005 through 2011, ResCap estimated that the fair value of this debt was equal to its face value.

(2) *Senior and Junior Secured Notes*: Priced using observable market data from financial data providers.[131]

(3) *Other Secured Borrowings*: ResCap completed an exchange of certain unsecured notes for senior and junior secured notes in June 2008. Other secured borrowings were assumed to be priced at par prior to June 2008. Other secured borrowings were valued using the same pricing as ResCap's senior secured notes after June 2008.

(4) *Unsecured Notes and Term Loan*: Priced using observable market data from financial data providers.[132]

---

[129] Shannon P. Pratt with Alina v. Niculita, Valuing a Business: The Analysis and Appraisal of Closely Held Companies 551 (5th ed. 2008).

[130] Beginning in November 2007, AFI implemented a program of open market purchases which may have affected the pricing of ResCap's debt securities. Such purchases would not necessarily indicate an increase in ResCap's value based on its underlying fundamentals, but could cause an upward bias in the valuation of ResCap's interest-bearing debt. No adjustment to the pricing of ResCap's interest-bearing debt was applied to account for this potential bias.

[131] Market pricing on bonds was observed from Interactive Data Corporation and Advantage Data Inc., providers of securities pricing data.

[132] Market pricing on bonds and loans was observed from Interactive Data Corporation, Advantage Data Inc., and Thomson Reuters LPC's Secondary Market Intelligence, providers of securities pricing data.

(5) *Other Unsecured Borrowings*: Other unsecured borrowings were valued using the weighted average of the unsecured notes' pricing.

ResCap's collateralized borrowings in securitization trusts were excluded from the insolvency analysis because they were secured by specific securitized mortgage assets not controlled by ResCap. The FHLB advances on ResCap's consolidated balance sheet were also excluded from the insolvency analysis because the FHLB advances were obligations with recourse to Ally Bank. The exclusion of these items did not have a material impact on the assessment of ResCap's insolvency because the market value of these liabilities approximated par at all relevant measurement dates.[133] The following table summarizes the analysis of the Fair Market Value of ResCap's interest-bearing debt.

EXHIBIT VI.B.4.a(2)
**ResCap Fair Market Value of Debt**
December 31, 2005 – December 31, 2011
*($ in Millions)*

| | [A]<br>Face Value<br>of ResCap Debt | [B]<br>Fair Market<br>Value<br>of ResCap Debt | [C] = [B] - [A]<br>Fair Market<br>Value Surplus /<br>(Deficit) | [D] = [B] / [A]<br>Fair Market<br>Value/<br>Face Value |
|---|---|---|---|---|
| 12/31/05 | $ 43,050.0 | $ 43,173.3 | $ 123.3 | 100.3% |
| 03/31/06 | 41,617.3 | 41,672.8 | 55.5 | 100.1% |
| 06/30/06 | 43,317.4 | 43,154.5 | (162.9) | 99.6% |
| 09/30/06 | 49,271.0 | 49,402.0 | 131.0 | 100.3% |
| 12/31/06 | 52,601.4 | 52,711.0 | 109.6 | 100.2% |
| 03/31/07 | 47,009.5 | 46,872.9 | (136.6) | 99.7% |
| 06/30/07 | 43,573.3 | 43,178.0 | (395.3) | 99.1% |
| 09/30/07 | 39,644.1 | 36,284.8 | (3,359.3) | 91.5% |
| 12/31/07 | 34,835.2 | 28,804.7 | (6,030.5) | 82.7% |
| 03/31/08 | 31,619.1 | 23,702.0 | (7,917.1) | 75.0% |
| 06/30/08 | 26,127.6 | 19,134.6 | (6,993.0) | 73.2% |
| 09/30/08 | 21,772.4 | 10,992.6 | (10,779.8) | 50.5% |
| 12/31/08 | 15,993.9 | 7,668.5 | (8,325.4) | 47.9% |
| 03/31/09 | 13,781.3 | 8,591.3 | (5,190.0) | 62.3% |
| 06/30/09 | 11,978.7 | 9,391.2 | (2,587.5) | 78.4% |
| 09/30/09 | 10,502.2 | 8,566.6 | (1,935.6) | 81.6% |
| 12/31/09 | 9,909.4 | 8,501.6 | (1,407.8) | 85.8% |
| 03/31/10 | 9,170.0 | 8,863.5 | (306.5) | 96.7% |
| 06/30/10 | 7,766.8 | 7,517.3 | (249.5) | 96.8% |
| 09/30/10 | 7,013.5 | 6,952.5 | (61.0) | 99.1% |
| 12/31/10 | 6,991.2 | 7,016.9 | 25.6 | 100.4% |
| 03/31/11 | 6,618.6 | 6,663.9 | 45.3 | 100.7% |
| 06/30/11 | 6,397.3 | 6,359.3 | (38.0) | 99.4% |
| 09/30/11 | 6,088.7 | 5,111.9 | (976.7) | 84.0% |
| 12/31/11 | 5,894.8 | 4,373.8 | (1,521.0) | 74.2% |

*Source: Appendix VI.B.4.a(4).*

---

[133] Accordingly, the net impact of excluding these items on the assessment of insolvency would be negligible because both the Fair Market Value of the debt and the face value of the debt would decrease by approximately the same amount.

### (3) Impact Of TARP Funding

ResCap's distressed financial condition was well recognized by the market. This is evident in ResCap's CDS spreads, which tracked the market's perception of ResCap's likelihood of default. During the second half of 2007, the market was pricing in a 72% chance that ResCap would default on its debt within one year.[134] An analyst noted, "[w]hat has driven ResCap's credit spreads to current levels has to do with something more practical and human. Simply put, there is little interest in taking the other side (*i.e.*, going long risk) of the trade."[135] ResCap's CDS spreads fluctuated significantly in the first half of 2008 amid market concerns that ResCap would default on its debt without a capital infusion from AFI. According to a market analyst, "ResCap's credit default swaps have been trading at levels that indicate investors have been expecting bankruptcy since the fall of 2007."[136]

EXHIBIT VI.B.4.a(3)—1
**ResCap Credit Default Swap Spreads** [(1)]
August 1, 2005 – December 31, 2011



*(1) Five year CDS spreads depicted; one year CDS spreads not depicted. Default probabilities per contemporaneous analyst commentary.*
*(2) Karen Brettell, US Credit –ResCap Debt Risk as Swaps Imply Distress, REUTERS, Aug. 21, 2007,*
*   http://uk.reuters.com/article/2007/08/21/markets-credit-idUKN2157256720070821.*
*(3) Karen Brettell, US Credit –ResCap Swaps Imply 72 Percent Default Risk, REUTERS, Nov. 20, 2007,*
*   http://www.reuters.com/article/2007/11/20/markets-credit-idUKN2053644620071120.*
*(4) Ari Levy & Caroline Salas, GMAC's $60 Billion Deal Loses Traction as Cash Burns (Update1), BLOOMBERG, Jun. 24, 2008,*
*   http://www.bloomberg.com/apps/news?pid=newsarchive&refer=home&sid=aFREd.COhlF4.*
*Source: Advantage Data Inc.*

---

[134] Karen Brettell, *US CREDIT–ResCap Swaps Imply 72 Percent Default Risk,* REUTERS, Nov. 20, 2007, www.reuters.com/assets/print?aid=UKN2053644620071120.

[135] VAN HESSER & DAPHNE FENG, HSBC, RESIDENTIAL CAPITAL, LLC LOOKING FOR SOMEONE TO TAKE THE OTHER SIDE OF THE TRADE 3 (Nov. 20, 2007).

[136] Cynthia Koons, *ResCap Bonds Command Pricey Insurance*, WALL ST. J., Aug. 2, 2008, http://online.wsj.com/article/SB121759683223604485.html.

A financial reporter noted in August 2008 that ResCap's "value in the credit markets is like that of a company on the verge of taking its last breath."[137] ResCap's CDS spreads spiked in November 2008, mirroring the decline in ResCap's bond prices and signaling the market's expectation of an imminent bankruptcy.[138] Moody's downgraded ResCap from Ca to C on November 20, 2008, and made the following comments with regard to ResCap's financial condition:

> ResCap cannot produce the required cash flow to service and ultimately repay its obligations . . . ResCap requires significant external support to continue as a going concern . . . [i]t is our opinion that ResCap would not be a going concern without support from [AFI] . . . each month requires additional support from [AFI] to prevent ResCap from violating its debt covenants and defaulting on its debt service.[139]

AFI received approval for $5 billion in TARP funds on December 24, 2008.[140] ResCap engaged in contingency planning for a bankruptcy filing in the weeks leading up to AFI's approval for TARP funding. Absent AFI receiving TARP funds, a ResCap bankruptcy filing in December 2008 appeared imminent.[141]

AFI received another $7.5 billion of TARP funding on May 21, 2009, and a third and final round of TARP funding of $3.8 billion on December 30, 2009.[142] After receipt of the third round of TARP funding, the Congressional Oversight Panel noted that ResCap's "ongoing existence and viability have remained highly doubtful without continued contributions from its parent. [AFI's] contributions to ResCap would not have been possible; however, had [AFI] not received TARP assistance. . . ."[143] Further, Carpenter testified before the Congressional Oversight Panel

---

[137] *Id.*

[138] A Fitch Financial Institutions "Special Report" noted:

An important caveat in using annualized spreads to imply annual probabilities of default is that if the market considers an entity's default to be imminent, the resulting implied probability of default could exceed 100%. For example, a protection buyer might be willing to pay 1,000 bps (or 10% of the notional CDS amount) for effectively a month's horizon of protection, which if annualized would translate to a spread of 12,000 bps and imply an annual probability of default of 200% (assuming a 60% loss severity).

Robert J. Grossman & Martin Hansen, Fitch, Financial Institutions: CDS Spreads and Default Risk Interpreting the Signals 2 (Oct. 12, 2010).

[139] Robert Young & Craig A. Emrick, Moody's, Rating Action: Moody's Downgrades ResCap to C (Nov. 20, 2008), http://www.moodys.com/research/Moodys-downgrades-ResCap-to-C--PR_167799.

[140] Cong. Oversight Panel, March Oversight Report: The Unique Treatment of GMAC Under the Tarp (Mar. 10, 2010), at 20, http://cybercemetery.unt.edu/archive/cop/20110402042135/http://cop.senate.gov/documents/cop-031110-report.pdf.

[141] Int. of T. Pohl, Feb. 26, 2013, at 41:10–44:16, 66:6–69:19.

[142] Cong. Oversight Panel, March Oversight Report: The Unique Treatment of GMAC Under the Tarp (Mar. 10, 2010), at 3, http://cybercemetery.unt.edu/archive/cop/20110402042135/http://cop.senate.gov/documents/cop-031110-report.pdf.

[143] *Id.* at 41.

on February 25, 2010, that "[f]or [AFI], over the last several years, [ResCap] has been what I have described publicly as a millstone around the company's neck. It has been the single-greatest barrier to the company's access to capital markets, it has been the greatest barrier on our profitability as an enterprise."[144]

As shown on the following chart, the receipt of TARP funds by AFI corresponded with significant increases in the pricing of ResCap's debt[145] following each of the three TARP funding dates.

EXHIBIT VI.B.4.a(3)—2
**Effect of AFI TARP Funding on ResCap Bond Pricing**
2008 – 2010



*Source: Pricing per Interactive Data Corporation, a provider of securities pricing data.*

As indicated above, AFI's receipt of TARP funds had a significant upward impact on the market prices of ResCap's publicly traded securities.

---

[144] *GMAC Financial Services and the Troubled Asset Relief Program: Hearing Before the Cong. Oversight Panel*, 111th Cong. 54 (2010), http://cybercemetery.unt.edu/archive/cop/20110402012152/http://cop.senate.gov/documents/transcript-022510-gmac.pdf.

[145] An analysis was performed of the historical pricing trends of ResCap's 6.5% bond maturing on April 17, 2013. This bond was selected because of the trading frequency and availability of data from 2006–2012. This bond is senior unsecured and is identified by CUSIP 76113BAR0.

### *(4) Market Approach Conclusion Of Value*

The Examiner's Financial Advisors estimated ResCap's Fair Market Value of invested capital by adding the Fair Market Value of ResCap's equity to the Fair Market Value of ResCap's interest-bearing debt. The face value of ResCap's interest-bearing debt was then subtracted from the Fair Market Value of invested capital to determine the Fair Market Value surplus or deficit. The following table summarizes the results of the Balance Sheet Test using the Market Approach.

EXHIBIT VI.B.4.a(4)
**Market Approach: Concluded Fair Market Value Surplus / (Deficit) of ResCap** [1]
December 31, 2005 – December 31, 2011
*($ in Millions)*

|  | [A] [2] Fair Market Value of ResCap Equity (Non-Marketable, Controlling Basis) | [B] Fair Market Value of ResCap Debt | [C] = [A] + [B] Fair Market Value of Invested Capital | [D] Face Value of ResCap Debt | [E] = [C] - [D] Fair Market Value Surplus / (Deficit) |
|---|---|---|---|---|---|
| 12/31/05 | $ 12,478.7 | $ 43,173.3 | $ 55,652.0 | $ 43,050.0 | $ 12,602.0 |
| 03/31/06 | 13,070.6 | 41,672.8 | 54,743.4 | 41,617.3 | 13,126.1 |
| 06/30/06 | 14,753.5 | 43,154.5 | 57,908.0 | 43,317.4 | 14,590.6 |
| 09/30/06 | 13,068.6 | 49,402.0 | 62,470.7 | 49,271.0 | 13,199.7 |
| 12/31/06 | 13,125.7 | 52,711.0 | 65,836.7 | 52,601.4 | 13,235.3 |
| 03/31/07 | 9,843.3 | 46,872.9 | 56,716.1 | 47,009.5 | 9,706.6 |
| 06/30/07 | 10,540.6 | 43,178.0 | 53,718.6 | 43,573.3 | 10,145.3 |
| 09/30/07 | 5,788.9 | 36,284.8 | 42,073.7 | 39,644.1 | 2,429.6 |
| 12/31/07 | 2,270.0 | 28,804.7 | 31,074.7 | 34,835.2 | (3,760.5) |
| 03/31/08 | 1,995.5 | 23,702.0 | 25,697.4 | 31,619.1 | (5,921.7) |
| 06/30/08 | 1,241.0 | 19,134.6 | 20,375.6 | 26,127.6 | (5,752.0) |
| 09/30/08 | 713.4 | 10,992.6 | 11,706.1 | 21,772.4 | (10,066.3) |
| 12/31/08 | 825.9 | 7,668.5 | 8,494.4 | 15,993.9 | (7,499.4) |
| 03/31/09 | 614.5 | 8,591.3 | 9,205.8 | 13,781.3 | (4,575.5) |
| 06/30/09 | 530.7 | 9,391.2 | 9,921.9 | 11,978.7 | (2,056.8) |
| 09/30/09 | 220.2 | 8,566.6 | 8,786.8 | 10,502.2 | (1,715.4) |
| 12/31/09 | 157.3 | 8,501.6 | 8,658.9 | 9,909.4 | (1,250.5) |
| 03/31/10 | 271.7 | 8,863.5 | 9,135.2 | 9,170.0 | (34.8) |
| 06/30/10 | 480.2 | 7,517.3 | 7,997.5 | 7,766.8 | 230.7 |
| 09/30/10 | 508.1 | 6,952.5 | 7,460.7 | 7,013.5 | 447.2 |
| 12/31/10 | 574.0 | 7,016.9 | 7,590.8 | 6,991.2 | 599.6 |
| 03/31/11 | 588.0 | 6,663.9 | 7,251.9 | 6,618.6 | 633.3 |
| 06/30/11 | 498.0 | 6,359.3 | 6,857.4 | 6,397.3 | 460.1 |
| 09/30/11 | 184.9 | 5,111.9 | 5,296.9 | 6,088.7 | (791.8) |
| 12/31/11 | 55.9 | 4,373.8 | 4,429.6 | 5,894.8 | (1,465.1) |

[1] *This section details the Fair Market Value surplus/(deficit) of ResCap under the Market Approach and is not necessarily indicative of the solvency of ResCap. As discussed in Section VI.B.3, the Examiner's Financial Advisors placed full weight on the Market Approach from Dec. 31, 2005 through Jun. 30, 2007. The Market Approach and Asset-Based Approach were weighted equally from Sep. 30, 2007 through Dec. 31, 2009. The Examiner's Financial Advisors placed full weight on the Asset-Based Approach for all quarterly measurement dates subsequent to Dec. 31, 2009.*
[2] *Reflects the value of the equity component of ResCap's overall capital structure and is not indicative of solvency, as described herein.*
Source: Appendix VI.B.4(a)(4).

### b. *Asset-Based Approach*

The Examiner's Financial Advisors also applied the Asset-Based Approach using the Adjusted Book Value Method to estimate the Fair Market Value of ResCap's total assets. Application of the Adjusted Book Value Method involved adjusting the book value of ResCap's assets to estimated market values. The Asset-Based Approach can be applied using either a going concern premise of value or a liquidation premise of value.[146] The Examiner's Financial Advisors concluded that the valuation for purposes of assessing ResCap's insolvency should be performed under a going concern premise of value.[147]

The Adjusted Book Value Method was deemed appropriate for valuing ResCap as this method "is useful for valuing a business that has had very erratic earnings, or has had successive years of losses, [because] both situations could render the income approach inapplicable. It is also used when market comparables are unavailable."[148] This method is particularly appropriate for companies such as ResCap where operating earnings are insignificant relative to the value of the underlying assets. Valuation literature indicates that "asset-intensive businesses with low profitability relative to their invested capital may be more appropriately valued using the asset approach under a going concern assumption."[149]

The Examiner's Financial Advisors applied the Adjusted Book Value Method considering contemporaneous asset-based valuation analyses prepared by various advisors and other third-party analysts from 2007 through 2009. Information considered by the Examiner's Financial

---

[146] Shannon P. Pratt with Alina v. Niculita, Valuing a Business: The Analysis and Appraisal of Closely Held Companies 64 (5th ed. 2008).

[147] Collier on Bankruptcy explains:

One of the most vexing problems in the valuation of the assets of a business enterprise as of a specified date is the question whether, and under what conditions, it should be treated as a going concern requiring appraisal of its property as an active unit rather than on an item-by-item basis. Fair value, in the case of a going concern, is determined by "the fair market price of the debtor's assets that could be obtained if sold in a prudent manner within a reasonable period of time." There is overwhelming authority to the effect that normally such valuation must be made from the vantage of a going concern and that subsequent dismemberment or impossibility to dispose of plant, equipment, inventory, etc., as an entirety should not enter into the picture. Indeed, it has been held that the court should use fair market going concern price "unless a business is on its deathbed," in which case a liquidating value should be used . . . . Where the going concern value is the appropriate standard, the appraisal must take into account the additional value element which flows from the combination of the various assets to an economic unit.

Collier on Bankruptcy ¶ 101.32 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2011) (citations omitted).

[148] Zabihollah Rezaee, Financial Institutions, Valuations, Mergers, & Acquisitions: The Fair Value Approach 206 (2d ed. 2001).

[149] Ian Ratner et al., Business Valuation And Bankruptcy 25 (2009).

Advisors included asset recovery assumptions reported by credit analysts from JPMorgan[150] and Citibank[151] during the second half of 2007, and also by Lazard during the fourth quarter of 2008[152] and second quarter of 2009.[153] These analyses each contained high, medium, and low asset recovery scenarios. The Examiner's Financial Advisors noted that these asset recovery rates were used to estimate the value of ResCap's assets in the event of liquidation. Therefore, the Examiner's Financial Advisors adjusted the recovery rates upward, as deemed appropriate, to reflect the going concern value of the business.[154] The Examiner's Financial Advisors assumed that ResCap's assets would be sold in a prudent manner within a reasonable period of time in order to achieve a going concern value, recognizing associated execution risk because of deteriorating market conditions.

The Examiner's Financial Advisors also considered the ABX index to be an indicator of the state of mortgage industry. The ABX index, created by the Markit Group, Ltd. ("Markit"), is a synthetic tradable index that allows investors to take positions on subprime mortgage-backed securities via CDS contracts.[155] The ABX index became a benchmark for the performance of subprime RMBS and served as a widely followed barometer of the United States subprime mortgage market.[156] During 2007 and 2008, the ABX BBB and A indices suffered declines of approximately 90% in value, while the AAA index suffered a decline of approximately 40%. The condition of the mortgage industry, as reflected by the ABX index, supports the trend in the asset value adjustments applied by the Examiner's Financial Advisors in the Adjusted Book Value Method for ResCap. The following graph demonstrates the precipitous decline across various credit-rated ABX sub-indices.

---

[150] KABIR CAPRIHAN & CHLOE THOMPSON, JPMORGAN, RESIDENTIAL CAPITAL CORP RECOVERY, LIQUIDITY, CASH FLOW BURN (Nov. 26, 2007); KABIR CAPRIHAN & MONICA PAREKH, JPMORGAN, COUNTRYWIDE AND RESIDENTIAL CAPITAL CORP RECOVERY, LIQUIDITY, BALANCE SHEET BURN, ETC. (Aug. 21, 2007).

[151] RYAN O'CONNELL & JERRY DOROST, CITIBANK, RESIDENTIAL CAPITAL LLC LOWERING THE ESTIMATED RECOVERY VALUES (Mar. 3, 2008) [CCM00049053].

[152] *See* Skadden & Lazard Project Scout Presentation, dated Oct. 8, 2008 [RC40008678].

[153] *See* Skadden & Lazard Project Scout II Presentation, dated Jun. 2009 [UBS-RESCAP-0015151]; Skadden & Lazard Project Scout II Presentation, dated Jul. 2009 [RC40010890].

[154] The Adjusted Book Value Method also requires the inclusion of the Fair Market Value of any off-balance sheet assets including intangible assets. The Examiner's Financial Advisors assumed the value of ResCap's off-balance sheet intangible assets to be negligible after June 2007 given ResCap's negative earnings, distressed financial condition, and unsustainable business model. Furthermore, ResCap wrote off all of its acquired intangible assets (including goodwill) in the third quarter of 2007.

[155] *See generally* Products and Services: Markit ABX.HE, MARKIT GROUP LTD., http://www.markit.com/en/ products/data/indices/structured-finance-indices/abx/abx.page.

[156] Ingo Fender & Martin Scheicher, *The ABX: How Do the Markets Price Subprime Mortgage Risk?*, BANK FOR INT'L SETTLEMENTS Q. REV., (Sept. 2008), at 67.



EXHIBIT VI.B.4.b—1
**ABX.HE Indices** [1]
December 30, 2005 – December 31, 2011

[1] *The ABX.HE is a series of five indices that track credit default swaps based on tranches of subprime mortgage-backed securities. The tranches differ by their ratings, from AAA to BBB-.*

*Source: Bloomberg; Declaration of Stewart M. Landefeld in Support of the Debtors' Chapter 11 Petitions and First Day Motions, In re Wash. Mutual, Inc., [Case No. 08-12229; Docket No. 13] at 12; IndyMac Bancorp, Inc. Current Report (Form 8-K) (Jul. 31, 2008), at 2; Bank of America Corporation, Annual Report (Form 10-K) (Feb. 27, 2009), at 17.*

The Examiner's Financial Advisors considered contemporaneous third-party asset recovery assumptions, the state of the mortgage industry, and the financial condition of ResCap[157] in estimating the asset value adjustments for ResCap's assets as of each quarterly measurement date.[158] The following chart summarizes the resulting overall value adjustment percentages for ResCap's assets across the quarterly measurement dates for each scenario.

---

[157] The Examiner's Financial Advisors reviewed the annual fair value estimates provided in ResCap's SEC Form 10-K disclosures, but did not rely heavily on these estimates because of the volatility in the mortgage industry and ResCap's acknowledgement of its inability to price certain assets accurately. *See* E-mails between D. Applegate, E. Feldstein, and S. Khattri (Jan. 27–28, 2007) [EXAM10163216].

[158] The application of the Adjusted Book Value Method considered appropriate market adjustments for the assets of Ally Bank, which included both the mortgage and automotive divisions. The Examiner's Financial Advisors noted that Ally Bank's assets were generally of higher quality than ResCap's (the delinquency rates of ResCap's mortgage loans were much higher than the delinquency rates of Ally Bank's mortgage loans). Total liabilities for Ally Bank and minority interests were then subtracted from the resulting value to derive an estimated value of ResCap's equity interest in the mortgage division of Ally Bank. The application of the Adjusted Book Value Method for ResCap on a consolidated basis is consistent with the analyses performed by JPMorgan. *See* KABIR CAPRIHAN & CHLOE THOMPSON, JPMORGAN, RESIDENTIAL CAPITAL CORP RECOVERY, LIQUIDITY, CASH FLOW BURN (Nov. 26, 2007); KABIR CAPRIHAN & MONICA PAREKH, JPMORGAN, COUNTRYWIDE AND RESIDENTIAL CAPITAL CORP RECOVERY, LIQUIDITY, BALANCE SHEET BURN, ETC. (Aug. 21, 2007).



EXHIBIT VI.B.4.b—2
**ResCap Asset-Based Approach**
**Adjusted Book Value Method: Total Asset Value Adjustment**
December 31, 2005 – December 31, 2011

*Source: Appendix VI.B.4.b.*

The Examiner's Financial Advisors estimated the Fair Market Value of ResCap's total assets by applying the asset value adjustments to the book value of ResCap's assets at each quarterly measurement date. The face value of ResCap's total liabilities[159] was then subtracted from the Fair Market Value of ResCap's total assets to determine ResCap's Fair Market Value surplus or deficit. The following table summarizes the results of the Balance Sheet Test using the Asset-Based Approach.

---

[159] Total liabilities include interest-bearing liabilities, non-interest bearing liabilities (i.e., payables, accrued expenses, and other current and non-current liabilities, etc.), and contingent and/or unliquidated liabilities.

EXHIBIT VI.B.4.b—3
**Asset-Based Approach: Concluded Fair Market Value Surplus / (Deficit) of ResCap [1]**
December 31, 2005 – December 31, 2011
*($ in Millions)*

| | Fair Market Value Surplus / (Deficit) | | |
|---|---|---|---|
| | **High** | **Low** | **Concluded Value** |
| 12/31/05 | $ 7,464.0 | $ 7,464.0 | $ 7,464.0 |
| 03/31/06 | 7,763.5 | 7,763.5 | 7,763.5 |
| 06/30/06 | 8,404.3 | 8,404.3 | 8,404.3 |
| 09/30/06 | 8,375.9 | 8,375.9 | 8,375.9 |
| 12/31/06 | 7,622.1 | 7,622.1 | 7,622.1 |
| 03/31/07 | 7,173.9 | 7,173.9 | 7,173.9 |
| 06/30/07 | 7,507.4 | 7,507.4 | 7,507.4 |
| 09/30/07 | 3,932.6 | (1,385.0) | 1,273.8 |
| 12/31/07 | 2,854.6 | (2,631.1) | 111.8 |
| 03/31/08 | 793.4 | (4,783.1) | (1,994.9) |
| 06/30/08 | (1,180.6) | (6,303.6) | (3,742.1) |
| 09/30/08 | (2,371.7) | (7,286.0) | (4,828.8) |
| 12/31/08 | (2,110.3) | (6,684.2) | (4,397.3) |
| 03/31/09 | (226.9) | (1,978.2) | (1,102.5) |
| 06/30/09 | (350.2) | (1,979.2) | (1,164.7) |
| 09/30/09 | (866.8) | (2,260.5) | (1,563.6) |
| 12/31/09 | (183.9) | (1,191.5) | (687.7) |
| 03/31/10 | (592.2) | (2,663.9) | (1,628.0) |
| 06/30/10 | (498.2) | (2,736.8) | (1,617.5) |
| 09/30/10 | (1,403.6) | (3,685.1) | (2,544.3) |
| 12/31/10 | (1,385.5) | (3,529.9) | (2,457.7) |
| 03/31/11 | (1,243.6) | (3,277.2) | (2,260.4) |
| 06/30/11 | (2,539.0) | (4,635.9) | (3,587.5) |
| 09/30/11 | (3,361.3) | (5,783.2) | (4,572.3) |
| 12/31/11 | (3,386.0) | (5,610.3) | (4,498.1) |

[1] *The Fair Market Value surplus/(deficit) shown above is calculated as the Fair Market Value of the total assets of ResCap less the face value of the total liabilities of ResCap as of each measurement date.*
Source: Appendix VI.B.4.b.

## 5. Contingent / Unliquidated Liabilities

### a. Legal Analysis

An assessment of ResCap's insolvency requires consideration of certain contingent and/or unliquidated liabilities (or unliquidated damages) that might not have been contemporaneously or adequately recorded when it issued its financial statements. The most prominent of these liabilities included potential representation and warranty-related claims. ResCap sold loans through whole-loan sales and securitizations, and was required to make customary representations and warranties regarding those loans. ResCap bore the risk of loss associated with those loans if they were intentionally or negligently misrepresented.[160]

In evaluating a debtor's insolvency, both present and contingent assets and liabilities are to be considered, so long as the contingency is capable of reasonable estimation and provided

---

[160] Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2008), at 34–36.

that such contingent assets or liabilities are properly discounted.[161] "It makes no difference whether the firm has a contingent asset or a contingent liability; the asset or liability must be reduced to its present, or expected, value before a determination can be made whether the firm's assets exceed its liabilities."[162] If contingencies are not properly discounted, the "absurd" result would be "that every individual firm that had contingent liabilities greater than his or its net assets" would be insolvent.[163]

Furthermore, when examining a debtor's insolvency as of the date of an allegedly fraudulent transfer, courts should not engage in an improper hindsight analysis.[164] As noted by the Third Circuit:

> Far from "hindsight" or "*post-hoc*" analysis, a court looks at the circumstances as they appeared to the debtor and determines whether the debtor's belief that a future event would occur was reasonable. The less reasonable a debtor's belief, the more a court is justified in reducing the assets (or raising the liabilities) to reflect the debtor's true financial condition at the time of the alleged transfers.[165]

The *Lippe v. Bairnco Corp.*[166] case provides an example of courts' valuation of a debtor's assets and liabilities as of the date of an allegedly fraudulent transfer. In *Lippe*, creditors of Keene Corporation ("Keene") sought to avoid a series of transfers made by the company as actually fraudulent under NY DCL section 276 and/or constructively fraudulent under NY DCL section 273. Keene filed for bankruptcy in 1993 after being overwhelmed by asbestos personal injury liabilities. The transfers challenged by the creditors were executed in 1983 through 1989.

---

[161] *Mellon Bank, N.A. v. Official Comm. of Unsecured Creditors of R.M.L., Inc.* (*In re R.M.L., Inc.*), 92 F.3d 139, 156 (3d Cir. 1996) ("If a debtor's treatment of an item as an 'asset' depends for its propriety on the occurrence of a contingent event, a court must take into consideration the likelihood of that event occurring from an objective standpoint.") (citations omitted); *In re Xonics Photochemical, Inc.*, 841 F.2d 198, 200 (7th Cir. 1988) ("By definition, a contingent liability is not certain—and often is highly unlikely—ever to become an actual liability. To value the contingent liability it is necessary to discount it by the probability that the contingency will occur and the liability will become real.").

[162] *In re Xonics Photochemical, Inc.*, 841 F.2d at 200.

[163] *Id.* at 199.

[164] *Lippe v. Bairnco Corp.*, 249 F. Supp. 2d 357, 380 (S.D.N.Y. 2003) (explaining that in consideration of a claim pursuant to the UFCA, "solvency must be gauged at the time of the transfer and not with the benefit of hindsight") (citations omitted), *aff'd*, 99 F. App'x 274 (2d Cir. 2004); *see also Paloian v. LaSalle Bank, N.A.*, 619 F.3d 688, 693 (7th Cir. 2010) (noting that "[h]indsight bias is to be fought rather than embraced" when determining whether debtor was insolvent under Illinois UFTA) (citing *Boyer v. Crown Stock Distrib., Inc.*, 587 F.3d 787, 794-95 (7th Cir. 2009); *In re R.M.L., Inc.,* 92 F.3d at 155 ("The use of hindsight to evaluate a debtor's financial condition for purposes of the [Bankruptcy] Code's 'insolvency' element has been criticized by courts and commentators alike.") (citation omitted); *Wolkowitz v. Am. Research Corp.* (*In re DAK Indus., Inc.*), 195 B.R. 117, 125 (Bankr. C.D. Cal. 1996) (cautioning against using hindsight to determine if business was on its "deathbed"), *aff'd*, 170 F.3d 1197 (9th Cir. 1999).

[165] *In re R.M.L., Inc.*, 92 F.3d at 156 (emphasis in original).

[166] *Lippe*, 249 F. Supp. 2d 357.

The defendants filed motions for summary judgment, seeking to dismiss, among other claims, the creditors' constructive fraudulent transfer claims. The district court's summary judgment decision turned, in part, on whether Keene was solvent at the time of the transfers under NY DCL section 271. That section provides that a person is insolvent if "the present fair salable value of his assets is less than the amount that will be required to pay his probable liability on his existing debts as they become absolute and matured."[167] Focusing on the phrase "probable," the district court calculated the debtor's liabilities as of the relevant transfer dates, considering only that information known to the company at the time of the transfers, and not including the company's ultimate asbestos liability.[168]

Emphasizing that "solvency must be gauged at the time of the transfer and not with the benefit of hindsight,"[169] the district court determined that the company "had, or believed it had, more than sufficient assets to cover its probable liabilities at the time of the transactions . . . and during the years it paid dividends."[170] Evidence gathered during discovery revealed that "Keene's managers and lawyers . . . never believed that Keene was insolvent or would be rendered insolvent by virtue of the asbestos cases"[171] based on the company's monitoring and calculations of its asbestos liability. Ultimately, the district court determined that "no reasonable jury could find that Keene actually believed its probable liabilities would exceed the amount of [its assets]" but that "of course, no one could predict the future"[172] when this remote likelihood ultimately occurred. With this finding, the district court refused to use hindsight to add retroactively Keene's ultimate asbestos liability to its balance sheet at the time of the transfers, and granted the summary judgment motion on the basis that the plaintiffs could not demonstrate that the debtor was insolvent at the time of the allegedly constructive fraudulent transfer claims.

In contrast, in a decision in the *In re W.R. Grace & Co.* bankruptcy cases, the Bankruptcy Court for the District of Delaware held that, in assessing whether W.R. Grace & Co. was insolvent at the time of an allegedly fraudulent transfer, it was appropriate for the court to consider future asbestos claims that had not yet been asserted against Grace, but were otherwise fully established.[173]

---

[167] N.Y. DEB. & CRED. LAW § 271.

[168] The District Court noted that "Keene could not predict the future, and it had no reason to know, at the time of the transfers, that years later it would be rendered insolvent by a flood of asbestos filings." *Lippe,* 249 F. Supp. 2d at 360.

[169] *Id.* at 380 (citations omitted).

[170] *Id.* at 378. The court noted that at the time of the transfers, Keene was contesting many of the asbestos claims and believed that many had no merit and that the amounts sought were exaggerated, and that "from 1984 through 1990, [Keene] won 97% of the cases that went to verdict, and lost only a total of $192,143 in the cases in which there were adverse verdicts." *Id.* at 380.

[171] *Id.* at 366.

[172] *Id.* at 379.

[173] *Official Comm. of Asbestos Pers. Injury Claimants of W.R. Grace & Co. v. Sealed Air Corp.* (*In re W.R. Grace & Co.*), 281 B.R. 852, 865 (Bankr. D. Del. 2002). The *Grace* decision was issued by the Honorable Alfred M. Wolin, United States District Judge for the District of New Jersey (sitting by designation in the Bankruptcy Court for the District of Delaware).

—

In that case, the creditors' committee sought to avoid Grace's prepetition transfer of one of its divisions as constructively fraudulent under the UFTA. The issue for the court was whether the liabilities the court should consider in determining Grace's insolvency as of the date of the allegedly fraudulent transfer were: (1) "those that were known on that date or those that the debtor reasonably should have known about at that time"; or (2) "the actual liabilities of the debtor" on that date, irrespective of "what the debtor may have known about those liabilities on the transfer date, reasonably or otherwise."[174] This issue was critical because Grace knew at the time of the transfer that it had asbestos liabilities, but it did not anticipate at that time that the liabilities would be as large as they ultimately were. If the entirety of the claims ultimately asserted against Grace could be retroactively considered in the analysis of Grace's insolvency, then Grace would be considered insolvent for purposes of fraudulent transfer law.

Turning to the UFTA, the court noted that two sections could be considered "constructive fraudulent transfer" provisions: (1) section 4(a)(2), which focused on what the debtor "reasonably should have believed" with respect to incurring debts beyond its ability to pay; and (2) section 5(a), which focused on the objective reality of whether "the debtor was insolvent at that time" and not by reference to what the debtor may have reasonably estimated its liabilities to be.[175] The *Grace* court described the insolvency test under section 5 as a "strict balance sheet test," with the debtor insolvent if its debts exceeded its assets.[176] Notably, the court did not discuss the actual statutory language of section 5, which provides that a debtor is insolvent "if the sum of the debtor's debts is greater than all of the debtor's assets, *at a fair valuation.*"[177]

Because the parties had focused on the section 5 definition of insolvency, the court limited its analysis to this "strict balance sheet test."[178] In calculating assets and debts pursuant to section 5, the defendants asserted that the value of the asbestos injury claims against Grace should be subject to the "probability discount rule" because those claims were contingent liabilities on the date of the allegedly fraudulent transfer and should be valued accordingly.[179]

The court disagreed, finding that the post-transfer date asbestos claims were not contingent at the time of the transfer, but simply "unknown" in amount. The court noted that

---

[174] *Id.* at 856.

[175] *Id.* at 855–856.

[176] *Id.* at 856.

[177] UFTA § 2(a) (emphasis added). The New Jersey UFTA, which was applicable in *Grace,* is identical to section 2(a) of the model UFTA: "A debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets, at a fair valuation." *Compare* N.J. STAT. ANN. § 25:2-23(a), *with* UFTA § 2(a). The legislative history of the model UFTA states that this definition contemplates "a fair valuation of the debts as well as the assets of the debtor." UFTA § 2(a) cmt. 1. It is notable that the bankruptcy court did include the relevant statutory language of UFTA section 4(a)(2) when describing that provision. *In re W.R. Grace & Co.,* 281 B.R. at 856.

[178] *In re W.R. Grace & Co.,* 281 B.R. at 856.

[179] *Id.* at 857–58.

the UFTA defined a debt as a "liability on a claim" and, applying the then-controlling Third Circuit case for what may be considered a claim,[180] the court determined that the asbestos claimants who had been exposed to asbestos and had physical manifestations of their exposure, even if the claimants did not know it at the time, had "a right to payment and thus a claim for purposes of the solvency analysis of the UFTA on the transfer date"[181] because "every element of liability was already present."[182]

The court emphasized that at the time of the challenged transfer, the debtors were well aware that they had liabilities relating to asbestos claims. In the three years leading up to the transfer date, the debtors averaged about 31,500 asbestos claims per year.[183] In distinguishing these asbestos claims from "contingent liabilities" that may be subject to the probability discount rule, the court noted that as of the transfer date, the debtor's asbestos products:

> [H]ad *already* proven dangerous on the transfer date affecting tens of thousands, not hundreds. The post-1998 increase in the claiming rate was not an airplane falling out of the sky nor a melt down in a reactor. Every element of liability was already present and had been for many years.[184]

In other words, at the time of the transfer, the debtor "knew it had an existing liability, it just did not know how big that liability was."[185] This unknown amount of liability did not make the claims contingent and therefore subject to reduced valuation.[186] "The law is the same–contingent liabilities are to be reduced by the reasonably probability of the contingency, but mere errors in the debtor's calculation of its solvency are to be corrected to reflect the

---

[180] *Avellino & Bienes v. M. Frenville Co.* (*In re M. Frenville Co.*), 744 F.2d 332 (3d Cir. 1984) (interpreting the meaning of the term "claim" under the Bankruptcy Code and holding that a "claim" does not "arise" until a cause of action has accrued under applicable nonbankruptcy, or state, law). The Third Circuit revisited its "accrual test" in 2010 and overturned the *Frenville* decision, holding instead that "a 'claim' arises when an individual is exposed prepetition to a product or other conduct giving rise to an injury, which underlies a 'right to payment' under the Bankruptcy Code." *JELD-WEN, Inc. v. Van Brunt* (*In re Grossman's Inc.*), 607 F.3d 114, 125 (3d Cir. 2010) (citation omitted).

[181] *In re W.R. Grace & Co.*, 281 B.R. at 862. *But see Sharp v. Chase Manhattan Bank USA, N.A.* (*In re Commercial Fin. Servs., Inc.*), 350 B.R. 520, 536 n.13 (Bankr. N.D. Okla. 2005) (noting that there is a difference "between claims allowable against the bankruptcy estate and liabilities recognizable on a solvency balance sheet").

[182] *In re W.R. Grace & Co.*, 281 B.R. at 865.

[183] *Id.* at 857.

[184] *Id.* at 865.

[185] *Id.* at 863.

[186] *Id.* at 865 ("The liability may have been unknown and the best estimates may have erred in protecting who could come forward with a claim of asbestos injury. This does not mean that liability for such claims was contingent.").

evidence."[187] As such, "courts may consider information originating subsequent to the transfer date if it tends to shed light on a fair and accurate assessment of the asset or liability as of the pertinent date."[188]

While this divergent case law arguably results in some confusion regarding when hindsight is appropriate in an insolvency analysis, the Examiner believes that the cases could be synthesized by focusing on what the debtors in the *Grace* and *Lippe* cases knew about their respective asbestos liabilities at the time of the challenged transfers. In *Lippe,* Keene reasonably thought the worst of the asbestos litigation was over at the times of the challenged transfers and, therefore, the court did not find it necessary to revise Keene's low calculations of its probable liabilities at those times.[189] But, in *Grace,* the allegedly fraudulent transfer took place ten years after the transfers reviewed in the *Lippe* case, by which time the dangers of asbestos and "W.R. Grace's asbestos liability in particular were nationally known and had been so for decades."[190] Grace's estimate of its asbestos liabilities, as required by the UFTA, arguably needed to reflect better the liabilities ultimately faced by Grace, because its lower estimates of such liabilities were arguably not reasonable at the time of the allegedly fraudulent transfer.[191]

Based on the foregoing, the Examiner concludes that the *Grace* decision has not changed the traditional "known or knowable" standard (as developed in the case law and relevant valuation literature) for valuing contingent and unliquidated liabilities in this case.

### b. Financial Analysis

The Examiner's Financial Advisors considered the implications of contingent and/or unliquidated liabilities in evaluating ResCap's insolvency. For purposes of assessing insolvency under the Market Approach, the Examiner's Financial Advisors relied upon the market's contemporaneous evaluation of such contingent and/or unliquidated liabilities as manifested in the market pricing of ResCap's debt securities. Debt pricing used in the Observable Market Value Method should reflect the market's expectation of ResCap's contingent and/or unliquidated liabilities based on information that was known or knowable by the market as of each quarterly measurement date. To the extent the market was not sufficiently incorporating such contingent and/or unliquidated liabilities, ResCap's liabilities and any associated condition of insolvency would increase by those unknown amounts, pursuant to the legal principles discussed in Section VI.B.5.a.

---

[187] *Id.* at 868.

[188] *Id.* at 869.

[189] *Lippe v. Bairnco Corp.*, 249 F. Supp. 2d 357, 366 (S.D.N.Y. 2003).

[190] *In re W.R. Grace & Co.*, 281 B.R. at 856.

[191] *See Wright v. Boston Scientific* (*In re Guidant Corp. Implantable Defibrillators Prods. Liability Litig.*), No. MDL 05–1708DWFAJB, 2006 WL 763212, at *4 (D. Minn. Mar. 24, 2006) (determining whether debtor was insolvent under Minnesota's UFTA, and refusing to add "unadjudicated, speculative damages" to balance sheet at time of transfer when lawsuit that would give rise to such damages was still pending).

With respect to the Examiner's Financial Advisors' application of the Asset-Based Approach, it was necessary to estimate the value of any contingent and/or unliquidated off-balance sheet liabilities and include the estimated amount for purposes of determining whether ResCap was insolvent.

ResCap, through its operating entities, RFC and GMAC Mortgage, sold loans that took the form of PLS, securitizations guaranteed by GSEs, and whole-loan sales.[192] In connection with these activities, ResCap "provide[d] to the GSEs, investors, and financial guarantors (monolines), and whole-loan purchasers various representations and warranties related to the loans sold."[193]

ResCap's methodology of reserving for liabilities associated with these representations and warranties was based on its history with individual purchasers (or investors). As disclosed in ResCap's financial statements for the years ended December 31, 2009 and 2010, ResCap considered "historical and recent demand trends in establishing the reserve" for representation and warranty-related liabilities.[194] In cases where ResCap did not have historical demand experience with an investor, ResCap acknowledged that it was "difficult to predict and estimate the level and timing of any potential future demands . . . and a liability [wa]s not recognized."[195]

With respect to non-Agency securitizations, ResCap's December 31, 2009 and 2010 financial statements noted that ResCap's "exposure to representation and warranty claims is most significant for loans sold between 2004 through 2008, specifically the 2006 and 2007 vintages which were originated and sold prior to enhanced underwriting standards and risk-mitigation actions implemented in 2008 . . . ." The financial statements, however, also noted the hurdles imposed on PLS investors seeking to make contractual claims for representations and warranties:

> In order to successfully assert a claim, an investor must prove breach of the representations and warranties that materially and adversely affects the interest of all investors. Securitization documents typically provide the investors with a right to request that the trustee investigate and initiate a repurchase claim. However, a class of investors generally are required to coordinate with other investors in that class comprising no less than 25% of the voting rights in securities for that class issued by the trust to pursue claims for breach of representation and warranties.[196]

These hurdles made it difficult for PLS investors to pursue representation and warranty-related claims against mortgage originators like ResCap. Beginning in early 2010, however,

---

[192] *See* Residential Capital, LLC Consolidated Financial Statements for the Years Ended December 31, 2010 and 2009, dated Feb. 28, 2011, at 18 [EXAM00123128].

[193] *Id.*

[194] *Id.* at 68.

[195] *Id.*

[196] *Id.* at 69–70.

investors banded together to obtain the 25% of voting rights in securitizations necessary to pursue claims for breach of representations and warranties.[197] In February 2010, PIMCO organized a conference and pitched MBS investors on a clearinghouse model to pursue potential MBS claims.[198] A July 2010 Reuters article stated that "using a clearinghouse model to aggregate positions is a milestone for investors who have been unable to organize . . . investors have finally reached a mechanism whereby they can act collectively to enforce their contractual rights," and "investors are eager to scrutinize loans against reps and warranties in ways [they] haven't been able to before."[199]

In July 2010, an investor group purportedly representing $500 billion in MBS sent letters to numerous trustees of mortgage-backed securitizations requesting that they enforce alleged servicing breaches related to allegedly improperly originated loans.[200]

An August 2010 presentation prepared by Elliott Associates and received by ResCap management,[201] noted that the dollar amount of non-Agency repurchase requests was only 13% of the Agencies' repurchase requests in 2006 and 2007, and that "one of the key reasons behind this phenomenon is the practical hurdles imposed by the 25% required vote on directing Trustees to take collective action."[202] The presentation went on to state that "the creation of an RMBS Investor Clearing House dramatically increases the likelihood that holders would meet the required 25% voting threshold," and that "as a result, the assumption that non-Agency repo request rates will remain a tiny fraction of Agency request rates looks tenuous at best."[203] Elliott Associates noted that under certain scenarios, ResCap's June 30, 2010 reserve balance of $855 million "would prove inadequate to the tune of $6.5 billion."[204]

In November 2010, the Congressional Oversight Panel released its November Oversight Report, titled "Examining the Consequences of Mortgage Irregularities for Financial Stability and Foreclosure Mitigation." The report stated that:

> [I]nvestors are beginning to take collective action, suggesting that the 25 percent threshold may not be an enormous burden for organized investors. A registry created by RMBS Clearing

---

[197] Alison Frankel, *Did Gibbs Pre-empt Rival Investor Group in BofA's MBS Deal?*, REUTERS, Oct. 3, 2011, http://blogs.reuters.com/alison-frankel/2011/10/03/did-gibbs-pre-empt-rival-investor-group-in-bofas-mbs-deal/.

[198] *Id.*

[199] Al Yoon, *Mortgage Bond Holders Get Legal Edge; Buybacks Seen,* REUTERS, Jul. 21, 2010, http://www.reuters.com/article/2010/07/21/mortgages-investors-idUSN2115720720100721.

[200] CHRIS GAMAITONI ET AL., COMPASS POINT RESEARCH & TRADING, LLC, MORTGAGE REPURCHASES PART II: PRIVATE LABEL RMBS INVESTORS TAKE AIM—QUANTIFYING THE RISKS (Aug. 17, 2010).

[201] E-mail from D. Cederholm (Aug. 6, 2010) [EXAM11122998].

[202] Ally Financial (GMAC Inc.) Repurchase Liability Analysis Presentation, dated Aug. 2010, at 4 [EXAM11123000].

[203] *Id.* at 7–8.

[204] *Id.* at 5, 11.

> House is providing a confidential data bank whose purpose is to identify and organize certificate holders into groups that can meet threshold requirements . . . .[205]

> RMBS Clearing House claims to represent more than 72 percent of the certificate holders of 2,300 mortgage-backed securities, more than 50 percent of holders of 900 mortgage-backed securities, and more than 66 percent of the holders of 450 mortgage-backed securities representing, in the aggregate, a face amount of $500 billion, or approximately one-third of the private label mortgage-backed securities market.[206]

The Congressional Oversight Panel used assumptions from analyst reports to provide "a top-level illustration of the cost of mortgage put-backs [related to the $1.5 trillion of PLS sold to investors between 2005 and 2008] could inflict on bank balance sheets."[207] The Congressional Oversight Panel estimated representations and warranty put-backs for these securities could be $16 billion on total issuances of $1.358 trillion, or 1.18%.[208]

The Examiner's Financial Advisors also noted that Bank of America settled its loan repurchase liabilities for $8.5 billion in June 2011.[209] Shortly after the announcement of that settlement, internal e-mail correspondence indicated that ResCap's potential PLS repurchase exposure could be $4 billion based on the Bank of America settlement (which implied a put-back percentage of approximately 2.0% of the original principal balance of Bank of America's securitizations).[210]

On October 17, 2011, AFI received a letter from Gibbs & Bruns LLP informing AFI that the firm represented investment advisers and holders of RMBS "issued and/or underwritten by Ally Financial, Inc. and/or its affiliates."[211] The letter also stated: "[t]here is widespread, readily available evidence suggesting that large numbers of mortgages securing the certificates held by our clients were sold or deposited into the RMBS pools based on false and/or fraudulent representations and warranties. . . ."[212]

---

[205] CONG. OVERSIGHT PANEL, NOVEMBER OVERSIGHT REPORT: EXAMINING THE CONSEQUENCES OF MORTGAGE IRREGULARITIES FOR FINANCIAL STABILITY AND FORECLOSURE MITIGATION (Nov. 16, 2010), at 30, http://www.gpo.gov/fdsys/pkg/CPRT-111JPRT61835/pdf/CPRT-111JPRT61835.pdf.

[206] *Id.* at 30 n.91.

[207] *Id.* at 70.

[208] *See Id.* at 72.

[209] Hugh Son, *BofA Settles Soured Mortgages for $8.5 Billion,* BLOOMBERG, Jun. 29, 2011, http://www.bloomberg.com/news/2011-06-29/bofa-reaches-8-5-billion-settlement-on-soured-mortgages-with-bondholders.html.

[210] E-mail from A. Norton (Jun. 29, 2011) [EXAM20206599].

[211] *See* Letter from K. Patrick to W. Solomon (Oct. 17, 2011) [ALLY_0212896]; *see also* Section III.J.4.c.

[212] *See* Letter from K. Patrick to W. Solomon (Oct. 17, 2011) [ALLY_0212896].

AFI disclosed the following in its March 31, 2012 quarterly report under the header "Potential Losses":

> We currently estimate that ResCap's reasonably possible losses over time related to the litigation matters and potential repurchase obligations and related claims described above could be between \$0 and \$4 billion over existing accruals. This estimated range is based on significant judgment and numerous assumptions that are subject to change, and which could be material. However, as a result of ResCap's current financial position, we believe ResCap's ability to pay for any such losses is very limited.[213]

In May 2012, the ResCap Board resolved to enter into the RMBS Plan Support Agreement which included a proposed allowed unsecured claim of \$8.7 billion related to securitizations issued by ResCap between 2004 and 2007.[214]

The Examiner and the Examiner's Professionals recognize the formation of the RMBS Investor Clearing House in early 2010 as a catalyst for the pursuit of representation and warranty-related claims by PLS investors. The formation of the RMBS Investor Clearing House established a formal process for PLS investors to assert their claims and substantially increased the likelihood that associated contingent and/or unliquidated liabilities would become liquidated, as well as the probable amount of those liabilities. As a result, by 2010, it was reasonably foreseeable that ResCap's contingent and/or unliquidated liabilities for non-Agency representation and warranty-related claims would materially exceed its accounting reserves. The Examiner's Financial Advisors estimated the potential incremental liabilities for ResCap's representation and warranty-related claims beginning in 2010, and recorded an adjustment for such amounts in excess of existing accounting reserves.

The original principal balance for ResCap's PLS securitizations between 2004 through 2007 was approximately \$221 billion.[215] The Examiner's Financial Advisors judgmentally estimated and applied a range of put-back percentages to the original principal balance of \$221 billion to calculate the total contingent and/or unliquidated liabilities related to representation and warranty-related claims as of each quarterly measurement date from March 31, 2010 through December 31, 2011. These total contingent and/or unliquidated liability amounts reflect the estimated payments that would be incurred by ResCap to settle repurchase claims, adjusted for probability of realization. The total contingent and/or unliquidated liabilities were reduced by ResCap's existing non-Agency reserves to arrive at a range of the total incremental contingent and/or unliquidated liabilities related to

---

[213] Ally Financial Inc., Quarterly Report (Form 10-Q) (Apr. 27, 2012), at 73; *see also* Memorandum, Legal/Rep and Warrant—Range of Reasonably Possible Loss Disclosure Considerations—Q1 2012, dated Apr. 27, 2012 [ALLY_PEO_0074712].

[214] *See* Section III.J.4.d.

[215] This included 392 securitizations. *See* PLS Trust Spreadsheet [EXAM00339947].

representation and warranty-related claims.[216] These incremental liability amounts were applied in the application of the Asset-Based Approach as of the respective measurement dates.[217]

EXHIBIT VI.B.5(b)
**Estimated Contingent and/or Unliquidated Liabilities Related to PLS Claims**
2010 – 2011
*($ in Millions)*

| | 03/31/10 | | 06/30/10 | | 09/30/10 | | 12/31/10 | |
|---|---|---|---|---|---|---|---|---|
| | Low | High | Low | High | Low | High | Low | High |
| ResCap PLS securitizations (2004 – 2007) [1] | $ 220,988 | $ 220,988 | $ 220,988 | $ 220,988 | $ 220,988 | $ 220,988 | $ 220,988 | $ 220,988 |
| Times: Estimated put-back percentage [2] | 0.50% | 1.00% | 0.50% | 1.00% | 1.00% | 1.50% | 1.00% | 1.50% |
| Estimated total contingent and/or unliquidated liability | 1,105 | 2,210 | 1,105 | 2,210 | 2,210 | 3,315 | 2,210 | 3,315 |
| Less: Balance sheet non-Agency reserves [3] | (575) | (575) | (553) | (553) | (729) | (729) | (633) | (633) |
| Incremental contingent and/or unliquidated liability | 530 | 1,635 | 552 | 1,657 | 1,481 | 2,586 | 1,577 | 2,682 |
| Incremental contingent and/or unliquidated liability, rounded | $ 530 | $ 1,630 | $ 550 | $ 1,660 | $ 1,480 | $ 2,590 | $ 1,580 | $ 2,680 |

| | 03/31/11 | | 06/30/11 | | 09/30/11 | | 12/31/11 | |
|---|---|---|---|---|---|---|---|---|
| | Low | High | Low | High | Low | High | Low | High |
| ResCap PLS securitizations (2004 – 2007) [1] | $ 220,988 | $ 220,988 | $ 220,988 | $ 220,988 | $ 220,988 | $ 220,988 | $ 220,988 | $ 220,988 |
| Times: Estimated put-back percentage [2] | 1.00% | 1.50% | 1.50% | 2.00% | 1.50% | 2.00% | 1.50% | 2.00% |
| Estimated total contingent and/or unliquidated liability | 2,210 | 3,315 | 3,315 | 4,420 | 3,315 | 4,420 | 3,315 | 4,420 |
| Less: Balance sheet non-Agency reserves [4] | (633) | (633) | (633) | (633) | (633) | (633) | (633) | (633) |
| Incremental contingent and/or unliquidated liability | 1,577 | 2,682 | 2,682 | 3,787 | 2,682 | 3,787 | 2,682 | 3,787 |
| Incremental contingent and/or unliquidated liability, rounded | $ 1,580 | $ 2,680 | $ 2,680 | $ 3,790 | $ 2,680 | $ 3,790 | $ 2,680 | $ 3,790 |

[1] *This included 392 securitizations. See PLS Trust Spreadsheet [EXAM00339947].*

[2] *The Examiner's Financial Advisors judgmentally estimated and applied a range of put-back percentages as adjusted for probability of realization.*

[3] *Non-Agency reserves include reserves for potential claims related to PLS, monolines and whole loan purchasers. For purposes of this analysis, the Examiner's Financial Advisors assumed that the entirety of the non-Agency reserves related to potential PLS claims. This assumption results in a conservative estimate of ResCap's potential incremental off-balance sheet liability for PLS representation and warranty-related claims. See Domestic Rep & Warranty Expense Presentation, undated [EXAM00338625].*

[4] *ResCap's total reserves (Agency and non-Agency) did not materially change from Dec. 31, 2010 through Dec. 31, 2011. Therefore, the Examiner's Financial Advisors held the non-Agency reserves constant at the Dec. 31, 2010 levels throughout fiscal year 2011. Source: Originating & Servicing and Legacy Portfolio & Other Q3 2011 Preliminary Earnings Presentation, dated Oct. 14, 2011, at 5 [EXAM12242367]; Residential Capital, LLC, Consolidated Financial Statements for the Years Ended December 31, 2011 and 2010, dated Mar. 28, 2012, at 66 [EXAM00122651].*

*Source: Appendix VI.B.4.b.*

---

[216] Non-Agency reserves include reserves for potential claims related to PLS, monolines and whole loan purchasers. For purposes of this analysis, the Examiner's Financial Advisors assumed that the entirety of the non-Agency reserves related to potential PLS claims. This assumption results in a conservative estimate of ResCap's potential incremental off-balance sheet liability for PLS representation and warranty-related claims.

[217] As previously discussed, the Examiner's Financial Advisors relied on the market's contemporaneous evaluation of such contingent and/or unliquidated liabilities as manifested in the market pricing of ResCap's debt securities in applying the Market Approach. Accordingly, no adjustment for contingent and/or unliquidated liabilities was made to the Market Approach on any measurement date.

## C. UNREASONABLY SMALL CAPITAL

### 1. Introduction

The "unreasonably small capital" or "inadequate capital"[218] test is the second of three independent determinations of financial distress recognized in the Bankruptcy Code and applicable state law. The Examiner evaluated the adequacy of ResCap's capitalization from its inception in 2005 through the Petition Date. The Examiner approached the issue from a broad perspective, considering quantitative and qualitative factors in his evaluation of the adequacy of capital. Although each of these factors informs the determination of whether a debtor is inadequately capitalized, usually a consideration of the totality of the factors presents a more complete image of a debtor's capitalization. In this regard, the Examiner considered the relevant facts, individually and in totality, in determining whether ResCap was left with unreasonably small capital at any time over the course of its existence. The Examiner further assessed these facts and circumstances in the context of events occurring within the industry and economy during the relevant time period.

This subsection initially introduces the conceptual framework and key indicators of inadequate capital as established in the applicable law. Special attention is paid to important themes developed through the cases that have addressed the concept underlying, and meaning of, the statutory term "unreasonably small capital." Next, this subsection presents the Examiner's conclusions on whether ResCap was left with unreasonably small capital during the relevant time period. This subsection then turns to the application of facts developed through the Investigation and an assessment of whether various key indicators of inadequate capital are present in these circumstances.

### 2. Conceptual Framework

The Bankruptcy Code and applicable state statutes do not define "unreasonably small capital." Thus, courts have been left with the task of formulating the test for determining when a debtor has "unreasonably small capital" as a result of a transfer or obligation. Nevertheless, several themes, and a litany of factors, may be distilled from the authorities addressing this question in the context of sophisticated business parties and transactions.

---

[218] For purposes of this report, "Unreasonably Small Capital" is considered to be equivalent to the concepts of "Unreasonably Small Assets" and/or "Inadequate Capital," while the inverse is referred to as "Adequate Capital" or "Capital Adequacy."

### a. Industry And Company-Specific Capital Needs

First, the unreasonably small capital test requires a fact-intensive assessment of the capital needs of a specific debtor in a particular industry. This is often accomplished by an assessment of the historic performance, liquidity, leverage, and other operational characteristics of the debtor in the context of the relevant industry and broader economy. As stated in Collier on Bankruptcy:

> Adequate capitalization is . . . a variable concept according to which specific industry of business is involved. The nature of the enterprise, normal turnover of inventory rate, method of payment by customers, etc., from the standpoint of what is normal and customary for other similar businesses in the industry, are all relevant factors in determining whether the amount of capital was unreasonably small at the time of, or immediately after, the transfer.[219]

Capital needs can vary greatly by industry and, therefore, the industry in which a debtor operates is relevant in determining whether its capital is adequate.[220] The concept of capital adequacy recognizes that there is no universal metric applicable in all situations. An assessment must take into account the nature and circumstances of the company at hand. Certain businesses in certain industries will need more capital than others, and the need for capital may be affected by the current state of the industry or economy. Thus, the following factors (among others) will affect an analysis of capital adequacy:

> (1) Industry Volatility—Companies operating in industries subject to high volatility in supply and demand, associated revenues, costs, profits, and cash flows require more capital than those operating in less volatile industries;
>
> (2) Industry Cyclicality—Companies operating in industries with greater cyclicality require more capital than those operating in less cyclical industries;
>
> (3) Stage of Business Cycle—Companies heading into an industry downturn, or in the midst of a decline in a business sector, require more capital than those facing an industry upturn;

---

[219] COLLIER ON BANKRUPTCY ¶ 548.05[3] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2010).

[220] *MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co.*, 910 F. Supp. 913, 917, 944 (S.D.N.Y. 1995) (noting that working capital needs matter in a determination of unreasonably small capital and that, for example, in the fixed-base operations industry comprised of "airport-based businesses that provide fuel, maintenance, hangaring and other services to aviation customers . . . companies with rapid inventory turnover can operate with small working capital").

(4) Degree of Leverage—Highly leveraged companies (e.g., leveraged buyout companies) require more capital than those with reduced amounts of leverage;

(5) Credit Worthiness—Companies with poor credit ratings require more capital than those with strong credit ratings;

(6) Capital Intensity—Companies that have high working capital, fixed costs, and capital expenditure needs require more capital than those with mostly lower working capital, mostly variable costs, and lower capital expenditure needs; and

(7) Contingent Needs—Companies operating in industries with reasonably foreseeable contingencies require more capital than those without such needs.

Courts may consider a wide range of factors in determining whether a debtor has been left with unreasonably small capital, including: (1) the nature of the business; (2) the stability or volatility of income; (3) the likelihood of future growth or contraction by the company; (4) the current secured and unsecured debts; (5) the likelihood of collateral backing secured debt retaining, gaining, or losing value; (6) the likelihood of incurring substantial consensual debt in the future;[221] (7) if a transferor is a guarantor, the likelihood that primary debtors will default; (8) the spending and saving habits of the entity; (9) the composition of the asset portfolio; (10) the track record of prior incidents and claims; (11) the amount of insurance; (12) the type of insurance coverage; and (13) whether the transferor reasonably discounted the likelihood that certain assets or liabilities would materialize.[222]

### b. Operating Performance And Capital Cushion

A debtor's operating performance and capital cushion are relevant factors in considering whether a debtor has been left with unreasonably small capital. These two factors are assessed before and after the transaction.[223] Essentially, the inadequate capital test gauges whether a

---

[221] *See United States v. Gleneagles Inv. Co.*, 565 F. Supp. 556, 580 (M.D. Pa. 1983), *aff'd sub nom. United States v. Tabor Court Realty Corp.*, 803 F.2d 1288 (3d Cir. 1986).

[222] *See* John E. Sullivan III, *Future Creditors and Fraudulent Transfers: When a Claimant Doesn't Have a Claim, When a Transfer Isn't a Transfer, When a Fraud Doesn't Stay Fraudulent, and Other Important Limits to Fraudulent Transfers Law for the Asset Protection Planner*, 22 DEL. J. CORP. L. 955, 1010–12 (1997).

[223] *Official Comm. of Unsecured Creditors of Norstan Apparel Shops, Inc. v. Lattman* (*In re Norstan Apparel Shops, Inc.*), 367 B.R. 68, 79–80 (Bankr. E.D.N.Y. 2007) (noting that "for the five and a half years before the LBO, Norstan's working capital averaged 29% of its net sales and 30% of its total assets," but that after the LBO, "Norstan's working capital [allegedly] averaged 2.1% of its net sales and 1% of its total assets," and holding that these allegations were sufficient to plead an allegation of unreasonably small capital).

debtor has sufficient capital to generate profits, or minimally cash flow, and maintain operations in accordance with its present and future business plan, thus meeting its obligations.[224]

An analysis of whether a debtor has been left with unreasonably small capital addresses the sufficiency of funding sources reasonably available to a debtor so that it may execute its business plan, maintain adequate liquidity and reserves, and satisfy its obligations as those obligations mature.[225] Thus, "[o]nly those cash inflows that were reasonable for a company to have expected to receive . . . whether through new equity, cash from operations, or available credit . . . are considered."[226] The critical determination is whether a debtor was rendered unable to access internal or external sources of capital and unable to generate sufficient cash flows to sustain operations.[227] Sources of capital can include operating profits, ongoing liquidity and working capital, availability on committed lines of secured and unsecured credit (including prospects of refinancing), potential sales of unencumbered and non-core assets to fund operations, and access to additional debt or equity through either the capital markets or affiliate support. Importantly, capitalization is considered adequate when a debtor has sufficient capital resources and cash flows to operate its business *and* withstand a reasonable range of foreseeable downside fluctuations in company specific, industry, and economic conditions.[228] It is unnecessary for a debtor to have sufficient resources to withstand "any and all setbacks."[229] "In undertaking an analysis of unreasonably small capital, courts

---

[224] *Moody v. Sec. Pac. Bus. Credit, Inc.*, 971 F.2d 1056, 1070 (3d Cir. 1992); *In re Tribune Co.*, 464 B.R. 126, 168 (Bankr. D. Del. 2011) (citing *Moody*, 971 F.2d at 1070)*; Vadnais Lumber Supply, Inc. v. Byrne* (*In re Vadnais Lumber Supply, Inc.*), 100 B.R. 127, 137 (Bankr. D. Mass. 1989).

[225] *See Brandt v. Hicks, Muse & Co.* (*In re Healthco Int'l, Inc.*), 208 B.R. 288, 302 (Bankr. D. Mass. 1997); *Salisbury v. Tex. Commerce Bank-Hous., N.A.* (*In re WCC Holding Corp.*), 171 B.R. 972, 985 (Bankr. N.D. Tex. 1994).

[226] *Statutory Comm. of Unsecured Creditors ex rel. Iridium Operating LLC v. Motorola, Inc.* (*In re Iridium Operating LLC*)*,* 373 B.R. 283, 345 (Bankr. S.D.N.Y. 2007).

[227] *Moody*, 971 F.2d at 1070; *Killips v. Schropp* (*In re Prime Realty, Inc.*), 380 B.R. 529, 537 (B.A.P. 8th Cir. 2007) (finding debtor left with unreasonably small capital where debtor has insufficient amounts in checking account to pay checks sent to creditors); *MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co.,* 910 F. Supp. 913, 944 (S.D.N.Y. 1995); *WRT Creditors Liquidation Trust v. WRT Bankr. Litig. Master File Defendants* (*In re WRT Energy Corp.*), 282 B.R. 343, 411 (Bankr. W.D. La. 2001); *Yoder v. T.E.L. Leasing, Inc.* (*In re Suburban Motor Freight, Inc.*), 124 B.R. 984, 999 (Bankr. S.D. Ohio 1990); *see Dahar v. Jackson* (*In re Jackson*), 459 F.3d 117, 123 (1st Cir. 2006); *West v. Seiffert* (*In re Hous. Drywall, Inc.*), Case No. 05-95161-H4-7, 2008 WL 2754526, at *28 (Bankr. S.D. Tex. Jul. 10, 2008); *In re Vadnais Lumber Supply, Inc.,* 100 B.R. at 137 (Bankr. D. Mass. 1989).

[228] *See, e.g.*, *Moody*, 971 F.2d at 1073; COLLIER ON BANKRUPTCY ¶ 548.05[3][b] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2010).

[229] *In re Iridium Operating LLC*, 373 B.R. at 345 (citing *MFS/Sun Life Trust*, 910 F. Supp. at 944); *see also MFS/Sun Life Trust*, 910 F. Supp. at 943 ("We know, with hindsight, that the forecasts were not realized. But the question the court must decide is not whether [the] projection was correct, for clearly it was not, but whether it was reasonable and prudent when made.").

compare a debtor's projected cash inflows with the debtor's capital needs throughout a reasonable period of time after the questioned transfer."[230]

### c. Reasonable Foreseeability

The unreasonably small capital test is also generally understood to measure a condition short of balance sheet or equitable insolvency (the two other independent tests for financial distress under applicable fraudulent transfer law). The test recognizes that an undercapitalized business, even if solvent today, might become insolvent at some point in the future,[231] thus harming its creditors. "[A] transaction leaves a company with unreasonably small capital when it creates an unreasonable risk of insolvency, not necessarily a likelihood of insolvency."[232] The unreasonably small capital test is designed to capture situations where a transaction may leave a debtor technically solvent but so depleted that it is "doomed to fail."[233]

Unreasonably small capital "connotes a condition of financial debility short of insolvency . . . but which makes insolvency reasonably foreseeable."[234] At least one court has likened this test to a test for negligence:

> In other words, a transaction leaves a company with unreasonably small capital when it creates an unreasonable risk of insolvency, not necessarily a likelihood of insolvency. This is similar to the concept of negligence, which is conduct that creates an unreasonable risk of harm to another's person or property.[235]

"The test of 'unreasonably small capital' is 'reasonable foreseeability,' tested by an objective standard anchored in projections of cash flow, sales, profit margins, and net profits and losses, including difficulties that are likely to arise."[236] In sum, an evaluation of

---

[230] *In re Iridium Operating LLC*, 373 B.R. at 345 (citing *Moody*, 971 F.2d at 1071–72).

[231] *Brandt v. Samuel, Son & Co.* (*In re Longview Aluminum, L.L.C.*), Case No. 03 B 12184, 2005 WL 3021173, at *6 (Bankr. N.D. Ill. Jul. 14, 2005) (citing *In re Vadnais Lumber Supply, Inc.*, 100 B.R. at 137), *aff'd sub nom. Baldi v. Samuel Son & Co.*, 548 F.3d 579 (7th Cir. 2008).

[232] *Brandt v. Hicks, Muse & Co.* (*In re Healthco Int'l, Inc.*), 208 B.R. 288, 302 (Bankr. D. Mass. 1997).

[233] *MFS/Sun Life Trust*, 910 F. Supp. at 944 (citing *Moody*, 971 F.2d at 1070 n.22) ("The test is aimed at transferees that leave the transferor technically solvent but doomed to fail.").

[234] *In re Healthco Int'l, Inc.*, 208 B.R. at 302; *see also Moody*, 971 F.2d at 1064 (noting that the "better view would seem to be that 'unreasonably small capital' denotes a financial condition short of equitable insolvency").

[235] *In re Healthco Int'l, Inc.*, 208 B.R. at 302.

[236] *Ring v. Bergman* (*In re Bergman*), 293 B.R. 580, 584 (Bankr. W.D.N.Y. 2003) (citing *Moody*, 971 F.2d at 1073 ("To a degree, parties must also account for difficulties that are likely to arise, including interest rate fluctuations and general economic downturns, and otherwise incorporate some margin for error.")).

unreasonably small capital should entail examining the financial performance of the business under a range of scenarios and assessing whether the debtor possesses or has reasonable access to sufficient capital to accommodate such scenarios.

Although courts may consider events occurring after the date of the questioned transfer, generally, only information known or knowable at the time of the transfer should be considered.[237] The determination of whether a debtor is adequately capitalized will be made as of the date of the transfer in question;[238] the test is prospective, however and a critical question is whether the debtor's demise was reasonably foreseeable.[239] Therefore, it is also necessary to consider the length of time between the transfer date and the failure of the business.[240] Courts may be less likely to find a company inadequately capitalized if the debtor continued to operate in the ordinary course of business and pay its creditors for an extended period of time after the transfer.[241] Further, courts have also found it relevant whether a debtor's decline in capitalization occurs in connection with a cause unrelated to the allegedly fraudulent transfer.[242]

### d. Leverage And Debt Capacity

As indicated above, highly leveraged companies require more capital resources than those with less leverage. The greater the debt, generally, the greater the risk associated with a

---

[237] *WRT Creditors Liquidation Trust v. WRT Bankr. Litig. Master File Defendants* (*In re WRT Energy Corp.*), 282 B.R. 343, 414 (Bankr. W.D. La. 2001) (citing *Moody*, 971 F.2d at 1070); *Salisbury v. Tex. Commerce Bank-Hous., N.A.* (*In re WCC Holding Corp.*), 171 B.R. 972, 985 (Bankr. N.D. Tex. 1994).

[238] *See, e.g.*, *In re WRT Energy Corp.*, 282 B.R. at 385 (internal citations omitted).

[239] *Moody*, 971 F.2d at, 1073; *see also Fid. Bond & Mortg. Co. v. Brand* (*In re Fid. Bond & Mortg. Co.*), 340 B.R. 266, 294 (Bankr. E.D. Pa. 2006) (citing *Moody*, 971 F.2d at 1073), *aff'd*, 371 B.R. 708 (E.D. Pa. 2007).

[240] *In re Fid. Bond & Mortg. Co.*, 340 B.R. at 299 (citing *Daley v. Chang* (*In re Joy Recovery Tech. Corp.*), 286 B.R. 54, 76 (Bankr. N.D. Ill. 2002)).

[241] *See Moody*, 971 F.2d at 1074 (no unreasonably low capital where creditors paid for twelve months after transaction); *MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co.*, 910 F. Supp. 913, 944 (S.D.N.Y. 1995) ("That the company remained viable [for eight months] after the LBO strongly suggests that its ultimate failure cannot be attributed to inadequacy of capital as of the date of the buyout."); *In re Fid. Bond & Mortg. Co.*, 340 B.R. at 299; (*In re Joy Recovery Tech. Corp.*, 286 B.R. at 76 ("Courts will not find that a company had unreasonably low capital if the company survives for an extended period of time after the subject transaction."). *But see Boyer v. Crown Stock Distrib., Inc.*, 587 F.3d 787 (7th Cir. 2009) (holding that a transferor's survival for three and a half years after an allegedly fraudulent transaction still left the transaction open to attack).

[242] *See Moody*, 971 F.2d at 1071, 1074–75 (noting that there is a "standard of causation which looks for a link between the challenged conveyance and the debtor's insolvency," but that, in the case before it, the debtor's insolvency was properly attributed to a "substantial drop in orders and sales" due to "increased foreign and domestic competition"); *MFS/Sun Life Trust*, 910 F. Supp. at 944 (holding that "the more persuasive view is that [the debtor] failed because of a concurrence of factors not related to the [allegedly fraudulent conveyance]" and pointing to increased competition, increased fees relating to operations, and the failure to implement cost-savings strategies as contributing factors to the debtor's failure).

firm, and the more likely it is that a firm is inadequately capitalized.[243] Debt capacity, defined as the amount of leverage a firm can reasonably support, is generally referenced as a relevant and reliable factor in assessing capital adequacy. Debt capacity often is evaluated by the use and analysis of various financial ratios.

Financial ratio analysis generally consists of examining the relationship between two or more numbers on financial statements. The ratios are used as metrics to evaluate the financial condition of a debtor. This form of analysis is employed in an effort to highlight a debtor's financial strengths and weaknesses. Leverage and coverage ratios can be informative with respect to debt capacity and capitalization, especially when compared to historic ratios for a subject company and/or comparable company ratios across a given industry. Leverage ratios measure the extent to which a firm has been financed by debt. A common measure of leverage is the debt-to-equity ratio, which is typically calculated using the face value of debt compared to the book value of equity. Coverage ratios generally provide a measure of a firm's ability to service its financing costs from operations. A common measure of coverage is the fixed-charge ratio, which is typically calculated using earnings before interest expense compared to interest expense.

### 3. Summary Of Examiner's Conclusions

The Examiner concludes that the evidence supports the proposition that ResCap was adequately capitalized on May 4, 2005, the date that AFI announced the capitalization of ResCap,[244] and was left with unreasonably small capital from August 15, 2007 through the Petition Date. [245] The Examiner's conclusions are based upon a detailed quantitative and qualitative analysis of ResCap's historical and projected financial and performance characteristics, focusing upon the evolution in ResCap's business model and capitalization needs in response to rapidly changing market conditions from 2005 through the Petition Date. This analysis included an assessment of ResCap's profitability and performance, operating cash flows, liquidity, leverage, and debt capacity. Additionally, the Examiner considered all reasonable external and internal sources of funds available to ResCap, including its ability to access capital markets through debt or equity issuances, and its ability to monetize assets to fund imminent financial needs. The Examiner considered the viability of ResCap's business model over time, including the reasonableness of ResCap's financial projections, liquidity forecasts, and business plans. The Examiner also considered the financial support received by ResCap from AFI in the form of intercompany loans, cash equity infusions, contributions of ResCap bond debt in the form of equity, and other forms of related-party support, including purchases of certain ResCap assets by affiliates. Furthermore, the Examiner considered events occurring within the mortgage industry and the economy.

---

[243] *MFS/Sun Life Trust*, 910 F. Supp. at 917, 944.

[244] General Motors Acceptance Corporation, Current Report (Form 8-K) (May 4, 2005), Ex. 99.1.

[245] The Examiner's conclusion that ResCap was adequately capitalized on May 4, 2005 also pertains to RFC and GMAC Mortgage.

Specifically, the Examiner based his conclusion that ResCap was left with unreasonably small capital as of August 15, 2007 through the Petition Date on a number of factors including, but not limited to, the following:

(1) The deterioration of the U.S. housing market intensified over the course of 2007, focusing primarily in subprime and other non-conforming mortgage related products. Increasing delinquencies and defaults on subprime mortgages led to the impairment of related mortgage-backed structured finance securities. As a result, the mortgage markets experienced significantly increased volatility and substantially reduced liquidity.

(2) ResCap eliminated sub-prime originations and reduced other non-conforming products from its core business in 2007. This process was the result of the rapid deterioration of the sub-prime and non-conforming mortgage markets, which resulted in the failure of many mortgage businesses.

(3) The global credit markets experienced a significant dislocation on or about August 9, 2007, which was characterized by dramatically increasing interest rate spreads on interbank lending, commercial paper, and other securities relative to risk free rates as reflected in U.S. Treasury securities. As a result, ResCap's access to the capital markets was impaired and ResCap's access to the secondary securitization markets was virtually eliminated.

(4) ResCap incurred billions of dollars in losses in 2007, 2008, and 2009. ResCap's continuing losses left it unable to service its debts from its operations, leaving it dependent upon support from AFI to meet its capital needs. Notwithstanding AFI's support, ResCap experienced chronic liquidity stress commencing in the Summer of 2007, and intensifying in 2008 and 2009. These liquidity concerns forced ResCap to consider various strategic alternatives, including an orderly liquidation as early as September 2007, and to consider a potential bankruptcy filing in the first half of 2008. After 2009, ResCap's liquidity was maintained at minimal levels pursuant to the structure of ResCap's line of credit agreement with AFI.

(5) ResCap's available cash dropped to a low point of $328 million on August 16, 2007. This liquidity crisis resulted in the expedited sale of Health Capital to AFI for $900.5 million in August 2007 and a $1 billion capital infusion from AFI in September 2007. ResCap's short-term projections in September 2007 indicated that it would be unable to service its obligations in the ordinary course and maintain sufficient liquidity. ResCap continued to project liquidity shortfalls in its 2008 and 2009 short-term projections.

(6) ResCap's ability to prepare reliable long-term financial projections and business plans was impaired by the rapid deterioration within its businesses and the concomitant deterioration within the mortgage industry and global economy in 2007, 2008, and 2009, among other causes.

(7) The marketplace considered ResCap to be at significant risk of future default on its debts in 2007, 2008, and 2009, as shown by the market price for ResCap's bonds and CDS over this time period. While the market price for ResCap's bonds recovered in 2010 (and its CDS prices declined), the recovery was recognized as being directly linked to the receipt of TARP funds by AFI.

(8) ResCap undertook significant changes to its business model in 2007 and 2008 as it attempted to adapt to rapidly changing market conditions and to survive as a going concern. Notwithstanding these changes, ResCap was not viable as a stand-alone business subsequent to August 15, 2007, because of ResCap's inability to generate profits or access sufficient capital to effectively restructure its business. As a result of its inability to service its obligations in the ordinary course and maintain sufficient liquidity, ResCap was dependent on AFI for continued financial support.

(9) AFI infused more than $8 billion in capital into ResCap from 2007 through 2012 in the form of $2.6 billion in direct contributions of cash, $3.8 billion in debt forgiveness, and $2 billion in other assets. Generally, AFI's contributions of cash to ResCap were made in an effort to address imminent liquidity needs. AFI's contributions of debt were made to address pending covenant default issues. In addition, excluding the Ally Bank Transactions, AFI purchased more than $3.3 billion of ResCap's assets from 2007 through 2012 for consideration of $2.2 billion in cash and $1.1 billion in assumed debt. AFI's support was insufficient to resolve ResCap's chronic undercapitalization issues.

The Examiner now turns to a detailed discussion of the various indicators and factors considered in the Examiner's evaluation of capital adequacy.

*4. Analysis Of ResCap's Capitalization*

Within the context of the themes discussed above, a variety of indicators and factors have emerged from the case law that have become part of the legal literature regularly referenced in assessing unreasonably small capital.[246] Such items are discussed below.

---

[246] *See, e.g.*, *MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co*, 910 F. Supp. 913, 944 (S.D.N.Y 1995) ("In order to determine the adequacy of capital, a court will look to such factors as the company's debt to equity ratio, its historical capital cushion, and the need for working capital in the specific industry at issue." (citation omitted)); *Kipperman v. Onex Corp.*, 411 B.R. 805, 836 (Bankr. N.D. Ga. 2009) (citing *MFS/Sun Life Trust*, 910 F. Supp. at 944 (S.D.N.Y. 1995)).

### a. Industry And Economic Considerations

An analysis of ResCap's capitalization from 2005 to 2012 requires appropriate consideration of the mortgage industry and the economy during this time period. As previously discussed in Section III, ResCap was seriously affected by the rapid deterioration in the market for subprime mortgage-backed securities in the summer of 2007, and the seizure of global credit markets on August 9, 2007. Many mortgage companies either filed for bankruptcy relief in 2007 or were subsequently acquired by larger enterprises. This industry crisis was the result of a confluence of many factors, including the inability of these enterprises to generate sufficient capital to sustain their respective business models during a time of severe market dislocation. Indeed, the failure of various mortgage origination and servicing businesses during this period resulted from a series of liquidity crises, which in turn were symptomatic of chronic undercapitalization issues within the industry. For example, New Century filed for bankruptcy relief after a spike in margin calls following a February 2007 announcement that it would be restating its financials.[247] Aegis ceased all mortgage origination activity as of August 3, 2007.[248] Aegis, American Home, and First Magnus filed for bankruptcy relief days after the credit markets seized in August 2007 because they were all unable to meet their margin calls, and because of the loss of their warehouse facilities.[249]

The FRB described the issues which led to the failure of many mortgage origination businesses as follows:

> Domestic and international financial markets experienced substantial strains and volatility in 2007 that were sparked by the ongoing deterioration of the subprime mortgage sector and emerging worries about the near-term outlook for U.S. economic growth. Substantial losses on structured products related to subprime mortgages caused market participants to reassess the risks associated with a wide range of other structured financial instruments. The result was a drying up of markets for subprime and nontraditional mortgage products as well as a significant impairment of the markets for asset-backed commercial paper and leveraged syndicated loans.[250]

[247] Declaration of Monika L. McCarthy in Support of Chapter 11 Petitions and First Day Relief, *In re New Century TRS Holdings, Inc.,* Case No. 07-10416, Docket No. 2, at 10–14.

[248] Declaration of Edward S. Robertson, Executive Vice President and Chief Financial Officer of the Debtors, in Support of First Day Motions, *In re Aegis Mortg. Corp.,* Case No. 07-11119, Docket No. 3, at 3.

[249] Decl. of Michael Strauss in Supp. of Chapter 11 Petitions and First Day Relief, *In re American Home Mortg. Holdings Inc.*, Case No. 07-11047, Docket No. 2, at 10–12; Decl. of Edward S. Robertson, Executive Vice President and Chief Financial Officer of the Debtors, in Supp. of First Day Motions, *In re Aegis Mortg. Corp.*, Case No. 07-11119, Docket No. 3, at 12–15; Decl. of Gurpreet S. Jaggi in Supp. of Debtor's Chapter 11 Petition and First Day Motions, In re First Magnus Financial Corp., Case No. 4:07-bk-01578, Docket No. 6, at 7–9.

[250] BD. OF GOVERNORS OF THE FED. RESERVE SYS., MONETARY POLICY REPORT TO THE CONGRESS (Feb. 27, 2008), at 23, http://www.federalreserve.gov/monetarypolicy/files/20080227_mprfullreport.pdf.

The failure of mortgage companies with large concentrations in subprime products in 2007 was directly attributable to funding issues:

> Over this period, mortgage companies specializing in subprime products began to experience considerable funding pressures, and many failed, because rising delinquencies on recently originated subprime mortgages required those firms to repurchase the bad loans from securitized pools. Financial markets calmed in April [2007], however, and liquidity in major markets remained ample. In June [2007], rating agencies downgraded or put under review for possible downgrade the credit ratings of a large number of securities backed by subprime mortgages. Shortly thereafter, a few hedge funds experienced serious difficulties as a result of subprime-related investments.[251]

Ultimately, the issues associated with subprime and other non-conforming mortgage products led to the virtual shut-down of the secondary securitization markets:

> Prices of indexes of credit default swaps on residential mortgage-backed securities backed by subprime mortgages—which had already weakened over the first half of 2007 for the lower-rated tranches—dropped steeply in July for both lower-rated and higher-rated tranches. Subsequently, investor demand for securities backed by subprime and alt-A mortgage pools dwindled, and the securitization market for those products virtually shut down. Those developments amplified credit and funding pressures on mortgage companies specializing in subprime mortgages; with no buyers for the mortgages they originated, more of those firms were forced to close or drastically reduce their operations, and subprime originations slowed to a crawl. Originations of alt-A mortgages—which had held up over the first half of the year—also dropped sharply beginning in July. . . In contrast, the market for conforming mortgages for prime borrowers was affected relatively little. Indeed, the issuance of securities carrying guarantees from Fannie Mae or Freddie Mac rose somewhat in the second half of the year.[252]

---

[251] *Id.*

[252] *Id.* at 23–24.

The disruption in the subprime mortgage market described above extended to the broader credit markets in August 2007. As described by Alan Greenspan, former chairman of the FRB:

> On [August] 9, 2007, and the days immediately following, financial markets in much of the world seized up. Virtually overnight the seemingly insatiable desire for financial risk came to an abrupt halt as the price of risk unexpectedly surged. Interest rates on a wide range of asset classes, especially interbank lending, asset-backed commercial paper and junk bonds, rose sharply relative to riskless U.S. Treasury securities.[253]

The August 2007 credit crisis was a seminal event in the mortgage industry and the global economy. At that time, the crisis was so severe that it affected the willingness of financial institutions to lend among themselves. As described by the FRB:

> At the same time, term interbank funding markets in the United States and Europe came under pressure. Banks recognized that the difficulties in the markets for mortgages, syndicated loans, and commercial paper could lead to substantially larger-than-anticipated calls on their funding capacity. Moreover, creditors found they could not reliably determine the size of their counterparties' potential exposures to those markets, and concerns about valuation practices added to the overall uncertainty. As a result, banks became much less willing to provide funding to others, including other banks especially for terms of more than a few days.[254]

While conditions improved in the credit markets in September and October 2007, in part because of quantitative easing by the Federal Reserve, the stress on the credit markets intensified in late 2007:

> The improvements in market functioning proved to be short lived, in part because of a further worsening in the outlook for the housing sector and associated concerns about possible effects on financial institutions and the economy.
>
> The strains in financial markets intensified during November and December [2007]. The syndicated loan market again ground to a halt.[255]

---

[253] Alan Greenspan, *The Roots of the Mortgage Crisis,* WALL ST. J., Dec. 12, 2007, http://online.wsj.com/article/SB119741050259621811.html.

[254] BD. OF GOVERNORS OF THE FED. RESERVE SYS., MONETARY POLICY REPORT TO THE CONGRESS (Feb. 27, 2008), at 25, http://www.federalreserve.gov/monetarypolicy/files/20080227_mprfullreport.pdf.

[255] *Id.* at 28.

Mortgage origination businesses with concentrations in subprime mortgage products experienced severe funding stress as a result of the deterioration of the subprime and non-conforming mortgage markets in 2007. This stress resulted in the failure of many mortgage businesses, as described above. ResCap also experienced the same market dynamics, which resulted in the virtual elimination of its subprime origination and secondary securitization business. AFI's financial support during this period, however, enabled ResCap to avoid a fate similar to that suffered by many mortgage businesses in 2007.

In 2008, the housing and related mortgage financing industries continued to decline. In July, the FRB reported "Housing demand, residential construction, and home prices have all continued to fall so far this year. Following a decline at an annual rate of 43 percent in the second half of 2007, sales of new homes decreased at an annual rate of 32 percent in the first five months of 2008."[256] In January 2008, Markit stopped issuing indices for the subprime market.[257] Delinquencies on subprime mortgages climbed above 17% by March, and increased to over 20% in September.[258] The problems in housing and finance began to spill over into the general economy as well. Unemployment increased to 5.1% in March, and continued rising from there, ending 2008 at 7.3%.[259] The FRB reported "[t]he U.S. economy remained sluggish in the first half of 2008, and steep increases in commodity prices boosted consumer price inflation."[260]

In March 2008, the stress from illiquid markets forced investment bank Bear Stearns to seek federal government support. By the end of March, JPMorgan Chase, working with the FRB, acquired Bear Stearns.[261] The FRB reported to Congress in July 2008 that:

> Substantial losses on even the highest-rated structured products based on subprime mortgages caused market participants to reassess the risks associated with other structured financial instruments and raised concerns about the exposures of major financial institutions to these assets. As liquidity in markets for structured products evaporated, banks were forced, at least temporarily, to hold more assets on their balance sheets than they anticipated. In addition, banks' losses on mortgage-related

---

[256] BD. OF GOVERNORS OF THE FED. RESERVE SYS., MONETARY POLICY REPORT TO THE CONGRESS (Jul. 15, 2008), at 3, http://www.federalreserve.gov/monetarypolicy/files/20080715_mprfullreport.pdf.

[257] *See* PERMANENT SUBCOMM. ON INVESTIGATIONS, U.S. SENATE COMM. ON HOMELAND SEC. AND GOVERNMENTAL AFFAIRS, WALL STREET AND THE FINANCIAL CRISIS: ANATOMY OF A FINANCIAL COLLAPSE (Apr. 13, 2011), at 47, .http://www.hsgac.senate.gov//imo/media/doc/Financial_Crisis/FinancialCrisisReport.pdf?attempt=2.

[258] *See* Exhibit III.F.1.c.

[259] *See* United States Department of Labor, Bureau of Labor Statistics, http://data.bls.gov/cgi-bin/surveymost.

[260] BD. OF GOVERNORS OF THE FED. RESERVE SYS., MONETARY POLICY REPORT TO THE CONGRESS (Jul. 15, 2008), at 1, http://www.federalreserve.gov/monetarypolicy/files/20080715_mprfullreport.pdf.

[261] FED. RESERVE BANK OF ST. LOUIS, THE FINANCIAL CRISIS: A TIMELINE OF EVENTS AND POLICY ACTIONS (undated), at 5, http://timeline.stlouisfed.org/pdf/CrisisTimeline.pdf.

securities and other assets prompted credit concerns among counterparties. Both of these factors contributed to strains in bank funding markets. The resulting deleveraging in the financial sector reduced the availability of credit to the overall economy.[262]

The first half of 2008 turned out to be the better half, as the global economy, and more specifically the financial markets, took a turn for the worse as summer ended:

> The second half of 2008 saw an intensification of the financial and economic strains that had initially been triggered by the end of the housing boom in the United States and other countries and the associated problems in mortgage markets. The ensuing turmoil in global credit markets affected asset values, credit conditions, and business and consumer confidence around the world. Over the summer, a weakening U.S. economy and continued financial turbulence led to a broad loss of confidence in the financial sector. In September, the government-sponsored enterprises Fannie Mae and Freddie Mac were placed into conservatorship by their regulator, and Lehman Brothers Holdings filed for bankruptcy. The insurance company American International Group, Inc., or AIG, also came under severe pressure, and the Federal Reserve, with the full support of the Treasury, agreed to provide substantial liquidity to the company. In addition, a number of other financial institutions failed or were acquired by competitors. As a result of the Lehman Brothers bankruptcy, a prominent money market mutual fund suffered capital losses, which prompted investors to withdraw large amounts from such funds. The resulting massive outflows undermined the stability of short-term funding markets, particularly the commercial paper market, upon which corporations rely heavily to meet their short-term borrowing needs. Against this backdrop, investors pulled back broadly from risk-taking in September and October, liquidity in short-term funding markets vanished for a time, and prices plunged across asset classes. Securitization markets, with the exception of those for government-supported mortgages, essentially shut down.[263]

---

[262] BD. OF GOVERNORS OF THE FED. RESERVE SYS., MONETARY POLICY REPORT TO THE CONGRESS (Jul. 15, 2008), at 23, http://www.federalreserve.gov/monetarypolicy/files/20080715_mprfullreport.pdf.

[263] BD. OF GOVERNORS OF THE FED. RESERVE SYS., MONETARY POLICY REPORT TO THE CONGRESS (Feb. 24, 2009), at 1, http://www.federalreserve.gov/monetarypolicy/files/20090224_mprfullreport.pdf.

In September and October 2008, in response to the turmoil, the FRB and U.S. Treasury began a number of federally-sponsored programs (including most notably TARP) to assist numerous companies and financial institutions facing severe financial distress. A number of these converted to bank holding companies to take advantage of the low-cost funding programs offered by the federal government.

Economic conditions continued to deteriorate in the first half of 2009, with unemployment increasing to 9.5%,[264] subprime delinquencies increasing to 25%,[265] and home prices declining an additional 7% to 18%.[266] The second half of 2009 however, was marked by a degree of stabilization in several sectors after more than two years of negative economic news:

> After declining for a year and a half, economic activity in the United States turned up in the second half of 2009, supported by an improvement in financial conditions, stimulus from monetary and fiscal policies, and a recovery in foreign economies. These factors, along with increased business and household confidence, appear likely to boost spending and sustain the economic expansion. However, the pace of the recovery probably will be tempered by households' desire to rebuild wealth, still-tight credit conditions facing some borrowers, and, despite some tentative signs of stabilization, continued weakness in labor markets.[267]

With the federal funds rate set as low as 0.01% by December 2009, and held below 1% since, the economy generally remained stable from 2010 through 2012. Slow improvements in the labor market resulted in unemployment dropping from a high of 10% in October 2009, to 7.8% in December 2012.[268] The S&P Case-Shiller Home Price Appreciation Index remained relatively flat after suffering through the steep declines of 2007 and 2008, and subprime mortgage delinquencies abated, dropping below 20% by the end of 2012.[269] "Financial market conditions improved notably in the fall of 2010, partly in response to actual and expected increases in monetary policy accommodation. In addition, later in the year, the tenor of incoming economic news strengthened somewhat, and the downside risks to economic growth

---

[264] *See* United States Department of Labor, Bureau of Labor Statistics, http://data.bls.gov/cgi-bin/surveymost.

[265] *See* Exhibit III.F.1.c.

[266] BD. OF GOVERNORS OF THE FED. RESERVE SYS., MONETARY POLICY REPORT TO THE CONGRESS (Jul. 21, 2009), at 4–5, http://www.federalreserve.gov/monetarypolicy/files/20090721_mprfullreport.pdf.

[267] BD. OF GOVERNORS OF THE FED. RESERVE SYS., MONETARY POLICY REPORT TO THE CONGRESS (Feb. 24, 2010), at 1, http://www.federalreserve.gov/monetarypolicy/files/20100224_mprfullreport.pdf.

[268] *See* United States Department of Labor, Bureau of Labor Statistics, http://data.bls.gov/cgi-bin/surveymost.

[269] *See* Exhibit III.F.1.c.

appeared to recede."[270] Though the economy in general showed signs of stabilization, and in some instances, slight improvement in the years 2010, 2011, and 2012, the FRB reported in February 2012:

> Activity in the housing sector remains depressed by historical standards. Although affordability has been boosted by declines in house prices and historically low interest rates for conventional mortgages, many potential buyers either lack the down payment and credit history to qualify for loans or are discouraged by ongoing concerns about future income, employment, and the potential for further declines in house prices. Yet other potential buyers—even those with sufficiently good credit records to qualify for a mortgage insured by one of the housing government-sponsored enterprises (GSEs)—continue to face difficulty in obtaining mortgage financing. Moreover, much of the demand that does exist has been channeled to the abundant stock of relatively inexpensive, vacant single-family houses, thereby limiting the need for new construction activity.[271]

### b. Changes In ResCap's Business Model

#### (1) Summary

As a result of the dislocation of the credit and securitization markets in August 2007, ResCap's business model was no longer viable as conceived. At that time, ResCap was engaged in the origination of residential mortgage loans using short-term third-party funding sources, then selling or securitizing such mortgage originations. The simultaneous dislocation of the credit and securitization markets compromised ResCap's business model because it was forced to use its available short-term credit to fund originations it could not subsequently sell. In addition, as the housing and mortgage markets continued to deteriorate, the value of the mortgage loans ResCap was forced to hold declined along with market-based advance rates, leading to increased margin calls and a corresponding evaporation of available liquidity.

#### (2) Background

Upon its initial formation, ResCap operated through four distinct operating segments: GMAC Residential, RCG, BCG, and IBG.[272] Its primary business activities included the origination, purchase, sale, securitization, and servicing of residential mortgage loans through each of GMAC Residential and RCG. While GMAC Residential had "a greater focus on the

---

[270] BD. OF GOVERNORS OF THE FED. RESERVE SYS., MONETARY POLICY REPORT TO THE CONGRESS (Mar. 1, 2011), at 1, http://www.federalreserve.gov/monetarypolicy/files/20110301_mprfullreport.pdf.

[271] BD. OF GOVERNORS OF THE FED. RESERVE SYS., MONETARY POLICY REPORT TO THE CONGRESS (Feb. 29, 2012), at 8, http://www.federalreserve.gov/monetarypolicy/files/20120229_mprfullreport.pdf.

[272] Residential Capital Corporation, Annual Report (Form 10-K) (Mar. 28, 2006), at 2.

direct origination of mortgage loans with consumers of prime credit quality that generally conform[ed] to the underwriting requirements of Fannie Mae or Freddie Mac,"[273] RCG "focus[ed] primarily on the purchase of residential mortgage loans in the secondary market and the origination of loans through mortgage brokers."[274] In addition, RCG's products ranged from prime to non-prime and "generally d[id] not conform to the underwriting requirements of Fannie Mae or Freddie Mac. [RCG's] mortgage loans [were] generally considered non-conforming because of the size of the loans or because they have more expansive documentation, property, or credit-related features (e.g., higher debt-to-income or loan-to-value ratios)."[275] "[RCG] was the fifth-largest non-agency issuer of mortgage-backed and mortgage-related asset-backed securities in the United States in 2005."[276]

### (3) Significant Changes In Originations

Beginning in the second half of 2006, as previously discussed in Section III, the U.S. housing and mortgage industries experienced distress as home price appreciation slowed, and in some instances declined, and subprime mortgage originations experienced increased delinquencies. As a result of the distress that affected subprime borrowers, ResCap recorded lower than expected earnings of $83 million for the quarter ended September 30, 2006, $200 million lower than the same period in 2005.[277] Later that year, ResCap reported an operating loss of $651 million in the quarter ended December 31, 2006, primarily because of large loss reserve adjustments to its subprime mortgage portfolio.[278] This was the first quarterly operating loss in ResCap's brief history.

"Beginning January 1, 2007, based on changes in the organizational structure and management of the GMAC Residential and [RCG] operating business segments, these segments [were] combined and [were] reported as one reportable operating segment, Residential Finance Group."[279] The change in operating segments coincided with ResCap's first restructuring, announced in January 2007 as an expense reduction initiative, whereby ResCap intended to reduce headcount by 800, not fill 200 open positions, accelerate the integration of GMAC Residential and RCG's operations and technology, and combine its servicing platforms into one. The press release in January 2007 noted, "ResCap's decision to reduce its workforce and accelerate its integration process is being driven by a number of factors, including slower originations, shifts in home prices and appreciation rates, a challenging interest rate environment and the continued deterioration of the sub-prime sector."[280]

---

[273] *Id.* at 12.

[274] *Id.* at 14.

[275] *Id.*

[276] *Id.* at 15.

[277] Residential Capital, LLC, Quarterly Report (Form 10-Q) (Nov. 7, 2006), at 4.

[278] Residential Capital, LLC, Current Report (Form 8-K) (Mar. 13, 2007), Ex. 99.1.

[279] Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2008), at 3.

[280] Residential Capital, LLC, Current Report (Form 8-K) (Jan. 16, 2007), at 2.

As 2007 progressed, the housing market and mortgage finance industries continued to encounter distress, primarily as a result of the continued deterioration in the subprime mortgage markets. ResCap reported a net loss of $910 million for the quarter ended March 31, 2007.[281] ResCap reported a $254 million loss for the quarter ended June 30, 2007.[282] ResCap reported, "[o]ur domestic loan production decreased 32.7% in the three months ended June 30, 2007 and 23.8% in the six months ended June 30, 2007"[283] in its quarterly financial statements. It further disclosed that:

> [D]omestic loan production decreased due to a decline in our non-prime, prime-nonconforming and prime second-lien products as a result of unfavorable market conditions. Non-prime loan production totaled $0.7 billion and $3.9 billion for the three- and six-months ended June 30, 2007, respectively, compared to $6.1 billion and $15.2 billion for the same period in 2006.[284]

By mid-2007 ResCap began encountering difficulties securitizing mortgage loans as well. ResCap reported this difficulty in its June 30 financial statements as follows:

> Gain on sale of mortgage loans, net decreased $239.5 million, or 71.0%, for the three months ended June 30, 2007 and $780.9 million, or 145.3%, for the six months ended June 30, 2007, compared to the same periods in 2006. The decrease in gain on sale of mortgage loans was primarily due to the decline in the fair value of our delinquent non-prime and prime second-lien loans in the held for sale portfolio. In addition, the gain on sale of current mortgage loans was reduced due to lower investor demand and lack of market liquidity. This severely affected our ability to securitize these loans at favorable margins. Finally, lower origination volume contributed to lower gain on sale income.[285]

As shown in Exhibit VI.C.4.b(3)—1 below, ResCap's mortgage origination business experienced a significant decline in 2007, as subprime originations effectively ended by the start of the third quarter, and continued distress in the housing market negatively affected originations of prime mortgages as well.

---

[281] Residential Capital, LLC, Quarterly Report (Form 10-Q) (May 8, 2007), at 4.

[282] Residential Capital, LLC, Quarterly Report (Form 10-Q) (Aug. 7, 2007), at 4.

[283] *Id.* at 29.

[284] *Id.*

[285] *Id.* at 34.



EXHIBIT VI.C.4.b(3)—1
**ResCap U.S. Loan Production**
December 31, 2005 – December 31, 2008
*($ in Millions)*

*Source: Residential Capital Corporation, Annual Report (Form 10-K) (Mar. 28, 2006), at 6; Residential Capital, LLC, Annual Report (Form 10-K) (Mar. 13, 2007), at 6; Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2008), at 7; Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2009), at 7.*

In June and July 2007, the major credit ratings agencies downgraded many subprime securitization ratings. This, in turn, caused substantial distress in the capital markets in July and August 2007 as lenders became wary of the credit risk of their counterparties. In early August 2007, the credit markets seized as commercial paper counterparties refused to roll maturities and banks refused to lend other than for the very short-term. The resulting impact on mortgage originators who relied on asset-backed commercial paper and other short-term funding sources was devastating as few had sufficient capital to overcome immediate commitments absent unimpaired access to the credit markets. A number of mortgage companies filed for bankruptcy, while others required rescue financing. ResCap's available cash dropped to a low of $328 million as of August 16, 2007, as margin calls increased, necessitating the immediate sale of Health Capital to AFI for $900.5 million.

In a September 7, 2007 ResCap Board presentation, ResCap's management explained "[m]acro mortgage market challenges continue to include: Significant erosion of non-conforming product margins characterized by extremely limited secondary market for most of these products."[286] It went on to discuss:

> Global credit markets continue to be severely stressed across a broad range of asset classes—Stress has spread from non-prime mortgages into prime non-conforming mortgages (Jumbos/Alt-A) and the broader credit markets (e.g., commercial paper)— Extremely limited liquidity for non-conforming loans has led to a significant buildup of HFS assets—This asset build-up has consumed significant funding capacity while margin calls and lower funding advance rates on eroding asset values have posed a drain on cash balances.[287]

Although ResCap had taken steps to eliminate subprime originations from its mortgage business, its business model was not able to accommodate both the deteriorating market conditions and seizure of the capital markets. ResCap's business model was to originate or purchase mortgage loans using low-cost, short-term funding, such as asset-backed commercial paper. These loans would then be securitized or sold to generate the funds necessary to repay the short term debt. As the securitization and credit markets froze, ResCap was left holding mortgages it intended to sell in the ordinary course. This posed two significant problems for ResCap: (1) ResCap's available funding capacity was consumed, leaving it with limited availability to continue originations; and (2) as the market value of its mortgage loans decreased, ResCap was required to post additional collateral to its lenders.

The September 7, 2007 ResCap Board Presentation noted the impact of liquidity constraints on ResCap's business:

> Limited access to liquidity has forced ResCap to further curtail asset originations
>
> – Non-prime originations essentially shut-off
>
> – Non-conforming originations reduced to 50% of Q2 2007 levels
>
> – Conforming originations continuing but at a slightly reduced levels
>
> – BCG is restricting additional credit approvals
>
> – IBG has raised pricing/eliminated products universally to reduce funding demands[288]

---

[286] ResCap Consolidated Operating Review Presentation, dated Sept. 7, 2007, at RC40012734 [RC40012695].

[287] *Id.* at RC40012735.

[288] *Id.* at RC40012736.

Recent ResCap initiatives include:

– Execution of significant underwriting changes to minimize origination of products with limited profitability or limited funding opportunities

– Re-classification of HFS portfolios to HFI, where appropriate, based on limited secondary market options

– Reduction in expense base in light of significant decline in production and margins

– Reduction/capping of balance sheet exposures

– Establishment of an operating model and go-to-market strategy that is more reflective of current mortgage market realities

– Appointment of Mike Rossi to lead ResCap turnaround[289]

ResCap disclosed in its public filings it had "[a]ctively managed our product offerings in light of changing market conditions and significantly reduced our non-conforming product offerings, including an effective suspension of our nonprime product offering."[290]

In its 2007 Annual Report (Form 10-K), ResCap noted:

During the second half of 2007, the change in the U.S. mortgage market has limited our ability to securitize many of our non-conforming loan products and has also resulted in a lack of demand and liquidity for the subordinate interests from these securitizations. This lack of liquidity has also reduced the level of whole loan transactions of certain non-conforming mortgages.[291]

ResCap further explained throughout the document that it had reduced its prime non-conforming, and effectively halted non-prime, originations because of market conditions, and had also reduced its warehouse lending and BCG activities as well. ResCap's Annual Report for 2007 disclosed:

In the short-term, it is probable the mortgage industry will continue to experience both declining mortgage origination volumes and reduced total mortgage indebtedness due to the deterioration of the non-prime and non-conforming mortgage market. Due to these market factors, including interest rates, the

---

[289] *Id.* at RC40012734–35.

[290] Residential Capital, LLC, Quarterly Report (Form 10-Q) (Nov. 8, 2007), at 39.

[291] Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2008), at 8.

business of acquiring and selling mortgage loans is cyclical. We do not expect the current market conditions to turn favorable in the near term.

The persistence of the global dislocation in the mortgage and credit markets referred to above may continue to negatively affect the value of our mortgage related assets. These markets continue to experience greater volatility, less liquidity, widening of credit spreads, repricing of credit risk and a lack or price transparency. We operate in these markets with exposure to loans, trading securities, derivatives and lending commitments. Our access to capital markets continues to be restricted, both domestically and internationally, impacting the renewal of certain facilities and our cost of funding. It is difficult to predict how long these conditions will exist and which markets, products and businesses will continue to be affected. Accordingly, these factors could continue to adversely impact our results of operations in the near term.

We have experienced a series of credit downgrades with the rating agencies during 2007 and 2008 due to the disruption in the capital markets. The actions of the rating agencies triggered an increase in our cost of funds due to the step up in coupon on our unsecured debt. A rating agency downgrade on February 22, 2008, resulted in an additional and final step-up of 50 basis points to our senior unsecured debt. We have also been impacted by margin calls and changes to advance rates on our secured facilities.[292]

Although ResCap executed a number of strategic decisions in an attempt to address the immediate issues it faced during this time period, as discussed later, it still required significant support from AFI. The challenges inherent in ResCap's business model were reflected in its financial performance, as shown in Exhibit VI.C.4.b(3)—2 below.

---

[292] *Id.* at 48.



EXHIBIT VI.C.4.b(3)—2
**ResCap Net Income**
Years Ended 2005 – 2011
*($ in Millions)*

Source: EXAM00122651; EXAM00123128; EXAM00124455; Residential Capital Corporation, Annual Report (Form 10-K) (Mar. 28, 2006),
at 95; Residential Capital, LLC, Annual Report (Form 10-K) (Mar. 13, 2007), at 101; Residential Capital, LLC, Annual Report
(Form 10-K) (Feb. 27, 2008), at 101; Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2009), at 119.

### (4) Effects Of International Business

The severe stress that affected the domestic market spread to foreign markets in the latter half of 2007. While IBG had increased originations from $19.7 billion in the nine months ended September 30, 2006 to $23.3 billion in the nine months ended September 30, 2007, it came at a cost. Net income for IBG of $72.8 million for the nine months ended September 30, 2006 turned to a net loss of $438.2 million for the nine months ended September 30, 2007.[293] ResCap reported that IBG's results "[w]ere impacted by the spread of the liquidity market tightening in Canada, the United Kingdom and Continental Europe during the [third] quarter."[294] In addition, ResCap reported "[m]argins in which deals were executed significantly decreased during the period due to lower investor demand and a lack of market liquidity."[295] In its Annual Report (Form 10-K) for 2007, ResCap disclosed that:

> During 2007, the mortgage and capital markets have experienced severe stress due to credit concerns and housing market contractions in the United States. During the second half of the year, these negative market conditions spread to the

_____

[293] Residential Capital, LLC, Quarterly Report (Form 10-Q) (Nov. 8, 2007), at 42.

[294] *Id.*

[295] *Id.* at 42–43.

foreign markets in which we operate, predominantly in the United Kingdom and Continental Europe.[296]

*(5) ResCap's Restructuring Efforts, Including Potential Liquidation*

As previously discussed, in January 2007 ResCap announced its first restructuring, including the reduction of one thousand positions and acceleration of certain integration activities in an effort to reduce costs. This was followed in October 2007, with a larger, formal restructuring plan as a result of "severe weakness in the housing market and mortgage industry."[297] This restructuring was intended to further streamline operations and provide ResCap with a scalable operating structure that would be easier to change as the operating environment changed. The most significant component of the restructuring plan was:

> [R]educing [ResCap's] current worldwide workforce of 12,000 associates by approximately 25 percent, or by approximately 3,000 associates, with the majority of reductions occurring in the fourth quarter of 2007. This reduction in workforce is in addition to the measures undertaken in the first half of 2007 in which 2,000 positions were eliminated.[298]

ResCap's Annual Report (Form 10-K) for 2007 further detailed the costs of the plan, explaining:

> The total restructuring charge of $127 million exceeded initial estimates of between $90 and $110 million due to unanticipated fixed asset write-downs and facility costs connected with certain workforce reductions. We believe we incurred substantially all of the restructuring costs in the fourth quarter of 2007 and that the plan will be operationally complete by mid 2008. As a result of a fully executed restructuring plan, we project we will realize annual cost reductions of $160 million in compensation and benefits and a further $25 million of reduced rent and asset depreciation.[299]

The restructuring plan had been in development since early September 2007 as indicated by presentations to the ResCap Board. One such presentation prepared for the September 26, 2007 ResCap Board meeting offered three possible scenarios:

> (1) Current Path: Aggressively restructure; Achieve profitability in 2008; Inject $725 [million] equity; Stabilize operations,

---

[296] Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2008), at 48.

[297] Residential Capital, LLC, Current Report (Form 8-K) (Oct. 17, 2007), Ex. 99.1, at 1.

[298] *Id.*

[299] Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2008), at 50.

preserve the franchise and fight for survival until conditions improve; Return to Board within 60 days to discuss capital situation and other business options;

(2) [Joint Venture or] Sale: Explore opportunities to sell ResCap in whole or in part; Understand valuation for whole business/parts of the business (i.e. RFG, IBG, BCG, Servicing) in the current environment; Identify potential acquisitions and/or JV partners; Discuss potential M&A options with Board within 60 days; and

(3) Orderly Liquidation/Other: Explore viability and economics of an orderly liquidation; Explore viability and economics of other exit or partial exit options.[300]

Even under the most optimistic of these three scenarios ("Current Path"), ResCap recognized it needed a $725 million cash equity contribution, stabilization of its operations, and "would fight for survival until conditions improve[d]." The presentation recognized ResCap's liquidity issues at the time and noted "ResCap liquidity position improved since August but [was] still fragile" and "will likely need more equity in Q4 depending on status at that time."[301]

### c.   ResCap's Liquidity

The term "liquidity" is generally understood to consist of a company's available cash balances, excess working capital, and available credit on committed lines that, when combined, represent funds available to the enterprise in the ordinary course of business. An assessment of liquidity includes an analysis of funds that can be generated from operating the business (cash flows from operations), and cash that might be realized through the sale of non-core assets to the extent that such assets can be monetized in a timely manner to satisfy imminent financial needs. Such an analysis can often provide compelling information regarding the sufficiency of a company's liquidity resources to support its business over a relevant time period, especially as it relates to a company's ability to deal with potential downturns, stresses, and contingencies. An evaluation of a company's liquidity must be performed in the context of its specific business needs, viewed through the lens of industry conditions and the macro-economic environment.

ResCap focused its liquidity management and reporting processes on its domestic liquidity portfolio, which included cash readily available to cover operating demands across its business operations. ResCap's domestic liquidity portfolio excluded certain cash balances, specifically international cash balances, cash balances maintained at Ally Bank, and certain

---

[300] ResCap Review Presentation, dated Sep. 26, 2007, at RC40012952 [RC40012907].

[301] *Id.* at RC40012914.

operating cash maintained within business segments to cover timing related outflows.[302] After June 2008, ResCap projected and reported its (i) unrestricted liquidity (unencumbered cash held in the United States by ResCap and its subsidiaries); and (ii) consolidated liquidity (cash and cash equivalents, excluding cash and cash equivalents maintained at Ally Bank) as required by certain financial covenants under the Secured Revolver Facility Loans.[303]

### (1) ResCap Was A Liquidity-Intensive Business

ResCap was a liquidity-intensive business in part due to the volatility inherent in its assets and the dependence of its business model on access to liquid capital.[304] In 2006, ResCap disclosed:

> Our liquidity needs are significant and we rely on access to capital markets to provide financing and fund asset growth. Our primary liquidity management objective is ensuring that we have adequate, reliable access to liquidity across all market cycles and in periods of financial stress. We meet our financing needs in a variety of ways, through whole-loan sales, the public debt capital markets, mortgage conduit facilities and asset-backed securities markets, as well as through the deposit-gathering and other financing activities of [Ally] Bank.[305]

Accordingly, an evaluation of ResCap's process for managing its liquidity needs provides valuable insight into ResCap's capital adequacy.

---

[302] ResCap focused on its domestic liquidity portfolio as certain sources of liquidity within the ResCap consolidated group of entities were not readily accessible to meet imminent liquidity needs, including: (1) IBG's available liquidity, which was located in several foreign countries and was subject to legal and tax repatriation issues, *see* Int. of J. Lombardo, Mar. 18, 2013, at 9:3–10:3; (2) cash for operating needs, which was "maintained within business segments to cover timing related outflows," *see* Residential Capital, LLC, Quarterly Report (Form 10-Q) (Nov. 8, 2007), at 48; (3) cash balances of "[Ally] Bank (& Auto Bank) Cash [that was] not available to ResCap and [was] earmarked to fund balance sheet growth," *see* ResCap Weekly Cash Rollforward and Dashboard [CERB011709] (quoting ResCap Total Cash & Cash Equivalent report on the "04.30.08" worksheet); and (4) unused revolvers, which were maintained as backup funding to support commercial paper and other short term secured funding facilities, *see* Section VI.C.4.c(2)(c).

[303] Secured Revolver Loan Agreement, § 7.02 [RC00024234]; Initial Line of Credit Agreement, §§ 2.03, 7.02 [ALLY_0023145].

[304] Residential Capital, LLC, Annual Report (Form 10-K) (Mar. 13, 2007), at 76.

[305] *Id.* at 76–77.

### (2) ResCap's Processes And Procedures For Managing Liquidity

ResCap outlined detailed processes and procedures by which it managed its liquidity risk.[306] These processes and procedures were comprised of, among other things, (1) maintaining sufficient short-term and long-term financing; (2) maintaining diversified sources of funding; (3) maintaining sufficient liquidity reserves; (4) maintaining an active dialogue with its credit rating agencies; and (5) employing a prudent management oversight and governance process.[307]

### (a) Short-Term And Long-Term Financing

ResCap tied its need for short-term financing to its various short-term asset classes, including HFS mortgage loans, lending receivables, and other liquid assets.[308] ResCap's need for long-term financing was tied to financing its longer term assets such as HFI mortgage loans, MSRs, real estate investments, and assets used as excess collateral for its various funding conduits.[309] ResCap focused on its liquidity daily, managing its debt maturities and credit facility expirations to minimize its liquidity risk.[310] ResCap stated it had achieved what it believed to be a "well-laddered" unsecured debt maturity profile as of December 31, 2006.[311] Notwithstanding the above, ResCap's ability to operate its business and deal with its pending debt maturities, as shown in Exhibit VI.C.4.c(2)(a) below, was dependent upon its ability to refinance billions of dollars in credit facilities that, in turn, was dependent upon ResCap's creditworthiness and continued access to the capital markets.

---

[306] The Federal Reserve Bank of San Francisco has explained:

> Liquidity is generally defined as the ability of a financial firm to meet its debt obligations without incurring unacceptably large losses. An example is a firm preferring to repay its outstanding one-month commercial paper obligations by issuing new commercial paper instead of by selling assets. Thus, 'funding liquidity risk' is the risk that a firm will not be able to meet its current and future cash flow and collateral needs, both expected and unexpected, without materially affecting its daily operations or overall financial condition. Financial firms are especially sensitive to funding liquidity risk since debt maturity transformation (for example, funding longer-term loans or asset purchases with shorter-term deposits or debt obligations) is one of their key business areas.

> JOSE A. LOPEZ, FED. RESERVE BANK OF S.F., FRBSF ECONOMIC LETTER 2008-33: WHAT IS LIQUIDITY RISK? 1 (Oct. 24, 2008), http://www.frbsf.org/publications/economics/letter/2008/el2008-33.pdf.

[307] Residential Capital, LLC, Annual Report (Form 10-K) (Mar. 13, 2007), at 77–79.

[308] *Id.* at 77.

[309] *Id.*

[310] *Id.*

[311] *Id.*



EXHIBIT VI.C.4.c(2)(a)
**ResCap Unsecured Long-Term Debt Maturities**
Years Ended 2007 – 2012
*($ in Millions)*

*Source: Residential Capital, LLC, Annual Report (Form 10-K) (Mar. 13, 2007), at 77.*

### (b) Diversified Sources Of Funding

ResCap endeavored to use a diversified array of funding sources, depending, in part, on the type and nature of the associated asset being financed. This diversification was intended to enhance ResCap's pricing across its debt facilities to reduce its reliance on any single source of liquidity. Diversification of financing options was important to ResCap's profitability and viability because ResCap operated a "spread business." ResCap distinguished three primary strategies to improve its debt pricing and access to liquidity. The first strategy focused on ResCap's secured funding programs through the mortgage and asset-backed securities markets, as well as long-term funding for ResCap's HFI portfolio. The second strategy focused on ResCap's unsecured funding sources at the ResCap LLC level. The third strategy focused on leveraging ResCap's relationship with Ally Bank to access deposits and FHLB advances. Maintaining diversified sources of financing was an important aspect of ResCap's operating strategy because ResCap recognized that dependence on any single source of capital would present significant risks to its business.

ResCap lost access to secondary market trading and securitization programs previously established to provide long-term financing for its mortgage loans following the dislocation of the capital markets in August 2007. In addition, short-term facilities such as its commercial paper conduits were also affected by the August 2007 dislocation of the capital markets.[312] As discussed previously, the August 2007 dislocation also presented challenges to IBG because lenders did not renew expiring facilities. ResCap faced new challenges in 2008 because its near-term maturities and a lack of third party lender support required it to seek continued support from AFI.

---

[312] Residential Capital, LLC, Quarterly Report (Form 10–Q) (Nov. 8, 2007), at 50.

### (c)  Liquidity Reserves

As of December 31, 2006, ResCap maintained liquidity reserves in the form of a portfolio of money market instruments and two $875 million, domestic, unsecured revolving credit facilities (one maturing July 2007, and the other maturing July 2008).[313] These reserves totaled $2.95 billion, of which $1.9 billion was unused and available as of December 31, 2006.[314] However, ResCap's ability to draw on its two $875 million "backup" revolving lines of credit was limited as a matter of practice—for example, the minutes of ResCap's "Liquidity and Funding Committee" stated that the "revolver is supposed to be viewed as contingency not as term funding. [ResCap] can borrow from time to time, but to use it consistently would be a problem."[315] Further, ResCap needed 100% committed backup lines to access the commercial paper market for funding.[316] In other words, ResCap's need to keep the revolving lines in place to access the commercial paper market also effectively restricted its ability to draw on them. Additionally, drawing on these facilities would impede ResCap's ability to negotiate secured financing with lenders.[317] Fitch stated that "[when] a company draws on its [backup] bank lines, it just basically gives off the impression that it has run out of options."[318] As such, any drawdown on these lines would likely exacerbate rather than alleviate ResCap's liquidity issues over time.

### (d)  Dialogue With Credit Rating Agencies

ResCap recognized that its credit rating was a critical factor in maintaining adequate liquidity because of the effect its credit rating had on the cost and availability of its existing facilities, and because of the effect its credit rating had on its ongoing access to the capital markets. Accordingly, an important component of ResCap's strategy for managing its liquidity centered on ResCap's commitment to maintain an investment-grade credit rating.[319]

---

[313] Residential Capital, LLC, Annual Report (Form 10-K) (Mar. 13, 2007), at 78–79.

[314] *Id.* at 79 (showing that the $2.96 billion was comprised of a $1.07 billion liquidity portfolio (domestic and international), $1.75 billion available under two $875 million unsecured revolving credit facilities and $145 million of international bank lines).

[315] Minutes of a Meeting of the Liquidity and Funding Committee of Residential Capital, LLC, Aug. 23, 2006, at EXAM10377281 [EXAM10377279].

[316] *Id.* at EXAM10377282, EXAM10377311.

[317] Int. of W. Casey, Jan. 31, 2013, at 54:12–55:3, 55:19–56:03; Int. of J. Pruzan, Mar. 28, 2013, at 54:25–55:16; ResCap Materials for Discussion of Debt Restructuring/Bond Exchange, dated Apr. 18, 2008, at RC40007702 [RC40007696].

[318] Thomas Lee, *More Mortgage Fallout: ResCap Debt Cut to Junk*, STAR TRIBUNE, Aug. 16, 2007, http://www.startribune.com/printarticle/?id=11218491.

[319] Residential Capital, LLC, Annual Report (Form 10-K) (Mar. 13, 2007), at 79.

ResCap established an investment-grade credit rating in June 2005.[320] ResCap believed that an active dialogue with the credit rating agencies was crucial to maintaining that investment-grade rating. Such a dialogue was, therefore, an important component of its liquidity management plan. ResCap's recognition of the importance of its investment-grade credit rating implicitly acknowledged that any future credit downgrades would have significant consequences for ResCap's continued access to capital markets, from both a cost of funds and credit availability perspective.

### (e) Liquidity Management Oversight And Governance Process

ResCap employed a number of mechanisms to monitor its liquidity and capital needs, and those mechanisms evolved over time. In 2006, ResCap's "Liquidity and Funding Committee," chaired by the ResCap's CFO with participation by the corporate treasurer and various business unit officers, was tasked with determining optimal capital structure, overseeing ongoing liquidity needs, and monitoring contingency funding plans. ResCap's global treasury function, comprised of business unit treasurers, was tasked with evaluating liquidity needs and communicating such needs to senior management. ResCap's daily liquidity management was designed to manage cash and liquidity centrally with input from each business segment.[321]

### (3) Effect Of Mortgage Crisis On ResCap's Liquidity In 2007

ResCap was unable to address its liquidity needs adequately during 2007. This was not unique to ResCap; industry-wide liquidity issues reached an apex with the virtual shutdown of the credit and securitization markets in August 2007. Although the mortgage crisis was initially limited to subprime products, it became apparent in 2007 that the issues extended to Alt-A and other non-conforming mortgages. ResCap's losses mounted as a result of the decline in production, increasing loan losses, and continued deterioration across its businesses both domestically and internationally as 2007 progressed.[322]

ResCap's liquidity was "dramatically impacted"[323] during this period. As shown in Exhibit VI.C.4.c(3) below, ResCap's domestic liquidity was at a "cash low point" of $328 million on August 16, 2007.[324] This liquidity shortfall led to the sale of Health Capital on August 17, 2007. AFI purchased Health Capital on an expedited basis for an initial payment of $775 million[325] and a subsequent true-up to $900.5 million based upon a valuation performed by Houlihan.[326]

---

[320] VICTORIA WAGNER & JOHN K. BARTKO, S&P, RESEARCH UPDATE: RESIDENTIAL CAPITAL CORP. ASSIGNED 'BBB-/A-3' RATINGS (Jun. 9, 2005); PHILIP KIBEL & JOHN J. KRIZ, MOODY'S, RATING ACTION: MOODY'S ASSIGNS BAA2 ISSUER RATING TO RESIDENTIAL CAPITAL CORPORATION; RATING OUTLOOK IS NEGATIVE (Jun. 9, 2005); CHRISTOPHER D. WOLFE & PHILIP S. WALKER, JR., FITCH, FITCH ASSIGNS 'BBB' & 'F2' RATINGS TO RESIDENTIAL CAPITAL CORP. (Jun. 9, 2005).

[321] Residential Capital, LLC, Annual Report (Form 10-K) (Mar. 13, 2007), at 79.

[322] Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2008), at 56.

[323] Treasury/Funding Analysis Presentation, dated Sept. 7, 2007, at RC40012729 [RC40012695].

[324] ResCap Liquidity Update, dated Oct. 15, 2007, at RC40012768 [RC40012763].

[325] Id.

[326] E.g., Houlihan Lokey HMO Valuation Materials, dated Sept. 28, 2007, at ALLY_0030374 [ALLY_0030363].



EXHIBIT VI.C.4.c(3)
**ResCap Daily Available Domestic Liquidity**
June 30, 2007 – June 18, 2008
*($ in Millions)*

Source: ALLY_0272658; ALLY_0273141; CERB018489; EXAM10609907; EXAM10612983; RC40012763.

The significant decline in ResCap's liquidity during July and August 2007 was driven by increasing margin calls, unfunded production, and the increasing liquidity needs of IBG.[327] Indeed, the impact of the U.S. subprime mortgage market collapse spread globally. IBG liquidity was negatively affected by "margin calls, revocation of existing credit lines, unwillingness of creditors to renew credit facilities, and increased borrowing costs."[328] The tipping point came on August 9, 2007, with the seizure of the global credit markets, followed by the August 16, 2007 downgrade of ResCap by Moody's and Fitch to non-investment grade.[329] This credit downgrade was expected to increase ResCap's borrowing costs under its existing indebtedness significantly. At that time, ResCap estimated that those costs would increase by $175 million per year.[330] ResCap's access to capital markets was severely impaired and its ability to securitize mortgage loans in the secondary market was virtually eliminated at that time. Thomas Jacob, an Independent Director, noted that he believed ResCap was

---

[327] ResCap Consolidated Operating Review Presentation, dated Sept. 7, 2007, at RC40012736 [RC40012695].

[328] IBG Business Review Presentation, dated Sept. 7, 2007, at RC40012745 [RC40012695].

[329] PHILIP KIBEL & JOHN J. KRIZ, MOODY'S, RATING ACTION: MOODY'S DOWNGRADES RESCAP TO BA1, FROM BAA3; RATINGS REMAIN ON REVIEW DOWN (Aug. 16, 2007), http://www.moodys.com/research/Moodys-downgrades-ResCap-to-Ba1-from-Baa3-ratings-remain-on—PR_139425; MOHAK RAO & PETER SHIMKUS, FITCH, FITCH LOWERS COUNTRYWIDE IDR TO 'BBB+' & RESCAP TO 'BB+' (Aug. 16, 2007).

[330] GMAC Special Board Meeting Business Update, dated Aug. 22, 2007, at ALLY_PEO_0004045 [ALLY_PEO_0004035].

in the zone of insolvency in "August of 2007 when [ResCap] had this credit crunch."[331] At the September 7, 2007 ResCap Board meeting, Mayer Brown presented "Fiduciary Duties of Directors and Related Legal Issues"[332] to the ResCap Board, including "the duties owed by the directors to shareholders and creditors when a company reaches the zone of insolvency or becomes insolvent."[333] An August 21, 2007 research report by JPMorgan stated:

> Liquidity and recovery are the operative words for [ResCap]. We believe ResCap has enough committed unused secured facilities for the near term, but we believe the business model is broken in the current environment. We give credit to new management for taking the right steps, but it seems that the market is always two steps ahead.[334]

From August 16, 2007 to September 28, 2007, ResCap's available domestic liquidity improved from $328 million to $3.3 billion, primarily because the Health Capital sale generated $900.5 million in proceeds and AFI contributed cash of $1 billion to ResCap's capital.[335] On September 26, 2007, ResCap management reported to the ResCap Board that its "liquidity position [had] improved since August but [was] still fragile."[336] ResCap management presented liquidity projections to the ResCap Board that forecasted a decline in cash balances from $2.9 billion in September 2007 to (1) $181 million in February 2008, then an increase to $821 million in March 2008, under the "Baseline" scenario;[337] (2) a deficit of $11.0 billion in February 2008 and a deficit of $10.9 billion in March 2008, under a "Risk Adjusted/Draconian" scenario;[338] and (3) a deficit of $9.9 billion in February 2008 and a deficit of $9.7 billion in March 2008, under a "Risk Adjusted/Draconian with Opportunities" scenario.[339] ResCap was projecting billions of dollars in net cash outflows over the six-month period in each of these liquidity projections. None of these projections addressed ResCap's $4.5 billion unsecured debt maturing in 2008, of which $1.5 billion was due in the second quarter of that year.[340]

---

[331] Int. of T. Jacob, Nov. 7, 2012, at 197:1–198:20.

[332] Mayer Brown Fiduciary Duties of Directors and Related Legal Issues Presentation, dated Sept. 7, 2007, at RC40012709 [RC40012695].

[333] Minutes of a Regular Meeting of the Board of Directors of Residential Capital, LLC, dated Sept. 7, 2007, at RC40005620 [RC40005558].

[334] KABIR CAPRIHAN & MONICA PAREKH, JPMORGAN, COUNTRYWIDE AND RESIDENTIAL CAPITAL CORP RECOVERY, LIQUIDITY, BALANCE SHEET BURN, ETC. 1 (Aug. 21, 2007).

[335] *See* ResCap Liquidity Update, dated Oct. 15, 2007, at RC40012768 [RC40012763]; Residential Capital, LLC, Quarterly Report (Form 10-Q) (Nov. 8, 2007), at 33.

[336] ResCap Review Presentation, dated Sept. 26, 2007, at RC40012914 [RC40012907].

[337] *Id.* at RC40012924.

[338] *Id.*

[339] *Id.*

[340] Treasury/Funding Analysis Presentation, dated Sept. 7, 2007, at RC40012731 [RC40012695].

As ResCap closed out the year, its liquidity portfolio, exclusive of its back-up lines of credit, declined from $4.0 billion as of September 30, 2007, to $2.2 billion as of December 31, 2007.[341] ResCap's liquidity position of $2.2 billion as of December 31, 2007 was bolstered by $2 billion of prior cash contributions from AFI and $900.5 million from sale of Health Capital. ResCap's liquidity would have been negative but for these cash inflows. ResCap described its liquidity issues in its Annual Report (Form 10-K) for the year ended December 31, 2007, as follows:

> Throughout most of 2007, the domestic and international residential real estate and capital markets experienced significant dislocation. As a result, our liquidity was negatively impacted by margin calls, changes to advance rates on our secured facilities, and the loss of significant asset-backed commercial paper conduit financing capacity along with other secured sources of liquidity, including weak securitization markets. This market dislocation prompted our liquidity providers to evaluate their risk tolerance for their exposure to mortgage related credits.[342]

### (4) ResCap's Liquidity Remained Stressed Throughout 2008

ResCap's liquidity position remained stressed as it entered 2008, despite $2 billion in cash contributions received from AFI in 2007.[343] Notwithstanding its distressed financial condition, ResCap asserted in its public filings that its plans would provide adequate liquidity for 2008. Such plans included:

> [S]trategic alternatives that will improve our liquidity, such as, continued strategic reduction of assets, focus our production on prime conforming products which currently provide more liquidity options, explore potential alliances and joint ventures with third parties involving portions of our business, potential dispositions of one or more of our businesses, and strategic acquisitions.[344]

ResCap's plans also included potentially tapping its backup committed unsecured lines of credit and exploring options for continued funding and capital support from AFI. ResCap acknowledged, however, that there could be no assurances that AFI would agree to provide such support.[345]

---

[341] *Compare* Residential Capital, LLC, Quarterly Report (Form 10-Q) (Nov. 8, 2007), at 48, *with* Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2008), at 76.

[342] Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2008), at 106.

[343] *Id.* at 49.

[344] *Id.* at 80–81.

[345] *Id.* at 81.

ResCap's liquidity position worsened in early 2008. In January 2008, ResCap retained financial advisors to assess restructuring options.[346] Casey, ResCap's treasurer, stated on April 2, 2008: "[ResCap's] current cash position is tight (forecasted to close tonight less than $700mm) and [ResCap's] forecasted cash position is dangerously low in mid-April ($121mm on the 18th)."[347] This was confirmed in ResCap's April 4, 2008 liquidity report:

> Domestic available liquidity is forecasted to go negative by the June month end due to repayment of $1.8 billion unsecured Bank Term Loan and continues its downward trend thru year end in conjunction with the repayment of $2.2 billion of unsecured debt . . . set to mature in 2008 . . . . ResCap has engaged counsel & key banking relationships to address this forecasted cash shortfall.[348]

In his interview, Casey also stated that ResCap lost existing credit facilities during the fourth quarter of 2007 through the early part of 2008 because its banks were not renewing its credit facilities upon maturity.[349]

The "May 2008 Project Duvall Discussion Materials" noted that the "[k]ey objective of [ResCap's] restructuring plan is to create enough liquidity runway so that the company has adequate time to restructure its business including orderly monetization or run-off of non-core assets."[350] The materials further noted that "the debt restructuring alone will not provide sufficient liquidity to satisfy its obligations."[351] Evidence of mounting liquidity concerns was confirmed by Timothy Pohl, a ResCap advisor, who stated that "ResCap was undercapitalized" due to the dramatic changes in 2007 and 2008 that affected the industry.[352] He further stated that ResCap was facing potential liquidity, covenant, and bond maturity issues that could trigger the need for ResCap to file for bankruptcy around May 2008.[353]

ResCap's inability to fund its operations and service its existing debts were noted in an internal document reviewing the accounting treatment of the June 2008 debt exchange:

> ResCap is highly leveraged relative to its cash flows with a declining liquidity portfolio (i.e., cash readily available to cover

---

[346] *See, e.g.*, Letter from D. Ammann to J. Jones (Feb. 13, 2008) [MELZER.008816].

[347] E-mail from W. Casey (Apr. 2, 2008) [EXAM10158807].

[348] ResCap Total Liquidity Roll Forward, dated Apr. 4, 2008 [CERB011671] (noting "Key Take Aways" on the "Cash Rollforward" worksheet).

[349] Int. of W. Casey, Jan. 31, 2013, at 143:14–21.

[350] Morgan Stanley Project Duvall Board of Directors Presentation, dated May 29, 2008, at RC40008095 [RC40008087].

[351] *Id.*

[352] Int. of T. Pohl, Feb. 26, 2013, at 23:11–16.

[353] *Id.* at 23:11–25:19.

> operating demands from across its business operations and
> maturing obligations). As a result of challenging credit markets
> and tight liquidity compounded by a cyclical downturn in the
> mortgage market, the Company absent the current modification
> could not obtain a new term facility outside the related party
> group at an effective interest rate equal to the current market
> interest rate for 'similar debt of a non-troubled debtor.'
>
> Additionally, ResCap's baseline projections (including
> restructuring initiatives but excluding possible opportunities) as
> of May 31, 2008 indicated that operating and financing cash
> flows beginning in early 2009 are expected to be insufficient to
> fund operations and service its existing debt pursuant to
> contractual terms. . . . .
>
> While ResCap initiated the bond exchange and tender offer to
> alleviate these immediate liquidity pressures, a large percentage
> of bond holders were willing to accept the proposed concessions
> in an effort to keep the company afloat and to facilitate an
> orderly disposition of non-core assets.[354]

ResCap's available domestic liquidity fell to a low of $299 million on May 21, 2008. The two $875 million unsecured revolving credit facilities were terminated in June 2008 in connection with the June 2008 debt restructuring. Further, ResCap no longer had access to any committed backup funding facilities because the credit facilities extended by AFI as part of the June 2008 debt restructuring were fully drawn during June 2008.

Following the June 2008 debt restructuring, ResCap was required to maintain daily consolidated liquidity of $750 million and unrestricted liquidity of $250 million.[355] However, the June 2008 restructuring failed to provide ResCap with sufficient liquidity to address its continuing undercapitalization issues. Within months, ResCap was faced with yet another liquidity crisis and imminent violations of its financial covenants. ResCap's advisors noted at a September 2008 ResCap Board meeting that ResCap should consider itself to be "within the zone of insolvency"[356] and presented analyses indicating that ResCap's liquidity would be exhausted within weeks.[357]

Lazard and Skadden prepared an analysis of the impact of a ResCap bankruptcy filing on its liquidity and potential creditor recoveries.[358] Lazard and Skadden reported that ResCap

---

[354] ResCap Bond Exchange Accounting Assessment, dated July 1, 2008, at ALLY_0242724 [ALLY_0242723].

[355] Initial Line of Credit Agreement, §§ 2.03, 7.02 [ALLY_0023145].

[356] Minutes of an Executive Session of the Board of Directors of Residential Capital, LLC, Sept. 23, 2008, at RC40006865 [RC40006865].

[357] Skadden and Lazard Project Scout Presentation, dated Oct. 2008, at 3 [EXAM20020824]; Skadden & Lazard Project Scout Presentation, dated Oct. 10, 2008, at 3 [EXAM10490750].

[358] Skadden and Lazard Project Scout Presentation, undated, at RC40008685 [RC40008678].

would "deplete its liquidity on November 17, [2008]" without a sale of its interest in Ally Bank or another cash infusion.[359] ResCap projected that it would deplete its liquidity by March 2009, even under scenarios where ResCap was projected to receive cash consideration from the sale of its shares in IB Finance to AFI.[360]

Goldman Sachs reported to the AFI Board on October 24, 2008 that "ResCap is dealing with liquidity shortfalls that are even more acute than AFI's liquidity issues."[361] ResCap's unrestricted liquidity was projected to be fully exhausted by November 5, 2008.[362] One of the strategic alternatives presented by Goldman Sachs to the AFI Board was a possible ResCap bankruptcy filing "prior to month-end."[363]

Tom Marano, ResCap's CEO, wrote in an e-mail, dated October 30, 2008 to the U.S. Treasury that "[ResCap] is extremely challenged from a liquidity and net worth point of view."[364] Marano asked the U.S. Treasury to "focus on [his] proposal to access TARP" as "the impact on the markets, borrowers, and the availability of mortgage credit will be staggering if we fail."[365] Ultimately, AFI instructed Marano to withdraw ResCap's request because AFI had separately applied for TARP funds.[366] ResCap prepared itself for a possible bankruptcy filing while awaiting word of whether AFI would receive TARP approval.

Goldman Sachs noted in a confidential capital committee memorandum in November 2008 that "ResCap management anticipates a liquidity hole of $0.8bn and a capital hole of $1.0bn by year-end 2008. Management has estimated that $1[bn] to $6bn of further capital injections may be required to support ResCap in a run-off scenario assuming its assets are held to maturity."[367]

While ResCap was dependent on AFI for funding, AFI was also facing its own financial difficulties. Goldman Sachs noted that AFI was "facing severe near term and long-term liquidity issues . . . [was] undercapitalized with only ~$8bn of tangible equity supporting a $211bn balance sheet" and was at risk of breaching its leverage covenant.[368]

AFI provided ResCap with the Initial Line of Credit Facility on November 20, 2008 as a source of contingency funding.[369] ResCap could only draw against this facility when its consolidated liquidity was less than $750 million, or its unrestricted liquidity was less than

---

[359] *Id.*

[360] *Id.*

[361] Goldman Sachs Discussion Materials, dated Oct. 24, 2008, at ALLY_0258942 [ALLY_0258921].

[362] *Id.* at ALLY_0258953.

[363] *Id.* at ALLY_0258955.

[364] E-mail from T. Marano to N. Kashkari (Oct. 30, 2008) [CCM00199669].

[365] *Id.*

[366] Int. of T. Marano, Nov. 26, 2012, at 24:7–15, 204:3–14, 208:3–16.

[367] Memorandum, Confidential Capital Committee Memo, dated Nov. 19, 2008, at 11 [GSResCap0000092038].

[368] *Id.* at 3, 11.

[369] Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2009), at 98.

$250 million, and was required to make mandatory repayments when its consolidated liquidity and unrestricted liquidity exceeded these amounts.[370] ResCap continued to plan intermittently for bankruptcy through December 2008; however, preparations for an imminent bankruptcy filing were suspended on or about December 24, 2008, when AFI received notification that its application for TARP had been approved.[371]

### (5) Continued Liquidity Constraints—2009 Through 2012

Although the receipt of TARP funds by AFI averted an almost certain ResCap bankruptcy filing on or about December 24, 2008, ResCap's liquidity issues continued throughout 2009. ResCap projected in January 2009 that it would exhaust its cash by May 2009, necessitating a draw on the Initial Line of Credit Facility to meet its minimum cash covenants.[372] ResCap's projections also indicated that a negative cash balance for July 2009 would exceed availability under the Initial Line of Credit Facility.[373] ResCap's liquidity outlook did not improve in March and April 2009 and, with cash outflows for 2009 projected to exceed ResCap's available liquidity, ResCap had to rely on uncertain funding from AFI to supplement its liquidity.[374] ResCap experienced significant cash outflows because of the rise in interest rates in the weeks leading up to June 10, 2009, which led to losses on hedge positions related to the value of ResCap's MSR assets and the corresponding need for ResCap to post cash collateral.[375] ResCap posted $1.1 billion in cash collateral on its hedges between May 19, 2009 and June 10, 2009, which was partially offset by incremental borrowings on its MSR facility from higher MSR values.[376] ResCap was experiencing daily cash flow issues by the summer of 2009, with the ResCap Board meeting daily to monitor ResCap's liquidity position.[377] Materials presented to the ResCap Board during its June 10, 2009 meeting included information from its financial advisors for Project Scout II,[378] which stated that:

> Ongoing market volatility may result in material cash out flows related to posting collateral for hedging activity, causing ResCap to run out of available liquidity to operate. Moreover, increased interest expense related to servicing advances, higher delinquency rates, and losses from legacy portfolios serve to exacerbate ResCap's already tenuous liquidity position . . . .

---

[370] *Id*. Ex.10.8.

[371] Int. of T. Pohl, Feb. 26, 2013, at 35:21–36:6.

[372] Executive Liquidity Report, dated Jan. 12, 2009, at RC40011090 [RC40011078].

[373] *Id.*

[374] ResCap Liquidity Update, dated Mar. 29, 2009, at RC40011128–34 [RC40011125]; ResCap Liquidity Update, dated Apr. 30, 2009, at RC40011188–94 [RC40011173].

[375] GMAC LLC Strategy Group "Support for ResCap LLC" Presentation, dated Jun. 10, 2009, at RC40011260 [RC40011250].

[376] *Id.*

[377] Int. of P. West, Dec. 18, 2012, at 129:1–6, 165:16–19.

[378] Draft Project Scout II Presentation, undated, at RC40011255 [RC40011250].

> Absent the funding sought [from AFI], ResCap could be forced to file for bankruptcy . . . .[379]

Goldin Associates stated in its June 24, 2009 and September 16, 2009 fairness opinion presentations to the Independent Directors that "ResCap [had] been unable to borrow against its unencumbered assets from new or existing third party lenders," and lenders had reduced ResCap's borrowing availability since June 2008.[380]

ResCap's access to third-party financing continued to decrease during 2009. ResCap reported in its 2009 audited financial statements that "[t]he market deterioration has led to fewer sources and significantly reduced levels, of liquidity available to finance the Company's operations."[381] ResCap considered bankruptcy contingencies numerous times during 2009.[382] UBS noted in its November 2009 presentation to the ResCap Board that "ResCap has been living month to month with the aid of AFI, via continuous debt forgiveness."[383]

Pamela West, a ResCap Independent Director, stated that after 2009, it seemed that AFI's support was more uncertain and tenuous:

> We felt like it was getting less and less in their benefit to make that support. The closing of the books that year end was painful. And so, it was looking to us like that support was less and less forthcoming . . . .[384]

> Because it seemed very difficult for us to get that support at the end of the year. And frankly, the support that we got gave us very little, if no wiggle room at all . . . . And it was a month to month kind of support look and that becomes untenable at a certain point.[385]

---

[379] Id.

[380] Goldin Associates Presentation to the Committee of Independent Members of the Board of Directors of Residential Capital, LLC Regarding the June 1, 2009 Secured Line of Credit with GMAC, LLC, dated Jun. 24, 2009, at GOLDIN00129194 [GOLDIN00129173]; Goldin Associates Presentation to the Committee of Independent Members of the Board of Directors of Residential Capital, LLC Regarding Amendments to the June 1, 2009 Secured Line of Credit and the November 20, 2008 Secured Line of Credit with GMAC, Inc., dated Sept. 16, 2009, at GOLDIN00129392 [GOLDIN00129361].

[381] Residential Capital, LLC Consolidated Financial Statements for the Years Ended December 31, 2009 and 2008, dated Feb. 26, 2010, at 10 [EXAM00124455].

[382] Int. of T. Pohl, Feb. 26, 2013, at 97:8–21; 99:3–7; 102:19–24; 103:14–104:5; 107:9–108:4.

[383] UBS Exchange Alternatives Discussion Materials, dated Nov. 24, 2009, at RC40016955 [RC40016938].

[384] Int. of P. West, Jan. 11, 2013, at 101:2–6.

[385] Id. at 102:2–9.

EXHIBIT VI.C.4.c(5)
**ResCap Daily Available Domestic Liquidity**
June 30, 2007 – May 10, 2012
*($ in Millions)*



*Source: ALLY_0080946; ALLY_0081503; ALLY_0272658; ALLY_0273141; ALLY_0275088; ALLY_0275797; ALLY_0276886;*
*ALLY_0280277; ALLY_0283223; ALLY_0284342; ALLY_0285555; CCM00028777; CCM00028940; CCM00029223;*
*CCM00059068; CCM00109218; CERB018489; EXAM00114686; EXAM00114687; EXAM00114688; EXAM00114689;*
*EXAM00114690; EXAM00114692; EXAM00114694; EXAM00114695; EXAM00114696; EXAM00114698; EXAM00114700;*
*EXAM00114702; EXAM00114704; EXAM00114706; EXAM00114708; EXAM00114709; EXAM00114711; EXAM00114713;*
*EXAM00114715; EXAM10158701; EXAM10609907; EXAM10612983; EXAM10667290; LAZ-RSCP-XMR00002342; RC40012763.*

Liquidity remained at minimal levels in 2010, 2011, and 2012, notwithstanding the substantial capital restructuring effected in December 2009 pursuant to which AFI contributed $2.9 billion to ResCap's equity with a combination of cash, debt forgiveness, and asset contributions.[386] Capital and liquidity were held to minimum levels as a result of the change in ResCap's business model from an originator, securitizer, and servicer of mortgage loans to a broker and servicer, as well as the covenants contained in its debt agreements with AFI.

In a February 2010 liquidity update to the ResCap Board, ResCap stated that the sale to Fortress of UK performing loans and domestic non-core assets "must be executed to ensure minimum liquidity is maintained to avoid a liquidity covenant breach."[387] In addition, other funding and risk management activities were identified as important for "ResCap [to have] adequate liquidity through August 2010."[388]

---

[386] *See* Residential Capital, LLC Consolidated Financial Statements for the Years Ended December 31, 2009 and 2008, dated Feb. 26, 2010, at 10 [EXAM00124455]; *see also* Exhibit VI.C.4.f(4)(b).

[387] ResCap Liquidity Update, dated Feb. 23, 2010, at RC40015645 [RC40015641].

[388] *Id.* at RC40015646.

In response to a possible liquidity need by ResCap in January 2011, Marano noted in an e-mail in November 2010 that "[l]iquidity and [profit and loss are] an issue. We are doing dumb stuff to maintain a charade of a fig leaf."[389] Further, a December 2010 e-mail from Lara Hall, of AFI Capital Markets, noted:

> There are only two ways to operate a finance company with assets of long duration and short duration liabilities unless [Michael A. Carpenter] wants to go to board with every need. 1) Capitalize it so that it can refinance its debts as they come due and support the $3B volatile asset on its balance sheet 2) take down operating agreement and run it like any other sub with the support of capital and liquidity at parent.[390]

In late 2010 and early 2011, liquidity remained stressed when Marano indicated:

> I would suggest you start thinking about making up a $500mm liquidity line or injection available to [ResCap] to see us through the next few months while we determine if we can find other sources of liquidity or decide to manage the MSR for cash as opposed to managing it for asset protection.[391]

ResCap's liquidity continued to be stressed throughout 2010, 2011, and 2012, although ResCap reported profits in 2010. In 2011 and 2012, ResCap incurred continuing losses because of unfavorable valuation adjustments, hedging of the servicing assets, mounting legal expenses, and additional provisions for representation and warranty issues.

In sum, liquidity was a chronic issue for ResCap from mid-2007 through the Petition Date. ResCap recognized that the maintenance of adequate liquidity was critical to its ability to operate as a going concern. Despite this recognition, ResCap was unable to generate sufficient liquidity to operate its business from its operations or from the capital markets, and found itself reliant upon billions of dollars of support from AFI.

### d. ResCap's Access To Capital Markets

ResCap's access to capital markets was essential to its continuing viability. As previously discussed, ResCap historically relied on a variety of external funding sources including "whole-loan sales, the public debt capital markets, mortgage conduit facilities, and asset-backed securities markets."[392] However, ResCap's access to these sources of funding

_____

[389] E-mail from T. Marano (Nov. 22, 2010) [ALLY_0359049].

[390] E-mail from L. Hall (Dec. 15, 2010) [ALLY_0218118].

[391] E-mail from T. Marano (Dec. 15, 2010) [ALLY_0200834].

[392] Residential Capital, LLC, Annual Report (Form 10-K) (Mar. 13, 2007), at 76.

was disrupted in August 2007 because of the seizure of the global credit markets. This disruption adversely affected ResCap's ability to obtain financing from external funding sources. As a result, ResCap became dependent on AFI for continuing support.

Further, the disruption in the global credit markets also negatively affected ResCap's ability to finance or otherwise monetize its unencumbered assets. Casey stated that ResCap was unable to obtain financing for its unencumbered assets in November 2007.[393] Goldin Associates further confirmed ResCap's inability to obtain third-party financing in its December 19, 2008 presentation to the Independent Directors in connection with ResCap's proposed increase in the Initial Line of Credit Facility (by adding collateral), stating that "ResCap has been unable to borrow against its unencumbered assets from new or existing third party lenders."[394] Goldin Associates repeated their December 19, 2008 comment on ResCap's inability to borrow against unencumbered assets in their June 24, 2009 and September 16, 2009 fairness opinion presentations to the Independent Directors.[395]

ResCap had $3.5 billion in syndicated unsecured bank credit facilities before the disruption in the global credit markets in August 2007. These facilities consisted of a $1.75 billion term loan due in 2008, an unused $875.0 million revolving credit facility due in 2008, and an unused $875.0 million revolving credit facility due in 2010. Following the disruption of the global credit markets in August 2007, ResCap's lenders were unwilling to renew or extend credit facilities to ResCap. William Casey stated that ResCap lost existing credit facilities during the fourth quarter of 2007 through the early part of 2008 because banks were not renewing the credit facilities upon maturity.[396] Sam Ramsey stated that ResCap's lenders could not put forth any constructive offer to renew ResCap's credit facilities or meet ResCap's needs, and "were not willing to provide even a secured loan on the terms that were constructive."[397] Lombardo also confirmed the unavailability of marketplace financing for ResCap.[398] Goldin Associates noted in their December 19, 2008 presentation to the Independent Directors that "ResCap's existing third party secured financing providers: Lehman Brothers, The Royal Bank of Scotland, Credit Suisse and JPMorgan Chase, have

---

[393] Int. of W. Casey, Jan. 31, 2013, at 181:10–182:9.

[394] Goldin Associates Presentation to the Committee of Independent Members of the Board of Directors of Residential Capital, LLC Regarding Proposed Amendment to the Secured Line of Credit with GMAC, LLC, dated Dec. 19, 2008, at GOLDIN00129114 [GOLDIN00129101].

[395] Goldin Associates Presentation to the Committee of Independent Members of the Board of Directors of Residential Capital, LLC Regarding the June 1, 2009 Secured Line of Credit with GMAC, LLC, dated Jun. 24, 2009, at GOLDIN00129194 [GOLDIN00129173]; Goldin Associates Presentation to the Committee of Independent Members of the Board of Directors of Residential Capital, LLC Regarding Amendments to the June 1, 2009 Secured Line of Credit and the November 20, 2008 Secured Line of Credit with GMAC, Inc., dated Sept. 16, 2009, at GOLDIN00129392 [GOLDIN00129361].

[396] Int. of W. Casey, Jan. 31, 2013, at 143:14–21.

[397] Int. of S. Ramsey, Dec. 10, 2012, at 82:14–20.

[398] Int. of J. Lombardo, Mar. 18, 2013, at 19:18–20:2.

reduced ResCap's borrowing availability since June 2008."[399] As a result of ResCap's inability to obtain adequate bank financing, AFI provided $3.5 billion in Secured Revolver Facility Loans to ResCap in June 2008. ResCap used $1.75 billion of this amount to repay its outstanding unsecured term loan, and subsequently used the majority of the remaining capacity to fund its June 2008 bond exchange.

AFI also assisted ResCap with monetizing its otherwise illiquid assets. AFI provided the $750 million Resort Finance Facility to ResCap in February 2008 to provide liquidity while Bear Stearns continued marketing Resort Finance. That facility was to be repaid from proceeds of the sale of Resort Finance, which was ultimately purchased by GMAC CF, a subsidiary of AFI. AFI also provided ResCap with the $750 million Secured MSR Facility in April 2008 as a means of providing additional liquidity. AFI increased the $750 million Secured MSR Facility to $1.2 billion in June 2008, arranged for GMAC CF to provide the $600 million Servicing Advance Factoring Facility, and arranged for GMAC CF to purchase Resort Finance, providing an additional $250 million advance on such sale to be credited at closing. Cerberus also purchased certain assets from ResCap for approximately $571 million in the third quarter of 2008.

ResCap also obtained $430 million under the Initial Line of Credit Facility from AFI on November 20, 2008. This facility was a source of contingency funding with borrowings only permitted when ResCap's liquidity fell below certain levels. AFI agreed to purchase ResCap's Canadian subsidiary, ResMor, and advanced ResCap $67 million to be applied to the ultimate purchase price, also in November 2008.

_____

[399] Goldin Associates Presentation to the Committee of Independent Members of the Board of Directors of Residential Capital, LLC Regarding Proposed Amendment to the Secured Line of Credit with GMAC, LLC, dated Dec. 19, 2008, at GOLDIN00129114 [GOLDIN00129101].

ResCap reported in its 2009 audited financial statements that "[t]he market deterioration has led to fewer sources and significantly reduced levels, of liquidity available to finance the Company's operations."[400] ResCap obtained the $370 million Second Line of Credit Facility from AFI on June 1, 2009. That facility was subsequently increased to $470 million on June 12, 2009, and to $670 million on December 21, 2009.

EXHIBIT VI.C.4.d
**ResCap Financing Received from AFI**
**Committed Facilities**
2008 – 2012
*($ in Millions)*

| | Resort Finance Facility | Secured MSR Facility | Secured Revolver Facility | ResMor Loan Facility | Initial Line of Credit Facility | Second Line of Credit Facility | A&R Line of Credit Facility [1] | BMMZ Repo Facility |
|---|---|---|---|---|---|---|---|---|
| | *(Secured)* | *(Secured)* | *(Secured)* | *(Secured)* | *(Secured)* | *(Secured)* | *(Secured)* | *(Secured)* |
| 02/21/08 | $750 | | | | | | | |
| 04/18/08 | | $750 | | | | | | |
| 06/01/08 | | $450 | | | | | | |
| 06/04/08 | | | $3,500 | | | | | |
| 11/20/08 | | | | $67 | | | | |
| 11/20/08 | | | | | $430 | | | |
| 06/01/09 | | | | | | $370 | | |
| 06/12/09 | | | | | | $100 | | |
| 12/21/09 | | | | | | $200 | | |
| 12/30/09 | | | | | | | $1,100 | |
| 12/23/10 | | | | | | | $500 [2] | |
| 12/21/11 | | | | | | | | $250 |
| 04/10/12 | | | | | | | ($500) [2] | |
| | $750 | $1,200 | $3,500 | $67 | $430 | $670 | $1,100 | $250 |

[1] The Initial Line of Credit Facility and Second Line of Credit Facility were merged into a single $1.1 billion facility on Dec. 30, 2009.
[2] The $500 million capacity added on Dec. 23, 2010 was unsecured. It was subsequently modified from unsecured to secured status on Sep. 23, 2011 and this incremental capacity was eliminated on Apr. 10, 2012.
*Source: EXAM00122651; EXAM00124455; RC00025831; RC00025655; Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2009), at 89, 90, 208; Residential Capital, LLC, Quarterly Report (Form 10-Q) (Aug. 7, 2009), at 65.*

---

[400] Residential Capital, LLC Consolidated Financial Statements for the Years Ended December 31, 2009 and 2008, dated Feb. 26, 2010, at 10 [EXAM00124455].

As shown in Exhibit VI.C.4.d above, AFI provided support to ResCap through numerous secured financings from 2008 to 2012. ResCap was, however, able to regain limited access to certain third-party financing sources in 2010. On May 13, 2010, Goldin Associates reported to the Independent Directors that banks were considering new financing against residential mortgage assets, compared to late 2009 when mortgage lenders were reducing lines of credit.[401] On May 14, 2010, ResCap entered into two secured financing agreements with third-party lenders with initial maximum facility amounts of $300 million each.[402] ResCap subsequently obtained a $250 million secured financing agreement with BMMZ, a wholly-owned subsidiary of AFI, in December 2011.[403] That facility replaced secured financing agreements with unaffiliated third-party liquidity providers.[404]

### e. ResCap's Creditworthiness

A company's creditworthiness is analyzed on a recurring basis by rating agencies, trade creditors, lenders, bondholders, debt traders, and even regulators in certain industries. Accordingly, relevant indicators for evaluating creditworthiness include credit ratings, outlooks, and market pricing of debt securities. These indicators provide insight into a company's ability to access the capital markets and associated financing costs.

### (1) Credit Ratings

ResCap was assigned an investment grade rating by Moody's, Fitch, and S&P when it entered the credit markets to seek financing in 2005.[405] As shown in Exhibit VI.C.4.e(1) below, ResCap maintained an investment grade rating with all three credit rating agencies until the seizure of global credit markets in August 2007.

---

[401] Goldin Associates Presentation to the Committee of Independent Members of the Board of Directors of Residential Capital, LLC Regarding the Addition of Certain Assets to the Collateral Package Pledged to Secure the December 30, 2009 Line of Credit with Ally Financial Inc., dated May 13, 2010, at GOLDIN00131489 [GOLDIN00131468].

[402] Residential Capital, LLC Consolidated Financial Statements for the Years Ended December 31, 2010 and 2009, dated Feb. 28, 2011, at 40 [EXAM00123128].

[403] Residential Capital, LLC Consolidated Financial Statements for the Years Ended December 31, 2011 and 2010, dated Mar. 28, 2012, at 10 [EXAM00122651].

[404] Id.

[405] VICTORIA WAGNER & JOHN K. BARTKO, S&P, RESEARCH UPDATE: RESIDENTIAL CAPITAL CORP. ASSIGNED 'BBB-/A-3' RATINGS (Jun. 9, 2005); PHILIP KIBEL & JOHN J. KRIZ, MOODY'S, RATING ACTION: MOODY'S ASSIGNS BAA2 ISSUER RATING TO RESIDENTIAL CAPITAL CORPORATION; RATING OUTLOOK IS NEGATIVE (Jun. 9, 2005); CHRISTOPHER D. WOLFE & PHILIP S. WALKER, JR., FITCH, FITCH ASSIGNS 'BBB' & 'F2' RATINGS TO RESIDENTIAL CAPITAL CORP. (Jun. 9, 2005)

EXHIBIT VI.C.4.e(1)
## ResCap Historical Credit Ratings
December 2004 – May 2012



Following the seizure of the credit markets, Moody's and Fitch downgraded the rating of ResCap's senior debt to non-investment grade on August 16, 2007,[406] triggering a hundred basis point step-up in the interest due under ResCap's bonds.[407] Moody's indicated that the ratings remained under review for possible further downgrade and that its ratings actions reflected:

> [T]he continued, significant funding and valuation volatility in the single-family mortgage market, coupled with ResCap's challenges in restructuring its residential financial group, as well as an adverse business environment that could create further profit pressure at the firm.[408]

Moody's further downgraded ResCap senior debt on November 1, 2007, following the release of ResCap's third-quarter results, its fourth consecutive quarterly loss. Moody's stated:

> The downgrade and negative outlook reflect the company's significant asset quality issues and potential franchise impairment. The non-performing level of ResCap's held-for-investment portfolio is well above its rated peer group across loan types, and Moody's expects elevated provisioning levels for several more quarters . . . Additionally, Moody's has concerns about potential franchise impairment at ResCap . . . 'the current market disruption requires ResCap to shift its origination channel, product mix, and secondary marketing strategies. The business model that will return ResCap to adequate profitability is unclear' . . . . In regards to liquidity, the company is inherently weaker than many of its mortgage banking peers due to its focus on secured market funding versus retail deposits and Federal Home Loan Bank advances. As a result, the company has a very low level of unencumbered assets which leave it vulnerable to disruptions in the wholesale markets.[409]

On November 1, 2007, S&P downgraded ResCap's senior debt to non-investment grade based on unfavorable third-quarter earnings and expectations of continued weak profitability.[410]

---

[406] PHILIP KIBEL & JOHN J. KRIZ, MOODY'S, RATING ACTION: MOODY'S DOWNGRADES RESCAP TO BA1, FROM BAA3; RATINGS REMAIN ON REVIEW DOWN (Aug. 16, 2007), http://www.moodys.com/research/Moodys-downgrades-ResCap-to-Ba1-from-Baa3-ratings-remain-on—PR_139425; MOHAK RAO & PETER SHIMKUS, FITCH, FITCH LOWERS COUNTRYWIDE IDR TO 'BBB+' & RESCAP TO 'BB+' (Aug. 16, 2007).

[407] ResCap Business Update, dated Aug. 21, 2007, at RC00016866 [RC00016856].

[408] PHILIP KIBEL & JOHN J. KRIZ, MOODY'S, RATING ACTION: MOODY'S DOWNGRADES RESCAP TO BA1, FROM BAA3; RATINGS REMAIN ON REVIEW DOWN (Aug. 16, 2007), http://www.moodys.com/research/Moodys-downgrades-ResCap-to-Ba1-from-Baa3-ratings-remain-on—PR_139425.

[409] CRAIG A. EMRICK & BRIAN L. HARRIS, MOODY'S, RATING ACTION: MOODY'S DOWNGRADES RESCAP TO BA3, FROM BA1; OUTLOOK NEGATIVE (Nov. 1, 2007), http://www.moodys.com/research/Moodys-downgrades-ResCap-to-Ba3-from-Ba1-outlook-negative—PR_143543.

[410] JOHN K. BARTKO ET AL., S&P, RESEARCH UPDATE: RESIDENTIAL CAPITAL LLC RATINGS OFF WATCH NEG, LOWERED TO 'BB+/B' FROM 'BBB-/A-3'; OUTLOOK NEG (Nov. 1, 2007).

ResCap's credit rating was further downgraded by Moody's on February 5, 2008. The downgrade reflected the decline in ResCap's liquidity and the risk of its net worth falling below its minimum TNW covenant absent parent support, which was not assured. The downgrade also reflected Moody's view of ResCap's impaired franchise and limited ability to gain market share and return to robust profitability.[411]

Moody's downgraded ResCap again on April 23, 2008, following the announcement of the resignation of the two Independent Directors, stating that "[t]he absence of independent directors increases the likelihood that ResCap will take actions that are negative for creditors."[412]

Following the announcement of a debt exchange offer, ResCap was downgraded by Moody's on to "Ca" (Extremely Speculative) May 2, 2008. Moody's noted:

> Despite the benefits this exchange could have on ResCap's ability to service its debt, the ratings remain under review for downgrade. This is because ResCap has not proven it has a business model that can produce the required operating cash flow to service and ultimately repay these reduced obligations.[413]

S&P also downgraded ResCap to "CC" (Extremely Speculative) on May 2, 2008, noting that "if the [debt] exchange fails, Residential Capital LLC might file for bankruptcy protection."[414]

Moody's again downgraded ResCap's debt rating to "C" (In Default) following AFI's announcement of an exchange offer for certain ResCap debt on November 20, 2008. Moody's noted:

> This transaction illustrates that ResCap cannot produce the required cash flow to service and ultimately repay its obligations. "It is our opinion that ResCap would not be a going concern without support from [AFI]. . . . Each month requires additional support from [AFI] to prevent ResCap from violating its debt covenants and defaulting on its debt service."[415]

---

[411] ROBERT YOUNG & CRAIG A. EMRICK, MOODY'S, RATING ACTION: MOODY'S DOWNGRADES RESCAP TO B2, OUTLOOK NEGATIVE (Feb. 5, 2008), http://www.moodys.com/research/Moodys-downgrades-ResCap-to-B2-outlook-negative—PR_148851.

[412] ROBERT YOUNG & CRAIG A. EMRICK, MOODY'S, RATING ACTION: MOODY'S DOWNGRADES RESCAP TO CAA1, RATINGS ON REVIEW DOWN (Apr. 23, 2008), http://www.moodys.com/research/Moodys-downgrades-ResCap-to-Caa1-ratings-on-review-down—PR_153927.

[413] ROBERT YOUNG & CRAIG A. EMRICK, MOODY'S, RATING ACTION: MOODY'S DOWNGRADES RESCAP TO CA, RATING UNDER REVIEW DOWN (May 2, 2008), http://www.moodys.com/research/Moodys-downgrades-ResCap-to-Ca-rating-under-review-down—PR_154705.

[414] JOHN K. BARTKO ET AL., S&P, RESEARCH UPDATE: RESIDENTIAL CAPITAL LLC DOWNGRADED TO 'CC'; STILL ON CREDIT WATCH NEGATIVE (May 2, 2008).

[415] ROBERT YOUNG & CRAIG A. EMRICK, MOODY'S, RATING ACTION: MOODY'S DOWNGRADES RESCAP TO C (Nov. 20, 2008), http://www.moodys.com/research/Moodys-downgrades-ResCap-to-C—PR_167799.

Moody's and Fitch maintained ResCap at their respective "In Default" grades throughout 2009.[416] S&P upgraded ResCap within the non-investment grade category during 2009.[417] Citing the expected improvement in ResCap's TNW resulting from the 2009 Bank Transaction, S&P raised ResCap's rating to "CCC" (In Poor Standing) in February 2009 following AFI's receipt of TARP funding in December 2008.[418] On December 31, 2009, Moody's reported that the $2.7 billion capital infusion from AFI:

> [A]lthough positive, [was] insufficient to stabilize the company . . . Moody's considers ResCap's obligations to be highly speculative as the company has been unprofitable on a quarterly basis for three years, its liquidity position is tenuous, capital insufficient and franchise impaired . . . . [T]he company has significant maturities in the first half of 2010 which it is unable to service with its current liquidity resources while staying compliant with its covenant to maintain liquidity of $750 million daily and unrestricted liquidity of $250 million daily.[419]

S&P again raised its rating to "B" (Highly Speculative) in January 2010 after the U.S. Treasury converted its preferred investment in AFI to common equity, [420] while Moody's and Fitch maintained ResCap at their respective "In Default" grades throughout 2010.

S&P once again upgraded its rating of ResCap to "B+" (Highly Speculative) on May 4, 2011, noting improved capital, credit quality, earnings, and liquidity.[421] However, S&P cautioned that "ResCap's financial status remains tenuous and its capital slim. Our rating on ResCap reflects the funding and capital support [AFI] has provided. Any change in [AFI's] willingness or ability to support ResCap—which we don't expect—would likely pressure ResCap's rating substantially."[422] Moody's and Fitch also upgraded ResCap in 2011, with Moody's moving to "Ca" (Extremely Speculative) and Fitch to "B" (Highly Speculative) in

---

[416] *See* Exhibit VI.C.4.e(1).

[417] *See* Exhibit VI.C.4.e(1).

[418] JOHN K. BARTKO ET AL., S&P, RESEARCH UPDATE: GMAC LLC AND RESIDENTIAL CAPITAL LLC RATINGS RAISED TO 'CCC/C'; OUTLOOK NEGATIVE (Feb. 4, 2009).

[419] ROBERT YOUNG & CRAIG A. EMRICK, MOODY'S, ANNOUNCEMENT: MOODY'S: ALTHOUGH POSITIVE, RESCAP NOT STABILIZED BY GMAC ACTIONS (Dec. 31, 2009), http://www.moodys.com/research/Moodys-Although-positive-ResCap-not-stabilized-by-GMAC-actions—PR_192808.

[420] JOHN K. BARTKO & VIKAS JHAVERI, S&P, RESEARCH UPDATE: GMAC INC., RESIDENTIAL CAPITAL LLC RATINGS RAISED TO 'B' FROM 'CCC', OUTLOOK STABLE (Jan. 27, 2010).

[421] BRENDEN BROWN & JOHN K. BARTKO, S&P, RESEARCH UPDATE: ALLY FINANCIAL INC., RESIDENTIAL CAPITAL RATING RAISED TO 'B+' FROM 'B' (May 4, 2011).

[422] *Id.*

February 2011.[423] The upgrades were short lived; by November 2011, both S&P and Fitch had downgraded ResCap once again to "CCC" (In Poor Standing), noting deterioration in year-to-date performance.[424] All three agencies subsequently downgraded ResCap, to an "In Default" rating by the Petition Date.

As discussed above, ResCap lost its investment credit rating in August 2007 and was subsequently rated speculative or highly speculative through the Petition Date. The rating actions reflected the significant increase in ResCap's credit risk throughout this time period.

### (2) Bond And CDS Pricing

The credit concerns of the major credit rating agencies were echoed by the broader market as indicated by the trading prices of ResCap's debt. As shown in Exhibit VI.C.4.e(2)—1 below, the pricing of ResCap's 6.5% bond maturing April 17, 2013, which had been trading around par since issuance, began to decline in 2007, reaching 67% of par on August 16, 2007, and declined further in the following months, falling to 53% of par by November 19, 2007.[425]

---

[423] Marc L. Wasden & Robert Young, Moody's, Rating Action: Moody's Upgrades Ally Financial Senior Unsecured to B1, ResCap to Ca (Feb. 7, 2011), http://www.moodys.com/research/Moodys-upgrades-Ally-Financial-senior-unsecured-to-B1-ResCap-to- PR_213605; Mohak Rao & Peter Shimkus, Fitch, Fitch Upgrades ResCap's IDR to 'B'; Outlook Stable (Feb. 3, 2011).

[424] Brendan Browne & John K. Bartko, S&P, Research Update: Residential Capital LLC Rating Lowered to 'CCC' and Placed on CreditWatch Negative (Nov. 10, 2011); Mohak Rao & Justin Fuller, Fitch, Fitch Downgrades ResCap's IDR to 'CCC' (Nov. 11, 2011).

[425] Pricing per Interactive Data Corporation.

EXHIBIT VI.C.4.e(2)—1
**ResCap Bond Pricing Activity**
May 31, 2006 – August 31, 2012



Source: Pricing per Advantage Data Inc.; Interactive Data Corporation.

The price of five-year CDS on ResCap secured debt increased from 141 bps on May 31, 2007 to 1,372 bps on August 21, 2007, signaling significant financial distress.[426] The price increased to 3,021 bps by November 20, 2007, meaning a buyer of protection against a ResCap default would need to pay over 30% of the face amount being protected. At that time, CDS protection on ResCap became more expensive than similar protection on its peers. The CDS spread on Countrywide, which had also been downgraded in August 2007, increased to 265 bps price in August, while the spread for WaMu CDS increased to 120 bps.[427] As shown in Exhibit VI.C.4.e(2)—2 below, the market prices for ResCap's credit default swaps indicated the market's decreasing confidence in the adequacy of ResCap's capitalization and ability to perform on its obligations as they matured.

---

[426] Pricing per Advantage Data Inc.

[427] GMAC Bank "Counterparty Exposure Review: ResCap" Presentation, dated Oct. 2007, at ALLY _PEO_0006067 [ALLY_PEO_0005941].

EXHIBIT VI.C.4.e(2)—2
**ResCap Credit Default Swap Spreads** [(1)]
August 1, 2005 – December 31, 2011



[(1)] *Five year CDS spreads depicted; one year CDS spreads not depicted. Default probabilities per contemporaneous analyst commentary.*
[(2)] *Karen Brettell, US Credit –ResCap Debt Risk as Swaps Imply Distress, REUTERS, Aug. 21, 2007,*
  *http://uk.reuters.com/article/2007/08/21/markets-credit-idUKN2157256720070821.*
[(3)] *Karen Brettell –ResCap Swaps Imply 72 Percent Default Risk, REUTERS, Nov. 20, 2007,*
  *http://www.reuters.com/article/2007/11/20/markets-credit-idUKN205364620071120.*
[(4)] *Ari Levy & Caroline Salas, GMAC's $60 Billion Deal Loses Traction as Cash Burns (Update1), BLOOMBERG, Jun. 24, 2008,*
  *http://www.bloomberg.com/apps/news?pid=newsarchive&refer=home&sid=aFREd.COhlF4.*
*Source: Pricing per Advantage Data Inc.*

ResCap initiated a tender offer to repurchase up to $750 million of certain of its senior unsecured notes on November 21, 2007. The purchase of those notes at a discount was intended to "increase ResCap's income in the fourth quarter of 2007 and its consolidated [TNW] as of the end of the year above the levels that would have occurred in the absence of acquiring notes pursuant to the tender offer."[428] Pricing on ResCap's 6.115% bond due in 2009 improved "to 69.63 cents on the dollar . . . from 60.25 cents"[429] following the announcement of its tender offer. However, analysts were "wary of the lowest dollar/longest maturity bonds because [they] believe[d] Cerberus [would] only put a finite amount of time/additional capital to turn around ResCap" and "the risk of ResCap sliding into bankruptcy remain[ed]."[430] ResCap's bondholders tendered $389 million of ResCap's outstanding unsecured debt and in December 2007 ResCap recognized $152 million of income on extinguishment of debt pursuant to the tender offer.[431]

---

[428] Residential Capital, LLC, Current Report (Form 8-K) (Nov. 21, 2007), Ex. 99.1, at 2.

[429] Karen Brettell, *US CREDIT–ResCap Debt Improved, Cerberus Support Key,* REUTERS, Nov. 27, 2007, http://www.reuters.com/article/2007/11/27/markets-credit-idUSN2756015020071127.

[430] *Id.*

[431] Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2008), at 58, 79.

It was publicly reported in December 2007 that by mid-November, the purchase of five-year default insurance on ResCap bonds "cost more than 40 points up front and 500 basis points per year," which meant "buying protection on $10 million of ResCap bonds cost more than $4 million up front plus $500,000 per year."[432] The five-year CDS spread on ResCap's secured debt increased significantly in 2008, indicating a further increase in default risk. ResCap's spreads reached 15,372 bps in November 2008, which mirrored the decline in its bond pricing and signaled an expected bankruptcy. According to a market analyst: "ResCap's credit default swaps have been trading at levels that indicate investors have been expecting bankruptcy since the fall of 2007."[433] Similarly, the pricing of ResCap's 6.5% bond maturing in 2013 continued to decline in 2008, decreasing to 40% of par on June 27, 2008, and then declining further to 9% of par on November 25, 2008.

The pricing of ResCap's 6.5% bond maturing in 2013 increased significantly during the first half of 2009, from 20 on January 5, 2009, to 70 on May 22, 2009. As previously discussed in Section VI.B, the market prices of ResCap's publicly traded securities post TARP no longer reflected the economic fundamentals of ResCap's business. This anomaly became even clearer in January 2010, after AFI disclosed that it had received an additional $3.8 billion from the U.S. Treasury and that AFI would contribute $2.7 billion to ResCap:

> The cost of insuring ResCap's debt in the credit default swap market [p]lunged to a spread equivalent of around 887 basis points, or $887,000 per year for five years to insure $10 million in debt, from more than 2,200 basis points, indicating significantly lower expectations of a default, according to Markit Intraday. ResCap's 8.375 percent bond due 2010 jumped to 94 cents on the dollar from 61 cents in mid-December, when it was last actively traded, according to MarketAxess.[434]

---

[432] MICHAEL LEWITT, THE WAGES OF FINANCIAL SIN (undated), *reprinted in* John Mauldin*, Credit Crunch Withdrawal of Capital as General Motors and Freddie Mac Stare into the Abyss*, THE MARKET ORACLE, Dec. 4, 2007, http://www.marketoracle.co.uk/Article2975.html.

[433] Cynthia Koons, *ResCap Bonds Command Pricey Insurance*, WALL ST. J., Aug. 2, 2008, http://online.wsj.com/article/SB121759683223604485.html.

[434] Karen Brettell, *US Credit–ResCap Rallies on Capital Support, Risks Remain*, REUTERS, Jan. 4, 2010, http://www.reuters.com/article/2010/01/04/markets-credit-idUSN0457155120100104.

Although the distressed debt trading market may have interpreted the U.S. Treasury support and AFI capital contribution as a sign of stability for ResCap, certain analysts expressed concern:

> Moody's Investors Service said [t]hat the capital injection, while positive for ResCap, would not be sufficient to stabilize the company. The rating agency also cited the risk of further deterioration in the company's mortgage securities remains and that government support for the unit could ebb. 'Should parental support be discontinued, we believe ResCap would eventually default on its obligations and unsecured creditors would face substantial losses,' Moody's said.[435]

### f. Other Considerations

#### (1) ResCap's Operating Cash Flow

Operating cash flow is a measure of a company's ability to generate cash from operating its business, as opposed to cash from financing or investing activities. The analysis of operating cash flow measures a company's ability to generate cash to meet its debt service obligations and reinvest in its operations. The analysis of operating cash flow also necessarily includes testing a company's ability to weather reasonably foreseeable downsides, stresses, and contingencies.

ResCap developed a liquidity reporting process in December 2007 which was referred to as Executive Liquidity Reports ("ELRs"). The ELRs, which were issued weekly through 2010 and monthly thereafter, provided projections of cash flows for the subsequent twelve months. Each of the ELRs, prepared at or around the end of each quarter from December 2007 through March 2010, projected substantial negative cash flows over the subsequent twelve month projection period. Further, the ELRs indicated that ResCap's projected operating cash flows were insufficient to service its debt obligations after December 2007, as shown in Exhibits VI.C.4.f(1)—1 and VI.C.4.f(1)—2 below.

---

[435] *Id.*

EXHIBIT VI.C.4.f(1)—1

**ResCap Projected Operating Cash Flow After Debt Service**

**Rolling One-Year Projections per Executive Liquidity Reports (ELR)**

December 31, 2007 – March 31, 2013

*($ in Millions)*



*Source: ALLY_0193580; ALLY_0193670; ALLY_0194078; ALLY_0194181; ALLY_0194266; ALLY_0297477; ALLY_0383598;*
*ALLY_PEO_0084328; EXAM10055830; EXAM10055877; EXAM10055944; EXAM10055957; EXAM10055973; EXAM10056015;*
*EXAM10056051; EXAM10056078; EXAM10056100; EXAM10056125.*

EXHIBIT VI.C.4.f(1)—2
**ResCap Projected Twelve Month Net Cash Flow**
December 31, 2007 – March 31, 2013
*($ in Millions)*

| ELR Report Date | Projected Operating Cash Flow | Projected Interest and Principal Payments | Projected Operating Cash Flow After Debt Service | Projected Asset Sale Proceeds | Projected Net Cash Activity | Projected Ending Unrestricted Liquidity |
|---|---|---|---|---|---|---|
| 12/31/07 | $3,475 | ($5,460) | ($1,984) | - | ($1,984) | $284 |
| 03/31/08 | 1,429 | (4,840) | (3,411) | - | (3,411) | (2,418) |
| 06/30/08 | 400 | (1,770) | (1,369) | - | (1,369) | (295) |
| 10/06/08 | (1,312) | (1,654) | (2,966) | - | (2,966) | (2,824) |
| 12/29/08 | (1,623) | (1,450) | (3,073) | - | (3,073) | (2,465) |
| 03/30/09 | (883) | (1,161) | (2,044) | - | (2,044) | (923) |
| 06/29/09 | (1,440) | (1,660) | (3,101) | - | (3,101) | (2,889) |
| 09/28/09 | (800) | (2,098) | (2,899) | - | (2,899) | (2,629) |
| 12/28/09 | 298 | (2,000) | (1,702) | - | (1,702) | (1,502) |
| 03/22/10 | 129 | (1,979) | (1,850) | $117 | (1,733) | (1,475) |
| 07/05/10 | 333 | (642) | (308) | 479 | 171 | 520 |
| 09/13/10 | 218 | (1,496) | (1,278) | 1,225 | (54) | 352 |
| 12/06/10 | 82 | (424) | (342) | 73 | (269) | 121 |
| 03/21/11 | 547 | (638) | (91) | 106 | 15 | 300 |
| 06/20/11 | 442 | (470) | (28) | - | (28) | 300 |
| 10/10/11 | 339 | (571) | (232) | 91 | (141) | 300 |
| 01/16/12 | 349 | (375) | (26) | - | (26) | 300 |
| 04/16/12 | 1,141 | (1,197) | (56) | - | (56) | 311 |

Source:  ALLY_0193580; ALLY_0193670; ALLY_0194078; ALLY_0194181; ALLY_0194266; ALLY_0297477; ALLY_0383598;
ALLY_PEO_0084328; EXAM10055830; EXAM10055877; EXAM10055944; EXAM10055957; EXAM10055973; EXAM10056015;
EXAM10056051; EXAM10056078; EXAM10056100; EXAM10056125.

### (2) ResCap's Projections

A central component of evaluating adequacy of capital and the viability of a business is an analysis of contemporaneous financial projections, including an assessment of the purpose for such projections and whether such projections were "reasonable and prudent" when made.[436] Such projections must be carefully scrutinized and evaluated in light of prior company performance, existing business, industry and economic trends, and reasonably foreseeable downsides, stresses, and contingencies.

---

[436] *Statutory Comm. of Unsecured Creditors ex rel. Iridium Operating LLC v. Motorola, Inc.* (*In re Iridium Operating LLC*), 373 B.R. 283, 345 (Bankr. S.D.N.Y. 2007) (citation omitted).

ResCap's ability to prepare reliable financial projections diminished after 2006 because of the rapid deterioration within its businesses, the concomitant deterioration within the mortgage industry, and global economy, among other causes. This is evident in the significant variance between ResCap's actual results as compared to its financial projections, as summarized in Exhibit VI.C.4.f(2)—1 below.

EXHIBIT VI.C.4.f(2)—1
**ResCap Financial Performance and Projections - Net Income (Loss)**
2006 – 2011
*($ in Millions)*

|  | Net Income (Loss) | | Variance |
| --- | --- | --- | --- |
| Year Ended | Plan | Actual | from Plan |
| 12/31/06 | $951 | $705 | ($246) |
| 12/31/07 | 1,015 | (4,346) | (5,361) |
| 12/31/08 | (1,718) | (5,611) | (3,893) |
| 12/31/09 | (1,072) | (4,544) | (3,472) |
| 12/31/10 | 367 | 575 | 208 |
| 12/30/11 | 311 | (845) | (1,156) |

*Source: EXAM00122651; EXAM00123128; EXAM00124455; EXAM00295529; RC40007361; RC40012214; RC40012974; RC40015763; RC40017167; Residential Capital, LLC, Annual Report (Form 10-K) (Mar. 13, 2007), at 101; Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2008), at 101; Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2009), at 119.*

In addition to the external factors affecting ResCap's ability to prepare reliable financial projections, ResCap had internal limitations as noted by David Applegate, ResCap's co-CEO, in January 2007 when he expressed "low confidence in [ResCap's] ability to predict HFI non-prime performance" because ResCap did not have "good tools" and "non-prime [HFI] and [MSRs] are difficult to forecast."[437] Flees, ResCap's controller and chief accounting officer, stated that the industry's historical models "were failing to predict what was going on."[438]

ResCap projected net income of $1.015 billion for 2007 in its 2007 Plan.[439] The net income projected for 2007 was virtually identical to the net income that ResCap had achieved in 2005 of $1.021 billion, prior to the downturn in the mortgage industry. As shown in Exhibit VI.C.4.f.(2)-2, despite ResCap having incurred a loss of $233 million in 2006, excluding the $415 million gain on sale of equity investments and $523 million gain on conversion to LLC, its 2007 Plan predicted a return its 2005 levels of performance in 2007. Further, ResCap's 2007 Plan projected continued growth in net income from 2007 through 2009, irrespective of the

---

[437] E-mail from D. Applegate (Jan. 27, 2007), at EXAM10163217 [EXAM10163216].

[438] Int. of R. Flees, Jan. 18, 2013, at 92:12–93:4.

[439] ResCap 2007–2009 Operating Plan Review, dated Dec. 2006, at RC40012385 [RC40012214] ("2007 Plan").

explicit assumption that the mortgage industry was in the midst of a significant downturn.[440] ResCap's 2007 Plan was not sufficiently grounded in recent events occurring within the Company or the industry. ResCap ultimately reported a net loss of $4.3 billion for 2007 (as compared to plan of $1.015 billion net income) as the downturn in the mortgage industry accelerated throughout the year.[441]

EXHIBIT VI.C.4.f(2)—2
**ResCap Net Income – Actual and 2007 Plan**
2005 – 2009
*($ in Millions)*



*(1)* 2006 actual net income was adjusted to exclude $415 million gain on sale of equity investments and $523 million gain on conversion to LLC.

*Source: Residential Capital Corporation, Annual Report (Form 10-K) (Mar. 28, 2006), at 95; Residential Capital, LLC, Annual Report (Form 10-K) (Mar. 13, 2007), at 101; ResCap 2007–2009 Operating Plan Review, dated Dec. 2006, at RC40012386 [RC40012214].*

ResCap's 2008 Plan[442] assumed risk reduction and shrinkage of ResCap's balance sheet through asset disposition and run-off to manage income statement volatility, limitation

---

[440] The 2007 Plan included an updated assessment of the market which reflected continued weakness in the mortgage industry for 2007 and only modest improvement in 2008. The 2007 Plan made specific reference to the rapid downturn in median home prices which occurred in 2006 and the implications for future delinquencies. The 2007 Plan noted that the housing market was cooling, that there was going to be an increase in 2007 delinquencies, and that margins would continue to fall. *Id.* at RC40012380, RC40012384.

[441] Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2008), at 56.

[442] ResCap Global Debt Restructuring Due Diligence Presentation, dated Mar. 13, 2008, at RC40007365 [RC40007361] ("2008 Plan").

of U.S. loan production to assets with market liquidity, and limitation of international production to assets with known exit strategies.[443] A net loss of $1.7 billion was projected for 2008, as compared to the actual net loss of $4.3 billion in 2007.[444] The 2008 Plan assumed "modest market improvement in late 2009 and into 2010,"[445] resulting in projected net income of $34 million for 2009, and $296 million for 2010.[446]

However, ResCap's ELRs issued in 2008 indicated that ResCap was downwardly revising its cash flow forecasts as the year progressed, as shown in Exhibit VI.C.4.f(2)—3 below. ELRs issued at or around each quarter end indicated that ResCap had difficulty providing reasonable forecasts of its cash flows on a quarterly basis. The ELR prepared as of March 31, 2008 forecasted operating cash flow of $9 million for the second quarter of 2008, compared to approximately $1.7 billion that had been forecasted for the same period in the ELR prepared just ninety days earlier. Further, the forecasted operating cash flow for the second half of 2008, as prepared on March 31, 2008, was almost identical to that projected as of December 31, 2007, notwithstanding the forecasted 99.5% reduction in operating cash flow for the second quarter of 2008.

---

EXHIBIT VI.C.4.f(2)—3
**ResCap Projected Operating Cash Flow**
Quarter 1, 2008 – Quarter 4, 2008
*($ in Millions)*

| Report Date | Q1 2008 | Q2 2008 | Q3 2008 | Q4 2008 |
|---|---|---|---|---|
| 12/31/07 | $492 | $1,670 | $840 | $474 |
| 03/31/08 | | 9 | 774 | 460 |
| 06/30/08 | | | 461 | (237) |
| 10/06/08 | | | | (970) |

*Source: Draft ResCap Executive Liquidity Report, dated Dec. 31, 2007 [EXAM10055830]; ResCap Executive Liquidity Report, dated Mar. 31, 2008 [EXAM10055877]; ResCap Executive Liquidity Report, dated Jun. 30, 2008 [EXAM10055944]; ResCap Executive Liquidity Report, dated Oct. 6, 2008 [EXAM10055957].*

---

[443] *Id.* at RC40007386.

[444] *Compare* ResCap Global Debt Restructuring Due Diligence Presentation, dated Mar. 13, 2008, at RC40007389 [RC40007361] ("2008 Plan"), *with* Residential Capital, LLC, Current Report (Form 8-K) (Feb. 5, 2008), Ex. 99.1, at 1 (noting AFI contribution to ResCap of $1.5 billion (face value) of ResCap's debt purchased in the open market, and ResCap recognition of a gain of $521 million on debt extinguishment in the fourth quarter of 2007; ResCap's operating loss for 2007 would have been $4.9 billion excluding the gain on debt extinguishment).

[445] ResCap Global Debt Restructuring Due Diligence Presentation, dated Mar. 13, 2008, at RC40007386 [RC40007361].

[446] *Id.* at RC40007389.

ResCap incurred an actual net loss of $5.6 billion in 2008, compared to the projected loss of $1.7 billion in the 2008 Plan.[447] Excluding gains on debt extinguishment, ResCap's operating loss for 2008 was $7.5 billion.[448]

ResCap projected a loss of $1.1 billion for 2009 in its 2009 Plan,[449] after incurring losses of $7.5 billion in 2008 and losses of $4.9 billion in 2007, excluding gains on debt extinguishment.[450] ResCap's 2009 Plan focused on "leveraging ResCap's capital market expertise and winding down [its] non-core businesses" after the sale of ResCap's interest in Ally Bank and ResMor.[451] In 2009, ResCap continued to assume recovery in its financial performance that was not reasonably supported by its actual results in prior periods or by its prior performance against previous financial projections. ResCap's financial performance in 2009 continued to be negatively affected by distressed conditions in the mortgage industry, which led to higher credit related costs and losses from disposition of its international assets. ResCap incurred a net loss of $4.5 billion in 2009, compared to the projected loss of $1.1 billion in the 2009 Plan.[452] ResCap's actual operating loss for 2009 was $6.3 billion, excluding gains on debt extinguishment.[453]

The overall economy became more stable in 2010 compared to 2009, as several measures of economic activity showed positive trends. Mortgage rates had fallen to historic lows in 2009. These historic lows benefitted homeowners and homebuyers, if not necessarily the business of mortgage servicing. The FRB cut its target funds rate to near zero, reaching 0.01%

---

[447] *Compare* Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2009), at 119, *with* 2008 Plan, at RC40007389.

[448] *See* Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2009), at 119.

[449] ResCap 2009 Business Plan Review, dated Mar. 26, 2009, at EXAM00295545 [EXAM00295529] ("2009 Plan").

[450] *See* Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2009), at 119.

[451] ResCap 2009 Business Plan Review, dated Mar. 26, 2009, at EXAM00295530 [EXAM00295529].

[452] *Compare* Residential Capital, LLC Consolidated Financial Statements for the Years Ended December 31, 2009 and 2008, dated Feb. 26, 2010, at 5 [EXAM00124455], *with* ResCap 2009 Business Plan Review, dated Mar. 26, 2009, at EXAM00295545 [EXAM00295529].

[453] *See* Residential Capital, LLC Consolidated Financial Statements for the Years Ended December 31, 2009 and 2008, dated Feb. 26, 2010, at 5 [EXAM00124455].

in December 2009.[454] The yield curve, which had inverted in 2006 and 2007 when short-term interest rates exceeded long-term rates, had normalized as the FRB held short-term rates low.[455] Marano stated that he believed the mortgage and capital markets business to be "a very good opportunity in 2010."[456] ResCap reported net income of $575 million for 2010, compared to its plan of $367 million.[457]

ResCap projected net income of $311 million for 2011 in its 2011 Plan.[458] The 2011 Plan projected lower net revenue and net income for 2011 than the 2010 Plan as a result of lower production and margins.[459] ResCap's financial performance turned down again in 2011, resulting in a net loss of $845 million,[460] primarily because of losses on the valuation and hedging of its servicing assets, additional reserves for representation and warranty expenses, and mortgage-related fines levied by government agencies.

### (3) ResCap's Leverage

An analysis of capital adequacy should also consider the degree to which leverage is used in a company's capital structure and business plan. Highly leveraged companies will likely have greater exposure to losses in downside environments and will have fewer capital resources, such as unencumbered assets and excess borrowing capacity, to obtain needed funds.

---

[454] The FRB Federal Open Market Committee stated in part:

> The Committee will maintain the target range for the federal funds rate at 0 to 1/4 percent and continues to anticipate that economic conditions, including low rates of resource utilization, subdued inflation trends, and stable inflation expectations, are likely to warrant exceptionally low levels of the federal funds rate for an extended period. To provide support to mortgage lending and housing markets and to improve overall conditions in private credit markets, the Federal Reserve is in the process of purchasing $1.25 trillion of agency mortgage-backed securities and about $175 billion of agency debt. In order to promote a smooth transition in markets, the Committee is gradually slowing the pace of these purchases, and it anticipates that these transactions will be executed by the end of the first quarter of 2010. The Committee will continue to evaluate the timing and overall amounts of its purchases of securities in light of the evolving economic outlook and conditions in financial markets.

Press Release, FRB, Untitled Fed. Open Market Comm. Statement (Dec. 16, 2009), http://www.federalreserve.gov/newsevents/press/monetary/20091216a.htm.

[455] Larry Kudlow, *The Yield Curve Is Signaling Bigger Growth* (Dec. 22, 2009), http://www.creators.com/opinion/lawrence-kudlow/the-yield-curve-is-signaling-bigger-growth.html.

[456] Int. of T. Marano, Nov. 26, 2012, at 71:23–72:18.

[457] *Compare* Residential Capital, LLC Consolidated Financial Statements for the Years Ended December 31, 2010 and 2009, dated Feb. 28, 2011, at 5 [EXAM00123128], *with* ResCap Preliminary 2010–2012 Business Plan, dated Mar. 19, 2010, at RC40015782 [RC40015763] ("2010 Plan").

[458] ResCap Preliminary 2011–2013 Business Plan, dated Dec. 22, 2010, at RC40017182, RC40017189 [RC40017167] ("2011 Plan").

[459] *Id.* at RC40017189.

[460] Residential Capital, LLC Consolidated Financial Statements for the Years Ended December 31, 2011 and 2010, dated Mar. 28, 2012, at 5 [EXAM00122651].

ResCap entered the 2006 industry downturn in a highly-leveraged position. ResCap incurred significant losses as it reduced its business and equity base to a fraction of its 2005 levels as the industry downturn progressed. ResCap's reported equity as of December 31, 2011 was only 1.2% of its December 31, 2005 balance.[461] ResCap was unable to service its fixed charges, primarily interest expense, with its operating income in 2006 through 2009, and again in 2011.[462]

Leverage can be measured by analyzing various financial ratios. The following financial ratios were calculated and analyzed for the period of 2005 to 2011 to evaluate ResCap's leverage: (1) debt to capitalization (book value)—interest bearing debt divided by the sum of interest bearing debt and book value of equity; and (2) fixed charge ratio—earnings before taxes and interest divided by interest expense.

*(a) Debt To Capitalization (Book Value)*

The debt-to-capitalization ratio is a financial measure of leverage that evaluates the proportion of invested capital funded by debt relative to the total capitalization of a company. As shown in Exhibit VI.C.4.f(3)(a) below, ResCap was highly leveraged from its inception, with debt representing 93% of its total capitalization. ResCap's declining equity base resulted in further deterioration of this ratio after 2007, except in 2010 when ResCap's financial position improved briefly.

---

[461] *Compare* Residential Capital Corporation, Annual Report (Form 10-K) (Mar. 28, 2006), at 94, *with* Residential Capital, LLC Consolidated Financial Statements for the Years Ended December 31, 2011 and 2010, dated Mar. 28, 2012, at 4 [EXAM00122651].

[462] *See* Section VI.C.4.f(3)(b) (discussing ResCap's fixed charge ratio).

EXHIBIT VI.C.4.f(3)(a)
**ResCap Financial Ratios – Debt as Percentage of Capitalization** [1]
December 31, 2005 – December 31, 2011
*($ in Millions)*

|  | Total Debt | Book Equity | Total Capitalization | Debt as Percentage of Capitalization |
|---|---|---|---|---|
| 12/31/05 | $103,576 | $7,464 | $111,040 | 93% |
| 12/31/06 | 105,901 | 6,082 | 111,983 | 95% |
| 12/31/07 | 50,981 | 4,045 | 55,026 | 93% |
| 12/31/08 | 19,746 | 358 | 20,104 | 98% |
| 12/31/09 | 11,394 | 275 | 11,669 | 98% |
| 12/31/10 | 8,049 | 846 | 8,895 | 90% |
| 12/30/11 | 6,725 | 92 | 6,817 | 99% |

[1] *The above analysis excludes debt and equity related to Ally Bank.*
*Source: EXAM00122651; EXAM00123128; EXAM00124455; EXAM00125069; EXAM0012546. EXAM00125532; Residential Capital Corporation, Annual Report (Form 10-K) (Mar. 28, 2006), at 94; Residential Capital, LLC, Annual Report (Form 10-K) (Mar. 13, 2007), at 100; Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2008), at 100; Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2009), at 118.*

### (b) Fixed Charge Ratio

The fixed charge ratio compares an entity's earnings before tax and interest to its interest expense. This ratio is a measure of whether a company is able to service its fixed obligations—primarily financing expenses—with its operating income.

ResCap's reported net income included one-time items such as gains from sale of equity investments, gains on debt extinguishment, gains on its conversion to an LLC, and goodwill impairment, all of which were excluded for purposes of an analysis of ResCap's fixed charge ratio for the period of 2005 through 2011. As shown in Exhibits VI.C.4.f(3)(b)—1 and VI.C.4.f(3)(b)—2 below, ResCap had insufficient operating income to cover its fixed charges in 2006 and 2007. In 2008 and 2009, ResCap's fixed charge ratio turned negative as ResCap incurred operating losses before interest expense during those years. ResCap recorded an operating profit in 2010, primarily due to an increase in net revenues from servicing asset valuation and hedge activities, and a decrease in representation and warranty-related expenses. This resulted in improved fixed charge coverage for 2010. The improved fixed charge coverage reversed in 2011, when ResCap again incurred operating losses before interest expense.

EXHIBIT VI.C.4.f(3)(b)—1
**ResCap Fixed Charge Ratio** [1]
December 31, 2005 – December 31, 2011



[1] *Fixed charge ratio is a measure of the operating earnings available to a company to service its fixed obligations. Earnings/(Deficit) in the above analysis were adjusted to exclude gain on sale of equity investments, gain on conversion to LLC , goodwill impairment, impairment of held-for-sale businesses and gain on debt extinguishment.*
Source: *EXAM00122651; EXAM00123128; EXAM00124455; Residential Capital Corporation, Annual Report (Form 10-K) (Mar. 28, 2006), at 95; Residential Capital, LLC, Annual Report (Form 10-K) (Mar. 13, 2007), at 101; Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2008), at 101; Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2009), at 119.*



EXHIBIT VI.C.4.f(3)(b)—2
**ResCap Earnings/(Deficit) in Excess of Fixed Charges** [1]
December 31, 2005 – December 31, 2011
*($ in Millions)*

[1] *Earnings/(Deficit) in the above analysis were adjusted to exclude gain on sale of equity investments, gain on conversion to LLC, goodwill impairment, impairment of held-for-sale businesses and gain on debt extinguishment.*
*Source: EXAM00122651; EXAM00123128; EXAM00124455; Residential Capital Corporation, Annual Report (Form 10-K) (Mar. 28, 2006), at 95; Residential Capital, LLC, Annual Report (Form 10-K) (Mar. 13, 2007), at 101; Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2008), at 101; Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2009), at 119.*

Taken together, these ratios show that ResCap was highly leveraged at all relevant times. This leverage increased ResCap's operational risk, restricted its flexibility, and limited its ability to weather economic downturns, all of which became evident in the Summer of 2007 through the Petition Date.

### (4) ResCap's Financial Support Received From AFI

#### (a) Summary

AFI's financial support was critical to ResCap's survival from 2007 through 2011. Recognizing that ResCap's risk profile had worsened with the decline in the residential mortgage industry in 2007 and 2008, AFI engaged in an ongoing process of infusing capital and/or liquidity into ResCap to avoid imminent covenant or payment defaults. Such infusions were insufficient, however, to address ResCap's chronic undercapitalization that commenced on or about August 15, 2007, and continued through the Petition Date. Instead, the evidence indicates that those capital infusions were defensive in nature, not only forestalling a potential bankruptcy filing by ResCap, but also protecting AFI from the consequences of such a filing. These consequences included potential cross defaults across various AFI credit agreements that could, in turn, have resulted in the bankruptcy of AFI, the potential for federal regulators to seize Ally Bank or ResCap's interest therein, and the potential for the GSEs to terminate servicing contracts with ResCap.

### (b) Capital Support

The capital support received from AFI over the relevant time period is particularly relevant (although not determinative) to the Examiner's evaluation of ResCap's capitalization. AFI infused more than $8 billion in capital into ResCap from 2007 through 2012 in the form of $2.6 billion in direct contributions of cash, $3.8 billion in debt forgiveness, and $2 billion in other assets. Generally, AFI's contributions of cash to ResCap were made in an effort to address imminent liquidity needs, whereas contributions of debt were made to address impending covenant issues. The nature of the contributions made by AFI to ResCap is therefore both informative as to, and symptomatic of, ResCap's larger capitalization issues at the time of such contribution.

That ResCap was subject to financial covenants under certain of its credit facilities is important in an analysis of ResCap's capitalization and leverage. Before June 2008, the most restrictive covenant required that ResCap maintain quarterly minimum consolidated TNW of $5.4 billion.[463] Following the June 2008 debt restructuring, ResCap was subject to new financial covenants that included a monthly minimum consolidated TNW requirement of $250 million (excluding the equity ResCap held in Ally Bank), minimum daily consolidated liquidity of $750 million, and unrestricted liquidity of $250 million.[464]

ResCap relied upon capital contributions from AFI to meet its TNW covenants throughout the period from 2007 to 2009. These capital contributions supported ResCap's TNW (equity) and reduced ResCap's outstanding debt. This, in turn, had a direct impact on compliance with various capitalization and leverage requirements during this period. Capital contributions from AFI during 2005 to 2011 are shown in Exhibit VI.C.4.f(4)(b)—1 below.

---

[463] Under GAAP, consolidated tangible net worth is defined as consolidated net worth less intangible assets.

[464] Secured Revolver Loan Agreement

EXHIBIT VI.C.4.f(4)(b)—1
**AFI Capital Contributions to ResCap**
2005 – 2012
*($ in Millions)*



*(1)* *Other capital contributions of $1.9 billion in December 2009 consisted of $1.4 billion HFS loans, $316 million receivables and $195 million affiliate payables.*

*Source:  AFI Capital Contributions to ResCap Legal Entity Spreadsheet, [ALLY_PEO_0075634]; Residential Capital Corporation, Annual Report (Form 10-K) (Mar. 28, 2006), at 98; Residential Capital, LLC Consolidated Financial Statements for the Years Ended December 31, 2011 and 2010, dated Mar. 28, 2012, at 77 [EXAM00122651].*

EXHIBIT VI.C.4.f(4)(b)—2
**AFI Capital Contributions to ResCap**
2005 – 2012
*($ in Millions)*

| Quarter Ended | Cash Contributions | Other Capital Contributions[1] | Debt Forgiveness | Total AFI Support | Cumulative AFI Support |
|---|---|---|---|---|---|
| Jun-05 | - | - | $2,000 | $2,000 | $2,000 |
| Mar-07 | $500 | - | - | 500 | 2,500 |
| Jun-07 | 500 | - | - | 500 | 3,000 |
| Sep-07 | 1,000 | $24 | - | 1,024 | 4,024 |
| Dec-07 | - | - | 763 | 763 | 4,787 |
| Mar-08 | - | - | 143 | 143 | 4,930 |
| Jun-08 | - | - | 21 | 21 | 4,951 |
| Sep-08 | - | 19 | 155 | 174 | 5,125 |
| Dec-08 | - | - | 910 | 910 | 6,035 |
| Mar-09 | - | 5 | 259 | 264 | 6,299 |
| Jun-09 | - | - | 898 | 898 | 7,197 |
| Dec-09 | 600 | 1,947 | 339 | 2,886 | 10,083 |
| Dec-11 | - | - | 109 | 109 | 10,192 |
| Mar-12 | - | - | 197 | 197 | 10,389 |
| | $2,600 | $1,995 | $5,794 | $10,389 | |

[1] *Other capital contributions of $1.9 billion in December 2009 consisted of $1.4 billion HFS loans, $316 million receivables and $195 million affiliate payables.*

*Source: AFI Capital Contributions to ResCap Legal Entity Spreadsheet, [ALLY_PEO_0075634]; Residential Capital Corporation, Annual Report (Form 10-K) (Mar. 28, 2006), at 98; Residential Capital, LLC Consolidated Financial Statements for the Years Ended December 31, 2011 and 2010, dated Mar. 28, 2012, at 77 [EXAM00122651].*

## (c) Asset Sales

AFI and Cerberus acted as primary sources of needed liquidity for ResCap by purchasing certain ResCap non-core assets at various times. ResCap undertook a series of transactions to monetize assets to fund imminent financial needs beginning in August 2007, with the sale of Health Capital to GMAC CF. The majority of those transactions were facilitated by AFI, through affiliated entities. Those transactions included the following:

EXHIBIT VI.C.4.f(4)(c)
**ResCap Asset Sale Transactions**
2007 – 2012
*($ in Millions)*

|          | Description                            | Counterparty | Total Consideration |
|----------|----------------------------------------|--------------|---------------------|
| Aug-07   | Health Capital Sale                    | GMAC CF      | $901                |
| Jun-08   | Servicing Advance Factoring Agreement  | GMAC CF      | 987                 |
| Jul-08   | Excess Servicing Rights Sales          | Cerberus     | 282                 |
| Jul-08   | Resort Finance Sale                    | GMAC CF      | 1,236               |
| Aug-08   | June 2008 Model Home Sale              | Cerberus     | 230                 |
| Sep-08   | September 2008 Model Home Sale         | Cerberus     | 59                  |
| Jan-09   | ResMor Sale                            | AFI          | 67 [1]              |
| Jan-09   | 2009 Bank Transaction                  | AFI          | 609 [2]             |
| May-09   | US/UK Broker-Dealer Sale               | AFI          | 110 [1]             |
|          |                                        |              | $4,481              |

[1] *ResMor Sale and US/UK Broker-Dealer Sale were sales of equity interests. The amounts shown above represent the net proceeds from the sale of these equity interests.*
[2] *Represents fair value of bonds contributed by AFI as additional consideration in the 2009 Bank Transaction.*
*Source: Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2009) at 16, 90; Residential Capital, LLC Condensed Consolidated Financial Statements for the Periods Ended September 30, 2009 and 2008, dated Sept. 30, 2009, at 68 [EXAM00124278]; Residential Capital, LLC, Current Report (Form 8-K) (Feb. 3, 2009) at 1; Residential Capital, LLC, Quarterly Report (Form 10-Q) (Nov. 8, 2007) at 41; Residential Capital, LLC, Quarterly Report (Form 10-Q) (Aug. 8, 2008) at 39; Residential Capital, LLC, Quarterly Report (Form 10-Q) (Nov. 10, 2008) at 42, 71; Residential Capital, LLC, Quarterly Report (Form 10-Q) (Aug. 7, 2009) at 64.*

Other than the transactions listed above with AFI or Cerberus, ResCap was unable to monetize other material unencumbered assets to fund its liquidity needs.[465]

### (5) AFI's Receipt Of TARP Funds

AFI's receipt of TARP funds proved to be a seminal event in the history of both AFI and ResCap. As discussed previously, AFI received its initial payment from TARP on December 28, 2008, averting a planned bankruptcy filing by ResCap around that time. A potential bankruptcy filing for ResCap in the latter half of 2008 was thoroughly planned and appeared imminent absent continued support from AFI. Further, AFI's continued support of ResCap without TARP funds was highly doubtful because of AFI's own financial difficulties during the global financial crisis in 2008.

---

[465] *See* Int. of W. Casey, Jan. 31, 2013, at 181:10–182:16.

AFI's receipt of TARP funds enabled ResCap to continue operations, although by that time ResCap's business model had largely changed from that of a mortgage originator and servicer to that of a mortgage broker and servicer. However, as described above, any such support was insufficient to restore ResCap's capitalization to a point where one could reasonably conclude the business was adequately capitalized. Indeed, following the receipt of TARP funds, AFI increasingly viewed ResCap as a substantial burden, resulting in the exploration of various options for the sale or liquidation of all or parts of ResCap's business.[466]

## D. ABILITY TO PAY DEBTS AS DUE

### 1. Introduction

The third disjunctive test for financial distress focuses on a debtor's intent or belief that it is or will be unable to pay its debts as they become due, a condition often referred to as "equitable insolvency."[467] This subsection addresses whether ResCap intended or believed that it was or would become unable to pay its debts as they became due, as that phrase is understood under the Bankruptcy Code, the UFCA, and the UFTA, for the period from 2005 through the Petition Date.

Like many other features of applicable fraudulent transfer law, the equitable insolvency test, particularly the intent element, is not defined or self-evident. Moreover, the "intent or belief" language is different in the UFTA than in the Bankruptcy Code or UFCA. The Bankruptcy Code asks whether the debtor "intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured."[468] The UFCA, as enacted in New York, uses virtually the same language.[469] Both the Bankruptcy Code and the UFCA appear to require a determination of the debtor-transferor's subjective

---

[466] *See* Int. of M. Carpenter, Mar. 4, 2013, at 42:9–44:7, 51:5–52:1.

[467] *MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co.*, 910 F. Supp. 913, 943 (S.D.N.Y. 1995) (citation omitted).

[468] 11 U.S.C. § 548(a)(1)(B)(ii)(III). The "to incur" and "would incur" language of the statute suggests a purely forward-looking inquiry. However, the Examiner is unaware of any case in which a court limited its inquiry to whether a debtor believed, as of the date of the challenged transfer, that its *future* incurrence of debt would render the debtor unable to pay those future debts as they mature. The only court that the Examiner is aware of that has squarely faced this argument elided the issue. *See Heller Ehrman LLP v. Jones Day* (*In re Heller Ehrman LLP*), No. 08-32514DM, 2013 WL 951706, at *7 (Bankr. N.D. Cal. Mar. 11, 2013) ("Orrick argues that the so-called 'intent or belief' test of those sections only looks forward to determine whether a debtor could pay debts incurred after the transfer. Intending to pay or paying future debt in full while making no or partial payments on existing debt *is* incurring debt beyond the debtor's ability to pay, whether a subjective or objective test of intent or belief is applied.").

[469] N.Y. DEBT. & CRED. LAW § 275 ("Every conveyance made and every obligation incurred without fair consideration when the person making the conveyance or entering into the obligation intends or believes that he will incur debts beyond his ability to pay as they mature, is fraudulent as to both present and future creditors.").

intent or belief.[470] Nevertheless, courts generally permit reasonable inferences regarding a debtor's subjective intent to be drawn from objective facts, which blurs the distinction between subjective and objective inquiry.[471] In contrast, the UFTA explicitly permits an objective inquiry (in addition to a subjective inquiry), asking whether the debtor "[i]ntended to incur, or believed *or reasonably should have believed* that [it] would incur, debts beyond [its] ability to pay as they became due."[472]

As discussed in Section VII.F, the Examiner has concluded that the Bankruptcy Court will likely apply Pennsylvania, Minnesota, or possibly (with respect to certain fraudulent transfer claims arising from tax transactions) Delaware law to constructive fraudulent transfer claims brought under section 544 of the Bankruptcy Code.[473] Minnesota, Pennsylvania, and Delaware have adopted the UFTA's standard equitable insolvency test.[474] Accordingly, the Examiner has analyzed the transactions at issue under both the objective and subjective standards.

---

[470] *Tese-Milner v. Edidin & Assocs.* (*In re Operations N.Y. LLC*), No. 10-13446, 2013 WL 1187879, at *9 (Bankr. S.D.N.Y. Mar. 21, 2013) ("[T]he 'ability to pay' financial test requires proof of the transferor's subjective intent or belief that it will incur debt it cannot pay at maturity.") (citing *MFS/Sun Life Trust*, 910 F. Supp. at 943); *WRT Creditors Liquidation Trust v. WRT Bankr. Litig. Master File Defendants* (*In re WRT Energy Corp.*), 282 B.R. 343, 415 (Bankr. W.D. La. 2001) (observing that "the statute suggests a standard based on subjective intent"); *In re Taubman*, 160 B.R. 964, 986 (Bankr. S.D. Ohio 1993) ("This prong of § 548(a)(2)(A)–(B) requires the court to undergo a subjective, rather than an objective, inquiry into a party's intent.").

[471] *See, e.g., ASARCO LLC v. Ams. Mining Corp.*, 396 B.R. 278, 399 (S.D. Tex. 2008) ("Intent may be inferred from the facts and circumstances surrounding the transaction.") (citation omitted); *Official Comm. of Unsecured Creditors of TOUSA, Inc. v. Citicorp N. Am., Inc.* (*In re TOUSA, Inc.*), 422 B.R. 783, 862–63 (Bankr. S.D. Fla. 2009) ("The 'inability to pay debts' prong of section 548 is met if it can be shown that the debtor made the transfer or incurred an obligation contemporaneous with an intent or belief that subsequent creditors likely would not be paid as their claims matured. While the statute suggests a standard based on subjective intent, the courts have held that the intent requirement can be inferred where the facts and circumstances surrounding the transaction show that the debtor could not have reasonably believed that it would be able to pay its debts as they matured . . . .") (quoting *In re WRT Energy Corp.*, 282 B.R. at 415 (citations omitted)), *aff'd in relevant part sub nom. Senior Transeastern Lenders v. Official Comm. of Unsecured Creditors* (*In re TOUSA, Inc.*), 680 F.3d 1298 (11th Cir. 2012); *In re Taubman*, 160 B.R. at 986 ("The record is silent as to any expressed intention or belief by the Debtor to incur debts beyond her ability to pay; however, the record does offer facts and circumstances from which such an intention may be found.") (citing *Yoder v. T.E.L. Leasing, Inc.* (*In re Suburban Motor Freight, Inc.*), 124 B.R. 984, 1000 n.14 (Bankr. S.D. Ohio 1990).

[472] UFTA § 4(a)(2)(ii) (emphasis added).

[473] The Examiner's choice of law analysis indicates that the jurisdictions whose substantive fraudulent transfer law would likely be applied by a New York federal or state court with respect to the transactions covered by this Report are Minnesota (as to most transfers by ResCap and RFC), Pennsylvania (as to transfers by GMAC Mortgage) or possibly Delaware (as to certain tax-related transfers by ResCap). That analysis is set forth in Section VII.F.

[474] *See* MINN. STAT. § 513.44(a)(2)(ii); 12 PA. CONS. STAT. § 5104(a)(2)(ii); 6 DEL. CODE ANN. tit. 6 § 1304(a)(2)(b).

### 2. Conceptual Framework

A debtor's contemporaneous subjective belief that it is or will be unable to pay its debts as they become due satisfies the financial distress requirement of all three fraudulent transfer statutes. This issue is not often litigated because of the difficulty of proof arising from the subjective intent requirement.[475] However, most courts have permitted proof of subjective intent through reasonable inferences drawn from facts and circumstances surrounding the transfer made or obligation incurred.[476] These factors include a debtor's contemporaneous cash flow projections prepared by management, payment history and practices during the relevant time period; short pays on invoices, holds on checks to vendors; past due accounts, demand letters and other collection efforts against the debtor, and liquidity and leverage issues similar to those analyzed under the unreasonably small capital test.[477]

For example, a debtor's cash flow projections developed contemporaneously with a challenged transfer generally form the starting point for testing its ability to pay debts as they become due. The key to unlocking intent from a debtor's cash flow projections is to assess the reasonableness of the projections over a relevant period based on information known or knowable as of the transfer date.[478] The relevant period will depend on the amount and term of the debts that a debtor carries and the timing of its projected cash flows. Thus, the debt that is

---

[475] *Yoder v. T.E.L. Leasing, Inc.* (*In re Suburban Motor Freight, Inc.*), 124 B.R. 984, 1000 n.14 (Bankr. S.D. Ohio 1990) ("There are few rulings on this particular prong of § 548(a)(2)(A)–(B), and it is rarely used by parties seeking to avoid a transfer as it appears to require the courts to undergo a subjective, rather than objective, inquiry into a party's intent.") (citation omitted).

[476] *See, e.g.*, *WRT Creditors Liquidation Trust v. WRT Bankr. Litig. Master File Defendants* (*In re WRT Energy Corp.*), 282 B.R. 343, 415 (Bankr. W.D. La. 2001) ("While the statute suggests a standard based on subjective intent, the courts have held that the intent requirement can be inferred where the facts and circumstances surrounding the transaction show that the debtor could not have reasonably believed that it would be able to pay its debts as they matured.").

[477] *See, e.g.*, *ASARCO LLC v. Ams. Mining Corp.*, 396 B.R. 278, 399–400 (S.D. Tex. 2008) ("In March 2002, Jim O'Neil, then ASARCO's Vice President of Finance testified that ASARCO had $138 million in past-due debts at the end of 2001 and that ASARCO was not able to pay those debts. At this time, ASARCO was in arrears to most of its vendors and was generally not paying its debts as they became due . . . . [ASARCO's treasurer] testified that perhaps thousands of vendors, service providers, and other creditors were having trouble getting paid in early 2003. ASARCO's past due and liquidated asbestos obligations exceeded $13.7 million in early March 2003, and ASARCO was in arrears with its own defense lawyers for over $3 million. The strongest evidence of ASARCO's belief that it was unable to pay its debts is that there were extensive 'hold lists' during the relevant time.") (citations omitted).

[478] *VFB LLC v. Campbell Soup Co.*, 482 F.3d 624, 631 (3d Cir. 2007) ("True, earnings projections 'must be tested by an objective standard anchored in [a] company's actual performance,' but such a test applies to information about a company's performance available 'when [the projection is] made.'") (alterations in original) (quoting *Moody v. Sec. Pac. Bus. Credit, Inc.*, 971 F.2d 1056, 1073 (3d Cir. 1992)).

coming due and a debtor's available liquidity must be evaluated in the context of the debtor's financial projections:

> A projection of the amount of liquidity available to the company to meet its debt requirements is estimated . . . To calculate a company's liquidity available for debt repayment, the analyst should project each of the following for several periods after the transaction: (1) any excess cash on hand, (2) free cash flows earned during each period, and (3) the company's borrowing availability on each due date to pay its debts.[479]

Although courts may adopt a presumption that management's projections were reasonable for these purposes,[480] a historically consistent trend of significant variances between actual and projected cash flows rebuts the presumption.[481] Additionally, whether a debtor was not paying debts as due in a timely manner (e.g., the company was stretching its payables, short paying its invoices, or holding checks) is a key indicator of intent.[482] Whether a debtor has access to sufficient available liquidity to continue to pay debts as due over the relevant time period is also an important indicator of intent.

Under the objective intent requirement, proof concerns are relaxed as the question becomes whether a debtor intended to incur or believed (or reasonably should have believed) that it would incur debts beyond its ability to pay as of the date of the challenged transfer. Many of the same factors employed in assessing inadequate capital are relevant indicators of a belief or reasonable basis to believe that a debtor could not pay its debts as they became due, but with a focus on liquidity, cash flows, risk, and shorter-term cash needs.

---

[479] ROBERT F. REILLY & ROBERT P. SCHWEIHS, HANDBOOK OF ADVANCED BUSINESS VALUATION 341–42 (1999).

[480] *See, e.g.*, *Cede & Co. v. JRC Acquisition Corp*, No. Civ.A. 18648-NC, 2004 WL 286963, at *2 (Del. Ch. Feb. 10, 2004) ("Regardless of the methodology, however, this Court prefers valuations based on management projections available as of the date of the merger and holds a healthy skepticism for post-merger adjustments to management projections or the creation of new projections entirely. Expert valuations that disregard contemporaneous management projections are sometimes completely discounted.") (citations omitted).

[481] *See, e.g.*, *Lids Corp. v. Marathon Inv. Partners, L.P.* (*In re Lids Corp.*), 281 B.R. 535, 544 (Bankr. D. Del. 2002) ("We . . . find that Houlihan has improperly relied on Lids' projections to calculate value. Over the last few years, Lids has consistently failed to meet its projections; in 2000 alone, Lids' budget was revised three times to account for poor performance. Despite these revisions, Lids still missed its projections for 2000. Furthermore, the Houlihan Report assumed that after October 31, 2000, when Lids' EBITDA was negative $6,299,000, the company would nonetheless turn around. Houlihan relied on Lids' projections that at FYE January 27, 2001, its EBITDA would increase to negative $3,456,000, and that at FYE January 26, 2002, its EBITDA would be positive $5,513,000. There is no evidence to support the assumption that such a dramatic change would occur. Therefore, any conclusions based on these projections are unconvincing.").

[482] *See, e.g.*, *ASARCO*, 396 B.R. at 399–400 (S.D. Tex. 2008) (evidence of intent included past-due debts, failing to pay vendors on time, and check hold lists).

### 3. Summary Of Examiner's Conclusions

The Investigation has not uncovered evidence that ResCap possessed a subjective intent to incur, or belief that it would incur, debts beyond its ability to pay as they became due. The Investigation also revealed no evidence that any officer or ResCap Board member possessed a subjective intent for ResCap to incur (or belief that ResCap would incur) debts beyond its ability to pay at the time from 2005 through the Petition Date.

However, with respect to the objective intent element, the Examiner concludes that the evidence supports the proposition that ResCap reasonably should have believed that it would incur debts beyond its ability to pay from August 15, 2007 through the Petition Date. The Examiner rests this conclusion on a detailed quantitative and qualitative analysis of ResCap's ability to service its debts from 2005 through the Petition Date, giving full consideration to resources reasonably available to ResCap (such as available liquidity, cash flows, committed credit lines, reasonable sources of capital, and monetization of non-core assets through sales) to meet its imminent financial needs and to repay or refinance its longer term obligations.

Although the inadequacy of capital test and the inability to pay test consider many of the same indicators and factors, the two tests address two different questions—consequences of a debtor's actions and the intent of a debtor's actions. The issue of a debtor being left with unreasonably small capital involves an assessment of the consequences of a challenged transfer or obligation, including an assessment of risk, cash flows, and downside scenarios; whereas the issue of a debtor intending or believing that it is incurring debts that it cannot pay involves an assessment of intent (both subjective and objective) contemporaneous with the transfer or obligation, inferred from matching likely cash flow projections to debt maturities, past due payments, and other unusual credit or collection activity. Thus, both tests are designed to complement each other and, together with the Balance Sheet Test, capture transfers and obligations potentially harmful to the unsecured creditors of a bankruptcy estate.

### 4. Analysis Of Ability To Pay Debts As Due

#### a. Subjective Intent Inquiry

ResCap's perceived liquidity needs and its response to those needs are key indicators of ResCap's intent. ResCap recognized it operated a liquidity-intensive business because of the volatility inherent in its assets and the dependence of its business model on access to liquid capital.[483] ResCap, therefore, established detailed processes and procedures by which it managed its liquidity risk. Those processes and procedures are described in Section VI.C. ResCap actively managed its liquidity through, among other things, the development and implementation of a liquidity plan, matching short-term and long-term financing debt and asset classes, and diversifying sources of funds.

ResCap also recognized that its credit rating was a critical factor in maintaining adequate liquidity. This was because of the effect its credit rating had on the cost and availability of

---

[483] Residential Capital, LLC, Annual Report (Form 10-K) (Mar. 13, 2007), at 76.

its existing facilities, and because of the potential effect its credit rating had on its ongoing access to the capital markets. Accordingly, an important component of ResCap's strategy for managing its liquidity centered on ResCap's commitment to maintain an investment grade credit rating. The importance of investment-grade credit ratings to ResCap's liquidity and capital needs is discussed in Section VI.C.

ResCap employed a number of mechanisms to monitor its liquidity and capital needs, with those mechanisms evolving over time. ResCap received liquidity support from its parent to pay its debts and, until December 2009, generally believed that this support would continue.[484] Although the Examiner has concluded that ResCap was left with unreasonably small capital as of August 15, 2007 through the Petition Date, the totality of the circumstances does not support the proposition that ResCap possessed the specific intent or belief that it was incurring debts beyond its ability to pay such debts as they matured at any time from 2005 through the Petition Date.

### b. Objective Intent Inquiry

Under an objective intent assessment, the evidence supports the proposition that ResCap reasonably should have believed that it would incur debts beyond its ability to pay from August 15, 2007 through the Petition Date. For example, Thomas Jacob, an Independent Director, noted that he believed ResCap was in the zone of insolvency in "August 2007 when [ResCap] had this credit crunch."[485] Subsequently, on September 7, 2007, the law firm of Mayer Brown made a presentation to the ResCap Board centered on duties owed by a director to various constituencies when a company is in the "zone of insolvency."[486] Included in this presentation was advice concerning potential fraudulent transfers at a time of financial distress.[487] Mayer Brown advised the ResCap Board that "if insolvency (or potentially a zone of insolvency) is present, the Company's directors should carefully consider the disinterestedness and independence of directors . . . in the context of any proposed transaction among the Company . . . or any of [its] respective affiliates."[488]

---

[484] *See* Int. of P. West, Jan. 11, 2013, at 101:2–6 ("We felt like it was getting less and less in their benefit to make that support. The closing of the books that year end was painful. And so, it was looking to us like that support was less and less forthcoming."); *id.* at 102:2–9 ("Because it seemed very difficult for us to get that support at the end of the year. And frankly, the support that we got gave us very little, if no wiggle room at all . . . . And it was a month to month kind of support look and that becomes untenable at a certain point.").

[485] Int. of T. Jacob, Nov. 7, 2012, at 197:1–6.

[486] Mayer Brown Presentation on Fiduciary Duties of Directors and Related Legal Issues, dated Sept. 7, 2007 [RC40012695].

[487] *Id.* at RC40012721–23. Mayer Brown gave a similar presentation regarding directors' fiduciary duties in distressed financial circumstances to the AFI Board in May 2008. *See* Minutes of a Special Meeting of the Board of Directors of GMAC LLC, May 30, 2008, at ALLY_PEO_0001080–81 [ALLY_PEO_0001009]. Independent Director Jacob stated that he believed ResCap had neared the "zone of insolvency" in August 2007, shortly before Mayer Brown gave its fiduciary duty presentation to the ResCap Board. Int. of T. Jacob, Nov. 7, 2012, at 197:1–198:25.

[488] Mayer Brown Presentation on Fiduciary Duties of Directors and Related Legal Issues, dated Sept. 7, 2007, at RC40012726 [RC40012695].

Timothy Pohl, a ResCap advisor, stated that "ResCap was undercapitalized" after the dramatic changes in 2007 and 2008 that affected the mortgage industry.[489] He further stated that ResCap was facing potential liquidity, covenant, and bond maturity issues in the near future that could trigger the need for ResCap to file for bankruptcy around May 2008.[490]

On September 23, 2008, Lazard advised "ResCap's balance sheet and current liquidity situation place it within the zone of insolvency and . . . the best course of action for the Directors is to act as if the company were insolvent and consider the best interest of all its creditors."[491] By October 2008, the ResCap Board was presented with various materials regarding pre-bankruptcy planning.[492] Bankruptcy planning was discussed again by the ResCap Board in June and July, 2009.[493]

In 2010 and 2011, AFI's advisors and officers made periodic presentations to the ResCap Board reflecting AFI's deliberations about ResCap's future.[494] On November 5, 2010, Michael Constantino of AFI's Capital Markets Group reported on the results of a bidding process organized by AFI for the sale of ResCap's assets.[495] Notably, the materials presented by Constantino to the ResCap Board indicated that all three potential bids implied a transaction loss and negative cash at closing of a sale, suggesting a market view of ResCap's financial distress.[496]

In addition to the observations by advisors to the ResCap Board and the AFI Board about zone of insolvency and insolvency concerns, a number of other facts and circumstances support the Examiner's conclusion of an inability to pay debts on an objective basis.

- First, as previously detailed in Section VI.C, ResCap had intensive liquidity needs and experienced challenges, stresses, and chronic liquidity shortfalls from

---

[489] Int. of T. Pohl, Feb. 26, 2013, at 23:11–16.

[490] Int. of T. Pohl, Feb. 26, 2013, at 25:4–17.

[491] Minutes of a Meeting of an Executive Session of the Board of Residential Capital, LLC, Sept. 23, 2008, at RC40006865 [RC40006865].

[492] *See, e.g.*, Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Oct. 8, 2008, at RC40005877-78 [RC40005652]; Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Oct. 10, 2008, at RC40005880–81 [RC40005652]; Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Oct. 17, 2008, at RC40005884–85 [RC40005652]; Minutes of a Meeting of the Board of Directors of Residential Capital, LLC, Oct. 20, 2008, at RC40005887–88 [RC40005652]; Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Oct. 23, 2008, at RC40005891–93 [ RC40005652].

[493] *See, e.g.*, Project Scout II Presentation, Jun. 10, 2009, at RC40011255–59 [RC40011250]; Lazard Project Scout II Presentation, dated Jul. 2009, at RC40010900 [RC40010890].

[494] *See, e.g.*, Mercer Oliver Wyman, Citibank & Goldman Sachs "Strategic Evaluation of AFI's Mortgage Business" Presentation, dated Apr. 30, 2010 [EXAM10424634].

[495] Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Nov. 5, 2010, at RC40018846 [RC40018729].

[496] Mortgage Strategic Alternatives Presentation, dated Oct. 29, 2010, at RC40016894, RC40016897–98 [RC40016871].

August 15, 2007, through the Petition Date. By August 21, 2007, the ResCap Board had been made aware that liquidity issues were affecting ResCap's operations.[497] Thereafter, most ResCap Board meetings included a discussion of ResCap's liquidity position. By June 2009, the ResCap Board was meeting daily to manage liquidity issues.

- Second, the capital intensive nature of ResCap's business and the volatility of ResCap's assets exacerbated and amplified the liquidity shortfalls and stresses.

- Third, because of its liquidity and leverage concerns, ResCap was unreasonably vulnerable to risks associated with changes in the credit markets, industry, and economy.

- Fourth, the global credit markets experienced a significant dislocation on or about August 9, 2007, impairing ResCap's access to the capital markets and virtually eliminating its access to the secondary securitization markets.

- Fifth, the deterioration of its once-investment grade credit rating also left ResCap in a precarious financial position, especially in consideration of its business plan and needs for capital.

- Sixth, an analysis of baseline cash flow projections in ResCap's ELRs[498] indicated that in each of its projections prepared quarterly from December 2007 through April 2012, ResCap projected negative or minimal net cash flows over the subsequent 12 months.

- Seventh, ResCap entered the industry downturn commencing in 2006 in a highly-leveraged position. ResCap incurred significant losses as it reduced its business and equity base to a fraction of its pre-downturn levels while the industry downturn progressed. ResCap's reported equity as of December 31, 2011, was only 1.2% of its December 31, 2005 balance.[499] ResCap was unable to service its fixed charges, primarily interest expense, from its operating income in 2006 through 2009, and again in 2011.[500]

---

[497] *See* Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Aug. 21, 2007, at RC40005617 [RC40005558].

[498] The Executive Liquidity Report, or ELR, as discussed further in Section VI.C.4.f, was a report developed and utilized by ResCap management along with its Board to analyze ResCap's current liquidity position, as well as its forecasted liquidity for the ensuing twelve month period.

[499] *Compare* Residential Capital, LLC, Annual Report (Form 10-K) (Mar. 28, 2006), at 94, *with* Residential Capital, LLC Consolidated Financial Statements for the Years Ended December 31, 2011 and 2010, dated Mar. 28, 2012, at 4 [EXAM00122651].

[500] *See* Exhibits VI.C.4.f(3)(b)—1 and VI.C.4.f(3)(b)—2

- Eighth, ResCap's ability to prepare reliable financial projections was negatively affected after 2006 because of, among other factors, the rapid deterioration within its businesses and the concomitant deterioration within the mortgage industry and global economy. This is evident in the significant variance between ResCap's actual results as compared to its financial projections, thus exacerbating liquidity and performance concerns.

- Finally, AFI's financial support was critical to ResCap's survival from 2007 through the Petition Date. Recognizing that ResCap's risk profile had worsened with the corresponding decline in the residential mortgage industry in 2007 and 2008, AFI engaged in an ongoing process of infusing capital and/or liquidity into ResCap to avoid imminent covenant or payment defaults. However, such infusions were insufficient to address the chronic undercapitalization that commenced on or about August 15, 2007, and continued through the Petition Date, all as fully analyzed in Section VI.C.

## E. FINANCIAL CONDITION TESTS AS APPLIED TO RESCAP'S SUBSIDIARIES

### 1. Introduction

ResCap was a holding company for a number of direct and indirect subsidiaries including RFC and GMAC Mortgage, its principal operating subsidiaries. These subsidiaries conducted ResCap's mortgage-related businesses, which comprised the vast majority of ResCap's overall business activities. Because certain potential claims and causes of action discussed in Section VII would be asserted by ResCap's subsidiaries for the benefit of their separate estates and creditors (as distinct from those of ResCap), the Examiner analyzed the three disjunctive financial condition tests discussed above as to RFC and GMAC Mortgage.

### 2. Summary Of Examiner's Conclusions

The Examiner concludes that the evidence supports the proposition that RFC and GMAC Mortgage each was balance sheet solvent and adequately capitalized on May 4, 2005, the date that AFI announced the capitalization of ResCap.[501] The Examiner concludes that the evidence supports the proposition that RFC and GMAC Mortgage each: (1) was balance sheet insolvent from December 31, 2007 through the Petition Date; (2) had unreasonably small capital from August 15, 2007 through the Petition Date; and (3) reasonably should have believed that it would incur debts beyond its ability to pay from August 15, 2007 through the Petition Date.

Based on an analysis of certain financial and factual information made available to the Examiner, the Examiner determined that the financial condition of RFC and GMAC Mortgage could be reasonably estimated from 2005, through the Petition Date through: (1) a detailed analysis of the financial condition and operating results of ResCap on a consolidated basis, recognizing ResCap had no significant operations separate and apart from its subsidiaries; (2) an assessment as to the relative size and operating performance of RFC and GMAC Mortgage, as reflected in ResCap's consolidated financial statements and subsidiary trial

---

[501] General Motors Acceptance Corporation, Current Report (Form 8-K) (May 4, 2005), Ex. 99.1.

balances; (3) an assessment of various intercompany receivables and/or payables, between and among ResCap, RFC, GMAC Mortgage, and their respective subsidiaries; (4) an evaluation of the nature and timing of certain intercompany account activity between and among ResCap, RFC, GMAC Mortgage, and their respective subsidiaries; (5) consideration of potential contingent and/or unliquidated liabilities, including those arising from certain RFC and GMAC Mortgage guarantee obligations; and (6) consideration of the effects of industry and economic conditions on RFC and GMAC Mortgage over the relevant time period.

### 3. Analysis Of Separate Subsidiary Financial Distress

#### a. Solvency

As previously discussed, an assessment of balance sheet solvency requires an assessment of whether the sum of a debtor's debts exceeds its assets, at a "fair valuation." Two additional important issues arise when evaluating the solvency of subsidiaries. First, it is common in large companies that affiliates share liquidity through a centralized cash management system implemented through an overall treasury policy. Fund transfers between affiliates are generally recorded through intercompany accounts, including payables/receivables, due to/due from accounts, and, in some instances, notes payables/notes receivables. Because these intercompany transfers are generally eliminated in consolidation, there is often a question of how reliable and accurate the internal accounting has been and whether the intercompany accounting reflects a reasonable and fair depiction of the relationships between the affiliates. Moreover, because there are potentially thousands of intercompany transfers occurring over a given time period, it is often impractical to attempt to untangle the web of intercompany accounts such that reliable separate entity financial statements can be reconstructed for purposes of assessing a subsidiary's solvency. Further, a full forensic analysis of intercompany transfers between ResCap and its subsidiaries is not contemplated by the Examiner Scope Approval Order. Second, contingent liabilities, such as obligations under any guaranties by subsidiaries or a parent, must be reasonably estimated and that amount then reduced by any corresponding offsets arising from the value of any equitable rights that may be exercised by a guarantor, including rights of reimbursement against the primary obligor and contribution against any co-guarantors.

The Examiner's Financial Advisors determined that the ability of ResCap to fund RFC, GMAC Mortgage, and their respective subsidiaries from its own resources and sources of capital was significantly impaired from August 15, 2007 through the Petition Date. RFC and GMAC Mortgage each reported significant intercompany receivables due from their subsidiaries at various times over the relevant time period. An analysis of intercompany receivables must necessarily consider their collectability. The intercompany activity between RFC and GMAC Mortgage and their subsidiaries primarily represented advances to fund capital needs and operating deficits. Based on a review of RFC's and GMAC Mortgage's general ledgers, the intercompany receivables due to RFC and GMAC Mortgage from their subsidiaries were impaired from August 15, 2007 through the Petition Date. These subsidiaries required significant capital contributions in the form of intercompany advances from RFC and GMAC Mortgage to cover operating losses commencing in 2007. The Investigation revealed no evidence that either RFC's or GMAC Mortgage's subsidiaries

possessed the capability, individually or in the aggregate, to repay these receivables subsequent to August 15, 2007. The need for capital by these subsidiaries increased as the credit crisis and global financial crisis intensified, resulting in the ultimate forgiveness of billions of dollars in intercompany obligations throughout the consolidated enterprise.

Turning to an assessment of RFC's and GMAC Mortgage's contingent liabilities arising from guarantee obligations, ResCap had issued $15.3 billion in public debt guaranteed by RFC and GMAC Mortgage as of December 31, 2007.[502] RFC and GMAC Mortgage served as guarantors of this public debt until June 2008. GMAC Mortgage disclosed this contingency in its annual financial statements.[503] Additionally, in June 2008, ResCap issued approximately $5.7 billion of senior and junior secured notes in exchange for approximately $8.6 billion of ResCap unsecured notes.[504] RFC and GMAC Mortgage, among other ResCap subsidiaries, served as guarantors on these debts,[505] and both disclosed this contingency in their annual financial statements.[506]

RFC and GMAC Mortgage also served as guarantors on certain unsecured revolving lines of credit and an unsecured term loan that ResCap maintained with various third-party lenders from June 2005 to June 2008.[507] In June 2008, ResCap's unsecured revolving lines of credit and unsecured term loan were refinanced. As part of that refinancing, AFI provided a $3.5 billion facility to RFC and GMAC Mortgage, secured by the assets of RFC and GMAC Mortgage.[508] In summary, both RFC and GMAC Mortgage guaranteed ResCap's unsecured public debt and unsecured line of credit/term loan facilities through June 2008.

These contingent liabilities—and any corresponding equitable rights—should be considered in any application of the financial distress tests to the two subsidiaries. The Examiner's Financial Advisors determined that these contingent liabilities would only worsen already existing conditions of financial distress at RFC and GMAC Mortgage. As upstream guarantors, RFC's and GMAC Mortgage's assets were at risk, and there existed little to no

---

[502] *See, e.g.*, Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2008), at 81; Residential Capital Corporation, Registration Statement (Form S-4) (July 15, 2005), Ex. 4.1 (ResCap Indenture, dated Jun. 24, 2005) (reflecting GMAC Mortgage and RFC as guarantors of ResCap's obligations).

[503] GMAC Mortgage, LLC Consolidated Financial Statements as of and for the Years Ended December 31, 2007 and 2006, dated Mar. 25, 2008, at 50 [EXAM00232043].

[504] Residential Capital, LLC, Amend. No. 1 to Annual Report (Form 10-K/A) (Aug. 25, 2009), at 100.

[505] *See* Residential Capital, LLC, Quarterly Report (Form 10-Q) (Aug. 8, 2008), Ex. 4.3 (8.5% Senior Secured Guaranteed Notes Indenture, dated June 6, 2008) (reflecting GMAC Mortgage and RFC as guarantors); Residential Capital, LLC, Quarterly Report (Form 10-Q) (Aug. 8, 2008), Ex. 4.4 (9.625% Junior Secured Guaranteed Notes Indenture, dated June 6, 2008) (reflecting GMAC Mortgage and RFC as guarantors).

[506] *See, e.g.*, GMAC Mortgage, LLC Consolidated Financial Statements as of and for the Years Ended December 31, 2008 and 2007, dated Mar. 25, 2009, at 69 [EXAM00126182]; Residential Funding Company, LLC Consolidated Financial Statements as of and for the Years Ended December 31, 2008 and 2007, Mar. 25, 2009, at 77 [EXAM00124988].

[507] *See* Subsidiary Guarantee Agreement, dated July 28, 2005, [EXAM00345139] (reflecting GMAC Mortgage and RFC as guarantors of ResCap's obligations, in favor of JPMorgan).

[508] Residential Capital, LLC, Current Report (Form 8-K) (Mar. 13, 2007), Ex. 99.1.

value in the right of reimbursement against ResCap. From August 15, 2007, ResCap was inadequately capitalized and also reasonably should have believed that it would incur debts beyond its ability to pay as they became due, and from December 31, 2007, ResCap was insolvent under the Balance Sheet Test. Thus, while the guarantees were in effect, ResCap, as the primary obligor on the guaranteed indebtedness, was in financial distress, rendering any right of reimbursement against it of little to no value.

The Examiner observes that certain guarantee agreements, though creating joint and several liability of RFC and GMAC Mortgage, had both "contribution" and "savings" clauses to prevent a contingent liability under the guarantee from causing RFC or GMAC Mortgage to become insolvent or be rendered insolvent.[509] Notwithstanding the recent debate concerning the enforceability of these types of savings clauses in guarantee agreements, the Examiner concludes that the evidence supports the proposition that RFC and GMAC Mortgage were each insolvent from December 31, 2007 through the Petition Date.

### b. Unreasonably Small Capital

Where a parent company is left with "unreasonably small capital" to operate its business, it logically follows that its subsidiaries will be inadequately capitalized absent their own independent sources of funds. This observation is generally supported in those cases where the corporate group maintains a centralized cash management system or where there is direct or indirect funding support from a parent to its subsidiaries or affiliates.[510] In both situations, a parent's access to capital and its present capital condition serve as the primary, if not exclusive, source of capital for its direct and indirect subsidiaries.

RFC and GMAC Mortgage maintained secured financing arrangements with third-party lenders through the Petition Date that provided advances for originating and acquiring mortgage assets for subsequent sale or securitization,[511] but both relied on ResCap (and ultimately AFI) for unsecured credit facilities and equity infusions to cover any shortfall in the

---

[509] *See, e.g.*, Residential Capital Corporation, Registration Statement (Form S-4) (Jul. 15, 2005), Ex. 4.1, at 56–57 (ResCap Indenture, dated Jun. 24, 2005, §§ 14.03, 14.05).

[510] *See Teleglobe USA, Inc. v. BCE Inc.* (*In re Teleglobe Commc'ns Corp.*), 392 B.R. 561, 602–03 (Bankr. D. Del. 2008) (holding that the test for subsidiary solvency should not exclude "the funding support actually given" by the immediate corporate parent until the point when it would no longer be reasonable to expect such support).

[511] Residential Funding Company, LLC Consolidated Financial Statements as of and for the Years Ended December 31, 2008 and 2007, dated Mar. 25, 2009, at 36 [EXAM00124988]; Residential Funding Company, LLC Consolidated Financial Statements as of and for the Years Ended December 31, 2010 and 2009, dated Mar. 10, 2011, at 36 [EXAM00123277]; GMAC Mortgage, LLC Consolidated Financial Statements as of and for the Years Ended December 31, 2008 and 2007, dated Mar. 25, 2009, at 32 [EXAM00126182]; GMAC Mortgage, LLC Consolidated Financial Statements as of and for the Years Ended December 31, 2010 and 2009, dated Mar. 10, 2011, at 34 [EXAM00123214].

VI-127

advance rates provided by the secured facilities and to fund operating deficits.[512] Further, ResCap and its subsidiaries shared liquidity through a centralized cash management system.[513] ResCap's inadequate capitalization therefore reverberated through its subsidiaries, including RFC and GMAC Mortgage.

RFC and GMAC Mortgage experienced similar consequences from the dislocation in the capital and secondary mortgage markets in August 2007. At that time, the market for securitizations of subprime, Alt-A, and otherwise non-conforming loans was virtually closed.[514] GMAC Mortgage was left predominantly with government agencies as a purchaser of conforming-only product.[515] Commercial paper conduits closed and short-term funding sources were very limited. Additionally, certain HFS loans had to be reclassified to HFI loans because there was no market channel available to sell the product. RFC was also hemorrhaging cash as margin calls were mounting. In fact, "all hands [were] on deck" in Minneapolis over the summer of 2007 to find possible solutions to the liquidity crisis.[516] Further, both companies reported significant losses in the third quarter of 2007, requiring them to obtain financial support from ResCap,[517] which, as discussed in Sections VI.B through VI.D, was itself undercapitalized at that time.

---

[512] *Compare* GMAC Mortgage, LLC Consolidated Financial Statements as of and for the Years Ended December 31, 2009 and 2008, dated Mar. 19, 2010, at 31 [EXAM00124578] and Residential Funding Company, LLC Consolidated Financial Statements as of and for the Years Ended December 31, 2009 and 2008, dated Mar. 19, 2010, at 31 [EXAM00124670], *with* GMAC Mortgage, LLC Consolidated Financial Statements as of and for the Years Ended December 31, 2007 and 2006, dated Mar. 25, 2008, at 33 [EXAM00232043] and Residential Funding Company, LLC Consolidated Financial Statements as of and for the Years Ended December 31, 2007 and 2006, dated Mar. 26, 2008, at 31 [EXAM00231913], respectively. *See also* Residential Funding Company, LLC Consolidated Financial Statements as of and for the Years Ended December 31, 2008 and 2007, dated Mar. 25, 2009, at 40 [EXAM00124988]; Int. of W. Casey, Jan. 31, 2013, at 143:14–21; Int. of S. Ramsey, Dec. 10, 2012, at 82:14–20; Int. of J. Lombardo, Mar. 18, 2013, at 19:18–20:2; Goldin Associates Presentation to the Committee of Independent Members of the Board of Directors of Residential Capital, LLC Regarding Proposed Amendment to the Secured Line of Credit with GMAC, LLC, dated Dec. 19, 2008, at GOLDIN00129114 [GOLDIN00129101].

[513] *See* Affidavit of James Whitlinger, Chief Financial Officer of Residential Capital, LLC, in Support of Chapter 11 Petitions and First Day Pleadings [Docket No. 6] at 53.

[514] BD. OF GOVERNORS OF THE FED. RESERVE SYS., MONETARY POLICY REPORT TO THE CONGRESS (Feb. 27, 2008), at 23, http://www.federalreserve.gov/monetarypolicy/files/20080227_mprfullreport.pdf.

[515] *Id.*

[516] *See* Int. of W. Casey, Jan. 31, 2013, at 41:23–42:13.

[517] Residential Funding Company, LLC Consolidated Financial Statements as of and for the Years Ended December 31, 2007 and 2006, dated Mar. 26, 2008, at 53 [EXAM00231913]; GMAC Mortgage, LLC Consolidated Financial Statements as of and for the Years Ended December 31, 2007 and 2006, dated Mar. 25, 2008, at 5 [EXAM00232043].

The credit markets were virtually closed to ResCap for new financing in 2008. Existing lenders were unwilling to extend credit facilities beyond current maturities.[518] As a result, AFI became the lender of last resort for RFC and GMAC Mortgage, as well as ResCap LLC. From April 2008 to the Petition Date, AFI extended secured credit facilities to both RFC and GMAC Mortgage.[519] RFC and GMAC Mortgage were unable to fund their operations with third-party unsecured credit facilities during this period.[520] In essence, RFC and GMAC Mortgage were no longer bankable entities. ResCap, itself inadequately capitalized, became the sole source of unsecured funding for RFC and GMAC Mortgage. The existence of both the public debt and line of credit/term loan guaranties prior to June 2008, and the guarantees under ResCap's secured public debt after June 2008,[521] served as both liabilities in an economic sense and debt overhang, dissuading any third-party funding and exacerbating their precarious financial condition. Based on the facts and circumstances, the Examiner concludes that the evidence supports the proposition that RFC and GMAC Mortgage each had unreasonably small capital from August 15, 2007 through the Petition Date.

### c. *Ability To Pay Debts As Due*

The Investigation has not uncovered evidence that RFC or GMAC Mortgage possessed a subjective intent to incur, or belief that it would incur, debts beyond its ability to pay as they became due. Further, neither RFC nor GMAC Mortgage had independently acting boards of directors, but rather each depended on the ResCap Board for supervision. The Investigation has not uncovered evidence that the ResCap Board intended for either RFC or GMAC Mortgage to incur debts beyond its ability to pay. Nevertheless, the Examiner concludes that the evidence supports the proposition that RFC and GMAC Mortgage each reasonably should have believed it would incur debts beyond its ability to pay from August 15, 2007 through the Petition Date.

This finding is based on the issues discussed in Section VI.D as applied to RFC and GMAC Mortgage and their respective obligations within the consolidated enterprise. RFC and

---

[518] *See* Int. of W. Casey, Jan. 31, 2013, at 143:14–21.

[519] Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2009), at 98; Residential Capital, LLC Consolidated Financial Statements as of and for the Years Ended December 31, 2009 and 2008, dated Feb. 26, 2010, at 42–43 [EXAM00124455]; Residential Capital, LLC Consolidated Financial Statements as of and for the Years Ended December 31, 2010 and 2009, dated Feb. 28, 2011, at 39 [EXAM00123128]; Residential Capital, LLC Consolidated Financial Statements as of and for the Years Ended December 31, 2011 and 2010, dated Mar. 28, 2012, at 38–39 [EXAM00122651].

[520] ResCap Bond Exchange Accounting Assessment, dated July 1, 2008, at ALLY_0242724 [ALLY_0242723]; Int. of W. Casey, Jan. 31, 2013, at 143:14–21; Int. of S. Ramsey, Dec. 10, 2012, at 82:14–20; Int. of J. Lombardo, Mar. 18, 2013, at 19:18–20:2; Goldin Associates Presentation to the Committee of Independent Members of the Board of Directors of Residential Capital, LLC Regarding Proposed Amendment to the Secured Line of Credit with GMAC, LLC, dated Dec. 19, 2008, at GOLDIN00129114 [GOLDIN00129101].

[521] GMAC Mortgage, LLC Consolidated Financial Statements as of and for the Years Ended December 31, 2008 and 2007, dated Mar. 25, 2009, at 69 [EXAM00126182]; Residential Funding Company, LLC Consolidated Financial Statements as of and for the Years Ended December 31, 2008 and 2007, dated Mar. 25, 2009, at 77 [EXAM00124988].

GMAC Mortgage each received substantial capital infusions from ResCap, which was itself in financial distress as discussed above.[522] RFC and GMAC Mortgage were each dependent on payment of amounts due from its subsidiaries. Each of these subsidiaries had increasing operating deficits, making it unlikely that the subsidiaries would be capable of repaying either RFC or GMAC Mortgage, as the case may be. Finally, AFI's financial support enabled ResCap, RFC, and GMAC Mortgage to continue operations from 2007 through the Petition Date. AFI infused capital and/or liquidity into ResCap, and through ResCap's centralized cash management system, to RFC and GMAC Mortgage, to avoid imminent covenant or payment defaults. However, such infusions were insufficient to address the chronic undercapitalization of ResCap, RFC, and GMAC Mortgage that commenced on or about August 15, 2007 through the Petition Date, all as fully discussed in Section VI.C.

---

[522] Residential Funding Company, LLC Consolidated Financial Statements as of and for the Years Ended December 31, 2007 and 2006, dated Mar. 26, 2008, at 53 [EXAM00231913]; GMAC Mortgage, LLC Consolidated Financial Statements as of and for the Years Ended December 31, 2007 and 2006, dated Mar. 25, 2008, at 5 [EXAM00232043].

## VII. REVIEW AND ANALYSIS OF ESTATE CAUSES OF ACTION IMPLICATED BY AFFILIATE TRANSACTIONS AND THE RELATIONSHIP AND COURSE OF DEALING AMONG RESCAP, AFI, ALLY BANK, AND CERBERUS

### A. SINGLE ENTITY THEORIES OF LIABILITY

#### 1. Piercing The Corporate Veil And Alter Ego Claims

The Examiner has been charged with investigating any potential claim(s) against AFI under theories of piercing the corporate veil and/or alter ego liability.[1] The Examiner concludes that Delaware law would govern and recognizes the existence of a potential claim by ResCap to pierce its own corporate veil that, if successful, could result in a judgment holding AFI liable for all of ResCap's debts.[2] The Examiner further concludes, however, that it is unlikely that any such potential veil-piercing claim would prevail.

Courts do not lightly pierce the corporate veil. A successful veil-piercing claim would require proof both (1) that ResCap and AFI operated as a "single economic entity"; and (2) of the presence of an "overall element of injustice or unfairness." Proof that AFI and ResCap operated as a "single economic entity" would have to do more than show that ResCap was AFI's wholly owned subsidiary or that AFI exercised the degree of control over ResCap that is typical of parent-subsidiary relationships. Likewise, the requisite "injustice or unfairness" must be something akin to fraud and the mere fact that ResCap is now unable to satisfy all the claims of its creditors would not be enough. Although the likelihood of success of a potential veil-piercing claim cannot be determined with complete certainty,[3] here the evidence would pose obstacles to any plaintiff seeking to surmount these high legal hurdles.

---

[1]  *See* AFI Settlement and Plan Sponsor Agreement, at 1; Examiner Scope Approval Order. The Examiner's description of the potential liability of AFI under such a theory as a "claim" is not a conclusion concerning whether such a theory is best described under applicable law as an equitable remedy or as a cause of action. *See, e.g.*, *Stern v. Singh Factors, LLC (In re Shore to Shore Realty Inc.)*, Adv. No. 09-08296, 2011 Bankr. LEXIS 415, at *17 (Bankr. E.D.N.Y. Feb. 1, 2011) ("While piercing the corporate veil is sometimes referred to as a cause of action or a claim, it is also viewed as a remedy imposed based on the facts and circumstances of the case.").

[2]  Courts have often used the terms "alter ego," "veil piercing," and "instrumentality" liability interchangeably when analyzing claims to disregard corporate separateness. *See Pearson v. Component Tech. Corp.*, 247 F.3d 417, 485 n.2 (3d Cir. 2001) ("Although the tests employed to determine when circumstances justifying 'veil-piercing' exist are variously referred to as the 'alter ego,' 'instrumentality,' or 'identity' doctrines, the formulations are generally similar, and courts rarely distinguish them."); *Mobil Oil Corp. v. Linear Films, Inc.*, 718 F. Supp. 260, 266 (D. Del. 1989) ("The terminology used by courts in considering whether a parent corporation will be held liable for the actions of its subsidiary has not been a model of clarity . . . . A subsidiary found to be the 'alter ego' of its parent company could likewise be designated its 'instrumentality.'"). Unless specifically noted otherwise, the Examiner does not distinguish between those terms.

[3]  *See PSG Poker, LLC v. DeRosa-Grund*, Civ. No. 06-1104, 2008 U.S. Dist. LEXIS 4225, at *36 (S.D.N.Y. Jan. 22, 2008) (noting that "the standard to be met [to pierce the corporate veil under Delaware law] is high (and, it should be recognized, less than clear)"); *Allied Capital Corp. v. GC-Sun Holdings, LP*, 910 A.2d 1020, 1043 (Del. Ch. 2006) ("[T]he tests used to determine whether a corporate veil should be pierced, or an entity should be considered a mere alter ego, yield few predictable results.") (quotation marks omitted).

The Investigation has uncovered evidence indicating the presence of certain indicia that ResCap and AFI operated as a single economic entity. ResCap's conduct in connection with certain Affiliate Transactions (e.g., the 2006 Bank Restructuring, the MSR Swap and the Pipeline Swap, the First 2009 Tax Allocation Agreement and the Second 2009 Tax Allocation Agreement, and the allocation of liability in connection with the FRB/FDIC Settlement and the DOJ/AG Settlement) departed in some important respects from appropriate corporate formalities, including the requirements of ResCap's Operating Agreement. For example, as detailed in Section V.A, the 2006 Bank Restructuring, whereby ResCap transferred its 100% controlling interest in Old GMAC Bank for a non-voting interest in IB Finance and other consideration (with a value of approximately $390–465 million less than the value of the controlling interest in Old GMAC Bank that it parted with), was approved by the ResCap Board without any formal fairness opinion or valuation and without disclosure to the Independent Directors of material information about potential alternatives that would have been more favorable to ResCap. Moreover, there is evidence—in particular after the closing of the Cerberus PSA—of interference in the day-to-day operations of ResCap by AFI and Cerberus (particularly Cerberus personnel who had assumed positions with AFI) outside the normal lines of corporate authority.

The Investigation also revealed evidence that could be used to attempt to prove that certain Affiliate Transactions constituted a "siphoning" of assets from ResCap, including with respect to the 2006 Bank Restructuring and the Second 2009 Tax Allocation Agreement. Affiliate Transactions where ResCap received less than fair market value appear, however, to have been the exception—not the rule. Apart from those exceptions, the various asset sales, financings, and derivatives transactions ResCap entered into with AFI and its affiliates provided ResCap with essential liquidity and resulted in ResCap's receipt of at least—and sometimes more than—fair value. Moreover, any inference of "siphoning" that could otherwise arise would be undermined by the more than $8 billion in financial support that ResCap received from AFI beginning in 2007 in the form of cash contributions, debt forgiveness, and contributions of other assets.

There is also other evidence in the factual record that is inconsistent with the theory that ResCap and AFI operated as a single economic entity. For example, rather than being set up for financial failure, ResCap was neither inadequately capitalized nor insolvent at or around its formation. Instead, AFI contributed to ResCap in 2005 the subsidiaries RFC and GMAC Mortgage together with $2 billion in capital in the form of debt forgiveness. ResCap soon thereafter raised billions of dollars in outside financing and would report hundreds of millions of dollars of net income in 2005 and 2006. ResCap is also unlikely to be considered a "mere façade" for AFI, given that ResCap and its subsidiaries operated multiple businesses, employed thousands of people, and entered into independent contractual relationships with a wide variety of outside parties.

Even assuming arguendo that ResCap and AFI were proven to be a single economic entity, a plaintiff would still face significant obstacles to establishing the second "injustice or unfairness" element of any veil-piercing claim. The available evidence does not appear to fit

the typical paradigm of "injustice or unfairness" sometimes found sufficient to pierce the corporate veil, where a subsidiary became unable to satisfy its creditors either because it was undercapitalized by its parent at formation or later siphoned of assets by its parent. By contrast, here ResCap was not undercapitalized at formation, and those Affiliate Transactions where ResCap received less than fair value were dwarfed in size by the $8 billion in contemporaneous financial support provided by AFI. The better view of the evidence appears to be that ResCap became unable to satisfy its creditors because of the billions of dollars in operating losses it recorded beginning in the fourth quarter of 2006[4] through the end of 2007[5] (which were sufficient to render ResCap insolvent), followed by billions of dollars in additional operating losses in 2008 and 2009[6]—not because of an abuse of the corporate form by AFI.

The Examiner does not expect any potential alternative theories of "injustice or unfairness" to fare better. For example, although the evidence supports the proposition that AFI's financial support of ResCap was at all times self-interested and generally inadequate to do more than maintain ResCap on "life support," the Investigation has uncovered no significant evidence that ResCap or its creditors were harmed as a result. That AFI may have continued to support ResCap as a means to the end of achieving bank holding company status and obtaining TARP funds does not change the effect of that support on ResCap's balance sheet. Without more, the Examiner expects that such theories would prove insufficient to warrant piercing the corporate veil and therefore concludes that such claims would not succeed.

### a. Choice Of Law

The Second Circuit Court of Appeals and lower courts in this circuit have in general recognized that "[t]he law of the state of incorporation determines when the corporate form

---

[4]   *See* Residential Capital, LLC, Annual Report (Form 10-K) (Mar. 13, 2007), at 54 (fourth quarter 2006 operating loss of $651 million); *see also* Section III.F.

[5]   *See* Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2008), at 56 (2007 net loss of $4.3 billion); *see also* Section III.G.

[6]   *See* Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 3, 2009), Item 9.01 (2008 net loss of $5.6 billion); *see also* Sections III.H and III.I.

will be disregarded and liability will be imposed on shareholders."[7] According to those courts, "[b]ecause a corporation is a creature of state law whose primary purpose is to insulate shareholders from legal liability, the state of incorporation has the greater interest in determining when and if that insulation is to be stripped away."[8] Under this approach, Delaware law would apply to any potential veil-piercing claim brought on behalf of ResCap against AFI, because ResCap (i.e., the entity with the "corporate veil" that needs to be "pierced" to reach indirect parent AFI) is organized under the laws of Delaware.[9]

Nonetheless, certain decisions by courts in this circuit have held or suggested that, at least in limited circumstances, the substantive law of a jurisdiction other than the jurisdiction of incorporation might be applied to a veil-piercing claim. For example, at least one such court has recognized that the veil-piercing law of the jurisdiction of incorporation may be "disregard[ed] . . . when the Defendant's contacts and the events at issue in the case substantially implicate [a different jurisdiction]" and contacts with the jurisdiction of

---

[7]  *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995) ("Because [subsidiary] Atex was a Delaware corporation, Delaware law determines whether the corporate veil can be pierced in this instance."); *see also Quinn v. Teti*, No. 99-9433, 2000 U.S. App. LEXIS 27210, at *7–8 & n.2 (2d Cir. Oct. 27, 2010) (assuming that Idaho law applies to veil-piercing claims where subsidiary "was an Idaho corporation"); *Kalb, Voorhis & Co., v. Am. Fin. Corp.*, 8 F.3d 130, 132 (2d Cir. 1993) ("Texas substantive law applies to this alter ego claim because Texas is the place of [the subsidiary's] incorporation"); *Official Comm. of Unsecured Creditors v. Bay Harbour Master Ltd.* (*In re BH S&B Holdings LLC*), 420 B.R. 112, 133 (Bankr. S.D.N.Y. 2009) (Glenn, J.) ("Since Holdings, Holdco and most of the other corporate entities here are based in Delaware, Delaware law applies to the veil-piercing and fiduciary-breach claims."); *In re Alper Holdings USA*, Case No. 07-12148, 2008 Bankr. LEXIS 522, at *16 n.7 (Bankr. S.D.N.Y. Feb. 25, 2008) ("[T]he law of the state of incorporation controls the analysis of alter ego claims and, accordingly, Delaware law controls our analysis."); *Official Comm. of Unsecured Creditors of RSL Com Primecall, Inc. v. Beckoff* (*In re RSL Com Primecall, Inc.*), Adv. Proc. No. 03-2176, 2003 Bankr. LEXIS 1635, at *24 (Bankr. S.D.N.Y. Dec. 11, 2003) (applying Delaware veil-piercing law "[s]ince [subsidiary] RSL USA is a Delaware corporation"); *Duke Energy Trading and Mktg., LLC v. Enron Corp.* (*In re Enron Corp.*), Adv. Proc. No. 02-3609A, 2003 Bankr. LEXIS 330, at *10 n.11 (Bankr. S.D.N.Y. Apr. 17, 2003) (applying Delaware law to determine "whether the Debtors have the right to assert a claim to pierce their own corporate veils" where the debtors "whose corporate veils the Duke Entities seek to pierce, are Delaware corporations or, in one instance, a Delaware limited liability company").

[8]  *Kalb, Voorhis & Co.*, 8 F.3d at 132 (quoting *Soviet Pan Am Travel Effort v. Travel Comm.*, 756 F. Supp. 126, 131 (S.D.N.Y. 1991)).

[9]  Assuming arguendo that the veil of ResCap's direct parent GMAC Mortgage Group LLC would separately need to be pierced, it too is organized under the laws of Delaware. As discussed at Section VII.A.1.c, there appear to be unsettled questions of Delaware law concerning whether and how intermediate entities like GMAC Mortgage Group LLC should be taken into consideration when assessing a veil-piercing claim against an indirect parent entity (here, AFI).

incorporation are minimal or nonexistent.[10] Moreover, "a separate line of cases . . . has applied substantive New York state law to veil piercing claims" where the parties "agreed, by briefing the veil piercing claim solely under New York law or otherwise, to apply New York law to the claim," and New York law and the law of the jurisdiction of incorporation are "virtually identical."[11]

Although the case law is not entirely uniform in this respect, the Examiner concludes that the application of Delaware law to the assessment of potential veil-piercing claims is consistent with the weight of authority in this circuit. Moreover, none of the parties has argued that the law of a different jurisdiction should apply here.[12]

### b. Can A Debtor Pierce Its Own Corporate Veil?

AFI, the Creditors' Committee, and the Debtors agree that "Delaware law allows a subsidiary to maintain an action [to pierce its own corporate veil] against a corporate

---

[10] *See Hayden Capital USA, LLC v. Northstar Agri Indus., LLC*, Civ. No. 11-594, 2012 U.S. Dist. LEXIS 58881, at *17–19 (S.D.N.Y. Apr. 23, 2012) (applying law of "Delaware, as the state of incorporation" to successor liability claim where although defendants' "contacts with Delaware are minimal, their contacts with New York are non-existent"); *see also UBS Sec. LLC v. Highland Capital Mgmt., LP*, 93 A.D.3d 489, 490 (N.Y. App. Div. 2012) (holding that "[t]he motion court correctly ruled that New York law governs plaintiff's veil-piercing claim" where entity was incorporated in Cayman Islands but had no other ties there); *Serio v. Ardra Ins. Co.*, 304 A.D.2d 362, 362 (N.Y. App. Div. 2003) (New York law applied to claim to pierce the veil of entity "incorporated in Bermuda, [where its] contacts with that jurisdiction were minimal").

[11] *See Wausau Bus. Ins. Co. v. Turner Constr. Co.*, 141 F. Supp. 2d 412, 417 (S.D.N.Y. 2001) ("As the standards for piercing the corporate veil are substantially similar under Delaware and New York law, New York law will be applied as per the parties' submissions.") (internal citation omitted); *Kempf v. Mitsui Plastics, Inc.*, Civ. No. 96-1106, 1996 U.S. Dist. LEXIS 17240, at *9 n.1 (S.D.N.Y. Nov. 18, 1996) ("Since there is no dispute between the parties, and they have not briefed the law of any other jurisdiction, I will apply New York law. I note, however, that the parties' assumption is probably incorrect [because Delaware was the state of incorporation]."); *S.J. Berwin & Co. v. Evergreen Entm't Group, Inc.*, Civ. No. 92-6209, 1995 U.S. Dist. LEXIS 15155, at *5–6 (S.D.N.Y. Oct. 12, 1995) ("Although it is clear that Delaware law should have applied to the piercing claim [of a Delaware corporation] from the outset, the law of the case doctrine, the conduct of the parties, and the fact that Delaware's piercing standard is not all that different from the one used in New York suggest that New York law should continue to apply.").

[12] *See* AFI Submission Paper, dated Dec. 19, 2012, at 3 ("Delaware law will govern any claim to pierce the corporate veil"); Debtors' Submission Paper, dated Dec. 18, 2012, at 86 ("Delaware law applies to any alter ego claims asserted against AFI or the Debtors"); Creditors' Committee Submission Paper, dated Mar. 7, 2013, at 88 n.71 ("Delaware law governs the Committee's veil-piercing claim"); Wilmington Trust Submission Paper, dated Oct. 24, 2012, at 30 ("Delaware law applies to any veil piercing analysis . . . .").

parent."[13] Although the Examiner concludes that those parties are correct, further discussion is warranted because "there is a great deal of ambiguity regarding whether [such] an alter ego claim or remedy [is available and] constitutes property of the estate."[14] "Bankruptcy courts normally determine whether any alter ego claims are included in the bankruptcy estate by looking at the law of the state where the corporate debtor is incorporated."[15] "[B]ecause the issue of whether alter ego claims constitute estate assets turns on state law, courts in different jurisdictions have come to different conclusions."[16]

---

[13] Debtors' Amended Joinder to Motion By Ally Financial Inc. and Ally Bank for an Order Enforcing the Automatic Stay Pursuant to 11 U.S.C. Section 362(a)(3) (Feb. 4, 2013) [Docket No. 2834] at 7; *see also* Motion By Ally Financial Inc. and Ally Bank for an Order Enforcing the Automatic Stay Pursuant to 11 U.S.C. § 362(a)(3) (Dec. 21, 2012) [Docket No. 2511] at 9 ("[A] bankruptcy trustee or debtor in possession has the right [under Delaware law] to assert a veil-piercing or alter ego claim on behalf of the estate."); AFI Submission Paper, dated Dec. 19, 2012, at 25 ("[E]ven if there were a potentially viable veil-piercing claim against AFI (and there is not), such a claim is the property of ResCap's estate . . . ."); Creditors' Committee Submission Paper, dated Mar. 7, 2013, at 87 n.68 ("[A]s a general matter, the veil-piercing claim belongs to the estate.").

[14] *In re Flintkote Co. and Flintkote Mines Ltd.*, 486 B.R. 99, 119 (Bankr. D. Del. 2012); *see also Limor v. Buerger* (*In re Del-Met Corp.*), 322 B.R. 781, 830 (Bankr. M.D. Tenn. 2005) ("A variety of fact patterns, difficult or nonexistent state law and not altogether consistent interpretations of state law by federal courts have produced a patchwork of reported decisions addressing whether a bankruptcy trustee has standing to disregard corporate form in an action to reach the assets of a nondebtor or to hold a nondebtor responsible for debts of the debtor."); *Raytheon Co. v. Boccard USA Corp.*, 369 S.W.3d 626, 636 (Tex. Ct. App. 2012) ("The decisions [concerning] whether a trustee has standing to assert an alter ego claim on behalf of the bankruptcy estate . . . vary widely from state to state.").

[15] *MeccaTech, Inc. v. Kiser*, Civ. No. 05-570, 2008 U.S. Dist. LEXIS 30829, at *36 (D. Neb. Apr. 15, 2008); *see also Kalb, Voorhis & Co. v. Am. Fin. Corp.*, 8 F.3d 130, 132 (2d Cir. 1993) ("If under governing state law the debtor could have asserted an alter ego claim to pierce its own corporate veil, that claim constitutes property of the bankrupt estate and can only be asserted by the trustee or the debtor-in-possession."); *Mixon v. Anderson* (*In re Ozark Restaurant Equip. Co.*), 816 F.2d 1222, 1226 n.7 (8th Cir. 1987) ("It is possible that some states permit the corporation or its stockholders to assert an alter ego cause of action to pierce the corporate veil, and thus, that a bankruptcy trustee would be able to enforce the claim . . . ."); *Mannucci v. Cabrini Med. Ctr.* (*In re Cabrini Med. Ctr.*), Civ. No. 12-6661, 2012 U.S. Dist. LEXIS 180896, at *20 (S.D.N.Y. Dec. 20, 2012) ("[T]he question of whether a veil-piercing claim is property of the estate . . . is a matter determined by the source of law giving rise to the veil piercing claim."); *Krasny v. Bagga* (*In re Jamuna Real Estate, LLC*), 365 B.R. 540, 563 (Bankr. E.D. Pa. 2007) ("[T]he majority of the decisions have allowed a trustee to bring an alter ego claim, but the result is a function of the underlying state law."); *Turner v. Bolduc* (*In re Crowe Rope Indus., LLC*), 307 B.R. 1, 6 (Bankr. D. Me. 2004) ("Whether a corporation can pierce its own veil must be determined under state law."); *Duke Energy Trading and Mktg., LLC v. Enron Corp.* (*In re Enron Corp.*), Adv. Proc. N 02–3609A, 2003 Bankr. LEXIS 330, at *10 (Bankr. S.D.N.Y. Apr. 17, 2003) ("Where a debtor has a right to assert an alter ego claim to pierce its own corporate veil under applicable state law, that claim is property of the debtor's estate and the claim may only be asserted by the trustee or debtor-in-possession."); 5 [COLLIER ON BANKRUPTCY] 541.07[5] (16th Ed. 2012) ("Bankruptcy trustees sometimes sue corporate affiliates of the debtor under a theory of alter ego. The standing of the trustee . . . generally depends upon whether, under nonbankruptcy law, the debtor itself would have had standing.").

[16] *In re Flintkote Co. and Flintkote Mines Ltd.*, 486 B.R. at 120 & n.57 (confirming plan of reorganization that provided for "abandonment of the alter ego claim, to the extent the estate holds one") (collecting cases); *see also* William T. Vukovich, *Civil Remedies in Bankruptcy for Corporate Fraud*, 6 AM. BANKR. INST. L. REV. 439, 461–62 (Winter 1998) ("Because different states answer this question differently, some cases hold that it is the right of the estate and assertable by the trustee while others conclude that it is the right of creditors and may not be asserted by the trustee.").

Although "[i]t may seem strange to allow a corporation to pierce its own veil, since it cannot claim to be . . . a creditor that was deceived or defrauded by the corporate fiction," various courts have recognized that the laws of several states permit "a debtor corporation to pursue a claim based upon such a theory."[17] Courts that have recognized such a claim have done so in part because, under the applicable substantive law, "piercing the corporate veil or alter ego causes of action are based upon preventing inequity or unfairness" and "are not based solely on a policy of protecting creditors."[18] Those courts also have "reasoned that allowing the representative of a corporation's bankruptcy estate to assert the claim, rather than

---

[17] *Phar-Mor, Inc. v. Coopers & Lybrand*, 22 F.3d 1228, 1240 n.20 (3d Cir. 1994); *see also Baillie Lumber Co., LP v. Thompson*, 413 F.3d 1293, 1295 (11th Cir. 2005) (Georgia law); *Steyr-Daimler-Puch of Am. Corp. v. Pappas*, 852 F.2d 132, 136 (4th Cir. 1988) (Virginia law); *Koch Refining v. Farmers Union Cent. Exch., Inc.*, 831 F.2d 1339, 1346 (7th Cir. 1987) (Illinois and Indiana law); *S.I. Acquisition, Inc. v. Eastway Delivery Serv., Inc.* (*In re S.I. Acquisition, Inc.*), 817 F.2d 1142, 1153 (5th Cir. 1987) (Texas law); *St. Paul Fire and Marine Ins. Co v. PepsiCo, Inc.*, 884 F.2d 688, 703 (2d Cir. 1989) (Ohio law); *Schupper v. Gefreh* (*In re Monument Gun Shop, Inc.*), Civ. No. 98-2288, 1999 U.S. Dist. LEXIS 23590, at *33–34 (D. Colo. Sept. 30, 1999) (Colorado law); *Towe v. Martinson*, 195 B.R. 137, 140–41 (D. Mont. 1996) (Montana law); *ANR Limited Inc. v. Chattin*, 89 B.R. 898, 904 (D. Utah 1988) (Utah law); *In re Cabrini Med. Ctr.*, Bankr. Case. No. 09-14398, 2012 Bankr. LEXIS 2747, at *28 (Bankr. S.D.N.Y. June 15, 2012) (New York law), *aff'd*, Civ. No. 12-6661, 2012 U.S. Dist. LEXIS 180896, at *21 (S.D.N.Y. Dec. 20, 2012); *Slone v. Lorenz* (*In re Lorenz*), Adv. No. 10-3264, 2011 Bankr. LEXIS 738, at *30 (Bankr. S.D. Ohio Mar. 8, 2011) (Ohio law); *In re Jamuna Real Estate, LLC*, 365 B.R. at 564 (Pennsylvania law); *In re Bridge Info. Sys., Inc.*, 325 B.R. 824, 833–34 (Bankr. E.D. Mo. 2005) (Missouri Law), *aff'd*, 344 B.R. 587, 596 (E.D. Mo. 2006); *Tsai v. Buildings By Jamie, Inc.* (*In re Buildings By Jaime, Inc.*), 230 B.R. 36, 41 (Bankr. D.N.J. 1998) (New Jersey law); *Henderson v. Buchanan* (*In re W. World Funding, Inc.*), 52 B.R. 743, 784 (Bankr. D. Nev. 1985) (Nevada law), *aff'd in part and rev'd in part*, 131 B.R. 859 (D. Nev. 1990), *rev'd*, 985 F.2d 1021 (9th Cir. 1993).

[18] *Phar-Mor, Inc.*, 22 F.3d at 1240 n.20; *see also St. Paul Fire and Marine Ins. Co.*, 884 F.2d at 703 ("If injustice would result from a corporation's not being recognized as the alter ego of its subsidiary, and that subsidiary brought an alter ego action against the parent, there is nothing to indicate that such an action would not be recognized in Ohio."); *In re S.I. Acquisition, Inc.*, 817 F.2d at 1152 ("[T]he predominate policy of Texas alter ego law is that the control entity that has misused the corporation form will be held accountable for the corporation's obligations. Since the corporation has an independent existence at law, we do not believe it is inconsistent in light of the above policy to say that a corporation may pierce its own corporate veil and hold accountable those who have misused the corporation in order to meet its corporate obligations.") (internal citations omitted); *Raytheon Co.*, 369 S.W.3d at 638 (concluding that Delaware and Pennsylvania law afford an insolvent corporation "standing to pierce its own corporate veil" and explaining that "[t]he focus of Delaware and Pennsylvania law is on the conduct of the corporation rather than on the relationship between the corporation and its creditors"); *Baillie Lumber Co. v. Thompson*, 612 S.E.2d 296, 300 (Ga. 2005) ("Georgia alter ego law is not focused solely on the relationships between parties, but also is premised on equitable principles designed to prevent unjust treatment in appropriate circumstances. We are convinced that this reasoning . . compels that we recognize that in these circumstances, a corporation has a right to pursue an alter ego action [in bankruptcy].") (internal citation omitted).

an individual creditor, furthers a goal of the Bankruptcy Code of providing similarly situated creditors with an equal distribution."[19] "Otherwise, any creditor could seek remuneration from the debtor's [parent], and the multi-jurisdictional, first-come/first-served, unequal distribution, which cuts against the policies of the Code, would be promoted."[20]

By contrast, courts applying the laws of certain "other states, including Arkansas, North Dakota, Missouri, Michigan, and Maryland, have held that a corporation may not pierce its own veil."[21] Such courts have "generally held that, in those states, piercing the corporate veil

---

[19] *In re iPCS Wireless, Inc.*, 297 B.R. 283, 297–98 (Bankr. N.D. Ga. 2003) (recognizing estate veil-piercing claim under Delaware law); *see also Kalb, Voorhis & Co.,* 8 F.3d at 133 ("granting the bankruptcy trustee exclusive standing to assert alter ego claims furthers the bankruptcy policy of ensuring that all similarly situated creditors are treated fairly"); *Koch Refining*, 831 F.2d at 1346 ("[T]his logical procedure obviates multiple liability of the debtor to separate creditors and accords with the Bankruptcy Code's ultimate goal of balancing the equities . . . in a bankruptcy case."); *In re Monument Gun Shop, Inc.*, 1999 U.S. Dist. LEXIS 23590, at \*34 ("By confining the alter-ego claim to the bankruptcy forum, it promotes the overriding policy of the Bankruptcy Code of 'equality of distribution among creditors,' as any recovery the bankruptcy trustee may have inures to the benefit of the bankruptcy estate.") (quotation marks omitted); *In re Enron Corp.*, 2003 Bankr. LEXIS 330, at \*12 ("The trustee or debtor-in-possession is given exclusive right to assert alter ego claims to ensure fair and equitable treatment of all similarly situated creditors."); *Moore v. Kumer* (*In re Adam Furniture Indus., Inc.*), 191 B.R. 249, 255 (Bankr. S.D. Ga. 1996) ("Within the bankruptcy context . . . it is entirely reasonable that an objective third-party, the trustee, would pursue the claim to enhance the debtor's estate.").

[20] *In re Schimmelpenninck*, 183 F.3d 347, 356 (5th Cir. 1999); *see also In re Enron Corp.*, 2003 Bankr. LEXIS 330, at \*12 ("Allowing the trustee or debtor-in-possession to pursue the claim avoids the prospect of creditors . . . pursuing the alter ego claims on a first-come, first-serve basis.").

[21] *Elegant Custom Homes, Inc. v. Dusharm* (*In re Elegant Custom Homes, Inc.*), Civ. No. 06-2574, 2007 U.S. Dist. LEXIS 35564, at \*9–11 (D. Ariz. May 14, 2007) (Arizona law); *see also Ahcom, Ltd. v. Smeding*, 623 F.3d 1248, 1252 (9th Cir. 2010) (California law); *Spartan Tube and Steel, Inc. v. Himmelspach* (*In re RCS Engineered Prods. Co.*), 102 F.3d 223, 226 (6th Cir. 1996) (Michigan law); *Mixon v. Anderson* (*In re Ozark Restaurant Equip. Co.*), 816 F.2d 1222, 1226 & n.7 (8th Cir. 1987) (Arkansas law); *Regions Bank v. JP Realty Partners, Ltd.*, Civ. No. 12-01113, 2012 U.S. Dist. LEXIS 173210, at \*35 (M.D. Tenn. Dec. 6, 2012) (Tennessee law); *Turner v. Bolduc* (*In re Crowe Rope Indus., LLC*), 307 B.R. 1, 7 (Bankr. D. Me. 2004) (Maine law); *Nat'l City Bank of Minneapolis v. Lapides (In re Transcolor Corp.),* 296 B.R. 343, 365 (Bankr. D. Md. 2003) (Maryland law); *Mar-Kay Plastics, Inc. v. Reid Plastics, Inc.* (*In re Mar-Kay Plastics, Inc.*)*,* 234 B.R. 473, 481–82 (Bankr. W.D. Mo. 1999) (Missouri law); *Limor v. Buerger* (*In re Del-Met Corp.*), 322 B.R. 781, 833–34 (Bankr. M.D. Tenn. 2005) (Tennessee law); *Amazing Enters. v. Jobin* (*In re M&L Bus. Mach. Co.*), 136 B.R. 271, 278 (Bankr. D. Colo. 1992) (Colorado law); *Armstrong v. Pedie* (*In re Dakota Drilling, Inc.*), 135 B.R. 878, 884 (Bankr. D.N.D. 1991) (North Dakota law); *Robert K. Morrow, Inc. v. Kelson* (*In re Morgan-Staley Lumber Co., Inc.*), 70 B.R. 186, 188 (Bankr. D. Or. 1986) (Oregon law); *Selcke v. Hartford Fire Ins. Co.* (*In re Rehabilitation of Centaur Ins. Co.*), 632 N.E.2d 1015, 1017 (Ill. 1994) (Illinois law).

is designed to protect the rights of third party creditors, not to protect the rights of the corporation itself."[22] Certain of those courts also have concluded that, under applicable state law, "an alter ego claim is not by itself a cause of action" and therefore cannot give rise to an estate claim.[23] For example, in *Ahcom, Ltd. v. Smeding*, the U.S. Court of Appeals for the Ninth Circuit reversed the dismissal of a veil-piercing claim asserted by a creditor against the debtor's owners, in part because California law does not "permit[] a corporation to bring a general alter ego claim against its owners."[24] The Ninth Circuit reasoned that, under California law, "there is no such thing as a substantive alter ego claim at all," and it was a "made-up cause of action."[25]

No party has identified any controlling decision on point applying Delaware law and the Examiner's Professionals have not located any such decision.[26] Courts in the Second Circuit and other jurisdictions have "found that a Delaware court would permit a debtor corporation to

---

[22] *Raytheon Co.*, 369 S.W.3d at 636; *see also In re RCS Engineered Prods. Co.*, 102 F.3d at 226 ("[T]he corporate veil is pierced only for the benefit of third parties, and never for the benefit of the corporation or its stockholders."); *In re Ozark Restaurant Equip. Co.*, 816 F.2d at 1225 ("[T]he obligations and liabilities of an action to pierce the corporate veil in Arkansas do not run to the corporation, but to third parties, *e.g.*, creditors of the corporation."); *In re Elegant Custom Homes, Inc.*, 2007 U.S. Dist. LEXIS 35564, at *11 ("[O]nly third parties who deal with the corporation may bring a veil piercing action."); *In re M&L Bus. Mach. Co.*, 136 B.R. at 278 ("The [veil-piercing] liability itself arises from fraud or injustice perpetrated not on the corporation, but on third persons dealing with the corporation."); *In re Dakota Drilling, Inc.*, 135 B.R. at 884 ("The trustee does not identify from where his power to invoke an alter ego remedy was derived, but . . . piercing of a corporate veil must never be made for the benefit of the corporation or its shareholders."); *In re Rehabilitation of Centaur Ins. Co.*, 632 N.E.2d at 1018 ("The alter ego doctrine was developed for and has been traditionally used by third persons injured due to their reliance on the existence of a distinct corporate entity."). Nonetheless, some courts have concluded that "the usual requirement of third-party benefit for a veil-piercing claim is, in fact, met in the case of an insolvent corporation [in] bankruptcy," because "any alter ego claim asserted by the corporation itself will necessarily benefit third parties by providing more money with which to satisfy unsecured claims." *Baillie Lumber Co.*, 612 S.E.2d at 300.

[23] *In re RCS Engineered Prods. Co.*, 102 F.3d at 226; *see also* Mark L. Prager, *Pursuing Alter-Ego Liability Against Non-Bankrupt Third Parties: Structuring a Comprehensive Conceptual Framework*, 35 ST. LOUIS U.L.J. 657, 690 (1991) ("Alter ego is not a cause of action in itself; rather, it is an equitable remedy which permits a creditor to impose on owners the liability for a pre-existing claim against the corporation. A corporation, of course, cannot possess a claim against itself. Thus, it possesses no cause of action for which it may shift the liability to its owners under the alter ego doctrine."); Richard L. Epling, *Trustee's Standing to Sue in Alter Ego or Other Damage Remedy Actions*, 6 BANKR. DEV. J. 191, 196 (1989) ("There is the strong sense . . . that federal courts [recognizing that a corporation may pierce its own corporate veil] are creating, not construing, state law in order to reach an appropriate policy result. These courts have made a determination that . . . the trustee is the best party to bring suit.").

[24] 623 F.3d at 1251.

[25] *Id.* at 1251–52.

[26] *See MC Asset Recovery, LLC v. S. Co.*, Civ. No. 06-0417, 2006 U.S. Dist. LEXIS 97034, at *40–42 (N.D. Ga. Dec. 11, 2006) (noting that "there are no Delaware cases directly on-point," apparently "because no Delaware court has ever addressed that question"); *Raytheon Co.*, 369 S.W.3d at 633 ("No Delaware . . . state court has answered this question.").

assert a claim to pierce its own corporate veil."[27] This finding has in part been "[b]ased on the fact that Delaware law allows a subsidiary [in certain other contexts] to maintain an action against a corporate parent."[28] In *Murray v. Miner*, for example, the U.S. District Court for the Southern District of New York explained that "[a]lthough no cases have been found holding that a trustee of a debtor corporation in bankruptcy may bring such a [veil-piercing] claim, several cases make clear that under Delaware law, a subsidiary may maintain an action against its corporate parent or controlling shareholder."[29] According to the *Murray* court, "[t]hese cases indicate that under Delaware law, because of a corporate parent's fiduciary duties to a subsidiary, the subsidiary may institute proceedings against the parent if it has sustained liability to third parties as a result of the parent's control."[30] Certain litigants have criticized *Murray* and its progeny for a "lack of analysis," but their criticisms appear not to have been met with success.[31]

---

[27]  *See Duke Energy Trading and Mktg., LLC v. Enron Corp.* (*In re Enron Corp.*), Adv. Proc. No. 03-2176, 2003 Bankr. LEXIS 330, at *11(Bankr. S.D.N.Y. Apr. 17, 2003); *see also MeccaTech, Inc. v. Kiser*, Civ. No. 05-570, 2008 U.S. Dist. LEXIS 30829, at *38 n.14 (D. Neb. Apr. 15, 2008) ("[T]he claim of a corporate debtor to pierce its own corporate veil is permitted under Delaware law."); *MC Asset Recovery, LLC*, 2006 U.S. Dist. LEXIS 97034, at *42 ("agree[ing] that Delaware law would allow [an action by a corporation to pierce its own corporate veil]"); *Murray v. Miner*, 876 F. Supp. 512, 517 (S.D.N.Y. 1995) ("[T]he trustee has sole standing to raise all alter ego claims of a general nature asserted [under Delaware law] by the Gnubrokers Companies' creditors."); *In re Alper Holdings USA*, Case No. 07-12148, 2008 Bankr. LEXIS 522, at *17 (Bankr. S.D.N.Y. Feb. 25, 2008) ("Under Delaware law, an alter ego cause of action constitutes a corporate right."); *In re Spiegel, Inc.*, Case No. 03-11540, 2006 Bankr. LEXIS 2158, at *25 (Bankr. S.D.N.Y. Aug. 16, 2006) ("[T]he alter ego type claims . . . are by law property of the Debtors . . . ."); *In re iPCS Wireless, Inc.*, 297 B.R. 283, 297 (Bankr. N.D. Ga. 2003) (agreeing that "Delaware law would allow a bankrupt corporation to pierce its own corporate veil" and granting creditors' committee's application for leave to assert veil-piercing claim to hold "the Sprint Companies . . . liable for the Debtors' debts"); *Raytheon Co.*, 369 S.W.3d at 638 ("[U]nder Delaware and Pennsylvania law, a corporation, particularly an insolvent one, has standing to pierce its own corporate veil under an alter ego theory to reach the assets of its parent."). Still other opinions have decided motions to dismiss claims asserted on behalf of a debtor seeking to pierce the debtor's own corporate veil without discussion of whether such claims are permitted by Delaware law. *See Burtch v. Opus, LLC* (*In re Opus East, LLC*), 480 B.R. 561, 571 (Bankr. D. Del. 2012) (granting on other grounds motion to dismiss without prejudice veil-piercing claim asserted by trustee against debtor's parent); *Official Comm. of Unsecured Creditors v. Bay Harbour Master Ltd.* (*In re BH S&B Holdings LLC*), 420 B.R. 112, 52 n.15 (Glenn, J.) (Bankr. S.D.N.Y. 2009) (granting motion to dismiss veil-piercing claim asserted by the creditors' committee and noting that "[t]he Complaint here only asserts claims belonging to the Debtors"); *Official Comm. of Unsecured Creditors of Verestar, Inc. v. Am. Tower Corp.* (*In re Verestar, Inc.*), 343 B.R. 444, 462, 465 (Bankr. S.D.N.Y. 2006) (denying motion to dismiss veil-piercing claim asserted by creditors' committee on behalf of debtor seeking judgment declaring that parent "should be liable for all of their debts").

[28]  *See In re Enron Corp.*, 2003 Bankr. LEXIS 330, at *11.

[29]  876 F. Supp. at 516.

[30]  *Id.* at 516–17 (S.D.N.Y. 1995).

[31]  *Raytheon Co.*, 369 S.W.3d at 633, 638; *see also MC Asset Recovery, LLC*, 2006 U.S. Dist. LEXIS 97034, at *40–41 (rejecting "attempt to question the holdings of [*Murray* and its progeny]" and noting that the defendant "can cite to no cases supporting [the] proposition [that Delaware law does not permit a subsidiary to pierce its own corporate veil]").

Accordingly, and although the issue is not entirely free from doubt in light of the apparent absence of controlling authority, the Examiner concludes that Delaware law recognizes the existence of a claim on behalf of a debtor to pierce its own corporate veil. Such an "alter ego claim constitutes property of the debtor corporation, and the debtor-in-possession or bankruptcy trustee, rather than individual creditors, has exclusive standing to assert the claim."[32] If granted standing by the Bankruptcy Court, a creditors' committee may pursue such a veil-piercing claim on behalf of the debtor's estate.[33] A debtor that succeeds in piercing its own corporate veil may "hold [its parent] liable for all of the Debtors' debts."[34]

---

[32] *Kalb, Voorhis & Co. v. Am. Fin. Corp.*, 8 F.3d 130, 133 (2d Cir. 1993); *see also In re Enron Corp.*, 2003 Bankr. LEXIS 330, at *11 ("[T]he trustee or debtor-in-possession would have exclusive standing to maintain a Delaware corporation's alter ego claim of a general nature."). The Examiner considers whether those Third-Party Claimants that have asserted claims against AFI on a veil-piercing theory have standing to pursue such claims in Section VIII.C.

[33] *See Official Comm. of Unsecured Creditors v. Bay Harbour Master Ltd.* (*In re BH S&B Holdings LLC*), 420 B.R. 112, 52 & n.15 (Glenn, J.) (Bankr. S.D.N.Y. 2009) (granting motion to dismiss veil-piercing claim asserted by the creditors' committee; noting that a prior order had granted the committee standing to pursue estate claims and "[t]he Complaint here only asserts claims belonging to the Debtors"); *Official Comm. of Unsecured Creditors of Verestar, Inc. v. Am. Tower Corp.* (*In re Verestar, Inc.*), 343 B.R. 444, 458–59 (Bankr. S.D.N.Y. 2006) (denying motion to dismiss veil-piercing claim asserted by creditors' committee and noting that the court had previously "approved a stipulation . . . granting the Committee standing to pursue claims on behalf of the Debtors").

[34] *Official Comm. of Unsecured Creditors of RSL Com Primecall, Inc. v. Beckoff* (*In re RSL Com Primecall, Inc.*), Adv. Proc. No. 03-2176, 2003 Bankr. LEXIS 1635, at *49 (Bankr. S.D.N.Y. Dec. 11, 2003) (granting motion to dismiss veil-piercing claim for failure to state a claim); *see also Palmer v. Am. Bodyworks, Inc.* (*In re Secure Buildout, LLC*), Adv. No. 12-05063, 2012 Bankr. LEXIS 4554, at *13 (Bankr. N.D. Ga. Aug. 22, 2012) ("Georgia law allows a corporation to pierce its own veil to hold the corporation's principals liable for the entirety of the corporations debts."); *In re Verestar, Inc.*, 343 B.R. at 462 (denying motion to dismiss veil-piercing claim asserting "that the Debtors should be treated as [the parent's] alter ego, and that [the parent] should be liable for all of their debts."); *In re iPCS Wireless, Inc.*, 297 B.R. 283, 298 (Bankr. N.D. Ga. 2003) ("[T]he injury is one that has been suffered by the corporation because of the exertion of control by another corporation, and the equitable remedy would be one that would provide a recovery to all of the Debtors' creditors, rather than to a particular creditor.") (applying Delaware law); William T. Vukovich, *Civil Remedies in Bankruptcy for Corporate Fraud*, 6 AM. BANKR. INST. L. REV. 439, 461 (1998) ("[T]he effect of disregarding the corporate veil is to hold the shareholders liable for the corporate debts.").

c. *How Many Corporate Veils Must Be Pierced To Reach The Ultimate Parent Company?*

Were a claim to be brought seeking to pierce the corporate veil of ResCap to impose liability on AFI, a question might arise as to whether it would be necessary also to plead and prove that the corporate veil of GMAC Mortgage Group LLC, ResCap's direct parent, should be pierced. The state of the law as to this question has been described as "far from clear" and there does not appear to be any controlling precedent on point.[35] Courts applying Delaware law to veil-piercing claims in circumstances involving intermediate entities have reached different conclusions. In *Faulkner v. Kornman (In re Heritage Org., LLC)*, for example, the Bankruptcy Court for the Northern District of Texas concluded that under Delaware law the test for veil-piercing liability "must be applied to, and satisfied at, each level or layer of ownership applicable within the multi-faceted entity structure."[36] That court further explained that veil-piercing "does not work on . . . a global basis" to "collapse" all related entity defendants.[37]

---

[35] *See In re BH S&B Holdings LLC*, 420 B.R. at 135 ("Since . . . the Committee has not adequately pled a veil-piercing theory . . . the Court does not have to reach the question whether the Committee would have to pierce each veil separately."); *see also Sykes v. Mel Harris and Assocs., LLC*, 757 F. Supp. 2d 413, 430 & n.15 (S.D.N.Y. 2010) ("The law in this jurisdiction is unclear as to whether a plaintiff is required to pierce the veil of each layer of alleged corporate control. Deciding that issue is not necessary here, as I find a plausible claim of veil-piercing against LNC with respect to the seven other corporate entities.") (internal citation omitted).

[36] 413 B.R. 438, 514 (Bankr. N.D. Tex. 2009) (entering judgment against plaintiff after trial on veil-piercing claims); *see also Soroof Trading Dev. Co. v. GE Microgen, Inc.*, Civ. No. 10-1391, 2012 U.S. Dist. LEXIS 67736, at *26 n.9 (S.D.N.Y. May 11, 2012) (granting motion for leave to filed amended complaint and noting that "it is necessary to pierce the corporate veil at each 'level or layer' of ownership" under Delaware law); *Hechinger Liquidation Trust v. Cooper Bussmann, Inc.* (*In re Hechinger Inv. Co. of Del., Inc.*), 297 B.R. 390, 393 n.3 (Bankr. D. Del. 2003) (denying motion for leave to file amended complaint and noting that "[t]echnically, in order to pierce the corporate veil to reach [proposed additional defendant] Cooper, Plaintiff would need to show that Bussmann was a mere instrumentality of its parent, McGraw-Edison, and that McGraw-Edison was a mere instrumentality of its parent, Cooper").

[37] *In re Heritage Org., LLC*, 413 B.R. at 515.

Notably, in *Official Comm. of Unsecured Creditors v. Bay Harbour Master Ltd. (In re BH S&B Holdings LLC)*, the Court appeared to express misgivings with the *In re Heritage Org., LLC* approach, explaining that "courts in other contexts . . . have refused to permit the corporate structure to stand in the way of a finding of liability," and adding that "[p]ermitting corporate actors to erect a series of shell corporations to make it more difficult for prospective plaintiffs to sue the real owners also makes little sense from a policy standpoint."[38] The Court dismissed the veil-piercing claims at issue on other grounds and, therefore, found it unnecessary to resolve the question of whether the plaintiff "would have to pierce each veil separately."[39]

More recently still, in *Official Comm. of Unsecured Creditors of Moll Indus., Inc. v. Highland Capital Mgmt. LP (In re Moll Indus., Inc.)*, the Delaware bankruptcy court rejected the view that a plaintiff must "establish alter ego liability at all layers of subsidiaries ranging from [the debtor] to [the indirect parent]."[40] At least where the plaintiff "is only seeking to treat [the debtor] and [the indirect parent] as one entity and is not seeking to hold any of the intermediaries liable," the court concluded a plaintiff's "failure to allege alter ego through all levels of the corporate structure does not warrant the claim's dismissal."[41] The court explained that it had found "no indication" in Delaware law that veil-piercing liability "may only be applied to a direct relationship such as a parent and subsidiary."[42]

---

[38] *In re BH S&B Holdings LLC*, 420 B.R. at 135; *see also Official Comm. of Unsecured Creditors of Buckhead Am. Corp. v. Reliance Capital Group, Inc.* (*In re Buckhead Am. Corp.*), 178 B.R. 956, 975 (D. Del. 1994) (rejecting view that "alter ego claims can be defeated and defendants can insulate themselves from liability by using corporate intermediaries and other complex business structures, thereby indirectly doing that which lawfully cannot be accomplished directly").

[39] *In re BH S&B Holdings LLC*, 420 B.R. at 135.

[40] 454 B.R. 574, 587 (Bankr. D. Del. 2011).

[41] *Id.* at 587–88.

[42] *Id.* 587–88 (Bankr. D. Del. 2011); *see also United States v. Golden Acres, Inc.*, 702 F. Supp. 1097, 1113 n.7 (D. Del. 1988) (rejecting argument that "it is necessary for us to pierce the corporate veils of both [the parent company] and [its subsidiary] to hold [the individual owners of the parent] personally liable for the debts of [the subsidiary]") (applying federal common law).

The Examiner finds it unnecessary to decide this unsettled legal question. GMAC Mortgage Group LLC is a holding company that had no operations and few employees.[43] Assuming arguendo that a court were to conclude that the evidence warrants piercing the corporate veil of ResCap, then the Examiner would view as a remote possibility a different conclusion as to GMAC Mortgage Group LLC.[44]

### d. Elements That Must Be Pleaded And Proved

"[P]ublic policy does not lightly disregard the separate legal existence of corporations."[45] "The corporate form was created to allow shareholders to invest without incurring personal liability for the acts of the corporation. These principles are equally applicable when the shareholder is, in fact, another corporation, and hence, mere ownership of a subsidiary does not justify the imposition of liability on the parent."[46] The use of the corporate form to limit liability "is seen as wealth-creating for society as it allows investors to cabin their risk and therefore encourages the investment of capital in new enterprises."[47] However, "upon a proper

---

[43] *See* Int. of D. Bricker, Mar. 15, 2013, at 12:19–13:3.

[44] The Examiner's reasoning is similar with respect to the potential claims that could be brought on behalf of ResCap indirect subsidiaries GMAC Mortgage and RFC—both also organized under Delaware law—seeking to pierce their respective corporate veils and impose liability on AFI for their respective debts (as opposed to the debts of ResCap). If a court were to hold that it were necessary to pierce the corporate veil between ResCap and AFI before such veil-piercing claims by GMAC Mortgage and RFC could prevail against AFI, then the Examiner concludes that such claims against AFI would be unlikely to prevail for that reason alone, given the Examiner's conclusion that a veil-piercing claim on behalf of ResCap against AFI is unlikely to prevail. Assuming arguendo that a court were to instead conclude that GMAC Mortgage and RFC need not pierce the corporate veil of ResCap before their veil-piercing claims could prevail against AFI, the Examiner concludes that any such claims would be unlikely to prevail for the reasons set for in Section VII.A.1.g(2).

[45] *BASF Corp. v. POSM II Properties P'ship*, Case No. 3608, 2009 Del. Ch. LEXIS 33, at *32 n.50 (Del. Ch. Mar. 3, 2009) (applying Delaware law); *see also Mason v. Network of Wilmington, Inc.*, Civ. No. 19434, 2005 Del. Ch. LEXIS 99, at *9 (Del. Ch. July 1, 2005) ("Persuading a Delaware Court to disregard the corporate entity is a difficult task.") (quoting *David v. Mast*, Civ. No. 1369, 1999 Del. Ch. LEXIS 34, at *5 (Del. Ch. Mar. 2, 1999); *Official Comm. of Unsecured Creditors v. Bay Harbour Master Ltd.* (*In re BH S&B Holdings LLC*), 420 B.R. 112, 133 (Glenn, J.) (Bankr. S.D.N.Y. 2009) ("In general, the corporate form is sacrosanct and courts will not disturb it to hold shareholders of a corporation, or members of an LLC, liable.").

[46] *Pearson v. Component Tech. Corp.*, 247 F.3d 471, 484 (3d Cir. 2001); *see also Trevino v. Merscorp, Inc.*, 583 F. Supp. 2d 521, 530 (D. Del. 2008) ("[L]imiting one's personal liability is a traditional reason for a corporation. Unless done deliberately, with specific intent to escape liability for a specific tort or class or torts, the cause of justice does not require disregarding the corporate entity.") (quotation marks omitted); *Mabon, Nugent & Co. v. Tex. Am. Energy Corp.*, Civ. No. 8578, 1990 Del. Ch. LEXIS 46, at *14 (Del. Ch. Apr. 12, 1990) ("[T]he separate corporate existences of parent and subsidiary will not be set aside merely . . . on a showing that the parent owned all the stock of the subsidiary.").

[47] *BASF Corp.*, 2009 Del. Ch. LEXIS 33, at *32 n.50.

showing corporate entities as between parent and subsidiary may be disregarded and the ultimate party in interest, the parent, be regarded in law and fact as the sole party."[48]

"Under Delaware law, to pierce the corporate veil and establish alter-ego liability, a plaintiff must show (1) that the parent and subsidiary 'operated as a single economic entity,' and (2) that an 'overall element of injustice or unfairness is present.'"[49] In general, "[t]he fact that [it] is a limited liability company does not change the analysis."[50]

### e. Pleading Standard And Burden Of Proof

"Although the question of domination is generally one of fact, courts have granted motions to dismiss as well as motions for summary judgment in favor of defendant parent companies where there has been a lack of sufficient evidence to place the alter ego issue in dispute."[51] "[B]ecause Delaware public policy does not lightly disregard the separate legal existence of

---

[48] *In re BH S&B Holdings LLC*, 420 B.R. at 133 (quoting *Pauley Petroleum, Inc. v. Cont'l Oil Co.*, 239 A.2d 629, 633 (Del. 1968)); *see also Pearson*, 247 F.3d at 484 ("under both state and federal common law, abuse of the corporate form will allow courts to employ the 'tool of equity' known as veil-piercing"); *Mason*, 2005 Del. Ch. LEXIS 99, at *9 ("Corporate form will be disregarded and individuals will be held personally liable 'in the interest of justice, when such matters as fraud, contravention of law or contract, public wrong, or where equitable consideration among members of the corporation require it, are involved'").

[49] *In re BH S&B Holdings LLC*, 420 B.R. at 133-34 (quoting *Trevino*, 583 F. Supp. 2d at 528 ); *see also NetJets Aviation, Inc. v. LHC Commc'ns, LLC*, 537 F.3d 168, 177 (2d Cir. 2008) (same).

[50] *Nat'l Gear & Piston, Inc. v. Cummins Power Sys., LLC*, Civ. No. 10-4145, 2012 U.S. Dist. LEXIS 72879, at *86 n.14 (S.D.N.Y. May 17, 2012); *see also NetJets Aviation, Inc.,* 537 F.3d at 176 ("Given the similar liability shields that are provided by corporations and LLCs to their respective owners, emerging caselaw illustrates that situations that result in a piercing of the limited liability veil are similar to those that warrant piercing the corporate veil.") (quotation marks omitted); *Luster v. Greenhill Capital Partners II, LLP* (*In re CLK Energy Partners, LLC*), Adv. No. 09-05042, 2010 Bankr. LEXIS 1564, at *19 (Bankr. W.D. La. May 12, 2010) ("Delaware courts have also held that the alter ego jurisprudence developed in cases involving corporations similarly applies to Delaware LLC's.").

[51] *Fletcher v. Atex*, 68 F.3d 1451, 1458 (2d Cir. 1995); *see also In re Buckhead Am. Corp.*, 178 B.R. at 975 (denying motion to dismiss veil-piercing claim and explaining that "the nature and extent of the dominion and control exercised by defendants over [the subsidiary is] a question of fact, not subject to resolution on a motion to dismiss"); *Youkelsone v. Wash. Mut., Inc.* (*In re Wash. Mut., Inc.*), Adv. No. 09-50039, 2010 Bankr. LEXIS 2453, at *30 (Bankr. D. Del. Aug. 13, 2010) ("[C]ourts routinely consider, and grant, motions to dismiss for failure to allege facts sufficient to support the imputation of liability on an alleged alter ego."); *Official Comm. of Unsecured Creditors of Sunbeam Corp. v. Morgan Stanley & Co., Inc.* (*In re Sunbeam Corp.*), 284 B.R. 355, 365 (Bankr. S.D.N.Y. 2002) ("Ordinarily the determination of the nature and extent of domination is a question of fact.").

corporations, a plaintiff must do more than plead that one corporation is the alter ego of another in conclusory fashion in order for the Court to disregard their separate legal existence."[52]

Whether a veil-piercing claim is also subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b)—made applicable to adversary proceedings by Federal Bankruptcy Rule 7009—has been described by courts in this circuit as a "knotty question."[53] Because a veil-piercing plaintiff can prevail without proving fraud, "veil-piercing claims are generally subject to the pleading requirements imposed by Fed. R. Civ. P. 8(a)."[54] However, "[w]hen a veil-piercing claim is based on fraud, it is subject to the requirements of [Rule 9(b)], which requires the pleading of 'particularized facts that give rise to a strong inference that defendant acted with fraudulent intent.'"[55] "[T]he Rule 9(b) pleading standard applies only to those components of fraud-based [veil-piercing] claims that relate to fraud. Thus, allegations

---

[52] *MicroStrategy Inc. v. Acacia Research Corp.*, Civ. No. 5735, 2010 Del. Ch. LEXIS 254, at *46 (Del. Ch. Dec. 30, 2010); *see also Spagnola v. Chubb Corp.*, 264 F.R.D. 76, 86 (S.D.N.Y. 2010) (collecting cases from other jurisdictions granting motions to dismiss veil-piercing claims); *In re Wash. Mut., Inc.*, 2010 Bankr. LEXIS 2453, at *36–37 (dismissing veil-piercing claim where complaint included "mere conclusions that [the parent] controlled [its subsidiary] but offer[ed] no factual allegations which would lead to a plausible inference that [the parent] directed [the subsidiary] to engage in misconduct specifically related to the servicing of Youkelsone's mortgage") (applying Washington law); *O'Connell v. Arthur Andersen LLP* (*In re AlphaStar Ins. Group Ltd.*), 383 B.R. 231, 279 (Bankr. S.D.N.Y. 2008) (dismissing veil-piercing claim where it appeared to be "another conclusory allegation of control based on share ownership and the nomination of its employees to positions on the Board") (applying Bermuda law).

[53] *Gabriel Capital, LP v. NatWest Fin., Inc.*, 122 F. Supp. 2d 407, 433 (S.D.N.Y. 2000) (quoting *Old Republic Ins. Co. v. Hansa World Cargo Serv., Inc.*, 170 F.R.D. 361, 374 (S.D.N.Y. 1997)).

[54] *EED Holdings v. Palmer Johnson Acquisition Corp.*, 228 F.R.D. 508, 512 (S.D.N.Y. 2005); *see also Rolls-Royce Motor Cars, Inc. v. Schudroff*, 929 F. Supp. 117, 122 (S.D.N.Y. 1996). At least one district court has concluded that Rule 9(b) has no application to veil-piercing claims. *See Time Warner Cable, Inc. v. Networks Group, LLC*, Civ. No. 09-10059, 2010 U.S. Dist. LEXIS 93855, at *12–13 (S.D.N.Y. Sept. 9, 2010) ("Several district courts in this district have applied Rule 9(b) to claims to pierce the corporate veil that are based on a defendant's fraudulent conduct. Until the Court of Appeals revisits its holding in *International Controls*, however, Rule 8 is the appropriate standard to weigh the sufficiency of the plaintiff's allegations to pierce the corporate veil.") (internal citations omitted) (citing *Int'l Controls Corp. v. Vesco*, 490 F.2d 1334, 1351 n.23 (2d Cir. 1974) (Rule 9(b) "is inapplicable here since [plaintiff] did not proceed on the theory that Vesco & Co., itself, committed fraud, but rather that Vesco perpetrated the securities violations and then sought to shield his assets from the reach of his victim by transferring them to Vesco & Co")).

[55] *TradeWinds Airlines, Inc. v. Soros*, Civ. Nos. 08-5901, 10-8175, 2012 U.S. Dist. LEXIS 39459, at *14 (S.D.N.Y. Mar. 22, 2012) (quoting *EED Holdings*, 228 F.R.D. at 512 (requirements of Rule 9(b) apply to veil-piercing claim that "sounds in fraudulent inducement")); *see also Pereria v. Greco Gas Ltd.* (*In re Saba Enters., Inc.*), 421 B.R. 626, 652 (Bankr. S.D.N.Y. 2009) ("To the extent that the Trustee's allegations related to the veil piercing claim involve fraud, they must satisfy the heightened standard for pleading fraud under [Rule 9(b)]; otherwise, the post-*Twombly* 'flexible plausibility' standard under [Rule 8(a)] governs the determination of the sufficiency of the Trustee's pleading.").

of dominance and control, for example, are not subject to the heightened pleading standard, even where the veil-piercing claim is based on an allegation that the corporate form was abused to perpetrate fraud."[56]

The standard of proof applicable to a veil-piercing claim under Delaware law is likewise a knotty question and one that remains unsettled.[57] The Delaware bankruptcy court analyzed the issue in *Foxmeyer Drug Co. v. G.E. Elec. Capital Corp. (In re Foxmeyer Corp.)*, where "the parties disagree[d] as to the appropriate standard of proof by which one must prove a case for a piercing of the corporate veil under Delaware law."[58] Although the court agreed with the plaintiff that "there does not appear to be any relevant caselaw that applies Delaware law wherein the clear and convincing evidence standard is utilized," that did not end the court's analysis.[59] Relying upon case law reciting the general difficulty of piercing the corporate veil under Delaware law, the bankruptcy court "f[ound] it nonsensical to suggest that the most minimal evidentiary standard of a preponderance of the evidence is equivalent to 'a very heavy burden.'"[60] The bankruptcy court held, therefore, "that the appropriate standard of proof by which one must prove a case for a piercing of the corporate veil under Delaware law is, if not a clear and convincing evidence standard, at least somewhat greater than merely a preponderance of the evidence standard."[61]

Other courts have disagreed. In *ASARCO LLC v. Americas Mining Corp.*, the U.S. District Court for the Southern District of Texas concluded that "Delaware would apply the

---

[56] *Sofia Classic S.A. De C.V. v. Hurowitz*, 444 F. Supp. 2d 231, 241 (S.D.N.Y. 2006); *see also In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278, 292 (S.D.N.Y. 2005) ("The domination and control elements of the [veil-piercing] claim, however, need comply only with Rule 8."); *Network Enters., Inc. v. APBA Offshore Productions, Inc.*, Civ. No. 01-11765, 2002 U.S. Dist. LEXIS 17256, at *16 (S.D.N.Y. Sept. 10, 2002) (rejecting "suggest[ion] that the domination and control elements of an alter ego claim are also subject to heightened pleading").

[57] The parties have not directed the Examiner to any controlling decision on point under Delaware law, nor have the Examiner's Professionals located any such decision. *Cf. Gadsden v. Home Preservation Co.*, Civ. No. 18888, 2004 Del. Ch. LEXIS 14, at *11–12 (Del. Ch. Feb. 20, 2004) (noting defendant's contention that plaintiff "must prove her case by clear and convincing evidence" but finding "adequate grounds to disregard Home Preservation's separate corporate existence" without ruling on standard of proof).

[58] 290 B.R. 229, 237 (Bankr. D. Del. 2003).

[59] *Id.* at 237. Some courts appear to have applied a clear and convincing standard of proof to veil-piercing claims, albeit under the laws of certain other jurisdictions. *See Trustees of the Nat'l Elevator Indus. Pension, Health Benefit and Educ. Funds v. Lutyk*, 332 F.3d 188, 192 (3d Cir. 2003) ("Because alter ego is akin to and has elements of fraud theory, we think it too must be shown by clear and convincing evidence.") (quotation marks omitted) (applying federal common law); *Int'l Controls and Measurements Corp. v. Watsco, Inc.*, 853 F. Supp. 585, 591 (N.D.N.Y. 1994) ("[T]he plaintiff has failed to provide clear and convincing evidence of control, fraud or any other mechanism by which Watsco, Inc. operates Gemaire as a mere instrumentality. Absent such a showing, the court will not pierce the corporate veil.") (applying federal common law).

[60] *In re Foxmeyer Corp.*, 290 B.R. at 237. *Cf. Pearson*, 247 F.3d at 485 (describing veil-piercing test as "notoriously difficult for plaintiffs to meet").

[61] *Id.* (finding that the plaintiff "does not even satisfy the minimal preponderance of the evidence standard when attempting to prove his case for a piercing of the corporate veil").

preponderance of the evidence standard" to veil-piercing claims.[62] That court explained that "the prevailing default standard in Delaware civil cases dictates the use of the preponderance of the evidence" and "[t]here is no authority stating that the standard under Delaware law is clear and convincing evidence."[63] Disagreeing with *Foxmeyer*, the *ASARCO* court "acknowledge[d] that it is not easy for a party to prevail on a veil-piercing claim, but [concluded that] this is due to the difficulty in demonstrating that the corporate form was used for a fraud or an injustice, not because there is a heightened burden of proof."[64]

In light of the lack of controlling authority imposing a heightened burden of proof on such claims, the Examiner assumes for the purposes of his analysis that ResCap would be required to prove each of the elements of its potential veil-piercing claim by a preponderance of the evidence.

### f. Single Economic Entity

Factors considered by courts applying Delaware law to determine whether a parent and subsidiary should be deemed a "single economic entity" include:

> (1) undercapitalization, (2) failure to observe corporate formalities, (3) nonpayment of dividends, (4) insolvency of the debtor corporation at the time, (5) siphoning off of the corporation's funds by the dominant parent, (6) absence of corporate records, and (7) the fact that the corporation is merely a facade for the operations of the dominant parent.[65]

Although this "list of factors is not exhaustive and no single factor is dispositive, some combination is required."[66] "[T]he absence of one or two factors may be sufficiently outweighed by the other considerations when balanced on whole."[67] And, "in the absence of

---

[62] 396 B.R. 278, 318 (S.D. Tex. 2008); *see also Hillsborough Holdings Corp. v. Celotex Corp.* (*In re Hillsborough Holdings Corp.*), 166 B.R. 461, 468 (Bankr. M.D. Fla. 1994) ("In order to pierce the corporate veil under Florida and Delaware law, it is the claimant's burden to establish by a preponderance of the evidence [the relevant factors].").

[63] *ASARCO LLC*, 396 B.R. at 318.

[64] *Id.* The *ASARCO* court also collected cases from a "majority of [other state] jurisdictions" that "apply a preponderance of the evidence standard to veil-piercing actions." *Id.*

[65] *Official Comm. of Unsecured Creditors v. Bay Harbour Master Ltd.* (*In re BH S&B Holdings LLC*), 420 B.R. 112, 134 (Bankr. S.D.N.Y. 2009); *see also NetJets Aviation, Inc.v. LHC Commc'ns*, 537 F.3d 168, 176–77 (2d Cir. 2008) (same).

[66] *Blair v. Infineon Technologies AG*, 720 F. Supp. 2d 462, 471 (D. Del. 2010); *see also Burtch v. Opus L.L.C.* (*In re Opus East, LLC*), 480 B.R. 561, 571 (Bankr. D. Del. 2012) (granting motion to dismiss veil-piercing claim where "[t]he Trustee's only facially plausible allegation is that the dividend payments . . . left the Debtor undercapitalized" because alleging "one element of the single economic entity test . . . is not, on its own, enough").

[67] *Blair*, 720 F. Supp. 2d at 472-73.

allegations of these specific factors," a plaintiff may still state a veil-piercing claim with "other relevant allegations."[68] Each of the enumerated factors is discussed below and, for convenience and where appropriate, certain of those factors are discussed together. For the reasons below, the Examiner concludes that the evidence does not support the proposition that AFI and ResCap should be considered a single economic entity.

### (1) Undercapitalization And Insolvency

#### (a) Legal Principles

"A shortage of capital, as with all the factors of the alter ego doctrine, is not *per se* a reason to pierce the corporate veil."[69] "If lack of adequate capitalization were alone enough to justify piercing the corporate veil, the veil of every insolvent subsidiary or failed start-up corporation could be pierced."[70] "Rather, the inquiry into corporate capitalization is most relevant for the inference it provides into whether the corporation was established to defraud its creditors or other improper purpose such as avoiding the risks known to be attendant to a type of business."[71]

"When determining whether a subsidiary was adequately capitalized, courts focus on the initial capitalization: whether a corporate entity was or was not set up for financial failure."[72] Although "courts usually analyze capitalization at the inception of a corporation," an analysis of capitalization may also be appropriate when, as a result of actions of the parent, "the corporation distinctly changes the nature or magnitude of its business."[73] Indeed, evidence of a

---

[68] *Official Comm. of Unsecured Creditors of Sunbeam Corp. v. Morgan Stanley & Co., Inc.* (*In re Sunbeam Corp.*), 284 B.R. 355, 365 (Bankr. S.D.N.Y. 2002); *see also Union Carbide Corp. v. Montell N.V.*, 944 F. Supp. 1119, 1145 (S.D.N.Y. 1996).

[69] *Trustees of the Nat'l Elevator Indus. Pension, Health Benefit and Educ. Funds v. Lutyk*, 332 F.3d 188, 197 (3d Cir. 2003) (applying federal common law); *see also In re BH S&B Holdings LLC*, 420 B.R. at 137 (dismissing veil-piercing claim in part because allegations that subsidiary was undercapitalized "would not support disregarding the corporate form" without "more unusual facts or circumstances," where subsidiary has "sufficient funds to operate for at least a few months" at its inception).

[70] *In re RSL Com Primecall, Inc.*, 2003 Bankr. LEXIS 1635, at *53.

[71] *Trevino*, 583 F. Supp. 2d at 530 (quotation marks omitted) (dismissing veil-piercing claim where plaintiffs admitted that company "was created for a legitimate purpose" and failed to "allege in their Amended Complaint any other factors, besides undercapitalization").

[72] *In re BH S&B Holdings LLC*, 420 B.R. at 136 (quotation marks omitted).

[73] *Pharmacia Corp. v. Motor Carrier Servs. Corp.*, 309 Fed. Appx. 666, 672 (3d Cir. Feb. 10, 2009) (quotation marks omitted) (applying New Jersey law) (rejecting argument that the district court had "improperly concluded that [the company] was undercapitalized" where "the nature of [the company's] business changed significantly when it was purchased" by the defendant and after that sale it "had no revenue at all").

subsidiary's undercapitalization at a time after its formation may be relevant whenever that undercapitalization is caused by the parent.[74] Although one decision by a Delaware court may have gone farther in suggesting that a parent company could have an "ongoing duty to maintain adequate capitalization" of a subsidiary, the Examiner does not consider that to be an accurate statement of Delaware law.[75]

Like undercapitalization, "[i]nsolvency, in and of itself, does not justify piercing the corporate veil."[76] Insolvency is not dispositive without more because:

> If creditors could enter judgments against shareholders every time that a corporation becomes unable to pay its debts as they become due, the limited liability characteristic of the corporate form would be meaningless. Thus, the insolvency inquiry must have a different purpose. Instead, insolvency is one factor to be considered in assessing whether the corporation engaged in conduct that unjustly shields its assets from its creditors. If so, and especially if particular shareholders benefited from and

---

[74] *See Official Comm. of Unsecured Creditors of Moll Indus., Inc. v. Highland Capital Mgmt. LP* (*In re Moll Indus., Inc.*), 454 B.R. 574, 588 (Bankr. D. Del. 2011) (dismissing veil-piercing claim where plaintiff "failed to allege that [the subsidiary] was inadequately capitalized at its inception or that [its parent] caused the undercapitalization or insolvency," and explaining that allegations that "various financial covenants and obligations were relaxed" would have "help[ed] (rather than hurt) [the subsidiary's] financial condition"); *see also Autobacs Strauss, Inc. v. Autobacs Seven Co.* (*In re Autobacs Strauss, Inc.*), 473 B.R. 525, 553 (Bankr. D. Del. 2012) (denying motion to dismiss veil-piercing claim where plaintiff alleged that subsidiary "ABST had no ability to access capital aside from its parent because of the controlling AB7-related ABST Directors" and "all it could do was ask . . . for operational funding for AB7 with hopes that 'Mama' would provide"); *In re Saba Enters., Inc.*, 421 B.R. at 653 (denying motion to dismiss veil-piercing claim where complaint alleged that "valuable assets of the Debtor . . . were siphoned off . . . thereby leaving the Debtor undercapitalized") (applying Colorado law); *In re Foxmeyer Corp.*, 290 B.R. at 244 ("[T]he Court agrees . . . that such factors are only relevant from a veil piercing standpoint if such subsidiary was inadequately capitalized and/or insolvent from its inception or such adverse status was subsequently caused by acts of the subsidiary's parent.").

[75] *United States v. Golden Acres, Inc.*, 702 F. Supp. 1097, 1105 (D. Del. 1988) (entering judgment in favor of the plaintiff's veil-piercing claim where "the corporation continued to be undercapitalized after defendants took control") (applying federal common law); *see also DeWitt Truck Bros., Inc. v. W. Ray Flemming Fruit Co.*, 540 F.2d 681, 686 (4th Cir. 1976) ("[T]he obligation to provide adequate capital begins with incorporation and is a continuing obligation thereafter during the corporation's operations.") (quotation marks omitted) (applying South Carolina law). The Examiner is not aware of any decision holding that a parent's failure to maintain the adequate capitalization of a subsidiary is a basis for veil-piercing liability under Delaware law, and such a rule would appear to invite courts to pierce the veil of "every insolvent subsidiary or failed start-up corporation." *See In re RSL Com Primecall, Inc.*, 2003 Bankr. LEXIS 1635, at *53.

[76] *EBG Holdings LLC v. Vredezicht's Gravenhage 109 B.V.*, Civ. No. 3184, 2008 Del. Ch. LEXIS 127, at *53 (Del. Ch. Sept. 2, 2008).

> controlled that conduct, then justice would require the piercing
> of the corporate veil in order to hold the benefiting shareholders
> responsible.[77]

As with evidence of undercapitalization, evidence of a subsidiary's insolvency after its formation may weigh in favor of veil-piercing liability if caused by the parent.[78]

### (b) Application To Facts

The Examiner has concluded that the evidence does not support the proposition that ResCap was inadequately capitalized or insolvent at or around its formation.[79] After March 2005, when AFI transferred subsidiaries RFC and GMAC Mortgage to ResCap and ResCap commenced operations, AFI contributed $2 billion in capital through debt forgiveness providing ResCap with an equity balance of approximately $6.4 billion.[80] AFI also converted certain intercompany borrowings from a single revolving facility to provide ResCap with a $5 billion ten-year subordinated note, $1.5 billion one-year term loan, and $2.5 billion two-year revolving line of credit.[81] ResCap obtained additional outside funding in 2005, including $3.5 billion in syndicated bank credit facilities and $1.25 billion of unsecured debt issued pursuant to a $12 billion shelf registration statement.[82]

This evidence does not support an inference that ResCap was "set up for financial failure."[83] To the contrary, the evidence indicates that ResCap was formed to hold AFI's mortgage operations and "enhance the liquidity and cost effectiveness of the financing" thereof by obtaining "a stand-alone credit rating."[84] Those mortgage operations were viewed by management as "very profitable" and a "crown jewel."[85] Consistent with that view, in 2005 and 2006, ResCap reported net income of $1 billion and $705.1 million, respectively.[86]

---

[77] *Mason*, 2005 Del. Ch. LEXIS at *12–13 (denying plaintiff's motion for summary judgment on veil-piercing claim where "even if [the corporation] was insolvent, there is no evidence in the record demonstrating that its assets were transferred in an attempt to avoid its creditors").

[78] *See In re Moll Indus., Inc.*, 454 B.R. at 588; *In re Foxmeyer Corp.*, 290 B.R. at 244.

[79] *See* Sections VI.B and VI.C.

[80] *See* Residential Capital, LLC, Annual Report (Form 10-K) (Mar. 28, 2006), at 73.

[81] *Id.*

[82] *Id.*

[83] *See In re BH S&B Holdings LLC*, 420 B.R. at 136–37 (quotation marks omitted) (complaint's allegations "cannot support a finding that [debtor] was undercapitalized" where debtor "had cash on hand, and . . . sufficient funds to operate for at least a few months" and was at least "initially a legitimate business").

[84] General Motors Acceptance Corp., Current Report (Form 8-K) (Jan. 13, 2005); *see also* Section III.A.

[85] Int. of E. Feldstein, Dec. 14, 2012, at 67:18–22.

[86] *See* Residential Capital, LLC, Annual Report (Form 10-K) (Mar. 28, 2006), at 57; Residential Capital, LLC, Annual Report (Form 10-K) (Mar. 13, 2007), at 55.

The Examiner's conclusion that ResCap was not inadequately capitalized or insolvent at or around its formation does not, however, end the inquiry. The Examiner has concluded that the evidence supports the proposition that ResCap was (1) left with unreasonably small capital from August 15, 2007 through the date of ResCap's chapter 11 bankruptcy filing; and (2) balance sheet insolvent from December 31, 2007 through the date of ResCap's chapter 11 bankruptcy filing.[87] Such evidence could weigh in favor of piercing the corporate veil if ResCap's inadequacy of capital and/or insolvency during those time periods was caused by the conduct of AFI.[88] The available evidence indicates that proving such a theory would be difficult.

In particular, that evidence indicates that the primary drivers of ResCap's inadequacy of capital and insolvency were the substantial operating losses reported beginning in the fourth quarter of 2006, which included a net loss of $4.3 billion in 2007.[89] Those reported losses reflected, inter alia, lower loan production and gain on sale margins, higher provisions for loan losses, and higher losses on foreclosed real estate.[90] The Examiner has not found evidence of any potential siphoning of assets by AFI from ResCap that could be shown to have been of a magnitude to have caused ResCap's inadequacy of capital and/or insolvency.[91] Although ResCap entered into various Affiliate Transactions, the Examiner has concluded—with certain exceptions—that ResCap received at least fair value in those transactions.[92] Moreover, those exceptional transactions with respect to which the Examiner finds that ResCap received less than fair value (i.e., the 2006 Bank Restructuring and the Second 2009 Tax Allocation Agreement)[93] were dwarfed in scale both by ResCap's operating losses and the more than

---

[87]  *See* Sections VI.B and VI.C.

[88]  *See In re Autobacs Strauss, Inc.*, 473 B.R. at 553; *In re Moll Indus., Inc.*, 454 B.R. at 588; *In re Saba Enters., Inc.*, 421 B.R. at 653; *In re Foxmeyer Corp.*, 290 B.R. at 244.

[89]  *See* Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2008), at 56; *see also* Sections VI.B–D.

[90]  *See* Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2008), at 57.

[91]  *See In re Saba Enters., Inc.*, 421 B.R. at 653 (denying motion to dismiss veil-piercing claim where complaint alleged that "valuable assets of the Debtor . . . were siphoned off . . . thereby leaving the Debtor undercapitalized") (applying Colorado law); *In re Verestar, Inc.*, 343 B.R. at 464–65 (denying motion to dismiss veil-piercing claim where complaint alleged that parent "stripped [debtor] of assets" and that debtor was "undercapitalized").

[92]  *See* Section V. The Examiner considers whether there is evidence that AFI siphoned assets from ResCap in Section VII.A.1.f(2).

[93]  This conclusion does not change if the misallocation of revenues on brokered loans discussed in Sections V.B.6, VII.L.2, and VII.A.1.f(2)(b) is included in the analysis.

$8 billion in financial support that AFI would provide to ResCap in the form of cash contributions, debt forgiveness, and other asset contributions.[94]

Nor has the Examiner encountered substantial evidence that AFI prevented ResCap from obtaining needed financing.[95] Instead, the factual record reflects that, beginning on or before the end of 2007, ResCap became unable to obtain financing in the market and became dependent upon AFI to meet its liquidity and capital needs.[96]

A plaintiff could in theory attempt to prove that ResCap would have obtained TARP funds on its own behalf but for the interference of AFI and that—with direct access to such funding rather than the periodic, indirect infusions of TARP funds that ResCap received from AFI—ResCap could have avoided bankruptcy.[97] The Examiner concludes that the evidence does not support that proposition. ResCap could not have obtained TARP funds without

---

[94] *See* Section VI.C.4.f(4). The $8 billion figure includes the contribution in December 2009 of $1.4 billion in "higher risk mortgage assets" that AFI purchased from Ally Bank and then contributed to ResCap. *See* GMAC Inc., Current Report (Form 8-K), (Dec. 30, 2009) at 2–3. The Creditors' Committee characterizes this as a "contribution of toxic assets." *See* Creditors' Committee Submission Paper, dated Mar. 7, 2013, at 71 & n.43. It has not been possible to separately value these assets based on the available information. However, the assets had an unpaid principal balance of $3.6 billion and a carrying value of $2.8 billion before their purchase from the Bank; GMAC Inc. purchased them for $1.4 billion (identified in SEC filings as "fair value"), and contributed capital to the Bank to make up the difference between the purchase price and the carrying value. *Id.* at 3. ResCap notably conducted a number of asset sales in 2010 on which it booked gains. *See* Residential Capital LLC Consolidated Financial Statements for the Years Ended December 31, 2009 and 2010 [EXAM00123128]. The Examiner's Professionals were not able to trace which of these assets contributed by AFI were (or were not) included in these sales. In any event, the Investigation has not disclosed evidence that the write-down of the assets to $1.4 billion was inadequate, that the assets were worth less than this amount, or that ResCap was somehow injured or disadvantaged by their contribution. Nonetheless, even if it were appropriate to discount or ignore the contribution of these assets, given the remaining contributions of over $6.5 billion by AFI, the Examiner's conclusions here would remain unaltered.

[95] *See In re Autobacs Strauss, Inc.*, 473 B.R. at 553 (denying motion to dismiss veil-piercing claim where plaintiff alleged that subsidiary "ABST had no ability to access capital aside from its parent because of the controlling AB7-related ABST Directors").

[96] *See* Section VI.B.

[97] *See* Section III.H (explaining that ResCap explored a potential application for TARP funds until it learned that AFI and Cerberus were also seeking such funds).

becoming a bank holding company,[98] which required Ally Bank's abandonment of its industrial bank charter and conversion to a charter subject to Bank Holding Company Act (BHCA) regulation, and would have triggered BHCA requirements for AFI (and Cerberus). This conversion could not have occurred without AFI's agreement and active involvement, which it was not obligated to provide.

---

[98] TARP, created pursuant to the Emergency Economic Stabilization Act of 2008, 12 U.S.C. § 5211, ultimately comprised several different programs. These programs had not been fully developed at the time of Marano's October 2008 proposal, which thus does not specify which program it seeks to invoke. *See* ResCap: Proposal for the TARP, at 1–9 [CCM00012373]; *see also* Minutes of a Special Meeting of the Board of Residential Capital, LLC, Oct. 10, 2008, at 2 (discussion of Marano's proposal) [EXAM00073840]. The Capital Purchase Program, a preferred stock and equity warranty purchase program (under which AFI sought and obtained relief), appears to have been the most likely program, but to be eligible, an entity had to be a "bank, savings association, bank holding company [or] savings and loan holding company organized under the laws of the United States." *See* U.S. DEPARTMENT OF THE TREASURY, PROCESS-RELATED FAQS FOR CAPITAL PURCHASE PROGRAM, www.financialstability.gov/roadtostability/CPPappdocs_faq1.htm. ResCap might also have sought relief under the Capital Assistance Program, but, it too, was limited to "bank holding companies, financial holding companies, insured depository institutions and savings and loan holding companies," and, further, no entity ever received funding under the program. *See* APPLICATION GUIDELINES FOR CAPITAL ASSISTANCE PROGRAM, http:/ /www.treasury.gov/initiatives/financial-stability/TARP-Programs/bank-investment-programs/scap-and-cap/ Documents/CAP_App-Guidelines.pdf; SUPERVISORY CAPITAL ASSESSMENT PROGRAM & CAPITAL ASSISTANCE PROGRAM PURPOSE AND OVERVIEW, http://www.treasury.gov/initiatives/financial-stability/TARP-Programs/bank-investment-programs/scap-and-cap/Pages/default.aspx.

Two other TARP programs, the Asset Guarantee Program and the Targeted Investment Program, were limited to institutions deemed "systemically significant" and were applied with "extreme discretion"; only two institutions, Bank of America and Citigroup Inc., were deemed to meet these standards. *See* ASSET GUARANTEE PROGRAM PURPOSE AND OVERVIEW, http://www.treasury.gov/initiatives/financial-stability/ TARP-Programs/bank-investment-programs/agp/Pages/default.aspx; U.S. Treasury Report to Congress Pursuant to Section 102 of the Emergency Economic Stabilization Act, at 1–2 (Dec. 31, 2008); TARGETED INVESTMENT PROGRAM: PROGRAM PURPOSE AND OVERVIEW, http://www.treasury.gov/initiatives/financial-stability/TARP-Programs/bank-investment-programs/tip/Pages/ default.aspx. Particularly in light of the views the U.S. Treasury expressed about ResCap (discussed in text), it appears highly unlikely that ResCap could have qualified for relief under these programs.

It appears ResCap would not have been eligible for the remaining TARP programs, such as (1) the Community Development Capital Initiative, a program to provide "low-cost capital to Community Development Financial Institutions as a means of helping them fulfill their mission of provident credit to small businesses and individuals in underserved communities," *see* MEMORANDUM TO CDCI PARTICIPANTS, http:// www.treasury.gov/initiatives/financial-stability/TARP-Programs/bank-investment-programs/tip/Pages/ default.aspx; BANK-THRIFT APPLICATION GUIDELINES FOR TARP COMMUNITY DEVELOPMENT CAPITAL INITIATIVE, http://www.treasury.gov/initiatives/financial-stability/TARP-Programs/bank-investment-programs/ cdci/Documents/ Bank20Thrift20CDCI20Application20Updated20Form.pdf, or (2) the Term Asset-Backed Securities Loan Facility, available to the holders of asset-backed securities where the "underlying credit exposures" are "auto loans, student loans, credit card loans, or small business loans guaranteed by the Small Business Administration." *See* TERM ASSET-BACKED SECURITIES LOAN FACILITY (TALF) TERMS AND CONDITIONS, http://www.federalreserve.gov/newsevents/monetary20081125a1.pdf.

As a practical matter, it does not appear likely that the federal government would have looked positively on separate, arguably competing applications from the parent and its subsidiary, and in light of AFI's own need for TARP assistance, it is not surprising that a single AFI application was pursued. Moreover, the evidence suggests that, even had a separate ResCap application otherwise been acceptable, the U.S. Treasury is unlikely to have looked favorably on ResCap's application. First, the U.S. Treasury itself "stated that . . . it regarded ResCap as 'marginal, at best' as a factor in the decision to support [AFI]."[99] Instead, the U.S. Treasury "defend[ed] its assistance to GMAC as crucial to supporting its extensive investments in GM and Chrysler, which, in turn were made for a variety of reasons, including the fear of shock to the economy—perhaps rising to the level of systemic risk if the domestic auto industry were to fail."[100] Notably, the federal government did not mandate that any portion of the TARP funds provided to AFI be given to ResCap.[101] When a Congressional Oversight Panel reviewed the matter in 2010, issuing a report entitled, "The Unique Treatment of GMAC Under the TARP," it noted that "while ResCap was once a profitable venture for GMAC, and ResCap holds significant market shares in both the mortgage origination and mortgage servicing sectors, there has been no suggestion that the disruption of these businesses caused by a bankruptcy would have any direct systemic effect."[102]

Although AFI's support for ResCap was never adequate to do more than maintain ResCap on "life support," the Examiner has not encountered evidence sufficient to demonstrate that such support was a cause—rather than a symptom—of ResCap's inadequacy of capital and insolvency.[103]

---

[99] CONGRESSIONAL OVERSIGHT PANEL, MARCH OVERSIGHT REPORT: THE UNIQUE TREATMENT OF GMAC UNDER THE TARP, at 79, http://cybercemetery.unt.edu/ archive/cop/20110402042135/http://cop.senate.gov/ documents/cop-031110-report.pdf. Tessler's observation that "[ResCap] was one of the significant reasons the Fed and FDIC decided to support [AFI] in becoming a BHC" does not compel a different conclusion. *See* E-mail from L. Tessler to M. Carpenter (Dec. 3, 2009), at CCM00065542 [CCM00065540]. Bank holding company status required approval by entities other than the U.S. Treasury, which made decisions concerning TARP approval (although they presumably coordinated efforts). Further, Tessler had little interaction with the federal government in connection with the TARP application. *See* Int. of L. Tessler, Feb. 28, 2013, at 94:21–97:15, 113:19–114:12.

[100] CONGRESSIONAL OVERSIGHT PANEL, MARCH OVERSIGHT REPORT: THE UNIQUE TREATMENT OF GMAC UNDER THE TARP, at 78.

[101] *See* TARP LETTER AGREEMENT BETWEEN U.S. DEPARTMENT OF THE TREASURY AND GMAC LLC (Dec. 29, 2008) (online at http://www.treasury.gov/initiatives/financial-stability/TARP-Programs/automotive-programs/ Documents/ GMAC%20Agreement%20Dated%2029%20December%202008.pdf.).

[102] CONGRESSIONAL OVERSIGHT PANEL, MARCH OVERSIGHT REPORT: THE UNIQUE TREATMENT OF GMAC UNDER THE TARP, at 78–79.

[103] *See* Section VI.B. ResCap's restructuring beginning in late 2008 likewise was a reaction to and not the cause of its ongoing undercapitalization. *See* Section III.H (describing proposed restructuring that would, inter alia, close GMAC Mortgage retail offices, curtail international business activities, and eliminate several thousand jobs). Accordingly, and given that this restructuring reduced the scope of ResCap's business, this is not a case where an entity's post-formation undercapitalization may be deemed relevant for purposes of veil piercing because the entity "change[d] the nature or magnitude of its business." *See Pharmacia Corp.*, 309 Fed. Appx. at 672 (quotation marks omitted) (applying New Jersey law).

### *(2) Siphoning Of The Subsidiary's Assets By A Parent*

#### *(a) Legal Principles*

"Siphoning" has been described as "the improper taking of funds [from an entity] that the owner was not legally entitled to receive."[104] The transfer of assets from a subsidiary to its parent may, in certain circumstances, be deemed "siphoning" that weighs in favor of a finding that the parent and subsidiary were a "single economic entity."[105] In *Official Comm. of Unsecured Creditors of Verestar, Inc. v. Am. Tower Corp. (In re Verestar, Inc.)*, for example, a veil-piercing claim was brought on the debtor's behalf alleging that "when it was clear that [the debtor] would ultimately have to be liquidated," its parent implemented "a scheme entitled 'Project Harvest,' a program to transfer as many of [the debtor's] assets and as much of its value as possible to [the parent] before [the debtor's] inevitable collapse."[106] The bankruptcy court denied a motion to dismiss that claim notwithstanding that there was "much in the Complaint inconsistent with a viable alter ego claim" or "merely indicative of many unremarkable parent-subsidiary relationships."[107] Nonetheless, the court explained, "[t]he key to a finding of alter ego liability is that the controlling owners operated the subsidiary as an 'incorporated pocketbook,'" and the plaintiff had adequately alleged that the parent "stripped [the debtor] of assets" while "attempting to shield itself from [the debtor's] liabilities."[108]

"[T]he mere making of payments and transfers [between a parent and subsidiary] alone does not create alter ego liability."[109] A transfer made for adequate consideration and with a

---

[104] *Autobacs Strauss, Inc. v. Autobacs Seven Co.* (*In re Autobacs Strauss, Inc.*), 473 B.R. 525, 557 (Bankr. D. Del. 2012) (quotation marks omitted).

[105] *Trustees of the Nat'l Elevator Indus. Pension, Health Benefit and Educ. Funds v. Lutyk*, 332 F.3d 188, 195 (3d Cir. 2003) (affirming summary judgment piercing corporate veil based in part on sole shareholder's "irregularly scheduled, erratic, but not insignificant 'drawings'" on corporate assets and "'loans' that [the shareholder] caused [the corporation] to repay him") (applying federal common law); *In re Saba Enters., Inc.*, 421 B.R. at 653 (denying motion to dismiss veil-piercing claim where complaint alleged that "valuable assets of the Debtor, in the form of those subsidiaries with value-generating operations as opposed to abandoned oil wells, were siphoned off to . . . its ultimate parent . . . prior to the filing of the Petition" in exchange for "nominal consideration") (applying Colorado law); *Gadsden*, 2004 Del. Ch. LEXIS 14, at *14–15 (entering judgment after trial in favor of plaintiff on veil-piercing claim where "after each Home Preservation project was completed, [its sole shareholder] Conaway transferred any excess cash from the company to his personal accounts"); *Mabon, Nugent & Co.*, 1990 Del. Ch. LEXIS 46, at *16 (denying defendant's motion for summary judgment on veil-piercing claim where subsidiary guaranteed loans of parent and "received no compensation in return").

[106] *In re Verestar, Inc.*, 343 B.R. at 457.

[107] *Id.* at 464.

[108] *Id.* at 465.

[109] *Liafail, Inc. v. Learning 2000, Inc.*, Nos. 01-599 & 01-678, 2002 U.S. Dist. LEXIS 22620, at *37–38 (D. Del. 2002) (granting defendant's motion for summary judgment on veil-piercing claim where plaintiff failed to "identify any facts from which the court, or a jury, could reasonably determine that [the payments and transfers] were improper").

legitimate business purpose is unlikely to be viewed as "siphoning" assets.[110] Moreover, evidence that the parent transferred assets *to* the subsidiary in an effort to stave off insolvency may, in certain circumstances, negate an inference that the parent "siphoned" assets from that subsidiary.[111]

Infusions of assets by a parent to its subsidiary do not, however, invariably defeat any allegation that the parent was abusing the corporate form.[112] For example, in *United States v. Golden Acres, Inc.*, the U.S. District Court for the District of Delaware's entry of judgment in favor of the plaintiff's veil-piercing claim relied in part on evidence that "defendants were siphoning funds out of the corporation at regular intervals," notwithstanding a record of certain "cash infusions into the corporation."[113] The district court explained that those "cash infusions" were "by short-term loan only" and, therefore, were consistent with the conclusion that defendants "had no concern for [the corporation's] balance sheet, they just wanted to keep the apartment project secure enough to continue generating funds."[114]

More recently, in *Autobacs Strauss, Inc. v. Autobacs Seven Co. (In re Autobacs Strauss, Inc.)*, the Delaware bankruptcy court denied a motion to dismiss a veil-piercing claim and rejected the argument that the parent "could not have siphoned money out of [the subsidiary]"

---

[110] *See id.*; *Harco Nat'l Ins. Co. v. Green Farms, Inc.*, Civ. No. 1131, 1989 Del. Ch. LEXIS 114, at *16 (Del. Ch. Sept. 19, 1989) (denying plaintiff's motion for summary judgment on veil-piercing claim in part because: "[A] transfer of assets [involving a corporation's repayment of shareholder loans], however, is not necessarily a basis for piercing the corporate veil. The plaintiffs must also show that such transfers were done to defraud creditors or were done merely to siphon off corporate assets, rather than to repay outstanding loans. This has not yet been done.").

[111] *See Alberto v. Diversified Group, Inc.*, 55 F.3d 201, 207 (5th Cir. 1995) (affirming granting of parent's motion for summary judgment on veil-piercing claim where bankrupt subsidiary was "already in desperate financial straits" when it was purchased and "was not bled white for the benefit of its new 'grandparent,' DGI; to the contrary, DGI . . . attempted to resuscitate [the subsidiary] by funneling millions of dollars of capital into the struggling company") (applying Delaware law); *In re Moll Indus., Inc.*, 454 B.R. at 590 (plaintiff did not adequately allege that the parent "siphoned funds" when it directed the subsidiary "to purchase the Tucson facility," where "the actual net result of this transaction was an increase in the money lent to [the subsidiary]"); *Tese-Milner v. TPAC, LLC (In re Ticketplanet.com)*, 313 B.R. 46, 71 (Bankr. S.D.N.Y. 2004) (dismissing veil-piercing claim despite allegation "that the Debtor merely served as a tool to further Defendants' interests," where the debtor had "received a substantial cash infusion from [defendant affiliate entity]").

[112] *See NetJets Aviation, Inc.*, 537 F.3d at 180, 182 (reversing grant of summary judgment dismissing veil-piercing claim where there was "ample" evidence to find that "[sole owner] Zimmerman completely dominated [limited liability company] LHC and that he essentially treated LHC's bank account as one of his pockets, into which he reached when he needed or desired funds for his personal use," notwithstanding the evidence of "numerous transfers of money by Zimmerman to LHC").

[113] *United States v. Golden Acres, Inc.*, 702 F. Supp. 1097, 1106 (D. Del. 1988).

[114] *Id.*

when the parent "put 'net' cash into the [subsidiary]."[115] The court explained that a net cash infusion may not always immunize from veil-piercing liability a parent that causes improper distributions by an insolvent subsidiary:

> The question is not what they put in the company, but when they took it out. If the infusions were, in fact, loans, then the insider was siphoning cash by requiring payments to be made under his loan at a time when the company was insolvent. If the infusions were, in fact, capital contributions, it is worse. The controlling insider was making dividends to itself at a time when the company was insolvent.[116]

The determination of whether any transfers of debts or assets to or from a subsidiary constitute a "siphoning" that could weigh in favor of veil-piercing liability must, therefore, turn on the terms of that transfer and the surrounding circumstances.

### (b) Application To Facts

The factual record does not evidence any simple looting by AFI of cash or other assets from ResCap. Rather than "crude corporate abuse" involving "diverted corporate funds," the Creditors' Committee asserts, "[t]his case is about practiced corporate abuse" making use of "large and often complicated corporate transactions."[117] The Examiner's analysis of the multitude of Affiliate Transactions entered into by ResCap in part considered whether there is evidence that any of those transactions resulted in ResCap receiving less than fair market value.[118] With certain exceptions, the Examiner concludes that the evidence supports the proposition that ResCap did not receive less than fair market value in those Affiliate Transactions. The bases for the Examiner's conclusions are set forth in greater detail below as to each of: (1) the Ally Bank Transactions; (2) the Second 2009 Tax Allocation Agreement; (3) the misallocation of certain brokered-loan revenues beginning in 2009; (4) the various asset sales and financings; (5) derivatives including the MSR Swap and the Pipeline Swap; and (6) the allocation of liability in connection with government settlements including the FRB/FDIC Settlement and the DOJ/AG Settlement.

Those Affiliate Transactions that were exceptions that resulted in ResCap's receipt of less than fair market value include the 2006 Bank Restructuring and the Second 2009 Tax Allocation Agreement.[119] The misallocation of revenues on loans brokered by GMAC Mortgage to Ally Bank, and more specifically, the response in early 2012, when the

---

[115] *In re Autobacs Strauss, Inc.*, 473 B.R. at 557.

[116] *Id.* at 557–58.

[117] Creditors' Committee Submission Paper, dated Mar. 7, 2013, at 100.

[118] *See* Section V (analyzing Affiliate Transactions).

[119] *See* Sections V.A, V.D.

misallocation was discovered, arguably should also be included in this analysis.[120] The Examiner concludes, however, that the finding that the 2006 Bank Restructuring and the Second 2009 Tax Allocation Agreement were for less than fair market value, and that Ally Bank retained brokered-loan revenues due to ResCap in 2012, does not—on balance and when viewed under all the circumstances—support the proposition that AFI engaged in "siphoning."[121] As an initial matter, the approximate total amounts by which the 2006 Bank Restructuring (i.e., $390–465 million) and the Second 2009 Tax Allocation Agreement (i.e., $50 million and the avoidance of an obligation now known to be worth up to $1.77 billion) fell short of fair market value, combined with the approximately $520.5 million at issue in connection with brokered loans, pale in comparison to the $8 billion in financial support that AFI provided to ResCap from 2007 to the Petition Date in 2012.[122] Specifically, AFI contributed to ResCap $2.9 billion in cash, $3.3 billion in debt forgiveness, and $1.9 billion in other assets during that time period.[123] That $8 billion figure does not account for the other Affiliate Transactions where ResCap received at least fair value, many of which provided ResCap with much-needed liquidity.[124] Indeed, the Examiner finds that at least a few such transactions resulted in ResCap's receipt of more than fair value.[125] In at least two instances, AFI required its subsidiary GMAC CF to purchase assets from ResCap despite the substantial concerns of that entity's management that the assets were over-valued.[126]

Although the Examiner agrees with the Creditors' Committee that net asset infusions by a parent to its subsidiary do not necessarily preclude a finding of "siphoning,"[127] here the

---

[120] *See* Section V.B.6, VII.L.2. As discussed there, while it appears that the misallocation of revenues that occurred from and after August 2009 was originally inadvertent, following the discovery of the issue in December 2011, the process which led to Ally Bank's retention of those revenues (and the requirement that ResCap repay revenues from the period January 1, 2009, to July 31, 2009) appears less benign. The events in 2012 arguably involve only the taking of an additional $51.4 million from GMAC Mortgage; the remaining $469.1 million had been taken unwittingly, but was not returned. For purposes of argument, the entire $520.5 million is considered as part of the "siphoning" analysis.

[121] The Examiner elsewhere considers whether one or more of those transactions may give rise to any other causes of action against AFI. *See* Sections VII.G, VII.H, and VII.L.2.

[122] *See* Sections V. This approximate dollar amount by which the non-voting IB Finance Class M Shares received by ResCap in the 2006 Bank Restructuring were less than the value transferred from ResCap was calculated including an indirect benefit to ResCap of avoiding the potential credit downgrade that may have occurred had the Cerberus PSA failed to close, which the Examiner has valued at approximately $143 million. *See* Section V.A.1.

[123] *See* Section VI.C.2, Ex. VI.C.4.f(4)(b)–1; *see also* Section VII.A.1.f(1)(b) (discussing Creditors' Committee's characterization of certain of the assets contributed by AFI as "toxic").

[124] *See* Sections V.E, V.F.

[125] *See* Section V.A.1.b (approximate excess value from 2008 Bank Transaction of $127–270 million); Section V.A.1.c (approximate excess value from 2009 Bank Transaction of $382–493 million); Section V.B.12 (GMAC Mortgage received a net benefit from the Pipeline Swap, the MSR Swap, and the related market hedges).

[126] *See* Section V.F (Health Care Finance and Resort Finance transactions).

[127] *See* Creditors' Committee Submission Paper, dated Mar. 7, 2013, at 102–3.

Examiner finds that any inference of "siphoning" is undermined by both the amount of AFI's financial support, and the lack of evidence that such support had the intent or effect of disguising or making possible further harm to ResCap and its creditors.[128]

Nor has the Investigation uncovered evidence of any broader plan to siphon assets from ResCap. Although AFI and various advisors explored from 2007 through 2011 a series of strategic initiatives for restructuring ResCap,[129] the available evidence distinguishes each of those initiatives from the type of "scheme" like the "Project Harvest" alleged in *Official Comm. of Unsecured Creditors of Verestar, Inc. v. Am. Tower Corp.* (*In re Verestar, Inc.*).[130] Unlike in *Verestar*, here there is no evidence that any of the AFI strategic initiatives contemplated causing ResCap "to sell certain assets to [AFI] for little or no consideration and to convey other assets to third parties and divert the proceeds to [AFI]."[131] For example, the AFI initiative once known as "Project Origin" and later as "Project Timex" contemplated an "out of court" purchase by AFI of ResCap's origination and servicing business.[132] Rather than a transfer of assets for little or no consideration, however, that initiative proposed a purchase price of $3.8 billion, offset by certain liabilities, and an AFI capital contribution of $600 million.[133] Moreover, AFI's proposal was the subject of counter-proposals from ResCap that sought increased consideration and other concessions from AFI.[134] In any event, none of the AFI strategic initiatives exploring an "out of court" restructuring of ResCap were ever implemented.[135]

The Creditors' Committee cites to an August 2008 e-mail exchange between Tessler, AFI Director and Managing Director of Cerberus, and de Molina, CEO of AFI, concerning the

---

[128] *Compare Golden Acres,* 702 F. Supp. at 1106 (entry of judgment in favor of the plaintiff's veil-piercing claim in part because cash infusions" were "by short-term loan only" and consistent with the conclusion that defendants "just wanted to keep the apartment project secure enough to continue generating funds"). The Investigation has not uncovered facts comparable to those alleged in *In re Autobacs Strauss, Inc.*, where the parent company provided its subsidiary "with a $12.3 million cash infusion" in order to avoid a "going concern qualification" on the subsidiary's audit report, and then compelled the subsidiary to "return $10.6 million and to treat the transaction as a 'loan prepayment'" less than two weeks later. *See In re Autobacs Strauss, Inc.* 473 B.R. 525, 549 (Bankr. D. Del. 2012) (denying motion to dismiss veil-piercing claim).

[129] *See* Sections III.G–J.

[130] *See In re Verestar,* 343 B.R. at 457.

[131] *See id.* at 457. The Examiner expresses no opinion as to whether any of the strategic initiatives for restructuring ResCap that were explored by AFI could have, if implemented, resulted in ResCap receiving less than fair market value (or otherwise implicated any potential causes of action).

[132] *See* Section III.I.f; *see also* Project Timex Update, prepared for a Special Meeting of the Board of Directors of GMAC Inc., dated Sept. 10, 2009, at 2 [ALLY_0003185].

[133] *See id.*

[134] *See* Section III.I; *see also* Board Materials prepared for a Special Meeting of the Board of Directors of Residential Capital, LLC, dated Aug. 12, 2009 [EXAM00007335]; Non-Negotiable Items Draft Discussion Document, prepared for a Special Meeting of the Board of Directors of Residential Capital, LLC, dated Aug. 17, 2009 [EXAM00096379].

[135] *See* Section III.

possibility of a sale of ResCap's mortgage servicing business to AFI as evidence of a plan to siphon assets from ResCap.[136] The Examiner finds that e-mail exchange to be equivocal, at best, and not probative of any plan to siphon assets from ResCap for less than fair value. The e-mail exchange could also be read as evidence of a concern to avoid a transaction that could "hollow out all of ResCap" and violate obligations to its bondholders.[137] Moreover, ResCap never did transfer its mortgage servicing business to AFI—let alone transfer it for less than fair market value.

In sum, the Examiner concludes that the evidence does not support the proposition that AFI "siphoned" assets from ResCap.

### (i)  The Ally Bank Transactions

In the 2006 Bank Restructuring, ResCap relinquished its controlling, 100% equity interest in Old GMAC Bank and, as required by the DFI, contributed $360 million in cash/debt to IB Finance.[138] In exchange, ResCap received two million non-voting IB Finance Class M Shares.[139] The Examiner has found that the 2006 Bank Restructuring resulted in ResCap receiving less than reasonably equivalent value.[140] In particular, the value of the IB Finance Class M Shares ResCap received, as a consequence of the absence of voting rights and the concomitant loss of control, was approximately $533–608 million less than the value ResCap transferred in the transaction.[141] Giving AFI credit for the indirect benefit to ResCap of avoiding the potential credit downgrade that may have occurred had the Cerberus PSA failed to close (which the Examiner has valued at approximately $143 million), ResCap received approximately $390–465 million less than fair value.[142]

Although individuals interviewed after the fact by the Examiner's Professionals in general sought to minimize the value of ResCap's loss of control, evidence arguably suggests that the 2006 Bank Restructuring was executed with knowledge or intent that ResCap would

---

[136] *See* Creditors' Committee Submission Paper, dated Mar. 7, 2013, at 50 (citing E-mail from L. Tessler to A. de Molina (Aug. 9, 2008) [CCM00121380] ("We can't hollow out all of ResCap or we are going to have a problem with Bonds but I am sure we can figure out something that works.")).

[137] *See* E-mail from L. Tessler to A. de Molina (Aug. 9, 2008) [CCM00121380]; *see also* Int. of L. Tessler, Feb. 28, 2013, at 60:23–61:11 ("Most bonds have a 'substantially all' provision. And you can't sell all of the assets of an organization without triggering those obligations."). The Examiner considers in Section VIII whether the "substantially all" covenant in ResCap's bonds was violated.

[138] *See* Section V.A.1.a.

[139] *See* Section V.A.1.a.

[140] *See* Section V.A.1.a.

[141] *See* Section V.A.1.e.

[142] *See* Section V.A. (estimating the approximate total value of the 100% interest in Old GMAC Bank and the cash/debt contribution to IB Finance at $1.98–2.26 billion and the approximate total value of the IB Finance Class M Shares, together with an indirect benefit to ResCap of avoiding potential credit downgrades that may have occurred had the Cerberus sale failed to close, at $1.59–1.80 billion).

thereby receive less than fair value for the assets transferred, particularly given ResCap's loss of a controlling interest in the Bank.[143] The facts concerning this issue are detailed in Sections V.A.1, VII.E, and VII.L.1.

The Examiner does not reach the same conclusions with respect to the subsequent 2008 Bank Transaction and 2009 Bank Transaction. The Examiner has found that the 2008 Bank Transaction, through which ResCap transferred to AFI the ResCap Preferred Interests and the right to exchange those interests for IB Finance Preferred Interests and AFI contributed to ResCap certain ResCap bonds, did not result in ResCap receiving less than FMV.[144] The Examiner has also found that the 2009 Bank Transaction, through which ResCap transferred to AFI its remaining IB Finance Class M Shares and AFI transferred to ResCap certain ResCap bonds, likewise did not result in ResCap receiving less than FMV.[145] Indeed, in both the 2008 Bank Transaction and the 2009 Bank Transaction, the Examiner has found that the value of the consideration received by ResCap likely exceeded the value of the assets transferred by ResCap.[146] The approximate amount of the "excess" value received by ResCap in the 2008 Bank Transaction and the 2009 Bank Transaction was $127–270 million and $382–493 million, respectively.[147]

### (ii) Second 2009 Tax Allocation Agreement

As discussed in Section V.D.3, the Second 2009 Tax Allocation Agreement, one of several agreements entered into by ResCap and AFI to allocate responsibility for payment of

---

[143] *See* Int. of S. Khattri, Oct. 25, 2012, at 97:18–21 ("I think the focus was this was considered a successful way where we were enabling the transaction and also protecting everybody's funding sources."); Int. of J. Young, Sept. 28, 2012, at 91:24–25 ("ResCap ended up in the same position they would've had before."); Int. of E. Feldstein, Dec. 14, 2012, at 110:17–18 ("I don't recall that being an issue."); Int. of M. Neporent, Feb. 6, 2013, at 26:1–3 ("[T]he voting or non-voting interest sort of seemed irrelevant at the time, at least from my perspective."). *But see* Int. of T. Melzer, Oct. 10, 2012, at 206:23–25 ("I think . . . voting would be better."); Int. of T. Hamzehpour, Oct. 5, 2012, at 157:17–19 (describing "a feeling personally that we should have at least had a voting interest versus a non–voting interest"); Int. of T. Marano, Nov. 26, 2012, at 35:21–36:23 (describing as "odd" and "kind of a remarkable thing" that ResCap "could own 51% of the company and have no voting rights").

[144] *See* Section V.A.

[145] *See* Section V.A. The Examiner attributed no material value to ResCap's loss of the right to redeem its IB Finance Preferred Interests at par value, which interests had an estimated value at the time of the 2009 Bank Transaction of below par. *See* Section V.A. Nor did the Examiner attempt to quantify the value of the sixty-day extension of the Initial Line of Credit Facility that was provided to ResCap by AFI pursuant to the 2009 Bank Transaction, which facility was undrawn at the time of the 2009 Bank Transaction. *See* Section V.A.

[146] *See* Sections V.A.

[147] *See* Section V.A. (estimating the total value of the bonds contributed by AFI in 2008 at approximately $841 million and the total value of the right transferred to AFI to exchange the ResCap Preferred Interests for IB Finance Preferred Interests at approximately $571–714 million); *id.* (estimating the total value of the bonds contributed by AFI at approximately $600 million and the total value of ResCap's remaining IB Finance Class M Shares at approximately $107–218 million).

income tax liabilities and the right to tax refunds, was fully executed on January 26, 2011.[148] AFI may use a total of up to $5 billion in tax benefits generated by ResCap, which (at a federal tax rate of 35%) would result in tax savings of up to $1.77 billion for AFI.[149] Had the First 2009 Tax Allocation Agreement remained in place, the amount of tax savings AFI realized would be payable to ResCap, though it is not clear how much of this benefit the parties should have anticipated would be payable to ResCap at the time they entered into the Second 2009 Tax Allocation Agreement.

The Examiner has concluded that the Second 2009 Tax Allocation Agreement resulted in ResCap receiving less than fair market value (regardless of whether the First 2009 Tax Allocation Agreement is held enforceable).[150] By its terms, there are no circumstances under which AFI would be required to make any payment to ResCap.[151] That agreement does, however, purport to require ResCap to make payments to AFI with respect to any tax on account of excess inclusion income generated by ResCap.[152] Under that agreement, ResCap paid to AFI approximately $32 million for the tax on account of excess inclusion income generated by ResCap from November 2, 2009 through December 31, 2011, and would be expected to make an additional payment of approximately $17.7 million to AFI for the tax on account of excess inclusion income projected to be generated for the following year.[153] Absent any tax allocation agreement and on a stand-alone basis, as a disregarded entity ResCap would not have had *any* income tax liability arising from its excess inclusion income (or otherwise).[154] As discussed in Section VII.K.2.c, the Examiner concludes that the approximately $50 million in ResCap payments under the Second 2009 Tax Allocation Agreement have not been made for FMV and may be avoided as fraudulent transfers. Given that the Examiner concludes that the First 2009 Tax Allocation Agreement is more likely than not to be deemed enforceable, the shortfall in value ResCap received in the Second 2009 Tax Allocation Agreement would include not just the $50 million, but also the value, at the time, of the AFI obligations to ResCap under the First 2009 Tax Allocation Agreement.

As detailed in Section V.D.2.b(3) and VII.K.2, the Investigation uncovered conflicting evidence as to whether the ResCap Board or its members knew, when they approved the Second 2009 Tax Allocation Agreement, that ResCap would have been entitled to significant payments under the First 2009 Tax Allocation Agreement and would receive nothing under

---

[148] *See* Section V.D.

[149] *See* Section V.D.

[150] *See* Section V.D.

[151] *See* Second 2009 Tax Allocation Agreement, at sections 1.03D, 2.03 [RC40016871]; *see also* Section V.D.

[152] *See* Second 2009 Tax Allocation Agreement, at sections 1.03D, 2.03 [RC40016871]; *see also* Section V.D.

[153] *See* Section V.D. The available evidence indicates that approximately $3 million of the $32 million billed by and paid to AFI corresponds to excess inclusion income generated by ResCap from July 1, 2009 through November 1, 2009—before the effective date of the Second 2009 Tax Allocation Agreement. *See* Section V.D.

[154] *See* Section V.D.

the Second 2009 Tax Allocation Agreement. Nonetheless, the evidence does not, ultimately, support a conclusion that the Second 2009 Tax Allocation Agreement was entered into with the intent to hinder, delay or defraud creditors.[155]

### (iii) Misallocation Of Brokered-Loan Revenues

As discussed in Sections V.B and VII.L.2, beginning August 1, 2009, Ally Bank retained revenues on brokered loans that, under the terms of the parties' agreement in connection with the Brokering Consumer Loans to Bank project, should have been allocated to GMAC Mortgage, revenues that totaled approximately $469.1 million. At least before the issue was discovered in December 2011, there is no evidence that this was intentional. On the contrary, the misallocation arose as the apparently unwitting result of the Ally Bank's fair-value election. When the issue came to light and then was investigated in early 2012, Ally Bank did not pay the amounts it had retained. Instead, ResCap was prevailed upon to pay Ally Bank the amounts it received from January 1, 2009 to July 31, 2009 (when revenues had been allocated as the parties agreed), plus interest, totaling $51.4 million, while AFI forgave an equivalent amount of debt upon this payment. As explained in Section VII.L.2, the evidence suggests that the 2012 resolution of this matter stemmed not from a fair, objective attempt to address the issue, but from an overarching concern, on the eve of ResCap's bankruptcy filing, to avoid restating prior financials, particularly those for Ally Bank, and the regulatory scrutiny that would have ensued. Nonetheless, given that Ally Bank's original retention of monies was not intentional, and that, for the most part, what is at issue is not taking additional funds from GMAC Mortgage, but failure when the issue came to light in 2012 to pay the additional monies due, it is debatable whether such sums should be considered for these purposes. For purposes of argument, however, the entire $520.5 million is considered as part of the siphoning analysis.

### (iv) Asset Sales And Financings

With respect to prepetition, related-party asset sales that ResCap entered into between August 2007 and May 2009, the Examiner has concluded that ResCap did not receive less than FMV in the Health Capital Sale, Excess Servicing Rights Sale, June 2008 Model Home Sale, September 2008 Model Home Sale, Resort Finance Sale, ResMor Sale, or US/UK Broker-Dealer Sale.[156] The approximate combined total of the gross cash consideration received by ResCap in those assets sales was approximately $1.75 billion.[157] The Examiner

---

[155] *See* Sections VII.K.2.

[156] *See* Section V.F.4. As discussed there, with respect to the June 2008 Model Home Sale the Examiner has concluded that, while a close question, the evidence supports the proposition that although the consideration ResCap received arguably was slightly below fair market value, particularly when the difficult market circumstances and surrounding exigencies are considered, ResCap received reasonably equivalent value.

[157] *See* Section V.F.4. The breakdown of the approximate gross cash consideration received in those asset sales is as follows: Healthcare Sale ($900.5 million); Excess Servicing Rights Sale ($282 million); June 2008 Model Home Sale ($230 million); September 2008 Model Home Sale ($59.2 million); Resort Finance Sale ($96.1 million); ResMor Sale (C$82 million, which was approximately US $67 million as of Dec. 31, 2008); US/UK Broker/Dealer Sale ($110.4 million). *See id.*

has likewise concluded that ResCap did not receive less than FMV in any of the prepetition, related-party financing transactions it entered into beginning in 2007.[158] Each of those financings was entered into on terms no less favorable—and in several cases more favorable—than those that could have been obtained in the market.[159]

The Investigation has not uncovered evidence that any of these asset sales or financings were executed with knowledge or intent that ResCap would receive less than FMV.[160] To the contrary, much of the available evidence appears to be inconsistent with such knowledge or intent. For example, the genesis of the Resort Finance Sale appears to have been as part of an effort to address "the fading asset sales and other situations" at ResCap by raising $650 million to $1 billion in cash.[161] The terms of the Resort Finance Sale were negotiated by ResCap, including the addition of a profit-sharing clause (that later proved inapplicable).[162] Indeed, management of GMAC CF appears to have believed that the Resort Finance Sale was executed on terms too favorable to ResCap and better than ResCap could have obtained from a third party.[163]

### (v) Derivatives

The Examiner's Professionals have concluded that, considered separately from GMAC Mortgage's market hedges, the Pipeline Swap was near break-even, that the MSR Swap was "in the money," and that GMAC Mortgage received a net benefit from the Pipeline Swap, the MSR Swap, and the related market hedges, considering the entirety of the economics of these transactions as they were implemented by the parties.[164] With respect to the MSR Swap—the transaction that seems to have engendered the most suspicion about its impact on ResCap—records reflect cumulative net cash payments made by Ally Bank to GMAC Mortgage of approximately $700 million over the period from its September 2007 inception through

---

[158] *See* Section V.E.

[159] *See id.*

[160] *See* Sections V.F.4 and V.E.

[161] *See* E-mail from J. Young (May 23, 2008) [EXAM10175040]; *see also* Section V.F.4.c.

[162] *See* Section V.F.4.c; Int. of L. Voss, Dec. 13, 2012, at 77:15–78:6 (describing negotiations and stating that "[t]here's no way that deal could have been a bad deal for ResCap").

[163] *See* Section V.F.4.c; Int. of W. Hall, Dec. 13, 2012, at 29:19–30:5, 177:2–177:12; Int. of L. Voss, Dec. 13, 2012, at 77:15–78:6; Minutes of a Special Meeting of the Board of Directors of GMAC Commercial Finance LLC, June 23, 2008, at ALLY_PEO_0001822 [ALLY_PEO_0001813] ("[AFI] has decided that the Business should be acquired by the Company and has directed the Company to enter into an asset purchase agreement with RFC for the purchase of the business.").

[164] *See* Sections V.B.12.a and V.B.12.b.

April 2012.[165] Accordingly, the Examiner concludes that the evidence concerning the MSR Swap and the Pipeline Swap does not support the proposition that either transaction constituted "siphoning."[166]

### (vi) Government Settlements

The Examiner concludes that evidence concerning the allocation of costs among ResCap and AFI in connection with the FRB/FDIC Settlement and the DOJ/AG Settlement does not support the proposition that such allocation constituted "siphoning."[167] ResCap and its subsidiaries, as the mortgage servicers, were responsible for a significant portion of the actionable issues that were the subject of those settlements. Although there may have been problematic aspects to ResCap's acceptance of an allocation of 92% of the settlement costs, that allocation appears to have been limited in effect to ResCap's and AFI's accounting. AFI further agreed to provide $196.5 million in debt forgiveness, thereby resulting in an effective allocation to AFI of approximately 25% of the total settlement costs. The Investigation has not located evidence to suggest that the allocation of costs was agreed to with knowledge or intent that ResCap would thereby be allocated a share of costs greater than its actual share of liability.[168]

### (3) Nonpayment Of Dividends

In certain circumstances, the failure to pay dividends has been found, like the absence of corporate formalities or adequate recordkeeping, to suggest that a company is not being operated like "a viable corporation, trying to maximize profits, pay off debt and distribute excess earnings."[169] However, context matters. Indeed, "many jurisdictions actually hold that the payment of dividends at a time when a corporation is insolvent *favors* piercing the corporate veil."[170]

With the exception of the LLC Conversion Dividend declared by the ResCap Board on November 27, 2006 and paid in the amount of $575 million, ResCap did not declare or pay any

---

[165] *See* Section V.B.12.b.

[166] The Examiner's conclusion concerning the MSR Swap and the Pipeline Swap excludes the misallocation of brokered revenues, which was discussed separately above. *See* Section VII.A.1.f(2)(b)(iii).

[167] *See* Section V.C.

[168] *See* Sections IV.A.2, V.C.1.f(4).

[169] *See United States v. Golden Acres*, 702 F. Supp. 1097, 1106 (D. Del. 1988).

[170] *Trustees of the Nat'l Elevator Indus. Pension, Health Benefit and Educ. Funds v. Lutyk*, 332 F.3d 188, 196 (3d Cir. 2003) (agreeing with district court's decision to "not afford any weight to . . . [the company's] failure to pay dividends" in a veil-piercing analysis) (emphasis in original); *see also Official Comm. of Unsecured Creditors of Moll Indus., Inc. v. Highland Capital Mgmt. LP* (*In re Moll Indus., Inc.*), 454 B.R. 574, 591 (Bankr. D. Del. 2011) ("[T]he Court finds that a [subsidiary's] failure to pay a dividend (especially in light of [subsidiary's] financial distress) is not enough to state a claim that [the subsidiary and parent] were a single economic enterprise.").

dividends to AFI.[171] By their terms, the 2005 Operating Agreement and the 2006 Amended Operating Agreement restricted ResCap from declaring or paying any dividend unless its stockholder's equity exceeded $6.5 billion and, even in such circumstances, imposed limitations on the amount of any dividend.[172] The stated purpose of this restriction (and others) was to "create separation between GM and [AFI], on the one hand, and ResCap, on the other" so that ResCap could "obtain[] investment grade credit ratings for its unsecured indebtedness that are separate from [AFI's] ratings and the ratings of GM."[173] In light of this context, and ResCap's distressed financial condition during 2007 through 2012, the Examiner does not afford any weight to ResCap's non-payment of dividends.[174]

### (4) Failure To Observe Corporate Formalities And Absence Of Corporate Records

#### (a) Legal Principles

Relevant factors include, without limitation, consideration of "whether adequate corporate records were kept, directors and shareholders met regularly, and corporate directors and officers functioned properly."[175] "When those formalities are not respected, the legal fiction of corporateness becomes less 'real' in the everyday experience of those involved in the firm's operations and any expectation that others would treat it as a distinct, liability-limiting entity becomes less reasonable."[176] "In the alter-ego analysis of an LLC, somewhat less emphasis is placed on whether the LLC observed internal formalities because fewer such formalities are legally required."[177] "[T]he Delaware Limited Liability Company Act . . . requires little more than that an LLC execute a proper certificate of formation, maintain a

---

[171] *See* Residential Capital, LLC, Annual Report (Form 10-K) (Mar. 13, 2007), at 80, 116. Because the LLC Conversion Dividend was authorized by the 2006 Amended Operating Agreement and declared and paid while ResCap was solvent, the Examiner concludes that the evidence does not support the proposition that it constituted "siphoning." *See* Section V.D.3.b.

[172] *See* 2005 Operating Agreement, § 2(d) [ALLY_0140795]; 2006 Amended Operating Agreement, § 2(d) [ALLY_0041818].

[173] General Motors Acceptance Corporation, Annual Report (Form 10-K) (Mar. 28, 2006), at 5; *see also* Section III.B.

[174] *See Trustees of the Nat'l Elevator Indus. Pension Funds*, 332 F.3d at 196; *In re Moll Indus., Inc.*, 454 B.R. at 591.

[175] *Golden Acres,* 702 F. Supp. at 1105, *see also Phoenix Can. Oil Co. v. Texaco, Inc.*, 842 F.2d 1466, 1476 (3d Cir. 1988) (noting that relevant facts may include "overlapping directorates and officers, separate record keeping, payment of taxes and filing of consolidated returns, maintenance of separate bank accounts, level of parental financing and control over the subsidiary, and subsidiary authority over day-to-day operations"); *PSG Poker, LLC*, 2008 U.S. Dist. LEXIS 4225, at *29 (finding that company and it sole shareholder were a "single economic entity" where the company "held no corporate meetings, employed no one other than [the shareholder], had no other officers or directors, . . . operated out of [the shareholder's] home," and "maintained no corporate records").

[176] *Irwin & Leighton, Inc. v. W.M. Anderson Co.*, 532 A.2d 983, 989 (Del. Ch. 1987).

[177] *NetJets Aviation, Inc.*, 537 F.3d at 178.

registered office in Delaware, have a registered agent for service of process in Delaware, and
maintain certain records for membership and tax purposes."[178]

Evidence of a parent's and its subsidiary's shared officers, directors, employees, offices,
corporate functions or services, and/or bank accounts may, in certain circumstances, be
indicative of a "single economic entity."[179] But, such evidence must show something other
than what is common in a normal parent-subsidiary relationship.[180] For example, "wholly-
owned subsidiaries may share officers, directors and employees with their parent" and,
without more, the court need not "infer that the subsidiary is a mere instrumentality for the

---

[178] *Official Comm. of Unsecured Creditors v. Bay Harbour Master Ltd.* (*In re BH S&B Holdings LLC*), 420 B.R.
112, 138 (Bankr. S.D.N.Y. 2009) (dismissing veil-piercing claim despite allegations that limited liability
company "Holdings had no Board meetings" and explaining that "Holdings had a single Manager at all times"
pursuant to "the Holdings LLC Agreements"). The Delaware Limited Liability Company Act affords "broad
discretion [to alter its default rules] in drafting the [Operating] Agreement." *See Elf Atochem N.A., Inc. v.
Jaffari*, 727 A.2d 286, 291 (Del. 1999); *see also* DEL. CODE ANN. tit. 6, § 18-1101(b) ("It is the policy of this
chapter to give the maximum effect to the principle of freedom of contract . . . .").

[179] *See TradeWinds Airlines, Inc.*, 2012 U.S. Dist. LEXIS 39459, at *16–17 (denying motion to dismiss
veil-piercing claim where plaintiff alleged that defendant "disregarded corporate formalities, failed to keep
proper records, and comingled C-S Aviation's funds with those of other companies"); *Sykes*, 757 F. Supp. 2d
at 430 (denying motion to dismiss veil-piercing claim where plaintiff alleged "overlap in ownership, officers,
directors, and personnel, common office space among the corporate entities") (quotation marks omitted);
*Mabon, Nugent & Co.*, 1990 Del. Ch. LEXIS 46, at *16 (denying defendant's motion for summary judgment
on veil-piercing claim in part because "the [parent's] and [subsidiary's] boards are substantially, if not wholly,
identical").

[180] *See Upjohn Co. v. Syntro Corp.*, Civ. No. 89-107, 1990 U.S. Dist. LEXIS 11512, at *15 (D. Del. Mar. 9,
1990) (granting summary judgment in favor of defendant on veil-piercing claim where "plaintiff establishes
merely a normal, legitimate parent-subsidiary relationship" and "has adduced no evidence of [the
subsidiary's] failure to keep separate records or accounts, or any lack of authority over its day-to-day
operations").

parent" or "that those officers and directors were not functioning properly."[181] "[T]he fact that a parent holds out to the public that a subsidiary is a department of its own business increases the likelihood that the parent will be held liable for the subsidiary's acts."[182] Such evidence has, however, been found insufficient—without more—to establish that a parent and its subsidiary were "a single economic entity."[183]

Evidence that a subsidiary failed to adequately maintain separate corporate records (e.g., financial statements, tax returns, minutes of board meetings) has been found probative of a

---

[181] *In re BH S&B Holdings LLC*, 420 B.R. at 138; *see also Fletcher v. Alex, Inc.*, 68 F.3d 1451, 1460 (2d Cir. 1995) (finding existence of one overlapping director between parent and subsidiary to be "negligible" and explaining that "[p]arents and subsidiaries frequently have overlapping boards of directors while maintaining separate business operations"); *Spagnola*, 264 F.R.D. at 87 (dismissing veil-piercing claims and explaining that "some overlap between the operations of Chubb and its subsidiaries" is "not unusual and Plaintiffs' allegations do not rise to the level that indicates the kind of complete domination and control that is required") (applying Minnesota and Indiana law); *In re Ticketplanet.com*, 313 B.R. at 71 ("An overlap in ownership, officers and directors and responsibilities is not uncommon or impermissible."); *Official Comm. of Unsecured Creditors of RSL Com Primecall, Inc. v. Beckoff* (*In re RSL Com Primecall, Inc.*), 2003 Bankr. LEXIS 1635, at *53 (Bankr. S.D.N.Y. Dec. 11, 2003) (dismissing veil-piercing claim in part because allegations of "extensive overlapping officers and directors," "managerial and other services that [the parent] provided to [the subsidiary], and "unspecified involvement in the day-to-day business affairs of [the subsidiary] by several officers and directors of [the parent]," merely "describe[d] a 'typical' relationship between parent and subsidiary"); *In re Foxmeyer Corp.*, 290 B.R. at 245 (finding that evidence of whether "corporate formalities of [subsidiary] Fox Drug were observed" was "equivocal at best" where there was a "certain overlap in ownership, officers, directors, and personnel between Fox Drug and [parent] Fox Corp., and that both entities used common office space, addresses, and telephone numbers," but "Fox Drug maintained corporate records, elected directors, held board meetings, and compiled minutes for such meetings"); *Case Fin., Inc. v. Alden*, Civ. No. 1184, 2009 Del. Ch. LEXIS 153, at *12–15 (Del. Ch. Aug. 21, 2009) (entering judgment after trial rejecting attempt by parent "to pierce its own corporate veil" where parent "Case Financial admits that [subsidiary] Case Capital's Board of Directors had some formal meetings or acted by written consent in lieu of such meetings," despite "overlapping boards of directors" and the "limited number of board meetings" by that subsidiary).

[182] *Japan Petroleum Co. (Nigeria), Ltd. v. Ashland Oil Co.*, 456 F. Supp. 831, 841 (D. Del. 1978); *see also Gabriel Capital, LP, v. NatWest Fin., Inc.*, 122 F. Supp. 2d 407, 434 (S.D.N.Y. 2005) (denying motion to dismiss veil-piercing claim where "documents and representatives of the NatWest defendants referred interchangeably to NatWest Finance, NatWest Capital and NatWest Bank").

[183] *Fletcher*, 68 F.3d at 1460 ("[T]he district court properly rejected the plaintiffs' argument that the descriptions of [the subsidiary Atex as a 'division' of the parent Kodak] and the presence of the Kodak logo in Atex's promotional literature justify piercing the corporate veil."); *Nat'l Gear & Piston, Inc.*, 2012 U.S. Dist. LEXIS 72879, at *83 (dismissing veil-piercing claim where plaintiff alleged that parent and subsidiary "shared the email address '@cummins.com'"); *Akzona Inc. v. E.I. DuPont De Nemours & Co.*, 607 F. Supp. 227, 237–38 (D. Del. 1984) (excerpts from the parent company's annual report and the testimony of an officer of the subsidiary referring to the subsidiary as a "division" of the parent were not sufficient evidence to support veil-piercing); *In re Wash. Mut., Inc.*, 2010 Bankr. LEXIS 2453, at *39 ("[A] common trade name is frequently used in parent-subsidiary relationships and is not a basis for disregarding the corporate form.") (applying Washington law).

single economic entity.[184] On the other hand, the practice of preparing consolidated financial statements and tax returns, where permitted by applicable accounting principles and regulations, has in general not been considered evidence of such a failure.[185]

Courts have "refuse[d] to pierce the veil just because parent corporations retain decision-making authority over subsidiaries."[186] The Second Circuit Court of Appeals has observed that the fact that a parent required its subsidiary "to seek its approval and/or participation" for major transactions "is typical of a majority shareholder or parent corporation."[187] Evidence

---

[184] *Compare Kacprzycki v. A.C. & S., Inc.*, Civ. No. 88-34, 1990 U.S. Dist. LEXIS 16552, at *6 (D. Del. Oct. 31, 1990) (granting defendant's motion for summary judgment on veil-piercing claim where subsidiary "kept its own books and records" and the "respective boards of directors of the [parent and subsidiary] held separate meetings and each kept their own minutes of such meetings"); *and In re Opus East, LLC*, 480 B.R. at 571 (granting motion to dismiss veil-piercing claim in part because allegation that "the Secretary was told to keep 'bare-bones' minutes does not create a facially plausible allegation that . . . the Debtor lacked proper corporate records"); *with Leber Associates, LLC v. Entm't Group Fund, Inc.*, Civ. No. 00-3759, 2003 U.S. Dist. LEXIS 13009, at *45 (S.D.N.Y. July 22, 2003) (issues of fact precluded summary judgment on veil-piercing counterclaim where the plaintiff "was unable to produce any corporate records or financial documents in response to defendants' discovery requests"); *Golden Acres,* 702 F. Supp. at 1106 ("Defendants also failed to meet their duty to observe corporate formalities with respect to the corporate records of Golden Acres. While corporate tax returns were filed and accounting books maintained, the corporate kit and record book were never even opened."); *Autobacs Strauss, Inc. v. Autobacs Seven Co.* (*In re Autobacs Strauss, Inc.*), 473 B.R. 525, 558 (Bankr. D. Del. 2012) (denying motion to dismiss veil-piercing claim in part because "plaintiffs have sufficiently alleged there was an inappropriate absence of corporate records" where "none of the loan agreements were circulated to the full ABST board for approval, no resolutions were passed, and no minutes of meetings exist"); *and Harco Nat'l Ins. Co.*, 1989 Del. Ch. LEXIS 114, at *15-16 (denying plaintiff's motion for summary judgment but noting that evidence of "lack of corporate formalities in operating Green Farms, Inc., especially [with respect to] the maintenance of adequate corporate records" would "seemingly present a good case for [veil] piercing").

[185] *See Alberto v. Diversified Group, Inc.*, 55 F.3d 201, 207 (5th Cir. 1995) (affirming granting of parent's motion for summary judgment on veil-piercing claim where parent "properly employed consolidated financial statements and consolidated tax returns for itself and its subsidiaries") (applying Delaware law); *McAnaney*, 665 F. Supp. 2d at 145 n.12 ("The fact that [defendants] consolidated the financial results of their subsidiaries in publicly filed statements merely reflects compliance with the SEC requirement that corporations consolidate the results of subsidiaries for which they own a 50 percent or more interest in such statements, and is not probative of control for corporate veil piercing purposes.") (applying New York law); *see also Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp.,* 751 F.2d 117, 121 n.3 (2d Cir. 1984) (noting that "rules regarding the consolidation of subsidiaries are controlled by generally accepted accounting principles, which require parent corporations to consolidate subsidiaries if the parent owns more than 50 percent of the subsidiary's stock").

[186] *In re BH S&B Holdings LLC*, 420 B.R. at 138 (allegations that "parents retained decision-making authority" over subsidiary insufficient to pierce veil) (collecting cases); *see also Upjohn Co.*, 1990 U.S. Dist. LEXIS 11512, at *14 ("Even the exercise of a significant degree of control by a parent over a subsidiary will not suffice to warrant the disregard of separate corporate entities.").

[187] *Fletcher*, 68 F.3d at 1459–60.

that the parent's management made decisions on behalf of a subsidiary without the subsidiary's management observing appropriate corporate formalities, however, may weigh in favor of a finding that the two were a "single economic entity."[188]

### (b) Application To Facts

This is a case where certain evidence concerning corporate formalities appears "inconsistent with a viable alter ego claim."[189] For example, ResCap has maintained a board of directors from its commencement of operations in 2005 to the present, which held meetings (ranging in number from four in 2005 to eighty-six in 2009), retained legal and financial advisors, considered resolutions, and kept minutes.[190] ResCap likewise has maintained corporate officers from its commencement of operations to the present including, among other officers, a Chief Executive Offer, Chief Financial Officer, Chief Operating Officer, Treasurer, and Secretary.[191] Moreover, ResCap maintained, separate from those of AFI, corporate headquarters, subsidiaries, employees, bank accounts, and books and records.[192] Such evidence is not, however, necessarily dispositive of whether Rescap observed all appropriate corporate formalities.[193]

To the contrary, the Examiner concludes that the evidence supports the proposition that ResCap failed to follow or followed inconsistently certain appropriate corporate formalities. For example, ResCap did not always follow certain provisions of the Operating Agreement including those requiring that (1) all "material" Affiliate Transactions be entered into on "arm's-length" terms and for "fair value"; (2) ResCap at all times maintain two Independent Directors; and (3) ResCap at all times maintain a tax allocation agreement that provides "for

---

[188] *Compare Sykes v. Mel Harris and Assocs.*, 757 F. Supp. 2d 413, 430 (S.D.N.Y. 2010) (denying motion to dismiss veil-piercing claim alleging "low amount of business discretion displayed by the allegedly dominated corporations") (quotation marks omitted); *and In re Autobacs Strauss, Inc.*, 473 B.R. at 556 (denying motion to dismiss veil-piercing claim in part because "Plaintiffs have sufficiently alleged the failure of [parent] AB7 and [subsidiary] ABST to observe corporate formalities" where "AB7 made decisions in Japan, communicated them to the Individual Defendants, and those decisions were implemented without observing corporate formalities at the [subsidiary]"); *with Fletcher*, 68 F.3d at 1461 (rejecting argument that subsidiary "Atex's assignment of its former CEO's mortgage to [parent] Kodak in order to close the sale of Atex's assets to a third party is evidence of Kodak's domination of Atex" where "[f]ormal contracts were executed, and the two companies observed all corporate formalities").

[189] *Official Comm. of Unsecured Creditors of Verestar, Inc. v. Am. Tower Corp.* (*In re Verestar, Inc.*), 343 B.R. 444, at 464 (Bankr. S.D.N.Y. 2006).

[190] *See* Section IV.A.

[191] *See* Appendix IV.A.

[192] *See* Residential Capital Corporation, Annual Report (Form 10-K) (Mar. 28, 2006), at Item 1 (describing business and operations of ResCap).

[193] *See In re Verestar, Inc.*, 343 B.R. at 464 (denying motion to dismiss veil-piercing claim notwithstanding that subsidiary had officers and directors, "its own employees and subsidiaries," and "a separate business with separate headquarters").

two-way sharing payments" between ResCap and AFI.[194] In connection with certain Affiliate Transactions (e.g., the 2006 Bank Restructuring and the Second 2009 Tax Allocation Agreement), ResCap's officers and directors—many of whom were burdened by multiple affiliations and potentially divided loyalties—failed to function properly with respect to the requirements of the Operating Agreement and otherwise. Moreover, the lines of authority within ResCap were sometimes blurred, as a result in part of initiatives that centralized a number of corporate functions and services within AFI and of day-to-day interference in ResCap's operations by Cerberus and AFI employees who held no positions at ResCap.

The Examiner discusses in detail below the evidence uncovered by the Investigation concerning those and other corporate formalities, including: (i) ResCap's compliance with its Operating Agreement; (ii) the functioning of ResCap's officers and directors; (iii) corporate functions and services shared by ResCap and AFI; (iv) ResCap's authority over its day-to-day operations; (v) ResCap's and AFI's statements concerning their relationship; and (vi) ResCap's consolidated financial reporting and tax returns.

### (i)  Compliance With ResCap's Operating Agreement

The Examiner's analysis of whether appropriate corporate formalities were followed includes the extent of ResCap's compliance with the provisions of its Operating Agreement. The Operating Agreement was entered into with a stated purpose to "create separation between GM and [AFI], on the one hand, and ResCap, on the other" so that ResCap could "obtain[] investment grade credit ratings for its unsecured indebtedness that are separate from [AFI's] ratings and the ratings of GM."[195] Section 2 of the Operating Agreement includes provisions restricting the ability of ResCap to, inter alia, enter into any "material transactions" with any "GMAC Affiliate" unless "on terms and conditions that are consistent with those that parties at arm's-length would agree to and for fair value."[196] That section also requires ResCap to have "at least two Independent Directors" and that it at all times maintain separate from any "GMAC Affiliate": (1) "books, records and financial statements"; (2) "bank accounts and cash management and account receivable systems"; (3) assets, which it must maintain in a manner not "costly or difficult to segregate, ascertain or identify" and must not "commingle"; (4) "asset investment and hedging programs and systems"; (5) use of "its own stationary, invoices, checks and business forms"; and (6) its identity as "a legal entity separate and distinct" including by holding itself out to the public as such.[197] It further requires ResCap to

---

[194] 2005 Operating Agreement, §§ 2(a)–(d) [ALLY_0140795]; *see also* 2006 Amended Operating Agreement, §§ 2(a)–(d) (attached to Residential Capital, LLC, Current Report (Form 8-K) (Nov. 30, 2006), Ex. 10.1).

[195] *See* General Motors Acceptance Corporation, Annual Report (Form 10-K) (March 28, 2006), at 5; *see also* Section III.B.

[196] *See* 2005 Operating Agreement, § 2(b) [ALLY_0140795]; *see also* 2006 Amended Operating Agreement, § 2(b) (attached to Residential Capital, LLC, Current Report (Form 8-K) (Nov. 30, 2006), Ex. 10.1); Section III.B.

[197] *See* 2005 Operating Agreement, § 2(f) [ALLY_0140795]; *see also* 2006 Amended Operating Agreement, § 2(e) (attached to Residential Capital, LLC, Current Report (Form 8-K) (Nov. 30, 2006), Ex. 10.1); Section III.B.

"maintain in effect an income tax allocation agreement [with AFI] that shall provide for two-way sharing payments based on the separately calculated tax liability or benefit of ResCap."[198]

To the extent that AFI intends to suggest that the Operating Agreement alone could defeat a potential veil-piercing claim, the Examiner is not persuaded.[199] If a plaintiff were to prove that material terms of the Operating Agreement were in practice disregarded, then the mere existence of the Operating Agreement would not shield AFI from a conclusion that ResCap and AFI operated as a single economic entity.[200] To the contrary, such proof would be evidence of a failure to observe appropriate corporate formalities.[201] On the other hand, that the ResCap Board waived or amended certain provisions of its Operating Agreement does not, without more, evidence that ResCap failed to observe appropriate corporate formalities. The Operating Agreement has by its terms always provided that its provisions could be "amended or waived" by agreement of the parties thereto and, in the case of "an amendment or waiver that materially and adversely affects the rights of any Class of Rated Indebtedness," subject to the additional requirement of approval by a majority of both the ResCap Board and its Independent Directors who shall "consider only the interest of ResCap, including its creditors."[202]

The Investigation has uncovered evidence that, in some cases, ResCap's officers and directors failed to follow or followed inconsistently certain provisions of its Operating Agreement. First, ResCap entered into certain "material" Affiliate Transactions that were not, contrary to section 2(b) of the Operating Agreement, "on terms and conditions that are consistent with those that parties at arm's-length would agree to and for fair value."[203] Neither the 2006 Bank Restructuring nor the Second 2009 Tax Allocation Agreement met those requirements.[204] Those Affiliate Transactions were executed without the parties obtaining any

---

[198] 2005 Operating Agreement, § 2(b)(iii) [ALLY_0140795]; 2006 Amended Operating Agreement, § 2(b)(iii) (attached to Residential Capital, LLC, Current Report (Form 8-K) (Nov. 30, 2006), Ex. 10.1); *see also* Section V.D.

[199] *See* AFI Submission Paper, dated Dec. 19, 2012, at 10 ("Claimants have no answer for the Operating Agreement—and the binding institutional measures of separation it contractually imposed.").

[200] *See FHFA v. Ally Fin., Inc.*, Civ. No. 11-7010, 2012 U.S. Dist. LEXIS 179768, at *13 (S.D.N.Y. Dec. 19, 2012) (denying motion to dismiss control person claim asserted against AFI under federal securities law and concluding that the "operating agreement entered into between AFI and ResCap in June 2005" failed to "demonstrate[] as a matter of law that [AFI] did not exercise control over the ResCap Sponsor and the ResCap Depositors during the period that the securitizations at issue were sold").

[201] *See In re BH S&B Holdings LLC*, 420 B.R. at 137 (considering terms of "the Holdings LLC Agreements" when determining whether the plaintiff had adequately pleaded that "Holdings failed to observe certain corporate formalities").

[202] 2005 Operating Agreement, § 8 [ALLY_0140795]; *see also* 2006 Amended Operating Agreement, § 8 (attached to Residential Capital, LLC, Current Report (Form 8-K) (Nov. 30, 2006), Ex. 10.1); Section III.B.

[203] 2005 Operating Agreement, § 2(b) [ALLY_0140795]; *see also* 2006 Amended Operating Agreement, § 2(b) (attached to Residential Capital, LLC, Current Report (Form 8-K) (Nov. 30, 2006), Ex. 10.1); Section III.B.

[204] *See* Sections V.A.2 and V.D.

third-party fairness opinions or valuations, despite that ResCap received less than FMV.[205] ResCap was not represented by outside counsel in connection with the negotiation or execution of the 2006 Bank Restructuring (although the Independent Directors retained Bryan Cave).[206]

Notwithstanding that the Independent Directors considered it their duty to review each Affiliate Transaction for compliance with section 2(b) of the Operating Agreement, and that material transactions which deviated from the arm's length and fair value requirements were a breach of section 2(b) absent waiver by the Independent Directors, such transactions were not uniformly presented to the ResCap Board for approval.[207] Instead, it appears that ResCap management sometimes elected not to seek the approval of the ResCap Board where, for example, management concluded that an Affiliate Transaction was not "material" and, in any event, "met the standard for arms length" and "fair value."[208] In other cases where Affiliate Transactions were executed without presentation to the ResCap Board for approval, the Investigation has revealed no evidence that any such determination that they satisfied section 2(b) of the Operating Agreement had been made by ResCap management.[209]

For example, the MMLPSA, the Pipeline Swap, the MSR Swap, and the amendments thereto, were, except for certain amendments in 2010 and 2011, never brought to the ResCap Board (or the GMAC Mortgage board of directors) for approval.[210] The 2010 MSR Swap amendment, entered into in or after November 2010 with a retroactive effective date of July 1, 2010, appears to be the first instance where such an amendment was approved by the ResCap Board.[211] Even then, it appears GMAC Mortgage and Ally Bank applied the new terms (including the increased Funding Fee interest rate) provided for by the 2010 Net Funding Schedule before it was executed or approved (and without obtaining any fairness opinion).[212]

---

[205] *See* Sections V.A.1.a(2) (2006 Bank Restructuring), V.D. (Second 2009 Tax Allocation Agreement). Those were not the only Affiliate Transactions where no third-party valuation or fairness opinion was obtained. *See, e.g.*, V.F.4.b(3) (June 2008 Model Home Sale).

[206] *See* Section V.A.1.a; Int. of T. Melzer, Oct. 10, 2012, at 184:9–186:7; Memorandum, Bank Restructuring Projects Plan, dated July 25, 2006, at Tasks E.19, E.20 [EXAM10256021].

[207] *See* Section IV.A.2. The Operating Agreement does not by its terms require that the ResCap Board or the Independent Directors approve Affiliate Transactions. *See* 2006 Amended Operating Agreement, § 2(b) (attached to Residential Capital, LLC, Current Report (Form 8-K) (Nov 30, 2006), Ex. 10.1).

[208] E–mail from T. Hamzehpour (Dec. 11, 2009) [MELZER.006946] (responding to e–mail from counsel for Independent Directors concerning a November 2007 Affiliate Transaction with Cerberus for a "sales price of \$3.2 million" that was not presented to the ResCap Board); *see also* Section IV.A.2.

[209] *See* Section IV.A.2; *see also* 2006 Amended Operating Agreement, § 2(b) (attached to Residential Capital, LLC, Current Report (Form 8-K) (Nov. 30, 2006), Ex. 10.1).

[210] *See* Section V.B.1.a.

[211] *See* Sections V.B.9.d, VII.L.2; Minutes of a Special Meeting of the Board of Residential Capital, LLC, Nov. 5, 2010, at RC40018847–48 [RC40018729].

[212] *See* Section V.B.9.d; E-mail from A. Glassner (Aug. 26, 2010) [EXAM10436075].

Similarly, the allocation among ResCap and AFI of liability in connection with the FRB/FDIC Settlement and the DOJ/AG Settlement was not presented for the approval of the ResCap Board.[213] Instead, decisions concerning that allocation appear to have been made by ResCap accounting personnel in consultation with AFI and AFI's auditors Deloitte & Touche LLP.[214] ResCap thereby agreed to an allocation where it would bear 92% of the costs associated with the government settlements while AFI would bear 8% of those costs, which was consistent with an FRB press release dated February 9, 2012, despite that such an allocation was not specified by the DOJ/AG Settlement or the CMP.[215]

As another example of inconsistent application of section 2(b) of the Operating Agreement, the Investigation has not located any evidence that the 2006 Tax Allocation Agreement was ever presented to the ResCap Board for approval.[216] Three other income tax allocation agreements (i.e., the Implemented 2005 Tax Allocation Agreement, the First 2009 Tax Allocation Agreement, and the Second 2009 Tax Allocation Agreement), by contrast, were presented to the ResCap Board for approval.[217] Notably, both of the Affiliate Transactions where the Examiner has found that ResCap received less than FMV (i.e., the 2006 Bank Restructuring and the Second 2009 Tax Allocation Agreement) were presented to and approved by the ResCap Board.[218]

Second, the Investigation also has located evidence that ResCap at least arguably did not comply with the Operating Agreement's requirement that it "shall at all times have . . . at least two Independent Directors," when the ResCap Board approved certain Affiliate Transactions

---

[213] *See* Sections IV.A, V.C; *see also* Int. of T. Marano, Feb. 27, 2013, at 51:17–23 ("I am not aware that [the ResCap Board] specifically approved the allocation.").

[214] *See* Section V.C; *see also* Int. of T. Marano, Feb. 27, 2013, at 21:4–17, 49:19–20 (allocation to "one or the other, I think was the decision of the accountants"); Int. of C. Dondzila, Nov. 9, 2012, at 196:15–18 ("after consultation with our parent and with our auditors, the decision was made . . . [as to] the appropriate way to allocate the obligation").

[215] *See* Section V.C; Int. of C. Dondzila, Nov. 9, 2012, at 195:15–197:8, 198:1–8 ("[B]ecause the press release was final and was public, the conclusion was to go with that."); Memorandum, Accrual for DOJ Settlement at December 31, 2011, dated Feb. 28, 2012, at 8–9 [EXAM00220938] ("While neither the DOJ/AG Settlement nor the CMP Order specifically allocate a portion of the fine to AFI, such an allocation was inferred in a press release issued by the [FRB] . . . ."). As explained above, AFI agreed to provide capital support to ResCap in connection with these costs pursuant to the January 30 Letter Agreement, which was approved by the ResCap Board on January 30, 2012. *See* Section V.C; Minutes of a Special Meeting of the Board of Residential Capital, LLC, Jan. 30, 2012, at RC40019197 [RC40019179].

[216] *See* Section V.D.

[217] *See* Section V.D; Unanimous Consent to Action of the Board of Directors of Residential Capital Corporation, June 15, 2006, at 2 [RC40005468] (Implemented 2005 Tax Allocation Agreement); Minutes of a Regular Meeting of the Board of Directors of Residential Capital, LLC, Aug. 6, 2012, at RC40018820–22 [RC40018729] (First 2009 Tax Allocation Agreement); Minutes of Special Meeting of Board of Directors of Residential Capital, LLC, Dec. 22, 2010, at 6 [RC40018729] (Second 2009 Tax Allocation Agreement). The Other 2005 Tax Allocation Agreement, which was not followed by the parties, was not presented to the ResCap Board for approval. *See* Section V.D.

[218] *See* Sections V.A.1.a(2) and V.D.2.b(3).

VII-A-45

absent a second Independent Director.[219] Independent Directors Tom Jacob and Tom Melzer resigned from the ResCap Board on April 20, 2008.[220] It was not until June 12, 2008 that both Edward Smith and Karin Hirtler-Garvey had been installed to replace them and, meanwhile, the Secured Revolver Facility and Resort Finance Sale were approved by the ResCap Board with Smith voting as the sole Independent Director.[221]

Third, there is evidence that ResCap was, at certain times, not in compliance with section 2(b)(iii) of the Operating Agreement, which required ResCap to "maintain in effect an income tax allocation agreement [with AFI] that shall provide for two-way sharing payments based on the separately calculated tax liability or benefit of ResCap."[222] For example, the 2006 Tax Allocation Agreement was entered into by ResCap and AFI effective December 1, 2006, but was not drafted or executed until late 2008 (and only after AFI's Director of Tax Allocation and Analysis noticed that an income tax allocation agreement was required by the 2006 Amended Operating Agreement).[223] Moreover, the Second 2009 Tax Allocation Agreement did not, contrary to section 2(b)(iii) of the Operating Agreement, provide for "two-way sharing payments" between ResCap and AFI.[224] Rather, there are no circumstances under which that agreement requires that any payments be made by AFI to ResCap.[225] The Investigation has not uncovered any evidence that the ResCap Board considered the requirements of section 2(b)(iii) of the Operating Agreement when it approved the Second 2009 Tax Allocation Agreement.[226]

---

[219] *See* 2005 Operating Agreement, § 2(g)(i) [ALLY_0140795]; *see also* 2006 Amended Operating Agreement, § 2(f)(i) [ALLY_0041818]. That question is not free from doubt. This section of the Operating Agreement further provides that "[i]n the event of a vacancy . . . [AFI] shall, as promptly as practicable, elect a successor Independent Director." *See id.* The Operating Agreement does not define "promptly" or specify whether the ResCap Board has the power to issue resolutions during such a vacancy. *See id.*

[220] *See* E-mail from A. de Molina (Apr. 20, 2008) [EXAM12336204]; Section IV.A.

[221] *See* Minutes of a Meeting of the Board of Directors of Residential Capital, LLC, June 1, 2008, at RC40005749, 55–56 [RC40005652]; Section IV.A.

[222] *See* 2006 Amended Operating Agreement, § 2(b)(iii) [ALLY_0041818]; *see also* Section V.D.

[223] *See* Section V.D.2.a; *see also* 2006 Tax Allocation Agreement, at ALLY_0178791 [ALLY_0178779]; Letter from W. Marx to D. DeBrunner (Sept. 30, 2008), at ALLY_0178792 [ALLY_0178779] ("To comply with the terms of the Operating Agreement, we have drafted the attached new tax allocation agreement between [AFI] and ResCap.").

[224] *See* 2006 Amended Operating Agreement, § 2(b)(iii) (attached to Residential Capital, LLC, Current Report (Form 8-K) (Nov. 30, 2006), Ex.10.1); *see also* Section V.D.

[225] *See* Second 2009 Tax Allocation Agreement, §§ 1.03D, 2.03 [RC40016871]; *see also* Section V.D.

[226] *See* Section V.D.

## (ii) Functioning Of ResCap's Officers And Directors

AFI exercised its authority under the Operating Agreement to elect each of the directors that served on the ResCap Board—including the Independent Directors.[227] The Rescap Board was consistently populated by directors affiliated with AFI and/or Cerberus.[228] As permitted under the 2006 Amended Operating Agreement (after the restrictions imposed under the 2005 Operating Agreement were eliminated with the approval of the Independent Directors), many officers and other employees of ResCap also possessed such multiple affiliations.[229] Without more, these facts do not support an inference that "the subsidiary is a mere instrumentality for the parent" or "that those officers and directors were not functioning properly."[230] The Investigation has revealed evidence suggesting, however, that ResCap officers and directors—perhaps as result of these potentially divided loyalties—failed in certain circumstances to function properly.

In particular, and in addition to the failures described above to follow consistently certain provisions of the Operating Agreement, ResCap directors and officers did not function properly in connection with the 2006 Bank Restructuring. With respect to the 2006 Bank Restructuring, the Investigation has uncovered no evidence that the Independent Directors were ever informed that an alternative transaction structure was possible where ResCap could have retained a voting interest in IB Finance (or in fact that such an alternative had been proposed by ResCap Chief Operations Officer David Applegate).[231] Neither the Cerberus PSA nor bank regulators mandated that ResCap lose its voting interest.[232] Nonetheless, and notwithstanding that ResCap General Counsel David Marple had warned management that as proposed the restructuring "cannot reasonably be deemed a transaction to which parties at arm's-length would agree," no evidence has been located that any of ResCap's inside directors or officers advised the Independent Directors that it could have been otherwise.[233]

---

[227] *See* 2005 Operating Agreement, § 2(g)(i) [ALLY_0140795]; 2006 Amended Operating Agreement, § 2(f)(i) (attached to Residential Capital, LLC, Current Report (Form 8-K) (Nov. 30, 2006), Ex.10.1); E-mail from W. Solomon (Apr. 14, 2008) [MELZER.004778] ("I am writing on behalf of [AFI] to confirm that you [T. Melzer and T. Jacob] were originally recruited, and continue to serve, as independent directors of Residential Capital, LLC at the request of [AFI], the sole shareholder of that company.").

[228] *See* Section IV.A; Appendix IV.A.

[229] Examples include without limitation: (1) Eric Feldstein, Chairman of the ResCap Board and AFI CEO; (2) Sanjiv Khattri, ResCap Director and AFI CFO; and (3) David Walker, Director of ResCap (and other Debtors) and AFI officer. *See* Appendix IV.A.

[230] *In re BH S&B Holdings LLC*, 420 B.R. at 138.

[231] *See* Section V.A.1.a; *see also* Memorandum, ILC Ownership and Control, dated Apr. 24, 2006 [EXAM11248641].

[232] *See* Section V.A.1.a; *see also* Int. of L. Tessler, Nov. 16, 2012, at 27:21–23 ("The specifics of how that [bank restructuring] ultimately got structured was more likely left in the hands of [AFI] and ResCap . . . .").

[233] Section V.A.1.a; *see also* Memorandum, GMAC Bank Restructuring, dated Apr. 20, 2006, at 4 [EXAM11248642].

As discussed in Section VII.K.2, the Examiner concludes that, although it is a close question in both cases, neither Young's actions with respect to the First 2009 Tax Allocation Agreement nor the ResCap Board's approval of the Second 2009 Tax Allocation Agreement involved a breach of fiduciary duty. Nonetheless, for the reasons discussed in Section VII.K.2, both circumstances arguably bespeak a level of dysfunction that the Examiner has considered as part of the present veil-piercing analysis.

Similarly, the process and decision-making in 2012 in connection with the allocation of revenues on brokered loans seems to reflect a failure by ResCap management to function properly and to defend ResCap's interests.[234] The initial, unvarnished reaction of ResCap and Ally Bank personnel when the issue was discovered in December 2011 was that Ally Bank had improperly retained a portion of the gain on sale. This was in contravention not only of the parties' specific agreements in connection with the Brokering Consumer Loans to Bank project, but of the long-standing arrangement that GMAC Mortgage, in exchange for assuming all the risk (including representation and warranty risk), was to receive the gain on sale. The process that followed discovery of the issue, however, appears to have been dominated by AFI and Ally Bank, particularly Young (who left ResCap for Ally Bank in mid-2011), and then left to accountants for resolution, without an effective advocate for ResCap. The result in 2012—in which ResCap not only did not pursue the additional $469 million the Examiner concludes likely would be held due to ResCap, but paid $51.4 million to Ally Bank—does not appear to be the product of a fair or balanced attempt to determine the parties' intent.

Likewise, as discussed in Section V.C, the process which led to the FRB/FDIC Settlement and the DOJ/AG Settlement and the allocation of costs under those settlements also reflects some level of dysfunction. For example, ResCap's officers only retained Bradley Arant as counsel, which also represented AFI (despite ResCap's and AFI's potentially adverse interests). AFI, on the other hand, was also represented by separate counsel at Sullivan & Cromwell (although it is unclear what, if any, effect this ultimately had on the settlement agreements). Further, the 92/8 allocation of the settlements between ResCap and AFI seems to have been settled on by the accountants, without involvement or approval by the ResCap Board.

### (iii) Shared Functions and Services

The Investigation has uncovered evidence reflecting that, over time, AFI and ResCap became increasingly intertwined with respect to a range of corporate functions and services.[235] Although the overlap of certain corporate functions and services among affiliated corporations is not unusual, the facts here depart to some extent from the "'typical' relationship between

_____

[234] *See* Sections V.B and VII.L.2.

[235] *See* Section V.H.

parent and subsidiary" in the scale of overlap, the degree of confusion in the lines of corporate reporting that resulted, and the undocumented basis on which certain services were shared.[236]

In March 2007, AFI CEO Eric Feldstein announced that "[t]he staff functions of GMAC [would] be realigned into strong global functions" in areas including, Finance, Information Technology, Communications, Human Resources, and Legal.[237] According to Feldstein, AFI's "historical business model" had "emphasized autonomous business units."[238] That structure had in many cases "led to the creation of duplicate and sometimes disparate support systems and fragmented staff functions."[239] By creating these "global functions," AFI anticipated "as much as $500 million in cost savings by eliminating redundant work, aligning processes, and integrating systems."[240] Although "local functional leadership [would] remain responsible for supporting individual business units as they [had] in the past, they [would] now also be charged to operate on a unified global basis within their function."[241]

Beginning in 2008, in an effort led by AFI CEO de Molina, additional steps were taken to further eliminate duplication and centralize the "global functions" of AFI and its subsidiaries.[242] Among other changes, the centralization of "global functions" resulted in certain ResCap employees reporting directly to employees of AFI, and vice versa. For example, as part of the "global" legal function Tammy Hamzehpour was both "the general counsel of ResCap but . . . also chief counsel for Ally's corporate services attorneys."[243] Moreover, "all of the litigation team that [had] reported to [Hamzehpour] . . . became reports of [AFI]."[244]

---

[236] *Official Comm. of Unsecured Creditors of RSL Com Primecall, Inc. v. Beckoff* (*In re RSL Com Primecall, Inc.*), Adv. Proc. No. 03-2176, 2003 Bankr. LEXIS 1635, at *53 (Bankr. S.D.N.Y. Dec. 11, 2003) (dismissing veil-piercing claim in part because allegations of "managerial and other services that [the parent] provided to [the subsidiary]" merely "describe[d] a 'typical' relationship between parent and subsidiary").

[237] *See* Memorandum, GMAC Global Functions, Mar. 15, 2007 [EXAM10063058].

[238] *See id.*

[239] *See id.*; *see also* Int. of L. Tessler, Feb. 28, 2013, at 34:7–14 ("ResCap was and has always been operated as a standalone company . . . . And, but definition, you have redundancies in cost structure as a result of that."); Int. of J. Whitlinger, Nov. 30, 2012, at 11:4–5 ("[Y]ou had two companies [RFC and GMAC Mortgage] that had two of everything. We called it Noah's Ark.").

[240] Memorandum, GMAC Global Functions, Mar. 15, 2007 [EXAM10063058].

[241] *See id.*

[242] *See* Int. of T. Hamzehpour, Oct. 5, 2012, at 67:21–68:3 ("The [AFI] organization historically was an organization of business unit silos and he viewed that as redundant and he wanted centralized functions. So all of the functions—finance, compliance, risk, legal were expected to centralize, and legal was one of the last ones [in January 2009]."); Int. of L. Tessler, Feb. 28, 2013, at 33:23–34:3 ("[T]here are two ways to survive a crisis. You know, raise revenues and reduce expenses and raise liquidity. And I suspect all of those options were on the table [in June 2008].").

[243] *See* Int. of T. Hamzehpour, Oct. 5, 2012, at 67:5–7.

[244] Int. of T. Hamzehpour, Oct. 5, 2012, at 63:20–22.

From the beginning, certain individuals within ResCap were concerned that this centralization of "global functions" within AFI could decrease ResCap's independence.[245] ResCap CFO James Giertz viewed these changes as part of a "drive to dismantle the ResCap structure and replace it with a more substantial infrastructure within the parent company [AFI]."[246] Giertz resigned in March 2007 citing this and other reasons.[247] A year later, ResCap Treasurer Bill Casey voiced similar complaints in an e-mail sent to Jim Jones, ResCap CEO, where Casey stated that he had been "left without direction, support or guidance from the senior management team in dealing with the past and current [AFI] leadership" and that "[o]ver the past nine months [his] reporting lines changed repeatedly" from reporting to ResCap, to AFI, then back again to ResCap.[248] Casey left ResCap a few months later.[249]

As of the Debtors' bankruptcy filing, ResCap and AFI continued to provide each other with a variety of services in areas including information technology, human resources, finance, compliance, risk management, treasury, legal, supply chain, capital markets, marketing, and facilities.[250] According to the Debtors, such services were "historically" provided "on an undocumented basis."[251]

---

[245] *See* Int. of T. Marano, Nov. 26, 2012, at 190:23–191:2 (Q: "Were there any concerns expressed . . . that by having shared functions it might erode the firewall that existed between ResCap and [AFI]?" A: "Yes."); E-mail from K. Tietjen (Apr. 17, 2008) [CCM00005242] ("Things are a little dicey at ResCap/RFG with the [AFI] corporate functions having been given the green light by Al to really start driving their agendas into the business units . . . . I'm fearful there will be a mass exodus of the leadership team at [ResCap] . . . if Al's team continues to treat them like second class citizens / impose the corporate agenda on the leaders without their input."). Marano agreed that the centralization of global functions "would get [ResCap] more entangled in [AFI]," but considered that an "advantage" because it would "probably make it harder for them to let us file." Int. of T. Marano, Nov. 26, 2012, at 191:9–14.

[246] E-mail from J. Giertz (Mar. 26, 2007) [EXAM10166630].

[247] *See id.*

[248] E-mail from W. Casey (Apr. 28, 2007), at EXAM10173944 [EXAM10173943]; *see also* Int. of J. Jones, Nov. 30, 2012, at 148:23–149:3 ("I think that the tension [that] was created for those functional managers [like Bill Casey] of well, do I report to you, Jones and Company, as the business heads [of ResCap] or do I report to the functional head of these activities at [AFI]. . . generally, the answer to that was yes.").

[249] *See* Int. of W. Casey, Jan. 31, 2013, at 6:12–16 (Casey resigned from ResCap in "June or July of [2008,] approximately").

[250] *See* Debtors' Motion for Interim and Final Orders Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing Residential Capital, LLC to Enter into a Shared Services Agreement with Ally Financial Inc. *Nunc Pro Tunc* to the Petition Date for the Continued Receipt and Provision of Shared Services Necessary for the Operation of the Debtors' Business [Docket No. 41] at 14–16.

[251] *Id.* at 6; *see also* Appendix to Ally Sept. 23, 2011 Board Presentation, at ALLY_0157506 [ALLY_0157478] ("Many intercompany administrative service agreements are being revised subject to approval by the FDIC. ResCap services under these agreements are currently provided to Ally Bank at no charge."); E-mail from J. Lombardo (Nov. 4, 2008) [ALLY_0324332] (describing "concerns" raised by J. Peterson including "the cost of services provided by ResCap to the Bank and the lack of true 'billing' between the two parties"). As discussed in Section V.H, for those periods where available information permits a conclusion to be drawn, the Examiner concludes that ResCap received adequate consideration for these services, when unallocated AFI Stewardship Costs for services provided to ResCap are taken into account.

### (iv)Authority Over Day-To-Day Operations

The Investigation has uncovered evidence of certain instances of interference by AFI and its affiliates in the day-to-day operations of ResCap. After the closing of the Cerberus PSA in particular, there is evidence that, in the words of one Cerberus employee, "[t]he lines of authority and accountability [became] blurred among [AFI], ResCap and Cerberus."[252] Upon his resignation in March 2007, ResCap CFO James Giertz would similarly observe that it was not "clear to [him] who is making the key decisions within the business but certainly the official management structure and decision making processes are not being respected frequently."[253]

Upon completion of the 2006 Cerberus acquisition of 51% of AFI, a number of high-ranking Cerberus personnel joined the AFI Board, including Leonard Tessler (Managing Director, Cerberus Capital Management), Mark Neporent (COO and General Counsel, Cerberus Capital Management), Frank Bruno, and Seth Plattus. They remained on AFI's Board until early 2009, when, in connection with AFI's becoming a bank holding company and its receipt of TARP funds, Cerberus entered the passivity agreement and Stephen Feinberg, co-founder, CEO, and Chief Investment Officer of Cerberus, became the Cerberus appointee to the AFI Board.

As of April 1, 2007, AFI entered into the Consulting Agreement with Cerberus.[254] Although ResCap was not a party to that agreement, it nonetheless provided for dozens of Cerberus employees to be embedded as consultants at ResCap.[255] This arrangement lasted until Cerberus entered into the passivity agreement in 2009. The evidence supports the proposition that, in certain instances, employees of Cerberus (who also held positions with AFI, or reported to those who did)—without holding any position at ResCap—gave instructions to employees of ResCap or its subsidiaries. For example, in April 2007 a ResCap trader reported to Ralph Flees, then the Controller of RFC, that "Frank Bruno . . . of Cerberus

---

[252] Memorandum (undated) [CCM00045982] (attached to an e-mail from R. Wechsler to L. Tessler (June 11, 2008) [CCM00045981]).

[253] E-mail from J. Giertz (Mar. 26, 2007) [EXAM10166630] ("I submitted my resignation to Bruce [Paradis] late last week . . . ."); *see also* Int. of E. Feldstein, Dec. 14, 2012, at 200:25–201:2 (explaining that he has resigned as CEO of AFI in part because "Cerberus had injected people into ResCap and other places who had felt like they were reporting to Cerberus not to me").

[254] *See* Section III.E.11; Consulting Agreement [ALLY_0401248].

[255] *See* Section III.E.11; Consulting Agreement, Ex. A [ALLY_0401248] (listing fifty-nine Cerberus employees to provide consulting services to ResCap). The Investigation has not located any evidence that ResCap executed a copy of the addendum to the Consulting Agreement to "opt-in" to that agreement. *See* Section III.E.11.

has requested that we begin selling portions of the HFI Book."[256] Similarly, in January 2008, Tessler negotiated terms of ResCap's engagement of Bear Stearns to market Resort Finance to third parties.[257]

Indeed, the evidence further indicates that members of ResCap senior management were replaced by Cerberus and AFI—rather than by the ResCap Board as the ResCap LLC Agreement contemplates.[258] For example, ResCap Chief Operating Officer David Applegate and CEO Bruce Paradis resigned in early 2007.[259] According to Tessler, they were replaced because "we lacked confidence in the ability of Mr. Paradis and Mr. Applegate to execute the underwriting discipline we thought was appropriate for the environment that the company was now operating in."[260] It was only after the fact that the ResCap Board acknowledged "recently announced organizational changes" and "accepted" the resignations of Applegate and Paradis.[261]

### (v) Statements By AFI And ResCap Concerning Their Relationship

Certain parties have argued to the Examiner that ResCap and AFI should be considered a single economic entity in part because they "held themselves out to the public as a single

---

[256] E-mail from F. Dibias to R. Flees (Apr. 4, 2007) [EXAM10164490]; *see also* Int. of R. Flees, Jan. 18, 2013, at 177:15–184:12.

[257] *See* Int. of L. Tessler, Feb. 28, 2013, at 12:9–12 ("I do recall being somewhat more involved in trying to market [R]esort [F]inance. I had some participation with Bear Stearns in this process."); E-mail from M. St. Charles (Jan. 18, 2008) [EXAM11309086] ("Steve Lipman spoke to Leonard Tessler last night about the $6 [million] fee that Bear [Stearns] has proposed for Time Off. Leonard spoke with Mike Rossi and they agreed that $6m was an appropriate fee for this transaction.").

[258] *See* Section III.F.2.d(2); 2006 ResCap LLC Agreement, § 16 (authorizing the ResCap Board to appoint and remove officers).

[259] *See* Section III.F.2.d(2).

[260] *See* Int. of L. Tessler, Nov. 16, 2012, at 86:14–19; *see also* Int. of M. Neporent, Feb. 6, 2013, at 55:7–9 (performance of Applegate and Paradis was a "general board issue at GMAC"); *id.* at 55:23–56:7 ("[W]e did not think that they were being properly responsive to the changes in the market and weren't recognizing . . . some tectonic changes in the . . . way the business had to be run. . . . I can't pinpoint who, or what, or when."); Section III.F.2.d(2).

[261] *See* Minutes of a Regular Meeting of the Board of Directors of Residential Capital LLC, Mar. 23, 2007, at 1–2 [EXAM00066636] ("The Chairman remarked on recently announced organizational changes and recommended that the Board accept David M. Applegate's resignation as a Director and Chief Operating Officer."); *see also* Minutes of a Regular Meeting of the Board of Directors of Residential Capital, LLC, May 11, 2007, at EXAM00066659 [EXAM00066660] (accepting resignation of Paradis); 2007 ResCap Update Report to GMAC Board of Directors, Mar. 15, 2007, at ALLY_0007505 [ALLY_0007439] (stating that a "new strategic plan is being implemented" and that ResCap had "[i]nstalled new senior management"); Memorandum, RFG Leadership, dated Mar. 5, 2007 [EXAM10255578] (reporting replacement of Applegate and Scholtz).

entity."[262] Those parties in principal part rely upon various public statements including, for example, language in AFI's SEC filings stating that "*We* are a leading real estate finance company" or referring to "*Our* Origination and Servicing Operations."[263] The Examiner does not find those or similar statements to be remarkable, or probative that AFI and ResCap held themselves out as a single entity. As an initial matter, those very same SEC filings disclose the existence of ResCap as a separate legal entity through which AFI conducts certain of its mortgage businesses.[264] Moreover, ResCap made its own SEC filings as a separate legal entity from AFI, including annual reports, quarterly reports, and current reports.[265] Courts have found inadequate allegations of similar statements in a parent corporation's annual report describing a subsidiary as part of a "division" where, as here, "[t]he annual report makes it clear that the . . . 'division' is composed of separate corporations."[266]

The Creditors' Committee and other parties have further argued that "ResCap employees held themselves out to the world as one with AFI" by "using email addresses with the 'ally.com' domain name."[267] It is undisputed that certain officers or employees of ResCap

---

[262] *See* Wilmington Trust Submission Paper, dated Mar. 8, 2013, at 15–17; *see also* FGIC Submission Paper, dated Oct. 17, 2012, at 14–18 ("[AFI] describes its subsidiaries as its own business units rather than separate and distinct entities.").

[263] GMAC LLC, Annual Report (Form 10-K) (Feb. 27, 2008), at 2 (emphasis added); Ally Financial, Inc., Annual Report (Form 10-K) (Feb. 25, 2011), at 5 (emphasis added); *see also* General Motors Acceptance Corporation, Annual Report (Form 10-K) (Mar. 28, 2006), at 1; GMAC LLC, Annual Report (Form 10-K) (Feb. 26, 2009), at 2; GMAC Inc., Annual Report (Form 10-K) (Feb. 26, 2010), at 3; 2011; Ally Financial, Inc., Annual Report (Form 10-K) (Feb. 28, 2012), at 4.

[264] *See* General Motors Acceptance Corporation, Annual Report (Form 10-K) (Mar. 28, 2006), at 1, 5 ("We operate directly and through our subsidiaries and affiliate in which we or GM have equity investments"; describing "Residential Capital Corporation" as "the holding company for our residential mortgage business"); GMAC LLC, Annual Report (Form 10-K) (Feb. 27, 2008), at 6 (noting that the mortgage business is run by "Residential Capital, LLC or ResCap" and defining "[t]he terms 'GMAC', 'the company', 'we', and 'us' [to] refer to GMAC LLC and its subsidiaries as a consolidated entity"); Ally Financial, Inc., Annual Report (Form 10-K) (Feb. 25, 2011), at 11 ("These [mortgage] operations are conducted through . . . subsidiaries of the Residential Capital, LLC (ResCap) legal entity in the United States.").

[265] *See, e.g.*, Residential Capital, LLC, Annual Report (Form 10-K) (Mar. 13, 2007); *see also* Section III.I.5 (explaining that the SEC permitted ResCap to discontinue filings in 2009).

[266] *Akzona Inc.*, 607 F. Supp. at 237. The Examiner reaches the same conclusion as to the other similar public statements identified by the parties, including, for example, certain excerpts from an AFI web site and ResCap marketing materials. *See* FGIC Submission Paper, dated Oct. 17, 2012, at 14–18 & Exs. 25, 28. Statements that ResCap was part of a "family of companies" or a "business unit" of AFI are not fairly construed under the circumstances as statements that ResCap and AFI were a single legal entity. *See id.*

[267] Creditors' Committee Submission Paper, dated Mar. 7, 2013, at 16; *see also* Wilmington Trust Submission Paper, dated Mar. 8, 2013, at 15–17; Wilmington Trust Submission Paper, dated Oct. 24, 2012, at 3–4 ("[ResCap] employees used 'ally.com' e-mail addresses, and letters and presentations were often made on AFI stationary"); FGIC Submission Paper, dated Oct. 17, 2012, at 11, 17–18.

maintained at various times an additional e-mail account with an AFI or Ally Bank domain name. This practice may have become more prevalent with the centralization of certain services and functions among ResCap and AFI beginning in 2007.[268] It also appears to be undisputed that certain ResCap marketing materials, presentations, and written correspondence sometimes bore AFI logos.[269] But, courts have often found such facts, without more, to be of little or no probative value when assessing whether a parent and subsidiary should be considered a single economic entity.[270]

The Examiner reaches the same conclusion here. Without more, evidence that ResCap employees used AFI e-mail addresses or that ResCap promotional materials or letterhead bore an AFI logo does not present a case where, for example, the "blur" between ResCap and AFI was so "pervasive" that the two entities were used interchangeably in contracts with third parties.[271] Nor has the Investigation uncovered evidence that any ResCap creditor was misinformed as to the separate legal identities of ResCap and AFI, or relied upon such misinformation as a promise that AFI would guarantee ResCap's obligations.[272] Although the Examiner is aware of certain instances where a third party (e.g., UBS Securities LLC, Berkshire Hathaway Inc.) appeared to have mistakenly referred in correspondence to a ResCap officer as an officer of AFI, or vice versa, such instances alone do not evidence that those parties perceived ResCap and AFI as sharing a legal identity.[273]

---

[268] *See* E-mail from E. Halloran (May 3, 2010) [EXAM20040019] ("[B]ecause we [in the GMAC Treasury group] are a global function our emails and business cards will change [to reflect the change from GMAC to AFI].").

[269] *See, e.g.,* AFI Submission Paper, dated Dec. 19, 2012, at 13–16. AFI does, of course, dispute that these things are of any moment.

[270] *See Fletcher*, 68 F.3d at 1460 ("[T]he district court properly rejected the plaintiffs' argument that the descriptions of [the subsidiary Atex as a 'division' of the parent Kodak] and the presence of the Kodak logo in Atex's promotional literature justify piercing the corporate veil."); *Nat'l Gear & Piston, Inc*., 2012 U.S. Dist. LEXIS 72879, at *83 (dismissing veil-piercing claim where plaintiff alleged that parent and subsidiary "shared the email address '@cummins.com'"); *In re Wash. Mut., Inc.*, 2010 Bankr. LEXIS 2453, at *39 ("[A] common trade name is frequently used in parent-subsidiary relationships and is not a basis for disregarding the corporate form.") (applying Washington law).

[271] *See Motown Record Co. v. iMesh.com, Inc.*, Civ. No. 03-7339, 2004 U.S. Dist. LEXIS 3972, at *14–16 (S.D.N.Y. Mar. 12, 2004) (denying motion to dismiss veil-piercing claim where lawsuit commenced by parent company was settled by an agreement naming its subsidiary as the releasor) (applying Delaware law).

[272] *Cf. Gabriel Capital, L.P. v. NatWest Fin. Inc.*, 122 F. Supp. 2d 407, 434–35 (S.D.N.Y. 2000), 122 F. Supp. 2d at 434–35 (denying motion to dismiss veil-piercing claim where "documents and representatives of the NatWest defendants referred interchangeably to NatWest Finance, NatWest Capital and NatWest Bank" and plaintiffs "were unaware of the role of [alleged alter ego] NatWest Bank when they purchased the Notes").

[273] *See* Letter from R.T. Weschler to M. Carpenter (May 4, 2012) [CCM00637385] (addressing T. Marano as "Chief Executive Officer Mortgage Operations and Chief Capital Markets Executive, Ally Financial Inc."); Letter from UBS Securities LLC to T. Marano (undated) [EXAM00220064] (addressed to T. Marano at "GMAC, LLC").

In sum, the Examiner's assessment of whether ResCap and AFI could be deemed a single economic entity does not ascribe significant weight to allegations that they held themselves out to the public as such.

### *(vi) Consolidated Financial Reporting And Tax Returns*

Wilmington Trust and other parties have argued that ResCap and AFI should be considered a single economic entity in part because ResCap "stopped filing public financial statements after the second quarter of 2009."[274] By letter dated November 3, 2009, the SEC approved ResCap's request to "stop filing periodic and current reports under the Securities Exchange Act of 1934."[275] Thereafter, AFI continued to file with the SEC consolidated financial statements.[276] Without more, the Examiner does not consider consolidated financial reporting to be probative of a failure to observe appropriate formalities.[277] The Investigation has not uncovered evidence that, as Wilmington Trust asserts, consolidated financial reporting concealed "the true state of [ResCap's] financial health and the extent of AFI's asset-stripping program."[278] Indeed, it appears that, even after deregistration, ResCap continued to make separate, unconsolidated financial statement available to bondholders.[279]

---

[274] Wilmington Trust Submission Paper, dated Mar. 8, 2013, at 24–25; *see also* FGIC Submission Paper, dated Oct. 17, 2012, at 16 (noting that AFI reported on the businesses "of its subsidiaries in later filings on an integrated basis").

[275] SEC No Action Letter (Nov. 3, 2009); *see also* Section III.I.5.

[276] *See, e.g.*, GMAC LLC, Annual Report (Form 10-K) (Mar. 1, 2010), at 120.

[277] *See Alberto*, 55 F.3d at 207 (affirming granting of parent's motion for summary judgment on veil-piercing claim where parent "properly employed consolidated financial statements . . . for itself and its subsidiaries") (applying Delaware law); *McAnaney v. Astoria Fin. Corp.*, 665 F. Supp. 2d 132, 145 n.12 (E.D.N.Y. 2009) ("The fact that [defendants] consolidated the financial results of their subsidiaries in publicly filed statements merely reflects compliance with the SEC requirement that corporations consolidate the results of subsidiaries for which they own a 50 percent or more interest in such statements, and is not probative of control for corporate veil piercing purposes.") (applying New York law); *see also Volkswagenwerk Aktiengesellschaft*, 751 F.2d at 121 n.3 (noting that "rules regarding the consolidation of subsidiaries are controlled by generally accepted accounting principles, which require parent corporations to consolidate subsidiaries if the parent owns more than 50 percent of the subsidiary's stock").

[278] Wilmington Trust Submission Paper, dated Mar. 8, 2013, at 24–25.

[279] The June 2008 Indentures provide that, if ResCap were not required to file with the SEC, then it would "maintain a non-public website on which Holders of Notes . . . may access the quarterly and annual financial information of [ResCap], and [ResCap would] direct Holders of Notes . . . on its publicly available website to contact [ResCap's CFO] to obtain access to the non-public website." *See* Senior Secured Notes Indenture, § 4.03(b); Junior Secured Notes Indenture, § 4.03(b) (same). During its deliberations concerning deregistration, the ResCap Board contemplated that certain more limited financial information would continue to be provided to debt investors and full audited financial statements would continue to be prepared by ResCap. *See* Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, June 24, 2009, at RC40006226–27 [RC40005949]; ResCap Board Presentation: ResCap's De-registration from SEC Filing Requirements, presented at a Special Meeting of the Board of Directors of Residential Capital, LLC, June 24, 2009 [EXAM11625696]. The available evidence indicates that ResCap continued to prepare such financial statements in the years after deregistration. *See* Residential Capital, LLC, Consolidated Financial Statements for the Years Ended December 31, 2011 and 2010 [EXAM00122651].

Nor does the Examiner find the consolidated income tax returns of AFI and ResCap to be probative of a failure to follow appropriate corporate formalities. Following ResCap's conversion to a limited liability company on October 24, 2006, ResCap elected to change its federal tax classification to that of a disregarded entity.[280] This treatment of ResCap as a "division" of AFI for federal income tax purposes is not, however, evidence that ResCap and AFI should be considered a single economic entity for all purposes.[281]

### (5) Merely A Facade For The Operations Of The Dominant Parent

#### (a) Legal Principles

"When a parent corporation exercises significant control over a subsidiary's operations and finances, an inference may arise that Defendants created a facade."[282] This factor requires that the control be in a nature outside of "a prototypical parent-subsidiary relationship."[283] One Delaware court has described this factor as satisfied where a corporation is "ignored" by its shareholders, who instead "operate[] the [corporation's business] as if they own[] it outright" despite the corporation's obligations to creditors.[284] Other courts applying Delaware law have suggested that "[t]he extent of the domination and control must preclude the controlled entity from having legal or independent significance of its own."[285] Moreover, several courts have

---

[280] *See* Sections III.E.5 and V.D; Memorandum, Final Tax Liabilities Allocated from GM, dated Jan. 25, 2008, at ALLY_0208456 [ALLY_0208456].

[281] *See Alberto*, 55 F.3d at 207 (affirming granting of parent's motion for summary judgment on veil-piercing claim where parent "properly employed . . . consolidated tax returns for itself and its subsidiaries" and explaining that "[t]he Internal Revenue Code allows a parent corporation to file consolidated income tax returns with its subsidiaries" in certain circumstances) (applying Delaware law and quotation marks omitted).

[282] *In re Autobacs Strauss, Inc.*, 473 B.R. at 558 (denying motion to dismiss veil-piercing claim); *see also Blair*, 720 F. Supp. 2d at 472 ("[Plaintiff's] other allegations also give rise to the inference that the Infineon defendants created a facade by exercising significant control over the Qimonda Subsidiaries' operations, finances, and the ultimate decision to close their plants in the United States.").

[283] *In re Autobacs Strauss, Inc.*, 473 B.R. at 558.

[284] *See Golden Acres*, 702 F. Supp. at 1106 ("Golden Acres was merely a facade for defendants' operations. Defendants operated the apartment complex as if they owned it outright, not as shareholders in a corporation which had defaulted on its mortgage on the building and still had payments to make. Now they are trying to rely on the very entity they ignored to shield themselves from liability to the corporation's creditors.") (applying federal common law).

[285] *In re BH S&B Holdings LLC*, 420 B.R. at 140–41 (quotation marks omitted); *see also Wallace v. Wood*, 752 A.2d 1175, 1184 (Del. Ch. 1999) (same).

recognized that "the existence of separate operating companies usually negates a piercing of the veils," finding such circumstances "inconsistent" with the allegation that a subsidiary was a "mere shell" or facade.[286]

### (b) Application To Facts

The Examiner expects that it would be a challenge to establish that ResCap was no more than a "shell" or "façade" for AFI. As an initial matter, the Examiner is not persuaded by the arguments of the Creditors' Committee and other parties that ResCap and AFI have "admitted" to the requisite degree of control.[287] Those parties cite to public statements concerning AFI's "control" of ResCap including, for example, a statement in the FRB/FDIC Consent Order that AFI "indirectly owns and controls Ally Bank . . . and numerous direct and indirect nonbank subsidiaries, including [ResCap and its subsidiaries]."[288] Courts have considered such statements insufficient to show that the subsidiary was a mere façade for its parent or that the subsidiary and parent were a single economic entity.[289] Were the rule otherwise, every parent company of a wholly owned subsidiary would be subject to

---

[286] *In re RSL Com Primecall, Inc.*, 2003 Bankr. LEXIS 1635, at *54 (dismissing veil-piercing claim); *see also Japan Petroleum Co. (Nigeria), Ltd. v. Ashland Oil Co.*, 456 F. Supp. 831, 843 (D. Del. 1978) (declining to pierce veil where subsidiary "AON is in no way a shell corporation, but is an operating company with extensive obligations and rights of its own under the Production Sharing Contract"); *In re Moll Indus., Inc.*, 454 B.R. at 589 (dismissing veil-piercing claim where plaintiff admitted that subsidiary and parent "conducted fundamentally different businesses," namely that the parent was "a hedge fund" and the subsidiary was "in the injection molding and manufacturing business"); *In re Foxmeyer Corp.*, 290 B.R. at 244 (finding that plaintiff "failed to produce evidence that would . . . demonstrate that [subsidiary] Fox Drug simply functioned as a facade for [parent] Fox Corp" where "Fox Drug existed in order to carry on Fox Corp.'s pharmaceutical distribution business" and "Fox Corp., as a holding company, conducted several discrete, albeit related healthcare businesses"); *Case Fin., Inc.*, 2009 Del. Ch. LEXIS 153, at *12–15 (entering judgment after trial rejecting attempt by parent "to pierce its own corporate veil" to establish standing to bring suit against CEO of subsidiary where parent "Case Financial did not prove that Case Capital operated as a mere facade for Case Financial; rather, Case Financial acted as a holding company and Case Capital acted as an operating subsidiary, which served a specific purpose within the . . . corporate family").

[287] *See* Creditors' Committee Submission Paper, dated Mar. 7, 2013, at 17 ("AFI's control was admitted in many public and private documents"); *see also* Wilmington Trust Submission Paper, dated Mar. 8, 2013, at 15–17; Wilmington Trust Submission Paper, dated Oct. 24, 2012, at 3–4; FGIC Submission Paper, dated Oct. 17, 2012, at 11, 17–18.

[288] FRB/FDIC Consent Order (Apr. 13, 2011), at 1.

[289] *See PSG Poker, LLC*, 2007 U.S. Dist. LEXIS 46661, at *10–11 (explaining that defendant's admission "to being the sole shareholder . . . and that he supervised and controlled the act of the corporations" he owned was "not sufficient to satisfy the rigorous standards for piercing the corporate veil [of those corporations] under Delaware law"); *see also Fletcher*, 68 F.3d at 1460 ("[T]he district court properly rejected the plaintiffs' argument that the descriptions of [the subsidiary Atex as a 'division' of the parent Kodak] and the presence of the Kodak logo in Atex's promotional literature justify piercing the corporate veil.").

veil-piercing liability. That is not the law.[290] Similar statements concerning the "control" of AFI over ResCap contained within ResCap SEC filings[291] and ResCap Board materials[292] are unavailing for the same reasons.

As set forth above, the Examiner has concluded that the evidence supports the proposition that ResCap failed to follow or followed inconsistently certain appropriate corporate formalities.[293] That conclusion in part relied upon evidence suggesting that the lines of authority within ResCap were sometimes blurred by initiatives that centralized a number of corporate functions and services within AFI and by day-to-day interference in ResCap's operations by Cerberus and AFI employees who held no positions at ResCap.[294] Nonetheless, the Examiner concludes that such evidence does not support the proposition that ResCap was so dominated and controlled as to be precluded from having any legal or independent significance of its own.[295]

Such evidence would likely be weighed against the undisputed facts that ResCap and its subsidiaries operated multiple businesses including, for example, domestic and international residential mortgage loan origination, acquisition, sale and securitization, management of a portfolio of HFI loans and retained interests from securitizations, servicing of residential mortgage loans, and financing homebuilders and residential land developers.[296] Owing to these and other businesses, ResCap reported net income in 2005 and 2006 of $1 billion and $705.1 million, respectively.[297] ResCap and it subsidiaries employed—at peak in or around

---

[290] *See Pearson*, 247 F.3d at 484 ("[M]ere ownership of a subsidiary does not justify the imposition of liability on the parent.").

[291] *See* Residential Capital Corporation, Registration Statement (Form S-4) (Feb. 27, 2008), at 23 ("GM and [AFI] control all fundamental matters affecting us"; "[AFI] indirectly owns all of our outstanding common stock and has the power to elect and remove all of our directors"); Residential Capital, LLC, Annual Report (Form 10-K) (Mar. 13, 2007), at 43 ("[AFI] controls all fundamental matters affecting us, and its interests may differ from ours.") (emphasis and italics omitted).

[292] Report to the Board of Directors Residential Capital Corporation, D.C.W. No. 3, dated Nov. 20, 2006, at RC40008940 [RC40008925] ("[AFI] would own 100% of the voting shares of the bank, but since [AFI] currently wholly owns ResCap and controls the ResCap Board, there would be no effective change in control."); *see also* E-mail from S. Cohen (Dec. 11, 2009) [ALLY_0307981] (responding to certain "accounting notes" and stating that "[s]ince [AFI] has voting control of ResCap the decision to change intent by the [AFI] board would carry through to the underlying assets (at the [AFI] level) since [AFI] is presumed to control decisions of ResCap").

[293] *See* Section VII.A.1.f(4)(b).

[294] *See* Section VII.A.1.f(4)(b)(iii)–(iv).

[295] *See In re BH S&B Holdings LLC*, 420 B.R. at 140–41; *Wallace v. Wood*, 752 A.2d 1175, 1184 (Del. Ch. 1999).

[296] *See* Section III.C.

[297] *See* Residential Capital, LLC, Annual Report (Form 10-K) (Mar. 28, 2006), at 57; Residential Capital, LLC, Annual Report (Form 10-K) (Mar. 13, 2007), at 55.

2006—approximately 14,000 people.[298] Moreover, AFI operated additional businesses with which ResCap and its subsidiaries had no operational involvement including the automotive finance and insurance businesses.[299] These facts are likely to be considered "inconsistent with the contention that [ResCap] was a mere shell" or façade.[300] A court instead would more likely find this to be a case of a parent company and an "operating subsidiary, which served a specific purpose within the . . . corporate family."[301]

### g.   Overall Element Of Injustice Or Unfairness

#### (1) Legal Principles

Applying Delaware law, the Second Circuit Court of Appeals has recently reiterated that "[t]o prevail under the alter-ego theory of piercing the veil, a plaintiff need not prove that there was actual fraud but must show . . . an 'overall element of injustice or unfairness.'"[302] Certain Delaware Chancery Court decisions could be read to the contrary and have stated that, in order to pierce the corporate veil, "[e]ffectively, the corporation must be a sham and exist for no other purpose than as a vehicle for fraud."[303] At least one New York district court has expressly declined to follow those "lower court decisions in Delaware [that] appear to require a showing of fraud," explaining that "until the Delaware Supreme Court makes a definitive ruling on the requirements of Delaware law, we are bound to follow Second Circuit precedent."[304]

---

[298] *See* Residential Capital, LLC, Annual Report (Form 10-K) (Mar. 13, 2007) at 34.

[299] *See* GMAC LLC, Annual Report (Form 10-K) (Mar. 13, 2007), at 2–3 (describing AFI "lines of business" including automotive finance and insurance as operated separately from ResCap's mortgage business).

[300] *In re RSL Com Primecall, Inc.*, 2003 Bankr. LEXIS 1635, at *54 (dismissing veil-piercing claim).

[301] *Case Fin., Inc.*, 2009 Del. Ch. LEXIS 153, at *12–15 (rejecting attempt by parent "to pierce its own corporate veil" to establish standing to bring suit against CEO of subsidiary); *see also In re RSL Com Primecall, Inc.*, 2003 Bankr. LEXIS 1635, at *54 (dismissing claim seeking to pierce the veil of company that "operated three business units (some or all acquired as operating concerns) and had its own employees responsible for its day-to-day operations").

[302] *Kertesz v. Korn*, 698 F.3d 89, 92 (2d Cir. 2012) (quotation marks omitted); *see also Fletcher*, 68 F.3d at 1457 ("[U]nder Delaware law, the alter ego theory of liability does not require any showing of fraud."); *Harco Nat'l Ins. Co.*, 1989 Del. Ch. LEXIS 114, at *10 (Del. Ch. Sept. 19, 1989) ("Fraud has traditionally been sufficient reason to pierce the corporate veil. Other grounds also exist.") (internal citation omitted); *Irwin & Leighton, Inc.*, 532 A.2d at 987 ("[C]onduct short of the active intent to deceive required to establish fraud may, nevertheless, occasion the 'piercing of the corporate veil,' to use the standard shorthand."); *In re Sunbeam Corp.*, 284 B.R. at 365 (same); *In re Verestar, Inc.*, 343 B.R. at 464 n.7 ("fraud is not a necessary element of a claim for alter ego liability"); *In re Ticketplanet.com*, 313 B.R. at 70 ("[t]here is no requirement of fraud").

[303] *Wallace v. Wood*, 752 A.2d 1175, 1184 (Del. Ch. 1999); *see also Mason*, 2005 Del. Ch. LEXIS 99, at *10 ("Delaware Courts have built on this analysis and require an element of fraud to pierce the corporate veil."); *In re Sunstates Corp. S'holder Litig.*, 788 A.2d 530, 534 (Del. Ch. 2001).

[304] *Leber Assocs., LLC*, 2003 U.S. Dist. LEXIS 13009, at *44 n.11.

Assuming arguendo that "fraud, strictly speaking, is not the only basis for finding an alter-ego relationship and piercing the corporate veil," in the absence of evidence of fraud, "something like it is required."[305] "[T]o meet the standard, fraud or inequity 'must be found in the defendants' use of the corporate form.'"[306] "The underlying cause of action does not supply the necessary fraud or injustice."[307] Moreover, without more, "the possibility that a plaintiff may have difficulty enforcing a judgment is not an injustice warranting piercing the corporate veil."[308] That said, "nothing prevents a court, in determining whether there is sufficient evidence of fraud or unfairness, from taking into account relevant evidence that is also pertinent to the question of whether the two entities in question functioned as one."[309] Finally, "the plaintiff need not prove that the corporation was created with fraud or unfairness in mind. It is sufficient to prove that it was so used."[310]

A "typical situation" where "fraud or injustice" may warrant piercing the corporate veil has been said to arise:

> [W]here an entity completely controls an undercapitalized subsidiary or affiliate and, through that dominance, causes the underfunded-controlled entity to engage in inequitable conduct. When, as a result of that conduct, the injured party attempts to obtain redress, the controlling entity shields itself from liability behind the facade of the shell corporation, while the injured

---

[305] *Mobil Oil Corp.*, 718 F. Supp. at 268; *see also In re Moll Indus., Inc.*, 454 B.R. at 591 (Delaware law does not require a showing of fraud but "something like fraud must be proven" and the difference is "largely superficial") (quotation marks omitted). Certain "[c]ourts and commentators have noted that this standard is less than clear and has been criticized for its ambiguity and randomness." *Soroof Trading Dev. Co.*, 2012 U.S. Dist. LEXIS 67736, at *27 (quotation marks omitted) (collecting cases).

[306] *Soroof Trading Dev. Co.*, 2012 U.S. Dist. LEXIS 67736, at *27 (quoting *Trevino*, 583 F. Supp. 2d at 530); *see also In re BH S&B Holdings LLC*, 420 B.R. at 133 ("There must be an abuse of the corporate form to effect a fraud or an injustice–some sort of elaborate shell game.") (quotation marks omitted).

[307] *NetJets Aviation, Inc.*, 537 F.3d at 183 ("To hold otherwise would render the fraud or injustice element meaningless.") (quotation marks omitted); *see also Mobil Oil Corp.*, 718 F. Supp. at 268 (explaining that although "[a]ny breach of contract and any tort – such as patent infringement – is, in some sense, an injustice," "[t]he underlying cause of action does not supply the necessary fraud or injustice" for veil-piercing; *In re CLK Energy Partners, LLC*, 2010 Bankr. LEXIS 1564, at *20 ("[P]roof of an underlying tort or contract claim against a corporate defendant does not, standing alone, support an alter ego finding against the corporation's principals. . . . The Complaint . . . fails to tie [the] alleged misrepresentations to a misuse by each of the Choctaw defendants of the limited liability afforded by CLK's LLC form.").

[308] *Trevino*, 583 F. Supp. 2d at 530 (allegation that subsidiary was "ill-equipped to handle potential liability arising from this action" not sufficient to allege necessary "injustice" to pierce its veil) (quotation marks omitted); *see also Secured Sys. Tech., Inc. v. Frank Lill & Son, Inc.*, Civ. No. 08-6256, 2012 U.S. Dist. LEXIS 141845, at *14 (W.D.N.Y. Oct. 1, 2012) ("[T]he required 'fraud or injustice' is not established merely because the alleged-subsidiary corporation may now be judgment proof.") (applying Delaware law).

[309] *NetJets Aviation, Inc.*, 537 F.3d at 183.

[310] *Id*. at 177.

party has no recourse against the undercapitalized shell corporation. In that instance, the corporate form was used to effect a fraud or injustice and the corporate veil is pierced to allow the injured party to obtain redress from the actual wrongdoer who has the wherewithal to pay any damages awarded.[311]

Accordingly, the necessary "fraud or injustice" has been found in several cases where a parent siphoned funds from a subsidiary to the detriment of the subsidiary's creditors.[312]

### (2) Application To Facts

The Examiner concludes that the evidence does not support the proposition that AFI engaged in the type of "injustice or unfairness" necessary to warrant piercing the corporate veil. This case does not present the "typical situation" where "fraud or injustice" may warrant piercing the corporate veil when a subsidiary becomes unable to satisfy its creditors either

---

[311] *In re Sunbeam Corp.*, 284 B.R. at 367; *see also On Command Video Corp. v. Roti*, 2013 U.S. App. LEXIS 848, at *12 (7th Cir. Jan. 14, 2013) (applying Illinois law) ("Whether adherence to the fiction of . . . corporate separateness would 'promote injustice' is a vague test. But it is best understood as asking whether there has been an abuse of limited liability, as when the owner of a party to a contract strips the party of assets so that if it breaks the contract the other party will have no remedy."); *In re Ticketplanet.com*, 313 B.R. at 70 ("To survive a motion to dismiss, a plaintiff must allege facts that the controlling owners operated the company as an 'incorporated pocketbook' and used the corporate form to shield themselves from liability.").

[312] *See NetJets Aviation, Inc.*, 537 F.3d at 183 (reversing grant of summary judgment dismissing veil-piercing claim where there was sufficient evidence such that a factfinder "could infer that [sole owner] Zimmerman's payments to [limited liability company] LHC were deliberately mischaracterized as loans in order to mask the fact that Zimmerman was making withdrawals from LHC that were forbidden by law, and could thereby properly find fraud or an unfair siphoning of LHC's assets"); *Soroof Trading Dev. Co.*, 2012 U.S. Dist. LEXIS 67736, at *29-30 (allegations of parent's "siphoning of funds" from subsidiaries and using those subsidiaries "to make promises that they could not meet" sufficient to grant leave to amend to add veil-piercing claim); *TradeWinds Airlines, Inc.*, 2012 U.S. Dist. LEXIS at *18-19 (finding "adequate injustice" to support veil-piercing claim where plaintiffs alleged that "Defendants siphoned funds from C-S Aviation" and thereby "deprived Plaintiffs of the ability to recover damages on its fraudulent inducement claim"); *Blair*, 720 F. Supp. 2d at 473 (denying motion to dismiss veil-piercing claim and concluding that plaintiff "sufficiently alleged that the [parent] defendants may have perpetrated an element of fraud or injustice" where it was alleged that "[parent] defendants misdirected funds, exercised crippling control, and purposely siphoned profits from the Qimonda Subsidiaries"); *PSG Poker, LLC*, 2008 U.S. Dist. LEXIS 4225, at *38 (granting plaintiff summary judgment on veil-piercing claim where there was "ample evidence in the record that [sole shareholder] DeRosa-Grund siphoned the funds received by [the company] for his personal benefit" and "sought to mislead and defraud" creditors); *In re Buckhead Am. Corp.*, 178 B.R. at 974 (denying motion to dismiss veil-piercing claim where plaintiff alleged that the parent caused its subsidiary "to make transfers and incur debts solely for the benefit of defendants (and others) to the detriment of [subsidiary] and its creditors"); *In re Autobacs Strauss, Inc.*, 473 B.R. at 559 (plaintiffs "sufficiently allege that [parent] may have perpetrated fraud . . . or something similar" when it "misdirected funds, exercised crippling control, and purposely siphoned money from [its subsidiary]"). *Cf. Fletcher*, 68 F.3d at 1461 (affirming grant of defendant's motion for summary judgment on veil-piercing claim where "[t]here is no indication that Kodak sought to defraud creditors and consumers or to siphon funds from its subsidiary").

because it was undercapitalized at formation or later siphoned of assets by its parent.[313] Here, the Examiner has concluded that the evidence does not support either proposition.[314] Instead, the factual record revealed by the Investigation reflects that ResCap was not inadequately capitalized or insolvent when it commenced operations but that it later became unable to satisfy its creditors because of billions of dollars in operating losses it recorded beginning in the fourth quarter of 2006 as market conditions steeply declined.[315]

Although ResCap entered into certain Affiliate Transactions, including the 2006 Bank Restructuring and the Second 2009 Tax Allocation Agreement for less than fair market value, and Ally Bank retained brokered-loan revenues due to ResCap in 2012, the Examiner has concluded that—on balance and when viewed under all the circumstances—the evidence does not support the proposition that AFI engaged in "siphoning."[316] In any event, the approximate amounts at issue with respect to the 2006 Bank Restructuring (i.e., $390-465 million), the Second 2009 Tax Allocation Agreement (i.e., $50 million, and the avoidance of an obligation now known to be worth up to $1.77 billion), and the misallocation of brokered-loan revenues ($567 million), while substantial, would likely be viewed in the context of the more than $8 billion in financial support that AFI provided to ResCap from 2007 to the petition date in 2012.[317] In the context of that financial support—which AFI did not begin to provide to ResCap until months *after* the close of the 2006 Bank Restructuring—it would be difficult to prove from those Affiliate Transactions that AFI used ResCap as an "incorporated pocketbook"[318] or for "some sort of elaborate shell game."[319]

The Creditors' Committee and other parties have suggested that there may be an element of "injustice or unfairness" in AFI's financial support of ResCap because that support was self-interested and generally inadequate to do more than maintain ResCap on "life support." The Examiner is not persuaded. Without more, this sort of allegation that ResCap "served as a tool to further [AFI's] interests" is unlikely to be considered "injustice or unfairness" arising from an abuse of the corporate form that could warrant piercing the corporate veil.[320]

---

[313] *See In re Sunbeam Corp.*, 284 B.R. at 368.

[314] *See* Sections VII.A.1(f)(1)(b) and VII.A.1(f)(2)(b).

[315] *See* Section VII.A.1(f)(1)(b).

[316] *See* Section VII.A.1(f)(2)(b).

[317] *Id.*

[318] *In re Ticketplanet.com*, 313 B.R. at 70.

[319] *In re BH S&B Holdings LLC*, 420 B.R. at 133 (quotation marks omitted).

[320] *In re Ticketplanet.com*, 313 B.R. at 71 (dismissing veil-piercing claim despite allegation "that the Debtor merely served as a tool to further Defendants' interests," where the debtor had "received a substantial cash infusion from [defendant affiliate entity]"); *see also In re RSL Com Primecall, Inc.*, 2003 Bankr. LEXIS 1635, at *53-54 (granting motion to dismiss veil-piercing claim where plaintiff argued that the subsidiary "merely served as a tool to further Defendants' interests" and explaining that "[t]his claim alone cannot support a finding that [the subsidiary] was used improperly for the benefit of its . . . affiliates, nor does it show overall fraud or injustice from the use of the corporate form").

Although the available evidence indicates that the precise motives for AFI's financial support of ResCap changed over time, there can be no dispute that AFI (not surprisingly) provided such support only when AFI believed it to be in AFI's interest.[321] When that financial support began in 2007, AFI believed that ResCap was a viable and valuable business that should receive support to weather what was viewed as a temporary crisis.[322] By November 2008, AFI considered bank holding company approval and eligibility for TARP funds to be critical to its survival and concluded that it was necessary for AFI to continue to provide financial support to ResCap to achieve that goal.[323] AFI also worried that a precipitous ResCap bankruptcy filing would have put AFI's access to financing and its control over Ally Bank at risk.[324] According to Tessler, AFI Board Member and Managing Director of Cerberus, the "unfortunate reality" was that because of these circumstances AFI "was forced to provide [ResCap] inter company loans and engage in the affiliated transactions."[325] By December 2009, if not earlier, AFI had come to view ResCap as a "millstone around the neck" that held "no businesses that are strategic for the future."[326] AFI continued to provide financial support to ResCap in part because, as late as December 2011, AFI was concerned about the effects of a ResCap bankruptcy given the "operational entanglement of the Bank and ResCap."[327]

That AFI may have continued to support ResCap as a means to its own shifting ends does not change the effect of that support on ResCap's balance sheet.[328] The Investigation has not

---

[321] Indeed, AFI acknowledges that it "only provided capital to ResCap when it was in the interest of AFI and its stakeholders." *See* AFI Submission Paper, dated Dec. 19, 2012, at 19.

[322] *See* Section III.F; Int. of L. Tessler, Nov. 16, 2012, at 143:24–147:4; Int. of A. de Molina, Nov. 20, 2012, at 25:12–26:16.

[323] *See* Section III.H.5; *see also* Board Agenda & Supporting Materials, GMAC LLC, Nov. 28, 2008, at EXAM10277378 [EXAM10277369] ("management believes that BHC status is achievable, but has been advised that support for ResCap is a prerequisite"); Int. of A. de Molina, Nov. 20, 2012, at 101:25–102:2 ("I was so petrified that [a ResCap bankruptcy] would derail the entire bank holding company strategy."); Int. of R. Hull, Feb. 7, 2013, at 177:8–11 ("it became clear that a filing of ResCap at all in the context of this BHC [request], it would complicate matters immensely").

[324] *See* E-mail from L. Tessler to M. Carpenter (Dec. 3, 2009), at CCM00065542 [CCM00065540] ("[T]he historic choices regarding what to do with ResCap have always resulted in the same conclusion which is, filing ResCap will bring down [AFI] . . . . Any actions taken to divorce ResCap from [AFI] during this period [before the close of the 2008 Bank Transaction] would have resulted in [AFI's] bank lines either being pulled or not renewed and the probable los[s] of the Bank to the FDIC."); Board Agenda and Supporting Material, GMAC LLC, Sept. 30, 2008, at ALLY_0361451 [ALLY_0361444] ("It is unclear whether the FDIC would seize the bank in the event of a [ResCap] bankruptcy. The bank is critical to [AFI's] future liquidity. This uncertainty poses a significant risk.").

[325] E-mail from L. Tessler to M. Carpenter (Dec. 3, 2009), at CCM00065542 [CCM00065540].

[326] Presentation to the U.S. Department of the Treasury: GMAC Request for SCAP Funding, dated Dec. 11, 2009, at 4-5 [ALLY_0231352]; *see* E-mail from M. Carpenter to L. Tessler (Dec. 6, 2009) [CCM00065540] (stating that he would "sell the whole company [(*i.e.*, ResCap)] for a dollar").

[327] E-mail from B. Yastine (Dec. 1, 2011) [ALLY_0304495].

[328] *See* Section VI.C.4.f(4).

uncovered evidence that ResCap and its creditors were defrauded or otherwise harmed by AFI's self-interested financial support. The Examiner does not consider this or any other alternative theory of "injustice or unfairness" to be any more likely to succeed.

Accordingly, the Examiner concludes that any veil-piercing claims asserted on behalf of ResCap against AFI are unlikely to prevail.[329]

---

[329] The Examiner likewise concludes that any potential veil-piercing claim asserted on behalf of GMAC Mortgage or RFC seeking to hold AFI liable for their respective debts would be unlikely to prevail. As explained above, the law is unsettled as to whether the veils of each intermediate entity between a subsidiary and its ultimate parent must be pierced. *See* Section VII.A.1.c. Assuming arguendo that it is unnecessary to pierce intermediate veils, a veil-piercing claim on behalf of RFC or GMAC Mortgage against AFI would still be unlikely to prevail for similar reasons as a veil-piercing claim on behalf of ResCap against AFI. The evidence indicates that RFC and GMAC Mortgage were not insolvent at creation and were not rendered insolvent by the actions of their parent entities, but by operating losses. *See* Sections VI.E and VII.A.1.f(1)(b). There is no viable evidence of any program to siphon assets from either entity. Old GMAC Bank was a subsidiary of neither RFC nor GMAC Mortgage. *See* May 19, 2006, Application to OTS [ALLY_0401697] (Old GMAC Bank was wholly owned subsidiary of GMAC Residential Holding Corp., a direct subsidiary of ResCap). The tax allocation agreement issues are germane to ResCap, not RFC or GMAC Mortgage. The misallocation of brokered-loan revenues does implicate GMAC Mortgage (but not RFC). However, while Ally Bank withheld $469.1 million the Examiner concludes should have been paid to GMAC Mortgage, those amounts originally had been withheld by mistake, not design; the argument for "siphoning" is stronger for the additional $51.4 million GMAC Mortgage paid to Ally Bank. Moreover, GMAC Mortgage had itself been the beneficiary of more than $2.5 billion in AFI debt forgiveness. *See* GMAC Mortgage LLC Consolidated Financial Statements for the Years Ended December 31, 2009 and 2008, at 35 [EXAM00124578]. The evidence concerning corporate formalities would be similar on a RFC or GMAC Mortgage claim; the analysis would be augmented perhaps by the fact that neither of these entities seems to have had any board meetings, and to have operated instead by written consent of their all-insider boards, but this seems to have been consistent with the requirements of their respective operating agreements. *See* GMAC Mortgage LLC Agreement, § 15.d (Apr. 13, 2006) [ALLY_0118835]; RFC LLC Agreement, § 15.d (Oct. 6, 2006) [GSResCap0000124921]; RFC LLC Agreement, § 15.d (Apr. 2, 2007) [EXAM00294621]. Nonetheless, as with respect to ResCap, there is no evidence that these entities were a "mere façade" for AFI. Finally, given the absence of either undercapitalization at formation or siphoning, there does not appear to be any "injustice or unfairness" arising from abuse of the corporate form that could warrant piercing the veil between RFC or GMAC Mortgage and AFI.

### 2. Substantive Consolidation

Several parties in interest have asserted that grounds exist to support the substantive consolidation of AFI into ResCap's bankruptcy case.[330]

While there is some evidentiary support for a claim of substantive consolidation, the Examiner concludes it is unlikely that an attempt to substantively consolidate AFI with and into the Estate of any Debtor would prevail.

#### a. Introduction

Substantive consolidation is a doctrine of federal bankruptcy law under which bankruptcy courts may, in the exercise of their general equitable powers under section 105(a) of the Bankruptcy Code, consolidate the assets and liabilities of affiliated entities and treat them as one for purposes of the bankruptcy proceeding.[331] Intercompany claims of the consolidated debtors are eliminated, the assets of the consolidated debtors are treated as common assets, and the claims of outside creditors against any of the debtors are treated as claims against the consolidated entity.[332]

The purpose of substantive consolidation is to provide for the equitable treatment of all creditors, without any undue prejudice to any particular set of creditors.[333] If companies inappropriately disregard corporate formalities to the detriment of their creditors, the court may order relief that disregards corporate boundaries to remedy the harm to injured parties.[334] Before the equitable remedy of substantive consolidation was created, courts employed other

---

[330] See, e.g., Wilmington Trust Submission Paper, dated Mar. 8, 2013, at 56 ("AFI and Residential Capital should be substantively consolidated").

[331] See In re Owens Corning, 419 F.3d 195, 205 (3d Cir. 2005) ("Substantive consolidation, a construct of federal common law, emanates from equity."); Union Savings Bank v. Augie/Restivo Baking Co. (In re Augie/Restivo Baking Co.), 860 F.2d 515, 518 n.1 (2d Cir. 1988) ("Courts have found the power to consolidate substantively in the court's general equitable powers as set forth in 11 U.S.C. § 105.") (citing cases); James Talcott, Inc. v. Wharton (In re Cont'l Vending Mach. Corp.), 517 F.2d 997, 1000 (2d Cir. 1975) ("The power to consolidate is one arising out of equity. . . ."). There is no direct statutory authority or prescribed standard for substantive consolidation. See In re Augie/Restivo Baking Co., 860 F.2d at 518–19; Alexander v. Compton (In re Bonham), 229 F.3d 750, 765–66 (9th Cir. 2000). But see In re Cyberco Holdings, Inc., 431 B.R. 404, 430–31 (Bankr. W.D. Mich. 2010) (concluding that Bankruptcy Code section 542 and, to a lesser extent, Bankruptcy Code section 502(j) serve as the statutory authority for substantive consolidation); In re Stone & Webster, Inc., 286 B.R. 532, 541–42 (Bankr. D. Del. 2002) (holding that Bankruptcy Code section 1123(a)(5)(C) authorizes substantive consolidation).

[332] See In re Augie/Restivo Baking Co., 860 F.2d at 518; In re Owens Corning, 419 F.3d at 202.

[333] See FDIC v. Colonial Realty Co., 966 F.2d 57, 61 (2d Cir. 1992) (sole aim of substantive consolidation is fairness to all creditors); Windels Marx Lane & Mittendorf, LLP v. Source Enters., Inc. (In re Source Enters., Inc.), 392 B.R. 541, 552 (S.D.N.Y. 2008) (noting that the "sole purpose" of substantive consolidation is "to ensure the equitable treatment of all creditors") (citing In re Augie/Restivo Baking Co., 860 F.2d at 518); In re Richton Intern. Corp., 12 B.R. 555, 558 (Bankr. S.D.N.Y. 1981).

[334] See In re Owens Corning, 419 F.3d at 205.

remedies to rectify the misuse of corporate forms by related entities. These remedies included veil-piercing, equitable subordination, debt recharacterization, avoidance of fraudulent conveyances to an insider, and turnover actions.[335]

As discussed below, courts have formulated different tests to be used in determining when substantive consolidation is warranted. Regardless of the test, courts have recognized that substantive consolidation may result in a harsh redistribution of value to some creditors at the expense of others[336] and, therefore, the remedy is an extraordinary one that must be exercised sparingly.[337]

### b.   The Evolution Of Substantive Consolidation

#### (1) Sampsell v. Imperial Paper & Color Corp.

Substantive consolidation as an independent remedy was first recognized by the Supreme Court in 1941 in *Sampsell v. Imperial Paper & Color Corp*.[338] In *Sampsell*, an individual named Downey incurred significant debt that he was unable to repay. The same month that he incurred the debt, he formed a corporation, of which he, his wife, and his son were the only stockholders, directors, and officers. He transferred his personal assets on credit to the company, which continued Downey's business.[339] Downey then filed for bankruptcy. In bankruptcy, the trustee sought to marshal the assets of the company for the benefit of Downey's creditors. The trustee's petition was granted, based on the referee's finding that Downey's transfer of property to the company was made with the intent to place the assets beyond the reach of Downey's creditors. The court ordered that the property of the company was property of Downey's bankruptcy estate to be administered for the benefit of the creditors of the estate.[340]

---

[335] *See* Timothy E. Graulich, *Substantive Consolidation—A Post-Modern Trend*, 14 AM. BANKR. INST. L. REV. 527 (2006); *see also In re Owens Corning*, 419 F.3d at 205–06 (identifying remedies utilized for corporate disregard prior to creation of substantive consolidation remedy).

[336] *See Drabkin v. Midland-Ross Corp*. (*In re Auto-Train Corp, Inc.*), 810 F.2d 270, 276–77 (D.C. Cir. 1987) (noting "consolidation almost invariably redistributes wealth among the creditors of the various entities").

[337] *See Bank of N.Y. Trust Co. v. Official Unsecured Creditors' Comm*. (*In re Pac. Lumber Co.*), 584 F.3d 229, 249 (5th Cir. 2009); *Wells Fargo Bank of Tex. N.A. v. Sommers* (*In re Amco Ins.*), 444 F.3d 690, 696 n.5 (5th Cir. 2006) (noting that those jurisdictions that allow substantive consolidation emphasize that such relief should be granted sparingly); *In re Owens Corning*, 419 F.3d at 210–11*; Gandy v. Gandy* (*In re Gandy*), 299 F.3d 489, 499 (5th Cir. 2002) (substantive consolidation is "an extreme and unusual remedy"); *FDIC v. Colonial Realty Co*., 966 F.2d at 61 ("Certainly this Court has insisted that substantive consolidation be invoked 'sparingly because of the possibility of unfair treatment of creditors'") (citing *Chem. Bank N.Y. Trust Co. v. Kheel*, 369 F.2d 845, 847 (2d Cir. 1966)); *In re Augie/Restivo Baking Co.,* 860 F.2d at 518); *James Talcott, Inc. v. Wharton* (*In re Cont'l Vending Mach. Corp.*), 517 F.2d 997, 1001 (2d Cir. 1975) (noting consolidation should be used sparingly because of possibility of unfair treatment of creditors); *Flora Mir Candy Corp. v. R. S. Dickson & Co*., 432 F.2d 1060, 1062–63 (2d Cir. 1970); *In re Source Enters. Inc.,* at 392 B.R. 552 (citing *In re Augie/Restivo, Baking Co.,* 860 F.2d at 518); *In re Snider Bros., Inc.,* 18 B.R. 230, 234 (Bankr. D. Mass. 1982).

[338] *Sampsell v. Imperial Paper & Color Corp*., 313 U.S. 215 (1941).

[339] *Id.* at 216.

[340] *Id.* at 217.

Thereafter, a creditor of Downey's company filed a claim seeking priority to distributions from the company's assets. The referee refused to grant the claim priority, and instead allowed it as a general unsecured claim against the estate. On appeal, the court of appeals reversed, and the trustee petitioned the Supreme Court for certiorari. The Supreme Court ultimately affirmed the referee's decision and, in the process, implicitly approved the referee's earlier decision "consolidating the estates" of the company and Downey.[341] The issue of substantive consolidation was not discussed in great detail, but courts following *Sampsell* have cited it as the seminal case from which the remedy of substantive consolidation evolved.[342]

### (2) Courts Begin To Recognize Substantive Consolidation

The very next year the Fourth Circuit invoked *Sampsell's* substantive consolidation remedy[343] in *Stone v. Eacho*.[344] In that case, Stone, the trustee for Tip Top Tailors, Inc., a corporation in bankruptcy in Delaware, filed a claim in the bankruptcy proceeding of one of its subsidiaries pending in Virginia for funds owed to the Delaware parent. Eacho, the trustee appointed in the bankruptcy proceeding of the Virginia subsidiary, objected to the claim, arguing that it should be subordinated to payment of other unsecured creditors on the basis that the Virginia corporation was not a separate entity, but merely a department of the Delaware corporation, and that the funds for which Stone sought repayment represented an advancement of operating capital.[345] The matter was referred to a special master who, siding with Eacho, found that Stone's claim should be subordinated to the claims of the unsecured creditors of the Virginia debtor. In response, Stone filed a petition seeking consolidation of the Virginia and Delaware entities. The district court denied Stone's petition and upheld the findings of the special master. Stone appealed.

On appeal, the Fourth Circuit noted that the subsidiary had no real separate existence from its parent: among other things it had no separate officers; it executed no contracts; it did not pay its own employees' salaries; and it kept none of its records on site. Noting that courts "will not be blinded by corporate forms," the Fourth Circuit stated "there is no reason why the

---

[341] *Id.* at 217.

[342] *See In re Owens Corning*, 419 F.3d at 206 ("the Supreme Court [in *Sampsell*] . . . approved (at least indirectly and perhaps inadvertently) what became known as substantive consolidation"); *Alexander v. Compton* (*In re Bonham*), 229 F.3d 750, 764 (9th Cir. 2000); *In re Cyberco Holdings, Inc.*, 431 B.R. 404, 411 n.19 (Bankr. W.D. Mich. 2010); *Gold v. Winget* (*In re NM Holdings*), 407 B.R. 232, 273–74 (Bankr. E.D. Mich. 2009)*; In re Coleman*, 417 B.R. 712, 725 (Bankr. S.D. Miss. 2009); *Simantob v. Lahijani* (*In re Lahijani*), No. SV 98-15561 GM, 2005 WL 4658490 at *6 (Bankr. C.D. Cal. Oct. 3, 2005); *In re Am. HomePatient, Inc.*, 298 B.R. 152, 165 (Bankr. M.D. Tenn. 2003); *In re Stone & Webster, Inc.*, 286 B.R. 532, 538 (Bankr. D. Del. 2002); *Gill v. Sierra Pac. Constr., Inc.* (*In re Parkway Calabasas Ltd.*), 89 B.R. 832, 837 (Bankr. C.D. Cal. 1988); *White v. Creditors Serv. Corp.* (*In re Creditors Serv. Corp.*), 195 B.R. 680, 689 n.4 (Bankr. S.D. Ohio 1996).

[343] The Third Circuit points out that the actual term "substantive consolidation" was not used in a reported case until 1975. *See In re Owens Corning,* 419 F.3d at 206 n.11 (3d Cir. 2007) (discussing in *James Talcott, Inc. v. Wharton* (*In re Cont'l Vending Mach. Corp.*), 517 F.2d 997, 1004 n.3 (2d Cir. 1975)).

[344] *Stone v. Eacho*, 127 F.2d 284 (4th Cir. 1942).

[345] *Id.* at 287.

courts should not face the realities of the situation and ignore the subsidiary for all purposes, allowing the creditors of both corporations to share equally in the pooled assets."[346]

Other circuits were slower to recognize substantive consolidation. It was not until 1964 that the Second Circuit recognized substantive consolidation in *Soviero v. Franklin National Bank*.[347] In that case, the trustee of Raphan Carpet Corporation sought the turnover of assets of fourteen entities, none of which were in bankruptcy. The facts were not disputed: the same individuals were the sole directors and stockholders of the debtor and each affiliate; the affiliates had no working capital; the debtor paid all obligations of the affiliates, including their leases, advertising and insurance charges; all individual accounting records were kept by the same staff at the debtor's place of business; no separate corporate minutes were maintained by the affiliates; and the affiliates had no real separate existences of their own.[348] Based on these facts the referee concluded that the affiliated companies were really mere instrumentalities of the debtor and to adhere to a "separate corporate entities" theory would result in injustice. Based on this conclusion, turnover was warranted. The court of appeals agreed and, citing to *Stone v. Eacho*, noted that ignoring the corporate entity of a subsidiary was appropriate based on the facts because only then could "all the creditors receive that equality of treatment which it is the purpose of the bankruptcy act to afford."[349]

Two years later the Second Circuit again invoked the remedy of substantive consolidation in *Chemical Bank New York Trust Co. v. Kheel*.[350] In *Kheel*, the referee recommended consolidation of eight debtor shipping companies that were operated as a single entity under the control of one individual. The Second Circuit affirmed the district court's grant of substantive consolidation, reasoning that consolidation was warranted due to the hopeless commingling of the debtors' assets and liabilities:

> Moreover, we have here an additional factor not present in *Soviero* or *Stone v. Eacho*, the expense and difficulty amounting to practical impossibility of reconstructing the financial records of the debtors to determine intercorporate claims, liabilities and ownership of assets. The power to consolidate should be used sparingly because of the possibility of unfair treatment of creditors of a corporate debtor who have dealt solely with that debtor without knowledge of its interrelationship with others. Yet in the rare case such as this, where the interrelationships of the group are hopelessly obscured and the time and expense necessary even to attempt to unscramble them so substantial as

---

[346] *Id.* at 288.

[347] *Soviero v. Franklin Nat'l Bank*, 328 F.2d 446 (2d Cir. 1964).

[348] *Id.* at 447.

[349] *Id.* at 449 (citing *Stone v. Eacho*, 127 F.2d at 288).

[350] *Chem. Bank N.Y. Trust Co. v. Kheel*, 369 F.2d 845 (2d Cir. 1966).

> to threaten the realization of any net assets for all creditors,
> equity is not helpless to reach a rough approximation of justice
> to some rather than deny any to all.[351]

In the cases that followed *Kheel*, courts in the Second Circuit considered numerous factors in determining whether substantive consolidation would result in equitable treatment for creditors. Courts evaluated: (1) whether creditors knowingly dealt with the companies to be consolidated as a unit;[352] (2) the presence of parent and inter-corporate guarantees;[353] (3) the presence of asset transfers without observance of corporate formalities;[354] (4) the presence of consolidated financial statements;[355] (5) whether the interrelationships of the group were closely entangled;[356] and (6) whether the cost of untangling would outweigh the benefit to creditors.[357]

In 1988, the Second Circuit reviewed prior decisions and synthesized the substantive consolidation factors into a two-prong test. That test is described in the next section.[358]

---

[351] *Id*. at 847. The Second Circuit again recognized the remedy of substantive consolidation in 1970 and 1975. *See Flora Mir Candy Corp. v. R.S. Dickson & Co*., 432 F.2d 1060 (2d Cir. 1970); *James Talcott, Inc. v. Wharton* (*In re Cont'l Vending Mach. Cor*p*.)*, 517 F.2d 997 (2d Cir. 1975).

[352] *See Union Savings Bank v. Augie/Restivo Baking Co*. (*In re Augie/Restivo Baking Co.*), 860 F.2d 515, 518 (2d Cir. 1988) (citing *In re Cont'l Vending Mach. Corp*., 517 F.2d at 1001).

[353] *See In re Augie/Restivo Baking Co.,* 860 F.2d at 518 (citing *In re Donut Queen, Ltd*., 41 B.R. 706 (Bankr. E.D.N.Y. 1984)).

[354] *See In re Augie/Restivo Baking Co.*, 860 F.2d at 518 (citing *In re Donut Queen, Ltd*., 41 B.R. 706).

[355] *See In re Augie/Restivo Baking Co.*, 860 F.2d at 518 (citing *In re Donut Queen, Ltd*., 41 B.R. 706).

[356] *See In re Augie/Restivo Baking Co.*, 860 F.2d at 518 (citing *Flora Mir Candy Corp. v. R.S. Dickson & Co*., 432 F.2d 1060 and *In re Donut Queen, Ltd*., 41 B.R. 706).

[357] *See In re Augie/Restivo Baking Co.*, 860 F.2d at 518 (2d Cir. 1988) (citing *Chem. Bank N.Y. Trust Co. v. Kheel*, 369 F.2d 845 (2d Cir. 1966)).

[358] Other circuits have developed different tests in determining whether substantive consolidation is appropriate. Some courts have designated certain factors, or elements, to be considered in determining the appropriateness of substantive consolidation. Some of the factors considered by courts include, among others: common officers and directors; one entity financing the other entity; the parent referring to the subsidiary as department or division of the parent; presence or absence of consolidated financial statements; commingling of assets and business functions; unity of interests and ownership between entities; existence of parent and intercorporate guarantees on loans; and transfers of assets without formal observance of corporate formalities. *See In re Tureaud*, 45 B.R. 658, 662 (Bankr. N.D. Okla. 1985) (citing *Fish v. East*, 114 F.2d 177 (10th Cir. 1940) and *FDIC v. Hogan* (*In re Gulfco Inv. Corp*.), 593 F.2d 921 (10th Cir. 1979); *In re Vecco Constr. Indus., Inc.,* 4 B.R. 407 (Bankr. E.D. Va. 1980). Other courts take these elements into account within the context of a balancing test in which the interests of the parties objecting to substantive consolidation are considered. *See Drabkin v. Midland-Ross Corp.* (*In re Auto-Train Corp.*), 810 F.2d 270, 277 (D.C. Cir. 1987); *Eastgroup Props. v. S. Motel Ass'n*., 935 F.2d 245, 249 (11th Cir. 1991).

### c.  Substantive Consolidation In The Second Circuit Today

In *In re Augie/Restivo Baking Co*.,[359] the Second Circuit set forth alternative tests to determine whether substantive consolidation is warranted:

- whether creditors dealt with the entities as a single economic unit and did not rely on their separate identities in extending credit (corporate separateness test); or

- whether the entities' affairs are so entangled that substantive consolidation will benefit all creditors (entanglement test).[360]

The presence of either factor is sufficient to grant substantive consolidation.[361] Numerous courts have adopted and explained the alternative tests,[362] and the bankruptcy courts in the Southern District of New York have found a variety of factors persuasive in connection with

_____

[359] 860 F.2d 515 (2d Cir. 1988).

[360] *See id.* at 518. The Second Circuit reaffirmed these tests in *FDIC v. Colonial Realty Co*., 966 F.2d 57, 61 (2d Cir. 1992).

[361] *See In re Augie/Restivo Baking Co., 860 F.2d at 518; Alexander v. Compton* (*In re Bonham*), 229 F.3d 750, 766 (9th Cir. 2000). *See also In re 599 Consumer Elecs., Inc.*, 195 B.R. 244, 250 (S.D.N.Y. 1996) ("A finding that creditors knew they were dealing with separate entities does not necessarily preclude substantive consolidation on the ground that it is impossible or prohibitively expensive to unravel the debtors' commingled finances.").

[362] *See, e.g*., *Windels Marx Lane & Mittendorf, LLP v. Source Enters., Inc*. (*In re Source Enters., Inc*.), 392 B.R. 541, 553–54 (S.D.N.Y. 2008); *ACC Bondholder Grp. v. Adelphia Comm'ns Corp.* (*In re Adelphia Comm'ns Corp*.), 361 B.R. 337, 359 (S.D.N.Y. 2007); *In re 599 Consumer Elecs., Inc*., 195 B.R. at 247–48; *In re Jennifer Convertibles, Inc*., 447 B.R. 713, 723 (Bankr. S.D.N.Y. 2011); *In re Reserve Capital Corp*., No. 03-60071–78, 2007 WL 880600, at *3–4 (Bankr. N.D.N.Y. Mar. 21, 2007); *Official Comm of Unsecured Creditors v. Am. Tower Corp.* (*In re Verestar, Inc.*), 343 B.R. 444, 462–63 (Bankr. S.D.N.Y. 2006); *In re Worldcom, Inc*., No. 02–13533, 2003 WL 23861928, at *35–37 (Bankr. S.D.N.Y. Oct. 31, 2003); *In re I.R.C.C., Inc*., 105 B.R. 237, 241–42 (Bankr. S.D.N.Y. 1989); *see also In re Bonham*, 229 F.3d at 766. In *In re Owens Corning*, the Third Circuit also followed the Second Circuit's test, which it recharacterized as follows: "what must be proven (absent consent) concerning the entities for whom substantive consolidation is sought is that (i) prepetition they disregarded separateness so significantly their creditors relied on the breakdown of entity borders and treated them as one legal entity, or (ii) postpetition their assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors." *In re Owens Corning*, 419 F.3d 195, 211 (3d Cir. 2005) (footnotes omitted). In expanding on the "corporate separateness" prong of the *Augie/Restivo* tests, the Third Circuit held that a prima facie case for substantive consolidation exists when, based on the parties' prepetition dealings, a proponent can prove "corporate disregard creating contractual expectations of creditors that they were dealing with debtors as one indistinguishable entity." *Id.* at 212. (footnote omitted). To this end, proponents of substantive consolidation "must also show that, in their prepetition course of dealing, they actually and reasonably relied on debtors' supposed unity." *Id.* An opponent of consolidation can defeat this prima facie showing by proving it is "adversely affected and actually relied on debtors' separate existence." *Id.* With respect to the entanglement test, the Third Circuit held that a proponent of substantive consolidation must demonstrate that every creditor will benefit from consolidation and, moreover, "the benefit to creditors should be from cost savings that make assets available rather than from the shifting of assets to benefit one group of creditors at the expense of another." *Id.* at 214. Benefit to only some creditors or administrative benefit to the court "falls far short" of that necessary to justify substantive consolidation. *Id.*

the "corporate separateness" test, including, inter alia: (1) operation under unified direction and control; (2) failure to observe corporate formalities; (3) dissemination of consolidated financial information to creditors; (4) use of consolidated cash management systems; and (5) whether one entity was run in the interest of another.[363]

### (1) Review Of Augie/Restivo

In the *Augie/Restivo* case, Union Savings Bank ("Union") extended credit to Augie's Baking Company ("Augie's"). Thereafter, Augie's entered into an agreement with Restivo Brothers Bakers, Inc. ("Restivo") pursuant to which Restivo acquired all of Augie's stock in exchange for fifty percent of Restivo's stock. After the stock exchange, Restivo changed its name to Augie/Restivo Baking Company, Ltd. ("Augie/Restivo"). Augie/Restivo became the sole operating company, but Augie's was not dissolved. Shortly after the name change, Manufacturers Hanover Trust Company ("MHTC") lent funds to Augie/Restivo, at the same time requiring a guarantee from Augie's. (MHTC had previously lent money to Restivo as well.) During this period, various other trade creditors extended credit to Augie/Restivo.[364]

The next year, Augie/Restivo and Augie's were forced into bankruptcy. In bankruptcy, the debtors sought the substantive consolidation of Augie/Restivo and Augie's, which was granted over Union's objection. Union appealed.[365]

In considering Union's appeal, the court of appeals reviewed the considerations of other courts in determining whether substantive consolidation was warranted and distilled those considerations into the two alternative tests noted above—the corporate separateness test and the entanglement test.[366]

In reviewing the corporate separateness test, the court of appeals asserted that creditors' expectations at the time of lending funds to a debtor create "significant equities," and lender expectations in the case before it did not justify substantive consolidation. The court of appeals noted that at the time that Union lent money to Augie's, the loan was based solely on Augie's financial condition and, at that time, Union had no knowledge of the merger negotiations between Augie's and Restivo. It was only after Union became a creditor of Augie's that Augie's and Restivo merged. The court of appeals also noted that MHTC, like Union, operated on the assumption that it was dealing with separate entities when it loaned

---

[363] *See In re The Leslie Fay Cos.*, 207 B.R. 764, 771, 780 (Bankr. S.D.N.Y. 1997); *In re Lionel L.L.C.*, No. 04-17324, 2008 Bankr. LEXIS 1047, at *31 (Bankr. S.D.N.Y. Mar. 31, 2008) (finding that, "[a]s a result of the Debtors' integrated and interdependent operations, substantial intercompany guaranties, common officers and directors, common control and decision making, reliance on a consolidated cash management system, and dissemination of principally consolidated financial information to third parties, the Debtors believe that they operated, and creditors dealt with the Debtors, as a single, integrated economic unit."); *cf. In re 599 Consumer Elecs., Inc.*, 195 B.R. at 249 (consolidation was not appropriate under the first prong of the *Augie/Restivo* test where there was no evidence of creditor confusion as to the debtors' separateness).

[364] *In re Augie/Restivo Baking Co.,* 860 F.2d at 516–17.

[365] *Id.* at 517.

[366] *Id.* at 518. The Second Circuit reaffirmed these tests in *FDIC v. Colonial Realty Co.*, 966 F.2d 57, 61 (2d Cir. 1992).

money to Augie/Restivo, evidenced by its request that Augie's guarantee the debt of Augie/Restivo. With these circumstances, even though other trade creditors may have believed they were dealing with a single entity in extending credit to Augie/Restivo, consolidation was not warranted.[367]

In reviewing the "entanglement test," the court of appeals established a stringent standard for the degree to which the debtors' affairs need to be obscured by commingled funds or lax corporate form before consolidation is appropriate. Reversing the lower court's substantive consolidation order, the court of appeals held:

> Resort to consolidation in such circumstances [corporate affiliates with commingled assets and business functions], however, should not be Pavlovian. Rather, substantive consolidation should be used only after it has been determined that all creditors will benefit because untangling is either impossible or so costly as to consume the assets . . . . Commingling, therefore, can justify substantive consolidation only where "the time and expense necessary even to attempt to unscramble them [is] so substantial as to threaten the realization of any net assets for all the creditors" . . . or where no accurate identification and allocation of assets is possible. In such circumstances, all creditors are better off with substantive consolidation.[368]

Under the "entanglement" analysis, poor or nonexistent record keeping of separate assets (particularly cash and other liquid assets) and liabilities and interaffiliate transactions is one of the more common reasons for imposing substantive consolidation. When the combination of affiliates' assets, liabilities and business affairs is so "hopelessly entangled" that segregation is either prohibitively expensive or impossible, courts are more willing to grant substantive consolidation. The degree of entanglement is the central question to be examined because the potentially prejudicial effect of substantive consolidation is not likely to be justified based on mere contentions of administrative convenience.[369]

---

[367] *See In re Augie/Restivo Baking Co.,* 860 F.2d at 519.

[368] *See id.* (citations omitted).

[369] *See Windels Marx Lane & Mittendorf, LLP v. Source Enters., Inc.* (*In re Source Enters., Inc.*), 392 B.R. 541, 553–54 (S.D.N.Y. 2008) ("The question, of course, is not whether some affairs were not entangled, but rather whether the commingling in this case was so pervasive that 'the time and expense necessary even to attempt to unscramble' the debtors' books would be 'so substantial as to threaten the realization of any net assets for all the creditors . . .' or where no accurate identification and allocation of assets is possible.'") (citing *In re Augie/Restivo Baking Co.,* 860 F.2d at 519). *See also In re Owens Corning*, 419 F.3d 195, 214 (3d Cir. 2005) ("Neither the impossibility of perfection in untangling the affairs of the entities nor the likelihood of some inaccuracies in efforts to do so is sufficient to justify consolidation.").

### d. Review Of Evidence Relating To Claim Of Substantive Consolidation

#### (1) AFI's Eligibility For Substantive Consolidation

As an initial matter, the fact that AFI is not a debtor under title 11 would not prevent the Bankruptcy Court from ordering the substantive consolidation of AFI's assets and liabilities with those of the Debtors in these bankruptcy cases, assuming the circumstances warranted the extraordinary remedy of substantive consolidation.

While there is some disagreement among courts as to whether a non-debtor may be substantively consolidated with other debtors,[370] the majority of courts, including those in the

---

[370] Some courts have raised jurisdictional concerns or asserted that substantive consolidation should not be used to bypass the requirements to place an entity into a bankruptcy proceeding involuntarily. *See In re Pearlman*, 462 B.R. 849 (Bankr. M.D. Fla. 2012) (noting among things that substantive consolidation of a non-debtor into a debtor would "circumvent" Bankruptcy Code section 303's procedures for involuntary bankruptcy proceedings); *Helena Chem. Co. v. Circle Land and Cattle Corp.* (*In re Circle Land and Cattle Corp.*), 213 B.R. 870 (Bankr. D. Kan. 1997) (dismissing complaint seeking to substantively consolidate assets of debtor's corporate parent company with debtor's estate on basis that to grant relief would be contrary to the Bankruptcy Code limitations on an involuntary bankruptcy filing and outside the bankruptcy court's jurisdiction); *Weinman v. Hamilton Props. Corp.* (*In re Hamilton*), 186 B.R. 991 (Bankr. D. Colo. 1995) (dismissing complaint seeking to "reverse pierce" the corporate veil to hold non-debtor entity liable for individual debtor's liabilities); *In re Julien Co.*, 120 B.R. 930 (Bankr. W.D. Tenn. 1990) (denying motion to amend petition to add debtor's shareholder as "debtor" based upon substantive consolidation theory); *Goldman v. Haverstraw Assoc.* (*In re R.H.N. Realty Corp.*), 84 B.R. 356 (Bankr. S.D.N.Y. 1988) (same); *In re DRW Prop. Co. 82*, 54 B.R. 489 (Bankr. N.D. Tex. 1985) (denying application for substantive consolidation of 109 related non-debtor partnerships with estate of affiliated debtor); *In re Alpha & Omega Realty, Inc.*, 36 B.R. 416 (Bankr. D. Idaho 1984) (denying motion to substantively consolidate non-debtor partnership with estate of affiliated debtor raising jurisdictional concerns and the issue that consolidation would violate due process rights otherwise protected by Bankruptcy Code section 303); Kurt A. Mayr, *Back to Butner's Basic Rule—the Fundamental Flaw of Nondebtor Substantive Consolidation*, 16 NORTON J. BANKR. L. & PRAC., 77 (Feb. 2007) (citing cases). *See also United States v. AAPC, Inc.* (*In re AAPC, Inc.*), 277 B.R. 785 (Bankr. D. Utah 2002) (ordering that notice of requested consolidation be given to all creditors of non-debtor and requesting that parties brief the issue of how and under what circumstances the provisions and safeguards of Bankruptcy Code section 303 may be defeated by Bankruptcy Code section 105 for purposes of consolidating a non-debtor individual into a corporate bankruptcy); *In re Horsley*, No. 99–30458, 2001 WL 1682013 (Bankr. D. Utah Aug. 17, 2001) (questioning propriety of proposed substantive consolidation of non-debtor with individual debtor control person of non-debtor); *Raslavich v. Ira S. Davis Storage Co.* (*In re Ira S. Davis, Inc.*), Bankr. No. 92-14259S, Adv. No. 93-0530S, 1993 WL 384501 (E.D. Pa. Sept. 22, 1993) (clarifying that prior *Lease-A-Fleet* decision should be read to render non-debtor substantive consolidation "doubtful in *any* circumstances") (emphasis in original); *Morse Operations, Inc. v. Robins Le-Cocq, Inc.* (*In re Lease-A-Fleet, Inc.*), 141 B.R. 869, 872–78 (Bankr. E.D. Pa. 1992) (noting "conceptual difficulties" in consolidating a non-debtor with debtor and suggesting that more conventional, expressly Code-sanctioned methods are preferable).

Second Circuit, have permitted the substantive consolidation of non-debtor entities with a debtor pursuant to the same standard applicable to the consolidation of multiple debtors.[371]

### (2) Standard For Substantive Consolidation—Augie/Restivo

The Second Circuit's standard for substantive consolidation, as articulated in the *Augie/Restivo* cases, will govern the Court's review of whether substantive consolidation is warranted in these circumstances.[372] As discussed in Section VII.A.2.c, the court of appeals created two alternative tests to determine when substantive consolidation is warranted.[373]

### (a) "Corporate Separateness" Test

The Examiner concludes that the evidence does not support the proposition that creditors reasonably relied on ResCap and AFI as a single economic unit at the time they extended credit to ResCap. Actions by creditors after they extended credit to ResCap that demonstrate a hope or expectation that such debt will be satisfied by AFI will not satisfy the corporate separateness test.

---

[371] *See*, *e.g.*, *Alexander v. Compton* (*In re Bonham*), 229 F.3d 750, 765 (9th Cir. 2000) (noting that the substantive consolidation of a debtor with non-debtors is within the equitable powers of the bankruptcy court and citing cases); *Soviero v. Franklin Nat'l Bank of Long Island*, 328 F.2d 446 (2d Cir. 1964) (permitting consolidation of assets and liabilities of fourteen non-debtors into debtor in bankruptcy); *Kapila v. S & G Fin. Servs., LLC*, (*In re S & G Fin. Servs. of S. Fla., Inc.*), 451 B.R. 573, 580–82 (Bankr. S.D. Fla. 2011) (holding that allegations in complaint seeking substantive consolidation with non-debtors were sufficient to withstand motion to dismiss); *Logistics Info. Sys., Inc. v. Braunstein* (*In re Logistics Info. Sys., Inc.*), 432 B.R. 1, 10–11 (Bankr. D. Mass. 2010) (holding that substantive consolidation with a non-debtor was warranted under the *Auto-Train* and veil-piercing test and noting that the majority of courts have found non-debtor consolidation to be appropriate in some circumstances); *see also In re Owens Corning*, 419 F.3d at 208 n.13. (noting that courts "have not restricted the remedy to debtors, allowing the consolidation of debtors with non-debtors," and citing cases); *Majik Market v. TOC Retail, Inc.* (*In re Munford, Inc.*), 115 B.R. 390, 397–98 (Bankr. N.D. Ga. 1990) (denying motion to dismiss debtor's action to substantively consolidate non-debtor licensee and management services company after determining that complaint's allegations sufficiently asserted grounds for relief under the *Augie/Restivo* substantive consolidation test); *cf. Official Comm of Unsecured Creditors v. Am. Tower Corp.* (*In re Verestar, Inc.*), 343 B.R. 444, 463 (Bankr. S.D.N.Y. 2006) (stating, "[a]lthough there is some authority to the contrary, it is assumed that in an appropriate case, it would be possible for the bankruptcy court to substantively consolidate debtor and non-debtor entities."); *Creditors Servs. Corp. v. Cooley* (*In re Creditors Servs. Corp.*), 182 F.3d 916 (Table), No. 98-3838, 1999 WL 519296, at *1–2 (6th Cir. July 15, 1999) (unpublished decision). Some courts have suggested that a stricter standard would apply. *See*, *e.g.*, *Wells Fargo Bank of Tex. N.A. v. Sommers* (*In re Amco Ins.*), 444 F.3d 690, 695–96 n.3 (5th Cir. 2006) (recognizing that some courts "have cautioned that 'as careful as the courts must be in allowing substantive consolidation of debtors to occur . . . , the caution must be multiplied exponentially in a situation where a consolidation of a debtor's case with a non-debtor is attempted.") (quoting *In re Lease-A-Fleet*, 141 B.R. 872).

[372] Substantive consolidation is a creation of federal bankruptcy law and its analysis is not driven by state law. Therefore, the fact that AFI is a Delaware company with its principal office located in Michigan will not require application of law outside the circuit where the bankruptcy cases are pending.

[373] *Augie/Restivo Baking Co.*, 860 F.2d at 518. The Second Circuit reaffirmed these tests in *FDIC v. Colonial Realty Co.*, 966 F.2d 57, 61 (2d Cir. 1992).

The Examiner reviews below the arguments that have been made by the parties in these Chapter 11 Cases with respect to whether substantive consolidation is warranted under the first prong of the Augie/Restivo test—whether creditors extended credit to ResCap on the belief that ResCap and AFI were a single economic unit.

### (i) Lack Of Corporate Formalities

As discussed in Section VII.A.1 in connection with the Examiner's review of an "alter ego" claim, several parties in interest have asserted that AFI and ResCap operated as a single economic unit. Some (but not all) of the factors that support a "single entity" finding in connection with an alter ego claim may also be considered by courts in connection with the "corporate separateness" test articulated by the Second Circuit in Augie/Restivo. These "single entity" factors include: operation under unified direction and control, failure to observe corporate formalities, and consolidated financial statements.[374]

In support of this prong of the test, one party in interest has asserted that ResCap and AFI did not observe sufficient corporate formalities, arguing that: (1) AFI and ResCap had overlapping directors and officers; (2) Ally Bank personnel sat on the GMAC Mortgage committee that managed interest rate and credit risk for all MSR investments; (3) AFI directed ResCap's management, business, and legal strategies; (4) ResCap employees frequently shuttled between employment at different AFI entities; (5) ResCap paid for services provided to Ally Bank; and (6) AFI publicly admitted its control over all fundamental matters affecting ResCap. Wilmington Trust has likewise asserted that substantive consolidation is warranted because AFI and ResCap operated as an integrated single economic unit[375] and that AFI and ResCap routinely disregarded corporate formalities.[376] Wilmington Trust asserts that AFI executives often simultaneously held executive positions in ResCap and AFI, and employees often did not know for which entity they worked or from which entity they were paid.[377] Wilmington Trust alleges that ResCap employees used "Ally" email domains, AFI stationary and received compensation from AFI,[378] and that ResCap did not file any standalone financial statements after 2009.[379]

---

[374] *See In re The Leslie Fay Cos.*, 207 B.R. 764, 771, 780 (Bankr. S.D.N.Y. 1997); *In re Lionel L.L.C.*, No. 04-17324, 2008 Bankr. LEXIS 1047, at *31 (Bankr. S.D.N.Y. Mar. 31, 2008) (finding that, "[a]s a result of the Debtors' integrated and interdependent operations, substantial intercompany guaranties, common officers and directors, common control and decision making, reliance on a consolidated cash management system, and dissemination of principally consolidated financial information to third parties, the Debtors believe that they operated, and creditors dealt with the Debtors, as a single, integrated economic unit."); *cf. In re 599 Consumer Elecs., Inc.*, 195 B.R. 244, 249 (S.D.N.Y. 1996) (consolidation was not appropriate under the first prong of the *Augie/Restivo* test where there was no evidence of creditor confusion as to the debtors' separateness).

[375] Wilmington Trust Submission Paper, dated Oct. 24, 2012, at 31–32, 34–35; Wilmington Trust Submission Paper, dated Mar. 8, 2013, at 14–23, 56–58.

[376] Wilmington Trust Submission Paper, dated Oct. 24, 2012, at ¶ 30.

[377] *Id.* ¶¶ 4–5.

[378] *Id.* ¶ 5.

[379] *Id.* ¶ 5.

The Debtors acknowledge that there is an overlap of senior employees and board members that would support an argument that ResCap and AFI operated as a single economic unit.[380] The Debtors also concede that AFI and ResCap shared services and, during the three years prior to the Petition Date, AFI centralized corporate functions, including the IT, legal, procurement, risk, treasury, finance and audit departments.[381] In addition, contracting was centralized and substantially all vendor arrangements ran through AFI.[382]

Cutting against a "single economic unit" argument, however, the Debtors assert that ResCap maintained an independent board composed of both inside and outside directors, and had its own management team, its own headquarters, and its own auditors.[383]

For its part, AFI argues that it and ResCap complied with corporate formalities, noting that AFI and ResCap had separate boards, separate corporate headquarters and facilities, separate financial statements, separate external auditors, separate bank accounts, and issued separate debt.[384] Several ResCap officers have disputed any claim of conflicting loyalties.[385] ResCap's Independent Directors testified that their duties were owed to ResCap, not AFI.[386]

In Section VII.A.1.f(4), the Examiner reviews the parties' assertions described above and evaluates whether ResCap and AFI observed appropriate corporate formalities. Based on the Examiner's analysis and discussion in that Section, the Examiner concludes that, while a close question, it is more likely than not that a court would find that ResCap and AFI operated as a single economic unit for purposes of the first prong of the Augie/Restivo test (this is not a conclusion concerning the "single economic entity" veil-piercing test, which involves additional factors and different standards). But, the Examiner has uncovered no credible evidence that creditors dealt with ResCap and AFI as such. As discussed in Section VII.A.1.f(4), the evidence does not support a finding that ResCap creditors—when extending credit to ResCap—did so on the expectation that a single economic unit comprised of ResCap and AFI was responsible for ResCap's obligations.

---

[380] *See* ResCap Presentation to Unsecured Creditors' Committee Regarding Ally Claims Investigation and Settlement, dated June 8, 2012, at 20–21 [RC00067790].

[381] *See id.* at 22.

[382] *Id.* at 22.

[383] *See* Debtors' Submission Paper, dated Jan. 7, 2013, at 12–13.

[384] AFI Submission Paper, dated Dec. 19, 2012, at 13.

[385] *See, e.g.*, Dep. of T. Marano, Nov. 11, 2012, at 205:8–206:15 (explaining that he always protected ResCap's interests); Dep. of J. Whitlinger, Nov. 15, 2012, at 56:9–57:12 (same); Dep. of J. Ruckdaschel, Nov. 8, 2012, 17:25–18:4, 22:16–19 (explaining that he is a ResCap employee and that the "the client for me was always ResCap," not AFI); Int. of D. Debrunner, Sept. 13, 2012, at 72:19–74:14 (explaining that as a member of ResCap's board of directors he acted in the interests of ResCap).

[386] *See, e.g.*, Int. of E. Smith, Nov. 30, 2012, at 139:12–20 (rejecting the notion that ResCap's independent directors were anything other than protectors of ResCap's best interests), 132:12–140:20 (concerned about voting in the best interest of only ResCap and its creditors when making decisions about proposed Affiliate Transactions); Int. of T. Melzer, Oct. 10, 2012, at 55:21–56:8, 104:1–16 (same); Int. of K. Hirtler-Garvey, Dec. 20, 2012, at 94:21–5:19 (explaining that she acted to protect the interests of ResCap, its creditors, and its stakeholders), 105:2–107:20 (rejecting suggestion of divided loyalty).

### (ii) Trading Activity In ResCap's Bonds

The Debtors have suggested that after TARP, ResCap bondholders assumed that AFI would back-stop ResCap.[387] As seen by the chart below, ResCap bonds jumped in price at the time of AFI's receipt of TARP funding. This correlation could be used to argue that bondholders assumed AFI would use some or all of the TARP funds for ResCap's benefit.

EXHIBIT VII.A.2.d(2)(a)(ii)
**ResCap Bond Pricing Activity**



*Source: Pricing per Interactive Data Corporation.*

The Examiner is not persuaded, however, that ResCap bond pricing activity supports a conclusion that AFI may have agreed to satisfy ResCap obligations after TARP. The jumps in ResCap bond pricing in connection with AFI's receipt of TARP funding can be readily

---

[387] ResCap Presentation to Unsecured Creditors' Committee Regarding Ally Claims Investigation and Settlement, dated June 8, 2012, at 23 [RC00067790].

explained by the fact that AFI announced that it would contribute some of the TARP funding to ResCap, not that AFI was signaling its guarantee of ResCap debt.[388]

AFI at no time overtly promised ResCap bondholders that they could look to AFI for satisfaction. The bonds were issued pursuant to the 2005 Indenture and the June 2008 Indentures. Those indentures stated clearly that the notes and other obligations arising under the indentures were solely those of ResCap and its subsidiary guarantors. AFI did not guarantee any of the obligations under the 2005 Indenture or June 2008 Indentures. Indeed, the indentures explicitly state that there is no recourse against ResCap's stockholders for any obligations contained in the indentures.[389] Accordingly, at the time the bondholders extended credit to ResCap under the 2005 Indenture and June 2008 Indentures, they could not have had any reasonable expectation that AFI and ResCap formed a unified source of repayment of ResCap's obligations to the bondholders.

As Moody's observed in December 2009:

> The US Treasury's actions increase [AFI's] ability to support ResCap, and the $2.7 billion capital contribution represents the latest in a long series of actions [AFI] has taken to provide ResCap with capital and liquidity support. However, despite this historical support, there remains no guarantee that [AFI] will support ResCap in the future. Should parental support be

---

[388] *See, e.g.*, GMAC Financial Services, Press Release, *GMAC Financial Services Announces Key Capital and Strategic Actions* (Dec. 30, 2009), http://media.ally.com/index.php?s=43&item=377 (noting that AFI would receive a $3.79 billion capital infusion from the U.S. Treasury and that ResCap would receive approximately $2.7 billion in additional capital); Karen Brettell, *US CREDIT—ResCap Rallies on Capital Support, Risks Remain*, REUTERS, Jan. 4, 2010, http://www.reuters.com/article/2010/01/04/markets-credit-idUSN0457155120100104 ("[AFI] . . . said on Wednesday it would receive another $3.8 billion from the U.S. Treasury, and would inject $2.7 billion into ResCap."). In late 2008, AFI announced its receipt of TARP funds and two days later noted that it had completed the notes exchange offers for certain of ResCap's notes. *See* GMAC Financial Services, Press Release, *GMAC Receives $5.0 Billion Investment from the U.S. Treasury* (Dec. 29, 2008), http://media.ally.com/index.php?s= 43&item=299; GMAC Financial Services, Press Release, *GMAC Announces Consummation of Its Notes Exchange Offers* (Dec. 29, 2008), http:// media.ally.com/index.php?s=43&item=301.

[389] *See* 2005 Indenture, § 13.01 (noting the indenture and securities were solely corporate obligations, with no recourse against any past, present or future incorporator, stockholder, officer or director); Junior Secured Notes Indenture, § 12.07 (noting that no director, officer, employee, incorporator or stockholder of ResCap or any of the listed guarantors would have any liability for any objections of the company of an guarantor under the notes, the indenture or the related guarantees); Senior Secured Notes Indenture, § 12.07 (noting that no director, officer, employee, incorporator or stockholder of ResCap or any of the listed guarantors would have any liability for any objections of the company of a guarantor under the notes, the indenture or the related guarantees). In 2008, ResCap was a limited liability company that did not have stock. The June 2008 Indentures' definitions note that "Capital Stock" includes membership interests for limited liability companies, making the "stockholder" reference applicable to ResCap's members.

discontinued, we believe ResCap would eventually default on its obligations and unsecured creditors would face substantial losses.[390]

### (iii) CDS Pricing And Credit Ratings

The CDS spreads, set out in the exhibit below, suggest that the market viewed ResCap and AFI as separate and distinct entities.



EXHIBIT VII.A.2.d(2)(a)(iii)
**TARP Funding: GMAC and ResCap CDS Spread Activity**

*Note:  Yellow lines represent GMAC's receipt of TARP Funding ($5 billion on 12/29/2008, $7.5 billion on 5/20/2009, $3.8 billion on 12/30/2009).*
*Source: Pricing per Interactive Data Corporation.*

As is evidenced by this exhibit, prior to AFI's receipt of TARP funds, the five-year CDS spread on ResCap's secured debt was higher than the spread on AFI's secured debt. The higher CDS spread for ResCap reflected the market's perception that there was a greater risk of ResCap defaulting on its secured debt than of AFI defaulting on its secured debt. This difference in risk perceptions demonstrates that during this time period, the market did not view ResCap and AFI as a single, integrated economic unit.

---

[390] *See* Moody's Investors Service, Press Release, *Although Positive, ResCap not Stabilized by GMAC Actions* (Dec 31, 2009) [ALLY_0215406] (emphasis added).

The difference in CDS spreads for ResCap's debt and AFI's debt continued until the third infusion of TARP funds. Thereafter, as discussed in Section VI.B, market prices no longer reflected the economic fundamentals of ResCap's business. The CDS spreads for both ResCap's debt and AFI's debt were minimal, arguably in recognition by the market that the U.S. Treasury was willing to backstop each entity's obligations, not because of any market perception that AFI and ResCap had morphed into a single economic unit at that point.

Lastly, in reviewing market evidence regarding creditors' perceptions of AFI and ResCap, the Examiner notes that AFI and ResCap had separate credit ratings. These credit ratings are reviewed in more detail in Section III.E. The rating agencies did not view AFI and ResCap as a single economic unit.

The Examiner does not believe that AFI's and ResCap's CDS spreads and credit ratings support the proposition that the market viewed AFI and ResCap as a single economic unit.

### (iv) Consolidated Financial Statements

Wilmington Trust has also argued that ResCap's failure to file any standalone financial statements after the second quarter of 2009 supports a finding that AFI and ResCap acted as a single economic unit.[391] As discussed in Section III.I.5, in November 2009 ResCap received approval from the SEC to stop filing periodic and current reports under the Securities Exchange Act of 1934.[392] Thereafter, the Debtors' financial information was included in consolidated financial statements filed with AFI. The fact that the Debtors did not file separate financial statements, however, is not remarkable for affiliated entities.[393]

AFI continued to state in its consolidated financial statements that ResCap's financial troubles were not necessarily financial troubles of AFI and that AFI should not be relied upon to prop up ResCap. Starting in early 2009, AFI consistently asserted in its financial statements

---

[391] Wilmington Trust Submission Paper, dated Oct. 24, 2012, at 21, 22, 32.

[392] *See* SEC No-Action Letter (Nov. 3, 2009), http://www.sec.gov/divisions/corpfin/cf-noaction/2009/residentialcapital110309-12h3.htm.

[393] Note also that the ResCap Board discussed that even with deregistering ResCap, financial information (albeit more limited than what would be included in SEC filings) would be provided to debt investors and full audited financial statements would continue to be required of ResCap. *See* Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, June 24, 2009, at RC40006226–27 [RC40005949]; SEC de-Registration Presentation to the ResCap Board, dated June 24, 2009, at RC40010462 [RC40010460].; *see also* Senior Secured Notes Indenture, § 4.03(b) (ResCap covenanted that if it was not required to file reports with the SEC, it "will maintain a non-public website on which Holders of Notes, prospective investors and securities analysts may access the quarterly and annual financial information of [ResCap], and [ResCap] will direct Holders of Notes, prospective investors and securities analysts on its publicly available website to contact [ResCap's] Chief Financial Officer to obtain access to the non-public website."); Junior Secured Notes Indenture, § 4.03(b) (same). Accordingly, the fact that separate financial statements were not filed for ResCap does not support a finding that substantive consolidation is warranted under the "entanglement" prong, because ResCap's financial affairs continued to be accounted for separately from those of AFI.

that, while it continued to believe ResCap was an important subsidiary, AFI's continued support of ResCap should not be assumed. In its Form 8-K filed January 9, 2009, AFI stated:

> In response to various questions that have come to [AFI's] attention, [AFI] reiterates that Residential Capital, LLC ("ResCap") is an important subsidiary of [AFI], and we have made significant progress in reshaping ResCap to better align it with current market conditions. [AFI] believes that the support it has provided to ResCap to date was in the best interests of [AFI] stakeholders. If ResCap were to need additional support, [AFI] would provide that support so long as it was in the best interests of [AFI] stakeholders. While there can be no assurances, [AFI's] recently approved status as a regulated bank holding company has increased the importance of its support for ResCap.[394]

In its Form 10-K for 2008, filed on February 27, 2009, AFI reiterated that its support was not unlimited and that it was not guaranteeing ResCap's obligations. In that report, AFI stated that "ResCap remains heavily dependent on [AFI] and its affiliates for funding and there can be no assurances that [AFI] or its affiliates will continue such actions"[395] and that AFI "would provide [ResCap] support so long as it was in the best interests of [AFI's] stakeholders."[396]

AFI made similar statements each following year noting that its contributions to ResCap were not assured and would be made only so long as they benefited AFI's stakeholders.[397] In AFI's Form 10-K filed for year 2011, AFI noted:

> In the future, [AFI] or ResCap may take additional actions with respect to ResCap as each party deems appropriate. These

---

[394] GMAC LLC, Current Report (Form 8-K) (Jan. 8, 2009), Item 7.01 (emphasis added).

[395] GMAC LLC, Annual Report (Form 10-K) (Feb. 27, 2009), at 72.

[396] *Id.*

[397] *See* GMAC Inc., Annual Report (Form 10-K) (Feb. 26, 2010), Note 1, at 128.

> "ResCap remains heavily dependent on [AFI] and its affiliates for funding and capital support, and there can be no assurance that [AFI] or its affiliates will continue such actions or that [AFI] will be successful in executing one or more sales, spin-offs, or other potential transactions with respect to ResCap. Although our continued actions through various funding and capital initiatives demonstrate support for ResCap, other than as described above, there are currently no commitments or assurances for future funding and/or capital support. Consequently, there remains substantial doubt about ResCap's ability to continue as a going concern. Should we no longer continue to support the capital or liquidity needs of ResCap or should ResCap be unable to successfully execute other initiatives, it would have a material adverse effect on ResCap's business, results of operations, and financial position."

> *See also* Ally Financial Inc., Annual Report (Form 10-K) (Feb. 25, 2011), Item 1A, at 21 ("ResCap remains heavily dependent on [AFI] for funding and capital support, and there can be no assurance that [AFI] will continue to provide such support."); Ally Financial Inc., Annual Report (Form 10-K) (Feb. 28, 2012), Note 1, at 128.

actions may include [AFI] providing or declining to provide additional liquidity and capital support for ResCap . . . . ResCap remains heavily dependent on [AFI] and its affiliates for funding and capital support, and there can be no assurance that [AFI] or its affiliates will continue such actions or that [AFI] will choose to execute any further strategic transactions with respect to ResCap or that any transactions undertaken will be successful. Consequently, there remains substantial doubt about ResCap's ability to continue as a going concern. Should [AFI] no longer continue to support the capital or liquidity needs of ResCap or should ResCap be unable to successfully execute other initiatives, it would have a material adverse effect on ResCap's business, results of operations, and financial position.[398]

The Examiner concludes that ResCap's failure after 2009 to file separate financial statements with the SEC does not support a finding that substantive consolidation of AFI and ResCap is warranted.

### (v)  Lack Of Guarantees

Some courts have cited to the presence of guarantees as a sign that creditors did not rely on the separate identity of the entities when extending credit to one.[399] If AFI had guaranteed a significant amount of ResCap's obligations, ResCap's creditors could argue they reasonably relied on the combined creditworthiness of ResCap and AFI. From ResCap's inception, however, AFI made clear that it was not providing a guarantee of ResCap's obligations. The 2005 Operating Agreement expressly states that the agreement is not a guarantee by GM or AFI of ResCap's indebtedness.[400]

---

[398] Ally Financial Inc., Annual Report (Form 10-K) (Feb. 28, 2012), Note 1, at 128 (emphasis added).

[399] *See In re Vecco Constr. Indus., Inc.*, 4 B.R. 407, 410 (Bankr. E.D. Va. 1980) (stating and elaborating on seven factors); *see also In re Mortgage Inv. Co*., 111 B.R. 604, 610 (Bankr. W.D. Tex. 1990) (applying *Vecco* factors); *Gould v. Bank of N.Y.* (*Holywell Corp. v. Bank of N.Y.*), 59 B.R. 340, 347 (S.D. Fla. 1986) (same). *But see In re Owens Corning*, 419 F.3d 195, 212–13 (3d Cir. 2005) (noting it is not unusual for entities to demand (and obtain) guarantees from affiliated entities in finance transactions and the presence of guarantees by themselves do not evidence a prepetition disregard of an entity's separateness).

[400] *See* 2005 Operating Agreement, § 7 [ALLY_0140795] ("This Agreement is not, and shall not be construed to be, a guarantee by GM or [AFI] of any indebtedness of ResCap or an agreement by GM or [AFI] to contribute additional capital to ResCap.").

The Examiner is aware of only one guarantee issued by AFI for the benefit of Ally Bank, which guaranteed the repayment of obligations of GMAC Mortgage to Ally Bank under the MMLPSA, MSR Swap, the Pipeline Swap and the Original Servicing Agreement.[401] As discussed in Section V.B.9, on October 5, 2010, and in response to FDIC pressures, AFI provided a guarantee to Ally Bank of all of GMAC Mortgage's obligations under the Original Servicing Agreement and the MSR Swap.[402] In April 2011, and again in response to continued FDIC concern about Ally Bank's exposure to GMAC Mortgage, AFI reaffirmed its October 5, 2010 Guarantee, extending its scope to include the Pipeline Swap and the MMLPSA.[403]

The presence of a guarantee, properly documented, by itself does not evidence a disregard of an entity's separateness. The fact that Ally Bank required the documentation of AFI's guarantee of GMAC Mortgage's obligations can be cited as an indication that Ally Bank was acutely aware of the separateness of GMAC Mortgage and AFI and was not relying on the treatment of GMAC Mortgage and AFI as a single economic unit.[404] Finally, this guarantee was issued only to Ally Bank. Any other creditor would be hard-pressed to prove that it reasonably relied on an AFI guarantee to Ally Bank in extending its own credit to the Debtors.

### (b) "Entanglement" Test

The Examiner concludes that the evidence does not support the proposition that AFI's and ResCap's affairs are so hopelessly entangled and confused that substantive consolidation would benefit all creditors.

Under the *Augie/Restivo* "entanglement" analysis, poor or nonexistent record keeping of separate assets (particularly cash and other liquid assets) and liabilities and interaffiliate transactions is one of the more common reasons for imposing substantive consolidation. When affiliates' assets, liabilities and business affairs are so "hopelessly entangled" that segregation is either prohibitively expensive or impossible, courts are more willing to grant substantive consolidation.

---

[401] Letter from J. Mackey to Ally Bank (Apr. 1, 2011) [RC00067937] (amending the agreements covered by the guarantee to included, inter alia, "the Confirmation of the Swap Relating to Loans in the Held For Sale Portfolio, dated April 1, 2011"). As discussed above, even if AFI had issued guarantees of more of ResCap's obligations, such guarantees would not necessarily evidence a prepetition disregard of an entity's separateness. *See, e.g.*, *In re Owens Corning*, 419 F.3d at 212–13. It is not unusual for entities to demand (and obtain) guarantees from affiliated entities in finance transactions.

[402] Letter from J. Mackey to Ally Bank (Oct. 5, 2010) [ALLY_0018084].

[403] Letter from J. Mackey to Ally Bank (Apr. 1, 2011) [RC00067937].

[404] *See In re Owens Corning*, 419 F.3d at, 212–13 (noting it is not unusual for entities to demand (and obtain) guarantees from affiliated entities in finance transactions and the presence of guarantees by themselves do not evidence a prepetition disregard of an entity's separateness).

### (i) 2005 Operating Agreement And 2006 Amended Operating Agreement

As discussed in Section III.B.3, ResCap entered into the 2005 Operating Agreement in order to erect a "firewall" between GM and GMAC, and ResCap.[405] Section 2(f) of the 2005 Operating Agreement included many of the provisions used to mitigate the risk of substantive consolidation. In particular, the 2005 Operating Agreement provided that ResCap shall at all times:

- Maintain its books, records, and financial statements separate from those of any and all AFI affiliates;

- Maintain its assets in a manner such that it would not be costly to segregate and identify such assets from those of any and all AFI affiliates;

- Maintain bank accounts and cash management and account receivable collections systems separate from any and all AFI affiliates;

- Maintain its own asset investment, risk management, and hedging programs separate for those of any and all AFI affiliates;

- Pay its own liabilities out of its own funds;

- Conduct the business operations of ResCap and its subsidiaries by its or their own employees and officers, who will not also be employees or officers of any AFI affiliate;[406]

- Not commingle funds or other assets with those of any AFI affiliate; and

- Otherwise take such action so that ResCap will maintain its separate legal existence and identity.[407]

The 2006 Amended Operating Agreement continued to include many of these separateness provisions, removing only the requirement that ResCap have employees that were not also employees of other AFI affiliates (as defined in the 2005 Operating Agreement).[408]

The 2006 Amended Operating Agreement did provide that ResCap and its Subsidiaries (as defined in the 2006 Amended Operating Agreement) could use trademarks and names of AFI affiliates (as defined in the 2006 Amended Operating Agreement) notwithstanding these separateness covenants.[409]

---

[405] Int. of B. Paradis, Dec. 14, 2012, at 40:15–17 ("The primary concern of the rating agencies was the 'firewall' or the independence between [AFI] and ResCap.").

[406] This separateness provision in the 2005 Operating Agreement was deleted in the 2006 Amended Operating Agreement.

[407] *See* 2005 Operating Agreement, § 2(f) [ALLY_0140795].

[408] *See* 2006 Amended Operating Agreement, § 2(e).

[409] *See id.* § 2(e)(ix).

While it may be argued that ResCap did not fully comply with all provisions of the 2005 Operating Agreement and 2006 Amended Operating Agreement (particularly in entering into transactions with affiliates),[410] the Investigation has not uncovered any material evidence that ResCap failed to account for its assets and liabilities separately from those of AFI. The Debtors maintained separate accounts, books and records and the Examiner has not found the Debtors' financial affairs to be commingled, much less "hopelessly commingled," with those of AFI such that substantive consolidation of AFI into the Debtors would benefit all creditors.

### e. Examiner's Conclusion

Based on the foregoing, the Examiner concludes it is unlikely that a proponent of substantive consolidation of AFI with and into the Estate of any Debtor would prevail.

---

[410] *See* Section VII.L.

VII-A-85

## VII. REVIEW AND ANALYSIS OF ESTATE CAUSES OF ACTION IMPLICATED BY AFFILIATE TRANSACTIONS AND THE RELATIONSHIP AND COURSE OF DEALING AMONG RESCAP, AFI, ALLY BANK, AND CERBERUS

### B. DEBT RECHARACTERIZATION

#### 1. Introduction

AFI has asserted in the Chapter 11 Cases various claims against ResCap, RFC, and GMAC Mortgage, including claims of not less than $747 million under the A&R Secured Revolver Loan Agreement and $380 million under the A&R Line of Credit Agreement.[1] This Section examines whether certain of AFI's claims against ResCap and its principal Subsidiaries, RFC and GMAC Mortgage, may be recharacterized as equity. If the AFI Secured Revolver Facility Claim and the AFI Line of Credit Agreement Claim were to be recharacterized as equity interests in ResCap, AFI would likely not receive anything on account of such interests. AFI, itself, has acknowledged that certain ResCap debt that it held may be vulnerable to recharacterization.[2]

In a presentation to the Examiner, the Creditors' Committee questioned whether the "debt" that was forgiven by AFI under the January 30 Letter Agreement should be properly characterized as equity.[3] Under the January 30 Letter Agreement, AFI agreed to provide capital support to ResCap and GMAC Mortgage by forgiving $196.5 million of indebtedness under the A&R Line of Credit Agreement.[4]

Wilmington Trust has asserted that Unsecured Notes and Senior Secured Notes in the aggregate face amount of $2.4 billion that were exchanged by AFI for, among other things, ResCap Preferred Interests in the 2008 Bank Transaction and ResCap's remaining IB Finance Class M Shares as part of the 2009 Bank Transaction, should be recharacterized as equity.[5] Should the Unsecured Notes and the Senior Secured Notes be recharacterized as equity, their

---

[1] Although outstanding as of the Petition Date, another financing, the BMMZ Repo Facility terminated on May 16, 2012 in connection with the transactions consummated under the Barclays DIP Financing Agreement. *See* Section VI.E.9. AFI has asserted several additional claims in the Chapter 11 Cases including, with limitation, surety bond claims, FRB consent order obligations, DOJ/AG settlement obligations, claims related to shared services, litigation claims, tax claims, contract claims, and claims for subrogation, setoff, recoupment and insurance.

[2] *See* GMAC LLC Board Meeting, Support for Rescap [sic] LLC, dated June 10, 2009, at 3 [ALLY_0240200] ("There is some risk that any loan would be re-characterized as equity in a bankruptcy given [AFI's] status as a lender of last resort under the doctrine of Debt Re-characterization."); *see also* Ally Financial Inc. (Amendment No. 6 to Form S-1 (Apr. 12, 2012), at 60 (noting that "it is possible that other ResCap creditors would seek to recharacterize loans to ResCap as equity contributions or to seek equitable subordination of our claims").

[3] *See* Kramer Levin Presentation to Hon. Arthur J. Gonzalez, Examiner, dated Oct. 18, 2012, at 10.

[4] Terms of Support Relating to Possible DOJ/State Attorneys' General Settlement, dated Jan. 30, 2012 [ALLY_0182747].

[5] Reply in Further Support of Wilmington Trust, National Association's Submission to Arthur J. Gonzalez, dated Mar. 8, 2013, at 42–43.

transfer by AFI to ResCap as consideration for the 2008 Bank Transaction and the 2009 Bank Transaction would not have provided reasonably equivalent value[6] and accordingly those transactions may be subject to avoidance on constructive fraudulent transfer grounds.

### 2. Overview

As a court of equity, a bankruptcy court is not bound by a party's characterization of a transaction.[7] A bankruptcy court may, where appropriate, acknowledge economic reality by recharacterizing debt as equity.[8] "In a recharacterization analysis, if the court determines that the advance of money is equity and not debt, the claim is recharacterized and the *effect* is subordination of the claim 'as a proprietary interest because the corporation repays capital

---

[6] The Examiner concludes that ResCap and its Subsidiaries RFC and GMAC Mortgage were balance sheet insolvent from December 31, 2007 through the Petition Date. *See* Section VI.A; Section VI.E. The equity of an insolvent enterprise is valueless and the transfer of such equity could not constitute reasonably equivalent value or fair consideration.

[7] *See, e.g., Pepper v. Litton,* 308 U.S. 295, 305 (1939) (noting that a bankruptcy court's equitable powers "have been invoked to the end that fraud will not prevail, that substance will not give way to form, that technical considerations will not prevent substantial justice from being done"); *see also Cohen v. KB Mezzanine Fund II, LP* (*In re Submicron Sys. Corp.*), 432 F.3d 448, 456 (3d Cir. 2006) (noting "the characterization as debt or equity is a court's attempt to discern whether the parties called an instrument one thing when in fact they intended it as something else"); *In re Cold Harbor Assocs.*, 204 B.R. 904, 915 (Bankr. E.D. Va. 1997) ("This Court is not required to accept the label of 'debt' or 'equity' placed by the debtor upon a particular transaction . . . .").

[8] *See, e.g., Rockville Orthopedic & Sports Assocs., P.C. v. Kort* (*In re Rockville Orthopedic Assocs., P.C.*), 377 B.R. 438, 442 (Bankr. D. Conn. 2007) (citing *Fairchild Dornier GMBH v. Official Comm. of Unsecured Creditors* (*In re Official Comm. of Unsecured Creditors for Dornier Aviation (N. Am.), Inc.*), 453 F.3d 225, 233 (4th Cir. 2006)). "Although the Second Circuit Court of Appeals has yet to address the issue, the Circuit Courts of Appeal that have considered it have all concluded 'that the bankruptcy court has the power to recharacterize a debt as an equity contribution.'" *Id.*; *see also Official Comm. of Unsecured Creditors v. Bay Harbour Master Ltd.* (*In re BH S&B Holdings LLC*), 420 B.R. 112, 157 n.17 (Bankr. S.D.N.Y. 2009) (noting that "courts in this jurisdiction . . . have held that courts do have equitable power to recharacterize debt as equity"), *aff'd*, 807 F. Supp. 2d 199 (S.D.N.Y. 2011).

contributions only after satisfying all other obligations of the corporation.'"[9] In general, a court may recharacterize a loan as equity if it determines that the parties intended the transaction to be an equity investment.[10]

### 3. Legal Standards For Recharacterization

Although similar in some ways to equitable subordination, recharacterization is different because it does not require a showing of inequitable conduct.[11] "[W]hen both issues are raised, recharacterization should be considered first, because if a 'particular advance is a capital contribution . . . equitable subordination never comes into play.'"[12]

While courts have adopted a variety of recharacterization tests,

> They devolve to an overarching inquiry: the characterization as debt or equity is a court's attempt to discern whether the parties called an instrument one thing when in fact they intended it as something else. That intent may be inferred from what the

---

[9]   *Bayer Corp. v. MascoTech, Inc.* (*In re AutoStyle Plastics, Inc.*), 269 F.3d 726, 749 (6th Cir. 2001). "To be a creditor in bankruptcy the debtor must owe a debt to the claimant. The issue is whether the claim is an indebtedness or whether it is a proprietary interest. If it is determined that the claim is a proprietary interest the claim will be subordinated, not equitably subordinated, as a matter of course since 'the essential nature of a capital interest is a fund contributed to meet the obligations of a business and which is to be repaid only after all other obligations have been satisfied.'" *Diasonics, Inc. v. Ingalls*, 121 B.R. 626, 630 (Bankr. N.D. Fla. 1990) (citation omitted). "In a case in which a creditor has contributed capital to a debtor in the form of a loan, but the loan has the substance and character of an equity contribution, the court may recharacterize the debt as equity regardless of whether other requirements of equitable subordination have been satisfied." *Herzog v. Leighton Holdings, Ltd.* (*In re Kids Creek Partners, L.P.*), 212 B.R. 898, 931 (Bankr. N.D. Ill. 1997) (citation omitted), *aff'd*, 233 B.R. 409 (N.D. Ill. 1999), *aff'd*, 200 F.3d 1070 (7th Cir. 2000).

[10]  The "overarching inquiry" in the recharacterization analysis is that "the characterization as debt or equity is a court's attempt to discern whether the parties called an instrument one thing when in fact they intended it as something else. That intent may be inferred from what the parties say in their contracts, from what they do through their actions, and from the economic reality of the surrounding circumstances." *In re Submicron Sys. Corp.*, 432 F.3d at 456.

[11]  *See, e.g.*, *In re Dornier Aviation (N. Am.), Inc.*, 453 F.3d at 232 ("While a bankruptcy court's recharacterization decision rests on the *substance of the transaction* giving rise to the claimant's demand, its equitable subordination decision rest on its assessment of the *creditor's behavior*."); *see also In re AutoStyle Plastics, Inc.*, 269 F.3d at 748–49; *Adelphia Commc'ns Corp. v. Bank of Am., N.A.* (*In re Adelphia Commc'ns Corp.*), 365 B.R. 24, 74 (Bankr. S.D.N.Y. 2007) (noting that "recharacterization and equitable subordination analyses differ from each other in that recharacterization analyses focus on the substance of the transaction, whereas equitable subordination analyses focus on the creditor's behavior").

[12]  *Fidelity Bond & Mort. Co. v. Brand* (*In re Fidelity Bond & Mort. Co.*), 340 B.R. 266, 302 (Bankr. E.D. Pa. 2006) (citation omitted).

> parties say in their contracts, from what they do through their actions, and from the economic reality of the surrounding circumstances. Answers lie in facts that confer context case-by-case.[13]

The party seeking to recharacterize a claim bears the burden of proof.[14] In determining whether to recharacterize a loan, some courts, including those located in the Southern District of New York, consider the following factors identified by the Sixth Circuit Court of Appeals in *Bayer Corp. v. MascoTech, Inc.* (*In re AutoStyle Plastics, Inc.*):[15]

(1) the names given to the instruments;

(2) the presence or absence of a fixed maturity date and schedule of payments;

(3) the presence or absence of a fixed rate of interest and interest payments;

(4) the source of repayments;

(5) the adequacy or inadequacy of capitalization;

(6) the identity of interest between the creditor and shareholder;

(7) the security for the advances;

(8) the corporation's ability to obtain financing elsewhere;

(9) the extent to which the advances were subordinated;

(10) the extent to which the advances were used to acquire capital assets; and

(11) the presence or absence of a sinking fund to provide repayment.

---

[13] *In re Submicron Sys. Corp.*, 432 F.3d at 456 (referring to *AutoStyle* factors and noting other factors considered by courts).

[14] *See Viera v. AGM II, LLC* (*In re Worldwide Wholesale Lumber, Inc.*), 378 B.R. 120, 124 (Bankr. D.S.C. 2007) ("The party seeking to reclassify a debt as an equity contribution needs to demonstrate that the intent of the parties at the time they entered into the transaction was to enter into an investment relationship, not a lending relationship.").

[15] 269 F.3d at 747–48 (adopting factors used in *Roth Steel Tube Co. v. Comm'r*, 800 F.2d 625, 630 (6th Cir. 1986); *see also Official Comm. of Unsecured Creditors v. Bay Harbour Master Ltd.* (*In re BH S&B Holdings LLC*), 420 B.R. 112, 154 (Bankr. S.D.N.Y. 2009), *aff'd*, 807 F. Supp. 2d 199 (S.D.N.Y. 2011); *In re Adelphia Commc'ns Corp.*, 365 B.R. at 74. The list set forth herein is generally referred to as the "*AutoStyle*" or "*Roth Steel*" factors.

"[T]he determination of whether an asserted debt should be recharacterized as equity depends on the facts and circumstances as they existed at the time of the issuance of the [alleged debt]."[16] None of the *Autostyle* factors is dispositive, and a court will likely weigh them differently depending upon the circumstances.[17] A court may dismiss a recharacterization claim "if the plaintiff fails 'to plead facts [that] trigger the applicability of the *Autostyle* factors, or a meaningful subset of them.'"[18] A more complete discussion of each of the *Autostyle* factors follows.

### a. Names Given To, And Terms Of, The Instruments

Although not bound to the labels given by the parties to the transaction documents, a court will examine the names and terms of the documents to determine the nature of, and the parties' intent with regard to, the transaction.[19] To state the obvious, "[w]ith respect to the first factor, '[t]he issuance of a stock certificate indicates an equity contribution; the issuance of a bond, debenture, or note is indicative of bona fide indebtedness.'"[20] In analyzing this factor, courts have noted that provisions in the transaction documents requiring the purported borrower "to pay for all 'reasonable out-of-pocket expenses' including attorneys' fees associated with the enforcement of the [transaction]" would be indicative of a loan.[21] Further, a court may consider the description of the transaction set forth in other documents, such as

---

[16] *Rockville Orthopedic Assocs., P.C. v. Kort* (*In re Rockville Orthopedic Assocs., P.C.*), 377 B.R. 438, 442 (Bankr. D. Conn. 2007) (citing *In re Cold Harbor Assoc., L.P.*, 204 B.R. 904, 916–17 (Bankr. E.D. Va. 1997)); *see, e.g.*, *In re AutoStyle Plastics, Inc.*, 269 F.3d at 747–48 ("Recharacterization is appropriate where the circumstances show that a debt transaction was 'actually [an] equity contribution [ ] *ab initio*.'"); *see also In re BH S& B Holdings LLC*, 420 B.R. at 157 (citing *In re AutoStyle Plastics, Inc.*, 269 F.3d at 747–48).

[17] *See Sender v. Bronze Grp. Ltd.* (*In re Hedged-Invs. Assocs., Inc.*), 380 F.3d 1292, 1298-99 (10th Cir. 2004) ("None of these factors is dispositive and their significance may vary depending upon circumstances."). "No mechanistic scorecard suffices. And none should . . . ." *In re Submicron Sys. Corp.*, 432 F.3d at 456.

[18] *In re BH S&B Holdings LLC*, 420 B.R. at 158 (Bankr. S.D.N.Y. 2009) (quoting *In re Adelphia Commc'ns Corp.*, 365 B.R. at 74), *aff'd*, 807 F. Supp. 2d 199 (S.D.N.Y. 2011).

[19] *See* Section VII.B.1; *see also Official Unsecured Creditors' Comm. v. Highland Capital Mgmt. L.P.* (*In re Broadstripe, LLC*), 444 B.R. 51, 95 (Bankr. D. Del. 2010) (concluding that this factor "weighs heavily in favor" of debt where the advances were provided under a "credit facility," "consistently referred to as 'loans' or 'debt' and are evidenced by 'notes'").

[20] *In re BH S&B Holdings LLC*, 420 B.R. at 158 (quoting *Stinnett's Pontiac Serv., Inc. v. Comm'r,* 730 F.2d 634, 638 (11th Cir. 1984)), *aff'd*, 807 F. Supp. 2d 199 (S.D.N.Y. 2011).

[21] *See Farr v. Phase-I Molecular Toxicology* (*In re Phase-I Molecular Toxicology*), 287 B.R. 571, 577 (Bankr. N.M. 2002).

SEC filings and UCC-1 financing statements, to determine the parties' intent.[22] The absence of debt instruments, such as notes, or other clear indicia of a loan may indicate that the transaction is an equity contribution and not a loan.[23] Nevertheless, courts have noted that "[t]he manner of documentation is only one factor in the recharacterization analysis."[24]

### b. Presence Or Absence Of A Fixed Maturity Date And Schedule Of Payments

"The absence of a fixed maturity date and a fixed obligation to repay is an indication that the advances were capital contributions and not loans."[25] Treatment of maturity dates as "illusory" and the failure to require the borrower to make principal payments as they become due may be indicative of an equity contribution.[26] Extensions of a maturity date, however, are not necessarily indicative of an equity contribution.[27]

### c. Presence Or Absence Of A Fixed Rate Of Interest And Interest Payments

"The absence of a fixed rate of interest and interest payments is a strong indication that the advances were capital contributions rather than loans."[28] The presence of both a fixed maturity date and a fixed (or specified), agreed-upon rate of interest is indicative of a loan.[29] For purposes of this factor, a "fixed" rate of interest refers to periodic interest payments,

---

[22] *See In re Submicron Sys. Corp.*, 432 F.3d at 457 ("The Court also found evidence of the parties' intent to create a debt investment outside the lending documents.").

[23] *See, e.g.*, *Bayer Corp. v. MascoTech, Inc.* (*In re AutoStyle Plastics, Inc.*), 269 F.3d 726, 747–48 (6th Cir. 2001) ("The absence of notes or other instruments of indebtedness is strong indication that the advances were capital contributions and not loans."); *Autobacs Strauss, Inc. v. Autobacs Seven Co., Ltd. (In re Autobacs Strauss, Inc.)*, 473 B.R. 525, 573 (Bankr. Del. 2012) (same); *see also In re Adelphia Commc'ns Corp,* 368 B.R. at 192 (noting absence of contemporaneous documentation supports equity argument).

[24] *In re Micro-Precision Techs., Inc.*, 303 B.R. 238, 247 (Bankr. N.H. 2003).

[25] *In re AutoStyle Plastics, Inc.*, 269 F.3d at 750 (citation omitted); *see also Official Unsecured Creditors' Comm. v. Highland Capital Mgmt, L.P.* (*In re Broadstripe, LLC*), 444 B.R. 51, 95 (Bankr. D. Del. 2010).

[26] *In re Autobacs Strauss, Inc.*, 473 B.R. at 573–74 (Bankr. Del. 2012).

[27] *Herzog v. Leighton Holdings, Ltd.* (*In re Kids Creek Partners, L.P.*), 212 B.R. 898, 932 (Bankr. N.D. Ill. 1997) (noting that "the mere fact that the loan terms were flexible does not demonstrate that the loans should be recharacterized"), *aff'd*, 233 B.R. 409 (N.D. Ill. 1999), *aff'd*, 200 F.3d 1070 (7th Cir. 2000).

[28] *In re AutoStyle Plastics, Inc.*, 269 F.3d at 750.

[29] *Daewoo Motor Am., Inc. v. Daewoo Motor Co., Ltd.* (*In re Daewoo Motor Am., Inc.*), 471 B.R. 721, 737 (C.D. Calif. 2012).

including fluctuating ones.[30] Further, a party's subsequent agreement to forbear from collecting payment of principal or interest does not by itself support recharacterization,[31] particularly when the forbearance was agreed to by a pre-existing lender.[32]

### d. Source Of Repayment

"If the expectation of repayment depends solely on the success of the borrower's business, the transaction has the appearance of a capital contribution."[33] A court would likely consider "the underlying economic reality and the general tie between the loan's repayment and the success of the business" to determine the source of repayment.[34] The existence of multiple sources of repayment, including collateral securing the advance, would be indicative of a loan.[35] Where, however, the only source of repayment is the borrower's earnings and the advance is unsecured, this factor would favor recharacterization.[36]

---

[30] *See In re Moll Indus., Inc.*, 454 B.R. at 582 (concluding that fixed rate refers to the periodic payment of interest). "When a transaction is intended as equity, there is usually no interest paid or interest payments are sporadic because the investor is more interested in seeing the value of its investment grow rather than receiving periodic payments." *Id*. In this case, the court concluded that the periodic payment of interest at rates that, although fluctuating, "are typical in the market place for debt instruments" and that, therefore, this factor would not support recharacterization. *Id*.

[31] *See In re AutoStyle Plastics, Inc*., 269 F.3d at 747–48; *see also Drake v. Franklin Equip. Co*. (*In re Franklin Equip. Co.*), 418 B.R. 176, 195–96 (Bankr. E.D. Va. 2009) ("If such forbearance could retroactively convert a good loan to equity that would indeed validate the saying that 'no good deed goes unpunished.'"). *But see Friedman's Liquidating Trust v. Goldman Sachs Credit Partners, L.P.* (*In re Friedman's Inc.*), 452 B.R. 512, 521 (Bankr. D. Del. 2011) (noting the "deferral of interest payments, the below prime interest rate" and the failure to repay loans from potential source of funding was indicative of equity).

[32] *See In re Moll Indus., Inc*., 454 B.R. at 583 ("In the case of a pre-existing lender, it is legitimate for the lender to take actions to protect its existing loans, including extending additional credit or granting forbearance.").

[33] *In re AutoStyle Plastics, Inc*., 269 F.3d at 751.

[34] *Autobacs Strauss, Inc. v. Autobacs Seven Co., Ltd*. (*In re Autobacs Strauss, Inc*.), 473 B.R. 525, 575 (Bankr. Del. 2012) (comparing cases).

[35] *See id.* at 575 (comparing cases); *see also In re Franklin Equip. Co*., 416 B.R. at 513 (noting that alternative sources of repayment is indicative of a loan).

[36] *See In re Autobacs Strauss, Inc*., 473 B.R. at 576 (courts have noted that the use of the proceeds of a subsequent sale of the borrower to repay a "bridge" loan made to cover the borrower's operating expense until such sale is indicative of a loan); *see also Farr v. Phase-I Molecular Toxicology* (*In re Phase-I Molecular Toxicology*), 287 B.R. 571, 577 (Bankr. N.M. 2002) ("This weighs in favor of characterizing the transaction as a loan, since the source of intended repayment when the advance was made was not dependant solely on the future success of the Debtor's business.").

### e.  Adequacy Or Inadequacy Of Capital

Thin or inadequate capitalization is strongly indicative that the transaction is not a loan but rather an equity contribution.[37] However, a court "should not put too much emphasis on this factor . . . because all companies in bankruptcy are in some sense undercapitalized."[38]

Some courts have held that capitalization should be assessed not only at initial capitalization, but also at the time of the transaction being challenged.[39] Other courts have held that the initial capitalization is more significant.[40] "Whether the Debtor was undercapitalized at the time of the transaction, though relevant, is not determinative."[41]

_____

[37]  *In re Franklin Equip. Co.*, 418 B.R. at 197 (citation omitted) ("Thin or inadequate capitalization is strong evidence that the advances are capital contributions rather than loans.").

[38]  *Official Comm. of Unsecured Creditors v. Bay Harbour Master Ltd.* (*In re BH S&B Holdings LLC*), 420 B.R. 112, 159 (Bankr. S.D.N.Y. 2009), *aff'd*, 807 F. Supp. 2d 199 (S.D.N.Y. 2011).

[39]  *See In re Autobacs Strauss, Inc.*, 473 B.R. at 576 ("Capitalization is assessed both at the times of initial capitalization and subsequent transactions."); *United States v. Colorado Invesco, Inc.*, 902 F. Supp. 1339, 1342 (D. Co. 1995) (noting that "theory looks either to the initial amount of capital in a corporation or its financial status at the time the loans were made").

[40]  *See In re N & D Props., Inc.*, 799 F.2d 726, 733 (11th Cir. 1986) ("Shareholder loans may be deemed capital contributions . . . where the trustee proves initial undercapitalization . . . ."); *Diasonics, Inc. v. Ingalls*, 121 B.R. 626, 631 (Bankr. N.D. Fla. 1990) ("It is the trustee's burden to show that the corporation was initially undercapitalized . . . .").

[41]  *In re Phase-I Molecular Toxicology*, 287 B.R. at 578.

Because the possibility of recharacterization may discourage loans to distressed corporations, a claimant's status as an insider and a debtor's undercapitalization alone will normally be insufficient to justify recharacterization of an insider's claim.[42] "However, when other factors indicate that the transaction is not a loan at all, recharacterization is appropriate to ensure the consistent application of the Bankruptcy Code."[43] A court may recharacterize a loan by an insider to an undercapitalized debtor that results in the insider obtaining "rights to pervasively control the Debtor" or the right to convert the loan into an equity interest in the debtor.[44]

---

[42] *See, e.g.*, *Fairchild Dornier GMBH v. Official Comm. of Unsecured Creditors* (*In re Official Comm. of Unsecured Creditors for Dornier Aviation (N. Am.), Inc.*), 453 F.3d 225, 234 (4th Cir. 2006) (noting that "a claimant's insider status and a debtor's undercapitalization alone will normally be insufficient to support the recharacterization of a claim"); *Herzog v. Leighton Holdings, Ltd.* (*In re Kids Creek Partners, L.P.*), 212 B.R. 898, 932 (Bankr. N.D. Ill. 1997) (noting that "insiders and others [may] shy away from lending to a corporation in financial distress or venture at a higher than usual risk."), *aff'd*, 233 B.R. 409 (N.D. Ill. 1999), *aff'd*, 200 F.3d 1070 (7th Cir. 2000). "In many cases, an insider will be the only party willing to make a loan to a struggling business, and recharacterization should not be used to discourage good faith loans." *In re Dornier Aviation (N. Am.), Inc.*, 453 F.3d at 234. *But see In re N & D Props., Inc.*, 799 F.2d at 733 ("Shareholder loans may be deemed capital contributions in one of two circumstances: where the trustee proves initial undercapitalization or where the trustee proves that the loans were made when no other disinterested lender would have extended credit."). Commentators have stated that the Eleventh Circuit's test in *In re N & D Properties, Inc.* for recharacterization is "simple," "alternative," "puzzling," and "disturbing" and emphasized that this test is a "minority approach . . . [that] has failed to gain traction" among courts other than those lower courts in the Eleventh Circuit. James M. Wilton & Stephen Moeller-Sally, *Debt Recharacterization Under State Law*, 62 BUS. LAW. 1257, 1260–61 (2007).

[43] *In re Dornier Aviation (N. Am.), Inc.*, 453 F.3d at 234 "The 'paradigmatic' recharacterization case involves a situation where 'the same individuals or entities (or affiliates of such) control both the transferor and the transferee, and inferences can be drawn that the funds were put into an enterprise with little or no expectation that they would be paid back along with other creditor claims.'" *In re BH S&B Holdings LLC*, 420 B.R. at 157 (quoting *Adelphia Commc'ns Corp. v. Bank of Am., N.A.* (*In re Adelphia Commc'ns Corp.*), 365 B.R. 24, 74 (Bankr. S.D.N.Y. 2007)), *aff'd*, 807 F. Supp. 2d 199 (S.D.N.Y. 2011). The presence of an "equity kicker" will not necessarily result in the recharacterization of a claim. *See Kalisch v. Maple Trade Fin. Corp.* (*In re Kalisch*), 413 B.R. 115 (Bankr. S.D.N.Y. 2008) ("The equity component was an inducement to the [sic] make the Loan, and was never a substitute for repayment."). "The more such an exchange appears to reflect the characteristics of such an arm's length negotiation, the more likely such a transaction is to be treated as debt." *In re Cold Harbor Assocs., LP*, 204 B.R. 904, 915 (Bankr. E.D. Va. 1997)).

[44] *Aquino v. Black* (*In re AtlanticRancher, Inc.*), 279 B.R. 411, 435 (Bankr. D. Mass. 2002).

### f.  Identity Of Interest Between The Creditor And Shareholder

"The identity-of-interest factor typically comes into play when multiple creditors make 'loans' to a debtor corporation . . . ."[45] Where stockholders make advances in proportion to their equity interests, this factor is indicative of an equity contribution.[46] Where there is no correlation to equity interests or only one or a handful of shareholders make a loan and there is "no evidence that other existing shareholders made contributions to the loan proportionate to their respective stock ownership," this factor would be indicative of a loan.[47]

### g.  Security For The Advances

"The absence of a security for an advance is a strong indication that the advances were capital contributions rather than loans."[48] Debt owed to pre-existing lenders, however, should not be recharacterized simply because additional loans were extended without additional security.[49]

---

[45]  *See Daewoo Motor Am., Inc. v. Daewoo Motor Co., Ltd.* (*In re Daewoo Motor Am., Inc.*), 471 B.R. 721, 742 (C.D. Calif. 2012) (citation omitted).

[46]  *See Bayer Corp. v. MascoTech, Inc.* (*In re AutoStyle Plastics, Inc.*), 269 F.3d 726, 751 (6th Cir. 2001).

[47]  *See id.* at 747–48 (noting "a sharply disproportionate ratio between a stockholder's percentage interest in stock and debt is indicative of bona fide debt"); *Farr v. Phase-I Molecular Toxicology* (*In re Phase-I Molecular Toxicology*), 287 B.R. 571, 577 (Bankr. N.M. 2002) (noting that lack of evidence of other stockholders making contributions proportionate to their equity is indicative of a loan); *see also Drake v. Franklin Equip. Co.* (*In re Franklin Equip. Co.*), 416 B.R. 483, 517 (E.D. Va. 2009) (noting that this factor was indicative of a loan where the source of the advance was one shareholder and the other shareholders did not participate in the debt arrangement). *But see Autobacs Strauss, Inc. v. Autobacs Seven Co., Ltd.* (*In re Autobacs Strauss, Inc.*), 473 B.R. 525, 576 (Bankr. Del. 2012) (concluding that this factor weighed in favor of recharacterization where the advances were fully funded by entity indirectly holding 100% equity interest in the borrower).

[48]  *In re AutoStyle Plastics, Inc.*, 269 F.3d at 752 (citation omitted).

[49]  *See Cohen v. KB Mezzanine Fund II, LP* (*In re Submicron Sys. Corp.*), 432 F.3d 448, 457 (3d Cir. 2004).

### h. The Debtor's Ability To Obtain Financing Elsewhere

"When there is no evidence of other outside financing, the fact that no reasonable creditor would have acted in the same manner is strong evidence that the advances were capital contributions rather than loans."[50] Indeed, several courts have held that proof of a debtor's inability to obtain a loan from a disinterested lender is sufficient to recharacterize a loan as an equity contribution.[51] Other courts have, however, concluded that the inability to obtain alternative financing does not by itself "tip the scale."[52] Evidence that would support the assertion that no other lender would provide a loan on similar terms includes (i) a low interest rate; (ii) the lack of security; (iii) the borrower's negative cash flow and financial condition; and (iv) the borrower's failure to provide its own financials when dealing with trade creditors or other potential lenders.[53]

### i. The Extent To Which The Advances Were Subordinated

"Subordination of advances to claims of all other creditors indicates that the advances were capital contributions and not loans."[54] Failure to enforce demand interest payments or principal payments at maturity may be evidence of de facto subordination that could weigh in favor of recharacterization.[55]

---

[50]  *In re AutoStyle Plastics, Inc.*, 269 F.3d at 752 (citation omitted); *see In re Phase-I Molecular Toxicology*, 287 B.R. at 577 (noting that this factor supports a capital contribution where "the Debtor was unable to obtain loans from other lenders at the time of the transaction"). "[T]he proper question is 'whether a reasonable outside creditor would have made a loan to the debtor on similar terms.'" *In re Autobacs Strauss, Inc.*, 473 B.R. at 579 (footnote omitted).

[51]  *See In re N&D Props., Inc.*, 799 F.2d 726, 733 (11th Cir. 1986) ("Shareholder loans may be deemed capital contributions…where the trustee proves that the loans were made when no other disinterested lender would have extended credit."); *Diasonics, Inc. v. Ingalls*, 121 B.R. 626, 631 (Bankr. N.D. Fla. 1990) ("It is the trustee's burden to show that … the loans were made when no other disinterested lender would have extended credit.").

[52]  *In re Phase-I Molecular Toxicology*, 287 B.R. at 578 (Bankr. N.M. 2002). "Existing lenders are often the only source of funding when a debtor faces distress. Therefore, inability to obtain alternative financing is insufficient to support recharacterization." *Official Comm. of Unsecured Creditors v. Highland Capital Mgmt. L.P.* (*In re Moll Indus., Inc.*), 454 B.R. 574, 584 (Bankr. D. De. 2011). "While the fact that the Debtor could not obtain a loan from any other disinterested lender weighs in favor of treating the advance as a capital contribution, [sic] by itself does not tip the scale." *Official Comm. of Unsecured Creditors v. Credit Suisse First Boston*, 299 B.R. 732, 742 (Bankr. D. Del. 2003) (internal quotations omitted) (quoting *In re Phase-I Molecular Toxicology*, 287 B.R. at 578 ).

[53]  *See In re Autobacs Strauss, Inc.*, 473 B.R. at 579–80.

[54]  *In re AutoStyle Plastics, Inc.*, 269 F.3d at 752 (citation omitted).

[55]  *See In re Autobacs Strauss, Inc.*, 473 B.R. at 580.

### j. *The Extent To Which The Advances Were Used To Acquire Capital Assets*

Capital contributions are typically made to start a business enterprise or to fund capital improvements.[56] "Use of advances to meet the daily operating needs of the corporation, rather than to purchase capital assets, is indicative of bona fide indebtedness."[57] Similarly, use of advances to refinance existing debt is also indicative of a loan.[58]

### k. *Presence Or Absence Of A Sinking Fund To Provide Repayment*

"A sinking fund is 'a fund consisting of regular deposits that are accumulated with interest to pay off a long-term debt.'"[59] While some courts have found the absence of a sinking fund to be a factor,[60] others have given it little weight.[61] Moreover, security for advances may minimize the significance of a sinking fund.[62] Indeed, the Bankruptcy Court previously noted in another matter that "[i]f the loan is secured by a lien, however, there is no need for a sinking fund."[63]

---

[56] *See Raymond v. United States.*, 511 F.2d 185, 191 (6th Cir. 1975) (affirming district court's conclusion that advances made to corporation were capital contributions where, among other things, "the advances were made in starting the corporation").

[57] *In re AutoStyle Plastics, Inc.*, 269 F.3d at 752 (citation omitted).

[58] *Official Unsecured Creditors' Comm. v. Highland Capital Mgmt., L.P. (In re Broadstripe), LLC*, 444 B.R. 51, 101 (Bankr. D. Del. 2010) (noting use of advances "to refinance existing secured debt" is indicative of a loan). *But see Riley v. Tencara, LLC (In re Wolverine, Proctor & Schwarz, LLC)*, 447 B.R. 1, 40 (Bankr. D. Mass. 2011) (noting that "use of the funds to satisfy existing debt rather than to acquire capital assets . . . might suggest that the advance was equity").

[59] *Turkmani v. Republic of Bol.*, 193 F. Supp. 2d 165, 167 (D.D.C. 2002) (quoting BLACK'S LAW DICTIONARY 682 (7th ed. 1999)).

[60] *In re AutoStyle Plastics, Inc.*, 269 F.3d at 753 ("The failure to establish a sinking fund for repayment is evidence that the advances were capital contributions rather than loans.").

[61] *Official Comm. of Unsecured Creditors v. Highland Capital Mgmt. L.P.* (*In re Moll Indus., Inc.*), 454 B.R. 574, 585 (Bankr. D. Del. 2011).

[62] *See In re AutoStyle Plastics, Inc.*, 269 F.3d at 753.

[63] *Official Comm. of Unsecured Creditors v. Bay Harbour Master Ltd.* (*In re BH S&B Holdings LLC*), 420 B.R. 112, 158 (Bankr. S.D.N.Y. 2009)

### *l.  Other Factors*

In addition to the factors set forth above, a court may consider (i) the right to enforce payment of principal and interest; (ii) the lender's participation in management of the borrower; (iii) the parties' intent; (iv) the failure of the debtor to repay on the due date; and (v) the ratio of shareholder loans to capital.[64]

### *4.  Statute Of Limitations*

A recharacterization claim does not appear to be subject to any statute of limitations because such claim is typically "brought under the Bankruptcy Code, as part of seeking a determination from the Court regarding the proper treatment of [claims], for purposes of distribution from the bankruptcy estate."[65] The Bankruptcy Court may nevertheless conclude that a recharacterization claim is subject to the law of the forum state—New York—and apply the six-year statute of limitations set forth in CPLR § 213(1), which governs causes of action for which no specific period has been provided.[66] In any event, because the debt subject to recharacterization assertions was issued within the six-year period immediately preceding the Petition Date, the Examiner concludes that the statute of limitations would not bar an effort to recharacterize AFI's claims under the A&R Secured Revolver Agreement, the A&R Line of Credit Agreement, the Senior Secured Notes, or the Junior Secured Notes.

---

[64] *See Cohen v. KB Mezzanine Fund II, LP* (*In re Submicron Sys. Corp.*), 432 F.3d 448, 456 n.8 (3d Cir. 2006) (referring to the recharacterization test adopted by the Fifth and Eleventh Circuit in the tax context); *see also In re Mangia Pizza Invs, LP*, No. 10-13235, 2012 WL 2194145, at *34 (Bankr. W.D. Tex. June 14, 2012) (noting that Texas recharacterization test consists of 16 factors); *Moglia v. Quantum Indus. Partners, LDC* (*In re Outboard Marine Corp.*), 2003 WL 21697357, at *5 (N.D. Ill. July 22, 2003) (considering the *Autostyle* factors and (a) "the ratio of shareholder loans to capital," and (b) "the amount or degree of shareholder control"). In a case under the Small Business Investment Act, the United States District Court for the District of Colorado noted that "[r]elevant factors used by courts to determine if a loan should be recharacterized include the amount of initial operating capital, the length of time the corporation was in operation and how the transactions were treated when made." *United States v. Colorado Invesco, Inc.*, 902 F. Supp 1339, 1342 (D. Co. 1995). In a recent case, the United States Bankruptcy Court for the District of Delaware note that (i) the presence of voting rights and (ii) lack of formalities would weigh in favor of recharacterization. *Autobacs Strauss, Inc. v. Autobacs Seven Co., Ltd.* (*In re Autobacs Strauss, Inc.*), 473 B.R. 525, 581 (Bankr. Del. 2012). In context of a small, closely held corporation, the lack of formalities may have little bearing on the recharacterization analysis. *See Internet Navigator Inc.*, 289 B.R. 133, 137 (Bankr. N.D. Iowa 2003).

[65] *Official Comm. of Unsecured Creditors v. Foss* (*In re Felt Mfg. Co., Inc.*), 371 B.R. 589, 629 (Bankr. D.N.H. 2007) (concluding "no applicable statute of limitations"); *see In re Maxim Truck Co., Inc.*, 415 B.R. 346, 359 (S.D. Ind. 2009) ("A claim to recharacterize debt as equity is not statutorily based and there is no explicit statute of limitations.").

[66] *See PSINet, Inc. v. Cisco Sys. Capital Corp.* (*In re PSINet, Inc.*), 271 B.R. 1, 39–41 (Bankr. S.D.N.Y. 2001) (holding that New York's six-year statute of limitations applicable to claims for which no statute of limitation is prescribed, including equity actions, applies to a claim for recharacterization of a lease as a disguised security arrangement).

### 5. AFI Was And Is An Insider Of ResCap

At all times relevant to the Investigation, ResCap was a wholly owned indirect subsidiary of AFI, and RFC and GMAC Mortgage were indirect, wholly owned subsidiaries of ResCap. Thus, AFI was and is an "insider" of ResCap, RFC and GMAC Mortgage as that term is defined in the Bankruptcy Code.[67] As an insider, AFI's claims are subject to close scrutiny.[68]

The Examiner concludes that ResCap and its Subsidiaries RFC and GMAC Mortgage were inadequately capitalized from and after August 15, 2007 and Balance Sheet Insolvent from and after December 31, 2007.[69] Thus, the AFI claims subject to recharacterization challenge were on account of advances made or debt securities transferred to ResCap at a time when it was undercapitalized. The facts alone will not result in recharacterization as "[a] claimant's insider status and a debtor's undercapitalization alone will normally be insufficient to support the recharacterization of a claim. In many cases, an insider will be the only party willing to make a loan to a struggling business, and recharacterization should not be used to discourage good faith loans."[70]

### 6. Recharacterization Is A Fact-Intensive Analysis

"Recharacterization cases turn on whether a debt actually exists."[71] In determining whether to recharacterize a claim as equity, a court analyzes whether "the parties called an instrument one thing when in fact they intended it as something else."[72] The recharacterization analysis has been described as "fact sensitive," because it depends on the circumstances and

---

[67] *See* 11 U.S.C. §101(31).

[68] *See Algonquin Power Income Fund v. Ridgewood Heights, Inc. (In re Franklin Indus. Complex, Inc.)*, No. 06-80254, 2007 WL 2509709, at *15 (Bankr. N.D.N.Y. 2007) ("Another rule of thumb in recharacterization analyses is that 'the claims of creditors who were corporate insiders and/or had conducted their transactions with the debtors in some inequitable manner are closely scrutinized [in recharacterization cases].'").

[69] *See* Section VI.

[70] *Rockville Orthopedic & Sports Assocs., P.C. v. Kort* (*In re Rockville Orthopedic Assocs., P.C.*), 377 B.R. 438, 442–43 (Bankr. D. Conn. 2007).

[71] *Adelphia Commc'ns Corp. v. Bank of Am., N.A.* (*In re Adelphia Commc'ns Corp.*), 365 B.R. 24, 73 (Bankr. S.D.N.Y. 2007)), *aff'd*, 807 F. Supp. 2d 199 (S.D.N.Y. 2011).

[72] *Cohen v. KB Mezzanine Fund II, LP* (*In re Submicron Sys. Corp.*), 432 F.3d 448, 456 (3d Cir. 2006) (referring to *AutoStyle* factors and noting other factors considered by courts).

facts existing at the time of the alleged debt.[73] Recharacterization is a rare remedy that is "becoming more narrow," with very few instances of a court recharacterizing a debt.[74]

### 7. Analysis Of The AFI Secured Revolver Facility Claim

#### a. The Secured Revolver Facility

As described in greater detail in Section V.E.3, the Secured Revolver Facility was initially placed in 2008 and amended and restated at year-end 2009.[75] The Secured Revolver Loan Agreement was modified to convert $1.55 billion of Secured Revolver Facility Revolver Loans into Secured Revolver Facility Term Loans, eliminating the ability of the Secured Revolver Facility Borrowers to draw any new loans under the Secured Revolver Facility.[76]

The Secured Revolver Facility was intended to replace existing indebtedness that could not be refinanced by existing lenders on a timetable suitable to ResCap.[77] Sam Ramsey, Chief Risk Officer of AFI at the time, in discussing the impetus for AFI entering into the Secured Revolver Agreement noted:

> And so, you know, as I said, we had to get through a negotiation with the four banks and a proposal that they could endorse and that their credit committees would approve prior to taking it out to the broader universe of syndicate participants or—and, in this case, bilateral institutions. And so, it was just simply not getting any particular constructive offer back from the bank group in terms of meeting ResCap's needs. And so, we decided to just take them out of that conversation, and for [AFI] to be the lender to ResCap. And that's why that facility was put into place as part of the overall renewal and restructuring of the bank facilities for both entities.[78]

---

[73] 4 COLLIER ON BANKRUPTCY, ¶ 510.02[3] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2012).

[74] Marvin C. Ruth & Scott K. Brown, *Pacific Express—On the Rise or Falling? An Update on Loan Recharacterization and Its Interplay with 11 U.S.C. § 510(B)*, 2007 No. 7 NORTON BANKR. L. ADVISER 2 (2007); *see also* Thomas R. Fawkes & Devon J. Eggert, *Recharacterization of Debt to Equity*, COMM. BANKR. LITIG. § 19:8 (2013) (stating that "it is infrequently the case that courts rule in favor of recharacterization, as evidenced by the scarcity of reported decisions in which a debt is recharacterized as equity").

[75] *See* Appendix V.E.8.

[76] *See id.*

[77] *See* Section V.E.3 (discussing the Secured Revolver Facility and the events leading to its entry).

[78] Int. of S. Ramsey, Dec. 10, 2012, 77:17–78:7. De Molina recalls the bank group initially agreed to fund half of the $3.5 billion available under the Secured Revolver Facility. Ultimately, however, he "decided because I was—the—we were getting a junior position, I decided to take the full three and a half." Int. of A. de Molina, Nov. 20, 2012, at 144:25–145:2.

AFI initially committed to make the Secured Revolver Facility Loans to the Secured Revolver Facility Borrowers, up to the lesser of $3.5 billion and the then existing borrowing base.[79] The borrowing base was determined by calculating the aggregate "value" of the First Priority Collateral, which, as set forth in Table V.E.3.b, was subject to a discount factor that varied depending on the type of asset.

As noted, the parties' subjective intent and expectations, including a lender's expectations regarding the repayment of advances, are important factors in the debt recharacterization analysis. The Investigation has not revealed any evidence indicating that AFI (or, for that matter, ResCap) ever intended, considered, or treated, the Secured Revolver Facility Loans as anything other than genuine loans, which ResCap was obligated to repay in accordance with the loans' terms.[80]

To the contrary, the evidence reflects that the parties always treated the advances under the Secured Revolver Facility as loans that were required contractually to be repaid—if necessary by liquidating collateral secured by liens.[81] According to de Molina, to ensure repayment, AFI "instead of taking the second behind guys that I thought would liquidate [i.e, the bank group] and leave us with nothing, we took a pari passu on the full pool."[82] In addition, ResCap was required to prepay Secured Revolver Facility Loans (1) to the extent the outstanding principal balance exceeded the borrowing base; and (2) with the net cash proceeds from certain collateral dispositions.[83] In addition, on June 4, 2008, AFI sold to GM and Cerberus a $750 million first loss participation interest in the Secured Revolver Facility, which is further evidence that AFI and third parties regarded the advances as loans.[84]

The Examiner's Financial Advisors confirmed that ResCap made payments under the Secured Revolver Facility significantly reducing its indebtedness over time. Indeed, in 2010 and 2011, ResCap paid $789.523 million of the balance due to AFI under the Secured Revolver Facility.[85]

---

[79] *See* Appendix V.E.3.b.

[80] The Secured Revolver Loan Agreement was approved by the ResCap Board and the boards of RFC and GMAC Mortgage. *See* Section V.E.3 (discussing approval of the Secured Revolver Loan Agreement). The A&R Secured Revolver Agreement was approved by the ResCap Board and the boards of RFC and GMAC Mortgage in December 2009. *See* Section V.E.8 (discussing approval of the A&R Secured Revolver Agreement).

[81] *See* Appendix V.E.3.g.

[82] Int. of A. de Molina, Nov. 20, 2102, at 145:11–13.

[83] *See* Section V.E.3.

[84] Memorandum, ResCap: Significant Capital Contributions and Related-Party Transactions, dated June 9, 2009, at 4 [ALLY_0240180]; Participation Agreement between GMAC LLC, GM and Cerberus ResCap Financing LLC, dated as of June 4, 2008 [ALLY_0043807]. The first loss participation was subsequently contributed to AFI on December 29, 2008 in exchange for equity in AFI. Participation Agreement between GMAC LLC, GM and Cerberus ResCap Financing LLC, dated as of June 4, 2008 [ALLY_0043807].

[85] Residential Capital, LLC Consolidated Financial Statements for the Years Ended December 31, 2009 and 2008 (Feb. 26, 2010), at 42 [EXAM00124455]; Residential Capital, LLC Consolidated Financial Statements for the Years Ended December 31, 2011 and 2010 (Mar. 28, 2012), at 38 [EXAM00122651].

Courts have acknowledged that the inability of a debtor to obtain a loan on similar terms from an independent third party in some instances may be indicative of an equity contribution.[86] Here, it appears that the Secured Revolver Facility was on better terms than a third party lender would provide.[87] However, "[i]n many cases, an insider will be the *only* party willing to make a loan to a struggling business, and recharacterization should not be used to discourage good-faith loans."[88] The Secured Revolver Facility fits that criterion, because it was made for legitimate purposes, including to repay existing indebtedness and for working capital purposes.[89]

Based on the foregoing, the Examiner concludes that when AFI and ResCap entered into the Secured Revolver Loan Facility, the parties intended the Secured Revolver Facility to be a loan with AFI expecting in good faith the repayment of the advances in accordance with the terms of the underlying agreements.

### b. An Examination Of The AFI Secured Revolver Facility Claim Under The Autostyle Factors

It has been noted that the "paradigmatic" recharacterization case involves a situation where the same party controls both the transferor and the transferee, and inferences can be drawn that the funds were put into an enterprise with little or no expectation that they would be paid back along with other creditor claims.[90] In considering recharacterization in the

---

[86] *See Gernsbacher v. Campbell (In re Equip. Equity Holdings, Inc.)*, No. 11-0362, 2013 WL 1335951, at *52 (Bankr. N.D. Tex. 2013) (noting that "the court recognizes that the fact that a corporation is unable to attract similar loans from other investors may weigh in favor of recharacterization"); *see also Official Comm. of Unsecured Creditors v. Bay Harbour Master Ltd*. (*In re BH S&B Holdings LLC*), 420 B.R. 112, 158 (Bankr. S.D.N.Y. 2009) (noting that "[t]he fact that no reasonable creditor would have acted in the same manner is strong evidence that the advances were capital contributions rather than loans"), *aff'd*, 807 F. Supp. 2d 199 (S.D.N.Y. 2011).

[87] *See* Section V.E.3 (discussing the terms of the A&R Secured Revolver Agreement).

[88] *Fairchild Dornier GMBH v. Official Comm. of Unsecured Creditors (In re Official Comm. of Unsecured Creditors for Dornier Aviation (N. Am.), Inc.)*, 453 F.3d 225, 234 (4th Cir. 2006) (emphasis added); *see* Rockville Orthopedic & Sports Assocs., P.C. v. Kort *(In re Rockville Orthopedic Assocs., P.C*.), 377 B.R. 438, 442–43 (Bankr. D. Conn. 2007) (citing *Dornier Aviation*, 453 F.3d at 34).

[89] *See* Section V.E.3; Section V.E.8; *see also* GMAC LLC, Current Report (Form 8-K) (June 4, 2008), at 6.

[90] *In re BH S&B Holdings LLC*, 420 B.R. at 157 (quoting *Adelphia Commc'ns Corp. v. Bank of Am., N.A*. (*In re Adelphia Commc'ns Corp*.), 365 B.R. 24, 74 (Bankr. S.D.N.Y. 2007)), *aff'd*, 807 F. Supp. 2d 199 (S.D.N.Y. 2011).

paradigmatic situation, a court would likely undertake an analysis of the *Autostyle* factors.[91] The following *Autostyle* factors are indicative of the AFI Secured Revolver Facility being a loan:

> (1) **The names given to, and the terms of, the instruments**: The AFI Secured Revolver Facility Claim refers to Claims arising under, derived from, or based upon the A&R Secured Revolver Loan Agreement and the A&R First Priority Security Agreement. The names of the underlying documents reflect that the transactions were intended to be loans and not equity contributions.[92] Promissory notes were executed and delivered in connection with the advances made.[93] In addition, as noted in Section V.E.8, the A&R Secured Revolver Loan Agreement contained representations and warranties, covenants, events of default and indemnification provisions that were standard for facilities of comparable size and nature (and would have been typical for a syndicated credit facility with unaffiliated lenders). Moreover, the Secured Revolver Facility was publicly described as a loan in SEC filings and UCC financing statements.[94]
>
> (2) **The presence of a fixed maturity date and schedule of payments**: The Secured Revolver Loan Agreement and the A&R Secured Revolver Loan Agreement had a stated maturity date at closing, which would have been typical for a syndicated credit facility with unaffiliated lenders.[95] Although extended, the maturity date of the A&R Secured Revolver Loan Agreement was not allowed to lapse.[96] The extension of a maturity date should not

---

[91] *See In re BH S&B Holdings LLC*, 420 B.R. at 157–58.

[92] The A&R Secured Revolver Loan Agreement is defined as "the Amended and Restated Credit Agreement, dated as of December 30, 2009 (as amended, supplemented, or otherwise modified), by and among . . . ."

[93] *See, e.g.,* Promissory Note of RFC and GMAC Mortgage, dated Dec. 30, 2009 [ALLY_0066913].

[94] *See* Residential Capital, LLC, Current Report (Form 8-K) (June 3, 2008) (describing loan terms and noting "[u]nder the Facility, [AFI] has agreed to make revolving loans to RFC and GMAC Mortgage"); *see, e.g.,* UCC-1 Financing Statement, naming RFC as debtor and Wells Fargo Bank, N.A. as Collateral Control Agent, as the secured party [ALLY_0069179]; UCC-1 Financing Statement, naming GMAC Mortgage as debtor and Wells Fargo Bank, N.A. as Collateral Control Agent, as the secured party [ALLY_0069180]; UCC-1 Financing Statement, naming ResCap as debtor and Wells Fargo Bank, N.A. as Collateral Control Agent, as the secured party [ALLY_0069181]; *see also* UCC-3 Amendment filing, naming RFC as debtor and GMAC as the secured party [ALLY_0072614]; UCC-3 Amendment filing, naming GMAC Mortgage as debtor and GMAC as the secured party [ALLY_0072639]; UCC-3 Amendment filing, naming ResCap as debtor and GMAC as the secured party [ALLY_0072664].

[95] *See* Appendix V.E.3.c (discussing the maturity of the Secured Revolver Loan Agreement); Appendix V.E.3.j (discussing the maturity of the A&R Secured Revolver Loan Agreement).

[96] *See* Appendix V.E.3.k(1), (4), (5) (discussing extensions to the maturity date of the A&R Secured Revolver Facility).

change a court's conclusion that this factor is indicative of a loan.[97] Moreover, the evidence reflects that ResCap made payments totaling approximately $789.5 million under the Secured Revolver Loan Facility.[98]

(3) **The presence of an agreed rate of interest and interest payments:** Interest on the Secured Revolver Facility Loans accrued at a rate of LIBOR + 2.75% per annum.[99] A specified, agreed upon rate of interest, whether fixed or floating, is indicative of a loan.[100] The evidence reflects that interest payments typically were made.[101]

(4) **The source of repayments:** The Secured Revolver Facility Loans were required to be repaid from, among other things, net cash proceeds from certain collateral dispositions. In addition, (1) the Secured Revolver Facility was secured by the First Priority Collateral, and (2) the other Secured Revolver Facility Guarantors guaranteed the obligations under the Secured Revolver Facility pursuant to an unconditional guarantee that was in form and substance typical for transactions of this nature. The existence of multiple sources of repayment is indicative of a loan.

(5) **The security for the advances:** The Secured Revolver Facility was secured by collateral, including all then unencumbered assets of the Secured Revolver Facility Borrowers and Secured Revolver Facility

---

[97] *See Daewoo Motor Am., Inc. v. Daewoo Motor Co., Ltd. (In re Daewoo Motor Am., Inc.)*, 471 B.R. 721, 738-39 (Bankr. C.D. Cal. 2012) ("Forbearance until a debtor's cash flow improves may be good judgment to keep a loan out of bankruptcy court, and that is all to be concluded from [the creditor]'s forbearance for a time in connection with [Debtor]'s debt . . . . If such forbearance could retroactively convert a good loan to equity, that would indeed validate the saying that 'no good deed goes unpunished.'").

[98] *See* Residential Capital, LLC Consolidated Financial Statements for the Years Ended December 31, 2009 and 2008, dated Feb. 26, 2010, at 42 [EXAM00124455]; Residential Capital, LLC Consolidated Financial Statements for the Years Ended December 31, 2011 and 2010, Mar. 28, 2012, at 38 [EXAM00122651].

[99] *See* Appendix V.E.3.c.

[100] *See, e.g., Official Comm. of Unsecured Creditors v. Highland Capital Mgmt. L.P. (In re Moll Indus., Inc.)*, 454 B.R. 574, 582 (Bankr. Del. 2011) (concluding that interest payable periodically at fluctuating rates are typical in the market and would be "insufficient to support a recharacterization claim"); *Bayer Corp. v. MascoTech, Inc. (In re AutoStyle Plastics, Inc.)*, 269 F.3d 726, 750 (6th Cir. 2001) (concluding that 2% over the prime rate was a fixed interest rate); *see also In re Daewoo Motor Am., Inc.*, 471 B.R. at 738–39 (Bankr. C.D. Cal. 2012) (noting that bankruptcy court did not err in finding this factor weighs "strongly against recharacterization" where rate of interest was adequately LIBOR plus 6%).

[101] Although ResCap did not provide monthly interest payment information, ResCap confirmed to the Examiner's Professionals that payments were made on account of interest expense. As such, interest expense reported at each year end was assumed to be equivalent to interest payments for the year. Interest payments for 2012 were based on interest expense and unpaid interest information provided by ResCap for that year.

Guarantors, including, among other assets, accounts, chattel paper, commercial tort claims, certain deposit and securities accounts, intellectual property, investment property, specific pledged shares and equity interests and specific pledged promissory notes.[102] The presence of such security is generally indicative of a loan.

(6) **The corporation's ability to obtain financing elsewhere**: It appears that financing for at least a portion of the advances provided by AFI was available elsewhere. The original structure of the facilities, as described in the minutes of a ResCap Board meeting, contemplated a $1.75 billion two-year first lien facility to be provided by ResCap's existing bank lenders, led by JP Morgan and Citibank.[103] In addition, AFI would provide ResCap with a new $1.75 billion term loan that would be secured on a second lien basis and would rank pari passu with the liens securing the proposed Senior Secured Notes. During the April 18, 2008 ResCap Board meeting,[104] Ramsey stated that AFI's management was considering a change in the structure for the credit facility, whereby AFI would replace the bank syndicate and provide the entire $3.5 billion facility and all of AFI's exposure thereunder would be secured by a first priority lien position in the collateral ahead of the proposed Senior Secured Notes and the Junior Secured Notes.[105] Such a structure would be "less complex and would allow ResCap to liquidate assets and repay the loan in a more attractive manner."[106] At a subsequent meeting of the ResCap Board held on April 20, 2008 it was reported that the new $3.5 billion credit facility would in fact be provided solely by AFI.[107] The partial availability of alternative financing provides some additional support for the conclusion that the Secured Revolver Facility should be treated as a loan.[108]

---

[102] *See* Appendix V.E.3.g.

[103] Minutes of a Special Meeting of the Board of Directors of ResCap, Apr. 18, 2008, at RC40005719–22 [RC40005652].

[104] *Id.*

[105] *Id.*

[106] *Id.*; *see* Int. of L. Hall, Nov. 29, 2012, at 130:3–130:5 ("[I]t made a lot more sense for GMAC to do the entire facility, which gave more flexibility to ResCap, better pricing, better terms . . . .").

[107] Minutes of a Special Meeting of the Board of Directors of ResCap, Apr. 20, 2008, at RC40005723–25 [RC40005652].

[108] Daniel Ammann and Jon Pruzan, representatives from Morgan Stanley, compared the facility being proposed by AFI (the Secured Revolver Facility), to a facility being proposed by the banks, stating that "the fees and advance rates between the two were similar; that [AFI] was willing to provide a full $3.5 billion, whereas the bank syndicate had offered only $1.75 billion; that the [AFI] covenant structure was more favorable to [ResCap] than that proposed by the bank syndicate." Ammann and Pruzan concluded ResCap would not have been able at the time to obtain a comparable secured facility in the market absent AFI's willingness to provide it. *See* Minutes of a Meeting of the Board of Residential Capital, LLC, June 1, 2008, at RC40005753 [RC40005652].

(7) **The extent to which the advances were subordinated**: Under the terms of the Intercreditor Agreement,[109] liens securing the Secured Revolver Facility and the AFI Hedge Agreements were senior and prior to the liens securing the Senior Secured Notes and the Junior Secured Notes. The lack of subordination is indicative of a loan.

(8) **The extent to which the advances were used to acquire capital assets**: The proceeds from the loans under the Secured Revolver Loan Facility were to be used to repay existing indebtedness of ResCap and for working capital purposes.[110] The Secured Revolver Facility was fully drawn in the amount of $3.5 billion as of June 6, 2008, with the proceeds having been used to exchange direct unsecured ResCap obligations owed to unaffiliated third parties (represented by the JPMorgan 2005 Term Loan Facility that was assigned and repaid and by the ResCap bonds tendered and/or exchanged) for direct secured obligations of the Secured Revolver Facility Borrowers owed to AFI.[111]

Based on the foregoing, the Examiner concludes that it is unlikely that an effort to recharacterize the AFI Secured Revolver Facility Claim would prevail.

8. *Analysis Of The AFI Line Of Credit Agreement Claim*

a. *The Line Of Credit Facilities And The A&R Line Of Credit Facility*

As described in greater detail in Section V.E.5, the Initial Line of Credit Facility (a precursor to the A&R Line of Credit Facility) was initially placed in 2008 and as described in greater detail in Section V.E.7, the Second Line of Credit Facility (the other precursor to the A&R Line of Credit Facility) was entered into on June 1, 2009. The A&R Line of Credit Agreement was executed at year-end 2009 to combine the Line of Credit Facilities, which at the time had borrowing limits of $430 million on the Initial Line of Credit Facility and $670 million on the Second Line of Credit Facility, respectively.[112]

AFI initially committed to make the A&R Line of Credit Loans to the A&R Line of Credit Borrowers, up to the lesser of (i) $1.1 billion and (ii) the then existing borrowing base reduced to the extent there was hedging exposure in favor of AFI.[113] At closing, the aggregate principal amount of A&R Line of Credit Loans outstanding totaled $949.4 million. The

---

[109] Intercreditor Agreement, dated June 6, 2008 [ALLY_0229287].

[110] GMAC LLC, Current Report (Form 8-K) (June 4, 2008), at 6.

[111] *See* Section V.E.3.

[112] *See* Appendix V.E.5.a (showing commitment amount of the Initial Line of Credit Facility); Appendix V.E.7.h.(10) (amendment to the Second Line of Credit Facility).

[113] *See* Appendix V.E.8.b.

borrowing base was determined by calculating the aggregate "value" of the A&R Line of Credit Collateral, which, as set forth in Table V.E.8.b, was subject to a discount factor that varied depending on the type of asset.

The Investigation has not revealed any evidence indicating that AFI (or, for that matter, ResCap) ever intended, considered, or treated the Initial Line of Credit Loans, the Second Line of Credit Loans, or the A&R Line of Credit Loans as anything other than genuine loans, which ResCap was obligated to repay in accordance with the loans' terms.[114] To the contrary, the evidence reflects that the parties always treated the advances made as loans. The evidence revealed during the course of the Investigation reflects that AFI made the loans under the Line of Credit Facilities and the A&R Line of Credit Facility for legitimate purposes, including to assist ResCap address liquidity concerns and comply with TNW covenants.[115] And repayment was expected—if necessary, by liquidating collateral. Indeed, the Initial Line of Credit Loans, the Second Line of Credit Loans, and the A&R Line of Credit Loans were secured by liens on certain collateral.[116] ResCap made regular payments under the Line of Credit Facilities and the A&R Line of Credit Facility.[117] Indeed, in 2011, ResCap made net payments of $388 million under the A&R Line of Credit Facility.[118]

Based on the foregoing, the Examiner concludes that when AFI and ResCap entered into the Line of Credit Facilities and the A&R Line of Credit Facility, the parties intended the advances thereunder to be loans with AFI expecting in good faith the repayment of the advances in accordance with the terms of the underlying agreements.

---

[114] The A&R Line of Credit Facility was formally documented and approved by the ResCap Board, including the Independent Directors. *See* Action by Written Consent of the Board of Directors of Residential Capital, LLC, dated Dec. 29, 2009 [ALLY_0072506] (approving A&R Line of Credit).

[115] See Section V.E.5 (describing the Initial Line of Credit Facility) and Section V.E.8 (describing the A&R Line of Credit Facility).

[116] *See* Appendix V.E.5.(g) (discussing Initial Line of Credit Loans); Appendix V.E.7.(g) (discussing Second Line of Credit Loans); Appendix V.E.8.(g) (discussing A&R Line of Credit Loans).

[117] See Ally Financial Inc. Summary of Intercompany Balances with ResCap, dated Sept. 25, 2012, at ALLY_0182799–824 [ALLY_0182793].

[118] Ally Financial Inc. Summary of Intercompany Balances with ResCap, dated Sept. 25, 2012, at ALLY_0182811–819 [ALLY_0182793].

b. *An Examination Of AFI Line Of Credit Agreement Claim Under The Autostyle Factors*

The following *Autostyle* factors are indicative of the AFI Line of Credit being a loan:

(1) **The names given to, and terms of, the instruments**: The AFI Line of Credit Agreement Claim refers to Claims arising under, derived from, or based upon the A&R Line of Credit Agreement, the A&R Initial Line of Credit Security Agreement, and the A&R Second Line of Credit Security Agreement. The names of the underlying documents reflect that the transactions were intended to be loans and not equity contributions.[119] Promissory notes were executed and delivered in connection with the closing of the A&R Line of Credit Facility.[120] In addition, as noted in Sections V.E.5, 7 and 8, the Initial Line of Credit Agreement, the Second Line of Credit Agreement and the A&R Line of Credit Agreement contained representations and warranties, covenants, events of default and indemnification provisions that were standard for facilities of comparable size and nature (and would have been typical for a syndicated credit facility with unaffiliated lenders). Moreover, the Line of Credit Facilities and the A&R Line of Credit Facility were publicly described as loans in UCC financing statements.[121] The Line of Credit Facilities were described as loans in SEC filings[122] and the A&R Line of Credit Facility was reported in ResCap's financial statements.[123]

(2) **The presence of a fixed maturity date and schedule of payments**: Each of the Initial Line of Credit Agreement, the Second Line of Credit Agreement and the A&R Line of Credit Agreement had a stated maturity date at closing, which is typical of third-party financings negotiated at arm's length.[124] Although extended, the maturity date was not allowed to lapse.[125]

---

[119] The A&R Line of Credit Agreement is defined as "the Amended and Restated Loan Agreement, dated as of December 30, 2009 (as amended, supplemented, or otherwise modified), by and among . . . ."

[120] *See* Amended and Restated Note of RFC and GMAC Mortgage, dated Dec. 30, 2009 [ALLY_0071281].

[121] *See, e.g.,* UCC-1 Financing Statement, naming RFC as debtor and the First Priority Collateral Agent as the secured party [ALLY_0045675]; UCC-1 Financing Statement, naming GMAC Mortgage as debtor and the First Priority Collateral Agent as the secured party [ALLY_0045685]; UCC-1 Financing Statement, naming ResCap as debtor and the First Priority Collateral Agent as the secured party [ALLY_0045692].

[122] Residential Capital, LLC, Current Report (Form 10-K) (Feb. 27, 2009), at 89; Residential Capital, LLC, Current Report (Form 10-Q) (May 11, 2009), at 24; Residential Capital, LLC, Current Report (Form 10-Q) (Aug 7, 2009), at 65.

[123] Residential Capital, LLC, Consolidated Financial Statements for the Years Ended December 31, 2010 and 2009 (Feb. 28, 2011) [GOLDIN00006898].

[124] *See* Appendix V.E.5.a (discussing Initial Line of Credit Facility); Appendix V.E.7.a (discussing Second Line of Credit Facility); V.E.8.a (discussing A&R Line of Credit Facility).

[125] *See* Appendix V.E.5.h.(2), (3), (4), (10), (11), (13), (16) (discussing amendments to Initial Line of Credit); Appendix V.E.7.h(2), (3), (5), (8) (discussing amendment to Second Line of Credit); Appendix V.E.7.h.(1), (5), (7) (discussing amendments to the A&R Line of Credit Facility).

Moreover, the evidence reflects that the parties' performance under the Line of Credit Facilities and the A&R Line of Credit Facility is indicative of a loan. Indeed, in 2011, ResCap repaid approximately $388 million of the advances made under the A&R Line of Credit Agreement.[126] Thereafter, on two separate occasions, AFI forgave indebtedness totaling $305.9 million under the A&R Line of Credit Facility, consisting of (1) $109.4 million in December 2011, and (2) $196.5 million on January 31, 2012.[127] One might argue that advances made subsequent to the debt forgiveness by AFI should be recharacterized as equity because of AFI's apparent willingness to forgive debt to enable ResCap to remain in compliance with TNW covenants. The extension of credit juxtaposed with contemporaneous debt forgiveness reflects a conflict that may signal a lack of confidence in repayment, thereby suggesting that the advance is an equity contribution in disguise. That argument is not particularly persuasive here because at the time AFI had no reason to suspect that its secured claim under the A&R Line of Credit Facility was less than fully secured.[128]

(3) **The presence of an agreed rate of interest and interest payments**: Interest on the A&R Line of Credit Loans accrued at a rate of LIBOR + 2.75% per annum.[129] A specified, agreed upon rate of interest, whether fixed or floating, is indicative of a loan. The evidence reflects that interest payments typically were made.[130]

(4) **The source of repayments**: The A&R Line of Credit Loans were supposed to be repaid by, among other things, the Liquidity Excess Amount (as defined in the A&R Line of Credit Agreement), which was a function of unencumbered cash available to ResCap. In addition, (1) the A&R Line of Credit Facility was secured by certain liens under the A&R Line of Credit

---

[126] *See* Ally Financial Inc. Summary of Intercompany Balances with ResCap, ALLY_0182811–819 [ALLY_0182793].

[127] *See* Residential Capital, LLC Consolidated Financial Statements for the Years Ended December 31, 2011 and 2010, at EXAM00122689 [EXAM00122651]. The $196.5 million was forgiven in accordance with the terms of the January 30 Letter Agreement, pursuant to which AFI agreed to provide capital support to ResCap and GMAC Mortgage so that ResCap would meet its obligations under the FRB Order and the DOJ/State AG Settlement. Terms of Support Relating to Possible DOJ/State Attorneys' General Settlement, dated Jan. 30, 2012 [ALLY_0182747].

[128] *See Official Comm. of unsecured creditors V. Highland Capital Mgmt. L.P. (In re Moll Indus., Inc.)*, 454 B.R. 574, 583–84 (Bankr. D. Del. 2011) (citation omitted) (noting that "it is legitimate for [a pre-existing] lender to take actions to protect its existing loans, including extending additional credit or granting forbearance"); *see also In re Randor Holdings Corp.*, 353 B.R. 820, 839 (Bankr. D. Del. 2006) (citation omitted).

[129] *See* Appendix V.E.8.c.

[130] Although ResCap did not provide monthly interest payment information, ResCap confirmed to the Examiner's Professionals that payments were made on account of interest expense. As such, interest expense reported at each year end was assumed to be equivalent to interest payments for the year. Interest payments for 2012 were based on interest expense and unpaid interest information provided by ResCap for that year.

Security Agreement, and (2) ResCap and the other A&R Line of Credit Guarantors guaranteed the obligations under the A&R Line of Credit Agreement pursuant to an unconditional guarantee that was in form and substance typical for transactions of this nature. The existence of multiple sources of repayment is indicative of a loan.

(5) **The security for the advances:** Pursuant to the A&R Line of Credit Security Agreement, the A&R Line of Credit Borrowers and the A&R Line of Credit Guarantors granted a security interest in favor of AFI, as lender agent, to secure the obligations owed under the A&R Line of Credit Agreement. The presence of such security is generally indicative of a loan.

(6) **The extent to which the advances were subordinated**: Under the A&R Line of Credit Agreement, the advances were not subordinated and the obligations thereunder were secured by the A&R Line of Credit Security Agreement. The lack of subordination is indicative of a loan.

(7) **The extent to which the advances were used to acquire capital assets**: The proceeds from the A&R Line of Credit Loans were used to meet operating needs, which further supports a finding of a loan.

Based on the foregoing, the Examiner concludes that it is unlikely that an effort to recharacterize the AFI Line of Credit Agreement Claims would prevail.

### 9. Recharacterization Of The Unsecured Notes And Senior Secured Notes

In connection with the 2008 and 2009 Bank Transactions, AFI exchanged Unsecured Notes and Senior Secured Notes in the face amount of $2.4 billion for ResCap Preferred Interests and ResCap's IB Finance Class M Shares.[131] Wilmington Trust has asserted that ResCap's indebtedness evidenced by the Unsecured Notes and Senior Secured Notes should be recharacterized as equity because AFI had no expectation of repayment at the time of their acquisition in the open market.[132] AFI has not asserted a claim for such debt by filing a proof of claim or otherwise because the indebtedness was exchanged for ResCap Preferred Interests and IB Finance Class M Shares in the 2008 Bank Transaction and the 2009 Bank Transaction, respectively, and retired.[133] If the Unsecured Notes and Senior Secured Notes are retroactively

---

[131] *See* Section VI.A.2 (discussing the 2008 Bank Transaction); Section VI.A.3 (discussing the 2009 Bank Transaction).

[132] Reply in Further Support of Wilmington Trust, National Association's Submission to Arthur J. Gonzalez dated Mar. 8, 2013, 42–43.

[133] Similarly, AFI has not asserted a claim for any debt under the MSR Facility given that all of such debt was forgiven prior to the Petition Date. The Investigation has not disclosed any evidence that suggests that the MSR Facility should be recharacterized as debt. *See* Section V.E.2 (discussing the MSR Facility).

recharacterized as equity, their transfer by AFI to ResCap as consideration for the 2008 Bank Transaction and the 2009 Bank Transaction would not have provided reasonably equivalent value and accordingly those transactions may be subject to avoidance on constructive fraudulent transfer grounds.

There is a split of authority in this District as to whether a claim for which a proof of claim has not been filed may be recharacterized. According to the court's decision in *In re BH S& B Holdings LLC,* a proof of claim is a prerequisite to recharacterization.[134] According to the Court, "[a]s a threshold matter . . . recharacterization require[s] filing a proof of claim: '[i]f a creditor has not filed a claim, there is nothing to subordinate nor any case or controversy to resolve.'"[135] The court therefore concluded that recharacterization claims could not be sustained against the entities that had not filed proofs of claim where the bar date had passed.[136]

In the chapter 11 case of *Musicland Holding Corp.*, the court was presented with a complaint against Best Buy Co., Inc. alleging that the financing it provided to Musicland Holding Corp. was nothing "more than window dressing to cover the return of Best Buy's equity."[137] Indeed, Best Buy "had never imposed any repayment terms" until well after the funds had been advanced. Rather than contesting the allegations, Best Buy argued that the recharacterization claim should be dismissed because the purported loans had been repaid prior to Musicland's chapter 11 case and Best Buy had not filed a claim. The court, however, disagreed and noted that "[t]he recharacterization claim, in this regard, is essentially one to

---

[134] *Official Comm. of Unsecured Creditors v. Bay Harbour Master Ltd.* (*In re BH S&B Holdings LLC*), 420 B.R. 112, 154 (Bankr. S.D.N.Y. 2009) *aff'd as modified*, 807 F. Supp. 2d 199 (S.D.N.Y. 2011). In this decision, United States Bankruptcy Judge Martin Glenn held that "recharacterization require[s] filing a proof of claim." *Id*; *see Togut v. RBC Dain Correspondent Servs.* (*In re S.W. Bach & Co.)*, 425 B.R. 78, 85 n.5 (Bankr. S.D.N.Y. 2010) (Judge Glenn notes that "recharacterization require[s] filing a proof of claim"); *see also Gold v. Winget* (*In re NM Holdings Co., LLC*), 407 B.R. 232, 289 (Bankr. E.D. Mich. 2009) (concluding that absent a proof of claim, "there is no debt to recharacterize").

[135] *In re BH S&B Holdings LLC*, 420 B.R. at 154.

[136] *In re BH S&B Holdings LLC*), 420 B.R. at 154 ("[The parties had not] filed proofs of claim here and the bar date has long since passed. Claims for equitable subordination or recharacterization cannot be sustained against them.").

[137] *Responsible Person v. Best Buy Co., Inc. (In re Musicland Holding Corp.)*, 398 B.R. 761, 775 (Bankr. S.D.N.Y. 2008). The *Musicland* decision was issued by United States Bankruptcy Judge Stuart M. Bernstein. *See also Miller v. Dow (In re Lexington Oil & Gas Ltd.)*, 423 B.R. 353, 378 (Bankr. E.D. Okla. 2010) (recharacterizing secured debt that was fully satisfied prepetition as equity and avoiding payments made on account of the recharacterized debt as constructive fraudulent transfers).

declare Debt Instruments void, and is integral to the fraudulent transfer claims."[138] Thus, a court may conclude that it has the authority to recharacterize a claim that was paid prior to a bankruptcy filing.[139] The Examiner, however, need not decide whether a court may retroactively recharacterize a claim for which a proof of claim has not been filed.

At the time of their issuance, the Unsecured Notes and Senior Secured Notes were undeniably debt. Indeed, no party in interest has contested that fact. Instead, Wilmington Trust has argued that certain Unsecured Notes and Senior Secured Notes somehow transformed into equity upon their acquisition by AFI, because AFI, allegedly, at that time had no expectation of repayment. Such a result would be inconsistent with a recharacterization analysis, which examines debt at the time of its issuance.[140] Moreover, the Examiner has not found any instance in which a court has recharacterized validly-issued debt upon its acquisition by an insider. Accordingly, the Examiner believes that there is no basis to recharacterize the Unsecured Notes and the Senior Secured Notes used by AFI as consideration in connection with the 2008 Bank Transaction and the 2009 Bank Transaction.

### 10. Summary Of Examiner's Conclusions

For the reasons set forth above, the Examiner concludes that it is unlikely that an attempt to recharacterize the A&R Secured Loan Revolver Claim and the AFI Line of Credit Agreement Claim reflected in AFI's proofs of claim would prevail. In addition, the Examiner concludes that it is unlikely that an attempt to retroactively recharacterize the debt reflected in the Unsecured Notes and Senior Secured Notes held by AFI as equity would prevail.

---

[138] *In re Musicland Holding Corp.*, 398 B.R. at 775.

[139] The court in *Musicland* did not recharacterize Best Buy's claim. Instead, the court denied a motion to dismiss the claim holding that the claim should "be read as a claim to avoid the Debt Instruments as fraudulent obligations under the *fraudulent transfer laws*." *Id.* at 775 (emphasis added). "Viewing the [recharacterization claim] in this light, it states a right to relief under the fraudulent transfer laws . . . ." *Id*.

[140] *See Rockville Orthopedic & Sports Assocs., P.C. v. Kort* (*In re Rockville Orthopedic Assocs., P.C.*), 377 B.R. 438, 444 (Bankr. D. Conn. 2007) (noting "expectation of repayment is relevant to the nature of the transaction only at the time of the transaction").

## VII. REVIEW AND ANALYSIS OF ESTATE CAUSES OF ACTION IMPLICATED BY AFFILIATE TRANSACTIONS AND THE RELATIONSHIP AND COURSE OF DEALING AMONG RESCAP, AFI, ALLY BANK, AND CERBERUS

### C. EQUITABLE SUBORDINATION

The Creditors' Committee and Wilmington Trust assert that all claims held by AFI against ResCap, including AFI's claims under the A&R Secured Revolver Loan Agreement ($747,127,553.38) and the A&R Line of Credit Agreement ($380,000,000), should be equitably subordinated to other allowed claims in the Chapter 11 Cases.[1] As set forth in the Examiner's Work Plan the Examiner has reviewed the merits of these assertions.

Section 510(c) of the Bankruptcy Code provides that a court may:

> (1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or
>
> (2) order that any lien securing such a subordinated claim be transferred to the estate.[2]

Through equitable subordination, a claim may be subordinated or relegated to the "bottom rung of claims," or it may be dropped below the claims of those creditors injured by the conduct of the holder of the claim to be subordinated.[3] Equitable subordination is a "drastic and unusual remedy," which should be applied in limited circumstances.[4] "As a threshold matter, equitable subordination . . . require[s] filing a proof of claim: '[i]f a creditor has not filed a claim, there is nothing to subordinate nor any case or controversy to resolve.'"[5]

### 1. Factors To Determine Whether Equitable Subordination Is Appropriate

In determining whether the equitable subordination of a claim or interest is appropriate, courts, including those in the Southern District of New York, have uniformly applied the three-pronged test set

---

[1]  *See* Creditors' Committee Submission Paper, dated Mar. 7, 2013, at 120–21; Wilmington Trust Reply Submission Paper, dated Mar. 8, 2013, at 52–53; Wilmington Trust Submission Paper, dated Oct. 24, 2012, at 44–46.

[2]  11 U.S.C. § 510(c).

[3]  5 COLLIER ON BANKRUPTCY ¶ 510.05[1] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.). "The plain language and legislative history of § 510(c) indicate that a claim may be subordinated to another claim and an interest may be subordinated to another interest under court-developed principles of equitable subordination." *Adelphia Recovery Trust v. Bank of Am.*, 390 B.R. 80, 98–99 (S.D.N.Y. 2008) adhered to on reconsideration, 05 CIV. 9050 (LMM), 2008 WL 1959542 (S.D.N.Y. May 5, 2008).

[4]  *Springfield Assocs., L.L.C. v. Enron Corp* (*In re Enron Corp.*), 379 B.R. 425, 434 (S.D.N.Y. 2007) (citations omitted); *see In re Featherworks Corp.*, 25 B.R. 634, 649 (Bankr. E.D.N.Y. 1982) ("Equitable subordination is a harsh remedy.").

[5]  *Official Comm. of Unsecured Creditors v. Bay Harbour Master Ltd.* (*In re BH S& B Holdings LLC*), 420 B.R. 112, 154 (Bankr. S.D.N.Y. 2009) (citations omitted), *aff'd as modified*, 807 F. Supp. 2d 199 (S.D.N.Y. 2011); *see O'Connell v. Arthur Andersen LLP* (*In re AlphaStar Ins. Group Ltd.*), 383 B.R. 231, 276 (Bankr. S.D.N.Y. 2008) ("If a creditor has not filed a claim, there is nothing to subordinate nor any case or controversy to resolve.").

forth in *Benjamin v. Diamond* (*In re Mobile Steel Corp.*).[6] In that case, the Fifth Circuit held that a court may equitably subordinate a claim when: (1) the claimant engaged in some type of inequitable conduct; (2) the misconduct resulted in injury to other creditors or conferred an unfair advantage on the claimant; and (3) equitable subordination is consistent with bankruptcy law.[7]

### a. Inequitable Conduct

A court will not equitably subordinate a claim in the absence of inequitable conduct.[8] An inequitable result, by itself, will not justify equitable subordination.[9]

Inequitable conduct is a "very slippery concept with little predictive value," making it a difficult prong to apply.[10] General descriptions of inequitable conduct have included everything from unlawful acts, such as fraudulent conduct, to lawful conduct that "shocks one's good conscience."[11] Notably, the inequitable conduct warranting subordination does not need to be related to the acquisition or assertion of the claim:[12]

---

[6]  563 F.2d 692 (5th Cir. 1977); *see Adelphia Commc'ns Corp. v. Bank of Am., N.A.* (*In re Adelphia Commc'ns Corp.*), 365 B.R. 24, 68 (Bankr. S.D.N.Y. 2007) ("Courts in this district, and elsewhere, regularly apply the standards set forth in the Fifth Circuit's decision in *Mobile Steel,* even though *Mobile Steel,* like *Pepper,* was a case under the former Act.") (footnote omitted), *aff'd in part sub nom. Adelphia Recovery Trust,* 390 B.R. 64; *see also In re BH S&B Holdings,* 420 B.R. at 155 (noting that "courts look to the three factors set out by the Fifth Circuit in *[Mobile Steel]*").

[7]  *In re Mobile Steel,* 563 F.2d at 700 (cited with approval in *United States v. Noland,* 517 U.S. 535, 538 (1996)); *see Merrimac Paper Co. v. Harrison* (*In re Merrimac Paper Co. Inc.*), 420 F.3d 53, 59 (1st Cir. 2005); *Official Comm. of Unsecured Creditors v. Austin Fin. Serv., Inc.* (*In re KDI Holdings, Inc.*), 277 B.R. 493, 508–09 (Bankr. S.D.N.Y. 1999); *80 Nassau Assocs. v. Crossland Fed. Sav. Bank (In re 80 Nassau Assocs.)*, 169 B.R. 832, 837 (Bankr. S.D.N.Y. 1994); *see also Schubert v. Lucent Techs. Inc.* (*In re Winstar Commc'ns, Inc.*), 554 F.3d 382, 411 (3d Cir. 2009); *Wooley v. Faulkner* (*In re SI Restructuring, Inc.*), 532 F.3d 355, 360 (5th Cir. 2008); *In re Kreisler,* 546 F.3d 863, 866 (7th Cir. 2008); *In re Enron Corp.,* 379 B.R. at 433 ("Even after the enactment of section 510(c), the vast majority of courts have continued *to* apply the *Mobile Steel* test.").

[8]  *See* Richard C. Solow, *The Very Limited No-Fault Equitable Subordination Theory: Why Section 510(c) Requires Misconduct in Nearly All Cases,* 22 NORTON J. OF BANKR. L. AND PRACT. 101, 122 (2013) (noting that, other than cases involving punitive claims, "not a single decision has applied no-fault subordination before or after the 1978 Bankruptcy Code was enacted"); *see also In re 80 Nassau Assocs.,* 169 B.R. at 837 ("Equitable subordination requires proof of 'inequitable conduct.'").

[9]  *See Official Comm. of Unsecured Creditors v. Blomen* (*In re Hydrogen, L.L.C.*), 431 B.R. 337, 362 (Bankr. S.D.N.Y. 2010) (noting that a court will analyze the second prong only if inequitable conduct is demonstrated).

[10]  *In re 80 Nassau Assocs.,* 169 B.R. at 837.

[11]  *In re Adelphia Commc'ns Corp.,* 365 B.R. at 68; *see also In re Ticketplanet.com,* 313 B.R. 46, 65 (Bankr. S.D.N.Y. 2004); *Picard v. Katz,* 462 B.R. 447, 456 (S.D.N.Y. 2007); *In re Enron,* 379 B.R. at 433 n.39; *In re Adler, Coleman Clearing Corp.,* 277 B.R. 520, 563 (Bankr. S.D.N.Y. 2002).

[12]  *See In re KDI Holdings, Inc.,* 277 B.R. at 509; *Anaconda-Ericsson, Inc. v. Hessen* (*In re Teletronics Servs., Inc.*), 29 B.R. 139, 168 (Bankr. E.D.N.Y. 1983); *In re Mobile Steel,* 563 F.2d at 700–01; *see also Enron Corp. v. Avenue Special Situations Fund II, LP* (*In re Enron Corp.*), 333 B.R. 205, 210 (Bankr. S.D.N.Y. 2005) (noting that "equitable subordination can apply to claims unrelated to any inequitable conduct held by the claimant alleged to have engaged in that conduct, limited by the amount of damages stemming from the inequitable conduct that is not otherwise compensated to that class"), *leave to appeal granted,* 2006 WL 2548592 (S.D.N.Y. 2008).

> The inequity which will entitle a bankruptcy court to regulate the distribution to a creditor, by subordination or other equitable means, need not therefore be specifically related to the creditor's claim, either in its origin or its acquisition, but it may equally arise out of any unfair act on the part of the creditor, which affects the bankruptcy results to other creditors and so makes it inequitable that he should assert a parity with them in the distribution of the estate.[13]

In considering whether the claimant engaged in inequitable conduct, courts will often first determine whether the claimant is an "insider" of the debtor. The legislative history of section 101(31) of the Bankruptcy Code—which defines "insiders"—states that the "term applies to 'one who has a sufficiently close relationship with the debtor that his conduct is made subject to closer scrutiny than those dealing at arm's length with the debtor.'"[14] Courts uniformly hold that the insider definition must be flexibly applied on a case-by-case basis.[15]

Insider status or control alone is not a sufficient basis for equitable subordination, but insiders are subject to a higher level of scrutiny than non-insiders due to the enhanced opportunities to adjust their position in a way that may prejudice other creditors.[16] "The reason that transactions of insiders will be

---

[13] *In re Adelphia Commc'ns Corp.*, 365 B.R. at 69 (quoting *In re 80 Nassau Assocs.*, 169 B.R. at 838), *Bank of Am. N.A.*, 390 B.R. 64 (S.D.N.Y. 2008), *adhered to on reconsideration*, 05 CIV. 9050 (LMM), 2008 WL 1959542 (S.D.N.Y. May 5, 2008).

[14] *In re KDI Holdings, Inc.*, 277 B.R. at 511 (quoting S. REP. NO. 989 (1978), as reprinted in 1978 U.S.C.C.A.N. 5785, 5810, 6269); *see In re Winstar Commc'ns, Inc.*, 554 F.3d at 396–97 (holding that "it is not necessary that a non-statutory insider have actual control; rather, the question 'is whether there is a close relationship [between debtor and creditor] and . . . anything other than closeness to suggest that any transactions were not conducted at arm's length'").

[15] *See Pan Am Corp. v. Delta Air Lines, Inc.*, 175 B.R. 438, 499 (S.D.N.Y. 1994) (noting that "courts have uniformly held that the Bankruptcy Code's definition is merely illustrative and that the term "insider" must be flexibly applied on a case-by-case basis"):

> In determining whether a creditor is an 'insider' of the debtor under this flexible approach, courts have considered a wide variety of factors, including whether the creditor: (i) received information from the debtor that was not available to other creditors, shareholders and the general public; (ii) attempted to influence decisions made by the debtor; (iii) selected new management for the debtor; (iv) had special access to the debtor's premises and personnel; (v) was the debtor's sole source of financial support; and (vi) generally acted as a joint venture or prospective partner with the debtor rather than an arms-length [sic] creditor.

*Id.* at 500 (citations omitted); *see also In re Adler, Coleman Clearing Corp.*, 277 B.R. 520, 564–65 (Bankr. S.D.N.Y. 2002) ("The Court is not limited to that list [set forth in the insider definition], and may consider whether one is an insider based on the totality of the circumstances.").

[16] *See Official Comm. of Unsecured Creditors v. Blomen* (*In re Hydrogen, L.L.C.*), 431 B.R. 337, 361 (Bankr. S.D.N.Y. 2010) ("The scrutiny for presence of inequitable conduct is more stringent with respect to creditors who are insiders of the debtor . . . ."); *Official Comm. of Unsecured Creditors v. Bay Harbour Master Ltd.* (*In re BH S&B Holdings LLC*), 420 B.R. 112, 156 (Bankr. S.D.N.Y. 2009) ("When the defendant is an insider, his conduct is subject to greater scrutiny."), *aff'd*, 807 F. Supp.2d 199 (S.D.N.Y. 2011); *In re AlphaStar Ins. Grp. Ltd.*, 383 B.R. 231, 276 (Bankr. S.D.N.Y. 2008) ("If the creditor is an insider, his conduct is subject to greater scrutiny.").

closely studied is because such parties usually have greater opportunities for such inequitable conduct, not because the relationship itself is somehow grounds for subordination."[17] This distinction between insider and non-insider is thus important because "the severity of misconduct required to be shown and the degree to which the court will scrutinize the claimant's actions toward the debtor or its creditors" depends on whether the creditor is an insider or non-insider.[18]

An insider's claim can be equitably subordinated if the insider breached a fiduciary duty or otherwise engaged in unfair conduct.[19] "Inequitable conduct by an insider may also include unjust enrichment caused by unconscionable, unjust, unfair, or foul conduct."[20] Courts have equitably subordinated insider claims in cases involving: "(1) fraud, illegality or breach of fiduciary duty, (2) undercapitalization, and (3) control or use of the debtor as an alter ego for the benefit of the claimant."[21] Undercapitalization alone, however, is generally insufficient to equitably subordinate an insider's claim.[22]

When addressing equitable subordination of a parent's claim, courts have concluded that the requisite inequitable conduct would include: "(i) . . . the 'looting' of [a subsidiary by its parent] during the period of [the subsidiary's] financial decline; (ii) the creation of false documentation for the purpose of improving the parent's position; and (iii) unjust double-dealing."[23] Use of a subsidiary as a mere

---

[17] *Blasblag v. Tarro (In re Hyperion Enters.)*, 158 B.R. 555, 563 (D.R.I. 1993) (citations omitted).

[18] *In re Teletronics Servs., Inc.*, 29 B.R. at 169; *see In re Hyperion*, 158 B.R. 555, 563 (D.R.I. 1993) ("Insider status goes only to determining the standard under which the creditor's conduct is reviewed.").

[19] *See In re Hydrogen, L.L.C.*, 431 B.R. at 361 (noting that "a breach of fiduciary duty or even mere engagement in conduct that is "somehow unfair" on the part of the insider may constitute inequitable conduct"); *see also Liberty Mut. Ins. Co. v. Lerory Holding Co., Inc.*, 226 B.R. 746, 755 (N.D.N.Y. 1998) ("This closer scrutiny means that an insider's claim will be subordinated if it is proven that the insider either breached a fiduciary duty or engaged in conduct that is somehow unfair.").

[20] *Liberty Mut. Ins. Co.*, 226 B.R. at 755 (citation omitted).

[21] *In re KDI Holdings, Inc.*, 277 B.R. at 511 (holding that committee's claims of creditor self-dealing and impermissible leveraging of debtor's assets were sufficient to allow court to find that creditor had control of debtor and creditor's contingent secured claims should be equitably subordinated to claims of general unsecured creditors) (citing *In re 80 Nassau Assocs.*, 169 B.R. at 837)); *see Nisselson v. Ford Motor Co.* (*In re Monahan Ford Corp.*), 340 B.R. 1, 45 (Bankr. E.D.N.Y 2006).

[22] *See In re Hydrogen, L.L.C.*, 431 B.R. at 362; *see also In re Herby's Foods, Inc.*, 2 F.3d 128, 132 (5th Cir. 1993). Capitalization is generally measured at the time of a company's formation. *See Le Café Creme, Ltd. v. Xavier Le Roux* (*In re Le Café Creme, Ltd.*), 244 B.R. 221, 235–36 (Bankr. S.D.N.Y. 2000). "Proof of subsequent undercapitalization may be further proof of inequitable conduct, such as actions of gross mismanagement, self interest, and the like." *Id.* (citations omitted).

[23] *Official Comm. of Unsecured Creditors v. Verestar, Inc.* (*In re Verestar, Inc.*), 343 B.R. 444, 461 (Bankr. S.D.N.Y. 2006).

instrumentality may also give rise to equitable subordination claims.[24] Domination of a subsidiary alone will not automatically result in the equitable subordination of a parent's claim.[25] Domination and exploitation of a subsidiary for the benefit of the parent may, however, lead to the equitable subordination of a parent's claim.[26] In addition, management of the subsidiary solely for the benefit of the parent's interests (and not for the benefit of the interests of the subsidiary's other creditors) may lead to the equitable subordination of the parent's claim, and "proof of fraud or illegality is not necessary" in such a situation.[27]

The insider and non-insider distinction is also important because, if a creditor is an insider, "once the proponent provides a substantial basis to support the charge of unfairness, the burden shifts to the insider to show the fairness of his claim."[28]

---

[24] *See N.Y. Trust Co. v. Island Oil & Transport Corp.*, 56 F.2d 580, 584 (2d Cir. 1932) ("If a subsidiary is a mere instrumentality and its business is really that of the parent company, a loan by the parent to the subsidiary will be subordinated to the claims of creditors of the subsidiary."); *see also In re Otsego Waxed Paper Co.*, 14 F. Supp. 15, 16 (W.D. Mich. 1935) ("The applicable principle is that, where a corporation is so organized and controlled as to make it a mere instrumentality or adjunct of another, and the subsidiary becomes bankrupt, the parent corporation cannot have its claim paid until all other claims are first satisfied.").

[25] "[E]ven total control of a debtor's affairs does not necessarily lead to equitable subordination; debts owed stockholders and directors are not automatically denied equality of distribution." *In re Featherworks*, 25 B.R. 634, 648 (Bankr. E.D. N.Y. 1982) (citations omitted); *see Liberty Mut. Ins. Co.,* 226 B.R. at 756 (noting that, while parent dominated subsidiary, there was no showing of wrongful conduct); *see also In re All Prods.Co*., 32 B.R. 811, 816 (Bankr. E.D. Mich. 1983) ("Domination of a subsidiary by a parent standing alone is not sufficient to invoke the doctrine.").

[26] *See Pepper v. Litton*, 308 U.S. 295, 308–310 (1939). In *Pepper*, the Supreme Court noted that equitable subordination would be appropriate where there is a "history of spoliation, mismanagement, and faithless stewardship of the affairs of the subsidiary by [the parent] to the detriment of the public investors." *Id.* The Supreme Court gave further examples where equitable subordination or disallowance would be appropriate:

> It is reached where the claim asserted is void or voidable because the vote of the interested director or stockholder helped bring it into being or where the history of the corporation shows dominancy and exploitation on the part of the claimant. It is also reached where on the facts the bankrupt has been used merely as a corporate pocket of the dominant stockholder, who, with disregard of the substance or form of corporate management, has treated its affairs as his own.

*Id.* at 309 (footnotes omitted) (citations omitted).

[27] *Gannett Co. v. Larry*, 221 F.2d 269, 275 (2d Cir. 1955).

[28] *In re 80 Nassau Assocs.*, 169 B.R. at 839 n.5 (citations omitted); *see Wallach v. Buchheit* (*In re Northstar Dev. Corp.*), 465 B.R. 6, 16 (Bankr. W.D.N.Y. 2012) (noting that the plaintiff has "the initial burden to establish the necessary elements of . . . equitable subordination" and once established "the burden then shifts to [the insider] to demonstrate its good faith and the fairness of its conduct"); *Le Café Creme, Ltd. v. Xavier Le Roux* (*In re Le Café Creme, Ltd.*), 244 B.R. 221, 235 (Bankr. S.D.N.Y. 2000); *see also In re Heartland Chemicals, Inc*., 136 B.R. 503, 516–17 (Bankr. C.D. Ill. 1992) (noting "once some inequity is demonstrated vis-à-vis an insider, the insider then has the burden of demonstrating the underlying fairness of the transaction").

### b. *Injury To Creditors Or An Unfair Advantage For The Claimant*

To satisfy the second element of the *In re Mobile Steel* test, "the proponent of equitable subordination need only allege 'that general creditors are less likely to collect their debts' as a result of the allegedly inequitable conduct."[29] In general, this element would be satisfied by identifying how the inequitable conduct affected or was unfair to other creditors.[30] If no unfair advantage was gained as a result of inequitable conduct, a court will not be justified in subordinating a creditor's claim.[31] Further, this element limits subordination to the extent necessary to remedy the harm.[32]

### c. *Equitable Subordination Must Not Be Inconsistent With Bankruptcy Law*

The third element is relevant only after the first two elements have been satisfied. Some courts have concluded that by virtue of the enactment of section 510(c) and the codification of the bankruptcy court's ability to equitably subordinate claims, which was not the case when *Mobile Steel* was decided, this element is likely moot.[33] "Accordingly, a complaint that satisfies the first two prongs of the *Mobile Steel* test would survive a motion to dismiss."[34] Indeed, where the first two elements are satisfied, it is

---

[29] *In re KDI Holdings, Inc*., 277 B.R. at 509 (citing *In re 80 Nassau Assocs*., 169 B.R. at 840) ("If the misconduct results in harm to the entire creditor body the objecting party need not identify the injured creditors or quantify their injury, but need only show that the creditors were harmed in some general, concrete manner."). "There is no requirement that the purported misconduct be a major cause of the debtor's bankruptcy." *Liberty Mut. Ins. Co*., 226 B.R. at 757 (citation omitted).

[30] *See 201 Forest Street LLC v. LBM Fin. LLC* (*In re 201 Forest St. LLC*), 409 B.R. 543, 572–73 (Bankr. D. Mass. 2009) ("The presence of inequitable conduct alone is not sufficient, as the second prong requires the bankruptcy court to identify how the inequitable conduct affected or was unfair to other creditors."). "If the misconduct harmed the entire creditor class, it is sufficient to show as harm that general creditors will be less likely to collect their debts as a result of the misconduct. When a specific creditor is the only party affected by the misconduct, the offending claimant should be subordinated only to that claim." *Liberty Mut. Ins. Co*., 226 B.R. at 757.

[31] *Liberty Mut. Ins. Co*., 226 B.R. at 757 (refusing to equitably subordinate claims where there was no showing that other creditors suffered harm or were prejudiced).

[32] *See Official Comm. of Unsecured Creditors v. Bay Harbour Master Ltd. (In re BH S&B)*, 420 B.R. 112, 156 (Bankr. S.D.N.Y. 2009) ("Under this prong, that claim is subordinated only to the extent necessary to offset the harm which the bankrupt and its creditors suffered on account of the inequitable conduct.").

[33] *See Official Comm. of Unsecured Creditors v. Blomen* (*In re Hydrogen, L.L.C.*), 431 B.R. 337, 360–61 (Bankr. S.D.N.Y. 2010) ("The third prong of the *Mobile Steel* test carries minimal significance today because the current Bankruptcy Code provides explicitly for the remedy of equitable subordination, whereas the former Bankruptcy Act—under which *In re Mobile Steel Co*. was decided—did not."); *In re 80 Nassau Assocs*., 169 B.R. at 840 (noting that "since the Bankruptcy Code, unlike its predecessors, expressly authorizes the remedy of equitable subordination, the third prong of the *Mobile Steel* test is likely to be moot"). *But see Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims*, 160 F.3d 982, 990 (3d Cir. 1998) ("This requirement 'has been read as a reminder to the bankruptcy court that although it is a court of equity, it is not free to adjust the legally valid claim of an innocent party who asserts the claim in good faith merely because the court perceives the result is inequitable.'").

[34] *In re Hydrogen, L.L.C.*, 431 B.R. at 361.

likely that a court would equitably subordinate the claim.[35] Nevertheless, courts have acknowledged that the third *Mobile Steel* element generally serves as a reminder that although bankruptcy courts are courts of equity, they should not lightly alter the statutory priority scheme.[36]

### 2. Burden Of Proof And Statute Of Limitations

Generally, "the burden of proving all the elements of subordination is on the objectant."[37] However, where "the validity of the underlying claim is in issue, the claimant has the burden of proving both the amount and legitimacy of the claim."[38] Once the claimant satisfies its burden, then "the objectant must prove *by a preponderance of the evidence* that the claimant engaged in such substantial inequitable conduct to the detriment of the debtor's other creditors that subordination is warranted."[39] As discussed above, there is a shifting of the burden in the insider context.[40]

---

[35] *In re 80 Nassau Assocs.*, 169 B.R. at 841 (noting that, "if a court determines that the party advocating equitable subordination has satisfied the first two prongs of the Mobile Steel test, it is difficult to imagine a situation in which equitable subordination would not be warranted by bankruptcy law").

[36] *See In re BH S&B Holdings LLC*, 420 B.R. at 156 (citations omitted). "This element recognizes that the doctrine is not a mechanism to be used by courts to alter the statutory scheme in an effort to reach a result the court considers more equitable than the distribution scheme provided for in the Bankruptcy Code." *Id.* (quoting *Official Comm. of Unsecured Creditors v. Morgan Stanley & Co.* (*In re Sunbeam Corp.*), 284 B.R. 355, 364 (Bankr. S.D.N.Y. 2002)).

[37] *Matter of Teltronics Servs, Inc.*, 29 B.R. 139, 168 (Bankr. E.D.N.Y. 1983) (citation omitted).

[38] *Id.* at 168–9 (citation omitted).

[39] *Id.* at 169 (emphasis added) (citation omitted); *see In re Heartland Chemicals, Inc.*, 136 B.R. 503, 517 (Bankr. C.D. Ill. 1992) (citations omitted) (stating that "the plaintiff must justify equitable subordination by a preponderance of the evidence"); *Le Café Crème, Ltd. v. Le Roux (In re Le Café Crème, Ltd.)*, 244 B.R. 221, 235 (Bankr. S.D.N.Y. 2000) (citations omitted) (stating that "[u]nder the Mobile Steel test, a claim is equitably subordinated if there is a showing by a preponderance of the evidence" of the three prongs of the equitable subordination test).

[40] *See* Section VII.C.1(a)(1).

"There is no specific statute of limitations applicable to equitable subordination claims."[41] An equitable subordination claim may, however, be subject to estoppel,[42] or barred by laches.[43] At least one court has concluded that equitable subordination is not time barred even if the underlying inequitable conduct forms the basis of a cause of action that is time barred.[44]

### 3. Other Limitations On Equitable Subordination

While courts have broad discretion in determining when equitable subordination is appropriate, there are limitations to the court's power to equitably subordinate a claim. Courts have described equitable subordination as "an unusual remedy, which should be applied only in limited circumstances."[45] The Supreme Court in *United States v. Noland* noted that a court may not "adjust the legally valid claim of an innocent party who asserts a claim in good faith merely because the court perceives that the result is inequitable."[46] Nor may the court "set up a subclassification of claims . . . and fix an order of priority for the sub-classes according to its theory of equity."[47] In *United States v. Reorganized CF&I Fabricators of Utah, Inc*., the Supreme Court further explained that its holding in *Noland* stands for the proposition that "categorical reordering of priorities [by a court] that takes place at the legislative level of consideration is beyond the scope of judicial authority to order equitable subordination under 510(c)."[48]

---

[41] *In re GNK Enters, Inc.*, 197 B.R. 444, 449 (Bankr. S.D. N.Y. 1996) (citing *In re Badger Freightways, Inc*., 106 B.R. 971, 974 (Bankr. N.D. Ill. 1989)); *see also In re 201 Forest St. LLC*, 409 B.R. 543 (Bankr. D. Mass. 2009) (noting that there is no statute of limitations with respect to equitable subordination actions); *In re Emergency Monitoring Techs. Inc*., 366 B.R. 476, 509 (Bankr. W.D. Pa. 2007) ("[T]he law is clear that a statute of limitations does not exist with respect to equitable subordination actions brought under §510(c)."); *In re Southwest Supermarkets, LLC*, 325 B.R. 417, 427 (Bankr. D. Ariz. 2005) ("[T]here has never been a statute of limitations for some other remedies, such as . . . equitable subordination.").

[42] *See, e.g., In re Assante*, 470 B.R. 707, 713 (Bankr. S.D.N.Y.) (holding that chapter 11 debtor was barred by collateral estoppel effect of state court's judgment from asserting same alleged misconduct as basis for equitably subordination claim).

[43] *See In re Badger Freightways, Inc*., 106 B.R. at 974 (noting in connection with equitable subordination claim that "[a] statute of limitations bars a cause of action based solely on the passage of time. In contrast, the laches doctrine arises due to a change in the conditions of the parties"); *see also In re Patt Freeman, Inc*., 42 B.R. 224, 231 (Bankr. Ohio. 1984) (holding that laches would not bar plaintiff's equitable subordination claim because plaintiff acted in a timely manner); *In re Octagon Roofing*, 141 B.R. 968, 983, n.5 (Bankr. N.D. Ill. 1992) (noting that argument of subordination would have to be weighed against defenses of waiver, estoppel, unclean hands and laches if not for court's ruling against the plaintiff).

[44] *In re Emergency Monitoring Techs. Inc*., 366 B.R. at 509 (concluding that trustee was not time barred from asserting inequitable conduct in connection with equitable subordination claim, "notwithstanding that such conduct perhaps cannot now be attacked via a fraudulent conveyance action").

[45] *Le Café Crème, Ltd. v. Xaxier Le Roux (In re Le Café Crème, Ltd.)*, 244 B.R. 221, 235 (Bankr. S.D.N.Y. 2000) (citing *Fabricators, Inc. v. Technical Fabricators, Inc.*, 926 F.2d 1458, 1464 (5th Cir. 1991); *see also Enron Corp. v. Springfield Assocs., L.L.C. (In re Enron Corp.)*, 379 B.R. 425, 434 (S.D.N.Y. 2007) (citations omitted) (stating that "many courts view equitable subordination as a 'drastic and unusual remedy'"); *Assante v. E. Savs. Bank, FSB*, No. 12-CV-5309 (CS), 2013 WL 787968, at *3 (S.D.N.Y. Mar. 4, 2013) (describing equitable subordination as an "unusual remedy").

[46] 517 U.S. 535, 539 (1996).

[47] *Id*. at 543 (citations omitted).

[48] 518 U.S. 213, 228–29 (1996).

Bankruptcy courts are also limited by the fact that "equitable subordination is remedial, not penal . . . a claim will be subordinated only to the extent necessary to offset the harm that resulted."[49] Although Examiner's Counsel found no reported case that says so expressly, given the remedial nature of the equitable subordination remedy, a court would likely consider the entire course of dealing and conduct of an offending claimant to determine whether such conduct, when considered in light of all relevant facts and circumstances, requires that the claimant should not share in accordance with the priority asserted for its claim.[50]

4.   *The Examiner Investigated Each Affiliate Transaction And AFI's General Course Of Dealings With ResCap And GMAC Mortgage For Evidence Of Inequitable Conduct And Resulting Harm To Creditors That Would Support A Claim Of Equitable Subordination*

During the course of the Investigation, the Examiner and his professionals analyzed the Affiliate Transactions individually and collectively, as well as AFI's general course of conduct and dealings with ResCap and GMAC Mortgage, for any evidence of: (1) fraud; (2) illegality; (3) breach of fiduciary duty; (4) unconscionable, unjust, unfair, or foul conduct; (5) undercapitalization, or (6) AFI's control or use of ResCap as an alter ego for AFI's benefit. The Examiner and the Examiner's Professionals also analyzed whether creditors were harmed by AFI's conduct.

a.   *AFI And Ally Bank's Claims Against ResCap*

Section 510(c) of the Bankruptcy Code expressly provides that a court may equitably subordinate allowed claims. AFI and its non-debtor affiliates have (including Ally Bank) filed approximately 149 proofs of claim in the Chapter 11 Cases. Pursuant to section 502(a) of the Bankruptcy Code, a claim, proof of which is filed, is deemed allowed unless a party in interest objects.[51] AFI has asserted in the Chapter 11 Cases various claims against ResCap, RFC, and GMAC Mortgage including claims in the amounts of not less than $747,127,553.38 under the A&R Secured Revolver Loan Agreement and $380,000,000 under the A&R Line of Credit Agreement. Ally Bank has filed ten proofs of claim against the Debtors, including unliquidated claims against ResCap, RFC, and GMAC Mortgage.

---

[49] *In re KDI Holdings, Inc.*, 277 B.R. at 509 (citing *In re 80 Nassau Assocs.*, 169 B.R. at 840); *see In re Mobile Steel Corp.*, 563 F.2d at 701 (citing *Pepper v. Litton*, 308 U.S. 295, 304 (1935)); *see also Official Comm. of Unsecured Creditors v. Bay Harbour Master Ltd.* (*In re BH S&B Holdings LLC*), 420 B.R. 112, 156 (Bankr. S.D.N.Y. 2009) ("This sets the 'limit of the remedy regardless of the nature of the claimant's conduct.'"); *Enron Corp. v. Ave. Special Situations Fund II, LP (In re Enron Corp.)*, 333 B.R. 205, 219 (Bankr. S.D.N.Y. 2005) ("The application of the Mobile Steel test ensures that the full breath of the remedy of equitable subordination is available while ensuring that its reach does not violate any provision of the Bankruptcy Code or become punitive as opposed to remedial.").

[50] *See In re Clap*, 5 F. Cas. 816, 817 (D. Mass. 1873) (noting "a court of equity will consider all circumstances and decline to assist the creditor, if, upon the whole, justice so requires"); *see also In re Porter*, 50 B.R. 510 (Bankr E.D. Va. 1985) (concluding that residual claim should not be subordinated because payment of settlement purged claimant's participation in fraudulent conveyance).

[51] 11 U.S.C. § 502(a).

### b.  AFI Was And Is An Insider Of ResCap And GMAC Mortgage

At all times relevant to the Investigation, ResCap was a wholly-owned indirect subsidiary of AFI and GMAC Mortgage was a wholly-owned, indirect subsidiary of ResCap. Thus, AFI was and is an "insider" of ResCap and GMAC Mortgage as that term is defined in the Bankruptcy Code.[52] As an insider, AFI's conduct with respect to ResCap and GMAC Mortgage is subject to a higher degree of scrutiny than would be the conduct of a non-insider.[53]

### c.  The Nature Of AFI's Conduct In Connection With The Affiliate Transactions And AFI's General Course Of Dealing

#### (1)  Whether AFI's Conduct In Connection With The 2006 Bank Restructuring Was Unfair Or Inequitable[54]

As discussed in Sections V.A, VII.E, and VII.L, ResCap and AFI explored multiple potential ownership structures for the reorganized bank, only one of which called for the approach ultimately implemented, i.e., 100% AFI ownership of voting control of IB Finance, non-voting interests for ResCap, and proportional earnings distribution to ResCap based on Ally Bank's mortgage operation.[55] It does not appear, however, that the Independent Directors were ever informed that alternative structures were viable and should be considered by the ResCap Board. These alternative structures could have avoided the result where ResCap's shares in IB Finance were non-voting.[56]

AFI's conduct surrounding communications with the Independent Directors with respect to the 2006 Bank Restructuring suggests that AFI chose to manage the information flow on this subject to minimize the likelihood that the Independent Directors would veto the transaction. As discussed more fully in Sections V.A, VII.E, and VII.L, the Examiner concluded that AFI withheld or caused to be withheld certain critical information from the Independent Directors regarding the 2006 Bank Restructuring, including the possibility of entering into a different transaction pursuant to which ResCap would retain a voting interest in IB Finance.[57]

---

[52]  *See* 11 U.S.C. § 101(31).

[53]  *See* Section VII.C.1.a.

[54]  *See* Section V.A (discussing the 2006 Bank Restructuring).

[55]  *See* Draft Memorandum, IB Alternatives, April 4, 2006, at 1 [EXAM11237439] (attached to E-mail from D. Applegate to B. Paradis) (April 4, 2006) [EXAM11237438], more fully addressed in Section V.A and VII.L.

[56]  *See* Section V.A.

[57]  *Id.* As explained in Section V.A.1.a(5) the Examiner concluded that the 2006 Bank Restructuring resulted in ResCap receiving less than reasonably equivalent value, one of the two elements of a constructive fraudulent transfer claim. An insider's receipt of a constructively fraudulent transfer may constitute grounds for the equitable subordination of the insider's claim in the transferor's subsequent bankruptcy case. *See Webster v. Barbara (In re Otis & Edwards, P.C.),* 115 B.R. 900, 921 (Bankr. E.D. Mich. 1990). However, as further explained in Sections VI. and VII.F, the Examiner has concluded that ResCap was not insolvent at the time of the 2006 Bank Restructuring or rendered insolvent by that transaction. Therefore, the lack of reasonably equivalent value in connection with the 2006 Bank Restructuring, by itself, does not support the proposition that AFI engaged in unfair or inequitable conduct in connection with the 2006 Bank Restructuring. As discussed in Section VII.A, the failure to pay reasonably equivalent value may be cited as evidence of siphoning, which is one element relevant to an alter-ego analysis. As described in that Section, the Examiner concluded that the evidence does not support the proposition that AFI siphoned assets from ResCap.

The Examiner concludes that AFI engaged in unfair and inequitable conduct by withholding or causing to be withheld certain critical information from the Independent Directors regarding the 2006 Bank Restructuring, including the possibility of entering into a different transaction pursuant to which ResCap would retain a voting interest in IB Finance.

### (2) Whether AFI's Conduct In Connection With The Second 2009 Tax Allocation Agreement Was Unfair Or Inequitable

As discussed in Section VII.K.2.e, although the Second 2009 Tax Allocation Agreement may have been unfair to ResCap, it would be difficult to find that it was the result of "gross and palpable overreaching" by AFI. Indeed, the Investigation revealed no direct evidence that AFI exerted undue influence over ResCap to execute the Second 2009 Tax Allocation Agreement.[58] Although ResCap's decision ultimately to approve the Second 2009 Tax Allocation Agreement was questionable, the decision-making process was thorough and ResCap's entry into the agreement appears to have been of its own free will.[59]

As discussed in Section VII.K.2.c, it appears that ResCap received no consideration, much less fair consideration or reasonably equivalent value, in exchange for entering into the Second 2009 Tax Allocation Agreement at a time when ResCap was insolvent.[60] As set forth in Section VII.K.2.c, the Examiner has concluded that a claim to avoid the Second 2009 Tax Allocation Agreement on constructive fraudulent transfer grounds is likely to prevail. A constructive fraudulent transfer to an insider is evidence of unfair or inequitable conduct that would support the remedy of equitable subordination.[61]

Accordingly, the Examiner concludes that AFI engaged in unfair and inequitable conduct by entering into the Second 2009 Tax Allocation Agreement with ResCap.

### (3) Whether AFI's And Ally Bank's Conduct In Connection With The Misallocation Of Revenues On Loans Brokered By GMAC Mortgage Was Unfair Or Inequitable

As discussed in Section V.B, when Ally Bank and GMAC Mortgage initially implemented the Broker Agreement, the revenue and expense allocation was implemented as they had agreed. Effective August 1, 2009, Ally Bank elected to implement the fair value option to account for HFS loans in accordance with FASB Accounting Standard Codification Topic 825, Financial Instruments. Consequently, rather than realizing the profits and loss benefit of points and other origination income as the parties had agreed, GMAC Mortgage instead received the cost-based, below-market broker fee.

---

[58] *See* Section VII.K.2.e (citing Int. of W. Marx, Apr. 18, 2013, at 131:2–12).

[59] Section VII.K.2.e.

[60] *See* Section VI.

[61] *See In re Otis & Edwards, P.C.,* 115 B.R. at 921 (concluding that an insider was the recipient of a constructively fraudulent transfer and insider's claims could be equitably subordinated).

As explained in Section VII.L.2.d, there is some evidence that AFI and Ally Bank squelched the review of the problem in late 2011 (that Ally Bank had retained gain on sale revenue due to GMAC Mortgage), and in 2012, AFI and Ally Bank, in the face of ResCap's impending bankruptcy, avoided restating Ally Bank's financials (and the regulatory scrutiny that would have ensued), rather than a fair and objective attempt to resolve the matter.

Based on the foregoing, the Examiner concludes that it is more likely than not that a court would find that AFI and Ally Bank engaged in unfair and inequitable conduct by refusing to disclose the misallocation, to rectify the situation, and by continuing the misallocation of funds.[62]

### (4) Whether AFI's Conduct In Connection With ResCap's Forgiveness Of Subsidiary Indebtedness And The 2009 Bank Transaction Was Unfair Or Inequitable

Wilmington Trust argues that AFI caused ResCap to breach the "all or substantially all" covenant included in the 2005 Indenture.[63] Specifically, Wilmington Trust alleges that AFI induced ResCap to embark upon a series of transactions in furtherance of a pre-arranged plan of AFI self-preservation that caused ResCap: (1) to forgive indirect and direct debts owed to it by certain of its subsidiaries, including GMAC Mortgage and RFC; and (2) to enter into the 2009 Bank Transaction. Wilmington Trust argues that these transactions resulted in the transfer of substantially all of ResCap's assets in violation of the 2005 Indenture. As discussed in Section VIII, the Examiner concluded that the evidence does not support the proposition that there was an actual breach of the "all or substantially all" covenant of the 2005 Indenture.[64] Accordingly, the conduct cited by Wilmington Trust does not provide support for the proposition that AFI engaged in unfair or inequitable conduct.

### (5) Whether AFI's Conduct In Connection With The Line Of Credit Facilities Was Unfair Or Inequitable

The Ad Hoc Group argues that AFI misappropriated collateral in favor of the Line of Credit Facilities and therefore, AFI's claims on account of the A&R Line of Credit Facility should be equitably subordinated to the claims of Junior Secured Noteholders.[65] Moreover, the Ad Hoc Group alleges that AFI knew that ResCap's entry into the Line of Credit Facilities was not an arm's-length transaction and

---

[62] As described in Section VII.L, the Examiner has also concluded GMAC Mortgage likely would succeed on a contractual claim that the allocation of revenues from January 1, 2009 to July 31, 2009 was proper, and that it is entitled to payment of the revenues misallocated to the Ally Bank from and after August 1, 2009.

[63] Wilmington Trust Submission Paper, dated Oct. 24, 2012, at 24–28.

[64] Moreover, as discussed in Section VIII, the Examiner concluded that the evidence does not support the proposition that AFI intentionally procured ResCap's breach of the "all or substantially all" covenant of the 2005 Indenture without justification and, therefore, the Examiner concluded that it is unlikely that the Wilmington Trust tortious interference with contract claim against AFI would prevail.

[65] See Preliminary Submission Paper of Ad Hoc Group of Junior Secured Noteholders, dated Nov. 14, 2012, at 32–33.

violated the Junior Secured Notes Indenture. According to the Ad Hoc Group, the pledging of released collateral to the Line of Credit Facilities left AFI's first priority position with respect to those assets intact, while effectively punishing the Junior Secured Noteholders.

As discussed in Section V.E.5, certain collateral was released from a blanket lien securing the Secured Revolver Facility, the Senior Secured Notes and the Junior Secured Notes and thereby made available to secure the Initial Line of Credit Facility. The collateral release provisions set forth in the Secured Revolver Loan Agreement,[66] the Senior Secured Notes Indenture,[67] the Junior Secured Notes Indenture[68] and the Intercreditor Agreement[69] made such a release possible.

Moreover, as discussed in Section V.E.5, AFI structured the Line of Credit Facilities to benefit ResCap; the Line of Credit Facilities contained provisions that were more favorable to the Initial Line of Credit Borrowers than would have been obtained in a syndicated credit facility with unaffiliated lenders, including no ongoing commitment or facility fees payable by the borrowers.[70]

Based upon the foregoing, the Examiner concludes that AFI's conduct in connection with the Line of Credit Facilities was not unfair or inequitable.

### (6) Equitable Subordination Based On Alter-Ego, Asset Stripping, And Aiding And Abetting Breach Of Fiduciary Duty Allegations

As noted above, a court may equitably subordinate claims held by a parent on the basis of the parent's treatment of the subsidiary debtor as its alter-ego.[71] In addition, aiding and abetting a breach of fiduciary duty may support a finding of inequitable conduct.[72]

The Creditors' Committee and Wilmington Trust argue that AFI's claims against the Debtors should be subordinated, because (1) AFI asserted its domination and control of ResCap for its sole benefit and (2) this misconduct gave AFI an unfair advantage by allowing AFI to strip ResCap of its sole material assets.[73] In addition, the Creditors' Committee and Wilmington Trust assert aiding and abetting breach of fiduciary claims against AFI.

---

[66]  Secured Revolver Loan Agreement, §12.11 [RC00024234].

[67]  Senior Secured Notes Indenture, §8.04(a) [RC00024456].

[68]  Junior Secured Notes Indenture, §8.04(a) [RC00037197].

[69]  Intercreditor Agreement, §5.1(a) [ALLY_0066819].

[70]  *See* Section V.E.5.

[71]  *See* Section VII.C. 2.a.

[72]  *See Rosener v. Majestic Mgmt., Inc.* (*In re OODC, LLC*), 321 B.R. 128, 146 (Bankr. D. Del. 2005) (citation omitted).

[73]  *See* Wilmington Trust Reply Submission Paper, dated Mar. 8, 2013, at ¶93; *see also* Wilmington Trust Submission Paper, dated Oct. 24, 2012, at ¶¶88 ("AFI's allowed claims should be subordinated to the claims of the Trustee and the Noteholders as a result of AFI's actions over many years of misconduct in connection with the mortgage business, and later, its use of Residential Capital as a shield from liability when the business failed, all at the expense of the Noteholders."). According to the Creditors' Committee, AFI's claims should be equitably subordinated, because "AFI pushed its undercapitalized subsidiaries into bankruptcy only after stripping value, imposing insurmountable liabilities, and otherwise protecting itself to the detriment of other creditors." Creditors' Committee Submission Paper, dated Mar. 7, 2013, at 121.

As described in Section VII.A, the Examiner concluded that (1) the evidence does not support the proposition that AFI "siphoned" assets from ResCap and (2) any alter-ego claims asserted on behalf of ResCap against AFI are unlikely to prevail. Similarly, for the reasons set forth in Section VII.G, there appear to be no viable claims against AFI for aiding and abetting breaches of fiduciary duties by ResCap directors and officers.

Accordingly, the Examiner concludes that AFI's claims are not subject to equitable subordination on the basis that AFI engaged in unfair or inequitable conduct by (1) siphoning or stripping assets from ResCap, or (2) using ResCap as its alter-ego, or (3) by aiding and abetting breaches of fiduciary duties.

### d. The Harm Resulting From AFI And Ally Bank's Conduct

As previously noted, inequitable conduct alone is not sufficient to justify the equitable subordination of a creditor's claims.[74] There must also be some injury to creditors or an unfair advantage conferred.[75] "If the misconduct results in harm to the entire creditor body, the [trustee] need not identify the injured creditors or quantify the injury, but need only show that the creditors were harmed in some general, concrete manner."[76]

Having concluded that AFI engaged in unfair or inequitable conduct towards ResCap and GMAC Mortgage with regard to the 2006 Bank Restructuring, the Second 2009 Tax Allocation Agreement, and the misallocation of revenues on loans brokered by GMAC Mortgage, the inquiry turns to whether ResCap and GMAC Mortgage and their creditors were harmed, and to what extent, by such unfair or inequitable conduct.

---

[74] *See 201 Forest Str. LLC v. LBM Fin. LLC* (*In re 201 Forest St. LLC*), 409 B.R. 543, 572–73 (Bankr. D. Mass. 2009) ("The presence of inequitable conduct alone is not sufficient, as the second prong requires the bankruptcy court to identify how the inequitable conduct affected or was unfair to other creditors.").

[75] *Official Comm. of Unsecured Creditors v. Bay Harbour Master Ltd.* (*In re BH S& B Holdings LLC*), 420 B.R. 112, 156 (Bankr. S.D.N.Y. 2009) ("The second prong requires a finding that the claimant's conduct injured the debtor or its creditors, or resulted in an unfair advantage to the claimant."). *But see Midlantic Nat'l Bank N., N.A. v. Borg-Warner Acceptance Corp. (In re Mayo)*, 112 B.R. 607, 651 (Bankr. D. Vt. 1990):

> Although the standard of "either injury to the debtor or other creditors" or "unfair advantage to the claimant" is much cited, it is not entirely clear whether the standard is in the conjunctive or disjunctive. *Mobile*, *supra*, articulates a disjunctive test, *In re Westgate, supra*, puts forth a conjunctive test. We hold that the test should be in the conjunctive because of the "no harm, no foul" rule. For one creditor to have achieved an unfair advantage there must have been a benefit. It must then be shown that such unfair advantage hurt the debtor or its creditors. Without the harm there would be no reason to apply equitable subordination to the claim.

*Id*, *see White Current Corp. v. Rural Util. Serv. (In re Vt. Elec. Generation & Transmission Coop., Inc.)*, 240 B.R. 476 (Bankr. D. Vt. 1999), *see also Chorches v. Ogden (In re Bolin & Co., LLC)*, 437 B.R. 731, 761 (D. Conn. 2010) (concluding that test is conjunctive and citing the Bankruptcy Court's decision in *80 Nassau Assocs.* as "implying that the test is disjunctive").

[76] *Springfield Assocs., L.L.C. v. Enron Corp. (In re Enron Corp.)*, 379 B.R. 425, 434, 487 (S.D.N.Y. 2007) (alteration in original).

*(1) Harm Resulting From AFI's Conduct In Connection With The 2006 Bank Restructuring*

The Examiner concluded that AFI engaged in unfair or inequitable conduct by withholding material information from the Independent Directors in connection with the 2006 Bank Restructuring. As discussed in Section VII.E, there is a threshold question of whether any harm actually resulted. Interview testimony creates some uncertainty regarding whether the concealment of information from the Independent Directors relating to ResCap obtaining a voting interest in the restructured bank ultimately made any difference regarding the transaction that the ResCap Board approved.

As explained in Section VII.E, the Examiner concluded that the evidence supports the proposition that had Jacob and Melzer known that the option of ResCap obtaining a voting interest in the restructured bank was a viable one or, at least, a negotiable term, they could have—and likely would have—exploited that leverage to extract better terms for ResCap in the transaction. At minimum, armed with the knowledge that a voting interest in the restructured bank was negotiable, the Independent Directors could have sought to make up the shortfall in the value that ResCap received in compensation for relinquishing control of the bank.

Accordingly, the Examiner concludes that AFI's unfair or inequitable conduct harmed ResCap by causing it to cede the voting interest for less than fair value. While it is difficult to speculate what greater value might have been obtainable by the Independent Directors, damages would likely be not less than the reasonably equivalent value deficiency of between \$390 to \$465 million,[77] and may be as much as the difference between the equity value of ResCap's interest in Old GMAC Bank, which it transferred, and the equity interest in IB Finance, which it received—between \$533 and \$688 million.[78]

*(2) Harm Resulting From AFI's Conduct In Connection With The Second 2009 Tax Allocation Agreement*

As set forth in Section VII.K.2.c, the Examiner concluded that a claim to avoid the Second 2009 Tax Allocation Agreement on constructive fraudulent transfer grounds is likely to prevail. Accordingly, payments made by ResCap under that Agreement would likely be avoidable as constructively fraudulent and subject to recovery pursuant to section 550 of the Bankruptcy Code. The Examiner currently estimates those amounts to be, in the aggregate, approximately \$50 million.[79]

Accordingly, the Examiner concludes that AFI's unfair or inequitable conduct in connection with the Second 2009 Tax Allocation Agreement harmed ResCap in the amount of not less than \$50 million.

---

[77] *See* Section V.A.2.b; Appendix V.A.2–4. These figures take into account \$143 million on the value received side, accounting for the avoidance of a credit rating downgrade. *See* Section V.A.2.b; Appendix V.A.2–4.

[78] *See* Section V.A.2.b; Appendix V.A.2–4.

[79] *See* VII.K.2.c. If the Second 2009 Tax Allocation Agreement is avoided as a fraudulent transfer, ResCap could seek to reinstate the First 2009 Tax Allocation Agreement. As discussed in Section VII.K.2.a, if that effort were successful, it would give rise to a significant contractual claim against AFI. Assuming all of ResCap's tax benefits are eventually used by AFI, ResCap would have a contractual claim against AFI under the First 2009 Tax Allocation Agreement in the approximate amount of \$1.77 billion. *See* VII.K.2.a(4). However, that potential claim is not directly attributable to AFI's inequitable conduct in connection with the Second 2009 Tax Allocation Agreement.

*(3) Harm Resulting From The Conduct Of AFI And Ally Bank In Connection With The Misallocation Of Revenues On Loans Brokered By GMAC Mortgage*

The Examiner concluded that AFI and Ally Bank engaged in unfair and inequitable conduct in connection with the misallocation of revenues on loans brokered by GMAC Mortgage. For the reasons set forth in Section VII.L, the Examiner concluded that the harm to creditors resulting from such unfair and inequitable conduct to be not less than $520.5 million.

### e. The Harm Caused By AFI And Ally Bank May Be Offset In Whole Or In Part By Other Action Taken By AFI To Support ResCap

Equitable subordination is remedial, not penal.[80] In that regard, courts in this District have noted that: (1) "the principle of equitable subordination . . . empowers and requires the Bankruptcy Court to tailor the remedy to *fit the harm*,"[81] and (2) "subordination is confined to *offsetting 'specific harm that creditors have suffered* on account of the inequitable conduct.'"[82]

Thus, AFI's and Ally Bank's claims should be equitably subordinated only to the extent necessary to remedy the harm suffered by creditors. If the harm caused by inequitable or unfair conduct is otherwise offset by other meritorious conduct that may have benefitted creditors of ResCap and GMAC Mortgage, the absence of any net harm may be cause to deny equitable subordination.

After the 2006 Bank Restructuring, AFI (1) made cash contributions to ResCap in the aggregate amount of $2.916 billion; (2) made other capital contributions to ResCap in the aggregate amount of $1.942 billion; and (3) forgave ResCap debt in the aggregate amount of $3.531 billion.[83] In light of this substantial financial support by AFI, the Examiner concludes that AFI's unfair and inequitable conduct in connection with the 2006 Bank Restructuring has been "purged"[84] and would not support the equitable subordination of AFI's claims against ResCap. Accordingly, the Examiner concludes that it is likely that a proponent of the equitable subordination of AFI's claims against ResCap on the basis of AFI's inequitable conduct in connection with the 2006 Bank Restructuring would not prevail.

It is not clear under the relevant case law whether a claimant's "good" or assuaging conduct must come after the inequitable conduct in temporal order, or whether a court is free to evaluate the

---

[80] *See In re Enron Corp.*, 379 B.R. 425, 434 (S.D.N.Y. 2007); *Picard v. Madoff (In re Bernard L. Madoff Inv. Sec. LLC)*, 458 B.R. 87, 121 (Bankr. S.D.N.Y.), *appeal denied,* 464 B.R. 578 (S.D.N.Y. 2011); *80 Nassau Assocs. v. Crossland Fed. Savs. Bank (In re 80 Nassau Assocs.*), 169 B.R. 832, 840 (Bankr. S.D.N.Y. 1994).

[81] *In re 80 Nassau Assocs.*, 169 B.R. 832, 840 (Bankr. S.D.N.Y. 1994) (emphasis added); *see Le Café Crème, Ltd. v. Le Roux (In re Le Café Crème, Ltd.*), 244 B.R. 221, 235 (Bankr. S.D.N.Y. 2000) (quoting *In re 80 Nassau*, 169 B.R. at 840).

[82] *In re Bernard L. Madoff Inv. Sec. LLC*, 458 B.R. 87, 121 (Bankr. S.D.N.Y. 2011) (emphasis added), *appeal denied,* 464 B.R. 578 (S.D.N.Y. 2011).

[83] *See* Section VI.C.4.f.4.

[84] *In re Porter*, 50 B.R. 510, 520 (Bankr. E. D. Va. 1985).

claimant's entire course of conduct during the relevant time period such that prior good conduct may be seen to ameliorate subsequent bad conduct, as part of a balancing of support on the one hand, against harm cause by inequitable conduct, on the other.

The vast majority of AFI's support of ResCap in the form of cash and other capital contributions and debt forgiveness occurred before AFI's misconduct in connection with the misallocation of brokered loan revenue and the Second 2009 Tax Allocation Agreement. While AFI thereafter forgave debt in December 2011 and January 2012 in the amounts of $109 million and $197 million, respectively, the sum of this debt forgiveness is quantitatively less than the harm occasioned by AFI's prior inequitable conduct in connection with the misallocation of brokered loan revenue and the Second 2009 Tax Allocation Agreement.

The Examiner is of the view that because equitable subordination is remedial and not punitive, and is a "drastic and unusual remedy," which should be applied in limited circumstances,[85] while a close question, it is more likely than not that a court would take a more expansive view of AFI's overall support of ResCap and would not be constrained by unquestioning devotion to the temporal sequence of AFI's inequitable and good conduct. Accordingly, the Examiner concludes that, while a close question, AFI's support of ResCap from 2007 until January of 2012 in the aggregate amount of $8.1 billion would be considered to offset the harm caused by AFI's and Ally Bank's misconduct in connection with the misallocation of brokered loan revenue and AFI's misconduct in connection with the Second 2009 Tax Allocation Agreement.

The Examiner therefore concludes it is more likely than not that a proponent of the equitable subordination of AFI's and Ally Bank's claims against GMAC Mortgage on account of their misconduct in connection with the misallocation of brokered loan revenue would not prevail. Further, the Examiner concludes it is more likely than not that a proponent of the equitable subordination of AFI's claims against ResCap on account of AFI's misconduct in connection with the Second 2009 Tax Allocation Agreement would not prevail.

### f. Claims Satisfied Before A Bankruptcy Filing And For Which No Proof Of Claim Has Been Filed May Not Be Equitably Subordinated

AFI exchanged certain claims represented by Unsecured Notes and Senior Secured Notes (aggregating $2.4 billion in face principal amount) for, inter alia, ResCap Preferred Interests in the 2008 Bank Transaction[86] and ResCap's remaining IB Finance Class M Shares as part of the 2009 Bank Transaction.[87] In addition, AFI forgave other debt in connection with the acquisition of ResMor.[88] Although no party has so asserted, the Examiner's Professionals examined whether ResCap debt that was transferred, surrendered, or forgiven by AFI in exchange for ResCap assets before the Petition Date might be subject to equitable subordination to the claims of all other creditors immediately prior to the transaction date. If so, and on the presumption that ResCap was insolvent on the dates of the

---

[85] *In re Enron Corp.*, 379 B.R. 425, 434 (S.D.N.Y. 2007) (citations omitted); *see In re Featherworks Corp.*, 25 B.R. 634, 649 (Bankr. E.D.N.Y. 1982) ("Equitable subordination is a harsh remedy.").

[86] *See* Section V.A.1.b (discussing exchange of ResCap bonds for convertible preferred interests).

[87] *See* Section V.A.1.c (discussing conversion of preferred interests and sale of remaining interests in IB Finance).

[88] *See* section V.F.4.f (discussing ResMor sale).

transactions, the debt transferred, surrendered, or forgiven by AFI in exchange for ResCap property would arguably be of little or no worth for reasonably equivalent value purposes, resulting in the potential avoidance of ResCap's transfers on a constructive fraud theory.

Significantly, there is no statutory basis or case law precedent for the equitable subordination of claims against a debtor that were irrevocably satisfied before the bankruptcy filing. To the contrary, the inability to retroactively subordinate retired debt is supported by the language of section 510(c) of the Bankruptcy Code, which provides, in pertinent part, as follows:

> (1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest . . . .[89]

A claim is defined as a "right to payment."[90] A right to payment cannot exist if the corresponding debt was extinguished. Thus, a debt satisfied prior to bankruptcy would not result in a claim, much less an "allowed" claim subject to equitable subordination. Stated differently, in the absence of an *allowed* claim, there is no claim to subordinate.

Moreover, there does not appear to be any reported case where a court equitably subordinated a claim that had been satisfied before the petition date so as to avoid a transfer made by the debtor in exchange for the transferee's transfer, surrender, or forgiveness of the debt. Accordingly, a creditor who acquires an asset from an insolvent debtor before the bankruptcy filing in exchange for the debtor's debt is likely not subject to a fraudulent transfer challenge on the basis that the debt (1) should be equitably subordinated to all other claims; (2) is therefore of no value; and (3) cannot possibly have conferred reasonably equivalent value to the debtor.

---

[89]  11 U.S.C. § 510(c)(emphasis added).

[90]  *See Id.* §101(5).

## VII. REVIEW AND ANALYSIS OF ESTATE CAUSES OF ACTION IMPLICATED BY AFFILIATE TRANSACTIONS AND THE RELATIONSHIP AND COURSE OF DEALING AMONG RESCAP, AFI, ALLY BANK, AND CERBERUS

### D.  EQUITABLE DISALLOWANCE

In *Pepper v. Litton*,[1] the Supreme Court considered whether a bankruptcy court could disallow (either as a secured or general unsecured claim) a judgment obtained by Litton, the dominant and controlling stockholder of a debtor corporation. Litton, the controlling stockholder of a "one-man" corporation, caused his corporation to confess judgment for unpaid wages in his favor when the corporation and Litton were the subject of a lawsuit by Pepper. After Pepper obtained a judgment against the corporation, Litton executed on his judgment and levied on the corporation's property that he later sold to an affiliate. Thereafter, the corporation filed for bankruptcy. Litton purchased wage claims held by third parties and persuaded other creditors to withdraw their claims against the debtor to gain an advantage over Pepper.[2] The bankruptcy court concluded "(1) that Litton and the [corporation] had made a 'deliberate and carefully planned attempt' to avoid 'the payment of just debt'; (2) that Litton and the corporation were 'in reality the same'; and (3) that the alleged salary claims underlying the Litton judgment did not represent an 'honest debt' of the bankrupt corporation . . . ."[3] Therefore, the court disallowed Litton's claim and directed the trustee to recover the property Litton purchased from the corporation.

On appeal, the Court held that the bankruptcy court properly disallowed Litton's claim. In reaching its decision, the Court noted that "courts of bankruptcy are essentially courts of equity, and their proceedings inherently proceedings in equity."[4] Indeed, according to the Court, "a bankruptcy court has full power to inquire into the validity of any claim asserted against the estate and to disallow it if it is ascertained to be without lawful existence."[5] Under "certain cardinal principles of equity," a court may disallow (or subordinate) a claim.[6] In this instance, Litton's claim was properly disallowed because (1) "Litton, though a fiduciary was enabled by astute legal manoeuvering [sic] to acquire most of the assets of the bankrupt not for cash or other consideration of value to creditors but for bookkeeping entries representing at best merely Litton's appraisal of the worth of Litton's services over the years," and (2) Litton had engaged in a "planned and fraudulent scheme."[7]

---

[1]   308 U.S. 295 (1939).

[2]   *Id.* at 299 ("This was done, according to the District Court, so that Pepper might be made to appear as the only general creditor-a situation designed to give Litton a decided technical advantage . . . .").

[3]   *Id.* at 301.

[4]   *Id.* at 304.

[5]   *Id.* at 305.

[6]   *Id.* at 306.

[7]   *Id.* at 295, 311-12.

Given the enactment of section 510(c), courts have noted that it is not clear that equitable disallowance remains a viable remedy.[8] In the years since *Pepper*, courts in the Second Circuit have on a number of occasions considered whether equitable disallowance is an appropriate remedy. For example, in *80 Nassau Assocs. v. Crossland Fed. Savs. Bank* (*In re 80 Nassau Assocs.*),[9] the Bankruptcy Court for the Southern District of New York noted that the doctrine of equitable subordination embodied in section 510(c) "is limited to reordering priorities, and does not permit disallowance of claim."[10] The court, citing to the Fifth Circuit's *Mobile Steel* decision, nevertheless acknowledged the possibility of disallowing a claim "[i]f the conduct of the creditor is so egregious that it affects the validity of the claim under applicable principles of law."[11]

In *Adelphia Commc'ns Corp. v. Bank of Am., N.A.* (*In re Adelphia Commc'ns Corp.*),[12] the Bankruptcy Court for the Southern District of New York discussed the viability of equitable disallowance as a remedy. In its analysis, the court first considered the relevant legislative history. The court noted that section 510(c) was designed to codify then existing case law "and is not intended to limit the court's power in any way . . . . Nor does this subsection preclude a bankruptcy court from completely disallowing a claim in appropriate circumstances."[13] Given the rules of statutory interpretation, the court could not hold that the enactment of section 510(c) precluded equitable disallowance.[14] Because the Supreme Court in *Pepper* linked subordination to disallowance by an "or" no less than five times, the bankruptcy court concluded that the Supreme Court perceived them as separate available remedies.[15] "That does not mean to this Court that they are equally appropriate alternatives, but it tells this Court that disallowance would be permissible in those extreme instances— perhaps very rare—where it is necessary as a remedy."[16] Thus, the bankruptcy court concluded that,

---

[8]  *See Adelphia Commc'ns Corp. v. Bank of America, N.A.* (*In re Adelphia Commc'ns Corp.*), 365 B.R. 24, 71 (Bankr. S.D.N.Y. 2007) ("While section 510(c) of the Code… expressly authorizes equitable subordination, it does not likewise expressly authorize equitable disallowance. Thus the Court must decide whether section 510(c) forecloses equitable disallowance-and if section 510(c) does not, the extent to which equitable disallowance was authorized under the pre-Code case law, and survived after the enactment of the Code."), *aff'd sub nom.*, *Adelphia Recovery Trust v. Bank of America, N.A.*, 390 B.R. 64 (S.D.N.Y. 2008). *But see* 11 U.S.C. § 502(j) ("A reconsidered claim may be allowed or disallowed according to the equities of the case."). The standard applicable to a reconsidered is not clear. "One court has observed that it must enter an appropriate order according to the equities of the case, after weighing the extent and reasonableness of any delay, prejudice to the debtor and other creditors, effect on efficient administration and the movant's good faith." 4 COLLIER ON BANKRUPTCY ¶ 502.11[5] (16th ed. 2009).

[9]  169 B.R. 832 (Bankr. S.D.N.Y. 1994).

[10]  *Id.* at 837.

[11]  *Id.* at 837 n.4 (citing to *In re Mobile Steel Co.*, 563 F.2d 692, 699 n. 10 (5th Cir. 1997)).

[12]  *In re Adelphia Commc'ns Corp.*, 365 B.R. at 73.

[13]  *Id.* at 71 (alteration in original) (footnote omitted).

[14]  *Id.* at 72 ("Thus the Court is not in a position to conclude that by expressly addressing equitable *subordination* in section 510(c), Congress intended to foreclose the possibility of invocation of equitable *disallowance*, under *Pepper* and its progeny.").

[15]  *Id.* at 73.

[16]  *Id*. Prior to the enactment of section 510, claims of an insider could be disallowed on the basis of, misrepresentation to creditors, false promises and concealment of a mortgage. *See Litzke v. Gregory*, 1 F.2d 112, 115-16 (8th Cir. 1924).

although it is "plainly" a "more draconian" remedy, equitable disallowance is a viable remedy appropriate in "a few" situations.[17] On appeal, the district court agreed with the bankruptcy court's conclusion that "equitable disallowance is permissible under *Pepper*."[18] Therefore, a court may equitably disallow a claim notwithstanding the enactment of section 510(c).[19]

For the reasons set forth in the preceding section on equitable subordination, the Examiner concludes that it is likely that any claim for equitable disallowance of AFI's claims against ResCap and GMAC Mortgage would not prevail.

---

[17] *In re Adelphia Commc'ns Corp.*, 365 B.R. at 73.

[18] *Adelphia Recovery Trust v. Bank of Am., N.A.*, 390 B.R. 64, 76 (S.D.N.Y. 2008) (citation omitted).

[19] *See Adelphia Recovery Trust v. Bank of Am., N.A.*, 390 B.R. 80, 99 (S.D.N.Y. 2008) (noting "to the extent equitable disallowance is a permissible remedy in bankruptcy it is available only in 'extreme instances'…and therefore applied more rarely [than equitable subordination]"), *aff'd*, 379 F. App'x 10 (2d Cir. 2010). Similarly, equitable disallowance may be a viable remedy in the Third Circuit. *See Citicorp Venture Capital, Ltd. v. Comm. of Creditors Holding Unsecured Claims*, 160 F.3d 982, 991 n.7 (3d Cir. 1998) (rejecting district court's conclusion that disallowance is not appropriate remedy, noting that the rationale of *Pepper* suggests that disallowance was appropriate under prior to Bankruptcy Code, but finding "it unnecessary here to resolve the issue as to whether equitable "disallowance" remains an available remedy"), *see also In re Washington Mutual, Inc.*, 461 B.R. 200, 257 (Bankr. D. Del. 2011) (stating that "the Court agrees with the well-reasoned decisions of the Bankruptcy and District Courts in *Adelphia* and concludes that it does have the authority to disallow a claim on equitable grounds 'in those extreme instances—perhaps very rare—where it is necessary as a remedy'"), *vacated on other grounds*, No. 08—12229 (MFW), 2012 WL 1563880 (Bankr. D. Del. Feb 24, 2012). *But see* Alan M. Ahart, *Why the Equitable Disallowance of Claims in Bankruptcy Must be Disallowed*, 20 AM. BANKR. INST. L. REV. 445, 463 (2012) (stating that "[f]ederal bankruptcy law simply does not enable the bankruptcy court to equitably disallow a claim in the first instance").

## VII. REVIEW AND ANALYSIS OF ESTATE CAUSES OF ACTION IMPLICATED BY AFFILIATE TRANSACTIONS AND THE RELATIONSHIP AND COURSE OF DEALING AMONG RESCAP, AFI, ALLY BANK, AND CERBERUS

### E.  CAUSES OF ACTION AGAINST RESCAP'S DIRECTORS AND OFFICERS

ResCap faced increasingly challenging financial circumstances over time, and confronted a tangled relationship with AFI dating from execution of the 2005 Operating Agreement. ResCap fiduciaries often operated under stressful and harried conditions, and the protocol, processes, and functioning of the ResCap Board were not always optimal. Yet there exist only a few potentially actionable claims with respect to breaches of fiduciary duties by ResCap's directors and officers. Certain potential claims for breaches of duties by ResCap fiduciaries will be discussed below, following a recitation of general legal principles relevant to those claims.[1] For discussion of fiduciary duty claims related to the parties' tax transactions, see Section VII.K.

   *1.  General Legal Principles Governing Potential Fiduciary Duty Claims*

       *a.  Delaware Law Applies To Breach Of Fiduciary Duty Claims*

Bankruptcy courts generally apply state choice-of-law rules.[2] Courts within the Second Circuit follow the "internal affairs doctrine," which states that "questions relating to the internal affairs of corporations are decided in accordance with the law of the place of incorporation."[3] This doctrine applies to breach of fiduciary duty claims.[4] Accordingly, Delaware law will apply to a plaintiff's breach of fiduciary duty claims against ResCap's directors and officers, because ResCap was incorporated in Delaware, and is now a limited liability company formed pursuant to the Delaware Limited Liability Company Act.[5] By initially incorporating in Delaware and later becoming a Delaware limited liability company, ResCap submitted to application of Delaware law to the governance of its internal affairs, including with respect to the fiduciary duties owed by its directors and officers.

---

[1]  Other types of claims grounded upon the same sets of facts as those underlying potential fiduciary duty claims (such as possible contractual violations of the Operating Agreements) are discussed elsewhere in Section VII.

[2]  *See Stanek Corp. v. Dev. Specialists, Inc.* (*In re Coudert Bros. LLP*), 673 F.3d 180, 186 (2d Cir. 2012).

[3]  *Scottish Air Int'l, Inc. v. British Caledonian Group, PLC*, 81 F.3d 1224, 1234 (2d Cir. 1996); *KDW Restructuring & Liquidation Servs. LLC v. Greenfield*, 874 F. Supp. 2d 213, 221, (S.D.N.Y. June 12, 2012) ("New York courts decide questions relating to corporate internal affairs 'in accordance with the law of the place of incorporation.'"); *Official Comm. of Unsecured Creditors of Hydrogen, L.L.C. v. Blomen* (*In re Hydrogen, L.L.C.*), 431 B.R. 337, 346–47 (Bankr. S.D.N.Y. 2010); s*ee also Brandt v. Hicks, Muse & Co., Inc.* (*In re Healthco Int'l, Inc.*), 208 B.R. 288, 300 n.18 (Bankr. D. Mass. 1997).

[4]  The doctrine also applies in the limited liability company context. *See In re Hydrogen, L.L.C.*, 431 B.R. at 347; *Ritchie Capital Mgmt. L.L.C. v. Coventry First LLC*, No. 07 Civ. 3494, 2007 WL 2044656, at *4 (S.D.N.Y. July 17, 2007).

[5]  *See e.g., KDW Restructuring*, 874 F. Supp. at 221, ("Jennifer is a Delaware corporation; therefore, Delaware law governs this breach of fiduciary duty claim."); *In re Hydrogen, L.L.C.*, 431 B.R. at 346–47; *Marino v. Grupo Mundial Tenedora, S.A.*, 810 F. Supp. 2d 601, 606–07 (S.D.N.Y. 2011); *Kipperman v. Onex Corp.*, 411 B.R. 805, 867 n.35 (N.D. Ga. 2009) ("The parties agree, and the Court has already concluded, that Delaware law applies to Plaintiff's breach of fiduciary duty claim based on the 'internal affairs doctrine.'").

ResCap became an LLC on October 24, 2006. GMAC Mortgage Group LLC was the sole member of ResCap LLC, and the sole member of GMAC Mortgage Group LLC was AFI.[6] The 2006 ResCap LLC Agreement did not materially modify, limit, or eliminate any default fiduciary duties.[7] Accordingly, as discussed below, the members of the ResCap Board, as the managers of the LLC,[8] continued to owe the traditional duties that fiduciaries owe a corporation.[9]

### b. Legal Standards For Fiduciary Duty Claims

Under Delaware law, fiduciary duties are owed by directors, officers, and controlling shareholders.[10] In general, fiduciary duties consist of the (1) duty of due care, and (2) duty of loyalty and good faith.[11] In order to prevail on a claim of breach of fiduciary duty under Delaware law, a plaintiff must prove "(i) that a fiduciary duty exists; and (ii) that a fiduciary breached that duty."[12]

### (1) Fiduciaries Owe A Duty Of Due Care

When a fiduciary exercises discretionary authority by making a business decision on behalf of a corporation, the fiduciary must do so with due care. The duty of care focuses on the decision-making process, and requires that a fiduciary be informed of all material information reasonably available before making a business decision.[13]

A party can state a claim for a breach of the duty of care by alleging that fiduciaries failed to exercise due care in informing themselves before approving a certain transaction. A successful claim for breach of the duty of care must prove conduct that reaches the level of "gross negligence," which requires showing that fiduciaries acted with so little information that their decision was unintelligible and unadvised or outside the bounds of reason and reckless.[14] Although fiduciaries may argue that they could not have acted with gross

---

6   *See* Section III.E.6.

7   *See* 2006 ResCap LLC Agreement, at 1 [ALLY_0255865].

8   *Id.* at § 14.

9   *See In re Atlas Energy Res. LLC*, C.A. No. 4589-VCN, 2010 WL 4273122, at *6 (Del. Ch. Oct. 28, 2010) ("[I]n the absence of explicit provisions in an [LLC] agreement to the contrary, the traditional fiduciary duties owed by corporate directors . . . apply in the [LLC] context.");

10   *See In re Hechinger Inv. Co.*, 274 B.R. at 93; *Harris v. Carter*, 582 A.2d 222, 234 (Del. Ch. 1990).

11   *See McMullin v. Beran*, 765 A.2d 910, 917 (Del. 2000); *Malone v. Brincat*, 722 A.2d 5, 10 (Del. 1998); *see also Buckley v. O'Hanlon*, No. 04-955GMS, 2007 WL 956947, at *3 (D. Del. Mar. 28, 2007); *Official Comm. of Unsecured Creditors of Fedders N. Am. v. Goldman Sachs Credit Partners L.P., (In re Fedders N. Am., Inc.)*, 405 B.R. 527, 539 (Bankr. D. Del. 2009).

12   *Legatski v. Bethany Forest Assoc., Inc.*, No. 03C-10-011, 2006 WL 1229689, at *3 (Del. Super. Ct. Apr. 28, 2006); *Estate of Eller v. Bartron*, 31 A.3d 895, 897 (Del. 2011) (citing *Heller v. Kiernan*, No. 1484-K, 2002 WL 385545, at *3 (Del. Ch. Feb. 27, 2002)); *KDW Restructuring*, 74 F. Supp. 2d at 221.

13   *See In re Healthco Int'l, Inc.*, 208 B.R. at 305.

14   "Gross negligence has a 'stringent meaning' in Delaware corporate law, involving 'indifference amounting to recklessness.'" *KDW Restructuring*, 874 F. Supp. 2d at 221 (citing *Disney II*, 906 A.2d at 67).

negligence because they relied on the advice of experts, it may be possible to overcome such defense by alleging that the fiduciaries did not consider certain information "so obvious that [their] failure to consider it was grossly negligent regardless of the expert's advice or lack of advice."[15]

The gravity of a business decision is relevant when determining whether the duty of due care has been breached:

> The more significant the subject matter of the decision, the greater is the requirement to probe and consider alternatives. For example, when the decision is to sell the company or to engage in a recapitalization that will change control of the firm, the gravity of the transaction places a special burden on the directors to make sure they have a basis for an informed view.[16]

A director will thus have heightened duties where approval of a transaction results in a sale or change of control.[17] In such circumstances, the directors have a duty to maximize value.[18]

### (2) Fiduciaries Owe A Duty Of Loyalty And Good Faith

Fiduciaries also owe a duty of loyalty and good faith. Delaware courts generally treat good faith as encompassed within the duty of loyalty rather than as a fully discrete duty.[19]

### (a) Duty Of Loyalty

The duty of loyalty requires, among other things, that a fiduciary not put his or her personal financial interests above the interests of the corporation.[20] A fiduciary may have breached his duty of loyalty if the fiduciary (1) was on both sides of a transaction, or (2) the fiduciary derived a personal financial benefit by self-dealing.[21]

---

[15] *Brehm v. Eisner*, 746 A.2d 244, 262 (Del. 2000) (*"Disney I"*); *see also Cal. Pub. Employees' Ret. Sys. v. Coulter*, 2002 WL 31888343, at *12 (Del. Ch. Dec. 18, 2002) (director's reliance on expert valuation report when approving acquisition was "grossly negligent" where "[e]ither the [directors] knew the report was based on grossly inaccurate data . . . or they worked very hard not to know that information").

[16] *In re Healthco Int'l, Inc*., 208 B.R. at 305.

[17] *See Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173 (Del. 1986).

[18] *Id.* at 182 (noting that the duty of the board had changed from the preservation of Revlon as a corporate entity to maximization of the company's value at a sale for stockholders' benefit); *see also Lyondell Chem. Co. v. Ryan*, No. 401, 2008, 2009 WL 1024764, at *3 (Del. Supr. March 15, 2009).

[19] *See, e.g., Nagy v. Bistricer*, 770 A.2d 43, 49 n.2 (Del. Ch. 2000) ("If it is useful at all as an independent concept, the good faith iteration's utility may rest in its constant reminder (1) that a fiduciary may act disloyally for a variety of reasons other than personal pecuniary interest; and (2) that, regardless of his motive, a director who consciously disregards his duties to the corporation and its stockholders may suffer a personal judgment for monetary damages for any harm he causes.").

[20] *In re Healthco Int'l, Inc.*, 208 B.R. at 302.

[21] *See Liquidation Trust of Hechinger Inv. Co. of Del., Inc. v. Fleet Retail Fin. Group* (*In re Hechinger Inv. Co.*), 327 B.R. 537, 549 (D. Del. 2005), *aff'd*, 278 F.3d Appx. 125 (3d Cir. 2008).

A plaintiff can state a claim for a breach of the duty of loyalty by alleging that the directors were "interested or lack[ed] independence relative to the [approval of the transaction]."[22] If a fiduciary is an interested actor (i.e., has some kind of self-interest in the transaction) and is accused of breaching his or her duty of loyalty, the fiduciary will be liable unless (1) the fiduciary disclosed the self-interest, and (2) a majority of disinterested directors approved the transaction.[23]

In determining whether the duty of loyalty has been breached in the parent-subsidiary context, "[t]he parent/subsidiary cases have provided courts with difficult issues in defining whether self-dealing exists."[24] The directors of a subsidiary owe a fiduciary duty to the parent, as either the sole shareholder (in the context of a wholly owned subsidiary) or majority shareholder.[25] When self-dealing occurs between a parent and subsidiary, the business judgment rule, which provides great deference to the business decisions of directors (as discussed below), may not apply: "When the situation involves a parent and a subsidiary, with the parent controlling the transaction and fixing the terms, the test of intrinsic fairness, with its resulting shifting of the burden of proof, is applied."[26]

However, the intrinsic fairness standard will not apply to all parent-subsidiary dealings:

> [P]arent-subsidiary dealings . . . alone will not evoke the intrinsic fairness standard. This standard will be applied *only* when the fiduciary duty is accompanied by self-dealing—the situation when a parent is on both sides of a transaction with its subsidiary. Self-dealing occurs when the parent, by virtue of its domination of the subsidiary, causes the subsidiary to act in such a way that the parent receives something from the subsidiary to the exclusion of, and detriment to, the minority stockholders of the subsidiary.[27]

If the intrinsic fairness test applies, the burden of proof shifts to the defendant "to prove, subject to careful judicial scrutiny, that its transactions with [the subsidiary] were objectively fair."[28]

---

[22] *Disney I*, 746 A.2d at 264 n.66.

[23] *In re Healthco Int'l, Inc*., 208 B.R. at 303.

[24] 1 F. HODGE O'NEAL AND ROBERT B. THOMPSON, OPPRESSION OF MINORITY SHAREHOLDERS AND LLC MEMBERS § 3:24 (1st ed. 2004).

[25] *See ASARCO LLC v. Ams. Mining Corp.*, 396 B.R. 278, 395 (S.D. Tex. 2008).

[26] *Sinclair Oil Corp. v. Levien*, 280 A.2d 717, 720 (Del. 1971); *see also Trans World Airlines, Inc. v. Summa Corp.*, 374 A.2d 5 (Del. Ch. 1977) (parent had engaged in self-dealing when subsidiary was not allowed to purchase its own jet aircraft, while parent was able to lease its own newly acquired aircraft to subsidiary at profit).

[27] *Sinclair Oil Corp.*, 280 A.2d at 720 (emphasis added); *see also Matsumura v. Benihana Nat. Corp.*, 2010 WL 882968, at *10 n.25 (S.D.N.Y. Mar. 5, 2010).

[28] *Sinclair Oil Corp.*, 280 A.2d at 720.

The duty of loyalty subsumes within it a corollary duty of disclosure and candor. "Delaware courts have long held that a certain duty to disclose inheres in the duty of loyalty."[29] Directors "ha[ve] an 'unremitting obligation' to deal candidly with their fellow directors."[30] Officers have a duty to inform directors of information material to a corporation's affairs:

> The duty of an officer includes the obligation to inform the superior officer to whom, or the board of directors or the committee thereof to which, the officer reports of information about the affairs of the corporation known to the officer, within the scope of the officer's functions, and known to the officer to be material to such superior officer, board, or committee . . . .[31]

This duty of disclosure flowing from management is required as "a board of directors could not function without the information provided to it by senior officers."[32] "At a minimum, this rule dictates that fiduciaries . . . may not use superior information or knowledge to mislead others in the performance of their own fiduciary obligations. The actions of those who join in such misconduct are equally tainted."[33]

Yet a fiduciary's duty to disclose is not unlimited:

> [A duty to disclose] is not a general duty to disclose everything the director knows about transactions in which the corporation is involved . . . . Rather, it is [t]he intentional failure or refusal of a director to disclose to the board a defalcation or scheme to defraud the corporation of which he has learned, [which] itself constitutes a wrong.[34]

Further, the duty to disclose has generally been confined to certain circumstances. In *Big Lots Stores, Inc. v. Bain Capital Fund VII, LLC*, the Delaware Chancery Court explained: "[T]he

---

[29] *Big Lots Stores, Inc. v. Bain Capital Fund VII, LLC*, 922 A.2d 1169, 1184 (Del. Ch. 2006); *see also Eurofins Pharma US Holdings v. BioAlliance Pharma SA*, 623 F.3d 147, 158 (3d Cir. 2010).

[30] *HMG/Courtland Properties, Inc. v. Gray*, 749 A.2d 94, 119 (Del. Ch. 1999) (citing *Mills Acquisition Co. v. Macmillan, Inc*., 559 A.2d 1261, 1283 (Del. 1989)).

[31] *Hampshire Group, Ltd. V. Kuttner*, C.A. No. 3607-VCS 2010 WL 2739995, at *13 n.85 (Del. Ch. July 12, 2010); *see also* Megan Wischmeier Shaner, *Restoring The Balance Of Power In Corporate Management: Enforcing An Officer's Duty Of Obedience*, 66 BUS. L.J. 27, 47 (2010) ("Shaner") ("In fact, in the context of the duty to disclose information to the board, the Delaware courts have found officers to occupy roles similar to those of agents of the corporation.").

[32] Shaner at 226.

[33] *Mills Acquisition Co. v. Macmillan, Inc.,* 559 A.2d 1261, 1283 (Del. 1989).

[34] *Eurofins Pharma US Holdings v. BioAlliance Pharma SA*, 623 F.3d 147, 158 (3d Cir. 2010) (citing *Big Lots Stores, Inc. v. Bain Capital Fund VII, LLC*, 922 A.2d 1169, 1184 (Del. Ch. 2006); *Big Lots Stores, Inc. v. Bain Capital Fund VII, LLC*, 922 A.2d 1169, 1184 (Del. Ch. 2006); *Thorpe v. CERBCO, Inc*., 676 A.2d 436 (Del.1996) (finding a duty to disclose where controlling shareholders and directors failed to tell disinterested directors of an offer to buy the company and instead arranged to sell their own shares only).

director disclosure cases decided in Delaware courts have implicated circumstances in which the director is personally engaged in transactions harmful to the corporation, but beneficial to the director."[35] Accordingly, "[d]irector disclosure cases are thus typically characterized at least in part by an element of self-dealing on the part of the director."[36]

Cases in which lack of disclosure has led to a finding of breach of fiduciary duty, therefore, have generally involved defendants who obtained a personal benefit at the expense of the company they served. For example, in *Hollinger International v. Black*, the court found that the controlling shareholder (also a director) breached his fiduciary duties when he did not disclose "that he was 'shopping' the company in violation of a signed contract that forbade him to do so."[37] The court emphasized that the fiduciary breached his duty by "diverting [a strategic] opportunity to himself . . . [and] improperly using confidential information belonging to [the company] to advance his own personal interests and not those of [the company], without authorization from his fellow directors."[38]

The court in *Thorpe v. CERBCO, Inc*. reached a similar conclusion, finding that two controlling shareholders and directors had a duty to disclose to disinterested directors an offer to buy the company, where they instead arranged with the bidder to sell their own shares only, benefiting themselves and potentially injuring the company.[39] Likewise, in *Mills Acquisition Co. v. Macmillan*, certain officers and directors breached their fiduciary duties, and stood to profit personally from their misconduct, where they leaked a bid to a potential buyer without informing the board. The court reasoned that "[g]iven the materiality of these tips, and the silence of [the defendant fiduciaries] in the face of their rigorous affirmative duty of disclosure at the . . . board meeting, there can be no dispute but that such silence was misleading and deceptive. In short, it was a fraud upon the board."[40]

Proof of damages is generally not required to demonstrate a breach of the duty of loyalty.[41] In *Shocking Technologies, Inc. v. Michael*, the court held that "damages constitute

---

[35] *Big Lots Stores, Inc. v. Bain Capital Fund VII, LLC*, 922 A.2d 1169, 1184 (Del. Ch. 2006) (applying Ohio law to the claims but referring to Delaware law for guidance).

[36] *In re PMTS Liquidating Corp.*, 452 B.R. 498, 509 n.3 (Bankr. D. Del. 2011).

[37] *Big Lots Stores, Inc. v. Bain Capital Fund VII, LLC*, 922 A.2d 1169, 1184 (Del. Ch. 2006) (citing *Hollinger International v. Black*, 844 A.2d 1022, 1061 (Del. Ch. 2004)); *see also Eurofins Pharma US Holdings v. BioAlliance Pharma SA,* 623 F.3d 147, 159 (3d Cir. 2010); *Int'l Equity Capital Growth Fund v. Clegg,* No. Civ.A. 1499 5, 1997 WL 208955, at *5–6, (Del. Ch. Apr. 22, 1997) (finding duty to disclose where an interested director induced board to purchase manufacturing plant that he knew, at time of purchase, manufactured "poor quality" defective products).

[38] *Hollinger International v. Black*, 844 A.2d 1022, 1061-62 (Del. Ch. 2004).

[39] *Thorpe v. CERBCO, Inc,* 676 A.2d 436 (Del. 1996).

[40] *Mills Acquisition Co. v. Macmillan, Inc.*, 559 A.2d 1261, 1283 (Del. 1989).

[41] *In re Fuqua Industries, Inc.*, No. Civ.A. 11974, 2005 WL 1138744, at *6 (Del. Ch. May 6, 2005) ("[I]n cases of the breach of the duty of loyalty, the plaintiff need not prove damages to establish a breach of that duty"); *Cline v. Grelock,* C.A. No. 404C-VCN, 2010 WL 761142, at *3 (Del. Ch. Mar. 2, 2010) (costs of actions were assessed against defendant for breach of fiduciary duty even though plaintiff was unable to show harm or damages).

an element of the tort," yet it went on to state that "a breach of the fiduciary duty of loyalty may be shown without proof of proximate damages."[42] As noted in *Thorpe*, a duty of loyalty breach "loosen[s] the stringent requirements of causation and damages."[43]

### *(b) Duty Of Good Faith*

In order to state a claim for breach of the duty of good faith, "a subsidiary element of the duty of loyalty," a plaintiff must demonstrate one of three actions:

> 1) [W]here the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation; 2) where the fiduciary acts with the intent to violate applicable positive law; or 3) where the fiduciary intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties.[44]

"Bad faith" conduct has been defined as an "intentional dereliction of duty, a conscious disregard for one's responsibilities."[45] For example, fiduciaries can act in bad faith by approving a transaction in "conscious disregard of their duties."[46] In the event that a plaintiff successfully alleges such conduct, the burden would shift to the fiduciaries to "demonstrate that the challenged act or transaction was entirely fair to the corporation and its shareholders."[47]

### *c. Fiduciary Duty Breaches May Be Continuing In Nature*

A breach of fiduciary duty can potentially be protracted in duration. The "continuing wrong" doctrine can toll the pertinent statute of limitations for a breach of fiduciary duty claim that is premised on recurring misconduct. For example, in *Kaymakcian v. Board of Managers of Charles House Condominium,* the court held that a condominium board's failure to repair the terrace of an apartment was a continuing wrong that was not "referable exclusively to the day the original wrong was committed," because "pursuant to the

---

[42] *Shocking Techs., Inc. v. Michael*, C.A. No. 7164-VCN, 2012 WL 4482838 n.66 (Del. Ch. Oct. 1, 2012); *see also Se. Pa. Transp. Auth. v. Volgenau*, C.A. No. 6354-VCN, 2012 WL 4038509, at *3 n.17 (Del. Ch. Aug. 31, 2012) ("Thus, SEPTA's claim for breach of fiduciary duty in Count IV could conceivably be the Complaint's one ultimately successful claim. SEPTA, of course, will likely only be able to recover on that claim if it can show damages flowing from the disparate treatment that Volgenau received.").

[43] *Thorpe v. CERBCO, Inc*., 676 A.2d 436, 445 (Del. Supr. 1996) (citing *Guth v. Loft, Inc*., 5 A.2d 503, 510 (Del. Supr. 1939)).

[44] *In re Direct Response Media, Inc.,* 466 B.R. 626, 652 (Bankr. D. Del. 2012) (citing *Disney II*, 906 A.2d at 67).

[45] *Disney II*, 906 A.2d at 66–67.

[46] *Id.*

[47] *Id.* at 52.

condominiums' by-laws, respondents had a continuing duty to repair the building's limited common elements."[48] Similarly, in *Butler v. Gibbons,* the court found that "plaintiff's allegations that defendant breached his fiduciary duty, by his repeated and continuing failure to account and turn over proceeds earned from renting certain properties, constituted a continuing wrong."[49]

However, the doctrine is employed somewhat sparingly. For example, in *Pike v. New York Life Ins. Co*., the court held that the continuing wrong doctrine did not apply where plaintiffs alleged that they were induced to purchase unsuitable insurance policies, because they could "not point to any specific wrong that occurred each time they paid a premium, other than having to pay it."[50] The court concluded that "any wrong accrued at the time of purchase of the policies, not at the time of payment of each premium."[51]

### d. Fiduciary Duties In Context Of Limited Liability Companies

Managers of an LLC owe fiduciary duties to the members and to the LLC.[52] This is because "[m]ost LLC statutes mandate that managers, including members who manage the LLC, have fiduciary duties to the members and the LLC," and "[e]ven in states whose LLC statutes do not specifically impose fiduciary duties on a manager, courts have ruled that managers including member-managers have fiduciary duties to the members."[53] Whether members of an LLC owe other members fiduciary duties is a more difficult question and varies by state.[54]

Delaware courts have generally, in the absence of provisions in the limited liability company agreement explicitly disclaiming the applicability of default principles of fiduciary duty, treated LLC managers and members as owing each other and the LLC the traditional

---

[48] 854 N.Y.S.2d 52 (N.Y. App. Div. 2008); *Merine on Behalf of Prudential–Bache Util. Fund, Inc. v. Prudential–Bache Util. Fund, Inc.*, 859 F. Supp. 715, 718 (S.D.N.Y. 1994) (holding that where defendant allegedly breached its fiduciary duty by charging plaintiff excessive servicing fees for a mutual fund, a continuing wrong occurred each time it charged the allegedly excessive fee).

[49] *Spitzer v. Schussel,* 792 N.Y.S.2d 798, 803 (N.Y. Sup. 2005) (discussing *Butler v. Gibbons*, 569 N.Y.S.2d 722 (N.Y. App. Div. 1991).

[50] 901 N.Y.S.2d 76, 81 (N.Y. App. Div.).

[51] 901 N.Y.S.2d 76, 81 (N.Y. App. Div.); *see also Schandler v. N.Y. Life Ins. Co*., No. 09 Civ. 10463, 2011 WL 1642574, at *11 (S.D.N.Y. Apr. 26, 2011); *Korn v. Merrill,* 403 F. Supp. 377, 388 (S.D.N.Y. 1975); *Barbara v. MarineMax, Inc*., No. 12-CV-0368, 2012 WL 6025604, at *9 (E.D.N.Y. Dec. 4, 2012).

[52] *See* NICHOLAS KAREMBELAS, LIMITED LIABILITY COMPANIES: LAW, PRACTICE & FORMS § 10:2 (1st ed. 2012).

[53] *Id.*

[54] *Id.*

duties that fiduciaries owe a corporation.[55] Similar to the Delaware General Corporation Law (the "DGCL"), the Delaware Limited Liability Company Act (the "LLC Act") does not explicitly state that traditional fiduciary duties apply by default.[56] A recent Delaware Chancery Court decision indicated, however, that the LLC Act is even more explicit than the DGCL regarding whether equitable fiduciary duties are incorporated.[57] Referencing Section 18-1004 of the LLC Act, which states that "[i]n any case not provided for in this chapter, the rules of law and equity . . . shall govern,"[58] the court held that, unlike in the corporate context, the rules of equity apply in the LLC context "by statutory mandate," and under traditional principles of equity, an LLC manager or member is a fiduciary of the LLC and its members, owing fiduciary duties of care and loyalty.[59] As such, the court held that the LLC Act provides that managers of limited liability companies owe enforceable fiduciary duties.[60]

The Delaware Supreme Court has yet to explicitly rule on whether there are default fiduciary duties in the LLC context.[61] A long line of Delaware Chancery Court decisions,

---

[55] *See Auriga Capital Corp. v. Gatz Props., LLC*, 40 A.3d 839, 853–55 (Del. Ch. Jan. 27, 2012); *Feeley v. NHAOCG, LLC*, --- A.3d ----, 2012 WL 6840577, at *7–8 (Del. Ch. Nov. 28, 2012) ("Numerous Court of Chancery decisions hold that the managers of an LLC owe fiduciary duties."); *Bay Center Apartments Owner, LLC v. Emery Bay PKI, LLC*, C.A. No. 3658-VCS 2009 WL 1124451, at *8 n.33 (Del. Ch. Apr. 20, 2009) ("The Delaware LLC Act is silent on what fiduciary duties members of an LLC owe each other, leaving the matter to be developed by the common law. The LLC cases have generally, in the absence of provisions in the LLC agreement explicitly disclaiming the applicability of default principles of fiduciary duty, treated LLC members as owing each other the traditional fiduciary duties that directors owe a corporation."); *Paron Capital Mgmt., LLC v. Crombie*, No. 7154-CS 2012 WL 2045857, at *7 n.22 (Del. Ch. May 22, 2012); *Phillips v. Hove*, C.A. No. 3644-VCL, 2011 WL 4404034, at *24 (Del. Ch. Sept. 22, 2011) ("Unless limited or eliminated in the entity's operating agreement, the member-managers of a Delaware limited liability company . . . owe traditional fiduciary duties to the LLC and its members."); *In re Atlas Energy Res. LLC*, C.A. No. 4589-VCN, 2010 WL 4273122, at *6 (Del. Ch. Oct. 28, 2010) ("[I]n the absence of explicit provisions in an [LLC] agreement to the contrary, the traditional fiduciary duties owed by corporate directors . . . apply in the [LLC] context."); *Kelly v. Blum*, Civ.A. No. 4516-VCP, 2010 WL 629850, at *10 (Del. Ch. Feb. 24, 2010) ("Delaware cases interpreting Section 18-1101(c) have concluded that, despite the wide latitude of freedom of contract afforded to contracting parties in the LLC context, 'in the absence of a contrary provision in the LLC agreement,' LLC managers and members owe 'traditional fiduciary duties of loyalty and care' to each other and to the company.").

[56] *See Auriga*, 40 A.3d at 850.

[57] *Id.*

[58] *Id.* at 849.

[59] *Id.* at 850.

[60] *Id.*

[61] *See Gatz Props., LLC v. Auriga Capital Corp.*, 59 A.3d 1206, 1215 (Del. Supr. Nov. 7, 2012).

however, indicates that a bankruptcy court will likely find that default fiduciary duties apply in the LLC context, absent a limitation or elimination of such duties in the LLC agreement.[62]

### e. Standing To Assert Fiduciary Duty Claims

#### (1) Corporate Context

Traditionally, under Delaware law, directors, officers, and controlling shareholders owe fiduciary duties to the corporation and its shareholders and not to the corporation's creditors.[63] In the absence of insolvency, the fiduciary duty may be enforced derivatively only by the corporation's shareholders, as it is the shareholders who have standing to bring derivative actions on behalf of the corporation because they are the ultimate beneficiaries of the corporation's growth and increased value.[64] Creditors of a solvent corporation have no right, as a matter of law, to assert direct claims for breach of fiduciary duty.[65]

In contrast, when a corporation is insolvent, creditors of the corporation "take the place of the shareholders as the residual beneficiaries of any increase in value."[66] As a result, "the creditors of an insolvent corporation have standing to maintain derivative claims against

---

[62] *See Burtch v. Opus E., L.L.C.*, 480 B.R. 561, 572 (Bankr. D. Del. 2012) ("Because the duties owed by fiduciaries are the same whether it be a corporation or limited liability company, the fiduciary duties the Defendants owe the Debtor are derived from common law and not dependent on the LLC Agreement."). Courts will generally look to the agreement in determining the applicable fiduciary duties, because "in the alternative entity context, it is frequently impossible to decide fiduciary duty claims without close examination and interpretation of the governing instrument of the entity giving rise to what would be, under default law, a fiduciary relationship." *Douzinas v. Am. Bureau of Shipping, Inc*., 888 A.2d 1146, 1149–50 (Del. Ch. 2006) (citing *Flight Options Int'l, Inc. v. Flight Options, LLC*, No. Civ. A. 1459-N, 2005 WL 2335353 (Del. Ch. Sept. 20, 2005); *see also Gelfman v. Weeden Investors, L.P.*, 859 A.2d 89 (Del. Ch. 2004); *Miller v. Am. Real Estate Partners, L.P.*, No. Civ. A. 16788, 2001 WL 1045643 (Del. Ch. Sept. 6, 2001); *R.S.M., Inc. v. Alliance Capital Mgmt. Holdings, L.P.*, 790 A.2d 478 (Del. Ch. 2001); *Cont'l Ins. Co. v. Rutledge & Co., Inc.*, 750 A.2d 1219 (Del. Ch. 2000); *Sonet v. Timber* Co., 722 A.2d 319 (Del. Ch. 1998). As noted above, the 2006 ResCap LLC Agreement did not modify or eliminate default fiduciary duties.

[63] *N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 99 (Del. 2007); *In re Hechinger Inv. Co*., 274 B.R. at 89.

[64] *Gheewalla*, 930 A.2d at 101. Trustees have standing to pursue claims for breaches of fiduciary duties and for aiding and abetting breaches of fiduciary duties. *See ASARCO LLC v. Ams. Mining Corp.*, 396 B.R. 278, 924 (S.D. Tex. 2008) (citing *Rosener v. Majestic Mgmt., Inc.* (*In re OODC, LLC*), 321 B.R. 128, 143 (Bankr. D. Del. 2005)).

[65] *Gheewalla*, 930 A.2d at 103.

[66] *Id.* at 101.

directors on behalf of the corporation for breaches of fiduciary duties."[67] However, even if a corporation is insolvent, a creditor has no standing for a direct claim for breach of fiduciary duty:

> [I]ndividual creditors of an insolvent corporation have no right to assert direct claims for breach of fiduciary duty against corporate directors. Creditors may nonetheless protect their interest by bringing derivative claims on behalf of the insolvent corporation or any other direct nonfiduciary claim . . . that may be available for individual creditors.[68]

#### (2) Limited Liability Company Context

Pursuant to a recent Delaware Supreme Court decision, creditors of a Delaware limited liability company have no standing to assert derivative claims on behalf of the limited liability company, even if the limited liability company is insolvent.[69] The court premised its ruling on the plain language of Section 18-1002 of the LLC Act, which states that only LLC members and assignees of an LLC interest have standing to bring derivative claims on behalf of the LLC.[70] The court held that "[b]ecause section 18-1002 is unambiguous, is susceptible of only one reasonable interpretation, and does not yield an absurd or unreasonable result, we apply its plain language. Only LLC members or assignees of LLC interests have derivative standing to sue on behalf of an LLC—creditors do not."[71] Accordingly, creditors of an insolvent Delaware LLC have more limited standing rights than creditors of an insolvent Delaware corporation.[72]

### f. Fiduciary Duties In The Parent-Subsidiary Context

#### (1) Duties Of Subsidiary Entity Fiduciaries

##### (a) Duties of Fiduciaries Of A Solvent Wholly Owned Subsidiary

In *Anadarko Petroleum Corp. v. Panhandle Eastern Corp.*, the Delaware Supreme Court stated in dicta that "in a parent and wholly-owned subsidiary context, the directors of the subsidiary are obligated only to manage the affairs of the subsidiary in the best interests of the

---

[67] *Id; see also In re AMC Investors, LLC,* No. 08-12264 2009 WL 1565823, at *7 (Bankr. D. Del. June 5, 2009); *In re Magnesium Corp. of Am.*, 399 B.R. at 759; *Miller v. McCowen De Leeuw & Co., Inc.,* (*In re The Brown Schools*), 368 B.R. 394, 409 (Bankr. D. Del. 2007); *Schoon v. Smith,* No. 554, 2006, 2007 WL 3021625 (Del. Supr. Aug. 22, 2007); *Official Comm. of Unsecured Creditors of TOUSA, Inc. v. Tech. Olympic, S.A.* (*In re TOUSA, Inc.*), 437 B.R. 447, 456 (Bankr. S.D. Fla. 2010).

[68] *Gheewalla*, 930 A.2d at 103.

[69] *See CML v. LLC v. Bax*, 28 A.3d 1037, 1041–42 (Del. Sept. 2, 2011).

[70] Del. Code Ann. tit 6, § 18-1002 (2013).

[71] *Bax,* 28 A.3d at 1043; *see also Bank of Am., N.A. v. Knight*, 875 F. Supp. 2d 837, 850 (N.D. Ill. 2012).

[72] *Bax,* 28 A.3d at 1042 n.16 (citing *Gheewalla*, 930 A.2d at 101).

parent and its shareholders."[73] Despite this statement, whether directors owe a fiduciary duty to the subsidiary itself is a point in controversy.[74] Several courts construing Delaware law have stated that directors of a wholly owned subsidiary owe a duty to the parent corporation, and not to the subsidiary corporation.[75] However, other courts have limited the *Anadarko* dicta to the facts of that case and found that the directors of a wholly owned subsidiary also owe a duty to that subsidiary, in addition to the parent corporation.[76] This may be in part because, "[e]ven before *Anadarko*, Delaware law recognized that individuals who act in a dual capacity

---

[73] 545 A.2d 1171, 1174 (Del. 1988); *see also* J. Haskell Murray, *"Latchkey Corporations": Fiduciary Duties in Wholly Owned, Financially Troubled Subsidiaries*, 36 DEL. J. CORP. L. 577, 593–94 (2011) (*Latchkey Corporations*). As described in more detail below, fiduciary duties are not owed to the creditors of a solvent corporation. *See id.*

[74] *See Latchkey Corporations*, 36 DEL. J. CORP. L. at 594.

[75] *Anadarko Petroleum Corp. v. Panhandle E. Corp.*, 545 A.2d 1171, 1174 (Del. 1988) ("[I]n a parent and wholly-owned subsidiary context, the directors of the subsidiary are obligated only to manage the affairs of the subsidiary in the best interests of the parent and its shareholders."); *The Responsible Pers. of Musicland Holding Corp. v. Best Buy Co., Inc.* (*In re Musicland Holding Corp.*), 398 B.R. 761, 786 (Bankr. S.D.N.Y. 2008) ("Ordinarily, the directors of a wholly owned subsidiary 'are obligated only to manage the affairs of the subsidiary in the best interests of the parent and its shareholders.'"); *Teleglobe USA Inc. v. BCE Inc.,* (*In re Teleglobe Commc'ns Corp.*), 493 F.3d 345, 366 (3d Cir. 2007) (stating in dicta that pursuant to Delaware law, "all of the duties owed to the subsidiaries flow back up to the parent"); *Aviall, Inc. v. Ryder Sys., Inc.*, 913 F. Supp. 826, 832 (S.D.N.Y. 1996), *aff'd on other grounds*, 110 F.3d 892 (2d Cir. 1997) ("When one company wholly owns another, the directors of the parent and the subsidiary are obligated to manage the affairs of the subsidiary in the best interests only of the parent and its shareholders."); *Official Comm. of Unsecured Creditors v. Bay Harbour Master Ltd.* (*"In re BHS & B Holdings LLC"*), 420 B.R. 112, 144 (Bankr. S.D.N.Y. 2009) ("[I]n a parent and wholly-owned subsidiary context, directors of the subsidiary are obligated only to manage the affairs of the subsidiary in the best interests of the parent and its shareholders.").

[76] *See Latchkey Corporations*, 36 DEL. J. CORP. L. at 594–95 (citing *First Am. Corp. v. Al-Nahyan*, 17 F. Supp. 2d 10, 26 (D.D.C. 1998) (a wholly owned subsidiary had standing to sue its directors for breach of fiduciary duties because "the directors of a wholly-owned subsidiary owe the corporation fiduciary duties, just as they would any other corporation"); *In re Mirant Corp.*, 326 B.R. 646, 651 (Bankr. N.D. Tex. 2005) (holding that the defendant had engaged in an "overly-broad reading of Anadarko" and noting that Anadarko "held that directors of a parent owed no fiduciary duty to prospective shareholders of the subsidiary prior to a spinoff, not that the subsidiary's directors owed no duty to the subsidiary"); *Claybrook v. Morris* (*In re Scott Acquisition Corp.*), 344 B.R. 283, 286–87 (Bankr. D. Del. 2006) ("The Southwest court relied on the Delaware Supreme Court's decision in [*Anadarko*] for the proposition that the directors of a wholly-owned insolvent subsidiary owe fiduciary duties to the parent but not the subsidiary corporation. I do not believe that Anadarko advances this position."); *Williams v. McGreevy* (*In re Touch Am. Holdings, Inc.*), 401 B.R. 107, 129 (Bankr. D. Del. 2009) (in the context of solvent wholly owned subsidiary, holding that "directors of a wholly-owned subsidiary owe fiduciary duties to both the subsidiary and to the sole shareholder, the parent corporation") (emphasis added); *Official Comm. of Unsecured Creditors of RSL Com Primecall, Inc. v. Beckoff* (*In re RSL COM Primecall, Inc.*), No. 01-11457 (ALG), 2003 WL 22989669, at *14 (Bankr. S.D.N.Y. Dec. 11, 2003) ("The Anadarko line of authority cannot be applied blindly to immunize an insolvent subsidiary's Board from liability for action in disregard of its own interests and those of its creditors.").

as directors of two corporations, one of whom is parent and the other subsidiary, owe the same duty of good management to both corporations . . . ."[77]

### (b) Duties of Fiduciaries Of An Insolvent Wholly Owned Subsidiary

As a general rule, fiduciaries owe duties only to the corporation and its shareholders, and not to creditors.[78] However, Delaware has adopted an "insolvency exception" to the general rule that there is no fiduciary duty to creditors.[79] When a wholly owned subsidiary becomes insolvent, the director's fiduciary duties to the corporation now "run to the benefit of the creditors . . . . The directors' focus is no longer solely on its shareholders' interests, but also on the creditors' interests."[80]

There is still some uncertainty with regard to whether an insolvent subsidiary's directors continue to owe any fiduciary duties to shareholders (i.e., the parent entity):

> There appears to be some difference of opinion regarding whether, in the case of insolvency, directors still owe any fiduciary duties to the shareholders, or rather, if the creditors essentially take the place of the shareholders as residual beneficiaries. Some courts seem to take a "community of interests" approach, while others recognize that the creditors and shareholders switch places.[81]

New York courts have held that, under Delaware law, directors and officers of an insolvent wholly owned subsidiary owe fiduciary duties to the subsidiary and its creditors, in addition to

---

[77] *See Latchkey Corporations*, 36 DEL. J. CORP. L. at 594 (citing *Weinberger v. UOP, Inc.*, 457 A.2d 701, 710 (Del. 1983)) (holding that "the long-existing principle of Delaware law that [parent] designated directors on [a subsidiary's] board still owed [the subsidiary] and its shareholders an uncompromising duty of loyalty," and noting that "[t]here is no dilution of this obligation where one holds dual or multiple directorships, as in a parent-subsidiary context").

[78] *See ASARCO LLC v. Ams. Mining Corp.,* 396 B.R. 278, 395 (S.D. Tex. 2008) (applying Delaware law); *see also Anadarko*, 545 A.2d at 1174.

[79] *See ASARCO,* 396 B.R. at 395 (citing *In re Scott Acquisition Corp.*, 344 B.R. 283, 289 (Bankr. D. Del. 2006)) (holding that a subsidiary's creditors and the subsidiary itself are owed a fiduciary duty upon insolvency); *Prod. Res. Group, LLC v. NCT Group*, 863 A.2d 772, 790–91 (Del. Ch. 2004) ("When a firm has reached the point of insolvency . . . the firm's directors are said to owe fiduciary duties to the company's creditors."); *see also Latchkey Corporations*, 36 DEL. J. CORP. L. at 596–97 (citing *Gheewalla*, 930 A.2d at 101).

[80] *ASARCO,* 396 B.R. at 395; *see also Prod. Res. Group, LLC*, 863 A.2d at 790–91 ("The fact of insolvency places the creditors in the shoes normally occupied by the shareholders—that of residual risk-bearers.").

[81] *ASARCO*, 396 B.R. at 395 (citing *VFB LLC v. Campbell Soup Co.*, 482 F.3d 624, 635–36 (3d Cir. 2007)).

the parent corporation.[82] Accordingly, "[t]here is no basis for the principle . . . that the directors of an insolvent subsidiary can, with impunity, permit it to be plundered for the benefit of its parent corporation."[83]

### (2) Duties Of Parent Entity Fiduciaries

As a general rule, fiduciaries of a parent corporation do not owe duties to the parent's wholly owned subsidiary,[84] as fiduciaries owe duties only to the corporation and its shareholders (which excludes entities owned by the parent). This general rule is distinguished from a situation in which a subsidiary is not wholly owned, as the parent (the dominant shareholder) will then owe fiduciary duties to minority shareholders.[85] The rationale for this exception "is that when minority shareholders are involved, the subsidiary does not exist solely for the parent's benefit. Recognition of a fiduciary duty in the dominant shareholder is designed to protect the entire community."[86]

Directors of a parent corporation to an insolvent subsidiary generally do not owe fiduciary duties to either the insolvent subsidiary or the insolvent subsidiaries' creditors.[87] However, as noted in *ASARCO*, because Delaware law recognizes a claim against a parent for aiding and abetting a breach of duty by a subsidiary's fiduciary, that claim "can serve this gap-filling purpose; thus, there is no need to impose a duty directly on the parent corporation."[88]

---

[82] *See Latchkey Corporations*, 36 DEL. J. CORP. L. 577, 597–98 (2011) (citing *In Re RSL COM Primecall, Inc.*, No. 01-11457 (ALG), 2003 WL 22989669, at *13 ("It would be absurd to hold that the doctrine that directors owe special duties after insolvency is inapplicable when the insolvent company is a subsidiary of another corporation. That is precisely when a director must be most acutely sensitive to the needs of a corporation's separate community of interests, including both the parent shareholder and the corporation's creditors."); *Roselink Investors, LLC v. Shenkman*, 386 F. Supp. 2d 209, 215 (S.D.N.Y. 2004) ("[D]irectors of a wholly owned subsidiary, who otherwise would owe fiduciary duties only to the parent, also owe fiduciary duties to creditors of the subsidiary when the subsidiary enters 'the zone of insolvency.'").

[83] *In re TOUSA, Inc.*, 437 B.R. at 458 (citing *In re Scott Acquisition*, 344 B.R. at 288; *ASARCO*, 396 B.R. at 395; *RSL Commc'n PLC ex rel. Jervis v. Bildirici*, No. 04-CV-5217 (KMK), 2006 WL 2689869, at *9 (S.D.N.Y. Sept. 14, 2006)).

[84] *See ASARCO*, 396 B.R. at 414 (citing *Trenwick Am. Litig. Trust v. Ernst & Young, LLP*, 906 A.2d 168, 191 (Del. Ch. 2006); *Citron v. Fairchild Camera & Instrument Corp*., 569 A.2d 53, 70 (Del. 1989)); *see also Anadarko Petroleum Corp. v. Panhandle E. Corp.*, 545 A.2d 1171, 1174 (Del. 1988); *Official Comm. of Unsecured Creditors of Hydrogen, LLC v. Blomen (In re Hydrogen, LLC)*, 431 B.R. 337, 347 (Bankr. S.D.N.Y. 2010) ("[T]he weight of authority around the country holds that the directors of a parent corporation owe no fiduciary duties to a wholly owned subsidiary.").

[85] *See ASARCO,* 396 B.R. at 414 (citing *Anadarko*, 545 A.2d at 1171).

[86] *Id.* (citing *Pepper v. Litton*, 308 U.S. 295, 307 (1939)).

[87] *See id.* 415–16 (denying a claim by wholly owned subsidiary against parent corporation for breach of fiduciary duty). *But see In re RSL COM Primecall, Inc.*, No. 01-11457 (ALG), 2003 WL 22989669, at *14 ("[D]irectors of the parent cannot be compelled at such time to attend only to the interests of the subsidiary, especially where (as here) both were insolvent.").

[88] *ASARCO,* 396 B.R. at 415–16 (explaining that "under . . . Delaware law, the aiding and abetting claim [the subsidiary] brought requires knowing participation by a *non-fiduciary*. Thus, by finding a parent corporation can be liable for aiding and abetting its subsidiary's directors' breach of fiduciary duty, courts, including this one, have implicitly acknowledged that the parent corporation has no fiduciary obligation to its insolvent wholly owned subsidiary or its subsidiary's creditors.").

### g. *Potential Defenses To A Claim For Breach Of Fiduciary Duty*

#### (1) The Business Judgment Rule Protects Certain Conduct

The Delaware Supreme Court has articulated the "business judgment rule" as follows:

> The business judgment rule has been well formulated by *Aronson*[89] and other cases. ("It is a presumption that in making a business decision the directors . . . acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the corporation.") Thus, directors' decisions will be respected by courts unless the directors are interested or lack independence relative to the decision, do not act in good faith, act in a manner that cannot be attributed to a rational business purpose or reach their decision by a grossly negligent process that includes the failure to consider all material facts reasonably available.[90]

Directors may avoid liability for breach of fiduciary duties by invocation of the business judgment rule.[91] The business judgment rule has four elements: "(1) a business decision; (2) disinterestedness and independence; (3) due care; and (4) good faith," and the presumption that the business judgment rule applies "can be rebutted by demonstrating that one of these elements is not present."[92] If a plaintiff can meet its burden and demonstrate that a director breached a fiduciary duty, the burden shifts and the director must prove the "entire fairness" of the transaction.[93] Entire fairness has two elements, fair dealing and fair price, and a director must prove both.[94]

---

[89] *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984).

[90] *Brehm v. Eisner*, 746 A.2d 244, 264 n.66 (Del. 2000) ("*Disney II*") (internal citation omitted); *see Responsible Person v. Best Buy Co., Inc. (In re Musicland Holding Corp.*), 398 B.R. 761, 788 (Bankr. S.D.N.Y. 2008); *FLI Deep Marine LLC v. McKim*, No. 04-V-5217 (KMK), 2009 WL 1204363, at \*2-3 (Del. Ct. April 21, 2009).

[91] *Aronson,* 473 A.2d at 812; *see Halpert Enter., Inc. v. Harrison*, No. 07-1144-CV 2008 WL 4585466, at \*1 (2d Cir. Oct. 15, 2008); *In re Tower Air, Inc.*, 416 F.3d at 238; *Lemond v. Manzulli*, No. OS Civ. 2222 (ILG), 2009 WL 1269840, at \*4 (E.D.N.Y. Feb. 9, 2009); *IT Litig. Trust v. D'Aniello (In re IT Group Inc.)*, No. 02-10118, 2005 WL 3050611, at \*7 (D. Del. Nov. 15, 2005); *McMullin v. Beran*, 765 A.2d 910, 916 (Del 2000). The Delaware Supreme Court has also articulated the business judgment rule in terms of gross negligence: "While the Delaware cases use a variety of terms to describe the applicable standard of care, our analysis satisfies us that under the business judgment rule director liability is predicated upon concepts of gross negligence." *Aronson*, 473 A.2d at 812; *see also Auburn Chevrolet-Oldsmobile-Cadillac, Inc. v. Branch*, Civil Case No. 5:06-CV-0362, 2009 WL 667430, at \*13 n.21 (N.D.N.Y. Mar. 10, 2009); *In re Ply Gem Indus., Inc. Shareholders Litig.*, No. Civ.A. 15779-NC, 2001 WL 1192206, at \*1 n.4 (Del. Ch. Oct 3, 2001); *Brittingham v. Bd. of Adjustment of City of Rehoboth Beach*, No. Civ.A. 03A-08-002, 2005 WL 1653979, at \*3 n.2 (Del. Supr. Jan. 14, 2005).

[92] *ASARCO*, 396 B.R. at 405 (citing *Roselink Investors, L.L.C. v. Shenkman*, 386 F. Supp. 2d 209, 217–21 (S.D.N.Y. 2004) (applying Delaware law)).

[93] *Liquidation Trust of Hechinger Inv. Co. of Del., Inc. v. Fleet Retail Fin. Group* (*In re Hechinger Inv. Co.*), 327 B.R. 537, 549 (D. Del. 2005), *aff'd*, 278 F.3d Appx. 125 (3d Cir 2008).

[94] *See Weinberger v. UOP, Inc.*, 457 A.2d 701, 711 (Del. 1983).

VII.E-15

A director will be considered interested if he either: "(1) stands on both sides of the transaction; or (2) expects to derive a personal financial benefit from the transaction."[95] A New York federal court, applying Delaware law, has held that "where the directors of a wholly owned subsidiary stand on both sides of a transaction by virtue of the fact that they also serve on the parent's board, this does not automatically rebut the business judgment rule presumption."[96] Other courts applying Delaware law have disagreed. The *ASARCO* court explained that it:

> disagrees with this rationale as it ignores the fact that the directors of an insolvent wholly owned subsidiary have divided loyalties (between the parent, their corporation (the subsidiary), and the subsidiary's creditors), and "[w]hen faced with such divided loyalties, directors have the burden of establishing the entire fairness of the transaction to survive careful scrutiny by the courts."[97]

Delaware courts, and other courts applying Delaware law, have followed *ASARCO*'s reasoning. For example, in *In re Digex, Inc. S'holders Litig.*, the court held that:

> [w]hen the directors of a Delaware corporation appear on both sides of a transaction, the presumption in favor of the business judgment rule is rebutted and the directors are required to demonstrate their "utmost good faith and the most scrupulous inherent fairness of the bargain . . . . Where a director holds dual directorships in the parent-subsidiary context, there is no dilution of this obligation to demonstrate the entire fairness of specific board actions.[98]

*In re Musicland Holding Corp.*, came to a similar conclusion. In that case, breach of fiduciary duty claims filed against officers and directors of a corporate subsidiary and related entities were found to be sufficient to rebut the business judgment rule because the complaint alleged that debt instruments between the parent and subsidiary and payments made pursuant to those instruments "were the product of dual loyalties and self-dealing" of the defendants.[99] The court found that the defendants had "significant financial interests" in the parent or owed fiduciary duties to both parent and subsidiary and related entities.[100] Accordingly, "because of

---

[95] *ASARCO*, 396 B.R. at, 405 (citing *Roslink Investors, L.L.C. v. Shenkman*, 386 F. Supp. 2d 209, 217 (S.D.N.Y. 2004)); *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984).

[96] *ASARCO*, 396 B.R. at, 405 n.149 (citing *Roslink Investors, L.L.C. v. Shenkman*, 386 F. Supp. 2d 209, 217 (S.D.N.Y. 2004) ("However, presence on both sides of the transaction does not automatically rebut the business judgment rule presumption.")).

[97] *ASARCO*, 396 B.R. at, 405 n.149.

[98] 789 A.2d 1176, 1206 (Del. Ch. 2000); *see also Seidel v. Byron*, 405 B.R. 277, 290–91 (N.D. Ill. 2009) (applying Delaware law).

[99] 398 B.R. 761, 788 (Bankr. S.D.N.Y. 2008).

[100] *Id.*

their connection to or relationship with [the parent], the Pre–Sale Individual Defendants were dependent upon [the parent] for continued employment and compensation and were therefore beholden to [the parent] to the detriment of [the subsidiary]," and therefore "lacked independence."[101] The court did not discuss applicability of the entire fairness standard, but did find that the business judgment rule was rebutted.[102]

### (2) Fiduciaries May Be Entitled To Rely On Expert Advice

Directors of Delaware corporations can "properly delegate responsibility to qualified experts in a host of circumstances,"[103] and "directors of Delaware corporations are fully protected in relying in good faith on the reports of officers and experts."[104] Specifically, under section 141(e) of the Delaware General Corporation Law, directors of a corporation may be protected from breach of the fiduciary duty of care claims on the basis that they relied in good faith on a qualified expert.[105] Section 141(e) provides:

> A member of the board of directors, or a member of any committee designated by the board of directors, shall, in the performance of such member's duties, be fully protected in relying in good faith upon the records of the corporation and upon such information, opinions, reports or statements presented to the corporation by any of the corporation's officers or employees, or committees of the board of directors, or by any other person as to matters the member reasonably believes are within such other person's professional or expert competence and who has been selected with reasonable care by or on behalf of the corporation.[106]

---

[101] *Id.* at 788–89.

[102] *Id.*

[103] *Ash v. McCall*, No. Civ.A. 17132, 2000 WL 1370341, at *9 (Del. Ch. Sept. 15, 2000) (dismissing breach of fiduciary duty of care claim where complaint "allege[d] that the . . . directors were advised by their experts . . . and that they relied on their expertise in conducting due diligence ancillary to the proposed merger").

[104] *In re Citigroup Inc. S'holder Derivative Litig.*, 964 A.2d 106, 132 (Del. Ch. 2009).

[105] *Brehm v. Eisner*, 746 A.2d 244, 261 (Del. 2000) ("*Disney I*") (citing DEL. CODE ANN. tit. 8 § 141(e) (2010)).

[106] DEL. CODE ANN. tit. 8, § 141(e) (2010).

For example, section 141(e) applies where a director relies on advice of counsel[107] or an investment banking firm delivers a fairness opinion.[108]

In order to survive a motion to dismiss a shareholder derivative action alleging breach of the duty of care, "where an expert has advised the board in its decisionmaking process," a complaint must allege facts that would show that:

> (a) the directors did not in fact rely on the expert; (b) their reliance was not in good faith; (c) they did not reasonably believe that the expert's advice was within the expert's professional competence; (d) the expert was not selected with reasonable care by or on behalf of the corporation, and the faulty selection process was attributable to the directors; (e) the subject matter that was material and reasonably available was so obvious that the board's failure to consider it was grossly negligent regardless of the expert's advice or lack of advice; or (f) that the decision of the board was so unconscionable as to constitute waste or fraud.[109]

With regard to legal advice, "[a] number of cases have held that it is the existence of legal advice that is material to the question of whether the board acted with due care, not the substance of that advice."[110] For example, in *Hollinger International, Inc. v. Black*, the court dismissed a breach of fiduciary duty claim because it found that the defendants had sufficiently informed themselves by seeking the advice of counsel.[111] In dismissing the claim, the court emphasized that it did not rely on the content of the advice in making its determination, but rather that the seeking of advice demonstrated the directors' effort to inform themselves properly.[112]

Fiduciaries are generally not held to a lesser standard when dealing with complex or difficult issues. Rather, "given the complex situations and business issues boards must address, in order to meet their fiduciary obligations to be fully informed, directors often must rely on lawyers, financial advisors, economists, and other specialized experts to advise

---

[107] *Gagliardi v. TriFoods Int'l, Inc*., 683 A.2d 1049, 1051 n.2 (Del. Ch. 1996) ("There can be no personal liability of a director for losses arising from illegal transactions if a director were financially disinterested, acted in good faith, and relied on advice of counsel reasonably selected in authorizing a transaction.").

[108] *Crescent / Mach I Partners, L.P. v. Turner*, 846 A.2d 963, 985 (Del. Ch. 2000) ("Section 141(e) of Delaware's corporation law provides that directors are protected from a breach of the duty of care when the directors reasonably believe the information upon which they rely has been presented by an expert selected with reasonable care and is within that person's professional or expert competence.").

[109] *Brehm v. Eisner*, 746 A.2d 244, 262 (Del. 2000) ("*Disney I*").

[110] *In re Comverge, Inc. S'holders Litig*., Civil Action No. 7368-VCP, 2013 WL 1455827, at *4 (Del. Ch. April 10, 2013).

[111] 844 A.2d 1022, 1084 (Del. Ch. 2004), *aff'd*, 872 A.2d 559 (Del. 2005).

[112] *Id.* at 1085; *see also Baxter Int'l, Inc. v. Rhône–Poulenc Rorer Inc*., No. Civ.A. 19328, 2004 WL 2158051, at *3 (Del. Ch. Sept. 17, 2004) (noting that "while the subject matter of the emails may be at issue (as is often the case with privileged material), the communications themselves are not").

them."[113] Delaware courts have recognized that "[d]irectors of Delaware corporations quite properly delegate responsibility to qualified experts in a host of circumstances."[114]

### (3) An Exculpation Clause May Insulate Certain Conduct

#### (a) Corporate Context

A defendant may also avoid responsibility for breach of fiduciary duties by relying on an exculpation clause in a corporate charter.[115] In general, an exculpation clause will release a director from liability for a breach of duty of care, but not for a breach of duty of loyalty.[116]

Assuming that a plaintiff can adequately show a breach of fiduciary duty sufficient to avoid application of the business judgment rule, a director may still invoke DEL. CODE. ANN. tit. 8, § 102(b)(7) as an affirmative defense if the pertinent exculpation provision reflects the language in § 102(b)(7).[117] However, this does not necessarily mean that duty of care claims would be subject to dismissal at the Rule 12(b)(6) stage. Courts have held that such dismissal would be premature where the complaint also adequately alleges damages resulting from breaches of the duty of loyalty or good faith, as such damages cannot be exculpated under § 102(b)(7).[118]

#### (b) Limited Liability Company Context

An exculpatory clause found in an LLC agreement "is functionally akin" to the exculpatory charter provision authorized under Delaware corporate law.[119] Accordingly, an exculpatory clause of an LLC agreement, like a corporate charter, can limit common law

---

[113] R. FRANKLIN BALOTTI ET AL., SAFE HARBOR FOR OFFICER RELIANCE: COMPARING THE APPROACHES OF THE MODEL BUSINESS CORPORATION ACT AND DELAWARE'S GENERAL CORPORATION LAW, at 170 (2011).

[114] Ash v. McCall, No. 17132, 2000 WL 1370341, at *9 (Del. Ch. Sept. 15, 2000); see also Perrine v. Pennroad Corp., 43 A.2d 721, 727 (Del. Ch. 1945). However, "Delaware courts have indicated that they may take into account the specialized skills of a particular individual in concluding whether that individual has met his or her fiduciary obligations." R. FRANKLIN BALOTTI ET AL., SAFE HARBOR FOR OFFICER RELIANCE: COMPARING THE APPROACHES OF THE MODEL BUSINESS CORPORATION ACT AND DELAWARE'S GENERAL CORPORATION LAW, at 174 n.49 (2011). See, e.g., In re Emerging Commc'ns, Inc. S'holders Litig., No. 16415, 2004 WL 1305745, at *39–40 (Del. Ch. May 3, 2004) (director with special expertise could not perfunctorily rely on advice of experts and could be held liable for breach of fiduciary duty based on knowledge that price was unfair).

[115] DEL. CODE ANN. tit. 8, § 102(b)(7) (2010); In re Direct Response, 466 B.R. at 651.

[116] See Graham v. Taylor Capital Group, Inc. (In re Reliance Sec. Litig.), 135 F. Supp. 2d 480, 519 (D. Del. 2001); see also KDW Restructuring, 874 F. Supp. 2d at 221 (citing In re NYMEX S'holder Litig., 2009 WL 3206051, at *6 (Del. Ch. Sept. 30, 2009)); In re Direct Response, 466 B.R. at 651.

[117] See Section IV.B (discussing exculpation provisions and principles pertinent to ResCap fiduciaries).

[118] See Bridgeport Holdings Inc. Liquidating Trust v. Boyer, 388 B.R. 548, 568 (Bankr. D. Del. 2008); In re Direct Response, 466 B.R. at 651.

[119] In re Opus, 2012 WL 4867169, at *7 (citing Auriga Capital Corp. v. Gatz Props., 40 A.3d 839, 859 (Del. Ch. 2012)).

fiduciary duties.[120] As in the corporate context, invocation by a fiduciary of such an exculpatory clause will be considered an affirmative defense.[121]

### h. Burden With Respect To Fraud-Based Fiduciary Duty Claim

A plaintiff alleging fraud as part of a claim for breach of fiduciary duty must satisfy the pleading requirements of Federal Rule of Civil Procedure 9(b).[122] However, "the normally rigorous particularity rule [of 9(b)] has been relaxed somewhat where the factual information is peculiarly within the defendant's knowledge or control."[123] "A bankruptcy trustee, as a third party outsider to the debtor's transactions, is generally afforded greater liberality under the more relaxed standard."[124] Despite this relaxed standard, "boilerplate and conclusory allegations will not suffice. Plaintiffs must accompany their legal theory with factual allegations that make their theoretically viable claim plausible."[125]

### i. Potential Remedies For Fiduciary Duty Breaches Can Vary

A successful claim for breach of fiduciary duty in a derivative action can allow recovery of monetary damages for the corporation.[126] A breach of fiduciary duty claim can also give rise to equitable relief, including requiring the fiduciary to disgorge profits, such as forcing an executive to surrender compensation.[127]

---

[120] *See id.*

[121] *Id.* (citing *Auriga Capital Corp. v. Gatz Props.*, 40 A.3d 839, 859 (Del. Ch. 2012) (citing *Ad Hoc Comm. of Equity Holders of Tectonic Network, Inc. v. Wolford*, 554 F. Supp. 2d 538, 561 (D. Del. 2008); *Mervyn's LLC v. Lubert-Adler Group IV, LLC* (*In re Mervyn's Holdings, LLC*), 426 B.R. 488, 502 (Bankr. D. Del. 2010)).

[122] *Marino v. Grupo Mundial Tenedora, S.A.*, 810 F. Supp. 2d 601, 606 (citing *DeBlasio v. Merrill Lynch & Co., Inc.*, No. 07 Civ. 318, 2009 WL 2242605, at \*10 (S.D.N.Y. July 27, 2009) (claims for breach of fiduciary duty and aiding and abetting breach of fiduciary duty that sound in fraud must meet Rule 9(b)); *Pacific Elec. Wire & Cable Co. v. Set Top Int'l. Inc.*, No. 03 Civ. 9623, 2005 WL 2036033, at \*15 (S.D.N.Y. 2005) (holding that "[b]oth counts [for breach of fiduciary duties and aiding and abetting breach of fiduciary duties] state that Defendants breached their fiduciary duties to Plaintiffs by making material misrepresentations to Plaintiffs. These claims sound in fraud and must meet the heightened pleading standard of Rule 9(b)").

[123] *In re Opus East, L.L.C.*, 480 B.R. 561, 573 (Bankr. D. Del. 2012) (citing *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1418 (3d Cir. 1997)).

[124] *Id.* (citing *Global Link Telecom Corp.*, 327 B.R. at 717); *see also Rosener v. Majestic Mgmt., Inc.* (*In re OODC, LLC*), 321 B.R. 128, 140 (Bankr. D. Del. 2005) (holding that 9(b) "requirement is relaxed even more when the plaintiff is a third party, such as a trustee, because a third party generally has less information on which to base its allegation").

[125] *In re Opus East, L.L.C.*, 480 B.R. 561, 573 (Bankr. D. Del. 2012) (citing *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1418 (3d Cir. 1997)).

[126] *See* 1 ROGER J. MAGNUSON, SHAREHOLDER LITIGATION § 10:21 (1st ed. 1982); *Official Comm. of Unsecured Creditors v. Fleet Retail Fin. Group* (*In re Hechinger Inv. Co.*), 274 B.R. 71, 89 n.8 (D. Del. 2002).

[127] *See* 1 ROGER J. MAGNUSON, SHAREHOLDER LITIGATION § 10:21 (1st ed. 1982).

### *(1) Monetary Damages May Be Available*

"Whether the action is direct or derivative, [a] plaintiff can recover damages that flow directly from defendant's breach of fiduciary duty."[128] Monetary damages suffered by a corporation as a result of a breach can be collected if the claim is part of a derivative action, or monetary damages suffered by an individual can be collected if the claim is part of a direct action.[129]

The appropriate quantum of damages is the amount lost as a result of the breach.[130] "Where this Court finds that a breach of fiduciary duty has occurred, the specificity and amount of evidence required from the Plaintiff on the issue of damages is minimal."[131] Delaware courts do not require absolute certainty in the award of damages so long as "a wrong has been proven and injury established,"[132] and damages resulting from a breach of the fiduciary duty of loyalty will be "liberally calculated."[133] "[A]lthough a damage award cannot be based on 'speculation' or 'conjecture,'[134] . . . as long as there is a responsible basis for an estimate of damages, 'mathematical certainty' is not required."[135] If evidentiary uncertainty

---

[128] *Id.*

[129] *Id.*; *Official Comm. of Unsecured Creditors v. Fleet Retail Fin. Group* (*In re Hechinger Inv. Co.*), 274 B.R. 71, 89 n.8 (D. Del. 2002).

[130] *Beard Research, Inc. v. Kates*, 8 A.3d 573, 615 (Del. Ch. 2010) ("the loss in value of Plaintiffs' business and the lost cash flow,[was] sufficient to support a responsible estimate of the damages suffered by CB and BR as a result of the wrongs alleged in this action"); *Thorpe v. CERBCO, Inc.*, Civ.A. No. 11713, 1993 WL 443406, at *12 (Del. Ch. Oct. 29, 1993) ("It is, of course, fundamental that a fiduciary who breaches his duty is liable for any loss suffered by the beneficiary of his trust."); *Ash v. Board of Managers of 155 Condominium*, 23 Misc.3d 1103(A), 881 N.Y.S.2d 361 (Table), at *8 (N.Y. Sup. Aug. 29, 2008) ("[T]he measure of damages for breach of fiduciary duty is the amount of the loss sustained."); *National Union Fire Ins. Co. v. Proskauer Rose Goetz & Mendelsohn*, 165 Misc.2d 539, 546, 634 N.Y.S.2d 609, 615 (N.Y. Sup. 1994) ("[t]he appropriate measure of damages [for a breach of fiduciary duty] requires placing [plaintiff] in the same condition it would have been had the wrong not occurred").

[131] *Encite LLC v. Soni*, Civil Action No. 2476-VGG 2011 WL 5920896, at *25; *Hampshire Group, Ltd. v. Kuttner*, 2010 WL 2739995, at *50 (Del. Ch. July 12, 2010); *Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.*, 817 A.2d 160, 176 (Del. 2002) ("[T]he scope of recovery for a breach of the duty of loyalty is not to be determined narrowly.").

[132] *Encite*, 2011 WL 5920896, at *25 (citing *Beard Research, Inc. v. Kates*, 8 A.3d 573, 613 (Del. Ch. 2010); *Great Am. Opportunities, Inc. v. Cherrydale Fundraising, LLC*, Civil Action No. 3718-VCP, 2010 WL 338219, at *22 (Del. Ch. Jan. 29, 2010)).

[133] *Auriga Capital Corp. v. Gatz Props.*, 40 A.3d 839, 879 (Del. Ch. 2012) (citing *Thorpe v. CERBCO, Inc.*, 676 A.2d 436, 444–45 (Del. 1996)).

[134] *Id.* (citing *Acierno v. Goldstein*, No. Civ.A. 20056-NC, 2005 WL 3111993, at *6 (Del. Ch. Nov. 16, 2005)).

[135] *Id.* (citing *Bomarko, Inc. v. Int'l Telecharge, Inc.*, 794 A.2d 1161, 1184 (Del. Ch. 1999), *aff'd*, 766 A.2d 437 (Del. 2000)).

exists in ascertaining damages attributable to the misconduct, the ambiguity will be construed against the defendant.[136]

Where a transaction is determined to be unfair, the measure of damages for a breach of fiduciary duty "is not necessarily limited to the difference between the price offered and the true value as determined under the appraisal proceedings . . . . [T]he [court] may fashion any form of equitable and monetary relief as may be appropriate, including rescissory damages."[137]

### (2) Equitable Remedies May Be Available

Constructive trusts are an example of a type of equitable remedy, where the fiduciary "is viewed as having taken the money subject to a trust which is constructed for him by the court."[138] The fiduciary then "must account in full" for the money improperly taken, and "pay back the highest of either his earnings with the trust assets, or what he could have earned in another investment."[139] The remedy that will apply with respect to any particular breach of fiduciary duty will ultimately turn on specific factual circumstances; "[b]ecause the breaches of duty are so variegated, the type and extent of damages recovered have no fixed pattern."[140]

### j.  Choice Of Law Regarding Statutes Of Limitations Is Uncertain

Choice-of-law issues exist with respect to determining the application of statutes of limitation to claims for breach of fiduciary duty.[141]

_____

[136] *See id.* ("Given his own breaches of loyalty, the attendant uncertainties cut against [defendant], not against the victims of his infidelity."); *Encite LLC v. Soni*, 2011 WL 5920896, at *25 C.A. No. 20213-VCN, ("Any uncertainty in awarding damages is resolved against the wrongdoer."); *Gentile v. Rossette*, 2010 WL 2171613, at *11 (Del. Ch. May 28, 2010) (uncertainties in accessing damages "may cut against the fiduciary who has not faithfully discharged his duties."); *Eastman Kodak Co. of N.Y. v. S. Photo Materials Co.*, 273 U.S. 359, 379, (1927) ("[A] defendant whose wrongful conduct has rendered difficult the ascertainment of the precise damages suffered by the plaintiff is not entitled to complain that they cannot be measured with the same exactness and precision as would otherwise be possible.").

[137] *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1166 (Del. 1995). Where defendant directors breach "their fiduciary duties of care and loyalty by allowing the company and its subsidiaries to take on additional debt in a fiscally irresponsible manner and by misusing corporate assets," deepening insolvency can be a valid theory of damages for the breach of fiduciary duty claim. *See In re The Brown Schools*, 386 B.R. 37, 48 (Bankr. D. Del. 2008) (citing *Alberts v. Tuft* (*In re Greater Southeast Cmty. Hosp. Corp. I*), 353 B.R. 324, 333 (Bankr. D.C. 2006)). *But see Seitz v. Detweiler, Hershey and Associates, P.C.* (*In re CitX Corp.*), 448 F.3d 672, 677-78 (3d Cir. 2006).

[138] 1 ROGER J. MAGNUSON, SHAREHOLDER LITIGATION § 10:21 (1st ed. 1982).

[139] *Id.*

[140] *Id.*

[141] *See Buchwald v. Renco Group, Inc.* (*In re Magnesium Corp. of Am.*), 399 B.R. 722, 743 (Bankr. S.D.N.Y. 2009).

### *(1) Claim Brought In New York Federal Court*

Assuming a claim were brought in federal court in New York, pursuant to N.Y. C.P.L.R. 202[142] New York has a "borrowing statute," "which requires the application of New York's statute of limitations when 'the cause of action accrued in favor of a resident of the state.'"[143] Essentially, this means that "for a non-resident of New York, a restrictive [Delaware] statute of limitations could not be circumvented by bringing suit in New York instead."[144] Because the New York borrowing statute is only consulted if a nonresident plaintiff's cause of action accrued outside the state of New York, whether N.Y. C.P.L.R. 202 applies will depend on the plaintiff's residence.

If the plaintiff were a non-resident of New York, and N.Y. C.P.L.R. 202 were applicable because the cause of action accrued in a state with a limitations period shorter than New York's (such as Delaware), N.Y. C.P.L.R. 202 "requires application of the shorter of the statute of limitations of New York and the statute of limitations of the state in which the cause of action accrued."[145] The location of a plaintiff's injury determines the place of accrual for purposes of N.Y. C.P.L.R. 202.[146] For claims of breach of fiduciary duty, because the "alleged injury is purely economic, the place of injury usually is where the plaintiff resides and sustains the economic impact of the loss."[147] For claims brought on behalf of incorporated entities, the claim accrues where the corporation sustained the economic impact of the alleged breach, which is either the state of its incorporation or its principal place of business.[148]

---

[142] N.Y. C.P.L.R. 202 provides that "[a]n action based upon a cause of action accruing without the state cannot be commenced after the expiration of the time limited by the laws of either the state or the place without the state where the cause of action accrued, except that where the cause of action accrued in favor of a resident of the state the time limited by the laws of the state shall apply."

[143] *Bianco v. Erkins* (*In re Gaston & Snow*), 243 F.3d 599, 604 (2d Cir. 2001). New York's borrowing statute will not be utilized if a court finds that federal choice-of-law rules apply. *See Bianco v. Erkins* (*In re Gaston & Snow*), 243 F.3d 599, 605 (2d Cir. 2001) ("By contrast, if federal choice of law rules are to be utilized, the borrowing statute would not be considered and there is little doubt that New York's statute of limitations would not apply."). However, in *In re Gaston & Snow*, the court held that "where no significant federal policy, calling for the imposition of a federal conflicts rule, exists," bankruptcy courts should apply the choice-of-law rules of the forum state. *In re Gaston & Snow*, 243 F.3d at 607; *see also In re Hydrogen, LLC*, 431 B.R. at 346 ("Bankruptcy courts adjudicating a state law claim should apply the choice-of-law rules of the forum state in the absence of federal policy concerns."); *In re Adelphia Commc'ns Corp.*, 365 B.R. 24, 58 n.136 (Bankr. S.D.N.Y. 2007) ("Where, as here, the Court is exercising bankruptcy jurisdiction over state law claims under 28 U.S.C. § 1334(b), the court applies the choice of law rules of the forum state to determine the applicable statute of limitations.").

[144] *Buchwald v. Renco Group, Inc.* (*In re Magnesium Corp. of Am.*), 399 B.R. 722, 744 n.51 (Bankr. S.D.N.Y. 2009).

[145] *In re Gaston & Snow*, 243 F.3d at 608–09. *See also In re Adelphia Commc'ns Corp.*, 365 B.R. at 57–58 ("[N.Y. C.P.L.R. 202] provides that where a plaintiff is not a New York resident (as here), the court should apply the shorter of New York's period of limitations or the statute of limitations applicable where the plaintiff resides.").

[146] *See Global Financial Corp. v. Triarc Corp.*, 93 N.Y.2d 525, 529–31 (N.Y. 1999).

[147] *Cantor Fitzgerald Inc. v. Lutnick*, 313 F.3d 704, 710 (2d Cir. 2002).

[148] *See id.* at 711.

### *(2) Claim Brought In Minnesota State Court*

If a claim for breach of fiduciary duty were to be brought in Minnesota state court, a three-year limitations period would apply unless a specific residency carveout could be invoked. For claims arising after April 2004, Minnesota's "borrowing statute" provides that "if a claim is substantively based . . . (1) upon the law of one other state, the limitation period of that state applies."[149] Accordingly, another state's statute of limitations applies in Minnesota if that other state's substantive law governs a case.[150] Thus, if Delaware's substantive law applies to a claim brought in a Minnesota court, the Delaware statute of limitation would also apply.[151] Minnesota applies the internal affairs doctrine, which holds that "the law of the state of incorporation normally determines issues relating to the internal affairs of a corporation."[152] Delaware law would apply to a breach of fiduciary duty claim relating to ResCap in a Minnesota case, and thus there would be no conflict between Minnesota and Delaware law.[153] Because Delaware's substantive law would apply to breach of fiduciary duty claims brought in a Minnesota court, the three-year Delaware statute of limitations would seemingly apply to those claims.[154]

However, Minnesota statute section 541.31 contains a carveout for Minnesota residents, which could be available with respect to a fiduciary duty claim brought by a plaintiff on ResCap's behalf. Where a plaintiff is a Minnesota resident and the cause of action arises under the law of another jurisdiction but is time-barred under the foreign jurisdiction's limitations period, the action may be brought in Minnesota if (1) the plaintiff has owned the cause of action since it accrued, and (2) the cause of action is not time-barred under the applicable

---

[149] MINN. STAT. § 541.31, 541.34 (2013). While MINN. STAT. § 541.33 (2013) provides that "[i]f the court determines that the limitation period of another state applicable under sections 541.31 and 541.32 is substantially different from the limitation period of this state and has not afforded a fair opportunity to sue upon, or imposes an unfair burden in defending against, the claim, the limitation period of this state applies," Minnesota courts have stated that the exception or "escape clause should 'rarely be employed' only in 'extreme cases.'" *See Burks v. Abbott Labs.*, 639 F. Supp. 2d 1006, 1019 (D. Minn. 2009). "[T]he mere difference between the prescriptive time periods" is not sufficient. *See id.*

[150] *See Huggins v. Stryker Corp.*, Civil No. 09-1250, 2013 WL 1191058, at *7 n.8 (D. Minn. Mar. 25, 2013); *Whitney v. Guys, Inc.*, 700 F.3d 1118, 1123 n.6 (8th Cir. 2012). Note that the statute expressly does not apply to claims arising from incidents that occurred prior to August 1, 2004. *Id.*

[151] *Whitney v. Guys, Inc.*, 700 F.3d 1118, 1126 (8th Cir. 2012).

[152] *See Matson Logistics, LLC v. Smiens*, Civil No, 12-400, 2012 WL 2005607, at *5 (D. Minn. June 5, 2012) (citing *Rupp v. Thompson*, No. C5-03-347, 2004 WL 3563775 (Minn. Dist. Ct. Mar. 17, 2004)); *Calleros v. FSI Intern., Inc.*, 892 F. Supp. 2d 1163, 1169 n.7 (D. Minn. 2012) ("Under the 'internal affairs' doctrine, fiduciary-duty claims against FSI's directors are governed by Minnesota law because FSI is a Minnesota corporation.") (citing *Atherton v. FDIC*, 519 U.S. 213, 223–24, 117 S.Ct. 666, 136 L.Ed.2d 656 (1997)); *Transocean Group Holdings Pty Ltd. v. South Dakota Soybean Processors*, LLC, 663 F. Supp. 2d 731, 742 n.5 (D. Minn. 2009) (citing *Potter v. Pohlad*, 560 N.W.2d 389, 391 (Minn. Ct. App. 1997)).

[153] *Matson Logistics, LLC v. Smiens*, 2012 WL 2005607, at *6-7; *Lagermeier v. Boston Scientific Corp.*, 2011 WL 2912642, at *8 (D. Minn. Sept. 29, 2011).

[154] *See Whitney v. Guys, Inc.*, 700 F.3d 1118, 1123 (8th Cir. 2012) (applying Delaware substantive law and the Delaware statute of limitations to a breach of fiduciary duty claim).

Minnesota limitations period.[155] Accordingly, if ResCap were determined to be a Minnesota resident as of the time of accrual of the claim, the six-year statute of limitations would likely apply to a claim for breach of fiduciary duty brought on its behalf.[156]

### (3) Potentially Applicable Statutes Of Limitations Vary

Under Delaware law (including as may be applied to a claim brought in Minnesota state court), the statute of limitations for a breach of fiduciary duty claim is three years.[157] By contrast, New York does not provide for a unitary limitations period for breach of fiduciary duty claims.[158] Determining the applicable statute of limitations for a breach of fiduciary duty claim under New York law generally depends upon the requested remedy:

> Where the relief sought is equitable in nature, the six-year limitations period of N.Y. C.P.L.R. 213(1) applies. On the other hand, where suits alleging a breach of fiduciary duty seek only money damages, courts have viewed such actions as alleging injury to property, to which a three-year statute of limitations applies.[159]

However, the determination may also be shaped by other factual and legal circumstances. Where a plaintiff does not allege fraud or the breach of a particular provision of an agreement, the three-year statute of limitations applies,[160] but where a plaintiff alleges fraud in relation to a breach of fiduciary duty claim, courts apply a six-year limitations period under N.Y. C.P.L.R. 213(8), even if the remedy sought is monetary in nature.[161]

---

[155] *See* MINN. STAT. § 541.31(2) (2013).

[156] *Hunt v. Nev. State Bank*, 285 Minn. 77, 104 n.28, 172 N.W.2d 292, 308 n.28 (Minn. 1969) (corporation with its principal place of business or other significant business contacts in state is deemed resident for purposes of long-arm statute); *United Barge Co. v. Logan Charter Serv.*, 237 F. Supp. 624, 629–30 (D. Minn. 1964) (concluding entity was a "resident[ ] of Minnesota" because it had its principal place of business as well as "permanent offices and employees" in the state pursuant to long-arm statute); *Caddy Products, Inc. v. American Seating Co.*, No. Civ. 05-800 2005 WL 2401910, at *3 (D. Minn. Sept. 28, 2005) ("For the purposes of venue, however, corporations are considered to be residents of the state of their incorporation and of the state where they maintain their principal place of business.").

[157] *See In re Tyson Foods, Inc.*, 919 A.2d 563, 584 (Del. Ch. 2007) (citing 10 DEL. CODE ANN. tit. 10, § 8106 (2008)).

[158] *See Donenfeld v. Brilliant Techs. Corp.*, 20 Misc.3d 1139(A), at *2, 872 N.Y.S.2d 690 (Table) (N.Y. Sup. 2008); *see also Williams v. Sidley Austin Brown & Wood, L.L.P.*, 15 Misc.3d 1125(A), at *5, 841 N.Y.S.2d 222 (Table) (N.Y. Sup. 2007) (citing *Lonegard v. Santa Fe Indus., Inc.*, 70 N.Y.2d 262, 266 (N.Y. 1987)).

[159] *Donenfeld*, 20 Misc.3d 1139(A), at *2, 872 N.Y.S.2d 690 (Table) (N.Y. Sup. 2008) (citing N.Y. C.P.L.R. 214[4]; *Kaufman v. Cohen*, 307 A.D.2d 113, 118, 760 N.Y.S.2d 157 (N.Y. App. Div. 2003) (citations omitted).

[160] *See Donenfeld*, 20 Misc.3d 1139(A), at *2, 872 N.Y.S.2d 690 (Table) (N.Y. Sup. 2008) (citing *Kaszirer v. Kaszirer*, 286 A.D.2d 598, 599, 730 N.Y.S.2d 87 (N.Y. App. Div. 2001)); *see also Mejia-Ricart v. Bear Stearns & Co.*, 1996 WL 94810, at *3 (S.D.N.Y. Mar. 4, 1996) (six-year limitations period applies to contract-based claim for breach of fiduciary duty seeking monetary damages).

[161] *See Kelly v. Legacy Benefits Corp.*, 34 Misc.3d 1242(A), at *9–10, 950 N.Y.S.2d 608 (Table) (N.Y. Sup. Mar. 12, 2012); *Donenfeld v. Brilliant Techs. Corp.*, 20 Misc.3d 1139(A), at *2, 872 N.Y.S.2d 690 (Table) (N.Y. Sup. 2008) (citing *Kaszirer v. Kaszirer*, 730 N.Y.S.2d 87 (N.Y. App. Div. 2001)).

A fiduciary duty claim must be scrutinized to assess whether the related fraud allegations are integral to it. "[I]f the fraud allegation is only incidental to the allegation of breach of fiduciary duty, and not essential to it, then the three-year statute of limitations will apply."[162] Accordingly, "where an allegation of fraud is not essential to the cause of action pleaded except as an answer to an anticipated defense of the Statute of Limitations, courts 'look for the reality, and the essence of the action and not its mere name.'"[163] "Otherwise, fraud would be used as a means to litigate stale claims."[164] "The test is whether the fraud is the gravamen of the action, the fraud statute contemplating only those causes of action in which there would be no injury except for the fraud."[165]

New York courts will thus look to see if a fraud claim could survive on the facts of the breach of fiduciary duty claim.[166] For example, in *Oxbow Calcining USA Inc. v. Am. Indus. Partners*, the court found N.Y. C.P.L.R. 213(8) to be applicable because:

> the essence of plaintiffs' claim is that AIP, as the holder of a controlling interest in GLC, breached its fiduciary duty to ensure that any self-dealing transaction between GLC and PASE would be entirely fair to GLC and its shareholders, by employing bait-and-switch tactics and making numerous misrepresentations to GLC's independent committee and management in order to fraudulently induce GLC to enter into the [agreement].[167]

---

[162] *Monaghan v. Ford Motor Co.*, 71 A.D.3d 848, 850, (N.Y. App. Div. 2010) (citing *Kaufman v. Cohen*, 60 N.Y.S.2d 157 (N.Y. App. Div. 2003)).

[163] *Kaufman v. Cohen*, 60 N.Y.S.2d 157, 165 (N.Y. App. Div. 2003) (quoting *Brick v. Cohn–Hall–Marx Co.,* 276 N.Y. 259, 264).

[164] *Kaufman*, 60 N.Y.S.2d 157, 165 (N.Y. App. Div. 2003) (citing *Powers Mercantile Corp. v. Feinberg*, 490 N.Y.S.2d 190, *aff'd* 67 N.Y.2d 981)). N.Y. C.P.L.R. 213(8) would not apply to a fiduciary duty claim based on failure to use care because fraud is not integral to such a claim. *See Carbon Capital Mgt., LLC v. American Express Co.*, 88 A.D.3d 933, 932 N.Y.S.2d 488 (N.Y. App. Div. 2011) ("the claim that [defendant] breached a fiduciary duty to [plaintiff] by failing to diligently ascertain Derivium's fitness as a lender is not based upon actual fraud and, therefore, that claim is governed by the three-year statute of limitations, and is time-barred").

[165] J. GEBAUER ET AL., CARMODY-WAIT 2D NEW YORK PRACTICE WITH FORMS, § 13:169 (2013); *see also Paolucci v. Mauro*, 903 N.Y.S.2d 584, 587 (N.Y. App. Div. 2010).

[166] *See Kaufman*, 60 N.Y.S.2d 157, 167 n.4 (N.Y. App. Div. 2003) ("The timeliness of plaintiffs' breach of fiduciary duty claim, therefore, turns on the viability of plaintiffs' fraud cause of action, an issue to which we now turn."); *IDT Corp. v. Morgan Stanley Dean Witter & Co.*, 12 N.Y.3d 132, 140, (N.Y. 2009) (not applying N.Y. C.P.L.R. 213(8) because the court did not "conclude that IDT's breach of fiduciary duty cause of action is a sufficiently pleaded fraud action").

[167] *Oxbow Calcining USA Inc. v. Am. Indus. Partners*, 96 A.D.3d 646, 651, 948 N.Y.S. 2d 24, 31 (1 Dep't. 2012) (citing *Carbon Capital Mgt., LLC v. American Express Co.*, 88 A.D.3d 933, 939–40, 932 N.Y.S.2d 488, 495 (N.Y. App. Div. 2011); *Monaghan v. Ford Motor Co.*, 71 A.D.3d 848, 897 N.Y.S.2d 482 (N.Y. 2010)).

Similarly, in *Carbon Capital Mgt., LLC v. American Express Co.*, the court held that:

> the claims that [defendant] breached his fiduciary duty to [plaintiff] by misrepresenting Derivium's legitimacy as a lender, the tax consequences of the alleged loan, and whether Derivium would hold the floating-rate notes as collateral are, in essence, fraud-based claims, and the Supreme Court correctly determined that these claims were governed by the six-year statute of limitations, and were timely.[168]

In *Kaufman v. Cohen*, in determining whether N.Y. C.P.L.R. 213(8) applied to a breach of fiduciary duty claim, the court ruled that "instead of an affirmative misrepresentation, a fraud cause of action may be predicated on acts of concealment where the defendant had a duty to disclose material information . . . . Thus, where a fiduciary relationship exists, 'the mere failure to disclose facts which one is required to disclose may constitute actual fraud, provided the fiduciary possesses the requisite intent to deceive.'"[169] In addition, where the claim for breach of fiduciary duty is based on actual fraud, "that is, fraud claims alleging an intent to deceive," the discovery rule applies, meaning that the claim accrues "only upon the plaintiff's actual or constructive discovery of the facts constituting the fraud."[170] "Claims of constructive fraud, i.e., a fiduciary's simple nondisclosure of facts it is obligated to disclose, accrue upon breach."[171]

Application of New York's three-year or six-year limitations period may also hinge on the corporate status of the nominal plaintiff. Claims for breach of fiduciary duty brought on behalf of a corporation against fiduciaries of that corporation will be governed by the six-year statute of limitations of N.Y. C.P.L.R. 213(7), regardless of whether such claims are legal or equitable in nature.[172] A bankruptcy estate trustee can bring claims on behalf of a debtor corporation under the six-year N.Y. C.P.L.R. 213(7) limitations period.[173]

---

[168] 932 N.Y.S.2d 488 (N.Y. App. Div. 2011). However, "the claim that [defendant] breached a fiduciary duty to [plaintiff] by failing to diligently ascertain Derivium's fitness as a lender is not based upon actual fraud and, therefore, that claim is governed by the three-year statute of limitations, and is time-barred." *Id.*

[169] 60 N.Y.S.2d 157, 165 (N.Y. App. Div. 2003) (citing *Whitney Holdings, Ltd. v. Givotovsky*, 988 F. Supp. 732, 748–49 (S.D.N.Y. 1997)).

[170] *Whitney Holdings, Ltd. v. Givotovsky*, 988 F. Supp. 732, 744 (S.D.N.Y. 1997).

[171] *Id.*

[172] *See Oxbow Calcining USA Inc. v. Am. Indus. Partners*, 948 N.Y.S.2d 24, 31 (N.Y. App. Div. 2012).

[173] *See Pereia v. Centel Corp.* (*In re Argo Commc'ns Corp.*), 134 B.R. 776, 786–87 (Bankr. S.D.N.Y. 1991) ("[W]e agree with [the] Trustee that the six-year limitations period applies here . . . . It is a basic principle of bankruptcy law that title to a debtor's causes of action vest in the trustee at the time of his or her appointment. In the matter *sub judice*, [the] Trustee was empowered to bring actions that the corporation itself could have initiated in its own name but for the filing of a bankruptcy petition.").

With respect to application of either the three-year or six-year limitations period under New York law, New York statutes of limitations are narrowly construed.[174] "It is well settled that a statute of limitations should not be applied to cases not clearly within its provisions, nor should it be extended by construction."[175] Accordingly, a court applying New York law would likely find that N.Y. C.P.L.R. 213(7) does not apply to claims brought on behalf of a limited liability company. As the Bankruptcy Court for the Southern District of New York has stated:

> N.Y. C.P.L.R. 213(7), by its terms, only applies to a actions [sic] brought by or on behalf of a "corporation." In the present matter, the Debtor is not a corporation; it is a limited liability company, formed in New York, and, as such, subject to the New York Limited Liability Company Law (the "NYLLCL"). None of the cases cited by the Trustee applies N.Y. C.P.L.R. 213(7) to an entity other than a corporation, and the Trustee's argument is devoid of the slightest merit.[176]

The court's determination comports with the general strict applicability of N.Y. C.P.L.R. 213(7).[177] Significantly, New York courts have not yet addressed whether N.Y. C.P.L.R. 213(7) would apply where the nominal plaintiff was a corporation when the fiduciary duty claim accrued but had converted to a limited liability company by the time the claim was brought.

### 2. Potential Claims Exist For Breaches Of Duties By ResCap Fiduciaries

#### a. Potential Fiduciary Duty Claims Relating To 2006 Bank Restructuring

Dual-affiliated ResCap fiduciaries may have engaged in misconduct related to securing the approval by Independent Directors Jacob and Melzer of the 2006 Bank Restructuring.[178] There is evidence that ResCap and AFI insiders, in an effort to facilitate the transaction, purposefully concealed certain material information from the Independent Directors relating to the option of ResCap obtaining voting interests in the restructured bank. The Independent Directors were led to believe that closing of the Cerberus transaction, and obtaining the expected credit rating boost for ResCap that would flow from the transaction, hinged on approval of the 2006 Bank Restructuring on the specific terms presented to them.

---

[174] *See Sunken Pond Estates Homeowners Ass'n, Inc. v. Sunken Pond Estates*, 36 Misc.3d 1209(A), 954 N.Y.S.2d 762 (Table), at *3 (N.Y. Sup. Ct. 2012).

[175] *Id.* (citing *N.Y. Med. & Diagnostic Ctr., Inc. v. Shah*, 941 N.Y.S.2d 460, 468 [2012 N.Y. Slip Op 22052]).

[176] *O'Connell v. Shallo* (*In re Die Fliedermaus LLC*), Bankruptcy No. 01-42518, 2005 WL 3789333, at *1 (Bankr. S.D.N.Y. May 6, 2005).

[177] *See Roslyn Union Free Sch. Dist. v. Barkan*, 950 N.E.2d 85, 88 (N.Y. 2011) (a school district qualifies as a corporation within the meaning of N.Y. C.P.L.R. 213(7), based on a straightforward statutory analysis of terms found in General Construction Law § 65 and defined in General Construction Law § 66); *Sunken Pond Estates Homeowners Ass'n, Inc. v. Sunken Pond Estates*, 36 Misc.3d 1209(A), 954 N.Y.S.2d 762 (Table), at *3 (N.Y. Sup. Ct. 2012) (N.Y. C.P.L.R. 213(7) not applicable to a condominium because, unlike a corporation, a condominium is not an entity recognized at law).

[178] *See* Sections V.A and VII.L.1 (discussing the facts surrounding the 2006 Bank Restructuring).

They were *not* informed, however, that achieving those objectives did not require ResCap to relinquish efforts to obtain a voting interest in Ally Bank or negotiate for improved terms.

Thus, the Independent Directors' approval of the 2006 Bank Restructuring was arguably procured on false premises. The reality is that ResCap did not receive reasonably equivalent value in the transaction primarily because it was not adequately compensated for the non-voting nature of the Ally Bank shares that it received in return for the assets it surrendered.[179] Yet, despite troubling factual circumstances surrounding the 2006 Bank Restructuring, formidable legal obstacles exist to the viability of a breach of fiduciary duty claim relating to it. While a close question, the Examiner concludes it is more likely than not that a claim for breach of duty by ResCap fiduciaries relating to the 2006 Bank Restructuring would not prevail.

### (1) ResCap Fiduciaries' Duty To Disclose Material Information To Fellow Fiduciaries

The analysis of a claim for breach of the duty of disclosure, which is subsumed within the duty of loyalty, is premised on the conclusion that dual-affiliated ResCap fiduciaries who potentially breached their duties would not be entitled to invoke the protection of the business judgment rule. The context of a transaction between a parent and subsidiary, in which ResCap directors and officers had affiliations to parties on both sides of the transaction, would trigger application of the intrinsic fairness test.[180] The lack of "disinterestedness" of the dual-affiliated ResCap fiduciaries would rebut the presumptive application of the business judgment rule.[181]

As discussed in Section VII.E.1.b(2)(a), the fiduciary duty of loyalty encompasses a duty of disclosure and candor. Directors generally must deal candidly with their fellow directors, and officers must inform directors of information material to a company's affairs.[182] Any such duty of disclosure would be owed by fiduciaries to corporate entities rather than to individuals.[183] ResCap fiduciaries, most of them with affiliations to AFI, arguably breached that duty.

The Independent Directors were never informed by their fellow ResCap fiduciaries that 100% AFI voting control of IB Finance was not inevitable and was not mandated by the terms of the Cerberus PSA.[184] As reflected in David Applegate's April 24, 2006 memorandum to

---

[179] *See* Section V.A.2.b (analyzing reasonably equivalent value with respect to the 2006 Bank Restructuring).

[180] *See* Section VII.E.1.b(2)(a).

[181] *See* Section VII.E.1.g(1).

[182] *See Big Lots Stores, Inc. v. Bain Capital Fund VII, LLC,* 922 A.2d 1169, 1184 (Del. Ch. 2006); *Eurofins Pharma US Holdings v. BioAlliance Pharma SA,* 623 F.3d 147, 158 (3d Cir. 2010); *HMG/Courtland Properties, Inc. v. Gray,* 749 A.2d 94, 119 (Del. Ch. 1999) (citing *Mills Acquisition Co. v. Macmillan, Inc.,* 559 A.2d 1261, 1283 (Del. 1989)); *Hampshire Group, Ltd. V. Kuttner,* C.A. No. 3607-VCS, 2010 WL 2739995, at *13 n.85 (Del. Ch. July 12, 2010); *see also* Megan Wischmeier Shaner, *Restoring The Balance Of Power In Corporate Management: Enforcing An Officer's Duty Of Obedience,* 66 BUS. LAW. 27, 47 (2010).

[183] *See* Section VII.E.1.f(1)(a) (discussing duties owed by fiduciaries of a solvent wholly owned subsidiary).

[184] For a complete exposition of the facts relevant to the ResCap insiders' potential breach of the duty of disclosure, see Sections V.A.1.a and VII.L.1.

AFI President William Muir, ResCap management had misgivings about losing its controlling interest in the bank. Indeed, Applegate proposed to Muir an alternative structure for IB Finance through which ResCap—and not AFI—would control at least 51% of the restructured bank.[185] Days earlier, on April 20, 2006, David Marple had stated in a memorandum to various ResCap and AFI directors that "ResCap will not be given any voting control with regard to . . . material business activities or the entity itself" and that it is "not reasonable to believe that ResCap's leadership would agree to transfer a material business to a third-party under a similar agreement."[186] Marple had further opined that "the restructuring of [Ally] Bank as currently proposed cannot reasonably be deemed a transaction to which parties at arm's-length would agree" as was required by the Operating Agreement.[187] Jacob and Melzer, whose approval of waivers to the 2005 Operating Agreement was a prerequisite to closing of the 2006 Bank Restructuring, and their counsel at Bryan Cave, were never informed about any of those facts.[188] When Jacob and Melzer were presented with the proposed terms of the 2006 Bank Restructuring on May 4, 2006, via a memorandum from ResCap Board Chair (and AFI Board Chair) Eric Feldstein, 100% AFI voting control of the restructured bank was already a fait accompli.[189] Jacob and Melzer, and the rest of the ResCap Board, ultimately approved the proposed transaction without dissent on November 20, 2006, and ResCap thereby obtained a non-voting interest in the restructured bank.[190]

As a factual matter, it is clear that various dual-affiliated ResCap fiduciaries who were aware that the Cerberus PSA did not preclude granting ResCap a voting interest in IB Finance did not disclose that material information to the Independent Directors to help inform the Independent Directors' consideration of and decision-making regarding the proposed transaction. Jacob and Melzer never found out that alternative bank ownership structures were viable. Among other opportunities by ResCap fiduciaries to inform the Independent Directors of such information in advance of the ResCap Board meeting at which the 2006 Bank Restructuring was approved, Marple, ResCap's then General Counsel, had a specific occasion to do so.

On May 10, 2006, not long after Marple's and Applegate's respective memoranda expressing concerns about the terms of the proposed transaction, Schenk, counsel to Jacob and Melzer at Bryan Cave, sent a list of issues to Marple raising questions about the transaction. Apparently accepting the false premise that the specific ownership structure of IB Finance as

---

[185] Memorandum, ILC Ownership and Control, dated Apr. 24, 2006 [EXAM11248641].

[186] Memorandum, GMAC Bank Restructuring, dated Apr. 20, 2006, at 4 [EXAM11248642].

[187] *Id.*

[188] Int. of T. Jacob, Apr. 17, 2013, at 51:15–52:9, 60:14–16, 70:9–22, 74:24–75:3, 77:2–8; Int. of T. Melzer, Mar. 22, 2013, at 62:25–63:12, 89:16–25, 91:17–23; Int. of E. Schenk, Apr. 24, 2013, at 35:20–36:6, 44:13–20, 47:5–10, 54:18–55:14, 86:17–87:10.

[189] Memorandum, Proposed Restructuring of GMAC U.S. Banking Entities, dated May 5, 2006, at 1 [EXAM10258913] (attached to E-mail from K. Sabatowski (May 4, 2006) [EXAM10258912]).

[190] Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Nov. 20, 2006 [RC00016852].

reflected in the proposed transaction was a necessary byproduct of the Cerberus transaction, Schenk stated that "[a]lthough not a direct request for information, the independent directors have noted and are considering the impact of the difference between the economic stake of ResCap and the voting rights in the IB / directorship positions."[191] Notably, that issue in Schenk's list was the only one of nine "questions" not actually framed in the form of a question. Marple responded to Schenk's "question" by simply stating: "Please let me know if you would like any further information in connection with your consideration of this matter."[192] Marple did not use the back-and-forth exchange with the Independent Directors' counsel to inform them of ResCap's prior endorsement of the option of ResCap obtaining a voting interest in the bank nor of Marple's own previously expressed concern about the arm's-length nature of the transaction.

However, as a technical legal matter it is uncertain that ResCap fiduciaries in possession of the withheld information had a fiduciary duty to disclose it to the Independent Directors. At the time of the events surrounding the 2006 Bank Restructuring, ResCap was a solvent entity.[193] As a threshold matter, fiduciary duties of the directors and officers of a solvent wholly owned subsidiary generally are owed to the subsidiary's sole shareholder (here, AFI), although some cases have stated that fiduciary duties are also owed to the subsidiary on whose board they sit.[194] Only if the inside fiduciaries had a duty of loyalty owed to ResCap (in addition to a duty to AFI)—which they may have had in light of certain legal authority indicating that they also owed fiduciary duties to the subsidiary—could they arguably have breached that duty in failing to disclose material information to Jacob and Melzer,[195] thereby wholly and improperly abandoning ResCap's interests in favor of AFI's.

Moreover, even if the inside fiduciaries were obligated to consider ResCap's interests and not entitled to completely forsake them in favor of AFI's (which is uncertain as a matter of law), cases applying the duty of disclosure toward a finding of breach of fiduciary duty (described in Section VII.E.1.b(2)(a)) have generally predicated that finding on the breaching fiduciary having obtained a personal benefit in the process of failing to disclose information. That type of direct personal self-dealing appears to be absent from this situation, although indirect benefits would accrue to AFI-affiliated ResCap fiduciaries through a transaction that favored AFI's interests at ResCap's expense. Thus, although information concerning a substantial transaction appears to have been concealed from the Independent Directors, the Examiner concludes that, while a close question, it is more likely than not that the inside fiduciaries would not be charged with a duty of disclosure owed to ResCap, and so could not have breached a duty that likely was unenforceable.

---

[191] E-mail from E. Schenk to D. Marple (May 10, 2006) [JACO.B000010].

[192] Memorandum from D. Marple to E. Schenk (May 12, 2006) [ALLY_0401600].

[193] *See* Section VI (discussing ResCap's financial condition at the time of the 2006 Bank Restructuring).

[194] *See* Section VII.E.1.f(1)(a) (discussing split in authority relating to the issue of whether fiduciaries of a solvent wholly owned subsidiary owe duties exclusively to the parent entity or also to the subsidiary).

[195] There appears to be no clear legal authority to support a potential argument that a duty of disclosure ran from one ResCap fiduciary to another, rather than from the fiduciaries to either or both of the parent and subsidiary entities.

Further, even if an enforceable fiduciary duty was breached, it was somewhat mitigated by the incomplete diligence by the Independent Directors and their counsel in investigating and pursuing the viability of ResCap obtaining a voting share in the restructured bank. Jacob and Melzer were clearly aware that ResCap was receiving only a non-voting interest, and were never misled about the ultimate terms of ownership of Ally Bank through the transaction. Yet the Independent Directors' own assessment of that ownership outcome was not exhaustive. The Independent Directors solicited no fairness opinion or third-party valuation report in connection with the proposed transaction, which could have further highlighted the voting rights issue by exposing that there was a shortfall between what ResCap was getting and giving up. And Schenk's noting to Marple the Independent Directors' consideration of the voting rights issue, without posing a specific question inquiring whether that transaction term was negotiable, was not framed optimally to elicit disclosure of the information that remained concealed. Marple's polite answer was technically responsive to Schenk's issue, which posed no question. Nevertheless, the answer did not provide information directly pertinent to the underlying issue, which Marple and other ResCap fiduciaries persistently withheld from Jacob and Melzer.

### (2) Fiduciary Duty Claims May Be Time-Barred

Even if ResCap fiduciaries (including Marple, Applegate, Feldstein, Walker, and Khattri) had a duty owed to ResCap to disclose information to, and deal candidly with, the Independent Directors regarding the potential viability of ResCap obtaining a voting interest in the restructured bank, and assuming that they violated an enforceable duty of disclosure (as a species of their duty of loyalty), a related claim for breach of fiduciary duty may be time-barred.

Assuming claims were brought in New York federal court, New York's statute of limitations may bar breach of fiduciary duty claims arising from the 2006 Bank Restructuring, which would be subject to New York's choice-of-law rules governing statutes of limitations.[196] New York's borrowing statute, N.Y. C.P.L.R. 202, requires that claims brought in New York by a non-resident be timely under the statutes of limitations of both New York and the state where the claim accrued.[197] As discussed below, the applicable New York statute of limitations for a breach of fiduciary duty claim is three years unless a plaintiff could show that (1) the claim is entitled to the six-year limitations period applicable to a corporation; (2) the claim is based on fraudulent conduct; or (3) the claim sought only an equitable remedy. Under a three-year limitations period (pursuant to New York law or to choice-of-law principles applied to a claim brought in Minnesota state court),[198] any claim based on 2006 conduct would be untimely. A fiduciary duty claim relating to the 2006 Bank Restructuring could possibly be timely only if a six-year limitations period applied, and even then would face challenging timeliness hurdles.

---

[196] *See Stanek Corp. v. Dev. Specialists, Inc.* (*In re Coudert Bros. LLP*), 673 F.3d 180, 188–89 (2d Cir. 2012) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, (1941)); *Bianco v. Erkins* (*In re Gaston & Snow*), 243 F.3d 599, 604, 609 (2d Cir. 2001).

[197] *See Oxbow Calcining USA Inc. v. Am. Indus. Partners*, 948 N.Y.S.2d 24, 31 (N.Y. App. Div. 2012) (citing Global Fin. Corp. v. Triarc Corp., 93 N.Y.2d 525, 528, (N.Y. 1999)).

[198] A claim for breach of fiduciary duty brought in Minnesota state court could be deemed timely under Minnesota's borrowing statute if the residency carveout were determined to apply. *See* Section VII.E.1.j(2).

A corporation's residence for purposes of N.Y. C.P.L.R. 202 is its principal place of business, rather than its state of incorporation.[199] The principal place of business:

> [i]s the place that Courts of Appeals have called the corporation's "nerve center." And in practice it should normally be the place where the corporation maintains its headquarters— provided that the headquarters is the actual center of direction, control, and coordination, i.e., the "nerve center," and not simply an office where the corporation holds its board meetings (for example, attended by directors and officers who have traveled there for the occasion).[200]

A New York court may not apply N.Y. C.P.L.R. 202 if "a plaintiff is either incorporated in New York or maintains its principal place of business there."[201] Although ResCap is a limited liability company, the same standard used for determining residency will likely be applied.[202] In cases relating to alternate forms of business entities, New York courts have determined that residency for purposes of N.Y. C.P.L.R. 202 is generally where the principal place of business is located.[203]

Under N.Y. C.P.L.R. 202, residency is determined as of the date the action accrued. *See THC Holdings Corp. v. Chinn*, 1998 WL 50202, at *5 (S.D.N.Y. Feb. 06, 1998) ("Under CPLR § 202, residency is determined at the date that the action accrued") (citing *Besser v. E.R. Squibb & Sons, Inc.*, 146 A.D.2d 107, 539 N.Y.S.2d 734, 739 (1st Dep't 1989), *aff'd*, 75 N.Y.2d 847, 552 N.Y.S.2d 923, 552 N.E.2d 171 (N.Y. 1990)); *Braune v. Abbott Laboratories*, 895 F. Supp. 530, 558 (E.D.N.Y. 1995) ("The controlling date for determining plaintiffs'

---

[199] *See McMahan & Co. v. Donaldson, Lufkin & Jenrete Sec. Corp.*, 727 F. Supp. 833, 834 (S.D.N.Y. 1989) (citing *Allegaert v. Warren*, 480 F. Supp. 817, 820 (S.D.N.Y. 1979)); *Pereira v. Cogan*, No. 00 Civ. 619 2001 WL 243537, at *18 (S.D.N.Y. Mar. 8, 2001) (finding that a corporation's state of residence, for purposes of the borrowing statute is New York, was where it maintained its principal place of business); *Brinckerhoff v. JAC Holding Corp.*, 263 A.D.2d 352, 352–353 (N.Y. App. Div. 999) (finding applicable statute of limitations of derivative breach of fiduciary duty claim to be Georgia where the state of incorporation was Delaware, but the principal place of business was Georgia); *Oxbow Calcining USA Inc. v. Am. Indus. Partners,* 948 N.Y.S.2d 24, 31 (N.Y. App. Div. 2012).

[200] *Hertz Corp. v. Friend*, 130 S.Ct. 1181, 1192, (2010); *see also Albstein v. Six Flags Entm't Corp*., No. 10 Civ. 5840 2010 WL 4371433, at *1 (S.D.N.Y. Nov. 4, 2010). Note that residency is a factual determination not to be decided on a motion to dismiss. *See Oxbow,* 948 N.Y.S.2d at 3.

[201] *In re Countrywide Fin. Corp. Mortg. Backed Secs. Litig.* 834 F. Supp. 2d 949, 958 (C.D. Cal. 2012) ("The goal of the statute is to prevent foreign claimants from flooding into New York courts to take advantage of New York's favorable limitations period . . . (in the context the borrowing statute's residency requirement) a person may have more than one residence . . . Accordingly, the Court will not apply the borrowing statute if a plaintiff is either incorporated in New York or maintains its principal place of business there.").

[202] *See Kat House Prod., LLC v. Paul, Hastings, Janofsky & Walker, LLP*, 897 N.Y.S.2d 90 (N.Y. App. Div. 2010) (limited liability company plaintiff's residence for purposes of N.Y. C.P.L.R. 202 was California, where its principal place of business was located).

[203] *See id.*; *Proforma Partners, LP v. Skadden Arps Slate Meagher & Flom, LLP,* 720 N.Y.S.2d 139, 140 (N.Y. App. Div. 2001).

residence [for borrowing statute purposes] is the date on which the cause of action accrued[,] not the date when the action is commenced."). In 2006, ResCap's principal place of business was Minnesota, where its headquarters and principal executive offices were located.[204]

Claims for breach of fiduciary duty accrue "where the plaintiff resides and sustains the economic impact of the loss."[205] Courts will look at where a plaintiff "most 'acutely' sustained the loss," and ask "who became poorer and where did they become poorer,"[206] rather than asking where directors met or voted.[207] The potential breach of fiduciary duty claims against ResCap's officers and directors accrued in Minnesota, where ResCap maintained its principal executive offices during the period of the 2006 Bank Restructuring. Minnesota is effectively where ResCap's "officers direct[ed], control[led], and coordinate[d] the corporation's activities."[208]

Minnesota applies a six-year statute of limitations to fiduciary duty claims,[209] and a claim brought on ResCap's behalf could be timely under Minnesota's choice-of-law law principles.[210] As noted above, however, a fiduciary duty claim in a New York federal court under N.Y. C.P.L.R. 202 must also be timely under New York's statute of limitations rules.

Although a close question, the six-year statute of limitations set forth in N.Y. C.P.L.R. 213(7) likely does not apply here because it is restricted by its terms to actions brought by a corporation. ResCap, while previously a corporation, since October 24, 2006 has been a

---

[204] *See* Residential Capital Corp. Current Report (Form 10-K) (Mar. 28, 2006), at 1, 3; Residential Capital, LLC, Current Report (Form 10-K) (March 13, 2007), at 1, 3; Residential Capital, LLC, Current Report (Form 10-K) (Feb. 27, 2008), at 1, 4.

[205] *Oxbow Calcining USA Inc. v. Am. Indus. Partners,* 948 N.Y.S.2d 24, 31 (N.Y. App. Div. 2012) (citing *Global Fin. Corp. v. Triarc Corp.*, 93 N.Y.2d 525, 529 (N.Y. 1999)); *see also Cantor Fitzgerald Inc. v. Lutnick*, 313 F.3d 704, 710 (2d Cir. 2002). There is an "extremely rare" exception to the rule that the harm occurs where the plaintiff resides. *See In re Countrywide Financial Corp. Mortgage-Backed Securities Litig.*, 834 F. Supp. 2d 949, 959 (C.D. Cal. 2012) (applying N.Y. C.P.L.R. 202). In these instances, it is the plaintiff who has the burden to demonstrate that extraordinary circumstances justify a departure from the standard rule. *See id.* In determining whether a plaintiff has met this burden, the court must consider all relevant factors. *See id.* For example, the "financial base" doctrine may apply [w]here a plaintiff 'maintains a separate financial base' and where the impact of the financial loss is felt at that location." However, the *Countrywide* court made clear that only two cases could be identified where the exception was applied. *See Countrywide*, 628 F. Supp. 2d at 960 n.11. Because these extraordinary circumstances do not appear to be present in this case, such an exception would likely not apply.

[206] *Countrywide,* 834 F. Supp. 2d at 957 (citing *Global Fin. Corp.*, 93 N.Y.2d 530).

[207] If a corporation is authorized to do business in New York but does not have its principal place of business there, those facts are generally insufficient to deem the corporation a New York resident for purposes of N.Y. C.P.L.R. 202. *See Allegaert v. Warren,* 480 F. Supp. 817, 820 (1979). Accordingly, if directors met and voted in a state other than the state of its incorporation or principal place of business, the action would generally not accrue in that state. *See Sompo Japan Ins. Co. of Am. v. Travelers Indem. Co.*, No. 118223/2003, 2004 WL 5487929, at *1 (Sup. Ct. N.Y. July 6, 2004) ("[A] foreign corporation will not be held a resident for purposes of the borrowing statute based on the mere fact that it is licensed to do business or is doing business in New York.").

[208] *Hertz Corp. v. Friend*, 130 S.Ct. 1181, 1192 (2010).

[209] *See* MINN. STAT. § 541.05 (2013).

[210] *See* Section VII.E.1.j(2).

limited liability company.[211] Statutes of limitations are narrowly construed in New York,[212] and application of N.Y. C.P.L.R. 213(7) has been expressly rejected in the LLC context.[213] As noted previously, however, the issue of whether N.Y. C.P.L.R. 213(7) applies where the plaintiff was a corporation when the claim (arguably) accrued, but a limited liability company when the claim was brought, has not been squarely addressed. However, the narrow construction of New York statutes of limitations likely militates against application of N.Y. C.P.L.R. 213(7) in the circumstance of ResCap's transition during the relevant period from a corporation to an LLC.[214]

A six-year limitations period is also potentially available under New York law, pursuant to N.Y. C.P.L.R. 213(8), where a plaintiff alleges fraud as integral to a fiduciary duty claim.[215] To trigger application of N.Y. C.P.L.R. 213(8), fraud allegations must be essential and not incidental to the claim for breach of fiduciary duty, and a fraud claim must be predicated on a duty to disclose the withheld information.[216] Material information was withheld from the Independent Directors, who relied on the good-faith conduct of the ResCap directors and officers to provide them with thorough and honest information for purposes of decision-making regarding proposed Affiliate Transactions. Jacob and Melzer were never apprised of Marple's conclusions regarding the proposed transaction, of Applegate's promotion of the option of ResCap retaining a voting share in the restructured bank, or that the Cerberus transaction did not predetermine an Ally Bank ownership result for ResCap. However, with respect to fiduciary duty claims relating to the 2006 Bank Restructuring, although a close call, it is more likely than not that N.Y. C.P.L.R. 213(8) would not apply. Although ResCap fiduciaries concealed material information from the Independent Directors, they likely owed no enforceable fiduciary duty to disclose such information.[217] In addition, any related fraud claim would likely be subject to successful affirmative defenses.[218]

---

[211] *See* Residential Capital, LLC, Current Report (Form 8-K) (Oct. 24, 2006).

[212] *See Sunken Pond Estates Homeowners Ass'n, Inc. v. Sunken Pond Estates*, 36 Misc.3d 1209(A), at *3 (N.Y. Sup. Ct. 2012).

[213] *See In re Die Fliedermaus LLC*, 2005 WL 3789333, at *1.

[214] In addition, as discussed below, a claim for breach of fiduciary duty relating to the 2006 Bank Restructuring arguably accrued after October 24, 2006, i.e., after ResCap had already converted from a corporation to an LLC.

[215] *See Oxbow Calcining USA Inc. v. Am. Indus. Partners*, 948 N.Y.S.2d 24, 31 (N.Y. App. Div. 2012) (citing *IDT Corp. v. Morgan Stanley Dean Witter & Co.*, 12 N.Y.3d 132, 139 (N.Y. 2009)).

[216] *See Monaghan v. Ford Motor Co.*, 71 A.D.3d 848, 850 N.Y.S.2d 482 (N.Y. App. Div. 2010) (citing *Kaufman v. Cohen*, 307 A.D.2d 113, 60 N.Y.S.2d 157 (N.Y. App. Div. 2003)).

[217] *See* Section VII.E.2.a(1).

[218] *See* Section VII.E.I.j(3) (discussing legal standards for application of N.Y. C.P.L.R. 213(8)); Section VII.L.1. (discussing the viability of a fraud claim against AFI related to the 2006 Bank Restructuring, including the applicability of potentially successful affirmative defenses).

If recovery on a claim for breach of fiduciary duty were limited to equitable remedies under N.Y. C.P.L.R. 213(1), a plaintiff could avail itself of the six-year limitations period.[219] However, a plaintiff pursuing a fiduciary duty claim would likely seek monetary damages, as equitable remedies may not be available,[220] and therefore would need to invoke either N.Y. C.P.L.R. 213(7) or N.Y. C.P.L.R. 213(8) to gain the benefit of the longer limitations period.

Yet even if a six-year limitations period were available under New York law through application of (1) N.Y. C.P.L.R. 213(7); (2) N.Y. C.P.L.R. 213(8); or (3) N.Y. C.P.L.R. 213(1), the timeliness of a fiduciary duty claim relating to the 2006 Bank Restructuring would still not be guaranteed. To be timely, a fiduciary duty claim would need to have accrued no earlier than May 14, 2006 (i.e., six years before the Petition Date).[221] Such a claim generally accrues, and the limitations period begins to run, upon the date of the alleged breach,[222] which occurs "as soon as the claim becomes enforceable, i.e., when all the elements of the tort can be truthfully alleged in a complaint."[223]

A fiduciary duty claim relating to the 2006 Bank Restructuring arguably accrued as early as May 4, 2006, when Feldstein's memorandum was sent to the Independent Directors outlining the terms of the proposed transaction, which did not reference the option of ResCap retaining a voting interest in the restructured bank despite the fact that various ResCap insiders (including Applegate and Marple) had discussed that option shortly before delivery of the memorandum. That date marks the initial occasion of ResCap insiders' withholding of information relating to the transaction, which they sought to persuade Jacob and Melzer to approve. If the claim accrued on May 4, 2006, it is time-barred even with the benefit of a six-year limitations period.

Yet, even if the claim accrued as early as May 4, 2006, through application of the "continuing wrong" doctrine[224] arguably the breach continued until the ResCap Board approved the 2006 Bank Restructuring on November 20, 2006, as the information regarding the transaction that was concealed from the Independent Directors could still have been disclosed at any time in advance of that Board approval. For example, the withheld information could have been disclosed by Marple on May 12, 2006 in response to Schenk's list of questions; by Walker on November 20, 2006 in his report to the ResCap Board regarding the proposed transaction before the Board approved it; and on any date in the several intervening months when Jacob and Melzer were considering the merits of the transaction, including several dates on which written communications regarding the

---

[219] *See* Section VII.E.1.j(3).

[220] *See* Section VII.I (discussing viability of constructive trust as potential remedy).

[221] Claims brought on behalf of ResCap's estate could invoke the benefit of tolling pursuant to the Bankruptcy Code. *See* 11 U.S.C. § 108(c).

[222] *See Sunken Pond Estates Homeowners Ass'n, Inc. v. Sunken Pond Estates, Inc.*, 36 Misc.3d 1209(A), at *3 (N.Y. Sup. Ct. June 21, 2012).

[223] *Kelly v. Legacy Benefits Corp.*, 34 Misc.3d 1242(A), at *12 (N.Y. Sup. Ct. Mar. 12, 2012).

[224] *See* Section VII.E.1.c.

transaction occurred.[225] The "continuing wrong" doctrine must be applied to preserve a fiduciary duty claim that definitively accrued as early as May 4, 2006, yet applicability of the doctrine is uncertain in light of limited case law.

However, it is more likely that a fiduciary duty claim accrued after May 4, 2006, when the possible harm caused by the potential breach of duty occurred. Arguably there was no actual injury until the ResCap Board approved the 2006 Bank Restructuring on November 20, 2006. Further, even if possible injury was caused as early as when the approval applications tied to the proposed transaction were submitted to the regulatory authorities on May 19, 2006,[226] the related fiduciary duty claim would still be timely if given the benefit of a six-year limitations period. It is likely that a claim for breach of fiduciary duty accrued at some point after May 14, 2006 when injury arguably occurred.

Overall, a claim for breach of fiduciary duty relating to the 2006 Bank Restructuring would have to overcome several impediments to be deemed timely. Although a close question, the Examiner concludes it is more likely than not that a fiduciary duty claim could not successfully trigger application of a six-year limitations period, which would be necessary to preserve the timeliness of the claim.

### (3) Proof Of Harm Resulting From A Potential Breach Of Fiduciary Duty May Be Uncertain

Although proof of damages is likely not required to demonstrate that the duty of loyalty has been breached, as stringent requirements are loosened in connection with a duty of loyalty breach,[227] nevertheless to earn a monetary recovery a claim based on a breach of fiduciary duty must ultimately show some accompanying harm. Even assuming that the inside fiduciaries owed an enforceable duty of loyalty to ResCap, which they breached in failing to disclose the withheld information to the Independent Directors, and that any related fiduciary duty claim could be deemed timely under a six-year limitations period, there is a threshold question of whether any harm to ResCap actually resulted from the possible breach.[228]

There is some uncertainty regarding whether the concealment of information from the Independent Directors relating to ResCap obtaining a voting interest in the restructured bank ultimately made any difference regarding the transaction that the ResCap Board approved. That is, the Independent Directors may possibly have approved the 2006 Bank Restructuring

_____

[225] *See generally* Section V.A.1.

[226] *See id.*

[227] *See* Section VII.E.1.b(2)(a).

[228] Because it is unlikely that a viable legal argument could be advanced that the duty of loyalty was owed by the inside fiduciaries directly to the Independent Directors rather than to ResCap (if a duty was owed to ResCap at all), it is similarly unlikely that any possible injury to the Independent Directors would be relevant to a potential claim. In any event, to date the Independent Directors arguably have suffered no harm as a result of the possible breach.

on the same terms as those agreed to even had they been provided with the concealed information. Jacob and Melzer stated that they conceived of the 2006 Bank Restructuring as a prerequisite for consummation of the Cerberus transaction, which they deemed beneficial to AFI and ResCap, and believed that ResCap received "fair value" in the transaction on the terms they approved.[229]

Nevertheless, the Examiner concludes that evidence supports the proposition that had Jacob and Melzer known that the option of ResCap obtaining a voting interest in the restructured bank was a viable or, at least, a negotiable term, they could—and likely would—have exploited that leverage to extract better terms for ResCap in the transaction.[230] At minimum, armed with the knowledge that a voting interest in the restructured bank was a negotiable transaction term, the Independent Directors could have sought to make up the shortfall in the value that ResCap received in compensation for relinquishing control of the bank. Potential damages on a fiduciary duty claim, reflecting harm to ResCap resulting from the possible breach, are (depending on the damages theory) $390–$465 million (FMV shortfall) or $533–$688 million (difference in value of equity interests transferred and received by ResCap).[231]

### (4) ResCap's Independent Directors Likely Did Not Breach Their Fiduciary Duties Of Care

Independent Directors Jacob and Melzer arguably breached their fiduciary duties of care in failing to exercise more thorough diligence regarding the 2006 Bank Restructuring. As noted above, the list of questions regarding the proposed transaction that Schenk sent to Marple on behalf of the Independent Directors did not technically solicit a response regarding the voting rights issue. At no time did the Independent Directors or their counsel at Bryan Cave, despite having considered the voting rights issue (as confirmed in Schenk's list of questions to Marple), actually ask anyone at ResCap whether ResCap could obtain a voting interest in the restructured bank. Had the Independent Directors or their counsel posed that question to ResCap managers, the withheld information regarding the voting rights issue may well have been exposed to them. Additionally, the Independent Directors commissioned no valuation of, or fairness opinion regarding, the interests in the restructured bank that they were receiving or relinquishing, which may call into question the informed basis upon which they approved the 2006 Bank Restructuring as being at arm's length and for fair value under the 2006 Amended Operating Agreement.

---

[229] *See* Int. of T. Jacob, Apr. 17, 2013, at 76:1–5; 77:9–19; 81:12–25; Int. of T. Melzer, Mar. 22, 2013, at 80:6–7; 82:14-15; *see also* Int. of E. Schenk, Apr. 24, 2013, at 67:14–16; 68:4–10; 77:14–23; 78:21–79:14; 82:11–15; *see* Section VII.L (discussing facts relevant to the post-hoc assessment of the significance of the concealed information).

[230] *See* Sections IV.A.1, IV.A.2, V.A.1, VII.L.1 (discussing independence of Jacob and Melzer in other contexts, particularly with respect to proposed affiliate transactions in 2008 preceding their simultaneous resignations).

[231] *See* Section V.A.2.b, Appendix V.A.2—4 (discussion of these damages calculations).

Yet the Examiner concludes it is unlikely that a claim against the Independent Directors for breach of the duty of care would prevail. Jacob and Melzer relied on the advice of counsel in assessing the proposed transaction, as well as on the candor of their ResCap co-fiduciaries. They performed certain—even if less than optimal—due diligence regarding the proposed transaction. In any event, any such breach of the duty of care would be exculpated under ResCap's charter.[232]

### b. *Potential Breach Of Fiduciary Duty Claims Relating To Prepetition Asset Sales*

While as many as three Prepetition Asset Sales (most notably the Health Capital Sale in August 2007) arguably occurred in a hurried manner, with negotiations and closings taking place on an accelerated schedule,[233] the Examiner concludes it is unlikely that any claim for breach of fiduciary duty with respect to the Prepetition Asset Sales would prevail. There is no indication in connection with any of the Prepetition Asset Sales that ResCap's fiduciaries lacked adequate information upon which to make an informed decision to sell on the proposed terms.

If anything, the speed at which Prepetition Asset Sales occurred likely benefited ResCap. The Health Capital Sale is illustrative. The purchase agreement contained a one-way true-up provision, requiring GMAC CF to pay to ResCap the difference between the earnest money deposit and a third-party valuation of the business. Because a premium was placed on providing ResCap with liquidity in short order, AFI was willing to deposit $775 million in earnest money without a signed purchase agreement and without a true-down provision in the final agreement. AFI agreed to a transaction structure that ensured that ResCap could keep the earnest money and potentially gain the benefit of an upward valuation adjustment, which could inure only to ResCap's benefit. The transaction structure and pace were therefore in ResCap's favor.

There is also no indication that ResCap's directors and officers disregarded corporate formalities with respect to any of the Prepetition Asset Sales. ResCap board minutes make clear that ResCap's directors and officers understood that they were obligated to obtain a fair price for each Prepetition Asset Sale, and to ensure that transaction terms overall were at least as beneficial to ResCap as those that might be available from an unrelated party. There is no evidence indicating that the ResCap Board acted in an unreasonable or uninformed fashion in concluding that each particular transaction met the required criteria. The documentary record (ResCap board minutes in particular) reflects that the Board routinely took steps to ensure compliance with pertinent requirements in the 2006 Amended Operating Agreement. Each Prepetition Asset Sale had a legitimate business reason—to improve ResCap's liquidity position—rendering each asset sale reasonable and justifiable in context.

Further, even assuming arguendo that ResCap fiduciaries breached duties with respect to asset sales that were negotiated and closed quickly, ResCap was not harmed in the process.

---

[232] *See generally* Section IV.B.

[233] *See* Section V.F (discussing pertinent facts related to the various related-party asset sales).

ResCap received fair value with respect to each of these transactions.[234] Here, too, the Health Capital Sale is illustrative. The record suggests that if ResCap had not sold the business to GMAC CF in August 2007, ResCap may have been unable to provide this business with the continued financing necessary for the business to preserve value going forward, potentially resulting in an appreciable loss of value if Health Capital were sold at a later time.

> ### c. Potential Breach Of Fiduciary Duty Claims Relating To The January 30 Letter Agreement, $48.4 million Prepetition Indemnity Payment, And A&R Servicing Agreement

The Investigation considered whether potential claims may exist for breaches of fiduciary duties relating to the January 30 Letter Agreement, a related $48.4 million prepetition indemnity payment to Ally Bank, and the A&R Servicing Agreement.[235] The Examiner concludes it is unlikely that such claims for breaches of fiduciary duties would prevail, although potential claims related to the prepetition indemnity payment are a close question.

Fiduciary duty claims relating to the January 30 Letter Agreement likely would not prevail. The January 30 Letter Agreement was the product of extensive negotiations involving sophisticated counsel for parties on both sides.[236] The agreement provided fair value to both ResCap and GMAC Mortgage, as it effectively required AFI to pay government fines through forgiveness of ResCap debt, to make additional capital contributions as might be needed, and to waive defaults under existing loan arrangements.[238] This allowed ResCap and GMAC Mortgage to continue to operate as going concerns in light of impending government penalties.[239] The ResCap Board considered the terms of the January 30 Letter Agreement at two separate meetings, with the Board, including three of the four Independent Directors, approving the agreement prior to its execution.[240] The evidence supports the proposition that the relevant ResCap fiduciaries negotiated the best possible deal for ResCap in what they viewed as a contentious situation.[241]

---

[234] See Section V.F.

[235] See Section V.C (discussing the facts relevant to these various issues and potential fiduciary duty claims).

[236] See Section V.C.2.a(3) (discussing these negotiations).

[237] See Section V.C.2 (detailing GMAC Mortgage's receipt of reasonably equivalent value with respect to the January 30 Letter Agreement and A&R Servicing Agreement transactions).

[238] See January 30 Letter Agreement [ALLY_0194817].

[239] Int. of S. Abreu, Jan. 22, 2013, at 370:4–22; Dep. of J. Whitlinger, Aug. 3, 2012, at 52:14–53:17 (if "ResCap didn't have the funds available" from AFI pursuant to the January 30 Letter Agreement, ResCap and GMAC Mortgage could not have entered into the DOJ/AG Settlement as they lacked the requisite net worth or liquidity.).

[240] Minutes of a Special Meeting of the Board of Residential Capital, LLC, Jan. 30, 2012, at RC40019197 [RC40019179]. Independent Director Ilany was absent from the January 30, 2012 special meeting for unidentified reasons.

[241] Int. of T. Marano, Feb. 27, 2013, at 70:18–20 ("[T]his is like every agreement was [sic] extremely contentious between us and [AFI] . . . ."); see E-mail from P. West to J. Whitlinger (Jan. 31, 2012) [EXAM10345463] (West thought that the end result was "Great. Looks like we got most of what we wanted. Good work."). See generally Section V.C.2.a(3).

The Examiner concludes that, while a close question, it is more likely than not that fiduciary duty claims relating to prepetition payment by ResCap to Ally Bank of $48.4 million for certain indemnification obligations would not prevail. The claims would be based on improper authorization by ResCap fiduciary Marano, in the absence of ResCap or GMAC Mortgage board approval, of a prepetition payment that would likely be subject later to challenge as an avoidable preference in the wake of ResCap's imminent bankruptcy filing. Yet the terms of the payment were negotiated at arm's length,[242] and the payment was due to Ally Bank pursuant to the January 30 Letter Agreement.[243] Although it may be a close question, payment of that debt, even without board consideration, was likely a reasonable exercise of the ResCap and GMAC Mortgage fiduciaries' business judgment, particularly in light of those entities' ongoing obligations. Additionally, evidence indicates that while GMAC Mortgage was contractually obligated to make the payment, Ally Bank also considered this payment a prerequisite for Ally Bank's entry into the A&R Servicing Agreement, which ResCap and GMAC Mortgage viewed as valuable.[244] The prepetition indemnity payment, made pursuant to an existing agreement between the parties, arguably helped ensure AFI's and Ally Bank's continued support leading up to ResCap's bankruptcy filing.

Potential fiduciary duty claims relating to the A&R Servicing Agreement likely would not prevail. The A&R Servicing Agreement was also the product of extensive, arm's-length negotiations that took place over the course of several months, with sophisticated counsel representing both parties.[245] Entry into the A&R Servicing Agreement was seen as critical to the preservation of GMAC Mortgage's servicing platform, which was ultimately the subject of a favorable postpetition disposition that benefited the Debtors' estate.[246] Although, as with the $48.4 million prepetition indemnity payment, there was no related approval by the GMAC Mortgage board of directors, the transaction would likely be considered by a court to be at arm's length and for fair value, and thus a claim would be unlikely to prevail.

---

[242] In connection with the payment, Ally Bank stated that a failure to make the payment would constitute a breach under the January 30 Letter Agreement, which would have serious consequences. *See* E-mail from B. Yastine to T. Marano (May 8, 2012) [RC40027250]. During the course of negotiations, Marano did what he could to further the interests of ResCap and GMAC Mortgage. *See* E-mail from T. Marano to J. Pensabene (May 8, 2012) [RC40032271] ("I will not be bullied. We will honor our specific contractual obligations and advise them professionally of what they need to do to protect their and our interests.").

[243] While the January 30 Letter Agreement did not expressly require the payment, subsequent written correspondence between the parties evidences their intent regarding the loan modifications and related indemnification obligations. Both February 9, 2012 e-mail correspondence and a May 11, 2012 agreement between the parties set forth the parties' understanding regarding the requirement to indemnify Ally Bank for modifications to loans in its portfolio. This agreement was also embedded in the A&R Servicing Agreement. *See* Sections V.C.2.a (2), V.C.2.e.

[244] *See* Section V.C.2.e (discussing the negotiations surrounding the $48.4 million prepetition indemnity payment).

[245] *See* Section V.C.2.d. (discussing a more detailed recitation of these negotiations).

[246] *See* Int. of J. Pensabene, Jan. 9, 2013, at 245:5–12 ("If we lost rights to service one-third of our overall portfolio and . . . even more as it relates to just the value of the portfolio then the auction of the business would not have been nearly as successful as it turned out to be. The value of the platform would have been diminished drastically.").

> d. *Potential Breach Of Fiduciary Duty Claims Relating To The Work Of The Special Review Committee And ResCap Board Regarding Approval Of The AFI And RMBS Trust Settlements*

The Investigation considered potential claims that might exist for breaches of fiduciary duties relating to approval by the ResCap Board of the (1) AFI Settlement and Plan Sponsor Agreement (which is now terminated) and (2) RMBS Trust Settlement Agreements. The work of the Special Review Committee of the ResCap Board, comprised of "super" Independent Directors Ilany and Mack, is particularly implicated by the ResCap Board's approval of the AFI Settlement and Plan Sponsor Agreement. The processes underlying the Board's approval of the AFI Settlement were flawed and are open to criticism. Despite the apparent deficiencies, no viable claims likely exist for breaches of fiduciary duties connected to those ResCap Board approval processes.

### (1) AFI Settlement And Plan Sponsor Agreement

Although the performance of the Independent Directors who comprised the Special Review Committee responsible for the claims investigation that led to the now-terminated AFI Settlement and Plan Sponsor Agreement was incomplete, tainted by certain conflicts of its counsel[247] and otherwise defective, those deficiencies do not rise to the level of a breach of fiduciary duties. The ResCap Board reasonably approved the settlement and related agreement based on the investigation of its legal counsel, even if the input of the Special Review Committee was virtually nonexistent.[248] The disinterestedness of Independent Directors Ilany and Mack cannot be seriously challenged.

The work of Ilany and Mack on the Special Review Committee was not marked by any particular diligence, or even conformity with the express terms of the ResCap Board resolutions that authorized their efforts. However, although a close question, their efforts on the Special Review Committee more likely than not did not violate their fiduciary duties. Ilany and Mack relied heavily on the advice of legal counsel in assessing the value of the claims to be settled, and believed in good faith that they had secured a favorable settlement for ResCap and its creditors. Based on the investigation that Morrison & Foerster conducted, the ResCap Board concluded that the AFI settlement was a reasonable resolution of complex and challenging litigation claims. The Special Review Committee and ResCap Board were entitled to delegate responsibility to their legal counsel for assessing the value of those litigation claims, and to rely on that expertise. The conclusions of the ResCap Board are entitled to the protection of the business judgment rule, and there is no credible basis to rebut the presumption that the ResCap Board and the Independent Directors upheld their fiduciary duties in the process of approving the settlement.

---

[247] *See* Sections III.J.1.c(6), III.J.3.g(1) (discussing conflicts related to Morrison & Foerster's investigation of potential legal claims against AFI).

[248] *See* Sections III.J.3.g, IV.A.5 (discussing facts related to the flawed process leading to the AFI Settlement and Plan Sponsor Agreement and underlying the work of the Special Review Committee).

### *(2) RMBS Trust Settlement Agreements*

The process that led to the RMBS Trust Settlement Agreements was also not a model of optimal board decision-making. The ResCap Board approved the settlement of momentous litigation claims within a highly condensed timeframe and based on imperfect expert advice.

Yet while the May 9, 2012 advisor presentation to the ResCap Board upon which the decision to approve the settlement may have been flawed, the Examiner does not believe such flaws undermine the conclusion that settlement negotiations were conducted at arm's length.[249] The settlement agreement was negotiated primarily by ResCap's outside counsel, upon whom the ResCap Board was entitled to rely to conduct negotiations competently and effectively. Although the comparative data points included in the May 9, 2012 presentation potentially misled or confused the ResCap Board, the Examiner concludes that, while a close question, it is more likely than not that breach of fiduciary duty claims related to approval of the RMBS Trust Settlement Agreements would not prevail. That the ResCap Board may have approved the settlement on a basis other than a pure assessment of the claims' legal merits is not dispositive. The ResCap Board acted on a sufficiently informed basis, in good faith, and with an honest and reasonable belief that the settlement of major claims—perceived by the Board as facilitating the efficacy of ResCap's imminent bankruptcy filing through eliminating an obstacle to sale of ResCap's assets—was in the best interests of ResCap and its creditors.

---

[249] *See* Section III.J.4.h (discussing facts related to the process leading to the RMBS Trust Settlement Agreements).

## VII. REVIEW AND ANALYSIS OF ESTATE CAUSES OF ACTION IMPLICATED BY AFFILIATE TRANSACTIONS AND THE RELATIONSHIP AND COURSE OF DEALING AMONG RESCAP, AFI, ALLY BANK, AND CERBERUS

### F.   AVOIDANCE ACTIONS[1]

Chapter 5 of the Bankruptcy Code sets forth several "avoiding powers" that the trustee, debtor-in-possession, or authorized estate representative can exercise to avoid prepetition transactions and return property to the estate for the benefit of all creditors. The Investigation focused specifically on transactions between the Debtors, on the one hand, and any of AFI, Cerberus, and Ally Bank, including any Affiliates or Subsidiaries of AFI, Cerberus, and Ally Bank, on the other hand.[2]

Based on the facts set forth in Section V, the Examiner concludes that there are certain transactions that may be avoidable based on: (1) the Minnesota "Insider Preference" statute as made applicable through section 544(b) of the Bankruptcy Code; (2) preference actions under section 547 of the Bankruptcy Code; and (3) constructive fraudulent transfer actions under either section 544 or 548 of the Bankruptcy Code. The proper recovery for the Debtors' Estates based on these avoidance actions would be governed by section 550 of the Bankruptcy Code.

Set forth below is the Examiner's analysis, as well as the Examiner's conclusions, with respect to potential avoidance actions that could be brought by one or more of the Debtors' Estates. Section VII.F.1 discusses which, if any, liens may be set aside pursuant to the section 544(a) strong-arm power. Section VII.F.2 discusses section 544 of the Bankruptcy Code, which permits an estate representative to access certain state law-based avoidance powers, and the choice of law principles that will determine which state's law is likely to control various avoidance actions. Section VII.F.3 discusses certain "safe harbor" defenses to avoidance actions created by section 546 of the Bankruptcy Code, as well as a potential method of bypassing the safe harbor defenses regarding claims that arise under state avoidance law. The Examiner has determined that Minnesota substantive law, as well as Minnesota's statute of limitations, is likely to control a number of avoidance actions, and Section VII.F.4 therefore discusses Minnesota's "Insider Preference" statute, as well as transactions that may be vulnerable to avoidance under that statute. Section VII.F.5 discusses the preference avoidance power created by section 547 of the Bankruptcy Code. Section VII.F.6 discusses general fraudulent transfer law—whether actual or constructive and whether based on state law or section 548 of the Bankruptcy Code—and identifies potentially avoidable transactions. Section VII.F.7 addresses avoidance of a postpetition transfer pursuant to section 549. Finally, Section VII.F.8 discusses the ability of the Debtors' Estates to recover avoided transfers pursuant to section 550 of the Bankruptcy Code.

---

[1]   This Section discusses all transactions identified by the Examiner that arguably give rise to colorable avoidance claims, including those that the Examiner believes are unlikely to succeed. Given the volume of transactions covered by the Investigation, this Section only discusses transactions as to which the Investigation has revealed sufficient evidence to support a colorable avoidance claim.

[2]   *See* Examiner Scope Approval Order, at 4. The Report does not analyze potential claims against other parties-in-interest or inter-Debtor claims.

1. *Strong Arm Powers Of Bankruptcy Trustee Under Section 544(a) Of The Bankruptcy Code*

Section 544(a) of the Bankruptcy Code confers on the trustee in bankruptcy the status of a hypothetical judgment lien creditor.[3] The trustee is treated as if it had extended credit to the debtor at the time of the bankruptcy filing and, at that moment, obtained a judicial lien on all property in which the debtor has any interest and that could be reached by a creditor.[4] Section 544(a) thus creates a "legal fiction that permits [a] trustee to assume the guise of a creditor with a judgment against the debtor."[5] "Under that guise, the trustee may invoke whatever remedies [are] provided by state law to judgment lien creditors to satisfy judgments against the debtor."[6]

The purpose of these "strong arm" powers under section 544(a) is to allow the bankruptcy trustee to cut off any secret or unperfected security interests on debtor property that would bind the debtor, but not the debtor's judgment creditor, who typically enjoys priority under state debtor and creditor laws (subject to any other validly perfected liens).[7] The extent of the trustee's priority and rights as a newly created 544(a) judgment creditor are determined by applicable state law.[8] On the other side of the equation, section 544(a) allows the trustee to avoid defective security interests and relegate the attendant secured claims to the status of general unsecured claims.[9]

As of the Petition Date, according to the Debtors' stipulations in the AFI DIP Order, the aggregate principal amount outstanding: (1) under the A&R Secured Revolver Loan Agreement was at least $747 million; and (2) under the A&R Line of Credit Agreement was at least $380 million plus accrued and unpaid interest thereon, in each case.[10]

According to the Debtors' trial balance as of February 29, 2012, attached as Exhibit A to the AFI DIP Order, the Debtors stipulated (and no party to date has disputed) that: (1) the A&R Secured Revolver Loan Agreement is secured by at least $1.3 billion of assets;[11] and (2) the A&R Line of Credit Agreement is secured by approximately $1.7 billion of assets.[12] Accordingly, assuming due and proper perfection, AFI appears to be substantially oversecured

---

[3]   *See Musso v. Ostashko*, 468 F.3d 99, 104 (2d Cir. 2006) (citing 11 U.S.C. § 544(a)(1)).

[4]   *Id.* (citing *Robinson v. Howard Bank* (*In re Kors, Inc.*), 819 F.2d 19, 22–23 (2d Cir. 1987)).

[5]   *Picard v. JPMorgan Chase & Co.*, 460 B.R. 84, 93 (S.D.N.Y. 2011) (quoting *Zilkha Energy Co. v. Leighton*, 920 F.2d 1520, 1523 (10th Cir. 1990)).

[6]   *Id.*

[7]   *Id.*; *see also Canney v. Merchs. Bank* (*In re Canney*), 284 F.3d 362, 374 (2d Cir. 2002).

[8]   *See Musso*, 468 F.3d at 104–05; *In re Kors Inc.*, 819 F.2d at 22–23.

[9]   *See Neilson v. Chang* (*In re First T.D. & Inv., Inc.*), 253 F.3d 520, 525 (9th Cir. 2001).

[10]  AFI DIP Order, ¶ 5(b).

[11]  *See id.* Ex. A. The trial balance also identified certain "Blanket Lien" assets of approximately $1.1 billion purportedly securing the A&R Secured Revolver Loan Agreement and the Junior Secured Notes. *See id.*

[12]  *See id.*

with respect to its claims under the A&R Secured Revolver Loan Agreement and A&R Line of Credit Agreement.[13] The Examiner did not undertake an independent collateral valuation exercise.

AFI's secured claims are neither secret nor undisclosed. Accordingly, the only relevant consideration is whether AFI's liens are unperfected or otherwise invalid. The Examiner's Professionals reviewed the UCC financing statements filed by AFI identifying ResCap LLC, GMAC Mortgage, RFC, and numerous other entities as debtors. The financing statements identify AFI or Wells Fargo Bank, N.A. (as agent on behalf of AFI), as secured party, with respect to the Secured Revolver Loan Agreement, A&R Secured Revolver Loan Agreement, the Initial Line of Credit Facility, the Second Line of Credit Facility, and the A&R Line of Credit Facility.[14]

In connection with the Secured Revolver Loan Agreement, and contemporaneously with the closing of that transaction on June 4, 2008, AFI filed UCC financing statements covering "all assets" against ResCap LLC, RFC, GMAC Mortgage, and numerous other entities. In connection with the A&R Secured Revolver Loan Agreement, UCC financing statements were filed on January 8, 2010, nine days after the date of that closing.[15]

In connection with the Initial Line of Credit Facility and the Second Line of Credit Facility, AFI filed UCC financing statements covering the assets specified by the related security agreements[16] against ResCap LLC, RFC, GMAC Mortgage, and numerous other entities. Those financing statements were filed contemporaneously with the closing of those transactions on November 20, 2008 and June 1, 2009, respectively. AFI did not file additional UCC financing statements in connection with the A&R Line of Credit Facility, but was not required to do so because that agreement was simply an amendment and restatement of the previously perfected Initial Line of Credit Facility and the Second Line of Credit Facility.

The Examiner concludes that AFI's liens on assets that can be perfected by the filing of a UCC financing statement are perfected to such an extent as not to jeopardize AFI's status as an oversecured creditor. Therefore, the use of section 544(a) would not yield any additional

---

[13]   *See id.*; *see also* RFC and GMAC Mortgage AFI Line of Credit Monthly Borrowing Base Report, Reporting Period Ending May 13, 2012, dated May 31, 2012 [EXAM00221834]; AFI—ResCap Secured Revolver Borrowing Base Report, Reporting Period Ending May 13, 2012, dated May 31, 2012 [EXAM00221438].

[14]   ResCap LLC, GMAC Mortgage, and RFC are each incorporated in Delaware. Accordingly, AFI's UCC financing statements related to those entities are properly filed in Delaware. *See* UCC §§ 9-301, 9-307(e), 9-501.

[15]   AFI was likely not required to file additional UCC financing statements in connection with the A&R Secured Revolver Loan Agreement because that agreement was simply an amendment and restatement of the Secured Revolver Loan Agreement. Accordingly, the brief delay in filing after the closing under the A&R Secured Revolver Loan Agreement does not appear to create any issues of delayed perfection.

[16]   The security agreements that relate to the Initial Line of Credit Facility and the Second Line of Credit Facility are the Initial Line of Credit Security Agreement and the Second Line of Credit Security Agreement, respectively.

recoveries for general unsecured creditors because AFI is substantially oversecured on both the A&R Secured Revolver Loan Agreement and the A&R Line of Credit Agreement.[17]

### 2. Invocation Of State Avoidance Law Under Section 544(b) Of The Bankruptcy Code

Section 544(b) of the Bankruptcy Code serves as a conduit for state fraudulent transfer laws,[18] "borrowing" such laws[19] and applying them in bankruptcy cases provided certain criteria are met. Section 544(b) allows a trustee to stand in the shoes of an actual, existing unsecured creditor and to bring such state law claims that such actual creditor could bring.[20] Application of section 544(b) necessitates three distinct steps: (1) performing a choice of law analysis to determine what state's law should be invoked by section 544; (2) establishing the existence of an actual unsecured creditor who, at the time of the bankruptcy filing, held a claim under state law and could have avoided the transfer at issue (also known as a "triggering creditor"); and (3) applying the relevant state law to determine if the transfer can be avoided.

---

[17] According to the Creditors' Committee, there is no deadline in the AFI DIP Order for any party-in-interest to challenge the claims and liens of AFI. *See* Motion of the Official Committee of Unsecured Creditors for Entry of an Order Authorizing it to Prosecute and Settle Certain Claims on Behalf of the Debtors' Estates [Docket No. 1546] at 11.

[18] *Stalnaker v. DLC, Ltd*. (*In re DLC, Ltd.*), 295 B.R. 593, 601 (B.A.P. 8th Cir. 2003) (noting that "section 544(b) [acts] as a conduit to assert state law-based fraudulent conveyance actions in bankruptcy").

[19] *Le Café Creme, Ltd*. *v. Le Roux* (*In re Le Café Creme, Ltd*.), 244 B.R. 221, 238 (Bankr. S.D.N.Y. 2000) ("Section 544(b) of the Bankruptcy Code 'borrows' applicable nonbankruptcy law which would be available to an unsecured creditor of the debtor . . . .").

[20] *Silverman v. Sound Around, Inc*. (*In re Allou Distribs., Inc.*), 392 B.R. 24, 32 (Bankr. S.D.N.Y. 2008) ("Next, a trustee must show that the triggering creditor is also 'a creditor holding an unsecured claim that is allowable under section 502 . . . .'"); *Young v. Paramount Commc'ns Inc.* (*In re Wingspread Corp.*), 178 B.R. 938, 945 (Bankr. S.D.N.Y. 1995) (noting that "the trustee must show that at least one . . . unsecured creditor[   ] . . . holds an allowable claim, against whom the transfer . . . was invalid under applicable state or federal law").

Because most states have adopted some version of either the Uniform Fraudulent Conveyance Act (the "UFCA") or the Uniform Fraudulent Transfer Act (the "UFTA"), analysis of section 544 claims usually requires the application of one of those uniform laws, as modified by individual state legislatures and interpreted by judicial decisions.[21] Here, as discussed below, the possible state laws that could apply include Delaware, Michigan, Minnesota, Pennsylvania, and New York. Delaware, Michigan, Minnesota, and Pennsylvania have all adopted the UFTA.[22] In contrast, New York is one of the only states that still applies the UFCA,[23] which is codified through New York's Debtor and Creditor Law (the "NY DCL").[24] While the UFTA and the NY DCL are "substantially similar,"[25] there are distinctions between the statutes that, as discussed below, can alter the outcome of fraudulent transfer litigation. Moreover, individual states' codification of the UFTA can vary in important ways, particularly with respect to statutes of limitation. Given these variations, the ultimate determination of whether a particular transaction may be avoided may turn on which state's law governs.

_____

[21] Although there are various laws addressing fraudulent transfers, they share many similarities and, as such, case law interpreting one law is often used by courts in analyses of the other laws. *See, e.g., Sharp Int'l Corp. v. State St. Bank & Trust Co.* (*In re Sharp Int'l Corp.*), 403 F.3d 43, 55 (2d Cir. 2005) (citing *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 634 n.8 (2d Cir. 1995)) (noting "New York's policy in favor of national uniformity in UFCA law"); *HBE Leasing Corp.,* 48 F.3d at 634 n.8 (2d Cir. 1995) ("In order to promote a uniform national interpretation of the UFCA, both this Circuit and the courts of New York have encouraged recourse to the case law of other jurisdictions."); *Tronox Inc. v. Anadarko Petrol. Corp.* (*In re Tronox Inc.*), 464 B.R. 606, 613 (Bankr. S.D.N.Y. 2012) ("Since the substantive provisions of state statutes under the Uniform Fraudulent Transfer Act and the earlier Uniform Fraudulent Conveyance Act are largely the same as § 548, a trustee's reliance on state fraudulent conveyance provisions may only have the effect of extending the statute of limitations, as the federal limitations period is shorter than the period in most state laws."); *Nisselson v. Empyrean Inv. Fund, L.P.* (*In re Marketxt Holdings Corp.*), 376 B.R. 390, 420, n.42 (Bankr. S.D.N.Y. 2007) (noting that "there is no dispute that Federal and State law are virtually identical as to their requirements for proving a constructive fraudulent conveyance"); *Official Comm. of Asbestos Prop. Damage Claimants of W.R. Grace & Co. v. Sealed Air Corp. & Cryovac, Inc.* (*In re W.R. Grace & Co.*), 281 B.R. 852, 857–58 (Bankr. D. Del. 2002) (noting that interpreting case law applying the UFTA the court "must be guided also by cases interpreting other, similarly worded statutes" and that "[t]he insolvency element of the Bankruptcy Code's constructive fraudulent conveyance section . . . is very close to the parallel provision in section 5 of the UFTA," such that after "[m]aking due allowance for differences of purpose and context, the Court will be guided by whatever case law exists interpreting these statutes"). Exceptions to this general concept occur, of course, where the specific nuances of the laws differ (for example, with respect to statutes of limitations).

[22] *See* Delaware Uniform Fraudulent Transfer Act, DEL. CODE ANN. tit. 6 §§ 1301–12; MICH. COMP. LAWS §§ 566.31–.42; MINN. STAT. §§ 513.41–.51; Pennsylvania Uniform Fraudulent Transfers Act, 12 PA. CONS. STAT. ANN. §§ 5101–10. Unless an individual state's adoption of the model UFTA contains a notable difference from the model UFTA, throughout this Section reference will be made to the model UFTA provisions as opposed to individual state statutes.

[23] N.Y. C.P.L.R. 270–81.

[24] N.Y. DEBT. & CRED. LAW §§ 273–75. Throughout this Section, relevant provisions will be referred to using their NY DCL designations as opposed to their model UFCA designations.

[25] *Drenis v. Haligiannis*, 452 F. Supp. 2d 418, 426 (S.D.N.Y. 2006).

*a. Choice Of Law Principles As Applied To Claims Under Section 544(b) Of The Bankruptcy Code*

Many of the transactions reviewed during the Investigation occurred outside the two-year look-back period contained in the federal fraudulent transfer statue.[26] Therefore, an estate representative seeking to avoid such transactions will be required to rely on section 544(b) of the Bankruptcy Code and its invocation of applicable state law.[27] To determine whether a transfer may be avoided under section 544(b), it is therefore necessary to determine which state's law is the "applicable law" to the transfer at issue.[28]

Although a representative of one or more of the Debtors' estates could choose to bring an action under section 544(b) of the Bankruptcy Code in a number of possible venues,[29] the Examiner believes that, in this case, such an action would likely be brought as an adversary proceeding in the Bankruptcy Court because the Bankruptcy Court's choice of law rules would likely result in the application of law that would favor a number of potential causes of action.

In Second Circuit jurisdictions, "bankruptcy courts confronting state law claims that do not implicate federal policy concerns should apply the choice-of-law rules of the forum state."[30] Accordingly, federal courts sitting in New York generally apply the choice of law rules of New York when deciding what law governs a claim under section 544(b).[31] However, a minority of courts have departed from this approach, and instead applied federal common law choice of law principles, because federal courts "possess[] federal question jurisdiction over any claim based on section 544(b) of the Bankruptcy Code."[32] Because it is the majority rule, the Examiner believes that the Bankruptcy Court would likely apply New York choice of

---

[26]  11 U.S.C. § 548(a)(1) ("The trustee may avoid any transfer . . . of an interest of the debtor in property, or any obligation . . . incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition . . . .").

[27]  *See* U.S.C. § 544(b).

[28]  *See Official Comm. of Unsecured Creditors of Hydrogen, L.L.C. v. Blomen* (*In re Hydrogen*), 431 B.R. 337, 353 (Bankr. S.D.N.Y. 2010).

[29]  *See* 28 U.S.C. § 1409(d).

[30]  *Bianco v. Erkins* (*In re Gaston & Snow*), 243 F.3d 599, 601–02 (2d Cir. 2001); *see also In re PSINet Inc.*, 268 B.R. 358, 376 (Bankr. S.D.N.Y. 2001) ("Where, as here, this Court's subject matter jurisdiction is based on 28 U.S.C. § 1334, the Court applies, with respect to matters of state law, the conflicts of law principles of the forum state, *i.e.*, the State of New York.").

[31]  *See O'Toole v. Karnani* (*In re Trinsum Grp., Inc.*), 460 B.R. 379, 389 (Bankr. S.D.N.Y. 2011) ("When performing a choice-of-law analysis, a court should follow the choice-of-law rules of the forum state.") (citing *In re Gaston & Snow*, 243 F.3d at 607–08) .

[32]  *In re WorldCom, Inc.*, No. 02-13533, 2003 WL 23861928, at *40 (Bankr. S.D.N.Y. Oct. 31, 2003); *In re Best Prods. Co., Inc.*, 168 B.R. 35, 51 (Bankr. S.D.N.Y. 1994), *aff'd*, 68 F.3d 26 (2d Cir. 1995) (citing *Corporacion Venezolana de Fomento v. Vintero Sales Corp.*, 629 F.2d 786, 795 (2d Cir. 1980)); *see also Koreag, Controle et Revision S.A. v. Refco F/X Assocs., Inc.* (*In re Koreag, Controle et Revision S.A.*), 961 F.2d 341, 350 (2d Cir. 1992).

law principles in this case. However, because the Bankruptcy Court could also reasonably adopt federal common law choice of law rules, the Examiner will address both New York and federal common law choice of law rules.

### (1) New York Choice Of Law Rules Applied To Claims Under Section 544(b)

#### (a) Whether A Choice Of Law Agreement Governs

New York choice of law rules would require the Bankruptcy Court to first determine whether an enforceable contractual choice of law provision governs the dispute at issue. As a general rule, "New York recognizes the right of contracting parties to agree to the choice-of-law."[33] However, "[u]nder New York law, a contractual choice-of-law provision governs only a cause of action sounding in contract, not one sounding in tort . . . unless the express language of the choice-of-law provision is sufficiently broad as to encompass the entire relationship between the contracting parties."[34] Fraudulent transfer or conveyance claims sound in tort, and are therefore not governed by contractual choice of law provisions unless such provisions are sufficiently broad to capture all conduct between the contracting parties.[35]

Courts applying New York law are generally reluctant to read choice of law clauses with sufficient breadth to control torts related to an underlying contract.[36] For example, a choice of law provision reading "[t]his Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware" has been held to be insufficiently broad to require application of Delaware law to fraudulent transfer claims arising from the agreement.[37] Nevertheless, in *Roselink Investors, L.L.C. v. Shenkman*, a virtually identical choice of law clause reading "[t]his Note shall be governed by and construed in accordance with the laws of the State of New York," when combined with a broad forum selection clause, led one court to conclude that "under the forum selection clause in [the relevant contracts] . . . New York law

---

[33] *Roselink Investors, L.L.C. v. Shenkman*, 386 F. Supp. 2d 209, 225 (S.D.N.Y. 2004) (citing *Turtur v. Rothschild Registry Int'l, Inc.*, 26 F.3d 304, 310 (2d Cir. 1994)).

[34] *H.S.W. Enters., Inc. v. Woo Lae Oak, Inc.*, 171 F. Supp. 2d 135, 141 n.5 (Bankr. S.D.N.Y. 2001) (*citing Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531, 1540 (2d Cir. 1997)); *accord Turtur,* 26 F.3d at 309–10; s*ee also Fin. One Pub. Co. Ltd. v. Lehman Bros. Special Fin., Inc.,* 414 F.3d 325, 335 (2d Cir. 2005) (citing *Krock v. Lipsay,* 97 F.3d 640, 645 (2d Cir. 1996); *Twinlab Corp. v. Paulson,* 724 N.Y.S.2d 496, 496 (N.Y. App. Div. 2001)) ("Under New York law . . . tort claims are outside the scope of contractual choice-of-law provisions that specify what law governs construction of the terms of the contract . . . . Presumably a contractual choice-of-law clause could be drafted broadly enough to reach such tort claims.").

[35] *See Geron v. Robinson & Cole LLP*, 476 B.R. 732, 737–38 (S.D.N.Y. 2012).

[36] *Fin. One Pub. Co. Ltd.*, 414 F.3d at 335.

[37] *See Drenis v. Haligiannis*, 452 F. Supp. 2d 418, 425–26 (S.D.N.Y. 2006) (citing *Knieriemen v. Bache Halsey Stuart Shields, Inc.*, 427 N.Y.S.2d 10 (N.Y. App. Div. 1980), *overruled on other grounds*, *Rescildo v. R.H. Macy's*, 594 N.Y.S.2d 139 (N.Y. App. Div. 1993)).

[was] the applicable law . . . ." with respect to a fraudulent transfer claim.[38] *Roselink*, however, is factually distinguishable from this case in that: (1) all creditors bringing the fraudulent conveyance claims in *Roselink* were parties to the agreements containing the applicable choice of law clause; (2) the fraudulent conveyance claim arose out of the contract that contained the choice of law clause; and (3) the action was not part of a larger bankruptcy case, and so did not directly affect the rights of other creditors who were non-parties to the choice of law agreement.

Highlighting the importance of this distinction, a number of courts have held that "parties to a contractual conveyance cannot in their contract make a choice-of-law that binds creditors who allege they were defrauded by the conveyance."[39] As one court put it, a choice of law agreement "will not be regarded where it would operate to the detriment of strangers to the agreement, such as creditors or lienholders."[40] The Examiner believes that these cases are well-reasoned and persuasive because it is difficult to see why a contractual choice of law provision between two parties should govern the rights of a third party with respect to a fraudulent transfer claim. Based on the foregoing, the Examiner concludes that it is unlikely that a contractual choice of law provision would be found to govern fraudulent transfer or conveyance claims arising from a contract.

### (b) Whether An Actual Conflict Of Law Exists Between New York Law And The Laws Of Other Interested Jurisdictions

If the Bankruptcy Court finds that a choice of law clause governs a particular claim, the analysis ends and the Bankruptcy Court will apply the agreed-upon law.[41] However, if no applicable choice of law clause exists or the Bankruptcy Court concludes that a such a clause does not govern the claim at issue, "[t]he first step of New York's choice-of-law rules is to

─────────────────────────────

[38] *Roselink*, 386 F. Supp. 2d at 226 (citing *Turtur*, 26 F.3d at 310). The forum selection clause in *Roselink* reads:

> The parties hereby agree that any dispute which may arise between them arising out of or in connection with this Subscription Agreement shall be adjudicated before a court located in New York City and they hereby submit to the exclusive jurisdiction of the courts of the State of New York located in New York, New York and of the federal courts in the Southern District of New York with respect to any action or legal proceeding commenced by any party.

*Roselink*, 386 F. Supp. 2d at 226.

[39] *Green v. Zukerkorn* (*In re Zukerkorn*), 484 B.R. 182, 200 (B.A.P. 9th Cir. 2012) (*quoting Ferrari v. Barclays Bus. Credit* (*In re Morse Tool, Inc.*), 108 B.R. 384, 386 (Bankr. D. Mass. 1989)); *see also Kraken Invs. Ltd. v. Jacobs* (*In re Salander-O'Reilly Galleries, LLC*), 475 B.R. 9, 32 (S.D.N.Y. 2012) (citing *In re Salander-O'Reilly Galleries,* 453 B.R. 106, 120 (Bankr. S.D.N.Y. 2011)).

[40] *Marine Midland Bank v. Portnoy* (*In re Portnoy*), 201 B.R. 685, 701 (Bankr. S.D.N.Y. 1996) (quoting *Hong Kong & Shanghai Banking Corp., Ltd. v. HFH USA Corp.,* 805 F. Supp. 133, 140 (W.D.N.Y. 1992)); *Carlson v. Tandy Computer Leasing,* 803 F.2d 391 (8th Cir. 1986); *In re Morse Tool, Inc.,* 108 B.R. at 386.

[41] *See Roselink*, 386 F. Supp. 2d at 226 (citing *Turtur*, 26 F.3d at 310).

determine whether there is an actual conflict between the laws of the jurisdictions involved."[42] In the absence of an actual conflict, New York law will apply.[43]

In this case, jurisdictions that are potentially interested in one or more of the transactions investigated by the Examiner include Delaware,[44] Michigan,[45] Minnesota,[46] New York,[47] and Pennsylvania.[48] As discussed in Section VI, the NY DCL is based on the UFCA. In contrast, the fraudulent transfer laws of Delaware, Michigan, Minnesota, and Pennsylvania are all based on the UFTA. Consequently, where a transaction has connections with jurisdictions other than New York, the Bankruptcy Court may need to determine whether an actual conflict exists between the specific provisions of the UFCA and the UFTA implicated by the dispute.[49]

Where the issue in dispute "would turn out the same under both forums' law . . . no true conflict exists."[50] Accordingly, if the litigants fail to present evidence of the difference between the laws of two potential forums, the Bankruptcy Court may conclude that no actual conflict exists.[51] Similarly, if the parties were to stipulate that no actual conflict of law exists as to the issue in dispute, the Bankruptcy Court may acquiesce and apply the law of New York, the forum state.[52] However, the parties need not show that a difference in law will

---

[42]   *Paradigm BioDevices, Inc. v. Viscogliosi Bros., LLC*, 842 F. Supp. 2d 661, 665 (S.D.N.Y. 2012) (citing *Drenis*, 452 F. Supp. 2d at 426).

[43]   *See Paradigm BioDevices*, 842 F. Supp. 2d at 665.

[44]   AFI, GMAC Mortgage, ResCap, and RFC are all incorporated in or otherwise organized under the laws of Delaware.

[45]   AFI's principal place of business is located in Michigan.

[46]   RFC's principal place of business is located in Minnesota. ResCap's principal place of business was located in Minnesota until at least March 10, 2012. According to the Debtors and AFI, ResCap's principal place of business was relocated to New York on March 10, 2012.

[47]   According to the First Day Affidavit, ResCap "maintains its headquarters at its New York office located at 1177 Avenue of the Americas, New York, New York 10036." First Day Affidavit, at 3. The Debtors further stated that "the New York office has served as the primary office for the senior executives and core management team of the largest operating Debtors—ResCap, Residential Funding Company LLC . . . and GMAC Mortgage, LLC." *Id.*

[48]   GMAC Mortgage's principal place of business is in Pennsylvania.

[49]   Whether a true conflict exists must be determined on a claim by claim basis. Thus, whether a court finds a true conflict between the laws of two jurisdictions will depend on the specific aspects of those laws implicated by a particular transaction. A court might thus reasonably find that no true conflict exists between the NY DCL and the UFTA of another state with respect to one type of fraudulent transfer claim, but find that a true conflict does exist with respect to another type of claim.

[50]   *Elgin Sweeper Co. v. Melson Inc.*, 884 F. Supp. 641, 648 (N.D.N.Y. 1994) (citing *Howard v. Clifton Hydraulic Press Co.*, 830 F. Supp. 708, 712 (E.D.N.Y. 1993)).

[51]   *See Paradigm BioDevices, Inc. v. Viscogliosi Bros., LLC*, 842 F. Supp. 2d 661, 665 n.1 (S.D.N.Y. 2012) ("[P]laintiff does not point to any specific differences between the UFTA and UFCA that show a conflict between Massachusetts's UFTA and New York's fraudulent conveyance statute to warrant the application of Massachusetts law to the fraudulent transfer claim in the present action.").

[52]   *See, e.g.*, *FCC v. NextWave Pers. Commc'ns, Inc.* (*In re NextWave Pers. Commc'ns, Inc.*), 200 F.3d 43, 56 n.13 (2d Cir. 1999).

definitely affect the dispute for the Bankruptcy Court to find that an actual conflict of law exists. Instead, an actual conflict of law exists so long as there are differences "that may eventually prove relevant to plaintiffs' claims in [the] litigation."[53]

Although authority on the issue is not uniform, certain courts applying New York's choice of law principles have found an actual conflict between the NY DCL and the UFTA.[54] As an example of an area where an actual conflict may exist, there are significant differences between the concept of "reasonably equivalent value" under the UFTA—which requires approximate equivalence between what is given and what is received by the debtor[55]—and the concept of "fair consideration" under the NY DCL—which requires "good faith" in addition to approximate equivalence between what is given and what is received by the debtor.[56] Where these statutory differences may be outcome-determinative, the Bankruptcy Court is likely to find an actual conflict of law.[57]

Actual conflicts of law have also been found to exist with respect to intentional fraudulent transfer or conveyance claims.[58] For example, under both the UFTA and the NY DCL, a transfer is potentially avoidable if the transferor acted with fraudulent intent. However, the UFTA provides a defense to transferees who either gave reasonably equivalent value or acted in good faith. In contrast, under the NY DCL, "every conveyance with actual intent to defraud present or future creditors is fraudulent, irrespective of transferee's good faith (or lack thereof) or exchange of fair consideration."[59] Given that the recipient of an alleged intentional fraudulent transfer will often be in a position to assert a colorable argument of good faith or reasonably equivalent value, and the outcome-determinative nature of such an assertion, some courts have found a fundamental conflict between the UFTA and the NY DCL with respect to intentional fraud claims.[60]

The Examiner concludes that it is likely that the Bankruptcy Court would find that an actual conflict exists between the NY DCL and the laws of the jurisdictions that employ the UFTA with respect to fraudulent conveyance or fraudulent transfer claims wherever the

---

[53] *Drenis v. Haligiannis*, 452 F. Supp. 2d 418, 426 (S.D.N.Y. 2006).

[54] *See, e.g.*, *O'Toole v. Karnani* (*In re Trinsum Grp., Inc.*), 460 B.R. 379, 389–94 (Bankr. S.D.N.Y. 2011) (finding that a conflict requiring application of choice of law principles existed between the NY DCL and Delaware constructive fraudulent transfer law, and analyzing, among other things, differing treatment of claims against insiders in the two jurisdictions).

[55] *See Viscount Air Servs., Inc. v. Cole* (*In re Viscount Air Servs., Inc.*), 232 B.R. 416 (Bankr. D. Ariz. 1998) ("[R]easonably equivalent value ordinarily means 'similar to fair market value.'") (citing *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 545 (1994)).

[56] *See* N.Y. DEBT. & CRED. LAW § 272.

[57] *See Drenis*, 452 F. Supp. 2d at 426–27.

[58] *See id.*

[59] *Id.* (citing N.Y. DEBT. & CRED. LAW § 276).

[60] *Id.*

statutory differences would be outcome determinative. The Examiner notes that actual conflicts of law are likely to exist where a debtor transferred property to an insider either for less than market value or in satisfaction of an antecedent debt, or where the recipient of an alleged intentional fraudulent conveyance or transfer has a plausible basis for asserting a defense of good faith or the provision of reasonably equivalent value.

### (c) The Jurisdiction With The Greatest Interest

If the Bankruptcy Court were to find that an actual conflict of law exists with respect to a potential fraudulent transfer claim under section 544(b) of the Bankruptcy Code, it would "conduct[] an interest analysis, and appl[y] the law of the jurisdiction having the greatest interest in the litigation."[61] In deciding which jurisdiction has the greatest interest, the Bankruptcy Court would consider "(1) what are the significant contacts and in which jurisdiction are they located; and, (2) whether the purpose of the law is to regulate conduct or allocate loss."[62]

In determining which jurisdiction has the most significant contacts, the Bankruptcy Court would consider: (1) the domicile, residence, place of incorporation, and place of business of the parties; (2) the place of injury; and (3) the place of injury-causing contact.[63]

However, "where . . . regulation of conduct is at issue, the state where the alleged tort took place has the greater interest."[64] Fraudulent conveyance laws are conduct-regulating rather than loss-allocating.[65] Accordingly, when considering a fraudulent transfer action under section 544(b) of the Bankruptcy Code, the Bankruptcy Court would likely apply the law of the state where the alleged fraudulent transfer occurred.

---

[61] *Geron v. Robinson & Cole LLP*, 476 B.R. 732, 738 (S.D.N.Y. 2012) (quoting *Istim, Inc. v. Chem. Bank*, 581 N.E.2d 1042 (N.Y. 1991) (quoting *Schultz v. Boy Scouts of Am., Inc.*, 480 N.E.2d 679 (N.Y. 1985))) (internal quotation marks omitted); *see also Krock v. Lipsay*, 97 F.3d 640, 645 (2d Cir. 1996) (requiring the court to conduct an "interest analysis" to determine "the jurisdiction having the greatest interest in the litigation."); *Paradigm BioDevices, Inc. v. Viscogliosi Bros., LLC*, 842 F. Supp. 2d 661, 665 (S.D.N.Y. 2012) ("If there is a conflict of law in tort actions, New York's choice-of-law rules use an 'interest analysis' that applies the laws of the jurisdiction with the greatest interest in the application of its law 'based on the occurrences within each jurisdiction, or contacts of the parties with each jurisdiction, that 'relate to the purpose of the particular law in conflict.'") (quoting *Pension Comm. of Univ. of Montreal Pension Plan v. Banc. of Am. Secs., LLC*, 446 F. Supp. 2d 163, 192 (S.D.N.Y. 2006)); *Official Comm. of Unsecured Creditors of Hydrogen, L.L.C. v. Blomen* (*In re Hydrogen*), 431 B.R. 337, 353–54 (Bankr. S.D.N.Y. 2010).

[62] *Padula v. Lilarn Props. Corp.*, 644 N.E.2d 1001 (N.Y. 1994) (citing *Schultz*, 480 N.E.2d at 684–85).

[63] *In re Hydrogen*, 431 B.R. at 353–54 (citations omitted).

[64] *Geron*, 476 B.R. at 738 (citing *GFL Advantage Fund, Ltd. v. Colkitt*, No. 03 Civ. 1256, 2003 WL 21459716, at *3 (S.D.N.Y. June 24, 2003)); *see also Drenis v. Haligiannis*, 452 F. Supp. 2d 418, 427 (S.D.N.Y. 2006) ("[T]he law of the jurisdiction where the tort occurred will generally apply because that jurisdiction has the greatest interest in regulating behavior within its borders.") (quoting *Pension Comm. of Univ. of Montreal Pension Plan*, 446 F. Supp. 2d at 192 (quoting *GlobalNet Financial.com, Inc. v. Frank Crystal & Co., Inc.*, 449 F.3d 377, 384 (2d Cir. 2006))).

[65] *Roselink Investors, L.L.C. v. Shenkman*, 386 F. Supp. 2d 209, 225 (S.D.N.Y. 2004) ("A fraudulent conveyance statute is conduct regulating rather than loss allocating.") (quoting *GFL Advantage*, 2003 WL 21459716, at *3).

In determining where a fraudulent transfer occurred:

> a court's "paramount" concern is the locus of the fraud, that is,
> "the place where the injury was inflicted," as opposed to the
> place where the fraudulent act originated. The place in which
> the injury is deemed to have occurred is "usually where the
> plaintiff is located."[66]

Determining where the "plaintiff" is located for fraudulent transfer purposes is complicated by the fact that, in bankruptcy, the debtor's estate, which is typically the nominal plaintiff, acts on behalf of the creditor body as a whole. As a result, the Bankruptcy Court may consider both the location of the transferor-debtor (based on its state of incorporation and principal place of business) and the locations of the debtor's various creditors.[67] However, where the transferor's creditors are widely dispersed, their location will be given only limited weight.[68] Additionally, little weight will be given to the transferor's state of incorporation unless the transaction at issue has some other nexus with that state.[69] Consequently, if the Bankruptcy Court were to find that: (1) an actual conflict of law exists between the NY DCL and the fraudulent transfer laws of other interested jurisdictions; (2) the transferor-debtor's creditors are widely dispersed; (3) the transaction at issue is not otherwise linked to the transferor-debtor's state of incorporation; and (4) no controlling choice of law agreement exists, it would likely apply the substantive law of the state in which the transferor-debtor's principal place of business is located.

---

[66] *Cromer Fin. Ltd. v. Berger*, 137 F. Supp. 2d 452, 492 (S.D.N.Y. 2001); *see also H.S.W. Enters., Inc. v. Woo Lae Oak, Inc.*, 171 F. Supp. 2d 135, 142 (S.D.N.Y. 2001) (citing *La Luna Enters. v. CBS Corp.*, 74 F. Supp. 2d 384, 389 (S.D.N.Y. 1999); *Krock*, 97 F.3d at 645) ("Although the law is somewhat unresolved on this point, New York courts consider the locus of a fraud to be the place where the injury was inflicted and not the place where the fraudulent act originated."); *RCA Corp v. Tucker*, 696 F. Supp. 845, 856 (E.D.N.Y. 1988) ("The authorities are unanimous that in fraud cases where the wrongful acts occur in a state other than that in which the injury is suffered, the case is governed by the law of the state where the injury or economic loss is felt.") (citing *Indus. Consultants, Inc. v. H.S. Equities, Inc.*, 646 F.2d 746 (2d Cir. 1981); *Sack v. Low*, 478 F.2d 360 (2d Cir. 1973); *Maiden v. Biehl*, 582 F. Supp. 1209 (S.D.N.Y. 1984); *Posner v. Merrill Lynch, Pierce, Fenner & Smith*, 469 F. Supp. 972, 979–80 (S.D.N.Y. 1979)) .

[67] *See In re Hydrogen*, 431 B.R. at 353–54; *In re WorldCom, Inc.*, No. 02–13533, 2003 WL 23861928, at *40 (Bankr. S.D.N.Y. Oct. 31, 2003) (citing *In re Best Prods. Co., Inc.*, 168 B.R. 35, 51 (Bankr. S.D.N.Y. 1994), *aff'd*, 68 F.3d 26 (2d Cir. 1995)).

[68] *See In re Hydrogen*, 431 B.R. at 354 n.10.

[69] *See Savage & Assocs., P.C. v. Mandl* (*In re Teligent, Inc.*), 380 B.R. 324, 332 n.6 (Bankr. S.D.N.Y. 2008) (conducting an "interest analysis," and holding the state of the debtor's incorporation—Delaware— inapplicable to fraudulent transfer claim since the fraudulent transfer occurred in another jurisdiction); *Faulkner v. Kornman* (*In re Heritage Org. L.L.C.*), 413 B.R. 438, 462 (Bankr. N.D. Tex. 2009) (conducting a "most significant factor" choice of law analysis and holding Delaware fraudulent transfer law inapplicable because the "only connection the Trustee's fraudulent transfer claims have to Delaware is that [transferor] and the [transferees] are Delaware entities"); *Official Comm. of Asbestos Pers. Injury Claimants v. Sealed Air Corp.* (*In re W.R. Grace & Co.*), 281 B.R. 852, 855 (Bankr. D. Del. 2002) (conducting choice of law analysis and holding Delaware fraudulent transfer law inapplicable because "Delaware's only contact with this matter is that it is the state of incorporation of the transferee and the subsidiary that is the subject of this fraudulent transfer action").

Based on a review of the Debtors' schedules and the numerous claims and causes of action that have been asserted in this case, the Examiner concludes that the creditors of each of the relevant Debtors are widely dispersed. Where the remaining three conditions discussed above are satisfied, the Examiner concludes that it is likely that: (1) Minnesota's substantive fraudulent transfer law would govern claims brought by the estates of, among others, ResCap[70] and RFC; and (2) Pennsylvania's substantive fraudulent transfer law would govern claims brought by the estate of GMAC Mortgage.

### *(d) The Internal Affairs Doctrine*

The internal affairs doctrine "recognizes that only one state should have the authority to regulate a corporation's internal affairs—matters peculiar to the relationships among or between the corporation and its current officers, directors and shareholders—because otherwise a corporation could be faced with conflicting demands."[71] "However, in certain circumstances 'application of the local law of some other state is required by reason of the overriding interest of that other state in the issue to be decided.'"[72] As a result, "the New York Court of Appeals has rejected 'any automatic application of the so-called 'internal affairs' choice-of-law rule.'"[73] Indeed, several courts have expressly declined to apply the internal affairs doctrine to fraudulent transfer or conveyance claims, even where the only aggrieved creditors were partners of the transferor-debtor.[74] Accordingly, the Examiner concludes that the Bankruptcy Court is unlikely to apply the internal affairs doctrine to any of the potential fraudulent transfer or fraudulent conveyance actions discussed below.

---

[70] Because all of the state-law based claims and causes of action discussed below arose prior to March 2012, when the Debtors and AFI contend that ResCap's principal place of business was shifted to New York, it is unnecessary for the Examiner to opine on whether that asserted shift in fact occurred.

[71] *Edgar v. MITE Corp.*, 457 U.S. 624, 645 (1982).

[72] *Drenis v. Haligiannis*, 452 F. Supp. 2d 418, 427 (S.D.N.Y. 2006) (quoting *Stephens v. Nat'l Distillers & Chem. Corp.*, No. 91 Civ. 2901, 1996 WL 271789, at *4 (S.D.N.Y. May 21, 1996) (quoting RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 302 cmt. b (1971))).

[73] *Drenis*, 452 F. Supp. 2d at 427 (quoting *Stephens*, 1996 WL 271789, at *4 (quoting *Greenspun v. Lindley*, 330 N.E.2d 79, 81 (N.Y.1975))).

[74] *See Drenis*, 452 F. Supp. 2d at 427; *see also Goodman v. H.I.G. Capital, LLC* (*In re Gulf Fleet Holdings, Inc.*), No. 11-50713, 2013 WL 13432751, at *7 (Bankr. W.D. La. Apr. 2, 2013) (citing *In re Heritage Org.*, 413 B.R. at 463); *Stanziale v. Dalmia* (*In re Allserve Sys. Corp.*), 379 B.R. 69, 79–80 (Bankr. D.N.J. 2007)).

### (2) Federal Common Law Choice Of Law Analysis

Federal common law choice of law rules require application of the "law of the jurisdiction with the most significant relationship to the transaction and to the parties."[75] This test appears to be indistinguishable from New York's greatest interest test.[76] Accordingly, federal common law choice of law analysis would only yield a different result than analysis under New York choice of law rules in instances where a court applying the New York rules finds no actual conflict between New York law and the laws of other potentially interested jurisdictions, in which case the choice of law issue would be moot by definition.

### b. Statutes Of Limitation And New York's Borrowing Statute

Courts in the Southern District of New York have applied New York's choice of law rules to determine the applicable statute of limitations.[77] Under New York's "borrowing statute," the Bankruptcy Court would apply the shorter of New York's statute of limitations or that of the state in which the plaintiff resides.[78] "When a bankruptcy trustee sues as a representative of the estate of the bankrupt corporation, it is the residency of the corporation which is applicable."[79] Residency in this context has generally been held to be a corporation's or limited liability company's principal place of business.[80] In this instance, the applicable

---

[75] *See In re Worldcom, Inc.*, No. 02-13533, 2003 WL 23861928, at *40 (Bankr. S.D.N.Y. Oct. 31, 2003) (citing *In re Best Prods. Co., Inc.*, 168 B.R. 35, 51 (Bankr. S.D.N.Y. 1994), *aff'd*, 68 F.3d 26 (2d Cir. 1995)).

[76] *See Kraken Invs. Ltd. v. Jacobs* (*In re Salander-O'Reilly Galleries, LLC*), 475 B.R. 9, 31 (S.D.N.Y. 2012) (quoting *Koreag, Controle et Revision S.A. v. Refco F/X Assocs., Inc.* (*In re Koreag, Controle et Revision S.A.*), 961 F.2d 341, 350 (2d Cir. 1992)) ("I need not determine whether the Bankruptcy Court should have applied federal or New York choice-of-law rules because both apply 'the law of the jurisdiction having the greatest interest in the litigation.'").

[77] *See, e.g.*, *Official Comm. of Asbestos Claimants of G-I Holding, Inc. v. Heyman*, 277 B.R. 20, 30 (S.D.N.Y. 2002); *Adelphia Commc'ns Corp. v. Bank of Am. N.A.* (*In re Adelphia Commc'ns Corp.*), 365 B.R. 24, 57 n.136 (Bankr. S.D.N.Y. 2007) ("Where, as here, the Court is exercising bankruptcy jurisdiction over state law claims under 28 U.S.C. § 1334(b), the court applies the choice of law rules of the forum state to determine the applicable statute of limitations."). Where the claim asserted before the bankruptcy court is derived from another claim pending in an out of state non-bankruptcy proceeding commenced prior to the bankruptcy case, the court should apply the choice of law rules of the state in which the original claim was brought to determine the applicable statute of limitations. *See Statek Corp. v. Dev. Specialists, Inc.* (*In re Coudert Bros. LLP*), 673 F.3d 180, 182 (2d Cir. 2012).

[78] *See In re Adelphia Commc'ns Corp.*, 365 B.R. at 57–58.

[79] *Heyman*, 277 B.R. at 30.

[80] *See, e.g.*, *id.*; *In re Adelphia Commc'ns Corp.*, 365 B.R. at 58 n.137.

jurisdiction may be Delaware,[81] Michigan,[82] Minnesota,[83] New York,[84] or Pennsylvania.[85] Thus, the Bankruptcy Court would compare the statute of limitations for fraudulent transfer or conveyance claims in New York against the statute of limitations of Michigan, Minnesota, or Pennsylvania, depending on which Debtor's Estate was asserting such claims.[86]

Delaware, Michigan, Minnesota, and Pennsylvania have all adopted the UFTA, which generally provides a four-year statute of limitations for general fraudulent transfer claims and one year for "Insider Preference" fraudulent transfer claims, which are unique to the UFTA.[87] Michigan, Minnesota, and Pennsylvania, however, have non-uniform statutes of limitation. Under Michigan law, general fraudulent transfer claims are subject to a six-year statute of limitations, while Insider Preference fraudulent transfer claims have a one-year statute of limitations.[88] Under Minnesota law, all fraudulent transfer claims, including Insider Preference fraudulent transfer claims, have a six-year statute of limitations.[89] Pennsylvania adopted the UFTA's four-year statute of limitations for general fraudulent transfer claims.[90] However,

---

[81]   AFI, GMAC Mortgage, ResCap, and RFC are all incorporated in, or otherwise organized under the laws of, Delaware.

[82]   AFI's principal place of business is located in Michigan.

[83]   RFC's principal place of business is located in Minnesota. ResCap's principal place of business was located in Minnesota until at least March 10, 2012. According to the Debtors and AFI, ResCap's principal place of business was relocated to New York on March 10, 2012. Because residency under New York's borrowing statute is measured as of the date on which a cause of action accrues, and all relevant transactions occurred prior to the alleged relocation of ResCap's principal place of business, the Examiner concludes that it is unnecessary to determine whether ResCap relocated its principal place of business to New York in March 2012.

[84]   As noted above, ResCap and AFI assert that ResCap's principal place of business was relocated to New York in March 2012. In the First Day Affidavit, the Debtors stated that ResCap "maintains its headquarters at its New York office located at 1177 Avenue of the Americas, New York, New York 10036." First Day Affidavit, at 3. The Debtors further stated that "the New York office has served as the primary office for the senior executives and core management team of the largest operating Debtors—ResCap, Residential Funding Company LLC . . . and GMAC Mortgage, LLC." *Id.*

[85]   GMAC Mortgage's principal place of business is in Pennsylvania.

[86]   In *Adelphia*, the court decided to compare the statute of limitations of New York to the limitations period in Pennsylvania, where the Adelphia debtors resided. In coming to its decision, the court rejected the argument that it should compare the New York's period to the limitations period in states where subsidiary debtors resided. 365 B.R. 24, 58 n.138 (Bankr. S.D.N.Y. 2007). "There are no allegations in the complaint that any Adelphia subsidiaries were under independent control, or directed by the Rigases or anyone else in different states." *Id.*

[87]   *See* UFTA § 9(a).

[88]   *See* MICH. COMP. LAWS ANN. §§ 566.39, 600.5813, 600.5855.

[89]   *See* MINN. STAT. ANN. § 541.05; *see also Georgen-Running v. Grimlie* (*In re Grimlie*), 439 B.R. 710, 720 n.25 (B.A.P. 8th Cir. 2010) (citing MINN. STAT. ANN. §541.05(6)) (ruling, in the context of a fraudulent transfer action, that "[i]n Minnesota, cases involving fraud have a statute of limitations of six years"); *In re Curry*, 160 B.R. 813, 819 n.5 (Bankr. D. Minn. 1993) (noting that fraudulent conveyance actions under Minnesota's Uniform Fraudulent Transfer Act have a statute of limitations of six years pursuant to § 541.05(6)).

[90]   *See* 12 PA. CONS. STAT. ANN. § 5109.

because Pennsylvania did not adopt the portion of the UFTA addressing Insider Preference fraudulent transfer claims, it also did not adopt the one-year statute of limitations for such claims.[91] Instead, Pennsylvania generally applies a two-year statute of limitations to claims that sound in fraud, and that two-year statute would likely apply to Insider Preference claims in the event that such a claim could be brought under another state's laws but subject to Pennsylvania's statute of limitations.[92] New York law applies a six-year statute of limitations to all fraudulent conveyance claims.[93]

Under New York's borrowing statute, the Examiner concludes that it is likely that the Bankruptcy Court would apply a four-year statute of limitations to general fraudulent transfer claims and a one-year statute of limitations to Insider Preference fraudulent transfer claims brought by the Estate of any Debtor that resides in Delaware. The Examiner concludes that it is likely that the Bankruptcy Court would apply a four-year statute of limitations to general fraudulent transfer claims and a two-year statute of limitations to Insider Preference fraudulent transfer claims brought by the Estate of any Debtor found to reside in Pennsylvania, including GMAC Mortgage. The Examiner concludes that it is likely that the Bankruptcy Court would apply a six-year statute of limitations to general fraudulent transfer claims and a one-year statute of limitations to Insider Preference fraudulent transfer claims brought by the Estate of any Debtor found to reside in Michigan. Finally, the Examiner concludes that the Bankruptcy Court would likely apply a six-year statute of limitations to any fraudulent transfer claims brought by the Estate of any Debtor found to reside in New York or Minnesota, including ResCap and RFC. Out of an abundance of caution, the Examiner will analyze all transactions that could potentially be challenged as fraudulent transfers if a six-year statute of limitations were applicable, even where the Examiner believes that a shorter statute of limitations is likely to apply. The Examiner will note which statute of limitations he believes is most likely to apply to each claim discussed in this Section.

### c. Triggering Creditors

To commence an action under section 544(b) of the Bankruptcy Code, the trustee must identify a creditor or class of creditors holding an allowable claim as of the date of the commencement of the case with standing to avoid a transfer under state law to pursue a

---

[91]  *See* 12 PA. CONS. STAT. ANN. §§ 5105, 5109.

[92]  *See* 42 PA. CONS. STAT. ANN. § 5524(7). Such a result could occur if the Bankruptcy Court were to conclude that Minnesota had the most significant contacts with a transfer made by GMAC Mortgage (perhaps based on the fact that GMAC Mortgage and RFC transferred property as part of an integrated transaction and RFC's involvement in the transfer predominated). The Bankruptcy Court would then apply Minnesota substantive law, but, because of the New York borrowing statute, would apply Pennsylvania's statute of limitations to claims brought by GMAC Mortgage's estate.

[93]  *See, e.g.*, *Liberty Co. v. Boyle*, 272 A.D.2d 380, 381 (N.Y. App. Div. 2000); *see Bobash, Inc. v. Festinger*, No. 03908/05, 2007 WL 969435, at *2 (N.Y. Sup. Ct. Mar. 30, 2007).

fraudulent transfer action under section 544(b).[94] These "triggering creditors" do not need to exist at the time the action is filed, nor does the trustee need to identify a specific creditor by name.[95] Furthermore, while a "triggering creditor" needs to hold a claim on both the date of the transfer and the petition date (i.e., be the same creditor), it does not need to hold the same claim, holding any qualifying claim on those two dates is sufficient.[96] Once a transfer is voidable under section 544(b), the entire fraudulent transfer may be recovered for the benefit of all creditors, not just to the extent necessary to satisfy the individual creditor actually holding the avoidance claim.[97] Because the trustee is "stepping into the shoes" of an actual unsecured creditor for purposes of section 544(b), the trustee "is subject to any defenses that could be asserted against the unsecured creditor."[98] As such, if a claim is time-barred against the "triggering creditor," it would also be time-barred if asserted by the trustee.

In this case, the Examiner concludes that the evidence supports the proposition that "triggering creditors" existed at each of the relevant Debtors at all relevant times. Triggering creditors for the ResCap Estates include, among others, holders of, and the indenture trustees for, the Unsecured Notes. Triggering creditors for the Estates of RFC and GMAC Mortgage include the holders of RMBS, who held repurchase claims at least as early as 2004.

_____

[94]   *See* 11 U.S.C. § 544(b); *see also Silverman v. Sound Around, Inc*. (*In re Allou Distribs., Inc*.) 392 B.R. 24, 31 (Bankr. E.D.N.Y. 2008) ("In order for a trustee to maintain an action for avoidance of a fraudulent conveyance, the trustee must show that at least one of the present unsecured creditors of the estate holds an allowable claim, against whom the transfer or obligation was invalid under applicable state or federal law.") (citing *Young v. Paramount Commc'ns, Inc*. (*In re Wingspread Corp*.), 178 B.R. 938, 945 (Bankr. S.D.N.Y. 1995)).

[95]   *In re Bernard L. Madoff Inv. Secs. LLC*, 445 B.R. 206, 234 (Bankr. S.D.N.Y. 2011) (noting that "simply pleading the existence of an unsecured creditor generally will suffice to satisfy" the trustee's pleading requirements).

[96]   *In re Allou Distribs., Inc*., 392 B.R. at 34 (noting that "a triggering creditor must be the same creditor on both the [t]ransfer [d]ate and the [p]etition [d]ate," but does not need to hold the same claim on both these dates).

[97]   This doctrine is commonly referred to as the doctrine of *Moore v. Bay*, because of the Supreme Court decision on which it is based. *See Moore v. Bay* (*In re Estate of Sassard & Kimball, Inc.*), 284 U.S. 4, 5 (1931); *see also* Bankruptcy Reform Act of 1978, Pub. L. 95-598, 1978 U.S.C.C.A.N. (92 Stat. 2549) 5963, 6328; Bankruptcy Reform Act of 1978, Pub. L. 95-598, 1978 U.S.C.C.A.N. (92 Stat. 2549) 5787, 5873 (confirming that congressional intent was to retain the rule of that case); *Tronox Inc. v. Anadarko Petrol. Corp*. (*In re Tronox Inc*.) 464 B.R. 606, 616 (Bankr. S.D.N.Y. 2012) ("Section 544(b) of the Bankruptcy Code adopts the ruling of the Supreme Court in *Moore v. Bay* . . . where the Court allowed a trustee to avoid a fraudulent transfer without regard to the size of the claim of the creditor whose rights and powers the trustee was asserting, with the rights of the trustee 'to be enforced for the benefit of the estate.'").

[98]   *In re Allou Distribs., Inc*., 392 B.R. at 34 (citing *Belfance v. Bushey* (*In re Bushey*), 201 B.R. 95, 100 (B.A.P. 6th Cir. 1997)) (noting that "a trustee's standing is 'completely derivative of that of an actual unsecured creditor'" and that the trustee is therefore subject to any defenses that could have been asserted against that unsecured creditor); *Hayes v. Palm Seedlings Partners* (*In re Agric. Research & Tech. Grp., Inc.*), 916 F.2d 528, 541 (9th Cir. 1990) (holding that trustee "stands in the overshoes of the debtor corporation's unsecured creditors").

### 3. Section 546 Safe Harbors

Section 546 of the Bankruptcy Code establishes certain "safe harbor" defenses that prohibit avoidance of prepetition transfers on any theory, except claims of actual fraudulent transfer under section 548(a)(1)(A). If applicable, these safe harbors prohibit avoidance on any other type of claim brought under chapter 5 of the Bankruptcy Code, including claims brought by an estate representative under section 544(b) of the Bankruptcy Code. The defenses set forth in section 546 are in addition to certain affirmative defenses specific to the particular type of claim in question.[99] This subsection addresses two relevant safe harbor defenses that apply generally to all avoidance actions (except actual fraudulent transfer claims) discussed in this Section.

#### a. Settlement Payment Defense

Section 546(e) of the Bankruptcy Code prohibits the avoidance, except pursuant to actual fraud under section 548(a)(1)(A) of the Bankruptcy Code, of transfers that are margin payments or settlement payments, as defined in section 741(8) of the Bankruptcy Code,[100] made by, to, or for the benefit of a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency.[101] The purpose of section 546(e) is "to minimize the displacement caused in the commodities and securities markets in the event of a major bankruptcy affecting those industries."[102] If all of the

---

[99] For example, section 548's "good faith transferee for value" defense has no application in an action to avoid a preferential transfer under section 547. *See* 11 U.S.C. § 548(c).

[100] Section 741(8) of the Bankruptcy Code provides that a "'settlement payment' means a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, or any other similar payment commonly used in the securities trade." *Id.* § 741(8).

[101] Section 546(e) provides in full as follows:

Notwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this title, the trustee may not avoid a transfer that is a margin payment, as defined in section 101, 741, or 761 of this title, or settlement payment, as defined in section 101 or 741 of this title, made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, or that is a transfer made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant or securities clearing agency, in connection with a securities contract, as defined in section 741(7), commodity contract, as defined in section 761(4), or forward contract, that is made before the commencement of the case, except under section 548(a)(1)(A) of [the Bankruptcy Code].

*Id.* § 546(e).

[102] *Picard v. Katz*, 462 B.R. 447, 452 (S.D.N.Y. 2011) (quoting *Gredd v. Bear, Stearns Sec. Corp.* (*In re Manhattan Inv. Fund Ltd.*), 310 B.R. 510, 513 (Bankr. S.D.N.Y. 2002)); *see also Kaiser Steel Corp v. Charles Schwab & Co., Inc.*, 913 F.2d 846, 848 (10th Cir. 1990) (citation omitted) (stating that section 546(e) is intended "to protect the nation's financial markets from the instability caused by the reversal of settled securities transactions").

elements of a section 546(e) safe harbor defense are satisfied, the defense is established and will be strictly applied, regardless of whether application of the defense in any particular instance is necessary to meet the goals of Congress.[103]

Section 546(e) requires that three elements be satisfied for a challenged transfer to fall within the safe harbor. First, there must be a prepetition transfer.[104] Second, the challenged transfer must have been made by, to, or for the benefit of a "financial institution,"[105] a "financial participant,"[106] or one of the other types of enumerated market participants.[107] Third, the transfer must *either*: (1) constitute a "margin payment" or a "settlement payment;" or (2) have been made in connection with a securities contract, commodity contract, or forward contract. With respect to this final element, the only types of transfers potentially implicated by the transactions analyzed in this Section are: (1) a settlement payment; and (2) a payment in connection with a securities contract.[108]

The Examiner did not independently analyze whether AFI, ResCap, or RFC meet the requirements of a "financial participant" under the Bankruptcy Code, but the Examiner's Counsel did request information on this point from both the Debtors and AFI.[109] Neither party asserted that AFI, ResCap, or RFC qualifies as one of the market participants listed in section 546(e). Accordingly, the Examiner proceeded with his analysis on the basis that none of

---

[103] *Lehman Bros. Holdings Inc. v. JPMorgan Chase Bank, N.A.* (*In re Lehman Bros. Holding*), 469 B.R. 415, 436 (Bankr. S.D.N.Y. 2012) ("Consistent with its approach in *Quebecor*, the Court will strictly construe the plain meaning of section 546(e) in judging whether the claims set forth in the Amended Complaint are subject to the safe harbors of that section of the Bankruptcy Code.").

[104] The Bankruptcy Code defines the term "transfer" to include: (1) the creation of a lien; (2) the retention of title as a security interest; (3) the foreclosure of a debtor's equity of redemption, or (4) each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or an interest in property. 11 U.S.C. § 101(54).

[105] The Bankruptcy Code defines a "financial institution" as "a Federal reserve bank, or an entity that is a commercial or savings bank . . . ." *Id.* § 101(22).

[106] The Bankruptcy Code's definition of a "financial participant" is intended to protect major market participants—an entity may qualify as a financial participant only if it has at least $1 billion in notional principal value of derivative contracts or $100 million in gross mark-to-market positions (aggregated across all counterparties but excluding affiliates) at certain times and during certain periods specified by the Bankruptcy Code. *See id.* § 101(22A).

[107] *Id.* § 546(e).

[108] It does not appear that any of the transactions at issue constitute "margin payments." *See id.* § 741(5) (defining margin payment as a "payment or deposit of cash, a security, or other property, that is commonly known in the securities trade as original margin, initial margin, maintenance margin, or variation margin, or as a mark-to-market payment, or that secures an obligation of a participant in a securities clearing agency."); *see also id.* § 101(38) (similarly defining "margin payment" for purposes of the forward contract portions of the Bankruptcy Code). Similarly, none of the transactions appear to involve commodities or forward contracts. *See id.* § 761(4) (defining "commodity contract"); *id.* § 101(25) (defining "forward contract").

[109] Although Ally Bank is a "financial institution," AFI is not. *See id.* § 101(22).

ResCap, RFC, or AFI qualified as a "financial participant" and, accordingly, that none of those entities would qualify for the safe harbor protections of section 546(e) of the Bankruptcy Code.

Assuming that AFI could establish that one or more of the transactions at issue involved a "financial participant," the inquiry would then shift to whether the transfer at issue either: (1) qualifies as a settlement payment; or (2) was made in connection with a securities contract.

### (1) Settlement Payment

The Bankruptcy Code defines settlement payment, somewhat circuitously, as "a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, or any other similar payment commonly used in the securities trade."[110] The last phrase of this definition, "commonly used in the securities trade," limits only the words "other similar payment," and therefore underscores the breadth of the settlement payment defense rather than substantively limiting it.[111] Several circuit courts have agreed that "courts should interpret the definition, 'in the context of the securities industry,' as 'the transfer of cash or securities made to complete [a] securities transaction.'"[112] Additionally, the term "settlement payment" has been read as "'extremely broad' and intended to encompass most payments that can be considered settlement payments."[113]

In *Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V*, the Second Circuit held that Enron's early retirement of outstanding unsecured notes fell within the plain language of "settlement payment" and was thus protected from avoidance under section 546(e).[114] Looking to the plain language of the relevant provisions, the Second Circuit explained that the "payments at issue were made to redeem commercial paper, which the Bankruptcy Code

---

[110] *Id.* § 741(8); *see also id.* § 101(51A) (similarly defining "settlement payment" for purposes of the forward contract portions of the Bankruptcy Code).

[111] *See Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.*, 651 F.3d 329, 337 (2d Cir. 2011) ("[W]e hold that the phrase "commonly used in the securities industry" limits only the phrase immediately preceding it; it does not limit the other transactions that § 741(8) defines as settlement payments."); *see also QSI Holdings, Inc. v. Alford* (*In re QSI Holdings, Inc.*), 571 F.3d 545, 549 (6th Cir. 2009) (emphasis omitted) (citation omitted) (characterizing the words "other similar payment commonly used in the securities trade" as "a catchall phrase intended to underscore the breadth of the § 546(e) exemption").

[112] *Enron*, 651 F.3d at 334 (quoting *Contemporary Indus. Corp. v. Frost*, 564 F.3d 981, 985 (8th Cir. 2009)).

[113] *Contemporary Indus. Corp.*, 564 F.3d at 985; *see also Lowenschuss v. Resorts Int'l, Inc.* (*In re Resorts, Int'l, Inc.*), 181 F.3d 505, 514–15 (3d Cir. 1999); *Jonas v. Resolution Trust Corp.* (*In re Comark*), 971 F.2d 322, 326 (9th Cir. 1992); *Kaiser Steel Corp. v. Charles Schwab & Co.,* 913 F.2d 846, 848 (10th Cir. 1990).

[114] 651 F.3d at 335–36 ("We find no basis in the Bankruptcy Code or the relevant caselaw to interpret § 741(8) as excluding the redemption of debt securities."); *see also Official Comm. of Unsecured Creditors of Quebecor World (USA) Inc. v. Am. United Life Ins. Co.* (*In re Quebecor World (USA) Inc.*), 480 B.R. 468, 475–76 (S.D.N.Y. 2012) (holding that a prepetition payment made by the debtor to a financial institution acting as trustee for noteholders, to repurchase and cancel privately-placed promissory notes, qualified as a "settlement payment").

defines as a security."[115] Accordingly the payments "constitute[d] the 'transfer of cash . . . made to complete [a] securities transaction' and [were] settlement payments . . . ."[116] In so ruling, the *Enron* court rejected several limitations proposed by the debtor, including that the settlement payment safe harbor should: (1) only protect "common" securities transactions; (2) apply only to the purchase or sale of securities; and (3) require that the transfer involve a financial intermediary.[117]

Courts interpreting the *Enron* decision have explained that its direction is "both uncomplicated and crystal clear."[118] These courts have refused to read into section 546(e) various limitations, including that: (1) the transfer must involve a formal settlement process using broker-dealers and clearing agencies to effect the exchange and payment;[119] (2) the safe harbor should cover only legitimate (non-fraudulent) securities transactions;[120] or (3) that the transfer be of a nature that, if avoided, would disrupt financial markets.[121] In short, courts have adhered to the basic premise that "in the context of the securities industry, a settlement payment means simply the transfer of cash or securities made to complete a securities transaction."[122]

### (2) In Connection With A Securities Contract

The term "securities contract" is defined in the Bankruptcy Code,[123] and was expanded in the 2006 amendments to the Bankruptcy Code to include "any extension of credit for the clearance or settlement of securities transactions."[124] In relevant part, the Bankruptcy Code defines a securities contract to mean "a contract for the purchase, sale, or loan of a security, a certificate of deposit, a mortgage loan, a group or index of securities, certificates of deposit, or mortgage loans or interests therein . . . or option on any of the foregoing . . . ."[125] The phrase "in connection with," as used in section 546(e), "means that the transfer must be 'related to'

---

[115] *Enron*, 651 F.3d at 339; *see also* 11 U.S.C. § 101(49) (defining securities to also include notes, bonds, stocks, debentures, etc.).

[116] *Enron*, 651 F.3d at 339.

[117] *Id.* at 335.

[118] *In re Quebecor World*, 453 B.R. at 215 ("The test has become quite simple and all-encompassing and does not lend itself easily to the formulation of nuanced exceptions."); *see also Secs. Investor Prot. Corp. v. Bernard L. Madoff Inv. Secs. LLC*, 476 B.R. 715, 721 (S.D.N.Y. 2012) ("[W]hereas some courts in this Circuit have accepted [the argument that § 546(e)'s coverage should be limited to legitimate brokerage firms and transactions], in this Court's view it cannot survive the broad and literal interpretation given § 546(e) in *Enron*.").

[119] *See In re Quebecor World*, 480 B.R. at 476; *AP Servs. LLP v. Silva*, 483 B.R. 63, 68 (S.D.N.Y 2012).

[120] *See Secs. Investor Prot. Corp.*, 476 B.R. at 721.

[121] *See AP Servs.,* 483 B.R. at 70.

[122] *See In re Quebecor World*, 480 B.R. at 476.

[123] *See* 11 U.S.C. § 741(7) (defining "securities contract").

[124] *Id.* § 741(7)(A)(v).

[125] *Id.* § 741(7).

the securities contract, commodity contract or forward contract at issue."[126] Unlike the settlement payments provision at issue in *Enron*, the securities contract provision of section 546(e) has been read to require that the security contract at issue be "for the purchase, sale, or loan" of securities.[127] Accordingly, there seems to be an open question about whether the "redemption" of outstanding notes would qualify for this safe harbor provision. At least one court avoided this question by explaining that a debtor's acquisition and cancellation of its outstanding debt obligations was ultimately structured as a "purchase" (or "repurchase").[128]

### b. Swap Payment Defense

Section 546(g) of the Bankruptcy Code similarly prohibits avoidance of any payment "made by or to (or for the benefit of) a swap participant or financial participant, under or in connection with any swap agreement and that is made before the commencement of the case, except under section 548(a)(1)(A) of [the Bankruptcy Code]."[129]

A defendant claiming the protection of a 546(g) safe harbor must prove that: (1) there is an agreement which is properly classified as a "swap agreement"; (2) the challenged transfer was made by, to, or for the benefit of a swap participant or financial participant; (3) the challenged transfer was made "under" or "in connection with" the swap agreement; and (4) the transfer occurred prior to the commencement of the bankruptcy case.

The first inquiry with respect to any asserted section 546(g) defense is whether a "swap agreement" exists. The term "swap agreement" is defined broadly and generally means:

> a bilateral agreement, frequently between a commercial entity involved with commodities or subject to interest rate, currency or equity price fluctuations and a financial intermediary, whereby cash payments are exchanged periodically (or a lump sum at termination) between the parties based upon changes in the price of the underlying asset or index as determined by an agreed-upon benchmark.[130]

---

[126] *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC* (*In re Madoff Sec.*), No. 12 MC 115(JSR), 2013 WL 1609154, at *9 (S.D.N.Y. Apr. 15, 2013) (citations omitted); *see also Lehman Bros. Holdings Inc. v. JPMorgan Chase Bank, N.A.* (*In re Lehman Bros. Holding*), 469 B.R. 415, 442 (Bankr. S.D.N.Y. 2012) (citation omitted) ("It is proper to construe the phrase 'in connection with' broadly to mean 'related to.'").

[127] *In re Quebecor World*, 480 B.R. at 479.

[128] *Id.*

[129] 11 U.S.C. § 546(g).

[130] *Nisselson v. Empyrean Inv. Fund, L.P.* (*In re MarketXT Holdings Corp.*), 376 B.R. 390, 423 (Bankr. S.D.N.Y. 2007) (citations omitted).

Specific types of agreements recognized as swap agreements by the Bankruptcy Code include, among others:

> any agreement, including the terms and conditions incorporated by reference in such agreement, which is—
>
> (I) an interest rate swap, option, future, or forward agreement, including a rate floor, rate cap, rate collar, cross-currency rate swap, and basis swap;
>
> . . .
>
> (VI) a total return, credit spread or credit swap, option, future, or forward agreement . . . .[131]

Moreover, the Bankruptcy Code specifically provides that any similar types of agreements that become the subject of recurrent dealings in the market may, subject to certain conditions, be treated as swap agreements.[132] The term swap agreement is thus expansive and malleable, and it can encompass a wide variety of transactions that allow parties to exchange future risk exposures.

Once it has been established that a swap agreement exists, the next inquiry is whether the challenged transfer was made by, to, or for the benefit of a "swap participant" or a "financial participant." Both terms are clearly defined by the Bankruptcy Code. A "swap participant" includes any "entity that, at any time before the filing of the petition, has an outstanding swap agreement with the debtor."[133] As set forth in Section VII.F.3.a, the term "financial participant" encompasses institutions with significant derivatives or mark-to-market positions with non-affiliated entities.[134]

If a defendant can establish that: (1) a swap agreement exists; and (2) the challenged transfer was made by, to, or for the benefit of a swap participant or financial participant, it must then prove that the transfer occurred under or in connection with the swap agreement.[135] A transfer occurs "under" a swap agreement "when it is accomplished according to the

---

[131] *See* 11 U.S.C. § 101(53B)(A)(i)(I), (VI).

[132] *See id.* § 101(53B)(A)(ii).

[133] *Id.* § 101(53C).

[134] *Id.* § 101(22A).

[135] Prior to the effective date of the 2005 amendments to the Bankruptcy Code, a defendant asserting a section 546(g) safe harbor defense was required to prove that the challenged transfer was made both under and in connection with a swap agreement. *See Interbulk, Ltd. v. Louis Dreyfus Corp.* (*In re Interbulk, Ltd.*), 240 B.R. 195, 202 (Bankr. S.D.N.Y. 1999) ("The phrases 'under,' [and] 'in connection with' . . . are conjunctive phrases, so each element must be met for a transfer to be unavoidable as a swap."). This phraseology was recognized as being inconsistent with the legislative history and likely intent of Congress, but it was nevertheless enforced accordingly to its unambiguous meaning. *See id.* at 202 n.10 (citation omitted). In 2005 Congress amended section 546(g) to make the "under" and "in connection with" tests disjunctive and, therefore, alternative means of establishing a safe harbor defense. *See* 11 U.S.C. § 546(g).

method prescribed in the agreement itself."[136] Alternatively, a transfer occurs "in connection with" a swap agreement, regardless of whether the payment was according to the mechanism specified in the agreement, so long as the transfer was related to the agreement.[137] The final element of the defense, which requires proof that the challenged transfer occurred "before the commencement of the case," is self-explanatory.

###### c.   The Tribune/Lyondell Workaround

As described above, the section 546 safe harbor provisions broadly protect certain types of financial transactions from avoidance by an estate representative in bankruptcy. However, the safe harbors may be limited in an important respect—they purport only to limit avoidance actions brought under sections 544, 545, 547, 548(a)(1)(B), and 548(b) of the Bankruptcy Code.[138] The UFCA and UFTA, however, do not contain safe harbor analogues. Consequently, creditors—who have direct standing to bring UFCA- or UFTA-based claims without resort to section 544 of the Bankruptcy Code—may seek to bring claims outside of bankruptcy that would be barred by the safe harbors within the bankruptcy context.

Outside of bankruptcy, the UFTA and UFCA permit a creditor of an insolvent transferor to recover certain transfers from the recipient of those transfers.[139] Once the transferor files for bankruptcy relief, the Bankruptcy Code prohibits creditors from commencing (or continuing to prosecute) such causes of action and vests in the trustee the exclusive right to pursue such causes of action for the benefit of all creditors of the debtor-transferor.[140] Nevertheless, the filing of a bankruptcy petition does not extinguish creditors' rights to pursue state law fraudulent transfer causes of action. Those rights are merely suspended in recognition of the trustee's exclusive power under section 544 of the Bankruptcy Code to bring such actions on behalf of the estate for the benefit of all creditors. Pursuant to section 546(a) of the Bankruptcy Code, the trustee (or other estate representative) has until the later of two years from the petition date or one year after the trustee's appointment or election (if such appointment or election occurs less than two years after the petition date) to commence

---

[136]   *In re Interbulk, Ltd.*, 240 B.R. at 202.

[137]   *Id.* ("A natural reading of 'in connection with' suggests a broader meaning similar to 'related to.'").

[138]   *See* 11 U.S.C. § 546(e), (f), (g).

[139]   *See* UFCA §§ 9, 10; UFTA § 7.

[140]   *See, e.g., FDIC v. Hirsch* (*In re Colonial Realty Co.*), 980 F.2d 125, 137 (2d Cir. 1992) (holding that a fraudulent conveyance action brought by a creditor was stayed); *Romagosa v. Thomas* (*In re Van Diepan, P.A.*), 236 F. App'x. 498, 501–02 (11th Cir. 2007) (stating that trustee has sole authority to prosecute fraudulent conveyance action); *Neb. State Bank v. Jones*, 846 F.2d 477, 478 (8th Cir. 1988) (finding that the Bankruptcy Code provides for the trustee to pursue a fraudulent conveyance cause of action under 11 U.S.C. §§ 548 and 544).

avoidance actions.[141] If that period expires or the bankruptcy case is closed before the trustee brings a particular state law avoidance action, the right to bring such action reverts to individual creditors.[142]

Accordingly, if an estate representative were to conclude that otherwise potentially valuable state law-based avoidance actions would be barred by the Bankruptcy Code's safe harbor provisions if brought pursuant to section 544 of the Bankruptcy Code, it could either: (1) attempt to abandon those rights of action to creditors; or (2) simply allow its exclusive period for bringing such claims to lapse.

In two recent major bankruptcy cases—*In re Tribune Co.* and *In re Lyondell Chem. Co.*—the debtors' estates pursued the latter strategy, and in the *Lyondell* case (although not in the case of *Tribune*) the plan of reorganization created a creditors' trusts to aggregate electing individual creditors' state law fraudulent transfer claims for collective prosecution outside the bankruptcy case and with no participation by estate representatives. In both cases, the parties who are the targets of those causes of actions objected on several grounds, arguing, among other things, that: (1) the section 546 safe harbor defenses preempt state law avoidance rights after the filing of a bankruptcy petition to the extent that such rights are inconsistent with the safe harbor defenses; and (2) the creditors lack standing to pursue fraudulent transfer claims. In both cases, those issues remain *sub judice*.

The *Tribune/Lyondell* safe harbor "workaround" may be relevant here because, as discussed below, although a close question, the Examiner concludes that it is more likely than not that the Bankruptcy Code's safe harbor provisions could prevent the avoidance, in an action commenced in the Bankruptcy Court, of certain transactions that would likely otherwise be avoidable. Although evaluating the merits of the safe harbor workaround is beyond the scope of this Report, the Examiner nevertheless believes that the parties should recognize that the section 546 safe harbor defenses may not provide absolute protection to the recipients of transfers that are avoidable under state law.

---

[141] *See* 11 U.S.C. § 546(a).

[142] *See Hatchett v. United States,* 330 F.3d 875, 886 (6th Cir. 2003) (holding that creditors could commence state law avoidance actions after the closure of a bankruptcy case); *Unisys Corp v. Dataware Prods., Inc.,* 848 F.2d 311, 314 (1st Cir. 1988) (allowing creditors to pursue fraudulent transfer claims after termination of the automatic stay); *Kathy B. Enters., Inc. v. United States,* 779 F.2d 1413, 1415 (9th Cir. 1986) (noting that the issue of whether the automatic stay precluded the IRS from collecting was not raised in the court below, but concluding that the IRS could pursue fraudulently conveyed assets, even if it did violate the automatic stay); *FDIC v. Davis,* 733 F.2d 1083, 1085 (4th Cir. 1984) (finding that once a bankruptcy case had been closed, creditors could pursue their state law fraudulent conveyance claims independently of the trustee).

### 4.  Transfers Fraudulent As To Present Creditors Under Minn. Stat. § 513.45(b)

This Section discusses Minnesota's "Insider Preference" statute, codified at Minnesota Statutes section 513.45(b)[143] as part of the Minnesota UFTA.[144] Because the analysis of that statute implicates several specific or non-uniform aspects of Minnesota law, the Examiner retained Leonard, Street and Deinard Professional Association ("Leonard Street") as his Special Minnesota Counsel. Leonard Street participated in the preparation of this Section and the analysis and conclusions contained herein have been reviewed by Leonard Street.[145]

#### a.  Overview

In addition to the "classic" types of fraudulent transfer actions described in Section VII.F.6 of the Report, the UFTA contains a cause of action that allows a creditor to avoid certain transfers between a debtor and its insiders for antecedent debts. This "Insider Preference" cause of action—which is based upon, but differs in several important respects from, section 547 of the Bankruptcy Code—has been adopted by a majority of states (including Minnesota).[146] It provides that:

> A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent.[147]

A transfer is fraudulent under the Insider Preference statute if: (1) there exists a creditor of the transferor-debtor whose claim arose before the transfer; (2) the transfer was made to an insider of the debtor; (3) the transfer was made for an antecedent debt; (4) the debtor was insolvent at the time of the transfer; and (5) the insider had reasonable cause to believe the debtor was insolvent.[148] The premise of this cause of action "is that an insolvent debtor is

---

[143]  *See* MINN. STAT. ANN. § 513.45(b).

[144]  *See* MINN. STAT. ANN. §§ 513.41–513.51.

[145]  The Examiner's retention of Leonard Street was approved by order of the Bankruptcy Court entered on April 29, 2013. *See* Order Authorizing the Employment and Retention of Leonard, Street and Deinard Professional Association as Special Minnesota Counsel to the Examiner *Nunc Pro Tunc* to April 15, 2013 [Docket No. 3549].

[146]  In all, 35 states and the District of Columbia have adopted the Insider Preference cause of action: Alabama, Arkansas, Colorado, Connecticut, Delaware, District of Columbia, Florida, Hawaii, Idaho, Illinois, Iowa, Kansas, Maine, Massachusetts, Michigan, Minnesota, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Rhode Island, South Dakota, Texas, Utah, Vermont, Washington, West Virginia, and Wisconsin.

[147]  MINN. STAT. ANN. § 513.45(b).

[148]  *Prairie Lakes Health Care Sys., Inc. v. Wookey*, 583 N.W. 2d 405, 413 (S.D. 1998) (citing *Alcan Bldg. Prods. v. Peoples*, 124 Idaho 338, 859 P.2d 374, 376–77 (Ct. App. 1993)). Although *Prairie Lakes* interpreted South Dakota's enactment of the UFTA, the substantive provisions of the statute that it analyzed and discussed were substantially identical to the model language adopted by Minnesota.

obliged to pay debts to creditors not related to him before paying those who are insiders."[149] "This provision attempts to diminish the unfair advantage insiders sometimes possess when they are familiar with the debtor's financial substance."[150] In essence, the cause of action subordinates insiders' rights of payment from insolvent debtors on antecedent debts during the preference period.

A plaintiff pursuing an Insider Preference cause of action bears the burden of proof on each element of the claim.[151] A creditor that can establish every element may obtain, subject to certain defenses, "avoidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim . . . ."[152] Moreover, as discussed above, pursuant to section 544(b) of the Bankruptcy Code, a trustee may assert a claim under applicable Insider Preference laws so long as there exists a "triggering" unsecured creditor who (a) had a claim predating the transfer the trustee wishes to challenge and (b) still has a claim on the petition date.[153] As discussed in greater detail in Section VII.F.2.c and Section VII.F.7, if the trustee establishes that a transfer can be avoided under the UFTA as to one creditor, the transfer can be avoided in full and recovered for the benefit of all creditors of the transferor-debtor's estate.[154] As discussed in Section VII.F.2.c of the Report, this "triggering creditor" requirement is satisfied with respect to ResCap and its two principal subsidiaries, GMAC Mortgage and RFC.

### b. Statute Of Limitations

Because of the similarity between the UFTA's "Insider Preference" cause of action and section 547 of the Bankruptcy Code, state law Insider Preference actions are rarely litigated and have been characterized as "an underutilized tool in the creditors' remedies' toolbox."[155] Indeed, because the UFTA's "Insider Preference" cause of action is generally subject to a one-year statute of limitations,[156] there is seldom any reason to bring such a claim in bankruptcy,

---

[149] UFTA, Prefatory Note, at 4.

[150] *Prairie Lakes Health Care Sys.*, 583 N.W. 2d at 413.

[151] *See First Res. Bank v. Rehbein*, No. 12–206 (PAM/SER), 2013 WL 618164, at *1 (D. Minn. Feb 19, 2013) ("First Resource bears the burden to prove each element of [section 513.45(b)] to prevail on its contention that the transfer must be set aside.").

[152] MINN. STAT. ANN. § 513.47(a)(1).

[153] *See* 11 U.S.C. § 544(b); *Girard v. Michener* (*In re Michener*), 217 B.R. 263, 270 (Bankr. D. Minn. 1998); *Moratzka v. Clark* (*In re Metro. Cosmetic Reconstructive Surgery P.A.*), 125 B.R. 556, 557 (Bankr. D. Minn. 1991).

[154] *See Bergquist v. Theisen* (*In re Theisen*), 45 B.R. 122, 126–27 (Bankr. D. Minn. 1984).

[155] Cass S. Weil, *Subsection 5(b) of the Uniform Fraudulent Transfers Act: An Underused Creditors' Remedy?*, Cass S. Weil, ABI Committee News. July 2009, www.abiworld.org/committees/newsleters/CFTF/vol6num2/5b.html.

[156] *See* UFTA § 9(c) ("A claim for relief cause of action with respect to a fraudulent transfer or obligation under this [Act] is extinguished unless action is brought: . . . (c) under Section 5(b), within one year after the transfer was made or the obligation was incurred.").

where section 547 of the Bankruptcy Code also provides a one-year insider reach-back period and does not require proof that the insider-transferee "had reasonable cause to believe the debtor was insolvent."[157]

As discussed in Section VII.F.2.a, the Examiner has concluded that the Bankruptcy Court would likely apply substantive Minnesota law when determining whether certain of the transactions reviewed during the Investigation are avoidable as fraudulent transfers pursuant to section 544 of the Bankruptcy Code. In particular, the Examiner has concluded that Minnesota law is likely to govern fraudulent transfer claims, including Insider Preference fraudulent transfer claims, with respect to transactions in which ResCap or RFC was the debtor-transferor.

Additionally, the Examiner has concluded that, under New York's borrowing statute, the Bankruptcy Court would likely refer to the limitations periods provided by Minnesota law and New York law with respect to transactions in which ResCap or RFC was the debtor-transferor. Minnesota, unlike every other state that has adopted the UFTA, neither adopted section 9 of the UFTA—which establishes the statutes of limitation for claims thereunder—nor specifically provided an alternative statute of limitation.[158] As a result, courts applying Minnesota's fraudulent transfer statutes have applied either Minnesota's statute of limitations for claims sounding in fraud[159] or, in one case, Minnesota's "catch-all" statute of limitations for statutory causes of action.[160] Those statutes provide that:

> [T]he following actions shall be commenced within *six years*:
>
> . . .
>
> (2) upon a liability created by statute, other than those arise upon a penalty or forfeiture or where a shorter period is provided by section 541.07
>
> . . .

_____

[157] *See* 11 U.S.C. § 547(b)(4)(B).

[158] *See* Minn. Stat. Ann. § 513.41–51.

[159] *See, e.g.*, *In re Curry*, 160 B.R. 813, 819 n.5 (Bankr. D. Minn. 1993)) (noting that fraudulent conveyance actions under Minnesota's Uniform Fraudulent Transfers Act have a statute of limitations of six years pursuant to § 541.05(6)); *Georgen-Running v. Grimlie* (*In re Grimlie*), 439 B.R. 710, 720 n.25 (8th Cir. B.A.P. 2010) (citing Minn. Stat. Ann. § 541.05(6)) (ruling, in the context of a fraudulent transfer action, that "[i]n Minnesota, cases involving fraud have a statute of limitations of six years."); *Bergquist v. Vista Dev., Inc.* (*In re Quality Pontiac Buick GMC Truck, Inc.*), 222 B.R. 865, 868 n.6 (Bankr. D. Minn. 1998) ("The Minnesota UFTA does not contain its own statute of limitations. Its remedies thus are subject to the general statutes of limitation. Minn. Stat. § 541.05, subd. 1 provides, in pertinent part: . . . the following actions shall be commenced within six years: . . . (6) For relief on the ground of fraud, in which case the cause of action shall not be deemed to have accrued until the discovery by the aggrieved party of the facts constituting the fraud . . . .").

[160] *Finn v. Alliance Bank*, No. 19HA–CV–11–2856, 2011 WL 5006458 (Minn. Dist. Ct., Aug. 16, 2011) (holding that a six-year statute of limitations, with no tolling for discovery, applied pursuant to Minn. Stat. Ann. § 541.05, subd. 1(2)).

> (6) for relief on the ground of fraud, in which case the cause of
> action shall be deemed to have accrued until the discovery by
> the aggrieved party of the facts constituting the fraud . . . .[161]

Minnesota law thus provides, at a minimum, a six-year statute of limitations for causes of action under the Minnesota UFTA, including claims to avoid Insider Preferences. As set forth above, New York also applies a six-year statute of limitations for fraudulent transfer actions.[162] Accordingly, under New York's borrowing statute, the Bankruptcy Court would likely find that a six-year statute of limitations applies to actions under the Minnesota Insider Preference statute brought by the estates of ResCap or RFC.[163] Once a bankruptcy petition is filed, section 546 of the Bankruptcy Code converts that statute of limitations into a six-year reach-back period from the petition date.[164] As a result, every transaction between those Debtors and an insider of such Debtor as to which Minnesota fraudulent transfer law would apply and that occurred within six years of the Petition Date will be subject to an Insider Preference analysis and, if appropriate, avoided.[165]

---

[161] MINN. STAT. ANN. § 541.05, subd. 1 (emphasis added).

[162] *See*, *e.g.*, *Liberty Co. v. Boyle*, 272 A.D.2d 380, 381 (N.Y. App. Div. 2000); *see Bobash, Inc. v. Festinger*, No. 03908/05, 2007 WL 969435, *3 (N.Y. Sup. Mar. 30, 2007).

[163] Notwithstanding the fact that the Minnesota Insider Preference statute is codified as part of Minnesota's UFTA, it is possible that a New York court might conclude that the Insider Preference cause of action does not sound in fraud, and might therefore apply New York's shorter three-year statute of limitations for statutory rights of actions. *See* N.Y. C.P.L.R. § 214(2). However, an estate representative could overcome this artificial limitation by commencing any suit requiring the longer limitations period in the United States District Court for the District of Minnesota. *See* 28 U.S.C. § 1409 (authorizing a trustee to commence suit under section 544(b) of the Bankruptcy Code in the United States District Court of any district in which a creditor could have brought the action in the absence of the bankruptcy case). A Minnesota court hearing an Insider Preference claim brought by the trustee of a debtor whose principal place of business was in Minnesota at the time the action accrued would likely apply Minnesota substantive law as well as Minnesota's statute of limitations.

[164] *See In re Bernard L. Madoff Inv. Sec. Inc.*, 445 B.R. 206, 231 (Bankr. S.D.N.Y. 2011) ("Although the New York statute of limitations for fraudulent conveyance actions allows a creditor to recover transfers made six years before the filing of the complaint, it is well established that once a bankruptcy petition is filed, section 546(a) of the Code is triggered, allowing a trustee to recover transfers made six years before the petition date."); *O'Toole v. Karani* (*In re Trinsum Grp., Inc.*, 460 B.R. 379, 390 (Bankr. S.D.N.Y. 2011) (quoting *In re Bernard L. Madoff Inv. Sec. Inc.*, 445 B.R. at 231) (same).

[165] Because a six-year reach-back period from the Petition Date is more than sufficient to reach all transfers that occurred on or after December 31, 2007, the date on which the evidence supports the proposition that ResCap and its principal subsidiaries became insolvent, there is no need to determine whether the reach-back period could be more than six years based upon the dates on which any allegedly fraudulent transfer was discovered.

### c.  Construction Of The Statute

Interpretation of Minnesota statutes is a question of law[166] and must begin with an examination of the language of the statute itself.[167] "If the statute is plain and unambiguous, [a court must] apply the words of the statute according to their plain meaning and engage in no further construction."[168] "Where failure of expression rather than ambiguity of expression concerning the elements of the statutory standard is the vice of the enactment, courts are not free to substitute amendment for construction and thereby supply the omissions of the legislature."[169] Moreover, "the rules of construction forbid adding words or meaning to a statute that were intentionally or inadvertently left out."[170]

However, "[w]here the words of a law are not explicit, the intent of the legislature may be ascertained by considering other laws upon the same or similar subjects."[171] Thus, if the Bankruptcy Court were to find portions of the Minnesota Insider Preference statute ambiguous, it could consult section 547 of the Bankruptcy Code or Minnesota statutes (even on unrelated topics) using similar phrasing and terminology to discern the Minnesota legislature's intent.[172]

The United States Bankruptcy Court for the Southern District of New York recently discussed how these principles of statutory construction should be applied to the Minnesota Insider Preference statute in the *Musicland Holding Corp.* chapter 11 cases ("*Musicland*").[173] In the decisions issued by the *Musicland* court to date,[174] the primary issue was the proper interpretation of the "new value" defense provided under Minnesota law, which, as discussed in greater detail in Section VII.F.4.e.2, provides that a "transfer is not voidable under section 513.45(b) . . . to the extent the insider gave new value to or for the benefit of the debtor after the transfer was made unless the new value was secured by a valid lien . . . ."[175] Unlike section

---

166  *See Reiter v. Kiffmeyer*, 721 N.W.2d 908, 910 (Minn. 2006) (citing *Camacho v. Todd & Leiser Homes*, 706 N.W.2d 49, 53 (Minn. 2005)) ("We approach the construction of a statute as a question of law.").

167  *See Reiter*, 721 N.W.2d at 910 (citing *Zurich Am. Ins. Co. v. Bjelland*, 710 N.W.2d 64, 68 (Minn. 2006)) ("We begin with the language of the statute, inquiring first whether the statute is ambiguous.").

168  *Reiter*, 721 N.W.2d at 910 (Minn. 2006) (citing *Wynkoop v. Carpenter*, 574 N.W.2d 422, 425 (Minn. 1998)).

169  *State v. Moseng*, 95 N.W.2d 6, 11–12 (Minn. 1959) (cited in *Responsible Pers. of Musicland Holding Corp. v. Best Buy Co.* (*In re Musicland Holding Corp.*), 462 B.R. 66, 73 (Bankr. S.D.N.Y. 2011)).

170  *Genin v. 1996 Mercury Marquis*, 622 N.W.2d 114, 117 (Minn. 2001) (cited in *In re Musicland Holding Corp*, 462 B.R. at 73).

171  *Shields v. Golestky* (*In re Butler*), 552 N.W.2d 226, 231 (Minn. 1996).

172  *See In re Butler*, 552 N.W.2d at 231.

173  *See In re Musicland Holding Corp.*, 462 B.R. at 73.

174  The *Musicland* court recently completed a trial on the merits of a claim under Minn. Stat § 513.45(b) as well as multiple affirmative defenses to that claim. Post-trial briefing is underway.

175  MINN. STAT. ANN. § 513.48(f)(1). The new value defense, along with all other potentially-applicable affirmative defenses, is discussed in detail in Section VII.F.4.e. The discussion of *Musicland* in this Section is included to illustrate the principles of statutory construction that a court would likely apply to any construction or interpretation issue arising under the Minnesota Insider Preference statute.

547(c)(4) of the Bankruptcy Code, the Minnesota Insider Preference statute does not, on its face, require that the new value "remain unpaid."[176]

Although the Minnesota Insider Preference statute contains no language suggesting that new value must remain unpaid, the plaintiff in *Musicland* argued that the Bankruptcy Court should nevertheless read that requirement into the defense so that the result under the Minnesota Insider Preference statute would be consistent with section 547(c)(4) of the Bankruptcy Code. As the plaintiff noted, and the Bankruptcy Court agreed, allowing the defendant to assert a new value defense while keeping payments received on account of the new value would "give[] double credit for the new value, and leave[] the estate unreplenished."[177] As the Bankruptcy Court further noted, this oddity was compounded by the fact that the Minnesota statute requires new value to be provided on an unsecured basis, presumably because of exactly the same concern regarding potential double counting of new value.[178]

Despite the harm that such a result would cause to unsecured creditors, the *Musicland* court concluded that it could not impose a requirement that new value remain unpaid. As the court reasoned, "the Minnesota Act unambiguously excludes a limitation on the new value defense resulting from payment for the new value and the Court cannot rewrite the statute to add it."[179] In sum, where the Minnesota UFTA creates unexpected results by employing different phraseology than is used in the Bankruptcy Code, "[a]ny necessary fix resides with the Minnesota legislature."[180]

The Examiner agrees with the well-reasoned approach to interpretation of the Minnesota Insider Preference statute adopted in *Musicland* and concludes that the Bankruptcy Court would likely apply the same principles of statutory construction in this case and reject similar efforts to incorporate Bankruptcy Code-based requirements or defenses into the Minnesota Insider Preference statute where such requirements or defenses are otherwise unsupported by the text of the Minnesota statute. This is an important point because, as set forth below, application of the unambiguous meaning of the Minnesota Insider Preference statute creates results that may vary from the operation of section 547 of the Bankruptcy Code.

---

[176] As the *Musicland* court explained, "[s]aying that the new value must remain 'unpaid' is merely a shorthand method of describing § 547(c)(4)(B)," which provides that the "new value" defense is only available if "the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor" on account of the new value. 462 B.R. at 71; *see also* 11 U.S.C § 547(c)(4)(B).

[177] *In re Musicland Holding Corp.*, 462 B.R. at 71.

[178] *Id.* at 73; *see also* UFTA § 8 cmt. 6 ("If the insider receiving the preference thereafter extends new credit to the debtor but also takes security from the debtor, the injury to the other creditors resulting from the preference remains undiminished by the new credit. On the other hand, if a lien taken to secure the new credit is itself voidable by a judicial lien creditor of the debtor, the new value received by the debtor may appropriately be treated as unsecured and applied to reduce the liability of the insider for the preferential transfer.").

[179] *In re Musicland Holding Corp.*, 462 B.R. at 73 (citing *Genin v. 1996 Mercury Marquis*, 622 N.W.2d 114, 117 (Minn. 2001); *State v. Moseng*, 95 N.W.2d 6, 11–12 (Minn. 1959)).

[180] *In re Musicland Holding Corp.*, 462 B.R. at 73.

### d. Elements Of The Minnesota Insider Preference Statute

#### (1) Pre-Existing Creditor

As an initial matter, an estate representative seeking to avoid a transfer as an Insider Preference under the UFTA must establish the existence of an unsecured creditor whose claim predates the transfer.[181] This element, which closely resembles the "triggering creditor" requirement of section 544(b) of the Bankruptcy Code, is essentially self-explanatory, except insofar as dispute may arise as to when a creditor's claim arose.

Under the UFTA:

> "Claim" means a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured.[182]

Courts determining when a claim arises for purposes of the Insider Preference statute have broadly construed this definition, finding, for example, that a claim on a guarantee arises the moment that the guarantee is executed (as opposed to when a default on the guaranteed obligation occurs or when a notice of default is served).[183] Breach of contract claims arise at the time of the breach.[184]

As set forth in section VII.F.2.c, the evidence supports the proposition that unsecured creditors existed continuously at each of the Debtors whose transfers would be governed by the Minnesota UFTA, including ResCap and RFC, from December 31, 2007, the date on which the Examiner has concluded the Debtors became insolvent, through the Petition Date. For example, the Unsecured Notes, which are unsecured obligations of ResCap, were issued beginning in 2005 and remain outstanding. RFC's unsecured creditors consist of, among others, parties holding claims for breaches of representations and warranties under RMBS that were issued, and breached, as early as 2004.

---

[181] *See Leonard v. Norman Vinitsky Residuary Trust* (*In re Jolly's, Inc.*), 188 B.R. 832, 846 (Bankr. D. Minn. 1995) (citing *Lippi v. City Bank*, 955 F.2d 599, 606 (9th Cir. 1992); *Kupetz v. Wolf*, 845 F.2d 842, 849–850 (9th Cir. 1988); *In re Richmond Produce Co., Inc.*, 151 B.R. 1012, 1016 n.5 (N.D. Cal. 1993); *In re Ohio Corrugating Co.*, 91 B.R. 430, 435 (Bankr. N.D. Ohio 1988)) ("To establish the bankruptcy estate's standing under these provisions of the UFTA, a trustee must demonstrate that at least one creditor's claim that existed as of the date of the transfer survived unsatisfied to the commencement of the bankruptcy case.").

[182] MINN. STAT. ANN. § 513.41(3).

[183] *See First Res. Bank v. Rehbein*, No. 12–206 (PAM/SER), 2013 WL 618164, at *2 (D. Minn. Feb 19, 2013) ("Under the very broad definition of claim in the MFTA, Patriot had a claim against Myrna the minute she signed the guaranty. Thus, it didn't matter whether there was a notice of default or a cure period; the claim arose the day she signed each guaranty. It might have been a contingent, unmatured claim, but for purposes of the MFTA, contingent, unmatured claims are claims nonetheless. First Resource is entitled to summary judgment on this element of its MFTA claim.").

[184] *See Parkhill v. Minn. Mut. Life Ins. Co.*, 174 F. Supp. 2d 951, 956 (D. Minn. 2000) (citing *Levin v. C.O.M.B. Co.*, 441 N.W.2d 801, 803 (Minn. 1989)) ("A breach of contract action 'accrue[s] at the time of the breach . . . .'"), *aff'd*, 286 F.3d 1051 (8th Cir. 2002).

*(2) Transfer To An Insider*

The second element of the Insider Preference statute, although simple on its face, requires the application of several statutory definitions. The result of these definitions is that, while AFI, Ally Bank, and GMAC CF are insiders of ResCap and all of its subsidiaries for purposes of the Minnesota UFTA, conveyances of the Debtors' property to those insiders were not "transfers" (and are therefore outside the scope of the statute) to the extent the transferred property was encumbered by a validly perfected and unavoidable lien.

Under the Minnesota UFTA:

> "Transfer" means every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, and creation of a lien or other encumbrance.[185]

Although similar to the definition of transfer under the Bankruptcy Code, the Minnesota UFTA's definition contains an important limitation, which is incorporated through the statute's definition of the word "asset." "'Asset' means property of the debtor, but the term does not include . . . property to the extent it is encumbered by a valid lien . . . ."[186] A "'valid lien' means a lien that is effective against the holder of a judicial lien subsequently obtained by legal or equitable process or proceedings."[187] Property is therefore not an "asset" and cannot be subject to a "transfer" within the meaning of the Minnesota UFTA to the extent it is encumbered by an unavoidable perfected lien.[188]

This limitation on the term "asset" is itself limited—it only excludes property *to the extent* of a valid lien.[189] Consequently, property that is worth more than the amount of any valid encumbering liens constitutes an asset to the extent of such excess. Alternatively, as one court construing the Minnesota UFTA has reasoned, "[u]nder the Uniform Commercial Code, a security interest in collateral is only enforceable against the debtor and third parties if value

---

[185] MINN. STAT. ANN. § 513.41(12). The Minnesota legislature carved-out certain conveyances to charitable organizations from the definition of transfer. *See id.* None of the transactions investigated by the Examiner involve conveyances to chartable organizations.

[186] MINN. STAT. ANN. § 513.41(2)(i).

[187] *Id.* § 513.41(13).

[188] *See Clarinda Color LLC v. BW Acquisition Corp.*, No. 00–CV–722 JMR/FLN, 2004 WL 2862298, at *3 (D. Minn. June 14, 2004) (citing MINN. STAT. § 513.41(2)(i)); *Ries v. Wintz Props., Inc.* (*In re Wintz Cos.*), 230 B.R. 848, 860 (B.A.P. 8th Cir. 1999); *Lorenz Bus Serv., Inc. v. Richfield Bus Co.*, No. C2-02-56, 2002 WL 2005468, *3 (Minn. Ct. App. Sept. 3, 2002)) ("[P]roperty is not an 'asset' under the statute to the extent it is encumbered by a valid lien.").

[189] MINN. STAT. ANN. § 513.41(2)(i).

has been given."[190] Accordingly, "[t]o the extent the value of the property exceeds the value of the security interest, the excess is an 'asset' subject to the UFTA."[191]

Examples of actions that have been found to be transfers include, but are not limited to, the granting of a lien,[192] the release of claims[193] and the cancellation of a contract.[194]

The second part of the element—"to an insider"—is more straightforward. Insiders of a debtor corporation (including a limited liability company), include: (1) a director of the debtor; (2) an officer of the debtor; (3) a person in control of the debtor; (4) a partnership in which the debtor is a general partner; (5) a general partner of a partnership in which the debtor is a general partner; (6) a relative of a general partner, director, officer or person in control of the debtor;[195] (7) an affiliate of the debtor; or (8) an insider of an affiliate of the debtor.[196] Moreover, this broad definition has been held to be illustrative rather than exhaustive.[197]

The word affiliate is also broadly defined, and encompasses, among others:

> (i) a person who directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor, other than a person who holds the securities,
>
>> (A) as a fiduciary or agent without sole discretionary power to vote the securities; or
>>
>> (B) solely to secure a debt, if the person has not exercised the power to vote . . . .
>
> (ii) a corporation 20 percent or more of whose outstanding voting securities are directly or indirectly owned, controlled, or

---

[190] *Clarinda Color LLC*, 2004 WL 2862298, at *3 (citing MINN. STAT. § 336.9–203(b)(1)).

[191] *Clarinda Color LLC*, 2004 WL 2862298, at *3 (citing *Preferred Funding, Inc. v. Jackson*, 61 P.3d 939, 942 (Or. App. 2003) (construing identically-worded Oregon statute)); *see also Achille Bayart & CIE v. Crowe*, 238 F.3d 44, 47 (1st Cir. 2001) ("To recover under the Maine UFTA, a plaintiff must prove that there was some determinable amount of value in the assets of the debtor over and above the amount of the secured debt."); *PDVSA Petroleo S.A. v. Trigeant, Ltd.*, No. C-09-38, 2012 WL 3249531, at *9–10 (S.D. Tex. Aug. 7, 2012) (holding foreclosure sale was transfer under Texas UFTA where property had liquidation value in excess of the lien).

[192] *See Stoebner v. Ritchie Capital Mgmt., L.L.C.* (*In re Polaroid Corp.*), 472 B.R. 22, 32 n.8 (Bankr. D. Minn. 2012).

[193] *Hedback v. Am. Family Mut. Ins. Co.* (*In re Mathews*), 207 B.R. 631, 650 (Bankr. D. Minn. 2007).

[194] *Shileds v. Goldestky* (*In re Butler*), 552 N.W.2d 226, 234 (Minn. 1996).

[195] *See* MINN. STAT. ANN. § 513.41(7)(ii).

[196] *See id.* § 513.41(7)(iv).

[197] *See Leonard v. Mylex Corp.* (*In re Northgate Computer Sys., Inc.*), 240 B.R. 328, 362 (Bankr. D. Minn. 1999) (describing the definitions of the term "insider" under MINN. STAT. § 513.41(7)(ii) and (iv) as "non-exclusive examples").

> held with power to vote, by the debtor or a person who directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor, other than a person who holds the securities.[198]

Under these definitions, AFI is an "insider" of, among others, ResCap and RFC because it directly or indirectly owns 100% of their outstanding voting securities.[199] Ally Bank and GMAC CF are also insiders of ResCap and RFC because they are indirectly wholly-owned by AFI, which in turn owns 100% of the Debtors' voting securities.[200]

### (3) For An Antecedent Debt

As under section 547 of the Bankruptcy Code, a transfer may only be avoided under the Minnesota Insider Preference statute if the transfer was made for an antecedent debt.[201] Because of the similarities between the Minnesota Insider Preference statute and section 547 of the Bankruptcy Code on this point, the only court that has meaningfully discussed the phrase "antecedent debt" under the Minnesota UFTA looked to well-established Bankruptcy Code-based precedents.[202] In that case, the court observed that "[u]nder § 547, the meaning of 'antecedent debt' is straightforward: A debt is 'antecedent' if it is incurred before the transfer, period."[203] Based on these precedents and the similarities between the Minnesota Insider Preference statute and section 547 of the Bankruptcy Code, the court concluded that the term "'antecedent debt' in § 513.45(b) likewise means nothing more than debt that exists before the transfer."[204]

However, other jurisdictions applying the UFTA have concluded that a transfer is not made for an "antecedent debt" if the debt in question was incurred relatively contemporaneously with the transfer at issue.[205] Courts have reached this conclusion by

---

[198] MINN. STAT. ANN. § 513.41(1).

[199] *See* First Day Affidavit, Ex. 2-1.

[200] *See* First Day Affidavit, Ex. 2-1, 2-4.

[201] *See* MINN. STAT. ANN. § 513.45(b).

[202] *See Elliot & Callan, Inc v. Crofton*, 615 F. Supp. 2d 963, 968–69 (D. Minn. 2009). In *Elliot & Callan*, the United States District Court for the District of Minnesota construed the Minnesota UFTA's definition of "antecedent debt," but the Examiner is unaware of any meaningful guidance on this issue from the state courts of Minnesota.

[203] *Id.* at 969 (citing *Velde v. Kirsch*, 543 F.3d 469, 472 (8th Cir. 2008) (noting that it was undisputed that a check was a preferential transfer because it paid a "preexisting obligation"); *Southmark Corp. v. Schulte Roth & Zabel* (*In re Southmark Corp.*), 88 F.3d 311, 316 (5th Cir. 1996) ("A debt is antecedent if it is incurred before the transfer"); *Lindquist v. Dorholt* (*In re Dorholt, Inc.*), 224 F.3d 871, 873 (8th Cir. 2000) (finding the loan was "antecedent" to grant of security interest where, although company executed a security agreement on the same day as it received the loan, the security interest was not perfected until sixteen days later); 5 COLLIER ON BANKRUPTCY, ¶ 547.03 [4] (Lawrence P. King et al. eds., 15th ed. 2000)).

[204] *Elliot & Callan, Inc.*, 615 F. Supp. 2d at 969.

[205] *See Hasbro, Inc. v. Serafino*, 37 F. Supp. 2d 94, 97 (D. Mass. 1999) (discussing statute identical to MINN. STAT. Ann. 513.45(b) and holding that mortgage granted at "essentially the same time" as loan did not cover antecedent debt); *Truelove v. Buckley*, 733 S.E.2d 499, 502 (Ga. Ct. App. 2012) (no preferential transfer where property transferred "at essentially the same time" after purchase).

looking to the equivalent of section 513.43(c) of the Minnesota statute, which reads: "[a] transfer is made for present value if the exchange between the debtor and the transferee is intended by them to be contemporaneous and is in fact substantially contemporaneous."[206] Commentators on the uniform law have reached the same conclusion, stating:

> Finally, to provide the rule necessary to the operation of the section 5(b) preference rule, section 3(c) provides that a disposition of property is made for a present value when the parties intend that the exchange be contemporaneous and it is in fact contemporaneous. As long as a transfer is in exchange for a present value rather than an antecedent obligation, the insider preference provision of the UFTA, section 5(b), will have no application.[207]

Although the issue has not been resolved as a matter of Minnesota law, and is therefore inherently uncertain and a close question, the Examiner concludes that it is more likely than not that the Bankruptcy Court, if called to interpret the Minnesota Insider Preference statute, would impose a "contemporaneous exchange" limitation when determining whether any given transaction occurred on account of an antecedent debt.

### (4) Insolvency

As under the Bankruptcy Code, a transfer is only avoidable under the Minnesota Insider Preference statute if the transferor-debtor was insolvent at the time of the transfer. For purposes of the Minnesota Insider Preference statute, a "debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets, at fair valuation."[208] Although the Balance Sheet Test is the only measure of insolvency under the Minnesota Insider Preference statute, a "debtor who is generally not paying debts as they become due is presumed to be insolvent."[209] As discussed in detail in Section VI.B and VI.E of the Report, the Examiner has concluded that the evidence supports the proposition that ResCap and its principal subsidiaries were insolvent under the Balance Sheet Test from December 31, 2007 through the Petition Date.

### (5) Insider Had Reasonable Cause To Believe Debtor Was Insolvent

Finally, unlike section 547 of the Bankruptcy Code, the Minnesota Insider Preference statute only permits avoidance of a transfer if "the insider had reasonable cause to believe that

---

[206] MINN. STAT. ANN. § 513.43(c).

[207] PETER A. ALCES, LAW OF FRAUDULENT TRANSFERS § 5:64 (2012).

[208] MINN. STAT. ANN. § 513.42(a). The statute further provides that "[d]ebts under this section do not include an obligation to the extent it is secured by a valid lien on property of the debtor not included as an asset." *Id.* § 513.42(e). The purpose of subsection (e) is to avoid "render[ing] a person insolvent . . . by counting as a debt an obligation secured by property of the debtor that is not counted as an asset. *See* UFTA § 2 cmt. 4.

[209] MINN. STAT. ANN. § 513.42(b).

the debtor was insolvent."[210] This requirement was adapted from section 547 of the Bankruptcy Code as it existed prior to 1984, which contained an identical requirement, and similar language from predecessor statutes dating back at least as far as the Bankruptcy Act of 1867.[211] An insider need not have actual knowledge of a debtor's insolvency to have "reasonable cause to believe that the [debtor] is insolvent."[212] Moreover, a plaintiff need not demonstrate that the insider actually believed that the debtor was insolvent—only that the insider had reasonable cause to so believe.[213] In judging whether an insider had reasonable cause to believe the debtor was insolvent, "[i]t is for the court to make a determination of the particular facts known, and to draw all inferences reasonably to be drawn from the *mise-en-scene*."[214]

> [A] creditor may be said to have reasonable cause to believe his debtor to be insolvent when such a state of facts is brought to his notice respecting the affairs and pecuniary condition of his debtor, in a case like the present, as would lead a prudent business man to the conclusion that he, the debtor, is unable to meet his obligations as they mature in the ordinary course of business.[215]

---

[210] *Id.*

[211] *See, e.g.*, *Buchanan v. Smith*, 83 U.S. (1 Wall.) 277 (1872) (construing the meaning of the phrase "reasonable cause to believe that the debtor was insolvent" as used in the preference provisions of the Bankruptcy Act of 1867); *Britton v. Payne*, 4 F.Cas. 183 (S.D.N.Y. 1874) (same). The 1984 Amendments to section 547 of the Bankruptcy Code eliminated the "reasonable cause to believe" element formerly included in that section.

[212] *See Kravetz v. Joange Bldg. Corp.*, 341 F.2d 561, 563 (2d Cir. 1965) ("Knowledge of insolvency is not necessary, nor even actual belief thereof; all that is required is a reasonable cause to believe that the debtor was insolvent at the time of the preferential transfer."); *Fisher v. Aztec Mktg. Corp.* (*In re Nat'l Merritt Inc.*), 11 B.R. 102, 104 (S.D.N.Y. 1981) ("Actual knowledge, however, is not the controlling standard, for all that is required is reasonable cause to believe."); *Hudson Feather & Down Prods., Inc. v. B&B Assocs., Inc.* (*In re Hudson Feather & Down Prods., Inc.*), 22 B.R. 247, 252 (Bankr. E.D.N.Y. 1982) (citation omitted) ("[K]nowledge of insolvency, or even actual belief, is unnecessary; all that is required is 'reasonable cause to believe.'"); *Beldock v. Faberge, Inc.* (*Matter of S & W Exps., Inc.*), 16 B.R. 941, 948 (Bankr. S.D.N.Y. 1982) (citation omitted) ("Knowledge of insolvency is not necessary, nor even actual belief thereof; all that is required is reasonable cause to believe that the debtor was insolvent at the time of the preferential transfer."); *Herald Publ'g Co. v. Barberino*, No. 93-0454680S, 1993 WL 498798, at *4 (Conn. Super. Oct. 27, 1993) (citing Levy v. Carter, Rice & Co., 136 Conn. 216, 219 (1949)) ("Reasonable cause to believe is not actual knowledge of the insolvency . . . .").

[213] *See In re Nat'l Merritt Inc.*, 11 B.R. at 104 (quoting *In re O'Neill Enters., Inc.*, 359 F. Supp. 940 (W.D. Va.1973) ("It is the cause to believe and not the belief itself that is determinative . . . .").

[214] *In re Nat'l Merritt Inc.*, 11 B.R. at 104.

[215] *Britton*, 4 F. Cas. at 186; *see also Buchanan*, 83 U.S. (1 Wall.) at 308; *Sharfman v. Tharpe & Co.*, 381 F. Supp. 1394, 1396 (S.D.N.Y. 1974) ("A creditor has reasonable cause to believe that a debtor is insolvent when such a state of facts is brought to the creditor's notice, respecting the affairs and pecuniary condition of the debtor, as would lead a prudent business person to the conclusion that the debtor is insolvent"); *Kravetz v. Joange Bldg. Corp.*, 341 F.2d 561, 563 (2d Cir. 1965); *Robinson v. Commerical Bank of N. Am.*, 320 F.2d 106, 107 (2d Cir. 1963).

Moreover, "where circumstances are such as would incite a man of ordinary prudence to make inquiry, the creditor is chargeable with notice of all facts which a reasonably diligent inquiry would have disclosed . . . ."[216]

The Examiner concludes that the evidence supports the proposition that AFI likely had reasonable cause to believe that ResCap and its principal subsidiaries were insolvent no later than December 31, 2007—the date on which the Examiner has concluded that ResCap and its principal subsidiaries actually became insolvent under the Balance Sheet Test. As discussed in greater detail in Section III.G, ResCap and its subsidiaries suffered a steep financial decline during the second half of 2007, which ultimately resulted in the Debtors' insolvency by year-end. The pertinent facts concerning the Debtors' financial distress were well-known to AFI, and would have led a reasonably prudent person to conclude that the Debtors were insolvent or, at the very least, to undertake an investigation that would have revealed such insolvency. Moreover, as discussed in greater detail in Section III.G.3 of the Report, the evidence suggests that AFI actually believed ResCap was insolvent, or would imminently become insolvent, no later than the third quarter of 2007.

For example, during the September 7, 2007 meeting of the ResCap Board, Rossi was nominated and elected as a Director of ResCap and Chairman of the ResCap Board, with the purpose of organizing a turnaround/restructuring for ResCap and its subsidiaries.[217] During that meeting, ResCap's outside counsel, Mayer Brown, gave a presentation on the fiduciary duties of directors of financially distressed companies.[218] Numerous senior officers and directors of AFI attended that meeting, including Solomon (AFI General Counsel), Feldstein, de Molina, Khattri, Walker and Zukauckas (all AFI Directors), and Bossidy (Office of the AFI Chair).[219] Solomon not only attended, but "participated in the discussion and commented on the duties owed by the directors to shareholders and creditors when a company reaches the zone of insolvency or becomes insolvent."[220] Following that presentation, the ResCap Board

---

[216] *Baranow v. Gibraltar Factors Corp.* (*In re Hygrade Envelope Corp.*), 366 F.2d 584, 586–87 (2d Cir. 1966) (citing *Levy v. Weinberg & Holman, Inc.*, 20 F.2d 565, 567 (2d Cir. 1927); *Pender v. Chatham Phx. Nat'l Bank & Trust Co.*, 58 F.2d 968, 970 (2d Cir. 1932); *Margolis v. Gem Factors Corp.*, 201 F.2d 803, 805 (2d Cir. 1953); *Robinson v. Commercial Bank of N. Am.*, 320 F.2d 106, 107–08 (2d Cir. 1963)); *see also In re Nat'l Merritt Inc.*, 11 B.R. at 104 (citing *Kravetz*, 341 F.2d 561; *Robinson*, 320 F.2d 106.

[217] *See* Minutes of a Regular Meeting of the Board of Directors of Residential Capital, LLC, Sept. 7, 2007, at RC40005619 [RC40005558]; Memorandum, November MD Meeting—Follow-up Q&A for Associates, dated Nov. 14, 2007, at EXAM10125766 ("[AFI] and our shareholders have put into place a team that has turnaround experience and works well together.").

[218] *See* Minutes of a Regular Meeting of the Board of Directors of Residential Capital, LLC, Sept. 7, 2007, at RC40005620–21 [RC40005558]; Mayer Brown Presentation on Fiduciary Duties of Directors and Related Legal Issues, dated Sept. 7, 2007, at RC40012709–20 [RC40012695].

[219] *See* Minutes of a Regular Meeting of the Board of Directors of Residential Capital, LLC, Sept. 7, 2007, at RC40005619 [RC40005558].

[220] *Id.* at RC40005620.

discussed, among other things, "the potential need for additional equity and strategic reasons supporting a capital injection in the near-term."[221] As a general rule, to which the Examiner sees no basis for exception here, knowledge of an officer or director of a Delaware corporation, such as AFI, is imputed to the corporation.[222] Accordingly, even in the absence of additional information, the Examiner concludes the evidence supports the proposition that AFI likely had knowledge of facts that would have led a reasonably prudent person to inquire into ResCap's solvency no later than September 7, 2007.

AFI's knowledge of ResCap's financial difficulties was not limited to what it learned in meetings of the ResCap Board. As described in greater detail in Section VIII.A by late 2007 AFI exercised close control over every major aspect of the Debtors' operations. Under those circumstances, it is inconceivable that AFI was not aware of the Debtors' financial state.

Moreover, by November 2007 even the public was well aware of ResCap's financial turmoil. On November 1, 2007, Moody's downgraded ResCap's senior debt to Baa1 with negative outlook, noting, among other things, that ResCap had suffered four consecutive quarterly losses and required a capital injection from AFI and observing that "[t]he business model that will return ResCap to adequate profitability is unclear."[223] On November 15, 2007, AFI CEO Feldstein emailed AFI COO de Molina observing that the "[m]arket has completely lost confidence in ResCap."[224] On November 19, 2007, Bloomberg published an article in which an independent bond analyst concluded that ResCap's exposure to homebuilders could result in a bankruptcy filing in which recoveries "may be even lower than implied by current distressed levels."[225] Indeed, according to the article, "[t]he implied probability of default assumes funds would be worth 40 cents on the dollar in the event of bankruptcy."[226] AFI was aware of these concerns, given that Cohen, of Cerberus, forwarded the November 19 Bloomberg article, without comment, to Tessler.[227]

---

[221] *Id.* at RC40005622.

[222] *See Am. Int'l Grp., Inc. v. Greenberg* (*In re Am. Int'l Grp., Inc.*), 976 A.2d 872, 883 n.25 (Del. Ch. 2009) (citing *Teachers' Ret. Sys. of La. v. Aidinoff*, 900 A.2d 654, 671 n.23 (Del. Ch. 2006) ("It is the general rule that knowledge of an officer or director of a corporation will be imputed to the corporation."); *Albert v. Alex. Brown Mgmt. Servs., Inc.*, No. 762-N, 2005 WL 2130607, at \*11 (Del. Ch. Aug. 26, 2005) ("Delaware law states the knowledge of an agent acquired while acting within the scope of his or her authority is imputed to the principal."); 3 AM. JUR. 2D *Agency* § 273 (principals are generally bound by the knowledge of their agents)).

[223] Shannon D. Harrington, *ResCap Credit Swaps Soar on Concern It May Default*, BLOOMBERG, Nov. 15, 2007. http://www.bloomberg.com/apps/news/?pid=newsarchive &sid=aTXFFjlPAPUk.

[224] *See* E-mail from E. Feldstein to A. de Molina (Nov. 15, 2007), at CCM00496802 [CCM00496800].

[225] *See* E-mail from S. Cohen to L. Tessler (Nov. 19, 2007) [CCM00176101], sending the article. *See also* Caroline Salas and Shannon D. Harrington, *ResCap Investments May Lead to Bankruptcy, Gimme Credit Says*, BLOOMBERG, Nov. 19, 2007.

[226] Caroline Salas and Shannon D. Harrington, *ResCap Investments May Lead to Bankruptcy, Gimme Credit Says*, BLOOMBERG, Nov. 19, 2007.

[227] *See* E-mail from S. Cohen to L. Tessler (Nov. 19, 2007) [CCM00176101].

By year end, ResCap required yet another capital injection from AFI, which came in the form of a contribution of $1.1 billion in face amount of bonds that AFI bought on the market for approximately $763 million.[228] Even accounting for the gain ResCap experienced from this debt cancellation, ResCap experienced a quarterly loss of $921 million – its fifth consecutive quarterly loss.[229]

Based on the above, as well as the other aspects of ResCap's ongoing financial deterioration described in more detail in Section III.G, the Examiner concludes that the evidence supports the proposition that no later than December 31, 2007, and at all times after that date, AFI likely had reasonable cause to believe that ResCap and its principal subsidiaries were insolvent.

### e. *Affirmative Defenses*

#### (1) Good Faith Transferee (Minn. Stat. § 513.48(d))

Minn. Stat. 513.48(d) provides that:

> Notwithstanding the voidability of a transfer or an obligation under sections 513.41 to 513.51, a good faith transferee or obligee is entitled, to the extent of the value given the debtor for the transfer or obligation, to
>
> (1) a lien on or a right to retain any interest in the asset transferred;
>
> (2) enforcement of any obligation incurred; or
>
> (3) a reduction in the amount of the liability on the judgment.[230]

Because satisfaction of an antecedent obligation constitutes "value" under the Minnesota UFTA,[231] section 513.48(d) (a general defense to claims under the Minnesota UFTA and not specifically targeted at the Insider Preference statute) appears, at first glance, to provide a defense to Insider Preference claims so long as the insider takes in good faith. This would be a particularly odd result given that Minnesota UFTA section 513.48(f)(3), which is a defense specifically applicable to the Insider Preference statute, establishes a defense only where good faith is coupled with the transferee (1) providing present value to rehabilitate the debtor and (2) securing antecedent debt.[232]

This apparent contradiction is resolved by the rule that "[k]nowledge of the facts rendering [a] transfer voidable [is] inconsistent with the good faith that is required of a

---

[228] *See* Section III.G.2.f.

[229] *See* Residential Capital, LLC, Current Report (Form 8-K) (Feb. 5, 2008), Ex. 99.1, at 1.

[230] Minn. Stat. Ann. § 513.48(d).

[231] *See id.* § 513.43(a) ("Value is given for a transfer or obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied . . . .").

[232] *See id.* § 513.48(f)(3).

protected transferee" for purposes of Minnesota UFTA section 513.45(d).[233] Indeed, finding good faith to exist even where an insider received property with knowledge of the Debtors' insolvency would make both the Insider Preference statute itself and the specific defense to that statute provided by Minnesota UFTA section 513.48(f)(3) meaningless. Such a result would be inconsistent with the "elementary canon of construction that a statute should be interpreted so as not to render one part inoperative."[234] Consequently:

> [a]n insider who receives property or an obligation from an insolvent debtor as security for or in satisfaction of an antecedent debt of the transferor or obligor is not a good faith transferee or obligee if the insider has reasonable cause to believe that the debtor was insolvent at the time the transfer was made or the obligation was incurred.[235]

In essence, an insider is not a good faith transferee for purposes of section 513.48(d) of the Minnesota UFTA if the insider receives a transfer that falls within the Insider Preference statute. The Examiner therefore concludes that it is unlikely that the "good faith transferee for value" defense provided by section 513.48(d) of the Minnesota statute is applicable to Insider Preference claims.

### (2) New Value Under The Minnesota UFTA

Minnesota UFTA section 513.48(f) provides three affirmative defenses that are specifically aimed at protecting certain transactions that would otherwise run afoul of the Minnesota Insider Preference statute. In each case, the burden of proving the defense rests with the party asserting it.[236] The first of these defenses provides that a transfer is not avoidable as an Insider Preference "to the extent the insider gave new value to or for the

---

[233] UFTA § 2 cmt. 1.

[234] *Colautti v. Franklin,* 439 U.S. 379, 392 (1979) (citing *United States v. Menasche*, 348 U.S. 528, 538–39 (1955)).

[235] UFTA § 8 cmt. 4.

[236] *See Elliot & Callan, Inc. v. Crofton*, 615 F. Supp. 2d 963, 971 (D. Minn. 2009) (stating, in the context of a defendant assert a "new value" defense that defendant "has the burden of proving this affirmative defense"); *Prairie Lakes Health Care Sys., Inc*. v. *Wookey*, 583 N.W. 2d 405, 414 (S.D. 1998) (stating that "the UFTA then authorizes three possible defenses to forestall avoidance" under the Insider Preference theory of avoidance and that "[t]he burden of qualifying for these falls to the one asserting them").

benefit of the debtor after the transfer was made unless the new value was secured by a valid lien."[237] The party asserting the new value defense bears the burden of quantifying the new value received by the debtor.[238]

In determining whether new value has been provided, it is first necessary to determine if "value" has been given at all. For purposes of the Minnesota UFTA, "[v]alue is given for a transfer or obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied."[239] "'[V]alue' includes 'property,' which would obviously include . . . money . . . loaned or advanced . . . ."[240] Satisfaction of an antecedent debt, whether through payment or forgiveness, likewise constitutes "value."[241]

After determining whether "value" has been provided, the court must determine whether that value is "new value" that can offset Insider Preference liability from prior transfers. Because Minnesota's UFTA uses but does not define the term "new value," the few courts that have interpreted the statute have looked to the Bankruptcy Code's definition of new value for guidance.[242] Under the Bankruptcy Code:

> "new value" means money or money's worth in goods, services, or new credit, or release by a transferee of property previously transferred to such transferee in a transaction that is neither void nor voidable by the debtor or the trustee under any applicable law, including proceeds of such property, but does not include an obligation substituted for an existing obligation.[243]

---

[237] MINN. STAT. ANN. § 513.48(f)(1).

[238] *See Lowrey v. U.P.G., Inc.* (*In re Robinson Bros. Drilling, Inc.*), 877 F.2d 32, 34 (10th Cir. 1989) (citing *In re Jet Fla. Sys., Inc.*, 861 F.2d 1555, 1559 (11th Cir. 1988)) ("While under *In re George Rodman, Inc.* the court will not inquire into the value of the liens released by Richardson . . . it is the defendants' burden to prove with specificity that Richardson gave new value equivalent to the remainder of the debt not secured by these liens."); *Gray v. Chace* (*In re Bos. Publ'g Co.*), 209 B.R. 157, 176 (Bankr. D. Mass. 1997) ("[I]t was incumbent upon Chace to quantify what he gave up at the time of the restructuring—full, or most likely, partial payment of his outstanding loans, as compared with what, if anything, he would receive."); *see also Creditors' Comm. v. Spada* (*In re Spada*), 903 F.2d 971, 976 (3d Cir. 1990) (quoting *In re Jet Fla. Sys., Inc.*, 861 F.2d 1555, 1558 (11th Cir. 1988)) ("[A] party seeking the shelter of section 547(c)(1) must prove the specific measure of the new value given to the debtor in the exchange.").

[239] *Elliot & Callan, Inc.*, 615 F. Supp. 2d at 972 (quoting MINN. STAT. § 513.43(a)).

[240] *Elliot & Callan, Inc.*, 615 F. Supp. 2d at 972.

[241] *See* MINN. STAT. ANN. § 513.43(a).

[242] *See Elliot & Callan, Inc.*, 615 F. Supp. 2d at 972 (quoting 11 U.S.C. § 547(a)(2)) ("Similarly, under the section of the Bankruptcy Code on preferential transfers, 'new value' includes 'money or money's worth in goods, services, or new credit.'").

[243] 11 U.S.C. § 547(a)(2).

Accordingly, new value can include, among other things, loans, advances or infusions of cash or cash-equivalents.[244]

In addition to infusions of cash or cash equivalents and extensions of new credit, forgiveness of antecedent debt may, under certain circumstances, qualify as "new value" for purposes of the Minnesota Insider Preference statute. There does not, however, appear to be a consensus regarding how such debt forgiveness should be evaluated. Even under section 547 of the Bankruptcy Code, cases addressing new value in the context of debt forgiveness are sparse and inconsistent. As a general principle, the relevant inquiry is "whether the new value replenishes the estate."[245] Courts generally agree that forgiveness of fully secured debt or the outright release of a valid lien or security interest replenishes the estate and therefore constitutes "new value."[246] At the opposite end of the spectrum, "the forgiveness of an antecedent, highly contingent obligation does not qualify as 'new value.'"[247] For transactions involving the forgiveness of debt that fall between those poles—i.e., debt that is unsecured but that likely has significant recovery value in bankruptcy—the result is uncertain. Some courts have suggested that forgiveness of such a debt cannot constitute new value.[248] Other decisions suggest that forgiveness of debt may constitute "new value," but only to the extent of the

---

[244] *See Elliot & Callan, Inc.*, 615 F. Supp. 2d at 972–73 ("The Court therefore concludes that, to the extent that Crofton made loans or advances to SCC after receiving transfers from SCC, those loans or advances are 'new value' that can offset previous transfers.").

[245] *Kroh Bros. Dev. Co. v. Cont'l Constr. Eng'rs* (*In re Kroh Bros. Dev. Co.*), 930 F.2d 648, 652 (8th Cir. 1991).

[246] *See Cocolat, Inc. v. Fisher Dev., Inc.* (*In re Cocolat, Inc.*), 176 B.R. 540, 548 (Bankr. N.D. Cal.1995) ("The release of a lien enlarges the estate from the point of view of unsecured creditors. Thus, a payment made in exchange for the release of a lien of equal amount does not diminish the estate."); *see also* UFTA § 8 cmt. 6 (stating that the new value defense to the Insider Preference statute "is adapted from § 547(c)(4) of the Bankruptcy Code, which permits a preferred creditor to set off the amount of new value subsequently advanced against the recovery of a voidable preference by a trustee in bankruptcy to the debtor without security. The new value may consist not only of money, goods, or services delivered on unsecured credit but also of the release of a valid lien").

[247] *Jones v. Ryder Integrated Logistics, Inc.* (*In re Jotan, Inc.*), 264 B.R. 735, 752 (Bankr. M.D. Fla. 2001).

[248] *See, e.g.*, *News Journal Co. v. Little Caesars of Del., Inc.*, No. CRIM.A.1999-04-241, 2000 WL 33653432, at *4 (Del. Ct. Com. PI. Oct. 20, 2000) ("LCE states in defense of the purchase that they gave 'new value' for the assets, as opposed to forgiveness of an antecedent debt.").

actual value, rather than nominal value, of the debt forgiven.[249] Still other decisions merely conclude that forgiveness of an unsecured debt (or an agreement to exchange unsecured debt for equity) "arguably" constitutes new value.[250]

Based on a review of the pertinent authority, the Examiner concludes that the Bankruptcy Court would likely treat forgiveness of fully-secured debt owed by a Debtor—accompanied by a corresponding reduction in the value of liens on such Debtor's assets—as a dollar-for-dollar extension of "new value." The Examiner further concludes that the Bankruptcy Court would be unlikely to treat forgiveness of unsecured debt owed by a Debtor as a dollar-for-dollar extension of "new value." Instead, the Examiner concludes that, although a close question, it is more likely than not that the Bankruptcy Court would treat forgiveness of unsecured debt owed by a Debtor as an extension of "new value" on a less than dollar-for-dollar basis and would impose on the party asserting the defense the burden of definitively quantifying the value received by the Debtor as a result of such debt forgiveness.[251]

If a transfer meets all the requirements for "new value," it must still overcome three hurdles before it can offset Insider Preference exposure. First, as with the similar "new value" defense afforded under section 547(c)(4) of the Bankruptcy Code, only unsecured new value (or new value secured by an unperfected or otherwise invalid lien) can offset Insider

_____

[249] *See In re Jotan, Inc.*, 264 B.R. at 752–53 ("The Court notes that it is likely that the proposed 'new value' provided by Defendants was almost worthless. Evidence of hypothetical value does not satisfy the specific proof requirement of Jet Florida. Defendant proved that it surrendered $722,398.24 in hypothetical dollars in potential judgments against Debtors. But Defendant did not prove that it surrendered any real dollars of the sort Debtors paid it in exchange for its hypothetical sacrifice during the ninety days prior to the petition date.").

[250] *See Gray v. Chace* (*In re Bos. Publ'g Co.*), 209 B.R. 157, 176 (Bankr. D. Mass. 1997) (citing *Trans World Airlines, Inc. v. Travellers Int'l AG* (*In re Trans World Airlines, Inc.*), 180 B.R. 389, 403 (Bankr. D. Del. 1994); *In re Cocolat, Inc.*, 176 B.R. at 548) ("[T]he Court finds that Chace arguably provided the Debtor with new value when he subordinated his debt to equity, as opposed to merely forbearing from collecting the obligations owed to him by the Debtor."); *see also Lowrey v. U.P.G., Inc.* (*In re Robinson Bros. Drilling, Inc.*), 877 F.2d 32, 34 (10th Cir. 1989) ("The defendants argue that, in addition to the release of valid liens, Richardson transferred new value in the form of new credit and forgiveness of debt. However, the record is devoid of any evidence of new credit extended to Robinson Brothers, and the fact that Richardson may have promised to continue to do business with Robinson Brothers if it paid its bills is not new credit or new value to the estate.").

[251] Given the inherent difficulties in proving value received by an insolvent debtor for having an unsecured debt forgiven, this requirement may, as a practical matter, be fatal to a creditor's new value defense. *See, e.g.*, *In re Bos. Publ'g Co.*, 209 B.R. at 176 (noting that although creditor's subordination of debt to equity arguably provided new value to debtor, new value defense failed because creditor did not quantify the extent of the new value received as a result of that subordination); *In re Jotan, Inc.*, 264 B.R. at 752 ("Defendant did provide evidence of the maximum value of its proposed 'new value'—$227,786.24 in 'waived' old balance plus about $494,612.00 for waiver of the new equipment obligation. However, these maximum values do not reflect the actual value of the 'waiver' of the old balance and of the waiver of the equipment purchase obligation in light of Debtors' extremely strained financial condition at the execution of and during the term of the new agreement.").

Preference liability.[252] Second, new value under the Minnesota Insider Preference statute only flows backwards—it cannot offset contemporaneous transfers.[253] Nor can new value offset later transfers.[254] Third, new value must be provided to the debtor (or for the debtor's benefit) by the same legal entity that is liable for the preferential transfer. "Third party" new value, even when provided by an entity closely related to, or controlled by, the entity that received the Insider Preference, cannot offset liability.[255] This point was most clearly illustrated in the recent *Musicland* decision. In that case, Best Buy Co., Inc. was the recipient of a transfer that was allegedly avoidable under the Minnesota Insider Preference statute. Best Buy moved for summary judgment, arguing, among other things, that new value it had provided to the plaintiff through its wholly-owned subsidiary provided it with a defense. The court rejected that argument, holding that "Best Buy cannot base a subsequent new value defense on services provided by its affiliate . . . ."[256] On the plaintiff's subsequent motion for summary judgment on the same issue, the court largely confirmed its reasoning, noting that, except where "reverse veil piecing" is appropriate, third-party new value cannot be counted as new value.[257]

Finally, despite the similarities between the "new value" defense under the Minnesota UFTA and the Bankruptcy Code, and the willingness of courts to look to section 547(c)(4) of the Bankruptcy Code in interpreting portions of the state law defense, critical differences exist. Most importantly, as described above, Minnesota UFTA's "new value" defense does not require that the new value "remain unpaid" to be credited against past preferential transfers and courts have expressly refused to read that Bankruptcy Code-based concept into a statute

---

[252] *Prairie Lakes Health Care Sys., Inc*. v. *Wookey*, 583 N.W. 2d 405, 415 (S.D. 1998) (citing 11 U.S.C. § 547(c)(4); UFTA § 8 cmt. 6.) ("This defense is an adaptation from the Bankruptcy Code § 547(c)(4) and like that provision its availability is limited to creditors who make unsecured advances.").

[253] *Prairie Lakes Health Care Sys.*, 583 N.W. 2d at 415 ("Moreover, the 'new value' must be made after, rather than contemporaneously with, the transfer. The note [defendant] gave was at the same time as the . . . transfer, thus the defense is unavailable.").

[254] *See Elliot & Callan, Inc. v. Crofton*, 615 F. Supp. 2d 963, 973 (D. Minn. 2009) ("The loans and advances cannot, however, offset *later* transfers, as § 513.48(f) expressly requires that 'new value' be given '*after* the transfer was made.'"); *see also Responsible Pers. of Musicland Holding Corp. v. Best Buy Co* (*In re Musicland Holding Corp.*), 462 B.R. 66, 70 (Bankr. S.D.N.Y. 2011) (citing *Mosier v. Ever-Fresh Food Co.* (*In re IRFM, Inc.*), 52 F.3d 228, 231 (9th Cir. 1995)) ("The party relying on the defense must show that it gave unsecured new value after the preferential transfer.").

[255] *See In re Musicland Holding Corp.*, 462 B.R. at 74 (Bankr. S.D.N.Y. 2011) ("The Minnesota Act, like its bankruptcy analog, requires the transferee to provide the new value, *i.e.*, third-party new value does not count.").

[256] *Id.*

[257] S*ee Responsible Pers. of Musicland Holding Corp. v. Best Buy Co.* (*In re Musicland Holding Corp.*), No. 08–01203, 2012 WL 769473, at *3 (Bankr. S.D.N.Y. Mar. 7, 2012) ("Best Buy relies on the control test, used to determine whether the transferred property was 'property of the debtor,' to argue that a preferred creditor can rely on subsequent new value provided by a wholly-owned subsidiary it controls. Although there are very limited situations, discussed below, that permit a shareholder to disregard the corporate identity of a subsidiary to shield itself from liability, Best Buy has failed to satisfy those requirements or provide any support for its argument that a preferred creditor can utilize third-party new value . . . .").

whose text does not support it.[258] Accordingly, "new value" that is itself paid for through an unavoidable transfer may nevertheless offset preference exposure under the Minnesota Insider Preference statute.

### (3) Ordinary Course Of Business (Minn. Stat § 513.48(f)(2))

The second affirmative defense under the Minnesota Insider Preference statute provides that a transfer is not avoidable "if made in the ordinary course of business or financial affairs of the debtor and the insider . . . ."[259] Like the new value defense, the "ordinary course" defense is derived from the Bankruptcy Code, albeit with important distinctions.[260] The most obvious of these differences are that the "ordinary course" defense under the UFTA: (1) omits the requirement that the debt being repaid have been incurred in the ordinary course of business; and (2) does not protect payments made according to ordinary business terms.[261] Accordingly, under the UFTA, "only the parties' prior dealings are examined to decide whether a transfer was made in the ordinary course . . . ."[262] As explained in official comment to the UFTA:

> Whether a transfer was in the "ordinary course" requires a consideration of the pattern of payments or secured transactions engaged in by the debtor and the insider prior to the transfer challenged under § 5(b). The defense provided by paragraph (2) is available, irrespective of whether the debtor or the insider or both are engaged in business, but the prior conduct or practice of both the debtor and the insider-transferee is relevant.[263]

Because it is the parties' history of dealings, rather than wider industry standards, that is controlling, "[c]ourts must engage in a 'peculiarly factual' analysis" to decide whether a

---

[258] *In re Musicland Holding Corp.*, 462 B.R. at 73 (citing *Genin v. 1996 Mercury Marquis*, 622 N.W.2d 114, 117 (Minn. 2001); *State v. Moseng*, 95 N.W.2d 6, 11–12 (Minn. 1959)) ("[T]he Minnesota Act unambiguously excludes a limitation on the new value defense resulting from payment for the new value, and the Court cannot rewrite the statute to add it."); *Elliot & Callan, Inc.*, 615 F. Supp. 2d at 973 ("The 'new value' provided by [defendant] in the form of loans or advances need not have remained unpaid in order to offset previous transfers.").

[259] MINN. STAT. ANN. § 513.48(f)(2).

[260] *See Prairie Lakes Health Care Sys., Inc*. v. *Wookey*, 583 N.W. 2d 405, 415 (S.D. 1998) (citing 11 U.S.C. § 547(c)(2)) ("Like the new value defense, § 8(f)(2) is also derived from the Bankruptcy Code.").

[261] *See Prairie Lakes Health Care Sys.*, 583 N.W. 2d at 415 (S.D. 1998) (citing 11 U.S.C. §§ 547(c)(2)(A), (C)) ("Unlike the Bankruptcy Code, however, § 8(f)(2) does not require that the transfer be made in payment of a debt incurred in the ordinary course of business, or that it be made according to ordinary business terms.").

[262] *Prairie Lakes Health Care Sys.*, 583 N.W. 2d at 415.

[263] UFTA § 8 cmt. 6 (citations omitted).

transfer occurred in the ordinary course of business.[264] As suggested by the comment to the UFTA above, "this means looking at the payment history to decide if a preferential transfer was made in the ordinary course."[265]

There are very few cases interpreting the "ordinary course" defense under the UFTA. Indeed, the only written decision applying Minnesota's version of the defense known to the Examiner is designated as unpublished and not for citation.[266] Because of this paucity of authority, courts applying that UFTA defense have typically looked to decisions interpreting the relevant portion of the Bankruptcy Code—11 U.S.C. § 547(c)(2)(A)—for guidance.[267]

A court seeking to determine whether a challenged transfer falls within the protection afforded by the Bankruptcy Code's "ordinary course as between the parties" defense may consider:

> (1) the time the parties engaged in the type of dealing at issue, (2) whether the subject transfer was for an amount more than usually paid, (3) if the payment was tendered in a manner different from previous payments, (4) whether there was unusual action by either the debtor or the creditor to collect or pay on the debt, and (5) whether the creditor did anything to gain an advantage (such as gain additional security) in light of the debtor's deteriorating financial condition.[268]

Before a court can properly evaluate these factors, however, the creditor asserting the defense must first establish a "baseline" of dealings between itself and the debtor-transferor.[269] In determining the proper baseline of dealings, courts look exclusively to the period prior to

---

[264] *Prairie Lakes Health Care Sys.*, 583 N.W. 2d at 415 (citing *Lovett v. St. Johnsbury Trucking*, 931 F.2d 494, 497 (8th Cir. 1991).

[265] *Prairie Lakes Health Care Sys.*, 583 N.W. 2d at 415.

[266] *See Thommes v. Thommes*, No. A11-1591, 2012 WL 2368877, at *5 (Minn. Ct. App. June 25, 2012) (finding that interest-only payments followed by lump-sum principal payments when funds became available fell within ordinary course of business between debtor and insider when loan agreement provided for payment on such terms).

[267] *Prairie Lakes Health Care Sys.*, 583 N.W. 2d at 415 ("Because there are so few reported cases interpreting the UFTA § 8(f)(2) defense and because this provision is derived from the Bankruptcy Code's exception to avoidance in 11 U.S.C. § 547(c)(2), we explore bankruptcy decisions interpreting the latter provision for insight into the meaning of the concept of ordinary course of business or financial affairs.").

[268] *Id.* at 416 (citing *Sulmeyer v. Suzuki* (*In re Grand Chevrolet, Inc.*), 25 F.3d 728, 732 (9th Cir.1994); *Logan v. Basic Distrib. Corp.* (*In re Fred Hawes Org.*), 957 F.2d 239, 244 (6th Cir. 1992)).

[269] *See Womack v. Horob Livestock Inc.* (*In re Horob Livestock Inc.*), 382 B.R. 459, 486 (Bankr. D. Mont. 2007) (quoting *In re Healthcentral.com*, 504 F.3d 775,790 (9th Cir. 2007)) ("First, the creditor must show a baseline of past practices between itself and the debtor.").

the preference period.[270] "Numerous decisions support the view that the historical baseline should be based on a time frame when the debtor was financially healthy."[271] As a result, under the Bankruptcy Code, "when the debtor-creditor relationship is of recent origin the industry norm becomes crucial because 'there is no baseline against which to compare the pre-petition transfers at issue to confirm the parties would have reached the same terms absent the looming bankruptcy.'"[272] However, unlike the Bankruptcy Code, the Minnesota Insider Preference statute does not permit the court to refer to wider industry norms in the absence of an established baseline of dealings between the parties.[273] Accordingly, a creditor who cannot establish an appropriate baseline of dealings between the parties is unlikely to be able to prevail on an ordinary course of business defense.[274]

The rule that creditors must establish a baseline of their own prior dealings that predates the preference period poses special challenges when applied in the context of the Minnesota Insider Preference statute.[275] While the Bankruptcy Code contains a one-year reach-back period for preferential transfers to insiders, the Minnesota Insider Preference statute imposes a six-year limitations period which, in bankruptcy, is converted to a six-year reach-back period. Accordingly, when applying the Minnesota Insider Preference statute, the Bankruptcy Court

---

[270] *Advo-Sys., Inc. v. Maxway Corp.*, 37 F.3d 1044 (4th Cir. 1994) (quoting *In re Tolona Pizza Prods. Corp.*, 3 F.3d 1029, 1032 (7th Cir.1993)) (explaining that the ordinary course test is whether payments "conform to the norm established by the debtor and the creditor in the period before, preferably well before, the preference period").

[271] *In re Quebecor World (USA), Inc.*, No. 08-10152, 2013 WL 1741946, at *5 (Bankr. S.D.N.Y. Apr. 23, 2013) (citing *Luper v. Columbia Gas of Ohio, Inc.* (*In re Carled, Inc.*), 91 F.3d 811 (6th Cir. 1996); *Fiber Lite Corp. v. Molded Acoustical Prods., Inc.* (*In re Molded Acoustical Prods., Inc.*), 18 F.3d 217 (3rd Cir. 1994); *Clark v. Baclor Real Estate Fin., Inc.* (*In re Meridith Hoffman Partners*), 12 F.3d 1549 (10th Cir. 1993); *Moltech Power Sys. v. Tooh Dineh Indus., Inc.* (*In re Moltech Power Sys. Inc.*), 327 B.R. 675 (Bankr. N.D. Fla. 2005); *Gonzales v. DPI Food Prod. Co.* (*In re Furrs Supermarkets, Inc.*), 296 B.R. 33 (Bankr. D.N.M. 2003)); *see also Official Comm. of Unsecured Creditors of TOUSA, Inc. v. Citicorp N. Am., Inc.* (*In re TOUSA, Inc.*), 422 B.R. 783, (Bankr. S.D. Fla. 2009) (citing *Caillouet v. First Bank & Trust* (*In re Entringer Bakeries, Inc.*), 368 B.R. 520, 532 (E.D. La. 2007); *Hechinger Inv. Co. of Del., Inc. v. Universal Forest Prods., Inc.* (*In re Hechinger Inv. Co. of Del., Inc.*), 489 F.3d 568, 578 (3d Cir. 2007); *J.P. Fyfe, Inc. of Fla. v. Bradco Supply Corp.*, 891 F.2d 66 (3d Cir. 1989)) (finding that payments made on account of debt that was restructured on an emergency basis while the debtor was financially distressed were not in the ordinary course), *aff'd*, 680 F.3d 1298 (11th Cir. 2012).

[272] *Advo-Sys., Inc.*, 37 F.3d at 1049–50 (quoting *In re Molded Acoustical Prods., Inc.*, 18 F.3d at 226).

[273] *See Prairie Lakes Health Care Sys.*, 583 N.W. 2d at 415 ("[O]nly the parties' prior dealings are examined to decide whether a transfer was made in the ordinary course of the parties' business affairs.").

[274] *See In re Horob Livestock Inc.*, 382 B.R. at 486 (citing *Mordy v. Chemcarb, Inc.* (*In re Food Catering & Housing, Inc.*), 971 F.2d 396, 398 (9th Cir. 1992)) ("Second the creditor must show that the relevant payments were 'ordinary in relation to these past practices.'").

[275] *See Advo-Sys., Inc.*, 37 F.3d at 1049 (quoting *In re Tolona Pizza Prods. Corp.*, 3 F.3d at 1032) (ordinary course test requires reference to baseline of dealings prior to the preference period); *In re Quebecor World (USA), Inc.*, 2013 WL 1741946, at * (citing *In re Carled, Inc.*, 91 F.3d 811; *In re Molded Acoustical Products, Inc.*, 18 F.3d 217; *In re Meridith Hoffman Partners*, 12 F.3d 1549; *In re Moltech Power Sys. Inc.*, 327 B.R. 675; *In re Furrs Supermarkets, Inc.*, 296 B.R. 33) (holding that baseline of dealings must be based on the parties' pattern of conduct during the period before the debtor became financially distressed).

could potentially look to the period before, and possibly well-before, that six-year reach-back period to evaluate the parties' baseline of dealings. Even if the Bankruptcy Court were instead to look only to the period before the Debtors became financially distressed, it would be required to look to parties' dealings before mid-2007 at the latest.

Here, however, the parties' course of dealings with respect to the transactions that may be subject to avoidance under Minnesota's Insider Preference statute occurred entirely during the Insider Preference period and while the Debtors were insolvent. Indeed, the transactions at issue were all undertaken as a *response* to the Debtors' financial distress.[276] It therefore appears that there is no ordinary course "baseline of dealings" against which the transactions that may be challenged under the Minnesota Insider Preference statute can be compared.[277]

Finding that payments on account of any of the transactions discussed below were made in the ordinary course of business would require a departure from the well-established rule that the Bankruptcy Court should look to the pre-preference period and pre-insolvency period in determining the parties' baseline of dealings for purposes of an ordinary course of business defense under the Minnesota Insider Preference statute. Moreover, such a finding would require the Bankruptcy Court to overlook the Debtors' chaotic financial situation through the entire reach-back period, the very condition that prompted most of the transactions under review.[278] Accordingly, the Examiner concludes that the ordinary course of business defense under the Minnesota Insider Preference statute is unlikely to apply to any of the transactions discussed below.

### (4) Good Faith Effort To Rehabilitate While Securing Present Value And Antecedent Debt (Minn. Stat § 513.48(f)(3))

Finally, a transfer may not be avoided under the Minnesota Insider Preference statute "if made pursuant to a good faith effort to rehabilitate the debtor and the transfer secured present value given for that purpose as well as an antecedent debt of the debtor."[279] This provision has no analogue in the Bankruptcy Code.[280] Instead it "reflects a policy judgment that an insider who has previously extended credit to a debtor should not be deterred from extending further credit to the debtor in a good faith effort to save the debtor from a forced liquidation in bankruptcy or otherwise."[281]

The Examiner has been unable to locate a reported decision in which this "good faith effort to rehabilitate" defense was substantively analyzed, whether under Minnesota law or the

---

[276]   *See* Section III.G.

[277]   *See, e.g.,* Section III.G.

[278]   *See, e.g.*, Section III.G.

[279]   MINN. STAT. ANN. § 513.48(f)(3).

[280]   *See* UFTA § 8 cmt. 6.

[281]   *Hill v. Gibson Dunn & Crutcher LLP* (*In re MS55, Inc.*), 420 B.R. 806, 824 n.11 (Bankr. D. Colo. 2009) (quoting UFTA § 8 cmt. 6).

law of another state that has adopted the UFTA (although the Examiner expects that the forthcoming trial decision in *Musicland* will do so). As a result, the Examiner does not have the benefit of case precedent on which to make an assessment of the defense.

The "good faith effort to rehabilitate" defense has three components.[282] First, the transferee must undertake a good faith effort to rehabilitate the debtor. Second, the transferee must provide present value that is secured with the goal of achieving that rehabilitation.[283] Third, the debtor must grant the transferee a security interest with respect to an antecedent debt. If the first two elements of the defense are met, the preferential transfer embodied in the third element is excused.[284] The defense may therefore be thought of as a carefully-circumscribed "contemporaneous new value" defense, as that term is used in the Bankruptcy Code.

While the second and third elements of the defense are self-explanatory, the first—which requires a good faith effort to rehabilitate the debtor—is more challenging and requires that two questions be answered. First, what does the term "good faith" mean in the context of the Minnesota Insider Preference statute? Second, what does it mean to attempt to "rehabilitate" a debtor?

Of these two inquiries, the first is the more straightforward: "good faith is determined according to an objective or 'reasonable person' standard, and not based on the subjective knowledge or belief of the transferee."[285] With respect to the "good faith effort to rehabilitate" defense, the term "good faith" modifies the phrase "effort to rehabilitate." Accordingly, the Examiner concludes that a party likely engages in a "good faith" effort to rehabilitate a debtor when it takes action that constitutes an objectively reasonable effort to rehabilitate such debtor. Such reasonableness can be objectively measured by, among other things, "the amount of the present value given, the size of the antecedent debt secured, and the likelihood of success for the rehabilitative effort . . . ."[286]

The second inquiry—the meaning of the word "rehabilitate"—can be resolved by principles of statutory construction. Minnesota courts have held that, "[w]here a statute is plain and unambiguous, [a court should] apply the words of the statute according to their plain

---

[282] *See* MINN. STAT. ANN. § 513.48(f)(3).

[283] "A transfer is made for present value if the exchange between the debtor and the transferee is intended by them to be contemporaneous and is in fact substantially contemporaneous." MINN. STAT. ANN. § 513.43(c). Thus, the second element of the defense is satisfied if, contemporaneously with the other transfers contemplated by the defense, the debtor receives value on a secured basis.

[284] *See* MINN. STAT. ANN. § 513.48(f)(3).

[285] *Roeder v. Lockwood* (*In re Lockwood Auto Grp., Inc.*), 428 B.R. 629, 636 (Bankr. W.D. Pa. 2010); *see also Armstrong v. Collins*, Nos. 01-2437, 2010 WL 1141158, at *19 (S.D.N.Y. Mar. 24, 2010) (quoting *Terry v. June*, 432 F. Supp. 2d 635, 641 (W.D. Va. 2006) ("In order to establish the element of good faith, the transferee must prove that he received the transfer 'in objective good faith.'"); *Terry*, 432 F. Supp. 2d at 641 (same); *Ameriserv Fin. Bank v. Commercebank, N.A.*, No. 07-1159, 2009 WL 890583, at *5 (W.D. Pa. Mar. 26, 2009).

[286] UFTA § 8 cmt. 6.

meaning and engage in no further construction."[287] When a statute uses a term but does not define it, both federal courts and Minnesota state courts will give the term its "ordinary" or "plain" meaning by examining its dictionary definition.[288] The Examiner's Professionals have reviewed a number of the dictionaries most commonly cited by the Supreme Court of the United States and the Supreme Court of Minnesota, which variously define the word "rehabilitate," in a financial or business context, to mean:

> To restore to a previous condition; to set up again in proper condition.[289]
>
> To restore to good condition, operation, or management, as a bankrupt business.[290]
>
> The process of reorganizing a debtor's financial affairs—under Chapter 11, 12, or 13 of the Bankruptcy Code—so that the debtor may continue to exist as a financial entity, with creditors satisfying their claims from the debtor's future earnings.[291]
>
> To restore to a state of solvency or efficiency.[292]

While differing in their phraseology, these definitions have a common element—each requires more than maintenance of the status quo and the prevention of a debtor's collapse into a forced liquidation. Instead, they require restoration to a proper condition, reorganization to allow an enterprise to survive and creditors to satisfy their claims from a debtor's future earnings (as opposed to satisfying their claims from a liquidation of the debtor's assets), or, most tellingly, a return to *solvency*.[293]

---

[287] *Reiter v. Kiffmeyer*, 721 N.W.2d 908, 910 (Minn. 2006) (citing *Wynkoop v. Carpenter*, 574 N.W.2d 422, 425 (Minn. 1998)).

[288] *See, e.g., Taniguchi v. Kan Pac. Saipan, Ltd.*, 132 S. Ct. 1997, 2002 (2012) (citing THE AMERICAN HERITAGE DICTIONARY, THE SCRIBNER–BANTAM ENGLISH DICTIONARY, THE RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE, THE OXFORD ENGLISH DICTIONARY, CHAMBERS TWENTIETH CENTURY DICTIONARY, BLACK'S LAW DICTIONARY and WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY); *Ransom v. FIA Card Servs., N.A.*, 131 S. Ct. 716, 724 (2011) (citing WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY, THE NEW OXFORD AMERICAN DICTIONARY and THE OXFORD ENGLISH DICTIONARY); *State v. Hartmann*, 700 N.W.2d 449, 453–54 (Minn. 2005) (citing WEBSTER'S DICTIONARY); *Larson v. State*, 790 N.W.2d 700, 703 (Minn. 2010) (citing THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE and BLACK'S LAW DICTIONARY).

[289] OXFORD ENGLISH DICTIONARY 527 (James. A. H. Murray et al. eds., 2d ed. 1991).

[290] THE RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE 1625 (Stuart Berg Flexner ed., 2d ed. 1987).

[291] BLACK'S LAW DICTIONARY 1399 (9th ed. 2009).

[292] WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1914 (Philip Babcock Grove, Jr., et al. eds., 1993).

[293] Use of the word rehabilitate elsewhere in Minnesota law likewise suggests that an effort directed at a true restoration to financial health, rather than merely maintaining the status quo by preventing complete collapse, is required. *See, e.g., Morgan Assocs., Inc. v. Midwest Mut. Ins. Co.*, 519 N.W.2d 499, 502 (Minn. Ct. App. 1994) ("An attempt to rehabilitate [an insurance agency requires] a good faith effort by the insurance company to reach a mutual agreement with the agent on a written plan for rehabilitation.").

The commentary to the model UFTA, however, arguably supports a lesser standard for "rehabilitate." According to the drafters:

> Paragraph (3) [the good faith rehabilitation defense] is new and reflects a policy judgment that an insider who has previously extended credit to a debtor should not be deterred from extending further credit to the debtor in a good faith effort *to save the debtor from a forced liquidation in bankruptcy or otherwise*. A similar rationale has sustained the taking of security from an insolvent debtor for an advance to enable the debtor to stave off bankruptcy and extricate itself from financial stringency.[294]

One reading of this commentary is that *any* effort to avoid forced liquidation—even if that effort was not aimed at restoring the debtor to true financial health—may satisfy the "effort to rehabilitate" prong of the defense.

Though a close question, the Examiner concludes it is more likely than not that the "good faith effort to rehabilitate" defense to the Minnesota Insider Preference statute requires the insider-transferee to prove that it engaged in a good-faith effort to restore the debtor to solvency. As an initial matter, the plain meaning of the word "rehabilitate," as used in section 513.48(f)(3) of the Minnesota statute, requires more than merely preventing a forced liquidation. Under Minnesota law, where the language of a statute is unambiguous, courts must apply the plain meaning of the statute regardless of whether extrinsic sources suggest a contrary legislative intent. Therefore, even if a court were to construe the model UFTA commentary as suggesting a lesser standard for "rehabilitate," the ordinary meaning of that term would likely control. Moreover, the Examiner is skeptical that the drafters of the UFTA intended to depart from the ordinary usage of the term "rehabilitate." In this regard, it bears noting that the drafters analogized to a case where the transfer at issue was intended to help the debtor "extricate itself from financial stringency."[295] Such language is consistent with the conclusion that "rehabilitate" requires an effort to restore a debtor to solvency.

### f.   Whether A Transfer To A Secured Creditor Can Be Avoided

Unlike section 547 of the Bankruptcy Code, the Minnesota Insider Preference statute does not require, as a condition for avoidance of a transfer, a showing that the recipient of the transfer received more that it would have received under the hypothetical chapter 7 test.[296] Instead, Minnesota law provides two specific protections for secured creditors. First, as

---

[294] UFTA § 8 cmt. 6 (emphasis added).

[295] UFTA § 8 cmt. 6. This language, combined with the clear statement that the premise of the Insider Preference statute "is that an insolvent debtor is obliged to pay debts to creditors not related to him before paying those who are insiders," suggests that a circumspect reading of the rehabilitative effort defense is appropriate. *Id.* Prefatory Note, at 4.

[296] *See* 11 U.S.C. § 547(b)(5).

discussed above, a conveyance of a debtor's property will not be regarded as a "transfer," and thus cannot be the subject of any avoidance action under the Minnesota UFTA, if the property conveyed is subject to a valid lien and the value of the conveyed property does not exceed the value of that lien.[297] Second, and irrelevant as to any of the transactions reviewed by the Examiner during the Investigation, a transfer that is the result of "enforcement of a security interest in compliance with article 9 of the Uniform Commercial Code" may not be avoided under the Minnesota UFTA, except as an actually fraudulent transfer.[298] Between these two protections, the Minnesota Insider Preference statute leaves a significant gap—it provides no explicit protection to secured creditors who receive payments on account of secured obligations from a debtor's unencumbered funds (or property).

At least one court (not in Minnesota) has held that a payment to a secured creditor, even from unencumbered funds, may not be avoided under the Insider Preference provisions of the UFTA. In *In re Maine Poly, Inc.*, the United States Bankruptcy Court for the District of Maine concluded that payments to a non-insider secured creditor, whose claim was guaranteed by an insider of the debtor, could not be recovered from the insider-guarantor as Insider Preferences under Maine's UFTA.[299] In that case, the debtor relied on a secured revolving line of credit for its working capital.[300] After the debtor's bankruptcy filing, the trustee sought to avoid a number of prepetition payments on the revolver as Insider Preferences under the Maine UFTA, arguing that the resulting reduction of the insider's guarantee obligations effectively converted the payments into transfers to an insider.[301] The court rejected this argument and noted that, because the lender was oversecured, the debtor's payments merely decreased the value of its lien on the debtor's assets and may have thereby benefitted creditors.[302] Moreover, the court found that any benefit to the debtor's insider was merely incidental to the payments.[303] Accordingly, the court concluded that the payments did not "represent[] a 'transfer' to insiders" and therefore could not be avoided as an Insider Preference.[304]

Despite its clear holding, the Examiner believes that *Maine Poly* is unlikely to be treated as particularly persuasive. First, *Maine Poly* is readily distinguishable in that, unlike the transactions in this case, *Maine Poly* did not involve a true conveyance to an insider. Instead, as the court noted, "[r]eduction of the defendant(s)' guaranty liability was an incidental

---

[297] *See* MINN. STAT. ANN. §§ 513.41(2), 513.41(12); *Clarinda Color LLC v. BW Acquisition Corp.*, No. 00-CV-722 JMR/FLN, 2004 WL 2862298, at *3 (D. Minn. June 14, 2004); *Lorenzo Bus Serv., Inc. v. Richfield Bus Co.*, No. C2-02-56, 2002 WL 2005468, at *3–4 (Minn. Ct. App. Sept. 3, 2002); *Knight v. Prod. Res. Grp., LLC*, No. Civ. 036443 (MJD/JGL), 2005 WL 1630523, at *4 (D. Minn. July 11, 2005).

[298] MINN. STAT. ANN. § 513.48(e)(2).

[299] *Turner v. JPB Enters., Inc.* (*In re Maine Poly, Inc.*), 317 B.R. 1, 13 (Bankr. D. Me. 2004). The Insider Preference provisions of the Maine UFTA are substantially identical to those of the Minnesota UFTA. *Compare* MINN. STAT. ANN. § 213.45(b), *with* ME. REV. STAT. ANN. 14 § 3576(2).

[300] *See In re Maine Poly*, 317 B.R. at 4.

[301] *See id.* at 5.

[302] *See id.* at 13.

[303] *See id.*

[304] *Id.*

consequence" of the transfer.[305] Unlike section 547 of the Bankruptcy Code, the UFTA's Insider Preference provisions are limited to transfers *to* an insider, rather than transfers *to or for the benefit of* a creditor.[306] Thus, the transfers at issue in *Maine Poly* arguably did not even implicate the UFTA's Insider Preference provision. The court could have properly reached its ultimate conclusion—that the payments to a third-party creditor under an insider-guaranteed credit agreement were not avoidable as Insider Preferences because they were not transfers to an insider—without addressing the fact that the revolver was fully secured.

Second, and more important, *Maine Poly*'s rationale does not appear to be grounded in either the text of the statute or case law.[307] As set forth above, the Bankruptcy Court for the Southern District of New York recently held that the Minnesota Insider Preference statute must be strictly construed where it is unambiguous, holding that "the Court cannot rewrite its statute to add" language excluded by the statute's drafters.[308] The Minnesota UFTA unambiguously fails to include language similar in effect to the "hypothetical liquidation test" contained in section 547 of the Bankruptcy Code. If *Musicland* is to be applied consistently, "[a]ny necessary fix resides with the Minnesota legislature."[309]

Accordingly, the Examiner concludes that it is likely that the Bankruptcy Court would not apply a hypothetical chapter 7 test in evaluating claims of avoidability under the Minnesota Insider Preference statute.

---

[305] *Id.*

[306] *Compare* UFTA § 5(b), *with* 11 U.S.C. § 547(b)(1).

[307] *Maine Poly* also appears to reach a result that would be contrary to the intent of the Minnesota legislature. As discussed above, under Minnesota law, "[t]he intention of the drafters of a statute becomes the legislative intent upon enactment." *Shields v. Goldetsky* (*In re Butler*), 552 N.W.2d 226, 231 (Minn. 1996) (citing *Layne-Minn. Co. v. Regents of the Univ. of Minn.*, 123 N.W.2d 371, 376 n.13 (Minn. 1963)). Accordingly, the Minnesota legislature's intent "is that an insolvent debtor is obliged to pay debts to creditors not related to him before paying those who are insiders." UFTA, Prefatory Note, at 4.

[308] *Responsible Pers. of Musicland Holding Corp. v. Best Buy Co.* (*In re Musicland Holding Corp.*), 462 B.R. 66, 73 (Bankr. S.D.N.Y. 2011) (citing *Genin v. 1996 Mercury Marquis*, 622 N.W.2d 114, 117 (Minn. 2001); *State v. Moseng*, 95 N.W.2d 6, 11–12 (Minn. 1959)).

[309] *In re Musicland Holding Corp.*, 462 B.R. at 73.

### g. *Transactions That Implicate Insider Preferential Transfer Law*

The following seven transactions or loan facilities[310] implicate potential claims under Minnesota's Insider Preference Statute: (1) the Secured Revolver Facility; (2) the A&R Line of Credit Facility; (3) the Secured MSR Facility; (4) the Servicing Advance Factoring Facility; (5) the Resort Finance Facility; (6) the 2008 Bank Transaction; and (7) the 2009 Bank Transaction.

As set forth above, the Examiner has concluded that the evidence supports the propositions that the following prima facie elements of an Insider Preference claim are met with respect to each of those seven transactions: (1) the Debtor-transferor had a "triggering creditor";[311] (2) AFI (or the relevant AFI-affiliate transferee)[312] is an insider of the Debtor-transferor;[313] (3) the Debtor-transferor was insolvent at the time of transaction;[314] and (4) AFI (or the relevant AFI-affiliate transferee) had reasonable cause to believe that the Debtor-transferor was insolvent at the time of transaction.[315] The Examiner has also concluded that the hypothetical chapter 7 test is not relevant under the Minnesota Insider Preference statute.[316] Thus, for the prima facie Insider Preference claim to be established, the only questions that need be answered on a transaction-by-transaction basis are: (1) whether the conveyance was "made for an antecedent debt"; and (2) whether what was conveyed was an "asset" of the Debtor-transferor that could be subject to a "transfer" within the meaning of the Minnesota UFTA.[317]

Further, the Examiner has concluded that, except where otherwise noted, the safe harbor, good faith transferee, ordinary course, and good faith effort to rehabilitate defenses are not

---

[310] The Examiner also considered whether the ResMor Loan Facility and the BMMZ Repo Facility raise potentially-significant claims under the Minnesota Insider Preference statute. However, RFC only reported a payment of $563,000 in connection with the ResMor Loan Facility. S*ee* ResCap Interest Journal Entry Spreadsheet, at Tab Ally ResMor-2020200001 [EXAM00338636]; Residential Funding Company, LLC Consolidated Financial Statements as of and for the Years Ended December 31, 2008 and 2007, Mar. 25, 2009, at 78 [EXAM00124988]. RFC only made payments of $332,000 and $1,448,756 in connection with the BMMZ Repo Facility. *See* Residential Funding Company, LLC, Consolidated Financial Statements as of and for the Years Ended December 31, 2011 and 2010, dated Mar. 28, 2012, at 61 [EXAM00232321]; ResCap Interest Journal Entry Spreadsheet [EXAM00338636] (see "Ally BMMZ-2020200025" worksheet); ResCap Interest Payable As of May 13, 2012 [EXAM00345973]. Given the de minimis nature of these payments and the potential defenses available to payments relating to the BMMZ Repo under section 546(f) of the Bankruptcy Code, the Report does not include a detailed analysis regarding these payments.

[311] *See* Section VII.F.4.d(1).

[312] GMAC CF, and not AFI, was the counterparty to RFC and GMAC Mortgage in the Servicing Advance Factoring Facility. GMAC CF, like AFI, is an insider of RFC. The evidence also supports the proposition that GMAC CF, as a wholly-owned subsidiary of AFI, had reasonable cause to believe that RFC was insolvent at the time of transfers.

[313] *See* Section VII.F.4.d(2).

[314] *See* Section VII.F.4.d(4).

[315] *See* Section VII.F.4.d(5).

[316] *See* Section VII.F.4.f.

[317] *See* MINN. STAT. § 513.45(b).

available to AFI in connection with the transfers described below for the reasons explained in Sections VII.F.3,[318] VII.F.4.e(1), VII.F.4.e(3), and VII.F.4.e(4), respectively. Consequently, the Examiner has concluded that new value is the only affirmative defense that will generally be available to AFI in connection with Insider Preference claims concerning these seven transactions. Because the new value defense must be considered in the aggregate, rather than on a transaction-by-transaction basis, it is addressed separately in Section VII.F.4.h.

### (1) 2008 Secured Revolver Facility

The Investigation has uncovered potential Minnesota Insider Preference claims associated with the Secured Revolver Facility transaction, whereby RFC and GMAC Mortgage agreed to (i) become directly liable as borrowers under the $3.5 billion Secured Revolver Facility and (ii) secure the $3.5 billion Secured Revolver Facility with substantially all of their assets (the "2008 Secured Revolver Transaction"). Based on the analysis below, the Examiner concludes it is likely that certain of those Insider Preference claims would prevail.

#### (a) Background

While the facts related to the Secured Revolver Facility are fully set forth in Section V.E and Appendix V.E.3, a brief summary is helpful to this analysis.

##### (i) 2005 Third Party Facilities

On July 28, 2005, ResCap, as borrower, entered into three separate unsecured syndicated credit facilities with various financial institutions, as lenders, and with JPMorgan Chase as administrative agent (collectively, the "2005 Third Party Facilities"): (1) a $1.75 billion term loan facility that matured on July 28, 2008 (the "2005 Term Loan Facility"); (2) an $875 million three-year revolving credit facility (the "2005 Three-Year Revolver"); and (3) an $875 million 364-day revolving credit facility (the "2005 364-day Revolver"). The 2005 Third Party Facilities were guaranteed by RFC and GMAC Mortgage on an unsecured basis pursuant to a separate Subsidiary Guarantee Agreement entered into for each of the 2005 Third Party Facilities.

The 2005 364-day Revolver was replaced twice, most recently on June 11, 2007 with a new $875 million unsecured 364-day revolver (the "2007 364-day Revolver").[319] The 2005 Three-Year Revolver was also replaced on June 11, 2007 with a new $875 million unsecured three-year revolver (the "2007 Three-Year Revolver" and together with the 2007 364-day Revolver, the "2007 Revolvers").[320] No amounts were ever drawn under the 2007 Revolvers.

---

[318] The Examiner's Counsel solicited information from AFI with respect to its potential eligibility to assert the settlement payment safe harbor defense provided by section 546(e) of the Bankruptcy Code. In its response to the Examiner's Counsel, AFI did not assert the settlement payment defense as to any of the transactions or facilities reviewed in this Section. Accordingly, the Examiner has proceeded on the assumption that no settlement payment safe harbor defense is available to AFI (or its affiliates). Additionally, none of the transactions discussed in this Section involve swap agreements. Accordingly, the swap agreement safe harbor provided by section 546(g) of the Bankruptcy Code is irrelevant to this Section.

[319] *See* JPMorgan Chase 364-Day Facility [EXAM00344999]. As with the 2005 364-day Revolver, the 2007 364-day Revolver was guaranteed by RFC and GMAC Mortgage. *See id.*

[320] As with the 2005 Third Party Facilities, the 2007 Revolvers were provided by unaffiliated third-party lenders.

### (ii) 2008 Secured Revolver Transaction

On or around June 4, 2008, the 2005 Term Loan Facility was refinanced, and the 2007 Revolvers were replaced, with a new $3.5 billion Secured Revolver Facility, under which AFI acted as lender. RFC and GMAC Mortgage, which were guarantors under the 2005 Term Loan Facility and the 2007 Revolvers, became direct borrowers, while ResCap, which had previously been a direct borrower, became a guarantor (along with various subsidiaries of ResCap). Although an integrated transaction, the 2008 Secured Revolver Transaction is most easily understood through its component transactions, each of which occurred on or around June 4, 2008:

- AFI acquired, by way of assignment from ResCap's various third-party lenders, approximately $1.29 billion of the $1.75 billion principal amount of outstanding loans under the 2005 Term Loan Facility (the "$1.29 Billion AFI Term Loan").[321]

- AFI, as lender, RFC and GMAC Mortgage, as borrowers, and ResCap and certain other subsidiaries of ResCap, as guarantors, entered into the Secured Revolver Facility.[322]

- The 2007 Revolvers were terminated.

- The $1.29 Billion AFI Term Loan, which was previously unsecured, was converted into a secured term loan under the Secured Revolver Facility.[323]

- RFC and GMAC Mortgage borrowed approximately $458 million under the Secured Revolver Facility to repay the remaining loans outstanding under the 2005 Term Loan Facility.[324]

- RFC and GMAC Mortgage borrowed $1.29 billion under the Secured Revolver Facility to fund the bond exchange described in Section V.E.3.[325]

- RFC and GMAC Mortgage borrowed approximately $457 million "to acquire other assets and for other working capital needs."[326]

Through these transactions, on or about June 4, 2008, RFC and GMACM borrowed the entire $3.5 billion available under Secured Revolver Facility, but retained no net proceeds from those borrowings.[327]

---

[321] *See* Master Assignment and Assumption Agreement, dated as of a date on or before June 6, 2008 among the Initial Lender and the Term Loan Lenders [ALLY_0043831].

[322] *See* Secured Revolver Loan Agreement [RC00024234].

[323] *See id.* § 2.01(c).

[324] Residential Capital, LLC, Current Report (Form 8-K) (June 3, 2008), Item 1.01.

[325] *See* Ally Revolver Use of Funds – June 2008 [EXAM00345926]; *see also* Residential Capital, LLC, Current Report (Form 8-K) (June 9, 2008), at 2; Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2009), at 100.

[326] Ally Revolver Use of Funds – June 2008 [EXAM00345926].

[327] In fact, it appears that, although technically borrowed by RFC and GMAC Mortgage, the loan proceeds were transferred directly to ResCap. *See* Ally Revolver Use of Funds – June 2008 [EXAM00345926].

According to ResCap's SEC filings, on or about July 28, 2008—the date on which the $1.29 Billion AFI Term Loan portion of Secured Revolver Facility was due to mature—RFC and GMAC Mortgage drew approximately $1.29 billion under the Secured Revolver Facility to repay the $1.29 Billion AFI Term Loan.[328] Such a draw should not have been possible under the terms of the Secured Revolver Credit Agreement because the Secured Revolver Facility was already fully drawn. Although the Examiner's Financial Advisors discussed this apparent contradiction with the Debtors, they were unable to provide any explanation or documentation to resolve the issue.[329] The Examiner therefore believes that the $1.29 Billion AFI Term Loan was informally converted into a regular borrowing under the Secured Revolver Facility when it otherwise would have matured.

### (iii) Accounting For The 2008 Secured Revolver Transaction[330]

Prior to November 2008, the Secured Revolver Facility remained on ResCap's accounting records, and was not posted to the accounting records of RFC or GMAC Mortgage. Because of the complexity of the facility, including its varied collateral and advance rates across the two entities, ResCap accounting personnel first focused on the collateral reporting aspect and only at year-end 2008 did legal entity accounting become a consideration. On November 30, 2008, RFC and GMAC Mortgage each recorded its share of the amount outstanding on the Secured Revolver Facility in its respective accounting records, with a corresponding reduction in intercompany payables owed to ResCap. The allocation of the outstanding loan balance to each of RFC and GMAC Mortgage at the end of each month was calculated based on the collateral values remaining at each entity at month end (which are estimated to have been 90 percent to RFC and 10 percent to GMAC Mortgage).

### (iv) The A&R Secured Revolver Loan Agreement

On December 30, 2009, the parties to the Secured Revolver Facility executed the A&R Secured Revolver Loan Agreement, which converted $1.55 billion in then-outstanding revolving loans into term loans.[331] The A&R Secured Revolver Loan Agreement had an initial maturity date of May 2010.[332] That maturity date was extended several times through the Petition Date. As of the Petition Date, $747 million was outstanding under the A&R Secured Revolver Loan Agreement.[333]

---

[328] *See* Residential Capital, LLC, Quarterly Report (Form 10-Q) (Nov. 10, 2008), at 78.

[329] Based on oral discussions with Barbara Westman (ResCap's Senior Director of Accounting Operations).

[330] The following details are based on oral discussions with Barbara Westman (ResCap's Senior Director of Accounting Operations).

[331] *See* A&R Secured Revolver Loan Agreement [ALLY_0066146]. There were no other amounts outstanding on the Secured Revolver Facility as of that date. *See id.*

[332] *See* A&R Secured Revolver Loan Agreement [ALLY_0066146].

[333] *See* First Day Affidavit, at 26.

*(v) Summary Of Payments Pursuant To The Secured Revolver Facility
And The A&R Secured Revolver Loan Agreement*

The Secured Revolver Facility began with a fully-drawn amount owed of $3.5 billion as of June 4, 2008, and ended as the A&R Secured Revolver Loan Agreement with a balance of $747 million outstanding on the Petition Date, a difference of approximately $2.753 billion. The following payments were made pursuant to the Secured Revolver Facility:[334]

---

[334] Although RFC and GMAC Mortgage had the right to redraw amounts repaid under the Secured Revolver Facility, no such reborrowings occurred. Additionally, no amounts owing under the Secured Revolver Facility were forgiven.

EXHIBIT VII.F.4.g(1)(a)(v)
**Secured Revolver Facility – Borrowings and Payments**
2008 – 2012
*($ in Millions)*

|  | Borrowings | Payments | | | |
|---|---|---|---|---|---|
|  |  | Principal | Interest[1] | Fees[2] | Total |
| Jun-08 | ($3,500.0) |  | $13.5 | $17.5 | $31.0 |
| Jul-08 |  | $279.0 | 14.9 |  | 293.9 |
| Aug-08 |  | 134.6 | 14.1 | 1.1 | 149.8 |
| Sep-08 |  | 164.3 | 13.1 |  | 177.4 |
| Oct-08 |  | 253.3 | 15.2 |  | 268.5 |
| Nov-08 |  | 236.7 | 11.8 |  | 248.5 |
| Dec-08 |  | 76.2 | 8.8 |  | 85.0 |
| Jan-09 |  | 37.8 | 6.4 |  | 44.2 |
| Feb-09 |  | 50.2 | 6.7 |  | 56.9 |
| Mar-09 |  | 98.1 | 6.2 |  | 104.3 |
| Apr-09 |  | 75.5 | 5.8 |  | 81.3 |
| May-09 |  | 45.6 | 5.6 |  | 51.2 |
| Jun-09 |  | 48.6 | 5.2 |  | 53.8 |
| Jul-09 |  | 169.6 | 4.9 |  | 174.5 |
| Aug-09 |  | 32.3 | 4.7 |  | 37.0 |
| Sep-09 |  | 109.1 | 4.4 |  | 113.5 |
| Oct-09 |  | 52.4 | 4.3 |  | 56.7 |
| Nov-09 |  | 27.7 | 4.1 |  | 31.8 |
| Dec-09 |  | 63.8 | 4.0 |  | 67.8 |
| Jan-10 |  | 15.7 | 3.8 |  | 19.5 |
| Feb-10 |  | 41.7 | 3.5 |  | 45.2 |
| Mar-10 |  | 76.0 | 3.8 |  | 79.8 |
| Apr-10 |  | 82.1 | 3.4 |  | 85.5 |
| May-10 |  | 98.7 | 3.4 |  | 102.1 |
| Jun-10 |  | 171.7 | 3.0 |  | 174.7 |
| Jul-10 |  | 24.6 | 2.8 |  | 27.4 |
| Aug-10 |  | 37.6 | 2.6 |  | 40.2 |
| Sep-10 |  | 10.3 | 2.5 |  | 12.8 |
| Oct-10 |  | 89.2 | 2.4 |  | 91.6 |
| Nov-10 |  | 9.1 | 2.2 |  | 11.3 |
| Dec-10 |  | 42.6 | 2.3 |  | 44.9 |
| Jan-11 |  | 3.9 | 2.2 |  | 6.1 |
| Feb-11 |  | 7.5 | 2.0 |  | 9.5 |
| Mar-11 |  | 41.7 | 2.1 |  | 43.8 |
| Apr-11 |  | 11.8 | 2.0 |  | 13.8 |
| May-11 |  | 4.1 | 2.0 |  | 6.1 |
| Jun-11 |  | 2.5 | 1.9 |  | 4.4 |
| Jul-11 |  | 1.4 | 2.0 |  | 3.4 |
| Aug-11 |  | 2.3 | 2.0 |  | 4.3 |
| Sep-11 |  | 4.4 | 1.9 |  | 6.3 |
| Oct-11 |  | 1.3 | 1.9 |  | 3.2 |
| Nov-11 |  | 5.7 | 1.9 |  | 7.6 |
| Dec-11 |  | 3.3 | 2.0 |  | 5.3 |
| Jan-12 |  | 2.2 | 2.0 |  | 4.2 |
| Feb-12 |  | 1.3 | 1.8 |  | 3.1 |
| Mar-12 |  | 2.4 | 1.9 |  | 4.3 |
| Apr-12 |  | 1.9 | 1.9 |  | 3.8 |
| May-12 |  | 0.9 | - |  | 0.9 |
|  | ($3,500.0) | $2,752.7 | $220.9 | $18.6 | $2,992.2 |

[1] *Although ResCap did not provide monthly interest payment information, ResCap did confirm that payments were made on account of interest expense. Monthly interest payments are based on monthly interest payable calculations provided by AFI. Interest payments for 2008 include interest incurred on account of GM's and Cerberus's share of this facility of $18.4 million and $19.3 million, respectively.*
[2] *ResCap did not provide information on any other fees paid on the Secured Revolver Facility.*
*Source: AFI Intercompany Loan to ResCap — Credit Facility 2008–2012, at ALLY_0182825-43[ALLY_0182793]; ResCap Credit Facility Journal Entry Spreadsheet, at Tab Ally Revolver – 2010000009, – 02(SS), – 02(PS) [EXAM00338635];Residential Capital, LLC Interest Payable—Ally Debt Facilities as of May 13, 2002 [EXAM00345973]; Wire Confirmation for Fees Related to the Secured Revolver Facility, dated Aug. 18, 2008 [EXAM00345974]; Wire Confirmation for Fees Related to the Secured Revolver Facility, dated June 4, 2008 [EXAM00345976].*

In summary, RFC and GMAC Mortgage made the following payments on account of the Secured Revolver Facility between June 8, 2008 (the date on which the first payment under the Secured Revolver Facility was made) and the Petition Date: (1) $2,752,872,447 in principal; (2) an estimated $220,629,677 in interest; and (3) $18,556,000 in fees and costs.

The Minnesota Insider Preference statute raises two separate questions with respect to the Secured Revolver Facility. First, are the liens granted for the benefit of AFI in connection with the conversion of the $1.29 Billion AFI Term Loan into a secured loan under the Secured Revolver Facility avoidable? Second, are the repayments made under the Secured Revolver Facility avoidable? Because these questions are analytically distinct, the Examiner will discuss them separately.

### (b) Application of Minn. Stat. § 513.45(b) To The $1.29 Billion AFI Term Loan

#### (i) Remaining Prima Facie Elements

The Examiner concludes that ResCap's and RFC's transfer of the liens to AFI in connection with the conversion of the $1.29 Billion AFI Term Loan into a secured loan under the Secured Revolver Facility likely meets the remaining prima facie elements of an Insider Preference. The grant of a lien is a statutorily-defined "transfer."[335] Thus, ResCap and RFC engaged in "transfers" by granting liens on their assets in connection with the Secured Revolver Facility. Because the liens were granted on June 4, 2008 to secure the $1.29 Billion AFI Term Loan,[336] which arose on July 28, 2005,[337] the transfer was on account of an antecedent debt. Thus, ResCap's and RFC's respective grants of liens to AFI in connection with the $1.29 Billion AFI Term Loan are prima facie avoidable under the Minnesota Insider Preference statute.

#### (ii) Good Faith Effort To Rehabilitate

As set forth in Section VII.F.4.d(4), the Minnesota UFTA provides an affirmative defense to an Insider Preference action for those transferees who can prove that: (1) it engaged in a good faith effort to rehabilitate the debtor-transferee; (2) the transfer secured present value given; and (3) the transfer secured an antecedent debt.[338] Because the second and third elements of the defenses are easily addressed, the Examiner will begin his analysis with those issues.

---

[335] MINN. STAT. § 513.41(12).

[336] *See* Secured Revolver Loan Agreement, § 2.01(c) [RC00024234].

[337] *See* JPMorgan 2005 Term Loan Facility [EXAM00345163].

[338] *See* MINN. STAT. § 513.48(f)(3).

### *(A) The Transfer Also Secured Present Value Given*

The Examiner concludes that the evidence supports proposition that the Secured Revolver Facility secured present value given. "A transfer is made for present value if the exchange between the debtor and the transferee is intended by them to be contemporaneous and is in fact substantially contemporaneous."[339] "Value" includes, among other things, money loaned.[340] The Examiner concludes that the evidence supports the proposition that the parties to the Secured Revolver Facility intended that ResCap's and RFC's grants of liens and AFI's advances of new money thereunder would occur contemporaneously.[341] The Examiner further concludes that the evidence supports the proposition that AFI did in fact advance approximately $2.2 billion of new money under the Secured Revolver Facility contemporaneously with receiving liens on ResCap's and RFC's assets.[342]

### *(B) The Transfer Secured An Antecedent Debt*

The Examiner also concludes that the evidence supports the proposition that the Secured Revolver Facility secured an antecedent debt of ResCap and RFC. Upon execution of the Secured Revolver Credit Agreement, the $1.29 Billion AFI Term Loan, which was then unsecured, was converted into a loan under the Secured Revolver Facility subject to the liens created by the Secured Revolver Credit Agreement and its ancillary documents.[343] As a result, the $1.29 Billion AFI Term Loan became a secured obligation of RFC, as borrower, and ResCap, as guarantor. ResCap's and RFC's debts with respect to the $1.29 Billion AFI Term Loan were antecedent to this grant of security—which occurred on June 4, 2008—because they arose on July 28, 2005 when the parties entered into the 2005 Term Loan Facility.[344]

### *(C) The Transfer Was Not A Good Faith Effort To Rehabilitate ResCap Or RFC*

In assessing whether AFI's actions with respect to the Secured Revolver Facility were a good faith effort to rehabilitate the debtor, the Bankruptcy Court would undertake an objective inquiry and would consider, among other things: (1) the amount of antecedent debt secured;

---

[339] Minn. Stat. § 513.43(c).

[340] *See Elliot & Callan, Inc. v. Crofton*, 615 F. Supp. 2d 963, 973 (D. Minn. 2009) ("'Value' includes 'property,' which would obviously include the money that Crofton loaned or advanced to SCC.").

[341] *See* Secured Revolver Loan Agreement, § 2.01(c) [RC00024234]; First Priority Security Agreement [RC00038119].

[342] *See* Ally Revolver Use of Funds – June 2008 [EXAM00345926].

[343] *See* Secured Revolver Loan Agreement, § 2.01(c) [RC00024234]; First Priority Security Agreement [RC00038119].

[344] Although RFC was only a guarantor under the 2005 Term Loan Facility, a debt on a guarantee arises the moment such guarantee is executed. *See First Res. Bank v. Rehbein*, No. 12–206 (PAM/SER), 2013 WL 618164, at *2 (D. Minn. Feb. 19, 2013) ("Under the very broad definition of claim in the MFTA, Patriot had a claim against Myrna the minute she signed the guaranty. Thus, it didn't matter whether there was a notice of default or a cure period; the claim arose the day she signed each guaranty. It might have been a contingent, unmatured claim, but for purposes of the MFTA, contingent, unmatured claims are claims nonetheless. First Resource is entitled to summary judgment on this element of its MFTA claim.").

(2) the amount of present value provided to the Debtors; and (3) the likelihood that the challenged transfer would result in the successful rehabilitation of the Debtors.[345] After undertaking such an objective analysis, the Examiner concludes that evidence does not support the proposition that AFI engaged in a good faith effort to rehabilitate ResCap or RFC in connection with the 2008 Secured Revolver Facility. The Examiner concludes that the evidence does not support the proposition that, on or about June 4, 2008, there existed any reasonable possibility that the parties' entry into the Secured Revolver Facility, and the liens granted by ResCap and RFC (among others) thereunder, would lead to the Debtors' rehabilitation.[346] Instead, the Examiner concludes that the evidence supports the proposition that ResCap's and RFC's financial failure was all but inevitable following their entry into the Secured Revolver Facility.

Many of the facts and conclusions set forth in Section VI of the Report support the conclusion that ResCap and RFC could not be rehabilitated as the Examiner believes that term to be used in Minnesota UFTA section 513.48(f)(3). Several of the more salient points that have led the Examiner to conclude that it is not likely that this affirmative defense would succeed include: (1) the purpose for which the Secured Revolver Facility was provided; (2) ResCap's financial condition and capital needs on or about June 4, 2008; and (3) the markets' perception of ResCap's default risk.

First, while the Secured Revolver Facility was nominally intended to provide ResCap and its subsidiaries with needed liquidity, it did not do so. Instead, as noted above, the vast majority of the availability under the Secured Revolver Facility was used to: (1) refinance the maturing obligations under the 2005 Term Loan Facility; and (2) fund ResCap's June 6, 2008 bond exchange.[347] As a result, the Debtors retained only approximately $457 million of the $3.5 billion "to acquire other assets and for other working capital purposes."[348]

Even after the Secured Revolver Facility was consummated, ResCap and RFC continued to be dependent on AFI to support their liquidity and capital needs through a series of asset sales, secured loans and capital contributions, and AFI arranged certain asset sales to affiliates to support the near term liquidity needs of ResCap and RFC. These included: (1) the Servicing Advance Factoring Agreement in June 2008; (2) the Excess Servicing Rights sale in July 2008; (3) the Resort Finance Sale in July 2008; (4) the September 2008 Model Home Sale; and (5) the November 2008 ResMor Sale.[349] AFI also provided additional secured loans to ResCap and RFC subsequent to the Secured Revolver Facility, including the Initial Line of

---

[345] *See* UFTA § 8 cmt. 6.

[346] As discussed in Section VII.F.4.d(4), although a close question, the Examiner believes that a "good faith effort to rehabilitate" a debtor, as that phrase is used in MINN. STAT. § 513.48(f)(3), requires an objectively reasonable effort to return the debtor to state of solvency or good operation.

[347] *See* Section VI.C.4.d.

[348] *See* Ally Revolver Use of Funds – June 2008 [EXAM00345926].

[349] *See* Exhibit VI.C.4.f(4)(c).

Credit in November 2008,[350] and agreed to amend and extend existing borrowing facilities between AFI and ResCap subsequent to the Secured Revolver Facility because ResCap was unable to meet the terms and maturities of such facilities, most notably, the Secured MSR Facility in October 2008.[351] AFI also provided ResCap with capital contributions in September 2008 and again in December 2008, totaling $1.1 billion, each time to prevent ResCap from violating its TNW covenants.[352]

ResCap and RFC continued to experience chronic liquidity stress in 2008[353] and ResCap's access to the capital markets remained impaired.[354] As discussed in Section VI.C.4.d, ResCap's existing third party secured financing providers had been reducing ResCap's borrowing availability since June 2008, and ResCap's advisors reported to the ResCap Board in December 2008 that ResCap was unable to borrow against its unencumbered assets from new or existing third party lenders. These liquidity concerns forced ResCap to consider various strategic alternatives, including a potential bankruptcy filing in June 2008, September 2008, and December 2008.[355]

Second, the deterioration of conditions in the housing and related finance markets that caused many mortgage companies to file for bankruptcy in 2007 continued through 2008.[356] These adverse market conditions adversely affected ResCap's and RFC's financial performance during this time. ResCap incurred a net loss of $2.7 billion for the six months ended June 30, 2008,[357] which grew to $5.6 billion for the year ended December 31, 2008.[358] As discussed in Section VI.C.4.f(2), ResCap continued to revise its cash flow forecasts downward as 2008 progressed. In its June 16, 2008 executive liquidity report, ResCap projected $1.5 billion in liquidity shortfalls for the subsequent twelve months.[359] ResCap's and RFC's continuing losses left them unable to service their debts from their dramatically reduced operations and income producing assets, leaving them dependent on AFI for continued support to meet liquidity and capital needs.[360]

---

[350] *See* Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2009), at 98; s*ee also*, Section VI.C.4.c(4).

[351] *See* Residential Capital, LLC, Current Report (Form 8-K) (Oct. 23, 2008).

[352] *See* Section VI.C.4.f(4)(b); Exhibit VI.C.4.f(4)(b)—2.

[353] *See* Section VI.C.4.c(4).

[354] *See* Section VI.C.4.d.

[355] *See* Int. of T. Pohl, Feb. 26, 2013, at 35:20–36:6; *see also* Minutes of an Executive Session of the Board of Directors of Residential Capital, LLC, Sept. 23, 2008, at RC40006865 [RC40006865]; Skadden and Lazard Project Scout Presentation, dated Oct. 2008, at EXAM20020826 [EXAM20020824]; Project Scout Presentation, dated Oct. 10, 2008, at EXAM10490752 [EXAM10490750].

[356] *See* Section VI.C.4.a.

[357] Residential Capital, LLC, Quarterly Report (Form 10-Q) (Aug. 8, 2008), at 4.

[358] Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2009), at 119.

[359] *See* GMAC ResCap Executive Liquidity Report, dated Jun. 16, 2008, at Tab Mon_ResCap_Revised [EXAM10055935].

[360] *See* ResCap Bond Exchange Accounting Assessment, dated Jul. 1, 2008, at ALLY_0242724 [ALLY_0242723].

Third, contrary to any suggestion that the market perceived the June refinancing as potentially rehabilitating ResCap, the market's views of ResCap *worsened* subsequent to the consummation of the Secured Revolver Facility. The marketplace considered ResCap to be at risk of imminent default on its debts in June 2008 as shown by the market prices for ResCap's unsecured bonds and CDS. In particular, ResCap's 6.5% bond due April 2013 was trading at 54 percent of par on May 2, 2008, just prior to the May 5, 2008 announcement of the contemplated Secured Revolver Facility and the June 6, 2008 bond exchange offer.[361] By June 4, 2008, the bond price had fallen to 47.5 percent of par.[362] By June 30, 2008, the bond price had fallen further to 39 percent of par.[363] CDS spreads for such bonds were 4,431 basis points on May 2, 2008, temporarily improved to 3,445 basis points on June 4, 2008, and then widened to 4,304 basis points by June 30, 2008 and 5,563 basis points by July 31, 2008.[364] It was reported in June 2008 that ResCap's "[c]redit-default swap prices [gave] ResCap a 100 percent chance of default within the next five years, based on a JPMorgan model."[365] Additionally, ResCap's new secured bonds issued pursuant to the June 9, 2008 bond exchange were rated Caa2 and Caa3.[366] Moody's commented on June 16, 2008, that "ResCap has not proven it has a business model that can produce the required operating cash flow to ultimately service these obligations."[367]

In sum, regardless of AFI's motivations for entering into the Secured Revolver Facility, the evidence does not support the proposition that the refinancing was an objectively reasonable effort to rehabilitate the Debtors. Instead, the evidence supports the proposition that the 2008 Secured Revolver merely postponed the Debtors' bankruptcy while elevating AFI's exposure with respect to the $1.29 Billion AFI Term Loan from an unsecured claim to a secured claim. Accordingly, the Examiner concludes that it is unlikely that AFI would prevail on a "good faith effort to rehabilitate" defense to avoidance of ResCap's and RFC's grant of liens with respect to the $1.29 Billion AFI Term Loan.

### *(iii) Conclusion With Respect To $1.29 Billion AFI Term Loan*

The Examiner concludes that ResCap's and RFC's transfer of liens to AFI to secure the $1.29 Billion AFI Term Loan likely meets the prima facie test for avoidance as an Insider Preference under Minnesota law. The Examiner further concludes that it is unlikely that AFI would prevail on a "good faith effort to rehabilitate" defense to avoidance of ResCap's and RFC's lien transfers with respect to the $1.29 Billion AFI Term Loan. Accordingly, the Examiner concludes that, except to the extent that AFI's liability may be offset by new value,

---

[361] Pricing per Interactive Data Corporation.

[362] *Id.*

[363] *Id.*

[364] Pricing per Advantage Data, Inc.

[365] Ari Levy & Caroline Salas, *GMAC's $60 Billion Deal Loses Traction as Cash Burns (Update1)*, BLOOMBERG, Jun. 24, 2008, http://www.bloomberg.com/apps/news?pid=newsarchive&refer=home&sid=aFREd.COhlF4.

[366] Caroline Salas, *GMAC Debt Downgraded One Level by Moody's on ResCap (Update1)*, BLOOMBERG, Jun. 16, 2008, http://www.bloomberg.com/apps/news?pid=newsarchive&refer=bond253&sid=aTFVUWpf2WSE.

[367] *Id.*

AFI's liens with respect to the $1.29 Billion AFI Term Loan (as subsequently converted to or repaid with regular borrowings under the Secured Revolver Facility) would likely be avoided.

### (c) Application Of Minn. Stat. § 513.45(b) To Repayments Of Amounts Advanced Under The Secured Revolver Facility

#### (i) Remaining Prima Facie Elements

The Examiner concludes that payments made by ResCap or RFC to AFI on account of amounts outstanding under the Secured Revolver Facility are unlikely to meet the remaining prima facie elements of an Insider Preference. First, the evidence supports the proposition that all repayments were made for antecedent debts—namely RFC's primary obligation and ResCap's guarantee obligation under the Secured Revolver Facility. ResCap's and RFC's obligations under the Secured Revolver Facility were incurred either in July 2005 (with respect to amounts owed under the $1.29 Billion AFI Term Loan portion of the Secured Revolver Facility)[368] or on June 4, 2008 (with respect to amounts owed under the remainder of the Secured Revolver Facility).[369] As shown on Exhibit VII.F.4.g(1)(a)(v) above, all payments made by ResCap and RFC with respect to amounts owed under the Secured Revolver Facility were made after those dates. Accordingly, the Examiner concludes that the evidence supports the proposition that such payments were made on account of antecedent debts.

However, based on discussions with the Debtors' accounting professionals, the Examiner concludes that the evidence supports the proposition that some or all of the funds used to repay the 2008 Secured Revolver were encumbered by valid liens.[370] As a result, to the extent of any such liens, such repayments were not "transfers" of "assets" susceptible to avoidance under the Minnesota UFTA.[371] Although the Debtors were unable to provide the Examiner with detailed accounting records showing that each payment of amounts owed under the Secured Revolver Facility was made from either cash collateral or traceable proceeds of collateral, the sample flow-of-funds entries provided by the Debtors were consistent with that conclusion.[372] The terms of the Secured Revolver Credit Agreement likewise indicate that the Secured Revolver Facility was intended to be repaid from the net proceeds of collateral dispositions.[373] Because a forensic examination of the Debtors' accounting records is beyond the scope of the Investigation, the Examiner has not undertaken such an analysis to determine conclusively whether all amounts paid under the Secured Revolver Facility were cash collateral or the traceable proceeds of collateral sales. Nevertheless, the Examiner concludes that the evidence supports the proposition that some or all of the funds used to repay the

---

[368] *See* JPMorgan 2005 Term Loan Facility [EXAM00345163].

[369] *See* Secured Revolver Loan Agreement [RC00024234].

[370] Based on oral discussions with Barbara Westman (ResCap's Senior Director of Accounting Operations).

[371] *See* MINN. STAT. ANN. § 513.41(2), (12).

[372] *See* AFI Revolver Flow of Funds Example [EXAM00345253].

[373] *See* Secured Revolver Loan Agreement, § 2.08(c) [RC00024234]

Secured Revolver Facility were encumbered by valid liens and that such repayments, to the extent of any such liens, were therefore not "transfers" of "assets" susceptible to avoidance under the Minnesota UFTA.[374]

### *(ii) Conclusion With Respect To Payments of Amounts Owed Under The Secured Revolver Facility*

The Examiner concludes that payments on account of the Secured Revolver Facility are unlikely to meet the prima facie test for avoidance as Insider Preferences to the extent that such payments were made from cash collateral or the traceable proceeds of collateral sales.[375]

### *(2) Line Of Credit Facilities*

While the facts of this transaction are fully set forth in Section V.E and Appendices V.E.5, V.E.7, and V.E.8, a brief summary is helpful to this analysis.

### *(a) Background*

On November 20, 2008, certain of ResCap's subsidiaries, as borrowers, RFC and GMAC Mortgage, among others, as guarantors, and AFI, as lender, entered into the $430 million Initial Line of Credit Facility.[376] To obtain additional liquidity for ResCap, on June 1, 2009, the parties entered into the $370 million Second Line of Credit Facility.[377] These lines of credit served as parallel liquidity sources for the Debtors, and were only available when ResCap's liquidity fell below designated threshold levels.[378]

On December 30, 2009, RFC and GMAC Mortgage and certain of the other Debtors, as borrowers, ResCap, as a guarantor, and AFI, as agent and lender, entered into the secured A&R Line of Credit Facility, with an initial amount of $1.1 billion. The A&R Line of Credit Facility amended, restated, and consolidated under one agreement the terms and provisions of the Initial Line of Credit Agreement and the Second Line of Credit Agreement.[379] As of the Petition Date, there was approximately $380 million outstanding under the A&R Line of Credit Facility.

---

[374] *See* MINN. STAT. ANN. § 513.41(2), (12).

[375] As explained above, to the extent that the cash used to make such payments was encumbered by a valid lien, such payments were not "transfers" of "assets" susceptible to avoidance under the Minnesota UFTA. *See id.*.

[376] *See* Initial Line of Credit Agreement [ALLY_0023145].

[377] *See* Second Line of Credit Agreement [ALLY_0023953]. On June 12, 2009, availability under the Second Line of Credit Facility was increased from $370 million to $470 million. *See* Amendment No. 1 to the Second Line of Credit Agreement, dated June 12, 2009, §2.2(a) [ALLY_0026615].

[378] *See* Initial Line of Credit Agreement, § 2.03 [ALLY_0023145]; Second Line of Credit Agreement, § 2.03 [ALLY_0023953].

[379] *See* A&R Line of Credit Agreement [ALLY_0240633].

*(b) Payments Pursuant To The A&R Line Of Credit Facility*

The following is a summary of payment and reborrowing activity under the A&R Line of Credit Facility:

EXHIBIT VII.F.4.g(2)(b)
**Line of Credit Facilities and A&R Line of Credit Facility – Borrowings and Payments**
2008 – 2012
*($ in Millions)*

| | Borrowings | Principal Payments | Net Payment (Borrowings) | Interest Payments[1] | Total Payments Net of Borrowings[2] |
|---|---|---|---|---|---|
| Nov-08 | ($480.0) | $152.0 | ($328.0) | $0.3 | ($327.7) |
| Dec-08 | - | 328.0 | 328.0 | - | 328.0 |
| Feb-09 | (72.0) | 72.0 | - | - | - |
| May-09 | (645.3) | 215.3 | (430.0) | 0.4 | (429.6) |
| Jun-09 | (896.3) | 752.4 | (143.9) | 1.9 | (142.0) |
| Jul-09 | (818.5) | 811.6 | (6.9) | 1.2 | (5.7) |
| Aug-09 | (531.5) | 597.4 | 65.9 | 1.6 | 67.5 |
| Sep-09 | (715.7) | 920.7 | 205.0 | 1.3 | 206.3 |
| Oct-09 | (1,359.1) | 1,068.6 | (290.5) | 1.1 | (289.4) |
| Nov-09 | (704.6) | 697.3 | (7.3) | 1.5 | (5.8) |
| Dec-09 | (918.0) | 1,182.2 | 264.2 | 2.1 | 266.3 |
| Jan-10 | (726.3) | 614.0 | (112.3) | 1.0 | (111.3) |
| Feb-10 | (642.2) | 880.3 | 238.1 | 0.5 | 238.6 |
| Mar-10 | (677.0) | 846.3 | 169.3 | 0.3 | 169.6 |
| Apr-10 | (652.8) | 598.2 | (54.6) | 0.3 | (54.3) |
| May-10 | (726.8) | 829.8 | 103.0 | 0.3 | 103.3 |
| Jun-10 | (305.0) | - | (305.0) | - | (305.0) |
| Jul-10 | (780.5) | 912.0 | 131.5 | 0.6 | 132.1 |
| Aug-10 | (407.6) | 581.1 | 173.5 | 0.3 | 173.8 |
| Sep-10 | (771.9) | 439.9 | (332.0) | 0.3 | (331.7) |
| Oct-10 | (1,065.0) | 1,008.0 | (57.0) | 0.9 | (56.1) |
| Nov-10 | (880.0) | 615.0 | (265.0) | 1.1 | (263.9) |
| Dec-10 | (1,226.0) | 1,199.0 | (27.0) | 1.7 | (25.3) |
| Jan-11 | (538.0) | 884.0 | 346.0 | 1.2 | 347.2 |
| Feb-11 | (1,159.0) | 878.0 | (281.0) | 1.3 | (279.7) |
| Mar-11 | (733.0) | 802.0 | 69.0 | 1.6 | 70.6 |
| Apr-11 | (785.0) | 710.0 | (75.0) | 1.5 | (73.5) |
| May-11 | (678.0) | 911.0 | 233.0 | 1.4 | 234.4 |
| Jun-11 | (839.0) | 741.0 | (98.0) | 1.1 | (96.9) |
| Jul-11 | (520.0) | 446.0 | (74.0) | 1.3 | (72.7) |
| Aug-11 | (938.0) | 1,061.0 | 123.0 | 1.3 | 124.3 |
| Sep-11 | (755.0) | 776.0 | 21.0 | 1.1 | 22.1 |
| Oct-11 | (637.0) | 455.0 | (182.0) | 1.6 | (180.4) |
| Nov-11 | (570.0) | 509.0 | (61.0) | 1.6 | (59.4) |
| Dec-11 | (785.0) | 1,152.0 | 367.0 | 1.5 | 368.5 |
| Jan-12 | (591.0) | 318.0 | (273.0) | 0.8 | (272.2) |
| Feb-12 | (746.5) | 903.0 | 156.5 | 0.4 | 156.9 |
| Mar-12 | (922.0) | 615.6 | (306.4) | 0.7 | (305.7) |
| Apr-12 | (296.0) | 400.0 | 104.0 | 1.0 | 105.0 |
| May-12 | (244.0) | 170.0 | (74.0) | - | (74.0) |
| | ($27,738.6) | $27,052.7 | ($685.9) | $38.1 | ($647.8) |

[1] *Although ResCap did not provide monthly interest payment information, ResCap did confirm that payments were made on account of interest expense. Monthly interest payments are based on monthly interest payable calculations provided by AFI.*
[2] *ResCap did not provide information on fees paid on the Line of Credit Facilities and A&R Line of Credit Facility.*
Source: *AFI Intercompany Loan to ResCap – Credit Facility 2008 – 2012, at ALLY_0182799–821[ALLY_0182793]; AFI Intercompany Loan to ResCap – GMAC Credit Agreement 2009 Spreadsheet [ALLY_0435012]; AFI Intercompany Loan to ResCap – Capital Cash Concentration Spreadsheet [ALLY_0435015];ResCap Credit Facility Journal Entry Spreadsheet,at Tab Ally LOC_CA [EXAM00338635]; ResCap Interest Payable As of May 13, 2012 [EXAM00345973].*

*(c) Application*

*(i) Remaining Prima Facie Elements*

The Examiner concludes that payments made by ResCap or RFC to AFI on account of amounts outstanding under the A&R Line of Credit Facility likely meet the remaining prima facie elements of an Insider Preference.[380] First, the evidence supports the proposition that all repayments were made for antecedent debts—namely RFC's primary obligation and ResCap's guarantee obligation under the A&R Line of Credit Facility. As shown on Exhibit VII.F.4.g(2)(b) above, the A&R Line of Credit Facility (and its predecessor facilities) was used as a typical revolving credit facility, with the borrowers first drawing money under the facility (thereby incurring a debt) and later repaying the money drawn, plus interest thereon (thereby satisfying that preexisting debt). Accordingly, the Examiner concludes that evidence supports the proposition that payments for amounts outstanding under the A&R Line of Credit Facility (and its predecessor facilities) were made on account of antecedent debts.

Second, the Examiner concludes that the evidence supports the proposition that payments for amounts outstanding under the A&R Line of Credit Facility were "transfers" of "assets" within the meaning of the Minnesota UFTA. Based on discussions with the Debtors' accounting professionals, the Examiner understands that the cash used to pay amounts owed under the A&R Line of Credit Facility was not cash collateral or the traceable proceeds of collateral.[381] Accordingly, and based on the information provided by the Debtors, the Examiner concludes that payments made by ResCap or RFC on account of the A&R Secured Line of Credit Facility (as well as its predecessor facilities, the Initial Line of Credit Facility and the Second Line of Credit Facility) meet the prima facie test for avoidance as Insider Preferences.

*(d) Conclusion*

The Examiner concludes that the payments made by ResCap or RFC to AFI in respect of amounts outstanding under the A&R Line of Credit Facility likely meet the prima facie test for avoidance under the Minnesota Insider Preference statute. The Examiner further concludes that, except to the extent such amounts are protected by the new value defense, as set forth in Section VII.F.4.h, they are likely to be avoidable as Insider Preferences and recoverable under section 550 of the Bankruptcy Code.

The Examiner notes that, because the A&R Line of Credit Facility and its predecessor facilities continuously revolved on a secured basis, literal application of the statute—which would seemingly call for avoidance of every payment made by ResCap or RFC while not acknowledging amounts reborrowed as new value—would lead to an absurd result in which

---

[380] As with payments made for amounts owed under the Secured Revolver Facility, payments on account of amounts owed under the A&R Line of Credit Facility (or its predecessor facilities) would not implicate the Minnesota Insider Preference statute to the extent that they were made by GMAC Mortgage. *See* Section VII.F.2.a.

[381] Based on oral discussions with Barbara Westman (ResCap's Senior Director of Accounting Operations).

AFI's Insider Preference liability with respect to the A&R Line of Credit Facility would vastly exceed the maximum amount available to be borrowed at any time under the facility. Although there is no case law or other authority on point, the Examiner concludes, after consultation with the Examiner's Counsel and his Minnesota counsel, that such a result would not likely be upheld by the courts of Minnesota or any other court.

The Examiner concludes that any court would instead likely resolve this issue in a way that comports with the premise of the statute, which is that an insolvent debtor should be obliged to pay debts to unrelated creditors before paying those who are insiders.[382] With this purpose in mind, AFI's Insider Preference liability for transfers that occurred prior to December 30, 2009 is likely to be completely offset by contributions of new value. The highest balance drawn on the A&R Line of Credit Facility after that date was approximately $1.03 billion, which occurred on February 23, 2011.[383] Deducting from that amount the balance that remained unpaid on the Petition Date—approximately $380 million—would yield a total Insider Preference liability on the A&R Line of Credit Facility of $650 million (which could be further reduced by new value contributed by AFI after December 30, 2009). However, the Examiner notes that the particular manner in which a court would treat debt forgiveness for calculating Insider Preference liability in the context of a continuously revolving secured line of credit is uncertain. The Examiner stresses that a court could reasonably calculate AFI's Insider Preference liability with respect to payments made on account of the A&R Line of Credit Facility in a variety of ways that would yield different results than those presented in this Report and its accompanying Exhibits.

### (3) Secured MSR Facility

While the facts of this transaction are fully set forth in Section V.E.2 and Appendix V.E.2, a brief summary is helpful to this analysis.

#### (a) Background

On April 18, 2008, RFC and GMAC Mortgage entered into the Secured MSR Facility, whereby AFI agreed to provide a revolving loan in the initial amount of the lesser of $750 million (which was later increased to $1.2 billion on June 2, 2008)[384] or the then existing borrowing base.[385] The Secured MSR Facility Collateral served as the borrowing base and included: (1) certain MSRs and the related Servicing Contracts; (2) certain pledged Fannie Mae, Freddie Mac and Ginnie Mae securities; and (3) certain pledged U.S. treasury securities.[386] AFI forgave indebtedness under the Secured MSR Facility in an aggregate

---

[382] *See* UFTA Prefatory Note at 4.

[383] *See* Ally Financing Inc. Summary of Intercompany Balances with ResCap, dated May 28, 2012, at ALLY_0182812 [ALLY_0182793].

[384] Amendment No. 3 to the Secured MSR Facility, dated June 2, 2008 [RC00037692].

[385] Secured MSR Loan Agreement [RC00024114]; s*ee* Appendix V.E.2.b.

[386] Secured MSR Loan Agreement, Art. IV [RC00024114].

amount of over $1.1 billion from inception until the facility was terminated on December 2009,[387] when all remaining outstanding indebtedness thereunder (including accrued and unpaid interest) was forgiven.[388]

### (b) Summary Of Payments Pursuant To The Secured MSR Facility

RFC's accounting records show that between April 2008 and December 2009, it paid approximately $213 million in principal and $26 million in interest under the Secured MSR Facility to AFI, for a total of $239 million.[389] These payments are shown on Exhibit VII.F.4.g(3)(b) below.[390]

---

[387] *See* Exhibit V.E.2 (showing debt forgiveness amounts).

[388] Letter from GMAC Inc. Re: Forgiveness of Certain Indebtedness and Termination of MSR Facility (Dec. 30, 2009), at 1–3 [ALLY_0353025].

[389] *See* AFI Intercompany Loan to ResCap – MSR 2008/09 Spreadsheet [ALLY_0401819]; ResCap Credit Facility Journal Entry Spreadsheet, at Tabs Ally MSR-2010000001, Ally MSR-23000005 [EXAM00338635]; ResCap Interest Journal Entry Spreadsheet, at Tab Ally MSR-20202000 [EXAM00338636]; Residential Funding Company, LLC, Consolidated Financial Statements for the Years Ended December 31, 2008 and 2007, dated Mar. 25, 2009, at 78 [EXAM00124988]; Residential Funding Company, LLC, Consolidated Financial Statements for the Years Ended December 31, 2009 and 2008, dated Mar. 19, 2010, at 78 [EXAM00124670]. As discussed in Section VII.F.4.g.(2) addressing the A&R Line of Credit Facility, because the Secured MSR Facility continuously revolved on a secured basis, literal application of the statute—which would seemingly call for avoidance of every payment made by RFC while not acknowledging amounts reborrowed as new value—would lead to an absurd result that would not likely be enforced by the courts of Minnesota or the Bankruptcy Court. Because all payments on the Secured MSR Facility were made before December 2009, any liability of AFI under the Minnesota Insider Preference statute is likely to be offset in any event by new value.

[390] *See* ResCap Credit Facility Journal Entry Spreadsheet, at Tabs Ally MSR-2010000001, Ally MSR-23000005 [EXAM00338635]. As noted in Exhibit VII.F.4.g(3)(b), based on journal entries provided by ResCap, the Examiner's Financial Advisors have identified the possibility that RFC did not make payments directly to AFI, but instead made them to GMAC Mortgage, which then passed them to AFI. If GMAC Mortgage did serve as an intermediary between RFC and AFI for such payments, GMAC Mortgage may—depending on the facts—be considered a mere conduit, as discussed further below in Section VII.F.8.a.(1). This would be the case if GMAC Mortgage did not exert dominion and control over the funds, with the right to use the funds for its own purposes. *See Christy v. Alexander & Alexander of N.Y. Inc.* (*In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey*), 130 F.3d 52, 57 (2d Cir. 1997) (citation omitted). The Examiner does not have facts sufficient to make a determination of this issue. Given that RFC was making payments to repay amounts loaned by AFI, it seems likely that GMAC Mortgage did not have dominion and control over such funds. For the purposes of the Report, the Examiner assumes that AFI is the initial transferee under Bankruptcy Code section 550(a)(1), and that any payments which satisfy the requirements of the Minnesota Insider Preference statute would be recoverable as against AFI.

EXHIBIT VII.F.4.g(3)(b)
**Secured MSR Facility – Borrowings and Payments by RFC [(1)]**
2008 – 2009
*($ in Millions)*

|  | Borrowings | Principal Payments | Net Payment (Borrowings) | Interest Payments[(2)] | Total Payments Net of Borrowings[(3)] |
|---|---|---|---|---|---|
| Apr-08 | ($412.0) |  | ($412.0) |  | ($412.0) |
| May-08 | (45.0) |  | (45.0) |  | (45.0) |
| Jun-08 | (321.0) |  | (321.0) |  | (321.0) |
| Sep-08 |  |  | - |  | - |
| Oct-08 | - | $126.0 | 126.0 |  | 126.0 |
| Nov-08 | - | 7.2 | 7.2 |  | 7.2 |
| Dec-08 | (4.3) | - | (4.3) | $18.8 | 14.5 |
| Jun-09 | (77.4) | 13.0 | (64.4) |  | (64.4) |
| Jul-09 | (18.0) | 20.0 | 2.0 |  | 2.0 |
| Aug-09 | - | 10.5 | 10.5 |  | 10.5 |
| Sep-09 | - | 6.5 | 6.5 |  | 6.5 |
| Oct-09 | (6.0) | 21.1 | 15.1 |  | 15.1 |
| Nov-09 | - | 9.0 | 9.0 |  | 9.0 |
| Dec-09 | (59.0) | - | (59.0) | 6.9 | (52.1) |
|  | ($942.7) | $213.3 | ($729.4) | $25.7 | ($703.7) |

*[(1)] Journal entries provided by ResCap indicate that borrowings and repayments on the Secured MSR Facility may have been first recorded at GMAC Mortgage before being transferred to RFC.*
*[(2)] Although ResCap did not provide monthly interest payment information, ResCap did confirm that payments were made on account of interest expense. As such, interest expense reported for 2008 was assumed to be equivalent to interest payments for that year.*
*[(3)] ResCap did not provide information on fees paid on the Secured MSR Facility.*
*Source: AFI Intercompany Loan to ResCap – MSR 2008/09 Spreadsheet [ALLY_0401819]; ResCap Credit Facility Journal Entry Spreadsheet, at Tabs Ally MSR-2010000001, Ally MSR - 23000005 [EXAM00338635]; ResCap Interest Journal Entry Spreadsheet, at Tab Ally MSR-2020200001 [EXAM00338636]; Residential Funding Company, LLC, Consolidated Financial Statements for the Years Ended December 31, 2008 and 2007, dated Mar. 25, 2009, at 78 [EXAM00124988]; Residential Funding Company, LLC, Consolidated Financial Statements as of and for the Years Ended December 31, 2009 and 2008, dated Mar. 19, 2010, at 78 [EXAM00124670].*

### (c) Application

The Examiner concludes that RFC's repayments on the Secured MSR Facility likely fall within the prima facie case for avoidance under the Minnesota Insider Preference statute. Payments made to AFI in respect of amounts outstanding under the Secured MSR Facility were transfers made for an antecedent debt—namely amounts drawn under the Secured MSR Facility. The Investigation has not uncovered any evidence indicating that cash transferred to AFI in satisfaction of amounts outstanding under the Secured MSR Facility was encumbered by valid liens securing the obligations under the Secured MSR Facility.[391] Accordingly, the Examiner concludes that it is likely that payments made by RFC to AFI in respect of amounts outstanding under the Secured MSR Facility between April 2008 and December 2009 meet the prima facie test for avoidance under the Minnesota Insider Preference statute.

---

[391] To the extent these payments were made from the traceable proceeds of collateral, such as the Servicing Contracts or pledged securities, in which AFI held a validly perfected and unavoidable lien, the payments would not be considered a "transfer" of an "asset," and would not be avoidable. *See* MINN. STAT. ANN. § 513.41(2), (12).

### (d) Conclusion

The Examiner concludes that it is likely that the payments of approximately $239 million made by RFC to AFI in respect of amounts outstanding under the Secured MSR Facility between April 2008 and December 2009 meet the prima facie test for avoidance under the Minnesota Insider Preference statute. However, as set forth in Section VII.F.4.h, the Examiner concludes that AFI's Insider Preference liability with respect to such payments would likely be offset by AFI's subsequent contributions of new value.

### (4) Servicing Advance Factoring Facility

While the facts of this transaction are fully set forth in Section V.E.4 and Appendix V.E.4, a brief summary is helpful to this analysis.

### (a) Background

On June 17, 2008, RFC and GMAC Mortgage,[392] as sellers, and GMAC CF, as purchaser, entered into the Servicing Advance Factoring Facility. Unlike other credit facilities entered into with AFI, AFI required that the Servicing Advance Factoring Facility (which was entered into with GMAC CF) be structured as a "true sale" of receivables and not as a financing.[393] GMAC CF committed to purchase receivables arising from Servicing Advances made by the Servicing Advance Factoring Sellers under certain designated Servicing Contracts, subject to a $600 million cap. Servicing Advances consisted of (1) P&I Advances (Servicing Advances relating to delinquent interest and/or principal); (2) T&I Advances (Servicing Advances relating to real estate taxes and/or hazard, flood or primary mortgage insurance premiums); and (3) Corporate Advances (Servicing Advances relating to preservation of properties, expenses for foreclosure actions and other expenses to maximize collateral value).[394]

### (b) Summary Of Payments Pursuant To The Servicing Advance Factoring Facility

On at least three occasions, RFC and GMAC Mortgage transferred additional property to GMAC CF under the Servicing Advance Factoring Facility. First, according to AFI, the initial sale of receivables pursuant to the Servicing Advance Factoring Facility "included approximately $3.7 million worth of receivables that were . . . ineligible under the

---

[392] GMAC Mortgage's transfers are unlikely to be subject to avoidance because, as discussed in section VII.F.2, the Examiner has concluded that Pennsylvania law would likely govern fraudulent transfer issues relating to GMAC Mortgage. Pennsylvania law, unlike Minnesota does not recognize an Insider Preference cause of action. With respect to the transfers described in this Section, it is unclear which entity actually made the transfers. For the purposes of this analysis, it is assumed that RFC made the transfers.

[393] Minutes of Meeting of the Board of Directors of Residential Capital, LLC, June 1, 2008, at RC40005752 [RC40005652] (De Molina stated that AFI could commit to the "GMAC Factoring Facility so long as it could be structured as a 'true sale' rather than as a financing."); *see also* Int. of B. Hall, Dec. 13, 2012, at 130:8–131:17.

[394] Servicing Advance Factoring Agreement [ALLY_0041874]; *see* Appendix V.E.4.b.

Agreement."[395] By a letter dated June 20, 2008, GMAC CF agreed to reassign the ineligible receivables to RFC and GMAC Mortgage, as applicable, "as a one time accommodation" in exchange for an assignment of replacement securities of approximately the same value.[396]

Second, by letter dated October 1, 2008, RFC informed GMAC CF that it, as well as GMAC Mortgage, had breached the terms Servicing Advance Factoring Facility by selling to GMAC CF ineligible receivables with an aggregate value of approximately $27 million. GMAC CF thereafter reassigned the ineligible receivables to RFC and GMAC Mortgage in exchange for a cash payment equal to the unpaid principal amount of the ineligible receivables.[397] As noted in Section V.E.4, the Factoring Facility contained provisions commonly found in factoring transactions whereby the sellers had an obligation to repurchase receivables upon a breach of a representation pertaining to such purchased receivable.

Third, by letter dated October 22, 2008, RFC and GMAC Mortgage informed GMAC CF that they had breached the terms of the Servicing Advance Factoring Facility by inadvertently selling to GMAC CF receivables that were not principal and interest receivables, and were thus ineligible receivables under the agreement. As a result of this breach of the Servicing Advance Factoring Facility, RFC and GMAC Mortgage thereafter paid GMAC CF $1.5 million.[398]

In total, RFC and GMAC Mortgage transferred cash and securities worth approximately $32 million to GMAC CF on account of obligations under the Servicing Advance Factoring Facility in the three transactions described above.[399]

### (c) Application

It is likely that the transfers made by RFC on account of its obligations under the Servicing Advance Factoring Facility meet the prima facie test for avoidance under the Minnesota Insider Preference statute. The transfers documented in RFC's letters dated June 20, 2008, October 1, 2008 and October 22, 2008, were made for antecedent debts stemming from breaches of the Servicing Advance Factoring Facility.

As noted above, jurisdictions applying the UFTA have concluded that a transfer is not made for an antecedent debt if the debt in question was incurred relatively contemporaneously with the transfer at issue. Here, certain receivables included in the sale to GMAC CF were identified as ineligible for purchase under the Servicing Advance Factoring Facility. Accordingly, within a short period of time these ineligible receivables were exchanged for cash or securities. While these transfers were made on short notice, it is likely that they would

---

[395] AFI Response to Examiner's Information Request, dated Apr. 18, 2013, at 1.

[396] *Id.*

[397] *See id.*

[398] *See id.*

[399] *See id.*

still be considered to be made for an antecedent debt. Additionally, the property transferred was not subject to any liens, and would likely satisfy the definition of "assets."[400] Accordingly, the Examiner concludes that it is likely that these transfers satisfy the prima facie elements of the Minnesota Insider Preference statute.

### (d) Affirmative Defenses—New Value

Two of the transfers described above were followed by the return of the ineligible receivables previously sold to GMAC CF.[401] GMAC CF would have a new value defense to the avoidance of the transfers to the extent GMAC CF could establish that these ineligible receivables provided value. Although the Examiner's Financial Advisors have attempted to determine the value of these receivables, they were unable to obtain sufficient information to do so. To the extent that GMAC CF (which would have the burden of proof on the affirmative defense of new value) could establish the value of the returned receivables, it would likely have the benefit of a new value defense.

### (e) Conclusion

The Examiner concludes that it is likely that the transfers made pursuant to the Servicing Advance Factoring Facility satisfy the prima facie elements for avoidance under the Minnesota Insider Preference statute. However, to the extent that GMAC CF could satisfy its burden of establishing the value of the ineligible receivables returned in connection with the June 20, 2008 and October 1, 2008 transfers, GMAC CF would have likely have a new value defense relating to those transfers. No such defense is available with respect to the October 22, 2008 transfer of approximately $1.5 million, as this transfer was not followed by a return of receivables. Additionally, the new value discussed in Section VII.F.4.h is inapplicable, as GMAC CF would not have the benefit of a new value defense for new value contributed by AFI.

### (5) Resort Finance Facility

While the facts of this transaction are fully set forth in Section V.E.1 and Appendix V.E.1, a brief summary is helpful to this analysis.

---

[400] On June 17, 2008, concurrently with the execution of the Servicing Advance Factoring Agreement, AFI, as Lender Agent under the Secured Revolver Loan Agreement and First Priority Collateral Agent, entered into a release agreement with respect to the subject Servicing Advances with GMAC CF and the Servicing Advance Factoring Sellers, which provided that upon the purchase by GMAC CF of any Servicing Advances, AFI and the First Priority Collateral Agent agreed to an automatic release of all liens and security interests on the purchased Servicing Advances, which served as collateral securing the Secured Revolver Facility, the Senior Secured Notes and the Junior Secured Notes. Release Agreement with respect to the Servicer Advance receivables, dated June 17, 2008 [ALLY_0118954].

[401] The transfer related to the October 22, 2008 transfer does not appear to include a return of ineligible receivables by GMAC CF. *See* AFI Response to Examiner's Information Request, dated Apr. 18, 2013. Instead, it is described as a purchase price adjustment. *Id.*

### (a) Background

On February 21, 2008, RFC entered into the $750 million Resort Finance Facility with AFI. That facility was intended to serve as bridge financing while ResCap searched for a third party to purchase its resort finance business.[402] The facility was secured and provided that repayment was to be made solely from collections on collateral, which consisted of certain loans made by RFC to developers in connection with resort financing transactions.[403] These loans included certain: (1) eligible developer loans; (2) construction loans; and (3) loans extended to finance the sale of time shares.[404] Upon the consummation of the Resort Finance Sale, the obligations of RFC under the Resort Finance Facility were transferred to, and assumed by, GMAC CF.[405] The facility was thereafter repaid in full.[406]

### (b) Summary Of Payments Pursuant To The Resort Finance Facility

The only payment made by RFC to AFI under the Resort Finance Facility evidenced by RFC's accounting records is an interest payment of $17.8 million made in 2008.[407]

### (c) Application

Further factual development is necessary to determine whether the interest payment made with respect to the Resort Finance Facility satisfies the prima facie elements for avoidance under the Minnesota Insider Preference statute. The questions that need to be resolved for the prima facie case to be established are whether RFC made a "transfer" of an "asset" and whether such transfer was made for an antecedent debt.

For purposes of the Minnesota UFTA, conveyances of RFC's property were not "transfers" of "assets" to the extent the transferred property was encumbered by a validly

_____

[402] E-mail from S. Khattri (Feb. 12, 2008) [EXAM11309438].

[403] Resort Finance Agreement, § 2.7(f) [ALLY_0116311] (providing that all payments were to be made only from collateral proceeds, and only to the extent sufficient payment from such proceeds was received).

[404] *Id.*, § 1.1 (definition of "Borrowing Base").

[405] Asset Purchase Agreement between Residential Funding Company, LLC, GMAC Residential Funding of Canada Limited, and GMAC Commercial Finance LLC, dated July 2, 2008, § 2.2 [RC00024026].

[406] Residential Capital, LLC, Quarterly Report (Form 10-Q) (May 11, 2009), at 56 ("On February 21, 2008, RFC entered into [the Resort Finance Facility] with GMAC, as a lender and as agent, to provide RFC with a revolving credit facility with a principal amount of up to $750.0 million. As part of the sale of the Resort Finance business to [GMAC CF] in the third quarter of 2008, the Resort Finance Facility was paid in full.").

[407] Although ResCap did not provide monthly interest payment information, ResCap did confirm that payments were made on account of interest expense. As such, interest expense reported for 2008 was assumed to be equivalent to interest payments for that year. *See* Residential Funding Company, LLC, Consolidated Financial Statements for the Years Ended December 31, 2008 and 2007, dated Mar. 25, 2009, at 78 [EXAM00124988].

perfected and unavoidable lien.[408] Under a stand-alone pledge agreement,[409] RFC pledged and granted to AFI a security interest in: (1) all its membership or other ownership interests in RFC Resort Funding, LLC; (2) certain scheduled loans; and (3) all collections relating to the collateral. AFI filed a UCC financing statement to perfect these interests.[410] It is unclear, however, whether AFI maintained a validly perfected and unavoidable lien with respect to the collections.[411]

The collections (in which AFI allegedly had a perfected security interest) were to be used to repay the Resort Finance Facility.[412] If the collections were subject to a perfected security interest in favor of AFI, they would not constitute an "asset" for the purposes of the Minnesota UFTA. However, if AFI's security interest in such collections was extinguished because the collections were commingled with RFC's other cash, the interest payments made by RFC would likely satisfy the prima facie elements of the Minnesota Insider Preference Statute. The payment would be considered a transfer, made for an antecedent debt—namely draws under the Resort Finance Facility.

### *(d) Conclusion*

The Examiner is unable to reach a definitive conclusion with respect to application of the Minnesota Insider Preference statute to the payment made by RFC to AFI under the Resort Finance Facility based on the facts currently available. If it could be shown that AFI's security interest in the collateral under the Resort Finance Facility was extinguished because the collections were commingled, it is likely that the prima facie elements of the Minnesota Insider Preference statute would be satisfied. However, as set forth in Section VII.F.4.h, the Examiner concludes that AFI's Insider Preference liability with respect to such payments would likely be offset by AFI's subsequent contributions of new value.

_____

[408] *See* MINN. STAT. ANN. § 513.41(2), (12).

[409] Pledge Agreement among Residential Funding Company, LLC and GMAC LLC, dated Feb. 21, 2008 [RC00036826].

[410] *See* UCC Financing Statement, dated Feb. 21, 2008, at ALLY_0116514 [ALLY_0116512].

[411] The Resort Finance Facility did not require establishment of deposit accounts to hold proceeds from the collections and under the terms of the Resort Finance Facility control agreements were not required with respect to existing deposit accounts of RFC. *See* Resort Finance Agreement [ALLY_0116311]. To the extent that RFC accepted payments with respect to the scheduled loans serving as collateral and placed those funds into an account where they were commingled with other funds, AFI's perfected security interest in the collections may have been extinguished. *See* DEL. CODE ANN. tit. 6, § 9-315(a)(2), (b)(2) (security interests attach to proceeds of collateral, except to the extent that such proceeds are commingled and not identifiable by a method of tracing). The Examiner's Financial Advisors have attempted to ascertain the mechanics of payments under the Resort Finance Facility, but have not been able to obtain adequate information to determine this issue.

[412] Resort Finance Agreement, § 2.7(f) [ALLY_0116311] (providing that all payments were to be made only from collateral proceeds, and only to the extent sufficient payment from such proceeds was received).

### (6) 2008 Bank Transaction[413]

Before considering whether the 2008 Bank Transaction may be avoided pursuant to the Minnesota Insider Preference statute, this Section provides a brief summary of that transaction, which is described in more detail in Section V.A.1.b.

#### (a) Background

Following the 2006 Bank Restructuring, ResCap's mortgage banking operations and AFI's automotive banking operations both resided within Ally Bank, which was directly held by IB Finance. IB Finance, in turn, was held jointly by ResCap LLC and AFI, with ResCap LLC holding two million non-voting IB Finance Class M Shares, and AFI holding two million IB Finance Class A shares. The IB Finance interests held by ResCap LLC and AFI entitled them to the economic rights in Ally Bank's mortgage and automotive divisions, respectively.

In March 2008, to address an imminent breach of ResCap's TNW covenants, the ResCap Board approved the 2008 Bank Transaction. Pursuant thereto, AFI contributed to ResCap approximately $1.5 billion in ResCap bonds that AFI had purchased on the open market during the first quarter of 2008. In return, ResCap transferred to AFI ResCap Preferred Interests that were convertible, at AFI's option, into IB Finance Preferred Interests at any time on or after January 1, 2009, as long as neither ResCap nor any of its significant subsidiaries was the subject of a bankruptcy proceeding on or before that date. If exercised, AFI's conversion of the ResCap Preferred Interests into IB Finance Preferred Interests would reduce ResCap's IB Finance Class M Shares on a unit-for-unit basis.

The transaction was approved by the ResCap Board on March 28, 2008, and then modified on March 31, 2008 to permit it to occur in two separate tranches. The first tranche was exchanged on March 31, 2008, when AFI contributed to ResCap bonds with a face amount of approximately $1.2 billion and a reported FMV at the time of approximately $607.192 million. In return, ResCap provided AFI with 607,192 ResCap Preferred Interests. The second tranche was exchanged on June 3, 2008, when AFI contributed to ResCap bonds with a face amount of approximately $249 million and a reported FMV of $199.152 million. In return, ResCap provided AFI with an additional 199,152 ResCap Preferred Interests.

In Section V.A.2.c(1), the Examiner concludes that the ResCap Preferred Interests had little to no value, given the Examiner's conclusion that ResCap was insolvent, inadequately capitalized, and could not have reasonably believed it was able to pay its debts as they became due, both immediately before and after the 2008 Bank Transaction.[414] Accordingly, the Examiner's Professionals conclude that the true value transferred from ResCap in the 2008 Bank Transaction was the right of AFI to convert the ResCap Preferred Interests into IB

---

[413] As explained more fully in Section V.A.1, the Ally Bank Transactions consist of three separate transactions: (1) the 2006 Bank Restructuring; (2) the 2008 Bank Transaction; and (3) the 2009 Bank Transaction. Because the Examiner has concluded that the evidence does not support the proposition that ResCap was insolvent at the time of the 2006 Bank Restructuring, only the 2008 Bank Transaction and the 2009 Bank Transaction are subject to possible claims under the Minnesota Insider Preference statute.

[414] *See* Section V.A.2.c(1).

Finance Preferred Interests.[415] The Examiner's Financial Advisors estimate that the value of the right to convert the ResCap Preferred Interests was approximately $403—504 million for the March tranche and approximately $168–210 million for the June tranche, for a combined total value of $571–714 million.[416] The Examiner's Financial Advisors determined that the bonds contributed by AFI to ResCap in March had a value of $595.1 million and the bonds contributed in June had a value of $246.3 million, for a total aggregate value of $841.4 million.[417]

### (b) Application

The Examiner concludes that the 2008 Bank Transaction likely satisfies the remaining prima facie elements for avoidance under the Minnesota Insider Preference statute. First, the Examiner concludes that the evidence supports the proposition that the ResCap Preferred Interests (and the conversion rights related thereto) conveyed to AFI as part of the 2008 Bank Transaction were "assets" of ResCap within the meaning of the Minnesota UFTA. The Investigation has not uncovered any evidence that such interests were encumbered by any validly perfected and unavoidable liens. Second, the Examiner concludes that the evidence supports the proposition that the transfers were made "for an antecedent debt" because the ResCap Preferred Interests were exchanged for ResCap's then-existing unsecured debt, which AFI had purchased on the open market.[418]

### (c) Conclusion

The Examiner concludes that it is likely that the 2008 Bank Transaction satisfies the prima facie elements for avoidance under the Minnesota Insider Preference statute. However, the Examiner also concludes, for the reasons discussed in Section VII.F.4.h, that it is likely that a court would find that AFI's potential Insider Preference liability for the 2008 Bank Transaction should be offset (in part or in full) by new value that AFI provided to ResCap.

### (7) 2009 Bank Transaction

Before considering whether the 2009 Bank Transaction may be avoided pursuant to the Minnesota Insider Preference statute, this Section provides a brief summary of that transaction, which is described in more detail in Section V.A.1.c.

### (a) Background

In the fall of 2008, ResCap continued to experience ongoing liquidity and TNW difficulties. The ResCap and AFI Boards considered several initiatives throughout the end of

---

[415] *See* Section V.A.2.c(2).

[416] *See* Section V.A.2.c(2).

[417] In connection with the 2008 Bank Transaction, ResCap also received a right to redeem the ResCap Preferred Interests and/or the IB Finance Interests at par, thereby regaining its full economic interest in Ally Bank. However, as explained in Section V.A.2.c(5)(a), the Examiner's Financial Advisors did not attribute value to this right because of its speculative nature and ResCap's likely inability to obtain the funds needed to make the redemption.

[418] *See* Minutes of a Meeting of the Special Committee of the Independent Directors of the Board of Residential Capital, LLC, Mar. 24, 2008, at MELZER.008985 [MELZER.008984].

2008 to ease these problems, and ResCap eventually resolved to sell its remaining interest in IB Finance to AFI. At the time of the transaction, ResCap LLC's remaining IB Finance Class M Shares appear to have been subject to the liens of AFI and the Senior and Junior Secured Notes.[419]

On January 30, 2009, AFI exercised its option to convert the ResCap Preferred Interests it had acquired in the 2008 Bank Transaction into an equal number of IB Finance Preferred Interests. This conversion reduced ResCap's two million IB Finance Class M Shares by 806,344 (leaving 1,193,656). Contemporaneously with the conversion, AFI purchased ResCap's remaining IB Finance Class M Shares. As consideration for the purchase, AFI contributed to ResCap Senior Secured Notes with a face amount of approximately $830.5 million and a then-reported FMV of approximately $608.5 million.[420] In connection with the closing of the 2009 Bank Transaction, the IB Finance Class M Shares were released from the liens of AFI and the Senior and Junior Secured Notes.[421]

The Examiner's Financial Advisors estimate that the value transferred from ResCap in the 2009 Bank Transaction (ResCap's remaining IB Finance Class M Shares) was approximately $107–218 million.[422] The Examiner's Financial Advisors estimate that the value of the bonds received by ResCap in the 2009 Bank Transaction was approximately $600 million.[423]

---

[419] *See* Membership Interest Purchase Agreement, dated Jan. 30, 2009, § 3.2 at ALLY_0031031 [ALLY_0031012] (indicating that such liens would be released as of the closing of the 2009 Bank Transaction); Consent and Direction to Release Collateral, dated Jan. 30, 2009, at ALLY_0031153–56 [ALLY_0031012] (contemplating the release of AFI's liens); Letter from T. Hamzehpour, Regarding Senior Secured Notes Collateral (Jan. 30, 2009), at ALLY_0031205–06 [ALLY_0031012] (concluding that ResCap had properly requested the release of the Senior Secured Notes' liens on the IB Finance Class M Shares); Letter from T. Hamzehpour, Regarding Junior Secured Notes Collateral (Jan. 30, 2009), at ALLY_0031207–08 [ALLY_0031012] (concluding that ResCap had properly requested the release of the Junior Secured Notes' liens on the IB Finance Class M Shares).

[420] While AFI previously contemplated that its forgiveness of ResCap debt on September 30, 2008 and December 31, 2008 would be credited toward its purchase price of ResCap's remaining interest in IB Finance, the debt forgiveness does not appear to have been included as consideration in the final sale terms. *See* Section V.A.1.c(2).

[421] *See* Membership Interest Purchase Agreement, dated Jan. 30, 2009, § 3.2 at ALLY_0031031 [ALLY_0031012] (providing that, as of January 30, 2009, ResCap was the "owner of all right, title and interest (record and beneficial) in and to the [IB Finance Class M Shares], free an clear of any Lien, other than . . . Liens securing the [AFI] Revolver, the Second Lien Notes and the Third Lien Notes (*which Liens will be released as of the Closing Date*)") (emphasis added); UCC Financing Statement Amendment No. 2009-0326311, dated Jan. 30, 2009, at ALLY_0031218 [ALLY_0031012] (releasing AFI's liens on the IB Finance Class M Shares); Officer's Certificate, dated Jan. 30, 2009, at ALLY_0031187–94 [ALLY_0031012] (requesting release of the IB Finance Class M Shares from the liens of the Senior Secured Notes); Officer's Certificate, dated Jan. 30, 2009, at ALLY_0031195–98 [ALLY_0031012] (requesting release of the IB Finance Class M Shares from the liens of the Junior Secured Notes).

[422] *See* Section V.A.2.d.

[423] *See* Section V.A.2.d.

*(b) Application*

The Examiner concludes that the 2009 Bank Transaction is unlikely to satisfy the remaining prima facie elements for avoidance under the Minnesota Insider Preference statute. The Examiner concludes that the evidence supports the proposition that, up until the time of the transfer, ResCap's interest in IB Finance was encumbered by liens in favor of AFI, the holders of the Senior Secured Notes, and the holders of the Junior Secured Notes and was unavailable to satisfy the claims of unsecured creditors.[424] The Examiner therefore concludes that the evidence supports the proposition that the IB Finance Class M Shares did not constitute an "asset" that could be the subject of a "transfer" within the meaning of the Minnesota UFTA.[425]

*(c) Conclusion*

The Examiner concludes that it is unlikely that the 2009 Bank Transaction could be avoided pursuant to the Minnesota Insider Preference statute. The IB Finance Class M Shares were encumbered up until the time of the transfer by the liens of AFI and the Senior and Junior Secured Notes. Accordingly, the IB Finance Class M Shares were not an "asset" that could be the subject of a "transfer" for purposes of the Minnesota UFTA. Even if a court were to find the 2009 Bank Transaction avoidable, however, the Examiner also concludes for the reasons discussed in Section VII.F.4.h, that it is likely that a court would find that AFI's potential Insider Preference liability for the 2009 Bank Transaction should be offset (in part or in full) by new value that AFI provided to ResCap.

*(8) Miscellaneous Additions To Collateral Packages*

The Examiner has also identified a number of instances in which one or more of the Debtors granted liens in favor of AFI on additional property to further secure their obligations under one or more of the secured financing facilities described above during the period in which the evidence supports the propositions that: (1) the Debtors were insolvent; and (2) AFI had reasonable cause to believe that the Debtors were insolvent. As discussed above, the granting of a lien is a statutorily-defined "transfer" for purposes of the Minnesota UFTA.[426]

---

[424] *See* UCC Financing Statement Amendment No. 2009-0326311, dated Jan. 30, 2009, at ALLY_0031218 [ALLY_0031012] (releasing AFI's liens on the IB Finance Class M Shares); UCC Financing Statement Amendment No. 2009-0326287, dated Jan. 30, 2009, at ALLY_0031216 [ALLY_0031012] (releasing from the Senior Secured Notes' collateral the IB Finance Class M Shares); UCC Financing Statement Amendment No. 2009-0326303, dated Jan. 30, 2009, at ALLY_0031217 [ALLY_0031012] (releasing from the Junior Secured Notes' collateral the IB Finance Class M Shares). The Examiner did not independently verify the validity and/or extent of these liens.

[425] *See* MINN. STAT. ANN. § 513.41(2), (12). If the liens on the IB Finance Class M Shares were for any reason determined to be invalid, the Examiner concludes that it is likely that the 2009 Bank Transaction would be avoidable pursuant to the Minnesota Insider Preference Statute. In addition to satisfying the prima facie elements discussed above, the transfer of the IB Finance Class M Shares was made in exchange for a contribution of ResCap's second lien notes, thus satisfying the antecedent debt requirement. *See* Residential Capital, LLC, Current Report (Form 8-K) (Feb. 3, 2009), Item 1.01; *see also* Certificate of Forgiveness of Indebtedness of Residential Capital, LLC, dated Jan. 30, 2009, at ALLY_0031136–39 [ALLY_0031012].

[426] *See* MINN. STAT. ANN. § 513.41(12).

The Examiner concludes that all such additional lien transfers, to the extent made by ResCap or RFC, meet the prima facie test for avoidance under the Minnesota Insider Preference statute. The Examiner further concludes that no affirmative defense—except for new value, which is discussed in Section VII.F.4.—is likely to apply with respect to such transfers. The additional lien transfers that the Examiner has identified as avoidable Insider Preferences are as follows:[427]

EXHIBIT VII.F.4.g(8)
**Agreements Granting Additional Collateral**

| Facility | Document | Date | Bates No |
|---|---|---|---|
| **Secured MSR Facility** | Omnibus Security Agreement | May 18, 2009 | ALLY_0024357 |
| | First Amendment to Omnibus Security Agreement | May 19, 2009 | ALLY_0058509 |
| | Third Amendment to Omnibus Security Agreement | June 5, 2009 | ALLY_0058544 |
| | Fourth Amendment to Omnibus Security Agreement | June 30, 2009 | ALLY_0028184 |
| | Fifth Amendment to Omnibus Security Agreement | September 18, 2009 | ALLY_0063306 |
| | Sixth Amendment to Omnibus Security Agreement | November 6, 2009 | ALLY_0075526 |
| | Seventh Amendment to Omnibus Security Agreement | December 16, 2009 | ALLY_0075538 |
| **Secured Revolver Facility ($3.5 Billion)** | First Amendment to First Priority Security Agreement | August 14, 2008 | ALLY_0048947 |
| | Second Amendment to First Priority Security Agreement | January 14, 2009 | ALLY_0051671 |
| | Third Amendment to First Priority Security Agreement | January 30, 2009 | ALLY_0056791 |
| | Real Estate Subsidiary Pledge and Security Agreement and Irrevocable Proxy | December 30, 2009 | ALLY_0066748 |
| **Initial Line of Credit Facility** | First Amendment to Initial Line of Credit Security Agreement | March 18, 2009 | ALLY_0058368 |
| | Second Amendment to Initial Line of Credit Security Agreement | May 19, 2009 | ALLY_0058381 |
| | Fourth Amendment to Initial Line of Credit Security Agreement | June 5, 2009 | ALLY_0058410 |
| | Fifth Amendment to Initial Line of Credit Security Agreement | June 30, 2009 | ALLY_0028155 |
| | Fifth Amendment to Omnibus Security Agreement | September 18, 2009 | ALLY_0063306 |
| | Sixth Amendment to Omnibus Security Agreement | November 6, 2009 | ALLY_0075526 |
| | Seventh Amendment to Omnibus Security Agreement | December 16, 2009 | ALLY_0075538 |
| **Second Line of Credit Facility** | First Amendment to Second Line of Credit Security Agreement | June 5, 2009 | ALLY_0362340 |
| | Second Amendment to Second Line of Credit Security Agreement | June 30, 2009 | ALLY_0026693 |
| | Fifth Amendment to Omnibus Security Agreement | September 18, 2009 | ALLY_0063306 |
| | Sixth Amendment to Omnibus Security Agreement | November 6, 2009 | ALLY_0075526 |
| | Seventh Amendment to Omnibus Security Agreement | December 16, 2009 | ALLY_0075538 |
| **A&R Line of Credit Facility** | Real Estate Subsidiary Pledge and Security Agreement and Irrevocable Proxy | December 30, 2009 | ALLY_0066748 |
| | First Amendment to A&R Initial Line of Credit Security Agreement | May 14, 2010 | ALLY_0071363 |
| | Second Amendment to A&R Initial Line of Credit Security Agreement | May 27, 2011 | GOLDIN00120856 |

---

[427] Given the variety of collateral implicated by these transactions, and the lack of clarity as to the value, or even the owner of much of that collateral, the Examiner has not attempted to identify the specific assets that were subjected to these additional liens or to quantify the value of such assets.

### h. *Availability Of The New Value Defense*

#### (1) *General Overview*

The Examiner considered the ability of AFI to assert a new value defense to offset otherwise avoidable Insider Preferences made by ResCap or RFC to AFI. AFI would have an affirmative defense to the extent AFI provided unsecured new value to or for the benefit of ResCap or RFC after the avoidable transfer was made.

In Section VII.F.4.g, the Examiner has identified several transactions where transfers were made by ResCap and by RFC, respectively, to AFI that are likely subject to avoidance under the Minnesota Insider Preference statute. These transactions include: (1) the Secured Revolver Facility transaction; (2) the A&R Line of Credit Facility transaction; (3) the 2008 Bank Transaction; (4) the 2009 Bank Transaction; (5) the Secured MSR Facility transaction; and (6) the Resort Finance Facility transaction. AFI could use the new value defense provided by section 513.48(f) of the Minnesota statute to offset these preferential transfers to the extent AFI provided new value to ResCap or RFC, respectively, following receipt of the preferential transfers.[428] However, new value cannot be used to offset contemporaneous or subsequent preferential transfers.[429]

Exhibit VII.F.4.h(1)—1 identifies significant transfers of value from AFI to or for the benefit of ResCap that took place from 2008 through 2012. These transfers took several forms, including cash contributions, debt forgiveness, and asset contributions. Subject to the "valuation-related" caveats discussed below, it appears that AFI may have provided as much as $2.6 billion of new value to ResCap through these transfers. All of these transfers occurred from March 2008 through December 2009. In December 2009 alone, AFI contributed assets valued by the Debtors at $916 million to ResCap, mainly in the form of a cash contribution. Because new value can only offset preferential transactions that occurred before the contribution, AFI will have at least this amount (subject to the "valuation-related" caveats discussed below) to offset any avoidable ResCap transfers that took place prior to December 2009.

---

[428] *See* MINN. STAT. ANN. § 513.48(f)(1).

[429] *See Elliot & Callan, Inc. v. Crofton*, 615 F. Supp. 2d 963, 973 (D. Minn. 2009); *see also Responsible Pers. of Musicland Holding Corp. v. Best Buy Co.* (*In re Musicland Holding Corp.*), 462 B.R. 66, 70 (Bankr. S.D.N.Y. 2011) (citing *Mosier v. Ever-Fresh Food Co.* (*In re IRFM, Inc.*), 52 F.3d 228, 231 (9th Cir. 1995)).

EXHIBIT VII.F.4.h(1)—1
**New Value Provided by AFI to ResCap**
2008 – 2012
*($ in Millions)*

|  | Cash | Receivables | Payables | Debt Forgiveness ResCap Bonds | Total |
|---|---|---|---|---|---|
| Mar-08 |  |  |  | $142.7 | $142.7 |
| Jun-08 |  |  |  | 21.3 | 21.3 |
| Sep-08 |  |  | $19.1 | 53.5 | 72.6 |
| Dec-08 |  |  |  | 219.9 | 219.9 |
| Mar-09 |  |  |  | 263.1 | 263.1 |
| Apr-09 |  |  |  | 34.7 | 34.7 |
| May-09 |  |  |  | 112.6 | 112.6 |
| Jun-09 |  |  |  | 750.8 | 750.8 |
| Nov-09 |  |  |  | 23.6 | 23.6 |
| Dec-09 | $600.0 | $316.2 |  |  | 916.2 |
| 2008 to 2012 | $600.0 | $316.2 | $19.1 | $1,622.3 | $2,557.6 |

*Source: Capital Contributions to ResCap Legal Entity as of Jan. 31, 2012 [ALLY_PEO_0075634]; Residential Capital, LLC, Consolidated Financial Statements for the Years Ended Dec. 31, 2009 and 2008, at 100 [EXAM00124455].*

Exhibit VII.F.4.h(1)—2 identifies significant transfers of value from AFI to or for the benefit of RFC that took place from 2008 through 2012. These transfers took several forms, including debt forgiveness and asset contributions. Subject to the "valuation-related" caveats discussed below, it appears that AFI may have provided as much as $2.4 billion of new value to or for the benefit of RFC through these transfers. Almost all of these transfers occurred from March 2008 through December 2009. In December 2009 alone, AFI contributed assets valued by the Debtors at $1.8 billion to RFC, mainly in the form of the contribution of the HFS Portfolio. Because new value can only offset preferential transactions that occurred prior to the contribution, AFI will have at least this amount (subject to the "valuation-related" caveats discussed below) to offset any avoidable RFC transfers that took place prior to December 2009. After 2009, AFI provided new value to RFC on two other occasions: in December 2011 and January 2012, AFI forgave secured debt of approximately $116 million owed by RFC.

EXHIBIT VII.F.4.h(1)—2
**New Value Provided by AFI to RFC** [(1)]
2008 – 2012
*($ in Millions)*

| | | | Debt Forgiveness | | |
| | | | Secured MSR Facility | A&R Line of Credit Facility | Total |
| --- | --- | --- | --- | --- | --- |
| | HFS | Payables | | | |
| Sep-08 | | | $37.6 | | $37.6 |
| Oct-08 | | | 140.5 | | 140.5 |
| Nov-08 | | | 264.4 | | 264.4 |
| Nov-09 | | | 52.4 | | 52.4 |
| Dec-09 | $1,435.6 | $195.0 | 164.2 | | 1,794.8 |
| Dec-11 | | | | $43.5 | 43.5 |
| Jan-12 | | | | 72.3 | 72.3 |
| 2008 to 2012 | $1,435.6 | $195.0 | $659.1 | $115.8 | $2,405.5 |

[(1)] *Certain new value provided by AFI to RFC was transferred through ResCap.*
*Source: AFI Affiliate Debt Entries, at Tab Ally MSR-2010000001 [EXAM00338635]; Residential Funding Company, LLC, Consolidated Financial Statements for the Years Ended December 31, 2009 and 2008, at 79 [EXAM00124670]; Residential Funding Company, LLC, Consolidated Financial Statements for the Years Ended December 31, 2011 and 2010, at 61 [EXAM00215221].*

### (2) New Value Defense Is Debtor-Specific

As described in Section VII.F.4.e(2), the new value defense is only available to offset avoidable payments made by a debtor to the extent such debtor, and not an affiliate of the debtor, is the recipient of the new value.[430] As a result, AFI will not be entitled to offset preferential payments made by RFC using new value that was provided to or for the benefit of ResCap, and vice versa. Simply put, to invoke the new value defense AFI will have to show that it provided new value to or for the benefit of the specific Debtor that made the avoidable transfer in question. It is important therefore to distinguish between new value provided by AFI to or for the benefit of ResCap and new value provided by AFI to or for the benefit of RFC.

Exhibit VII.F.4.h(1)—1 does this and shows that AFI's transfers to ResCap may have had a total value of as much as $2.6 billion (subject to the "valuation-related" caveats discussed below). AFI's transfers to ResCap are comprised of contributions of ResCap secured and unsecured notes, cash, and intercompany receivables. Exhibit VII.F.4.h(1)—2 further shows that AFI's transfers to RFC may have had a total value of as much as $2.4 billion (subject to the "valuation-related" caveats discussed below). AFI's transfers to RFC are comprised of debt forgiveness by AFI under the Secured MSR Facility and the A&R Line of Credit Facility, the contribution of the HFS Portfolio, and the release of affiliate payables.

Notably, certain of the contributions made by AFI to RFC may have passed through ResCap. For example, the HFS Portfolio, valued by the Debtors at $1.4 billion (subject to the "valuation-related" caveats discussed below), was contributed by AFI to RFC through a chain of holding

---

[430]   *See* Minn. Stat. Ann. § 513.48(f)(1).

companies, including ResCap.[431] The fact that new value may have passed through ResCap to RFC would not invalidate the new value defense so long as ResCap was merely a conduit or an intermediary, or if it can be shown that the contribution to ResCap was for RFC's benefit.[432]

To successfully offset the avoidable transfers from RFC where AFI later contributed new value that passed through ResCap to RFC, AFI must show that ResCap was a mere conduit, meaning that ResCap never acquired an interest in the property, or that the contribution to ResCap (to the extent it did not flow through to RFC) was nevertheless made for RFC's benefit.[433] In this case, for example, AFI's contribution of the HFS Portfolio to RFC passed through ResCap and other affiliates. The contribution was clearly made to RFC, not to ResCap or any of the other affiliates, because the ResCap Board accepted the contribution and approved the further contribution of the HFS Portfolio down a chain of entities to RFC in one resolution.[434] The ResCap Board stated in the resolution that it was "necessary and desirable" to contribute the HFS Portfolio down the chain of holding companies to RFC.[435] Accordingly, AFI would be considered to have provided new value to or for the benefit of RFC to the extent of the actual value of the HFS Portfolio (which may differ from the $1.4 billion value ascribed to it by the Debtors) even though AFI's contribution to RFC was indirect.

In contrast, if AFI were to fail to meet its burden to establish that ResCap was a mere conduit with respect to other contributions by AFI ostensibly to RFC or that such contributions were not really made for RFC's benefit, such contributions would not constitute new value from AFI to RFC that could offset RFC's preferential transfers.

---

[431] There may have been other instances where transfers from AFI to RFC may have passed through ResCap. For example, on December 30, 2009, the AFI Board approved AFI's "capital contribution to ResCap, and ResCap's contribution to RFC (through sequential contributions to, and by, intermediate subsidiaries)." Unanimous Consent To Action of the GMAC Board of Directors, dated Dec. 30, 2009, at ALLY_0169105 [ALLY_0169104] (AFI Board approval was required pursuant to the Reservation of Authorities of the Board.). It is not clear as to what specific transfer this board resolution refers.

[432] The Examiner is not aware of any case law addressing whether a contribution passing through affiliates would be considered new value provided by the defendant under the Minnesota Insider Preference statute. Nevertheless, there is considerable case law considering whether property that transfers through a debtor to an affiliate is property of the estate under the federal bankruptcy law. The new value defense to the Insider Preference statute is adapted from section 547(c)(4) of the Bankruptcy Code. *See* UFTA § 8 cmt. 6. As described above, if the Bankruptcy Court were to find portions of the Minnesota Insider Preference statute ambiguous, it could consult section 547 of the Bankruptcy Code and relevant authorities thereunder in order to discern the Minnesota legislature's intent. *See* Section VII.F.4.c; *see also Shields v. Goldetsky (In re Butler),* 552 N.W.2d 226, 231 (Minn. 1996).

[433] *See, e.g., City of Springfield v. Ostrander (In re Lan Tamers, Inc.)*, 329 F.3d 204, 210 (1st Cir. 2003) ("The plain text of § 541(d) excludes property from the estate where the bankrupt entity is only a delivery vehicle and lacks any equitable interest in the property it delivers."); *T & B Scottdale Contractors, Inc. v. United States*, 866 F.2d 1372, 1376 (11th Cir. 1989) (when the debtor held funds that were to be paid out to certain individuals, the debtor was simply an intermediary and the funds were not property of the estate); *see also* MINN. STAT. ANN. § 513.48(f)(1).

[434] *See* Minutes of a Special Meeting of the Board of Residential Capital, LLC, Dec. 29, 2009, at RC40006359–60 [RC40005949].

[435] *Id.* at RC40006360.

### (3) Potential New Value

The Examiner identified and investigated significant contributions made from AFI to ResCap and RFC from March 2008 through the Petition Date. As noted above, the transactions analyzed include contributions in the form of: (1) cash; (2) secured and unsecured notes; (3) debt forgiveness under the A&R Line of Credit Facility; (4) debt forgiveness under the Secured MSR Facility; (5) forgiveness of miscellaneous payables owed; and (6) other assets, such as the HFS Portfolio and an intercompany receivable.

#### (a) Cash

AFI contributed $600 million of the cash on December 30, 2009 to help ResCap comply with its TNW covenants.[436] This cash contribution constitutes new value to ResCap on a dollar-for-dollar basis.[437]

#### (b) Debt Forgiveness

AFI forgave substantial amounts of ResCap debt and RFC debt from 2008 through 2011. There are four categories of debt that were forgiven: (a) ResCap secured and unsecured notes, (b) borrowings under the Secured MSR Facility (under which RFC was a borrower), (c) drawings under the A&R Line of Credit Facility, and (d) affiliate payables. As discussed in Section VII.F.4.e(2), forgiveness of antecedent debt may, under certain circumstances, constitute new value for purposes of the Minnesota Insider Preference statute. Courts generally treat the forgiveness of fully secured debt as new value on a dollar-for-dollar basis.[438] On the other hand, there is little guidance on how to value debt forgiveness when it involves unsecured debt or under-secured debt. Courts generally are reluctant to treat the

---

[436] *See* Residential Capital, LLC, Consolidated Financial Statements for the Years Ended Dec. 31, 2009 and 2008, dated Feb. 26, 2010, at 100 [EXAM00124455]. For a detailed summary of ResCap's difficulties in complying with its TNW covenants and its reliance on contributions from AFI throughout 2009, see Sections III.I.1–3.

[437] Certain parties have suggested that cash contributed by AFI to ResCap would not qualify as new value because it purportedly would be captured by the blanket lien in favor of AFI and would only enhance AFI's collateral package. The Examiner does not find this argument persuasive. Putting aside the issue of whether cash contributions from AFI became subject to a perfected lien in favor of AFI, the fact that the cash itself may be pledged as collateral once contributed does not appear to implicate the statutory exception that excludes new value only if "the *new value* was secured by a valid lien." *See* MINN. STAT. ANN. § 513.48(f)(1) (emphasis added). Based on the statutory language, the exception clearly applies to the circumstance where the recipient of an avoidable transfer subsequently extends credit on a secured basis. The Examiner has been unable to find any case law or other legal support suggesting that the statutory exception would apply to other forms of new value. Moreover, a strong argument exists that cash contributed to ResCap, even if part of AFI's collateral package, "replenishes" the estate if AFI were deemed to be oversecured (which no party appears to dispute). *See Kroh Bros. Dev. Co. v. Cont'l Constr. Eng'rs* (*In re Kroh Bros. Dev. Co.*), 930 F.2d 648, 652 (8th Cir. 1991) (stating that the relevant inquiry in determining whether a transfer provides new value is "whether the new value replenishes the estate").

[438] *See, e.g., Cocolat, Inc. v. Fisher Dev., Inc.* (*In re Cocolat, Inc.*), 176 B.R. 540, 548 (Bankr. N.D. Cal.1995); *see also* UFTA § 8 cmt. 6 (1984).

forgiveness of unsecured debt or under-secured debt as new value on a dollar-for-dollar basis,[439] if at all,[440] and the party asserting the affirmative defense bears the burden of proving the amount of new value that it provided through such debt forgiveness.[441]

### (i)  Secured And Unsecured Notes

AFI contributed ResCap secured and unsecured notes to ResCap for retirement throughout 2008 and 2009. ResCap reported these transfers in its financial statements as capital contributions in the amounts of AFI's cost basis in the notes. Exhibit VII.F.4.h(1)—1, above, uses the amounts reported in ResCap's financial statements (recognizing that there may be significant valuation issues) in describing the amounts of new value that AFI may have provided.

Beginning in the fourth quarter of 2007, and continuing into 2008, AFI purchased ResCap unsecured notes at deep discounts in the open market.[442] According to ResCap's financial statements, AFI contributed approximately $218 million of these unsecured notes to ResCap from March 2008 through September 2008 to enable ResCap to maintain compliance with its TNW covenants.[443] In December 2008, AFI completed a private exchange and cash tender offer for the acquisition of ResCap secured and unsecured notes.[444] On December 31, 2008, ResCap continued to face liquidity concerns and, as a result, AFI contributed approximately $220 million of unsecured notes to ResCap to prevent ResCap from breaching its TNW covenants.[445]

---

[439]  *See, e.g.*, *Jones v. Ryder Integrated Logistics, Inc.* (*In re Jotan, Inc.*), 264 B.R. 735, 752–53 (Bankr. M.D. Fla. 2001).

[440]  *See Gray v. Chace* (*In re Bos. Publ'g Co.*), 209 B.R. 157, 176 (Bankr. D. Mass. 1997) (citing *Trans World Airlines, Inc. v. Travellers Int'l AG* (*In re Trans World Airlines, Inc.*), 180 B.R. 389, 403 (Bankr. D. Del. 1994) and *In re Cocolat, Inc.*, 176 B.R. at 548); *see also Lowrey v. U.P.G., Inc.* (*In re Robinson Bros. Drilling, Inc.*), 877 F.2d 32, 34 (10th Cir. 1989).

[441]  *See In re Robinson Bros. Drilling, Inc.*, 877 F.2d at 34 ("While . . . the court will not inquire into the value of the liens released by Richardson . . . it is the defendants' burden to prove with specificity that Richardson gave new value equivalent to the remainder of the debt not secured by these liens." (citing *Jet Fla., Inc. v. Am. Airlines, Inc.* (*In re Jet Fla. Sys., Inc.*), 861 F.2d 1555, 1559 (11th Cir. 1988))); *In re Bos. Publ'g Co.*, 209 B.R. at 176 ("[I]t was incumbent upon Chace to quantify what he gave up at the time of the restructuring—full, or most likely, partial payment of his outstanding loans, as compared with what, if anything, he would receive on his resulting equity investment."); *see also Creditors' Comm. v. Spada* (*In re Spada*), 903 F.2d 971, 976 (3d Cir. 1990) ("[A] party seeking the shelter of section 547(c)(1) must prove the specific measure of the new value given to the debtor in the exchange." (quoting *In re Jet Fla. Sys., Inc.*, 861 F.2d at 1558)).

[442]  *See* Residential Capital, LLC, Quarterly Report (Form 10-Q) (Nov. 10, 2008), at 40.

[443]  *See id.* at 7; Residential Capital, LLC, Quarterly Report (Form 10-Q) (Aug. 7, 2008), at 7; Residential Capital, LLC, Quarterly Report (Form 10-Q) (May 8, 2008), at 7, 48. For a more detailed summary of ResCap's difficulties in complying with its TNW covenants and its reliance on contributions from AFI throughout 2008, see Sections III.G.3, III.H.3–5.

[444]  *See* Residential Capital, LLC, Annual Report (Form 10-K/A) (Aug. 25, 2009), at 89.

[445]  *See id.*

During 2009, AFI contributed approximately $1.185 billion of the secured and unsecured notes it acquired in the December 2008 private exchange and cash tender offer to ResCap to help ResCap comply with its TNW covenants.[446] All of the bonds contributed by AFI in 2009 were either Junior Secured Notes or senior unsecured notes.[447] The total amount of secured debt that AFI contributed was $1.150 billion, and the total amount of unsecured debt that AFI contributed was $35 million.[448] The secured debt, however, was significantly under-secured due to the existence of higher priority liens on the collateral.[449] Accordingly, all of the $1.622 billion in notes contributed by AFI to ResCap during 2008 and 2009 was either unsecured or significantly under-secured.[450]

A court may not value these note contributions on a cost basis because the notes were unsecured or significantly under-secured. Given the lack of judicial guidance, it is unclear what "new value," if any, is attributable to this debt forgiveness. Again, AFI would bear the burden of substantiating the amount of new value if it were to raise the affirmative defense.

### (ii) Secured MSR Facility

During 2008 and 2009, AFI forgave outstanding debt owed by RFC under the Secured MSR Facility. RFC had borrowed from AFI under the Secured MSR Facility, which was secured by the Secured MSR Facility Collateral and guaranteed on a full recourse basis by ResCap.[451] AFI forgave a total of approximately $659 million of RFC's outstanding debt and interest under the Secured MSR Facility from September 2008 through December 2009 to help ResCap comply with its consolidated TNW covenants.[452] The Examiner concludes that

---

[446] *See* Residential Capital, LLC, Consolidated Financial Statements for the Years Ended Dec. 31, 2009 and 2008, dated Feb. 26, 2010, at 100–101 [EXAM00124455]. For a more detailed summary of ResCap's difficulties in complying with its TNW covenants and its reliance on contributions from AFI throughout 2009, see Sections III.I.1–3.

[447] *See* Residential Capital, LLC, Consolidated Financial Statements for the Years Ended Dec. 31, 2009 and 2008, dated Feb. 26, 2010, at 100–01 [EXAM00124455].

[448] *See id.* at 9.

[449] *See* Residential Capital, LLC, Consolidated Financial Statements for the Years Ended Dec. 31, 2009 and 2008, dated Feb. 26, 2010, at 38 [EXAM00124455]; Secured Revolver Facility Borrowing Base Report, dated Jan. 19, 2009 [EXAM00221203].

[450] Notably, all of the Junior Secured Notes were guaranteed by RFC and GMAC Mortgage. The law is unclear on how new value should be allocated among affiliates where the debt that is forgiven was guaranteed by an affiliate. AFI would have to prove how much new value, if any, should be allocated to the guarantors. For illustrative purposes, all new value has been allocated to ResCap, as the borrower under the Junior Secured Notes.

[451] Secured MSR Loan Agreement, § 4.01 [RC00024114]; Guarantee by Residential Capital, LLC, for Secured MSR Facility, dated Apr. 18, 2008, § 3 [RC00037568].

[452] *See* AFI Intercompany Loan to ResCap – MSR 2008/09 Spreadsheet, at Tab Summary [ALLY_0401819] (providing the aggregate amounts of RFC and GMAC Mortgage debts under the facility that were forgiven); AFI Affiliate Debt Journal Entries, at Tab ALLY MSR-2010000001 [EXAM00338635] (providing the amounts of RFC debts under the facility that were forgiven); Minutes of a Special Meeting of the Board of Residential Capital, LLC, Oct. 1, 2008, at RC40005875 [RC40005652] (describing recent contributions in the form of debt forgiveness that satisfied ResCap's TNW covenants and immediate cash needs).

this debt forgiveness constituted new value to RFC and, perhaps, ResCap as well as guarantor, on a dollar-for-dollar basis because the debt was fully secured. The affirmative defense to avoidance of a preferential transfer under the Minnesota Insider Preference statute applies only to new value provided by the insider to the specific debtor that made the avoidable transfer in question. As noted above, the law is unclear on how new value should be allocated among affiliates where the debt that is forgiven was guaranteed by an affiliate. Because AFI bears the burden of quantifying new value, AFI would have to prove how much new value should be allocated to each of ResCap and RFC.

### (iii) A&R Line Of Credit Facility

On December 30, 2011, AFI forgave $109 million of the outstanding balance of the A&R Line of Credit Facility, under which RFC and GMAC Mortgage were both liable.[453] ResCap and several of its affiliates guaranteed RFC's and GMAC Mortgage's obligations under the A&R Line of Credit Facility.[454] It appears that $44 million of the $109 million in debt forgiveness was allocated to RFC for purposes of the affiliates' financial statements based on AFI's journal entries.[455] Because the forgiven debt was fully secured, this debt forgiveness constitutes new value to RFC on a dollar-for-dollar basis to the extent that it was allocated to RFC (as opposed to GMAC Mortgage, ResCap, or the other guarantors). This new value, however, presents the same difficulties discussed above regarding the allocation of new value between borrowers and guarantors, and the Investigation has not uncovered evidence regarding the methodology used by AFI or the Debtors in allocating the debt forgiveness among RFC, GMAC Mortgage, ResCap, and the other guarantors. As a result, the Examiner is unable to quantify the allocation of new value attributable to RFC and ResCap, respectively.

On January 30, 2012, AFI forgave another $196.5 million of the outstanding balance on the A&R Line of Credit Facility.[456] $72 million of the $196.5 million in debt forgiveness was allocated to RFC for purposes of the affiliates' financial statements.[457] A portion of the $196.5 million in debt forgiveness was subject to the March 14 Earmark Agreement under which the amounts forgiven were required to be used to fund the payment of obligations (including obligations for which AFI, ResCap, RFC, and GMAC Mortgage were jointly liable) owed to

---

[453] *See* Residential Capital, LLC, Consolidated Financial Statements for the Years Ended Dec. 31, 2011 and 2010, at 38–39 [EXAM00215221].

[454] A&R Line of Credit Agreement, § 11.01 [ALLY_0240633]

[455] *See* AFI Affiliate Debt Journal Entries, Tab ALLY LOC-2010000001 [EXAM00338635].

[456] *See* Residential Capital, LLC, Consolidated Financial Statements for the Years Ended Dec. 31, 2011 and 2010, at 38–39 [EXAM00215221].

[457] *See* Residential Funding Company, LLC, Consolidated Financial Statements for the Years Ended December 31, 2011 and 2010, dated Mar. 28, 2012, at 11, 61 [RC00032246] (stating that on January 30, 2012, RFC "recognized a capital contribution . . . of $72.3 million, and a corresponding reduction in our borrowings under the [A&R Line of Credit Agreement]"); AFI Affiliate Debt Journal Entries, at Tab ALLY LOC-2010000001 [EXAM00338635]; Memorandum, Significant Transaction: Mortgage Fine, Waivers and Debt Forgiveness, dated Feb. 2012, at EXAM00220159–60 [EXAM00220147].

the U.S. government pursuant to the DOJ/AG Consent Judgment.[458] However, the evidence reveals that only the debt forgiveness allocated to GMAC Mortgage was used to fund the payment of the government settlement because GMAC Mortgage remitted the full fine of $109,628,425 to an escrow account created pursuant to the DOJ/AG Consent Judgment on March 14, 2012.[459] There is no evidence that any of the debt forgiveness allocated to RFC was used to fund the payment of the government settlement or any other obligation for which AFI was liable.[460] The Examiner therefore concludes that it is likely that the $72 million of debt forgiveness in favor of RFC would constitute new value.[461] For a more detailed discussion of the uses of the $196.5 million in debt forgiveness and the application of the earmarking doctrine in the consideration of preferential transfers, see Section VII.F.5.c(1).

### *(iv) Affiliate Payables*

On December 30, 2009, AFI released a $195 million payable owed to it by RFC on account of management fees.[462] This release is equivalent to the forgiveness of an unsecured debt. As discussed above, it is unclear how much new value, if any, a court would attribute to the release of the payable. The full amount of the payable in Exhibit VII.F.4.h(1)—2 is used for illustrative purposes only.

In addition, ResCap appears to have received $19.1 million from AFI as a result of a tax settlement between the two parties in September 2008.[463] The Investigation has not uncovered any information regarding the tax settlement, including the tax liabilities or tax refunds to which the settlement pertained. The Investigation revealed evidence in which the tax settlement was considered to be a capital contribution by AFI to ResCap,[464] but also revealed evidence from 2008 in which the tax settlement was not considered to be a capital contribution because the tax settlement was "not part of GMAC's initiative to support ResCap."[465] If the

---

[458]   *See* Earmark Agreement, ¶¶ 1–4 [ALLY_0000001] ("ResCap reaffirms and agrees that $109,628,425.00 of the liquidity provided by AFI pursuant to the January 30 Letter Agreement will be used solely to fund the Direct Payment Settlement Amount . . . .").

[459]   *See* E-mail from C. Dondzila (Mar. 15, 2012) [EXAM11004487]; ResCap Liquidity Update: A Presentation for the ResCap Board of Directors, dated Mar. 23, 2012, at RC40020491 [RC40020488]; Special Examiner Presentation: DOJ/AG Settlement, dated Dec. 11, 2012, at EXAM00220908 [EXAM00220897]; ResCap Consolidating Financial Statements—2012, dated Oct. 29, 2012 [ALLY_0244598] (showing GMAC Mortgage remitted the actual funds).

[460]   For a more detailed discussion of the allocation of liability under the DOJ/AG Consent Judgment and the payments made and actions taken by each legal entity in accordance with the settlement, see Section V.C.1.d–g.

[461]   *See Kroh Bros. Dev. Co. v. Cont'l Constr. Eng'rs* (*In re Kroh Bros. Dev. Co.*), 930 F.2d 648, 652 (8th Cir. 1991) (stating that the relevant inquiry in determining whether a transfer provides new value is "whether the new value replenishes the estate").

[462]   *See* Residential Funding Company, LLC, Consolidated Financial Statements for the Years Ended Dec. 31, 2009 and 2008, dated Mar. 19, 2010, at 79 [EXAM00124670].

[463]   *See* Capital Contributions to ResCap Legal Entity as of Jan. 31, 2012 [ALLY_PEO_0075634].

[464]   *See, e.g.*, *id.*

[465]   ResCap Capital Contributions from AFI for Year Ended Dec. 31, 2008, at tab GMAC contributions [ALLY_0327055].

tax settlement was a payment to ResCap on account of an intercompany receivable on ResCap's books, then the $19.1 million would not constitute new value because the payment merely converted a receivable into cash without replenishing the estate.[466] On the other hand, if the tax settlement does constitute a real contribution to ResCap, it would be akin to the forgiveness of an unsecured debt. As a result, it is unclear how much new value, if any, a court would attribute to ResCap on account of the tax settlement.

### (c) Asset Contributions

On December 30, 2009, AFI contributed assets to RFC and ResCap to prevent ResCap from breaching its consolidated TNW covenants. The contributed assets consisted of the HFS Portfolio and certain intercompany receivables. These contributions may have provided new value to RFC and ResCap.

### (i) HFS Portfolio

According to RFC's financial statements, AFI contributed the HFS Portfolio with a book value of approximately $1.436 billion to RFC on December 30, 2009.[467] As discussed in Section VII.F.4.h(4), AFI transferred the HFS Portfolio to RFC through a series of contributions to holding companies, including ResCap, which acted as mere conduits.[468] The HFS Portfolio, therefore, constitutes new value for RFC. The book value of the HFS Portfolio is shown in Exhibit VII.F.4.h(1)—2, but AFI would bear the burden of proving that the book value used by RFC was consistent with the actual market value of the HFS Portfolio at the time of contribution.

### (ii) Intercompany Receivables

According to ResCap's financial statements AFI contributed certain intercompany receivables in the amount of $316 million to ResCap on December 30, 2009.[469] The Investigation has not uncovered more specifics about these intercompany receivables, including which affiliate(s) had the obligation(s) to pay the receivables, or how the receivables were valued for purposes of financial reporting. The amount of new value attributable to an intercompany receivable may depend, in part, on the likelihood of the receivable being satisfied.[470] If the possibility that a receivable will be satisfied is highly contingent, the

---

[466] *See In re Kroh Bros. Dev.*, 930 F.2d at 652.

[467] *See* Residential Funding Company, LLC, Consolidated Financial Statements for the Years Ended Dec. 31, 2009 and 2008, dated Mar. 19, 2010, at 79 [EXAM00124670].

[468] *See* Minutes of a Special Meeting of the Board of Residential Capital, LLC, Dec. 29, 2009, at RC40006359–60 [RC40005949] (resolving that ResCap initially accepts the contribution of the HFS Portfolio from AFI, through GMAC Mortgage Group, LLC, and that it then "necessary and desirable" to contribute it down the chain of entities to RFC).

[469] *See* Residential Capital, LLC, Consolidated Financial Statements for the Years Ended Dec. 31, 2009 and 2008, dated Feb. 26, 2010, at 100 [EXAM00124455].

[470] *See, e.g., Jones v. Ryder Integrated Logistics, Inc.* (*In re Jotan, Inc.*), 264 B.R. 735, 752–53 (Bankr. M.D. Fla. 2001); *News Journal Co. v. Little Caesars of Del., Inc.*, No. CRIM.A.1999-04-241, 2000 WL 33653432, at *4 (Del. Com. Pl. Oct. 20, 2000).

contribution of such intercompany receivables may be of little or no value. It is therefore uncertain how much new value, if any, a court would attribute to the contribution of the intercompany receivables. Exhibit VII.F.4.h(1)—1 shows a value of $316 million, which is the amount set forth in ResCap's financial statements. AFI would bear the burden of proving that this reflects an accurate valuation of the intercompany receivables at the time of contribution.

### (4) Applying New Value to Avoidable Transfers

As described in Section VII.F.4.g, the Examiner has concluded that the following transactions may give rise to transfers to AFI that are avoidable as Insider Preference payments:

VII.F.4.h(4)
**Summary of Avoidable Preferential Transfers**
*($ in Millions)*

| Transaction | Debtor-Transferor | Amount | Date of Transfers |
|---|---|---|---|
| 2008 Bank Transaction | ResCap | $403 – $504 | Mar. 30, 2008 |
| 2008 Bank Transaction | ResCap | $168 – $210 | Jun. 3, 2008 |
| Secured Revolver Facility | RFC | $1,300 [1] | Jun. 4, 2008 |
| Resort Finance Facility | RFC | $18 | 2008 |
| Secured MSR Facility | RFC | $239 [2] | Apr. 2008 – Dec. 2009 |
| A&R Line of Credit Facility | RFC | $650 | Jan. 2010 – May 2012 |

[1] This amount is on account of lien avoidance.
[2] This is the total amount of principal and interest payments made by RFC on the Secured MSR Facility from April 2008 through December 2009 as shown in Exhibit VII.F.4.g(3)(b). These payments would not constitute avoidable transfers to the extent that the funds used to make the payments were encumbered by valid liens.
Source: See Section VII.F.4.g.

As described above, to offset new value against an avoidable preferential transfer, the new value must have been received by the transferor: (1) after the avoidable transfer; and (2) from the transferee (i.e., new value provided by a third party is not valid). Exhibit VII.F.4.h(4) above shows that only avoidable transfers made by ResCap relate to the 2008 Bank Transaction, while the rest of the avoidable transfers were made by RFC.

As set forth in Exhibit VII.F.4.h(4), the Examiner has concluded that AFI received transfers from ResCap that are likely avoidable under the Minnesota Inside Preference Statute in an amount of up to $714 million. The latest of these transfers occurred in June 2008. With respect to new value provided by AFI to ResCap, Exhibit VII.F.4.h(1)—1 shows that ResCap received as much as $2.6 billion in new value from AFI, with approximately $2.4 billion received after June 2008. Therefore, to the extent that AFI would be able to substantiate the amounts of new value set forth in Exhibit VII.F.4.h(1)—1, *which amounts AFI would have the burden of establishing*, the new value would appear to be sufficient to offset all of the avoidable preferential transfers by ResCap to AFI.

As set forth in Exhibit VII.F.4.h(4), the Examiner has concluded that AFI received transfers from RFC that are likely avoidable under the Minnesota Inside Preference Statute in an amount of up to $2.2 billion. Of this amount, $1.55 billion in transfers were made prior to the December 30, 2009, and $650 million in transfers were made after December 30, 2009. With respect to new value provided by AFI to RFC, Exhibit VII.F.4.h(1)—2 shows that RFC received as much as $2.4 billion in new value from AFI, with $1.79 billion received in December 2009. The amount of new value received just in December 2009 is sufficient to offset all of the preferential transfers made prior to that time. With respect to the period after December 30, 2009, it appears that AFI would have approximately $116 million of new value to offset the portion of the $650 million in avoidable transfers that was made prior to RFC's receipt of new value. In sum, the Examiner concludes that, to the extent that AFI would be able to substantiate the amounts of new value set forth in Exhibit VII.F.4.h(1)—2, *which amounts AFI would have the burden of establishing*, the new value would appear to be sufficient to offset all but $534 million of the avoidable preferential transfers by RFC to AFI.

## 5.  *Preferential Transfers Under Bankruptcy Code Section 547*

### a.  *Overview Of Elements*

"A preference is a transfer that enables a creditor to receive payment of a greater percentage of his claim against the debtor than he would have received if the transfer had not been made and he had participated in the distribution of the assets of the bankrupt estate."[471] Preferential transfer claims may be brought under section 547 of the Bankruptcy Code or under section 544 of the Bankruptcy Code, implementing state preferential transfer laws, as discussed in Section VII.F.4. Claims under section 547 do not implicate choice-of-law issues, as courts apply the governing federal law of the circuit in which it sits, here the Second Circuit.

### *(1) Section 547 Of The Bankruptcy Code*

Under section 547 of the Bankruptcy Code, an estate representative may avoid any transfer of an interest of the debtor in property if five conditions are satisfied and unless one of the defined affirmative defenses is applicable. Section 547 provides that a trustee or debtor-in-possession may avoid as a preference any transfer of an interest of the debtor in property made:

- to or for the benefit of a creditor;

- for or on account of an antecedent debt;

- while the debtor was insolvent;

- on or within ninety days of the petition date or up to one year before the petition date if such creditor was an insider at the time of the transfer; and

---

[471]  Bankruptcy Reform Act of 1978, Pub. L. No. 95-598, 1978 U.S.C.C.A.N. (92 Stat. 2546) 5963, 6138.

- that enables such creditor to receive more than such creditor would receive if:

  - the case was a chapter 7 case;

  - the transfer had not been made; and

  - such creditor received payment of such debt to the extent provided by the Bankruptcy Code.[472]

The estate representative has the burden of proving each of these elements by a preponderance of evidence. A transfer is not avoidable as a preference unless every element is proven.[473]

### (2) Elements Of A Preference Claim

#### (a) Transfer Of An Interest Of The Debtor In Property

As a threshold matter, only a "transfer of an interest of the debtor in property"[474] is subject to possible avoidance under section 547. The Bankruptcy Code defines "transfer"[475] as "(A) the creation of a lien; (B) the retention of title as a security interest; (C) the foreclosure of a debtor's equity of redemption; or (D) each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with—(i) property; or (ii) an interest in property."[476] This definition should be viewed in the broadest sense possible.[477] "Transfer of possession, custody or control fall within" this definition.[478] Federal law determines what constitutes a "transfer" for purposes of section 547, and also when such transfer is complete.[479]

Property is broadly construed to include "all legal or equitable interests of the debtor in property as of the commencement of the case."[480] In other words, "property of the debtor" includes property that would have been available for distribution to creditors had it not been

---

[472] 11 U.S.C. § 547(b); *Cadle Co. v. Mangan* (*In re Flanagan*), 503 F.3d 171, 180 (2d Cir. 2007).

[473] 11 U.S.C. § 547(g) ("[T]he trustee has the burden of proving the avoidability of a transfer under subsection (b) of this section."); *In re Flanagan*, 503 F.3d at 180 (providing that the burden rests on the trustee "to establish each of [the] elements by a preponderance of the evidence").

[474] 11 U.S.C. § 547(b).

[475] Section 101 defines a "transfer" to include "each mode, direct, or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with—(i) property or (ii) with an interest in property." *Id.* § 101(54)(D).

[476] *Id.* § 101(54).

[477] Act of July 14, 1978, Pub. L. 95-598, 1978 U.S.C.C.A.N. (92 Stat. 2549) 5787.

[478] *Le Café Creme, Ltd. v. Le Roux* (*In re Le Café Creme, Ltd.*), 244 B.R. 221, 233 (Bankr. S.D.N.Y. 2000).

[479] *Barnhill v. Johnson*, 503 U.S. 393, 397 (1992).

[480] 11 U.S.C. § 541(a)(1).

transferred before the commencement of the bankruptcy case.[481] In the absence of controlling federal law, what constitutes "property" is determined by state law.[482]

### (b) To Or For The Benefit Of A Creditor

Under section 547(b)(1) a transfer is avoidable only if it was to or for the benefit of a creditor.[483] There is no requirement that the benefit which accrues to a creditor be direct. Indeed, transfers that result in indirect benefits to creditors can be avoided as preferences.[484]

The Bankruptcy Code defines "creditor" in broad terms to include any "entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor."[485] "Claim" is in turn broadly defined as:

> (A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or (B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.[486]

---

[481] *See Begier v. IRS,* 496 U.S. 53, 58 (1990).

[482] *Barnhill*, 503 U.S. at 398 (citing *McKenzie v. Irving Trust Co.*, 323 U.S. 365, 369–70 (1945)) ("In the absence of any controlling federal law, 'property' and 'interests in property' are creatures of state law."); *Butner v. United States*, 440 U.S. 48, 54 (1979) ("Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law.").

[483] 11 U.S.C. § 547(b)(1).

[484] *Nat'l Bank of Newport v. Nat'l Herkimer Cnty. Bank,* 225 U.S. 178, 184 (1912) ("To constitute a preference, it is not necessary that the transfer be made directly to the creditor. It may be made to another for his benefit."); *Am. Universal Ins. Co. v. Dunlap* (*In re Microwave Prods. of Am., Inc.*), 118 B.R. 566 (Bankr. W.D. Tenn. 1990) (holding that a transfer which benefits a creditor indirectly may still constitute a preference under 11 U.S.C. § 547(b)).

[485] The Bankruptcy Code's full definition of "creditor" is as follows:

> (A) entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor;
>
> (B) entity that has a claim against the estate of a kind specified in section 348(d), 502(f), 502(g), 502(h) or 502(i) of this title; or
>
> (C) entity that has a community claim.

11 U.S.C. § 101(10).

[486] *Id.* § 101(5).

Even the United States government, if it is determined to otherwise be a creditor of the debtor, is not immune from preference actions brought by the trustee in bankruptcy.[487]

### (c) On Account Of An Antecedent Debt

A transfer can be avoided as a preference only if it was made on account of an antecedent debt,[488] that is, if the debt was incurred before the alleged preferential transfer.[489]

### (d) While Debtor Was Insolvent

Under section 547(b)(3) a transfer is avoidable only if it was made while the debtor was insolvent.[490] With respect to a corporation or limited liability corporation (such as ResCap, GMAC Mortgage or RFC), "insolvent" is defined in the Bankruptcy Code as a "financial condition such that the sum of an entity's debts is greater than all of the entity's property, at a fair valuation, exclusive of . . . property transferred, concealed, or removed with intent to hinder, delay, or defraud [the] entity's creditors."[491] This definition of insolvency is the same for preference actions under section 547 and fraudulent conveyance actions under section 548.[492] Under the Bankruptcy Code, there is a rebuttable presumption that a debtor is "insolvent on and during the 90 days immediately preceding the date of the filing of the petition."[493]

### (e) Transfers Made Within Ninety Days Or One Year

Section 547(b)(4) requires that the transfer to be avoided have been made within ninety days before the petition date or, if the transfer was made to an insider, within one year before the petition date.[494]

The Bankruptcy Code provides for a one year look-back period, instead of the otherwise applicable ninety-day look-back period, if the creditor who received the allegedly preferential

---

[487] *See In re Husher*, 131 B.R. 550, 552–53 (E.D.N.Y. 1991) (noting that Congress has waived the government's sovereign immunity with respect to preference actions brought under section 547 of the Bankruptcy Code by the operation of section 106(c) of the Bankruptcy Code).

[488] 11 U.S.C. § 547(b)(2).

[489] *See Breeden v. L.I. Bridge Fund, L.L.C.* (*In re the Bennett Funding Grp., Inc.*) 220 B.R. 739, 742 (B.A.P. 2d Cir. 1998) (noting that "'an antecedent debt' is a pre-existing debt that was incurred when the debtor previously obtained a property interest in the consideration provided by the creditor that gave rise to the debt").

[490] 11 U.S.C. § 547(b)(3).

[491] *Id.* § 101(32)(A); *accord Statutory Comm. of Unsecured Creditors on behalf of Iridium Operating LLC v. Motorola, Inc.* (*In re Iridium Operating LLC*), 373 B.R. 283, 344 (Bankr. S.D.N.Y. 2007).

[492] *See Official Comm. of Former Partners v. Brennan (In re Labrum & Doak, LLP),* 227 B.R. 383, 387 (Bankr. E.D. Pa. 1998). For a more complete discussion of the tests for determining insolvency, see Section VI.B.

[493] 11 U.S.C. § 547(f); *see, e.g.*, *In re Iridium Operating LLC*, 373 B.R. at 343; *Jacobs v. Matrix Capital Bank* (*In re AppOnline.com, Inc.*), 315 B.R. 259, 281–82 (Bankr. E.D.N.Y. 2004).

[494] 11 U.S.C. § 547(b)(4).

transfer was an "insider" at the time of such transfer.[495] The term "insider" is defined in the Bankruptcy Code to include directors, officers, and any other person in control of the debtor.[496] However, this definition of "insider" is not exhaustive and, as such, courts have been left "to define the limits of non-statutory insider status."[497] To determine whether a person is a non-statutory insider, courts perform a fact-intensive analysis on a case-by-case basis.[498] In performing this analysis, courts consider the following two factors: "(1) the closeness of the relationship between the debtor and the transferee, and (2) whether the transactions between the transferee and the debtor were conducted at arm's length."[499] In making this determination, courts examine the relevant facts at hand, including:

> (1) [w]hether the loan made to the debtor was documented (e.g., promissory note, mortgage, and specified repayment terms); (2) [w]hether the loans were made on an unsecured basis and without inquiring into the debtor's ability to repay the loans; (3) [w]hether the transferee knew that the debtor was insolvent at the time the debtor made the loans or recorded the security agreements; (4) [w]hether there were numerous loans between the parties; (5) [w]hether there were any strings attached as to how the debtor could use loan proceeds; (6) [w]hether the loans were commercially motivated; (7) [w]hether the transferee had an ability to control or influence the debtor; (8) [w]hether there was a personal, business, or professional relationship between the transferee and the debtor allowing the transferee to gain an

---

[495] *Id.* § 547(b)(4)(B).

[496] Section 101 of the Bankruptcy Code defines an "insider" as, in pertinent part:

. . . (B) if the debtor is a corporation –

(i) director of the debtor;

(ii) officer of the debtor;

(iii) person in control of the debtor;

(iv) partnership in which the debtor is a general partner;

(v) general partner of the debtor; or

(vi) relative of a general partner, director, officer or person in control of the debtor;

(E) affiliate, or insider of an affiliate as if such affiliate were the debtor; and

(F) managing agent of the debtor.

*Id.* § 101(31).

[497] *Hirsch v. Tarricone* (*In re A. Tarricone, Inc.*), 286 B.R. 256, 262 (Bankr. S.D.N.Y. 2002).

[498] *Id.*

[499] *Id.*; *see also Le Café Creme, Ltd. v. Le Roux* (*In re Café Creme, Ltd.*), 244 B.R. 221, 233 (Bankr. S.D.N.Y. 2000) (citing *In re F & S Cent. Mfg., Corp.*, 53 B.R. 842, 848 (Bankr. E.D.N.Y.1985)) (noting that "[a] creditor who does not deal at arms length with the debtor but who has a special relationship with the debtor through which it can compel payment of its debt, has sufficient control over the debtor to be deemed an insider").

> advantage such as that attributable simply to affinity;
> (9) [w]hether the transferee had authority to make business
> decisions for the debtor; (10) [w]hether there is evidence of a
> desire to treat the transferee differently from all other general
> unsecured creditors; and (11) [w]hether there was an agreement
> among the parties to share profits and losses from business
> transactions.[500]

As explained in greater detail in Section VII.F.8, the Bankruptcy Code separates the concepts of avoidance and recovery. Section 550 of the Bankruptcy Code governs affirmative recovery beyond avoidance in situations where the estate representative seeks to recover the property transferred by the avoidable transaction or the value of such property. Prior to 1994, a line of cases, led by the Seventh Circuit's decision in *Levit v. Ingersoll Rand Financial Corp.* (*In re Deprizio Constr. Co.*),[501] permitted estate representatives to recover payments made to non-insiders a full year prior to the bankruptcy filing, in situations where an insider benefitted from the transfer in some way.[502] Subsequent amendments to the Bankruptcy Code, through changes to section 547 and 550, explicitly corrected the "*DePrizio* problem" and clarified that the ninety-day look-back period applies to non-insiders.[503] But *DePrizio's* general rule that transferees and entities for whose benefit the transfer was made are equally liable under section 550 for recoveries of avoidable transfers remains undisturbed by these statutory amendments.[504]

---

[500] *Schreiber v. Stephenson* (*In re Emerson*), 235 B.R. 702, 707 (Bankr. D. N.H. 1999) (citations omitted); *see also In re Café Creme, Ltd.*, 244 B.R. at 233 (citing *In re F & S Cent. Mfg., Corp.*, 53 B.R. at 848) (noting that "[a] creditor who does not deal at arms length with the debtor but who has a special relationship with the debtor through which it can compel payment of its debt, has sufficient control over the debtor to be deemed an insider").

[501] 874 F.2d 1186 (7th Cir. 1989).

[502] *See id.* at 1195–96 (7th Cir. 1989) (holding both (1) that a one-year statutory look-back period could apply to non-insiders where the insider benefitted in some way from the transfer to the non-insider and (2) that the liability of the transferee and the entity "for whose benefit" the transfer was made is coextensive, and that "[a] single payment therefore is one 'transfer,' no matter how many persons gain thereby").

[503] *See* 140 Cong. Rec. H10767 (daily ed. Oct. 4, 1994) (noting that the addition of new section 550(c) "overrules the *Deprizio* line of cases and clarifies that non-insider transferees should not be subject to the preference provisions of the Bankruptcy Code beyond the 90-day statutory period"); Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, 2005 U.S.C.C.A.N. 88.

[504] *See, e.g.*, *Official Comm. of Unsecured Creditors of 360networks* (*USA*) *Inc. v. U.S. Relocation Servs., Inc.* (*In re 360networks* (*USA*) *In*c.), 338 B.R. 194, 207 n.15 (Bankr. S.D.N.Y. 2005) ("However, both amendments relate to the applicable preference period and do not otherwise affect the general rule of coextensive liability between transferees and entities for whose benefit the transfer was made.").

AFI and Ally Bank are insiders of the Debtors. AFI was ResCap's parent company and sole shareholder at all relevant times and therefore is an "insider."[505] Ally Bank, another wholly-owned subsidiary of AFI, was also an affiliate of the Debtors at all relevant times and therefore is an "insider."[506]

There is no presumption of insolvency outside of the ninety-day period preceding the petition date, and the burden is therefore on the trustee to establish the debtor's insolvency on the date of the transfer by a preponderance of the evidence in an insider preference case where the challenged transfer took place more than ninety days before the petition date.[507]

### (f) Hypothetical Chapter 7 Test

Finally, section 547(b)(5) requires that a transfer must enable a creditor to receive more than it would have received in a chapter 7 liquidation had the challenged transfer not been made.[508] This provision is often referred to as the "hypothetical chapter 7 test" and is considered the most important element of the preference analysis "because it determines whether the defendant received more than other similarly classified claimants would in a hypothetical Chapter 7 distribution."[509] While all other elements of a preference pursuant to

---

[505] 11 U.S.C. § 101(31)(B)(iii) (defining "person in control of the debtor" as a statutory insider); First Day Affidavit at 1, n.1.

[506] 11 U.S.C. § 101(31)(E) (defining "affiliate" as a statutory insider); *id.* § 101(2)(B) (defining "affiliate" as a "corporation 20 percent or more of whose outstanding voting securities are directly or indirectly owned, controlled or held with power to vote . . . by an entity that directly or indirectly owns, controls or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor . . . "); First Day Affidavit, at 8 ("The Debtors are affiliated with Ally Bank, which is an indirect wholly owned subsidiary of AFI.").

[507] *See, e.g.*, *Pryor v. Zerbo* (*In re Zerbo*), 397 B.R. 642, 657 (Bankr. E.D.N.Y. 2008) (noting that "[s]ection 547(f) creates a presumption that the Debtor was insolvent, but that presumption applies only to the ninety (90) days preceding the petition date"); *Pummill v. McGivern* (*In re Am. Eagle Coatings, Inc.*), 353 B.R. 656, 669 (Bankr. W.D. Mo. 2006); *Roblin Indus., Inc. v. Ford Motor Co.* (*In re Roblin Indus., Inc.*), 78 F.3d 30, 34 (2d Cir. 1996) (noting that the trustee bears the burden of proving insolvency by a preponderance of the evidence).

[508] 11 U.S.C. § 547(b)(5); *Tese-Milner v. Edidin & Assocs. (In re Operations N.Y. LLC),* No. 12-01783, 2013 WL 1187879, at *13 (Bankr. S.D.N.Y. Mar. 21, 2013) (noting that the hypothetical chapter 7 test "essentially imposes an improvement of position test, and the plaintiff must plead facts showing that there are creditors in the same class that would receive less than 100% of their claims from the bankruptcy state"); *Savage & Assocs., P.C. v. Mandl (In re Teligent Inc.),* 380 B.R. 324, 339 (Bankr. S.D.N.Y. 2008) ("The proponent must construct a hypothetical chapter 7 case, and determine the percentage distribution that the defendant would have received on the petition date."); *Aspen Data Graphics, Inc. v. Boulton (In re Aspen Data Graphics, Inc.),* 109 B.R. 677, 681 (Bankr. E.D. Pa. 1990) (noting that "to prove this element the trustee merely has to show that the creditors would receive less . . . in liquidation").

[509] *See McGoldrick v. Juice Farms, Inc.* (*In re Ludford Fruit Prods., Inc.*), 99 B.R. 18, 22 (Bankr. C.D. Cal. 1989); *cf. Pereira v. Summit Bank*, No. 94-1565, 2001 WL 563730, at *15 (S.D.N.Y. May 23, 2001) (citing 5 COLLIER ON BANKRUPTCY ¶ 547.03[7] (Lawrence P. King et al. eds., 15th ed. 2000)) (noting that the hypothetical chapter 7 test is "a central element of the preference section").

section 547(b) are determined as of the time the transfer was made, a determination that a creditor received more than it would have received in liquidation is measured "as of the time of filing the petition."[510]

Under this sub-section, "the court must focus on the relative distribution between classes as well as the amount that will be received by the members of the class of which the preferee is a member."[511] It is generally acknowledged that, unless creditors would receive a full payout, "any unsecured creditor who receives a payment during the preference period is in a position to receive more than it would have received under a Chapter 7 liquidation."[512] In contrast, payments to a fully secured creditor are generally not preferential under section 547.[513]

In short, when a plaintiff brings a section 547 preference claim, the court is required to determine (1) "what a targeted creditor would have received if the" challenged transfer had not been made and "the estate had been liquidated and distributed to the creditors as provided

---

[510] *Hassett v. Goetzmann* (*In re CIS Corp.*), 195 B.R. 251, 262 (Bankr. S.D.N.Y. 1996) ("Thus, the [section] 547(b)(5) analysis is to be made as of the time the Debtor filed its bankruptcy petition."); *see, e.g.*, *Falcon Creditor Trust v. First Ins. Funding* (*In re Falcon Prods., Inc.*), 381 B.R. 543, 547 (B.A.P. 8th Cir. 2008) (noting that "Supreme Court precedent requires that the hypothetical liquidation test be conducted as of the petition date").

[511] Bankruptcy Reform Act of 1978, Pub. L. 95-598, 1978 U.S.C.C.A.N. (92 Stat. 2549) 5963, 6328; Bankruptcy Reform Act of 1978, Pub. L. 95-598, 1978 U.S.C.C.A.N. (92 Stat. 2549) 5787, 5873.

[512] *Velde v. Reinhardt*, 366 B.R. 894, 898 (D. Minn. 2007); *see also Jacobs v. Matrix Capital Bank* (*In re AppOnline.com, Inc.*), 315 B.R. 259, 281 (Bankr. E.D.N.Y. 2004) (quoting *Elliott v. Frontier Props*. (*In re Lewis W. Shurtleff, Inc.*), 778 F.2d 1416 (9th Cir. 1986)) (noting that "as long as the distribution in bankruptcy is less than one-hundred percent, *any* payment 'on account' to an unsecured creditor during the preference period will enable that creditor to receive more than he would have received in liquidation had the payment not been made").

[513] *Buchwald Capital Advisors, LLC v. Metl-Span I., Ltd*. (*In re Pameco Corp.*), 356 B.R. 327, 336 (Bankr. S.D.N.Y. 2006) ("Generally, a prepetition transfer to a fully secured creditor will not be considered preferential because such creditor would be paid in full in a hypothetical chapter 7 liquidation as a result of realization on its claim."); *see also Batlan v. TransAmerica Commercial Fin. Corp*. (*In re Smith's Home Furnishings, Inc*.), 265 F.3d 959, 964, 969 (9th Cir. 2001); *Comm. of Creditors Holding Unsecured Claims v. Koch Oil Co*. (*In re Powerine Oil Co.*), 59 F.3d 969, 972 (9th Cir. 1995); *Ray v. City Bank & Trust Co*. (*In re C-L Cartage Co.*), 899 F.2d 1490, 1493 (6th Cir. 1990); *Velde v. Kirsch*, 366 B.R. 902, 906 n.4 (D. Minn. 2007), *aff'd*, 543 F.3d 608 (8th Cir. 2008); *Savage Assocs., P.C. v. Cnty. of Fairfax, Va*. (*In re Teligent, Inc*.), 2006 WL 1030417, *3 (Bankr. S.D.N.Y. Apr. 13, 2006).

Section VII.F.4 discusses whether a court applying the Minnesota Insider Preference statute would apply a hypothetical chapter 7 test even though the Minnesota UFTA does not contain any provision comparable to Bankruptcy Code section 547(b)(5).

in chapter 7 on the date that the bankruptcy petition was filed," and (2) "whether the creditor in question received more than that amount" taking into account the challenged transfer.[514]

### b. Overview Of Defenses

There are several affirmative defenses to preferential transfer allegations that are provided by the Bankruptcy Code or that have been developed through judicial rulings. Only the defenses that are relevant to the transactions covered by the Investigation are discussed in this Section. The defendant has the burden of proving these affirmative defenses by a preponderance of the evidence.[515]

#### (1) Contemporaneous New Value

Under section 547(c)(1), a trustee may not avoid a transfer to the extent it was: (1) intended by the debtor and the transferee to be a contemporaneous exchange for new value given to the debtor; and (2) in fact a substantially contemporaneous exchange.[516]

Section 547(a)(2) defines "new value" as

> money or money's worth in goods, services, or new credit or release by a transferee of property previously transferred to such transferee in a transaction that is neither void nor voidable by the debtor or the trustee under any applicable law, including proceeds of such property, but does not include an obligation substituted for an existing obligation.[517]

---

[514] *Gouveia v. Cahillane* (*In re Cahillane*), 408 B.R. 175, 210 (Bankr. N.D. Ind. 2009); *see also In re Superior Toy & Mfg. Co., Inc.*, 78 F.3d 1169, 1171 (7th Cir. 1996); *Neuger v. United States* (*In re Tenna Corp.*), 801 F.2d 819, 822 (6th Cir. 1986); 4 COLLIER ON BANKRUPTCY, ¶ 547.08, at 547–45 (Lawrence P. King et al. eds., 15th ed. 1995); *cf. Savage & Assocs., P.C. v. Mandl* (*In re Teligent Inc.*), 380 B.R. 324, 339 (Bankr. S.D.N.Y. 2008) ("The proponent must construct a hypothetical chapter 7 case, and determine the percentage distribution that the defendant would have received on the petition date.").

[515] 11 U.S.C. § 547(g); *Lawson v. Ford Motor Co.* (*In re Roblin Indus., Inc.*), 78 F.3d 30, 39 (2d Cir. 1996).

[516] 11 U.S.C. § 547(c)(1); *see also Official Comm. of Unsecured Creditors of 360networks (USA) Inc. v. U.S. Relocation Services, Inc.* (*In re 360networks (USA) Inc.*), 338 B.R. 194, 204 (Bankr. S.D.N.Y. 2005).

[517] 11 U.S.C. § 547(a)(2).

The determination of "new value" is a question of fact.[518] There is no requirement that the new value provided to the debtor be made by the defendant; value provided by a third party is sufficient.[519]

The second element of the defense requires a determination of whether the parties intended a contemporaneous exchange for new value.[520] Intent is a question of fact and may be proved by circumstantial objective evidence, including the terms in any documents or memoranda between the parties.[521]

Finally, the contemporaneous new value defense will only be available to a defendant if the challenged transfer and the provision of new value were actually made at substantially the same time. Whether a transfer is substantially contemporaneous requires a "case-by-case

---

[518] *In re Rustia*, 20 B.R. 131 (Bankr. S.D.N.Y. 1982); *In re Duffy*, 3 B.R. 263 (Bankr. S.D.N.Y. 1980).

[519] *See In re 360networks (USA) Inc.*, 338 B.R. at 205. This rule differs from the new value defense under the Minnesota Insider Preference statute and from the subsequent new value defense of section 547(c)(4), neither of which generally recognizes value provided by a third party in applying those defenses. This distinction arises from the varying language of the statutes. Section 547(c)(4) requires that "such creditor" (i.e., the creditor that received the possibly preferential transfer) gives new value, 11 U.S.C. § 547(c)(4), and the Minnesota UFTA similarly provides that a transfer is not avoidable "to the extent the insider gave new value." MINN. STAT. ANN. § 513.48(f)(1). These sections therefore require that the creditor/insider that is the target of the preferential transfer allegation give new value in order for the affirmative defense to apply. In contrast, section 547(c)(1) merely requires that a transfer be intended by the debtor and creditor to be a contemporaneous exchange for new value and that such transfer actually be a substantially contemporaneous exchange, but includes no requirement that the new value come from the defendant-creditor itself. 11 U.S.C. § 547(c)(1).

[520] *Buchwald Capital Advisors, LLC v. Metl-Span I., Ltd.* (*In re Pameco Corp.*), 356 B.R. 327, 338 (Bankr. S.D.N.Y. 2006) (noting that the Bankruptcy Code requires that both the debtor and the transferee intended the transfer to be contemporaneous); *In re 360networks (USA) Inc.*, 338 B.R. at 207 (noting that the relevant intent is that of the debtor and either (1) the entity to whom the transfer was made or (2) the entity for whose benefit such transfer was made); *see, e.g.*, *Hechinger Inv. Co. of Del., Inc. v. Universal Forest Prods., Inc.* (*In re Hechinger Inv. Co.*), 489 F.3d 568, 574 (3d. Cir. 2007); *Official Plan Comm. v. Expeditors Int'l of Wash., Inc.* (*In re Gateway Pac. Corp.*), 153 F.3d 915, 918 (8th Cir. 1998); *Sulmeyer v. Suzuki* (*In re Grand Chevrolet, Inc.*), 25 F.3d 728, 733 (9th Cir. 1994); *Tyler v. Swiss Am. Sec., Inc.* (*In re Lewellyn & Co., Inc.*), 929 F.2d 424, 428 (8th Cir. 1991); *Silverman Consulting, Inc. v. Canfor Wood Prods. Mktg.* (*In re Payless Cashways, Inc.*), 306 B.R. 243, 248 (B.A.P. 8th Cir. 2004), *aff'd*, 394 F.3d 1082 (8th Cir. 2005); *Feltman v. City Nat'l Bank of Fla.* (*In re Sophisticated Commc'ns., Inc.*), 369 B.R. 689, 703 (Bankr. S.D. Fla. 2007).

[521] *In re 360networks (USA) Inc.*, 338 B.R. at 209; *see, e.g.*, *In re Lewellyn & Co., Inc.*, 929 F.2d at 427 ("The existence of intent, contemporaneousness, and new value are questions of fact."); *Ray v. Sec. Mut. Fin. Corp.* (*In re Arnett*), 731 F.2d 358, 360 (6th Cir. 1984); *In re Payless Cashways, Inc.*, 306 B.R. at 249 ("Since parties rarely testify as to their intent, courts look to the circumstances surrounding each situation."); *Eide v. U.S.* (*In re Quade*), 108 B.R. 681, 683 (Bankr. N.D. Iowa 1989); *see also In re Gateway Pac. Corp.*, 153 F.3d at 918; *Schnittjer v. Pickens* (*In re Pickens*), 2008 WL 63251, *2 (Bankr. N.D. Iowa Jan. 3, 2008); *Tomsis v. Sales Consultants of Bos, Inc.* (*In re Salience Assocs., Inc.*), 371 B.R. 578, 587 (Bankr. D. Mass. 2007); *Ganton Techs., LLC v. Chemtool, Inc.* (*In re Intermet Corp.*), 372 B.R. 358, 365–66 (Bankr. E.D. Mich. 2007).

inquiry into all relevant circumstances,"[522] including the length of delay, the reasons for any delays, and industry standards.[523] "Courts have consistently held that payments on account of an antecedent debt are not contemporaneous exchanges" for new value.[524]

### (2) Ordinary Course Of Business

Section 547(c)(2) of the Bankruptcy Code provides an "ordinary course" affirmative defense to the avoidance of facially preferential transfers. A transfer that satisfies all of the elements of a preference is nevertheless unavoidable if:

> (1) the transfer was in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee; and (2) such transfer was (a) made in the ordinary course of business or financial affairs of the debtor and the transferee, or (b) made according to ordinary business terms.[525]

The Bankruptcy Code does not define "ordinary course of business"; however, courts have looked to the legislative history which states that this section is designed to "leave undisturbed normal financial relations."[526]

If the defendant can establish that the debtor incurred the antecedent debt in the ordinary course of business, it must then establish that the debtor paid that debt in the ordinary course as well. When determining whether a transfer was made in the ordinary course of business, the bankruptcy court will undertake an objective analysis (i.e., whether the transfer was "made in

---

[522]   *In re 360networks (USA) Inc.*, 338 B.R. at 209 (quoting *Pine Top Ins. Co. v. Bank of Am. Natl. Trust & Sav. Assoc.,* 969 F.2d 321, 328 (7th Cir.1992)) (noting that "the modifier 'substantial' makes clear that contemporaneity is a flexible concept which requires a case-by-case inquiry into all relevant circumstances").

[523]   *See Telecash Indus., Inc. v. Universal Assets (In re Telecash Indus., Inc.)*, 104 B.R. 401, 403–04 (Bankr. D. Utah 1989) (noting issue of contemporaneous exchange is "a question of fact"); *Gropper v. Samuel Kunstler Textiles, Inc. (In re Fabric Buys of Jericho, Inc.)*, 22 B.R. 1013, 1016 (Bankr. S.D.N.Y. 1989) (finding that over ninety days is not contemporaneous); *Jahn v. First Tenn. Bank (In re Burnette)*, 14 B.R. 795, 803 (Bankr. E.D. Tenn. 1981) (finding twenty days is contemporaneous); *see also Pine Top Ins. Co.*, 969 F.2d at 328; *Moser v. JP Morgan Chase Bank, N.A. (In re Brown)*, 375 B.R. 348, 354 (Bankr. E.D. Tex. 2007); *Kerst v. Wray State Bank (In re Kerst)*, 347 B.R. 418, 426 (Bankr. D. Colo. 2006).

[524]   *In re 360networks (USA) Inc.*, 338 B.R. at 205 (citing *Sapir v. Keener Lumber Co. (In re Ajayem Lumber Corp.)*, 143 B.R. 347, 352 (Bankr. S.D.N.Y.1992)) (finding that transfer intended by the parties to be for or on account of antecedent debt was not a contemporaneous exchange for new value given to the debtor).

[525]   11 U.S.C. § 547(c)(2).

[526]   Bankruptcy Reform Act of 1978, Pub. L. 95-598, 1978 U.S.C.C.A.N. (92 Stat. 2549) 5963, 6329 (stating that the purpose of this defense "is to leave undisturbed normal financial relations, because it does not detract from the general policy of the preference section to discourage unusual action by either the debtor or [its] creditors during the debtor's slide into bankruptcy"); *Lawson v. Ford Motor Co. (In re Roblin Indus., Inc.)*, 78 F.3d 30, 41 (2d Cir. 1996); *see also Courtney v. Octopi, Inc. (In re Colonial Discount Corp.)*, 807 F.2d 594, 600 (7th Cir. 1986) ("The purpose of the ordinary course of business exception is to ensure that normal commercial transactions are not caught in the net of the trustee's avoidance powers."); *Marathon Oil Co. v. Flatau (In re Craig Oil Co.)*, 785 F.2d 1563, 1566 (11th Cir. 1986).

the ordinary course of business or financial affairs of the debtor and the transferee") and a subjective analysis (i.e., whether the transfer was "made according to ordinary business terms").[527] Because these two tests are disjunctive, satisfying either prong is sufficient to shield a payment from avoidance (so long as the underlying debt was incurred in the ordinary course).[528]

Although the ordinary course defense has generated a substantial volume of case law defining its scope and limits, the Examiner does not believe this defense is even arguably relevant to the three transfers discussed in Section VII.F.5.c and, accordingly, the Report does not include an encyclopedic exposition of that body of law.

### (3) Subsequent New Value

Under section 547(c)(4), a trustee cannot avoid the transfer if the transferee can show that, after having received the transfer, it gave new value to the debtor on an unsecured basis.[529] This affirmative defense recognizes that the "new value" provided by the transferee essentially repays the earlier preferential transfer and therefore offsets the harm done to the debtor's other creditors.[530] To prevail on this defense the transferee must prove that: (1) it extended new value to the debtor after receiving a preference; (2) the new value was unsecured; and (3) such new value remains unpaid.[531]

### (4) Earmarking

The earmarking doctrine is not set forth in the Bankruptcy Code but rather is a judge-made equitable exception[532] that prohibits the avoidance of a transfer otherwise avoidable as a preference if: (1) a new lender agrees to advance funds to a debtor on the condition that the

---

[527] 11 U.S.C. § 547(c)(2).

[528] For bankruptcy cases filed prior to October 17, 2005, the ordinary course of business defense required establishing that the payment was objectively in the ordinary course, as measured against the industry standard. However, for cases filed after Congress's 2005 amendments to the Bankruptcy Code became effective, satisfaction of either the subjective or objective prongs of the test is sufficient. *See Cellmark Paper, Inc. v. Ames Merch. Corp.* (*In re Ames Dep't Stores, Inc.*), 470 B.R. 280, 284 n.5 (S.D.N.Y. 2012) ("As the Bankruptcy Court noted, section 547(c)(2) of the Bankruptcy Code was amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 . . . In the amended version of section 547(c)(2), a creditor need only prove, in addition to the first element, that either the second or third element are met, rather than both.") (citations omitted).

[529] 11 U.S.C. § 547(c)(4).

[530] *Savage & Assocs., P.C. v. Level(3) Commc'ns* (*In re Teligent, Inc.*), 315 B.R. 308, 315 (Bankr. S.D.N.Y. 2004) (quoting *Kroh Bros. Dev. Co. v. Cont'l Constr. Eng'r, Inc.* (*In re Kroh Bros. Dev. Co.*), 930 F.2d 648, 652 (8th Cir. 1991)) ("Accordingly, 'the relevant inquiry under section 547(c)(4) is whether the new value replenishes the estate.'").

[531] *In re Teligent, Inc.,* 315 B.R. at 315 ("A transferee, may, under § 547(c)(4), offset a preferential transfer to the extent he gave the debtor 'new value' *after* the date of the transfer, and the 'new value' remains unpaid.") (citations omitted); *Bruno Mach. Corp. v. Troy Die Cutting Co., LLC* (*In re Bruno Mach. Corp.*), 435 B.R. 819, 847 (Bankr. N.D.N.Y. 2010).

[532] *In re Maxwell Newspapers, Inc.*, 151 B.R. 63 (Bankr. S.D.N.Y. 1993).

debtor use funds to pay a specified antecedent debt; (2) the parties perform the agreement according to its terms; and (3) the transaction, when viewed as a whole, does not diminish the debtor's estate.[533] The specifics of this defense will be addressed below where applicable.

### c. Transactions That Implicate Bankruptcy Code Section 547

#### (1) March 2012 Payments Made Pursuant To The FRB/FDIC Settlement And The DOJ/AG Settlement

##### (a) Background

As described in detail in Section V.C, GMAC Mortgage ultimately paid the full fine of approximately $109.6 million pursuant to the DOJ/AG Consent Judgment on March 14, 2012.[534] This payment to the government appears to meet all of the conditions of a preferential transfer: (1) it was a transfer of GMAC Mortgage's interest in property for the benefit of the government on account of its antecedent obligations under the DOJ/AG Consent Judgment;[535] (2) GMAC Mortgage was insolvent at the time of the transfer;[536] (3) the transfer was made within ninety days of the filing date of the Debtors' bankruptcy petitions; and (4) the government would have received less than the full payment if the payment had not been made and it had received a distribution as an unsecured creditor in a hypothetical chapter 7 liquidation of GMAC Mortgage.[537] However, as noted in Section V.C, the Examiner Scope Approval Order specifically limited the scope of the Investigation in this regard "to the propriety of the allocation of obligations as among the Debtors and AFI under the [FRB/FDIC Consent Order], [DOJ/AG Consent Judgment], and [CMP]."[538]

Consistent with the limitations of the Examiner Scope Approval Order, the Examiner has analyzed whether GMAC Mortgage could assert that the March 2012 payment made to the government is avoidable under section 547 and is recoverable from AFI as "the entity for

---

[533] *See Cadle Co. v. Mangan* (*In re Flanagan*), 503 F.3d 171, 184–85 (2d Cir. 2007) (citing *McCuskey v. Nat'l Bank of Waterloo* (*In re Bohlen Enters.*)), 859 F.2d 561, 566 (8th Cir. 1988); *Kaler v. Cnty. First Nat'l Bank* (*In re Heitkamp*), 137 F.3d 1087, 1088–89 (8th Cir. 1998).

[534] *See* E-mail from C. Dondzila (Mar. 15, 2013) [EXAM11004487]; ResCap Consolidating Financial Statements—2012, dated Oct. 29, 2012 [ALLY_0244598].

[535] *See* DOJ/AG Earmark and Indemnification Agreement, dated Mar. 9, 2012 [ALLY_0001865].

[536] *See* Section VI.B for the Examiner's analysis and conclusions as to ResCap's solvency.

[537] The payment at issue here was not a payment on a tax claim that would have priority under section 507(a)(8) of the Bankruptcy Code. Tax priority claims are senior to the claims of the Debtors' general unsecured creditors for purposes of the hypothetical chapter 7 test.

[538] Examiner Scope Approval Order, at 4 n.2.

whose benefit such transfer was made" under Bankruptcy Code section 550 (the Examiner does not consider any such claims that could be made against the government).[539] This Section analyzes that potential claim.[540]

> #### *(b) Analysis*
>
> ##### *(i)  AFI As Co-Obligor On The $109.6 Million Payment*

As noted in Section V.C, the DOJ/AG Consent Judgment provides by its terms that ResCap, AFI, and GMAC Mortgage (as the collective "Defendant" under the DOJ/AG Consent Judgment) shall collectively pay the $109.6 million hard dollar payment.[541] The DOJ/AG Consent Judgment also provides that the terms of the exhibits attached to the judgment shall govern in the event of a conflict between the judgment and the exhibits.[542] Exhibit I of the DOJ/AG Consent Judgment, in turn, provides that ResCap, GMAC Mortgage, and RFC shall pay the $109.6 million hard dollar payment but is silent as to AFI's payment obligation.[543] But the exhibit specifically provides that the parties agreed to this payment "[i]n recognition of . . . the agreements of AFI with respect to the payment of settlement funds in the event [ResCap, GMAC Mortgage, and RFC] do not perform certain obligations"[544] and

---

[539]  11 U.S.C. § 550(a)(1). Notably, AFI and the government contemplated the possibility that these payments would be preferential transfers, as evidenced by the DOJ/AG Earmark and Indemnification Agreement, dated Mar. 9, 2012 [ALLY_0001865], which indemnifies the U.S. government and certain states from any payments required to be made as a result of a chapter 5 avoidance actions.

[540]  In any action to recover the March 2012 payment, sovereign immunity, nondischargeablity or some other government-specific defense may be asserted in an effort to defeat the underlying preference claim (as against the government) and prevent recovery. Although the merits of potential preference claims against the government and defenses against those claims are not within the scope of the Investigation, it does not appear to the Examiner that meritorious defenses exist given: (1) section 106(a) of the Bankruptcy Code, which provides that, among other things, sovereign immunity is abrogated as to a governmental unit (defined in section 101(27) of the Bankruptcy Code to include the United States and any State) with respect to claims asserted under section 547; and (2) the substantial body of law addressing preference suits against the States. *See, e.g.*, 11 U.S.C. § 106(a); *Cent. Va. Cmty. College v. Katz*, 546 U.S. 356 (2006) (holding that, inter alia, sovereign immunity does not protect States from preference avoidance and recovery); *Murray v. Withrow* (*In re PM-II Assocs., Inc.*), 100 B.R. 94 (Bankr. S.D. Ohio 1989) (holding that a preferential transfer action seeking recovery of civil penalties paid to the State of Ohio (pursuant to a consent judgment settling claims related to violations of Ohio state law) would not be barred by sovereign immunity because, in part, of an earlier codification of section 106 of the Bankruptcy Code); *State Comp. Ins. Fund v. Zamora* (*In re Silverman*), 616 F.3d 1001 (9th Cir. 2010); *Reynolds v. Dixie Nissan* (*In re Car Renovators*), 946 F.2d 780 (11th Cir. 1991); *Babitzke v. Mantelli* (*In re Mantelli*), 149 B.R. 154 (B.A.P. 9th Cir. 1993) (holding that nondischargeability is not a relevant issue with respect to the hypothetical chapter 7 test and that collection with respect to a nondischargeable debt can still be compelled even if a transfer is avoided as a preference). However, if the initial transfer to the government is subject to a meritorious defense, AFI would not be liable for the March 2012 payment under section 550 because there would be no underlying avoidable transfer.

[541]  DOJ/AG Consent Judgment, ¶ 3. The judgment specifically states that "Defendant" shall pay the settlement amount, *id*. ¶ 3, and defines "Defendant" as ResCap, AFI, and GMAC Mortgage, collectively, *id.* at 1.

[542]  *Id.* ¶ 19.

[543]  *Id.* Ex. I ¶ 1.

[544]  *Id.* Ex. I, at 1.

with the understanding that, pursuant to the terms of the DOJ/AG Earmark and Indemnification Agreement, AFI agreed to indemnify the United States government from any payments required to be made as a result of chapter 5 avoidance actions directed against the government.[545] Although the documentation is not as clear as the documentation of the CMP Order,[546] these provisions read together support the proposition that ResCap, GMAC Mortgage, RFC, and AFI were all financially liable to the government for the payments, with ResCap, GMAC Mortgage, and RFC required to make the payments in the first instance. There are also consistent extrinsic indications that the DOJ and AGs viewed AFI as responsible for the relief provided in the DOJ/AG Consent Judgment in the event that ResCap could not pay.[547]

The March 14 Earmark Agreement, agreed to by AFI and ResCap, provides that "pursuant to the Consent Judgment, ResCap is required to pay" the $109.6 million hard dollar payment. Although AFI could contend that this statement is an acknowledgement by ResCap of its sole responsibility for making these payments, the Examiner concludes that the evidence (in this case, the DOJ/AG Consent Judgment itself) supports the proposition that AFI was liable to the government along with ResCap, GMAC Mortgage, and RFC.

An examination of what would happen in a hypothetical chapter 7 liquidation of ResCap and its subsidiaries illustrates this point. If ResCap and its subsidiaries had filed for bankruptcy prior to making the $109.6 million payment to the government, the government would have enforced the payment against AFI (as "Defendant" obligated to make the payments provided for in paragraph 3 of the DOJ/AG Consent Judgment) and AFI, in turn, would have asserted a claim for that amount in the hypothetical chapter 7 liquidation. Although AFI and ResCap apparently agreed between themselves that ResCap and its subsidiaries would make the hard dollar payment, that agreement did not change the obligations of AFI to the government under the DOJ/AG Consent Judgment.

The Examiner therefore concludes that the evidence supports the proposition that AFI was liable, together with ResCap, RFC, and GMAC Mortgage, for the $109.6 million hard dollar payment and that AFI therefore received a benefit in the amount of $109.6 million from the payment made by GMAC Mortgage.

### (ii) AFI As Beneficiary Of DOJ/AG Settlement Release

Even if AFI were not liable for the $109.6 million hard dollar payment, it would still have received a benefit from that payment because AFI received a release as a result of GMAC Mortgage's payment. The DOJ/AG Consent Judgment by its terms provides for a release of AFI from certain claims and remedies assertable by the DOJ and the state AGs in

---

[545] *Id.* Ex. I, at 1–12.

[546] CMP Order, ¶ 1 (explicitly providing that AFI, ResCap and GMAC Mortgage and its subsidiaries are jointly and severally responsible for the $207 million CMP).

[547] *See* Int. of J. Pensabene, Jan. 9, 2013, at 189:8–190:2 (noting that in discussions regarding the DOJ/AG Settlement "the discussion with the government about the [hard dollar] amount was just whether or not [AFI] would be a party to the settlement" and that the government "insisted" that AFI be a party "because of concern's about ResCap's ability to pay the fine").

consideration for, in part, the payment of the $109.6 million hard dollar payment.[548] Regardless of whether AFI was co-liable for the hard dollar payment, AFI indisputably received a benefit from that payment in the form of a release from any potential civil or administrative claims arising from conduct that occurred prior to the settlement agreement.[549]

While not exactly on-point, the decision of the U.S. Bankruptcy Court for the Northern District of Texas in *Carolyn's Kitchen* v. *Cybergenics Corp*.[550] is instructive. In *Carolyn's Kitchen*, the debtor made prepetition payments to a creditor on account of a settlement agreement for which a non-debtor party was also a co-obligor and then sought to avoid these transfers as preferential payments under Bankruptcy Code section 547. After examining the transaction, the bankruptcy court held that the Debtor's payment of $122,500 on account of the settlement agreement was a preferential transfer.[551] The bankruptcy court also held that the non-debtor party that was a "co-maker" of the settlement obligations was "an entity for whose benefit such transfer was made within the meaning of §550(a)(1) and is jointly and severally liable with [the recipient of the avoidable transfer] for such . . . payment subject to the limitation of a single satisfaction set forth in §550(c)."[552] While the *Carolyn's Kitchen* case does not provide a substantive analysis of this issue, it does indicate that there is authority to hold a co-obligor under a settlement agreement responsible for the full value of preferential transfers made pursuant to that settlement agreement.

### (iii) Recovery From AFI Under Section 550

The evidence therefore supports the proposition that AFI was an "entity for whose benefit" the avoidable $109.6 million transfer was made, whether or not it was financially liable to make the payment.[553]

Because: (1) the Examiner concludes that the evidence supports the proposition that AFI was liable to the government along with ResCap, GMAC Mortgage, and RFC; (2) the Examiner concludes that the evidence supports the proposition that AFI received a direct,

---

[548] DOJ/AG Consent Judgment, ¶¶ 9–10, Ex. G, H. The consideration set forth in the DOJ/AG Consent Judgment for this release also includes the $200 million in consumer relief that was ultimately provided by ResCap and its subsidiaries. Pursuant to the terms set forth in Ex. I of the DOJ/AG Consent Judgment, AFI agreed to provide this $200 million in consumer relief to the extent that ResCap, GMAC Mortgage, and RFC did not perform such obligations. *Id*. Ex. I ¶ 3.

[549] *Id.* Ex. G, H. These releases were effective upon payment of the $109.6 million "Direct Payment Settlement Amount." *Id*. Ex. I, ¶ 3.c.

[550] 209 B.R. 204 (Bankr. N.D. Tex. 1997).

[551] *Id*. at 208.

[552] *Id.* at 209.

[553] As fully explained in Section V.C.1(f), AFI did believe that there was some benefit to the release that it received under the DOJ/AG Settlement, but ultimately determined that there was no "good mechanism" to determine an appropriate fair value of the release. *See, e.g.*, DOJ/AG Settlement—Allocation Scenarios, dated Feb. 13, 2012 [EXAM10999353] (attached to E-mail from H. McKay (Feb. 13, 2012) [EXAM10999352]); Int. of D. DeBrunner, Apr. 18, 2013, at 77:17–24, 81:20–82:8.

ascertainable, and quantifiable benefit commensurate with the full amount of the value transferred by being relieved of its obligations to make the $109.6 million payment in the event ResCap and its subsidiaries did not make the payment; (3) there is authority to suggest that a co-obligor under a settlement agreement is an "entity for whose benefit" a payment under that settlement agreement is made; (4) whether or not AFI was liable to make the payment, AFI received a benefit from GMAC Mortgage's transfer of the $109.6 million by obtaining a release from certain claims and remedies assertable by the DOJ and the state AGs; and (5) an entity for whose benefit an avoidable transfer was made would be jointly and severally liable with the recipient of an avoided transfer in a recovery action under section 550 of the Bankruptcy Code, the Examiner concludes it is likely that a preference claim under section 550 of the Bankruptcy Code against AFI for $109.6 million would prevail.

### (iv) Effect Of The March 14 Earmark Agreement And AFI's $196.5 Million Debt Forgiveness

If faced with the argument that all or a portion of the $109.6 million payment is recoverable against it under section 550, AFI would likely argue that the March 14 Earmark Agreement, clarifying the January 30 Letter Agreement, invokes the protection of the "earmarking doctrine" and would prevent AFI from being held responsible for this transfer. If the earmarking doctrine does apply, the funds transferred by GMAC Mortgage were never part of GMAC Mortgage's assets and therefore do not meet the threshold requirements of section 547 of the Bankruptcy Code.[554] The earmarking doctrine is a judicially-crafted doctrine that focuses on the requirement that a preferential transfer must be a transfer "of an interest of the debtor in property" and recognizes that, "where a third party lends money to the debtor for the specific purposes of paying a selected creditor," no transfer of the debtor's property has occurred because such transferred funds were "earmarked."[555]

Pursuant to the terms of the January 30 Letter Agreement, AFI agreed to forgive $196.5 million of indebtedness under the A&R Line of Credit Agreement, under which RFC and GMAC Mortgage were borrowers and ResCap and certain other affiliates were guarantors. As explained in Section V.E, the A&R Line of Credit Agreement was entered into on December 30, 2009 by amending, restating, and consolidating the Initial Line of Credit Agreement and the Second Line of Credit Agreement. These secured revolver facilities were designed to provide ResCap and its subsidiaries with additional liquidity.

---

[554] *See, e.g.*, *Chase Manhattan Mort. Corp. v. Shapiro* (*In re Lee*), 530 F.3d 458, 468 (6th Cir. 2008) ("The earmarking doctrine, then, is a judicially-created defense that may be invoked by a defendant to a preference action in an attempt to negate § 547(b)'s threshold requirement—a transfer of an interest of the debtor in property.").

[555] *See, e.g*, *Cadle Co. v. Mangan* (*In re Flanagan*), 503 F. 3d 171, 184 (2d Cir. 2007).

On January 30, 2012, AFI forgave the $196.5 million of indebtedness as set forth in the January 30 Letter Agreement.[556] ResCap then allocated $124.2 million of this forgiveness to GMAC Mortgage and the remaining $72.3 million of forgiveness to RFC.[557] GMAC Mortgage then took advantage of this additional availability under the A&R Line of Credit Agreement to borrow $112 million, of which $109.6 million was paid to the government on March 14, 2012.[558]

The March 14 Earmark Agreement provides that ResCap "reaffirms and agrees" that: (1) the debt forgiveness provided by AFI was to allow ResCap to make the $109.6 million hard dollar payment; (2) without the debt forgiveness provided by AFI, ResCap would be unable to make the $109.6 million hard dollar payment; (3) $109.6 million of the liquidity provided by the $196.4 million debt forgiveness will be used solely to fund the $109.6 million hard dollar payment; and (4) AFI's provision of capital support and ResCap's use of that capital support "viewed as a whole, does not result in any additional debt obligations or other diminution of ResCap."[559]

In the classic earmarking case, a third party makes a loan to a debtor specifically to enable that debtor to satisfy the claim of a designated creditor. As Collier's notes:

> Under the "earmarking doctrine," funds provided to a debtor for the purpose of paying a specific indebtedness may not be recoverable as a preference from the creditor to which they are paid, on the premise that the property "transferred" in such a situation was never property of the debtor and so the transfer did not disadvantage other creditors. One creditor has been substituted for another; Thus when new funds are provided by the new creditor to or for the benefit of the debtor for the purpose of paying the obligation owed to the older creditor, the funds are said to be "earmarked" and the payment is held not to be a voidable preference.[560]

To determine if the earmarking doctrine should apply, courts have developed a three-part test which examines: (1) whether there is an agreement between the new lender and the debtor

---

556  *See* GMAC Mortgage, LLC Consolidated Financial Statements for the Years Ended December 31, 2011 and 2010 (Mar. 28, 2012), at 11, 69 [RC00032177] (stating that on January 30, 2012 GMAC Mortgage "recognized a capital contribution . . . of $124.2 million, and a corresponding reduction in borrowings under the [A&R Line of Credit Agreement]"); Residential Funding Company, LLC Consolidated Financial Statements for the Years Ended December 31, 2011 and 2010 (Mar. 28, 2012), at 11, 61 [RC00032246] (stating that on January 30, 2012, RFC "recognized a capital contribution . . . of $72.3 million, and a corresponding reduction in our borrowings under the [A&R Line of Credit Agreement]").

557  Memorandum, Significant Transaction Memo: General Information and Transaction Description Re Mortgage Fine, Waivers and Debt Forgiveness, dated Feb. 2012, at EXAM00220160 [EXAM00220147].

558  *See* ResCap Daily Liquidity Rollforward, dated Mar. 14, 2012 [EXAM00010050].

559  March 14 Earmark Agreement, ¶ 1–4.

560  5 COLLIER ON BANKRUPTCY, ¶ 547.03[2][a] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.).

that the new funds will be used to pay a specified antecedent debt; (2) whether that agreement was performed according to its terms; and (3) whether the transaction viewed as a whole (including the transfer in of the new funds and the transfer out to the old creditor) does not result in any diminution of the estate.[561] Notably, "the doctrine will only protect a transfer from avoidance to the extent it did not diminish the debtor's estate."[562] "[W]here a debtor replaces an unsecured obligation with a secured obligation, the payment is voidable to the extent of the collateral transferred by the debtor."[563] In other words, where a debtor offers its own property as collateral for the loan that is allegedly subject to the earmarking doctrine, the debtor has "transferred an interest in its property and therefore the earmarking defense is not available."[564]

The Examiner concludes that the transaction described above does not satisfy the requirements for invoking the earmarking doctrine in favor of AFI. GMAC Mortgage paid an unsecured obligation owed to the government by drawing down $112 million on its pre-existing secured loan agreement, $109.6 million of which was then used to pay the fine.[565] This draw was made under the A&R Line of Credit Agreement and accompanying A&R Line of Credit Security Agreement, which granted a lien in favor of AFI over specified collateral to the extent that any obligations under the A&R Line of Credit Agreement remain outstanding.[566] The obligations, including the obligations arising from this draw, were secured by the liens on GMAC Mortgage's assets granted under the A&R Line of Credit Security Agreement.[567] As discussed in Section VI.F.1, the collateral securing the A&R Line of Credit Facility was worth more than the outstanding amount of that obligation, i.e., the facility was oversecured. Given that GMAC Mortgage therefore exchanged an unsecured obligation for a secured obligation, the Examiner concludes that the evidence does not support the proposition that the earmarking doctrine would apply to this transaction.

### *(v)  Limitation On Recovery To The Value Received By AFI*

AFI may seek to limit its liability for the full $109.6 million based on the argument that it was not jointly and severally obligated on the DOJ/AG Consent Judgment and/or that it did

---

[561]  *See, e.g*, *Cadle Co. v. Mangan* (*In re Flanagan*), 503 F. 3d 171, 184–85 (2d Cir. 2007) (citing *McCuskey v. Nat'l Bank of Waterloo* (*In re Bohlen Enters.*)*,* 859 F.2d 561, 566 (8th Cir. 1988)).

[562]  *In re Flanagan*, 503 F. 3d at 185 (citing *Glinka v. Bank of Vt.* (*In re Kelton Motors, Inc.*), 97 F.3d 22, 28 (2d Cir. 1996)).

[563]  *In re Flanagan*, 503 F. 3d 185–86 (citing *In re Kelton Motors, Inc.*, 97 F.3d at 28).

[564]  *In re Kelton Motors, Inc.*, 97 F.3d at 29.

[565]  The total amount that GMAC Mortgage drew down was actually $112 million, which draw occurred on March 14, 2012 (the same day of the payment to the government) and was tied to the payment of the hard dollar fine under the DOJ/AG Consent Judgment. *See* ResCap Daily Liquidity Rollforward, dated Mar. 14, 2012 [EXAM00010050].

[566]  A&R Line of Credit Security Agreement, ¶ 2 [EXAM00110733].

[567]  At the time of this draw, it is clear that the A&R Line of Credit Agreement was oversecured. *See* A&R Line of Credit Agreement Monthly Borrowing Base Report for the Reporting Period Ending on Mar, 31, 2012, dated Apr. 16, 2012 [EXAM00221830].

not receive the entire benefit from the payment in question. This argument would likely rest on: (1) an assertion that the terms of the DOJ/AG Consent Judgment and its accompanying exhibits were unclear and therefore do not make AFI liable for the hard dollar payment; (2) the agreement by ResCap and its subsidiaries to make the payment; and (3) the fact that some courts have held that transfer beneficiary liability "should be limited to the value of the benefit actually received" by such entity.[568]

The Examiner has concluded that the evidence supports the proposition that AFI was jointly liable to the government for the $109,628,425 hard dollar payment. Even if this conclusion is incorrect, there is a body of case law holding that section 550(a)(1) of the Bankruptcy Code permits an avoided transfer to be recovered from either the initial transferee or the entity for whose benefit such transfer was made and that such liability is "coextensive."[569] The Examiner therefore concludes it is unlikely that an effort by AFI to limit the amount of its liability for this transfer would prevail.

### (vi) Other Possible Defenses

AFI may assert that one or more of the affirmative defenses found in section 547(c) should apply to prevent avoidance and recovery. The Examiner concludes it is unlikely that the ordinary course defense of section 547(c)(2) would be applicable here because the payment on account of the DOJ/AG Settlement was a one-time transaction and was incurred and paid under extraordinary circumstances.[570]

AFI may argue that this transfer should be protected by the new value defenses contained in section 547(c)(1) because the transfer of the $109.6 million payment provided GMAC Mortgage with a release from its obligations under the DOJ/AG Consent Judgment. This argument has been rejected by courts on the basis that "settlement agreements which require

---

[568] *Terry v. Meredith* (*In re Stephen S. Meredith, CPA, P.C.*), 367 B.R. 558, 562 (E.D. Va. 2007).

[569] *Official Comm. of Unsecured Creditors of 360networks* (*USA*) *Inc. v. U.S. Relocation Servs., Inc.* (*In re 360networks* (*USA*) *Inc*.), 338 B.R. 194, 207 (Bankr. S.D.N.Y. 2005) ("[Section 550] provides that a transfer that is avoided under § 547 can be recovered from either the initial transferee or the entity 'for whose benefit such transfer was made.' The liability of these two parties is coextensive."); *see also* Section VII.F.8.

[570] *See Official Comm. of Unsecured Creditors of Enron Corp. v. Martin* (*In re Enron Creditors Recovery Corp.*), 376 B.R. 442, 462 (Bankr. S.D.N.Y. 2007) ("[F]or a 'first time' transfer to qualify for application of the defense [in 11 U.S.C. § 547(c)(2)], it should be of a type that could have been a 'recurring, customary trade transaction had the parties continued their business relationship—not a single isolated transaction that would never have been repeated in any case."); *Durant's Rental Ctr., Inc. v. United Truck Leasing, Inc.* (*In re Durant's Rental Ctr., Inc.*), 116 B.R. 362, 365 (Bankr. D. Conn. 1990) (finding that the parties' settlement "was a one time, non-recurring transaction outside of the ordinary course of their business" because 11 U.S.C. § 547(c)(2) is not meant to protect "one time payments in settlement of contractual claims"); *Intercontinental Publ'ns, Inc. v. Perry* (*In re Intercontinental Publ'ns, Inc.*), 131 B.R. 544, (Bankr. D. Conn. 1991) (finding that severance and attorney's fee payment to former editor-in-chief of magazine resulting from publisher's violation of employment contract was not a "recurring" transaction within the meaning of 11 U.S.C. § 547(c)(2)).

expenditures by the debtor without tangible enhancement of the estate rarely provide new value of the sort contemplated by § 547(a)(2)."[571] Or, in the words of the Seventh Circuit:

> [A] payment is not a preference unless the debtor is insolvent and the creditor receives more than he would have otherwise received. Therefore, in a preference situation a release is likely to be worthless to other creditors. The release does not free up any assets for other creditors because the debtor could not have paid the preferred claim anyway. All the payment for the settlement and release does is deplete the debtor's estate at the other creditors' expense, frustrating Congress's intent to promote fair distribution among creditors.[572]

Given this authority, the Examiner concludes it is unlikely that a defense based on new value provided to GMAC Mortgage as a result of a release from the judgment would succeed.

Finally, the Examiner also concludes it is unlikely that an argument that AFI provided contemporaneous new value under section 547(c)(1) by forgiving a portion of GMAC Mortgage's indebtedness under the A&R Line of Credit Agreement on January 30, 2012 would prevail. Even if the debt forgiveness is assumed to be contemporaneous (a matter that is not self-evident), GMAC Mortgage had to re-borrow the entire amount needed to pay the fine under the A&R Line of Credit Agreement,[573] thereby eliminating any new value arguably provided by the January 30, 2012 debt forgiveness.[574]

AFI may also argue that it provided some form of subsequent new value to GMAC Mortgage and that the $109.6 million payment would therefore be protected by section 547(c)(1) or 547(c)(4) of the Bankruptcy Code. However, as set forth in Section VII.F.4, the last possible new value provided by AFI to GMAC Mortgage occurred on January 30, 2012, when AFI forgave $196.5 million of indebtedness under the A&R Line of Credit

---

[571] *Phx. Rest. Grp, Inc. v. Fuller, Fuller & Assocs., P.A.* (*In re Phx. Rest. Grp., Inc.*), 316 B.R. 671, 680 (Bankr. M.D. Tenn. 2004); *see also Carolyn's Kitchen, Inc. v. Cybergenics Corp.* (*In re Carolyn's Kitchen, Inc.*), 209 B.R. 204 (Bankr. N.D. Tex. 1997); *Bioplasty, Inc. v. First Trust Nat'l Ass'n* (*In re Bioplasty, Inc.*), 155 B.R. 495 (Bankr. D. Minn. 1993).

[572] *Energy Co-op., Inc. v. SOCAP Int'l, Ltd.* (*In re Energy Co-op., Inc.*), 832 F.2d 997, 1003–04 (7th Cir. 1987).

[573] The total amount that GMAC Mortgage drew down was actually $112 million, which draw occurred on March 14, 2012 (the same day of the payment to the government) and was tied to the payment of the hard dollar fine under the DOJ/AG Consent Judgment. *See* ResCap Daily Liquidity Rollforward, dated Mar. 14, 2012 [EXAM00010050].

[574] *See* GMAC Mortgage, LLC Consolidated Financial Statements for the Years Ended December 31, 2011 and 2010 (Mar. 28, 2012), at 11, 69 [RC00032177] (stating that on January 30, 2012 GMAC Mortgage "recognized a capital contribution . . . of $124.2 million, and a corresponding reduction in borrowings under the [A&R Line of Credit Agreement]"); Residential Funding Company, LLC Consolidated Financial Statements for the Years Ended December 31, 2011 and 2010 (Mar. 28, 2012), at 11, 61 [RC00032246] (stating that on January 30, 2012, RFC "recognized a capital contribution . . . of $72.3 million, and a corresponding reduction in our borrowings under the [A&R Line of Credit Agreement]").

Agreement.[575] Given that the debt forgiveness occurred fifteen days before GMAC Mortgage's payment of the $109.6 million, it does not qualify as a subsequent infusion of new value.[576]

### (c) Conclusion[577]

The Examiner concludes that it is likely that the $109.6 million payment made by GMAC Mortgage to the government on March 14, 2012 on account of the obligations under the DOJ/ AG Consent Judgment would be avoidable as a preferential transfer under section 547 and that the payment would be recoverable from AFI under section 550 as an entity for whose benefit the transfer was made.

### (2) March 2012 Payments Made To Ally Bank Pursuant To The MMLPSA And Pipeline Swap

### (a) Background

As set forth in greater detail in Section V.B, the Examiner has concluded that revenues on loans brokered by GMAC Mortgage were likely improperly allocated to Ally Bank for the period between January 1, 2009 and May 2012, when the MMLPSA and the Pipeline Swap were terminated. That allocation appears to have been in breach of GMAC Mortgage's and Ally Bank's agreement, as documented in the MMLPSA and the Pipeline Swap, that all revenues (except net carry) from the GMAC Mortgage-brokered loans would be payable to GMAC Mortgage. Section V.B sets forth in detail the facts underlying this issue and, in Section V.B, the Examiner concludes that GMAC Mortgage likely would succeed on a contractual claim that the allocation of revenues (to GMAC Mortgage) from January 1, 2009 to July 31, 2009 were proper and that GMAC Mortgage is entitled to payment of the revenues thereafter misallocated to the Bank. Accordingly, the preference issue discussed in this Section would be moot if, as the Examiner has concluded is likely, such a contractual claim by GMAC Mortgage were to prevail and would be relevant only if (contrary to the Examiner's conclusion) such a contractual claim were not to prevail.

As discussed in greater detail in Section V.B, GMAC Mortgage did in the first instance receive revenues for the period between January 1, 2009 and July 31, 2009, with Ally Bank earning only net interest carry during that period. In early 2012, Ally Bank demanded that ResCap pay to Ally Bank the funds received by GMAC Mortgage during the first half of 2009

---

[575] *See* ResCap 2011 Financial Statements, at 39 [EXAM00122651]. Only $124.2 million of this total forgiveness was allocated to GMAC Mortgage. *See* GMAC Mortgage, LLC Consolidated Financial Statements for the Years Ended December 31, 2011 and 2010 (Mar. 28, 2012), at 11, 69 [RC00032177].

[576] *See Eisenberg v. O. Censor & Co., (In re Baumgold Bros.)*, 103 B.R. 436, 439 (Bankr. S.D.N.Y. 1989) ("[A] preferential transfer may be set off only against new value advanced *after* the preference was received.").

[577] As noted in Section VII.F.3 above, because fraudulent transfer issues related to GMAC Mortgage are likely governed by Pennsylvania law and Pennsylvania (unlike Minnesota) has not adopted an Insider Preference avoidance statute, there are no alternative state law preference recovery issues that need to be analyzed regarding this transaction.

(plus interest). On March 27, 2012, at Ally Bank's demand,[578] GMAC Mortgage paid $51.4 million to Ally Bank for what the parties noted was a reimbursement of revenues and expenses that was allegedly owed to Ally Bank for the period between January 1, 2009 and July 31, 2009. At the same time, contingent on GMAC Mortgage's payment to Ally Bank, AFI forgave an equivalent amount of intercompany debt owed by GMAC Mortgage to AFI.

### (b) Analysis

The Examiner concludes that it is likely that GMAC Mortgage's $51.4 million payment to Ally Bank meets the prima facie elements of a preferential transfer: (1) it was a transfer of GMAC Mortgage's interest in property (cash) to and for the benefit of Ally Bank to satisfy amounts owed pursuant to the MMLPSA and the Pipeline Swap (antecedent debts); (2) GMAC Mortgage was insolvent at the time of the transfer; (3) the transfer was made within ninety days of the filing date of the Debtors' bankruptcy petitions; and (4) Ally Bank would have received less than the full $51.4 million under the hypothetical chapter 7 liquidation test.

### (c) Possible Defenses

Even though it is likely that GMAC Mortgage could establish a prima facie case that its March 27 payment of $51.4 million to Ally Bank was an avoidable preference, the Examiner nonetheless concludes that it is likely that Ally Bank could establish, pursuant to section 546(g) of the Bankruptcy Code, a valid safe harbor defense to avoidance of that payment.

As set forth above, section 546(g) precludes avoidance of a transfer, except pursuant to section 548(a)(1)(A) of the Bankruptcy Code, if: (1) a swap agreement exists; (2) the challenged transfer was made by, to or for the benefit of a swap or financial participant; (3) the challenged transfer was made "under" or "in connection with" the swap agreement; and (4) the transfer occurred prior to the commencement of the bankruptcy case.[579] The Examiner concludes that GMAC Mortgage's March 27, 2012 payment to Ally Bank likely meets all of these criteria.

First, the Pipeline Swap falls squarely within the definition of a "swap agreement."[580] It was documented under an International Swaps and Derivatives Association ("ISDA") Master Agreement—Multicurrency-Cross Border (1992 form) and related Schedule,[581] and was

---

[578] The ordinary course defense of section 547(c)(2) is not applicable here. Payments made as a result of unusual economic pressure or debt collection practices do not fall within the "ordinary course of business." *See, e.g.*, *Buchwald Capital Advisors, LLC v. Metl-Span I., Ltd.* (*In re Pameco Corp.*), 356 B.R. 327, 340 (Bankr. S.D.N.Y. 2006).

[579] *See* 11 U.S.C. § 546(g).

[580] *See* 11 U.S.C. § 101(53B).

[581] 2004 Pipeline Swap [ALLY_0041583]; 2004 Pipeline Swap Schedule [ALLY_0041808]. The Pipeline Swap was amended several times and eventually was documented under a 2002 ISDA Master Agreement, dated as of April 1, 2011, an Amended and Restated Schedule to the 2002 ISDA Master Agreement, dated as of April 1, 2011, and an ISDA Credit Support Annex to the Schedule to the Master Agreement, dated as of April 1, 2011. The April 2002 ISDA Master Agreement, Amended and Restated Schedule and Credit Support Annex also applied to the MSR Swap. There were separate confirmations for the Pipeline Swap and the MSR Swap.

designed to hedge the Bank from any changes in the fair market value of loans (generally because of market interest rate changes) between "rate lock" and "funding" of the loans.[582] The definition of "swap agreement" is very broad,[583] and includes "an interest rate swap, option, future, or forward agreement."[584]

Second, Ally Bank, the recipient of the transfer, is a "swap participant" because it had an outstanding swap agreement—namely the Pipeline Swap—with GMAC Mortgage prior to the Petition Date.[585]

Third, although the payment does not appear to have been made "under" the Pipeline Swap, as it was not "accomplished according to the method prescribed in the agreement itself,"[586] it nevertheless occurred "in connection with" the Pipeline Swap. As discussed more in Section V.B.5, GMAC Mortgage and Ally Bank did not account for mortgage loans sold from Ally Bank to GMAC Mortgage in strict compliance with the terms of the MMLPSA and Pipeline Swap, but the net effect was to get to the same economic result.[587] Had GMAC Mortgage and Ally Bank accounted for the transfer of funds strictly in accordance with the terms of the agreements, the amount "repaid" by GMAC Mortgage to Ally Bank in March 2012 would have been with respect to funds owing "under" the Pipeline Swap. As discussed in more detail in Section V.B.6.b, it was the combined effect of the 2008 MMLPSA and the Pipeline Swap by which GMAC Mortgage purchased loans from Ally Bank and funds relating to those loans flowed between the two parties with respect to those loans. At a minimum, therefore, the funds paid by GMAC Mortgage to the Bank were "in connection with" the Pipeline Swap.[588]

Fourth, the payment occurred on March 27, 2012, before the Petition Date. With this, all four elements of the section 546(g) defense are present, and the Examiner concludes that it is likely that Ally Bank would prevail on a defense that the entire payment is not subject to avoidance under section 547 of the Bankruptcy Code by reason of the safe harbor defense.[589]

---

[582] See Section V.B.4 for more information on the Pipeline Swap.

[583] *See Hutson v. E.I. DuPont de Nemours & Co.* (*In re Nat'l Gas Distrib., LLC*), 556 F.3d 247, 253 (4th Cir. 2009) ("With the 2005 Amendments to the Bankruptcy Code, adopted in the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, 119 Stat. 23 (2005) . . . Congress substantially expanded the protections it had given to financial derivatives participants and transactions by expanding the definition of 'swap participants' and 'swap agreements' that are exempted from the automatic stay and from trustees' avoidance powers.").

[584] 11 U.S.C. § 101(53B)(A)(i)(I).

[585] *See id.* § 101(53C).

[586] *Interbulk, Ltd v. Louis Dreyfus Corp.* (*In re Interbulk, Ltd.*), 240 B.R. 195, 202 (Bankr. S.D.N.Y. 1999).

[587] *See* Section V.B.5. Note that reaching the same economic result under the MMLPSA and Pipeline Swap requires an assumption that the Pipeline Swap is to include the period from funding to sale, and to include originated loans, as discussed in more detail in Section V.B.

[588] *See Casa de Cambio Majapara S.A. de C.V. v. Wachovia Bank, N.A.* (*In re Casa de Cambio Majapara S.V. de C.V.*), 390 B.R. 595, 598–99 (Bankr. N.D. Ill. 2008) (noting that section 546(g) only requires "that the transfer be 'under *or* in connection with any swap agreement,'" and that the court's analysis does not end simply because the payments were not "under" the swap agreement).

[589] 11 U.S.C. § 546(g).

### (d) Conclusion[590]

The Examiner concludes that is unlikely that a preferential transfer claim related to the March 2012 payments to Ally Bank Pursuant to the MMLPSA and Pipeline Swap would prevail.

### (3) May 2012, Loan Modification Reimbursement Payments

#### (a) Background

As described more fully in Section V.C, on May 10 and 11, 2012, GMAC Mortgage made multiple payments, totaling approximately $48.4 million,[591] to Ally Bank pursuant to the January 30 Letter Agreement and the terms of the A&R Servicing Agreement's AG Menu Matrix.[592] Under the A&R Servicing Agreement, GMAC Mortgage was permitted to modify certain Ally Bank loans to a greater extent than it was permitted to under the Original Servicing Agreement. However, GMAC Mortgage was required to indemnify Ally Bank for loss incurred as a result of such loan modifications to the extent such modifications exceeded those permitted under the Original Servicing Agreement.

#### (b) Analysis

The Examiner concludes that it is likely that an action to avoid the May 10 and 11, 2012 payments as preferential transfers would prevail. First, the Examiner concludes that the evidence supports the propositions that Ally Bank, for whose benefits the payments were made, was a creditor of GMAC Mortgage and that the payments were made on account of an antecedent debt. Although the A&R Servicing Agreement was not executed until after the May 10 and 11, 2012 payments were made, the Examiner concludes that GMAC Mortgage was likely nevertheless required to make the payments at issue by the terms of the January 30 Letter Agreement, which bound GMAC Mortgage to comply with the A&R Servicing Agreement.[593] Indeed, Jim Young, Chief Financial Executive for Ally Bank, specifically rejected the notion that the fact that GMAC Mortgage had not yet signed the A&R Servicing Agreement limited GMAC Mortgage's responsibility to pay, stating that "[o]nce they [(meaning GMAC Mortgage)] have performed the principal reductions in line with the [January 30 Letter Agreement], they owe [Ally Bank] the money."[594] Further, the transfers

---

[590] As noted in Section VII.F.2 above, because fraudulent transfer issues related to GMAC Mortgage are likely governed by Pennsylvania law, and Pennsylvania (unlike Minnesota) has not adopted an Insider Preference avoidance statute, there are no alternative state law preference recovery issues that need to be analyzed regarding this transaction.

[591] As noted in Exhibit V.C.1.d(4)(b)(iii)(A), GMAC Mortgage ultimately paid $96.8 million pursuant to the January 30 Letter Agreement and the A&R Servicing Agreement. Only the $48.4 million discussed here was paid prepetition and therefore is the subject of this analysis.

[592] The May 10, 2012 payment totaled $45 million and the May 11, 2012 payment totaled $3.4 million. *See* Exhibit V.C.1.d(4)(b)(iii)(A).

[593] *See* Section V.C.2.e.

[594] E-mail from J. Young to H. Benton, B. Yastine, C. Evans, D. Shevsky, and P. Murray (May 7, 2013), at EXAM20272697 [EXAM20272696] (discussing Ally Bank's right to immediate payment under the Amended Subservicing Agreement).

occurred well within the preference period, occurring only days before the Petition Date. Finally, the Examiner concludes that these payments enabled Ally Bank to receive more than it would have received under the hypothetical chapter 7 test.[595]

### (c) Possible Defenses

The Investigation has not uncovered any potential preference defenses that would apply to these payments.[596] In particular, the Examiner concludes it is likely that any argument that these payments were contemporaneous exchanges for new value would fail. These payments were not made to secure any "new value" attributable to Ally Bank's agreement to enter into the A&R Servicing Agreement on May 11, 2012, but rather were payments of a debt incurred in accordance with the January 30 Letter Agreement.[597] The evidence supports this proposition. Ally Bank's invoices for these payments stated that the payments related to "loan modification activities performed by GMAC Mortgage, LLC as sub-servicer, prior to April 30, 2012 and in connection with the DOJ/State AG Settlement."[598] Barbara Yastine, the CEO of Ally Bank, stated in an e-mail to Thomas Marano that "[u]nder the terms of the [January 30 Letter Agreement], ResCap committed to reimbursing [Ally] Bank for DOJ modifications as a condition to doing such modifications . . . ."[599] She further expressly stated the payments were not related to the A&R Servicing Agreement, noting that "tying reimbursement to the new servicing agreement puts ResCap in breach of the January 30 [Letter] Agreement."[600] Marano replied to Yastine in a letter on May 9, 2012: "[Ally] Bank authorized the use of its portfolio for modifications . . . . This was done . . . on the condition that [Ally] Bank would be reimbursed for its losses consistent with the language in the [January 30 Letter Agreement] . . . ."[601] Finally, the parties expressly set out their understanding in a May 11, 2012 agreement, which specified that "[t]he parties acknowledge

---

[595] E-mail from H. Benton to J. Young, B. Yastine et al. (May 7, 2012), at EXAM20272697 [EXAM20272696] (stating that he spoke to Ray Schrock and that Ray indicated "[b]etter to have the money and fight over a preference than have an unsecured claim").

[596] As noted above, the last possible subsequent new value provided by AFI to GMAC Mortgage occurred on January 30, 2012 when it forgave indebtedness under the A&R Line of Credit Agreement. Given that this debt forgiveness occurred over two months before GMAC Mortgage's payment to Ally Bank, it does not qualify as subsequent new value. *See, e.g.*, *Eisenberg v. O. Censor & Co., Inc.* (*In re Baumgold Bros., Inc.*), 103 B.R. 436, 439 (Bankr. S.D.N.Y. 1989) ("[A] preferential transfer may be set off only against new value advanced *after* the preference was received."). Furthermore, the ordinary course defense of section 547(c)(2) is not applicable here. Payments made as a result of unusual economic pressure or debt collection practices do not fall within the "ordinary course of business." *See, e.g.*, *Buchwald Capital Advisors, LLC v. Metl-Span I., Ltd.* (*In re Pameco Corp.*), 356 B.R. 327, 340 (Bankr. S.D.N.Y. 2006). As fully set forth in Section V.C.2.e, such pressure occurred here.

[597] *See* Section V.C.2.e.

[598] *See* Invoice from Ally Bank to ResCap (May 9, 2012) [ALLY_0196290]; Invoice from Ally Bank to ResCap (May 10, 2012) [ALLY_0196308]; *see also* E-mail from J. Pensabene (May 9, 2012) [ALLY_0196286] ("The money will be transferred first thing tomorrow.").

[599] E-Mail from B. Yastine to T. Marano (May 8, 2012), at ALLY_0182249 [ALLY_0182247].

[600] *Id.*

[601] Letter from T. Marano to B. Yastine (May 9, 2012), at EXAM20208564 [EXAM20208564].

that [the loan modifications performed] are conditioned on full reimbursement to Ally Bank of all losses in accordance with the [January 30 Letter Agreement]."[602] The parties did not intend for these payments to be contemporaneous exchanges for any value attributable to Ally Bank's entry into the A&R Servicing Agreement on May 11, 2012.

Nor did Ally Bank provide contemporaneous new value to GMAC Mortgage by permitting GMAC Mortgage to modify Ally Bank's loans in order to comply with the DOJ/AG Settlement. While GMAC Mortgage may have received value from its ability to modify Ally Bank's loans through compliance with the government settlements (and, as noted above, new value provided under section 547(c)(1) does not need to come from the transferor), there is simply no evidence that the value GMAC Mortgage received was contemporaneous with the payments made on May 10 and 11. In fact, the evidence indicates that Ally Bank believed these payments were on behalf of value that Ally Bank had *already* provided to GMAC Mortgage.[603] As the Seventh Circuit has explained:

> To insist that "new value" be "new" is not reading an additional requirement into the statutory definition. . . . Congress intended the definition of "new value" to codify the principle of consideration from contract law. That familiar principle requires "consideration" to be something that the promisor is not already obliged to give to the promisee (that is, something additional or new); the "[p]erformance of a legal duty owed to a promisor . . . is not consideration."[604]

The continued compliance by Ally Bank with its obligation to permit GMAC Mortgage to modify its loan portfolio in exchange for reimbursement in accordance with the parties' January 30 agreement is not new value. Payments made by GMAC Mortgage for debts owed under the parties' agreement would be on account of antecedent debts and would therefore by

---

[602] Agreement for AG Settlement Loan Modifications For April 2012, dated May 11, 2012 [ALLY_PEO_0087335].

[603] *See* E-mail from B. Yastine to T. Marano (May 8, 2012), at ALLY_0182249 [ALLY_0182247]; Invoice from Ally Bank to ResCap (May 9, 2012) [ALLY_0196290] (stating that the invoices were for "loan modification activities performed by GMAC Mortgage, LLC as sub-servicer, prior to April 30, 2012 and in connection with the DOJ/State AG Settlement"); Invoice from Ally Bank to ResCap (May 10, 2012) [ALLY_0196308] (same).

[604] *Gouveia v. RDI Grp.* (*In re Globe Bldg. Materials, Inc.*), 484 F.3d 946, 949 (7th Cir. 2007) (citing *In re Spada,* 903 F.2d 971, 976 (3d Cir. 1990); RESTATEMENT (SECOND) OF CONTRACTS § 73). *Globe Building* was distinguished by *Ames Merchandising Corp. v. Revere Mills Inc.* (*In re Ames Department Stores, Inc.*) on the grounds that its holding would not apply to contracts where the provision of goods came simultaneously with or shortly after payments were wired by allegedly preferential transferee. No. 01-42217, 2010 WL 2403104 (Bankr. S.D.N.Y. June 10, 2010). This distinction is not applicable here, where the alleged value was provided by Ally Bank on January 30 and payments were not made until May.

definition not be contemporaneous exchanges for new value.[605] Given all of these facts, the Examiner concludes it is unlikely that the payments totaling $48.4 million made by GMAC Mortgage to Ally Bank would be protected under the contemporaneous exchange for new value defense.

### (d) Conclusion

Based on the above analysis, the Examiner concludes it is likely that a claim under Bankruptcy Code section 547 challenging GMAC Mortgage's May 2012 payments to Ally Bank pursuant to the January 30 Letter Agreement and the terms of the A&R Servicing Agreement's AG Menu Matrix in the amount of approximately $48.4 million would prevail.

### 6. Fraudulent Transfers

Transfers made or obligations incurred by a debtor may be avoided if the transfer or incurrence was either actually or constructively fraudulent. Actual fraudulent transfer claims require a showing that the transferor made the transfer with the actual intent to hinder, delay, or defraud its creditors. In contrast, constructive fraudulent transfer claims do not require proof of actual fraudulent intent, but rather a showing that: (1) the transferor did not receive reasonably equivalent value for the transfer; and (2) at the time of the transfer the transferor was suffering from one or more statutorily-defined forms of financial distress. Section VI contains both a detailed discussion of the tests for financial distress under the relevant statutes, as well as the Examiner's specific conclusions as to periods during which ResCap and its principal subsidiaries were and remained financially distressed within the meaning of each of those statutory tests. In a bankruptcy case, fraudulent transfer claims may be brought under both section 548 of the Bankruptcy Code, which codifies federal fraudulent conveyance law, and section 544 of the Bankruptcy Code, which enables a representative of a debtor's estate to invoke state fraudulent transfer laws.

### a. Actual Fraudulent Transfers

#### (1) Section 548(a)(1)(A): Intentional Fraudulent Transfers Under Federal Law

The Bankruptcy Code recognizes a federal cause of action based on intentional or actual fraud. Section 548(a)(1)(A) provides that a debtor's transfer of an interest in its property or the incurrence of an obligation, within two years before the date of its bankruptcy petition, may be avoided if the debtor "made such transfer or incurred such obligation with actual intent to

---

[605] "A payment made on account of an antecedent debt is not a contemporaneous exchange." *Buchwald Capital Advisors LLC v. Metl-Span I., Ltd.* (*In re Pameco Corp.*), 356 B.R. 327, 338 (Bankr. S.D.N.Y. 2006) (citing *In re 360networks* (*USA*) *Inc.*, 338 B.R. 194, 206 (Bankr. S.D.N.Y. 2005); *Sapir v. Keener Lumber Co., Inc.* (*In re Ajayem Lumber Corp.*), 143 B.R. 347, 352 (Bankr. S.D.N.Y. 1992); *In re Alpex Computer Corp.*, 60 B.R. 315, 319 (Bankr. D. Colo. 1986)).

hinder, delay or defraud" its creditors.[606] Because these elements are disjunctive, a finding of any one of the proscribed states of intent would satisfy the statutory requirement. Furthermore, the impermissible intent need not be directed towards any specific creditor; a general intent directed at the debtor's present or future creditors is sufficient.[607] There is no requirement that the trustee prove insolvency, either before or after the challenged transaction, in order to avoid a transaction as an intentional fraudulent transfer.

Although it is generally the intent of the debtor-transferor (and not that of the transferee) that is relevant in assessing actual fraudulent intent,[608] the intent of the transferee can be imputed to the debtor where—as here with AFI and ResCap—the transferee is an insider of the debtor or otherwise "is in a position to control the disposition of property of the debtor."[609]

---

[606] 11 U.S.C. § 548(a)(1)(A). Section 548(a)(1)(A) reads, in relevant part, as follows:

(a)(1) The trustee may avoid any transfer (including any transfer to or for the benefit of an insider under an employment contract) of an interest of the debtor in property, or any obligation (including any obligation to or for the benefit of an insider under an employment contract) incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

(A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted . . . .

[607] *See, e.g., Bayou Accredited Fund, LLC v. Redwood Growth Partners, L.P.* (*In re Bayou Grp., LLC*), 396 B.R. 810, 826 (Bankr. S.D.N.Y. 2008) ("[A] plaintiff need not prove that the debtor intended to hinder, delay or defraud the transferee or any other particular creditor."), *rev'd on other grounds*, 439 B.R. 284 (S.D.N.Y. 2010).

[608] *See, e.g., Lippe v Bairnco Corp.*, 249 F. Supp. 2d 357, 374 (S.D.N.Y. 2003) (analyzing actual fraudulent intent under New York's Debtor and Creditor Law, which contains "hinder, delay, or defraud" language similar to that in section 548(a)(1)(A) of the Bankruptcy Code); *Silverman v. Actrade Capital, Inc.* (*In re Actrade Fin. Techs. Ltd.*), 337 B.R. 791, 808 (Bankr. S.D.N.Y. 2005) ("Cases under § 548(a)(1)(A) indicate that it is the intent of the transferor and not the transferee that is relevant for purposes of pleading a claim for intentional fraudulent conveyance under the Bankruptcy Code.") (citations omitted); *Gredd v. Bear Stearns Sec. Corp.* (*In re Manhattan Inv. Fund Ltd.*), 310 B.R. 500, 505 (Bankr. S.D.N.Y. 2002) ("The operative requirement for a transfer to be avoided under this section is the *debtor's* actual fraudulent intent."); *Picard v. Estate of Stanley Chais* (*In re Bernard L. Madoff Inv. Sec. LLC*), 445 B.R. 206, 220 (Bankr. S.D.N.Y. 2011) (noting that, to adequately plead an actual fraud claim, the complaint must state with particularity the factual circumstances constituting fraud under Federal Rule of Civil Procedure 9(b) and that "[u]nder the [Bankruptcy Code], the trustee must show such intent on the part of the debtor-transferor." (citing *Andrew Velez Constr., Inc. v. Consol. Edison Co. of N.Y., Inc.* (*In re Andrew Velez Constr., Inc.*), 373 B.R. 262, 269 (Bankr. S.D.N.Y. 2007)); 5 COLLIER ON BANKRUPTCY ¶ 548.04 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.) ("Section 548(a)(1)(A) does not contain any reference to the state of mind or knowledge of the transferee. The only inquiry concerning actual intent that matters is that of the debtor: whether the debtor causing the transfer or incurring the obligation intended to hinder, delay or defraud its creditor. As a result, 'for the purposes of avoidance pursuant to § 548 the transferee's good faith or lack of it does not matter.'") (footnotes omitted).

[609] *In re Andrew Velez Constr., Inc.*, 373 B.R. at 269–70 (noting that "imputation of the transferee's intent to the transferor [is] justified . . . where the person or entity exercising control over the disposition of the debtor's property stands in a position to do so by reason of a relationship of ownership, executive office or other insider role") (citing *Jackson v. Mishkin* (*In re Adler, Coleman Clearing Corp.*), 263 B.R. 406, 447–49 (S.D.N.Y. 2001)); *Krol v. Wilcek* (*In re H. King & Assocs.*), 295 B.R. 246, 283 (Bankr. N.D. Ill. 2003) ("Where the transferee is an insider of the debtor and is in a position to control the disposition of property of the debtor, the transferee's intent is imputed to the debtor.").

Generally, an intentional fraudulent transfer requires that the transferor engage in some form of wrongdoing that is related to the transfer or obligation that the trustee seeks to avoid.[610] But the bad conduct need not rise to the level of tortious fraud to be avoidable as an actual fraudulent transfer.[611] For example, "a general scheme or plan to strip the debtor of its assets that does not have the primary purpose of defrauding creditors has been held to support a finding of fraudulent intent."[612]

When dealing with a corporate debtor, courts will examine the knowledge and intent of the debtor's directors, officers, and other agents.[613] This "fundamental principal of agency" dictates "that the misconduct of [agents] within the scope of their employment will normally be imputed to the corporation."[614] In situations involving fraud, courts impute the fraud of an officer to a corporation when the officer commits the fraud: (1) in the course of his employment; and (2) for the benefit of the corporation.[615]

---

[610] *See*, *e.g.*, *In re Actrade Fin. Techs., Ltd.*, 337 B.R. at 809 (noting that intentional fraudulent conveyance claims are concerned with situations "where there is a knowing intent on the part of the defendant to damage creditors" and that "although [*In re Sharp Int'l Corp.*] only directly addressed pleading under [New York's Debtor and Creditor Law], there is no reason why its reasoning" that the fraud must be related to the transaction that the trustee seeks to avoid "should not be applicable to claims of intentional fraudulent conveyance under the Bankruptcy Code as well") (citing *Sharp Int'l Corp. v. State St. Bank & Trust Co.* (*In re Sharp Int'l Corp.*), 403 F.3d 43, 56 (2d Cir. 2005). "However, the intentional fraudulent conveyance claims fails for the independent reason that Sharp inadequately alleges fraud with respect to the transaction that Sharp seeks to void, *i.e.*, Sharp's $12.25 million payment to State Street." *In re Sharp Int'l Corp.*, 403 F.3d at 56.

[611] *Plotkin v. Pomona Valley Imps.* (*In re Cohen*), 199 B.R. 709, 716 (B.A.P. 9th Cir. 1996) (noting, with respect to actual fraudulent transfers under the Bankruptcy Code and the UFTA, that "[f]raud, in the sense of morally culpable conduct, need not be present in either category of fraudulent transfer. An actually fraudulent transfer could, in principle, occur without genuine fraud."); *Christian Bros. High Sch. Endowment v. Bayou No Leverage Fund* (*In re Bayou Grp., LLC*), 439 B.R. 284, 304–05 (S.D.N.Y. 2010) (evaluating actual fraudulent transfer claims asserted under the Bankruptcy Code).

[612] *Adelphia Commc'ns Corp. v. Bank of Am., N.A.*, (*In re Adelphia Commc'ns Corp.*), 365 B.R. 24, 35 (Bankr. S.D.N.Y. 2007) (citing *Wieboldt Stores, Inc. v. Schottenstein*, 94 B.R. 488, 504 (N.D. Ill. 1988)); *see Responsible Pers. of Musicland Holding Corp. v. Best Buy Co.* (*In re Musicland Holding Corp.*), 398 B.R. 761, 774 (Bankr. S.D.N.Y. 2008) ("A strong inference of fraudulent intent 'may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.'") (citing *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994)).

[613] *Baker v. Latham Sparrowbush Assocs.*, 72 F.3d 246, 255 (2d Cir. 1995) ("The knowledge of a director, officer, sole shareholder or controlling person of a corporation is imputable to that corporation.") (citations omitted) (internal quotation marks omitted).

[614] *Bankr. Servs., Inc. v. Ernst & Young* (*In re CBI Holding Co.*), 529 F.3d 432, 448 (2d Cir. 2008) (also noting that this tenet is "based on the presumption that an agent will normally discharge his duty to disclose to his principal all the material facts coming to his knowledge with reference to the subject of his agency and thus any misconduct engaged in by a manager is with—at least—his corporation's tacit consent.") (citations omitted).

[615] *See, e.g.*, *McNamara v. PFS* (*In re Pers. & Bus. Ins. Agency*), 334 F.3d 239, 242–43 (3d Cir. 2003) (citations omitted).

Actual intent is a difficult element to prove[616] because evidence of a transferor's state of mind is often difficult to unearth.[617] Therefore, to assist in determining whether actual intent exists, courts examine "the circumstances surrounding the transfer"[618] to look for common indicia or "badges of fraud,"[619] including:

- The lack, or inadequacy, of consideration;

- A close relationship between the parties;[620]

- The retention of possession, benefit, or use of the property in question;

- The financial condition of the party that made the transfer or obligation both before and after the transaction in question;

- The existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency, or threat of suits by creditors; and

- The general chronology of the events and transactions under inquiry.[621]

---

[616] The plaintiff has the burden of showing that the transfer was made with actual fraudulent intent, and must do so under the clear and convincing standard. *See Mendelsohn v. Jacobwitz* (*In re Jacobs*), 394 B.R. 646, 661 (Bankr. E.D.N.Y. 2008).

[617] "Persons whose intention it is to shield their assets from creditor attack while continuing to derive the equitable benefit of those assets rarely announce their purpose. Instead, if their intention is to be known, it must be gleaned from inferences drawn from a course of conduct." *Sacklow v. Vecchione* (*In re Vecchione*), 407 F. Supp. 609, 615 (E.D.N.Y. 1982) (citing *In re Saphire*, 139 F.2d 34, 35 (2d Cir. 1943)).

[618] *Brown v. Third Nat'l Bank* (*In re Sherman*), 67 F.3d 1348, 1353 (8th Cir. 1995) ("Because proof of actual intent to hinder, delay or defraud creditors may rarely be established by direct evidence, courts infer fraudulent intent from the circumstances surrounding the transfer.") (citations omitted).

[619] *Id.*; *Roeder v. Lockwood* (*In re Lockwood Auto Grp., Inc.*), 450 B.R. 557, 571 (Bankr. W.D. Pa. 2011) ("The use of badges of fraud in this regard is done in recognition of the fact that it is often difficult to adduce direct evidence of fraud. The theory is that badges of fraud represent circumstances that so frequently accompany fraudulent transfers that their very presence may give rise to an inference of intent.") (citations omitted).

[620] *Kipperman v. Onex Corp.*, 411 B.R. 805, 854–59 (N.D. Ga. 2009).

[621] *Le Café Créme, Ltd. v. Roux* (*In re Le Café Créme, Ltd.*), 244 B.R. 221, 239 (Bankr. S.D.N.Y. 2000) (citing *Salomon v. Kaiser* (*In re Kaiser*), 722 F.2d 1574, 1582 (2d Cir. 1983)); *see also Kelly v. Armstrong*, 206 F.3d 794, 798 (8th Cir. 2000) (noting badges of fraud may also include: "(1) actual or threatened litigation against the debtor; (2) a transfer of all or substantially all of the debtor's property; (3) insolvency on the part of the debtor; (4) a special relationship between the debtor and the transferee; and (5) retention of the property by the debtor after the transfer") (citations omitted) (internal quotation marks omitted); *Lippe v. Bairnco Corp.*, 249 F. Supp. 2d 357, 374–75 (S.D.N.Y. 2003); *Pereira v. Grecogas Ltd.* (*In re Saba Enters., Inc.*), 421 B.R. 626, 643 (Bankr. S.D.N.Y. 2009) (listing, among the badges of fraud, "secrecy, haste, or unusualness of the transaction"). The "badges" apply to proving both intent to defraud, as well as intent to hinder or delay. *See, e.g.*, *Adamson v. Bernier* (*In re Bernier*), 282 B.R. 773, 781–82 (Bankr. D. Del. 2002).

A trustee does not need to show all of these badges of fraud to prove fraudulent intent, though the presence of a single badge is generally not sufficient.[622] The presence of multiple badges may constitute "conclusive evidence of an actual intent to defraud"[623] and, depending on the context of the alleged fraudulent conduct, certain badges of fraud will carry more weight.[624] Courts have also held that a legitimate business purpose can negate an inference of actual fraudulent intent caused by the presence of several badges of fraud and other indicia.[625]

### (2) Intentional Fraudulent Transfers Under The UFTA

In addition to federal law causes of action under section 548(a)(1)(A) of the Bankruptcy Code, an estate representative may also use Bankruptcy Code section 544(b) to pursue claims of intentional fraudulent transfer arising under applicable state law. As noted in Section VII.F.3, the potential jurisdictions with interests in the transactions reviewed by the Examiner include Delaware, Pennsylvania, Michigan, Minnesota, and New York.[626] Delaware, Pennsylvania, Michigan, and Minnesota have all adopted some form of the UFTA.

The UFTA provides for a cause of action based on intentional fraud "if the debtor made the transfer or incurred the obligation . . . with actual intent to hinder, delay or defraud any creditor of the debtor."[627] The UFTA explicitly states that a court determining actual intent may consider, among other factors, whether:

> (1) the transfer or obligation was to an insider; (2) the debtor
> retained possession or control of the property transferred after
> the transfer; (3) the transfer or obligation was disclosed or

---

[622] *In re Sherman*, 67 F.3d at 1354 ("The presence of a single badge of fraud is not sufficient to establish actual fraudulent intent . . . ." (citing *Max Sugarman Funeral Home, Inc. v. A.D.B. Investors*, 926 F.2d 1248, 1254–55 (1st Cir. 1991). "The presence of a single badge of fraud may spur mere suspicion; the confluence of several can constitute conclusive evidence of an actual intent to defraud, absent 'significantly clear' evidence of a legitimate supervening purpose." *Max Sugarman Funeral Home, Inc.*, 926 F.2d at 1254–55.

[623] *Picard v. Taylor* (*In re Park South Sec., LLC*), 326 B.R. 505, 518 (Bankr. S.D.N.Y. 2005) (noting that "absent 'significantly clear' evidence of a legitimate supervening purpose" the "confluence of several [badges of fraud] can constitute conclusive evidence of an actual intent to defraud" (citing *Max Sugarman Funeral Home, Inc.*, 926 F.2d at 1254–55)).

[624] *MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co.*, 910 F. Supp. 913, 934–35 (S.D.N.Y. 1995) (deciding actual fraud under New York state law and noting that "[d]epending on the context, badges of fraud will vary in significance, though the presence of multiple indicia will increase the strength of the inference").

[625] *ASARCO LLC v. Ams. Mining Corp.*, 396 B.R. 278, 391–93 (S.D. Tex. 2008) (noting that "even though Plaintiff proved that AMC had the requisite [actual fraudulent] intent, AMC may still prevail on this claim if it can prove that there was a legitimate supervening purpose for the transaction" but ultimately determining that "even though there was a legitimate business purpose for the transfer," the other aspects of the transaction had no legitimate business purpose and thus the inference of actual fraud was not rebutted (citing *Kelly*, 206 F.3d at 801; *In re Harris*, Case No. 02-05803, 2003 WL 23096966, at *2 (Bankr. D. Del. Dec. 30, 2003)).

[626] As discussed in Section VII.F.3.a above, the Examiner concludes that it is unlikely that New York law would apply to any of the transactions reviewed in this section.

[627] UFTA § 4(a)(1).

concealed; (4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit; (5) the transfer was of substantially all the debtor's assets; (6) the debtor absconded; (7) the debtor removed or concealed assets; (8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred; (9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred; (10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and (11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.[628]

The commentary to the model UFTA also states that when considering the factors set forth in section 4(b), "a court should evaluate all the relevant circumstances involving a challenged transfer or obligation. Thus the court may appropriately take into account all indicia negativing as well as those suggesting fraud."[629]

Under Pennsylvania law,[630] actual fraudulent transfer claims are extinguished unless an action is brought "within four years after the transfer was made or the obligation was incurred or, if later, within one year after the transfer or obligation was or could reasonably have been discovered by the claimant."[631] Under Minnesota law, actual fraudulent transfer claims have a six-year statute of limitations.[632] Although Minnesota's six-year statute of limitations for fraud claims runs from discovery, the applicability of the discovery rule is not relevant in this case because all of the transfers in question happened within six years before the Petition Date.

---

[628] *Id.* § 4(b).

[629] *Id.* § 4(b) cmt. 6.

[630] As discussed in Section VII.F.3.a above, the Examiner concludes that either Pennsylvania or Minnesota law would apply to the transactions reviewed in this section.

[631] 12 Pa. Cons. Stat. Ann. § 5109.

[632] *See* Minn. Stat. Ann. § 541.05(6) (noting that actions for relief on the ground of fraud shall be commenced within six years and that such an action "shall not be deemed to have accrued until the discovery by the aggrieved party of the facts constituting fraud"); *see also Georgen-Running v. Grimlie* (*In re Grimlie*), 439 B.R. 710, 720 n.25 (B.A.P. 8th Cir. 2010) (ruling, in the context of a fraudulent transfer action, that "[i]n Minnesota, cases involving fraud have a statute of limitations of six years") (citing §541.05(6)); *In re Curry*, 160 B.R. 813, 819 n.5 (Bankr. D. Minn. 1993)) (noting that fraudulent conveyance actions under Minnesota's UFTA have a statute of limitations of six years pursuant to § 541.05(6)).

### b. Constructive Fraudulent Transfers

#### (1) Section 548(a)((1)(B): Constructive Fraudulent Transfers Under Federal Law

Bankruptcy Code section 548(a)(1)(B) empowers a bankruptcy trustee to avoid a transfer[633] or obligation incurred within two years of the petition date if: (1) the debtor received less than a reasonably equivalent value in exchange for the transfer or obligation; and (2) the debtor: (a) was insolvent on the date of the transfer or obligation or became insolvent as a result of the transfer or obligation; (b) was left with unreasonably small capital to carry on its business or a contemplated transaction; or (c) intended to incur, or believed it would incur, debts beyond its ability to pay as debts matured.[634]

#### (2) Bankruptcy Code Section 544(b): Constructive Fraudulent Transfers Under UFTA

Section 544(b) of the Bankruptcy Code permits the trustee or estate representative to "step into the shoes" of an actual unsecured creditor with standing to seek the avoidance of a transfer under applicable state fraudulent transfer laws.[635] Section 544(b) functionally integrates relevant applicable state fraudulent transfer law into the Bankruptcy Code. To assert a claim under section 544(b), the trustee or estate representative must prove that: (1) there was a transfer of an interest of the debtor in property; (2) there actually exists an unsecured creditor holding an allowable claim; and (3) applicable law allows that unsecured creditor to void the transfer.

In such a case, the trustee or estate representative could invoke section 4(2) of the UFTA,[636] which provides that transfers are fraudulent as to both present and future creditors if the debtor made the transfer or incurred the obligation: (1) without receiving reasonably

---

[633] Pursuant to section 101(54) of the Bankruptcy Code, the term "transfer" means—

   A. the creation of a lien;

   B. the retention of title as a security interest;

   C. the foreclosure of a debtor's equity of redemption; or

   D. each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with—

      (i) property; or

      (ii) an interest in property.

[634] *See* 11 U.S.C. § 548(a)(1)(B). A separate test, not relevant to the Report, allows for the avoidance of transfers for less than reasonably equivalent value if the debtor made such transfer to or for the benefit of an insider under an employment contract and outside of the ordinary course of business.

[635] *See id.* § 544(b) (the ability to avoid "any transfer of an interest of the debtor in property . . . that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under [section 502 of the Bankruptcy Code].").

[636] Minnesota and Pennsylvania have largely adopted verbatim section 4 of the model UFTA. S*ee* MINN. STAT. ANN. § 513.44; 12 PA. CONS. STAT. ANN. § 5104.

equivalent value in exchange for the transfer or obligation; and (2) the debtor (a) "was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction"; or (b) "intended to incur, or believed or reasonably should have believed that" it would incur, debts beyond its ability to pay as they became due.[637] The trustee or estate representative could also invoke section 5(a) of the UFTA,[638] which provides that transfers are fraudulent as to present creditors if the debtor did not receive reasonably equivalent value in exchange for the transfer or obligation and the transfer or obligation was made or incurred while the debtor was insolvent or where the debtor became insolvent as a result of the transfer or obligation.[639]

### c. Reasonably Equivalent Value For Constructive Fraudulent Transfer Purposes

#### (1) Definitions Of Reasonably Equivalent Value

Section 548(a)(1)(B) of the Bankruptcy Code requires that the trustee prove by a preponderance of the evidence[640] that the debtor did not receive "reasonably equivalent value" in exchange for the challenged transfer or obligation. Section 548(d)(2) of the Bankruptcy Code defines "value" as "property, or satisfaction or securing of a present or antecedent debt of the debtor, but does not include an unperformed promise to furnish support to the debtor or to a relative of the debtor."[641] The Bankruptcy Code does not define when value is "reasonably equivalent," leaving such determination to the courts. In analyzing "reasonably equivalent value," courts determine "the value of the consideration exchanged between the parties at the time of the conveyance or incurrence of debt which is challenged."[642]

> In determining whether the value received by one party is so disproportionately small as to constitute a lack of fair consideration, the "court need not strive for mathematical precision" but must "keep the equitable purposes of the statute firmly in mind, recognizing that any significant disparity

---

[637] S*ee* MINN. STAT. ANN. § 513.44; 12 PA. CONS. STAT. ANN. § 5104.

[638] Minnesota and Pennsylvania have adopted section 5(a) of the model UFTA nearly verbatim. S*ee* MINN. STAT. ANN. § 513.45; 12 PA. CONS. STAT. ANN. § 5105.

[639] As explained in Section VII.F.2.c, once a transfer is voidable under section 544(b), the entire fraudulent transfer may be recovered for the benefit of all creditors, not just to the extent necessary to satisfy the individual creditor actually holding the avoidance claim.

[640] *Togut v. RBC Dain Correspondent Servs.* (*In re S.W. Bach & Co.*), 435 B.R. 866, 875 (Bankr. S.D.N.Y. 2010) (burden on movant to demonstrate the elements of a constructive fraudulent transfer claim by preponderance of evidence).

[641] 11 U.S.C. § 548(d)(2)(A).

[642] *Liquidation Trust v. Daimler AG* (*In re Old Carco LLC*), No. 11-5279-BK, 2013 WL 335993, at *1 (2d Cir. Jan. 30, 2013) (citing *In re NextWave Pers. Commc'ns, Inc.*, 200 F.3d 43, 56 (2d Cir. 1999)) (emphasis omitted) (internal quotation marks omitted) (citations omitted).

> between the value received and the obligation assumed . . . will
> have significantly harmed the innocent creditors of that
> [party]."[643]

Like the Bankruptcy Code, the UFTA recognizes a claim for a constructive fraudulent transfer when a debtor transfers assets for less than "reasonably equivalent value" at a time when it is in one or more of the states of financial distress defined in the UFTA. The concept of "reasonably equivalent value" in section 548 of the Bankruptcy Code and the UFTA are identical, and courts considering whether "reasonably equivalent value" has been provided in transactions subject to avoidance under the UFTA may look to cases decided under section 548 of the Bankruptcy Code for guidance on reasonably equivalent value issues.[644]

### (2) Determining Whether Value Was Reasonably Equivalent To What The Debtor Transferred

Whether reasonably equivalent value was received is normally a question of fact,[645] and valuation factors will turn "on the case-specific circumstances surrounding the debtor's decision to enter into the challenged transaction."[646] Courts look to, among other things:

---

[643] *In re Old Carco LLC*, 2013 WL 335993, at *1 (citing *Rubin v. Mfrs. Hanover Trust Co.*, 661 F.2d 979, 994 (2d Cir. 1981) (discussing § 67(d) of the Bankruptcy Act of 1898, predecessor to § 548 of the Bankruptcy Code)).

[644] *See*, *e.g.*, *Cardiello v. Casale* (*In re Phillips Grp., Inc.*), 382 B.R. 876, 887 (Bankr. W.D. Pa. 2008) (noting that, because the phrase "reasonably equivalent value" as used in the Pennsylvania UFTA is patterned after Bankruptcy Code section 548(a) "we may look to interpretations of the phrase as it appears in the latter to understand its use in the former"); *Chorches v. Fleet Mortg. Corp.* (*In re Fitzgerald*), 255 B.R. 807, 812 n.14 (Bankr. D. Conn. 2000) ("The UFTA . . . concept of 'reasonably equivalent value' is identical to the Section 548(a)(1)(B) concept of 'reasonably equivalent value.'") (citing *Leibowitz v. Parkway Bank & Trust Co.* (*In re Image Worldwide, Ltd.*)*,* 139 F.3d 574, 577 (7th Cir. 1998)); *Leonard v. Mylex Corp.* (*In re Northgate Computer Sys., Inc.*), 240 B.R. 328, 366–67 (Bankr. D. Minn. 1999) (noting that the Minnesota UFTA contains a nearly identical provision to the Bankruptcy Code's constructive fraudulent transfer provision and "because of the near-identity of the statutory elements and the inherently-factual nature of the primary issue, the analysis under the federal-law analog is applicable here and no further discussion is warranted").

[645] *Tex. Truck Ins. Agency, Inc. v. Cure* (*In re Dunham*), 110 F.3d 286, 288–89 (5th Cir. 1997); *Jacoway v. Anderson* (*In re Ozark Rest. Equip. Co.*), 850 F.2d 342, 344 (8th Cir. 1988); *Klein v. Tabatchnick*, 610 F.2d 1043, 1047 (2d Cir. 1979) ("Fairness of consideration is generally a question of fact.") (citations omitted); *Alberts v. HCA Inc.* (*In re Greater Se. Cmty. Hosp. Corp. I*), Bankr. No. 02-02250, 2008 WL 2037592, *8 (Bankr. D.C. May 12, 2008); *Daley v. Chang* (*In re Joy Recovery Tech. Corp.*), 286 B.R. 54, 75 (Bankr. N.D. Ill. 2002); *In re Northgate Computer Sys., Inc.*, 240 B.R. at 365. *But see In re Old Carco*, 2013 WL 335993 (concluding as a matter of law that the plaintiff in a fraudulent transfer suit failed to plausibly allege that the debtor received less than reasonably equivalent value).

[646] *Lowe v. B.R.B. Enters., Ltd.* (*In re Calvillo*), 263 B.R. 214, 220 (W.D. Tex. 2000); *see, e.g., Lindquist v. JNG Corp.* (*In re Lindell*), 334 B.R. 249, 255 (Bankr. D. Minn. 2005) ("There is no bright line rule used to determine when reasonably equivalent value is given."); *Weaver v. Kellogg*, 216 B.R. 563, 574 (S.D. Tex. 1997) (examining reasonably equivalent value under the Bankruptcy Code and Texas state law and noting that defendants do not need to prove "a dollar-for-dollar exchange in order to show" that reasonably equivalent value was received) (citing *Butler Aviation Int'l, Inc. v. Whyte* (*In re Fairchild Aircraft Corp.*), 6 F.3d 1119 (5th Cir. 1993)).

(1) whether the value of what was transferred is equal to the value of what was received; (2) the market value of what was transferred and received; (3) whether the transaction took place at arm's length; and (4) the good faith of the transferee.[647] The inquiry of whether reasonably equivalent value was received "is fundamentally one of common sense, measured against market reality."[648]

Reasonable, not exact, equivalence is all that is required.[649] In *In re Calvillo*, the bankruptcy court noted "[t]here is no set minimum percentage or monetary amount necessary" for a court to find that the debtor received reasonably equivalent value.[650] In evaluating whether reasonably equivalent value has been given to a debtor, a court must compare the benefits the debtor received as a result of the transaction against the obligations the debtor incurred in exchange.[651] Both direct and indirect benefits may be considered,[652] though generally courts will not recognize "indirect benefits" unless they are "fairly concrete."[653]

### *(a) Direct Benefits*

Section 548(d)(2)(A) of the Bankruptcy Code and section 3(a) of the UFTA both explicitly provide that the satisfaction or securing of an antecedent debt constitutes value.[654]

---

[647] *See Barber v. Golden Seed Co.*, 129 F.3d 382, 387 (7th Cir. 1997); *Mellon Bank v. Official Comm. of Unsecured Creditors of R.M.L., Inc.* (*In re R.M.L. Inc.*), 92 F.3d 139, 149 (3d Cir. 1996).

[648] *In re Northgate Computer Sys., Inc.*, 240 B.R. at 365; *accord Sullivan v. Schultz* (*In re Schultz*), 368 B.R. 832, 836 (Bankr. D. Minn. 2007) (citing *In re Northgate Computer Sys., Inc.*, 240 B.R. at 365); *In re Lindell*, 334 B.R. at 256 (same).

[649] *See In re Fairchild Aircraft Corp.*, 6 F.3d at 1125–26; *Rubin v. Mfrs. Hanover Trust Co.*, 661 F.2d 979, 994 (2d Cir. 1981); *Waste Mgmt., Inc. v. Danis Indus. Corp.*, No. 3:00cv256, 2009 WL 347773 at *21 (S.D. Ohio Feb. 10, 2009); *In re Calvillo*, 263 B.R. at 220; *MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co.*, 910 F. Supp. 913, 937 (S.D.N.Y. 1995); *Coan v. Fleet Credit Card Servs., Inc.* (*In re Guerrerra*), 225 B.R. 32, 36 (Bankr. D. Conn. 1998) ("It is not necessary that there be 'mathematical precision' or a 'penny-for-penny' exchange . . . .") (citing *Rubin,* 661 F.2d at 994); *Murphy v. Meritor Savings Bank* (*In re O'Day Corp.*), 126 B.R. 370, 393 (Bankr. D. Mass. 1991).

[650] *In re Calvillo*, 263 B.R. at 220.

[651] *Mellon Bank, N.A. v. Metro Commc'ns, Inc.*, 945 F.2d 635, 647 (3d Cir. 1991).

[652] *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 638 (2d Cir. 1995) (holding that "under the well established doctrine of *Rubin*, the fact that the consideration initially goes to third parties may be disregarded to the extent that the debtor indirectly receives a benefit from the entire transaction"); *Rubin*, 661 F.2d at 993 (decided under the Bankruptcy Act and recognizing that indirect benefits can constitute reasonably equivalent value but also noting that the lower court had failed to "quantify the indirect benefits" provided to the debtor and therefore a determination of whether fair consideration (the Bankruptcy Act's measure of value) had been provided was impossible); *see Pension Transfer Corp. v. Beneficiaries Under the Third Amendment to Fruehauf Trailer Corp. Ret. Plan No. 003* (*In re Fruehauf Trailer Corp.*), 444 F.3d 203, 212 (3d Cir. 2006); *Mellon Bank, N.A.*, 945 F.2d at 646; 5 COLLIER ON BANKRUPTCY ¶ 548.05 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.) (noting that a finding of reasonably equivalent value in such circumstances "requires the indirect benefit to be reasonably certain and quantifiable") (footnote omitted).

[653] *Silverman v. Paul's Landmark, Inc.* (*In re Nirvana Rest., Inc.*), 337 B.R. 495, 502 (Bankr. S.D.N.Y. 2006). (citing *Leibowitz v. Parkway Bank & Trust Co.* (*In re Image Worldwide Ltd.*), 139 F.3d 574, 578 (7th Cir. 1997)).

[654] 11 U.S.C. § 548(d)(2)(A); UFTA § 3(a).

Indeed, for fraudulent transfer purposes (as distinct from preferences under Bankruptcy Code section 547 and the Insider Preference statute contained in the UFTA), a debtor receives dollar-for-dollar value for the reduction of its debt, even where it is insolvent and the payment in full of one creditor could disadvantage remaining creditors,[655] provided the debt reduction equals the value of the asset transferred, and the debt reduction occurs at or about the time of the transfer.[656] In contrast, courts have consistently held that corporate dividends and the redemption of equity interests are not transfers for reasonably equivalent value or fair consideration.[657]

---

[655] *See Lisle v. John Wiley & Sons, Inc.* (*In re Wilkinson*), 196 F. App'x 337, 343 (6th Cir. 2006). In *Wilkinson*, the debtor, while insolvent, paid $1 million to a publisher on behalf of a bookstore in which the debtor owned a majority interest. *Id.* at 339. In exchange, the bookstore reduced by $1 million the debt owed to it by the debtor. *Id.* The court held that, as appropriately measured on the date of the transfer, the debtor received reasonably equivalent value for its transfer to the publisher through the dollar-for-dollar debt reduction, and that the debtor's net worth was unaffected by the transfer. *Id.* at 343.

[656] *See, e.g., Butler Aviation Int'l, Inc. v. Whyte* (*In re Fairchild Aircraft Corp.*), 6 F.3d 1119, 1126 (5th Cir. 1993); *Walker v. Sonafi Pasteur* (*In re Aphton Corp.*), 423 B.R. 76, 89 (Bankr. D. Del. 2010) (noting that "when a transfer is made to pay an antecedent debt, the transfer may not be set aside as constructively fraudulent"); *see also Pardo v. Gonzaba* (*In re APF Co.*), 308 B.R. 183, 187 (Bankr. D. Del. 2004) (dismissing constructive fraud claim, holding "the payments made on the promissory note were made for value—satisfaction of an antecedent debt"); *Sierra Invs., LLC v. SHC, Inc.* (*In re SHC, Inc.*), 329 B.R. 438, 445–46 (Bankr. D. Del. 2005); *Stalnaker v. Gratton* (*In re Rosen Auto Leasing, Inc.*), 346 B.R. 798, 805 (B.A.P. 8th Cir. 2006); *B.Z. Corp. v. Cont'l Bank, N.A.* (*In re B.Z. Corp.*), 34 B.R. 546, 548 (Bankr. E.D. Pa. 1983) ("The loan payments made [by the debtor] are not avoidable since under § 548(d)(2)(A) the payments were made for value, *i.e.*, 'the satisfaction of . . . antecedent debt . . . .'") (internal quotation marks omitted).

[657] *See, e.g., Fisher v. Hamilton* (*In re Teknek, LLC*), 343 B.R. 850, 861 (Bankr. N.D. Ill. 2006) (noting that a dividend is "not a transfer in exchange for reasonably equivalent value"); *Fid. Bond & Mortg. Co. v. Brand* (*In re Fid. Bond & Mortg. Co.*), 340 B.R. 266, 286–88 (Bankr. E.D. Pa. 2006) (holding that debtor did not receive reasonably equivalent value for a dividend after noting that "[o]ther courts have held that a dividend or reduction in capital through the purchase of stock adds no value for creditors"); *see also Brandt v. Hicks, Muse & Co.* (*In re Healthco Int'l, Inc.*), 195 B.R. 971, 980 (Bankr. D. Mass. 1996) (distributions in termination of stock interests, by their very nature, are not for consideration).

### (b) Indirect Benefits

Courts have concluded that, under certain circumstances, indirect benefits can provide reasonably equivalent value,[658] as long as the value received is reasonably equivalent to what the debtor parted with in the challenged transaction.[659] This requirement has been interpreted to mean that any indirect benefit, to constitute reasonably equivalent value, must be concrete and quantifiable.[660] The burden is on the party claiming to have delivered value to quantify such value.[661] However, there is disagreement among courts about how precise the

---

[658] *See, e.g., Mellon Bank, N.A. v. Metro Commc'ns, Inc.*, 945 F.2d 635, 647 (3d Cir. 1991) (noting that the "strong synergy" created by the affiliation of the target-debtor and its acquirer in a leveraged buyout provided value and enabled the debtor to "establish[   ] a permanent relationship with a production company with highly sophisticated equipment and an experienced and reputable production and technical staff," thus allowing for the apparent creation of "a stronger and more profitable combination."); *Mellon Bank, N.A. v. Official Comm. of Unsecured Creditors of R.M.L., Inc.* (*In re R.M.L., Inc.*), 92 F.3d 139, 149–50 (3d Cir. 1996) (recognizing that the ability to access credit may constitute an indirect benefit for purposes of the reasonably equivalent value calculus, but nevertheless finding that the debtor's purported ability to obtain credit was not reasonably equivalent to the fees paid to the lender because the anticipated future financing was so contingent on a number of improbable events that the likelihood of the debtor ever realizing the actual benefits of the financing was minimal); *Marquis Prods., Inc. v. Conquest Carpet Mills, Inc.* (*In re Marquis Prods., Inc.*), 150 B.R. 487, 491 (Bankr. D. Me. 1993) ("Indirect benefits can arise in a variety of circumstances in the parent/subsidiary context. For instance, a subsidiary which guarantees a parent's debt may benefit indirectly by securing a future sale, or by improving its public image through consummating a large transaction.").

[659] *Mellon Bank N.A.*, 945 F.2d at 646–47; *see HBE Leasing Corp. v. Frank*, 48 F.3d 623, 638–39 (2d Cir. 1995); *see Official Comm. of Unsecured Creditors of Hechinger Inv. Co. of De. Inc. v. Fleet Retail Fin. Grp.* (*In re Hechinger Inv. Co. of Del.*), 274 B.R. 71, 82 (D. Del. 2002); *Collegeville/Imagineering, L.P. v. L.J. Liff & Assocs., Ltd.* (*In re Collegeville/Imagineering, L.P.*), No. 95-1619, 1999 WL 33220041 at *7 (D. Del. 1999).

[660] *In re Wilkinson*, 196 F. App'x at 342 (noting that some courts have held that once it has been established that an indirect benefit exists, the burden of demonstrating and quantifying such benefit shifts to the defendant and that "[t]he burden of showing that the benefit is concrete and quantifiable can be challenging in a case where the alleged benefit is goodwill, corporate synergy, a business opportunity, the continuation of a business relationship, or some other intangible benefit") (citing *Fid. Bond & Mortg. Co. v. Brand* (*In re Fid. Bond & Mortg. Co.*), 340 B.R. 266, 287 (Bankr. E.D. Pa. 2006)); *Henshaw v. Field* (*In re Henshaw*), 485 B.R. 412, 422 (D. Haw. 2013) ("Although the court may determine 'value' based on both direct and indirect benefits received, the value of the benefit must be tangible and quantifiable.").

[661] *Braunstein v. Walsh* (*In re Rowanoak Corp.*), 344 F.3d 126, 131–33 (1st Cir. 2003) ("[O]nce the Trustee establishes his prima facie case, he need not affirmatively disprove every other potential theory.") (affirming bankruptcy court's finding third-party transfers fraudulent in absence of documentation of loan); *First Nat'l Bank in Anoka v. Minn. Utility Contracting, Inc.* (*In re Minn. Utility Contracting, Inc.*), 110 B.R. 414, 419 (D.Minn.1990) (holding that once a trustee has established that consideration for the transfer passed to a third party, the burden of demonstrating and quantifying reasonably equivalent value for the transfer shifts to the creditor); *Leonard v. First Commercial Mortg. Co.* (*In re Circuit Alliance, Inc.*), 228 B.R. 225, 231 (Bankr. D. Minn. 1998) (when trustee establishes transfer was made on account of third party's debt or obligation, burden shifts to defendant to demonstrate debtor received benefit that was "tangible, of concrete economic value, and reasonably equivalent to what the debtor gave up"); 5 COLLIER ON BANKRUPTCY ¶ 548.05 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.) (noting that if an indirect benefit can be quantified then "the transferee bears the burden of establishing that quantification") (footnote omitted).

defendant's quantification must be, with some courts holding that value must be quantified with "reasonable precision"[662] and with other courts noting that even intangible benefits that are "incapable of precise measurement" can confer value.[663]

### d. Transactions That Potentially Implicate Fraudulent Transfer Laws

Several of the transactions reviewed by the Examiner implicate potential constructive or actual fraudulent transfer claims. Because fraudulent transfer claims related to the Debtors' tax sharing arrangements and other tax-related issues are inextricably intertwined with the complex facts surrounding those arrangements, fraudulent transfer issues relating to those matters are not discussed in this Section but are instead presented in Section VII.K. With that exception, this Section analyzes and presents the Examiner's conclusions as to each of the fraudulent transfer claims reviewed by the Examiner.

To determine which state law would be available to challenge certain transactions, the Examiner performed the choice-of-law analysis set forth in Section VII.F.2 above. Based on that analysis, the Examiner concludes that fraudulent transfer claims brought on behalf of the estate of ResCap or RFC would likely be governed by Minnesota law, and fraudulent transfer claims brought on behalf of the estate of GMAC Mortgage would likely be governed by

---

[662] *Blixseth v. Kirschner* (*In re Yellowstone Mountain Club, LLC*), 436 B.R. 598, 666 (Bankr. D. Mont. 2010) (evaluating claims under Montana's state fraudulent transfer law and noting that the burden of proof on a defendant in a fraudulent transfer action is to show that any indirect benefits were tangible and concrete, and to quantify their value with reasonable precision) (citations omitted).

[663] *See Mellon Bank, N.A.,* 945 F.2d at 646–47; *see also In re R.M.L., Inc.*, 92 F.3d at 151 ("Significantly, the court in *Metro Communications, Inc.*, went on to discover several *potential*, intangible benefits, that, although incapable of precise measurement, conferred value on Metro despite their failure to materialize.").

Pennsylvania law. Courts in both Minnesota[664] and Pennsylvania[665] have held that each state's version of the UFTA with respect to actual and constructive fraudulent transfer claims is substantially the same as Bankruptcy Code section 548 and that the statutes should be treated as *in pari materia*. Because each of the transactions identified below occurred outside of the Bankruptcy Code's two-year look-back period,[666] the Examiner analyzes each of the transactions below under the relevant state's UFTA (made applicable through section 544(b)).

---

[664] Many cases have noted that the fraudulent transfer provisions of Minnesota's UFTA are substantially the same as the Bankruptcy Code and have ruled on Minnesota fraudulent transfer claims using the guidance from Bankruptcy Code cases. *See, e.g., Kaler v. Craig* (*In re Craig*), 144 F.3d 587, 593 (8th Cir. 1998) (outlining that Congress intended to bring federal bankruptcy law of fraudulent transfers into conformity with analogous state law); *Brown v. Third Nat'l Bank* (*In re Sherman*), 67 F.3d 1348, 1353–54 (8th Cir. 1995); *Stoebner v. Ritchie Capital Mgmt., LLC* (*In re Polaroid Corp.*), 472 B.R. 22, 55 (Bankr. D. Minn. 2012) ("The Minnesota enactment of the Uniform Fraudulent Transfer Act has a provision that is functionally identical to § 548(a)(1)(A), Minn.Stat. § 513.44(a)(1). In the Eighth Circuit, corollary provisions in the federal and state law that address intentionally-fraudulent transfers receive the same construction and application.") (citing *In re Graven*, 936 F.2d 378, 383 (8th Cir. 1991) (Uniform Fraudulent Conveyance Act and § 548(a)(1) use "the same standard")); *Stoebner*, 472 B.R. at 34 ("Whether styled under 11 U.S.C. § 548(a)(1) or under a state-law analog (here Minn. Stat. § 513.44(a)(1)) . . . ."); *Leonard v. Mylex Corp.* (*In re Northgate Computer Sys., Inc.*), 240 B.R. 328, 361 n.45 (Bankr. D. Minn. 1999) ("In recent years, the [Eighth] Circuit has given a uniform construction to the law of actually-fraudulent transfers under state statute and the Bankruptcy Code.") (citations omitted).

[665] Pennsylvanian courts have consistently held that the fraudulent transfer provisions of Pennsylvania's UFTA "mirror" those of the Bankruptcy Code and have looked to cases interpreting the Bankruptcy Code as authoritative on issues of law arising under the Pennsylvania UFTA. *See, e.g., Image Masters, Inc. v. Chase Home Fin.*, No. 10-1141, 2013 WL 878832, at *6 (E.D. Pa. Mar. 11, 2013) (analyzing case law interchangeably for claims asserted under the Bankruptcy Code and the Pennsylvania UFTA); *Bohm v. Titus* (*In re Titus*), 467 B.R. 592, 616 (Bankr. W.D. Pa. 2012) (applying other states' versions of the UFTA and the Bankruptcy Code, since all the statutes were "similarly worded to and similarly construed with" the relevant Pennsylvania UFTA provisions of 12 Pa. C.S.A. § 5104) (citations omitted); *Cardiello v. Casale* (*In re Phillips Grp., Inc.*), 382 B.R. 876, 887 (Bankr. W.D. Pa. 2008) (noting that, because the phrase "reasonably equivalent value" as used in the Pennsylvania UFTA is patterned after Bankruptcy Code section 548(a) "we may look to interpretations of the phrase as it appears in the latter to understand its use in the former"); *Bohm v. Dolata* (*In re Dolata*), 306 B.R. 97, 115 (Bankr. W.D. Pa. 2004) (noting that, to the extent the language of the statutes parallels each other, the fraudulent transfer provisions of the Bankruptcy Code and the Pennsylvania UFTA should be construed consistently with each other); *Satriale v. Key Bank USA, N.A.* (*In re Burry*), 309 B.R. 130, 134 (Bankr. E.D. Pa. 2004) (noting that the Bankruptcy Code and the Pennsylvania UFTA "mirror each other in terms of causes of action" related to both constructive and actual fraud) (footnotes omitted).

[666] 11 U.S.C. § 548(a)(1) ("The trustee may avoid any transfer . . . of an interest of the debtor in property, or any obligation . . . incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition . . . .").

### *(1) 2006 Bank Restructuring*

The Creditors' Committee asserts that there are potential constructive and intentional fraudulent transfer claims relating to the Ally Bank Transactions.[667] The Examiner has analyzed these matters and concludes it is unlikely that these fraudulent transfer claims would prevail.

As discussed in Section V.A.1.a, effective November 20, 2006, and before ResCap became financially distressed under any of the applicable statutory tests, ResCap transferred: (1) $360 million in cash and debt to IB Finance; and (2) 100% of the equity of Old GMAC Bank. In exchange, ResCap received: (1) the value of a de-linked credit rating (an indirect benefit); and (2) two million IB Finance Class M Shares. Section V.A.2.b contains the Examiner's detailed analysis and conclusion that the evidence supports the proposition that ResCap did not receive reasonably equivalent value in the 2006 Bank Restructuring.[668]

#### *(a) Actual Fraudulent Transfer Analysis*

##### *(i) Badges Of Fraud Present In The 2006 Bank Restructuring*

An actual fraudulent transfer claim relating to the 2006 Bank Restructuring would likely be governed by Minnesota's version of the UFTA, as incorporated by Bankruptcy Code section 544(b).[669] Minnesota courts often look to cases decided under the Bankruptcy Code as well as the Minnesota UFTA,[670] which sets forth a non-exclusive list of certain badges of fraud that, if present in a "confluence," can provide a rebuttable presumption of the debtor's intent to defraud.[671] The following two badges of fraud are present in the 2006 Bank Restructuring:

> (1) the transfer or obligation was to an insider; . . . [and] (8) the value of the consideration received by the debtor was not reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred.[672]

---

[667] Committee's Motion for Entry of an Order Authorizing It to Prosecute and Settle Certain Claims on Behalf of the Debtors' Estates [Docket No. 3412] at 37, ¶ 63.

[668] For a full analysis of this issue, see Section V.A.2.b.

[669] *See* Section VII.F.3.

[670] MINN. STAT. ANN. § 513.44 (a)(1). The Eighth Circuit, which includes Minnesota, has concluded that law of actual fraudulent transfers under the UFTA and the Bankruptcy Code is identical. *See Graven v. Fink* (*In re Graven*), 936 F.2d 378, 383 (8th Cir. 1991); *Kaler v. Craig* (*In re Craig*), 144 F.3d 587, 593 (8th Cir. 1998); *see also Hedback v. Am. Family Mut. Ins. Co.* (*In re Mathews*), 207 B.R. 631, 646 n.24 (D. Minn. 1997) (noting that the Eighth Circuit gives identical construction to the language "with actual intent to hinder, delay, or defraud creditors" regardless of whether it is interpreting state fraudulent transfer laws or the Bankruptcy Code) (citations omitted).

[671] *Kelly v. Armstrong*, 206 F.3d 794, 798 (8th Cir. 2000) (examining actual fraudulent transfer claims under section 548 of the Bankruptcy Code and stating that "[i]f there is a confluence of the 'badges of fraud,' then the Trustee is entitled to a presumption of fraudulent intent. To overcome a presumption, a 'legitimate supervening purpose' for the transfers must be shown by the bankrupt").

[672] MINN. STAT. ANN. § 513.44(b).

First, as shown in Section VII.F.3, AFI is an "insider" of ResCap.[673] Second, as shown in Section V.A.2.b, the Examiner has concluded that ResCap did not receive reasonably equivalent value in the 2006 Bank Restructuring.

### (ii) Evidence Suggesting An Absence Of Fraud In The 2006 Bank Restructuring

There is no bright-line rule regarding the number of badges of fraud that must be present for fraudulent intent to be found, but courts have generally held that "several" badges of fraud need to be present to raise the presumption of actual fraudulent intent.[674] The Eighth Circuit has held that once the party seeking to avoid a transfer as actually fraudulent establishes a confluence of *several* badges of fraud it is entitled to a presumption of fraudulent intent.[675]

---

[673] A transfer to an insider, without further evidence of fraud, is insufficient to find an actual fraudulent transfer occurred. For example, in the case of *Kipperman v. Onex Corp*., 411 B.R. 805, 854–59 (N.D. Ga. 2009), the district court addressed whether an actual fraudulent transfer had occurred. Plaintiff pointed to the fact that the transferee was an "affiliate" of the debtor as evidence of a badge of fraud supporting the actual fraud allegation. *Id.* at 854. The district court held that the transferee was "an 'affiliate' of and thus an 'insider' with respect to the Debtors" and that the transferee benefitted from the allegedly fraudulent transfer "in the form of management fees, an ownership interest in the Debtors, and potential tax credits." *Id*. at 854, 856. "Because the court finds that the [transfers] were made to benefit the [transferees], the court finds that the transfers were made 'for the benefit of insiders' and satisfy this badge of fraud." *Id*. However, because the plaintiffs were unable to establish any other badges of fraud, the district court granted summary judgment for the transferees on the issue of actual fraud. *Id*. at 854–59.

[674] *See, e.g., Glassman v. O'Brian* (*In re Valley Bldg. & Const. Corp.*), 435 B.R. 276, 286 (Bankr. E.D. Pa. 2010) (interpreting Pennsylvania's UFTA and noting that "[a] 'goodly' number of these factors or badges of fraud must be proven to support a claim of actual fraud") (citing *Provident Life & Accident Ins. Co. v. Gen. Syndicators of Am., Managers, Inc.*, Nos. CIV.A 97-3135, 95-19102DAS, 1997 WL 587288, at *5 (E.D. Pa. Sept. 8, 1997)); *Kipperman*, 411 B.R. at 853–54 ("'While a single badge of fraud may only create a suspicious circumstance and may not constitute the requisite fraud to set aside a conveyance . . . several of them when considered together may afford a basis to infer fraud.'") (citing *Gen. Trading, Inc. v. Yale Materials Handling Corp.,* 119 F.3d 1485, 1498–99 (11th Cir. 1997) (applying Florida's UFTA)); *Silverman v. Actrade Capital, Inc.* (*In re Actrade Fin. Techs. Ltd.*), 337 B.R. 791, 809 (Bankr. S.D.N.Y. 2005) (noting that "the existence of several badges of fraud can constitute clear and convincing evidence of actual intent"). At least one court has held outright that "[a]s a matter of law, a finding of fraudulent intent cannot properly be inferred from the existence of just one 'badge of fraud.'" *See Ingalls v. SMTC Corp.* (*In re SMT Mfg. of Tex.*), 421 B.R. 251, 300 (Bankr. W.D. Tex. 2009) (citations omitted). While one court has stated that the existence of insolvency and lack of fair consideration alone could justify a finding of fraudulent intent due to the importance of these two factors, that court ultimately ruled that a transfer was actually fraudulent where nearly all of the badges of fraud were present. *Liebersohn v. Zisholtz* (*In re Martin's Aquarium, Inc.*), 225 B.R. 868, 876 (Bankr. E.D. Pa. 1998).

[675] *Kelly,* 141 F.3d 799, 802 (8th Cir. 1998).

Just as there are badges of fraud, courts and the UFTA commentary note that certain contrary facts may serve to negate or counter any suggestion of fraudulent intent. For example, the court in *Lippe v. Bairnco Corp.*[676] stated:

> [T]he flip side of [the] badges of fraud is that their absence—or evidence that fair consideration was paid, the parties dealt at arm's-length, the transferor was solvent, the transfer was not questionable or suspicious, the transfer was made openly, or the transferor did not retain control—would constitute evidence that there was no intent to defraud.[677]

Although *Lippe* involved the New York Debtor and Creditor Law rather than the UFTA,[678] courts have made it clear that analysis of these issues proceeds in a very similar manner regardless of which statute is being applied. For example, the court in *MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Services Co.*[679] examined actual fraudulent transfer claims from a leveraged buy-out transaction that arose under the fraudulent conveyance statutes of New York, Minnesota, and Delaware and determined that the laws of these three states were similar and had the same origin, and therefore performed one combined analysis of the actual fraudulent transfer claims at issue.[680] In addition to this authority, the commentary to the model UFTA also states that a court "may appropriately take into account all indicia negativing as well as those suggesting fraud."[681]

Several facts relating to the 2006 Bank Restructuring weigh against a finding of actual intent. An important fact is that ResCap was not financially distressed under any of the statutory tests at the time of or after giving effect to the 2006 Bank Restructuring.[682] As the

---

[676] 249 F. Supp. 2d 357, 375 (S.D.N.Y. 2003) (examining actual fraud issues under the New York Debtor and Creditor Law).

[677] *Id.*

[678] *Id*.

[679] 910 F. Supp. 913 (S.D.N.Y. 1995).

[680] *Id.* at 933–34 (noting that the laws of New York, Minnesota and Delaware "trace their origins to the 'statute of 13 Elizabeth,' enacted by the English Parliament in 1571" and that the "laws of Minnesota and Delaware are similar" to the actual fraudulent transfer law of New York). In examining the circumstances surrounding the transaction, the District Court determined that even though several badges of fraud were present actual intent was not present. *Id.* at 935–36. In making that determination, the District Court noted several badges of fraud that were missing, including a lack of secrecy surrounding the transaction. *Id.* at 935 ("The transaction was not secretive, nor was it structured in some manner unusual for an LBO.").

[681] UFTA § 4(b) cmt. 6.

[682] *See* Section VI.

court noted in *Allstate Insurance Co. v. Countrywide Financial Corp.*,[683] insolvency is one of the "most compelling" badges of fraud.[684]

The Minnesota UFTA also lists as a valid consideration whether "the transfer or obligation was disclosed or concealed."[685] Here, the 2006 Bank Restructuring[686] was publicly disclosed through SEC filings as early as April 2006, with updates regarding the transaction disclosed throughout 2006.[687] Courts have treated disclosure as a relevant fact weighing against a finding of actual intent. For example, in *Leonard v. Mylex Corp.* (*In re Northgate Computer Sys., Inc.*), the court determined that, under section 548(a)(1) of the Bankruptcy Code, there was no basis for an intentional fraudulent transfer claim because, in part, there was no evidence of "conceal[ment] [of] the payments from any party that might be interested in them."[688] The court analyzed various other factors, ultimately determining that the only applicable badge of fraud was the debtor's "mounting insolvency," which, standing alone, was insufficient to establish an intentional fraudulent transfer.

The terms of the 2006 Bank Restructuring were disclosed and ResCap's creditors, and the credit markets in general, did not consider the transaction to be alarming. The only bond rating changes that occurred during the three months before and after the 2006 Bank Restructuring was that, in November 2006, after the 2006 Bank Restructuring, both S&P and Fitch raised their rating on ResCap's senior debt from BBB- to BBB. ResCap's unsecured bonds traded at or near par following the announcement of the 2006 Bank Restructuring. The following Exhibit, detailing activity with respect to ResCap's 6.5% bonds maturing on April 17, 2013, illustrates this point:[689]

---

[683] 842 F. Supp. 2d 1216 (C.D. Cal. 2012). This case involved the actual fraudulent transfer provisions of the Illinois UFTA, which is similar to the Minnesota UFTA. *Compare* MINN. STAT. ANN. § 544.44(a)(1), *with* 740 ILL. COMP. STAT. ANN. 160/5(a)(1).

[684] *Id.* at 1224 ("Though solvency and adequacy of consideration are only two of the eleven statutorily enumerated badges of fraud, they are among the most compelling . . . .").

[685] MINN. STAT. ANN. § 513.44(b)(3).

[686] Even though there was a failure to disclose alternative structures considered with respect to the 2006 Bank Restructuring, which may have other implications as fully analyzed in Section VII.L.1, that does not change the fact that the terms of the actually consummated deal were publicly disclosed.

[687] *See* Residential Capital Corporation, Current Report (Form 8-K) (Apr. 3, 2006); Residential Capital Corporation, Quarterly Report (Form 10-Q) (Aug. 8, 2006), at 10; Residential Capital, LLC, Quarterly Report (Form 10-Q) (Nov. 7, 2006), at 11; Residential Capital, LLC, Current Report (Form 8-K) (Nov. 27, 2006).

[688] 240 B.R. 328, 360–62 (D. Minn. 1999). The court also found that actual fraud was not made out under section 513.44(a)(1) under Minnesota law because it contains a "nearly identical" provision to section 548(a)(1) of the Bankruptcy Code. *Id.* at 366; s*ee also Felker v. McGhan Med. Corp.* (*In re Minn. Breast Implant Litig.*), 36 F. Supp. 2d 863, 882 (D. Minn. 1998) (noting that the public disclosure of the sale of a business argued against an actual fraudulent intent).

[689] An analysis was performed of the historical pricing trends of ResCap's 6.5% bond maturing on April 17, 2013. *See* Section VI.B.4.a.



EXHIBIT VII.F.6.d(1)(a)(ii)—1
**ResCap Bond Pricing Activity – Three Months Before and After the 2006 Bank Restructuring**
August 2006 – March 2007

*Source: Pricing per Interactive Data Corporation, a provider of securities pricing data.*

Spreads for CDS on which ResCap was the reference entity also showed little movement in response to the news of the 2006 Bank Restructuring, as the following exhibit shows:



EXHIBIT VII.F.6.d(1)(a)(ii)—2
**ResCap Five Year Credit Default Swap Spreads – Three Months Before and After the 2006 Bank Restructuring**
August 2006 – March 2007

*Source: Advantage Data Inc.*

The cases that mention disclosure of a transaction's terms as a relevant factor suggesting an absence of actual intent to hinder, delay, or defraud creditors do not explain exactly why disclosure is inconsistent with fraudulent intent. But, as a matter of common sense and logic, one of the purposes and effects of disclosure is to permit creditors to invoke their legal remedies if they believe a transaction has harmed them, and/or to sell (or purchase CDS protection against) their debt positions if they believe the transaction left their obligor significantly weakened. The fact that neither litigation, nor a decline in ResCap's bond pricing or unsecured debt ratings, nor an increase in the cost of CDS protection on ResCap obligations, followed the announcement of the 2006 Bank Restructuring suggests that ResCap's creditors did not view the transaction as harmful.

A review of the other relevant considerations set forth in the Minnesota UFTA reveals that the 2006 Bank Restructuring shows many signs negating actual fraud: (1) there is no evidence that ResCap retained possession or control of the property transferred; (2) there is no evidence that ResCap was sued or threatened with suit prior to the transfers; (3) the transfers were not of substantially all of ResCap's assets; (4) ResCap did not "abscond" following the transfer; and (5) there is no indication that ResCap removed or concealed assets.[690]

The Examiner also concludes that the evidence supports the proposition that there was a legitimate business purpose for the 2006 Bank Restructuring.[691] As fully explained in Section V.A.1.a(1), the 2006 Bank Restructuring was necessary to allow the Cerberus deal to close. The Cerberus transaction provided substantial benefits to ResCap, including allowing ResCap to avoid a potential credit rating downgrade.

### (iii) Conclusion

Based on the totality of the facts and circumstances presented by the Investigation, the Examiner concludes it is unlikely that actual fraudulent transfer claims related to the 2006 Bank Restructuring would prevail.

---

[690] MINN. STAT. ANN. § 513.44(b).

[691] *Kelly v. Armstrong*, 206 F.3d 794, 798 (8th Cir. 2000) (examining actual fraudulent transfer claims under section 548 of the Bankruptcy Code and stating that "[i]f there is a confluence of the 'badges of fraud,' then the Trustee is entitled to a presumption of fraudulent intent. To overcome a presumption, a 'legitimate supervening purpose' for the transfers must be shown by the bankrupt") (citations omitted); *ASARCO LLC v. Ams. Mining Corp.*, 396 B.R. 278, 391–93 (S.D. Tex. 2008) (noting that "even though Plaintiff proved that AMC had the requisite [actual fraudulent] intent, AMC may still prevail on this claim if it can prove that there was a legitimate supervening purpose for the transaction" but ultimately determining that "even though there was a legitimate business purpose for the transfer" the other aspects of the transaction had no legitimate business purpose and thus the inference of actual fraud was not rebutted) (citing *Kelly*, 206 F.3d at 801); *Burch v. Harris* (*In re Harris*), Nos. 02-10938, 02-05803, 2003 WL 23096966, at *2 (Bankr. D. Del. Dec. 30, 2003).

#### (b) Constructive Fraudulent Transfer Analysis

Because ResCap was not financially distressed within the meaning of any applicable fraudulent transfer statutes at the time of this transaction,[692] the Examiner concludes that a plaintiff would be unable to establish a prima facie case for a constructive fraudulent transfer claim.

#### (2) 2008 Secured Revolver Transaction

The facts relating to the 2008 Secured Revolver Transaction are fully set forth in Section V.E.3 and are also briefly summarized in Section VII.F.4.h above. For purposes of a fraudulent transfer analysis of the 2008 Secured Revolver Transaction, it is necessary to identify the transfers made and obligations incurred by RFC and GMAC Mortgage[693] and then to assess the difference in the direct and indirect value received in exchange.[694]

RFC and GMAC Mortgage incurred secured obligations for the entire $3.5 billion Secured Revolver Facility.[695] In exchange for these secured obligations, RFC and GMAC Mortgage received: (1) a release of their obligations as guarantors under the $1.75 billion 2005 Term Loan Facility; (2) a release of their obligations as guarantors under the undrawn $1.75 billion 2007 Revolvers (which facilities were never drawn); (3) a release of their guarantees of $1.29 billion of bonds (those bonds were retired as a result of the June 6, 2008 bond exchange); and (4) an offset of at least $2.43 billion of intercompany debt owed by RFC and GMAC Mortgage to ResCap.[696]

---

[692]  For a full analysis of the Debtors' financial condition during relevant periods, see Section VI.

[693]  Because ResCap received reasonably equivalent value in this transaction through receipt of the loan proceeds (in exchange for its obligations as guarantor), an extended constructive fraudulent transfer analysis with respect to ResCap's potential claims is not necessary.

[694]  The Examiner concludes that it is likely that the Bankruptcy Court would apply Minnesota (as to RFC) or Pennsylvania (as to GMAC Mortgage) law to fraudulent transfer issues arising from the 2008 Secured Revolver Transaction based on the analysis set forth in Section VII.F.3.a above. Because the transaction occurred outside the Bankruptcy Code's two-year reach-back period, section 548(a)(1)(B) of the Bankruptcy Code is not applicable. *See* 11 U.S.C. § 548(a)(1).

[695]  As noted above, many transfers occurred in connection with the 2008 Secured Revolver Transaction, including RFC and GMAC Mortgage's grant of security interests on a second- and third-lien basis over substantially all of their assets as guarantors under the Senior Secured Notes and the Junior Secured Notes. Consistent with the scope of the Investigation, this analysis focuses on potential fraudulent transfer claims associated with transfers to or for the benefit of or obligations incurred to, or for the benefit of, AFI, Cerberus, and their respective affiliates.

[696]  As discussed below, ResCap recorded the Secured Revolver Transaction in its accounting records in June 2008, but did not record any indebtedness arising from the Secured Revolver Transaction in RFC's or GMAC Mortgage's accounting records until November 30, 2008, after which the accounting records allocated the outstanding indebtedness under the Secured Revolver Facility to RFC and GMAC Mortgage based on collateral values at each through the Petition Date. Between June 2008 and November 2008, approximately $1.07 billion in payments were made on the Secured Revolver Facility. It is unclear, though likely, that RFC and GMAC Mortgage were the source of the funds for these payments. In such event, in addition to the $2.43 billion in debt forgiveness recorded on November 30, 2008, RFC and GMAC Mortgage would have received additional reductions of intercompany debt owed to ResCap in the amount of $1.07 billion.

### (a) Actual Fraudulent Transfer Claims

Only two badges of fraud are present with respect to the 2008 Secured Revolver Transaction: (1) the transfers were made to AFI, an insider; and (2) the transfers were made at a time when the Examiner has concluded that ResCap, RFC, and GMAC Mortgage each: (a) were balance sheet insolvent; (b) had unreasonably small capital (assets); and (c) reasonably should have believed that it would incur debts beyond its ability to pay.[697]

Several significant facts serve to counter these two badges of fraud. The most important of these is the Examiner's conclusion that each of ResCap, RFC, and GMAC Mortgage received reasonably equivalent value in exchange for the transfers made in connection with the 2008 Secured Revolver Transaction (as explained below). In addition, these transactions were disclosed to the public in SEC filings,[698] constituting evidence that the transfers and obligations were not concealed. Disclosure weighs against a finding of actual fraud, as does the absence of any other badges of fraud.[699] There is no evidence that ResCap, RFC, and/or GMAC Mortgage: (1) retained possession or control of the property transferred; (2) were sued or threatened with suit prior to the transfers; (3) transferred substantially all of their assets; (4) absconded following the transfer; or (5) removed or concealed assets.

The Examiner therefore concludes, based upon all the facts and circumstances surrounding these transfers, that it is unlikely that actual fraudulent transfer claims arising from the 2008 Secured Revolver Transaction would prevail.

### (b) Constructive Fraudulent Transfer Claims

A debtor incurring an obligation under a credit agreement will normally receive a direct benefit from the loan proceeds it receives as a result of the transaction. When the 2008 Secured Revolver Facility transaction was consummated, $1.29 billion of the 2005 Term Loan Facility was assigned to AFI and became part of the Secured Revolver Facility.[700] AFI also provided $2.21 billion of new funds under the Secured Revolver Facility. Although RFC and GMAC Mortgage were the borrowers under the Secured Revolver Facility, and the publicly stated reason for the facility was, in part, for working capital purposes,[701] RFC and GMAC Mortgage did not directly receive any of the $2.21 billion of new funds. Rather, AFI sent the loan proceeds directly to ResCap, which in turn: (1) used approximately $458 million to repay

---

[697] *See* Section VI.E.2.

[698] *See* Section V.E.

[699] *See Official Comm. of Unsecured Creditors of Fedders N. Am., Inc. v. Goldman Sachs Credit Partners L.P.* (*In re Fedders N. Am., Inc.*), 405 B.R. 527, 545–46 (Bankr. D. Del. 2009) ("[T]he facts pled in the complaint show that Fedders' dealings with Lenders were anything but concealed. Fedders' borrowing was disclosed in a public filing with the SEC, as was the fact that it was seeking refinancing it ultimately obtained from the Lenders.").

[700] *See* Master Assignment and Assumption Agreement, dated as of a date on or before June 6, 2008 among the Initial Lender and the Term Loan Lenders [ALLY_0043831].

[701] GMAC LLC, Current Report (Form 8-K) (June 9, 2008), at 6 ("The proceeds will be used to repay existing indebtedness of ResCap, to acquire certain assets, and for other working capital purposes.").

the portion of the 2005 Term Loan Facility not assumed by AFI;[702] (2) paid certain cash obligations related to the June 6, 2008 bond exchange, totaling approximately $1.29 billion[703] (the bond exchange resulted in the cancellation of $8.6 billion of tendered notes and the issuance of $5.7 billion of Senior and Junior Secured Notes);[704] and (3) used approximately $457 million "to acquire other assets and for other working capital needs."[705] As a result of these transfers, RFC and GMAC Mortgage's liability to third parties as guarantors of the 2005 Term Loan and the 2007 Revolvers was released.

"[P]ayments on an existing guarantee generally are considered to be for reasonably equivalent value"[706] because such payments are on account of an antecedent debt.[707] RFC and GMAC Mortgage were liable as guarantors under the 2005 Term Loan, the 2007 Revolvers, and ResCap's unsecured bonds. Approximately $3.04 billion of the Secured Revolver Facility was used to retire or replace these guaranteed obligations.[708]

In June 2008, ResCap recorded the Secured Revolver Facility in its accounting records. On November 30, 2008, ResCap allocated $1 billion of the Secured Revolver Facility to GMAC Mortgage and $1.43 billion to RFC.[709] In return, each received a dollar-for-dollar reduction in debt owed to ResCap.[710] Satisfaction of a bona fide antecedent debt is, by definition, for fair consideration or reasonably equivalent value.[711] This holds true even where the antecedent debt in question is intercompany debt.[712]

---

[702] Ally Revolver Use of Funds—June 2008 [EXAM00345926].

[703] *Id.*; *see also* Residential Capital, LLC, Current Report (Form 8-K) (June 9, 2008), at 2; Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2009), at 100.

[704] *See* Residential Capital, LLC, Current Report (Form 8-K) (June 12, 2008), at 1.

[705] Ally Revolver Use of Funds—June 2008 [EXAM00345926]. It is likely that GMAC Mortgage and RFC received some if not all of the funds used for working capital. However, a tracing of these funds is outside the scope of the Investigation.

[706] *Official Comm. of Unsecured Creditors of R.M.L., Inc. v. Conceria Sabrina S.P.A.* (*In re R.M.L., Inc.*), 195 B.R. 602, 618 (Bankr. M.D. Pa. 1996).

[707] *Id.* at 618 (Bankr. M.D. Pa. 1996) (noting that "courts generally recognize that '[a] proportionate reduction in rights or liability constitutes an exchange of reasonably equivalent value for fraudulent transfer purposes under the Bankruptcy Code'") (citations omitted).

[708] Ally Revolver Use of Funds—June 2008 [EXAM00345926].

[709] *Id*. As noted above, these allocations were based on the collateral values at each entity.

[710] *Id*.

[711] *See, e.g., Pereira v. Dow Chem. Co.* (*In re Trace Int'l Holdings, Inc.*), 301 B.R. 801, 805 (Bankr. S.D.N.Y. 2003) ("Past consideration is good consideration. An 'antecedent debt' satisfies the requirement of fair consideration and reasonably equivalent.") (citations omitted), *vacated on other grounds*, No. 04-1295, 2009 WL 1810112 (S.D.N.Y. June 25, 2009); *In re Capmark Fin. Grp. Inc.*, 438 B.R. 471, 518 (Bankr. D. Del. 2010) ("Where a bona fide antecedent debt exists, a debtor's payment on account of that creditor's claim, even if it has the result of preferring that creditor over others, is not by itself a fraudulent transfer.").

[712] *Official Unsecured Creditors Comm. of Valley-Vulcan Mold Co. v. Ampco-Pittsburgh Corp.* (*In re Valley-Vulcan Mold Co.*), 5 F. App'x 396, 398 (6th Cir. 2001) ("The repayment of intercompany debt was a dollar-for-dollar transaction that, by definition, satisfied fair consideration."); *Scharffenberger v. Phila. Health Care Trust* (*In re Allegheny Health, Educ. & Research Found.*), 253 B.R. 157, 171–72 (Bankr. W.D. Pa. 2000) (concluding that elimination of an intercompany debt by simultaneous elimination of an intercompany receivable constituted reasonably equivalent value. However, not all intercompany debts are bona fide debts. For example, an intercompany debt that is not scrupulously recorded as a liability on a company's financial statements may not be treated as a bona fide debt for purposes of determining fair consideration or reasonably equivalent value. *See Murphy v. Meritor Sav. Bank* (*In re O'Day Corp.*), 126 B.R. 370, 397 (Bankr. D. Mass. 1991). Here there is no indication that these intercompany debts should not be treated as bona fide debts. *See* Section VII. B–D.

VII.F-144

Thus, after the 2008 Secured Revolver Transaction was consummated, RFC and GMAC Mortgage were indebted as borrowers on the $3.5 billion Secured Revolver Facility. Of this amount $1.29 billion was simply an exchange of debt on a dollar-for-dollar basis. While RFC and GMAC Mortgage were now borrowers rather than guarantors on the new debt, which was now secured rather than unsecured, as ResCap's principal operating subsidiaries, RFC's and GMAC Mortgage's assets were the principal source of repayment in either case. In exchange for the $2.21 billion of proceeds, for which RFC and GMAC Mortgage became liable under the Secured Revolver Facility, RFC and GMAC Mortgage received: (1) releases from approximately $1.75 billion of guaranteed indebtedness to third parties; and (2) the offset of at least $2.43 billion of intercompany debt. Because RFC and GMAC Mortgage each received reasonably equivalent value, the Examiner concludes it is unlikely that constructive fraudulent transfer claims related to the 2008 Secured Revolver Transaction would prevail.[713]

### (3) Other Transactions

The following transactions were identified during the course of the Investigation as being potential actual or constructive fraudulent transfers: (1) June 2008 Model Home Sale; (2) Resort Finance Sale; (3) 2008 Bank Transaction; and the (4) 2009 Bank Transaction.

### (a) Actual Fraudulent Transfer Analysis

For each of these transactions the same two badges of fraud are present: (1) the transfers were to an insider; and (2) the transfers were made while the Debtor-transferor(s) was financially distressed.

These transactions also present significant countervailing facts and circumstances that case law and the official commentary to the UFTA specifically note as tending to negate an assertion of actual fraudulent intent. The most important of these is that the Examiner has concluded that for each of these transactions, the Debtor-transferor(s) received reasonably equivalent value.[714] The receipt of reasonably equivalent value is strong evidence against a

---

[713] The delay in the "push down" for accounting treatment from ResCap to RFC and GMAC Mortgage of the cash and debt forgiveness may pose a question of whether the cash and/or debt forgiveness constituted value received by RFC and GMAC Mortgage in exchange for the obligation incurred and property transferred. The documentation of the 2008 Secured Revolver Transaction contemplates that all the events were to take place substantially contemporaneously. *See, e.g.,* Master Assignment and Assumption Agreement, dated on or before June 6, 2008 [ALLY_0043831]; Ally Revolver Use of Funds—June 2008 [EXAM00345926]. The Examiner concludes that the delay in completing the internal accounting for the Secured Revolver Transaction is immaterial to his conclusions in these circumstances.

[714] *See* Sections VII.F.4.h, V.F, V.A.1.

finding that the transaction was actually fraudulent,[715] given that "adequacy of consideration" is one of the "most significant" badges of fraud.[716]

Second, the material terms of all of these transactions were disclosed to the public in SEC filings.[717] The June 2008 Model Home Sale was the result of an auction process[718] and the Resort Finance Sale was completed only after significant marketing efforts were made in an attempt to sell these assets to an independent third party.[719] These facts indicate that secrecy and concealment were not present with respect to any of these transactions and that, in fact, the June 2008 Model Home Sale and the Resort Finance Sale were both completed only after the proposed transactions had been exposed to the market.

Finally, additional relevant considerations under the Minnesota UFTA and the Pennsylvania UFTA also tend to negate an assertion of actual fraudulent intent because there is no evidence that any of the Debtors: (1) retained possession or control of the relevant property after these transfers; (2) were sued or threatened with suit prior to the transfers; (3) transferred substantially all of its assets; (4) absconded following the transfer; or (5) removed or concealed assets.[720]

Based on an evaluation of all the facts and circumstances surrounding each of these transfers, the Examiner concludes that it is unlikely that actual fraudulent transfer claims arising from these transfers would prevail.

---

[715] *See Lippe v. Bairnco Corp.*, 249 F. Supp. 2d 357, 375–76 (S.D.N.Y. 2003) (noting that the plaintiff's failure to show damages resulting from an alleged actual fraudulent transfer weighed against a finding of actual fraud and stating "[i]t is hornbook law that '[a] conveyance cannot be fraudulent as to creditors if the debtor's solvency is not affected thereby, that is, if the conveyance does not deplete or otherwise diminish the value of the assets of the debtor's estate remaining available to creditors") (citations omitted); *Geltzer v. Bloom* (*In re Silverman Laces, Inc.*), 404 B.R. 345, 360 (Bankr. S.D.N.Y. 2009) (evaluating a claim under New Jersey's UFTA and noting that "[a]lthough it is possible for a transfer for reasonably equivalent value to be avoided as long as actual intent to hinder, delay or defraud creditors is proven [a review of the UFTA's badges of fraud] shows the importance of whether reasonably equivalent value was provided in exchange for the transfer, or whether the transfer depleted assets otherwise available for creditors") (citing *United States v. McCombs*, 30 F.3d 310, 327–28 (2d Cir. 1994)).

[716] *Liebersohn v. Zisholtz* (*In re Martin's Aquarium, Inc.*), 225 B.R. 868, 876 (Bankr. E.D. Pa. 1998) ("[T]he issues of adequacy of consideration and insolvency of the transferor . . . are 'the most significant' of the badges."); *see also Allstate Ins. Co v. Countrywide Fin. Corp.*, 842 F. Supp. 2d 1216, 1224 (C.D. Cal. 2012).

[717] *See* Sections V.A.1, V.E.3, V.F. Public disclosure of a transaction's terms has been held to constitute evidence that a transfer was not concealed and such disclosure weighs against a finding of actual fraud. *See Official Comm. of Unsecured Creditors of Fedders N. Am., Inc. v. Goldman Sachs Credit Partners L.P.* (*In re Fedders N. Am., Inc.*), 405 B.R. 527, 545–46 (Bankr. D. Del. 2009) ("[T]he facts pled in the complaint show that Fedders' dealings with Lenders were anything but concealed. Fedders' borrowing was disclosed in a public filing with the SEC, as was the fact that it was seeking the refinancing it ultimately obtained from the Lenders.").

[718] *See* Section V.F.

[719] *See id.*

[720] Minn. Stat. Ann. § 513.44(b); 12 Pa. Const. Stat. Ann. § 5104(b).

### (b) Constructive Fraudulent Transfer Analysis

The transactions described above all fit into the following fact pattern: (1) they occurred outside of the Bankruptcy Code's two-year reach-back period and therefore would likely be governed by the Minnesota UFTA (as to ResCap and RFC) or the Pennsylvania UFTA (as to GMAC Mortgage),[721] in either case as invoked by section 544(b) of the Bankruptcy Code; (2) in each case, as set forth in Section VI, the relevant Debtor-transferor was suffering from one or more of the statutorily defined forms of financial distress at the time of the transaction; and (3) in each case the relevant Debtor-transferor received reasonably equivalent value in exchange for the transfers it made or obligations it incurred.[722]

Because each of these transactions resulted in the relevant Debtor(s) receiving reasonably equivalent value, the Examiner concludes it is unlikely that constructive fraudulent transfer claims arising from any of these transactions would prevail.[723]

### (4) Transactions Implicating Collapsing Or "Step Transaction" Doctrine

As discussed in Section V.A.1, the Ally Bank Transactions consist of three separate transactions: (1) the November 2006 restructuring of Old GMAC Bank and GMAC Automotive Bank; (2) ResCap's March 2008 and June 2008 issuance of ResCap Preferred Interests in exchange for debt forgiveness by AFI; and (3) AFI's January 2009 conversion of the ResCap Preferred Interests and purchase of ResCap's remaining interest in IB Finance. Certain parties-in-interest have argued that these three separate transactions should not be reviewed separately, but rather should be viewed (in some combination) as one single transaction pursuant to the "step transaction" doctrine. For the purposes of applying fraudulent transfer laws, courts may collapse parts of a complex transaction into one transaction by application of the "step transaction" or "collapsing" doctrine.[724] Here, the Investigation has uncovered no evidence that the Ally Bank Transactions were "part of one integrated transaction" for purposes of the "collapsing" doctrine. To the contrary, as fully explained in Section V.A.1, each of the Ally Bank Transactions was motivated independently by separate

---

[721] *See* Section VII.F.3.

[722] *See* Sections V.A.1, V.F.

[723] While a close question, the Examiner concludes it is more likely than not that a constructive fraudulent transfer claim with respect to the June 2008 Model Home Sale would not succeed, because it is more likely than not that a court would find the value received by RFC from the transaction to constitute reasonable equivalent value based on the totality of the circumstances. *See* Section V.F.3.

[724] *United States v. Tabor Court Realty Corp.*, 803 F.2d 1288, 1302–03 (3d Cir. 1986) (holding two loans constituted one integrated transaction for purposes of considering whether the loan was a fraudulent conveyance); *Official Comm. of Unsecured Creditors of M. Fabrikant & Sons, Inc. v. JP Morgan Chase Bank, N.A.* (*In re M. Fabrikant & Sons, Inc.*), 394 B.R. 721, 731 (Bankr. S.D.N.Y. 2008) ("Under appropriate circumstances, multiple transactions will be collapsed and treated as steps in a single transaction for analysis under the fraudulent conveyance laws.") (citing *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 635 (2d Cir. 1995)); *MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co.*, 910 F. Supp. 913, 934 (S.D.N.Y. 1995) ("No single transfer would take place without the expectation that the entire transaction will be consummated.").

business considerations. The Examiner therefore concludes that the evidence does not support the proposition that any or all of the Ally Bank Transactions should be collapsed for purposes of a fraudulent transfer analysis.

### 7. *Transfers Avoidable Under Section 549 Of The Bankruptcy Code*

Pursuant to section 549(a) of the Bankruptcy Code, a court may "avoid a transfer of property of the estate . . . that occurs after the commencement of the case . . . and . . . that is not authorized under this title or by the court."[725] Section 363 governs the use, sale, or lease of property by debtors.[726] If a transaction is outside of the ordinary course of business, notice and a hearing are required under section 363(b) before a payment can be authorized.[727] Postpetition transactions not in the ordinary course of business, made without court approval, are thereby subject to avoidance under section 549.[728]

#### a. *Background*

The Debtors filed a motion on May 14, 2012 seeking authority to continue to perform under the A&R Servicing Agreement.[729] The motion generally discussed the A&R Servicing Agreement as well as the DOJ/AG Settlement.[730] The motion specifically referenced borrower relief required by the DOJ/AG Settlement, which would include "loan modifications, such as principal reductions, rate modifications, and refinancing for borrowers" with respect to mortgage loans owned by Ally Bank.[731] The motion did not explicitly mention that GMAC Mortgage was required to indemnify Ally Bank for losses suffered in connection with these loan modifications or the amount of any such indemnification.[732] However, the A&R Settlement Agreement, which contained the indemnity provision, was attached as an exhibit to

---

[725] 11 U.S.C. § 549(a); *see, e.g.*, *Marathon Petrol. Co., LLC v. Cohen* (*In re Delco Oil, Inc.*), 599 F.3d 1255 (11th Cir. 2010) (trustee avoided debtor's unauthorized postpetition transfers of cash collateral under section 549); *Aalfs v. Wirum* (*In re Straightline Invs. Inc.*), 525 F.3d 870, 879 (9th Cir. 2008) (finding postpetition transfer of accounts receivable avoidable under section 549).

[726] 11 U.S.C. § 363.

[727] *Id.*

[728] *See In re Straightline Invs. Inc.*, 525 F.3d at 879.

[729] Debtors' Motion for Interim and Final Orders Under Bankruptcy Code Sections 105(a) and 363 Authorizing the Debtors to Continue to Perform Under the Ally Bank Servicing Agreement in the Ordinary Course of Business [Docket No. 47].

[730] *Id.* at 7.

[731] *Id.*

[732] *Id.*

the motion.[733] The motion also specifically stated that the Debtors were "not seeking to pay any prepetition claims through or pursuant to the [A&R] Servicing Agreement."[734]

The court entered an interim order on May 16, 2012 authorizing the Debtors to continue to perform under the A&R Servicing Agreement.[735] The interim order stated only that the Debtors were authorized to "continue to perform under the terms of the [A&R] Servicing Agreement . . . ."[736] The interim order did not refer to, or specifically permit, indemnity payments related to the loan modifications.[737]

On June 13, 2012, the Debtors made a postpetition transfer of $19.9 million to Ally Bank pursuant to the indemnity obligation set forth in section 10.01(e) of the A&R Servicing Agreement. A portion of this payment, $12.9 million, related to loan modifications which were performed prepetition.[738] Based on the analysis below, the Examiner has concluded that the payment was not made in the ordinary course of the Debtors' business and was not authorized by the Court.

### b. Analysis

#### (1) The Indemnity Payment Was Not Made In The Ordinary Course Of The Debtors' Business

"The term 'ordinary course of business' has generally been accepted 'to embrace the reasonable expectations of interested parties of the nature of transactions that the debtor would likely enter in the course of its normal, daily business.'"[739] "[T]wo tests have emerged to

---

[733] *See id.* Ex. 3, §10.01(e). While the Debtors did not specifically reference the indemnity provision and the amount of indemnity payments, the Investigation did not reveal evidence that the Debtors intentionally withheld information.

[734] Debtors' Motion for Interim and Final Orders Under Bankruptcy Code Sections 105(a) and 363 Authorizing the Debtors to Continue to Perform Under the Ally Bank Servicing Agreement in the Ordinary Course of Business [Docket No. 47] at 15.

[735] Interim Order Pursuant to Sections 105(a) and 363 of the Bankruptcy Code Authorizing the Debtors to Continue to Perform Under the Ally Bank Servicing Agreements in the Ordinary Course of Business [Docket No. 90].

[736] *Id.* at 2.

[737] *Id.*

[738] *See* Letter from L. Nashelsky to R. Schrock (July 9, 2012), at 3 (attached to Declaration of Thomas Marano, Chief Executive Officer of Residential Capital, LLC, in Further Support of Debtors' Ally Servicing Motion [Docket No. 793-1], Ex. 7); Statement of the Official Committee of Unsecured Creditors Regarding the Debtors' Motion for an Order Authorizing the Debtors to Continue to Perform Under the Ally Bank Servicing Agreement in the Ordinary Course of Business [Docket No. 1280] at 6; Declaration of Thomas Marano, Chief Executive Officer of Residential Capital, LLC, in Further Support of Debtors' Ally Servicing Motion [Docket No. 793-1] at 6.

[739] *Med. Malpractice Ins. Assoc. v. Hirsch* (*In re Lavigne*), 114 F.3d 379, 384 (2d Cir. 1997) (citations omitted).

determine whether a transaction is 'ordinary.' These tests are (1) the 'creditor's expectation test' also known as the 'vertical test,' and (2) the 'industry-wide test' also known as the 'horizontal test.'"[740]

The indemnification payments made to Ally Bank were required because ResCap and GMAC Mortgage needed to perform loan modifications on loans owned by Ally Bank to satisfy the DOJ/AG Settlement. Like the $48.4 million prepetition payment discussed in Section VII.F.5, the postpetition indemnification payment made to Ally Bank was not similar to payments ResCap and GMAC Mortgage had made in the past. As the obligations to make such payments stem from GMAC Mortgage's responsibilities under a one-time settlement with the government, the payment would not likely be within "interested parties' reasonable expectations."[741] Accordingly, the payment would fail the vertical test, and would not be considered an ordinary course payment. Such payment could therefore only be made if authorized by the court after notice and a hearing.[742]

### (2) The Indemnity Payment Was Not Authorized By The Court

The interim order entered on May 16, 2012 authorized the Debtors to "continue to perform under the terms of the [A&R] Servicing Agreement . . . ."[743] This language is broad, and arguably covers the $12.9 million payment. However, the Debtors' motion seeking entry of the interim order explicitly stated that the Debtors were "not seeking to pay any prepetition claims through or pursuant to the [A&R] Servicing Agreement."[744] This straightforward representation clarifies any ambiguity found in the interim order regarding whether payments relating to prepetition obligations were authorized.

Additionally, the indemnification obligations under the A&R Servicing Agreement were not conspicuously disclosed in the Debtors' motion, and there was no mention of the amount of payments to be made. While it is a close question, based on the Debtors' express representations in the motion and lack of disclosure, it appears more likely than not that the interim order did not authorize the Debtors to make payments to satisfy obligations incurred prepetition.

_____

[740] *Id.* (citations omitted).

[741] *Id.* (citations omitted). The payment would also likely fail the horizontal test. While a number of other financial institutions in the mortgage industry were party to the DOJ/AG Settlement, the transaction at issue was not the "type that other similar businesses would engage in as ordinary business." *Id.* at 385 (citations omitted). As stated, this was a one-time settlement of a unique nature.

[742] 11 U.S.C. § 363.

[743] Interim Order Pursuant to Sections 105(a) and 363 of the Bankruptcy Code Authorizing the Debtors to Continue to Perform Under the Ally Bank Servicing Agreements in the Ordinary Course of Business [Docket No. 90] at 1.

[744] Debtors' Motion for Interim and Final Orders Under Bankruptcy Code Sections 105(a) and 363 Authorizing the Debtors to Continue to Perform Under the Ally Bank Servicing Agreement in the Ordinary Course of Business [Docket No. 47] at 15.

### c. Conclusion

The Examiner concludes that the Debtors likely were required to seek authority to make payments based on the indemnity provisions of the A&R Servicing Agreement, which related to prepetition obligations as such payments were not made in the ordinary course of the Debtors' business. The May 14, 2012 motion and the May 16, 2012 interim order did not authorize indemnification payments for obligations incurred prepetition. Accordingly, the Examiner concludes that, while a close question, it is more likely than not that the Debtors' approximately $12.9 million postpetition payment relating to obligations incurred prepetition may be avoided under section 549(a) of the Bankruptcy Code.[745]

### 8. Recovery Under Bankruptcy Code Section 550

To the extent that a transfer of a debtor's property is avoided under Bankruptcy Code sections 544, 547, or 548, as discussed above, Bankruptcy Code section 550 permits a trustee to "recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property."[746] The purpose of section 550 is "to restore the estate to the financial condition that it would have enjoyed if the transfer had not occurred."[747] In seeking recovery under section 550, a trustee must, among other things, identify the entities from which recovery may be obtained.[748]

---

[745] AFI and Ally Bank urge that the indemnification obligations are administrative expenses. Statement of Ally Financial Inc. and Ally Bank in Support of the Stipulation and Proposed Order Reserving Rights With Respect to Debtors' Motion to Approve Subservicing Agreement with Ally Bank [Docket No. 1279] at 6. The status of any claim that Ally Bank may have, however, likely has no bearing on whether the $12.9 million postpetition payment is avoidable under section 549. *See Sapir v. CPQ Colorchrome Corp*. (*In re Photo Promotion Assocs., Inc*.) 881 F.2d 6, 10 (2d Cir. 1989) (holding that creditor guilty of an "end-run around § 364(c)" must, pursuant to sections 549 and 550, "first return the funds it obtained. After that, [the creditor] must wait in line with the other § 503(b) creditors . . . for its pro rata share"); *Martino v. First Nat'l Bank of Harvey* (*In re Garofalo's Finer Foods, Inc*.), 186 B.R. 414, 435 (N.D. Ill. 1995) (requiring bank to disgorge payments under sections 549 and 550 despite status of claims as administrative expenses).

[746] 11 U.S.C. § 550(a). The Bankruptcy Code allows a trustee to avoid both transfers and obligations in appropriate circumstances. *See* 11 U.S.C. §§ 544, 548. Section 550 addresses only the recovery of avoided "transfers," not avoided "obligations." *Id.* § 550(a). There is nothing to "recover" when an obligation is avoided because such avoidance simply decreases the claims against property in the debtor's possession. *See In re Asia Global Crossing, Ltd*., 333 B.R. 199, 202 (Bankr. S.D.N.Y. 2005).

[747] *Andrew Velez Constr., Inc. v. Consol. Edison Co.* (*In re Andrew Velez Constr., Inc*.), 373 B.R. 262, 274 (Bankr. S.D.N.Y. 2007) (citing *Hirsch v. Gersten* (*In re Centennial Textiles, Inc*.), 220 B.R. 165, 176 (Bankr. S.D.N.Y. 1998)).

[748] *Pereira v. Grecogas Ltd.* (*In re Saba Enters., Inc*.), 421 B.R. 626, 657 (Bankr. S.D.N.Y. 2009) (citing *Sec. Investor Prot. Corp. v. Stratton Oakmont, Inc*., 234 B.R. 293, 312 (Bankr. S.D.N.Y. 1999)). "The particular theory under which a transfer has been avoided is, for all intents and purposes, irrelevant to the liability of the transferee against whom the trustee claims recovery of the property." 5 COLLIER ON BANKRUPTCY ¶ 550.01 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.) (footnote omitted).

### a. Recovery Under Section 550(a)(1)

To the extent that a trustee successfully avoids a transfer of an interest of the debtor in property, the trustee may seek recovery of such property (or its value) pursuant to Bankruptcy Code section 550(a)(1) from either the "initial transferee" *or* any "entity for whose benefit such transfer was made."[749] The liability of the initial transferee and the beneficiary entity is "coextensive."[750] Additionally, Bankruptcy Code section 550(a)(2) allows recovery from subsequent transferees, subject to certain limitations.[751]

The distinction between initial transferees and entities for whose benefit a transfer was made, on the one hand, and subsequent transferees, on the other hand, is important because neither an initial transferee nor an entity for whose benefit a transfer was made may avail itself of the protections afforded to subsequent transferees under Bankruptcy Code section 550(b).[752] In other words, the Bankruptcy Code establishes strict liability under section 550(a)(1) for initial transferees or entities for whose benefit such transfer was made.[753]

### (1) Initial Transferee

"The Bankruptcy Code does not define 'initial transferee' and there is no helpful legislative history."[754] The Second Circuit has adopted the "mere conduit" test for determining who is an initial transferee under Bankruptcy Code section 550, recognizing that the initial transferee is not necessarily "the owner of the first pair of hands to touch the property . . . ."[755] Rather, "the minimum requirement of status as a 'transferee' is dominion over the money or

---

[749] *See* 11 U.S.C. § 550(a)(1); *Christy v. Alexander & Alexander of N.Y. Inc.* (*In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey*), 130 F.3d 52, 56 (2d Cir. 1997); *Enron Creditors Recovery Corp. v. J.P. Morgan Sec., Inc.* (*In re Enron Creditors Recovery Corp.*), 407 B.R. 17, 34 (Bankr. S.D.N.Y. 2009), *rev'd on other grounds*, 422 B.R. 423 (S.D.N.Y. 2009).

[750] *Official Comm. of Unsecured Creditors of 360networks* (*USA*) *Inc. v. U.S. Relocation Servs., Inc.* (*In re 360networks* (*USA*) *In*c.), 338 B.R. 194, 207 (Bankr. S.D.N.Y. 2005) (citation omitted).

[751] *See* 11 U.S.C. § 550(a)(2)–(b).

[752] *Id.* § 550(b); *see also* 5 COLLIER ON BANKRUPTCY ¶ 550.02[4][c] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.) (footnote omitted). Section 550(b) provides that a trustee may not recover under section 550(a)(2) from either (1) a subsequent "transferee that takes for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided"; or (2) "any immediate or mediate good faith transferee of [that] subsequent transferee." 11 U.S.C. § 550(b).

[753] *See In re Finley, Kumble*, 130 F.3d at 57; *Stratton Oakmont*, 234 B.R. at 312.

[754] *Tese-Milner v. Moon* (*In re Moon*), 385 B.R. 541, 552 (Bankr. S.D.N.Y. 2008) (citing *Bonded Fin. Servs., Inc. v. European Am. Bank*, 838 F.2d 890, 893 (7th Cir. 1988)).

[755] *In re Finley, Kumble*, 130 F.3d at 56 (citations omitted) (noting that "[n]umerous courts have recognized the distinction between the initial recipient—that is, the first entity to touch the disputed funds—and the initial transferee under section 550").

other asset, the right to put the money to one's own purposes."[756] Accordingly, "an initial transferee is the [entity that] has dominion and control over the subject of the initial transfer to the extent that [it] may dispose of it as [it] pleases . . . ."[757]

### (2) Entity For Whose Benefit A Transfer Was Made

Unlike the initial transferee, the entity for whose benefit a transfer was made does not exercise dominion and control over the subject of the transfer—the benefit arises "without the beneficiary ever holding the money or property, precisely because someone else received it."[758] The archetype of the "entity for whose benefit a transfer [was] made is a guarantor" of the debtor.[759] "Even though the guarantor does not receive any payment, the guarantor is 'no longer exposed to liability on its guarantee because the underlying obligation has been satisfied.'"[760]

"The key to pegging the entity for whose benefit a transfer was made" is a two-part inquiry: (1) "the entity must [have been] the intended beneficiary" of the transfer; and (2) "the intended benefit must have originated from the initial transfer."[761] With respect to the intent requirement, "showing a direct, ascertainable and quantifiable monetary benefit to the defendant would obviate the need to show intent."[762] Therefore, "[i]n order to establish liability for [an entity] for whose benefit the transfer was made, [t]he benefit must be direct, ascertainable and quantifiable and must correspond to, or be commensurate with, the value of the property that was transferred."[763]

### (3) AFI Was The Initial Transferee Or The Entity For Whose Benefit Certain Transfers Were Made

In certain of the transfers discussed in this Section, the property at issue passed through certain ResCap entities before ultimately being transferred to AFI or one of its affiliates. In such instances, AFI was the initial transferee within the meaning of section 550(a)(1) because either (1) the last ResCap entity to exercise dominion and control over the property transferred

---

[756] *Id.* at 57 (quoting *Bonded Fin. Servs.,* 838 F.2d at 893).

[757] *Stratton Oakmont,* 234 B.R. at 313 (citations omitted).

[758] *Id.* at 313–14 (citing *In re Finley, Kumble*, 130 F.3d at 57; *Bowers v. Atlanta Motor Speedway, Inc.* (*In re Se. Hotel Props Ltd. P'ship*), 99 F.3d 151, 155 (4th Cir. 1996); *Danning v. Miller* (*In re Bullion Reserve of N. Am.*), 922 F.2d 544, 547–48 (9th Cir. 1991); *Bonded Fin. Servs.,* 838 F.2d at 895)).

[759] *Gowan v. Amaranth LLC* (*In re Dreier LLP*), 452 B.R. 451, 466 (Bankr. S.D.N.Y. 2011) (citing *Bonded Fin. Servs.,* 838 F.2d at 890).

[760] *Id.* (quoting *Enron Creditors Recovery Corp. v. J.P. Morgan Sec., Inc* (*In re Enron Creditors Recovery Corp.*), 407 B.R. 17, 32–33 (Bankr. S.D.N.Y. 2009), *rev'd on other grounds*, 422 B.R. 423 (S.D.N.Y. 2009)).

[761] *Id.* (quoting *Stratton Oakmont*, 234 B.R. at 314).

[762] *In re Enron Creditors Recovery Corp.*, 407 B.R. at 34.

[763] *In re Dreier LLP*, 452 B.R. at 466 (alternation in original) (quoting *In re Enron Creditors Recovery Corp.*, 407 B.R. at 33) (internal quotation marks omitted).

it directly to AFI; or (2) an intermediate ResCap entity that initially received property could be characterized as a "mere conduit" between the transferor ResCap entity and AFI. In certain other of the transfers discussed in this Section, AFI was an "entity for whose benefit such transfer was made" within the meaning of section 550(a)(1) because it received a direct, ascertainable, and quantifiable benefit commensurate with the full amount of the value transferred. Therefore, the Examiner concludes that, to the extent that any of transfers identified in this Section are avoided, such transfers are recoverable under Bankruptcy Code section 550(a)(1) and that it is unlikely that AFI or its affiliates would prevail in asserting any of the defenses available only to subsequent transferees under Bankruptcy Code section 550(b).

### b. Recovery Limited To A Single Satisfaction

As discussed above, under Bankruptcy Code section 550(a), to the extent a transfer is avoided, the trustee is permitted to recover from any of the initial transferee, an entity for whose benefit such transfer was made, or a subsequent transferee (subject, in the case of a subsequent transferee, to the limitations set forth in Bankruptcy Code section 550(b)). However, pursuant to section 550(d), "[t]he trustee is entitled to only a single satisfaction under [section 550](a)."[764] Therefore, even though more than one entity may be liable with respect to an avoided transfer, the trustee's remedy is limited to the recovery of the transferred property (or its value), and not damages.[765]

### c. Statute Of Limitations Governing Section 550

Under section 550(f), an action to recover avoided transfers of property must be brought no later than the earlier of (1) one year after the transfer was avoided; or (2) the date the bankruptcy case is closed or dismissed.[766] The limitations period runs from the date the transfer in question has been avoided, not from the date the transfer was made.[767]

---

[764] 11 U.S.C. § 550(d).

[765] *Andrew Velez Constr., Inc. v. Consol. Edison Co.* (*In re Andrew Velez Constr., Inc.*), 373 B.R. 262, 274–75 (Bankr. S.D.N.Y. 2007) (citation omitted) ("The trustee is not entitled to double recovery, or a windfall that would benefit the estate.").

[766] 11 U.S.C. § 550(f); *Enron Corp. v. J.P. Morgan Sec. Inc.*, (*In re Enron Corp.*), 361 B.R. 36, 50 n.7 (Bankr. S.D.N.Y. 2006) (citation omitted).

[767] *See Picard v. Madoff* (*In re Bernard L. Madoff Inv. Sec. LLC*), 468 B.R. 620, 632 (Bankr. S.D.N.Y. 2012) (quoting *Official Comm. of Unsecured Creditors of M. Fabrikant & Sons, Inc. v. J.P. Morgan Chase Bank, N.A.* (*In re M. Fabrikant & Sons, Inc.*), 394 B.R. 721, 745 n.23 (Bankr. S.D.N.Y. 2008)) ("[W]ithout the judgment of avoidance, the period of limitations under § 550(f) would never start to run.").

## VII. REVIEW AND ANALYSIS OF ESTATE CAUSES OF ACTION IMPLICATED BY AFFILIATE TRANSACTIONS AND THE RELATIONSHIP AND COURSE OF DEALING AMONG RESCAP, AFI, ALLY BANK, AND CERBERUS

### G.  AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

As discussed in Section VII.E, potential claims exist for breaches of fiduciary duties by ResCap's directors and officers. The Examiner has concluded that, although certain potential claims for breaches of duties by ResCap fiduciaries are a close question, none of those fiduciary duty claims is likely to prevail.[1] Based on that conclusion, it is also unlikely that any corollary claims against AFI and its affiliates for aiding and abetting breaches of duties by ResCap fiduciaries would prevail, despite troubling conduct in particular circumstances that makes certain claims a close question. General legal principles governing potential aiding and abetting claims will be discussed below, followed by analysis of the viability of certain potential claims in light of those legal principles.

#### 1.  General Principles Of Aiding And Abetting Breach Of Fiduciary Duty

If a fiduciary breaches a duty, any third parties involved in the pertinent transaction, including parent entities, financial advisors, law firms, banking institutions, and private equity firms, may be found liable for aiding and abetting the underlying breach of fiduciary duty.[2]

##### a.  Choice Of Law Regarding Substantive Legal Standards

It is likely that either Delaware or Minnesota law would apply to a potential claim brought in a New York federal court against AFI Affiliates for aiding and abetting a breach of fiduciary duty by ResCap's directors and officers.[3] In New York, courts use three approaches to determine which state's law applies to a claim for aiding and abetting a breach of fiduciary duty: (1) "an internal affairs approach"; (2) "a torts based 'greatest interest' approach"; and (3)

---

[1]  *See* Section VII.E.2 (discussing various potential claims for breaches of duties by ResCap fiduciaries).

[2]  *See, e.g., Marino v. Grupo Mundial Tenedora, S.A.*, 810 F. Supp. 2d 601, 613 (S.D.N.Y. 2011); *Brandt v. Hicks, Muse & Co., Inc. (In re Healthco Int'l, Inc.)*, 208 B.R. 288, 309 (Bankr. D. Mass. 1997).

[3]  *See Buckley v. Deloitte & Touche USA LLP*, No. 06 Civ. 3291(SHS), 2007 WL 1491403, at \*13 (S.D.N.Y. May 21, 2007) (aiding and abetting breach of fiduciary duty claim is "relate[d] to the internal affairs of a corporation, [and was therefore] governed by the law of the state of incorporation"); *Official Comm. of Unsecured Creditors of Hydrogen, L.L.C. v. Blomen (In re Hydrogen, L.L.C.)*, 431 B.R. 337, 350 (Bankr. S.D.N.Y. 2010); *Buchwald v. Renco Group, Inc. (In re Magnesium Corp. of Am.)*, 399 B.R. 722, 742 (Bankr. S.D.N.Y. 2009) (applying New York law to aiding and abetting breach of fiduciary duty claims with respect to corporation incorporated in Delaware with principal place of business in New York); *Adelphia Commc'ns Corp. v. Bank of Am., N.A. (In re Adelphia Commc'ns Corp)* 365 B.R. 24, 24, 41 (Bankr. S.D.N.Y. June 11, 2007) (applying Pennsylvania law to aiding and abetting breach of fiduciary duty claims with respect to corporation incorporated in Delaware with principal place of business in Pennsylvania). The relevant entity for purposes of the choice-of-law analysis is ResCap rather than AFI. *See In re Hydrogen, L.L.C.*, 431 B.R. at 350. The same choice-of-law outcome applicable to a claim brought in New York federal court would likely apply to a claim brought in Minnesota state court, as a result of the substantial similarities of the elements of aiding and abetting breach of fiduciary duty claims under Delaware and Minnesota law. *See Nelson v. Delta Int'l Machinery Corp.*, Civil No. 05-63, 2006 WL 1283896, at \*2 (D. Minn. May 09, 2006) ("the first inquiry is whether an actual conflict of law exists," which will be found "if the application of either state's law would be outcome determinative"); *Nodak Mut. Ins. Co. v. Am. Family Mut. Ins.*, 604 N.W.2d 91, 93-94 (Minn. 2000).

"a hybrid approach."[4] Many courts have applied the internal affairs doctrine and thus have applied the law of the state of incorporation, similar to the choice-of-law analysis for a claim for breach of fiduciary duty.[5] However, recent decisions have reflected a preference for the "greatest interest" approach.[6] "The jurisdiction with the greatest interest is generally that of the principal place of business, where any injury as a consequence of any aiding and abetting would have been suffered."[7]

With respect to claims for aiding and abetting breaches of duties by ResCap fiduciaries, Delaware law would apply under an "internal affairs" approach (Delaware was ResCap's state of incorporation, as well as its limited liability company location),[8] or Minnesota law would apply under a "greatest interest" approach (Minnesota was ResCap's principal place of business).[9] Because, as discussed below, there are no material differences between aiding and abetting legal principles under Delaware and Minnesota law, the substantive outcome of the claim would be the same regardless of the approach taken under a choice-of-law analysis.

---

[4]   *Marino*, 810 F. Supp. 2d at 613. *Compare Buckley*, 2007 WL 1491403, at *13 (aiding and abetting breach of fiduciary duty claim is "relate[d] to the internal affairs of a corporation, [and is therefore] governed by the law of the state of incorporation"), *with Solow v. Stone*, 994 F. Supp. 173, 177 (S.D.N.Y. 1998) (determining choice of law for aiding and abetting claim under tort analysis, applying law of jurisdiction with greatest interest in regulating behavior), *and Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 446 F. Supp. 2d 163, 191–92 (S.D.N.Y. 2006) (New York follows internal affairs doctrine but does not require its application if another state has overriding interest in dispute).

[5]   *See In re Hydrogen, L.L.C.*, 431 B.R. at 350 ("Caselaw in this district is split as to what choice-of-law principle applies to a claim for aiding and abetting breach of fiduciary duty."); *In re Adelphia Commc'ns Corp.*, 365 B.R. at 39–40 ("The New York cases that address choice of law issues applicable to claims for aiding and abetting breaches of corporate fiduciary duty are split on whether the law of the state of incorporation or the law of the state with the greatest interests applies. Many apply the law of the state of incorporation to claims for aiding and abetting breaches of corporate fiduciary duty, just as they apply the law of the state of incorporation to claims of breaches of corporate fiduciary duty themselves.").

[6]   *In re Hydrogen, L.L.C.*, 431 B.R. at 350–51; *In re Magnesium Corp. of Am.*, 399 B.R. at 742 (citing *LaSala v. UBS, A.G.*, 510 F. Supp. 2d 213, 230–231 (S.D.N.Y. 2007); *O'Connell v. Arthur Andersen LLP (In re AlphaStar Ins. Grp. Ltd.)*, 383 B.R. 231, 271–72 (Bankr. S.D.N.Y. 2008); *Silverman v. H.I.L. Assocs. Ltd. (In re Allou Distrib. Inc.)*, 387 B.R. 365, 395–96 (Bankr. E.D.N.Y. 2008)).

[7]   *In re Hydrogen, L.L.C.*, 431 B.R. at 350; *In re Magnesium Corp. of Am.*, 399 B.R. at 742 (applying New York law to aiding and abetting breach of fiduciary duty claims, with respect to corporation incorporated in Delaware with principal place of business in New York); *In re Adelphia Commc'ns Corp.*, 365 B.R. at 41 (applying Pennsylvania law to aiding and abetting breach of fiduciary duty claims with respect to corporation incorporated in Delaware with a principal place of business in Pennsylvania).

[8]   *See* Sections III.E.6, VII.E.1.a. The "internal affairs" doctrine would lead to application of Delaware law to an aiding and abetting claim relating to a breach of fiduciary duty that occurred both before and after ResCap became a limited liability company. *See In re Hydrogen, L.L.C.*, 431 B.R., at 347.

[9]   *See* Residential Capital Corporation, Current Report (Form 10-K) (Mar. 28, 2006), at 1, 3; Residential Capital, LLC, Current Report (Form 10-K) (Mar. 13, 2007), at 1, 3; Residential Capital, LLC, Current Report (Form 10-K) (Feb. 27, 2008), at 1, 4.

### b.  Choice Of Law Regarding Statutes Of Limitations

With respect to an aiding and abetting claim brought in New York federal court, the choice-of-law analysis for the statute of limitations will mirror that applicable to the underlying fiduciary duty claim, and therefore the same limitations period will likely govern both claims.[10] However, there is no unitary limitations period under New York law for a fiduciary duty claim, as the governing limitations period will depend on the basis of the claim and the relief sought.[11] Thus, the statute of limitations governing a corollary aiding and abetting claim may similarly vary.[12] There is some uncertainty with respect to the applicable limitations period, as between three and six years, that would govern an aiding and abetting claim brought in Minnesota state court.[13]

### c.  Elements Of A Claim For Aiding And Abetting Breach Of Fiduciary Duty

Under Delaware law, "[t]he elements of a claim for aiding and abetting a breach of fiduciary duty are (1) the existence of a fiduciary relationship, (2) the fiduciary breached its duty, (3) a defendant, who is not a fiduciary, knowingly participated in [the] breach, and (4) damages to the plaintiff resulted from the concerted action of the fiduciary and the non-fiduciary."[14] Some Delaware courts have elaborated that in order to be liable for aiding and

---

[10] *In re Adelphia Commc'ns Corp.,* 365 B.R. at 57–58; *In re Magnesium Corp. of Am.*, 399 B.R. at 743; *Soward v. Deutsche Bank AG*, 814 F. Supp. 2d 272, 279 (S.D.N.Y. 2011) (the "fiduciary duty-based claims, which include . . . claims for breach of fiduciary duty and aiding and abetting breach of fiduciary duty, have the same statute of limitations").

[11] *See* Section VII.E.1.j(1) (discussing various potentially applicable statutes of limitations under New York law).

[12] *See* Section VII.E.1.j(3); *Donenfeld v. Brilliant Tech Corp.*, 20 Misc.3d 1139(A), at *2 (S.D.N.Y. July 14, 2008).

[13] The Minnesota statute of limitations for a claim for aiding and abetting a breach of fiduciary duty is six years. *See Alliance Bank v. Dykes* No. 62-CV-09-10096, 2012 WL 6734457, at *10 (Minn. App. Dec. 31, 2012). However, although there is scant relevant case authority, there is some possibility that a Minnesota court would apply the same "internal affairs" doctrine to an aiding and abetting claim as it would to the underlying claim for breach of fiduciary duty, which might result in a three-year limitations period under MINN. STAT. § 541.31 (2013). *See Matson Logistics, LLC* v. *Smiens,* Civil No. 12-400, 2012 WL 2005607, at *5 (D. Minn. June 05, 2012) (citing *Rupp v. Thompson,* No. C5-03-347, 2004 WL 3563775 (Minn. Dist. Ct. Mar. 17, 2004); *Calleros v. FSI Intern., Inc.,* 892 F. Supp. 2d 1163, 1169 n.7 (D. Minn. 2012) ("Under the 'internal affairs' doctrine, fiduciary-duty claims against FSI's directors are governed by Minnesota law because FSI is a Minnesota corporation.") (citing *Atherton v. FDIC,* 519 U.S. 213, 223–24 (1997)); *Transocean Grp. Holdings Pty Ltd. v. S.D. Soybean Processors, LLC,* 663 F. Supp. 2d 731, 742 n.5 (D. Minn. 2009) (citing *Potter v. Pohlad,* 560 N.W.2d 389, 391 (Minn. Ct. App. 1997)).

[14] *Feeley v. NHAOCG, LLC*, 62 A.3d 699, 658 (Del. Ch. 2012); *see also In re Direct Response*, 466 B.R. at 653; *McGowan v. Ferro*, 859 A.2d 1012, 1041 (Del. Ch. 2004), *aff'd*, 873 A.2d 1099 (Del. 2005); *CVC Claims Litig. LLC v. Citicorp Venture Capital Ltd.*, No. 03 Civ. 7936, 2007 WL 2915181, at *4 (S.D.N.Y. Oct. 4, 2007); *Miller v. Greenwich Capital Fin. Prods., Inc.* (*In re Am. Bus. Fin. Servs., Inc. I*), 361 B.R. 747, 757 (Bankr. D. Del. 2007); *Teacher's Ret. Sys. of La. v. Aidinoff*, 900 A.2d 654, 671 n.23 (Del Ch. 2006).

abetting a breach of fiduciary duty, the defendant must give "substantial assistance or encouragement to the fiduciary's wrongful conduct."[15]

Under Minnesota law, the elements of a claim for aiding and abetting the tortious conduct of another, including aiding and abetting breach of a fiduciary duty, are: "(1) the primary tort-feasor must commit a tort that causes an injury to the plaintiff; (2) the defendant must know that the primary tort-feasor's conduct constitutes a breach of duty; and (3) the defendant must substantially assist or encourage the primary tort-feasor in the achievement of the breach."[16]

The elements of the Delaware and Minnesota causes of action are substantially similar. As a threshold matter, under both Delaware and Minnesota law, an aiding and abetting claim is dependent upon the viability of an underlying claim for breach of fiduciary duty.[17] Further, under both Delaware and Minnesota law, a plaintiff must demonstrate specific facts alleging that the defendant knowingly participated in the underlying breach, in addition to showing damages.[18]

### d.   Aiding And Abetting Principles Under Delaware Law

As noted above, under Delaware (and Minnesota) law, a predicate breach of fiduciary duty must exist in order for an aiding and abetting claim to be actionable, let alone successful.[19] "Knowing participation" in the fiduciary duty breach "requires that the third party act with the knowledge that the conduct advocated or assisted constitutes such a breach."[20] The evidence must support the allegation that the defendant actively induced,

_____

[15] *See Rosener v. Majestic Mgmt., Inc. (In re OODC, LLC)*, 321 B.R. 128, 144 (Bankr. D. Del. 2005) (citations omitted).

[16] *Alliance Bank,* 2012 WL 6734457, at *11 (citing *Witzman v. Lehrman, Lehrman & Flom*, 601 N.W.2d 179, 187 (Minn. 1999)); *see also Senior Cottages of Am., LLC v. Morris, (In re Senior Cottages of Am., LLC)*, 438 B.R. 414, 426 (Bankr. D. Minn. 2010).

[17] *Debakey Corp. v. Raytheon Serv. Co*. No. 14947, 2000 WL 1273317, at *20 (Del. Ch. Aug. 25, 2000); *Alliance Bank,* 2012 WL 6734457, at *11 (citing *Witzman,* 601 N.W.2d at 187).

[18] *Malpiede v. Townson,* 780 A.2d 1075, 1097, 1098 n.84 (Del. Supr. 2001); *Matthews v. Eichorn Motors, Inc.,* 800 N.W.2d 823, 830–31 (Minn. App. July 11, 2011) (citing *Witzman,* 601 N.W.2d at 186).

[19] *See Debakey Corp. v. Raytheon Serv. Co*., 2000 WL 1273317, at *20; *see also Related Westpac LLC v. JER Snowmass LLC*, C.A. No. 5001-VCS, 2010 WL 2929708, at *8 (Del. Ch. July 23, 2010) ("Furthermore, because the breach of fiduciary duty claim is dismissed, the aiding and abetting claim must also be dismissed. Because 'no cognizable breach of fiduciary duty claim is stated,' the aiding and abetting claim also fails.").

[20] *Malpiede,* 780 A.2d at 1097; *see also Beard Research, Inc. v. Kates*, 8 A.3d 573, 603 (Del. Ch. 2010); *In re Nortel Networks, Inc*., 469 B.R. 478, 510 (Bankr. D. Del. 2012) ("[T]he defendant must have known that the fiduciary's conduct constituted a breach of the fiduciary's duties."); *Miller v. Greenwich Capital Fin. Prods., Inc*. (*In re Am. Bus. Fin. Servs., Inc. II*), 384 B.R. 80, 91 (Bankr. D. Del. 2008).

encouraged, or exploited the fiduciary's conduct that resulted in the breach of duty.[21] Merely engaging in an arm's-length transaction, however, will not amount to knowing participation in a fiduciary duty breach.[22] Further, knowing participation can be inferred from the facts.[23]

A plaintiff advancing an aiding and abetting claim must show that it suffered damages as a result of the underlying fiduciary duty breach.[24] This element can be satisfied where, as a result of a breach of fiduciary duty, monies are no longer available to pay creditors of an insolvent company.[25] For example, in *ASARCO LLC v. Americas Mining Corp*., the court held that creditors had established damages where as a result of an entity's overpayment of certain bonds in breach of a fiduciary duty, "ASARCO could have paid its vendors and service providers to continue operations and generate more income to satisfy other creditors, or if forced into bankruptcy, this amount would have been available to ASARCO's creditors as part of its bankruptcy estate."[26]

---

[21] *See Malpiede*, 780 A.2d at 1097–98, 1098 n.84.

[22] *See id.*

[23] *See In re Am. Bus. Fin. Servs., Inc. II*, 384 B.R. at 91. For example, in *Kates*, the court held that an entity and one of its officers aided and abetted a breach of fiduciary duty committed by a defendant who allegedly misappropriated trade secrets. *See Kates*, 8 A.3d at 604. The *Kates* court found that the entity and officer "knowingly participated" in the breach, as the officer arranged for the manager to give a presentation revealing confidential information, and the defendant entity "funded [a company], the vehicle to which Kates brought over a vast quantity of information in breach of his fiduciary duties." *Id*. While the officer contended that he interrupted the presentation to ensure that Kates was not disclosing confidential information, the court held that "actions . . . speak louder than their words . . . . [They] knew or should have known that Kates was using and disclosing to [the entity] confidential information . . . thereby breaching his fiduciary duties." *Id*. However, Delaware courts have dismissed aiding and abetting claims where a "[c]omplaint merely states in general terms that [the defendant] knew the directors and officers of [the entity] who breached their fiduciary duties, knew that their conduct amounted to such breach, and directed, encouraged, and assisted such conduct." *Official Comm. of Unsecured Creditors v. CIT Group/Business Credit, Inc. (In re Jevic Holding Corp.)*, Bankruptcy No. 08-11006, 2011 WL 4345204, at *13 (Bankr. D. Del. Sept. 15, 2011) ("'Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.'").

[24] *See McGowan*, 859 A.2d at 1041; *see also In re Jevic Holding Corp.*, 2011 WL 4345204, at *13 (plaintiff must "allege that it sustained damage that 'resulted from the concerted action of the fiduciary and the nonfiduciary,' as it is required to do under Delaware law").

[25] *See ASARCO LLC v. Am. Mining Corp.*, 396 B.R. 278, 413 (S.D. Tex. Aug. 30, 2008) (applying Delaware and New Jersey law).

[26] *See id.*

*e. Aiding And Abetting Principles Under Minnesota Law*

Under Minnesota law, in addition to requiring a successful underlying claim for breach of fiduciary duty, the "latter two elements [of an aiding and abetting claim] are evaluated 'in tandem'" such that "where there is a minimal showing of substantial assistance, a greater showing of scienter is required."[27] With respect to these elements of the claim:

> [W]hether the requisite degree of knowledge or assistance exists depends in part on the particular facts and circumstances of each case. Factors such as the relationship between the defendant and the primary tortfeasor, the nature of the primary tortfeasor's activity, the nature of the assistance provided by the defendant, and the defendant's state of mind all come into play.[28]

Further, "aiding and abetting liability is based on proof of a scienter—the defendants must know that the conduct they are aiding and abetting is a tort."[29] This requires that the third party generally must have "actual knowledge that the primary tortfeasor's conduct was wrongful."[30] However, "[i]n cases where the primary tortfeasor's conduct is clearly tortious or illegal, some courts have held that a defendant with a long-term or in-depth relationship with that tortfeasor may be deemed to have constructive knowledge that the conduct was indeed tortious."[31] Generally, imputing constructive knowledge to an aiding and abetting defendant may be unlikely, as "whether [a primary tortfeasor's] actions constituted a breach of his fiduciary duties requires a fact-intensive look at his conduct in comparison with that of a prudent person."[32]

---

[27] *Matthews v. Eichorn Motors, Inc.,* 800 N.W.2d 823, 830 (Minn. App. July 11, 2011) (citing *Witzman v. Lehrman, Lehrman & Flom*, 601 N.W.2d 179, 186 (Minn. 1999)).

[28] Matthews, 800 N.W.2d at 830.

[29] *Park Midway Bank, N.A. v. R.O.A., Inc.,* No. A11-2092, 2012 WL 3263866, at *4 (Minn. App. Aug. 13, 2012) (citing *Witzman*, 601 N.W.2d at, 186).

[30] *Senior Cottages of Am., LLC v. Morris, (In re Senior Cottages of Am., LLC)*, 438 B.R. 414, 426 (Bankr. D. Minn. 2010) (citing *Witzman*, 601 N.W.2d at, 188).

[31] *Christopher v. Hanson*, Civil No. 09-3703, 2011 WL 2183286, at *11 (D. Minn. June 06, 2011) (citing *Witzman*, 601 N.W.2d at, 188.

[32] *Id.*

### f. *Aiding And Abetting Breach Of Fiduciary Duty In The Parent-Subsidiary Context*

Parent corporations can be held liable for aiding and abetting breaches of fiduciary duties.[33] In fact, "it is uncontroversial for parent corporations to be subjected to claims for aiding and abetting breaches of fiduciary duty committed by directors of their subsidiaries."[34] Aiding and abetting claims can be brought against a parent entity where a subsidiary is left insolvent; a creditor of an insolvent debtor can sue a debtor's parent for purposely injuring the insolvent debtor to benefit the parent.[35] For example, an aiding and abetting claim may lie against a parent entity where it has "concocted, in bad faith, a scheme whereby one of its controlled, first-tier subsidiaries was rendered unable to pay its debts because [the parent] and a second-tier subsidiary permitted [the parent's] newly formed affiliate to obtain an equity interest in a third-tier subsidiary for an unfair value."[36]

With regard to the requisite knowledge a parent entity must have in order to be found liable for aiding and abetting, a relevant factor is whether "there was significant overlap between the board members" of the parent and subsidiary entities.[37] The *ASARCO* court noted that "ASARCO's board members who were not also on [the parent's] board were otherwise affiliated" with the parent company,[38] and also emphasized that "stocking the boards of its subsidiaries with [parent company] employees or loyal retainers was described as a 'uniform practice' and was one that continued up through the transaction in question, contrary to the advice of its corporate counsel."[39] The *ASARCO* court similarly found that the parent's actions could establish "substantial assistance" with respect to the underlying fiduciary duty breach:

> [The parent] gave substantial assistance or encouragement to ASARCO's directors' breach . . . [and the parent] was intricately involved in every aspect of the transaction. It was [the parent] that established the terms of the transaction and orchestrated the transfer of the stock from ASARCO [   ] to [the parent]. It also

---

[33] *See ASARCO LLC v. Ams. Mining Corp.*, 396 B.R. 278, 415–16 (S.D. Tex. Aug. 30, 2008); *VFB v. Campbell Soup Co*., 482 F.3d 624, 634 (3d Cir. 2007); *Claybrook v. Morris* (*In re Scott Acquisition Corp*.), 344 B.R. 283, 290 (Bankr. D. Del. 2006) (recognizing that a parent company may be sued for aiding and abetting breaches related to its subsidiary).

[34] *Allied Capital Corp. v. GC-Sun Holdings, L.P*., 910 A.2d 1020, 103–39 (Del. Ch. 2006) ("[Delaware's] acceptance of claims for aiding and abetting breaches of fiduciary duty brought against parent corporations and their affiliates, including subsidiaries, belies any outright rejection of the proposition that wholly-owned and/or commonly-controlled entities cannot be held responsible for each other's acts when those acts result from concerted unlawful activity").

[35] *See id*. at 1025.

[36] *Id*.

[37] *ASARCO*, 396 B.R. at 412.

[38] *Id*.

[39] *Id*. at 302–3.

dictated how the funds would be spent. It rejected all alternatives and insisted [on] the transaction . . . . [T]he evidence clearly establishes [the parent's] substantial assistance in structuring and closing the transaction that constituted the directors' breach. Therefore, the Court finds that [the parent] knowingly participated in ASARCO's directors' breach of fiduciary duty.[40]

g. *Aiding And Abetting Breach Of Fiduciary Duty In The Limited Liability Company Context*

Parties may be held liable for aiding and abetting breaches of fiduciary duties owed by members and managers of a limited liability company.[41] For example, in *In re Opus East, L.L.C.*, a bankruptcy trustee brought aiding and abetting breach of fiduciary duty claims against a limited liability company that was the debtor's sole member, a related corporation, and other entities and individuals who controlled the debtor, which allegedly existed to distribute capital to its parent.[42] While the defendant pointed to an exculpatory clause in the limited liability company agreement in support of its motion to dismiss the aiding and abetting claims, the court held that an exculpatory clause is an affirmative defense and not a basis for a motion to dismiss, and that "[b]ecause the duties owed by fiduciaries are the same whether it be a corporation or limited liability company, the fiduciary duties the Defendants owe the Debtor are derived from common law and not dependent on the LLC Agreement."[43]

---

[40] *Id.* at 412–13.

[41] *See Feeley v. NHAOCG, LLC*, 62 A.3d 644, 660 (Del. Ch. Nov. 28, 2012) ("Numerous Court of Chancery decisions hold that the managers of an LLC owe fiduciary duties."); *In re Opus East, L.L.C.*, 480 B.R. 561, 572 (Bankr. D. Del. 2012) ("[T]he duties owed by fiduciaries are the same whether it be a corporation or limited liability company, the fiduciary duties the Defendants owe the Debtor are derived from common law and not dependent on the LLC Agreement.").

[42] *See* 480 B.R. at 566.

[43] *Id.* at 572; *see also In re OODC., LLC*, 321 B.R. 128, 144 (Bankr. D. Del. 2005) (principal of selling company could be held liable in action brought by Chapter 11 trustee of limited liability company for aiding and abetting breaches of fiduciary duties owed by selling company's officers and directors).

### h. Potential Affirmative Defenses To An Aiding And Abetting Claim

#### (1) Exculpation Provision

While a party accused of breaching a fiduciary duty may avoid liability by asserting as an affirmative defense section 102(b)(7) of the Delaware Code, which exculpates certain breaches of fiduciary duty,[44] "[s]ection 102(b)(7) . . . do[es] not protect aiders and abetters."[45] Even if the underlying primary violator on a claim for breach of fiduciary duty cannot be held liable because of an applicable exculpation clause, aiders and abetters of that breach can nevertheless be held liable:

> [The] duty of care claim is dismissed as to the director Individual Defendants because the § 102(b)(7) provision in [the entity's] certificate of incorporation exculpates them from monetary liability on such a claim . . . . The fact that [the] directors can be held harmless for breaching their duty of care does not necessarily prevent the Court from ultimately finding that a breach of the duty of care occurred and was knowingly assisted by some or all of the Lenders, however.[46]

Accordingly, a viable aiding and abetting claim can be advanced even in connection with an underlying claim for breach of the duty of care that may be exculpated by a corporate charter.

#### (2) In Pari Delicto Defense

Both Delaware and Minnesota law recognize the *in pari delicto* doctrine as a potential defense to an aiding and abetting claim.[47] Under the *in pari delicto* doctrine, "a party is barred from recovering damages if his losses are substantially caused by activities the law forbade him to engage in."[48] Delaware courts do not require the application of an "equal fault"

---

[44] *See* Section IV.B (discussing exculpation issues with respect to ResCap fiduciaries).

[45] *In re Celera Corp. Shareholder Litig*., Civil Action No. 6304-VCP, 2012 WL 1020471, at *28 (Del. Ch. Mar. 23, 2012); *see also In re Del Monte Foods Co. Shareholders Litig*., 25 A.3d 813, 838 (Del. Ch. 2011) ("By their terms, Sections 102(b)(7) and 141(e) do not protect aiders and abetters.").

[46] *In re Fedders N. Am., Inc*., 405 B.R. 527, 544 n.8 (Bankr. D. Del. 2009) (citing *Khanna v. McMinn*, No. Civ. A. 20545-NC, 2006 WL 1388744 at * 25 (Del. Ch. May 9, 2006) ("Charter provisions adopted under § 102(b)(7) merely work to exculpate liability, but do not erase the underlying breach of fiduciary duty.")).

[47] *See Am. Int'l Grp. v. Greenberg (In re Am. Int'l. Grp. Consol. Deriv. Litig*.), 976 A.2d 872, 882 (Del. Ch. 2009) (citing *Burns v. Ferro*, No. C.A. 88C-SE-178, 1991 WL 53834, at *2 (Del. Super. Mar. 28, 1991)); *In re Senior Cottages of Am., LLC*, 482 F.3d 997, 1005 (8th Cir. 2007); *In re Petters Co., Inc*., 480 B.R. 346, 360-61 (Bankr. D. Minn. 2012).

[48] *In re Am. Int'l Grp. Consol. Deriv. Litig.,* 976 A.2d 872, 883 (citing *In re LJM2 Co–Inv., L.P.*, 866 A.2d 762, 883 (Del. Ch.2004)); *see also OHC Liquidation Trust v. Credit Suisse First Bos. (In re Oakwood Homes Corp*.), 389 B.R. 357, 365 (D. Del. 2008) ("a plaintiff's recovery may be barred by his own wrongful conduct") (quoting *Pinter v. Dahl*, 486 U.S. 622, 632 (1988)), *aff'd*, 356 F. App'x 622 (3d Cir. 2009); *In re Petters Co., Inc*., 480 B.R. 346, 360 (Bankr. D. Minn. 2012).

principle that requires a court to discern "which of the parties acted with the guiltiest mind."[49] Rather, the application of the *in pari delicto* doctrine in Delaware "simply requires the court to determine that each party acted with scienter in the sense that it was a knowing and substantial participant in the wrongful scheme."[50] Under Minnesota law, "in pari delicto operates to bar suits between two wrongdoers who are at equal fault."[51] Several exceptions exist to the applicability of the *in pari delicto* doctrine,[52] including the "adverse interest" exception under both Delaware and Minnesota law.[53]

### i. Burden With Respect To Fraud-Based Aiding And Abetting Claim

As with respect to a claim for breach of fiduciary duty, a plaintiff alleging fraud as an aspect of a claim for aiding and abetting a breach of fiduciary duty must meet the requirements of Federal Rule of Civil Procedure 9(b).[54]

### j. Remedies On An Aiding And Abetting Claim

A party that aids and abets a fiduciary duty breach "is liable for the full amount of damages to the injured party caused by that breach,"[55] and will be liable for these damages even if that party did not profit from the breach.[56] Accordingly, a successful claim for aiding and abetting breach of fiduciary duty may result in a monetary recovery against aiders and abettors.[57]

---

[49] *In re Am. Int'l Grp. Consol. Deriv. Litig.,* 976 A.2d at 884.

[50] *Id.*

[51] *Christians v. Grant Thornton, LLP*, 733 N.W.2d 803, 810 (Minn. App. 2007).

[52] *See In re Am. Int'l Grp. Consol. Deriv. Litig.,* 976 A.2d at 883; *Off. Comm. of Unsecured Creditors of Allegheny Health, Educ. & Research Found. v. PricewaterhouseCoopers, LLP*, 607 F.3d 346, 354 (3d Cir. 2010) (citations omitted); *Christians v. Grant Thornton, LLP*, 733 N.W.2d 803, 810 (Minn. App. 2007).

[53] *See In re Am. Int'l Grp. Consol. Deriv. Litig.*, 976 A.2d at 891; *Christians v. Grant Thornton, LLP*, 733 N.W.2d 803, 810 (Minn. App. 2007); *see generally* Section VII.L.1.b.2 (discussing the applicability of the *in pari delicto* doctrine and its exceptions under New York and Minnesota law with respect to the 2006 Bank Restructuring).

[54] *See Marino v. Grupo Mundial Tenedora, S.A.*, 810 F. Supp. 2d 601, 606 (S.D.N.Y. 2011); *Silverman v. H.I.L. Assocs. Ltd. (In re Allou Distribs. Inc.*), 387 B.R. 365, 409 (Bankr. E.D.N.Y. 2008); *see also* Section VII.E.1.h (discussing a plaintiff's burden with respect to advancing a fraud-based fiduciary duty claim).

[55] 28 GLEN BANKS, N.Y. PRAC., CONT. L. § 21:68 (1st ed. 2006) (citing *Klein v. Gutman*, 12 A.D.3d 348, 784 N.Y.S.2d 145 (N.Y. App. Div. 2004)); *see also Beard Research, Inc. v. Kates*, 8 A.3d 573, 619 (Del. Ch. 2010); *Pace v. Perk*, 81 A.D.2d 444, 454-456 (N.Y. App. Div. 1981) ("Any one who knowingly participates with a fiduciary in a breach of trust is liable for the full amount of the damage caused thereby to the *cestuis que* trust.").

[56] *See* 28 GLEN BANKS, N.Y. PRAC., CONT. L. § 21:68 (1st ed. 2006) (citing *Diduck v. Kaszycki & Sons Contractors, Inc*., 974 F.2d 270, 284 (2d Cir. 1992)).

[57] *See In re Hechinger Inv. Co*., 274 B.R. 71, 89 n.8 (D.Del. 2002).

## 2. Potential Claims Exist For Aiding And Abetting Breaches Of Duties By ResCap Fiduciaries

As discussed in Section VII.E.2, potential claims exist for breaches of duties by ResCap fiduciaries related to various Affiliate Transactions between ResCap and AFI. However, although ResCap fiduciaries engaged in certain problematic conduct in connection with such transactions, the Examiner has concluded that fiduciary duty claims, although a close question with respect to specific ones, would be unlikely to prevail because of particular factual and legal impediments to their success.[58] As a result, any corollary claims against AFI for aiding and abetting underlying breaches of fiduciary duty would similarly be unlikely to prevail. In the absence of a viable predicate claim of breach of fiduciary duty, it is unlikely that any associated aiding and abetting claim against AFI could survive as a matter of law.[59]

### a. Potential Aiding And Abetting Claims Relating To 2006 Bank Restructuring

The factual circumstances surrounding the effort to secure approval by Independent Directors Jacob and Melzer of the 2006 Bank Restructuring are troubling.[60] ResCap fiduciaries, including several with dual affiliations with ResCap and AFI (including Feldstein and Walker), purposefully withheld certain material information from Jacob and Melzer relating to the option of ResCap obtaining a voting interest in the restructured bank.

The Independent Directors were led to believe that the closing of the Cerberus transaction hinged on the approval of the 2006 Bank Restructuring on the transaction terms presented, which encompassed ResCap obtaining only a non-voting interest in the restructured bank. That result, in fact, was not dictated by the terms of the Cerberus PSA. ResCap fiduciaries had ample opportunities to disclose the withheld information to Jacob and Melzer and their counsel, but chose not to do so. The Independent Directors' approval of the 2006 Bank Restructuring, therefore, was arguably procured on the basis of incomplete material information. Had the dual-affiliated ResCap fiduciaries provided the withheld information to the Independent Directors, further negotiations between the parties regarding the terms of the transaction could—and likely would—have resulted in more favorable terms for ResCap.[61]

AFI-affiliated insiders, therefore, were involved in a protracted effort to withhold certain material information from the Independent Directors, which accrued to ResCap's detriment.[62] However, while a close question, the Examiner concludes it is more likely than not that a

---

[58] *See* Section VII.E.2 (discussing merits of, and conclusions regarding, various potential fiduciary duty claims).

[59] *See* Section VII.G.1.c (an aiding and abetting claim is dependent on the viability of an underlying claim for breach of fiduciary duty).

[60] *See* Sections V.A, VII.E.2.a, VII.L.1 (discussing the facts relevant to the 2006 Bank Restructuring).

[61] *See* Sections VII.E.2.a(3), VII.L.1 (discussing issues related to the harm that may have resulted from the concealment by ResCap fiduciaries, including affiliates of AFI, from the Independent Directors of material information relating to the 2006 Bank Restructuring).

[62] *See* Sections V.A, VII.E.2.a, VII.L.1 (discussing role of AFI-affiliated insiders in concealment effort).

claim against AFI and its affiliates for aiding and abetting a breach of duty by ResCap fiduciaries would not prevail. As a threshold matter, the Examiner has determined that the underlying fiduciary duty claim, upon which an aiding and abetting claim necessarily would be predicated,[63] is, although a close question, unlikely to prevail.[64] Legal impediments exist to the success of the underlying fiduciary duty claim, including the absence of a definitive fiduciary duty to disclose the withheld information to the Independent Directors[65] and barriers to the claim's timeliness.[66] Accordingly, to the extent the underlying fiduciary duty claim is destined to fail in the face of formidable legal obstacles, a corollary aiding and abetting claim could not succeed.

Further, even if the underlying fiduciary duty claim could overcome the various impediments to its success, a related aiding and abetting claim would confront its own hurdles. A plaintiff would have to show "knowing participation" by the AFI-affiliated insiders in the underlying breach of fiduciary duty.[67] While the AFI-affiliated insiders likely understood that certain information was being withheld from the Independent Directors, it is much less certain that they understood that any fiduciary duties were being breached in the process. Indeed, it is likely, as a matter of law, that a fiduciary duty to disclose the withheld information would not be chargeable to the ResCap fiduciaries,[68] and therefore unlikely that the AFI-affiliated insiders "knowingly participated" in conduct that they understood constituted a breach of fiduciary duty. Further, they may have rationalized withholding the information from the Independent Directors on the basis of their own conception of and justification for the transaction in a broader context.[69] The AFI-affiliated insiders, therefore, likely did not know they were aiding and abetting a tort, and thus more likely than not lacked the requisite scienter to satisfy a key element of the claim. Finally, as with respect to a potential fraud claim against AFI related to the 2006 Bank Restructuring, the *in pari delicto* doctrine would pose a substantial threshold barrier to an aiding and abetting claim based on the participation of ResCap fiduciaries in the alleged misconduct.[70]

---

[63] *See* Section VII.G.1.c (discussing necessary dependence of aiding and abetting claim on predicate claim for breach of fiduciary duty).

[64] *See* Section VII.E.2.a (discussing conclusions regarding viability of underlying claim for breach of fiduciary duty related to the 2006 Bank Restructuring).

[65] *See* Section VII.E.2.a(1) (discussing whether ResCap directors and officers had a fiduciary duty to disclose the withheld information to the Independent Directors).

[66] *See* Section VII.E.2.a(2) (discussing whether the underlying fiduciary duty claim may be time-barred).

[67] *See* Section VII.G.1.c.

[68] *See* Section VII.E.2.a(1).

[69] *See* Sections VII.L.1.a, VII.L.1.b(2), VII.L.1.b(3) (discussing the factual background of the 2006 Bank Restructuring and the viability of a related fraud claim in the context of the broader circumstances).

[70] *See* Section VII.L.1.b(2) (discussing standing and *in pari delicto* impediments to the viability of a fraud claim).

#### b. *Potential Aiding And Abetting Claims Relating To Prepetition Asset Sales*

The Examiner concludes it is unlikely that a claim for aiding and abetting breaches of fiduciary duty relating to the Prepetition Asset Sales would prevail. There was likely no misconduct by and no harm to ResCap associated with those Affiliate Transactions.

As discussed in Section VII.E.2.b, the Examiner concluded it is unlikely that any claim for breach of fiduciary duty relating to the Prepetition Asset Sales would prevail. Although certain of those transactions occurred under hurried circumstances and on a rapid schedule,[71] ResCap fiduciaries appear to have made informed decisions to engage in the transactions. Further, even if fiduciary duties were breached, there is no indication that ResCap was harmed. Thus, in the absence of a viable claim for breach of duty by ResCap fiduciaries related to the Prepetition Asset Sales, a corollary aiding and abetting claim against AFI is unlikely to prevail.

#### c. *Potential Aiding And Abetting Claims Relating To The January 30 Letter Agreement, $48.4 Million Prepetition Indemnity Payment, And A&R Servicing Agreement*

The Examiner concludes it is unlikely that claims for aiding and abetting breaches of fiduciary duty relating to the January 30 Letter Agreement, a related $48.4 million prepetition indemnity payment to Ally Bank, and the A&R Servicing Agreement would prevail.

As discussed in Section VII.E.2.c, those Affiliate Transactions were generally the product of extensive, arm's-length negotiations; reflected reasonable decision-making by ResCap fiduciaries, often in the face of difficult circumstances; and resulted in no harm to ResCap.[72] Here, too, an aiding and abetting claim would need to be predicated on a viable underlying claim for breach of fiduciary duty,[73] and likely could not be.

#### d. *Potential Aiding And Abetting Claims Relating To Approval Of The AFI And RMBS Trust Settlements*

The Examiner concludes it is unlikely that claims for aiding and abetting breaches of fiduciary duty relating to the work of the Special Review Committee and ResCap Board with respect to approval of the (now-terminated) AFI Settlement and Plan Sponsor Agreement and the RMBS Trust Settlement Agreements would prevail. Although the efforts of the involved ResCap fiduciaries were not optimal, they do not rise to the level of breaches of fiduciary duty,[74] and therefore no corollary aiding and abetting claims against AFI are likely to be viable.

---

[71] *See generally* Section V.F (discussing facts pertinent to the Prepetition Asset Sales between ResCap and AFI).

[72] *See generally* Section V.C (discussing facts pertinent to these related-party transactions).

[73] *See* Section VII.G.1.c.

[74] *See* Section VII.E.2.d (discussing viability of potential fiduciary duty claims related to these agreements).

Most significantly, AFI cannot be held liable for the sub-optimal performance of the ResCap Board in relation to these agreements.[75] The work of the Special Review Committee of the ResCap Board and their legal counsel in connection with investigating and settling potential claims against AFI was incomplete and flawed, yet AFI cannot be held legally responsible for those deficiencies as the work was conducted independently of AFI. Similarly, defects in the ResCap Board's consideration and approval of the RMBS Trust Settlement Agreements cannot properly be attributed to participation by AFI.

---

[75] *See generally* Section III.J (discussing flawed processes that led to the ResCap Board's approval of the AFI Settlement and Plan Sponsor Agreement and RMBS Trust Settlement Agreements).

## VII. REVIEW AND ANALYSIS OF ESTATE CAUSES OF ACTION IMPLICATED BY AFFILIATE TRANSACTIONS AND THE RELATIONSHIP AND COURSE OF DEALING AMONG RESCAP, AFI, ALLY BANK, AND CERBERUS

## H.  COMMON LAW CONTRIBUTION CLAIMS

During the course of the Investigation, it was asserted that ResCap may have a right of contribution against (1) Ally Bank with respect to representation and warranty claims; and (2) AFI with respect to federal securities violations. The Examiner also considered whether ResCap may have a claim for contribution against AFI with respect to payments made under the DOJ/AG Consent Judgment.

Very generally, there are two primary prerequisites for a claim for contribution: (1) a situation in which the party seeking contribution and the party or parties from whom contribution is being sought share some liability or burden; and (2) the party seeking contribution has discharged more than its fair share of the liability or burden.

### 1.  Choice-Of-Law

A bankruptcy court confronting state law claims is to apply the choice-of-law rules of the state in which it sits.[1] Given that the Bankruptcy Court sits in New York, the Examiner applied New York's choice-of-law rules to determine the governing law for potential contribution claims.

#### a.  Does An Actual Conflict-Of-Law Exist Between New York Law And The Laws Of Other Interested Jurisdictions?

"The first step of New York's choice-of-law rules is to determine whether there is an actual conflict between the laws of the jurisdictions involved."[2] In this case, jurisdictions that are potentially interested in one or more of the transactions investigated by the Examiner include Michigan,[3] Minnesota,[4] New York,[5] and Pennsylvania.[6]

---

[1]   *See Statek Corp. v. Dev. Specialists, Inc. (In re Coudert Bros. LLP)*, 673 F.3d 180, 186 (2d Cir. 2012) ("It is well established that a federal court sitting in diversity must generally apply the choice-of-law rules of the state in which it sits. And it is now well established that a bankruptcy court must also apply state choice of law rules."); *Bianco v. Erkins* (*In re Gaston & Snow*), 243 F.3d 599, 601–02 (2d Cir. 2001) ("bankruptcy courts confronting state law claims that do not implicate federal policy concerns should apply the choice-of-law rules of the forum state."); *In re PSINet Inc.*, 268 B.R. 358, 376 (Bankr. S.D.N.Y. 2001) ("Where, as here, this Court's subject matter jurisdiction is based on 28 U.S.C. § 1334, the Court applies, with respect to matters of state law, the conflicts of law principles of the forum state, *i.e.*, the State of New York.").

[2]   *Paradigm BioDevices, Inc. v. Viscogliosi Bros., LLC*, 842 F. Supp. 2d 661, 665 (S.D.N.Y. 2012) (citing *Drenis v. Haligiannis*, 452 F. Supp. 2d 418, 426 (S.D.N.Y.2006)) (quoting *In the Matter of Allstate Ins. Co.*, 613 N.E.2d 936 (NY 1993)). If there is no actual conflict between the laws of the jurisdictions involved, a court may avoid the choice-of-law analysis. *Curley v. AMR Corp.*, 153 F.3d 5, 12 (2d Cir. 1998) (citing *Matter of Allstate Ins. Co.*, 613 N.E.2d at 937).

[3]   AFI's principal place of business is located in Michigan.

[4]   ResCap's principal place of business is located in Minnesota.

[5]   In the First Day Affidavit, the Debtors stated that ResCap "maintains its headquarters at its New York office located at 1177 Avenue of the Americas, New York, New York 10036." First Day Affidavit at 3. The Debtors further stated that "the New York office has served as the primary office for the senior executives and core management team of the largest operating Debtors—ResCap, Residential Funding Company LLC . . . and GMAC Mortgage, LLC." *Id.*

[6]   Ally Bank and GMAC Mortgage's principal place of business is in Pennsylvania.

Under Pennsylvania,[7] Minnesota,[8] and Michigan[9] law, a common law claim for contribution may only be asserted against a tortfeasor who shares a common liability to the injured party. In contrast, under New York law, a tortfeasor may assert a claim for contribution against another entity that is not liable to the injured party. It is "well established" in New York that a tortfeasor "may seek contribution from a third party even if the injured party has no direct right of recovery against that party" provided that "there has been a breach of duty that runs from the contributor to the defendant who has been held liable" and that breach "had a part in causing or augmenting the injury for which contribution is sought."[10] This rule reflects New York's expansive approach to permitting contribution claims regardless of whether the injured party chose to sue a potential defendant or whether such action may have been barred against such defendant because of substantive or procedural rules.[11] Accordingly, the

---

[7]  *See* 42 PA. CONS. STAT. § 8321. Pennsylvania has adopted the Uniform Contribution Among Tortfeasors Act (1939). Its contribution statute provides, in relevant part:

> § 8322. Definition.
> As used in this subchapter "joint tort-feasors" means two or more persons jointly or severally liable in tort for the same injury to persons or property, whether or not judgment has been recovered against all or some of them.

> § 8324. Right of contribution.
> (a)  General rule.—The right of contribution exists among joint tort-feasors.
> (b)  Payment required.—A joint tort-feasor is not entitled to a money judgment for contribution until he has by payment discharged the common liability or has paid more than his pro rata share thereof.

42 PA. CONS. STAT. § 8322, 8324.

[8]  Minnesota recognizes a common law contribution claim, but has not codified the law. *See In re Individual 35w Bridge Litig.*, 786 N.W.2d 890, 894 (Minn. Ct. App. 2010) (internal citations omitted). Under Minnesota law, "[t]wo requirements must be met before contribution may be obtained: First, the co-tortfeasors must be under a common liability to the injured party. Second, the co-tortfeasors claiming contribution must have paid a disproportionate share of the judgment." *Id.* (internal citations omitted).

[9]  *See* MICH. COMP. LAWS ANN. § 600.2925a. Michigan has codified its common law claim for contribution in Michigan Comparative Law § 600.2925a and provides, in relevant part:

> (1) Except as otherwise provided in this act, when 2 or more persons become jointly or severally liable in tort for the same injury to a person or property or for the same wrongful death, there is a right of contribution among them even though judgment has not been recovered against all or any of them.

> (2) The right of contribution exists only in favor of a tort-feasor who has paid more than his pro rata share of the common liability and his total recovery is limited to the amount paid by him in excess of his pro rata share. A tort-feasor against whom contribution is sought shall not be compelled to make contribution beyond his own pro rata share of the entire liability.

MICH. COMP. LAWS ANN. § 600.2925a.

[10]  *Mar-Cone Appliance Parts Co. v. Mangan*, 879 F. Supp. 2d 344, 362 (W.D.N.Y. 2012) (citing *Raquet v.* Braun, 681 N.E.2d 404 (N.Y. 1997)).

[11]  *See Mar-Cone Appliance Parts Co.*, 879 F. Supp. 2d at 362.

Examiner concludes that it is likely that the Bankruptcy Court would find that an actual conflict exists between the contribution laws of New York and the other relevant jurisdictions.[12]

### b. Application Of New York Choice-Of-Law Rules

New York's choice-of-law rules differ depending on the nature of the claim (i.e. tort claims or contract claims).[13] With respect to tort claims, New York choice-of-law rules further differ depending whether the underlying substantive law is "conduct-regulating" or "loss allocating."[14] Conduct regulating law has "the prophylactic effect of governing conduct to prevent injuries from occurring."[15] Loss allocating law "prohibit[s], assign[s], or limit[s] liability after the tort occurs."[16] When a conflict concerns a loss allocating rule, including a claim for contribution, the court applies the three-part interest analysis rule established in *Neumeier v. Kuehner*[17] to determine the state with the greatest interest or concern with the specific issues raised in the litigation.[18]

The first *Neumeier* rule requires that when the plaintiff and defendant share a common domicile, the loss allocating rule of that state controls.[19] That rule does not resolve the present conflict because ResCap, on the one hand, and AFI, Ally Bank, and Ally Securities,[20] on the other hand, are domiciled in different states.[21] In that event, the second *Neumeier* rule provides that if the tort occurred in a state

_____

[12] *See Curley v. AMR Corp.*, 153 F.3d 5, 12 (2d Cir. 1998) ("Where the applicable law from each jurisdiction provides different substantive rules, a conflict of laws analysis is required."). An actual conflict is present "[w]here the applicable law from each jurisdiction provides different substantive rules." *Id.* at 12.

[13] *In re BP p.l.c. Derivative Litigation*, 507 F. Supp. 2d 302, 307 (S.D.N.Y. 2007)

[14] *Padula v. Lilarn Properties Corp.*, 84 N.Y.2d 519, 521–22 (N.Y. 1994).

[15] *Id.* at 552.

[16] *Id.* (noting that loss allocating rules include contribution rules).

[17] 286 N.E.2d 454, 457–58 (N.Y. 1972) (applying Ontario guest statute).

[18] *Mar-Cone Appliance Parts Co. v. Mangan*, 879 F. Supp. 2d 344, 363 (W.D.N.Y. 2012) (citing *Stichting Ter Behartiging Van de Belangen Van Oudaandeelhouders In Het Kapitaal Van Saybolt Int'l B.V. v. Schreiber*, 407 F.3d 34, 50 (2d Cir. 2005)); *see also Neumeier v. Kuehner*, 286 N.E.2d 454, 457–58 (N.Y. 1972); *Cooney v. Osgood Mach.*, 612 N.E.2d 277, 281 (N.Y. 1993).

[19] *See Mar-Cone Appliance Parts Co.*, 879 F. Supp. 2d at 363 (citing *Neumeier*, 286 N.E.2d at 457–58).

[20] AFI, Ally Bank, and Ally Securities are all AFI Defendants and AFI is a party to the DOJ/AG Settlement.

[21] The first *Neumeier* rule looks to the domicile of the parties involved in the litigation. The domicile of a corporation under New York choice-of-law rules is the state where the corporation maintains its principal place of business. *See Arakelian v. Omnicare, Inc.*, 735 F. Supp. 2d 22, 39 (S.D.N.Y. 2010) (citing *DiTondo v. Meagher*, 24 Misc. 3d 720 (N.Y. Sup. Ct. 2009)); *Carroll v. LeBoeuf, Lamb, Greene & MacRae, L.L.P.*, 392 F. Supp. 2d 621, 629, n.47 (S.D.N.Y. 2005) (citing *Elson v. Defren*, 283 A.D.2d 109, 116 (N.Y. App. Div. 2001)). The Second Circuit determines a corporation's principal place of business by applying the nerve center test, which is normally where a corporation maintains its headquarters. *See Chevron Corp. v. Donziger*, 871 F. Supp. 2d 229, 243 (S.D.N.Y. 2012); *Astra Oil Trading v. PRSI Trading Co. LP*, 794 F. Supp. 2d 462, 469 (S.D.N.Y. 2011); *Albstein v. Six Flags Entm't Corp.*, 2010 WL 4371433, *1 (S.D.N.Y. Nov. 4, 2010).

where one of the parties is domiciled and such state law favors its citizen, the law of the place of the tort controls.[22] If neither of the first two rules applies, the third *Neumeier* rule requires that the law of the state where the tort took place apply, "'unless it can be shown that displacing that normally applicable rule will advance the relevant substantive law purposes without impairing the smooth working of the multistate system or proceeding great uncertainty for litigations.'"[23]

Lawsuits asserting Third-Party Claims have been filed in different state and federal courts and the locations of the transactions subject to the Third-Party Claims vary. For the reasons discussed in Section VIII.C.1, the Examiner has analyzed Third-Party Claims issues under New York and Second Circuit law.[24] Given this analysis and the noted difficulties in undertaking a choice-of-law analysis with alleged torts having occurred across the United States, the Examiner has, for illustrative purposes only, chosen to consider ResCap's potential contribution claims under New York law.

## 2. New York Contribution Law

### a. Principles Of A Contribution Cause Of Action

Pursuant to § 1401 of New York Civil Practice Law and Rules, a claim for contribution may be alleged by one tortfeasor against another "based on a breach of duty of a tortious nature owed either to the plaintiff by the contributing third party or a special duty of tortious nature owed by the third party to the defendant seeking contribution or both."[25] The critical element in allowing a tortfeasor to proceed with a claim for contribution is that the party it seeks contribution from "must have had a part in causing or augmenting the injury for which contribution is sought."[26] Notably, New York law does not require that the party from whom contribution is sought be liable under the same theories of recovery, have acted in concert with the entity seeking contribution, or owe a duty to the injured party, so long as it

---

[22] *See Benitez v. Hitachi Metals Am. Ltd.*, 2012 WL 3249417, at *4 (S.D.N.Y. Aug. 4, 2012) (citing *Edwards v. Erie Coach Lines Co.*, 17 N.Y.3d 306 (2011); *Neumeier*, 286 N.E.2d 454).

[23] *Benitez*, 2012 WL 3249417, at *4 (quoting *Edwards v. Erie Coach Lines Co.*, 17 N.Y.3d 306 (2011)).

[24] *See* Section VIII.C.1. The Examiner also reviews the DOJ/AG Settlement under New York contribution law because it settles torts that occurred in multiple states and therefore presents the same difficulties noted with respect to Third Party Claims.

[25] *Mar-Cone Appliance Parts Co. v. Mangan*, 879 F. Supp. 2d 344, 368 (W.D.N.Y. 2012) (referring to N.Y. C.P.L.R. § 1401).

[26] *Amusement Indus., Inc. v. Stern*, 693 F. Supp. 2d 319, 324 (S.D.N.Y. 2010) (citing *Raquet v. Braun*, 681 N.E.2d 404 (N.Y. 1997) (citing *Nassau Roofing & Sheet Metal Co. v. Facilities Dev. Corp.*, 523 N.E.2d 803 (N.Y. 1988) (internal quotation marks omitted); *accord Rosner v. Paley*, 481 N.E.2d 553 (N.Y. 1985)). Note, however, that New York law provides that economic loss resulting from a breach of contract does not constitute "injury to property" within the meaning of New York's contribution statute. *See Board of Educ. of Hudson City Sch. Dist. v. Sargent, Webster, Crenshaw & Folley,* 71 N.Y.2d 21, 26 (1987).

owes a duty to one of the tortfeasors.[27] As a result, contribution claims are not limited to joint tortfeasors, but may be asserted against "concurrent, successive, independent, alternative, and intentional tortfeasors."[28]

In addition, the liability need not be proportioned equally among the tortfeasors.[29] Instead, the relative degrees of fault of the tortfeasors are to be taken into consideration in determining their pro rata shares.[30]

Under New York law, contribution can be pursued before an action has been brought or a judgment has been rendered against the person from whom contribution is sought.[31] However, such a claim does not entitle a party to contribution until such party has actually paid an amount in excess of its proportionate share of the judgment.[32]

---

[27] *See Silverman v. Seeling (In re Agape World, Inc.)*, 467 B.R. 556, 587 (Bankr. E.D.N.Y. 2012) (citing *Nassau Roofing*, 523 N.E.2d 803; *Perkins Eastman Architects, P.C. v. Thor Eng'rs, P.A.I*, 769 F. Supp. 2d 322, 327 (S.D.N.Y. 2011)) (applying New York contribution law in connection with a trustee's claim for contribution); *Firestone v. Berrios*, 2013 WL 297780, at *15 (E.D.N.Y. Jan. 22, 2013) (citing *Trustees of Columbia Univ. v. Mitchell/Giurgola Assocs.*, 109 A.D.2d 449 (N.Y. App. Div. 1985)).

[28] *Millennium Import, LLC v. Reed Smith LLP*, 104 A.D.3d 190, 194 (N.Y. App. Div. 2013) (citing *Schauer v. Joyce*, 429 N.E.2d 83 (N.Y. 1981)); *see also Mar-Cone Appliance Parts*, 879 F. Supp. 2d at 376 (citing *Board of Educ. of Hudson City School Dist.*, 517 N.E.2d at 1364 (holding that, like Delaware law, "New York [contribution] law also requires that to claim contribution the predicate special duty owed to a defendant by a third-party . . . must also arise in tort so as to render . . . such party a 'joint,' 'concurrent, successive independent alternative [or] . . . intentional tort feasor.'").

[29] *See Garret v. Holiday Inns*, 58 N.Y.2d 253, 258 (N.Y. 1983) ("Principles allowing apportionment among tort-feasors reflect the important policy that responsibility for damages to an injured person should be borne by those parties responsible for the injury, in proportion to their respective degrees of fault"); *Kelly v. Long Is. Light Co*, 286 N.E.2d 241, 243 (N.Y. 1972) ("The rule . . . now permits apportionment of damages among joint or concurrent tort-feasors regardless of the degree or nature of the concurring fault . . . . The fairer rule, we believe is to distribute the loss in proportion to the allocable concurring fault.").

[30] *See Westchester Cnty. v. Welton Becket Assocs.*, 102 A.D.2d 34, 47 (N.Y. App. Div. 1984) ("Each of the wrongdoers owes a duty to the injured party, and it is a fact question for the jury as to the degree of responsibility each wrongdoer must bear for causing the injury.").

[31] N.Y. C.P.L.R. § 1401 (1996); *see also Tokio Marine & Nichido Fire Ins. Co., Ltd. v. Calabrese*, 2013 WL 752259, at *11 (E.D.N.Y. Feb. 26, 2013) (citing *Klinger v. Dudley*, 361 N.E.2d 974, 979 (N.Y. 1977) (noting that a defendant may assert a claim for contribution prior to the payment of any amount to the plaintiff)).

[32] N.Y. C.P.L.R. § 1402 (1996); *see also Andrulonis v. United States*, 26 F.3d 1224, 1233 (2d Cir. 1994) (citing *Klinger v. Dudley*, 361 N.E.2d 974, 979 (N.Y. 1977)) ("Under New York law, the right to contribution does not arise in favor of the defendant unless and until the defendant pays the plaintiff an amount exceeding its equitable share of the primary judgment.").

### (1) Standard Of Proof

Under New York law, a party seeking contribution has the burden of proving that it is entitled to contribution.[33] To the extent liability is to be proportioned based on fault, the party seeking contribution must also provide some evidence as to what proportion of the obligations falls upon each tortfeasor.[34]

### (2) Statute Of Limitations

Under New York law, the statute of limitations for contribution is six years from when the claim accrues.[35] As noted above, a claim for contribution accrues when a party pays more than its proportionate share.[36]

### b. Transactions Implicated By The Contribution Causes Of Action

### (1) Third-Party Claims

As described in more detail in Section VIII, the Examiner has reviewed claims that have been asserted against the Debtors, AFI, Ally Bank, and Ally Securities on account of RMBS issued by the Debtors between 2003 and 2007.[37] These claims are based upon various legal theories, including breach of contract, fraud, negligence, and violation of state and federal securities laws. The plaintiffs are mainly investors who purchased securities from the Debtors and monoline insurers who guaranteed principal and interest payments to investors on account of the securities. Given the Examiner's mandate to determine whether the AFI Defendants have provided sufficient consideration for the Third-Party Release, the Investigation focused primarily on the extent to which AFI, Ally Bank, and Ally Securities might be held derivatively liable for the Debtors' RMBS-related conduct (assuming the Debtors are found liable for the underlying primary claims).

In order for ResCap to be entitled to contribution from AFI, Ally Bank or Ally Securities in connection with these claims, ResCap is required to have actually paid an amount in excess of its

---

[33] *See Silverman v. Seeling (In re Agape World, Inc.)*, 467 B.R. 556, 578 (Bankr. E.D.N.Y. 2012) ("[T]he party seeking contribution must make out all of the essential elements of a cause of action against the proposed contributor"); *Figueroa v. Kahn*, 101 Misc.2d 821, 822 (N.Y. Sup. Ct 1979).

[34] *See* 18 AM. JUR. 2D CONTRIBUTION § 117 (2013); *Charney v. Muss*, 149 A.D.2d 393, 394 (N.Y. App. Div. 1989).

[35] *See* N.Y. C.P.L.R. § 213; *see also Calcutti v. SBU, Inc.*, 273 F. Supp. 2d 488, 497 (S.D.N.Y. 2003) (citing *White v. Long*, 229 A.D. 2d 178, 182 (N.Y. App. Div. 1997); *Blum v. Good Humor Corp.*, 57 A.D.2d 911 (N.Y. App. Div. 1977)) ("Claims for contribution under New York law do not accrue, for statute of limitations purposes, until six years after payment is made on the underlying claim.").

[36] *Andrulonis v. United States*, 26 F.3d 1224, 1233 (2d Cir. 1994) (citing *Klinger v. Dudley*, 361 N.E.2d 974, 979 (N.Y. 1977)) ("Under New York law, the right to contribution does not arise in favor of the defendant unless and until the defendant pays the plaintiff an amount exceeding its equitable share of the primary judgment.").

[37] *See, e.g.*, Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the RMBS Trust Settlement Agreements [Docket No. 320] at 3 ("The R&W Claims are the single largest set of disputed claims against the Debtors' estates by a wide margin").

proportionate share of a judgment for liability.[38] The underlying lawsuits asserting Third Party Claims are still pending and ResCap has not been found liable pursuant to any judgment, much less paid more than its proportionate share of any such judgment. While under New York law, ResCap may assert a claim for contribution today, in no state (including New York) can ResCap recover from AFI, Ally Bank, or Ally Securities unless and until ResCap has paid more than its pro rata share in those lawsuits.[39] It is therefore premature for the Examiner to undertake any substantive analysis regarding any right to contribution that ResCap would have against AFI or Ally Bank.

### (2) February 2012 Payment Made Pursuant to the DOJ/AG Settlement

As described in more detail in Section V.C.1, on April 4, 2012, AFI, ResCap and GMAC Mortgage agreed to settle a number of potential civil claims against them for conduct related to the servicing of mortgage loans, the servicing of loans of borrowers in bankruptcy, and the origination of mortgage loans.[40] The DOJ/AG Consent Judgment provided that in return for the release of these potential claims, ResCap, AFI, and GMAC Mortgage were required to take a number of actions, including collectively paying $109.6 million to an escrow account of the DOJ, which would then be distributed to the states who were parties to the DOJ/AG Settlement.[41] Exhibit I of the DOJ/AG Consent Judgment specified that ResCap, GMAC Mortgage, and RFC (and not AFI) would pay the $109.6 million hard dollar payment and incorporated the DOJ/AG Earmark and Indemnification Agreement.[42]

In order for ResCap to have a claim for contribution against AFI, ResCap must prove that: (1) AFI had a part in causing or augmenting the injury for which contribution is sought; and (2) that ResCap discharged more than its pro rata share of the obligation to the DOJ under the DOJ/AG Settlement. At first glance, it would appear that ResCap could assert a contribution cause of action against AFI: AFI, ResCap, and GMAC Mortgage were all named settling parties under the DOJ/AG Consent Judgment and ResCap, through GMAC Mortgage, paid the entire hard cost of $109.6 million to the DOJ.[43] In

---

[38] As noted above, if ResCap is found liable solely on a breach of contract basis, it would not have a right of contribution against AFI. *See Board of Educ. Of Hudson City School Dist. v. Sargent, Webster, Crenshaw & Folley,* 71 N.Y.2d 21, 26 (1987).

[39] *See* N.Y. C.P.L.R. § 1402 ("The amount of contribution to which a person is entitled shall be the excess paid by him over and above his equitable share of the judgment recovered by the injured party; but no person shall be required to contribute an amount greater than his equitable share."); 42 PA. CONS. STAT. § 8329 ("A joint tort-feasor is not entitled to a money judgment for contribution until he has by payment discharged the common liability or has paid more than his pro rata share thereof"); MICH. COMP. LAWS. SERV. § 600.2925a ("The right of contribution exists only in favor of a tort-feasor who has paid more than his pro rata share of the common liability and his total recovery is limited to the amount paid by him in excess of his pro rata share."); *In re Individual 35w Bridge Litig.*, 786 N.W.2d 890, 894 (Minn. Ct. App. 2010) (noting that a co-tortfeasor seeking contribution must have paid more than its share of the judgment before contribution can be obtained).

[40] *See* Section V.C.1.d.(1).

[41] DOJ/AG Consent Judgment, ¶ 3. The judgment specifically states that "Defendant" shall pay the settlement amount and defines "Defendant" as ResCap, AFI and GMAC Mortgage, collectively. *Id.* at 1.

[42] DOJ/AG Consent Judgment, Ex. I, at 1-12.

[43] As noted in Section V.C.1.c.(5)(b), while ResCap is expected to incur significant remediation costs in connection with the FRB/FDIC Consent Order, it has not yet made any payments. Any meaningful analysis of a contribution claim relating to these remediation costs is premature.

exchange for ResCap's payment, the DOJ/AG Consent Judgment released AFI and its affiliates, including ResCap and GMAC Mortgage, from certain federal and state claims assertable by the DOJ and state AGs.[44]

While ResCap paid the entire $109.6 million owed under the DOJ/AG Settlement, AFI helped ensure that ResCap had the funds to make the payment. As discussed in Section V.C, AFI and ResCap entered into two agreements in anticipation of the government settlements to provide ResCap with sufficient liquidity to make payments that would be owed. First, AFI and ResCap entered into the January 30 Letter Agreement, pursuant to which AFI agreed to forgive secured indebtedness of $196.5 million under the A&R Line of Credit Agreement in exchange for ResCap's payment of future cash fines owed directly to applicable governmental authorities.[45] ResCap also agreed that it would reimburse AFI for any amounts expended in satisfying any obligation under the anticipated DOJ/AG Settlement.[46] Second, on March 14, 2012, AFI and ResCap entered into the Earmark Agreement, whereby ResCap agreed that it would use $109 million of the liquidity provided by AFI pursuant to the January 30 Letter Agreement to make the "hard cost" payment to the DOJ.[47] Without the debt forgiveness, ResCap would have been unable to pay the $109 million owed under the DOJ/AG Settlement.[48]

Assuming ResCap can demonstrate that AFI had a part in causing or augmenting the underlying injury that was settled pursuant to the DOJ/AG Settlement, it would still need to prove that ResCap discharged all or greater than its share of the joint obligation for the benefit of AFI. Such analysis would need to take into account value provided by AFI pursuant to the January 30 Letter Agreement and the Earmark Agreement. ResCap would bear the burden of proving the proper allocation of liability between ResCap and AFI.

As described in Section V.C.1.f, it appears that sometime in mid-February 2012, ResCap's and AFI's accounting departments determined that a 92%/8% allocation contained in a press release relating to the FRB/FDIC Settlement would govern how costs relating to all of the government settlements were to be allocated between ResCap and AFI.[49] This allocation was used to allocate costs of the DOJ/AG Settlement between ResCap and AFI, apparently without considering or making any effort to take into account the allegations that were actually being settled in the DOJ/AG Settlement.[50] The DOJ/AG

---

[44] DOJ/AG Consent Judgment, ¶¶ 9–10, Ex. G,H. The consideration set forth in the DOJ/AG Consent Judgment for this release also includes $200 million in consumer relief that was ultimately provided by ResCap and its subsidiaries. Pursuant to the terms set forth in Ex. I of the DOJ/AG Consent Judgment, AFI agreed to provide this $200 million in consumer relief to the extent that ResCap, GMAC Mortgage, and RFC did not perform such obligations. *Id*. Ex. I, ¶ 3.

[45] *See* Section V.C.2.a.

[46] *See* Section V.C.2.a.

[47] *See* Section V.C.1.d(3).

[48] *See* Section V.C.1.d(3).

[49] *See* Section V.C.1.f(4).

[50] According to Marano, the FRB/FDIC Settlement and the DOJ/AG Settlement were perceived as involving separate criteria. Int. of T. Marano, Feb. 27, 2013, at 23:1–24:12 (noting that the FRB used different criteria than the DOJ in evaluating the settlements and that the FRB criteria involved a separate examination resulting in the identification of 15 statutory violations, 11 of which were attributable to ResCap and 4 of which were attributable to AFI).

Settlement itself does not include any allocation of fault between AFI and ResCap. As discussed in Section V.C.1, the allocation of costs for the DOJ/AG Settlement between AFI and ResCap was ultimately based on the division contained in the FRB press release.

The Examiner is unable to conclude whether another allocation of fault between AFI and ResCap relating to the DOJ/AG Settlement would be more appropriate and, therefore, whether a contribution claim asserted by ResCap would prevail. The burden of proof to the extent ResCap believes that AFI should bear a greater percentage of the costs will rest with ResCap.

As discussed above, however, AFI did forgive debt and provide liquidity to ResCap so that it could pay the settlement amount. In addition, as noted in Section V.C.6, it is undisputed that ResCap and its subsidiaries, as the mortgage servicers, were responsible for the significant portion of the actionable issues that were the subject of the DOJ/AG Settlement.[51]

---

[51]   *See* Section V.C.4.

## VII. REVIEW AND ANALYSIS OF ESTATE CAUSES OF ACTION IMPLICATED BY AFFILIATE TRANSACTIONS AND THE RELATIONSHIP AND COURSE OF DEALING AMONG RESCAP, AFI, ALLY BANK, AND CERBERUS

### I. CONSTRUCTIVE TRUST CLAIMS

#### 1. Introduction

Wilmington Trust argues that a constructive trust should be imposed on (1) ResCap's interest in the "mortgage division" of Ally Bank, which AFI allegedly obtained by violating a "confidential relationship" with ResCap; and (2) proceeds of TARP funds that AFI received by virtue of its relationship to ResCap.[1] This Section examines the merits of constructive trust claims against AFI.

##### a. Unjust Enrichment And Constructive Trust

Unjust enrichment is an equitable doctrine that permits courts to infer the existence of an implied contract to prevent an entity that has obtained a benefit from another from unjustly enriching itself at the other party's expense.[2]

A constructive trust is an equitable device a court may impose when the holder of legal title to property acquired the property under such circumstances that the holder "in good conscience" should not be allowed to retain it.[3] A claim for constructive trust is a remedy, often to a corresponding allegation of unjust enrichment.[4] When a constructive trust is imposed, the holder becomes a trustee, holding the property for the benefit of the plaintiff.[5] When considering such equitable relief, however, a court is constrained by two considerations: (1) the property must be discernible and traceable to the plaintiff; and (2) the requested relief may not be in lieu of damages—a constructive trust is only available to prevent the title holder

---

[1] In addition, Wilmington Trust asserts that AFI was unjustly enriched by the implementation of the Second 2009 Tax Allocation Agreement. For the reasons set forth in Section VII.K, the Examiner concludes that ResCap would not be entitled to seek equitable remedies against AFI, including a claim based on unjust enrichment, in connection with the Second 2009 Tax Allocation Agreement.

[2] *See IDT Corp. v. Morgan Stanley Dean Witter & Co.*, 907 N.E.2d 268, 274 (N.Y. 2009) ("[Unjust enrichment] is an obligation imposed by equity to prevent injustice, in the absence of an actual agreement between the parties concerned."); *see also Newbro v. Freed*, 409 F. Supp. 2d 386, 398 (S.D.N.Y. 2006) (alteration in original) (citation omitted) (noting "a cause of action for unjust enrichment arises when one party possesses money . . . that in equity and good conscience they should not have obtained or possessed because it rightfully belongs to another").

[3] *Simonds v. Simonds*, 380 N.E.2d 189, 193 (N.Y. 1978) (citing *Beatty v. Guggenheim Exploration Co.*, 122 N.E. 378, 380 (N.Y. 1919)); *see also* RESTATEMENT (FIRST) OF RESTITUTION § 160 (1937) ("Where a person holding title to property is subject to an equitable duty to convey it to another on the ground that he would be unjustly enriched if he were permitted to retain it, a constructive trust arises.").

[4] *Counihan v. Allstate Ins. Co.*, 194 F.3d 357, 361 (2d Cir. 1999) (citation omitted) ("A constructive trust is an equitable remedy, necessarily flexible to accomplish its purpose. Its purpose is to prevent unjust enrichment . . . .").

[5] *F.T.C. v. Bronson Partners, LLC*, 654 F.3d 359, 373 (2d Cir. 2011) ("Tracing is necessary where a private plaintiff seeks to impose a constructive trust, because liability is premised on the fiction that the victim at all times retained title to the property in question, which the defendant merely holds in trust for him."); *see also Healy v. Comm'r*, 345 U.S. 278, 282 (1953) ("A constructive trust is a fiction imposed as an equitable device for achieving justice.").

from being unjustly enriched, not to provide a second avenue to an award otherwise available under a breach of contract claim.[6] Under certain circumstances, a plaintiff may be awarded the property as well as any profits earned from it.[7]

### b.   Choice Of Law

In the Second Circuit, the choice of law rules of the forum state will apply to claims premised on state law, unless state law would conflict with a federal policy or interest.[8] The Examiner concludes that it is likely that New York choice of law rules will apply to claims of unjust enrichment or constructive trust because of: (1) the apparent absence of any federal interest;[9] (2) the pendency of the Chapter 11 Cases in the Southern District of New York; and (3) the similarity between New York law and the corresponding laws of the other related jurisdictions, Delaware,[10] Michigan,[11] Minnesota,[12] and Pennsylvania.[13]

---

[6]   *Bronson Partners, LLC*, 654 F.3d at 373 (comparing constructive trust (requiring tracing) to the government's right to disgorgement (where no tracing is required)); *see also United States v. Benitez*, 779 F.2d 135, 140 (2d Cir. 1985) (tracing required); *Superintendent of Ins. v. Ochs* (*In re First Cent. Fin. Corp.*), 377 F.3d 209, 213 (2d Cir. 2004) (determining that the existence of a valid and enforceable contract precludes the imposition of a constructive trust); *Petrello v. White*, 412 F. Supp. 2d 215, 232–33 (E.D.N.Y. 2006) (same), *aff'd*, 344 F. App'x 651 (2d Cir. 2009). Constructive trusts lack the element of intent that is found in express or resulting trusts. *See, e.g.*, *Healy*, 345 U.S. at 282–83; *Conn. Res. Recovery Auth. v. Enron Corp.* (*In re Enron Corp.*), No. 01 B 16034(AJG), 2003 WL 1571719, at *5 (Bankr. S.D.N.Y. Mar. 27, 2003), *aff'd*, No. 01-16034 (AJG), 2004 WL 726088 (S.D.N.Y. Apr. 2, 2004).

[7]   *Great-W. Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 214, n.2 (2002). The rules requiring the plaintiff to be able to trace property to a specific *res* does not apply to profits. *Id.* (emphasis added).

[8]   *Bianco v. Erkins* (*In re Gaston & Snow*), 243 F.3d 599, 601–02 (2d Cir. 2001) ("[B]ankruptcy courts confronting state law claims that do not implicate federal policy concerns should apply the choice of law rules of the forum state."). If a claim before a bankruptcy court were "already pending in a parallel, out-of-state, non-bankruptcy proceeding" that was filed before the bankruptcy petition, the bankruptcy court "should apply the choice of law rules of the state where the underlying prepetition claim was filed." *Statek Corp. v. Dev. Specialists, Inc.* (*In re Coudert Bros. LLP*), 673 F.3d 180, 182 (2d Cir. 2012).

[9]   *In re Gaston & Snow*, 243 F.3d at 606 (explaining that the federal common law applies only in very limited circumstances where "a significant conflict between some federal policy or interest and the use of state law [is] specifically shown") (quoting *Atherton v. F.D.I.C.*, 519 U.S. 213, 218 (1997)).

[10]   AFI, GMAC Mortgage, ResCap, and RFC are all domiciled in Delaware.

[11]   AFI's principal place of business is located in Michigan. *See* General Motors Acceptance Corporation, Annual Report (Form 10-K) (Mar. 28, 2006), at 9; GMAC LLC, Annual Report (Form 10-K) (Mar. 13, 2007), at 11; GMAC LLC, Annual Report (Form 10-K) (Feb. 27, 2008), at 14.

[12]   The principal place of business for both ResCap and RFC is Minnesota. *See* Residential Capital Corporation, Annual Report (Form 10-K) (Mar. 28, 2006), at 3, 46; Residential Capital, LLC, Annual Report (Form 10-K) (Mar. 13, 2007), at 3; Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2008), at 1, 4; Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 26, 2009), at 1, 4.

[13]   GMAC Mortgage's principal place of business is in Pennsylvania. *See* GMAC LLC, Annual Report (Form 10-K) (Feb. 27, 2008), at 14; GMAC LLC, Annual Report (Form 10-K) (Feb. 26, 2009), at 21; GMAC Inc., Annual Report (Form 10-K) (Mar. 1, 2010), at 22; Ally Financial Inc., Annual Report (Form 10-K) (Feb. 25, 2011), at 29; Ally Financial Inc., Annual Report (Form 10-K) (Feb. 28, 2012), at 26.

In New York, "[t]he first step in any case presenting a potential choice of law issue is to determine whether there is an actual conflict between the laws of the jurisdictions involved";[14] if the laws of the relevant jurisdictions are substantively the same, a court may dispense with the choice of law analysis.[15] Because there is no material difference between the unjust enrichment and constructive trust laws of New York[16] and those of Delaware,[17] Michigan,[18]

---

[14] *Curley v. AMR Corp.*, 153 F.3d 5, 12 (2d Cir. 1998) (citing *Matter of Allstate Ins. Co. (Stolarz)*, 613 N.E.2d 936, 937 (N.Y. 1993).

[15] *See Curley*, 153 F.3d at 12 (citing *J. Aron & Co. v. Chown*, 647 N.Y.S.2d 8, 8 (N.Y. App. Div. 1996)) ("It is only when it can be said that there is no actual conflict that New York will dispense with a choice of law analysis."). "An actual conflict is present "[w]here the applicable law from each jurisdiction provides different substantive rules . . . ." *Curley*, 153 F.3d at 12.

[16] In New York, a plaintiff asserting an unjust enrichment claim must establish "(1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution." *Tasini v. AOL, Inc.*, 851 F. Supp. 2d 734, 739 (S.D.N.Y. 2012) (quoting *In re Mid-Island Hosp., Inc.*, 276 F.3d 123, 129–30 (2d Cir. 2002)), *aff'd*, No. 12-1428-cv, 2012 WL 6176559 (2d Cir. Dec. 12, 2012). A "'plaintiff need not be in privity with the defendant to state a claim for unjust enrichment,' [but] there must exist a relationship or connection between the parties that is not too 'attenuated.'" *Georgia Malone & Co., Inc. v. Rieder*, 973 N.E.2d 743, 746 (N.Y. 2012) (quoting *Sperry v. Crompton Corp.*, 863 N.E.2d 1012, 1018 (N.Y. 2007)).

Before imposing a constructive trust, New York courts will look at whether there is "(1) a confidential or fiduciary relationship, (2) a promise, (3) a transfer in reliance thereon and (4) unjust enrichment." *Sharp v. Kosmalski*, 351 N.E.2d 721, 723 (N.Y. 1976) (citations omitted). This is a flexible standard, however, and not all elements must be satisfied for a unjust enrichment claim to stand. *See Tekinsight.Com, Inc. v. Stylesite Mktg., Inc. (In re Stylesite Mktg., Inc.)*, 253 B.R. 503, 508 (Bankr. S.D.N.Y. 2000); *see also Marini v. Lombardo*, 912 N.Y.S.2d 693, 696 (N.Y. App. Div. 2010) (noting that because the "elements serve only as a guideline, a constructive trust may still be imposed even if all of the elements are not established").

[17] In Delaware, unjust enrichment requires: "(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and the impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law." *Jackson Nat'l Life Ins. Co. v. Kennedy*, 741 A.2d 377, 393 (Del. Ch. 1999) (citation omitted). The imposition of a constructive trust in Delaware is proper "when 'a defendant's fraudulent, unfair or unconscionable conduct causes him to be unjustly enriched at the expense of another to whom he owed some duty.'" *Id.* at 393–94 (quoting *Dodge v. Wilmington Trust Co.*, No. 1257-K, 1995 Del. Ch. LEXIS 26, at *21, (Del. Ch. Feb. 3, 1995)); *see also O'Toole v. Karnani (In re Trinsum Grp., Inc.)*, 460 B.R. 379, 395 (Bankr. S.D.N.Y. 2011) ("The elements for unjust enrichment claims under Delaware law are similar to that of New York law.").

[18] "Under Michigan law, the elements of an unjust enrichment claim are '(1) the receipt of a benefit by defendant from plaintiff, and (2) an inequity resulting to plaintiff because of the retention of the benefit by the defendant.'" *Ajuba Int'l, L.L.C. v. Saharia*, 871 F. Supp. 2d 671, 692 (E.D. Mich. 2012) (citation omitted). "A constructive trust may be imposed where such trust is necessary to do equity or to prevent unjust enrichment." *Kammer Asphalt Paving Co., Inc. v. E. China Twp. Schs.*, 504 N.W.2d 635, 641 (Mich. 2006) (citations omitted). A constructive trust will be imposed "where a person occupies a fiduciary relationship as agent for another, and thereby gains something for himself which in equity and good conscience he should not be permitted to keep . . . ." *MacKenzie v. Fritzinger*, 121 N.W.2d 410, 414 (Mich. 1963) (citations omitted).

Minnesota,[19] and Pennsylvania,[20] the Bankruptcy Court could apply New York unjust enrichment and constructive trust jurisprudence without engaging in extensive analysis.

### *(1) New York Unjust Enrichment Law*

To bring a claim for unjust enrichment under New York law, a plaintiff must demonstrate by a preponderance of the evidence[21] "(1) that the defendant benefitted, (2) at the plaintiff's expense, and (3) that equity and good conscience require restitution."[22] The claim for unjust enrichment is quasi-contractual,[23] and courts have noted that "[t]he essential inquiry in any action for unjust enrichment . . . is whether it is against equity and good conscience to permit

---

[19] "To establish [an unjust enrichment] claim under Minnesota law, a plaintiff must demonstrate 'that another party knowingly received something of value to which he was not entitled, and that the circumstances are such that it would be unjust for that person to retain the benefit.'" *T.B. Allen & Assocs., Inc. v. Euro-Pro Operating LLC*, No. 11-3479 (JRT/JSM), 2012 WL 2508021, at *3 (D. Minn. June 28, 2012) (citation omitted). Under Minnesota law, a court may impose a constructive trust in cases that "involve fraud, taking improper advantage of a confidential or fiduciary relationship, or unjust enrichment." *Kunkel v. Ries (In re Morken)*, 199 B.R. 940, 964 n.35 (Bankr. D. Minn. 1996) (citation omitted).

[20] "Under Pennsylvania law, a showing of unjust enrichment requires a plaintiff to prove that it: (1) conferred a benefit on the defendant; (2) such benefit was known and was retained or accepted by the defendant; and (3) it would be inequitable to allow the defendant to retain such benefit." *Am. Fed'n of State, Cnty. & Mun. Emps. v. Cephalon (In re Actiq Sales and Mktg. Practices Litig.)*, 790 F. Supp. 2d 313, 329 (E.D. Pa. 2011) (footnote omitted); *see also Ainbinder v. Potter*, 282 F. Supp. 2d 180, 184 n.3 (S.D.N.Y. 2003) (applying New York law where the defendant sought the application of Pennsylvania law, but "readily admit[ted] that the Court need not resolve the choice-of-law issue to rule on the motions to dismiss because there is no material difference between New York and Pennsylvania law with respect to claims of breach of contract, unjust enrichment, and fraud").

"The Supreme Court of Pennsylvania has said that the need for a constructive trust arises where a person who holds title to property is subject to an equitable duty to convey it to another on the ground that [the holder] would be unjustly enriched if he were permitted to retain it." *Kontonotas v. Hygrosol Pharm. Corp.*, No. 07-4989, 2009 WL 1734223, at *4 (E.D. Pa. June 16, 2009) (citing *Balazick v. Ireton*, 541 A.2d 1130, 1133 (Pa. 1988)). "The necessity for such a trust may arise from circumstances evidencing fraud, duress, undue influence or mistake. The controlling factor in determining whether a constructive trust should be imposed is whether it is necessary to prevent unjust enrichment." *Nagle v. Nagle*, 799 A.2d 812, 819 (Pa. Super. Ct. 2002) (citations omitted).

[21] *Newman v. Herbst*, No. 09-cv-4313 (TLM), 2011 WL 684165, at *6 (E.D.N.Y. Feb. 15, 2011) (citation omitted) (noting that a claim for unjust enrichment must be proven "by a preponderance of the evidence").

[22] *Tasini v. AOL, Inc.*, 851 F. Supp. 2d 734, 739 (S.D.N.Y. 2012) (citations omitted), *aff'd*, No. 12-1428-cv, 2012 WL 6176559 (2d Cir. Dec. 12, 2012); *see also Khreativity Unlimited v. Mattel, Inc.*, 101 F. Supp. 2d 177, 184 (S.D.N.Y. 2000) (citation omitted) ("In order to sustain a claim for unjust enrichment, plaintiff must demonstrate that (1) defendants were enriched; (2) such enrichment was at plaintiff's expense; and (3) under the circumstances it would be unjust not to compensate plaintiff."), *aff'd sub nom.*, 242 F.3d 366 (2d Cir. 2000).

[23] *See*, *e.g.*, *Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 54 (2d Cir. 2011) (citations omitted) ("The theory of unjust enrichment lies as a quasi-contract claim. It is an obligation the law creates in absence of an agreement.").

the defendant to retain what is sought to be recovered."[24] Thus, a plaintiff that cannot show "some expectation of compensation that was denied" cannot recover on an unjust enrichment claim under New York law.[25]

Nor can a plaintiff prevail on an unjust enrichment claim if the subject matter of the dispute is governed by an enforceable written contract between the parties.[26] Unjust enrichment is intended to remedy a wrong that contract law would otherwise address if a contract existed. If, on the other hand, a contract exists and damages are or could have been available to the plaintiff, equitable relief is precluded.[27] Similarly, a plaintiff cannot rely on an unjust enrichment claim to address a breach of an obligation imposed by law, as opposed to an

───────────────────────────────

[24] *Tasini*, 851 F. Supp. 2d at 739–40 (omission in original) (quoting *Dragon Inv. Co. II LLC v. Shanahan*, 854 N.Y.S.2d 115, 118 (N.Y. App. Div. 2008)).

[25] *See id.* at 741 (concluding that "under New York law, a plaintiff must plead some expectation of compensation that was denied in order to recover under a theory of unjust enrichment"). *But see Gidatex, S.r.L. v. Campaniello Imps., Ltd*., 49 F. Supp. 2d 298, 302–03 (S.D.N.Y. 1999) (concluding that expectation of compensation is not required to prevail on unjust enrichment claim). Subsequent decisions have been critical of the court's reasoning in *Gidatex*. *See Tasini*, 851 F. Supp. 2d at 740 n.3 ("The opinion in *Gidatex* is contrary to the great majority of well-reasoned cases. It is also contrary to the subsequent clear statement by the Court of Appeals for the Second Circuit . . . .").

[26] *See Belleza Fruit, Inc. v. Suffolk Banana Co., Inc*., No. CV-12-3033(SJF)(WDW), 2012 WL 2675066, at *14 (E.D.N.Y. July 5, 2012) (citations omitted) ("It is impermissible . . . to seek damages in an action sounding in quasi-contract where the suing party has fully performed on a valid written agreement, the existence of which is undisputed, and the scope of which clearly covers the dispute between the parties."); *IDT Corp. v. Morgan Stanley Dean Witter & Co*., 907 N.E.2d 268, 274 (N.Y. 2009) (citation omitted) ("Where the parties executed a valid and enforceable written contract governing a particular subject matter, recovery on a theory of unjust enrichment for events arising out of that subject matter is ordinarily precluded.").

[27] *See Goldman v. Met. Life Ins. Co*., 841 N.E.2d 742, 746 (N.Y. 2005) (holding that under New York law, equitable remedies are inappropriate when remedies at law are available under an existing contract); *Petrello v. White*, 412 F. Supp. 2d 215, 233 (E.D.N.Y. 2006) (citations omitted) ("New York Courts and the Second Circuit have consistently held 'that the existence of a written agreement precludes a finding of unjust enrichment.'"), *aff'd*, 344 F. App'x 651 (2d Cir. 2009).

obligation arising from the receipt of an unjustly retained benefit.[28] Because unjust enrichment claims are quasi-contractual claims, a defendant has an array panoply of defenses and may assert the *in pari delicto* defense[29] against unjust enrichment claims.[30]

### *(2) New York Constructive Trust Law*

In New York, a court may impose a constructive trust to remedy unjust enrichment.[31] In New York, as in other jurisdictions, a constructive trust, like unjust enrichment, is analogous to a "quasi-contractual" obligation.[32] Four elements generally must be satisfied to support the imposition of a constructive trust: "(1) a confidential or fiduciary relationship, (2) a promise, (3) a transfer in reliance thereon, and (4) unjust enrichment."[33] These elements, however, are not "talismanic," and New York "courts have held that a constructive trust can be imposed in the absence of some of these factors."[34]

---

[28] *See Bessette v. Avco Fin. Servs., Inc.*, 230 F.3d 439, 447 (1st Cir. 2000) (finding that breach of obligations under section 524 of the Bankruptcy Code does not give rise to unjust enrichment claim); *Pacamor Bearings, Inc. v. Minebea Co., Ltd.*, 892 F. Supp. 347, 356–57 (D.N.H. 1995) (determining that claims under Lanham Act and state unfair competition statutes do not give rise to unjust enrichment claims).

[29] The *in pari delicto* defense dictates that "[i]n a case of equal or mutual fault . . . the position of the [defending] party . . . is the better one." *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 306 (1985) (alterations in original). The doctrine prevents a plaintiff from asserting "a claim against a defendant if the plaintiff bears fault for the claim." *Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co.*, 267 F.3d 340, 354 (3d Cir. 2001) (citations omitted). In the Second Circuit, a defendant may also be able to assert the "Wagoner rule." *See Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114 (2d Cir. 1991). Under the Wagoner rule, "a plaintiff acting on behalf of a debtor cannot sue an outside professional or other third party for damages for which the corporation itself can be held responsible." *Official Comm. of Unsecured Creditors v. Am. Tower Corp.* (*In re Verestar, Inc.*), 343 B.R. 444, 478 (Bankr. S.D.N.Y. 2006).

[30] *See Globaltex Grp. Ltd. v. Trends Sportswear Ltd.*, No. 09–CV–0235, 2010 WL 1633438, at *4 (E.D.N.Y. Apr. 21, 2010) ("In pari delicto is applicable to claims of breach of contract, unjust enrichment, conversion, rescission, or damages in tort."). *But see Picard v. Madoff* (*In re Bernard L. Madoff Inv. Sec. LLC*), 468 B.R. 620, 633 (Bankr. S.D.N.Y. 2012) (noting the lack of case law on "whether *in pari delicto* applies to transfers to a non-insider that were joint and simultaneous with transfers to an insider").

[31] *See, e.g., Counihan v. Allstate Ins. Co.*, 194 F.3d 357, 361 (2d Cir. 1999) (noting that constructive trust in New York is designed to "prevent unjust enrichment").

[32] *See Equity Corp. v. Groves*, 60 N.E.2d 19, 21 (N.Y. 1945) (A constructive trust "is analogous to a 'quasi-contractual obligation' . . . ."); *see also Superintendent of Ins. v. Ochs* (*In re First Cent. Fin. Corp.*), 377 F.3d 209, 214 (2d Cir. 2004) (citation omitted) (noting that "the principles that apply to quasi-contractual remedies also apply to constructive trusts").

[33] *Sharp v. Kosmalski*, 351 N.E.2d 721, 723 (N.Y. 1976) (citations omitted).

[34] *Lines v. Bank of Am. Nat'l Trust & Sav. Ass'n*, 743 F. Supp. 176, 180 (S.D.N.Y. 1990) (citations omitted); *see also Tekinsight.Com, Inc. v. Stylesite Mktg., Inc. (In re Stylesite Mktg., Inc.)*, 253 B.R. 503, 508 (Bankr. S.D.N.Y. 2000) (citations omitted) ("Notwithstanding the stated requirements, the remedy is a flexible one, and the facts need not satisfy every element in all cases."); *Marini v. Lombardo*, 912 N.Y.S.2d 693, 696 (N.Y. App. Div. 2010) (citations omitted) (noting that because the "elements serve only as a guideline, a constructive trust may still be imposed even if all of the elements are not established").

"Most frequently, it is the existence of a confidential relationship which triggers the equitable consideration leading to the imposition of a constructive trust."[35] In New York, a fiduciary relationship exists where a person "is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation."[36] Parties to an arm's-length transaction, however, are not fiduciaries,[37] and parent corporations are not fiduciaries to their wholly-owned subsidiaries.[38]

A court may still impose a constructive trust even in the absence of a fiduciary relationship. As an equitable claim and a remedy, courts do not require "strict adherence to the confidential or fiduciary relationship element of a constructive trust," describing it as "not necessary when a party holds property under circumstances that in equity and good conscience [it] ought not retain."[39] Thus, even under New York law, a constructive trust may be imposed irrespective of the parties' relationship.[40]

The imposition of a constructive trust generally requires an express or implied promise.[41] A promise may be inferred from the circumstances, including arising from the nature of the

---

[35] *See Sharp*, 351 N.E.2d at 723 (citations omitted).

[36] *Boccardi Capital Sys., Inc. v. D.E. Shaw Laminar Portfolios, L.L.C.*, 355 F. App'x 516, 519 (2d Cir. 2009) (citation omitted); *see also Trumpet Vine Invs., N.V. v. Union Capital Partners I, Inc*., 92 F.3d 1110, 116–17 (11th Cir. 1996) (citations omitted) (applying New York law).

[37] *See Beneficial Commercial Corp. v. Murray Glick Datsun, Inc*., 601 F. Supp. 770, 772 (S.D.N.Y. 1985) (citations omitted) (noting that "courts have rejected the proposition that a fiduciary relationship can arise between parties to a business transaction"); *Oursler v. Women's Interart Ctr., Inc*., 566 N.Y.S.2d 295, 297 (N.Y. App. Div. 1991) (citation omitted) ("A conventional business relationship, without more, does not become a fiduciary relationship by mere allegation.").

[38] *See Official Comm. of Unsecured Creditors v. Bay Harbour Master Ltd*. (*In re BH S&B Holdings LLC*), 420 B.R. 112, 144 (Bankr. S.D.N.Y. 2009) (alteration in original) (citation omitted) (noting that "[p]arent corporations do not owe [wholly owned] subsidiaries fiduciary duties"), *aff'd*, 807 F. Supp. 2d 199 (S.D.N.Y. 2011). "Although it is said in general terms that a parent corporation owes a fiduciary obligation to its subsidiaries, this obligation does not arise as such unless the subsidiary has minority stockholders." 420 B.R. at 144 (quoting *Trenwick Am. Lit. Trust v. Ernst & Young LLP*, 906 A.2d 168, 173 (Del. Ch. 2006)).

[39] *Petrello v. White*, 412 F. Supp. 2d 215, 232 (E.D.N.Y. 2006) (citing *Sec. Pac. Mortg. & Real Estate Servs., Inc. v. Republic of Philippines*, 962 F.2d 204, 210 (2d Cir. 1992)), *aff'd*, 344 F. App'x 651 (2d Cir. 2009).

[40] *See Tekinsight.Com, Inc. v. Stylesite Mktg., Inc. (In re Stylesite Mktg., Inc.)*, 253 B.R. 503, 508 (Bankr. S.D.N.Y. 2000) (citation omitted) (noting that "a court may impose a constructive trust in the absence of a fiduciary relationship . . ."); *see also Pfohl Bros. Landfill Site Steering Comm. v. Allies Waste Sys., Inc*., 255 F. Supp. 2d 134 (W.D.N.Y. 2003) (imposing constructive trust on dividends paid to parent corporation in connection with liquidation of subsidiary).

[41] *See Brand v. Brand*, 811 F.2d 74, 78 (2d Cir. 1987) (noting that "[t]he second element of a constructive trust is the making of a promise," and that such promise may be express or implied). The *Brand* court noted: "Indeed, silence itself 'in the presence of conditional assertions may constitute tacit consent and promise to comply with the conditions.'" *Id.* (citing *Farano v. Stephanelli*, 183 N.Y.S.2d 707, 712 (N.Y. App. Div. 1959)).

relationship the between plaintiff and the party holding the property.[42] Although a transfer is one of the enumerated elements for a constructive trust, courts have noted that this element is not absolutely essential to the imposition of a constructive trust.[43] "[U]njust enrichment[, however,] is the backbone of a constructive trust claim," and without a showing of unjust enrichment, courts are reluctant to impose a constructive trust.[44] Given that a constructive trust is designed to address a gap that could be remedied by a contract if one existed, a court also will not impose a constructive trust if an enforceable contract governs the parties' relationship.[45] Moreover, a court will impose a constructive trust only if the plaintiff demonstrates that the property is in the defendant's possession, and can be traced.[46]

While the burden is on the plaintiff to prove the necessity of a constructive trust, New York courts are divided as to the standard of proof. Some courts have concluded that a plaintiff must demonstrate the facts justifying the imposition of a constructive trust by clear

---

[42] *See Brand,* 811 F.2d at 78. Constructive trusts are often imposed in family disputes over property, because the law recognizes certain familial relationships as confidential (i.e., between spouses, parent/child, etc.), and property may be transferred among family members with promises or conditions attached. *See, e.g.*, *Farano*, 183 N.Y.S.2d at 712 (daughters purportedly refuse to return property to father upon request, as promised at the time of the conveyance). These types of cases have less application to the dispute here, where the property changed hands as part of a business transaction, and subject to a contract.

[43] *See Moak v. Raynor*, 814 N.Y.S.2d 289, 291 (N.Y. App. Div. 2006) (citation omitted) (noting that "courts have extended the transfer element to include instances where funds, time and effort were contributed in reliance on a promise to share in some interest in property, even though no transfer actually occurred"). This may be relevant to whether a constructive trust could be imposed with regard to AFI's receipt of TARP funds from the U.S. Treasury. No transfer from ResCap occurred; therefore, it would need to be shown that ResCap had a right to share in the TARP proceeds.

[44] *Petrello*, 412 F. Supp. 2d at 232; *see Superintendent of Ins. v. Ochs* (*In re First Cent. Fin. Corp.*), 377 F.3d 209, 212 (2d Cir. 2004) (noting that "[t]he fourth element is the most important"); *LFD Operating, Inc. v. Ames Dep't Stores, Inc.* (*In re Ames Dep't Stores, Inc.*), 274 B.R. 600, 626 (Bankr. S.D.N.Y. 2002) (citation omitted) ("Despite the elasticity of the doctrine, the prevention of unjust enrichment remains the key requirement for a constructive trust."), *aff'd sub nom.,* No. 02 Civ. 6271(SHS), 2004 WL 1948754 (S.D.N.Y. Sept. 1, 2004), *aff'd sub nom.*, 144 F. App'x 900 (2d Cir. 2005).

[45] *See In re First Cent. Fin. Corp.*, 377 F.3d at 213 (holding that valid and enforceable contract precludes constructive trust); *Petrello*, 412 F. Supp. 2d at 233 (holding that because there was a valid, enforceable contract, "as a matter of law, the Court cannot impose a constructive trust").

[46] *See United States v. Benitez*, 779 F.2d 135, 140 (2d Cir. 1985) (citation omitted) ("It is hornbook law that before a constructive trust may be imposed, a claimant to a wrongdoer's property must trace his own property into a product in the hands of a wrongdoer."); *see also United States v. Peoples Benefit Life Ins. Co.*, 271 F.3d 411, 416 (2d Cir. 2001).

and convincing evidence,[47] while other courts have held that a preponderance of the evidence will suffice.[48] A defendant may defeat a constructive trust claim by demonstrating the plaintiff's unclean hands.[49]

### c. Statute Of Limitations

Whatever substantive law the Bankruptcy Court applies to claims for unjust enrichment or constructive trust, New York's choice of law rules will decide the applicable statute of limitations.[50] When a nonresident sues in New York on a cause of action that accrued outside of New York, the New York "borrowing statute" requires the cause of action to be timely in New York *as well as* in the jurisdiction where the cause of action accrued.[51] As such, a New York court will apply the shorter of the two states' applicable statutes of limitations, if different, and New York's statute of limitations if they are the same.[52]

If the injury alleged is "purely economic," the cause of action is deemed to have accrued "where the plaintiff resides and sustain[ed] the economic impact of the loss."[53] Courts in the Second Circuit have "consistently held that a business entity's residence is determined by its

---

[47] *See, e.g., SEC v. Credit Bancorp, Ltd.*, 138 F. Supp. 2d 512, 532–33 (S.D.N.Y. 2001) (citations omitted) ("The claimant to a constructive trust must establish the facts giving rise to the trust by clear and convincing evidence."), *rev'd on other grounds*, 297 F.3d 127 (2d Cir. 2002); *LFD Operating Inc. v. Ames Dep't Stores, Inc.* (*In re Ames Dep't Stores, Inc.*), 274 B.R. 600, 626 (Bankr. S.D.N.Y. 2002) (citation omitted).

[48] *See, e.g., Beacher v. Estate of Beacher*, 756 F. Supp. 2d 254, 276 (E.D.N.Y. 2010) ("The proper burden of proof in this civil action seeking equitable relief is by 'a preponderance of the credible evidence.'").

[49] *See Barbieri v. Barbieri* (*In re Barbieri*), 380 B.R. 284, 296–99 (Bankr. E.D.N.Y. 2007) (noting that equitable considerations of waiver, laches, and unclean hands can preclude constructive trust). "Whenever a party seeks to invoke the court's equitable powers, the party's claims are subject to any applicable equitable defenses." *Id.* At 296 (citing *British Columbia Inv. Co. v. Fed. Deposit Ins. Corp.*, 420 F. Supp. 1217, 1222 (S.D. Cal. 1976)). In one case, a court regarded "'clean hands,' 'unclean hands' and *'in pari delicto'* as alternative ways of saying the same thing." *Adelphia Commc'ns Corp. v. Bank of Am.* (*In re Adelphia Commc'ns Corp.*), 365 B.R. 24, 47 n.75 (Bankr. S.D.N.Y. 2007).

[50] *See, e.g., Official Comm. of Asbestos Claimants of G-I Holding, Inc. v. Heyman*, 277 B.R. 20, 30 (S.D.N.Y. 2002); *In re Adelphia*, 365 B.R. at 57 n.136 (citation omitted) ("Where, as here, the Court is exercising bankruptcy jurisdiction over state law claims under 28 U.S.C. § 1334(b), the court applies the choice of law rules of the forum state to determine the applicable statute of limitations.").

[51] *See* N.Y. C.P.L.R. § 202 ("An action based upon a cause of action accruing without the state cannot be commenced after the expiration of the time limited by the laws of either the state or the place without the state where the cause of action accrued, except that where the cause of action accrued in favor of a resident of the state the time limited by the laws of the state shall apply.").

[52] *Global Fin. Corp. v. Triarc Corp.*, 715 N.E.2d 482, 484 (N.Y. 1999); *see also In re Adelphia*, 365 B.R. at 57–58. In the context of a bankruptcy, the court may apply a foreign state's longer statute of limitations with regard to a prepetition claim that was filed in the foreign state. *Statek Corp. v. Dev. Specialists, Inc.* (*In re Coudert Bros. LLP*), 673 F.3d 180, 191 (2d Cir. 2012).

[53] *Global Fin.*, 715 N.E.2d at 485.

VII.I-9

principal place of business" rather than the state of incorporation, under CLPR 202.[54] Residency is determined at the date that the action accrued, so the relevant inquiry for CPLR 202 purposes is where an entity's principal place of business was located when the claim accrued.[55] When a bankruptcy trustee sues as a representative of the estate of the bankrupt corporation, a New York court will look to the business entity's principal place of business as the place where the entity "sustained the economic impact of the loss."[56] In this instance, the applicable jurisdiction is Minnesota, the principal place of business of ResCap.[57]

New York's statute of limitations for unjust enrichment and constructive trust claims is six years.[58] "The statute of limitations for a claim of unjust enrichment begins to run

---

[54] *See Woori Bank v. Merrill Lynch*, No. 12 Civ. 3993(VM), 2013 WL 449912, at *3 (S.D.N.Y. Feb. 6, 2013) (citations omitted); *see also McMahan & Co. v. Donaldson, Lufkin & Jenrette Sec. Corp.,* 727 F. Supp. 833, 834 (S.D.N.Y. 1989) ("[I]n order to determine residence under the borrowing statute, we need to determine where its principal office is, or 'where it conducts its day-to-day affairs'"); *Pereira v. Cogan*, No. 00 CIV. 619(RWS), 2001 WL 243537, at *18 (S.D.N.Y. Mar. 8, 2001) (finding that a corporation's state of residence, for purposes of the borrowing statute was New York, where it maintained its principal place of business); *THC Holdings Corp. v. Chinn*, No. 95 CIV. 4422(KMW), 1998 WL 50202, at *5 (S.D.N.Y. Feb. 6, 1998) (citing *Shamrock Assocs. v. Sloane*, 738 F. Supp. 109, 113 (S.D.N.Y. 1990)) ("The principal place of business determines residency under CPLR § 202."); *Brinckerhoff v. JAC Holding Corp*., 263 A.D.2d 352, 352–353 (N.Y. App. Div. 1999) (finding applicable statute of limitations for a derivative breach of fiduciary duty claim to be Georgia where the state of incorporation was Delaware, but the principal place of business was Georgia); *Oxbow Calcining USA Inc. v. Am. Indus. Partners*, 948 N.Y.S.2d 24, 31 (N.Y. App. Div. 2012).

[55] *See THC Holdings Corp. v. Chinn,* 1998 WL 50202, at *5 (S.D.N.Y. Feb. 06, 1998) (citing *Besser v. E.R. Squibb & Sons, Inc*., 146 A.D.2d 107 (N.Y. App. Div. 1989), *aff'd*, N.E.2d 171 (N.Y. 1990)); *Oxbow*, 948 N.Y.S.2d 24, 31 (N.Y. App. Div. 2012).

[56] *Official Comm. of Asbestos Claimants of G-I Holding, Inc. v. Heyman*, 277 B.R. 20, 30 (S.D.N.Y. 2002); *see also Adelphia Commc'ns Corp. v. Bank of Am. N.A.* (*In re Adelphia Commc'ns Corp.*), 365 B.R. 24, 58 n.137 (Bankr. S.D.N.Y. 2007).

[57] In *Adelphia*, the court compared the statute of limitations of New York to the limitations period in Pennsylvania, where the Adelphia debtors resided. In coming to its decision, the court rejected the argument that it should compare New York's period to the limitations period in states where subsidiary debtors resided because there were "no allegations in the complaint that any Adelphia subsidiaries were under independent control, or directed by the [corporate owners] or anyone else in different states." *In re Adelphia Commn'cs Corp*., 365 B.R. at 58 n.138.

[58] *See Golden Pac. Bancorp v. Fed. Deposit Ins. Corp*., 273 F.3d 509, 518 (2d Cir. 2001) (citations omitted) ("The statute of limitations in New York for claims of unjust enrichment . . . is generally six years."); *see also Bice v. Robb*, 324 F. App'x 79, 81 (2d Cir. 2009) (citation omitted) ("New York law provides a six-year statute of limitations for breach of contract and constructive trust claims."); *Stewart v. Atwood*, 834 F. Supp. 2d 171, 182 (W.D.N.Y. 2012) (citation omitted) ("Since a cause of action for a constructive trust is one 'for which no limitation is specifically prescribed by law,' it is governed by New York's six-year statute of limitations.").

'upon the occurrence of the wrongful act giving rise to a duty of restitution.'"[59] If another state's statute of limitations was the same or longer, the Bankruptcy Court would apply the New York limitations period.

Like New York's, Minnesota's statute of limitation is six years,[60] beginning "when [the] damage occurs."[61] Because the statutes of limitations are the same in New York and Minnesota, the Bankruptcy Court will likely apply New York's six-year statute of limitations to ResCap's unjust enrichment or constructive trust claims.

### d. Explanation Of Examiner's Conclusions

During the course of the Investigation, the Examiner and the Examiner's Professionals analyzed (1) the Ally Bank Transactions;[62] and (2) AFI's receipt of TARP funds, for any

---

[59] *Golden Pac.*, 273 F.3d at 520 (quoting *Congregation Yetev Lev D'Satmar, Inc. v. 26 Adar N.B. Corp.*, 596 N.Y.S.2d 435, 437 (N.Y. App. Div. 1993)); *see Cohen v. Cohen*, 773 F. Supp. 2d 373, 396–97 (S.D.N.Y. 2011) (noting that unjust enrichment claims are not subject to "discovery rule"), *vacated on other grounds*, *Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353 (2d Cir. 2013). There are conflicting authorities in New York suggesting that the time begins to run with respect to a constructive trust: (1) when the wrongful act occurs; or (2) when the party seeking the imposition of a constructive trust "should have known" of the wrongful act. *Compare Two Clinton Square Corp. v. Friedler*, 459 N.Y.S.2d 179, 181 (N.Y. App. Div. 1983) ("The statute of limitations for the purpose of imposing a constructive trust is six years and the action accrues when the party seeking to impose the trust knows or should have known of the wrongful withholding."), *with Stewart v. Atwood*, 834 F. Supp. 2d 171, 182 (W.D.N.Y. 2012) (citation omitted) (holding that "accrual of a claim for constructive trust 'runs from the occurrence of the wrongful act or event which creates a duty of restitution.'"). *See also Auffermann v. Distl*, 867 N.Y.S.2d 527, 528 (N.Y. App. Div. 2008) (citation omitted) ("A cause of action to impose a constructive trust is governed by a six-year statute of limitations and begins to accrue 'upon the occurrence of the wrongful act giving rise to a duty of restitution and not from the time the facts constituting the fraud are discovered.'").

[60] *See Block v. Litchy*, 428 N.W.2d 850, 854 (Minn. Ct. App. 1988) ("The applicable time limit for bringing an action in unjust enrichment is six years."); *see also* MINN. STAT. ANN. § 541.05 (applying six-year statute of limitations (1) "upon a contract or other obligation, express or implied, as to which no other limitation is expressly prescribed"; and (2) "to enforce a trust"). One Minnesota court also deemed equitable relief to be available in unique circumstances, where the plaintiff and defendant had opposing claims to funds being held by a third-party law firm and neither had made a claim during the time available under the statute of limitations. The court allowed the claim for constructive trust to proceed although an analogous claim would be time-barred. *Asha Enters. v. Peterson*, 1999 Minn. App. LEXIS 29, at *7–8 (Minn. Ct. App. Jan. 12, 1999) (unpublished).

[61] *Block*, 428 N.W.2d at 854 (citation omitted).

[62] *See* Wilmington Trust Submission Paper, dated Mar. 8, 2013, at 59–60; *see also id.* at 45–52; Wilmington Trust, Motion for Standing to Pursue Claims and Complaint [Docket No. 3475] at 84–86 (alleging that AFI "hold's [ResCap's] interests in Ally Bank, including the proceeds of any sale of its mortgage assets, in constructive trust for the benefit of Residential Capital because [AFI] took such interests in violation of its promise not to engage in any material transaction with [ResCap] that would violate the Operating Agreement"). Wilmington Trust's proposed claim for fraudulent conveyance based on an assertion that AFI holds ResCap's "tax attributes under both the 2006 Tax Agreement and the 2009 Tax Amendment in constructive trust." *Id.* at 45, is referenced in Section V.D. (discussing the Tax Agreement and Tax Amendment), and is outside the scope of the present discussion.

evidence of unjust enrichment by examining whether AFI received a benefit that in "equity and good conscience" it should not be permitted to retain and for which constructive trusts should be imposed. The Examiner's conclusions follow.

### (1) Whether A Constructive Trust Would Be Imposed Against AFI In Connection With The Ally Bank Transactions

Wilmington Trust's proposed claim for a constructive trust to return ResCap's interest in the mortgage division of Ally Bank[63] is based on an assertion that "all or substantially all of [ResCap's] assets were stripped away in furtherance of a pre-arranged plan of self-preservation instituted by AFI in response to the financial and mortgage crises,"[64] resulting in AFI being unjustly enriched. Wilmington Trust alleges that the imposition of a constructive trust is proper because AFI and ResCap were "in a 'confidential relationship' at the time" of the Ally Bank Transactions "by virtue of [AFI's] domination and control such that [AFI] owed an express or implied duty to [ResCap] not to gain an unfair advantage from such domination and control."[65]

In support of its constructive trust claim, Wilmington Trust alleges that AFI "orchestrated" the Ally Bank Transactions, which, according to Wilmington Trust, were "below-market, non-arm's-length transactions that violated the Operating Agreement, and the Indenture."[66] Wilmington Trust further asserts that AFI was "responsible" for the transactions, and had "full knowledge that they would breach [ResCap's] Operating Agreement and the Indenture."[67]

The Ally Bank Transactions consist of the 2006 Bank Restructuring, the 2008 Bank Transaction, and the 2009 Bank Transaction. As noted in Section V.A, ResCap did not receive reasonably equivalent value in connection with the 2006 Bank Restructuring, which suggests that AFI may have received a benefit that in equity and good conscience it should not be entitled to retain. However, because constructive trust is designed to address a gap that could be remedied by a contract if one existed, a court will not impose a constructive trust if an enforceable contract

---

[63] Wilmington Trust proposes that the Trustee bring a claim for breach of contract related to the Operating Agreement. Wilmington Trust Submission Paper, dated Mar. 8, 2013, at 46 n.11.

[64] *Id.* at 6; *see also id.* at 45.

[65] Wilmington Trust, Motion for Standing to Pursue Claims and Complaint [Docket No. 3475] at 85.

[66] Wilmington Trust Submission Paper, dated Mar. 8, 2013, at 45.

[67] *Id.* (stating "the Noteholders are express third-party beneficiaries to enforce the Operating Agreement").

governs the parties' relationship.[68] Because the 2005 Operating Agreement[69] and the indenture governing the Unsecured Notes[70] controls the parties' relationship, there can be no constructive trust.

In regard to the 2008 Bank Transaction and the 2009 Bank Transaction, the Examiner has concluded that ResCap received reasonably equivalent value in exchange.[71] Accordingly, AFI did not receive anything in connection with those transaction that in equity and good conscience it should not retain. Moreover, as noted, Wilmington Trust's constructive trust claims are in essence claims for breach of contract for which damages is the proper remedy[72] and claims for unjust enrichment or constructive trust are not applicable.[73]

Finally, "[i]t is hornbook law that before a constructive trust may be imposed, a claimant to a wrongdoer's property must trace [its] own property into a product in the hands of the wrongdoer."[74] The "party asserting [the] existence of a constructive trust bears the burden [of proving] that a trust *res* exists."[75] Here, Wilmington Trust's vague references to ResCap's "Mortgage Division" does not adequately identify a discrete *res* which in equity and good conscience should be returned to ResCap.[75]

Accordingly, the Examiner concludes that it is unlikely that a claim for the imposition of a constructive trust in connection with the Ally Bank Transactions would prevail.

---

[68] *See Superintendent of Ins. v. Ochs* (*In re First Cent. Fin. Corp.*), 377 F.3d 209, 213 (2d Cir. 2004) (holding that valid and enforceable contract precludes constructive trust); *Petrello v. White*, 412 F. Supp. 2d 215, 233 (E.D.N.Y. 2006) (holding that because there was a valid, enforceable contract, "as a matter of law, the Court cannot impose a constructive trust").

[69] See Section VII.L for a discussion of possible breach of contract claims arising from the 2006 Bank Restructuring.

[70] See Section VIII for a discussion of possible breach of indenture claims.

[71] *See* Section V.A.

[72] If a breach of contract claim were possible, the appropriate remedy would be damages. *See In re First Central Fin. Corp.*, 377 F.3d at 212 (holding that valid and enforceable contract precludes constructive trust); *Petrello*, 412 F. Supp. 2d at 232 (holding that because there was a valid, enforceable contract, "as a matter of law, the Court cannot impose a constructive trust"). *See* Section VII.L.1 for a discussion of whether the 2006 Bank Restructuring resulted in a breach of the 2005 Operating Agreement. *See* Section V.A for a discussion of the 2008 and 2009 Bank Transactions.

[73] *See In re First Central Fin. Corp.*, 377 F.3d at 212 (holding that valid and enforceable contract precludes constructive trust).

[74] *United States v. Benitez*, 779 F.2d 135, 140 (2d Cir. 1985) (citation omitted). Wilmington Trust suggests that Michigan law would apply to a TARP-related constructive trust claim. As discussed, the Bankruptcy Court may choose to apply the law of the forum (New York law) or the law where the property is located (Michigan law) to this constructive trust claim, as there is no substantive difference between the two states' laws.

[75] *Majutama v. Drexel Burnham Lambert Grp.* (*In re Drexel Burnham Lambert Grp., Inc.*), 142 B.R. 633, 637 (S.D.N.Y. 1992) (citation omitted).

[75] As discussed in Section V.A.2.e, the Examiner's Financial Advisors concluded there was no equity value remaining in the Mortgage Bank after December 1, 2009 that could have been attributed to ResCap's legacy equity interest in IB Finance.

*(2) Whether A Constructive Trust Would Be Imposed In Connection With AFI's Receipt and Retention Of TARP Funds*

The Troubled Asset Relief Program, also known as "TARP," was created by the Emergency Economic Stabilization Act of 2008 (the "EESA"), to allow the U.S. Treasury "to purchase, and to make and fund commitments to purchase, troubled assets from any financial institution,"[76] up to $700 billion in total. Ultimately, the U.S. Treasury invested $17.2 billion in AFI under TARP.[77]

Wilmington Trust alleges that the TARP funds AFI received rightfully belong to ResCap and should be held in constructive trust for the benefit of ResCap's estate.[78] According to Wilmington Trust, AFI's receipt of TARP funding likely was based on a showing of "overall financial weakness, lack of liquidity, and systemic risk to the banking system."[79] It argues that AFI relied on the stress of the mortgage business, including ResCap, to support its cause in obtaining TARP funds, and that ResCap was an intended beneficiary of the TARP funds although "in all cases, AFI kept the [TARP] installments for itself and provided only meager support to the Debtors."[80] Wilmington Trust proffers in support of its position a short and somewhat ambiguous e-mail exchange between Marano and Renzi as evidence that the first TARP installment of $5.7 billion "was supposed to go to" ResCap.[81] The bulk of the evidence, however, suggests that the U.S. Treasury was focused on the automotive industry and not on ResCap.

---

[76] 12 U.S.C. § 5211(a)(1). A "financial institution" is defined in the EESA to include, among other entities, any U.S. "bank, savings association, credit union, security broker or dealer, or insurance company." 12 U.S.C. § 5202(5).

[77] U.S. TREASURY, OFFICE OF FINANCIAL STABILITY, TROUBLED ASSET RELIEF PROGRAM, FOUR YEAR RETROSPECTIVE REPORT, AN UPDATE ON THE WIND-DOWN OF TARP, March 2013, at 17, http://www.treasury.gov/initiatives/financial-stability/reports/Documents/TARP%20Four%20Year%20Retrospective%20Report.pdf.

[78] Wilmington Trust Submission Paper, dated Mar. 8, 2013, at 51; s*ee also* Wilmington Trust, Motion for Standing to Pursue Claims and Complaint [Docket No. 3475] at 89–90.

[79] Wilmington Trust Submission Paper, dated Mar. 8, 2013, at 51; *see also* Wilmington Trust, National Association, Motion for Standing to Pursue Claims and Complaint [Docket No. 3475] at 89–90.

[80] Wilmington Trust Submission Paper, dated Mar. 8, 2013, at 51; *see also* Wilmington Trust, Motion for Standing to Pursue Claims and Complaint [Docket No. 3475] at 89–90.

[81] Wilmington Trust Submission Paper, dated Mar. 8, 2013, at 51; s*ee also* Wilmington Trust, Motion for Standing to Pursue Claims and Complaint [Docket No. 3475] at 89–90.

### (a) ResCap Did Not Apply For TARP

ResCap was interested in obtaining TARP funds and prepared a lengthy proposal to the U.S. Treasury, but never completed the process.[82] As discussed in Section III.H, Marano raised the possibility of TARP funding with the ResCap Board in October 2008 and indeed discussed a possible $5 billion injection under TARP with one or more U.S. Treasury officials. Initially, Marano was unaware that AFI was making a similar request.[83] Marano stopped pursuing TARP funds for ResCap when he learned that AFI and Cerberus did not view it as productive to have both ResCap and AFI pursuing TARP funding.[84]

### (b) Congressional Oversight Panel Report

On March 10, 2010, the Congressional Oversight Panel issued a report entitled The Unique Treatment of GMAC Under the TARP, which criticized the U.S. Treasury's initial and subsequent decisions to support AFI.[85] The report notes that supporting or saving ResCap was not part of the rationale for providing TARP funds to AFI. The report states that "while ResCap was once a profitable venture for [AFI], and ResCap holds significant market shares in both the mortgage origination and mortgage servicing sectors, there has been no suggestion that the disruption of these businesses caused by a bankruptcy would have any direct systemic effect."[86] The report explains that the "Treasury has stated that . . . it regarded ResCap as 'marginal, at best' as a factor in the decision to support [AFI]."[87] Further, the report states that the U.S. Treasury "defends its assistance to [AFI] as crucial to supporting its extensive investments in GM and Chrysler, which, in turn, were made for a variety of reasons, including the fear of shock to the economy—perhaps rising to the level of systemic risk if the domestic

---

[82] *See* ResCap: Proposal for the TARP [CCM00012373].

[83] *See* e-mail from T. Marano to N. Kashkari (Oct. 22, 2008) ("As we discussed, I believe it will take an equity investment of approximately $5 billion dollars [sic] to recapitalize ResCap and provide stability for the next 24 months . . . . [A]n investment of $3 billion would provide needed capital through 2009 as we work to find additional partners to preserve our platform.") [CCM00012371]. According to Marano, however, he intentionally inflated the $5 billion estimate by as much as $3 billion, to account for anticipated "horse-trading." Int. of T. Marano, Nov. 26, 2012, at 206:8–23.

[84] *See, e.g., id* at 22:2–14 ("And so at one point [in the Fall of 2008], unbeknownst to me, [AFI], the parent, was asking for assistance from TARP. I was asking for assistance from TARP . . . . And then actually, I found out Cerberus was looking for assistance as well for the combined outfit. That was a very memorable moment when I found out all three of us were seeking assistance from some of the same people."); *id*. at 24:9–15 ("[I]t was logical that the parent would be the one that would be seeking support. And so I made sure the parent knew everything that I was aware of that we needed and what the challenges were so that the parent could seek the support."); *see also* Minutes of a Special Meeting of the Board of Residential Capital, LLC, Oct. 17, 2008, at RC40005885 ("Mr. Marano mentioned that he is working with Cerberus and with Morrison & Foerster on a term sheet to use in communicating to the Treasury Department for participation in the TARP program.") [RC40005652].

[85] CONGRESSIONAL OVERSIGHT PANEL, MARCH OVERSIGHT REPORT: THE UNIQUE TREATMENT OF GMAC UNDER THE TARP (Mar. 10, 2010), at 78–79, http://purl.access.gpo.gov/GPO/LPS123013; *see also* CONGRESSIONAL OVERSIGHT PANEL, JANUARY OVERSIGHT REPORT: AN UPDATE ON TARP SUPPORT FOR THE DOMESTIC AUTOMOTIVE INDUSTRY, (Jan. 13, 2011), at 71, http://purl.fdlp.gov/GPO/gpo5490.

[86] CONGRESSIONAL OVERSIGHT PANEL, MARCH OVERSIGHT REPORT, at 67.

[87] *Id.*

auto industry were to fail,"[88] and that AFI's "automotive finance operations . . . would have the most impact on the U.S. economy if [AFI]were to be allowed to fail."[89] There is no evidence that if AFI had not requested TARP funds, the U.S. Treasury would have instead given those funds to ResCap.

### (c) U.S. Treasury's Office Of Financial Stability Report

A March 2013 report from the U.S. Treasury's Office of Financial Stability underscores that the government's interest was in the automotive side of AFI's business, and not in saving ResCap.

> Treasury also made a $17.2 billion investment in [AFI] under TARP. The company has been the primary source of financing for GM's dealers and consumers for more than 90 years. Subsequently, after Treasury's investment, [AFI] became a primary source of financing for Chrysler dealers. Supporting [AFI] made it possible for GM and Chrysler dealers to continue providing car loans to their customers and secure financing to run their businesses during the financial crisis.[90]

The report also notes:

> As of December 31, 2012, Treasury had recovered approximately one-third ($5.8 billion) of its original $17.2 billion investment. Treasury expects to begin monetizing its remaining investment as the company completes two critical strategic initiatives: the Chapter 11 proceeding for its mortgage subsidiary, Residential Capital, LLC (ResCap) and the sale of its international auto finance operations. In November 2012, Ally announced that it had reached an agreement to sell its remaining international operations and that it expected total proceeds from those transactions of $9.2 billion.[91]

As discussed above, unjust enrichment is a fundamental prerequisite to the imposition of constructive trust. There is, however, no evidence that AFI was unjustly enriched by TARP at ResCap's expense. Indeed, it would not be against equity and good conscience to permit AFI to retain the funds.

---

[88] *Id.* at 66.

[89] *Id. at* 67.

[90] U.S. TREASURY, OFFICE OF FINANCIAL STABILITY, TROUBLED ASSET RELIEF PROGRAM, FOUR YEAR RETROSPECTIVE REPORT, AN UPDATE ON THE WIND-DOWN OF TARP, March 2013, at 17, http://www.treasury.gov/initiatives/financial-stability/reports/Documents/TARP%20Four%20Year%20Retrospective%20Report.pdf.

[91] *Id.*

The three TARP installments were paid to AFI directly by the U.S. Treasury and they were not conditioned upon AFI turning the funds over to ResCap. Further, the evidence reflects that AFI's receipt of TARP funds was a by-product of the U.S. government's interest in rescuing GM and Chrysler, not ResCap. ResCap has no identifiable interest in the TARP funds. Had AFI not applied for TARP funding, there is no evidence that the U.S. Treasury would have provided that funding to ResCap.

Based on the foregoing, the Examiner concludes that it is unlikely that a constructive trust claim premised on the TARP funding received by AFI would prevail.

## VII. REVIEW AND ANALYSIS OF ESTATE CAUSES OF ACTION IMPLICATED BY AFFILIATE TRANSACTIONS AND THE RELATIONSHIP AND COURSE OF DEALING AMONG RESCAP, AFI, ALLY BANK, AND CERBERUS

### J.  UNCONSCIONABLE CONTRACTS AND CONTRACTS OF ADHESION

The Examiner has reviewed the potential applicability of the doctrines of unconscionability and adhesion to contracts between the Debtors and AFI. After reviewing these doctrines, the Examiner determined that the defensive nature of the doctrines, which greatly limits their application, as well as other considerations discussed below, generally preclude the use of these doctrines in the Chapter 11 Cases. Accordingly, the Examiner focused on more traditional theories of recovery and remedies including breach of fiduciary duty, aiding and abetting breach of fiduciary duty, veil-piercing, and equitable subordination in his analysis as discussed in other sections of this Report.

#### 1.  Choice Of Law

In the United States Court of Appeals for the Second Circuit, the choice-of-law rules of the forum state will apply to claims premised on state law, unless state law would conflict with a federal policy or interest.[1] Thus, the Examiner believes that New York choice-of-law principles will apply to any claim of unconscionability or adhesion because of the apparent absence of any federal interest and the pendency of the Chapter 11 Cases in the Southern District of New York.

In New York, "[t]he first step in any case presenting a potential choice of law issue is to determine whether there is an actual conflict between the laws of the jurisdictions involved."[2] If the laws of the relevant jurisdictions are substantively the same, a court may avoid the choice of law analysis and apply the law of the forum.[3] Here, with respect to both

---

[1]  *Bianco v. Erkins* (*In re Gaston & Snow*), 243 F.3d 599, 601–02 (2d Cir. 2001) ("Because federal choice of law rules are a type of federal common law, which federal courts have only a narrow power to create, we decide that bankruptcy courts confronting state law claims that do not implicate federal policy concerns should apply the choice of law rules of the forum state.").

[2]  *In re Allstate Ins. Co.*, 613 N.E. 2d 936, 937 (1993). An actual conflict is present "[w]here the applicable law from each jurisdiction provides different substantive rules." *Curley v. AMR Corp.*, 153 F.3d 5, 12 (2d Cir. 1998).

[3]  *See Curley v. AMR Corp.,* 153 F.3d 5, 12 (2d Cir. 1998) ("It is only when it can be said that there is no actual conflict that New York will dispense with a choice of law analysis." (citing *J. Aron & Co. v. Chown*, 647 N.Y.S.2d 8 (N.Y. App. Div. 1996))); *Nat'l Oil Well Maint. Co. v. Fortune Oil & Gas, Inc.*, No. 02 CV. 7666(LBS), 2005 WL 1123735, at *1 (S.D.N.Y. May 11, 2005).

unconscionability[4] and adhesion,[5] it appears that there is no material difference between the laws of potentially relevant jurisdictions, including New York, Delaware, Pennsylvania, Michigan, and Minnesota. Thus, the Bankruptcy Court would likely apply New York law.

### 2. *Unconscionable Contracts And Contracts Of Adhesion*

The doctrines of unconscionability and adhesion largely overlap and are often pled concurrently, as they require a very similar two-part showing of wrongful inducement to enter

---

[4] All five jurisdictions in question employ what is essentially a two-part test with respect to unconscionability. *See, e.g.*, *Baron Assocs., LLC v. Garcia Group Enters.*, 946 N.Y.S.2d 611, 612 (N.Y. App. Div. 2012) ("As a general proposition, unconscionability . . . requires some showing of an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party.") (citation omitted); *US Acquisition Prop. XIV, LLC v. Reserves Dev. Corp.*, Nos. S10C-06-034-ESB, 2012 WL 1415717, at *5 (Del. Super. Ct. Feb. 23, 2012) ("Contract terms are considered to be unconscionable when there is an absence of meaningful choice and the terms unreasonably favor one of the parties.") (citation omitted); *Delinger, Inc. v. Dendler*, 608 A.2d 1061, 1068 (Pa. Super. Ct. 1992) ("The test of unconscionability, as mandated by our supreme court, is twofold. First, for a contract or term to be unconscionable, the party signing the contract must have lacked a meaningful choice in accepting the challenged provision. Second, the challenged provision must 'unreasonably favor' the party asserting it.") (citation omitted); *Vittiglio v. Vittiglio*, 824 N.W.2d 591 (Mich. Ct. App. 2012) ("The examination of a contract for unconscionability involves inquiries for both procedural and substantive unconscionability . . . . Procedural unconscionability exists where the weaker party had no realistic alternative to acceptance of the [agreement] . . . . Substantive unconscionability exists where the challenged term is not substantively reasonable . . . . The term must be more than merely disadvantageous; rather, 'the inequity of the term [must be] so extreme as to shock the conscience.'") (citations omitted); *Dorso Trailer Sales, Inc. v. American Body and Trailer, Inc.*, 372 N.W.2d 412, 415 (Minn. Ct. App. 1985) ("A finding of unconscionability requires that one contracting party show that it had no 'meaningful choice' but to accept the contract term as offered, and that the [contract term] was 'unreasonably favorable' to the other party.") (citation omitted).

[5] The test of whether a contract is adhesive is substantially similar in all five relevant jurisdictions. *See, e.g.*, Klos v. Polskie Linie Lotnicze, 133 F.3d 164, 168 (2d Cir. 1997) (Under New York law "[a] court will find adhesion only when the party seeking to rescind the contract establishes that the other party used 'high pressure tactics' or 'deceptive language,' or that the contract is unconscionable.") (citation omitted); *HCR-Manor Care v. Fugee*, No. 07C-10-024 MMJ, 2010 WL 780020, at *5 (Del. Super. Ct. Jan. 26, 2010) ("An 'adhesion contract' is defined as a 'standard-form contract prepared by one party, to be signed by the party in a weaker position, usually a consumer, who adheres to the contract with little choice about the terms.'") (citations omitted); *Chepkevich v. Hidden Valley Resort, L.P.*, 2 A.3d 1174, 1190 (Pa. 2010) ("An adhesion contract is a 'standard-form contract prepared by one party, to be signed by the party in a weaker position, usu[ally] a consumer, who adheres to the contract with little choice about the terms.'") (citation omitted); *Comerica Bank v. Gorelick*, No. 256773, 2006 WL 168020, at *3 (Mich. Ct. App. Jan. 24, 2006) ("In determining whether a contract is one of adhesion, this Court considers the relative bargaining power of the parties, their relative economic strength, and the alternative sources of supply.") (citation omitted); *Valspar Refinish, Inc. v. Gaylord's Inc.*, Nos. A05-1640 and A05-1867, 2006 WL 1529472, at *2 (Minn. Ct. App. 2006) ("Whether a contract is one of adhesion depends on factors such as the bargaining power of the parties, whether they negotiated the contract, the business sophistication of the parties, and the need for the subject of the agreement.") (citation omitted).

into a contract in addition to substantive unfairness of the contract.[6] For example, in discussing cases involving unconscionable contracts, the Restatement (Second) of Contracts addresses the overlap, stating that "[i]n many of the cases cited contracts of adhesion were involved. It is to be emphasized that a contract of adhesion is not unconscionable per se, and that all unconscionable contracts are not contracts of adhesion."[7] Generally speaking, unconscionability focuses more on the substance of the contract, while adhesion focuses more on the contract formation process.

### a. Unconscionable Contracts

Under New York law, a contract is unconscionable when it is "so grossly unreasonable or unconscionable in the light of the mores and business practices of the time and place as to be un-enforceable according to its literal terms."[8] "Generally, there must be a showing that such a contract is both procedurally and [substantively] unconscionable."[9] First, there must be some showing of an absence of meaningful choice on the part of one of the parties,[10] i.e., a showing that the negotiation process was unfair. Second, the challenged provision must be unreasonably favorable to the other party.[11] "[W]hether a contract or clause is unconscionable is to be decided by the court against the background of the contract's commercial setting, purpose and effect."[12]

### b. Contracts Of Adhesion

A contract is considered to be adhesive when the party seeking to enforce the contract has used "high pressure tactics" or "deceptive language" in the contract and there is "inequality of bargaining power" between the parties.[13] "Typical contracts of adhesion are standard-form contracts offered by large, economically powerful corporations to

---

[6] *See*, *e.g.*, *Klos*, 133 F.3d at 168 (Under New York law "[a] court will find adhesion only when the party seeking to rescind the contract establishes that the other party used 'high pressure tactics' or 'deceptive language,' or that the contract is unconscionable.") (citation omitted); *Sablosky v. Edward S. Gordon Co., Inc.*, 535 N.E.2d 643, 644-45 (N.Y. 1989) ("Plaintiff contends that the arbitration clause is invalid…and that it should not be given effect . . . because the . . . agreement constitutes a contract of adhesion and is unconscionable.")

[7] RESTATEMENT (SECOND) OF CONTRACTS § 208 cmt. a (1981).

[8] *Ragone v. Atl. Video at the Manhattan Ctr.*, 595 F.3d 115, 121 (2d Cir. 2010) (quoting *Nayal v. HIP Network Servs. IPA, Inc.*, 620 F. Supp. 2d 566, 571 (S.D.N.Y. 2009)).

[9] *Id.*

[10] *Baron Assocs., LLC v. Garcia Group Enters.,* 946 N.Y.S.2d 611, 612 (N.Y. App. Div. 2012) (citation omitted).

[11] *Id.*, 612.

[12] *Sablosky*, 535 N.E.2d at 647.

[13] *Id.*

unrepresented, uneducated, and needy individuals on a take-it-or-leave-it basis, with no opportunity to change any of the contract's terms."[14] "To be considered an unenforceable contract of adhesion, the contract must also inflict substantive unfairness on the weaker party, because its terms are not within the reasonable expectations of that party, or because its terms are unduly oppressive, unconscionable, or contrary to public policy."[15] The doctrine may not be invoked to trump the clear language of an agreement unless there is a disturbing showing of unfairness, undue oppression, or unconscionability.[16]

### c. Remedies

Under New York law, unconscionability[17] and adhesion[18] are affirmative defenses to the enforcement of a contract. A court that determines a contract is unconscionable is not authorized to award damages; rather, the court is given the power to refuse to enforce the agreement in its entirety, to delete the unconscionable clause and enforce the remainder of the contract, or to limit the unconscionable clause's application so that an unconscionable result will be avoided.[19] The District Court for the Eastern District of New York recently discussed remedies available when a contract is found to be unconscionable. The court quoted the United States Court of Appeals for the Eleventh Circuit, which stated that "[t]he equitable theory of unconscionability has never been utilized to allow for the affirmative recovery of money damages. . . . [N]either the common law of Florida, nor that of any other state, empowers a court addressing allegations of unconscionability to do more than refuse *enforcement* of the unconscionable section or sections of the contract so as to avoid an unconscionable result."[20] This statement of the doctrine limits its use to instances such as these. Similarly, if a court finds that a contract is a contract of adhesion, "the court's only remedy is non-enforcement, not reformation."[21]

---

[14] *Aviall, Inc. v. Ryder Sys., Inc.*, 913 F.Supp. 826, 831 (S.D.N.Y. 1996) (citation omitted).

[15] *Id.*

[16] *Id.*

[17] *Ng v. HSBC Mortgage Corp.*, (No. 07-CV-5434 (RRM)(VVP), 2011 WL 3511296, at *8 (E.D.N.Y. 2011) (citation omitted).

[18] *See, e.g.*, *N. Am. Specialty Ins. Co. v. Schuler*, 737 N.Y.S.2d 741, 742 (N.Y. App. Div. 2002).

[19] *See, e.g.*, *Avildsen v. Prystay*, 574 N.Y.S.2d 535, 537 (N.Y. App. Div. 1991) ("The doctrine of unconscionability is to be used as a shield, not a sword, and may not be used as a basis for affirmative recovery. Under both the UCC and common law, a court is empowered to do no more than refuse enforcement of the unconscionable contract or clause.") (citation omitted); RESTATEMENT (SECOND) OF CONTRACTS § 208 (1981).

[20] *Ng v. HSBC Mortgage Corp.*, (No. 07-CV-5434 (RRM)(VVP), 2011 WL 3511296, at *8 (E.D.N.Y. 2011) (quoting *Cowin Equip. Co., Inc. v. Gen. Motors Corp.*, 734 F.2d 1581 (11th Cir. 1984)).

[21] *See Aviall*, 913 F.Supp., at 831–832 (citation omitted).

### 3. Contracts Between Parent And Its Wholly Owned Subsidiary

There does not appear to be any case law directly on point with respect to the issue of whether an insolvent wholly owned subsidiary may seek to render unenforceable contracts with its parent on the basis of unconscionability or adhesion. Instead, it seems that plaintiffs have favored more traditional theories in such circumstances, such as breach of fiduciary duty, likely because of available remedies. While it is unclear whether it is possible to render a parent-subsidiary contract unenforceable on the basis of unconscionability or adhesion, as discussed below, it may be inferred from case law that the nature of the parent-subsidiary relationship—that a wholly-owned subsidiary exists solely for the benefit of its parent[22]— could preclude such an action.[23]

The case most instructive with respect to this issue is *Aviall*. In *Aviall*, a subsidiary corporation brought suit against its former parent, seeking to disqualify an accounting firm as arbitrator of a dispute over the allocation of pension-related items set forth in a distribution agreement governing the spin-off of the subsidiary. In its attempt to disqualify the proposed arbitrator, the subsidiary argued that the arbitration clause in the distribution agreement could not be enforced because the agreement was one of adhesion.[24] In support of this argument, the subsidiary asserted that the parent "dictated the terms of the distribution agreement, and that there was no negotiation at all."[25] Specifically, the subsidiary complained that the parent did not provide it with independent counsel, and that the parent's counsel drafted the entire agreement and that an officer of the parent signed the agreement on the subsidiary's behalf.[26]

While finding that these allegations were generally true, the court dismissed the subsidiary's claim of adhesion. The court reasoned that the procedure that the subsidiary "decrie[d] as oppressive . . . [was] entirely consistent with traditional principles of corporate governance."[27] The court stated that when one company wholly owns another, the directors of the parent and the subsidiary are obligated to manage the affairs of the subsidiary in the best interests only of the parent and its shareholders.[28] Because the officers and directors of the parent do not owe allegiance to the wholly owned subsidiary, the court found that it was reasonable to conclude that the parent corporation itself was under no obligation to provide the subsidiary with independent representation during the spin-off process.[29] It may be inferred

---

[22] *See, e.g.*, *Anadarko Petroleum Corp. v. Panhandle E. Corp.*, 545 A.2d 1171, 1174 (Del. 1988) ("[I]n a parent and wholly-owned subsidiary context, the directors of the subsidiary are obligated to manage the affairs of the subsidiary in the best interests of the parent and its shareholders.") (citations omitted).

[23] *See generally Aviall*, 913 F.Supp. at 832 (citation omitted).

[24] *See id.* at 831.

[25] *See id.* at 832.

[26] *See id.*

[27] *See id.*

[28] *See id.*

[29] *See id.*

that the court found that because no fiduciary duties exists between a parent and its solvent, wholly owned subsidiary, i.e. that the parent is not accountable to the subsidiary, there cannot be any oppression or overwhelming of the subsidiary, which is required to demonstrate that the contract in question was unconscionable or one of adhesion. While this decision is clear in the case of a solvent wholly owned subsidiary, the question of whether the insolvency of the subsidiary alters the analysis remains.

Arguably, if the parent corporation did not owe any duties to the wholly owned subsidiary, even in the case of the insolvency of such subsidiary, claims of unconscionability or adhesion would also be futile in that circumstance. Whether a parent owes duties in such an instance is unclear,[30] and any extension of the *Aviall* court's analysis is speculative at best.

### 4. Conclusion

The Examiner has determined that further consideration of the doctrines of unconscionability and adhesion would be unproductive for a number of reasons. First, the doctrines are affirmative defenses and are generally only used to defeat enforcement of a contract rather than to seek an affirmative recovery. Therefore they would be of limited utility. Second, based on the nature of the parent-subsidiary relationship, it is unlikely that the claims would prevail. Finally, in the situation where a parent and an insolvent, wholly owned subsidiary enter into an unfair agreement at the behest of the parent, there are alternative, more effective means of redress. Creditors of a debtor subsidiary may bring claims for breach of fiduciary duty against the directors and officers of the subsidiary, in addition to claims against the parent for aiding and abetting breach of fiduciary duty.[31] Other avenues of recovery may be available, including under fraudulent conveyance law, piercing the corporate veil and equitable subordination. All of these remedies are discussed elsewhere in the Report.

---

[30] *See ASARCO LLC v. Ams. Mining Corp.,* 396 B.R. 278, 415-16 (S.D.Tex. 2008) (denying a claim by a wholly owned subsidiary against the parent corporation for a breach of fiduciary duty). *But see The Official Comm.of Unsecured Creditors of RSL COM Primecall, Inc., v. Beckoff (In re RSL COM Primecall, Inc.),* Nos. 01–11457 (ALG), 01–11458(ALG), 01–11459(ALG), 01–11460(ALG), 01–11461(ALG), 01–11462(ALG), 01–11463(ALG), 01–11464(ALG), 01–11465(ALG), 01–11466(ALG), 01–11467(ALG), 01–11468(ALG), 01–11469(ALG), and ADV. 03–2176(ALG), 2003 WL 22989669, at *14 (Bankr. S.D.N.Y. December 11, 2003) ("[D]irectors of the parent cannot be compelled at such time to attend only to the interests of the subsidiary, especially where (as here) *both* were insolvent.").

[31] *See ASARCO,* 396 B.R. at 415–16.

## VII. REVIEW AND ANALYSIS OF ESTATE CAUSES OF ACTION IMPLICATED BY AFFILIATE TRANSACTIONS AND THE RELATIONSHIP AND COURSE OF DEALING AMONG RESCAP, AFI, ALLY BANK, AND CERBERUS

## K. ESTATE CAUSES OF ACTION ARISING OUT OF RESCAP'S TAX SHARING ARRANGEMENTS AND RESCAP'S CONVERSION TO DISREGARD ENTITY STATUS

Section VII contains an analysis of various Estate causes of action arising from Affiliate Transactions and the relationship and course of dealing among ResCap, AFI, Ally Bank, and Cerberus. In general, the legal analysis in Section VII is organized and presented on a "cause of action by cause of action" basis, whereby the Examiner identifies a specific cause of action and then analyzes all transactions that may give rise to such a claim.

This Section, however, which addresses potential "tax-related" claims and causes of action, is presented differently. Instead of presenting the tax claims by cause of action, they are presented on a "transaction by transaction" basis, whereby the Examiner identifies a specific tax-related transaction and then analyzes all potential claims arising from it. The Examiner believes this approach is particularly appropriate here because of: (1) the unique nature of certain of the tax claims, which do not fit squarely into any of the standard causes of action; and (2) the interplay and interdependency between certain of the claims.

Although several transactions are analyzed below, the primary focus of this Section is on ResCap's entry into a tax allocation agreement that was effective beginning in the 2009 tax year. As described below, the Examiner has concluded that, while a close question, it is more likely than not that a first version of the tax allocation agreement (i.e., the First 2009 Tax Allocation Agreement), that was approved by the ResCap Board and signed by AFI, is an enforceable contract, despite not having been signed by a ResCap officer. The Examiner has also concluded that it is likely that a second version of the tax allocation agreement (i.e., the Second 2009 Tax Allocation Agreement), that was signed by both AFI and ResCap and that purports to supersede the First 2009 Tax Allocation Agreement, may be avoided as a constructive fraudulent transfer. Based on the Examiner's conclusions, ResCap may have a contractual claim against AFI under the First 2009 Tax Allocation Agreement based on AFI's use of ResCap's tax benefits that have passed since the 2009 tax year. As discussed below, ResCap's contract claim against AFI could be as much as $1.77 billion, depending on how much of ResCap's tax benefits AFI ultimately uses.

### 1. ResCap's 2006 Conversion To A Limited Liability Company And Election To Become A Disregarded Entity For Tax Purposes

As described in Section V.D.3, on October 24, 2006 ResCap converted from a corporation to a single member limited liability company and initially chose to continue to be treated as a corporation for tax purposes. In November 2006, ResCap changed its tax classification to a disregarded entity effective November 21, 2006.[1] A disregarded entity does not pay federal income taxes. Instead, it is treated as a branch or division of its member who

---

[1]   Notably, a limited liability company's member must consent to the company's election to be treated as a disregarded entity. *See* Treas. Reg. § 301.7701-3(c)(2) (2006).

reports its income or losses on its own income tax returns. As a result of ResCap's conversion to a single member limited liability company and related election to be treated as a disregarded entity, ResCap was no longer a taxpayer and lost the ability to use its tax attributes, including its NOLs. As described in Section V.D.2.c(2), since the 2006 election, ResCap has generated large NOLs that have passed to AFI.[2] The Examiner has analyzed whether there are any claims for fraudulent conveyance, unjust enrichment, or breach of fiduciary duty arising from ResCap's 2006 conversion and election to be treated as a disregarded entity. For the reasons described below, the Examiner concludes it is unlikely that claims for fraudulent conveyance, unjust enrichment, and breach of fiduciary duty related to the 2006 conversion and election would prevail.

### a. Fraudulent Conveyance

#### (1) Significance Of The Choice Of Law Analysis

The Bankruptcy Code imposes a time limitation (sometimes referred to as a look-back period) on the avoidance of fraudulent transfers. A debtor may only avoid a constructively fraudulent transfer under section 548 of the Bankruptcy Code if the transfer was made within two years of the date of the debtor's bankruptcy filing. Because ResCap elected to become a disregarded entity more than five years prior to the Petition Date, section 548 of the Bankruptcy Code does not provide a basis to avoid that transaction, even if the remaining elements of a fraudulent transfer could be established. However, section 544(b) of the Bankruptcy Code permits a trustee to bring a state law fraudulent conveyance action.[3]

As described in Section VII.F.2.a(1), New York's choice of law rules will apply to determine which state law would govern a constructive fraudulent transfer claim brought in the Bankruptcy Court. "The first step of New York's choice-of-law rules is to determine whether there is an actual conflict between the laws of the jurisdictions involved."[4] In the absence of an actual conflict, New York law will apply.[5]

In determining whether a conflict exists, the potentially relevant jurisdictions, other than New York, are Minnesota and Delaware. As further described in Section VII.F.2.a(1), under the "greatest interest" analysis, courts will look to the location of the transferor-debtor based on its principal place of business and state of incorporation. ResCap is incorporated in Delaware, and its principal place of business is located in Minnesota (and was located there during the relevant time periods). Notably, little weight will be given to a debtor's state of

---

[2]  AFI was itself a pass-through entity until it elected to be taxed as a corporation as of July 1, 2009. Prior to this election, ResCap's NOLs passed through AFI and up to GM and Cerberus.

[3]  *See Picard v. Chais* (*In re Bernard L. Madoff Inv. Secs. LLC*), 445 B.R. 206, 231–32 (Bankr. S.D.N.Y. 2011).

[4]  *Paradigm BioDevices, Inc. v. Viscogliosi Bros., LLC*, 842 F. Supp. 2d 661, 665 (S.D.N.Y. 2012) (citing *Drenis v. Haligiannis*, 452 F. Supp. 2d 418, 426 (S.D.N.Y. 2006) (quoting *In re Allstate Ins. Co.*, 613 N.E.2d 936, 937 (N.Y. 1993))).

[5]  *See Paradigm BioDevices, Inc*., 842 F. Supp. 2d at 665–65.

incorporation unless the transaction at issue has some other nexus with that state.[6] Here, however, the 2006 election transaction involved ResCap changing its corporate and tax status. By its very nature, the transaction implicates Delaware's corporate law.

Both Delaware and Minnesota fraudulent transfer law are derived from the UFTA, while New York fraudulent transfer law is derived from the UFCA. Although, as described in Section VII.F, there are certain material differences between the UFTA and UFCA, here the result of the fraudulent transfer analysis will be the same regardless of which state's law applies. As described in more detail in Sections VII.K.1.a(2)(a) and VI, the Examiner concludes that ResCap was solvent when it elected to be treated as a disregarded entity for tax purposes in November 2006. And, as discussed below, ResCap received fair consideration in connection with its election to be treated as a disregarded entity. Therefore, none of the material differences between the fraudulent transfer laws of Minnesota, Delaware, or New York are relevant or outcome determinative to this analysis. Where the issue in dispute "would turn out the same under both forums' law . . . no true conflict exists."[7] Based on the foregoing, the Examiner believes it is appropriate to analyze ResCap's tax election under New York's fraudulent conveyance law.

With respect to statute of limitations, under New York's "borrowing statute," the Bankruptcy Court would apply the shorter of New York's statute of limitations or that of the state in which the plaintiff resides.[8] Residency in this context has generally been held to be a business entity's principal place of business.[9] Again, ResCap's principal place of business is located in Minnesota, which has a six-year statute of limitations.[10] New York also has a six-year statute of limitations.[11] Accordingly, a state law fraudulent transfer claim brought under section 544(b) of the Bankruptcy Code would not be time-barred.

---

[6] *See Savage & Assoc. v. Mandl* (*In re Teligent, Inc.*), 380 B.R. 324, 332 n.6 (in conducting a choice-of-law interest analysis, holding the state of the debtor's incorporation—Delaware—inapplicable to a fraudulent transfer claim since the fraudulent transfer occurred in another jurisdiction); *Faulkner v. Kornman* (*In re Heritage Org., L.L.C.*), 413 B.R. 438, 462 (Bankr. N.D. Tex. 2009) (in conducting a "most significant factor" choice-of-law analysis, holding Delaware fraudulent transfer law inapplicable because the "only connection the Trustee's fraudulent transfer claims have to Delaware is that [transferor] and the [transferees] are Delaware entities"); *Official Comm. of Asbestos Pers. Injury Claimants v. Sealed Air Corp.* (*In re W.R. Grace & Co.*), 281 B.R. 852, 855 (Bankr. D. Del. 2002) (in choice-of-law analysis, holding Delaware fraudulent transfer law inapplicable because "Delaware's only contact with this matter is that it is the state of incorporation of the transferee and the subsidiary that is the subject of this fraudulent transfer action").

[7] *Elgin Sweeper Co. v. Melson Inc.*, 884 F. Supp. 641, 648 (N.D.N.Y. 1994) (citing *Howard v. Clifton Hydraulic Press Co.*, 830 F. Supp. 708, 712 (E.D.N.Y. 1993)).

[8] *See Adelphia Commn'cs Corp. v. Bank of Am. N.A.* (*In re Adelphia Commn'cs Corp.*), 365 B.R. 24, 57–58 (Bankr. S.D.N.Y. 2007).

[9] *See, e.g.*, *Official Comm. of Asbestos Claimants of G-I Holding, Inc. v. Heyman*, 277 B.R. 20, 30 (S.D.N.Y. 2002); *In re Adelphia Commn'cs Corp.*, 365 B.R. at 58 n.137.

[10] MINN. STAT. § 541.05(6) (2013).

[11] N.Y. C.P.L.R. 213(8) (McKinney 2013).

### (2) ResCap's Election To Be Treated As A Disregarded Entity Does Not Satisfy The Elements Of A Fraudulent Conveyance Claim Under New York Law

Section 544(b) provides that a trustee may avoid a transfer of a debtor's property interest under applicable state law. Under New York law, a transfer is constructively fraudulent[12] where: (1) the transfer was made without fair consideration; and (2) either (a) the debtor was insolvent or was rendered insolvent by the transfer, (b) the debtor was left with unreasonably small capital, or (c) the debtor intended or believed that it would incur debts beyond its ability to pay as the debts matured.[13]

### (a) ResCap Was Solvent At The Time Of Its Election To Be Treated As A Disregarded Entity

As an initial matter, no constructive fraudulent conveyance can be found where a transferor was solvent at the time it made the transfer. Insolvency under the UFCA refers to: (1) bankruptcy insolvency (a deficit net worth immediately after the conveyance) and (2) equitable insolvency (an inability to pay debts as they mature).[14] Proof of insolvency can be demonstrated by satisfying one of the following three tests: (1) the "balance sheet" test, i.e., the transferor is insolvent or will be rendered insolvent by the transfer in question;[15] (2) the "unreasonably small capital" test, i.e., the transferor is engaged in or is about to engage in a business transaction for which its remaining property constitutes unreasonably small capital;[16] and (3) the "ability to pay debts" test, i.e., the transferor believes that it will incur debt beyond its ability to pay.[17]

---

[12] The Investigation has uncovered no evidence to suggest that any party acted with an actual intent to defraud ResCap's creditors in connection with ResCap's conversion and election to be treated as a disregarded entity. Accordingly, this analysis will focus on constructive fraudulent transfer only.

[13] N.Y. DEBT. & CRED. LAW §§ 273–275 (McKinney 2013). Throughout this Section, New York Debtor and Creditor Law provisions will be referred to using their NY DCL designations. *See* Section VII.F.6 (providing a detailed discussion of the case law regarding constructive fraudulent conveyance under New York law).

[14] *See Moody v. Sec. Pac. Bus. Credit, Inc.*, 971 F.2d 1056, 1066, 1066 n.13 (3d Cir. 1992) (citing cases).

[15] NY DCL § 273 ("Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration.").

[16] NY DCL § 274. ("Every conveyance made without fair consideration when the person making it is engaged or is about to engage in a business or transaction for which the property remaining in his hands after the conveyance is an unreasonably small capital, is fraudulent as to creditors and as to other persons who become creditors during the continuance of such business or transaction without regard to his actual intent."). By its terms, therefore, NY DCL section 274 only applies to conveyances and therefore cannot be relied on to invalidate guaranties or other types of obligations. *See Official Comm. of Unsecured Creditors of M. Fabrikant & Sons, Inc. v. JP Morgan Chase Bank, N.A.* (*In re M. Fabrikant & Sons, Inc.*), 394 B.R. 721, 734 n.13 (Bankr. S.D.N.Y. 2008) ("By its terms [NY DCL section 274] . . . applies to conveyances but not obligations, and cannot be relied on to invalidate the debtors' loan debt or guaranties . . . .").

[17] NY DCL § 275 ("Every conveyance made and every obligation incurred without fair consideration when the person making the conveyance or entering into the obligation intends or believes that he will incur debts beyond his ability to pay as they mature, is fraudulent as to both present and future creditors.").

Here, ResCap's conversion and election to be treated as a disregarded entity occurred in late 2006. As discussed in Section VI, ResCap was solvent and not otherwise in financial distress as prescribed by applicable law in late 2006 at the time it elected treatment as a disregarded entity. Accordingly, it is unlikely that a claim to avoid ResCap's election on constructive fraudulent conveyance grounds would prevail. Nevertheless, because: (1) there is always the possibility (however remote) that a court may reach a different conclusion regarding solvency; and (2) the election to treat ResCap as a disregarded entity resulted in it losing the ability to use what has turned out to be several billions of dollars of NOLs, the Examiner has analyzed the remainder of the elements for a fraudulent conveyance claim under New York law.

### (b) For Avoidance Purposes, ResCap's Tax Treatment Election Constitutes Debtor's Property

A trustee or debtor-in-possession cannot use the strong-arm powers of section 544(b) of the Bankruptcy Code and avoid a transfer under state law if the threshold requirement that the debtor have an interest in the transferred property is not met.[18] Accordingly, before considering the other elements of New York's fraudulent conveyance law, a preliminary issue to consider is whether ResCap's election to be treated as a disregarded entity constitutes "property of the debtor" under section 544.

The term "property of the debtor" has generally been interpreted to be co-extensive with the term "property of the estate," which is defined by section 541 of the Bankruptcy Code. "The scope of [section] 541 is very broad and includes property of all descriptions, tangible and intangible."[19] Moreover, an "interest [in property] is not outside its reach because it is novel or contingent or because enjoyment must be postponed."[20] Accordingly, a debtor's property is generally understood to include all things that, if transferred to another party, would diminish the assets available to pay creditors.[21]

Given the extremely broad scope of what constitutes a debtor's property, courts uniformly hold that a debtor's tax attributes (and the right to use those attributes) are "property of the debtor" for purposes of a fraudulent conveyance claim.[22] A debtor's right to elect whether to be treated as

---

[18] *See ASARCO LLC v. Am. Mining Corp.*, 396 B.R. 278, 316 (S.D. Tex. 2008); *Williams v. Tomer* (*In re Tomer), 147 B.R. 461, 455 (S.D. Ill. 1993*).

[19] *Ramsay v. Dowden* (*In re Cent. Ark. Broad. Co.*), 68 F.3d 213, 214 (8th Cir. 1995) (internal citation omitted); *see also Official Comm. of Unsecured Creditors of Forman Enters. v. Forman* (*In re Forman Enters.*), 281 B.R. 600, 611 (Bankr. W.D. Pa. 2002) (citing *United States v. Whiting Pools*, 462 U.S. 198, 205 n.9 (1983)) ("[t]he legislative history of § 541(a) indicates that it is expansive and includes 'all kinds of property, including tangible or intangible property, causes of action . . . and all other forms of property . . . .'").

[20] *United States v. Towers* (*In re Feiler*), 230 B.R. 164, 167 (B.A.P. 9th Cir. 1999) (citing *Neuton v. Danning* (*In re Neuton*), 922 F.2d 1379, 1382 (9th Cir. 1990) (internal citation omitted)).

[21] *In re Forman Enters.*, 281 B.R. at 612 (citing *In re Merchants Grain, Inc.*, 93 F.3d 1347, 1353 (7th Cir. 1996); *In re Bullion Reserve of N.A.*, 836 F.2d 1214, 1217 (9th Cir. 1988)).

[22] *See United States v. Sims* (*In re Feiler*), 218 F.3d 948, 955–56 (9th Cir. 2000); *Unofficial Comm. of Unsecured Creditors v. PSS S.S. Co.* (*In re Prudential Lines, Inc.*), 928 F.2d 565, 571–72 (2d. Cir. 1991); *Gibson v. United States* (*In re Russell*), 927 F.2d 413, 417–18 (8th Cir. 1991); *Parker v. Saunders* (*In re Bakersfield Westar, Inc.*), 226 B.R. 227, 233–35 (B.A.P. 9th Cir. 1998); *Guinn v. Lines* (*In re Trans-Lines W., Inc.*), 203 B.R. 653, 661–62 (Bankr. E.D. Tenn. 1996).

a taxable entity or a pass-through entity (which includes a disregarded entity) for tax purposes, which may have an impact on the debtor's right to use its tax attributes, is also generally treated as property of the debtor.[23] Accordingly, ResCap's right to elect to become a disregarded entity would be treated as "property of the debtor" for purposes of a fraudulent conveyance analysis.

### (c) For Avoidance Purposes, ResCap's Tax Treatment Election Is A Conveyance

Similar to the Bankruptcy Code's broad definition of the term "transfer,"[24] the term "conveyance" is broadly defined under New York DCL to include "every payment of money, assignment, release, transfer, lease, mortgage or pledge of tangible or intangible property, and also the creation of any lien or encumbrance."

Based on this broad definition, almost any means by which a debtor may dispose of a property right constitutes a conveyance for avoidance purposes. Given that a debtor has a property right in its tax status, courts not surprisingly conclude that elections that have an impact on a debtor's tax status, which may increase debtor's tax liability or affect a debtor's ability to use its tax attributes, constitute "transfers"[25] for purposes of avoidance. For example, in *In re Trans-Lines West, Inc.*, the court held that the debtor corporation had a property interest in its subchapter S status, reasoning that the IRC affords a corporation that elects subchapter S-corporation status the "guaranteed, indefinite right to use, enjoy and dispose of that status."[26] The court thus held that "the [d]ebtor's prepetition revocation of its subchapter S status constitute[d] a 'transfer'" for avoidance purposes.[27]

Similarly, in *In re Bakersfield Westar, Inc.*, the United States Court of Appeals for the Ninth Circuit held that a shareholder's prepetition revocation of a debtor's subchapter S status

---

[23] *See In re Bakersfield Westar, Inc.*, 226 B.R. at 233–34 (finding that debtor's right to make or revoke its subchapter S status is property of the estate); *Frank Funaro Inc. v. Funaro* (*In re Frank Funaro Inc.*), 263 B.R. 892, 898 (B.A.P. 8th Cir. 2001) (adopting *Bakersfield* for proposition that debtor has property interest in S-corporation status); *In re Trans-Lines W., Inc.*, 203 B.R. at 661–62 (finding that an S-corporation's tax status constitutes property interest under the Bankruptcy Code).

[24] The Bankruptcy Code's definition of a transfer includes "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with . . . property; or . . . an interest in property." 11 U.S.C. § 101(54)(D) (2012); *see also Barnhill v. Johnson*, 503 U.S. 393, 400 (1992) ("We acknowledge that § 101(54) adopts an expansive definition of transfer").

[25] The Investigation has not turned up any cases addressing whether a company's tax election is a "conveyance" under New York state fraudulent conveyance law. However, several cases have addressed whether a debtor's tax election is a "transfer" under federal bankruptcy law. Courts have held that a transaction that would constitute a "transfer" under the Bankruptcy Code would also constitute a "conveyance" under the UFCA. *See, e.g.*, *In re Trans-Lines W., Inc.*, 203 B.R. at 664 ("Given that it has already been determined that the Debtor's revocation of its Subchapter S status constituted a 'transfer' under the Bankruptcy Code, the court does not see why the same act would not constitute a 'conveyance' under [the UFCA]"). Accordingly, the cases cited in this Section are instructive, and the reasoning of the cases should apply with equal force to an analysis under New York fraudulent conveyance law.

[26] *Id*. at 661.

[27] *Id*. at 663.

constituted a "transfer" that could be avoided as a fraudulent conveyance.[28] The court reasoned that the revocation of the debtor's subchapter S-corporation status caused the debtor to "dispose" of its right to pass its tax liabilities through to the debtor's principals.[29] Accordingly, the court concluded that, by electing to revoke the debtor's subchapter S-corporation status, the shareholder transferred a heavy tax burden to the bankruptcy estate and thereby diminished the assets available to satisfy the claims of creditors.[30]

More recently, in *In re Majestic Star Casino, LLC*, the Bankruptcy Court for the District of Delaware considered whether a non-debtor parent's revocation of its subchapter S-corporation election, which resulted in the termination of its subsidiary debtor's pass-through tax status, was an avoidable transfer.[31] In concluding that the revocation was in fact a transfer, the court relied on the broad definition of transfer as set forth in the Bankruptcy Code as well as the decisions by the courts in *In re Bakersfield Westar, Inc.* and *In re Trans-Lines West, Inc.* that held that the revocation of a debtor's subchapter S-corporation election was a transfer of property of the estate.[32]

Based on the foregoing cases, the Examiner concludes that it is likely that AFI's consent and ResCap's election to treat itself as a disregarded entity, which resulted in the forfeiture of the use of its future NOLs, would be deemed to be a "conveyance" for fraudulent conveyance purposes.

### (d) ResCap's Tax Treatment Election Is Not A Conveyance Made Without Fair Consideration

"Fair consideration" is expressly defined in the UFCA and, by extension, the NY DCL. Section 272 of the NY DCL states that:

> Fair consideration is given for property, or obligation,
>
> a. When in exchange for such property, or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied, or
>
> b. When such property, or obligation is received in good faith to secure a present advance or antecedent debt in amount not disproportionately small as compared with the value of the property, or obligation obtained.[33]

---

[28] *In re Bakersfield Westar, Inc.*, 226 B.R. at 233–34.

[29] *See id.* at 234.

[30] *See id.*

[31] *Majestic Star Casino LLC v. Barden Dev., Inc.* (*In re Majestic Star Casino, LLC*), 466 B.R. 666 (Bankr. D. Del. 2012).

[32] *Id.* at 678. The ruling in *In re Majestic Star Casino, LLC* is currently on appeal to the United States Court of Appeals for the Third Circuit. Oral argument occurred on February 19, 2013. Transcript of Oral Argument, *Majestic Star Casino LLC v. Barden Dev., Inc.* (*In re Majestic Star Casino, LLC*), Nos. 12-3200, 3201 (3d Cir. Feb. 19, 2013), Document 003111184937. No decision had been issued as of the date of this Report.

[33] NY DCL § 272.

The fair consideration test therefore requires an analysis of whether: (1) the recipient of the debtor's property either (a) conveyed property in exchange, or (b) discharged an antecedent debt in exchange; (2) such exchange was a "fair equivalent" of the property received; and (3) such recipient made the exchange "in good faith."[34]

While *In re Bakersfield Westar, Inc*., *In re Trans-Lines West, Inc.*, and *In re Majestic Star Casino, LLC* make clear that a debtor's conversion from a non-taxable subchapter S-corporation to a taxable corporation may be an avoidable transfer, it is not clear that the reverse is true. Each of these decisions was premised, at least in part, on the fact that conversion from a non-taxable entity to a taxable entity deprived the estate of value by imposing a tax burden on the debtor. Indeed, these cases recognized the intrinsic value to a company of having pass-through tax status.[35] However, where a debtor converts from a taxable entity to a non-taxable entity, it is not clear that the assets available to pay the debtor's creditors have been diminished.

In this case, it is difficult to see how ResCap's election to be treated as a disregarded entity can, on the whole, be said to have deprived ResCap's Estate of any asset or resulted in a loss of value. By electing to become a disregarded entity, ResCap's unused pre-conversion NOLs and other tax attributes passed to GM, and its post-conversion tax attributes, including its NOLs, were reported by AFI and then passed to Cerberus (51%) and GM (49%).[36] However, since there was no agreement requiring ResCap to make any federal income tax payments to AFI,[37] that election also excused ResCap from any obligation to pay federal taxes that it otherwise would have had to pay. Although, with the benefit of hindsight, it is now known that ResCap generated mostly losses following the 2006 tax year, the expectation of GM and AFI in 2006 was that ResCap was going to be profitable and, consequently, would benefit from the conversion.[38]

---

[34] *Sharp Int'l Corp. v. State St. Bank & Trust Co.* (*In re Sharp Int'l Corp.*), 403 F.3d 43, 53 (2nd Cir. 2005) (quoting *HBE Leasing Corp. v. Frank*, 61 F.3d 1054, 1058–59 (2nd Cir. 1995)).

[35] *Parker v. Saunders* (*In re Bakersfield Westar, Inc*.), 226 B.R. 227, 234 (B.A.P. 9th Cir. 1998) ("The ability to not pay taxes has a value to the debtor-corporation in this case."); *In re Majestic Star Casino, LLC*, 466 B.R. at 674 (citing numerous cases for the proposition that "the 'S' corporation's status is property of the estate because of the tax benefits that status confers on the debtor.").

[36] *See* Residential Capital, LLC Rating Agency Review Presentation, dated Nov. 2006, at 8 [EXAM10124762] (stating that the purpose of the LLC conversion was to "obtain significant tax benefits, including . . . ResCap and its U.S. subsidiaries will no longer pay Federal (or most state) income taxes. Rather, ResCap's shareholders (GM and other investors) will be subject to tax on the income.").

[37] For a three-year period following ResCap's election to be treated as a disregarded entity (from December 2006 until November 2009), ResCap did not operate under a tax allocation agreement with respect to federal income taxes.

[38] *See* Report to the Board of Directors of Residential Capital, LLC, dated Nov. 20, 2006, at RC00016783 [RC00016782] (stating that "[t]he present value of the ability to use GM's tax losses to offset the taxable income of [ResCap] by using the LLC conversion structure has been estimated at $1.1 billion.").

Moreover, in 2008, ResCap generated excess inclusion income in the approximate amount of $28.6 million.[39] By operation of law, ResCap could not offset this income against its losses. Nevertheless, as a result of being a disregarded entity, ResCap did not have to pay federal income taxes on the excess inclusion income. Had ResCap remained a corporate taxpayer, ResCap would have been obligated to pay these taxes.

In addition, at the time of ResCap's conversion to a disregarded entity, it was a party to the Implemented 2005 Tax Allocation Agreement.[40] ResCap's conversion and Cerberus's purchase of AFI's equity interests resulted in termination of the agreement. However, the termination of that agreement does not appear to have deprived ResCap of any value.

As described in Section V.D.2.c, the Implemented 2005 Tax Allocation Agreement was not particularly favorable to ResCap. Under the Implemented 2005 Tax Allocation Agreement, ResCap was obligated to pay AFI for all tax obligations that ResCap would hypothetically have been required to pay on a stand-alone basis. However, ResCap's right to be compensated for the use of its tax benefits by AFI was conditional and speculative. ResCap was compensated for the use of its tax benefits only where both GM and AFI were able to make use of them (although ResCap's ability to use its tax benefits was not a condition to payment).

Finally, ResCap's conversion and disregarded entity status election were requirements of the Cerberus PSA and appeared to be key components of a transaction that conferred benefits upon all the entities involved in the Cerberus PSA, including ResCap.[41]

Based on the foregoing, the Examiner concludes that ResCap's election to be treated as a disregarded entity did not result in a "conveyance" for less than fair consideration that deprived ResCap's Estate of assets that "otherwise could be utilized to satisfy the allowable claims of creditors."[42] Accordingly, the Examiner concludes that, even if there were a finding that ResCap was insolvent at the time of its tax election in November 2006, it is unlikely that a constructive fraudulent conveyance claim would prevail.

### b. Post-2006 NOL Transfers Are Not Subject To Avoidance

An additional and related question the Examiner considered is whether ResCap's transfer of its tax benefits through AFI to GM and Cerberus at the end of each taxable year subsequent to 2006, including years in which ResCap might have been in financial distress, might be subject to avoidance on fraudulent conveyance grounds. The Examiner does not believe that fraudulent conveyance law provides a basis to provide relief to ResCap for the loss of its tax

---

[39] *See* GMAC LLC, U.S. Return of Partnership Income (I.R.S. Form 1065) for Calendar Year 2008, at ALLY_03900052, 114 [ALLY_0390037].

[40] *See* Implemented 2005 Tax Allocation Agreement [ALLY_0178779].

[41] *See* Residential Capital, LLC Rating Agency Review Presentation, dated Nov. 2006, at 37 [EXAM10124762] (stating that Cerberus provided numerous benefits to ResCap in connection with Cerberus's purchase of 51% of AFI).

[42] *Official Comm. of Unsecured Creditors of Forman Enters. v. Forman* (*In re Forman Enters.*), 281 B.R. 600, 612 (Bankr. W.D. Penn. 2002).

benefits. Once ResCap elected to become a disregarded entity, ResCap's right to use any future tax benefits inured to the benefit of GM and Cerberus by operation of tax law.[43] As described below, ResCap was merely a conduit—treated under federal income tax law as a division of AFI—from which the tax benefits and the right to use them redounded to the benefit of AFI and its owners. Accordingly, no transfer of a debtor's interest in property occurred.[44]

A company's election to be treated as either a taxable entity or pass-through entity (including a disregarded entity) for federal tax purposes does not per se determine the company's ownership rights with respect to its tax attributes, including its NOLs.[45] Indeed, the tax regulations do not expressly address a disregarded entity's ownership rights in its tax attributes. The tax regulations only provide that if an "entity [LLC] is disregarded, *its activities are treated in the same manner* as a sole proprietorship, branch, or division of the owner."[46] Further, as described in Section VII.K.1.a(2)(b), a debtor's tax attributes generally qualify as property of the estate.[47] However, a company's status as a pass-through or disregarded entity can affect its right to use its tax attributes. This is important because the transfer of property in which a debtor holds bare legal title, but no equitable interest, is not subject to avoidance because such a transfer does not diminish the debtor's estate.[48]

There is a glaring lack of case law addressing whether the tax attributes of a disregarded entity constitute "property of a debtor" for purposes of avoidance claims under the Bankruptcy Code. One case, however, *In re Forman Enterprises, Inc.*, squarely addressed the issue in analyzing whether tax refunds received or to be received by a debtor's parent (based on the carry-back of the debtor subchapter S-corporation's NOLs) were avoidable as postpetition transfers under section 549 of the Bankruptcy Code.[49] The court answered in the negative,

---

[43] *See* Treas. Reg. § 301.7701-2(a) (2006); *see also In re Forman Enters.*, 281 B.R. at 612 ("Under the provisions of the Internal Revenue Code . . . the NOL and the right to use it automatically passed through by operation of law to defendants as S corporate shareholders.").

[44] As described in Section VII.K.1.a, any fraudulent conveyance analysis under New York or other state law, made applicable through section 544(b) of the Bankruptcy Code, requires a showing that the debtor has an interest in the property being transferred (i.e., that the property transferred would qualify as "property of the estate" under the Bankruptcy Code). *See ASARCO LLC v. Am. Mining Corp.*, 396 B.R. 278, 316 (S.D. Tex. 2008); *Williams v. Tomer* (*In re Tomer*), 147 B.R. 461, 255 (S.D. Ill. 1993).

[45] In promulgating regulations under section 7701 of the IRC concerning disregarded entities, the Treasury Department stated that "[w]hether an organization is treated as an entity for federal tax purposes is a matter of federal tax law, and does not affect the rights and obligations of its owners under local law." T.D. 8697, 1997-1 C.B. 215.

[46] Treas. Reg. § 301.7701-2(a) (2006) (emphasis added).

[47] *See, e.g.*, *IRS v. Luongo* (*In re Luongo*), 259 F.3d 323, 335 (5th Cir. 2001); *United States v. Towers* (*In re Feiler*), 230 B.R. 164, 167–68 (B.A.P. 9th Cir. 1999).

[48] *See* 11 U.S.C. § 541(d) (2012); *Cage v. Wyo-Ben, Inc.* (*In re Ramba, Inc.*), 437 F.3d 457, 460 (5th Cir. 2006); *Geremia v. Dwyer* (*In re Dwyer*), 250 B.R. 472, 474–45 (Bankr. D.R.I. 2000); *Furr v. Reynolds* (*In re Reynolds*), 151 B.R. 974, 977 (Bankr. S.D. Fla. 1993).

[49] *Official Comm. of Unsecured Creditors of Forman Enters. v. Forman* (*In re Forman Enters.*), 281 B.R. 600, 600 (Bankr. W.D. Pa. 2002).

finding that the requisite "transfer of a debtor's property" did not occur.[50] The court held that a pass-through entity's NOLs are not property of the estate because, under the IRC, NOLs and the debtor's right to use them passed through to the debtor's shareholders by operation of law. Specifically, the court noted that "[a]ny tax benefits resulting from the NOL and the right to use it inure solely to the benefit of . . . shareholders and would not be available to satisfy claims of the corporation's creditors."[51] Accordingly, the court held that the debtor, as a pass-through entity, was "merely a 'conduit' through which the NOL and right to use it passed to them."[52]

Under the "mere conduit" theory, property over which the debtor has no control and that merely "passes through" the debtor does not give rise to a transfer of an interest of the debtor in property for avoidance purposes under section 544 of the Bankruptcy Code, which, as described above, is a threshold requirement for avoidance under applicable state law.[53] The Examiner concludes that the *Forman* court's invocation of the conduit theory was proper for avoidance purposes and provides a sound basis to conclude that it is unlikely that a claim to avoid ResCap's post-2006 transfers of its tax benefits would prevail.[54]

### c. The 2006 Conversion And Election Does Not Result In Unjust Enrichment Or Breach Of Fiduciary Duty

As discussed in Section VII.I.1.b, New York choice of law principles will apply to any unjust enrichment claim because of the pendency of the Chapter 11 Cases in the Southern District of New York. In New York, "[t]he first step in any case presenting a potential choice of law issue is to determine whether there is an actual conflict between the laws of the

---

[50] *Id.* at 612.

[51] *Id.*

[52] *Id.*

[53] *See*, *e.g.*, *Miller v. Credit Suisse First Boston Next Fund, Inc.* (*In re Refco, Inc. Secs. Litig.*), 07 MDL No. 1902, Nos. 09 Civ. 2885, 2990, 2992, 2009 U.S. Dist. LEXIS 129944, at *52–54 (S.D.N.Y. 2009) (noting that "[s]ection 541(d) of the Bankruptcy Code provides that the debtor must have an 'equitable interest' in property in order for it to become property of the estate" and that "an asset is property of the estate when the debtor had 'control' over that property"); *City of Springfield v. Ostrander* (*In re Lan Tamers, Inc.*), 329 F.3d 204, 210 (1st Cir. 2003) ("The plain text of § 541(d) excludes property from the estate where the bankrupt entity is only a delivery vehicle and lacks any equitable interest in the property it delivers."); *T & B Scottsdale Contractors, Inc. v. United States*, 866 F.2d 1372, 1376 (11th Cir. 1989) (when the debtor held funds that, pursuant to contract, were to be paid out to certain individuals, the debtor was simply an intermediary and the funds were not property of the estate).

[54] ResCap's tax status as a disregarded entity impacts another issue that was raised during the course of the Investigation. It was suggested that AFI's forgiveness of debts owed by ResCap in the aggregate amount of $2.4 billion from March 2008 through June 2009 and in November 2009 may have adversely affected ResCap's rights under certain tax allocation agreements in place with AFI. *See* Capital Contributions to ResCap Legal Entity as of January 31, 2012 [ALLY_PEO_0075634]. Notably, all these transfers of debt from AFI to ResCap occurred when ResCap was a disregarded entity treated as a branch or division of AFI for federal income tax purposes. As a result, no debt transfers occurred for federal income tax purposes, and the debt forgiveness did not create income that would absorb any of ResCap's beneficial tax attributes.

jurisdictions involved."[55] If the laws of the relevant jurisdictions are substantively the same, a court may avoid a choice of law analysis.[56] Here, it appears that there is no material difference between the unjust enrichment law of New York[57] and that of Delaware (ResCap's state of incorporation),[58] Minnesota (ResCap's principal place of business)[59] and Michigan (AFI's principal place of business).[60] Thus, the Bankruptcy Court would likely apply New York law.[61]

Although New York's substantive law is likely to apply to an unjust enrichment claim, as further discussed in Section VII.I.1.c, under New York's "borrowing statute," it is likely that a court would apply the statute of limitations in Minnesota because that was the location of ResCap's principal place of business in 2006.[62] In Minnesota, the statute of limitations for a claim of unjust enrichment is six years,[63] which is the same as the statute of limitations in New York.[64] Under a six-year statute of limitations, ResCap would not be barred from bringing a claim based on conduct that occurred in 2006.

---

[55] *In re Allstate Ins. Co.*, 613 N.E.2d 936, 937 (N.Y. 1993). An actual conflict is present "[w]here the applicable law from each jurisdiction provides different substantive rules." *Curley v. AMR Corp*., 153 F.3d 5, 12 (2d Cir. 1998) (citing cases).

[56] *See Curley,* 153 F.3d at 12 (citing *J. Aron & Co. v. Chown*, 647 N.Y.S.2d 8, 8 (N.Y. App. Div. 1996)) ("It is only when it can be said that there is no actual conflict that New York will dispense with a choice of law analysis.").

[57] In New York, a plaintiff asserting an unjust enrichment claim must establish: "(1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution." *Tasini v. AOL, Inc*., 851 F. Supp. 2d 734, 739 (S.D.N.Y. 2012) (quoting *Mid-Island Hosp., Inc. v. Empire Blue Cross Blue Shield* (*In re Mid-Island Hosp., Inc.*), 276 F.3d 123, 129–30 (2d Cir. 2002)).

[58] In Delaware, unjust enrichment requires: "(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and the impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law." *Jackson Nat'l Life Ins. Co. v. Kennedy*, 741 A.2d 377, 393 (Del. Ch. 1999) (footnote omitted). *See also O'Toole v. Karnani* (*In re Trinsum Grp., Inc.*), 460 B.R. 379, 395 (Bankr. S.D.N.Y. 2011) ("The elements for unjust enrichment claims under Delaware law are similar to that of New York law.").

[59] To establish an unjust enrichment claim under Minnesota law, "a plaintiff must demonstrate 'that another party knowingly received something of value to which he was not entitled, and that the circumstances are such that it would be unjust for that person to retain the benefit.'" *T.B. Allen & Assocs., Inc. v. Euro-Pro Operating LLC*, No. 11-3479, 2012 WL 2508021, at \*3 (D. Minn. June 28, 2012) (citation omitted).

[60] "Under Michigan law, the elements of an unjust enrichment claim are "(1) the receipt of a benefit by defendant from plaintiff, and (2) an inequity resulting to plaintiff because of the retention of the benefit by the defendant." *Ajuba Int'l, L.L.C. v. Saharia*, No. 11-12936, 2012 WL 1672713, at \*17 (E.D. Mich. May 14, 2012) (citation omitted).

[61] *See* Section VII.I.1.b (providing a more comprehensive analysis of the application of New York's "choice of law" principles to unjust enrichment claims).

[62] *See*, *e.g.*, *Adelphia Commn'cs Corp. v. Bank of America N.A.* (*In re Adelphia Commn'cs Corp.*), 365 B.R. 24, 58 n.137 (Bankr. S.D.N.Y. 2007); *Official Comm. of Asbestos Claimants of G-I Holding, Inc. v. Heyman*, 277 B.R. 20, 30 (S.D.N.Y. 2002).

[63] *See Block v. Litchy*, 428 N.W.2d 850, 854 (Minn. Ct. App. 1988) ("The applicable time limit for bringing an action in unjust enrichment is six years.").

[64] *See Golden Pac. Bancorp v. FDIC*., 273 F.3d 509, 518 (2d Cir. 2001) ("The statute of limitations in New York for claims of unjust enrichment . . . is generally six years.").

Under New York law, a plaintiff seeking to recover under a theory of unjust enrichment must establish the elements of the claim by a preponderance of the evidence.[65] In particular, the plaintiff must demonstrate: "(1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution."[66] Courts have noted that "[t]he essential inquiry in any action for unjust enrichment . . . is whether it is against equity and good conscience to permit the defendant to retain what is sought to be recovered."[67] Thus, a plaintiff that cannot show "some expectation of compensation that was denied" cannot recover on an unjust enrichment claim.[68]

Assuming that ResCap's election to be treated as a disregarded entity is not subject to avoidance as a fraudulent conveyance (which the Examiner concludes is the likely result), there is no basis for an unjust enrichment claim against AFI with respect to ResCap's NOLs. Indeed, as a disregarded entity, ResCap's post-conversion tax benefits passed to GM and Cerberus by operation of tax law, just the same as ResCap's potential tax liabilities passed to GM and Cerberus. Accordingly, as a disregarded entity, ResCap could not possibly have had "some expectation of compensation that was denied" (i.e., an expectation that it would be able to use its NOLs), which is a requirement for an unjust enrichment claim.

Moreover, a claim for unjust enrichment requires a showing that it would be "against equity and good conscience to permit the defendant to retain what is sought to be recovered."[69] This showing requires more than merely demonstrating unfairness. In *In re Forman Enterprises, Inc.,* the bankruptcy court rejected a claim of unjust enrichment, holding that while it might be "disconcerting" to creditors for the corporation's shareholders to retain for themselves tax refunds arising from NOLs while the corporation went through Chapter 7

––––––––––––––––––––––––––––––––––––––––––––

[65] *Republic of Benin v. Mezel*, No. 96 Civ 870, 2011 WL 4373921, at *7 (S.D.N.Y. Sept. 20, 2011) ("A claim for unjust enrichment or restitution must be proven by the claimant by a preponderance of the evidence.").

[66] *Tasini v. AOL, Inc.*, 851 F. Supp. 2d 734, 739 (S.D.N.Y. 2012) (quoting *Mid-Island Hosp., Inc. v. Empire Blue Cross Blue Shield* (*In re Mid-Island Hosp., Inc.*), 276 F.3d 123, 129–30 (2d Cir. 2002)). *See Khreativity Unltd. v. Mattel, Inc*., 101 F. Supp. 2d 177, 184 (S.D.N.Y. 2000) ("In order to sustain a claim for unjust enrichment, plaintiff must demonstrate that (1) defendants were enriched; (2) such enrichment was at plaintiff's expense; and (3) under the circumstances it would be unjust not to compensate plaintiff.") (citing *R.B. Ventures, Ltd. v. Shane*, 112 F.3d 54, 60 (2d Cir. 1997)).

[67] *Tasini v. AOL, Inc.*, 851 F. Supp. 2d at 739–40 (omission in original) (quoting *Dragon Inv. Co. II LLC v. Shanahan*, 854 N.Y.S.2d 115, 118 (N.Y. App. Div. 2008)).

[68] *See Tasini*, 851 F. Supp. 2d at 741 (concluding that "under New York law, a plaintiff must plead some expectation of compensation that was denied in order to recover under a theory of unjust enrichment"). *But see Gidatex, S.r.L. v. Companiello Imps., Ltd*., 49 F. Supp. 2d 298, 302–03 (S.D.N.Y. 1999) (concluding that expectation of compensation is not required to succeed on unjust enrichment claim). Subsequent decisions have been critical of the court's reasoning in *Gidatex. Tasini,* 851 F. Supp. 2d at 740 n.3 ("The opinion in *Gidatex* is contrary to the great majority of well-reasoned cases. It is also contrary to the subsequent clear statement by the Court of Appeals for the Second Circuit . . . .") (citing *Leibowitz v. Cornell Univ.*, 584 F.3d 487 (2d Cir. 2009)).

[69] *Tasini*, 851 F. Supp. 2d at 741 (quoting *Dragon Inv. Co. II LLC v. Shanahan*, 854 N.Y.S.2d 115, 118 (2008)).

liquidation, there was nothing inequitable or unjustifiable in the shareholders' retention of the refunds of a kind required to support a claim for unjust enrichment.[70] In so holding, the court explained:

> The trustee offered no evidence showing that this arrangement between debtor and defendants was "done on the sly" or that it was artifice devised by defendants to benefit themselves and to deprive debtor's creditors should debtor become insolvent.[71]

Here, ResCap's conversion to a disregarded entity appears to have been done in an attempt to improve ResCap's liquidity—not harm it. Additionally, the decision was made in conjunction with extensive advice from independent third parties and based on the consent of the Independent Directors, at a time when ResCap was solvent and was not yet in financial distress. In short, the Investigation has uncovered no evidence to suggest that GM or AFI intended to harm ResCap in connection with ResCap's conversion to a disregarded entity. Accordingly, the Examiner concludes that it is unlikely that a claim for unjust enrichment would prevail.

Moreover, if ResCap's conversion and election does not constitute a fraudulent conveyance or result in unjust enrichment, then it is unlikely that ResCap's directors breached any associated duties of due care and loyalty and good faith.[72] ResCap's conversion and election to be treated as a disregarded entity was implemented as part of Cerberus's acquisition of AFI, which was the subject of significant discussion and analysis by and among the ResCap Independent Directors, inside counsel, outside counsel, independent auditors, accountants and Cerberus personnel as well. The Investigation has revealed ample evidence that extensive analysis was done regarding the ultimate impact of ResCap's conversion and election. Accordingly, the Examiner concludes that it is unlikely that a claim based on breach of fiduciary duty would prevail.

### d. Payment Of The LLC Conversion Dividend Does Not Constitute A Fraudulent Conveyance

As described in Section V.D.3.b, the LLC Conversion Dividend purportedly was made to reflect an increase in the equity value of ResCap attributable to the write-off of tax assets and tax liabilities required as a result of ResCap's conversion to a disregarded entity. Although the write-off of tax assets and liabilities was required under FAS 109 because ResCap was relieved of its obligation to pay future taxes, there was no corresponding requirement that

---

[70] *Official Comm. of Unsecured Creditors of Forman Enters. v. Forman* (*In re Forman Enters.*), 281 B.R. 600, 609 (Bankr. W.D. Pa. 2002).

[71] *Id.* at 609. It should also be noted that the court in *In re Forman Enterprises, Inc.* analyzed the claim for unjust enrichment under both Pennsylvania and Delaware law. However, there is no discernible difference between the laws of New York, Pennsylvania, and Delaware regarding unjust enrichment claims, and, therefore, the analysis provided in *In re Forman Enterprises, Inc.* should apply with equal force in New York.

[72] *Id.* at 610 (holding that if the trustee was unable to demonstrate a claim for unjust enrichment, then a cause of action for breach of fiduciary duty arising from the same transaction must also fail).

ResCap distribute the resulting increase in equity. ResCap's decision to approve and make the LLC Conversion Dividend to GM was discretionary. The Investigation has uncovered no evidence to suggest that the LLC Conversion Dividend was a condition to, or requirement of, the conversion transaction.[73] Accordingly, there does not appear to be any basis to collapse the conversion and the LLC Conversion Dividend in considering whether ResCap received fair consideration in exchange for the dividend payment.[74]

Courts have generally held that the payment of a dividend is deemed to be for no consideration.[75] However, certain courts have held that a dividend by a subchapter S-corporation or other pass-through tax entity may be for REV if the dividend is intended to satisfy, and does not exceed, the pass-through tax liability of the subchapter S-corporation.[76] For example, in *In re Northlake Foods, Inc.*, the court held that a dividend that a corporate debtor paid to its shareholder, in the exact amount of the shareholder's proportionate share of pass-through income tax liability, incurred as a result of the corporation's status as a subchapter S-corporation, was not avoidable as a constructively fraudulent transfer.[77] The court explained that the tax benefit to the debtor as a result of its subchapter S-corporation status was "reasonably equivalent value" for its corresponding obligation to pay the dividend, of a kind sufficient to preclude a constructive fraudulent transfer claim.[78]

However, the *Northlake* case is distinguishable from the present case because: (1) here, the LLC Conversion Dividend was not made pursuant to a shareholder agreement or any other contractual obligation; and (2) the amount of the LLC Conversion Dividend was not based on ResCap's pass-through tax liability. Rather, it reflected the purported increase in equity value

---

[73] In considering whether transactions should be collapsed for fraudulent transfer purposes, courts have generally considered three factors: "(1) whether all of the parties involved had knowledge of the multiple transactions; (2) whether each transaction would have occurred on its own; and (3) whether each transaction was dependent or conditioned on other transactions." *Mervyn's LLC v. Lubert-Adler Grp. IV, LLC* (*In re Mervyn's Holdings, LLC*), 426 B.R. 488, 497 (Bankr. D. Del. 2010) (internal citations omitted).

[74] As with ResCap's tax status election described above, the result of any fraudulent transfer analysis with respect to the LLC Conversion Dividend will be the same regardless of what state law applies, because the Examiner has concluded that ResCap was solvent in November 2006. Accordingly, New York's fraudulent conveyance law would likely apply to consideration of the LLC Conversion Dividend.

[75] *See* 5 COLLIER ON BANKRUPTCY ¶ 548.05[2][c] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.). ("Dividends or other distributions to equity owners in respect of their equity interests are transfers for which the corporation or other entity receives no value"); *See*, *e.g.*, *Fisher v. Hamilton* (*In re Teknek, LLC*), 343 B.R. 850, 861 (Bankr. N.D. Ill. 2006) (noting a dividend is "not a transfer in exchange for reasonably equivalent value"); *Fidelity Bond & Mortg. Co. v. Brand* (*In re Fidelity Bond & Mortg. Co.*), 340 B.R. 266, 286–88 (Bankr. E.D. Pa. 2006) (holding that debtor did not receive reasonably equivalent value for dividend after noting that "[o]ther courts have held that a dividend or reduction in capital through the purchase of stock adds no value for creditors").

[76] *See Crumpton v. Stephens* (*In re Northlake Foods, Inc.*), 483 B.R. 247 (M.D. Fla. 2012); *Gold v. United States* (*In re Kenrob Info. Tech. Solutions, Inc.*), 474 B.R. 799 (Bankr. E.D. Va. 2012).

[77] *In re Northlake Foods, Inc.*, 483 B.R. at 252–53.

[78] *Id.* It is also important to note that in *Northlake*, the corporation agreed to reimburse its shareholders for any resulting tax liability at the time of their election for subchapter S-corporation status.

as a result of the conversion from a taxable corporation to a disregarded entity. Accordingly, it is likely that the LLC Conversion Dividend would be deemed to be for no consideration.

Ultimately, the above analysis may prove to be academic because, as explained in Section VII.K.1.a(2)(a), a claim for fraudulent conveyance will ultimately fail unless the Debtors can demonstrate that the dividend was paid at a time when ResCap was insolvent or in financial distress as defined by the relevant statute, and the Examiner has concluded that ResCap did not become financially distressed until approximately nine months after the date of the LLC Conversion Dividend.[79] For that reason, even though the LLC Conversion Dividend was for less than fair consideration, the Examiner concludes that it is unlikely that a constructive fraudulent conveyance claim would prevail.[80]

### e. ResCap Has A Contractual Claim For Compensation Under The Implemented 2005 Tax Allocation Agreement

From March 2005 through November 30, 2006, ResCap was included in the GM consolidated federal income tax return. During this period, AFI and ResCap were parties to the Implemented 2005 Tax Allocation Agreement. Pursuant to the Implemented 2005 Tax Allocation Agreement, ResCap was entitled to be compensated by AFI to the extent that ResCap's NOLs and other tax benefits were used by both GM and AFI to reduce each of their separate group tax liabilities, which was a hypothetical computation in the case of AFI. As described in Section V.D.2.c(1), ResCap received a payment from AFI in the amount of $85.9 million for GM's and AFI's use of ResCap tax benefits for the tax year ending November 30, 2006. However, when the 2006 GM consolidated federal income tax returns were prepared in 2007, the parties determined that ResCap generated potential tax savings for GM in the amount of $101 million for such tax year. Accordingly, ResCap still had a contingent right under the Implemented 2005 Tax Allocation Agreement to the remaining $15.1 million in potential tax savings generated by ResCap, which would become fixed, in whole or in part, if and when GM used the tax benefits. During the course of the Investigation, GM confirmed that it has used all of ResCap's tax benefits that were originally unused by GM in 2006.

The Examiner has considered whether ResCap may have a contract claim against AFI under the Implemented 2005 Tax Allocation Agreement based on the tax benefits that were generated by ResCap and passed to, but were unused by, GM in 2006, prior to when the agreement terminated.

---

[79]  As discussed in Section VI, the Examiner concludes as follows: (1) ResCap was insolvent as of December 31, 2007, through the Petition Date; (2) ResCap was left with unreasonably small capital as of August 15, 2007, through the Petition Date; and (3) ResCap reasonably believed that it had incurred debts beyond its ability to pay as of August 15, 2007, through the Petition Date.

[80]  The question of whether the dividend constituted an impermissible dividend under Delaware General Corporation Law was considered as well. However, the dividend was paid after ResCap converted to a limited liability company. Accordingly, the payment of the dividend must instead be analyzed under the terms of the Delaware Limited Liability Company Act and that statute does not contain similar provisions to those found in the Delaware General Corporation Law, which would potentially render a dividend impermissible. Nor does it appear that the Delaware General Corporation Law applies in the absence of such provisions in the Delaware Limited Liability Company Act.

As a threshold matter, the Implemented 2005 Tax Allocation Agreement is governed by Michigan law.[81] Under Michigan law, a claim to recover damages for breach of contract must be brought within six years after the claim accrues.[82] A contract claim accrues when a promise is breached, i.e., when a party fails to perform under the contract.[83] Here, AFI's obligation to compensate ResCap (i.e., its duty to perform) is triggered when ResCap's tax benefits can be used by GM and AFI to reduce each of their separate group taxes. Although it is not precisely known when the remaining portion of ResCap's 2006 tax benefits were used by AFI and GM, the evidence establishes that they were not used until some time after 2006.[84] Accordingly, ResCap's contract claim[85] against AFI under the Implemented 2005 Tax Allocation Agreement could not have accrued until, at the earliest, some time after 2006. Therefore, ResCap's contract claim will not be time barred.

Moreover, ResCap's right to payment on account of its 2006 tax benefits would be unaffected by the subsequent termination of the Implemented 2005 Tax Allocation Agreement. The Implemented 2005 Tax Allocation Agreement provided that, even if terminated, it would "continue to apply to all years and that part of a year ending prior to the date of termination."[86] According to its plain meaning, the agreement "continue[s] to apply" to determine the parties' respective rights and obligations for the 2006 tax year.[87] In this case, ResCap's right to payment against AFI, albeit contingent and conditional, arose when it performed under the Implemented 2005 Tax Allocation Agreement (i.e., when it generated tax benefits through November 30, 2006 that passed to GM).[88]

Based on the foregoing, the Examiner concludes that it is likely that a contract claim in the approximate amount of $15.1 million against AFI arising under the Implemented 2005 Tax Allocation Agreement would prevail.

### 2. The 2009 Tax Allocation Agreement

ResCap operated as a disregarded entity without a federal income tax allocation agreement from December 1, 2006 through November 1, 2009. During this period, ResCap paid no federal income taxes, nor did it make any payments to its owners or any other entity

---

[81]  Implemented 2005 Tax Allocation Agreement, § 6.05 [ALLY_0178779].

[82]  *See* MICH. COMP. LAWS ANN. § 600.5807(8) (West 2013); *see also Miller-Davis Co. v. Ahrens Constr., Inc.*, 817 N.W.2d 609, 613 (Mich. Ct. App. 2012).

[83]  *See Miller-Davis Co. v. Ahrens Constr., Inc.*, 817 N.W.2d 609, 614; *see also* 31 WILLISTON ON CONTRACTS § 79:14 (4th ed. 2004) ("[I]f the promise is to pay a debt . . . a right of action is complete, and the statute begins to run as soon as the debt is due and unpaid.").

[84]  *See* Section V.D.2.c(1) (providing a discussion regarding the use of ResCap's tax benefits by AFI and GM).

[85]  The maximum amount of the contract claim, assuming all of ResCap's 2006 tax benefits were used by GM and AFI, would be approximately $15.1 million, which reflects the difference between the $27.5 million of remaining tax benefits and the $12.4 million overestimation of GM's utilization made on November 30, 2006.

[86]  Implemented 2005 Tax Allocation Agreement, § 6.08 [ALLY_0178779].

[87]  *Id.*

[88]  *See Munderloh v. Comm'r*, 48 T.C. 452 (1967) (distinguishing between when a contract party's obligation to make a payment exists, and when the party's duty to perform may arise).

on account of federal income tax obligations. In December 2009, AFI proposed that a tax allocation agreement be put in place between ResCap and AFI to be effective as of the date when ResCap became part of AFI's corporate consolidated group, November 1, 2009.[89] The First 2009 Tax Allocation Agreement was drafted to treat ResCap as if it were a stand-alone taxpayer, with an additional proviso that was very favorable to ResCap: AFI would pay ResCap for ResCap's tax benefits that AFI could currently use even if ResCap could not yet use the tax benefits on a stand-alone basis.[90]

The First 2009 Tax Allocation Agreement was unanimously approved by the ResCap Board at an August 6, 2010 meeting, at which time it was resolved that "each of the officers of [ResCap] is authorized and empowered, in the name and on behalf of [ResCap] and its relevant subsidiaries, to make or cause to be made, and to execute and deliver, the [First 2009 Tax Allocation Agreement] . . . ."[91] The First 2009 Tax Allocation Agreement was viewed by the ResCap Board as being so objectively fair to ResCap that the Board did not believe it was necessary for the agreement to first be considered and recommended by the Special Committee of Independent Directors, which was normal protocol for consideration of affiliate agreements.[92] As of October 13, 2010, the First 2009 Tax Allocation Agreement was executed by all parties (including AFI),[93] except for ResCap, as Young, ResCap's CFO at the time[94] and the officer who was designated to execute the agreement[95] on behalf of ResCap, claims to have never executed it.[96]

---

[89] *See* E-mail from W. Marx (Dec. 6, 2009) [EXAM12308200].

[90] *See id.*

[91] *See* Minutes of a Regular Meeting of the Board of Residential Capital LLC, Aug. 6, 2010, at RC40018821–22 [RC40018729].

[92] *See id.*

[93] As described in Section V.D.2.b(3), Examiner's Counsel requested, but did not receive, an executed or partially executed copy of the First 2009 Tax Allocation Agreement. Nevertheless, David DeBrunner, AFI's VP and Chief Accounting Officer in late 2010, confirmed during his interview that he executed the agreement on behalf of AFI. *See* Int. of D. DeBrunner, Apr. 18, 2013, at 116:3–22.

[94] Young was also a director of ResCap at this time. *See* Appendix IV.A—3.

[95] The August 6, 2010 ResCap Board resolution did not specifically designate Young as ResCap's signatory on the First 2009 Tax Allocation Agreement. However, there does not appear to be a question that Young would be the ResCap officer signing. As Young explained during his interview, "we just looked at the board minutes where the board delegated the authority to a ResCap officer and it didn't say Jim Young, chief financial officer, but I was an officer of ResCap, and it would make perfect sense that I was the one signing a tax allocation agreement being that I'm the chief financial officer of the company." Int. of J. Young, Apr. 22, 2013, at 200:12–201:9. Notably, Young's name appeared on the signature block for ResCap in the draft of the agreement that was presented to the ResCap Board at the August 6, 2010 board meeting, and he was the signatory on prior tax allocation agreements, as well as the signatory on the Second 2009 Tax Allocation Agreement. *See* First 2009 Tax Allocation Agreement, at RC40016384 [RC40016362]; *see also* 2006 Tax Allocation Agreement, at ALLY_0178791 [ALLY_0178779]; Second 2009 Tax Allocation Agreement, at 6 [RC00028796].

[96] *See* Int. of J. Young, Apr. 22, 2013, at 146:19–147:4.

Despite having already signed the First 2009 Tax Allocation Agreement around September 13, 2010,[97] in October 2010 AFI had a change of heart and decided it did not want to move forward with implementing the agreement.[98] Instead, AFI proposed a modification of the First 2009 Tax Allocation Agreement that removed ResCap's right to receive payments from AFI for AFI's utilization of ResCap tax benefits without substituting any provision that would be favorable to ResCap.[99] ResCap's Independent Directors discussed the revised agreement with their counsel, who characterized this key aspect of the revised tax allocation agreement as being "very unfair" to ResCap.[100] However, after certain revisions were made to the Second 2009 Tax Allocation Agreement, the Independent Directors believed that the fairness concerns had been addressed to their counsel's satisfaction.[101] The ResCap Board approved the agreement and it was executed on January 26, 2011.[102] The Second 2009 Tax Allocation Agreement was made retroactive to November 1, 2009, and is still putatively in effect today. ResCap's entry into the Second 2009 Tax Allocation Agreement has resulted in it having to pay AFI for tax on excess inclusion income, which from 2009 through 2012 totaled approximately $50 million. ResCap has not received, and will never be entitled to receive, any payments under the Second 2009 Tax Allocation Agreement (other than an adjustment for an erroneous overpayment).

ResCap's decision to enter into the Second 2009 Tax Allocation Agreement is troubling because: (1) the ResCap Board had previously approved a much more favorable tax allocation agreement; and (2) when they authorized its execution, the Independent Directors were unaware that ResCap would be required to make payments to AFI on account of taxes on excess inclusion income. There are multiple bases to be considered to challenge the Second 2009 Tax Allocation Agreement and recover the payments made by ResCap to AFI thereunder. There may also be a basis for ResCap to enforce the First 2009 Tax Allocation Agreement and assert claims against AFI arising thereunder based on tax benefits that have passed (and are likely in the future to pass) to AFI.

---

[97] *See* Int. of D. DeBrunner, Apr. 18, 2013, at 110:14–111:19, 115:11–116:22 (stating that "Bill Marx told me that I would be getting a binder of tax allocation agreements that needed to be executed by an officer of [AFI]" and "So, I signed those agreements, I gave the binder back or sent the binder back to Bill."); Int. of W. Marx, Apr. 18, 2013, at 57:20–58:9 ("So Monday the 13th, I believe I walked the binder down to David's office . . . . I don't recall exactly how long it was before I got it back. It might have been a day or two, or he might have gotten it back to me the same day.").

[98] *See* E-mail from W. Marx (Oct. 13, 2010) [ALLY_0245484] (estimating that AFI's payments to ResCap under the First 2009 Tax Allocation Agreement "may be on the order of $200 to $250m, due 10/31. (Additional $300 to $400m would likely be due for the 2010 tax year, payable this time next year)").

[99] *See* Discussion Items for Residential Capital, LLC Board Meeting, dated Nov. 5, 2010, at RC40016933 [RC40016871]; *see also* E-mail from T. Hamzehpour (Nov. 10 2010), at EXAM10432502–03 [EXAM10432501].

[100] E-mail from M. Connolly (Dec. 16, 2010), at EXAM10432518 [EXAM10432517].

[101] *See* Int. of P. West, Apr. 16, 2013, at 91:21–24.

[102] *See id.* at 28:2–15, 90:6–91:24.

### a. The First 2009 Tax Allocation Agreement Likely Constitutes A Valid And Enforceable Contract

The ResCap Board, of which Young was a member, unanimously passed a resolution on August 6, 2010 authorizing and empowering him, as an officer of the company, to execute the First 2009 Tax Allocation Agreement on behalf of ResCap. AFI signed the agreement, but Young failed to do so for ResCap. During his interview conducted on March 15, 2013, Young was unable to explain why he had not signed the First 2009 Tax Allocation Agreement. In fact, during his interview, Young stated "I don't recall," when asked if he had ever signed the First 2009 Tax Allocation Agreement.[103] Marx, however, said during his interview that he did not mail the agreement to Young for signature until around October 15, 2010.[104] During Young's subsequent interview under oath, conducted on April 22, 2013,[105] Young still had difficulty recalling many events surrounding his failure to execute the First 2009 Tax Allocation Agreement, but he did recall the reason for not signing the agreement. Young stated that he did not sign the First 2009 Tax Allocation Agreement because he was told by a high-ranking AFI officer (James Mackey) that the agreement had not been properly vetted or approved within AFI.[106]

Despite Young's failure to sign the agreement on behalf of ResCap, the first issue the Examiner has considered is whether the First 2009 Tax Allocation Agreement could be deemed to be a valid and enforceable contract based on AFI's signing, and the ResCap Board's approval, of the agreement. This analysis is significant because, as described below, the Examiner believes that there is a basis to avoid the Second 2009 Tax Allocation Agreement as a fraudulent transfer. If the First 2009 Tax Allocation Agreement is enforceable, and the Second 2009 Tax Allocation Agreement is voided, then ResCap would have significant claims against AFI based on tax benefits that have passed from ResCap to AFI since November 1, 2009.

### (1) Michigan Law Governs Enforcement Of The Contract

New York courts will give effect to a choice of law provision if the parties have included one in their agreements.[107] The Implemented 2005 Tax Allocation Agreement, which the First 2009 Tax Allocation Agreement purported to amend, as well as the First 2009 Tax Allocation Agreement itself, both designate Michigan law as the controlling law.[108]

---

[103] See Int. of J. Young, Mar. 15, 2013, at 37:13–16.

[104] See Int. of W. Marx, Apr. 18, 2013, at 65:7–12.

[105] Young was asked by the Examiner to submit to an interview under oath, because during the course of the Investigation certain information and/or statements were attributed to Young that were not consistent with the information provided by Young during his interview conducted on March 15, 2013.

[106] See Int. of J. Young, Apr. 22, 2013, at 11:3–11:10, 97:13–21, 160:14–161:10.

[107] See, e.g., Gambar Enters. v. Kelly Servs., 418 N.Y.S.2d 818, 822 (N.Y. App. Div. 1979) (applying choice of law provision in contract specifying application of Michigan law).

[108] See Implemented 2005 Tax Allocation Agreement, § 6.05 [ALLY_0178779]; First 2009 Tax Allocation Agreement, § 5.05 [RC40016362].

### (2) Michigan Contract Analysis

Under Michigan law, the elements of a valid contract are: "(1) parties competent to contract, (2) a proper subject matter, (3) a legal consideration, (4) mutuality of agreement, and (5) mutuality of obligation."[109] Mutuality of agreement means that there must be "mutual assent or a meeting of the minds on all material or essential terms" in order to form a contract.[110] An objective standard is used to determine whether there was a meeting of the minds, which involves considering the express words and visible acts of the parties and not their subjective states of mind.[111] Further, for certain types of contracts to be enforceable, the Michigan statute of frauds provides that they must be "in writing and signed with an authorized signature by the party to be charged" with the agreement.[112]

With respect to the First 2009 Tax Allocation Agreement, there is no dispute regarding whether the parties were competent to contract, whether the contract involved a proper subject matter or adequate legal consideration, or if there was a mutuality of obligation. The critical issue here is whether, from an objective standpoint, there was "mutual assent or a meeting of the minds" between ResCap and AFI as to the essential terms of the agreement, including whether the First 2009 Tax Allocation Agreement was intended to be enforceable upon its approval by the parties or only upon it being signed by all parties.

Under Michigan law, there is support for the proposition that an unsigned contract can be enforceable:

> If the party sought to be charged intended to close a contract prior to the formal signing of a written draft, or if he signified such an intention to the other party, he will be bound by the contract actually made, though the signing of the written draft be omitted. If, on the other hand, such party neither had nor signified such an intention to close the contract until it was fully expressed in a written instrument, and attested by signatures, then he will not be bound until the signatures are affixed. The expression of the idea may be attempted in other words: If the written draft is viewed by the parties merely as a convenient memorial or record of their previous contract, its absence does not affect the binding force of the contract. If, however, it is viewed as the consummation of the negotiation, there is no contract until the written draft is finally signed.[113]

---

[109] *Hess v. Cannon Twp.*, 696 N.W.2d 742, 748 (2005) (citations omitted).

[110] *Garrison Co. v. Bishop Int'l Airport Auth.*, No. 293415, 2010 WL 4679501, at *3 (Mich. Ct. App. Nov. 18, 2010) (citation omitted).

[111] *Id.*

[112] MICH. COMP. LAWS ANN. § 566.132 (West 2012).

[113] *Am. Bentonite Corp. v. Clark Equip. Co.*, 43 F.2d 392 (W.D. Mich. 1928) (quoting *Mississippi & Dominion S.S. Co. v. Swift*, 29 A. 1063, 1066–67 (Me. 1894). *See also High v. Capital Senior Living Props. 2-Heatherwood, Inc.*, 594 F. Supp. 2d 789, 798 (E.D. Mich. 2008) ("The absence of a signature is not necessarily fatal to a finding of an agreement. Michigan law permits an inference that an offeree accepted the terms of the agreement when she signaled her assent through conduct.") (citations omitted).

Courts will look to the intent of the contracting parties to determine whether their unsigned contracts were intended to be enforceable upon the assent of the parties or only upon formal signing.[114] Notably, a partially-signed agreement may be enforceable against the party executing the agreement unless it can be shown that the parties did not intend to be bound unless and until all other parties signed.[115] The "question as to whether those who have signed are bound is generally to be determined by the intention and understanding of the parties at the time of the execution of the instrument."[116] Where "a written agreement is silent as to whether the persons who sign it intend to be become legally obligated to each other before all persons named in it as parties have signed, parole evidence is admissible to show the intention of the parties."[117]

Here, the First 2009 Tax Allocation Agreement contains no express provision providing that it is effective and enforceable only upon being signed by all parties to the agreement.[118] Accordingly, it is appropriate to consider parole evidence to determine if the parties intended to be bound by the First 2009 Tax Allocation Agreement. The first issue to consider is whether the ResCap Board's approval of the First 2009 Tax Allocation Agreement is evidence of ResCap's intent to be bound by the agreement, despite the fact that an officer of ResCap never signed the agreement.

In a case with facts similar to those here, the Michigan Court of Appeals held that a company's board resolution that authorized its officer to execute a contract resulted in a "valid contractual relationship," even though the contract was not formally signed thereafter. In *Garrison Co. v. Bishop International Airport Authority*, an airport's governing board accepted a construction company's offer to perform a construction project in accordance with bid

---

[114] *See Wiegand v. Tringali*, 177 N.W.2d 435, 437–38 (Mich. Ct. App. 1970).

[115] *See id.* at 437 n.5 (citing *Cox v. Berry*, 431 P.2d 575, 579 (Utah 1967) ("Even where it appears that it was intended that others sign an agreement, it is not necessarily invariably true that all must sign before any are bound. This depends upon the agreement and whether it appears that part of the consideration for signing was that others would also sign and be bound jointly with them. It is usually to be assumed that the parties signing an agreement are bound thereby unless it appears that they did not so intend unless others also signed.")); *see also Dillon v. Anderson*, 43 N.Y. 231, 235 (1870).

[116] *Wiegand v. Tringali*, 177 N.W.2d at 438 (quoting 17 C.J.S. CONTRACTS § 62 (2011)).

[117] *See Wiegand v. Tringali*, 177 N.W.2d at 483 n.7.

[118] The First 2009 Tax Allocation Agreement does contain a merger clause (section 5.04) and does contain language preceding the signature block that reads: "IN WITNESS WHEREOF, the parties hereto have executed this AGREEMENT on the date indicated below…." *See* First 2009 Tax Allocation Agreement, § 5.04 [RC40016362]. These are fairly standard contractual provisions, but some courts have found that the presence of these provisions, in certain circumstances (usually in combination with other contractual provisions and/or communications between the parties that there be formal execution), may be factors to conclude that the parties did not intend to be bound prior to the execution of a written agreement. *See Kargo, Inc. v. Pegaso PCS, S.A. de CV.*, No, 05 Civ. 10528. 2008 WL 4579758, at *8 (S.D.N.Y. Oct. 14. 2008); *Nat'l Gear & Piston, Inc. v. Cummins Power Sys., LLC*, 861 F. Supp. 2d 344, 357 (S.D.N.Y. 2012). Moreover, the 2006 Tax Allocation Agreement, which the First 2009 Tax Allocation purported to amend, provides that any amendment must be in writing, but does not expressly state that the document must be fully signed in order to be effective. *See* 2006 Tax Allocation Agreement, § 6.04 [ALLY_0178779].

documents which comprehensively described the work to be done.[119] Although the board "authorized" its CEO to sign the necessary contracts to carry out the project, the CEO did not sign the contracts.[120] Nevertheless, e-mails between the construction company and the airport's architect suggested that the parties were proceeding as if a contractual relationship existed and that the signing of the agreements was a mere formality.[121] However, the airport attempted to rescind its acceptance a month after it approved the bid and the construction company brought suit claiming the airport breached the contract.[122]

In holding that a valid contract existed, the court in *Garrison* found that there was "objective evidence of a meeting of minds on the essential terms of a contract" based on the board's resolution accepting the construction company's bid and the board's communication of its acceptance to the other party.[123] The court noted that the board resolution was not conditional, further negotiations were not envisioned, and there was not enough support for the airport board's position that the parties did not intend to be bound until the construction contracts were fully executed.[124] Given that both parties had already agreed to the contracts as part of the bidding process, the court found that "the act of formally executing the construction contracts was not a step that had to be completed before a valid contractual relationship arose."[125] Furthermore, the court pointed out that although there may have been minor contractual details that remained to be addressed, the essential terms of a contract were already in place.[126]

The *Garrison* case supports the position that the First 2009 Tax Allocation Agreement could be enforceable based on the ResCap Board's approval of the agreement. First, as in the *Garrison* case, there is ample evidence to find that the ResCap Board was fully aware of the salient terms of the First 2009 Tax Allocation Agreement when it approved the agreement.[127] ResCap's counsel reviewed and commented on the agreement, and provided the ResCap Board with a memorandum dated July 11, 2010 summarizing the key terms of the agreement.[128] Moreover, at its August 6, 2010 meeting, the ResCap Board discussed the Joint

---

[119] *Garrison Co. v. Bishop Int'l Airport Auth.*, No. 293415, 2010 WL 4679501, at *2 (Mich. Ct. App. Nov. 18, 2010).

[120] *Id.*

[121] *Id*.

[122] *Id.* at *2–3.

[123] *Id.* at *4.

[124] *Id*.

[125] *Id*.

[126] *Id*.

[127] To enforce an unsigned contract, it must be shown that the party who failed to sign the agreement fully understood the terms thereof. *See High v. Capital Senior Living Properties 2-Heatherwood, Inc*., 594 F. Supp. 789, 798 (E.D. Mich. 2008). This is especially important, because "the absence of a signature deprives the defendant of a presumption that it otherwise might enjoy: that one who signs a written agreement is presumed to know the nature of the document and to understand its contents." *Id*.

[128] Memorandum, Revised Tax Allocation Agreement Draft, dated July 11, 2010 [EXAM20269709].

ResCap-AFI Tax Memorandum to ResCap Board that attached, and explained in detail, the First 2009 Tax Allocation Agreement.[129] The fact that the memorandum presented to the ResCap Board was prepared by officers of both ResCap and AFI lends further support that the First 2009 Tax Allocation Agreement was understood by both parties and that there was a "meeting of the minds" on the salient terms of the agreement.

Second, there is no doubt that ResCap's Board intended for ResCap to execute and be bound by the First 2009 Tax Allocation Agreement. The recitals preceding the ResCap Board resolution approving the First 2009 Tax Allocation Agreement provided that "management has recommended that . . . [ResCap Board] approve the execution and delivery" of the agreement, and the resolution itself unequivocally stated that each of ResCap's officers was authorized to "execute and deliver" the agreement.[130] As in the *Garrison* case, the ResCap Board resolution was unconditional and did not contemplate further negotiations. Indeed, Pamela West, one of ResCap's Independent Directors, stated at her interview that following Board approval of the First 2009 Tax Allocation Agreement, the ResCap Board "assumed that [ResCap's officers] would execute and deliver the agreement [because] [w]e authorized them to do that."[131]

AFI also believed that ResCap viewed the First 2009 Tax Allocation Agreement as being "resolved" and "done." In an e-mail from Marx to Mackey, sent on October 15, 2010, two months after ResCap's Board approved the agreement, Marx stated that "[p]eople at ResCap think the method of allocation has been resolved and we are just finalizing docs and the allocation will follow."[132] In a follow-up e-mail the same day from Marx to Mackey, Marx further stated that "I would go back to Jim Young at this time merely as a courtesy to let him know that we have more work to do here because he has been in the loop on the development of these [tax allocation] agreements and thinks they are done."[133] There is also evidence that AFI viewed the First 2009 Tax Allocation Agreement as final (i.e., they "weren't expecting additional edits") when it was sent out for execution in early September 2010.[134]

Third, AFI was aware that the ResCap Board approved the First 2009 Tax Allocation Agreement when AFI executed the agreement. In a September 9, 2010 memorandum from Marx to all designated signatories of the First 2009 Tax Allocation Agreement, Marx noted

---

[129] *See* Minutes of a Regular Meeting of the Board of Directors of Residential Capital, LLC, Aug. 6, 2010, at RC40018820–22 [RC40018729].

[130] *Id.*

[131] *See* Int. of P. West, Apr. 16, 2013, at 58:17–19.

[132] E-mail from W. Marx (Oct. 15, 2010), at ALLY_0424663 [ALLY_0424660].

[133] E-mail from W. Marx (Oct. 15, 2010), at ALLY_0424662 [ALLY_0424660]. Although Marx's contemporaneous belief in October 2010 was that Young viewed the First 2009 Tax Allocation Agreement as being "done," Young stated during his interview that he did not intend for the First 2009 Tax Allocation Agreement to be binding until he signed the agreement, nor does he believe that anyone on the ResCap side intended for ResCap to be bound by the agreement until it was signed by a ResCap officer. *See* Int. of J. Young, Apr. 22, 2013, at 209:20–210:10.

[134] *See* Int. of W. Marx, Apr. 18, 2013, at 55:12–24. Marx now states that he never viewed the First 2009 Tax Allocation Agreement as being binding because it was not fully executed. *Id.* at 143:18–144:13.

that "the [First 2009 Tax Allocation Agreement] has been reviewed by outside legal counsel representing the ResCap Board and ResCap General Counsel Tammy Hamzehpour, and has been approved by the ResCap Board."[135] Notably, David DeBrunner, AFI's Chief Accounting Officer at the time and the officer designated to sign the agreement on behalf of AFI, was a recipient of the memorandum. Thus, when AFI executed the First 2009 Tax Allocation Agreement some time around September 13, 2010,[136] it was aware that the ResCap Board had already approved the agreement.

Moreover, it appears that AFI expected the First 2009 Tax Allocation Agreement to be implemented. AFI calculated its expected payment obligations to ResCap under the First 2009 Tax Allocation Agreement and discussed those payments with their outside accountants. In an October 13, 2010 e-mail from Marx to James Mackey, AFI's CFO at the time, with the subject line "High Priority-Tax Allocation- Large Payment Possibly due ResCap October 30," Marx expressly noted that under the First 2009 Tax Allocation Agreement, AFI would be required to pay ResCap for the losses used by the AFI group and then estimates that those payments "may be on the order of $200 to $250m, due 10/31. (Additional $300 to $400 m would likely be due for the 2010 tax year, payable this time next year.)."[137] Marx also sent a follow-up e-mail to Mackey on October, 15, 2010, in which Marx stated that "[c]alculations were started immediately upon filing the first consolidated return on September 15."[138]

Finally, as discussed in detail in Section VII.L.2, there were several prior occasions when AFI and ResCap engaged in contractual arrangements where they did not stand on ceremony or formality in carrying out and enforcing their agreements. The parties' prior course of conduct with respect to other contracts supports the conclusion that AFI and ResCap viewed execution of the agreement as a mere formality.

Accordingly, the Examiner concludes that the evidence supports the proposition that there was a "meeting of the minds" or mutual assent between AFI and ResCap on all material terms of the First 2009 Tax Allocation Agreement and that the ResCap Board's approval of the agreement evidences ResCap's intent to be bound by the agreement. In reaching this conclusion, the Examiner is aware that Young stated during his interview that, despite ResCap Board approval, he did not intend for the First 2009 Tax Allocation Agreement to be binding until he signed the agreement, and that he did not believe that "anyone on the ResCap side" intended for ResCap to be bound by the agreement until it was signed by a ResCap officer.[139]

---

[135] *See* Memorandum, Action Required—ResCap Tax Allocation Agreements for Execution, dated Sept. 9, 2010 [ALLY_0435003].

[136] DeBrunner could not recall the precise date that he executed the First 2009 Tax Allocation Agreement on behalf of AFI. *See* Int. of D. DeBrunner, Apr. 18, 2013, at 122:8–14. But Marx recalled that he hand-delivered the agreement to DeBrunner for execution on or around September 13, 2010. *See* Int. of W. Marx, Apr. 18, 2013, at 57:20–58:5.

[137] E-mail from W. Marx (Oct. 13, 2010) [ALLY_0245484]. Marx further states that the payments to ResCap "would be a Q4 event and will be treated as a capital contribution to ResCap. Deloitte concurs." *Id*.

[138] *See* E-mail from W. Marx (Oct. 15, 2010), at ALLY_0424661 [ALLY_0424660].

[139] *See* Int. of J. Young, Apr. 22, 2013, at 209:20–210:10.

However, the Examiner finds it difficult to give any weight to Young's opinion as to whether others at ResCap, and in particular the ResCap Board, intended for the First 2009 Tax Allocation Agreement to be binding and enforceable given that Young has no specific recollection of speaking to anyone on the ResCap Board about why he did not sign the agreement or what was said if, in fact, he did discuss the agreement with the Board.[140]

The Examiner also concludes that the evidence supports the proposition that AFI's execution of the agreement evidences AFI's intent to the bound by the agreement, despite ResCap's failure to sign the agreement. While the Investigation turned up several communications between Marx and other officers at AFI wherein he indicates that the First 2009 Tax Allocation Agreement was not binding on AFI,[141] these statements were all made *after* AFI had already signed the First 2009 Tax Allocation Agreement and the ResCap Board had approved the agreement. Marx's opinion aside, the Investigation has uncovered no evidence to establish that AFI required signature by ResCap to be a condition to the agreement being enforceable.

Moreover, the Examiner is not aware of any basis to conclude that AFI should not be bound by its execution of the First 2009 Tax Allocation Agreement because it was a "mistake" that obligated AFI to make large payments to ResCap.[142] The Investigation has uncovered no evidence that supports this conclusion. The provision in the First 2009 Tax Allocation Agreement requiring AFI to compensate ResCap for its tax benefits was fully understood by AFI when the agreement was first proposed in December 2009. In fact, the evidence demonstrates that this provision was intentional and strategic. At his interview, Marx, who drafted the agreement,[143] stated that the "primary driver" of the payment provision was to find a way to maximize the use of ResCap's deferred tax assets in order to permit ResCap to get an "equity bump."[144] Marx further stated that this strategy was "explored" with AFI's external

---

[140] *Id.* at 146:20–147:16.

[141] *See* E-mail from W. Marx (Oct. 13, 2010) [ALLY_0245484] (wherein Marx describes various "options" for AFI, including "[d]o not complete execution of the [First 2009 Tax Allocation Agreement]." Marx goes on to state that "[a]bsent a signed agreement, the accounting should default to stand-alone treatment under GAAP."). This statement suggests that Marx believed that the agreement was not yet enforceable. *See also* E-mail from W. Marx (Oct. 15, 2010), at ALLY_0424663 [ALLY_0424660] (wherein Marx says to Mackey "[a]s we do not have a fully executed agreement with ResCap at this point, I don't think we need to respect the deadlines in the proposed agreement."). Moreover, during his interview, Marx stated that he did not believe the First 2009 Tax Allocation Agreement was binding and enforceable until it was fully executed. However, he noted that he never sought legal advice with respect to the issue. *See* Int. of W. Marx, Apr. 18, 2013, at 82:15–24, 143:18–144:13.

[142] *See* Int. of P. West, Apr. 16, 2013, at 20:3–8; Int. of D. DeBrunner, Apr. 18, 2013, at 116:13–22, 118:8–23, 125:16–22.

[143] *See* Int. of W. Marx, Apr. 18, 2013, at 36:24–37:6.

[144] *See id.* at 29:14–31:3.

auditors.[145] Moreover, in an e-mail sent on December 6, 2009, Marx explicitly describes the benefit of the First 2009 Tax Allocation Agreement to ResCap:

> If ResCap or any of its relevant sub-groups or subsidiaries generates foreign tax credits, net operating losses, or capital losses that it would not be able to use on a stand-alone basis in the current period, but the [AFI] group can utilize the benefits on the consolidated [AFI] return, then the ResCap entity will be paid currently for those benefits. This deviation from strict stand-alone accounting will in all cases be either neutral or more beneficial to ResCap than strict stand-alone. We drafted the agreements in this manner to be consistent with other allocation agreements in the Group (Bank and Insurance have similar agreements already in place).[146]

The evidence establishes that AFI changed its mind *after* executing the agreement, when it calculated its expected payment obligation to ResCap and realized that its payment obligation to ResCap would be hundreds of millions of dollars. This desire to get out from the First 2009 Tax Allocation Agreement is set out in an October 18, 2010 e-mail from Marx to Young and Hamzehpour, when Marx explains:

> The [First 2009 Tax Allocation Agreement] was initially drafted and proposed under a previous [AFI] senior financial management team. In light of the potentially large capital contributions that could result under such an agreement, I have requested review and approval by [AFI's] current senior leadership.[147]

If there was any "mistake" made here, it was AFI's unilateral mistake in failing to anticipate the magnitude of its monetary obligation under the First 2009 Tax Allocation Agreement.[148]

AFI's failure to appreciate the financial consequences of the First 2009 Tax Allocation Agreement does not provide a basis to nullify or reform the agreement. "While a court has the power to reform a contract to avoid an unconscionable harm, reformation is not appropriate

---

[145] *See id.* at 30:12–31:7.

[146] *See* E-mail from W. Marx (Dec. 6, 2009) [EXAM12308200]. DeBrunner, who executed the First 2009 Tax Allocation Agreement on behalf of AFI, was copied on this e-mail. The beneficial nature of the First 2009 Tax Allocation Agreement to ResCap was also set out in the Joint ResCap-AFI Tax Memorandum to ResCap Board which Marx took part in preparing. *See* Memorandum, Agreements for Allocation of Taxes, dated Aug. 6, 2010, at RC40016374–84 [RC40016362].

[147] E-mail from W. Marx (Oct. 18, 2010) [ALLY_0424659].

[148] Marx stated during his interview that "we didn't intend to be making major capitalization decisions with respect to ResCap in the tax department. . . . I simply didn't consider the ramifications of putting an agreement in place that could compel very large capital contributions when that's something the board was very focused on." Int. of W. Marx, Apr. 18, 2013, at 62:9–12, 75:8–12.

simply because the contract produces a suboptimal or inconvenient result viewed in hindsight."[149] Moreover, if the terms of an agreement are accurate and agreed upon, the court will honor the writing and will not modify those terms to alleviate "a hard or oppressive bargain" subsequently realized.[150] The mistake must be a *mutual* mistake of fact, and not a mistake as to the legal effect or consequences of the contract.[151] Indeed, a unilateral mistake is not sufficient to warrant reformation.[152] Accordingly, AFI's remorse based on the unexpected amount of compensation owed to ResCap under the First 2009 Tax Allocation Agreement does not provide a basis to nullify or reform the agreement to the extent that it is otherwise deemed to be valid and enforceable.

It was also suggested by DeBrunner during the course of the Investigation that AFI should not be bound by the First 2009 Tax Allocation Agreement because board approval is required before AFI is authorized to make any sizeable capital contributions.[153] Notably, AFI's failure to obtain proper senior level approval is the reason given by Young for having failed to sign the agreement on behalf of ResCap.[154] A resolution adopted by the AFI Board on October 5, 2009, provides, in relevant part, that the AFI Board has sole authority with respect to "[a]n injection of equity into any company or joint venture where, as a result of such capital injection, [AFI] invests $50 million or more or ends up with significant operating control."[155] AFI also had an accounting policy in place since December 23, 2009 providing that "[a]ll tax sharing agreements must be approved by the respective boards of directors or appropriate management designee."[156]

Despite the foregoing governance provisions, the Examiner does not find this position to be persuasive. Regardless of how payments under a tax allocation agreement may be treated

---

[149] 66 AM. JUR. 2d REFORMATION OF INSTRUMENTS § 11 (2013) (citing *Chandler v. Hayden*, 215 P.3d 485 (Idaho 2009)).

[150] *See id*. (citing *LaSalle Bank, N.A. v. Reeves*, 919 A.2d 738 (Md. 2007)); *see also George Backer Mgmt. Corp. v. Acme Quilting Co., Inc*., 385 N.E.2d 1062, 1066–67 (N.Y. 1978) (holding that a contract that subsequently resulted in monetary consequences to a party that the party did not anticipate was still valid because the contract was highly negotiated, and the party could not show that the consequence of the contract was due to a mistake in the contract).

[151] *See Casey v. Auto Owners Ins. Co.*, 729 N.W.2d 277, 284–85 (Mich. Ct. App. 2006); *see also VoiceAge Corp. v. RealNetworks, Inc*., No. 5753, 2013 WL 680932 (S.D.N.Y. Feb. 26, 2013); *Cobalt Multifamily Investors I, LLC v. Bridge Capital (USVI), LLC*, No. 5738, 2007 WL 2584926 (S.D.N.Y. Sept. 7, 2007).

[152] *See Casey v. Auto Owners Ins. Co.*, 729 N.W.2d 277, 284–85 (Mich. Ct. App. 2006).

[153] *See* Int. of D. DeBrunner, Apr. 18, 2013, at 118:8–23, 125:16–126:1 (BeDrunner stated that the First 2009 Tax Allocation Agreement "was not intended to be a, quote-unquote, 'backdoor for capital contributions' because I was fully aware that that required the approval of the [AFI Board] for anything over $50 million. So again, you know, there was a delegated authority. If it were anything up to that amount I could sign on behalf . . . . Anything over and above that would require a specific board action."); *see also* Int. of W. Marx, Apr. 18, 2013, at 126:10–25.

[154] *See* Int. of J. Young, Apr. 22, 2013, at 10:14–11:7, 97:8–21.

[155] *See* Minutes of a Special Meeting of the Board of GMAC Inc., Oct. 5, 2009, at ALLY_0115241, –43 [ALLY_0114717].

[156] AFI Accounting Policy 3330: Accounting for Income Taxes, effective Oct. 1, 2010, at EXAM12354101 [EXAM12354093].

on AFI's books for accounting purposes,[157] The Examiner is aware of no legal authority for the proposition that payments under a tax allocation agreement should be characterized as capital contributions.

Moreover, when DeBrunner signed the First 2009 Tax Allocation Agreement, he believed he was acting under "delegated authority."[158] AFI's in-house counsel was of the same belief. A September 9, 2010 memorandum circulated by Marx provides that AFI's in-house counsel had advised that "no additional governance is required at the [AFI] level" in connection with execution of the First 2009 Tax Allocation Agreement.[159] Notably, the Investigation did not reveal any evidence of the AFI Board ever considering the approval of any tax allocation agreements, including the Second 2009 Tax Allocation Agreement, which was signed by DeBrunner but not approved by the AFI Board. The process for AFI's entry into the First 2009 Tax Allocation Agreement appears to have been no different than the process for its entry into other tax allocation agreements.[160]

### (3) The Statute Of Frauds Is Not Applicable To The First 2009 Tax Allocation Agreement

Before deciding the issue of the enforceability of the First 2009 Tax Allocation Agreement, the Examiner also considered whether Michigan's statute of frauds has an impact on whether the First 2009 Tax Allocation Agreement would be enforceable. The Examiner concludes that it is unlikely that the statute of frauds would invalidate the First 2009 Tax Allocation Agreement.

The only provision of the Michigan statute of frauds that is potentially applicable to the First 2009 Tax Allocation Agreement is the requirement that "[a]n agreement that, by its terms is not to be performed within 1 year from the making of the agreement" must be "in writing and signed with an authorized signature by the party to be charged."[161] Michigan courts have "declined to adopt narrow and rigid rules for compliance with the statute of frauds," and instead use a "case-by-case approach."[162]

According to the Michigan Supreme Court, "[t]o determine whether an agreement comes within this section, the proper inquiry is whether the contract is capable of performance within

---

[157] E-mail from W. Marx (Oct. 13, 2010) [ALLY_0245484] ("This payment [under the First 2009 Tax Allocation Agreement] would be a Q4 event and will be treated as a capital contribution to ResCap. Deloitte concurs.").

[158] *See* Int. of D. DeBrunner, Apr. 18, 2013, at 125:9–126:9 ("As an officer of the company, they asked me to be the signer on it. My recollection is it had been reviewed with multiple parties around the company and I was asked to sign on that . . . . So, again, you know, there was a delegated authority.").

[159] *See* Memorandum, Action Required—ResCap Tax Allocation Agreements for Execution, dated Sept. 9, 2010 [ALLY_0435003].

[160] *See, e.g.*, Letter from W. Marx to D. DeBrunner (Sept. 30, 2008), at ALLY_0178793 [ALLY_0178779] (enclosing 2006 Tax Allocation Agreement for DeBrunner's signature on behalf of AFI); Letter from W. Marx to J. Young (Nov. 13, 2008), at ALLY_0178792 [ALLY_0178779] (enclosing same for Young's signature on behalf of ResCap, and noting the Agreement has "already been executed by David DeBrunner").

[161] MICH. COMP. LAWS ANN. § 566.132(1)(a) (West 2012).

[162] *See Kelly-Stehney & Assocs., Inc. v. Mac Donald's Indus., Prods., Inc.*, 693 N.W.2d 394, 397–98 (Mich. Ct. App. 2005) (citations omitted).

one year of [entry into the agreement]."[163] Significantly, "if there is any possibility that [a] contract is capable of being completed within a year, it is not within the statute of frauds, even though it is clear that the parties may have intended and thought it probable that it would extend over a longer period, and even though it does so extend."[164] Finally, "a contract for an indefinite term has traditionally been considered capable of performance within the first year."[165]

Section 5.08 of the First 2009 Tax Allocation Agreement provides that it "shall be effective as of November 1, 2009, and shall continue in effect until ResCap is no longer included in the consolidated Federal income tax return of [AFI] . . . ."[166] On its face, the term of the First 2009 Tax Allocation Agreement is not delineated by a finite end date, but rather remains effective until the occurrence of an event (i.e., ResCap no longer being included in AFI's consolidated federal income tax returns). The term of the agreement is of an indefinite duration, and was capable of performance within the first year. Accordingly, the First 2009 Tax Allocation Agreement is not subject to the one-year rule set forth in Michigan's statute of frauds.

While a close question, the Examiner concludes that it is more likely than not that the First 2009 Tax Allocation Agreement is an enforceable contract.[167] The Examiner has qualified his conclusion as being "a close question" primarily because cases assessing whether a partially executed, unexecuted oral agreement is enforceable focus on whether the parties' conduct or performance reflects an intent to be bound by the contract. By the nature of a tax allocation agreement, which generally does not require the parties to engage in any overt acts until payments are made thereunder, it is difficult to glean "intent" based on performance or lack thereof. Other than AFI calculating its potential payment obligations to ResCap under the First 2009 Tax Allocation Agreement (which was required under section 3.02 of the

---

[163] *Wolding v. Clark*, No. 10-10644, 2010 WL 4739432, at *6 (E.D. Mich. Nov. 16, 2010) (citations omitted).

[164] *Drummey v. Henry*, 320 N.W.2d 309, 312 (Mich. Ct. App. 1982); *see also Southwell v. Parker Plow, Co.*, 207 N.W. 872, 873 (Mich.1926) (citing *Smalley v. Mitchell*, 68 N.W. 978, 979 (Mich. 1896)).

[165] *Adell Broad. Corp. v. Cablevision Indus.*, 854 F. Supp. 1280, 1290 (E.D. Mich. 1994) (citation omitted); *see also Phinney v. Verbrugge*, 564 N.W.2d 532, 542 (Mich. Ct. App. 1997) (finding that an agreement for an indefinite period of employment does not fall within the purview of the statute of frauds).

[166] First 2009 Tax Allocation Agreement, § 5.08 [RC40016362].

[167] In reaching this conclusion, the Examiner also considered whether the officers of a corporation have any discretion to ignore or otherwise deviate from the clear and unconditional instructions given by a board of directors. There is minimal case law addressing this issue. However, the Examiner was able to find at least one other situation where a corporation's board resolution on a matter was found to be enforceable and bind the company even when the officers did not implement the action approved by the board. *See Landis v. Sci. Mgmt. Corp.*, No. 7483, 1991 WL 19848 (Del. Ch. Feb. 15, 1991) (Defendant corporation's board approved a finder's fee of up to $200,000 to be payable upon the consummation of an acquisition of a target company found by Plaintiffs. Defendant's board authorized its officers to pay such fee; however the fee was not paid. Plaintiffs brought suit. In holding for the Plaintiffs, the court found that the board resolution satisfied the requirements of the statute of frauds and established Defendant's obligation to pay the fee.); *see also Onslow Wholesale Plumbing & Elec. Supply, Inc. v. Fisher*, 298 S.E.2d 718, 720–21 (N.C. Ct. App. 1982) (failure of corporate officer to comply with board resolution deemed to be breach of fiduciary duty).

agreement),[168] the Investigation has uncovered no evidence of performance by either party. Nevertheless, based on the analysis above, including that there was a clear "meeting of the minds" as to all terms of the First 2009 Tax Allocation Agreement, the Examiner believes that the agreement is more likely than not an enforceable contract.

### (4) Potential Damages Could Be Significant

If the First 2009 Tax Allocation Agreement is found to be enforceable, and is not deemed to be superseded by the Second 2009 Tax Allocation Agreement, ResCap would be entitled to compensation for AFI's use of ResCap's tax benefits that have passed to AFI since November 1, 2009. As described in Section V.D.2.c(3), AFI will have approximately $5.056 billion in ResCap tax benefits available for use as of the end of the tax year in which the Chapter 11 Cases conclude. Applying a 35% federal income tax rate, that amount corresponds to $1.770 billion in potential tax savings. AFI expects to use a substantial portion of the $5.056 billion in tax benefits before the end of 2014 and may eventually use all of the tax benefits. Assuming all of ResCap's tax benefits are eventually used by AFI, ResCap would have a contractual claim against AFI in the approximate amount of $1.770 billion.

### b. Whether James Young's Failure To Execute The First 2009 Tax Allocation Agreement Constitutes A Breach Of Fiduciary Duty

In connection with the First 2009 Tax Allocation Agreement, the Examiner has also considered whether Young's failure to comply with the ResCap Board resolution and sign the agreement gives rise to a claim for breach of fiduciary duty.

As a threshold matter, with respect to choice of law, New York courts follow the "internal affairs doctrine," which provides that "questions relating to the internal affairs of corporations are decided in accordance with the law of the place of incorporation."[169] This doctrine applies to breach of fiduciary duty claims.[170] Accordingly, Delaware law will apply to

---

[168] *See* First 2009 Tax Allocation Agreement, § 3.02 [RC40016362]. Section 3.02 of the agreement provides as follows:

> Within forty-five (45) days following the filing of the [AFI] Group consolidated Federal income tax return . . . [GMAC Mortgage Group LLC] shall notify ResCap of the amount of the Separate ResCap Group Tax Liability. Within fifteen (15) days after such notification, Rescap shall pay to [GMAC Mortgage Group LLC] or [GMAC Mortgage Group LLC] will pay to ResCap as the circumstances warrant, the difference between the Separate ResCap Group Tax Liability and the estimated tax payments previously made by ResCap.

[169] *Scottish Air Int'l, Inc. v. British Caledonian Grp.*, 81 F.3d 1224, 1234 (2d Cir. 1996); *accord KDW Restructuring & Liquidation Servs. LLC v. Greenfield*, 874 F. Supp. 2d 213, 221 (S.D.N.Y. 2012) ("New York courts decide questions relating to corporate internal affairs in accordance with the law of the place of incorporation.") (citations omitted); *Official Comm. of Unsecured Creditors of Hydrogen, L.L.C. v. Blomen* (*In re Hydrogen, L.L.C.*), 431 B.R. 337, 346–47 (Bankr. S.D.N.Y. 2010).

[170] The doctrine also applies in the limited liability company context. *See In re Hydrogen, L.L.C.*, 431 B.R. at 347; *Ritchie Capital Mgmt. L.L.C. v. Coventry First LLC*, No. 07 Civ. 3494, 2007 WL 2044656, at *4 (S.D.N.Y. July 17, 2007).

consideration of a breach of fiduciary duty claim against Young, because ResCap is domiciled in Delaware.[171]

As described in Section VII.E, once a company becomes insolvent, the company's officers and directors owe a fiduciary duty, including a duty of good faith,[172] to the company and its creditors.[173] Specifically, a fiduciary will be found to have violated the duty of good faith under any of the following circumstances:

> 1) [W]here the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation; 2) where the fiduciary acts with the intent to violate applicable positive law; or 3) where the fiduciary intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties.[174]

In the event that a plaintiff successfully alleges bad-faith conduct by a fiduciary, the burden shifts to the director to "demonstrate that the challenged act or transaction was entirely fair to the corporation and its shareholders."[175] "Bad faith" conduct has been defined as an "intentional dereliction of duty, a conscious disregard for one's responsibilities."[176] Notably, the "business judgment" rule will not immunize an officer's decision or action if the officer is interested or lacks independence relative to the decision, does not act in good faith, acts in a manner that

---

[171] *See, e.g., KDW Restructuring & Liquidation Servs. LLC*, 874 F. Supp. 2d 213, 221 (S.D.N.Y. 2012) ("Jennifer is a Delaware corporation; therefore, Delaware law governs this breach of fiduciary duty claim."); *In re Hydrogen, L.L.C.*, 431 B.R. at 346–47; *Marino v. Grupo Mundial Tenedora, S.A.*, 810 F. Supp. 2d 601, 606–07 (S.D.N.Y. 2011); *Kipperman v. Onex Corp.*, 411 B.R. 805, 867 n.35 (N.D. Ga. 2009) ("The parties agree, and the Court has already concluded, that Delaware law applies to Plaintiff's breach of fiduciary duty claim based on the 'internal affairs doctrine.'").

[172] While some courts characterize good faith as a separate duty, the courts in Delaware generally treat it as subsumed within the duty of loyalty. *See, e.g.*, *Nagy v. Bistricer*, 770 A.2d 43, 49 n.2 (Del. Ch. 2000) ("If it is useful at all as an independent concept, the good faith iteration's utility may rest in its constant reminder (1) that a fiduciary may act disloyally for a variety of reasons other than personal pecuniary interest; and (2) that, regardless of his motive, a director who consciously disregards his duties to the corporation and its stockholders may suffer a personal judgment for monetary damages for any harm he causes").

[173] *See ASARCO LLC v. Am. Mining Corp.*, 396 B.R. 278, 314 (S.D. Tex. 2008) (citing *Claybrook v. Morris* (*In re Scott Acquisition Corp.*), 344 B.R. 283, 289–90 (Bankr. D. Del. 2006) (holding that a subsidiary's creditors and the subsidiary itself are owed a fiduciary duty upon insolvency); *Prod. Res. Grp., L.L.C. v. NCT Grp., Inc.*, 863 A.2d 772, 790–91 (Del. Ch. 2004) ("When a firm has reached the point of insolvency . . . the firm's directors are said to owe fiduciary duties to the company's creditors.")). *See also* J. Haskell Murray, "*Latchkey Corporations": Fiduciary Duties in Wholly Owned, Financially Troubled Subsidiaries*, 36 DEL. J. CORP. L. 577, 596–97 (citing *N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 101 (Del. 2007)).

[174] *Burtch v. Seaport Capital, LLC* (*In re Direct Response Media, Inc.*), 466 B.R. 626, 652 (Bankr. D. Del. 2012) (citing *Brehm v. Eisner* (*In re Walt Disney Co. Derivative Litig.*), 906 A.2d 27, 67 (Del. 2006)).

[175] *In re Walt Disney Co. Derivative Litig.*, 906 A.2d at 52.

[176] *Id.* at 66–67.

cannot be attributed to a rational business purpose, or reaches his decision by a grossly negligent process that includes the failure to consider all material facts reasonably available.[177]

The case law provides very little guidance as to whether an officer's failure to comply with a board resolution is a per se violation of the officer's fiduciary duty. However, there is at least one case that supports the proposition that an officer's failure to comply with a board's directive may amount to a breach of fiduciary duty. In *Onslow Wholesale Plumbing & Elec. Supply, Inc. v. Fisher*,[178] the general manager of a corporation bought shares of the corporation's stock in his own name, and then transferred the shares to his son. The corporation alleged a breach of fiduciary duty because the president and director of the corporation instructed the manager to buy the shares for the corporation rather than for himself or his son.[179] The court, considering agency law, held that the "defendant . . . breached a duty to plaintiff corporation by willfully failing to carry out the directive of the board of directors."[180] In reaching this holding, the court reasoned that "[t]he directive given to defendant by plaintiff's president and chairmen of the board of directors constituted board action and was therefore within the scope of defendant's agency. [The board] had every reason to believe that defendant would carry out this directive faithfully . . . ."[181]

Young's failure to execute the First 2009 Tax Allocation Agreement raises concerns because the agreement was unanimously approved by the ResCap Board and was highly beneficial to ResCap. Moreover, Young was a co-author of the Joint ResCap-AFI Tax Memorandum to ResCap Board that was presented to the ResCap Board on August 6, 2010 and recommended approval of the agreement.[182] Additionally, the Investigation has uncovered no evidence that Young attempted to inform other members of the ResCap Board that he did not intend to sign the agreement or explain his reasons for not signing. Young himself had no specific recollection of speaking to anyone on the ResCap Board about why he did not sign the agreement or what was said if, in fact, he did discuss this issue with the ResCap Board.[183] Therefore, as in *Onslow*, it would appear that the ResCap Board had every reason to believe, and in fact did believe, that Young would carry out the ResCap Board's directive faithfully.[184]

---

[177] *Brehm v. Eisner*, 746 A.2d 244, 264 n.66 (Del. 2000) (internal citation omitted). *See also Responsible Person v. Best Buy Co.* (*In re Musicland Holding Corp.*), 398 B.R. 761, 788 (Bankr. S.D.N.Y. 2008); *FLI Deep Marine LLC v. McKim*, No. 4138, 2009 WL 1204363, at *2–3 (Del. Ch. Apr. 21, 2009).

[178] 298 S.E.2d 718, 719 (N.C. Ct. App. 1982).

[179] *See id*.

[180] *See id*. at 721–22.

[181] *See id*. (finding that officer breached both a statutory duty and also a contractual duty to follow the directions of the corporation's board); *see also* 3 WILLIAM MEADE FLETCHER ET AL., FLETCHER CYCLOPEDIA OF THE LAW OF PRIVATE CORPORATIONS § 1011 (West 2012) (citing the *Onslow* case for the proposition that "[o]fficers have a duty to follow the orders, advice, and direction of the board of directors.").

[182] *See* Memorandum, Agreements for Allocation of Taxes, dated Aug. 6 2010, at RC40016374–78 [RC40016362]; Minutes of a Regular Meeting of the Board of Directors of Residential Capital, LLC, Aug. 6, 2010, at RC40018820–22 [RC40018729].

[183] *See* Int. of J. Young, Apr. 22, 2013, at 146:20–147:16.

[184] *See* Int. of P. West, Apr. 16, 2013, at 58:17–19.

Here, there is no factual dispute that Young failed to execute the First 2009 Tax Allocation Agreement and fulfill the ResCap Board's resolution.[185] However, the issue is whether Young's conduct rises to the level of a breach of fiduciary duty, which requires a showing that Young intentionally acted with a purpose other than to advance ResCap's interests or intentionally failed to act in dereliction of his duties. The first issue the Examiner considered is *why* Young failed to carry out ResCap's Board resolution to execute the agreement.

Young's recollection of the events surrounding his failure to execute the First 2009 Tax Allocation Agreement, and in particular the timing of those events, was spotty.[186] Nevertheless, there is evidence that Young was not presented with an execution copy of the First 2009 Tax Allocation Agreement until mid-October 2010, approximately two months after the ResCap Board authorized Young to sign the agreement.[187] The evidence establishes that Marx, who was overseeing and coordinating execution of the First 2009 Tax Allocation Agreement by all parties,[188] did not send Young an execution copy of the First 2009 Tax Allocation Agreement until around October 15, 2010.[189]

There is evidence that on or around October 18, 2010, shortly after the time that Young allegedly received an execution copy of the First 2009 Tax Allocation Agreement, he was contacted by Marx who expressed concern that the First 2009 Tax Allocation Agreement would require AFI to pay what he described as "potentially large capital contributions" to ResCap.[190] Marx informed Young that he would be proposing changes to the agreement to make it "strict stand-alone" (i.e., he would be removing AFI's obligation to pay ResCap for AFI's use of ResCap's tax benefits).[191] It was also around this time, although Young does not recall precisely when, that someone at AFI (Young believed that to be Mackey) told Young not to sign the First 2009 Tax Allocation Agreement because it had not been properly vetted and approved by senior-level management at AFI.[192]

There is evidence to suggest that, at this juncture, Young did not advocate for ResCap's interests in seeking to enforce or preserve the First 2009 Tax Allocation Agreement. First, it

---

[185] Notably, Young believed that the August 6, 2010 ResCap Board resolution provided him with discretion not to sign the First Tax Allocation Agreement if in reviewing the final document "there was something amiss." Int. of J. Young, Apr. 22, 2013, at 92:6–20.

[186] *See* Int. of J. Young, March 15, 2013, at 37:13–16; Int. of J. Young, Apr. 22, 2013, at 101:4–104:18.

[187] *See* Int. of W. Marx, Apr. 18, 2013, at 65:7–12.

[188] *See id.* at 54:19–25, 57:16–58:5.

[189] *See id.* at 59:14–18, 65:7–12.

[190] *See* E-mail from W. Marx (Oct. 18, 2010) [ALLY_0424659] ("In light of the potentially large capital contributions that could result under such an agreement, I have requested review and approval by Ally's current senior leadership."). Notably, Young did not have any recollection of the timeline with respect to when he received the execution copy of the First 2009 Tax Allocation Agreement as compared to when he was contacted by AFI officers and told not to execute the agreement. *See* Int. of J. Young, Apr. 22, 2013, at 101:4–104:18.

[191] *See* E-mail from W. Marx (Oct. 18, 2010) [ALLY_0424659].

[192] *See* Int. of J. Young, Apr. 22, 2013, at 10:14–11:7, 97:8–21.

appears that Young never considered signing the First 2009 Tax Allocation Agreement after being told by AFI that the agreement had not been properly vetted or approved by AFI.[193] On October 18, 2010, the same day that Young first received e-mails from AFI about the proposed change in the tax allocation agreement, and without apparently consulting any other member of the ResCap Board, Young sent an e-mail to AFI:

> Since all tax benefits will ultimately belong to Ally, this is more about how to managerially show the tax impacts on the legal entity of ResCap LLC. ResCap board would only be concerned if cash was being extracted from LLC in an "unfair" way via the tax allocation agreement . . . but I don't see that happening.[194]

Additional communications between Marx and Young confirm that Young did not oppose AFI's efforts to replace the First 2009 Tax Allocation Agreement with a tax allocation agreement that would be much less favorable to ResCap. An e-mail from Marx to Mackey sent on November 2, 2010[195] summarizes Marx's discussion with Young about the proposed new tax allocation agreement (i.e., the Second 2009 Tax Allocation Agreement) and shows that Young essentially acquiesced to removing the favorable payment provision in favor of ResCap:[196]

- I had a call with Jim Young on an unrelated matter, and tacked on a discussion on the tax allocation to ResCap.

- I shared with him the reason why we stopped the execution of the draft agreements, i.e., they would have compelled capital contributions to ResCap on the order of hundreds of millions for 2009 and 2010 tax years, versus a cash payment to Ally of $6m if we removed the beneficial language with respect to NOL's, capital losses and foreign tax credits.

- He understood the reason and did not think changing the draft agreements was disadvantageous to ResCap because the change would eliminate beneficial treatment which Ally is not compelled to provide to ResCap.

- Jim's view was that we need to move ahead and present a revised, stand-alone agreement to the ResCap Board for approval and that an executed agreement would be required to allow remittance of funds.

---

[193] *See id.* at 97:13–21.

[194] *See* E-mail from J. Young (Oct. 18, 2010), at EXAM20317195 [EXAM20317195].

[195] *See* E-mail from W. Marx (Nov. 2, 2010), at ALLY_0424660 [ALLY_0424660].

[196] Marx characterized his discussions with Young as being "never really adversarial" and stated that: "[Young] seemed to agree with what we were saying. And you know, there was no coaching, cajoling, convincing." Int. of W. Marx, Apr. 18, 2013, at 131:2–12.

It is troubling that Young was so quickly supportive of the Second 2009 Tax Allocation Agreement, especially after being informed that: (1) ResCap would have received significant sums of money under the First 2009 Tax Allocation Agreement (estimated by AFI to be approximately $600 million for the 2009 and 2010 tax years);[197] and (2) ResCap would be obligated to pay tax on excess inclusion income in the amount of $6 million to AFI under the Second 2009 Tax Allocation Agreement.[198]

Nevertheless, as described above, establishing "bad faith" conduct requires a high level of proof and the evidence must establish that Young *intentionally* failed to advance ResCap's interests or failed to act in a way that would demonstrate a conscious disregard for his duties.

Young explained that he did not sign the First 2009 Tax Allocation Agreement because he did not believe that it would be enforceable based on AFI's alleged failure to receive proper signing authority:

> I found out that [AFI] had not gone through the proper level of governance from their perspective. . . . [A]lthough I don't know their governance process, . . . I was informed that whoever signed the documents didn't have the authority to do so. And, as you know, of course I'm not going to enter into a transaction where it's not going to stand up.[199]

Moreover, although Young does not have a recollection of any specific discussions he had as to whether the agreement would have been enforceable had he signed it, he believes that he may have discussed this issue with Tammy Hamzehpour, ResCap's General Counsel at the time.[200] Hamzehpour was aware of AFI's position as she was a recipient or was copied on several of the e-mails, including the October 18, 2010 e-mail from Marx where he explains that AFI may be proposing changes to the agreement.[201] The Investigation has uncovered no evidence that Hamzehpour urged Young to sign the First 2009 Tax Allocation Agreement after AFI changed its mind or requested that a different ResCap officer sign the agreement. Young also explained that, based on his constant dealings with AFI, he "had no reason to believe that what [he] was being told was not true,"[202] and that he "took [AFI's] word that they understood their governance and that they were being honest and truthful of which [he]

---

[197] Young does not recall ever disclosing to the ResCap Board the amount that ResCap might have been owed under the First 2009 Tax Allocation Agreement. *See* Int. of J. Young, Apr. 22, 2013, at 148:2–149:11.

[198] *See* e-mail from W. Marx (Nov. 2, 2010), at ALLY_0424660 [ALLY_0424660]; *see also* E-mail from W. Marx (Dec. 22, 2010) at ALLY_0424667 [ALLY_0424667] (noting that "Jim Young was very supportive" of AFI's efforts to address the fairness concerns raised by counsel to the Independent Directors concerning the Second 2009 Tax Allocation Agreement).

[199] *See* Int. of J. Young, Apr. 22, 2013, at 97:13–21.

[200] *See id.* at 98:5–15.

[201] *See* E-mail from W. Marx (Oct. 18, 2010) [ALLY_0424659].

[202] *See* Int. of J. Young, Apr. 22, 2013, at 98:14–15.

never had a reason to doubt."[203] The Investigation has uncovered no evidence to dispute that what Young says he believed is not true.

Moreover, Young testified that he did not attempt to compel AFI to perform under the First 2009 Tax Allocation Agreement because he believed that doing so would possibly strain the AFI/ResCap relationship and make it less likely that ResCap would receive needed capital infusions from AFI in the future:

> [S]omewhere along the line before these agreements were executed, we learned that our counterparty hadn't vetted it. And this counterparty by the way is very important to us. They were providing capital and liquidity to separate transactions for a long period of time where we couldn't go to third parties. Very important for us. And the fact that they hadn't gone through their process, certainly as a businessperson at that time, given the importance of this counterparty, *we weren't going to talk about a short-term forcing them into a transaction that could ultimately turn off our ability to do further transactions with them.*[204]

Although the Investigation has uncovered no evidence beyond Young's testimony to support the notion that AFI would be less inclined or less incentivized to support ResCap if the First 2009 Tax Allocation Agreement had been enforced by ResCap,[205] the Examiner has no basis to doubt Young's concerns. Significantly, regardless of whether Young's belief was correct, it may demonstrate that his actions were motivated by what he believed was in ResCap's best interests.

Finally, Young's state of mind is relevant in determining whether his actions or inactions were motivated by bad faith. During his interview, Young testified that he did not (and still does not) view a tax allocation agreement as a tool for capital-generation purposes. On multiple occasions, Young stated his belief that a tax allocation agreement is intended to allocate tax attributes between companies on a "stand-alone" basis and to be used as an accounting tool to assist readers of financial statements so they can understand financial results, but it is not intended to "transfer value" or be a vehicle through which a subsidiary compels capital contributions from its parent.[206] Based on Young's understanding of the purpose of a tax allocation agreement, Young viewed the favorable payment provision to ResCap in the First 2009 Tax Allocation Agreement as a "windfall," because it was better than stand-alone treatment.[207] Putting aside Young's misconception of the purpose of a tax

---

[203] *See id.* at 162:9–13.

[204] *See id.* at 160:19–161:10 (emphasis added).

[205] *See id.* at 173:16–22 (Question: "Did anyone at [AFI] ever suggest in words or substance to you that if ResCap sought to enforce the [First 2009 Tax Allocation Agreement], that there would be consequences to doing so?" Answer: "No discussion like that ever occurred.").

[206] *See id.* at 63:10–22, 77:8–78:2, 82:16–83:23, 139:18–21.

[207] *See id.* at 76:10–16.

allocation agreement,[208] the evidence suggests that Young's lack of vigor in seeking to enforce the First 2009 Tax Allocation Agreement against AFI can be explained by his belief that the agreement should not be used to compel capital contributions against AFI.

Young's belief also appears to have been shared by the ResCap Board, as evidenced by the fact that the ResCap Board unanimously approved the Second 2009 Tax Allocation Agreement. Moreover, the Investigation has uncovered no evidence that anyone at ResCap, including the Independent Directors, were ever critical of Young for failing to sign, or for failing to seek to compel AFI to be bound by, the First 2009 Tax Allocation Agreement. To the contrary, West, like Young, described the favorable payment provision in the First 2009 Tax Allocation Agreement as a "windfall" and was satisfied to achieve "stand-alone" treatment for ResCap under a tax allocation agreement.[209]

Based on the evidence revealed in the Investigation concerning Young's motivations and actions, the Examiner concludes that, while a close question, it is more likely than not that a claim for breach of fiduciary duty[210] against Young, based on his failure to carry out the ResCap Board's resolution authorizing him to sign the First 2009 Tax Allocation Agreement, would not prevail.

### c. *The Second 2009 Tax Allocation Agreement Is Likely To Be Avoided As A Fraudulent Transfer*

The Examiner next considers whether there is any basis to challenge the Second 2009 Tax Allocation Agreement, which, by its terms, "supersede[d] any earlier agreement for the allocation of income taxes between the parties."[211] The Examiner first considered whether ResCap's entry into the agreement is avoidable as a constructive fraudulent transfer. By its plain terms, section 548 of the Bankruptcy Code permits the avoidance of an obligation incurred within two years before the commencement date of a bankruptcy filing,[212] including

---

[208] The purpose of a tax allocation agreement is to allocate the responsibilities for payment of tax liabilities and the right to receive tax refunds among affiliated entities (not to determine how tax attributes are reported in financial statements). These agreements are put into place to determine cash flow rights and may provide for different treatment than strict "stand-alone." *See* Section V.D.1.b (providing a complete discussion regarding the purpose of tax allocation agreements).

[209] *See* Int. of West, Apr. 16, 2013, at 17:20–24, 39:23–40:19.

[210] The circumstances surrounding Young's failure to execute the First 2009 Tax Allocation Agreement appear to implicate the fiduciary duty of good faith more so than the duty of care. However, for many of the same reasons discussed above, the Examiner believes that a claim based on a breach of duty of care would not prevail. In any event, a breach based on a violation of the duty of care (in the absence of willful misconduct or bad faith) is subject to the exculpation and indemnification provisions contained in the 2008 ResCap Amended LLC Agreement. *See* 2008 ResCap Amended LLC Agreement, §§ 17, 18 [KL000000433]; *see also* Section IV.B.1.e(3)–(4) (providing a more detailed discussion of the 2008 ResCap Amended LLC Agreement).

[211] *See* Second 2009 Tax Allocation Agreement, § 5.04 [RC00028796].

[212] *See* 11 U.S.C. § 548(a)(1) (2012); *see also* 5 COLLIER ON BANKRUPTCY ¶ 548.03[4] (Alan N. Resnick & Henry J. Sommer eds., 16th ed) ("Section 548 not only gives the estate representative the power to avoid transfers, but also the power to avoid obligations.").

contractual obligations incurred within the two-year reach-back period.[213] Given that ResCap's entry into the Second 2009 Tax Allocation Agreement occurred in January 2011, ResCap's obligations under the agreement were incurred within the two-year reach-back period contained in section 548 of the Bankruptcy Code.[214] Moreover, the Second 2009 Tax Allocation Agreement was executed in January 2011, at a time when ResCap was insolvent.[215] Therefore, the key issue is whether ResCap received reasonably equivalent value for entering into the Second 2009 Tax Allocation Agreement.

Based on the Examiner's prior conclusion that there may be a basis to find that the First 2009 Tax Allocation Agreement is enforceable, the proper starting point is to compare the consideration ResCap would be entitled to under the Second 2009 Tax Allocation Agreement as opposed to the First 2009 Tax Allocation Agreement. When the agreements are compared, there is little doubt that the Second 2009 Tax Allocation Agreement placed ResCap in a much worse position and provided no benefit to ResCap at all.[216] ResCap went from being a party to an agreement obligating AFI to pay ResCap for AFI's use of ResCap's tax benefits, to being a party to an agreement that eliminated this benefit and provided no possibility of payments being made to ResCap.[217] In fact, there is no provision in the Second 2009 Tax Allocation Agreement that permits any possibility of payments being made to ResCap (other than an adjustment for an erroneous overpayment).[218] ResCap could only take into account the tax benefits it generates as carryovers in calculating its positive tax liability on a stand-alone basis for a future year.[219]

---

[213] *See Edner v. Mathews*, 58 F. Supp. 486, 488 (W.D. Pa. 1944) (considering whether the contract in question was subject to avoidance on constructive fraud grounds but rejecting claim based on exchange of fair consideration); *Sw. Holdings, L.L.C., v. Kohlberg & Co.* (*In re Sw. Supermkts., LLC*), 325 B.R. 417, 431 (Bankr. D. Az. 2005) (noting that "if the underlying contracts are avoidable as fraudulent transfers, then the Debtor did not receive reasonably equivalent value by satisfying an obligation that is void or voidable").

[214] *See* 5 COLLIER ON BANKRUPTCY ¶ 548.03[5] (Alan N. Resnick & Henry J. Sommer eds., 16th ed) ("[A]n obligation is incurred when it becomes legally binding under applicable nonbankruptcy law.") (citing *Advanced Telecomm. Network, Inc. v. Allen* (*In re Advanced Telecomm. Network, Inc.*), 490 F.3d 1325 (11th Cir. 2007) and *TSIC, Inc. v. Thalheimer* (*In re TSIC, Inc.*), 428 B.R. 103 (Bankr. D. Del. 2010) for the proposition that obligations arising under settlement and severance agreements, respectively, incurred when agreements executed by parties).

[215] *See* Section VI (setting forth the solvency analysis).

[216] Even Marx acknowledges that the Second 2009 Tax Allocation Agreement, which AFI has characterized as a strict stand-alone agreement, is not as beneficial to ResCap as the First 2009 Tax Allocation Agreement. *See* E-mail from W. Marx (Oct. 13, 2010) [ALLY_0245484] ("[AFI] would propose a new strict stand-alone agreement with ResCap for which the ResCap Board would likely require a fairness opinion of outside counsel . . . . This will likely be unpopular as the Board has already been presented and approved a more beneficial agreement.").

[217] *Compare* First 2009 Tax Allocation Agreement, at RC40016379–84 [RC40016362], *with* Second 2009 Tax Allocation Agreement, §§ 1.03D, 2.03 [RC00028796].

[218] *See* Second 2009 Tax Allocation Agreement, §§ 1.03D, 2.03 [RC00028796].

[219] *See id.* § 1.03D [RC00028796] ("For the avoidance of doubt, any [tax benefits] that are generated by the ResCap Group in any taxable period (to the extent not previously utilized pursuant to this sentence in prior periods) shall be taken into account and treated as available and unutilized in determining the Separate ResCap Group Tax Liability for any subsequent periods . . . .").

Even when the Second 2009 Tax Allocation Agreement is considered on its own (and assuming that the First 2009 Tax Allocation Agreement was not enforceable and looking at ResCap's situation as it existed before the First 2009 Tax Allocation Agreement), serious questions arise as to whether ResCap received any consideration at all. The only foreseeable consequence of ResCap's entry into the Second 2009 Tax Allocation Agreement was the incurrence of an obligation by ResCap to pay AFI amounts of tax on account of excess inclusion income[220]—*an obligation that ResCap did not have prior to the Second 2009 Tax Allocation Agreement because it was a disregarded entity*—without any corresponding right to be compensated for its tax benefits. Again, the Second 2009 Tax Allocation Agreement contained no provision permitting any possibility of payments being made to ResCap.

Although an argument can be asserted that ResCap may have received value because the 2006 Amended Operating Agreement required that ResCap and AFI be parties to a tax allocation agreement,[221] such argument is unpersuasive in light of ResCap's financial condition at the time and the fact that the Second 2009 Tax Allocation Agreement did not provide for two-way payments. Although the Second 2009 Tax Allocation Agreement provides for "stand-alone" treatment, it provides for one-way stand-alone treatment in favor of AFI. To comply with the 2006 Amended Operating Agreement, the Second 2009 Tax Allocation Agreement should have provided for two-way stand-alone treatment, even if the parties did not believe that ResCap would be in a position to be able to use its losses any time soon. Moreover, given ResCap's financial condition and the fact that its obligation to pay taxes on excess inclusion income was known, the agreement could have been drafted to allow ResCap to use its substantial losses to offset the excess inclusion income, even though such offset is not available under federal tax laws. Based on the foregoing, the Examiner concludes that the evidence supports the proposition that ResCap received no consideration, much less fair consideration or REV in exchange for entering into the Second 2009 Tax Allocation Agreement.

In reaching this determination, the Examiner is conscious of the fact that AFI made significant capital contributions to ResCap in and around the time that the Second 2009 Tax Allocation Agreement was executed and may have conferred other benefits upon ResCap.[222] However, the Examiner finds no basis to link ResCap's entry into the Second 2009 Tax Allocation Agreement with any other transaction. The Investigation has uncovered no document or any other evidence suggesting that any transaction, including the payment of any capital contribution from AFI to ResCap, was conditioned or dependent on ResCap's entry into the Second 2009 Tax Allocation Agreement.

---

[220] Well before the Second 2009 Tax Allocation Agreement was entered in January 2011, Marx informed officers of both AFI and ResCap that one consequence of the Second 2009 Tax Allocation Agreement would be that ResCap would have to pay AFI income of the magnitude of approximately $6 million for 2009. *See* E-mail from W. Marx (Oct. 15, 2010), at ALLY_0424662 [ALLY_0424660]; E-mail from W. Marx (Nov. 2, 2010), at ALLY_0424660 [ALLY_0424660].

[221] 2006 Amended Operating Agreement, § 2(b)(iii) [ALLY_0041818].

[222] *See* Capital Contributions to ResCap Legal Entity as of January 31, 2012 [ALLY_PEO_0075634].

Based on the foregoing, the Examiner concludes that a claim to avoid the Second 2009 Tax Allocation Agreement on constructive fraudulent transfer grounds is likely to prevail. The impact of avoidance is to nullify the transfer in question and place the parties back in the position that they were prior to the transaction.[223] Voiding the Second 2009 Tax Allocation Agreement has two important implications. First, if the First 2009 Tax Allocation Agreement could be found to be enforceable as discussed in Section VII.K.2.a, it would give rise to a significant contractual claim against AFI. Second, the Debtors would be able to recover any amounts paid by ResCap to AFI under the Second 2009 Tax Allocation Agreement (regardless of whether or not the First 2009 Tax Allocation Agreement is enforceable). If the Second 2009 Tax Allocation Agreement is avoided, then any payments made pursuant to the agreement will not have been made for REV and may themselves be avoided as constructive fraudulent transfers. In addition, the Debtors may seek equitable remedies against AFI, such as unjust enrichment, to recover amounts paid under the Second 2009 Tax Allocation Agreement. The Examiner currently estimates those amounts to be, in the aggregate, approximately $50 million.[224]

### d. Potential Additional Basis To Set Aside A Tax Allocation Agreement Between A Parent Company And Its Subsidiary

The Examiner has also considered whether there are any grounds, in addition to constructive fraudulent conveyance, to challenge the Second 2009 Tax Allocation Agreement.

Courts generally agree that members of a consolidated tax filing group are free to adjust among themselves each member's rights and responsibilities regarding tax payments and refunds.[225] In the context of a parent corporation and its subsidiaries or affiliates, courts generally enforce the terms of tax allocation agreements absent evidence of fraud or overreaching.[226] Typically, courts express this proposition by stating that a tax allocation agreement will not be set aside absent "gross and palpable overreaching" by the parent company.[227] One factor courts

---

[223] *See Gibson v. United States* (*In re Russell*), 927 F.2d 413, at 417; *see also* 5 COLLIER ON BANKRUPTCY ¶ 548.10[2] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.) ("Avoidance is the setting aside or nullification of a transaction. Nullification generally means that the transfer is retroactively ineffective and . . . the trustee may act as if the transfer had not occurred. If the trustee avoids an obligation, nullification means that the transferee acquired no rights as a result of the transaction and that the trustee need not consider the obligation valid as against the estate.").

[224] *See* Ordinary & Capital Losses Generated by ResCap Companies Analysis, prepared by AFI [ALLY_0424653].

[225] *See Unofficial Comm. of Unsecured Creditors v. PSS S.S. Co.* (*In re Prudential Lines, Inc.*), 928 F.2d 565, 570 (2d Cir. 1991); *W. Dealer Mgmt., Inc. v. England* (*In re Bob-Richards Chrysler-Plymouth Corp.*), 473 F.2d 262, 264–65 (9th Cir. 1973); *Superintendent of Ins. v. First Central Fin. Corp.* (*In re First Central Fin. Corp.*)*,* 269 B.R. 481, 488–89 (Bankr. E.D.N.Y. 2001).

[226] *Franklin Sav. Corp. v. Franklin Sav. Ass'n* (*In re Franklin Sav. Corp.*), 159 B.R. 9, 29–30 (Bankr. D. Kan. 1993). *See also In re First Cent. Fin. Corp.*, 269 B.R. at 489–90; *In re All Prods. Co.,* 32 B.R. 811, 814 (E.D. Mich. 1983) (citing *In re Bob Richards Chrysler-Plymouth Corp*, 473 F.2d 262, 264 n.4 (9th Cir. 1973)).

[227] *See In re Franklin Sav. Corp.,* 159 B.R. at 30 (quoting 18A AM. JUR. 2d CONVERSION § 802 (Feb. 2013)); *see also In re Coral Petroleum, Inc.*, 60 B.R. 377, 389–90 (Bankr. S.D. Tex. 1986); *In re All Prods. Co.,* 32 B.R. at 814.

consider is whether entry into the contract in question was the result of a breach of fiduciary duty. For example, in *In re First Central Financial Corp.*, the court held that "in the absence of overreaching or breach of fiduciary duty in the creation or implementation of the [t]ax [a]llocation [a]greement, the [a]greement will be given effect. . . ."[228]

In short, a determination as to whether a parent has engaged in conduct that amounts to overreaching is extremely fact-specific, and the courts have established a high threshold to set aside a tax allocation agreement. The Examiner was able to locate only one example where a court determined that a tax allocation agreement between a parent and its subsidiary was the product of such improper conduct to warrant invalidating the contract. In *Lincoln Savings & Loan v. Wall*, a parent company was strapped for funds to meet debt service on a $51 million obligation and had stored up NOL carryforwards that it could use against its subsidiary's earnings.[229] In order to upstream funds from the subsidiary to the parent, tax agreements were executed that required the subsidiary to remit to its parent on a quarterly basis the tax it would owe based on its "net profits" calculated under GAAP.[230] As the tax agreements were interpreted and applied by the parent company, the subsidiary was required to forward all of its GAAP profits to the parent even though it owed no taxes on a stand-alone basis.[231] The court ultimately determined that because the subsidiary owed no taxes, it was in effect making unsecured loans to its parent when it remitted payments under the agreements.[232] The court referred to the tax allocation agreement as a "pretext for improperly stripping [the debtor] of its funds."[233] Moreover, the court also held that the tax allocation agreements at issue were improperly used to pass fictitious profits of contrived transactions from the subsidiary to the parent in order to fund the parent's needs for its own obligations.[234]

The Examiner considers below whether ResCap's entry into the Second 2009 Tax Allocation Agreement was the result of overreaching on the part of AFI such as would warrant setting aside the contract.

### e. The Second 2009 Tax Allocation Agreement Is Not The Product Of Overreaching By AFI

As set forth in Section V.D.2.c(3), the Second 2009 Tax Allocation Agreement purports to be a pure stand-alone agreement in that ResCap is obligated to pay to AFI its hypothetical

---

[228] *In re First Cent. Fin. Corp.,* 269 B.R. at 500–01 (citing *In re Franklin Sav. Corp.,* 159 B.R. at 33); *Nisselson v. Drew Indus.* (*In re White Metal Rolling & Stamping Corp.*), 222 B.R. 417, 423 (Bankr. S.D.N.Y. 1998); *see also In re Franklin Sav. Corp.,* 159 B.R. at 30, 33 (holding that "the agreement will control unless it can be shown that the advantaged member has acted 'unfairly' in the fiduciary relationship." According to the court, "the concept of unfairness equates to 'gross and palpable overreaching'").

[229] *Lincoln Sav. & Loan v. Wall*, 743 F. Supp. 901, 908 (D.D.C. 1990).

[230] *Id.*

[231] *Id.* at 910.

[232] *Id.* at 911.

[233] *Id.* at 910.

[234] *Id.* at 911.

separate tax liability each year. However, the Second 2009 Tax Allocation Agreement does not appear to operate as a pure stand-alone agreement because there is nothing requiring AFI to compensate ResCap for any refund that ResCap might be entitled to on a stand-alone basis. There is simply no provision in the Second 2009 Tax Allocation Agreement that provides for any payment (other than an adjustment for an erroneous overpayment) to ResCap. Additionally, the agreement was executed at a time (January 2011) when all of the available evidence suggests that ResCap was in financial distress and could ill afford to make payments it otherwise would not be required to make. Accordingly, on its face, the Second 2009 Tax Allocation Agreement only benefits AFI and appears to be objectively unfair to ResCap and its creditors. Moreover, in the absence of a tax allocation agreement, ResCap, as a disregarded entity, would have had no liability whatsoever to make tax payments.

Although the Second 2009 Tax Allocation Agreement may have been unfair to ResCap, it would be difficult to find that it was the result of "gross and palpable overreaching" by AFI. As is discussed in Section VII.K.2.d, courts are highly reluctant to set aside tax allocation agreements that are willingly entered into between a parent and its subsidiary, even if such agreements only benefit the parent or appear one-sided.

Here, there are several facts that militate both for and against a finding that the Second 2009 Tax Allocation Agreement should be set aside on equitable grounds. On one hand, ResCap was insolvent when the Second 2009 Tax Allocation Agreement was executed. AFI proposed an agreement which imposed a one-sided payment obligation on ResCap at a time when ResCap could least afford to dispense with its capital.

Moreover, section 2(b)(iii) of the 2006 Amended Operating Agreement contains an express requirement that ResCap and AFI maintain "an income tax allocation agreement that shall provide for two-way sharing payments based on the separately calculated tax liability or benefit of ResCap." The Second 2009 Tax Allocation Agreement would fail to qualify as a "two-way-sharing agreement," even under the most expansive interpretation of that phrase. Accordingly, the Second 2009 Tax Allocation Agreement would likely be found to be in violation of the 2006 Amended Operating Agreement.[235] This violation further supports the conclusion that the agreement is unfair based on the standard established by the parties.[236]

On the other hand, the Investigation revealed no direct evidence that AFI exerted undue influence over ResCap to execute the Second 2009 Tax Allocation Agreement.[237] To the

---

[235] A third-party beneficiary creditor might bring suit to invalidate the Second 2009 Tax Allocation Agreement as violation of the 2006 Amended Operating Agreement, but its remedy would be limited to specific performance. *See* 2006 Amended Operating Agreement, §11.

[236] Interestingly, Marx is of the view that the First 2009 Tax Allocation Agreement was probably not in compliance with the 2006 Amended Operating Agreement because it provided, in his view, better than "stand-alone" treatment to ResCap. Int. of W. Marx, Apr. 18, 2013, at 34:3–12.

[237] *See id.* at 131:2–12 ("No, no, there was no coaching or counseling. It was, you know, my recollection of this whole back and forth was that as soon as we brought up our issue with the first agreement, [Young] was like, 'Oh yeah, I see that. You know, that's okay. If we need to have some further discussion, let's do it.' You know, he got it. He seemed to agree with what we were saying. And you know, there was no coaching, cajoling, convincing. It was just, oh yeah, I understand that. That makes sense.").

contrary, the Investigation revealed that the ResCap Board engaged in a thorough review process before approving the Second 2009 Tax Allocation Agreement. Significantly, and as described further below, the Second 2009 Tax Allocation Agreement was approved by the Independent Directors of ResCap, who had their own counsel. Counsel to the Independent Directors reviewed and commented on the agreement and engaged in direct discussions with AFI concerning the terms of the agreement.[238] Although the ResCap Board's decision to approve the Second 2009 Tax Allocation Agreement was questionable, the decision-making process was thorough and ResCap's entry into the agreement appears to have been of its own free will.

Moreover, unlike the facts in *Lincoln Savings & Loan v. Wall,* the Investigation has uncovered no evidence that the Second 2009 Tax Allocation Agreement was devised by AFI as a nefarious scheme to extract significant payments from ResCap. Indeed, putting aside ResCap's favorable position under the First 2009 Tax Allocation Agreement, the Second 2009 Tax Allocation Agreement actually had little impact on ResCap as compared to its status as a disregarded entity. As a result of ResCap's disregarded entity status, AFI had the right to use ResCap's tax benefits *before* the parties entered into a tax allocation agreement for the 2009 tax year. Moreover, the amount of the payments that ResCap made to AFI under the Second 2009 Tax Allocation Agreement on account of excess inclusion income (an obligation that ResCap did not have as a disregarded entity prior to entering into the Second 2009 Tax Allocation Agreement) was relatively small, totaling approximately $50 million over a three-year period.[239]

Finally, the evidence supports the finding that AFI proposed the Second 2009 Tax Allocation Agreement because it did not want to be contractually obligated under the First 2009 Tax Allocation Agreement to have to make what it described as "potentially large capital contributions" to ResCap.[240] Notably, AFI had provided ResCap with approximately $2.7 billion in capital in the year preceding entry into the Second 2009 Tax Allocation Agreement. AFI's position was that any additional capital contributions to ResCap needed to be approved by the AFI Board.[241] Putting aside the issue of whether AFI's position was correct, the evidence establishes that the "capital contribution" issue was the reason for AFI proposing the Second 2009 Tax Allocation Agreement.[242] As such, from AFI's perspective, the Second 2009 Tax Allocation Agreement was intended to put the parties in a neutral or "stand-alone" position.

─────────────────────────

[238] E-mail from W. Marx (Dec. 22, 2010), at ALLY_0424667 [ALLY_0424667]; E-mail from M. Connolly (Dec. 16, 2010), at EXAM10432518 [EXAM10432517].

[239] *See* Exhibit V.D.2.c(3)—2.

[240] *See* E-mail from W. Marx (Oct. 18, 2010) [ALLY_0424659].

[241] *See id*.

[242] *See id*.

It appears, however, that ResCap's obligation to pay tax on excess inclusion income was simply not given significant consideration by the parties.[243]

In short, while the Second 2009 Tax Allocation Agreement may not be fair to ResCap under the circumstances, after considering and weighing the evidence uncovered during the Investigation, the Examiner does not believe that the agreement was the result of "overreaching" by AFI that would warrant setting the agreement aside. The Examiner's conclusion is influenced by the fact that the Second 2009 Tax Allocation Agreement was approved by ResCap's Independent Directors who were advised by their own counsel.

Accordingly, given the high threshold established by the cases to set aside a written tax allocation agreement, while a close question, the Examiner concludes it is more likely than not that a claim to set aside the Second 2009 Tax Allocation Agreement on equitable theories relating to overreaching would not prevail. As such, ResCap would not be entitled to seek equitable remedies against AFI, including a claim based on unjust enrichment.[244]

### f. The ResCap Board's Approval Of The Second 2009 Tax Allocation Agreement Likely Does Not Constitute A Breach Of Fiduciary Duty

The Examiner has also considered whether ResCap's entry into the Second 2009 Tax Allocation Agreement gives rise to a breach of fiduciary duty claim against ResCap's directors. In general, fiduciary duties consist of the: (1) duty of due care; and (2) duty of loyalty and good faith.[245] New York courts have held that, under Delaware law, directors and officers of an insolvent wholly owned subsidiary owe fiduciary duties to the subsidiary and its

---

[243] Although Marx informed Young that one consequence of the Second 2009 Tax Allocation Agreement would be ResCap's obligation to pay AFI $6 million in tax on excess inclusion income, the Investigation has revealed that this was not considered by the ResCap Board. *See* Int. of P. West, Apr. 16, 2013, at 95:14–96:13, 97:25–98:8. Notably, during the interview of Isaac Grossman, tax counsel for the Independent Directors of ResCap, he stated that he was not aware of the possibility of ResCap having to pay tax on excess inclusion income in his review and analysis of the Second 2009 Tax Allocation Agreement. *See* Int. of I. Grossman, Apr. 16, 2013, at 27:22–28:9.

[244] *See Goldman v. Met Life Ins. Co.*, 841 N.E.2d 742, 746–47 (N.Y. 2005) (holding that under New York law, equitable remedies are inappropriate when remedies at law are available under an existing contract); *Petrello v. White*, 412 F. Supp. 2d 215, 233 (E.D.N.Y. 2006) ("New York Courts and the Second Circuit have consistently held 'that the existence of a written agreement precludes a finding of unjust enrichment.'") (citations omitted). The Examiner's conclusion in Section VII.K.2.e of the Report does not impact his earlier conclusion that the Second 2009 Tax Allocation Agreement may be avoided as a constructive fraudulent transfer and payments made thereunder may be recoverable on equitable grounds, including unjust enrichment.

[245] *See McMullin v. Beran*, 765 A.2d 910, 917 (Del. 2000); *Malone v. Brincat*, 722 A.2d 5, 10 (Del. 1998); *see also Buckley v. O'Hanlon*, No. 04-955, 2007 WL 956947, at *3 (D. Del. Mar. 28, 2007); *Official Comm. of Unsecured Creditors of Fedders N. Am. v. Goldman Sachs Credit Partners L.P.* (*In re Fedders N. Am., Inc.*), 405 B.R. 527, 539 (Bankr. D. Del. 2009).

creditors, in addition to the parent corporation.[246] When ResCap entered into the Second 2009 Tax Allocation Agreement in January 2011, ResCap was insolvent. Accordingly, the ResCap Board had a duty to act in the best interest of ResCap and its creditors when it authorized the company to enter into the agreement.

Here, a difficult question is presented as to whether the ResCap Board may have breached its fiduciary duties to ResCap and its creditors. On the one hand, the Second 2009 Tax Allocation Agreement was unfavorable to ResCap, especially in comparison to the First 2009 Tax Allocation Agreement approved by the ResCap Board (but not signed by Young on behalf of ResCap). Although the Second 2009 Tax Allocation Agreement may have been described as a "stand-alone" tax agreement, the agreement contained no provision providing even a possibility that ResCap would receive any payments from AFI (other than an adjustment for an erroneous overpayment). The ResCap Board knew this, or should have known this, as Morrison Cohen, counsel to the Independent Directors, characterized key aspects of the agreement as being "very unfair" and suggested substantive revisions.[247] Certain of Morrison Cohen's comments were incorporated into the Second 2009 Tax Allocation Agreement, but those comments simply clarified ResCap's ability to use carryovers of tax benefits as an offset in calculating its stand-alone tax liability in future years. They did not address the fact that there was no possibility that ResCap could receive a cash payment under the agreement. Yet, the ResCap Board approved entry into the Second 2009 Tax Allocation Agreement anyway.

On the other hand, as described above, the Investigation revealed that the ResCap Board engaged in a thorough review and approval process. A draft of the Second 2009 Tax Allocation Agreement was discussed at a November 5, 2010 ResCap Board meeting and then discussed again at a subsequent ResCap Board meeting that took place on December 9, 2010.[248] Following that meeting, Morrison Cohen reviewed and commented on the agreement.[249] Then on December 21, 2010, a conference call occurred between ResCap, AFI

---

[246] *See* J. Haskell Murray, "*Latchkey Corporations": Fiduciary Duties in Wholly Owned, Financially Troubled Subsidiaries,* 36 DEL. J. CORP. L. 577, 597–78 (citing *Official Comm. of Unsecured Creditors of RSL Com Primecall, Inc. v. Beckoff* (*In Re RSL COM Primecall, Inc.*), Nos. 01-11457-69, Adv. 03-2176, 2003 WL 22989669, at \*13 (Bankr. S.D.N.Y. Dec. 11 2003) ("It would be absurd to hold that the doctrine that directors owe special duties after insolvency is inapplicable when the insolvent company is a subsidiary of another corporation. That is precisely when a director must be most acutely sensitive to the needs of a corporation's separate community of interests, including both the parent shareholder and the corporation's creditors."); *Roselink Investors, L.L.C. v. Shenkman*, 386 F. Supp. 2d 209, 215 (S.D.N.Y. 2004) ("[D]irectors of a wholly-owned subsidiary, who otherwise would owe fiduciary duties only to the parent, also owe fiduciary duties to creditors of the subsidiary when the subsidiary enters 'the zone of insolvency.'")).

[247] E-mail from M. Connolly (Dec. 16, 2010), at EXAM10432518 [EXAM10432517].

[248] *See* Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Nov. 5, 2010, at RC40018848 [RC40018729]; E-mail from T. Hamzehpour (Dec. 16, 2010), at EXAM10432502 [EXAM10432501].

[249] E-mail from M. Connolly (Dec. 16, 2010), at EXAM10432518 [EXAM10432517].

and Morrison Cohen, in which it appears that ResCap and Morrison Cohen "pressed AFI fairly hard about" and "took several runs at" the fairness issue.[250]

Based on the foregoing, it would be difficult to prove that the ResCap Board breached its "duty of care,"[251] which focuses on the decision-making process and generally requires a fiduciary to inform himself of all material information reasonably available before making a business decision.[252] Indeed, as described in Section VII.E, a director's or officer's reliance on legal or other expert advice is almost a per se defense to a claim based on a breach of a duty of care.[253]

The fact that the Second 2009 Tax Allocation Agreement was considered and approved by the Independent Directors also cuts strongly against any claim that the ResCap Board may have breached its "duty of loyalty." Here, despite the fact that certain aspects of the Second 2009 Tax Allocation Agreement may be unfair, the Investigation has uncovered no evidence to establish that the ResCap Board engaged in self-dealing. To the contrary, the Investigation has revealed that the Board, including the Independent Directors, specifically considered whether any "interested directors" had a conflict of interest, and concluded there were no conflicts.[254] There is also evidence that the Independent Directors believed that the Second 2009 Tax Allocation Agreement was favorable to ResCap.[255]

---

[250] *See* Conference call invitation (subject: "Discuss ResCap—Ally Tax Allocation Agreement") from T. Hamzehpour [EXAM10902438]; *see also* E-mail from W. Marx (Dec. 20, 2010), at EXAM10432501 [EXAM10432501]; E-mail from W. Marx (Dec. 22, 2010), at ALLY_0424667 [ALLY_0424667].

[251] As described above, a breach based on a violation of the duty of care (in the absence of willful misconduct or bad faith) is subject to the exculpation and indemnification provisions contained in the 2008 ResCap Amended LLC Agreement. *See* 2008 ResCap Amended LLC Agreement, §§ 17, 18 [KL000000433]. Therefore, even if a breach of the duty of care can be sustained, absent any proof of willful misconduct or bad faith, such a claim will not prevail.

[252] *Brandt v. Hicks, Muse & Co.* (*In re Healthco Int'l, Inc.*), 208 B.R. 288, 305 (Bankr. D. Mass. 1997) (applying Delaware law.)

[253] *See, e.g.*, *Hollinger Int'l, Inc. v. Black*, 844 A.2d 1022, 1084 (Del. Ch. 2004), *aff'd*, 872 A.2d 559 (Del. 2005) (dismissing a breach of fiduciary duty claim because defendant had sufficiently informed themselves by seeking advice of counsel). Notably, the defense may be overcome, but requires a showing that the directors failed to consider information "so obvious that the board's failure to consider it was grossly negligent regardless of the expert's advice or lack of advice." *Brehm v. Eisner*, 746 A.2d 244, 262 (Del. 2000); *see also Cal. Pub. Emps.' Ret. Sys. v. Coulter*, No. 19191, 2002 WL 31888343, at *12 (Del. Ch. Dec. 18, 2002) (director's reliance on expert valuation report when approving acquisition was "grossly negligent" where "[e]ither the [directors] knew the report was based on grossly inaccurate data . . . or they worked very hard not to know that information").

[254] *See* Int. of P. West, Apr. 16, 2013, at 55:22–57:23.

[255] *See id.* at 65:7–22.

VII.K-47

Finally, the Examiner has considered whether the ResCap Board may have breached its duty of good faith, which is generally treated as being subsumed within the duty of loyalty.[256] A breach of duty of good faith may be found where:

> 1) the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation; 2) where the fiduciary acts with the intent to violate applicable positive law; or 3) where the fiduciary intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties.[257]

Here, there are facts that suggest that the ResCap Board's decision to authorize ResCap to enter into the Second 2009 Tax Allocation Agreement was not done with the purpose of advancing the best interests of ResCap. As described above, the ResCap Board approved an agreement that: (1) counsel to the Independent Directors characterized originally as "very unfair," (2) provided no basis for ResCap to get paid for AFI's use of ResCap's tax benefits, and (3) resulted in ResCap having to pay AFI taxes on account of excess inclusion income at a time when ResCap was in financial distress.

Moreover, as discussed above, it is likely that the Second 2009 Tax Allocation Agreement would be found to be in violation of the 2006 Amended Operating Agreement, which further supports the conclusion that the agreement was not in the best interest of ResCap.

On the other hand, the Investigation has uncovered no evidence that the ResCap Board *intentionally* acted against ResCap's interests or intentionally disregarded its duties. To the contrary, the Independent Directors were advised by independent counsel who was tasked with reviewing and commenting on the Second 2009 Tax Allocation Agreement. The evidence establishes that counsel for the Independent Directors identified potential issues with the agreement and conveyed them to the Independent Directors. There is further evidence that counsel for the Independent Directors engaged in discussions with AFI about their concerns and pushed AFI hard to revise the agreement. Moreover, the evidence suggests that counsel for the Independent Directors ultimately became comfortable with the Second 2009 Tax Allocation Agreement after certain of its comments were incorporated into the agreement.

Although counsel was not successful in remedying the lack of reciprocal payment obligations under the agreement, it appears that the Independent Directors were under the belief that Morrison Cohen's comments that were incorporated into the agreement adequately

---

[256] *See, e.g.*, *Nagy v. Bistricer*, 770 A.2d 43, 49 n.2 (Del. Ch. 2000) ("If it is useful at all as an independent concept, the good faith iteration's utility may rest in its constant reminder (1) that a fiduciary may act disloyally for a variety of reasons other than personal pecuniary interest; and (2) that, regardless of his motive, a director who consciously disregards his duties to the corporation and its stockholders may suffer a personal judgment for monetary damages for any harm he causes.").

[257] *Burtch v. Seaport Capital, LLC* (*In re Direct Response Media, Inc*.), 466 B.R. 626, 652 (Bankr. D. Del. 2012) (citing *Brehm v. Eisner* (*In re Walt Disney Co. Derivative Litig.*)*,* 906 A.2d 27, 67 (Del. 2006)).

addressed any fairness concerns and made the agreement a "two-way street."[258] Although the correctness of the Independent Directors' characterization of the Second 2009 Tax Allocation Agreement as being a "two-way street" is debatable, the Independent Directors relied on the advice of counsel and kept informed of the status of negotiations.

In short, although certain aspects of the Second 2009 Tax Allocation Agreement are unfavorable to ResCap, the Examiner concludes that the evidence does not support the proposition that the ResCap Board intentionally flouted their duties or failed to advance ResCap's interests.

Based on the foregoing, while a close question, the Examiner concludes that it is more likely than not that a claim for breach of the fiduciary duty of good faith against the members of the ResCap Board would not prevail.[259]

---

[258] *See* Int. of P. West, Apr. 16, 2013, at 28:2–15, 90:6–91:24.

[259] Based on the fact that a claim for breach of fiduciary duty against the ResCap Board is unlikely to prevail, any related claim for aiding and abetting a breach of fiduciary duty against AFI would also fail. *See Marino v. Grupo Mundial Tenedora, S.A.*, 810 F. Supp. 2d 601, 613 (S.D.N.Y. 2011); *Official Comm. of Unsecured Creditors of Hydrogen, L.L.C. v. Blomen* (*In re Hydrogen, L.L.C.*), 431 B.R. 337, 352 (Bankr. S.D.N.Y. 2010). *See* Section VII.G.1 (providing a detailed discussion of claims based on aiding and abetting breach of fiduciary duty).