## VII. REVIEW AND ANALYSIS OF ESTATE CAUSES OF ACTION IMPLICATED BY AFFILIATE TRANSACTIONS AND THE RELATIONSHIP AND COURSE OF DEALING AMONG RESCAP, AFI, ALLY BANK, AND CERBERUS

### L. CONTRACTUAL ISSUES AND RELATED CLAIMS

The transactions between ResCap and ResCap Subsidiaries, on the one hand, and AFI and Ally Bank on the other hand, may implicate a number of contractual issues and related claims, including the following:

>  1. Claims for breach of, and tortious interference with, the 2005 Operating Agreement, and fraud, arising from the 2006 Bank Restructuring;
>
>  2. Contractual claims related to the MMLPSA, the Pipeline Swap, the MSR Swap, and the Broker Agreement; and
>
>  3. Claims regarding the Debtors' indemnity obligations for loan modifications under the January 30 Letter Agreement and the A&R Servicing Agreement.

These issues are addressed below.[1]

#### 1. Contract And Tort Claims Related To 2006 Bank Restructuring

Pursuant to the analysis in Section V.A.2.b, summarized in Section V.A.1.a(5), the Examiner has concluded that ResCap did not receive reasonably equivalent value in the 2006 Bank Restructuring, in large measure because ResCap was not fully compensated for the non-voting nature and other qualities of the IB Finance Class M Shares that ResCap received in the transaction.[2] There are troubling facts associated with the 2006 Bank Restructuring and, after summarizing the circumstances of that transaction, this Section considers whether the estate may have viable fraud claims or contract claims arising from the 2005 Operating Agreement with respect to the 2006 Bank Restructuring.[3]

##### a. Summary Of Factual Background

In 2006, ResCap in essence sold the assets and liabilities of Old GMAC Bank to AFI in exchange for a non-voting, partial ownership interest in IB Finance, the newly established holding company for Ally Bank (f/k/a GMAC Automotive Bank).[4] That interest was

---

[1] In addition to these issues, there is a further contractual issue regarding the enforceability of the First 2009 Tax Allocation Agreement, which is addressed in Section VII.K.

[2] ResCap had a controlling interest in Old GMAC Bank; it received a non-voting, non-controlling interest in relatively unmarketable tracking shares of IB Finance. *See* Section V.A.1.a (2006 Bank Restructuring narrative); Section V.A.2.b (2006 Bank Restructuring REV explanation); Appendix V.A.2.b (supporting data and calculations).

[3] Similar potential claims by third-party beneficiaries of the 2005 Operating Agreement are addressed in Section VIII.C.5.b. Elsewhere in this Report, the Examiner considers the 2006 Bank Restructuring with respect to: (1) alter ego/veil piercing; (2) equitable subordination; (3) fraudulent transfer claims; and (4) fiduciary duty claims. *See* Sections VII.A.1.f, VII.C.4.c(1), VII.F.6.f(1)(a), VII.E.2.a (respectively).

[4] For a more detailed narrative of the 2006 Bank Restructuring, refer to Section V.A.1.

represented by two million IB Finance Class M Shares.[5] The Independent Directors, who (together with the ResCap Board) approved the transaction, were told by ResCap and AFI management and directors that the transfer was necessary in order to close the Cerberus investment in AFI.[6] ResCap stood to benefit from the Cerberus transaction through avoidance of a credit rating decline (although no formal valuation of this benefit was conducted at the time). In order to ensure that Cerberus would not become a bank holding company through its ownership interest in AFI, the Cerberus PSA required the removal of Old GMAC Bank (a federal thrift) from the Cerberus ownership chain, and specified that the assets and liabilities of Old GMAC Bank were to be transferred to Ally Bank (a Utah industrial bank).[7] But accomplishing this, and obtaining the expected credit rating impact of the transaction, did not require that ResCap be left with no voting interest in Ally Bank, nor did it require ResCap to be under-compensated for its loss of control. The Cerberus PSA, in fact, did not specify how that transfer was to be accomplished nor how Ally Bank and its holding company were to be structured; indeed, it specifically acknowledged that ResCap could be given sole ownership of Ally Bank.[8] In particular, the Cerberus PSA did not mandate that ResCap trade its interest in Old GMAC Bank, at book value, for non-voting interests in a newly established holding company that would own the industrial bank formerly known as GMAC Automotive Bank.[9]

Indeed, ResCap and AFI management initially explored multiple potential ownership structures for the reorganized bank, only one of which called for the approach ultimately implemented, i.e., 100% AFI voting control of IB Finance, only non-voting interests in IB Finance for ResCap, and proportional earnings distribution to ResCap based on Ally Bank's mortgage operation.[10] The evidence shows, however, that the Independent Directors were never told that any such alternative structures were possible or were considered (or could or should have been considered by the ResCap Board), much less told whether such alternative

---

[5]  ResCap received $1.161 billion, which it contributed to IB Finance. After closing, ResCap was immediately called upon to contribute additional capital of $360 million to the mortgage division of Ally Bank. *See* Section V.A.1.a.

[6]  *See* Walker Report, at 9 [RC40008925]. Note that David Walker, a ResCap director, also had an affiliation with AFI, as did others involved in this transaction. *See also* Memorandum, Proposed Restructuring of GMAC U.S. Banking Entities, dated May 5, 2006, at 1 [EXAM10258913] (attached to E-mail from K. Sabatowski to T. Melzer and T. Jacob (May 4, 2006) [EXAM10258912]) (explaining that absent completion of the 2006 Bank Restructuring described therein, including AFI ownership of the voting shares, the Cerberus PSA would not close).

[7]  Cerberus PSA, § 4.1(e)(i) [CERB000521].

[8]  The Cerberus PSA did not specify a particular structure for GMAC Automotive Bank's future ownership other than that it had to be "directly or indirectly wholly owned" by AFI. *Id.; see also id.* Ex. H, at 1 ("[AFI] *or ResCap* will wholly own the Industrial Bank, or it will be co-owned by [AFI] and ResCap.") (emphasis added).

[9]  As addressed in Section V.A.1.a, interviews of Cerberus officers are consistent with the conclusion that Cerberus did not require a specific form of ownership for the restructured bank and, in any event, no such requirement was reflected in the Cerberus PSA.

[10]  *See* Draft Memorandum, IB Alternatives, dated Apr. 4, 2006, at 1 [EXAM11237439] (attached to E-mail from D. Applegate to B. Paradis (Apr. 4, 2006) [EXAM11237438]).

structures were viable, or the reason or reasons that they were rejected in favor of the structure ultimately adopted, i.e., under which ResCap's shares of IB Finance were non-controlling and non-voting.[11]

Further, the April 20, 2006 memorandum by ResCap General Counsel David Marple,[12] which was addressed to David Applegate and copied to multiple ResCap officials,[13] was never shared with the Independent Directors. That memorandum stated that "[AFI] maintains that it must control the Industrial Bank in order for its automotive businesses to be covered under the 'call option' provided by [the Cerberus PSA]."[14] Marple's memorandum posited three ways in which the contemplated transaction conflicted with the 2005 Operating Agreement:[15] (1) the loss of control would violate the "arm's-length" and "fair value" requirement for agreements between ResCap and AFI;[16] and the new structure would contravene (2) the AFI affiliate investment prohibition;[17] and (3) the requirement that ResCap run its business separately from that of AFI.[18] Marple's memorandum also observed that "if either of the independent directors believes that the amendment is a 'close call' under the Operating Agreement—they will likely veto the amendment."[19]

The misgivings concerning the loss of "controlling interest in a bank" expressed by Applegate, and his proposal in an April 24, 2006 memorandum to AFI President William Muir of an alternative structure whereby ResCap would manage and control at least 51% of the restructured bank,[20] were apparently never shared with the Independent Directors.[21] Instead, a

---

[11]  *See* Section V.A.1.a.

[12]  *See* Memorandum, GMAC Bank Restructuring, dated Apr. 20, 2006 [EXAM11248642].

[13]  The memorandum was also copied to William Solomon, AFI General Counsel, to whom Marple had at least a dotted line reporting relationship. *See* Int. of D. Marple, Jan. 22, 2013, at 46:15–18 ("So my solid line was into Bruce Paradis. My dotted was into Bill. Bill probably saw fewer spaces between those dots than others, but, you know.").

[14]  Memorandum, GMAC Bank Restructuring, dated Apr. 20, 2006, at 2 [EXAM11248642].

[15]  *See id.* at 3–5.

[16]  2005 Operating Agreement, § 2(b) [ALLY_0140795].

[17]  *Id.* § 2(a)(ii).

[18]  *Id.* § 2(f).

[19]  Memorandum, GMAC Bank Restructuring, dated Apr. 20, 2006, at 6 [EXAM11248642].

[20]  Memorandum, ILC Ownership and Control, dated Apr. 24, 2006 [EXAM11248641].

[21]  When interviewed by the Examiner's Professionals, Muir suggested that he did not even consider Applegate's proposal to be a serious proposal. *See* Int. of W. Muir, Mar. 1, 2013, at 26:2–7 ("Well, I would say my recollection is that it wasn't a—how can I put it? It wasn't a seriously considered proposition. It was not something that, I don't think, Dave himself ever really thought was reasonable and was going to fly. But it didn't hurt to ask."); *see also* Int. of E. Schenk, Apr. 24, 2013, at 55:2–14 (Schenk, who was counsel to the Independent Directors, was unfamiliar with the contents of Applegate's memorandum).

few days after Applegate wrote to Muir, ResCap Chairman (and AFI Chairman) Eric Feldstein explained to the Independent Directors how AFI would "divest [ ] itself of its thrift charter," as required by Cerberus.[22]

In this first presentation to the Independent Directors on the topic, Feldstein's memorandum advised that "[o]ne alternative considered" was that of ResCap obtaining the charter of a "new industrial bank," into which Old GMAC Bank's business could be transferred, but that "this is not a viable option" due to time constraints.[23] Thus, while not explicitly stating that the structure was mandated by the terms of the Cerberus PSA, Feldstein's memorandum "propose[d] an alternative" in order to move forward with the Cerberus PSA, whereby Old GMAC Bank would be restructured in a manner such that its assets, liabilities, management, employees, and operations would be transferred to Ally Bank; "economic ownership" would be split proportionally between AFI and ResCap; and "voting ownership . . . would remain 100% with [AFI]."[24] Feldstein's memorandum said:

> Given the proposed structure preserves the economics to ResCap and that this transaction would only be completed in connection with the sale of 51% of [AFI] (which should result in [AFI] and ResCap ratings being de-linked from GM's ratings), this approach is prudent and sound for ResCap.[25]

The memorandum further advised the Independent Directors that "[t]he ResCap Board . . . is prepared to approve the bank restructuring and related waivers in the Operating Agreement" and noted that "each of you (as independent directors) must also approve the waivers if they materially and adversely affect the rights of the rated debt."[26] Feldstein's memorandum, which concluded by expressing the hope that "you can agree with the proposed course of action," and a request for the Independent Directors' "thoughts,"[27] did not mention: (1) the alternative structures that were considered in Applegate's April 4 memorandum; (2) that such structures had been rejected by AFI management, apparently as an accommodation to GM; or (3) that Applegate had misgivings about the loss of control.

A few days later, through their counsel (Erika Schenk of Bryan Cave), the Independent Directors raised with Marple a number of questions concerning the proposal; however, apparently accepting that the structure was a necessary aspect of the transaction with

---

[22] Memorandum, Proposed Restructuring of GMAC U.S. Banking Entities, dated May 5, 2006, at 1 [EXAM10258913] (attached to E-mail from K. Sabatowski to T. Melzer and T. Jacob (May 4, 2006) [EXAM10258912]). This memorandum was copied to everyone who was then a member of the ResCap Board.

[23] *Id.*

[24] *Id.*

[25] *Id.* at 2.

[26] *Id.*

[27] *Id.*

Cerberus, the Independent Directors simply noted the subject of "the economic stake of ResCap and the voting rights in the IB"[28] as an issue, but did not ask any questions about it. Marple—who two weeks earlier had advised Applegate and others that "[i]t is not reasonable to believe that ResCap's leadership would agree to transfer a material business to a third-party under a similar arrangement"[29]—provided only a sparing response: "let me know if you would like any further information in connection with your consideration of this matter."[30] A more complete and candid response would have disclosed the possibility of alternative structures obviating or ameliorating control issues, or would have provided information or advice regarding his views of the contemplated transaction in light of the restrictions on inter-company transactions under the 2005 Operating Agreement.[31] The Investigation has found no evidence that the Independent Directors or their counsel questioned Marple's response.[32] More generally, the Investigation has revealed no evidence showing that the Independent Directors were ever informed of the possibility of alternative ownership structures in connection with the 2006 Bank Restructuring which, inter alia, may have included proportional voting control[33] or compensation to ResCap for its loss of control.[34]

The AFI officials in control of the transaction and related communications with the Independent Directors included the chief architects and proponents of the sale of 51% of AFI to Cerberus—Feldstein and David Walker—and given the contents of Marple's memorandum and Applegate's memorandum, they had reason to fear that the Independent Directors would find that the transaction was not in the best interests of ResCap and its creditors. The Examiner concludes that material information regarding possible alternative structures was withheld from the Independent Directors by AFI or officials under its control, as was the fact that accommodation of GM's call option played a role in, and may have been a primary reason

---

[28] E-mail from E. Schenk to D. Marple (May 10, 2006) [JACOB.000010]. Melzer was aware that "voting shares would have been better." Int. of T. Melzer, Oct. 10, 2012, at 206:18–25, 208:25–209:7.

[29] Memorandum, GMAC Bank Restructuring, dated Apr. 20, 2006, at 4 [EXAM11248642].

[30] Memorandum, GMAC Bank Restructuring, dated May 12, 2006, at Question 4 [ALLY_0401600].

[31] *See* Memorandum, GMAC Bank Restructuring, dated Apr. 20, 2006 [EXAM11248642].

[32] Schenk said that she could not "recall with specificity" whether she asked for additional information. Int. of E. Schenk, Apr. 24, 2013, at 89:19–90:1. And she said in her experience if Marple "knew we were interested in an issue, he was always very good about coming back even if we hadn't requested something and saying . . . I just saw this and here it is." *Id*. at 68:9–19. No additional correspondence between Marple and the Independent Directors or their counsel on the subject of voting rights was located in the Investigation (nor any reference to such correspondence), and the Examiner concludes that the evidence supports the proposition that no such correspondence occurred.

[33] *See* Int. of S. Khattri, Oct. 25, 2012, at 73:10–17 ("[Q:] Was there any presentation to the independent directors that suggested that it was an option that ResCap receive something other than a non-voting interest? [A:] To the best of my knowledge no.").

[34] *See* Int. of T. Jacob, Apr. 17, 2013, at 77:9–19.

for, AFI's rejection of alternative structures at that time.[35] Instead, incomplete and, consequently, misleading information was provided. It is apparent, moreover, that the AFI proponents of the Cerberus PSA communicated the urgent view, and the Independent Directors were led to believe,[36] that the failure of ResCap to execute the 2006 Bank Restructuring in the proposed manner would cause the Cerberus PSA to fail to the detriment of both AFI and ResCap.[37]

In November 2006, after approval by the FDIC and DFI of the restructuring of GMAC Automotive Bank,[38] the ResCap Board, including the Independent Directors, were presented with the Walker Report in connection with their November 20, 2006 vote on the restructuring of Old GMAC Bank.[39] The Walker Report stated: "Successful completion of the bank restructuring is a condition to the closing of the [AFI] Sale."[40] It explained, further, that if the "[AFI] Sale" did not close, statements from ratings agencies "clearly indicate prompt and adverse actions,"[41] e.g., "Moody's would relink [AFI's] credit rating with GM's rating."[42] Given the linkage between AFI's credit rating and that of ResCap, the Walker Report explained, "we expect that if [AFI] is downgraded, ResCap will be downgraded to non-investment grade."[43]

The Walker Report included no explanation, however, for the non-voting status of the IB Finance Class M Shares under the transaction the ResCap Board was being asked to approve.

---

[35] As noted in Section VI.A.1.a, Muir's suggestion that alternative structures were rejected by AFI in order to ensure that Ally Bank spoke to regulators with only "one voice" is difficult to reconcile with the record. *See* Int. of W. Muir, Mar. 1, 2013, at 35:19–36:15.

[36] *See, e.g.*, Walker Report, at 9 [RC40008925] ("Successful completion of the bank restructuring is a condition to the closing of the [AFI] Sale. This sale is intended to de-link ResCap's credit rating from GM, and may facilitate ratings upgrades . . . . Conversely, if the [AFI] Sale does not close . . . statements from the ratings agencies clearly indicate prompt and adverse actions.").

[37] *See, e.g.*, Int. of W. Muir, Mar. 1, 2013, at 22:7–19. ("And so, as a part of that process, the ResCap executives—I would put it in the category, 'Well, it doesn't hurt to ask'—said, 'Well, we'd like to control the bank.' And basically they weren't given that opportunity, because we didn't feel it was in the best interests of the bank or the parent company to let that happen. And, since—you know, basically it was ResCap's choice as to whether or not they wanted to participate along the terms that we were providing, which we felt were economically very fair and in everybody's best interests and going to be a good deal for one and all.").

[38] *See* DFI, Findings, Conclusions & Order Conditionally Approving Application, Nov. 15, 2006 [CERB003827]; *see also* FDIC Approval Letter from S. L. Thompson (Nov. 15, 2006) [GOLDIN00093066].

[39] *See* Walker Report [RC40008925]. The ResCap Board had a draft of the Walker Report a month earlier. *See* Draft Report to the Board of Directors of ResCap, dated Oct. 16, 2006, at RC00016557 [RC00016501] (included in the materials circulated to the ResCap Board in advance of its October 19, 2006 meeting).

[40] Walker Report, at 9 [RC40008925].

[41] *Id.*

[42] *Id.*

[43] *Id.*

The Walker Report stated that notwithstanding the non-voting shares it would receive, "ResCap's control over the bank would . . . be unchanged," because AFI (the putative owner of all of the voting shares in IB Finance) was and would remain the sole member of ResCap and thus "controls the ResCap [B]oard."[44]

Moreover, the Walker Report notably mentioned only two of the three relevant provisions of the 2005 Operating Agreement highlighted in Marple's April 20, 2006, memorandum.[45] In particular, the Walker Report did not mention the requirement under section 2(b) of the 2005 Operating Agreement that any material transaction between ResCap and AFI be "on terms and conditions that are . . . arm's-length . . . and for fair value."[46] Similarly, it did not mention Marple's prior conclusion and advice to management that the proposed restructuring ran afoul of those section 2(b) requirements.[47]

The conduct surrounding communications with the Independent Directors with respect to the 2006 Bank Restructuring suggests that ResCap and AFI officials chose to manage the information flow on this subject to minimize the likelihood that the Independent Directors would "veto"[48] the transaction. The failure specifically to mention section 2(b) in the Walker Report appears to have been an intentional effort to manage the vote of the Independent Directors so that they would not veto the amendment. Even Applegate, who expressed misgivings to Muir in his April 24 memorandum, had said in an earlier e-mail that "[t]he goal is to solidify our leadership of the process and end ownership."[49]

The 2006 Bank Restructuring was approved unanimously by the ResCap board members present at its November 20, 2006 meeting,[50] and the ResCap Board granted a "waiver of the Operating Agreement,"[51] although only sections 2(a) and 2(f) thereof were specifically

---

[44]  *Id.* at 9–10.

[45]  Memorandum, GMAC Bank Restructuring, dated Apr. 20, 2006 [EXAM11248642].

[46]  2005 Operating Agreement, § 2(b) [ALLY_0140795].

[47]  *See* Memorandum, GMAC Bank Restructuring, dated Apr. 20, 2006, at 4 [EXAM11248642]. In addition, while accommodating GM's call option was a key predicate for the restructuring proposal that the ResCap Board was considering (a fact not mentioned in the Walker Report), the Walker Report said that any risk of GM exercising the option, leaving ResCap without access to bank funding, was remote. *See* Walker Report, at 7 [RC40008925]. The Walker Report suggested that by the time GM was in any financial condition to do so, ResCap would have acquired a new industrial bank of its own. *See id.*

[48]  Memorandum, GMAC Bank Restructuring, dated Apr. 20, 2006, at 6 [EXAM11248642].

[49]  E-mail from D. Applegate to J. Barr and R. Hall (Mar. 21, 2006) [EXAM11740324].

[50]  The minutes reflect that ResCap CEO Bruce Paradis was not present. Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Nov. 20, 2006, at RC40006837 [RC40006748]. Paradis had been appointed to AFI's "Executive Committee" a few days earlier. *See* Minutes of a Regular Meeting of the Board of Directors of GMAC LLC, Nov. 16, 2006, at ALLY_0002358 [ALLY_0002260].

[51]  Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Nov. 20, 2006, at RC40006839 [RC40006748]. Under section 8 of the 2005 Operating Agreement, such a waiver could only be valid if "a majority of . . . ResCap's Board . . . including a majority of the Independent Directors" approved it.

mentioned in the ResCap board minutes memorializing that action.[52] There was no fairness opinion or any independent third-party valuation report in connection with the transaction.[53] ResCap was under-compensated for its interest in Old GMAC Bank: the REV shortfall was between $390-465 million.[54] The difference in the equity value of Old GMAC Bank and the 2 million IB Finance Class M Shares was between $533 and $608 million.[55]

### b. Fraud

The facts just outlined are, as noted above, disconcerting. Despite the presence of the 2005 Operating Agreement, the Independent Directors clearly were not fully advised regarding the transaction, and therefore made a less-than fully informed decision when they agreed to a waiver under the 2005 Operating Agreement. ResCap received considerably less value in the form of non-voting IB Finance Class M Shares than that which it gave up, i.e. ownership of Old GMAC Bank, and the Independent Directors may well have pressed for ResCap to receive more value if they had known the facts that were kept from them.

The analysis of potential claims in this area is subject to an initial question about whether a wholly owned subsidiary can bring a claim sounding in fraud against its parent and sole shareholder. In a 1972 *per curiam* ruling, the Minnesota Supreme Court affirmed the dismissal of a fraud counterclaim brought by a former subsidiary against its parent on several grounds, one of which was that "[w]e think the subsidiary is without standing to challenge the acts of its parent."[56] The case, which cites no authority for this proposition, has not been cited for this proposition in the 41 years since it was issued, and involved complex facts. Nearly twenty years later, an Illinois federal district court, in a much more developed discussion, allowed a contract claim by a wholly owned subsidiary against its parent to proceed, stating, inter alia, a parent cannot "reap[ ] the benefits of its subsidiary's independent corporate existence . . .

---

[52] *Id.* The minutes state that "full and robust deliberation" preceded the ResCap Board's vote. *Id.* The Investigation has revealed no suggestion that the discussion addressed the very information which appears to have been purposefully left out of related correspondence and reports. *See* Int. of S. Khattri, Oct. 25, 2012, at 73:10–16 (stating there was no presentation to the Independent Directors suggesting any option for ResCap to receive other than non-voting interest); Int. of E. Feldstein, Dec. 14, 2012, at 112:25–113:10 (stating there was no discussion with the Independent Directors of voting shares versus non-voting shares); Int. of D. Walker, Nov. 28, 2012, at 147:22–23 ("I'm saying I don't recall whether they were presented with that."); Int. of E. Schenk, Apr. 24, 2013, at 57:22–58:1 ("[Q:] So, and to your knowledge, was it always presented to them that [AFI] would retain 100 percent of voting interest in the bank? [A:] Yes.").

[53] *See* Int. of T. Melzer, Oct. 10, 2012, 213:5–15 ("So as to not leave the . . . bank discussion open, there were aspects of that transaction that concern me. But, on balance, all things considered, I felt it was in the best interests of all stakeholders . . . . [W]e did not have independent valuations of the interests in this particular case. But I think it was probably a book value transaction, which is not uncommon, and I wasn't uncomfortable with that approach.").

[54] *See* Section V.A.2.b; Appendix V.A.2.b.

[55] *See* Section V.A.2.b; Appendix V.A.2.b.

[56] *See Blenda Life Corp. v. Blenda Life, Inc.*, 196 N.W.2d 925, 927 (Minn. 1972) (per curiam) (terming this issue "dispositive").

while at the same time side-stepping its reciprocal pit-falls."[57] This issue of suits by wholly owned subsidiaries against parents is further complicated here because the power that a parent corporation typically enjoys with respect to its wholly owned subsidiary is qualified to a certain extent in the AFI-ResCap relationship by the structure and procedures created by the 2005 Operating Agreement.[58] The Examiner's Professionals have not been able to identify other judicial precedents addressing a situation of this kind. Whether Minnesota courts today would apply an unsupported statement made in a *per curiam* decision from 1972 to bar claims in the circumstances of the present case is far from clear.

Assuming, however, that a wholly owned subsidiary can bring a claim sounding in fraud against its parent and sole shareholder, the *Wagoner* rule and the doctrine of *in pari delicto* are likely to present an impediment to such claim in this instance.

### *(1) Choice Of Law And Statute Of Limitations*

New York law governs the 2005 Operating Agreement.[59] In New York courts, however, a contractual choice-of-law provision does not govern a cause of action sounding in tort, absent express agreement or an exceptionally broad choice of law provision (neither of which is the case here).[60] Minnesota courts, on the other hand, recognize that "tort claims 'rais[ing] issues of performance' under a contract . . . are governed by the contract's choice-of-law clause."[61] Accordingly, and consistent with the choice-of-law analysis in Section VII.F.2.a, a potential action for fraud is examined both with respect to New York law and with respect to the law of the jurisdiction that is likely to be applicable based on general choice-of-law principles. For the reasons outlined in Section VII.F.2.a, the Examiner therefore considers the substantive law and the statutes of limitations under the law of New York and of Minnesota.

The limitations period for fraud under either New York[62] or Minnesota[63] law is six years. Under Minnesota law the statute does not begin to run until "the discovery by the aggrieved party of the facts constituting the fraud."[64] However, it is plaintiff's burden to establish that it

---

[57] *Stamp v. Inamed Corp.*, 777 F. Supp. 623, 627–28 (N.D. Ill. 1991); *cf. Teleglobe USA Inc. v. BCE, Inc. (In re Teleglobe Commc'ns Corp.*), 493 F.3d 345, 371–72 (3d Cir. 2007) (reasoning similarly in the context of a privilege dispute).

[58] 2005 Operating Agreement [ALLY_0140795].

[59] *Id.* § 13.

[60] *See H.S.W. Enters., Inc. v. Woo Lae Oak, Inc.*, 171 F. Supp. 2d 135, 141 n.5 (Bankr. S.D.N.Y. 2001).

[61] *Ceres Envtl. Serv., Inc. v. Arch Specialty Ins. Co.*, 853 F. Supp. 2d 859, 865 (D. Minn. 2012); *see also Fla. State Bd. of Admin. v. Law Eng'g & Envtl. Serv., Inc.*, 262 F. Supp. 2d 1004, 1012–15 (D. Minn. 2003) (concluding under Minnesota law that contractual Florida choice-of-law provision applies to tort claims, including breach of fiduciary duty, negligence, and negligent misrepresentation, because they are all "closely related to the parties' contractual relationship").

[62] N.Y. C.P.L.R. § 213(8).

[63] MINN. STAT. § 541.05, subd. 1(6).

[64] *Id.*

could not have discovered the facts any sooner than within six years of when the action is commenced.[65] Similarly, New York law holds that a claim for fraud is timely if commenced either within six years of the date the fraud occurs, or within two years of the date the fraud is discovered or through reasonable diligence should have been discovered, whichever is longer.[66] The question of when a fraud reasonably should have been or could have been discovered is one of fact[67] or a mixed question of fact and law.[68] In this instance, because the conduct underlying the claim of fraud continued at least until November 20, 2006, and ResCap's estate has the benefit of the two-year extension under the Bankruptcy Code,[69] the statute of limitations should not be an impediment.

### (2) Standing (The Wagoner Rule) And In Pari Delicto

Under the *in pari delicto* doctrine,[70] or its Second Circuit analogue—the *Wagoner* rule[71]—"[w]hen it comes to common law claims . . . a bankruptcy trustee is often barred from bringing claims on behalf of the debtor's estate because . . . [the doctrine] generally precludes a wrongdoer . . . from recovering from another wrongdoer."[72] While the *Wagoner* rule is technically addressed to standing in the bankruptcy context, whereas *in pari delicto* is a state

---

[65] *Alliance Bank v. Dykes*, No. A12-0455, 2012 Minn. App. Unpub. LEXIS 1253, at *44 (Minn. Ct. App. Dec. 31, 2012) (citing *Jane Doe 43C v. Diocese of New Ulm*, 787 N.W.2d 680, 684 (Minn. Ct. App. 2010)), *review denied*, 2013 Minn. LEXIS 166 (Minn. Mar. 19, 2013); *see also Veldhuizen v. A.O. Smith Corp.*, 839 F. Supp. 669, 675–76 (D. Minn. 1993) (limitation period begins to run when plaintiff is "aware of facts sufficient to put a reasonable person on notice that a fraud claim may exist").

[66] *See Liberty Co. v. Boyle*, 708 N.Y.S.2d 122, 125 (N.Y. App. Div. 2000); *see also Bobash, Inc. v. Festinger*, No. 03908/05, 839 N.Y.S.2d 431 (Table) (N.Y. Sup. Ct. Mar. 30, 2007), *appeal dismissed as academic*, 868 N.Y.S.2d 747 (N.Y. App. Div. 2008).

[67] *See Barry v. Barry*, 78 F.3d 375, 380 (8th Cir. 1996).

[68] *See Saphir Int'l, SA v. UBS PaineWebber Inc.*, 807 N.Y.S.2d 58, 59 (N.Y. App. Div. 2006).

[69] *See* 11 U.S.C. § 108(a).

[70] *See Kirschner v. KPMG, LLP*, 938 N.E.2d 941, 950–51 (N.Y. 2010); *State v. AAMCO Automatic Transmissions, Inc.*, 199 N.W.2d 444, 448 (Minn. 1972); *Christians v. Grant Thornton, LLP*, 733 N.W.2d 803, 810 (Minn. Ct. App. 2007).

[71] *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 118–20 (2d Cir. 1991).

[72] *Picard v. HSBC Bank PLC*, 454 B.R. 25, 29 (S.D.N.Y. 2011), *amended on other grounds*, No. 11 Civ. 763 (JSR), 2011 WL 3477177 (S.D.N.Y. Aug. 8, 2011). "'[T]here is no practical difference between the [*in pari delicto* and *Wagoner*] doctrines, for both seek to test whether, on the face of the pleadings, there is wrongdoing imputed to the plaintiffs that prevents them from pursuing their claims.'" *Cobalt Multifamily Investors I, LLC v. Shapiro*, 857 F. Supp. 2d 419, 429 n.5 (S.D.N.Y. 2012) (quoting *Krys v. Sugrue (In re Refco Sec. Litig.)*, 779 F. Supp. 2d 372, 374 n.1 (S.D.N.Y. 2011), *aff'd sub nom. Krys v. Butt*, 486 F. App'x 153 (2d Cir. 2012)). Federal courts in other jurisdictions address the issue without reference to the *Wagoner* "standing" approach. *See generally McHale v. Citibank, N.A. (In re 1031 Tax Grp., LLC)*, 420 B.R. 178, 197 (Bankr. S.D.N.Y. 2009) (noting that the First, Third, Fifth, Eighth, and Eleventh Circuits do not follow the Second Circuit's approach); *Moratzka v. Morris (In re Senior Cottages of Am., LLC)*, 482 F.3d 997, 1004 (8th Cir. 2007) ("We agree with the First, Third, Fifth, and Eleventh Circuits that the collusion of corporate insiders with third parties to injure the corporation does not deprive the corporation of standing to sue the third parties . . . .").

law affirmative defense,[73] "[t]he two concepts are similar and are both grounded in common law agency principles."[74] Both may be resolved on a motion to dismiss.[75]

The New York Court of Appeals has emphasized when reviewing the law of *in pari delicto* (in the context of a fraud claim) on certified questions from both the Second Circuit and the Delaware Supreme Court that "all corporate acts . . . are subject to the presumption of imputation. . . . [T]here are strong considerations of public policy underlying this precedent."[76] "A corporation must . . . be responsible for the acts of its authorized agents even if particular acts were unauthorized."[77]

To the extent that the circumstances regarding the 2006 Bank Restructuring are suggestive of wrongdoing on the part of AFI, through its agents (e.g., Feldstein, Walker), they are also suggestive of wrongdoing on the part of ResCap, through its agents—both insiders (such as Marple and Applegate), and those with dual affiliation (again, e.g., Feldstein, Walker). There is little doubt that, absent an applicable exception, a fraud claim by the trustee against AFI would be barred by the *Wagoner* rule and *in pari delicto*.

"[T]he principle that a wrongdoer should not profit from his own misconduct is so strong in New York that we have said the defense applies even in difficult cases and should not be 'weakened by exceptions.'"[78] Therefore, exceptions to these doctrines are narrowly construed.[79] The primary exception to the *in pari delicto* defense is the "adverse interest exception," which acts to prevent the imputation to a corporation of its agents' wrongdoing in circumstances where such imputation is not defensible under agency law principles from which the *in pari delicto* doctrine derives.[80] This is, however, the "most narrow of exceptions."[81]

Thus, "[t]o come within the exception, the agent must have totally abandoned his principal's interest and be acting entirely for his own or another's purposes [and] [i]t cannot

---

[73] *See* Kirschner, 938 N.E.2d at 946 n.3.

[74] *McHale*, 420 B.R. at 197 (noting the "near total congruency of the two concepts" and citing *Wight v. BankAmerica Corp.*, 219 F.3d 79, 86 (2d Cir. 2000)).

[75] *See Kirschner*, 938 N.E.2d at 946 n.3.

[76] *Id.* at 951 (citation omitted).

[77] *Id.* at 950 (citation omitted); *see also State v. AAMCO Automatic Transmissions, Inc.*, 199 N.W.2d 444, 448 (Minn. 1972) ("Generally, anyone who engages in a fraudulent scheme forfeits all right to protection, either at law or in equity.") (quoting *Kansas City Operating Corp. v. Durwood*, 278 F.2d 354, 357 (8th Cir. 1960)).

[78] *Kirschner*, 938 N.E.2d at 950 (citation omitted).

[79] *See McConnell v. Commonwealth Pictures Corp.*, 166 N.E.2d 494, 497 (N.Y. 1960) ("We are not working here with narrow questions of technical law. We are applying fundamental concepts of morality and fair dealing not to be weakened by exceptions.").

[80] *See Kirschner*, 938 N.E.2d at 952; *see also Christians v. Grant Thornton, LLP*, 733 N.W.2d 803, 810 (Minn. Ct. App. 2007) ("The 'adverse interest' exception prevents imputation, however, if the individual's conduct provides *no* benefit to the corporation.") (citing RESTATEMENT (SECOND) OF AGENCY § 228(1) (1958)).

[81] *Kirschner*, 938 N.E.2d at 952.

be invoked merely because he has a conflict of interest or because he is not acting primarily for his principal."[82] "Total abandonment" is not shown merely by actions that are "detrimental to the corporation's interest" or even "entirely adverse to" the corporation.[83]

In analyzing whether the adverse interest exception may apply, so that the estate's putative fraud claim against AFI would not be *in pari delicto*, the result may turn upon whether the restructuring of Ally Bank should be considered in isolation, or considered in the context of the Cerberus investment transaction in which it played a part. There are arguments in support of either approach—with potentially opposing results under the adverse interest exception—but on balance the more reasonable approach is the latter. First, it is clear that all actors considered the restructuring in the context of the Cerberus PSA.[84] Second, and fundamentally, it is clear that the 2006 Bank Restructuring occurred because of the Cerberus transaction. The Investigation has revealed no evidence suggesting otherwise; it was a requirement under the Cerberus PSA that the Old GMAC Bank be removed from the AFI ownership chain so that Cerberus, as the new 51% shareholder, would not become a bank holding company.[85]

Considered in this manner, the adverse interest exception is unlikely to apply. It is common ground that the Cerberus transaction was conceived and executed with the intention of benefitting AFI and ResCap. By bringing in a new majority owner, Cerberus, AFI and ResCap hoped and expected that GM would cease to be a drag on the companies' credit ratings. There is no reason to believe that this view was anything other than sincere. Thus, regardless of whether ResCap suffered a detriment with respect to the 2006 Bank Restructuring itself—even a very sizable one—it is difficult to conclude that any relevant conduct by the ResCap directors and officers involved was akin to "outright theft or looting or embezzlement—where the insider's misconduct benefits only himself or a third party."[86]

Accordingly, it appears that the adverse interest exception would not be applicable and, if that is so, then the fraud claim would be blocked by the *Wagoner* rule or *in pari delicto*.

Some courts have pointed to an "innocent insider" exception to the *Wagoner* rule or *in pari delicto*.[87] However, to the extent it applies under New York or Minnesota law, "innocent insider" is a much narrower exception than its name suggests. In a thoughtful 2004 decision

---

[82] *Id.* (internal quotation marks omitted).

[83] *Mediators, Inc. v. Manney (In re Mediators, Inc.)*, 105 F.3d 822, 827 (2d Cir. 1997) (citing *Center v. Hampton Affiliates, Inc.*, 488 N.E.2d 828, 829–30 (N.Y. 1985)).

[84] *See, e.g.*, Int. of E. Feldstein, Dec. 14, 2012, at 125:13–21; Int. of B. Paradis, Dec. 14, 2012, at 120:16–21; Int. of W. Muir, Mar. 1, 2013, at 20:11–21:5; Int. of D. Applegate, Mar. 14, 2013, at 46:11–25; Int. of S. Khattri, Oct. 25, 2012, at 103:3–104:13, Int. of T. Melzer, Mar. 22, 2013, at 83:22–84:7; Int. of T. Jacob, Nov. 7, 2012, at 136:25–137:5; Int. of L. Zukauckas, Oct. 19, 2012, at 130:24–131:17.

[85] *See* Cerberus PSA, § 4.1(e)(i) [CERB000521].

[86] *Kirschner*, 938 N.E.2d at 952.

[87] For example, in *SEC v. Lee*, 720 F. Supp. 2d 305 (S.D.N.Y. 2010), the court commented that the "innocent insider" exception may save a claim otherwise subject to *in pari delicto* when "there is another agent within the corporation who had no knowledge of the fraud and who had the will and the ability to stop the fraud had it come to his or her attention." *Id.* at 332.

a court "reject[ed]" the "so-called 'innocent insider' exception,"[88] and provided an extensive analysis of its origin and misapplication. The court explained that, at most, "innocent insider" functions as a gloss on the so-called "sole actor" exception[89] to the adverse interest exception. "[U]nless the adverse interest exception to the presumption of imputation applies, it is immaterial whether innocent insiders exist[ ]; the agent is still acting on behalf of the company, and his actions will be imputed to the company notwithstanding the existence of those innocent insiders."[90]

Because the adverse interest exception is likely not applicable here, there is no occasion to consider whether the "sole actor" exception to the adverse interest exception should apply given AFI's status as ResCap's sole shareholder. There likewise is no occasion to consider whether the Independent Directors should be regarded as "innocent insiders" whose role and performance under the 2005 Operating Agreement would defeat application of the sole actor exception here were it otherwise applicable.[91]

Notwithstanding the foregoing analysis of the *Wagoner* rule and the *in pari delicto* defense, these doctrines are subject to a degree of interpretation if for no other reason than the complexity of the range of "exceptions to exceptions." And, as noted, if a court were to analyze the "adverse interest" exception more narrowly—considering only the 2006 Bank Restructuring and not the larger Cerberus investment transaction of which it was a part— conceivably it could find that these doctrines do not bar the claim. While a close question, the Examiner concludes it is more likely than not that the *Wagoner* rule or the affirmative

---

[88] *Ernst & Young v. Bankr. Servs., Inc. (In re CBI Holding Co., Inc.)*, 311 B.R. 350, 372 (S.D.N.Y. 2004), *aff'd in part and rev'd in part*, 529 F.3d 432 (2d Cir. 2008); *see also McHale v. Citibank, N.A. (In re 1031 Tax Grp., LLC)*, 420 B.R. 178, 203 (Bankr. S.D.N.Y. 2009) ("While other courts have employed the innocent insider exception as an independent exception to both the *Wagoner* rule and *in pari delicto doctrine*, this Court is skeptical that this is the law. New York state cases do not recognize 'innocent insider' as an independent exception that stands alone from the adverse interest exception.").

[89] "This exception to the adverse interest exception, styled the 'sole actor rule,' operates most clearly in the context of a corporation owned and managed by a single person. When that person, in his role as manager, defrauds the corporation in order to benefit only himself, he has acted outside of the scope of his agency; technically, the agent's fraudulent actions should not be imputed to the company pursuant to the 'adverse interest' exception." *Ernst & Young*, 311 B.R. at 373; *see also* RESTATEMENT (THIRD) OF AGENCY § 5.04 note c (2006) (viewing "innocent insider" as a gloss on the "sole actor" exception).

[90] *Ernst & Young*, 311 B.R. at 372; *see also Ernst & Young*, 529 F.3d at 447 n.5 ("Judge Wood's analysis of the innocent insider exception and its likely genesis as a product of courts' confusion regarding the relationship between the normal rule of imputation, the adverse interest exception to that rule, and the sole actor exception to that exception is extremely persuasive.").

[91] *See generally Breeden v. Kirkpatrick & Lockhart LLP (In re Bennett Funding Grp., Inc.)*, 336 F.3d 94, 101 (2d Cir. 2003). It is not entirely clear whether the "innocent insider" gloss on the "sole actor" exception to the "adverse interest" exception exists under Minnesota law, as there appear to be no cases precisely on point. *See, e.g.*, *Sussel Co. v. First Fed. Sav. & Loan Ass'n of St. Paul*, 238 N.W.2d 625, 628 (Minn. 1976) (supporting sole actor exception to independent fraudulent act exception to imputation principle but not addressing "innocent insider"). In any event, as noted, there is no occasion to consider "innocent insider" because the "adverse interest" exception does not apply in the first place.

defense of *in pari delicto* would prevail, thereby precluding the estate's fraud claim against AFI. Because the *Wagoner* rule and *in pari delicto* analysis are close questions, which a court may view differently, the fraud claim is also considered on the merits in the following Section.

### *(3) The Claim And Its Elements*

The elements of a claim for fraud under New York law are: "(1) a material misrepresentation or omission of fact (2) made by defendant with knowledge of its falsity (3) and intent to defraud; (4) reasonable reliance on the part of the plaintiff; and (5) resulting damage to plaintiff."[92] The elements under Minnesota law are substantially similar: "(1) a false representation . . . of a past or existing material fact susceptible of knowledge; (2) made with knowledge of the falsity of the representation or made without knowing whether it was true or false; (3) with the intention to induce [plaintiff] to act in reliance thereon; (4) that the representation caused [plaintiff] to act in reliance thereon; and (5) that [plaintiff] suffered pecuniary damages as a result of the reliance."[93]

The law in both jurisdictions recognizes instances in which silence, i.e., non-disclosure rather than "affirmative misrepresentation,"[94] may be the premise for fraud. "Special circumstances"[95] where there may be such a duty to disclose include:

> First, "[o]ne who speaks must say enough to prevent his words from misleading the other party." Second, "[o]ne who has special knowledge of material facts to which the other party does not have access may have a duty to disclose these facts to the other party." Third, "[a] duty to disclose facts may exist when a fiduciary relationship exists between the parties . . . ."[96]

Thus, non-disclosure typically serves as a premise for a claim of fraud "only when the party concealing the material fact is under a legal or equitable obligation to communicate that fact to the other party who in turn is entitled to disclosure of the material fact."[97]

---

[92] *Del Carmen Onrubia de Beeck v. Costa*, 959 N.Y.S.2d 628, 637 (N.Y. Sup. Ct. 2013) (quoting *Crigger v. Fahnestock & Co.*, 443 F.3d 230, 234 (2d Cir. 2006)); *see also Ross v. Louise Wise Servs., Inc.*, 868 N.E.2d 189, 195 (N.Y. 2007).

[93] *Valspar Refinish, Inc. v. Gaylord's, Inc.*, 764 N.W.2d 359, 368 (Minn. 2009).

[94] *Kaufman v. Cohen*, 760 N.Y.S.2d 157, 165 (N.Y. App. Div. 2003).

[95] *Trenholme v. QRS Diagnostic, LLC*, No. A05-2472, 2006 WL 2601664, at *3 (Minn. Ct. App. Sept. 12, 2006) (citing *Klein v. First Edina Nat'l Bank*, 196 N.W.2d 619, 622 (Minn. 1972)).

[96] *Trenholme*, 2006 WL 2601664, at *3 (quoting *Heidbreder v. Carton*, 645 N.W.2d 355, 367 (Minn. 2002); *Klein,* 196 N.W.2d at 622) (citations omitted).

[97] *Trenholme*, 2006 WL 2601664, at *3 (citing *Richfield Bank & Trust Co. v. Sjogren*, 244 N.W. 2d 648, 650 (Minn. 1976)); *see also Kaufman*, 760 N.Y.S.2d at 165 ("[A] fraud cause of action may be predicated on acts of concealment where the defendant had a duty to disclose material information.").

"Concealment," as distinguished from "non-disclosure," may also serve as a premise for a claim of fraud: "Concealment of a fact can be as effective a misrepresentation as an outright lie . . . ."[98] Accordingly:

> [I]f a party conceals a fact material to the transaction, and peculiarly within his own knowledge, knowing that the other party acts on the presumption that no such fact exists, it is as much a fraud as if the existence of such facts were expressly denied, or the reverse of it expressly stated.[99]

Similarly, there can be circumstances where a duty to disclose arises from the possession of superior knowledge:

> Under New York law, a duty to disclose material facts arises in one of three ways: (1) where the parties stand in a confidential fiduciary relationship, (2) *where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge,* or (3) where a party to a business transaction has made a partial or ambiguous statement, on the theory that once a party has undertaken to mention a relevant fact to the other party it cannot give only half of the truth.[100]

Finally, "[o]ne who speaks must say enough to prevent his words from misleading the other party."[101] Failure to do so, again, serves as a premise for a claim of fraud. "A misrepresentation may be made by an affirmative statement that is itself false or by concealing or not disclosing certain facts that render facts disclosed misleading."[102]

The evidence described above demonstrates that the information which these AFI and dual-hat ResCap insiders provided to the Independent Directors regarding the contemplated transaction could only be rendered non-misleading by more complete disclosure. This is

---

[98] *Thorp Credit & Thrift Co. v. Pommerer (In re Pommerer)*, 10 B.R. 935, 939 (Bankr. D. Minn. 1981) (citing *In re Schnabel*, 61 F. Supp. 386, 392 (D. Minn. 1945)); *see also* RESTATEMENT (SECOND) OF TORTS § 550 (1977) ("One party to a transaction who by concealment or other action intentionally prevents the other from acquiring material information is subject to the same liability to the other, for pecuniary loss as though he had stated the nonexistence of the matter that the other was thus prevented from discovering.").

[99] *Thomas v. Murphy*, 91 N.W. 1097, 1098 (Minn. 1902).

[100] *Abu Dhabi Commercial Bank v. Morgan Stanley & Co.*, No. 08 Civ. 7508(SAS), 2012 WL 4762039, at *3 (S.D.N.Y. Oct. 5, 2012).

[101] *Klein*, 196 N.W.2d at 622 (citation omitted); *see also Am. Computer Trust Leasing v. Boerboom Int'l, Inc.*, 967 F.2d 1208, 1212 (8th Cir. 1992) (stating that fraud occurs "when disclosure is necessary to clarify misleading information already disclosed").

[102] *Heidbreder v. Carton*, 645 N.W.2d 355, 367 (Minn. 2002) (citing *M.H. v. Caritas Family Servs.*, 488 N.W.2d 282, 289 (Minn. 1992)).

particularly true of Feldstein's May 5, 2006 note to the Independent Directors,[103] and the Walker Report.[104] Considered in the context of the 2005 Operating Agreement, which could only function as intended if all insiders dealt in good faith with the Independent Directors, partial disclosures take on added significance—even more so in light of the unqualified trust the Independent Directors held for the dual-hat AFI directors.[105]

Hence, whether viewed in light of the requirement at law not to stand idly by while the Independent Directors proceeded on the basis of mistaken knowledge, or the requirement at law not to provide only "half truth," the facts respecting this transaction appear to support the claim.

In order to succeed on a claim of fraud, the estate would have to establish scienter, i.e., false representation (or concealment) made with intent to defraud (New York) or intent to induce reliance (Minnesota). The standards are similar. "[S]hort of the defendant's own admission, the plaintiff can often prove knowing falsehood only by circumstantial evidence. Such evidence must not be merely speculative, but if it is strong enough, it is not only admissible but may meet the clear and convincing standard."[106]

Under New York law, "knowledge of falsity or reckless pretense of knowledge may establish scienter."[107] Similarly, under Minnesota law, "[t]here is no doubt of fraudulent intent when the misrepresenter knows or believes the matter is not as he or she represents it to be."[108] "Fraudulent intent is, in essence, dishonesty or bad faith. What the misrepresenter knows or

---

[103] Memorandum, Proposed Restructuring of GMAC U.S. Banking Entities, dated May 5, 2006 [EXAM10258913] (attached to E-mail from K. Sabatowski to T. Melzer and T. Jacob (May 4, 2006) [EXAM10258912]).

[104] Walker Report [RC40008925].

[105] "[W]ith respect to management that was running the company when Tom [Jacob] and I got involved . . . ResCap management and . . . [AFI] management and there were representatives of [AFI] including the chairman and CEO and the CFO and so forth that were on the board of ResCap . . . . [W]e had really the utmost confidence in those individuals and their motivations at that point in time. . . . [W]e were appropriately relying on that." Int. of T. Melzer, Mar. 22, 2013, at 17:3–15.

[106] DAN B. DOBBS, PAUL T. HAYDEN, & ELLEN M. BUBLICK, THE LAW OF TORTS § 665 (2d ed. 2012); *see also* RESTATEMENT (SECOND) OF TORTS § 525 (1977) (requiring a "purpose" of inducing reliance). Under Minnesota law, however, proof of fraud is not subject a heightened evidentiary standard. *See Humphrey v. Alpine Air Prods., Inc*., 500 N.W.2d 788, 790 (Minn. 1993) ("Minnesota common law . . . favors the use of the preponderance of the evidence standard in a civil fraud case."); *cf. Merrick Gables Ass'n, Inc. v. Hempstead*, 691 F. Supp. 2d 355, 361 (E.D.N.Y. 2010) (noting that under New York law, the clear and convincing standard applies).

[107] *Bd. of Educ. v. Sargent*, 539 N.Y.S.2d 814, 820 (N.Y. App. Div. 1989).

[108] *Noske v. Friedberg* 713 N.W.2d 866, 876 (Minn. Ct. App. 2006) (quoting *Florenzano v. Olson* 387 N.W.2d 168, 173 (Minn. 1986).

believes is the key to proof of intent. Wrongful intent, as a state of mind, is rarely proved directly, e.g. by an admission of bad faith, but is normally established through circumstantial evidence."[109]

In this regard, as already outlined, there is little question that AFI directors and ResCap directors and management with obvious loyalties to AFI had more complete knowledge of the background of the 2006 Bank Restructuring, and that the Independent Directors were knowingly kept in the dark. Marple's memorandum,[110] for example, went to Applegate, who at the time in addition to being ResCap COO and a ResCap Board member, was a board member of GMAC Mortgage Holdings LLC (a non-ResCap subsidiary of AFI). It also went to Bruce Paradis, ResCap CEO and ResCap Board member, and later a member of AFI's "Executive Committee." Marple himself had a reporting relationship to William Solomon, AFI General Counsel, who also was a recipient of the April 20, 2006 memorandum. There is no basis to conclude that the memorandum and its contents were ever shared with the Independent Directors.

Applegate's April 24, 2006 memorandum[111]—which attached a copy of Marple's April 20 "GMAC Bank Restructuring" memorandum[112] and expressed misgivings about the proposed transaction structure—was addressed to Muir (AFI President) and copied to (1) Sanjiv Khattri (AFI Board member and CFO, as well as ResCap Board member); (2) Walker (AFI CFO for Mortgage Operations, CFO and board member of GMAC Mortgage Group, as well as ResCap Board member); and (3) Paradis (member of AFI's "Executive Committee"). Karen Sabatowski (GMAC Mortgage), another recipient of Applegate's April 24, 2006 memorandum, sent Feldstein's (AFI CEO and Chairman, and ResCap Board member) May 5, 2006 "Proposed Restructuring" note to the two ResCap Independent Directors. Marple sent, and Sabatowski and Walker were copied on, the May 12, 2006 response memorandum to the questions posed by the Independent Directors and their counsel on May 10, 2006.[113]

It appears that Walker, whose report to the ResCap Board would later be the basis of the ResCap Board's vote in favor of the 2006 Bank Restructuring, did not address Marple's obvious failure to provide greater disclosure respecting voting rights for ResCap under the new structure (even though Marple himself had addressed the Operating Agreement implications in his April 20, 2006 memorandum, and Walker had been a recipient of Applegate's April 24, 2006 memorandum). In his November 20, 2006 report to the ResCap Board regarding the proposed bank restructuring, Walker made no mention of possible alternative structures, no mention of any management misgivings, and no mention of section 2(b) of the Operating Agreement. In that presentation, Walker advised that "ResCap's control over the bank would also be unchanged relative to its current position," because although

---

[109] *Florenzano*, 387 N.W.2d at 173.

[110] Memorandum, GMAC Bank Restructuring, dated Apr. 20, 2006 [EXAM11248642].

[111] Memorandum, ILC Ownership and Control, dated Apr. 24, 2006 [EXAM11248641].

[112] Memorandum, GMAC Bank Restructuring, dated Apr. 20, 2006 [EXAM11248642].

[113] Memorandum, GMAC Bank Restructuring, dated May 12, 2006 [ALLY_0401600].

"[AFI] would own 100% of the voting shares of the bank," it also owned ResCap and "control[led] the ResCap board."[114]

There is no evidence that Feldstein did anything to correct the statements in his May 5, 2006 memorandum (which also went to Applegate, Khattri, Marple, Muir, Paradis, Walker, Davee Olson, and Linda Zukauckas) implying that the transfer of voting control to AFI was a condition of the Cerberus PSA. That memorandum—which did not address the section 2(b) requirements of the Operating Agreement—advised Jacob and Melzer that "[t]he ResCap Board of Directors is prepared to approve the bank restructuring" and that the proposed structure "preserves the economics to ResCap."[115]

The November 20, 2006 ResCap board minutes reflect that the 2006 Bank Restructuring and associated 2005 Operating Agreement waiver, were (as Feldstein predicted in his May 5, 2006 note to the Independent Directors) approved by every inside ResCap board member, as well as by the two Independent Directors.[116]

The only inside ResCap board member who conceivably might be viewed as a non-AFI insider, James Giertz,[117] had very little concrete recollection of the ResCap Board's consideration regarding any aspect of the 2006 Bank Restructuring, and none at all regarding voting rights,[118] although he did state generally that "it was our duty to protect the interest of ResCap."[119] He did not recall voting for the transaction nor, when advised that there had been a unanimous vote, did he remember what if anything caused him to believe the adopted structure was appropriate.[120] Zukauckas (ResCap board member and AFI official) said that

---

[114] Walker Report, at 9–10 [RC40008925]. Applegate thought Walker was correct as regards control of the ResCap Board and "was never confused on who ultimately called the shots." Int. of D. Applegate, Dec. 7, 2012, at 242:24–243:2. When interviewed, the Independent Directors were equivocal as to whether they agreed with Walker's explanation. Jacob said: "[W]e concluded that the control of the bank essentially remained unchanged because although [AFI] had the 100 percent voting rights [AFI] also owned 100 percent of ResCap and controlled the ResCap board." Int. of T. Jacob, Apr. 17, 2013, at 76:6–10. And Melzer said that "the reality is that [AFI] controlled that bank both before and after." Int. of T. Melzer, Mar. 22, 2013, at 88:17–89:15. Yet, in an earlier interview Melzer expressed disagreement. *See* Int. of T. Melzer, Oct. 10, 2012, at 207:14–18 ("[Q:] Do you agree with that statement? [A:] No. No, not if you're sitting there looking after the interests of ResCap's creditors."); *see also id.* at 208:7 ("[I]n terms of control, there is a change. . . . Because of the voting/nonvoting securities.").

[115] Memorandum, Proposed Restructuring of GMAC U.S. Banking Entities, dated May 5, 2006, at 2 [EXAM10258913] (attached to E-mail from K. Sabatowski to T. Melzer and T. Jacob (May 4, 2006) [EXAM10258912]).

[116] Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Nov. 20, 2006, at RC40006837–40 [RC40006748].

[117] Giertz had a dotted line reporting relationship to AFI's Khattri, however. *See* Int. of J. Giertz, Jan. 25, 2013, at 19:17–20.

[118] *Id.* at 64:5–79:12.

[119] *Id.* at 69:15–23.

[120] *Id.* at 78:22–79:12.

she did not know why AFI obtained all of the voting rights in the 2006 Bank Restructuring and acknowledged that she did not recall "any probing" by the ResCap Board on that aspect of the transaction.[121]

Non-board members Marple, Solomon, and Sabatowski were present at the November 20, 2006 ResCap Board meeting.[122] Despite a notation in the minutes that there had been "full and robust deliberation" of the proposed restructuring (which was presented by Sabatowski),[123] Jacob said that nobody ever mentioned to him any possibility of structuring the transaction in way that would preserve a voting interest in Ally Bank for ResCap or indeed that any alternative structure may have been possible.[124] The proposal for 100% voting ownership to AFI—as reflected in Feldstein's May 5, 2006 memorandum—was the only structure ever shared by ResCap or AFI management with the Independent Directors.[125]

Jacob said that he and Melzer concluded that ResCap was receiving "fair value" in the transaction because its approval would allow the Cerberus PSA to close.[126] Indeed, it is apparent that Melzer and Jacob viewed the 2006 Bank Restructuring—as structured—to be part and parcel of the Cerberus PSA, and that they believed that without closing the bank transaction—as structured—the Cerberus PSA would not close either. Melzer said that he "didn't look at the bank transaction as a separate transaction"[127] and that "[d]oing that transaction enabled the Cerberus transaction."[128] They did not consider putting a value on the lost control.[129] Because they believed ResCap was receiving "fair value" in the transaction, Jacob explained the Independent Directors did not believe they were waiving section 2(b) of the 2005 Operating Agreement (contrary to the explanation appearing in Marple's memorandum, which they never saw, and not mentioned in the Walker Report, which they did see).[130]

These observations are consistent with comments from Schenk, who was counsel to the Independent Directors regarding their consideration of the 2006 Bank Restructuring: "We

---

[121] Int. L. Zukauckas, Oct. 19, 2012, at 161:9–18.

[122] Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Nov. 20, 2006, at RC40006837 [RC40006748].

[123] *Id.* at RC40006839.

[124] *See* Int. of T. Jacob, Apr. 17, 2013, at 59:24–60:16, 70:7–22; *see also* Int. of T. Melzer, Mar. 22, 2013, at 74:6–9.

[125] *See* Int. of T. Jacob, Apr. 17, 2013, at 71:14–72:4; *see also* Int. of T. Melzer, Mar. 22, 2013, at 85:18–19 ("What was presented to us was really the model that was ultimately approved.").

[126] *See* Int. of T. Jacob, Apr. 17, 2013, at 76:1–5, 77:13–19.

[127] Int. of T. Melzer, Mar. 22, 2013, at 80:6–7. "[W]e didn't look at the arm's-length and fair value narrowly in the context of just the bank transfer." *Id*. at 82:8–10.

[128] *Id.* at 82:14–15.

[129] *See* Int. of T. Jacob, Apr. 17, 2013, at 77:9–19.

[130] *Id.* at 81:12–25. Yet, Jacob recalled that they did waive the "arms-length" requirement. *Id*. at 82:7–13.

would have been looking . . . at the entirety of the circumstances surrounding the sale."[131] As Schenk explains it, the 2006 Bank Restructuring could only have closed on the terms presented, and the interests of ResCap's creditors were protected because absent the transaction, the Cerberus PSA would fail, leading to a series of detrimental events.[132] She saw the benefits of the Cerberus transaction as immediate,[133] while the consequences of the loss of ownership rights were remote.[134] In hindsight, such comments from the Independent Directors and their counsel may suggest a lack of purposefulness in thinking through the loss of control,[135] and perhaps a degree of post-hoc rationalization. They do not, however, change the evident facts that the Independent Directors were not advised of Marple's conclusions,[136] did not know of Applegate's misgivings,[137] and were faced with evaluating the 2006 Bank Restructuring (as presented) as a sole option,[138] inextricably connected to the success or failure of the Cerberus investment.[139]

As already observed, AFI officials in control of the transaction and related communications with the Independent Directors included the chief architects and proponents of the sale of 51% of AFI to Cerberus—Feldstein and Walker. Given the contents of Marple's memorandum[140] and Applegate's memorandum,[141] they had reason to fear that the Independent Directors would find that the transaction was not in the best interests of ResCap

---

[131] Int. of E. Schenk, Apr. 24, 2013, at 69:14–16.

[132] *Id.* at 78:21–79:13 ("The Cerberus transaction would not have gone through . . . . They would have stayed out of the GM family. They would have been downgraded appropriately. . . . to non-investment grade. . . . Then your access to funds is really depleted. And . . . likely they would end up having to sell off ResCap's assets in a fire sale . . . . And at the end of the day that was not in the best interest of ResCap.").

[133] *Id.* at 70:4–10 ("And so, we had an opportunity . . . for ResCap to improve its position from what would . . . at that point be the inevitable conclusion that its rating would be downgraded . . . which would have been devastating to ResCap.").

[134] *Id.* at 77:14–23 ("The voting versus non-voting . . . certainly that is a difference. . . . But at the end of the day, I'm not sure it made much difference, particularly since ResCap was a subsidiary of [AFI].").

[135] *Id.* at 82:11–15 ("So the change of ownership [to] an economic-only ownership from one that had also the voting side of things was not necessarily considered to be a particularly significant change.").

[136] *E.g., id.* at 53:24–54:1 ("[Q:] Did Mr. Marple ever convey that view to you? [A:] No.").

[137] *E.g., id.* at 55:13–14 ("I don't recall any of these specific arguments being discussed with me.").

[138] "I remember the transaction being presented as this is the transaction . . . there was no presentation of alternatives . . . ." *Id.* at 35:24–36:5.

[139] "The transaction was presented to us as a package, and we were evaluating the transaction as a package." *Id.* at 87:1–3.

[140] "However, ResCap will not be given any voting control with regard to either these material business activities or the entity itself. It is not reasonable to believe that ResCap's leadership would agree to transfer a material business to a third party under a similar arrangement." Memorandum, GMAC Bank Restructuring, dated Apr. 20, 2006, at 4 [EXAM11248642].

[141] Memorandum, ILC Ownership and Control, dated Apr. 24, 2006 [EXAM11248641].

and its creditors.[142] And the evidence shows that important information was withheld or provided in an incomplete and, therefore, misleading manner. It is clear that the Independent Directors were never privy to any discussion with management on the subject of voting control.[143] While Walker said that he does not recall whether the notion of a transaction that preserved voting rights for ResCap was discussed with the Independent Directors[144] he emphasized that "the Toms [Jacob and Melzer] were smart, independent, thoughtful, thorough people. . . . they were not pushovers."[145] Ultimately, such comments support the conclusion that the Independent Directors did not know that other structures were possible and had actually been considered by management, and that as "independent, thoughtful, thorough people" they would have been able to better protect the "interest of ResCap, including its creditors"[146] had such information not been withheld.

Were a fraud action viable, damages could be substantial, likely amounting to not less than the Fair Market Value shortfall of between $390 to $465 million,[147] and perhaps as much as the difference between the equity value of ResCap's interest in Old GMAC Bank, which it transferred, and the equity interest in IB Finance, which it received, i.e., between $533 and $608 million.[148]

### (4) Conclusion As To Fraud Claim

While a close question, the Examiner concludes that, particularly in light of the threshold issues under the *Wagoner* rule and the *in pari delicto* doctrine, it is more likely than not that a claim by the estate against AFI for fraud arising from the 2006 Bank Restructuring would not prevail.

### c.   Breach Of Contract

Under section 2(b) of the 2005 Operating Agreement, ResCap was prohibited from engaging in material transactions with AFI "unless such transactions [were] on terms and conditions that are consistent with those that parties at arm's-length would agree to and for

---

[142] "The proposed restructuring of [Old] GMAC Bank raises potential conflicts under ResCap's Operating Agreement. While these conflicts could be waived . . . any such amendment would require the affirmative vote of both of ResCap's independent directors. This approval cannot be assured . . . ." Memorandum, GMAC Bank Restructuring, dated Apr. 20, 2006, at 1 [EXAM11248642].

[143] *See* Int. of T. Melzer, Mar. 22, 2013, at 89:22–25.

[144] "I'm saying I don't recall whether they were presented with that." Int. of D. Walker, Nov. 28, 2012, at 147:22–23.

[145] *Id.* at 148:3–7.

[146] 2005 Operating Agreement, § 8 [ALLY_0140795].

[147] *See* Section V.A.2.b; Appendix V.A.2.b. These figures take into account $143 million on the value received side, accounting for the avoidance of a credit rating downgrade. *See id.*

[148] *See* Section V.A.2.b; Appendix V.A.2.b.

fair value."[149] As reflected in Marple's memorandum,[150] and given the conclusion in Section V.A.2.b regarding fair value, there is little question that the 2006 Bank Restructuring did not comply with this restriction, and no exception under the 2005 Operating Agreement was applicable.[151] The facts surrounding the transaction demonstrate that the AFI and ResCap insiders had material information regarding the transaction that was not completely and accurately shared with the Independent Directors. Accordingly, although the ResCap Board, including the Independent Directors, resolved to waive the provisions of the 2005 Operating Agreement, as permitted by section 8 of the 2005 Operating Agreement,[152] from the perspective of the Independent Directors the waiver was not "knowing," a requirement for any waiver to be valid.[153]

This section considers whether ResCap's estate has a viable claim against AFI for breach of the 2005 Operating Agreement in connection with the 2006 Bank Restructuring. Such a claim is unlikely to be time-barred,[154] assuming the accrual date was November 22, 2006 (when the 2006 Bank Restructuring closed) or any date later than May 14, 2006 (six years before the Petition Date).[155]

### *(1) The Claim And Its Elements*

To establish breach of contract, New York requires proof of four elements: (1) existence of a contract; (2) performance under the contract by the plaintiff; (3) breach by the defendant; and (4) that the plaintiff was damaged as a result.[156] As with the fraud claim potentially arising

---

[149] 2005 Operating Agreement, § 2(b) [ALLY_0140795].

[150] Memorandum, GMAC Bank Restructuring, dated Apr. 20, 2006 [EXAM11248642].

[151] *See* 2005 Operating Agreement, § 2(c) [ALLY_0140795].

[152] "[N]o amendment or waiver that materially and adversely affects the rights of any Class of Rated Indebtedness shall become effective unless such amendment or waiver as been approved by a majority of the members of ResCap's Board of Directors, including a majority of the Independent Directors. In acting or otherwise voting on matters referred to in this Section 8 that materially and adversely affect the rights of any Class of Rated Indebtedness, to the fullest extent permitted by law, the Independent Directors shall consider only the interest of ResCap, including its creditors." *Id.* § 8.

[153] *See generally Gen. Motors Acceptance Corp. v. Clifton-Fine Cent. Sch. Dist.*, 647 N.E.2d 1329, 1331 (N.Y. 1995); *Nassau Trust Co. v. Montrose Concrete Prods. Corp.*, 436 N.E.2d 1265, 1269–70 (N.Y. 1982) (stating that contractual rights may be waived if they are knowingly, voluntarily and intentionally abandoned); *Weeks Dredging & Contracting, Inc. v. Hendry Corp.*, No. 84 CIV 2424 (CSH), 1988 U.S. Dist. LEXIS 3482, at *8–9 (S.D.N.Y. Apr. 21, 1988).

[154] *See* 2005 Operating Agreement, § 13 [ALLY_0140795] (specifying that New York law governs); *Notaro v. Sterling Transp. Servs., LLC*, 943 N.Y.S.2d 793 (Table) (N.Y. Sup. Ct. 2012) ("New York courts will generally enforce a clear and unambiguous choice-of-law clause contained in an agreement so as to give effect to the parties' intent."). The applicable statute of limitation is six years. *See* N.Y. C.P.L.R. § 213(2).

[155] ResCap's estate generally has at least two years from the Petition Date to commence an action that ResCap could have brought on the Petition Date. *See* 11 U.S.C. § 108(a).

[156] *See JP Morgan Chase v. J.J. Elec. of N.Y., Inc.*, 893 N.Y.S.2d 237, 239 (N.Y. App. Div. 2010).

from the same operative facts, a breach of contract claim would be subject to challenge based on the *Wagoner* rule and the *in pari delicto* doctrine. In addition, two specific terms of the agreement present impediments to an action for breach of contract: (1) the "sole obligation"[157] provision; and (2) the "sole remedy"[158] provision.

### (2) Standing (The Wagoner Rule) And In Pari Delicto

When a contract claim arises from and involves the same underlying facts as a fraud claim, the contract claim likewise is subject to the *Wagoner* rule and *in pari delicto*.[159] The analysis of the *Wagoner* rule and *in pari delicto* as to the breach of contract claim is thus the same as provided in Section VII.L.2.b.(2). The Examiner accordingly concludes that, while a close question, it is more likely than not that a claim by the estate against AFI for breach of the 2005 Operating Agreement arising from the 2006 Bank Restructuring would be precluded by these doctrines. In the event a court were to conclude differently, the breach of contract claim is also considered on the merits in the following Sections.

### (3) "Sole Obligation"

An obstacle to the estate's breach of contract claim is presented by the prescription of section 7 of the 2005 Operating Agreement, establishing that AFI's "sole obligation"[160] thereunder is "to comply with the Independent Director provisions of Section 2(g) and the provisions of Sections 2(h) and 2(i)."[161] Specifically, section 2(g) requires only that AFI appoint at least two Independent Directors, promptly fill any vacancies, and not bring any action for breach of fiduciary duty against any Independent Director for acting pursuant to the provisions of the Operating Agreement.[162] In short, AFI's conduct surrounding the 2006 Bank Restructuring does not appear to have violated any explicit obligation under the 2005 Operating Agreement, because AFI's undertaking was limited to those specific obligations referenced in section 2(g).

Notwithstanding the difficulty in identifying any breach of an express contractual obligation by virtue of the "sole obligation" clause, the 2005 Operating Agreement incorporates an implied covenant of good faith and fair dealing, as do all contracts governed by New York law.[163] Under New York law, the duty of good faith and fair dealing establishes

---

[157] 2005 Operating Agreement, § 7 [ALLY_0140795].

[158] *Id.*

[159] *See Mediators, Inc. v. Manney (In re Mediators, Inc.)*, 105 F.3d 822, 827 (2d Cir. 1997); *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1092–94 (2d Cir. 1995); *Ernst & Young v. Bankr. Servs., Inc. (In re CBI Holding Co.)*, 318 B.R. 761, 765–66 (S.D.N.Y. 2004), *aff'd in part and rev'd in part*, 529 F.3d 432 (2d Cir. 2008); *see also State v. AAMCO Automatic Transmissions, Inc.*, 199 N.W.2d 444, 448 (Minn. 1972).

[160] 2005 Operating Agreement, § 7 [ALLY_0140795].

[161] *Id.*

[162] *Id.* § 2(g)(i). Sections 2(h) and 2(i), which relate to AFI's financial statements and to AFI's obligation to hold ResCap and its subsidiaries out as separate and distinct legal entities, are not relevant to this analysis.

[163] *See generally Fleisher v. Phoenix Life Ins. Co.*, 858 F. Supp. 2d 290, 298–88 (S.D.N.Y. 2012); *Spread Enters., Inc., v. First Data Merch. Servs. Corp.*, No. 11-CV-4743 (ADS) (ETB), 2012 WL 3679319, at *3 (E.D.N.Y. Aug. 22, 2012).

that "neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract."[164] The duty of good faith and fair dealing "protects the promisee not against a breach of the express terms of a contract but of the reasonable expectations and inferences otherwise derived from the agreement.[165]

A claim based on a breach of the duty of good faith and fair dealing "may be brought . . . only where one party's conduct, though not breaching the terms of the contract in a technical sense, nonetheless deprived the other party of the benefit of its bargain."[166] Here, it would be reasonable for ResCap to expect that AFI, including any officials with dual ResCap affiliation, would exhibit candor in disclosing to the Independent Directors information related to a transaction covered by sections 2(b) and 8 of the 2005 Operating Agreement.[167] All insiders were undoubtedly aware that the Independent Directors were dependent upon them for information. While the explicit terms of the 2005 Operating Agreement do not require AFI to have exhibited candor in its dealings with the Independent Directors, absent such candid disclosures the Independent Directors would be hindered in their ability to evaluate such a transaction and the associated waivers under the 2005 Operating Agreement, particularly in their ability to "consider only the interests of ResCap, including its creditors."[168]

Such a failure to more candidly inform the Independent Directors could not form the basis for a claim of breach of an explicit contract term against AFI, due to the "sole obligation" limitation. Whether an action based on the duty of good faith and fair dealing could be premised on such failings by AFI is debatable. Indeed, actions based on the duty of good faith and fair dealing rarely survive a motion to dismiss because they are generally

---

[164] *Fleisher*, 858 F. Supp. 2d at 298–99 (citations omitted).

[165] *Net2Globe Int'l, Inc. v. Time Warner Telecom of N.Y.*, 273 F. Supp. 2d 436, 467 (S.D.N.Y. 2003) (citing *Sauer v. Xerox Corp.*, 95 F. Supp. 2d 125, 132 (W.D.N.Y. 2000)).

[166] *Sauer*, 95 F. Supp. 2d at 132.

[167] *See, e.g., Hampshire Grp., Ltd. v. Kuttner*, No. 3607-VCS, 2010 WL 2739995, at *13 (Del. Ch. July 12, 2010) (noting fiduciaries have a duty to inform other fiduciaries of information material to the affairs of the corporation). In view of their "duty of candor," the Delaware Supreme Court has recognized that "[a]t a minimum . . . fiduciaries, corporate or otherwise, may not use superior information or knowledge to mislead others in the performance of their own fiduciary obligations." *Mills Acquisition Co. v. Macmillan, Inc.,* 559 A.2d 1261, 1283 (Del. 1989); *see generally* Section VII.E.2.a.(1) (concluding that, while not certain under Delaware law, ResCap insiders likely did not have a fiduciary duty of disclosure to the Independent Directors). Without suggesting that there is an actionable fiduciary duty from AFI to ResCap, the overlapping presence of AFI officials and managers on the ResCap Board informs the Examiner's understanding of the standard of conduct one would expect when such officials interact with the Independent Directors.

[168] 2005 Operating Agreement, § 8 [ALLY_0140795].

viewed as duplicative of a claim for breach of the explicit terms of the contract.[169] That is not always the case, however.[170] On balance, the Examiner concludes that while it is a close question, it is more likely than not that a court would find in these circumstances that AFI's conduct amounted to a breach of the covenant of good faith and fair dealing.

### (4) "Sole Remedy"

The 2005 Operating Agreement includes a second provision which may preclude ResCap from recovering on a breach of contract claim against AFI. Section 7 of the 2005 Operating Agreement specifies that the "sole remedy" available from AFI is "specific performance."[171] Such a remedy is at this point unlikely to be of value to the estate. Section 7 also specifies: "Under no circumstances shall . . . [AFI] be liable for damages for breach of this Agreement."[172]

Contractual liability limitations are presumptively enforceable, as the manifestation of the parties' bargain.[173] That presumption may in some circumstances be overcome in the case of a "special relationship between the parties."[174] Moreover, "an exculpatory agreement, no matter how flat and unqualified its terms, will not exonerate a party from liability under all circumstances."[175]

---

[169] *See, e.g.*, *Fleisher v. Phoenix Life Ins. Co.*, 858 F. Supp. 2d 290, 299 (S.D.N.Y. 2012) (stating that a court will dismiss as "redundant" or "duplicative" a claim for breach of the covenant of good faith and fair dealing "where the conduct allegedly violating the implied covenant is also the predicate for breach of covenant of an express provision of the underlying contract.").

[170] *See JFK Family Ltd. P'ship v. Millbrae Natural Gas Dev. Fund 2005, L.P.*, 873 N.Y.S.2d 234, 234 (N.Y. Sup. Ct. 2008). The JFK decision relies in part upon *Fitzgerald v. Cantor*, 1998 Del. Ch. LEXIS 212, at *4–6 (Del. Ch. 1998). Both cases denied defendant's motion to dismiss a claim for breach of the covenant of good faith and fair dealing. *See also Travelers Int'l, A.G. v. Trans World Airlines, Inc.*, 41 F.3d 1570, 1577 (2d Cir. 1994) (confirming judgment finding liability for breach of the covenant of good faith and fair dealing); *House of Diamonds v. Borgioni, LLC*, 737 F. Supp. 2d 162, 169–71 (S.D.N.Y. 2010) (granting summary judgment for breach of covenant of good faith and fair dealing).

[171] 2005 Operating Agreement, § 7 [ALLY_0140795].

[172] *Id.*

[173] *See Metro. Life Ins. Co. v. Noble Lowndes Int'l, Inc.,* 643 N.E.2d 504, 507 (N.Y. 1994)

[174] *Peluso v. Tauscher Cronacher Prof'l Eng'rs, P.C.*, 704 N.Y.S.2d 289, 290 (N.Y. App. Div. 2000).

[175] *Kalisch-Jarcho, Inc. v. City of N.Y.*, 448 N.E.2d 413, 416 (N.Y. 1983) (finding limitation on contractor's delay damages could be invalidated on showing that city acted in bad faith and with deliberate intent delayed the plaintiff in the performance of its obligation).

The standard for overcoming a liability limitation is a high one—i.e., "conduct that evinces a reckless indifference to the rights of others."[176] Thus:

> [A]n exculpatory agreement . . . will not exonerate a party from liability under all circumstances. . . . [I]t will not apply to exemption of willful or grossly negligent acts . . . [or when] the misconduct for which it would grant immunity smacks of intentional wrongdoing. This can be explicit, as when it is fraudulent, malicious or prompted by the sinister intention of one acting in bad faith. Or when, as in gross negligence, it betokens a reckless indifference to the rights of others, it may be implicit.[177]

Given the purposes of the 2005 Operating Agreement, the dependence of the Independent Directors (and the third-party beneficiaries) upon the good faith and candor of the insiders in order to fulfill their role in effectuating that purpose, and the evident lack of candor by, for example, Feldstein and Walker, AFI's conduct appears to "smack[ ] of intentional wrongdoing," and as discussed in Section VII.L.1.b above, was arguably fraudulent.

There are countervailing considerations, however. For example, the importance of closing the Cerberus PSA in order to prevent a detrimental credit rating downgrade for both AFI and its ResCap subsidiary may present a partial, and credible, explanation for the conduct of the inside directors and others who had loyalties to AFI. Acting out of expediency or even carelessness is not necessarily "reckless indifference to the rights of others."[178]

### (5) Conclusion As To Breach Of Contract Claim

While a close question, the Examiner concludes that particularly in light of the threshold issues under the *Wagoner* rule and the *in pari delicto* doctrine, it is more likely than not that a claim by the estate against AFI for breach of either the express terms of the 2005 Operating Agreement and/or the covenant of good faith and fair dealing thereunder, arising from the 2006 Bank Restructuring, would not prevail.

---

[176] *Sommer v. Fed. Signal Corp.*, 593 N.E.2d 1365, 1370–71 (N.Y. 1992) (placing as a jury question whether alarm company's failure to report alarm amounted to "reckless indifference" which would overcome contractual liability limitation). *See also Castagna, & Son, Inc. v. Bd. of Educ.*, 570 N.Y.S.2d 286, 287 (N.Y. App. Div. 1991) (finding despite no-damages-for-delay clause, "plaintiffs have presented sufficient evidence to raise triable issues of fact as to whether the delay damages were caused by the Board's bad faith, or its willful, malicious or grossly negligent conduct with respect to its performance under the parties' contract").

[177] *Net2Globe Int'l, Inc. v. Time Warner Telecom of N.Y., 273* F. Supp. 2d 436, 450 (S.D.N.Y. 2003) (quoting *Kalisch-Jarcho, Inc.,* 448 N.E.2d at 416–17.

[178] *Kalisch-Jarcho, Inc.*, 448 N.E.2d at 416–17; *cf. Deutsche Lufthansa AG v. Boeing Co.*, No. 06 CV 7667 (LBS), 2007 U.S. Dist. LEXIS 9519, at *8–11 (S.D.N.Y. Feb. 2, 2007) (finding that defendant had not acted with "purpose of injuring [plaintiff]" and therefore enforcing $100,000 damages limit even though plaintiff spent over $1 million preparing to meet supply needs of defendant, who had not disclosed to plaintiff that it was considering exiting business line).

Were a breach of contract action viable here, damages could be substantial:

> It is well settled that in breach of contract actions "the nonbreaching party may recover general damages which are the natural and probable consequence of the breach." Special, or consequential damages, which "do not so directly flow from the breach," are also recoverable in limited circumstances. . . . "[I]n order to impose on the defaulting party a further liability than for damages [which] naturally and directly [flow from the breach], i.e., in the ordinary course of things, arising from a breach of contract, such unusual or extraordinary damages must have been brought within the contemplation of the parties as the probable result of a breach at the time of or prior to contracting."[179]

As noted, the Fair Market Value shortfall was between $390 to $465 million.[180] These figures take into account $143 million on the value-received side, accounting for the avoidance of a credit rating downgrade.[181] More broadly, the difference between the equity value of ResCap's interest in Old GMAC Bank, which it transferred, and the equity interest in IB Finance, which it received, was between $533 and $608 million.[182] Damages for breach of contract in this instance are most likely to fall within one of these ranges, corresponding to the terms which ResCap could and likely would have achieved had the breach not occurred, such that the Independent Directors would have been prompted to obtain a valuation of the transaction and press for a more fair outcome.[183]

### d. Tortious Interference With Contract

The elements of tortious interference with contract under the law of New York and Minnesota are substantially similar. Under Minnesota law, the elements are: "'(1) the existence of a contract; (2) the alleged wrongdoer's knowledge of the contract; (3) intentional

---

[179] *Bi-Economy Mkt., Inc. v. Harleysville Ins. Co. of N.Y.*, 886 N.E.2d 127, 130 (N.Y. 2008) (quoting *Kenford Co. v. Cnty. of Erie*, 537 N.E.2d 176, 178 (N.Y. 1989); *Am. List Corp. v. U.S. News & World Report, Inc.*, 549 N.E.2d 1161, 1164 (N.Y. 1989)).

[180] *See* Section V.A.2.b; Appendix V.A.2.b.

[181] *See* Section V.A.2.b.

[182] *See* Section V.A.2.b; Appendix V.A.2.b.

[183] As the valuation performed in the course of the Investigation demonstrates, such damages are capable of measurement, and a valuation could have been done in connection with the 2006 Bank Restructuring. Damages which are too speculative may not be recovered. *Kenford Co. v. Cnty. of Erie*, 493 N.E.2d 234, 235 (N.Y. 1986) (affirming denial of damages for loss of future profits as too speculative). *But see Vidas Cousins Realty Corp. v. PB & J Assocs., Inc.*, SP 005616/07, 39 Misc. 3d 1204(A) (N.Y. Dist. Ct. Apr. 1, 2013) (finding loss of future profit caused by the landlord's failure to repair a leaking roof, requiring a business to close, may be recoverable if the loss is "capable of proof with reasonable certainty").

procurement of its breach; (4) without justification; and (5) damages.'"[184] Under New York law, the elements are: "(1) the existence of a valid contract between plaintiff and a third party; (2) the defendant's knowledge of the contract; (3) the defendant's intentional procuring of the breach; and (4) damages."[185] Fatal to a claim of tortious interference with the 2005 Operating Agreement in either jurisdiction is the established rule that only a third party, unrelated to the contract, may be liable for tortious interference. "Plaintiffs cannot state a claim for tortious interference against one of the contracting parties."[186] Accordingly, the Examiner concludes that is unlikely that an estate claim against AFI for tortious interference with the 2005 Operating Agreement, arising from conduct surrounding the 2006 Bank Restructuring, would prevail.[187]

---

[184] *E-Shops Corp. v. U.S. Bank Nat'l Ass'n*, 678 F.3d 659, 664 (8th Cir. 2012) (quoting *Furlev Sales & Assocs., Inc. v. N. Am. Auto. Warehouse, Inc*., 325 N.W.2d 20, 25 (Minn. 1982)).

[185] *Foster v. Churchill*, 665 N.E.2d 153, 156 (N.Y. 1996); s*ee also Maillet v. Frontpoint Partners, LLC*, No. 02 Civ. 7865 (GBD), 2003 WL 21355218, at *2 (S.D.N.Y. 2003).

[186] *Maillet,* 2003 WL 21355218, at *2 (quotation and citations omitted); *Shearin v. E.F. Hutton Grp., Inc.* 652 A.2d 578, 590 (Del. Ch. 1994); *Bouten v. Richard Miller Homes, Inc*., 321 N.W.2d 895, 900–01 (Minn. 1982); *see generally* DAN B. DOBBS, PAUL T. HAYDEN, AND ELLEN M. BUBLICK, THE LAW OF TORTS § 635 (2d ed. 2012) ("[O]nly a stranger can commit the tort of interference with contract.").

[187] The *Wagoner* rule would likely also apply and, under the law of New York but not of Minnesota, *in pari delicto* might also present a defense to a tortious interference action by the estate against AFI. S*ee BrandAid Mktg. Corp. v. Biss*, 462 F.3d 216, 218–19 (2d Cir. 2006); *Bieter Co. v. Blomquist*, 848 F. Supp. 1446, 1451 (D. Minn. 1994). The applicable New York statute of limitations is three years. *See* N.Y. C.P.L.R. § 214(4). Under Minnesota law, the statute of limitations is six years. *See* MINN. STAT. § 541.05 (2000); *see also Wallin v. Minn. Dep't of Corrs.*, 598 N.W.2d 393, 401 (Minn. Ct. App. 1999).

2. *Contractual Claims Related To The MMLPSA, Pipeline Swap, MSR Swap, And Broker Agreement*

The parties' dealings in connection with the MMLPSA, Pipeline Swap, MSR Swap, and Broker Agreement, detailed in Section V.B, give rise to the following potential contractual claims:

> (1) Claims concerning representation and warranty liabilities under the 2001 and 2006 MMLPSAs;
>
> (2) Claims that entry into various of these agreements or amendments thereto violated the pertinent Operating Agreement because the Independent Directors did not waive the arm's length and fair value requirements for affiliate transactions;
>
> (3) Claims that application of the Pipeline Swap to the period from funding to sale and to brokered loans violated the terms of that agreement;
>
> (4) Claims that revenues on loans GMAC Mortgage brokered to Ally Bank were misallocated; and
>
> (5) Claims under the MSR Swap that Ally Bank improperly failed to pay GMAC Mortgage the value of correspondent-loan MSRs and purchased MSRs.

Each of these claims is analyzed below.

a. *Contractual Representation And Warranty Liabilities Under The 2001 And 2006 MMLPSAs*

As discussed in Sections V.B.3.a(4) and V.B.3.b(3), under the 2001 MMLPSA as written, Old GMAC Bank provided representations and warranties for all mortgage loans, while under the 2006 MMLPSA as written, Ally Bank provided representations and warranties for Second Lien Loans[188] only. ResCap/GMAC Mortgage assumed financial responsibility in later years for repurchase and representation and warranty liabilities on loans purchased from Old GMAC Bank and Ally Bank under the MMLPSA, e.g., when ResCap entered into settlements with Fannie Mae and Freddie Mac in 2010.[189] The discussion that follows addresses whether ResCap/GMAC Mortgage have claims against AFI and/or Ally Bank with respect to such liabilities.

_____

[188] As used in this Section, "Second Lien Loan" shall mean: (1) an individual mortgage loan secured by a mortgage that creates a second priority lien upon the pledged collateral; (2) a HELOC; and/or (3) in the context of an MMLPSA, a "Second Lien Mortgage Loan" as defined in the applicable MMLPSA.

[189] *See* Section III.I (discussing the Fannie Mae and Freddie Mac settlements).

*(1) Representation And Warranty Liabilities Under The 2001 MMLPSA*

For the reasons detailed below, the Examiner concludes that any claim against AFI or Ally Bank for loan representations and warranties under the 2001 MMLPSA is not likely to prevail.

*(a) Successor Liability And Indemnification Theories Are Not Likely To Prevail*

As discussed in Section V.B.3.a(6), the 2001 MMLPSA was not assumed by Ally Bank in the 2006 Bank Restructuring.[190] Accordingly, to assert a contractual claim against AFI or Ally Bank with respect to loans purchased under the 2001 MMLPSA, ResCap would have to show either that (1) Ally Bank is responsible for the liabilities of Old GMAC Bank under a theory of successor liability; or (2) AFI is responsible for Old GMAC Bank's liabilities under (a) the indemnification provided in connection with the OTS approval of the 2006 Bank Restructuring or (b) the indemnification provisions of the 2005 Operating Agreement or the 2006 Amended Operating Agreement.

*(i) Successor Liability*

*(A) Choice Of Law*

In the Second Circuit, the choice-of-law rules of the forum state apply to claims premised on state law, unless state law would conflict with a federal policy or interest.[191] Thus, New York choice-of-law principles will apply to any successor-liability claim here because of the apparent absence of any federal interest and the pendency of the Chapter 11 Cases in the Southern District of New York.

In New York, "[t]he first step in any case presenting a potential choice of law issue is to determine whether there is an actual conflict between the laws of the jurisdictions involved."[192] If the laws of the relevant jurisdictions are substantively the same, a court may

---

[190] Minutes of a Regular Meeting of the Board of Directors of GMAC Bank, Nov. 30, 2006, at 2 [ALLY_PEO_0020880]; Review of GMAC Bank Affiliate Agreements Assigned from GMAC Bank FSB to GMAC Bank ILB, dated Nov. 30, 2006, at ALLY_0260095–97 [ALLY_0260087]; Purchase and Assumption Agreement, Sched. B [ALLY_PEO_0021066].

[191] *Bianco v. Erkins (In re Gaston & Snow)*, 243 F.3d 599, 601–02 (2d Cir. 2001) ("Because federal choice of law rules are a type of federal common law, which federal courts have only a narrow power to create, we decide that bankruptcy courts confronting state law claims that do not implicate federal policy concerns should apply the choice of law rules of the forum state."). "[W]here (1) the claim before the bankruptcy court is wholly derived from another legal claim already pending in a parallel, out-of-state, non-bankruptcy proceeding; and (2) the pending original, or 'source,' claim was filed in a court prior to the commencement of the bankruptcy case, bankruptcy courts should apply the choice of law rules of the state where the underlying prepetition claim was filed." *Statek Corp. v. Dev. Specialists, Inc.* (*In re Coudert Bros. LLP*), 673 F.3d 180, 182 (2d Cir. 2012).

[192] *In re Allstate Ins. Co.*, 613 N.E.2d 936, 937 (1993). An actual conflict is present "[w]here the applicable law from each jurisdiction provides different substantive rules." *Curley v. AMR Corp.*, 153 F.3d 5, 12 (2d Cir. 1998).

avoid the choice-of-law analysis.[193] However, if there is a conflict, New York courts apply an "interest analysis" in order to determine which state law governs a successor liability claim.[194] In applying the interest analysis to successor-liability claims, New York courts enforce the law of the state in which the defendant was formed, unless the law of that state is the same as New York law.[195] In this case, the state of incorporation of the potential defendant, Ally Bank, is Utah.

While Utah successor-liability law is less robust than New York law in certain respects, both Utah and New York apply the four traditional exceptions to the general rule that a successor entity that acquires the assets of another is not liable for the obligations of the predecessor entity: (1) where the successor expressly assumed the debt at issue; (2) the transaction constitutes a de facto merger; (3) the successor is a mere continuation of the predecessor; or (4) the transaction was entered into fraudulently to escape obligations of the predecessor.[196] As discussed in more detail below, although Utah and New York law differ with respect to the de facto merger exception, they appear to be consistent with respect to the other three exceptions.

### (B) Exceptions To The General Rule Of No Successor Liability

For the reasons detailed below, the Examiner concludes that each of the four exceptions is likely to be held inapplicable here, so that Ally Bank is unlikely to be held liable on a successor-liability theory.

### i.    Assumption Of Liability

While Utah courts recognize the assumption of liability exception to the general rule of no successor liability, there is no case under Utah law that explains or analyzes the application

---

[193] *See Curley*, 153 F.3d at 12 (citing *J. Aron & Co. v. Chown*, 231 A.D.2d 426 (N.Y. Sup. Ct. 1996)) ("It is only when it can be said that there is no actual conflict that New York will dispense with a choice of law analysis.").

[194] *Planet Payment, Inc. v. Nova Info. Sys., Inc.*, No. 07-cv-2520, 2011 WL 1636921, at *6 (E.D.N.Y. Mar. 31, 2011) (citing *Fin. One Pub. Co. Ltd. v. Lehman Bros. Special Fin., Inc.*, 414 F.3d 325, 336 (2d Cir. 2005)).

[195] *Hayden Capital USA, LLC v. Northstar Agri Indus., LLC*, 2012 WL 1449257, at *7 (S.D.N.Y. April 23, 2012); *U.S. Fidelity & Guar. Co. v. Petroleo Brasileiro S.A.-Petrobras*, No. 98 Civ. 3099(THK), 2005 WL 289575, at *5 (S.D.N.Y. Feb. 4, 2005); *Planet Payment*, 2011 WL 1636921, at *7 (holding that Georgia, as defendant's state of incorporation had the greatest interest because "claims of successor liability which . . . involve questions of corporate liability for the acts of others are of greater interest to the state of incorporation and residence of the defendants") (internal quotations omitted); *Soviet Pan Am Travel Effort v. Travel Comm., Inc.*, 756 F. Supp. 126, 131 (S.D.N.Y. 1991) (applying Maryland law to successor liability claim where defendants were incorporated there); *Howard v. Clifton Hydraulic Press Co.*, 830 F. Supp. 708, 712 (E.D.N.Y. 1993) (applying both New York and New Jersey law where defendant was incorporated in New Jersey, because "the issue of successor liability does not turn out differently under New York or New Jersey law").

[196] *See Schumacher v. Richards Shear Co.*, 451 N.E.2d 195, 198 (N.Y. 1983); *Decius v. Action Collection Serv., Inc.*, 105 P.3d 956, 958-59 (Utah Ct. App. 2004) (citing *Florom v. Elliott Mfg.*, 867 F.2d 570, 575 n.2 (10th Cir. 1989)).

of the exception.[197] New York, which has a more robust body of law on the exception, looks to the language of the governing contract to determine whether the buyer expressly or impliedly agreed to assume liabilities of the successor.[198]

As noted above, the 2001 MMLPSA was not assumed by Ally Bank under the Purchase and Assumption Agreement. Further, the Purchase and Assumption Agreement expressly states that Ally Bank assumes only those liabilities set forth on a schedule to the agreement, and assumes no other liabilities.[199] None of the items on the schedule would encompass liabilities under the 2001 MMLPSA or, in particular, representation and warranty liabilities for loans sold thereunder.[200] The Examiner therefore concludes that an assumption theory is unlikely to prevail.

### ii. De Facto Merger

Utah and New York law governing the de facto merger exception appear to differ. New York considers whether there is: (1) continuity of ownership between the predecessor and successor corporation; (2) cessation of ordinary business and dissolution of the predecessor corporation; (3) assumption of liabilities ordinarily necessary for the continuation of the predecessor's business; and (4) continuity of management, personnel, physical location, assets and general business operation.[201] Utah, in contrast, (a) considers "whether the business operations and management continued" and (b) requires that "the buyer paid for the asset purchase with its own stock."[202] Because the analysis required under Utah law differs from that under New York law, Utah law, as the law of the jurisdiction of Ally Bank's incorporation, would govern the de facto merger analysis.

Applying the Utah de facto merger test to the facts here, it appears that the first requirement is met, but that the second cannot be satisfied. Old GMAC Bank was headquartered in Horsham, Pennsylvania and most of its 550 employees were located there at the time of the bank restructuring.[203] Following the consummation of the restructuring, the management, employees, location, and operations of the mortgage banking division largely remained the same despite the new ownership structure.[204] Officers from Old GMAC Bank

---

[197] *See Decius*, 105 P.3d at 958–59.

[198] *See Hartford Acc. & Indem. Co., Inc. v. Canron, Inc.* 373 N.E.2d 364, 364–65 (N.Y. 1977); *Valenta Enters., Inc. v. Columbia Gas of N.Y., Inc.*, 455 N.Y.S. 2d 996, 998 (N.Y. App. Div. 1982); *Emrich v. Kroner*, 434 N.Y.S.2d 491, 492 (N.Y. App. Div. 1980).

[199] Purchase and Assumption Agreement, § 2.3 [ALLY_PEO_0021066].

[200] *Id.* at Sched. C.

[201] *See In re Seventh Dist. Asbestos Litig.*, 788 N.Y.S.2d 579, 583 (N.Y. Sup. Ct. 2005); *Sweatland v. Park Corp.*, 587 N.Y.S.2d 54, 56 (N.Y. App. Div. 1992); *New York v. Nat'l Serv. Indus., Inc.*, 460 F.3d 201, 209 (2d Cir. 2006).

[202] *See Decius*, 105 P.3d at 959 (citations omitted) (internal quotation marks omitted) (citing *Travis* v. *Harris Corp.*, 565 F.2d 443, 447 (7th Cir. 1977)).

[203] Walker Report, at 1 [RC40008925].

[204] *See* Int. of D. Walker, Nov. 28, 2012, at 76:4–14; Int. of R. Groody, Dec. 17, 2012, at 60:20–61:3, 61:21–62:1.

became the officers of the mortgage division within the restructured bank.[205] Although the buyer was and remained headquartered in Utah, the mortgage division and operations remained in Horsham, Pennsylvania and nearly all of the employees of Old GMAC Bank were retained and remained there as well.[206] Thus, the continuity of business and operations requirement appears to be met.

Nonetheless, application of the de facto merger doctrine would be precluded by Utah's requirement that the buyer have paid for the asset purchase with its own stock. Under the Purchase and Assumption Agreement, cash was paid as consideration for the assets and liabilities transferred.[207] Accordingly, the Examiner concludes that a de facto merger theory is unlikely to prevail.

### iii. Mere Continuation

Under the "mere continuation" exception, Utah courts consider "not whether the business operation[s] continued, but whether the corporate entity continued . . . . A mere continuation demands a common identity of stock, directors and stockholders and the existence of only one corporation at the completion of the transfer."[208] Similarly, New York courts have not found "mere continuation" if the selling corporation continues to exist after the asset sale—even if the selling corporation is stripped of its assets.[209]

Old GMAC Bank continued to exist for three years after the asset sale.[210] Accordingly, the Examiner concludes that a "mere continuation" theory is also unlikely to prevail.

### iv. Fraud

Utah case law adopts the fraud exception, but has not explained or defined the exception in detail.[211] Similarly, New York courts recognize the fraud exception,[212] but there is relatively little case law analyzing the exception's requirements. Of two New York cases briefly addressing the fraud exception: (1) one held that in order for the fraud exception to apply, a plaintiff must plead that the transaction was entered into with the intent to escape liability to the predecessor's creditors;[213] and (2) the other held that the fraud exception did not apply because there can be no fraudulent intent where there was a legitimate business explanation

---

[205] *See* Int. of R. Groody, Dec. 17, 2012, at 60:15–19; Int. of D. Walker, Nov. 28, 2012, at 126:6–10; *see, e.g.*, Walker Report, at 5 [RC40008925].

[206] *See* Int. of D. Walker, Nov. 28, 2012, at 126:6–21; *see, e.g.*, Walker Report, at 5 [RC40008925].

[207] Purchase and Assumption Agreement, §3.1(c) [ALLY_PEO_0021066].

[208] *Decius v. Action Collection Serv., Inc.*, 105 P.3d 956, 959 (Utah Ct. App. 2004).

[209] *Ladjevardian v. Laidlaw-Coggeshall, Inc*., 431 F. Supp. 834, 839 (S.D.N.Y. 1977).

[210] INSTITUTION DIRECTORY—NATIONAL MOTORS BANK FSB, FDIC, http://www2.fdic.gov/idasp/confirmation_outside.asp?inCert1=35054 (last updated Dec. 20, 2012).

[211] *See Decius,* 105 P.3d at 958–59.

[212] *See Schumacher v. Richards Shear Co., Inc.*, 451 N.E.2d 195 (N.Y. 1983).

[213] *See Beck v. Roper Whitney, Inc*., 190 F. Supp. 2d 524, 539 (W.D.N.Y. 2001).

for the transaction.[214] Other jurisdictions applying this exception have examined whether there was a lack of good faith, as where there is inadequate consideration and the creditors of the predecessor are not provided for.[215] Here, there is no evidence that the aim of the transfer of Old GMAC Bank's assets was to defraud *the Bank's* creditors.[216] And there is no evidence that the parties at the time anticipated the magnitude of the representation and warranty liabilities that would later arise with respect to the loans sold by Old GMAC Bank (or, as discussed below, that the Bank would bear such liabilities). Accordingly, the Examiner concludes that an attempt to hold Ally Bank responsible for the liabilities of Old GMAC Bank under the fraud exception to the doctrine of successor liability is unlikely to prevail.

### (ii) AFI Indemnification

#### (A) Indemnification In Connection With The OTS Approval Of The 2006 Bank Restructuring

The OTS approved the transfer of assets under the 2006 Bank Restructuring subject to certain conditions, including the provision of a "holding company guarantee confirming responsibility for any of [Old GMAC Bank's] contingent liabilities following the consummation of the transaction" and the receipt of written non-objection thereto from the OTS.[217] An indemnification on these terms, if made in favor of ResCap/GMAC Mortgage, arguably would have covered the representation and warranty claims at issue because they arose from contingent liabilities of Old GMAC Bank and the indemnity, as phrased by the OTS, was broad enough to cover both contingent liabilities of Old GMAC Bank that were transferred to Ally Bank as well as those that remained with Old GMAC Bank. In AFI's November 10, 2006 response to the OTS's request, however, AFI agreed only to "indemnify, defend and hold harmless [Old GMAC Bank] with respect to any post-closing claims or

---

[214] *See Krisher v. Monarch Mach. Tool Co.*, 1994 WL 705264, at *3 (N.D.N.Y. 1994).

[215] *See Huray v. Fournier NC Programming, Inc*, No. C9-02-1852, 2003 WL 21151772 at *3 (Minn. Ct. App. May 20, 2003); *McKee v. Harris-Seybold Co.*, 264 A.2d 98, 107 (N.J. Law Div. 1970); *Welco Indus., Inc. v. Applied Cos.*, 617 N.E.2d 1129, 1134 (Ohio 1993); *In re Thorotrast Cases*, 26 Phila. Co. Rptr. 479, 488–89 (Pa. Com. Pl. 1994); *Ostrowski v. Hydra-Tool Corp*., 479 A.2d 126, 127 (Vt. 1984)).

[216] It is a separate issue whether the fact that ResCap received a non-voting interest in IB Finance involved fraud or a lack of good faith (which is analyzed in Section VII.L.1). The proper focus of the present analysis is instead whether the transfer of Old GMAC Bank's assets was itself done with an intent to defraud Old GMAC Bank's creditors. *See Eagle Pac. Ins. Co. v. Christensen Motor Yacht Corp*., 934 P.2d 715, 721 (Wash. Ct. App. 1997) (holding that in the case of a successor corporation created solely to hinder the creditors of the predecessor, the plaintiff had sufficiently shown a fraudulent purpose to impose liability on the successor); *Schumacher*, 451 N.E.2d at 199; *Decius*, 105 P.3d at 958–59.

[217] Letter from OTS to J. Feinberg (Aug. 16, 2006) [EXAM10221739].

liabilities relating to the assets sold to [Ally Bank]" as described in the applications to the OTS.[218] This indemnification was narrower than that requested by the OTS. Nevertheless, the OTS issued a non-objection letter with respect to the indemnity AFI provided.[219]

The indemnification AFI provided would not cover the claims here. First, it was made for the benefit of Old GMAC Bank, not ResCap/GMAC Mortgage. Second, the indemnity was limited to liabilities "relating to the assets sold to [Ally Bank]"; neither the 2001 MMLPSA nor the loans previously sold thereunder were among the assets sold to Ally Bank in the 2006 Bank Restructuring. Accordingly, the Examiner concludes it is unlikely that a claim for indemnification under AFI's November 10, 2006 letter to the OTS would prevail.

### (B) Indemnification Under The ResCap Operating Agreements

As discussed in Section III.B, AFI agreed in both the 2005 Operating Agreement and the 2006 Amended Operating Agreement to "indemnify, defend and hold harmless ResCap and its Subsidiaries from and against any Losses related to GMAC Indemnifiable Liabilities (*other than 'GM Indemnifiable Liabilities'*)."[220] As discussed below, while representation and warranty liabilities of Old GMAC Bank likely would be subject to the indemnification obligation under the 2006 Amended Operating Agreement were it not for the "other than 'GM Indemnifiable Liabilities'" carveout, this limitation likely would defeat any indemnification claim here.

The 2005 Operating Agreement and the 2006 Amended Operating Agreement defined "GMAC Indemnifiable Liabilities" to include, in pertinent part:

> all Liabilities of any GMAC Affiliate to the extent such Liabilities (a) relate to, (b) arise out of or (c) result principally from any of the following items:
>
> (i) the failure of any GMAC Affiliate to pay, perform or promptly discharge any Liabilities of such GMAC Affiliate in accordance with their terms; or
>
> (ii) the GMAC Affiliate Business.[221]

---

[218] Letter from S. Khattri to R. Albanese (Nov. 10, 2006) [ALLY_0402156]. In consideration of AFI's agreement to provide the holding company guarantee requested by the OTS, ResCap agreed to counter-indemnify AFI with respect to the same post-closing claims or liabilities. Letter from S. Khattri to B. Paradis (Nov. 10, 2006) [ALLY_0018335]. This indemnity was approved by the ResCap Board. Certificate of C. Quenneville (Nov. 22, 2006) [CERB001616].

[219] Letter from R. Albanese to J. Feinberg (Nov. 20, 2006) [ALLY_0401904].

[220] 2005 Operating Agreement, § 3 [ALLY_0140795] (emphasis added); 2006 Amended Operating Agreement, § 3 (Residential Capital, LLC, Current Report (Form 8-K) (Nov. 30, 2006), Ex. 10.1) (emphasis added).

[221] 2005 Operating Agreement, § 1 [ALLY_0140795]; 2006 Amended Operating Agreement, § 1 (Residential Capital, LLC, Current Report (Form 8-K) (Nov. 30, 2006), Ex. 10.1).

"GMAC Affiliate Business" in turn, was defined to include "all business and operations (whether or not such businesses or operations are terminated, divested or discontinued) of the GMAC Affiliates as conducted from time to time."[222] "GM Indemnifiable Liabilities" and "GM Affiliate Business" were defined similarly (save for the use of "GM Affiliate" instead of "GMAC Affiliate").[223]

A "GM Affiliate" was defined as "an Affiliate of GM other than GMAC and its Subsidiaries,"[224] while a "GMAC Affiliate" was defined as "GM, GMAC and any Person that is an Affiliate of GM or GMAC, other than ResCap and its Subsidiaries."[225] An "Affiliate" is a person or entity "directly or indirectly Controlling or Controlled by or under direct or indirect common Control with" the person or entity in question.[226]

Before the 2006 Bank Restructuring, Old GMAC Bank, as a ResCap Subsidiary, would not have qualified as a "GMAC Affiliate." However, from and after the time when Old GMAC Bank was sent as a dividend to GM as part of the 2006 Bank Restructuring,[227] Old GMAC Bank was both a "GMAC Affiliate" and a "GM Affiliate," since it was then controlled by GM and was no longer a ResCap Subsidiary.

Old GMAC Bank's liabilities, if any, for breach of representations and warranties likely would constitute Liabilities arising from "(i) the failure of [a] GMAC Affiliate to pay, perform or otherwise promptly discharge any Liabilities of such GMAC Affiliate in accordance with their terms; or (ii) the GMAC Affiliate Business." However, they would, by the same token, constitute Liabilities arising from "(i) the failure of [a] GM Affiliate to pay, perform or otherwise promptly discharge any Liabilities of such GM Affiliate in accordance with their terms; or (ii) the GM Affiliate Business." Consequently, the Liabilities would constitute "GM Indemnifiable Liabilities," and would therefore be excluded from the scope of the indemnification provided by GMAC, which is limited to Liabilities "other than GM Indemnifiable Liabilities."[228]

---

[222] 2005 Operating Agreement, § 1 [ALLY_0140795]; 2006 Amended Operating Agreement, § 1 (Residential Capital, LLC, Current Report (Form 8-K) (Nov. 30, 2006), Ex. 10.1).

[223] 2005 Operating Agreement, § 1 [ALLY_0140795]; 2006 Amended Operating Agreement, § 1 (Residential Capital, LLC, Current Report (Form 8-K) (Nov. 30, 2006), Ex. 10.1).

[224] 2005 Operating Agreement, § 1 [ALLY_0140795]; 2006 Amended Operating Agreement, § 1 (Residential Capital, LLC, Current Report (Form 8-K) (Nov. 30, 2006), Ex. 10.1).

[225] 2005 Operating Agreement, § 1 [ALLY_0140795]; 2006 Amended Operating Agreement, § 1 (Residential Capital, LLC, Current Report (Form 8-K) (Nov. 30, 2006), Ex. 10.1).

[226] 2005 Operating Agreement, § 1 [ALLY_0140795]; 2006 Amended Operating Agreement, § 1 (Residential Capital, LLC, Current Report (Form 8-K) (Nov. 30, 2006), Ex. 10.1).

[227] *See* Certificate of Share Transfer, dated Nov. 21, 2006 [ALLY_0401265]; Transfer of Shares Agreement, dated Nov. 22, 2006 [CERB001787].

[228] 2005 Operating Agreement, § 3(b) [ALLY_0140796-97]; 2006 Amended Operating Agreement, § 3(b) (Residential Capital, LLC, Current Report (Form 8-K) (Nov. 30, 2006), Ex. 10.1).

Accordingly, the Examiner concludes it is unlikely that a claim against AFI for indemnification under either the 2005 Operating Agreement or the 2006 Amended Operating Agreement for representation and warranty liabilities of Old GMAC Bank would prevail.

> ### (b) The MMLPSA's Two-Year Survival Clause Likely Bars All Claims For Loans Sold Thereunder

The MMLPSA is governed by Delaware law.[229] The governing statute of limitations for a breach of contract claim under Delaware law is typically three years.[230] However, the MMLPSA includes a "survival" clause that provides as follows:

> Each party hereto covenants and agrees that the representations and warranties, covenants and obligations contained in Articles III through VI of this Agreement shall survive the execution hereof, and the Closing Date, and any inspection, investigation, or determination made by, or on behalf of, either party, and expiration or termination of this Agreement, for a period of two (2) years from the applicable Closing Date.[231]

---

[229] Section 8.5 of the 2001 MMLPSA specifies that the agreement is to be governed by Delaware law. 2001 MMLPSA, § 8.5 [ALLY_0018253]. New York courts generally honor such contractual choice-of-law provisions. *See, e.g.*, *Millennium Falcon Corp. v. WRD Sales, Inc*., 848 N.Y.S.2d 707, 708–09 (N.Y. App. Div. 2007) ("Since the parties to the note agreed that it would be governed by Connecticut law, we must apply the substantive law of that forum . . . ."); *Notaro v. Sterling Transp. Servs., LLC*, 943 N.Y.S.2d 793 (N.Y. Sup. Ct. 2012) ("New York courts will generally enforce a clear and unambiguous choice-of-law clause contained in an agreement so as to give effect to the parties' intent."). "Choice of law clauses are accorded *prima facie* validity and are to be enforced absent a strong showing that the clause resulted from fraud or overreaching, that it is unreasonable or unfair, or that enforcement would contravene some strong public policy of the forum." *MBIA Ins. Corp. v. Royal Bank of Can.*, No. 12238/09, 2010 WL 3294302, at *21 (N.Y. Sup. Ct. Aug. 19, 2010) (citing *Hirschman v. Nat'l Textbook Co*., 184 A.D.2d 494, 495 (N.Y. App. Div. 1992)); *see also Composite Holdings v. Westinghouse Elec. Corp*., 992 F. Supp. 367, 370 n.25 (S.D.N.Y. 1998) (noting that the "public policy of New York strongly supports enforcement of forum selection clauses").

[230] DEL. CODE ANN. tit. 10 § 8106 (West 2008); *Wedderien v. Collins*, 937 A.2d 140 (Del. 2007).

[231] 2001 MMLPSA, § 8.3 [ALLY_0018253]; 2006 MMLPSA, § 8.3 [ALLY_0018291] (same); 2007 MMLPSA, § 8.3 [ALLY_0018275] (same).

While this provision is not a model of clarity, Delaware courts have typically construed survival clauses such as this one to be contractual statutes of limitation.[232] "[C]ase law in Delaware has read survival clauses . . . as acting to shorten the statute of limitations and require that suit be brought before the relevant survival period expires."[233] Accordingly, the MMLPSA's survival clause likely would be read to require that GMAC Mortgage bring any claims related to breach of the representations and warranties within two years of the date of the pertinent loan sale.[234] Because GMAC Mortgage stopped buying loans from Old GMAC Bank under the 2001 MMLPSA in November 2006, the survival period for any claims related to breach of Old GMAC Bank's representations and warranties expired, at latest, in November 2008.

---

[232] *See GRT, Inc. v. Marathon GTF Tech., Ltd.*, No. 5571-CS, 2011 WL 2682898, at *3 (Del. Ch. 2011); *Sterling Network Exch., LLC v. Digital Phoenix Van Buren, LLC*, No. 07C-08-050WLW, 2008 WL 2582920, at *5 (finding that the time in which the purchaser could bring claims related to representations and warranties was contractually limited by survival clauses); *see also State St. Bank & Trust Co. v. Denman Tire Corp.*, 240 F.3d 83, 87–88 (1st Cir. 2001) (applying Illinois law to provision that representations and warranties "shall expire on the second (2nd) anniversary of the Closing" and holding that such language "was reasonably susceptible to only one meaning: that any claim based on warranties contained in the Purchase Agreement must be brought within [the specified time period] of the closing") (quotation omitted); LOU R. KLING & EILEEN T. NUGENT, 2 NEGOTIATED ACQUISITIONS OF COMPANIES, SUBSIDIARIES AND DIVISIONS § 15.02[2] (explaining that in merger and acquisition agreements, "[t]he survival period is, in effect, a contractual statute of limitations").

[233] *GRT, Inc. v. Marathon GTF Tech., Ltd.*, No. 5571-CS, 2011 WL 2682898, at *3 (Del. Ch. 2011) ("Delaware law does not have any bias against contractual clauses that shorten statutes of limitations because they do not violate the legislatively established statute of limitations, there are sound business reasons for such clauses, and our case law has long upheld such clauses as a proper exercise of the freedom to contract."); *see also Shaw v. Aetna Life Ins.*, 395 A.2d 384, 386 (Del. Super. Ct. 1978) ("[A]n express provision in a contract which [a]bbreviates the time for filing a claim, so long as it remains a reasonable time, hastens the enforcement and complements the policy behind the statute of limitations . . . .") (citing 1A CORBIN ON CONTRACTS § 218 (1963)).

[234] 2001 MMLPSA, § 1.7 [ALLY_0018253] (defining "Closing Date" to mean, "with respect to each purchase of Mortgage Loans . . . , the date on which such purchase shall occur and the applicable Purchase Price shall be paid . . ."). Other states, such as New York and California generally refuse to read survival clauses related to representations and warranties as shortening the applicable statute of limitations absent "clear and explicit" language. *See, e.g.*, *W. Filter Corp. v. Argan, Inc.*, 540 F.3d 947, 953 (9th Cir. 2008). However, "[u]nder Delaware law, which is more contractarian than that of many other states, parties' contractual choices are respected and there is no special rule requiring that in order to contractually shorten the statute of limitations, parties utilize 'clear and explicit' language." *GRT, Inc. v. Marathon GTF Tech., Ltd.*, No. 5571-CS, 2011 WL 2682898, at *12 (Del Ch. July 11, 2011).

Similarly, the MMLPSA's survival clause likely limits any right GMAC Mortgage would otherwise have for indemnification against Old GMAC Bank. Pursuant to the 2001 MMLPSA, Old GMAC Bank agreed to indemnify GMAC Mortgage against "any losses, damages, deficiencies, claims, causes of action, [etc.] . . . which result from any material breach of any representation, warranty or covenant . . . ."[235] However, the survival clause contained in section 8.3 of the MMLPSA explicitly limits obligations contained in Article VI of the MMLPSA, which include Old GMAC Bank's indemnification of GMAC Mortgage. It appears that under Delaware law, such remedy provisions can be limited in the same manner as the representations and warranties themselves.[236]

Absent the contractual limitations of the survival clause, claims by GMAC Mortgage concerning loans sold pursuant to the 2001 MMLPSA likely would be barred only to the extent that they relate to repurchases or settlements occurring more than three years before the Debtors' bankruptcy filing (i.e., before May 14, 2009). This is because while Delaware's three-year statute of limitations for contract claims "begins to run when the contract is breached" and would thus bar any action for breach of the representations and warranties themselves,[237] claims for indemnification do not accrue until the "indemnitor-liability

---

[235] 2001 MMLPSA, § 6.1 [ALLY_0018253].

[236] *See GRT, Inc. v. Marathon GTF Tech., Ltd.*, No. 5571-CS, 2011 WL 2682898, at *16 (Del. Ch. July 11, 2011) ("The Survival Clause at issue in this case . . . not only expressly terminates the . . . Representations upon the expiration of the Survival Period, it also terminates the 'remedies provided pursuant to Section 7.4.' The parties' decision to terminate the . . . Representations and the sole remedy for their breach, from an objective point of view, is further evidence of an intent to give . . . one-year [to] . . . file a claim for breach . . . .").

[237] *Aronow Roofing Co. v. Gillbane Bldg. Co.,* 902 F.2d 1127, 1128 (3d Cir. 1990); *see Baron v. Allied Artists Pictures Corp.*, 717 F.2d 105, 108 (3d Cir. 1983) ("A cause of action for breach of contract accrues at the time of the breach and a cause of action in tort accrues at the time of the injury.") (citation omitted); *E.I. duPont de Nemours & Co. v. Medtronic Vascular, Inc.*, No. N10C-09-058-MMJ, 2013 WL 261415, at *11 (Del Super. Ct. Jan. 29, 2013) ("The cause of action accrues 'at the time of the wrongful act, even if the plaintiff is ignorant of the cause of action.' The wrongful act in a breach of contract claim is the breach and the cause of action accrues at the time of breach.") (citations omitted); *see also Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Holdings LLC*, No. 5140-CS, 2012 WL 3201139, at *17 (Del. Ch. Aug. 7, 2012) ("'Because representations and warranties about facts pre-existing, or contemporaneous with, a contract's closing are to be true and accurate when made,' a breach of such representations and warranties 'occurs on the date of the contract's closing and hence the cause of action accrues on that date.'") (citations omitted). For contracts involving severable performances, such as the MMLPSA (periodic loan sales), "the statute of limitations generally begins to run on each severable portion when a party breaches that portion of the contract." *SPX Corp. v. Garda USA, Inc.*, No. N10C-10-162, 2012 WL 6841398, at *3 (Del. Super. Ct. Dec. 6, 2012) (citation omitted).

becomes fixed and ascertained or as soon as the debt becomes due."[238] "The point at which the indemnitee suffers loss or damage through payment of a claim after judgment or settlement is the determining factor."[239] Accordingly, absent the survival clause discussed above, indemnification claims by GMAC Mortgage against Old GMAC Bank for repurchases and settlements that occurred after May 14, 2009 (within three years of the Petition Date and the tolling afforded by section 108 of the Bankruptcy Code) would be timely.[240]

---

[238] *Oliver B. Cannon & Son, Inc. v. Fidelity & Cas. Co. of N.Y.,* 484 F. Supp. 1375, 1389 (D. Del. 1980) (citation omitted); *see also Ne. Controls, Inc. v. Fisher Controls Int'l, LLC*, No. 06-412-SLR, 2008 WL 181336, at *4 n.5 (D. Del. Jan. 18, 2008) (overruled on other grounds) ("[I]n the case of a contract for indemnity, the cause of action accrues and 'the statute of limitations begins to run when the indemnitor-liability becomes fixed and ascertained or as soon the debt becomes due.'" ) (citation omitted); *Sorensen v. Overland Corp.*, 142 F. Supp. 354, 361 (D. Del. 1956) ("Indemnity against loss or damage does not accrue (nor does the statute begin to run) until the indemnitee has made payment or has actually suffered loss or damage."); *Stifel Fin. Corp. v. Cochran*, 809 A.2d 555, 559 (Del. 2002) ("[B]ecause indemnification is a right conferred by contract, under statutory auspice, actions seeking indemnification are subject to the three year limitations period."); *Witco Corp. v. Adriatic Ins. Co.*, No. Civ.A. 95C-06-030, 2000 WL 302079, at *2 (Del Super. Ct. Jan. 31, 2000) ("The duty to indemnify does not arise until final judgment against [the] insured or [the] insured enters into a settlement."); *Marcucilli v. Boardwalk Builders, Inc.*, No. Civ.A 99C-02-007, 1999 WL 1568612, at *8 (Del Super. Ct. Dec. 22, 1999) ("[T]he limitations period on a claim for indemnification does not begin to run until the cause of action for indemnity arises or the indemnity suffers damage.").

[239] *Council of Unit Owners of Sea Colony, Phase III Condo. v. Carl M. Freeman Assocs., Inc.,* 1989 WL 40973, at *3 (Del Super. Ct. Apr. 11, 1989); *Oliver B. Cannon & Son, Inc.*, 484 F. Supp. at 1388 (citation omitted) ("Liability becomes fixed and ascertained only upon the entry of a final judgment against the indemnitee"); *see also Shively v. Ken-Crest Ctrs. for Exceptional Pers.*, No. 96C-05-316, 1998 WL 960719, at *3 (Del Super. Nov. 19, 1998) ("An indemnification contract, by its very nature, cannot be breached until one party is liable and seeks indemnification from the other.").

[240] The decision in *CertainTeed Corp. v. Celotex Corp.,* No. Civ.A 471, 2005 WL 217032 (Del. Ch. Jan. 24, 2005), is not to the contrary. *CertainTeed* held that a buyer's claim for indemnification arising from breach of contractual representations and warranties accrued on the date of the transaction, when the contractual rights were breached. *Id*. at *5. However, the court drew a distinction between indemnification claims for injuries suffered directly by the indemnified party as a result of the breach and claims for losses resulting from liability to a third party. *Id*. "[I]n the case of counts for breach of contract and misrepresentation, where claims involve direct injury to [the plaintiff]—e.g., claims resting on the assertion that [plaintiff] was injured because a . . . condition was not as represented in the Agreement—timeliness is to be measured by the statute of limitations for breach of contract and torts, respectively, with accrual occurring at the date of breach or injury, absent tolling." *Id*. By contrast, "if the underlying claim for contractual indemnification is actually a claim for losses resulting from liability to a third party (i.e., like a common law indemnity claim) . . . [plaintiff's] claim accrue[s] at the time when the last dollar of loss is ascertainable." *Id.* Accordingly, where a defendant's breach of contractual representations and warranties causes the plaintiff to incur liability to a third party, the plaintiff's indemnity cause of action accrues when such liability becomes fixed. *See Jolly v. MPTC Holdings, Inc.*, No. 3:08-CV-1374-M, 2009 WL 4279379, at *4–5 (N.D. Tex. Dec. 1, 2009) (interpreting Delaware law, including *CertainTeed*, to find that a purchaser's post-closing claim for indemnification had not yet accrued, despite an undisputed breach of representations and warranties by the seller, because no third party had yet made a claim against the purchaser and the potential loss had not been ascertained).

The statute of limitations may only be tolled where the defendant has "fraudulently concealed the basis for [the plaintiff's] claims."[241] While the Investigation has not encompassed a review of the details of every loan sale under the 2001 MMLPSA, it has not disclosed any evidence of fraudulent concealment by Old GMAC Bank. Moreover, given that Old GMAC Bank was a ResCap Subsidiary when the 2001 MMLPSA was in effect, and that GMAC Mortgage was the loan servicer and was intimately aware of the loans' characteristics, it is unlikely that GMAC Mortgage would have a viable claim that the statute of limitations should be tolled for fraudulent concealment of any representation and warranty breaches.[242]

In sum, by virtue of the two-year survival clause contained in section 8.3 of the MMLPSA, all claims by GMAC Mortgage against Old GMAC Bank related to the 2001 MMLPSA are likely time-barred. Even if the survival clause were not construed as shortening the statute of limitations, contractual indemnification claims against Old GMAC Bank related to repurchases and settlements that occurred before May 14, 2009 would be untimely.

### (c) Whether Old GMAC Bank Provided Representations And Warranties To GMAC Mortgage

Even if a claimant could overcome the obstacles just discussed, the question would remain whether Old GMAC Bank had enforceable representation and warranty obligations to GMAC Mortgage under the 2001 MMLPSA.

Under Delaware law, the elements of a breach of contract claim are: (1) a contractual obligation; (2) a breach of that obligation; and (3) resulting damages.[243] The key issue here

---

[241] *See SmithKline Beecham Pharm. Co. v. Merck & Co., Inc.*, 766 A.2d 442, 450 (Del. Super. Ct. 2000); *David B. Lilly Co. v. Fisher*, 18 F.3d 1112, 1117 (3d Cir. 1994) ("Under Delaware law, the statute of limitations generally 'begins to run at the time of the wrongful act, and, ignorance of a cause of action, absent concealment or fraud, does not stop it.'"); *Isaacson, Stolper & Co. v. Artisans' Sav. Bank*, 330 A.2d 130, 132 (Del. 1974) ("It is well established in common law jurisdictions generally that ignorance of the facts is in the ordinary case no obstacle to the operation of a statute of limitations. There are, of course, certain well defined exceptions, such as infancy, incapacity, certain types of fraud, or concealment of the facts . . . .") (citation omitted). The Delaware Supreme Court has also established a "discovery exception," but it is narrowly confined to medical malpractice cases and situations where an injury is both "inherently unknowable" and sustained by a "blamelessly ignorant" plaintiff. *See David B. Lilly Co.*, 18 F.3d at 1117; *Kaufman v. C.L. McCabe & Sons, Inc*., 603 A.2d 831, 835 (Del. 1992) ("The time of discovery exception, in cases other than those of medical malpractice, is narrowly confined in Delaware to injuries which are both: (a) 'inherently unknowable'; and (b) sustained by a 'blamelessly ignorant' plaintiff."); *see also Layton v. Allen*, 246 A.2d 794 (Del. 1968) (establishing the discovery exception in Delaware).

[242] *See E.I. DuPont De Nemours & Co. v. Medtronic Vascular, Inc.*, No. N10C-09-058-MMJ, 2013 WL 261415, at *12 (Del Super. Ct. 2013) ("The doctrines of inherently unknowable injury, and fraudulent concealment, do not apply when the plaintiff has actual knowledge of the breach and potential injuries to follow.").

[243] *Interim Healthcare, Inc. v. Spherion Corp.*, 884 A.2d 513, 548 (Del. Super. 2005), *aff'd*, 886 A.2d 1278 (Del. 2005).

appears to be whether the express contractual representation and warranty obligations under the 2001 MMLPSA remained in effect, or whether the agreement was modified or amended through the parties' subsequent actions to eliminate those obligations.[244]

The general rule in Delaware is that a written contract may be modified by agreements which themselves are not formally written.[245] The 2001 MMLPSA requires that amendments be written, stating:

> This Agreement may not be changed orally but only by an agreement in writing, signed by the party against whom enforcement of any waiver, change, modification or discharge is sought.[246]

Delaware law, however, nonetheless contemplates that even where the written contract explicitly forbids oral modifications, the parties can, "by their conduct, substitute a new oral contract without a formal abrogation of the written agreement."[247] But Delaware courts do not freely permit such modifications: "To make such a leap of faith. . . the Court must first rule out the possibility that the asserting party has alleged an oral modification in an attempt to unilaterally alter a pre-existing, but unfavorable, agreement."[248] The evidence of such a modification "must be of such specificity and directness as to leave no doubt of the intention

---

[244] The original inclusion of the written representations and warranties in the written agreement does not appear to have been the result of a mistake or scrivener's error. Celini explained that the 2001 MMLPSA, including its representations and warranties, had been copies from a third-party arrangement. Int. of A. Celini, Feb. 18, 2013, at 64:11–18. Celini asserts that the parties then agreed that the Bank would not have representation and warranty exposure in connection with negotiation of the January 2002 Addendum revising the First Lien Loan pricing provisions. *See id.* at 69:11–71:15.

[245] *Haft v. Dart Grp. Corp.*, 841 F. Supp. 549, 567 (D. Del. 1993) (citing *Pepsi-Cola Bottling Co. v. Pepsico, Inc.*, 297 A.2d 28, 33 (Del. 1972)).

[246] 2001 MMLPSA, § 8.8 [ALLY_0018253].

[247] *Pepsi-Cola Bottling Co.*, 297 A.2d at 33 (Del. 1972); *see also Reeder v. Sanford Sch., Inc.*, 397 A.2d 139, 141 (Del. Super. Ct. 1979) (holding "[t]he general rule is that a written contract may be modified by subsequent oral agreement").

[248] *Cont'l Ins. Co. v. Rutledge & Co., Inc.*, 750 A.2d 1219, 1230 (Del. Ch. 2000).

of the parties to change what they previously solemnized by formal document."[249] Further, the modification must be based on mutual consideration; past consideration is not sufficient to form an enforceable modification.[250]

While the application of this standard here is not a matter that is entirely free from doubt, the Examiner concludes it is more likely than not that AFI/Ally Bank would prevail on a claim that the 2001 MMLPSA had been modified to eliminate representations and warranties with respect to First Lien Loans.[251] According to Celini, in connection with the negotiation of First Lien Loan pricing in the January 2002 Addendum, there was explicit discussion and agreement that the agreed-upon cost-basis pricing meant that Old GMAC Bank would not have representation and warranty liability.[252] Old GMAC Bank was realizing only net carry on the loans, consistent with its limited role as a financing conduit for GMAC Mortgage's purchase of First Lien Loans.[253] ResCap-side personnel, while not recalling the specific discussions Celini referenced, agreed that the understanding reached was that Old GMAC Bank would not have representation and warranty liability to GMAC Mortgage.[254]

Of course, the fact that the parties did not document this understanding in the January 2002 Addendum when they documented the First Lien Loan pricing, and waited to do so until adoption of the 2006 MMLPSA, is a significant factor weighing against finding a modification. But the parties' conduct (including the lack of Bank reserves and the assumption of liabilities by GMAC Mortgage) seems to have consistently reflected an understanding that the Bank had no such liability. None of the documents produced suggest that the parties ever had another understanding, and none of the witnesses interviewed held a contrary view.

---

[249] *See Reeder,* 397 A.2d at 141 (finding that defendant's promise through his statement to change the termination clause and to modify the salary term of a contract constituted extrinsic evidence and may be used to negate the mutuality of assent to the original agreement); *Cont'l Ins. Co.*, 750 A.2d at 1230–32 (plaintiffs asserted that they orally modified a withdrawal provision in their limited partnership agreement to reflect their new investment strategy but the court, relying on letters and affidavits, found the evidence insufficient to meet the high burden to establish that the parties had agreed upon the alteration of withdrawal rights); *Tunney v. Hilliard,* No. 1317-VCN, 2008 WL 3975620, at *5 (Del. Ch. Aug. 20, 2008) (Del. 2009) (court held against the finding of a modification because of a lack of testimony from credible witnesses or first-hand knowledge of the alleged oral agreement, and found no clear evidence that plaintiff undertook the responsibilities alleged as part of the modified agreement), *aff'd,* 970 A.2d 257 (Del. 2009); *see also Pegasus Dev. Corp. v. Hane*, 314 F. App'x 489, 492 (3d Cir. 2009) (holding that a single e-mail exchange submitted by defendant to show intent to modify agreement was insufficient to meet the burden established in *Reeder*).

[250] *See Cont'l Ins. Co.*, 750 A.2d at 1232.

[251] As used in this Section, "First Lien Loan" shall mean: (1) an individual mortgage loan (other than a HELOC) secured by a mortgage that creates a first priority lien upon the pledged collateral; and/or (2) in the context of an MMLPSA, a "First Lien Mortgage Loan" as defined in the applicable MMLPSA.

[252] *See* Int. of A. Celini, Feb. 18, 2013, at 71:9–74:5.

[253] *See id.* at 71:9–74:5.

[254] Int. of B. Bier, Feb. 22, 2013, at 22:8–24:5; Int. of J. Whitlinger, Nov. 30, 2012, at 51:2–14; Int. of S. Blitzer, Mar. 5, 2013, at 26:18–28:15. Kenneth Blackburn had no recollection whether or not, as part of the process whereby the Bank sold loan to GMAC Mortgage, the Bank provided any representations and warranties on such loans. Int. of K. Blackburn, Mar. 26, 2013, at 11:1–14:3. *See also* Int. of J. Young, Sept. 28, 2012, at 262:22–263:23; Int. of R. Groody, Dec. 17, 2012, at 121:21–122:18, 127:12–128:4.

Instead, the parties seem to have agreed early on to Groody's axiom that the recipient of the gain on sale (GMAC Mortgage) would retain the representation and warranty risk.

By the same token, however, it seems likely that an AFI/Ally Bank assertion that the 2001 MMLPSA had been modified to exclude representation and warranty liability for Second Lien Loans would fail. Celini's discussions about limiting representation and warranty liability arose in the context of an agreement that the purchase price on First Lien Loans would be at cost, limiting the Bank's revenues to net carry. The pricing on Second Lien Loans was not modified by the January 2002 Addendum and, moreover, included a premium over the Bank's cost during the entire life of the 2001 MMLPSA (and beyond, as discussed below).[255] While Celini protested that this premium remained too small to support representation and warranty liability,[256] the Bank was receiving more than net carry. Further, when the parties "cleaned up" the representation and warranty provisions in the 2006 MMLPSA, excluding First Lien Loans from their scope, the Agreement explicitly maintained representations and warranties for Second Lien Loans (on which the Bank continued to receive a premium above its cost).[257] Neither Celini nor Groody could provide an explanation for why these provisions were included in the 2006 MMLPSA if it was understood that the Bank would have no representation and warranty liability for Second Lien Loans.[258] The MMLPSA was amended to eliminate Second Lien Loan representation and warranties only in the 2007 MMLPSA (when Second Lien Loan pricing was placed on the same basis as First Lien Loans).[259]

It is true that the personnel interviewed generally understood that the Bank provided no representations and warranties for *any* loans, and that the Bank maintained no reserves for Second Lien Loan representation and warranty liabilities. Nevertheless, given the First Lien Loan pricing context of Celini's original representation and warranty discussions, the disparate pricing between First and Second Lien Loans, and the evidence of the parties' intent supplied by the 2006 MMLPSA, it is likely that the 2001 MMLPSA representation and warranty provisions would be deemed effective for Second Lien Loans.

### (d) The Representation And Warranty Liabilities GMAC Mortgage Incurred For Loans Purchased Under The 2001 MMLPSA

While the Examiner concludes that it is not likely that a claim against AFI or Ally Bank for 2001 MMLPSA representation and warranty liabilities will prevail, the Examiner's Professionals undertook analyses to evaluate the liabilities GMAC Mortgage incurred for

---

[255] 2001 MMLPSA, Ex. C [ALLY_0018253] (setting premium at 450 basis points); Third Addendum to 2001 MMLPSA, dated Jan. 1, 2003 [ALLY_0018247] (modifying premium to 175 basis points).

[256] Int. of A. Celini, Feb. 18, 2013, at 72:15–24.

[257] 2006 MMLPSA, Art. IV, Ex. C [ALLY_0018291].

[258] *See* Section V.B.3.b(3).

[259] 2007 MMLPSA, Art. IV (eliminating all loan-level representations and warranties), §§ 1.13, 1.9, 1.24 (pricing provisions do not distinguish between First and Second Lien Loans) [ALLY_0018275].

repurchases and settlement of representation and warranty claims in connection with loans purchased from Old GMAC Bank under the 2001 MMLPSA. This effort involved an analysis of ResCap's records related to (1) loans repurchased from investors (for which available records are limited to repurchases in and after 2008); (2) the loans covered by the Debtors' settlements with Fannie Mae and Freddie Mac; and (3) the Trust R&W Claims.[260] That analysis is, as discussed below, limited in several ways by the data maintained by the Debtors, particularly for the last of these categories, the Trust R&W Claims.

For the first two categories, the Examiner's Professionals estimate that the total dollar amount of representation and warranty and settlement liabilities incurred by GMAC Mortgage on First Lien Loans sold by Old GMAC Bank under the 2001 MMLPSA is approximately $278.2 million, including $255.2 million in repurchases from and after May 14, 2009.[261] This estimate includes charge-offs incurred as a result of repurchases made through 2012,[262] the settlements with Fannie Mae and Freddie Mac in 2010, and the related 2013 "cure" settlements with those entities. Loans the Bank purchased from GMAC Mortgage are excluded (because GMAC Mortgage provided representations and warranties to the Bank on such loans). This amount does not take into account any recoveries made by GMAC Mortgage through subsequent disposition of the loan (and to that extent may be overstated).

The dollar amount of representation and warranty settlement liabilities incurred by GMAC Mortgage on Second Lien Loans sold by Old GMAC Bank under the 2001 MMLPSA (excluding loans purchased from GMAC Mortgage) for charge-offs (all incurred as a result of repurchases made on or after May 14, 2009) totaled approximately $5.1 million. (Second Lien Loans are not included in the Fannie Mae and Freddie Mac settlements.)

It is clear that there were also loans, including First and Second Lien Loans, sold by Old GMAC Bank under the 2001 MMLPSA that are included in the securitizations that comprise the Trust R&W Claims. However, while it appears that the representation and warranty liability associated with such loans was no more than $400 million (including $343 million for Second Lien Loans), these numbers are likely overstated due to limitations in the available data.[263] For example, the data does not permit segregation of loans purchased by the Bank from GMAC Mortgage. Given the limited and imprecise nature of the Debtors' records concerning these securitizations, the Examiner's Professionals are unable to provide a more accurate estimate of this liability.

---

[260] *See* 2008–2011 GMACM Repurchases Chargeoff Info Final [EXAM00339948]; FHLMC 2010 Settlement LL [EXAM00338680]; FNMA 2010 Settlement LL [EXAM00338681]; ResCap PLS Spreadsheet [EXAM00339947]; 2008–2011 GMACM Repurchases Chargeoff Info Final v2 [EXAM00345890]; #4 Cure Claim Allocation [EXAM00345891].

[261] As discussed in Section VII.L.2.a(1)(b), the 2001 MMLPSA's two-year survival provisions likely bar all claims concerning loans sold under the agreement; even absent the two-year survival provision, claims related to repurchases made before May 14, 2009, would still be barred.

[262] 2008–2011 GMACM Repurchases Chargeoff Info Final v.2 [EXAM00345890].

[263] ResCap PLS Spreadsheet [EXAM00339947].

    *(i) Representation And Warranty Charge-Offs For Loans Purchased Under The 2001 MMLPSA*

The Examiner's Professionals analyzed the Debtors' records concerning charge-offs on a per-loan basis for loans sold by Old GMAC Bank under the 2001 MMLPSA (excluding loans the Bank purchased from GMAC Mortgage in the first instance). The available records are limited to repurchases in and after 2008.[264]

These charge-offs related to both Fannie Mae/Freddie Mac loans and to non-Agency loans. The charge-offs represented the difference between the unpaid balance of the loans at the time of repurchase and the Debtors' estimate of the loan value at that time. The Debtors' records included, among other data, the year the charge-off was recorded on the Debtors' general ledger, the amount of the charge-off, the effective date of the loan sale as recorded on the Debtors' general ledger, categorization of the entity that initially funded and underwrote the loan, identification of First Lien Loans and Second Lien Loans, the amount wired to the investor for the repurchase of the loan, and, where applicable, any recoveries the Debtors realized from third-party correspondents from whom the loans were purchased.

The Debtors' records for charge-offs did not include any recoveries GMAC Mortgage realized through the subsequent disposition of the repurchased loans or foreclosed properties. As a result, the estimates of costs associated with the charge-offs provided below do not include the effect of any such recoveries. Charge-offs were categorized as impairment, make whole, or interest expense during 2010 through 2012.[265] Loan-level detail for 2008 and 2009 did not include the distinction between impairments and interest expense, though the charge-off was inclusive of both.

---

[264] *See* 2008–2011 GMACM Repurchases Chargeoff Info Final [EXAM00339948]; 2008–2011 GMACM Repurchases Chargeoff Info Final v2 [EXAM00345890] (providing information on charge-off activity by individual loan for 2008 through 2012).

[265] 2008–2011 GMACM Repurchases Chargeoff Info Final [EXAM00339948]; 2008–2011 GMACM Repurchases Chargeoff Info Final v2 [EXAM00345890]. Impairment is the amount charged to the Debtors' general ledger to record the difference between the amounts paid to repurchase the loan, less the current value of the loan. Make whole is the amount the Debtors paid to third party investors for the losses incurred on the loan. Interest expense is the amount paid to third party investors for accrued interest on the loan.

Based on an analysis of the Debtors' records for repurchases occurring in and after 2008, GMAC Mortgage's total liability for repurchases of loans purchased from Old GMAC Bank (net of recoveries from correspondents) totaled approximately $5.1 million for Second Lien Loans (all repurchased on or after May 14, 2009) and $77.8 million for First Lien Loans (including an estimated $54.9 million for First Lien Loans repurchased on or after May 14, 2009).[266] The table below provides a summary of these charge-offs:

EXHIBIT VII.L.2.a(1)(d)(i)
**Estimated Liability Related to Repurchase Activity for Loans Sold Under the 2001 MMLPSA** [(1)]
2008 – 2012
*($ in Millions)*

| | 2008 | 2009 Jan 1 – May 13 | 2009 May 14 – Dec 31 | 2009 Total | 2010 | 2011 | 2012 | Total 2008 – 2012 | Total May 14, 2009 – 2012 |
|---|---|---|---|---|---|---|---|---|---|
| **First Lien Loans** | | | | | | | | | |
| Repurchase charge-offs | $ 12.7 | $ 11.2 | $ 19.5 | $ 30.7 | $ 28.8 | $ 4.9 | $ 3.9 | $ 81.0 | $ 57.2 |
| Recoveries | (0.7) | (0.3) | (0.5) | (0.8) | (1.6) | (0.1) | (0.2) | (3.2) | (2.3) |
| Estimated liability under 2001 MMLPSA | 12.0 | 10.9 | 19.0 | 29.9 | 27.3 | 4.9 | 3.7 | 77.8 | 54.9 |
| **Second Lien Loans** | | | | | | | | | |
| Repurchase charge-offs | - | - | - | - | 3.4 | 1.7 | - | 5.1 | 5.1 |
| Recoveries | - | - | - | - | - | - | - | - | - |
| Estimated liability under 2001 MMLPSA | - | - | - | - | 3.4 | 1.7 | - | 5.1 | 5.1 |
| Total estimated liability under 2001 MMLPSA | $ 12.0 | $ 10.9 | $ 19.0 | $ 29.9 | $ 30.7 | $ 6.6 | $ 3.7 | $ 83.0 | $ 60.0 |

*(1) For loans where no sale effective date was available, the analysis assumes that loans were sold after 2001. This assumption is consistent with the Debtors' records which reflect that less than 1% of loans sold by Old GMAC Bank and repurchased between 2008 and 2011 related to pre-2002 loan vintages.*
*Source: 2008–2011 GMACM Repurchases Chargeoff Info Final [EXAM00339948]; 2008–2011 GMACM Repurchases Chargeoff Info Final v2 [EXAM00345890].*

### (ii) Representation and Warranty Liability Related To The 2010 Fannie Mae And Freddie Mac Settlements For Loans Purchased Under the 2001 MMLPSA

The Examiner's Professionals analyzed liabilities for the 2010 Fannie Mae and Freddie Mac settlements.[267] The available data included the unpaid principal balances as of the settlement date, the year the loan was funded, the entity that funded and underwrote the loan, and the Debtors' allocation of the total settlement amount on a per-loan basis. The Debtors allocated the total settlement amounts pro rata based on the unpaid principal balances of the loans included in the settlements. Because the loans at issue are Fannie Mae and Freddie Mac loans, they consist of First Lien Loans.

---

[266] Because the Debtors' records contained only the year in which the loans were repurchased, and not the specific day or month, it was necessary to allocate the 2009 First Lien Loan repurchases to estimate the portion that occurred before May 14, 2009. The 2009 repurchases were allocated on the assumption that they occurred evenly over the course of the year. Accordingly, 2009 charge-offs were reduced by 36.4% (133 days/365 days).

[267] *See* FHLMC 2010 Settlement LL [EXAM00338680]; FNMA 2010 Settlement LL [EXAM00338681].

As summarized in the table below, approximately $97.6 million of the total $461.5 million 2010 Fannie Mae settlement, and $65.5 million of the total $325 million 2010 Freddie Mac settlement relate to loans sold by Old GMAC Bank under the 2001 MMLPSA (excluding loans purchased from GMAC Mortgage):

EXHIBIT VII.L.2.a(1)(d)(ii)
**Estimate of 2010 Fannie Mae and Freddie Mac Settlement Amounts Related to Loans Sold Under the 2001 MMLPSA** [1]
*($ in Millions)*

| | Total Settlement Amount | | Estimated Portion Related to Loans Sold Under the 2001 MMLPSA | |
|---|---|---|---|---|
| 2010 Fannie Mae settlement | $ | 461.5 | $ | 97.6 |
| 2010 Freddie Mac settlement | | 325.0 | | 65.5 |
| Total | $ | 786.5 | $ | 163.1 |

[1] *The Debtors' records did not include the specific sale dates of the Fannie Mae and Freddie Mac loans included in the 2010 settlements. Allocation of the settlements related to 2001 and 2006 assumes that loan sales occurred evenly over the course of those years. Accordingly, the Fannie Mae and Freddie Mac total settlement values during 2001 and 2006 were allocated to the effective dates of the 2001 MMLPSA (December 15, 2001 – October 31, 2006) based on the following; 4.7% for 2001 (17 days/365 days) and 83.3% for 2006 (304 days/365 days).*
*Source: GMAC ResCap, Significant Transaction Memo #1458, Q4 2010 FNMA Settlement, dated Dec. 29, 2010, at 1 [EXAM00221485]; GMAC ResCap, Significant Transaction Memo #1385, FHLMC Repurchase Settlement, dated Mar. 31, 2010, at 2 [EXAM00220583]; FHLMC 2010 Settlement LL [EXAM00338680]; FNMA 2010 Settlement LL [EXAM00338681].*

### (iii) Representation And Warranty Liability Related To The 2013 Fannie Mae And Freddie Mac Cure Settlements For Loans Purchased Under The 2001 MMLPSA

The Examiner's Professionals analyzed the claims under the 2013 "cure" settlements with Fannie Mae and Freddie Mac. These settlements encompassed claims excluded from the 2010 Fannie Mae and Freddie Mac settlements such as claims for mortgage insurance coverage and title defects, as well as servicing-related claims.[268] Because the cure claims relate to Fannie Mae and Freddie Mac loans, the loans at issue by definition are First Lien Loans, rather than Second Lien Loans.

---

[268] Proof of Claim No. 4875, filed by Freddie Mac on Nov. 15, 2012 [Case No. 12-12019]; Proof of Claim No. 4899, filed by Freddie Mac on Nov. 15, 2012 [Case No. 12-12032]; Proof of Claim No. 4852, filed by Fannie Mae on Nov. 16, 2012 [Case No. 12-12019]; Proof of Claim No. 4853, filed by Fannie Mae on Nov. 16, 2012 [Case No. 12-12020]; Proof of Claim No. 4854, filed by Fannie Mae on Nov. 16, 2012 [Case No. 12-12032]; Proof of Claim No. 4855, filed by Fannie Mae on Nov. 16, 2012 [Case No. 12-12033]; Proof of Claim No. 4849, filed by Fannie Mae on Nov. 16, 2012 [Case No. 12-12042].

### (A) The Freddie Mac Cure Settlement

On November 15, 2012, Freddie Mac filed proofs of claim against the Debtors totaling $73.5 million.[269] These claims were settled for a total of $39.4 million.[270] Exhibit A to the proofs of claim allocates the $73.5 million to nine categories of "outstanding and projected obligations."[271] Two of the categories involve, or potentially involve, representation and warranty claims, including a "representations and warranties" category containing claims totaling $2.4 million,[272] and an "outstanding repurchases" category containing claims totaling $5.6 million.[273] The remaining claim categories appear not to involve representation and warranty liabilities.[274]

From the available information, it is not clear how much of the $39.4 million settlement is attributable to the two categories of claims potentially related to representation and warranty liability. The $8 million in claims in these two categories equates to 11% of the total $73.5 million in filed claims. Simply allocating the $39.4 million settlement on this basis would indicate that these potential representation and warranty claims accounted for $4.3 million of the settlement.

This figure would have to be further reduced to eliminate loans not purchased from Old GMAC Bank and loans the Bank purchased from GMAC Mortgage. Unfortunately, the available information does not include loan-level data permitting analysis of these issues. Given that the Bank played a relatively smaller role in GMAC Mortgage's production in earlier years, it seems likely that most of the claims at issue were not purchased from the Bank or were sold to the Bank in the first instance by GMAC Mortgage. Even if 50% of remaining total survived these hurdles (which seems unlikely), the net liability at issue would be reduced to just over $2 million.

---

[269] Proof of Claim No. 4875, filed by Freddie Mac on Nov. 15, 2012 [Case No. 12-12019]; Proof of Claim No. 4899, filed by Freddie Mac on Nov. 15, 2012 [Case No. 12-12032].

[270] Stipulation and Order Relating to the Assumption and Assignment of Certain Agreements of Freddie Mac Pursuant to section 365 of the Bankruptcy Code and Related Relief [Docket No. 2894] at 3.

[271] Proof of Claim No. 4875, filed by Freddie Mac on Nov. 15, 2012, Ex. A [Case No. 12-12019].

[272] *Id.*

[273] Debtor personnel involved in the cure settlement process assert that this category actually relates predominantly to servicing violations, but the available data did not permit verification of this assertion.

[274] The remaining categories include: (1) performing loan fees; (2) outstanding compensatory fees; (3) compensatory fees not yet billed; (4) foreclosure timeline violation; (5) loan prospector fees; (6) seller fees; and (7) servicing error repurchases. Proof of Claim No. 4875, filed by Freddie Mac on Nov. 15, 2012, Ex. A [Case No. 12-12019].

## *(B) The Fannie Mae Cure Settlement*

On November 16, 2012, Fannie Mae filed proofs of claim totaling $382.7 million.[275] According to the proofs of claim, a total of approximately $290 million of the total $382.7 million related to representation and warranty issues (though the proofs do not provide loan-level detail of claim size); the remainder of the $382.7 million related to servicing.[276] These claims settled in 2013 for a total of $265 million.[277] Allocating the settlement on a pro rata basis based on claim size, $200.8 million of the total $265 million settlement would be attributable to representation and warranty issues.

Records obtained from ResCap provide certain loan-level detail for $273.1 million of the $290 million in representation and warranty claims.[278] This data specifies which loans were sold by Old GMAC Bank to GMAC Mortgage, whether the loan was originally purchased from GMAC Mortgage, the unpaid principal balance of each loan, and further, the sale date of the loan as recorded on the Debtors' general ledger. This data shows that 18.5% of the unpaid principal balance of loans in the representation and warranty category related to loans sold by Old GMAC Bank under the 2001 MMLPSA that Old GMAC Bank had not purchased from GMAC Mortgage. Because the data available does not include the per-loan claim amount, it is not possible to allocate the settlement based on this factor. Allocating the $200.8 million portion of the settlement related to representation and warranty based on the 18.5% of the total unpaid principal balance attributable to loans which were acquired from Old GMAC Bank (excluding loans the Bank acquired from GMAC Mortgage) under the 2001 MMLPSA yields an estimate of $37.2 million attributable to such loans.

---

[275] Proof of Claim No. 4852, filed by Fannie Mae on Nov. 16, 2012 [Case No. 12-12019]; Proof of Claim No. 4853, filed by Fannie Mae on Nov. 16, 2012 [Case No. 12-12020]; Proof of Claim No. 4854, filed by Fannie Mae on Nov. 16, 2012 [Case No. 12-12032]; Proof of Claim No. 4855, filed by Fannie Mae on Nov. 16, 2012 [Case No. 12-12033]; Proof of Claim No. 4849, filed by Fannie Mae on Nov. 16, 2012 [Case No. 12-12042]; #4 Cure Claim Allocation [EXAM00345891].

[276] Proof of Claim No. 4852, filed by Fannie Mae on Nov. 16, 2012, Sched. 1 [Case No. 12-12019].

[277] Stipulation and Order for the Assumption and Assignment of Certain Agreements of Fannie Mae Pursuant to section 365 of the Bankruptcy Code and Related Relief [Docket No. 2769] at 4; Proof of Claim No. 4852, filed by Fannie Mae on Nov. 16, 2012, Sched. 1 [Case No. 12-12019].

[278] #4 Cure Claim Allocation [EXAM00345891]. GMAC Mortgage Risk Officer Jeff Cancelliere has explained that a variety of issues related to the data for the remaining $16.9 million in representation and warranty claims prevented provision of this data for such claims. E-mail from J. Cancelliere to Mesirow Financial (Apr. 19, 2013).

*(iv) 2001 MMLPSA Loans Covered By The $8.7 Billion Proposed RMBS Trust Settlement Agreement*

The Examiner's Professionals reviewed data provided by the Debtors related to the 392 securitizations included in the proposed $8.7 billion settlement for the Trust R&W Claims.[279] The securitization detail provided by the Debtors included for each securitization, among other data, the following: (1) securitization name; (2) issue year of the securitization; (3) original principal balance; (4) estimated long-term loss; (5) cumulative collateral losses incurred on the securitization through March/April 2012; (6) estimated future losses on the remaining collateral based on a third-party vendor model; (7) total estimated losses on the securitization; (8) categorization of the loan product (includes both First Lien and Second Lien Loans); and (9) percentage of each securitization originated by the Bank and subsequently sold to GMAC Mortgage.[280]

The original principal balance of these securitizations was approximately $221 billion.[281] In schedules that the Debtors prepared in connection with the negotiation of the RMBS Trust Settlement Agreements, the Debtors estimated the losses associated with each of the 392 securitizations, including both cumulative losses through March/April 2012 and estimated future losses; the estimated losses totaled $43.8 billion.[282] As part of their analysis, the Debtors allocated the $8.7 billion allowed claim among the 392 securitizations pro rata based upon each securitization's share of the estimated total losses.[283]

The Debtors' records and prospectus supplements disclosed that Old GMAC Bank or Ally Bank was a source of loans for 124 of the 392 securitizations included in the Trust R&W Claims. Of these 124 Securitizations, sixty-six were issued before November 22, 2006, the date of the 2006 Bank Restructuring.[284] The table below provides a break-down of these sixty-six securitizations by lien type and original principal balance:

---

[279] ResCap PLS Spreadsheet [EXAM00339947].

[280] The Debtors' records for GMAC Mortgage securitizations include the percentage of the loans originated by Old GMAC/Ally Bank as disclosed in the prospectus supplements. For securitizations issued by RFC, the data included information extracted from GMAC Mortgage's subledger system. The Examiner's Professionals identified certain inconsistencies between the Debtors' records and the filed prospectus supplements and in those instances relied upon the data in the prospectus supplements.

[281] ResCap PLS Spreadsheet, Box K-411 [EXAM00339947].

[282] *Id.* at Box O-411.

[283] *Id.* at Box P-411.

[284] It is unclear from the prospectus supplement for a Second Lien Loan securitization issued November 28, 2006 whether or what portion of the loans included were purchased from Old GMAC Bank under the 2001 MMLPSA, or from Ally Bank under the 2006 MMLPSA. The estimates provided here assume that these loans were purchased from Ally Bank.

EXHIBIT VII.L.2.a(1)(d)(iv)–1
**Securitizations Included in Trust R&W Claims and Containing Loans Originated or Purchased by Old GMAC Bank**
January 1, 2004 – November 21, 2006
*($ in Millions)*

|  | First Lien | Second Lien | Total |
|---|---|---|---|
| Number of securitizations | 54 | 12 | 66 |
| Original principal balance | $ 32,331 | $ 11,994 | $ 44,325 |

*Source: ResCap PLS Spreadsheet [EXAM00339947].*

These sixty-six securitizations have an original principal balance of approximately $44.3 billion, or 20.1% of the total original principal balance of all 392 securitizations included in the Trust R&W Claims.[285] Under the Debtors' allocation based on estimated total losses, the portion of the RMBS Trust Settlement Agreements associated with these sixty-six securitizations is $1.7 billion.[286]

The prospectus supplements and the Debtors' records set forth the percentage of loans in each securitization attributable to the Bank, but do not provide information as to whether the loans in question were first sold to the Bank by GMAC Mortgage.[287] The table below summarizes the percentage of loans attributed to Old GMAC Bank for those securitizations:

EXHIBIT VII.L.2.a(1)(d)(iv)–2
**Percentage of Loans Disclosed as Originated or Sold by Old GMAC Bank for Securitizations Included in Trust R&W Claims**
January 1, 2004 – November 21, 2006

|  | First Lien | Second Lien | Total |
|---|---|---|---|
| 0-25% | 37 | 0 | 37 |
| 26-50% | 15 | 1 | 16 |
| 51-75% | 1 | 6 | 7 |
| >75% | 1 | 5 | 6 |
|  | 54 | 12 | 66 |

*Source: ResCap PLS Spreadsheet [EXAM00339947].*

If the $8.7 billion allowed claim is allocated based on the percentage of each securitization attributed to the Bank, and on the allocation of the allowed claim to the various securitizations based upon the Debtors' estimate of total losses associated with each securitization (the $1.7 billion calculated above), the portion of the settlement that would be attributed to loans sold by Old GMAC Bank under the 2001 MMLPSA would be $400 million. Dividing this further between First and Second Lien Loans, the allocation would be approximately $57 million for First Lien Loans, and $343 million for Second Lien Loans.

---

[285] ResCap PLS Spreadsheet [EXAM00339947].

[286] *Id.*

[287] *See, e.g.,* GMAC Mortgage Corporation, GMACM Home Equity Loan Trust 2005-HE1, Prospectus Supplement (Mar. 23, 2005), at S-4; GMAC Mortgage Corporation, GMACM Mortgage, LLC Home Equity Loan Trust 2006-HE1, Prospectus Supplement (Mar. 29, 2006), at S-5; GMAC Mortgage Corporation, GMACM Home Equity Loan Trust 2006-HE2, Prospectus Supplement (June 27, 2006), at S-5.

There are, however, important reasons for believing that these amounts would overstate the liability properly allocable to loans purchased from Old GMAC Bank. First, as noted above, the data does not permit segregation of loans that the Bank acquired in the first instance from GMAC Mortgage. Second, the allocation assumes that the loans purchased from Old GMAC Bank performed the same as all other loans in the pertinent securitization. Available data does not permit an evaluation of this assumption; however, as the Debtors' analysis noted, "[h]istorically Bank production was high credit quality, which could lead to better performance[.]"[288] In light of the limitations in the available data, the Examiner's Professionals are unable to provide a more accurate estimate of the liability associated with the RMBS Trust Settlement Agreements attributable to loans purchased from Old GMAC Bank under the 2001 MMLPSA.

In any event, for the reasons discussed in Sections VII.L.2.a(1)(a) and VII.L.2.a(1)(b), the Examiner concludes that a claim against AFI or Ally Bank for recovery of amounts related to representation and warranty liabilities for loans sold under the 2001 MMLPSA is unlikely to prevail.

> *(2) While The 2006 MMLPSA Likely Would Be Interpreted As Imposing Representation And Warranty Obligations On Ally Bank For Second Lien Loans, The MMLPSA's Two-Year Survival Clause Likely Bars All Claims For Loans Sold Thereunder*

Ally Bank is a party to the 2006 MMLPSA, unlike the 2001 MMLPSA. As discussed in Section VII.L.2.a(1)(c), the 2001 MMLPSA likely would be interpreted as maintaining Second Lien Loan representations and warranties. This result seems even more likely for the 2006 MMLPSA, given that while the 2006 MMLPSA eliminates Bank representations and warranties for First Lien Loans, it explicitly retains them for Second Lien Loans.[289] This revision is difficult to interpret as anything other than a reaffirmation that the Bank is providing representations and warranties for Second Lien Loans.

Of course, the 2006 MMLPSA remained in effect for only seven months, from October 31, 2006 to June 1, 2007, when the 2007 MMLPSA took effect. As discussed above, the 2007 MMLPSA eliminated the separate pricing provisions previously applicable to Second Lien Loans and eliminated all loan-level representation and warranty provisions.

In any event, the Examiner concludes that claims concerning loans purchased under the 2006 MMLPSA, including Second Lien Loans, are not likely to prevail because the 2006 MMLPSA includes a two-year survival clause identical to the one contained in the 2001 MMLPSA.[290] Consequently, all claims by GMAC Mortgage against Ally Bank related to the representations and warranties under the 2006 MMLPSA likely would be held to have expired

---

[288] ResCap PLS Spreadsheet [EXAM00339947].

[289] 2006 MMLPSA, Art. IV [ALLY_0018291].

[290] *Id*. § 8.3; *see also* Section VII.L.2.a(1)(b) (discussing the enforceability and application of the 2001 MMLPSA's survival clause).

as of June 1, 2009, two years after the last loans were sold to GMAC Mortgage pursuant to the 2006 MMLPSA. Absent this survival clause, it is likely that Delaware's three-year statute of limitations for indemnification claims, and the fact that such claims accrue when the indemnifiable liability becomes fixed,[291] would have preserved claims by GMAC Mortgage against Ally Bank for repurchases or settlements related to Second Lien Loans occurring after May 14, 2009.[292]

While the Examiner concludes that claims related to loans sold under the 2006 MMLPSA are not likely to prevail, the Examiner's Professionals analyzed the available data to evaluate the liabilities GMAC Mortgage incurred for repurchases and settlement of representation and warranty claims in connection with Second Lien Loans purchased under the 2006 MMLPSA. It appears from the Debtors' records that there were no repurchases of Second Lien Loans of this vintage (before or after May 14, 2009).[293] There were, however, loans purchased from Ally Bank included among the securitizations issued by GMAC Mortgage in late 2006 and in 2007 that would be covered by the proposed $8.7 billion RMBS Trust Settlement Agreements. The available information concerning the precise volume and nature of these loans is limited, but they include Second Lien Loans. Ally Bank was identified as an originator or purchaser of loans in the prospectus supplements or the Debtors' records for thirty-eight securitizations issued between November 22, 2006 and May 31, 2007,[294] the period during which GMAC Mortgage purchased loans from Ally Bank under the 2006 MMLPSA. Of these thirty-eight

---

[291] *See* Section VII.L.2.a(1)(b) (for a discussion of the law concerning the statute of limitations applicable to claims for indemnification).

[292] *See* Section VII.L.2.a(1)(b); 2007 MMLPSA, § 6.1 [ALLY_0018275] (indemnification provision).

[293] 2008–2011 GMAC Repurchases Charged Info Final [EXAM00339948].

[294] GMAC Mortgage, LLC, GMACM Home Equity Loan Trust 2006-HE5, Prospectus Supplement (Nov. 28, 2006), at S-5; GMAC Mortgage, LLC, GMACM Home Equity Loan Trust 2007-HE, Prospectus Supplement (Mar. 28, 2007), at S-5. It is unclear from the prospectus supplements for securitizations issued in November 2006 after the November 22, 2006 Bank Restructuring whether or to what extent loans were purchased from Old GMAC Bank under the 2001 MMLPSA or from Ally Bank under the 2006 MMLPSA. For purposes of this analysis, the lone November 2006 Second Lien Loan securitization dated after November 22, 2006 is assumed to consist of Ally Bank loans.

securitizations, the disclosures identify two as containing Second Lien Loans.[295] These two securitizations have an original principal balance of approximately $2.4 billion, or 1.1% of the total original principal balance of all securitizations included in the Trust R&W Claims. The Exhibit below provides a summary of these two securitizations:

EXHIBIT VII.L.2.a(2)
**Securitizations Included in Trust R&W Claims and Containing Second Lien Loans Purchased from Ally Bank Under the 2006 MMLPSA**
November 22, 2006 – May 31, 2007
*($ in Millions)*

| Securitization Name | Original Principal Balance | Estimated Bank % | % of Total $8.7 Billion Settlement |
|---|---|---|---|
| 2006 - HE5 | $ 1,244 | 86.0% | 0.6% |
| 2007 - HE1 | 1,186 | 83.0% | 0.5% |
| Total | $ 2,430 | | 1.1% |

*Source: ResCap PLS Spreadsheet [EXAM00339947]; GMAC Mortgage, LLC, GMACM Home Equity Loan Trust 2006-HE5, Prospectus Supplement, at S-5 (Nov. 28, 2006); GMAC Mortgage, LLC, GMACM Home Equity Loan Trust 2007-HE1, at S-5 (Mar. 28 2007).*

As discussed in Section VII.L.2.a(1)(d)(iv), the Debtors allocated the $8.7 billion allowed claim pro rata based on an analysis of the estimated losses on each of the 392 securitizations. Under that allocation, the portion of the allowed claim attributed to these two securitizations was $102 million.[296] Based on the percentage of each securitization consisting of loans sold by Ally Bank identified in the prospectus supplements, the portion of the settlement attributable to such loans would be $86.1 million.[297]

However, as with the analysis in Section VII.L.2.a(1) of loans purchased under the 2001 MMLPSA, there are important reasons for believing that these amounts would overstate the liability properly allocable to loans purchased from Ally Bank. The same considerations noted there apply here. First, the available data does not permit segregation of loans that the Bank acquired in the first instance from GMAC Mortgage. Second, the allocation assumes that the loans purchased from the Bank performed the same as all other loans in the pertinent securitization. The data available do not permit an evaluation of this assumption; however, as the Debtors' spreadsheet analyzing the claims noted, "[h]istorically Bank production was high credit quality, which could lead to better performance[.]"[298]

In sum, the Examiner concludes that, while Ally Bank likely would be held to have provided representations and warranties for Second Lien Loans under the 2006 MMLPSA, a claim against the Bank for loans sold under the 2006 MMLPSA is unlikely to prevail because it would be time-barred under the two-year survival provision. If such claims were viable, based on the available data, it appears that the amount at issue would be less than $86.1 million.

---

[295] GMAC Mortgage, LLC, GMACM Home Equity Loan Trust 2006-HE5, Prospectus Supplement (Nov. 28, 2006), at S-5; GMAC Mortgage, LLC, GMACM Home Equity Loan Trust 2007-HE1, Prospectus Supplement (Mar. 28, 2007), at S-5.

[296] ResCap PLS Spreadsheet [EXAM00339947].

[297] *Id.*

[298] *Id.*

b.  *Failure To Obtain Independent Director Approval/Waivers Under The Operating Agreements*

As discussed in Section V.B, there are numerous agreements and revisions to agreements, including the 2006 MMLPSA and later revisions thereto, the 2007 through 2009 versions of the Pipeline Swap, and the 2007 MSR Swap, as well as the 2008 agreements regarding brokering loans to the Bank, that occurred between the inception of the 2005 Operating Agreement and November 2010, none of which were presented to the ResCap Board, or more particularly, to the Independent Directors.[299] Each of the 2005 Operating Agreement and the 2006 Amended Operating Agreement barred ResCap transactions with GMAC Affiliates that were not "consistent with those that parties at *arm's length* would agree to and for fair value,"[300] absent waiver of these restrictions by the Independent Directors.[301] As the parties themselves (and the regulators) repeatedly recognized, the MMLPSA, Pipeline Swap, and MSR Swap (considered singly or together) were not on terms that were available in the market, to which parties at arm's length would have agreed.

That GMAC Mortgage, rather than ResCap, entered into the agreements did not render the 2005 Operating Agreement's or the 2006 Amended Operating Agreement's affiliate transaction restrictions inapplicable; both the 2005 Operating Agreement and the 2006 Amended Operating Agreement explicitly required that ResCap's subsidiaries comply with the restrictions on affiliate transactions.[302] As David Walker, a former CFO of GMAC Mortgage Group and one of the architects of ResCap's formation and the 2005 Operating Agreement,[303] stated, the Operating Agreement's provisions concerning transactions with affiliates should be read to require approval of ResCap's subsidiaries' contracts with affiliates that were not ResCap subsidiaries "[b]ecause the point of the Operating Agreement is that ResCap's business, which would include that subsidiary activity, needs to be distinct from, you know, the rest of [AFI] . . . ."[304]

Walker, however, further suggested that ResCap/GMAC Mortgage transactions with the Bank would not trigger those provisions because the mortgage side of the Bank essentially should be viewed as a ResCap subsidiary, even after the 2006 Bank Restructuring

---

[299] The July 2010 MSR Swap revisions were approved by the ResCap Board in November 2010. Minutes of a Special Meeting of the Board of Residential Capital, LLC, Nov. 5, 2010, at RC40018844–45 [RC40018729].

[300] 2005 Operating Agreement, § 2(b) [ALLY_0140795] (emphasis added); 2006 Amended Operating Agreement, § 2(b) (Residential Capital, LLC, Current Report (Form 8-K) (Nov. 30, 2006), Ex. 10.1) (emphasis added).

[301] 2005 Operating Agreement, § 8 [ALLY_0140795]; 2006 Amended Operating Agreement, § 8 (Residential Capital, LLC, Current Report (Form 8-K) (Nov. 30, 2006), Ex. 10.1).

[302] 2005 Operating Agreement, § 2(b) [ALLY_0140795]; 2006 Amended Operating Agreement, § 2(b) (Residential Capital, LLC, Current Report (Form 8-K) (Nov. 30, 2006), Ex. 10.1) (ResCap required to assure that "its Subsidiaries" comply with restrictions on transactions with GMAC Affiliates).

[303] Int. of D. Walker, Nov. 28, 2012, at 11:10–21:24.

[304] *Id.* at 31:11–14.

(*see* Section V.A.1) occurred.[305] Of course, ResCap had no interest in Ally Bank at the time the 2006 MMLPSA was executed. But even after ResCap acquired its interest in IB Finance, under the terms of the 2006 Amended Operating Agreement, because ResCap's interest was non-voting, Ally Bank remained a "GMAC Affiliate" subject to the Operating Agreement's restrictions on Affiliate Transactions; and Ally Bank was not a ResCap "Subsidiary" to whom the restrictions did not apply.[306] Further, whatever logical force this position might have held in earlier years, it no longer held after January 2009, when ResCap sold the balance of its non-voting interest in Ally Bank; yet 2009 amendments to the Pipeline Swap and the MSR Swap were not presented to the ResCap Board or the Independent Directors.[307]

Nonetheless, the Examiner concludes there are significant obstacles that make it unlikely that any claim for breach of the Operating Agreements would result in any recovery against AFI.

First, as discussed in Sections V.B.12.a and V.B.12.b, the agreements at issue do not appear to have resulted in losses to GMAC Mortgage. While not on arm's-length terms, it does not appear that the agreements themselves were economically unfair to ResCap (though there are issues as to whether there were breaches of the agreements, discussed separately below). In short, the agreements do not appear to have materially and adversely affected ResCap's creditors.[308]

Second, and perhaps in contrast to the 2006 Bank Restructuring, the information obtained in the Investigation does not suggest that AFI or Ally Bank was responsible for the determination as to whether the agreements in question were submitted to the Independent Directors for review. Further, AFI's obligations under the Operating Agreements are narrowly

---

[305] *Id.* at 32:5–17 ("GMAC Mortgage engaging with the mortgage side of the bank is really like staying within the ResCap walls.").

[306] After the 2006 Bank Restructuring, GMAC Bank was wholly owned by IB Finance, which in turn was owned by AFI with 2 million IB Finance Class A Shares and ResCap with 2 million IB Finance Class M Shares. *See* Section V.A. To qualify as a "Subsidiary" of ResCap under the 2006 Amended Operating Agreement, ResCap had to own "a majority of the *voting interests*" of such company, either directly or indirectly. *See* 2006 Amended Operating Agreement, § 1 (Residential Capital, LLC, Current Report (Form 8-K) (Nov. 30, 2006), Ex. 10.1) (definition of "Subsidiary") (emphasis added). Here, ResCap owned no voting interests of GMAC Bank. Instead, GMAC held all of the voting interests of GMAC Bank, making GMAC Bank a Subsidiary of GMAC and a "GMAC Affiliate." *See id.* § 1. Consequently, transactions between GMAC Bank, on the one hand, and ResCap or its "Subsidiaries" (including GMAC Mortgage), on the other hand, clearly fell within the scope of transactions subject to restrictions pursuant to the 2006 Amended Operating Agreement's section 2(b) *Id.* § 2(k).

[307] *See* Sections V.B.1.a, VII.L.2.b.

[308] 2005 Operating Agreement, § 8 [ALLY_0140795]; 2006 Amended Operating Agreement, § 8 (Residential Capital, LLC, Current Report (Form 8-K) (Nov. 30, 2006), Ex. 10.1).

circumscribed,[309] and the Investigation has not revealed evidence of any breach of AFI's implied contractual duty of good faith[310] in connection with the execution of these agreements or the failure to submit them to the Independent Directors or ResCap's Board.

Third, and finally, as discussed in Section III.B, under the Operating Agreements, the remedies of third-party beneficiary creditors are "limited to specific enforcement of the provisions of th[e] Agreement";[311] there is a similar limitation of the remedies available against AFI to specific performance, coupled with an express prohibition on liability for damages.[312] With respect to the agreements at issue here, it does not appear that there is a basis for avoiding this limitation on remedies based on bad faith, fraud or conduct that "smacks of intentional wrongdoing."[313] Of course, the agreements in question were later replaced by successor versions approved by the Independent Directors and/or terminated.

Consequently, the Examiner concludes that any claims that the Operating Agreements were breached because the MMLPSA, Pipeline Swap, MSR Swap, or broker-related agreements were not on terms that parties at arm's length would have agreed to, and that this departure was not waived by the Independent Directors, are not likely to prevail.

### c. Application Of The Pipeline Swap To The Funding To Sale Period And To Bank-Originated Loans

As discussed in Sections V.B.5 and V.B.10.b(1), when HFS loans were added to the Pipeline Swap in July 2008 (contemporaneously with adoption of the 2008 MMLPSA), the parties did not revise the terms of the Pipeline Swap to extend the period covered beyond the rate lock to funding time period to include the time from the loan's funding to its sale to GMAC Mortgage under the MMLPSA.[314] They likewise failed to modify the Pipeline Swap's definition of Subject Transactions to include loans "originated" by the Bank, so that the Pipeline Swap by its terms remained limited to loans "purchased" by the Bank. Yet, it is clear

---

[309] 2005 Operating Agreement, § 7 [ALLY_0140795]; 2006 Amended Operating Agreement, § 7 (Residential Capital, LLC, Current Report (Form 8-K) (Nov. 30, 2006), Ex. 10.1). AFI's obligations under these provisions do not encompass section 2(b)'s covenant that ResCap and its "Subsidiaries" will not enter into affiliate agreements that are not on arm's length, fair-value terms, or section 8's provisions for waiver by the Independent Directors.

[310] *See* Section VII.L.1.

[311] 2005 Operating Agreement, § 11 [ALLY_0140795]; 2006 Amended Operating Agreement, § 11 (Residential Capital, LLC, Current Report (Form 8-K) (Nov. 30, 2006), Ex. 10.1).

[312] 2005 Operating Agreement, § 7 [ALLY_0140795]; 2006 Amended Operating Agreement, § 7 (Residential Capital, LLC, Current Report (Form 8-K) (Nov. 30, 2006), Ex. 10.1).

[313] *See* Section VII.L.1; *Deutsche Lufthansa A.G. v. Boeing Co.*, 2007 U.S. Dist. LEXIS 9519, at *7 (S.D.N.Y. Feb. 2, 2007); *Indus. Risk Insurers v. Port Auth.*, 387 F. Supp. 2d 299, 305 (S.D.N.Y. 2005); *Net2Globe Int'l, Inc. v. Time Warner Telecomm. of N.Y.*, 273 F. Supp. 2d 436, 454 (S.D.N.Y. 2003).

[314] As discussed in Section V.B.4, "rate lock" refers to the date upon which the Bank commits to fund or purchase a loan; "funding" refers to the date on which the Bank purchases or funds the loan, and "sale" refers to the date of sale under the MMLPSA.

that from and after July 2008 the Swap was applied as though it encompassed the period from funding to sale for HFS loans, and was applied to brokered loans originated by Ally Bank.

The issue, then, is whether application of the Pipeline Swap in this fashion should be considered a breach of the Pipeline Swap, or whether, notwithstanding the Pipeline Swap's seemingly unambiguous language, this application of the Pipeline Swap should be considered consonant with the parties' agreement. To resolve this question requires consideration of: (1) whether the doctrine of mistake should be applied to reform the Pipeline Swap's terms; and (2) whether, even if the doctrine of mistake is inapplicable, the parties modified the terms of the Pipeline Swap through their subsequent dealings.

### (1) Mutual Mistake

The Pipeline Swap is governed by New York law.[315] Under New York law, "[a] written agreement may be reformed for mutual mistake where the parties have reached an oral agreement and, unknown to either, the signed writing does not express that agreement."[316] Reformation is proper to "restate the intended terms of an agreement when the writing that memorializes that agreement is at variance with the intent of both parties."[317] A mistake in the reduction of the agreement to writing, no matter if the mistake is by a scrivener or a party, and

---

[315] March 2008 Pipeline Swap Schedule, part 4(h) [ALLY_0018074]; July 2008 Pipeline Swap Schedule, part 4(h) [ALLY_0018237]; Amended and Restated Schedule to the 2002 ISDA Master Agreement, dated as of Apr. 1, 2011, part 4(h) [RC00027879].

[316] *CRP/Extell Parcel I, L.P. v. Cuomo*, 34 Misc. 3d 1214(A), at *5 (N.Y. Sup. Ct. 2012), *aff'd*, 101 A.D.3d 473 (2012) (citing *Ebasco Constructors, Inc. v. Aetna Ins. Co.*, 260 A.D.2d 287, 290 (N.Y. App. Div. 1999); *see also Travelers Indem. Co. of Ill. v. CDL Hotels USA, Inc.*, 322 F. Supp. 2d 482, 495 (S.D.N.Y. 2004) ("Reformation or rescission may be appropriate where a writing does not set forth the actual agreement of the parties."); *Resort Sports Network Inc. v. PH Ventures III, LLC*, 67 A.D.3d 132, 135 (N.Y. App. Div. 2009) (same). By contrast, New York only permits reformation for a "unilateral mistake" where the mistake is coupled with fraud. *See Travelers Indem. Co. of Ill.*, 322 F. Supp. 2d at 498. Further, if the terms of the written agreement accurately memorialize the parties' agreement, the court will honor the writing and will not reform those terms to "alleviate a hard or oppressive bargain" subsequently realized. *George Backer Mgmt. Corp. v. Acme Quilting Co., Inc.*, 385 N.E.2d 1062, 1066 (N.Y. 1978) (holding that a contract that subsequently resulted in monetary consequences to a party that the party did not anticipate was still valid because the contract was highly negotiated, and the party could not show that the consequence of the contract was due to a mistake in the contract).

[317] *US Bank Nat'l Ass'n v. Lieberman*, 98 A.D.3d 422, 423–24 (N.Y. App. Div. 2012) (finding reformation not warranted where evidence proffered by plaintiff showed that the written agreement conformed to the intent of the parties). A claim for reformation of the 2008 Pipeline Swap would be timely. An action for reformation is governed by the six-year statute of limitations governing contracts in New York. N.Y.C.P.L.R. 213 (McKinney 2004); *Wilshire Credit Corp. v. Ghostlaw*, 300 A.D.2d 971, 973 (N.Y. App. Div. 2002) (citing *Wallace v. 600 Partners Co.*, 658 N.E.2d 715, 716 (N.Y. 1995)); *Schmitt v. Schmitt*, 123 A.D.2d 617 (N.Y. App. Div. 1986). The statute of limitations for such a claim begins to run from the time the asserted error was allegedly committed. *See Wallace*, 658 N.E.2d at 717.

no matter how the mistake occurred, can be corrected by reformation.[318] However, where the language of the contract is unambiguous, claims that the agreement does not reflect the parties' agreement face a heightened evidentiary burden.[319] The proponent of reformation must present "a high level of proof, free from contradiction or equivocation, that the instrument is not written as intended by both parties."[320] This requires "clear and convincing evidence"[321] of a prior agreement between the parties, showing exactly what the parties agreed upon.[322]

### (2) Modification

Under New York law, a written contract generally can be modified by agreement, whether express or implied.[323] The Pipeline Swap, however, explicitly provides that amendments to the agreement must be in writing:

> No amendment, modification or waiver in respect of this Agreement will be effective unless in writing (including a writing evidenced by a facsimile

---

[318] *Simek v. Cashin*, 292 A.D.2d 439, 440 (N.Y. App. Div. 2002); *see also Ebasco Constructors,* 260 A.D.2d at 290 (finding that plaintiffs overwhelmingly established the occurrence of a scrivener's error that justified remedy of reformation because evidence showed numerous errors in the insurance policy).

[319] *See S. Fork Broad. Corp. v. Fenton*, 141 A.D.2d 312 (N.Y. App. Div. 1988) (finding that conclusory assertions by a sophisticated party that the writing did not express the terms of the agreement cannot defeat summary judgment because the party must overcome a heavy presumption that a deliberately prepared and executed written instrument manifests the true intention of the parties).

[320] *CRP/Extell Parcel*, 34 Misc. 3d 1214(A), at *6–7 (citing 16 N.Y. JUR.2D CANCELLATION OF INSTRUMENTS § 92); *see also S. Fork Broad. Corp.*, 141 A.D.2d at 315 ("The proponent of reformation must show in no uncertain terms not only that mistake or fraud exists, but exactly what was really agreed upon between the parties."). The burden of proof for reformation is high in part because it implicates the type of danger against which the parol evidence rule and Statute of Frauds were meant to protect, namely, "the danger that a party, having agreed to a written contract that turns out to be disadvantageous, will falsely claim the existence of a different, oral contract." *Resort Sports Network*, 67 A.D.3d at 135 (citing *Chimart Assoc. v. Paul*, 489 N.E.2d 231, 234 (N.Y. 1986)).

[321] *See Healy v. Rich Prods. Corp.*, 981 F.2d 68, 73 (2d Cir. 1992); *Yu Han Young v. Chiu*, 49 A.D.3d 535, 536 (N.Y. App. Div. 2008).

[322] *See Lieberman*, 98 A.D.3d at 424 (stating that reformation based upon a scrivener's error requires proof of a prior agreement between parties); *K.I.D.E. Assocs., Ltd. v. Garage Estates Co.*, 280 A.D.2d 251, 253 (N.Y. App. Div. 2001) (noting that the evidence must show what parties agreed upon, particularly if the negotiations were conducted by sophisticated and counseled parties).

[323] *See S. Fed. Sav. & Loan Ass'n of Ga. v. 21-26 E. 105th St. Assocs.*, 145 B.R. 375, 380 (S.D.N.Y. 1991), *aff'd*, 978 F.2d 706 (2d Cir. 1992); *see also Robotic Vision Sys., Inc. v. Gen. Scanning, Inc.*, 96-CV-3884 (JG), 1997 WL 1068696, at *6 (E.D.N.Y. Sept. 8, 1997) (stating that "[p]arties to a contract may modify the terms of a written contract by a subsequent course of conduct").

transmission) and executed by each of the parties or confirmed by an exchange of telexes or electronic messages on an electronic messaging system.[324]

New York law concerning such provisions is similar to Delaware law.[325] "Under certain conditions, however, a written agreement which provides that it cannot be modified except by a writing, can be modified by a course of conduct or actual performance."[326] To demonstrate a modification, there must be mutual assent of each party.[327] It is not enough to simply show that the parties acted inconsistently with the terms of the written contract;[328] the parties' altered performance must be "unequivocally referable" to a modified oral agreement.[329] On the other hand, the course of performance and conduct of parties will hold great weight as to whether there was a modified oral agreement, as courts have held that "[t]he practical interpretation of a contract by the parties, manifested by their conduct subsequent to its formation for any considerable length of time before it becomes a subject of controversy, is

---

[324] ISDA Master Agreement, dated as of Oct. 1, 2004, § 9(b) [ALLY_0041583]; *see also* ISDA 2002 Master Agreement, dated as of Apr. 1, 2011, § 9(b) [RC00027962]:

> An amendment, modification or waiver in respect of this Agreement will only be effective if in writing (including a writing evidenced by a facsimile transmission) and executed by each of the parties or confirmed by an exchange of telexes or by an exchange of electronic messages on an electronic messaging system.

[325] *See* Section VII.L.2.a(1)(c) (discussing Delaware law).

[326] *S. Fed. Sav. & Loan Ass'n*, 145 B.R. at 380 (citing *Seven-Up Bottling Co. (Bangkok), Ltd. v. PepsiCo, Inc.*, 686 F. Supp. 1015, 1022 (S.D.N.Y. 1988)).

[327] *See Larson v. Eney*, 741 F. Supp. 2d 459, 465 (S.D.N.Y. 2010) (noting that mutual assent includes a meeting of the minds as to all material terms); *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 783 (2d Cir. 2003) ("[A] single act of accepting payment is not a course of performance sufficient to demonstrate mutual assent.").

[328] *See, e.g.*, *Airway Maint., LLC v. N. Fork Bank*, No. 0015081/2004, 2007 WL 4846194 (N.Y. Sup. Ct. Nov. 21, 2007) (finding that conduct itself could not produce a modification, particularly where plaintiffs did not produce any evidence of an oral agreement to modify); *Robotic Vision Sys.*, 1997 WL 1068696, at *6 (rejecting as insufficient a party's claim that a confidentiality agreement, which required oral designations of confidentiality to be followed by a written designation, was modified by the parties' course of conduct because the parties never designated anything in writing); *S. Fed. Sav. & Loan Ass'n*, 145 B.R. at 380–81 (finding that a bank's conduct, which demonstrated an intention to ignore restrictions and limitations in the contract and to use undisbursed funds to pay hard and soft costs, did not amount to a modification by conduct because there was no evidence that the parties had mutually assented and agreed to modification).

[329] *See S. Fed. Sav. & Loan Ass'n*, 145 B.R. at 380–81 (stressing that the party must show evidence that the conduct and verbal agreement refers specifically to the modification, rather than only to an intent to modify or to an action inconsistent with the written contract. Without this implied agreement to modify, conduct on its own is insufficient); *Airway Maint.*, 2007 WL 4846194 (stating that plaintiff needs to prove that conduct is unequivocally referable to the alleged oral modification and that the conduct conferred some benefit on the party against whom enforcement is sought); *Ballard v. Parkstone Energy, LLC*, 522 F. Supp. 2d 695, 709 (S.D.N.Y. 2007) ("For a course of performance to demonstrate mutual assent to a modification, it must be 'unequivocally referable' to the modification.").

entitled to great, if not controlling weight in the construction of the contract."[330] Further, a valid modification must include consideration—legal detriment incurred by both parties—to support the change.[331]

Here, given the available evidence and the exacting standard, while the applicability of the doctrine of mistake is a closer question, there appears to be a strong argument for modification.

As discussed in Section V.B.5, the Bank's HFS portfolio historically had been hedged through the application of the MMLPSA and its cost-based pricing. The 2008 revision of the MMLPSA and the addition of the HFS portfolio to the Pipeline Swap, were by all accounts aimed at maintaining the hedged status of the portfolio.[332] The contemporaneous MMLPSA pricing revisions, with their reference to hedge accounting, appear to reflect a similar intent.[333] Moreover, it appears that, from the outset, the parties performed as though the HFS portfolio was fully hedged, so that, in combination with the MMLPSA, the loans would be transferred to GMAC Mortgage at cost, as they always had. None of the personnel interviewed, and none of the documents produced, evidence any other view.

The language of the Swap, however, unambiguously refers solely to the rate lock to funding period, and Bank personnel, at least, realized that this was the language in the agreement.[334] There seems to be no doubt that the language used was language the parties

_____

[330] *Viacom Int'l, Inc. v. Lorimar Prods., Inc.*, 486 F. Supp. 95, 98 n.3 (S.D.N.Y. 1980); *see also Austin v. Barber*, 227 A.D.2d 826, 828 (N.Y. App. Div. 1996) (finding that, despite a contractual provision barring modification except in writing, the conduct of the parties demonstrated a modification because evidence showed plaintiff requested certain additions to a construction contract, and defendant performed those requests).

[331] *See Rooney v. Slomowitz*, 11 A.D.3d 864, 867 (N.Y. App. Div. 2004) ("Consideration is necessary to prove the existence of an oral modification of a written agreement."); *Metzger v. Aetna Ins. Co.*, 229 A.D. 2, 6 (N.Y. App. Div. 1930) (finding sufficient consideration where defendant received a larger premium and plaintiff was relieved from danger of immediate cancellation); *Pactiv Corp. v. Multisorb Techs. Inc.*, 823 F. Supp. 2d 840, 847 (N.D. Ill. 2011) (applying New York law and rejecting as insufficient a party's claim that a confidentiality agreement between food packaging manufacturer and its competitor was modified through conduct so as to include oral disclosures and non-designated documents as confidential information under the agreement when there was no consideration for these additional inclusions); *Ballard*, 522 F. Supp. 2d at 710 (finding that there was no consideration for the seller's purported waiver of a 60 day deadline); *Estate of Anglin v. Estate of Kelley*, 270 A.D.2d 853 (N.Y. App. Div. 2000) (holding no modification by conduct to have been made because there was no consideration made by either party for any change to plaintiff's entitlement under a buy-sell agreement).

[332] Int. of R. Groody, Dec. 17, 2012, at 160:10–161:6, 164:25–165:13, 167:9–174:14; Int. of A. Celini, Feb. 18, 2013, at 196:22–197:18; GMAC Bank Affiliate Transaction Memorandum, July 1, 2008 Schedule to ISDA Master Agreement, dated June 30, 2008, at 3 [ALLY_0017919] (asserting that the transaction results in a "perfect hedge for the Bank").

[333] 2008 MMLPSA, § 1.9 [ALLY_0201210].

[334] *See* GMAC Bank Affiliate Transaction Memorandum, July 1, 2008 Schedule to ISDA Master Agreement, dated June 30, 2008, at 1 [ALLY_0017919] (noting swap covers changes in value "from the rate lock date to the time of funding for HFI and HFS").

knew they were using. The Investigation has uncovered no evidence that the parties specifically agreed that the period covered should be rate lock to sale,[335] and that this simply did not get transcribed in the document.

Instead, the problem appears to be that these were complicated transactions, and, whether through carelessness in analysis, sloppiness in preparation of the agreements (of which there are numerous examples),[336] or otherwise, the parties simply seem not to have understood that to achieve their agreed general purpose, this language should have been revised to extend the period to which the Swap applied to the date of sale. While hedging the HFI portfolio only for the period from lock to funding fit the business purpose of that portion of the transaction, hedging the HFS portfolio only for this shorter period and leaving the portfolio unhedged from funding to sale would have made little business sense. The parties' consistent conduct following adoption of the 2008 Pipeline Swap and MMLPSA revisions was to apply the Swap to the full rate lock to sale period; GMAC Mortgage, for example, hedged the risk in the market as though it had fully assumed the risk, rather than leaving the risk for the funding to sale period with Ally Bank.[337]

Whether the contract would be reformed under the doctrine of mistake based on these facts is a close question, but the Examiner concludes that a court more likely than not would reform the contract.

The argument for application of the mistake doctrine to reform the 2008 Pipeline Swap to encompass brokered loans is weaker. In July 2008, the volume of brokered, Bank-originated loans was very small.[338] There appears to be no evidence that these loans were specifically discussed in the discussions leading up to adoption of the 2008 Pipeline Swap.

However, it is abundantly clear from the written record of the Brokering Consumer Loans to Bank Project, described in Section V.B.6.a and in Section V.B.6.d, that the parties intended that the Pipeline Swap apply not only to brokered loans, but also to the "funding to sale" period. Those documents, including e-mails exchanged between the parties documenting their agreement on the economics, reflect an agreement that the Pipeline Swap will apply to brokered loans, and will apply from rate lock to sale; indeed, the whole analysis of the allocation of revenues undertaken in connection with the project turns upon application of the Swap in this fashion. Consequently, even if one were to conclude that the doctrine of mistake was inapplicable to the contract terms as originally written, there appears to be a very strong argument that, at minimum, the contract terms were modified in connection with the Brokering Consumer Loans to Bank Project.

---

[335] As discussed in Section V.B.4, "rate lock" is when the funding price to the borrower or purchase price to a third party is fixed and "sale" is when the loan is sold to GMAC Mortgage.

[336] *See, e.g.*, Section V.B.4.d (discussing the May 2007 Pipeline Swap).

[337] *See* Int. of S. Blitzer, Mar. 5, 2013, at 105:21–107:24; *see also* Int. of J. Whitlinger, Nov. 30, 2012, at 134:19–135:5, 137:10–20, 147:25–148:11.

[338] *See* Int. of A. Celini, Feb. 18, 2013, at 41:19–23.

Accordingly, the Examiner concludes that it is unlikely that a claim that the Pipeline Swap was breached when it was applied to the funding to sale period would prevail, and it is unlikely that a claim that application of the Swap to brokered loans was a breach would prevail.

### d. The Misallocation Of Net Revenues On Loans Brokered By GMAC Mortgage

Section V.B.6 sets forth in detail the facts underlying this issue, and the Examiner's evaluation of the evidence concerning the negotiation of the brokering arrangement, the implementation of the agreed allocation of revenues in January–July 2009, the effect of the Bank's fair-value election, and the 2011–12 investigation of and response to the revenue-allocation issue.

In sum, the evidence shows that the participants in the Brokering Consumer Loans to Bank Project agreed to an allocation of revenues on loans GMAC Mortgage brokered to the Bank that was consistent with the prior allocation of revenues on 250.250 loans, and with the application of the pricing and swap provisions of the MMLPSA and Pipeline Swap. While the Bank initially was to receive certain revenues such as points and origination fees, and to incur certain expenses such as broker expense, the BCL2B Presentation and contemporaneous e-mail exchanges between Bank and ResCap representatives all demonstrate that the parties contemplated that, through the application of FAS 91 deferrals, the economic effect of all these revenues and expenses would be transferred to GMAC Mortgage. The accounting examples provided in the BCL2B Presentation are equally clear on this point. It is telling that the parties upon inception of the brokering arrangement implemented the revenue allocation in just this fashion.

The parties' agreement, moreover, reflected the parties' fundamental approach to the allocation of revenues, repeatedly articulated by Bank officers Celini and Groody: the Bank would act as a financing conduit, collecting net carry, while GMAC Mortgage would assume the risks on the transaction, including representation and warranty risk, hedging risk, etc., and was consequently entitled to the gain on sale.

Later claims in 2012 that the BCL2B Presentation was somehow "unclear" appear to simply ignore the repeated demonstration of how the parties in 2008 (and afterwards) understood the revenue allocation would work (perhaps, in the case of KPMG, because it lacked access to all of the available information). There is ample fodder here for an argument that the initial reaction of those reviewing the problem in late 2011 (that the Bank had retained gain on sale revenue due to GMAC Mortgage) was squelched, and that the result in 2012 was the product of a desire, in the face of ResCap's impending bankruptcy, to avoid restating Ally Bank's financials (and the regulatory scrutiny that would have ensued), rather than a fair and objective attempt to resolve the matter.[339]

---

[339] It might be possible to fashion a breach of fiduciary duty claim against ResCap officials who apparently succumbed to AFI's and the Bank's desires. As discussed in Section VII.E.2.c, such claims face a variety of substantial obstacles. More to the point, they would appear in this instance to be wholly redundant of the recoveries the Examiner concludes are already available to Debtors under contract law.

The evidence shows that the Bank's August 1, 2009 conversion to fair-value accounting, even if unintentionally, resulted in a straightforward breach of the parties' agreement, documented in the MMLPSA and Pipeline Swap and in the parties' communications and documentation concerning the Brokering Consumer Loans to Bank Project and in their subsequent conduct from January 1, 2009 to July 31, 2009.[340] There is no evidence that GMAC Mortgage agreed to the fundamental reallocation of revenues wrought by the Bank's fair-value accounting election—that it agreed that it would continue to absorb the risks related to the loan transaction while allowing the Bank to retain a portion of the gain on sale. Indeed, neither party seems to have even understood that the fair-value election had effected this change until December 2011. In any case, as the Bank's Sponsor of the Brokering Consumer Loans to Bank Project, Celini, noted, to alter the revenue allocation that had been agreed upon (whether through a change in accounting or otherwise) would have required an affirmative agreement of the parties, and there was no such agreement here. There thus does not appear to be any basis to conclude that the fair-value election reflected a modification of the parties' agreements.

Accordingly, the Examiner concludes that GMAC Mortgage likely would prevail on a contractual claim that the allocation of revenues from January 1, 2009 to July 31, 2009 was proper, and that it is entitled to payment of the revenues misallocated to the Bank from and after August 1, 2009.[341] GMAC Mortgage would be entitled not only to return of the $51.4

---

[340] Even if the contemplated allocation of revenues was not mandated by the terms of the 2008 MMLPSA and Pipeline Swap, the contemporaneous Brokering Consumer Loans to Bank Project documentation and the parties ensuing implementation of the arrangement would constitute a written modification of those agreements to provide for the contemplated revenue allocation. *See* Section V.B.6; ISDA Master Agreement, dated as of Oct. 1, 2004, § 9(b) [ALLY_0041583] (acknowledging agreement to modify through electronic messages); 2008 MMLPSA, § 8.8 [ALLY_0201210]. Although the 2008 MMLPSA requires that any modification include a signed writing, Delaware courts have held that modifications to agreements may nevertheless be valid even if such modifications do not comply with the terms set forth for modifications in the original agreement. *See Pepsi-Cola Bottling Co. v. Pepsico Inc.*, 297 A.2d 28, 33 (Del. 1972) ("We think, therefore, that a written agreement between contracting parties, despite its terms, is not necessarily only to be amended by formal written agreement."); *see also Cont'l Ins. Co. v. Rutledge & Co., Inc.*, 750 A.2d 1219, 1229 (Del. Ch. 2000) ("[I]t is settled law that contract provisions deeming oral modifications unenforceable can be waived orally or by a course of conduct just like any other contractual provision.").

[341] The claim would be predicated upon the MMLPSA, governed by Delaware law, and the Pipeline Swap, governed by New York law, and the parties' agreements reflected in the documentation of the Brokering Consumer Loans to Bank Project. See 2001 MMLPSA, § 8.5 [ALLY_0018253]; March 2008 Pipeline Swap, part 4(h) [ALLY_0018074]; July 2008 Pipeline Swap Schedule, part 4(h) [ALLY_0018237]; Amended and Restated Schedule to the 2002 ISDA Master Agreement, dated as of Apr. 1, 2011, part 4(h) [RC00027879]. Under either Delaware's three-year statute of limitations (and Bankruptcy Code section 108's tolling provisions) or New York's six-year statute, the claims would be timely. New York law would call for the application of interest at the rate of 9% per annum. See N.Y. C.P.L.R. § 5004. Under Delaware law, the applicable rate would be 5% above the Federal Reserve discount rate. See DEL. CODE ANN. tit. 6, § 2301(a); see also Chaplake Holdings Ltd. v. Chrysler Corp., No. Civ.A 94C-04-164-JO, 2003 WL 22853462, at *5 (Del. Super. Ct. Oct. 30, 2003). Precisely which rate a court would apply in these circumstances is unclear, but the pertinent rate would be applied to the $51.4 million component repaid to Ally Bank from the repayment date, and to the $469.1 million in revenues retained by the Bank for the period August 1, 2009 through April 2012 from the date on which each of the constituent portions of those revenues was due to GMAC Mortgage (i.e., the sale date of the pertinent loan).

million paid to Ally Bank in March 2012,[342] but also to payment of over $469 million in additional revenues (net of the below-market broker fee) that it would have received had the parties' agreed revenue allocation been abided by from August 1, 2009 to April 30, 2012, when the MMLPSA and Pipeline Swap were terminated.

### e. Failure To Pay The Value Of Correspondent-Loan And Purchased MSRs To GMAC Mortgage Under The MSR Swap

As discussed in Section V.B.10.b.(2), Ally Bank has, as part of its payments under the MSR Swap, paid to GMAC Mortgage the value of MSRs arising from Bank-originated loans upon their initial capitalization, but has not done so for MSRs arising from loans the Bank purchased from correspondents or for purchased MSRs. GMAC Mortgage has a potential claim that Ally Bank breached the Swap's requirements by failing to pay to GMAC Mortgage the value of such newly recognized MSRs. The value of the MSRs not paid to GMAC Mortgage is approximately $1.725 billion, including $1.329 billion for the period before the April 2011 revision of the MSR Swap.[343] As discussed below, this claim raises issues similar to those under the 2001 MMLPSA and the Pipeline Swap, discussed in Sections VII.L.2.a(1)(c) and VII.L.2.c, involving the parties' consistent implementation of a contract in a fashion that conflicts with its written terms. However, the proper resolution of those issues in this context is less clear-cut.

The MSR Swap's FMV Schedule (before the April 2011 revisions) defined the "Subject Transaction" as the "dollar amount of mortgage servicing rights owned by [Ally Bank] as reported on the accounting general ledger of [the Bank]," and requires periodic payment of the "FMV Change," defined as "in respect of a Subject Transaction . . . the FAS 156 mark to market for the Valuation Period as recorded by [Ally Bank] against the mortgage servicing right asset."[344] These FMV Swap provisions do not explicitly distinguish between "FAS 156 mark to market" changes related to bank-originated loan MSRs and those related to the recognition of correspondent-loan MSRs or purchased MSRs. By their terms, the provisions turn on the value of the MSRs on the balance sheet, not on whether the Bank has recognized a gain on the asset in its income statement.

As a preliminary matter, the evidence does not appear to support Young's assertions concerning this issue. As discussed in Section V.B.10.b(2), Young contended that the increases in the value of the Bank's MSR portfolio due to newly recognized MSRs were not required to be paid under the MSR Swap's FMV Schedule because they are not part of the "FAS 156 mark to market," and that the Bank had instead paid the capitalized value of Bank-originated loan MSRs to GMAC Mortgage not under the FMV Swap, but as part of the Net Servicing Fee. As Young pointed out, the Bank recognizes a gain, or earnings, on MSRs arising from Bank-originated loans (having paid nothing to purchase the MSR), while, for

---

[342] Whether the payment of the $51,419,494 constituted a voidable preference is addressed separately in Section VII.F.5.c(3).

[343] *See* Section V.B.10.b(2), Ex. V.B.10.b(2).

[344] 2007 FMV Schedule, parts 6(a)(iii), (v) [RC00027822].

purchased MSRs and correspondent-loan MSRs for which the Bank paid an SRP (servicing-released premium), it does not recognize a gain because it records the MSR at the value for which it was purchased. The same is true for excess servicing rights (where the capitalized value of the excess servicing rights for both Bank-originated loans and correspondent loans also corresponded to a gain). Were Young's explanation correct, the Bank's treatment of newly recognized MSRs would be consistent with the MSR Swap.

The Examiner concludes, however, that Young's attempt to reconcile the parties' practices with the terms of the MSR Swap is not likely to prevail for several reasons reflected in the discussion in Section V.B.10.b(2):

> (1) First, FAS 156 *does* encompass the initial recognition of an asset on an entity's balance sheet.

> (2) Second, the original Net Servicing Fee definition, when speaking to "amounts collected or earned by" the Bank, referred to these amounts as "*i.e.* normal servicing fees and ancillary income" (not, "*e.g.* normal servicing fees and ancillary income"); Young acknowledged that the amounts in question are neither.

> (3) Third, while the documentary evidence concerning the portion of the MSR Swap under which the capitalization of Bank-originated MSRs was paid is limited, it reflects that the parties understood the payment was made under the FMV Swap.

> (4) Fourth, Cortese, who was heavily involved in implementation of the Swaps, plainly understood that these payments were made under the FMV Swap (before and after the April 2011 revisions).

Further, the April 2011 revisions to the MSR Swap do not appear to eliminate the applicability of the FMV Swap to recognition of new MSRs on the Bank's balance sheet (including capitalization of the correspondent-loan MSRs and purchased MSRs). On the contrary, the FMV and FMV Change definitions adopted in April 2011 speak simply of changes in the "estimated valuation of the mortgage servicing rights then owned by [the Bank],[345] abandoning the requirement that the change be the "FAS 156 mark to market." To the extent Young's argument that the FMV Swap was inapplicable because recognition of a new MSR is not a "FAS 156 mark to market" had any force, it is inapplicable to the revised language adopted in April 2011.

On the other hand, it is true that the April 2011 MSR Swap Confirmation's definition of Actual Net Servicing Fee eliminates the reference to "normal servicing fees and ancillary income" found in the Net Servicing Fee definition in earlier versions of the Swap. Instead, the Actual Net Servicing Fee definition as written encompasses *any* amounts "posted to all servicing and mortgage servicing rights related income statement accounts" in the Bank's general ledger, not limited to normal servicing fees and ancillary income. This would

---

[345] April 2011 MSR Swap Confirmation, § 2 [ALLY_0041799] (definitions of FMV Change and FMV Value).

encompass the gains on Bank-originated loan MSR capitalization and the recognition of excess servicing rights, but not the recognition of correspondent-loan MSRs or purchased MSRs (which involve no gain). But, by the same token, if this definition is not limited to normal servicing fees and ancillary income, then it also encompasses the amounts Young concedes were always covered by the FMV Swap—the periodic adjustments to fair value (mark to market) of MSRs previously capitalized on the Bank's general ledger, because those amounts are also posted to mortgage servicing rights income statement accounts in the Bank's general ledger.[346] Consequently, that the revised Actual Net Servicing Fee definition is broad enough to encompass capitalization of MSRs for Bank-originated loans does not resolve whether the FMV Swap also applies.

Focusing first on the period before the April 2011 amendment, the question is whether application of the FMV Swap to encompass changes in the value of MSRs arising from Bank-originated loans, but not to MSRs arising from correspondent loans or to purchased MSRs, is consistent with the parties' agreement. As Cortese's explanation of the disparate treatment of the different types of MSRs reflects, it rested on a notion that the "Swap is more of a revenue, of a P&L view, than, say, the balance sheet," and the MSRs were differentiated based on whether they involved a "gain or loss," rather than whether their recognition involved a "change[] in the balance sheet." But this is plainly at odds with the language of the FMV Schedule, which explicitly and unambiguously speaks to the balance sheet—"the dollar amount of mortgage servicing rights owned by [the Bank] as reported on the accounting general ledger of [the Bank]"—not to whether the Bank's initial booking of the asset involves a gain or loss.

Nevertheless, here, as in other instances discussed above, the parties appear to have consistently applied the agreement in a way that is at odds with its language. The question then, is whether the parties should be understood to have agreed to different terms than those reflected in the language of their agreement, based either on the doctrine of mistake or on a claim that they modified the terms of their contract.

The MSR Swap is governed by New York law.[347] New York law governing the doctrines of mistake and modification is discussed in Sections VII.L.2.c(1) and VII.L.2.c(2).

The doctrine of modification does not appear to be the proper rubric for analysis of this issue, at least before the April 2011 revisions (which are analyzed below). There is no suggestion here of an agreement after the Swap was adopted to alter its terms (in contrast to Celini's statements concerning an agreement to modify the 2001 MMLPSA representation and warranty provisions, *see* Section V.B.3, and the Broker to Bank evidence of agreement that the Pipeline Swap would govern brokered loans, *see* Section V.B.6). Like the MMLPSA

---

[346] *See* Mortgage Segment Legacy YTD Consolidating Trial Balance (Dec. 31, 2011) [EXAM00228758]. Although this is undoubtedly not what the parties intended, applied in accordance with its terms, the revised Actual Net Servicing Fee language would arguably require double payments to GMAC Mortgage of the gain on MSR and excess servicing fee capitalization.

[347] *See* 2007 FMV Schedule, part 4(h) [RC00027822] (stating that New York law governs); 2007 Net Funding Schedule, part 4(h) [RC00027852] (same); 2010 FMV Schedule, part 4(h) [ALLY_0018110] (same); 2010 Net Funding Schedule, part 4(h) [ALLY_0018118] (same); Amended and Restated Schedule to the 2002 ISDA Master Agreement, dated as of Apr. 1, 2011, part 4(h) [RC00027879] (same).

and the Pipeline Swap, the MSR Swap barred oral modifications.[348] Consequently, as discussed above, to establish a modification, it is not enough to show that the parties acted inconsistently with a contract's written terms; the parties' altered performance must be "unequivocably referable" to a modified oral agreement.[349] Of course, in evaluating claims that there was such an oral modification, the parties' subsequent conduct would be entitled to great weight.[350] But, again, before April 2011, there is no claim of modification here and no event that seems to entail a modification. Further, it does not appear that a modification in which GMAC Mortgage simply gave up the right to receive the newly recognized value of correspondent-loan MSRs and purchased MSRs would be supported by mutual consideration.[351]

Instead, the claim, best articulated by Cortese, is that the parties always intended the agreement to operate in the fashion in which it was applied, and, implicitly, that the inconsistent language in the FMV Swap—which unambiguously applies to the value of MSRs on the balance sheet, rather than their impact on the income statement—should be understood

---

[348] The MSR Swap provides:

> No amendment, modification or waiver in respect of this Agreement will be effective unless in writing (including a writing evidenced by a facsimile transmission) and executed by each of the parties or confirmed by an exchange of telexes or electronic messages on an electronic messaging system.

ISDA Master Agreement, dated June 12, 2007, § 9(b) [ALLY_0041610].

[349] *See S. Fed. Sav. & Loan Ass'n of Ga. v. 21-26 E. 105th St. Assocs.*, 145 B.R. 375, 380–81 (S.D.N.Y. 1991), *aff'd*, 978 F.2d 706 (2d Cir. 1992) (stressing that the party must show evidence that the conduct and verbal agreement refers specifically to the modification, rather than only to an intent to modify or to an action inconsistent with the written contract. Without this implied agreement to modify, conduct on its own is insufficient); *Airway Maint., LLC v. N. Fork Bank*, No. 0015081/2004, 2007 WL 4846194 (N.Y. Sup. Ct. Nov. 21, 2007) (stating that plaintiff needs to prove that conduct is unequivocally referable to the alleged oral modification and that the conduct conferred some benefit on the party against whom enforcement is sought); *Ballard v. Parkstone Energy, LLC*, 522 F. Supp. 2d 695, 709 (S.D.N.Y. 2007) ("For a course of performance to demonstrate mutual assent to a modification, it must be 'unequivocally referable' to the modification.").

[350] *Viacom Int'l, Inc. v. Lorimar Prods., Inc.*, 486 F. Supp. 95, 98 n.3 (S.D.N.Y. 1980); *see also Austin v. Barber*, 227 A.D.2d 826, 828 (N.Y. App. Div. 1996) (finding that, despite a contractual provision barring modification except in writing, the conduct of the parties demonstrated a modification because evidence showed plaintiff requested certain additions to a construction contract, and defendant performed those requests).

[351] *See Rooney v. Slomowitz*, 11 A.D.3d 864, 867 (N.Y. App. Div. 2004) ("Consideration is necessary to prove the existence of an oral modification of a written agreement."); *Metzger v. Aetna Ins. Co.*, 229 A.D. 2, 6 (N.Y. App. Div. 1930) (finding sufficient consideration where defendant received a larger premium and plaintiff was relieved from danger of immediate cancellation); *Pactiv Corp. v. Multisorb Techs. Inc.*, 823 F. Supp. 2d 840, 847 (N.D. Ill. 2011) (applying New York law and rejecting as insufficient a party's claim that a confidentiality agreement between food packaging manufacturer and its competitor was modified through conduct so as to include oral disclosures and non-designated documents as confidential information under the agreement when there was no consideration for these additional inclusions); *Ballard v. Parkstone Energy, LLC*, 522 F. Supp. 2d 695, 710 (S.D.N.Y. 2007) (finding that there was no consideration for the seller's purported waiver of a 60 day deadline); *Estate of Anglin v. Estate of Kelley*, 270 A.D.2d 853 (N.Y. App. Div. 2000) (holding no modification by conduct to have been made because there was no consideration made by either party for any change to plaintiff's entitlement under a buy-sell agreement).

as a mistake in the drafting of the agreement. As discussed in Section VII.L.2.c(1), where the language of the contract is unambiguous, claims that the agreement does not reflect the parties' agreement face a heightened evidentiary burden.[352] The proponent of reformation must present "a high level of proof, free from contradiction or equivocation that the instrument is not written as intended by both parties."[353] This requires "clear and convincing evidence"[354] of a prior agreement between the parties, showing exactly what the parties agreed upon.[355]

According to Cortese, the focus on whether the MSR involved a gain for the Bank was attributable to the fact that "[t]he intent of the swap was to have all those economics, net cash flows, go back to GMAC Mortgage," since "[t]he Bank was holding the MSR for, I think, purely financing purposes."[356] Cortese, of course, was not a party to the negotiation of the MSR Swap, and, unfortunately, the recollection of the participants in those negotiations, particularly with respect to the issue of the treatment of newly recognized MSRs, was limited.[357]

However, the documentary record shows that from the outset, the MSR Swap was conceptualized as a "total return swap."[358] Under this "total return swap," all of the economics of the MSRs would be traded to GMAC Mortgage in exchange for a fixed rate of return,

---

[352] *See S. Fork Broad. Corp. v. Fenton*, 141 A.D.2d 312 (N.Y. App. Div. 1988) (finding that conclusory assertions by a sophisticated party that the writing did not express the terms of the agreement cannot defeat summary judgment because the party must overcome a heavy presumption that a deliberately prepared and executed written instrument manifests the true intention of the parties).

[353] *CRP/Extell Parcel I, L.P. v. Cuomo*, 34 Misc. 3d 1214(A), at *6–7 (N.Y. Sup. Ct. 2012), *aff'd*, 101 A.D.3d 473 (2012) (citing 16 N.Y. Jur.2d Cancellation of Instruments § 92); *see also S. Fork Broad. Corp.*, 141 A.D.2d at 315 ("The proponent of reformation must show in no uncertain terms not only that mistake or fraud exists, but exactly what was really agreed upon between the parties."). The burden of proof for reformation is high in part because it implicates the type of danger against which the parol evidence rule and Statute of Frauds were meant to protect, namely, "the danger that a party, having agreed to a written contract that turns out to be disadvantageous, will falsely claims the existence of a different, oral contract." *Resort Sports Network Inc. v. PH Ventures III, LLC*, 67 A.D.3d 132, 135 (N.Y. Sup. Ct. 2009) (citing *Chimart Assoc. v. Paul*, 489 N.E.2d 231, 234 (N.Y. 1986)).

[354] *See Healy v. Rich Prods. Corp.*, 981 F.2d 68, 73 (2d Cir. 1992); *Yu Han Young v. Chiu*, 49 A.D.3d 535, 536 (N.Y. App. Div. 2008).

[355] *See U.S. Bank Nat. Ass'n v. Lieberman*, 98 A.D.3d 422, 424, 950 N.Y.S.2d 127, 129 (N.Y. App. Div. 2012) (stating that reformation based upon a scrivener's error requires proof of a prior agreement between parties); *K.I.D.E. Assocs., Ltd. v. Garage Estates Co.*, 280 A.D.2d 251, 253 (N.Y. App. Div. 2001) (noting that the evidence must show what parties agreed upon, particularly if the negotiations were conducted by sophisticated and counseled parties).

[356] Int. of J. Cortese, Mar. 7, 2013, at 28:19–29:9.

[357] *See* Int. of R. Groody, Dec. 17, 2012, at 215:21–216:5; Int. of B. Bier, Feb. 22, 2013, at 154:23–158:5.

[358] *See* Preliminary Analysis of Bank Opportunity [EXAM11248134] (referring to total return swap) (attached to e-mail from B. Bier to D. Applegate (Dec. 14, 2006) [EXAM11232773]).

eliminating risk (other than counterparty risk) to the Bank.[359] Precisely what this meant in the context of the recognition and capitalization of new MSRs does not appear from the available evidence to have been specifically addressed at the time; the principal focus was instead on the volatility of the asset. The Bank did recognize a gain on the capitalization of new MSRs for Bank-originated loans that it did not recognize for the other MSRs in question, and passing this gain on to GMAC Mortgage preserved the Bank's profit and loss neutrality. Further, Groody's August 2007 presentation to the Bank Board, after saying that "the Bank will pay cash to GMAC [Mortgage] in the event the market value of the asset increases" (and vice versa if the market value decreases), states that "[t]he swap will use the recorded amounts in the Bank's income statement at the basis for the cash settlement of the swap to ensure all monthly income statement volatility is removed from the Bank each month." The presentation is not specific to MSR capitalization or recognition, and, again, is not particularly detailed, but, like Cortese, it does focus on "income statement" impact.

However, the parties nevertheless chose to draft the FMV Swap to call for payments based on changes to the balance sheet value of the Bank's MSR assets. The Investigation has revealed no evidence to suggest use of this specific language was somehow unintended, or that the parties had intended that other language be used. As with the Pipeline Swap, discussed in Section VII.L.2.c, the issue instead seems to be that the language was included intentionally, but did not accomplish the parties' agreed purpose (or match the parties' consistent implementation of the agreement).

Notably, in light of the absence of any provision for unwinding the MSR Swap on termination, discussed in Section V.B.9.b(5), it is questionable whether the economics of the transaction ultimately make sense, even as applied, with the payment for capitalization of MSRs limited to those for Bank-originated loans. The terms of the MSR Swap permit GMAC Mortgage to keep the remaining value of the MSRs (to the extent not already repaid to Ally Bank through amortization and market-driven declines in value) upon termination of the agreement, even though it had not paid an SRP to acquire the MSR (as it would have done before implementation of the MSR Swap). As discussed in Section V.B.9.b(5), this could be viewed as akin to permitting the borrower on a loan to retain the loan's remaining unpaid principal balance upon termination. One might have expected the MSR Swap's termination provisions to include a provision for a run-off of the existing MSR portfolio or for a return of the remaining value of the MSRs to the Bank on termination. But they contain no such provisions, and, as a result, upon termination of the MSR Swap, results were simply trued up through the termination date. The Bank paid GMAC Mortgage approximately $364 million under the MSR Swap for Bank-originated loan MSRs from 2007 through April 2012,[360] and GMAC Mortgage kept the unamortized portion of those MSRs at termination.

Whatever one concludes about the economics of the Swap as implemented, it would make little economic sense to enforce the pre-April 2011 MSR Swap as written and require

---

[359] *See, e.g.*, Minutes of a Regular Meeting of the Board of Directors of GMAC Bank, Aug. 22, 2007, at ALLY_PEO_0001451 [ALLY_PEO_0001400].

[360] *See* Section V.B.12.b(1), Ex. V.B.12.b(1)-3.

payment to GMAC Mortgage of the value of correspondent-loan MSRs and purchased MSRs, which totaled $1.329 billion for the period from the inception of the Swap until its amendment in April 2011 (including $402 million in 2007 and 2008 before the 2009 Bank Transaction).[361] The Bank had paid to purchase these MSRs (either through payment of an SRP or by purchasing the MSR separately from a loan). Requiring that their value be paid to GMAC Mortgage when the MSR was recorded on the Bank's balance sheet and not recovered on termination is more difficult to justify than paying GMAC Mortgage the value of Bank-originated loan MSRs. While Ally Bank owned all of these MSRs, and GMAC Mortgage paid an SRP for none of them, paying over Bank-originated loan MSRs at least preserved P&L neutrality for the Bank.

The MSR Swap, as discussed in Section V.B.9, was a recurring subject of concern for the Bank's regulators. It is not clear that they (or anyone else) understood this aspect of the MSR Swap's functioning with respect to Bank-originated loan MSRs. It may be that the Bank would have substantial arguments that the arrangement would not have withstood regulatory scrutiny had it been applied to require payment of the value of purchased and correspondent-loan MSRs upon recognition. And the Bank, of course, had the right to terminate the MSR Swap upon relatively short notice, particularly after the September 2009 amendment permitting the Bank to terminate on thirty days' notice.

Accordingly, as with the application of the Pipeline Swap, based on the available evidence and the exacting standard which governs the application of the doctrine of mistake, while it is a close question, the Examiner concludes that a court more likely than not would reform the pre-April 2011 MSR Swap to require payment of the value of newly recognized MSRs only for those MSRs on which the Bank recognized a gain.

Turning, then, to the period from adoption of the April 2011 MSR Swap Confirmation through termination of the Swap, the first issue is whether the revisions establish that the value of newly purchased MSRs or correspondent-loan MSRs would not be captured by the FMV portion of the Swap.[362] However, as discussed above, the April 2011 FMV Change and FMV definitions are, if anything, even clearer in their applicability, given the elimination of the "FAS 156 mark to market" reference. Apart from that revision, the only substantive April 2011 change to the FMV Swap is the introduction of the "MSR Amount" adjustment to the FMV Change.[363] However, as Young pointed out, that provision applies only to circumstances where the Bank has sold MSRs, requiring adjustment of the FMV Change based on the gain or loss realized in such sales. While calculation of the Bank's gain or loss on such sales does take into account any gain the Bank realized on capitalization of the MSRs, the reference to gain on capitalization is limited to this context, and is not made applicable to the calculation of the FMV Change except where there has been a sale of MSRs.

---

[361] *See* Section V.B.10.b(2), Ex V.B.10.b(2).

[362] *See Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 466–67 (2d Cir. 2010); *R/S Assocs. v. New York Job Dev. Auth.*, 771 N.E.2d 240, 242 (N.Y. 2002); *W.W.W. Assocs., Inc. v. Giancontieri*, 566 N.E.2d 639, 642 (N.Y. 1990).

[363] April 2011 MSR Swap Confirmation, § 2, at 4 [ALLY_0041799] (definition of MSR Amount).

The issue, therefore, again becomes whether the doctrine of mistake is applicable. All of the same considerations applicable to the analysis of the pre-April 2011 MSR Swap set forth above are similarly applicable to the April 2011 MSR Swap Confirmation. Added to these considerations is the fact that, by April 2011, the parties' practice had long been in place, that, as Cortese testified, the accountants had gone to those preparing the revised language to tell them "this is how we're doing it" and seek "language that coincided with how [the accountants] were doing it."[364] On the other hand, the requested revisions seem not to have been executed in a way that accomplished this purpose. Further, the disparate economic result of transferring the newly recognized value of purchased MSRs and correspondent-loan MSRs to GMAC Mortgage, MSRs for which it had paid no SRP, would be an additional $397 million for the period when the April 2011 MSR Swap was in effect.[365]

Considering all of the facts and circumstances, the Examiner concludes that, while it is a close question, a court more likely than not would reform the April 2011 MSR Swap Confirmation to require payment of the value of newly recognized MSRs only for those MSRs on which the Bank recognized a gain.

### 3.   Dispute Regarding Application Of Indemnity Cap

As discussed in Section V.C.2, the interpretation of the provisions set forth in the January 30 Letter Agreement, the Servicing Agreement Modification Terms, and ultimately the A&R Servicing Agreement, have been the subject of a dispute. The Debtors assert that the January 30 Letter Agreement, and thus the A&R Servicing Agreement, provides for a cap on indemnity payments to be made to Ally Bank by GMAC Mortgage relating to the modification of loans in the Ally Bank portfolio. AFI and Ally Bank argue that the A&R Servicing Agreement, which constitutes the entire agreement of the parties, is unambiguous, does not include a cap on indemnity payments relating to loan modifications, and is consistent with the terms of the January 30 Letter Agreement.

#### a.   The Terms Of The January 30 Letter Agreement

The "reimbursement" and "indemnity" provisions set forth in the January 30 Letter Agreement and the Servicing Agreement Modification Terms, respectively, are not identical and appear to cover distinct situations. A closer examination of these provisions illustrates the differences.

---

[364] Int. of J. Cortese, Mar. 7, 2013, at 37:24–38:13.

[365] *See* Section V.B.10.b(2); Ex. V.B.10.b(2).

The reimbursement provision of the January 30 Letter Agreement, paragraph 5, provides that:

> ResCap and [GMAC Mortgage] each acknowledges and agrees to fully reimburse AFI and Ally Bank for any and all amounts expended by AFI or Ally Bank in connection with AFI's or Ally Bank's performance or satisfaction of obligations under any [DOJ/AG Settlement] or FRB/FDIC Consent Order and for any fines, penalties or other amounts levied against AFI or Ally Bank, in each case, as a result of the failure of ResCap, [GMAC Mortgage] or their subsidiaries to perform their obligations under any [DOJ/AG Settlement] or FRB/FDIC Consent Order.[366]

This provision is expressly limited by the following language:

> ResCap and [GMAC Mortgage] shall not have any further obligation to reimburse AFI or Ally Bank for Settlement Costs pursuant to this Paragraph 5 from and after the time ResCap and [GMAC Mortgage] have effected the hard dollar payments . . . and have earned $200,000,000 of funds paid or credited as a result of mitigation, remediation or other financial accommodation to mortgage loan borrowers or other third parties . . . pursuant to the [DOJ/AG Settlement].[367]

This reimbursement obligation (and the subsequent limitation) covers "amounts expended by AFI and Ally Bank . . . as a result of the failure of ResCap, [GMAC Mortgage] or their subsidiaries to perform their obligations under any [DOJ/AG Settlement] . . ." and is capped as set forth therein.[368]

In contrast, the indemnity provision set forth in Servicing Agreement Modification Terms provides that GMAC Mortgage "shall indemnify Ally Bank for any loss suffered by Ally Bank with respect to Subject Loans as a result of any modification or loss mitigation . . . ."[369] These two provisions, covering "amounts expended . . . for any fines, penalties, or other amounts levied against AFI or Ally Bank" as opposed to "loss[es] suffered" as a result of loan modification activity provide distinct and targeted language crafted to address two different

---

[366] January 30 Letter Agreement, ¶ 5 [ALLY_0194817].

[367] *Id*.

[368] *Id*.

[369] *Id*. Ex. C-1.

issues.[370] The indemnity provision included in the Servicing Agreement Modification Terms lacks a limitation similar to that provided in paragraph 5 of the January 30 Letter Agreement. The only limiting provision prohibits GMAC Mortgage from performing "modifications or other loss mitigation activities once indemnification payments to Ally Bank pursuant to the Modification Amendment exceed $75,000,000 in the aggregate."[371]

A review of drafts of the January 30 Letter Agreement distributed during negotiation also highlights this distinction.[372] For example, paragraphs 4 and 5 of AFI's January 25 draft agreement, detailed in Section V.C.2.a, have separate provisions with language almost identical to the separate provisions discussed above.[373] The inclusion of both provisions in the text of the same draft agreement would indicate that the drafter considered these two separate and distinct provisions. ResCap's response to this draft agreement corroborates this interpretation. ResCap's mark-up of AFI's January 25 draft agreement incorporated a cap on the reimbursement for "amounts expended by AFI or Ally Bank" in connection with the DOJ/AG Settlement "from and after the time ResCap and [GMAC Mortgage] have effected the hard dollar payments . . . and $200 million of soft dollar credits pursuant to the DOJ/State AG Settlement."[374] However, ResCap only deleted most of what was paragraph 5 of AFI's January 25 draft agreement regarding the reimbursement of "Ally Bank for any loss suffered by Ally Bank with respect to any mortgage loan as a result of any modification or loss mitigation" in connection with the DOJ/AG Settlement,[375] rather than proposing a cap as it had in the other provision.

### b. The Terms Of The A&R Servicing Agreement

The A&R Servicing Agreement incorporates the indemnity provision required by the Servicing Agreement Modification Terms. Specifically, the A&R Servicing Agreement provides that "[GMAC Mortgage] shall indemnify [Ally Bank] for losses suffered by [Ally Bank] as a result of any action taken in accordance with the AG Menu Items attached hereto as Exhibit 4-B; provided, that [GMAC Mortgage] shall not be required to indemnify [Ally Bank] for any losses in connection with any such action that also would have been permitted under the terms of the Standard Matrix."[376] Exhibit 4-B provides the framework for "ResCap AG Consumer Relief," or the implementation of the consumer relief required by the DOJ/AG Settlement.

---

[370] Employees of GMAC Mortgage admit that, at the very least, the language in the Servicing Agreement Modification Terms is more specific to modification activity. *See* Int. of J. Pensabene, Jan. 9, 2013, at 205:19–21 (when asked about the language in Exhibit C to the January 30 Letter Agreement in comparison to the language in paragraph 5, Pensabene noted that it was "language clearly much more specific to modification activity.").

[371] January 30 Letter Agreement, Ex. C-2 [ALLY_0194817].

[372] An in-depth discussion of the negotiation of the January 30 Letter Agreement is included in Section V.C.2.a.

[373] AFI Draft Terms of Support Relating to Possible DOJ/State Attorneys' General Settlement, dated Jan. 25, 2012, ¶¶ 4–5 [EXAM20276340].

[374] Draft Terms of Support Relating to Possible DOJ/State Attorneys' General Settlement—ResCap Comments, dated Jan. 26, 2012, ¶ 4 [RC00067767].

[375] *Id*. ¶ 6.

[376] A&R Servicing Agreement, § 10.01(e) [ALLY_0114469].

The A&R Servicing Agreement also includes the limitation on modifications as set forth in the Servicing Agreement Modification Terms, which states that "[i]n no case shall [GMAC Mortgage] evaluate additional Portfolio Loans for actions pursuant to the AG Menu Items in the month following the month in which indemnification payments to [Ally Bank] . . . exceed $75,000,000 in the aggregate."[377] The A&R Servicing Agreement notably omits, however, any cap on indemnity such as the cap included in paragraph 5 of the January 30 Letter Agreement, which limits GMAC Mortgage's reimbursement liabilities once the "hard dollar payments" have been made under the DOJ/AG Settlement, and ResCap and GMAC Mortgage have earned $200 million of "soft dollar credits."[378]

### c. Ambiguity

The January 30 Letter Agreement and the A&R Servicing Agreement are governed by New York law.[379] Under New York law, an ambiguity exists when an agreement "on its face" is "reasonably susceptible" to more than one interpretation.[380]

No ambiguity exists when contract language has "a definite and precise meaning, unattended by danger of misconception in the purport of the [agreement] itself, and concerning which there is no reasonable basis for a difference of opinion."[381] In addition, contractual "[l]anguage whose meaning is otherwise plain does not become ambiguous merely because the parties urge different interpretations," unless each is a reasonable interpretation.[382] When determining whether a particular provision is ambiguous, the agreement must be read "as a whole to ensure that undue emphasis is not placed upon particular words and phrases."[383] Taking the agreement "as a whole" should involve the recognition of contrasting provisions[384] and may eliminate any ambiguity.[385]

---

[377] *Id.* § 10.01(f).

[378] January 30 Letter Agreement, ¶ 5 [ALLY_0194817].

[379] *Id.* ¶ 13; A&R Servicing Agreement, § 12.07 [ALLY_0114469].

[380] *Greenfield v. Philles Records, Inc.*, 780 N.E.2d 166, 171 (N.Y. 2002); *Chimart Assocs. v. Paul*, 489 N.E.2d 231, 233 (N.Y. 1986); *see, e.g.*, *Readco, Inc. v. Marine Midland Bank,* 81 F.3d 295, 299 (2d Cir. 1996).

[381] *Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 467 (2d Cir. 2010); *Greenfield*, 780 N.E.2d at 170–71; *Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir. 1989); *Breed v. Ins. Co. of N.A.*, 385 N.E.2d 1280, 1282–83 (N.Y. 1978).

[382] *Law Debenture Trust Co.*, 595 F.3d at 467 (citing *Hunt Ltd.* 889 F.2d at 1277).

[383] *Id.* (citing *Bailey v. Fish & Neave*, 868 N.E.2d 956, 959 (N.Y. 2007)); *Crow & Sutton Assocs., Inc. v. Welliver McGuire, Inc.*, 820 N.Y.S.2d 179, 179 (N.Y. App. Div. 2006); *see also Lockheed Martin Corp. v. Retail Holdings, N.V.*, 639 F.3d 63, 69 (2d Cir. 2011).

[384] *See, e.g.*, *W.W.W. Assocs., Inc. v. Giancontieri*, 566 N.E.2d 639, 642 (N.Y. 1990).

[385] *Law Debenture Trust Co.*, 595 F.3d at 467 (citing *Readco, Inc.*, 81 F.3d at 299) ("[W]here consideration of the contract as a whole will remove the ambiguity created by a particular clause, there is no ambiguity."); *see also Hudson-Port Ewen Assocs., L.P. v. Chien Kuo*, 578 N.E.2d 435, 435 (N.Y. 1991).

The primary objective of contract interpretation is to construe an agreement in accordance with the parties' "expressed" intent,[386] and "the best evidence of what parties to a written agreement intend is what they say in their writing."[387] Accordingly, "a written agreement that is complete, clear and, unambiguous on its face must be [interpreted] according to the plain meaning of its terms,"[388] without any assistance from extrinsic evidence.[389]

While evidence "outside the four corners of a document as to what was really intended . . . is generally inadmissible to add to or vary the writing,"[390] extrinsic evidence of the parties' intent may be considered if an agreement is ambiguous.[391] However, "extrinsic and parol evidence is not admissible to create an ambiguity" in an otherwise complete and clear agreement.[392]

### d. Analysis

The Examiner concludes that it is likely that a court would find that AFI's and Ally Bank's position, that there was no cap on the indemnity obligation set forth in the Servicing Agreement Modification Terms and the A&R Servicing Agreement, would prevail.

The indemnity provision of the A&R Servicing Agreement is likely to be considered unambiguous. The only limitation with respect to this provision is that modifications must cease when indemnification payments reach $75 million in the aggregate, and may only resume upon agreement by the parties. The A&R Servicing Agreement does not incorporate a cap relating to the payment of the hard dollar payments and the earning of $200 million in soft dollar credits. The Debtors do not dispute this. They instead argue that the A&R Servicing

---

[386] *Hunt Ltd.*, 889 F.2d at 1277; *Law Debenture Trust Co.*, 595 F.3d at 467; *see also Welsbach Elec. Corp. v. MasTec N.A., Inc.,* 859 N.E.2d 498, 500 (N.Y. 2006); *Greenfield v. Philles Records, Inc.*, 780 N.E.2d 166, 170 (N.Y. 2002).

[387] *Greenfield*, 780 N.E.2d at 170 (citing *Slamow v. Del Col,* 594 N.E.2d 918, 919 (N.Y. 1992)); *see, e.g., Wallace v. 600 Partners Co.,* 658 N.E.2d 715, 717 (N.Y. 1995); *Breed v. Ins. Co. of N.A.*, 385 N.E.2d 1280, 1282 (N.Y. 1978).

[388] *Law Debenture Trust Co.,* 595 F.3d at 467 (citing *Greenfield*, 780 N.E.2d at 170); *see, e.g., R/S Assocs. v. N.Y. Job Dev. Auth.*, 771 N.E.2d 240, 242 (N.Y. 2002); *Reiss v. Fin. Performance Corp.*, 764 N.E.2d 958, 960 (N.Y. 2001); *Bailey v. Fish & Neave*, 868 N.E.2d 956, 959 (N.Y. 2007) ("[W]here the language is clear, unequivocal and unambiguous, the contract is to be interpreted by its own language.") (internal quotation marks omitted); *W.W.W. Assocs., Inc.*, 566 N.E.2d at 642 ("[W]hen parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms.").

[389] *Int'l Multifoods Corp. v. Commercial Union Ins. Co.,* 309 F.3d 76, 83 (2d Cir. 2002); *Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's, London, England,* 136 F.3d 82, 86 (2d Cir.1998); *see, e.g., State v. Home Indem. Co.*, 486 N.E.2d 827, 828–29 (N.Y. 1985).

[390] *Law Debenture Trust Co.*, 595 F.3d at 466; *R/S Assocs.*, 771 N.E.2d at 242; *W.W.W. Assocs., Inc.*, 566 N.E.2d at 642.

[391] *Law Debenture Trust Co.*, 595 F.3d at 467; *Greenfield*, 780 N.E.2d at 170.

[392] *S.Rd. Assocs., LLC v. Int'l Bus. Machines Corp.*, 826 N.E.2d 806, 809 (N.Y. 2005) (citing *W.W.W. Assocs., Inc.*, 566 N.E.2d at 642); *R/S Assocs.*, 771 N.E.2d at 242–43; *Reiss*, 764 N.E.2d at 961.

Agreement must be read in conjunction with the January 30 Letter Agreement, and that the January 30 Letter Agreement "capped the Debtors' reimbursement obligations to AFI and Ally Bank once the Debtors had made the $110 million cash payment and earned $200 million in Soft Dollar Credits."[393]

Even assuming the Debtors are correct, and these documents cannot be interpreted independently of each other,[394] the Examiner's conclusion remains the same, as a court would likely conclude that the terms of the January 30 Letter Agreement are also unambiguous. Taking the January 30 Letter Agreement as a whole, and considering contrasting the provisions of paragraph 5 and the Servicing Agreement Modification Terms likely eliminates any ambiguity. As stated above, the reimbursement provision in paragraph 5 of the January 30 Letter Agreement and the indemnity provision set forth in the Servicing Agreement Modification Terms and the A&R Servicing Agreement are different. The provision in paragraph 5 has a cap, while the provisions in the Servicing Agreement Modification Terms and the A&R Servicing Agreement are subject only to the limitation relating to the payment of $75 million in the aggregate. While individuals interviewed by the Examiner have stated that the parties had a business understanding that there was to be a cap on indemnity payments made under the terms of the Servicing Agreement Modification Terms and the A&R Servicing Agreement,[395] a plain reading of the document would be unlikely to support such an interpretation.

Moreover, even if a court were to find the January 30 Letter Agreement ambiguous, and thus look to extrinsic evidence, the Examiner finds it likely that a court would determine that the parties did not intend to include a cap on the indemnity payments related to loan modifications. As provided herein, a review of the drafts of the January 30 Letter Agreement does not indicate any intent of the parties to include an indemnity cap, but instead supports the proposition that the provisions were distinct. In two ancillary writings, which provided the parties an opportunity to clarify their alleged business understanding, a February 9, 2012

---

[393] Letter from L. Nashelsky to R. Schrock (July 9, 2012) (attached to Declaration of Thomas Marano, Chief Executive Officer of Residential Capital, LLC, in Further Support of Debtors' Ally Servicing Motion [Docket No. 793-1] at Ex. 7).

[394] The Examiner has not been asked to opine on this issue, and it appears unlikely that the Examiner's ultimate conclusion would be impacted either way.

[395] *See, e.g.*, Int. of J. Whitlinger, Feb. 27, 2013, at 206:25–207:8 ("[O]ur view was—and I was very clear when we were negotiating some of this—that 'You're giving us debt forgiveness of $196.5 million. And once we hit above that amount, we don't have to pay anymore. Because you only gave us debt forgiveness up to that amount. Yes.?' 'Yes.' That was the business understanding."). Despite this, Whitlinger acknowledged that this understanding may not have made it into the actual agreement. *See id.* at 209:5–12 (responding to a question of whether this understanding made it into the January 30 Letter Agreement or elsewhere and stating that "[w]hat you have is what you have. That's why we were debating it for my other deposition"); Int. of J. Pensabene, Jan. 9, 2013, at 242:19–24 ("It was my understanding that one, we had exceeded our estimate—internal estimates indicated that we had exceeded $200 million worth of credit and as a result we were not required to make any further reimbursement to the bank.").

e-mail[396] and a May 11, 2012 agreement regarding the reimbursement obligations of ResCap and GMAC Mortgage,[397] the parties specifically refer to the use of Ally Bank's loan portfolio in exchange for "full reimbursement" to Ally Bank, rather than discussing a cap in any manner. The course of conduct of the parties supports this proposition as well. In reviewing voluminous correspondence concerning the lengthy negotiation of the A&R Servicing Agreement, the negotiation of the AG Menu Matrix, or the discussions regarding the prepetition indemnity payment, the Examiner did not encounter any evidence of the parties discussing any indemnity cap. There were numerous discussions regarding the $75 million aggregate cap and how to deal with that issue, both pre- and postpetition.[398] While this aggregate limit was the cause of great concern for the parties, at no time prior to June 20 did ResCap and GMAC Mortgage indicate that the alleged cap on indemnity payments was an issue.

---

[396] E-mail from J. Young to R. Zachary, H. Benton, T. Hamzehpour, J. Pensabene, C. Evans, and J. Whitlinger (Feb. 9, 2012), at EXAM20169859–60 [EXAM20169858] (responding to a request for e-mail confirmation regarding the ability to perform modifications in Ally Bank's loan portfolio, Young stated "[y]es, under the agreement of full reimbursement for all losses related to loan preservation activities").

[397] *See* Agreement for AG Settlement Loan Modifications For April 2012, dated May 11, 2012 [ALLY_PEO_0087335] ("The parties acknowledge that such modifications, which are required in order . . . to comply with the terms of the [DOJ/AG Settlement], are conditioned on full reimbursement to Ally Bank of all losses in accordance with the [January 30 Letter Agreement], as well as the [AG Menu Matrix] . . . .").

[398] *See* Sections V.C.2.b, V.C.2.c, V.C.2.d. Further, the majority of discussions involving the $75 million aggregate cap involved concern over whether the cap would prevent GMAC Mortgage from performing the required modifications. *See* E-mail from C. Schares (Apr. 12, 2012) [EXAM00001279] (responding to a question from Rosen of whether reimbursements were capped at $75 million, Schares responded "[u]nfortunately, yes. But we could still argue for our interpretation and we can also ask to increase the cap"). This seems inconsistent with the existence of an indemnity cap as the Debtors allege.

## VIII. THIRD-PARTY CLAIMS AGAINST THE AFI DEFENDANTS

## A.  INVESTIGATION OF THIRD-PARTY CLAIMS

The AFI Settlement and Plan Sponsor Agreement provided for, among other things, a broad Third-Party Release of the AFI Released Parties from any and all causes of action arising from or related in any way to the Debtors.[1] The Examiner Scope Approval Order directs the Examiner to: (1) investigate the merits of the claims to be released pursuant to the Third-Party Release; (2) analyze the sufficiency of the consideration to be provided for the Third-Party Release; and (3) solicit the parties' views concerning the merits of such claims and the potential amount of damages arising therefrom (but not to independently quantify such damages).[2] Following the expiration of the AFI Settlement and Plan Sponsor Agreement on February 28, 2013,[3] the Examiner determined, in consultation with the Bankruptcy Court and representatives of the Debtors, the Creditors' Committee, and AFI, that such an analysis remained important to any potential global settlement and plan of reorganization. Accordingly, the Investigation of Third-Party Claims proceeded as contemplated by the Examiner Scope Approval Order.

### 1.  Scope Of Third-Party Claims Investigation

Given the potential breadth of claims and the time frame available to investigate them, the Investigation focused primarily on identifying claims that could materially affect the terms of a settlement with AFI and corresponding Third-Party Release. The Investigation identified

---

[1]  AFI Settlement and Plan Sponsor Agreement, § 3.1(d)(ii). The Third-Party Release, as originally proposed, provided in relevant part as follows:

> On and as of the Effective Date, the holders of Claims and Interests shall be deemed to provide a full discharge and release to the Released Parties and their respective property from any and all Causes of Action, whether known or unknown, whether for tort, fraud, contract, violations of federal or state securities laws, veil piercing or alter-ego theories of liability, or otherwise, arising from or related in any way to the Debtors, including those in any way related to residential mortgage backed securities issued and/or sold by Debtors and/or the Chapter 11 Cases or the Plan; provided that claims of the Debtors' directors and officers against Ally pursuant to Ally's indemnification obligations and Section 2.2 hereof (as well as any applicable insurance related thereto) shall not be released. . . . The Confirmation Order will permanently enjoin the commencement or prosecution by any person or entity, whether directly, derivatively or otherwise, of any Claims, obligations, damages, demands, debts, rights, suits, Causes of Action, judgments, or liabilities released pursuant to the Plan.

> *Id.* "Released Parties" refers to AFI "on behalf of its direct and indirect subsidiaries and affiliates" as well as "each of theirs and the Debtors' respective members, officers, directors, agents, financial advisors, attorneys, employees, partners, affiliates, and representatives." *Id.* § 1.2.

[2]  Examiner Scope Approval Order, at 5.

[3]  *See* Response of the Official Committee of Unsecured Creditors to Debtors' Motions for (I) Appointment of a Chief Restructuring Officer and (II) Entry of an Order Further Extending Their Exclusive Periods to File a Chapter 11 Plan and Solicit Acceptance Thereof [Docket No. 3042] at 7.

four main categories of claims that merit discussion: (1) claims against the Debtors and the AFI Defendants on account of residential mortgage-backed securities (the "RMBS Claims"); (2) claims against the Debtors' and the AFI Defendants' directors and officers related to mortgage-backed securities (the "D&O RMBS Claims"); (3) claims against the Debtors and the AFI Defendants related to areas of the Debtors' businesses other than the securitization of mortgage loans (the "Non-RMBS Claims"); and (4) the potential causes of action assertable by holders of the Unsecured Notes (the "Unsecured Noteholder Causes of Action").

The RMBS Claims represent one of the most significant sources of potential liability for the Debtors and the AFI Defendants.[4] Of the four types of claims described above, the RMBS Claims are the only type explicitly identified in the Third-Party Release.[5] This is unsurprising given the fact that the pending actions related to the RMBS Claims (the "RMBS Actions") are large-scale, complex litigations, some of which have been pending in state or federal court for years.[6]

The RMBS Claims are based upon various legal theories, including breach of contract, fraud, negligence, and violation of state and federal securities laws. They arise from the same body of underlying facts as the claims implicated in the RMBS Trust Settlement Agreements, but differ with respect to the types of claims asserted and the parties asserting them. The representation and warranty claims proposed to be released by the RMBS Trust Settlement Agreements relate to breach of contract claims assertable on behalf of the RMBS trusts and arise from the Debtors' failure to repurchase defective loans.[7] Because the Debtors intend to address those claims in conjunction with the RMBS Trust Settlement Agreements, they were

---

[4]  *See, e.g.*, Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the RMBS Trust Settlement Agreements [Docket No. 320] at 3 ("The R&W Claims are the single largest set of disputed claims against the Debtors' estates by a wide margin").

[5]  *See* AFI Settlement and Plan Sponsor Agreement, § 3.1(d)(ii) (releasing claims "in any way related to residential mortgage backed securities issued and/or sold by Debtors . . . .").

[6]  *See, e.g.*, Am. Compl., *MBIA Ins. Corp. v. Residential Funding Co., LLC*, Case No. 603552/2008, Docket No. 28 (N.Y. Sup. Ct. Mar. 19, 2010); Compl., *MBIA Ins. Corp. v. GMAC Mortg., LLC*, Case No. 600837/2010, Docket No. 2 (N.Y. Sup. Ct. Apr. 1, 2010); Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 For Approval of the RMBS Trust Settlement Agreements [Docket No. 320] at 24–26. Debtors' Second Supplemental Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the RMBS Trust Settlement Agreements [Docket No. 1887] at 27–28 ("[T]he litigation of alleged representation and warranty breaches alone is extremely complex, labor-intensive, costly and time-consuming. The discovery required to resolve claims based on the 1.6 million loans in the Trusts would be massive, as the relevant documents and information will differ from case to case. . . . ResCap's experience in *MBIA Insurance Corp. v. Residential Funding Company, LLC* illustrates the true enormity and difficulty of such litigation. . . . [F]act discovery has not been completed over three and a half years after MBIA first sued RFC.").

[7]  *See* Debtors' Motion Pursuant to Fed. R. Bankr. P. 9019 for Approval of the RMBS Trust Settlement Agreements [Docket No. 320] at 2 ("The RMBS Trust Settlement resolves . . . alleged and potential representation and warranty claims . . . held by up to 392 securitization trusts . . . [which] allegedly arise under Pooling and Servicing Agreements, Assignment and Assumption Agreements, Indentures, Mortgage Loan Purchase Agreements and other documents governing the Trusts . . . .").

not included in the Investigation of Third-Party Claims. By contrast, the RMBS Claims are mostly securities law and tort-based causes of action asserted by investors who purchased securities from the Debtors.[8]

With respect to the AFI Defendants, and as discussed further below, many of the RMBS Claims rely on derivative liability theories, such as alter ego and "control person" liability under state and federal securities laws. To succeed on such theories, plaintiffs must essentially make two showings: (1) that the Debtors are liable for a primary violation; and (2) that the facts warrant holding the AFI Defendants responsible for the Debtors' conduct. Given the Examiner's mandate to determine whether the AFI Defendants have provided sufficient consideration for the Third-Party Release, the Investigation focused primarily on the second showing—the extent to which the AFI Defendants might be held derivatively liable for the Debtors' RMBS-related conduct (assuming the Debtors are found liable for the underlying primary claims).[9]

Further, given this focus, the Examiner's Professionals did not undertake certain activities necessary to evaluate the Debtors' primary liability, such as loan-level diligence, re-underwriting of loan files, or calculation of breach rates, loss-share rates, or the securitization trusts' estimated lifetime losses. While these issues are contested and could significantly affect any ultimate findings of liability and/or quantum of damages, a full investigation into the Debtors' underlying liability and the corresponding defenses was outside the scope of the Investigation. Accordingly, the Examiner's findings with respect to the RMBS Claims are not meant to represent a dispositive analysis of all outstanding claims. Rather, they represent an evaluation of the claims most likely to affect the value of any future AFI settlement and Third-Party Release. Unless otherwise noted, the Examiner has not reached any definitive conclusions with respect to the Third-Party Claims, all of which would require further factual development before final determinations of liability could be made.

One final noteworthy aspect of the RMBS Claims and RMBS Actions is that the Third-Party Claimants themselves have, for the most part, conducted only limited investigation of the underlying facts. Only a handful of the RMBS Actions have progressed beyond motions to

---

[8]   One potential area of overlap between the Investigation of Third-Party Claims and the RMBS Trust Settlements is the claims of monoline insurers, such as FGIC and MBIA. *See* Debtors' Reply Brief re Non-*Iridium* Issues in Support of Motion for Approval of RMBS Settlement Agreements [Docket No. 2804] at 18 ("If the Debtors' view is correct, then MBIA's and FGIC's fraudulent inducement claims fall within the scope of the release set out in section 7.01 [of the RMBS Trust Settlements]. MBIA and FGIC, of course, may argue that their fraudulent inducement claims exist independently of the governing agreements."). Accordingly, the Investigation of Third-Party Claims included these claims, but the Examiner notes that their viability may be affected by the RMBS Trust Settlements.

[9]   In analyzing these claims, the Examiner's Professionals also considered RMBS Actions that do not, as of yet, explicitly name any of the AFI Defendants. The Examiner's Professionals considered these claims because (1) they are substantially similar to the RMBS Actions that do name the AFI Defendants; and (2) some parties that did not initially plead claims against the AFI Defendants, and have not had an opportunity to amend their complaints, have advised the Examiner's Professionals that they believe they do in fact hold such claims.

dismiss and none have yet proceeded to trial. This status is not limited to the RMBS Actions identified herein, but is generally representative of RMBS-related litigation as a whole.[10] As the Debtors' RMBS litigation expert, Jeffrey Lipps, has represented to the Court, the RMBS Actions pose "unique legal and evidentiary challenges, many of which have not fully developed in a definitive way in the case law to date, and none of which have been litigated to resolution with respect to the Debtors specifically."[11] The Examiner's Professionals have surveyed the relevant decisions in this area (several of which were issued during the course of the Investigation) and note that this area of law is relatively underdeveloped and it is not yet clear as to how it may eventually evolve.

With respect to the D&O Claims and the Non-RMBS Claims, for the reasons discussed in Sections VIII.C.3 and VIII.C.4, the Examiner does not believe that the merits or magnitude of these claims should have a material effect on the consideration to be provided for the Third-Party Release. Accordingly, the Report provides information regarding these claims, but unless otherwise noted, the Examiner does not reach conclusions with respect to their merits. Finally, an analysis of the Unsecured Noteholder Causes of Action is provided in Section VIII.C.5.

## 2. Conduct Of The Third-Party Claims Investigation

The Examiner's Professionals identified approximately thirty-eight RMBS Actions, twenty-nine of which name at least one of the AFI Defendants. A list of the RMBS Actions can be found at Appendix VIII.A—1. In addition, the Examiner's Professionals identified approximately eighteen pending lawsuits that assert claims against the Debtors and/or the AFI Released Parties related to other aspects of the Debtors' businesses, such as loan origination and servicing. A list of pending lawsuits related to the Non-RMBS Claims (the "Non-RMBS Actions") can be found at Appendix VIII.A—2. The Examiner's Professionals relied upon a number of sources to identify the Debtors' and AFI Defendants' significant pending litigations, including filings in the Chapter 11 Cases,[12] public filings made by the Debtors and AFI,[13] documents produced by the Debtors and AFI,[14] and presentations by the Debtors, AFI, and the Creditors' Committee,[15] among others.

_____

[10] One notable exception is the merits decision in *Assured Guar. Mun. Corp. v. Flagstar Bank*, *FSB*, No. 11-2375, 2013 WL 440114 (S.D.N.Y. 2013), which was issued by Judge Rakoff on February 5, 2013 and discussed below.

[11] Supplemental Declaration of Jeffrey A. Lipps [Docket No. 1887-4] at 7.

[12] *See, e.g.*, Appendix to Declaration of Jeffrey Lipps [Docket No. 320-9]; Proof of Claim No. 3974, filed by AFI on Nov. 12, 2012 [Case No. 12-12060], at 19–21, Ex. C; Compl., *Residential Capital, LLC v. Allstate Ins. Co.*, Case No. 12-1671, Docket No. 1 (Bankr. S.D.N.Y. May 25, 2012) (requesting that the Bankruptcy Court extend the automatic stay to or enjoin the continuation of several of the RMBS Actions).

[13] *See, e.g.*, Ally Financial Inc., Annual Report (Form 10-K) (Feb. 28, 2012), at 228–30 (discussing the Debtors' and AFI's mortgage-backed securities litigation).

[14] *See, e.g.*, Appendix to the Presentation to the AFI Board of Directors, dated Sept. 23, 2011, at 51–58 [ALLY_0157478].

[15] *See* AFI Presentation to the Examiner, dated Aug. 2, 2012, at 57–60.

As part of the Third-Party Claims Investigation, the Examiner Scope Approval Order required that the Examiner "solicit [third] parties' views concerning the merits of such claims and the potential amount of damages arising from such claims."[16] The Examiner's Professionals accomplished this objective through two separate requests for third-party analyses and information.

First, on September 21, 2012, the Examiner's Professionals sent a letter to twenty parties requesting Submission Papers "setting forth any arguments, analyses and/or supporting documents" that could bear meaningfully upon the Investigation of Third-Party Claims.[17] The letter also requested that the parties provide their "views concerning the potential amount of damages arising from such claims."[18] The letter stated that the Submission Papers would not be confidential and that they would be shared with "the Debtors and . . . existing or potential adversaries identified therein in order to solicit their substantive responses."[19] Given the large number of potential Third-Party Claimants, the Examiner's Professionals determined that requesting substantive briefs from all identifiable parties would be duplicative and excessive. Accordingly, the Examiner's Professionals selected twenty recipients representing a cross-section of the types of Third-Party Claims at issue, as well as several parties that had otherwise been active in the Chapter 11 Cases and could contribute to the analysis of the relevant issues. The Examiner's Professionals subsequently conferred with all of these parties by e-mail and/or phone, and in some cases held in-person meetings with the parties solicited. Of the twenty parties solicited, eight ultimately provided Submission Papers.[20] The Examiner's Professionals shared the Submission Papers with the Debtors, AFI, and the Creditors' Committee to solicit their responses. The Debtors and AFI responded with substantial written responses, which were in turn shared with the third parties to whom they were directed, as well as with the Creditors' Committee. Certain of the solicited parties then submitted replies to the responses of the Debtors and AFI.[21] This exercise assisted the Investigation by identifying and narrowing points of legal and factual contention.

Second, on December 21, 2012, the Examiner's Professionals sent a second letter to an additional thirty-one parties that had filed and/or threatened litigation against AFI or its

---

[16] Examiner Scope Approval Order, at 5.

[17] Letter from the Examiner to Third Parties (Sept. 21, 2012), at 1. A copy of this letter is attached to the Report as Appendix VIII.A—3.

[18] *Id.*

[19] *Id.* at 2.

[20] The Examiner received Submission Papers from the following parties: Allstate, AIG, Mass Mutual, and Prudential (joint submission); the Federal Home Loan Banks of Boston, Chicago, and Indianapolis; FGIC; the Ad Hoc Group of Junior Secured Noteholders; MBIA; the RMBS Steering Committee; the Talcott Franklin Group; and Wilmington Trust. Additional limited responses were received from the FHFA, John Hancock Life Insurance Co., Stichting Pensioenfonds ABP, and Huntington Bancshares (joint submission).

[21] The Examiner received reply submissions from Wilmington Trust, MBIA, and Allstate, AIG, MassMutual, and Prudential (jointly).

affiliates on account of the Debtors' businesses.[22] This letter requested that the recipients provide a "quantification of the damages arising from [their] existing or potential litigation . . . ." (each a "Damages Letter").[23] Additionally, the letter requested that the recipients address "any additional theories of liability" not identified in their respective pleadings.[24] The recipients of the December 21, 2012 letter represented all of the remaining Third-Party Claimants identified by the Examiner's Professionals that had not received the Examiner's letter of September 21, 2012. In response to the December 21, 2012 letter, eleven parties submitted Damages Letters.[25] The remaining parties that received the December 21 letter declined to respond to Examiner's Counsel's request.[26]

In addition to analyzing the Submission Papers, the Investigation of Third-Party Claims relied on document discovery and witness interviews. With respect to document discovery, to manage the potentially vast amount of responsive information, the Examiner's Professionals in many cases requested representative samples of various types of deal documentation and communications. With respect to interviews, in addition to officers and directors of AFI and the Debtors, the subject matter of Third-Party Claims required the Examiner's Professionals to interview several witnesses from the Debtors' operating subsidiaries who were closer to the Debtors' relevant day-to-day business activities. The time frame at issue presented another challenging aspect of the Investigation of Third-Party Claims. Many of the Third-Party Claims, and in particular the RMBS Claims, relate to events (typically securitization deals) going back to as early as 2004 and most ending prior to 2008. Few of the Debtors' and AFI's personnel from that early time period remain employed with the companies, and several of those interviewed by the Examiner's Professionals remembered few details. The Examiner's Professionals also requested documents from the Debtors and AFI from this earlier time period, focusing upon the Debtors' origination and securitization activities. In some cases, certain documents, such as e-mail communications, had not been preserved and therefore could not be produced to the Examiner.[27]

---

[22] Letter from the Examiner to Third Parties (Dec. 21, 2012). A copy of this letter is attached to the Report as Appendix VIII.A—4.

[23] *Id.* at 2.

[24] *Id.*

[25] For an indication of which parties submitted Damages Letters, see Appendix VIII.D.1.

[26] Many plaintiffs declined the Examiner's request for damages quantifications out of concern for the impact a response could potentially have upon their pending litigation.

[27] For example, AFI informed the Examiner's Professionals that AFI had not preserved certain e-mail communications for its officers and directors from 2004–2007. AFI explained that its document retention policy for that period was to maintain e-mail backup tapes for rolling thirty-day periods, after which backup tapes were re-used and any data on the tapes was overwritten. In addition, computer hard drives, e-mail inboxes, and any documents maintained on shared drives were typically deleted thirty days after an employee was terminated (provided that the employee was not the subject of a legal hold). Accordingly, the Investigation of this time period was constrained in certain respects by the unavailability of historical materials.

### 3. The Debtors' Underlying Liability

The RMBS Claims against the Debtors and the AFI Defendants are symptomatic of the contingent liability problem that has beset the mortgage banking industry for the past several years.[28] The Financial Crisis Inquiry Commission ("FCIC"), which conducted a sixteen-month investigation into the type of business activities underlying the claims against the Debtors, catalogued a "rising incidence of mortgage fraud, which flourished in an environment of collapsing lending standards and lax regulation."[29] Among other things, the FCIC observed that the "major financial institutions ineffectively sampled loans they were purchasing to package and sell to investors."[30] These institutions "knew a significant percentage of the sampled loans did not meet their own underwriting standards or those of the originators" but a review of "many prospectuses provided to investors found that this critical information was not disclosed."[31] While the FCIC's final report does not provide any specific findings with respect to the Debtors' business, it does report indicia of negligence and fraud throughout the relevant industry during this time.[32]

The Debtors were by no means immune from these problems, as demonstrated by the substantial settlements that they and AFI have entered into relating to the Debtors' conforming and non-conforming securitization businesses.[33] Some claimants, such as the RMBS Steering

---

[28] *See, e.g.*, Rick Rothacker & Aruna Viswanatha, *Bank of America, Other Banks Move Closer to Ending Mortgage Mess*, Chi. Trib., Jan. 7, 2013, http://articles.chicagotribune.com/2013-01-07/business/sns-rt-us-bofa-msrs-salebre9060d2-20130107_1_countrywide-and-bank-banks-move-jonathan-finger ("Bank of America Corp announced more than $14 billion of legal settlements over bad mortgages it sold to investors and flaws in its foreclosure process, taking the bank a step closer to ending the home loan problems that have dogged it for years."); Nelson D. Schwartz, *Federal Regulators Sue Big Banks Over Mortgages*, N.Y. Times, Sept. 2, 2011, http://www.nytimes.com/2011/09/03/business/bank-suits-over-mortgages-are-filed.html ("A bruising legal fight pitting the country's most powerful banks against the full force of the United States government began Friday, as federal regulators filed suits against 17 financial institutions that sold the mortgage giants Fannie Mae and Freddie Mac nearly $200 billion in mortgage-backed securities that later soured."); *see also* Jia Lynn Yang, *Federal Lawsuit Accuses S&P of Defrauding Investors*, Wash. Post, Feb. 5, 2013, http://articles.washingtonpost.com/2013-02-05/business/36755795_1_s-p-analyst-s-p-and-other-ratings-ratings-agency ("The actions of S&P and other ratings agencies, such as Moody's, have drawn criticism because they issued top ratings for toxic securities whose values were based on residential mortgages. These ratings caused investors to think the products were safe, but when housing prices nose-dived, the securities lost their value, nearly wiping out the finances of the biggest banks in the country.").

[29] Financial Crisis Inquiry Commission, Financial Crisis Inquiry Commission Report: Final Report of the National Commission on the Causes of the Financial and Economic Crisis in the United States (Jan. 2011), at xxii, http://fcic.law.stanford.edu/report.

[30] *Id.*

[31] *Id.*

[32] *Id*. at xxii, 110–11, 190, 215.

[33] *See, e.g.*, RMBS Trust Settlement Agreement, § 5.01; *Ally Financial in $462 Million Settlement with Fannie*, Reuters, Dec. 27, 2010, http://www.reuters.com/article/2010/12/27/us-fanniemae-ally-idUSTRE6BQ3OA20101227 ("Ally Financial Inc, the lender formerly known as GMAC, on Monday said it agreed to pay $462 million to Fannie Mae to avoid having to repurchase poorly underwritten mortgages sold to the housing finance giant.").

Committee Group, have argued that "[t]he massive losses suffered by the RMBS Trusts, and the high levels of breaches of representations and warranties associated with mortgages originated and sold by [GMAC Mortgage] and RFC into the trusts . . . suggest strongly that intentional fraud was pervasive in the . . . origination process."[34] While the Examiner offers no conclusions regarding whether the losses suffered by the RMBS trusts and other RMBS investors were the result of fraud, the fact remains that the Debtors continue to face substantial potential liabilities related thereto. This potential or alleged liability could remain the subject of litigation and settlement negotiations for years.

## B. THE MORTGAGE SECURITIZATION BUSINESS

To assess the merits of the RMBS Claims, an understanding of the RMBS securitization process is necessary, both in terms of industry norms and, more specifically, as conducted by ResCap from 2004 to 2007.[35]

### 1. The Securitization Market In General

Securitization consists of pooling assets and then selling securities backed by those assets into the bond market. In the case of RMBS, the assets that are pooled are individual residential mortgage loans. By securitizing loans and selling the resulting securities, mortgage lenders create income streams that require less capital than holding the individual mortgages on their balance sheets.

---

[34] Steering Committee Group Submission Paper, dated Oct. 17, 2012, at 7.

[35] The year in which a mortgage loan was originated is often referred to as its "vintage." The vintages with the highest rates of defaulting borrowers have been 2006 and 2007, and to a somewhat lesser degree 2005. The 2006 and 2007 vintages are characterized as having weaker underwriting standards coupled with a loss of liquidity in the mortgage market, which appear to have been the driving factors causing high delinquencies and defaults. Secondary factors include declining home prices and a decline in the economy, causing high unemployment which continued to hamper loss mitigation efforts; further stressing the securitizations from those vintages and earlier. *See* S&P, U.S. RMBS CREDIT QUALITY RESTS ON SEVERAL KEY HOUSING MARKET TRENDS (June 15, 2012), at 3, http://www.standardandpoors.com/ratings/articles/en/us/?articleType=HTML&assetID=1245335672130.

RMBS come in two basic varieties: Agency[36] and PLS. Agency securitizations are issued to investors through GSEs such as Fannie Mae, Freddie Mac, and Ginnie Mae.[37] By contrast, PLS or "non-Agency" RMBS are sold directly to investors. Loans purchased by the GSEs must conform to the respective agency's standards, and are therefore commonly referred to as "conforming" loans. Conversely, loans that do not conform to the GSE loan standards are commonly referred to as "non-conforming." The PLS market is comprised largely of non-conforming loans.

Conforming loans typically involve "prime" borrowers, while non-conforming loans can include both prime and "subprime" borrowers. The primary difference between prime (low credit risk) and subprime (high credit risk) loans is the borrower's credit history.[38] A subprime borrower's FICO score is generally 660 or below, and the borrower's credit history may include past delinquent payments, defaults, or bankruptcies.[39] As such, a subprime borrower generally has a higher probability of default than a prime borrower.

### a. Key Securitization Parties

The principal parties involved in mortgage securitization include:

- **Borrower**—The individual responsible for making mortgage payments on the mortgage note.[40]

---

[36] Fannie Mae and Freddie Mac, both chartered by Congress, participate in the mortgage market by buying mortgage loans and mortgage-related securities in the secondary market, and then issuing guaranties on mortgage-backed securities. *See* COMPANY PROFILE, FREDDIE MAC, http://www.freddiemac.com/corporate/company_profile; FANNIE MAE CHARTER, FANNIE MAE, http://www.fanniemae.com/portal/about-us/governance/our-charter.html. Ginnie Mae provides a guaranty of the principal and timely interest payments on certain government-sponsored mortgage loans, such as those provided by FHA or VA programs. COMPANY OVERVIEW, GINNIE MAE, http://www.ginniemae.gov/pages/default.aspx. Before September 2009, Fannie Mae's and Freddie Mac's guarantee was not explicitly backed by the U.S. government, but both entities had the right to draw on the U.S. Treasury. Because of Fannie Mae's and Freddie Mac's implied backing by the government, rating agencies and the market treated their securities as government-agency issuances. FRANK J. FABOZZI, THE HANDBOOK OF MORTGAGE BACKED SECURITIES 47 (6th ed. 2005). It wasn't until September 2009, after Fannie Mae and Freddie Mac were placed into the FHFA's conservatorship, that Freddie Mac and Fannie Mae received the U.S. government's guarantee. *See* U.S. Treasury, Press Release, *Statement by Secretary Henry M. Paulson, Jr. on Treasury and Federal Housing Finance Agency Action to Protect Financial Markets and Taxpayers* (Sept. 7, 2009), http://www.treasury.gov/press-center/press-releases/Pages/hp1129.aspx.

[37] FEDERAL RESERVE BANK OF SAN FRANCISCO, MORTGAGE LOAN SECURITIZATION AND RELATIVE LOAN PERFORMANCE (Aug. 2011), at 6, http://www.frbsf.org/publications/economics/papers/2009/wp09-22bk.pdf.

[38] [FDIC] SUBPRIME BACKGROUND DEFINITIONS, http://www.fdic.gov/about/comein/background.html.

[39] *Id.*

[40] COMPTROLLER OF THE CURRENCY ADMINISTRATION OF NATIONAL BANKS, ASSET SECURITIZATION, COMPTROLLER'S HANDBOOK (Nov. 1997), at 8, http://www.occ.gov/publications/publications-by-type/comptrollers-handbook/assetsec.pdf.

- **Credit Enhancer (Bond Insurer Monoline)**—A third-party entity that provides a guarantee of principal and timely interest payments on part or all of a given securitization.[41]

- **Custodian**—A third-party entity that serves as agent for the trustee and has a contractual obligation to: (1) assume ownership of the mortgage notes; (2) review the mortgage notes to ensure they were properly executed and endorsed; (3) provide notification to the trustee and various other transaction parties of representation and warranty breaches; and (4) upon proper authorization, release the mortgage notes to the trustee or servicer.[42]

- **Depositor**—An intermediary which sells or "deposits" loans into the trust.[43]

- **Investor**—Purchases the RMBS in the market.[44]

- **Originator/Lender**—Interacts directly with borrowers to create the mortgage loans that will ultimately be securitized.[45]

- **Rating Agency**—Evaluates the credit quality of the various tranches of RMBS issued by the trust and provides credit ratings to assist investors in assessing risk and making investment decisions.[46]

- **Servicer**—Responsible for the daily administration of the mortgage loans from the time of funding until they are paid in full. This includes mailing monthly statements and collecting principal and interest payments. The servicer also monitors delinquencies and pursues loss mitigation on defaulted loans. Typically, the servicer receives a small percentage of the monthly interest remitted (e.g., .25%, .50%) as compensation. The mortgage servicing rights may be retained by the originator or sold/subcontracted to a third party.[47]

---

[41] *Id.* at 11. A credit enhancer is generally a triple AAA rated insurance company (e.g. AMBAC, FGIC, FSA, etc.). *See* Timothy C. Leixner, *Securitization of Financial Assets*, Sept. 1, 1999, at 5, http://mx.nthu.edu.tw/~chclin/Class/Securitization.htm.

[42] *See, e.g.*, Custodial Agreement between JPMorgan Chase Bank, as trustee, GMAC Mortgage Corporation, as servicer, and GMAC Bank, as custodian, dated July 27, 2004, § 2.1–2.4 [ALLY_0032656].

[43] MOODY'S, DEAL SPONSOR AND CREDIT RISK OF U.S. ABS AND MBS SECURITIES (Dec. 2006), at 9, http://www.moodys.com/sites/products/DefaultResearch/2006200000426039.pdf.

[44] COMPTROLLER OF THE CURRENCY ADMINISTRATOR OF NATIONAL BANKS, ASSET SECURITIZATION, COMPTROLLER'S HANDBOOK (Nov. 1997), at 12, http://www.occ.gov/publications/publications-by-type/comptrollers-handbook/assetsec.pdf.

[45] *Id.* at 9.

[46] *See id.* at 11.

[47] *Id.* at 10.

- **Sponsor (Seller/Issuer)**—Purchases mortgage assets from originators to form a pool of assets to be securitized. Also creates the trust into which the depositor will ultimately deposit the mortgage assets.[48]

- **Trust**—The special purpose entity ("SPE")[49] that holds the rights to the cash flows on the underlying assets and issues the RMBS representing a beneficial interest in the trust.[50]

- **Trustee**—A third party retained to administer the trust holding the mortgage assets. The trustee oversees the proceeds generated by the assets and distributes them based on a prescribed formula. The trustee is also responsible for enforcing the obligations of the various parties involved in the securitization. For example, the trustee is responsible for ensuring that the servicer is performing its obligations.[51]

- **Underwriter**—Markets the RMBS directly to investors. The underwriter, which in most cases is an independent investment banking institution, also acts in an advisory role. The underwriter knows investors' preferences and advises the sponsor on structuring and marketing the RMBS. A securitization may have multiple underwriters (typically, a lead underwriter and one or more co-underwriters). The lead underwriter is responsible for the management of the securitization process. Co-underwriters assist with the sale of the securities into the market.[52]

---

[48]  MOODY'S, DEAL SPONSOR AND CREDIT RISK OF U.S. ABS AND MBS SECURITIES (Dec. 2006), at 10, http://www.moodys.com/sites/products/DefaultResearch/2006200000426039.pdf.

[49]  An SPE is a bankruptcy remote legal entity with limited operations, generally created by the sponsor, set up for the purpose of holding the securitized assets. *See* NATIONAL BUREAU OF ECONOMIC RESEARCH, THE RISKS OF FINANCIAL INSTITUTIONS, SPECIAL PURPOSE VEHICLES AND SECURITIZATION (Jan. 2007), at 549–50, http://www.nber.org/chapters/c9619.pdf.

[50]  COMPTROLLER OF THE CURRENCY ADMINISTRATION OF NATIONAL BANKS, ASSET SECURITIZATION, COMPTROLLER'S HANDBOOK, at 23 (Nov. 1997), http://www.occ.gov/publications/publications-by-type/comptrollers-handbook/assetsec.pdf.

[51]  *Id.* at 10.

[52]  *Id.* at 12.

b. *Securitization Process*

Below is a diagram of the basic steps in the securitization process. Several of these steps are discussed in more detail below.

EXHIBIT VIII.B.1.b
**Securitization Overview**



(1) *Loan Origination*[53]

The RMBS securitization process begins with an originator marketing a loan product to a borrower. The originator underwrites the loan, a process which requires the borrower to provide specific financial information and an assessment on the value of the mortgaged property. Loan underwriting is critical in assessing a borrower's ability to repay a loan as well as the mortgage note holder's ability to recover from the underlying collateral in the event that the borrower defaults.[54]

---

[53]  For a more detailed discussion of the loan origination and acquisition processes see Appendix VIII.B.1.b(1).

[54]  *See* Frank J. Fabozzi, The Handbook of Mortgage Backed Securities 17 (6th ed. 2005).

### *(2) Loan Acquisition*

Originators that do not securitize or hold loans on their balance sheet typically act as a broker or correspondent for a sponsor.[55] Brokers perform the initial borrower review based upon the sponsor's underwriting guidelines but do not make any underwriting decisions or fund the loans—two tasks reserved for the sponsor.[56] By contrast, correspondents both underwrite *and* fund their own loans, and then sell the loans to sponsors through a bidding process.[57] Typically, as a condition of purchase, the sponsor will receive loan-level representations and warranties from the brokers and correspondents.[58] The representations and warranties are covenants written into the sale agreement regarding, among other things, the quality of the loan underwriting. In the event of a breach of the representations and warranties, the sponsor may "put back" a loan to the originator for repurchase or replacement.[59]

### *(3) Structuring The Securitization*

Structuring a securitization requires isolating and distributing credit risk, usually through various credit enhancement techniques.[60] The structuring process consists of four primary stages: (1) segregating the assets; (2) adding credit enhancement to mitigate risk and improve salability; (3) creating an SPE or trust to hold the assets; and (4) issuing interests in the asset pool (i.e., RMBS).[61]

The process of securitization is overseen by the sponsor who typically works with a third party investment bank in the role of lead underwriter.[62] Together the sponsor and lead underwriter structure the RMBS to be offered. The lead underwriter typically has several

---

[55]  *See* THE FINANCIAL CRISIS INQUIRY COMMITTEE, FINAL REPORT OF THE NATIONAL COMMISSION ON THE CAUSES OF THE FINANCIAL AND ECONOMIC CRISIS IN THE UNITED STATES (Jan. 2011), at 88–89, http://www.gpo.gov/fdsys/pkg/GPO-FCIC/pdf/GPO-FCIC.pdf.

[56]  CONSUMER FINANCIAL PROTECTION BUREAU, EXAMINATION PROCEDURES MORTGAGE ORIGINATION (Jan. 11, 2012), at 5, http://files.consumerfinance.gov/f/2012/01/Mortgage-Origination-Examination-Procedures.pdf.

[57]  *Id.*

[58]  Adam B. Ashcroft & Til Schuermann, *Understanding the Securitization of Subprime Mortgage Credit*, FED. RES. BANK N.Y. STAFF REP., Mar. 2008, at 5–6, http://www.newyorkfed.org/research/staff_reports/ sr318.pdf. Examples of certain representations and warranties that would accompany a mortgage loan being purchased relate to the underlying property, applicable documentation in the loan file and the loan origination process, among others. AMERICAN SECURITIZATION FORUM, ASF MODEL RMBS REPRESENTATIONS AND WARRANTIES (Jul. 15, 2009), at 4, http://www.americansecuritization.com/uploadedfiles/ asf_restart_representations_rfc_071509.pdf.

[59]  Adam B. Ashcroft & Til Schuermann, *Understanding the Securitization of Subprime Mortgage Credit*, FED. RES. BANK N.Y. STAFF REP., Mar. 2008, at 6, http://www.newyorkfed.org/research/staff_reports/sr318.pdf.

[60]  COMPTROLLER OF THE CURRENCY ADMINISTRATION OF NATIONAL BANKS, ASSET SECURITIZATION, COMPTROLLER'S HANDBOOK (Nov. 1997), at 12–13, http://www.occ.gov/publications/publications-by-type/ comptrollers-handbook/assetsec.pdf.

[61]  *Id.*

[62]  *See* Nicola Cetorelli & Stavros Peristiani, *The Role of Banks in Asset Securitization*, FED. RES. BANK N.Y. ECON. POL'Y REV., July 2012, at 49, http://www.newyorkfed.org/research/epr/12v18n2/1207peri.pdf.

additional responsibilities such as: (1) contracting with the loan due diligence firm; (2) interacting with rating agencies, bond insurers, and legal counsel; and (3) assisting in the selection of the servicer, trustee and custodian entities.[63] A more detailed outline of the securitization process is contained in Appendix VIII.B.1.b(3).

## 2. *ResCap Securitization Processes*

The description of the ResCap securitization process contained in this Section is based upon documentation provided to the Examiner, as well as interviews and deposition testimony.[64] However, because of the limitations on witness testimony and document discovery noted in Section VIII.A.2, the summary below primarily describes how the process was intended to work and may not accurately represent the operations in practice at any given point in time. The Examiner's Professionals conducted a high-level investigation into ResCap's operations during 2004 through 2007, but a comprehensive description of every level of ResCap and AFI's organizational structure and respective operations would be outside the scope of the Investigation.

### a. *Overview*

ResCap both originated its own loans and acquired previously-originated or "closed" loans. Loans were originated through its direct lending networks and mortgage brokers, while closed loans were acquired through correspondent and institutional lenders.[65] Regardless of whether ResCap originated or acquired particular loans, it generally disposed of them through two means: securitization and whole-loan sales.[66]

From 2005 to 2007, RFC and GMAC Mortgage did business as RFG.[67] RFC had a larger securitization program than GMAC Mortgage and issued a wider array of product types, specifically subprime and non-conforming loans.[68] GMAC Mortgage, which primarily performed whole-loan sales with the GSEs and private investors,[69] had a considerably smaller PLS program.[70]

---

[63]   *See id.*

[64]   Dep. Testimony, *MBIA Ins. Corp. v. Residential Funding Co.*, Case No. 603552/2008 (N.Y. Sup. Ct. 2010).

[65]   Residential Capital, LLC, Annual Report (Form 10-K) (Mar. 13, 2007), at 4.

[66]   *Id.* at 8.

[67]   Between 2005–2006, ResCap focused on integrating the operations of GMAC Mortgage and RFC into RFG. From 2006 on, the operations of RFC, described below in Section VIII.B.2.d, were performed under ResCap's RFG. *See* Interagency Review of Homecomings and RFC Business Overview, dated Mar. 5, 2008, at 9 [MBIADEPEXH0039908].

[68]   RFC issued 351 out of ResCap's 392 securitizations between 2004–2007. *See* PLS Trust Spreadsheet [EXAM00339947].

[69]   Residential Capital, LLC, Annual Report (Form 10-K) (Mar. 13, 2007), at 3–9.

[70]   Carpenter Lipps Presentation on ResCap PLS Overview, dated Jan. 30, 2013, at EXAM00234435 [EXAM00234431].

### b. *Types Of Loans*

Through RFC and GMAC Mortgage, ResCap originated and acquired the following types of mortgage loans. However, as noted above, GMAC Mortgage specialized in the conforming loans while RFC acquired most of the non-conforming, second lien and non-prime loans.

- **Prime Conforming Loans**—Prime first-lien loans secured by single-family residences which conformed to GSE underwriting guidelines.[71]

- **Prime Non-Conforming Loans**—Prime first-lien loans secured by single-family residences which did not conform to the GSE's underwriting guidelines.[72]

- **Government Mortgage Loans—**First-lien government program loans (e.g. FHA, VA loans, etc.), secured by single-family residences.[73]

- **Prime Second-Lien Mortgage Loans**—Home equity loans secured by a second-lien on single-family residences.[74]

- **Nonprime Mortgage Loans**—Subprime first-and second-lien loans secured by single-family residences.[75]

### c. *ResCap Depositor Entities And Shelves*

RFC and GMAC Mortgage issued 392 RMBS securitizations between 2004 and 2007.[76] In the aggregate, the original deal balance of the 392 securitizations was $221 billion.[77] Ally Securities served as a lead or joint-lead underwriter on approximately 105 of the 392 securitizations.[78]

RFC and GMAC Mortgage, as the sponsors, generally issued securitizations through five Depositor Entities.[79] All of the Depositor Entities were subsidiaries of RFC Holding.[80] RFC filed various base prospectuses, known as "shelves," with the SEC for the different types of securitizations.[81] The shelves allowed RFC to issue securities without waiting for SEC

---

[71]   Residential Capital, LLC, Annual Report (Form 10-K) (Mar. 13, 2007), at 5.

[72]   *Id.*

[73]   *Id.*

[74]   *Id.*

[75]   *Id.*

[76]   *See* PLS Trust Spreadsheet [EXAM00339947]; *see also* Appendix VIII.B—1 (discussing details (principal balance, underwriters, originator, etc.) on all 392 securitizations issued under the RMBS Trust Settlement Agreement).

[77]   PLS Trust Spreadsheet [EXAM00339947].

[78]   *See* Appendix VIII.B—2.

[79]   RFC "branded" certain shelves with unique names to help investors identify the type/characteristics of loans they were purchasing. The names corresponded to the particular depositor entity used to deposit the assets into the SPE. (e.g., RALI, RAMP, and RASC). *See* Int. of C. Blahut, Mar. 13, 2013, at 54:7–11.

[80]   ResCap Organizational Structure, dated Jan. 31, 2007 [RC40005141].

[81]   Int. of C. Blahut, Mar. 13, 2013, at 54:18–22.

approval of each offering. With each offering, RFC filed a prospectus supplement, which contained information about the specific offering that was not included in the shelf prospectus.[82] For example, prospectus supplements provided detailed information about the loan pool collateralizing particular RMBS offerings, including FICO scores, DTI, LTV, geography of the underlying properties, and information on the underwriting guidelines of the primary loan originators.[83]

### d. RFC's PLS Business

Within RFC, the day-to-day operations of loan acquisition and securitization resided within certain designated divisions, each with specific functions and responsibilities, including, Capital Markets,[84] Credit Policy,[85] and the Service Delivery Group.[86]

#### (1) Loan Acquisition

RFC did not originate loans in the traditional sense, but rather acted as a conduit that acquired mortgage loans from third parties with the intent to sell those loans as part of whole-loan transactions or securitizations.[87] RFC acquired "closed" loans from correspondents who are originators that fund their loans prior to sale.[88] In many cases the correspondents funded

---

[82]   *See, e.g.*, Residential Funding Corporation, RFMSI Series 2004-S4 Trust, Prospectus Supplement (Apr. 27, 2004); Residential Funding Corporation, RAMP Series 2006-EFC1 Trust, Prospectus Supplement (Jan. 26, 2006).

[83]   Int. of C. Blahut, Mar. 13, 2013, at 56:13–23.

[84]   Capital Markets was a group composed of several sub-groups, namely Trading, Structured Finance, Product Management, and Investor Relations, each with their own respective functions. Carpenter Lipps Presentation on ResCap PLS Overview, dated Jan. 30, 2013, at EXAM00234442 [EXAM00234431]. Trading was ultimately responsible for purchasing loans and assisting in negotiating the structure of the securitization. *See id*. at EXAM00234441–44 [EXAM00234431]. Structured Finance assisted in the securitization process by pooling loans, developing structure, and overseeing the preparation of documentation. *See id.* at EXAM00234444–45 [EXAM00234431]. Product Management worked with and received input from multiple groups (Trading, Structured Finance, etc.) in deciding which loan types to acquire. *See id.* at EXAM00234439. Investor Relations provided information to investors in ResCap's RMBS and responsible for creation of RFC's Vision website. *See* Int. of J. Steinhagen, Apr. 3, 2013, at 18:6–10, 23:3–12; *see also* Section VIII.B.2.d(2) (discussing RFC's Vision website).

[85]   The Credit Policy group was responsible for overseeing RFC's "Client Guide" (underwriting guidelines). Carpenter Lipps Presentation on ResCap PLS Overview, dated Jan. 30, 2013, at EXAM00234437 [EXAM00234431].

[86]   The Service Delivery Group supported the acquisition of loans through operations and underwriting functions. *See id.* Operations first performed basic reviews of loans received through RFC's automated underwriting system Assetwise while underwriting served as a second review when exceptions were noted. *See id.* at EXAM00234441. *See also* Sections VIII.B.2.d(1)(a), VIII.B.2.d(1)(b) (discussing these processes in greater depth).

[87]   Carpenter Lipps Presentation on ResCap PLS Overview, dated Jan. 30, 2013, at EXAM00234435 [EXAM00234431].

[88]   Conference call with Carpenter Lipps, Counsel for Debtors, and FTI, Financial Advisor to Debtors (Feb. 7, 2013).

the loans using warehouse lending facilities provided by RFC.[89] RFC also acquired loans from brokers who are originators that sell unfunded loans.[90] Unfunded loans would typically be acquired by RFC subsidiary Homecomings Financial which would fund the loan.[91] RFC typically acquired loans in two ways: (1) through bulk or group loan transactions; or (2) on a continuous loan-by-loan flow basis.[92] These transactions were entered into with three channels of clients:

- **Correspondent**—This channel was comprised of smaller to mid-size correspondents that typically committed loans to RFC on a flow or bulk basis.[93] GMAC Mortgage was considered a correspondent client.[94]

- **Institutional**—This channel consisted of larger companies that typically committed loans to RFC on a bulk basis.[95]

- **Broker or Wholesale**—This channel was essentially Homecomings Financial, an RFC subsidiary that worked with brokers to fund loans.[96]

### (a) Bulk Sale Acquisitions

Bulk deals were primarily purchased from larger correspondent and institutional clients.[97] The size of these deals could range from ten to over fifteen thousand loans.[98] Such sales were initiated when a client sent RFC a file consisting of loan data and a request that RFC bid on the loans.[99] These bid requests provided general information on the loan group, along with certain client conditions and stipulations (e.g., servicing retained or released, settlement date,

---

[89] RFC's warehouse lending facilities gave a competitive advantage in loan acquisition based on RFC's relationship with and access to capital from GMAC.

[90] Conference call with Carpenter Lipps, Counsel for Debtors, and FTI, Financial Advisor to Debtors (Feb. 7, 2013).

[91] *Id.*

[92] Carpenter Lipps Presentation on ResCap PLS Overview, dated Jan. 30, 2013, at EXAM00234441 [EXAM00234431]. The RFC origination process was to buy loans from their clients, and "basically acquiring mortgage loans . . . from correspondents, which are other banks or mortgage banks and mortgage bankers that are originating loans with borrowers." Int. of E. Scholtz, Mar. 28, 2013, at 25:16–19.

[93] *See* Dep. of J. Larson, May 11, 2011, at 11:22–23.

[94] GMAC Mortgage, LLC, Consolidated Financial Statements (Dec. 31, 2006), at 50.

[95] Dep. of J. Larson, May 11, 2011, at 11:24–12:7.

[96] *Id.* at 12:8–22.

[97] GMAC-RFC Presentation on CM Trading Business Overview, dated Dec. 1, 2005, at MBIADEPEXH0003578 [MBIADEPEXH0003443].

[98] *Id.*

[99] Draft ResCap Presentation on CM Trading Overview: Bulk Bidding, dated Jan. 18, 2006, at MBIADEPEXH0003669 [MBIADEPEXH0003664].

and custodian).[100] The Trading group would then run loan-level data through a number of diligence processes.[101] Pricing of the loans was done by using loan models and industry benchmarks.[102]

To test the loans for compliance with RFC's underwriting guidelines, loan data was entered into one of its underwriting diligence systems.[103] If the diligence process resulted in a loan falling outside of RFC's underwriting guide or the client-specific negotiated criteria,[104] Underwriting was expected to take one of several actions with respect to each loan: (1) correct the error and approve the loan; (2) approve the loan with an exception, but without a price adjustment; (3) approve the loan with an exception and request a price adjustment; or (4) decline the loan.[105] Underwriting, within RFC's Service Delivery Group, relayed any exceptions to Trading before the loans were funded.[106] Trading would then approve the final price of the bulk sale or negotiate a price adjustment with the client.[107]

### (b) Loan Flow Acquisition

Loan flow acquisitions were completed through RFC's correspondent and wholesale/broker clients.[108] In this process, clients and Trading would enter into commitment agreements[109] pursuant to which the client would commit to sell loans on a flow or individual

---

[100] *Id.* at MBIADEPEXH0003676.

[101] *Id.* at MBIADEPEXH0003684. Diligence included an automated valuation model ("AVM"), which provided automated property values based upon, among other factors, comparable property sales, characteristics, and neighborhood trends. *See* Susan Allen, *What's in Your AVM?*, CORELOGIC, 2012, at 2–3, http://www.corelogic.com/downloadable-docs/whats-in-your-avm.pdf.

[102] *See* Draft ResCap Presentation on CM Trading Overview: Bulk Bidding, dated Jan. 18, 2006 at MBIADEPEXH0003691–92 [MBIADEPEXH0003664].

[103] *See* Second Mortgage Review/Diligence—Current State, Jan. 2007, at MBIADEPEXH0005585 [MBIADEPEXH0005582].

[104] *See id.*

[105] *Id.*

[106] Trading did not review each loan file to determine if the loan conformed with established guidelines. *See* Int. of L. Lundsten, Feb. 20, 2013, at 43:13–15 ("Trading is not looking at each loan file . . . Acquisition is looking at the loans as they come in.").

[107] *See* ResCap Presentation on CM Trading Overview: Bulk Bidding, at MBIADEPEXH0003701 [MBIADEPEXH0003664]. Prices were re-negotiated if the loans were economically (e.g., rate, product type, etc.) different than the loans that were originally bid on. *See* Int. of E. Scholtz, Mar. 28, 2013, at 53:4–9, 81:2–15.

[108] GMAC-RFC Presentation on CM Trading Business Overview, dated Dec. 1, 2005, at MBIADEPEXH0003582 [MBIADEPEXH0003443].

[109] Conference call with Carpenter Lipps, Counsel for Debtors, and FTI, Financial Advisor to Debtors (Feb. 7, 2013).

basis.[110] An automated underwriting system, Assetwise, would then process the loan information[111] and render an automated decision that would either: (1) approve the loan with conditions; or (2) decline the loan.[112]

When a price adjustment was required, the loan was referred by Underwriting to Trading which had the authority to negotiate price adjustments with the client.[113] Once a loan was approved, the loan was purchased and a wire would be sent to the client.[114]

### (c) Quality Control

A second review for loan compliance, known as "post-fund quality control," was then conducted to ensure that acquired loans were in compliance with applicable policies and legal requirements.[115] Loans were both randomly selected, using a basic sampling tool to include a variation of product types and geographies, and specifically targeted based on risk.[116]

### (2) RFC Securitization Process

The majority of the loans implicated by the RMBS Claims were loans acquired by RFC. Allegations regarding GMAC Mortgage loans were primarily addressed through the settlements with the GSEs.[117]

The non-conforming loan securitization process primarily resided within RFC at Capital Markets, specifically Trading and Structured Finance.[118] Trading would engage an investment bank[119] to serve as lead underwriter.[120] One of the responsibilities of the lead underwriter was to distribute the securities to investors and also make certain decisions on the structuring of

---

[110] *See* Dep. of S. Klein, Sept. 27, 2011, at 18:10–18.

[111] Loan information included automated property valuations, credit reports, debt, bankruptcy history, etc. Dep. of R. Torborg, Apr. 27, 2011, at 34:19–35:8.

[112] *Id.* at 37:12–15. Approved loans required a diligence check similar to that performed in the bulk bid process. *See* Second Mortgage Review/Diligence—Current State, Jan. 2007, at MBIADEPEXH0005585 [MBIADEPEXH0005582].

[113] Dep. of S. Klein, Sept. 27, 2011, at 24:23–25:16.

[114] Dep. of R. Torborg, Apr. 27, 2011, at 43:2–6.

[115] Dep. of S. McCumber, Mar. 4, 2011, at 35:10–17, 93:14–21.

[116] *Id.* at 89:23–90:13.

[117] *See* Section III.I.12 (providing additional details).

[118] *See* Carpenter Lipps Presentation on ResCap PLS Overview, dated Jan. 30, 2013, at EXAM00234436–46[EXAM00234431].

[119] Investment banks were often chosen based upon which ones were providing valuable services throughout the organization (e.g., funding, etc.). *See* Int. of E. Scholtz, Mar 28, 2013, at 40:4–15. The determination of whether to use RFS as lead/co underwriter was made by Scholtz as head of Capital Markets. *See id.* at 60:16–19 ("[I]n 2006, I'd send [sic] a general strategy . . . [with] the desk that say, 'Include RFS in some way, shape or form in 25% of the transactions.'").

[120] *Id.* at 27:11–14.

the securities that they would be selling to investors (e.g., use of bond insurer enhancement and sizing of tranches).[121] Structured Finance would pool the loans[122] and perform a pool diligence resulting in an asset pool which matched anticipated securitization parameters.[123] Trading was to address any critical issues (e.g., high LTVs or loan delinquencies) that were highlighted by the diligence review prior to their approval/denial of the pool.[124]

If approved, Trading would provide a list of assets to be added or removed from the preliminary pool or would define new parameters (e.g., subordination or different overcollateralization levels).[125] At this stage in the process, the rating agencies worked with Trading and Structured Finance to achieve investment grade ratings on certain classes or tranches of the certificates.[126]

A loan pool due diligence was then performed by an independent third party[127] that was generally hired by the lead underwriter.[128] The lead underwriter would select the loan sample to be reviewed.[129] However, when a bond insurer was involved, the insurer also would participate in the selection of the diligence firm[130] and the review of loan sample to be reviewed.[131]

Where the securitization was insured, the bond insurer received a loan tape for analysis and would provide preliminary credit enhancement targets (e.g., overcollateralization levels

---

[121] *Id.* at 29:10–13.

[122] *See* Int. of L. Lundsten, Feb. 20, 2013, at 17:17–18 (Structured Finance employees' role was, in part, to "make sure that everything was in order in the files and that the pool was ready to sell").

[123] GMAC-RFC Securitization Transaction Activity Diagram, dated Sept. 18, 2000, at MBIADEPEXH0000059–60 [MBIADEPEXH0000056] (attached to E-mail from H. Peterson (Aug. 30, 2006) [MBIADEPEXH0000056]).

[124] *Id.* at MBIADEPEXH0000060.

[125] *Id.* at MBIADEPEXH0000062.

[126] *Id.* at MBIADEPEXH0000064.

[127] *See* Int. of L. Lundsten, Feb. 20, 2013, at 79:25–80:15 (indicating these independent third parties included Clayton and The Bohan Group, Inc.). These firms perform a comprehensive review of loan files for compliance with investor preference and not necessarily if loans complied with RFC's client guide. *See* Conference call with Carpenter Lipps, Counsel for Debtors, and FTI, Financial Advisor to Debtors (Feb. 7, 2013).

[128] A lead underwriter has more responsibility in the securitization process, as opposed to a co-underwriter, because, among other duties, they create the structure for the classes and "bring in investor demand." Int. of E. Scholtz, Mar. 28, 2013, at 28:24–29:13.

[129] GMAC-RFC Securitization Transaction Activity Diagram, dated Sept. 18, 2000, at MBIADEPEXH0000065 [MBIADEPEXH0000056].

[130] *See* Int. of L. Lundsten, Feb. 20, 2013, at 78:14–19 (rather than performing separate due diligence, the insurer would "piggyback" on the underwriter's due diligence and "the two of them would decide together how many loans they wanted to review and how they wanted to review it").

[131] GMAC-RFC Securitization Transaction Activity Diagram, dated Sept. 18, 2000, at MBIADEPEXH0000065 [MBIADEPEXH0000056].

and letters of credit) to Trading.[132] Trading, Structured Finance, the lead underwriter, and the bond insurer would negotiate credit enhancement targets until an agreement was reached.[133] A deal structure was agreed upon by Trading and the underwriter,[134] driven by the preliminary risk levels and market conditions.[135] The lead underwriter would then create marketing materials which would be distributed to potential investors.[136] In some instances RFC would sell the loans to the lead underwriter, who would distribute the securities on its own.[137] The determination by RFC of whether to sell the loans to the underwriter or hold them until the securitization got executed was based upon profitability and risk appetite.[138]

The lead underwriter would provide pricing information on the securities to Trading based upon feedback received from investors.[139] Structured Finance would manage the production of the preliminary deal documents, including the indenture, mortgage loan purchase agreements, and insurance and indemnity agreements.[140] Structured Finance created tables for the prospectus supplement that contained information about the loan pool, such as the distribution of credit scores, original loan balances, and LTVs,[141] and worked with the lead underwriter to review the deal documents to provide any necessary changes to both in-house and external counsel.[142]

For the transaction to close, the independent accounting firm compared the data in the pool to the respective loan files and finalized the comfort letter.[143] Structured Finance facilitated the registration of the security and the final prospectus supplement was filed with the SEC in addition to other deal information.[144] Registration of the physical securities with

---

[132] *Id.* at MBIADEPEXH0000067.

[133] *Id.*

[134] *Id.* at MBIADEPEXH0000069.

[135] *Id.*

[136] *Id.* at MBIADEPEXH0000068.

[137] Int. of E. Scholtz, March 28, 2013, at 27:14–16.

[138] *See id.* at 43:23–44:1.

[139] However if the underwriter(s) owned the loans, RFC did not participate in the pricing discussions with investors. *See id.* at 30:19–25 ("If [the underwriters] own it, we don't care because they own it at a dollar price. If we still own it and they are working as our underwriter, then they're getting pricing feedback. They come back to us and say, 'These are where the bonds are going to trade' . . . and we work with them.").

[140] GMAC-RFC Securitization Transaction Activity Diagram, dated Sept. 18, 2000, at MBIADEPEXH0000080 [MBIADEPEXH0000056].

[141] *Id.* at MBIADEPEXH0000076.

[142] *Id.* at MBIADEPEXH0000080.

[143] *Id.* at MBIADEPEXH0000066;–81.

[144] *Id.* at MBIADEPEXH0000082–85.

the Depository Trust Company was done by the trustee.[145] Once funds were wired to RFC per the funding statement, Structured Finance would mark the pool as sold and provide a verbal confirmation to release the bonds.[146]

Upon securitization closing, or immediately prior, the custodian would take receipt of the mortgage notes associated with the pool of loans for the securitization. The custodian would confirm to the trustee that all of the relevant mortgage notes were received and that the mortgage notes were executed and endorsed, as required under the pooling and servicing agreement.[147]

---

[145] *Id.* at MBIADEPEXH0000084.

[146] The Depository Trust Company would release the securities to the trustee, who then released the securities to the investors. *See id.* at MBIADEPEXH0000095–96. For monitoring of securities or investor tracking, RFC had a proprietary database, Vision, which was designed to provide investors with as much transparency as possible with respect to the performance of loans backing their certificates. The Vision database "had extensive information that [RFC] provided investors in terms of performance of our securities." Int. of E. Scholtz, Mar. 28, 2013, at 31:6–9. Through Vision, the investor could manipulate loan level data (e.g., delinquency, foreclosure, REO, losses, etc) to derive its own perspective of performance of a given securitization. *See id.* at 31:12–22.

[147] In the event there were missing or defective mortgage notes, the custodian was required to notify the trustee, servicer, and RFC. The custodian also had an ongoing responsibility to provide timely notification to the sponsor and trustee if it discovered a breach of the representations and warranties made by the sponsor. *See, e.g.*, Custodial Agreement, RALI Series 2007-QH6, dated June 1, 2007, §§ 2.1, 2.3(a), 2.4 [GSResCap0000117072].

### e.  GMAC Mortgage's PLS Business

#### (1) Sources Of Loan Production

GMAC Mortgage both originated and acquired loans.[148] Its primary sources for originations were through direct lending[149] and mortgage brokerages,[150] while it acquired loans through correspondent lenders[151] and Ally Bank.[152]

#### (a) GMAC Mortgage Loan Origination

Loan origination through GMAC Mortgage's direct lending and broker networks was similar in nature to that of RFC's, with the following notable differences:

- Different underwriting/exceptions process, mostly managed by brick and mortar retail operations across the country.[153]

- As noted above, GMAC Mortgage's Underwriting guidelines were structured more around GSE standards and conforming products rather than the more exotic, high yield products that came through RFC.[154]

---

[148] Carpenter Lipps Presentation on ResCap PLS Overview, dated Jan. 30, 2013, at EXAM00234435 [EXAM00234431].

[149] GMAC Mortgage conducted origination in this channel through retail branches, the internet and telephone operations. Through their servicing platform, GMAC Mortgage was able to originate loans by refinancing borrower's mortgage loans. *See* Residential Capital, LLC, Annual Report (Form 10-K) (Mar. 13, 2007), at 4.

[150] Through this network, mortgage brokers served as liaisons between GMAC Mortgage and borrowers. A mortgage broker assisted in identifying potential borrowers, compiled necessary information/documents and completed the loan application. GMAC Mortgage was responsible for underwriting, setting the interest rate and funding the loan. *See id.*

[151] Correspondent lenders closed and funded their own loan originations, and subsequently sold the loans to GMAC Mortgage. Larger correspondent lenders were known as institutional lenders. These sales could take the form of bulk acquisitions. *See id*.

[152] GMAC Mortgage often sold loans it originated or acquired to Ally Bank for a holding period. Pursuant to the MMLPSA, Ally Bank subsequently sold these loans, along with other loans it had originated and acquired, back to GMAC Mortgage prior to sale or securitization by GMAC Mortgage. *See* Memorandum, GMAC Mortgage to GMAC Bank Loan Transfer SAB99 Review, dated Jan. 6, 2009, at 1–2 [EXAM12042904]. For a more in depth discussion of the relationship between Ally Bank and GMAC Mortgage, see Section V.B.1.b. To take advantage of Ally Bank's lower cost of funds, sales of these loans were conducted through a standard client correspondent agreement under Regulation W of section 23 of the Federal Reserve Act. Under exemption 250.250, Ally Bank was permitted to purchase up to 50% of GMAC Mortgage's loan production in a 12 month period. *See* Residential Capital, LLC, Annual Report (Form 10-K) (Mar. 13, 2007), at 29.

[153] Carpenter Lipps Presentation on ResCap PLS Overview, dated Jan. 30, 2013, at EXAM00234457 [EXAM00234431].

[154] *Id.*

*(b) GMAC Mortgage Securitization*

The process of mortgage securitization was similar in nature to that of RFC's, with the following notable differences:

- RFC, through the Structured Finance Group, would structure the transactions (i.e., deciding on senior/subordinate, credit enhancement, utilizing bond insurers, etc.), while GMAC Mortgage relied more upon third-party underwriters for this process.[155]

- GMAC Mortgage issued different representations and warranties than RFC (e.g., it did not use an underwriting representation and warranty in second lien deals and usually did not make any fraud representations and warranties).[156]

- GMAC Mortgage's PLS often had different structures such as, inter alia, a revolving structure which enabled them to add loans after the deal closed by using proceeds, from the initial sale of the RMBS, to purchase the additional loans.[157]

## C. ANALYSIS OF CLAIMS

### 1. Choice Of Law

A comprehensive choice-of-law analysis with respect to each of the Third-Party Claims would not have been practicable because of the number of relevant actions pending in different state and federal courts. The relevant choice-of-law questions are complicated by: (1) numerous states of incorporation and principal places of business of the plaintiffs and defendants; (2) varying locations of the subject transactions; and (3) differing choice-of-law rules for various venues and causes of action.[158] Accordingly, unless otherwise noted, the Examiner has analyzed Third-Party Claims issues under New York and Second Circuit law. This approach was appropriate given that the RMBS Actions, which as noted above are the

---

[155] *Id.* at EXAM00234458.

[156] *Id.*

[157] *Id.*

[158] *See* Debtors' Omnibus Response to Third-Party Submissions, dated Dec. 18, 2012, at 46 n.48 ("The PLS Investors' claims present choice-of-law issues given the varying residences of the investors, the Debtors and the varying locations of the subject transactions. Nonetheless, for purposes of this submission, the Debtors will look to the law of New York as setting forth the basic factors applicable to common-law fraud claims.").

most significant actions in monetary terms, are pleaded under New York and Second Circuit law[159] and the agreements governing the Debtors' securitization transactions typically designate New York law as controlling.[160]

New York courts generally enforce choice-of-law provisions.[161] However, choice-of-law provisions that specify a contract will be governed by a certain body of law do "not dispositively determine the law which will govern a tort claim arising incident to a contract."[162] Generally, "tort claims are outside the scope of contractual choice of law provisions" unless the "express language of the provision [is] 'sufficiently broad' as to encompass the entire relationship between the contracting parties."[163] Nevertheless, under the New York "interest analysis," the New York and Second Circuit law of torts arising incident to a contract is applied where the underlying facts of the case have "significant contacts" with New York.[164] The Second Circuit has stated that "[i]n all interest analyses, the significant

---

[159] FHFA's Mem. of Law in Opp. to Def.'s Mot. to Dismiss Am. Compl., *FHFA v. Ally Fin. Inc.*, Case No. 11-07010, Docket No. 205, at 14–15, 23–24 (S.D.N.Y. Sep. 7, 2012); AFI's Mem. of Law in Supp. of Mot. to Dismiss Am. Compl., *Union Cent. Life Ins. Co. v. Ally Fin. Inc.*, Case No. 11-02890, Docket No. 219, at 2–6 (S.D.N.Y. July 27, 2012); Mem. of Law in Opp. to Def.'s Mot. to Dismiss, *N.J. Carpenters Health Fund v. Residential Capital, LLC*, Case No. 08-08781, Docket No. 194, at 5 (S.D.N.Y. Dec. 3, 2012); Pl.'s Mem. of Law in Opp. to Def.'s Mot. to Dismiss, *MBIA Ins. Corp. v. Residential Funding Co., LLC*, Case No. 603552/2008, Docket No. 08, at 8 (N.Y. Sup. Ct. Feb. 3, 2009); Joint Mem. of Law in Supp. of Def.'s Mot. to Dismiss Compl., *FDIC v. Chase Mortg. Fin. Co.,* Case No. 12-6166, Docket No. 70, at 4, 34 (S.D.N.Y. Nov. 13, 2012). The Non-RMBS Actions have been filed in more diverse jurisdictions, but the Examiner has not undertaken an in-depth analysis of the choice of law issues that may arise (if any) in these cases.

[160] *See, e.g.*, Standard Terms of Pooling and Servicing Agreement, dated Nov. 1, 2006, § 11.02 [EXAM00234978]; Underwriting Agreement—RALI 2006-Q09, dated Nov. 28, 2006, §12 [EXAM00234794]; Pooling and Servicing Agreement—RASC 2006-KS3, dated Mar. 1, 2006, § 11.04 [EXAM00236698]; FGIC Insurance and Indemnity Agreement—RASC 2007-EMX1, dated Mar. 12, 2007, § 6.04 [EXAM30905047] (providing that "[t]his Insurance Agreement shall be governed by and construed in accordance with the laws of the State of New York"); MBIA Insurance Agreement—RFMS 2007-HSA1, dated Feb. 27, 2007, § 6.04 [EXAM30412508] ("This insurance agreement shall be governed by and construed in accordance with the Laws of the State of New York without regard to choice of law provisions.").

[161] *See MBIA Ins. Corp. v. Royal Bank of Canada*, No. 12238/09, 2010 WL 3294302, at *21 (N.Y. Sup. Ct. 2010) ("Choice of law clauses are accorded *prima facie* validity and are to be enforced absent a strong showing that the clause resulted from fraud or overreaching, that it is unreasonable or unfair, or that enforcement would contravene some strong public policy of the forum.") (citation omitted).

[162] *Krock v. Lipsay,* 97 F.3d 640, 645 (2d Cir. 1996) (emphasis omitted); *see also Fin. One Pub. Co. Ltd. v. Lehman Bros. Spec. Fin., Inc.*, 414 F.3d 325, 333 (2d Cir. 2005) ("New York courts decide the scope of [a contractual choice of law clause] under New York law, not under the law selected by the clause . . . .").

[163] *Fin. One Pub. Co. Ltd.,* 414 F.3d at 335; *Krock,* 97 F.3d at 645; *Winter-Wolff Int'l., Inc. v. Alcan Packaging Food & Tobacco Inc.*, 499 F. Supp. 2d 233, 240 (E.D.N.Y. 2007) (citation omitted) ("[T]he Second Circuit surveyed New York cases and found that there were *no* reported New York state cases where a contractual choice-of-law clause was drafted broadly enough to reach tort claims.").

[164] *Fin. One Pub. Co. Ltd.,* 414 F.3d at 337.

VIII-25

contacts are, almost exclusively, the parties' domiciles and the locus of the tort,"[165] and Third-Party Claimants are generally New York plaintiffs who have pleaded that "substantial activity giving rise to the claims . . . occurred within New York County."[166]

Regardless of what law controls in each particular case, in light of the similarities between the causes of action in the potentially relevant jurisdictions[167] and the fact that the Submission Papers did not raise any significant choice-of-law issues, it seems likely that any jurisdictional variation among the causes of action will be slight.[168] Nonetheless, to ensure

---

[165] *Krock*, 97 F.3d at 646 (citations omitted).

[166] Compl., *FGIC v. Residential Funding Co. LLC*, Case No. 11-09736, Docket No. 1-1, at 6 (N.Y. Sup. Ct. Dec. 30, 2011); Compl., *MBIA Ins. Corp. v. Ally Fin. Inc.*, Case No. 12-18889, at 8 (Minn. Dist. Ct. Sept. 17, 2012); Compl., *Assured Guar. Mun. Corp. v. GMAC Mortg., LLC*, Case No. 12-03776, Docket No. 1, at 5 (S.D.N.Y. May 11, 2012); Second Am. Compl., *Rothstein v. Ally Fin. Inc.*, Case No. 12-03412, Docket No. 39, at 5 (S.D.N.Y. Jan. 22, 2013).

[167] For instance, state blue-sky statutes are typically construed in accordance with federal securities laws. *See, e.g.*, *Kesling v. Kesling*, 546 F. Supp. 2d 627, 636 n.4 (N.D. Ind. 2008) ("The Supreme Court of Indiana recently noted that reference to federal authority is often appropriate in interpreting the Indiana Securities Act."); *Fenoglio v. Augat, Inc.*, 50 F. Supp. 2d 46, 59 (D. Mass. 1999) ("These provisions of the Massachusetts blue sky law are 'substantially similar to the federal securities laws and therefore decisions construing the federal statutory language are applicable to the state statute as well.'"); *Adler v. William Blair & Co.*, 271 Ill. App. 3d 117, 130 (4th Dist. 1995) ("Illinois courts therefore look to Federal case law to interpret these provisions."). Similarly, the elements of fraud and aiding and abetting are substantially similar in New York and Minnesota, the two states where such claims have most frequently been brought. *Compare Eurycleia Partners, L.P. v. Seward & Kissel, LLP*, 910 N.E.2d 976, 979 (N.Y. 2009) (under New York law, "[t]he elements of a cause of action for fraud require a material misrepresentation of fact, knowledge of its falsity, an intent to induce reliance, justifiable reliance by the plaintiff and damages") (citations omitted), *and Prickett v. N.Y. Life Ins. Co.*, No. 09 Civ. 3137, 2012 WL 4053810, at *11 (S.D.N.Y. 2012) (aiding and abetting fraud under New York law requires "a primary violation, actual knowledge of the violation on the part of the aider and abettor, and substantial assistance") (citation omitted), *with Valspar Refinish, Inc. v. Gaylord's, Inc.*, 764 N.W.2d 359, 369 (Minn. 2009) (noting that under Minnesota law, fraud requires: (1) a false representation of a past or existing material fact susceptible of knowledge; (2) made with knowledge of the falsity of representation or made without knowing whether it was true or false; (3) with the intention to induce the claimant to act in reliance thereon; (4) that the representation caused the claimant to act in reliance thereon; and (5) that the claimant suffered pecuniary damages as a result of the reliance), *and Witzman v. Lehrman, Lehrman & Flom*, 601 N.W.2d 179,187 (Minn. 1999) (outlining that to establish aiding and abetting, a plaintiff must show: (1) the primary tortfeasor committed a tort that caused an injury to the plaintiff; (2) the defendant knew the primary tortfeasor's conduct constituted a breach of duty; and (3) the defendant substantially assisted or encouraged the primary tortfeasor in the achievement of the breach).

[168] The first step in a choice of law analysis "is to determine whether there is an actual conflict between the laws of the jurisdictions involved." *In re Allstate Ins. Co.*, 613 N.E.2d 936, 937 (1993). An actual conflict is present "[w]here the applicable law from each jurisdiction provides different substantive rules." *Curley v. AMR Corp.*, 153 F.3d 5, 12 (2d Cir. 1998). If the laws of the relevant jurisdictions are substantively the same, a court may avoid the choice of law analysis. *See id.* (citing *J. Aron & Co. v. Chown*, 231 A.D.2d 426, (N.Y. App. Div. 1996) ("It is only when it can be said that there is no actual conflict that New York will dispense with a choice of law analysis.")).

consideration of all relevant issues, the Examiner's Professionals have noted legal developments in other potentially relevant jurisdictions where appropriate.[169]

### 2. *RMBS Claims*

The RMBS Claims appear to fall into two broad categories: (1) claims by the financial guaranty (i.e., monoline) companies that insured various of the Debtors' RMBS offerings (the "RMBS Insurer Claims"); and (2) claims by purchasers of RMBS, including private and public investors (the "RMBS Investor Claims"). The RMBS Insurer Claims typically allege fraud and/or breach of contractual representations and warranties contained in the insurance and RMBS documentation.[170] The RMBS Investor Claims typically allege material misrepresentations and omissions in connection with the sale of RMBS in violation of state and federal securities laws, as well as state common law.[171]

### a. *Claims Against AFI*

A variety of Third-Party Claimants either have asserted or may assert claims against AFI seeking to impose liability on it for underlying RMBS Claims asserted against one or more of the Debtors and/or Ally Securities. Such claims are premised upon one of three principal theories of liability: (1) piercing the corporate veil of the Debtors to hold AFI liable for underlying claims asserted against those Debtors; (2) "control person" claims seeking to hold AFI liable under federal or state securities laws for alleged primary securities law violations by the Debtors and/or Ally Securities in connection with the issuance of RMBS; and (3) common law aiding and abetting claims to hold AFI liable for alleged fraud or fraudulent inducement by the Debtors and/or Ally Securities in connection with their issuance of RMBS or their procurement of financial guaranty insurance for RMBS.

Because each of those theories of liability requires Third-Party Claimants to prove an underlying claim against one or more of the Debtors or Ally Securities, and as noted above definitive conclusions as to the likelihood of success of those underlying claims are beyond the scope of the Investigation, the Examiner does not reach definitive conclusions as to the ultimate merits of theories seeking to impose those unproven liabilities on AFI. With those necessary limitations, the Examiner reaches certain factual and legal conclusions as to the RMBS claims that have been or may be asserted against AFI under those three theories of liability.

First, the Examiner concludes it is unlikely that any pending or potential claims by Third-Party Claimants seeking to hold AFI liable on a veil-piercing or alter ego theory of liability for

---

[169] Other potentially relevant jurisdictions include Delaware (the Debtors' place of organization), Minnesota (the Debtors' place of business), Michigan (AFI's place of business), and Utah (Ally Bank's place of organization).

[170] *See, e.g.*, Compl., *FGIC v. Ally Fin., Inc.*, Case No. 12-01601, Docket No. 1 (S.D.N.Y. Mar. 5, 2012); Am. Compl., *MBIA Ins. Corp. v. Residential Funding Co., LLC*, Case No. 603552/2008, Docket No. 28 (N.Y. Sup. Ct. Mar. 19, 2010).

[171] *See, e.g.*, Compl., *John Hancock Life Ins. Co. v. Ally Fin. Inc.*, Case No. 12-01841, Docket No. 1 (D. Minn. July 27, 2012); Am. Compl., *FHFA v. Ally Fin. Inc.*, Case No. 11-07010 (S.D.N.Y. June 12, 2012).

RMBS Claims asserted against the Debtors would prevail. For the reasons explained above, the Examiner has concluded that a potential veil-piercing claim asserted on behalf of the Debtors to hold AFI liable for all of those Debtors' debts is unlikely to prevail.[172] Veil-piercing claims asserted by Third-Party Claimants would be governed by the same applicable Delaware law and would face many of the same legal and factual hurdles as a potential veil-piercing claim asserted on behalf of the Debtors.

Moreover, any veil-piercing claim asserted by Third-Party Claimants seeking to hold AFI liable for RMBS Claims against the Debtors would face the additional hurdle of standing. Delaware law recognizes the existence of a claim of an entity to pierce its own corporate veil and that such claim constitutes property of the bankruptcy estate. Accordingly, an individual creditor lacks standing to assert veil-piercing claims against the shareholders of the debtor unless its alleged injury is peculiar and personal to that creditor or a group of creditors (rather than general and common to the debtor and all creditors). Third-Party Claimants seeking to hold AFI liable for underlying RMBS Claims against the Debtors would appear vulnerable to such a standing defense because their alleged injury—that the Debtors are insolvent and cannot satisfy any judgment that may be obtained—may be deemed to be "generalized" in nature and common to all creditors.

Second, with respect to "control person" claims asserted against AFI under federal or state securities laws, several such claims—although not all—have survived motions to dismiss. Although the case law in this area continues to develop, several courts have found allegations that a parent company exercised direction and control over a vertically integrated structure of wholly owned subsidiaries that issued RMBS to be sufficient to plead that the parent was a "controlling person" of the subsidiaries and the alleged primary securities law violators. Of course, even if Third-Party Claimants succeed at the pleading stage in alleging "control," it does not necessarily mean they would succeed in proving their claims. While a close question, the Examiner concludes that it is more likely than not that a court would not find the requisite control by AFI over the alleged primary securities violators.

The totality of the evidence indicates that it would be difficult to prove the necessary degree of control during the relevant time period of 2004–2007. The Investigation has not uncovered evidence that AFI—notwithstanding the existence of overlapping officers and directors and certain shared corporate functions and services—had any direct involvement in any of the Debtors' securitizations. Moreover, even if Third-Party Claimants were to succeed in proving a prima facie case for control person liability, certain of those securities claims appear subject to potential affirmative defenses. For example, certain of the securities claims asserted by Third-Party Claimants—including in particular certain claims under the Minnesota Securities Act—may be susceptible to a defense that they are time-barred by the applicable statutes of limitations and/or repose.

Third, with respect to common law aiding and abetting fraud claims asserted against AFI, Third-Party Claimants in general face higher pleading standards and burdens of proof than many of the claims asserted under state and federal securities laws. Despite the need to plead

---

[172] *See* Section VII.A.1.

with particularity to meet those standards, aiding and abetting fraud claims asserted by one of the Third-Party Claimants have to date survived the pleading stage and proceeded to discovery. That said, the Investigation has revealed no evidence that supports the assertion that AFI provided substantial assistance to the conduct alleged to give rise to Third-Party Claimants' common law fraud claims. The available evidence does not indicate that AFI had any direct involvement in any of the securitizations at issue that could be considered the proximate cause of the Debtors' alleged fraud. Evidence concerning the financial support that AFI provided to the Debtors and the corporate functions and services shared with AFI is not likely to suffice. Not only is such general assistance to the Debtors' businesses unlikely to be deemed the proximate cause of the Debtors' alleged fraud, but much of that assistance came after the Debtors ceased private label securitizations in 2007. Subject to discovery of contradictory facts, such evidence is unlikely to be enough to hold AFI liable for the alleged fraud of its subsidiaries.

### (1) Piercing The Corporate Veil And Alter Ego Claims

The Examiner concludes it is unlikely that any pending or potential claims by Third-Party Claimants seeking to hold AFI liable on a veil-piercing or alter ego theory of liability for RMBS Claims asserted against the Debtors would prevail. The Examiner applies Delaware law—the law of the jurisdiction of organization of each of AFI, GMAC Mortgage Group, LLC, ResCap, GMAC Mortgage, and RFC—to any such veil-piercing claim.[173] Courts do not lightly pierce the corporate veil.[174] Under Delaware law, a successful veil-piercing claim would require proof both that: (1) the defendant Debtors and AFI "operated as a single economic entity"; and (2) an "overall element of injustice or unfairness is present."[175] In the context of assessing potential veil-piercing claims that could be asserted on behalf of the Debtors against AFI, the Examiner concludes that the evidence does not support the proposition that the Debtors and AFI should be considered a single economic entity.[176] That same evidence alone makes unlikely to prevail any claims asserted by Third-Party Claimants seeking to pierce the corporate veil of the Debtors to impose liability upon AFI.

---

[173] *See* Section VII.A.1.a.

[174] *See BASF Corp. v. POSM II Props. P'ship*, No. 3608, 2009 Del. Ch. LEXIS 33, at *32 n.50 (Del. Ch. Mar. 3, 2009) ("[P]ublic policy does not lightly disregard the separate legal existence of corporations."); *Official Comm. of Unsecured Creditors v. Bay Harbour Master Ltd.* (*In re BH S&B Holdings LLC*), 420 B.R. 112, 133 (Bankr. S.D.N.Y. 2009) ("In general, the corporate form is sacrosanct and courts will not disturb it to hold shareholders of a corporation, or members of an LLC, liable.").

[175] *In re BH S&B Holdings LLC*, 420 B.R. at 133–34 (quotation marks omitted); *see also NetJets Aviation, Inc. v. LHC Commc'ns, LLC*, 537 F.3d 168, 177 (2d Cir. 2008).

[176] *See* Section VII.A.1. To reach that conclusion, the Examiner considered evidence including without limitation concerning each of the following factors: "(1) undercapitalization, (2) failure to observe corporate formalities, (3) nonpayment of dividends, (4) insolvency of the debtor corporation at the time, (5) siphoning off of the corporation's funds by the dominant parent, (6) absence of corporate records, and (7) the fact that the corporation is merely a facade for the operations of the dominant parent." *In re BH S&B Holdings LLC*, 420 B.R. at 134; *see also NetJets Aviation, Inc.*, 537 F.3d at 176–77.

Even assuming arguendo that Third-Party Claimants were to prevail on their underlying claims against the Debtors and then prove that the Debtors and AFI should be considered a single economic entity, each of Third-Party Claimants would still need to prove that it had suffered the requisite "injustice or unfairness." That "fraud or inequity 'must be found in the defendants' use of the corporate form.'"[177] Neither the "[t]he underlying cause of action"[178] nor "the possibility that a plaintiff may have difficulty enforcing a judgment"[179] suffices. The Investigation has revealed evidence inconsistent with the assertion by Third-Party Claimants that theirs is the type of "typical situation" where "fraud or injustice" may warrant piercing the corporate veil when a subsidiary becomes unable to satisfy its creditors either because it was undercapitalized at formation or later siphoned of its assets.[180] Although the Examiner has concluded that ResCap was left with unreasonably small capital and balance sheet insolvent from August 15, 2007 and December 31, 2007, respectively, the available evidence indicates that the primary drivers of that inadequacy of capital and insolvency were ResCap's substantial operating losses reported beginning in the fourth quarter of 2006—not any conduct of AFI.[181] In light of that evidence, the Examiner expects that it would be difficult for Third-Party Claimants to prove that AFI used the Debtors as an "incorporated pocketbook"[182] or for "some sort of elaborate shell game."[183]

---

[177] *Soroof Trading Dev. Co. LTD v. GE Microgen, Inc.*, Civ. No. 10-1391, 2012 U.S. Dist. LEXIS 67736, at *27 (S.D.N.Y. May 11, 2012) (quoting *Trevino v. Merscorp, Inc.*, 583 F. Supp. 2d 521, 530 (D. Del. 2008)); *see also In re BH S&B Holdings LLC*, 420 B.R. at 133 ("There must be an abuse of the corporate form to effect a fraud or an injustice–some sort of elaborate shell game.") (quotation marks omitted).

[178] *NetJets Aviation, Inc.*, 537 F.3d at 183 ("To hold otherwise would render the fraud or injustice element meaningless.") (quotation marks omitted); *see also Mobil Oil Corp. v. Linear Films, Inc.*, 718 F. Supp. 260, 268 (D. Del. 1989) (explaining that although "[a]ny breach of contract and any tort – such as patent infringement – is, in some sense, an injustice," "[t]he underlying cause of action does not supply the necessary fraud or injustice").

[179] *Trevino*, 583 F. Supp. 2d at 530 (allegation that subsidiary was "ill-equipped to handle potential liability arising from this action" not sufficient to allege necessary "injustice") (quotation marks omitted); *see also Secured Sys. Tech., Inc. v. Frank Lill & Son, Inc.*, Civ. No. 08-6256, 2012 U.S. Dist. LEXIS 141845, at *14 (W.D.N.Y. Oct. 1, 2012) ("[T]he required 'fraud or injustice' is not established merely because the alleged-subsidiary corporation may now be judgment proof.") (applying Delaware law).

[180] *Official Comm. of Unsecured Creditors of Sunbeam Corp. v. Morgan Stanley & Co., Inc. (In re Sunbeam Corp.)*, 284 B.R. 355, 368 (Bankr. S.D.N.Y. 2002) (explaining that "the corporate form was used to effect a fraud or injustice" where "an entity completely controls an undercapitalized subsidiary or affiliate and, through that dominance, causes the underfunded-controlled entity to engage in inequitable conduct" and then "shields itself from liability behind the facade of the shell corporation").

[181] *See* Section VII.A.1.f(1)(b).

[182] *See Tese-Milner v. TPAC, LLC (In re Ticketplanet.com)*, 313 B.R. 46, 70 (Bankr. S.D.N.Y. 2004).

[183] *See Official Comm. of Unsecured Creditors v. Bay Harbour Master Ltd.* (*In re BH S&B Holdings LLC*), 420 B.R. 112, 133 (Bankr. S.D.N.Y. 2009) (quotation marks omitted). The Examiner reaches no definitive conclusions as to the likelihood that any of the Third-Party Claimants, if they were to prevail on an underlying claim against the Debtors and prove that the Debtors and AFI should be considered a single economic entity, could then succeed in proving the requisite "injustice or unfairness." Addressing such a hypothetical would require an assessment of the Third-Party Claimants' individual facts and circumstances and the particular theory or theories of "injustice or unfairness" asserted thereby.

The Examiner has identified ten pending RMBS Actions where a Third-Party Claimant seeks to hold AFI liable on a veil-piercing or alter ego theory of liability.[184] FGIC is the plaintiff in each of those actions, which are pending in the U.S. District Court for the Southern District of New York.[185] FGIC asserts that its claims "arise from certain financial guaranty insurance policies . . . issued by FGIC in connection with several securitization transactions . . . sponsored by [the Debtors]."[186] FGIC's claims include causes of action against certain of the Debtors for "fraudulent inducement of FGIC's participation in the [t]ransactions" and "material breaches of their insurance agreements."[187] FGIC seeks to hold AFI liable for the Debtors' alleged fraud and breach of contract in part on the theory that AFI and the Debtors "were and continue to be alter egos of each other."[188] To date, each of the ten actions brought by FGIC remains stayed by Order of the Bankruptcy Court.[189]

For the same reasons set forth above that the Examiner concludes it is unlikely that any veil-piercing claims asserted by Third-Party Claimants seeking to hold AFI liable for RMBS Claims against the Debtors would prevail, the Examiner concludes it is unlikely that the particular veil-piercing claims asserted by FGIC would prevail. Moreover, and as explained further below, the Examiner concludes it is likely that a defense that FGIC lacks standing to assert its alleged veil-piercing claims against AFI would prevail. Although the law is unsettled as to whether a veil-piercing claim asserted by a creditor against a shareholder of a debtor is "peculiar" or "personal" to that creditor or a group of creditors—and therefore not property of the estate—a court would likely consider FGIC's veil-piercing allegations "generalized" in nature. Absent allegations that the conduct that warrants piercing the corporate veil is at least in part the same conduct that directly harmed the plaintiff (rather than indirectly harmed the plaintiff by rendering the Debtors judgment proof), any future veil-piercing claim brought by other Third-Party Claimants seeking to hold AFI liable for RMBS Claims against the Debtors would appear vulnerable to the same defense.

---

[184] *See* Am. Compl., *FGIC v. Ally Fin. Inc.*, Civ. No. 11-09729, Docket No. 29 (S.D.N.Y. Mar. 30, 2012); Compl., *FGIC v. Ally Fin., Inc.*, Civ. No. 12-00338, Docket No. 1 (S.D.N.Y. Dec. 27, 2011); Compl., *FGIC v. Ally Fin., Inc.*, Civ. No. 12-00339, Docket No. 1 (S.D.N.Y. Dec. 27, 2011); Compl., *FGIC v. Ally Fin., Inc.*, Civ. No. 12-00340, Docket No. 1 (S.D.N.Y. Dec. 27, 2011); Compl., *FGIC v. Ally Fin., Inc.*, Civ. No. 12-00341, Docket No. 1 (S.D.N.Y. Dec. 15, 2011); Compl., *FGIC v. Ally Fin., Inc.*, Civ. No. 12-00780, Docket No. 1 (S.D.N.Y. Jan. 31, 2012); Compl., *FGIC v. Ally Fin., Inc.*, Civ. No. 12-01658, Docket No. 1 (S.D.N.Y. Mar. 6, 2012); Compl., *FGIC v. Ally Fin., Inc.*, Civ. No. 12-01860, Docket No. 1 (S.D.N.Y. Mar. 13, 2012); Compl., *FGIC v. Ally Fin., Inc.*, Civ. No. 12-01601, Docket No. 1 (S.D.N.Y. Mar. 5, 2012); Compl., *FGIC v. Ally Fin., Inc.*, Civ. No. 12-01818, Docket No. 1 (S.D.N.Y. Mar. 12, 2012).

[185] *See id.* FGIC also asserts RMBS Insurer Claims against certain of the Debtors (but not AFI) in two other actions pending in the U.S. District Court for the Southern District of New York. *See* Compl., *FGIC v. Residential Funding Co. LLC*, Civ. No. 11-09736, Docket No. 1 (S.D.N.Y. Nov. 29, 2011); Compl., *FGIC v. Residential Funding Co. LLC*, Civ. No. 11-09737, Docket No. 1 (S.D.N.Y. Nov. 29, 2011).

[186] FGIC Submission Paper, dated Oct. 17, 2012, at 2.

[187] *Id.*

[188] *Id.* The Examiner below assesses the aiding and abetting fraud claims asserted against AFI by certain Third-Party Claimants including FGIC. *See* Section VIII.C.2.a(3).

[189] *See* Stipulation and Order with Respect to Debtors' Motion to Extend the Automatic Stay or, in the Alternative, for Injunctive Relief [Case No. 12–01671; Docket No. 90].

### (a) Standing To Pursue Veil-Piercing Claims

#### (i) Legal Principles

Delaware law recognizes the existence of a claim of an entity to pierce its own corporate veil.[190] Moreover, such a veil-piercing claim "constitutes property of the debtor corporation, and the debtor-in-possession or bankruptcy trustee, rather than individual creditors, has exclusive standing to assert the claim."[191] That a debtor may possess a potential claim to pierce its own corporate veil does not necessarily divest a creditor of standing to assert a claim outside of the bankruptcy seeking to pierce the corporate veil of the debtor and recover from a shareholder.[192] "In determining whether a [veil-piercing] claim should be brought [on behalf of the debtor] or by the individual creditors, the court must consider whether the injury alleged is peculiar and personal to the claimant or is general and common to the corporation and creditors."[193]

An individual creditor possesses "standing to maintain [a veil-piercing] cause of action" where the claim is "peculiar and personal" to that creditor rather than "general and common to

---

[190] *See* Section VII.A.1.b.

[191] *See Kalb, Voorhis & Co. v. Am. Fin. Corp.*, 8 F.3d 130, 131 (2d Cir. 1993); *see also Duke Energy Trading and Mktg., LLC v. Enron Corp.* (*In re Enron Corp.*), Adv. No. 02-3609A, 2003 Bankr. LEXIS 330, at *11 (Bankr. S.D.N.Y. Apr. 17, 2003) ("[T]he trustee or debtor-in-possession would have exclusive standing to maintain a Delaware corporation's alter ego claim of a general nature.").

[192] *See Kalb, Voorhis & Co. v. Am. Fin. Corp.*, Civ. No. 92-7754, 1993 U.S. Dist. LEXIS 6558, at *20 n.1 (S.D.N.Y. May 14, 1993) ("[S]ome veil piercing claims may be specific to individual creditors."), *aff'd*, 8 F.3d 130 (2d Cir. 1993); *see also Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC* (*In re Bernard L. Madoff*), 429 B.R. 423, 433 (Bankr. S.D.N.Y. 2010) ("[I]t is possible for a bankruptcy estate and a creditor to own separate claims against third parties arising out of the same general conduct.").

[193] *Labarbera v. United Crane and Rigging Servs., Inc.*, Civ. No. 08-3274, 2011 U.S. Dist. LEXIS 20939, at *16 (E.D.N.Y. Mar. 2, 2011); *see also Levey v. Sys. Div., Inc.* (*In re Teknek LLC*), 563 F.3d 639, 647 (7th Cir. 2009) ("To determine whether an action accrues individually to a claimant or generally to a corporation, then, we must look to the injury for which relief is sought. We must consider whether that injury is 'peculiar and personal to the claimant or general and common to the corporation and creditors.'") (quoting *Koch Refining v. Farmers Union Cent. Exch., Inc.*, 831 F.2d 1339, 1349 (7th Cir. 1987)); *St. Paul Fire and Marine Ins. Co v. PepsiCo, Inc.*, 884 F.2d 688, 701 (2d Cir. 1989) ("If a claim is a general one, with no particularized injury arising from it, and if that claim could be brought by any creditor of the debtor, the trustee is the proper person to assert the claim, and the creditors are bound by the outcome of the trustee's action."); *Flake v. Alper Holdings USA, Inc.* (*In re Alper Holdings USA, Inc.*), 398 B.R. 736, 759 (S.D.N.Y. 2008) (claim to pierce debtor's corporate veil is "property of the estate" where it is "general to the corporation rather than personal to the creditors"); *Duke Energy Trading and Mktg., LLC*, 2003 Bankr. LEXIS 330 at *11-12 ("What must be considered is whether the injury alleged is peculiar and personal to the claimant or is general and common to the corporation and creditors.").

the [debtor] and creditors."[194] "A cause of action is considered 'personal' if there is injury to only one or a select group of specific creditors, and other creditors have no interest in the action."[195] "For example, where the debtor and its corporate shareholder falsely hold themselves out to some creditors but not to others as being a single entity rather than two distinct corporations, a veil piercing claim intended to hold the shareholder liable for the debtor's debts could be deemed specific to the creditors misled into believing that the two corporations are a single entity."[196]

"Where the harm suffered by the claimant is no different than the harm suffered by other creditors, the action belongs to the trustee or debtor-in-possession."[197] "The injury [to the

---

[194] *Duke Energy Trading and Mktg., LLC*, 2003 Bankr. LEXIS 330, at *11–12, 26 (granting motion to dismiss creditor's "general [veil-piercing] claim that similarly affects all of the creditors of the respective Debtors' estates"); *see also Hamilton v. Am. Corrective Counseling Servs., Inc.*, Civ. No. 05-434, 2009 U.S. Dist. LEXIS 30753, at *13 (N.D. Ind. Apr. 8, 2009) ("The plaintiffs' alter ego claims are based on a particularized injury, not a generalized injury common to all creditors and the corporation, so their claims aren't the property of the bankruptcy estate."); *Trustees of the Bricklayers Local 7 Pension Trust v. Stileitaliano Int'l*, Civ. No. 04-952, 2004 U.S. Dist. LEXIS 15928, at *13 (N.D. Cal. Aug. 6, 2004) ("Plaintiffs have adequately plead a sufficiently particularized injury to confer upon them standing to bring this [veil-piercing] claim."); *Variable-Parameter Fixture Dev. Corp. v. Morpheus Lights, Inc.*, 945 F. Supp. 603, 608 (S.D.N.Y. 1996) (declining to extend automatic stay to creditor's veil-piercing claims that alleged "a 'particularized injury' and hence . . . are not property of the bankruptcy estate"). In *Steinberg v. Buczynski*, the Seventh Circuit described this use of the terms "personal" and "general" as "not an illuminating usage." *See* 40 F.3d 890, 893 (7th Cir. 1994); *see also Highland Capital Mgmt. LP v. Chesapeake Energy Corp.* (*In re Seven Seas Petroleum Inc.*), 522 F.3d 575, 588 (5th Cir. 2008) ("We agree with Judge Posner . . . . These terms are perhaps best understood as descriptions to be applied after a claim has been analyzed to determine whether it is properly assertable by the debtor or creditor, and not as a substitute for the analysis itself."). "The point is simply that the trustee is confined to enforcing entitlements of the corporation. . . . [T]here is a difference between a creditor's interest in the claims of the corporation against a third party, which are enforced by the trustee, and the creditor's own direct–not derivative–claim against the third party, which only the creditor himself can enforce." *Steinberg*, 40 F.3d at 893.

[195] *Mannucci v. Cabrini Med. Ctr.* (*In re Cabrini Med. Ctr.*), Bankr. Case. No. 09-14398, 2012 Bankr. LEXIS 2747, at *29 (Bankr. S.D.N.Y. June 15, 2012), *aff'd, In re Cabrini Med. Ctr.*, Civ. No. 12-6661, 2012 U.S. Dist. LEXIS 180896 (S.D.N.Y. Dec. 20, 2012); *see also Highland Capital Mgmt. LP*, 522 F.3d at 588 ("We . . . wish to dispel any notion that a claim belongs to the estate or is otherwise only assertable by the trustee merely because it could be brought by a number of creditors, instead of just one.").

[196] *Kalb, Voorhis & Co.*, 1993 U.S. Dist. LEXIS 6558 at *20 n.1; *see also Autobacs Strauss, Inc. v. Autobacs Seven Co.* (*In re Autobacs Strauss, Inc.*), 473 B.R. 525, 555–56 (Bankr. D. Del. 2012) (rejecting argument that creditor "failed to allege any particularized harm" and lacked standing to assert veil-piercing claim where creditor alleged that it was "fraudulently induced by [parent defendants] to endorse the . . . Plan [of reorganization of the subsidiary]").

[197] *Duke Energy Trading and Mktg., LLC v. Enron Corp.* (*In re Enron Corp.*), Adv. No. 02-3609A, 2003 Bankr. LEXIS 330, at *12 (Bankr. S.D.N.Y. Apr. 17, 2003); *see also Labarbera*, 2011 U.S. Dist. LEXIS 20939, at *22 ("[A]n alter ego claim is general where the allegations supporting the claim were suffered by all other creditors, thus making the alter ego claim available to all creditors."); *In re Eagle Enters., Inc.*, 265 B.R. 671, 678 (Bankr. E.D. Pa. 2001) ("Appellants' alter ego theory is predicated on USA Waste's alleged domination of debtors and disregard of their separate corporate existence. Any creditor could seek to impose liability on USA Waste for debtors' debts on these allegations. . . . The Bankruptcy Court properly considered appellants' alter ego claim to be property of the estate subject to the automatic stay.").

creditor] must be a particular injury that can be traced to the conduct of the entity controlling the debtor corporation."[198] "If the direct injury stemming from the misuse of the corporate form and misappropriation of corporate assets is to the controlled entity, and merely reduces assets available to pay creditors, the cause of action belongs to the corporation."[199] Accordingly, veil-piercing claims alleging that a parent company engaged in "fraudulent transfer[s]" that resulted in "gross undercapitalization" of a debtor subsidiary have been found to be "of a generalized nature" and, therefore, property of the estate.[200] At least one court, however, has found that creditors had "standing to bring their alter ego claim" where they alleged "they were injured in a way that other creditors of [the debtor] were not" because the debtor's "undercapitalization was achieved specifically [by the debtor and its alter ego] to avoid financial obligations to Plaintiffs."[201]

The assertion of a breach of contract or tort claim against the debtor by one creditor, without more, "fail[s] to distinguish it from [the debtor's] other creditors" or to give rise to "standing to assert . . . alter ego/veil piercing claims . . . against [the shareholder of the

---

[198] *In re Cabrini Med. Ctr.*, 2012 Bankr. LEXIS 2747, at *29; *see also St. Paul Fire and Marine Ins. Co.*, 884 F.2d at 704 (creditor lacked standing to assert veil-piercing claim where alleged injury "was not a particular one that can be directly traced to [parent entity's] conduct" but instead "a secondary effect from harm done to [the debtor subsidiary]").

[199] *In re Cabrini Med. Ctr.*, 2012 Bankr. LEXIS 2747, at *30; *see also Maney v. Fischer*, Civ. No. 96-0561, 1998 U.S. Dist. LEXIS 4077, at *5 (S.D.N.Y. Mar. 31, 1998) ("Where plaintiffs are harmed because of the injury the alter ego does to the controlled corporation, the alter ego claim belongs to the bankruptcy estate.").

[200] *See In re Alper Holdings USA*, Case No. 07-12148, 2008 Bankr. LEXIS 522, at *20 (Bankr. S.D.N.Y. Feb. 25, 2008); *see also St. Paul Fire and Marine Ins. Co*, 884 F.2d at 704 (affirming dismissal of creditor's veil-piercing claim for lack of standing where "[plaintiff's] harm is precisely that suffered by all other creditors of [debtors]: because [debtors] were used by [the parent company] to preferentially pay off debts owed to [the parent], all other creditors . . . fell into disfavored positions"); *Mannucci v. Cabrini Med. Ctr.* (*In re Cabrini Med. Ctr.*), Civ. No. 12-6661, 2012 U.S. Dist. LEXIS 180896, at *40 (S.D.N.Y. Dec. 20, 2012) ("[T]he kind of harm alleged by the [complaint] was no different from the harm suffered by the unsecured creditors of Cabrini generally, i.e. that due to the diminution of Cabrini's assets by Missionary Sisters, they would not fully recover their claims."); *The Mediators, Inc. v. Manney* (*In re The Mediators, Inc.*), Adv. No. 93-2304, 1996 U.S. Dist. LEXIS 7639, at *5, 19 (S.D.N.Y. June 3, 1996) (denying motion to dismiss creditors' committee's veil-piercing claim asserted against sole shareholder of debtor where the "complaint asserts an indirect injury common to every member of the creditors' committee" and alleged that shareholders "misappropriated corporate assets . . . so as to place those assets beyond the reach of creditors and enrich themselves at [debtor's] expense"); *Murray v. Miner*, 876 F. Supp. 512, 517 (S.D.N.Y. 1995) ("The amended complaint avers only that [shareholder] MMAR wasted [debtor's] assets . . . . Under such circumstances, plaintiffs may assert a veil-piercing claim only if the claim has been abandoned by the trustee."); *Duke Energy Trading and Mktg., LLC*, 2003 Bankr. LEXIS 330, at *15 (granting creditors' committee's motion to dismiss individual creditor's veil-piercing claim for lack of standing where "[t]he conduct described in the Amended Complaint by which various Debtors were allegedly looted and controlled by other of the Debtors and which allegedly caused the [individual creditor] to suffer injury is the same conduct that allegedly injured all of the other creditors").

[201] *Trustees of the Bricklayers Local 7 Pension Trust v. Stileitaliano Int'l*, Civ. No. 04-952, 2004 U.S. Dist. LEXIS 15928, at *14–15 (N.D. Cal. Aug. 6, 2004).

debtor]."[202] Courts have explained that "all of [the debtor's] creditors have some contractual or tortious ground for their individual claims against [the debtor], none of these creditors have been fully paid as a result of [the debtor's] insolvency, and all share the same general interest . . . in [piercing the debtor's corporate veil to reach the shareholder]."[203] Nonetheless, some courts have allowed a veil-piercing claim against a shareholder of the debtor by one creditor to proceed where the creditor alleged that the shareholder "directly and actively participated" in the conduct that gave rise to the claim of that creditor against the debtor.[204]

For example, in *Variable-Parameter Fixture Dev. Corp. v. Morpheus Lights, Inc.*, the U.S. District Court for the Southern District of New York granted the plaintiff's motion for discovery sanctions as to a defendant who was the sole shareholder of a debtor, and rejected the argument that plaintiff's veil-piercing claim against the shareholder was "generalized" and "exclusively the property of the debtor."[205] According to the district court, the shareholder's

---

[202] *Kalb, Voorhis & Co. v. Am. Fin. Corp.*, Civ. No. 92-7754, 1993 U.S. Dist. LEXIS 6558, at *20, 23 (S.D.N.Y. May 14, 1993), *aff'd*, 8 F.3d 130 (2d Cir. 1993); *see also Murray*, 876 F. Supp. at 513 (denying motion for leave to amend to assert veil-piercing claim "that seeks to hold [the shareholder] liable . . . for the contractual obligations of [debtors]"); *Gosconcert v. Hillyer*, 158 B.R. 24, 25, 29 (S.D.N.Y. 1993) (granting motion to dismiss creditor's "action against [controlling shareholder] alleging that she exerted such domination and control over [debtor] that the company was a 'mere instrumentality' and that, as a result, [the shareholder] should be held jointly liable for [debtor's] breach of contract"; explaining that complaint "contains no allegations which uniquely affected Plaintiffs"); *In re Cabrini Med. Ctr.*, 2012 Bankr. LEXIS 2747, at *2, *37 (denying "[creditors'] renewed motion to lift the automatic stay to pursue alter ego causes of action against the NY Missionary Sisters" to hold that non-debtor corporation liable for breach of "certain deferred compensation agreements" entered into by creditors and debtor Cabrini Medical Center; explaining that "the alter ego causes of action at issue belong to the Debtor's estate" because creditors' allegations "specify no direct or particularized injury to [them] from the conduct of the NY Missionary Sisters"); *Raytheon Co. v. Boccard USA Corp.*, 369 S.W.3d 626, 628–29 (Tex. Ct. App. 2012) (vacating for lack of standing trial court's judgment where creditor "sued Raytheon Company seeking to hold it liable for a breach of contract by Raytheon Company's former third-tier subsidiary [the debtor] based on the theory of alter ego").

[203] *Kalb, Voorhis & Co.*, 1993 U.S. Dist. LEXIS 6558, at *20, 24; *see also Levey v. Sys. Div., Inc. (In re Teknek LLC)*, 563 F.3d 639, 644 (7th Cir. 2009) ("[T]he fact that the underlying harm suffered by [creditor] SDI was patent infringement does not, by itself, make [its veil-piercing claim against shareholders of debtor] a claim no other creditor could assert. By such logic, all creditors' claims would be personal to the specific creditor: a supplier's claim for payment on supplies would be deemed personal because no other creditor could claim payment for the same supplies; an employee's claim for his back pay would be personal to the extent that no other employee could claim back pay for that employee's hours worked. If all such claims were 'personal,' no creditor would have to wait in line behind the bankruptcy trustee to assert her claims.").

[204] *Variable-Parameter Fixture Dev. Corp. v. Morpheus Lights, Inc.*, 945 F. Supp. 603, 607 (S.D.N.Y. 1996); *see also Hamilton v. Am. Corrective Counseling Servs., Inc.*, Civ. No. 05-434, 2009 U.S. Dist. LEXIS 30753, at *12–13 (N.D. Ind. Apr. 8, 2009) ("These plaintiffs assert that as the alter egos of [debtor], the non-case debtor defendants directly harmed them by acting as debt collectors through their corporate shells."); *MeccaTech, Inc. v. Kiser*, Civ. No. 05-570, 2008 U.S. Dist. LEXIS 30829, at *39–40 (D. Neb. Apr. 18, 2008) ("A RICO claim, where the shareholders were instrumental in the fraud, provides a case where the injury to the creditor is different from a general one which can be brought by any creditor. . . . In this case, [plaintiff] MTI has an injury that is distinct from the general creditors in that O'Hara [the sole owner of the debtor], in conjunction with Lange, has used [debtor] SGS and ESP LLC, to engage in a pattern of racketeering to harm MTI.").

[205] 945 F. Supp. at 607.

"characterization of [plaintiff's] claims . . . is simply incorrect."[206] Although the plaintiff's complaint "does allege that [the shareholder] siphoned assets from [the debtor] and thereby damaged [the debtor]," the "gist of the claim against [the shareholder]" was instead that "as the alter ego of [the debtor], [the shareholder directly and actively participated in infringing on plaintiff's patent and] caused harm directly to [plaintiff]."[207] Accordingly, "[plaintiff's] alter ego claims against [the shareholder] do not fall into the category of a 'generalized alter ego' claim" and "do not fall within the ambit of the automatic stay."[208]

Certain subsequent decisions have distinguished *Variable-Parameter*, including on grounds that, unlike there, "the 'gist' of the alter ego claim [at issue was] a general alter ego claim based upon injuries inflicted on the corporation as a whole."[209] In *Labarbera v. United Crane and Rigging Servs., Inc.*, for example, the U.S. District Court for the Eastern District of New York denied plaintiffs' motion for summary judgment on their "successorship and alter ego claim" against a non-debtor and dismissed that claim for lack of standing because the debtor's "bankruptcy proceedings are ongoing, and Plaintiffs' claim is the property of [debtor's] bankruptcy estate."[210] According to the district court, "case law [including *Variable-Parameter*] demonstrates that an alter ego or successorship claim is personal, and thus can be asserted by an individual creditor, only if the conduct that supports [such] claim is the same conduct that directly harmed the creditor in the underlying cause of action."[211] By contrast, in *Labarbera* the plaintiffs failed to "assert allegations in support of their alter ego claims that are associated with the underlying harm for which they seek damages."[212] Although plaintiffs asserted that the non-debtor defendant was "in cahoots" with the debtor

---

[206] *Id.*

[207] *Id.* at 607–08; *see also Trustees of the Bricklayers Local 7 Pension Trust v. Stileitaliano Int'l*, Civ. No. 04-952, 2004 U.S. Dist. LEXIS 15928, at *14 (N.D. Cal. Aug. 6, 2004) ("That some of Plaintiffs' allegations could support an alter ego claim brought by another creditor of [debtor] does not mean that Plaintiffs are asserting a generalized injury to the corporation for which only the trustee can seek redress.").

[208] *Variable-Parameter Fixture Dev. Corp.*, 945 F. Supp. at 608.

[209] *In re Landmark Fence Co.*, Civ. No. 10-00143, 2010 U.S. Dist. LEXIS 130250, at *12–13 (C.D. Cal. Dec. 3, 2010) (holding that "[plaintiff's] alter ego claim is a general alter ego claim and belongs to the estate rather than to [plaintiffs]" where "[t]he vast majority of this evidence [asserted in support of plaintiff's alter ego claim] relates to activities that affect all creditors equally" and "[o]nly the evidence with respect to the falsification of the payroll reports and the policies of underpayment relate directly to [plaintiff's] injury"); *see also Ginger Root Office Assocs., LLC v. Farmer* (*In re Advanced Packaging and Prods. Co.*), 426 B.R. 806, 823 (C.D. Cal. 2010) ("The plaintiff in *Variable-Parameter* . . . alleged that the president/director participated in the infringement in his role as alter ego of the corporation. Here, by contrast, [plaintiff] does not connect [the alleged parent company's] contamination of its property to its alleged role as [the debtor's] alter ego. Rather, [plaintiff] alleges that [the parent] independently acted to contaminate its property; it asserts direct claims – not alter ego claims – against [the parent] on this basis.").

[210] Civ. No. 08-3274, 2011 U.S. Dist. LEXIS 20939, at *3, 15 (E.D.N.Y. Mar. 2, 2011).

[211] *Id.* at *19.

[212] *Id.* at *23.

that avoided ERISA contributions owed to plaintiffs' pension fund, "there are no allegations in the complaint that their working 'in cahoots' was in any way related to [debtor's] avoidance of ERISA contributions."[213]

### (ii) Application To RMBS Claims

AFI asserts that Third-Party Claimants including FGIC "lack standing" to assert a veil-piercing claim against AFI and that "such a claim is the property of ResCap's estate."[214] According to AFI, "[t]he veil-piercing claim that [Third-Party Claimants] . . . would assert is property of the estate because it is a general veil-piercing claim . . . and not an individual veil-piercing claim that is particular to one creditor."[215] The Examiner agrees that, as alleged, FGIC's veil-piercing claims are likely to be considered "generalized" in nature and to lack any "particularized injury" stemming from them.[216] The Examiner concludes it is likely that a defense that FGIC lacks standing to assert its alleged veil-piercing claims against AFI would prevail.

Much of what FGIC alleges in support of its claim that "[AFI], ResCap, and [GMAC Mortgage] were and continue to be alter egos of each other"[217] is consistent with a veil-piercing claim that "could be brought by any creditor of the debtor."[218] For example, FGIC alleges that AFI "exercised . . . domination and control over its subsidiaries," used "ResCap as an intermediary instrument to achieve its goals," "shares resources, management and employees with its subsidiaries," "considers its mortgage businesses to be 'units' of its business," and "has consistently been involved in the day-to-day operations of its subsidiaries."[219] Moreover, FGIC alleges that this "domination and control" by AFI caused

---

[213] *Id.*

[214] AFI Submission Paper, dated Dec. 19, 2012, at 25; *see also* Debtors Submission Paper, dated Dec. 18, 2012, at 13 ("[O]nly the Debtors have standing to bring these claims.").

[215] AFI Submission Paper, dated Dec. 19, 2012, at 25–26 (emphases omitted); *see also* Debtors Submission Paper, dated Dec. 18, 2012, at 12-13, 85.

[216] *See Duke Energy Trading and Mktg., LLC v. Enron Corp.* (*In re Enron Corp.*), Adv. No. 02-3609A, 2003 Bankr. LEXIS 330, at *11–12, 26 (Bankr. S.D.N.Y. Apr. 17, 2003) (granting motion to dismiss creditor's "general [veil-piercing] claim that similarly affects all of the creditors of the respective Debtors' estates"); *see also St. Paul Fire and Marine Ins. Co v. PepsiCo, Inc.*, 884 F.2d 688, 701 (2d Cir. 1989).

[217] *E.g.*, Am. Compl., *FGIC v. Ally Fin. Inc.*, Civ. No. 11-09729, Docket No. 29, at 94 (S.D.N.Y. Mar. 30, 2012).

[218] *St. Paul Fire and Marine Ins. Co*, 884 F.2d at 701.

[219] *E.g.*, Am. Compl., *FGIC v. Ally Fin. Inc.*, Civ. No. 11-09729, Docket No. 29, at 2–3, 71, 78 (S.D.N.Y. Mar. 30, 2012).

harm to the Debtors.[220] To the extent FGIC intends to assert that it suffered particularized injuries from the "fraudulent inducement" and "breach of [contractual] representations, warranties, and covenants" it alleges,[221] the Examiner is not persuaded that a court would find such allegations sufficient to give rise to standing.[222] FGIC does not allege that those injuries were the direct result of any abuse of the corporate form.[223]

Nor do FGIC's allegations present a case where a veil-piercing claim might be deemed "specific to the creditors misled into believing that the two corporations are a single entity" because "the debtor and its corporate shareholder falsely [held] themselves out to some creditors [including FGIC] but not to others as being a single entity."[224] FGIC variously alleges that "at least one" AFI employee was "on a working group list for transactions involving ResCap subsidiaries that FGIC insured," that a ResCap employee "communicated with FGIC regarding rescission requests using an [AFI] email address," and that FGIC was "specifically instructed" to send "'official letters' regarding several AFI subsidiaries" to "[AFI's] internal counsel."[225] FGIC does not, however, allege that AFI or any one or more of the Debtor defendants ever represented to FGIC that they were a single entity, or that FGIC

---

[220] *See, e.g.*, Am. Compl., *FGIC v. Ally Fin. Inc.*, Civ. No. 11-09729, Docket No. 29, at 71 ("[AFI] has a business relationship with its subsidiaries designed to benefit itself at [their] expense . . . [AFI] treated ResCap as an extension of itself, rather than a subsidiary whose dealings were at arm's length"), 78–79 ("[AFI]—at least in the view of certain of ResCap's bondholders—is believed to have stripped assets from its subsidiary. . . [AFI] is currently using its subsidiaries' resources as its own in order to earn favorable ratings by credit rating agencies.") (S.D.N.Y. Mar. 30, 2012). FGIC's allegations that AFI caused harm to the Debtors are not entirely consistent. *See id*. at 71 ("[AFI] also provided ResCap with liquidity and capital."); *id.* at 74 ("[AFI] has also agreed to directly pay the losses or expenses of ResCap."); *id.* at 76 ("There is also substantial evidence that billions of dollars of TARP funds meant to stabilize [AFI] were given to ResCap by [AFI]."); *id*. at 241 ("In addition to the direct financial support [AFI] contributed to ResCap, it was also instrumental in obtaining outside investments that flowed directly to its mortgage subsidiaries.").

[221] *See, e.g.*, Am. Compl., *FGIC v. Ally Fin. Inc.*, Civ. No. 11-09729, Docket No. 29, at 83–94 (S.D.N.Y. Mar. 30, 2012).

[222] *See Kalb, Voorhis & Co. v. Am. Fin. Corp.*, Civ. No. 92-7754, 1993 U.S. Dist. LEXIS 6558, at *20 (S.D.N.Y. May 14, 1993) ("Kalb's contractual claims based on the Debentures fail to distinguish it from Circle K's other creditors: all of Circle K's creditors have some contractual or tortious ground for their individual claims against Circle K, none of these creditors have been fully paid as a result of Circle K's insolvency, and all share the same general interest as Kalb in the alter ego claim alleged in the Complaint."), *aff'd*, 8 F.3d 130 (2d Cir. 1993); *see also Levey v. Sys. Div., Inc.* (*In re Teknek LLC*), 563 F.3d 639, 644 (7th Cir. 2009) ("[T]he fact that the underlying harm suffered by [creditor] SDI was patent infringement does not, by itself, make [its veil-piercing claim against shareholders of debtor] a claim no other creditor could assert.").

[223] *See Labarbera v. United Crane & Rigging Servs., Inc.*, Civ. No. 08-3274, 2011 U.S. Dist. LEXIS 20939, at *19 (E.D.N.Y. Mar. 2, 2011) ("[A]n alter ego or successorship claim is personal, and thus can be asserted by an individual creditor, only if the conduct that supports the claim is the same conduct that directly harmed the creditor in the underlying cause of action.").

[224] *See Kalb, Voorhis & Co.*, 1993 U.S. Dist. LEXIS 6558 at *20 n.1.

[225] *See, e.g.*, Am. Compl., *FGIC v. Ally Fin. Inc.*, Civ. No. 11-09729, Docket No. 29, at 78–82 (S.D.N.Y. Mar. 30, 2012).

was misled by such alleged representations.[226] To the contrary, FGIC concedes that the Debtors—and not AFI—were parties to the agreements FGIC entered into in connection with the disputed transactions.[227]

Although the Examiner can reach no definitive conclusions concerning standing to pursue potential veil-piercing claims, the foregoing analysis of FGIC's pending claims suggests that other veil-piercing claims that may be brought by Third-Party Claimants are likely to be vulnerable to a lack of standing defense.[228]

### (2) Control Person Liability Under Federal And State Securities Laws

The Examiner has identified six pending RMBS Investor Actions where Third-Party Claimants seek to hold AFI liable as a "control person" under federal and/or state securities laws for an alleged primary securities law violation by one or more of the Debtors and/or Ally Securities.[229] Those actions are pending in state and federal courts located in Illinois,

---

[226] FGIC's allegations that AFI "describes its subsidiaries as its own business units" in certain public SEC filings and on an AFI website could be asserted by any creditor. *See, e.g.*, Am. Compl., *FGIC v. Ally Fin. Inc.*, Civ. No. 11-09729, Docket No. 29, at 78–79 (S.D.N.Y. Mar. 30, 2012). The Examiner has explained that his assessment of whether the Debtors and AFI could be deemed a single economic entity does not ascribe significant weight to similar allegations that they held themselves out to the public as such. *See* Section VII.A.1.f(4).

[227] *See, e.g.*, Am. Compl., *FGIC v. Ally Fin. Inc.*, Civ. No. 11-09729, Docket No. 29, at 28–31 (S.D.N.Y. Mar. 30, 2012).

[228] The Examiner's conclusion that a lack of standing defense is likely to prevail against the veil-piercing claim asserted by Third-Party Claimant FGIC should not, however, be interpreted as a conclusion that no individual creditor or group of creditors could possess standing to hold AFI liable on a veil-piercing theory of liability. The potential veil-piercing claim that Wilmington Trust intends to assert on behalf of the Unsecured Noteholders, for example, appears to be on a different footing. *See* Motion of Wilmington Trust, National Association, Solely in its Capacity as Indenture Trustee for the Senior Unsecured Notes issued by Residential Capital, LLC for an Order Authorizing it to Prosecute Claims and Other Causes of Action on Behalf of the Residential Capital, LLC Estate [Docket No. 3475], Ex. B at 69–71. Although Wilmington Trust's Proposed Complaint contains allegations of "asset stripping" that allege harm to ResCap, *id.* at 60, it further alleges that the Unsecured Noteholders suffered a "unique injury" from an alleged breach of the "substantially all" covenant in section 11.01 of the 2005 Indenture. *See id.* at 71. While a close question, the Examiner concludes it is more likely than not that a lack of standing defense would not prevail against such an alleged veil-piercing claim. As alleged, this "unique injury" could be deemed to have been directly caused by the same "asset stripping" allegations alleged to support the Unsecured Noteholders' veil-piercing theory of liability (rather than indirectly caused by such "asset stripping" because it rendered ResCap unable to satisfy its debts). *See Labarbera*, 2011 U.S. Dist. LEXIS 20939, at *19 ("[A]n alter ego or successorship claim is personal, and thus can be asserted by an individual creditor, only if the conduct that supports claim is the same conduct that directly harmed the creditor in the underlying cause of action.").

[229] *See* Am. Compl., *FHFA v. Ally Fin. Inc.*, Civ. No. 11-7010, Docket No. 114 (S.D.N.Y. June 13, 2012); Am. Compl., *FHLB of Boston v. Ally Fin., Inc.*, Civ. No. 11-10952, Docket No. 180 (D. Mass. June 29, 2012); Am. Compl., *FHLB of Chicago v. Banc of Am. Funding Corp.*, Case No. 10-CH-45033 (Ill. Cir. Ct. Apr. 8, 2011); Am. Compl., *John Hancock Life Ins. Co. (U.S.A.) v. Ally Fin. Inc.*, Civ. No.12-01841, Docket No. 84 (D. Minn. Oct. 15, 2012); Am. Compl., *Stichting Pensioenfonds ABP v. Ally Fin. Inc.*, Civ. No. 12-01381, Docket No. 101 (D. Minn. Oct. 11, 2011); Am. Compl., *Union Central Life Ins. Co. v. Ally Fin., Inc.*, Civ. No. 11-02890, Docket No. 146 (S.D.N.Y. May 4, 2012).

Massachusetts, Minnesota, and New York.[230] AFI filed pre-answer motions to dismiss the control person claims asserted against it in each of those actions.[231] To date, Third-Party Claimants' control person claims have survived AFI motions to dismiss, in whole or in part, in two of those six actions.[232] According to Third-Party Claimants, those two actions are now "in the early stages of discovery."[233]

AFI's motion to dismiss control person claims asserted against it in one of the six actions was granted and those claims were dismissed without prejudice and with an opportunity to seek leave to amend.[234] AFI's motions to dismiss remain pending as to the control person

---

[230] *See* Am. Compl., *FHFA v. Ally Fin. Inc.*, Civ. No. 11-7010, Docket No. 114 (S.D.N.Y. June 13, 2012); Am. Compl., *FHLB of Boston v. Ally Fin., Inc.*, Civ. No. 11-10952, Docket No. 180 (D. Mass. June 29, 2012); Am. Compl., *FHLB of Chicago v. Banc of Am. Funding Corp.*, Case No. 10-CH-45033 (Ill. Cir. Ct. Apr. 8, 2011); Am. Compl., *John Hancock Life Ins. Co. (U.S.A.) v. Ally Fin. Inc.*, Civ. No.12-01841, Docket No. 84 (D. Minn. Oct. 15, 2012); Am. Compl., *Stichting Pensioenfonds ABP v. Ally Fin. Inc.*, Civ. No. 12-01381, Docket No. 101 (D. Minn. Oct. 11, 2011); Am. Compl., *Union Central Life Ins. Co. v. Ally Fin., Inc.*, Civ. No. 11-02890, Docket No. 146 (S.D.N.Y. May 4, 2012).

[231] *See* Mem. of Law in Supp. of Ally Fin. Inc.'s and GMAC Mortg. Group, Inc's Mot. to Dismiss the Am. Compl., *FHFA v. Ally Fin. Inc.*, Civ. No. 11-7010, Docket No. 149 (S.D.N.Y. July 13, 2012); Defs.' Mem. of Law in Supp. of Their Mot. to Dismiss the Am. Compl., *FHLB of Boston v. Ally Fin., Inc.*, Civ. No. 11-10952, Docket No. 200 (D. Mass. Oct. 11, 2012); Defs.' Joint Mem. of Law in Supp. of Their Joint Combined Mot. to Dismiss Pl.'s Am. Compl. for Rescission and Damages, *FHLB of Chicago v. Banc of Am. Funding Corp.*, Case No. 10-CH-45033 (Ill. Cir. Ct. June 3, 2011); Mem. in Supp. of the Ally Defs.' Mot. to Dismiss the Am. Compl., *John Hancock Life Ins. Co. (U.S.A.) v. Ally Fin. Inc.*, Civ. No.12-01841, Docket No. 104 (D. Minn. Dec. 14, 2012); Mem. in Supp. of the Ally Defs.' Mot. to Dismiss the Am. Compl., *Stichting Pensioenfonds ABP v. Ally Fin. Inc.*, Civ. No. 12-01381, Docket No. 129 (D. Minn. Mar. 11, 2013); Ally Fin. Inc.'s Mem. of Law in Supp. of Mot. to Dismiss the Am. Compl., *Union Central Life Ins. Co. v. Ally Fin., Inc.*, Civ. No. 11-02890, Docket No. 219 (S.D.N.Y. July 27, 2012).

[232] *See FHFA v. Ally Fin., Inc.*, Civ. No. 11-7010, 2012 U.S. Dist. LEXIS 179768, at *11–15 (S.D.N.Y. Dec. 19, 2012); Order, *FHLB of Chicago v. Banc of Am. Funding Corp.*, Case No. 10-CH-45033, at 33 (Ill. Cir. Ct. Sept. 19, 2012).

[233] *See* Joint Submission Paper of Federal Home Loan Banks of Boston, Chicago, and Indianapolis, dated Oct. 19, 2012, at 7.

[234] *See* Order, *Union Central Life Ins. Co. v. Ally Fin., Inc.*, Civ. No. 11-02890, Docket No. 263, at 7 n.7 (S.D.N.Y. Mar. 29, 2013) (granting plaintiffs opportunity to "file a letter motion to amend which attaches a proposed amended complaint within sixty (60) days").

claims asserted against it in the other three actions.[235] No final judgment has been entered as to the control person claims in any of these six RMBS Investor Actions.[236]

Of those six RMBS Investor Actions, one asserts control person claims against AFI under section 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77o.[237] One other of those actions asserts control person claims against AFI under section 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78t(a).[238] Five of those six actions assert control person claims against AFI under state securities (sometimes known as "blue sky") laws of Illinois (the Illinois Securities Law of 1953 (the "Illinois Securities Law"), 815 Ill. Comp. Stat. Ann. 5/1 *et seq.*), Massachusetts (the Massachusetts Uniform Securities Act (the "MUSA"), Mass. Gen. Law. ch. 110A §§ 101 *et seq.*), Minnesota (the Minnesota Securities Act, Minn. Stat. §§ 80A.40 *et seq.*), North Carolina (the North Carolina Securities Law, N.C. Gen. Stat. §§ 78A-1 *et seq.*), and/or Virginia (the Virginia Securities Act, Va.

---

[235] *See* Defs.' Mem of Law in Supp. of Their Mot. to Dismiss the Am. Compl., *FHLB of Boston v. Ally Fin., Inc.*, Civ. No. 11-10952, Docket No. 200 (D. Mass. Oct. 11, 2012); Mem. in Supp. of the Ally Defs.' Mot. to Dismiss the Am. Compl., *John Hancock Life Ins. Co. (U.S.A.) v. Ally Fin. Inc.*, Civ. No.12-01841, Docket No. 104 (D. Minn. Dec. 14, 2012); Mem. in Supp. of the Ally Defs.' Mot. to Dismiss the Am. Compl., *Stichting Pensioenfonds ABP v. Ally Fin. Inc.*, Civ. No. 12-01381, Docket No. 129 (D. Minn. Mar. 11, 2013).

[236] The Examiner has identified one additional RMBS Investor Action that was dismissed with prejudice, including the control person claims asserted against AFI under the Minnesota Securities Act. *See* Order Granting Defs.' Mot. to Dismiss Compl., *Huntington Bancshares, Inc. v. Ally Fin. Inc.*, Case No. 27-cv-11-20276 (Minn. Dist. Ct. Dec. 11, 2012).

[237] *See* Am. Compl., *FHFA v. Ally Fin. Inc.*, Civ. No. 11-7010, Docket No. 114, at 124–27 (S.D.N.Y. June 13, 2012). Certain Third-Party Claimants have asserted section 15 claims against Ally Securities and officers and directors of one or more of the Debtors. *See* Second Am. Compl., *N.J. Carpenters Health Fund v. Residential Capital, LLC*, Civ. No. 08-8781, Docket No. 121, at 98–99 (S.D.N.Y. Jan. 3, 2011); Am. Compl., *John Hancock Life Ins. Co. (U.S.A.) v. Ally Fin. Inc.*, Civ. No.12-01841, Docket No. 84, at 330–32 (D. Minn. Oct. 15, 2012).

[238] *See* Am. Compl., *Union Central Life Ins. Co. v. Ally Fin., Inc.*, Civ. No. 11-02890, Docket No. 146, at 240–43 (S.D.N.Y. May 4, 2012). Third-Party Claimants also assert therein a claim against AFI under section 20(b) of the Exchange Act, which provision states that it "shall be unlawful for any person . . . to do any act or thing which it would be unlawful for such person to do under the [the Exchange Act] through or by means of any other person." 15 U.S.C. § 78t(b). "There is a dearth of authority construing [s]ection 20(b), which has been thought largely superfluous in 10b-5 cases." *Janus Capital Group, Inc. v. First Derivative Traders*, 131 S. Ct. 2296, 2311 (2011) (Breyer, J., dissenting) (quotation marks omitted). Those "[f]ew reported cases [to] discuss the applicability of [s]ection 20(b)" suggest that it requires a showing that a "controlling person knowingly used the controlled person to commit the illegal act." *Cohen v. Citibank, N.A.*, 954 F. Supp. 621, 630 (S.D.N.Y. 1996) (quotation marks omitted). The Examiner does not address separately section 20(b) of the Exchange Act.

Code. Ann. §§ 13.1-501 *et seq.*).[239] The Examiner has identified twelve other RMBS Investor Actions where federal and/or state securities law claims are pending against one or more of the Debtors and/or Ally Securities, but where, to date, no control person claims have been asserted against AFI.[240]

Control person liability "is a separate inquiry from that of primary liability and provides an alternative basis of culpability."[241] "Typically, a control person is a parent corporation, the employer of the primary violator, or a director or officer of the primary violator corporation."[242] Section 15 and section 20(a) are "roughly parallel control person provisions" under the federal securities laws.[243] "Section 15 [of the Securities Act] imposes joint and several vicarious liability for violations of §§ 11 and 12 [of that statute] on any person who 'controls' the primary violator."[244] "Section 20(a) of the [Exchange] Act imposes joint and several liability on any person who controls another person who violates [provisions of that statute including section 10(b)]."[245]

---

[239] *See* Am. Compl., *FHFA v. Ally Fin. Inc.*, Civ. No. 11-7010, Docket No. 114, at 130–33 (S.D.N.Y. June 13, 2012) (Virginia Securities Act); Am. Compl., *FHLB of Boston v. Ally Fin., Inc.*, Civ. No. 11-10952, Docket No. 180, at 406–20 (D. Mass. June 29, 2012) (MUSA); Am. Compl., *FHLB of Chicago v. Banc of Am. Funding Corp.*, Case No. 10-CH-45033, at 268–92 (Ill. Cir. Ct. Apr. 8, 2011) (Illinois Securities Law and North Carolina Securities Act); Am. Compl., *John Hancock Life Ins. Co. (U.S.A.) v. Ally Fin. Inc.*, Civ. No.12-01841, Docket No. 84, at 314–18 (D. Minn. Oct. 15, 2012) (Minnesota Securities Act); Am. Compl., *Stichting Pensioenfonds ABP v. Ally Fin. Inc.*, Civ. No. 12-01381, Docket No. 101, at 200–04 (D. Minn. Oct. 11, 2011) (Minnesota Securities Act). In *Mass. Mut. Life Ins. Co. v. Residential Funding Co., LLC*, Third-Party Claimants assert a MUSA § 410(b) claim against certain officers and directors of one or more of the Debtors—but not against AFI. *See* First Am. Compl., Civ. No. 11-30035, Docket No. 86, at 77–78 (D. Mass. Feb. 29, 2012).

[240] *See* Am. Compl., *Cambridge Place Inv. Mgmt., Inc. v. Morgan Stanley & Co.*, Case No. 10-2741 (Mass. Super. Ct. Oct. 14, 2011); Am. Compl., *Cambridge Place Inv. Mgmt., Inc. v. Morgan Stanley & Co.*, Case No. 11-0555 (Mass. Super. Ct. Oct. 14, 2011); Second Am. Compl., *Charles Schwab Corp. v. BNP Paribas Securities Corp.*, Case No. 10-501610 (Cal. Super. Ct. Apr. 9, 2012); Am. Compl., *FDIC v. Bear Stearns Asset Back Sec. I, LLC*, Civ. No. 12-4000, Docket No. 76 (S.D.N.Y. Oct. 12, 2012); Compl., *FDIC v. CitiGroup Mortg. Loan Trust Inc.*, Case No. 12-901036 (Ala. Cir. Ct. Aug. 10, 2012); Am. Compl., *FDIC v. Chase Mortg. Fin. Co.*, Civ. No. 12-6166, Docket No. 72 (S.D.N.Y. Aug. 10, 2012); Second Am. Compl., *FDIC v. Ally Securities LLC*, Case No. 12-2522, Docket No. 91 (Tex. Dist. Ct. Nov. 19, 2012); First Am. Compl., *Mass. Mutual Life Ins. Co. v. Residential Funding Co., LLC*, Civ. No. 11-30035, Docket No. 86 (D. Mass. Feb. 29, 2012); First Am. Compl., *Nat'l Credit Union Admin. Bd. v. Goldman, Sachs & Co.*, Civ. No. 11-6521, Docket No. 129 (C.D. Cal. Oct. 29, 2012); First Am. Compl., *Nat'l Credit Union Admin. Bd. v. RBS Securities Inc.*, Civ. No. No. 11-2340, Docket No. 123 (D. Kan. Aug. 24, 2012); Second Am. Securities Class Action Compl., *N.J. Carpenters Health Fund v. Residential Capital, LLC*, Civ. No. 08-8781, Docket No. 121 (S.D.N.Y. Jan. 3, 2011); Am. Compl., *W. & S. Life Ins. Co. v. Residential Funding Co., LLC*, Case No. A1105042 (Ohio Ct. Com. Pl. Sept. 9, 2011).

[241] *See Suez Equity Investors, LP v. Toronto-Dominion Bank*, 250 F.3d 87, 101 (2d Cir. 2001).

[242] *Kalin v. Xanboo, Inc.*, 526 F. Supp. 2d 392, 404 (S.D.N.Y. 2007).

[243] *See Wyo. State Treasurer v. Moody's Investors Serv., Inc.* (*In re Lehman Bros. Mortgage-Backed Sec. Litig.*), 650 F.3d 167, 185 (2d Cir. 2011).

[244] *Iowa Pub. Emps.' Ret. Sys. v. MF Global, Ltd.*, 620 F.3d 137, 140 n.3 (2d Cir. 2010).

[245] *Carr v. Equistar Offshore, Ltd.*, Civ. No. 94-5567, 1995 U.S. Dist. LEXIS 13703, at *46 (S.D.N.Y. Sept. 20, 1995).

Several state securities laws, including state securities laws relied upon by Third-Party Claimants, have been described by courts as analogous to provisions of federal securities laws in certain respects.[246] Accordingly, courts applying those state securities laws have looked to decisions applying federal securities laws for guidance.[247] For these reasons, the Examiner frames his discussion of pending or potential control person claims against AFI in terms of federal securities laws, with additional discussion of state securities laws where appropriate.

Whether asserted under section 15 or section 20(a) or the aforementioned provisions of the securities laws of Illinois, Massachusetts, Minnesota,[248] North Carolina, or Virginia,

---

[246] *See Capital Ventures Int'l v. J.P. Morgan Mortg. Acquisition Corp.*, Civ. No. 12-10085, 2013 U.S. Dist. LEXIS 19227, at *5 (D. Mass. Feb. 13, 2013) ("These MUSA provisions [including § 410(b)] are modeled on similar provisions in the federal [Securities Act], and the Massachusetts legislature has directed courts to interpret MUSA in accordance with its federal counterpart."); *Marram v. Kobrick Offshore Fund, Ltd.*, 809 N.E.2d 1017, 1025 (Mass. 2004) ("[W]e interpret the [MUSA] in coordination with the Securities Act of 1933."); *Minneapolis Emps. Retirement Fund v. Allison-Williams Co.*, 519 N.W.2d 176, 179 (Minn. 1994) ("The Minnesota Securities Act is patterned after federal law."); *Hunt v. Miller*, 908 F.2d 1210, 1214 n.5 (4th Cir. 1990) ("The controlling person provision of the North Carolina Securities Act, § 78A-56(c), has been interpreted by reference to federal law."); *Andrews v. Browne*, 662 S.E.2d 58, 62 (Va. 2008) ("[T]he Virginia Securities Act should receive similar construction as the 1933 and 1934 Acts."); *Atocha Ltd. P'Ship v. Witness Tree, LLC*, 65 Va. Cir. 213, 225 (Va. Cir. Ct. 2004) ("[T]he VSA [control person] section at issue closely tracks . . . § 20(a).").

[247] *See Fenoglio v. Augat, Inc.*, 50 F. Supp. 2d 46, 59 (D. Mass. 1999) ("[D]ecisions construing the federal statutory language are applicable to the [MUSA] as well.") (quotation marks omitted); *Marram*, 809 N.E.2d at 1025 ("[W]e look to Federal decisions under § 12(2) [of the Securities Act], as well as to the plain language of the statute and decisions of our appellate courts, for our interpretation of [MUSA § 410(a)(2)]."); *Stephenson v. Deutsche Bank AG*, 282 F. Supp. 2d 1032, 1060 n.22 (D. Minn. 2003) ("The parties agree that control-person liability under [the Minnesota Securities Act] follows the federal law."); *Minneapolis Emps. Retirement Fund*, 519 N.W.2d at 179 ("Federal case law is of considerable value in deciding issues arising under the [Minnesota Securities] Act."); *Andrews v. Fitzgerald*, Civ. No. 89-649, 1992 U.S. Dist. LEXIS 9315, at *9 (M.D.N.C. Feb. 7, 1992) ("Section § 78A-56(c) [of the North Carolina Securities Act] parallels the federal law . . . in this area, however. Therefore, other courts' analyses of the 'controlling person' doctrine with those federal statutes are helpful.") (internal citations omitted); *Dunn v. Borta*, 369 F.3d 421, 428 (4th Cir. 2004) ("judicial constructions of section 12(2) of the [Securities Act], a statute substantially identical to section 13.1-522(A) of the [Virginia Securities] Act" are "instructive"); *Andrews*, 662 S.E.2d at 62 ("When engaged in interpretation of a term used in the Virginia Securities Act, it is appropriate to look to the federal courts' interpretation of the same term in the context of the 1933 and 1934 Acts.") (internal citations and quotation marks omitted); *Witness Tree, LLC*, 65 Va. Cir. at 225 ("Given the close similarity between the [Virginia and federal securities] statutes, federal cases concerning control are informative.").

[248] "Effective August 1, 2007, Minnesota Statutes §§ 80A.01-.31 (2006) were repealed and replaced" by Minn. Stat. §§ 80A.40–90. *See Risdall v. Brown-Wilbert, Inc.*, 753 N.W.2d 723, 727 n.1 (Minn. 2008). Nonetheless, the replaced statute "continues to govern all actions based on conduct occurring before that date." *Trooien v. Mansour*, 608 F.3d 1020, 1027 n.2 (8th Cir. 2010); *see also* MINN. STAT. § 80A.90(a) ("The predecessor act exclusively governs all actions or proceedings that are pending on August 1, 2007, or may be instituted on the basis of conduct occurring before August 1, 2007 . . . ."). The Examiner applies Minn. Stat. §§ 80A.01–31 to the Minnesota Securities Act claims asserted by Third-Party Claimants because, as alleged, they arise in whole or in principal part from conduct occurring on or before August 1, 2007. *See* Am. Compl., *John Hancock Life Ins. Co. (U.S.A.) v. Ally Fin. Inc.*, Civ. No. 12-01841; Docket No. 84, at 40–41 (D. Minn. Oct. 15, 2012); Am. Compl., *Stichting Pensioenfonds ABP v. Ally Fin. Inc.*, Civ. No. 12-01381, Docket No. 101, at 31 (D. Minn. Oct. 11, 2011).

common elements of a control person claim that must be pleaded and proved by any plaintiff include: (1) the existence of a primary securities law violation by the controlled person; and (2) the presence of control of the primary violator.[249] Some courts have required plaintiffs asserting control person claims under federal securities laws also to plead and prove the

---

[249] *See Wyo. State Treasurer v. Moody's Investors Serv., Inc.* (*In re Lehman Bros. Mortgage-Backed Sec. Litig.*), 650 F.3d 167, 186 (2d Cir. 2011) ("To establish § 15 liability, a plaintiff must show a 'primary violation' of § 11 and control of the primary violator by defendants."); *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007) ("To establish a prima facie case of control person liability [under section 20(a)], a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud."); *Capital Ventures Int'l v. UBS Sec. LLC*, Civ. No. 11-11937, 2012 U.S. Dist. LEXIS 140663, at *52 (D. Mass. Sept. 28, 2012) ("For 'control person' liability to attach [under the MUSA], [plaintiff] must allege (1) an underlying violation by the controlled entity, and (2) that the 'control person' controlled the violator."); *Wooton v. CL, LLC*, Civ. No. 09-34, 2010 U.S. Dist. LEXIS 101182, at *24 (E.D.N.C. Sept. 27, 2010) ("An individual who directly or indirectly controls one who unlawfully sells such a security is also liable under the [North Carolina Securities Act]."); *Au v. ADSI, Inc.*, 74 Va. Cir. 219, 220 (Va. Cir. Ct. 2007) ("Should the Court determine that one or more of the defendants acted as . . . control person and that materially false or misleading information was also conveyed in connection with such sale of securities, then the burden of avoiding liability shifts to the defendant(s)."); *Jacobs v. James*, 574 N.E.2d 1292, 1295 (Ill. App. Ct. 1991) ("[Defendant] is liable [under the Illinois Securities Law] as a controlling person in that he was part of a group of persons acting in concert in the illegal sale of the [securities]."); *Murrin v. Mosher*, Case No. 08-1418, 2009 Minn. App. Unpub. LEXIS 863, at *27–29 (Minn. Ct. App. Aug. 4, 2009) (unpublished) (control person claim under Minnesota Securities Act requires "predicate liability" and that "defendant is a controlling person").

"culpable participation" of the alleged control person in the primary violation.[250] In its submissions to the Examiner, AFI has not asserted that Third-Party Claimants must plead and prove culpable participation to prevail on any of the control person claims they assert against

---

[250] Put another way, "some courts view the pleading burden for a [control person] claim more akin to pleading [s]ection 10(b) scienter, while other courts find that a plaintiff need allege no more than control status in order to survive a motion to dismiss [such a] claim." *Edison Fund v. Cogent Inv. Strategies Fund, Ltd.*, 551 F. Supp. 2d 210, 231 (S.D.N.Y. Mar. 31, 2008). The Second Circuit Court of Appeals has stated that "[t]o establish a prima facie case of [section 20(a)] control person liability, a plaintiff must show . . . that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *ATSI Commc'ns, Inc.*, 493 F.3d at 108. District courts in this circuit are split concerning whether such precedent obligates a section 20(a) plaintiff to affirmatively plead and prove "culpable participation." *Compare Meridian Horizon Fund, L.P. v. Tremont Group Holdings, Inc.*, Civ. No. 09-3708, 2012 U.S. Dist. LEXIS 175760, at *5 (S.D.N.Y. Dec. 11, 2012) ("[T]his court regards the need for a plaintiff to plead 'culpable participation' [under section 20(a)] to be the law of the Second Circuit."); *with In re Lehman Bros. Sec. and ERISA Litig.*, 799 F. Supp. 2d 258, 307 (S.D.N.Y. 2011) (holding that "a [s]ection 20(a) plaintiff need not allege culpable participation at the pleading stage" and noting that it is a "question [that] remains open in this Circuit").

Among those district courts in the Second Circuit that *have* required section 20(a) plaintiffs to plead "culpable participation," there is a further "split . . . as to whether 'culpable participation' must [likewise] be pleaded to state a claim under [s]ection 15." *See In re Sec. Capital Assurance Ltd. Sec. Litig.*, Civ. No. 07-11086, 2011 U.S. Dist. LEXIS 112926, at *23 n.4 (S.D.N.Y. Sep. 23, 2011); *see also Wyo. State Treasurer*, 650 F.3d at 186 ("The parties dispute whether we should further adopt the [culpable participation] requirement . . . for purposes of § 15. That issue has divided district courts in this Circuit.") (internal citation omitted). Although multiple district courts in this circuit have held or suggested that "culpable participation" is a required element of a section 15 claim, an "apparent majority" have disagreed. *See Am. Homes High-Income Trust v. AlliedSignal*, 329 F. Supp. 2d 534, 549 n.10 (S.D.N.Y. 2004); *see also Deutsche Bank AG Sec. Litig.*, Civ. No. 09-1714, 2011 U.S. Dist. LEXIS 93867, at *35 (S.D.N.Y. Aug. 19, 2011) ("It would be incongruous to require allegations regarding 'state of mind' . . . when the [s]ection 11 claims on which the [s]ection 15 claims are premised contain no 'state of mind' element."); *In re WorldCom, Inc.*, 377 B.R. 77, 103 (Bankr. S.D.N.Y. 2007) ("[A]lthough a split exists, 'culpable participation' is generally a requirement of [s]ection 20 claims but not of [s]ection 15 claims."). *But see In re Am. Bank Note Holographics, Inc. Sec. Litig.*, 93 F. Supp. 2d 424, 441 (S.D.N.Y. 2000) ("applying the same test" to claims under sections 15 and 20(a), including "culpable participation" element).

An apparent majority of courts in other circuits, including several Circuit Courts of Appeals, have declined to require a plaintiff asserting a claim under section 20(a)—let alone section 15—to plead and prove culpable participation. *See Belmont v. MB Inv. Partners, Inc.*, 708 F.3d 470, 484 n.20 (3d Cir. 2013) (noting that "a difference of opinion has emerged among district courts of this Circuit as to the pleading requirements for a § 20(a) claim" and declining to "resolve [it] at this time"); *Lustgraaf v. Behrens*, 619 F.3d 867, 873–74 (8th Cir. 2010) ("Culpable participation . . . is not part of a [section 20(a)] plaintiff's prima facie case."); *Adams v. Kinger-Morgan, Inc.*, 340 F.3d 1083, 1109 (10th Cir. 2003) ("[W]e have expressly rejected those decisions that may be read to require a plaintiff to show the defendant actually or culpably participated in the primary violation.") (quotation marks omitted); *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000) ("Plaintiff need not show that the [section 20(a)] defendant was a culpable participant in the violation . . . ."); *Harrison v. Dean Witter Reynolds, Inc.*, 79 F.3d 609, 614 (7th Cir. 1996) ("we have never used any test similar to the culpable participant test"); *In re Credit Suisse – AOL Sec. Litig.*, Civ. No. 02-12146, 2011 U.S. Dist. LEXIS 95889, at *26 (D. Mass. Aug. 26, 2011) (holding that section 20(a) "does not require proof . . . of 'culpable participation'" but noting that "the First Circuit has reserved the issue").

AFI.[251] Moreover, the prevailing view among courts in pertinent jurisdictions appears to be that plaintiffs are not required to plead or prove culpable participation, with the potential exception in the Second Circuit of claims asserted under section 20(a). For those reasons, the Examiner does not further address any "culpable participation" element.[252]

The Examiner's factual and legal conclusions concerning certain elements or defenses relevant to Third-Party Claimants' control person claims are discussed below.

### (a) Pleading Standard And Burden Of Proof

In assessing whether a plaintiff asserting a control person claim has adequately alleged the requisite primary securities law violation, "several circuits have distinguished between allegations of fraud and allegations of negligence, applying Rule 9(b) only to claims pleaded under [s]ection 11 and [s]ection 12(a)(2)," or state securities law provisions that likewise do not require proof of scienter, if those claims "sound in fraud."[253] Accordingly, a court may "conduct a preliminary inquiry into whether plaintiffs' allegations are premised on fraud so as to require

---

[251] *See* AFI Submission Paper, dated Dec. 19, 2012, at 30–36; AFI Submission Paper, dated Apr. 14, 2013, at 4–5. AFI did, however, move to dismiss on the ground of failure to plead "culpable participation" the control person claims asserted by Third-Party Claimants under federal securities law in actions pending in the Second Circuit. *See* Mem. of Law in Supp. of Ally Fin. Inc.'s and GMAC Mortg. Group, Inc.'s Mot. to Dismiss the Am. Compl., *FHFA v. Ally Fin. Inc.*, Civ. No. 11-7010, Docket No. 149, at 8 n.5 (S.D.N.Y. July 31, 2012) ("The Court also should dismiss FHFA's [s]ection 15 claim because it has failed to plead AFI's . . . 'culpable conduct.'"); Ally Financial, Inc's Mem. of Law in Supp. of Mot. to Dismiss the Am. Compl., *Union Central Life Ins. Co. v. Ally Fin., Inc.*, Civ. No. 11-02890, Docket No. 219, at 6 (S.D.N.Y. July 27, 2012) ("control person liability under § 20(a) requires a plaintiff to show . . . that the defendant was, in some meaningful sense, a culpable participant"). In *FHFA v. Ally Fin., Inc.*, the district court denied AFI's motion to dismiss the section 15 claims asserted against it by the FHFA without any apparent consideration of any "culpable participation" requirement. *See* Civ. No. 11-7010, 2012 U.S. Dist. LEXIS 179768, at *11–15 (S.D.N.Y. Dec. 19, 2012). In *Union Central Life Ins. Co. v. Ally Fin., Inc.*, the district court granted AFI's motion to dismiss the section 20 claims asserted against it without reaching whether section 20(a) required the pleading of "culpable participation." *See* Order, Civ. No. 11-02890, Docket No. 263, at 3–4 (S.D.N.Y. Mar. 29, 2013) (granting motion to dismiss "claims against [AFI] for violations of [s]ection 20(a) and 20(b) of the Exchange Act").

[252] In the event that AFI's assertion that "securities claims against AFI fail for the independent reason that [Third-Party Claimants] cannot show that AFI had knowledge of the Debtors' alleged misstatements" is intended to argue culpable participation. *See* AFI Submission Paper, dated Dec. 19, 2012, at 35–36. The Examiner addresses this assertion below in Section VIII.C.2.a(3)(c)(ii).

[253] *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004) (collecting cases); *see also Wagner v. First Horizon Pharm. Corp.*, 464 F.3d 1273, 1277 (11th Cir. 2006) ("[W]e hold that Rule 9(b) applies when the misrepresentation justifying relief under the Securities Act is also alleged to support a claim for fraud under the Exchange Act and Rule 10b-5."); *Sears v. Likens*, 912 F.2d 889, 893 (7th Cir. 1990) (suggesting that Securities Act claims sounding in fraud must be pleaded with particularity). But see Carlon v. Thaman (*In re NationsMart Corp. Sec. Litig.*), 130 F.3d 309, 314 (8th Cir. 1997) ("We hold that the particularity requirement of Rule 9(b) does not apply . . . because proof of fraud or mistake is not a prerequisite to establishing liability under § 11.").

satisfaction of the heightened pleading standards of Fed. R. Civ. P. 9(b)."[254] Courts have declined to apply Rule 9(b) to securities claims where the "plaintiffs' complaint explicitly does not allege fraud" but instead alleges that the defendant "acted negligently in preparing its Registration Statement and Prospectus."[255] By contrast, where the alleged primary securities law violation is pleaded under section 10(b) of the Exchange Act, then the plaintiff must "plead fraud with particularity sufficient to satisfy the requirements of Fed. R. Civ. P. 9(b) . . . and of the PSLRA."[256]

Courts have described the determination of "whether a person is a controlling person [under federal or state securities laws as] a fact-intensive inquiry" that "generally should not be resolved on a motion to dismiss."[257] "At the pleading stage, allegations of . . . control need not be set forth with particularity."[258] Instead, "[c]ontrol allegations are evaluated under the

---

[254] *Wyo. State Treasurer*, 650 F.3d at 174 (quotation marks omitted); *see also In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 374 (S.D.N.Y. 2011) ("determining whether Securities Act claims sound in fraud necessarily requires a case-by-case analysis of particular pleadings") (quotation marks omitted).

[255] *See Litwin v. Blackstone Group, L.P.*, 634 F.3d 706, 715 (2d Cir. 2011); *see also Hutchison v. Deutsche Bank Sec. Inc.*, 647 F.3d 479, 484 (2d Cir. 2011) (declining to apply Rule 9(b) to Securities Act claims where plaintiffs "expressly disclaim any allegation of fraud and Defendants do not contend otherwise") (quotation marks omitted); *FHFA v. JPMorgan Chase & Co.*, Civ. No. 11-6188, 2012 U.S. Dist. LEXIS 158442, at *16 n.10 (S.D.N.Y. Nov. 5, 2012) (declining to apply Rule 9(b) to Securities Act claims where complaint "explicitly disclaims any suggestion of fraud"); *N.J. Carpenters Health Fund v. NovaStar Mortg., Inc.*, Civ. No. 08-5310, 2012 U.S. Dist. LEXIS 56010, at *10–11 (S.D.N.Y. Mar. 29, 2012) ("Since Plaintiff's allegations [that the underwriting guidelines set forth in the offering documents were systematically disregarded] and [Securities Act] claims sound in strict liability, not fraud, the [complaint] is subject to the standards of Rule 8(a), not to the heightened pleading requirements of Rule 9(b)."); *Emps.' Ret. Sys. of the Gov't of the Virgin Is. v. J.P. Morgan Chase & Co.*, 804 F. Supp. 2d 141, 152 (S.D.N.Y. 2011) (Rule 9(b) not applicable to Securities Act claim alleging misrepresentations "concerning underwriting standards, appraisal standards, LTV ratios, and investment ratings"); *N.J. Carpenters Health Fund v. Residential Capital, LLC*, Civ. No. 08-8781, 2010 U.S. Dist. LEXIS 32058, at *13 (S.D.N.Y. Mar. 31, 2010) ("Defendants argue that Plaintiffs' [Securities Act] claims sound in fraud, but Plaintiffs expressly disclaim any allegations of fraud, and their allegations focus on the alleged negligent omission of information.").

[256] *See Rombach*, 355 F.3d at 170. Among other requirements, a complaint must "'specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.'" *See id.* (quoting 15 U.S.C. § 78u-4(b)(1)(B)).

[257] *See Citilines Holdings, Inc. v. iStar Fin., Inc.*, 701 F. Supp. 2d 506, 517 (S.D.N.Y. 2010) (quotation marks omitted); *see also In re Citigroup Inc. Bond Litig.*, 723 F. Supp. 2d 568, 596 (S.D.N.Y. 2010); *CompuDyne Corp. v. Shane*, 453 F. Supp. 2d 807, 829 (S.D.N.Y. 2006).

[258] *In re Am. Int'l Group, Inc.*, *2008 Sec. Litig.*, 741 F. Supp. 2d 511, 535 (S.D.N.Y. 2010); *see also Dobina v. Weatherford Int'l Ltd.*, Civ. No. 11-1646, 2012 U.S. Dist. LEXIS 160663, at *61 (S.D.N.Y. Nov. 7, 2012) ("[A]llegations of control [need not] be pleaded with particularity."); *Sgalambo v. McKenzie*, 739 F. Supp. 2d 453, 474 (S.D.N.Y. 2010) ("Allegations of control are not averments of fraud and therefore need not be pleaded with particularity.") (quoting *In re Parmalat Sec. Litig.*, 414 F. Supp. 2d 428, 440 (S.D.N.Y. 2006)).

liberal pleading standard set forth in Federal Rule of Civil Procedure 8(a)."[259] Even under that standard, conclusory allegations of control do not suffice.[260] "While a party cannot be held liable for both a primary violation and as a control person, alternative theories of liability are permissible at the pleading stage."[261]

Where a plaintiff succeeds in stating a claim under section 15 of the Securities Act, section 20(a) of the Exchange Act, or the control person provisions of pertinent state securities laws, the plaintiff will then bear the burden of proving each element of the claim by a preponderance of the evidence.[262] Likewise, where the alleged control person asserts an

---

[259] *In re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d 493, 517 (S.D.N.Y. 2009); *see also In re Scottish Re Group Sec. Litig.*, 524 F. Supp. 2d 370, 386 (S.D.N.Y. 2007) ("at the pleading stage, the extent to which the control must be alleged will be governed by Rule 8's pleading standard") (quotation marks omitted). Most of those courts that have required plaintiffs to plead "culpable participation" under sections 15 and/or 20(a) appear to have concluded that this element "is subject to the heightened pleading requirements of the [Private Securities Litigation Reform Act (the "PSLRA")]." *See Pa. Pub. Sch. Emps.' Ret. Sys. v. Bank of Am. Corp.*, Civ. No. 11-733, 2012 U.S. Dist. LEXIS 96317, at *69 (S.D.N.Y. July 11, 2012) (quotation marks omitted). Some courts have instead concluded that the "culpable participation" element "is not the same as scienter" and is "governed by Rule 8's pleading standard." *See Tronox, Inc. Sec. Litig.*, Civ. No. 09-6220, 2010 U.S. Dist. LEXIS 67664, at *64 (S.D.N.Y. June 28, 2010); *see also Sedona Corp. v. Ladenburg Thalmann & Co.*, Civ. No. 03-3120, 2005 U.S. Dist. LEXIS 16382, at *54 (S.D.N.Y. Aug. 9, 2005) ("A plaintiff's pleading as to these elements [including culpable participation] must meet the requirements of [Rule 8(a)] . . . since neither the PSLRA (because scienter is not an essential element), nor Rule 9(b) (because fraud is not an essential element), apply to a [s]ection 20(a) claim.") (quotation marks omitted).

[260] *See Suez Equity Investors, LP v. Toronto-Dominion Bank*, 250 F.3d 87, 102 (2d Cir. 2001) (finding a section 20(a) claim "insufficient . . . as a matter of law" where allegations of control were "conclusory at best"); *N.J. Carpenters Health Fund v. Residential Capital, LLC*, Civ. No. 08-8781, 2011 WL 2020260, at *4 (S.D.N.Y. May 19, 2011) (dismissing section 15 claim as "purely conclusory" where complaint alleged that underwriter defendants possessed "power to influence, and exercised that power and influence" over primary violators); *Emps.' Ret. Sys. of the Gov't of the Virgin Is.*, 804 F. Supp. 2d at 157 ("The Second Amended Complaint's further allegation that JPMC 'had the power to, and did, direct JPM Acceptance' is too conclusory to warrant an inference in the plaintiff's favor.").

[261] *In re Am. Int'l Group, Inc., 2008 Sec. Litig.*, 741 F. Supp. 2d 511, 534–35 (S.D.N.Y. 2010).

[262] *See Healey v. Chelsea Res. Ltd.*, 947 F.2d 611, 617 (2d Cir. 1991) (noting that plaintiff was required to prove Securities Act claims "by a preponderance of the evidence"); *SEC v. Moran*, 922 F. Supp. 867, 887 (S.D.N.Y. 1996) ("There is no doubt that in a private securities action, the correct standard of proof is preponderance of the evidence."); *Polycast Tech. Corp. v. Uniroyal, Inc.*, 792 F. Supp. 244, 251 (S.D.N.Y. 1992) ("In federal securities cases the plaintiff's burden of proof is the 'preponderance-of-the-evidence standard generally applicable in civil actions.'") (quoting *Herman & MacLean v. Huddleston*, 459 U.S. 375, 390 (1983)); *Access Cardiosystems, Inc. v. Fincke (In re Access Cardiosystems, Inc.)*, 404 B.R. 593, 672 (Bankr. D. Mass. 2009) (assessing MUSA § 410(a)(2) claim under "preponderance of the evidence" standard).

affirmative defense to liability, including for example his "good faith" or lack of knowledge, that defendant bears the burden of proof under a preponderance standard.[263]

### (b) Primary Violation

"Any claim for 'control person' liability under [section 15 of the Securities Act or section] 20(a) of the Exchange Act must be predicated on a primary violation of securities law."[264] To establish "control person liability pursuant to Section 20(a)," a plaintiff must demonstrate "a primary violation of [the Exchange Act such as a violation of] [s]ection 10(b) and Rule 10b-5."[265] Similarly, "to succeed on a claim under section 15, a plaintiff must demonstrate primary liability under section 11 or 12 [of the Securities Act]."[266] "Control person" claims under either section are routinely dismissed where the plaintiff fails to state a corresponding "primary violation."[267] Any claim for control person liability under the

---

[263] *See Dietrich v. Bauer*, 126 F. Supp. 2d 759, 764 (S.D.N.Y. 2001) ("[T]o establish a good faith defense, the burden is on the defendant . . . ."); *Mecca v. Gibraltar Corp. of Am.*, 746 F. Supp. 338, 341 (S.D.N.Y. 1990) (noting that defendants "could have avoided [control person] liability if they had proven to the jury by a preponderance of the evidence . . . that they acted in good faith"); *Access Cardiosystems, Inc.*, 404 B.R. at 640 ("Once the [MUSA § 410(a)(2)] plaintiff has demonstrated that the defendant has made an untrue statement of material fact . . . the burden shifts to the defendant to demonstrate either that the plaintiff knew of the falsity or omission or that the defendant did not know and could not, in the exercise of reasonable care, have known of the falsity or omission.").

[264] *Pac. Inv. Mgmt. Co. LLC v. Mayer Brown LLP*, 603 F.3d 144, 160 (2d Cir. 2010); *see also Rombach v. Chang*, 355 F.3d 164, 177–78 (2d Cir. 2004) ("Each of these [section 15 and 20(a)] claims is necessarily predicated on a primary violation of securities law.").

[265] *See Oughtred v. E*Trade Fin. Corp.*, Civ. No. 08-3295, 2011 U.S. Dist. LEXIS 35712, at *36 (S.D.N.Y. Mar. 31, 2011) (dismissing section 20(a) claim for failure to plead a primary violation).

[266] *See Fait v. Regions Fin. Corp.*, 655 F.3d 105, 109 n.2 (2d Cir. 2011).

[267] *See id.* at 109 n.2 (2d Cir. 2011) ("Since we conclude that the district court properly dismissed the section 11 and 12 claims, we also find no error in the court's dismissal of plaintiffs' section 15 claims."); *Wilson v. Merrill Lynch & Co., Inc.*, 671 F.3d 120, 139 (2d Cir. 2011) ("Having concluded that [plaintiff] failed to state a claim for any primary violation of the securities laws, we affirm the district court's dismissal of his [s]ection 20(a) claim alleging that Merrill Lynch & Co. is liable as a controlling person."); *Pac. Inv. Mgmt. Co. LLC*, 603 F.3d at 160 (affirming dismissal of section 20(a) claim "[b]ecause we hold that plaintiffs failed to state a claim for a primary violation"); *ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 207 (2d Cir. 2009) (affirming dismissal of "control person liability claim pursuant to section 15 of the Securities Act and section 20 of the Exchange Act . . . for want of a primary violation"); *In re Lehman Bros. Sec. & ERISA Litig.*, Md. No. 09-2017, 2012 U.S. Dist. LEXIS 148177, at *57 (S.D.N.Y. Oct. 15, 2012) ("Absent a primary violation of [s]ection 11 or 12 by another person, there can be no liability for a controlling person under [s]ection 15.").

securities laws of Illinois, Massachusetts, Minnesota, North Carolina, or Virginia likewise must be predicated upon a primary violation of the respective securities laws of that state.[268]

"In a typical [section 10(b)] action a plaintiff must prove: (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."[269] "[U]nlike securities fraud claims pursuant to [section 10(b)], plaintiffs bringing claims under sections 11 and 12(a)(2) need not allege scienter, reliance, or loss causation."[270] Instead, the elements of a claim under section 11 of the Securities Act include that: "(1) [the plaintiff] purchased a registered security, either directly from the issuer or in the aftermarket following the offering; (2) the defendant participated in the offering in a manner sufficient to give rise to liability under section 11; and (3) the registration statement 'contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading.'"[271] In turn, the elements of a claim under section 12(a)(2) of the Securities Act include that: "(1) the defendant is a 'statutory seller'; (2) the sale was effectuated 'by means of a prospectus or oral communication'; and (3) the prospectus or oral communication 'included an untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements . . . not misleading.'"[272]

Although their elements vary, in general the provisions of state securities laws relied upon by Third-Party Claimants share more in common with claims under section 11 or 12(a)(2) of the

---

[268] *See Capital Ventures Int'l v. UBS Sec. LLC*, Civ. No. 11-11937, 2012 U.S. Dist. LEXIS 140663, at *53 (D. Mass. Sept. 28, 2012) (granting motion to dismiss control person claims under MUSA § 410(b) where plaintiff had "not adequately pled primary violations"); *Dunn v. Ronbotics Corp.*, Civ. No. 02-952, 2003 U.S. Dist. LEXIS 27951, at *31 (E.D. Va. Feb. 23, 2003) ("Because the Court fails to find that any of the Defendants are primarily liable under the Virginia statute, the Court dismisses [the control person claim] against all Defendants."), *rev'd on other grounds*, 369 F.3d 421 (4th Cir. 2004); *Murrin v. Mosher*, Case No. 08-1418, 2009 Minn. App. Unpub. LEXIS 863, at *29 (Minn. Ct. App. Aug. 4, 2009) (affirming dismissal of control person claim under Minnesota Securities Act where "appellants failed to establish the predicate liability of any of the defendants in this case").

[269] *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008).

[270] *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 359 (2d Cir. 2010).

[271] *Id.* (quoting 15 U.S.C. § 77k(a)).

[272] *Id.* (quoting 15 U.S.C. § 77l(a)(2)).

Securities Act than claims under section 10(b) of the Exchange Act.[273] In particular, Third-Party Claimants need not plead or prove scienter to prevail on a primary securities claim under pertinent provisions of the Illinois Securities Law,[274] the MUSA,[275] the Minnesota Securities

---

[273] *See Carlucci v. Han*, 886 F. Supp. 2d 497, 528 (E.D. Va. 2012) ("[T]o state a claim under the Virginia Securities Act, a plaintiff must plead a material misrepresentation."); *Elipas v. Jedynak*, Civ. No. 07-3026, 2011 U.S. Dist. LEXIS 48340, at *36 (N.D. Ill. May 5, 2011) ("[P]laintiffs [asserting claims under 815 Ill. Comp. Stat. Ann. 5/12(F)-(G)] must show at a minimum that [defendant] (1) made a misstatement or omission, (2) of material fact, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiffs relied.") (quotation marks omitted); *NNN Durham Office Portfolio 1, LLC v. Highwoods Realty Ltd. P'ship*, Case No. 12-3945, 2013 NCBC Lexis 11, at *64 (N.C. Super. Ct. Feb. 19, 2013) ("[N.C. Gen. Stat. § 78A-56(a)(2)] provides a cause of action against the offeror or seller of a security who (1) makes any untrue statement of a material fact, or (2) fails to state a material fact necessary for a statement which was made to not be misleading."); *Marram v. Kobrick Offshore Fund, Ltd.*, 809 N.E.2d 1017, 1026–27 (Mass. 2004) ("It is enough [under MUSA § 410(a)(2)] for the plaintiff to establish that (1) the defendant offers or sells a security; (2) in Massachusetts; (3) by making any untrue statement of a material fact or by omitting to state a material fact; (4) the plaintiff did not know of the untruth or omission; and (5) the defendant knew, or in the exercise of reasonable care would have known of the untruth or omission.") (quotation marks omitted); *Siler v. Principal Fin. Sec., Inc.*, Case No. 1-00-576, 2000 Minn. App. LEXIS 1239, at *8–9 (Minn. App. Ct. Dec. 12, 2000) (unpublished) ("To present a claim under Minn. Stat. § 80A, the plaintiff must allege a misstatement or omission in connection with his own decision to purchase or sell a security.").

[274] *See Elipas v. Jedynak*, Civ. No. 07-3026, 2011 U.S. Dist. LEXIS 48340, at *36 (N.D. Ill. May 5, 2011) ("The elements of a [815 ILL. COMP. STAT. ANN. 5/12(F)-(G)] claim mirror the elements of a Rule 10b-5 claim, except that the plaintiff is not required to prove scienter and loss causation.") (citations omitted); *Lucas v. Downtown Greenville Investors Ltd. P'ship*, 671 N.E.2d 389, 400 (Ill. App. Ct. 1996) ("Lacking any express statutory language or other authority which requires that the plaintiffs prove 'loss causation,' we decline to impose such a requirement."); *Foster v. Alex*, 572 N.E.2d 1242, 1245 (Ill. App. Ct. 1991) (holding that "scienter need not be pled nor proved in a civil case brought under sections 12(F) and 12(G) of the Illinois Securities Act"). Some courts have stated that the 815 ILL. COMP. STAT. ANN. 5/12(F)-(G) plaintiff is required to plead reliance on the alleged misrepresentation. *See Tirapelli v. Advanced Equities, Inc.*, 813 N.E.2d 1138, 1142 (Ill. App. Ct. 2004) ("[R]easonable reliance is an element of sections 12(F), 12(G), and 12(I) of the Illinois Securities Law.").

[275] *See Mass. Mut. Life Ins. Co. v. Residential Funding Co.*, LLC, 843 F. Supp. 2d 191, 200 (D. Mass. 2012) ("Plaintiff does not need [under MUSA § 410(a)(2)] to prove negligence, scienter, reliance, or loss causation."); *Marram*, 809 N.E.2d at 1026–27 (MUSA § 410(a)(2) does not require the plaintiff "to prove either negligence or scienter" or "reliance").

Act,[276] the North Carolina Securities Act,[277] or the Virginia Securities Act.[278] Moreover, like sections 11 and 12(a)(2) of the Securities Act, some of those state securities laws make available to defendants affirmative defenses, including that: (1) the defendant exercised "due diligence" or "reasonable care";[279] (2) there was an absence of loss causation;[280] and/or (3) the plaintiff knew of the alleged untruth or omission at the time of purchase.[281]

---

[276] *See Trooien v. Mansour*, 608 F.3d 1020, 1027–28 (8th Cir. 2010) (holding that "claims arising under § 80A.01(b) require only a showing of negligence" and explaining that its "plain language . . . contains no words of intent, no reference to fraud, or deceit"); *see also Minneapolis Emps.' Ret. Fund v. Allison-Williams Co.*, 519 N.W.2d 176, 181 (Minn. 1994) ("Minn. Stat. §§ 80A.01(b) and 80.01(c) may in some instances proscribe negligent as well as intentional misconduct."); *Sprangers v. Interactive Techs., Inc.*, 394 N.W.2d 498, 503 (Minn. Ct. App. 1986) ("Minn. Stat. § [80A.01(b)] does not require scienter, but supports a negligence-based theory of recovery."). *But see Loop Corp. v. McIlroy*, Case No. 04-362, 2004 Minn. App. LEXIS 1146, at *16 (Minn. App. Ct. Oct. 5, 2004) (unpublished) ("[W]e agree with the district court that scienter is required [to state a claim under Minn. Stat. § 80A.01]."). Those Third-Party Claimants asserting claims against AFI under the Minnesota Securities Act take the position (in opposition to AFI's motions to dismiss) that they must plead scienter. *See* Pls.' Omnibus Opp. to Defs.' Mots. to Dismiss the Am. Compl., *John Hancock Life Ins. Co. (U.S.A.) v. Ally Fin. Inc.*, Civ. No.12-01841, Docket No. 118, at 90–91 n.62 (D. Minn. Feb. 15, 2013) ("Scienter also is an element of the violation."); Pls.' Ombibus Mem. of Law in Opp. to Defs.' Mot. to Dismiss the Am. Compl., *Stichting Pensioenfonds ABP v. Ally Fin. Inc.*, Civ. No. 12-01381, Docket No. 142, at 75 n.47 (D. Minn. Mar. 11, 2013) (same).

[277] *See NNN Durham Office Portfolio 1, LLC v. Highwoods Realty Ltd. P'ship*, Case No. 12-3945, 2013 NCBC LEXIS 11, at *66 (N.C. Super. Ct. Feb. 19, 2013) ("[N.C. Gen. Stat. § 78A-56(a)(2)] does not additionally require proof of scienter or justifiable reliance."); *see also Venturtech II, LP v. Learning Res. Inc.*, 790 F. Supp. 576, 588 (E.D.N.C. 1992) ("[§ 78A-56(a)(2)] closely parallels § [12(a)(2)] of the [Securities Act]").

[278] *See Dunn v. Borta*, 369 F.3d 421, 433 (4th Cir. 2004) ("We therefore decline to read the elements of reliance and causation into the [Virginia Securities Act]."); *Carlucci*, 886 F. Supp. 2d at 528 n.25 ("Scienter, reliance, and causation are not required elements of a Virginia Securities Act claim.").

[279] *See In re Fuwei Films Sec. Litig.*, 634 F. Supp. 2d 419, 435 n.10 (S.D.N.Y. 2009) ("Section 12(a)(2) provides for a defense of reasonable care, which . . . may be asserted by all 'sellers' under section 12(a)(2), including the issuer of a security.") (quotation marks omitted); *In re Worldcom, Inc. Sec. Litig.*, 346 F. Supp. 2d 628, 662 (S.D.N.Y. 2004) ("[T]wo of the affirmative defenses available [to defendants other than the issuer] under [s]ection 11(b) are collectively known as the 'due diligence' defense."); Mass. Gen. Law. ch. 110A § 410(a)(2) (defendant may "sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the untruth or omission"); Minn. Stat. § 80A.23(4) (same); N.C. Gen. Stat. § 78A-56(a)(2) (same); Va. Code Ann. § 13.1-522(A) (same).

[280] *See Iowa Pub. Emps.' Ret. Sys. v. MF Global, Ltd.*, 620 F.3d 137, 145 (2d Cir. 2010) ("Loss causation is not an element of a plaintiff's prima facie case [under section 11 or 12(a)(2)]; rather, the absence of loss causation is an affirmative defense."); *see also In re Mass. Mut. Life Ins. Co.*, 2012 U.S. Dist. LEXIS 149145 at *24–26 (denying as "simply too early" a motion to strike a "loss causation" affirmative defense to a MUSA § 410 claim and explaining that merely because the plaintiff "need not prove the cause of its loss, does not necessarily mean that a lack of causation is not an affirmative defense"); *Premier Capital Mgmt., LLC v. Cohen*, Civ. No. 02-5368, 2008 U.S. Dist. LEXIS 23484, at *61 (N.D. Ill. Mar. 24, 2008) (holding that the absence of "loss causation is not an affirmative defense to claims under the [Virginia Securities Act]" because the statute "does not require loss causation").

[281] *See In re IPO Sec. Litig.*, 483 F.3d 70, 73 n.1 (2d Cir. 2007) (section 11 or 12(a)(2) defendant "can assert a defense that the plaintiff knew of the untruth or omission at the time of his or her acquisition of the security"); Mass. Gen. Law. ch. 110A § 410(a)(2) (plaintiff "knowing of the untruth or omission" may not recover); N.C. Gen. Stat. § 78A-56(a)(2) (same); Va. Code Ann. § 13.1-522(A) (same).

Third-Party Claimants assert that the primary securities law claims underlying the control person claims brought against AFI either have or "will survive motions to dismiss and proceed to discovery."[282] They anticipate that discovery and "direct access to . . . the underlying loan files" will substantiate allegations that offering materials contained misrepresentations concerning, inter alia, compliance with underwriting guidelines, appraisal practices and LTV ratios, investment ratings, and owner-occupancy statistics.[283] Although AFI concedes that "certain of the [Third-Party Claimants] apparently have learned how to plead their claims to survive dismissal," AFI asserts that Third-Party Claimants will be unable to "prove . . . their claims" and withstand potential affirmative defenses.[284] AFI argues that Third-Party Claimants' primary securities law claims will "fail on every element" including because the offering materials "disclosed . . . the very facts that [Third-Party Claimants] now assert are misrepresentations."[285]

---

[282] *See* Joint Submission Paper of AIG, Allstate Life Ins. Co., Mass. Mut. Life Ins. Co., and Prudential Ins. Co. of Am., dated Oct. 17, 2012, at 3–4; *see also* Joint Submission Paper of Federal Home Loan Banks of Boston, Chicago, and Indianapolis, dated Oct. 19, 2012, at 20–21 ("[T]he FHLBs' effectively universal success in defeating Defendants' motions to dismiss provides support for the conclusion that [their] claims have merit.").

[283] *See* Joint Submission Paper of AIG, Allstate Life Ins. Co., Mass. Mut. Life Ins. Co., and Prudential Ins. Co. of Am., dated Oct. 17, 2012, at 23; *see also* Joint Submission Paper of Federal Home Loan Banks of Boston, Chicago, and Indianapolis, dated Oct. 19, 2012, at 7.

[284] *See* AFI Submission Paper, dated Apr. 14, 2013, at 8.

[285] *See* AFI Submission Paper, dated Dec. 19, 2012, at 50–52.

As AFI acknowledges, many of the primary securities law claims asserted by RMBS investors against the Debtors and Ally Securities[286] or against other unaffiliated issuers and

---

[286] *See Mass. Mut. Life Ins. Co. v. Residential Funding Co, LLC*, 843 F. Supp. 2d 191, 200 (D. Mass. 2012) (denying motion to dismiss MUSA § 410(a)(2) claim asserted against Ally Securities where complaint alleged that "representations about the underwriting process" were "false because the originators systematically violated the underwriting standards by, for example, issuing loans on the basis of overstated incomes, inflated appraisals, and unjustified exceptions to the standards"); *FHFA v. Ally Fin., Inc.*, Civ. No. 11-7010, 2012 U.S. Dist. LEXIS 179768, at *18 (S.D.N.Y. Dec. 19, 2012) (denying in part motions to dismiss section 11 and 12(a)(2) claims and Virginia Securities Act claims asserted against Ally Securities); Order, *FHLB of Chicago v. Banc of Am. Funding Corp.*, Case No. 10-CH-45033, at 15–29 (Ill. Cir. Ct. Sept. 19, 2012) (denying motion to dismiss primary claims asserted against Ally Securities under the Illinois Securities Law and the North Carolina Securities Act); *N.J. Carpenters Health Fund v. Residential Capital, LLC*, Civ. No. 08-8781, 2010 U.S. Dist. LEXIS 32058, at *4, 21 (S.D.N.Y. Mar. 31, 2010) (denying in part motions to dismiss section 11 and 12(a)(2) claims asserted against certain of the Debtors and Ally Securities, allowing "[c]laims related to [misrepresentations concerning] the alleged disregard of underwriting guidelines [to] proceed," and explaining that those alleged misrepresentations "are not cured by the risk disclosures . . . in the Offering Documents"); *Cambridge Place Inv. Mgmt., Inc. v. Morgan Stanley & Co.*, Case No. 2010-02741, 2012 Mass. Super. LEXIS 272, at *29 (Mass. Super. Ct. Sept. 28, 2012) (denying motion to dismiss MUSA § 410(a)(2) claim against Ally Securities alleging "misrepresentation with respect to underwriting guidelines, LTV ratios and appraisal standards, owner-occupancy rates, debt-to-income ratios, . . . and credit enhancements"); *W. & S. Life Ins. Co. v. Residential Funding Co., LLC*, Case No. A1105042, 2012 Ohio Misc. LEXIS 100, at *23 (Ohio Ct. Com. P. June 6, 2012) (denying motion to dismiss Ohio securities law claims against Ally Securities alleging misrepresentations concerning underwriting guidelines, the appraisal process, investment ratings, and owner occupancy). *But see* Order, *Union Cent. Life Ins. Co. v. Ally Fin., Inc.*, Civ. No. 11-02890, Docket No. 263, at 3 (S.D.N.Y. Mar. 29, 2013) (dismissing without prejudice claims asserted under section 10(b) of the Exchange Act against AFI and Ally Securities where plaintiffs "have not pled any facts with particularity to demonstrate . . . scienter" and failed to specify "which defendant engaged in any specific conduct").

underwriters of RMBS[287] have survived in whole or in part motions to dismiss for failure to state a claim, notwithstanding the risk disclosures in the offering materials at issue. In at least one case, securities claims asserted against an unaffiliated issuer of RMBS (neither Debtors

---

[287] *See N.J. Carpenters Health Fund v. Royal Bank of Scot. Group, PLC*, 709 F.3d 109, 122 (2d Cir. 2013) (reversing in part decision dismissing section 11 and 12(a)(2) claims and explaining that such claims should "proceed where the plaintiff has provided a 'fairly specific' account of how the relevant underwriters had systematically disregarded the guidelines disclosed in a security's registration statement"); *Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, 632 F.3d 762, 773 (1st Cir. 2011) (finding allegations of "wholesale abandonment of underwriting standards" sufficient to state a Securities Act claim); *FHFA v. UBS Ams. Inc.*, 858 F. Supp. 2d 306, 332 (S.D.N.Y. 2012) (denying motion to dismiss Securities Act claims where plaintiff alleged "widespread failure to conduct any underwriting"); *In re Bear Stearns Mortg. Pass-Through Certificates Litig.*, 851 F. Supp. 2d 746, 767–69 (S.D.N.Y. 2012) (finding that the complaint "properly states a [section 11 and 12(a)(2)] claim as to the underwriting allegations."); *Capital Ventures Int'l v. UBS Sec. LLC*, Civ. No. 11-11937, 2012 U.S. Dist. LEXIS 140663, at *53 (D. Mass. Sept. 28, 2012) (denying in part motion to dismiss MUSA § 410(a)(2) claim alleging misrepresentations "regarding underwriting guidelines, owner-occupancy rates, appraisals and LTV ratios"); *Nat'l Credit Union Admin. Bd. v. RBS Sec., Inc.*, Civ. No. 11-2340, 2012 U.S. Dist. LEXIS 103170, at *95 (D. Kan. July 25, 2012) (denying motion to dismiss section 11 and 12(a)(2) claims insofar as they allege that "underwriting standards . . . were systematically abandoned"); *Plumbers' & Pipefitters' Local #562 Supplemental Plan & Trust v. J.P. Morgan Acceptance Corp. I*, Civ. No. 08-1713, 2012 WL 601488, at *17 (E.D.N.Y. Feb. 23, 2012) (denying motion to dismiss section 11 claim alleging "systematic deviation" from underwriting guidelines); *Dexia Holdings, Inc. v. Countrywide Fin. Corp.*, Civ. No. 11-07165, 2012 WL 1798997, at *2 (C.D. Cal. Feb. 17, 2012) ("Plaintiffs' [section 11] claim that Countrywide abandoned its underwriting standards . . . is adequately pleaded."); *Emps.' Ret. Sys. of the Gov't of the Virgin Is. v. J.P. Morgan Chase & Co.*, 804 F. Supp. 2d 141, 153-54 (S.D.N.Y. 2011) ("allegations regarding deviations from underwriting standards are sufficient to survive dismissal"); *In re Morgan Stanley Mortg. Pass-Through Certificates Litig.*, 810 F. Supp. 2d 650, 672 (S.D.N.Y. 2011) ("Plaintiffs have adequately alleged actionable misstatements or omissions . . . [concerning] the alleged systematic disregard of underwriting criteria . . . ."); *Pub. Emps.' Ret. Sys. of Miss. v. Goldman Sachs Group, Inc.*, Civ. No. 09-1110, 2011 U.S. Dist. LEXIS 3267, at *34 (S.D.N.Y. Jan. 12, 2011) ("Plaintiff has pled sufficient factual allegations [under section 11] to plausibly infer that the underwriting guidelines were disregarded . . . in conflict with the disclosures made in the Offering Documents."); *Boilermakers Nat'l Annuity Trust Fund v. WaMu Mortg. Pass-Through Certificates, Series AR1*, 748 F. Supp. 2d 1246, 1254–55 (W.D. Wash. 2010) (denying motion to dismiss section 11 claim alleging "improper deviations from underwriting guidelines"); *In re Lehman Bros. Sec. & ERISA Litig.*, 684 F. Supp. 2d 485, 493 (S.D.N.Y. 2010) (denying motion to dismiss section 11 claim with respect to allegations that underwriting guidelines were "systematically disregarded"). *But see Footbridge Ltd. Trust v. Countrywide Home Loans, Inc.*, Civ. No. 09-4050, 2010 U.S. Dist. LEXIS 102134, at *32 (S.D.N.Y. Sept. 28, 2010) (dismissing section 10(b) claim and holding that allegations that "defendants were too flexible in the underwriting decisions" were "insufficient to set forth a plausible claim of fraud based on the heightened pleading requirements of Rule 9(b) and the PSLRA").

nor AFI is a party) also have survived a motion for summary judgment.[288] Of course, here "[d]iscovery may reveal that the actual facts support the inferences drawn by [AFI], rather than those drawn by the [Third-Party Claimants]."[289] Definitive conclusions concerning the likelihood of success of the primary securities law claims underlying Third-Party Claimants' control person claims in these six pending RMBS Investor Actions (and other such claims) are outside the scope of the Investigation. The Examiner describes, in Section VIII.C.2.b, the primary claims asserted against Ally Securities under federal and state securities laws.

### (c) Control Over A Primary Violator

#### (i) Legal Principles

"Control over a primary violator may be established by showing that the defendant possessed 'the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.'"[290] "Actual control over the wrongdoer and the transactions in question is necessary for control person liability."[291] "Control in this context is not the mere ability to persuade, but almost always means the practical ability to *direct* the actions of people who issue or sell

---

[288] *See In re Wash. Mut. Mortg. Backed Sec. Litig.*, Civ. No. 09-37, 2012 U.S. Dist. LEXIS 102064, at *37 (W.D. Wash. July 23, 2012). There, as here, the plaintiffs' section 11 claims were premised in part on allegations that the defendant RMBS issuer "systematically deviated from its underwriting guidelines so as to render the statements in the offering documents false." *Id*. at *31. "Taking the facts in the light most favorable to Plaintiffs," the court found "a dispute of material fact" that precluded summary judgment. *Id*. at *37. The court clarified that plaintiffs would not "have to show the underwriting guidelines ceased to exist in order to prevail in this case," but instead "show a pattern of deviations from the underwriting practices caused the disclosures to be materially misleading or false." *Id*. at *30–31. Plaintiffs' evidence that defendant's "internal risk management concluded there were substantial deviations in loan quality that far exceeded the [underwriting] benchmarks" and "expert reports finding that 37.1% of the loans sampled suffered from material defects" sufficed at this stage "to sustain the § 11 claims." *Id*. at *32. According to the court, the "countervailing facts" presented by defendants might lead a jury to "reach[] a verdict in Defendants' favor," but "do not negate the extensive evidence Plaintiffs present" or "foreclose Plaintiffs' § 11 claims" from reaching trial. *Id*. at *34–37.

[289] *See N.J. Carpenters Health Fund v. Royal Bank of Scot. Group, PLC*, 709 F.3d 109, 125 (2d Cir. 2013).

[290] *See SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472–73 (2d Cir. 1996) (quoting 17 C.F.R. § 240.12b-2); *see also Wyo. State Treasurer v. Moody's Investors Serv., Inc. (In re Lehman Bros. Mortgage-Backed Sec. Litig.)*, 650 F.3d 167, 185 (2d Cir. 2011) ("Because § 15 and § 20(a) are roughly parallel control person provisions . . . we here adopt the quoted *First Jersey* definition of control for § 15 claims."); *In re AOL Time Warner, Inc. Sec. & ERISA Litig.*, 381 F. Supp. 2d 192, 234 (S.D.N.Y. 2004) ("means of exercising control pursuant to [s]ections 15 and 20(a)" include "stock ownership," "business relationships, interlocking directors, family relationships, and the power to influence and control the activities of another").

[291] *Cromer Fin. Ltd. v. Berger*, 137 F. Supp. 2d 452, 484 (S.D.N.Y. 2001); *see also Cohen v. Stevanovich*, 722 F. Supp. 2d 416, 435 (S.D.N.Y. 2010) ("The [s]ection 20(a) defendant must not only have actual control over the primary violator, but have actual control over the *transaction* in question.") (quotation marks omitted); *In re Refco Sec. Litig.*, 503 F. Supp. 2d 611, 637 (S.D.N.Y. 2007) ("To prevail on a § 15 claim, a plaintiff is required to prove actual control, not merely control person status.") (quotation marks omitted); *In re Livent, Inc. Sec. Litig.*, 78 F. Supp. 2d 194, 221 (S.D.N.Y. 1999) ("Actual control is essential to control person liability.").

securities."[292] Some courts in the Second Circuit have clarified that "control requires only the ability to direct the actions of the controlled person, and not the active exercise thereof."[293] Courts in certain other jurisdictions have required that "the alleged control person actually exercised control over the general operations of the primary violator" and "possessed—but did not necessarily exercise—the power to determine the specific acts or omissions upon which the underlying violation is predicated."[294]

"A court 'must consider the total effect of the various indicia of control in combination,' rather than examining any one indicia in isolation."[295] "Allegations that an entity was the parent corporation of a primary violator, standing alone, do not make out a claim of

---

[292] *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 352 F. Supp. 2d 429, 458 (S.D.N.Y. 2005) (quotation marks omitted); *see also Wyo. State Treasurer*, 650 F.3d at 18 ("[A]llegations of advice, feedback, and guidance fail to raise a reasonable inference that the Rating Agencies had the power to direct, rather than merely inform, the banks' ultimate structuring decisions. Put another way, providing advice that the banks chose to follow does not suggest control."); *N.J. Carpenters Health Fund v. NovaStar Mortg., Inc.*, Civ. No. 08-5310, 2011 U.S. Dist. LEXIS 36363, at *29 (S.D.N.Y. Mar. 31, 2011) ("Plaintiff's allegations do not demonstrate control, but only the power to influence or persuade those who issued or sold the securities."); *In re Alstom Sec. Litig.*, 406 F. Supp. 2d 433, 487 (S.D.N.Y. 2005) ("[E]xercise of influence, without power to direct or cause the direction of management and policies . . . is not sufficient to establish control for purposes of [s]ection 20(a).").

[293] *See CompuDyne Corp. v. Shane*, 453 F. Supp. 2d 807, 829 (S.D.N.Y. 2006) (quoting *Dietrich v. Bauer*, 126 F. Supp. 2d 759, 764 (S.D.N.Y. 2001)); *see also Epstein v. Haas Sec. Corp.*, 731 F. Supp. 1166, 1175 n.5 (S.D.N.Y. 1990) (rejecting argument that "plaintiffs must show that defendants actually exercised control over the conduct constituting the violation" because it "clearly runs counter" to the rule that "the plaintiff need not allege that the defendant actively exercised the control in the transaction in question").

[294] *See Lustgraaf v. Behrens*, 619 F.3d 867, 873 (8th Cir. 2010) (applying section 20(a) of the Exchange Act); *see also In re Credit Suisse – AOL Sec. Litig.*, Civ. No. 02-12146, 2011 U.S. Dist. LEXIS 95889, at *25 (D. Mass. Aug. 26, 2011) (same); *Premier Capital Mgmt., LLC v. Cohen*, Civ. No. 02-5368, 2008 U.S. Dist. LEXIS 23484, at *26 (N.D. Ill. Mar. 24, 2008) ("First, [under section 15] the 'control person' needs to have actually exercised general control over the operations of the wrongdoer, and second, the control person must have had the power or ability—even if not exercised—to control the specific transaction or activity that is alleged to give rise to liability.") (quoting *Donohoe v. Consol. Operating & Prod. Corp.*, 30 F.3d 907, 911– 12 (7th Cir. 1994)); *Semrad v. Edina Realty, Inc.*, 493 N.W.2d 528, 532–33 (Minn. 1992) (applying same standard under MINN. STAT. § 80A.23). To the extent AFI argues that Third-Party Claimants must instead demonstrate that AFI "exercised operational control over . . . the securitizations they challenge," *see* AFI Submission Paper, Dec. 19, 2012, at 30, 34, that argument is inconsistent with what appears to be the prevailing view. None of the decisions relied upon by AFI are to the contrary. *See, e.g.*, *Ho v. Duoyuan Global Water, Inc.*, 887 F. Supp. 2d 547, 579 (S.D.N.Y. 2012) (dismissing section 15 claims where complaint failed to allege that defendant *possessed* "actual control over the transaction in question," without suggesting that plaintiff was required to plead that defendant *exercised* such control over that transaction) (quotation marks and emphasis omitted).

[295] *In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*, 398 F. Supp. 2d 244, 262 (S.D.N.Y. 2005) (quoting *In re Leslie Fay Cos., Inc. Sec. Litig.*, 918 F. Supp. 749, 763 (S.D.N.Y. 1996)); *see also United States v. Corr*, 543 F.2d 1042, 1050 (2d Cir. 1976) (explaining that "[w]hile there is no statutory definition of 'control,' its concept is not a narrow one," but "depends upon the totality of the circumstances").

control."[296] By itself, "[t]he parent/subsidiary relationship is an insufficient basis from which to infer control because a parent corporation and its subsidiary are regarded as legally distinct entities."[297] "Minority stock ownership [by a parent] and the ability to appoint a minority of the board," without more, "do not create power to direct management and policies, and thus do not constitute sufficient control."[298] The existence of overlapping officers or directors among parent and subsidiary entities likewise may not "create any presumption of control for purposes of establishing control person liability."[299] "Moreover, the right [of a parent] to access another [affiliated] firm's books and records, without more, does not suggest any concomitant right to control that firm."[300]

Nonetheless, "[i]n cases involving parent-subsidiary relationships, courts have regularly based findings of control person liability on allegations of substantial stock ownership and

[296] *Emps.' Ret. Sys. of the Gov't of the Virgin Is. v. J.P. Morgan Chase & Co.*, 804 F. Supp. 2d 141, 157 (S.D.N.Y. 2011) (dismissing section 15 claim as against parent entity); *see also Suez Equity Investors, LP v. Toronto-Dominion Bank*, 250 F.3d 87, 102 (2d Cir. 2001) (finding a section 20(a) claim "insufficient . . . as a matter of law" where allegations that "Holdings controlled various of the other corporate defendants" were "conclusory at best"); *Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co. Inc.*, 714 F. Supp. 2d 475, 484 (S.D.N.Y. 2010) (dismissing section 15 claim where plaintiffs "failed to allege beyond 'formulaic recitation' how Merrill . . . exercised control over [the alleged primary violators]" where plaintiffs "merely allege that [they] were Merrill subsidiaries and affiliates of each other"); *In re Global Crossing, Ltd., Sec. Litig.*, Civ. No. 02-910, 2005 U.S. Dist. LEXIS 16232, at *13 (S.D.N.Y. Aug. 5, 2005) ("The mere existence of a parent/subsidiary relationship may be an insufficient basis from which to infer control for allegations of [s]ection 15 liability, but plaintiffs have pled more than that.") (citation omitted); *Alameda Co. Emps.' Ret. Ass'n v. Ebbers (In re WorldCom, Inc. Sec. Litig.)*, Civ. Nos. 02-3288 & 03-0890, 2004 U.S. Dist. LEXIS 8661, at *10–11 (S.D.N.Y. May 18, 2004) (granting motion to dismiss section 15 claim where complaint "does not allege any ownership of voting securities or other basis for asserting that the Holding Company Defendants have the power to direct or cause the direction of the management or policies of the defendant subsidiaries").

[297] *Pub. Emps.' Ret. Sys. of Miss.*, 714 F. Supp. 2d at 484 (quotation marks omitted).

[298] *In re Alstom Sec. Litig.*, 406 F. Supp. 2d at 492 (dismissing section 20(a) claim where "Alcatel was a [24%] minority shareholder"); *see also In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 352 F. Supp. 2d 429, 458 (S.D.N.Y. 2005) (allegations that "Verizon owned 30% of Flag's voting shares and had the power to appoint three members to Flag's Board of Directors" not adequate to establish "control"); *In re Deutsche Telekom AG Sec. Litig.*, Civ. No. 00-9475, 2002 U.S. Dist. LEXIS 2627, at *19 (S.D.N.Y. Feb. 20, 2002) (deciding that allegation that "KfW owned 22 percent of Deutche Telekom" was "insufficient by itself to infer control of Deutsche Telecom by KfW, especially given the 43% ownership share of Deutsche Telekom by the Federal Republic of Germany").

[299] *See In re WorldCom, Inc.*, 377 B.R. 77, 105 (Bankr. S.D.N.Y. 2007) (denying plaintiff's motion for summary judgment as to control person liability where it was undisputed that "the same individual, Lawrence Tucker, simultaneously served as a member on the board of directors for both [alleged control person] WorldCom and [alleged primary violator] WAXS"); *see also Suez Equity Investors, LP v. Toronto-Dominion Bank*, 250 F.3d 87, 102 (2d Cir. 2001) ("vague allegations . . . indicating only that certain employees worked for multiple defendants" are "insufficient under § 20 as a matter of law" to plead that "Holdings controlled various of the other corporate defendants"); *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 308 F. Supp. 2d 249, 274 (S.D.N.Y. 2004).

[300] *In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278, 311 (S.D.N.Y. 2005) ("Plaintiffs' [section 20] claim in respect of GT-USA, however, falls short. The only non-conclusory allegations of control are that of relative size and GT-USA's access to member firms' books and records.").

VIII-58

common principals."[301] Allegations that a "control person" defendant "was not simply the corporate parent" of its subsidiary but instead exercised day-to-day direction or supervision over that subsidiary's actions have been found indicative of control.[302] Similarly, allegations

_____

[301] *STMicroelectronics v. Credit Suisse Group*, 775 F. Supp. 2d 525, 536 (E.D.N.Y. 2011) (quoting *Kalin v. Xanboo, Inc.*, 526 F. Supp. 2d 392, 406 (S.D.N.Y. 2007)); *see also Healey v. Chelsea Res. Ltd.*, 947 F.2d 611, 626 (2d Cir. 1991) (noting that "[w]hether or not sufficient, such proof [of a parent-wholly-owned-subsidiary relationship] would at least seem relevant" to determination of "control"); *In re Citigroup Inc. Bond Litig.*, 723 F. Supp. 2d 568, 595 (S.D.N.Y. 2010) (denying motion to dismiss section 15 claim where alleged primary violator was the "wholly-owned subsidiary" of the alleged control person); *In re Prestige Brands Holdings, Inc. Sec. Litig.*, Civ. No. 05-6924, 2006 U.S. Dist. LEXIS 81980, at *7 (S.D.N.Y. Nov. 9, 2006) (denying motion to dismiss section 15 claim where plaintiff's allegations of control included that "GTCR formed Prestige and owned 85.2% of its stock" and "GTCR placed two of its principals on Prestige's five member Board of Directors"); *In re Parmalat Sec. Litig.*, 375 F. Supp. 2d at 311 ("[A]llegations that the top executives of [alleged control person] Deloitte & Touche LLP held the top two positions at [affiliate] DTT and that at least one of those executives was involved in the Parmalat audit are sufficient to give rise to an inference of control."); *Dietrich v. Bauer*, 126 F. Supp. 2d 759, 765 (S.D.N.Y. 2001) ("A sole shareholder of the company that is the primary wrongdoer has been held to be a control person within the meaning of [s]ection 20(a), as ownership strongly suggests that the defendant has the potential power to influence and direct the activities of the wrongdoer."); *Pollack v. Laidlaw Holdings, Inc.*, Civ. No. 90-5788, 1995 U.S. Dist. LEXIS 5909, at *59 (S.D.N.Y. May 2, 1995) (denying motion to dismiss control person claims because "plaintiffs have provided prima facie evidence of Laidlaw Holdings' status as a controlling person" where it was alleged that "Laidlaw Holdings controlled both Laidlaw Equities and Laidlaw Asset Management through one hundred percent stock ownership and through common officers and directors"); *Borden, Inc. v. Spoor Behrins Campbell & Young, Inc.*, 735 F. Supp. 587, 591 (S.D.N.Y. 1990) (holding that "plaintiffs have sufficiently stated control status and therefore, a [s]ection 20 claim" because "[p]laintiffs' allegation that defendants were sole shareholders of [alleged primary violator] SBCY clearly meets [the 'control'] standard").

[302] *See FHFA v. UBS Ams. Inc.*, 858 F. Supp. 2d 306, 333 (S.D.N.Y. 2012) (denying motion to dismiss section 15 claim where plaintiff alleged that "UBS Americas was not simply the corporate parent of UBS Securities and MASTR but, in practice, controlled their actions in issuing and selling RMBS certificates"); *see also Kalin v. Xanboo, Inc.*, 526 F. Supp. 2d 392, 405 (S.D.N.Y. 2007) (finding that "[p]laintiff has sufficiently pled that RDI is a 'control person' over the primary violator Xanboo" where plaintiff alleged "a mix of substantial stock ownership, shared officers and principals, and at least some direct involvement in Xanboo by officers of RDI"); *In re Global Crossing, Ltd., Sec. Litig.*, Civ. No. 02-910, 2005 U.S. Dist. LEXIS 16232, at *13–14 (S.D.N.Y. Aug. 5, 2005) (plaintiffs' allegations were "sufficient to state a claim of control under [s]ection 15" where plaintiffs "alleged that Securities is JPMC's wholly owned subsidiary, that the directors of both corporations were 'interchangeable,' and that JPMC 'had direct involvement in the day-to-day operations of Securities'") (internal citations omitted); *Cromer Fin. Ltd. v. Berger*, 137 F. Supp. 2d 452, 484 (S.D.N.Y. 2001) (denying motion to dismiss section 20(a) claim complaint alleged that defendant entity "exercis[ed] 'direct, daily supervision, oversight and control' through common personnel and shared offices" with affiliates).

that a parent used its subsidiary as a vehicle to conduct the parent's business may also be relevant to a finding of control.[303]

In recent years, courts have applied these standards to decide motions to dismiss control person claims asserted by investors under federal or states securities laws against the parents or affiliates of issuers or underwriters of RMBS. Some courts granted such motions to dismiss explaining that "[a]llegations that an entity was the parent corporation of a primary violator, standing alone, do not make out a claim of control."[304] Several other courts, however, denied motions to dismiss control person claims where the plaintiff did more than plead mere corporate ownership or affiliation including, for example, by alleging facts showing that a parent "operated its subsidiaries as a collective enterprise with respect to the origination of mortgage loans"[305] or "structured [its affiliates] to facilitate the issuance and sale of the [RMBS] and controlled them directly."[306] Some courts denying motions to dismiss have also

---

[303] *See In re Indep. Energy Holdings PLC Sec. Litig.*, 154 F. Supp. 2d 741, 770 (S.D.N.Y. 2001) (finding that "[p]laintiffs have pled sufficient facts supporting an inference that DLJ Inc. controlled DLJ Securities and DLJ International" where plaintiffs alleged that "DLJ Inc. conducts its business domestically and internationally through [those] wholly-owned subsidiaries" and that "DLJ Inc. was running the business of DLJ Securities through common management") (quotation marks omitted); *Cromer Fin. Ltd. v. Berger*, 137 F. Supp. 2d 452, 484 (S.D.N.Y. 2001) (denying motion to dismiss section 20(a) claim and finding that complaint "adequately alleges . . . actual control" where, among other allegations, the complaint stated that "EYB identified FASB and K&W as 'the corporate vehicles through which' EYB provided administrative services to its clients"); *see also Emps.' Ret. Sys. of the Gov't of the Virgin Is. v. J.P. Morgan Chase & Co.*, 804 F. Supp. 2d 141, 157 (S.D.N.Y. 2011) ("Nor is the fact that the J.P Morgan name appeared prominently on the Prospectus Supplement [issued by its subsidiary], lending the investment the imprimatur of the larger corporation, enough to establish control person liability.").

[304] *See Emps.' Ret. Sys. of the Gov't of the Virgin Is.* 804 F. Supp. 2d at 157 (granting motion to dismiss section 15 claim asserted against parent of issuer and underwriter of RMBS despite allegations "that the [parent's] name appeared prominently on the Prospectus Supplement"); *see also Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co. Inc.*, 714 F. Supp. 2d 475, 485 (S.D.N.Y. 2010) (granting motion to dismiss section 15 claim where plaintiffs "failed to allege beyond formulaic recitation how Merrill . . . exercised control over Merrill Depositor" and "merely allege that . . . [the defendants] were Merrill subsidiaries and affiliates of each other") (quotation marks omitted).

[305] *See Mass. Mut. Life Ins. Co. v. Countrywide Fin. Corp.*, 2012 U.S. Dist. LEXIS 121702, at *17 (C.D. Cal. Aug. 17, 2012) (denying motion to dismiss state-law control person claims asserted against Countrywide Financial Corporation, "the corporate parent of [primary violator] CSC," where the complaint "alleged that CFC operated its subsidiaries as a collective enterprise with respect to the origination of mortgage loans, while maintaining high-level control"); *see also In re Wash. Mut., Inc.*, 462 B.R. 137, 141 (Bankr. D. Del. 2011) (denying objection to control person claims asserted by creditor under section 15 and California securities laws where plaintiff adequately alleged that the parent "controlled the offering entities as divisions of an integrated mortgage-backed securities production 'factory'").

[306] *See Me. State Ret. Sys. v. Countrywide Fin. Corp.*, Civ. No. 10-0302, 2011 U.S. Dist. LEXIS 125203, at *45 (C.D. Cal. May 5, 2011) (denying motion to dismiss section 15 claim asserted against Countrywide Financial Corporation where the plaintiff "alleges that CFC structured the [primary violator] Issuer Defendants to facilitate the issuance and sale of the [RMBS] and controlled them directly"); *see also Capital Ventures Int'l v. J.P. Morgan Mortg. Acquisition Corp.*, Civ. No. 12-10085, 2013 U.S. Dist. LEXIS 19227, at *30 (D. Mass. Feb. 13, 2013) (denying motion to dismiss MUSA § 410(b) claim where the complaint alleged that the securitization sponsor "had day-to-day control" over the primary violations including control over "select[ing] the loans that would be securitized" and "the disclosures made in connection with the related securitizations").

found relevant allegations of a "significant overlap in the controlling executives and directors of each entity [involved in the securitization process]."[307]

### (ii) Application To RMBS Claims

Third-Party Claimants allege that AFI "had the practical ability to and in fact exercised direction and control of [its] subsidiaries in coordinating the [vertically-integrated] securitization process, determining the structure of each offering, and issuing and selling the [securities] purchased by [Third-Party Claimants]."[308] In support of such allegations, Third-Party Claimants further allege, inter alia, that (1) "[AFI], [GMAC Mortgage Group, LLC], ResCap, and [RFC] shared overlapping management with each other and/or [the Depositor Entities]"; (2) AFI "supports its subsidiaries financially"; (3) AFI "publicly reports on its own business and that of its subsidiaries on an integrated basis"; (4) AFI "provides various services to [the Debtors], which demonstrate the integrated nature of the . . . businesses"; and (5) "[u]nlike typical arm's length securitizations, [these] involved various [AFI] subsidiaries and affiliates at virtually each step in the chain."[309]

---

[307] *See Genesee Co. Emps.' Ret. Sys. v. Thornburg Mortg. Sec. Trust 2006-3*, 825 F. Supp. 2d 1082, 1222 (D.N.M. 2011) (denying motion to dismiss section 15 claim where the complaint's allegations that "[control person] RBS Securities created [primary violator] GC Acceptance and receives basically all of its revenue from securitizations" and that there was "significant overlap in the controlling executives and directors of each entity" were sufficient to "demonstrate that RBS Securities had the practical ability to direct the actions of the primary violator"); *see also Capital Ventures Int'l*, 2013 U.S. Dist. LEXIS 19227, at *30 (denying motion to dismiss MUSA § 410(b) control person claim where complaint alleged "details about how the depositors were organized and managed" including that "the management of the depositor and sponsor often overlap").

[308] *See* Am. Compl., *FHFA v. Ally Fin. Inc.*, Civ. No. 11-07010, Docket No. 114, at 25–26 (S.D.N.Y. June 13, 2012); *see also* Am. Compl., *FHLB of Boston v. Ally Fin., Inc.*, Civ. No. 11-10952, Docket No. 180, at 46–47 113 (D. Mass. June 29, 2012) ("[AFI] possessed the practical ability to direct or cause the direction of the management, policies, and actions of Defendants . . . and in fact exercised such direction and control . . . related to the issuance and sale of the Certificates."); Am. Compl., *FHLB of Chicago v. Banc of Am. Funding Corp.*, Case No. 10-CH-45033, at 20, 200–201 (Ill. Cir. Ct. Apr. 8, 2011); Am. Compl., *John Hancock Life Ins. Co. (U.S.A.) v. Ally Fin. Inc.*, Civ. No.12-01841, Docket No. 84, at 12 (D. Minn. Oct. 15, 2012) ("[AFI] is the ultimate corporate parent of all the other [defendants] and controls the policy of the . . . business operation. In this capacity, [AFI] pursued the securitizations at issue . . . at the expense of Plaintiffs."); Am. Compl., *Stichting Pensioenfonds ABP v. Ally Fin. Inc.*, Civ. No. 12-01381, Docket No. 101, at 10–11 (D. Minn. Oct. 11, 2011) (same); Am. Compl., *Union Central Life Ins. Co. v. Ally Fin., Inc.*, Civ. No. 11-02890, Docket No. 146, at 13, 240–241 (S.D.N.Y. May 4, 2012).

[309] *See* Am. Compl., *FHFA v. Ally Fin. Inc.*, Civ. No. 11-7010, Docket No. 114, at 26–31 (S.D.N.Y. June 13, 2012); *see also* Am. Compl., *FHLB of Boston v. Ally Fin., Inc.*, Civ. No. 11-10952, Docket No. 180, at 278 (D. Mass. June 29, 2012); Am. Compl., *FHLB of Chicago v. Banc of Am. Funding Corp.*, Case No. 10-CH-45033, at 200–202 (Ill. Cir. Ct. Apr. 8, 2011); Am. Compl., *John Hancock Life Ins. Co. (U.S.A.) v. Ally Fin. Inc.*, Civ. No.12-01841, Docket No. 84, at 263–269 (D. Minn. Oct. 15, 2012); Am. Compl., *Stichting Pensioenfonds ABP v. Ally Fin. Inc.*, Civ. No. 12-01381, Docket No. 101, at 162–168 (D. Minn. Oct. 11, 2011); Am. Compl., *Union Cent. Life Ins. Co. v. Ally Fin., Inc.*, Civ. No. 11-02890, Docket No. 146, at 240–241 (S.D.N.Y. May 4, 2012).

To date, two courts have found such allegations sufficient as a matter of law to plead that AFI was a "controlling person" of one or more alleged primary violators.[310] In *FHFA v. Ally Fin., Inc.*, the U.S. District Court for the Southern District of New York denied AFI's motion to dismiss the section 15 claims asserted against it by the FHFA.[311] The district court rejected AFI's argument that the FHFA's allegations of control were "insufficient" and found adequate the complaint's allegations that AFI "(1) exercised direction and control over a vertically integrated structure of wholly owned subsidiaries that sold the [RMBS] Certificates, (2) shared officers and directors with those subsidiaries, (3) supplied them with essential services and financial support, and (4) profited substantially from this vertically integrated approach to the securitization process."[312] In *FHLB of Chicago v. Banc of Am. Funding Corp.*, the Circuit Court in Cook County, Illinois, denied AFI's motion to dismiss control person claims asserted under the Illinois Securities Law and the North Carolina Securities Act.[313] Those courts that have granted motions to dismiss control person claims asserted by Third-Party Claimants against AFI do not appear to have done so on the ground of a failure to plead control.[314]

Of course, the denial of a motion to dismiss "is not to say that [such] claims are strong, or that they will necessarily succeed."[315] To prevail on the merits of their control person claims against AFI, Third-Party Claimants will be required to prove by a preponderance of the evidence the necessary control (among other elements).[316] In their submissions to the Examiner, Third-Party Claimants have asserted that they expect to "demonstrate the controlling person status of [AFI] through [its] extensive operational control of the relevant debtor affiliates, such as their control over all major decisions respecting the debtor affiliates

---

[310] *See FHFA v. Ally Fin., Inc.*, Civ. No. 11-7010, 2012 U.S. Dist. LEXIS 179768, at *11–15 (S.D.N.Y. Dec. 19, 2012); Order, *FHLB of Chicago v. Banc of Am. Funding Corp.*, Case No. 10-CH-45033, at 33 (Ill. Cir. Ct. Sept. 19, 2012).

[311] Civ. No. 11-7010, 2012 U.S. Dist. LEXIS 179768, at *11–15 (S.D.N.Y. Dec. 19, 2012).

[312] *Id*. at *12–13; *see also FHFA v. UBS Americas, Inc.*, 858 F. Supp. 2d 306, 333 (S.D.N.Y. 2012) (Cote, J.) (denying motion to dismiss section 15 claim where the complaint "alleges that [control person] UBS Real Estate was actively involved in coordinating the securitization process and determining the structure of each offering and that [control person] UBS Americas was not simply the corporate parent of UBS Securities and MASTR but, in practice, controlled their actions in issuing and selling RMBS certificates").

[313] *See* Order, *FHLB of Chicago v. Banc of Am. Funding Corp.*, Case No. 10-CH-45033, at 33 (Ill. Cir. Ct. Sept. 19, 2012) ("The [FHLB] correctly argues that it has stated a claim for 'control person' liability because it has properly stated claims for primary violations of securities laws.").

[314] *See* Order, *Union Cent. Life Ins. Co. v. Ally Fin., Inc.*, Civ. No. 11-02890, Docket No. 263, at 3–4 (S.D.N.Y. Mar. 29, 2013) (granting motion to dismiss "claims against [AFI] for violations of [s]ection 20(a) and 20(b) of the Exchange Act" where plaintiffs "have not pled any facts with particularity to demonstrate [defendants'] scienter" and such allegations were "wholly conclusory"); *Huntington Bancshares, Inc. v. Ally Fin. Inc.*, Case No. 27-cv-11-20276, at 9 (Minn. Dist. Ct. Dec. 11, 2012) (dismissing with prejudice Minnesota Securities Act claims asserted against AFI as "barred as a matter of law by the three-year statute of limitations").

[315] *See City of Ann Arbor Emps.' Ret. Sys. v. Citigroup Mortg. Loan Trust Inc.*, Civ. No. 08-1418, 2010 U.S. Dist. LEXIS 137290, at *16–17 (E.D.N.Y. Dec. 23, 2010) (denying motion to dismiss Securities Act claims alleging a "departure from underwriting standards").

[316] *See* Section VIII.C.2.a(2)(a).

and shared personnel," and that "discovery will yield even more evidence."[317] AFI disagrees, contending that Third-Party Claimants "offer no evidence" and cannot prove that "AFI ever exercised operational control over ResCap (or its operating subsidiaries), much less that it did so with respect to the securitizations."[318]

While a close question, the Examiner concludes that it is more likely than not that a court would not find the requisite control of AFI over the alleged primary securities violators. To reach this conclusion, the Examiner considered the parties' arguments and the available evidence, including with respect to: (A) the Operating Agreement; (B) overlapping officers and directors; (C) shared functions and services; (D) AFI's audits of the Debtors; and (E) certain statements by AFI and the Debtors concerning their relationship.

### (A) The Operating Agreement

AFI asserts that it "was walled off from ResCap as a result of ResCap's Operating Agreement" and that those "restrictions . . . collectively precluded AFI from exercising actual control over ResCap's operations . . . and . . . ResCap's conduct in connection with the RMBS transactions at issue here."[319] To the extent that AFI intends to argue that the Operating Agreement alone could defeat Third-Party Claimants' control person claims, that argument has been rejected by one court and does not persuade the Examiner.[320]

In *FHFA v. Ally Fin., Inc.*, the district court concluded that the "operating agreement entered into between AFI and ResCap in June 2005" failed to "demonstrate[] as a matter of law that [AFI] did not exercise control over [RFC] and the [Depositor Entities] during the period that the securitizations at issue were sold."[321] According to the court, the complaint contained allegations that "call into question the appearance of independence that might be conveyed by the Operating Agreement in isolation" including that "in several instances officers of AFI served on the board of ResCap or its subsidiaries."[322] Although "[i]t may be the case that, whether because of the Operating Agreement or for other reasons, the involvement of [AFI] in ResCap's securitization activities was not sufficient to give rise to control-person liability," such a finding could not be made as a matter of law based on the text of the Operating Agreement alone.[323]

---

[317] *See* Joint Submission Paper of Federal Home Loan Banks of Boston, Chicago and Indianapolis, dated Oct. 19, 2012, at 23–24, 28; *see also* Joint Submission Paper of AIG, Allstate Life Ins. Co., Mass. Mut. Life Ins. Co., and Prudential Ins. Co. of Am., dated Oct. 17, 2012, at 25 ("The Investors have powerful claims that [AFI] aided and abetted the fraud of the debtor and non-debtor entities which issued the RMBS . . . . The Examiner likely will find further evidence of [AFI's] vicarious liability through the discovery into [AFI's] management of ResCap and the other Debtors prior to the financial crisis.").

[318] *See* AFI Submission Paper, Dec. 19, 2012, at 30.

[319] *See id*. at 32 (emphasis omitted).

[320] *See* Section VII.A.1.f(4)(b)(i) (explaining that the Operating Agreement is not dispositive of whether the Debtors observed all appropriate corporate formalities).

[321] *FHFA v. Ally Fin., Inc.*, Civ. No. 11-7010, 2012 U.S. Dist. LEXIS 179768, at *13 (S.D.N.Y. Dec. 19, 2012).

[322] *Id*. at *14–15.

[323] *Id*. at *15.

Indeed, the Investigation has revealed evidence that, in some cases, ResCap's officers and directors failed to follow or inconsistently followed certain provisions of the Operating Agreement.[324] Moreover, the terms of the Operating Agreement are not necessarily inconsistent with the type of control required by the pertinent securities laws.[325] The Operating Agreement authorizes AFI to appoint each member of the ResCap Board, including its Independent Directors.[326] Although the Operating Agreement imposes certain limitations on related-party transactions and contains a series of provisions "so that ResCap will maintain its separate legal existence and identity," it does not purport to expressly prevent AFI's involvement in any one or more aspects of the securitization process at ResCap and its subsidiaries.[327]

The Examiner is conversely not persuaded by Third-Party Claimants' assertion that the "Operating Agreement enabled [AFI] to financially control ResCap, by preventing ResCap from declaring dividends or paying off debt owed to [AFI]."[328] The stated purpose of such restrictions was to "create separation between GM and [GMAC], on the one hand, and ResCap, on the other" so that ResCap could "obtain[] investment grade credit ratings for its unsecured indebtedness that are separate from [GMAC's] ratings and the ratings of GM."[329] The Investigation has revealed no evidence that would suggest that limitations on the circumstances in which ResCap was permitted to make payments to AFI somehow gave rise to AFI's "'power to direct or cause the direction of the management and policies of [the Debtors].'"[330]

---

[324] *See* Section VII.A.1.f(4)(b)(i).

[325] *See, e.g.*, *In re Prestige Brands Holdings, Inc. Sec. Litig.*, Civ. No. 05-6924, 2006 U.S. Dist. LEXIS 81980, at *7 (S.D.N.Y. Nov. 9, 2006) (denying motion to dismiss section 15 claim where plaintiff's allegations of control included that "GTCR formed Prestige and owned 85.2% of its stock" and "GTCR placed two of its principals on Prestige's five member Board of Directors").

[326] *See* 2005 Operating Agreement, section 2(g)(i) [ALLY_0140795]; *see also* 2006 Amended Operating Agreement, § 2(f)(i) (attached to Residential Capital, LLC, Current Report (Form 8-K) (Nov. 30, 2006), Ex. 10.1).

[327] *See* 2005 Operating Agreement, §§ 2(b), (f) [ALLY_0140795]; *see also* 2006 Amended Operating Agreement, § 2(b), (e) (attached to Residential Capital, LLC, Current Report (Form 8-K) (Nov. 30, 2006), Ex. 10.1). Notably, the 2006 Amended Operating Agreement removed the requirement that "ResCap shall at all times . . . cause to be conducted the business operations of itself and its Subsidiaries by its or their own employees and officers, who will not also be employees or officers of any GMAC Affiliates." *Compare* 2005 Operating Agreement, § 2(f) [ALLY_0140795], *with* 2006 Amended Operating Agreement, § 2(e) (attached to Residential Capital, LLC, Current Report (Form 8-K) (Nov. 30, 2006), Ex. 10.1).

[328] *See* Joint Submission Paper of AIG, Allstate Life Ins. Co., Mass. Mut. Life Ins. Co., and Prudential Ins. Co. of Am., dated Oct. 17, 2012, at 25; *see also* Joint Submission Paper of Federal Home Loan Banks of Boston, Chicago, and Indianapolis, dated Oct. 19, 2012, at 28 n.18 (noting the "financial dependence of ResCap on Ally").

[329] *See* General Motors Acceptance Corporation, Annual Report (Form 10-K) (March 28, 2006), at 5.

[330] *See SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472–73 (2d Cir. 1996) (quoting 17 C.F.R. § 240.12b-2).

In sum, whether AFI had the requisite control over one or more alleged primary violators "depends upon the totality of the circumstances," and the text of the Operating Agreement alone is unlikely to be dispositive.[331]

### (B) Overlapping Officers And Directors

Third-Party Claimants assert as evidence of control that AFI "shared overlapping management with [its] controlled entities."[332] AFI responds that "the existence of some common management and directors" is a "common characteristic[] of a parent-subsidiary relationship" and "insufficient to establish control person liability."[333] According to AFI, its officers and directors did not have "any involvement in selecting loans for collateral pools, conducting due diligence on the loans, approving individual RMBS issuances, drafting offering materials, or marketing RMBS for sale."[334]

It is undisputed that the management of AFI overlapped with that of ResCap.[335] AFI exercised its authority under the Operating Agreement to elect each of the directors that served on the ResCap Board—including the Independent Directors.[336] From 2004 through 2007, several of the directors that served on the ResCap Board were affiliated with AFI and/or Cerberus.[337] Moreover, many officers and other employees of ResCap also possessed dual affiliations.[338] Although overlapping management among a parent and wholly owned

---

[331] *See United States v. Corr*, 543 F.2d 1042, 1050 (2d Cir. 1976). For the same reasons, the text of the Operating Agreement is unlikely to be dispositive of the aiding and abetting common law fraud claims asserted against AFI. *See FHFA v. Ally Fin., Inc.*, Civ. No. 11-7010, 2012 U.S. Dist. LEXIS 179768, at *15 (S.D.N.Y. Dec. 19, 2012) (denying motion to dismiss aiding and abetting claim asserted against AFI and rejecting argument that the Operating Agreement could defeat such claims as a matter of law).

[332] *See* Joint Submission Paper of Federal Home Loan Banks of Boston, Chicago, and Indianapolis, dated Oct. 19, 2012, at 27-28; *see also* Joint Submission Paper of AIG, Allstate Life Ins. Co., Mass. Mut. Life Ins. Co., and Prudential Ins. Co. of Am., dated Oct. 17, 2012, at 25 ("The management of [AFI] and the Debtors substantially overlapped.").

[333] *See* AFI Submission Paper, dated Dec. 19, 2012, at 33.

[334] *Id.* at 35.

[335] *See* Appendix IV.A—1, —3.

[336] *See* 2005 Operating Agreement, § 2(g)(i) [ALLY_0140795]; 2006 Amended Operating Agreement, § 2(f)(i) (attached to Residential Capital, LLC, Current Report (Form 8-K) (Nov. 30, 2006), Ex. 10.1); E-mail from W. Solomon (Apr. 14, 2008) [MELZER.004778] ("I am writing on behalf of GMAC to confirm that you [T. Melzer and T. Jacob] were originally recruited, and continue to serve, as independent directors of Residential Capital, LLC at the request of GMAC, the sole shareholder of that company.").

[337] *See* Appendix IV.A—3.

[338] *See* Appendix IV.A—1.

subsidiary may perhaps not be unusual, courts have nonetheless considered it relevant to establishing the requisite control.[339]

The Investigation has not, however, uncovered evidence that AFI—through such overlapping directors and officers or otherwise—had any direct involvement in any of the Debtors' securitizations. Sanjiv Khattri, AFI CFO and ResCap Board member, described the degree of involvement, if any, of AFI in the securitizations of RFC or GMAC Mortgage as "[n]one whatsoever, to the best of my knowledge."[340] According to Khattri and others inside AFI and its subsidiaries during the relevant time period, the "departments [within ResCap and its subsidiaries] were very strong and independent" and "siloed."[341] In particular, those interviewed by the Examiner's Professionals did not recall any direct involvement by AFI in

_____

[339] *See Healey v. Chelsea Res. Ltd.*, 947 F.2d 611, 626 (2d Cir. 1991) (noting that "[w]hether or not sufficient, such proof [of a parent wholly owned subsidiary relationship] would at least seem relevant" to determination of "control"); *STMicroelectronics v. Credit Suisse Grp.*, 775 F. Supp. 2d 525, 536 (E.D.N.Y. 2011) (denying motion to dismiss section 20(a) claim where "CSS is a wholly-owned subsidiary of CSG and that the entities' executives overlap significantly at the highest levels"); *In re Prestige Brands Holdings, Inc. Sec. Litig.*, Civ. No. 05-6924, 2006 U.S. Dist. LEXIS 81980, at *7 (S.D.N.Y. Nov. 9, 2006) (denying motion to dismiss section 15 claim where "GTCR placed two of its principals on Prestige's five member Board of Directors"); *In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278, 311 (S.D.N.Y. 2005) ("[A]llegations that the top executives of [alleged control person] Deloitte & Touche LLP held the top two positions at [affiliate] DTT and that at least one of those executives was involved in the Parmalat audit are sufficient to give rise to an inference of control."); *Pollack v. Laidlaw Holdings, Inc.*, Civ. No. 90-5788, 1995 U.S. Dist. LEXIS 5909, at *59 (S.D.N.Y. May 2, 1995) (denying motion to dismiss control person claims where it was alleged that "Laidlaw Holdings controlled both Laidlaw Equities and Laidlaw Asset Management through one hundred percent stock ownership and through common officers and directors"). AFI's reliance on *In re Parmalat Sec. Litig.* appears misplaced, as that decision concerned an agency theory of liability and not a control person claim asserted under pertinent federal or state securities laws. 501 F. Supp. 2d 560, 588 (S.D.N.Y. 2007) (granting motion to dismiss complaint and rejecting theory that defendant accounting firm was the "agent" of its affiliate, notwithstanding that the affiliates "share officers and directors") (cited by AFI Submission Paper, dated Dec. 19, 2012, at 33).

[340] Int. of S. Khattri, Apr. 5, 2013, at 5:4–18.

[341] *Id.* at 8:8–16, 52:10–21 (describing "the culture at RFC and ResCap" as "independent" and "very siloed"); *see also* Int. of J. Steinhagen, Apr. 3, 2013, at 19:4–5 ("I didn't pay much attention to what was going on at [AFI]."); Int. of D. Olson, Apr. 26, 2013, at 14:6–7 ("[W]e [at RFC] were operating fairly independently or very independently before [the formation of ResCap] and continued that way."); Int. of E. Scholtz, Mar. 28, 2013, at 18:8–22 (answering "No" to whether there were "any [AFI] representatives on the RFC Executive Committee [or any of the other senior management committees in which Scholtz participated]," whether "[AFI] personnel attend[ed] any of those meetings," and whether he "ever report[ed] to anyone who was an officer or employee of [AFI or GM]"). Eric Scholtz, Head of Capital Markets at RFC, did recall, without specific details, that AFI officer David Walker "may have sat in a couple of those meetings" of the "Funding Liquidity Committee [in 2005 or 2006] where we would discuss . . . all of the support that all these [investment] banks were providing in each individual area of the company." *Id.* at 41:6–43:4.

any securitization with respect to acquisition of the mortgage loans,[342] pooling of the loans and structuring of the securitizations,[343] due diligence performed by underwriters and/or third-party vendors,[344] whether and under what terms to obtain financial guaranty insurance,[345]

---

[342] *Id.* at 44:22–45:4 (stating that "details as to what the underwriters would do, what the quality control folks would do, what the fraud folks would do [in connection with acquiring loans]" did not reach his level), 58:6–14 ("That was three levels below me and, frankly, I had a lot of people in a lot of departments to manage so I didn't get involved in the detailed work of a three level below trader [concerning bulk sale agreements and negotiated criteria agreements].").

[343] Int. of S. Khattri, Apr. 5, 2013, at 5:19–23 ("[Q:] [N]either GM nor GMAC supervised any of the securitizations or participated in structuring those deals? [A:] No, no."); Int. of L. Lundsten, Feb. 20, 2013, at 44:1–8 ("[Q:] [A]re you aware of any situations where . . . [AFI] would be involved in product development. . . ? [A:] I'm not aware of any, no."), 65:6–14 ("[Q:] [A]re you aware of any circumstances where a question about whether to include or remove loans from a pool went above RFC . . . to anyone in [AFI]? [A:] No, I'm not aware. . . . [T]hey did not get that I recall ever involved at that level of detail . . . not even close. It generally stayed within Capital Markets.").

[344] Int. of S. Khattri, Apr. 5, 2013, at 6:11–15 ("[Q:] Do you know if [AFI] recommended which . . . [underwriters] RFC might use in connection with a securitization? [A:] To the best of my knowledge, nowhere."); Int. of D. Olson, Apr. 26, 2013, at 74:6–23 (Olson did not recall AFI involvement in "picking underwriters for deals").

[345] Int. of S. Khattri, Apr. 5, 2013, at 11:13–19 ("[Q:] Do you have any understanding as to what criteria, if any, were used by RFC . . . to determine whether to obtain an insurance [w]rap for a securitization? [A:] I'm not aware of it actually, no."), 11:20–25 ("[Q:] Do you know how it is that RFC or ResCap would determine which monoline to use? [A:] I was not privy to that process at all. They were independent."); Int. of L. Lundsten, Feb. 20, 2013, at 140:3–17 ("[Q:] Can you recall any instance where someone from ResCap or [AFI] became involved with . . . the terms of any insurance agreement in a deal that was securitized by RFC? [A:] [N]o, I can't remember any specific instance. . . . [B]ased on my recollection, it would have seemed odd for them to get into that level of detail."); Int. of E. Scholtz, Mar. 28, 2013, at 37:2–6 ("[T]raders were probably three levels below me after 2001 in terms of management levels, so I wouldn't have been involved at that level of specificity [in determining whether to obtain financial guaranty insurance for a securitization].").

obtaining ratings from ratings agencies,[346] preparing the offering materials,[347] or marketing RMBS to investors.[348] Further discovery would permit these recollections to be tested against a full factual record and to reach definitive conclusions with respect to Third-Party Claimants' allegations of day-to-day AFI control over the Debtors and their securitizations.[349]

### (C) Shared Functions And Services

Third-Party Claimants assert that AFI and the Debtors "shared services" at relevant times.[350] The Investigation has revealed evidence that supports Third-Party Claimants' assertion. AFI provided certain financial, operational, and administrative services to the

---

[346] Int. of S. Khattri, Apr. 5, 2013, at 6:11–15 ("[Q:] Do you know if [AFI] had any input into the selection which rating agency . . . RFC might use? [A:] To the best of my knowledge, no, none whatsoever."), 7:14–15 ("[B]ecause of the firewall, all the rating agency issues were handled by ResCap."), 6:21–25 ("[Q:] Did you attend any of the rating agency meetings [with] either RFC or ResCap in connection with any securitization? [A:] No, I did not."); Int. of E. Scholtz, Mar. 28, 2013, at 39:18–21 ("[Q:] Do you recall if [AFI] ever had any input into which rating agencies RFC should consider using? [A:] Never."), 108:23–109:1 ("[Q:] Did you ever have conversations with [AFI] relating to rating taken on various RFC offerings? [A:] Never."); Int. of D. Olson, Apr. 26, 2013, at 74:6–23 (Olson did not recall any AFI involvement in "dealing with rating agencies"). The Investigation revealed evidence that, at least on one occasion, AFI officers provided high–level guidance concerning the selection of rating agencies for the Debtors' securitizations. *See* E-mail from D. Walker (Mar. 18, 2005) [EXAM11735388] (Walker wrote to ResCap CFO Davee Olson and others "to make you aware of . . . Sanjiv [Khattri's] vision and to request your support" for increasing the number of ratings agencies used by the Debtors to "improv[e] the competitiveness of the ratings industry").

[347] Int. of L. Lundsten, dated Feb. 20, 2013, at 93:12–95:10 (Lundsten recalled that she was "layer[s] removed" from the preparation of offering materials for RFC securitizations, which process involved RFC "deal managers . . . working with outside counsel"); *see also* Int. of D. Olson, Apr. 26, 2013, at 14:6–7 ("[Q:] [D]o you recall [AFI] weighing in on various transactions that RFC might have been involved in? [A:] I don't recall [AFI] weighing in on transactions. We would have utilized their expertise to help advise us on things and . . . asked the lawyers or something up at the [AFI] level what they thought to see for consistency. . . . I don't have any recollection of seeking advice [from AFI concerning the securitization process].").

[348] Int. of S. Khattri, Apr. 5, 2013, at 8:18–21 ("[Q:] Did representat[ives] of [AFI] participate in meetings with RMBS investors? [A:] No, they did not, to the best of my knowledge."); Int. of J. Steinhagen, Apr. 3, 2013, at 112:3–11 ("[Q:] Did [AFI] ever attend [investor conferences] in connection with the mortgage operations? [A:] No.").

[349] The Investigation has revealed no evidence to support Third-Party Claimants' assertion that AFI was a party to any of the "Pooling and Servicing Agreement, Mortgage Loan Purchase Agreement, Servicing Agreement, [or] Assignment, Assumption and Recognition Agreement" executed in connection with the issuance of RMBS by its affiliates. *See* Joint Submission Paper of Federal Home Loan Banks of Boston, Chicago, and Indianapolis, dated Oct. 19, 2012, at 25. Instead, such agreements were entered into by other parties including entities affiliated with AFI acting as sponsor, depositor, or servicer. *See*, *e.g.*, Pooling and Servicing Agreement for Home Equity Mortgage Asset-Backed Pass-Through Certificates Series 2006-KS3, dated Mar. 1, 2006 [EXAM00236698] (entered into by RFC as Master Servicer, RASC as Depositor, and U.S. Bank National Association, as Trustee); Assignment and Assumption Agreement, dated Nov. 29, 2006 [EXAM00235471] (entered into by RFC and RALI); *see also* Section VIII.B.1.b.

[350] *See* Joint Submission Paper of Federal Home Loan Banks of Boston, Chicago, and Indianapolis, dated Oct. 19, 2012, at 26–27.

Debtors for which it was paid management fees from 2004 through 2007 (and later).[351] The available evidence also offers, however, at least two reasons to expect that such evidence would be of minimal probative value with respect to allegations of AFI's control over the Debtors' securitization process during the relevant time period.

First, many of the corporate functions and services identified by the Debtors as being "shared" or "integrated" with AFI do not implicate control by AFI of the Debtors' securitization process.[352] As of the date of the Debtors' bankruptcy petition, AFI provided to the Debtors certain services in areas including information technology, human resources, finance, treasury, supply chain, capital markets, and facilities.[353] AFI's provision of such ordinary corporate services likely could not, without more, demonstrate the requisite "actual control over the transaction in question" (i.e., over the Debtors' securitization process).[354]

Second, to the extent certain of the services provided by AFI to the Debtors could be probative of the requisite control, those services may not have been provided until *after* the alleged securities law violations. For example, Third-Party Claimants assert that the "shared services" provided by AFI to the Debtors included "legal services."[355] It was not until March 2007, however, that AFI CEO Eric Feldstein announced that "[t]he staff functions of GMAC [would] be realigned into strong global functions" in areas including legal, finance, information technology, communications, and human resources.[356] According to Feldstein, AFI's "historical business model" had "emphasized autonomous business units."[357] Indeed, the evidence indicates that it was not until 2008 or later that legal and other "global functions"

---

[351] *See* Section V.H (describing arrangements for sharing of certain services); *see also* Residential Capital Corporation, Annual Report (Form 10-K) (Mar. 28, 2006), at 142 ("[AFI] has provided [ResCap] with certain services for which a management fee was paid. [ResCap] paid [AFI] management fees of $8.7 and $5.4 million for 2005 and 2004, respectively."); Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2009), at 206 (disclosing management fees paid by ResCap to AFI from 2006–2008 for services in areas including "finance, information technology, communication, corporate marketing, procurement, and services related to facilities").

[352] *See* Debtors' Motion for Interim and Final Orders Under Bankruptcy Code sections 105(a) and 363(b) Authorizing Residential Capital, LLC to Enter into a Shared Services Agreement with Ally Financial Inc. *Nunc Pro Tunc* to the Petition Date for the Continued Receipt and Provision of Shared Services Necessary for the Operation of the Debtors' Business [Docket No. 41] at 4, 14–16.

[353] *See id.* at 14.

[354] *See Cohen v. Stevanovich*, 722 F. Supp. 2d 416, 435 (S.D.N.Y. 2010) (emphasis omitted).

[355] *See* Joint Submission Paper of Federal Home Loan Banks of Boston, Chicago, and Indianapolis, dated Oct. 19, 2012, at 26–27.

[356] *See* Memorandum, GMAC Global Functions, dated Mar. 15, 2007 [EXAM10063058].

[357] *See id.*; *see also* Int. of L. Tessler, Feb. 28, 2013, at 34:7–14 ("ResCap was and has always been operated as a standalone company . . . . And, [by] definition, you have redundancies in cost structure as a result of that.").

were centralized within AFI.[358] Evidence of alleged control by AFI that did not commence until after most if not all of the securities law violations alleged by Third-Party Claimants would not support their control person claims.[359]

## (D) AFI's Audits Of The Debtors

Third-Party Claimants assert as evidence of AFI control that AFI "was responsible for auditing ResCap and other of the Debtors' loan acquisition, distribution, servicing and underwriting processes and procedures."[360] The Investigation has revealed evidence to support Third-Party Claimants' assertion.

Audit Services, a "global" business function, performed an internal "audit function" at AFI and its subsidiaries.[361] Audit Services performed audits at AFI subsidiaries including GMAC Mortgage, RFC, Homecomings Financial, Ally Securities, and Ally Bank.[362] The Audit Services personnel that conducted audits at the Debtors were employees of the Debtors who considered themselves "independent" and reported to Audit Services at GM and later AFI.[363] From 2004 through 2007, the areas audited by Audit Services included several related to the Debtors' securitization process such as certain aspects of loan acquisition, loan pooling

---

[358]  *See* Int. of T. Hamzehpour, Oct. 5, 2012, at 67:16–24 ("The GMAC organization historically was an organization of business unit silos and he viewed that as redundant and he wanted centralized functions. So all of the functions—finance, compliance, risk, legal were expected to centralize, and legal was one of the last ones [in January 2009]."); Int. of L. Tessler, Feb. 28, 2013, at 33:23–34:3 ("[T]here are two ways to survive a crisis. You know, raise revenues and reduce expenses and raise liquidity. And I suspect all of those options were on the table [in June 2008].").

[359]  *See Ho v. Duoyuan Global Water, Inc.*, 887 F. Supp. 2d 547, 579 (S.D.N.Y. 2012) (dismissing section 15 claims where the defendant's "veto power [over the actions of the alleged primary violator] ceased prior to the IPO . . . and thus provides no support for Plaintiffs' contention that [the defendant] was a control person during the § 11 violations alleged in this action.").

[360]  *See* Joint Submission Paper of AIG, Allstate Life Ins. Co., Mass. Mut. Life Ins. Co., and Prudential Ins. Co. of Am., dated Oct. 17, 2012, at 25; *see also* MBIA Submission Paper, Nov. 9, 2012, at 28–30.

[361]  *See* Int. of S. Khattri, Apr. 5, 2013, at 46:12–15 ("[T]he audit was a global function . . . and the department was called GMAC Audit."), 14:20–15:6. Before "GMAC became an independent company," the "audit function of GMAC" and its subsidiaries was performed by GM Audit Services as "part of the audit function of GM." *Id.* at 14:7–15:6. The Examiner uses the term "Audit Services" to refer both to GM Audit Services and its successor GMAC Audit.

[362]  *See* Int. of H. McKenzie, Apr. 23, 2013, at 7:12–15 ("GM Audit Services actually oversaw audit practices basically for all of the GM subsidiaries which included [AFI] and in that case included [RFC]."); *see also* Report on Audit of GMACM – Pool Delivery and Collateral Curative, dated Oct. 22, 2004 [ALLY_0220624]; Report on Audit of GMAC-RFC Homecomings Financial Network, dated Nov. 1, 2004 [ALLY_0220627]; Report on Audit of GMAC-RFC Securities, dated Nov. 4, 2004 [ALLY_0220643]; Report on Audit of GMAC Bank – Trust & Custody Services, dated Sept. 23, 2005 [ALLY_0220368]; Audit Report of: GMAC-RFC Service Delivery Group, dated May 18, 2006 [EXAM12501048].

[363]  *See* Int. of H. McKenzie, Apr. 23, 2013, at 36:9–12 ("I reported to the ResCap director [Bill Russell]. The ResCap director reported to the GMAC director who reported to the GM Financial."), at 70:13–18 ("[B]ecause the internal audit function is required to be independent of the organization, the reporting line for internal audit actually went up to GM Audit Services."), 81:2–6 ("[Q:] When you went in as a team to . . . conduct this audit, your team, were they all [RFC] employees? [A:] Yes.").

and structuring, and the preparation of deal documents.[364] The typical stated objective of those audits was "to identify risk exposures and evaluate the adequacy and effectiveness of internal controls, risk management practices, and corporate governance."[365]

Audit Services prepared audit reports containing "a summary of [its] conclusions, [the] issues, and a brief description of the objectives and scope of the audit."[366] Those audit reports often assigned an overall "Rating" to the areas audited of "1" ("Satisfactory"), "2" ("Needs Improvement"), or "3" ("Unsatisfactory").[367] In general, they set also forth any "Matters Requiring Management's Attention" and "Management's Action Plan" to address the identified matters.[368] For example, an Audit Services report titled "GMAC ResCap— Creating & Accounting for Structured Finance Transactions," dated January 31, 2007, identified certain "Matters Requiring Management Attention" including that "Finance does not formally review security and whole loan transaction documents . . . to determine the appropriate accounting treatment under GAAP."[369] The corresponding "Management Action Plan" stated that management would "improve the control by implementing a detailed checklist," assigned "Implementation Responsibility" to Lisa Lundsten, Managing Director of

---

[364] *See* Int. of L. Lundsten, Feb. 20, 2013, at 153:22–25 ("There was a group from GMAC that did conduct a formal audit [of the Structured Finance Group within RFC] on a number of occasions."); Audit Report of: GMAC-RFC Service Delivery Group, dated May 18, 2006, at 2 [ALLY_0220776] ("[T]his audit focused on Asset Acquisition processes including loan serviceability, salability and funding."); GMAC ResCap— Creating & Accounting for Structured Finance Transactions, dated Jan. 31, 2007, at 2 [EXAM10380373] ("This audit focused on pooling of assets, accuracy of disclosures, compliance with SEC filing requirements, inventory management, [and] approval of deal structures . . . .").

[365] *See* Report on Audit of: GMAC Residential Funding – Warehouse Lending Operations, dated Feb. 2, 2004 [ALLY_0220507]; *see also* Int. of H. McKenzie, Apr. 23, 2013, at 31:3–6 ("[T]he bulk of . . . our work and our focus was on the control environment as it related to the established policies and practices that had been defined.").

[366] *See, e.g.*, GMAC ResCap—Creating & Accounting for Structured Finance Transactions, dated Jan. 31, 2007 [EXAM10380373].

[367] *See* Int. of S. Khattri, Apr. 5, 2013, at 23:10–17 ("[M]ost of the time we were rating and I think we had Unsat, Sat, and Needs Improvement. You know, so, 1, 2, 3, something like that."); Int. of H. McKenzie, Apr. 23, 2013, at 98:2–7 ("[I]t's satisfactory, needs improvement, and unsatisfactory."), 142:11–15; GMAC ResCap—Creating & Accounting for Structured Finance Transactions, dated Jan. 31, 2007 [EXAM10380373] (assigning "Rating: 2" and concluding that "[t]he system of internal control needs improvement"); Report on Audit of GMAC Residential Funding – Warehouse Lending Operations, dated Feb. 2, 2004, at 1 [ALLY_0220507] (assigning "Rating: Satisfactory" and concluding that "[t]he overall system of internal controls for Warehouse Lending is satisfactory").

[368] *See* Audit Report: GMAC-RFC Master Servicing, dated Jan. 13, 2006 [ALLY_0220429]; *see also* Int. of H. McKenzie, Apr. 23, 2013, at 21:10–22:21 ("[D]eficiencies that are identified are documented. Those were provided to management in a note saying this is the issue that we've identified. In some cases you would have a recommendation . . . the goal was to get management to determine what actions they were going to take to actually remediate the issue and the management action plan was owned by management. . . . [T]hen it moves on to the next phase which is monitoring and on a regular basis we would monitor all the issues that had been identified previously and then we provided reporting up to the audit committee of any issues that were again outstanding . . . .").

[369] *See* GMAC ResCap—Creating & Accounting for Structured Finance Transactions, dated Jan. 31, 2007, at 1 [EXAM10380373].

the Structured Finance Group of RFC, and set an "Expected Implementation Date."[370] Lundsten recalled that RFC complied with this "Management Action Plan" as "part of the process."[371]

Audit Services reports were generally circulated to members of the senior management of AFI, ResCap, RFC, and GMAC Mortgage, as well as to the respective outside auditors of AFI and ResCap.[372] The available evidence indicates that, as in the example above, Audit Services's findings and recommendations often prompted action from the Debtors. In response to one Audit Services report dated May 6, 2005, GMAC Mortgage CFO David Walker wrote RFC CEO David Applegate that they should "move on this stuff quickly."[373] Similarly, upon receiving an Audit Services report dated January 17, 2006, Eric Scholtz, head of Capital Markets at RFC, wrote that "[w]e need to be prepared to get after these issues."[374] On another occasion, Applegate wrote Scholtz concerning an Audit Services report dated May 18, 2006, and stated that "I know you are working on this—you need to be the disciplinarian and push all parties including the channels to clean up their acts."[375]

The evidence also indicates that, in certain cases, AFI management took additional steps to monitor compliance by the Debtors with Audit Services findings and recommendations. AFI CFO (and ResCap Board member) Sanjiv Khattri considered himself to have "ultimate oversight as the CFO of [AFI]" over the "internal audit" process.[376] Accordingly, Khattri would "definitely read the [Audit Services reports] that had some critical comments [in] them" and, "depending on what the issue was, [would] raise the issue or have a discussion, or find out what has been done to fix it."[377] Khattri was "sure there were many, many instances where [he] would get involved—especially if the report was not good."[378] Indeed, upon receipt of

---

[370] *See id.* at 3.

[371] *See* Int. of L. Lundsten, Feb. 20, 2013, at 162:9–18; *see also* Int. of H. McKenzie, Apr. 23, 2013, at 33:2–13 ("Most of the disagreements [with management concerning findings of Audit Services] were tied to a need for additional clarity or just making sure that the facts as we had them documented were accurate . . . . But in terms of our role within the organization we were independent of the business and ultimately again once we got our facts straight . . . there was no real kind of disagreement I guess from that perspective.").

[372] *See* Int. of H. McKenzie, Apr. 23, 2013, at 33:17–34:21 ("[W]e had pretty broad distribution."); GMAC ResCap—Creating & Accounting for Structured Finance Transactions, dated Jan. 31, 2007, at 7 [EXAM10380373] (recipient list includes, among others, ResCap COO David Applegate, ResCap CFO James Giertz, Chairman of the AFI Board Eric Feldstein, AFI CFO Khattri, and AFI Controller Linda Zuckauckas).

[373] *See* E-mail from D. Walker (May 6, 2005) [EXAM11956737]; *see also* Report on Audit of GMACM—Home Connects Lending Services, dated May 6, 2005 [ALLY_0220732].

[374] *See* E-mail from E. Scholtz (Jan. 18, 2006) [EXAM12500763]; *see also* Report on Audit of GMAC Mortgage—Capital Markets Pricing, dated Jan. 17, 2006 [EXAM12500764].

[375] *See* E-mail from D. Applegate (May 20, 2006) [EXAM12499915]; *see also* Report on Audit of GMAC-RFC Service Delivery Group, dated May 18, 2006 [ALLY_0220776].

[376] Int. of S. Khattri, Apr. 5, 2013, at 21:1–18.

[377] *Id.* at 21:18–22:19; *see also* Int. of H. McKenzie, Apr. 23, 2013, at 46:18–25 ("I didn't work directly with Sanjiv [Khattri] . . . but Bill Russell would have in his role as the ResCap audit director.").

[378] Int. of S. Khattri, Apr. 5, 2013, at 22:22–24.

one Audit Services report Walker advised Applegate that it "doesn't read well" and he should expect to receive "other love notes from Sanjiv."[379]

The Examiner considers below, in Section VIII.C.2.a(2)(d)(ii), the assertion by Third-Party Claimants that the Audit Services reports evidence knowledge of the alleged securities law violations.

### (E) Statements By AFI And The Debtors Concerning Their Relationship

Third-Party Claimants assert that they expect to "demonstrate the controlling person status of [AFI]" in part from public statements in SEC filings and elsewhere by which AFI "admitted" that it "operated its consolidated subsidiaries as a collective enterprise."[380] For example, Third-Party Claimants rely upon language in AFI's SEC filings stating that "*We* originate, purchase, service, sell and securitize residential and commercial mortgage loans" and that "*Our* business activities include the . . . securitization of residential mortgage loans."[381] Third-Party Claimants further rely upon statements such as the statement in the FRB/FDIC Consent Order that AFI "indirectly owns and controls Ally Bank . . . and numerous direct and indirect nonbank subsidiaries, including [ResCap and its subsidiaries]."[382]

Although similar statements have been found relevant in the context of a motion to dismiss for failure to state a claim, the Examiner affords them little weight when assessing whether Third-Party Claimants would succeed in proving the requisite control. In *FHFA v. Ally Fin., Inc.*, the district court denied AFI's motion to dismiss the FHFA's section 15 claim in part because a registration statement filed with the SEC by ResCap stated that AFI "controls all fundamental matters affecting ResCap."[383] The district court explained that while this and other allegations sufficed to preclude "a finding [of the absence of control] as a matter of law," the facts might yet show that "the involvement of AFI . . . in ResCap's securitization activities was not sufficient to give rise to control-person liability."[384] Without more, the

---

[379]  E-mail from D. Walker (May 6, 2005) [EXAM11956737].

[380]  *See* Joint Submission Paper of Federal Home Loan Banks of Boston, Chicago, and Indianapolis, dated Oct. 19, 2012, at 24; *see also* Joint Submission Paper of AIG, Allstate Life Ins. Co., Mass. Mut. Life Ins. Co., and Prudential Ins. Co. of Am., dated Oct. 17, 2012, at 25 ("[AFI] repeatedly represented to the market and regulators that it owns and controls the Debtors.").

[381]  *See* General Motors Acceptance Corp., Annual Report (Form 10-K) (Mar. 28, 2006), at 1 (emphasis added); GMAC LLC, Annual Report (Form 10-K) (Mar. 13, 2007), at 3 (emphasis added).

[382]  *See* FRB/FDIC Consent Order (Apr. 13, 2011), at 1; *see also* Residential Capital Corporation, Registration Statement (Form S-4) (Feb. 27, 2008), at 23 ("GM and GMAC control all fundamental matters affecting us"; "GMAC indirectly owns all of our outstanding common stock and has the power to elect and remove all of our directors."); Residential Capital, LLC, Annual Report (Form 10-K) (Mar. 13, 2007), at 43 ("GMAC controls all fundamental matters affecting us, and its interests may differ from ours.") (emphasis omitted).

[383]  *See* Civ. No. 11-7010, 2012 U.S. Dist. LEXIS 179768, at *14–15 (S.D.N.Y. Dec. 19, 2012).

[384]  *Id*. at *14–15.

Examiner does not consider such public statements of AFI's "control" over its subsidiaries to be probative of AFI's "actual control over the transaction in question" (i.e., the Debtors' securitization process).[385]

Nor does the Examiner consider probative of control Third-Party Claimants' allegation that AFI was "prominently identified . . . in the Offering Documents."[386] Although the offering documents for the securitizations typically identified affiliates of the transaction parties including AFI,[387] such statements only repeated the undisputed fact that AFI was the indirect parent of each of the Debtors.[388] Courts have found similar language in offering materials to be insufficient as a matter of law to establish control.[389]

### (d) Good Faith Or Lack Of Knowledge Defense

#### (i) Legal Principles

"[O]nce control is established, section 15 and section 20(a) each contain an affirmative exception to liability."[390] Section 20(a) provides for an affirmative defense that "exempts a controlling person from liability if 'the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the underlying violation or cause of action.'"[391] Similarly, "lack of knowledge (i.e., lack of 'culpable participation') is an affirmative defense under section 15: the text of the statute eliminates Securities Act 'control person' liability where the alleged control person 'had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person

---

[385] *See Cohen v. Stevanovich*, 722 F. Supp. 2d 416, 435 (S.D.N.Y. 2010) (emphasis omitted).

[386] *See* Joint Submission Paper of Federal Home Loan Banks of Boston, Chicago, and Indianapolis, dated Oct. 19, 2012, at 25.

[387] *See, e.g.*, Prospectus Supplement for Mortgage Asset-Backed Pass-Through Certificates Series 2006-QO9, dated Nov. 28, 2006 [EXAM00234465], at S-50 (diagram that "illustrates the various relationships among the affiliated transaction parties").

[388] *Emps.' Ret. Sys. of the Gov't of the Virgin Is. v. J.P. Morgan Chase & Co.*, 804 F. Supp. 2d 141, 157 (S.D.N.Y. 2011) ("Allegations that an entity was the parent corporation of a primary violator, standing alone, do not make out a claim of control."); *Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co. Inc.*, 714 F. Supp. 2d 475, 484 (S.D.N.Y. 2010) (dismissing section 15 claim where plaintiffs "failed to allege beyond 'formulaic recitation' how Merrill . . . exercised control over [the alleged primary violators]" where plaintiffs "merely allege that [they] were Merrill subsidiaries and affiliates of each other").

[389] *See Emps.' Ret. Sys.*, 804 F. Supp. 2d at 157 ("Nor is the fact that the J.P Morgan name appeared prominently on the Prospectus Supplement [issued by its subsidiary], lending the investment the imprimatur of the larger corporation, enough to establish control person liability.").

[390] *Cordius Trust v. Kummerfeld (In re Kummerfeld)*, 444 B.R. 28, 43 (Bankr. S.D.N.Y. 2011).

[391] *See In re WorldCom, Inc. Sec. Litig.*, Civ. No. 02-3288, 2005 U.S. Dist. LEXIS 4193, at *49 (S.D.N.Y. Mar. 21, 2005) (quoting 15 U.S.C. § 78t(a)).

is alleged to exist.'"[392] Pertinent state securities laws recognize an analogous affirmative defense where the alleged control person proves that it did not and could not reasonably have known of the primary violation.[393]

"In order to establish a good faith defense, the burden is on the defendant to 'prove that he exercised due care in his supervision of the violator's activities in that he maintained and enforced a reasonable and proper system of supervision and internal controls.'"[394] Evidence that the control person "had no notice of any alleged wrongdoing" may not suffice to establish a "good faith defense" if the evidence shows that the control person "should have known of the primary fraud, but was willfully blind to the facts."[395] Moreover, "[i]t is not enough on a motion for summary judgment to demonstrate that plaintiffs fall short of producing evidence of culpable conduct; rather, the defendant must put forth her own evidence of this defense sufficient to direct a conclusion of law that she is entitled to the defense."[396]

---

[392] *McKenna v. Smart Techs. Inc.*, Civ. No. 11-7673, 2012 U.S. Dist. LEXIS 47134, at *60 (S.D.N.Y. Apr. 3, 2012) (quoting 15 U.S.C. § 77o(a)); *see also DeMarco v. Edens*, 390 F.2d 836, 841–42 (2d Cir. 1968) (section 15 "specifically provide[s] that a defendant may exculpate himself from liability by fulfilling his burden of proving that he did not know . . . of the existence of the facts by reason of which the liability of the controlled person is alleged to exist"); *In re Ambac Fin. Group, Inc. Sec. Litig.*, 693 F. Supp. 2d 241, 281 (S.D.N.Y. 2010) (noting that section 15 claims are "subject only to the defense of 'good faith'"); *In re IPO Sec. Litig.*, 241 F. Supp. 2d 281, 352 n.84 (S.D.N.Y. 2003) (section 15 "defendant may raise, as an affirmative defense, that the underlying violation occurred without her knowledge").

[393] *See* MASS. GEN. LAWS ch. 110A § 410(b) (control person liable unless he "sustains the burden of proof that he did not know, and in exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist."); VA. CODE ANN. § 13.1-522(C) (same); N.C. GEN. STAT. § 78A-56(c)(1) (same). The Illinois Securities Law does not contain the same language and the Examiner's Professionals have not identified any controlling decision on point concerning whether such an affirmative defense is available to an alleged control person. *See* 815 ILL. COMP. STAT. ANN. 5/2.4 & 5/13.

[394] *Dietrich v. Bauer*, 126 F. Supp. 2d 759, 764 (S.D.N.Y. 2001) (quoting *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1473 (2d Cir. 1996)).

[395] *See id.* at 768 (S.D.N.Y. 2001) (rejecting defendant's argument that he "is entitled to summary judgment [on section 20(a) claim] based on a good faith defense" where "there is sufficient evidence from which a jury could conclude that [defendant] knew or should have known of the primary fraud, but was willfully blind to the facts"); *see also In re Ivan F. Boesky Sec. Litig.*, MDL No. 732, 1995 U.S. Dist. LEXIS 10759, at *3 (S.D.N.Y. Aug. 1, 1995) ("[W]illful blindness . . . cannot form the basis for a defense of good faith to a charge under § 20(a)."); *Ingenito v. Bermec Corp.*, 441 F. Supp. 525, 533 (S.D.N.Y. 1977) ("If the perpetration of fraud went unnoticed because of willful or reckless disregard, the good faith defense is unavailable.").

[396] *In re Ivan F. Boesky Sec. Litig.*, 1995 U.S. Dist. LEXIS 10759, at *3–4 (denying defendant's motion for summary judgment on section 20(a) claim because "[t]he possibility that [alleged control person] Seema Boesky may have recklessly or intentionally disregarded the alleged primary violations leaves open a triable issue of fact on which the defendant bears the burden of proof"); *see also In re WorldCom, Inc. Sec. Litig.*, 2005 U.S. Dist. LEXIS 4193, at *54 (denying alleged control person's motion for summary judgment on section 15 claim where defendant failed to show "that there is no material disputed issue of fact that he had no reasonable ground to believe in the facts constituting the violation").

### *(ii) Application To RMBS Claims*

AFI asserts that "AFI simply could not have known, or even had reason to know, of any misrepresentations in the Offering Materials for the securitizations at issue here."[397] According to AFI, it could not have possessed such knowledge because it did not have "any involvement in selecting loans for collateral pools, conducting due diligence on the loans, approving individual RMBS issuances, drafting offering materials, or marketing RMBS for sale."[398] Moreover, the alleged misrepresentations "including supposed inflated valuations, inaccurate owner-occupancy statistics, and abandonment of underwriting standards . . . have nothing to do with the business of AFI."[399] Third-Party Claimants respond that "Ally plainly knew of the Debtor subsidiaries' fraudulent origination and securitization practices" and suggest that evidence of such knowledge will be developed through discovery.[400]

---

[397] *See* AFI Submission Paper, dated Dec. 19, 2012, at 36; *see also* AFI Submission Paper, dated Apr. 14, 2013, at 5. The Examiner is not persuaded that Third-Party Claimants bear the burden of proving AFI's knowledge of the alleged securities law violations. *See* AFI Submission Paper, dated Dec. 19, 2012, at 36; *see also* AFI Submission Paper, dated Apr. 14, 2013, at 5. Except by those courts that have held that section 15 and/or section 20(a) requires the plaintiff to plead and prove culpable participation, the alleged control person's lack of knowledge is solely an affirmative defense to liability under the federal securities laws that must be proven by the defendant. *See McKenna*, 2012 U.S. Dist. LEXIS 47134, at *60 ("[L]ack of knowledge (i.e., lack of 'culpable participation') is an affirmative defense under section 15: the text of the statute eliminates Securities Act 'control person' liability where the alleged control person 'had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist.'") (quoting 15 U.S.C. § 77o(a)); *In re WorldCom, Inc. Sec. Litig.*, 2005 U.S. Dist. LEXIS 4193, at *49 (noting that section 20(a) affirmative defense "exempts a controlling person from liability if 'the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the underlying violation or cause of action'") (quoting 15 U.S.C. § 78t(a)). The same is true of certain of those state securities laws under which Third-Party Claimants assert control person claims against AFI. *See* MASS. GEN. LAWS ch. 110A § 410(b) (control person liable "unless the non-seller who is so liable sustains the burden of proof that he did not know, and in exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist"); MINN. STAT. § 80A.23(4) (same); N.C. GEN. STAT. § 78A-56(c)(1) (same); VA. CODE ANN. § 13.1-522(C) (same). Although the Illinois Securities Law requires a plaintiff to prove that an alleged control person "act[ed] in concert in the offer or sale of a security," AFI identifies no authority requiring proof that the alleged control person acted with knowledge of a material misrepresentation made in violation of 815 ILL. COMP. STAT. ANN. 5/12(F)–(G). *See* 815 ILL. COMP. STAT. ANN. 5/2.4; *see also Froehlich v. Matz*, 417 N.E.2d 183, 190 (Ill. App. Ct. 1981) ("While overt action by a member of a controlling group would not always be required, there must be some showing of assent, approval or concurrence, albeit tacit approval, in the action of the group in selling securities, before an individual will be held liable for the actions of the controlling group."). Notably, scienter is not an element of a primary violation alleged under those provisions of the Illinois Securities Law. *See Foster v. Alex*, 572 N.E.2d 1242, 1245 (Ill. App. Ct. 1991) ("scienter need not be pled nor proved . . . under sections 12(F) and 12(G)").

[398] *See* AFI Submission Paper, dated Dec. 19, 2012, at 35.

[399] *See id.* at 35–36.

[400] *See* Joint Submission Paper of AIG, Allstate Life Ins. Co., Mass. Mut. Life Ins. Co., and Prudential Ins. Co. of Am., dated Oct. 17, 2012, at 10, 25; *see also* Joint Submission Paper of Federal Home Loan Banks of Boston, Chicago, and Indianapolis, dated Oct. 19, 2012, at 28.

As explained above, definitive conclusions concerning the facts underlying the primary securities law violations alleged by Third-Party Claimants against the Debtors and Ally Securities are outside the scope of the Investigation. Accordingly, the likelihood that AFI could succeed in proving an affirmative defense of lack of knowledge of such as yet unproven facts also is outside the scope of the Investigation. With those important caveats, the Examiner has considered the available evidence concerning AFI's assertion that it did not have "knowledge of the Debtors' alleged misstatements."[401] Third-Party Claimants have not produced nor has the Investigation located any evidence to support the assertion that AFI possessed knowledge of the primary securities law violations alleged by Third-Party Claimants.[402] The Investigation has, however, revealed evidence that could support attempts by Third-Party Claimants to cast doubt on AFI's blanket statement that it "simply could not have known, or even had reason to know, of any misrepresentations."[403]

For example, it is undisputed that there was significant overlap among the officers and directors of AFI and the Debtors.[404] Moreover, the available evidence does indicate that, at least in certain circumstances and on an informal basis, management of the Debtors would communicate with and report to management of AFI.[405] If, as Third-Party Claimants assert, there was an abandonment of underwriting standards at the Debtors, such overlapping management and lines of communication could have the potential, with further discovery, to undermine an AFI defense that it "had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist."[406]

---

[401]  *See* AFI Submission Paper, dated Dec. 19, 2012, at 35.

[402]  Although certain of Third-Party Claimants' submission papers define "Ally" to mean AFI, the term "Ally" is used interchangeably therein to refer to any one or more of AFI and its direct and indirect subsidiaries. *See* Joint Submission Paper of AIG, Allstate Life Ins. Co., Mass. Mut. Life Ins. Co., and Prudential Ins. Co. of Am., dated Oct. 17, 2012, at 1. For example, in support of the assertion that "Ally plainly knew of the Debtor subsidiaries' fraudulent origination and securitization practices," Third-Party Claimants rely on information allegedly provided by a director of Ally Securities concerning Ally Securities—not AFI. *See id.* at 10–11. Absent evidence that *AFI* knew such information, which Third-Party Claimants have not provided, the Examiner affords no weight to such allegations when assessing the evidence of AFI's knowledge of the alleged securities fraud violations.

[403]  *See* AFI Submission Paper, dated Dec. 19, 2012, at 36; *see also* AFI Submission Paper, dated Apr. 14, 2013, at 5.

[404]  *See* Section VIII.C.2.a(2)(c)(ii)(B).

[405]  *See* Int. of D. Olson, Apr. 26, 2013, at 63:24–64:12 ("I would characterize my relationship as I had solid line reporting to the CEOs of ResCap and dotted line reporting to Sanjiv [Khattri]. . . . "[S]olid line, day-to-day interaction would have been with the CEOs direction and all that. Dotted line would have been more periodic or random as necessary to Sanjiv."); Int. of E. Scholtz, Mar. 28, 2013, at 20:2–21:10 (recalling generally that he "had conversations with Eric [Feldstein] from time to time" but that those conversations did not involve "the securitization process").

[406]  *McKenna v. Smart Techs. Inc.*, Civ. No. 11-7673, 2012 U.S. Dist. LEXIS 47134, at *60 (S.D.N.Y. Apr. 3, 2012) (quoting 15 U.S.C. § 77o(a)); s*ee also In re WorldCom, Inc. Sec. Litig.*, Civ. No. 02–3288, 2005 U.S. Dist. LEXIS 4193, at *55 (S.D.N.Y. Mar. 21, 2005) (denying alleged control person's motion for summary judgment on section 15 claim "[b]ecause sufficient evidence exists to create a question of fact regarding whether [that defendant] had no reasonable grounds to believe that financial improprieties were present").

The same is true of evidence concerning the series of audits of AFI's subsidiaries conducted by Audit Services from 2004 through 2007, including several with respect to areas related to the Debtors' securitization process.[407] Audit Services interviewed personnel and collected information from AFI's subsidiaries concerning aspects of that process.[408] Audit Services prepared reports that were circulated to and reviewed by members of senior management of AFI including AFI CFO Khattri.[409] Assuming arguendo that Third-Party Claimants were to prevail in proving the alleged underlying securities law violations, AFI's access through Audit Services to information concerning the Debtors' securitization process could, subject to discovery of contradictory evidence, potentially undermine an AFI "good faith" or lack of knowledge defense.

The available Audit Services reports do not purport on their face to make any findings of the facts Third-Party Claimants allege give rise to their primary securities law claims. Of the dozens of Audit Services reports from 2004 through 2007 that were identified by the Examiner, only a small minority assigned a rating to the areas audited of "2" or "Needs Improvement," and even fewer assigned a rating of "3" or "Unsatisfactory."[410] Although certain Third-Party Claimants contend otherwise, the findings in those Audit Services reports are unlikely to be sufficient to demonstrate AFI's knowledge of the alleged securities law violations.[411] Moreover, Humphrey McKenzie, a Director in Audit Services who performed audits at RFC during 2004 through 2007, did not recall encountering any indication that there

---

[407] *See* Section VIII.C.a(2)(c)(ii)(D).

[408] *See* Int. of L. Lundsten, Feb. 20, 2013, at 157:10–158:6 (when performing an audit of RFC's Structured Finance Group, Audit Services would "come in and talk to [Lundsten] and [her] managers," "ask[] for information," and then "go off and do their work"); Int. of H. McKenzie, Apr. 23, 2013, at 19:18–21:17 (Audit Services would develop an "audit plan" including by "work[ing] with management to get due diligence information" and then "go in and execute whatever control testing is needed to review and validate").

[409] *See* Int. of S. Khattri, Apr. 5, 2013, at 21:18–22:19; GMAC ResCap—Creating & Accounting for Structured Finance Transactions, dated Jan. 31, 2007, at 7 [EXAM10380373] (recipient list).

[410] *See* Int. of S. Khattri, Apr. 5, 2013, at 23:18–24:11 ("[Q:] Do you recall ever seeing an audit report of either ResCap or RFC that had a 3 rating?" [A:] Which would be unsatisfactory? I don't think so."). Those audit reports identified by the Examiner to which a rating of "3" or "Unsatisfactory" was assigned generally do not implicate the facts Third-Party Claimants allege give rise to their primary securities law claims. *See, e.g.*, Nerve Center Project Audit, dated Sept. 21, 2007, at 2 [EXAM11280122]; RFG Finance – Servicing Loan Accounting, dated Sept. 28, 2007, at 2 [EXAM10385423].

[411] MBIA identifies certain Audit Services reports that it considers evidence that AFI "had actual and constructive knowledge of the Debtors' fraudulent conduct." MBIA Submission Paper, Nov. 9, 2012, at 26, 29–30. The Examiner is not persuaded, however, that the findings of those identified reports could, without more, demonstrate such knowledge. For example, Audit Services's finding of "inadequate management reporting on the levels, trends and root causes of . . . unsalable loans" does not evidence that "unsalable loans" were included in any relevant securitizations when they should not have been or prove any alleged misrepresentations in the offering documents issued in connection with those securitizations. *See* Report on Audit of GMAC-RFC Service Delivery Group, dated May 18, 2006, at 1 [ALLY_0220776]. Instead, that Audit Services report represents that such "unsalable loans" would be "in need of repair prior to being included in a loan pool" and sets forth a management action plan to "develop new reporting" and "update existing training." *See id.* at 5.

had been an abandonment of underwriting standards.[412] Nonetheless, further discovery concerning the information and judgments that resulted in the findings set forth in the audit reports—and any other information that may have been discovered in the course of the audit and communicated to AFI but not reflected in any audit reports—would be necessary to determine whether AFI had no knowledge of or reasonable grounds to believe in the existence of the facts alleged by Third-Party Claimants.

### (e) Statute Of Limitations Defenses

AFI asserts that those Third-Party Claimants that have brought control person claims against it "did not bring their securities claims until well after the applicable statutes of limitations had run."[413] Third-Party Claimants respond that "all of [their] claims are timely."[414] In each of the six pending RMBS Investor Actions identified by the Examiner where Third-Party Claimants assert control person claims against AFI, AFI has moved to dismiss such claims as time-barred.[415] Where those motions to dismiss have been denied—to date they have been denied in two of those six actions—AFI seeks to prove as an affirmative defense that such control person claims are time-barred.[416]

The Examiner concludes it is likely that AFI's statute of limitations defense will prevail with respect to certain of the alleged control person claims subject to statutes of repose. The Examiner does not reach any definitive conclusions concerning the likelihood that AFI's timeliness defenses will prevail as to those statute of limitations provisions that begin to run

---

[412] Int. of H. McKenzie, Apr. 23, 2013, at 53:19–54:2 ([Q]: "[D]id you in internal audit ever identify any concern or red flags that underwriting standards were being ignored or not follow[ed] closely for the sake of being able to continue to write volume of business? [A:] As far as I know, no.").

[413] AFI Submission Paper, dated Dec. 19, 2012, at 50.

[414] Joint Submission Paper of AIG, Allstate Life Ins. Co., Mass. Mut. Life Ins. Co., and Prudential Ins. Co. of Am., dated Mar. 15, 2013, at 19; *see also* Joint Submission Paper of Federal Home Loan Banks of Boston, Chicago and Indianapolis, dated Oct. 19, 2012, at 21 ("FHLB's effectively universal success in defeating Defendants' motions to dismiss . . . . cast[s] doubt on the merits of Defendants' affirmative defenses, many of which [including the statute of limitations] were raised by Rule 12 motions.").

[415] *See* Mem. of Law in Supp. of Ally Fin. Inc.'s and GMAC Mortg. Group, Inc's Mot. to Dismiss the Am. Compl., *FHFA v. Ally Fin. Inc.*, Civ. No. 11-7010, Docket No. 149, at 15 (S.D.N.Y. July 13, 2012); Def.'s Mem. of Law in Supp. of Their Mot. to Dismiss the Am. Compl., *FHLB of Boston v. Ally Fin., Inc.*, Civ. No. 11-10952, Docket No. 200, at 54 (D. Mass. Oct. 11, 2012); Def.'s Joint Mem. of Law in Supp. of Their Joint Combined Mot. to Dismiss Pl.' s Am. Compl. for Rescission and Damages, *FHLB of Chicago v. Banc of Am. Funding Corp.*, Case No. 10-CH-45033, at 12–19 (Ill. Cir. Ct. June 3, 2011); Mem. in Supp. of the Ally Defs.' Mot. to Dismiss the Am. Compl., *John Hancock Life Ins. Co. (U.S.A.) v. Ally Fin. Inc.*, Civ. No.12-01841, Docket No. 104, at 16 (D. Minn. Dec. 14, 2012); Mem. in Supp. of the Ally Defs.' Mot. to Dismiss the Am. Compl., *Stichting Pensioenfonds ABP v. Ally Fin. Inc.*, Civ. No. 12–01381, Docket No. 129, at 16 (D. Minn. Mar. 11, 2013); Ally Financial, Inc's Mem. of Law in Supp. of Mot. to Dismiss the Am. Compl., *Union Cent. Life Ins. Co. v. Ally Fin., Inc.*, Civ. No. 11-02890, Docket No. 219, at 5 (S.D.N.Y. July 27, 2012).

[416] *See* Def. Ally Fin. Inc. and GMAC Mortg. Group, Inc's Answer, Defenses and Affirmative Defenses to FHFA's Am. Compl., *FHFA v. Ally Fin. Inc.*, Civ. No. 11-7010, Docket No. 371, at 74 (S.D.N.Y. Feb. 1, 2013) ("Each of FHFA's claims is time-barred, in whole or in part, by the applicable statute of limitations and/or repose.").

only when Third-Party Claimants possess actual or constructive knowledge of sufficient facts. As to those claims, however, the available evidence and pertinent case law appear to present potential hurdles to AFI's attempts to prove that the time for Third-Party Claimants to bring their securities claims began to run as early as 2007. Finally, although the Examiner can reach no definitive conclusions as to potential claims, any similar control person claim asserted against AFI in the future by Third-Party Claimants that have not to date asserted claims against AFI would appear presumptively time-barred under applicable statutes of limitations and/or repose.

The Examiner's conclusions concerning AFI's asserted statute of limitations defenses turn in part upon the particularities of the timing provisions of each of the federal and state securities laws invoked by Third-Party Claimants. "Because [s]ection 20 merely creates a derivative liability for violations of other sections of the [Exchange] Act, claims under [s]ection 20 are governed by the limitations periods for those other sections."[417] Specifically, "claims brought under § 10(b) and § 20(a) of the Exchange Act may be brought no later than the earlier of: (1) two years after the discovery of the facts constituting the alleged fraud, or (2) five years after such fraud."[418] The "same limitations period" applicable to claims under section 11 or 12(a)(2) of the Securities Act also "applies to [s]ection 15 claims."[419] All such claims are "subject to the two-pronged timing provision of [s]ection 13 of the Securities Act."[420] "The first prong of [s]ection 13 is a statute of limitations, which provides that claims

---

[417] *Dodds v. Cigna Sec., Inc.*, 12 F.3d 346, 350 n.2 (2d Cir. 1993); *see also Glonti v. Stevenson*, Civ. No. 08-8960, 2009 U.S. Dist. LEXIS 13857, at *14 (S.D.N.Y. Feb. 6, 2009) ("A [s]ection 20(a) claim alleges derivative liability based on someone else's violation of [s]ection 10(b). Therefore, the statute of limitations for [s]ection 20(a) claims is identical to that of . . . [s]ection 10(b) claims."); *In re MBIA Inc. Sec. Litig.*, Civ. No. 05-03514, 2007 U.S. Dist. LEXIS 10416, at *27 (S.D.N.Y. Feb. 13, 2007) ("Plaintiffs' claims for control person liability under [s]ection 20(a) of the Exchange Act are subject to the same statute of limitations as Section 10(b) claims . . . ."); *Shah v. Morgan Stanley*, Civ. No. 03-8761, 2004 U.S. Dist. LEXIS 20897, at *44 n.12 (S.D.N.Y. Oct. 15, 2004) ("Since the Court dismisses plaintiff's § 10(b) claim as untimely, the § 20(a) claim against Purcell, which is dependant on the underlying § 10(b) claim and shares the same limitations period, is also dismissed.").

[418] *Pro Bono Invs., Inc. v. Gerry*, Civ. No. 03-4347, 2005 U.S. Dist. LEXIS 22348, at *23 n.5 (S.D.N.Y. Sept. 30, 2005); *see also* 28 U.S.C. § 1658(b). The two-year "limitations period commences not when a reasonable investor would have begun investigating, but when such a reasonable investor conducting such a timely investigation would have uncovered the facts constituting a violation." *City of Pontiac Gen. Emps.' Ret. Sys. v. MBIA, Inc.*, 637 F.3d 169, 174 (2d Cir. 2011); *see also FirstBank P.R. v. La Vida Merger Sub, Inc.*, 638 F.3d 37, 38 (1st Cir. 2011) ("[An Exchange Act] cause of action accrues (1) when the plaintiff did in fact discover, or (2) when a reasonably diligent plaintiff would have discovered, the facts constituting the violation—whichever comes first.") (quotation marks omitted). In *Merck & Co. v. Reynolds*, the U.S. Supreme Court rejected an argument that "the limitations period began to run" as to an Exchange Act claim at the "point the plaintiffs were on 'inquiry notice.'" *See* 130 S. Ct. 1784, 1797, 1799 (2010). The Court explained that it could not accept such an argument "[b]ecause the statute contains no indication that the limitations period should occur at some earlier moment before 'discovery,' when a plaintiff would have *begun* investigating." *Id*. at 1797 (emphasis in original).

[419] *See In re Morgan Stanley Mortg. Pass-Through Certificates Litig.*, 810 F. Supp. 2d 650, 662 (S.D.N.Y. 2011); *see also Dodds*, 12 F.3d at 350 n.1 ("Since [s]ection 15 merely creates a derivative liability for violations of [s]ections 11 and 12, [s]ection 13 applies to it as well.").

[420] *In re Bear Stearns Mortg. Pass-Through Certificates Litig.*, 851 F. Supp. 2d 746, 761 (S.D.N.Y. 2012).

must be brought within one year of 'the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence.'"[421] The second prong of section 13 contains "a three year statute of repose."[422]

Control person claims asserted under pertinent state securities laws are governed by limitations periods of two years (the Virginia Securities Act), three years (the Illinois Securities Law, the Minnesota Securities Act, and the North Carolina Securities Act), or four

---

[421] *Id.* (quoting 15 U.S.C. § 77m). There is "conflicting law" in the Second Circuit and certain other jurisdictions concerning whether the "inquiry notice standard . . . applies [to Securities Act claims] following the Supreme Court's decision in *Merck*." *Pa. Pub. Sch. Emps.' Ret. Sys. v. Bank of Am. Corp.*, 874 F. Supp. 2d 341, 364 (S.D.N.Y. 2012) (collecting cases). Several courts have "declined to apply *Merck* to [s]ection 11 [or 12(a)(2)] claims" because "the *Merck* Court construed . . . the limitations statute applicable to [s]ection 10(b) claims" and "[t]he text of [that provision] is different from [section 13]." *Id.* at 364–65; *see also Lighthouse Fin. Grp. v. Royal Bank of Scot. Grp., PLC*, Civ. No. 11-398, 2012 U.S. Dist. LEXIS 146640, at *36–37 n.11 (S.D.N.Y. Sept. 27, 2012) (declining to apply *Merck* to Securities Act claims); *Pension Trust Fund for Operating Eng'rs v. Mortg. Asset Securitization Transactions, Inc.*, Civ. No. 10-898, 2012 U.S. Dist. LEXIS 106542, at *13 n.5 (D.N.J. July 31, 2012) (same); *In re IndyMac Mortgage-Backed Sec. Litig.*, 793 F. Supp. 2d 637, 648 (S.D.N.Y. 2011) (same); *In re Barclays Bank PLC Sec. Litig.*, Civ. No. 09-1989, 2011 U.S. Dist. LEXIS 2667, at *24 (S.D.N.Y. Jan. 5, 2011) (same). Other courts have reasoned that "although [*Merck*] concerns the statute of limitations [for Exchange Act claims], to apply them to a Securities Act cause of action is consistent with the Securities Act's statute of limitations." *See Brecher v. Citigroup Inc.*, Civ. No. 09-7359, 2011 U.S. Dist. LEXIS 131104, at *10 n.1 (S.D.N.Y. Nov. 14, 2011); *see also FHFA v. UBS Ams. Inc.*, 858 F. Supp. 2d 306, 319 (S.D.N.Y. 2012) ("[T]he majority of district courts that have considered the matter have concluded that [*Merck* applies to Securities Act claims].") (internal citations omitted); *In re Bear Stearns Mortg. Pass-Through Certificates Litig.*, 851 F. Supp. 2d at 763 (applying *Merck* to Securities Act claims); *Nat'l Credit Union Admin. Bd. v. RBS Sec., Inc.*, Civ. No. 11-2340, 2012 U.S. Dist. LEXIS 103170, at *60 (D. Kan. July 25, 2012) (same); *In re Direxion Shares ETF Trust*, Civ. No. 09-8011, 2012 U.S. Dist. LEXIS 29709, at *9 n.3 (S.D.N.Y. Mar. 6, 2012) (same); *N.J. Carpenters Health Fund v. Residential Capital, LLC*, Civ. Nos. 08-8781 and 08-5093, 2011 U.S. Dist. LEXIS 46066, at *23-24 (S.D.N.Y. Apr. 28, 2011) (same); *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 371 n.39 (S.D.N.Y. Mar. 31, 2011) (same).

[422] *In re IndyMac Mortgage-Backed Sec. Litig.*, 718 F. Supp. 2d 495, 507 (S.D.N.Y. 2010); *see also* 15 U.S.C. § 77m ("In no event shall any such action be brought to enforce a liability created under section 11 or section 12(a)(1) more than three years after the security was bona fide offered to the public, or under section 12(a)(2) more than three years after the sale."). "[T]he three year statute of repose set forth in [s]ection 13 provides an absolute limit." *In re Lehman Bros. Sec. & ERISA Litig.*, Md. No. 09-2017, 2012 U.S. Dist. LEXIS 148177, at *25 (S.D.N.Y. Oct. 15, 2012). With respect to a section 15 control person claim alleging an underlying primary violation of section 11, the three-year period "normally begins to run when the security is *first* bona fide offered" to the public at the effective date of the registration statement. *See id.* at *26; *see also P. Stolz Family P'ship L.P. v. Daum*, 355 F.3d 92, 99–100 (2d Cir. 2004) (agreeing with "vast majority of courts" and holding that the section 13 "three-year period begins when the security is first bona fide offered"). As to a section 15 claim alleging a primary violation of section 12(a)(2), the three-year period begins to run at the time of "sale." *See* 15 U.S.C. § 77m; *see also Finkel v. Stratton Corp.*, 962 F.2d 169, 173 (2d Cir. 1992) ("[A] sale occurs for [section 12(a)(2)] purposes when the parties obligate themselves to perform what they had agreed to perform even if the formal performance of their agreement is to be after a lapse of time.") (quotation marks omitted).

years (the MUSA).[423] The three-year limitations period under the Illinois Securities Law runs from "the date upon which the party bringing the action has notice of facts which in the exercise of reasonable diligence would lead to actual knowledge of the alleged violation."[424] The Illinois Securities Law also features a five-year statute of repose, beyond which the discovery rule cannot toll the otherwise applicable limitations period.[425] The three-year limitations period under the North Carolina Securities Act runs from the date when "the

---

[423] *See* 815 ILL. COMP. STAT. ANN. 5/13(D) (three years); MASS. GEN. LAWS ch. 110A § 410(e) (four years); MINN. STAT. § 80A.23(7) (three years); N.C. GEN. STAT. § 78A-56(f) (three years); VA. CODE ANN. § 13.1–522(D) (two years). To the extent that Third-Party Claimants have asserted or may assert a claim against AFI under the Minnesota Securities Act "on the basis of conduct occurring [on or after] August 1, 2007," Minn. Stat. § 80A.90, then such claim would instead be timely if brought "within the earlier of two years after discovery of the facts constituting the violation or five years after the violation." *See* MINN. STAT. § 80A.76(j)(2).

[424] 815 ILL. COMP. STAT. ANN. 5/13(D)(2). There is disagreement concerning what triggers the running of this limitations period. *Compare Blumenthal v. Flynn*, Case No. 11–2306, 2012 Ill. App. Unpub. LEXIS 2441, at *16-18 (Ill. App. Ct. Sept. 28, 2012) ("[T]he language of the statute of limitations at issue in [*Merck*] differs significantly from the language of [the Illinois] Securities Law"; the 815 Ill. Comp. Stat. Ann. 5/13 limitations period runs from when the plaintiff obtains actual "notice of facts which in the exercise of reasonable diligence, would lead to actual knowledge of [defendant's] acts and omissions."), Order, *FHLB of Chicago v. Banc of Am. Funding Corp.*, Case No. 10-CH-45033, at 13–14 (Ill. Cir. Ct. Sept. 19, 2012) (denying motion to dismiss Illinois Securities Law claims as untimely where "Defendants' exhibits fail to show that the [plaintiff] had 'actual knowledge'"), *and Allstate Ins. Co. v. Countrywide Fin. Corp.*, 824 F. Supp. 2d 1164, 1182–83 (C.D. Cal. 2011) ("If facts sufficient to support a claim [under 815 Ill. Comp. Stat. Ann. 5/13] were public and/or discoverable by Allstate, then the clock began to run when Allstate had notice of facts that should have triggered an investigation into its Countrywide-issued RMBS. . . . The Court understands this to require that Allstate must have had actual, not constructive, notice of facts that should have triggered an investigation."), *with Stone v. Chicago. Inv. Grp. LLC*, Civ. No. 11-51, 2011 U.S. Dist. LEXIS 149153, at *7–8 (N.D. Ill. Dec. 29, 2011) ("The language of the statute indicates that the three-year period begins to run when the plaintiff is on inquiry notice . . . . It is not clear how Illinois Courts will interpret this provision in light of *Merck*, but . . . both parties agree that an inquiry notice standard applies to the state law claim."), *and Grumhaus v. Comerica Secs., Inc.*, Civ. No. 99-1776, 2003 U.S. Dist. LEXIS 11033, at *7 (N.D. Ill. June 27, 2003) ("[A]s in federal securities actions, the limitations begins to run when the plaintiff has 'inquiry notice' of the conduct giving rise to the claim. . . . This is an objective test: not whether plaintiffs actually knew of the conduct but whether they reasonably should have known.").

[425] *See* 815 ILL. COMP. STAT. ANN. 5/13(D)(2) ("[I]n no event shall the period of limitation so extended be more than 2 years beyond the expiration of the 3 year period otherwise applicable."); *see also Klein v. George G. Kerasotes Corp.*, 500 F.3d 669, 671 (7th Cir. 2007) ("[T]he total period of repose expires five years after the violation, no matter when it was discovered.").

person discovers facts constituting the violation."[426] The four-year limitations period under the MUSA "runs from the date of 'the discovery by the person bringing the action of a violation.'"[427]

The two-year limitations period under the Virginia Securities Act, by contrast, begins to run at the time of the "transaction upon which it is based,"[428] and "does not provide for a discovery rule."[429] Similarly, the three-year limitations period under the Minnesota Securities Act runs from "the occurrence of the act or transactions constituting the violation,"[430] and is not tolled by any "discovery rule" or "fraudulent concealment."[431]

The bases for the Examiner's conclusions are set forth below concerning the application of the foregoing statutes of limitations and repose to the control person claims asserted (or that might be asserted in the future) against AFI by Third-Party Claimants.

---

[426] N.C. GEN. STAT. § 78A-56(f); *see also Kelley v. CINAR Corp. (In re CINAR Corp. Sec. Litig.)*, 186 F. Supp. 2d 279, 321 (E.D.N.Y. 2002) (providing that N.C. Gen. Stat. § 78A-56(f) limitations period runs "from the time when the fraud reasonably should have been discovered"). The statute further provides that "[n]o person may sue under this section . . . later than five years after the sale or contract of sale, except that if a person who may be liable under this section engages in any fraudulent or deceitful act that conceals the violation or induces the person to forgo or postpone commencing an action based upon the violation, the suit may be commenced not later than three years after the person discovers or should have discovered that the act was fraudulent or deceitful." N.C. GEN. STAT. § 78A-56(f).

[427] *Capital Ventures Int'l v. UBS Sec. LLC*, Civ. No. 11-11937, 2012 U.S. Dist. LEXIS 140663, at *43 (D. Mass. Sept. 28, 2012) (quoting MASS. GEN. LAW. ch. 110A § 410(e)). According to one district court, "courts are divided" as to "whether the statute of limitations for section 410 of MUSA is tied to inquiry notice or to the discovery rule." *See Capital Ventures Int'l v. J.P. Morgan Mortg. Acquisition Corp.*, Civ. No. 12-10085, 2013 U.S. Dist. LEXIS 19227, at *22–23 n.8 (D. Mass. Feb. 13, 2013) (declining to "resolve that question here"); *see also Capital Ventures Int'l*, 2012 U.S. Dist. LEXIS 140663, at *43–44 ("The limitations period [of MUSA § 410(e)] does not begin [until] the later date on which an investor, alerted by storm warnings and thereafter exercising reasonable diligence, would have discovered the fraud.") (quotation marks omitted); *Mass. Mut. Life Ins. Co. v. Residential Funding Co., LLC*, 843 F. Supp. 2d 191, 208 (D. Mass. 2012) ("Claims under MUSA section 410(a) are subject to a four-year statute of limitations that runs from the date the plaintiff is put on inquiry notice of its claims.").

[428] VA. CODE ANN. § 13.1-522(D).

[429] *Libon v. Infineon Techs.,* AG, Civ. No. 04-929, 2006 U.S. Dist. LEXIS 76430, at *35 (E.D. Va. Aug. 7, 2006) ("[T]he claim for violation of the Virginia Securities Act, filed more than two years after its accrual, is barred by the applicable statute of limitations."); *see also Caviness v. Derand Res. Corp.*, 983 F.2d 1295, 1306 (4th Cir. 1993) ("[W]e conclude from the plain meaning of the statute that the Virginia legislature intended to provide unqualifiedly that a claim must be brought within two years 'after the transaction upon which it is based.'").

[430] MINN. STAT. § 80A.23(7).

[431] *See Kopperud v. Agers*, 312 N.W.2d 443, 446–47 (Minn. 1981); *see also Hayden v. McDonald*, 742 F.2d 423, 437 (8th Cir. 1984) ("We view this authority as favoring a continued strict interpretation of the limitations period in section 80A.23(7) of the present statute, especially in actions based entirely upon the nonregistration of securities."); *Semrad v. Edina Realty, Inc.*, 470 N.W.2d 135, 140 (Minn. Ct. App. 1991) ("We conclude that fraud does not toll the limitations period for claims under section 80A.23 . . . ."), *rev'd in part on other grounds*, 493 N.W.2d 528, 534 (Minn. 1992) ("The court of appeals affirmed [the trial court's statute of limitations] ruling and the plaintiffs do not complain of it here.").

### (i) Application Of Statutes Of Limitations To RMBS Claims

AFI moved to dismiss certain of the control person claims asserted by Third-Party Claimants under section 15 and 20(a) of the federal securities laws and under the Illinois Securities Law, the MUSA, and the North Carolina Securities Act, on the ground that such claims were in whole or part barred by applicable statutes of limitations.[432] According to AFI, "all evidence demonstrates that [Third-Party Claimants] have known [or reasonably should have known] the facts underlying their securities claims for years" including because they were "among the most sophisticated purchasers of [RMBS]" and the "originator practices" they now allege were "the subject of intense public scrutiny and numerous critical media and government reports" before the end of 2007.[433] Third-Party Claimants respond that certain courts have denied motions to dismiss filed by AFI and rejected the "same arguments as [AFI] makes here."[434] "[K]nowledge that RMBS in general were risky," Third-Party Claimants assert, is different from knowledge that "the loans underlying [their] Certificates were being misrepresented."[435]

The Examiner reaches no definitive conclusions concerning the likelihood that AFI's statute of limitations defenses will prevail. Determining when any of Third-Party Claimants possessed actual or constructive knowledge of "sufficient facts" to begin the running of a statute of limitations is "a fact-intensive inquiry and, thus, generally ill-suited for resolution at the motion to dismiss stage."[436] In most cases "a motion to dismiss will only be granted where

---

[432]  *See* Mem. of Law in Supp. of Ally Fin. Inc.'s and GMAC Mortg. Group, Inc's Mot. to Dismiss the Am. Compl., *FHFA v. Ally Fin. Inc.*, Civ. No. 11-7010, Docket No. 149, at 16 (S.D.N.Y. July 13, 2012) (noting that one-year limitations period for section 15 claim "expired long ago with respect to two of the Securitizations" where certain tranches received credit rating downgrades beginning in July 2007); Defs.' Mem. of Law in Supp. of Their Mot. to Dismiss the Am. Compl., *FHLB of Boston v. Ally Fin., Inc.*, Civ. No. 11-10952, Docket No. 200, at 55 (D. Mass. Oct. 11, 2012) ("[T]here were 'storm warnings' sufficient to alert FHLB Boston as to the 'possibility' of its [MUSA § 410] claims more than four years before it filed the Complaint on April 20, 2011."); Defs.' Joint Mem. of Law in Supp. of Their Joint Combined Mot. to Dismiss Pl.'s Am. Compl. for Rescission and Damages, *FHLB of Chicago v. Banc of Am. Funding Corp.*, Case No. 10-CH-45033 (Ill. Cir. Ct. June 3, 2011) ("[FHLB] knew or should have known of the issues in the complaint [giving rise to its Illinois Securities Law and North Carolina Securities Act claims] more than three years before it filed suit in October 2010."); Ally Fin. Inc's Mem. of Law in Supp. of Mot. to Dismiss the Am. Compl., *Union Cent. Life Ins. Co. v. Ally Fin., Inc.*, Civ. No. 11-02890, Docket No. 219, at 5 (S.D.N.Y. July 27, 2012) (section 20 claims are time-barred); *see also* Ally Securities' Mem. of Law in Supp. of Mot. to Dismiss the Am. Compl., *Union Cent. Life Ins. Co. v. Ally Fin., Inc.*, Civ. No. 11-02890, Docket No. 222, at 9 (S.D.N.Y. July 28, 2012) ("Because Plaintiffs failed to bring [these claims under section 10(b) of the Exchange Act] within two years after the April 6, 2009 [credit rating] downgrades, their federal securities claims are untimely and should be dismissed.").

[433]  AFI Submission Paper, dated Dec. 19, 2012, at 44, 46.

[434]  *See* Joint Submission Paper of AIG, Allstate Life Ins. Co., Mass. Mut. Life Ins. Co., and Prudential Ins. Co. of Am., dated Mar. 15, 2013, at 19; *see also* Joint Submission Paper of Federal Home Loan Banks of Boston, Chicago, and Indianapolis, dated Oct. 19, 2012, at 21 ("FHLB's effectively universal success in defeating Defendants' motions to dismiss . . . . cast[s] doubt on the merits of Defendants' affirmative defenses, many of which [including the statute of limitations] were raised by Rule 12 motions.").

[435]  Joint Submission Paper of AIG, Allstate Life Ins. Co., Mass. Mut. Life Ins. Co., and Prudential Ins. Co. of Am., dated Mar. 15, 2013, at 19.

[436]  *See In re Bear Stearns Mortg. Pass-Through Certificates Litig.*, 851 F. Supp. 2d 746, 763 (S.D.N.Y. 2012).

uncontroverted evidence irrefutably demonstrates that the plaintiff discovered or should have discovered facts sufficient to [begin the running of the statute of limitations]."[437] Accordingly, and without discovery from Third-Party Claimants, the fact that certain courts have issued decisions denying AFI's motions to dismiss is not necessarily dispositive of the statute of limitations defenses asserted by AFI.[438] With that qualification, the Examiner considers those decisions—and others deciding motions by the Debtors or unaffiliated defendants seeking to dismiss securities claims asserted by RMBS investors—to be instructive of potential hurdles AFI may face in proving that the time for Third-Party Claimants to bring their securities claims began to run as early as 2007.

At least at the motion to dismiss stage, some courts have appeared "reluctant to conclude that purchasers of mortgage-backed securities were on inquiry notice of [potential securities] claims as late as mid-2008, let alone as early as 2007."[439] Indeed, several courts have found evidence of public knowledge of general problems in the housing or RMBS markets to be insufficient, without more, to warrant dismissal on statute of limitations grounds of Securities

---

[437] *Id.* (denying motion to dismiss Securities Act claims on statute of limitations grounds); *see also In re IPO Sec. Litig.*, 341 F. Supp. 2d 328, 345 (S.D.N.Y. 2004) ("[D]efendants bear a heavy burden in establishing that the plaintiff was on inquiry notice as a matter of law. Inquiry notice exists only when uncontroverted evidence irrefutably demonstrates when plaintiff discovered or should have discovered the fraudulent conduct.") (quotation marks omitted).

[438] *See FHFA v. Ally Fin., Inc.*, Civ. No. 11-7010, 2012 U.S. Dist. LEXIS 179768, at *18 (S.D.N.Y. Dec. 19, 2012); Order, *FHLB of Chicago v. Banc of Am. Funding Corp.*, Case No. 10-CH-45033, at 13 (Ill. Cir. Ct. Sept. 19, 2012). Unlike other Third-Party Claimants, FHFA has recourse to the statute of limitations provisions of the Housing and Economic Recovery Act of 2008 ("HERA"). *See FHFA v. UBS Ams., Inc.*, 858 F. Supp. 2d 306, 311 (S.D.N.Y. 2012), *aff'd*, No. 12-3207, 2013 U.S. App. LEXIS 6962 (2d Cir. Apr. 5, 2013). HERA "affords FHFA three years from the [September 6, 2008] date of conservatorship [over the GSEs] to bring suit on its Securities Act claims, irrespective of any other provision of law." *Id.* at 317; *see also* 12 U.S.C. § 4617(b)(12). Notably, "HERA explicitly provides that the statute does not revive claims for which the statute of limitations had expired prior to the conservatorship unless the claim arose from 'fraud, intentional misconduct resulting in unjust enrichment, or intentional misconduct resulting in substantial loss to the regulated entity.'" *FHFA*, 858 F. Supp. 2d at 317–18 (quoting 12 U.S.C. § 4617(b)(13)).

[439] *Mass. Mut. Life Ins. Co. v. Residential Funding Co, LLC*, 843 F. Supp. 2d 191, 208–09 (D. Mass. 2012).

Act claims.[440] Downgrades in the investment ratings of RMBS have, however, been found sufficient in certain circumstances to begin the running of the statute of limitations.[441] That said, "downgrades alone do not convey facts sufficient to plead a [s]ection 11 or 12(a)(2)

---

[440] *See FHFA*, 858 F. Supp. 2d at 321 ("[E]ven under the pre-*Merck*, duty-of-inquiry standard for accrual, generalized reports like [the 2007 reports, lawsuits and investigations regarding loan origination practices] relied upon by defendants are insufficient to trigger the statute of limitations."); *In re Bear Stearns Mortg. Pass-Through Certificates Litig.*, 851 F. Supp. 2d at 763–64 ("news articles" reporting "[a]llegations of industry-wide or market-wide troubles" were "unconnected to any of the entities that were involved in the origination, packaging, and sale of the BSMF 2006-AR1 trust" and insufficient to warrant dismissal) (quotation marks omitted); *Capital Ventures Int'l v. UBS Secs. LLC*, Civ. No. 11-11937, 2012 U.S. Dist. LEXIS 140663, at *45 (D. Mass. Sept. 28, 2012) (denying motion to dismiss MUSA claim on limitations grounds where "the sources upon which the Defendants rely . . . deal with the mortgage industry generally"); *Nat'l Credit Union Admin. Bd. v. RBS Sec., Inc.*, Civ. No. 11-2340, 2012 U.S. Dist. LEXIS 103170, at *64 (D. Kan. July 25, 2012) ("[F]ind[ing] that the general information regarding troubling issues in the [RMBS] market is insufficient to [start running the statute of limitations] under § 11 or § 12(a)(2)."); *Plumbers' & Pipefitters' Local #562 Supplemental Plan & Trust v. J.P. Morgan Acceptance Corp. I*, Civ. No. 08-1713, 2012 WL 601488, at *11 (E.D.N.Y. Feb. 23, 2012) (denying motion to dismiss section 11 claim where defendants reference "seventy news stories" but "none of stories refer to the offerings, the Certificates, or tie the originators to securities offered by the defendants"); *In re Morgan Stanley Mortg. Pass-Through Certificates Litig.*, Civ. No. 09-2137, 2012 U.S. Dist. LEXIS 98669, at *7–8 (S.D.N.Y. Jul. 16, 2012) ("Defendants' exhibits do not persuade the Court that . . . there was enough information in the public domain for Plaintiffs to have filed a complaint that could survive a 12(b)(6) motion. The exhibits paint a vivid picture of a distressed [RMBS] industry, but not one references by name any of the entities that were involved in the origination, packaging, and sale of the Certificates at issue here."); *In re Morgan Stanley Mortg. Pass-Through Certificates Litig.*, 810 F. Supp. 2d 650, 665 (S.D.N.Y. 2011) ("The cited [news] articles and [SEC] report were not specifically about Morgan Stanley and were therefore too general to provide inquiry notice."); *N.J. Carpenters Vacation Fund v. Royal Bank of Scot. Grp., PLC*, 720 F. Supp. 2d 254, 267 (S.D.N.Y. 2010) ("Although Defendants point to a number of publicly available documents generally related to the weakening and outright disregard for underwriting guidelines by subprime originators, this information alone does not relate directly to the misrepresentations and omissions alleged [here].") (quotation marks omitted).

[441] *See In re Morgan Stanley Mortg. Pass-Through Certificates Litig.*, Civ. No. 09-2137, 2010 WL 3239430, at *8 (S.D.N.Y. Aug. 17, 2010) (granting motion to dismiss Securities Act claims and finding it "plain that inquiry notice arose well before May 2008" where "thirteen of sixteen downgrades by Moody's of 2007–11AR occurred before May 2008, and four out of sixteen downgrades by S&P of 2007–11AR occurred before May 2008"); *see also FHFA*, 858 F. Supp. 2d at 322 ("[I]t cannot be said that [the GSEs] should have 'discovered' that those securitizations in fact contained loans that failed to meet the standards set out in the offering materials until they were alerted to this possibility by the ratings agencies in early 2008 [when the securities they held were downgraded from investment grade to near-junk status].").

claim" and "can occur for any number of reasons."[442] The limitations period may not be considered to have started to run until the investment ratings of the specific certificates or tranches purchased by the plaintiff were downgraded.[443] Prior lawsuits and regulatory actions concerning the particular defendants or RMBS at issue have also been deemed, when sufficiently similar, to put investors on notice of their potential securities claims.[444]

Courts deciding motions by AFI and the Debtors to dismiss federal and state securities claims have shown similar reluctance to find as a matter of law that statutes of limitations began to run in 2007. For example, in *N.J. Carpenters Health Fund v. Residential Capital, LLC*, the U.S. District Court for the Southern District of New York denied the Debtors' motion to dismiss

---

[442] *In re Bear Stearns Mortg. Pass-Through Certificates Litig.*, 851 F. Supp. 2d at 766 (denying motion to dismiss complaints on statute of limitations grounds); *Pub. Emps.' Ret. Sys. of Miss. v. Goldman Sachs Grp. Inc.*, Civ. No. 09-1110, 2011 U.S. Dist. LEXIS 3267, at *26-27 (S.D.N.Y. Jan. 12, 2011) (denying motion to dismiss section 11 claims as untimely where ratings agencies "downgraded their ratings of the Certificates by December 2007" but "it was not until [2008]" that one of the ratings agencies "downgraded the GSAMP Trust Series 2006-S2 Certificates to below investment grade"); *Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co. Inc.*, 714 F. Supp. 2d 475, 479–80 (S.D.N.Y. 2010) (Securities Act claims are not time barred where "the certificates at issue were not downgraded below investment grade until April 2008, that is, after the March 27, 2008 limitation date, and, even then, the downgrade was not premised on the discovery of fraud but only on a perceived increase in risk"); *cf. Carlucci v. Han*, 886 F. Supp. 497, 516 (E.D. Va. 2012) (rejecting "the notion that poor performance of an investment is in itself sufficient to commence the limitations period [for a section 10(b) claim]").

[443] *See In re Bear Stearns Mortg. Pass-Through Certificates Litig.*, 851 F. Supp. 2d at 766–67 (denying motion to dismiss complaints on statute of limitations grounds where plaintiff "purchased exclusively from the AAA-rated tranches" of the RMBS issuance that were "(at least as judged by the ratings) seemingly untarnished by the problems that plagued the [RMBS] industry as a whole"); *see also In re Morgan Stanley Mortg. Pass-Through Certificates Litig.*, 810 F. Supp. 2d at 664–65 ("In light of the maintenance of investment-grade ratings on the 2006-14SL Trust well into the one-year limitation period . . . the cited delinquency rates and ratings changes are insufficient to warrant dismissal of [plaintiff's] claim as untimely as a matter of law.").

[444] *See FDIC v. Countrywide Fin. Corp.*, Civ. No. 12-4354, 2012 U.S. Dist. LEXIS 167696, at *9–14 (C.D. Cal. Nov. 21, 2012) (granting motion to dismiss section 11 claim as untimely where defendants "submitted ten complaints filed against Countrywide entities before May 22, 2008," certain of which "had survived a motion to dismiss"); *Lighthouse Fin. Grp. v. Royal Bank of Scot. Grp. PLC*, Civ. No. 11-398, 2012 U.S. Dist. LEXIS 146640, at *39 (S.D.N.Y. Sept. 27, 2012) (dismissing Securities Act claims as untimely in part because plaintiff's filing of earlier lawsuit against defendant "undermines their contention that they could not have known about [defendant's] alleged misstatements and omissions" until later); *In re Morgan Stanley Mortg. Pass-Through Certificates Litig.*, 2010 WL 3239430, at *8 (granting motion to dismiss Securities Act claims and finding it "plain that inquiry notice arose well before May 2008" where "Lead Plaintiff's counsel [had filed an earlier lawsuit], which involved similar allegations regarding [RMBS-related] misconduct by . . . the key originator of mortgages held by 2007–11AR"); *Nat'l Credit Union Admin. Bd.*, 2012 U.S. Dist. LEXIS 103170, at *81 ("A reasonably diligent investor who was aware of this [FDIC] cease and desist order [against defendant Fremont Investment and Loan] would have been alerted to discover facts prior to March 20, 2008 which would support a plausible claim against the issuers, underwriters and sellers of the Fremont certificates."); *Boilermakers Nat'l Annuity Trust Fund v. WaMu Mortg. Pass Through Certificates, Series AR1*, 748 F. Supp. 2d 1246, 1258 (W.D. Wash. 2010) (granting motion to dismiss Securities Act claims of one of the named plaintiffs in a consolidated class action because the first named plaintiff's complaint was "sufficient to put other holders of WaMu certificates on notice of underwriting and appraisal issues," notwithstanding that "the two [complaints] involved different securities").

section 11 and 12(a)(2) claims on statute of limitations grounds.[445] There, the Debtors argued that "claims relating to the 2006-QS8 offering must be dismissed as time-barred because [plaintiff] failed to bring them within one year of being on inquiry notice."[446] According to the district court, "the clock starts to tick when 'a reasonably diligent plaintiff would have discovered the facts constituting the violation.'"[447] The court concluded that "[d]efendants fail[ed] to show that a reasonably diligent plaintiff would have discovered the facts constituting the violation over a year before bringing this action, or by May 18, 2008."[448] In particular, that "delinquency rates for 2006-QS8 approached 15%" was "not enough," and that a ratings agency "put the relevant securities on ratings watch for possible downgrades" was considered "an even further reach."[449]

In *FHLB of Chicago v. Banc of America Funding Corp.*, the Circuit Court in Cook County, Illinois, denied AFI's motion to dismiss as time-barred control person claims asserted against it by a Third-Party Claimant under the Illinois Securities Law and the North Carolina Securities Act.[450] The court found that the plaintiff "pled facts demonstrating that its claims were brought [on October 15, 2010] within two years of discovery of the defendants' wrongs, which means that the claims are timely under Illinois . . . and North Carolina law."[451] In particular, plaintiff pleaded that it had no "access to the loan files" and no "way of testing the rating agencies' triple-A ratings," which "began to be downgraded only in 2008."[452] The court rejected AFI's argument that the plaintiff was "on inquiry notice prior to October 2007."[453] As an initial matter, when the statute of limitations begins to run is "ordinarily a question of fact . . . unless only one conclusion can be drawn at some particular point from undisputed

---

[445] *See* Civ. Nos. 08–8781 and 08–5093, 2011 U.S. Dist. LEXIS 46066, at *23–26 (S.D.N.Y. Apr. 28, 2011); *see also Mass. Mut. Life Ins. Co. v. Residential Funding Co., LLC*, 843 F. Supp. 2d 191, 208–09 (D. Mass. 2012) (denying Debtors' motion to dismiss MUSA section 410(a) claims on statute of limitations grounds where "generalized reports on the industry" and "reports show[ing] an increase in the number of loans going into default" may "have indicated that the loans were performing poorly, [but] did not put Plaintiff on notice [by early 2007] that the specific underwriting and appraisal practices represented in the offering materials were false").

[446] *N.J. Carpenters Health Fund v. Residential Capital,* LLC, Civ. Nos. 08–8781, 05–5093, 2011 U.S. Dist. LEXIS 46066, at *23 (S.D.N.Y. Apr. 28, 2011).

[447] *Id.* at *24 (quoting *Merck & Co. v. Reynolds*, 130 S. Ct 1784, 1797 (2010)).

[448] *Id.* at *25.

[449] *Id.* at *25–26.

[450] Order, *FHLB of Chicago v. Banc of Am. Funding Corp.*, Case No. 10-CH-45033, at 13 (Ill. Cir. Ct. Sept. 19, 2012).

[451] *Id*.

[452] *Id*.

[453] *Id*. at 14.

facts."[454] Moreover, "generalized information about the mortgage market or about certain mortgage originators cannot trigger the statute of limitations."[455]

Although the law in this area continues to evolve, it may pose obstacles to AFI prevailing on statute of limitations defenses (including its pending motions to dismiss) premised upon arguments that general "public scrutiny and numerous critical media and government reports" started limitations periods running in 2007.[456] Discovery could perhaps permit AFI to prove that, notwithstanding the limited information available to the public at that time, one or more of Third-Party Claimants had knowledge sufficient for the applicable statute of limitations period to have run before it filed its claims against AFI.[457] Moreover, this body of case law also suggests that any Third-Party Claimants that have not to date asserted claims against AFI would face potential dismissal of future control person claims asserted under federal or state securities laws. Even under the four-year limitations period that governs control person claims asserted under MUSA § 410(b), a Third-Party Claimant asserting such a claim for the first time now would be required to allege that it lacked sufficient knowledge of the alleged misrepresentations as late as mid-2009.[458] In light of intervening credit rating downgrades and

---

[454] *Id.* at 12.

[455] *Id.* at 14. The court also denied AFI's motion to dismiss under 815 Ill. Comp. Stat. Ann. 5/13(B). *See id.* at 8–10. That provision requires a plaintiff asserting a claim under the Illinois Securities Law to have given written notice "within 6 months after the purchaser shall have knowledge that the sale of the securities to him or her is voidable, to each person from whom recovery will be sought." 815 ILL. COMP. STAT. ANN. 5/13(B). AFI argued that the FHLB of Chicago had failed to "plead affirmative facts demonstrating that it served notices of rescission on defendants within six months of acquiring constructive knowledge that each certificate was voidable." *See* Order, *FHLB of Chicago v. Banc of Am. Funding Corp.*, Case No. 10–CH–45033, at 8 (Ill. Cir. Ct. Sept. 19, 2012). The court declined to find as a matter of law that the notices of rescission sent by the FHLB of Chicago in July 2010 were untimely. *See id.* at 9–10. The court explained that "the six-month period begins when a party gains actual or constructive knowledge that the purchase is legally voidable . . . rather than . . . of the facts underlying the claim." *Id.* at 9. In the context of a motion to dismiss, AFI had not met the "burden of showing that the Bank has failed to comply with the six-month notice provision." *See id.* The Examiner reaches no conclusion concerning whether the FHLB of Chicago complied with this six-month notice provision, which is a "mixed question of law and fact" that to answer would require discovery concerning the circumstances by which the plaintiff "learned that the sale was voidable." *See 766347 Ontario Ltd. v. Zurich Capital Markets Inc.*, 249 F. Supp. 2d 974, 989 (N.D. Ill. 2003) (quotation marks omitted); *see also Reshal Assocs., Inc. v. Long Grove Trading Co.*, 754 F. Supp. 1226, 1236 (N.D. Ill. 1990) ("Illinois courts have been lenient in their interpretation of what constitutes knowledge of voidability. They have held that the time for notice begins to run not from the time of knowledge of the underlying facts, but rather from the time of knowledge that those facts give rise to a right of rescission.").

[456] *See* AFI Submission Paper, dated Dec. 19, 2012, at 46–47; *see also* Defs.' Mem. of Law in Supp. of Their Mot. to Dismiss the Am. Compl., *FHLB of Boston v. Ally Fin., Inc.*, Civ. No. 11-10952, Docket No. 200, at 55 (D. Mass. Oct. 11, 2012) ("[T]here were 'storm warnings' sufficient to alert FHLB Boston as to the possibility of its [MUSA § 410] claims more than four years before it filed the Complaint on April 20, 2011.").

[457] For example, AFI asserts—but would need to prove—that "if [Third-Party Claimants'] allegations of systematic abandonment of underwriting guidelines were true, there would be no entity that would have been more aware of that fact than Freddie/Fannie" because "Freddie Mac personnel visited nearly every originator in the business." *See* AFI Submission Paper, dated Dec. 19, 2012, at 47 (emphasis omitted).

[458] *See* MASS. GEN. LAWS ch. 110A § 410(e) ("No person may sue under this section more than four years after the discovery by the person bringing the action of a violation . . . .").

the filing of other lawsuits concerning the Debtors' securitizations, such a claim could be susceptible to dismissal as time-barred as a matter of law.[459]

### (ii) Application Of Statutes Of Repose To RMBS Claims

AFI moved to dismiss claims asserted by Third-Party Claimants under section 20(a) of the Exchange Act, the Minnesota Securities Act, and the Virginia Securities Act as barred by applicable statutes of repose.[460] In *Union Central Life Ins. Co. v. Ally Fin., Inc.*, AFI's motion to dismiss section 20(a) claims was granted on other grounds.[461] In *FHFA v. Ally Fin., Inc.*, the plaintiff agreed to "abandon" Virginia Securities Act claims as to "securitizations it

---

[459] *See In re Morgan Stanley Mortg. Pass-Through Certificates Litig.*, Civ. No. 09–2137, 2010 WL 3239430, at *8 (S.D.N.Y. Aug. 17, 2012) (granting motion to dismiss Securities Act claims and finding it "plain that inquiry notice arose well before May 2008" where "Lead Plaintiff's counsel [had filed an earlier lawsuit], which involved similar allegations regarding [RMBS-related] misconduct by . . . the key originator of mortgages held by 2007–11AR"); *Nat'l Credit Union Admin. Bd. v. RBS Sec., Inc.*, Civ. No. 11-2340, 2012 U.S. Dist. LEXIS 103170, at *81 (D. Kan. July 25, 2012) ("A reasonably diligent investor who was aware of this [FDIC] cease and desist order [against defendant Fremont Investment and Loan] would have been alerted to discover facts prior to March 20, 2008 which would support a plausible claim against the issuers, underwriters and sellers of the Fremont certificates."); *In re Morgan Stanley Mortg. Pass-Through Certificates Litig.*, 2010 WL 3239430, at *8 (granting motion to dismiss Securities Act claims and finding it "plain that inquiry notice arose well before May 2008" where "thirteen of sixteen downgrades by Moody's of 2007–11AR occurred before May 2008, and four out of sixteen downgrades by S & P of 2007–11AR occurred before May 2008"). The Examiner reaches no definitive conclusions concerning whether any potential control person claims asserted against AFI would be subject to dismissal as time-barred under these or other federal or state securities laws.

[460] *See* Mem. of Law in Supp. of Ally Fin. Inc.'s and GMAC Mortg. Group, Inc's Mot. to Dismiss the Am. Compl., *FHFA v. Ally Fin. Inc.*, Civ. No. 11-7010, Docket No. 149 (S.D.N.Y. July 13, 2012) (Virginia Securities Act); Mem. in Supp. of the Ally Defs.' Mot. to Dismiss the Am. Compl., *John Hancock Life Ins. Co. (U.S.A.) v. Ally Fin. Inc.*, Civ. No.12-01841, Docket No. 104 (D. Minn. Dec. 14, 2012) (Minnesota Securities Act); Mem. in Supp. of the Ally Defs.' Mot. to Dismiss the Am. Compl., *Stichting Pensioenfonds ABP v. Ally Fin. Inc.*, Civ. No. 12-01381, Docket No. 129 (D. Minn. Mar. 11, 2013) (Minnesota Securities Act); Ally Fin, Inc's Mem. of Law in Supp. of Mot. to Dismiss the Am. Compl., *Union Cent. Life Ins. Co. v. Ally Fin., Inc.*, Civ. No. 11-02890, Docket No. 219 (S.D.N.Y. July 27, 2012) (section 20 of the Exchange Act).

[461] *See* Order, Civ. No. 11-02890, Docket No. 263, at 7 n.7 (S.D.N.Y. Mar. 29, 2013) (granting plaintiffs opportunity to "file a letter motion to amend which attaches a proposed amended complaint within sixty (60) days"). Assuming arguendo that plaintiffs were to seek and be granted leave to file an amended complaint asserting section 20 claims AFI would presumably again assert the defense that such claims are barred by the five-year statute of repose because AFI "was not named as a defendant in this action until . . May 4, 2012" and "all of the certificates . . . were issued in 2005 or 2006." *See* Ally Fin. Inc's Mem. of Law in Supp. of Mot. to Dismiss the Am. Compl., Civ. No. 11-02890, Docket No. 219, at 5 (S.D.N.Y. July 27, 2012). Plaintiffs opposed dismissal on the theory that their section 20 claims against AFI "relate[] back to the date of the original pleading" pursuant to Rule 15(c) of the Federal Rules of Civil Procedure. *See* Pl.'s Opp. to Defs. Ally Sec., LLC, Ally Fin. Inc. and Bruce J. Paradis' Mots. to Dismiss the Am. Compl., Civ. No. 11-02890, Docket No. 234, at 11 (S.D.N.Y. Oct. 1, 2012). The Examiner reaches no conclusions concerning the likelihood of success of a statute of repose defense with respect to these section 20 claims. The Examiner does note, however, that the "relation back" doctrine under Rule 15(c) requires, inter alia, "a mistake concerning the proper party's identity." *See* FED. R. CIV. P. 15(c)(1)(C)(ii).

purchased before September 6, 2006."[462] AFI's motions to dismiss remain pending as to the Minnesota Securities Act claims asserted against it in two RMBS Investor Actions in the U.S. District Court for the District of Minnesota.[463]

AFI argues that "claims brought [therein by Third-Party Claimants] for violations of the [Minnesota Securities Act] based on 'conduct occurring' before August 1, 2007" are time-barred because they were not asserted within three years.[464] Those two actions were commenced on October 11, 2011 and July 27, 2012, respectively.[465] The Examiner concludes it is likely that AFI's statute of limitations defense will prevail as to all Minnesota Securities Act claims asserted in those two actions and based upon conduct occurring before August 1, 2007.[466]

Minnesota Securities Act claims asserted against AFI in *Huntington Bancshares, Inc. v. Ally Financial, Inc.* were recently dismissed with prejudice by the Minnesota District Court for Hennepin County.[467] The court granted AFI's motion to dismiss such claims as "barred as a matter of law . . . because the [three-year] statute of repose expired on September 29, 2009."[468] The court explained that plaintiff waited until 2011 to bring its claims but "[a]ll of the claims asserted in Plaintiff's complaint" concern "Offering Documents [that] were issued

---

[462] Civ. No. 11-7010, 2012 U.S. Dist. LEXIS 179768, at *8 n.4 (S.D.N.Y. Dec. 19, 2012).

[463] *See* Mem. in Supp. of the Ally Defs.' Mot. to Dismiss the Am. Compl., *John Hancock Life Ins. Co. (U.S.A.) v. Ally Fin. Inc.*, Civ. No.12-01841, Docket No. 104 (D. Minn. Dec. 14, 2012); Mem. in Supp. of the Ally Defs.' Mot. to Dismiss the Am. Compl., *Stichting Pensioenfonds ABP v. Ally Fin. Inc.*, Civ. No. 12–01381, Docket No. 129 (D. Minn. Mar. 11, 2013).

[464] Mem. in Supp. of the Ally Defs.' Mot. to Dismiss the Am. Compl., *John Hancock Life Ins. Co. (U.S.A.) v. Ally Fin. Inc.*, Civ. No. 12-01841, Docket No. 104, at 16 (D. Minn. Dec. 14, 2012); *see also* Mem. in Supp. of the Ally Defs.' Mot. to Dismiss the Am. Compl., *Stichting Pensioenfonds ABP v. Ally Fin. Inc.*, Civ. No. 12–01381, Docket No. 129, at 16-19 (D. Minn. Mar. 11, 2013).

[465] *See* Compl., *John Hancock Life Ins. Co. (U.S.A.) v. Ally Fin. Inc.*, Civ. No.12-01841, Docket No. 1 (D. Minn. July 27, 2012); Compl., *Stichting Pensioenfonds ABP v. Ally Fin. Inc.*, Case No. 27–CV–11–20426 (Minn. Dist. Ct. Oct. 11, 2011).

[466] AFI concedes that the Minnesota Securities Act claims asserted as to one of the securitizations at issue (RALI 2007-QS11) would not, as alleged, be barred by the three-year statute of repose because the prospectus was issued on September 27, 2007 (i.e., after the August 1, 2007 effective date of Minn. Stat. § 80A.76). *See* Mem. in Supp. of the Ally Defs.' Mot. to Dismiss the Am. Compl., *John Hancock Life Ins. Co. (U.S.A.) v. Ally Fin. Inc.*, Civ. No.12-01841, Docket No. 104, at 18-19 (D. Minn. Dec. 14, 2012). AFI argues that claims as to that securitization are nonetheless time-barred under the applicable statute of limitations because plaintiffs "had knowledge of the facts . . . more than two years before they brought this suit" as a result of credit rating downgrades and the filing of lawsuits by other plaintiffs concerning other of Debtors' securitizations. *See id.*; MINN. STAT. § 80A.76(j)(2) (claims must be brought "within . . . two years after discovery of the facts constituting the violation"). The Examiner discussed above similar statute of limitations defenses raised by AFI in other RMBS Investor Actions. *See* Section VIII.C.2.a(2)(e)(i).

[467] *See* Order Granting Defs.' Mots. to Dismiss Compl., Case No. 27-CV-11-20276, at 9 (Minn. Dist. Ct. Dec. 11, 2012).

[468] *Id.*

between July 11, 2003 and September 29, 2006."[469] The Examiner finds no reason to expect a different result as to those Minnesota Securities Act claims that remain pending against AFI.[470]

The statutes of repose that govern control person claims asserted under sections 15 and 20(a) of the federal securities laws and several state securities laws also have potential implications for whether any Third-Party Claimants that have not to date asserted any claims against AFI could in the future timely assert control person claims against AFI. The available evidence suggests that many such future claims would be time-barred. Even under the five-year statute of repose applicable to control person claims asserted under section 20(a) of the Exchange Act (and the Illinois Securities Law), any such claim asserted on May 10, 2013 would be subject to an apparent time bar unless it accrued no earlier than May 10, 2008.[471] A control person claim asserted on May 10, 2013 under section 15 of the Securities Act would be subject to an apparent time bar by the three-year statute of repose unless it accrued no earlier than May 10, 2010.[472] Accordingly, given that the Debtors ceased private label securitizations by 2007, any future control person claims asserted under federal or state securities laws governed by a statute of repose of five years or less would appear presumptively time-barred.[473]

---

[469] *See id.*

[470] The Examiner is not persuaded that the three-year statute of repose under Minn. Stat. § 80A.23(7) is only applicable to claims that "could have been instituted . . . prior to August 1, 2007." *See* Pls.' Omnibus Opp. to Defs.' Mots. to Dismiss the Am. Compl., *John Hancock Life Ins. Co. (U.S.A.) v. Ally Fin. Inc.*, Civ. No.12-01841, Docket No. 118, at 88 (D. Minn. Feb. 15, 2013). Such an interpretation is inconsistent with the plain meaning of the relevant statute and has not been adopted by the courts. *See* MINN. STAT. § 80A.90(a) ("The predecessor act exclusively governs all actions or proceedings that are pending on August 1, 2007, or may be instituted on the basis of conduct occurring before August 1, 2007 . . . ."); *Trooien v. Mansour*, 608 F.3d 1020, 1027 n.2 (8th Cir. 2010) (predecessor statute "continues to govern all actions based on conduct occurring before that date"); Order Granting Defs.' Mots. to Dismiss Compl., *Huntington Bancshares, Inc. v. Ally Fin. Inc.*, Case No. 27-CV-11-20276, at 9 (Minn. Dist. Ct. Dec. 11, 2012) ("[A]ny claims brought for violation of the MSA based on conduct occurring before August 1, 2007 are governed by the prior version of the MSA . . . ."). Notably, Third-Party Claimants concede that, even under Minn. Stat. § 80A.76(j)(2), their Minnesota Securities Act claims would be time-barred by its five-year statute of repose as to at least some of the securitizations at issue. *See* Pls.' Omnibus Opp. to Defs.' Mots. to Dismiss the Am. Compl., *John Hancock Life Ins. Co. (U.S.A.) v. Ally Fin. Inc.*, Civ. No.12-01841, Docket No. 118, at 92 (D. Minn. Feb. 15, 2013) ("While some of Plaintiffs' claims are barred by the five-year statute of repose, many are not"); *see also* Pls.' Ombibus Memo. of Law in Opp. to Defs.' Mot. to Dismiss the Am. Compl., *Stichting Pensioenfonds ABP v. Ally Fin. Inc.*, Civ. No. 12-01381, Docket No. 142, at 77 (D. Minn. Apr. 25, 2013) (same).

[471] *See* 28 U.S.C. § 1658(b); 815 ILL. COMP. STAT. ANN. 5/13(D).

[472] *See* 15 U.S.C. § 77m.

[473] *See* Section III.G; Int. of J. Gray, Mar. 1, 2013, at 61:8–63:23. The Examiner reaches no definitive conclusions concerning whether any potential control person claims asserted against AFI would be subject to dismissal as time-barred under these or other federal or state securities laws. Such conclusions would require a case-by-case assessment of the facts and the law including, for example, whether any tolling agreement might permit otherwise time-barred claims to proceed.

### (3) Aiding And Abetting Fraud And Fraudulent Inducement

The Examiner has identified fourteen pending RMBS Actions where Third-Party Claimants seek to hold AFI liable for aiding and abetting an alleged common law fraud by one or more of the Debtors.[474] Those actions are pending in federal district courts located in Minnesota and New York.[475] Of those fourteen actions, ten are RMBS Insurer Actions brought by either FGIC or MBIA, who contracted to provide financial guaranty insurance in connection with issuances of RMBS by the Debtors.[476] The other four actions are RMBS Investor Actions brought by purchasers of RMBS issued by the Debtors.[477]

AFI filed pre-answer motions to dismiss the aiding and abetting claims asserted against it in five of those fourteen actions (the other nine actions brought by FGIC remain stayed by

---

[474] *See* Am. Compl., *FGIC v. Ally Fin., Inc.*, Civ. No. 11-09729, Docket No. 29, at 86–88 (S.D.N.Y. Mar. 30, 2012); Compl., *FGIC v. Ally Fin., Inc.*, Civ. No. 12-00338, Docket No. 1, at 67–68 (S.D.N.Y. Dec. 27, 2011); Compl., *FGIC v. Ally Fin., Inc.*, Civ. No. 12-00339, Docket No. 1, at 63 (S.D.N.Y. Dec. 27, 2011); Compl., *FGIC v. Ally Fin., Inc.*, Civ. No. 12-00340, Docket No. 1, at 69 (S.D.N.Y. Dec. 27, 2011); Compl., *FGIC v. Ally Fin., Inc.*, Civ. No. 12-00341, Docket No. 1, at 57 (S.D.N.Y. Dec. 15, 2011); Compl., *FGIC v. Ally Fin., Inc.*, Civ. No. 12-01658, Docket No. 1, at 88–90 (S.D.N.Y. Mar. 6, 2012); Compl., *FGIC v. Ally Fin., Inc.*, Civ. No. 12-01860, Docket No. 1, at 88–89 (S.D.N.Y. Mar. 13, 2012); Compl., *FGIC v. Ally Fin., Inc.*, Civ. No. 12-01601, Docket No. 1, at 85 (S.D.N.Y. Mar. 5, 2012); Compl., *FGIC v. Ally Fin., Inc.*, Civ. No. 12-01818, Docket No. 1, at 91–92 (S.D.N.Y. Mar. 12, 2012); Am. Compl., *FHFA v. Ally Fin. Inc.*, Civ. No. 11-07010, Docket No. 114, at 135 (S.D.N.Y. June 13, 2012); Am. Compl., *John Hancock Life Ins. Co. (U.S.A.) v. Ally Fin. Inc.*, Civ. No.12-01841 Docket No. 84, at 278–82 (D. Minn. Oct. 15, 2012); Compl., *MBIA Ins. Co. v. Ally Fin. Inc.*, Case. No. Civ. No. 12–02563, Docket No. 1, at 49–55 (D. Minn. Sept. 17, 2012); Am. Compl., *Stichting Pensioenfonds ABP v. Ally Fin. Inc.*, Civ. No. 12–01381, Docket No. 101, at 176-80 (D. Minn. Oct. 11, 2011); Am. Compl., *Union Cent. Life Ins. Co. v. Ally Fin., Inc.*, Civ. No. 11-02890, Docket No. 146, at 237-38 (S.D.N.Y. May 4, 2012).

[475] *See id.*

[476] *See* Am. Compl., *FGIC v. Ally Fin., Inc.*, Civ. No. 11-09729, Docket No. 29 (S.D.N.Y. Mar. 30, 2012); Compl., *FGIC v. Ally Fin., Inc.*, Civ. No. 12-00338, Docket No. 1 (S.D.N.Y. Dec. 27, 2011); Compl., *FGIC v. Ally Fin., Inc.*, Civ. No. 12-00339, Docket No. 1 (S.D.N.Y. Dec. 27, 2011); Compl., *FGIC v. Ally Fin., Inc.*, Civ. No. 12-340, Docket No. 1 (S.D.N.Y. Dec. 27, 2011); Compl., *FGIC v. Ally Fin., Inc.*, Civ. No. 12-341, Docket No. 1 (S.D.N.Y. Dec. 15, 2011); Compl., *FGIC v. Ally Fin., Inc.*, Civ. No. 12-01658, Docket No. 1 (S.D.N.Y. Mar. 6, 2012); Compl., *FGIC v. Ally Fin., Inc.*, Civ. No. 12-1860, Docket No. 1 (S.D.N.Y. Mar. 13, 2012); Compl., *FGIC v. Ally Fin., Inc.*, Civ. No. 12-1601, Docket No. 1 (S.D.N.Y. Mar. 5, 2012); Compl., *FGIC v. Ally Fin., Inc.*, Civ. No. 12–1818, Docket No. 1 (S.D.N.Y. Mar. 12, 2012); Compl., *MBIA Ins. Co. v. Ally Fin. Inc.*, Case. No. Civ. No. 12–02563, Docket No. 1 (D. Minn. Sept. 17, 2012).

[477] *See* Am. Compl., *FHFA v. Ally Fin. Inc.*, Civ. No. 11–7010, Docket No. 114 (S.D.N.Y. June 13, 2012); Am. Compl., *John Hancock Life Ins. Co. (U.S.A.) v. Ally Fin. Inc.*, Civ. No.12-01841 Docket No. 84 (D. Minn. Oct. 15, 2012); Am. Compl., *Stichting Pensioenfonds ABP v. Ally Fin. Inc.*, Civ. No. 12-01381, Docket No. 101 (D. Minn. Oct. 11, 2011); Am. Compl., *Union Cent. Life Ins. Co. v. Ally Fin., Inc.*, Civ. No. 11-02890, Docket No. 146 (S.D.N.Y. May 4, 2012).

Order of the Bankruptcy Court).[478] To date, Third-Party Claimants' aiding and abetting claims in one of those actions have survived an AFI motion to dismiss and are in discovery,[479] while aiding and abetting claims in one other action were dismissed without prejudice.[480] The three other AFI motions to dismiss remain pending. No final judgment has been entered as to the aiding and abetting claims asserted against AFI in any of these fourteen RMBS Actions.[481] The Examiner has identified six other RMBS Actions where common law fraud claims are pending against one or more of the Debtors, but where, to date, no aiding and abetting claims have been asserted against AFI.[482]

"The purpose of an aiding and abetting claim is to draw in defendants who would not be liable on the main fraud claim, but who are alleged to have actual knowledge of the fraud and substantially assisted it."[483] Accordingly, any plaintiff asserting a claim that a defendant aided and abetted an underlying fraud must plead and prove the following elements: (1) the existence of the fraud; (2) knowledge of the fraud by that defendant; and (3) substantial

---

[478] *See* Mem. of Law in Supp. of Ally Fin. Inc.'s and GMAC Mortg. Group, Inc's Mot. to Dismiss the Am. Compl., *FHFA v. Ally Fin. Inc.*, Civ. No. 11–7010, Docket No. 149 (S.D.N.Y. July 13, 2012); Mem. in Supp. of the Ally Defs.' Mot. to Dismiss the Am. Compl., *John Hancock Life Ins. Co. (U.S.A.) v. Ally Fin. Inc.*, Civ. No.12–01841, Docket No. 104 (D. Minn. Dec. 14, 2012); Am. Mem. of Law in Supp. of Defs.' Mot. to Dismiss, *MBIA Ins. Co. v. Ally Fin. Inc.*, Civ. No. 12–02563, Docket No. 36 (D. Minn. Mar. 12, 2013); Mem. in Supp. of the Ally Defs.' Mot. to Dismiss the Am. Compl., *Stichting Pensioenfonds ABP v. Ally Fin. Inc., et al.*, Civ. No. 12–01381, Docket No. 129 (D. Minn. Mar. 11, 2013); Ally Fin., Inc's Mem. of Law in Supp. of Mot. to Dismiss the Am. Compl., *Union Cent. Life Ins. Co. v. Ally Fin., Inc.*, Civ. No. 11–02890, Docket No. 219 (S.D.N.Y. July 27, 2012); Stipulation and Order with Respect to Debtors' Motion to Extend the Automatic Stay or, in the Alternative, for Injunctive Relief [Case No. 12–01671; Docket No. 90].

[479] *See FHFA v. Ally Fin., Inc.*, Civ. No. 11–7010, 2012 U.S. Dist. LEXIS 179768, at *15 (S.D.N.Y. Dec. 19, 2012).

[480] *See* Order, *Union Cent. Life Ins. Co. v. Ally Fin., Inc.*, Civ. No. 11–02890, Docket No. 263, at 7 n.7 (S.D.N.Y. Mar. 29, 2013) (granting plaintiffs opportunity to "file a letter motion to amend which attaches a proposed amended complaint within sixty (60) days").

[481] One additional RMBS Investor Action that asserted aiding and abetting claims against AFI was dismissed with prejudice. *See* Order Granting Defs.' Mot. to Dismiss Compl., *Huntington Bancshares, Inc. v. Ally Fin. Inc.*, Case No. 27–cv–11–20276 (Minn. Dist. Ct. Dec. 11, 2012).

[482] *See* First Am. Compl., *Allstate Ins. Co. v. GMAC Mortgage LLC*, Case No. 11–3480 (Minn. Dist. Ct. Apr. 15, 2011); Compl., *FGIC v. Residential Funding Co. LLC*, Civ. No. 11–9736, Docket No. 1 (S.D.N.Y. Nov. 29, 2011); Compl., *FGIC v. Residential Funding Co. LLC*, Civ. No. 11–9737, Docket No. 1 (S.D.N.Y. Nov. 29, 2011); First Am. Compl., *MBIA Ins. Corp. v. Residential Funding Co., LLC*, Index No. 603552/2008 (N.Y. Sup. Ct. Mar. 19, 2010); Compl., *MBIA Ins. Corp. v. GMAC Mortg., LLC*, Index No. 600837/2010 (N.Y. Sup. Ct. Apr. 1, 2010); Compl., *W. Va. Inv. Mgmt. Bd. v. Residential Accredit Loans, Inc.*, Civ. No. 10-0461, Docket. No. 1 (S.D.W.V. Apr. 7, 2010).

[483] *380544 Canada, Inc. v. Aspen Tech., Inc.*, 633 F. Supp. 2d 15, 36 (S.D.N.Y. May 5, 2009) (citation omitted).

assistance in the commission of the fraud by that defendant.[484] "Rule 9(b)'s particularity requirement for fraud applies equally to a claim for aiding and abetting."[485] Thus, a plaintiff must "plead facts with the requisite particularity" to show the defendant's "actual knowledge of fraud."[486] If the plaintiff satisfies this pleading burden, then "[a] claim for aiding and abetting fraud must be proven by clear and convincing evidence."[487]

---

[484] *See Dexia SA/NV v. Bear, Stearns & Co., Inc.*, Civ. No. 12-4761, 2013 U.S. Dist. LEXIS 30916, at * 28–29 (S.D.N.Y. Feb. 26, 2013) ("U]nder New York law, plaintiffs must allege (1) the existence of an underlying fraud, (2) actual knowledge of the fraud, and (3) substantial assistance in the commission of the fraud."); *Christopher v. Hanson*, Civ. No. 09-3703, 2011 U.S. Dist. LEXIS 60201, at *33 (D. Minn. June 6, 2011) ("Aiding and abetting tortious conduct has three elements [under Minnesota law]: (1) the primary tort-feasor must commit a tort that causes an injury to the plaintiff; (2) the defendant must know that the primary tort-feasor's conduct constitutes a breach of duty; and (3) the defendant must substantially assist or encourage the primary tort-feasor in the achievement of the breach."). Because these fourteen RMBS Actions are pending in Minnesota and New York courts, the Examiner's discussion of the law of aiding and abetting common law fraud relies upon both Minnesota and New York law. With certain distinctions to be discussed below, the laws of those jurisdictions do not appear to be in conflict. *See Am. Bank of St. Paul v. TD Bank, N.A.*, 2013 U.S. App. LEXIS 8489, at *11 n.4 (8th Cir. Apr. 26, 2013) ("New York and Minnesota both follow the Second Restatement approach to aiding and abetting."); *Thrivent Fin. for Lutherans v. Countrywide Fin. Corp.*, Civ. No. 11-71376, 2012 U.S. Dist. LEXIS 71376, at *18 (C.D. Cal. Feb. 17, 2012) (noting that Minnesota and New York apply the same elements to claims of aiding and abetting fraud claims).

[485] *E-Shops Corp. v. U.S. Bank Nat'l Ass'n*, 678 F.3d 659, 663 (8th Cir. 2012); *see also Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 292–93 (2d Cir. 2006). "[C]onclusory allegations" do not suffice and "[i]nstead, the complaint must set forth the who, what, when, where, and how surrounding the alleged fraud." *See E-Shops Corp.*, 678 F.3d at 663 (quotation marks omitted); *see also Lerner*, 459 F.3d at 290 ("[I]n order to comply with Rule 9(b), the complaint must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.") (quotation marks omitted).

[486] *See Lerner*, 459 F.3d at 292–93; *see also E-Shops Corp.*, 678 F.3d at 663 (affirming dismissal of aiding and abetting fraud claim that failed to "plead with particularity how [defendant] knowingly and substantially assisted the underlying fraud" and explaining that "[a]n aider and abettor's knowledge of the wrongful purpose is a crucial element in aiding or abetting cases") (quotation marks omitted). Courts in the Second Circuit have explained that "pleading knowledge for purposes of an aiding and abetting claim requires allegations of facts that give rise to a 'strong inference' of actual knowledge." *Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC*, 479 F. Supp. 2d 349, 367 (S.D.N.Y. 2007) (quoting *Lerner*, 459 F.3d at 293).

[487] *Mazzaro De Abreu v. Bank of Am. Corp.*, 812 F. Supp. 2d 316, 322 (S.D.N.Y. 2011) (quotation marks omitted) (applying New York law). If a court were instead to apply Minnesota law, however, "'[t]he standard of proof in all fraud cases is the preponderance of the evidence standard.'" *Cornerstone Home Builders, Inc. v. Guyers Dev., LLC*, Case No. A09-1178, 2010 Minn. App. Unpub. LEXIS 342, at *7 (Minn. App. Cr. Apr. 20, 2010) (unpublished) (quoting *State by Humphrey v. Alpine Air Prods., Inc.*, 500 N.W.2d 788, 791 (Minn. 1993)).

The Examiner's factual and legal conclusions concerning certain elements or defenses relevant to Third-Party Claimants' aiding and abetting claims are discussed below.[488]

### (a) Primary Violation

Any aiding and abetting fraud claim requires the plaintiff to plead and prove "the existence of an underlying fraud."[489] "Absent a sufficient claim of a primary fraud, a claim for aiding and abetting fraud must fail without regard to whether the remaining elements are satisfied."[490] The elements of a cause of action for common law fraud include that: "(1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance."[491]

---

[488] In its submissions to the Examiner, AFI in general does not assert that the common law aiding and abetting frauds claims asserted by Third-Party Claimants would be time-barred by an applicable statute of limitations. Although AFI in its initial submission argued that "MBIA's recently asserted [aiding and abetting fraud] claims against AFI . . . will also fail as time-barred," AFI Submission Paper, dated Dec. 17, 2012, at 74–75, AFI's subsequent amended motion to dismiss those claims appears to abandon such arguments. *See* Am. Mem. of Law in Supp. of Defs.' Mot. to Dismiss, *MBIA Ins. Corp. v. Ally Fin. Inc.*, Civ. No. 12-02563, Docket No. 36 (D. Minn. Mar. 12, 2013). Accordingly, the Examiner does not further address the timeliness of Third-Party Claimants' aiding and abetting fraud claims except to note that the limitations periods applicable to such claims under the laws of certain potentially relevant jurisdictions appear lengthier than those applicable to Third-Party Claimants' securities law claims. *See, e.g.*, MINN. STAT. § 541.05(6) (six-year statute of limitations for fraud claims "shall not be deemed to have accrued until the discovery by the aggrieved party of the facts constituting the fraud"); N.Y. C.P.L.R. § 213(8) (statute of limitations for fraud claims "the greater of six years from the date the cause of action accrued or two years from the time the plaintiff or the person under whom the plaintiff claims discovered the fraud, or could with reasonable diligence have discovered it").

[489] *Dexia* SA/NV, 2013 U.S. Dist. LEXIS 30916, at *28–29; *see also Christopher*, 2011 U.S. Dist. LEXIS 60201, at *33–34.

[490] *See In re Lehman Bros. Sec. & ERISA Litig.*, Case No. 09-MD-2017, 2012 U.S. Dist. LEXIS 148177, at *82 (S.D.N.Y. Oct. 15, 2012); *see also Kittay v. Atl. Bank of N.Y. (In re Global Serv. Group LLC)*, 316 B.R. 451, 462 (Bankr. S.D.N.Y. 2004) ("Without a primary violation, there is no wrongdoing to aid and abet."); *Alliance Bank v. Dykes*, Case No. A12-0455, 2012 Minn. App. Unpub. LEXIS 1253, at *33–34 n.12 (Minn. Ct. App. Dec. 31, 2012) (unpublished) (affirming decision granting defendant's motion for summary judgment on aiding and abetting claim in part "under the first element of such a claim because it is contingent on the conclusion that [the primary tortfeasor] breached its fiduciary duty").

[491] *Banque Arabe et Internationale D'Investissement v. Md. Nat'l Bank*, 57 F.3d 146, 153 (2d Cir. 1995) (applying New York law); *see also Eurycleia Partners, LP v. Seward & Kissel, LLP*, 12 N.Y.3d 553, 559 (N.Y. 2009) ("The elements of a cause of action for fraud [under New York law] require a material misrepresentation of a fact, knowledge of its falsity, an intent to induce reliance, justifiable reliance by the plaintiff and damages."); *Damon v. Groteboer*, Civ. No. 10-92, 2013 U.S. Dist. LEXIS 45223, at *38 (D. Minn. Mar. 29, 2013) ("Under Minnesota law, the elements of fraud are: (1) there was a false representation by a party of a past or existing material fact susceptible of knowledge; (2) made with knowledge of the falsity of the representation or made as of the party's own knowledge without knowing whether it was true or false; (3) with the intention to induce another to act in reliance thereon; (4) that the representation caused the other party to act in reliance thereon; and (5) that the party suffer pecuniary damage as a result of the reliance.").

Third-Party Claimants assert that, like certain of their securities law claims, the common law fraud claims underlying the aiding and abetting claims brought against AFI either will or "have already survived motions to dismiss, and will proceed to trial."[492] Certain common law fraud claims asserted by Third-Party Claimants against the Debtors and Ally Securities have foundered at the pleading stage for failure to plead fraud with the requisite particularity.[493] In several other cases, however, such primary claims have survived the pleading stage and proceeded to discovery.[494]

Definitive conclusions concerning the likelihood of success of the primary fraud claims underlying Third-Party Claimants' aiding and abetting claims in these fourteen pending RMBS Actions (and other such underlying claims) are outside the scope of the Investigation. The Examiner further describes, in Section VIII.C.2.b, the primary common law fraud claims that have been asserted against Ally Securities.

---

[492] Joint Submission Paper of AIG, Allstate Life Ins. Co., Mass. Mut. Life Ins. Co., and Prudential Ins. Co. of Am., dated Oct. 17, 2012, at 35; *see also* Joint Submission Paper of Federal Home Loan Banks of Boston, Chicago, and Indianapolis, dated Oct. 19, 2012, at 21 ("[T]he FHLBs' effectively universal success in defeating Defendants' motions to dismiss provides support for the conclusion that [their] claims have merit.").

[493] *See* Order, *Union Cent. Life Ins. Co., et al. v. Ally Fin., Inc.*, Civ. No. 11-02890, Docket No. 263, at 3 (S.D.N.Y. Mar. 29, 2013) (dismissing without prejudice common law fraud claims because plaintiffs "have not pled any facts with particularity to demonstrate [defendants'] scienter"); Order Granting Defendants' Motions to Dismiss Compl., *Huntington Bancshares, Inc. v. Ally Fin., Inc.*, Case No. 27-CV-11-20276, at 6–7 (Minn. Dist. Ct. Dec. 11, 2012) (dismissing common law fraud claim where "Plaintiff has not pled with particularity which specific [defendant] was responsible for the alleged misrepresentation or omission and . . . has not identified the specific misrepresentation or omission"); *see also Footbridge Ltd. Trust v. Countrywide Home Loans, Inc.*, Civ. No. 09-4050, 2010 U.S. Dist. LEXIS 102134, at *69–70 (S.D.N.Y. Sept. 28, 2010) (dismissing common law fraud claims for failure to plead with particularity "a material, false representation or that defendants made such statements with an intent to defraud the plaintiffs").

[494] *See FHFA v. Ally Fin., Inc.*, Civ. No. 11-7010, 2012 U.S. Dist. LEXIS 179768, at *18 (S.D.N.Y. Dec. 19, 2012) (denying in part motion to dismiss common law fraud claims asserted against Ally Securities); *Allstate Ins. Co. v. GMAC Mortgage, LLC*, Case No. 27-cv-11-3480, at 12 (Minn. Dist. Ct. Nov. 28, 2011) (denying motion to dismiss common law fraud claims asserted against certain of the Debtors and Ally Securities in part because "[a]llegations of wholesale abandonment of underwriting standards that loan originators purported to follow, but in fact ignored, meet the particularity requirement for fraud"); *W. & S. Life Ins. Co. v. Residential Funding Co., LLC*, Case No. A1105042, 2012 Ohio Misc. LEXIS 100, at *28 (Ohio Ct. Com. Pl. June 6, 2012) (denying motion to dismiss common law fraud claim against Ally Securities and rejecting argument that complaint "fails to state the fraud and misrepresentation claims with particularity"); *MBIA Ins. Co. v. Residential Funding Co., LLC*, Index No. 603552/08, 2009 N.Y. Misc. LEXIS 3523, at *13 (N.Y. Sup. Ct. Dec. 22, 2009) (denying motion to dismiss common law fraud claim); *see also Dexia Holdings, Inc. v. Countrywide Fin. Corp.*, Civ. No. 11-07165, 2012 WL 1798997, at *5 (C.D. Cal. Feb. 17, 2012) (denying motion to dismiss common law fraud claims as to alleged misrepresentations concerning "underwriting standards" and "appraisals, [LTV] ratios, and ratings"). Notably, in *MBIA Insurance Co. v. Ally Financial Inc.*, AFI's pending motion to dismiss MBIA's aiding and abetting fraud claim does not argue that MBIA fails to adequately plead an underlying fraud. *See* Am. Mem. of Law in Supp. of Defs.' Mot. to Dismiss, *MBIA Ins. Corp. v. Ally Fin. Inc.*, Civ. No. 12-02563, Docket No. 36, at 12 (D. Minn. Mar. 12, 2013) ("Whether MBIA was in fact defrauded by the Securitization Sponsors can be left for another day, for it is clear that the Complaint fails to plead adequately the elements of aiding and abetting fraud.").

#### (b) Knowledge Of Fraud

##### (i) Legal Principles

The elements of a cause of action for aiding and abetting fraud include that "the defendant had actual knowledge of the wrongful conduct committed, not simply that the defendant should have known of the conduct."[495] Thus, actual, not "constructive knowledge" is required.[496] Although the "burden of demonstrating actual knowledge is a heavy one," the

---

[495] *Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 442 (S.D.N.Y. 2010) (applying New York law); *see also Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 292 (2d Cir. 2006) ("actual knowledge is required to impose liability on an aider and abettor under New York law") (quotation marks omitted); *Thrivent Fin. for Lutherans v. Countrywide Fin. Corp.*, Civ. No. 11-07154, 2012 U.S. Dist. LEXIS 71376, at *18 (C.D. Cal. Feb. 17, 2012) ("Minnesota, like New York, requires a plaintiff to show . . . actual knowledge of the primary violation . . . ."); *Witzman v. Lehrman, Lehrman & Flom*, 601 N.W.2d 179, 188 (Minn. 1999) ("[W]here the conduct is not a facial breach of duty, courts have been reluctant to impose liability on an alleged aider and abettor for anything less than actual knowledge that the primary tort-feasor's conduct was wrongful.") (applying Minnesota law). "[U]nder certain circumstances, some courts [in the Second Circuit] have found that a plaintiff met the actual knowledge requirement for aiding and abetting fraud or a breach of fiduciary duty through allegations of conscious avoidance." *Clarke v. Cosmo (In re Agape Litig.)*, 773 F. Supp. 2d 298, 308 (E.D.N.Y. 2011). "Lower courts disagree whether conscious avoidance is legally equivalent to actual knowledge." *Krys v. Butt*, 486 Fed. Appx. 153, 157 n.5 (2d Cir. 2012) (collecting cases). Some of the courts considering the question have, however, construed "the difference [as] a narrow one" that will not always be "material." *Krys v. Sugrue (In re Refco Inc. Sec. Litig.)*, Civ. Nos. 08-3065, 08-3086, 2012 U.S. Dist. LEXIS 108305, at *17 (S.D.N.Y. July 28, 2012); *see also Boyarsky v. Hoberman (In re Jeweled Objects LLC)*, Adv. Pro. No. 10-03198, 2012 Bankr. LEXIS 3877, at *27 (Bankr. S.D.N.Y. Aug. 22, 2012) ("The distinction between actual knowledge and conscious avoidance is, at most miniscule, however: consciously avoiding something is tantamount to knowing it.").

[496] *See Chemtex, LLC v. St. Anthony Enters., Inc.*, 490 F. Supp. 2d 536, 546 (S.D.N.Y. 2007) ("New York courts . . . have uniformly required that a defendant have actual knowledge of the alleged fraud to sustain a claim for aiding and abetting."); *see also Kolbeck v. LIT Am. Inc.*, 939 F. Supp. 240, 246 (S.D.N.Y. 1996) ("New York common law . . . has not adopted a constructive knowledge standard for imposing aiding and abetting liability."). The Minnesota Supreme Court has suggested that "constructive knowledge" may arise where a defendant has a "long-term or in-depth relationship" with a tortfeasor whose "conduct is clearly tortious or illegal." *See Witzman*, 601 N.W.2d at 188 (allegations failed to satisfy "actual knowledge" requirement where "most of [the primary tortfeasor's] activities regarding the trusts were not clear violations of the broad discretionary authority he held as trustee"). Subsequent decisions have disagreed concerning the scope of this apparent exception to the "actual knowledge" requirement. *Compare Christopher v. Hanson*, Civ. No. 09-3703, 2011 U.S. Dist. LEXIS 60201, at *34–35 (D. Minn. June 6, 2011) (granting defendant's motion for summary judgment on aiding and abetting claim where there was no "evidence of actual knowledge", despite "in-depth familial relationship" of the defendants, because the determination of an underlying breach of duty "requires a fact-intensive look at [the primary tortfeasor's] conduct in comparison with that of a prudent person"); *with Bank of Montreal v. Avalon Capital Grp. Inc.*, Civ. No. 10-591, 2012 U.S. Dist. LEXIS 46935, at *21 (D. Minn. Apr. 3, 2012) (denying motion to dismiss aiding and abetting claim where "the facts pled . . . are sufficient to create a plausible implication of constructive knowledge [of the sole manager and owner of the primary tortfeasor] of clearly tortious or illegal conduct"). In *Huntington Bancshares, Inc. v. Ally Financial Inc.*, the Minnesota District Court for Hennepin County granted AFI's motion to dismiss aiding and abetting claims in part on the ground that the plaintiff had "not adequately pled actual knowledge of the alleged fraud." *See* Order Granting Defs.' Mots. to Dismiss Compl., Case No. 27-CV-11-20276, at 8 (Minn. Dist. Ct. Dec. 11, 2012) (applying Minnesota law). According to the court, "actual knowledge" was necessary because "the alleged primary tortfeasor's conduct is not a clear breach of a clear duty." *Id*.

defendant's "actual knowledge does not have to be based on defendant's explicit acknowledgment of the fraud."[497] "Rather, actual knowledge may be inferred from circumstantial evidence, provided that the central inquiry remains whether the evidence permits a reasonable finder of fact to infer that the defendant *actually knew* of the underlying fraud."[498] An inference of actual knowledge may arise from, inter alia, "facts showing a motive for participating in a fraudulent scheme and a clear opportunity to do so."[499]

A corporation may be charged with the knowledge of its directors, officers, and employees.[500] Without more, the parent-subsidiary relationship has in general not been found

---

[497] *IMG Fragrance Brands, LLC v. Houbigant, Inc.*, 759 F. Supp. 2d 363, 385 (S.D.N.Y. 2010); *see also Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 652 F. Supp. 2d 495, 503–04 (S.D.N.Y. 2009) (denying defendant's motion for summary judgment on aiding and abetting claim despite that "every . . . employee [of the defendant] has denied any actual knowledge of the fraud" and there was "no email, memorandum, or other . . . document that expressly admits knowledge of the fraud," because there was other evidence that "would permit a reasonable jury to infer that [defendant] had actual knowledge"); *Silverman v. United Talmudical Acad. Torah Vyirah, Inc. (In re Allou Distribs., Inc.)*, 446 B.R. 32, 51 (Bankr. E.D.N.Y. 2011) ("[A] defendant's admission of actual knowledge of the underlying fraud is likely to be rare. But such direct evidence of actual knowledge is not necessary to establish this element of the claim.").

[498] *In re Allou Distribs., Inc.*, 446 B.R. at 51; *see also Am. Bank of St. Paul v. TD Bank, N.A.*, Civ. No. 09-2240, 2011 U.S. Dist. LEXIS 49646, at *22 (D. Minn. May 9, 2011) ("Actual knowledge is usually a question of fact, as it must be inferred from circumstantial evidence.").

[499] *AHT Corp. v. Bioshield Techs., Inc. (In re AHT Corp.)*, 292 B.R. 734, (S.D.N.Y. 2003), *aff'd*, 123 Fed. Appx. 17 (2d Cir. 2005). An "ordinary economic motive" does not suffice. *See Burns v. Del. Charter Guar. & Trust Co.*, 805 F. Supp. 2d 12, 30 (S.D.N.Y. 2011) (dismissing aiding and abetting claim where "[d]efendants had no motive to assist Westgate in perpetrating a fraud on their investors, and any motive would have been ordinary economic motive").

[500] *See City of Monroe Emps.' Ret. Sys. v. Hartford Fin. Servs. Group, Inc.*, Civ. No. 10-2835, 2011 U.S. Dist. LEXIS 106046, at *48 (S.D.N.Y. Sept. 19, 2011) ("Courts routinely impute to the corporation the intent of officers and directors acting within the scope of their authority."); *In re Medtronic Inc., Sec. Litig.*, 618 F. Supp. 2d 1016, 1035 (D. Minn. 2009) ("Plaintiffs [may] establish corporate scienter by adequately alleging the scienter of individual corporate officers."); *In re Marsh & McLennan Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 481 (S.D.N.Y. 2006) ("A corporate defendant's scienter is necessarily derived from its employees. While there is no simple formula for how senior an employee must be in order to serve as a proxy for corporate scienter, courts have readily attributed the scienter of management-level employees to corporate defendants.") (citation omitted); *Adams v. RTC*, 831 F. Supp. 1471, 1480 (D. Minn. 1993) (granting defendant corporation's motion for summary judgment as to aiding and abetting securities fraud claim where the plaintiff "failed to produce any evidence demonstrating that an employee, officer, or director of [the corporation] had actual knowledge of any misrepresentations contained in, or omissions made from, the debenture offering documents").

sufficient to impute knowledge from one entity to another.[501] Likewise, that a parent company of an alleged primary violator "was vested generally with 'management and control' of [the subsidiary]" and "had the authority to require [the subsidiary] to comply with applicable laws" has been found insufficient to "permit an inference that [the parent] had actual knowledge of the alleged fraud."[502] More is needed to charge a parent with knowledge of a fraud by its subsidiary. For example, allegations that "high-level executives of the [parent] knew and participated in creating policies that incentivized high-risk lending and reduced controls [at its subsidiaries] in order to increase profits by creating greater numbers of RMBS regardless of quality" could, if proven, "satisfy the knowledge . . . requirement[ ] of aiding and abetting fraud."[503]

### (ii) Application To RMBS Claims

Third-Party Claimants assert that "[t]he evidence will show that [AFI] had actual and constructive knowledge that the Debtors were perpetrating a fraud through the securitizations."[504] AFI responds that it "had limited knowledge of the Debtors' day-to-day business" and that there is "no evidence that AFI had knowledge regarding any specific securitization transaction, let alone the alleged fraudulent conduct."[505]

As explained above, the Investigation revealed evidence suggesting that—if the facts underlying the alleged fraud were to be proven—there may be a basis to expect that Third-Party Claimants could prove that AFI had at least constructive knowledge of those facts.[506] For example, the existence of overlapping officers or directors among AFI and the Debtors presents a potential avenue for proof of knowledge that could be imputed to AFI.[507] Similarly, the audits AFI conducted through Audit Services of the mortgage and securitization operations

---

[501] *Compare Valentini v. Citigroup, Inc.*, 837 F. Supp. 2d 304, 317 (S.D.N.Y. 2011) ("[T]he mere existence of a parent-subsidiary or affiliate relationship is not on its own sufficient to impute the scienter of the subsidiary to the parent or affiliate. Instead, plaintiffs must demonstrate that the parent or affiliate possessed some degree of control over, or awareness about, the fraud."), *and Defer LP v. Raymond James Fin., Inc.*, 654 F. Supp. 2d 204, 218 (S.D.N.Y. 2009) ("[T]here is no . . . rule requiring the imputation of a subsidiary's knowledge to its parent, at least where there are no allegations as to the existence of an agency relationship or other foundation on which to premise the parent's vicarious liability."), *with Marino v. Grupo Mundial Tenedora, S.A.*, Civ. No. 10-4126, 2011 U.S. Dist. LEXIS 27543, at *15 (S.D.N.Y. Mar. 17, 2011) (holding that "knowledge of the transaction should be attributed to [defendant]" that was "a wholly-owned and controlled shell subsidiary of [the alleged primary violator] set up for the sole purpose of receiving the proceeds of the below fair market value sale . . . to disguise the self-dealing transaction").

[502] *Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC*, 376 F. Supp. 2d 385, 412–13 (S.D.N.Y. 2005).

[503] *Dexia SA/NV v. Bear, Stearns & Co., Inc.*, Civ. No. 12-4761, 2013 U.S. Dist. LEXIS 30916, at *29–30 (S.D.N.Y. Feb. 26, 2013).

[504] MBIA Submission Paper, dated Nov. 9, 2012, at 25.

[505] *See* AFI Submission Paper, dated Dec. 19, 2012, at 36–37.

[506] *See* Section VIII.C.2.a(2)(d)(ii).

[507] *See id.*

of its subsidiaries from 2004 through 2007 offer another potential opportunity where additional discovery would clarify whether the audit process resulted in AFI obtaining knowledge of the facts underlying the alleged fraud.[508]

However, Third-Party Claimants have not produced nor has the Investigation revealed any evidence to support the assertion that AFI possessed actual knowledge of the facts underlying the fraud alleged by Third-Party Claimants. MBIA asserts that "[i]n early 2007, AFI replaced management throughout the Debtors with hand-picked executives," which "provided AFI with additional knowledge . . . of the Debtors' . . . securitization practices."[509] In particular, MBIA asserts that two of those "hand-picked" executives—Jim Redmond (ResCap Chief Risk Officer) and Luke Hayden (Head of Capital Markets)—may have obtained "insight into the deficient aspects of the Debtors' securitization practices."[510] The available evidence supports the proposition that after the close of the Cerberus PSA various members of the Debtors' management were replaced by individuals (including Redmond and Hayden) who were recruited, directly or indirectly, by Cerberus and AFI.[511] Nonetheless, there are at least two reasons why knowledge of facts underlying the alleged fraud possessed by Redmond and Hayden, if any, may not be probative of AFI's knowledge of those same facts at a relevant time. First, neither joined ResCap earlier than March 2007, which MBIA acknowledges was after the closing of all but two of the seven transactions it challenges (and months or years after many of the securitizations challenged by other Third-Party Claimants).[512] Second, MBIA does not assert that after Redmond and Hayden were "installed" by AFI they also served as officers of AFI.[513] Subject to evidence that they or other "hand-picked" executives of the Debtors communicated such facts to AFI, therefore, their knowledge may not be imputed to AFI on the basis of the parent-subsidiary relationship alone.[514]

---

[508] *See id.*

[509] *See* MBIA Submission Paper, dated Nov. 9, 2012, at 27.

[510] *See id.* at 27–28; Int. of J. Redmond, Nov. 13, 2012, at 5:22–6:25.

[511] *See* Sections III.E, VII.A.1.f(4)(b)(iv); *see also* Int. of J. Redmond, Nov. 13, 2012, at 5:22–6:25 ("In 2006 . . . some people I'd worked with before . . . . asked me to come help them with the [Cerberus] diligence on the GMAC portal portfolio [as a consultant]. . . . [T]hat's primarily what I was doing until sometime in the first part of January '07, when Jim Jones reached out and said would I like to come to work for ResCap . . . . Eventually I joined the team . . . sometime between March and April of '07 and that's how I got involved with ResCap."). Cerberus and AFI also installed Cerberus and COAC employees at ResCap as consultants pursuant to the April 1, 2007 Consulting Agreement. *See* Section III.E.

[512] *See* MBIA Submission Paper, dated Nov. 9, 2012, at 4, 32; *see also* Int. of J. Redmond, Nov. 13, 2012, at 6:22–25 ("I joined the [ResCap] team . . . sometime between March and April of '07"). For the same reason, MBIA's assertion that "Khattri met with MBIA in [July] 2007 to discuss expanding the relationship between MBIA and the Debtors" is not, without more, probative of AFI knowledge of the facts underlying the alleged fraud. *See* MBIA Submission Paper, dated Nov. 9, 2012, at 4, 32.

[513] *See* MBIA Submission Paper, dated Nov. 9, 2012, at 27–28.

[514] *See Valentini v. Citigroup, Inc.*, 837 F. Supp. 2d 304, 317 (S.D.N.Y. 2011) ("[T]he mere existence of a parent-subsidiary or affiliate relationship is not on its own sufficient to impute the scienter of the subsidiary to the parent or affiliate.").

The evidence of AFI's knowledge proffered by FGIC has similar limitations. FGIC asserts that "at least one [AFI] employee . . . appeared on the working group list for [certain securitization transactions insured by FGIC] and received all distributions . . . including all drafts, final versions, and communications concerning the Operative and Offering Documents."[515] FGIC did not provide the Examiner with any such communications that it considered probative of that unidentified AFI employee's knowledge of the alleged fraud and, without evidence that such communications were further shared with officers or directors of AFI, any such knowledge possessed by that "employee" is unlikely to be imputed to AFI.[516]

That Third-Party Claimants have not provided and the Investigation has not uncovered evidence to support the assertion that AFI possessed actual knowledge of the facts underlying the alleged fraud is not, of course, dispositive of whether Third-Party Claimants would succeed after conducting further discovery in proving the requisite knowledge with respect to each challenged securitization.

#### (c) Substantial Assistance

##### (i) Legal Principles

Third-Party Claimants must further plead and prove "substantial assistance" in the alleged primary violation, which exists "where a defendant affirmatively assists, helps conceal, or by virtue of failing to act when required to do so enables the fraud to proceed."[517] "[T]he actions of the aider/abettor [must have] proximately caused the harm on which the primary liability is predicated."[518] Accordingly, "'[b]ut-for' causation is insufficient; aider and

---

[515] FGIC Submission Paper, dated Oct. 17, 2012, at 24.

[516] *See In re Marsh & McLennan Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 481 (S.D.N.Y. 2006) ("While there is no simple formula for how senior an employee must be in order to serve as a proxy for corporate scienter, courts have readily attributed the scienter of management-level employees to corporate defendants.") (internal citation omitted).

[517] *Fezzani v. Bear, Stearns & Co., Inc.*, 592 F. Supp. 2d 410, 423 (S.D.N.Y. 2008) (quoting *Cromer Fin. Ltd. v. Berger*, 137 F. Supp. 2d 452, 470 (S.D.N.Y. 2001)).

[518] *Cromer Fin. Ltd.*, 137 F. Supp. 2d at 470; *see also Metge v. Baehler*, 762 F.2d 621, 624 (8th Cir. 1985) ("Regarding the 'substantial assistance' factor, we note that the district court properly held that the appellants had the burden of showing that the secondary party proximately caused the violation."); *In re TMJ Implants Prods. Liab. Litig.*, 880 F. Supp. 1311, 1319 (D. Minn. 1995) ("A plaintiff seeking to demonstrate aiding-abetting liability must also show proximate cause . . . .").

abettor liability requires the injury to be a direct or reasonably foreseeable result of the conduct."[519] "Inaction is actionable participation only when the defendant owes a fiduciary duty directly to the plaintiff."[520]

Several courts have found the provision of routine business services to, or the entry into ordinary course transactions with, an alleged primary violator, without more, to be insufficient to demonstrate substantial assistance.[521] However, even conduct "routinely performed in the course of business" can "constitute substantial assistance under some circumstances, such as

---

[519] *Cromer Fin. Ltd.*, 137 F. Supp. 2d at 470; *see also In re TMJ Implants Prods. Liab. Litig.*, 880 F. Supp. at 1319 (proximate cause requires a "substantial causal connection between the culpable conduct of the alleged aider and abettor and the harm to the plaintiff" or that "the encouragement or assistance is a substantial factor in causing the resulting tort") (quotation marks omitted).

[520] *Cromer Fin. Ltd.*, 137 F. Supp. 2d at 470 (quotation marks omitted); *see also Am. Bank of St. Paul v. TD Bank, N.A.*, Civ. Nos. 12-1806, 12-1862, 12-23999, 2013 U.S. App. LEXIS 8489, at *7 (8th Cir. Apr. 26, 2013) ("Some affirmative step is required, because the mere presence of the particular defendant at the commission of the wrong, or his failure to object to it, is not enough to charge him with responsibility.") (applying Minnesota law); *Christopher v. Hanson*, Civ. No. 09-3703, 2011 U.S. Dist. LEXIS 60201, at *34–35 (D. Minn. June 6, 2011) (granting defendant's motion for summary judgment on aiding and abetting claim where "the showing of substantial assistance . . . amounts to a failure to monitor"); *J.P. Morgan Chase Bank v. Winnick*, 406 F. Supp. 2d 247, 258 (S.D.N.Y. 2005) ("Mere presence [at meetings], and passive receipt of email, cannot, by definition, constitute affirmative assistance.").

[521] *See Greenberg v. Bear, Stearns & Co.*, 220 F.3d 22, 29 (2d Cir. 2000) ("The simple providing of normal clearing services to a primary broker who is acting in violation of the law does not make out a case of aiding and abetting against the clearing broker.") (quotation marks omitted); *Halo Tech Holdings, Inc. v. Cooper*, Civ. No. 07-489, 2008 U.S. Dist. LEXIS 24831, at *66 (D. Conn. Mar. 26, 2008) (granting motion to dismiss aiding and abetting fiduciary duty claim despite allegations that defendants provided substantial assistance "by performing due diligence, providing financial advice, participating in negotiations, and continuing their financial support," because those actions were merely "steps to complete the [transaction]" that had been commenced before defendants learned of the alleged breach of fiduciary duty) (applying Connecticut law); *Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 446 F. Supp. 2d 163, 174 (S.D.N.Y. 2006) (granting motion to dismiss aiding and abetting fraud claim against "prime broker and custodian" to hedge funds allegedly defrauded by their manager despite allegations that broker provided the manager "with dial-in access to its computer network and allow[ed] him to generate false position statements"; explaining that "routine functions such as clearing trades, administrative tasks, and portfolio management" did not, in this context, plead "substantial assistance" in the underlying fraud); *Felker v. McGhan Med. Corp. (In re Minn. Breast Implant Litig.)*, 36 F. Supp. 2d 863, 877 (D. Minn. 1998) (dismissing claim that defendant that allegedly "sold the division knowing that the breast implants were defective" had aided and abetted the subsequent torts of the third party that purchased the division; allegations that defendant "allowed [the third party] to purchase the implant division on credit" and "reorganized the debt twice following the . . . sale" did not "rise to the level of substantial assistance") (applying Arizona law); *In re TMJ Implants Prods. Liab. Litig.*, 880 F. Supp. at 1319 (granting defendant parent company's motion for summary judgment on aiding and abetting claim where the parent provided "research assistance and facilities" to its primary violator subsidiary but "[t]here [was] no evidence . . . that [the subsidiary] was 'heavily dependent' upon [its parent] for any assistance regarding the manufacture of [the allegedly defective] TMJ implants").

where there is an extraordinary motivation to aid the fraud."[522] "The critical test is not . . . whether the alleged aiding and abetting conduct was routine, but whether it made a substantial contribution to the perpetration of the fraud."[523]

Some courts have required that "where the alleged primary violations consist of misrepresentations in a document, the defendant must be alleged to have given substantial assistance to the making and dissemination of that document."[524] If otherwise, "in most situations, [the plaintiffs] could not say that their losses were proximately caused by the aider and abettor's actions."[525] For example, in *Dexia Holdings, Inc. v. Countrywide Financial Corp.*, the U.S. District Court for the Central District of California granted a motion to dismiss aiding and abetting fraud claims asserted under New York law against a defendant that "operates [one of the alleged primary violators] as a subsidiary."[526] The district court explained that the defendant "must have assisted with the allegedly false statements [concerning mortgage loan underwriting standards, appraisal and LTV ratios, investment ratings, and title transfers] that form the basis of the complaint; assistance with underwriting at Countrywide generally does not suffice."[527] Other courts have determined that a plaintiff need not prove that a defendant "assist[ed] in the preparation of the documents themselves" if those documents were but one part of a "highly interdependent scheme in which both parties

---

[522] *Winnick*, 406 F. Supp. 2d at 257 (denying motion by in-house counsel to dismiss aiding and abetting claim where he was "alleged to have been directly involved in bringing about—including negotiating—transactions, which while not themselves necessarily fraudulent, are alleged to have been carried out solely for the purpose of inflating revenue and thus could reasonably be understood as a proximate cause leading foreseeably to defrauding the [plaintiffs]") (quotation marks omitted); *see also K&S P'ship v. Cont'l Bank, N.A.*, 952 F.2d 971, 980 (8th Cir. 1991) ("[A] party's involvement in only routine business transactions will not necessarily protect it from aiding and abetting liability.") (applying federal common law); *Primavera Familienstiftung v. Askin*, 130 F. Supp. 2d 450, 511 (S.D.N.Y. 2001) (collecting cases where participation in "ordinary course transactions" or "financing the fraudulent scheme" was considered "substantial assistance" in context). Courts applying Minnesota law have evaluated knowledge and substantial assistance "in tandem" and, thus, "where there is a minimal showing of substantial assistance, a greater showing of scienter is required." *Witzman v. Lehrman, Lehrman & Flom*, 601 N.W.2d 179, 188 (Minn. 1999) (quotation marks omitted).

[523] *Id.* at 257.

[524] *Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC*, 479 F. Supp. 2d 349, 371 (S.D.N.Y. 2007); *see also Morin v. Trupin*, 711 F. Supp. 97, 113 (S.D.N.Y. 1989) (granting motion to dismiss aiding and abetting claim where "plaintiffs acknowledge that the . . . defendants had no involvement in the preparation or dissemination of the offending documents").

[525] *Fraternity Fund Ltd.*, 479 F. Supp. 2d at 371.

[526] *See* Civ. No. 11-07165, 2012 U.S. Dist. LEXIS 71374, at *25 (C.D. Cal. Feb. 17, 2012).

[527] *Id.* at *24.

benefitted from [the primary violator's] fraudulent activity."[528] "In such circumstances, allegations that a defendant actively assisted and facilitated the fraudulent scheme itself . . . are sufficient."[529]

### (ii) Application To RMBS Claims

Third-Party Claimants assert that AFI "provided substantial assistance to the Debtors' [fraud]" including through "managerial and financial assistance."[530] AFI responds that it never "provided substantial assistance in support of . . . any fraud" and that Third-Party Claimants "only point to alleged conduct occurring after the . . . securitizations at issue."[531]

The Investigation has revealed no evidence that supports the assertion that AFI provided substantial assistance to the conduct alleged to give rise to Third-Party Claimants' common law fraud claims. The Examiner discusses below the parties' arguments and the available evidence, including with respect to: (A) direction and control of the securitizations at issue; (B) financial support; and (C) shared functions and services.

### (A) Direction And Control Of The Debtors' Securitizations

Third-Party Claimants assert as evidence of substantial assistance that "AFI controlled the Debtors and directed their loan acquisition, underwriting and securitization practices."[532] Third-Party Claimants note that there were "shared officers and directors among and between [AFI] and its subsidiaries" with "overlapping responsibilities."[533] As discussed above, there was extensive overlap of the directors and officers of AFI with those of ResCap, and each member of the ResCap Board was elected by AFI.[534] Moreover, at least in certain circumstances and on an informal basis, certain members of the management of the Debtors

---

[528] *ABF Capital Mgmt. v. Askin Capital Mgmt., L.P.*, 957 F. Supp. 1308, 1328 (S.D.N.Y. 1997).

[529] *Id.* ("[T]he allegations related to the Brokers' involvement in the fraudulent scheme need not be limited to assistance with the preparation of the materials themselves, and their provision of the allegedly 'toxic' securities and lenient financing constitute substantial assistance in the fraud."); *see also Nathel v. Siegal*, 592 F. Supp. 2d 452, 470 (S.D.N.Y. 2008) (denying motion to dismiss aiding and abetting fraud claim where defendants "signed Partnership Agreements that misrepresented their expertise and permitted [the primary violator] to represent them as experts in the oil and gas field," despite that defendants did not assist in the preparation of the allegedly misleading offering memoranda provided to plaintiffs); *Gabriel Capital, LP v. NatWest Fin., Inc.*, 94 F. Supp. 2d 491, 495 n.1, 512 (S.D.N.Y. 2000) (denying motion to dismiss aiding and abetting fraud claim where the complaint did not "allege that [defendant] participated in the drafting of the [misleading] Offering Memorandum or slides," but defendant's "participation in this scheme played a substantial role in inducing . . . investors to purchase the [debt securities]" issued pursuant to that offering memorandum for an experimental steel mill venture because defendant was the "owner of a well-regarded [similar] operation").

[530] MBIA Submission Paper, dated Nov. 9, 2012, at 25, 31; *see also* FGIC Submission Paper, dated Oct. 17, 2012, at 24; Joint Submission Paper of AIG, Allstate Life Ins. Co., Mass. Mut. Life Ins. Co., and Prudential Ins. Co. of Am., dated Oct. 17, 2012, at 25–26.

[531] *See* AFI Submission Paper, dated Dec. 19, 2012, at 36, 40 (emphasis omitted).

[532] MBIA Submission Paper, Nov. 9, 2012, at 31.

[533] FGIC Submission Paper, dated Oct. 17, 2012, at 23.

[534] *See* Section VIII.C.2.a(2)(c)(ii)(B); Appendix IV.A.

would report to management of AFI.[535] AFI disputes that any of its directors and officers had "any involvement in selecting loans for collateral pools, conducting due diligence on the loans, approving individual RMBS issuances, drafting offering materials, or marketing RMBS for sale."[536]

The Investigation has not uncovered evidence that AFI—through such overlapping directors and officers or otherwise—had any direct involvement in any of the Debtors' securitizations.[537] Those individuals interviewed by the Examiner's Professionals either denied or could not recall any such involvement.[538] The evidence provided to the Examiner by Third-Party Claimants does not, without more, suggest an inference to the contrary. For example, FGIC asserts that AFI officer David Walker "acting as a director of [RAMP]" was "a signatory to RAMP's December 20, 2005 'Unanimous Written Consent of Directors in Lieu of Meeting of Board of Directors,' which was included among the closing documents for [a securitization transaction for which FGIC provided insurance]."[539] FGIC does not, however, provide evidence that Walker was involved with the acquisition of relevant mortgage loans, the pooling of those loans in securitizations, the preparation of the deal documents for those securitizations, or any of the alleged misrepresentations allegedly made to FGIC.[540] If accurate, the Examiner considers the fact that an AFI officer signed a written consent as a director of one of the Depositor Entities, which was then "included among" insurance transaction documents, to be unlikely, by itself, to weigh in favor of a finding that AFI made "a substantial contribution to the perpetration of the fraud."[541]

### (B) Financial Support

Third-Party Claimants also assert as evidence of substantial assistance that "AFI made $1 billion worth of capital infusions into ResCap over the first four months of 2007."[542] AFI responds that "AFI's financial investment . . . in ResCap" is "common . . . of a parent-subsidiary relationship" and that "helping ResCap continue in business" did not "proximately cause[ ] any of the losses for which [Third-Party Claimants] seek redress."[543] The timing and

---

[535] *See* Section VIII.C.2.a(2)(d)(ii).

[536] *See* AFI Submission Paper, dated Dec. 19, 2012, at 35.

[537] *See* Section VIII.C.2.a(2)(c)(ii)(B).

[538] *See id.*

[539] FGIC Submission Paper, dated Oct. 17, 2012, at 23.

[540] *Id.*

[541] *J.P. Morgan Chase Bank v. Winnick*, 406 F. Supp. 2d 247, 257 (S.D.N.Y. 2005).

[542] MBIA Submission Paper, Nov. 9, 2012, at 32; *see also* FGIC Submission Paper, dated Oct. 17, 2012, at 21 ("[AFI] also provided ResCap with liquidity and capital in order to perpetuate the securitization business"); Joint Submission Paper of AIG, Allstate Life Ins. Co., Mass. Mut. Life Ins. Co., and Prudential Ins. Co. of Am., dated Oct. 17, 2012, at 25 ("[AFI's] 2011 Form 10-K states that 'ResCap remains heavily dependent on [AFI] and its affiliates for funding and capital support.'").

[543] *See* AFI Submission Paper, dated Dec. 19, 2012, at 33, 40.

circumstances of AFI's financial support of ResCap are likely to pose hurdles to Third-Party Claimants' efforts to rely upon that support as evidence of substantial assistance of the alleged primary violations.

First, AFI's financial support of ResCap occurred after most, if not all, of the fraudulent misrepresentations alleged by Third-Party Claimants and therefore could not have assisted in causing such misrepresentations. Although AFI provided more than $8 billion in financial support to ResCap in advance of the Petition Date in 2012, that support did not begin until March 2007.[544] Before the end of 2007, the Debtors had ceased private label securitizations.[545] Second, to the extent Third-Party Claimants' primary fraud claims rely upon misrepresentations that occurred on or after the date AFI commenced its financial support of ResCap, such support may be viewed as the type of ordinary business conduct that does not, without more, constitute "substantial assistance."[546] The Examiner expects that it would be difficult, given the available evidence, for Third-Party Claimants to prove that AFI's capital contributions to ResCap provided the requisite substantial assistance to the alleged fraud in connection with the securitizations at issue.[547]

The Examiner reaches similar conclusions concerning FGIC's assertion as evidence of substantial assistance that AFI "modif[ied] its corporate structure" to "improve and maintain the investment-grade rating and profitability of [its] mortgage securitization business."[548] Presumably referring to the formation of ResCap and contribution in 2005 of RFC and GMAC Mortgage to ResCap, FGIC is correct that the available evidence indicates that this restructuring was intended to allow the mortgage business, through ResCap, to "obtain[] investment grade credit ratings for its unsecured indebtedness that are separate from [AFI's and GM's] ratings."[549] As with AFI's direct financial support of the Debtors, the Examiner expects it would be challenging, given the available evidence, to prove that lowering the

---

[544] *See* Section VI.B.

[545] *See* Section III.G; Int. of J. Gray, Mar. 1, 2013, at 61:8–63:23 ("I think in early August [2007] there was a significant pullback in the marketplace in terms of what investors were willing to buy and I think that was the major impetus for [shutting down non-conforming products].").

[546] *See Felker v. McGhan Med. Corp.(In re Minn. Breast Implant Litig.)*, 36 F. Supp. 2d 863, 877 (D. Minn. 1998) (dismissing claim that defendant that allegedly "sold the division knowing that the breast implants were defective" had aided and abetted the subsequent torts of the third party that purchased the division; allegations that defendant "allowed [the third party] to purchase the implant division on credit" and "reorganized the debt twice following the . . . sale" did not "rise to the level of substantial assistance") (applying Arizona law).

[547] *Cf. Henry v. Lehman Commercial Paper, Inc.*, 471 F.3d 977, 995 (9th Cir. 2006) (finding evidence that parent "satisfied all of [its mortgage origination subsidiary's] financing needs" sufficient to support jury finding of "substantial assistance" in "a situation where [the subsidiary's] whole business is built like a house of cards on a fraudulent enterprise").

[548] FGIC Submission Paper, dated Oct. 17, 2012, at 22, 24.

[549] *See* General Motors Acceptance Corporation, Annual Report (Form 10-K) (March 28, 2006), at 5; *see also* Section III.B.

Debtors' costs of raising capital via a 2005 restructuring was a proximate cause of the alleged fraudulent inducement of FGIC to provide insurance in connection with the Debtors' securitizations.[550]

### (C) Shared Functions And Services

Third-Party Claimants assert that AFI provided "managerial . . . and strategic assistance to its subsidiaries"[551] and that such "seemingly routine business practices give rise to aiding and abetting liability."[552] As explained above, AFI provided certain financial, operational, and administrative services to the Debtors for which it was paid management fees from 2004 through 2007 (and later).[553] The available evidence suggests, however, that such services would likely be found to be of minimal probative value as to AFI's alleged substantial assistance of fraud during the relevant time period. Certain corporate functions and services identified by the Debtors as being "shared" or "integrated" with AFI (e.g., in areas including information technology, human resources, finance, treasury, supply chain, capital markets, and facilities)[554] appear to be the type of ordinary business functions and services that would not, without more, be expected to have substantially assisted the alleged fraud.[555]

---

[550] *See Cromer Fin. Ltd. v. Berger*, 137 F. Supp. 2d 452, 470 (S.D.N.Y. 2001); *In re TMJ Implants Prods. Liab. Litig.*, 880 F. Supp. 1311, 1319 (D. Minn. 1995).

[551] FGIC Submission Paper, dated Oct. 17, 2012, at 24.

[552] MBIA Submission Paper, dated Nov. 9, 2012, at 31–32.

[553] *See* Section V.H (describing arrangements for sharing of certain services); *see also* Residential Capital Corporation, Annual Report (Form 10-K) (Mar. 28, 2006), at 143 ("[AFI] has provided [ResCap] with certain services for which a management fee was paid. [ResCap] paid [AFI] management fees of $8.7 and $5.4 million for 2005 and 2004, respectively."); Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2009), at 206 (disclosing management fees paid by ResCap to AFI from 2006–2008 for services in areas including "finance, information technology, communication, corporate marketing, procurement, and services related to facilities").

[554] *See* Debtors' Motion for Interim and Final Orders Under Bankruptcy Code [s]ections 105(a) and 363(b) Authorizing Residential Capital, LLC to Enter into a Shared Services Agreement with Ally Financial Inc. *Nunc Pro Tunc* to the Petition Date for the Continued Receipt and Provision of Shared Services Necessary for the Operation of the Debtors' Business [Docket No. 41] at ¶ 14.

[555] *See Greenberg v. Bear, Stearns & Co.*, 220 F.3d 22, 29 (2d Cir. 2000) ("The simple providing of normal clearing services to a primary broker who is acting in violation of the law does not make out a case of aiding and abetting against the clearing broker.") (quotation marks and citations omitted); *Pension Comm. of the Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 446 F. Supp. 2d 163, 174, 203–04 (S.D.N.Y. 2006) (granting motion to dismiss aiding and abetting fraud claim against "prime broker and custodian" to hedge funds allegedly defrauded by their manager despite allegations that broker provided the manager "with dial-in access to its computer network and allow[ed] him to generate false position statements"; explaining that "routine functions such as clearing trades, administrative tasks, and portfolio management" did not, in this context, plead "substantial assistance" in the underlying fraud); *In re TMJ Implants Prods. Liab. Litig.*, 880 F. Supp. at 1319 (granting defendant parent company's motion for summary judgment on aiding and abetting claim where the parent provided "research assistance and facilities" to its primary violator subsidiary but "[t]here [was] no evidence . . . that [the subsidiary] was 'heavily dependent' upon [its parent] for any assistance regarding the manufacture of [the allegedly defective] TMJ implants").

Moreover, the evidence indicates that it was not until 2008 or later that many of the "global functions" including the in-house legal function were centralized within AFI.[556]

### b. *Claims Against Ally Securities As Securities Underwriter*

#### (1) *Ally Securities' Role As Underwriter Of RFC Offerings*

The RMBS Claims involving Ally Securities focus on Ally Securities' role as underwriter in the applicable securitizations. Generally speaking, the role of an underwriter in a private label securitization is to bring the security into the marketplace.[557] From 2004 to 2007, Ally Securities underwrote "a significant portion of ResCap's securitization activity."[558] Specifically, it underwrote mortgage-backed securities issued by its affiliates of approximately $8.6 billion in 2004,[559] $14.3 billion in 2005,[560] $13.5 billion in 2006,[561] and $10.3 billion in 2007.[562]

#### (a) *Lead Underwriter And Co-Underwriter*

Ally Securities' role as underwriter varied in the securitizations. As detailed in Appendix VIII.B–1, Ally Securities was an underwriter on 236 of the 392 RFC and GMAC Mortgage securitizations. Of those securitizations, Ally Securities served as lead or joint lead

---

[556] *See* Int. of T. Hamzehpour, Oct. 5, 2012, at 67:16–68:3 ("The GMAC organization historically was an organization of business unit silos and he viewed that as redundant and he wanted centralized functions. So all of the functions—finance, compliance, risk, legal were expected to centralize, and legal was one of the last ones [in January 2009]."); Int. of L. Tessler, Feb. 28, 2013, at 33:23–34:3 ("[T]here are two ways to survive a crisis. You know, raise revenues and reduce expenses and raise liquidity. And I suspect all of those options were on the table [in June 2008].").

[557] Dep. of J. Getchis, Apr. 21, 2011, at 10:16–25 [MBIADEP0000278]. For a discussion of the role of an underwriter in securitizations, see Section VIII.B.1.a.

[558] Draft Goldin Associates Presentation to the Committee of Independent Members of the Board of Directors of Residential Capital, LLC Regarding the Purchase of Residential Funding Securities, LLC and RFC Investments Limited by GMAC, LLC, dated Mar. 18, 2009, at 11 [GOLDIN00132386]; Int. of K. Dammen, Apr. 25, 2013, at 14:20–24 ("[C]apital markets could create a security, have one of the Wall Street firms being the lead and [Ally Securities] as a co-lead or a co-manager, and place securities to certain accounts that we were in touch with.").

[559] Residential Funding Securities, Corporation Financial Statements and Supplementary Schedules, Dec. 31, 2004, at 11 [FHFA-AS-0314592].

[560] Residential Funding Securities Corporation Financial Statements and Supplementary Schedules, Dec. 31, 2005, at 11 [FHFA-AS-0314471].

[561] Residential Funding Securities, LLC Financial Statements and Supplementary Schedules, Dec. 31, 2006, at 11 [FHFA-AS-0314430].

[562] Residential Funding Securities, LLC Financial Statements and Supplementary Schedules, Dec. 31, 2007, at 11 [FHFA-AS-0314450].

underwriter 105 times, and served as co-underwriter 131 times.[563] Ally Securities typically served as lead underwriter in single issuer deals,[564] which were generally smaller.[565]

All underwriters, whether lead or otherwise, have certain roles and duties, as set forth in the applicable underwriting agreements.[566] These roles and duties are discussed in Section VIII.B.1.a. The role of lead underwriter carries more responsibility and a higher profile.[567] The lead underwriter takes the lead in structuring the securities with the sponsor, and has "a higher responsibility to bring in investor demand."[568] John Getchis, Chief Operational Officer of Ally Securities, described the difference in responsibility as follows:

> The lead underwriter would generally interact with the issuer to effect . . . the design and structure of the securitization in its final form; it would be responsible for the development of the offer[ing] materials; and primarily responsible for the price talk and setting expectations . . . of the proceeds they could expect in the marketplace for that particular securitization.[569]

Generally, the co-underwriter assists the lead underwriter in selling the RMBS into the marketplace.[570]

### (b) Due Diligence

Ally Securities purported to follow general procedures regarding due diligence performed on underlying loan pools.[571] These procedures provided that the diligence that Ally Securities performed was essentially a function of two variables: whether the loans were RFC collateral

---

[563]  *See* Appendix VIII.B—1 and VIII.B—2. Data was obtained from RMBS prospectus supplements.

[564]  Single issuer deals were deals where RFC capital markets purchased all of the loans from one correspondent. Int. of K. Dammen, Apr. 25, 2013, at 155:1–2.

[565]  *Id.* at 121:10–12 ("I know that we were lead typically on single issuer deals which were considerably smaller.").

[566]  *See* Section VIII.B.1.a.

[567]  Int. of K. Dammen, Apr. 25, 2013, at 26:9–16 ("The lead underwriter is going to create the structure of the different classes or the different tranches. And they're going to buy the lion's share of the bonds. They're going to run the books . . . . And their name is going to be on the prospectus in the biggest letters.").

[568]  Int. of E. Scholtz, Mar. 28, 2013, at 29:6–7.

[569]  Dep. of J. Getchis, Apr. 21, 2011, at 13:24–14:10 [MBIADEP0000278].

[570]  IAN GIDDY, THE SECURITIZATION PROCESS, Stern School of Business, New York University, 2001, at 41, http://people.stern.nyu.edu/igiddy/ABS/absprocess.pdf; Int. of E. Scholtz, Mar. 28, 2013, at 28:9–15.

[571]  *See* Residential Funding Securities Policies and Supervisory Procedures Manual, updated Mar. 30, 2007, at 56 [EXAM12503903].

(i.e., RFC had purchased and diligenced the underlying loans)[572] and whether Ally Securities was a sole underwriter or a co-underwriter (either lead or otherwise).[573]

If the loans were RFC collateral and Ally Securities was the sole underwriter, Ally Securities would "rel[y] on the front-end review done by [RFC], additional due diligence [was] not conducted for each deal . . . ."[574] This was subject to two exceptions: monoline-insured deals and senior-subordinated deals.[575] Getchis explained that where Ally Securities was the sole underwriter, it was the only interested party—there was no other "interested party in [the] transaction to conduct additional diligence or insist upon additional diligence with the specific asset."[576] While Dennis Crosson, Director of Ally Securities, disagreed with the assertion that additional due diligence was not conducted where Ally Securities was the sole underwriter, stating that Ally Securities "always did a sample,"[577] evidence does not support this proposition.[578]

If the loans were RFC collateral and Ally Securities was a co-underwriter, the underwriters on a given deal would confer in hiring an outside due diligence firm and would share the results of this diligence.[579] Crosson explained that generally the lead underwriter would retain the third-party due diligence firm to conduct the due diligence by re-underwriting a sample of loans.[580] The use of this process is discussed in a January 2013 presentation

---

[572] *See* Int. of K. Dammen, Apr. 25, 2013, at 33:14–16. The loans would not be considered RFC collateral if purchased from a correspondent who diligenced the loans. *See id.* at 155:3–24.

[573] *See* Residential Funding Securities Policies and Supervisory Procedures Manual, updated Mar. 30, 2007, at 56 [EXAM12503903].

[574] *Id.*

[575] *Id.*; Underwriting Procedures, at FHFA-AS-0363175–76 [FHFA-AS-0363173]. Evidence indicates that these exceptions occurred frequently. In the Dammen interview, Jeffrey Lipps states that the monoline deals and the senior-subordinated deals were "a big portion of the securitizations." This was confirmed by Dammen. *See* Int. of K. Dammen, Apr. 25, 2013, at 35:4–36:8.

[576] Dep. of J. Getchis, Apr. 21, 2011, at 156:15–158:7 [MBIADEP0000278].

[577] Dep. of D. Crosson, Apr. 20, 2011, at 124:10–125:8 [MBIADEP0000500].

[578] E-mail from J. Blaschko (Jan 8, 2007), at FHFA-AS-0255786 [FHFA-AS-0255785].

[579] *E.g.,* AFI Submission Paper, dated Dec. 19, 2012, at 76.

[580] Dep. of D. Crosson, Apr. 20, 2011, at 48:14–49:2 [MBIADEP0000500]. In some circumstances, the lead underwriter might conduct its own diligence. Residential Funding Securities Policies and Supervisory Procedures Manual, updated Mar. 30, 2007, at 56 [EXAM12503903]; Underwriting Procedures, at FHFA-AS-0363175 [FHFA-AS-0363173]. Ally Securities did not conduct its own diligence. *Id.*

prepared by Carpenter Lipps, summarizing the diligence related to the ResCap PLS process.[581] When Ally Securities retained an outside diligence firm, it typically retained Office Tiger LLC.[582]

If the loans were not RFC collateral with Ally Securities as sole underwriter, Ally Securities would hire an outside firm to perform diligence, which would either be a sample or a 100% review, depending on Ally Securities' comfort level with the loans.[583] If Ally Securities was a co-underwriter, it would share in the diligence with the other underwriters.[584] Employees of Ally Securities at the time believed that Ally Securities' loan review selection process was standard for the industry.[585]

Ally Securities was aware of the existence of problematic loans. For example, Ally Securities was aware in 2006 that RFC Trading was relying more on the originators' diligence process and that certain loans were underperforming.[586] That same year, Cerberus, in connection with its acquisition of AFI, brought in Navigant Consulting Inc., a third-party consulting firm, to go to Ally Securities and "check into the business and understand . . . what

---

[581] Carpenter Lipps ResCap PLS Overview Presentation, Jan. 30, 2013, at EXAM00234446 [EXAM00234431]. The presentation generally characterized the underwriting process in stages: (1) the underwriter oversees loan file diligence; (2) the lead underwriter retains an external diligence firm; (3) the underwriter randomly selects a loan sample; (4) the diligence firm reviews the actual loan files and provides initial results; (5) RFC's diligence underwriting team responds to these results by providing missing documents, clarifying the application of underwriting guidelines, and identifying compensating factors; and (6) the underwriter makes a final decision regarding whether to keep a loan or remove it from the pool. *Id.; see also* Int. of K. Dammen, Apr. 25, 2013, at 148:2–20 ("The process would be that if we were ever involved in diligence, which would be when we're a lead and could have been when we were co . . . . RFC does a quality control process for every loan that theyor for a sampling of loans that they buy. . . . [Ally Securities], though, we would diligence anywhere from a hundred percent to a lesser number, if we were the lead.").

[582] *E.g.,* AFI Submission Paper, dated Dec. 19, 2012, at 76. Evidence shows that Ally Securities also used Clayton at times. *See* Int. of K. Dammen, Apr. 25, 2013, at 145:25–146:3.

[583] Residential Funding Securities Policies and Supervisory Procedures Manual, updated Mar. 30, 2007, at 56 [EXAM12503903].

[584] *Id.*

[585] Int. of K. Dammen, Apr. 25, 2013, at 218:3–10 ("I believe that Dennis [Crosson] and John [Getchis] were consistent with the way the street was diligencing loans. . . . I believe the broker-dealer was doing diligence in a comparable way to other street firms."); E-mail from D. Crosson (Oct. 30, 2006), at 1 [FHFA-AS-0255028] ("GRS as Lead Underwriter has a selection process that we work to keep in line with other Street selection trends for diligence."). Crosson also noted that Ally Securities' underwriting process also covered Fannie Mae and Freddie Mac requirements, however the types of loans sold to such GSEs were typically conforming loans, rather than subprime and non-conforming loans. E-mail from D. Crosson (Feb. 7, 2007), at FHFA-AS-0115852 [FHFA-AS-0115849].

[586] E-mail from B. Cleary (Sept. 28, 2006) [FHFA-AS-0146218]; *see* Carpenter Lipps ResCap PLS Overview Presentation, Jan. 30, 2013, at EXAM00234442 [EXAM00234431] (listing B. Cleary under Trading in RFC).

we had bought, but maybe also what we were buying."[587] Navigant was also "reviewing processes and loan data."[588] After this review, "they had questions and subsequently either suggestions or directives on things that they might want changed."[589] Evidence indicates that Navigant found certain credits to have issues, including one which had "extremely liberal" underwriting guidelines.[590]

### (c) Offering Documents

The underwriter of a securitization had an obligation to ensure that disclosures in offering documents were accurate. This included testing the accuracy of the information disclosed in a prospectus against information from the issuer.[591] Getchis viewed lead or co-underwriters as having equal liability and therefore an equal interest in ensuring that the disclosures in offering materials were accurate.[592]

Ally Securities' policies and procedures manuals provided that in any securitization in which Ally Securities was an underwriter, RFG's Structured Finance group was to review the prospectus to ensure that the prospectus was adequately prepared and complied with all legal requirements.[593] The manuals provided that where Ally Securities was sole underwriter, RFG Structured Finance was to take the lead role on behalf of the underwriter, and coordinate all interactions. If Ally Securities was a co-underwriter, RFG Structured Finance was to assist

---

587  Int. of K. Dammen, Apr. 25, 2013, at 65:9–12; Int. of D. Olson, Apr. 26, 2013, at 113:6–12 ("I viewed Navigant's role as being a resource to my group in making sure that we were on top of our credits and minimizing any losses that . . . would be occurring coming out of the . . . backing away, by Wall Street of buying mortgage loans.").

588  Int. of K. Dammen, Apr. 25, 2013, at 65:18–23.

589  Id.

590  E-mail from J. DelPonti, Navigant Consulting (Dec. 21, 2006), at EXAM11336243 [EXAM11336242]; see also Int. of D. Olson, Apr. 26, 2013, at 114:3–8.

591  Dep. of J. Getchis, Apr. 21, 2011, at 11:16–23; 33:19–25 [MBIADEP0000278]; see Int. of K. Dammen, Apr. 25, 2013, at 198:19–20 ("The underwriter has to make the—be comfortable with the reps and warrants made in the pro supp.").

592  Dep. of J. Getchis, Apr. 21, 2011, at 15:7–15; see also Int. of K. Dammen, Apr. 25, 2013, at 29:17–30:10 ("[O]ur role at [Ally Securities] was to be comfortable with what capital markets has created, so understand that they're giving us sufficient information to describe those bonds to our investors. . . . And then our role . . . was to tell that story within the rules of how one tells a story to sell bonds. . . . [W]e always would describe the bonds within the purview of what we did as a broker/dealer and the SEC.").

593  Residential Funding Securities Policies and Supervisory Procedures Manual, updated Mar. 30, 2007, at 58 [EXAM12503903]; Underwriting Procedures, at FHFA-AS-0363177 [FHFA-AS-0363173]; Underwriting Procedures, at EXAM30974518–20 [EXAM30974511]. The RFG Structured Finance Group were "the people that basically put the securities together, interact[ed] with the attorneys and accountants and the rating agencies and things of that nature, and create the different securities on the different shelves that RFC issued on." Int. of K. Dammen, April 25, 2013, at 13:8–13. Dammen also noted that "people on my staff would very carefully review the pro supp to make sure what they were saying was correct." Id. at 170:11–13.

Ally Securities in negotiations concerning allocation, pricing, fees, and expense sharing.[594] The manuals did not specify the process that applied where there was more than one underwriter, with Ally Securities as lead underwriter.[595]

### (2) Description Of Claims Against Ally Securities

Based upon Ally Securities' activities as underwriter, Third-Party Claimants generally assert that "[n]on-debtor Ally Securities . . . is directly liable for false statements in the Offerings Materials."[596] These plaintiffs allege that "[a]s underwriter for most of the certificates at issue, Ally Securities directly participated in the structuring of the RMBS, the preparation of the Offering Materials, and the marketing of the RMBS to investors."[597] Plaintiffs have asserted several causes of action against Ally Securities including claims based on (1) federal and state securities law; (2) common law fraud and fraudulent inducement; (3) aiding and abetting fraud; and (4) negligent misrepresentation.[598]

---

[594] Residential Funding Securities Policies and Supervisory Procedures Manual, updated Mar. 30, 2007, at 58–59 [EXAM12503903]; Underwriting Procedures, at FHFA-AS-0363177–78 [FHFA-AS-0363173]; Underwriting Procedures, at EXAM30974512–21 [EXAM30974511]. The manuals further provided that in deals where RFC did not provide collateral but was sole underwriter or co-underwriter, RFG Structured Finance represented Ally Securities to all external parties. Residential Funding Securities Policies and Supervisory Procedures Manual, updated Mar. 30, 2007, at 58–59 [EXAM12503903]; Underwriting Procedures, at FHFA-AS-0363177–78 [FHFA-AS-0363173]; Underwriting Procedures, at EXAM309745120–21 [EXAM30974571]; *see also* Dep. of J. Getchis, Apr. 21, 2011, at 193:14–23 [MBIADEP0000278] (describing the role of underwriter at other firms with respect to interactions with monoline insurers: "the underwriter would get the call and the underwriter would interact with monoline insurers. RFC had a different approach, is that the issuer would take on that relationship").

[595] Residential Funding Securities Policies and Supervisory Procedures Manual, updated Mar. 30, 2007, at 58–59 [EXAM12503903]; Underwriting Procedures, at FHFA-AS-0363177–78 [FHFA-AS-0363173]; Underwriting Procedures, EXAM309745120–21 [EXAM30974511].

[596] AIG, Allstate, MassMutual, and Prudential Joint Reply Submission Paper, dated Feb. 12, 2013, at 3.

[597] *Id.*

[598] These theories of recovery account for the overwhelming majority of claims against Ally Securities. Certain Third-Party Claimants have raised claims based on other theories which are not discussed as they have only been raised in a very limited context. Third-Party Claimant Union Central Life Insurance Co. brought a claim based on unjust enrichment, which was recently dismissed without prejudice. *Union Cent. Life Inc. Co. v. Ally Fin., Inc.*, Case No. 11-cv-2890, Docket No. 261 (S.D.N.Y. Mar. 29, 2013). Allstate Insurance Co. has brought a claim under the Minnesota Consumer Fraud Act, which has survived a motion to dismiss (along with its common law fraud claims). *See* Order, *Allstate Ins. Co. v. GMAC Mortg., LLC*, Case No. 27-cv-11-3480, Docket No. 740 at 24–34 (Minn. Dist. Ct. Nov. 28, 2011). However, this is the only instance in which such a claim is raised, and the parties do not address it at length in their submissions. Accordingly, while this claim may have some value, the Examiner focuses on the most significant disputed claims.

All of these theories of liability stem from alleged misrepresentations made in the RMBS Offering Documents. A number of Third-Party Claimants have separately described these misrepresentations or omissions in their complaints and submissions. The majority of these alleged misrepresentations are substantively similar, including that:

- ***The loans underlying the RMBS would be generated in accordance with underwriting guidelines***. Plaintiffs allege that the RMBS Offering Documents represent that the loans underlying the mortgage pools were originated in accordance with certain underwriting guidelines. However, these underwriting guidelines were systematically abandoned, and thus the loans underlying the RMBS were substantially riskier than advertised, and therefore much more likely to default.[599]

- ***The loans had specific LTV features and were based on valid appraisals performed in accordance with specific regulations and standards.*** Plaintiffs generally allege that despite representing that LTV and other ratios would not exceed specified percentages, Ally Securities routinely ignored this requirement. Further, it is alleged that the appraisals underlying such ratios were not performed in accordance with stated standards and were inflated without justification.[600]

- ***A specified percentage of the mortgage loan properties were the primary residence of the borrower***. Plaintiffs allege that the RMBS Offering Documents misstated and omitted information regarding the primary residence status of the mortgaged properties. They allege that Ally Securities knew that many of those properties were being purchased as investment properties or vacation homes rather than as a primary residence.[601]

- ***The ratings agencies conducted analyses that were designed to assess the likelihood of delinquency and defaults in the underlying mortgage pools.*** Plaintiffs allege that the ratings set forth in the RMBS Offering Documents were corrupted by unreliable data and faulty assumptions, which made representations that the process would assess the likelihood of receipt of payment misleading.[602]

---

[599] *E.g.,* AIG, Allstate, MassMutual, and Prudential Joint Reply Submission Paper, dated Feb. 12, 2013, at 5; Pl.'s Original Pet. for Damages, *FDIC v. Ally Sec. LLC*, Case No. 12-002522, Docket No. 1, at 23–30 (Tex. 200th Dist. Aug. 17, 2012).

[600] *E.g.,* AIG, Allstate, MassMutual, and Prudential Joint Reply Submission Paper, dated Mar. 15, 2013, at 7; AIG, Allstate, MassMutual, and Prudential Joint Reply Submission Paper, dated Feb. 12, 2013, at 8; Federal Home Loan Banks of Boston, Chicago, and Indianapolis Submission Paper, dated Oct. 19, 2012, at 11.

[601] *E.g.,* AIG, Allstate, MassMutual, and Prudential Joint Reply Submission Paper, dated Feb. 12, 2013, at 8–9; Federal Home Loan Banks of Boston, Chicago, and Indianapolis Submission Paper, dated Oct. 19, 2012, at 19. Plaintiffs state that these allegations are "just the tip of the iceberg. This is because the Offering Materials made representations as to numerous risk features beyond loan-to-value ratios and occupancy status that can only be scrutinized by reviewing the actual loan files, which the Investors largely do not have." AIG, Allstate, MassMutual, and Prudential Joint Reply Submission Paper, dated Mar. 15, 2013, at 4.

[602] *E.g.,* AIG, Allstate, MassMutual, and Prudential Joint Reply Submission Paper, dated Feb. 12, 2013, at 9–10; Federal Home Loan Banks of Boston, Chicago and Indianapolis Submission Paper, dated Oct. 19, 2012, at 18.

Third-Party Claimants adduce certain evidence of the falsity of these representations, which, as stated in complaints and submissions to the Examiner, is also substantively similar. In supporting their theories of liability, plaintiffs generally rely on the following evidence:

- ***Loan-Specific Forensic Analyses***. A number of Third-Party Claimants have engaged consultants to conduct investigations of the mortgage pools underlying the RMBS at issue. These consultants sampled loans from the RMBS transactions using an automated valuation model analysis. The claimants generally assert that these analyses show that a significant percentage of the loans sampled were inconsistent with representations in the RMBS Offering Documents, which evidences a systematic disregard of stated underwriting guidelines.[603]

- ***Review of Actual Loan Files***. Certain Third-Party Claimants were able to obtain and review samples of loan files for some RMBS. These claimants allege that the results of such reviews demonstrate that a large percentage of the loans did not comply with stated underwriting guidelines.[604]

- ***Confidential Witness Statements***. Third-Party Claimants assert that they have interviewed confidential witnesses, who have provided details regarding the improper origination and securitization practices employed with respect to the RMBS.[605]

- ***Rising Default Rates and Plummeting Credit Ratings***. Further, claimants point to existing defaults, high delinquency rates of the mortgage loans, and other "industry- and originator- specific facts" as evidence of the systematic abandonment of underwriting standards.[606]

Based on the alleged misrepresentations or omissions and the purported evidence of these misrepresentations or omissions, Third-Party Claimants have advanced several theories of liability against Ally Securities.[607]

---

[603] *E.g.,* AIG, Allstate, MassMutual, and Prudential Joint Reply Submission Paper, dated Feb. 12, 2013, at 6 ("The results not only show that the specific data-points were misrepresented, but also confirm a systemic underwriting abandonment problem. For example, AIG's analysis of nearly 14,400 loans revealed a breach rate of 36.5%, and Prudential's analysis of 22,400 loans revealed a breach rate of 41.66%."); Pl.'s Original Pet. for Damages, *FDIC v. Ally Sec. LLC*, Case No. 12-002522, Docket No 1, at 23–30 (Tex. 200th Dist. Aug. 17, 2012).

[604] *E.g.,* AIG, Allstate, MassMutual, and Prudential Joint Reply Submission Paper, dated Feb. 12, 2013, at 6–7 (stating that the results of AIG's review show "that over 90% of the loans failed to comply with underwriting guidelines" and that MBIA found "breach rates of 88 and 89%" across a sample of "thousands of mortgages") (emphasis omitted).

[605] *E.g.,* AIG, Allstate, MassMutual, and Prudential Joint Reply Submission Paper, dated Mar. 15, 2013, at 15.

[606] *E.g.,* AIG, Allstate, MassMutual, and Prudential Joint Reply Submission Paper, dated Feb. 12, 2013, at 5, 9–10.

[607] A discussion of potential damages under these theories of liability is set forth in Section VIII.D. Additionally, a discussion of potentially applicable statutes of limitation and repose is provided in Section VIII.C.2.a.3.e.

### (3) Analysis Of Claims

#### (a) Federal And State Securities Law

Sections 11 and 12(a)(2) of the Securities Act of 1933[608] "impose liability on certain participants in a registered securities offering when the publicly filed documents used during the offering contain material misstatements or omissions."[609] "Section 11 . . . prohibits materially misleading statements or omissions in registration statements filed with the SEC" and "provides for a cause of action by the purchaser of the registered security against the security's issuer, its underwriter, and certain other statutorily enumerated parties."[610] "Section 12(a)(2) provides similar redress" against so-called "statutory sellers" where "the securities at issue were sold using prospectuses or oral communications."[611]

"[U]nlike securities fraud claims pursuant to [section 10(b) of Exchange Act], plaintiffs bringing claims under sections 11 and 12(a)(2) need not allege scienter, reliance, or loss causation."[612] Instead, the elements of a claim under section 11 require that:

> (1) [The plaintiff] purchased a registered security, either directly from the issuer or in the aftermarket following the offering; (2) the defendant participated in the offering in a manner sufficient to give rise to liability under section 11; and (3) the registration statement 'contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading.'[613]

---

[608] 15 U.S.C. §§ 77k(a); 77l(a)(2). Third-Party Claimants have also brought analogous state law claims. *E.g.. Mass. Mut. Life Ins. Co. v. Residential Funding Co, LLC*, 843 F. Supp. 2d 191 (D. Mass. 2012) (claims brought under Massachusetts Uniform Securities Act § 410(a)(2)); *W. & S. Life Ins. Co. v. Residential Funding Co., LLC*, Case No. A1105042, 2012 Ohio Misc. LEXIS 100 (Ohio Ct. Com. Pl. June 6, 2012) (claims under Ohio securities law).

[609] *Lindsay v. Morgan Stanley* (*In re Morgan Stanley Info. Fund Sec. Litig.*), 592 F.3d 347, 358 (2d Cir. 2010).

[610] *Id.*; *see also Wyo. State Treasurer v. Moody's Investors Serv., Inc.* (*In re Lehman Bros. Mortg.-Backed Sec. Litig.*), 650 F.3d 167, 175 (2d Cir. 2011). In *Wyo. State Treasurer*, the court found that:

> The imposition of strict liability [under Section 11] is limited, however, to statutorily enumerated parties: (1) signatories of the registration statement; (2) directors or partners of the issuer at the time of filing; (3) persons consenting to be named as about to become a director or partner; (4) accountants or other experts consenting to be named as preparing or certifying part of the registration statement; and (5) underwriters of the security at issue.

650 F.3d at 175.

[611] *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d at 359 (explaining that section 12(a)(2) liability is limited to "statutory sellers," which term has been interpreted to include parties that "(1) passed title, or other interest in the security, to the buyer for value, or (2) successfully solicited the purchase of a security, motivated at least in part by a desire to serve his own financial interests or those of the securities' owner").

[612] *Id.*

[613] *Id.* at 358–59 (quoting 15 U.S.C. § 77k(a)).

The elements of a claim under section 12(a)(2) require that:

> (1) the defendant is a 'statutory seller'; (2) the sale was effectuated 'by means of a prospectus or oral communication'; and (3) the prospectus or oral communication 'included an untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements . . . not misleading.'[614]

The elements of a section 11 or 12(a)(2) claim must be proven "by a preponderance of the evidence."[615] Defendants bear the burden of proof with respect to any affirmative defenses to liability.[616]

Debtors' and AFI's submissions to the Examiner do not purport to challenge any of the Third-Party Claimants' standing or that any of the named defendants participated in the RMBS offerings at issue in a manner sufficient to give rise to liability.[617] Accordingly, two elements are central to the claimants' section 11 and 12(a)(2) claims: "(1) the existence of either a misstatement or an unlawful omission; and (2) materiality."[618]

To satisfy the first of these two elements, a plaintiff must allege: "(1) a misrepresentation; (2) an omission in contravention of an affirmative legal disclosure obligation; [or] (3) an omission of information that is necessary to prevent existing disclosures from being misleading."[619] The second "[m]ateriality" element "is satisfied when a plaintiff

---

[614] *Id.* at 359 (quoting 15 U.S.C. § 77l(a)(2)).

[615] *See Healey v. Chelsea Res. Ltd.*, 947 F.2d 611, 617 (2d Cir. 1991) (affirming judgment entered after trial dismissing of section 12(a)(2) claims); *cf. Herman & MacLean v. Huddleston*, 459 U.S. 375, 387 (1983) (stating that "plaintiffs must prove their [section 10(b) of the Exchange Act claim] by a preponderance of the evidence," as in "a typical civil suit for money damages").

[616] *See In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d at 359, n.7 ("Generally speaking, defendants bear the burden of demonstrating the applicability of each of these defenses, which are therefore unavailing as a means of defeating a motion to dismiss . . . ."); *Loftin v. Bande* (*In re Flag Telecom Holdings, Ltd. Sec. Litig.*), 574 F.3d 29, 36 (2d Cir. 2009) (noting that defendant "bears the burden of demonstrating that something other than the misstatement at issue caused plaintiff's loss"); *Miles v. Merrill Lynch & Co.* (*In re IPO Sec. Litig.*), 483 F.3d 70, 73 n.1 (2d Cir. 2007) (noting that section 11 defendant "can assert a defense that the plaintiff knew of the untruth or omission at the time of his or her acquisition of the security," but there is no "reliance element" that plaintiff must prove) (quotation marks omitted); *In re Turkcell Iletisim Hizmetleri, A.S. Sec. Litig.*, 202 F. Supp. 2d 8, 12 (S.D.N.Y. 2001) ("[T]he burden of proof for the [due diligence defenses] is on the defendant.").

[617] *See, e.g.*, AIG, Allstate, MassMutual, and Prudential Joint Reply Submission Paper, dated Mar. 15, 2013, at 20–21. Case law and commentary generally agree. The distinction between lead and other underwriters in Securities Act cases is normally only considered in the application of the due diligence defense. *See, e.g.*, William K. Sjostrom, Jr., *The Due Diligence Defense Under Section 11 of the Securities Act of 1933*, 44 BRANDEIS L.J. 549, 592 (Spring 2006) ("Section 11 does not make a distinction between lead and participating underwriters—both are potential Section 11 defendants.").

[618] *See In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d at 360.

[619] *See id.*

alleges 'a statement or omission that a reasonable investor would have considered significant in making investment decisions.'"[620]

"In the wake of the recent collapse of the housing market, courts within the Second Circuit [and other jurisdictions] have repeatedly dealt with suits brought under the Securities Act against issuers of mortgage-backed securities."[621] The majority of courts considering motions to dismiss Securities Act (and state securities law) claims premised on the misrepresentations summarized above have found, at least in part, that plaintiffs have adequately alleged a claim.[622] The same is true for similar claims against Ally Securities.[623]

---

[620] *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 716–17 (2d Cir. 2011) (quoting *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161–62 (2d Cir. 2000)).

[621] *Emps.' Ret. Sys. of the Gov't of the Virgin Is. v. J.P. Morgan Chase & Co.*, 804 F. Supp. 2d 141, 152 (S.D.N.Y. 2011).

[622] *See, e.g.*, *N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC*, 709 F.3d 109 (2d Cir. 2013); *Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, 632 F.3d 762 (1st Cir. 2011); *FHFA v. UBS Ams., Inc.*, 858 F. Supp. 2d 306 (S.D.N.Y. 2012); *In re Bear Stearns Mortg. Pass-Through Certificates Litig.*, 851 F. Supp. 2d 746 (S.D.N.Y. 2012); *Plumbers' & Pipefitters' Local #562 Supplemental Plan & Trust v. J.P. Morgan Acceptance Corp. I*, No. 08-1713, 2012 U.S. Dist. LEXIS 132057 (E.D.N.Y. Feb. 23, 2012); *Emps.' Ret. Sys. of the Gov't of the Virgin Is.*, 804 F. Supp. 2d 141. State law claims have seen similar results. *See, e.g.*, *Capital Ventures Int'l v. UBS Sec. LLC*, No. 11-11937, 2012 U.S. Dist. LEXIS 140663 (D. Mass. Sept. 28, 2012).

[623] *See Mass. Mut. Life Ins. Co. v. Residential Funding Co., LLC*, 843 F. Supp. 2d 191, 200 (D. Mass. 2012) (denying motion to dismiss MUSA § 410(a)(2) claim asserted against Ally Securities where complaint alleged that "representations about the underwriting process" in the offering materials "were false because the originators systematically violated the underwriting standards by, for example, issuing loans on the basis of overstated incomes, inflated appraisals, and unjustified exceptions to the standards"); *FHFA v. Ally Fin., Inc.*, Civ. No. 11-7010, 2012 U.S. Dist. LEXIS 179768, at *18 (S.D.N.Y. Dec. 19, 2012) (denying in part motions to dismiss Section 11 and 12(a)(2) and primary Virginia Securities Act claims asserted against Ally Securities); Order, *Fed. Home Loan Bank of Chicago v. Banc of Am. Funding Corp.*, Case No. 10-CH-45033, at 15–29 (Ill. Cir. Ct. Sept. 19, 2012) (denying motion to dismiss primary claims asserted against Ally Securities under the Illinois Securities Law and the North Carolina Securities Act); *N.J. Carpenters Health Fund v. Residential Capital, LLC*, Civ. No. 08-8781, 2010 U.S. Dist. LEXIS 32058, at *4, 21 (S.D.N.Y. Mar. 31, 2010) (denying in part motions to dismiss Section 11 and 12(a)(2) claims asserted against certain of the Debtors and Ally Securities, allowing "[c]laims related to [misrepresentations concerning] the alleged disregard of underwriting guidelines [to] proceed," and explaining that those alleged misrepresentations "are not cured by the risk disclosures Defendants point to in the Offering Documents"); *Cambridge Place Inv. Mgmt., Inc. v. Morgan Stanley & Co.*, Case No. 2010-02741, 2012 Mass. Super. LEXIS 272, at *29 (Mass. Super. Ct. Sept. 28, 2012) (denying motion to dismiss MUSA § 410(a)(2) claim against Ally Securities alleging "misrepresentation with respect to underwriting guidelines, LTV ratios and appraisal standards, owner-occupancy rates, debt-to-income ratios . . . and credit enhancements"); *W. & S. Life Ins. Co. v. Residential Funding Co., LLC*, Case No. A1105042, 2012 Ohio Misc. LEXIS 100, at *23 (Ohio Ct. Com. Pl. June 6, 2012) (denying motion to dismiss Ohio securities law claims against Ally Securities alleging misrepresentations concerning underwriting guidelines, the appraisal process, investment ratings, and owner occupancy). *But see* Order, *Union Cent. Life Ins. Co. v. Ally Fin., Inc.*, Case No. 11-02890, Docket No. 263, at 3 (S.D.N.Y. Mar. 29, 2013) (dismissing without prejudice claims asserted under Section 10(b) of the Exchange Act against AFI and Ally Securities where plaintiffs "have not pled any facts with particularity to demonstrate . . . scienter" and failed to specify "which defendant engaged in any specific conduct").

The parties do not appear to dispute this. AFI has essentially acknowledged that such claims are sufficient to survive a motion to dismiss.[624]

### (i) Affirmative Defenses

### (A) Due Diligence And Reasonable Care Defenses

"[S]ection 11 provides for two distinct 'due diligence' defenses for all of the statutorily enumerated [defendants] other than the issuer of a security."[625] "Section 12(a)(2) provides for a defense of reasonable care, which . . . may be asserted by all 'sellers' under section 12(a)(2), including the issuer of a security."[626]

"[T]wo of the affirmative defenses available under [s]ection 11(b) are collectively known as the 'due diligence' defense."[627] The first such defense protects a defendant from liability where "'he had, after reasonable investigation, reasonable ground to believe and did believe, at the time . . . the registration statement became effective, that the statements therein were true and that there was no omission to state a material fact required . . . to make the statements therein not misleading.'"[628] The second such due diligence defense, sometimes labeled "the reliance defense," "applies when a [s]ection 11 defendant is entitled to rely upon the opinion of an expert."[629]

---

[624] *See* AFI Submission Paper, dated April 14, 2013, at 8 ("The lengthy string cites that the Allstate Reply touts . . . are wholly beside the point. No one is disputing that some RMBS plaintiffs—including certain of the Investor Claimants—have apparently learned how to plead their claims to survive dismissal on a facial basis.").

[625] *In re Fuwei Films Sec. Litig.*, 634 F. Supp. 2d 419, 435 n.10 (S.D.N.Y. 2009); *see also* 15 U.S.C. §§ 77k(b) (providing for Section 11 due diligence defenses); Lindsay v. Morgan Stanley (*In re Morgan Stanley Info. Fund Sec. Litig.*), 592 F.3d 347, 360 n.7 (2d Cir. 2010) ("[S]ection 11 provides several due diligence defenses available to non-issuer defendants."); *Degulis v. LXR Biotechnology, Inc.*, 928 F. Supp. 1301, 1314 (S.D.N.Y. 1996) ("Unlike certain other Section 11 defendants, the issuer has no 'due diligence' defense available.").

[626] *In re Fuwei Films Sec. Litig.*, 634 F. Supp. 2d at 435 n.10 (quotation marks omitted); *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d at 360 n.7 ("[S]ection 12(a)(2) contains a 'reasonable care' defense."); 15 U.S.C. § 77l(a)(2) (providing Section 12(a)(2) defense where defendant "sustain[s] the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of [the] untruth or omission").

[627] *In re Worldcom, Inc. Sec. Litig.*, 346 F. Supp. 2d 628, 662 (S.D.N.Y. 2004).

[628] *Id.* (quoting 15 U.S.C. § 77k(b)(30(A))).

[629] *Id.* at 663.

The section 12(a)(2) defense of "reasonable care" has been construed by some courts as "less demanding than the duty of due diligence imposed under [s]ection 11."[630] "A defendant may show 'reasonable care' by introducing evidence that the allegedly fraudulent prospectus was the result of reasonable investigation."[631]

### (B) Loss Causation Defense

"Loss causation is not an element of a plaintiff's prima facie case [under section 11 or 12(a)(2)]; rather, the absence of loss causation is an affirmative defense."[632] Accordingly, the defendant "bears the burden of demonstrating that something other than the misstatement at issue caused plaintiff's loss."[633] For example, the defendant may demonstrate that "the plaintiffs' losses were not attributable to the misrepresentations . . . but resulted . . . from general market decline."[634] "Although 'not insurmountable,' defendants' burden in establishing this defense is heavy since 'the risk of uncertainty' is allocated to defendants."[635]

---

[630] *See id.*; *see also John Nuveen & Co., Inc. v. Sanders*, 450 U.S. 1005 (1981) (Powell, J. dissenting) (arguing that section 12(a)(2) "reasonable care" standard is lower than section 11 "reasonable investigation" standard); *In re Fuwei Films Sec. Litig.*, 634 F. Supp. 2d at 435 n.10 (finding the "reasonable care" defense "less demanding than the duty of due diligence under section 11") (quotation marks omitted). *But see Dannenberg v. PaineWebber Inc.* (*In re Software Toolworks Inc.*), 50 F.3d 615, 621 (9th Cir. 1994) ("Because section 11's 'reasonable investigation' standard is similar, if not identical, to section 12(2)'s 'reasonable care' standard, the analysis of each on summary judgment is the same.") (citations omitted); *Sanders v. John Nuveen & Co.*, 619 F.2d 1222, 1228 (7th Cir. 1980) ("[T]he reasonable care standard required [a] reasonable investigation . . . . Since what constitutes reasonable care under § 12(2) depends upon the circumstances, we . . . do not intimate that the duty of a seller under § 12(2) is always the same as that of an underwriter in a registration offering under § 11."); *In re MetLife Demutualization Litig.*, 262 F.R.D. 217, 235 (E.D.N.Y. 2009) ("Courts have likened [s]ection 12(a)(2)'s 'reasonable care' standard to the requirement that sellers make a 'reasonable investigation' in order to avoid liability under Section 11 for making fraudulent misrepresentations in a registration statement.").

[631] *In re MetLife Demutualization Litig.*, 262 F.R.D. at 235.

[632] 15 U.S.C. § 77k(e) (providing that section 11 does not permit recovery to the extent that "defendant proves that any portion or all of [plaintiff's] damages represents other than the depreciation in value of such security resulting from . . . the registration statement . . . not being true or omitting to state a material fact required to be stated therein or necessary to make the statements therein not misleading"); 15 U.S.C. § 77l(b) (providing that section 12(a)(2) does not permit recovery to the extent the defendant demonstrates "that any portion or all of the amount recoverable under subsection (a)(2) represents other than the depreciation in value of the subject security resulting from . . . the prospectus or oral communication . . . not being true or omitting to state a material fact required to be stated therein or necessary to make the statement not misleading"); *Iowa Pub. Emps.' Ret. Sys. v. MF Global, Ltd.*, 620 F.3d 137, 145 (2d Cir. 2010); *see also In re Fuwei Films Sec. Litig.*, 634 F. Supp. 2d at 444 ("Plaintiff is not required to demonstrate loss causation to plead adequately claims under sections 11 and 12(a)(2), as he would be if bringing a claim pursuant to section 10(b).").

[633] *Loftin v. Bande* (*In re Flag Telecom Holdings, Ltd. Sec. Litig.*), 574 F.3d 29, 36 (2d Cir. 2009); *see also In re Fuwei Films Sec. Litig.*, 634 F. Supp. 2d at 444 ("Defendants bear the burden of 'negating' causation, an affirmative defense sometimes referred to as 'negative causation.'").

[634] *Kaye v. Fast Food Operators, Inc.*, 99 F.R.D. 161, 163 (S.D.N.Y. 1983).

[635] *In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d at 408 (quoting *Akerman v. Oryx Commc'ns, Inc.*, 810 F.2d 336, 341 (2d Cir. 1987)).

### (C) Knowledge Of Misrepresentations Defense

"A plaintiff 'may not recover under [sections] 11 or 12(a)(2) if the plaintiff knew of the alleged untruth or omission at the time of purchase.'"[636] "Knowledge that a misstatement or omission exists is sufficient to defeat a [section] 11 or 12(a)(2) claim; defendants need not demonstrate plaintiffs' actual knowledge of the truth."[637] Accordingly, the defendant "can assert a defense that the plaintiff knew of the untruth or omission at the time of his or her acquisition of the security."[638]

### (ii) Conclusions

As stated above, the Debtors and AFI do not challenge the Third-Party Claimants' standing, nor do they challenge that any of the named defendants, including Ally Securities, participated in the RMBS offerings in a manner sufficient to give rise to liability under the Securities Act. Thus, the two remaining elements central to Third-Party Claimants' section 11 and 12(a)(2) claims are: (1) whether the RMBS Offering Documents contained untrue statements; and (2) whether those statements were material. Claimants would have to demonstrate both elements by a preponderance of the evidence. In most of the RMBS Actions that have advanced to litigation, courts have held that Third-Party Claimants' have adequately alleged that Ally Securities made misrepresentations in the RMBS Offering Documents. Generally, Third-Party Claimants have also adequately alleged that, if proven to be untrue, these statements would be material.[639] Accordingly, the success of these claims will ultimately hinge upon whether Third-Party Claimants can effectively demonstrate that these statements were untrue.

This showing will require an intensive inquiry into the circumstances surrounding each challenged securitization transaction, including a review of underlying loan data and related materials. Such an inquiry is not within the scope of the Investigation. The Examiner notes that some Third-Party Claimants, including MBIA, AIG, and the FHLBs, for example, have devoted several years of discovery to investigating these issues and prepared expert reports

---

[636] *In re Barclays Bank PLC Sec. Litig.*, No. 09-1989, 2011 U.S. Dist. LEXIS 2667, at *36 (S.D.N.Y. Jan. 5, 2011) (quoting *In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 441 (S.D.N.Y. 2001)); *see also* 15 U.S.C. § 77k(a) (providing that section 11 plaintiff may recover "unless it is proved that at the time of such acquisition he knew of [the] untruth or omission"); 15 U.S.C. § 77l(a)(2) (providing that section 12(a)(2) plaintiff may recover where "not knowing of [the] untruth or omission"). *Mayer v. Oil Field Sys. Corp.*, 803 F.2d 749, 755 (2d Cir. 1986) (holding that plaintiff may not "recover under §§ 11 and 12(2) of the 1933 Act unless . . . plaintiff had no knowledge of the untruth or omission").

[637] *In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d at 441; *see also In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*, No. 03-1529, 2007 U.S. Dist. LEXIS 66911, at *21–22 (S.D.N.Y. Sept. 7, 2007) ("[P]laintiffs aware that a statement is false need not be shown to know the truth behind it to have their claims barred.").

[638] *Miles v. Merrill Lynch & Co.* (*In re IPO Sec. Litig.*), 483 F.3d 70, 73 n.1 (2d Cir. 2007).

[639] *See, e.g.*, Order, *Allstate Ins. Co. v. GMAC Mortg., LLC*, Case No. 27-cv-11-3480, Docket No. 740, at 10 (Minn. Dist. Ct. Nov. 28, 2011) ("Allstate adequately alleges the existence of material misrepresentations. Each subject above informs investors of the underlying loans' risk profiles, which affects the perceived value of the underlying loans.").

detailing what they allege to be significant evidence of the systematic abandonment of underwriting standards, as well as other allegations in the complaints.[640] If these reports are found to be persuasive and accurate, the section 11 and 12(a)(2) claims are likely to succeed. However, the Debtors have also commenced the preparation of similar reports, which have been delayed because of the pendency of the Chapter 11 Cases. Thus, the Examiner recognizes that this underlying dispute will remain contested.

In addition to attempting to undermine the Third-Party Claimants' prima facie claims, Ally Securities will likely assert a number of defenses. These include the section 11 due diligence defense, the section 12(a)(2) reasonable care defense, loss causation defense, and the knowledge of misrepresentation defense. Both the due diligence and reasonable care defenses would defeat a prima facie section 11 or section 12(a)(2) claim, respectively, if Ally Securities is able to show that after a reasonable investigation (or after the exercise of reasonable care) Ally Securities believed that the alleged misstatements made in the RMBS Offering Documents were true.[641] As these are affirmative defenses, and are generally not raised as a basis for dismissal at the pleading stage, there has been little discussion of these defenses in the existing RMBS Actions.

Ally Securities will likely argue that Third-Party Claimants' losses were not attributable to the misrepresentations, but instead resulted from the deterioration of the housing market generally, as well as other macroeconomic factors.[642] To date, courts in other RMBS cases have discussed loss causation and have rejected this as a defense to liability at the pleading stage.[643] However, this defense may be more successful at later stages of litigation given more factual development.

---

[640] *E.g.,* AIG, Allstate, MassMutual, and Prudential Joint Reply Submission Paper, dated Feb. 12, 2013, at 6–7 (stating that the results of AIG's review show "that over 90% of the loans failed to comply with underwriting guidelines" and that MBIA found "breach rates of 88 and 89%" across a sample of "thousands of mortgages") (emphasis omitted); Federal Home Loan Banks of Boston, Chicago, and Indianapolis Submission Paper, dated Oct. 19, 2012, at 8–9.

[641] AFI asserts that the due diligence defense renders any Securities Act claims worthless. *See* AFI Submission Paper, dated April 14, 2013, at 5–6; AFI Submission Paper, dated Dec. 19, 2012, at 75–76. As with many of the claims discussed herein, the success or failure of these claims will largely be determined by the facts. Both AFI and Third-Party Claimants cite Ally Securities' diligence in support of their respective positions. In asserting the due diligence defense, AFI is stating that Ally Securities conducted diligence which would lead it to reasonably believe that the representations in the RMBS Offering Documents were true. Third-Party Claimants take the exact opposite viewpoint, as they must, with respect to their fraud claims discussed below. Third-Party Claimants argue that because Ally Securities conducted diligence, they had knowledge of the purported misrepresentations and their falsity. Arriving at a conclusion would require a review of each individual securitization at issue, as Ally Securities' procedures regarding such diligence differed deal by deal, as noted above.

[642] *See* AFI Submission Paper, dated Dec. 19, 2012, at 78 ("Nor can Claimants demonstrate that any alleged misrepresentations or omissions caused their losses, in light of the nationwide plunge in home values and the Great Recession.").

[643] *See, e.g., FHFA v. JPMorgan Chase & Co.*, No. 11-6188, 2012 WL 5395646, at *18 (S.D.N.Y. Nov. 5, 2012) (noting that the Second Circuit has emphasized that loss causation is "a matter of proof at trial and not to be decided on a . . . motion to dismiss").

The knowledge of misrepresentation defense requires that Ally Securities show that the Third-Party Claimants knew that the alleged misrepresentations were false at the time they purchased the RMBS. This defense has been raised at the pleading stage by certain defendants in RMBS cases. To date, courts have noted that lack of knowledge is presumed, and thus the defense has not been successful.[644] This defense would likely be developed by Ally Securities as the RMBS Actions progress, where Ally Securities may argue that Third-Party Claimants are sophisticated investors who had access to information which would have made them aware of the alleged misrepresentations.

With respect to claims for violation of the Securities Act, as well as other claims discussed below for fraud, aiding and abetting fraud, and negligent misrepresentation, Third-Party Claimants' alleged damages against Ally Securities and their ability to collect on a judgment are discussed in Section VIII.D.

### (b) Common Law Fraud And Fraudulent Inducement

Fraud and fraudulent inducement are essentially identical claims, often used interchangeably.[645] Indeed, numerous New York courts have stated that the elements of claims for fraud and fraudulent inducement are the same.[646] In order to demonstrate a claim for either fraud or fraudulent inducement, a plaintiff is required to show (1) a misrepresentation or omission of material fact which was false and known to be false by defendant; (2) made with the intent to induce reliance; (3) justifiable reliance; and (4) damages cause by the misrepresentation.[647] Each element of the fraud claim must be shown by clear and convincing evidence.[648]

---

[644] *See, e.g.*, *N.J. Carpenters Health Fund v. Residential Capital, LLC*, No. 08-8781, 2011 U.S. Dist. LEXIS 46066, at *27 (S.D.N.Y. Apr. 28, 2011).

[645] *E.g.*, *Centro Empresarial Empresa v. Am. Movil*, 952 N.E.2d 995, 1000 (N.Y. 2011) (citation omitted) (providing that a plaintiff alleging fraudulent inducement must "establish the basic elements of fraud, namely a representation of material fact, the falsity of that representation, knowledge by the party who made the representation that it was false when made, justifiable reliance by the plaintiff, and resulting injury"); *N.Y. Univ. v. Cont' Ins. Co.*, 662 N.E.2d 763, 768–69 (N.Y. 1995) ("In plaintiff's fifth cause of action, sounding in fraud, it alleges that defendants induced plaintiff to purchase and maintain the insurance policy . . . .The essential elements of a cause of action for fraud are 'representation of a material existing fact, falsity, scienter, deception and injury.'") (citation omitted).

[646] *E.g.*, *Dexia SA/NV v. Deutsche Bank AG*, No. 5672, 2013 WL 98063, at *3 (S.D.N.Y Jan. 4, 2013) ("In order to make out a claim for fraud under New York law, the plaintiffs must plausibly allege 'a material misrepresentation of a fact, knowledge of its falsity, an intent to induce reliance, justifiable reliance by the plaintiff and damages.' . . . The plaintiffs must plead the same elements in order to make out a claim for fraudulent inducement.") (citations omitted); *Dandong v. Pinnacle Performance Ltd.*, No. 8086, 2011 U.S. Dist. LEXIS 126552, at *41–42 (S.D.N.Y. Oct. 31, 2011); *UniCredito Italiano SPA v. JPMorgan Chase Bank*, 288 F. Supp. 2d 485, 498 (S.D.N.Y. Dec. 12, 2003).

[647] *See Banque Arabe et Internationale D'Investissement v. Md. Nat'l Bank*, 57 F.3d 146, 153 (2d Cir. 1995); *Eurycleia Partners*, 910 N.E.2d 976, 979 (N.Y. 2009); *Lama Holding Co. v. Smith Barney Inc.*, 668 N.E.2d 1370, 1373 (N.Y. 1996); *Mateo v. Senterfitt*, 918 N.Y.S.2d 438 (N.Y. App. Div. 2011).

[648] *Century Pac., Inc. v. Hilton Hotels Corp.*, 528 F. Supp. 2d 206, 219 (S.D.N.Y. 2007).

As with Securities Act claims, a number of courts considering a motion to dismiss claims based on common law fraud have found that plaintiffs have adequately alleged fraud.[649] This includes claims against Ally Securities.[650]

### (i) Conclusions

Third-Party Claims for fraud and fraudulent inducement are similar to the claims under section 11 and section 12(a)(2) of the Securities Act described above. With respect to fraud, Third-Party Claimants have generally asserted that the RMBS Offering Documents contained various material representations which Ally Securities knew were false. Claimants state that they justifiably relied on these misrepresentations and that they were damaged as a result. As stated in Section VIII.A, ascertaining facts which might lead to a definitive conclusion on the merits of such claims is outside the scope of the Investigation. The Examiner notes, however, that Third-Party Claimants' allegations of fraud and fraudulent inducement will be more difficult to prove than the Securities Act claims, as such claims require an affirmative showing of Ally Securities' knowledge of the fraud, intent to defraud, justifiable reliance, and damages causation. Ultimately, it is possible that a plaintiff with the benefit of full discovery could prove such elements, but this would require additional factual development.

### (A) Knowledge And Intent To Defraud

Claims against Ally Securities based upon allegations of fraud have survived motions to dismiss.[651] The fraud claims against Ally Securities are generally premised upon the notion that Ally Securities, in its role as underwriter, performed and had access to diligence performed on the underlying loans and would therefore be in a position to have knowledge of the alleged fraud. Plaintiffs will have to demonstrate this knowledge at trial, which may be difficult. Regardless, plaintiffs have asserted that given appropriate discovery, they will be able to procure such evidence. The Investigation has not determined whether such evidence exists. Accordingly, the Examiner can make no determinations regarding whether Ally Securities intended to defraud the Third-Party Claimants.

---

[649] *See, e.g.*, *Dexia SA/NV*, 2013 WL 98063; *Stichting Pensioenfonds ABP v. Credit Suisse Grp. AG*, Case No. 653665, Docket No. 110 (N.Y. Sup. Ct. Nov. 30, 2012). Recently, a claim for common law fraud survived a motion for summary judgment in a similar RMBS case. *See* Order, *MBIA Ins. Co. v. Countrywide Home Loans, Inc.,* Case No. 08-602825, Docket No. 4092 (N.Y. Sup. Ct. Apr. 29, 2013).

[650] *FHFA v. Ally Fin. Inc.*, No. 11-7010, 2012 WL 6616061, at *3 (S.D.N.Y. Dec. 19, 2012) ("As to Ally Securities, it is likewise true that, given the firm's representations that it reviewed portions of the loan pool for compliance with guidelines, the high defect rate alleged . . . is strongly suggestive that the firm knew the loans were underwritten to standards lower than those reported in the Offering Documents. . . . [T]hese allegations are more than adequate to plead fraud with respect to the [RMBS Offering Documents] representations regarding mortgage-underwriting standards."); Order, *Allstate Ins. Co. v. GMAC Mortg., LLC*, Case No. 27-cv-11-3480, Docket No. 740, at 15–16 (Minn. Dist. Ct. Nov. 28, 2011) (denying motion to dismiss common law fraud claims asserted against certain Debtors and Ally Securities); *W. & S. Life Ins. Co. v. Residential Funding Co., LLC*, No. A1105042, 2012 Ohio Misc. LEXIS 100, at *27 (Ohio Ct. C.P. June 6, 2012).

[651] *See, e.g.*, *FHFA v. Ally Fin. Inc.*, 2012 WL 6616061.

### (B) Reliance And Loss Causation

Third-Party Claimants' common law fraud claims also require establishing reasonable reliance and loss causation. These elements required to establish fraud are similar to the knowledge of misrepresentation defense and the loss causation defense discussed in connection with the Securities Act claims above, with the difference being that the plaintiff bears the burden of demonstrating these elements when alleging fraud. If the claims were to advance to trial, Ally Securities would likely argue that the plaintiffs had knowledge of the risks involved in purchasing the RMBS at issue and that their losses were caused by intervening factors rather than Ally Securities' activities.[652] Given the parties' sophistication, an argument that the claimants did not justifiably rely on the alleged misrepresentations could be made at trial. Similarly, it is possible that a court might find that the overall market decline was the proximate cause of claimants' losses.

### (c) Aiding And Abetting Common Law Fraud And Fraudulent Inducement

To state a claim for aiding and abetting fraud, plaintiffs must allege (1) the existence of an underlying fraud; (2) knowledge of the fraud; and (3) substantial assistance in the commission of the fraud.[653] Each element of aiding and abetting fraud must be established by clear and convincing evidence.[654]

Claims for aiding and abetting fraud in the RMBS context have survived motions to dismiss, including claims against AFI.[655] With respect to Ally Securities, only MBIA has asserted a claim for aiding and abetting fraud.[656] MBIA generally alleges that Ally Securities had knowledge of the Debtors' underlying fraud as it "received information about all aspects of

---

[652] *See* AFI Submission Paper, dated Dec. 29, 2012, at 78 ("Nor can Claimants demonstrate that any alleged misrepresentations or omissions caused their losses, in light of the nationwide plunge in home values and the Great Recession."); Debtors' Submission Paper, dated Dec. 18, 2012, at 58 ("Generally, the PLS Investors' claims require proof of causation. Some courts have held that the market collapse can serve as a defense to claims under securities statutes, as well as common law claims for fraud and negligent misrepresentation.").

[653] *E.g., Dexia/NV*, 2013 WL 98063, at *3 (citing *VTech Holdings, Ltd. v. Pricewaterhouse Coopers, LLP*, 348 F. Supp. 2d 255, 269 (S.D.N.Y. 2004)); *UniCredito Italiano SPA v. JPMorgan Chase Bank*, 288 F. Supp. 2d 485, 503 (S.D.N.Y. 2003).

[654] *King Cnty., Wash. v. IKB Deutsche Industriebank AG*, No. 09-8387, 2013 WL 45878, at *2 (S.D.N.Y. Jan. 3, 2013) ("In New York, a plaintiff alleging fraud must establish each element of its fraud claim by 'clear and convincing evidence.' The same is true for a plaintiff asserting a claim of aiding and abetting fraud.").

[655] *FHFA v. Ally Fin. Inc.*, 2012 WL 6616061, at *4; *see also Dexia SA/NV v. Bear, Stearns & Co., Inc.*, No. 12-4761, 2013 U.S. Dist. LEXIS 30916, at *29 (S.D.N.Y. Feb. 26, 2013) (alleging that "high-level executives of the defendant entities knew and participated in creating policies that incentivized high-risk lending and reduced controls in order to increase profits by creating greater number of RMBS regardless of quality" were sufficient to satisfy both knowledge and participation requirements of aiding and abetting fraud); *Stichting Pensioenfonds ABP v. Credit Suisse Grp. AG*, Case No. 653665, Docket No. 110 (N.Y. Sup. Ct. Nov. 30, 2012).

[656] *See* Compl., *MBIA Ins. Co. v. Ally Fin. Inc.*, Case No. 27-CV-12-18889, Docket No. 1, at 3–5, 47–49 (Minn. Dist. Ct. Sept. 17, 2012) (removed to the United States District Court for the District of Minnesota (12-2563)).

the Debtors' securitization business, including results of third-party diligence, underwriting guidelines, loan performance and transaction losses, loans 'kicked out' of securitization pools and loan details for the securitization pools."[657] MBIA also asserts that "Ally Securities substantially assisted the Debtors' fraud by contemporaneously providing underwriting services in connection with the Securitizations."[658] A motion to dismiss is pending in that case.[659]

### (i) Conclusions

To succeed on claims against Ally Securities for aiding and abetting fraud, Third-Party Claimants must show that there was an underlying fraud, as well as that Ally Securities knew of that fraud and provided substantial assistance to the Debtors in perpetrating that fraud. The Examiner concludes that if Third-Party Claimants can demonstrate an underlying fraud against the Debtors, it is likely that a claim of aiding and abetting fraud against Ally Securities would prevail as well. As noted above in Section VIII.B, an underwriter, particularly the lead underwriter, plays an integral role throughout the life of a securitization transaction. Given Ally Securities' position as underwriter, it is possible, perhaps even probable, that Ally Securities had knowledge of the Debtors' alleged fraud[660] and, in marketing the RMBS, it could be determined that Ally Securities substantially assisted in the fraud.

### (d) Negligent Misrepresentation

Negligent misrepresentation is a traditional common law cause of action that generally has three elements: (1) a misstatement by one party in a transaction; (2) reasonable reliance by the counterparty leading to a loss; and (3) a duty of care on the part of the communicating party towards the aggrieved party. Thus far, plaintiffs have had difficulty pursuing negligent misrepresentation claims in the context of RMBS transactions—and have frequently seen their complaints dismissed at the pleading stage—due to their inability to show a duty of care. As a general rule, courts have concluded that sophisticated commercial parties engaged in RMBS transactions do not owe each other a duty of care that can support a negligent misrepresentation claim, even where the parties have a history of doing business.[661] Allstate's

---

[657] MBIA Reply Submission Paper, dated Mar. 18, 2013, at 58.

[658] *Id.* at 62.

[659] *See* Am. Memo. of Law in Supp. of Defs.'s Mot. to Dismiss, *MBIA Ins. Co. v. Ally Fin. Inc.*, Case No. 12-CV-02563, Docket No. 36 (D. Minn. Mar. 12, 2013) (removed from Minnesota state court (27-CV-12-18889)).

[660] AFI essentially admits as much in its submissions. *See* AFI Submission Paper, dated Dec. 20, 2012, at 76 ("Where Ally Securities served as the lead underwriter for a securitization, it typically retained Office Tiger to review the loans in the securitization and to identify any loans that might be defective. Through Office Tiger, Ally Securities investigated samples of loans included in each securitization . . . ."). Thus, given Ally Securities' due diligence, if fraud existed, it would likely have been aware of it.

[661] *E.g., Woori Bank v. RBS Sec., Inc.*, No. 12 4254, 2012 WL 6703352, at *8 (S.D.N.Y. Dec. 27, 2012); *Stichting Pensioenfonds ABP v. Credit Suisse Grp. AG*, Case No. 653665, Docket No. 110, at 25 (N.Y. Sup. Ct. Nov. 30, 2012) (discussing the relationship between a purchaser and issuer of RMBS and stating that "[t]he transactions at issue in this case were arm's length interactions between two sophisticated entities, and did not create any duty which might support a claim of negligent misrepresentation"); *MBIA Ins. Co. v. Residential Funding Co., LLC*, 906 N.Y.S.2d 781 (N.Y. Sup. Ct. 2009).

claim against Ally Securities for negligent misrepresentation was dismissed.[662] However, some recent cases, including two cases against Ally Securities, have passed the pleading stage.[663]

With respect to the FHLB of Indianapolis's claim of negligent misrepresentation brought against Ally Securities in Indiana state court, it appears that Indiana law is unclear on the nature of the relationship required to support a claim.[664] The court in *Western & Southern Life Insurance Co. v. Residential Funding Co., LLC*, did not examine the nature of the relationship between the purchaser of the RMBS and the seller in any depth, but stated only that plaintiffs had "adequately plead[ed] a claim for negligent misrepresentation, including their relationship to Defendants."[665] Accordingly, while these claims have survived a motion to dismiss, they do not otherwise provide any significant guidance.

### (i) Conclusions

The success of claims made under the theory of negligent misrepresentation appears to turn on whether plaintiffs can demonstrate a special relationship with defendants. A review of the relationships between individual Third-Party Claimants and Ally Securities is beyond the scope of the Investigation. Accordingly, the Examiner does not come to a conclusion on whether claims of negligent misrepresentation will ultimately be successful. Based upon a review of the case law, however, while some negligent misrepresentation claims against Ally Securities have survived motions to dismiss, these decisions only seem to allow plaintiffs to proceed to discovery, rather than being indicative of potential future success. In most cases where the court examined in more depth the nature of the parties' relationship in an RMBS

---

[662] Order, *Allstate Ins. Co. v. GMAC Mortg., LLC*, Case No. 27-cv-11-3480, Docket No. 740, at 22–24 (Minn. Dist. Ct. Nov. 28, 2011).

[663] *See Dexia SA/NV v. Bear, Stearns & Co., Inc.*, No. 12-4761, 2013 U.S. Dist. LEXIS 30916, at *31 (S.D.N.Y. Feb. 26, 2013) (ruling that plaintiff's claim for negligent misrepresentation, most specifically its allegation of a special relationship, raised a question of fact that was better reserved for determination after discovery); Order on Mot. to Dismiss, *Fed. Home Loan Bank v. Banc of Am. Mortg. Sec.*, Case No. 49D05 1010 PL 45071, at 6 (Ind. Super. Ct. July 3, 2012); *W. & S. Life Ins. Co. v. Residential Funding Co., LLC*, No. A1105042, 2012 Ohio Misc. LEXIS 100, at *27 (Ohio Ct. C.P. June 6, 2012).

[664] The seminal case in the state, *Eby v. York-Division, Borg-Warner*, 455 N.E.2d 623 (Ind. Ct. App. 1983), specifically limited the recognition of negligent misrepresentation to the context of an employer-employee relationship. In a number of post-*Eby* decisions, the Indiana appellate courts have declined to recognize the tort of negligent misrepresentation outside the context of an employment relationship. *Trytko v. Hubbell, Inc.*, 28 F.3d 715, 720 (7th Cir. 1994). In *Trytko*, the Seventh Circuit considered whether Indiana recognizes the tort and ultimately concluded that Indiana would continue to recognize the tort of negligent misrepresentation, but only in circumstances closely analogous to those present in *Eby*. *Id.* at 721. Recent cases have echoed this interpretation. *Mart v. Forest River, Inc.*, 854 F. Supp. 2d 577, 595 (N.D. Ind. 2012) ("The tort of negligent misrepresentation is recognized in Indiana in the limited circumstance of the employer-employee relationship."). Thus, it appears that the tort of negligent misrepresentation is limited to an employer-employee relationship in the State of Indiana. The court in *Federal Home Loan Bank v. Banc of America Mortg. Securities* did not discuss this issue at all, so the validity of that decision may be questioned in the future.

[665] 2012 Ohio Misc. LEXIS 100, at *27.

transaction, the court concluded that a special relationship did not exist.[666] Irrespective of this, two of the claims for negligent misrepresentation asserted against Ally Securities remain pending.

### c. Claims Against Ally Bank As Loan Originator And Custodian

#### (1) Description Of Claims

Third-Party Claimants assert claims directly against Ally Bank on several theories of liability. First, certain monolines have alleged breach of contract claims against Ally Bank on account of its role as loan custodian.[667] In connection with certain GMAC Mortgage securitizations, Ally Bank (and previously Old GMAC Bank) entered into custodial agreements, "whereby it agreed to serve as Custodian of the underlying mortgage loan notes on behalf of the respective RMBS trusts."[668] The monolines assert that they are third-party beneficiaries of the custodial agreements and that pursuant to those agreements, Ally Bank received "substantial fees" in return for its obligation to "ensure that the Mortgage Loans for the [securitizations] contained complete and accurate information and that [GMAC Mortgage] was in compliance with its representations and warranties regarding the origination, selection, and underlying characteristics of those loans."[669] The monolines further assert that as custodian, "[i]f Ally Bank determined that GMAC Mortgage was not in compliance, its custodial duties obligated Ally Bank to give prompt written notice to [the monolines]."[670] The monolines allege that Ally Bank breached the custodial agreements by (1) failing to notify them that mortgage notes were missing from certain loan files; (2) providing inaccurate and/or incomplete certifications regarding mortgage loans; and (3) failing to notify the monolines of breaches by GMAC Mortgage of the representations and warranties contained in certain

---

[666] *E.g., Stichting Pensioenfonds ABP v. Credit Suisse Grp. AG*, Case No. 653665, Docket No. 110, at 25 (N.Y. Sup. Ct. Nov. 30, 2012) (discussing the relationship between a purchaser and issuer of RMBS and stating that "[t]he transactions at issue in this case were arm's length interactions between two sophisticated entities, and did not create any duty which might support a claim of negligent misrepresentation").

[667] *See* FGIC Submission Paper, dated Oct. 17, 2012, at 25–26; Compl., *MBIA Ins. Corp. v. Ally Fin. Inc*., Case No. 27-CV-12-18889, at 56 (Minn. Dist. Ct. Sept. 17, 2012); Compl., *Assured Guar. Mun. Corp. v. GMAC Mortg., LLC,* Case No. 12-03776, Docket No. 1, at 40 (S.D.N.Y. May 11, 2012) ("Ally Bank has materially breached its obligations under the Custodial Agreement by failing to provide documents relating to Subsequent Mortgage Loan transfers to [Assured] and by failing to notify [Assured]of [GMAC Mortgage's] breaches of its representations and warranties.").

[668] FGIC Submission Paper, dated Oct. 17, 2012, at 25 ("For these transactions, Ally Bank agreed that it would hold a document known as the Mortgage Note that it would review and deliver to FGIC a certification of 'the completeness of the receipt of the Mortgage Notes.'").

[669] *Id.* at 25; *see also* MBIA Submission Paper, dated Nov. 9, 2012, at 33–34 (same); Compl., *Assured Guar. Mun. Corp. v. GMAC Mortg., LLC,* Case No. 12-03776, Docket No. 1, at 3 (S.D.N.Y May 11, 2012).

[670] MBIA Submission Paper, dated Nov. 9, 2012, at 34 (citation omitted); *see also* FGIC Submission Paper, dated Oct. 17, 2012, at 25 ("Ally Bank further agreed to notify FGIC of breaches of the [mortgage loan purchase agreements] by [GMAC Mortgage], by providing that: 'Upon discovery by the Custodian of a breach of any representation or warranty made by [GMAC Mortgage] in the Purchase Agreement . . . with respect to a Mortgage Loan . . . the Custodian shall give prompt written notice to [FGIC].'").

mortgage loan purchase agreements.[671] Additionally, the monolines assert that because Ally Bank originated a majority of the loans underlying the relevant GMAC Mortgage securitizations, "it must have been keenly aware of the breadth and scope of the underwriting failures with respect to those loans."[672]

Second, Third-Party Claimants allege that Ally Bank is liable for aiding and abetting fraud by virtue of its role as loan originator and custodian with respect to certain GMAC Mortgage securitizations.[673] According to Third-Party Claimants, Ally Bank, as an originator of mortgages underlying the Debtors' securitizations, was "well aware of the true nature of the loan pool"[674] and is therefore "directly liable for passing false information to underwriters and

---

[671] *See* FGIC Submission Paper, dated Oct. 17, 2012, at 25–26; *see also* MBIA Submission Paper, dated Nov. 9, 2012, at 33–34; Compl., *MBIA Ins. Corp. v. Ally Fin. Inc.,* Case No. 27-CV-12-18889, at 49 (Minn. Dist. Ct. Sept. 17, 2012) (alleging that "a review of a sample of mortgage loan documents has uncovered numerous breaches of the representations and warranties guaranteed under the Custodial Agreements, including missing Mortgage Notes or other documents necessary for closing on the loan, as well as breaches for incurable credit and compliance breaches.").

[672] FGIC Submission Paper, dated Oct. 17, 2012, at 26; *see also* MBIA Submission Paper, dated Nov. 9, 2012, at 32 ("Ally Bank was responsible for the origination or acquisition of 80% of the loans in the GMAC Mortgage [s]ecuritizations.").

[673] FGIC Submission Paper, dated Oct. 17, 2012, at 26–27; *see also* Compl., *MBIA Ins. Corp. v. Ally Fin. Inc.*, Case No. 27-CV-12-18889, at 49, 54–55 (Minn. Dist. Ct. Sept. 17, 2012). The plaintiffs in *John Hancock Life Insurance. Co. v. Ally Financial Inc.*, assert additional claims against Ally Bank, including common law fraud, securities fraud, and negligent misrepresentation. Case No. 12-01841 (D. Minn. 2012). With respect to the fraud claims, the alleged fraudulent conduct is the same as that alleged by most plaintiffs to give rise to aiding and abetting liability. Because fraud and aiding and abetting fraud are similar claims and it is unlikely that a plaintiff will be found liable for fraud but not aiding and abetting fraud, this Section analyzes Ally Bank's liability under an aiding and abetting standard. With respect to the *John Hancock* plaintiffs' securities fraud claims, the Examiner is not aware of any allegation that Ally Bank helped draft or disseminate securities offering materials or "controlled" the otherwise responsible entities. With respect to John Hancock's claims for negligent misrepresentation, such claims have typically been dismissed for failure to establish the requisite "special relationship." *See, e.g.*, *AllState Ins. Co. v. GMAC Mortg., LLC*, No. 27-CV-11-3480, 2011 WL 7943021 (Minn. Dist. Ct., Nov. 28, 2011) (dismissing Allstate's claim for negligent misrepresentation because under Minnesota law "no negligent representation claim lies where parties deal at arm's length in a commercial transaction, even if one party supplies guidance to another"); *MBIA Ins. Co. v. Residential Funding Co., LLC*, 906 N.Y.S.2d 781, 781 (N.Y. Supr. Ct. Dec. 22, 2009) ("Generally, the requisite 'special relationship' does not exist between sophisticated commercial entities that enter into an agreement through an arm's-length business transaction."). For an analysis of these types of claims against Ally Securities, see Section VIII.C.2.b.

[674] FGIC Submission Paper, dated Oct. 17, 2012, at 26; *see also* AIG, Allstate, MassMutual, and Prudential Joint Submission Paper, dated Oct. 17, 2012, at 24 ("Ally Bank was an originator of loans in many of the RMBS at issue and is liable both for the false information it transmitted to securitizing and underwriting entities—typically its sister companies—that it then passed on to the Investors, as well as for collaborating with Ally affiliates in the dissemination of that information.").

sponsors, knowing it would be disseminated to investors."[675] These claimants argue that "[b]ut for Ally Bank's financing activities, a significant number of the loans could not have been included in the [s]ecuritizations . . . ."[676] Claimants argue that if ResCap had stopped issuing securitizations, Ally Bank would have been left holding excellent, risky loans.[677] Finally, claimants assert that as a direct loan originator, "Ally Bank issued loans in violation of guidelines, and then passed on false information about the credit quality of the loans . . . to the securitizing trusts and underwriting banks."[678] Additionally, the plaintiffs allege that Ally Bank substantially assisted GMAC Mortgage's fraud by representing to insurers that, as loan custodian, it would "hold and monitor certain key information and documentation" regarding the mortgage loans and would provide notice of any breaches of representations and warranties by GMAC Mortgage.[679] Claimants allege that rather than report deficiencies, "Ally Bank facilitated the Debtors' fraudulent activities by concealing the deficiencies in the loans and GMAC Mortgage's misrepresentations . . . ."[680]

### (2) Analysis Of Claims

As a preliminary matter, this Section analyzes the conduct of both Old GMAC Bank and its successor, Ally Bank. While substantially all of the assets and liabilities of Old GMAC Bank were transferred to Ally Bank in connection with the 2006 Bank Restructuring, the Examiner has concluded in Section VII.L.2.a(1)(a)(i) that a court is unlikely to conclude that Ally Bank is a successor in liability of Old GMAC Bank.[681] Because a Third-Party Release will likely only affect claims against Ally Bank, this Section refers to Old GMAC Bank where it is necessary to distinguish between the two entities. However, where it is not necessary to distinguish between the two entities, this Section simply refers to both entities as the Bank.

---

675  AIG, Allstate, MassMutual, and Prudential Joint Reply Submission Paper, dated Feb. 12, 2013, at 3; Compl., *MBIA Ins. Corp. v. Ally Fin. Corp.*, Case No. 27-CV-12-18889, at 54–55 (Minn. Dist. Ct. Sept. 17, 2012) ("Ally Bank profited from extending warehouse financing to the originators of non-compliant loans acquired and securitized by the Securitization Sponsors. If the fraudulent scheme ended, and the Securitization Sponsors no longer acquired non-compliant mortgage loans, the originators selling such loans would stop originating such loans, and therefore no longer need financing from Ally Bank.").

676  MBIA Submission Paper, dated Nov. 9, 2012, at 32–33; *see also* Compl., *John Hancock Life Ins. Co. v. Ally Fin. Inc.*, Case No. 12-01841, Docket No. 1, at 56 (D. Minn. July 27, 2012) ("Defendant Ally Bank . . . was the vehicle through which Defendant Ally Financial funded and controlled its vertically-integrated mortgage operations, including its mortgage origination, securitization, and servicing activities.").

677  Compl., *MBIA Ins. Corp. v. Ally Fin. Corp.*, Case No. 27-CV-12-18889, at 55 (Minn. Dist. Ct. Sept. 17, 2012). This claim is somewhat inaccurate given that the June 4, 2002 addendum to the 2001 MMLPSA required GMAC Mortgage to purchase on a "mandatory delivery basis" all first lien loans originated or acquired by Old GMAC Bank. *See* Second Addendum to 2001 MMLPSA, dated June 4, 2002, § 2.1 [ALLY_0018245]. This requirement was later extended to second lien loans in June 2007. *See* 2007 MMLPSA, dated June 1, 2007, § 2.1 [ALLY_0018275]. For further discussion regarding the MMLPSA and its terms, see Section V.B.3.

678  AIG, Allstate, MassMutual, and Prudential Joint Submission Paper, dated Oct. 17, 2012, at 24.

679  FGIC Submission Paper, dated Oct. 17, 2012, at 27; *see also* MBIA Submission Paper, dated Nov. 9, 2012, at 33–34.

680  MBIA Submission Paper, dated Nov. 9, 2012, at 34.

681  *See* Section VII.L.2.a(1)(a)(i).

### (a) Breach Of Custodial Agreements

#### (i) Bank Obligations Under The Custodial Agreements

From mid-2004 through late 2007,[682] the Bank was enlisted as loan custodian for approximately thirty-four of ResCap's 392 PLS securitizations.[683] Before the 2006 Bank Restructuring, custodial agreements were entered into between GMAC Mortgage and Old GMAC Bank.[684] Following the 2006 Bank Restructuring, existing custodial agreements were "repapered" with Ally Bank, and future custodial agreements were entered into between Ally Bank and GMAC Mortgage.[685] Throughout the relevant period, the Bank provided document custody services through its Document Custody Division ("DCD"), which was housed in its Horsham, Pennsylvania and Waterloo, Iowa facilities.[686] Ally Bank continues to provide custodial services on the relevant securitizations through the present.

Generally, the loan custodian of a securitization serves as an agent for the trustee and has a contractual obligation to hold and review the mortgage notes underlying the securitizations and to provide certain notices to the loan servicer, the securitization trustee, and, in certain

---

[682] As discussed throughout the Report, the Debtors effectively halted their private label securitization business in the late summer/early fall of 2007. *See* Int. of J. Gray, Mar. 1, 2013, at 61:8–63:23 ("I think in early August there was a significant pullback in the marketplace in terms of what investors were willing to buy and I think that was the major impetus for [shutting down non-conforming products].").

[683] *See* Appendix VIII.B—3 (providing information on the securitizations for which Ally Bank and Old GMAC Bank served as custodian). Int. of M. Hebling, Apr. 16, 2013, at 12:13–13:7, 13:18–19 ("[In July 2004, Old] GMAC Bank was entering the document custody business. . . . And taking over a business from Escrow Bank USA, [which was] an on-site custodian to GMAC Mortgage. And the intent was that the bank would enter that business, provide that service to the affiliate."); It appears that Old GMAC Bank served as custodian for at least one RFC securitization, but for the vast majority of the Debtors' securitization deals, other banks such as JPMorgan, Wells Fargo, or U.S. Bank served as custodian. *See* Int. of M. Hebling, Apr. 16, 2013, at 45:18–46:7 ("We held one small deal [for RFC that] we inherited from Escrow Bank USA.").

[684] *See, e.g.*, Custodial Agreement—GMACM 2006-HE2, dated June 29, 2006 [ALLY_0033251]. As of June, 2005, DCD held more than 1.7 million mortgage notes in custody, with GMAC Mortgage generating "more than 90% of all loans handled and stored by [Old] GMAC Bank." Report on Audit of GMAC Bank—Trust & Custody Services, Sept. 23, 2005, at 1 [ALLY_0220368].

[685] *See* Summary—Review of GMAC Bank Affiliate Agreements (Draft), Nov. 14, 2006, at ALLY_0402127–29 [ALLY_0402056]; Minutes of a Special Meeting of the Board of Directors of GMAC Bank (Draft), Nov. 22, 2006, at ALLY_0401911–12 [ALLY_0401905]. Documents related to the 2006 Bank Restructuring suggest it was easier for Ally Bank to simply enter into new custodial agreements (or "repaper") with GMAC Mortgage rather than assign the existing custodial agreements. *See* Bank Restructuring Project Plan, Oct. 17, 2006, at EXAM10255917 [EXAM10255899].

[686] Report on Audit of GMAC Bank—Trust & Custody Services, Sept. 23, 2005, at 1 [ALLY_0220368].

circumstances, the monoline.[687] At the Bank, DCD is responsible for the certification, safeguarding, retrieval, and release of loan collateral documents (i.e., mortgage notes).[688] DCD provides this service for agency clients, including Fannie Mae, Freddie Mac, and Ginnie Mae, as well as for private securitization sponsors, such as its affiliate, GMAC Mortgage.[689] Ally Bank bills each customer, including GMAC Mortgage, monthly service fees based upon standard rates under the terms of individuallly negotiated agreements.[690]

The Bank's obligations as custodian are controlled by the custodial agreements contained in each securitization's closing set.[691] Pursuant to these agreements, the Bank had, and in some cases continues to have, several responsibilities. First, it must acquire and hold mortgage notes (sometimes referred to as loan agreements) in trust for the use and benefit of the trustee and investors.[692] Typically, the mortgage notes were acquired by the Bank staff directly from

---

[687] *See* Custodial Agreement—GMACM 2006-HE2, dated June 29, 2006, §§ 2.1–2.3 [ALLY_0033251]; Custodial Agreement—GMACM 2006-HE4, dated Sept. 27, 2006, §§ 2.1–2.3 [ALLY_0033295]; Custodial Agreement—GMACM 2007-HE1, dated Mar. 29, 2007, §§ 2.1–2.3 [ALLY_0033359]; Custodial Agreement, RALI Series 2007-QH6, dated June 1, 2007, §§ 2.1, 2.3(a) [GSResCap0000117072]; Int. of M. Hebling, Apr. 16, 2013, at 14:11–16 ("[The Document Custody Division] handled the receipt, review, and certification of collateral to an investor as well as safeguarded that collateral once it had been certified to an investor. So, we maintained a vault of collateral."). The monoline insurers are express third-party beneficiaries of the custodial agreements related to their respective transactions. *See* Custodial Agreement—GMACM 2006-HE2, dated June 29, 2006, § 5.6 [ALLY_0033251]; Custodial Agreement—GMACM 2006-HE4, dated Sept. 27, 2006, § 5.6 [ALLY_0033295]; Custodial Agreement—GMACM 2007-HE1, dated Mar. 29, 2007, § 5.6 [ALLY_0033359].

[688] *See* Report on Audit of GMAC Bank—Trust & Custody Services, Sept. 23, 2005, at 1 [ALLY_0220368].

[689] *See id.*; Int. of M. Hebling, Apr. 16, 2013, at 18:6–15 ("With each of our clients we had a bi-party custodial agreement . . . . For each client that we provided agency or Fannie Mae, Freddie Mac, or Ginnie Mae custodial services there's an agency custodial agreement . . . . And then at times we were party to certain securitization agreements where we provided custodial services.").

[690] *See* Report on Audit of GMAC Bank—Trust & Custody Services, Sept. 23, 2005, at 1 [ALLY_0220368].

[691] *See* Int. of M. Hebling, Apr. 16, 2013, at 18:6–23.

[692] *See, e.g.*, Custodial Agreement—GMACM 2006-HE2, dated June 29, 2006, § 2.1 [ALLY_0033251]; Custodial Agreement—GMACM 2006-HE4, dated Sept. 27, 2006, § 2.1 [ALLY_0033295]; Custodial Agreement—GMACM 2007-HE1, dated Mar. 29, 2007, § 2.1 [ALLY_0033359]. A typical provision reflecting this obligation is as follows:

> Acceptance of the Mortgage Notes. The Custodian, as the duly appointed agent of the Indenture Trustee for these purposes acknowledges receipt of the Loan Agreement relating to each of the Initial Mortgage Loans listed on Schedule A hereto (the "Mortgage Loan Schedule") and declares that it holds and will hold the Mortgage Notes relating to any Subsequent Mortgage Loan as agent solely for the Indenture Trustee in trust, for the use and benefit of the Securityholders. The Servicer agrees to promptly deliver to the Custodian any amended Mortgage Loan Schedule necessary to reflect the addition of any Subsequent Mortgage Loans.

Custodial Agreement—GMACM 2006-HE2, dated June 29, 2006, § 2.1 [ALLY_0033251].

GMAC Mortgage, but in some circumstances, DCD reached out directly to title companies.[693] Second, on or prior to the securitization closing date, the Bank was required to issue an "Initial Certification" to the trustee evidencing the custodian's receipt of the mortgage notes.[694] Third, within a certain amount of time following the closing date, the Bank was required to review each mortgage note and issue a "Final Certification" evidencing the completeness of the receipt of the mortgage notes.[695] Fourth, the Bank was required to confirm that the mortgage notes were "properly executed and are appropriately endorsed," but was "under no duty or obligation to inspect, review or examine such Mortgage Notes to determine that the same are genuine, enforceable, or appropriate for the represented purpose or that they are other than what they purport to be on their face."[696] If in performing this post-closing review, the Bank found that a mortgage note was defective, it was required to promptly notify the trustee.[697] Fifth, and finally, the Bank was required to give prompt written notice to the trustee, sponsor,

---

[693]  *See* Int. of M. Hebling, Apr. 16, 2013, at 22:7–11; 45:5–15; 52:15–18 ("As custodian, we would receive collateral related to this particular deal or securitization, which we would then be required to hold on behalf of that investor. . . . If collateral had not been received, we would proactively call the title company or research where the collateral was to try and make sure that it arrived.").

[694]  *See, e.g.*, Custodial Agreement—GMACM 2006-HE2, dated June 29, 2006, § 2.2(a) [ALLY_0033251]; Custodial Agreement—GMACM 2006-HE4, dated Sept. 27, 2006, § 2.2(a) [ALLY_0033295]; Custodial Agreement—GMACM 2007-HE1, dated Mar. 29, 2007, § 2.2(a) [ALLY_0033359]. A typical provision reflecting this obligation is as follows:

> Review of the Mortgage Notes. The Custodian shall deliver to the Indenture Trustee, as pledgee of the Issuer, with respect to the Mortgage Notes related to the Initial Mortgage Loans and the Mortgage Notes related to any Subsequent Mortgage Loans, on or prior to the Closing Date or the related Subsequent Transfer Date, as applicable, an Initial Certification . . . evidencing receipt of the Mortgage Notes for each Initial Mortgage Loan and the Mortgage Notes for each Subsequent Mortgage Loan listed on the Mortgage Loan Schedule or amended Mortgage Loan Schedule.

Custodial Agreement—GMACM 2006-HE2, dated June 29, 2006, § 2.2(a) [ALLY_0033251].

[695]  *See, e.g.*, Custodial Agreement—GMACM 2006-HE2, dated June 29, 2006, § 2.2(b) [ALLY_0033251]; Custodial Agreement—GMACM 2006-HE4, dated Sept. 27, 2006, § 2.2(b) [ALLY_0033295]; Custodial Agreement—GMACM 2007-HE1, dated Mar. 29, 2007, § 2.2(b) [ALLY_0033359]. A typical provision reflecting this obligation is as follows:

> Within 90 days from the Closing Date or Subsequent Transfer Date, as applicable, the Custodian agrees to review in accordance with the provisions of Section 2.1(f) of [the Mortgage Loan Purchase Agreement], each [Loan Agreement/Mortgage Loan], and shall deliver to the Indenture Trustee, as pledgee of the Issuer and to [the monoline insurer], a Final Certification . . . evidencing the completeness of the receipt of the Mortgage Notes, provided that upon reasonable request of the Indenture Trustee delivered from time to time in writing to the Custodian, the Custodian shall deliver updates of any exceptions to the Indenture Trustee electronically.

Custodial Agreement—GMACM 2006-HE2, dated June 29, 2006, § 2.2(b) [ALLY_0033251].

[696]  Custodial Agreement—GMACM 2006-HE2, dated June 29, 2006, § 2.2(b) [ALLY_0033251]; Custodial Agreement—GMACM 2006-HE4, dated Sept. 27, 2006, § 2.2(b) [ALLY_0033295]; Custodial Agreement—GMACM 2007-HE1, dated Mar. 29, 2007, § 2.2(b) [ALLY_0033359].

[697]  *See* Custodial Agreement—GMACM 2006-HE2, dated June 29, 2006, § 2.2(b) [ALLY_0033251]; Custodial Agreement—GMACM 2006-HE4, dated Sept. 27, 2006, § 2.2(b) [ALLY_0033295]; Custodial Agreement—GMACM 2007-HE1, dated Mar. 29, 2007, § 2.2(b) [ALLY_0033359].

and monoline if it discovered "a breach of any representation or warranty."[698] With respect to this final obligation, the Bank had "no duty to review and know the substantive content of such representations and warranties or to actively police any breach of such representations and warranties."[699] The custodian is typically indemnified and held harmless by the servicer for any claims that may arise from the custodial duties.[700]

### (ii) Applicable Law

The custodial agreements under which Ally Bank serves as custodian are governed by Pennsylvania law.[701] To establish a breach of contract claim under Pennsylvania law, a plaintiff must plead: (1) the existence of a contract, including its essential terms; (2) a breach of a duty imposed by the contract; and (3) resultant damages.[702] The Pennsylvania statute of limitations for a breach of contract claim is four years from the date of breach.[703] The Examiner has not conducted a timeliness analysis of these claims with respect to any particular securitization.

The Submission Papers received by the Examiner have not raised any issues with respect to the existence of the Bank's obligations under the custodial agreements or the timeliness of

---

[698] Custodial Agreement—GMACM 2006-HE2, dated June 29, 2006, § 2.3 [ALLY_0033251]; Custodial Agreement—GMACM 2006-HE4, dated Sept. 27, 2006, § 2.3 [ALLY_0033295]; Custodial Agreement—GMACM 2007-HE1, dated Mar. 29, 2007, § 2.3 [ALLY_0033359].

[699] Custodial Agreement—GMACM 2006-HE2, dated June 29, 2006, § 2.3 [ALLY_0033251]; Custodial Agreement—GMACM 2006-HE4, dated Sept. 27, 2006, § 2.3 [ALLY_0033295]; Custodial Agreement—GMACM 2007-HE1, dated Mar. 29, 2007, § 2.3 [ALLY_0033359].

[700] *See* Custodial Agreement—GMACM 2006-HE2, dated June 29, 2006, § 3.2 [ALLY_0033251]; Custodial Agreement—GMACM 2006-HE4, dated Sept. 27, 2006, § 3.2 [ALLY_0033295]; Custodial Agreement—GMACM 2007-HE1, dated Mar. 29, 2007, § 3.2 [ALLY_0033359]; *see also* Debtors' Omnibus Reply Submission Paper, dated Dec. 18, 2012, at 22 ("Ally Bank has indemnity rights against GMAC Mortgage . . . under certain custodial agreements entered into between, among others, Ally Bank and [GMAC Mortgage] in connection with a series of home equity loan transactions. . . . Therefore, to the extent that AFI or its subsidiaries incur defense costs and losses in connection with the [custodial agreements], AFI will have direct claims against the Debtors' estates on account of these indemnification obligations . . . ."). While these indemnification rights will affect which entity ultimately bears the loss associated with such claims, indemnification has no bearing on the validity of the initial claim against the custodian and therefore does not alter the Examiner's analysis with respect to claims against Ally Bank as custodian.

[701] *See* Custodial Agreement—GMACM 2006-HE2, dated June 29, 2006, § 5.3 [ALLY_0033251] ("Governing Law. This Agreement shall be deemed a contract made under the laws of the state of Pennsylvania and shall be construed and enforced in accordance with and governed by the laws of the state of Pennsylvania."); Custodial Agreement—GMACM 2006-HE4, dated Sept. 27, 2006, § 5.3 [ALLY_0033295] (same); Custodial Agreement—GMACM 2007-HE1, dated Mar. 29, 2007, § 5.3 [ALLY_0033359] (same).

[702] *See Guerra v. Redevelopment Auth.*, 27 A.3d 1284, 1289 (Pa. Super. Ct. 2011); *Omicron Sys., Inc. v. Weiner*, 860 A.2d 554, 564 (Pa. Super. Ct. 2004); *Cole v. Lawrence*, 701 A.2d 987, 989 (Pa. Super. Ct. 1997). These elements must be proven by a preponderance of the evidence. *See Ferranti Int'l, PLC v. Jasin*, 47 F. App'x 103, 107 (3d Cir. 2002); *Snyder v. Gravell*, 666 A.2d 341, 343 (Pa. Super. Ct. 1995).

[703] 42 PA. CONS. STAT. § 5525(a)(8); *see also Steiner v. Markel*, 968 A.2d 1253, 1255 n.5 (Pa. 2009) ("The statute of limitations for a breach of contract claim is four years.").

claims asserted with respect thereto. Accordingly, the Investigation focused on whether the custodial agreements have been breached. Consistent with the Examiner Scope Approval Order, the Examiner offers no opinion on the damages resulting from any breach.

### (iii) Evidence Related To The Bank's Breach Of The Custodial Agreements

The Investigation did not include an audit of the mortgage notes held by DCD, but did review documents produced to the Examiner for evidence of missing notes. An internal audit by Audit Services in September, 2005 "did not observe or detect any significant control weaknesses" with respect to collateral certifications, obtainment, and processing, among other things.[704] Similarly, e-mail communications among custodial associates suggest that throughout 2006 and 2007, the Bank was largely successful in acquiring and holding mortgage notes for the securitizations on which it served as custodian.[705] These documents suggest that during the relevant period of time, the Bank did not experience any significant disruption in acquiring mortgage notes, as required by the custodial agreements.

There is, however, some evidence to suggest that Ally Bank had difficulty acquiring certain modified mortgage notes beginning in early 2009.[706] For instance, a February 2009 presentation by DCD to ResCap's Operations Risk Committee explained that DCD was "experiencing a significant increase in missing collateral and Note deficiencies due to loan modifications."[707] Loan modifications occurred when the borrower and servicer agreed to change one or more of the loan's terms as reflected in the original mortgage note. When such a modification occurred (typically after the loan had been repurchased from a securitization trust), DCD would acquire and review the new, modified mortgage note.[708] During this time period, modified loans represented sixty-eight percent of all loans received in the "collateral curative unit" of DCD.[709] DCD further reported that it took an average of 35.8 days to "cure"

---

[704] Report on Audit of GMAC Bank—Trust & Custody Services, Sept. 23, 2005, at 2 [ALLY_0220368].

[705] *See* E-Mail from C. Hodder (May 2, 2007) [EXAM10823010] (indicating that for the period from October 2006 through March 2007, Ally Bank received in excess of 99.6% of first lien mortgage notes and 99.75% of second lien mortgage notes within twenty days of closing or subsequent transfer); Int. of M. Hebling, Apr. 16, 2013, at 53:2–25 ("My recollection is that would mean 99.9 percent of the collateral is received by the custodian within 20 days of funding.").

[706] *See, e.g.*, GMAC Bank and RFG Operations Risk Committee Minutes, Aug. 27, 2009, at 1–2 [EXAM11072090] ("Ms. Krawczun noted that rework continues to significantly increase in DCD due to missing collateral and note deficiencies due to loan modifications that are repurchased, modified, and re-delivered. Mr. Rizzo questioned if repurchases meant from distressed loans or loans pulled out of a pool by Servicing. Ms. Krawczun replied both types.").

[707] Operations Risk Committee—GMAC ResCap Loan Modification Process Issues, at 2 [EXAM12310627].

[708] *See* Int. of M. Hebling, Apr. 16, 2013, at 132:3–14 ("Loans were repurchased by GMAC Mortgage, became portfolio loans, many of those loans had been modified and we were requested to do a new audit of that loan, which would require us to review the Loan Modification document, which is comparable to the note at that point, to the data that they currently had. One of the issues that we had was when we were being asked to perform this review . . . we did not have the Loan Modification in our custody to perform the audit.").

[709] Operations Risk Committee—GMAC ResCap Loan Modification Process Issues, at 2 [EXAM12310627].

modified loans—i.e., to acquire the new mortgage notes following loan modifications by the servicer—and that it had identified twenty-three loans aged over 360 days that were "unlikely to cure."[710] It appears, however, that these missing notes related primarily to loans that had already been repurchased from the RMBS trusts, and thus would have had limited, if any, impact on the securitizations insured by the monolines.[711]

As an affiliate of ResCap, Ally Bank had certain intercompany relationships that third party custodians lacked, such as "direct access to channels and customers" and "the ability to load information directly onto [AFI's] systems providing real-time information."[712] These systems included (1) Loan Serve, a servicing platform used by GMAC Mortgage; (2) WALT, a correspondent management system used by GMAC Mortgage; and (3) CMS, GMAC Mortgage's capital markets system.[713] However, this direct access to intercompany systems seems only to have been used by Bank associates in limited ways, namely to compare and correct basic borrower information including names and addresses.[714] DCD did not review mortgage notes for compliance with representations and warranties, except in limited circumstances where this type of review was explicitly provided for in the relevant documentation.[715]

---

[710]  *Id.*

[711]  Int. of M. Hebling, Apr. 16, 2013, at 132:3–18 ("Loans were repurchased by GMAC Mortgage, became portfolio loans, many of those loans had been modified and we were requested to do a new audit of that loan, which would require us to review the Loan Modification document, which is comparable to the note at that point . . . . One of the issues that we had was when we were being asked to perform this review, after the loan was repurchased it became a portfolio [loan], we did not have the Loan Modification in our custody to perform the audit. So our goal at some point was to figure out where in the process these modifications were so that we could help GMAC Mortgage get them into our custody so that we could perform the review for them."). Reports from late 2008 through 2010 suggest that Ally Bank continued to experience the highest note deficiency rates for loans in GMAC Mortgage's "Repurchase/Reinstatement" channel, as opposed to its correspondent and consumer channels. *See, e.g*., Operations Risk Management Monthly Report, dated Nov. 2008, at 18 [EXAM12335998] (reflecting a 10.96% overall deficiency rate and a repurchases/reinstatements rate of over 80%); Operations Risk Management Monthly Report, dated Mar. 2009, at 35 [EXAM12310632]; Quality Metric Deck—Gess/Glemser Monthly Report, dated Apr. 30, 2010, at 13–14 [EXAM12030111].

[712]  FTI Consultants, Custodian Analysis (Draft), dated July 23, 2008, at 11–12 [EXAM20003577].

[713]  Int. of M. Hebling, Apr. 16, 2013, at 56:19–57:20; 59:9–60:14; 144:24–146:25.

[714]  *Id.*, at 56:19–57:20; 59:11–23; 145:12–21 ("[Q:] [W]hat is Loan Serve? . . . [A:] It's the servicing system for the loan servicer. . . . ("[Q:] And did your department work with this system? [A:] In a very small way. . . . Some associates had access to view parts of that system and fewer associated had direct access to make minor changes in that system. . . . After the note review was performed, if a defect was found, a typo in the name or address, a certain group of associates could go into that system and make the correction to that spelling.").

[715]  *Id.* at 35:17–36:11, 101:1–6 ("[Q:] I just want to confirm that the note audit process that your department conducted did not include a review for breaches of reps and warranties, is that correct? [A:] We only reviewed the original note.").

From a diligence standpoint, it seems that as loan custodian, the Bank was required to perform only a minimal level of diligence on the mortgage notes they received and held.[716] As provided by the custodial agreements, DCD's review of the mortgage notes was limited to information that appeared on the mortgage notes themselves, such as the borrower's name, the property address, the interest rate, and perhaps the first payment date.[717] This information was checked against a data file provided by the servicer, such as GMAC Mortgage.[718] Any defects or "exceptions" were reported to GMAC Mortgage's capital markets group.[719] While the Investigation revealed evidence that, on at least one recent occasion, technical flaws in the mortgage note review software caused underreporting of note defects,[720] the problem appears to have been limited to repurchased or HFS loans, not loans held by a securitization trust.[721]

#### (iv) Defenses Asserted by AFI/Ally Bank

As a defense to Ally Bank's potential liability, AFI points to the non-policing nature of the custodian's responsibilities, arguing that "Ally Bank is not required to police the loans for

---

[716] *See* Int. of C. Blahut, Mar. 13, 2013, at 172:9–20 ("[Q:] Does the custodian check over all of these loan files to make sure that it has the information that would be needed to foreclose on someone? [A:] Probably after the fact. If they were probably notified that they might be taking some sort of enforcement of that, they might open it up and start taking a look and making sure, and then giving somebody the heads up. But, you know, there's just such a flow of documentation that there's no quality control with what comes in."); Int. of M. Hebling, Apr. 16, 2013, at 82:24–83:10 ("Again, we're only reviewing the original note. We're reviewing it after the loan has closed prior to the loan being sold to any type of investor. And for an individual note, an auditor never probably takes, I don't know, less than five minutes to review a note. . . . ("[Q:] So it's [a] quick [ ] check . . . . Make sure everything is there, follow up and then they just continuously go through notes. . . . [A:] Yes.").

[717] *See* Int. of M. Hebling, Apr. 16, 2013, at 25:21–26:6 ("We would make sure that the document was complete and executed, and that certain data elements on that note or terms of that note were correct or matched the data that we were provided. . . . We would look at a borrower's name, the property, address, and interest rate, perhaps the first payment date, depending on the type of loan that it was."). While the custodial agreements do not specify which pieces of information need to be reviewed by the custodian, the custodial agreements typically referenced the related mortgage loan purchase agreements, which required the custodian to identify any "material defect" that would "materially and adversely affect" the value of the mortgage note collateral. *See, e.g.*, Custodial Agreement—GMACM 2006-HE4, dated Sept. 27, 2006, § 2.2(b) [ALLY_0033251] ("[T]he Custodian agrees to review in accordance with the provisions of Section 2.1(f) of [the Mortgage Loan Purchase Agreement], each Loan Agreement . . . ."); Mortgage Loan Purchase Agreement—GMACM 2006-HE4, dated Sept. 27, 2006, § 2.1(f) [GOLDIN00076207] (requiring the servicer to cure, repurchase, or replace any mortgage loan for which the custodian discovers any "material defect in any Loan Agreement . . . which may materially and adversely affect the value of the related Mortgage Loan . . . .").

[718] *See* Int. of M. Hebling, Apr. 16, 2013, at 26:11–15.

[719] *See id.* at 29:13–30:7.

[720] *See* E-mail from D. Chiodo (Sept. 26, 2012) [EXAM30003806] ("On Monday, our Team in Iowa identified a potential issue in our exception report for the Legacy loans . . . . We determined that the report was not selecting all of the exceptions for the report. The issue was identified as faulty logic in the reporting query . . . .").

[721] *See* Int. of M. Hebling, Apr. 16, 2013, at 94:11–95:21 ("They had given us a population of loans that they were intending to sell, asked that we do a pre-review to a certain standard and let them know if there were any defects with the documents that we had as portfolio loans . . . . We were not the custodian for these loans. We were providing a review prior to sale so that they knew what exceptions their new custodian would give them. . . . They were loans that were in a portfolio status as far as we tracked in our system.").

which it is custodian for potential breaches, but simply to issue a notice '[u]pon discovery' of an actual breach."[722] AFI's articulation of the Bank's responsibilities under the custodial agreements is correct and, as discussed earlier, it appears that the Bank's custodial associates completed only a limited review of the mortgage notes, thus implicating only a subset of the representations and warranties given on any particular securitization deal.[723] However, the monolines do not only allege that the Bank failed to police the quality of the mortgage notes, but also that it had actual knowledge of representation and warranty breaches that it did not convey to the trustees or monolines.[724] While the monolines have not identified any evidence that conclusively demonstrates this knowledge, the relationship between the Bank and GMAC Mortgage, including overlapping officers and directors, the close operational proximity in which their personnel worked, and the fact that the Bank sold to GMAC Mortgage many of the loans for which it was serving as custodian,[725] do support an inference that Bank personnel would have been aware, to some extent, of the quality of the loans for which it was serving as custodian. This aspect of shared knowledge between ResCap entities and the Bank is explored in more depth in Section VIII.C.2.c(2)(b)(ii)(A).

In response to the monolines' contention that the Bank must have known of actual breaches of the representations and warranties because it originated loans in the relevant trusts, AFI argues that "knowledge of certain Ally Bank employees involved in originating loans cannot be imputed to entirely different Ally Bank employees involved in performing custodial duties for securitization transactions."[726] According to AFI, "[w]hile a corporation may be charged with the collective knowledge of its employees, a plaintiff 'may not use this principle to shore up a claim of essentially fraudulent conduct when it is unable to allege that any specific employee(s) has the requisite knowledge.'"[727] Under Pennsylvania law, however, this principal seems limited to instances where a plaintiff attempts to use collective knowledge to establish a state of mind, and would not necessarily hold true for a breach of contract

---

[722] AFI Submission Paper, dated Dec. 19, 2012 at 79.

[723] *See, e.g.*, MBIA Reply Submission Paper, dated Mar. 18, 2013, at 8, 18–21 (alleging misrepresentations that would not have been apparent from review of only a mortgage note, such as income level, LTV, CLTV, and DTI levels, borrower occupancy status, credit score, and application of underwriting criteria); Joint Submission Paper of AIG, Allstate, MassMutual, and Prudential, dated Oct. 17, 2012, at 3–4 (same).

[724] *See* FGIC Submission Paper, dated Oct. 17, 2012, at 26–27; Compl., *MBIA Ins. Corp. v. Ally Fin. Inc.*, Case No. 27-CV-12-18889, at 49 (Minn. D. Ct. Sept. 17, 2012) ("Because Ally Bank originated or acquired over 80% of the loans at issue in the GMAC Mortgage Securitizations, it was aware of the deficiencies of these loans, but nevertheless did nothing to correct or make MBIA aware of these pervasive problems.").

[725] *Compare* Appendix VIII.B—3, *with* PLS Trust Spreadsheet [EXAM00339947] (indicating that the securitizations for which the Bank served as custodian contained as much as 89% Bank-attributable loans).

[726] AFI Submission Paper, dated Dec. 19, 2012, at 80 (citing *Midfirst Bank, SSB v. C.W. Haynes & Co.*, 893 F. Supp. 1304, 1316 (D.S.C. 1994)).

[727] AFI Submission Paper, dated Dec. 19, 2012, at 80 (citing *Musalli Factory for Gold & Jewelry v. JPMorgan Chase Bank, N.A.*, 261 F.R.D. 13, 24 n.11 (S.D.N.Y. 2009); *Midfirst Bank*, 893 F. Supp. at 1316).

claim.[728] Further, the need to rely on the collective knowledge of the company is reduced, given the monolines' allegations that some of ResCap and AFI's most senior directors and officers (who in some cases overlapped with those of the Bank) were aware of the Debtors' alleged breaches of representations and warranties, as well as the alleged deficient underwriting.[729]

AFI's final defense to the Bank's alleged liability as loan custodian is to assert that the Bank was only required to certify its receipt of mortgage notes, not full mortgage files, and that claimants have failed to assert that the Bank certified the receipt of any mortgage note that was not actually received.[730] Because the Examiner's Professionals did not conduct an audit of mortgage notes held by DCD, the Examiner offers no conclusions with respect to specific notes.

### (v) Conclusion With Respect To Ally Bank's Liability For Breach Of The Custodial Agreements

The Investigation has revealed no evidence to support the Third-Party Claimants' assertions that the Bank breached its custodial obligations to obtain, review, and certify mortgage notes. However, because the Examiner's Professionals did not conduct an audit of individual mortgage notes held by the Bank pursuant to the custodial agreements, this observation should not be considered dispositive of the monolines' claims. Further, the Investigation has revealed no evidence to support the Third-Party Claimants' assertions that the Bank breached its obligations to alert the trustees and monolines as to breaches of representation and warranties related to the securitizations. Given that Bank custodial associates only performed a limited review of mortgage notes, not entire loan files, it is unlikely that this review would have alerted the custodial division to the broad breaches of representations and warranties alleged by Third-Party Claimants. Whether such knowledge was held by other Bank employees, including its officers and directors, is discussed in Section VIII.C.2.c(2)(b)(ii)(A).

### (b) Aiding And Abetting Fraud

#### (i) Applicable Law

Below is a brief summary of the law regarding aiding and abetting fraud. A more robust discussion of these principles is contained in Section VIII.C.2.a(3). To state a claim for aiding and abetting fraud, plaintiffs must allege (1) the existence of an underlying fraud;

---

[728] *Lind v. Jones, Lang Lasalle Ams., Inc.*, 135 F. Supp.2d 616, 622 n.6 (E.D. Pa. 2001) ("Although knowledge possessed by employees is aggregated so that a corporate defendant is considered to have acquired the collective knowledge of its employees, specific intent cannot be aggregated similarly.") (citations omitted).

[729] *See, e.g.*, MBIA Submission Paper, dated Nov. 9, 2012, at 27 ("AFI officers, directors or employees knew about the Debtors' fraudulent activities from their active involvement in the day-to-day business activities of the Debtors.").

[730] AFI Submission Paper, dated Dec. 19, 2012 at 80–81; *accord* Int. of M. Hebling, Apr. 16, 2013, at 101:1–6 ("[Q:] I just want to confirm that the note audit process that your department conducted did not include a review for breaches of reps and warranties, is that correct? [A:] We only reviewed the original note.").

(2) knowledge of the fraud; and (3) substantial assistance in the commission of the fraud.[731] New York courts require actual knowledge of the primary wrong by the alleged aider and abetter.[732] "The 'knowledge' element of an aiding and abetting fraud claim is not identical to the scienter required for the underlying fraud."[733] While a strong inference of scienter can be satisfied by a showing of "facts that constitute strong circumstantial evidence of . . . recklessness," aiding and abetting requires actual knowledge.[734]

New York courts have defined "substantial assistance" to require that a defendant "affirmatively assists, helps conceal, or by virtue of failing to act when required to do so enables the fraud to proceed."[735] Substantial assistance requires the plaintiff to allege that the actions of the aider/abettor proximately caused the harm on which the primary liability is predicated.[736] "But-for" causation is insufficient; aider and abettor liability requires the injury to be a direct or reasonably foreseeable result of the alleged wrongful conduct.[737] "Executing transactions, even ordinary course transactions, can constitute substantial assistance under some circumstances, such as where there is an extraordinary economic motivation to aid in the fraud."[738]

---

[731] *E.g., Dexia SA/NV v. Deutsche Bank AG*, Nos. 11 Civ. 5672, 6141, 2013 WL 98063 at *3 (S.D.N.Y. Jan. 4, 2013) (citing *VTech Holdings, Ltd. v. Pricewaterhouse Coopers, LLP*, 348 F. Supp. 2d 255, 269 (S.D.N.Y. 2004)); *UniCredito Italiano SPA v. JPMorgan Chase Bank*, 288 F. Supp. 2d 485, 502 (S.D.N.Y. 2003).

[732] *Williams v. Bank Leumi Trust Co. of N.Y.*, 1997 WL 289865 at *5 (S.D.N.Y. 1997); *Kolbeck v. LIT Am., Inc.*, 939 F. Supp. 240, 246 (S.D.N.Y. 1996) ("New York common law, which controls the analysis here, has not adopted a constructive knowledge standard for imposing aiding and abetting liability. Rather, New York and federal courts in this district, have required actual knowledge."); *see also Holtkamp v. Parlex Assocs.*, 926 N.Y.S.2d 344 (NY Sup. Ct. 2011) (explaining that constructive knowledge of the underlying fraud is insufficient to establish an aiding and abetting claim).

[733] *King Cnty., Wash. v. IKB Deutsche Industriebank AG*, No. 09 Civ. 8387(SAS), 2013 WL 45878, at *3 (S.D.N.Y. 2013) (quoting *JPMorgan Chase Bank v. Winnick*, 406 F. Supp. 2d 247, 253 n.4 (S.D.N.Y. 2005)).

[734] *Id.; Kolbeck*, 939 F. Supp. at 246 ("New York common law, which controls the analysis here, has not adopted a constructive knowledge standard for imposing aiding and abetting liability. Rather, New York courts and federal courts in this district, have required actual knowledge."). Under Minnesota law, constructive knowledge may be sufficient where the primary tortfeasor's conduct is "clearly tortious or illegal." *See Witzman v. Lehrman, Lehrman & Flom*, 601 N.W.2d 179, 188 (Minn. 1999) ("In cases where the primary tortfeasor's conduct is clearly tortious or illegal, some courts have held that a defendant with a long-term or in-depth relationship with that tortfeasor may be deemed to have constructive knowledge that the conduct was indeed tortious."). Given the complexity of the alleged fraud underlying the RMBS Claims, this standard is unlikely to govern these claims, even where Minnesota law arguably applies.

[735] *Cromer Fin. Ltd. v. Berger*, 137 F. Supp. 2d 452, 470 (S.D.N.Y. 2001) (citation omitted).

[736] *Id.*; *see also Houbigant, Inc. v. Deloitte & Touche*, 303 A.D.2d 92, 100 (N.Y. App. Div. 2003) ("[T]he plaintiff must only allege facts from which it may be inferred that the defendant was aware that its misrepresentations would be reasonably relied upon by the plaintiff, not that the defendant intended to induce the particular acts of detrimental reliance ultimately undertaken by the plaintiff.").

[737] *Cromer Fin.*, 137 F. Supp. 2d at 470.

[738] *Primavera Familienstifung v. Askin*, 130 F. Supp. 2d 450, 511 (S.D.N.Y. 2001), *abrogated on other grounds by Casey v. Merck & Co.*, 653 F.3d 95, 100 (2d Cir. 2011).

In certain jurisdictions, warehouse lending and origination activities have been deemed sufficient to support allegations of "substantial assistance."[739] While there are no cases directly on point in New York, or certain other potentially relevant jurisdictions such as Minnesota or Pennsylvania, there appears to be some support under New York law for considering financing activities to constitute substantial assistance, if the financing activities are atypical and accompanied by a sufficient level of knowledge regarding the alleged fraud.[740]

### (ii) Analysis Of Aiding And Abetting Fraud Claims Against Ally Bank

#### (A) Knowledge

As a preliminary matter, the Investigation did not reveal any evidence of the Bank's overt knowledge of the type of fraud alleged by Third-Party Claimants. However, the close relationship between the Bank and ResCap (specifically, GMAC Mortgage), suggests that their management and personnel kept in close contact and were generally very knowledgeable as to the business operations of the various affiliate entities.

At the officer and director level, there were several instances of overlap between the Bank and ResCap. For instance, David Applegate, ResCap's co-CEO from late 2004 to late 2005 and later its Chief Operating Officer, served as a Director of Ally Bank from late 2006 through early 2007.[741] Davee Olson, who was ResCap's CFO from late 2004 through late 2006 and a Director of Ally Securities from 1992 through 2006, served as a Director of Ally Bank from late 2006 through mid-2007.[742] James Van Orman, who was a Director and Vice President of ResCap in 2004 and 2005, served as Chairman of the Board of Directors of Old GMAC Bank from early 2005 through late 2006 and continued as a Director of Ally Bank through early 2007.[743] These individuals received updates from ResCap management with

---

[739] *See Henry v. Lehman Comm. Paper, Inc.* (*In re First Alliance Mortg. Co.*), 471 F.3d 977, 994–95 (9th Cir. 2006) (refusing to disturb a jury determination that warehouse lender's financing of mortgage origination, when coupled with lender's knowledge that originator employed "dubious lending practices," was sufficient to support "substantial assistance" element of aiding and abetting fraud); *Jordan v. Paul Fin., LLC*, 285 F.R.D. 435, 453–54 (N.D. Cal. 2012) (finding a genuine issue of material fact existed as to whether RBS provided substantial assistance to mortgage originator's fraud where it was "uncontroverted that RBS was one of [the originator's] major secondary market purchasers, as well as the affiliate to a major warehouse lender" and "[h]undreds of millions of dollars, if not billions, flowed through [the originator] because of RBS' involvement").

[740] *See also Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 48 (2d Cir. 1978) ("[S]ubstantial assistance might include . . . executing transactions or investing proceeds, or perhaps . . . financing transactions." (quoting 2 A. Bromberg, Securities Law § 8.5 (515) (1974))); *In re Gas Reclamation, Inc. Sec. Litig.*, 659 F. Supp. 493, 504 (S.D.N.Y. 1987) ("[T]he Court concludes that the Investors have alleged active wrongdoing by these defendants satisfying the substantial assistance requirement. These include, *inter alia*, allegations that the defendants reviewed and approved the first [private placement memorandum], devised the marketing and financing scheme for [the defendant entity], and *engaged in atypical financing transactions*.") (emphasis added).

[741] *See* AFI Employee Profiles, David Applegate, at ALLY_0004706 [ALLY_0004637].

[742] *See* AFI Employee Profiles, Davee Olson, at ALLY_0004714 [ALLY_0004637].

[743] *See* AFI Employee Profiles, Jerome Van Orman, Jr., at ALLY_0004718 [ALLY_0004637].

respect to increases in nontraditional mortgage products and loan performance,[744] as well as audits of various ResCap and affiliate functions.[745] A more detailed discussion of AFI's audit process is contained in Section VIII.C.2.a(3)(c)(ii)(D).

At an operations level, ResCap and Bank management and personnel served on various committees together to, among other things, help centralize their diligence and risk management procedures.[746] One such effort, the RFG Diligence Forum, focused on areas such as "credit/appraisal, legal, servicing and compliance, which are critical components to the product offerings [made to] clients and investors."[747] Another similar effort sought to "[a]lign

---

[744] *See, e.g.*, ResCap Board Performance and Market Update, dated June 22, 2006, at RC40011855, RC40011874, [RC40011836] (distributed to Applegate and Olson and indicating that "RFG continues to expand market share despite market contraction. . . . Growth is due to increases in all products, with non-conforming products supporting the increase in the third and fourth quarters [of 2006]."); ResCap Board Performance and Market Update, dated Sept. 15, 2006, at RC40011956, RC40011980 [RC40011954] (distributed to Applegate and indicating that "[s]ubprime delinquencies and severities have been slightly worse than expectations over the past quarter, with the 2006 vintage performing much weaker than expectations"); GMAC ERM Committee Meeting Presentation, dated Nov. 15, 2006, EXAM11443901 [EXAM11443901] (indicating Van Orman's attendance and participation in a meeting focused on various aspects of AFI's risk management, including residential mortgage operations); E-mail from L. Zukauckas to J. Li, J. Young, J. Van Orman, and D. Olson (Jan. 18, 2006) [EXAM10832755] ("Jim—Today you are expected to get us a plain english explanation on why your provision has decreased when the portfolio has increased and other credit trends (proportion of subprime in portfolio, etc) seem to indicate increased risk.").

[745] *See, e.g.*, GM Audit Services, Report on Audit of GMAC RFC—Warehouse Lending Operations, dated Aug. 8, 2005, at 3 [ALLY_0220358] (indicating distribution to Olson); GM Audit Services, Report on Audit of GMAC Bank—Wholesale Lending, dated Oct. 3, 2005, at 3 [ALLY_0220375] (indicating distribution to Applegate). For a detailed discussion of these types of reports, see GM Audit Services, Report on Audit of GMAC-RFC Service Delivery Group, dated May 18, 2006, at 1, 6 [ALLY_0220776] (indicating distribution to Applegate and Olson and finding "insufficient resources to clear servicing exceptions on new loans" and "inadequate management reporting on the levels, trends and root causes of F-status loans (i.e. unsaleable loans)"). The overlap between Ally Bank and ResCap officer does not appear to have been limited to only the most senior positions. *See, e.g.*, Int. of S. Blitzer, Mar. 5, 2013, at 7:23–8:20 (explaining that he was a vice president at GMAC Mortgage and "had dual officership for GMAC Bank" though he was "not necessarily an employee of the bank").

[746] *See, e.g.*, Strategic Initiatives Minutes, Aug. 12, 2005, at 1 [EXAM11762755] (indicating attendance by David Applegate of ResCap, and Jay Barr and Robert Groody of Old GMAC Bank); Draft RFG Corporate Governance—Proposal on Risk Committee Structure Presentation, dated Mar. 10, 2006, at 7 [EXAM11377135] (proposing a financial risk committee to include, among others, Groody, Barr, Applegate, Scholtz, and Flees); Financial Risk Committee Minutes, Sept. 7, 2006 [EXAM11754507]; RFG Diligence Forum Charter (Draft), dated Oct. 6, 2006, at MBIADEPEXH0028479–81 [MBIADEPEXH0028464] (providing for various Old GMAC Bank personnel to sit on both the "core team" and the "advisory team"); Memorandum, Product and Business Strategy Management Product Approval Process, dated Oct. 11, 2006, at 1 [EXAM10011774] (addressed to "EC Committee Members," including Barry Bier of Old GMAC Bank, Keenen Dammen of Ally Securities, and Applegate); Responsible Practices Committee Meeting Agenda, Dec. 15, 2006, at 1 [EXAM11244367] (indicating membership, though not attendance by Applegate, Bier, and Dammen, among many others).

[747] *See* RFG Diligence Forum Charter (Draft), Oct. 6, 2006, at MBIADEPEXH0028479 [MBIADEPEXH0028464].

the risk governance structure" of ResCap and Old GMAC Bank.[748] A proposal for this joint risk committee suggested that personnel from various ResCap entities, including Old GMAC Bank, would "[p]rovide oversight on all responsible lending and servicing assessments" and help "[e]stablish underwriting policy."[749] Representation and warranty policies also appear to have been discussed and communicated between ResCap and Old GMAC Bank, suggesting that their personnel often worked as an integrated enterprise.[750]

One example of the collaboration between Old GMAC Bank and ResCap is a working group session called to formulate a response to the December 2005 interagency guidance on nontraditional mortgage products, which was proposed by certain federal regulators, including the FDIC, OTS, and FRB.[751] In those discussions, Al Celini, then Chief Credit and Risk Officer of Old GMAC Bank,[752] expressed disagreement with changing ResCap and Old GMAC Bank's underwriting practices in response to the proposed guidance.[753] However, Celini advised the group that they should be cautious with their response, because it could potentially "be spun into 'we made the loan with a primary repayment source that is a refinance.'"[754] Celini thought that "[e]ven though this is a reality, it probably is not best to officially state."[755]

Despite defending the issuance of nontraditional mortgage products by ResCap as a whole, Celini expressed his belief that Old GMAC Bank's portfolio in particular had borrowers with strong credit scores and lower default risk.[756] A presentation to the Ally Bank Board from late 2006 (just one week after the 2006 Bank Restructuring) confirms Celini's

---

[748] RFG Corporate Governance—Proposal on Risk Committee Structure, Mar. 1, 2006, at 2 [EXAM11741476].

[749] *Id.* at 4 (providing that Jay Barr, then President of Old GMAC Bank, would serve on the committee).

[750] *See* E-mail from L. Lundsten (June 16, 2006) [EXAM11247435] (listing several Old GMAC Bank personnel along with RFC personnel).

[751] *See* MRizzo RFG Interview Notes, Proposed Interagency Guidance on Nontraditional Mortgage Products, dated Mar. 16, 2006, at EXAM11361090 [EXAM11361090]; GMAC Bank Nontraditional Mortgage Products Risks Presentation, distributed Nov. 21, 2006, at ALLY_0401992 [ALLY_0401905] ("Cross-enterprise [nontraditional mortgage products] Working Group convened in Feb-Apr'06. The Working Group included associates from Credit, Ops Risk, Legal and Product Development Personnel . . . and included Bank (MRizzo—leader, ACelini), GMACR and RFC representation.").

[752] Int. of A. Celini, Feb. 18, 2013, at 9:3–10:13.

[753] *See* MRizzo RFG Interview Notes, Proposed Interagency Guidance on Nontraditional Mortgage Products, dated Mar. 16, 2006, at EXAM11361092 [EXAM11361090].

[754] *Id.*

[755] *Id.* (adding that "[f]rom the bank perspective, these assets are not purchased with the expectation that they will be 30 year assets. Duration is much shorter.").

[756] *See id.*

observation that loans originated and held by the Bank (typically prime, conforming loans) were of a higher quality than those originated by RFC's brokers and correspondents.[757]

Another aspect of the Bank and GMAC Mortgage's operations that supports an inference of knowledge is their shared information systems. As discussed in Section VIII.C.2.c, in connection with its role as loan custodian, the Bank had access to at least three GMAC Mortgage systems, which allowed the Bank to confirm and correct certain pieces of mortgage loan data.[758] One of these systems was a shared capital markets system, which GMAC Mortgage personnel "used to understand what loans were available in total to be pooled . . . ."[759] Through this system, GMAC Mortgage personnel could look to the Bank's HFS portfolio, select loans that fit their desired criteria, and request that the loans be sold to GMAC Mortgage for securitization.[760]

The close relationship between ResCap and Old GMAC Bank appears to have been uninterrupted by the 2006 Bank Restructuring. ResCap and Ally Bank personnel continued to work closely in setting and adhering to product policies,[761] and Ally Bank remained a high-volume source of loans for GMAC Mortgage.[762]

---

[757] *Compare* Minutes of a Regular Meeting of the Board of Directors of GMAC Bank, Nov. 30, 2006, at 4–5 [ALLY_PEO_0020880] ("In the review of [Ally] Bank payment option ARMs ('POAs'), Mr. Rizzo informed the Board that the HFI account has no exposure to POAs and that, as of September 30, 2006, 11% of the HFS account consists of POAs."), *with* ResCap Board Performance and Market Update, dated Dec. 12, 2006, at RC40012260 [RC40012214] (indicating that payment-option ARM products accounted for 15.7% of ResCap's year-to-date mortgage funding as of September 2006); *see also* Enterprise Risk Management Committee Meeting Minutes, Sept. 28, 2006, at EXAM10010358 [EXAM10010357] (indicating that approximately 90% of borrowers were "making minimum payments and are therefore negatively amortizing"); Int. of C. Blahut, Mar. 13, 2013, at 31:3–10 ("[Old GMAC Bank] had more of the . . . franchise on dealing with prime or conforming originations. They dealt with a lot of jumbo prime that might be the fixed rate . . . or they did some hybrid ARMs. But it was generally prime first and second liens. I'm not familiar with them doing any type of Alt-A or reduced documentation underwriting."); Int. of J. Gray, Mar. 1, 2013, at 13:4–9 (GMAC Mortgage was organized around products that were more conventional).

[758] *See* Section VIII.C.2.c.

[759] Int. of R. Groody, Dec. 17, 2012, at 85:16–19.

[760] *See id.*, at 85:16–86:6.

[761] *See* E-mail from J. Young (Dec. 6, 2006) [EXAM10166101]; E-mail from A. Peacock (Mar. 1, 2007) [EXAM10119873]; E-mail from P. Fossell (Oct. 24, 2007) [EXAM10059604] (circulating updates to underwriting authority policies); E-mail from R. Scott (July 5, 2007) [EXAM10120526]. Additionally, it appears that in later years, Ally Bank employees performed work for its affiliates, including AFI. *See* E-mail from S. McCumber (Nov. 18, 2010) [EXAM31587084]; Bank Associates Doing Work for Affiliates Spreadsheet [EXAM31590681] (indicating that some Ally Bank employees spent as much as 40% of their time performing work for affiliates). It is not clear if this type of cross-enterprise work was performed during the period of time when ResCap is alleged to have made misrepresentations with respect to their private label securitizations (2004–2007).

[762] *See* Audit Services, GMAC Bank—Mortgage Loan Sales, dated Mar. 29, 2007, at 1 [EXAM10081553] ("During 2006, [Old GMAC Bank] and [Ally Bank] sold $18 billion in first mortgage loans, and $5 billion in home equity loans/lines, to [GMAC Mortgage].").

*(B) Substantial Assistance*

To succeed on a claim for aiding and abetting fraud against the Bank, claimants must show not only that the Debtors engaged in an underlying fraud, but that the Bank knew of the fraud and provided substantial assistance to the Debtors in furtherance of the fraud.[763] Consideration of whether the Bank affirmatively assisted the Debtors' alleged fraud will turn on a number of factors, including the nature of services provided by the Bank and the volume of loans sold by the Bank to GMAC Mortgage.

Old GMAC Bank (and later Ally Bank)[764] served as a source of loan production for GMAC Mortgage since 2001.[765] As Robert Groody, formerly CFO of Old GMAC Bank and Chief Mortgage Accountant at Ally Bank, put it, "the bank was built to be primarily a funding vehicle for the benefit of GMAC Mortgage, and then ultimately . . . ResCap."[766] While the Bank represented only one source of funding for RFC and GMAC Mortgage, it was a strategic source because of its funding advantage relative to other sources of financing.[767] Loans funded or acquired by the Bank were sold to GMAC Mortgage primarily for the purpose of GSE securitization.[768] These were typically conforming loans, of better quality than those that were pooled into private securitizations.[769] These activities were conducted pursuant to six principal agreements between GMAC Mortgage and the Bank related to mortgage origination, servicing, and hedging, most of which were not arm's length and incorporated terms that were not available in the market.[770]

_____

[763] *See* Section VIII.C.2.c(2)(b)(i).

[764] Neither the Submitting Parties nor AFI have raised any issues with respect to Ally Bank's successor liability for the liabilities of Old GMAC Bank. However, the 2006 Bank Restructuring could present a barrier to Ally Bank's liability for pre-November 2006 Bank conduct, as the Examiner concludes in Section VII.L.2.a(1)(a)(i) that a court is unlikely to find that Ally Bank is the successor in liability of Old GMAC Bank.

[765] *See* Sections V.B.3. It is possible that loans originated by Old GMAC Bank and Ally Bank also made their way into RFC securitizations, but such occurrences were likely rare. *See* Int. of E. Scholtz, Mar. 28, 2013, at 176:8–13 ("[Q:] Did RFC securitize any loans that were acquired or written by GMAC Bank? [A:] I would guess they did. It was just a funding vehicle, so it was another funding source.").

[766] Int. of R. Groody, Dec. 17, 2012, at 19:15–18; *see also* Int. of A. Celini, Feb. 18, 2013, at 21:13–22:23 ("The bank's primary business during [2003 to 2004] was really to serve as a funding conduit. . . . We would originate through our correspondents or brokers. . . . And we would sell back to the affiliate for them to deliver and execute into the market.").

[767] *See* Sections V.A.1.a; V.B.

[768] *See* Int. of R. Groody, Dec. 17, 2012, at 73:12–25; Int. of A. Celini, Feb. 18, 2013, at 27:14–19 ("[Q:] My understanding is the bread and butter was [the] conforming loan business. . . . [A:] That was the overwhelming majority of the assets that were going through.").

[769] *See* Int. of R. Groody, Dec. 17, 2012, at 73:12–74:8.

[770] *See* Section V.B (discussing the Correspondent Agreement, MMLPSA, the Pipeline Swap, the Broker Agreement, the Original Servicing Agreement, and the MSR Swap).

The Bank also sold non-conforming loans (primarily HELOCs) to GMAC Mortgage for inclusion in private securitizations.[771] Loans originated or acquired by the Bank were included in approximately 124 of the Debtors' 392 private label securitizations.[772] In those 124 securitizations, loans sold from the Bank to GMAC Mortgage comprised anywhere from 0.03% to 89% of a given loan pool.[773] While data was not available to evaluate the performance of Bank loans contained in the Debtors' private securitizations, the Debtors have noted that "[h]istorically Bank production was high credit quality, which could lead to better performance."[774]

Old GMAC Bank had three primary channels of loan production: (1) the broker channel, whereby Old GMAC Bank funded loan origination in its own name; (2) the correspondent channel, whereby Old GMAC Bank purchased already-funded loans; and (3) GMAC Mortgage, which acted like a correspondent that would sell loans to the Bank and later buy them back for securitization.[775] Additionally, the Bank had a warehouse facility, whereby it provided a line of credit to correspondent originators who would draw upon the line of credit to fund loans and then sell the loans to the Bank using the sale proceeds to repay the facility.[776] While the Bank had its own underwriting criteria for both conforming and nonconforming loan products,[777] these criteria appear to have been developed by GMAC Mortgage and adopted by the Bank.[778] Additionally, the Bank entered into agreements with

---

[771] *See* Int. of R. Groody, Dec. 17, 2012, at 73:12–25, 80:21–81:1; Int. of A. Celini, Feb. 18, 2013, at 27:14–28:10 (approximating that conforming loan products represented ninety percent of Old GMAC Bank's production, while nonconforming products, such as jumbo loans and HELOCs, accounted for the remaining ten percent). For more information regarding GMAC Mortgage's private securitization deals, see Section VIII.B.1.

[772] *See* PLS Trust Spreadsheet [EXAM00339947]; *see also* Appendix VIII.B-1 (showing which securitization prospectuses disclosed that at least ten percent of their loans were acquired from the Bank).

[773] *See* PLS Trust Spreadsheet [EXAM00339947] (indicating that, among other things, 8 of the securitizations contained more than 75% Bank-attributable loans; 9 securitizations contained between 50 to 75%; and 17 contained between 25% and 50%). Notably, this securitization-level information does not provide information as to whether the loans in question were first sold to the Bank by GMAC Mortgage. *See* Section V.B.2 (explaining that pursuant to the Correspondent Agreement, GMAC Mortgage sold loans it had acquired or originated to the Bank).

[774] PLS Trust Spreadsheet, Disclaimer/Note 6 [EXAM00339947].

[775] *See* Int. of A. Celini, Feb. 18, 2013, at 22:23–23:22; 24:8–11.

[776] *See id.*; *see also* Int. of C. Blahut, Mar. 13, 2013, at 34:17–35:7 ("[The warehouse facility is] sort of a symbiotic type of relationship where they're able to extend financing to them and it helps deepen the relationship with the originator so that they would be able to aggregate more loans.").

[777] *See* Int. of A. Celini, Feb. 18, 2013, at 25:19–23; 44:20–45:4.

[778] *See id.* at 285:6–16 ("[Q:] I think what you said is the affiliate had a set of underwriting standards. The bank looked at them and approved them and adopted [them] as bank underwriting standards. [A:] Right. . . . And we went through them and we actually suggested revisions . . . .").

third-party correspondents that paralleled the correspondent agreements that GMAC Mortgage had in place with the same correspondents.[779] These parallel agreements allowed the entities to help each other identify and fund particular loans, with certain processing and underwriting fees paid between them.[780]

While many of the loans exchanged between Old GMAC Bank and GMAC Mortgage were originated by third-party correspondent lenders,[781] pursuant to the 2001 MMLPSA, Old GMAC Bank was required to provide GMAC Mortgage with loan-level information.[782] Additionally, for each loan sold to GMAC Mortgage pursuant to the 2001 MMLPSA, Old GMAC Bank provided a lengthy series of representation and warranties, including that the loans had been originated in accordance with applicable underwriting standards.[783] While the Examiner concludes that it is more likely than not that a court would find that the 2001 MMLPSA was orally modified in January 2002 to exclude representations and warranties on first lien loans,[784] the Bank continued providing representations and warranties on second lien loans to GMAC Mortgage through June 2007.[785] These representations and warranties were substantially similar to those that were passed on through ResCap's Depositor Entities and the issuing trusts, to RMBS investors.[786] Further, because the Bank was required to provide loan-level information to GMAC Mortgage, the Bank was intimately aware of the characteristics of a large percentage of the loans placed into GMAC Mortgage securitizations.[787]

### (iii) Defenses Asserted By AFI/Ally Bank

As a defense to the Bank's potential liability for aiding and abetting fraud, AFI asserts that Ally Bank did not know the quality of the loans it was funding because its warehouse facilities operated on a "wet-funding" basis, meaning that the Bank funded the loans before

---

[779] *See id.* at 285:24–287:20 ("[GMAC Mortgage] had its own correspondent agreement . . . with the third-party correspondent, [and] [Old GMAC Bank] had one . . . that was there as well. They were co-terminus. They had the same.").

[780] *See id.* at 285:24–287:20 (indicating that this practice "wasn't a prevalent activity" but "it happened from time to time").

[781] *See* Section VIII.B.2.e.

[782] *See* Second Addendum to 2001 MMLPSA, dated June 4, 2002, § 2.2(a) [ALLY_0018245].

[783] *See* 2001 MMLPSA, dated Dec. 15, 2001, Art. IV [ALLY_0018253].

[784] *See* Section VII.L.2.a(1)(c) (discussing Old GMAC Bank's representations and warranties to GMAC Mortgage).

[785] *See* 2007 MMLPSA, dated June 1, 2007, Art. IV [ALLY_0018275].

[786] *See, e.g.*, Int. of R. Groody, Dec. 17, 2012, at 122:4–11 ("[Q:] But for loans that were purchased from third parties, . . . they would give you reps and warrants. You, in turn, would pass on reps and warrants to GMAC Mortgage. And GMAC Mortgage would be able to go back up the chain to the original correspondent. [A:] Correct."); Int. of K. Patrick, Mar. 18, 2013, at 268:15–268:20 ("[Q:] Where did they fall on the flow of the rep and warranty liability? [A:] They have front-line rep and warrant liability with the originator. The depositor and the seller both have rep and warrant liability.").

[787] As discussed earlier, certain of the securitization trusts contained as much as 89% Bank-attributable loans. *See* PLS Trust Spreadsheet [EXAM00339947].

the loan files were sent to the Bank.[788] This alleged lack of knowledge does not alter the fact that the loans were required to be underwritten to Bank guidelines,[789] eventually delivered to the Bank by the third-party originator, and passed on to GMAC Mortgage for later securitization. Further, AFI asserts that "once the loans were securitized and Ally Bank was paid as warehouse lender, Ally Bank no longer retained any security interest in the loans and would not have had any knowledge of their compliance with underwriting guidelines."[790] This argument seemingly contradicts the MMLPSA'a requirement that the Bank provide GMAC Mortgage with loan-level information, as discussed further in Section V.B.3.

### (iv) Conclusion With Respect To Ally Bank's Liability For Aiding And Abetting Fraud

The Examiner offers no conclusions with respect to the existence of an underlying fraud committed by the Debtors. With respect to Ally Bank's knowledge of any fraud committed by ResCap, Third-Party Claimants solicited by the Examiner were unable to identify any evidence of actual knowledge of the alleged fraud. This lack of evidence is not wholly determinative, however, given the limited discovery conducted by most of the Submitting Parties. Generally, the Investigation has revealed evidence to support the Third-Party Claimants' assertions that Ally Bank personnel were intricately involved in ResCap's operations. This evidence includes overlap between Ally Bank and ResCap leadership, the existence of several inter-company committees designed to centralize product and risk management, and shared information systems. While an inference of knowledge would not be sufficient for an aiding and abetting claim to succeed under New York law, such an inference suggests that a Third-Party Claimant with the benefit of full discovery may, in time, also uncover evidence of actual knowledge.

Similarly, the Investigation has revealed evidence to support the Third-Party Claimants' assertions that Ally Bank's financing activities would be considered a form of substantial assistance to the extent ResCap is found to have engaged in fraudulent conduct. This finding is primarily supported by the fact that Ally Bank was created to serve as a conduit for funding GMAC Mortgage's securitization activity, which the entities carried out through a series of

---

[788] AFI Submission Paper, dated Dec. 19, 2012 at 82.

[789] Int. of C. Blahut, Mar. 13, 2013, at 42:16–25 ("[Q:] So is there a separate set of criteria for what [the client] can put into the warehouse? Towards the quality of collateral. [A:] Yes, generally they try to. Generally they try to because . . . you don't want bad loans being held in a warehouse that are unmarketable. So yes, they do try to create a criteria.").

[790] AFI Submission Paper, dated Dec. 19, 2012 at 82.

atypical and non-arm's-length financing transactions. While Ally Bank represented only one of many sources of loan origination for GMAC Mortgage, it was a strategic and steady source nonetheless.[791]

Finally, as discussed in more depth in Section VIII.D, the RMBS Claims against Ally Bank may be limited by the Examiner's conclusion that, under Utah law,[792] a court is unlikely to find that Ally Bank is a successor in liability of Old GMAC Bank.[793] If a court were to agree with this finding, RMBS Claims against Ally Bank may be limited to those securitizations that contain loans sold by Ally Bank after the 2006 Bank Restructuring.[794]

### 3. D&O RMBS Claims

#### a. Generally

The Examiner's Professionals have identified several pending actions on account of D&O RMBS Claims (the "D&O RMBS Actions").[795] The Examiner believes that the D&O RMBS Actions are generally representative of the types of RMBS Claims that could be asserted by Third-Party Claimants against Debtor and AFI directors and officers.

---

[791] Although Third-Party Claimants also allege that the Bank's role as custodian supports an aiding and abetting fraud claim, the Bank's custodial role was considerably less integral to ResCap's securitization business than was the Bank's funding, as loan custodial services could be, and often were, provided by independent third-parties. *See* Appendix VIII.B (showing that a third-party bank, namely Wells Fargo, routinely provided this service for both RFC and GMAC Mortgage securitizations); Int. of M. Hebling, Apr. 16, 2013, at 139:24–140:3 ("GMAC Mortgage is treated as a client, as we would treat any other client. The custodial agreement, the designated fee schedule, and all the services are provided according to that agreement."); *see also Rosner v. Bank of China*, 528 F. Supp. 2d 419, 427 (S.D.N.Y. 2007) ("Financial transactions that are not considered 'atypical' or 'non-routine' do not constitute substantial assistance.").

[792] As discussed further in Section VII.L.2.a(1)(a)(i), New York and Utah law are consistent with respect to all of the traditional exceptions to the general rule of successor liability, except the de facto merger exception. With respect to this limited conflict, the Examiner concludes that a New York court would likely apply the law of the state in which the defendant was formed, in this case, Utah.

[793] See Section VII.L.2.a(1)(a)(i).

[794] See Section V.A.1.a for a discussion of the 2006 Bank Restructuring. Additionally, for a discussion of Ally Bank's potential contractual liability on loans sold to GMAC Mortgage after the 2006 Bank Restructuring, see Section VII.L.2.

[795] *See e.g.*, Compl., *John Hancock Life Ins. Co. (U.S.A.) v. Ally Fin. Inc*., Case No. 12-01841, Docket No. 1 (D. Minn. July 27, 2012); Am. Compl., *Mass. Mut. Life Ins. Co. v. Residential Funding Co., LLC*, Case No. 11-30035, Docket No. 68-1 (D. Mass. Feb. 29, 2012); Second Am. Compl., *N.J. Carpenters Health Fund v. Residential Capital, LLC*, Case No. 08-8781, Docket No. 121 (S.D.N.Y. Jan. 3, 2011); Compl., *Stichting Pensioenfonds ABP v. Ally Fin., Inc*., Case No. 11-20426 (Minn. Dist. Ct. Oct. 11, 2011); Am. Compl., *Union Cent. Life Ins. Co. v. Ally Fin. Inc.*, Case No. 11-2890, Docket No. 146 (S.D.N.Y. May 4, 2012); Am. Compl., *W. & S. Life Ins. Co. v. Residential Funding Co., LLC*, Case No. A1105042 (Ohio Ct. Com. Pl. Sept. 9, 2011); Compl., *White v. GMAC Mortg., LLC*, Case No. 2809-CV-2011 (Pa. Ct. Com. Pl. Mar. 28, 2011).

The D&O RMBS Actions assert claims against the following defendants:[796]

- **Kenneth Duncan**: Duncan served as CFO of various of the Debtors' depositor entities (RALI, RAMP, RASC and RFMSI) and Executive VP and director of RFC and Homecomings.[797]

- **Ralph Flees**: Flees worked at RFC beginning in 1996 and served as Chief Accounting Officer and Controller of ResCap from April 2008 until January 2009.[798]

- **Jack Katzmark**: Katzmark served as Treasurer and Controller of various depositor entities (RFC, RASC, RAMP, RALI and RFMSI) and as managing director of RFC and ResCap.[799]

- **Lisa Lundsten**: Lundsten worked in various positions at RFC and Ally Securities beginning in 1991 and served as the head of the structured finance group beginning in 2005.[800]

- **Davee Olson**: Olson served as Executive VP, CFO, and director of RFMSI and RALI; director of RASC; CFO of ResCap; and a director of GMAC RFC, RFC and Homecomings.[801]

---

[796] The titles and tenures of the officers and directors were identified by plaintiffs in their respective actions. For further information, refer to Appendix IV.A, which lists all the ResCap and AFI directors and officers and their tenures.

[797] Compl., *John Hancock Life Ins. Co. (U.S.A.) v. Ally Fin. Inc.*, Case No. 12-01841, Docket No. 1, at 17 (D. Minn. July 27, 2012); Am. Compl., *Mass. Mut. Life Ins. Co. v. Residential Funding Co., LLC,* Case No. 11-30035, Docket No. 68-1, at 5 (D. Mass. Feb. 29, 2012); Second Am. Compl., *N.J. Carpenters Health Fund v. Residential Capital, LLC*, Case No. 08-8781, Docket No. 121, at 19 (S.D.N.Y. Jan. 3, 2011); Compl., *Stichting Pensioenfonds ABP v. Ally Fin., Inc.*, Case No. 11-20426, at 11 (Minn. Dist. Ct. Oct. 11, 2011); Am. Compl., *W. & S. Life Ins. Co. v. Residential Funding Co., LLC*, Case No. A1105042, at 9 (Ohio Ct. Com. Pl. Sept. 9, 2011).

[798] Compl., *John Hancock Life Ins. Co. (U.S.A.) v. Ally Fin. Inc.*, Case No. 12-01841, Docket No. 1, at 18 (D. Minn. July 27, 2012); Am. Compl., *Mass. Mut. Life Ins. Co. v. Residential Funding Co., LLC,* Case No. 11-30035, Docket No. 68-1, at 5 (D. Mass. Feb. 29, 2012); Second Am. Compl., *N.J. Carpenters Health Fund v. Residential Capital, LLC*, Case No. 08-8781, Docket No. 121, at 19 (S.D.N.Y. Jan. 3, 2011); Compl., *Stichting Pensioenfonds ABP v. Ally Fin., Inc.*, Case No. 11-20426, at 11 (Minn. Dist. Ct. Oct. 11, 2011); Am. Compl., *W. & S. Life Ins. Co. v. Residential Funding Co., LLC*, Case No. A1105042, at 9 (Ohio Ct. Com. Pl. Sept. 9, 2011).

[799] Compl., *John Hancock Life Ins. Co. (U.S.A.) v. Ally Fin. Inc.*, Case No. 12-01841, Docket No. 1, at 18 (D. Minn. July 27, 2012).

[800] *Id.* at 19; Second Am. Compl., *N.J. Carpenters Health Fund v. Residential Capital, LLC*, Case No. 08-8781, Docket No. 121, at 19 (S.D.N.Y. Jan. 3, 2011); Compl., *Stichting Pensioenfonds ABP v. Ally Fin., Inc.*, Case No. 11-20426, at 12 (Minn. Dist. Ct. Oct. 11, 2011).

[801] Compl., *John Hancock Life Ins. Co. (U.S.A.) v. Ally Fin. Inc.*, Case No. 12-01841, Docket No. 1 (D. Minn. July 27, 2012); Am. Compl., *Mass. Mut. Life Ins. Co. v. Residential Funding Co., LLC,* Case No. 11-30035, Docket No. 68-1, at 4–5 (D. Mass. Feb. 29, 2012); Second Am. Compl., *N.J. Carpenters Health Fund v. Residential Capital, LLC*, Case No. 08-8781, Docket No. 121, at 19 (S.D.N.Y. Jan. 3, 2011); Compl., *Stichting Pensioenfonds ABP v. Ally Fin., Inc.*, Case No. 11-20426, at 12 (Minn. Dist. Ct. Oct. 11, 2011); Am. Compl., *W. & S. Life Ins. Co. v. Residential Funding Co., LLC*, Case No. A1105042, at 8 (Ohio Ct. Com. Pl. Sept. 9, 2011).

- **Bruce Paradis**: Paradis worked as head of marketing at RFC beginning in 1983, as President of RFC beginning in 1994, and CEO of ResCap from 2005 to 2007.[802]

- **David Walker**: Walker began working for the GMAC organization in 1985 and served as CFO of GMAC Mortgage from 2000 to 2006 and Treasurer of GMAC from 2007 to 2009.[803]

- **Diane Wold**: Wold served as GMAC RFC's Senior VP of Securitization Management until 2005, when she became head of investor relations and corporate finance at ResCap.[804]

- **James Jones**: Jones served as COO of ResCap from March 2007 until June 2007 and CEO of ResCap from June 2007 until July 2008.[805]

- **David Bricker**: Bricker served as director and CFO of RALI in addition to CFO of GMAC Mortgage and GMAC RFC.[806]

- **James Young**: Young served in various financial accounting titles at ResCap beginning in 2005 through 2011, including Chief Accounting Officer and Controller, Deputy CFO, Principal Accounting Officer, and CFO.[807]

---

[802] Compl., *John Hancock Life Ins. Co. (U.S.A.) v. Ally Fin. Inc.*, Case No. 12-01841, Docket No. 1, at 20 (D. Minn. July 27, 2012); Am. Compl., *Mass. Mut. Life Ins. Co. v. Residential Funding Co., LLC,* Case No. 11-30035, Docket No. 68-1, at 4 (D. Mass. Feb. 29, 2012); Second Am. Compl., *N.J. Carpenters Health Fund v. Residential Capital, LLC*, Case No. 08-8781, Docket No. 121, at 18 (S.D.N.Y. Jan. 3, 2011); Compl., *Stichting Pensioenfonds ABP v. Ally Fin., Inc*., Case No. 11-20426, at 12 (Minn. Dist. Ct. Oct. 11, 2011); Am. Compl., *Union Cent. Life Ins. Co. v. Ally Fin. Inc.*, Case No. 11-2890, Docket No. 146, at 15 (S.D.N.Y. May 4, 2012); Am. Compl., *W. & S. Life Ins. Co. v. Residential Funding Co., LLC*, Case No. A1105042, at 8 (Ohio Ct. Com. Pl. Sept. 9, 2011).

[803] Compl., *John Hancock Life Ins. Co. (U.S.A.) v. Ally Fin. Inc*., Case No. 12-01841, Docket No. 1, at 20–21 (D. Minn. July 27, 2012); Am. Compl., *Mass. Mut. Life Ins. Co. v. Residential Funding Co., LLC,* Case No. 11-30035, Docket No. 68-1, at 5 (D. Mass. Feb. 29, 2012); Compl., *Stichting Pensioenfonds ABP v. Ally Fin., Inc*., Case No. 11-20426, at 12 (Minn. Dist. Ct. Oct. 11, 2011); Am. Compl., *W. & S. Life Ins. Co. v. Residential Funding Co., LLC*, Case No. A1105042, at 8–9 (Ohio Ct. Com. Pl. Sept. 9, 2011).

[804] Compl., *John Hancock Life Ins. Co. (U.S.A.) v. Ally Fin. Inc*., Case No. 12-01841, Docket No. 1, at 21 (D. Minn. July 27, 2012); Compl., *Stichting Pensioenfonds ABP v. Ally Fin., Inc*., Case No. 11-20426, at 12 (Minn. Dist. Ct. Oct. 11, 2011).

[805] Compl., *John Hancock Life Ins. Co. (U.S.A.) v. Ally Fin. Inc*., Case No. 12-01841, Docket No. 1, at 21 (D. Minn. July 27, 2012); Compl., *Stichting Pensioenfonds ABP v. Ally Fin., Inc*., Case No. 11-20426, at 12 (Minn. Dist. Ct. Oct. 11, 2011).

[806] Compl., *John Hancock Life Ins. Co. (U.S.A.) v. Ally Fin. Inc*., Case No. 12-01841, Docket No. 1, at 21 (D. Minn. July 27, 2012); Am. Compl., *Mass. Mut. Life Ins. Co. v. Residential Funding Co., LLC,* Case No. 11-30035, Docket No. 68-1, at 5 (D. Mass. Feb. 29, 2012); Second Am. Compl., *N.J. Carpenters Health Fund v. Residential Capital, LLC*, Case No. 08-8781, Docket No. 121, at 19 (S.D.N.Y. Jan. 3, 2011); Compl., *Stichting Pensioenfonds ABP v. Ally Fin., Inc*., Case No. 11-20426, at 11 (Minn. Dist. Ct. Oct. 11, 2011); Am. Compl., *W. & S. Life Ins. Co. v. Residential Funding Co., LLC*, Case No. A1105042, at 9 (Ohio Ct. Com. Pl. Sept. 9, 2011).

[807] Compl., *John Hancock Life Ins. Co. (U.S.A.) v. Ally Fin. Inc*., Case No. 12-01841, Docket No. 1, at 22 (D. Minn. July 27, 2012); Second Am. Compl., *N.J. Carpenters Health Fund v. Residential Capital, LLC*, Case No. 08-8781, Docket No. 121, at 19 (S.D.N.Y. Jan. 3, 2011); Compl., *Stichting Pensioenfonds ABP v. Ally Fin., Inc*., Case No. 11-20426, at 12 (Minn. Dist. Ct. Oct. 11, 2011).

- **Frank Ruhl**: Ruhl served as VP of GMAC Mortgage.[808]

The Third-Party Claimants asserting D&O RMBS Claims consist primarily of RMBS investors and individual borrowers. The D&O RMBS Claims include common-law as well as federal and state statutory causes of action. The common-law causes of action include fraud, aiding and abetting fraud, civil conspiracy, negligent misrepresentation, intentional deceit, and negligent supervision with respect to the roles these individuals played within their organizations.[809] Most of the statutory causes of action include violations of sections 11 and 15 of the Securities Act, section 20(a) and (b) of the Exchange Act, and various state securities laws for the alleged material misstatements and omissions in registration statements and offering materials issued in connection with RMBS transactions.[810] The facts and circumstances underlying the D&O RMBS Claims are substantially the same as those raised in many of the claims asserted against the AFI Defendants, as discussed further in Section VIII.C.[811] Director and officer indemnification and/or insurance may provide coverage if the director and officer defendants are ever found to be liable. For a detailed analysis of ResCap's and AFI's indemnification and insurance policies, see Section IV.B.

The complaints most commonly allege liability against the directors and officers for signing registration statements. Section 11 of the Securities Act provides that, where a registration statement "contained an untrue statement of a material fact or omitted to state a

---

[808] Compl., *White v. GMAC Mortg., LLC*, Case No. 2809-CV-2011, at 8 (Pa. Ct. Com. Pl. Mar. 28, 2011). Ruhl is the only director or officer defendant named in a Non-RMBS Action. The plaintiffs in this action allege that Ruhl committed fraud by signing and filing a false assignment of mortgage.

[809] *See, e.g.*, Compl., *John Hancock Life Ins. Co. (U.S.A.) v. Ally Fin. Inc*., Case No. 12-01841, Docket No. 1, at 2 (D. Minn. July 27, 2012) (alleging aiding and abetting fraud and negligent misrepresentation); Compl., *Stichting Pensioenfonds ABP v. Ally Fin., Inc*., Case No. 11-20426, at 1 (Minn. Dist. Ct. Oct. 11, 2011) (alleging aiding and abetting fraud and negligent misrepresentation); Compl., *W. & S. Life Ins. Co. v. Residential Funding Co., LLC*, Case No. A1105042, at 1 (Ohio Ct. Com. Pl. Sept. 9, 2011) (alleging civil conspiracy and common law fraud); Compl., *White v. GMAC Mortg., LLC*, Case No. 2809-CV-2011, at 9, 21 (Pa. Ct. Com. Pl. Mar. 28, 2011) (alleging common law fraud, intentional deceit and negligent supervision).

[810] *See e.g.*, Compl., *John Hancock Life Ins. Co. (U.S.A.) v. Ally Fin. Inc*., Case No. 12-01841, Docket No. 1, at 2 (D. Minn. July 27, 2012) (alleging violations of the Minnesota Securities Act, and sections 11 and 15 of the Securities Act); Compl., *Stichting Pensioenfonds ABP v. Ally Fin., Inc*., Case No. 11-20426, at 1 (Minn. Dist. Ct. Oct. 11, 2011) (alleging violations of the Minnesota Securities Act); Am. Compl., *Mass. Mut. Life Ins. Co. v. Residential Funding Co., LLC*, Case No. 11-30035, Docket No. 68-1, at 1 (D. Mass. Feb. 29, 2012) (alleging violations of the Massachusetts Uniform Securities Act); Second Am. Compl., *N.J. Carpenters Health Fund v. Residential Capital, LLC*, Case No. 08-8781, Docket No. 121, at 1 (S.D.N.Y. Jan. 3, 2011) (alleging violations of sections 11 and 15 of the Securities Act); Am. Compl., *Union Cent. Life Ins. Co. v. Ally Fin. Inc.*, Case No. 11-2890, Docket No. 146, at 7, 242 (S.D.N.Y. May 4, 2012) (alleging violations of section 20 of the Exchange Act); Compl., *W. & S. Life Ins. Co. v. Residential Funding Co., LLC*, Case No. A1105042, at 1 (Ohio Ct. Com. Pl. Sept. 9, 2011) (alleging violations of the Ohio Securities Act).

[811] The *John Hancock* director and officer defendants have a motion to dismiss pending before the court. *See* Mem. of Law in Supp. of Individual Defs.' Mot. to Dismiss the Compl., *John Hancock Life Ins. Co. (U.S.A.) v. Ally Fin. Inc*., Case No. 12-01841, Docket No. 95, at 2 (D. Minn. Dec. 14, 2012) ("Plaintiffs seek to plead their case against the Individual Defendants based on a misguided theory of *res ipsa loquitur*, assuming that their losses can only be explained by fraud, and that the Individual Defendants should be held liable simply because of their positions as directors and/or officers of various entities.").

material fact," an investor may sue "every person who signed the registration statement . . . ."[812] Further, the SEC has also stated that "prospectus supplements and the information contained in them are subject to liability under [s]ection 11."[813] Thus, if it is determined that the registration statements or prospectus supplements at issue did in fact contain untrue statements of material fact or omitted to state a material fact, the signatory defendants may be held liable under section 11. As noted above, the Investigation did not focus upon the underlying allegations as to each securitization transaction.

Third-Party Claimants also allege common-law causes of action, noting that the defendants either knew or were reckless in not knowing about their organizations' "abandonment" of underwriting standards and were "familiar with and participated in [AFI's] RMBS operations through . . . top-ranking positions with ResCap."[814] The plaintiffs in *Union Cent. Life Ins. Co.* state:

> [Defendants], by virtue of their status and their high-level positions, as well as their participation in and awareness of their respective organization's operations and public statements, were able to and did influence and control their organization's decision making, including controlling the content and dissemination of the documents that . . . contained materially false and misleading information . . . .[815]

To the extent that the D&O RMBS Claims rely upon theories of liability similar to those alleged against the AFI Defendants, such as alter ego, aiding and abetting, and control person theories of liability, those theories are discussed further in Section VIII.C.

*4. Non-RMBS Claims*

The Examiner's Professionals identified approximately twenty-four pending actions on account of the Non-RMBS Claims. In these cases, Third-Party Claimants allege both statutory and common-law causes of action related to mortgage ownership, underwriting practices, disclosure failures, insurance schemes, foreclosure practices, and other servicing practices. Of these cases, 15 are borrower class actions. One of the cases, *Mitchell v. Residential Funding Corp.*,[816] is specifically discussed in Section VI.G. As with the RMBS Actions and the RMBS

---

[812] 15 U.S.C. § 77k.

[813] Securities Offering Reform, 70 Fed. Reg. 44,722, 44, 771 n.445 (Aug. 3, 2005); *see also In re Marsh & Mclennan Cos., Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 491 (S.D.N.Y. 2006) (stating that "at least since 1998, the SEC believed that 'prospectus statements and the information contained in them are subject to liability under [s]ection 11'") (citation omitted).

[814] Compl., *John Hancock Life Ins. Co. (U.S.A.) v. Ally Fin. Inc*., Case No. 12-01841, Docket No. 1, at 167–75 (D. Minn. July 27, 2012).

[815] Am. Compl., *Union Cent. Life Ins. Co. v. Ally Fin. Inc.*, Case No. 11-2890, Docket No. 146, at 241 (S.D.N.Y. May 4, 2012); *see also* Am. Compl., *Mass. Mut. Life Ins. Co. v. Residential Funding Co., LLC,* Case No. 11-30035, Docket No. 68-1, at 72–76, 77–78 (D. Mass. Feb. 29, 2012).

[816] Case Nos. WD70210, WD 70227, WD70244, WD70263 (Mo. Dist. Ct. App. 2008.).

Claims, the Examiner believes that the Non-RMBS Actions are generally representative of the types of Non-RMBS Claims that could be asserted by Third-Party Claimants.

As a preliminary matter, most Third Party Claimants in the Non-RMBS Actions assert claims against AFI related to the underwriting, servicing, and foreclosure of mortgages that are derivative or alternative to claims asserted against the Debtor entities. In addition, as set forth in Section VIII.D, with one exception, the damages sought in the Non-RMBS Actions appear to be relatively minimal.

### a. Claims Relating To Origination, Acquisition, And Servicing Of Loans

The first category of Non-RMBS Actions is comprised of class action or individual suits based upon the origination, acquisition, and servicing of loans (including damages from foreclosures).[817] Plaintiffs in these actions allege that they were harmed by defendants' unchecked abandonment of underwriting guidelines, inflated appraisals, poor disclosure practices, inaccurate valuations, fraudulent foreclosure affidavits, and the use of electronic mortgage registries to exploit local recording statutes and lending standards.[818] Many of the Non-RMBS Actions in this category include generally vague allegations of liability against multiple defendants, including non-Debtor and non-AFI entities that are unrelated to the Chapter 11 Cases.[819] The allegations in these complaints are particularly vague with respect to AFI. [820] Of course, some of these factual inaccuracies or vague allegations could potentially be clarified with amendments to the complaints.

---

[817] *See, e.g.*, Second Am. Compl., *Abraham v. Am. Home Mortg. Servicing. Inc*., Case No. 12-4686, Docket No. 94 (E.D.N.Y. Nov. 8, 2012); Am. Compl., *Abucay v. GMAC Mortg. Corp.*, Case No. 11-05523, Docket No. 25 (D.N.J. Aug. 14, 2012); Am. Compl., *Adams v. US Bank, NA*, Case No. 12-04640, Docket No. 77 (E.D.N.Y. Dec. 18, 2012); Am. Compl., *Anctil v. Ally Fin. Inc.*, Case No. 12-08572, Docket No. 32 (S.D.N.Y. Jan. 28, 2013); Compl., *LaFitte v. Ally Fin.*, Case No. 10-02820, Docket No. 1 (D.S.C. Nov. 1, 2010); Compl., *Dennis v. Homecomings Fin., LLC*., Case No. 11-00066, Docket No. 1 (D. Wyo. Feb. 22, 2011); Compl., *Kalugin v. Geithner*, Case No. 12-1792, Docket No. 1 (D.D.C. Oct. 31, 2012); Compl., *Kanagaki v. Ally Fin. Inc.*, Case No. 12-03955, Docket No. 1 (C.D. Cal. May 7, 2012); Compl., *White v. GMAC Mortg., LLC*, Case No. 2809-CV-2011 (Pa. Ct. Com. Pl. Mar. 28, 2011).

[818] *See, e.g.*, Second Am. Compl., *Abraham v. Am. Home Mortg. Servicing Inc*., Case No. 12-4686, Docket No. 94, at 150–53 (E.D.N.Y. Nov. 8, 2012).

[819] *See, e.g.*, *id.*; Am. Compl., *Adams v. US Bank, NA*, Case No. 12-04640, Docket No. 77 (E.D.N.Y. Dec. 18, 2012).

[820] *See* AFI Submission Paper, dated Dec. 19, 2012, at A-9 ("[Plaintiffs] simply assume that the non-debtor Ally entities are liable for the acts of their subsidiaries without any allegation or assertion for why that is so. . . . The sole allegation concerning AFI is that it owns Debtor GMAC Mortgage."). In addition, certain actions list AFI as a defendant because GMAC Mortgage is its "ultimate successor" in liability. *See* Am. Compl., *Abucay v. GMAC Mortg. Corp.*, Case No. 11-05523, Docket No. 25, at 3 (D.N.J. Aug. 14, 2012). Other Complaints confuse the role of AFI and the Debtor entities that perform mortgage servicing. *See* Am. Compl., *Adams v. US Bank, NA*, Case No. 12-04640, Docket No. 77, at 6 (E.D.N.Y. Dec. 18, 2012) ("Defendant ALLY, NA is the alleged 'servicer' of the loan and purported agent for Defendant GMAC in connection with a non-judicial foreclosure proceeding as to the Property."); *see also* Compl., *LaFitte v. Ally Fin.*, Case No. 10-02820, Docket No. 1, at 1 (D.S.C. Nov. 1, 2010) ("[U]pon information and belief, GMAC [LLC] operated also under the name of GMAC Mortg. CO., LLC.").

The Non-RMBS Actions allege several common-law and statutory causes of action. The common-law causes of action include breach of contract, negligence, slander of title, ejectment, concert of action, joint enterprise, unjust enterprise, and fraudulent, intentional, and negligent misrepresentation, among others.[821] The statutory causes of action include violations of state laws against unlawful and deceptive trade practices, the Truth in Lending Act ("TILA"),[822] the Real Estate Settlement Procedures Act ("RESPA"),[823] the Fair Debt Collection Practices Act,[824] the Fair Credit Reporting Act,[825] the Racketeer Influenced and Corrupt Organizations Act ("RICO"),[826] the Home Ownership and Equity Protection Act,[827] and the Equal Credit Opportunity Act.[828]

As noted, however, the Non-RMBS Actions asserting these claims fail to articulate any particularized allegations against AFI. Unless substantially amended, most, if not all, of the complaints in this category of Non-RMBS Actions likely would not survive a motion to dismiss.

### b. Claims Relating To Alleged Insurance Schemes

The second category of Non-RMBS Actions consists of two complaints asserting that the defendants participated in insurance schemes that allegedly provided AFI with illegal kickbacks under RESPA and RICO. Specifically, these actions allege direct liability against Ally Bank and indirect liability against AFI.[829]

---

[821] Second Am. Compl., *Abraham v. Am. Home Mortg. Servicing Inc.*, Case No. 12-4686, Docket No. 94, at 150–67 (E.D.N.Y. Nov. 8, 2012) (alleging fraud, deceit, and fraudulent concealment; intentional misrepresentation; negligent misrepresentation; breach of contract; constructive trust; negligence; slander of title; ejectment; concert of action and joint enterprise; and unjust enrichment); Am. Compl., *Adams v. US Bank, NA*, Case No. 12-04640, Docket No. 77, at 13–23 (E.D.N.Y. Dec. 18, 2012) (alleging conversion, conspiracy to commit conversion, fraudulent concealment, negligent misrepresentation, intentional misrepresentation, promissory estoppel, breach of contract, and unjust enrichment); Am. Compl., *Anctil v. Ally Fin. Inc.*, Case No. 12-08572, Docket No. 32, at 37 (S.D.N.Y. Jan. 28, 2013) (alleging unjust enrichment); Compl., *LaFitte v. Ally Fin.*, Case No. 10-02820, Docket No. 1 (D.S.C. Nov. 1, 2010) (alleging slander of title, fraud, trespass, and wrongful foreclosure); Compl., *Dennis v. Homecomings Fin., LLC.*, Case No. 11-00066, Docket No. 1, at 6–10 (D. Wyo. Feb. 22, 2011) (alleging fraud, breach of contract, and intentional infliction of emotional distress); Compl., *Kanagaki v. Ally Fin. Inc.*, Case No. 12-03955, Docket No. 1, at 2 (C.D. Cal. May 7, 2012) (alleging privity of contract and negligence); Compl., *White v. GMAC Mortg., LLC*, Case No. 2809-CV-2011, at 9–15, 21–22 (Pa. Ct. Com. Pl. Mar. 28, 2011) (alleging fraud and intentional deceit, negligent misrepresentation, fraudulent concealment, and negligent supervision).

[822] 15 U.S.C. §§ 1601–1667f.

[823] 12 U.S.C. § 2601.

[824] 15 U.S.C. § 1692.

[825] *Id.* §§ 1681–81x.

[826] 18 U.S.C. §§ 1961–68.

[827] 15 U.S.C. § 1639.

[828] *Id.* §§ 1691–91f.

[829] AFI addressed these causes of action by noting that "[l]ender-placed insurance is not a 'settlement service' under RESPA because it is not paid at closing" and that "plaintiffs fail to plead a RICO enterprise, any participation by AFI and/or Ally Bank, or causation." AFI Submission Paper, dated Dec. 19, 2012, at A-11.

In the first case, *Rothstein v. GMAC Mortg., LLC*,[830] the plaintiffs allege that GMAC Mortgage, along with certain providers of hazard insurance and a subcontracted insurance tracker called Newport Management Corporation, devised a scheme to defraud borrowers and loan owners by overcharging them for the insurance.[831] Specifically, the *Rothstein* plaintiffs allege that the insurance providers paid GMAC Mortgage secret rebates and that GMAC Mortgage kept the rebates while fraudulently billing borrowers based upon the purported full price of the insurance.[832]

The *Rothstein* plaintiffs claim that AFI is liable for the alleged insurance fraud under the alter ego theory.[833] Specifically, the complaint alleges that AFI exercised complete domination and control over its subsidiaries and "caused GMAC [Mortgage] to engage in the misconduct alleged herein, and used GMAC [Mortgage's] corporate form to accomplish the fraudulent and extortionate objectives alleged herein to injure Plaintiffs and the Class."[834] See Section VIII.C. for a discussion of alter ego liability, which is equally applicable in this context.

The *Rothstein* plaintiffs also argue that "Ally Bank is [directly] liable under . . . agency principles for the misconduct of its agent, GMAC [Mortgage], and for the misconduct of its sub-agent, Newport [Management Corporation]."[835] Plaintiffs emphasize that "insurance tracking" is a "servicing responsibility" created by the servicing agreements that GMAC Mortgage subcontracted to Newport Management Corporation.[836] In addition, plaintiffs allege that GMAC Mortgage "possessed actual authority to service the loans of Plaintiffs . . . by

---

[830] Second Am. Compl., *Rothstein v. GMAC Mortg., LLC*, Case No. 12-03412, Docket No. 39 (S.D.N.Y. Jan. 22, 2013). This case was filed in the later stages of the Investigation.

[831] *Id.* at 1–3.

[832] *Id.* at 3–4 (alleging that such conduct violated RICO).

[833] The Examiner notes that AFI and Ally Bank have filed a motion later joined by the Debtors seeking, inter alia, an order enjoining the veil-piercing claims asserted against AFI in the putative class action captioned *Rothstein v. Ally Financial, Inc.,* Civ. No. 12-3412 (S.D.N.Y.). *See* Motion By Ally Financial Inc. and Ally Bank for an Order Enforcing the Automatic Stay Pursuant to 11 U.S.C. § 362(a)(3) (Dec. 21,2012) [Docket No. 2511]; Debtors' Amended Joinder to Motion By Ally Financial Inc. and Ally Bank for an Order Enforcing the Automatic Stay Pursuant to 11 U.S.C. Section 362(a)(3) (February 4, 2013) [Docket No. 2834]. On April 2, 2013, the Committee responded to that motion by joining the request of AFI, Ally Bank, and the Debtors that *Rothstein* be stayed, but asking that the Court do so without "reach[ing] the issue of whether any [creditor] will be permitted to pursue individual veil-piercing or alter ego claims." *See* Response by Committee to the Motion By Ally Financial Inc. and Ally Bank for an Order Enforcing the Automatic Stay Pursuant to 11 U.S.C. § 362(a)(3) (Apr. 2, 2013) [Docket No. 3345] at 4. That same day, the plaintiffs in *Rothstein* objected to the motion, arguing in part that its veil-piercing claims against AFI are "based on allegations of 'particularized injury'" and "outside the ambit of the automatic stay." *See* Objection by Plaintiffs in *Rothstein* to the Motion By Ally Financial Inc. and Ally Bank for an Order Enforcing the Automatic Stay Pursuant to 11 U.S.C. § 362(a)(3) (Apr. 2, 2013) [Docket No. 3343] at 2. To date, that motion remains pending.

[834] Second Am. Compl., *Rothstein v. GMAC Mortg., LLC*, Case No. 12-03412, Docket No. 39, at 51–82 (S.D.N.Y. Jan. 22, 2013). For a discussion of alter ego claims, see Section VIII.C.

[835] *Id.* at 4.

[836] *Id.* at 2.

virtue of sub-servicing agreements between Ally Bank and GMAC [Mortgage], [such that,] "[w]hen GMAC [Mortgage] engaged in the [alleged] misconduct . . . , it was acting in the course and scope of its authority as an authorized agent of Ally Bank."[837]

Plaintiffs' claim that GMAC Mortgage had "actual authority" from Ally Bank to service loans "by virtue of contract" is at odds with the express terms of the Original Servicing Agreement.[838] Specifically, section 11.1 of the Original Servicing Agreement states:

> The parties hereto do not intend to create herby a partnership or joint venture between them, and nothing herein contained shall be construed to create such a partnership or joint venture. The services rendered by GMAC [Mortgage] hereunder are rendered by GMAC [Mortgage] as an independent contractor and shall be so construed for all purposes.[839]

Case law discussing the creation of an actual agency relationship states that if "an agreement specifically precludes the creation of an agency relationship, courts will not create one."[840] Thus, the language of the Original Subservicing Agreement itself is likely to preclude the Rothstein plaintiffs' assertions that GMAC Mortgage possessed "actual authority" by virtue of the subservicing agreements.[841]

Additional theories of agency law, however, can create an agency relationship even if an express provision of the contract precludes one. Under New York law, an agency relationship "is not determined by what [the purported agent] is called but is to be determined from what [the purported agent] does."[842] Courts in other relevant jurisdictions note that "the parties'

---

[837] *Id.* at 48.

[838] Objection of Plaintiffs in *Rothstein v. GMAC Mortg., LLC* to the Motion of Ally Financial, Inc. and Ally Bank For an Order Enforcing the Automatic Stay Pursuant to 11 U.S.C. §362(A)(3) To (1) Enjoining Prosecution of Alter Ego and Veil Piercing Claims in *Rothstein*, and (2) Declaring Such Claims Void *Ab Initio*; and Cross-Motion for an Order Granting Relief From the Automatic Stay Pursuant to 11 U.S.C. §362(D) to the Extent Any Claims Asserted by Plaintiffs are Subject to the Automatic Stay [Docket No. 3343] at 11.

[839] Original Servicing Agreement, §11.1 [ALLYKE000000741].

[840] *Municipality of Bremanger v. Citigroup Global Mkts. Inc.,* No. 09 Civ. 7058(VM), 2013 WL 1294615, at *19 (S.D.N.Y. Mar. 28, 2013) (quoting *Tellium, Inc. v. Corning Inc.,* No. 03 Civ. 8487, 2004 WL 307238, at *6 (S.D.N.Y. 2004)); *see also Encyc. Brown Prods., Ltd. v. Home Box Office, Inc.,* 25 F. Supp. 2d 395, 403 (S.D.N.Y. 1998) (finding an absence of agency where the agreements at issue specifically disclaimed any such relationship, among other reasons); *Bellino Schwartz Padob Adver., Inc. v. Solaris Mktg. Grp., Inc.,* 635 N.Y.S.2d 587, 588 (N.Y. App. Div. 1995) (holding that there was no agency relationship when the agreement specifically stated that nothing in the agreement would be construed to create an agency relationship between the parties).

[841] Second Am. Compl., *Rothstein v. GMAC Mortg., LLC,* Case No. 12-03412, Docket No. 39, at 48 (S.D.N.Y. Jan. 22, 2013).

[842] *Guardian Life Ins. Co. of Am. v. Chem. Bank,* 727 N.E.2d 111, 116 (N.Y. 2000) (citations omitted).

characterization of a relationship is without consequence when determining whether an agency relationship exists."[843] Thus, an "agreement . . . deny[ing] the existence of an agency relationship is not in itself determinative of the manner."[844] "Rather, it is the nature and the extent of control, as established by the practice of the parties, that is controlling."[845]

Apparent authority, for example, is "'the power to affect the legal relations of another person by transactions with third persons, professedly as agent for the other, arising from and in accordance with the other's manifestations to such third persons.'"[846] "[A]pparent authority is created only by the representations of the principal to the third party, and explicitly rejects the notion that an agent can create apparent authority by his own actions or representations."[847] The Rothstein plaintiffs allege certain facts indicating that Ally Bank may have had knowledge of the alleged fraud or misrepresentations.[848] For example, plaintiffs note that "the agreements . . . required the disclosure of all of GMAC [Mortgage's] vendor and subcontractor agreements to Ally Bank" and that Ally Bank "regularly received (i) reports relating to insurance tracking and (ii) certifications attesting to compliance with the insurance requirements."[849] In addition, plaintiffs source Ally Bank's knowledge from (1) disclosure obligations in the agreements providing Ally Bank with "'management reports' and 'electronic data' in connection with the administration of the loans"; (2) Ally Bank's access to GMAC Mortgage's internal books and records; (3) Ally Bank's and GMAC Mortgage's shared officers, directors, and personnel; and (4) Ally Bank's consent order with the FRB and FDIC obligating Ally Bank "to oversee, supervise, and monitor the mortgage servicing

---

[843] *Meredith v. Oakwood Healthcare, Inc.*, No. 288507, 2010 WL 1404426, at *2 (Mich. Ct. App. Apr. 8, 2010) (citation omitted). *But see WaveDivision Holdings, LLC v. Highland Capital Mgmt., L.P.*, 49 A.3d 1168, 1177 (Del. 2012) (footnotes omitted) ("[A]lthough the 'label' that the parties ascribe to their relationship is not controlling, 'whether or not the parties believe they are creating the relation of master and servant' is one of the relevant factors under the Restatement for determining whether an agency relationship exists.").

[844] *Drexel v. Union Prescription Ctrs.*, 582 F.2d 781, 786 (3d Cir. 1978); *see also Drummond v. Hilton Hotel Corp.*, 501 F. Supp. 29, 31 (E.D. Pa.1980) (citation omitted) ("[T]he mere fact that there is express denial of the existence of an agency relationship is not in itself determinative of the matter.").

[845] *Sauers v. Pancoast Pers., Inc.*, 294 Pa. Super. 306, 312 (citation omitted) (1982).

[846] *In re Worldcom, Inc.*, No. 02–13533 (AJG), 2007 WL 735021, at *5 (Bankr. S.D.N.Y. Mar. 9, 2007) (quoting RESTATEMENT (SECOND) OF AGENCY § 8 (1958)).

[847] *Fennell v. TLB Kent Co.*, 865 F.2d 498, 502 (2d Cir. 1989) (citations omitted); *see also William B. Tanner Co., Inc. v. WIOO, Inc.*, 528 F.2d 262, 266 (3d Cir. 1975) ("Under Pennsylvania law, apparent authority flows from the conduct of the principal and not that of the agent."); *Billops v. Magness Constr. Co.*, 391 A.2d 196, 198 (Del.1978) (citations omitted) ("In order to establish a chain of liability to the principal based on apparent agency, a litigant must show reliance on the indicia of authority originated by the principal, and such reliance must have been reasonable."); *Auto-Owners Ins. Co. v. Ryder Truck Rental*, No. 222114, 2002 WL 207550, at *4 (Mich. Ct. App. Feb. 8, 2002) (emphasis in original) (citation omitted) ("Fundamental principles of agency law provide that an agent's apparent authority to bind a principle does not arise by virtue of the agent's actions, but rather, arises by virtue of actions undertaken by the *principle* which lead a third party to reasonably believe that an agency relationship exists.").

[848] Second Am. Compl., *Rothstein v. GMAC Mortg., LLC*, Case No. 12-03412, Docket No. 39, at 48–49 (S.D.N.Y. Jan. 22, 2013).

[849] *Id.* at 49.

operations that GMAC [Mortgage] performs on behalf of Ally Bank."[850] Plaintiffs do not allege that Ally Bank directly made representations to them to create an apparent authority relationship.[851]

Courts, however, have noted that "silence . . . in the face of unauthorized acts of a purported agent can serve as the basis of establishing apparent authority [but] only where the purported principal knew of the unauthorized acts and took no action."[852] Without evidence that Ally Bank "knew of or authorized" GMAC Mortgage's actions, Ally Bank's "silence . . . in the face of unauthorized acts of [GMAC Mortgage] [cannot] serve as the basis for establishing apparent authority."[853] Investigating GMAC Mortgage's individual insurance transactions is outside the scope of the Investigation; therefore, the Examiner does not reach any conclusions as to whether Ally Bank had sufficient knowledge of the alleged insurance fraud that could give rise to liability. Nor did the Examiner investigate the underlying merits of the alleged insurance fraud.

In the second action, *Moore v. GMAC Mortg., LLC*,[854] plaintiffs allege GMAC Mortgage and Ally Bank were engaged in an illegal captive reinsurance arrangement.[855] The plaintiffs allege that GMAC Mortgage and Ally Bank "acted in concert with their affiliated reinsurer, Cap Re" to capture illegal referral payments in violation of RESPA, which "prohibits lenders from accepting kickbacks or referral fees from any person providing a real estate settlement service, including providers of private mortgage insurance.[856] According to the plaintiffs, GMAC Mortgage referred borrowers to private mortgage insurers who agreed to reinsure with Cap Re.[857] The plaintiffs allege that "the actual risk" transferred to the reinsurer was "hardly commensurate with the premiums it extract[ed] from the primary insurer" and that lenders, in this case, GMAC Mortgage, received illegal referral fees as a result of this arrangement.[858]

The Moore complaint further alleges that Ally Bank "provides funding for residential mortgage loans originated by the GMAC mortgage group[,] . . . provides residential mortgage

---

[850] *Id.* at 49–50.

[851] *Municipality of Bremanger v. Citigroup Global Mkts. Inc.*, No. 09 Civ. 7058(VM), 2013 WL 1294615, at *20 (S.D.N.Y. Mar. 28, 2013).

[852] *Id.* at *21 (citations omitted); *accord Hall v. F.A. Halamicek Enters., Inc.*, 669 S.W.2d 368, 375 (Tex. Ct. App. 2002) (citation omitted) ("Without the principal's participation, either through his acts or knowledge of, and acquiescence in those of the agent, no mere combination of circumstances which may mislead persons into a false inference of authority, however reasonable, will serve as a predicate for apparent authority."); *Deere & Co. v. Int'l Trade Comm'n*, 605 F.3d 1350, 1357 (Fed. Cir. 2010) (citation omitted) (internal quotation marks omitted) (holding apparent authority may exist if the principal "silently act[s] in a manner which creates a reasonable appearance of an agent's authority.").

[853] *See Municipality of Bremanger*, 2013 WL 1294615, at *21 (emphasis added) (citations omitted).

[854] Third Am. Compl., *Moore v. GMAC Mortg., LLC*, Case No. 07-04296, Docket No. 163 (E.D. Pa. Nov. 26, 2010).

[855] *Id.* at 1–2.

[856] *Id.*

[857] *Id.* at 2 (citation omitted).

[858] *Id.* at 13. *But see* AFI Submission Paper, dated Dec. 19, 2012, at A-11 ("[Cap Re] has paid more than $300 million in claims, making clear that the reinsurance obligations were real and not a violation of RESPA.").

loan and home equity loans to consumers, . . . and participates in the acquisition of mortgage loans from GMAC [Mortgage's] correspondent lenders."[859] The complaint does not specify with any particularity the role of Ally Bank in the alleged scheme.

As with the first category of Non-RMBS Actions discussed above, this complaint would need to be amended in order to state a claim that would survive an Ally Bank motion to dismiss. Alternatively, if the plaintiff is articulating a theory of alter ego or aiding and abetting liability, the analysis would likely be similar to that discussed in Section VIII.C.

### c. Claims Unrelated To The Mortgage Business

The third category of Non-RMBS Claims involves claims against the AFI Defendants alleging (1) wrongful eviction and/or termination of tenancy practices; or (2) overcharge fees from automatic payment systems or overtime labor violations.[860] These cases similarly do not discuss specific allegations against AFI but, instead, describe behavior directly attributable to Debtor entities, such as the failure to pay overtime and provide proper meal or rest periods to underwriter employees,[861] wrongful self-help eviction, breach of the covenant of quiet use and enjoyment,[862] and overcharging for property inspections and other fees.[863] Plaintiffs also allege violations of state labor and fair lending laws and common law causes of action such as misrepresentation, breach of contract, negligence, trespass, and infliction of emotional distress. Arguably, similar indirect alter ego or veil piercing claims may be applied here

---

[859] Third Am. Compl., *Moore v. GMAC Mortg., LLC*, Case No. 07-04296, Docket No. 163, at 5 (E.D. Pa. Nov. 26, 2010).

[860] *See, e.g.*, Am. Compl., *Bollinger v. Residential Capital, LLC*, Case No. 10-01123, Docket No. 113 (W.D. Wash. 2010); Compl., *Chatman v. GMAC LLC*, Case No. 2008-90015 (Ala. Cir. Ct. Apr. 10, 2008); Compl., *Chao v. Wells Fargo Bank, N.A.*, Case No. RG12633544, Docket No. 1 (Cal. Super. Ct. June 7, 2012); Am. Compl., *Donaldson v. GMAC Mortg., LLC*, Case No. 9-3359D, Docket No. 1 (Ga. Super. Ct. Feb. 17, 2010); Second Am. Compl., *Robinson v. Homecomings Fin., LLC*, Case No. 2008-900007 (Ala. Cir. Ct. July 3, 2012). In addition, *Chao v. Wells Fargo Bank, N.A.*, names non-Debtor and non-AFI entity defendants in addition to AFI and Debtor entities. Compl., *Chao v. Wells Fargo Bank, N.A.*, Case No. RG12633544, Docket No. 1 (Cal. Super. Ct. June 7, 2012).

[861] Am. Compl., *Bollinger v. Residential Capital, LLC*, Case No. 10-01123, Docket No. 1, at 2 (W.D. Wash. Nov. 23, 2011); *see also* AFI Submission Paper, dated Dec. 19, 2012, at A-8 ("The plaintiffs' only basis for any recovery from AFI would be theories of derivative liability. They utterly fail to articulate any such theory, and their claims against AFI are meritless.").

[862] Compl., *Chao v. Wells Fargo Bank, N.A.*, Case No. RG12633544, Docket No. 1, at 5–7 (Cal. Super. Ct. June 7, 2012).

[863] Compl., *Chatman v. GMAC LLC*, Case No. 2008-90015, at 1 (Ala. Cir. Ct. Apr. 10, 2008).

against AFI as in other contexts discussed above. However, none of the complaints specifically articulate this type of allegation and, regardless, the damages implicated by these claims appears to be relatively minor.[864]

### d. Cases Not Naming The AFI Defendants

The fourth and final category of Non-RMBS Actions involves cases that do not name any of the AFI Defendants.[865] However, the Investigation includes these actions because they allege similar actions as are described in the preceding categories and could, presumably, be amended to include AFI or its affiliates as defendants. Further, AFI included these Non-RMBS Actions in the summary of potential litigation it provided to the Examiner. Specifically, as with the others, these actions involve the behavior of Debtor entities in the underwriting, servicing, and foreclosure of mortgages. Plaintiffs in these actions cite several common-law and statutory causes of action, including misrepresentation, breach of contract, negligence, slander of title, ejectment, concert of action, joint enterprise, and unjust enterprise.[866] The statutory causes of action include violations of state laws protecting against unlawful and deceptive trade practices, TILA, RESPA, and RICO.[867]

The plaintiffs in one action, *In re Community Bank of N. Va*, have moved to certify class claims filed against the Debtors under the direction of Rowena Drennen, a member of the Creditors' Committee.[868] The complaint to date has not alleged liability against AFI.[869]

---

[864] Some of the plaintiffs in these actions have disclosed the amount in controversy in their complaints. *See id.* at 19 (plaintiffs seek to recover compensatory damages not exceeding $74,500); Second Am. Compl., *Robinson v. Homecomings Fin., LLC*, Case No. 2008-900007, at 18 (Ala. Cir. Ct. July 3, 2012) (plaintiffs also seek to recover compensatory damages not exceeding $74,500). Additionally, the Examiner has received damage letters from several parties. However, only the Bollinger Damages Letter gave a specific estimate of damages. *See* Bollinger Damages Letter, dated Jan. 4, 2013 (estimating damages in the amount of several million dollars, including liquidated damages for unpaid overtime compensation and allegedly based on the applicable statute of limitations). *See also* Donaldson, Chatman, and Robinson Damages Letter, dated Jan. 21, 2013.

[865] *See, e.g.*, Am. Compl., *In re Cmty. Bank of N. Va.*, Case Nos. 03-0425, 02-1201, 05-0688, 05-1386, Docket No. 71 (W.D. Pa. Oct. 4, 2011); Compl., *Kelly. v. Am. Home Mortg. Holdings, Inc.*, Case No. 12-06240, Docket Nos. 1–2 (N.Y. Sup. Ct. Dec. 19, 2012); Am. Compl., *Kral v. GMAC Mortg., LLC*, Case No. 12-01023, Docket No. 9 (C.D. Cal. Apr. 25, 2012).

[866] Compl., *Kelly. v. Am. Home Mortg. Holdings, Inc.*, Case No. 12-06240, Docket Nos. 1–2 (N.Y. Sup. Ct. Dec. 19, 2012) (alleging fraud, deceit, fraudulent conveyance, intentional misrepresentation, negligent misrepresentation, breach of contract, constructive trust, negligence, slander of title, ejectment, concert of action, and unjust enrichment).

[867] Am. Compl., *In re Cmty. Bank of N. Va.*, Case Nos. 03-0425, 02-1201, 05-0688, 05-1386, Docket No. 71 (W.D. Pa. Oct. 4, 2011) (alleging violations of RESPA, TILA, and RICO); Am. Compl., *Kral v. GMAC Mortg., LLC*, Case No. 12-01023, Docket No. 9 (C.D. Cal. Apr. 25, 2012) (alleging violations of TILA and state law).

[868] *See* Notice of Motion to Apply Bankruptcy Rule 7023 and to Certify Class Claims [Docket No. 2044].

[869] Drennen declined the Examiner's request to submit a Submission Paper and did not respond to the damages request.

To the extent these complaints were amended to include AFI or its affiliates or to the extent Third-Party Claimants bring additional or new claims based upon these causes of action or limitations issues, the relevant analysis articulated above and in other sections of the Report would apply.[870]

### 5. Unsecured Noteholder Causes Of Action

#### a. Tortious Interference With The 2005 Indenture

##### (1) Description Of The Claim

In addition to the RMBS Claims and Non-RMBS Claims discussed above, the Investigation considered a potential tortious interference with contract claim by the Unsecured Noteholders against AFI. Wilmington Trust, solely in its capacity as indenture trustee under the 2005 Indenture and on behalf of the Unsecured Noteholders, alleges that AFI caused ResCap to breach the "all or substantially all" covenant included in the 2005 Indenture.[871] Specifically, the Unsecured Noteholders allege that AFI induced ResCap to embark upon a series of transactions in furtherance of a pre-arranged plan of AFI self-preservation that caused ResCap to (1) forgive indirect and direct debts owed to it by certain of its subsidiaries, including GMAC Mortgage and RFC, and (2) enter into the 2009 Bank Transaction. The Unsecured Noteholders argue that these transactions resulted in the transfer of substantially all of ResCap's assets in violation of the 2005 Indenture. Further, the Unsecured Noteholders allege that AFI tortiously interfered with the 2005 Indenture because a contract existed, AFI knew about the 2005 Indenture provisions, and AFI took intentional steps to cause its breach without justification.[872]

##### (a) The Unsecured Noteholders' Arguments

Section 11.01 of the 2005 Indenture prohibits, subject to certain exceptions, the transfer of all or substantially all of ResCap's assets unless the transferee assumes liability for the

---

[870] *See* Section VIII.C.

[871] Wilmington Trust Submission Paper, dated Oct. 24, 2012, at 24–25. The Unsecured Noteholders initially argue that AFI is liable for the breach as an alter ego of ResCap. If AFI and ResCap are viewed as separate entities, the Unsecured Noteholders alternatively argue that AFI is liable for breach of the "substantially all" provision of the 2005 Indenture because it tortiously interfered by causing ResCap's assets to become fully depleted. *Id*. at 24–25, 33.

[872] *Id*. at 34.

applicable Unsecured Notes.[873] The Unsecured Noteholders assert that at the end of 2008, ResCap's assets were comprised principally of: (1) intercompany receivables from its operating subsidiaries; (2) its ownership of common and preferred units in IB Finance, the holding company of Ally Bank; and (3) its equity interests in its operating subsidiaries.[874] The Unsecured Noteholders contend that the forgiveness of debt by ResCap from 2008 to 2009 and ResCap's transfer of its interest in IB Finance interest effectively left ResCap with no material assets by the end of 2009.[875] Because no transferee assumed the obligations under the 2005 Indenture, the Unsecured Noteholders argue that the "all or substantially all" provision of the 2005 Indenture was breached.[876] Finally, the Unsecured Noteholders allege that these transactions were orchestrated by AFI and constituted a scheme to allow AFI to obtain ResCap's interest in IB Finance and avoid the risk of losing Ally Bank in the event of a ResCap bankruptcy filing.[877]

The Unsecured Noteholders assert that they can satisfy each element of a claim for tortious interference with contract because it has demonstrated: (1) the existence of the 2005 Indenture; (2) AFI's knowledge of the 2005 Indenture; (3) AFI's intentional inducement of ResCap to breach the 2005 Indenture without justification; (4) actual breach of the 2005

---

[873] 2005 Indenture, §11.01[EXAM40024737]. Section 11.01 states:

> Section 11.01. Corporation May Consolidate, etc., on Certain Terms. The Company covenants that it will not merge or consolidate with any other Corporation or sell, assign, transfer, lease or otherwise convey all or substantially all of its property or assets to any Person, unless (i) either the Company shall be the continuing Corporation, or the successor Person (if other than the Company) shall be a Corporation organized and existing under the laws of the United States of America or a state thereof and such Corporation shall expressly assume the due and punctual payment of the principal of (and premium, if any), interest, if any, and Additional Amounts, if any, on all the Securities and any Coupons, according to their tenor, and the due and punctual performance and observance of all of the covenants and conditions of this Indenture to be performed by the Corporation by supplemental indenture satisfactory to the Trustee, executed and delivered to the Trustee by such Corporation, (ii) each Guarantor shall, by supplemental indenture, confirm that their Guarantee shall apply to the surviving entity's obligations under the Securities and this Indenture, as modified by such supplemental indenture, and confirm the due and punctual performance of the Guarantee and the covenants of the Guarantor in this Indenture, and (iii) the Company or such successor Corporation, as the case may be, shall not, immediately after such merger or consolidation, or such sale or conveyance, be in default in the performance of any such covenant or condition.

> For purposes of the foregoing, any sale, assignment, transfer, lease or other conveyance of the properties and assets of one or more Significant Subsidiaries (other than to the Company or another Subsidiary of the Company), which, if such assets were owned by the Company, would constitute all or substantially all of the properties and assets of the Company, shall be deemed to be the transfer of all or substantially all of the properties and assets of the Company.

> *Id.*

[874] Wilmington Trust Submission Paper, dated Oct. 24, 2012, at 25, 27. The Unsecured Noteholders argue that the equity interests were in fact worthless because the mortgage-related liabilities faced by those subsidiaries combined with existing market conditions rendered them insolvent. *Id*. at 27.

[875] *Id*. at 28.

[876] *Id*. at 25.

[877] *Id*. at 9–10.

Indenture; and (5) pecuniary damages.[878] Additionally, the Unsecured Noteholders argue that they have standing to assert the tortious interference claim against AFI because the claim is a direct claim based upon a particularized injury to the Unsecured Noteholders, which cannot be brought by any other creditor or group of creditors.[879]

### (b) The Debtors And AFI's Response

First, in their Submission Papers, the Debtors and AFI assert three defenses to the tortious interference claim that the Unsecured Noteholders lack standing to pursue the proposed tortious interference claim. The Debtors claim that the proposed tortious interference claim is an allegation that the 2009 Bank Transaction and ResCap's forgiveness of intercompany debt rendered ResCap insolvent and, as a result, is essentially a fraudulent conveyance claim belonging to the estate.[880]

Second, the Debtors assert that there is no evidence to support the allegation that the 2009 Bank Transaction and the forgiveness of debt transactions were prearranged parts of a single transaction. Despite that the transactions partially overlap chronologically and were generally intended to avoid the breach of certain TNW covenants and increase liquidity, the Debtors claim that each of the transactions could stand alone without the others and that the 2009 Bank Transaction did not create any binding commitment to later engage in the forgiveness of debt transactions.[881] Further, even if the transactions could be treated as a singular transaction, the Debtors argue that the transactions do not constitute a transfer of substantially all of ResCap's assets because ResCap's equity in its operating subsidiaries had value.[882]

Finally, the Debtors and AFI argue that the Unsecured Noteholders have failed to show the necessary elements of a tortious interference claim because the Unsecured Noteholders made no showing of several necessary elements, including that AFI intentionally induced ResCap to breach the "substantially all" provision of the 2005 Indenture.[883] The Debtors claim

---

[878] Wilmington Trust Submission Paper, dated Mar. 8, 2013, at 30 (citing *Lama Holding Co. v. Smith Barney Inc.*, 668 N.E.2d 1370 (N.Y. 1996)).

[879] Wilmington Trust Submission Paper, dated Mar. 8, 2013, at 32–33 (citing *In re Ionosphere Clubs, Inc.*, 156 B.R. 414, 439–40 (S.D.N.Y. 1993); *Caplin v. Marine Midland Grace Trust Co.*, 406 U.S. 416, 434 (1972)).

[880] Debtors' Submission Paper, dated Jan. 7, 2013, at 29–30. "Thus, while the proposed tortious interference claim and the 'fraudulent conveyance claim do not contain identical elements, that all share the same underlying focus' (i.e., allegations of fraud or other unlawful actions related to the Debtors' forgiveness of intercompany debt and the IB Finance Transaction)." *Id*. at 29–30 (citing *Nat'l Am. Ins. Co. v. Ruppert Landscaping Co.*, 187 F.3d 439, 441 (4th Cir. 1999)).

[881] Debtors' Submission Paper, dated Jan. 7, 2013, at 23.

[882] *Id*. at 24.

[883] *See id*. at 30–32; AFI Submission Paper, dated Dec. 19, 2012, at A-6. The Debtors also question whether the 2009 Bank Transaction and the forgiveness of intercompany debt caused any pecuniary damage to the holders of the Unsecured Notes. Debtors Submission Paper, dated Jan. 7, 2013, at 32.

that ResCap independently concluded, based upon advice from independent advisors, that it was in ResCap's interests to enter into the 2009 Bank Transaction.[884] Additionally, the Debtors claim that economic justifications for the 2009 Bank Transaction and the forgiveness of intercompany debt counter the Unsecured Noteholder's claim for tortious interference.[885]

### (c) The Unsecured Noteholders' Standing Motion

On April 19, 2013, the Unsecured Noteholders filed a motion seeking standing and authority to prosecute and, if appropriate, settle certain claims and causes of action held by ResCap in conjunction with third-party claims belonging to the Unsecured Noteholders.[886] Along with the motion, the Unsecured Noteholders filed a proposed complaint that sets forth each of their alleged claims (the "Proposed Complaint").[887] The Proposed Complaint sets forth the tortious interference claim raised by the Unsecured Noteholders in the Submission Papers. Specifically, the fourth cause of action in the proposed complaint is a tortious interference with contract claim against AFI, by which the Unsecured Noteholders assert that AFI "intentionally, maliciously, willfully, improperly, and in bad faith, induced, caused and procured" ResCap's breach of the "substantially all" covenant of the 2005 Indenture as part of a unified plan by AFI to benefit itself at the expense of the ResCap's creditors and were intended to insulate AFI and Ally Bank from the RMBS crisis that AFI created.[888]

### (2) The Unsecured Noteholders' Standing To Assert Tortious Interference With Contract Claim

Before analyzing the disputed factors of tortious interference, the Examiner first considered whether the Unsecured Noteholders would have standing to assert the tortious interference with contract claim. "[S]tanding is a threshold inquiry, and an indispensable part of a plaintiff's case; failure to establish standing generally obviates the need to consider the merits of a dispute."[889] In the bankruptcy context, "when a claim is a general one with no particular injury arising from it and if that claim could be brought by any creditor of the debtor, the trustee is the proper person to assert the claim."[890] In order for the Unsecured

---

[884] Debtors' Submission Paper, dated Jan. 7, 2013, at 31; see AFI Submission Paper, dated Dec. 19, 2012, at A-7.

[885] Debtors' Submission Paper, dated Jan. 7, 2013, at 31–32.

[886] Motion of Wilmington Trust, National Association, Solely in its Capacity as Indenture Trustee for the Senior Unsecured Noteholders Issued by Residential Capital, LLC for an Order Authorizing it to Prosecute Claims and Other Causes of Action on Behalf of the Residential Capital, LLC Estate [Docket No. 3475].

[887] *Id*.

[888] *Id*.

[889] *WTC Families for a Proper Burial, Inc. v. City of N.Y.*, 567 F. Supp. 2d 529, 536 (S.D.N.Y. 2008).

[890] *Kalb, Voorhis & Co. v. Am. Fin. Corp.*, 8 F.3d 130, 132 (2d Cir. 1993) (holding that under Texas law, a veil-piercing action should be brought by the trustee because, if proven, such a claim would inure to the benefit of all creditors).

Noteholders to assert the tortious interference claim, the Unsecured Noteholders must have suffered a particularized injury significantly different from the injuries to ResCap's other general unsecured creditors.[891]

As noted in the Debtors' Submission, some courts have denied standing to a party asserting a tortious interference claim if the court determines that the claim is in fact a restatement of a fraudulent conveyance claim that belongs to the debtor's estate. For example, in *National American Insurance Co. v. Ruppert Landscaping Co.*, the court held that creditors lacked standing to assert a tortious interference claim against a third party because the claim depended upon a showing of fraud or unlawful action and all creditors, not just the creditors asserting the claim, had a stake in exposing the impropriety of the underlying transaction.[892] In *In re Ionosphere Clubs, Inc. v. American National Bank and Trust Company of Chicago*, the debtor's preferred shareholders asserted that actions of the debtor's management rendered the debtor insolvent. They alleged that that conduct amounted to tortious interference with the debtor's contractual obligations under the preferred stock certificates to pay preferred dividends.[893] The court noted that although the shareholders' right to receive preferred dividends was unique to their status as preferred shareholders, the nature of the injury stemmed from the damage done to the debtor by the debtor's management and that would affect all creditors the same.[894] Accordingly, the court held that the tortious interference with contract claim, which was based upon acts rendering the debtor insolvent and unable to pay its contractual debts to the preferred shareholders, "is for fraudulent conveyance properly brought by the trustee."[895]

*Retired Partners of Coudert Brothers Trust v. Baker & McKenzie LLP (In re Coudert Brothers LLP)* is another case that addressed individual standing to assert a tortious interference claim. *Coudert Brothers* involved a trust of retired partners of the debtor who brought, among other things, tortious interference with contract claims against three law firms who had each bought a large share of the debtor's business while it was winding down.[896] The contract at issue was a partnership agreement that entitled the retired partners to payment of

---

[891] *See Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 429 B.R. 423, 431 (S.D.N.Y. 2010) (citing *In re Sage Enter., Inc.*, 2006 WL 1722582, at *15 (Bankr. N.D. Ill. Apr. 28, 2006)) ("[W]here the creditors' injury, while having some personal elements, overlaps with injury suffered by other creditors . . . the question to be answered is whether the injury to the creditor is significantly different from the injuries to other creditors in general.").

[892] 187 F.3d 439, 440–41 (4th Cir. 1999) (stating that two sureties of the debtor challenged asset transfers between the debtor and a third party alleging, among other things, tortious interference with contract claims against the third party).

[893] 156 B.R. 414, 439 (S.D.N.Y. 1993). The preferred shareholders asserted that the debtor was rendered insolvent through a series of transactions by which management approved actions to allow the debtor's parent corporation to transfer many of the debtor's valuable assets to affiliated corporations also owned by the parent. *In re Ionosphere Clubs, Inc. v. Am. Nat'l Bank & Trust Co.*, 17 F.3d 600, 602 (2d Cir. 1994).

[894] *Airline Pilots Assoc., Int'l v. Am. Nat'l Bank & Trust Co. of Chicago (In re Ionosphere Clubs, Inc.)*, 156 B.R. 414, 439 (S.D.N.Y. 1993).

[895] *Id*.

[896] 2012 WL 1267827 (S.D.N.Y. April 12, 2012).

retirement income from the partnership or a successor partnership in the event the original partnership was sold.[897] The trust alleged that the firms tortiously interfered with the partnership agreement by luring away the debtor's employees and buying pieces of the business large enough to render the debtor insolvent, but small enough to avoid successor liability.[898] The court observed that

> if this theory works for the [t]rust, it would also work for every other creditor of [the debtor]: each could say that the [f]irms tortiously interfered with its contract by rendering [the debtor] unable to perform. Nor is the Trust's theory limited to creditors who entered contracts with [the debtor]; a judgment creditor, or a tort creditor, could claim that the asset sales rendered the [debtor] insolvent and therefore constituted a fraudulent transfer.[899]

As a result, the court held that the trust's claim was in fact a disguised fraudulent conveyance claim, which belonged to the estate and, as a result, could not be brought by the trust to pursue on behalf of its members.[900]

To counter the above authority, the Unsecured Noteholders cite to *In re HHL Financial Services, Inc.*[901] *In re HHL Financial Services, Inc.* involved a claim by noteholders against the defendants for tortiously interfering with the notes. More specifically, the noteholders argued that the defendants diverted significant revenues from the debtor, causing the debtor to default on promissory notes and which ultimately led to the debtor's bankruptcy filing.[902] The court found that the nature of the wrongs asserted and injuries suffered with respect to the tortious interference claim were specific to the plaintiffs as noteholders, not creditors in general and, as a result, were not related to the debtor's chapter 11 proceeding.[903]

The Examiner considered both the nature of the wrongs alleged and the nature of the injury for which the relief would be brought for purposes of determining whether the Unsecured Noteholders would have standing to assert the tortious interference with contract

---

[897] *Id.* at *1. The retired partner's entitlement to retirement income, however, was conditioned upon the firm generating profits sufficient to meet the debtor's obligations to higher priority claimants. *Id.*

[898] *Id.* at *7.

[899] *Id.*

[900] *Id.* at *8.

[901] 2001 WL 34367298 (Bankr. D. Del. 2001). The plaintiffs had filed suit alleging substantially similar claims against the defendants in state court and in an adversary proceeding in connection with the debtor's chapter 11 proceeding. *See id.* at *1. The case involved a decision on the plaintiffs motion for abstention in order to allow the claims to be decided in the state court action. *See id.*

[902] *Id.* at *7.

[903] *Id.* at *2.

claim.[904] The Unsecured Noteholders argue that they have particularized claims related to the 2005 Indenture that are unique to the Unsecured Noteholders.[905] The nature of the wrongs alleged by the Unsecured Noteholders is that AFI induced ResCap to breach the "substantially all" provision of the 2005 Indenture by "causing [ResCap's] assets to become fully depleted."[906] The nature of the injury for which relief is brought is that "there are no assets to support the [Unsecured Notes] as bargained for under the [2005] Indenture."[907]

Unlike *Ruppert Landscaping,* the nature of the wrong caused by the alleged tortious interference with the 2005 Indenture does not depend upon allegations of fraud or breach of fiduciary duty and is not available to all estate creditors. Instead, the nature of the wrong is similar to that asserted in *Ionosphere*, *Coudert Brothers Trust*, and *HHL Financial Services*, where the courts found the nature of a breach of contract to be unique to the plaintiffs. Unlike *Ionosphere* and *Coudert Brothers Trust*, however, the Unsecured Noteholders' claim is not premised upon a theory that the breach of the 2005 Indenture was a result of AFI rendering ResCap insolvent through the forgiveness of intercompany debt and the 2009 Bank Transaction. Rather, the Unsecured Noteholders' claim is premised upon a theory that when AFI allegedly caused ResCap to breach the "substantially all" provision, the Unsecured Noteholders were denied their right to a degree of continuity of ResCap's assets as bargained for pursuant to section 11.01 of the 2005 Indenture.[908] Similar to *HHL Financial Services,*[909] the nature of the injury asserted by the Unsecured Noteholders is not available to all of the Debtors' creditors, but unique to the Unsecured Noteholders. As a result, the Examiner concludes that it is more likely than not that a court would find that the Unsecured Noteholders have standing to assert the tortious interference with contract claim against AFI.

### (3) Analysis Of The Tortious Interference With Contract Claim

As noted above, in order to establish tortious interference with contract, a plaintiff must prove "(1) existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of the contract; (3) the defendant's intentional procurement of the third-party's breach of contract without justification; (4) actual breach of the contract; and

---

[904] Opinion, *Retired Partners of Coudert Bros. Trust v. Deltour* (*In re Coudert Bros., LLP*), Adv. No.09-01215, at 6 (Bankr. S.D.N.Y. June 15, 2010) (citing *In re Granite Partners, L.P.*, 194 B.R. 318, 324 (Bankr. S.D.N.Y. 1996); *In re The 1031 Tax Grp., LLC*, 397 B.R. 679–80 (Bankr. S.D.N.Y. 2008)).

[905] Wilmington Trust Submission Paper, dated Oct. 24, 2012, at 33.

[906] *Id*.

[907] *Id*. at 34.

[908] *Cf. Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*, 691 F.2d 1039, 1050–51 (2d Cir. 1982) (noting that the purpose of successor obligor clauses is to protect a borrower's right to merge or liquidate all of its assets, while protecting a lender's right to a degree of continuity of assets).

[909] *In re HHL Fin. Serv. Inc.,* 2001 WL 34367298, at *2 (Bankr. D. Del. 2001).

(5) damages resulting therefrom."[910] AFI does not contest that the 2005 Indenture is a valid contract or that it had knowledge of the 2005 Indenture.[911] Accordingly, the issue is whether the Unsecured Noteholders can show an actual breach of the contract with damages resulting therefrom, as well as AFI's intentional procurement of the ResCap's breach without justification.

### (a) Breach Of The "Substantially All" Provision Of The 2005 Indenture

The Unsecured Noteholders allege that the 2005 Indenture was breached when "substantially all" of ResCap's assets were stripped away in furtherance of a "unified plan to preserve and insulate [AFI] and Ally Bank from the consequences of the RMBS crisis that [AFI] had created."[912] In 2008, the Unsecured Noteholders assert that ResCap's assets comprised of (1) intercompany receivables from its operating subsidiaries; (2) its ownership of common and preferred units in IB Finance; and (3) its equity interests in its operating subsidiaries.[913] By the beginning of 2010, the Unsecured Noteholders claim that ResCap had transferred substantially all of its assets.[914] The Unsecured Noteholders recognize that none of these transactions taken individually would constitute a transfer of "substantially all" of ResCap's assets. Instead, to support their claim they seek to aggregate the 2009 Bank Transaction with a series of intercompany debt forgiveness transactions.[915] As a result, the Unsecured Noteholder's allegation that AFI caused ResCap to breach the "substantially all"

---

[910] *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 401–02 (2d Cir. 2006) (citing *Lama Holding Co. v. Smith Barney Inc.*, 668 N.E.2d 1370 (N.Y. 1996)); *see also White Plains Coat & Apron Co., Inc. v. Cintas Corp.*, 460 F.3d 281, 285 (2d Cir. 2006); *Winter-Wolff Int'l, Inc. v. Alcan Packaging Food & Tobacco Inc.*, 499 F. Supp. 2d 233, 241 (E.D.N.Y. 2007); *Hidden Brook Air, Inc. v. Thabet Aviation Int'l Inc.*, 241 F. Supp. 2d. 246, 278 (S.D.N.Y. 2002); *Rupert v. Krautheimer (In re Krautheimer)*, 241 B.R. 330, 336 (Bankr. S.D.N.Y. 1999).

A choice of law analysis may be avoided when there is no conflict in law with respect to a tortious interference with contract claim. *See Curley v. AMR Corp.*, 153 F.3d 5, 12 (2d Cir. 1998) (citing *J. Aron & Co. v. Chown*, 647 N.Y.S.2d 8 (N.Y. App. Div. 1996)). The Unsecured Noteholders, AFI, and the Debtors do not dispute applicable law in their respective Submission Papers, and the Unsecured Noteholders relied on New York law in their most recent Submission Paper. There is no conflict in the applicable law between Minnesota, New York, or other applicable states, therefore the Examiner looked to New York law to the analysis of the Unsecured Noteholders' claims.

[911] AFI Submission Paper, dated Dec. 19, 2012.

[912] Motion of Wilmington Trust, National Association, Solely in its Capacity as Indenture Trustee for the Senior Unsecured Noteholders Issued by Residential Capital, LLC for an Order Authorizing it to Prosecute Claims and Other Causes of Action on Behalf of the Residential Capital, LLC Estate [Docket No. 3475], Ex. B, at 47.

[913] *Id*. at 47; Wilmington Trust Submission Paper, dated Oct. 24, 2012, at 25, 27.

[914] Motion of Wilmington Trust, National Association, Solely in its Capacity as Indenture Trustee for the Senior Unsecured Noteholders Issued by Residential Capital, LLC for an Order Authorizing it to Prosecute Claims and Other Causes of Action on Behalf of the Residential Capital, LLC Estate [Docket No. 3475], Ex. B, at 47.

[915] *Id*. Wilmington Trust Submission Paper, dated Oct. 24, 2012, at 27.

covenant of the 2005 Indenture is dependent upon (1) the aggregation of the intercompany debt forgiveness transactions with the 2009 Bank Transaction and (2) the equity held by ResCap in its operating subsidiaries being worthless at the time the assets at issue were transferred.

### (i)  Aggregation Of The Transactions

### (A) The Sharon Steel Standard

Under New York law, a series of transactions can be aggregated for the purpose of determining whether a "substantially all" provision in an indenture has been breached.[916] *Sharon Steel Corp. v. Chase Manhattan Bank, N.A.* has been cited as the "leading decision on aggregating transactions for purposes of a substantially all analysis in the context of a successor obligor provision."[917] In *Sharon Steel,* the obligor of certain notes, UV Industries Inc. ("UV"), decided to liquidate its assets through a series of transactions over a 12 month period.[918] UV first sold a number of its assets to unrelated purchasers and then sold its remaining assets to Sharon Steel, which agreed to assume the notes. UV relied upon the successor obligation provisions in the underlying indentures to transfer the notes to Sharon Steel without noteholder approval.[919]

The indenture trustee and the noteholders challenged Sharon Steel's assumption of the notes and argued that the sale did not constitute the transfer of "substantially all" of UV's assets to Sharon Steel.[920] Sharon Steel argued it was permitted to assume the notes because it had acquired all of UV's assets in the final sale of a multi-step liquidation plan. The court disagreed with Sharon Steel's literal read of the "substantially all" provision. It held that because all of the sales were designed to "accomplish the predetermined goal of liquidating UV under a formal plan of liquidation, even though only one asset sale had been indentified at the time the liquidation plan was adopted," it would be inappropriate to review the transaction with Sharon Steel in isolation.[921] In coming to this conclusion, the court distinguished a plan of liquidation from sales of assets in the regular course of business that stand on their own merits without reference to another.[922]

---

[916] *Bank of N.Y. Mellon Trust Co., N.A. v. Liberty Media Corp.*, 29 A.3d 225, 243 (Del. 2011). Given that 2005 Indenture is governed by New York law, the Examiner applied New York law to determine whether ResCap has breached the "substantially all" covenant in the 2005 Indenture. *See, e.g.*, *id*. at 237 (applying New York law to a "substantially all" analysis because the indenture was governed by New York law).

[917] *Bank of N.Y. Mellon Trust Co.*, 29 A.3d at 237 (internal quotation marks omitted).

[918] *See Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*, 691 F.2d 1039 (2d Cir. 1982).

[919] *See id*.

[920] *See id*.

[921] *See id*. at 1050.

[922] *See id*. at 1050–51 ("To the extent that a decision to sell off some properties is not part of an overall scheme to liquidate and is made in the regular course of business it is considerably different from a plan of piecemeal liquidation. . . [a] sale in the absence of a plan to liquidate is undertaken because the directors expect the sale to strengthen the corporation as a going concern.").

The court then looked to UV's assets at the time UV adopted the plan to liquidate—before the first sales transaction—and compared them to the assets transferred to Sharon Steel.[923] The court held that while UV transferred all of its assets through the series of transactions over a period of time, UV did not transfer "substantially all" of its assets to Sharon Steel in the last transaction of the series because the transferred assets were responsible for 38% of UV's operating revenues and 13% of UV's operating profits and constituted 41% of the book value of UV's operating properties and 51% of UV's total assets.[924]

### (B) Subsequent Court Application Of The Sharon Steel Standard

There is limited additional case law on the aggregation of multiple transactions for purposes of a "substantially all" provision in an indenture. However, one court has held that

> in the context of the "substantially all" analysis under a boilerplate successor obligor provision in an indenture, . . . the principles articulated in *Sharon Steel* are the proper basis of determining under New York law, the nature and degree of interrelationship that will warrant aggregation of otherwise separate and individual transactions as part of a "series."[925]

In *Bank of New York Mellon Trust Co., N.A. v. Liberty Media Corp.*, the Delaware Supreme Court addressed whether a proposed split-off by Liberty Media Corp. in June 2010, which would be the company's fourth major distribution of assets since March 2004, should be aggregated with three prior dispositions for purposes of determining whether a transfer of "substantially all" of the company's assets had occurred.[926] The proposed split-off, by itself, would not have constituted a transfer of "substantially all" of the assets. [927] The court noted that "[i]n *Sharon Steel*, the Second Circuit focused on the fact that all of the sales were pursued to accomplish the predetermined goal of liquidating [the debtor] under a formal plan of liquidation" and emphasized that "[t]he *Sharon Steel* court was careful to distinguish the piecemeal liquidation at issue in that case from situations where a company disposes of assets over time and not as part of a preconceived plan of liquidation."[928] The court concluded that Liberty Media's transactions were not part of an overall plan to liquidate or to strip its assets from the corporate structure, but were the result of a discrete, context-based decision applying

---

[923] *See id*. at 1051.

[924] *Bank of N.Y. Mellon Trust Co., N.A. v. Liberty Media Corp.*, 29 A.3d 225, 237–38 (Del. 2011) (discussing *Sharon Steel Corp.*, 691 F.2d at 1051).

[925] *Bank of N.Y. Mellon Trust Co.*, 29 A.3d at 243. The court noted the near absence of any authoritative New York case law on the issue in coming to its conclusion. *See id*.

[926] *See id*. at 237.

[927] *See id.* If aggregated together, the transactions would have constitute a transfer of 67% of Liberty Media's assets.

[928] *See id*. at 237–38 (citing *Sharon Steel Corp.*, 691 F.2d 1039).

the company's overarching business strategy.[929] Because the strategy was not part of an overall plan to deplete Liberty Media's assets, the transactions at issue should not be aggregated.[930]

In *Bank of New York v. Tyco Int'l Group, S.A.*, the District Court for the Southern District of New York applied the *Sharon Steel* standard in determining whether the spin-off of two businesses constituted a breach of a "substantially all" provision of an indenture.[931] The court held that the transfers could not be aggregated under *Sharon Steel* because the case involved a company restructuring, not a liquidation, and the transferred assets stayed within the conglomeration.[932] The transfers at issue "clearly resulted from a decision to sell off some properties made in the regular course of business" as opposed to a plan of liquidation.[933]

### (C) Application Of The Sharon Steel Standard To The Transactions At Issue

The Examiner reviewed the evidence to determine whether the forgiveness of intercompany debt by ResCap and the 2009 Bank Transaction were part of an overall scheme to liquidate the assets of ResCap or would otherwise justify aggregation of the transactions under the *Sharon Steel* standard. As set forth in the Proposed Complaint, the Unsecured Noteholders allege that the transactions were part of a unified plan designed by AFI to preserve itself and Ally Bank.[934] While a close question, the Examiner concludes that it is more likely than not that a court would not find that the transactions at issue should be aggregated under the *Sharon Steel* standard.

As discussed in Section V.A.1.b(1), throughout 2007 and the first quarter of 2008, ResCap faced ongoing challenges with respect to its liquidity and TNW covenants in light of volatile market conditions.[935] It became clear toward the end of 2007 that AFI and ResCap would need to consider potential solutions to ResCap's TNW covenants for the first quarter of 2008.[936] In early March 2008, AFI considered a substantial equity infusion into ResCap to ensure ResCap would meet its TNW covenants.[937] ResCap's interest in IB Finance does not appear to have been part of the discussion surrounding the potential equity infusion at that time.[938]

---

[929] *See Bank of N.Y. Mellon Trust Co.*, 29 A.3d 225 at 237.

[930] *Id.* at 243 ("[A]ggregation is appropriate only when a series of transactions are part of a 'plan of piecemeal liquidations' and 'an overall scheme to liquidate' and not where each transaction stands on its own merits without reference to the others.").

[931] *Bank of N.Y. v. Tyco Int'l Grp., S.A.*, 545 F. Supp. 2d 312, 320–21 (S.D.N.Y. 2008).

[932] *Id*.

[933] *Id*. at 321.

[934] *See* Wilmington Trust Submission Paper, dated Mar. 8, 2013.

[935] *See* Section V.A.1.b(1).

[936] *See id.*

[937] *See id.*

[938] *See id.*

On March 28, 2008, AFI proposed the 2008 Bank Transaction to ResCap as a solution to help improve ResCap's financial condition.[939] Corey Pinkston of GMAC Financial Services informed the Independent Directors of the ResCap Board that

> he had been working with [AFI] management and PricewaterhouseCoopers on a structure for the contribution by [AFI] of the bonds in a manner that would clearly be considered "shareholder equity" for the purposes of compliance with ResCap's [TNW] covenants, but that would also provide some flexibility to allow [AFI] to maximize the value of the contribution.[940]

A few days later, Pohl advised the ResCap Board that based upon his extensive expertise in bankruptcy, "it was his feeling that a covenant default by ResCap for failing to meet the [TNW] Test and the resulting consequences thereof would be very detrimental to ResCap, its enterprise value and the value of the outstanding bonds."[941] ResCap's legal and financial advisors confirmed that if the proposed transaction was not approved, ResCap would not meet its TNW covenants, which most likely would cause a bankruptcy filing and an immediate loss of significant value to its public bondholders.[942] The ResCap Board subsequently approved the transaction.[943] That same day, the AFI Board discussed ResCap's status and outlook, including actions that had been taken to stabilize ResCap's performance and "focus the business model on core activities."[944] AFI discussed and approved the 2008 Bank Transaction and incremental capital injections only to the extent ResCap needed it to meet the TNW covenants.[945] The

---

[939] *See* Minutes of a Special Meeting of the Board of GMAC LLC, Mar. 28, 2008, ALLY_PEO_0001027–28 [ALLY_PEO_0001009].

[940] Minutes of a Meeting of the Special Committee of the Independent Directors of the Board of Residential Capital, LLC, Mar. 24, 2008, at RC40006616 [RC40006611].

[941] Minutes of a Special Meeting of the Board of Residential Capital, dated Mar. 28, 2008, at RC40005677 [RC40005652].

[942] *Id*. at RC40005678.

[943] *Id*.; *see also* Minutes of a Special Meeting of the Board of Residential Capital, LLC, dated Mar. 25, 2008, at RC40006621 [RC40006611]; Minutes of a Special Meeting of the Board of Residential Capital, LLC, dated Mar. 26, 2008, at RC40006625 [RC40006611]. Pohl and Daniel Ammann from Morgan Stanley (financial advisor for ResCap) noted to the ResCap board that the only option available to ResCap if it did not accept GMAC's proposal for the contribution of bonds with the ResCap board, which was to draw down the entire unsecured credit facility in March and then to file for bankruptcy protection in April. *Id*.

[944] Minutes of a Special Meeting of the Board of GMAC LLC, dated Mar. 28, 2008, at ALLY_PEO_0001026–28 [ALLY_PEO_0001009] (resolving to make capital contributions to ResCap "due to the volatility and uncertainty of market conditions and ResCap's financial condition" that required assessment on a day-to-day basis).

[945] *Id*. at ALLY_PEO_0001028–30 (resolving to make capital contributions to ResCap "due to the volatility and uncertainty of market conditions and ResCap's financial condition" that required assessment on a day-to-day basis).

transaction was consummated on March 31, 2008.[946] There is no indication that the 2008 Bank Transaction was structured so as to inevitably lead to the 2009 Bank Transaction or that the 2009 Bank Transaction had even been contemplated at this time.[947]

On March 26, 2008, the Executive Committee of ResCap's Board approved a capital injection into RFC in the form of forgiveness of affiliate borrowings from ResCap in the amount of \$2 billion or other amount as necessary to meets its TNW covenants in RFC's borrowing facilities.[948] The capital allocation would "ensure[ ] RFC's compliance with the financial covenants in its debt agreements as of March 31, 2008, and [was] expected to provide sufficient net worth to ensure compliance with RFC's financial covenants through June 30, 2008."[949] Throughout 2008 and into 2010, ResCap infused additional capital into its operating subsidiaries in the form of intercompany debt forgiveness.[950] On December 30, 2009, the AFI Board approved AFI's capital contribution to ResCap, and ResCap's subsequent capital contribution of over \$50 million to RFC, as required under the AFI Board's Reservation of Authorities.[951]

The Investigation did not uncover any evidence that would suggest AFI considered acquiring ResCap's remaining interest in IB Finance until late summer/early fall of 2008.[952] At that time, ResCap had yet to stabilize and, as a result, ResCap considered a potential sale of its remaining interest in IB Finance to AFI in order to alleviate ResCap's ongoing liquidity and TNW difficulties.[953] For AFI, the "[i]ntention of the acquisition [was] to simplify [Ally] Bank ownership issues to support long-term GMAC access to bank funding."[954] On September 30, 2008, the AFI Board "discussed continued volatility and disruption in the capital markets and the probability of completing planned asset sale transactions which themselves [were] paramount to ensuring that ResCap has sufficient liquidity required to

[946] Minutes of a Special Meeting of the Board of Residential Capital, LLC, dated Apr. 25, 2008, at RC40005744 [RC40005652].

[947] *See* Section V.A.1.b(1).

[948] Minutes of a Special Meeting of the Executive Committee Board of Directors of Residential Capital, LLC, dated Mar. 26, 2008, at RC40006438–39 [RC40006437].

[949] *Id*. at RC40006438.

[950] *See* ResCap—Intercompany Transactions—Draft Presentation, prepared by Morrison Foerster and FTI Consulting, dated April 4, 2013, at 10 [EXAM00345894].

[951] Unanimous Consent to Action by the GMAC Board of Directors, dated Dec. 30, 2009, at ALLY_0169105 [ALLY_0169104] ("WHEREAS, under the Reservation of Authorities of the Board, the Board must approve [AFI's] capital contribution to ResCap, and ResCap's contribution to RFC (through sequential contributions to, and by, intermediate subsidiaries) to the extent each contribution is \$50 million or more.").

[952] *See* Section V.A.1.b(1).

[953] *See* Section V.A.1.c (discussing early consideration of the 2009 Bank Transaction); *see also* Minutes of a Regular Meeting of the Board of GMAC LLC, dated Sept. 11, 2008, at ALLY_PEO_0001234–39 [ALLY_PEO_0001009]. On September 11, 2008, Samuel Ramsey presented to the AFI Board on a potential opportunity for the sale of ResCap's interest in the Ally Bank to AFI). *Id*; *see also* Minutes of a Regular Meeting of the Board of Residential Capital, LLC, dated Sept. 12, 2008, at RC40005864–65 [RC40005652].

[954] GMAC Bank Transaction Update for the Board of GMAC LLC, dated Sept. 29, 2008, at 1 [ALLY_0238653].

continue its restructuring efforts and return to profitability."[955] However, ResCap and AFI were unable to finalize the proposed Ally Bank sale and the AFI Board passed a resolution providing ResCap with up to $400 million in debt forgiveness to satisfy ResCap's TNW covenants and immediate cash needs.[956] The AFI Board was concerned that a ResCap bankruptcy filing would interfere with AFI's future acquisition of Ally Bank, by delaying FDIC approval of the transfer, allowing another purchaser to acquire ResCap's shares of IB Finance through a bankruptcy auction, or by giving the FDIC cause to seize the bank.[957] On October 16, 2008, Thomas Marano abruptly informed the ResCap Board that AFI was no longer considering the purchase of Ally Bank.[958] AFI's decision to walk away from the potential purchase of IB Finance at this time appears to have been driven, at least in part, by its own economic difficulties[959] as well as concerns over fraudulent transfer liability in the event of a ResCap bankruptcy filing.[960]

In December 2008, AFI again considered acquiring ResCap's interest in IB Finance in connection with its decision to become a bank holding company.[961] If AFI converted to a charter that triggered bank holding company requirements, Ally Bank would be able to offer demand deposit accounts and to provide full banking services.[962] As described in more detail in Section V.A.1.c(2) and Section V.A.1.c(3), AFI exercised its option to exchange the ResCap Preferred Interests for the IB Finance Preferred Interests on January 30, 2009 and, immediately following the exchange, ResCap sold its remaining IB Finance Class M Shares in

---

[955] Minutes of a Special Meeting of the Board of GMAC LLC, dated Sept. 30, 2008, at ALLY_PEO_0001288 [ALLY_PEO_0001009].

[956] Agenda and Supporting Materials, GMAC Board of Directors Meeting, Sept. 30, 2008, at ALLY_PEO_0003732 [ALLY_PEO_0003715]; Minutes of a Special Meeting of the Board of Residential Capital, LLC, Oct. 1, 2008, at RC4000587576 [RC40005652].

[957] *See* Section VI.A.3.a (discussing early consideration of an IB Finance/All Bank sale) (citing to Agenda and Supporting Materials, GMAC Board of Directors Meeting, Sept. 30, 2008, at ALLY_PEO_0003722 [ALLY_PEO_0003715]); Int. of S. Ramsey, Dec. 10, 2012, at 157:24–158:4 ("The joint ownership of the bank could've been very disruptive with the regulators. If there was a single ownership of the bank by GMAC when a [ResCap bankruptcy] occurred, if it was to occur, it would be less risk. It was that simple.").

[958] *See* Section V.A.3.a.

[959] *See, e.g.*, E-mail from T. Marano to N. Kashkari and J. Lambright (Oct. 30, 2008) [CCM00199669] ("I have been offered limited shorter term support from our parent GMAC. I have yet to receive longer term support as they themselves are challenged."); Int. of M. Neporent, Feb. 6, 2013, at 172:24–174:10.

[960] *See* Minutes of a Special Meeting of the Board of GMAC LLC, Sept. 30, 2008, at ALLY_PEO_0001287–88 [ALLY_PEO_0001009] ("Mr. Ramsey presented materials that . . . provided an overview of the risks to GMAC in the event of a ResCap bankruptcy filing. . . . Management and the advisors in attendance at the meeting responded to questions raised regarding the disposition of GMAC Bank; the impact on GMAC's 11:1 leverage ratio covenant; and matters associated with preference and fraudulent transfers."); Agenda and Supporting Materials, GMAC Board of Directors Meeting, Sept. 30, 2008, at ALLY_PEO_0003722–24 [ALLY_PEO_0003715].

[961] Int. of L. Tessler, Nov. 16, 2012, at 177:6–15 (as member of the AFI Board).

[962] *Id.* (as member of the AFI Board)

exchange for AFI's contribution of the 8.5% Second Lien Notes.[963] Following the transfer, AFI owned all of the equity interest in Ally Bank.[964]

As required by *Sharon Steel*, the Examiner considered whether the evidence supports the proposition that ResCap adopted a plan of liquidation before December 31, 2008 that would justify aggregating the 2009 Bank Transaction with the series of intercompany debt forgiveness transactions that took place in 2009. Similar to *Liberty,* no evidence was found to support the allegation that AFI engaged in an overall scheme of liquidation to transfer substantially all of ResCap's assets. Instead, the evidence supports the proposition that in early 2008, AFI's business strategy was for ResCap to have sufficient liquidity to continue its restructuring efforts and return to profitability. By late 2008, AFI was concerned with its own survival, which was dependent upon ResCap's survival and ability to maintain its TNW covenants. The intercompany debt forgiveness ensured that ResCap' operating subsidiaries maintained TNW covenants. The 2009 Bank Transaction provided ResCap with much needed liquidity and allowed AFI to become a bank holding company. As in *Liberty*, the evidence supports the proposition that the transactions at issue could each stand on their own merits without reference to the other. As a result, the Examiner concludes that it is more likely than not that a court would not find that all of the transactions should be aggregated for purposes of determining whether the "substantially all" provision on the 2005 Indenture was breached under the *Sharon Steel* standard.

### (D) Step-Transaction Doctrine

The Investigation also considered the Unsecured Noteholder's argument that the step-transaction doctrine justifies aggregating the transactions.[965] The step-transaction doctrine is traditionally a tax principle that looks to the substance of a series of transactions, not the form,

---

[963] *See* Section V.A.1.c(3) (discussing the January 2009 conversion of the ResCap Preferred Interests and sale of the IB Finance Class M Shares).

[964] *See* Section V.A.1.c(3).

[965] *See Bank of N.Y. Mellon Trust Co., N.A. v. Liberty Media Corp.*, 29 A.3d 225, 237 (Del. 2011) (concluding that it is unnecessary to decide whether the step-transaction doctrine would be applicable under New York law in determining whether to aggregate a series of transactions in a "substantially all" analysis).

to govern the transaction's tax treatment.[966] Courts, however, have applied the step transaction concept in other contexts as well, such as corporate governance, contract interpretation, and fraudulent conveyances.[967]

In *Liberty Media Corp*., the trustee argued that the step-transaction was legally irrelevant for purposes of determining whether multiple transactions constituted a transfer of "substantially all" assets.[968] The lower court previously held that the transactions at issue did not trigger the step-transaction doctrine because they were not part of a plan to remove assets from the corporate form or to evade the bondholders claims.[969]

The *Liberty Media Corp*. court implicitly rejected the lower court's adoption of the step-transaction doctrine.[970] Instead, the court concluded that the *Sharon Steel* standard was the proper basis to determine the interrelationship of transactions and that "it [was] unnecessary to reach or decide whether the step transaction doctrine and its three component tests would be adopted . . . to determine whether to aggregate a series of transactions in a 'substantially all' analysis."[971] Despite the holding, and at the urging of the Unsecured Noteholders, the Examiner considered whether the transactions at issue could be aggregated under the step-transaction doctrine.

The step-transaction doctrine "treats the 'steps' in a series of formally separate but related transactions involving the transfer of property as a single transaction, if all the steps are

---

[966] *See Comm'r v. Clark*, 489 U.S. 726, 738 (1989) ("By thus linking together all interdependent steps with legal or business significance, rather than taking them in isolation, federal tax liability may be based on a realistic view of the entire transaction."); *G.D. Parker, Inc. v. Comm'r*, 2012 WL 5935661, at \*10 (U.S. Tax. Ct. 2012) (citing *Del Commercial Props., Inc. v. Comm'r*, 251 F.3d 210, 213–14 (D.C. Cir. 2001), *aff'g T.C. Memo*. 1999-411) ("'Under the step transaction doctrine, a particular set in a transaction is disregarded for tax purposes if the taxpayer could have achieved its objective more directly, but instead included the step for no other purpose than to avoid U.S. Taxes.'"); *see also Greene v. United States*, 13 F.3d 577, 583 (2d Cir. 1994) ("By emphasizing substance over form, the step transaction doctrine prevents a taxpayer from escaping taxation.").

[967] *See Big V Supermarkets, Inc. v. Wakefern Food Corp. (In re Big V Holding Corp.)*, 267 B.R. 71, 92 (Bankr. D. N.J. 2001) (citing *Voest-Alpine Trading USA, Corp. v. Vantage Steel Corp.*, 919 F.2d 206, 21113 (3d Cir. 1990); *United States v. Tabor Court Realty Corp.*, 803 F.2d 1288, 1303 (3d Cir. 1986); *In re Crowthers McCall Pattern, Inc.*, 120 B.R. 279, 290 (Bankr. S.D.N.Y. 1990)).

[968] *See Bank of N.Y. Mellon Trust Co.*, 29 A.3d at 228.

[969] *See id.* at 239 ("The Court of Chancery added a second layer of the analysis, which it described as 'doctrinal hindsight,' to conclude that the *Sharon Steel* holding 'fits within the step-transaction framework' and proceeded to apply that analytical framework to the facts of this case.")

[970] *See id*. at 239, 244 ("The Court of Chancery could have ended its analysis with the above-described application of the *Sharon Steel* holding to the facts of this case.").

[971] *See id*. at 244.

substantially linked."[972] Courts apply three alternative tests in determining whether to invoke the step transaction doctrine.[973]

> First, under the "end result test," the doctrine will be invoked "if it appears that a series of separate transactions were prearranged parts of what was a single transaction, cast from the outset to achieve the ultimate result." Second, under the "interdependence test," separate transactions will be treated as one if "the steps are so interdependent that the legal relations created by one transaction would have been fruitless without a completion of the series." The third and "most restrictive alternative is the binding-commitment test under which a series of transactions are combined only if, at the time the first step is entered into, there was a binding commitment to undertake the later steps."[974]

The circumstances surrounding the transactions need only satisfy one of the tests in order for the step transaction doctrine to apply.[975]

The Unsecured Noteholders have asserted that the transactions at issue satisfy both the end result test and the interdependence test and, as a result, should be aggregated for the "substantially all" analysis.[976] The Unsecured Noteholders do not attempt to argue that the transactions would fit within the binding commitment test and the Investigation has found no evidence of a binding commitment that required ResCap to forgive the intercompany debt and to enter into the January 2009 Bank Transaction.

The Unsecured Noteholders argue that their claim satisfies the end result test because the 2009 Bank Transaction and the intercompany debt forgiveness were part of a single plan of self preservation designed by AFI. Under the end-result test, a series of closely related steps in a transaction will be treated as a single transaction if the steps were taken to reach a particular end result.[977] It focuses upon the actual intent of the parties at the time of the transactions. The transactions will not be viewed as one unless it can be shown that at the time the parties engaged in each of the individual steps, they contemplated a single end result.[978]

The Examiner considered whether the transactions were in fact "prearranged parts" of a single transaction "cast from the outset to achieve the ultimate result." Before the 2009 Bank

---

[972] *See id.* at 239.

[973] *See id.* at 240.

[974] *Id.* (citing *Noddings Inv. Grp., Inc. v. Capstar Commc'ns, Inc*, 1999 WL 182565 (Del. Ch. Mar. 24, 1999), *aff'd* 741 A.2d 16 (Del. 1999)).

[975] *See Bank of N.Y. Mellon Trust Co., N.A.*, 29 A.3d at 240.

[976] Wilmington Trust Submission Paper, dated Mar. 8, 2013, at 7, 9, 57.

[977] *See Kornfeld v. Comm'r*, 137 F.3d 1231, 1235 (10th Cir. 1998); *G.D. Parker, Inc. v. Comm'r*, 2012 WL 5935661, at *10 (U.S. Tax. Ct. 2012); *Greene v. U.S.*, 13 F.3d 577, 583 (2d Cir. 1994).

[978] *See G.D. Parker, Inc. v. Comm'r,* 2012 WL 5935661, at *11 (U.S. Tax. Ct. 2012).

Transaction, the Investigation uncovered evidence that AFI intended to acquire Ally Bank in connection with AFI's conversion to a bank holding company.[979] A bankruptcy filing by ResCap could have jeopardized AFI's ability to acquire the bank either by delaying FDIC approval of the transfer, allowing a purchaser to acquire ResCap's shares of IB Finance through a bankruptcy auction or by giving the FDIC cause to seize the bank.[980] The capital infusions into ResCap and its operating subsidiaries allowed ResCap to maintain its TNW covenants and, in January 2009, AFI obtained Ally Bank. By that time, AFI had become a bank holding company and AFI was operating under the assumption that it would be imprudent to allow a subsidiary of a bank holding company to file for bankruptcy.[981] ResCap needed to continue meeting its TNW covenants in order to avoid filing for bankruptcy. It is undisputed that throughout 2009, ResCap forgave intercompany debt owed to it by its operating subsidiaries. The Investigation uncovered evidence that these transactions were intended to enable ResCap and its operating subsidiaries to meet their TNW covenants and liquidity needs, which avoided a ResCap bankruptcy filing.[982] As a result, the Examiner concludes while it is a close question, it is more likely than not that a court would find that the 2009 Bank Transaction and the intercompany debt forgiveness transactions were part of a plan to reach the end result of obtaining and maintaining Ally Bank.

The Unsecured Noteholders also assert that their claim satisfies the interdependent test because the acquisition of Ally Bank would have been futile without the intercompany debt forgiveness.[983] The interdependence test is a variation of the end result that requires a court to determine "whether the individual steps had 'independent significance or whether they had meaning only as part of a larger transaction.'"[984] The Examiner reviewed whether the transactions were distinct corporate events that could have stood on their own merits and would not have been fruitless in isolation. Although the 2009 Bank Transaction may have been interdependent on the intercompany debt forgiveness transactions, the intercompany debt

---

[979]   *See* Section V.A.3.b.

[980]   *See* Section V.A.1.c(1) (discussing early consideration of an IB Finance/All Bank sale) (citing to Agenda and Supporting Materials, GMAC Board of Directors Meeting, Sept. 30, 2008, at ALLY_PEO_0003722 [ALLY_PEO_0003715]; Int. of S. Ramsey, Dec. 10, 2012, at 157:24–158:4 ("The joint ownership of the bank could've been very disruptive with the regulators. If there was a single ownership of the bank by GMAC when a [ResCap bankruptcy] occurred, if it was to occur, it would be less risk. It was that simple.")).

[981]   *See* Int. of A. de Molina, Nov. 20, 2012, at 170:6–172:25 (explaining that a bankruptcy filing by ResCap after AFI obtained bank holding status would be imprudent and could risk AFI's relationship with the FDIC); *see also* Int. of T. Marano, Nov. 26, 2012, at 157:1–12 ("Once we became a bank holding company, it—one of the key reasons why [ResCap] didn't think [ResCap would] ever file is . . . that [the Fed] had never let a subsidiary of a bank holding company file for bankruptcy before.").

[982]   Unanimous Consent to Action by the GMAC Board, dated Dec. 30, 2009, at ALLY_0115311-19 [ALLY_0114717]; Material for a GMAC Board of Directors Meeting, dated Sept. 30, 2008 [ALLY_PEO_0003715]; *see* ResCap—Intercompany Transactions—Draft Presentation, prepared by Morrison Foerster and FTI Consulting, dated April 4, 2013, at 12 [EXAM00345894].

[983]   Wilmington Trust Submission Paper, dated Mar. 8, 2013, at 9–10.

[984]   *Greene v. United States*, 13 F.3d 577, 584 (2d Cir. 1994) (citing *Penrod v. Comm'r*, 88 T.C. 1415, 1430 (Tax Ct. 1987)); *see also Kornfeld v. Comm'r*, 137 F.3d 1231, 1235 (10th Cir. 1998).

forgiveness transactions had their own independent significance apart from the 2009 Bank Transaction in that the transactions enabled ResCap's operating subsidiaries to maintain their TNW covenants. As a result, the Examiner concludes that it is unlikely that a court would find that the interdependency test warrants aggregation of the intercompany debt forgiveness transactions with the 2009 Bank Transaction.

Although the transactions may satisfy the step-transaction doctrine if they trigger the end-result test, given the holding in *Liberty Media Corp.*, it is unlikely that a court would apply the step-transaction test but would instead apply the *Sharon Steel* standard. Under that test, as noted above, the Examiner concludes that it is more likely than not that the Unsecured Noteholders' argument to aggregate the transactions would fail.

### (ii) Transfer of Substantially All Of ResCap's Assets

Should a court nevertheless find that the transactions could be aggregated, the issue of whether the transactions at issue constituted a transfer of "substantially all" of ResCap's assets in the context of the 2005 Indenture would still need to be determined. The case law interpreting the "all or substantially all" language in context of successor obligor clauses is limited.[985] The first published case to interpret the meaning of "substantially all" in the context of an indenture found that the sale of stock held in another company constituted a sale of "substantially all" of the corporation's assets because the stock comprised more than 75% of the corporation's total assets and was the only substantial income-producing asset.[986] Since then, courts have not applied a mechanical test to determine if a transfer involves "all or substantially all" of a corporation's assets, but instead examine all facts and circumstances surrounding the transfer using both qualitative and quantitative analyses.[987]

---

[985] Given the lack of guidance in context of an indenture, a court may consider case law deciding "substantially all" in context of shareholder-protection statutes. Shareholder-protection statutes prohibit a corporation from selling all or substantially all of its assets without shareholder approval. *See, e.g.*, N.Y.CLS BUS. CORP. § 909 (requires approval of two thirds of the stockholders entitled to vote if a corporation desires to transfer not in the regular course of its business all or substantially all of its assets that are essential to the conduct of the business of the corporation); Del. Code Ann. Tit. 8, § 271 (requires majority shareholder vote of approval before the corporation may sell lease or exchange all or substantially all of its property and assets).

At least one court has held that cases interpreting "substantially all" in context of shareholder-protection statutes are helpful in interpreting "substantially all" in context of an indenture. *U.S. Bank Nat'l Ass'n v. Angeion Corp*., 615 N.W.2d 425, 432 (Minn. Ct. App. 2000) ("Because the shareholder-protection statutes have identical language and a similar purpose, we conclude that these interpretations may have affected the parties' understanding at the time they entered the indenture and thus are relevant to intent and reasonable expectations.").

[986] *B.S.F. Co. v. Philadelphia Nat'l Bank*, 204 A.2d 746, 750 (Del. 1964) (applying Pennsylvania law to determine whether a corporation transferred "substantially all" of its assets when it sold a substantial block of another company's stock).

[987] *See, e.g.*, *Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*, 691 F.2d 1039, 1050–51 (2d Cir. 1982); *Bank of N.Y. v. Tyco Int'l Grp., S.A.*, 545 F. Supp. 2d 312 (S.D.N.Y. 2008); *In re BankAtlantic Bancorp, Inc. Litig.*, 39 A.3d 824, 843 (Del. 2012); *Angeion Corp*., 615 N.W.2d 425 (holding that, under New York law, the "substantially all" provision on an indenture is measured both quantitatively and qualitatively, but there was genuine issues of material facts that precluded summary judgment on trustee's claim for breach of the substantially all provision in the underlying indenture).

A qualitative analysis considers whether the transfer violated the intent of the lenders and whether the transfers rendered the issuer incapable of operating as a going concern.[988] A quantitative analysis, on the other hand, may look to the percentage of operating revenue, operating profits, operating assets, or total assets transferred.[989] Transfers involving higher percentages of a corporation's assets are more likely to be deemed a transfer of "all or substantially all" of the assets of the corporation, regardless of the character or nature of the assets being sold.[990] Less weight will be given to the percentage significance of the assets transferred if such assets are central to the corporation's business.[991]

The Unsecured Noteholders argue that a quantitative and qualitative analysis supports their position that the forgiveness of intercompany debt and the transfer of ResCap's interest in IB Finance constitute a transfer of significantly all of ResCap's assets by 2009, or alternatively, by 2010.[992] The Examiner first considered the quantitative factors of the transactions at issue to determine the percentage of transferred assets in relation to ResCap's total assets and operating assets held prior to the 2009 Bank Transaction.[993]

---

[988] *See In re BankAtlantic Bancorp, Inc. Litig.*, 39 A.3d at 842 (applying New York law to determine whether a transaction conveyed "substantially all" of a company's assets).

[989] *See id.* at 838–42 (applying New York law to determine whether a transaction conveys "substantially all" of a company's assets).

[990] *See id.* (finding that a proposed sale transaction would constitute a transfer of "substantially all" of the corporation's assets because the transaction conveyed 85–90% of the corporation's assets and would transform completely the nature of the corporation's operations).

[991] *See id.*

[992] The Unsecured Noteholders in their Submission Paper argue that ResCap's forgiveness of intercompany debt owed to it between 2008 through 2009 was part of the AFI's plan of self-preservation. *See* Wilmington Trust Submission Paper, dated Oct. 24, 2012, at 17; Wilmington Trust Submission Paper, dated Mar. 8, 2013, at 7. To support this argument, the Unsecured Noteholders provided two separate "substantially all" analysis. The first analyzed the intercompany debt forgiveness from 2008 through 2009. Supplement to Wilmington Trust's Submission Paper, dated Dec. 11, 2012. The second, however, analyzed the intercompany debt forgiveness from 2009 through 2010. Supplement to Wilmington Trust's Submission Paper, dated Mar. 22, 2013.

[993] Courts have considered what percentage of operating revenue, operating profit or book value of the transferred assets represented in deciding whether a "substantially all" provision in an indenture has been triggered. *See Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*, 691 F.2d 1039, 1051 (2d Cir. 1982) (considering operating revenues, operating profits, and book value of operating assets and total assets); *In re BankAtlantic Bancorp, Inc. Litig.*, 39 A.3d at 839 (considering book value of total assets); *U.S. Bank Nat'l Ass'n v. Angeion Corp.*, 615 N.W.2d 425, 433 (Minn. Ct. App. 2000) (applying New York law and holding that without information on operating revenue, operating profit or book value of the transferred assets, "it is nearly impossible to weigh any of the factors that have been used by the courts to determine whether a corporation has transferred all or substantially all assets").

An analysis of operating revenues or operating profits was not applicable as ResCap's two primary revenue sources in 2008 were net financing revenues and gains on extinguishment of debt of $133 million and $1.925 billion, respectively. *See* Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2009), at 216.

As reported in its annual report on Form 10-K for the year ended December 31, 2008, the most recent annual filing before the 2009 Bank Transaction, ResCap's total assets as of that date had a book value of approximately $12.422 billion.[994] ResCap's total assets primarily were comprised of equity interests in its subsidiaries, intercompany receivables owed to ResCap by its subsidiaries, and additional assets including cash, accounts receivables and other assets.[995] The book value of ResCap's total assets as of December 31, 2008 are summarized below:

EXHIBIT VIII.C.5.a(3)(a)(i)(A)(ii)
**ResCap Total Assets**
As of December 31, 2008
*($ in Millions, rounded)*

| Total Assets | | Book Value 12/31/2008 |
| --- | --- | --- |
| Cash and cash equivalents | $ | 563 |
| Accounts receivable | | 49 |
| Intercompany loans receivable: | | |
| Note receivable from RFC | | 3,042 |
| Note receivable from GMAC Holding | | 2,610 |
| Subtotal | | 5,651 |
| | | |
| Investment in subsidiaries: | | |
| RFC Holding | | 1,970 |
| GMAC Holding | | 1,819 |
| Ally Bank | | 1,829 |
| Other | | 46 |
| Subtotal | | 5,664 |
| | | |
| Other assets | | 495 |
| | | |
| Total assets | $ | 12,422 |

*Source: ResCap HoldCo Balance Sheets Analysis, prepared by ResCap [EXAM00345975]; Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2009), at 215.*

---

[994]  Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2009), at 215. Given the holding in *Sharon Steel,* the quantitative analysis looked to ResCap's assets at the time AFI allegedly adopted the plan to liquidate—prior to the 2009 Bank Transaction—and compared them to the assets transferred at the end of 2009 and 2010.

[995]  *Id.*

The quantitative analysis considered both the book value and FMV of the assets transferred.[996] On a book value basis, ResCap's transfer of its interest in Ally Bank and the debt forgiveness transactions in 2009 resulted in an approximate 47.0% reduction in ResCap total assets and an approximate 51.6% reduction in ResCap's operating assets.[997] Alternatively, ResCap's transfer of its interest in Ally Bank and the debt forgiveness transactions that took place in 2009 and adding debt forgiveness transactions that took place in 2010 resulted in an approximate 52.0% to 57.1% reduction in ResCap's total assets and operating assets, respectively. The book value analysis can be found at Appendix VIII.C.6.c.

On a FMV basis, ResCap's transfer of its interest in Ally Bank and the debt forgiveness transactions that took place in either 2009 or in 2009 throughout 2010 resulted in an approximate 34.8% reduction in ResCap's total assets and an approximate 100% reduction in ResCap's operating assets. The FMV analysis can also be found at Appendix VIII.C.6.c.

In contrast to the book value analysis, the FMV analysis contained certain fair-value adjustments to ResCap's equity interest in its subsidiaries, Ally Bank, RFC Holding and GMAC Holding, and ResCap's intercompany receivables owed by RFC and GMAC Holding, and their subsidiaries, at December 31, 2008. Specifically, ResCap's equity interest in Ally Bank was reduced to $592 million, or the value of the IB Finance Preferred Interests and the Remaining IB Finance Class M Shares transferred in connection with the 2009 Bank Transaction.[998] ResCap's equity interests in RFC Holding and GMAC Holding, the holding companies of RFC and GMAC Mortgage, were valued at zero as the Examiner concluded that RFC and GMAC Mortgage each: (1) was balance sheet insolvent from December 31, 2007, through the Petition Date; (2) had unreasonably small capital (assets) from August 15, 2007, through the Petition Date; and (3) reasonably should have believed that it would incur debts beyond its ability to pay from August 15, 2007, through the Petition Date.[999] As a result of RFC's and GMAC Mortgage's insolvency, ResCap's intercompany receivables due from RFC and GMAC Holding, and their subsidiaries, were also impaired. See Section VI.E.3 for further discussion regarding financial distress of ResCap's subsidiaries. The FMV analysis can be found at Appendix VIII.C.6.c.

In light of the holding in *Sharon Steel,* a court may place less emphasis on qualitative factors in concluding that there has been no transfer of "substantially all" assets when less than 50% of a company's total and operating assets have been transferred. On the other hand,

---

[996] While most courts consider book value of the transferred assets, "[n]othing in New York law suggests that a court is limited to book value when evaluating a parent corporation's 100% equity interest in an operating subsidiary." *In re BankAtlantic Bancorp, Inc. Litig.*, 39 A.3d at 839 (the court, however, considered the book value of total assets given that it was a conservative metric).

[997] For purposes of this quantitative analysis, the operating assets include the equity interests in its subsidiaries and the intercompany receivables. It is not entirely clear whether the intercompany receivables would constitute "operating assets" in context of a "substantially all" analysis, but the analysis includes them for purposes of providing a conservative evaluation of the assets transferred.

[998] *See* Appendix V.A.2.d.(6). For purposes of this analysis, the midpoint of the range of value for the IB Finance Preferred Interests and the remaining IB Finance Class M Shares (non-marketable, non-controlling) at January 30, 2009 was utilized.

[999] *See* Section VI.E.2.

it is unclear as to what percentage over 50% will be so compelling to resolve the question of whether a transaction constitutes a transfer of "substantially all" assets based on quantitative factors alone. In *B.S.F. Co. v. Philadelphia Nat'l Bank,* the court held that the sale of a company's asset constituted a sale of "substantially all" assets because the asset comprised more than 75% of the corporation's total assets and was the only substantial income-producing asset.[1000] In *In re BankAtlantic Bancorp, Inc. Litigation,* the court held that a proposed sale transaction would constitute a transfer of "substantially all" of the corporation's assets because the transaction conveyed 85-90% of the corporation's assets and would transform completely the nature of the corporation's operations.[1001] The *B.S.F.* court and the *BankAtlantic* court both took into account the qualitative nature of the transferred assets despite the high percentage of the quantitative factors.

Similar to *Sharon Steel*, the book value of operating assets and total assets transferred by ResCap in 2009 fall within a range that is less than or barely above 50%. However, the quantitative analysis also took into account (1) the FMV of operating assets and total assets transferred in 2009 and (2) the book value and FMV of the operating assets and total assets transferred in 2009 through 2010. Combining the two different types of analyses changes the total range of percentages from thirty-four percent to one-hundred percent. This uncertainty does not present a clear quantitative conclusion. As a result, the Examiner weighed both the quantitative and qualitative factors as a totality.[1002]

"The guiding inquiry when evaluating a transaction qualitatively is whether the debtor 'would cease to operate the business to which, in practical effect the [noteholders] have looked for payment of the [notes].'"[1003] In ResCap's annual report for the year ended December 31, 2008, ResCap listed its businesses as including "the origination, purchase, servicing, sale and securitization of residential mortgage of loans."[1004] The transactions at issue did not alter the fundamental nature of ResCap's business. By the end of 2009, ResCap was conducting its operations through two operating businesses, its core originating and servicing business and its non-core asset business.[1005] ResCap's non-core asset management business included the legacy Principal Investment Activity, Business Capital Group, and International Business Groups.[1006] From a qualitative perspective, the evidence does not support the proposition that the transactions completely changed the nature of ResCap's operations. ResCap continued operating after the 2009 Bank Transaction substantially as before the sale.

---

[1000] *See B.S.F. Co. v. Philadelphia Nat'l Bank*, 204 A.2d 746, 750 (Del. 1964) (applying Pennsylvania law to determine whether a corporation transferred "substantially all" of its assets when it sold a substantial block of another company's stock).

[1001] *See In re BankAtlantic Bancorp, Inc. Litig.*, 39 A.3d at 838–42.

[1002] *See id.* at 838 ("In the typical case involving a significant sale, however, a court will need to weigh both quantitative and qualitative factors as a totality.").

[1003] *Id.* at 843 (Del. 2012) (applying New York law in evaluating whether the qualitative factors of a transaction).

[1004] *See* Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2009), at 3.

[1005] ResCap Consolidated Financial Statements for the Years Ended December 31, 2009 and 2008, at EXAM00124464 [EXAM00124455].

[1006] ResCap Consolidated Financial Statements for 2009, at EXAM11163041 [EXAM11163031].

Because the quantitative analysis on its own does not clearly demonstrate a transfer of "substantially all" assets and the character of the assets transferred did not transform the operations of ResCap, the Examiner concludes that it is more likely than not that a court would not find there was an actual breach of the "all or substantially all" covenant of the 2005 Indenture. Without an actual breach of the 2005 Indenture, the Unsecured Noteholders could not pursue a tortious interference with contract claim against AFI.

### (b) AFI's Intentional Procurement Of ResCap's Breach Of The 2005 Indenture Without Justification

Given that a court might find—contrary to the conclusion of the Examiner—that there was a breach of the "substantially all" covenant of the 2005 Indenture, the Investigation considered whether AFI could be found to have tortiously interfered with the contract by intentionally procuring ResCap's breach of the 2005 Indenture without justification. "[D]eliberate or intentional interference may be shown where the defendant is certain, or substantially certain, that his actions will result in a breach of contract."[1007] The Unsecured Noteholders must be able to show that AFI was at least substantially certain that its actions would result in a breach of the 2005 Indenture.[1008] If intentional procurement of the breach can be established, AFI may rebut liability for tortious interference by raising the economic interest defense, which would require AFI to show that it acted to protect its own legal or financial stake in the breaching party's business.[1009]

The Unsecured Noteholders allege that AFI intentionally procured, without justification, the breach of the "substantially all" covenant of the 2005 Indenture by dictating ResCap's role in the 2009 Bank Transaction and ordering ResCap to engage in the intercompany debt forgiveness transactions for AFI's ultimate benefit.[1010] Further, the Unsecured Noteholders

---

[1007] *High Falls Brewing Co., LLC v. Boston Beer Corp.*, 852 F. Supp. 2d 306, 311 (W.D.N.Y. 2011) ("The rule applies . . . to an interference that is incidental to the actor's independent purpose and desire but known to him to be a necessary consequence of his action.") (citing RESTATEMENT (SECOND) OF TORTS § 766, comment j (1979)); *see also In re Refco Inc. Sec. Litig.*, 826 F. Supp. 2d 478, 521 (S.D.N.Y. 2010) ("Whatever the Defendants might have intended by their alleged wrongs, their goal was not to cause a breach of contractual relations . . . [a]t best any breach . . . was a collateral effect of the Defendants' [actions]."); *Watt v. Jackson Hewitt Tax Serv. Inc.*, 675 F. Supp. 2d 274, 282 (E.D.N.Y. 2009) (citing *Innovative Networks, Inc. v. Young*, 978 F. Supp. 167, 180 (S.D.N.Y. 1997)).

[1008] *See High Falls Brewing Co., LLC*, 852 F. Supp. 2d at 311–12.

[1009] *White Plains Coat & Apron Co., Inc. v. Cintas Corp.*, 867 N.E.2d 381, 383 (N.Y. 2007); *see Felsen v. Sol Café Mfg. Corp.*, 24 N.Y.2d 682, 687 (N.Y. 1969) (noting that a corporation that has a financial interest in the business of another "is privileged to interfere with a contract with that . . . business had with a third person . . . to protect [its] own interest," as long as it does so without employing improper means); *Picard v. Chais (In re Bernard L. Madoff Inv. Secs. LLC)*, 440 B.R. 282, 294 (Bankr. S.D.N.Y. 2010) ("Under New York law, actions taken to protect an economic interest are justified and cannot give rise to a tortious interference with contract claim.").

[1010] Motion of Wilmington Trust, National Association, Solely in its Capacity as Indenture Trustee for the Senior Unsecured Noteholders Issued by Residential Capital, LLC for an Order Authorizing it to Prosecute Claims and Other Causes of Action on Behalf of the Residential Capital, LLC Estate [Docket No. 3475], Ex. B, at 48; Wilmington Trust Submission Paper, dated March 8, 2013, at 5–7.

claim that AFI's actions were unjustified because the transactions "were neither fair or on arm's length terms, were contrary to the promise [AFI] made in the Operating Agreement, and were improper means of promoting AFI's interests . . . at a time when AFI knew that the companies' respective interests in these transactions were diametrically opposed."[1011]

The Debtors and AFI assert that there is no evidence that AFI intentionally induced ResCap to breach the "substantially all" covenant of the 2005 Indenture because ResCap (1) forgave intercompany debt after written consent by the ResCap Board and (2) entered into the 2009 Bank Transaction based on advice from its independent advisors and approval by the ResCap board.[1012] To the extent AFI intentionally induced the breach, AFI and the Debtors argue that AFI was economically justified in doing so in order to protect "its interest in ResCap and/or advancing ResCap's own financial interests, and there has been no showing of malice, fraud, or illegality."[1013]

There is evidentiary support that AFI was aware of the "substantially all" covenant of the 2005 Indenture.[1014] The Investigation, however, did not uncover any evidence that AFI intended the 2009 Bank Transaction and the intercompany debt forgiveness to cause a breach of the 2005 Indenture. AFI's goal, to the extent the transactions could be aggregated as suggested by the Noteholders, was to acquire and maintain Ally Bank. The breach of the "substantially all" covenant of the 2005 Indenture was therefore a collateral effect of AFI's alleged role in the transactions. Even if AFI intentionally procured the breach, however, the Examiner concludes that it is likely that an economic interest defense would prevail.

In response to a tortious interference claim, a defendant may raise the economic interest defense to defeat a tortious interference claim if the defendant acted to protect its own legal or financial stake in the breaching party's business.[1015] Therefore, "where a third party has an 'economic interest' in an entity and interferes with an existing contractual relationship between the plaintiff and that entity, such interference is considered privileged."[1016] Liability

---

[1011] Motion of Wilmington Trust, National Association, Solely in its Capacity as Indenture Trustee for the Senior Unsecured Noteholders Issued by Residential Capital, LLC for an Order Authorizing it to Prosecute Claims and Other Causes of Action on Behalf of the Residential Capital, LLC Estate [Docket No. 3475], Ex. B, at 48.

[1012] *See* Debtors' Submission Paper, dated Jan. 7, 2013, at 31; *see* AFI Submission Paper, dated Dec. 19, 2012, at A-7.

[1013] AFI Submission Paper, dated April 12, 2013, at 21.

[1014] For instance, after Tessler suggested to De Molina that AFI consider exchanging ResCap notes held by AFI for ResCap's in IB Finance, De Molina responded that "perhaps the servicing business works in as well." E-mail from A. de Molina to L. Tessler (Aug. 9, 2008) [CCM00121378]. Tessler, however, noted that "[w]e can't hollow out all of ResCap or we are going to have a problem with Bonds." *Id*.

[1015] *See Howe v. Bank of N.Y. Mellon*, 783 F. Supp. 2d 466 (S.D.N.Y. 2011); *White Plains Coat & Apron Co. v. Cintas Corp*., 460 F.3d 281 (2d Cir. 2006); *Foster v. Churchill*, 665 N.E.2d 153 (N.Y. 1996).

[1016] *Id.* at 283 (citing *Foster*, 665 N.E.2d 153; *Felsen v. Sol Café Mfg. Corp.*, 24 N.Y.2d 682, 687 (1969)).

for tortious interference may still be imposed in spite of a defense of economic interest if it can be shown that the interfering party acted with malice or employed fraudulent or illegal means to procure the breach of contract.[1017]

A parent corporation is generally presumed to have an economic interest in its subsidiaries and its subsidiaries' contracts.[1018] The relationship between a parent and its subsidiary, however, is not enough to establish an economic justification; the parent must also establish that it acted to protect its economic interest.[1019] The case of *WMW Machinery Co., Inc. v. Koerber AG* is instructive. The case involved a corporation that acquired manufacturers who had exclusive distribution contracts with a certain distributor and then terminated the contracts. The court found such termination to be economically justified because the corporation, as parent to the manufacturers, had an economic interest in the manufacturers and that the distributor was not performing under the contract. Given that the corporation did not employ fraudulent or illegal means and did not act maliciously, the corporation's economic justification for the termination of the contracts precluded the distributor's claims of tortious interference with contract.[1020]

ResCap is a wholly-owned, indirect subsidiary of AFI.[1021] As its parent, AFI held an economic interest in ResCap during the 2009 Bank Transaction and throughout ResCap's intercompany debt forgiveness transactions. Before the 2009 Bank Transaction, it was apparent to AFI that it had to support ResCap if it wanted to preserve the full benefits of Ally

---

[1017] *Armstrong Pump, Inc. v. Hartman*, 745 F. Supp. 2d 227, 239 (W.D.N.Y. 2010) (citing *Foster*, 665 N.E.2d 153); *see also Howe v. Bank of N.Y. Mellon*, 783 F. Supp. 2d at 481 (citing *Vinas v. Chubb Corp.*, 499 F. Supp. 2d 427, 431 (S.D.N.Y 2007)) (noting that to the extent a defendant has an economic interest in the contract, a plaintiff must demonstrate that interference with the contract was malicious or involved conduct rising to the level of criminality or fraud."); *Shaker Loudon Assocs. v. Burlington Coat Factory Warehouse Corp.*, 1996 U.S. Dist. LEXIS 5228, at *3 (W.D.N.Y. Apr. 16, 1996) (holding that a complaint properly alleged malice on the part of a corporate parent by claiming that the parent interfered with its subsidiary's contract "without legal or moral justification . . . and an outrage warranting the imposition of punitive damages"); *Felsen v. Sol Café Mfg. Corp.*, 24 N.Y.2d 682, 687 (1969).

[1018] *See, e.g.*, *Multi-Juice, S.A. v. Snapple Beverage Corp.*, 2003 WL 1961636, at *4 (S.D.N.Y. Apr. 25, 2003) (citing *Koret Inc. v. Christian Dior, S.A.*, 161 A.D.2d 156, 157 (N.Y. App. Div. 1990)); *Koret, Inc.,* 161 A.D.2d at 157 (given the evidence that indicated that the parent interfered with its subsidiary's contract to protect its economic interest, the parent could not be liable for tortious interference with contract; *MTI/ Image Grp. v. Fox Studios E.,* 240 A.D.2d 400 (N.Y. Sup. Ct. 1997) (dismissing of a tortious interference with contract claim asserted against a parent company because the parent had an economic interest in the subsidiary's contract, the plaintiff failed to demonstrate malice, and the corporate agent who allegedly committed the tort also acted as agent for the subsidiary in negotiating and executing the underlying contract).

[1019] *MDC Corp. v. John H. Harland Co.*, 228 F. Supp. 2d 387, 39899 (S.D.N.Y. 2002) (citing *U.S. Fid. & Guar. Co. v. Petroleo Brasileiro S.A. Petrobras*, 2001 WL 300735, at *24 (S.D.N.Y. Mar. 27, 2001); *Preferred Health Care*, *Ltd. v. Empire Blue Cross & Blue Shield*, 1997 WL 160489, at *3 (S.D.N.Y. Apr. 7, 1997)).

[1020] *WMW Mach. Co., Inc. v. Koerber AG*, 658 N.Y.S.2d 385 (N.Y. Sup. Ct. 1997).

[1021] *See* Section III.B.1.

Bank and ensure its own survival.[1022] Without AFI's support, ResCap faced the possibility of failing to meet its TNW covenants.[1023] If ResCap or its operating subsidiaries defaulted on their TNW covenants, ResCap most likely would have been forced to file for bankruptcy.[1024] A bankruptcy filing by ResCap would have had a negative impact on AFI for several reasons. First, it could have required AFI to renegotiate its covenants with its lenders.[1025] In the environment at the time, AFI believed that it was highly uncertain whether renegotiation could be accomplished and, if so, at what price.[1026] AFI also believed that the failure to renegotiate could result in its own bankruptcy filing and the loss of substantial enterprise value.[1027]

Second, AFI believed that a bankruptcy filing by ResCap could jeopardize AFI's acquisition of Ally Bank. As described in more detail in Section V.A.1.c(1)., in December 2008, AFI considered acquiring ResCap's interest in IB Finance to facilitate approval of its bank holding application and to simplify Ally Bank ownership."[1028] AFI believed that a bankruptcy filing by ResCap would have interfered with AFI's future acquisition of Ally Bank.

As discussed above, the 2009 Bank Transaction and ResCap's intercompany debt forgiveness were intended to enable ResCap and its operating subsidiaries to meet their TNW covenants and liquidity needs.[1029] This enabled ResCap to avoid defaulting on its TNW covenants, thereby avoiding filing for bankruptcy, and AFI was able to acquire and maintain Ally Bank. The Examiner therefore concludes that the evidence supports the proposition that AFI had a legitimate business purpose and acted to protect its economic interest to the extent AFI procured the breach of the 2005 Indenture.

---

[1022] *See* Section V.A.1.c(1). The AFI Board considered that bankruptcy filing by ResCap could necessitate AFI to renegotiate its covenants with its lenders and, given the environment at the time, it was uncertain whether it could be accomplished and, if so, at what price. Material for a GMAC Board of Directors Meeting, dated Sept. 30, 2008, at 4 [ALLY_PEO_0003715]. To the extent AFI failed to renegotiate covenants, it could result in a bankruptcy proceeding by AFI and the loss of substantial enterprise value. *See id.*

[1023] Unanimous Consent to Action by the GMAC Board of Directors, dated Dec. 30, 2009, at ALLY_0115311 [ALLY_0114717]; Material for a GMAC Board of Directors Meeting, dated Sept. 30, 2008 [ALLY_PEO_0003715].

[1024] Unanimous Consent to Action by the GMAC Board of Directors, dated Dec. 30, 2009, at ALLY_0115311 [ALLY_0114717]; Material for a GMAC Board of Directors Meeting, dated Sept. 30, 2008 [ALLY_PEO_0003715].

[1025] Material for a GMAC Board of Directors Meeting, dated Sept. 30, 2008, at 4 [ALLY_PEO_0003715].

[1026] *Id.*

[1027] *Id.*

[1028] GMAC Bank Transaction Update for the Board of GMAC LLC, dated Sept. 29, 2008, at 1 [ALLY_0238653].

[1029] Unanimous Consent to Action by the GMAC Board of Directors, dated Dec. 30, 2009, at ALLY_0115311 [ALLY_0114717]; Material for a GMAC Board of Directors Meeting, dated Sept. 30, 2008 [ALLY_PEO_0003715].

Further, the Investigation did not uncover any evidence that AFI employed malice, fraud, or illegality in connection with the 2009 Bank Transaction and the intercompany debt forgiveness transactions.[1030] As noted in Section V.A.2, the Examiner found that neither the 2008 Bank Transaction nor the 2009 Bank Transaction resulted in ResCap receiving less than reasonably equivalent value or were a result of actual fraud or other illegality. In fact, the Examiner found that the value of the consideration received by ResCap with respect to the 2008 Bank Transaction and the 2009 Bank Transaction likely exceeded the value of the assets transferred by ResCap. With respect to the intercompany debt forgiveness transactions, the investigation did not uncover any evidence that AFI intended to injure ResCap or employed any fraudulent or illegal means to the extent AFI procured the breach of the 2005 Indenture. Instead, the available evidence supports the argument that the intercompany debt forgiveness transactions were done to ensure that ResCap's operating subsidiaries maintained their TNW covenants and liquidity needs for the benefit of ResCap and AFI.

The Examiner finds that the evidence does not support the proposition that AFI intentionally procured ResCap's breach of the "all or substantially all" covenant of the 2005 Indenture without justification and, therefore, the Examiner concludes it is unlikely that the Unsecured Noteholders tortious interference with contract claim against AFI would prevail.

### b. Claims Related To The 2006 Bank Restructuring

As summarized in Section VII.L.1.a, there are troubling facts and circumstances in connection with the 2006 Bank Restructuring,[1031] which raise questions concerning whether AFI complied with the 2005 Operating Agreement regarding that transaction. Pursuant to the analysis in Section V.A.2.b and as summarized in Section V.A.1.a(5), the Examiner has concluded that ResCap did not receive reasonably equivalent value in the 2006 Bank Restructuring, in large measure because ResCap was not compensated for the non-voting nature and other qualities of the IB Finance Class M Shares received by ResCap in the transaction.[1032] The Unsecured Noteholders are intended third-party beneficiaries of the 2005 Operating Agreement.[1033] This Section considers potential claims by the Unsecured

_____

[1030] *See* Section V.A.

[1031] For a more complete narrative concerning the 2006 Bank Restructuring, refer to Section V.A.1.a.

[1032] ResCap had a controlling interest in Old GMAC Bank; it received 2 million non-voting, non-controlling and relatively unmarketable tracking shares of IB Finance. *See* Section V.A.1.a. The FMV shortfall was between $390–465 million, and the difference in the equity value of Old GMAC Bank and the 2 million IB Finance Class M Shares was between $533 and $608 million. *See* Section V.A.2.b; Appendix V.A.2.b.

[1033] *See* 2005 Operating Agreement, § 11 [ALLY_0140795] ("The holders of Rated Indebtedness and any lenders under any credit facility under which ResCap is a borrower shall be deemed third party beneficiaries of this Agreement.").

Noteholders against AFI for breach of the 2005 Operating Agreement, or for tortiously interfering with it, as well as a potential claim against AFI for fraud.[1034]

### (1) Breach Of Contract

Potential bases for, and obstacles to, a claim by ResCap that AFI breached the 2005 Operating Agreement are outlined in Section VII.L.1.c. Certain of the obstacles discussed there would not apply to a claim by the Unsecured Noteholders, most notably, the doctrine of *in pari delicto* and the *Wagoner* rule. However, the Unsecured Noteholders nonetheless face what appears to be an insurmountable impediment to any contract claim predicated on the 2006 Bank Restructuring: the claim accrued no later than November 22, 2006.[1035] Unlike ResCap, the Unsecured Noteholders do not have the benefit of the two-year extension under Bankruptcy Code section 108.[1036] Consequently, it appears that the putative action would be time-barred under the governing six-year statue of limitations.[1037]

---

[1034] The Examiner considers it more likely than not that a court would find that injuries to the Unsecured Noteholders from the alleged wrongdoing in connection with the 2006 Bank Restructuring are particularized to them in light of their rights under the 2005 Operating Agreement, and that they would have standing to assert such claims. *See Fisher v. Apostolou,* 155 F.3d 876, 881 (7th Cir. 1998) (finding that a group of creditor-investors may be able to show particularized harm based on fraud, separate and distinct to each creditor); *Bankers Trust Co. v. Rhoades,* 859 F.2d 1096, 1100–01 (2d Cir. 1988) (holding that creditor that brought fraud-based claims against debtor's officers had standing to bring RICO claim, despite fact that debtor might also have suffered identical injury for which it had similar right); *Andrew Greenberg, Inc. v. Svane, Inc.,* 830 N.Y.S.2d 358, 361 (N.Y. App. Div. 2007) (holding that plaintiff-creditor's claims for tortious interference with contract and breach of contract alleged a "direct injury to property rights unique to plaintiff rather than the corporation or all of the creditors, and recovery of damages by the corporation would not rectify plaintiff's injury"); *Nw. Racquet Swim & Health Clubs, Inc. v. Deloitte & Touche*, 535 N.W.2d 612, 619 (Minn. 1995) (holding in an action by debenture noteholder for misrepresentation against auditor for insolvent debenture issuer, that the debenture noteholder's claims against auditor were not derivate, and finding that noteholder "also alleges specific misrepresentations in the audit report that affected [noteholder] directly in its decision to purchase the debentures"); *see also Larson v. Ernst & Young*, C3-94-2514, 1995 WL 434466, at *3 (Minn. Ct. App. July 25, 1995). Further, the Examiner concludes in Section VII.L.1 that it is more likely than not that the estate does not have the ability to pursue fraud and breach of contract claims arising under the 2005 Operating Agreement with respect to the 2006 Bank Restructuring. To the extent that such claims are not property of the estate, they are property of creditors. *See In re Bennett Funding Grp., Inc*., 336 F.3d 94, 102 (2d Cir. 2003) (citing *Shearson Lehman Hutton, Inc. v. Wagoner,* 944 F.2d 114, 120 (2d Cir.1991)).

[1035] The 2006 Bank Restructuring was approved unanimously by the ResCap Board members present at its November 20, 2006 meeting, and the ResCap Board granted a "waiver of the Operating Agreement" by resolution at that meeting. *See* Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Nov. 20, 2006, at RC40006839 [RC40006748]. The transaction closed on November 22, 2006. *See* Residential Capital, LLC, Current Report (Form 8-K) (Nov. 27, 2006), at 2.

[1036] *See* 11 U.S.C. § 108(a).

[1037] *See* 2005 Operating Agreement, § 13 [ALLY_0140795] (New York governing law); *see also* N.Y. C.P.L.R. § 213(2) (six-year limitations for actions on contract).

Accordingly, the Examiner concludes that it is unlikely that a claim by the Unsecured Noteholders against AFI for breach of the express terms of the 2005 Operating Agreement and/or the covenant of good faith and fair dealing thereunder, arising from the 2006 Bank Restructuring, would prevail.[1038]

### (2) Tortious Interference With Contract

As addressed in Section VII.L.1.d, "only a stranger can commit the tort of interference with contract."[1039] Accordingly, the Examiner concludes that it is unlikely that a claim by the Unsecured Noteholders against AFI for tortious interference with the 2005 Operating Agreement would prevail.

### (3) Fraud

Potential bases for, and obstacles to, a claim by ResCap against AFI for fraud arising from the 2006 Bank Restructuring are outlined in Section VII.L.1.b. Certain of the obstacles discussed there would not apply to a claim by the Unsecured Noteholders, most notably, the doctrine of *in pari delicto* and the *Wagoner* rule. The Unsecured Noteholders would nonetheless face a challenging obstacle to a fraud claim predicated on the 2006 Bank Restructuring: the difficulty of establishing the detrimental reliance-in-fact element necessary to prove a claim of fraud. It is possible that such a claim would be governed by the substantive tort law of New York, pursuant to which there may be an avenue to pursue a fraud claim under a "third-party reliance" theory, but the law is unsettled and it is uncertain whether the Unsecured Noteholders could successfully invoke third-party reliance.

### (a) New York Law Likely Would Apply If The Claim Were Brought In Minnesota; Minnesota Law Likely Would Apply If The Claim Were Brought In New York

As discussed below in Section VIII.C.5.b(3)(b), the viability of the Unsecured Noteholders' fraud claim against AFI may turn in part upon whether they can invoke New York's "third-party reliance" doctrine. The answer to that question may turn on where the claim is heard. The 2005 Operating Agreement has a New York governing law provision.[1040] A New York court would be unlikely to consider that provision in determining the law applicable to a fraud claim, however.[1041] "Under New York's 'interest analysis,' the important factors     determining     the     proper     law     to     apply     are     the

---

[1038] Remedies available to third-party beneficiaries are limited to "specific performance." 2005 Operating Agreement, § 11 [ALLY_0140795]. It may be possible on a showing of conduct that "smacks of intentional wrongdoing" to overcome such a limitation. *See* Section VI.L.1.c(4).

[1039] Dan B. Dobbs, Paul T. Hayden, and Ellen M. Bublick, The Law of Torts § 635 (2d ed. 2012).

[1040] 2005 Operating Agreement, § 13 [ALLY_0140795].

[1041] *See, e.g., BrandAid Mktg. Corp. v. Biss*, 03 CIV. 5088 (WHP), 2008 WL 190494, at *4 (S.D.N.Y. Jan. 22, 2008), *aff'd*, 08-0941-CV, 2009 WL 742077 (2d Cir. Mar. 23, 2009) ("While [the choice-of-law] provision is effective as to breach of contract claims, it does not apply to fraud claims, which sound in tort.") (quotation and citation omitted); *see also H.S.W. Enters., Inc. v. Woo Lae Oak, Inc.*, 171 F. Supp. 2d 135, 141 n.5 (Bankr. S.D.N.Y. 2001) (stating that unless expressly agreed upon by the parties or exceptionally broad, contractual choice-of-law provisions do not govern a cause of action sounding in tort).

parties' domiciles and the locus of the tort."[1042] Thus, where the parties are domiciled in different states, the place or location of the tort is "paramount."[1043] Accordingly, a court in New York is unlikely to conclude that New York law would apply to the Unsecured Noteholders' fraud claim against AFI, because New York is not meaningfully connected to the tort. Rather, as addressed in Section VII.L, a New York court likely would apply the substantive law of Minnesota to the claim.

Were the fraud claim brought in a Minnesota court, on the other hand, it is possible that the court would, in deference to the governing law provision of the 2005 Operating Agreement, find that the tort law of New York is applicable. Minnesota law recognizes that "tort claims 'rais[ing] issues of performance' under a contract . . . are governed by the contract's choice-of-law clause."[1044] Minnesota law also holds that it is the law of the forum state which determines the scope of a contract's governing law clause.[1045] Thus, if a fraud action against AFI were brought in Minnesota, a court would likely find that the law of Minnesota, and not that of New York, would determine the applicability to the claim of the New York governing law provision of the 2005 Operating Agreement. Given the entanglement of the fraud claim with the 2005 Operating Agreement, and the authority cited above, it is likely that a Minnesota court would find that the claim falls within the scope of the contract's governing law provision, and therefore that New York law would govern the fraud claim.[1046]

### (b) If The Claim Is Brought In Minnesota, The Unsecured Noteholders May Be Able To Show Reliance Based Upon New York Law

As described in the preceding section, if the Unsecured Noteholders brought a claim for fraud against AFI in a New York court, Minnesota law likely would apply. Conversely, if the

---

[1042] *BrandAid Mktg. Corp.*, 2008 WL 190494, at *4 (quotation and citation omitted); *see also Winter-Wolff Int'l, Inc. v. Alcan Packaging Food & Tobacco Inc.*, 499 F. Supp. 2d 233, 240 (E.D.N.Y. 2007) ("As the tort claim is not covered by the choice of law provision in the contract, this Court must apply New York's interest analysis which gives controlling effect to the law of the jurisdiction which, because of its relationship or contact with the occurrence or the parties, has the greatest concern with the specific issue raised in the litigation.") (quotation and citation omitted); *Krock v. Lipsay*, 97 F.3d 640, 646 (2d Cir. 1996) ("in all interest analyses, the significant contacts are, almost exclusively, the parties' domicile and the locus of the tort." (quotation and citation omitted)).

[1043] *Rosenberg v. Pillsbury Co.*, 718 F. Supp. 1146, 1150 (S.D.N.Y. 1989); *see also Winter-Wolff*, 499 F. Supp. 2d at 241.

[1044] *Ceres Envtl. Serv., Inc. v. Arch Specialty Ins. Co.*, 853 F. Supp. 2d 859, 865 (D. Minn. 2012); *see also Fla. State Bd. of Admin. v. Law Eng'g & Envtl. Serv., Inc.*, 262 F. Supp. 2d 1004, 1012–15 (D. Minn. 2003) (concluding under Minnesota law that contractual Florida choice of law provision applies to tort claims, including breach of fiduciary duty, negligence, and negligent misrepresentation, because they are all "closely related to the parties' contractual relationship").

[1045] *Ceres Envtl. Serv.*, 853 F. Supp. 2d at 866.

[1046] *See, e.g., Fla. State Bd. of Admin.*, 262 F. Supp. 2d at 1014 (finding that negligent misrepresentation claim was "closely related to defendant's performance of the contract because the allegation is premised upon plaintiff's allegation that the report defendant delivered pursuant to the contract did not accurately reflect the condition of the structure, the extent of project repair or the total cost of maintenance").

claim were brought in a Minnesota court, New York law is likely to apply because of the treatment under that state's law of the governing law provision of the 2005 Operating Agreement. This section considers the "reliance" element of a fraud claim under the law of both jurisdictions.

### (i)  The Elements Of Fraud

The elements of fraud under Minnesota law are: "(1) a false representation . . . of a past or existing material fact susceptible of knowledge; (2) made with knowledge of the falsity of the representation or made without knowing whether it was true or false; (3) with the intention to induce [plaintiff] to act in reliance thereon; (4) that the representation caused [plaintiff] to act in reliance thereon; and (5) that [plaintiff] suffered pecuniary damages as a result of the reliance."[1047] The elements of fraud under New York law are similar.[1048]

### (ii) Reliance Under Minnesota Law

As discussed in Section VII.L.1.b, certain facts and circumstances leading up to the November 20, 2006 ResCap Board resolution, which waived the 2005 Operating Agreement in connection with the 2006 Bank Restructuring, raise concerns as to whether representations by AFI through its agents to the Independent Directors in connection with that transaction were fraudulently incomplete and misleading. "A representation is not actionable unless the plaintiff in fact relies upon it. To rely, the plaintiff must enter a transaction in whole or part because of the representation."[1049] The Unsecured Noteholders arguably suffered pecuniary damages as a result of the 2006 Bank Restructuring, inasmuch as ResCap received much less than reasonably equivalent value.[1050] Yet, because it does not appear that any misrepresentations were actually made to the Unsecured Noteholders, it is unlikely that they can meet the usual requirement of "reliance-in-fact."[1051]

The law of Minnesota incorporates such a requirement as an element of proof for a claim of fraud. "Under Minnesota law, one of the elements of a claim of fraudulent misrepresentation is 'communication of the false statement to plaintiff.'"[1052] Thus, a fraud claim "cannot survive unless the alleged misrepresentation was actually repeated to a person to whom the defendant intends or has reason to expect to have it repeated."[1053]

---

[1047] *Valspar Refinish, Inc. v. Gaylord's, Inc.*, 764 N.W.2d 359, 368 (Minn. 2009).

[1048] *See* Section VII.L.1.b.

[1049] DAN B. DOBBS, PAUL T. HAYDEN, AND ELLEN M. BUBLICK, THE LAW OF TORTS § 671 (2d ed. 2012).

[1050] *See* Section V.A.2.b; Appendix V.A.2.b.

[1051] DAN B. DOBBS, PAUL T. HAYDEN, AND ELLEN M. BUBLICK, THE LAW OF TORTS § 671 (2d ed. 2012).

[1052] *Bank of Montreal v. Avalon Capital Grp., Inc.*, No. 10-591 (MJD/AJB), 2012 WL 1110691, at *7 (D. Minn. Apr. 3, 2012) (citations omitted).

[1053] *Id.* (citations and internal quotation marks omitted); s*ee also LaFleche v. Clark Prods., Inc.*, No. 05-2549 MJD/AJB, 2007 WL 2023564, at *15 (D. Minn. July 9, 2007) (determining that the plaintiff could not assert a fraud claim based on a representation that was made by the defendant to a third-party but was not transmitted to the plaintiff before he entered into an agreement with the defendant).

As the above quotation suggests, however, Minnesota law allows for a degree of indirect reliance in some instances such that "a defendant may be liable for making fraudulent misrepresentations to a third party if it intended or had reason to expect that they would be communicated to the plaintiff and influence the plaintiff's conduct."[1054] An example of such a "chain of reliance" fraud occurred when an accounting firm made misrepresentations to the Commissioner of Insurance regarding a firm's financial condition and, in reliance on the representations, the Commissioner made a further representation to plaintiff regarding the solvency of the subject firm.[1055]

That decision and similar cases have been described as applying "in limited circumstances,"[1056] but even such a "chain of reliance" rubric is in accord with the Restatement view, and is not in derogation of the usual reliance-in-fact requirement:

> The maker of a fraudulent misrepresentation is subject to liability for pecuniary loss to another who acts in justifiable reliance upon it if the misrepresentation, although not made directly to the other, is made to a third person and the maker intends or has reason to expect that its terms will be repeated or its substance communicated to the other, and that it will influence his conduct in the transaction or type of transaction involved.[1057]

Because the Investigation did not uncover evidence to suggest that any of the arguably fraudulent misrepresentations described in Section VII.L.1.b were made to or relied upon by the Unsecured Noteholders, whether directly or indirectly, it appears that the Unsecured Noteholders likely would be unable to establish a claim of fraud against AFI under Minnesota law.

### (iii) Third-Party Reliance Under New York Law

New York law, however, may recognize a more expansive "third-party reliance" doctrine, which "operates as an exception to the normal justifiable reliance element of common law fraud," whereby a plaintiff alleging fraud can "show that a third-party relied

---

[1054] *Corporate Comm'n of Mille Lacs Band of Ojibwe Indians v. Money Ctrs. of Am., Inc.*, No. 12-1015 (RHK/LIB), 2012 WL 5439170, at *7 (D. Minn. Nov. 7, 2012) (citations omitted).

[1055] *See Bonhiver v. Graff*, 248 N.W.2d 291, 298–301 (Minn. 1976).

[1056] *Nat'l City Bank v. Coopers & Lybrand,* 409 N.W.2d 862, 869 (Minn. 1987); *see also Dakota Bank v. Eiesland,* 645 N.W.2d 177, 178–79 (Minn. Ct. App. 2002) (defendant accountants knew that their financial statements contained false information and that the bank would rely on these financial statements in determining whether to loan money to accountant's client); *see generally* RESTATEMENT (SECOND) OF TORTS § 552 (1977).

[1057] RESTATEMENT (SECOND) OF TORTS § 533 (1977); *see also Corporate Comm'n of Mille*, 2012 WL 5439170, at *5–7 (citing § 533 of the RESTATEMENT and noting limited circumstances in which "indirect fraud" is actionable).

upon a misrepresentation by the defendant, which resulted in injury to the plaintiff."[1058] For example, in one recent case, plaintiff patentee sued defendant (a competitor) whom it alleged "fraudulently placed a false patent number" on its products, which were sold to the public.[1059] In seeking dismissal, defendant argued that plaintiff failed to plead reliance on any alleged misrepresentation. The court, denying the motion to dismiss, stated that: "While [defendant] is correct that Plaintiffs never pled their own reliance on misrepresentations, New York allows plaintiffs to bring claims based on a theory of third party reliance. . . . [I]t is clear that the Plaintiffs are claiming that customers relied on . . . the false patent number, when buying Defendants' products. . . [and] Plaintiffs were harmed by customers' reliance on Defendants' misstatements."[1060]

In New York, the third-party reliance doctrine has a somewhat checkered history. In 1998, the Second Circuit Court of Appeals rejected the notion of third-party reliance, viewing it as an incorrect statement of New York law.[1061] But a 2012 decision from the Southern District of New York concluded that the New York Court of Appeals would "allow recovery for common law fraud based on third party reliance,"[1062] explicitly calling into "further doubt" the aforementioned Second Circuit decision.[1063]

Moreover, although the New York Court of Appeals has not considered the question since the 19th century,[1064] the Appellate Division of the New York Supreme Court has in modern cases determined that a plaintiff's fraud claim can exist "where a false representation is made to a third party, resulting in injury to the plaintiff."[1065] Within the past several months,

---

[1058] *Prestige Builder & Mgmt. LLC v. Safeco Ins. Co. of Am.*, No. 12 Civ. 1947(ILG)(LB), 2012 WL 4801769, at \*3 (E.D.N.Y. Oct. 10, 2012) (footnote omitted) (citation omitted).

[1059] *See My First Shades v. Baby Blanket Suncare*, No. 08-CV-4599 (MKB), 2012 WL 6675118, at \*10 (E.D.N.Y. Dec. 21, 2012).

[1060] *Id.* at \*11; *see also Buxton Mfg. Co., Inc. v. Valiant Moving & Storage Inc.*, 657 N.Y.S.2d 450, 451 (N.Y. App. Div. 1997) (denying summary judgment on fraud claim against defendant, a prime contractor, whose allegedly fraudulent progress payment certification to customer resulted in customer releasing funds which would otherwise have been available to pay plaintiff).

[1061] *Cement & Concrete Workers Distr. Council Welfare Fund v. Lollo*, 148 F.3d 194, 196–97 (2d Cir. 1998).

[1062] *Chevron Corp. v. Donziger*, 871 F. Supp. 2d 229, 256–57 (S.D.N.Y. 2012) (citing cases and noting that in the 1800's the New York Court of Appeals "held not once, but three times, that a claim for common law fraud may rest on third-party reliance").

[1063] *Chevron*, 871 F. Supp. 2d at 257 (citing *Cement & Concrete*, 148 F.3d 194); *see also Prestige*, 2012 WL 4801769, at \*5 ("The third-party reliance doctrine is good law in New York.").

[1064] *See Eaton, Cole & Burnham Co. v. Avery*, 83 N.Y. 31, 33–34 (1880); *Rice v. Manley*, 66 N.Y. 82, 87 (1876); *Bruff v. Mali*, 36 N.Y. 200, 205–06 (1867).

[1065] *Buxton Mfg.*, 657 N.Y.S.2d at 451 (citations omitted); *see also Litvinov v. Hodson*, 905 N.Y.S.2d 400, 401 (N.Y. App. Div. 2010).

however, a U.S. District Court, noting that in 2008 "the Second Circuit settled the matter,"[1066] stated that "New York law is ambivalent as to whether reliance by a third party is sufficient to support a fraud claim."[1067]

Whether in fact the Second Circuit has "settled the matter" is unclear. As noted, there are 2012 District Court decisions (from both the Southern and Eastern Districts of New York) supporting the third-party reliance doctrine. Moreover, despite the Second Circuit's expressed opposition to the third-party reliance doctrine under New York law, that court has also in recent years summarily affirmed at least two cases from the Eastern District of New York and the Southern District of New York that referenced the third-party reliance doctrine as valid under New York law.[1068]

Finally, in 2013, a U.S. District Court denied a motion for an order certifying for interlocutory appeal the question of "whether New York law permits a claim for fraud based on injury suffered as a result of detrimental reliance by a person other than the plaintiff."[1069] In determining that an interlocutory appeal would not materially advance the case, the court recognized that the Second Circuit has stated "that New York law does not permit fraud claims based on third party reliance."[1070] Nevertheless, in the same decision, the court emphasized that the New York Court of Appeals is the ultimate decision maker on issues of New York law and stated that New York does in fact recognize fraud claims based on third-party reliance.[1071]

### (iv) Whether A Minnesota Court Would Apply New York's Third-Party Reliance

Given the conflicting authority, it is unclear in general whether even a court sitting in New York would consider the third-party reliance doctrine valid. It is similarly unclear, therefore, how a court sitting in Minnesota, but applying New York law, would treat this question.

---

[1066] *Chapin Home for the Aging v. McKimm,* No. 11-CV-667 (FB)(RER), 2013 WL 948110, at *3 (E.D.N.Y. Mar. 11, 2013) (citing *City of N.Y. v. Smokes-Spirits.com*, 541 F.3d 425, 454 (2d Cir. 2008), *rev'd and remanded on other grounds*, *Hemi Group, LLC v. City of N.Y.*, 559 U.S. 1 (2010)).

[1067] *Chapin Home for the Aging,* 2013 WL 948110, at *2.

[1068] *See O'Brien v. Argo Partners, Inc.*, 736 F. Supp. 2d 528, 537 (E.D.N.Y. 2010) (citation omitted), *aff'd*, 426 F. App'x 36 (2d Cir. 2011); *Liberty Life Assurance Co. of Bos. v. Bahan*, No. 09 Civ. 4715(JRS), 2010 WL 3431147, at *2 n.4 (S.D.N.Y. Aug. 23, 2010) (citations omitted), *aff'd,* 441 F. App'x 21 (2d Cir. 2011).

[1069] *Chevron Corp. v. Donziger,* No. 11 Civ. 0691(LAK), 2013 WL 98013, at *1, 5 (S.D.N.Y. Jan. 7, 2013) (footnote omitted).

[1070] *Chevron Corp.*, 2013 WL 98013, at *3.

[1071] *See id.*

*(c) The Statute Of Limitations Applicable To This Claim Is Likely Tolled By A Discovery Rule*

As addressed in Section VII.L.1.b, both New York and Minnesota have six-year statutes of limitations for fraud claims.[1072] The Unsecured Noteholders are not entitled to the benefit of the two-year extension under the Bankruptcy Code.[1073] Under Minnesota law, the limitations period does not begin to run until "the discovery by the aggrieved party of the facts constituting the fraud."[1074] However, it is plaintiff's burden to establish that it could not have discovered the facts any sooner than within six years of when the action is commenced.[1075]

Pursuant to the Uniform Conflict of Laws-Limitations Act,[1076] as adopted in Minnesota, if a court in that state determines that the Unsecured Noteholders' fraud claim is governed by the law of New York, then Minnesota will also apply New York's statute of limitations.[1077] New York law holds that a claim for fraud is timely if commenced either within six years of the date the fraud occurs, or within two years of the date the fraud is discovered or through reasonable diligence should have been discovered, whichever is longer.[1078] The question of when a fraud reasonably should have been or could have been discovered is a mixed question of fact and law under New York law.[1079]

New York courts employ a two-step test to determine the accrual date of the two-year discovery rule: "whether and when the plaintiff had (1) inquiry notice and (2) constructive knowledge of the alleged fraud."[1080] The inquiry notice requirement protects a plaintiff "who has no reason to suspect that he has been defrauded."[1081] Once the plaintiff is on inquiry notice, the limitations period will begin running when plaintiff is "aware of enough operative facts so that, with reasonable diligence, he could have discovered the fraud."[1082]

---

[1072] *See* N.Y. C.P.L.R. § 213(8); MINN. STAT. § 541.05, subdiv. 1(6) (2012).

[1073] *See* 11 U.S.C. § 108(a).

[1074] MINN. STAT. § 541.05, subdiv. 1(6).

[1075] *Alliance Bank v. Dykes*, No. A12-0455, 2012 Minn. App. Unpub. LEXIS 1253, at *44 (Minn. Ct. App. Dec. 31, 2012) (citing *Jane Doe 43C v. Diocese of New Ulm*, 787 N.W.2d 680, 684 (Minn. Ct. App. 2010)), *review denied*, 2013 Minn. LEXIS 166 (Minn. Mar. 19, 2013),; *see also Veldhuizen v. A.O. Smith Corp.*, 839 F. Supp. 669, 675–76 (D. Minn. 1993) (limitation period begins to run when plaintiff is "aware of facts sufficient to put a reasonable person on notice that a fraud claim may exist").

[1076] UNIF. CONFLICT OF LAWS-LIMITATIONS ACT § 2, U.L.A. (1982).

[1077] *See* MINN. STAT. § 541.31, subdiv. 1(a)(1).

[1078] *See Liberty Co. v. Boyle*, 708 N.Y.S.2d 122, 125 (N.Y. App. Div. 2000); *Bobash, Inc. v. Festinger*, No. 03908/05, 839 N.Y.S.2d 431, at *3 (Table) (N.Y. Sup. Ct. Mar. 30, 2007), *appeal dismissed as academic*, 868 N.Y.S.2d 747 (N.Y. App. Div. 2008); *see also* N.Y. C.P.L.R. § 213(8).

[1079] *See Saphir Int'l, SA v. UBS PaineWebber Inc.*, 807 N.Y.S.2d 58, 59 (N.Y. App. Div. 2006). Under Minnesota law it is considered a question of fact. *See Barry v. Barry*, 78 F.3d 375, 380 (8th Cir. 1996).

[1080] *Kelly v. Legacy Benefits Corp.*, 950 N.Y.S.2d 608, at *7 (N.Y. Cty. 2012).

[1081] *Id.* (citation and quotation omitted).

[1082] *Id.*

The operative facts concerning a possible fraud regarding the 2006 Bank Restructuring likely occurred in the time frame between May 5, 2006—the date of Eric Feldstein's memorandum to the Independent Directors[1083]—and November 22, 2006, when the 2006 Bank Restructuring was executed, two days after approval by the Independent Directors.[1084] The accrual date for a fraud claim is, therefore, likely not later than November 22, 2006. If the New York limitations period applies, the action became time-barred not later than November 22, 2012, unless the Unsecured Noteholders did not discover or, with reasonable diligence, could not have discovered the fraud. In that case an action on the fraud must be commenced not later than two years after actual or constructive knowledge.[1086]

"The test as to when fraud should with reasonable diligence have been discovered is an objective one. . . . [W]here the circumstances are such as to suggest to a person of ordinary intelligence the probability that he has been defrauded, a duty of inquiry arises, and if he omits that inquiry when it would have developed the truth, and shuts his eyes to the facts which call for investigation, knowledge of the fraud will be imputed to him."[1087]

Notably, within a few days of the transaction, ResCap filed a public report addressing the 2006 Bank Restructuring.[1088] That report included the "Purchase and Assumption Agreement between [Old GMAC Bank] and GMAC Automotive Bank" executed on November 22, 2006, and related that "ResCap's board of directors (including both [I]ndependent [D]irectors) unanimously waived compliance with the provisions of the Operating Agreement."[1089] It also disclosed that the transfer of Old GMAC Bank was for book value, and that ResCap satisfied a $360 million capital call immediately after the transfer.[1090] Additionally, the report disclosed the nature of ResCap's interest in the newly formed IB Finance:

> Immediately following the P&A Transaction, [AFI] contributed all of its shares of GMAC Automotive Bank to [AFI's] wholly-owned subsidiary, IB Finance Holding Company LLC, a newly created limited liability holding company

---

[1083] *See* Memorandum, Proposed Restructuring of GMAC U.S. Banking Entities, dated May 5, 2006 [EXAM10258913] (attached to E-mail from K. Sabatowski to T. Melzer and T. Jacob (May 4, 2006) [EXAM10258912]).

[1084] Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Nov. 20, 2006, at RC40006839 [RC40006748].

[1085] *See* Walker Report [RC40008925].

[1086] *See Gutkin v. Siegal*, 926 N.Y.S.2d 485, 486 (N.Y. App. Div. 2011).

[1087] *Id.* (quotations and citations omitted).

[1088] *See* Residential Capital, LLC, Current Report (Form 8-K) (Nov. 27, 2006). Further, pursuant to the 2005 Operating Agreement, following the waiver, ResCap was required to "provide each Class Agent and Bank Agent a copy of any amendment or waiver." 2005 Operating Agreement, § 8 [ALLY_0140795].

[1089] Residential Capital, LLC, Current Report (Form 8-K) (Nov. 27, 2006), at 2.

[1090] *Id.*

subsidiary of [AFI]. ResCap purchased certain non-voting interests in IB Finance Holding Company LLC from [AFI] for $1.161 billion pursuant to an Equity Purchase Agreement. [AFI] retained the voting interests in IB Finance Holding Company LLC.[1091]

Thus, substantial public information was available regarding the 2006 Bank Restructuring at the time the transaction occurred.

Nonetheless, without access to some or all of the key documents, such as David Marple's memorandum,[1092] David Applegate's memorandum,[1093] Feldstein's note to the Independent Directors,[1094] Marple's responses to the Independent Directors' questions,[1095] and the Walker Report,[1096] it seems unlikely that the Unsecured Noteholders could have had actual knowledge of a fraud. Further, while the Investigation has not focused on communications between ResCap or AFI on the one hand, and the Unsecured Noteholders on the other hand, nor on what other sources of information may have been available to the Unsecured Noteholders, the Investigation has not revealed circumstances which would have put the Unsecured Noteholders on notice of a possible fraud, nor has it revealed circumstances suggesting that the Unsecured Noteholders should be charged with constructive knowledge of a possible fraud.

The Examiner therefore concludes that, while a close question, it is more likely than not that a statute of limitations defense would not prevail as to a claim by the Unsecured Noteholders against AFI for fraud arising from the 2006 Bank Restructuring.

### (d) Conclusion As To Fraud Claim

While the facts surrounding the 2006 Bank Restructuring raise serious concerns, a claim by the Unsecured Noteholders against AFI for fraud would nonetheless face difficult challenges. Such a claim would have little chance of success unless the court concludes that the "third-party reliance" doctrine remains good law in New York and is applicable to the Unsecured Noteholders' claim. But the state of the law on this rarely invoked doctrine is entirely unsettled. Further, even if one concludes that the Unsecured Noteholders have a

---

[1091] *Id.*

[1092] Memorandum, GMAC Bank Restructuring, dated Apr. 20, 2006 [EXAM11248642].

[1093] Memorandum, ILC Ownership and Control, dated Apr. 24, 2006 [EXAM11248641].

[1094] Memorandum, Proposed Restructuring of GMAC U.S. Banking Entities, dated May 5, 2006 [EXAM10258913] (attached to E-mail from K. Sabatowski to T. Melzer and T. Jacob (May 4, 2006) [EXAM10258912]).

[1095] Memorandum, GMAC Bank Restructuring, dated May 12, 2006 [ALLY_0401600].

[1096] Walker Report [RC40008925].

compelling case on the remaining issues (including the statute of limitations and the other aspects of a fraud claim addressed above and in Section VII.L.1.b), resolution of those issues in the Unsecured Noteholders' favor is not certain. Accordingly, weighing these considerations and all the facts and circumstances, the Examiner concludes that, while it is a close question, it is more likely than not that the Unsecured Noteholders' fraud claim would not prevail.

Were a fraud action viable, damages could be substantial, likely amounting to not less than the FMV shortfall of between $390 to $465 million,[1097] and perhaps as much as the difference between the equity value of ResCap's interest in Old GMAC Bank, which it transferred, and the equity interest in IB Finance, which it received, i.e., between $533 and $608 million.[1098]

## D. POTENTIAL ALLEGED DAMAGES

### 1. Disclosed Alleged Damages

The Examiner Scope Approval Order provides that the Examiner should "solicit the parties' views concerning . . . the potential amount of damages arising from [Third-Party Claims], but . . . not attempt to independently quantify such damages."[1099] Consistent with that directive, the Examiner's Professionals solicited damages information from Third-Party Claimants in the Examiner's September 21, 2012 letter requesting Submission Papers and Examiner's Counsel's December 21, 2012 letter requesting Damages Letters.[1100] Where parties declined the Examiner's requests for information, the Examiner's Professionals collected information from Third-Party Claimants' various complaints and proofs of claim filed in the Debtors' Chapter 11 Cases.[1101] Consistent with the Examiner Scope Approval Order,[1102] however, the Examiner's Professionals did not independently calculate such damages information.

As a general matter, the damages information received and compiled by the Examiner relates to those Third-Party Claims that have progressed to litigation. While pending litigation likely represents only a subset of the potential universe of Third-Party Claims, the Investigation has not identified every RMBS investor or mortgage borrower potentially

---

[1097] *See* Section V.A.2.b; Appendix V.A.2.b. These figures take into account $143 million on the value received side, accounting for the avoidance of a credit rating downgrade. *See id.*

[1098] *See* Section V.A.2.b; Appendix V.A.2.b.

[1099] *See* Examiner Scope Approval Order at 5.

[1100] *See* Section VIII.A.2. These letters are attached as Appendices VIII.A—3 and VIII.A—4, respectively.

[1101] While the proofs of claim filed in the Chapter 11 Cases may be more reflective of claims against the Debtors than against the AFI Defendants, many of the Third-Party Claimants filed proofs of claim that include allegations against the AFI Defendants or simply attach RMBS Action complaints that contain similar accusations against the AFI Defendants. Accordingly, certain of the proofs of claim appear to be relevant to the AFI Defendants' potential liability as well as to the Debtors' potential liability.

[1102] *See* Examiner Scope Approval Order, at 5.

affected by the Debtors and the AFI Defendants' conduct (nor could the Investigation have done so). Accordingly, the alleged damages disclosed to the Examiner likely represent only a portion of the potential claims that could be asserted against the AFI Defendants. Given the outstanding principal balance and the estimated lifetime losses of the Debtors' RMBS, which as of March/April 2012 were $62.4 billion and $43.8 billion, respectively, such further potential damages could be substantial.[1103]

In response to the Examiner's Professionals' solicitations, the plaintiffs in the RMBS Actions have reported approximately $6.3 billion in alleged damages against AFI and the Debtors on account of the Debtors' issuance of RMBS and the AFI Defendants' purported role therein.[1104] Alleged damages relating to the D&O RMBS Actions, which are largely on account of the same conduct as the RMBS Actions and have been pleaded as components thereof, are included within those damages disclosures. Additionally, plaintiffs in the Non-RMBS Actions have reported approximately $987.5 million in alleged damages, almost all of which reflects the damages asserted in *Rothstein v. GMAC Mortgage*.[1105] Finally, the Unsecured Noteholders assert that their potential Causes of Action are worth in excess of $1 billion.[1106]

### a.   Additional Factors Relevant To Potential RMBS Claims Damages

It is important to note that the potential Third-Party Claims damages assertable against Ally Securities and Ally Bank may be limited in certain respects. As discussed in Sections VIII.C.2.b and VIII.C.2.c, liability is asserted directly against these entities on account of their role in the securitization process—i.e., Ally Securities as underwriter and Ally Bank as loan originator/funder and custodian. Accordingly, any potential damages assertable against these entities are likely limited by the number of securitizations in which they participated and the original or outstanding principal balance of those securitizations.

Ally Bank, as loan originator, purchaser, and warehouse financer, contributed loans to 124 GMAC Mortgage and RFC securitizations, in the approximate aggregate amount of $16 billion in original deal balance.[1107] In connection with the RMBS Trust Settlement Agreements, the Debtors estimated the lifetime losses on each of their 392 securitizations.[1108]

---

[1103] *See* PLS Trust Spreadsheet [EXAM00339947]. In some cases, claims that have not yet been pleaded may be time-barred. *See, e.g.*, Section VIII.C.a.1 (discussing the statutes of limitations for securities law claims). In other circumstances, additional Third-Party Claimants may elect to join an existing class action or may be able to invoke other arguments that would support the tolling of applicable statutes of limitations. In any event, as a practical matter, the Investigation was only able to solicit damages information from readily identifiable Third-Party Claimants, namely the plaintiffs in the RMBS and Non-RMBS Actions.

[1104] *See* Appendix VIII.D.1.

[1105] *See* Appendix VIII.D.1; Damages Letter from M. Strauss (Jan. 11, 2013).

[1106] *See* Appendix VIII.D.1. This estimate corresponds with the aggregate outstanding amount of the Unsecured Notes. *See* Wilmington Trust Submission Paper, dated Oct. 24, 2012, at 1.

[1107] *See* PLS Trust Spreadsheet [EXAM00339947].

[1108] *See id.*

In that analysis, the portion of the securitizations' losses attributable to Bank loans is approximately $2.8 billion.[1109] However, it is likely that this amount overstates the losses properly allocable to the Bank's loans, because the allocation assumes that loans purchased from the Bank performed the same as all other loans in the pertinent securitization. While data was not available to evaluate the performance of particular groups of loans within the Debtors' securitizations, the Debtors have noted that "[h]istorically Bank production was high credit quality, which could lead to better performance."[1110] Accordingly, the losses attributable to Bank loans are likely less than $2.8 billion. This amount relates to both Old GMAC Bank and Ally Bank because their respective losses cannot be segregated based on the available data. However, given that a majority of these securitizations were completed before the 2006 Bank Restructuring, much of these losses are likely attributable to Old GMAC Bank.

In terms of the Bank's custodial role, Old GMAC Bank served as original loan custodian for twenty-eight GMAC Mortgage securitizations and Ally Bank served as original loan custodian for six GMAC Mortgage securitizations, together representing an aggregate original principal balance of approximately $21.7 billion.[1111]

Ally Securities served as lead or joint lead underwriter on 105 of the Debtors' 392 PLS deals, representing an original principal balance of approximately $57.2 billion.[1112] Ally Securities served as a co-underwriter on an additional 131 PLS deals.[1113] However, RMBS Claims against Ally Securities may be limited by the amount of assets it has available to satisfy potential judgments. As of December 31, 2012, Ally Securities had assets of approximately $14.5 million, liabilities of approximately $2.8 million, and net equity of approximately $11.7 million.[1114] The Investigation has revealed no evidence of indemnification rights of Ally Securities against AFI for claims in connection with Ally Securities' underwriting role.[1115] However, the Investigation has identified certain recent transfers by Ally Securities to AFI that may give rise to fraudulent transfer liability. These transactions are discussed in Section VIII.D.5.

---

[1109] *See id.*

[1110] *Id.* at Disclaimer/Note 6 [EXAM00339947].

[1111] *See* Appendix VIII.B—3.

[1112] *See* Appendix VIII.B—2.

[1113] *See* Appendix VIII.B—1, n.2.

[1114] Ally Securities LLC Financial Statements as of and for the Year Ended Dec. 31, 2012, Supplementary Schedules as of the Year Ended Dec. 31, 2012, at 3 [ALLY_0424625].

[1115] In response to a request to AFI's counsel to provide the Examiner with indemnification agreements in connection with Ally Securities' underwriting role, AFI's counsel provided a sample underwriting agreement, which provides for: (1) indemnification by the issuer and master servicer (the Debtors) in favor of the underwriters (including Ally Securities) and their directors, officers, and any person controlling them within the meaning of section 15 of the Securities Act or section 20 of the Exchange Act; and (2) indemnification by the underwriters in favor of the issuer and master servicer and their directors, officers, and any person controlling them within the meaning of section 15 of the Securities Act or section 20 of the Exchange Act. *See* Underwriting Agreement, dated Aug. 29, 2007 [ALLY_0402298]. AFI's counsel confirmed that no other indemnification arrangements exist between Ally Securities and AFI.

### b. Additional Factors Relevant To Potential Non-RMBS Claims Damages

The substantial majority of the damages asserted with respect to the Non-RMBS Actions come from *Rothstein v. GMAC Mortgage*.[1116] There, the plaintiffs assert approximately $971 million in damages.[1117] As discussed in Section VIII.C.4.b, those claims are currently the subject of a motion in the Bankruptcy Court, brought by AFI and Ally Bank, to enjoin the prosecution of alter-ego claims by anyone other than by representatives of the Debtors' estates.[1118] To the extent that motion succeeds, the alleged damages associated with the Non-RMBS Actions (at least as disclosed to the Examiner) would likely become negligible as compared with the RMBS Actions and the Unsecured Noteholders' Causes of Action.

### 2. Release Of Third-Party Claims

Given the Examiner's conclusion that the proposed consideration under the AFI Settlement and Plan Sponsor Agreement would not have been adequate to support a release of the Debtors' Estates' claims against AFI,[1119] it follows that the Examiner also concludes that the proposed $750 million cash contribution is inadequate to secure the additional release of Third-Party Claims.[1120]

### 3. Transfer Of Liability In Connection With The Sale Of Ally Bank

In November 2006, ResCap and AFI completed a restructuring of their U.S. banking entities. Pursuant to that restructuring, Old GMAC Bank transferred substantially all of its assets and liabilities to GMAC Automotive Bank, an industrial bank then wholly owned by AFI. ResCap's equity in Old GMAC Bank was then sent by dividend to GM, thus removing the entity from Cerberus, AFI, and ResCap's ownership. Old GMAC Bank subsequently changed its name from "GMAC Bank" to "National Motors Bank FSB," and was eventually voluntarily dissolved in February 2009. Contemporaneously, AFI contributed 100% of its interests in GMAC Automotive Bank to a newly created limited liability holding company, IB Finance. AFI retained an interest in IB Finance that entitled AFI to earnings and distributions from the automotive division of GMAC Automotive Bank, while ResCap purchased an interest in IB Finance that represented a non-voting economic interest in the mortgage division of GMAC Automotive Bank.[1121]

The Purchase and Assumption Agreement entered into between Ally Bank and Old GMAC Bank in connection with the 2006 Bank Restructuring expressly stated that Ally Bank only assumed the liabilities set forth on a schedule to the agreement and not any other

---

[1116] Case No. 12-03412 (S.D.N.Y. 2012).

[1117] Damages Letter from M. Strauss (Jan. 11, 2013), at 1.

[1118] *See* Section VIII.C.4.b.

[1119] *See* Sections I.I, IX.B (discussing the merits of AFI's proposed $750 million cash contribution in connection with the AFI Settlement and Plan Sponsor Agreement).

[1120] *See* Section IX.C.

[1121] For a more detailed explanation of these transactions, see Section V.A.1.

liabilities.[1122] There is no provision in the schedules to the Purchase and Assumption Agreement that relate to general tort liability or contractual obligations under the custodian agreements between Old GMAC Bank and GMAC Mortgage.[1123] Additionally, the Examiner has concluded that it is unlikely that a court would find that Ally Bank is the successor in liability of Old GMAC Bank.[1124] Accordingly, there appears to be limited basis for holding Ally Bank responsible for the potential liabilities of Old GMAC Bank.

### 4.  Transfer Of Liability In Connection With The Sale Of Ally Securities

During the period 2004 through 2007 when Ally Securities was an underwriter of the securities at issue, Ally Securities was a direct subsidiary of RFC. It was incorporated on February 17, 1989 as a Delaware corporation, under the name Residential Funding Securities Corporation[1125] and was registered with the National Association of Securities Dealers, Inc. on June 6, 1990.[1126]

On June 1, 2006, Ally Securities was converted to a Delaware limited liability company, under the name Residential Funding Securities, LLC[1127] and continued to be owned by RFC.[1128] Under Delaware law, assets and liabilities automatically carry over from converted former corporations to new limited liability companies,[1129] and the existence of a limited liability company is deemed to have commenced on the date that the converted former corporation was incorporated.[1130] As such, all liabilities of Residential Funding Securities Corporation continued to be liabilities of Residential Funding Securities, LLC.

---

[1122] *See* Purchase and Assumption Agreement, dated Nov. 20, 2006, § 2.3 [ALLY_PEO_0021066].

[1123] *See id.*, Scheds. B, C (listing (1) the contracts assigned from Old GMAC Bank to Ally Bank and (2) the Old GMAC Bank liabilities assumed by Ally Bank). As explained in Section VIII.C.2.c, the Old GMAC Bank's custodial obligations were "repapered" with Ally Bank after the 2006 Bank Restructuring.

[1124] *See* Section VII.L.2.a(1)(a)(i).

[1125] Certificate of Incorporation of Residential Funding Securities Corporation, dated Feb. 17, 1989 [ALLY_0402297].

[1126] Residential Funding Securities Policies and Supervisory Procedures Manual, updated Mar. 30, 2007, at 6 [EXAM12503903].

[1127] Ally Securities' name was changed from Residential Funding Securities, LLC to Ally Securities LLC effective Aug. 1, 2011. Certificate of Amendment, dated Aug. 1, 2011, filed July 25, 2011 [ALLY_0402275]. While it was Residential Funding Securities, LLC and Residential Funding Securities Corporation, it did business as "GMAC RFC Securities" and was internally referred to as "GRS." Dep. of J. Getchis, Apr. 21, 2011, at 26:16–27:8 [MBIADEP0000278]; Dep. of D. Crosson, Apr. 20, 2011, at 5:4–15 [MBIADEP0000500].

[1128] Certificate of Conversion to Limited Liability Company, dated June 1, 2006 [ALLY_0402360]; Limited Liability Company Agreement, dated June 1, 2006, Sched. A [ALLY_0402277].

[1129] DEL. CODE ANN. tit. 6, § 18-214(f) (2013).

> [A]ll debts, liabilities and duties of the other entity that has converted shall remain attached to the domestic limited liability company to which such other entity has converted, and may be enforced against it to the same extent as if said debts, liabilities and duties had originally been incurred or contracted by it in its capacity as a domestic limited liability company.

[1130] *Id.* § 18-214(d).

RFC owned Ally Securities[1131] until May 1, 2009,[1132] when AFI purchased all of the membership interests of Ally Securities from RFC pursuant to a Membership Interest and Share Purchase Agreement dated March 31, 2009.[1133] In a transfer of membership interests, the purchaser takes ownership of the limited liability company, and the limited liability company continues to own its assets and retains its liabilities (rather than the purchaser acquiring specific assets and/or liabilities). The liabilities of Ally Securities continued to be retained by Ally Securities and are its own liabilities rather than those of its member (i.e., AFI).[1134]

Generally, pursuant to a purchase agreement the seller and purchaser will be subject to certain representations and warranties for a certain period of time. The Membership Interest and Share Purchase Agreement contained certain representations and warranties by RFC as seller, including relating to liabilities and obligations, material contracts, and litigation and representations and warranties by AFI as purchaser relating to authority, membership certificates, consents and approvals, financing, and brokers and finder's fees.[1135] RFC and AFI agreed to indemnify each other for certain breaches of the representations and covenants in the Membership Interest and Share Purchase Agreement.[1136] The indemnification provisions generally survived only until the 24-month anniversary of the closing date (i.e., until May 1,

---

[1131] Limited Liability Company Agreement, dated June 1, 2006, Sched. A [ALLY_0402277].

[1132] Residential Funding Securities, LLC Financial Statements and Supplementary Schedules, Dec. 31, 2009, at 7 [FHFA-AS-0314518].

[1133] Membership Interest and Share Purchase Agreement between Residential Funding Company, LLC and GMAC LLC, dated Mar. 31, 2009 [RC00026472]; Assignment and Assumption of Limited Liability Company Interests, dated May 1, 2009 [EXAM00339023]. See Section V.F.4.g for a discussion of the terms of the sale of Ally Securities.

[1134] DEL. CODE ANN. tit. 6, § 18-303(a). Except in certain circumstances as set forth in chapter 18 (the Delaware Limited Liability Company Act):

> debts, obligations and liabilities of a limited liability company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the limited liability company, and no member . . . shall be obligated personally for any such debt, obligation or liability of the limited liability company . . . solely by reason of being a member . . . .

The exceptions set forth in the chapter relate to contributions and distributions prior to or upon dissolution. *Id.* §§ 18-502, 607. See also Ally Securities' Limited Liability Company Agreement, specifically providing that:

> [e]xcept as otherwise provided by the Act, the debts, obligations and liabilities of [Ally Securities], whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of [Ally Securities], and [AFI] shall not be obligated personally for any such debt, obligation or liability of [Ally Securities] solely by reason of being a member of [Ally Securities].

Limited Liability Company Agreement, dated June 1, 2006, § 9 [ALLY_0402277].

[1135] Membership Interest and Share Purchase Agreement between Residential Funding Company, LLC and GMAC LLC, dated Mar. 31, 2009, Art. 3, 4 [RC00026472]; Disclosure Letter from RFC (Mar. 31, 2009) [ALLY_0127990].

[1136] Membership Interest and Share Purchase Agreement between Residential Funding Company, LLC and GMAC LLC, dated Mar. 31, 2009, §§ 8.2, 8.3 [RC00026472].

2011).[1137] Notwithstanding this limitation, the Membership Interest and Share Purchase Agreement contained an exception in the event of a representation or warranty that constituted fraud, in which case such breach would not be subject to the indemnification basket, cap, or any other limitation set forth in the Membership Interest and Share Purchase Agreement.[1138] The Investigation has revealed no evidence that AFI has asserted, or contemplates asserting, any claims against RFC for indemnification under the Membership Interest and Share Purchase Agreement.[1139] The Investigation has revealed no evidence that RFC would have an indemnification claim against AFI under the Membership Interest and Share Purchase Agreement.[1140]

### 5.  Potential Fraudulent Conveyance Exposure Of Ally Securities

#### a.  Ally Securities Recapitalizes In 2011, Ceases Operations In 2012, And Makes Dividend Payments To AFI

In April 2011, Ally Securities sought and obtained authority from the Financial Industry Regulatory Authority to recapitalize and resume previous trading levels and underwriting activity.[1141] Ally Securities also requested authority to become an eligible member of the Ginnie Mae Real Estate Mortgage Investment Conduits securities underwriting group.[1142] In connection with this grant of authority and resumption of trading activities, Ally Securities received a capital contribution in the amount of $175 million from AFI in July 2011.[1143] AFI also contributed $50 million of Ally Securities' subordinate debt in exchange for capital.[1144]

---

[1137] *Id.*

[1138] *Id.* § 8.9.

[1139] AFI Submission Paper, dated Dec. 19, 2012. No proofs of claims for indemnification under the Membership Interest and Share Purchase Agreement were filed by AFI.

[1140] Indemnification for breaches of representations that constitute fraud survived the 24-month post-closing period but AFI's representations were limited to those relating to authority, membership certificates, consents and approvals, financing, and brokers and finder's fees. Membership Interest and Share Purchase Agreement between Residential Funding Company, LLC and GMAC LLC, dated Mar. 31, 2009, Art. 4, §§ 8.3, 8.9 [RC00026472].

[1141] *See* Letter to the Financial Industry Regulatory Authority (May 16, 2011) [ALLY_0424717]; *see also* Letter to the Financial Industry Regulatory Authority (Apr. 7, 2011) [ALLY_0424724]. Prior to 2011, Ally Securities' mortgage trading operations had not recovered to pre-2007 levels.

[1142] Ally Securities LLC Presentation on Capital Reduction, dated Apr. 2012, at 3 [ALLY_PEO_0094439].

[1143] Ally Securities LLC Financial Statements as of and for the Year Ended Dec. 31, 2011, Supplementary Schedules as of the Year Ended Dec. 31, 2011, at 13 [FHFA-AS-0314565]; E-mail from P. Lagermasini (Dec. 19, 2012) [ALLY_0434973]; *see also* Letter to Financial Industry Regulatory Authority from Ally Securities (Apr. 7, 2011) [ALLY_0424724] (providing that "[t]he purpose of the Recapitalization [was] to (x) position RFS to resume its previous levels of trading and underwriting operations, (y) to meet GAAP equity thresholds such that RFS would become an eligible member of [Ginnie Mae's] securities underwriting group, and (3) to strengthen RFS as a credit counterparty to institutional investors").

[1144] Ally Securities LLC Financial Statements as of and for the Year Ended Dec. 31, 2011, Supplementary Schedules as of the Year Ended Dec. 31, 2011, at 13 [FHFA-AS-0314565]; E-mail from P. Lagermasini (Dec. 19, 2012) [ALLY_0434973].

Nine months later in April 2012, Ally Securities paid a dividend in the amount of $200 million to AFI in connection with its decision to cease all mortgage operations.[1145] In a letter to the SEC and Financial Industry Regulatory Authority, Ally Securities explained that it had decided to exit all mortgage-related securities underwriting and trading activities.[1146] Ally Securities represented to the SEC and the Financial Industry Regulatory Authority that following the distribution, Ally Securities would have adequate excess net capital to continue its then-current operations and to meet its obligations to its creditors.[1147] In August 2012, Ally Securities made another dividend payment to AFI in the amount of $25.5 million.[1148] In an August 2012 letter to the SEC and Financial Industry Regulatory Authority, Ally Securities stated that the amount of excess net capital remaining after the August 2012 dividend payment would be sufficient to meet the obligations of the firm to its creditors.[1149]

---

[1145] *See* Ally Securities LLC Financial Statements as of and for the Year Ended Dec. 31, 2012, Supplementary Schedules as of the Year Ended Dec. 31, 2012, at 10 [ALLY_0424625]; E-mail from P. Lagermasini (Dec. 19, 2012) [ALLY_0434973]; *see also* E-mail from S. Polimene (Apr. 13, 2012), at ALLY_0424621 [ALLY_0424620] (Financial Industry Regulatory Authority approving Ally Securities' $200 million dividend payment to AFI); Ally Securities LLC Consent to Action, Apr. 11, 2012 [ALLY_0424624] (Board of Directors consent to payment of $200 million distribution to AFI).

[1146] Letter to SEC and Financial Industry Regulatory Authority (Apr. 10, 2012) [ALLY_0424689].

[1147] *See id.* at ALLY_0424689; *see also* Ally Securities LLC Presentation on Capital Reduction, dated Apr. 2011, at 3 [ALLY_PEO_0094439] ("[Ally Securities] is overcapitalized to the extent that [Ginnie Mae] issuance is less relevant as a percentage of the revenue stream. . . . GMAC Mortgage [Ginnie Mae] loan production has decreased by ~50% since 2010, which has reduced the need and ability for [Ally Securities] to distribute this product through Agency CMO securitization.").

[1148] *See* E-mail from P. Lagermasini (Dec. 19, 2012) [ALLY_0434973]; Letter to SEC and Financial Industry Regulatory Authority (Aug. 20, 2012), at ALLY_0434974 [ALLY_0434974] ("Please be advised that . . . Ally Securities . . . has determined to make a distribution of excess net capital to its parent and sole member, [AFI] . . . in the amount of $25,500,000."); *see also* Ally Securities LLC Consent to Action, Aug. 17, 2012 [ALLY_0434979] (Board of Directors consent to payment of $25.5 million distribution to AFI).

[1149] *See* Letter to SEC and Financial Industry Regulatory Authority (Aug. 20, 2012), at ALLY_0434975 [ALLY_0434974].

### b. *Financial Condition Of Ally Securities At The Time Of The April 2012 And August 2012 Transfers*

During 2012, Ally Securities ceased all mortgage-related trading activities and as of December 31, 2012 no longer held financial instruments.[1150] At year-end 2012, Ally Securities had total assets of $14,451,620 (essentially cash), total liabilities of $2,773,500 (primarily a payable to affiliate), and total members' equity of $11,678,120.[1151] Exhibit VIII.D.5.b shows its total assets, total liabilities and total equity for the years 2004 through 2012:

EXHIBIT VIII.D.5.b
**Ally Securities LLC – Balance Sheet Information**
2004 – 2012

|  | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
|---|---|---|---|---|---|---|---|---|---|
| Total Assets | $1,021,435,917 | $550,864,201 | $1,441,869,041 | $285,945,782 | $96,772,985 | $110,480,802 | $124,581,493 | $695,170,481 | $14,451,620 |
| Total Liabilities | 935,795,910 | 461,089,404 | 1,345,727,356 | 217,557,799 | 50,759,449 | 78,775,374 | 94,212,416 | 446,998,195 | 2,773,500 |
| Total Equity | 85,640,007 | 89,774,797 | 96,141,685 | 68,387,983 | 46,013,536 | 31,705,428 | 30,369,077 | 248,172,286 | 11,678,120 |

*Source: FHFA-AS-0314592; FHFA-AS-0314471; FHFA-AS-0314430; FHFA-AS-0314450; FHFA-AS-0314492; FHFA-AS-0314518; FHFA-AS-0314542; FHFA-AS-0314565; ALLY_0424625.*

The Examiner's Professionals attempted to pinpoint the exact amount of assets and liabilities held by Ally Securities at the time of the transfers. However, the Examiner's Professionals were unable to identify financial statements for the dates surrounding the April and August 2012 transfers. Accordingly, the Examiner's Professionals attempted to estimate Ally Securities' financial condition at the time of the transfers.

On April 16 and August 20, 2012, Ally Securities made transfers of $200 million and $25.5 million to AFI, respectively. Because the transfers were made after Ally Securities had ceased any trading activities,[1152] the Examiner's Financial Advisors used the remaining total capital on April 16 and August 20 as a proxy for Ally Securities' total equity on those

---

[1150] Ally Securities LLC Financial Statements as of and for the Year Ended Dec. 31, 2012, Supplementary Schedules as of the Year Ended Dec. 31, 2012, at 8 [ALLY_0424625].

[1151] *Id.* at 3.

[1152] Trading activity would "cease at the end of the week of April 9th." Market Risk Committee Presentation on Ally Financial & Ally Bank, dated Apr. 17, 2012, at EXAM00014087 [EXAM00014072].

dates.[1153] Letters from Ally Securities to the SEC and Financial Industry Regulatory Authority note that Ally Securities' total capital following the April 16 and August 20 transfers was $49.5 million[1154] and $16.3 million,[1155] respectively.

### c. *The Dividend Payments Are Likely To Be Constructive Fraudulent Transfers*

The Examiner concludes that it is likely that a constructive fraudulent transfer claim with respect to the April 2012 and August 2012 dividend payments from Ally Securities to AFI would prevail. The April 2012 and August 2012 payments satisfy all of the elements of a constructive fraudulent transfer: the transfers were made by Ally Securities while insolvent and for less than reasonably equivalent value.

#### (1) Solvency

As stated above, at the time of the April 2012 dividend payment, Ally Securities' assets exceeded its fixed liabilities by approximately $49.5 million. As of the August 2012 transfer, assets exceeded fixed liabilities by approximately $16.3 million. As of April 2012, Ally Securities was a defendant in ten RMBS-related lawsuits, three of which had survived a motion to dismiss at that time.[1156] These lawsuits alleged that plaintiffs had suffered billions of dollars in damages because of Ally Securities' actions.[1157] Prior to the August 2012 dividend payment, another five RMBS-related lawsuits were filed against Ally Securities, and two other cases survived motions to dismiss.

In evaluating a debtor's insolvency, both present and contingent assets and liabilities are to be considered, so long as the contingency is capable of reasonable estimation and provided

---

[1153] This appears to be a fair approximation of total equity. Ally Securities financial statements of the year-ended December 31, 2011 reflected total equity of $248.1 million and total capital of $247.2 million and Ally Securities had a net loss of $11 million for the year-ended Dec. 31, 2012. Ally Securities, LLC Financial Statements as of and for the Year Ended Dec. 31, 2011, Supplementary Schedules as of the Year Ended Dec. 31, 2011, at 19 [FHFA-AS-0314565]. Total capital was computed on Ally Securities' supplemental schedules by adjusting total equity for items specified by the SEC. Adjustments include deductions for ownership equity not allowable for net capital, the addition of liabilities subordinated to claims of general creditors allowable in computation of net capital and other deductions and credits. *See* SEC Form X-17A-5 Financial and Operational Combined Uniform Single Report, Part II, at 11, http://www.sec.gov/about/forms/formx-17a-5_2.pdf.

[1154] *See* Letter to SEC and Financial Industry Regulatory Authority (Apr. 10, 2012), at ALLY_0424689 [ALLY_0424689]

[1155] *See* Letter to SEC and Financial Industry Regulatory Authority (Aug. 20, 2012), at ALLY_0434974 [ALLY_0434974].

[1156] Three other claims have survived similar motions since, while several others await decisions on a motion to dismiss.

[1157] These lawsuits and their relative merits are discussed in more detail in Section VIII.C.2.b.

that such contingent assets or liabilities are properly discounted.[1158] "It makes no difference whether the firm has a contingent asset or a contingent liability; the asset or liability must be reduced to its present, or expected, value before a determination can be made whether the firm's assets exceed its liabilities."[1159] Under these circumstances, a court would have to determine the expected value of Ally Securities' RMBS-related lawsuits as of the April 2012 and August 2012 dividend payments. Given that some of these claims had passed the pleading stage, and that AFI, the Debtors and certain other parties in interest were discussing a global settlement of these and other massive claims at the time of the April 2012 transfer, it is reasonable to assume that Ally Securities would have ascribed at least some value to these actions. While the Examiner has not quantified the potential liabilities for these lawsuits, in light of the significant alleged damages, the Examiner concludes that a reasonable quantification of these liabilities would likely overwhelm Ally Securities' $49.5 million in equity as of the April 2012 transfer as well as the $16.3 million as of the August 2012 transfer, and that the evidence supports the proposition that Ally Securities was insolvent at both the April 2012 and August 2012 transfers.[1160]

### (2) Reasonably Equivalent Value

The Examiner concludes that it is likely that the April 2012 and August 2012 discretionary dividend payments to AFI were not made for reasonably equivalent value. Numerous courts have held that dividends paid to members of a limited liability company are not made for value.[1161] Ally Securities was under no obligation, contractually or otherwise, to

---

[1158] *Mellon Bank, N.A. v. Official Comm. of Unsecured Creditors of R.M.L., Inc.* (*In re R.M.L., Inc.*), 92 F.3d 139, 156 (3d Cir. 1996) ("[I]f a debtor's treatment of an item as an 'asset' depends for its propriety on the occurrence of a contingent event, a court must take into consideration the likelihood of that event occurring from an objective standpoint."); *In re Xonics Photochemical, Inc.*, 841 F.2d 198, 200 (7th Cir. 1988) ("By definition, a contingent liability is not certain—and often is highly unlikely—ever to become an actual liability. To value the contingent liability it is necessary to discount it by the probability that the contingency will occur and the liability will become real."). A complete discussion of the valuation of contingent assets and liabilities for solvency purposes can be found in Section VI.5.

[1159] *In re Xonics Photochemical, Inc.*, 841 F.2d at 200.

[1160] *See also In re Xonics Photochemical, Inc.*, 841 F.2d at 200 ("[An] asset or liability must be reduced to its present, or expected, value before a determination can be made whether the firm's assets exceed its liabilities."). As stated, nearly any quantification of these liabilities would render Ally Securities insolvent for fraudulent transfer purposes.

[1161] *E.g., Fisher v. Hamilton* (*In re Teknek, LLC*), 343 B.R. 850, 861 (Bankr. N.D. Ill. 2006) (holding that dividend paid to limited liability company members was not a transfer for reasonably equivalent value); *see Michaelson v. Farmer* (*In re Appleseed's Intermediate Holdings, LLC*), 470 B.R. 289, 300 (D. Del. 2012) ("Defendants have not persuaded the Court that a voluntarily disbursed dividend to preferred shareholders, even if some payments are a return of capital, constitutes reasonably equivalent value. Defendants do not suggest that Debtors were otherwise required to return the capital . . . ."); *United States v. Rocky Mountain Holdings, Inc.*, 782 F. Supp. 2d 106, 122–23 (E.D. Pa. 2011) (nothing that equity interests are not debt, thus "limited partnership distributions do not qualify as 'antecedent debt' constituting an exchange 'for value'"); *Freeland v. Enodis Corp.* (*In re Consol. Indus. Corp.*), 2006 WL 3136924, at *8 (N.D. Ind. 2006); *Sherman v. FSC Realty* (*In re Brentwood-Lexford Partners, LLC*), 292 B.R. 255, 267 (Bankr. N.D. Tex. 2003); *Pereira v. Equitable Life Ins. Soc'y of the U.S.* (*In re Trace Int'l Holdings, Inc.*), 289 B.R. 548, 557 (Bankr. S.D.N.Y. 2003).

make either the April 2012 dividend payment or the August 2012 dividend payment. Thus, as these were discretionary dividends to AFI which did not satisfy any antecedent debt or otherwise provide value to Ally Securities, a court would likely conclude that this payment was made for less than reasonably equivalent value.

> ### d. Whether The Dividend Payments Constitute An Actual Fraudulent Transfer Is A Close Question

The Examiner concludes that, while a close question, it is more likely than not that an actual fraudulent transfer claim with respect to the April 2012 and August 2012 dividend payments would also prevail.[1162] A transfer may be avoided if the transferor made the transfer with the actual intent to hinder, delay or defraud its present or future creditors.[1163] Courts have generally held that actual fraudulent intent must be proven by clear and convincing evidence, which may be inferred from the circumstances surrounding the transaction.[1164] This inference

---

[1162] While it is possible that creditors could bring fraudulent transfer actions against Ally Securities in several jurisdictions, the laws of the states most relevant to the analysis, Delaware (the state of incorporation of Ally Securities) and Minnesota (the principal place of business of Ally Securities), both of which have incorporated the UFTA, are substantially the same for the purposes herein. Even if a party in interest sought to apply the law of a jurisdiction which had incorporated the UFCA, such as New York, the actual fraud analysis, as well as the solvency and reasonably equivalent value analyses under the different acts are essentially the same. *See, e.g.*, *Nisselson v. Empyrean Inv. Fund, L.P.* (*In re MarketXT Holdings Corp.*), 376 B.R. 390, 420 n.42 (Bankr. S.D.N.Y. 2007) (noting that "there is no dispute that Federal and State law are virtually identical as to their requirements for proving a constructive fraudulent conveyance"). Additionally, though there are various laws addressing fraudulent transfers, they share many similarities and, as such, case law interpreting one law is often used by courts in analyses of the other laws. *See, e.g.*, *Sharp Int'l Corp. v. State St. Bank & Trust Co.* (*In re Sharp Int'l Corp.*), 403 F.3d 43, 55 (2d Cir. 2005) (citing *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 634 n.8 (2d Cir. 1995)) (noting "New York's policy in favor of national uniformity in UFCA law"); *HBE Leasing Corp.*, 48 F.3d at 634 n.8 ("In order to promote a uniform national interpretation of the UFCA, both this Circuit and the courts of New York have encouraged recourse to the case law of other jurisdictions."). As the transactions occurred within the last 13 months, there are no statute of limitation issues. Thus, the Examiner has not engaged in a choice of law analysis.

[1163] *See, e.g.*, UFTA § 4(a)(1); N.Y. DEBT. & CRED. LAW § 276.

[1164] *See, e.g.*, *HBE Leasing Corp.*, 48 F.3d at 639; *In re Dreier LLP*, 452 B.R. 391, 408 (Bankr. S.D.N.Y. 2011) ("[C]ourts have recognized that allegations of circumstantial evidence are sufficient to establish fraudulent intent, because the trustee's lack of personal knowledge is compounded with complicated issues and transactions which extend over lengthy periods of time.") (internal citations and quotation marks omitted).

can be made by relying on "badges of fraud."[1165] The April 2012 and August 2012 dividend payments implicate several badges of fraud. The transfers, which comprised substantially all of Ally Securities' property,[1166] were made: (1) for no consideration (as discussed above); (2) between a parent and its wholly owned subsidiary; (3) while Ally Securities was likely insolvent (as discussed); and (4) under the threat of massive pending litigation. Thus, there are a number of badges of fraud present.

Additionally, the general chronology of events and circumstances surrounding the transfers supports an inference of fraud. From April 2011 to August 2012, the outlook for Ally Securities grew progressively worse. Ally Securities faced mounting litigation, with more parties filing RMBS-related complaints as time progressed. Additionally, as noted above, plaintiffs began to have some success in their litigation, defeating several motions to dismiss. Both AFI and the Debtors were aware of this, as there is evidence that the parties viewed the equity of Ally Securities as having little value just prior to the April 2012 dividend payment. At a meeting that took place on or about March 23, 2012, Michael Carpenter, CEO of AFI, outlined various restructuring alternatives for ResCap, one of which included a contribution of all of the equity of Ally Securities, in addition to cash and other considerations. According to John Mack, a ResCap Board director, the "ancillary items," including the equity of Ally Securities, "ultimately didn't really have value."[1167] Gary Lee of Morrison & Foerster also stated that the perception was that the cash was the only thing of value in the settlement offer.[1168] Lee further stated that "it was ResCap's view that the value of Ally Securities was functionally zero and maybe even a negative number."[1169] After Carpenter attempted to include Ally Securities in a settlement offer, and it was refused as adding little or no value,

---

[1165] These may include, but are not limited to:

> (1) the lack or inadequacy of consideration; (2) [a] close associate relationship between the parties; (3) the retention of possession, benefit or use of the property in question; (4) the financial condition of the party that made the transfer or obligation both before and after the transaction in question; (5) the existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; and (6) the generally chronology of events and transactions under inquiry.

> *Le Café Creme, Ltd. v. Le Roux* (*In re Le Café Creme, Ltd.*), 244 B.R. 221, 239 (Bankr. S.D.N.Y. 2000) (citing *Salomon v. Kaiser* (*In re Kaiser*), 722 F.2d 1574, 1582–83 (2d Cir. 1983)); *see also Kelly v. Armstrong*, 206 F.3d 794, 798 (8th Cir. 2000) (noting badges of fraud may also include "(1) actual or threatened litigation against the debtor; (2) a transfer of all or substantially all of the debtor's property; (3) insolvency on the part of the debtor; (4) a special relationship between the debtor and the transferee; and (5) retention of the property by the debtor after the transfer").

[1166] *See* Letter to SEC and Financial Industry Regulatory Authority (Apr. 10, 2012), at ALLY_0424689 [ALLY_0424689] ("[T]his amount represents approximately 96.49% of the excess capital of Ally Securities . . . .").

[1167] Dep. of J. Mack, Nov. 14, 2012, at 97:4–8.

[1168] *See* Int of G. Lee, Feb. 20, 2013, at 264:6–266:9.

[1169] *Id.* at 265:24–266:1. This settlement offer is more fully discussed in Section III.J.

less than a month later Ally Securities began transferring substantially all of its "excess capital" to AFI. This chronology, together with the presence of multiple badges of fraud, can constitute "conclusive evidence of an actual intent to defraud."[1170]

This inference of actual fraudulent intent may be negated by a legitimate business purpose.[1171] As noted above, Ally Securities has stated that it made the April 2012 and August 2012 transfers because it had "made the decision to exit all mortgage-related securities underwriting and trading activities."[1172] Thus, the payments were a "return of capital . . . devoted to the mortgage-related securities activities, including the $175 million . . . in capital that [AFI] invested in Ally Securities in 2011 in order to permit Ally Securities to become a Ginnie Mae [Real Estate Mortgage Investment Conduits] underwriter."[1173] The presence of this potential legitimate business purpose creates a close question. However, given the multiple badges of fraud and circumstances described above, the Examiner concludes that, while a close call, it is more likely than not that a court would find the strong inference of fraudulent intent outweighs the stated business purpose. Accordingly, the April 2012 and August 2012 dividend payments may be recovered by creditors of Ally Securities as actual fraudulent transfers.

### e. It Is Unlikely That The Dividend Payments Would Be Unlawful Dividends

The Examiner concludes that it is unlikely that a court would determine that the April 2012 dividend payment and the August 2012 dividend payment would constitute unlawful dividends. "Under Delaware law, the directors of a corporation may declare and pay a dividend to the shares of its capital stock only out of the corporation's surplus."[1174] "A corporation's surplus is 'the excess of net assets over the par value of the corporation's issued stock.'"[1175] "Net assets are the amount by which total assets exceed total liabilities."[1176] Accordingly, whether the dividend payments would be considered unlawful would turn on a determination of whether the dividend payments came out of the corporate surplus of Ally

---

[1170] *Picard v. Taylor* (*In re Park S. Sec., LLC*), 326 B.R. 505, 518 (Bankr. S.D.N.Y. 2005) (noting that "absent 'significantly clear' evidence of a legitimate supervening purpose" the "confluence of several [badges of fraud] can constitute conclusive evidence of an actual intent to defraud") (citing *Max Sugarman Funeral Home, Inc. v. A.D.B. Investors*, 926 F.2d 1248, 1254–55 (1st Cir. 1991)).

[1171] *Picard*, 326 B.R. at 518 (noting that "absent 'significantly clear' evidence of a legitimate supervening purpose" the "confluence of several [badges of fraud] can constitute conclusive evidence of an actual intent to defraud") (citing *Max Sugarman Funeral Home, Inc.*, 926 F.2d at 1254–55).

[1172] *See* Letter to SEC and Financial Industry Regulatory Authority (Aug. 20, 2012), at ALLY_0434974 [ALLY_0434974].

[1173] *See id.* at ALLY_0434974.

[1174] *U.S. Bank Nat'l Ass'n v. Verizon Commc'ns Inc.*, 892 F. Supp. 2d 805, 822 (N.D. Tex. 2012).

[1175] *Id.* at 822 (citing *Klang v. Smith Food & Drug Ctrs., Inc.*, 702 A.2d 150, 153 (Del. 1997)).

[1176] *U.S. Bank Nat'l Ass'n*, 892 F. Supp. 2d at 822 (citing DEL. CODE ANN. tit. 8, § 154 (2012)).

Securities. Ally Securities stated that the payments were made out of "excess capital."[1177] It is unclear whether this would constitute surplus, regardless of how it was identified by Ally Securities. As one court has stated, "directors . . . have almost unfettered discretion in defining the extent of the corporation's surplus."[1178] "The easy manipulation of a corporation's surplus has prompted one commentator to note that statutes prohibiting payment of dividends out of surplus are 'virtually meaningless.'"[1179] Thus, it is difficult to predict whether a court would treat Ally Securities' "excess capital" as surplus. There are few cases which discuss such a calculation. Given the massive potential liabilities of Ally Securities, a creditor could argue that these payments were not made from a surplus, and that Ally Securities' liabilities exceeded its assets, as discussed above. However, it is unclear how much deference a court would give to Ally Securities' directors' judgment. If a court were to find these dividends to be unlawful, they would be voidable, and may be recovered as a fraudulent transfer.[1180] This could give creditors of Ally Securities an alternative basis for recovery. In light of the conclusions above with respect to actual and constructive fraud, this may be unnecessary.

---

[1177] *See* Letter to SEC and Financial Industry Regulatory Authority (Apr. 10, 2012), at ALLY_0424689 [ALLY_0424689] ("Please be advised that . . . Ally Securities . . . has determined to make a distribution of excess net capital to its parent and sole member, [AFI] . . . in the amount of $200,000,000. This amount represents approximately 96.49% of the excess capital of Ally Securities . . . .").

[1178] *Official Comm. of the Unsecured Creditors of Color Tile, Inc. v. Blackstone Family Inv. P'ship* (*In re Color Tile, Inc.*), 200 WL 152129, at *3 (D. Del. 2000).

[1179] *Id.*

[1180] *Pereira v. Equitable Life Ins. Soc'y of the United Sates* (*In re Trace Int'l Holdings, Inc.*), 289 B.R. 548, 560 (Bankr. S.D.N.Y. 2003) (applying Delaware law).

## IX. EVALUATION OF CONSIDERATION FOR RELEASES

### A. REVIEW OF PROPOSED RELEASE OF ESTATE AND THIRD-PARTY CLAIMS UNDER NOW-TERMINATED SETTLEMENT AGREEMENT WITH AFI

The AFI Settlement and Plan Sponsor Agreement proposed to settle all Estate Causes of Action and Third-Party Claims against the AFI Released Parties. AFI proposed a cash contribution of $750 million (plus other non-cash contributions to the Debtors) to achieve the settlement of *both* Estate Causes of Action *and* Third-Party Claims.

Under the AFI Settlement and Plan Sponsor Agreement, the Debtors agreed to include in their proposed chapter 11 plan the Debtor Release and a Third-Party Release in favor of the AFI Released Parties.[1] The Debtors also agreed, pursuant to the AFI Settlement and Plan Sponsor Agreement, to include in the confirmation order relating to such plan a provision permanently enjoining the commencement or prosecution by any person or entity of any causes of action released pursuant to such plan.[2]

During the course of the Investigation, the Debtors terminated the AFI Settlement and Plan Sponsor Agreement.[3] Accordingly, no Debtor Release or Third-Party Release in favor of the AFI Released Parties is now before the Bankruptcy Court. However, the parties may well contemplate a new settlement between the Debtors and AFI, one which would include a release of Claims, including Third-Party Claims, against the AFI Released Parties.[4]

To provide some guidance to parties in connection with any potential future settlement, the Examiner has reviewed the terms of the AFI Settlement and Plan Sponsor Agreement to determine whether a Debtor Release or Third-Party Release would have been warranted based on AFI's proposed contributions as part of that earlier settlement. The Examiner concludes that it is unlikely that a court would have found that AFI's contributions to the Debtors, as contemplated under the now-terminated AFI Settlement and Plan Sponsor Agreement, supported the proposition that the AFI Released Parties were entitled to the Debtor Release, much less a Third-Party Release. Section IX sets forth the rationale for that conclusion.

---

[1]   *See* AFI Settlement and Plan Sponsor Agreement, § 3.1(d)(ii).

[2]   *Id.*

[3]   The Debtors terminated the AFI Settlement and Plan Sponsor Agreement as of February 28, 2013. *See* Ally Financial Inc., Annual Report (Form 10-K) (Mar. 1, 2013), at 17.

[4]   AFI has not withdrawn its offer to provide a $750 million cash contribution to the Debtors' Estates in the event that a new settlement is agreed. *See* Ally Financial Inc., Annual Report (Form 10-K) (May 1, 2013), at 11.

## B. EVALUATION OF CONSIDERATION PROPOSED IN EXCHANGE FOR RELEASE OF ESTATE CLAIMS AGAINST AFI

### 1. Legal Standard Applicable To Debtors' Settlement Of Debtors' Claims Against AFI

Pursuant to Bankruptcy Rule 9019, a bankruptcy court may "approve a compromise or settlement" if the settlement is "fair, equitable, and in the best interests of the estate."[5] In considering the settlement's terms, a bankruptcy court must "canvass the issues and see whether the settlement falls below the lowest point in the range of reasonableness."[6] If a bankruptcy court correctly concludes that a proposed settlement falls within the range of reasonableness and approves the settlement on that basis, that approval will not be reversed on appeal even if a better or more favorable settlement was possible.[7]

In determining whether the proposed settlement falls within the range of reasonableness, a bankruptcy court is not required to conduct a "mini-trial" to decide the individual issues of fact and law implicated by a proposed settlement.[8] Instead, a bankruptcy court need only apprise itself "of those facts that are necessary to enable it to evaluate the settlement and to make a considered and independent judgment."[9] "In evaluating the necessary facts, a court may rely on the opinion of the debtor, parties to the settlement, and the professionals."[10]

---

[5] *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424–25 (1968); *HSBC Bank USA, N.A. v. Fane* (*In re MF Global Inc.*), 466 B.R. 244, 247 (Bankr. S.D.N.Y. 2012); *Air Line Pilots Assoc. v. Am. Nat'l Bank & Trust Co. of Chi.* (*In re Ionosphere Clubs, Inc.*), 156 B.R. 414, 426 (S.D.N.Y. 1993).

[6] *In re MF Global Inc.* 466 B.R. at 247 (citing *In re Chemtura Corp.*, 439 B.R. 561, 594 (Bankr. S.D.N.Y. 2010); *In re Adelphia Commc'ns Corp.*, 327 B.R. 145, 159 (Bankr. S.D.N.Y. 2005) (quoting *In re W.T. Grant Co.*, 699 F.2d 599, 608 (2d Cir. 1983)).

[7] *See Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972) ("[T]here is a range of reasonableness with respect to a settlement—a range which recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion—and the judge will not be reversed if the appellate court concludes that the settlement lies within that range."); *In re Adelphia Commc'ns Corp.*, 327 B.R. at 159 (citing *In re Penn Cent. Transp. Co.*, 596 F.2d 1102, 1114 (3d Cir. 1979); *Official Comm. of Unsecured Creditors of Int'l Distrib. Ctrs., Inc. v. James Talcott, Inc.* (*In re Int'l Distrib. Ctrs., Inc.*), 103 B.R. 420, 423 (Bankr. S.D.N.Y. 1989)).

[8] *In re Adelphia Commc'ns Corp.*, 327 B.R. at 159 (citing *In re Purofied Down Prods. Corp.*, 150 B.R. 519, 522 (S.D.N.Y. 1993); *In re Int'l Distrib. Ctrs., Inc.*, 103 B.R. at 423).

[9] *In re Adelphia Commc'ns Corp.*, 327 B.R. at 159 (citing *In re Purofied Down Prods. Corp.*, 150 B.R. at 522; *In re Energy Coop., Inc.*, 886 F.2d 921, 924–25 (7th Cir. 1989)).

[10] *In re Purofied Down Prods. Corp.*, 150 B.R. at 522–23; *In re Dewey & LeBoeuf LLP*, 478 B.R. 627, 641 (Bankr. S.D.N.Y. 2012) (citing *In re Chemtura Corp.*, 439 B.R. at 594). Of these opinions that *may* be considered, courts generally agree that the business judgment of the debtor recommending the settlement is a factor that *should* be considered. *See In re Dewey & LeBoeuf LLP*, 478 B.R. at 641; *In re MF Global Inc.*, 466 B.R. at 247 (noting that "[a]lthough courts have discretion to approve settlements, the business judgment of the debtor in recommending the settlement should be factored into the court's analysis . . . . At the same time, a court may not simply defer to a debtor in possession's judgment, but must independently evaluate the reasonableness of the settlement") (internal citation omitted); *JPMorgan Chase Bank, N.A. v. Charter Commc'ns Operating LLC* (*In re Charter Commc'ns*), 419 B.R. 221, 252 (Bankr. S.D.N.Y. 2009).

In the Second Circuit, bankruptcy courts consider seven factors, known as the *Iridium* factors, in evaluating whether a proposed settlement is fair and equitable for purposes of approval pursuant to Bankruptcy Rule 9019:

- the balance between the litigation's possibility of success and the settlement's future benefits;

- the likelihood of complex and protracted litigation, with its attendant expense, inconvenience, and delay, including the difficulty in collecting on the judgment;

- the paramount interests of the creditors, including each affected class's relative benefits and the degree to which creditors either do not object to or affirmatively support the proposed settlement;

- whether other parties in interest support the settlement;

- the competency and experience of counsel supporting, and the experience and knowledge of the bankruptcy court judge reviewing, the settlement;

- the nature and breadth of releases to be obtained by officers and directors; and

- the extent to which the settlement is the product of arm's-length bargaining.[11]

### 2. Analysis Of Debtors' Proposed Settlement Of The Estates' Claims Against AFI

As discussed in Section I, the Debtors' Estates may assert claims of not less than $1.31 billion against AFI that the Examiner concludes are likely to succeed, and additional claims of not less than $1.78 billion against AFI that, while, a close question, the Examiner concludes are more likely than not to succeed.

Given AFI's large potential litigation exposure to the Debtors, the Examiner concludes that it is unlikely that a court would have approved a Bankruptcy Rule 9019 settlement of the Estate Causes of Action against the AFI Released Parties in exchange for the consideration proposed under the now-terminated AFI Settlement and Plan Sponsor Agreement, particularly because the settlement set forth in the AFI Settlement and Plan Sponsor Agreement did not have the support of any creditor group or party in interest, other than the RMBS Institutional

---

[11] *Motorola, Inc. v. Official Comm. of Unsecured Creditors* (*In re Iridium Operating LLC*), 478 F.3d 452, 462 (2d Cir. 2007) (citing *In re WorldCom, Inc.*, 347 B.R. 123, 137 (Bankr. S.D.N.Y. 2006); *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968); *In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285, 292 (2d Cir. 1992) (internal quotations and alterations omitted)). When the proposed settlement is one with an insider, such as AFI, the settlement's terms may be subject to heightened level of scrutiny. *In re Charter Commc'ns*, 419 B.R. at 240–41 (court viewed debtor's settlement with its controlling shareholder "with heightened scrutiny and some skepticism").

Investors.[12] As discussed above, two of the *Iridium* factors (the paramount interests of creditors and whether other parties in interest support the settlement) require the Bankruptcy Court to take into consideration the amount of support afforded to a proposed settlement.[13]

### a. AFI's Non-Cash Contributions To The Debtors' Estates

Pursuant to the AFI Settlement and Plan Sponsor Agreement, AFI was to provide the Debtors with $750 million and other non-cash contributions as consideration for the settlement. In this Section, the Examiner reviews the Debtors' and AFI's valuation of certain of AFI's non-cash contributions to the Debtors' Estates.

In the AFI Settlement and Plan Sponsor Agreement, AFI had agreed that it would make the following contributions to the Debtors:

- serve as the stalking horse bidder for the Debtors' whole loan portfolio, which the Debtors asserted provided up to $200 million in additional value;

- enter into the Shared Services Agreement with the Debtors;

- provide use of AFI cash collateral;

- enter into a Transition Services Agreement with the purchaser of the Debtors' platform;

- provide up to $220 million in financing pursuant to the AFI DIP Financing Agreement;

- support GMAC Mortgage Group LLC's retirement plan; and

- support the Debtors' continued origination of mortgage loans, which the Debtors valued at approximately $100 million.[14]

The Debtors ascribed settlement value of not less than $300 million to AFI's willingness to provide these contributions, attributing, as noted above, $200 million to AFI's willingness to

---

[12] Pursuant to the Junior Secured Noteholders' Plan Support Agreement, the Consenting Junior Secured Noteholders agreed to vote to accept, and support confirmation of, a plan that included the Debtor Release and a Third-Party Release. *See* Junior Secured Noteholders' Plan Support Agreement, § 4.1(f), (g). As discussed in Section III.J.5, the Junior Secured Noteholders' Plan Support Agreement was terminated by the Consenting Junior Secured Noteholders on or about September 28, 2012, and they were no longer bound to—and in fact ceased to—support the Debtors' proposed settlement and release of claims against the AFI Released Parties.

[13] While creditors' views of a settlement are not dispositive, courts consider carefully the reasonable view of creditors. *See O'Connell v. Packles* (*In re Hilsen*), 404 B.R. 58, 70, 76 (Bankr. E.D.N.Y. 2009) (noting that a court "must carefully consider the reasonable views of creditors, but it may also exercise its discretion to approve a settlement over the objection of some creditors, a majority of creditors, or even the sole creditor, if after weighing all the factors, the settlement falls above the lowest point in the range of reasonableness") (citations omitted).

[14] *See* AFI Settlement and Plan Sponsor Agreement, § 2.1; *see also* AFI Submission Paper, dated Dec. 19, 2012, at 96–99; Debtors' Submission Paper, dated Dec. 18, 2012, at 30–39.

serve as the stalking horse bidder for the HFS Portfolio and $100 million to AFI's willingness to allow the Debtors to continue originating loans.[15] Accordingly, the Examiner has focused on the value of these two non-cash contributions. The Examiner's review of certain other of AFI's non-cash contributions provided to the Debtors is set forth in Section III.J.

### (1) AFI Support For The Debtors' Origination And Servicing Of Mortgage Loans

AFI agreed to allow the Debtors to continue originating (by serving as a broker to Ally Bank) and servicing loans during the pendency of the Chapter 11 Cases. AFI attributed significant value to this agreement, characterizing it as an unprecedented accomplishment that added "substantial" value to the Debtors' Estates.[16] AFI asserted that the Debtors' ability to continue originating and servicing loans during the Chapter 11 Cases resulted in: (1) a sale of the Debtors' servicing platform, servicing rights, and servicing advances for $3 billion; and (2) approximately $160 million to $180 million in market-based broker fees paid by Ally Bank to the Debtors for loans originated since the bankruptcy filing.[17]

The Debtors have been more conservative in ascribing value to AFI's origination and servicing support, describing this contribution as worth approximately $100 million to the Debtors.[18] In support of this estimate, the Debtors had provided projections for the period of May 2012 through March 2013, which included $118 million in origination profit ($265 million in broker fees and other revenue less associated expenses).[19] According to FTI,

---

[15] *See* Dep. of M. Puntus, Nov. 5, 2012, at 42:5–49:4 (stating that AFI "asked for monetary credit for both the willingness to originate loans as well as their willingness to be the stalking horse bidder for the whole loan portfolio" at a value that was higher than the next higher bidder and noting that AFI wanted $200 million in settlement credit for its stalking horse bid); Debtors' Omnibus Response to Third-Party Submissions, dated Dec. 18, 2012, at 29 (asserting continued consumer lending origination support provided approximately $100 million in value).

[16] AFI Submission Paper, dated Dec. 19, 2012, at 94–95.

[17] *Id.* at 95.

[18] Debtors' Submission Paper, dated Dec. 18, 2012, at 31. While the Debtors have focused on AFI's origination support, GMAC Mortgage also benefited from its ability to continue to service the Ally Bank portfolio, which permitted GMAC Mortgage to maintain operations at historical levels and may have positively affected the Debtors' ultimate ability to sell their mortgage servicing assets. *See* Int. of J. Pensabene, Jan. 9, 2013, at 245:4–12 ("If we lost rights to service one-third of our overall portfolio and . . . even more as it relates to just the value of the portfolio then the auction of the business would not have been nearly as successful as it turned out to be. The value of the platform would have been diminished dramatically."). *See also* Joint Servicing – Ally Subservicing Agreement Presentation by Centerview, Morrison Foerster and FTI, dated July 17, 2012, at RC00075961 [RC00075960] ("The discontinuation of the subservicing agreement would result in collateral damage to the Company's servicing platform overall, which would influence potential buyers when submitting their bids for the business . . . . Rejection of the agreement would also result in distractions in transferring approximately 700K loans to Ally Bank's designated servicer.").

[19] Projected ResCap Origination P&L [EXAM00219982] (this document includes May 2012 as the first projected period and was prepared for the first day hearings in the Chapter 11 Cases). Meeting with Evercore, Financial Advisor to AFI, in N.Y., N.Y. (Sept. 6, 2012) (noting that FTI prepared cash flow projections supporting the approximately $100 million of value attributed to originations during the prepetition negotiations).

however, the actual volume of originations was lower than originally projected.[20] In December 2012, FTI therefore estimated that the continuation of mortgage origination would result in profit to the Debtors of only $50 million.[21]

AFI also benefited from enabling the Debtors to continue originating loans as a broker to Ally Bank, originally projecting earning a profit of $400 million[22] from these activities as well as generating $100 million in additional MSR assets for Ally Bank.[23] AFI subsequently calculated Ally Bank's profit from consumer lending in the postpetition period through January 2013 and projected pre-tax profit in a run-off period thereafter totaling $291 million, net of broker fees paid to the Debtors of $195 million, as shown in the following exhibit.[24] This amount of broker fees is consistent with FTI's comments regarding a reduced level of originations as compared to the Debtors' original projections and would imply that the Debtors in turn earned a profit of approximately $87 million, using the profit margin from FTI's original analysis.[25]

---

[20] FTI asserted that the actual volume of originations for the period of May 2012 through September 2012 was lower than projected because of reduced staffing levels at the Debtors and more disruption than anticipated from the bankruptcy filing. Origination volume was in-line with projections for October 2012 through December 2012. Meeting with FTI, Financial Advisor to the Debtors, via telephone (Dec. 21, 2012).

[21] Meeting with FTI, Financial Advisor to the Debtors, via telephone (Dec. 21, 2012) and Projected ResCap Origination P&L [EXAM00219982]. FTI indicated that they were unable to produce an updated schedule of origination profit because of personnel departures, E-mail from FTI to Examiner's Financial Advisors (Apr. 9, 2013).

[22] Evercore, Kirkland & Ellis and Mayer Brown Project Rodeo Presentation, dated Apr. 23, 2012, at 4 [CCM00335615].

[23] *Id*.

[24] Ally Financial Consumer Lending Income Contribution [ALLY_PEO_0089616].

[25] Projected ResCap Origination P&L [EXAM00219982] ($118 million profit / $265 million revenue = 44.5%).

EXHIBIT IX.B.2.a(1)
**Income Earned by Ally Bank from Postpetition Residential Mortgage Loan Originations**
*($ in Millions)*

|  | May 2012 – December 2012 | | January 2013 & Run-off | | Total | |
|---|---|---|---|---|---|---|
| **Revenue** | | | | | | |
| Net interest income | $ | 16 | $ | 4 | $ | 21 |
| Gain on sale | | 160 | | 15 | | 174 |
| Loan processing fees | | 284 | | 70 | | 354 |
| Total revenue | | 460 | | 89 | | 549 |
| **Expenses** | | | | | | |
| Compensation & benefit expenses | | 4 | | 2 | | 6 |
| Broker fee expense | | 150 | | 45 | | 195 |
| Other expenses | | 15 | | 4 | | 19 |
| Total expense | | 170 | | 51 | | 220 |
| Pre-tax income | | 290 | | 39 | | 329 |
| Expense allocation | | 33 | | 6 | | 39 |
| Pre-tax income with expense allocation | $ | 258 | $ | 33 | $ | 291 |

*Source: Ally Financial Consumer Lending Income Contribution [ALLY_PEO_0089616].*

AFI asserts that, while no other third party was willing to enter into an arrangement with the Debtors to allow continued origination of Mortgage Loans postpetition, the postpetition broker agreement was on market terms.[26]

Finally, Centerview also acknowledged that Ally Bank profited from the continued loan origination. In fact, negotiations with AFI regarding originations started as a stand-alone issue that was only later "roped in" to the ResCap/AFI settlement discussions when determining how much settlement consideration was provided by AFI.[27]

As to the increase in value achieved in the Postpetition Asset Sales, the evidence supports the proposition that AFI's actions supported the Debtors' continued operation as a going concern and thus likely enhanced the value achieved. It is difficult to regard auctions that

---

[26] *See* AFI Submission Paper, dated Dec. 19, 2012, at 94 ("Ally entered into a broker agreement with the Debtors that calls for Ally to fund the mortgages on market terms—a step that no other third party was willing to take."); Int. of G. Lee, Feb. 20, 2013, at 353:7–14 ("I don't think that any bankrupt entity is going to be able to broker loans to a federally chartered bank anywhere in the world.").

[27] Meeting with Centerview, Investment Bankers for the Debtors, in N.Y., N.Y. (Jan. 18, 2013). Centerview and Houlihan Lokey took the position that continued loan origination was part of a "status quo" scenario without a settlement. However, AFI in its prepetition negotiations with ResCap stated it was unwilling to broker loans in bankruptcy if settlement value was not assigned. E-mails between J. Strelcova, J. Young, K. Chopra and J. Lewis (May 7, 2012) [ALLY_0157778] (discussing AFI settlement value for continued originations in bankruptcy).

generated approximately $800 million (or 22%) in incremental value above the stalking horse bids and enabled the continued operations of the Debtors' businesses as anything but a success.[28]

How much of this success can be attributed to AFI, however, is difficult to quantify. Numerous market and competitive factors may also have affected the ultimate purchase price. As one example, the Debtors have asserted that the RMBS Institutional Investors had significant influence on the Debtors' ability to sell the Platform Assets,[29] and without the RMBS Trust Settlement Agreements, the Platform Assets may have sold for less in the auction.[30]

On balance, the Examiner concludes that the evidence does not support the proposition that AFI provided significant settlement value to the Debtors' Estates in allowing the Debtors to continue mortgage origination.

### *(2) Stalking Horse Bid On HFS Portfolio*

AFI asserts that its willingness to serve as the stalking horse bidder for the Debtors' HFS Portfolio provided value of at least $200 million to the Debtors' Estates by, among other things, setting the floor for the bidding to continue at auction.[31] However, when AFI first requested settlement credit for the extra $200 million that AFI would have paid if the assets were sold pursuant to a plan incorporating the Third-Party Release, ResCap debated whether such value should be allocated to the settlement.[32] Puntus stated that Centerview viewed the $200 million settlement credit as "ridiculous" at the time it was first proposed[33] and was

---

[28] As described in Section III.J, as of the Petition Date, the stalking horse bids, which totaled $3.7 billion were comprised of a $2.3 billion bid by Fortress in the Platform Sale and a $1.4 billion bid by AFI in the Legacy Sale (pursuant to a section 363 sale, or $1.6 billion pursuant to a plan of reorganization). Before the auction, the stalking horse bids were modified and increased to $2.4 billion by Fortress in the Platform Sale and $1.45 billion by Berkshire Hathaway in the Legacy Sale. The ultimate auction resulted in proceeds of $4.5 billion, comprised of the Platform Sale to Ocwen and Walter for $3.0 billion and the Legacy Sale to Berkshire Hathaway for $1.5 billion. Sales Procedure Motion, ¶ 6; Nationstar Mortgage LLC, Current Report (Form 8-K) (July 5, 2012), at Item 1.01; Order Approving Sale Procedures, at 4; Third AFI DIP Order, at 2–3.

[29] *See* Int. of G. Lee, Feb. 20, 2013, at 122:12-20 ("…we had been thinking about how to achieve the sale of a live platform. And we were very conscious of the fact that the parties that would have perhaps, after AFI, the most influence on our ability to do so would be the investors who control the trustees."), 152:11-21 ("I mean, the reality is, if the investors directed the trustees to say, 'We want you to take back the trusts' or, 'we don't like this servicer,' I mean, her group, because they control the trust to a sufficient extent, could kill a sale, full stop."); *see also* Int. of J. Ilany, Nov. 28, 2012, at 173:19-24 ("How much of this $3 billion is that it is [an] operating company and it inures to the agreement with [AFI] and how much inures to the fact that [the platform's] inoculated? Sir, this is really–you divvy it up.").

[30] *See also* Int. of J. Ilany, Nov. 28, 2012, at 173:6-24 ("… I believe that without getting a release from the trustees, this transaction is not closing. If anybody thinks that this transaction[  ] closes on January 31st without a release from trustees, people are in for tears. It's not closing because nobody's buying….").

[31] *See* AFI Submission Paper, dated Dec. 19, 2012, at 94.

[32] *See* Dep. of M. Puntus, Nov. 5, 2012, at 123:6–14.

[33] Meeting with Centerview, Investment Bankers for the Debtors, in N.Y., N.Y. (Jan. 18, 2013).

"skeptical as to whether that did or did not actually constitute settlement value."[34] Rather than spend a lot of time disputing the issue with AFI, according to Puntus, Centerview "said, okay, you call it what you want, I think it was referenced as settlement value; and then as the case proceeds, we will see whether it's settlement value or sale value."[35] In other words, Centerview's opinion was that if AFI were overbid during the auction, the $200 million had no settlement value but more accurately reflected the assets' actual value.[36]

AFI was concerned that ResCap would not confirm settlement credit of $200 million if AFI was overbid.[37] ResCap was concerned about losing AFI's bid, so it agreed in the AFI Settlement and Plan Sponsor Agreement to give AFI the settlement credit even if it was overbid.[38] ResCap believed that, in any case, the allocation of $200 million to the settlement credit would ultimately be decided by a judge.[39]

The Examiner concludes that the evidence does not support the proposition that AFI should be credited with any settlement value for its willingness to serve as the stalking horse bidder in the sale of the HFS Portfolio.

### (3) Examiner's Conclusion Concerning The Value Of AFI's Non-Cash Contributions

While the Debtors previously had attributed, and AFI continues to attribute, significant value to AFI's participation and contributions in the Chapter 11 Cases, the Examiner concludes that the evidence does not support the proposition that significant settlement value should have been ascribed to AFI's non-cash contributions in connection with the now-terminated AFI Settlement and Plan Sponsor Agreement.

---

[34] *See* Dep. of M. Puntus, Nov. 5, 2012, at 42:5–13.

[35] *See id.* at 47:16–20.

[36] Meeting with Centerview, Investment Bankers for the Debtors, in N.Y., N.Y. (Jan. 18, 2013). Puntus noted that, in light of how the auction transpired, it was hard to say at that point that the $200 million had any settlement value. *Id.* As of August 16, 2012, in the then most recent waterfall analysis provided by the Debtors, FTI assumed an AFI settlement contribution of only $850 million, which consisted of $750 million in cash and $100 million in origination support. FTI Hypothetical Waterfall Analysis Presentation, dated Aug. 16, 2012, at 4 [EXAM00176577]. The Examiner believes AFI's bid on the HFS Portfolio was not given any settlement value in this FTI waterfall analysis because AFI was no longer serving as the stalking horse bidder. *See also* Dep. of T. Marano, Nov. 12, 2012, at 254:6-255:10 (when presented with an e-mail noting that AFI's settlement contribution was "750 plus 200 plus 100," Marano could not recall "what the 200 was for," (although he recalled that $100 million related to the value of AFI's enabling the Debtors "to originate through bankruptcy")).

[37] E-mail from L. Tessler to J. Ilany (Apr. 28, 2012) [EXAM11114982] (AFI bid on HFS Portfolio).

[38] E-mail from J. Ilany to J. Tanenbaum and T. Marano (Apr. 28, 2012) [EXAM11114982] (AFI bid on HFS Portfolio).

[39] E-mail from T. Marano to J. Ilany (Apr. 29, 2012) [EXAM11114982] (AFI bid on HFS Portfolio).

## C. EVALUATION OF CONSIDERATION PROPOSED IN EXCHANGE FOR RELEASE OF THIRD-PARTY CLAIMS AGAINST AFI

As discussed in the next Section, the threshold for obtaining third-party releases in the Second Circuit is extremely high and, absent the consent of all or substantially all creditors, very difficult to obtain. The Second Circuit has admonished that such releases should be granted only rarely and only in "unique" circumstances.[40] The Examiner concludes that the evidence does not support the proposition that those unique circumstances existed to justify a Third-Party Release in favor of AFI under the terms proposed by the AFI Settlement and Plan Sponsor Agreement.

Given the high threshold for obtaining non-consensual third-party releases in the Second Circuit, it would be extremely difficult to craft a confirmable Plan that includes a non-consensual Third-Party Release absent a negotiated consensual settlement encompassing all, or substantially all, of the claims held by third parties.

### 1. Legal Standard Applicable To The Release Of Third Parties' Claims Against AFI

Third-party releases and injunctions are neither explicitly permitted nor prohibited by the Bankruptcy Code. Bankruptcy Code section 524(e) provides that the "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt."[41] The circuit courts are split as to section 524(e)'s effect, if any, on a bankruptcy court's authority to release the liability of non-debtors. The Fifth, Ninth, and Tenth Circuits limit the propriety of non-consensual third-party non-debtor releases to the asbestos context under Bankruptcy Code section 524(g), and to committee members for their work performed pursuant to Bankruptcy Code section 1103(c).[42] The Second, Third, Fourth, Sixth,

---

[40] *Deutsche Bank AG v. MetroMedia Fiber Network, Inc.* (*In re Metromedia Fiber Network, Inc.*), 416 F.3d 136, 141–42 (2d Cir. 2005).

[41] 11 U.S.C. § 524(e).

[42] *See*, *e.g.*, *Bank of N.Y. Trust Co. v. Official Unsecured Creditors Comm.* (*In re Pac. Lumber Co.*), 584 F.3d 229, 252 (5th Cir. 2009); *Resorts Int'l v. Lowenschuss* (*In re Lowenschuss*), 67 F.3d 1394, 1401 (9th Cir. 1995); *Landsing Diversified Props.-II v. First Nat'l Bank & Trust Co.* (*In re W. Real Estate Fund, Inc.*)*,* 922 F.2d 592, 600 (10th Cir. 1990), *modified by Abel v. West*, 932 F.2d 898 (10th Cir. 1991).

and Seventh Circuits permit third-party non-debtor releases in limited circumstances.[43] The circumstances in which third-party, non-debtor releases have been granted are nuanced and, in the Second Circuit, proponents of such releases must demonstrate that "truly unusual" circumstances warrant such relief.[44]

Given that the Bankruptcy Code does not expressly authorize bankruptcy courts to release third-party claims against non-debtors, a review of a bankruptcy court's jurisdiction provides a good framework in which to consider the scope of the Bankruptcy Court's authority to rule on third-party claims. The next section provides an overview of Congress's grant of jurisdiction to bankruptcy courts.

### a. *Overview Of A Bankruptcy Court's Jurisdiction And Authority To Enjoin Claims Against Non-Debtor Third Parties*

Consideration of a bankruptcy court's subject matter jurisdiction begins with 28 U.S.C. § 1334. District courts are granted original "and exclusive" jurisdiction over bankruptcy cases.[45] As to all other civil proceedings "arising under," "arising in," or "related to" a case under title 11, district courts are granted original "but not exclusive" jurisdiction.[46] The district courts may refer these bankruptcy-related proceedings to bankruptcy courts pursuant to 28

---

[43] *See*, *e.g.*, *Behrmann v. Nat'l Heritage Found.*, 663 F.3d 704, 712 (4th Cir. 2011) (noting that approval of non-debtor releases "should be granted cautiously and infrequently"); *In re Ingersoll, Inc.*, 562 F.3d 856, 865 (7th Cir. 2009) (upholding third-party non-debtor release included in plan as "narrowly tailored and critical to the plan as a whole"); *Johns-Manville Corp. v. Chubb Indem. Ins. Co.* (*In re Johns-Manville, Corp.*) (*Manville II*), 517 F.3d 52, 66 (2d Cir. 2008), *rev'd on other grounds and remanded sub nom. Travelers Indem. Co. v. Bailey*, 557 U.S. 137 (2009); *Airadigm Comm. v. FCC* (*In re Airadigm Comm., Inc.*), 519 F.3d 640, 657 (7th Cir. 2008) (Bankruptcy Code sections 105 and 1123(b)(6) give bankruptcy courts "residual authority" to approve non-consensual releases but whether a particular release is "appropriate" is "fact intensive and depends on the nature of the reorganization."); *In re Metromedia Fiber Network, Inc.*, 416 F.3d at 142–43; *Class Five Nev. Claimants v. Dow Corning Corp.* (*In re Dow Corning Corp.*), 280 F.3d 648, 658 (6th Cir. 2002) (holding that non-consenting creditors' claims could be enjoined against a non-debtor when seven factors were present); *Gillman v. Continental Airlines* (*In re Continental Airlines, Inc.*), 203 F.3d 203, 214 (3d Cir. 2000) (while the court of appeals did not establish a rule regarding the conditions that would justify or permit a non-debtor release or injunction, it noted that the "hallmarks of permissible non-consensual releases" were fairness, necessity to the reorganization and specific factual findings to support these conclusions); *Menard-Sanford v. Mabey* (*In re A.H. Robins Co.*), 880 F.2d 694, 702 (4th Cir. 1989) (approving permanent injunction against thousands of direct claims for birth control devices which protected among others insurer, present and former officers and directors and certain attorneys, based in part upon payments made by some of them and in part upon some of them holding indemnification rights against the debtors); *In re Wash. Mut., Inc.*, 442 B.R. 314, 352 (Bankr. D. Del. 2011) (noting that any release of a non-debtor "must be based on consent of the releasing party (by contract or the mechanism of voting in favor of the plan)").

[44] *In re Metromedia Fiber Network, Inc.*, 416 F.3d at 143 (2d Cir. 2005); *Kenton Cnty. Bondholders Comm. v. Delta Airlines, Inc.* (*In re Delta Air Lines, Inc.*), 374 B.R. 516, 525-26 (S.D.N.Y. 2007); *In re Spiegel Inc.*, No. 03-11540, 2006 WL 2577825, at *7 (Bankr. S.D.N.Y. Aug. 16, 2006).

[45] 28 U.S.C. § 1334(a) (2012).

[46] 28 U.S.C. § 1334(b).

U.S.C. § 157(a).[47] The statutory language supports a broad grant of jurisdiction to bankruptcy courts,[48] but the jurisdiction conferred is not intended to be "limitless."[49]

Depending on the circumstances, a bankruptcy court's jurisdiction may extend to litigation between two non-debtors pursuant to the "related to" jurisdiction granted it by Congress.[50] Like other circuits, the Second Circuit has adopted an expansive interpretation of "related to" jurisdiction, holding that the test for determining whether a bankruptcy court has jurisdiction over litigation is "whether its outcome might have any 'conceivable effect' on the bankrupt estate."[51] In considering whether a court has jurisdiction to approve a third-party release, the Second Circuit has articulated this test slightly differently, holding that a bankruptcy court has jurisdiction to enjoin third-party claims against non-debtors if those claims directly affect the property of the bankruptcy estate.[52]

Before 2008, most courts in the Second Circuit considered whether they had jurisdiction to approve third-party releases pursuant to a somewhat perfunctory "shared or common facts" analysis that found jurisdiction if the claims to be released could be said to have some

---

[47] The District Court for the Southern District of New York refers all cases arising under title 11 to the bankruptcy court in this district pursuant to its Amended Standing Order of Reference, 12 Misc. 00032 (S.D.N.Y. Jan. 31, 2012). *See In re FairPoint Commc'ns, Inc.*, 452 B.R. 21, 27 (S.D.N.Y. 2011).

[48] *See Celotex Corp. v. Edwards*, 514 U.S. 300 (1995). In *Celotex*, the Supreme Court noted that Congress's choice of words in section 1334(b) of the Bankruptcy Code suggested the grant of jurisdiction was "of some breadth." *Id.* at 308. Section 1334(b)'s grant of jurisdiction is distinctly different from that conferred under prior Acts, which had limited the basis for jurisdiction to either possession of property by the debtor or consent. *Id.* (citing S. Rep. No. 95-989, 2nd Sess., at 153, 154 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5939, 5940).

[49] *See id.* (citing *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984)). In *Pacor*, John and Louise Higgins filed a lawsuit in state court against Pacor, a chemical supplies distributor, alleging injuries caused by exposure to asbestos contained in Pacor's products. Pacor filed a third-party complaint impleading Johns-Manville, the initial asbestos manufacturer. After Johns-Manville filed for bankruptcy, the Higgins sought to remove their lawsuit to the related bankruptcy court. The bankruptcy denied removal. The Third Circuit affirmed, concluding that "related to" jurisdiction did not extend to the state court lawsuit because the lawsuit was, at best, "a mere precursor to the potential third-party claim for indemnification by [defendant] against [the debtor]." *Pacor v. Higgins*, 743 F.2d at 995. Because Johns-Manville could not be bound automatically by the Higgins-Pacor lawsuit, it was not "related to" debtor Johns-Manville's bankruptcy case.

[50] *Celotex v. Edwards*, 514 U.S. at 308 n.5 ("Proceedings 'related to' the bankruptcy include (1) causes of action owned by the debtor which become property of the estate pursuant to 11 U.S.C. § 541, and (2) suits between third parties which have an effect on the bankruptcy estate.").

[51] *Pfizer Inc. v. Law Offices of Peter G. Angelos* (*In re Quigley Co.*), 676 F.3d 45, 57 (2d Cir. 2012) ("the touchstone for bankruptcy jurisdiction remains 'whether its outcome might have any "conceivable effect" on that bankruptcy estate.'" (citing *In re Cuyhoga Equip. Corp.*, 980 F.2d 110, 114 (2d. Cir. 1992)). The test for determining whether the court has bankruptcy jurisdiction has also been described as "an inquiry whether the third-party action has 'a significant connection' with the bankruptcy case in question." *In re Quigley Co.,* 676 F.3d at 57 (*citing Turner v. Ermiger* (*In re Turner*), 724 F.2d 338, 341 (2d Cir. 1983)).

[52] *See In re Quigley Co.*, 676 F.3d at 56 (citing *Johns-Manville Corp. v. Chubb Indem. Ins. Co.* (*In re Johns-Manville, Corp.*) (*Manville II*), 517 F.3d 52, 66 (2d Cir. 2008), *rev'd on other grounds and remanded sub nom. Travelers Indem. Co. v. Bailey*, 557 U.S. 137 (2009)).

conceivable effect on the bankruptcy estate or if the claims simply shared facts in common with the third party's relationship with the debtor.[53] After quickly dispatching with this jurisdictional issue, if addressing it at all,[54] courts concentrated on whether the circumstances of the case justified the granting of an injunction in favor of third parties.[55] However, in 2008 the Second Circuit made it explicit that courts must consider carefully whether they have jurisdiction to approve third-party releases and that this jurisdictional evaluation turns on whether the claims to be enjoined would have a direct effect on the bankruptcy estate.[56] That claims indirectly affect the estate or arise out of facts relating to the third party's relationship with the debtor is not enough to give bankruptcy courts jurisdiction to release and enjoin such claims.[57]

---

[53] In 1988 the Second Circuit did address at some length the scope of the court's jurisdiction over third-party claims. *See MacArthur Co. v. Johns-Manville Corp. (In re Johns-Manville Corp.)* (*Manville I*), 837 F.2d 89 (2d Cir. 1988). The cases following, however, did not. *See supra* text accompanying note 54.

[54] The two Second Circuit decisions before *Manville II* addressing third-party claims did not discuss subject matter jurisdiction at all. *See In Deutsche Bank AG v. MetroMedia Fiber Network, Inc.* (*In re Metromedia Fiber Network, Inc.*), 416 F.3d 136 (2d Cir. 2005); *SEC v. Drexel Burnham Lambert Grp.* (*In re Drexel Burnham Lambert Grp.*), 960 F.2d 285 (2d Cir. 1992). *See also JPMorgan Chase Bank, N.A. v. Charter Commc'ns Operating LLC* (*In re Charter Commc'ns*), 419 B.R. 221, 258 (Bankr. S.D.N.Y. 2009) (no reference to subject matter jurisdiction). The Examiner notes these courts' lack of discussion regarding subject matter jurisdiction not to suggest that the courts inappropriately exercised jurisdiction but rather to highlight the shift in 2008 in the Second Circuit's approach to analyzing whether to approve third-party releases.

[55] *See, e.g.*, *Kenton Cnty. Bondholders Comm. v. Delta Airlines, Inc.* (*In re Delta Air Lines, Inc.*)*, 374 B.R. 516, 525–26 (S.D.N.Y. 2007) (in dismissing an argument that bankruptcy court lacked jurisdiction or power to approve releases of claims against non-debtors, the district court noted that the releases at issue were of the kind listed as acceptable by *Metromedia*, 416 F.3d at 142, and cited to *Drexel,* 960 F.2d at 293, for the proposition that a court may approve the release of claims against third parties where the releases play an "important part" in a debtor's reorganization plan); *Cartalemi v. Karta Corp.* (*In re Karta Corp.*), 342 B.R. 45, 53–57 (S.D.N.Y. 2006) (holding that the claims to be enjoined against the non-debtor third parties were of the type permissible under *Metromedia* and *Drexel* given the unique circumstances present, the importance of the releases to the plan, and other factors. The court did note that the specific language of the release needed to be modified so as not to apply to claims that had nothing to do with the debtor's business, focusing on the facts giving rise to the proposed enjoined claims rather than the effect of the claims on the estate, if successful); *In re Spiegel Inc.*, No. 03-11540, 2006 WL 2577825, at *7 (Bankr. S.D.N.Y. Aug. 16, 2006) (noting that the court has the power to enjoin claims against non-debtor third parties where the actions have "at least a conceivable effect upon the Debtors or implicate the interpretation or enforcement of this Court's orders." (citing *LTV Corp. v. Back* (*In re Chateaugay Corp.*), 201 B.R. 48, 66 (Bankr. S.D.N.Y. 1996)), and reviewing whether the proposed third-party non-debtor release was warranted under the *Metromedia* analysis); *Rosenberg v. XO Commc'ns, Inc.* (*In re XO Commc'ns, Inc.*), 330 B.R. 394, 440 (Bankr. S.D.N.Y. 2005) (finding that the substantial consideration provided by the lenders, the identity of interest present as a result of the indemnification/contribution exposure of the debtor and the necessity of satisfying a plan condition that certain litigation be resolved all supported the conclusion that the unique circumstances necessary under *Metromedia* for allowing non-debtor releases were present with respect to breach of fiduciary type actions).

[56] *Johns-Manville Corp. v. Chubb Indem. Ins. Co. (In re Johns-Manville, Corp.)* (*Manville II*), 517 F.3d 52 (2d Cir. 2008), *rev'd on other grounds and remanded sub nom. Travelers Indem. Co. v. Bailey*, 557 U.S. 137 (2009).

[57] *Id.* at 66.

Accordingly, before releasing claims against non-debtors, a bankruptcy court must first confirm that it has subject matter jurisdiction over the claims that would be subject to the requested injunction and release, which jurisdiction will exist only if the court determines that the claims would, if not enjoined or released, directly affect the property of the bankruptcy estate.[58] If a bankruptcy court determines it has subject matter jurisdiction, it must then consider whether the circumstances warrant approval of an injunction, with the understanding that circumstances sufficiently unique to justify such relief will occur only rarely.[59]

While the analysis to be undertaken by courts can be summed up simply, its implementation is complex. As noted by the Bankruptcy Court in this case, third-party releases raise many difficult legal and factual issues.[60] The next Section reviews the evolution of the Second Circuit's analysis regarding when third-party releases are appropriate.

### b. The Evolution Of The Second Circuit's View Of The Propriety Of Third-Party Non-Debtor Releases

#### (1) Manville I[61]—1988

In 1988, the Court of Appeals for the Second Circuit considered whether a bankruptcy court had authority to enjoin third-party actions against a debtor's insurers, which, in essence,

---

[58] *Id.* Courts considering the appropriateness of third-party non-debtor releases after the Second Circuit's 2008 decision have undertaken a careful analysis of whether they have subject matter jurisdiction over the claims to be released and/or enjoined. *See In re Dreier LLP*, 429 B.R. 112, 131–32 (Bankr. S.D.N.Y. 2010) (court must decide whether it has subject matter jurisdiction before determining whether the proponent of an injunction has demonstrated unusual circumstances to justify it); *Pfizer Inc. v. Law Offices of Peter G. Angelos* (*In re Quigley Co.*), 676 F.3d 45, 56 (2d Cir. 2012) (bankruptcy court jurisdiction is appropriate over "third-party non-debtor claims that directly affect the res of the bankruptcy estate") (citing *Manville II*, 517 F.3d at 66); *In re FairPoint Commc'ns, Inc.*, 452 B.R. at 27–30 (confirming bankruptcy court had subject matter jurisdiction to approve third-party injunction included in plan and that sufficient circumstances existed to justify such injunction).

[59] *In re Metromedia Fiber Network, Inc.*, 416 F.3d at 141–42.

[60] Memorandum Opinion and Order Granting Berkshire Hathaway's Motion to Appoint an Examiner Under 11 U.S.C. §1104(c) [Docket. No. 454] at n.10 (citing *Johns-Manville Corp. v. Chubb Indem. Ins. Co.* (*In re Johns-Manville Corp.*) (*Manville III*), 600 F.3d 135 (2d Cir. 2010) (adhering to jurisdictional limitation for approving third-party non-debtor releases); *Manville II*, 517 F.3d at 66 (finding that a bankruptcy court "only has jurisdiction to enjoin third-party non-debtor claims that directly affect the res of the bankruptcy estate"); *In re Metromedia Fiber Network, Inc.*, 416 F.3d at 141 ("[A] nondebtor release is a device that lends itself to abuse. By it, a nondebtor can shield itself from liability to third parties. In form, it is a release; in effect, it may operate as a bankruptcy discharge arranged without a filing and without the safeguards of the Code. The potential for abuse is heightened when releases afford blanket immunity."); *In re Metcalfe & Mansfield Alt. Invs.*, 421 B.R. 685, 695–96 (Bankr. S.D.N.Y. 2010); *In re Dreier*, 429 B.R. at 132 (finding that before a court can even decide if the "unusual circumstances" standard delineated in *Metromedia* is met, it must first determine whether it has subject matter jurisdiction under *Manville*)). *See also In re The 1031 Tax Grp., LLC*, 397 B.R. 670, 687 (Bankr. S.D.N.Y. 2008) ("Cases make clear that the bankruptcy courts in this Circuit have very limited power to approve settlements or chapter 11 plans containing permanent or channeling injunction in favor of non-debtors.") (citing cases).

[61] *MacArthur Co. v. Johns-Manville Corp.* (*In re Johns-Manville Corp.*) (*Manville I*), 837 F.2d 89 (2d Cir. 1988).

IX-14

operated as a discharge of claims against those non-debtor parties.[62] Before it filed for bankruptcy, the debtor Johns-Manville Corporation ("Manville") was one of the largest manufacturers and distributors of asbestos products in the United States. As a result, Manville was faced with the possibility of lawsuits by many thousands of asbestos victims, with potential liability of more than \$2 billion.[63] When it filed for bankruptcy, Manville was engaged in litigation with its insurance carriers regarding their coverage of these asbestos-related claims. During the course of its bankruptcy case, Manville agreed to settle these insurance claims with its insurers for approximately \$770 million.[64] The insurance settlements provided that the insurers would be released of all obligations relating to the relevant insurance policies and would also receive the benefit of injunctions which barred third-party claims against them based on the insurers' obligations under the insurance policies. The third-party claims were instead channeled to a "Manville Personal Injury Settlement Trust" (the "Manville Trust"), which was funded with the insurers' \$770 million settlement payment. The Manville Trust funds were to be used to satisfy asbestos claims against Manville, whether asserted against Manville at the time of the bankruptcy or thereafter by persons who had not yet manifested symptoms of asbestos-related illnesses.

Manville's settlements with its insurers were approved pursuant to two orders—the "Insurance Settlement Order" and the "Manville Confirmation Order." These orders enjoined all persons from commencing and/or continuing any suit, arbitration or other proceeding of any type or nature for "policy claims" against any or all members of the settling insurer group.[65] The insurers were to have no further duties or obligations based upon, arising out of or related to the policies and were thereafter released from any and all insurance policy claims.[66] The policy claims included any and all claims (whether or not presently known) which could be asserted by any person against any of the settling insurers "based upon, arising out of or relating to" any or all of the policies.[67] The Insurance Settlement Order was incorporated by reference into the Manville Confirmation Order.

MacArthur Company ("MacArthur"), a distributor of Manville's asbestos products, objected to the injunctions in the Insurance Settlement Order and Manville Confirmation Order, arguing that they impaired MacArthur's contractual right to coverage pursuant to "vendor endorsements"[68] that had been added to the insurance policies subject to the

---

[62] *See id.*

[63] *Id.* at 90.

[64] *Id*. In confirming Manville's chapter 11 plan, the bankruptcy court found that the present asbestos claimants would receive 100% on their claims under the plan. *Kane v. Johns-Manville Corp*., 843 F.2d 636, 649 (2d Cir. 1988). 95.8% of the present health asbestos claims voted in favor of the plan. *Id*. at 641.

[65] *In re Johns-Manville Corp*., 2004 WL 1876046, at *15 ¶ 61 (Bankr. S.D.N.Y. Aug. 17, 2004).

[66] *Id.*

[67] *Id.* at *15 ¶ 62.

[68] Vendor endorsements entitled distributors to insurance coverage for liability that resulted from the vendor's sale of Manville products. *Manville I,* 837 F.2d at 90.

settlements. The bankruptcy court overruled MacArthur's objections, asserting that MacArthur's "interest in the policies is highly speculative."[69] The district court affirmed and MacArthur appealed to the Court of Appeals for the Second Circuit.

MacArthur's principal argument on appeal was that the bankruptcy court lacked jurisdiction and authority to enjoin claims against the debtor's insurers, and the injunction was a "*de facto* discharge" of non-debtor party liability.[70] The Second Circuit overruled the objection, noting that it is "well established" that a bankruptcy court has jurisdiction over property of a debtor's estate, and the insurance policies were property of the estate.[71] In rejecting MacArthur's "*de facto* discharge" argument, the Second Circuit noted that "the injunction orders do not offer the umbrella protection of a discharge in bankruptcy. Rather, they preclude only those suits against the settling insurers that arise out of or relate to Manville's insurance policies.[72]

The court of appeals then noted that: (1) MacArthur's rights in the insurance policies under the vendor endorsements were derivative of Manville's rights; and (2) MacArthur's claims sought to recover against the insurance policies based on Manville's conduct.[73] With these findings, the court of appeals held that the bankruptcy court had authority to enjoin actions that threatened or diminished the insurance policies and to channel those claims to the proceeds of the Manville Trust.[74]

### (2) Drexel Burnham[75]—1992

Four years later, the Second Circuit was again called upon to review the appropriateness of a third-party plan injunction in the bankruptcy case of *Drexel Burnham Lambert Group*.[76] Before Drexel filed for bankruptcy protection, the SEC commenced a lawsuit against Drexel, alleging that Drexel had violated federal law in securities transactions.[77] Drexel and the SEC ultimately agreed to settle the lawsuit and, as part of the settlement, Drexel created a $350 million fund (the "SEC Fund") for the benefit of the victims of Drexel's illegal transactions in "junk bonds."[78] Drexel paid $200 million into the SEC Fund, but then filed a petition for

---

[69] *Id*. at 91.

[70] *Id.*

[71] *Id*. at 90.

[72] *Id.* at 91. As discussed below, in *Manville II*, the court of appeals focused on the limits of the bankruptcy court's subject matter jurisdiction and stressed that such jurisdiction was limited to third-party actions that affected the estate property. While there has been some commentary suggesting that *Manville II* departed from prior Second Circuit decisions addressing third-party releases, *Manville II*'s focus on the bankruptcy court's in rem jurisdiction is consistent with the Second Circuit's analysis in *Manville I*.

[73] *Id.* at 92–93.

[74] *Id.* at 93.

[75] *SEC v. Drexel Burnham Lambert Grp.* (*In re Drexel Burnham Lambert Grp.*), 960 F.2d 285 (2d Cir. 1992).

[76] *Id.*

[77] *Id.* at 287–88.

[78] *Id.* at 288.

bankruptcy relief under chapter 11 before paying the final $150 million it owed. The SEC promptly filed a claim for $150 million in Drexel's bankruptcy case. Many other parties filed claims as well, resulting in 850 proofs of claim based on Drexel's actions in buying, selling, and underwriting securities (the "Securities Claims").[79]

In an attempt to facilitate settlement, the Securities Claims were withdrawn from the bankruptcy court and a "Securities Litigation Claimants Group" was formed. The claimants and Drexel negotiated and ultimately reached a settlement that, among other things, required that the 850 securities claimants be certified as a mandatory, non-opt-out class that was divided into two subclasses.[80] Subclass A mainly included several failed banks being administered by the FDIC or the Resolution Trust Corporation and claimants asserting derivative suits against Drexel. Subclass B consisted of claimants whose actions against Drexel had been consolidated by the Panel on Multidistrict Litigation.[81]

For its part, Drexel was required to pay the $150 million it still owed to the SEC Fund. The fund's entire $350 million was then divided into two subclasses—A and B—for distribution to the two subclasses of claimants. Subclass A was to receive 75% of the SEC Fund. Subclass B was to receive 25% of the SEC Fund. Drexel's remaining assets were also to be divided between the subclasses in the same 75%–25% ratio. Finally, Drexel agreed to pool any recoveries from lawsuits against its former officers and directors with subclass A. However, members of subclass B were not entitled to share in these recoveries and were enjoined from bringing any future lawsuits against the former officers and directors[82] (these lawsuits were eventually settled and provided for a total pooled recovery of $1.3 billion).

The district court found that the proposed settlement was fair and approved its terms over objections filed by only eight of the proposed 850 class members. Three of the class members appealed, arguing among other things that the settlement provisions that entitled subclass A to receive all of the pooled recoveries from the lawsuit against Drexel's directors and officers and enjoined the subclass B members from pursuing actions against the same directors and officers, should have been stricken.[83]

---

[79] *Id.*

[80] *Id*.

[81] *Id.*

[82] *Id.* at 289.

[83] *Id.* at 293.

In affirming the district court's findings on appeal, the Second Circuit dismissed the appellants' challenge to the injunction, stating:

> In bankruptcy cases, a court may enjoin a creditor from suing a third-party, provided the injunction plays an important part in a debtor's reorganization plan. *See In re: A.H. Robins Co.*, 880 F.2d 694, 701 (4th Cir.) . . . . The Settlement Agreement is unquestionably an essential element of Drexel's ultimate reorganization. In turn, the injunction is a key component of the Settlement Agreement. As the district court noted, the injunction limits the number of lawsuits that may be brought against Drexel's former directors and officers. This enables the directors and officers to settle these suits without fear that future suits will be filed. Without the injunction, the directors and officers would be less likely to settle. Thus, we hold that the district court did not abuse its discretion in approving the injunction.[84]

How to determine whether an injunction was sufficiently "important" was not discussed by the court of appeals, giving lower courts great leeway in approving third-party releases, so long as parties could make a case that such release was "important" or "essential" to the debtor's plan.

### (3) Metromedia Fiber Network, Inc.[85]—2005

The Second Circuit revisited the issue of third-party releases in 2005 in the Metromedia Fiber Network, Inc. bankruptcy cases. The Metromedia debtors were part of the large conglomerate Metromedia Company, which was owned by John Kluge. As part of the plan of reorganization, Kluge and certain other "insiders" were released from all claims relating to Metromedia. The release, referred to in the plan as the "Kluge Comprehensive Release," provided that a trust established by Kluge and other insiders:

> shall receive a full and complete release, waiver and discharge from . . . any holder of a claim of any nature . . . of any and all claims, obligations, rights, causes of action and liabilities arising out of or in connection with any matter related to [Metromedia] or one or more subsidiaries . . . based in whole or in part upon any act or omission or transaction taking place on or before the Effective Date.[86]

---

[84] *Id.*

[85] *Deutsche Bank AG v. Metromedia Fiber Network, Inc.* (*In re Metromedia Fiber Network, Inc.*), 416 F.3d 136 (2d Cir. 2005).

[86] *Id.* at 141.

In exchange for this release, Kluge agreed that his trust would: (1) forgive approximately $150 million in unsecured claims it held against the estate; (2) convert $15.7 million in senior secured claims to equity in AboveNet, Inc. (the reorganized entity); (3) invest approximately $12.1 million in AboveNet; and (4) agree to backstop the purchase of up to $25 million of common stock in AboveNet's planned stock offering.[87] Subordinated noteholders objected to the plan of reorganization, arguing that the Kluge Comprehensive Release and two other releases in favor of certain non-debtors were not authorized by the Bankruptcy Code.[88] The bankruptcy court overruled the noteholders' objections to the plan, and its decision was affirmed by the district court. The noteholders appealed to the Second Circuit, arguing that the releases were unauthorized by the Bankruptcy Code.

Reviewing its decision in the *Drexel* case, the court of appeals acknowledged that none of its prior decisions explained when a release of a non-debtor is "important" to a debtor's plan, but asserted that "such release [would be] proper only in rare cases."[89] The court of appeals expressed a "reluctance" to approve third-party releases, stating first that the only explicit authorization for non-debtor releases is section 524(g) of the Bankruptcy Code, which authorizes releases only in asbestos cases and even there only when specified conditions are met, including the creation of a trust to satisfy future claims.[90] The court of appeals then noted that a third-party release "is a device that lends itself to abuse" because it in effect operates as a bankruptcy discharge without requiring a bankruptcy filing and the oversight and safeguards of the Bankruptcy Code.[91]

In an attempt to provide more guidance regarding the type of "rare" cases in which a third-party non-debtor release may be appropriate, the court of appeals noted that in earlier cases such releases had been approved when: (1) the estate received substantial consideration;[92] (2) the enjoined claims were "channeled" to a settlement fund rather than

---

[87] *Id.*

[88] *Id.*

[89] *Id.*

[90] *Id.* at 142.

[91] *Id.*

[92] *Id.* (*citing SEC v. Drexel Burnham Lambert Grp.* (*In re Drexel Burnham Lambert Grp.*), 960 F.2d 285, 293 (2d Cir. 1992)). Since *Metromedia Fiber Network*, other courts have cited to substantial contributions to be made by released parties in support of a finding that unique circumstances exist to justify third-party releases. *See, e.g., In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 268 (Bankr. S.D.N.Y. 2007) (third-party release in favor of parties who had provided substantial consideration to the reorganization was allowed); *JPMorgan Chase Bank, N.A. v. Charter Commc'ns Operating LLC* (*In re Charter Commc'ns*), 419 B.R. 221, 258 (Bankr. S.D.N.Y. 2009) (noting that third-party releases were permissible where among other things debtors were to receive substantial financial and non-financial consideration and there was an identity of interest between the debtors and the non-debtor releasees by indemnification agreements); *In re Metropolitan 885 Third Ave. Leasehold, LLC*, No. 10-16106, 2010 WL 6982778 (Bankr. S.D.N.Y Dec. 22, 2010), ¶ 32 (finding that (1) the case was "unique" and that "unusual circumstances" existed that made the third-party releases essential to the plan; (2) that the released parties had tendered substantial consideration to the debtor by reducing claims and waiving distributions (which allowed all other unsecured creditors to receive a 100% distribution on allowed claims) and making other substantial contributions to accommodate the debtor's business objectives; and (3) that there were no pending claims or causes of action against the released parties).

extinguished;[93] (3) the enjoined claims would indirectly impact the debtor's reorganization "by way of indemnity or contribution;"[94] (4) the plan otherwise provided for the full payment of the enjoined claims;[95] or (5) the affected creditors consented to the non-debtor releases.[96] However, the court of appeals immediately noted that a determination of whether a third-party release is appropriate should not be considered a matter of "factors and prongs," and it stressed that no case has permitted third-party releases absent "unique" circumstances.[97]

Turning to the appeal before it, the Second Circuit stated that the only justification for the Kluge Comprehensive Release was the fact that the Kluge trust had made a "material contribution" to the estate. The Second Circuit found this insufficient, stating that "a non-debtor release in a plan of reorganization should not be approved absent the finding that truly unusual circumstances render the release terms important to the success of the plan, focusing on the considerations [noted above.]"[98] After the *Metromedia* decision, courts continued to approve third-party releases, but stressed the "unique circumstances" that justified them.[99]

---

[93] *In re Metromedia Fiber Network, Inc*., 416 F.3d at 142 (citing *MacArthur Co. v. Johns-Manville Corp.* (*In re Johns-Manville Corp.*) (*Manville I*), 837 F.2d 89, 93–94 (2d Cir. 1988); *Menard-Sanford v. Mabey* (*In re A.H. Robins Co.*), 880 F.2d 694, 701 (4th Cir. 1989)).

[94] *In re Metromedia Fiber Network, Inc.*, 416 F.3d at 142 (citing *Manville I*, 837 F.2d at 93–94; *In re A.H. Robins Co.*, 880 F.2d at 701).

[95] *Id.*

[96] *Id.; see also In re Ion Media Networks, Inc.,* 419 B.R. 585, 602 (Bankr. S.D.N.Y. 2009) (finding that the releases were appropriate under *Metromedia Fiber Network,* and noting, among other things, that the third-party releases had been consented to by a vast majority of the affected creditors).

[97] *In re Metromedia Fiber Network, Inc*., 416 F.3d at 142.

[98] *Id.* at 143. While insufficient findings would normally be remedied by remand, the court of appeals dismissed the appeal as equitably moot because the chapter 11 plan had been substantially consummated. *Id*. at 143–44.

[99] *Cartalemi v. Karta Corp. (In re Karta Corp.*), 342 B.R. 45, 56 (S.D.N.Y. 2006) (based on unique circumstances, court found that the releases "are exactly the sort of releases that should be sanctioned under *Metromedia/Drexel*"); *JPMorgan Chase Bank, N.A. v. Charter Commc'ns Operating LLC* (*In re Charter Commc'ns*), 419 B.R. 221, 258 (Bankr. S.D.N.Y. 2009) (after acknowledging that non-debtor releases should be rare, the court found that the record before it justified the non-debtor releases. The debtors were to receive substantial financial and non-financial consideration in exchange for such releases; there was an identity of interest between the debtors and non-debtors by indemnification agreements; and the case involved "truly unusual circumstances" to make the releases important to the plan); *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 267 (Bankr. S.D.N.Y. 2007) (noting that *Metromedia* "requires the bankruptcy community in this Circuit to be much more circumspect in providing third-party releases than it used to be."); *In re XO Commc'ns, Inc.*, 330 B.R. 394, 440 (Bankr. S.D.N.Y. 2005) (finding the record supported unique circumstances necessary, under *Metromedia*, for allowing non-debtor releases concerning breach of fiduciary duty type claims).

*(4) Manville II[100]—2008*

In 2008, the Second Circuit was again called upon to consider the third-party non-debtor releases granted in *Manville I* in the 1986 Insurance Settlement Order and incorporated into the Manville Confirmation Order (together, the "1986 Orders"). In the years that followed Manville's reorganization, groups of plaintiffs, undeterred by the injunction in the two 1986 Orders, brought "direct action" lawsuits[101] against the settling insurers, asserting claims fitting into two broad categories: claims based on statutory regulation of insurance practices and claims based on common law theories.[102]

In response to the large number of lawsuits filed against it, Travelers[103] filed a motion in the bankruptcy court seeking to enjoin twenty-six independent actions pending in Louisiana, Massachusetts, Texas, and West Virginia state courts, pursuant to the 1986 Orders.[104] The matter was referred to mediation, and three classes of plaintiffs settled with Travelers. The settlements were conditioned upon the bankruptcy court's entry of an order clarifying that the state court lawsuits were, and always had been, prohibited by the 1986 Orders.[105] The bankruptcy court approved the settlement agreements and entered the requested "Clarifying Order," specifying that the direct actions were barred by the 1986 Orders. In connection with its ruling, the bankruptcy court found that because "the gravamen of [the state court lawsuits] were acts or omissions by Travelers arising from or relating to Travelers' insurance relationship with Manville, . . . all claims against Travelers based on such actions or omissions necessarily 'arise out of' and [are] 'related to' the [insurance policies]."[106]

The district court upheld the Clarifying Order on appeal, and multiple state court asbestos plaintiffs and Chubb Indemnity Insurance Company, none of whom were party to the more recent settlements agreements with Travelers, appealed to the Second Circuit. The appellants argued that the bankruptcy court did not have jurisdiction to enjoin the third-party suits against Travelers. The Second Circuit agreed, noting that the courts below had erroneously focused solely on the relationship between Manville and Travelers in considering whether jurisdiction

---

[100] *Johns-Manville Corp. v. Chubb Indem. Ins. Co.* (*In re Johns-Manville, Corp.*) (*Manville II*), 517 F.3d 52 (2d Cir. 2008).

[101] A "direct action" in the insurance context is a suit in which the injured party steps into the shoes of the tortfeasor and can assert any right of the tortfeasor-insured against the insurance company. *Pfizer Inc. v. Law Offices of Peter G. Angelos* (*In re Quigley Co.*), 676 F.3d 45, 55 n.10 (2d Cir. 2012) (internal citations omitted).

[102] *Manville II*, 517 F.3d at 57–58.

[103] The Court referred to The Travelers Indemnity Company, Travelers Casualty and Surety Company, Travelers Property Casualty Corp., Citigroup Inc., The Travelers Insurance Company, Travelers Life and Annuity Company, and each of their respective direct or indirect parents, subsidiaries, and sister companies, as well as each of their respective predecessors, successors, assigns, officers, and directors, together, as "Travelers." *Id.* at 55 n.3.

[104] *Id.* at 58.

[105] *Id.*

[106] *Id.* at 59 (internal citation omitted).

over the claims existed. Asserting that this factual inquiry regarding the parties' relationship "was only half of the equation," the court of appeals looked to the laws of the states where the claims arose to determine if Travelers had an independent legal duty in its dealings with the appellants.[107] The nature of the claims would determine the source of funds used to satisfy any judgment—the Manville Trust or Travelers.

This more focused review on the nature of the claims being released had not been undertaken in the *Metromedia* decision, and instead appears to have been inspired by the Second Circuit's review of the Fifth Circuit's decision in the *Zale* bankruptcy cases.[108] In *Zale*, the Fifth Circuit noted that:

> Those cases in which courts have upheld "related to" jurisdiction over third-party actions do so because the subject of the third-party dispute is property of the estate, or because the dispute over the asset would have an effect on the estate. Conversely, courts have held that a third-party action does not create "related to" jurisdiction when the asset in question is not property of the estate and the dispute has no effect on the estate. Shared facts between the third-party action and a debtor-creditor conflict do not in and of themselves suffice to make the third-party action "related to" the bankruptcy . . . . [T]he district court's desire to "foster and encourage and then preserve settlement in federal court" does not in and of itself confer jurisdiction.[109]

Here, the appellants sought to recover directly from Travelers based on its independent wrongdoing.[110] Accordingly, the court of appeals held that the bankruptcy court did not have jurisdiction to enjoin such claims because they made "no claim against an asset of the bankruptcy estate, nor [did] their actions affect the estate."[111] The Second Circuit went on to note the fact that the settling insurers had contributed funds to the estate was not relevant to its jurisdictional analysis. Given the inherent risk of abuse in permitting third-party releases,

---

[107] *Id.* at 63.

[108] *Feld v. Zale Corp.* (*In re Zale Corp.*), 62 F.3d 746 (5th Cir. 1995).

[109] *Manville II,* 517 F.3d at 64 (citing *In re Zale Corp,* 62 F.3d at 753–54).

[110] *Manville II,* 517 F.3d at 65. The court of appeals noted that in West Virginia, claims based on Travelers' alleged violations of West Virginia's Unfair Trade Practices Act could entitle the plaintiff appellants to recover attorneys' fees and punitive damages, if successful. The settlement of a claim against a tortfeasor in West Virginia also did not preclude independent recovery against the tortfeasor's insurer out of alleged bad faith insurance practice. Accordingly, West Virginia plaintiffs' claims were clearly independent tort claims. *Id.* at 63.

[111] *Id.* at 65.

such releases cannot be justified solely on the basis of the third party's financial contribution to the estate.[112] If that were the case, the Second Circuit observed, then:

> a debtor could create subject matter jurisdiction over any non-debtor third-party by structuring a plan in such a way that it depended upon third-party contributions. As we have made clear, subject matter jurisdiction cannot be conferred by consent of the parties. Where a court lacks subject matter jurisdiction over a dispute, the parties cannot create it by agreement even in a plan of reorganization.[113]

In conclusion, the court of appeals held that the district court lacked subject matter jurisdiction to enjoin claims against Travelers that were predicated, as a matter of state law, on Travelers' own alleged misconduct and unrelated to the property of Manville's estate.[114]

### (5) Travelers v. Bailey[115]—2009

Travelers sought and obtained certiorari review by the Supreme Court. After considering the expansive definition of insurance policy claims enjoined as against Travelers by the 1986 Orders, the Supreme Court agreed with Travelers that the state court lawsuits filed by the appellees were based on the type of claims barred by the 1986 Orders.[116]

After noting that the Clarifying Order properly interpreted the 1986 Orders to bar such claims, the question for the Supreme Court was whether the bankruptcy court, in approving the Clarifying Order, had subject matter jurisdiction to do so. The Supreme Court easily found that such jurisdiction did exist, on the principle that the court "plainly had jurisdiction to interpret and enforce its own prior orders."[117]

This ended the necessary inquiry as far as the Supreme Court was concerned. The Supreme Court stated that whether the bankruptcy court had jurisdiction to approve the injunction in favor of the settling insurers in 1986 was not properly before the court of appeals in 2008 and, therefore, not properly before the Supreme Court.[118] Accordingly, the Supreme Court found that the court of appeals erred in reevaluating the bankruptcy court's exercise of jurisdiction with respect to its 1986 Orders.[119] Once those orders became final on direct

---

[112] *Id.* at 66.

[113] *Id.* (citing *In re Combustion Eng'g, Inc.* 391 F.3d 190, 228 (3d Cir. 2004)).

[114] *Manville II,* 517 F.3d at 66–68.

[115] *Travelers Indem. Co. v. Bailey,* 557 U.S. 137 (2009).

[116] *Id.* at 148–51.

[117] *Id.* at 151 (citing *Local Loan Co. v. Hunt*, 292 U.S. 234, 239 (1934)).

[118] *Travelers v. Bailey,* 557 U.S. at 148.

[119] *Id.* at 151.

review, they became res judicata to the "parties and those in privity with them, not only as to every matter which was offered and received to sustain or defeat the claim or demand, but as to any other admissible matter which might have been offered for that purpose."[120] The fact that the proposed challenge to those orders was one of subject matter jurisdiction did not change this analysis.[121]

In closing, the Supreme Court made explicit that its holding was narrow and not one of jurisdiction, stating that it was not resolving "whether a bankruptcy court, in 1986 or today, could properly enjoin claims against non-debtor insurers that are not derivative of the debtor's wrongdoing."[122]

The Supreme Court did not decide which parties were bound by the 1986 Orders. Chubb Indemnity Insurance had consistently asserted that it was not given sufficient notice of the 1986 Orders and that due process mandated that it not be bound by those orders. The Supreme Court instructed the Second Circuit to consider this due process argument, as well as other properly preserved objections.

### (6) Manville III[123]—2010

On remand, the Second Circuit again found it necessary to delve into the circumstances giving rise to the Insurance Settlement Order and the Manville Confirmation Order. The issue was whether those 1986 Orders, and the injunction of claims against Travelers, could be enforced against Chubb, who had received no notice of the orders. After reviewing "bedrock concepts of due process of law,"[124] the court of appeals held that Chubb was not adequately represented in the bankruptcy proceedings and did not receive constitutionally sufficient notice of the 1986 Orders.[125] Accordingly, Chubb was not bound by the 1986 Orders or the 2004 Clarifying Order, and was free to challenge the bankruptcy court's subject matter jurisdiction in issuing the 1986 Orders.

---

[120] *Id.* at 152 (internal citations omitted).

[121] *Id.* ("[e]ven subject-matter jurisdiction . . . may not be attacked collaterally.") (citing *Kontrick v. Ryan*, 540 U.S. 443, 455 n.9 (2004)).

[122] *Travelers v. Bailey,* 557 U.S. at 155.

[123] *Johns-Manville Corp. v. Chubb Indem. Ins. Co.* (*In re Johns-Manville Corp.*) (*Manville III*), 600 F.3d 135, 138 (2d Cir. 2010).

[124] *Id.*

[125] *Id.* at 158. In its analysis of Chubb's due process argument, the Second Circuit focused on the in personam nature of the 1986 Orders, as interpreted by the bankruptcy court. As stated by the court of appeals, a court is exercising in personam jurisdiction when it addresses a claim for liability against a particular party. *Id.* at 153 n.13 (citing Restatement (Second) of Judgments § 2 cmt. B, at 36–37). The contribution and indemnity claims asserted by Chubb against Travelers did not seek to collect from the Manville Trust funds. Accordingly, in approving the Clarifying Order to bar Chubb's claims against Travelers, the bankruptcy court was interpreting the 1986 Orders, whatever their language, to bar claims having no effect on the res of the Manville estate, giving them an in personam effect. *Manville III*, 600 F.3d at 152–53. The in personam nature of the 1986 Orders required a more rigorous due process analysis and, after considering the lack of notice given in 1986 to Chubb, the Second Circuit held that Chubb had not received constitutionally sufficient notice of the 1986 Orders, as interpreted by the Clarifying Order. *Id.* at 158.

While the court of appeals could have limited its analysis to this due process issue on remand, it went on to reiterate its analysis in *Manville II*, noting that a bankruptcy court only has jurisdiction to enjoin third-party non-debtor claims that directly affect the res of the estate.[126] Accordingly, it "remain[ed] persuaded" on remand that the 1986 Orders, as interpreted in 2004, exceeded the scope of the bankruptcy court's in rem jurisdiction[127] and found that Chubb's jurisdictional attack had merit.[128]

### c. *The Second Circuit Landscape After Manville III*

*Manville II*, as reaffirmed by *Manville III*, remains the law of the Second Circuit. Since its entry, courts called upon to judge the propriety of third-party non-debtor releases must consider first whether the court has subject matter "related to" jurisdiction over the claims to be enjoined.[129] If the court determines that the claims to be released or enjoined directly affect the estate, it may then consider whether unique circumstances that would justify the release are present.[130] Parties cannot contract around this initial jurisdictional hurdle.[131]

---

[126] *Id.* at 152. (citing *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 225 (3d Cir. 2004) ("[T]he exercise of bankruptcy power must be grounded in statutory bankruptcy jurisdiction."); *Universal Oil Ltd v. Allfirst Bank* (*In re Millennium Seacarriers, Inc.*), 419 F.3d 83, 92 (2d Cir. 2005) ("Congress has granted the . . . courts expansive bankruptcy jurisdiction to adjudicate claims against a debtor's estate.").

[127] *Manville III*, 600 F.3d at 153.

[128] *Id.* at 158. The Second Circuit's reiteration of its jurisdiction analysis of third-party releases may have been a response to some uncertainty voiced by lower courts after the Supreme Court's ruling in *Travelers v. Bailey*. *See In re Metcalfe & Mansfield Alt. Invs.*, 421 B.R. 685, 695 (Bankr. S.D.N.Y. 2010) (decided two months before *Manville III*, the bankruptcy court stated that after the Supreme Court's reversal of *Manville II*, "[i]t is unclear whether the circuit panel's decision [in *Manville II*] remains binding law in this Circuit on other issues decided by the panel—specifically on the jurisdictional limits on a bankruptcy courts' power to approve a third-party non-debtor release and injunction. Even if the circuit panel decision is not binding, it may nevertheless be persuasive with respect to the jurisdictional issue.").

[129] *See, e.g.*, *In re FairPoint Commc'ns, Inc.*, 452 B.R. 21 (Bankr. S.D.N.Y. 2011) (third-party non-debtor claims that would, if successful, trigger a debtor's duty to indemnify or make a contribution to that third-party sufficiently affect the bankruptcy estate such that bankruptcy jurisdiction exists); *In re Dreier LLP*, 429 B.R. 112 (Bankr. S.D.N.Y. 2010) (requested injunction was too broad and barred claims outside court's jurisdiction); *but see In re Metropolitan 885 Third Ave. Leasehold, LLC*, No. 10-16103, 2010 WL 6982778 (Bankr. S.D.N.Y Dec. 22, 2010) (not discussing whether court had subject matter jurisdiction over claims).

[130] *See In re Dreier LLP*, 429 B.R. at 131–32 (reviewing the history of third-party releases in the Second Circuit).

[131] It is black letter law that parties cannot consent or stipulate to jurisdiction where it does not exist. *Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982) ("[N]o action of the parties can confer subject-matter jurisdiction upon a federal court."); *Geruschat v. Ernst Young LLP* (*In re Seven Fields Dev. Corp.*), 505 F.3d 237, 262 n.23 (3d Cir. 2007).

2. *Analysis Of Possible Release Of Third-Party Claims Against AFI*

   a. *Jurisdictional Issues Faced By Parties In Releasing Third-Party Claims*

The tenet that a bankruptcy court has jurisdiction to release only those third-party claims that directly affect the res of the bankruptcy estate is not disputed.[132] What is disputed in this case, however, is the identity of those Third-Party Claims that fall within the scope of the Bankruptcy Court's jurisdiction and that may therefore be released as part of any future chapter 11 plan.[133]

The Examiner finds it premature to undertake an evaluation of whether the Bankruptcy Court has subject matter jurisdiction to release each and every potential cause of action that may be asserted against the AFI Released Parties. There is currently no proposed settlement of Third-Party Claims before the Bankruptcy Court, and the scope of any third-party release that may be proposed may differ from that included in the now-terminated AFI Settlement and Plan Sponsor Agreement. Based on a review of recent cases addressing third-party releases, the Examiner notes that the broader the scope of the release, the more likely the court will find that it does not have jurisdiction over all claims proposed to be released.[134]

---

[132] *See* AFI Submission Paper, dated Dec. 19, 2012, at 82–83 (citing *Johns-Manville Corp. v. Chubb Indem. Ins. Co. (In re Johns-Manville, Corp.)* (*Manville II*), 517 F.3d 52, 66 (2d Cir. 2008)); Debtors' Submission Paper, dated Dec. 18, 2012, at 6 (citing *same*); Joint Submission Paper of Paper of AIG, Allstate, Mass Mutual and Prudential, dated Oct. 17, 2012, at 26–27 (citing *same*); Joint Submission Paper of the Federal Home Loan Banks of Boston, Chicago and Indianapolis, dated Oct. 19, 2012, at 30 (citing *same*).

[133] *See* Debtors' Submission Paper, dated Dec. 18, 2012, at 8–24; AFI Submission Paper, dated Dec. 19, 2012, at 82–91; Joint Submission Paper of AIG, Allstate, Mass Mutual and Prudential, dated Feb. 12, 2013, at 26–27; Joint Submission Paper of Paper of AIG, Allstate, Mass Mutual and Prudential, dated Oct. 17, 2012, at 27–28; Joint Submission Paper of the Federal Home Loan Banks of Boston, Chicago and Indianapolis, dated Oct. 19, 2012, at 30–32; Federal Housing Finance Agency Letter to Examiner, dated Oct. 12, 2012.

[134] *In re Dreier LLP*, 429 B.R. at 133 (holding that the proposed bar order went "well beyond derivative claims, and ultimately exceed[ed] the Court's subject matter jurisdiction" because creditors and parties could have direct claims against the parties to be released that were unrelated to their status as creditor or parties in interest in the bankruptcy cases); *In re FairPoint Commc'ns, Inc.*, 452 B.R. 21, 29 (Bankr. S.D.N.Y. 2011) (holding that bankruptcy court had subject matter jurisdiction to enter an injunction "which is carefully crafted so that it is limited to actions that create contingent obligations against the estate").

Some plan proponents, in including a third-party release in a proposed chapter 11 plan, have limited the scope of the third-party release so that, by its own terms, the release only operates "to the maximum extent permitted by applicable law."[135] If the parties were to reach agreement on a settlement that provided for a third-party release in favor of the AFI Released Parties, this type of scope limitation may permit the Bankruptcy Court to confirm a chapter 11 plan without ruling on whether it has jurisdiction over each and every claim proposed to be released.

### b. After Determining The Scope Of Its Jurisdiction, The Court Must Consider Whether Circumstances Merit Approval Of A Third-Party Release

Assuming the Bankruptcy Court determines that it has subject matter jurisdiction to approve a release of Third-Party Claims as part of a proposed future plan settlement, it would then have to consider whether unique circumstances that justify the release exist.[136] As discussed above, in the seminal case reviewing what circumstances justify the approval of a third-party release—*Metromedia Fiber Network*—the Second Circuit asserted that "such a release is proper only in rare cases."[137] The Debtors and AFI both asserted that sufficiently unique circumstances existed to justify the granting of a third-party release in favor of the AFI Released Parties, based in large part on AFI's proposed cash and non-cash contributions to the Chapter 11 Cases.[138]

------

[135] *See* Confirmation Order, ¶¶ 26, 27, *In re Metro-Goldwyn-Mayer Studios, Inc.*, No. 10-15774 (Bankr. S.D.N.Y. Dec. 6, 2010), ECF No. 173 (confirming Amended Joint Prepackaged Plan of Reorganization at § 9.3, filed Nov. 23, 2010, ECF No. 142); Confirmation Order, ¶¶ FF, 30,31, *In re RHI Entm't, Inc.*, No. 10-16536 (Bankr. S.D.N.Y. Mar. 29, 2011), ECF No. 323 (confirming Final Cumulative Joint Prepackaged Plan of Reorganization at § 11.8, filed Apr. 1, 2011, ECF No. 329). *See also In re Chemtura*, 439 B.R. 561, 610 (Bankr. S.D.N.Y. 2010) (holding that fact that proposed third-party releases included in plan were impermissible under *Metromedia Fiber Network* did not make plan unconfirmable because of "self-correction" features that the releases be limited to "the extent permitted by applicable law;" instead, court held the releases to be unenforceable); *Rosenberg v. XO Commc'ns, Inc.* (*In re XO Commc'ns, Inc.*), 330 B.R. 394, 412 n.13 (Bankr. S.D.N.Y. 2005) (third-party release in confirmed plan was limited in scope, releasing non-consensual third-party claims "to the fullest extent permissible under applicable law, as such law may be extended or interpreted subsequent to the Effective Date").

[136] *See In re Dreier LLP*, 429 B.R. at 131–32 (reviewing the history of third-party releases in the Second Circuit).

[137] *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 141 (2d Cir. 2005).

[138] The Debtors and AFI also asserted that the Third-Party Release was justified because the enjoined claims would indirectly impact the Debtors' reorganization through indemnity or contribution. *See* Debtors' Omnibus Response to Third-Party Submissions, dated Dec. 18, 2012, at 37–41; AFI Submission Paper, dated Dec. 19, 2012, at 99. Courts note that an "identity of interest" exists between the parties when the enjoined claims would affect the estate, through indemnification or otherwise. *See JPMorgan Chase Bank, N.A. v. Charter Commc'ns Operating LLC* (*In re Charter Commc'ns*), 419 B.R. 221, 258 (Bankr. S.D.N.Y. 2009) (noting identity of interest between debtors and non-debtor releases by indemnification agreements); *In re XO Commc'ns, Inc.*, 330 B.R. at 411 (identity of interest is generally established as a result of indemnification/contribution exposure of the debtor). Whether this "identity of interest" factor supports a third-party release requires an in-depth analysis of each claim to be released and its potential effect on the estate. That analysis is similar to the required jurisdictional analysis discussed above. Because the proposed settlement is no longer before the Bankruptcy Court, the Examiner has not undertaken any such analysis.

The Examiner has concluded above that it is unlikely that a court would have approved a settlement of the Debtors' claims against AFI in exchange for the contributions by AFI contemplated by the now-terminated AFI Settlement and Plan Sponsor Agreement. It follows that the consideration proposed by the AFI Settlement and Plan Sponsor Agreement would have been deemed insufficient to justify a non-consensual release of Third-Party Claims against the AFI Released Parties. The Examiner therefore concludes that a court would have found that AFI's contributions to the Debtors, as contemplated by the now-terminated Settlement and Plan Sponsor Agreement, did not support the proposition that the AFI Released Parties would have been entitled to a Third-Party Release.

Dated: New York, New York
     May 13, 2013

          Respectfully submitted,

          */s/ Arthur J. Gonzalez*
          Examiner

          CHADBOURNE & PARKE LLP
          30 Rockefeller Plaza
          New York, New York 10112
          Telephone: (212) 408-5100
          Facsimile: (212) 541-5369

          Howard Seife
          David M. LeMay
          Thomas J. McCormack
          N. Theodore Zink, Jr.
          Robin D. Ball
          Seven R. Rivera
          Andrew Rosenblatt
          Marc D. Ashley
          Christy L. Rivera
          Francisco Vazquez

          *Counsel to Examiner*

          MESIROW FINANCIAL CONSULTING, LLC
          666 Third Avenue, 21st Floor
          New York, New York 10017
          Telephone: (212) 808-8330
          Facsimile: (212) 682-4995

          Ralph S. Tuliano
          James C. Atkinson
          James F. Feltman
          Melissa Kibler Knoll
          Jack F. Williams

          *Financial Advisors to Examiner*

UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

*In re:*                                    :   Chapter 11

RESIDENTIAL CAPITAL, LLC, *et. al.*         :   Case Number 12-12020 (MG)
                                                (Jointly Administered)

                        Debtors.            :

## REPORT OF ARTHUR J. GONZALEZ, AS EXAMINER

### APPENDIX

CHADBOURNE & PARKE LLP
30 Rockefeller Plaza
New York, New York 10112
Telephone: (212) 408-5100
Facsimile: (212) 541-5369

Howard Seife
David M. LeMay
Thomas J. McCormack
N. Theodore Zink, Jr.
Robin D. Ball
Seven R. Rivera
Andrew Rosenblatt
Marc D. Ashley
Christy L. Rivera
Francisco Vazquez

*Counsel to Examiner*

MESIROW FINANCIAL CONSULTING, LLC
666 Third Avenue, 21st Floor
New York, New York 10017
Telephone: (212) 808-8330
Facsimile: (212) 682-4995

Ralph S. Tuliano
James C. Atkinson
James F. Feltman
Melissa Kibler Knoll
Jack F. Williams

*Financial Advisors to Examiner*

UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

*In re:*                                  :   Chapter 11

RESIDENTIAL CAPITAL, LLC, *et. al.*       :   Case Number 12-12020 (MG)
                                              (Jointly Administered)
                            Debtors.      :

**REPORT OF ARTHUR J. GONZALEZ, AS EXAMINER**

APPENDIX

CHADBOURNE & PARKE LLP
30 Rockefeller Plaza
New York, New York 10112
Telephone: (212) 408-5100
Facsimile: (212) 541-5369

Howard Seife
David M. LeMay
Thomas J. McCormack
N. Theodore Zink, Jr.
Robin D. Ball
Seven R. Rivera
Andrew Rosenblatt
Marc D. Ashley
Christy L. Rivera
Francisco Vazquez

*Counsel to Examiner*

MESIROW FINANCIAL CONSULTING, LLC
666 Third Avenue, 21st Floor
New York, New York 10017
Telephone: (212) 808-8330
Facsimile: (212) 682-4995

Ralph S. Tuliano
James C. Atkinson
James F. Feltman
Melissa Kibler Knoll
Jack F. Williams

*Financial Advisors to Examiner*

# APPENDIX
## Table of Contents

**Name**          **Number**

Glossary .................................................................................................................................... I


ResCap Timeline of Selected Events 2005 – 2012 ............................................... III
ResCap – Evolution of Barclays DIP Financing Proposals ................................ III.J.1.c(1)(b)—1
ResCap – Evolution of Citibank DIP Financing Proposals ............................... III.J.1.c(1)(b)—2


ResCap Officer Chart 2004 – 2012 ................................................................... IV.A—1
ResCap Summary of Board Composition 2004 – 2012 .................................... IV.A—2
ResCap Board of Directors Chart 2004 – 2012 ............................................... IV.A—3
ResCap Independent Director Annual Compensation (By Type) 2005 – 2012 ...................... IV.B.1.d—1
ResCap Independent Director Annual Compensation (By Director) 2005 – 2012 .................. IV.B.1.d—2
ResCap Independent Director Payment Information by VEND Number ................... IV.B.1.d—3
Summary of Comparable Board of Directors Compensation 2006 – 2011 ........................ IV.B.1.d(8)—1
Director Compensation Benchmarking 2011 – 2012 ........................................... IV.B.1.d(8)—2
AFI and ResCap Independent Director Compensation (Comparison of Total
    Aggregate) 2008 – 2012 ............................................................................. IV.B.1.d(8)—3
AFI and ResCap Independent Director Compensation (Comparison by Director)
    2008 – 2012 ............................................................................................... IV.B.1.d(8)—4
AFI and ResCap Independent Director Compensation (Comparison by Type)
    2008 – 2012 ............................................................................................... IV.B.1.d(8)—5
ResCap Officers Receiving AFI Equity Compensation 2006 – 2012 ........................ IV.B.1.d(12)


Ally Bank Transactions: Reasonably Equivalent Value .................................... V.A.2.a
2006 Bank Restructuring ................................................................................... V.A.2.b
2008 Bank Transaction ...................................................................................... V.A.2.c
2009 Bank Transaction ...................................................................................... V.A.2.d
Summary of Government Settlement Economics ............................................... V.C.1.c(4)
Resort Finance Facility ...................................................................................... V.E.1
Secured MSR Facility ........................................................................................ V.E.2
Secured Revolver Facility .................................................................................. V.E.3
Servicing Advance Factoring Facility ............................................................... V.E.4
Initial Line of Credit Facility ............................................................................ V.E.5
ResMor Loan Facility ........................................................................................ V.E.6
Second Line of Credit Facility .......................................................................... V.E.7
A&R Line of Credit Facility .............................................................................. V.E.8
BMMZ Repo Facility ......................................................................................... V.E.9
Health Capital – Historical Financial Statements ............................................. V.F.4.a(1)
Health Capital – Summary of Houlihan Lokey's Valuation ............................. V.F.4.a(3)
Resort Finance – Historical Financial Statements ............................................ V.F.4.c(1)
Resort Finance – Summary of Houlihan Lokey's Valuation ............................. V.F.4.c(3)
ResMor Trust Company – Summary of Goldin Associates' Fairness Opinion
    Valuation Analysis as of November 20, 2008 ............................................. V.F.4.f(4)(a)
Residential Financial Securities, LLC – Historical Financial Statements ............... V.F.4.g(1)(a)
RFC Investment Limited / RFSC International Limited – Historical Financial
    Statements ................................................................................................... V.F.4.g(1)(b)

Residential Funding Securities, LLC – Summary of Goldin Associates' Fairness
    Opinion Valuation Analysis as of March 18, 2009 ...................................................... V.F.4.g(4)(a)
RFC Investments Limited – Summary of Goldin Associates' Fairness Opinion
    Valuation Analysis as of March 18, 2009 ................................................................. V.F.4.g(4)(b)


ResCap, LLC – Quarterly Solvency Analysis: Balance Sheet Test 2005 – 2011 .............................. VI.B.3
ResCap, LLC – Quarterly Solvency Analysis: Market Approach .......................................... VI.B.4.a(4)
ResCap, LLC – Quarterly Solvency Analysis: Asset-Based Approach ......................................... VI.B.4.b
ResCap, LLC Historical Financial Statements
ResCap, LLC Historical Financial Statements Years Ended 2005 – 2011 ...................................... VI.B.4.b
ResCap, LLC Historical Financial Statements Quarters Ended 2005 – 2011 .................................. VI.B.4.b
Subsidiary Historical Financial Statements
GMAC Mortgage, LLC Historical Financial Statements Years Ended 2003 – 2011 ...................... VI.E—1
Residential Funding Company, LLC Historical Financial Statements Years Ended
    2003 – 2011 ...................................................................................................... VI.E—2


List of RMBS Actions .......................................................................................................... VIII.A—1
List of Non-RMBS Actions ................................................................................................... VIII.A—2
Arthur J. Gonzalez, Examiner Letter Re: *In re Residential Capital, LLC, et al.*,
    No. 12-12020 (MG) — Request for Submissions
    Regarding Third-Party Claims .......................................................................... VIII.A—3
Chadbourne & Park, LLP Letter Re: *In re Residential Capital, LLC, et al.*,
    No. 12-12020 (MG) (Bankr. S.D.N.Y.) — Request for Third-Party Claims
    Damages Quantification ................................................................................. VIII.A—4
ResCap 392 PLS Deal Details .............................................................................................. VIII.B—1
Ally Securities as Lead and Joint Lead Underwriter on ResCap's PLS deals .............................. VIII.B—2
Old GMAC Bank and Ally Bank as Custodian on ResCap's PLS Deals ...................................... VIII.B—3
Loan Origination ............................................................................................................ VIII.B.1.b(1)
Structuring the Securitization ........................................................................................... VIII.B.1.b(3)
ResCap, LLC, et.al. All or Substantially All Analysis .............................................................. VIII.C.6.c
Alleged RMBS / Non-RMBS and Unsecured Noteholder Claims Analysis .................................. VIII.D.1

List of Complete Citations for Exhibits With Truncated Citations ............................................................ X

# GLOSSARY

1.1     <u>Definitions</u>.  For purposes of the Report, the following defined terms will have the following meanings:

"**2001 MMLPSA**" means the Master Mortgage Loan Purchase and Sale Agreement between GMAC Bank, as Seller, and GMAC Mortgage Corporation, as Purchaser, dated December 15, 2001.

"**2004 Pipeline Swap**" means the ISDA Master Agreement between GMAC Mortgage Corporation and GMAC Bank, dated October 1, 2004, including the Schedule thereto, dated October 1, 2004.

"**2004 Pipeline Swap Schedule**" means the Schedule to the ISDA Master Agreement between GMAC Mortgage and GMAC Bank, dated October 1, 2004.

"**2005 Indenture**" means the Indenture by and among Residential Capital Corporation, any Guarantors Party thereto, and Deutsche Bank Trust Company Americas, as Trustee, dated June 24, 2005.

"**2005 Operating Agreement**" means the Operating Agreement by and between GM, AFI, and ResCap, dated June 24, 2005.

"**2005 Pipeline Swap Schedule**" means the Schedule to the ISDA Master Agreement between GMAC Mortgage and GMAC Bank, dated March 30, 2005.

"**2006 AFI Amended LLC Operating Agreement**" means the Amended and Restated Limited Liability Company Operating Agreement of GMAC, dated November 30, 2006.

"**2006 AFI LLC Agreement**" means the Limited Liability Company Agreement of GMAC LLC, dated July 21, 2006.

"**2006 Amended Operating Agreement**" means the Amended and Restated Operating Agreement by and between GM, AFI and ResCap, dated November 27, 2006.

"**2006 Bank Restructuring**" means the November 2006 transaction whereby: (1) substantially all of the assets and liabilities of Old GMAC Bank were transferred to GMAC Automotive Bank; (2) IB Finance acquired all of the outstanding shares of GMAC Automotive Bank; (3) ResCap acquired a non-voting economic interest in IB Finance's (and indirectly, GMAC Automotive Bank's) mortgage business; and (4) GMAC Automotive Bank was renamed "GMAC Bank."

"**2006 MMLPSA**" means the Master Mortgage Loan Purchase and Sale Agreement between GMAC Bank, as Seller, and GMAC Mortgage, as Purchaser, dated October 31, 2006.

"**2006 ResCap LLC Agreement**" means the Limited Liability Company Agreement of ResCap, dated October 24, 2006.

"**2006 Tax Allocation Agreement**" means the Agreement for the Allocation of Income Taxes by and between GMAC and ResCap, effective as of December 1, 2006.

"**2007 FMV Schedule**" means the Schedule to the ISDA Master Agreement (FMV) between GMAC Mortgage and GMAC Bank, dated August 31, 2007.

"**2007 MMLPSA**" means the Master Mortgage Loan Purchase and Sale Agreement between GMAC Bank, as Seller, and GMAC Mortgage, as Purchaser, amended and restated as of June 1, 2007.

"**2007 MSR Swap**" means the ISDA Master Agreement between GMAC Mortgage and GMAC Bank, dated June 12, 2007, including the FMV Schedule thereto, dated August 31, 2007 and the Net Funding Schedule thereto, dated August 31, 2007.

"**2007 Net Funding Schedule**" means the Schedule to the ISDA Master Agreement (Net Funding) between GMAC Mortgage and GMAC Bank, dated August 31, 2007.

"**2007 Pipeline Swap Schedule**" means the Schedule to the ISDA Master Agreement between GMAC Mortgage and GMAC Bank, dated May 1, 2007.

"**2007 Restructuring Plan**" means that ResCap business plan initially presented to the ResCap Board in September 2007, which included proposed reductions and contingency planning.

"**2008 Bank Transaction**" means, collectively, the: (1) March 2008 transaction whereby ResCap issued 607,192 ResCap Preferred Interests pursuant to the terms of its 2008 Amended ResCap LLC Agreement to AFI in exchange for AFI's contribution of ResCap notes with a face amount of $1.2 billion and a fair value of approximately $607,192,000; and (2) June 2008 transaction whereby ResCap issued an additional 199,152 ResCap Preferred Interests pursuant to the terms of the 2008 Amended ResCap LLC Agreement to AFI in exchange for AFI's contribution of ResCap notes with a face amount of $249,085,000 and a fair value as of March 31, 2008 of approximately $199,152,000.

"**2008 MMLPSA**" means the Master Mortgage Loan Purchase and Sale Agreement between GMAC Bank, as Seller, and GMAC Mortgage, as Purchaser, amended and restated as of July 1, 2008.

"**2008 ResCap Amended LLC Agreement**" means the Amended and Restated Limited Liability Company Agreement of ResCap, dated March 31, 2008.

"**2009 AFI Amended Certificate**" means the GMAC Inc. Amended and Restated Certificate of Incorporation, dated December 30, 2009.

"**2009 AFI Certificate**" means the GMAC Inc. Certificate of Incorporation, dated June 30, 2009.

"**2009 Bank Transaction**" means, collectively, the January 30, 2009 transactions whereby: (1) AFI exercised its option to convert its 806,344 ResCap Preferred Interests into the

same number of IB Finance Preferred Interests; and (2) ResCap sold its remaining IB Finance Class M Shares to AFI in exchange for AFI's contribution of ResCap notes with a face amount of approximately $830.5 million and accrued interest and a fair value of $608.5 million.

"**2010 FMV Schedule**" means the Schedule to the ISDA Master Agreement (FMV) between GMAC Mortgage and GMAC Bank, dated July 1, 2010.

"**2010 Net Funding Schedule**" means the Schedule to the ISDA Master Agreement (Net Funding) between GMAC Mortgage and GMAC Bank, dated July 1, 2010.

"**2011 AFI Amended Certificate**" means the AFI Amended and Restated Certificate of Incorporation, as amended, dated March 25, 2011.

"**2012 MMLPSA**" means the Amended and Restated Master Mortgage Loan Purchase and Sale Agreement between Ally Bank, as Seller, and GMAC Mortgage, as Purchaser, dated May 1, 2012.

"**A&R First Priority Security Agreement**" means the Amended and Restated First Priority Pledge and Security Agreement and Irrevocable Proxy among GMAC Mortgage, RFC, ResCap, GMAC Holding, RFC Holding, and Homecomings Financial and certain other affiliated entities party thereto from time to time, as Grantors, AFI as lender and agent, and Wells Fargo Bank, N.A., as first priority collateral agent and collateral control agent, dated December 30, 2009, which amends and restates the First Priority Security Agreement.

"**A&R Initial Line of Credit Security Agreement**" means the Amended and Restated Pledge and Security Agreement and Irrevocable Proxy among GMAC Mortgage and RFC, ResCap, RAHI, PATI, GMAC Holding, RFC Holding and Equity Investment I, LLC, as grantors, AFI, as Omnibus Agent and Lender Agent under the A&R Line of Credit and the Secured MSR Facility, and, together with Ally Investment Management, as secured parties, dated December 30, 2009, which amends and restates the Initial Line of Credit Security Agreement and the Omnibus Security Agreement.

"**A&R Line of Credit Agreement**" means the Amended and Restated Loan Agreement by and among GMAC Mortgage and RFC, as borrowers, ResCap, RAHI, PATI, GMAC Holding, RFC Holding, Homecomings Financial, and Equity Investment I, LLC, as guarantors, and AFI as, initial lender and lender agent, dated December 30, 2009, which amends and restates the Initial Line of Credit Agreement and the Second Line of Credit Agreement.

"**A&R Line of Credit Borrowers**" means RFC and GMAC Mortgage.

"**A&R Line of Credit Collateral**" means the collateral securing the obligations under the A&R Line of Credit Agreement.

"**A&R Line of Credit Facility**" means the credit facility evidenced by the A&R Line of Credit Agreement and all documents, instruments, or agreements executed and delivered in connection therewith.

"**A&R Line of Credit Guarantors**" means ResCap, RAHI, PATI, GMAC Holding, RFC Holding, Homecomings Financial, and Equity Investment I, LLC.

"**A&R Line of Credit Loans**" means the revolving loans made under the A&R Line of Credit Agreement.

"**A&R Second Line of Credit Security Agreement**" means the Amended and Restated Pledge and Security Agreement and Irrevocable Proxy among GMAC Mortgage and RFC, ResCap, RAHI, PATI, GMAC Holding, RFC Holding, and Equity Investment I, LLC, as grantors and AFI, as a secured party, dated December 30, 2009, which amends and restates the Second Line of Credit Security Agreement.

"**A&R Second Priority Security Agreement**" means the Amended and Restated Second Priority Pledge and Security Agreement and Irrevocable Proxy among GMAC Mortgage, RFC, ResCap, GMAC Holding, RFC Holding, and Homecomings Financial and certain other affiliated entities party thereto from time to time, as Grantors, AFI as lender and agent, and Wells Fargo Bank, N.A., as second priority collateral agent and collateral control agent, dated December 30, 2009, which amends and restates the Second Priority Security Agreement.

"**A&R Secured Revolver Loan Agreement**" means the Amended and Restated Credit Agreement by and among GMAC Mortgage and RFC, as borrowers, ResCap, GMAC Holding, RFC Holding, and Homecomings Financial and certain other affiliated entities party thereto from time to time, as guarantors, AFI as initial lender and agent, and Wells Fargo Bank, N.A., as first priority collateral agent, dated December 30, 2009, which amends and restates the Secured Revolver Loan Agreement.

"**A&R Servicing Agreement**" means the Amended and Restated Servicing Agreement by and between Ally Bank, as owner, and GMAC Mortgage, as servicer, dated May 11, 2012.

"**A&R Third Priority Security Agreement**" means the Amended and Restated Third Priority Pledge and Security Agreement and Irrevocable Proxy among GMAC Mortgage, RFC, ResCap, GMAC Holding, RFC Holding, and Homecomings Financial and certain other affiliated entities party thereto from time to time, as Grantors, AFI as lender and agent, and Wells Fargo Bank, N.A., as third priority collateral agent and collateral control agent, dated December 30, 2009, which amends and restates the Third Priority Security Agreement.

"**Ad Hoc Group**" means the Ad Hoc Group as defined in the Junior Secured Noteholders' Plan Support Agreement.

"**Adjusted Book Value Method**" means a method within the Asset-Based Approach whereby all assets and liabilities (including off-balance sheet, intangible, and contingent) are adjusted to their fair market values.

"**Aegis**" means Aegis Mortgage Corporation.

"**Affiliate**" means a Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with the Person specified. For purposes of this definition, the term "control" of a Person means the possession, direct or indirect, of the

power to: (1) vote 20% or more of the voting securities of such Person, or (2) direct or cause the direction of the management and policies of such Person, whether by Contract or otherwise, and the terms and phrases "controlling," "controlled by," and "under common control with" have correlative meanings.

"**Affiliate Transaction**" means any material prepetition transaction and any material verbal or written agreement or contract between the Debtors and any affiliate of the Debtors (other than ResCap's subsidiaries), including AFI, Cerberus, and Ally Bank, and any of their respective current and former, direct and indirect affiliates and subsidiaries.

"**AFI**" means Ally Financial Inc., formerly known as GMAC LLC and GMAC Inc., and all of its direct and indirect subsidiaries, excluding ResCap.

"**AFI Board**" means the board of directors of AFI as constituted from time to time.

"**AFI Defendants**" means AFI, Ally Bank, and Ally Securities and their respective directors and officers, in their capacity as defendants in the Third-Party Claims litigations.

"**AFI DIP Financing Agreement**" means the Debtor-in-Possession Financing Amendment by and among GMAC Mortgage and RFC, as borrowers, ResCap and certain Affiliates of the borrowers, as guarantors, AFI, as the initial lender and agent, and the lenders party thereto, dated May 25, 2012, that was approved by the AFI DIP Order.

"**AFI DIP Order**" means the Final Order Under Sections 105, 361, 362, 363, and 364 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001, 6004, and 9014 (I) Authorizing the Debtors to Obtain Postpetition Financing on a Secured Superpriority Basis, (II) Authorizing the Debtors to Use Cash Collateral, and (III) Granting Adequate Protection to Adequate Protection Parties entered in the Chapter 11 Cases on June 25, 2012 at [Docket No. 491].

"**AFI Hedge Agreements**" means, collectively: (1) each agreement identified on Schedule X to the Omnibus Security Agreement; and (2) each additional agreement and any related documentation between Ally Investment Management and ResCap, RFC and/or GMAC Mortgage, as counterparty, evidencing a hedging transaction entered into by Ally Investment Management and such ResCap entity as the case may be.

"**AFI Line of Credit Agreement Claim**" means any Claim arising under, derived from, or based upon the A&R Line of Credit Agreement, the A&R Initial Line of Credit Security Agreement, and the A&R Second Line of Credit Security Agreement.

"**AFI Released Parties**" means AFI, its direct and indirect subsidiaries and affiliates (other than the Debtors and the Debtors' direct and indirect subsidiaries), and each of their respective members, officers, directors, agents, financial advisors, attorneys, employees, partners, affiliates, and representatives.

"**AFI Secured Revolver Facility Claim**" means any Claim arising under, derived from, or based upon the A&R Secured Revolver Loan Agreement and the A&R First Priority Security Agreement.

"**AFI Settlement and Plan Sponsor Agreement**" means the agreement, entered into by the Debtors and AFI, dated May 14, 2012, which is attached as Exhibit 8 to the First Day Affidavit.

"**AG**" means Attorney General.

"**AG Menu Matrix**" means the schedule set forth in Exhibit 4-B of the A&R Servicing Agreement, which provides a methodology for calculating the indemnification obligation of GMAC Mortgage with respect to losses suffered by Ally Bank as a result of certain loan modification activity related to the DOJ/AG Settlement.

"**Agency**" means a government-sponsored secondary mortgage market enterprise or Government Entity acquiring, owning, or guaranteeing Mortgage Loans, including Fannie Mae, FHA, Freddie Mac, Ginnie Mae, and HUD.

"**Ally Bank**" means Ally Bank, a commercial state non-member bank chartered under the laws of the State of Utah, formerly known as GMAC Bank and GMAC Automotive Bank.

"**Ally Bank Transactions**" means collectively to all consummated transactions, agreements, or events concerning: (1) the 2006 Bank Restructuring; (2) the 2008 Bank Transaction; and (3) the 2009 Bank Transaction.

"**Ally Investment Management**" means Ally Investment Management LLC, formerly known as GMAC Investment Management LLC.

"**Ally Securities**" means Ally Securities LLC, formerly known as Residential Funding Securities, LLC, Residential Funding Securities Corporation, and GMAC-RFC Securities.

"**ALTA**" means the American Land Title Association or any successor thereto.

"**Alt-A**" means alternative a-paper, a type of mortgage.

"**American Home**" means American Home Mortgage Holdings.

"**Annualized P/E**" means MVE divided by annualized earnings.

"**Antitrust Authority**" means the Federal Trade Commission, the Department of Justice, any attorney general of any state of the U.S., or any other antitrust or competition authority of any jurisdiction.

"**April 2011 MSR Swap Confirmation**" means the Confirmation of the Total Return Swap Relating to Mortgage Servicing Rights of Ally Bank, dated April 1, 2011.

"**April 2011 Pipeline Swap Confirmation**" means the Confirmation of the Swap Relating to Loans in the Held for Sale Portfolio, dated April 1, 2011.

"**ARMs**" means adjustable rate mortgages.

"**Asset-Based Approach**" means the standard valuation approach to valuing a business by adjusting the asset and liability balances on the subject company's balance sheet to their market value equivalents (also commonly referred to as the asset approach or adjusted balance sheet approach).

"**Audit Services**" means either GM Audit Services or GMAC Audit Services.

"**Balance Sheet Test**" means the standard solvency assessment that compares an entity's property to its debt, at a fair valuation.

"**Bank Board**" means the board of directors of Ally Bank as constituted from time to time.

"**Bank of America**" means Bank of America Corporation and all of its direct and indirect affiliates.

"**Bankruptcy Code**" means title 11 of the U.S. Code.

"**Bankruptcy Court**" means the U.S. Bankruptcy Court for the Southern District of New York.

"**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure.

"**Barclays**" means Barclays Bank PLC and all of its direct and indirect affiliates.

"**Barclays DIP Financing Agreement**" means the Amended and Restated Superpriority Debtor-in-Possession Credit and Guaranty Agreement by and among GMACM Borrower and RFC Borrower, as borrowers, ResCap, GMAC Mortgage, RFC, and certain Subsidiaries of ResCap, as guarantors, GMAC Mortgage and RFC, as administrators, originators, receivables custodians and servicers, the lenders party thereto, GMAC Mortgage, as GMACM servicer, and Barclays, as administrative agent, collateral agent and syndication agent, dated May 16, 2012, that was approved by the Barclays DIP Order.

"**Barclays DIP Order**" means the Final Order Pursuant to 11 U.S.C. §§ 105, 362, 363(b)(1), 363(f), 363(m), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) and Bankruptcy Rules 4001 and 6004 (I) Authorizing Debtors (A) to Enter into and Perform under Receivables Purchase Agreements and Mortgage Loan Purchase and Contribution Agreements Relating to Initial Receivables and Mortgage Loans and Receivables Pooling Agreements Relating to Additional Receivables, and (B) to Obtain Post-Petition Financing on a Secured Superpriority Basis, and (II) Granting Related Relief entered in the Chapter 11 Cases [Docket No. 490] on June 25, 2012.

"**BCG**" means the five business units that comprised the business capital group of ResCap.

"**BCL2B Presentation**" means the Brokering Consumer Loans 2 Bank project (BCL2B), Legal Entity Revenue, Expense, and Broker Fee Proposal, dated November 19, 2008.

"**Bear Stearns**" means Bear, Stearns & Co. Inc. and all of its direct and indirect affiliates.

"**Berkshire Hathaway**" means Berkshire Hathaway Inc.

"**BH Legacy APA**" means the Asset Purchase Agreement among Berkshire Hathaway, ResCap, RFC, GMAC Mortgage, GMACM Borrower, and RFC Borrower, dated June 28, 2012.

"**Bilateral Facilities**" means, collectively, the specified bilateral credit facilities listed on Schedule 7.01(t) to the Secured Revolver Facility from time to time; each, a "Bilateral Facility."

"**Bloomberg**" means Bloomberg Inc.

"**BMMZ**" means BMMZ Holdings LLC.

"**BMMZ Master Repo Agreement**" means the Master Repurchase Agreement by and among BMMZ, as buyer, GMAC Mortgage, as seller and servicer, RFC, as seller, and ResCap, as guarantor, dated December 21, 2011.

"**BMMZ Repo Facility**" means the repurchase facility evidenced by the BMMZ Master Repo Agreement and all documents, instruments or agreements executed and delivered in connection therewith.

"**BMMZ Repo Sellers**" means, collectively, RFC, as seller, and GMAC Mortgage, as seller and servicer under the BMMZ Repo Facility.

"**bps**" means basis points.

"**Broker Agreement**" means the Broker Agreement between GMAC Bank, GMAC Mortgage, and Ditech, LLC, dated November 20, 2008.

"**Bryan Cave**" means Bryan Cave LLP.

"**Business Day**" means any day of the year, other than any Saturday, Sunday or any day on which banks located in New York, New York generally are closed for business.

"**Capital IQ**" means S&P Capital IQ.

"**CAPM**" means capital asset pricing model.

"**Cap Re**" means Cap Re of Vermont, LLC.

"**Carpenter Lipps**" means Carpenter Lipps & Leland LLP.

"**Cash Collateral Order**" means the Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing on a Secured Superpriority Basis, (II) Authorizing the Debtors to Use Cash Collateral, and (III) Granting Adequate Protection to Adequate Protection Parties [Docket No. 491], dated June 25, 2012.

12-12020-mg  Case 22-11068-JTD  Doc 3098-36  Filed 05/13/13  Doc 05/13/13  Entered 02/03/23 13/18 07:36:13  Page 386 of 709  Appendix
Pg 12 of 385

**Appendix I**, Page 9 of 38

"**Causes of Action**" means any and all Claims, actions, causes of action, choses in action, rights, demands, suits, claims, liabilities, encumbrances, lawsuits, adverse consequences, debts, damages, dues, sums of money, accounts, reckonings, deficiencies, bonds, bills, disbursements, expenses, losses, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, judgments, remedies, rights of set-off, third-party claims, subrogation claims, contribution claims, reimbursement claims, indemnity claims, counterclaims, and cross-claims (including those of the Debtors and/or bankruptcy estate of any Debtor created pursuant to sections 301 and 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Cases), whether known or unknown, foreseen or unforeseen, suspected or unsuspected, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, whether held in a personal or representative capacity, that are or may be pending on the Effective Date or instituted after the Effective Date against any entity, based in law or equity, including under the Bankruptcy Code, whether direct, indirect, derivative, or otherwise and whether asserted or unasserted as of the date of entry of the Confirmation Order.

"**CDS**" means credit default swap.

"**Centerbridge**" means Centerbridge Partners, L.P.

"**Centerview**" means Centerview Partners Holdings LLC and all of its direct and indirect affiliates.

"**Cerberus**" means Cerberus Capital Management, L.P. and all of its direct and indirect affiliates and subsidiaries, including Cerberus FIM, LLC, Cerberus FIM Investors LLC, and FIM Holdings LLC.

"**Cerberus PSA**" means the Purchase and Sale Agreement by and among GM, General Motors Acceptance Corporation, GM Finance Co. Holdings Inc., and FIM Holdings LLC, dated April 2, 2006.

"**Cerberus Secondment Agreements**" means, collectively: (1) the Secondment Agreement by and among Cerberus, COAC, and Thomas Marano, dated September 2008; and (2) the Secondment Agreement by and among Cerberus, COAC, and Joshua Weintraub, dated September 2008.

"**Chapter 11 Cases**" means the voluntary chapter 11 cases filed by the Debtors with the Bankruptcy Court.

"**Citibank**" means Citibank, N.A. and all of its direct and indirect affiliates.

"**Citibank MSR Loan Agreement**" means the Amended and Restated Loan and Security Agreement by and among GMACM, ResCap, and Citibank, dated June 30, 2010.

"**Claims**" means any right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured, known or unknown; or any right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right

to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured, known or unknown.

"**Class A Senior Preferred Shares**" means the senior class of membership interest in CMH.

"**Class B Junior Preferred Shares**" means the junior class of membership interest in CMH.

"**Clayton**" means Clayton Holdings LLC.

"**CMH**" means CMH Holdings LLC, an entity set up by Cerberus in connection with the June 2008 Model Home Sale.

"**CMP**" means the civil money penalty issued in connection with the FRB/FDIC Settlement against AFI, ResCap, and GMAC Mortgage in the amount of $207,000,000 announced on February 9, 2012 and effectively entered on February 10, 2012.

"**CMP Order**" means the Order of Assessment of a Civil Money Penalty Issued upon Consent Pursuant to the Federal Deposit Insurance Act, as Amended, by and among the Federal Reserve Board, AFI, ResCap, and GMAC Mortgage and its subsidiaries, and issued in connection with the FRB/FDIC Consent Order in the amount of $207,000,000, announced on February 9, 2012 and executed on February 10, 2012.

"**COAC**" means Cerberus Operations and Advisory Company, LLC, an affiliate of Cerberus Capital Management, L.P.

"**Committee Rule 2004 Motion**" means the Motion of the Official Committee of Unsecured Creditors of Debtors Residential Capital, LLC, *et al*., for Entry of an Order Pursuant to Bankruptcy Rule 2004 Authorizing the Issuance of Subpoenas for the Production of Documents and the Provision of Testimony by the Debtors and Others entered in the Chapter 11 Cases [Docket No. 192] on June 1, 2012.

"**Committee Rule 2004 Order**" means the Order Authorizing the Official Committee of Unsecured Creditors to Issue Subpoenas Compelling the Production of Documents and Provision of Testimony by the Debtors and Others Pursuant to Federal Rule of Bankruptcy Procedure 2004 entered in the Chapter 11 Cases [Docket No. 217] on June 5, 2012.

"**Confirmation Order**" means an order of the Bankruptcy Court confirming any Plan, as amended, supplemented, or modified, under, among others, section 1129 of the Bankruptcy Code.

"**Consenting Junior Secured Noteholders**" means the holders of Junior Secured Notes Claims that are or were party to the Junior Secured Noteholders' Plan Support Agreement.

"**Correspondent Agreement**" means the Correspondent Agreement between GMAC Mortgage, as seller, and GMAC Bank, as purchaser, of mortgage loans, dated August 21, 2001.

"**Countrywide**" means Countrywide Financial Corp. and all of its direct and indirect affiliates, now known as Bank of America Home Loans.

"**Countrywide Settlement**" means the settlement of mortgage repurchase and servicing claims entered into on or about June 28, 2011 between Bank of America, BAC Home Loans Servicing, LP, and its legacy Countrywide affiliates, and Bank of New York Mellon.

"**Creditors' Committee**" means the Official Committee of Unsecured Creditors of Residential Capital, LLC, *et al*. in the Chapter 11 Cases.

"**Credit Suisse**" means Credit Suisse Securities LLC and all of its direct and indirect affiliates.

"**D&O RMBS Actions**" means those litigations brought on account of D&O RMBS Claims.

"**D&O RMBS Claims**" means claims against the Debtors' and the AFI Defendants' directors and officers related to mortgage-backed securities.

"**Damages Letter**" means any submission by a Third-Party Claimant in response to the Examiner's Counsel's letter of December 21, 2012.

"**Davis Polk**" means Davis Polk & Wardwell LLP.

"**DBRS**" means DBRS Limited and all of its direct and indirect affiliates.

"**DCD**" means either Old GMAC Bank's or Ally Bank's Document Custody Division.

"**DCF Method**" means the discounted cash flow method of the Income Approach.

"**Debtor Release**" means a release of claims on substantially the same or similar terms as set forth in section 3.1(d)(i) of the now-terminated AFI Settlement and Plan Sponsor Agreement.

"**Debtors**" means ResCap and its direct and indirect subsidiaries that have filed voluntary petitions commencing a case under chapter 11 of the Bankruptcy Code, and are debtors and debtors-in-possession on behalf of each such entity and its Estate in the Chapter 11 Cases, as set forth on Schedule A.

"**Deloitte**" means Deloitte & Touche LLP, AFI's auditor for the entirety of the Investigation period and ResCap's auditor beginning in 2009.

"**Delta Financial**" means Delta Financial Corporation.

"**Depositor Entities**" means, collectively, RALI, RAMP (sometimes d/b/a RAAC), RASC, RFMSI, and RFMSII.

"**DFI**" means Utah Department of Financial Institutions.

"**Disclosure Statement**" means any disclosure document relating to a Plan filed in the Chapter 11 Cases pursuant to section 1125 of the Bankruptcy Code, as the same may be amended, supplemented, or otherwise modified from time to time.

"**Document Depository**" means the central document depository established by the Examiner and approved by the Bankruptcy Court pursuant to the Examiner Rule 2004 Order.

"**DOJ**" means the Department of Justice.

"**DOJ/AG Consent Judgment**" means the settlement agreement entered into by AFI, ResCap and GMAC Mortgage with the U.S., acting through the DOJ, and with the AGs of various states, agreed to on February 8, 2012 and filed on April 4, 2012, to settle certain potential civil claims for conduct related to the servicing of mortgage loans.

"**DOJ/AG Settlement**" means the settlement memorialized by the DOJ/AG Consent Judgment, among the DOJ and various state AGs on the one hand and AFI, ResCap, and GMAC Mortgage on the other.

"**DTI**" means debt-to-income.

"**Duff & Phelps**" means Duff & Phelps, LLC.

"**Earmark Agreement**" means the agreement between ResCap and AFI, dated March 14, 2012, which dictated the terms of ResCap's use of liquidity provided by AFI pursuant to the January 30 Letter Agreement solely to fund the payments required under the DOJ/AG Consent Judgment.

"**Effective Date**" means the first Business Day on which no stay of a Confirmation Order is in effect and all conditions precedent to the effectiveness of a Plan have been satisfied or waived.

"**EPD**" means early payment default.

"**Estate**" means, as to each Debtor, the estate created for the Debtor pursuant to section 541 of the Bankruptcy Code.

"**EV**" means enterprise value.

"**EV/TA**" means enterprise value divided by total assets (net of cash).

"**Evercore**" means Evercore Partners Inc. and all of its direct and indirect affiliates.

"**Examiner**" means Arthur J. Gonzalez, Esq., as the examiner appointed by the U.S. Trustee and approved by the Court in the Examiner Approval Order to conduct the Investigation and perform such other duties as set forth in the Examiner Order and the Examiner Scope Approval Order.

"**Examiner Approval Order**" means the Order Approving Appointment of Arthur J. Gonzalez, Esq. as Examiner entered in the Chapter 11 Cases [Docket No. 674] on July 3, 2012.

"**Examiner Memorandum Opinion**" means the Memorandum Opinion and Order Granting Berkshire Hathaway's Motion to Appoint an Examiner Under 11 U.S.C. § 1104(c) entered in the Chapter 11 Cases [Docket No. 454] on June 20, 2012.

"**Examiner Motion**" means the Motion of Berkshire Hathaway Inc. for the Appointment of an Examiner Pursuant to 11 U.S.C. § 1104(c) entered in the Chapter 11 Cases [Docket No. 208] on June 4, 2012.

"**Examiner Order**" means the Order Directing the Appointment of an Examiner Pursuant to Section 1104(c) of the Bankruptcy Code entered in the Chapter 11 Cases [Docket No. 536] on June 28, 2012.

"**Examiner Rule 2004 Motion**" means the Motion of the Examiner for Entry of an Order (I) Granting Authority to Issue Subpoenas for the Production of Documents and Authorizing the Examination of Persons and Entities, (II) Establishing Procedures for Responding to those Subpoenas, (III) Approving Establishment of a Document Depository and Procedures to Govern Use, and (IV) Approving Protective Order filed in the Chapter 11 Cases [Docket No. 1093] on August 10, 2012.

"**Examiner Rule 2004 Order**" means the Order (I) Granting Examiner Authority to Issue Subpoenas for the Production of Documents and Authorizing the Examination of Persons and Entities, (II) Establishing Procedures for Responding to those Subpoenas, (III) Approving Establishment of a Document Depository and Procedures to Govern Use, and (IV) Approving Protective Order entered in the Chapter 11 Cases [Docket No. 1223] on August 20, 2012.

"**Examiner Scope Approval Order**" means the Order Approving Scope of Investigation of Arthur J. Gonzalez, Examiner, entered in the Chapter 11 Cases [Docket No. 925] on July 27, 2012, including the Examiner's Preliminary Statement as annexed thereto as Exhibit A.

"**Examiner Work Plan**" means the Work Plan of Arthur J. Gonzalez, Examiner, filed in the Chapter 11 Cases [Docket No. 1010] on August 6, 2012.

"**Examiner Work Plan Fourth Supplement**" means the Fourth Supplement to Work Plan of Arthur J. Gonzalez, Examiner, entered in the Chapter 11 Cases [Docket No. 3361] on April 5, 2013.

"**Examiner Work Plan Second Supplement**" means the Second Supplement to Work Plan of Arthur J. Gonzalez, Examiner, filed in the Chapter 11 Cases [Docket No. 2263] on November 26, 2012.

"**Examiner Work Plan Supplement**" means the Supplement to Work Plan of Arthur J. Gonzalez, Examiner, filed in the Chapter 11 Cases [Docket No. 1240] on August 23, 2012.

"**Examiner Work Plan Third Supplement**" means the Third Supplement to Work Plan of Arthur J. Gonzalez, Examiner, entered in the Chapter 11 Cases [Docket No. 2868] on February 8, 2013.

"**Examiner's Counsel**" means Chadbourne & Parke LLP.

"**Examiner's Financial Advisors**" means Mesirow Financial Consulting, LLC.

"**Examiner's Preliminary Statement**" means the Preliminary Statement of Arthur J. Gonzalez, Examiner, Regarding the Scope and Timing of his Investigation attached as Exhibit A to the Examiner Scope Approval Order.

"**Examiner's Professionals**" means, collectively, Examiner's Counsel and Examiner's Financial Advisors.

"**Excess Servicing Rights Sales**" means, collectively, the Freddie Mac Sale and Fannie Mae Sale.

"**Exchange Act**" means the Securities Exchange Act of 1934.

"**Fair Market Value**" means the price, expressed in terms of cash equivalents, at which property would change hands between a hypothetical willing and able buyer and a hypothetical willing and able seller, acting at arm's length in an open and unrestricted market, when neither is under compulsion to buy or sell and when both have reasonable knowledge of the relevant facts.

"**Fannie Mae**" means the Federal National Mortgage Association (FNMA).

"**Fannie Mae Sale**" means the transaction whereby GMAC Mortgage, a wholly-owned subsidiary of ResCap, sold by way of auction certain securitized excess servicing rights representing a portion of the servicing fees payable under the Fannie Mae guide to Cerberus, pursuant to an Asset Purchase Agreement dated July 30, 2008.

"**FAS**" means Statement of Financial Accounting Standards.

"**FASB**" means the Financial Accounting Standards Board.

"**FCIC**" means the Financial Crisis Inquiry Commission.

"**FDIC**" means the Federal Deposit Insurance Corporation.

"**FGIC**" means Financial Guaranty Insurance Company.

"**FHA**" means the Federal Housing Administration of HUD.

"**FHA Loans**" means mortgages insured by the FHA.

"**FHFA**" means the Federal Housing Finance Agency.

"**FHLB**" means Federal Home Loan Bank.

"**FICO**" means the Fair Isaac Corporation, the creators of the FICO score.

"**First 2009 Tax Allocation Agreement**" means the Amended and Restated Agreement for the Allocation of United States Federal Income Taxes among GMAC Mortgage Group LLC, ResCap Investments LLC, and ResCap, made as of November 1, 2009, attached as Exhibit A to the Joint ResCap-AFI Memorandum to ResCap Board on 2009 Tax Allocation Agreement, and approved by the ResCap Board at a meeting held on August 6, 2010.

"**First Amendment to APA**" means the first amendment to the Asset Purchase Agreement dated July 26, 2008, related to the Resort Finance Sale.

"**First Day Affidavit**" means the Affidavit of James Whitlinger, Chief Financial Officer of Residential Capital, LLC, In Support of Chapter 11 Petitions And First Day Pleadings and entered in the Chapter 11 Cases [Docket No.6] on May 14, 2012.

"**First Magnus**" means First Magnus Financial Corporation and all of its direct and indirect affiliates.

"**First Priority Collateral**" means the collateral securing the obligations under the Secured Revolver Facility.

"**First Priority Collateral Agent**" means Wells Fargo Bank, N.A., as First Priority Collateral Agent under the First Priority Security Agreement and the A&R First Priority Security Agreement.

"**First Priority Security Agreement**" means the First Priority Pledge and Security Agreement and Irrevocable Proxy (as amended, supplemented or otherwise modified prior to being amended and restated by the A&R First Priority Security Agreement) among GMAC Mortgage, RFC, ResCap, RAHI, PATI, GMAC Holding, RFC Holding, Homecomings Financial, and Equity Investment I, LLC, and certain of their affiliates party thereto from time to time, as grantors, and AFI as lender and lender agent and Wells Fargo Bank, N.A., as First Priority Collateral Agent, dated June 4, 2008.

"**Fitch**" means Fitch Ratings and all of its direct and indirect affiliates.

"**Flume No. 8 Note**" means the Flume No. 8 Initial Note or any other note issued from time to time under and in accordance with the Flume No. 8 Note Issuance Facility Deed, dated November 14, 2008 and including any notes given in substitution or replacement therefor; Flume No. 8 Notes means, collectively, all of them.

"**FMV**" means Fair Market Value.

"**FMV Schedule**" means the Schedule to the ISDA Master Agreement (FMV) between GMAC Mortgage and GMAC Bank, dated August 31, 2007.

"**FNMA EAF Agreement**" means the term sheet between Fannie Mae and GMAC Mortgage, dated August 1, 2010, amended and restated as of January 18, 2011, and further amended and restated on August 1, 2011.

"**Fortress**" means Fortress Investment Group LLC and all of its direct and indirect affiliates and subsidiaries including, but not limited to, Nationstar.

"**Forward P/E**" means MVE divided by projected earnings for the current or upcoming year.

"**Fox-Pitt**" means Fox-Pitt Kelton Cochran Caronia Waller.

"**FRB**" means the Board of Governors of the Federal Reserve System.

"**FRB/FDIC Consent Order**" means the Consent Order to Cease and Desist by and among the Federal Reserve Board and the Federal Deposit Insurance Corporation and AFI, Ally Bank, ResCap and GMAC Mortgage, as defendants, dated April 13, 2011.

"**FRB/FDIC Settlement**" means the settlement memorialized by the FRB/FDIC Consent Order and related CMP, among the FRB and the FDIC on the one hand and AFI, Ally Bank, ResCap, and GMAC Mortgage on the other (though Ally Bank was not a party to the CMP).

"**Freddie Mac**" means the Federal Home Loan Mortgage Corporation (FHLMC).

"**Freddie Mac Sale**" means the transaction whereby GMAC Mortgage, a wholly owned subsidiary of ResCap, sold by way of auction certain securitized excess servicing rights representing a portion of the servicing fees payable under the Freddie Mac guide to Cerberus, pursuant to an Asset Purchase Agreement dated July 30, 2008.

"**FTI**" means FTI Consulting, Inc. and all of its direct and indirect affiliates.

"**GAAP**" means U.S. generally accepted accounting principles.

"**Ginnie Mae**" means the Government National Mortgage Association (GNMA), a body corporate organized and existing under the laws of the U.S. within HUD.

"**GM**" means General Motors Corporation, now known as Motors Liquidation Co.

"**GM Preferred Holdco**" means GM Preferred Finance Co. Holdings Inc.

"**GMAC**" means GMAC LLC.

"**GMAC Automotive Bank**" means the Utah industrial bank, a direct wholly-owned subsidiary of AFI, which was the predecessor of Ally Bank (f/k/a GMAC Bank).

"**GMAC Bank**" means GMAC Bank, now known as Ally Bank and formerly known as GMAC Automotive Bank.

"**GMAC Canada**" means GMAC Residential Funding of Canada, Limited, a corporation governed by the laws of Canada.

"**GMAC CF**" means GMAC Commercial Finance LLC, a wholly owned subsidiary of AFI.

"**GMAC Debtors**" means the Debtors that are Subsidiaries of GMAC Holding.

"**GMAC FS**" means GMAC Financial Services, a wholly owned subsidiary of AFI.

"**GMAC Holding**" means GMAC Residential Holding Company, LLC.

"**GMAC LLC Agreement**" means the 2006 AFI LLC Agreement.

"**GMAC Management**" means GMAC Management LLC.

"**GMAC MHF**" means GMAC Model Home Finance I, LLC.

"**GMAC Mortgage**" means GMAC Mortgage, LLC (f/k/a GMAC Mortgage Corporation).

"**GMACM Borrower**" means GMACM Borrower LLC.

"**Goldin Associates**" means Goldin Associates, LLC.

"**Goldman Sachs**" means Goldman Sachs Group Inc. and all of its direct and indirect affiliates.

"**Government Entity**" means any U.S. federal, state or local, or any supranational, court, judicial or arbitral body, administrative or regulatory body, or other governmental or quasi-Government Entity with competent jurisdiction (including any political or other subdivision thereof), including the Agencies, the DOJ, the FDIC, the FRB, the IRS, the SEC, the VA, any State Agency, and any Antitrust Authority.

"**GSAP Facility**" means the financing facility under: (1) the Fourth Amended and Restated Indenture among GMAC Mortgage Servicer Advance Funding Company Ltd., an exempted company incorporated with limited liability under the laws of the Cayman Islands, as issuer, GMAC Mortgage, as an administrator and a servicer, RFC, as an administrator and a servicer, and The Bank of New York Mellon, as indenture trustee, calculation agent and paying agent, dated March 15, 2011, as amended by Amendment No. 1, dated March 13, 2012, as amended or supplemented; (2) the Series 2012-VF1 Indenture Supplement by and among GMAC Mortgage Servicer Advance Funding Company Ltd., as issuer, GMAC Mortgage, as an administrator and servicer, RFC, as an administrator and servicer, The Bank of New York Mellon, as indenture trustee, calculation agent and paying agent, and Barclays, as administrative agent, dated March 13, 2012; (3) the VFN Purchase Agreement by and among GMAC Mortgage Servicer Advance Funding Company Ltd, GMAC Mortgage, as an originator, RFC, as an originator, GMACR Mortgage Products, LLC, as a seller, RFC-GSAP Servicer Advance, LLC, as a seller, and Barclays, as administrative agent and purchaser, dated March 13, 2012, relating to the GMAC Mortgage Servicer Advance Funding Company Ltd., GMAC Mortgage Advance Receivables-Backed Notes, Series 2012-VF1 issued pursuant to the indenture and indenture supplement identified in items (1) and (2) above; and (4) the Series 2012-VF1 notes and all other notes issued pursuant to the indenture and indenture supplement identified in items (1) and (2) above.

"**GSE**" means government-sponsored enterprise, including Fannie Mae and Freddie Mac.

"**Guarantors**" means, collectively, the Junior Secured Notes Guarantors, the Secured Revolver Facility Guarantors, and the A&R Line of Credit Guarantors.

"**Guideline M&A Method**" means the guideline merged and acquired company method of the Market Approach.

"**Guideline Publicly Traded Company Method**" means the guideline publicly traded company method of the Market Approach.

"**GX II Notes**" means the note of GX CE Funding H B.V. issued pursuant to the GX II VFLN Agreement by and among ResCap, GX CE Funding II B.V., Stichting Security Trustee GX CE Funding II, GMAC-RFC Investments B.V. and GMAC RFC Nederland B.V. and including any notes given in substitution or replacement therefor; GX II Notes means, collectively, all of them.

"**Health Capital**" means the division within the BCG that provided capital solutions to the healthcare industry.

"**Health Capital Sale**" means the transaction whereby RFC and Equity Investments II, LLC, each wholly owned subsidiaries of ResCap, sold substantially all of the assets and operations comprising their healthcare finance business to GMAC CF pursuant to an Asset Purchase Agreement dated August 27, 2007.

"**HELOC**" means a Mortgage Loan that is a home equity line of credit.

"**HFI**" means held-for-investment.

"**HFI Portfolio**" means HFI consumer finance receivables and loan portfolio.

"**HFS**" means held-for-sale.

"**HFS Asset Purchase Agreement**" means the Asset Purchase Agreement among AFI, BMMZ, ResCap, RFC, GMAC Mortgage, and additional sellers identified on Schedule A thereto, dated May 13, 2012.

"**HFS Portfolio**" means ResCap's HFS portfolio of mortgage loans, which are the subject of the HFS Asset Purchase Agreement.

"**HOEPA**" means the Home Ownership and Equity Protection Act of 1994.

"**Homecomings Financial**" means Homecomings Financial, LLC.

"**Houlihan Lokey**" means Houlihan Lokey Howard & Zukin Financial Advisors, Inc.

"**HSBC**" means HSBC Holdings plc and all of its direct and indirect affiliates.

"**HUD**" means the Department of Housing and Urban Development.

"**Ibbotson Associates**" means Ibbotson Associates, Inc.

"**IB Finance**" means IB Finance Holding Company, LLC, the holding company for Ally Bank.

"**IB Finance 2006 LLC Agreement**" means the Limited Liability Company Agreement of IB Finance Holding Company, LLC, dated November 20, 2006.

"**IB Finance 2008 LLC Agreement**" means the Amended and Restated Limited Liability Company Agreement of IB Finance Holding Company, LLC, dated March 31, 2008.

"**IB Finance LLC Agreements**" means, collectively, the IB Finance 2006 LLC Agreement and the IB Finance 2008 LLC Agreement.

"**IB Finance Class A Shares**" means the voting common interests in IB Finance that track the performance of Ally Bank's automotive business.

"**IB Finance Class M Shares**" means the non-voting common interests in IB Finance that track the performance of Ally Bank's mortgage business.

"**IB Finance Preferred Interests**" means non-voting, non-cumulative, non-participating, perpetual class M preferred membership interests of IB Finance.

"**IBG**" means the international business group of ResCap.

"**IMF**" means the International Monetary Fund.

"**Implemented 2005 Tax Allocation Agreement**" means the Agreement for the Allocation of United States Federal Income Taxes by and between GMAC and ResCap, effective as of January 1, 2005.

"**Income Approach**" means the standard valuation approach to valuing a business based on the present value of the cash flows that the business can be expected to generate in the future.

"**Independent Directors**" means the independent directors of the ResCap Board from time to time.

"**IndyMac**" means IndyMac Bancorp, Inc. and all of its direct and indirect affiliates.

"**Initial Line of Credit Agreement**" means the Loan Agreement (as amended, supplemented or otherwise modified prior to being amended and restated by the A&R Line of Credit Agreement) by and among PATI and RAHI, as borrowers, RFC, GMAC Mortgage and ResCap, as guarantors, and AFI, as initial lender and lender agent, dated November 20, 2008.

"**Initial Line of Credit Borrowers**" means PATI and RAHI.

"**Initial Line of Credit Collateral**" means the collateral securing the obligations under the Initial Line of Credit Agreement.

"**Initial Line of Credit Facility**" means the credit facility evidenced by the Initial Line of Credit Agreement and all documents, instruments, or agreements executed and delivered in connection therewith.

"**Initial Line of Credit Guarantors**" means ResCap, RFC, and GMAC Mortgage.

"**Initial Line of Credit Loans**" means the revolving loans under the Initial Line of Credit.

"**Initial Line of Credit Security Agreement**" means the Pledge and Security Agreement and Irrevocable Proxy (as amended, supplemented, or otherwise modified prior to being amended and restated by the A&R Initial Line of Credit Security Agreement) among PATI, RAHI, ResCap, RFC, and GMAC Mortgage, as Grantors, and AFI, as lender agent, dated November 20, 2008.

"**Intercreditor Agreement**" means the agreement by and among Wells Fargo, N.A., as First Priority Collateral Agent for the First Priority Secured Parties under the First Priority Documents, Wells Fargo Bank, N.A., as Second Priority Collateral Agent for the Second Priority Secured Parties under the Second Priority Documents, Wells Fargo Bank, N.A., as Third Priority Collateral Agent for the Third Priority Secured Parties under the Third Priority Documents, AFI, in its capacity as agent for the Lenders under the Secured Revolver Facility, U.S. Bank National Association, as Trustee under the 2010 Indenture, U.S. Bank National Association, as Trustee under the 2015 Indenture, RFC, GMAC Mortgage, and ResCap, dated June 6, 2008.

"**Interest**" means any "Equity Security," as defined in section 101(16) of the Bankruptcy Code, of a Debtor existing immediately prior to the Effective Date.

"**Internal Revenue Code**" means the Internal Revenue Code of 1986.

"**Investigation**" means the investigation conducted by the Examiner pursuant to the Examiner Order and the Examiner Scope Approval Order.

"**IRS**" means the Internal Revenue Service.

"**January 26 Goldin Letter**" means the January 26, 2009 financial fairness opinion from Goldin Associates to the Committee of Independent Members of the ResCap Board, regarding the sale of ResCap's remaining IB Finance Class M Shares to AFI (the January 26 Goldin Letter is misdated January 26, 2008).

"**January 30 Goldin Letter**" means the January 30, 2009 supplementary financial fairness opinion from Goldin Associates to the Committee of Independent Members of the ResCap Board, regarding the sale of ResCap's remaining IB Finance Class M Shares to AFI.

"**January 30 Letter Agreement**" means the January 30, 2012 letter agreement regarding the "Terms of Support Relating to Possible DOJ/State Attorneys' General Settlement" entered into by ResCap, GMAC Mortgage, and AFI.

"**Joint Collateral**" means certain of the Debtors' assets that secure the AFI Secured Revolver Facility Claims and the Junior Secured Notes Claims, as described in the A&R First Priority Security Agreement and the A&R Third Priority Security Agreement.

"**Joint ResCap-AFI Tax Memorandum to ResCap Board**" means the memorandum from William J. Marx, James. N. Young, and Tammy Hamzehpour to the ResCap Board, dated August 6, 2010, regarding Agreements for Allocation of Taxes.

"**JPMorgan**" means JPMorgan Chase & Co. and all of its direct and indirect affiliates.

"**JPMorgan 2005 Term Loan Facility**" means the Term Loan Facility among ResCap, the several lenders from time to time parties thereto, the documentation agents named therein, Citibank, as syndication agent, and JPMorgan, as administrative agent, dated July 28, 2005.

"**JPMorgan 364-Day Facility**" means the 364-Day Competitive Advance and Revolving Credit Facility among ResCap, the several lenders from time to time party thereto, the documentation agents named therein, Citibank, as syndication agent, and JPMorgan, as administrative agent, dated June 11, 2007.

"**July 2008 Pipeline Swap Schedule**" means the Schedule to the ISDA Master Agreement between GMAC Mortgage and GMAC Bank, dated July 1, 2008.

"**June 2008 Indentures**" means, collectively, the Senior Secured Notes Indentures and the Junior Secured Notes Indenture.

"**June 2008 Model Home Sale**" means the transaction whereby ResCap and GMAC Model Home Finance I, LLC, a wholly owned subsidiary of ResCap, sold certain model home assets including model homes, option lots, and real estate owned by certain wholly owned subsidiaries of ResCap to CMH, a newly formed affiliate entity of Cerberus, pursuant to an Asset Purchase Agreement dated June 6, 2008.

"**Junior Secured Noteholders' Plan Support Agreement**" means the agreement by and among the Debtors, AFI, the Consenting Holders, and the Ad Hoc Group entered into as of May 13, 2012, which is attached as Exhibit 9 to the First Day Affidavit.

"**Junior Secured Noteholders**" means the holders of the Junior Secured Notes.

"**Junior Secured Notes**" means the 9.625% Junior Secured Guaranteed Notes due 2015 issued under the Junior Secured Notes Indenture.

"**Junior Secured Notes Claims**" means any Claim arising from or relating to the Junior Secured Notes, excluding the reasonable and documented fees and expenses, including professional fees and expenses, of U.S. Bank National Association, as indenture trustee or successor indenture trustee under the Junior Secured Notes Indenture, together with its respective successors and assigns in such capacity, incurred pursuant to the Junior Secured Notes Indenture after the Petition Date in connection with carrying out its duties as provided for under the Junior Secured Notes Indenture, service on the Creditors' Committee, and making distributions under a Plan.

"**Junior Secured Notes Indenture**" means the indenture among ResCap LLC, as issuer, GMAC Holding, RFC Holding, GMAC Mortgage, RFC, and Homecomings Financial, as guarantors, and U.S. Bank National Association, as trustee, dated June 6, 2008.

"**Kirkland & Ellis**" means Kirkland & Ellis LLP.

"**KPMG Report**" means the Ally Financial Inc. Investigation Report by KPMG LLP, dated March 16, 2012.

"**Lazard**" means Lazard Ltd and all of its direct and indirect affiliates.

"**Legacy Sale**" means the sale of the HFS Portfolio to Berkshire Hathaway.

"**Lehman**" means Lehman Brothers Holdings Inc. and all of its direct and indirect affiliates.

"**LIBOR**" means London Interbank Offered Rate.

"**Lien**" means any lien, charge, pledge, deed of trust, right of first refusal, security interest, conditional sale agreement or other title retention agreement, lease, mortgage, option, proxy, hypothecation, voting trust agreement, transfer restriction, easement, servitude, encroachment, or other encumbrance (including the filing of, or agreement to give, any financing statement under the UCC of any jurisdiction).

"**Line of Credit Facilities**" means the Initial Line of Credit Facility and the Second Line of Credit Facility.

"**LLC Conversion Dividend**" means the cash dividend declared by the Executive Committee of the ResCap Board on November 27, 2006, in an amount equal to the net increase in the equity of ResCap resulting from ResCap and certain of its domestic subsidiaries (on a consolidated basis) having all their tax-related accounts released upon converting to disregarded entities under federal income tax law in November 2006.

"**LTM**" means latest twelve months.

"**LTM P/E**" means MVE divided by LTM earnings.

"**LTV**" means loan-to-value ratios.

"**March 2005 Pipeline Schedule**" means the Schedule to the ISDA Master Agreement between GMAC Mortgage Corporation and GMAC Bank, dated October 1, 2004 and amended as of March 30, 2005.

"**March 2008 Pipeline Swap Schedule**" means the Schedule to the ISDA Master Agreement between GMAC Mortgage and GMAC Bank, dated March 14, 2008.

"**Market Approach**" means the standard valuation approach to valuing a business in which market transactions are used in completing a relative comparison between the subject

company and guideline market transactions (commonly used through identifying guideline publicly traded companies and guideline merged & acquired companies).

"**Market Value of Invested Capital**" means the combined market value of the equity and debt interest in a company, inclusive of cash.

"**Master Netting Agreement**" means the Guarantee and Master Netting Agreement among GMAC, Ally Investment Management, GMAC Mortgage, RFC, ResCap, PATI, and RAHI, dated March 18, 2009.

"**Mayer Brown**" means Mayer Brown LLP.

"**MBIA**" means MBIA, Inc. and all of its direct and indirect affiliates.

"**MBS**" means mortgage backed-securities.

"**MCAPM**" means modified capital asset pricing model.

"**Mergerstat**" means Mergerstat Review.

"**Mitchell Appeal Decision**" means *Mitchell v. Residential Funding Corp.*, 334 S.W.3d 477 (Mo. Ct. App. 2010).

"**Mitchell Defendants**" means RFC, Homecomings Financial, LLC, as defendants in *Mitchell v. Residential Funding*, No. 03CV220489 (Mo. Cir.).

"**Mitchell Plaintiffs**" means the class of consumers who obtained second mortgage loans on Missouri real property from Mortgage Capital Resource Corporation on or after July 29, 1997, including Steven and Ruth Mitchell, among others, as plaintiffs in *Mitchell v. Residential Funding*, No. 03CV220489 (Mo. Cir.).

"**Mitchell Trial Order**" means *Mitchell v. Residential Funding*, No. 03CV220489, 2008 WL 310998 (Mo. Cir. Jan. 14, 2008).

"**MMLPSA**" means a Master Mortgage Loan Purchase and Sale Agreement between Ally Bank and GMAC Mortgage governing the purchase of mortgage loans by GMAC Mortgage from Ally Bank.

"**Moody's**" means Moody's Investors Service, Inc. and all of its direct and indirect affiliates.

"**Morrison & Foerster**" means Morrison & Foerster LLP.

"**Morrison Cohen**" means Morrison Cohen LLP.

"**Mortgage Bank**" means, as used in Section V.A.2, Old GMAC Bank prior to the 2006 Bank Restructuring, and the mortgage division of Ally Bank from and after the 2006 Bank Restructuring.

12-12020-mg Case 22-11068-JTD Doc 3698-36 Filed 05/13/13 Doc 05/13/13 Entered 05/13/13 Page 27 of 385 Page 351 of 709 Appendix
Pg 27 of 385

**Appendix I**, Page 24 of 38

"**Mortgage Loan**" means any U.S. individual residential (one-to-four family) mortgage loan or other extension of credit secured by a Lien on U.S. real property of a borrower originated, purchased, or serviced by any of the Debtors (which, for avoidance of doubt, may be a charged-off Mortgage Loan).

"**MSCI Barra**" means Barra, LLC, a wholly owned subsidiary of MSCI, Inc (MSCI, Inc. acquired Barra, Inc., a leading provider of risk management systems and services to managers of portfolio and firm-wide investment risk in 2004).

"**MSMLA**" means Missouri's Second Mortgage Loan Act, MO. REV. STAT. §§ 408.231–41.

"**MSR**" means mortgage servicing rights, including the rights under Servicing Contracts to: (1) receive servicing fees; (2) be reimbursed for Servicing Advances; (3) receive ancillary income (*e.g.*, late charge fees); and (4) hold and administer custodial fees and accounts.

"**MSR Swap**" means the ISDA Master Agreement between GMAC Mortgage and GMAC Bank, dated June 12, 2007, including the FMV Schedule thereto, dated August 31, 2007 and the Net Funding Schedule thereto, dated August 31, 2007.

"**MVE**" means market value of equity.

"**MVIC**" means market value of invested capital.

"**National Motors Bank FSB**" means the federal savings bank formerly known as Old GMAC Bank.

"**Nationstar**" means Nationstar Mortgage LLC and all of its direct and indirect affiliates.

"**Natixis**" means Natixis Real Estate Capital, Inc., (f/k/a IXIS Real Estate Capital, Inc.), a New York corporation.

"**NAV**" means net asset value.

"**NBV**" means net book value of equity.

"**Net Funding Schedule**" means the Schedule to the ISDA Master Agreement (Net Funding) between GMAC Mortgage and GMAC Bank, dated August 31, 2007.

"**New Century**" means New Century Financial Corporation.

"**NFY**" means next fiscal year.

"**NOL**" means net operating loss as that term is defined in section 172(c) of the Internal Revenue Code.

"**Non-RMBS Actions**" means litigations related to the Non-RMBS Claims, as listed in Appendix VIII.A−2.

"**Non-RMBS Claims**" means claims against the Debtors and the AFI Defendants related to areas of the Debtors' business other than the securitization of mortgage loans.

"**Observable Market Value Method**" means the standard valuation methodology that uses observable market prices to value equity, debt, or assets.

"**OCC**" means the Office of the Comptroller of the Currency.

"**Ocwen**" means Ocwen Financial Corporation.

"**Ocwen Platform Asset Purchase Agreement**" means the Asset Purchase Agreement between Ocwen and ResCap, RFC, GMAC Mortgage, Executive Trustee Services, LLC, ETS of Washington, Inc., EPRE LLC, GMACM Borrower, and RFC Borrower, dated November 2, 2012, attached as Exhibit 1 to the Court's Order Under Bankruptcy Code Sections 105, 363, and 365 and Fed. Bankr. P. 2002, 6004, 6006, and 9014 (I) Approving (A) Sale of Debtors' Assets Pursuant to Asset Purchase Agreement With Ocwen Loan Servicing, LLC; (B) Sale of Purchased Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (C) Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Thereto; (D) Related Agreements; and (II) Granting Related Relief Platform Sale [Docket No. 2246].

"**Old GMAC Bank**" means the federal savings bank now known as National Motors Bank FSB.

"**Omnibus Agent**" means AFI, in its capacity as Omnibus Agent pursuant to the Omnibus Security Agreement.

"**Omnibus Security Agreement**" means the Omnibus Pledge and Security Agreement and Irrevocable Proxy (as amended, supplemented or otherwise modified, prior to being amended and restated by the A&R Initial Line of Credit Security Agreement) among GMAC Mortgage, RFC, ResCap, RAHI, PATI, and certain of their affiliates party thereto from time to time, as grantors and, AFI, as Omnibus Agent, Lender, Lender under the Secured MSR Facility and, together with Ally Investment Management, as secured parties, dated March 18, 2009.

"**Order**" means, with respect to any Person, any award, decision, injunction, judgment, stipulation, order, ruling, subpoena, writ, decree, consent decree, or verdict entered, issued, made, or rendered by any Government Entity affecting such Person or any of its properties.

"**Original Servicing Agreement**" means the Servicing Agreement between GMAC Bank and GMAC Mortgage, dated August 21, 2001.

"**Other 2005 Tax Allocation Agreement**" means the Agreement for the Allocation of United States Federal Income Taxes by and between GMAC and ResCap, effective as of January 24, 2005.

"**OTS**" means Office of Thrift Supervision.

"**P/E**" means MVE or price divided by earnings.

"**P/NBV**" means MVE divided by net book value of equity.

"**P/TBVE**" means MVE divided by TBVE.

"**PATI**" means Passive Asset Transactions, LLC.

"**Pentalpha**" means Pentalpha Capital Group LLC and all of its direct and indirect affiliates.

"**Person**" means a natural person, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, Government Entity, or other entity or organization.

"**Petition Date**" means May 14, 2012.

"**Pipeline Letter Agreement**" means the Letter Agreement Re: Preservation of Sales of Mortgage Loans to ResCap and Other Matters among ResCap, GMAC Mortgage, AFI, and GMAC Mortgage Group, LLC, dated December 5, 2011.

"**Pipeline Swap**" means the ISDA Master Agreement between GMAC Mortgage and GMAC Bank, dated October 1, 2004, including the Schedule thereto, dated October 1, 2004.

"**Plan**" means any chapter 11 plan of Residential Capital, LLC, et al., including all addenda, exhibits, schedules, and other attachments, as may be amended, modified, or supplemented from time to time.

"**Plan Support Agreements**" means, collectively, the AFI Settlement and Plan Sponsor Agreement, the Junior Secured Noteholders' Plan Support Agreement, and the RMBS Plan Support Agreements.

"**Plan Term Sheet**" means the chapter 11 plan term sheet, dated May 14, 2012, which is Exhibit 4 to the AFI Settlement and Plan Sponsor Agreement.

"**Platform Asset Purchase Agreement**" means the Amended and Restated Asset Purchase Agreement between Nationstar and ResCap, RFC, GMAC Mortgage, Executive Trustee Services, LLC, ETS of Washington, Inc., EPRE LLC, GMACM Borrower, and RFC Borrower, dated June 28, 2012.

"**Platform Sale**" means the sale of the Debtors' Mortgage Loan origination and servicing businesses to Ocwen and Walter Investment Management Corp. as authorized pursuant to: (1) the Court's Order Under Bankruptcy Code Sections 105, 363, and 365 and Fed. Bankr. P. 2002, 6004, 6006, and 9014 (I) Approving (A) Sale of Debtors' Assets Pursuant to Asset Purchase Agreement With Ocwen Loan Servicing, LLC; (B) Sale of Purchased Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (C) Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Thereto; (D) Related Agreements; and (II) Granting Related Relief [Docket No. 2246].

"**PLS**" means private label mortgage-backed securities.

"**PMI**" means personal mortgage insurance.

"**Postpetition Asset Sales**" means the Platform Sale and the Legacy Sale.

"**Prepetition Asset Sales**" means, collectively, Freddie Mac Sale, Fannie Mae Sale, Health Capital Sale, June 2008 Model Home Sale, Resort Finance Sale, ResMor Sale, September 2008 Model Home Sale, and US/UK Broker-Dealer Sale.

"**Protective Order**" means Uniform Protective Order for Examiner Discovery approved by the Bankruptcy Court pursuant to the Examiner Rule 2004 Order.

"**Purchase and Assumption Agreement**" means the Purchase and Assumption Agreement by and between Old GMAC Bank and GMAC Automotive Bank dated November 20, 2006.

"**PwC**" means PricewaterhouseCoopers LLP.

"**RAAC**" means Residential Asset Acquisition Corp., a name under which RAMP sometimes did business.

"**RAHI**" means RFC Asset Holdings II, LLC.

"**RALI**" means Residential Accredit Loans, Inc., an RFC Holding subsidiary and one of the Depositor Entities.

"**RAMP**" means Residential Asset Mortgage Products, Inc., an RFC Holding subsidiary and one of the Depositor Entities (for certain securitizations, RAMP sometimes did business as RAAC).

"**RASC**" means Residential Asset Securities Corp., an RFC Holding subsidiary and one of the Depositor Entities.

"**Rating Agencies**" means, collectively, DBRS, Fitch, Moody's, and S&P.

"**RCG**" means Residential Capital Group, an operating segment of ResCap housed under RFG, responsible for activities relating to origination, acquisition, warehouse lending, servicing, investment banking, capital markets, portfolio, and asset management.

"**Reorganized Debtors**" means the Debtors, or any successors thereto by merger, consolidation, or otherwise, on and after the Effective Date.

"**Report**" means the report filed by the Examiner pursuant to the Examiner Order and the Examiner Scope Approval Order, including exhibits therein and appendices thereto.

"**ResCap**" means ResCap LLC and, as the context may require, all of its direct and indirect subsidiaries.

"**ResCap Board**" means the board of directors of ResCap as constituted from time to time.

"**ResCap By-Laws**" means the By-Laws of Residential Capital Corporation, dated August 20, 2004.

"**ResCap Guideline Companies**" means Countrywide, IndyMac, and WaMu.

"**ResCap LLC**" means Residential Capital, LLC, formerly known as Residential Capital Corporation.

"**ResCap LLC Agreement**" means the limited liability agreement of ResCap in effect from time to time.

"**ResCap Preferred Interests**" means the non-participating, perpetual preferred membership interests of ResCap, with a liquidation preference of $1,000 per unit; the ResCap Preferred Interests were exchangeable, at AFI's option, on a unit-for-unit basis for IB Finance Preferred Interests at any time on or after January 1, 2009, as long as neither ResCap nor any of its significant subsidiaries was the subject of a bankruptcy proceeding on or before that date.

"**ResMor**" means ResMor Capital Corporation.

"**ResMor Facility Borrower**" means GMAC Canada.

"**ResMor Loan**" means the term loan made under the ResMor Loan Agreement.

"**ResMor Loan Agreement**" means the Loan Agreement between GMAC Canada, as borrower, and AFI, as lender, dated November 20, 2008.

"**ResMor Loan Facility**" means the credit facility evidenced by the ResMor Loan Agreement and all documents, instruments, or agreements executed and delivered in connection therewith.

"**ResMor Sale**" means the transaction whereby GMAC Canada, an indirect subsidiary of ResCap, sold all of the outstanding the shares of 1020491 Alberta Ltd and all of the shares of ResMor Capital Corporation that GMAC Canada owned to AFI pursuant to a Share Purchase Agreement dated November 20, 2008.

"**Resort Facility Borrower**" means RFC.

"**Resort Facility Collateral**" means the collateral securing the obligations under the Resort Finance Agreement.

"**Resort Facility Loans**" means the revolving loans made under the Resort Finance Agreement.

"**Resort Finance**" means the division within the BCG that provided capital solutions to the resort finance industry, including RFC Resort Funding, LLC.

"**Resort Finance Agreement**" means the Credit Agreement among RFC, as borrower, and AFI, as lender and agent, dated February 21, 2008.

**Appendix I**, Page 29 of 38

"**Resort Finance Facility**" means the credit facility evidenced by the Resort Finance Agreement and all documents, instruments, or agreements executed and delivered in connection therewith.

"**Resort Finance Sale**" means the transaction whereby RFC and GMAC Canada, each indirect wholly owned subsidiaries of ResCap, sold 100% of ResCap's resort finance business, including RFC Resort Funding, LLC, a wholly owned subsidiary of RFC, to GMAC CF pursuant to an Asset Purchase Agreement dated July 2, 2008.

"**Restricted Stock Units**" means any compensation provided to employees, management, and/or directors of ResCap in connection with the Ally Financial Inc. Long-Term Equity Compensation Plan, the Residential Capital, LLC Annual Plan, the ResCap Reward and Recognition Program and Sign-on Bonus Program, or any discretionary variable pay plans involving ResCap (RSUs).

"**REV**" means reasonably equivalent value.

"**RFC**" means Residential Funding Company, LLC.

"**RFC Borrower**" means RFC Borrower LLC.

"**RFC Holding**" means GMAC-RFC Holding Company, LLC.

"**RFCIL**" means RFSC Investments Limited.

"**RFG**" means Residential Funding Group, the operating segment name used for RFC and GMAC Mortgage, in connection with their origination and securitization operations.

"**RFMSI**" means Residential Funding Mortgage Securities I, Inc., an RFC Holding subsidiary and one of the Depositor Entities.

"**RFMSII**" means Residential Funding Mortgage Securities II, Inc., an RFC Holding subsidiary and one of the Depositor Entities.

"**RFS**" means Residential Funding Securities, LLC, now known as Ally Securities, LLC.

"**RFSCIL**" means RFSC International Limited.

"**RMBS**" means residential mortgage-backed securities.

"**RMBS Actions**" means litigations related to the RMBS Claims, as listed in Appendix VIII.A−1.

"**RMBS Claims**" means claims against the Debtors and the AFI Defendants on account of RMBS.

"**RMBS Institutional Investors**" means the Steering Committee Group together with the Talcott Franklin Group.

"**RMBS Insurer Actions**" means the RMBS Actions pending against the Debtors and/or the AFI Released Parties that were brought by financial guaranty (i.e., monoline) insurance companies that insured various of the Debtors' RMBS offerings.

"**RMBS Investor Actions**" means the RMBS Actions pending against the Debtors and/or the AFI Released Parties that were brought by purchasers of RMBS.

"**RMBS Offering Documents**" means documents prepared in connection with the Debtors' PLS securities offerings, including but not limited to, shelf registrations, prospectuses, and prospectuses supplements.

"**RMBS Plan Support Agreements**" means the Plan Support Agreement by and between the Debtors, AFI, and the Steering Committee Group, entered into as of May 13, 2012, together with the Plan Support Agreement by and between the Debtors, AFI, and the Talcott Franklin Group, entered into as of May 13, 2012.

"**RMBS Trust Settlement Agreements**" means the RMBS Trust Settlement Agreement by and between the Debtors and the Steering Committee Group, entered into as of May 13, 2012, together with the RMBS Trust Settlement Agreement by and between the Debtors and the Talcott Franklin Group, entered into as of May 13, 2012.

"**ROE**" means return on equity.

"**Rule 2004**" means Rule 2004 of the Bankruptcy Rules.

"**S&P**" means Standard & Poor's and all of its direct and indirect affiliates.

"**Sandler O'Neill**" means Sandler O'Neill + Partners, L.P. and all of its direct and indirect affiliates.

"**Sarbanes-Oxley**" means the Sarbanes-Oxley Act of 2002.

"**SEC**" means the Securities and Exchange Commission.

"**Second 2009 Tax Allocation Agreement**" means the Amended and Restated Agreement for the Allocation of United States Federal Income Taxes among GMAC Mortgage Group LLC, ResCap Investments LLC, and ResCap, made as of November 1, 2009.

"**Second Line of Credit Agreement**" means the Loan Agreement (as amended, supplemented or otherwise modified prior to being amended and restated by the A&R Line of Credit Agreement) by and among PATI and RAHI, as borrowers, RFC, GMAC Mortgage and ResCap, as guarantors, and AFI, as initial lender and lender agent, dated June 1, 2009.

"**Second Line of Credit Borrowers**" means PATI and RAHI.

"**Second Line of Credit Collateral**" means the collateral securing the obligations under the Second Line of Credit Agreement.

"**Second Line of Credit Facility**" means the credit facility evidenced by the Second Line of Credit Agreement and all documents, instruments, or agreements executed and delivered in connection therewith.

"**Second Line of Credit Guarantors**" means ResCap, RFC, and GMAC Mortgage.

"**Second Line of Credit Loans**" means revolving loans made under the Second Line of Credit.

"**Second Line of Credit Security Agreement**" means the Pledge and Security Agreement and Irrevocable Proxy (as amended, supplemented or otherwise modified prior to being amended and restated by the A&R Second Line of Credit Security Agreement) among PATI and RAHI, ResCap, RFC and GMAC Mortgage, as Grantors, and AFI, as secured party, dated June 1, 2009.

"**Second Priority Collateral Agent**" means Wells Fargo Bank, N.A., as Second Priority Collateral Agent under the Second Priority Security Agreement.

"**Second Priority Security Agreement**" means the Second Priority Pledge and Security Agreement and Irrevocable Proxy (as amended, supplemented or otherwise modified prior to being amended and restated by the A&R Second Priority Security Agreement) among GMAC Mortgage, RFC, ResCap, RAHI, PATI, GMAC Holding, RFC Holding, Homecomings Financial, and Equity Investment I, LLC, and certain of their affiliates party thereto from time to time, as grantors, and AFI as lender and lender agent and Wells Fargo Bank, N.A., as Second Priority Collateral Agent, dated June 6, 2008.

"**Secured MSR Facility**" means the credit facility evidenced by the Secured MSR Loan Agreement and all documents, instruments, or agreements executed and delivered in connection therewith.

"**Secured MSR Facility Borrowers**" means RFC and GMAC Mortgage.

"**Secured MSR Facility Collateral**" means the collateral securing the obligations under the Secured MSR Facility.

"**Secured MSR Facility Loans**" means revolving loans made under the Secured MSR Facility.

"**Secured MSR Loan Agreement**" means the Loan and Security Agreement by and between RFC and GMAC Mortgage, as borrowers, ResCap, as Guarantor, and AFI, as lender, dated April 18, 2008.

"**Secured Revolver Facility**" means, collectively: (1) the Secured Revolver Loan Agreement; and (2) the A&R Secured Revolver Loan Agreement, and includes all documents, instruments, or agreements executed and delivered in connection with each such loan agreement.

"**Secured Revolver Facility Borrowers**" means RFC and GMAC Mortgage.

"**Secured Revolver Facility Guarantors**" means ResCap, GMAC Holding, RFC Holding, Equity Investment I, LLC, and Homecomings Financial and certain other affiliated entities.

"**Secured Revolver Facility Loans**" means the Secured Revolver Facility Term Loan and the Secured Revolver Facility Revolver Loans made under the Secured Revolver Facility.

"**Secured Revolver Facility Revolver Loans**" means revolving loans made under the Secured Revolver Facility.

"**Secured Revolver Facility Term Loan**" means the term loan made under the Secured Revolver Facility.

"**Secured Revolver Loan Agreement**" means the Loan Agreement (as amended, supplemented or otherwise modified prior to being amended and restated by the A&R Secured Revolver Loan Agreement) among RFC and GMAC Mortgage, as borrowers, ResCap, GMAC Holding, RFC Holding, Equity Investment I, LLC, and Homecomings Financial and certain other affiliated entities party thereto from time to time, as guarantors, and AFI, as initial lender and lender agent, dated June 4, 2008.

"**Securities Act**" means the Securities Act of 1933.

"**Senior Secured Notes**" means the ResCap 8.5% Senior Secured Guaranteed Notes that were due May 15, 2010.

"**Senior Secured Notes Indenture**" means the indenture among ResCap, the guarantors party thereto, and U.S. Bank National Association, as trustee, dated June 6, 2008.

"**September 2008 Model Home Sale**" means the transaction whereby ResCap, DOA Holding Properties, LLC, and DOA Properties IIIB (KB Models), LLC, each a wholly owned subsidiary of ResCap, sold by way of auction certain model home assets to MHPool Holdings, LLC, an affiliate of Cerberus, pursuant to an Asset Purchase Agreement dated September 30, 2008.

"**Servicing Advance Factoring Agreement**" means the Servicer Advance Factoring Agreement among RFC and GMAC Mortgage, as sellers, and GMAC CF, as purchaser, dated June 17, 2008.

"**Servicing Advance Factoring Facility**" means the factoring facility evidenced by the Servicing Advance Factoring Agreement and all documents, instruments, or agreements executed and delivered in connection therewith.

"**Servicing Advance Factoring Sellers**" means RFC and GMAC Mortgage.

"**Servicing Advances**" means advances contractually obligated to be made by a servicer under a Servicing Contract, including advances: (1) for delinquent interest and/or principal; (2) for real estate taxes or flood or primary mortgage insurance premiums; and (3) in connection with collateral protection, maintenance, and foreclosures.

"**Servicing Agreement Modification Terms**" means the terms to be incorporated into any amendment to the Original Servicing Agreement as set forth in Exhibit C to the January 30, 2012 letter agreement entered into by ResCap, GMAC Mortgage, and AFI.

"**Servicing Contract**" means any agreement, whether entitled "servicing agreement," "pooling and servicing agreement," or "sale and servicing agreement," pursuant to which the servicer is obligated to perform collection, enforcement, or foreclosure services with respect to, or to maintain and remit any funds collected from, persons obligated on specified pools of loans.

"**Share Contribution Agreement**" means the Share Contribution Agreement by and between Old GMAC and IB Finance, dated November 20, 2006.

"**Shared Services Agreement**" means the Shared Services Agreement by and between AFI and the Debtors and attached as Exhibit A to the Shared Services Approval Order.

"**Shared Services Approval Order**" means the Final Order Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing Residential Capital, LLC to Enter Into A Shared Services Agreement with Ally Financial Inc. Nunc Pro Tunc to the Petition Date for the Continued Receipt and Provisions of Shared Services Necessary for the Operation of the Debtors' Business entered in the Chapter 11 Cases [Docket No. 387] on June 15, 2012.

"**Skadden**" means Skadden, Arps, Slate, Meagher & Flom LLP.

"**SPE**" means special purpose entity.

"**Special Review Committee**" means the special committee of the ResCap Board, established as of December 5, 2011, comprised of Jonathan Ilany and John Mack.

"**State Agency**" means any state agency or regulatory authority with authority to regulate the activities of any of the Debtors relating to the origination or servicing of Mortgage Loans, determine the servicing requirements with regard to Mortgage Loan origination, purchasing, servicing, master servicing, or certificate administration performed by any of the Debtors, or to otherwise participate in mortgage lending.

"**Steering Committee Group**" means those holders, and authorized managers for such holders, of certain notes, bonds, and/or certificates backed by mortgage loans held by certain securitization trusts, represented by Kathy Patrick of Gibbs & Bruns LLP.

"**Sterne Agee**" means Sterne, Agee & Leach, Inc.

"**STM**" means significant transaction memo.

"**Submission Paper**" means any submission by a Third-Party Claimant in response to the Examiner's letter of September 21, 2012.

"**Submitting Parties**" means those parties who prepared Submission Papers for the Examiner on the topic of Third Party Claims.

**Appendix I**, Page 34 of 38

"**Subsidiary**" means, as to any person or entity, any corporation, partnership, association, trust, or other form of legal entity of which: (1) more than 50% of the outstanding voting securities are directly or indirectly owned by such person or entity; or (2) such person or entity or any subsidiary of such person or entity is a general partner (excluding partnerships in which such person or entity or any subsidiary of such person or entity does not have a majority of the voting interests in such partnership).

"**Sullivan & Cromwell**" means Sullivan & Cromwell LLP.

"**Talcott Franklin Group**" means those holders, and authorized managers for such holders, of certain notes, bonds, and/or certificates backed by mortgage loans held by certain securitization trusts, represented by Talcott Franklin of Talcott Franklin, P.C.

"**TARP**" means the Troubled Asset Relief Program.

"**TBVE**" means tangible book value of equity.

"**Third-Party Claimant**" means any party holding Third-Party Claims.

"**Third-Party Claims**" means the causes of action, whether known or unknown, whether for tort, fraud, contract, violations of federal or state securities laws, veil piercing, or alter-ego theories of liability, or otherwise, arising from or related in any way to the Debtors, including those in any way related to residential mortgage backed securities issued and/or sold by Debtors and/or the Chapter 11 Cases, held by the holders of Claims and Interests against AFI, and each of theirs and the Debtors' respective members, officers, directors, agents, financial advisors, attorneys, employees, partners, affiliates, and representatives, which causes of action include, but are not limited to, the RMBS Actions and the Non-RMBS Actions.

"**Third-Party Release**" means a release of Third-Party Claims on substantially the same or similar terms as set forth in section 3.1(d)(ii) of the now-terminated AFI Settlement and Plan Sponsor Agreement.

"**Third Priority Collateral Agent**" means Wells Fargo Bank, N.A., as Third Priority Collateral Agent under the Third Priority Security Agreement and the A&R Third Priority Security Agreement.

"**Third Priority Security Agreement**" means the Third Priority Pledge and Security Agreement and Irrevocable Proxy (as amended, supplemented or otherwise modified prior to being amended and restated by the A&R Third Priority Security Agreement) among GMAC Mortgage, RFC, ResCap, RAHI, PATI, GMAC Holding, RFC Holding, Homecomings Financial, and Equity Investment I, LLC, and certain of their affiliates party thereto from time to time, as grantors, and AFI as lender and lender agent, and Wells Fargo Bank, N.A., as Third Priority Collateral Agent, dated June 6, 2008.

"**TNW**" means tangible net worth.

"**Treasury Regulations**" means all the regulations promulgated by the U.S. Treasury under the Internal Revenue Code.

"**Triaxx**" means, collectively, Triaxx Prime CDO 2006-1, LLC, Triaxx Prime 2006-2, LLC, and Triaxx Prime CDO 2007-1, LLC.

"**Trust R&W Claims**" means alleged and potential representation and warranty claims held by up to 392 securitization trusts in connection with approximately 1.6 million mortgage loans and approximately $221 billion in original issue balance of associated RMBS, comprising all such securities issued by the Debtors' affiliates from 2004 to 2007.

"**U.S.**" means the United States of America.

"**U.S. Treasury**" means the U.S. Department of the Treasury.

"**U.S. Trustee**" means the Office of the U.S. Trustee.

"**UBS**" means UBS Investment Bank and all of its direct and indirect affiliates.

"**UCC**" means the Uniform Commercial Code.

"**UFCA**" means the Uniform Fraudulent Conveyance Act (1918).

"**UFTA**" means the Uniform Fraudulent Transfer Act (1984).

"**Unsecured Noteholder Causes of Action**" means the claims against the AFI Defendants identified in the Submission Papers of Wilmington Trust, N.A., solely in its capacity as indenture trustee for various series of Unsecured Notes.

"**Unsecured Noteholders**" means the holders of the Unsecured Notes.

"**Unsecured Notes**" means the various series of senior unsecured notes issued by ResCap LLC under that certain indenture dated June 24, 2005, including $1,250,000,000 6.5% notes due 2012, $1,750,000,000 6.5% notes due 2013, $750,000,000 6.875% notes due 2015, €750,000,000 5.125% notes due 2012, £400,000,000 6.375% notes due 2013, and £400,000,000 7.875% notes due 2014, with a total aggregate outstanding principal amount of approximately $1 billion (based on the foreign exchange rates as of the Petition Date).

"**US/UK Broker-Dealer Sale**" means the transaction whereby RFC, a wholly owned subsidiary of ResCap, sold all of its interests in RFS (a SEC-registered broker-dealer, now known as Ally Securities LLC) and RFC Investments Limited (the parent of RFSCIL, a broker-dealer registered with the Financial Services Authority in the United Kingdom) to GMAC (now known as Ally Financial Inc.), pursuant to a Membership Interest and Share Purchase Agreement dated March 31, 2009.

"**VA**" means the Department of Veteran Affairs.

"**VA Loans**" means the Mortgage Loans guaranteed by the VA.

"**Walker Report**" means the report to the ResCap Board, which was signed by David C. Walker and entitled "D.C.W. No. 3," dated November 20, 2006 (the report analyzes and ultimately recommends the 2006 Bank Restructuring).

"**WaMu**" means Washington Mutual, Inc. and all of its direct and indirect affiliates.

"**Wilmington Trust**" means Wilmington Trust, National Association, solely in its capacity as indenture trustee for various series of the Unsecured Notes.

    1.2    <u>Rules of Interpretation</u>.  For purposes of the Report, unless otherwise specified, the following rules of interpretation apply:

    a.    The singular includes the plural and the plural includes the singular.

    b.    The masculine includes the feminine and the feminine includes the masculine.

    c.    Any reference to a statute, code, ordinance or other law includes all amendments and modifications thereto, and all regulations, rulings, and other legal requirements promulgated thereunder.

    d.    Any reference to a governmental agency or entity includes references to any successor thereto and to any direct or indirect affiliates.

    e.    The word "including" (in its various forms) means without limitation.

    f.    A reference to a document, instrument or agreement includes all exhibits, schedules, and other attachments thereto and any amendment, supplement, or modification thereof.

    g.    Titles appearing at the beginning of any articles, sections, subsections, other subdivisions, exhibits, or appendices are for convenience only and are disregarded in construing the language hereof.

    h.    All references to "$" and "dollars" refer to U.S. currency unless otherwise specifically provided.

## SCHEDULE A
### DEBTORS

ditech, LLC
DOA Holding Properties, LLC
DOA Properties IX (Lots-Other), LLC
EPRE LLC
Equity Investment I, LLC
ETS of Virginia, Inc.
ETS of Washington, Inc.
Executive Trustee Services, LLC
GMAC Model Home Finance I, LLC
GMAC Mortgage, LLC
GMAC Mortgage USA Corporation
GMAC Residential Holding Company, LLC
GMAC RH Settlement Services, LLC
GMACM Borrower LLC
GMACM REO LLC
GMACR Mortgage Products, LLC
GMAC-RFC Holding Company, LLC
HFN REO Sub II, LLC
Home Connects Lending Services, LLC
Homecomings Financial, LLC
Homecomings Financial Real Estate Holdings, LLC
Ladue Associates, Inc.
Passive Asset Transactions, LLC
PATI A, LLC
PATI B, LLC
PATI Real Estate Holdings, LLC
RAHI A, LLC
RAHI B, LLC
RAHI Real Estate Holdings, LLC
RCSFJV2004, LLC
Residential Accredit Loans, Inc.
Residential Asset Mortgage Products, Inc.
Residential Asset Securities Corporation
Residential Capital, LLC
Residential Consumer Services, LLC
Residential Consumer Services of Alabama, LLC
Residential Consumer Services of Ohio, LLC
Residential Consumer Services of Texas, LLC
Residential Funding Company, LLC
Residential Funding Mortgage Exchange, LLC
Residential Funding Mortgage Securities I, Inc.
Residential Funding Mortgage Securities II, Inc.
Residential Funding Real Estate Holdings, LLC
Residential Mortgage Real Estate Holdings, LLC

RFC Asset Holdings II, LLC
RFC Asset Management, LLC
RFC Borrower LLC
RFC Construction Funding, LLC
RFC REO LLC
RFC SFJV-2002, LLC
RFC-GSAP Servicer Advance, LLC

# ResCap
## Timeline of Selected Events
## 2005 – 2012

■ ResCap Event
● AFI Event
♦ Industry Event

Appendix III, Page 2 of 11

## ResCap Timeline of Selected Events



**Legend:** ■ ResCap Event ● AFI Event ♦ Industry Event

**2005**

**Jan**
- ♦ Jan 2005 DOL reports unemployment rate at 5.3%
- ♦ Jan 2005 Mortgage Bankers Association reports 11.1% subprime delinquency rate for 4Q 2004
- ♦ Jan 2005 S&P reports 16% increase in Case-Shiller Home Price Index for 2004 over 2003

**Feb**
- ♦ Feb 2, 2005 Federal Funds Rate increases to 2.5%
- ♦ Feb 14, 2005 DBRS rates GM and AFI BBB

**Mar**
- ♦ Mar 2005 FRB reports annualized economic growth rate of 3%
- ♦ Mar 22, 2005 Federal Funds Rate increases to 2.75%

**Apr**
- ♦ Apr 2005 Mortgage Bankers Association reports 9.5% subprime delinquency rate for 1Q 2005
- ■ Apr 20, 2005 Independent Directors Jacob and Melzer and AFI CAO Zukauckas join ResCap Board; Van Orman departs ResCap Board

**May**
- ● May 4, 2005 AFI contributes $2 billion capital to ResCap in form of forgiveness of ResCap subsidiaries' debt
- ♦ May 3, 2005 Federal Funds Rate increases to 3.0%
- ● May 4, 2005 AFI announces formation of ResCap

**Jun**
- ♦ Jun 2005 FRB reports annualized economic growth of 3.3%
- ♦ Jun 2005 Federal Funds Rate increases to 3.25%
- ■ Jun 2005 ResCap issues $4 billion unsecured debt to repay portion of existing AFI debt
- ■ Jun 24, 2005 ResCap, GM, and AFI enter into 2005 Operating Agreement

**Jul**
- ■ Jul 2005 ResCap obtains $3.5 billion in syndicated bank credit facilities and repays $1.5 billion term loan from AFI
- ♦ Jul 30, 2005 Mortgage Bankers Association reports 10.4% subprime delinquency rate for 2Q 2005

**Aug**
- ♦ Aug 2005 DOL reports unemployment rate at 4.9%
- ♦ Aug 9, 2005 Federal Funds Rate increases to 3.5%
- ■ Aug 24, 2005 Moody's downgrades ResCap to Baa3 (non-investment grade), citing link to struggling GM

**Sep**
- ♦ Sep 20, 2005 Federal Funds Rate increases to 3.75%
- ■ Sep 26, 2005 Fitch downgrades ResCap to BBB- (non-investment grade), citing link to struggling GM
- ■ Sep 29, 2005 ResCap receives SEC approval of $12 billion shelf registration

**Oct**
- ♦ Oct 2005 Mortgage Bankers Association reports 11.0% subprime delinquency rate for 3Q 2005
- ♦ Oct 14, 2005 DBRS downgrades GM to BB (non-investment grade)
- ● Oct 19, 2005 ResCap appoints Paradis as CEO and Applegate as COO

**Nov**

**Dec**
- ■ Nov 2005 ResCap issues $1.25 billion unsecured debt and repays $620 million under AFI subordinated note
- ♦ Nov 1, 2005 Federal Funds Rate increases to 4.0%
- ■ Dec 2005 ResCap terminates $2.5 billion AFI revolver
- ■ Dec 2005 ResCap makes $250 million payment on AFI sub note
- ♦ Dec 13, 2005 Federal Funds Rate increases to 4.25%
- ■ 2005 ResCap earns net income for year of $1.0 billion

Appendix III, Page 2 of 11

# ResCap Timeline of Selected Events

Appendix III, Page 3 of 11

■ ResCap Event
● AFI Event
♦ Industry Event

## 2006

**Jan**

**Feb**

■ **Feb 2006** ResCap issues $1.75 billion of unsecured debt and makes $500 million payment on AFI sub note

**Mar**

■ **Mar 2006** ResCap's auditor notifies ResCap that it will not sign off on 2005 audit report because of concerns regarding ResCap's statement of cash flows

■ **Mar 29, 2006** ResCap Board discusses LLC conversion to allow for sale of 20%+ interest in ResCap to third party while still allowing tax benefits to flow to GM as parent; Jacob and Melzer raise concerns

**Apr**

● **Apr 3, 2006** GM announces its intention to sell 51% stake in AFI to investor group led by Cerberus in sale expected to close in Q4 2006

■ **Apr 19, 2006** ResCap issues $3.5 billion unsecured debt to repay balance of AFI sub note

■ **Apr 20, 2006** Marple expresses concerns that ResCap's loss of controlling interest in GMAC Bank pursuant to Bank Restructuring will run afoul of Operating Agreement and that Independent Directors would "likely veto" transaction

■ **Apr 24, 2006** Applegate expresses concerns regarding implications of ResCap losing controlling interest in GMAC Bank pursuant to Bank Restructuring and proposes alternate structure where ResCap would maintain controlling interest in Ally Bank

**May**

♦ **May 2006** Ameriquest announces layoffs and closes retail branches

■ **May 4, 2006** Jacob and Melzer receive proposal regarding Bank Restructuring transaction; neither Marple or Applegate's concerns nor alternate structure are included

♦ **May 5, 2006** Merit Financial files Chapter 11

**Jun**

**Jul**

♦ **Summer 2006** Housing bubble peaks; interest rates continue to increase; subprime market begins to see significant rise in defaults

**Aug**

♦ **Aug 2006** U.S. Home Construction Index drops over 35% compared to prior year

**Sep**

■ **Sep 12, 2006** ResCap advises Cerberus that "RFG's August [2006] results were poor and deviated significantly from forecast"

■ **Sep 15, 2006** ResCap Board appoints Giertz as CFO (effective Oct 1, 2006), replacing Olson

**Oct**

■ **Oct 24, 2006** ResCap converts to LLC; ResCap and GMAC Mortgage execute 2006 ResCap LLC Agreement

■ **Oct 31, 2006** GMAC Mortgage and Ally Bank enter into MMLPSA eliminating first lien loan level representation and warranty (R & W) provisions

**Nov**

■ **Nov 15, 2006** FDIC approves application for transfer of assets and liabilities from Old GMAC Bank (FSB) to GMAC Automotive Bank

■ **Nov 20, 2006** ResCap Board approves proposed Bank Restructuring and waiver of certain provisions of 2005 Operating Agreement

■ **Nov 20, 2006** ResCap transfers assets of Old GMAC Bank plus $360 million of additional capital in exchange for non-voting IB Finance Class M Shares. AFI contributes GMAC Automotive Bank in exchange for voting IB Finance Class A shares

■ **Nov 27, 2006** ResCap Exec Committee approves $575 million LLC Conversion Dividend to AFI

■ **Nov 27, 2006** ResCap, AFI, and GM enter into 2006 Amended Operating Agreement

■ **Nov 27 – 30, 2006** Fitch and S&P upgrade ResCap ratings to BBB with negative outlook (lower medium grade)

■ **Nov 28, 2006** ResCap pays $575 million LLC Conversion Dividend to AFI

● **Nov 30, 2006** GM sells 51% of AFI to Cerberus led group (FIM Holdings LLC) for $7.353 billion

● **Nov 30, 2006** GM receives $2.7 billion dividend from conversion of AFI and subsidiaries to LLCs

**Dec**

■ **Dec 12, 2006** ResCap Board holds its first regular meeting following closing of Cerberus transaction

♦ **Dec 28, 2006** Ownit Mortgage Solutions files Chapter 11

■ **4Q 2006** ResCap incurs quarterly operating loss of ($651 million), first in its history

♦ **2006** Foreclosure filings soar as delinquencies rise from 10% to 15% on subprime loans

■ **2006** ResCap earns net income for year of $705 million





**ResCap Timeline of Selected Events**

Appendix III, Page 4 of 11

■ ResCap Event
● AFI Event
♦ Industry Event

**2007**

| Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sept |

**Jan 2007**
■ Jan 2007
ResCap announces workforce reduction to increase operational effectiveness and reduce costs

♦ Jan 30, 2007
American Freedom Mortgage files Chapter 7

**Feb**
♦ Feb 5, 2007
Mortgage Lenders Network USA files Chapter 11

♦ Feb 8, 2007
HSBC warns of 20% higher bad debt provisions ($10.5 billion)

♦ Feb 27, 2007
Freddie Mac announces it will no longer buy certain subprime loans

**Mar**
♦ Mar 2007
Foreclosures reach record levels

● Mar 2007
AFI contributes $500 million cash to ResCap

■ Mar 13, 2007
Moody's affirms ResCap's ratings at Baa3 with stable outlook

■ Mar 23, 2007
ResCap Board appoints Jones COO of ResCap, replacing Applegate, and appoints Jones, Bossidy, and Kravit to Board; Casey is elected to Treasurer (effective June 1, 2007)

■ Mar 26, 2007
Gietz announces his resignation as CFO, citing concerns regarding Cerberus's management style

■ 1Q 2007
ResCap incurs quarterly loss of ($910 million)

**Apr**
● Apr 2007
AFI contributes $500 million cash to ResCap

♦ Apr 2, 2007
New Century (largest U.S. subprime lender) files Chapter 11

■ Apr 20, 2007
ResCap Board confirms Khattri as CFO and Chapman as Director

**May**
■ May 2007
ResCap issues $2.25 billion unsecured bonds

■ May 11, 2007
Paradis submits resignation as Director and CEO; ResCap Board appoints Jones as President and CEO and Zukauckas as CAO and Controller

♦ May 14, 2007
Cerberus purchases 80% of Chrysler Holdings for $7.4 billion

■ May 2, 2007
S&P downgrades ResCap to BBB- (lower medium grade)

**Jun**
■ Jun 2007
ResCap issues €600 million 3-year floating rate bond, GBP 400 million 7-year fixed rate bond, and MXP 1.8 billion 5-year fixed rate bond

■ Jun 2007
ResCap renews $875 million 1-year revolver and $875 million 3-year syndicated revolver

● Jun 1, 2007
GMAC Mortgage and Ally Bank amend MMLPSA (eliminating second lien loan level R & W provisions)

♦ Jun 7, 2007
Bear Stearns halts redemptions for two of its CDO hedge funds

■ Jun 25, 2007
Chapman departs ResCap Board

■ 2Q 2007
ResCap incurs quarterly loss of ($254 million)

**Jul**
♦ Jul 2007
ResCap bond pricing declines sharply

**Aug**
♦ Aug 2007
Banks raise 3-month interbank rates

♦ Aug 2007
Foreclosures up 115% from August 2006

♦ Aug 6, 2007
Cerberus ceases operations of Aegis Mortgage

♦ Aug 6, 2007
American Home Mortgage Investment files Chapter 11

♦ Aug 9, 2007
Global credit markets seize

♦ Aug 9, 2007
BNP Paribas suspends three subprime investment funds due to "complete evaporation of liquidity"

♦ Aug 10, 2007
FRB and central banks inject $290 billion into global markets to increase liquidity

♦ Aug 16, 2007
Countrywide obtains $11 billion rescue-financing package

■ Aug 16, 2007
Moody's and Fitch downgrade ResCap to Ba1 and BB-, respectively (non-investment grade)

■ Aug 17, 2007
ResCap's available cash decreases to $0.3 billion; receives $775 million deposit for Health Capital Sale

● Aug 17, 2007
Sentinel Mgmt Group files Chapter 11

■ Aug 21, 2007
Analyst indicates ResCap CDS prices imply 45% risk of default within one year

■ Aug 21, 2007
ResCap Board notes "further rapid deterioration in residential mortgage market conditions and unexpectedly large ResCap losses"

● Aug 27, 2007
ResCap sells Health Capital to GMAC Commercial Finance (GMAC CF) for $900.5 million

● Aug 30, 2007
After Health Capital Sale, Jacob and Melzer request robust diligence materials and ample time to review for any future related party transactions

■ Aug 31, 2007
GMAC Mortgage and Ally Bank enter into MSR Swap Agreement

♦ Aug 31, 2007
Ameriquest ceases operations

● Aug 20, 2007
AFI COO de Molina joins ResCap Board

**Sept**
♦ Sep 2007
Department of Labor reports first month of negative job growth since 2003

● Sep 2007
AFI contributes $1 billion in cash to ResCap

● Sep 6, 2007
AFI enters into financing agreement with Citibank

■ Sep 7, 2007
Feldstein resigns as chairman of ResCap Board and is replaced by Rossi

■ Sep 7, 2007
Mayer Brown makes presentation to ResCap Board regarding fiduciary duties in zone of insolvency

■ Sep 26, 2007
ResCap Board hears presentation outlining restructuring options, including staying in the current course, sale of business, or liquidation

■ 3Q 2007
ResCap incurs its fourth consecutive quarterly net loss ($2.3 billion)

Appendix III, Page 4 of 11



# ResCap Timeline of Selected Events

■ ResCap Event
● AFI Event
♦ Industry Event

## 2007

### Oct

■ **Oct 2007** ResCap announces formal restructuring plan including elimination of 3,000 jobs

♦ **Oct 5, 2007** Merrill Lynch incurs loss of ($8.4 billion)

### Nov

♦ **Nov 2007** FRB injects $41 billion into money supply to keep credit markets open

● **Nov 2007** AFI executes open market purchases of certain ResCap senior unsecured bonds

■ **Nov 1, 2007** Moody's and S&P announce downgrades of ResCap's senior debt to Ba3 and BB+ with negative outlook (non-investment grade)

● **Nov 1, 2007** Moody's downgrades AFI to Ba2 (non-investment grade)

● **Nov 1, 2007** AFI states it is aggressively moving to restructure ResCap's risk profile

■ **Nov 20, 2007** Analyst indicates ResCap CDS prices imply 72% risk of default within one year

■ **Nov 21, 2007** ResCap announces tender offer for up to $750 million of outstanding bonds to increase income and TNW

### Dec

■ **Dec 2007** Bondholders tender $389 million face value of ResCap bonds for cash of $241 million

● **Dec 2007** AFI provides $763 million capital to ResCap to overcome TNW shortfall

♦ **Dec 2007** U.S. enters recession

■ **Dec 2007** ResCap establishes third party facilities to fund $1.5 billion MSRs and up to $2 billion conforming and non-conforming mortgages

♦ **Dec 2007** FRB establishes Term Auction Facility to provide additional bank funding

■ **4Q 2007** ResCap incurs quarterly loss of ($921 million)

■ **2007** ResCap incurs net loss for year of ($4.3 billion)

## 2008

### Jan

♦ **Jan 2008** Markit stops issuing ABX subprime indices; S&P downgrades or places on credit watch more than 8,000 RMBS and CDO securities

♦ **Jan 2008** Stock market begins prolonged downturn

■ **Jan 2008** ResCap retains Morgan Stanley as financial advisors to advise on strategic and financial alternatives

♦ **Jan 11, 2008** Countrywide sold to Bank of America ("BofA")

### Feb

■ **Feb 5, 2008** Moody's downgrades ResCap to B2 (highly speculative)

● **Feb 21, 2008** AFI provides $750 million advance facility to ResCap to be repaid from proceeds of Resort Finance sale

■ **Feb 22, 2008** S&P downgrades ResCap to B (highly speculative)

### Mar

● **Mar 2008** AFI provides $143 million capital to ResCap to overcome TNW shortfall

■ **Mar 3, 2008** Fitch downgrades ResCap to BB- (highly speculative)

♦ **Mar 16, 2008** JPMorgan acquires Bear Stearns with assistance from U.S. Treasury

■ **Mar 20, 2008** Rossi resigns as ResCap chairman

■ **Mar 28, 2008** ResCap Board approves 2008 ResCap Amended LLC Agreement

### Apr

■ **Apr 2008** ResCap Board asked to approve $3.5 billion AFI credit facility

■ **Apr 2008** ResCap enters into $750 million Secured MSR Facility with AFI

♦ **Apr 18, 2008** Cerberus hires Marano as Managing Director

■ **Apr 18, 2008** Khattri resigns from ResCap Board

■ **Apr 20, 2008** Independent Directors Jacob and Melzer resign from ResCap Board

■ **Apr 21, 2008** Bossidy resigns from ResCap Board; Young joins ResCap Board

■ **Apr 23, 2008** Cerberus employees Marano and Weintraub join ResCap Board

■ **Apr 23, 2008** Moody's downgrades AFI and ResCap credit ratings to B2 (highly speculative) and Caa1 (substantial risk), respectively

### May

■ **May 2008** FTI retained to advise ResCap in developing liquidity forecasting process

■ **May 5, 2008** ResCap announces exchange offer and states that Operating Agreement requires two Independent Directors and, "[a]s of the date hereof, the two independent director positions are currently vacant"

■ **May 7, 2008** ResCap retains Lazard to advise on potential restructuring, sale, and/or refinancing

■ **May 15, 2008** Smith joins ResCap Board as Independent Director

■ **May 16, 2008** Morgan Stanley updates ResCap Board regarding various scenarios in potential restructurings

■ **May 29, 2008** At ResCap Board meeting, Skadden discusses fiduciary duties

● **May 30, 2008** Mayer Brown advises AFI Board on fiduciary duties in affiliate transactions

### Jun

■ **Jun 1, 2008** ResCap Board approves five affiliate transactions with only one Independent Director (Smith)

■ **Jun 2, 2008** ResCap amends AFI Secured MSR Facility to $1.2 billion

● **Jun 4, 2008** AFI provides $3.5 billion secured facility to RFC and GMAC Mortgage, replacing ResCap's unsecured lines

■ **Jun 4 – 5, 2008** Fitch and S&P downgrade ResCap to D (default) and SD (selective default), respectively

■ **Jun 6, 2008** ResCap issues new Senior and Junior Secured Notes as part of exchange offer

■ **Jun 9, 2008** Cerberus purchases certain model home assets from ResCap for $230 million

■ **Jun 12, 2008** Hirtler-Garvey joins ResCap Board as Independent Director

■ **Jun 13, 2008** AFI CAO DeBrunner joins ResCap Board

■ **Jun 16, 2008** Moody's rates new ResCap secured debt from bond exchange Caa2 and Caa3 (in poor standing)

■ **Jun 24, 2008** Analyst indicates ResCap CDS prices imply 100% risk of default within five years



## ResCap Timeline of Selected Events

■ ResCap Event
● AFI Event
♦ Industry Event

## 2008

### Jul

- ■ **Jul 1, 2008** GMAC Mortgage and Ally Bank amend MMLPSA (changing purchase price to market) and Amended and Restated Pipeline Swap (adding HFS loans)
- ♦ **Jul 12, 2008** Federal regulators seize IndyMac
- ♦ **Jul 15, 2008** SEC places restrictions on naked short selling of certain financial stocks
- ■ **Jul 15, 2008** S&P upgrades ResCap to CCC+ (substantial risk)
- ■ **Jul 21, 2008** Jones resigns as President and CEO of ResCap and is replaced by Marano as CEO, who remains employed by Cerberus
- ■ **Jul 30, 2008** Cerberus purchases FNMA and FHLMC excess servicing rights from ResCap for $282 million after auction
- ■ **Jul 30, 2008** ResCap sells Resort Finance to GMAC CF for net purchase price of $96.1 million

### Sep

- ■ **Sep – Dec 2008** ResCap and advisors begin planning for potential Chapter 11 filing
- ■ **Sep 2008** ResCap Board considers sale of ResCap's interest in Ally Bank to AFI
- ■ **Sep 3, 2008** ResCap publicly announces plans for restructuring
- ■ **Sep 3, 2008** ResCap begins closing branches and wholesale broker channel, curtails business lending and international operations, reduces worldwide workforce
- ♦ **Sep 16, 2008** Federal Reserve Bank of New York loans AIG $85 billion to avoid bankruptcy
- ♦ **Sep 21, 2008** Morgan Stanley and Goldman Sachs become bank holding companies
- ■ **Sep 23, 2008** Lazard advises ResCap Board to consider ResCap in "zone of insolvency"
- ♦ **Sep 25, 2008** FDIC seizes WaMu and sells its assets to JPMorgan
- ♦ **Sep 7, 2008** Federal Housing Finance Agency (FHFA) takes over Fannie Mae and Freddie Mac
- ● **Sep 11, 2008** AFI Board discusses potential sale of ResCap's interest in Ally Bank to AFI
- ♦ **Sep 15, 2008** Lehman Brothers files Chapter 11
- ♦ **Sep 15, 2008** Merrill Lynch avoids filing Chapter 11 by agreeing to purchase by BofA
- ♦ **Sep 16, 2008** Money market funds announce they have "broken the buck"
- ● **Sep 29, 2008** Kirkland & Ellis discusses fiduciary duties with AFI Board
- ● **Sep 30, 2008** AFI Board receives report addressing risks to AFI of ResCap bankruptcy
- ■ **Sep 30, 2008** ResCap completes second sale of model home assets to Cerberus for $59 million after auction
- ● **Sep 30, 2008** AFI renews Secured MSR Facility with ResCap through May 1, 2009 and reduces advance rate to 76.6%
- ● **Sep 30, 2008** AFI forgives $101.5 million of ResCap Secured MSR Facility
- ● **Sep 30, 2008** AFI contributes $54 million of ResCap unsecured bonds as capital

### Oct

- ♦ **Oct 3, 2008** U.S. Treasury creates $700 billion TARP program to purchase failing bank assets
- ♦ **Oct 6 – 10, 2008** Stock market plummets 18%, worst one-week drop in history
- ♦ **Oct 7, 2008** FRB announces its new Commercial Paper Funding Facility ("CPFF") to provide liquidity "backstop" to non-financial sector companies
- ● **Oct 10, 2008** AFI Board meets and focuses on AFI's liquidity concerns
- ♦ **Oct 12, 2008** Wells Fargo acquires Wachovia Bank
- ■ **Oct 17, 2008** At ResCap Board meeting Marano describes working with Cerberus and Morrison & Foerster on term sheet to request TARP funds from U.S. Treasury
- ■ **Oct 17, 2008** ResCap agrees to meet $168 million margin call under AFI Secured Revolver Facility
- ♦ **Oct 7, 2008** In attempt to inject liquidity, IRS relaxes rules on U.S. corporations repatriating money held overseas
- ♦ **Oct 7, 2008** FRB makes emergency move to lend $1.3 trillion directly to companies outside financial sector
- ♦ **Oct 8, 2008** AIG obtains another $37.8 billion in loans from government
- ♦ **Oct 8, 2008** Central banks worldwide announce coordinated rate cut
- ■ **Oct 8, 2008** Skadden and Lazard make presentation to ResCap Board on impact and timing of bankruptcy filing on ResCap's liquidity and creditor recoveries; they conclude that without another cash infusion or sale of its interest in Ally Bank, ResCap will run out of cash in November
- ● **Oct 17, 2008** AFI Board discusses pursuing bank holding company status, AFI's liquidity position, ResCap's proposed participation in TARP, and extension of $1.2 billion Secured MSR Facility provided by AFI
- ♦ **Oct 28, 2008** Four commercial banks, three investment banks, and two custodian banks receive $125 billion in TARP funds
- ● **Oct 30, 2008** Moody's downgrades AFI's credit rating to Caa1 (substantial risk)
- ● **Oct 31, 2008** AFI Board discussion notes ResCap bankruptcy would likely be fatal to AFI's bank holding company application
- ● **Oct 31, 2008** AFI forgives $238.9 million of ResCap Secured MSR Facility

### Nov

- ♦ **Nov 2008** U.S. Treasury, FRB, and FDIC announce $301 billion guarantee of Citigroup assets
- ● **Nov 3, 2008** AFI authorizes debt forgiveness sufficient to cover ResCap's TNW covenant in October
- ■ **Nov 5, 2008** ResCap reports 3Q 2008 ($1.9 billion) net loss with "going concern" qualification
- ♦ **Nov 17, 2008** U.S. Treasury announces distribution of $33.6 billion of TARP funds to 21 smaller and regional banks
- ■ **Nov 20, 2008** GMAC Mortgage and Ally Bank enter into Broker Agreement
- ■ **Nov 20, 2008** ResCap and AFI announce commencement of exchange offers
- ■ **Nov 20, 2008** PATI and RAHI enter $430 million AFI Line of Credit Agreement
- ■ **Nov 20, 2008** AFI and ResCap each downgraded by Moody's to C (in default) and downgraded by S&P to CC (default imminent)
- ● **Nov 20, 2008** AFI applies for TARP and bank holding company status
- ♦ **Nov 25, 2008** FRB announces it will purchase $100 billion of MBS securities
- ● **Nov 30, 2008** AFI forgives $451.5 million of ResCap Secured MSR Facility

### Dec

- ■ **Dec 2008** AFI secured facility with RFC and GMAC Mortgage is reduced to $3 billion
- ♦ **Dec 19, 2008** U.S. Treasury announces loans to GM and Chrysler
- ● **Dec 24, 2008** FRB approves AFI's application to become bank holding company
- ● **Dec 24, 2008** AFI receives notification of TARP approval, forestalling ResCap bankruptcy
- ● **Dec 30, 2008** AFI receives $5 billion of TARP funding from U. S. Treasury
- ● **Dec 31, 2008** AFI announces completion of its exchange offer and cash tender offer for exchange of $3.7 billion of ResCap bonds
- ● **Dec 31, 2008** AFI contributes $219.9 million in bonds to ResCap
- ■ **Dec 31, 2008** S&P downgrades both AFI and ResCap to SD (selective default)
- ♦ **2008** Over 3 million real property foreclosures take place in U.S. (81% increase over 2007)
- ■ **2008** ResCap incurs loss for year of ($5.6 billion)

# ResCap Timeline of Selected Events

## Appendix III, Page 7 of 11

**Legend:**
- ■ ResCap Event
- ● AFI Event
- ◆ Industry Event

### 2009

#### Jan

- ◆ **Jan 16, 2009** U.S. Treasury announces $20 billion investment in BofA and $25 billion investment through Capital Purchase Program (part of TARP)
- ■ **Jan 30, 2009** AFI exercises its option to convert its ResCap Preferred Interests to IB Finance Preferred Interests and purchases ResCap's remaining IB Finance Class M Shares

#### Feb

- ◆ **Feb 17, 2009** President Obama signs $787 billion stimulus package
- ◆ **Feb 18, 2009** U.S. Treasury announces increase in funding commitment to Fannie Mae and Freddie Mac from $100 billion to $200 billion
- ◆ **Feb 26, 2009** Fannie Mae requests $15.2 billion from U.S. Treasury due to Q4 2008 losses
- ● **Feb 26, 2009** AFI reiterates its Jan 8, 2009 qualified statement of support in its 2008 annual report
- ■ **Feb 26, 2009** ResCap discloses in its Form 10-K that "there is substantial doubt about the Company's ability to continue as a 'going concern'"

#### Mar

- ◆ **Mar 2, 2009** U.S. Treasury states it may need to invest another $30 billion in AIG
- ◆ **Mar 11, 2009** Freddie Mac requests additional $30.8 billion from U.S. Treasury
- ◆ **Mar 18, 2009** FRB announces decision to buy $1.2 trillion of government bonds and mortgage-related securities, including $200 billion of Fannie Mae and Freddie Mac debt
- ● **1Q 2009** AFI initiates "Project Windmill," which analyzes AFI's exposure in event of ResCap bankruptcy filing

#### Apr

- ■ **Apr 6, 2009** GMAC Mortgage and Ally Bank amend Pipeline Swap (eliminating HFI loans)
- ■ **Apr 30, 2009** Marano informs ResCap Board that Hittler-Garvey is joining AFI as Chief Risk Executive, but that she will continue on ResCap Board
- ◆ **Apr 30, 2009** Chrysler files Chapter 11

#### May

- ■ **May 1, 2009** ResCap closes U.S./U.K. Broker-Dealer Sale to AFI for $110 million
- ◆ **May 8, 2009** Fannie Mae requests additional $19 billion from U.S. Treasury
- ◆ **May 12, 2009** Freddie Mac requests additional $6.1 billion from U.S. Treasury
- ◆ **May 15, 2009** AFI receives $7.5 billion in TARP funds from U.S. Treasury

#### Jun

- ● **Jun 15, 2009** Young presents AFI Board with pro forma analysis of two scenarios: (1) ResCap bankruptcy plus AFI partial absorption of ResCap, and (2) full absorption of ResCap
- ■ **Jun 16, 2009** ResCap Board meets with Morrison & Foerster to discuss potential Chapter 11 filing
- ■ **Jun 23, 2009** Hittler-Garvey leaves ResCap Board
- ● **2Q 2009** S&P upgrades AFI ratings to CCC (extremely speculative), while Fitch downgrades AFI to RD (restricted default)

---

- ■ **Jan 1, 2009** ResMor sale to AFI closes for $87 million
- ■ **Jan 5, 2009** Flees resigns as ResCap CAO and Controller, replaced by Dondzila
- ● **Jan 8, 2009** In statement filed with SEC, ResCap indicates AFI will provide support to ResCap as long as it is in best interests of AFI stakeholders

- ● **Feb 3, 2009** AFI tells investors that despite challenges, ResCap is meeting all of its covenants in fourth quarter due largely to continued support from AFI
- ● **Feb 6, 2009** AFI reports that ResCap has no direct access to TARP funds, but has support of AFI; AFI likely to continue supporting ResCap as long as it benefits AFI stakeholders

- ■ **Mar 2009** Cerberus executives Kravit and Weintraub resign from ResCap Board; Marano nominates Renzi to ResCap Board; AFI's de Molina resigns from ResCap Board, subsequently joins AFI Board and becomes AFI CEO
- ● **Mar 2009** AFI makes capital contribution to ResCap of $263.1 million in bonds

- ● **Apr 2009** AFI makes capital contribution to ResCap of $34.7 million in bonds
- ■ **Apr 2009** CEO Marano becomes ResCap employee

- ■ **May 8, 2009** ResCap confirms West as Independent Director
- ● **May 2009** AFI makes capital contribution to ResCap of $112.6 million in bonds

- ● **Jun – Jul 2009** ResCap and FTI resume planning for anticipated Chapter 11 filing
- ● **Jun 2009** AFI makes capital contribution to ResCap of $750.8 million in bonds

- ■ **Jun 1, 2009** PATI and RAHI enter into $370 million AFI revolving credit facility guaranteed by RFC, GMAC Mortgage, and ResCap
- ◆ **Jun 1, 2009** GM files Chapter 11
- ■ **Jun 5, 2009** Marano discusses request by AFI Board for business plan projection of core ResCap business separate from legacy business
- ● **Jun 10, 2009** Moody's upgrades AFI to Ca with stable outlook (default imminent)

- ■ **Jun 10, 2009** Lazard gives presentation to ResCap Board on "free-fall" Chapter 11 filing by ResCap and potential ramifications for AFI and Ally Bank
- ● **Jun 10, 2009** AFI Board discusses MSR hedge, support for ResCap, and consequences of hypothetical ResCap free-fall Chapter 11 filing for AFI and Ally Bank
- ● **Jun 12, 2009** AFI increases ResCap Secured MSR Facility commitment to $400 million

---

*Daily liquidity meetings by ResCap Board*



Appendix III, Page 8 of 11

**ResCap Timeline of Selected Events**

Legend:
- ■ ResCap Event
- ● AFI Event
- ♦ Industry Event

**2009**

**Jul**

■ **Jul 7, 2009**
ResCap Board considers presentation prepared by Lazard on risk to various constituents if ResCap files Chapter 11

■ **Jul 15 – 16, 2009**
DeBrunner and Walker resign from ResCap Board

**Aug**

■ **Aug 2009**
Ally Bank makes fair value election for HFS loans, changing revenue allocation under Broker Agreement

♦ **Aug 8, 2009**
Fannie Mae requests additional $10.7 billion from U.S. Treasury

**Sep**

■ **Sep 8, 2009**
Renzi resigns from ResCap Board, reducing ResCap Board to four Directors (Marano, Young, and Independent Directors Smith and West)

**Oct**

♦ **Oct 2009**
Unemployment peaks at 10.2%, highest rate since 1983

**Nov**

♦ **Nov 1, 2009**
CIT Group files Chapter 11

■ **Nov 3, 2009**
SEC approves ResCap's request to deregister as separate filer

♦ **Nov 4, 2009**
Fannie Mae requests additional $15 billion from U.S. Treasury

● **Nov 16, 2009**
Carpenter replaces de Molina as AFI CEO

■ **Nov 2009 – Jan 2010**
ResCap and FTI resume planning for potential Chapter 11 filing

● **Nov 2009**
AFI contributes $23.6 million to ResCap in bonds from December 2008 exchange offer

● **Nov 2009**
AFI forgives $52.4 million of ResCap Secured MSR Facility

■ **Nov 2009**
ResCap ceases daily liquidity meetings

**Dec**

● **Dec 11, 2009**
AFI discusses ResCap exit strategy in meeting with U.S. Treasury to request funds under SCAP program

● **Dec 30, 2009**
AFI receives $3.8 billion from TARP, and U.S. Treasury becomes majority owner of AFI

● **Dec 30, 2009**
AFI contributes $1.4 billion in HFS loans, $600 million in cash, $316.2 million in receivables, $262.7 million in Secured MSR Facility debt forgiveness, and $195 million in forgiveness of intercompany payables to ResCap

● **Dec 30, 2009**
AFI converts $3 billion ResCap Secured Revolver Facility loan into amortizing term loan

♦ **2009**
Foreclosure filings increase 21% over 2008; subprime mortgage delinquencies increase to 25.5%

■ **2009**
ResCap incurs loss for year of ($4.5 billion)

Daily liquidity meetings by ResCap Board

Appendix III, Page 8 of 11

Appendix III, Page 9 of 11



ResCap Timeline of Selected Events

Legend:
- ■ ResCap Event
- ● AFI Event
- ◆ Industry Event

**Jan**
- ■ Jan 27, 2010 S&P upgrades ResCap's rating to B (highly speculative)
- ■ Jan 29, 2010 Abreu appointed President of ResCap

**Feb**
- ◆ Feb 2010 PIMCO organizes investor conference to pursue potential RMBS claims

**Mar**
- ◆ Mar 2010 Lenders report declining provisions for loan losses on their balance sheets
- ■ Mar 17, 2010 GMAC Mortgage, RFC, and AFI enter into $325 million settlement with Freddie Mac for R & W claims
- ■ Mar 29, 2010 Abreu confirmed to ResCap Board
- ● 1Q 2010 Moody's, S&P, and Fitch upgrade AFI's credit rating to B3, B, and B, respectively (highly speculative)

**Apr**
- ◆ Apr 2010 Delinquency rate on sub-prime variable rate loans hovers at 40%

**May**
- ◆ May 9 – 10, 2010 EU enacts EFSF and EFSM funding programs to address Eurozone crisis

**Jun**
- ◆ Jun 2010 Unemployment remains high with second quarter average of 9.75%
- ■ Jun 14, 2010 MBIA files $4 billion R & W lawsuit against GMAC Mortgage

**Jul**
- ■ Jul 2010 Article published by Reuters describes potential of clearinghouse model to aggregate RMBS claimants
- ■ Jul 1, 2010 GMAC Mortgage and Ally Bank amend MSR Swap (increasing margin from 1.0% to 3.25% and adding loan repurchase expense)

**Aug**
- ■ Aug 2010 Elliot Assoc. provides presentation to ResCap estimating potential RMBS claims against ResCap at $7.3 billion
- ● Aug 6, 2010 Goldman Sachs updates AFI Board on strategic alternatives for mortgage operations, including third party interest in ResCap's core operations, asset sales, and trade settlements
- ■ Aug 6, 2010 ResCap Board approves First 2009 Tax Allocation Agreement; the agreement is signed by AFI but not signed by Young

**Sep**
- ◆ Fall 2010 DOJ, FRB, FDIC, SEC, and authorities in all 50 states begin investigating mortgage servicing companies, including ResCap, regarding foreclosure issues

**Oct**
- ◆ Sept – Oct 2010 Several lenders, including AFI, suspend foreclosure proceedings in wake of "robosigning" issues
- ■ Oct 2010 ResCap sells its European mortgage assets and operations to Fortress
- ● Oct 5, 2010 AFI provides guarantee to Ally Bank of GMAC Mortgage obligations under Original Servicing Agreement and MSR Swap
- ■ Oct 5, 2010 GMAC Mortgage executes "sideletter" with Ally Bank acknowledging responsibility for "any aspect of the foreclosure affidavit process"
- ◆ Oct 8, 2010 AFI receives letter from several U.S. Senators demanding that AFI stop foreclosures in all 50 states
- ● Oct 29, 2010 AFI Board receives results of bid process for ResCap; all three bids indicate implied transaction loss and negative cash at closing as well as concerns regarding contingent liabilities; AFI Board agrees to terminate sale process

**Nov**
- ◆ Nov 3, 2010 U.S. Treasury announces it will purchase $600 billion of Treasury securities by end of 2011
- ◆ Nov 4, 2010 Congressional Oversight Panel estimates R & W claims could be as much as $16 billion
- ■ Nov 5, 2010 Results of AFI bid process are presented to ResCap Board
- ■ Nov 18, 2010 Marano testifies at hearing on foreclosure issues

**Dec**
- ◆ Dec 2010 Housing prices continue to decline past mid-2009 low; foreclosure filings increase from first half of 2010
- ■ Dec 22, 2010 ResCap Board approves Second 2009 Tax Allocation Agreement proposed by AFI despite outside counsel's comment that it is unfair to ResCap
- ■ Dec 23, 2010 ResCap and AFI add unsecured $500 million swingline tranche to line of credit agreement with RAHI and PATI
- ■ Dec 23, 2010 ResCap, LLC and Ally Securities, et al. enter into $461.5 million settlement with Fannie Mae for R & W claims
- ■ 2010 ResCap earns net income for year of $575 million, its first profitable year since 2006

2010

Appendix III, Page 9 of 11





## ResCap Timeline of Selected Events

■ ResCap Event
● AFI Event
♦ Industry Event

**2011**

■ **1Q – 2Q 2011**
Moody's, S&P, and Fitch upgrade ResCap to Ca (default imminent), B+ (highly speculative), and B (highly speculative), respectively

■ **Jan 26, 2011**
AFI and ResCap execute Second 2009 Tax Allocation Agreement

● **Feb 2 – 7, 2011**
Moody's and Fitch upgrade AFI to B1 (highly speculative) and BB (non-investment grade), respectively

● **Mar 31, 2011**
AFI files SEC Form S-1 for IPO

♦ **1Q 2011**
Foreclosure filings decrease

■ **Apr 1, 2011**
GMAC Mortgage and Ally Bank revise MSR and Pipeline Swaps in response to FDIC concerns, expanding guarantee

■ **Apr 13, 2011**
ResCap, GMAC Mortgage, AFI, and Ally Bank, enter into Consent Order with FRB and FDIC

● **Apr 28, 2011**
AFI Board receives report that analysts have significant questions surrounding AFI IPO related to ResCap

■ **May 20, 2011**
CFO Young departs ResCap Board, Whitlinger joins ResCap Board and appointed CFO

♦ **Jun 2011**
Rate of unemployed who have been jobless six months or more peaks at 45%, a post WWII high

● **Jun 6, 2011**
AFI Board advised by IPO underwriters that AFI IPO should not be launched due to market conditions and concerns around R & W exposure

■ **Jun 14, 2011**
ResCap Board approves Apr 1, 2011 revisions to MSR and Pipeline Swaps

♦ **Jun 29, 2011**
BofA announces settlement of PLS claims for $8.5 billion

■ **Jul – Dec 2011**
ResCap, Cerberus, and AFI evaluate potential ResCap sale to Cerberus

■ **Jul 29, 2011**
In wake of BofA's announced settlement with PLS investors, ResCap estimates internally that ResCap's R & W claims could be as much as $4 billion

■ **Aug 2011 – May 2012**
ResCap and FTI resume planning for potential Chapter 11 filing

● **Aug 3, 2011**
DeBrunner presents review of R & W claims and potential exposure to DOJ/AG Settlements to AFI Board

■ **Aug 12, 2011**
ResCap CEO Marano sends AFI CEO Carpenter letter describing ResCap's precarious financial condition

■ **Aug 18, 2011**
ResCap Board receives liquidity and MSR update and in executive session discusses "a variety of strategic matters," including potential bankruptcy

■ **Aug 19 – 31, 2011**
ResCap Board meets on four separate occasions to discuss preparations for bankruptcy or restructuring

● **Aug 19, 2011**
AFI CFO Mackey expresses belief that R & W claims against ResCap are inevitable and will be "avalanche"

■ **Aug 19, 2011**
ResCap Board receives update on MSR hedge activity and in executive session discusses contingency planning

■ **Aug 25, 2011**
ResCap Board receives liquidity update and in executive session discusses strategic options for ResCap, potential implications of mortgage foreclosure issues, securities litigation exposure, R & W exposure, and effect of capital markets volatility on ResCap's equity position

● **Aug 29, 2011**
AFI Board resolves to provide ResCap with enough capital to exceed $250 million minimum TNW covenants by $50 million

■ **Sept – Oct 2011**
ResCap Board continues to evaluate "various different strategic scenarios" and "contingency planning" options

♦ **Sept 2011**
Unemployment reported steady at 9%

● **Sept 2, 2011**
FHFA files $6 billion R & W lawsuit against Ally *et al.*

● **Sep 16, 2011**
AFI EVP Brown emails Carpenter, recommending that AFI and ResCap "[s]top origination immediately" and "[a]nnounce we are exiting future mortgage business"

● **Sep 23, 2011**
AFI Board reviews strategic alternatives for ResCap and impact on AFI

■ **Sep 27, 2011**
ResCap Board meets in executive session to discuss foreclosure issue and potential settlements with FHFA and DOJ, as well as ResCap's near-term projected equity position in relation to its TNW covenant requirements

● **Sep 27, 2011**
AFI Board resolves again to provide ResCap with enough capital to exceed its TNW covenants by $50 million

● **Oct 6, 2011**
AFI Board meets and discusses "merits and potential consequences of remaining in or exiting all or a portion of the mortgage business"

● **Oct 15, 2011**
AFI engages Evercore to analyze strategic alternatives in connection with AFI's mortgage business

● **Oct 17, 2011**
Attorney Patrick alleges R & W claims against AFI for class of RMBS claimants

■ **Oct 17, 2011 – May 8, 2012**
RMBS Steering Committee, Talcott Franklin, and ResCap discuss and negotiate RMBS Trust Settlement

■ **Oct 18, 2011**
ResCap retains Centerview as its investment banker to assist in restructuring efforts

● **Oct 25, 2011**
AFI Board resolves again to provide ResCap with enough capital to exceed its TNW covenants by $50 million

■ **Oct 28, 2011**
Morrison & Foerster gives presentation on fiduciary duties of directors during executive session of ResCap Board

♦ **Oct 31, 2011**
MF Global files Chapter 11

## ResCap Timeline of Selected Events

- ■ ResCap Event
- ● AFI Event
- ♦ Industry Event

### 2011

#### Nov

● **Nov 4, 2011**
DeBrunner presents review of R & W litigation and other mortgage contingency matters to AFI Audit Committee

■ **Nov 4, 2011**
ResCap Board receives liquidity update and discusses inability to obtain fairness opinion as to collateral that will potentially be pledged to AFI LOC

● **Nov 22, 2011**
AFI Board receives counsel by advisors that Chapter 11 and 363 sale process is best way to address legacy mortgage exposure

■ **Nov 25, 2011**
Carpenter attends special meeting of ResCap Board to discuss AFI - ResCap relationship

■ **Nov 28, 2011**
ResCap makes formal request for additional support from AFI in preparation for bankruptcy, including DIP financing and 363 sale support

■ **Nov 8, 2011**
ResCap Board holds special meeting with advisors Morrison & Foerster, Centerview, and FTI regarding contingency planning

■ **Nov 10 – 11, 2011**
S&P and Fitch both downgrade ResCap to CCC (extremely speculative)

■ **Nov 14 – 16, 2011**
Centerview prepares preliminary assessment of ResCap's asset sale alternatives and advises that Cerberus is prime purchaser candidate

■ **Nov 16, 2011**
ResCap Board confirms Ilany and Mack as Independent Directors

♦ **Nov 29, 2011**
AMR files Chapter 11

● **Nov 30, 2011**
AFI Board resolves again to provide ResCap with enough capital to exceed its TNW covenants by $50 million

■ **Nov – Dec 2011**
FGIC files several suits alleging $7 billion in R & W damages against AFI and its affiliates, including ResCap

#### Dec

♦ **Dec 2011**
Credit markets continue to be tight, with 80% of lenders reducing credit limits for specific counterparties

● **Dec 2011**
AFI and its advisors begin to focus on preparations for ResCap bankruptcy

● **Dec 2011**
AFI contributes $109.4 million in capital to ResCap with forgiveness of debt on LOC

♦ **Dec 2011**
Mortgage delinquency rates remain elevated but steady

■ **Dec 2 – 4, 2011**
ResCap Board discusses need for continued capital support and potential DIP financing from AFI in event of ResCap bankruptcy

■ **Dec 5, 2011**
ResCap Board establishes Special Review Committee

■ **Dec 5, 2011**
GMAC Mortgage and ResCap execute Pipeline Letter Agreement with AFI agreeing to post up to $4 billion of collateral with Ally Bank

■ **Dec 21, 2011**
ResCap enters into repo/factoring facility (BMMZ Repo Facility) with BMMZ, an indirect wholly owned subsidiary of AFI

● **Dec 29, 2011**
AFI Board resolves again to provide ResCap with enough capital to exceed its TNW covenants by $50 million

■ **2011**
ResCap incurs loss for year of ($845 million)

### 2012

#### Jan

■ **Jan – Mar 2012**
ResCap undertakes DIP marketing process, negotiates with Barclays and Citibank

♦ **Jan – May 2012**
EU fiscal crisis intensifies; Greece receives additional bailout funds

♦ **Jan 2012**
Unemployment declines to 8.25%, lowest rate in three years

● **Jan 20, 2012**
AFI provides draft DIP financing term sheet to ResCap

● **Jan 25, 2012**
AFI Board approves capital contribution to ResCap of up to $65 million

■ **Jan 25, 2012**
Morrison & Foerster presents initial results of claims investigation to ResCap Board

■ **Jan 30, 2012**
ResCap Board authorizes Marano's letter request for capital support to AFI

● **Jan 30, 2012**
January 30 Letter Agreement: AFI provides capital contribution to ResCap via $196.5 million in debt forgiveness related to government settlement and commits to provide ResCap with enough capital to exceed its TNW covenants by $25 million for Jan 2012

■ **Jan – Feb 2012**
Potential "stalking horse" bidders interested in ResCap's assets conduct substantial due diligence and submit preliminary non-binding letters of intent

#### Feb

● **Feb 2012**
Cerberus exec Tessler hired by AFI to assist in restructuring efforts but remains employed by Cerberus

● **Feb 2, 2012**
Fitch downgrades AFI's rating to BB-(non-investment grade), reflecting deterioration of ResCap

■ **Feb 9, 2012**
FRB announces settlement agreement imposing CMP of $207 million on AFI corporate group

■ **Feb 9, 2012**
DOJ/AG Consent Judgment agreed to include: $109.6 million payment and $200 million borrower relief

■ **Feb 14, 2012**
Morrison & Foerster meets with AFI's counsel Kirkland & Ellis to present results of claims investigation

■ **Feb 24, 2012**
Analyst at Brookfield states, "No matter [the advisor], the overwhelming issue is that ResCap is effectively insolvent"

■ **Feb 29, 2012**
Fortress selected as exclusive "stalking horse" bidder

#### Mar

■ **Mar 2012**
GMAC Mortgage and RFC issue term notes under GSAP facility with Barclays and defease existing notes

■ **Mar 8, 2012**
Mack begins settlement negotiations with Carpenter and Tessler

■ **Mar 21, 2012**
ResCap Board agrees to submit request to AFI for equity support in form of debt forgiveness

■ **Mar 23, 2012**
ResCap Board receives liquidity update showing cash, excess collateral, and borrowing capacity falling below zero within one year

#### Apr

■ **Apr 4, 2012**
DOJ/AG Consent Judgment filed

■ **Apr 9, 2012**
ResCap executes committed DIP facility term sheet with Barclays

■ **Apr 12, 2012**
ResCap Board resolves not to make scheduled Apr 17, 2012 interest payment on senior unsecured bonds

■ **Apr 12, 2012**
Fortress submits revised bid requiring AFI financing

● **Apr 16 – May 10, 2012**
AFI and Berkshire Hathaway explore out of court restructuring proposals

■ **Apr 18, 2012**
Moody's downgrade ResCap to C (default imminent)

■ **Apr 30, 2012**
ResCap Board discusses DIP financing and overview and update on Fortress bid

■ **Apr 30, 2012**
GMAC Mortgage and Ally Bank terminate MSR and Pipeline Swaps

#### May

■ **May 1, 2012**
GMAC Mortgage and Ally Bank amend MMLPSA

● **May 4, 2012**
AFI Independent Directors and Carpenter consent to ResCap filing bankruptcy

■ **May 9, 2012**
ResCap enters into real estate transaction with AFI/GMAC Mortgage

■ **May 9, 2012**
ResCap Board receives executive summary of proposed $8.7 billion RMBS Trust Settlement Agreement and approves it shortly thereafter

■ **May 11, 2012**
GMAC Mortgage executes amended servicing agreement with Ally Bank

■ **May 11, 2012**
Assured Guarantee files $1.2 billion R & W lawsuit against GMAC Mortgage

■ **May 13, 2012**
ResCap Board and Independent Directors authorize bankruptcy filing

■ **May 13, 2012**
ResCap, AFI, and Consenting Junior Secured Noteholders enter into Junior Secured Noteholders' Plan Support Agreement

● **May 13, 2012**
AFI replaces Fortress as "stalking horse" bidder on HFS portfolio

■ **May 14, 2012**
ResCap *et al.* file Chapter 11

■ **May 14, 2012**
ResCap files 363 sale motion with Fortress for Platform Sale and AFI for Legacy Sale

■ **May 14, 2012**
ResCap and AFI enter into AFI Settlement and Plan Sponsor Agreement

Appendix III.J.1.c(1)(b)—1, Page 1 of 1

**Residential Capital, LLC**
**Evolution of Barclays DIP Financing Proposals**

| Term | Barclays February 17, 2012 Terms | Barclays March 8, 2012 Terms | Barclays March 21, 2012 Terms [1] | Barclays May 14, 2012 Terms |
|---|---|---|---|---|
| Facility summary | $1.80 billion facility comprised of: $200 million revolver; $1.00 billion term loan (A-1 TL); $600 million term loan (A-2 TL) | $1.35 billion facility comprised of: $200 million revolver; $1.25 billion term loan (A-1 TL) | $1.50 billion facility comprised of: $200 million revolver; $1.10 billion term loan (A-1 TL); $200 million term loan (A-2 TL) | $1.45 billion facility comprised of: $200 million revolver; $1.05 billion term loan (A-1 TL); $200 million term loan (A-2 TL) |
| Prepetition facilities refinanced | GSAP Facility; BMMZ Repo Facility; Citibank MSR Loan; FNMA EAF Facility | GSAP Facility; BMMZ Repo Facility; FNMA EAF facility | GSAP Facility; BMMZ Repo Facility; FNMA EAF facility | GSAP Facility; BMMZ Repo Facility |
| Pricing | Revolver: L + 400-450 bps (LIBOR floor of 1.25%); A-1 TL: L + 400-450 bps (LIBOR floor of 1.25%); A-2 TL: L+550-600 bps (LIBOR floor of 1.25%) | Revolver: L + 400-450 bps; A-1 TL: L + 400-450 bps (LIBOR floor of 1.25%) | Revolver: L + 400 bps; A-1 TL: L + 400 bps (LIBOR floor of 1.25%); A-2 TL: L + 600 bps (LIBOR floor of 1.25%) | Revolver: L+400 bps; A-1 TL: L + 400 bps (LIBOR floor of 1.25%) [2]; A-2 TL: L+600 bps (LIBOR floor of 1.25%) [2] |
| Maturity | 18 months from closing, or earliest of certain other milestones | 18 months from closing, or earliest of certain other milestones | 18 months from closing, or earliest of certain other milestones | 18 months from closing, or earliest of certain other milestones |
| Upfront fees/OID | Revolver: 150 bps; A-1 TL: 99 OID; A-2 TL: 98 OID | Revolver: 150 bps; A-1 TL: 100 OID | Revolver: 150 bps; A-1 TL: 99 OID; A-2 TL: 98 OID | $52 million [3] |
| Underwriting fee | Underwriting fee: 200 bps on aggregate commitment; Structuring fee: 50 bps on aggregate commitment | Underwriting fee: 200 bps; Structuring fee: 50 bps | Underwriting fee: 200 bps on aggregate commitment; Structuring fee: 50 bps, with rebate if more than 100 bps of price flex is required | See footnote [3] |
| Flex | - Increase pricing by 150 bps on weighted basis; - Increase commitment fee by 50 bps; - Add LIBOR floor of 1.25% to revolver; - Shorten DIP tenor to 12 months; - Add prepayment premium to A-1 and A-2 TLs; - Reallocate portions of the revolver and TLs | - Margin/OID: 200 to 250 bps; - Unused line fee: 50 bps; - LIBOR floor on revolver; - Tenor to 12 months; - Soft call premium; - Reallocate $100 million revolver to A-1 Term Loan; - Reallocate $300 million A-1 to A-2 Term Loan | - Margin/OID: 200 bps; - Unused line fee: 50 bps; - LIBOR floor on revolver; - Tenor to 12 months; - Soft call premium; - Reallocate $100 million revolver to A-1 Term Loan (considering removing at ResCap's request); - Reallocate $200 million of A-1 to A-2 Term Loan | See footnote [3] |
| Total yield | 10.06% – 12.03% | 9.21% – 11.79% | 9.53% – 10.95% | 8.87% |

[1] Barclays also submitted a March 19, 2012 DIP proposal.

[2] Amended to A-1 TL: L+375 bps (LIBOR floor of 1.25%) and A-2 TL: L+550 bps (LIBOR floor of 1.25%). Notice of Filing of Amendment to Financing Fee Letters [Docket No. 417] at 1.

[3] Barclays' DIP Motion indicated $52 million in aggregate fees and did not provide detailed fees by component. These fees were subsequently adjusted downward after the Debtors' objection to the DIP Financing and Cash Collateral Motions.

Source: Barclays Confidential Presentation of Financing Discussion Materials, dated Feb. 17, 2012, at RC40020317–29 [RC40020290]; Confidential Presentation of Financing Discussion Materials, dated Mar. 19, 2012, at 2–4 [EXAM00073480]; Centerview Materials for Discussion, dated Mar. 23, 2012, at 2–4 [RC00000384]; Barclays DIP Motion, at 10–17; Debtors' Omnibus Reply to Objections to DIP Financing and Cash Collateral Motions [Docket No. 372] at 6–7.

Appendix III.J.1.c(1)(b)—1, Page 1 of 1

Appendix III.J.1.c(1)(b)—2, Page 1 of 1

**Residential Capital, LLC**
**Evolution of Citibank DIP Financing Proposals**

| Term | Citibank<br>February 21, 2012 Terms | Citibank<br>March 6, 2012 Terms [1] |
|---|---|---|
| Facility summary | Up to $1.8 billion DIP facility, comprised of:<br>- STBD revolving tranche<br>- STBD term loan tranche | Up to $1.35 billion DIP facility, comprised of:<br>- Up to $800 million Advance Facility (Barclays)<br>- Up to $550 million Liquidity Facility (Citibank) |
| Prepetition facilities<br>refinanced | GSAP Facility<br>Citibank MSR Loan Agreement<br>BMMZ Repo Facility<br>FNMA EAF facility | GSAP Facility (Advance Facility)<br>BMMZ Repo Facility (Liquidity Facility) |
| Pricing | Approximately 9.50% | Approximately 7.00% |
| Maturity | 12 months | 12 months |
| Upfront fees/OID | 100 bps revolver facility<br>97 OID term loan facility | Liquidity Facility: 98 OID |
| Underwriting fee | TBD | 250 bps |
| Flex | Not included | 200 bps as coupon or OID |

[1] Terms are related only to the Citibank Liquidity Facility and do not include the Barclays Advance Facility.
Source: Citibank DIP Financing Considerations Presentation, dated Feb. 21, 2012, at RC40020349-50 [RC00020290]; Citibank DIP Financing Considerations Presentation, dated Mar. 6, 2012, at 1-3 [EXAM00074757].

Appendix III.J.1.c(1)(b)—2, Page 1 of 1

# ResCap Officer Chart

## 2004 – 2012

*R* = ResCap

*D* = Dual-Affiliated [1]

[1] Individuals denoted as Dual-Affiliated held ResCap officer positions at the same time they also held: (1) an AFI officer position; (2) an AFI director position; or (3) a Cerberus position, via consulting or secondment agreement or otherwise. An alphabetical listing of all ResCap officers who had Dual Affiliations at any time during their service is listed at the end of the chart.

*Sources: Ally Employee Individual Profiles [ALLY_0004637]; interviews conducted by the Examiner's Professionals; Minutes of ResCap, AFI and Ally Bank Board of Directors Meetings, from 2004 – 2012.*

Appendix IV.A—1, Page 2 of 14

ResCap Officers
January 1, 2004 – December 31, 2004

| | Affiliation | Jan-04 | Feb-04 | Mar-04 | Apr-04 | May-04 | Jun-04 | Jul-04 | Aug-04 | Sep-04 | Oct-04 | Nov-04 | Dec-04 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| David Applegate | R | | | | | | | | | Titles: Co-CEO **Relevant Dates: 9/2004 – 10/2005** | | | |
| Louise Herrle | R | | | | | | | | | Titles: Treasurer **Relevant Dates: 9/2004 – 6/2007** | | | |
| Sanjiv Khattri | D | | | | | | | | | Titles: Vice-President **Relevant Dates: 9/2004 – 3/2005** Dual Affiliate Positions: CFO (3/2004 – 12/2007); Exec. VP (3/2004 – 5/2008) at AFI | | | |
| Davee Olson | R | | | | | | | | | Titles: CFO **Relevant Dates: 9/2004 – 8/2006** | | | |
| Bruce Paradis | R | | | | | | | | | Titles: Co-CEO **Relevant Dates: 9/2004 – 10/2005** | | | |
| Cathy Quenneville | D | | | | | | | | | Titles: Secretary **Relevant Dates: 9/2004 – 5/2012** Dual Affiliate Positions: Secretary at AFI (8/1997 – present) | | | |
| Jerome Van Orman | D | | | | | | | | | Titles: Vice-President **Relevant Dates: 9/2004 – 3/2005** Dual Affiliate Positions: CFO (10/1999 – 3/2007); Group VP at AFI | | | |
| David Walker | D | | | | | | | | | Titles: Vice-President **Relevant Dates: 9/2004 – 3/2005** Dual Affiliate Positions: CFO-Mortgage Operations (5/2002 – 11/2006); Group VP (3/2004 – 8/2009) | | | |

Appendix IV.A—1, Page 2 of 14

**Appendix IV.A—1, Page 3 of 14**

ResCap Officers
January 1, 2005 – December 31, 2005

| | Affiliation | Jan-05 | Feb-05 | Mar-05 | Apr-05 | May-05 | Jun-05 | Jul-05 | Aug-05 | Sep-05 | Oct-05 | Nov-05 | Dec-05 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| David Applegate | R | Titles: Co-CEO, COO — Relevant Dates: 9/2004 – 10/2005; 10/2005 – 3/2007 | | | | | | | | | | | |
| Louise Herrle | R | Titles: Treasurer — Relevant Dates: 9/2004 – 6/2007 | | | | | | | | | | | |
| Sanjiv Khattri | D | Titles: Vice-President — Relevant Dates: 9/2004 – 3/2005; Dual Affiliate Positions: CFO (3/2004 – 12/2007), Exec. VP (3/2004 – 5/2008) at AFI | | | | | | | | | | | |
| David Marple | R | | | | | | Titles: General Counsel — Relevant Dates: 6/2005 – 10/2007 | | | | | | |
| Davee Olson | R | Titles: CFO — Relevant Dates: 9/2004 – 8/2006 | | | | | | | | | | | |
| Bruce Paradis | R | Titles: Co-CEO, CEO — Relevant Dates: 9/2004 – 10/2005; 10/2005 – 6/2007 | | | | | | | | | | | |
| Cathy Quenneville | D | Titles: Secretary — Relevant Dates: 9/2004 – 5/2012; Dual Affiliate Positions: Secretary at AFI (8/1997 – present) | | | | | | | | | | | |
| Kenneth Spindel | R | Titles: Co-Chief Risk Officer — Relevant Dates: 1/2005 – 9/2007 (est.) | | | | | | | | | | | |
| Thomas Stenger | R | Titles: Co-Chief Risk Officer — Relevant Dates: 1/2005 – 9/2007 | | | | | | | | | | | |

Appendix IV.A—1, Page 3 of 14

Appendix IV.A—1, Page 4 of 14

ResCap Officers
January 1, 2005 – December 31, 2005

| | Affiliation | Jan-05 | Feb-05 | Mar-05 | Apr-05 | May-05 | Jun-05 | Jul-05 | Aug-05 | Sep-05 | Oct-05 | Nov-05 | Dec-05 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Jerome Van Orman | D | **Titles:** Vice-President **Relevant Dates: 9/2004 – 3/2005** Dual Affiliate Positions: CFO (10/1999 – 3/2007), Group VP at AFI | | | | | | | | | | | |
| David Walker | D | **Titles:** Vice-President **Relevant Dates: 9/2004 – 3/2005** Dual Affiliate Positions: CFO-Mortgage Operations (5/2002 – 11/2006); Group VP (3/2004 – 8/2009) at AFI | | | | | | | | | | | |
| James Young | R | | | Titles: CAO and Interim Controller **Relevant Dates: 3/2005 - 6/2007** | | | | | | | | | |

Appendix IV.A—1, Page 4 of 14

**Appendix IV.A—1, Page 5 of 14**

ResCap Officers
January 1, 2006 – December 31, 2006

| | Affiliation | Jan-06 | Feb-06 | Mar-06 | Apr-06 | May-06 | Jun-06 | Jul-06 | Aug-06 | Sep-06 | Oct-06 | Nov-06 | Dec-06 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| David Applegate | R | Titles: COO — Relevant Dates: 10/2005 – 3/2007 | | | | | | | | | | | |
| James Giertz | R | Titles: Treasurer — Relevant Dates: 9/2004 – 6/2007 | | | | | | | | | Titles: CFO — Relevant Dates: 10/2006 – 4/2007 | | |
| Louis Herrle | R | Titles: Treasurer — Relevant Dates: 9/2004 – 6/2007 | | | | | | | | | | | |
| David Marple | R | Titles: General Counsel — Relevant Dates: 6/2005 – 10/2007 | | | | | | | | | | | |
| Davee Olson | R | Titles: CFO — Relevant Dates: 9/2004 – 8/2006 | | | | | | | | | | | |
| Bruce Paradis | R | Titles: CEO — Relevant Dates: 10/2005 – 6/2007 | | | | | | | | | | | |
| Cathy Quenneville | D | Titles: Secretary — Relevant Dates: 9/2004 – 5/2012 — Dual Affiliate Positions: Secretary at AFI (8/1997 – present) | | | | | | | | | | | |
| Kenneth Spindel | R | Titles: Co-Chief Risk Officer — Relevant Dates: 12/2005 – 9/2007 (est.) | | | | | | | | | | | |
| Thomas Stenger | R | Titles: Co-Chief Risk Officer — Relevant Dates: 12/2005 – 9/2007 | | | | | | | | | | | |
| James Young | R | Titles: CAO and Interim Controller; CFO — Relevant Dates: 3/2005 – 6/2007; 8/2006 – 10/2006 | | | | | | | | | | | |

Appendix IV.A—1, Page 6 of 14

ResCap Officers
January 1, 2007 – December 31, 2007

| | Affiliation | Jan-07 | Feb-07 | Mar-07 | Apr-07 | May-07 | Jun-07 | Jul-07 | Aug-07 | Sep-07 | Oct-07 | Nov-07 | Dec-07 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| David Applegate | R | Titles: COO; Relevant Dates: 10/2005 – 3/2007 | | | | | | | | | | | |
| Craig Chapman | R | | | | | | Titles: President; Relevant Dates: Appointed, Resigned 6/2007 | | | | | | |
| William Casey | R | | | | | | Titles: Treasurer; Relevant Dates: 6/2007 – 7/2008 | | | | | | |
| James Giertz | R | Titles: CFO; Relevant Dates: 10/2006 – 4/2007 | | | | | | | | | | | |
| Louise Herrle | R | Titles: Treasurer; Relevant Dates: 9/2004 – 6/2007 | | | | | | | | | | | |
| Tammy Hamzehpour | R | | | | | | | | | | Titles: General Counsel; Relevant Dates: 10/2007 – present | | |
| James Jones | R | | | Titles: President and COO; President and CEO; Relevant Dates: 3/2007 – 6/2007; 6/2007 – 7/2008 | | | | | | | | | |
| Sanjiv Khattri | D | | | | Titles: CFO; Relevant Dates: 4/2007 – 3/2008; Dual Affiliate Positions: CFO (3/2004 – 12/2007); Exec. VP (3/2004 – 5/2008) at AFI | | | | | | | | |
| David Marple | R | Titles: General Counsel; Relevant Dates: 6/2005 – 10/2007 | | | | | | | | | | | |
| Bruce Paradis | R | Titles: CEO; Relevant Dates: 10/2005 – 6/2007 | | | | | | | | | | | |

Appendix IV.A—1, Page 6 of 14

ResCap Officers
January 1, 2007 – December 31, 2007

| | Affiliation | Jan-07 | Feb-07 | Mar-07 | Apr-07 | May-07 | Jun-07 | Jul-07 | Aug-07 | Sep-07 | Oct-07 | Nov-07 | Dec-07 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cathy Quenneville | D | Titles: Secretary **Relevant Dates: 9/2004 – 5/2012** Dual Affiliate Positions: Secretary at AFI (8/1997 – present) | | | | | | | | | | | |
| James Redmond | D | | | | Titles: Chief Risk Officer **Relevant Dates: 4/2007 – 8/2008** Dual Affiliate Positions: Cerberus consultant pre-2007 | | | | | | | | |
| Kenneth Spindel | R | Titles: Co-Chief Risk Officer **Relevant Dates: 1/2005 – 9/2007 (est.)** | | | | | | | | | | | |
| Thomas Stenger | R | Titles: Co-Chief Risk Officer **Relevant Dates: 1/2005 – 9/2007** | | | | | | | | | | | |
| James Young | R | Titles: CAO and Interim Controller; Deputy CFO and Principal Accounting Officer **Relevant Dates: 3/2005 – 6/2007; 11/2007 – 3/2008** | | | | | | | | | | | |
| Linda Zukauskas | D | | | | | | Titles: Temporary CAO and Controller **Relevant Dates: 6/2007 – 11/2007** Dual Affiliate Positions: CAO and Corporate Controller (5/2002 – 9/2007) | | | | | | |

**ResCap Officers**
January 1, 2008 – December 31, 2008

| | Affiliation | Jan-08 | Feb-08 | Mar-08 | Apr-08 | May-08 | Jun-08 | Jul-08 | Aug-08 | Sep-08 | Oct-08 | Nov-08 | Dec-08 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| William Casey | R | Titles: Treasurer — **Relevant Dates: 6/2007 – 7/2008** | | | | | | | | | | | |
| Catherine Dondzila | R | | | | Titles: Controller — **Relevant Dates: 4/2008 – 1/2009** | | | | | | | | |
| Ralph Flees | R | | | | Titles: CAO and Controller — **Relevant Dates: 4/2008 – 1/2009** | | | | | | | | |
| Tammy Hamzehpour | R | Titles: General Counsel — **Relevant Dates: 10/2007 – present** | | | | | | | | | | | |
| James Jones | R | Titles: President and CEO — **Relevant Dates: 6/2007 – 7/2008** | | | | | | | | | | | |
| Sanjiv Khattri | D | Titles: CFO — **Relevant Dates: 4/2007 – 3/2008** Dual Affiliate Positions: Exec. VP (3/2004 – 5/2008) at AFI | | | | | | | | | | | |
| Gerald Lombardo | D | | | | | | | Titles: Treasury Executive — **Relevant Dates: 7/2008 – 1/2009** Dual Affiliate Positions: Cerberus consultant 2007 – 2008 | | | | | |
| Thomas Marano | D | | | | | | | Titles: Chairman; CEO — **Relevant Dates: 4/2008 – present; 7/2008 – present** Dual Affiliate Positions: Seconded from Cerberus 2008 – 2009 | | | | | |
| Joseph Pensabene | R | | | | | | | Titles: Chief Servicing Officer — **Relevant Dates: 7/2008 – present** | | | | | |
| Cathy Quenneville | D | Titles: Secretary — **Relevant Dates: 9/2004 – 5/2012** Dual Affiliate Positions: Secretary at AFI (8/1997 – present) | | | | | | | | | | | |
| James Redmond | D | Titles: Chief Risk Officer — **Relevant Dates: 4/2007 – 8/2008** Dual Affiliate Positions: Cerberus consultant pre-2007 | | | | | | | | | | | |

ResCap Officers
January 1, 2008 – December 31, 2008

| | Affiliation | Jan-08 | Feb-08 | Mar-08 | Apr-08 | May-08 | Jun-08 | Jul-08 | Aug-08 | Sep-08 | Oct-08 | Nov-08 | Dec-08 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Anthony Renzi | R | | | | | | | Titles: COO<br>Relevant Dates: 7/2008 – 3/2010 | | | | | |
| James Young | R | Titles: Deputy CFO and Principal Accounting Officer; CFO<br>Relevant Dates: 11/2007 – 3/2008; 3/2008 – 5/2011 | | | | | | | | | | | |

**ResCap Officers**
January 1, 2009 – December 31, 2009

| Name | Affiliation | Jan-09 | Feb-09 | Mar-09 | Apr-09 | May-09 | Jun-09 | Jul-09 | Aug-09 | Sep-09 | Oct-09 | Nov-09 | Dec-09 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Catherine Dondzila | R | Titles: CAO and Controller; Relevant Dates: 1/2009 – present | | | | | | | | | | | |
| Ralph Flees | R | Titles: CAO and Controller; Relevant Dates: 4/2008 – 1/2009 | | | | | | | | | | | |
| Tammy Hamzehpour | R | Titles: General Counsel; Relevant Dates: 10/2007 – present | | | | | | | | | | | |
| Gerald Lombardo | D | Titles: Treasury Executive; Relevant Dates: 7/2008 – 1/2009; Dual Affiliate Positions: Cerberus consultant 2007 – 2008 | | | | | | | | | | | |
| Thomas Marano | D | Titles: Chairman; CEO; Relevant Dates: 6/2008 – present; 7/2008 – present; Dual Affiliate Positions: Seconded from Cerberus 2008 – 2009; Chief Capital Markets Officer (3/2009 – present) at AFI | | | | | | | | | | | |
| Joseph Pensabene | R | Titles: Chief Servicing Officer; Relevant Dates: 7/2008 – present | | | | | | | | | | | |
| Cathy Quenneville | D | Titles: Secretary; Relevant Dates: 9/2004 – 5/2012; Dual Affiliate Positions: Secretary at AFI (8/1997 – present) | | | | | | | | | | | |
| Anthony Renzi | R | Titles: COO; Relevant Dates: 7/2008 – 3/2010 | | | | | | | | | | | |
| James Young | R | Titles: CFO; Relevant Dates: 3/2008 – 5/2011 | | | | | | | | | | | |

ResCap Officers
January 1, 2010 – December 31, 2010

| | Affiliation | Jan-10 | Feb-10 | Mar-10 | Apr-10 | May-10 | Jun-10 | Jul-10 | Aug-10 | Sep-10 | Oct-10 | Nov-10 | Dec-10 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Steven Abreu | R | Titles: President<br>Relevant Dates: 1/2010 – present | | | | | | | | | | | |
| Catherine Dondzila | R | Titles: CAO and Controller<br>Relevant Dates: 1/2009 – present | | | | | | | | | | | |
| Tammy Hamzehpour | R | Titles: General Counsel<br>Relevant Dates: 10/2007 – present | | | | | | | | | | | |
| Thomas Marano | D | Titles: Chairman; CEO<br>Relevant Dates: 4/2008 – present; 7/2008 – present<br>Dual Affiliate Positions: Chief Capital Markets Officer (3/2009 – present) at AFI | | | | | | | | | | | |
| Joseph Pensabene | R | Titles: Chief Servicing Officer<br>Relevant Dates: 7/2008 – present | | | | | | | | | | | |
| Cathy Quenneville | D | Titles: Secretary<br>Relevant Dates: 9/2004 – 5/2012<br>Dual Affiliate Positions: Secretary at AFI (8/1997 – present) | | | | | | | | | | | |
| Anthony Renzi | R | Titles: COO<br>Relevant Dates: 7/2008 – 3/2010 | | | | | | | | | | | |
| James Young | R | Titles: CFO<br>Relevant Dates: 3/2008 – 5/2011 | | | | | | | | | | | |

Appendix IV.A—1, Page 12 of 14

ResCap Officers
January 1, 2011 – December 31, 2011

| | Affiliation | Jan-11 | Feb-11 | Mar-11 | Apr-11 | May-11 | Jun-11 | Jul-11 | Aug-11 | Sep-11 | Oct-11 | Nov-11 | Dec-11 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Steven Abreu | R | Titles: President<br>Relevant Dates: 1/2010 – present | | | | | | | | | | | |
| Catherine Dondzila | R | Titles: CAO and Controller<br>Relevant Dates: 1/2009 – present | | | | | | | | | | | |
| Tammy Hamzehpour | R | Titles: General Counsel<br>Relevant Dates: 10/2007 – present | | | | | | | | | | | |
| Thomas Marano | D | Titles: Chairman, CEO<br>Relevant Dates: 4/2008 – present; 7/2008 – present<br>Dual Affiliate Positions: Chief Capital Markets Officer (3/2009 – present) at AFI | | | | | | | | | | | |
| Joseph Pensabene | R | Titles: Chief Servicing Officer<br>Relevant Dates: 7/2008 – present | | | | | | | | | | | |
| Cathy Quenneville | D | Titles: Secretary<br>Relevant Dates: 9/2004 – 5/2012<br>Dual Affiliate Positions: Secretary at AFI (8/1997 – present) | | | | | | | | | | | |
| James Whidinger | R | | | | | Titles: CFO<br>Relevant Dates: 5/2011 – present | | | | | | | |
| James Young | R | Titles: CFO<br>Relevant Dates: 3/2008 – 5/2011 | | | | | | | | | | | |

Appendix IV.A—1, Page 12 of 14

ResCap Officers
January 1, 2012 – May 31, 2012

| | Affiliation | Jan-12 | Feb-12 | Mar-12 | Apr-12 | May-12 |
|---|---|---|---|---|---|---|
| Steven Abreu | *R* | Titles: President<br>**Relevant Dates:** 1/2010 – present | | | | |
| Catherine Dondzila | *R* | Titles: CAO and Controller<br>**Relevant Dates:** 1/2009 – present | | | | |
| Tammy Hamzehpour | *R* | Titles: General Counsel<br>**Relevant Dates:** 10/2007 – present | | | | |
| Thomas Marano | *D* | Titles: Chairman; CEO<br>**Relevant Dates:** 4/2008 – present; 7/2008 – present<br>Dual Affiliate Positions: Chief Capital Markets Officer (3/2009 – present) at AFI | | | | |
| Joseph Pensabene | *R* | Titles: Chief Servicing Officer<br>**Relevant Dates:** 7/2008 – present | | | | |
| Cathy Quenneville | *D* | Titles: Secretary<br>**Relevant Dates:** 9/2004 – 5/2012<br>Dual Affiliate Positions: Secretary at AFI (8/1997 – present) | | | | |
| Joseph Ruhlin | *R* | | Titles: Treasury Executive<br>**Relevant Dates:** 2/2012 – present | | | |
| James Whitlinger | *R* | Titles: CFO<br>**Relevant Dates:** 5/2011 – present | | | | |

**Appendix IV.A—1**, Page 14 of 14

**Dual-Affiliated ResCap Officers:**

| | |
|---|---|
| Sanjiv Khattri: | CFO for ResCap from 2007 – 2008; various positions at AFI, last position CFO from 2004 – 2008 |
| Gerry Lombardo: | Treasurer for ResCap from 2008 – 2009; Cerberus consultant from 2007 – 2008 |
| Thomas Marano: | President and CEO for ResCap from 2008 – present; Chief Capital Markets Officer and Chief Mortgage Officer at AFI, 2009 – 2012; Cerberus secondee 2008 – 2009 |
| James Redmond: | Chief Risk Officer for ResCap from 2007 – 2008; Cerberus consultant pre – 2007 |

**ResCap Officers who left ResCap to work for AFI:**

| | |
|---|---|
| Joe Cortese: | Accounting Director for ResCap, 2008 – 2009; Chief Accounting Officer for Ally Bank from 2009 – present |
| Gerry Lombardo: | Treasurer for ResCap from 2008 – 2009; various positions at AFI from 2009 – 2012, last position was Global Liquidity and Funding Executive |
| James Young: | Various positions at ResCap from 2005 – 2011, last position CFO, CFO at Ally Bank from 2011 – present |

Appendix IV.A—1, Page 14 of 14

**Appendix IV.A—2**, Page 1 of 1

**Residential Capital, LLC**
Summary of Board Composition
2004 – 2012



| | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
|---|---|---|---|---|---|---|---|---|---|
| **Board Appointments:** | 7 | 3 | 1 | 5 | 7 | 2 | 1 | 3 | 0 |
| **Board Departures:** | 0 | 1 | 1 | 3 | 9 | 7 | 0 | 1 | 0 |

Number of Directors [1]

**Affiliations:**   ResCap:   Dual-Affiliated [2]:   Independent:

[1] Each column represents the composition of the Board during part of that year. Change in columns represents change in Board affiliation make-up.
[2] Individuals denoted as Dual-Affiliated held ResCap director positions at the same time they also held: (1) an AFI officer position; (2) an AFI director position; or (3) a Cerberus position, via consulting or secondment agreement or otherwise.
Source: Ally Employee Individual Profiles [ALLY_0004637]; interviews conducted by the Examiner's Professionals; Minutes of ResCap; AFI Board of Directors Meetings, from 2004 – 2012.

Appendix IV.A—2, Page 1 of 1

# ResCap Board of Directors Chart

## 2004 – 2012



**R** = ResCap

**D** = Dual-Affiliated [1]

**I** = Independent

[1] Individuals denoted as Dual-Affiliated held ResCap director positions at the same time they also held: (1) an AFI officer position; (2) an AFI director position; or (3) a Cerberus position, via consulting or secondment agreement or otherwise. An alphabetical listing of all ResCap directors who had Dual Affiliations at any time during their service is listed at the end of the chart.

Source: Ally Employee Individual Profiles [ALLY_0004637 ]; interviews conducted by the Examiner's Professionals; Minutes of ResCap, AFI and Ally Bank Board of Directors Meetings, from 2004 – 2012.

Appendix IV.A—3, Page 2 of 13

**ResCap Board Membership**
August 1, 2004 – December 31, 2004

| | Affiliate | Jan-04 | Feb-04 | Mar-04 | Apr-04 | May-04 | Jun-04 | Jul-04 | Aug-04 | Sep-04 | Oct-04 | Nov-04 | Dec-04 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| David Applegate | *R* | | | | | | | | **Relevant Dates: 8/2004 – 3/2007** Board Roles: Board Member ResCap Officer Titles: Co-CEO (9/2004 – 10/2005) | | | | |
| Eric Feldstein | *D* | | | | | | | | **Relevant Dates: 8/2004 – 4/2008** Board Roles: Board Member; Exec. Committee (9/2004 – 4/2008) Dual Affiliate Positions: AFI Board Member (1/1996 – 11/2006); COB AFI (12/2002 – 11/2006); President (2002 – 2004) | | | | |
| Sanjiv Khattri | *D* | | | | | | | | **Relevant Dates: 8/2004 – 4/2008** Board Roles: Board Member; Exec. Committee ResCap Officer Titles: Vice-President (9/2004 – 3/2005) Dual Affiliate Positions: CFO (3/2004 – 12/2007); Exec. VP (3/2004 – 5/2008) at AFI | | | | |
| Davee Olson | *R* | | | | | | | | **Relevant Dates: 8/2004 – 8/2006** Board Roles: Board Member ResCap Officer Titles: CFO (9/2004 – 8/2006) | | | | |
| Bruce Paradis | *R* | | | | | | | | **Relevant Dates: 8/2004 – 6/2007** Board Roles: Board Member ResCap Officer Titles: Co-CEO (9/2004 – 10/2005) | | | | |
| Jerome Van Orman | *D* | | | | | | | | **Relevant Dates: 8/2004 – 4/2005** Board Roles: Board Member ResCap Officer Titles: Vice President (9/2004 – 3/2005) Dual Affiliate Positions: CFO (10/1999 – 3/2007), Group VP at AFI | | | | |
| David Walker | *D* | | | | | | | | **Relevant Dates: 8/2004 – 7/2009** Board Roles: Board Member; Exec. Committee (9/2004 – 11/2007) ResCap Officer Titles: Vice President (9/2004 – 3/2005) Dual Affiliate Positions: CFO-Mortgage Operations (5/2002 – 11/2006); Group VP (3/2004 – 8/2009) at AFI | | | | |

Appendix IV.A—3, Page 2 of 13

Appendix IV.A—3, Page 3 of 13

**ResCap Board Membership**
January 1, 2005 – December 31, 2005

| | Affiliate | Jan-05 | Feb-05 | Mar-05 | Apr-05 | May-05 | Jun-05 | Jul-05 | Aug-05 | Sep-05 | Oct-05 | Nov-05 | Dec-05 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **David Applegate** | R | Relevant Dates: 8/2004 – 3/2007<br>Board Roles: Board Member<br>ResCap Officer Titles: Co-CEO (9/2004 – 10/2005); COO (10/2005 – 3/2007) | | | | | | | | | | | |
| **Eric Feldstein** | D | Relevant Dates: 8/2004 – 4/2008<br>Board Roles: Board Member; COB (6/2005 – 9/2007), Exec. Committee (9/2004 – 4/2008)<br>Dual Affiliate Positions: AFI Board Member (1/1996 – 11/2006); COB AFI (12/2002 – 11/2006); President (2002 – 2004) | | | | | | | | | | | |
| **Thomas Jacob** | I | | | | Relevant Dates: 4/2005 – 4/2008<br>Board Roles: Independent Director; Chair of Audit Committee | | | | | | | | |
| **Sanjiv Khattri** | D | Relevant Dates: 8/2004 – 4/2008<br>Board Roles: Board Member; Exec. Committee<br>ResCap Officer Titles: Vice-President (9/2004 – 3/2005); CFO (4/2007 – 3/2008)<br>Dual Affiliate Positions: CFO (3/2004 – 12/2007); Exec. VP (3/2004 – 5/2008) at AFI | | | | | | | | | | | |
| **Thomas Melzer** | I | | | | Relevant Dates: 4/2005 – 4/2008<br>Board Roles: Independent Director; Audit Committee | | | | | | | | |
| **Davee Olson** | R | Relevant Dates: 8/2004 – 8/2006<br>Board Roles: Board Member<br>ResCap Officer Titles: CFO (9/2004 – 8/2006) | | | | | | | | | | | |
| **Bruce Paradis** | R | Relevant Dates: 8/2004 – 6/2007<br>Board Roles: Board Member<br>ResCap Officer Titles: Co-CEO (9/2004 – 10/2005); CEO (10/2005 – 6/2007) | | | | | | | | | | | |
| **Jerome Van Orman** | D | Relevant Dates: 8/2004 – 4/2005<br>Board Roles: Board Member<br>ResCap Officer Titles: Vice President (9/2004 – 3/2005)<br>Dual Affiliate Positions: CFO (10/1999 – 3/2007); Group VP at AFI | | | | | | | | | | | |
| **David Walker** | D | Relevant Dates: 8/2004 – 7/2009<br>Board Roles: Board Member; Exec. Committee (9/2004 – 11/2007)<br>ResCap Officer Titles: Vice President (9/2004 – 3/2005)<br>Dual Affiliate Positions: CFO-Mortgage Operations (5/2002 – 11/2006); Group VP (3/2004 – 8/2009) at AFI | | | | | | | | | | | |
| **Linda Zukauckas** | D | | | | Relevant Dates: 4/2005 – 6/2008<br>Board Roles: Board Member; Exec. (until 11/2007) and Audit (until 6/2007) Committees<br>Dual Affiliate Positions: CAO and Corporate Controller at AFI | | | | | | | | |

Appendix IV.A—3, Page 3 of 13

Appendix IV.A—3, Page 4 of 13

**ResCap Board Membership**
January 1, 2006 – December 31, 2006

| | Affiliate | Jan-06 | Feb-06 | Mar-06 | Apr-06 | May-06 | Jun-06 | Jul-06 | Aug-06 | Sep-06 | Oct-06 | Nov-06 | Dec-06 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| David Applegate | R | **Relevant Dates: 8/2004 – 3/2007** Board Roles: Board Member ResCap Officer Titles: COO (10/2005 – 3/2007) | | | | | | | | | | | |
| Eric Feldstein | D | **Relevant Dates: 8/2004 – 4/2008** Board Roles: Board Member; COB (6/2005 – 9/2007), Exec. Committee (9/2004 – 4/2008) Dual Affiliate Positions: AFI Board Member (1/1996 – 11/2006); COB AFI (12/2002 – 11/2006) | | | | | | | | | | | |
| James Giertz | R | | | | | | | | | | **Relevant Dates: 10/2006 – 4/2007** Board Roles: Board Member ResCap Officer Title: CFO; ResCap (10/2006 – 4/2007) | | |
| Thomas Jacob | I | **Relevant Dates: 4/2005 – 4/2008** Board Roles: Independent Director; Chair of Audit Committee | | | | | | | | | | | |
| Sanjiv Khattri | D | **Relevant Dates: 8/2004 – 4/2008** Board Roles: Board Member; Exec. Committee Dual Affiliate Positions: CFO (3/2004 – 12/2007); Exec. VP (3/2004 – 5/2008) at AFI | | | | | | | | | | | |
| Thomas Melzer | I | **Relevant Dates: 4/2005 – 4/2008** Board Roles: Independent Director; Audit Committee | | | | | | | | | | | |
| Davee Olson | R | **Relevant Dates: 8/2004 – 8/2006** Board Roles: Board Member ResCap Officer Titles: CFO (9/2004 – 8/2006) | | | | | | | | | | | |
| Bruce Paradis | R | **Relevant Dates: 8/2004 – 6/2007** Board Roles: Board Member ResCap Officer Titles: CEO (10/2005 – 6/2007) | | | | | | | | | | | |
| David Walker | D | **Relevant Dates: 8/2004 – 7/2009** Board Roles: Board Member; Exec. Committee (9/2004 – 11/2007) Dual Affiliate Positions: CFO-Mortgage Operations (5/2002 – 11/2006); Group VP (3/2004 – 8/2009) at AFI | | | | | | | | | | | |
| Linda Zukauckas | D | **Relevant Dates: 4/2005 – 6/2008** Board Roles: Board Member; Exec. until 11/2007) and Audit (until 6/2007) Committees Dual Affiliate Positions: CAO and Corporate Controller at AFI | | | | | | | | | | | |

Appendix IV.A—3, Page 4 of 13

**ResCap Board Membership**
January 1, 2007 – December 31, 2007

| | Affiliate | Jan-07 | Feb-07 | Mar-07 | Apr-07 | May-07 | Jun-07 | Jul-07 | Aug-07 | Sep-07 | Oct-07 | Nov-07 | Dec-07 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| David Applegate | R | **Relevant Dates: 8/2004 – 3/2007** Board Roles: Board Member ResCap Officer Titles: COO (10/2005 – 3/2007) | | | | | | | | | | | |
| Paul Bossidy | R | | | **Relevant Dates: 3/2007 – 4/2008** Board Roles: Board Member | | | | | | | | | |
| Craig Chapman | R | | | | **Relevant Dates: 4/2007 – 6/2007** Title: President (6/2007 – 6/2007) Board Roles: Board Member | | | | | | | | |
| Alvaro de Molina | D | | | | | | | | **Relevant Dates: 8/2007 – 3/2009** Board Roles: Board Member Dual Affiliate Positions: COO (8/2007 – 4/2008) at AFI | | | | |
| Eric Feldstein | D | **Relevant Dates: 8/2004 – 4/2008** Board Roles: Board Member; COB (6/2005 – 9/2007); Exec. Committee (9/2004 – 4/2008) | | | | | | | | | | | |
| James Giertz | R | **Relevant Dates: 10/2006 – 4/2007** Board Roles: Board Member ResCap Officer Title: CFO (10/2006 - 4/2007) | | | | | | | | | | | |
| Thomas Jacob | I | **Relevant Dates: 4/2005 – 4/2008** Board Roles: Independent Director, Chair of Audit Committee | | | | | | | | | | | |
| James Jones | R | | | **Relevant Dates: 3/2007 – 8/2008** Board Roles: Board Member; Exec. Committee ResCap Officer Titles: President and COO (3/2007 – 6/2007), President and CEO (6/2007 – 7/2008) | | | | | | | | | |
| Sanjiv Khattri | D | **Relevant Dates: 8/2004 – 4/2008** Board Roles: Board Member; Exec. Committee ResCap Officer Titles: CFO (4/2007 – 3/2008) Dual Affiliate Positions: CFO (3/2004 – 12/2007); Exec. VP (3/2004 – 5/2008) at AFI | | | | | | | | | | | |
| Ronald Kravit | D | | | **Relevant Dates: 3/2007 – 3/2009** Board Roles: Board Member Dual Affiliate Positions: Managing Principal, Cerberus Real Estate | | | | | | | | | |
| Thomas Melzer | I | **Relevant Dates: 4/2005 – 4/2008** Board Roles: Independent Director, Audit Committee | | | | | | | | | | | |
| Bruce Paradis | R | **Relevant Dates: 8/2004 – 6/2007** Board Roles: Board Member ResCap Officer Titles: CEO (10/2005 – 6/2007) | | | | | | | | | | | |

ResCap Board Membership
January 1, 2007 – December 31, 2007

| | Affiliate | Jan-07 | Feb-07 | Mar-07 | Apr-07 | May-07 | Jun-07 | Jul-07 | Aug-07 | Sep-07 | Oct-07 | Nov-07 | Dec-07 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Michael Rossi | R | | | | | | | | | Relevant Dates: 9/2007 – 3/2008 Board Roles: COB (9/2007 – 3/2008); Exec. Committee (11/2007 – 3/2008) | | | |
| David Walker | D | Relevant Dates: 8/2004 – 7/2009 Board Roles: Board Member; Exec. Committee (9/2004 – 11/2007) Dual Affiliate Positions: Group VP (3/2004 – 8/2009); Treasurer (12/2007 – 8/2009) at AFI | | | | | | | | | | | |
| Linda Zukauckas | D | Relevant Dates: 4/2005 – 6/2008 Board Roles: Board Member; Exec. (until 11/2007) and Audit (until 6/2007) Committees ResCap Officer Titles: CAO and Temporary Controller (6/2007 – 11/2007) Dual Affiliate Positions: CAO and Corporate Controller at AFI | | | | | | | | | | | |

**ResCap Board Membership**
January 1, 2008 – December 31, 2008

| | Affiliate | Jan-08 | Feb-08 | Mar-08 | Apr-08 | May-08 | Jun-08 | Jul-08 | Aug-08 | Sep-08 | Oct-08 | Nov-08 | Dec-08 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Paul Bossidy | R | **Relevant Dates: 3/2007 – 4/2008** Board Roles: Board Member | | | | | | | | | | | |
| David DeBrunner | D | | | | | | **Relevant Dates: 6/2008 – 7/2009 (originally appointed 4/2008 but rescinded ab initio)** Board Roles: Board Member and Audit Committee; Dual Affiliate Positions: CAO, Controller, VP at AFI | | | | | | |
| Alvaro de Molina | D | **Relevant Dates: 8/2007 – 3/2009** Board Roles: Board Member; Dual Affiliate Positions: COO (8/2007 – 4/2008); Exec. Committee (8/2007 – 11/2009); CEO (4/2008 – 11/2009) at AFI | | | | | | | | | | | |
| Eric Feldstein | D | **Relevant Dates: 8/2004 – 4/2008** Board Roles: Board Member; Exec. Committee (9/2004 – 4/2008) | | | | | | | | | | | |
| Karin Hirtler-Garvey | I | | | | | | **Relevant Dates: 6/2008 – 6/2009** Board Roles: Independent Director; Chair of Audit Committee (6/2008 – 6/2009); Special Oversight Committee | | | | | | |
| Thomas Jacob | I | **Relevant Dates: 4/2005 – 4/2008** Board Roles: Independent Director; Chair of Audit Committee | | | | | | | | | | | |
| James Jones | R | **Relevant Dates: 3/2007 – 8/2008** Board Roles: Board Member; Exec. Committee; ResCap Officer Title: President and CEO (6/2007 – 7/2008) | | | | | | | | | | | |
| Sanjiv Khattri | D | **Relevant Dates: 8/2004 – 4/2008** Board Roles: Board Member; Exec. Committee; ResCap Officer Titles: CFO (4/2007 – 3/2008); Dual Affiliate Positions: Exec. VP (3/2004 – 5/2008) at AFI | | | | | | | | | | | |
| Ronald Kravit | D | **Relevant Dates: 3/2007 – 3/2009** Board Roles: Board Member; Dual Affiliate Positions: Managing Principal, Cerberus Real Estate | | | | | | | | | | | |
| Thomas Marano | D | | | | **Relevant Dates: 4/2008 – present** Board Roles: Board Member, Audit and Exec. Committees; non-Exec. Chairman (as of 4/2008); ResCap Officer Titles: CEO (as of 7/2008); Dual Affiliate Positions: Cerberus (4/2008 – 4/2009) | | | | | | | | |

Appendix IV.A—3, Page 8 of 13

**ResCap Board Membership**
January 1, 2008 – December 31, 2008

| | Affiliate | Jan-08 | Feb-08 | Mar-08 | Apr-08 | May-08 | Jun-08 | Jul-08 | Aug-08 | Sep-08 | Oct-08 | Nov-08 | Dec-08 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Thomas Melzer | I | **Relevant Dates: 4/2005 – 4/2008** Board Roles: Independent Director; Audit Committee | | | | | | | | | | | |
| Michael Rossi | R | **Relevant Dates: 9/2007 – 3/2008** Board Roles: COB (9/2007 – 3/2008); Exec. Committee (11/2007 – 3/2008) | | | | | | | | | | | |
| Edward Smith | I | | | | | **Relevant Dates: 5/2008 – present** Board Roles: Independent Director; Audit, Special Oversight, and Independent Director Committees | | | | | | | |
| David Walker | D | **Relevant Dates: 9/2004 – 7/2009** Board Roles: Board Member Dual Affiliate Positions: Group VP (3/2004 – 8/2009); Treasurer (12/2007 – 8/2009) at AFI | | | | **Relevant Dates: 4/2008 – 3/2009** | | | | | | | |
| Joshua Weintraub | D | | | | **Relevant Dates: 4/2008 – 3/2009** Board Roles: Vice Chairman; Exec. Committee Dual Affiliate Positions: Cerberus (4/2008 – present) | | | | | | | | |
| James Young | R | | | | **Relevant Dates: 4/2008 – 5/2011** Board Roles: Board Member ResCap Officer Titles: Deputy CFO (11/2007 – 3/2008); CFO (3/2008 – 5/2011) | | | | | | | | | |
| Linda Zukauskas | D | **Relevant Dates: 4/2005 – 6/2008** Board Roles: Board Member Dual Affiliate Positions: CAO and Corporate Controller at AFI | | | | | | | | | | | |

Appendix IV.A—3, Page 8 of 13

ResCap Board Membership
January 1, 2009 – December 31, 2009

| | Affiliate | Jan-09 | Feb-09 | Mar-09 | Apr-09 | May-09 | Jun-09 | Jul-09 | Aug-09 | Sep-09 | Oct-09 | Nov-09 | Dec-09 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| David DeBrunner | D | Relevant Dates: 6/2008 – 7/2009 (originally appointed 4/2008 but recinded ab initio) — Board Roles: Board Member and Audit Committee — Dual Affiliate Positions: CAO, Controller; VP at Ally Bank & AFI | | | | | | | | | | | |
| Alvaro de Molina | D | Relevant Dates: 8/2007 – 3/2009 — Board Roles: Board Member — Dual Affiliate Positions: CEO; Various positions at AFI | | | | | | | | | | | |
| Karin Hirtler-Garvey | I | Relevant Dates: 6/2008 – 6/2009 — Board Roles: Independent Director, Audit Committee (6/2008 – 6/2009); Special Oversight Committee — Dual Affiliate Positions: GMAC Mgmt Comm. at AFI, Chief Risk Exec. at Ally Bank | | | | 5/2009: Resigns as Independent Director | | | | | | | |
| | | | | | | | | Chief Risk Officer; GMAC — Board Roles: Board Member; Audit and Independent Director Committees | | | | | |
| Ronald Kravit | D | Relevant Dates: 3/2007 – 3/2009 — Board Roles: Board Member — Dual Affiliate Positions: Managing Principal, Cerberus Real Estate | | | | | | | | | | | |
| Thomas Marano | D | Relevant Dates: 4/2008 – present — Board Roles: Board Member; Audit and Exec. Committees; non-Exec. Chairman (as of 4/2008) — ResCap Officer Titles: CEO (as of 7/2008) — Dual Affiliate Positions: Cerberus (4/2008 – 4/2009); Chief Capital Markets Officer (3/2009 – present) at AFI | | | | | | | | | | | |
| Anthony Renzi | R | | | Relevant Dates: 3/2009 – 9/2009 — Board Roles: Board Member and Exec. Committee — ResCap Officer Titles: Exec. Vice President and COO | | | | | | | | | |
| Edward Smith | I | Relevant Dates: 5/2008 – present — Board Roles: Independent Director; Audit, Special Oversight, and Independent Director Committees | | | | | | | | | | | |
| David Walker | D | Relevant Dates: 8/2004 – 7/2009 — Board Roles: Board Member — Dual Affiliate Positions: Group VP (3/2004 – 8/2009); Treasurer (12/2007 – 8/2009) at AFI | | | | | | | | | | | |
| Joshua Weintraub | D | Relevant Dates: 4/2008 – 3/2009 — Board Roles: Vice Chairman; Board Member; Exec. Committee — Dual Affiliate Positions: Cerberus (4/2008 – present) | | | | | | | | | | | |
| Pamela West | I | | | | | Relevant Dates: 5/2009 – present — Board Roles: Independent Director; Chair of Audit Committee; Special Oversight Committee | | | | | | | |
| James Young | R | Relevant Dates: 4/2008 – 5/2011 — Board Roles: Board Member; Exec. Committee (3/2009 – 5/2011) — ResCap Officer Titles: CFO (3/2008 – 5/2011) | | | | | | | | | | | |

**ResCap Board Membership**
January 1, 2010 – December 31, 2010

| | Affiliate | Jan-10 | Feb-10 | Mar-10 | Apr-10 | May-10 | Jun-10 | Jul-10 | Aug-10 | Sep-10 | Oct-10 | Nov-10 | Dec-10 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Steven Abreu | R | | | **Relevant Dates: 3/2010 – present**<br>Board Roles: Board Member; Exec. Committee<br>ResCap Officer Titles: President (as of 1/2010) | | | | | | | | | |
| Thomas Marano | D | **Relevant Dates: 4/2008 – present**<br>Board Roles: Board Member; Audit and Exec. Committees, non-Exec. Chairman (as of 4/2008)<br>ResCap Officer Titles: CEO (as of 7/2008)<br>Dual Affiliate Positions: Chief Capital Markets Officer (3/2009 – present) at AFI | | | | | | | | | | | |
| Edward Smith | I | **Relevant Dates: 5/2008 – present**<br>Board Roles: Independent Director, Audit, Special Oversight, and Independent Director Committees | | | | | | | | | | | |
| Pamela West | I | **Relevant Dates: 5/2009 – present**<br>Board Roles: Independent Director, Chair of Audit Committee; Special Oversight Committee | | | | | | | | | | | |
| James Young | R | **Relevant Dates: 4/2008 – 5/2011**<br>Board Roles: Board Member; Exec. Committee (3/2009 – 5/2011)<br>ResCap Officer Titles: CFO (3/2008 – 5/2011) | | | | | | | | | | | |

**ResCap Board Membership**
January 1, 2011 – December 31, 2011

| | Affiliate | Jan-11 | Feb-11 | Mar-11 | Apr-11 | May-11 | Jun-11 | Jul-11 | Aug-11 | Sep-11 | Oct-11 | Nov-11 | Dec-11 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Steven Abreu | R | **Relevant Dates: 3/2010 – present** Board Roles: Board Member; Exec. Committee ResCap Officer Titles: President (as of 1/2010) | | | | | | | | | | | |
| Jonathan Ilany | I | | | | | | | | | | | **Relevant Dates: 11/2011 – present** Board Roles: Independent Director; Audit and Special Review Committees | |
| John Mack | I | | | | | | | | | | | **Relevant Dates: 11/2011 – present** Board Roles: Independent Director; Audit and Special Review Committees | |
| Thomas Marano | D | **Relevant Dates: 4/2008 – present** Board Roles: Board Member; Audit and Exec. Committee Member; non-Exec. Chairman (as of 4/4/2008) ResCap Officer Titles: CEO (as of 7/2008) Dual Affiliate Positions: Chief Capital Markets Officer (3/2009 – present) at AFI | | | | | | | | | | | |
| Edward Smith | I | **Relevant Dates: 5/2008 – present** Board Roles: Independent Director; Audit, Special Oversight, and Independent Director Committees | | | | | | | | | | | |
| Pamela West | I | **Relevant Dates: 5/2009 – present** Board Roles: Independent Director; Chair of Audit; Special Oversight and Consent Order Compliance (as of 5/2011) Committees | | | | | | | | | | | |
| James Whitlinger | R | | | | | | **Relevant Dates: 5/2011 – present** Board Roles: Board Member; Exec. Committee ResCap Officer Titles: CFO (5/2011 – present) | | | | | | |
| James Young | R | **Relevant Dates: 4/2008 – 5/2011** Board Roles: Board Member; Exec. Committee (3/2009 – 5/2011) ResCap Officer Titles: CFO (3/2008 – 5/2011) Dual Affiliate Positions: CFO (as of 7/2011) at Ally Bank | | | | | | | | | | | |

**Appendix IV.A—3, Page 12 of 13**

**ResCap Board Membership**
January 1, 2012 – May 31, 2012

| | Affiliate | Jan-12 | Feb-12 | Mar-12 | Apr-12 | May-12 |
|---|---|---|---|---|---|---|
| Steven Abreu | R | **Relevant Dates: 3/2010 – present** Board Roles: Board Member; Exec. Committee ResCap Officer Titles: President (as of 1/2010) | | | | |
| Jonathan Ilany | I | **Relevant Dates: 11/2011 – present** Board Roles: Independent Director, Audit and Special Review Committees | | | | |
| John Mack | I | **Relevant Dates: 11/2011 – present** Board Roles: Independent Director, Audit, Chair of Compensation Committee (as of 3/2012), and Special Review Committee | | | | |
| Thomas Marano | D | **Relevant Dates: 4/2008 – present** Board Roles: Board Member; Audit and Exec. Committees, non-Exec. Chairman (as of 4/2008) ResCap Officer Titles: CEO (as of 7/2008) Dual Affiliate Positions: Chief Capital Markets Officer (3/2009 – present) at AFI | | | | |
| Edward Smith | I | **Relevant Dates: 5/2008 – present** Board Roles: Independent Director, Audit, Special Oversight, and Independent Director Committees | | | | |
| Pamela West | I | **Relevant Dates: 5/2009 – present** Board Roles: Independent Director; Chair of Audit; Special Oversight, Consent Order Compliance (as of 5/2011), and Compensation (as of 3/2012) Committees | | | | |
| James Whitlinger | R | **Relevant Dates: 5/2011 – present** Board Roles: Board Member; Exec. Committee ResCap Officer Titles: CFO (5/2011 – present) | | | | |

Appendix IV.A—3, Page 13 of 13

**Dual-Affiliated ResCap Directors:**

| | |
|---|---|
| David DeBrunner: | Director on ResCap Board from 2008 – 2009; Chief Accounting Officer and Controller at AFI, 2007 – present |
| Alvaro de Molina: | Director on ResCap Board from 2007 – 2009; Cerberus 2007 – 2008; various positions at AFI from 2008 – 2009, last position CEO |
| Eric Feldstein: | Director on ResCap Board from 2004 – 2008; various positions at AFI from 1996 – 2008, last position CEO |
| Ronald Kravit: | Director on ResCap Board from 2007 – 2009; at Cerberus, 1996 – present |
| Jerome Van Orman: | Director on ResCap Board from 2004 – 2005; various positions at AFI from 1990 – 2007, last position Group Vice President and CFO for North American Operations; Director on Ally Bank Board, 2005 – 2007 |
| David Walker: | Director on ResCap Board from 2000 – 2009; various positions at AFI from 1985 – 2009, last position Treasurer and Group Vice President |
| Joshua Weintraub: | Director on ResCap Board from 2008 – 2009; at Cerberus from 2008 – present |
| Linda Zukauckas: | Director on ResCap Board from 2005 – 2008; various positions at AFI from 2000 – 2011, last position Managing Director, Corporate Strategy |

Appendix IV.B.1.d—1, Page 1 of 1

**Residential Capital, LLC**
**Independent Director Annual Compensation (By Type)**
**2005 – 2012**

| Compensation Arrangement | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 [1] | 2012 [2] |
|---|---|---|---|---|---|---|---|---|
| Base compensation | Not disclosed | $ 100,000 | $ 110,000 | $ 110,000 | $ 110,000 | $ 110,000 | $ 120,000 | $ 180,000 |
| Audit committee member | Not disclosed | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 |
| Audit committee chair | Not disclosed | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 |
| Compensation committee member | N/A | N/A | N/A | N/A | N/A | N/A | N/A | 10,000 |
| Compensation committee chair | N/A | N/A | N/A | N/A | N/A | N/A | N/A | 20,000 |
| Meeting fee (per meeting) | N/A | N/A | N/A | N/A | N/A | N/A | 1,500 | 1,500 |
| 2011 true-up for 2012 comp plan – base compensation | N/A | N/A | N/A | N/A | N/A | N/A | N/A | 60,000 |
| 2011 true-up for 2012 comp plan – meeting fee (per meeting) | N/A | N/A | N/A | N/A | N/A | N/A | N/A | 1,500 |
| Supplemental compensation [3] | N/A | N/A | N/A | 100,000 | 100,000 | 100,000 | N/A | N/A |

[1] 2011 base compensation was increased from $120,000 to 180,000 due to retroactive application of 2012 compensation plan. This true-up was paid in 2012.
[2] 2012 compensation plan also removed the $25,000 cap on meeting fees retroactively for 2011. This true-up for additional meeting fees was paid in 2012.
[3] Supplemental compensation of $100,000 was approved at the February 1, 2008 Board meeting.

*Source: E-mail from W. Hasson (Jan. 8, 2007) at EXAM10164167 [EXAM10164165]; E-mail from D. Marple (Jan. 9, 2007) [EXAM10165583]; Minutes of a Special Meeting of the Board of Directors of Residential Capital Corporation, Oct. 19, 2006, at RC40006816 [RC40006748]; Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Feb. 1, 2008, at RC40005653–54 [RC40005652]; Karin Hetler-Garvey—Independent Board Member payment schedule [EXAM00294336]; Spreadsheet, PAYMENT INFO BY VEND Number, Edward F. Smith, III [EXAM00294332]; Spreadsheet reflecting payments to Pamela E. West [EXAM00294341]; E-mail from T. Hamzehpour to C. Kollenberg (Dec. 3, 2010) [EXAM10357376]; E-mail from C. Kollenberg to T. Hamzehpour (Jan. 10, 2011) [EXAM20136494]; Minutes of a Special Meeting of the Board of Residential Capital, LLC, Jan. 27, 2011, at RC40018421–22 [RC40018411]; Unanimous Written Consent of the Management Members of the Board of Directors of Residential Capital, LLC, dated Dec. 9, 2011, at RC40018728 [RC40018411]; Unanimous Written Consent of the Management Members of the Board of Directors of Residential Capital, LLC, May 4, 2012 at RC40019214–18 [RC40019179].*

Appendix IV.B.1.d—1, Page 1 of 1

Appendix IV.B.1.d—2, Page 1 of 1

**Residential Capital, LLC**
**Independent Director Annual Compensation (By Director) [1]**
2005 – 2012

| Independent Director | 2005 [2] | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
|---|---|---|---|---|---|---|---|---|
| Thomas Jacob [2] | Not disclosed | $ 130,000 | $ 130,000 | $ 80,000 | N/A | N/A | N/A | N/A |
| Thomas Melzer [2] | Not disclosed | 110,000 | 110,000 | 73,333 | N/A | N/A | N/A | N/A |
| Edward Smith | N/A | N/A | N/A | 190,877 | $ 230,000 | $ 210,000 | $ 155,000 | $ 409,500 |
| Karin Hirtler-Garvey | N/A | N/A | N/A | 225,184 | 146,667 | N/A | N/A | N/A |
| Pamela West | N/A | N/A | N/A | N/A | 97,500 | 219,167 | 175,000 | 464,500 |
| Jonathan Ilany [3] | N/A | N/A | N/A | N/A | N/A | N/A | - | 373,000 |
| John Mack [3] | N/A | N/A | N/A | N/A | N/A | N/A | - | 409,000 |
| Total | - | $ 240,000 | $ 240,000 | $ 569,394 | $ 474,167 | $ 429,167 | $ 330,000 | $ 1,656,000 |
| Average annual compensation per director [4] | - | $ 120,000 | $ 120,000 | $ 230,000 | $ 230,000 | $ 214,583 | $ 165,000 | $ 414,000 |

[1] Compensation reported by year on cash basis.

[2] 2005 compensation data was not disclosed; Jacob and Melzer 2006–2008 compensation is extrapolated from cited sources.

[3] Note that Ilany and Mack each were paid $31,500 in January, 2012 for their 2011 partial-year service on the ResCap Board.

[4] Annual compensation averages exclude directors who served partial years; the 2008 "average" reflects the 2008 payment arrangement because no Independent Director served a full year.

Source: E-mail from W. Hasson (Jan. 8, 2007) at EXAM10164167 [EXAM10164165]; E-mail from D. Marple (Jan. 9, 2007) [EXAM10165583]; Minutes of a Special Meeting of the Board of Directors of Residential Capital Corporation, Oct. 19, 2006, at RC40006816 [RC40006748]; Proposed 2008 Compensation Plan for ResCap Independent Directors, dated Jan. 31, 2008, at RC40007277 [RC40007261]; Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Feb. 1, 2008, at RC40005653–54 [RC40005652]; Minutes of a Meeting of the Special Committee of the Independent Directors of the Board of Residential Capital, LLC, Mar. 25, 2008, at RC40006622 [RC40006611]; E-mail from T. Hamzehpour to R. Hull (Apr. 30, 2008) [EXAM1024306]; E-mail from C. Quenneville (May 23, 2008) [EXAM11234420]; Spreadsheet, PAYMENT INFO BY VEND Number, Edward F. Smith, III [EXAM00294352]; Spreadsheet, PAYMENT INFO BY VEND Number, Karin Hirtler-Garvey, [EXAM00294334]; Spreadsheet reflecting payments to Pamela E. West [EXAM00294341]; Spreadsheet, PAYMENT INFO BY VEND Number, Jonathan Ilany [EXAM00294335]; Spreadsheet, PAYMENT INFO BY VEND Number, John E. Mack [EXAM00294337].

Appendix IV.B.1.d—2, Page 1 of 1

**Appendix IV.B.1.d—3**, Page 1 of 11

Residential Capital, LLC
Independent Director Payment Information by VEND Number
June 2008 – April 2009

| Unit | Remit Vndr | Name | Amount | Voucher | Invoice | Invoice Date | Check Number | Payment Date | GL Unit | Acct | Dept ID | Descr | Type |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| RFC2 | 2000020242 | KARIN HIRTLER-GARVEY | 111,666.67 | 20508855 | 060108 | 6/25/2008 | 725557 | 6/25/2008 | 10010 | 5050200002 | 1309 | JUNE 2008 PAYMENT | CHK |
| RFC2 | 2000020242 | KARIN HIRTLER-GARVEY | 11,666.67 | 20508856 | 070108 | 6/25/2008 | 725557 | 6/25/2008 | 10010 | 5050200002 | 1309 | JULY 2008 PAYMENT | CHK |
| RFC2 | 2000020242 | KARIN HIRTLER-GARVEY | 11,666.67 | 20503046 | 072408 | 7/24/2008 | 726616 | 7/28/2008 | 10010 | 5050200002 | 1309 | AUGUST 2008 PAYMENT | CHK |
| RFC2 | 2000020242 | KARIN HIRTLER-GARVEY | 11,666.67 | 20505412 | 090108 | 8/18/2008 | 727550 | 8/26/2008 | 10010 | 5050200002 | 1309 | SEPTEMBER 08 PAYMENT | CHK |
| RFC2 | 2000020242 | KARIN HIRTLER-GARVEY | 31,850.56 | 20505917 | 6240-258 | 8/30/2008 | 727778 | 9/5/2008 | 10010 | 5020600008 | 7000 | BOARD MEMBER AUTO ALLOWANCE | CHK |
| RFC2 | 2000020242 | KARIN HIRTLER-GARVEY | 11,666.67 | 20507208 | 100108 | 9/24/2008 | 728368 | 9/25/2008 | 10010 | 5050200002 | 1309 | OCTOBER 2008 PAYMENT | CHK |
| RFC2 | 2000020242 | KARIN HIRTLER-GARVEY | 11,666.67 | 20508922 | 110108 | 10/20/2008 | 086738 | 10/24/2008 | 10010 | 5050200002 | 1309 | NOV 2008 PAYMENT | EFT |
| RFC2 | 2000020242 | KARIN HIRTLER-GARVEY | 11,666.67 | 20511940 | 120108 | 11/24/2008 | 086930 | 11/26/2008 | 10010 | 5050200002 | 1309 | DECEMBER 2008 PAYMENT | EFT |
| RFC2 | 2000020242 | KARIN HIRTLER-GARVEY | 11,666.67 | 20513593 | 121808-HIRTLER-GARVEY | 12/18/2008 | 087105 | 12/29/2008 | 10010 | 5050200002 | 1309 | DEC 2008 PAYMENT | EFT |
| RFC2 | 2000020242 | KARIN HIRTLER-GARVEY | 11,666.67 | 20516144 | 02012009 | 2/1/2009 | 087286 | 2/6/2009 | 10010 | 5050200002 | 1309 | FEB 2009 PAYMENT | EFT |
| RFC2 | 2000020242 | KARIN HIRTLER-GARVEY | 11,666.67 | 20516978 | 030109 | 2/18/2009 | 087346 | 2/20/2009 | 10010 | 5050200002 | 1309 | MARCH 2009 PAYMENT | EFT |
| RFC2 | 2000020242 | KARIN HIRTLER-GARVEY | 111,666.67 | 20518915 | 031809 | 3/18/2009 | 087494 | 3/27/2009 | 10010 | 5050200002 | 1309 | APRIL 2009 PAYMENT | EFT |
| RFC2 | 2000020242 | KARIN HIRTLER-GARVEY | 11,666.67 | 20520424 | 04212009 | 4/21/2009 | 087657 | 4/24/2009 | 10010 | 5050200002 | 1309 | May 2009 Payment | EFT |

*Source: Spreadsheet, PAYMENT INFO BY VEND Number, Karin Hirtler-Garvey [EXAM00294334].*

Appendix IV.B.1.d—3, Page 1 of 11

**Appendix IV.B.1.d—3**, Page 2 of 11

**Residential Capital, LLC**
**Independent Director Payment Information by VEND Number**
January 2012 – January 2013

| Unit | Remit Vndr | Name | Amount | Voucher | Invoice | Invoice Date | Check Number | Payment Date | GL Unit | Acct | Dept ID | Descr | Type |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| RFC2 | 2000029097 | JONATHAN ILANY | 22,500.00 | 20541944 | 01052012 | 1/5/2012 | 090013 | 1/13/2012 | 10010 | 5050700001 | 1309 | 2011 Dir Fee Pro Rata | EFT |
| RFC2 | 2000029097 | JONATHAN ILANY | 9,000.00 | 20542025 | 01122012 | 1/12/2012 | 090024 | 1/20/2012 | 10010 | 5860410001 | 1309 | Dir Pmt - 2011 Mtg Adj | EFT |
| RFC2 | 2000029097 | JONATHAN ILANY | 15,833.33 | 20542026 | Jan 2012 Dir Pmt | 1/12/2012 | 090024 | 1/20/2012 | 10010 | 5860410001 | 1309 | Jan 2012 Dir Payment | EFT |
| RFC2 | 2000029097 | JONATHAN ILANY | 15,833.33 | 20542094 | 02012012 | 2/1/2012 | 090038 | 2/3/2012 | 10010 | 5860410001 | 1309 | Feb 2012 Dir Payment Fee | EFT |
| RFC2 | 2000029097 | JONATHAN ILANY | 15,833.33 | 20542360 | 03012012 | 3/1/2012 | 090063 | 3/2/2012 | 10010 | 5860410001 | 1309 | March Director Fee Payment | EFT |
| RFC2 | 2000029097 | JONATHAN ILANY | 15,833.33 | 20542576 | 04032012 | 4/3/2012 | 090098 | 4/5/2012 | 10010 | 5050200002 | 1309 | April Director Fee Payment | EFT |
| RFC2 | 2000029097 | JONATHAN ILANY | 18,000.00 | 20542667 | Q1 Mtg Comp | 3/28/2012 | 090113 | 4/19/2012 | 10010 | 5050200002 | 1309 | Q1 Dir Mtg Compensation | EFT |
| RFC2 | 2000029097 | JONATHAN ILANY | 15,833.33 | 20542768 | May Dir Pmt | 5/1/2012 | 090130 | 5/3/2012 | 10010 | 5050200002 | 1309 | May Director Fee Payment | EFT |
| RFC2 | 2000029097 | JONATHAN ILANY | 36,000.00 | 20542835 | 05112012 | 5/11/2012 | WIR0B | 5/13/2012 | 10010 | 5050200002 | 1309 | BD COMM MTG FEES | Wired from Treasury Cash Desk |
| RFC2 | 2000029097 | JONATHAN ILANY | 15,833.33 | 20542849 | 06012012 | 6/1/2012 | 090148 | 6/15/2012 | 10010 | 5050200002 | 1309 | June Director Fee Payment | EFT |
| RFC2 | 2000029097 | JONATHAN ILANY | 15,833.33 | 20543009 | 7022012 JUL DIR PMT | 7/2/2012 | 090161 | 7/6/2012 | 10010 | 5050200002 | 1309 | JULY DIRECTOR FEE PMT | EFT |
| RFC2 | 2000029097 | JONATHAN ILANY | 7,500.00 | 20543057 | 07062012 | 7/6/2012 | 090172 | 7/19/2012 | 10010 | 5050200002 | 1309 | Q2 Comp for Meetings Attended | EFT |
| RFC2 | 2000029097 | JONATHAN ILANY | 15,833.33 | 20543147 | 08012012 | 8/1/2012 | 090185 | 8/2/2012 | 10010 | 5050200002 | 1309 | Aug Director Fee Payment | EFT |
| RFC2 | 2000029097 | JONATHAN ILANY | 15,833.33 | 20543405 | 09012012 | 9/1/2012 | 090217 | 9/6/2012 | 10010 | 5050200002 | 1309 | Sept Director Payment | EFT |
| RFC2 | 2000029097 | JONATHAN ILANY | 15,833.33 | 20543710 | 10012012 | 10/1/2012 | 090242 | 10/4/2012 | 10010 | 5050200002 | 1309 | October Dir Fee Pmt | EFT |
| RFC2 | 2000029097 | JONATHAN ILANY | 31,500.00 | 20543716 | 09282012 | 9/28/2012 | 090242 | 10/4/2012 | 10010 | 5050200002 | 1309 | Comp Pmt for 3Q Mtgs Attended | EFT |
| RFC2 | 2000029097 | JONATHAN ILANY | 15,833.33 | 20544172 | 11012012 | 11/1/2012 | 090279 | 11/8/2012 | 10010 | 5050200002 | 1309 | November Dir Fee Payment | EFT |
| RFC2 | 2000029097 | JONATHAN ILANY | 15,833.33 | 20544536 | 12012012 | 12/1/2012 | 090309 | 12/6/2012 | 10010 | 5050200002 | 1309 | Dec Director Fee Payment | EFT |
| RFC2 | 2000029097 | JONATHAN ILANY | 58,500.00 | 20544934 | 12212012 | 12/21/2012 | 090337 | 12/27/2012 | 10010 | 5050200002 | 1309 | 4Q Mtg Compensation Pmt | EFT |
| RFC2 | 2000029097 | JONATHAN ILANY | 15,833.33 | 20545050 | 01092013 | 1/9/2013 | 090357 | 1/17/2013 | 10010 | 5050200002 | 1309 | January Director Comp. Pmt | EFT |

*Source: Spreadsheet, PAYMENT INFO BY VEND Number, Jonathan Ilany [EX6M00294335].*

Appendix IV.B.1.d—3, Page 2 of 11

Residential Capital, LLC
Independent Director Payment Information by VEND Number
January 2012 – January 2013

| Unit | Remit Vndr | Name | Amount | Voucher | Invoice | Invoice Date | Check Number | Payment Date | GL Unit | Acct | Dept ID | Descr | Type |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| RFC2 | 2000029098 | JOHN E MACK | 22,500.00 | 20541943 | 01052012 | 1/5/2012 | 090032 | 1/27/2012 | 10010 | 5050700001 | 1309 | 2011 Retainer pro-rata Dir Fee | EFT |
| RFC2 | 2000029098 | JOHN E MACK | 9,000.00 | 20542069 | 01122012 | 1/12/2012 | 090032 | 1/27/2012 | 10010 | 586041001 | 1309 | Pay Adj for 2011 Comm Mtgs | EFT |
| RFC2 | 2000029098 | JOHN E MACK | 15,833.33 | 20542070 | Jan 2012 Dir Fee | 1/12/2012 | 090032 | 1/27/2012 | 10010 | 586041001 | 1309 |  | EFT |
| RFC2 | 2000029098 | JOHN E MACK | 15,833.33 | 20542097 | 02012012 | 2/1/2012 | 090039 | 2/3/2012 | 10010 | 586041001 | 1309 | Feb 2012 Dir Fee Pmt | EFT |
| RFC2 | 2000029098 | JOHN E MACK | 15,833.33 | 20542363 | 03012012 | 3/1/2012 | 090064 | 3/2/2012 | 10010 | 586041001 | 1309 | March Director Fee Payment | EFT |
| RFC2 | 2000029098 | JOHN E MACK | 15,833.33 | 20542579 | 04032012 | 4/3/2012 | 090099 | 4/5/2012 | 10010 | 5050200002 | 1309 | April Director Fee Payment | EFT |
| RFC2 | 2000029098 | JOHN E MACK | 18,000.00 | 20542666 | Q1 Mtg Comp | 3/28/2012 | 090114 | 4/19/2012 | 10010 | 5050200002 | 1309 | Q1 Dir Mtg Comp | EFT |
| RFC2 | 2000029098 | JOHN E MACK | 7,500.00 | 20542676 | Q1 Mtg Comp Difference | 3/28/2012 | 090116 | 4/19/2012 | 10010 | 5050200002 | 1309 | Q1 Mtg Comp Difference | EFT |
| RFC2 | 2000029098 | JOHN E MACK | 15,833.33 | 20542772 | May Dir Pmt | 5/1/2012 | 090131 | 5/3/2012 | 10010 | 5050200002 | 1309 | May Director Payment Fee | EFT |
| RFC2 | 2000029098 | JOHN E MACK | 34,500.00 | 20542832 | 05112012 | 5/11/2012 | WIRMTG | 5/13/2012 | 10010 | 5050200002 | 1309 | BD MTG FEES | Wired from Treasury Cash Desk |
| RFC2 | 2000029098 | JOHN E MACK | 15,833.33 | 20542852 | 06012012A | 6/1/2012 | 090149 | 6/15/2012 | 10010 | 5050200002 | 1309 | June Director Fee Payment | EFT |
| RFC2 | 2000029098 | JOHN E MACK | 15,833.33 | 20543012 | 7022012 JUL DIR PMT | 7/2/2012 | 090162 | 7/6/2012 | 10010 | 5050200002 | 1309 | JULY DIRECTOR FEE PMT | EFT |
| RFC2 | 2000029098 | JOHN E MACK | 6,000.00 | 20543059 | 07062012 | 7/6/2012 | 090173 | 7/19/2012 | 10010 | 5050200002 | 1309 | Q2 Comp for Mtgs Attended | EFT |
| RFC2 | 2000029098 | JOHN E MACK | 17,499.99 | 20543150 | 08012012 | 8/1/2012 | 090186 | 8/2/2012 | 10010 | 5050200002 | 1309 | August Dir Fee Pmt | EFT |
| RFC2 | 2000029098 | JOHN E MACK | 4,316.92 | 20543156 | CR070612MACK | 7/6/2012 | 090191 | 8/9/2012 | 10010 | 5050200002 | 1309 | CR070612MACK | EFT |
| RFC2 | 2000029098 | JOHN E MACK | 2,349.72 | 20543158 | PCR070612MAC | 7/6/2012 | 090213 | 8/30/2012 | 10010 | 5050200002 | 1309 |  | EFT |
| RFC2 | 2000029098 | JOHN E MACK | 17,499.99 | 20543408 | 09012012 | 9/1/2012 | 090218 | 9/6/2012 | 10010 | 5050200002 | 1309 | Sept Director Pmt | EFT |
| RFC2 | 2000029098 | JOHN E MACK | 17,499.99 | 20543713 | 10012012 | 10/1/2012 | 090248 | 10/4/2012 | 10010 | 5050200002 | 1309 | October Director Fee Pmt | EFT |
| RFC2 | 2000029098 | JOHN E MACK | 37,500.00 | 20543714 | 09282012 | 9/28/2012 | 090248 | 10/4/2012 | 10010 | 5050200002 | 1309 | Comp Pmt for 3Q Mtgs Attended | EFT |
| RFC2 | 2000029098 | JOHN E MACK | 17,499.99 | 20544175 | 11012012 | 11/1/2012 | 090289 | 11/8/2012 | 10010 | 5050200002 | 1309 | November Dir Fee Payment | EFT |
| RFC2 | 2000029098 | JOHN E MACK | 17,499.99 | 20544539 | 12012012 | 12/1/2012 | 090310 | 12/6/2012 | 10010 | 5050200002 | 1309 | Dec Director Fee Payment | EFT |
| RFC2 | 2000029098 | JOHN E MACK | 69,000.00 | 20544933 | 12212012 | 12/21/2012 | 090338 | 12/27/2012 | 10010 | 5050200002 | 1309 | 4Q Mtg Compensation Pmt | EFT |
| RFC2 | 2000029098 | JOHN E MACK | 17,499.99 | 20545051 | 01092013 | 1/9/2013 | 090358 | 1/17/2013 | 10010 | 5050200002 | 1309 | January Director Comp. Pmt | EFT |

*Source: Spreadsheet, PAYMENT INFO BY VEND Number, John E. Mack [EXAM00294337].*

Residential Capital, LLC
Independent Director Payment Information by VEND Number
May 2009 – January 2013

| Unit | Remit Vndr | Name | Amount | Voucher | Invoice | Invoice Date | Check Number | Payment Date | GL Unit | Acct | Dept ID | Descr |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| RFC2 | 2000020838 | PAMELA E WEST | 10,833.33 | 20522900 | 5082009 | 5/8/2009 | 733811 | 6/12/2009 | 10010 | 5050200002 | 1309 | MAY 09 DIRECTOR PAYMENT |
| RFC2 | 2000020838 | PAMELA E WEST | 10,833.33 | 20522901 | 6082009 | 6/8/2009 | 733811 | 6/12/2009 | 10010 | 5050200002 | 1309 | JUNE 2009 DIRECTOR PAYMENT |
| RFC2 | 2000020838 | PAMELA E WEST | 10,833.33 | 20523457 | 7012009 | 7/1/2009 | 87942 | 6/26/2009 | 10010 | 5050200002 | 1309 | 7/1/2009 |
| RFC2 | 2000020838 | PAMELA E WEST | 10,833.33 | 20524655 | 08082009-WEST | 8/8/2009 | 88086 | 7/31/2009 | 10010 | 5050200002 | 1309 | 8/1/2009 |
| RFC2 | 2000020838 | PAMELA E WEST | 10,833.33 | 20526182 | 09082009-WEST | 9/8/2009 | 88201 | 8/31/2009 | 10010 | 5050200002 | 1309 | SEPT 09 DIRECTOR PAYMENT |
| RFC2 | 2000020838 | PAMELA E WEST | 10,833.33 | 20527623 | 9252009 | 9/25/2009 | 88339 | 9/30/2009 | 10010 | 5050200002 | 1309 | OCTOBER 2009 DIRECTOR PYMT |
| RFC2 | 2000020838 | PAMELA E WEST | 10,833.33 | 20529334 | 11082009 | 11/8/2009 | 88499 | 11/6/2009 | 10010 | 5050200002 | 1309 | NOV 2009 DIRECTOR PAYMENT |
| RFC2 | 2000020838 | PAMELA E WEST | 10,833.33 | 20530134 | 12082009-WEST | 12/8/2009 | 88629 | 12/3/2009 | 10010 | 5050200002 | 1309 | DEC 2009 PAYMENT |
| RFC2 | 2000020838 | PAMELA E WEST | 10,833.33 | 20531374 | 1082010 | 1/8/2010 | 88754 | 12/29/2009 | 10010 | 5050200002 | 1309 | 01/08/2010 PAYMENT |
| RFC2 | 2000020838 | PAMELA E WEST | 10,833.33 | 20532099 | 2082010 | 2/8/2010 | 88819 | 1/25/2010 | 10010 | 5050200002 | 1309 | FEBRUARY DIRECTOR FEE |
| RFC2 | 2000020838 | PAMELA E WEST | 10,833.33 | 20533144 | 3012010 | 3/1/2010 | 88906 | 2/26/2010 | 10010 | 5050200002 | 1309 | MARCH DIRECTOR FEE PAYMENT |
| RFC2 | 2000020838 | PAMELA E WEST | 10,833.33 | 20534143 | 4012010 | 4/1/2010 | 89001 | 3/31/2010 | 10010 | 5050200002 | 1309 | APRIL DIRECTOR FEE PAYMENT |
| RFC2 | 2000020838 | PAMELA E WEST | 100,000.00 | 20534713 | 41310 | 4/13/2010 | 89056 | 4/16/2010 | 10010 | 5050200002 | 1309 | Independent Board Member Fee |
| RFC2 | 2000020838 | PAMELA E WEST | 10,833.33 | 20534992 | 4262010 | 4/26/2010 | 89089 | 4/30/2010 | 10010 | 5050200002 | 1309 | MAY 2010 DIRECTOR FEE PAYMENT |
| RFC2 | 2000020838 | PAMELA E WEST | 10,833.33 | 20535809 | 6012010 | 6/1/2010 | 89163 | 5/28/2010 | 10010 | 5050200002 | 1309 | June Director Fee Payment |
| RFC2 | 2000020838 | PAMELA E WEST | 10,833.33 | 20536361 | 7012010 | 7/1/2010 | 89243 | 6/30/2010 | 10010 | 5050200002 | 1309 | July Director Fee Payment |
| RFC2 | 2000020838 | PAMELA E WEST | 10,833.33 | 20536857 | 8012010 | 8/1/2010 | 89307 | 7/30/2010 | 10010 | 5050200002 | 1309 | August Director Fee Payment |
| RFC2 | 2000020838 | PAMELA E WEST | 10,833.33 | 20537331 | 9012010 | 9/1/2010 | 89365 | 8/27/2010 | 10010 | 5050200002 | 1309 | September Director Fee Payment |
| RFC2 | 2000020838 | PAMELA E WEST | 10,833.33 | 20537764 | 10012010 | 10/1/2010 | 89416 | 9/30/2010 | 10010 | 5050200002 | 1309 | OCTOBER DIRECTOR FEE PAYMENT |
| RFC2 | 2000020838 | PAMELA E WEST | 10,833.33 | 20538184 | 11012010 | 11/1/2010 | 89477 | 10/29/2010 | 10010 | 5050200002 | 1309 | November Director Fee Payment |
| RFC2 | 2000020838 | PAMELA E WEST | 10,833.33 | 20538599 | 12012010 | 12/1/2010 | 89555 | 11/30/2010 | 10010 | 5050200002 | 1309 | December Director Fee Payment |
| RFC2 | 2000020838 | PAMELA E WEST | 11,666.67 | 20539014 | 1012011 | 1/1/2011 | 89599 | 1/7/2011 | 10010 | 5050200002 | 1309 | January 2011 Director Payment |
| RFC2 | 2000020838 | PAMELA E WEST | 12,500.00 | 20539375 | 2012011 | 2/1/2011 | 89646 | 2/4/2011 | 10010 | 5050200002 | 1309 | February Director Fee Payment |
| RFC2 | 2000020838 | PAMELA E WEST | 833.33 | 20539412 | 20411 | 2/4/2011 | 89654 | 2/11/2011 | 10010 | 5097000001 | 1309 | INDEPENDENT DIRECTOR. |
| RFC2 | 2000020838 | PAMELA E WEST | 12,500.00 | 20539664 | 3012011 | 3/1/2011 | 89687 | 3/4/2011 | 10010 | 5050200002 | 1309 | March Director Fee Payment |
| RFC2 | 2000020838 | PAMELA E WEST | 12,500.00 | 20540044 | 4012011 | 4/1/2011 | 89725 | 4/8/2011 | 10010 | 5050200002 | 1309 | April Director Fee Payment |
| RFC2 | 2000020838 | PAMELA E WEST | 9,000.00 | 20540192 | 41411 | 4/14/2011 | 89750 | 4/22/2011 | 10010 | 5097000001 | 1309 | First Qtr 2011 Director Comp |
| RFC2 | 2000020838 | PAMELA E WEST | 12,500.00 | 20540300 | 5022011 | 5/2/2011 | 89773 | 5/6/2011 | 10010 | 5050200002 | 1309 | May Director Fee Payment |
| RFC2 | 2000020838 | PAMELA E WEST | 12,500.00 | 20540563 | 6012011 | 6/1/2011 | 89848 | 6/3/2011 | 10010 | 5050200002 | 1309 | June Director Payment |
| RFC2 | 2000020838 | PAMELA E WEST | 12,500.00 | 20540756 | 7012011 | 7/1/2011 | 89843 | 7/8/2011 | 10010 | 5050200002 | 1309 | July Director Fee Payment |
| RFC2 | 2000020838 | PAMELA E WEST | 12,500.00 | 20540921 | 8012011 | 8/1/2011 | 89875 | 8/5/2011 | 10010 | 5050200002 | 1309 | August Director Fee Payment |
| RFC2 | 2000020838 | PAMELA E WEST | 3,000.00 | 20540924 | 7272011 | 7/27/2011 | 89875 | 8/5/2011 | 10010 | 5050200002 | 1309 | ResCap Director Comp Q1 |
| RFC2 | 2000020838 | PAMELA E WEST | 12,500.00 | 20541114 | 9012011 | 9/1/2011 | 89915 | 9/2/2011 | 10010 | 5050200002 | 1309 | September Director Fee Payment |
| RFC2 | 2000020838 | PAMELA E WEST | 12,500.00 | 20541277 | 10012011 | 10/1/2011 | 89945 | 10/7/2011 | 10010 | 5050200002 | 1309 | October Director Fee Payment |
| RFC2 | 2000020838 | PAMELA E WEST | 12,500.00 | 20541447 | 11012011 | 11/1/2011 | 89972 | 11/4/2011 | 10010 | 5050200002 | 1309 | November Director Fee Payment |
| RFC2 | 2000020838 | PAMELA E WEST | 13,000.00 | 20541584 | Q3 Dir Comp | 11/22/2011 | 89986 | 11/25/2011 | 10010 | 586041001 | 1309 | Rescap Dir Comp - Q3 2011 |

**Residential Capital, LLC**
**Independent Director Payment Information by VEND Number**
May 2009 - January 2013

| Unit | Remit Vndr | Name | Amount | Voucher | Invoice | Invoice Date | Check Number | Payment Date | GL Unit | Acct | Dept ID | Descr |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| RFC2 | 200002838 | PAMELA E WEST | 12,500.00 | 20541617 | Dec 2011 Director Fees | 12/1/2011 | 89990 | 12/22/2011 | 10010 | 5050200002 | 1309 | December Director Fee Payment |
| RFC2 | 200002838 | PAMELA E WEST | 60,000.00 | 20541892 | 1052012 | 1/5/2012 | 90018 | 1/13/2012 | 10010 | 5050700001 | 1309 | Pay Adj for base comp for 2011 |
| RFC2 | 200002838 | PAMELA E WEST | 51,500.00 | 20542024 | 1122012 | 1/12/2012 | 90027 | 1/20/2012 | 10010 | 586041001 | 1309 | Dir Pmt - 2011 Mtg Adj |
| RFC2 | 200002838 | PAMELA E WEST | 17,500.00 | 20542028 | Jan 2012 Dir Pmt | 1/12/2012 | 90027 | 1/20/2012 | 10010 | 586041001 | 1309 | Jan 2012 Dir Payment |
| RFC2 | 200002838 | PAMELA E WEST | 17,500.00 | 20542096 | 2012012 | 2/1/2012 | 90037 | 2/3/2012 | 10010 | 586041001 | 1309 | Feb 2012 Dir Fee Pmt |
| RFC2 | 200002838 | PAMELA E WEST | 17,500.00 | 20542362 | 3012012 | 3/1/2012 | 90062 | 3/2/2012 | 10010 | 586041001 | 1309 | March Director Fee Payment |
| RFC2 | 200002838 | PAMELA E WEST | 17,500.00 | 20542578 | 4032012 | 4/3/2012 | 90096 | 4/5/2012 | 10010 | 5050200002 | 1309 | April Director Fee Payment |
| RFC2 | 200002838 | PAMELA E WEST | 28,500.00 | 20542665 | Q1 Meeting Comp | 3/28/2012 | 90112 | 4/19/2012 | 10010 | 5050200002 | 1309 | Q1 Dir Mtg Compensation |
| RFC2 | 200002838 | PAMELA E WEST | 17,500.00 | 20542771 | May Dir Payment | 5/1/2012 | 90129 | 5/3/2012 | 10010 | 5050200002 | 1309 | May Director Payment Fee |
| RFC2 | 200002838 | PAMELA E WEST | 24,000.00 | 20542833 | 5112012 | 5/11/2012 | WIR0MT | 5/13/2012 | 10010 | 5050200002 | 1309 | |
| RFC2 | 200002838 | PAMELA E WEST | 17,500.00 | 20542851 | 6012012 | 6/1/2012 | 90147 | 6/15/2012 | 10010 | 5050200002 | 1309 | June Director Fee Payment |
| RFC2 | 200002838 | PAMELA E WEST | 17,500.00 | 20543010 | 7022012 JUL DIR PMT | 7/2/2012 | 90160 | 7/6/2012 | 10010 | 5050200002 | 1309 | JULY DIRECTOR FEE PMT |
| RFC2 | 200002838 | PAMELA E WEST | 4,500.00 | 20543056 | 7062012 | 7/6/2012 | 90170 | 7/19/2012 | 10010 | 5050200002 | 1309 | Q2 Comp for Mtgs Attended |
| RFC2 | 200002838 | PAMELA E WEST | 18,833.33 | 20543149 | 8012012 | 8/1/2012 | 90184 | 8/2/2012 | 10010 | 5050200002 | 1309 | Aug Director Fee Payment |
| RFC2 | 200002838 | PAMELA E WEST | 2,158.46 | 20543157 | CR070612WEST | 7/6/2012 | 90190 | 8/9/2012 | 10010 | 5050200002 | 1309 | CR070612WEST |
| RFC2 | 200002838 | PAMELA E WEST | 1,174.86 | 20543159 | PCR070612WEST | 7/6/2012 | 90212 | 8/30/2012 | 10010 | 5050200002 | 1309 | ORDINARY VENDOR - DO NOT PAY |
| RFC2 | 200002838 | PAMELA E WEST | 18,333.33 | 20543407 | 9012012 | 9/1/2012 | 90216 | 9/6/2012 | 10010 | 5050200002 | 1309 | Sept Director Payment |
| RFC2 | 200002838 | PAMELA E WEST | 18,333.33 | 20543712 | 10012012 | 10/1/2012 | 90241 | 10/4/2012 | 10010 | 5050200002 | 1309 | October Director Fee Payment |
| RFC2 | 200002838 | PAMELA E WEST | 24,000.00 | 20543715 | 9282012 | 9/28/2012 | 90241 | 10/4/2012 | 10010 | 5050200002 | 1309 | Comp Pmt for 3Q Mtgs Attended |
| RFC2 | 200002838 | PAMELA E WEST | 18,333.33 | 20544174 | 11012012 | 11/1/2012 | 90277 | 11/8/2012 | 10010 | 5050200002 | 1309 | November Dir Fee Payment |
| RFC2 | 200002838 | PAMELA E WEST | 18,333.33 | 20544538 | 12012012 | 12/1/2012 | 90306 | 12/6/2012 | 10010 | 5050200002 | 1309 | Dec Director Fee Payment |
| RFC2 | 200002838 | PAMELA E WEST | 54,000.00 | 20544931 | 12212012 | 12/21/2012 | 90336 | 12/27/2012 | 10010 | 5050200002 | 1309 | 4Q Mtgs Attended Comp |

*Source: Spreadsheet reflecting payments to Pamela E. West [EXAM0294341].*

Appendix IV.B.1.d—3, Page 6 of 11

**Residential Capital, LLC**
**Independent Director Payment Information by VEND Number**
May 2009 – January 2013

| Unit | Remit Vndr | Name | Amount | Voucher | Invoice | Invoice Date | Check Number | Payment Date | GL Unit | Acct | Dept ID | Descr |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| RFC2 | 2000020838 | PAMELA E WEST | 501.40 | 20523458 | 6222009 | 6/22/2009 | 87942 | 6/26/2009 | 10010 | 5050200002 | 1309 | EXPENSES |
| RFC2 | 2000020838 | PAMELA E WEST | 745.06 | 20527259 | 91009 | 9/10/2009 | 82280 | 9/18/2009 | 10010 | 5050200002 | 1309 | PAM WEST EXPENSES |
| RFC2 | 2000020838 | PAMELA E WEST | 868.40 | 20527608 | 91809 | 9/18/2009 | 88312 | 9/25/2009 | 10010 | 5050200002 | 1309 | PAM WEST EXPENSES |
| RFC2 | 2000020838 | PAMELA E WEST | 582.54 | 20530136 | 11182009 | 11/18/2009 | 88598 | 11/30/2009 | 10010 | 5050200002 | 1309 | EXPENSES |
| RFC2 | 2000020838 | PAMELA E WEST | 197.90 | 20534068 | 32510 | 3/25/2010 | 88988 | 3/26/2010 | 10010 | 5050700001 | 1118 | P.WEST DIR.EXP-NJ |
| RFC2 | 2000020838 | PAMELA E WEST | 40.00 | 20534068 | 32510 | 3/25/2010 | 88988 | 3/26/2010 | 10010 | 5050700004 | 1118 | P.WEST DIR.EXP-NJ |
| RFC2 | 2000020838 | PAMELA E WEST | 16.00 | 20534068 | 32510 | 3/25/2010 | 88988 | 3/26/2010 | 10010 | 5050700005 | 1118 | P.WEST DIR.EXP-NJ |
| RFC2 | 2000020838 | PAMELA E WEST | 36.57 | 20534068 | 32510 | 3/25/2010 | 88988 | 3/26/2010 | 10010 | 5050700007 | 1118 | P.WEST DIR.EXP-NJ |
| RFC2 | 2000020838 | PAMELA E WEST | 337.90 | 20537433 | 6042010 | 6/4/2010 | 89377 | 9/3/2010 | 10010 | 5050700001 | 1309 | PAMELA WEST BOARD MEETING. |
| RFC2 | 2000020838 | PAMELA E WEST | 68.00 | 20537433 | 6042010 | 6/4/2010 | 89377 | 9/3/2010 | 10010 | 5050700004 | 1309 | PAMELA WEST BOARD MEETING. |
| RFC2 | 2000020838 | PAMELA E WEST | 27.00 | 20537433 | 6042010 | 6/4/2010 | 89377 | 9/3/2010 | 10010 | 5050700005 | 1309 | PAMELA WEST BOARD MEETING. |
| RFC2 | 2000020838 | PAMELA E WEST | 552.00 | 20537433 | 6042010 | 6/4/2010 | 89377 | 9/3/2010 | 10010 | 5050700006 | 1309 | PAMELA WEST BOARD MEETING. |
| RFC2 | 2000020838 | PAMELA E WEST | 715.80 | 20540923 | 7292011 | 7/29/2011 | 89875 | 8/5/2011 | 10010 | 5050700001 | 1309 | Travel Expenses for Mtg |
| RFC2 | 2000020838 | PAMELA E WEST | 1,917.10 | 20541285 | 100311 | 10/3/2011 | 89945 | 10/7/2011 | 10010 | 5050700001 | 1309 | BOARD MEETING EXPENCE 09-14 TO |
| RFC2 | 2000020838 | PAMELA E WEST | 1,236.14 | 20541824 | 121511 | 12/15/2011 | 90007 | 12/30/2011 | 10010 | 5050700001 | 1309 | EXPENSE PAYMENT FOR TRAVEL TO |
| RFC2 | 2000020838 | PAMELA E WEST | 797.90 | 20541888 | 10312 | 1/3/2012 | 90018 | 1/13/2012 | 10010 | 5050700001 | 1309 | TRAVEL TO BOARD MEETING |
| RFC2 | 2000020838 | PAMELA E WEST | 16.00 | 20541888 | 10312 | 1/3/2012 | 90018 | 1/13/2012 | 10010 | 5050700005 | 1309 | TRAVEL TO BOARD MEETING |
| RFC2 | 2000020838 | PAMELA E WEST | 178.10 | 20542066 | 11912 | 1/19/2012 | 740435 | 1/27/2012 | 10010 | 5050700001 | 1309 | |
| RFC2 | 2000020838 | PAMELA E WEST | 16.00 | 20542066 | 11912 | 1/19/2012 | 740435 | 1/27/2012 | 10010 | 5050700005 | 1309 | |
| RFC2 | 2000020838 | PAMELA E WEST | 21.60 | 20542066 | 11912 | 1/19/2012 | 740435 | 1/27/2012 | 10010 | 5050700006 | 1309 | |
| RFC2 | 2000020838 | PAMELA E WEST | 35.00 | 20542066 | 11912 | 1/19/2012 | 740435 | 1/27/2012 | 10010 | 5050700004 | 1309 | |
| RFC2 | 2000020838 | PAMELA E WEST | 408.10 | 20542237 | 20912 | 2/9/2012 | 90051 | 2/17/2012 | 10010 | 5050700001 | 1309 | CCOC COMMITTE MEETING-1/25/12 |
| RFC2 | 2000020838 | PAMELA E WEST | 35.00 | 20542237 | 20912 | 2/9/2012 | 90051 | 2/17/2012 | 10010 | 5050700005 | 1309 | CCOC COMMITTE MEETING-1/25/12 |
| RFC2 | 2000020838 | PAMELA E WEST | 378.43 | 20542237 | 20912 | 2/9/2012 | 90051 | 2/17/2012 | 10010 | 5050700006 | 1309 | CCOC COMMITTE MEETING-1/25/12 |
| RFC2 | 2000020838 | PAMELA E WEST | 36.00 | 20542237 | 20912 | 2/9/2012 | 90051 | 2/17/2012 | 10010 | 5050700004 | 1309 | CCOC COMMITTE MEETING-1/25/12 |
| RFC2 | 2000020838 | PAMELA E WEST | 474.10 | 20542405 | 2-24-12 Travel Expense | 3/1/2012 | 90067 | 3/9/2012 | 10010 | 5050700001 | 1309 | NY Travel Expense 2-24-12 |
| RFC2 | 2000020838 | PAMELA E WEST | 32.00 | 20542405 | 2-24-12 Travel Expense | 3/1/2012 | 90067 | 3/9/2012 | 10010 | 5050700005 | 1309 | NY Travel Expense 2-24-12 |
| RFC2 | 2000020838 | PAMELA E WEST | 323.65 | 20542405 | 2-24-12 Travel Expense | 3/1/2012 | 90067 | 3/9/2012 | 10010 | 5050700006 | 1309 | NY Travel Expense 2-24-12 |
| RFC2 | 2000020838 | PAMELA E WEST | 35.00 | 20542405 | 2-24-12 Travel Expense | 3/1/2012 | 90067 | 3/9/2012 | 10010 | 5050700004 | 1309 | NY Travel Expense 2-24-12 |
| RFC2 | 2000020838 | PAMELA E WEST | 21.00 | 20542405 | 2-24-12 Travel Expense | 3/1/2012 | 90067 | 3/9/2012 | 10010 | 5050700007 | 1309 | NY Travel Expense 2-24-12 |

Residential Capital, LLC
Independent Director Payment Information by VEND Number
May 2009 – January 2013

| Unit | Remit Vndr | Name | Amount | Voucher | Invoice | Invoice Date | Check Number | Payment Date | GL Unit | Acct | Dept ID | Descr |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| RFC2 | 2000020838 | PAMELA E WEST | 828.86 | 20542501 | 3/8/12 Travel Exp | 3/15/2012 | 90081 | 3/22/2012 | 10010 | 5050700001 | 1309 | 3/8/12 CCOC & Bd Mtg |
| RFC2 | 2000020838 | PAMELA E WEST | 358.10 | 20542550 | Travel Exp-NY 3/23/12 | 3/26/2012 | 90090 | 3/30/2012 | 10010 | 5050700001 | 1309 | Travel Exp - NY BD Mtg 3/23 |
| RFC2 | 2000020838 | PAMELA E WEST | 16.00 | 20542550 | Travel Exp-NY 3/23/12 | 3/26/2012 | 90090 | 3/30/2012 | 10010 | 5050700005 | 1309 | Travel Exp - NY BD Mtg 3/23 |
| RFC2 | 2000020838 | PAMELA E WEST | 72.00 | 20542550 | Travel Exp-NY 3/23/12 | 3/26/2012 | 90090 | 3/30/2012 | 10010 | 5050700004 | 1309 | Travel Exp - NY BD Mtg 3/23 |
| RFC2 | 2000020838 | PAMELA E WEST | 480.10 | 20542664 | 4/9/12 Travel Exp | 4/12/2012 | 90112 | 4/19/2012 | 10010 | 5050700001 | 1309 | 4/9/12 Travel Expense |
| RFC2 | 2000020838 | PAMELA E WEST | 16.00 | 20542664 | 4/9/12 Travel Exp | 4/12/2012 | 90112 | 4/19/2012 | 10010 | 5050700005 | 1309 | 4/9/12 Travel Expense |
| RFC2 | 2000020838 | PAMELA E WEST | 74.00 | 20542664 | 4/9/12 Travel Exp | 4/12/2012 | 90112 | 4/19/2012 | 10010 | 5050700004 | 1309 | 4/9/12 Travel Expense |
| RFC2 | 2000020838 | PAMELA E WEST | 735.75 | 20542816 | 05082012 Expenses | 5/8/2012 | 90142 | 5/9/2012 | 10010 | 5050700001 | 1309 | Estimated Travel Expenses |
| RFC2 | 2000020838 | PAMELA E WEST | 1,055.20 | 20543369 | 8272012 | 8/27/2012 | 90212 | 8/30/2012 | 10010 | 5050700001 | 1309 | Travel Expenses |
| RFC2 | 2000020838 | PAMELA E WEST | 144.00 | 20543369 | 8272012 | 8/27/2012 | 90212 | 8/30/2012 | 10010 | 5050700005 | 1309 | Travel Expenses |
| RFC2 | 2000020838 | PAMELA E WEST | 461.35 | 20543369 | 8272012 | 8/27/2012 | 90212 | 8/30/2012 | 10010 | 5050700006 | 1309 | Travel Expenses |
| RFC2 | 2000020838 | PAMELA E WEST | 53.36 | 20543369 | 8272012 | 8/27/2012 | 90212 | 8/30/2012 | 10010 | 5050700007 | 1309 | Travel Expenses |
| RFC2 | 2000020838 | PAMELA E WEST | 165.09 | 20544279 | Travel 10/22 - 10/26 | 11/7/2012 | 90288 | 11/15/2012 | 10010 | 5050700001 | 1309 | Travel Exp 10/22 - 10/26 |
| RFC2 | 2000020838 | PAMELA E WEST | 85.00 | 20544279 | Travel 10/22 - 10/26 | 11/7/2012 | 90288 | 11/15/2012 | 10010 | 5050700005 | 1309 | Travel Exp 10/22 - 10/26 |
| RFC2 | 2000020838 | PAMELA E WEST | 70.00 | 20544279 | Travel 10/22 - 10/26 | 11/7/2012 | 90288 | 11/15/2012 | 10010 | 5050700004 | 1309 | Travel Exp 10/22 - 10/26 |
| RFC2 | 2000020838 | PAMELA E WEST | 2,330.83 | 20544279 | Travel 10/22 - 10/26 | 11/7/2012 | 90288 | 11/15/2012 | 10010 | 5050700006 | 1309 | Travel Exp 10/22 - 10/26 |
| RFC2 | 2000020838 | PAMELA E WEST | 100.67 | 20544279 | Travel 10/22 - 10/26 | 11/7/2012 | 90288 | 11/15/2012 | 10010 | 581010014 | 1309 | Travel Exp 10/22 - 10/26 |
| RFC2 | 2000020838 | PAMELA E WEST | 175.00 | 20544540 | 11/26/2012 | 11/26/2012 | 90306 | 12/6/2012 | 10010 | 5050700001 | 1309 | Expenses for NYC trip 11/14 |
| RFC2 | 2000020838 | PAMELA E WEST | 16.00 | 20544540 | 11/26/2012 | 11/26/2012 | 90306 | 12/6/2012 | 10010 | 5050700005 | 1309 | Expenses for NYC trip 11/14 |
| RFC2 | 2000020838 | PAMELA E WEST | 576.11 | 20544540 | 11/26/2012 | 11/26/2012 | 90306 | 12/6/2012 | 10010 | 5050700006 | 1309 | Expenses for NYC trip 11/14 |
| RFC2 | 2000020838 | PAMELA E WEST | 37.00 | 20544540 | 11/26/2012 | 11/26/2012 | 90306 | 12/6/2012 | 10010 | 5050700004 | 1309 | Expenses for NYC trip 11/14 |
| RFC2 | 2000020838 | PAMELA E WEST | 356.10 | 20545016 | 1022013 | 1/2/2013 | 90350 | 1/10/2013 | 10010 | 5050700001 | 1309 | Travel Exp 12/13 - 12/14/12 |
| RFC2 | 2000020838 | PAMELA E WEST | 95.00 | 20545016 | 1022013 | 1/2/2013 | 90350 | 1/10/2013 | 10010 | 5050700004 | 1309 | Travel Exp 12/13 - 12/14/12 |
| RFC2 | 2000020838 | PAMELA E WEST | 576.11 | 20545016 | 1022013 | 1/2/2013 | 90350 | 1/10/2013 | 10010 | 5050700006 | 1309 | Travel Exp 12/13 - 12/14/12 |
| RFC2 | 2000020838 | PAMELA E WEST | 19.00 | 20545016 | 1022013 | 1/2/2013 | 90350 | 1/10/2013 | 10010 | 5050700006 | 1309 | Travel Exp 12/13 - 12/14/12 |

**Appendix IV.B.1.d—3**, Page 8 of 11

**Residential Capital, LLC**
**Independent Director Payment Information by VEND Number**
May 2009 – January 2013

| Unit | Remit Vndr | Name | Amount | Voucher | Invoice | Invoice Date | Check Number | Payment Date | GL Unit | Acct | Dept ID | Descr |
|------|-----------|------|--------|---------|---------|--------------|--------------|--------------|---------|------|---------|-------|
| RFC2 | 2000020838 | PAMELA E WEST | 313.10 | 20545017 | 01022013A | 1/2/2013 | 90350 | 1/10/2013 | 10010 | 5050700001 | 1309 | Travel Exp 12/17 - 12/18/12 |
| RFC2 | 2000020838 | PAMELA E WEST | 45.00 | 20545017 | 01022013A | 1/2/2013 | 90350 | 1/10/2013 | 10010 | 5050700004 | 1309 | Travel Exp 12/17 - 12/18/12 |
| RFC2 | 2000020838 | PAMELA E WEST | 275.45 | 20545017 | 01022013A | 1/2/2013 | 90350 | 1/10/2013 | 10010 | 5050700006 | 1309 | Travel Exp 12/17 - 12/18/12 |
| RFC2 | 2000020838 | PAMELA E WEST | 34.00 | 20545017 | 01022013A | 1/2/2013 | 90350 | 1/10/2013 | 10010 | 5050700005 | 1309 | Travel Exp 12/17 - 12/18/12 |

*Source: Spreadsheet reflecting payments to Pamela E. West [EXAM0029434].*

Appendix IV.B.1.d—3, Page 8 of 11

Residential Capital, LLC
Independent Director Payment Information by VEND Number
June 2008 – January 2013

| Unit | Remit Vndr | Name | Amount | Voucher | Invoice | Invoice Date | Check Number | Payment Date | GL Unit | Acct | Dept ID | Descr | Type |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| RFC2 | 2000020241 | EDWARD F. SMITH III | 35.00 | 20500853 | 060108 | 6/25/2008 | 085485 | 6/26/2008 | 10010 | 5050200002 | 1309 | JUNE 2008 BANK FEE | EFT |
| RFC2 | 2000020241 | EDWARD F. SMITH III | 10,000.00 | 20500854 | 070107 | 6/25/2008 | 085485 | 6/26/2008 | 10010 | 5050200002 | 1309 | JULY 2008 PAYMENT | EFT |
| RFC2 | 2000020241 | EDWARD F. SMITH III | 10,000.00 | 20503044 | 072408 | 7/24/2008 | 086042 | 7/29/2008 | 10010 | 5050200002 | 1309 | AUGUST 2008 PAYMENT | EFT |
| RFC2 | 2000020241 | EDWARD F. SMITH III | 20,841.94 | 20504310 | 75716 | 7/31/2008 | 086268 | 8/15/2008 | 10010 | 5020600008 | 7000 | BOARD MEMBER AUTO ALLOWANCE | EFT |
| RFC2 | 2000020241 | EDWARD F. SMITH III | 10,000.00 | 20505676 | 090108 | 8/18/2008 | 086472 | 9/8/2008 | 10010 | 5050200002 | 1309 | SEPTEMBER 2008 PAYMENT | EFT |
| RFC2 | 2000020241 | EDWARD F. SMITH III | 10,000.00 | 20507210 | 100108 | 9/24/2008 | 086590 | 9/26/2008 | 10010 | 5050200002 | 1309 | OCTOBER 2008 PAYMENT | EFT |
| RFC2 | 2000020241 | EDWARD F. SMITH III | 10,000.00 | 20508920 | 110108 | 10/20/2008 | 086737 | 10/24/2008 | 10010 | 5050200002 | 1309 | NOV 2008 PAYMENT | EFT |
| RFC2 | 2000020241 | EDWARD F. SMITH III | 10,000.00 | 20511941 | 120108 | 11/24/2008 | 086929 | 11/26/2008 | 10010 | 5050200002 | 1309 | DECEMBER 2008 PAYMENT | EFT |
| RFC2 | 2000020241 | EDWARD F. SMITH III | 10,000.00 | 20513594 | 12182008- | 12/18/2008 | 087104 | 12/29/2008 | 10010 | 5050200002 | 1309 | DEC 2008 PAYMENT | EFT |
| RFC2 | 2000020241 | EDWARD F. SMITH III | 10,000.00 | 20516145 | 01012009 | 1/1/2009 | 731664 | 2/5/2009 | 10010 | 5050200002 | 1309 | JAN 2009 PAYMENT | CHK |
| RFC2 | 2000020241 | EDWARD F. SMITH III | 10,000.00 | 20516146 | 02012009 | 2/1/2009 | 731664 | 2/5/2009 | 10010 | 5050200002 | 1309 | FEB 2009 PAYMENT | CHK |
| RFC2 | 2000020241 | EDWARD F. SMITH III | 10,000.00 | 20516976 | 030109 | 2/18/2009 | 087345 | 2/20/2009 | 10010 | 5050200002 | 1309 | MARCH 2009 PAYMENT | EFT |
| RFC2 | 2000020241 | EDWARD F. SMITH III | 10,000.00 | 20518916 | 031809 | 3/18/2009 | 087493 | 3/27/2009 | 10010 | 5050200002 | 1309 | APRIL 2009 PAYMENT | EFT |
| RFC2 | 2000020241 | EDWARD F. SMITH III | 10,000.00 | 20520425 | 04212009 | 4/21/2009 | 087656 | 4/24/2009 | 10010 | 5050200002 | 1309 | May 2009 Payment | EFT |
| RFC2 | 2000020241 | EDWARD F. SMITH III | 10,000.00 | 20522170 | 05272009-SMITH | 5/27/2009 | 087813 | 5/29/2009 | 10010 | 5050200002 | 1309 | JUNE 2009 PAYMENT | EFT |
| RFC2 | 2000020241 | EDWARD F. SMITH III | 10,000.00 | 20523456 | 0701209 | 7/1/2009 | 087939 | 6/26/2009 | 10010 | 5050200002 | 1309 | JULY 2009 | EFT |
| RFC2 | 2000020241 | EDWARD F. SMITH III | 10,000.00 | 20524656 | 08012009-SMITH | 8/1/2009 | 088084 | 7/31/2009 | 10010 | 5050200002 | 1309 | AUGUST 2009 | EFT |
| RFC2 | 2000020241 | EDWARD F. SMITH III | 10,000.00 | 20526183 | 09012009-SMITH | 9/1/2009 | 088198 | 8/31/2009 | 10010 | 5050200002 | 1309 | SEPT 09 DIRECTOR PAYMENT | EFT |
| RFC2 | 2000020241 | EDWARD F. SMITH III | 10,000.00 | 20527624 | 09252009 | 9/25/2009 | 088336 | 9/30/2009 | 10010 | 5050200002 | 1309 | OCT 2009 DIRECTOR PAYMENT | EFT |
| RFC2 | 2000020241 | EDWARD F. SMITH III | 10,000.00 | 20529335 | 11012009 | 11/1/2009 | 088498 | 11/6/2009 | 10010 | 5050200002 | 1309 | NOV 2009 DIRECTOR PAYMENT | EFT |
| RFC2 | 2000020241 | EDWARD F. SMITH III | 10,000.00 | 20530133 | 12012009-SMITH | 12/1/2009 | 088595 | 11/30/2009 | 10010 | 5050200002 | 1309 | DEC 2009 PAYMENT | EFT |
| RFC2 | 2000020241 | EDWARD F. SMITH III | 10,000.00 | 20531373 | 01012010-SMITH | 1/1/2010 | 088750 | 12/29/2009 | 10010 | 5050200002 | 1309 | 01/01/2010 Payment | EFT |
| RFC2 | 2000020241 | EDWARD F. SMITH III | 10,000.00 | 20532100 | 02012010 | 2/1/2010 | 088817 | 1/25/2010 | 10010 | 5050200002 | 1309 | FEBRUARY DIRECTOR FEE PAYMENT | EFT |
| RFC2 | 2000020241 | EDWARD F. SMITH III | 10,000.00 | 20533142 | 03012010 | 3/1/2010 | 088904 | 2/26/2010 | 10010 | 5050200002 | 1309 | MARCH DIRECTOR FEE PAYMENT | EFT |
| RFC2 | 2000020241 | EDWARD F. SMITH III | 110,000.00 | 20534142 | 04012010 | 4/1/2010 | 089002 | 3/31/2010 | 10010 | 5050200002 | 1309 | APRIL DIRECTOR PAYMENT | EFT |

**Residential Capital, LLC**
**Independent Director Payment Information by VEND Number**
June 2008 – January 2013

| Unit | Remit Vndr | Name | Amount | Voucher | Invoice | Invoice Date | Check Number | Payment Date | GL Unit | Acct | Dept ID | Descr | Type |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| RFC2 | 2000020241 | EDWARD F. SMITH III | 10,000.00 | 20534993 | 04262010 | 4/26/2010 | 089088 | 4/30/2010 | 10010 | 5050200002 | 1309 | MAY DIRECTOR FEE PAYMENT | EFT |
| RFC2 | 2000020241 | EDWARD F. SMITH III | 10,000.00 | 20535798 | 06012010 | 6/1/2010 | 089161 | 5/28/2010 | 10010 | 5050200002 | 1309 | June Director Fee Payment | EFT |
| RFC2 | 2000020241 | EDWARD F. SMITH III | 10,000.00 | 20536362 | 07012010 | 7/1/2010 | 089242 | 6/30/2010 | 10010 | 5050200002 | 1309 | July Director Fee Payment | EFT |
| RFC2 | 2000020241 | EDWARD F. SMITH III | 10,000.00 | 20536870 | 08012010 | 8/1/2010 | 089305 | 7/30/2010 | 10010 | 5050200002 | 1309 | August Director Fee Payment | EFT |
| RFC2 | 2000020241 | EDWARD F. SMITH III | 10,000.00 | 20537330 | 09012010 | 9/1/2010 | 089363 | 8/27/2010 | 10010 | 5050200002 | 1309 | September Director Fee Payment | EFT |
| RFC2 | 2000020241 | EDWARD F. SMITH III | 10,000.00 | 20537765 | 10012010 | 10/1/2010 | 089415 | 9/30/2010 | 10010 | 5050200002 | 1309 | OCTOBER DIRECTOR FEE PAYMENT | EFT |
| RFC2 | 2000020241 | EDWARD F. SMITH III | 10,000.00 | 20538185 | 11012010 | 11/1/2010 | 089475 | 10/29/2010 | 10010 | 5050200002 | 1309 | November Director Fee Payment | EFT |
| RFC2 | 2000020241 | EDWARD F. SMITH III | 10,000.00 | 20538600 | 12012010 | 12/1/2010 | 089534 | 11/30/2010 | 10010 | 5050200002 | 1309 | December Director Fee Payment | EFT |
| RFC2 | 2000020241 | EDWARD F. SMITH III | 10,000.00 | 20539013 | 01012011 | 1/1/2011 | 089598 | 1/7/2011 | 10010 | 5050200002 | 1309 | January 2011 Director Payment | EFT |
| RFC2 | 2000020241 | EDWARD F. SMITH III | 10,833.33 | 20539374 | 02012011 | 2/1/2011 | 089645 | 2/4/2011 | 10010 | 5050200002 | 1309 | February Director Fee Payment | EFT |
| RFC2 | 2000020241 | EDWARD F. SMITH III | 833.33 | 20539413 | 020411 | 2/4/2011 | 089653 | 2/11/2011 | 10010 | 5050700001 | 1309 | INDEPENDENT DIRECTOR. | EFT |
| RFC2 | 2000020241 | EDWARD F. SMITH III | 10,833.33 | 20539663 | 03012011 | 3/1/2011 | 089686 | 3/4/2011 | 10010 | 5050200002 | 1309 | March Director Fee Payment | EFT |
| RFC2 | 2000020241 | EDWARD F. SMITH III | 10,833.33 | 20540042 | 04012011 | 4/1/2011 | 089724 | 4/8/2011 | 10010 | 5050200002 | 1309 | APRIL DIRECTOR FEE PAYMENT | EFT |
| RFC2 | 2000020241 | EDWARD F. SMITH III | 9,000.00 | 20540191 | 041411 | 4/14/2011 | 089749 | 4/22/2011 | 10010 | 5050700001 | 1309 | First Qtr 2011 Director Comp | EFT |
| RFC2 | 2000020241 | EDWARD F. SMITH III | 10,833.33 | 20540299 | 05022011 | 5/2/2011 | 089771 | 5/6/2011 | 10010 | 5050200002 | 1309 | May Director Fee Payment | EFT |
| RFC2 | 2000020241 | EDWARD F. SMITH III | 10,833.33 | 20540562 | 06012011 | 6/1/2011 | 089807 | 6/3/2011 | 10010 | 5050200002 | 1309 | June Director Payment | EFT |
| RFC2 | 2000020241 | EDWARD F. SMITH III | 10,833.33 | 20540755 | 07012011 | 7/1/2011 | 089841 | 7/8/2011 | 10010 | 5050200002 | 1309 | July Director Fee Payment | EFT |
| RFC2 | 2000020241 | EDWARD F. SMITH III | 10,833.33 | 20540920 | 08012011 | 8/1/2011 | 089874 | 8/5/2011 | 10010 | 5050200002 | 1309 | August Director Fee Payment | EFT |
| RFC2 | 2000020241 | EDWARD F. SMITH III | 3,000.00 | 20540922 | 07272011 | 7/27/2011 | 089874 | 8/5/2011 | 10010 | 5050200002 | 1309 | ResCap Director Comp Q1 | EFT |
| RFC2 | 2000020241 | EDWARD F. SMITH III | 10,833.33 | 20541113 | 09012011 | 9/1/2011 | 089914 | 9/2/2011 | 10010 | 5050200002 | 1309 | September Director Fee Payment | EFT |
| RFC2 | 2000020241 | EDWARD F. SMITH III | 10,833.33 | 20541276 | 10012011 | 10/1/2011 | 089944 | 10/7/2011 | 10010 | 5050200002 | 1309 | October Director Fee Payment | EFT |
| RFC2 | 2000020241 | EDWARD F. SMITH III | 10,833.33 | 20541448 | 11012011 | 11/1/2011 | 089971 | 11/4/2011 | 10010 | 5050200002 | 1309 | November Director Fee Payment | EFT |

**Residential Capital, LLC**
**Independent Director Payment Information by VEND Number**
June 2008 – January 2013

| Unit | Remit Vndr | Name | Amount | Voucher | Invoice | Invoice Date | Check Number | Payment Date | GL Unit | Acct | Dept ID | Descr | Type |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| RFC2 | 2000020241 | EDWARD F. SMITH III | 13,000.00 | 20541583 | 3RD QTR COMP | 11/22/2011 | 089984 | 11/25/2011 | 10010 | 586041001 | 1309 | Rescap Dir Com - Q3 2011 | EFT |
| RFC2 | 2000020241 | EDWARD F. SMITH III | 10,833.33 | 20541618 | Dec 2011 Dir Fee Pmt | 12/1/2011 | 089989 | 12/2/2011 | 10010 | 5050200002 | 1309 | Dec 2011 Director Fee Payment | EFT |
| RFC2 | 2000020241 | EDWARD F. SMITH III | 60,000.00 | 20541891 | 01052012 | 1/5/2012 | 090017 | 1/13/2012 | 10010 | 5050700001 | 1309 | Pay Adj for base comp for 2011 | EFT |
| RFC2 | 2000020241 | EDWARD F. SMITH III | 53,000.00 | 20542023 | 01122012 | 1/12/2012 | 090026 | 1/20/2012 | 10010 | 586041001 | 1309 | Dir Pmt - 2011 Mtg Pay Adj | EFT |
| RFC2 | 2000020241 | EDWARD F. SMITH III | 15,833.33 | 20542027 | Jan 2012 Dir Pmt | 1/12/2012 | 090026 | 1/20/2012 | 10010 | 586041001 | 1309 | Jan 2012 Director Payment | EFT |
| RFC2 | 2000020241 | EDWARD F. SMITH III | 15,833.33 | 20542095 | 02012012 | 2/1/2012 | 090036 | 2/3/2012 | 10010 | 586041001 | 1309 | Feb 2012 Director Fee Pmt | EFT |
| RFC2 | 2000020241 | EDWARD F. SMITH III | 15,833.33 | 20542361 | 03012012 | 3/1/2012 | 090061 | 3/2/2012 | 10010 | 586041001 | 1309 | March Director Fee Payment | EFT |
| RFC2 | 2000020241 | EDWARD F. SMITH III | 15,833.33 | 20542577 | 04032012 | 4/3/2012 | 090095 | 4/5/2012 | 10010 | 5050200002 | 1309 | April Director Fee Payment | EFT |
| RFC2 | 2000020241 | EDWARD F. SMITH III | 27,000.00 | 20542668 | Q1 Mtg Comp | 3/28/2012 | 090111 | 4/19/2012 | 10010 | 5050200001 | 1309 | Q1 Dir Mtg Compensation | EFT |
| RFC2 | 2000020241 | EDWARD F. SMITH III | 15,833.33 | 20542770 | May Dir Pmt | 5/1/2012 | 090128 | 5/3/2012 | 10010 | 5050200002 | 1309 | May Director Payment Fee | EFT |
| RFC2 | 2000020241 | EDWARD F. SMITH III | 18,000.00 | 20542834 | 05112012 | 5/11/2012 | WIR05A | 5/13/2012 | 10010 | 5050200002 | 1309 | BD COMM FEES | Wired from Treasury Cash Desk |
| RFC2 | 2000020241 | EDWARD F. SMITH III | 15,833.33 | 20542850 | 06012012 | 6/1/2012 | 090146 | 6/15/2012 | 10010 | 5050200002 | 1309 | June Director Fee Payment | EFT |
| RFC2 | 2000020241 | EDWARD F. SMITH III | 15,833.33 | 20543011 | 70/22012 JUL DIR PMT | 7/2/2012 | 090159 | 7/6/2012 | 10010 | 5050200002 | 1309 | JULY DIRECTOR FEE PMT | EFT |
| RFC2 | 2000020241 | EDWARD F. SMITH III | 6,000.00 | 20543058 | 07062012 | 7/6/2012 | 090169 | 7/19/2012 | 10010 | 5050200002 | 1309 | Q2 Comp for Mtgs Attended | EFT |
| RFC2 | 2000020241 | EDWARD F. SMITH III | 15,833.33 | 20543148 | 08012012 | 8/1/2012 | 090183 | 8/2/2012 | 10010 | 5050200002 | 1309 | Aug Director Fee Payment | EFT |
| RFC2 | 2000020241 | EDWARD F. SMITH III | 15,833.33 | 20543406 | 09012012 | 9/1/2012 | 090215 | 9/6/2012 | 10010 | 5050200002 | 1309 | Sept Director Payment | EFT |
| RFC2 | 2000020241 | EDWARD F. SMITH III | 15,833.33 | 20543711 | 10012012 | 10/1/2012 | 090240 | 10/4/2012 | 10010 | 5050200002 | 1309 | October Director Fee Pmt | EFT |
| RFC2 | 2000020241 | EDWARD F. SMITH III | 16,500.00 | 20543717 | 09282012 | 9/28/2012 | 090240 | 10/4/2012 | 10010 | 5050200002 | 1309 | Comp Pmt for 3Q Mtgs Attended | EFT |
| RFC2 | 2000020241 | EDWARD F. SMITH III | 15,833.33 | 20544173 | 11012012 | 11/1/2012 | 090276 | 11/8/2012 | 10010 | 5050200002 | 1309 | November Dir Fee Payment | EFT |
| RFC2 | 2000020241 | EDWARD F. SMITH III | 15,833.33 | 20544537 | 12012012 | 12/1/2012 | 090305 | 12/6/2012 | 10010 | 5050200002 | 1309 | Dec Director Fee Payment | EFT |
| RFC2 | 2000020241 | EDWARD F. SMITH III | 39,000.00 | 20544932 | 12212012 | 12/21/2012 | 090329 | 12/27/2012 | 10010 | 5050200002 | 1309 | 4Q Mtg Compensation Pmt | EFT |
| RFC2 | 2000020241 | EDWARD F. SMITH III | 15,833.33 | 20545049 | 01092013 | 1/9/2013 | 090354 | 1/17/2013 | 10010 | 5050200002 | 1309 | January Director Comp. Pmt | EFT |

Source: Spreadsheet, PAYMENT INFO BY VEND Number, Edward F. Smith, III [EXAM00294353].

**Appendix IV.B.1.d(8)—1**, Page 1 of 1

**Summary of Comparable Board of Director Compensation** [1]
2006 – 2011

| Company Name/Date of Bankruptcy Filing or Sale | Cash | | Stock Awards | | Option Awards | | Other Compensation | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|
| | BY - 1 [2] | BY [3] | BY - 1 [2] | BY [3] | BY - 1 [2] | BY [3] | BY - 1 [2] | BY [3] | BY - 1 [2] | BY [3] |
| Accredited Home Lenders Holding Co. (May 2009) | $ N/A | $ 73,500 | $ N/A | $ 89,619 | $ N/A | $ 9,200 | $ N/A | $ 18,805 | $ N/A | $ 172,319 |
| Ambac Financial Group, Inc. (Nov. 2010) | 117,549 | 138,334 | 114,125 | 170,000 | - | - | 8,435 | - | 240,110 | 327,138 |
| BankUnited Financial Corporation (May 2009) | N/A | 65,298 | N/A | 13,216 | N/A | - | N/A | - | N/A | 78,514 |
| Capitol Bancorp, Ltd. (Aug. 2012) | 29,183 | 31,753 | - | - | 14,063 | - | 4,844 | 5,533 | 48,089 | 37,287 |
| Capmark Financial Group Inc. (Oct. 2009) | 55,000 | 58,636 | - | - | - | - | - | - | 55,000 | 58,636 |
| CIT Group Inc. (Nov. 2009) | 60,000 | 60,000 | 27,208 | 44,329 | 43,322 | 59,936 | - | - | 130,530 | 164,265 |
| Colonial Banegroup Inc. (Aug. 2009) | 26,970 | 36,001 | 29,457 | 21,560 | - | - | - | - | 56,427 | 57,561 |
| Conus Financial Corporation (June 2010) | 90,088 | 109,550 | - | - | - | - | - | 3,400 | 90,088 | 112,950 |
| Countrywide Financial Corp (July 2008) | 105,750 | 147,349 | 265,199 | 269,867 | 1,074 | - | 53,628 | 54,511 | 424,577 | 472,800 |
| Delta Financial Corp. (Dec. 2010) | N/A | 50,000 | N/A | - | 2,993 | - | N/A | 273 | N/A | 53,266 |
| Guaranty Financial Group Inc. (Aug. 2009) | N/A | 79,313 | N/A | - | N/A | - | N/A | 4,125 | N/A | 83,438 |
| HomeBanc Corp. (Aug. 2007) | N/A | 83,373 | N/A | 42,863 | N/A | - | N/A | - | N/A | 126,236 |
| IndyMac Bancorp Inc. (July 2008) | 123,186 | 109,922 | 29,213 | 44,821 | 82,417 | 60,476 | 2,397 | 1,110 | 237,212 | 216,329 |
| LandAmerica Financial Group, Inc. (Nov. 2009) | 106,719 | 104,206 | 77,519 | 71,849 | - | - | 888 | 806 | 185,126 | 176,861 |
| Lehman Brothers Holdings, Inc. (Sep. 2008) | 111,056 | 112,611 | 196,297 | 217,812 | 56,936 | 28,265 | 6,222 | 6,389 | 370,511 | 365,077 |
| Majestic Capital, Ltd. (Apr. 2011) | 77,857 | 83,338 | 24,305 | 25,000 | - | - | - | - | 102,163 | 108,338 |
| PMI Group Inc. (Nov. 2011) | 93,402 | 97,812 | 13,725 | 16,000 | 36,275 | 34,000 | - | - | 143,402 | 147,812 |
| Residential Capital, LLC (May 2012) | 214,583 | 165,000 | - | - | - | - | - | - | 214,583 | 165,000 |
| The Bear Stearns Companies, LLC (May 2008) | 76,250 | 83,667 | 72,188 | 82,677 | 75,313 | 69,752 | 2,406 | 2,056 | 226,156 | 238,151 |
| WMI Holdings Corp. (Sep. 2008) | 93,682 | 97,896 | 60,168 | 55,203 | 26,820 | 29,733 | 4,688 | 3,901 | 185,359 | 186,732 |

[1] Data represents the average compensation for the board's independent directors. Data excludes board members who resigned or were newly appointed.

[2] "BY - 1" = 1 fiscal year prior to the BY data.

[3] "BY" = most recent data available just prior to bankruptcy/sale.

Source: Information for comparable companies provided by Capital IQ and verified with each companies' annual filings and proxy statements: Spreadsheet, PAYMENT INFO BY VEND Number, Edward F. Smith, III [EXAM00294352]; Spreadsheet, PAYMENT INFO BY VEND Number, Karin Hirtler-Garvey [EXAM00294334]; Spreadsheet reflecting payments to Pamela E. West [EXAM00294341]; Spreadsheet, PAYMENT INFO BY VEND Number, Jonathan Ilany [EXAM00294335]; Spreadsheet, PAYMENT INFO BY VEND Number, John E. Mack [EXAM00294337].

Appendix IV.B.1.d(8)—1, Page 1 of 1

**Director Compensation Benchmarking**
2011 - 2012

**2011 U.S. Director Compensation and Board Practices Report [(1),(2),(3)]**

| | Assets <$1 Billion | Assets $1 - $9.9 Billion | Assets $10 - $99 Billion | Assets >$100 Billion | Financial Services | ResCap 2012 [(4)] |
|---|---|---|---|---|---|---|
| Cash retainer | $ 40,000 | $ 32,500 | $ 50,000 | $ 77,500 | $ 45,000 | $ 180,000 |
| Meeting fees | 10,500 | 8,250 | N/A | N/A | 6,200 | 1,500 |
| Committee chair fees | 14,908 | 13,571 | 13,750 | 28,500 | 20,153 | 20,000 |
| Committee member fees | 2,254 | 5,006 | 3,667 | 10,400 | 6,443 | 10,000 |
| Stock/equity | 37,800 | 25,000 | 70,000 | 150,000 | 63,896 | N/A |
| Total compensation | $ 104,000 | $ 80,500 | $ 158,340 | $ 240,000 | $ 146,000 | $ 409,250 |

[(1)] Amounts shown for compensation by asset size are median numbers.
[(2)] Meeting fees shown are per total annual compensation. The report did not include a per meeting fee.
[(3)] Committee chairman and member fees shown are for audit committee fees.
[(4)] ResCap's numbers reflect ResCap's 2012 compensation plan. The total compensation number is the median of the total compensation (rather than the average) shown on preceding charts paid to the four Independent Directors in 2012 (which includes the retroactive payment to the directors paid in 2012).
Source: The Conference Board's 2011 U.S. Director Compensation and Board Practices Report. The report summarizes results of survey of 334 publicly-traded companies.

**2012 Director Compensation Report [(1),(2),(3)]**

| | Small Cap (<$1 Billion) | Mid Cap ($1 - $5 Billion) | Large Cap (>$5 Billion) | Financial Services | ResCap 2012 [(4)] |
|---|---|---|---|---|---|
| Cash retainer | $ 40,000 | $ 50,000 | $ 75,000 | $ 50,000 | $ 180,000 |
| Meeting fees | 1,500 | 2,000 | 2,000 | 1,500 | 1,500 |
| Committee chair fees | 15,000 | 20,000 | 20,000 | 15,000 | 20,000 |
| Committee member fees | N/A | N/A | N/A | N/A | 10,000 |
| Stock/equity | 56,780 | 100,000 | 130,000 | 70,000 | N/A |
| Total compensation | $ 118,000 | $ 178,000 | $ 204,000 | $ 134,000 | $ 409,250 |

[(1)] All amounts shown are median numbers.
[(2)] Meeting fees shown are per meeting and not total annual fees.
[(3)] Committee chairman fees shown are for audit committee fees.
[(4)] ResCap's numbers reflect ResCap's 2012 compensation plan. The total compensation number is the median of the total compensation (rather than the average) shown on preceding charts paid to the four Independent Directors in 2012 (which includes the retroactive payment to the directors paid in 2012).
Source: Frederic W. Cook & Co., Inc.'s 2012 Director Compensation Report. The report summarizes information on 240 publicly-traded companies.

**2012 Spencer Stuart Board Index [(1),(2)]**

| | S&P 500 Companies | ResCap 2012 [(3)] |
|---|---|---|
| Cash retainer | $ 75,000 | $ 180,000 |
| Meeting fees | 2,224 | 1,500 |
| Committee chair fees | 13,035 | 20,000 |
| Committee member fees | 8,189 | 10,000 |
| Stock/equity | 122,479 | N/A |
| Total compensation | $ 231,247 | $ 409,250 |

[(1)] Amounts shown for cash retainer and total compensation are median numbers; amounts shown for all other categories are averages.
[(2)] Meeting fees shown are per meeting and not total annual numbers.
[(3)] ResCap's numbers reflect ResCap's 2012 compensation plan. The total compensation number is the median of the total compensation (rather than the average) shown on preceding charts paid to the four Independent Directors in 2012 (which includes the retroactive payment to the directors paid in 2012).
Source: Spencer Stuart's 2012 Board Index. The report summarizes information on 485 companies listed on the S&P 500 Index.

Appendix IV.B.1.d(8)—3, Page 1 of 1

**AFI and ResCap Independent Director Compensation (Comparison of Total Aggregate)**
**2008 – 2012**

### AFI

| Compensation Type | 2008 | 2009 (2) | 2010 (3) | 2011 | 2012 (4),(5) |
|---|---|---|---|---|---|
| Annual retainer (1) | $ 360,000 | $ 832,500 | $ 960,165 | $ 1,348,548 | $ 1,547,758 |
| Committee fees | 60,000 | 263,750 | 345,195 | 556,682 | 712,093 |
| Meeting fees | - | 300,750 | 219,000 | 168,750 | 162,500 |
| Supplemental compensation | - | - | - | - | 165,000 |
| Total | $ 420,000 | $ 1,397,000 | $ 1,524,360 | $ 2,073,980 | $ 2,587,351 |
| | | | | | |
| Average annual compensation per director | $ 140,000 | $ 200,875 | $ 283,445 | $ 296,283 | $ 314,060 |

(1) Annual retainers are prorated based on non-employee directors actual service on board and committees.
(2) In 2009, Duggan, Hirsch and Scully served as non-employee directors for approximately six months.
(3) In 2010, Mageer served as a non-employee director for approximately seven months; Stack served as a non-employee director for approximately nine months.
(4) In 2012, Miller and Greenwald served as non-employee directors for approximately five months.
(5) Beginning January 1, 2012, Stack received additional compensation for being a member of the GMAC Bank Board.
Source: Ally Financial Inc., Annual Report (Form 10-K) (Feb. 27, 2009), at 217; Ally Financial Inc., Annual Report (Form 10-K) (Mar. 1, 2010), at 232–33; Ally Financial Inc., Annual Report (Form 10-K) (Feb. 25, 2011), at 270; Ally Financial Inc., Annual Report (Form 10-K) (Feb. 28, 2012), at 250–52; Ally Financial Inc., Annual Report (Form 10-K) (Mar. 1, 2013), at 223–25.

### ResCap

| Compensation Type | 2008 | 2009 | 2010 | 2011 (1) | 2012 (2) |
|---|---|---|---|---|---|
| Annual retainer | $ 210,833 | $ 238,333 | $ 201,667 | $ 240,000 | $ 720,000 |
| Committee fees | 39,167 | 35,833 | 27,500 | 40,000 | 73,000 |
| Meeting fees | - | - | - | 50,000 | 565,500 |
| 2011 true-up for 2012 comp plan – base | | | | | 165,000 |
| 2011 true-up for 2012 comp plan – meeting fee | | | | | 122,500 |
| Supplemental compensation | 266,667 | 200,000 | 200,000 | - | 10,000 |
| Expenses | 52,728 | | | | - |
| Total | $ 569,394 | $ 474,167 | $ 429,167 | $ 330,000 | $ 1,656,000 |
| | | | | | |
| Average annual compensation per director (3) | $ 230,000 | $ 230,000 | $ 214,583 | $ 165,000 | $ 414,000 |

(1) 2011 base compensation was increased from $120,000 to 180,000 due to retroactive application of 2012 compensation plan. This true-up was paid in 2012.
(2) 2012 compensation plan also removed the $25,000 cap on meeting fees retroactively for 2011. This true-up for additional meeting fees was paid in 2012.
(3) Annual compensation averages exclude directors who served partial years; the 2008 "average" reflects the 2008 payment arrangement because no Independent Director served a full year.
Source: Spreadsheet, PAYMENT INFO BY YEND Number, Edward T. Smith, III [EXAMIN00294352]; Spreadsheet, PAYMENT INFO BY YEND Number, Karin Hirtler-Garvey, [EXAMIN00294344]; Spreadsheet reflecting payments to Pamela E. West [EXAMIN00294341]; Spreadsheet, PAYMENT INFO BY YEND Number, Jonathan Ilany [EXAMIN00294355]; Spreadsheet, PAYMENT INFO BY YEND Number, John E. Mack [EXAMIN00294337].

Appendix IV.B.1.d(8)—3, Page 1 of 1

## AFI and ResCap Independent Director Compensation (Comparison By Director)
2008 – 2012

### AFI

| Independent Director | 2008 | 2009 [1] | 2010 [2] | 2011 | 2012 [3],[4] |
|---|---|---|---|---|---|
| Robert Scully | $ 120,000 | $ 60,000 | N/A | N/A | N/A |
| Douglas Hirsch | 140,000 | 70,000 | N/A | N/A | N/A |
| T.K. Duggan | 160,000 | 80,000 | N/A | N/A | N/A |
| Robert Blakely | N/A | 233,750 | $ 281,812 | $ 281,500 | $ 309,000 |
| Michael Carpenter | N/A | 180,750 | N/A | N/A | N/A |
| Mayree Clark | N/A | 236,250 | 287,480 | 299,508 | 304,750 |
| Kim Fennebresque | N/A | 231,000 | 243,124 | 242,000 | 276,000 |
| Franklin Hobbs | N/A | 305,250 | 364,192 | 495,353 | 505,000 |
| Marjorie Magner | N/A | N/A | 158,532 | 272,124 | 274,250 |
| John Stack | N/A | N/A | 189,220 | 291,655 | 489,750 |
| John Durrett | N/A | N/A | N/A | 191,840 | 257,750 |
| Henry Miller | N/A | N/A | N/A | N/A | 85,001 |
| Gerald Greenwald | N/A | N/A | N/A | N/A | 85,850 |
| Total | $ 420,000 | $ 1,397,000 | $ 1,524,360 | $ 2,073,980 | $ 2,587,351 |
| | | | | | |
| Average annual compensation per director | $ 140,000 | $ 200,875 | $ 283,445 | $ 296,283 | $ 314,060 |

[1] In 2009, Duggan, Hirsch, and Scully served as non-employee directors for approximately six months.
[2] In 2010, Magner served as a non-employee director for approximately seven months; Stack served as a non-employee director for approximately nine months.
[3] In 2012, Miller and Greenwald served as non-employee directors for approximately five months.
[4] Beginning January 1, 2012, Stack received additional compensation for being a member of the GMAC Bank Board.
Source: Ally Financial Inc., Annual Report (Form 10-K) (Feb. 27, 2009), at 217; Ally Financial Inc., Annual Report (Form 10-K) (Mar. 1, 2010), at 232–33; Ally Financial Inc., Annual Report (Form 10-K) (Feb. 25, 2011), at 270; Ally Financial Inc., Annual Report (Form 10-K) (Feb. 28, 2012), at 250–52; Ally Financial Inc., Annual Report (Form 10-K) (Mar. 1, 2013), at 223–25.

### ResCap [1]

| Independent Director | 2008 | 2009 | 2010 | 2011 | 2012 |
|---|---|---|---|---|---|
| Thomas Jacob [1] | $ 80,000 | N/A | N/A | N/A | N/A |
| Thomas Melzer [2] | 73,333 | N/A | N/A | N/A | N/A |
| Edward Smith | 190,877 | 230,000 | $ 210,000 | $ 155,000 | $ 409,500 |
| Karin Hirtler-Garvey | 225,184 | 146,667 | 219,167 | 175,000 | N/A |
| Pamela West | N/A | 97,500 | N/A | N/A | 464,500 |
| Jonathan Ilany [3] | N/A | N/A | N/A | - | 373,000 |
| John Mack [3] | N/A | N/A | N/A | - | 409,000 |
| Total | $ 569,394 | $ 474,167 | $ 429,167 | $ 330,000 | $ 1,656,000 |
| | | | | | |
| Average annual compensation per director [4] | $ 230,000 | $ 230,000 | $ 214,583 | $ 165,000 | $ 414,000 |

[1] Compensation reported by year on cash basis.
[2] Jacob and Melzer 2008 compensation is extrapolated from cited sources.
[3] Note that Ilany and Mack were paid $31,500 in January 2012 for their 2011 partial-year service on the ResCap Board
[4] Annual compensation averages exclude directors who served partial years; the 2008 "average" reflects the 2008 payment arrangement because no Independent Director served a full year

Source: Proposed 2008 Compensation Plan for ResCap Independent Directors, dated Jan. 31, 2008, at RC4000727 [RC4000726]; Minutes of a Special Meeting of the Board of Directors of Residential Capital LLC, Feb. 1, 2008, at RC4000655–54 [RC4000652]; Minutes of a Meeting of the Special Committee of the Independent Directors of the Board of Residential Capital, LLC, Mar. 25, 2008, at RC4000622 [RC4000611]; Email from T. Hamelspar to R. Hull (Apr. 30, 2008) [EXAM0248306]; Email from C. Quenneville (May 23, 2008) [EXAM1234420]; Spreadsheet, PAYMENT INFO BY YEND Number, Edward F. Smith, III [EXAM0294353]; Spreadsheet, PAYMENT INFO BY YEND Number, Karin Hirtler-Garvey, [EXAM0294384]; Email from C. West [EXAM0294341]; Spreadsheet reflecting payments to Pamela E. West [EXAM0294341]; Spreadsheet, PAYMENT INFO BY YEND Number, Jonathan Ilany [EXAM0294335]; Spreadsheet, PAYMENT INFO BY YEND Number, John E. Mack [EXAM0294337].

**AFI and ResCap Independent Director Compensation (Comparison By Type)**
2008 – 2012

## AFI [1]

| Compensation Arrangement | 2008 | 2009 [2] | 2010 [3] | 2011 [1] | 2012 [4],[5] |
|---|---|---|---|---|---|
| Base compensation | $ 120,000 | $ 180,000 | $ 180,000 | $ 180,000 | $180,000 – $200,000 |
| Committee member (audit) | 20,000 | 20,000 | 20,000 | N/A | N/A |
| Committee member (other) | N/A | 10,000 | 10,000 | 20,000 | 20,000 |
| Committee chair (audit) | 40,000 | 45,000 | 45,000 | N/A | N/A |
| Committee chair (other) | N/A | 25,000 | 25,000 | 50,000 | 50,000 |
| Meeting fee (per meeting) | N/A | 750 – 1,500 | 750 – 1,500 | 750 – 1,500 | 2,000 |
| Chairman of the Board | N/A | 120,000 | 120,000 | 250,000 | 250,000 |
| Supplemental compensation | N/A | N/A | N/A | N/A | N/A |

[1] Annual retainers are prorated based on non-employee directors actual service on board and committees.
[2] In 2009, Duggan, Hirsch and Scully served as non-employee directors for approximately six months.
[3] In 2010, Mayer served as a non-employee director for approximately seven months; Stack served as a non-employee director for approximately nine months.
[4] In 2012, Miller and Greenwald served as non-employee directors for approximately five months.
[5] Beginning January 1, 2012, Stack received additional compensation for being a member of the GMAC Bank Board.

Source: Ally Financial Inc., Annual Report (Form 10-K) (Feb. 27, 2009), at 217; Ally Financial Inc., Annual Report (Form 10-K) (Mar. 1, 2010), at 232–33; Ally Financial Inc., Annual Report (Form 10-K) (Feb. 25, 2011), at 270; Ally Financial Inc., Annual Report (Form 10-K) (Feb. 28, 2012), at 250–52; Ally Financial Inc., Annual Report (Form 10-K) (Mar. 1, 2013), at 223–25.

## ResCap

| Compensation Arrangement | 2008 | 2009 | 2010 | 2011 [1] | 2012 [2] |
|---|---|---|---|---|---|
| Base compensation | $ 110,000 | $ 110,000 | $ 110,000 | $ 120,000 | $ 180,000 |
| Committee member (audit) | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 |
| Committee member (other) | N/A | N/A | N/A | N/A | 10,000 |
| Committee chair (audit) | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 |
| Committee chair (other) | N/A | N/A | N/A | N/A | 20,000 |
| Meeting fee (per meeting) | N/A | N/A | N/A | 1,500 | 1,500 |
| 2011 true-up for 2012 comp plan - base compensation | N/A | N/A | N/A | N/A | 60,000 |
| 2011 true-up for 2012 comp plan - meeting fee (per meeting) | N/A | N/A | N/A | N/A | 1,500 |
| Supplemental compensation [3] | 100,000 | 100,000 | 100,000 | N/A | N/A |

[1] 2011 base compensation was increased from $120,000 to 180,000 due to retroactive application of 2012 compensation plan. This true-up was paid in 2012.
[2] 2012 compensation plan also removed the $25,000 cap on meeting fees retroactively for 2011. This true-up for additional meeting fees was paid in 2012.
[3] Supplemental compensation of $100,000 was approved at the February 1, 2008 Board meeting.

Source: Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Feb. 1, 2008, at RC40005653–54 [RC40005652]; Karin Hirtler-Garvey—Independent Board Member payment schedule [EXAM00294336]; Spreadsheet, PAYMENT INFO BY VEND Number, Edward F. Smith, III [EXAM00294352]; Spreadsheet reflecting payments to Pamela E. West [EXAM00294341]; E-mail from T. Hamzehpour to C. Kollenberg (Dec. 3, 2010) [EXAM10357376]; E-mail from C. Kollenberg to T. Hamzehpour (Jan. 10, 2011) [EXAM201364941]; Minutes of a Special Meeting of the Board of Directors of Residential Capital, LLC, Jan. 27, 2011, at RC40018421–22 [RC40018411]; Unanimous Written Consent of the Management Members of the Board of Directors of Residential Capital, LLC, dated Dec. 9, 2011, at RC40018728 [RC40018411]; Unanimous Written Consent of the Management Members of the Board of Directors of Residential Capital, LLC, May 4, 2012 at RC40019214–18 [RC40019179].

**Appendix IV.B.1.d(12)**, Page 1 of 1

**Residential Capital, LLC**
**Officers Receiving AFI Equity Compensation** [1],[2],[3],[4]
**2006 – 2012**

| Name | ResCap Title | Compensation Type | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 |
|---|---|---|---|---|---|---|---|---|---|
| Thomas Marano | CEO (7/08 – Present) | Salary (Cash) | | | | $ 2,419,231 | $ 500,000 | $ 600,000 | $ 600,000 |
| | | Equity (DSU) | | | | 135,885 | 4,437,500 | 4,735,633 | 1,821,397 |
| | | Equity (IRSU) | | | | 402,681 | 2,468,750 | 2,667,816 | |
| | | Equity (RSU) | | | | 2,684,542 | - | - | 5,582,052 |
| | | Deferred Cash | | | | - | - | - | 27,099 |
| | | Other comp. | | | | 51,994 | 26,785 | 31,450 | |
| | | | $ - | $ - | $ - | $ 5,694,333 | $ 7,433,035 | $ 8,034,899 | $ 8,030,548 |
| Sanjiv Khattri | CFO (4/07 – 3/08) | Salary (Cash) | $ 406,250 | $ 700,000 | | | | | |
| | | Bonus | | 450,000 | | | | | |
| | | Stock awards | 183,080 | 145,000 | | | | | |
| | | Option awards | 47,877 | 260,453 | | | | | |
| | | Non-equity incentive plan comp. | 228,400 | | | | | | |
| | | Non-qualified deferred comp. | 70,900 | | | | | | |
| | | Expense/change in pension value | | 1,670,210 | | | | | |
| | | Other comp. (inc. $500K retention payment in 2007) | 57,512 | | | | | | |
| | | | $ 994,019 | $ 3,225,663 | $ - | $ - | $ - | $ - | $ - |
| James Jones | President & CEO (5/07 – 8/08) | Salary (Cash) | | | $ 570,433 | | | | |
| | | Bonus | | | - | | | | |
| | | Stock awards | | | (165,272) | | | | |
| | | Option awards | | | (102,258) | | | | |
| | | Non-qualified deferred comp. | | | - | | | | |
| | | Expense/change in pension value | | | | | | | |
| | | Other comp. (incl. severance of $2.11M) | | | 2,411,787 | | | | |
| | | | $ - | $ - | $ 2,714,690 | $ - | $ - | $ - | $ - |
| Bruce Paradis | EVP, Chairman & CEO (9/04 – 6/07) | Salary (Cash) | $ 353,846 | | | | | | |
| | | Bonus | - | | | | | | |
| | | Stock awards | - | | | | | | |
| | | Option awards | - | | | | | | |
| | | Non-qualified deferred comp. | 69,900 | | | | | | |
| | | Expense/change in pension value | 33,759 | | | | | | |
| | | Other comp. | | | | | | | |
| | | | $ 457,505 | $ - | $ - | $ - | $ - | $ - | $ - |
| Michael Rossi | Chairman (9/07 – 3/08) | Salary (Cash) | | $ 392,308 | | | | | |
| | | Bonus | | 900,000 | | | | | |
| | | Stock awards | | 516,476 | | | | | |
| | | Option awards | | 194,016 | | | | | |
| | | Non-qualified deferred comp. | | | | | | | |
| | | Expense/change in pension value | | | | | | | |
| | | Other comp. (incl. equity tax-related payments of $2.02M) | | 2,872,601 | | | | | |
| | | | $ - | $ 4,875,401 | $ - | $ - | $ - | $ - | $ - |

**Compensation Amounts Per Year**

[1] DSU = Deferred Stock Units.
[2] IRSU = Incentive Restrictive Stock Units.
[3] RSU = Restricted Stock Units
[4] Other compensation includes 401K match, life insurance, perquisites, etc.

Source: Ally Financial Inc., Annual Report (Form 10-K) (Feb. 13, 2007) at 137; Ally Financial Inc., Annual Report (Form 10-K) (Feb. 27, 2008) at 153–54; Ally Financial Inc., Annual Report (Form 10-K) (Mar. 26, 2009) at 209–10; Ally Financial Inc., Annual Report (Form 10-K) (Mar. 1, 2010) at 215–28; Ally Financial Inc., Annual Report (Form 10-K) (Feb. 25, 2011) at 259–67; Ally Financial Inc., Annual Report (Form 10-K) (Feb. 28, 2012) at 235–48; Ally Financial Inc., Annual Report (Form 10-K) (Mar. 1, 2013) at 218–23.

Appendix IV.B.1.d(12), Page 1 of 1

Appendix V.A.2.a, Page 1 of 4

**Ally Bank Transactions: Reasonably Equivalent Value Summaries**
*($ in Millions)*

| | Appendix Reference | Fair Market Value | | |
|---|---|---|---|---|
| | | Low | to | High |
| **2006 Bank Restructuring** | | | | |
| Transfers from ResCap: | | | | |
| a) Equity value of Old GMAC Bank (non-marketable, controlling) | V.A.2.b, at 1 | $ 1,615.0 | | $ 1,900.0 |
| b) Capital contribution to IB Finance | | 360.0 | | 360.0 |
| Total property transferred | V.A.2.b, at 1 | 1,975.0 | | 2,260.0 |
| Value received by ResCap: | | | | |
| a) Equity value of IB Finance Class M Shares (non-marketable, non-controlling) | V.A.2.b, at 1 | 1,442.0 | | 1,652.0 |
| b) Cost savings to ResCap as a result of de-linking AFI's credit rating from GM | V.A.2.b, at 1 | 142.7 | | 142.7 |
| Total property received | | $ 1,584.7 | | $ 1,794.7 |
| Value received by ResCap less value transferred from ResCap [1] | | $ (390.3) | to | $ (465.3) |
| **2008 Bank Transaction** | | | | |
| Transfers from ResCap: | | | | |
| a) ResCap Preferred Interests | | $ - | | $ - |
| b) Right to exchange ResCap Preferred Interests for IB Finance Preferred Interests | V.A.2.c, at 1 | 571.4 | | 714.2 |
| Total property transferred | | 571.4 | | 714.2 |
| Value received by ResCap: | | | | |
| a) Contribution of bonds | V.A.2.c, at 1 | 841.3 | | 841.3 |
| b) Right to redeem IB Finance Preferred Interests | | - | | - |
| Total property received | | $ 841.3 | | $ 841.3 |
| Value received by ResCap less value transferred from ResCap | | $ 269.9 | to | $ 127.1 |
| **2009 Bank Transaction** | | | | |
| Transfers from ResCap: | | | | |
| a) Remaining 1.2 million IB Finance Class M Shares (non-marketable, non-controlling) | V.A.2.d, at 1 | $ 106.5 | | $ 217.5 |
| b) Forfeited right to redeem IB Finance Preferred Interests | | - | | - |
| Total property transferred | | 106.5 | | 217.5 |
| Value received by ResCap: | | | | |
| a) Contribution of bonds | V.A.2.d, at 1 | 600.2 | | 600.2 |
| Total property received | | $ 600.2 | | $ 600.2 |
| Value received by ResCap less value transferred from ResCap | | $ 493.7 | to | $ 382.7 |

[1] The low end of the range of value for property transferred is paired with the low end of the range of value for property received (with a similar pairing of the respective high ends) in order to maintain consistency between the economic assumptions associated with the respective ranges.

*Source: Appendix V.A.2.b, at 1; Appendix V.A.2.c, at 1; Appendix V.A.2.d, at 1.*

Appendix V.A.2.a, Page 1 of 4

Appendix V.A.2.a, Page 2 of 4

**Ally Bank Transactions: Reasonably Equivalent Value**
**Historical Financial Statements**
**Balance Sheets**
2003 – 2008
*($ in Thousands)*

| | Old GMAC Bank | | | Mortgage Bank | | Mortgage Division of Ally Bank | | |
|---|---|---|---|---|---|---|---|---|
| | 12/31/2003 (1) | 12/31/2004 (2) | 12/31/2005 (2) | 9/30/2006 (3) | 12/31/2006 (4) | 12/31/2007 (5) | 3/31/2008 (5) | 12/31/2008 (6) |
| **Assets** | | | | | | | | |
| Cash and cash equivalents | 48,892 | 63,314 | 43,102 | 58,946 | 913,574 | 1,411,317 | 1,882,194 | 2,825,381 |
| Investment securities | 59,616 | 9,972 | 15,380 | 14,887 | 22,028 | 27,598 | 26,988 | 25,150 |
| Accounts receivable | 9,247 | 12,626 | 32,727 | | 70,145 | | | - |
| HFS mortgage loans, net | 1,555,304 | 2,041,520 | 2,676,496 | | 1,079,501 | 2,345,985 | 2,293,238 | 882,754 |
| Finance receivables and loans | | | | | | | | |
| HFI mortgage loans | 788,140 | 1,232,354 | 6,347,891 | | 11,504,026 | 15,004,490 | 15,433,268 | 15,375,957 |
| Consumer finance receivables | | | | | | | 85,006 | 89,723 |
| Commercial loans | | 48,225 | 169,396 | | 335,938 | | | - |
| Warehouse lending | 180,764 | 376,409 | 214,786 | | 1,023,183 | 1,181,663 | 1,409,408 | 1,440,670 |
| Allowance for credit losses | (2,007) | (2,971) | (7,108) | | (23,760) | (55,866) | (82,402) | (363,714) |
| Finance receivables and loans, net | 966,897 | 1,654,017 | 6,724,965 | 13,493,236 | 12,839,387 | 16,130,287 | 16,845,280 | 16,542,636 |
| MSRs | | | | 2,537 | 2,566 | 119,545 | 297,449 | 418,628 |
| Property & equipment | 2,101 | 2,454 | 2,767 | | | | | |
| FHLB stock | | | | 527,046 | 440,844 | 495,542 | 512,947 | 496,090 |
| Other assets | 4,487 | 89,819 | 249,024 | | | 62,390 | 206,978 | 823,128 |
| Total Assets | 2,646,544 | 3,873,722 | 9,744,461 | 14,096,652 | 15,368,045 | 20,592,664 | 22,065,074 | 22,013,768 |
| **Liabilities** | | | | | | | | |
| Deposits | 1,302,521 | 1,707,383 | 4,215,512 | 6,307,725 | 5,974,386 | 6,687,197 | 9,836,455 | 10,600,537 |
| FHLB borrowings | 822,000 | 1,507,000 | 4,448,000 | 6,224,998 | 7,279,000 | 11,349,000 | 9,815,000 | 9,303,000 |
| Accrued expenses and other liabilities | 205,852 | 199,199 | 372,164 | 425,129 | 526,760 | 571,395 | 412,243 | 285,760 |
| Total Liabilities | 2,330,373 | 3,413,582 | 9,035,676 | 12,957,852 | 13,780,146 | 18,607,592 | 20,063,698 | 20,189,297 |
| **Stockholder's equity** | | | | | | | | |
| Common stock and paid-in capital | 217,237 | 270,423 | 391,320 | 657,049 | 1,560,155 | 1,760,155 | 1,760,155 | 1,760,155 |
| Retained earnings | 98,934 | 189,717 | 317,519 | 481,751 | 27,804 | 225,212 | 241,775 | 65,723 |
| Accumulated other comprehensive income | | | (54) | | (60) | (294) | (553) | (1,406) |
| Total stockholder's equity | 316,171 | 460,140 | 708,785 | 1,138,800 | 1,587,899 | 1,985,073 | 2,001,377 | 1,824,472 |
| Total liabilities and stockholder's equity | 2,646,544 | 3,873,722 | 9,744,461 | 14,096,652 | 15,368,045 | 20,592,664 | 22,065,074 | 22,013,768 |
| **Memo Items:** | | | | | | | | |
| Stockholder's equity to total assets | 11.9% | 11.9% | 7.3% | 8.1% | 10.3% | 9.6% | 9.1% | 8.3% |

(1) GMAC Bank Financial Statements for the Years Ended December 31, 2004 and 2003, at 2, 11-12 [BON0035660].
(2) GMAC Bank Financial Statements for the Years Ended December 31, 2005 and 2004, at 1, 11-12 [EXAM0025849].
(3) September 30, 2006 GMAC Bank call report. The call report provided less detail than sources utilized for other periods in this schedule. HFS loans are included in finance receivables and loans.
(4) GMAC Bank Consolidated Financial Review, dated Jan. 25, 2007, at ALLY_PEO_0006664 [ALLY_PEO_0006664].
(5) GMAC Bank 2008 Mid-Year Forecast Variance vs. Business Plan Review, dated Aug. 20, 2008, at ALLY_PEO_0007258 [ALLY_PEO_0007227].
(6) GMAC Bank 2008-2011 Business Plan Review, dated Mar. 17, 2009, at ALLY_PEO_0007939 [ALLY_PEO_0007787].

Appendix V.A.2.a, Page 2 of 4

Appendix V.A.2.a, Page 3 of 4

**Ally Bank Transactions: Reasonably Equivalent Value**
**Historical Financial Statements**
**Income Statements**
2003 – 2008
*($ in Thousands)*

| | Mortgage Bank | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Old GMAC Bank | | | | | Mortgage Division of Ally Bank | | |
| | 12 months ended 12/31/2003 (1) | 12 months ended 12/31/2004 (2) | 12 months ended 12/31/2005 (2) | LTM 9/30/2006 (3) | 12 months ended 12/31/2006 (4) | 12 months ended 12/31/2007 (5) | LTM 3/31/2008 (6) | 12 months ended 12/31/2008 (7) |
| **Revenue** | | | | | | | | |
| Total interest income | $ 117,996 | $ 171,221 | $ 366,100 | $ 717,284 | $ 800,132 | $ 1,075,721 | $ 1,128,312 | $ 1,148,570 |
| Interest and discount expense | 18,357 | 34,003 | 163,761 | 425,698 | 509,575 | 715,861 | 758,104 | 861,471 |
| Net financing revenue before provision for credit losses | 99,639 | 137,218 | 202,339 | 291,586 | 290,557 | 359,860 | 370,208 | 287,099 |
| Gain (loss) on sale of loans | 41,137 | 65,748 | 63,671 | | - | 49,731 | 32,362 | (2,581) |
| Origination fees | 30,045 | 19,892 | 24,837 | | - | 42,391 | 39,497 | 33,563 |
| Other income | 1,593 | 8,978 | 21,560 | 169,197 | 178,228 | 49,618 | 50,850 | 87,792 |
| Total non-interest income | 72,775 | 94,618 | 110,068 | 169,197 | 178,228 | 141,740 | 122,709 | 118,774 |
| Total net revenue before provision for credit losses | 172,414 | 231,836 | 312,407 | 460,783 | 468,785 | 501,600 | 492,917 | 405,873 |
| Provision for credit losses | 1,806 | 877 | 5,306 | 10,606 | 16,748 | 85,486 | 112,697 | 524,254 |
| **Expenses** | | | | | | | | |
| Compensation and benefits expense | 37,217 | 45,472 | 55,798 | 64,239 | 62,266 | 56,342 | 57,341 | 58,834 |
| Other operating expense | 26,533 | 29,631 | 33,214 | 62,648 | 48,767 | 51,881 | 53,566 | 64,412 |
| Total non-interest expense | 63,750 | 75,103 | 89,012 | 126,887 | 111,033 | 108,223 | 110,907 | 123,246 |
| Income before income tax expense | 106,858 | 155,856 | 218,089 | 323,290 | 341,004 | 307,891 | 269,313 | (241,627) |
| Income tax expense / (benefit) | 44,815 | 65,073 | 90,287 | 121,465 | 125,470 | 110,484 | 97,388 | (90,754) |
| Net income (loss) | $ 62,043 | $ 90,783 | $ 127,802 | $ 201,825 | $ 215,534 | $ 197,407 | $ 171,925 | $ (150,873) |

(1) *GMAC Bank Financial Statements for the Years Ended December 31, 2004 and 2003, at 3 [RC0035600].*

(2) *GMAC Bank Financial Statements for the Years Ended December 31, 2005 and 2004, at 2 [EXA000125849].*

(3) *See National Motors Bank FSB, FDIC, Call Report (Mar. 31, 2005); National Motors Bank FSB, FDIC, Call Report (June 30, 2005); National Motors Bank FSB, FDIC, Call Report (Sep. 30, 2005); National Motors Bank FSB, FDIC, Call Report (Dec. 31, 2005); National Motors Bank FSB, FDIC, Call Report (Mar. 31, 2006); National Motors Bank FSB, FDIC, Call Report (June 30, 2006); National Motors Bank FSB, FDIC, Call Report (Sep. 30, 2006). http://www2.fdic.gov/idasp/confirmation_outside.asp?inCert1=35054.*

(4) *GMAC Bank Consolidated Financial Review, dated Jan. 25, 2007, at ALLY_PEO_0006859 [ALLY_PEO_0006664].*

(5) *GMAC Bank 2008 Mid-Year Forecast Variance vs. Business Plan Review, dated Aug. 20, 2008, at ALLY_PEO_0007259 [ALLY_PEO_0007227].*

(6) *See GMAC Bank 2007 4th - Quarter Forecast Variance vs. Business Plan Review, dated Nov. 20, 2007, at ALLY_PEO_0006201 [ALLY_PEO_0006616]; GMAC Bank 2008 Mid-Year Forecast Variance vs. Business Plan Review, dated Aug. 20, 2008, at ALLY_PEO_0007259 [ALLY_PEO_0007227].*

(7) *GMAC Bank 2009-2011 Business Plan Review, dated Mar. 17, 2009, at ALLY_PEO_0007940 [ALLY_PEO_0007887].*

Appendix V.A.2.a, Page 3 of 4

Appendix V.A.2.a, Page 4 of 4

**Ally Bank Transactions: Reasonably Equivalent Value**
**HFI Delinquency Trends**
April 2006 – February 2009



D30+ — Delinquent 30 or more days, foreclosures, and other real estate owned

Non-Performing Assets — Delinquent 90 or more days, foreclosures, and other real estate owned

[1] GMAC Bank Mortgage Operation Credit Review, dated Apr. 30, 2007, at EXAMII1415755 [EXAMII1415741]; GMAC Mortgage Division Credit Review, dated Oct. 31, 2007, at ALLY_PEO_0006249 [ALLY_PEO_0006161]; GMAC Bank Consolidated Financial Review, dated Aug. 20, 2008, at ALLY_PEO_0007247 [ALLY_PEO_0007227]; GMAC Bank Consolidated Financial Review, dated Mar. 17, 2009, at ALLY_PEO_0007920 [ALLY_PEO_0007887].

Appendix V.A.2.a, Page 4 of 4

**Appendix V.A.2.b,** Page 1 of 15

**Ally Bank Transactions: Reasonably Equivalent Value**
**2006 Bank Restructuring**
**Value Summary**
As of November 22, 2006
*($ in Millions)*

| Value Transferred from ResCap | Appendix Reference | Fair Market Value Low | Fair Market Value High | Weighting |
|---|---|---|---|---|
| Market Approach: Guideline Publicly Traded Company Method | V.A.2.b, at 2 | $ 1,691.7 | $ 2,125.5 | 50.0% |
| Market Approach: Guideline M&A Method | V.A.2.b, at 11 | 2,689.9 | 2,848.8 | 0.0% |
| Income Approach: DCF Method | V.A.2.b, at 13 | 1,667.8 | 1,965.3 | 50.0% |
| Asset-Based Approach: Adjusted Book Value Method | V.A.2.b, at 15 | 1,192.2 | 1,192.2 | 0.0% |
| Equity value of Old GMAC Bank (marketable, controlling) | | 1,679.7 | 2,045.4 | |
| Equity value of Old GMAC Bank (marketable, controlling, rounded) | | 1,700.0 | 2,000.0 | |
| Private company discount | 5.0% | (85.0) | (100.0) | |
| Equity value of Old GMAC Bank (non-marketable, controlling) | | 1,615.0 | 1,900.0 | |
| Capital contribution to IB Finance | | 360.0 | 360.0 | |
| Total property transferred | | $ 1,975.0 | $ 2,260.0 | |
| **Value Received by ResCap** | | | | |
| Equity value of Old GMAC Bank before capital contribution (marketable, controlling) | | $ 1,700.0 | $ 2,000.0 | |
| Capital contribution to IB Finance | | 360.0 | 360.0 | |
| Value of IB Finance Class M Shares (marketable, controlling) | | 2,060.0 | 2,360.0 | |
| Discount for attributes of shares | 30.0% | (618.0) | (708.0) | |
| Value of IB Finance Class M Shares (non-marketable, non-controlling) | | 1,442.0 | 1,652.0 | |
| Cost savings to ResCap as a result of de-linking AFI's credit rating from GM [1] | | 142.7 | 142.7 | |
| Total property received | | $ 1,584.7 | $ 1,794.7 | |
| Value received by ResCap less value transferred from ResCap [2] | | $ (390.3) to | $ (465.3) | |

**Memo Item:**

| | | Low | High | |
|---|---|---|---|---|
| Value of IB Finance Class M Shares (non-marketable, controlling) less equity value of Old GMAC Bank (non-marketable, controlling) less capital contribution to IB Finance | | $ (533.0) | $ (608.0) | |

[1] The present value of management's estimated $250 million pre-tax annual cost savings discounted over one year (after-tax) using mid-period convention (1 / (1 + discount rate) ^ 0.5).
[2] The low end of the range of value for property transferred is paired with the low end of the range of value for property received (with a similar pairing of the respective high ends) in order to maintain consistency between the economic assumptions associated with the respective ranges.
Source: Appendix V.A.2.b, at 2, 11, 13, 15.

Appendix V.A.2.b, Page 1 of 15

**Ally Bank Transactions: Reasonably Equivalent Value**
**2006 Bank Restructuring**
**Guideline Publicly Traded Company Method Summary**
As of November 22, 2006
*($ in Millions)*

| | Old GMAC Bank Financial Metric | Multiple Range [1] | | Range of Value Low | High | Weighting |
|---|---|---|---|---|---|---|
| Forward P/E | $ 238.6 [2] | 8.0x | 10.0x | $ 1,908.8 | $ 2,386.0 | |
| Less capital contribution to IB Finance | | | | (360.0) | (360.0) | |
| Value before capital contribution to IB Finance | | | | 1,548.8 | 2,026.0 | 25.0% |
| LTM P/E | 201.8 [3] | 9.0x | 11.0x | 1,816.4 | 2,220.1 | 25.0% |
| P/TBVE | 1,161.0 [4] | 1.2x | 1.5x | 1,393.2 | 1,741.5 | 50.0% |
| Equity value of Old GMAC Bank (marketable, minority) | | | | 1,537.9 | 1,932.3 | |
| Control premium | | | 10% | 153.8 | 193.2 | |
| Equity value of Old GMAC Bank (marketable, controlling) | | | | $ 1,691.7 | $ 2,125.5 | |

[1] Refer to Appendix V.A.2.b, at 3 for multiples of guideline public companies and Section V.A.2.b(1)(c) for a discussion of the selection of multiples.

[2] GMAC Bank Consolidated Financial Review, dated Jan. 25, 2007, at ALLY_PEO_0006859 [ALLY_PEO_0006664].

[3] See National Motors Bank FSB, FDIC, Call Report (Mar. 31, 2005); National Motors Bank FSB, FDIC, Call Report (June 30, 2005); National Motors Bank FSB, FDIC, Call Report (Sep. 30, 2005); National Motors Bank FSB, FDIC, Call Report (Dec. 31, 2005); National Motors Bank FSB, FDIC, Call Report (Mar. 31, 2006); National Motors Bank FSB, FDIC, Call Report (June 30, 2006); National Motors Bank FSB, FDIC, Call Report (Sep. 30, 2006); http://www2.fdic.gov/idasp/confirmation_outside.asp?inCert1=35054.

[4] Residential Capital Corporation, Current Report (Form 8-K) (Nov. 20, 2006), at 2.

**Alt Bank Transactions: Reasonably Equivalent Value**
**2006 Bank Restructuring**
**Guideline Publicly Traded Company Method Multiples**
As of November 22, 2006
($ in Millions)

| | [A] MVE | [B] TBVE | [C] LTM Earnings | [D] Forward Earnings | [E] = [A] / [B] P/TBVE | [F] = [A] / [C] LTM P/E | [G] = [A] / [D] Forward P/E |
|---|---|---|---|---|---|---|---|
| Old GMAC Bank | N/A | $ 1,161.0 | $ 201.8 | $ 238.6 | N/A | N/A | N/A |
| Guideline Publicly Traded Companies | | | | | | | |
| Astoria Financial Corporation | $ 2,776.6 | $ 1,076.0 | $ 195.5 | $ 148.0 | 2.6x | 14.2x | 18.8x |
| BankUnited Financial Corporation | 968.0 | 725.3 | 83.9 | 106.4 | 1.3x | 11.5x | 9.1x |
| Capitol Federal Financial, Inc. | 2,789.5 | 863.2 | 48.1 | 47.0 | 3.2x | 58.0x | 59.4x |
| Downey Financial Corp. | 2,070.7 | 1,352.2 | 193.4 | 208.9 | 1.5x | 10.7x | 9.9x |
| FirstFed Financial Corp. | 1,108.1 | 667.7 | 123.7 | 133.1 | 1.7x | 9.0x | 8.3x |
| Flagstar Bancorp Inc. | 963.4 | 815.0 | 91.1 | 79.9 | 1.2x | 10.6x | 12.1x |
| Franklin Bank Corp. | 462.0 | 192.7 | 24.3 | 37.2 | 2.4x | 19.1x | 12.4x |
| Hudson City Bancorp, Inc. | 7,076.4 | 4,841.7 | 294.2 | 325.8 | 1.5x | 24.1x | 21.7x |
| Investors Bancorp Inc. | 1,743.0 | 915.1 | 13.4 | 17.0 | 1.9x | 130.0x | 102.5x |
| MAF Bancorp Inc. | 1,456.4 | 650.9 | 102.6 | 101.4 | 2.2x | 14.2x | 14.4x |
| NewAlliance Bancshares, Inc. | 1,626.8 | 848.4 | 49.6 | 71.3 | 1.9x | 32.8x | 22.8x |
| Northwest Bancorp, Inc. | 1,389.1 | 446.2 | 56.0 | 52.4 | 3.1x | 24.8x | 26.5x |
| Washington Federal Inc. | 2,039.2 | 1,206.5 | 143.1 | 152.8 | 1.7x | 14.3x | 13.3x |
| | | | | Mean [1] | 2.0x | 16.8x | 15.4x |
| | | | | Median [1] | 1.9x | 14.2x | 13.3x |

[1] LTM P/E and Forward P/E multiples greater than 50x were excluded from the mean and median.

Source: Bloomberg; Guideline company projections per Thomson Reuters SMIntelligence; Astoria Financial Corporation, Annual Report (Form 10-K) (Nov. 7, 2006), at 2-3, 41; Astoria Financial Corporation, Annual Report (Form 10-K) (Mar. 10, 2006), at 81; Astoria Financial Corporation, Annual Report (Form 10-Q) (Nov. 4, 2005), at 3; BankUnited Financial Corporation, Annual Report (Form 10-K) (Dec. 14, 2006), at 45, 67-68; Capitol Federal Financial, Inc., Annual Report (Form 10-K) (Dec. 14, 2006), at 16, 44-46; Downey Financial Corp., Quarterly Report (Form 10-Q) (Nov. 1, 2005), at 2; FirstFed Financial Corp., Quarterly Report (Form 10-Q) (Nov. 8, 2006), Quarterly Report (Form 10-Q) (Nov. 1, 2006), at 1-2, 45; Downey Financial Corp., Annual Report (Form 10-K) (Mar. 1, 2006), at 75; Downey Financial Corp., Quarterly Report (Form 10-Q) (Nov. 1, 2005), at 2; FirstFed Financial Corp., Quarterly Report (Form 10-Q) (Nov. 8, 2006), at 1, 3-4, 23; FirstFed Financial Corp., Annual Report (Form 10-K) (Mar. 15, 2006), at 44; FirstFed Financial Corp., Quarterly Report (Form 10-Q) (Nov. 10, 2005), at 4; Flagstar Bancorp Inc., Quarterly Report (Form 10-Q) (Nov. 9, 2006), at 1-2, 5, 15; Franklin Bank Corp., Quarterly Report (Form 10-Q) (Nov. 10, 2006), at 2-3, 15; Franklin Bank Corp., Annual Report (Form 14, 2006), at 70; Franklin Bank Corp., Quarterly Report (Form 10-Q) (Nov. 9, 2005), at 2; Hudson City Bancorp, Inc., Quarterly Report (Form 10-Q) (Nov. 8, 2006), at 4-5, 38; Hudson City Bancorp, Inc., Annual Report (Form 10-K) (Mar. 16, 2006), at 96, 119; Hudson City Bancorp, Inc., Quarterly Report (Form 10-Q) (Nov. 9, 2005), at 5; Investors Bancorp Inc., Quarterly Report (Form 10-Q) (Nov. 9, 2006), at 1-2, 12; Investors Bancorp Inc., Annual Report (Form 10-K) (Sep. 13, 2006), at 56; Investors Bancorp Inc., Quarterly Report (Form 10-Q) (Nov. 14, 2005), at 2; MAF Bancorp Inc., Quarterly Report (Form 10-Q) (Nov. 9, 2006), at 1, 3-4, 9, 30; MAF Bancorp Inc., Annual Report (Form 10-K) (Mar. 15, 2006), at 58; MAF Bancorp Inc., Quarterly Report (Form 10-Q) (Nov. 3, 2005), at 4; NewAlliance Bancshares, Inc., Quarterly Report (Form 10-Q) (Nov. 9, 2006), at 1, (Nov. 6, 2006), at 1, 3-4, 14, 17, 19, 35; NewAlliance Bancshares, Inc., Annual Report (Form 10-K) (Feb. 28, 2006), at 51; NewAlliance Bancshares, Inc., Quarterly Report (Form 10-Q) (Nov. 3, 2005), at 4; Northwest Bancorp, Inc., Quarterly Report (Form 10-Q) (Nov. 9, 2006), at 1, 3-4, 17; Northwest Bancorp, Inc., Annual Report (Form 10-K) (Mar. 15, 2006), at 54; Northwest Bancorp, Inc., Quarterly Report (Form 10-Q) (Nov. 10, 2005), at 2; Washington Federal Inc., Annual Report (Form 10-K) (Nov. 22, 2006), at 1, 5, 10-11.

**Appendix V.A.2.b, Page 4 of 15**

**Ally Bank Transactions: Reasonably Equivalent Value**
**2006 Bank Restructuring**
**Guideline Publicly Traded Company Method Ratios and Financial Information**
As of November 22, 2006
*($ in Millions)*

| | [A] Barra Predicted Beta | [B] Total Assets | [C] Non-Performing Assets | [D] LTM Earnings | [E] Book Value of Equity | [F] = [C] / [E] Non-Performing Assets/Book Value of Equity | [G] = [D] / [E] ROE |
|---|---|---|---|---|---|---|---|
| Old GMAC Bank | N/A | $ 14,096.7 | $ 29.7 | $ 201.8 | $ 1,161.0 | 2.6% | 17.4% |
| **Guideline Publicly Traded Companies** | | | | | | | |
| Astoria Financial Corporation | 0.70 | $ 21,599.1 | $ 55.5 | $ 195.5 | $ 1,261.2 | 4.4% | 15.5% |
| BankUnited Financial Corporation | 0.86 | 13,570.9 | 21.5 | 83.9 | 753.7 | 2.8% | 11.1% |
| Capitol Federal Financial, Inc. | 0.54 | 8,199.1 | 8.0 | 48.1 | 863.2 | 0.9% | 5.6% |
| Downey Financial Corp. | 0.88 | 16,982.8 | 66.5 | 193.4 | 1,352.2 | 4.9% | 14.3% |
| FirstFed Financial Corp. | 0.87 | 10,076.2 | 11.1 | 123.7 | 667.7 | 1.7% | 18.5% |
| Flagstar Bancorp Inc. | 0.59 | 15,120.0 | 158.8 | 91.1 | 815.0 | 19.5% | 11.2% |
| Franklin Bank Corp. | 0.57 | 5,173.2 | 33.9 | 24.3 | 349.7 | 9.7% | 6.9% |
| Hudson City Bancorp, Inc. | 0.90 | 33,638.0 | 26.5 | 294.2 | 5,002.2 | 0.5% | 5.9% |
| Investors Bancorp Inc. | 0.78 | 5,626.7 | 3.7 | 13.4 | 915.1 | 0.4% | 1.5% |
| MAF Bancorp Inc. | 0.50 | 11,464.8 | 52.3 | 102.6 | 1,059.2 | 4.9% | 9.7% |
| NewAlliance Bancshares, Inc. | 0.82 | 7,198.6 | 10.8 | 49.6 | 1,354.1 | 0.8% | 3.7% |
| Northwest Bancorp, Inc. | 0.73 | 6,543.2 | 50.9 | 56.0 | 612.4 | 8.3% | 9.1% |
| Washington Federal Inc. | 0.57 | 9,069.0 | 7.7 | 143.1 | 1,262.7 | 0.6% | 11.3% |
| | | | | | Mean | 4.6% | 9.6% |
| | | | | | Median | 2.8% | 9.7% |

Source: Bloomberg; MSCI Barra; National Motors Bank FSB, FDIC, Call Report (Mar. 31, 2005); National Motors Bank FSB, FDIC, Call Report (June 30, 2005); National Motors Bank FSB, FDIC, Call Report (Sept. 30, 2005); National Motors Bank FSB, FDIC, Call Report (Dec. 31, 2005); National Motors Bank FSB, FDIC, Call Report (Mar. 31, 2006); National Motors Bank FSB, FDIC, Call Report (June 30, 2006); National Motors Bank FSB, FDIC, Call Report (Sep. 30, 2006), http://www2.fdic.gov/idasp/confirmation_outside.asp?inCert1=35916; GMAC Consolidated Financial Review, dated Jan. 25, 2007, at ALLY_PEO_00006846, 59 [1413_PEO_00006846]; GMAC Bank Mortgage Operation Credit Review, dated Apr. 30, 2007, at EXAM1415759 [EXAM1415741]; Astoria Financial Corporation, Quarterly Report (Form 10-Q) (Nov. 4, 2005), at 3; BankUnited Financial Corporation, Annual Report (Form 10-K) (Nov. 1, 2006), at 81; Astoria Financial Corporation, Annual Report (Form 10-K) (Dec. 14, 2006), at 3, 41; Astoria Financial Corporation, Annual Report (Form 10-K) (Dec. 14, 2006), at 18, 44-46; Downey Financial, Inc., Annual Report (Form 10-K) (Dec. 1, 2005), at 2; FirstFed Financial Corp., Quarterly Report (Form 10-Q) (Nov. 3, 2006), at 1, 3-4, 23; FirstFed Financial Corp., Annual Report (Form 10-K) (Mar. 15, 2006), at 44; FirstFed Financial Corp., Annual Report (Form 10-K) (Nov. 8, 2005), at 4; Flagstar Bancorp Inc., Quarterly Report (Form 10-Q) (Nov. 1, 2006), at 4-5; Flagstar Bancorp Inc., Annual Report (Form 10-K) (Mar. 16, 2006), at 55; Flagstar Bancorp Inc., Quarterly Report (Form 10-Q) (Nov. 10, 2005), at 4; Franklin Bank Corp., Quarterly Report (Form 10-Q) (Nov. 9, 2006), at 1-2, 5, 15; Franklin Bank Corp., Annual Report (Form 10-K) (Mar. 14, 2006), at 70; Franklin Bank Corp., Quarterly Report (Form 10-Q) (Nov. 9, 2005), at 2; Hudson City Bancorp, Inc., Annual Report (Form 10-K) (Mar. 1, 2006), at 96, 119; Hudson City Bancorp, Inc., Quarterly Report (Form 10-Q) (Nov. 9, 2005), at 5; Investors Bancorp Inc., Quarterly Report (Form 10-Q) (Nov. 9, 2006), at 1-2; Investors Bancorp Inc., Annual Report (Form 10-K) (Sep. 15, 2006), at 56; Investors Bancorp Inc., Annual Report (Form 10-K) (Nov. 14, 2005), at 2; MAF Bancorp Inc., Quarterly Report (Form 10-Q) (Nov. 9, 2006), at 1, 3-4, 9, 30; MAF Bancorp Inc., Annual Report (Form 10-K) (Feb. 28, 2006), at 51; NewAlliance Bancshares, Inc., Quarterly Report (Form 10-Q) (Nov. 4, 2005), at 4; NewAlliance Bancshares, Inc., Quarterly Report (Form 10-Q) (Nov. 9, 2005), at 4; Northwest Bancorp, Inc., Quarterly Report (Form 10-Q) (Nov. 9, 2006), at 1, 3-4, 17; Northwest Bancorp, Inc., Annual Report (Form 10-K) (Mar. 15, 2006), at 54; Northwest Bancorp, Inc., Quarterly Report (Form 10-Q) (May 10, 2005), at 2; Washington Federal Inc., Annual Report (Form 10-K) (Nov. 22, 2006), at 1, 5, 10-1.

Appendix V.A.2.b, Page 5 of 15

**Ally Bank Transactions: Reasonably Equivalent Value**
**Guideline Publicly Traded Company Business Descriptions**

| Company | Ally Bank Transactions Date [1] | Business Description [2] |
|---|---|---|
| **Astoria Financial Corporation** | 2006 and 2009 | Astoria Financial Corporation was headquartered in Lake Success, New York, and conducted operations primarily through its subsidiary Federal Savings and Loan Association. Its principle business was attracting retail deposits from the general public and investing those deposits, together with funds generated from operations, primarily in one-to-four-family mortgage loans, multi-family mortgage loans, commercial real estate loans and mortgage-backed securities. It also invested in construction loans, consumer and other loans, securities and other investments. Its results of operations were dependent primarily on its net interest income, its loan and securities portfolios, and the interest paid on its deposits and borrowings. Non-interest income included customer service fees; other loan fees; net gain on sales of securities; mortgage banking income; and other noninterest income. Astoria's one-to-four-family mortgage portfolio was comprised mostly of interest-only ARMs, but did not include option ARMs or loans with negative amortization features. Most of its lending portfolio was originated with full documentation. |
| **BankUnited Financial Corporation** | 2006 and 2009 | BankUnited Financial Corporation was headquartered in Florida, and conducted operations primarily through its subsidiary, BankUnited, FSB, which was founded in 1984 and was the largest banking institution headquartered in Florida based on assets. It offered a full spectrum of consumer and commercial banking products and services to consumers and businesses located primarily in Florida. Its revenues consisted mainly of interest earned on loans and investments and fees received for its financial services and products. Its expenses consist primarily of interest paid on deposits and borrowings and expenses incurred in providing services and products. It operated seventy-five full service branches in Florida, three loan production offices in Florida and five outside of Florida, and an extensive wholesale network for originating loans through mortgage broker relationships. Most of its mortgage loan portfolio was comprised of interest option ARM products. |
| **Capitol Federal Financial, Inc.** | 2006 and 2009 | Capitol Federal Financial, Inc. was headquartered in Kansas, and was a federally chartered mid-tier mutual holding company incorporated in March 1999. It conducted operations primarily through its subsidiary Capitol Federal Savings Bank. It operated through twenty-nine traditional and nine in-store banking offices located in Kansas. Its primary source of funds was deposits from the general public and it invested primarily in permanent loans secured by first mortgages on owner-occupied, one-to-four-family residences. It also originated consumer loans, loans secured by first mortgages on non-owner-occupied one-to-four-family residences, permanent and construction loans secured by one-to-four-family residences, commercial real estate loans and multi-family real estate loans. Its results of operations depended primarily on net interest income. Its mortgage portfolio was 100% fully documented, and consisted mostly of fixed-rate mortgages. |
| **Downey Financial Corp.** | 2006 | Downey Financial Corporation was headquartered in California and conducted operations primarily through Downey Federal Savings Bank, a federally-chartered savings and loan association formed in 1957. Downey conducted its business primarily through 172 retail deposit branches, including 91 full-service, in-store branches. Its banking activities focused on: attracting funds from the general public and institutions and obtaining borrowings; originating and investing in loans, primarily residential real estate mortgage loans, investment securities and mortgage-backed securities; and originating and selling loans to investors in the secondary markets. Downey's loan portfolio was concentrated in California, and was comprised predominantly of loans subject to negative amortization, most of which had been originated without full documentation. |
| **FirstFed Financial Corp.** | 2006 and 2009 | FirstFed Financial Corp. was headquartered in California, and conducted operations primarily through its subsidiary First Federal Bank of California. Its principle business was attracting deposits from the general public, and using such deposits, together with borrowings and other funds, to make real estate, business and consumer loans. Its revenue was derived principally from interest and fees on loans, interest on investments and gains on loan sales. Its major items of expense were interest on deposits and borrowings, and general and administrative expense. It operated thirty-two full-service banking branches, all located in Southern California. It also operated six lending offices located in both Southern and Northern California, a call center which conducted transactions with deposit and loan clients by telephone, and an internet website through which clients could open accounts, transfer funds or pay bills. It was a major provider of interest option ARM products. Most of its mortgage loans lacked full documentation. |

[1] Ally Bank Transactions year in which the guideline company was considered in the Examiner's Financial Advisors' analyses.

[2] For the guideline companies considered in the 2006 Bank Restructuring and the 2009 Bank Transaction, the business description describes the companies as of 2006. For those companies only considered as of either 2006 or 2009, the description is reflective of the business at that time. Sources: Astoria Financial Corporation, Annual Report, (Form 10-K) (June 1, 2007); BankUnited Financial Corporation, Annual Report, (Form 10-K) (Dec. 14, 2006); Capitol Federal Financial, Inc., Annual Report (Form 10-K) (Dec. 14, 2006); Downey Financial Corp., Annual Report (Form 10-K) (Mar. 1, 2007); FirstFed Financial Corp., Annual Report (Form 10-K) (Mar. 1, 2007).

Appendix V.A.2.b, Page 5 of 15

**Appendix V.A.2.b,** Page 6 of 15

**Ally Bank Transactions: Reasonably Equivalent Value**
**Guideline Publicly Traded Company Business Descriptions**

| Company | Ally Bank Transactions Date [1] | Business Description [2] |
|---|---|---|
| **Flagstar Bancorp** | 2006 and 2009 | Flagstar Bancorp was headquartered in Michigan, and conducted operations primarily through its subsidiary Flagstar Bank, FSB. It was the largest publicly held savings bank in the Midwest and the seventeenth largest savings bank in the United States. It operated 151 banking centers located in Michigan, Indiana and Georgia (of which 41 are located in retail stores such as Wal-Mart) and 76 home loan centers located in twenty states. Its earnings were from its retail banking activities, which generate net interest income, and non-interest income from sales of residential mortgage loans to the secondary market, the servicing of loans for others, the sale of servicing rights related to mortgage loans serviced and fee-based services provided to its customers. Approximately 96% of its total loan production during 2006 represented mortgage loans and home equity lines of credit that were secured by first or second mortgages on single-family residences. |
| **Franklin Bank Corp.** | 2006 | Franklin Bank Corp. was headquartered in Texas, and conducted operations primarily through its subsidiary Franklin Bank, S.S.B., a Texas state savings bank. It provided community banking products and services and commercial banking services to corporations and other business clients and originate single family residential mortgage loans. It conducted business at thirty-eight banking offices in Texas, seven regional commercial lending offices in Florida, Arizona, Michigan, Pennsylvania, Colorado, California, Washington D.C., and mortgage origination offices in nineteen states throughout the United States. Franklin Bank grew rapidly after 2001, and over 80% of its single family mortgage portfolio was originated after 2003. It relied on FHLB advances and brokered deposits for most of its funding. |
| **Hudson City Bancorp** | 2006 and 2009 | Hudson City Bancorp was headquartered in New Jersey and conducted operations primarily through its only subsidiary, Hudson City Savings Bank, a federally-chartered savings bank that began operations in 1868. In July 2006, it completed the acquisition of Sound Federal Bancorp, Inc., which operated banking branches in New York and Connecticut. It offered traditional thrift products such as conforming one-to-four-family residential mortgages, certificates of deposit, and passbook savings accounts. Its portfolio was comprised primarily of fixed rate mortgages, with no option ARMs or negative amortization products. A major product line was jumbo mortgage lending to higher-income customers. Its revenues were derived principally from interest on its mortgage loans and mortgage-backed securities and interest and dividends on its investment securities. Its primary sources of funds were customer deposits and other borrowings. |
| **Investors Bancorp, Inc.** | 2006 and 2009 | Investors Bancorp, Inc. was headquartered in New Jersey, and conducted operations primarily through its subsidiary Investors Savings Bank, a New Jersey-chartered savings bank founded in 1926. It conducted business from its main office located in Short Hills, New Jersey, and its forty-six branch offices located in New Jersey. Its primary business was attracting deposits from the public through its branch network and borrowing funds in the wholesale markets to originate loans and to invest in securities. It originated mortgage loans secured by one-to-four family residential real estate and consumer loans, the majority of which were home equity loans and home equity lines of credit. Its lending activities also included commercial real estate, construction and multi-family loans. A large portion of its assets were securities, primarily U.S. Government and Federal Agency obligations, mortgage-backed and other securities. |
| **MAF Bancorp, Inc.** | 2006 | MAF Bancorp, Inc. was headquartered in Illinois, and conducted operations primarily through its subsidiary Mid America Bank, FSB. It had operated in the Chicago area since 1922. Over the five year period ending 2006, the Bank had grown from thirty-two branches to eighty-two branches. The Bank was one of the largest community-oriented financial institutions in the Chicago and Milwaukee metropolitan areas, serving both retail and business banking customers. It also engaged in residential real estate land development. |

[1] *Ally Bank Transactions year in which the guideline company was considered in the Examiner's Financial Advisors' analyses.*

[2] *For the guideline companies considered in the 2006 Bank Restructuring and the 2009 Bank Transaction, the business description describes the companies as of 2006. For those companies only considered as of either 2006 or 2009, the description is reflective of the business at that time. Sources: Franklin Bank Corp., Annual Report (Form 10-K) (Mar. 14, 2007); Flagstar Bancorp, Inc., Annual Report (Form 10-K) (Mar.1, 2007); Investors Bancorp, Annual Report (Form 10-K) (Mar. 1, 2007); Hudson City Bancorp, Annual Report (Form 10-K) (Sep. 15, 2006); MAF Bancorp, Annual Report (Form 10-K) (Mar. 1, 2007).*

**Ally Bank Transactions: Reasonably Equivalent Value**
**Guideline Publicly Traded Company Business Descriptions**

| Company | Ally Bank Transactions Date [1] | Business Description [2] |
|---|---|---|
| NewAlliance Bancshares, Inc. | 2006 and 2009 | NewAlliance Bancshares, Inc. was headquartered in Connecticut, and conducted operations primarily through its subsidiary NewAlliance Bank. It operated seventy-two banking offices providing a full range of banking services to customers located in Southwestern, Central, South Central, and Southeastern Connecticut. Its funding came primarily from deposits from the general public and businesses in the communities and surrounding towns served by its branch network. It originated and purchased residential real estate loans, consumer loans (primarily home equity loans and lines of credit), commercial loans and commercial real estate loans. It retained in its portfolio loans that it originated and purchased except for fixed rate residential loans scheduled to amortize over more than fifteen years, which were generally sold in the secondary market with servicing rights retained. It also invested in mortgage-backed and debt securities and other permissible investments. Its results of operations depended primarily on net interest income. |
| Northwest Bancorp, Inc. | 2006 | Northwest Bancorp, Inc. was headquartered in Pennsylvania, and was the holding company of Northwest Savings Bank. As of December 31, 2006, it operated 160 community-banking offices throughout its market area in northwest, southwest and central Pennsylvania, western New York, eastern Ohio, Maryland, and Florida. It operated forty-nine consumer-lending offices throughout Pennsylvania and two consumer lending offices in New York. Its primary lending activity was the origination of loans secured by first mortgages on owner-occupied, one-to-four-family residences. It also made consumer and commercial loans. Its primary source of funds was deposits. Its results of operations depended primarily on interest income. |
| TFS Financial Corporation | 2009 | TFS Financial Corporation was headquartered in Ohio, and was the holding company for Third Federal Savings and Loan Association of Cleveland a federally chartered savings and loan association organized in 1938. It completed its initial public stock offering in April of 2007. It conducted its operations from its main office in Cleveland, Ohio, and from thirty-seven additional, full-service branches and eight loan production offices located throughout the states of Ohio and Florida, including twenty-three full-service offices in Ohio and fifteen in Florida. Its principle business consisted of originating residential real estate mortgage loans and equity loans and lines of credit and attracting retail savings deposits. It also originated residential construction loans. It attracted retail deposits from the general public in the areas surrounding its main office and its branch offices. It retained in its portfolio the majority of the loans that it originated, and retained the servicing rights on all loans that it sold. Its primary source of funds was deposits and operating results depended primarily on net interest income. |
| Washington Federal, Inc. | 2006 and 2009 | Washington Federal, Inc. was headquartered in Seattle, Washington, and was the holding company for Washington Federal Savings, a federally-chartered savings and loan association that began operations in 1917. It had 123 full service branches located in Washington, Oregon, Idaho, Arizona, Utah, Nevada, and Texas. Its business consisted primarily of attracting savings deposits from the general public and investing these funds in loans secured by first lien mortgages on single-family dwellings, including loans for the construction of such dwellings, and loans on multi-family dwellings. It also originated other types of loans for its portfolio and invested in United States government and agency obligations and other investments. It also engaged in real estate investment and insurance brokerage activities. |

[1] Ally Bank Transactions year in which the guideline company was considered in the Examiner's Financial Advisors' analyses.

[2] For the guideline companies considered in the 2006 Bank Restructuring and the 2009 Bank Transaction, the business description describes the companies as of 2006 except for TFS Financial Corporation which is only used in the 2009 Bank Transaction. For those companies only considered as of either 2006 or 2009, the description is reflective of the business at that time. Sources: NewAlliance Bancshares, Inc., Annual Report (Form 10-K) (Mar.1, 2007); Northwest Bancorp, Inc., Annual Report (Form 10-K) (Mar.14, 2007); TFS Financial Corporation, Annual Report (Form 10-K) (Nov. 23, 2009); Washington Federal, Inc., Annual Report (Form 10-K) (Nov. 22, 2006).

Appendix V.A.2.b, Page 8 of 15

Ally Bank Transactions: Reasonably Equivalent Value
2006 Bank Restructuring
Tier 1 Leverage Ratio Analysis
2006 – 2008

| Company Name | Banking Subsidiary | Tier 1 Capital as a % of Average Adjusted Total Assets [1] | | |
| --- | --- | --- | --- | --- |
| | | 9/30/2006 | 3/31/2008 | 12/31/2008 |
| Astoria Financial Corporation | Astoria Federal Savings and Loan Association | 6.8% | 6.7% | 6.4% |
| BankUnited Financial Corporation | BankUnited, FSB | 7.2% | 7.7% | (0.2%) |
| Capitol Federal Financial, Inc. | Capitol Federal Savings Bank | 9.5% | 9.8% | 9.9% |
| Downey Financial Corp. | Downey Savings and Loan Association | 8.5% | 8.4% | N/A |
| FirstFed Financial Corp. | First Federal Bank of California | 7.5% | 10.2% | 5.4% |
| Flagstar Bancorp Inc. | Flagstar Bank, FSB | 6.4% | 5.5% | 4.8% |
| Franklin Bank Corp. | Franklin Bank, S.S.B | 7.6% | N/A | N/A |
| Hudson City Bancorp, Inc. | Hudson City Savings Bank | 11.9% | 8.9% | 8.0% |
| Investors Bancorp Inc. | Investors Savings Bank | 11.9% | 12.0% | 9.0% |
| MAF Bancorp Inc. | Mid America Bank, FSB | 7.2% | N/A | N/A |
| NewAlliance Bancshares, Inc. | NewAlliance Bank | 10.1% | N/A | 9.5% |
| Northwest Bancorp, Inc. | Northwest Savings Bank | 8.4% | N/A | N/A |
| TFS Financial Corp. | Third Federal Savings and Loan Association of Cleveland | N/A | 13.2% | 12.1% |
| Washington Federal Inc. | Washington Federal Savings and Loan Association | 13.4% | 10.1% | 10.9% |
| | Mean | 9.0% | 9.3% | 7.6% |
| | Median | 8.4% | 9.3% | 8.5% |

[1] Tier 1 capital as a percent of average adjusted total assets from the FDIC call reports for September 30, 2006, March 31, 2008, and December 31, 2008 for the banking subsidiary of the guideline companies used for the Guideline Publicly Traded Company Method. N/A means the company did not meet the selection criteria for guideline companies as described in Section V.A.2.b(1)(a)(i) of the Report on the indicated date.
Source: http://www2.fdic.gov/idasp/main.asp

Appendix V.A.2.b, Page 8 of 15

**Ally Bank Transactions: Reasonably Equivalent Value**
**2006 Bank Restructuring**
**Control Premium Analysis**
2006 – 2008

| | 2006 | 2007 | 2008 |
|---|---|---|---|
| All industries (median) | 20.6% | 20.7% | 31.4% |
| Financial services (median) | 19.6% | 20.2% | 29.3% |
| Banking & credit agencies (median) | 25.0% | 27.0% | 30.3% |

**Savings Banks and Savings & Loans**

| Target | Closing Date | 2006 Premium |
|---|---|---|
| Cavalry Bancorp, Inc. | 03/16/06 | 29.6% |
| Union Community Bancorp | 03/20/06 | 56.4% |
| Northern Savings & Loan Co. | 06/27/06 | 31.7% |
| Golden West Financial Corp. | 10/02/06 | 9.6% |
| NewMil Bancorp, Inc. | 10/06/06 | 42.1% |
| Harbor Florida Bancshares, Inc. | 12/01/06 | 17.3% |
| FLAG Financial Corp. | 12/08/06 | 0.7% |
| Median | | 29.6% |

| Target | Closing Date | 2007 Premium |
|---|---|---|
| Fidelity Bankshares, Inc. | 01/08/07 | 9.2% |
| Pocahontas Bancorp, Inc. | 02/02/07 | 31.7% |
| First Federal Banc of the Southwest, Inc. | 02/13/07 | 42.1% |
| PSB Bancorp, Inc. | 04/02/07 | 51.0% |
| MAF Bancorp, Inc. | 09/04/07 | 33.6% |
| Synergy Financial Group, Inc | 10/01/07 | 7.9% |
| City Savings Financial Corp. | 10/12/07 | 60.0% |
| Median | | 33.6% |

| Target | Closing Date | 2008 Premium |
|---|---|---|
| KNBT Bancorp, Inc. | 02/01/08 | 24.1% |
| Great Lakes Bancorp, Inc. | 02/15/08 | 8.3% |
| MFB Corp. | 07/18/08 | 7.0% |
| MASSBANK Corp. | 09/03/08 | 4.7% |
| Willow Financial Bancorp, Inc | 12/05/08 | 14.6% |
| Median | | 8.3% |

*Source: Mergerstat Control Premium Study, 4th Quarter 2006, 2007, 2008.*

Ally Bank Transactions: Reasonably Equivalent Value
2006 Bank Restructuring
Restricted Stock Discount Analysis
1985 – 2009

| SIC | Company | Transaction Date | Transaction Discount |
|-----|---------|------------------|----------------------|
| 6035 | Freedom Savings & Loan Association | 08/01/85 | 23.9% |
| 6022 | Commerce Union Corporation | 03/01/86 | 6.7% |
| 6022 | First Colonial Bankshares Corp. | 06/01/86 | 13.4% |
| 6022 | KeyCorp | 04/01/88 | 38.0% |
| 6021 | Mark Twain Bancshares, Inc. | 07/01/88 | 3.2% |
| 6022 | First Regional Bancorp | 03/01/03 | 35.9% |
| 6021 | Community Bancorp Inc | 08/07/03 | 11.4% |
| 6022 | First Regional Bancorp | 03/25/04 | 84.6% |
| 6021 | Center Bancorp Inc | 09/29/04 | 5.5% |
| 6021 | Commonwealth Bankshares, Inc. | 10/14/04 | 3.6% |
| 6022 | Ameriserv Financial Inc | 12/01/04 | 11.4% |
| 6021 | Commonwealth Bankshares, Inc. | 06/27/05 | 4.7% |
| 6021 | Savannah Bancorp, Inc. (The) | 08/26/05 | 8.6% |
| 6022 | Convera Corp | 02/28/06 | 6.6% |
| 6035 | Broadway Financial Corporation | 05/22/06 | -8.7% |
| 6021 | Commonwealth Bankshares, Inc. | 10/26/06 | 3.0% |
| 6022 | State Bancorp, Inc. | 12/21/06 | 10.0% |
| 6021 | BNC Bancorp | 12/31/07 | 7.7% |
| 6035 | Harrington West Financial Group Inc. | 03/25/08 | -1.6% |
| 6022 | Monarch Financial Holdings, Inc. | 05/30/08 | 7.0% |
| 6022 | Western Alliance Bancorporation | 06/27/08 | 2.1% |
| 6021 | Pinnacle Financial Partners Inc. | 07/17/08 | 12.1% |
| 6022 | Texas Capital BancShares Inc. | 09/08/08 | 12.3% |
| 6022 | Smithtown Bancorp Inc. | 09/26/08 | 31.7% |
| 6022 | Western Alliance Bancorporation | 09/29/08 | 25.8% |
| 6022 | Washington Trust Bancorp Inc. | 10/02/08 | 23.8% |
| 6022 | SCBT Financial Corp. | 10/27/08 | 5.9% |
| 6021 | Pacific Continental Corporation | 01/07/09 | 9.6% |
| | Mean | | 14.2% |
| | Median | | 9.1% |
| | First Quartile | | 5.3% |
| | Third Quartile | | 16.0% |

Source: Summary of 28 transactions (1985–Jan. 2009) for Standard Industrial Classification 6021, 6022, and 6035 reported by FMV Restricted Stock database, available at www.BVResources.com.

Appendix V.A.2.b, Page 11 of 15

**Ally Bank Transactions: Reasonably Equivalent Value**
**2006 Bank Restructuring**
**Guideline M&A Method Summary**
As of November 22, 2006
*($ in Millions)*

| | Old GMAC Bank Financial Metric | Multiple Range [1] | | Range of Value | | Weighting |
|---|---|---|---|---|---|---|
| | | | | Low | High | |
| LTM P/E | $ 201.8 [2] | 14.0x | 15.0x | $ 2,825.6 | $ 3,027.4 | 50.0% |
| P/TBVE | 1,161.0 [3] | 2.2x | 2.3x | 2,554.2 | 2,670.3 | 50.0% |
| Equity value of Old GMAC Bank (marketable, controlling) | | | | $ 2,689.9 | $ 2,848.8 | |

[1] Refer to Appendix V.A.2.b, at 12 for multiples of guideline target companies and Section V.A.2.b(2)(c) of the Report for a discussion of the selection of multiples.

[2] See National Motors Bank FSB, FDIC, Call Report (Mar. 31, 2005); National Motors Bank FSB, FDIC, Call Report (June 30, 2005); National Motors Bank FSB, FDIC, Call Report (Sep. 30, 2005); National Motors Bank FSB, FDIC, Call Report (Dec. 31, 2005); National Motors Bank FSB, FDIC, Call Report (Mar. 31, 2006); National Motors Bank FSB, FDIC, Call Report (June 30, 2006); National Motors Bank FSB, FDIC, Call Report (Sep. 30, 2006), http://www2.fdic.gov/idasp/confirmation_outside.asp?inCert1=35054.

[3] Residential Capital Corporation, Current Report (Form 8-K) (Nov. 20, 2006), at 2.

Appendix V.A.2.b, Page 11 of 15

Appendix V.A.2.b, Page 12 of 15

**Ally Bank Transactions: Reasonably Equivalent Value**
**2006 Bank Restructuring**
**Guideline M&A Valuation Multiples**
As of November 22, 2006
*($ in Millions)*

| Closed Date | Announced Date | Target [1] | Acquirer | Percent Acquired | Target Equity Value [2] | Target LTM Earnings | Target TBVE [3] | Control Premium [4] | LTM P/E | P/TBVE |
|---|---|---|---|---|---|---|---|---|---|---|
| 10/1/2006 | 5/7/2006 | Golden West Financial Corp. [5] | Wachovia Corporation | 100.0% | $ 25,017 | $ 1,529 | $ 9,043 | 10% | 16.4x | 2.8x |
| 10/1/2006 | 4/23/2006 | Commercial Capital Bancorp, Inc. [6] | WMI Holdings Corp. | 100.0% | 954 | 65 | 326 | 13% | 14.7x | 2.9x |
| 6/1/2006 | 10/24/2005 | Independence Community Bank Corp. [7] | Santander Holdings USA, Inc. | 100.0% | 3,438 | 221 | 993 | 29% | 15.6x | 3.5x |
| 3/1/2006 | 9/12/2005 | Westcorp [8] | Wachovia Corp. | 100.0% | 3,352 | 236 | 1,462 | 17% | 14.2x | 2.3x |
| 12/2/2005 | 6/13/2005 | Commercial Federal Corp. [9] | The Bank of the West | 100.0% | 1,297 | 5 | 594 | 33% | 247.9x | 2.2x |
| | | | | | | | | Mean [10] | 15.2x | 2.7x |
| | | | | | | | | Median [10] | 15.1x | 2.8x |

[1] Transactions identified from Capital IQ. Capital IQ transaction screening criteria: transactions announced between Jan. 1, 2005 and Nov. 22, 2006, for companies operating in the savings institutions industry (Standard Industrial Classification 6035 and 6036) with total assets greater than $5 billion.

[2] Target equity value as of announced date.

[3] Target tangible book value of equity equals total common equity minus goodwill and other intangibles.

[4] Mergerstat, Control Premium Study: 3rd Quarter 2006, at 18; Mergerstat, Control Premium Study: 4th Quarter 2006, at 17–18.

[5] Golden West Financial Corporation, Current Report (Form 8-K) (May. 8, 2006); Golden West Financial Corporation, Quarterly Report (Form 10-Q) (May 9, 2006), at 4–5; Golden West Financial Corporation, Annual Report (Form 10-K) (Mar. 8, 2006), at F-3; Golden West Financial Corporation, Quarterly Report (Form 10-Q) (May 9, 2005), at 5.

[6] Commercial Capital Bancorp, Inc., Current Report (Form 8-K) (Apr. 25, 2006); Commercial Capital Bancorp, Inc., Quarterly Report (Form 10-Q) (May 10, 2006), at 3–4; Commercial Capital Bancorp, Inc., Annual Report (Form 10-K) (Mar. 16, 2006), at 83; Commercial Capital Bancorp, Inc., Quarterly Report (Form 10-Q) (May 10, 2005), at 2.

[7] Independence Community Bank Corp., Current Report (Form 8-K) (Oct. 25, 2005); Independence Community Bank Corp., Quarterly Report (Form 10-Q) (Nov. 4, 2005), at 2–3; Independence Community Bank Corp., Annual Report (Form 10-K) (Mar. 11, 2005), at 81; Independence Community Bank Corp., Quarterly Report (Form 10-Q) (Nov. 8, 2004), at 3.

[8] Westcorp, Current Report (Form 8-K) (Sep. 12, 2005); Bloomberg; Westcorp, Quarterly Report (Form 10-Q) (Aug. 9, 2005), at 2–3; Westcorp, Annual Report (Form 10-K) (Mar. 14, 2005), at F-6; Westcorp, Quarterly Report (Form 10-Q) (Aug. 9, 2004), at 3.

[9] Commercial Federal Corporation, Current Report (Form 8-K) (June 17, 2005); Commercial Federal Corporation, Quarterly Report (Form 10-Q) (May 6, 2005); Commercial Federal Corporation, Annual Report (Form 10-K) (Mar. 1, 2005); Commercial Federal Corporation, Quarterly Report (Form 10-Q) (May 3, 2004).

[10] LTM P/E multiples greater than 50x have been excluded from summary statistic calculations.

Appendix V.A.2.b, Page 12 of 15

**Ally Bank Transactions: Reasonably Equivalent Value**
**2006 Bank Restructuring**
**DCF Method**
As of November 22, 2006
*($ in Millions)*

**Notes:**

| Assumptions: | | |
|---|---|---|
| Discount rate (k) | 10.50% | See Appendix V.A.2.b, at 14 |
| Residual period assumptions: | | |
| Long-term growth rate (g) | 0.00% | Estimate by the Examiner's Financial Advisors |
| Net finance margin % of average loans plus securities | 2.50% | Based on management projection for 2007 |
| Normal provision % of HFI mortgage loans | 0.33% | Based on management projection for 2007 |
| Income tax rate | 40.00% | Estimated federal and state tax rate |
| Normalized equity [3] | 9.00% | See Section V.A.2.b(3)(d) of the Report for a discussion of normalization of equity |
| Years until normalization of equity (distribution of capital surplus) | 2.0 | See Section V.A.2.b(3)(d) of the Report for a discussion of normalization of equity |
| Interest expense as % of deposits plus borrowings (after tax) | 3.18% | Based on management projection for 2007 |

| | Projected [1] | |
|---|---|---|
| | Year One | Residual |
| **Balance Sheet Items** | | |
| HFI mortgage loans | $ 10,608.3 | $ 10,608.3 [2] |
| Loans plus securities | 15,990.3 | 15,990.3 [2] |
| Total assets | 16,909.3 | 16,909.3 [2] |
| Equity | 2,055.2 | |
| Normalized equity [3] | 1,521.8 | 1,521.8 [2] |
| Equity capital surplus | 533.4 | |
| **Income Statement and Cash Flows** | | |
| Net financing revenue | $ 373.9 | $ 399.5 [4] |
| Other income | 189.6 | 189.6 [2] |
| Net revenue | 563.5 | 589.1 |
| Provision for credit losses | (34.6) | (35.0) [5] |
| Non-interest expense | (141.0) | (141.0) [2] |
| Income tax expense | (149.4) | (165.2) |
| Net income | 238.6 | 247.8 |
| Less increase in equity | (467.3) | - |
| Cash flow | (228.7) | 247.8 |
| Capitalization rate (k-g) | | 10.5% |
| Cash flow | (228.7) | 2,360.3 |
| Present value factor [6] | 0.9513 | 0.9513 |
| Present value of cash flow | $ (217.6) | $ 2,245.4 |
| Sum of present value of cash flow | 2,027.8 | |
| Adjustment for November 22, 2006 capital contribution | (360.0) | |
| Equity value of Old GMAC Bank before adjustment for capital surplus | 1,667.8 | |
| Adjustment for capital surplus | 297.6 | |
| Equity value of Old GMAC Bank after adjustment for capital surplus | $ 1,965.3 | |
| **Adjustment for Capital Surplus** | | |
| Present value of projected equity capital surplus [7] | $ 436.8 | |
| Capitalization of interest on equity capital surplus [8] | (139.2) | |
| Adjustment for capital surplus | $ 297.6 | |

[1] *Projected balance sheet and income statement per GMAC Bank Consolidated Financial Review, dated Jan. 25, 2007, at ALLY_PEO_0006858 -.59 [ALLY_PEO_0006664]. Assumes management's projections for 2007 were reasonably forecastable for the first twelve months following the transaction date.*

[2] *Assumed to grow at long-term residual growth rate of zero percent beyond the first projected year.*

[3] *Normalized equity equals the assumed normal equity to asset ratio multiplied by projected total assets. For the normalized residual period, this balance is assumed to grow at the long-term growth rate.*

[4] *Residual net financing revenue equals the average of the beginning and ending balance of loans plus securities times net finance margin percentage.*

[5] *Provision for credit losses equals the average of the beginning and ending balance of HFI mortgage loans times the normal provision percentage.*

[6] *Present value factor employs mid-period convention.*

[7] *Present value discounted two years (the assumed number of years until the normalization of equity).*

[8] *Present value of interest expense as a percentage of deposits plus borrowings (after-tax) times projected equity capital surplus. This is discounted over the number of years until normalization of equity using mid-period discounting convention (assumes distribution is permitted to regulators).*

**Ally Bank Transactions: Reasonably Equivalent Value**
**2006 Bank Restructuring**
**Discount Rate Analysis**
2006 – 2009

| | 2006 Bank Restructuring | 2009 Bank Transaction | |
|---|---|---|---|
| | 11/22/06 | 01/30/09 | |
| **Calculation of MCAPM** [1] | | | |
| Risk-free rate [2] | 4.76% | 3.86% | [A] |
| Market risk premium | 5.00% | 6.50% | [B] |
| Beta [3] | 0.86 | 1.58 | [C] |
| CAPM | 9.07% | 14.12% | [D] = [A] + ([B] × [C]) |
| Size premium [4] | 1.49% | 1.99% | [E] |
| MCAPM | 10.56% | 16.10% | [F] = [D] + [E] |
| | | | |
| Equity discount rate used in DCF Method | 10.50% | 16.00% | |

[1] See section V.A.2.b(3)(a) of the Report for a discussion of the calculation of MCAPM.
[2] 20-year U.S. Treasury yield per Federal Reserve Board H.15 statistical release dated Nov. 29, 2006 and Feb. 2, 2009, for the 2006 Bank Restructuring and 2009 Bank Transaction, respectively.
[3] 75th percentile of guideline companies was selected. For 2006: see Appendix V.A.2.b, at 4. For 2009: see Appendix V.A.2.d, at 4.
[4] For 2006: 5th decile, Ibbotson Associates, SBBI: Valuation Edition 2006 Yearbook (2006). For 2009: Average of the 7th decile and 8th decile and 8th decile, Morningstar, Inc., Ibbotson SBBI: 2009 Valuation Yearbook (2009).

**Ally Bank Transactions: Reasonably Equivalent Value**
**2006 Bank Restructuring**
**Adjusted Book Value Method**
As of November 22, 2006
*($ in Thousands)*

| | Book Value [1] | Adjustments | Fair Market Value |
|---|---|---|---|
| **Assets** | | | |
| Cash and cash equivalents | $ 913,574 | $ - | $ 913,574 [2] |
| Investment securities | 22,028 | - | 22,028 [2] |
| Accounts receivable | 70,145 | - | 70,145 [2] |
| HFS mortgage loans, net | 1,079,501 | (58,517) | 1,020,984 [4] |
| Finance receivables and loans | | | |
| HFI mortgage loans | 11,504,026 | (22,031) | 11,481,995 [4] |
| Commercial automotive | 335,938 | 1,685 | 337,623 [4] |
| Warehouse lending | 1,023,183 | 34,841 | 1,058,024 [4] |
| Allowance for credit losses | (23,760) | 23,760 | - [5] |
| Finance receivables and loans, net | 12,839,387 | 38,255 | 12,877,642 |
| Property & equipment | 2,566 | - | 2,566 [2] |
| Other assets | 440,844 | - | 440,844 [2] |
| Total assets | $ 15,368,045 | $ (20,262) | $ 15,347,783 |
| **Liabilities** | | | |
| Deposits | $ 5,974,386 | $ (14,683) | $ 5,959,703 [3] |
| FHLB borrowings | 7,279,000 | 30,094 | 7,309,094 [4] |
| Accrued expenses and other liabilities | 526,760 | - | 526,760 [2] |
| Total liabilities | 13,780,146 | 15,411 | 13,795,557 |
| Total stockholder's equity | 1,587,899 | (35,673) | 1,552,226 |
| Less: Capital contribution | (360,000) | - | (360,000) |
| Equity value of Old GMAC Bank | $ 1,227,899 | $ (35,673) | $ 1,192,226 |

[1] Dec. 31, 2006 balance sheet used as a proxy for Nov. 22, 2006 balance sheet. GMAC Bank Consolidated Financial Review, dated Jan. 25, 2007, at ALLY_PEO_0006846 [ALLY_PEO_0006664].
[2] The Examiner's Financial Advisors assumed fair value equals book value.
[3] Fair value assumed equal to the Mortgage Bank's book value as a percent of the consolidated Ally Bank book value times management's estimated fair value on a consolidated basis. See GMAC Bank Consolidated Financial Statements as of Dec. 31, 2006 and Independent Auditors' Report, at 35 [RC00035095].
[4] Management's estimate of fair value. See GMAC Bank Consolidated Financial Statements as of December 31, 2006 and Independent Auditors' Report, at 35 [RC00035095].
[5] Allowance for credit losses assumed to be accounted for in management's estimated fair value of HFI mortgage loans.

**Appendix V.A.2.c,** Page 1 of 4

**Ally Bank Transactions: Reasonably Equivalent Value**
**2008 Bank Transaction**
**Value Summary**
As of March 31, 2008 and June 3, 2008
*($ in Millions)*

| | Appendix Reference | Fair Market Value | |
| --- | --- | --- | --- |
| | | Low | High |
| **Value Transferred from ResCap:** | | | |
| ResCap Preferred Interests | V.A.2.c, at 2 | $ - | $ - |
| Right to exchange ResCap Preferred Interests for IB Finance Preferred Interests | | 571.4 | 714.2 |
| Total property transferred | | 571.4 | 714.2 |
| **Value Received by ResCap:** | | | |
| Contribution of bonds | V.A.2.c, at 3 | 841.3 | 841.3 |
| Right to redeem IB Finance Preferred Interests | | - | - |
| Total property received | | $ 841.3 | $ 841.3 |
| Value received by ResCap less value transferred from ResCap | | $ 269.9 to | $ 127.1 |

*Source: Appendix V.A.2.c, at 2 – 3.*

Appendix V.A.2.c, Page 2 of 4

**Ally Bank Transactions: Reasonably Equivalent Value**
**2008 Bank Transaction**
**Right to Exchange ResCap Preferred Interests for IB Finance Preferred Interests**
As of March 31, 2008 and June 3, 2008
*($ in Millions)*

| | March 31, 2008 | | June 3, 2008 | |
| --- | --- | --- | --- | --- |
| | Low | High | Low | High |
| IB Finance Preferred Interests (number of units) [1] | 607,192 | 607,192 | 199,152 | 199,152 |
| Redemption value [2] | $ 607.2 | $ 607.2 | $ 199.2 | $ 199.2 |
| Annual dividend @ 10% of redemption value [3] | $ 60.7 | $ 60.7 | $ 19.9 | $ 19.9 |
| Divided by: market dividend yield [4] | 10% | 8% | 10% | 8% |
| Capitalized value assuming exchange on January 1, 2009 | $ 607.2 | $ 759.0 | $ 199.2 | $ 248.9 |
| Present value factor | 0.6640 | 0.6640 | 0.8449 | 0.8449 |
| Value of right to exchange ResCap Preferred Interests for IB Finance Preferred Interests | $ 403.1 | $ 503.9 | $ 168.3 | $ 210.3 |
| Total value of right to exchange ResCap Preferred Interests for IB Finance Preferred Interests | $ 571.4 to $ 714.2 | | | |
| Assumptions for the Present Value Factor | | | | |
| Discount rate for short-term ResCap obligations [5] | 71.9% | | 33.7% | |
| Days until January 1, 2009 | 276 | | 212 | |
| Present value factor | 0.6640 | | 0.8449 | |

[1] *Residential Capital, LLC, Current Report (Form 8-K) (Apr. 4, 2008); Residential Capital, LLC, Current Report (Form 8-K) (June 9, 2008).*
[2] *IB Finance 2008 LLC Agreement, § 2.1(b)(iii) [ALLY_0031313].*
[3] *Id. at § 2.5.*
[4] *Derived from analysis of preferred stock benchmarks as of transaction dates. See Appendix V.A.2.c, at 4.*
[5] *Average of yield-to-maturities on ResCap senior unsecured notes maturing Apr. 17, 2009 and Nov. 21, 2008, per Bloomberg; notes were selected to approximate a January maturity.*

Appendix V.A.2.c, Page 2 of 4

**Ally Bank Transactions: Reasonably Equivalent Value**
**2008 Bank Transaction**
**Contribution of ResCap Bonds by AFI**
As of March 31, 2008 and June 3, 2008
*($ in Millions, except bond prices)*

| Coupon | Debt Rank (1) | Maturity | [A] Price (2) | [B] Face Amount Contributed (3) | [C] = [A] × [B] Observed Market Value | [D] Accrued Interest (3) | [E] = [C] + [D] Observed Market Value Plus Accrued Interest |
|---|---|---|---|---|---|---|---|
| **March 31, 2008:** | | | | | | | |
| Floating | Sr unsecured | 11/21/08 | 68.0 | $ 71.0 | $ 48.3 | $ 0.5 | $ 48.8 |
| Floating | Sr unsecured | 04/17/09 | 57.0 | 36.0 | 20.5 | 0.5 | 21.0 |
| Floating | Sr unsecured | 05/22/09 | 57.0 | 51.0 | 29.1 | 0.3 | 29.4 |
| 6.375 | Sr unsecured | 06/30/10 | 50.3 | 206.9 | 104.0 | 4.2 | 108.2 |
| Floating | Sr unsecured | 09/27/10 | 45.0 | 31.2 | 14.0 | - | 14.0 |
| 6.000 | Sr unsecured | 02/22/11 | 49.0 | 60.0 | 29.4 | 0.5 | 29.9 |
| 5.125 | Sr unsecured | 05/17/12 | 45.5 | 163.7 | 74.5 | 8.7 | 83.2 |
| 6.500 | Sr unsecured | 06/01/12 | 49.0 | 135.0 | 66.2 | 3.7 | 69.9 |
| 6.500 | Sr unsecured | 04/17/13 | 48.5 | 63.0 | 30.6 | 2.3 | 32.9 |
| 6.375 | Sr unsecured | 05/17/13 | 44.5 | 20.0 | 8.9 | 1.3 | 10.2 |
| 7.875 | Sr unsecured | 07/01/14 | 44.5 | 44.0 | 19.6 | 1.0 | 20.6 |
| 6.875 | Sr unsecured | 06/30/15 | 48.5 | 113.0 | 54.8 | 2.4 | 57.2 |
| Floating | Sr subordinated | 04/17/09 | 37.0 | 181.4 | 67.1 | 2.8 | 69.9 |
| Total | | | | $ 1,176.2 | $ 566.9 | $ 28.2 | $ 595.1 [F] |
| **June 3, 2008:** | | | | | | | |
| Floating | Sr unsecured | 06/09/08 | 98.0 | $ 249.1 | $ 244.1 | $ 2.1 (4) | $ 246.3 [G] |
| Contribution of bonds | | | | | | | $ 841.3 [F] + [G] |

(1) Debt rank per Bloomberg.
(2) Pricing per Interactive Data Corporation, a vendor of securities pricing data.
(3) Face amount contributed and accrued interest values obtained from Morgan Stanley Project Duvall Discussion Materials, dated Mar. 28, 2008, at RC4000749 [RC4000748]; for the June 3 contribution, face amount contributed per Residential Capital, LLC, Current Report (Form 8-K) (June 9, 2008).
(4) Estimated by the Examiner's Financial Advisors.

Appendix V.A.2.c, Page 3 of 4

Appendix V.A.2.c, Page 4 of 4

**Ally Bank Transactions: Reasonably Equivalent Value**
**2008 Bank Transaction**
**Benchmark Preferred and Debt Yields**
2008 – 2009

| | 3/31/08 [2] | 6/03/08 [2] | 1/30/09 [2] |
|---|---|---|---|
| Instruments Cited by Morgan Stanley [1] | | | |
| Colonial Bancgroup Inc. | 10.4% | 10.1% | 34.7% |
| SunTrust Capital X | 8.6% | 8.3% | 14.9% |
| KeyCorp Capital X | 11.3% | 13.3% | 24.4% |
| PNC Financial Services | 8.4% | 8.4% | 12.0% |
| National City Corp | 8.9% | 8.8% | 9.3% |
| M&T Capital Trust IV | 8.5% | 8.5% | 8.8% |
| Susquehanna Capital I | 9.2% | 8.6% | 13.2% |
| | | | |
| Other Large Financial Institutions Preferred Yields | | | |
| Bank of America Corp at 7.25% | 7.3% | 7.5% | 15.6% |
| Bank of America Corp at 6.63% | 7.4% | 7.3% | 16.1% |
| Bank of America Corp at 6.2% | 7.2% | 7.3% | 14.8% |
| Bank of America Corp at 6.38% | 7.9% | 8.1% | 17.1% |
| Bank of America Corp at 6.7% | 8.1% | 7.5% | 17.0% |
| Bank of America Corp at 6.25% | 8.2% | 7.9% | 16.1% |
| | | | |
| Merrill Lynch & Co., Inc. at 7.12% | 8.4% | 8.4% | 14.6% |
| Merrill Lynch & Co., Inc. at 7.28% | 8.5% | 8.4% | 14.1% |
| | | | |
| Wells Fargo & Co at 8% | 8.2% | 8.3% | 11.2% |
| | | | |
| Wachovia at 7.25% | 7.7% | 8.1% | 10.6% |
| | | | |
| Citigroup Inc at 8.13% | 8.6% | 8.5% | 23.6% |
| | | | |
| JPMorgan Chase & Co at 5.72% | 17.4% | 16.1% | 24.8% |
| JPMorgan Chase & Co at 5.49% | 18.9% | 18.9% | 16.6% |
| | | | |
| Selected Interest Rate Benchmarks | | | |
| ML US High Yield Master II Index | 10.9% | 10.2% | 18.1% |
| ML US High Yield BB Rated | 8.8% | 8.2% | 13.0% |
| ML US High Yield B Rated | 11.2% | 10.2% | 16.4% |
| ML US High Yield CCC and Lower Rated | 15.4% | 14.8% | 30.9% |
| ML US High Yield Banks & Thrifts | 13.6% | 12.4% | 27.3% |

[1] *Morgan Stanley Project Duvall, dated Mar. 28, 2008, at RC40007501 [RC40007480].*
[2] *Preferred stock yields per Bloomberg as of the dates of the 2008 Bank Transaction and 2009 Bank Transaction.*

Appendix V.A.2.c, Page 4 of 4

**Ally Bank Transactions: Reasonably Equivalent Value**
**2009 Bank Transaction**
**Value Summary**
As of January 30, 2009
*($ in Millions)*

| | Appendix Reference | Fair Market Value Low | High | Weighting |
|---|---|---|---|---|
| **Value Transferred from ResCap:** | | | | |
| Market Approach: Guideline Publicly Traded Company Method | V.A.2.d, at 2 | $ 602.1 | $ 1,003.5 | 50.0% |
| Market Approach: Guideline M&A Method | | N/A | N/A | 0.0% |
| Income Approach: DCF Method | V.A.2.d, at 5 | 412.3 | 874.8 | 50.0% |
| Asset-Based Approach: Adjusted Book Value Method | V.A.2.d, at 6 | 363.8 | 363.8 | 0.0% |
| Equity value of the Mortgage Bank (marketable, controlling) | | $ 507.2 | $ 939.1 | |
| Equity value of the Mortgage Bank (marketable, controlling), rounded | | 500.0 | 900.0 | |
| IB Finance Preferred Interests | V.A.2.d, at 8 | 322.5 | 537.6 | |
| Remaining 1.2 million IB Finance Class M Shares (marketable, controlling) | | 177.5 | 362.4 | |
| Discount for attributes of shares | | | 40.0% | |
| Remaining 1.2 million IB Finance Class M Shares (non-marketable, non-controlling) | | (71.0) | (145.0) | |
| Forfeited right to redeem IB Finance Preferred Interests | | 106.5 | 217.5 | |
| Total property transferred | | $ 106.5 | $ 217.5 | |
| **Value Received by ResCap** | | | | |
| Contribution of bonds | V.A.2.d, at 9 | $ 600.2 | $ 600.2 | |
| Total property received | | 600.2 | 600.2 | |
| Value received by ResCap less value transferred from ResCap | | $ 493.7 to | $ 382.7 | |

*Source: Appendix V.A.2.d, at 2, 5–6, 8–9.*

Appendix V.A.2.d, Page 2 of 9

**Ally Bank Transactions: Reasonably Equivalent Value**
**2009 Bank Transaction**
**Guideline Publicly Traded Company Method Summary**
As of January 30, 2009
*($ in Millions)*

| | Mortgage Bank Financial Metric | Multiple Range [1] | | Range of Value | |
| --- | --- | --- | --- | --- | --- |
| | | | | Low | High |
| P/TBVE | $ 1,824.5 [2] | 0.3x | 0.5x | $ 547.3 | $ 912.2 |
| | | | | | |
| Equity value of the Mortgage Bank (marketable, minority) | | | | 547.3 | 912.2 |
| Control premium | | | 10% | 54.7 | 91.2 |
| Equity value of the Mortgage Bank (marketable, controlling) | | | | $ 602.1 | $ 1,003.5 |

[1] Refer to Appendix V.A.2.d, at 3 for multiples of guideline public companies and Section V.A.2.d(2)(a)(i)(B)(ii) of the Report for a discussion of the selection of multiples.
[2] GMAC Bank 2009−2011 Business Plan Review, dated Mar. 17, 2009, at ALLY_PEO_0007939 [ALLY_PEO_0007887].

Appendix V.A.2.d, Page 2 of 9

**Appendix V.A.2.d**, Page 3 of 9

Ally Bank Transactions: Reasonably Equivalent Value
2009 Bank Transaction
Guideline Publicly Traded Company Method Multiples
As of January 30, 2009
($ in Millions)

| | [A] | [B] | [C] | [D] | [E] = [A] / [B] | [F] = [A] / [C] | [G] = [A] / [D] |
|---|---|---|---|---|---|---|---|
| | MVE | TBVE | LTM Earnings | Forward Earnings | P/TBVE | LTM P/E | Forward P/E |
| Mortgage Bank | N/A | $ 1,824.5 | $ (150.9) | $ (241.9) | N/A | N/A | N/A |
| Guideline Publicly Traded Companies | | | | | | | |
| Astoria Financial Corporation | $ 815.6 | $ 996.6 | $ 75.3 | $ 90.0 | 0.8x | 10.8x | 9.1x |
| BankUnited Financial Corporation | 9.3 | 547.8 | (202.6) | (100.9) | 0.0x | N/M | N/M |
| Capitol Federal Financial, Inc. | 3,066.7 | 897.4 | 57.7 | 69.7 | 3.4x | 53.2x | 44.0x |
| FirstFed Financial Corp. | 11.6 | 258.7 | (401.7) | (98.1) | 0.0x | N/M | N/M |
| Flagstar Bancorp Inc. | 50.2 | 472.3 | (275.4) | (40.2) | 0.1x | N/M | N/M |
| Hudson City Bancorp, Inc. | 5,673.9 | 4,786.7 | 445.6 | 540.1 | 1.2x | 12.7x | 10.5x |
| Investors Bancorp Inc. | 1,164.7 | 753.8 | (68.2) | 35.2 | 1.5x | N/M | 33.1x |
| NewAlliance Bancshares, Inc. | 1,089.2 | 810.2 | 45.3 | 37.3 | 1.3x | 24.0x | 29.2x |
| TFS Financial Corp | 4,006.1 | 1,794.8 | 47.2 | 24.5 | 2.2x | 84.9x | 163.3x |
| Washington Federal Inc. | 1,079.6 | 1,163.4 | 50.8 | 74.1 | 0.9x | 21.3x | 14.6x |
| | | | | Mean [1] | 1.2x | 17.2x | 23.4x |
| | | | | Median [1] | 1.1x | 17.0x | 21.9x |

[1] LTM P/E and Forward P/E multiples greater than 50x were excluded from the mean and median.

Source: Bloomberg; Guideline company projections per Thomson Reuters SMInttelligence; Astoria Financial Corporation, Annual Report (Form 10-K) (Feb. 27, 2009), at 76, 95-96, 128.; BankUnited Financial Corporation, Quarterly Report (Form 10-Q) (Aug. 25, 2008), at 3-4, 47; BankUnited Financial Corporation, Annual Report (Form 10-K) (Nov. 29, 2007), at 78; BankUnited Financial, Inc., Quarterly Report (Form 10-Q) (Feb. 9, 2007), at 4; Capitol Federal Financial, Inc., Quarterly Report (Form 10-Q) (Feb. 4, 2009), at 1; 3-4; Capitol Federal Financial, Inc., Annual Report (Form 10-K) (Dec. 1, 2008), at 15, 49; Capitol Federal Financial, Inc., Quarterly Report (Form 10-Q) (Feb. 4, 2008), at 4; FirstFed Financial Corp., Annual Report (Form 10-K) (Mar. 31, 2009), at 43, 62-63.; Flagstar Bancorp Inc., Annual Report (Form 10-K) (Mar. 13, 2009), at 52, 72-73; Hudson City Bancorp, Inc., Annual Report (Form 10-K) (Feb. 27, 2009), at 19, 97-98, 123; Investors Bancorp Inc., Quarterly Report (Form 10-Q) (Feb. 9, 2009), at 1-2; Investors Bancorp Inc., Annual Report (Form 10-K) (Aug. 22, 2008), at 11, 66; Investors Bancorp Inc., Quarterly Report (Form 10-Q) (Feb. 11, 2008), at 2; NewAlliance Bancshares, Inc., Annual Report (Form 10-K) (Feb. 27, 2009), at 67-68, 88, 94, 96; TFS Financial Corp., Quarterly Report (Form 10-Q) (Feb. 6, 2009), at 3-4; TFS Financial Corp., Annual Report (Form 10-K) (Nov. 26, 2008), at 76, 14; TFS Financial Corp., Quarterly Report (Form 10-Q) (Feb. 14, 2008), at 4; Washington Federal Inc., Quarterly Report (Form 10-Q) (Feb. 9, 2009), at 3-4; Washington Federal Inc. Annual Report (Form 10-K) (Nov. 28, 2008), at 7, 14; Washington Federal Inc., Quarterly Report (Form 10-Q) (Feb. 4, 2008), at 4.

Appendix V.A.2.d, Page 3 of 9

Appendix V.A.2.d, Page 4 of 9

**Ally Bank Transactions: Reasonably Equivalent Value**
**2009 Bank Transaction**
**Guideline Publicly Traded Company Method Ratios and Financial Information**
As of January 30, 2009
($ in Millions)

| | [A] Barra Predicted Beta | [B] Total Assets | [C] Non-Performing Assets | [D] LTM Earnings | [E] Book Value of Equity | [F] = [C] / [E] Non-Performing Assets/Book Value of Equity | [G] = [D] / [E] ROE |
|---|---|---|---|---|---|---|---|
| Mortgage Bank | N/A | $ 22,013.8 | $ 691.9 | $ (150.9) | $ 1,824.5 | 37.9% | -8.3% |
| **Guideline Publicly Traded Companies** | | | | | | | |
| Astoria Financial Corporation | 1.22 | $ 21,982.1 | $ 264.1 | $ 75.3 | $ 1,181.8 | 22.3% | 6.4% |
| BankUnited Financial Corporation | 2.16 | 14,119.5 | 1,099.6 | (202.6) | 576.2 | 190.9% | -35.2% |
| Capitol Federal Financial, Inc. | 0.42 | 8,157.3 | 18.8 | 57.7 | 897.4 | 2.1% | 6.4% |
| FirstFed Financial Corp. | 2.02 | 7,450.6 | 521.5 | (401.7) | 258.7 | 201.6% | -155.2% |
| Flagstar Bancorp Inc. | 1.70 | 14,203.7 | 755.2 | (275.4) | 472.3 | 159.9% | -58.3% |
| Hudson City Bancorp, Inc. | 0.99 | 54,145.3 | 233.1 | 445.6 | 4,938.8 | 4.7% | 9.0% |
| Investors Bancorp Inc. | 0.67 | 7,183.8 | 19.4 | (68.2) | 753.8 | 2.6% | -9.1% |
| NewAlliance Bancshares, Inc. | 0.76 | 8,299.5 | 40.4 | 45.3 | 1,381.2 | 2.9% | 3.3% |
| TFS Financial Corp | 0.36 | 10,875.8 | 187.0 | 47.2 | 1,794.8 | 10.4% | 2.6% |
| Washington Federal Inc. | 0.93 | 12,521.9 | 164.2 | 50.8 | 1,383.8 | 11.9% | 3.7% |
| | | | | | Mean | 60.9% | -22.6% |
| | | | | | Median | 11.1% | 3.0% |

Source: Bloomberg; MSCI Barra; OMAC Bank 2009-2011 Business Plan Review, dated Mar. 17, 2009, at ALLY_PEO_0007939-48 [ALLY_PEO_0007939-48] [ALLY_PEO_0007939-48] Business Plan Review, dated Mar. 17, 2009, at ALLY_PEO_0007939-48;
[44] [ALLY_PEO_0007920]; ALLY PEO_0007949-50; [ALL1_PEO_0007887]; Astoria Financial Corporation, Annual Report (Form 10-K) (Feb. 27, 2009), at 76, 85-96, 128; BankUnited Financial Corporation, Quarterly Report (Form 10-Q) (Aug. 25, 2008), at 3-4, 47;
BankUnited Financial Corporation, Annual Report (Form 10-K) (Nov. 29, 2007), at 78; BankUnited Financial Corporation, Quarterly Report (Form 10-Q) (Feb. 8, 2009), at 4; Capitol Federal Financial, Inc., Quarterly Report (Form 10-Q) (Feb. 9, 2009), at 3-4; Capitol
Federal Financial, Inc., Annual Report (Form 10-K) (Dec. 1, 2008), at 15, 40; Capitol Federal Financial, Inc., Quarterly Report (Form 10-Q) (Feb. 4, 2008), at 4; FirstFed Financial Corp., Annual Report (Form 10-K) (Mar. 31, 2009), at 43, 62-63; Flagstar Bancorp Inc.,
Annual Report (Form 10-K) (Mar. 13, 2009), at 32, 72-73; Hudson City Bancorp, Inc., Annual Report (Form 10-K) (Feb. 27, 2009), at 19, 97-98, 123; Investors Bancorp Inc., Annual Report (Form
10-K) (Aug. 22, 2008), at 11, 66; Investors Bancorp Inc., Quarterly Report (Form 10-Q) (Feb. 11, 2008), at 2; NewAlliance Bancshares, Inc., Annual Report (Form 10-K) (Feb. 27, 2009), at 67-68, 86, 94, 96; TFS Financial Corp., Quarterly Report (Form 10-Q) (Feb. 6, 2009), at
3-4; TFS Financial Corp., Annual Report (Form 10-K) (Nov. 26, 2008), at 76; TFS Financial Corp., Quarterly Report (Form 10-Q) (Feb. 14, 2008), at 4; Washington Federal Inc., Annual Report
(Form 10-K) (Nov. 28, 2008), at 7, 14; Washington Federal Inc., Quarterly Report (Form 10-Q) (Feb. 4, 2008), at 4.

Appendix V.A.2.d, Page 4 of 9

**Appendix V.A.2.d, Page 5 of 9**

Ally Bank Transactions: Reasonably Equivalent Value
2009 Bank Transaction
DCF Method
As of January 30, 2009
($ in Millions)

| Assumptions: | | Notes: |
|---|---|---|
| Discount rate (k) | 16.00% | See Appendix V.A.2.b, at 14 |
| Residual period assumptions: | | |
| Long-term growth rate (g) | 0.00% | Estimate by the Examiner's Financial Advisers |
| Net finance margin % of average loans plus securities | 2.04% | Based on management projection for 2011 |
| Normal provision % of HFI mortgage loans | 0.33% | Projection used for 2006 Bank Restructuring DCF Method |
| Income tax rate | 40.00% | Estimated federal and state tax rate |
| Normal equity to asset ratio | 9.00% | See Section V.A.2.d(2)(b)(iii) of the Report for a discussion of normalization of equity |
| Years until normalization of equity (required capital contribution) | 3.0 | See Section V.A.2.d(2)(b)(iii) of the Report for a discussion of normalization of equity |
| Interest expense as % of deposits plus borrowings (after tax) | 2.38% | Based on management projection for 2009 |

|  | Year One | Projected [1] Year Two | Year Three | Residual |
|---|---|---|---|---|
| **Balance Sheet Items** | | | | |
| HFI mortgage loans | $ 16,755.9 | $ 17,367.9 | $ 17,962.6 | $ 17,962.6 [2] |
| Loans plus securities | 23,697.6 | 23,747.0 | 24,602.0 | 24,602.0 [2] |
| Total assets | 26,868.5 | 27,275.2 | 28,479.1 | 28,479.1 [2] |
| Equity | 1,584.0 | 1,597.6 | 1,703.4 | |
| Normalized equity [3] | 2,418.2 | 2,454.8 | 2,563.1 | 2,563.1 [2] |
| Equity capital deficiency | (834.2) | (857.2) | (859.7) | |
| **Income Statement and Cash Flows** | | | | |
| Net financing revenue | 360.0 | 577.8 | 492.9 | 501.6 [4] |
| Gain (loss) on sale of loans | (42.7) | (23.4) | (25.2) | - |
| Origination fees | 227.6 | 195.5 | 212.5 | 212.5 [2] |
| Other income | 32.8 | 33.2 | 58.9 | 58.9 [2] |
| Net revenue | 577.7 | 783.0 | 739.1 | 773.1 |
| Provision for credit losses | (583.4) | (401.3) | (200.6) | (59.3) [5] |
| Non-interest expense | (369.1) | (360.8) | (375.7) | (375.7) [2] |
| Income tax expense | 132.9 | (7.3) | (57.0) | (135.2) |
| Net income | (241.9) | 13.6 | 105.8 | 202.8 |
| Less increase in equity | 240.5 | (13.6) | (105.8) | - |
| Other comprehensive income | 1.4 | 0.0 | 0.0 | - |
| Cash flow | - | - | - | 202.8 |
| Capitalization rate (k-g) | | | | 16.0% |
| Cash flow value | | | | 1,267.8 |
| Present value factor [6] | 0.9285 | 0.8004 | 0.6900 | 0.6900 |
| Equity value of Mortgage Bank before adjustment for capital deficiency | $ 874.8 | | | 874.8 |
| Adjustment for capital deficiency | (462.4) | | | |
| Equity value of Mortgage Bank after adjustment for capital deficiency | $ 412.3 | | | |
| **Adjustment for Capital Deficiency** | | | | |
| Present value of projected equity capital deficiency [7] | $ (550.8) | | | |
| Capitalization of interest on equity capital deficiency [8] | 88.4 | | | |
| Adjustment for capital deficiency | $ (462.4) | | | |

[1] GMAC Bank 2009–2011 Business Plan Review, dated Mar. 17, 2009, at ALLY_PEO_0007939-40; ALLY_PEO_0007949-50; ALLY_PEO_0007958-59 [ALLY_PEO_0007873]. Assumes management's projections for 2009–2011 represent reasonably forecastable expectations for the first thirty-six months after the transaction date.
[2] Assumed to grow at long-term residual growth rate of zero percent beyond the third year of the projection period.
[3] Normalized equity equals the assumed normal equity to asset ratio multiplied by projected total assets. For the normalized residual period, this balance is assumed to grow at the long-term growth rate of zero percent.
[4] Residual net financing revenue equals the average of the beginning and ending balance of loans plus securities times net finance margin percentage.
[5] Provision for credit losses equals the average of the beginning and ending balance of HFI mortgage loans times the normal provision percentage.
[6] Present value factor employs mid-period discounting convention.
[7] Present value discounted three years (the assumed number of years until the normalization of equity).
[8] Present value of interest expense as a percentage of deposits plus borrowings (after-tax) times projected equity capital deficiency. This is discounted over the number of years until normalization of equity using mid-period discounting convention.

12-12020-mg Case 22-11068-JTD Doc 3698-36 Doc 6139 Filed 02/03/23 Filed 05/13/13 Entered 05/13/13 17:08:13 Page 454 of 709 Appendix
Pg 130 of 385

Appendix V.A.2.d, Page 6 of 9

**Ally Bank Transactions: Reasonably Equivalent Value**
**2009 Bank Transaction**
**Adjusted Book Value Method**
As of January 30, 2009
*($ in Thousands)*

| | Book Value [1] | Adjustments | Fair Market Value |
|---|---|---|---|
| Assets | | | |
| Cash and cash equivalents | $ 2,825,381 | $ - | $ 2,825,381 [2] |
| Investment securities | 25,150 | - | 25,150 [2] |
| HFS mortgage loans, net | 882,754 | - | 882,754 [4] |
| Finance receivables and loans | | | |
| HFI mortgage loans | 15,375,957 | (1,188,817) | 14,187,140 [5] |
| Consumer finance receivables | 89,723 | - | 89,723 [2] |
| Warehouse lending | 1,440,670 | - | 1,440,670 [4] |
| Allowance for credit losses | (363,714) | 363,714 | - [6] |
| Finance receivables and loans, net | 16,542,636 | (825,103) | 15,717,533 |
| MSRs | 418,628 | - | 418,628 [8] |
| FHLB stock | 496,090 | - | 496,090 [8] |
| Other assets | 823,128 | - | 823,128 [2] |
| Total assets | $ 22,013,768 | $ (825,103) | $ 21,188,665 |
| Liabilities | | | |
| Deposits | $ 10,600,537 | $ 64,194 | $ 10,664,731 [7] |
| FHLB borrowings | 9,303,000 | 571,416 | 9,874,416 [3] |
| Accrued expenses and other liabilities | 285,760 | - | 285,760 [2] |
| Total liabilities | 20,189,297 | 635,610 | 20,824,907 |
| Equity value of Mortgage Bank | $ 1,824,472 | $ (1,460,714) | $ 363,758 |

[1] GMAC Bank 2009–2011 Business Plan Review, dated Mar. 17, 2009, at ALLY_PEO_0007939 [ALLY_PEO_0007887].
[2] The Examiner's Financial Advisors assumed fair value equals book value.
[3] Fair value of FHLB borrowings estimated by subtracting FRB borrowings from management's estimated fair value of the combined FHLB and FRB borrowings. See GMAC Bank Consolidated Financial Statements as of December 31, 2008 and 2007 and Independent Auditors' Report, at 33, 50 [RC00034535].
[4] Management's estimate of fair value. See GMAC Bank Consolidated Financial Statements as of December 31, 2008 and 2007 and Independent Auditors' Report, dated Mar. 17, 2009, at 50 [RC00034535].
[5] Estimated Fair Market Value of HFI mortgage loans. See Appendix V.A.2.d, at 7.
[6] Book allowance assumed to be reflected in management's estimate of fair value of loans.
[7] Fair value of deposits assumed equal to Mortgage Bank's book value of deposits as a percent of consolidated GMAC deposits (approximately 54.9% times estimated fair value of consolidated deposits (approximately $19.4 billion).
[8] Management's estimate of fair value. See GMAC Bank Consolidated Financial Statements as of December 31, 2008 and 2007 and Independent Auditors' Report, dated Mar. 17, 2009, at 16 [RC00034535].

**Appendix V.A.2.d,** Page 7 of 9

**Ally Bank Transactions: Reasonably Equivalent Value**
**2009 Bank Transaction**
**Fair Market Value of HFI Mortgage Loans**
As of January 30, 2009
*($ in Thousands)*

Fair Market Value of HFI Mortgage Loans

| | | |
|---|---|---|
| Management's estimate of fair value of HFI mortgage loans [1] | $ 15,008,726 | |
| Projected provisions in excess of current allowance | (821,586) | |
| Fair Market Value of HFI mortgage loans | $ 14,187,140 | |

Projected Provisions in Excess of Current Allowance

| | | |
|---|---|---|
| Allowance for credit losses (12/31/08) [2] | $ 363,714 | [A] |
| Projected provisions for credit losses (2009 to 2011) [3] | 1,185,300 | [B] |
| Projected provisions in excess of current allowance | $ (821,586) | [C] = [A] - [B] |

[1] *Management's estimate of fair value. See GMAC Bank Consolidated Financial Statements as of December 31, 2008 and 2007 and Independent Auditors' Report, dated Mar. 17, 2009, at 50 [RC00034535].*
[2] *GMAC Bank 2009–2011 Business Plan Review, dated Mar. 17, 2009, at ALLY_PEO_0007939 [ALLY_PEO_0007887].*
[3] *GMAC Bank 2009–2011 Business Plan Review, dated Mar. 17, 2009, at ALLY_PEO_0007940, ALLY_PEO_0007959, ALLY_PEO_0007959 [ALLY_PEO_0007887].*

Appendix V.A.2.d, Page 7 of 9

**Ally Bank Transactions: Reasonably Equivalent Value**
**2009 Bank Transaction**
**IB Finance Preferred Interests**
As of January 30, 2009
*($ in Millions)*

| | Range of Value | | |
|---|---|---|---|
| | **Low** | | **High** |
| IB Finance Preferred Interests (number of units) [1] | 806,344 | | 806,344 |
| Redemption value [2] | $ 806.3 | $ | 806.3 |
| Annual dividend @ 10% of redemption value [3] | $ 80.6 | $ | 80.6 |
| Divided by: Market dividend yield [4] | 25% | | 15% |
| Value of IB Finance Preferred Interests | $ 322.5 | $ | 537.6 |

[1] *Residential Capital, LLC, Current Report (Form 8-K) (Feb. 3, 2009).*
[2] *IB Finance 2008 LLC Agreement, § 2.1(b)(iii) [ALLY_0031315].*
[3] *Id. at § 2.5.*
[4] *Analysis of contemporary yields on preferred shares of financial institutions. See Appendix V.A.2.c, at 4.*

Appendix V.A.2.d, Page 9 of 9

**Ally Bank Transactions: Reasonably Equivalent Value**
**2009 Bank Transaction**
**Contribution of ResCap Bonds by AFI**
As of January 30, 2009
*($ in Millions)*

| Coupon | Debt Rank [1] | Maturity | [A] Price [2] | [B] Face Amount Contributed [3] | [C] = [A] × [B] Observed Market Value | [D] Accrued Interest [4] | [E] = [C] + [D] Observed Market Value Plus Accrued Interest |
|---|---|---|---|---|---|---|---|
| January 30, 2009 | | | | | | | |
| 8.5% | 2nd lien | 05/15/10 | 70.5 | $ 830.5 | $ 585.5 | $ 14.7 | $ 600.2 |
| Contribution of bonds | | | | | | | $ 600.2 |

[1] *Debt rank per Bloomberg.*
[2] *Pricing per Interactive Data Corporation.*
[3] *Jan. 30, 2009 face amount contributed per GMAC LLC, Annual Report (Form 10-K) (Feb. 27, 2009), at 113.*
[4] *Jan. 30, 2009 accrued interest per Memorandum, ResCap Significant Transaction Memo, dated Feb. 3, 2009, at EXAM0020313 [EXAM0020301].*

Appendix V.A.2.d, Page 9 of 9

Appendix V.C.1.c(4), Page 1 of 1

12-12020-mg Doc 3698-36 Filed 05/13/13 Entered 05/13/13 17:58:13 Appendix
Case 12-11068-JTD Doc 65139 Filed 02/03/23 Page 458 of 709
Pg 134 of 385

**Residential Capital, LLC**
**Summary of Government Settlement Economics**
*($ in Millions)*

| Item | AFI | | | ResCap | | | Total |
|---|---|---|---|---|---|---|---|
| | Actual Costs Incurred | Go Forward Estimate | AFI Subtotal | Actual Costs Incurred | Go Forward Estimate | ResCap Subtotal | |
| **FRB/FDIC Consent Order Costs** | | | | | | | |
| Incremental compliance costs [1] | $ - | $ - | $ - | $ - | $ 80.0 | $ 80.0 | $ 80.0 |
| Foreclosure Review and remediation [2],[3] | - | - | - | 73.0 | 364.0 | 437.0 | 437.0 |
| Subtotal FRB/FDIC Consent Order Costs | - | - | - | 73.0 | 444.0 | 517.0 | 517.0 |
| CMP ($207 – offset by borrower relief) | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| **DOJ/AG Consent Judgment – hard costs [4]** | | | | | | | |
| Penalty/fine [5],[6] | - | - | - | 109.6 | - | 109.6 | 109.6 |
| Ally Bank reimbursement – borrower relief [5],[7],[8],[9] | - | - | - | 96.8 | 37.7 | 134.5 | 134.5 |
| Accounting impact of ResCap loan modifications – borrower relief [5] | - | - | - | 12.2 | 3.5 | 15.7 | 15.7 |
| Other costs associated with DOJ/AG Consent Judgment [5],[10] | - | - | - | 4.0 | - | 4.0 | 4.0 |
| Subtotal DOJ/AG Consent Judgment – hard costs | - | - | - | 222.6 | 41.2 | 263.8 | 263.8 |
| January 30 Letter Agreement – debt forgiveness (face amount) [11] | 196.5 | - | 196.5 | (196.5) | - | (196.5) | - |
| Total costs incurred to date and estimated future costs | $ 196.5 | $ - | $ 196.5 | $ 99.1 | $ 485.2 | $ 584.3 | $ 780.8 |

[1] AFI estimates that incremental costs to the applicable mortgage companies for implementation and ongoing compliance related to the FRB/FDIC Consent Order to be approximately $40 million annually during 2012 and 2013, and then reducing over time. The majority of these incremental annual costs are for additional servicing personnel, enhancements to information systems, vendor management, costs to comply with MERS requirements, and increased audit and compliance costs - Ally Financial Inc., Annual Report (Form 10-K) (Feb. 28, 2012), at 12.

[2] As of December 31, 2012, the Debtors had paid PwC approximately $73 million for services rendered by PwC professionals in connection with the FRB Foreclosure Review. - Declaration of Thomas Marano, Chief Executive Officer of Residential Capital, LLC, in Support of Debtors' Motion Pursuant to Bankruptcy Code Section 362(A) for a Determination that (I) GMAC Mortgage's FRB Foreclosure review Obligation is a General Unsecured Claim and (II) the Automatic Stay Prevents Enforcement of the FRB Foreclosure Review Obligation [Docket No. 3055-3] at 4-5.

[3] Debtors believe that the cost of the Foreclosure Review (and remediation of any borrower harm) may burden still further if nothing is done to stem the costs, perhaps reaching $415 to $459 million (total estimated at midpoint of $437M). - FRB Unsecured Claim Motion [Docket No. 3055] at 7.

[4] In February 2012, AFI booked a payable of $18.3 million due to ResCap relating to the DOJ/AG Consent Judgment - Analysis, Refreshed DOJ Settlement Liability Adjustments, dated Feb. 16, 2012, at 1 [EXAM0000678] (attached to E-mail from C. Dondzila to J. Fracci, A. Beck, B. Westman, D. DeBrunner, and J. Whitinger (Feb. 17, 2012) [EXAM0002673]). However, no record of an actual obligation from AFI to GMAC Mortgage has been identified in the accounting records or otherwise.

[5] Special Examiner Presentation, DOJ/AG Settlement, dated Dec. 11, 2012, at EXAM0023098 [EXAM0023089].

[6] This payment was made on March 14, 2012. - See E-mail from C. Dondzila to D. DeBrunner and J. Whitinger (Mar. 15, 2012) [EXAM11084487].

[7] Actual costs incurred are as of January 31, 2013 per Monthly AG Activity Reimbursement invoices to ResCap, prepared by Ally Bank, dated May 9, 2012 [ALLY_0196290], May 10, 2012 [EXAM0061399], June 4, 2012 [ALLY_0402171], June 28, 2012 [ALLY_0402172], July 3, 2012 [ALLY_0402173], Aug. 3, 2012 [EXAM00221497], Sept. 7, 2012 [EXAM00221497], Nov. 2, 2012 [EXAM00237710], Dec. 6, 2012 [ALLY_0402175], Jan. 3, 2013 [ALLY_0402176], Feb. 4, 2013 [ALLY_0402177].

[8] Of the $90.3 million in reimbursement costs to Ally Bank incurred as of January 31, 2013, $48.4 million was paid pre-petition (May 10, 2012 and May 11, 2013). The remaining payments are currently held in escrow.

[9] The go forward estimates are as of February 1, 2013 forward. Given that actual reimbursement payments for the period November 1, 2012 – January 31, 2013 were $10.4 million per the Monthly AG Activity Schedules, we have assumed that estimated reimbursement payments from February 1, 2013 through the end of the borrower relief program would be $37.7 million ($48.1 million - $10.4 million = $37.7 million).

[10] Includes attorney fees ($8.9 million), MTF FC fines and penalty ($1.4 million) and Hope Portfolio ($1.7 million).

[11] Per the January 30 Letter Agreement between ResCap, GMACM and AFI. The amount of debt forgiveness was originally calculated based on an assumption that 11/15ths (73%) of the DOJ/AG settlement (estimated at $268 million) would be allocated to ResCap and 4/15ths (27%) would be allocated to AFI. ($268 × .73 = 196.5). - Accounting Presentation by C. Dondzila, dated Jan. 10, 2012, at RC40020152 [RC40020121].

**Appendix V.E.1**, Page 1 of 3

### 1.    *Resort Finance Facility[1]*

### a.    *Principal Terms*

On February 21, 2008, the Resort Facility Borrower (RFC), entered into the Resort Finance Facility with AFI, as lender and agent.  The principal terms of the Resort Finance Facility were as follows:

TABLE V.E.1.a
**Resort Finance Facility - Principal Terms**
February 21, 2008

| | |
|---|---|
| Closing Date: | February 21, 2008 |
| Borrower: | RFC |
| Guarantor: | ResCap |
| Lender/Agent: | AFI |
| Facility Type: | Secured revolver |
| Purpose: | General corporate purposes and supplements existing financing for resort finance business |
| Committed Amount: | $750 million |
| Interest Rate: | LIBOR + 3.00% |
| Scheduled Termination Date: | 182 days after the closing date; and unless termination was triggered pursuant to an insolvency event of default, payment of all obligations was required one year from the first anniversary of the Termination Date |
| Fees: | Commitment fee of 0.20% |

*Source: Resort Finance Agreement [ALLY_0116311].*

### b.    *Borrowing Base/Collateral*

AFI initially committed to make Resort Facility Loans to the Resort Facility Borrower, up to the lesser of $750 million and the then existing borrowing base.  The borrowing base was determined by calculating the aggregate "value" of the Resort Facility Collateral, which consisted of the outstanding balances (subject to certain adjustments) of the following loan types extended by RFC to certain eligible developers in connection with resort financing transactions (1) timeshare backed loans (eligible developer loans pledged and permitted to be released under the bank facility agreement);[2] (2) construction loans (loans to acquire, develop, construct and

---

[1]    Resort Finance Agreement [ALLY_0116311].

[2]    Loan and Security Agreement (as amended, supplemented or otherwise modified), among RFC Resort Funding, LLC, as borrower, Residential Funding Corporation, as master servicer, the persons from time to time party thereto, as conduit lenders, the financial institutions from time to time parties thereto, as committed lenders, the

(Cont'd on following page)

complete resorts or resort amenities); and (3) pre-sale loans (loans to finance the sale of timeshares pursuant to pre-sale agreements for which deeds had not yet been delivered). The collateral "value" was determined by multiplying each of the items in (1), (2) and (3) above by a discount factor (90% in the case of the timeshare backed loans, 75% in the case of construction loans and 50% in the case of pre-sale loans). Developer eligibility requirements were determined under the Bank Facility Agreement in the case of timeshare backed loans and under the Resort Finance Facility in the case of construction loans and pre-sale loans.

### c.    Interest and Maturity

Interest accrued at a rate of LIBOR + 3.00% per annum. Resort Facility Loans were made available to the Resort Facility Borrower during a commitment period that was scheduled to terminate on the earlier of (1) the 182nd day after the closing date (February 21, 2008); and (2) the termination of the facility pursuant to an event of default. Other than with respect to certain indemnification obligations, all payment obligations under the Resort Finance Facility were non-recourse to the Resort Facility Borrower and to be made solely from collections with respect to the Resort Facility Collateral. If the Resort Finance Facility was terminated pursuant to an insolvency event of default, the Resort Facility Loans were immediately due and payable; however, unless the obligations were accelerated by AFI as a result of any other event of default, the Resort Facility Borrower had until one year from the date of termination of the commitment period to repay the Resort Facility Loans and obligations as and when amounts were collected subject to a waterfall provision.

### d.    ResCap Guarantee[3]

ResCap guaranteed the obligations of the Resort Facility Borrower under the Resort Finance Facility pursuant to a separate stand-alone unsecured unconditional performance guarantee; however, the guarantee excluded obligations relating to (1) non-recourse obligations of the Resort Facility Borrower relating to the payment of principal or interest on, any note(s) evidencing Resort Facility Loans or related fees; (2) payments relating to the outstanding principal balance of the Resort Facility Loans exceeding the borrowing base (however, ResCap was obligated to make payment relating to required repayments in connection with the breach of certain representations and covenants relating to the Resort Facility Collateral); and (3) certain indemnifications relating to, among other things, illegality, increased costs, taxes or breakage fees.

--------------------------------------------

(Cont'd from preceding page)

financial institutions from time to time parties there to, as managing agents and Deutsche Bank AG, New York Branch, as administrative agent, dated Jan. 26, 2006 [ALLY_0104683] (the "Bank Facility Agreement").

[3]    Performance Guarantee of Residential Capital, LLC, in favor of GMAC LLC, dated Feb. 21, 2008 [RC00036842].

**Appendix V.E.1**, Page 3 of 3

e.    *Pledge Agreement*

Under a stand-alone pledge agreement,[4] RFC pledged and granted to AFI a perfected security interest in (1) all its membership or other ownership interests in RFC Resort Funding, LLC; (2) certain scheduled loans; and (3) all collections relating to the aforementioned collateral.

---

[4]    Pledge Agreement among Residential Funding Company, LLC and GMAC LLC, dated Feb. 21, 2008 [RC00036826].

2.   *Secured MSR Facility*[5]

a.   *Principal Terms*

On April 18, 2008, the Secured MSR Facility Borrowers (RFC and GMAC Mortgage) and ResCap, as guarantor, entered into the Secured MSR Facility with AFI, as sole lender.  The principal terms of the Secured MSR Facility, when initially entered into, were as follows:

TABLE V.E.2.a
**Secured MSR Facility - Principal Terms**
April 18, 2008

| | |
|---|---|
| Closing Date: | April 18, 2008 |
| Borrowers: | RFC and GMAC Mortgage |
| Guarantor: | ResCap |
| Lender: | AFI |
| Facility Type: | Secured revolver |
| Purpose: | General corporate purposes |
| Committed Amount: | $750 million |
| Interest Rate: | LIBOR + 2.00% |
| Scheduled Maturity Date: | October 17, 2008 |
| Fees: | None |

*Source: Secured MSR Loan Agreement [RC00024114].*

b.   *Borrowing Base/Collateral*

AFI initially committed to make the Secured MSR Facility Loans to the Secured MSR Facility Borrowers, up to the lesser of $750 million and the then existing borrowing base.  The borrowing base was determined by calculating the aggregate "value" of the Secured MSR Facility Collateral, which consisted of: (1) MSRs and the related specified Servicing Contracts and collections accounts; (2) securities issued and/or guaranteed by Fannie Mae, Freddie Mac or Ginnie Mae specifically pledged to AFI; and (3) U.S. Treasury securities specifically pledged to AFI.  The collateral "value" was determined by multiplying each of the items in (1), (2) and (3) above by a discount factor (50% in the case of the MSRs, 85% in the case of GSE issued or guaranteed securities, and 92-98% in the case of U.S. Treasury securities).  Excluded from the Secured MSR Facility Collateral (and therefore the borrowing base) were (1) MSRs and Servicing Contracts with respect to the GSEs; and (2) Servicing Advances.

---

[5]   Secured MSR Loan Agreement [RC00024114].

   *c. Interest and Maturity*

  Interest accrued at a rate of LIBOR + 2.00% per annum.  The initial maturity date was scheduled to occur on the earlier of October 17, 2008 and the receipt of a commitment from a third party lender for a replacement facility secured by the same Secured MSR Facility Collateral.

   *d. ResCap Guarantee*

  ResCap guaranteed the obligations under the Secured MSR Facility pursuant to a separate stand alone unsecured unconditional guarantee.[6]

   *e. Amendments to Secured MSR Facility*

  The Secured MSR Facility was amended on 14 different occasions.

   *(1) Amendment No. 1 (May 21, 2008)[7]*

  This amendment eliminated the event of default relating to the maintenance of minimum servicer and master servicer ratings.

   *(2) Amendment No. 2 (May 22, 2008)[8]*

  This amendment expanded the list of Servicing Contracts excluded from the Secured MSR Facility Collateral by including Servicing Contracts identifying mortgage loans or pools of mortgage loans (1) owned by any Secured MSR Facility Borrower; and (2) transferred pursuant to a master repurchase agreement pursuant to which a Secured MSR Facility Borrower is a party.

   *(3) Amendment No. 3 (June 2, 2008)[9]*

  This amendment increased the collateral "value" for determining the borrowing base with respect to MSRs, from 50% to 85% (which gave the Secured MSR Facility Borrowers more borrowing capacity), and increased the lending commitment from $750 million to $1.2 billion.

---

[6] Guarantee of Residential Capital, LLC, dated Apr. 18, 2008 [RC00037568] (in favor of GMAC LLC as lender pursuant to the Secured MSR Facility).

[7] Amend. No. 1 to the Secured MSR Facility, dated May 21, 2008 [RC00024219].

[8] Amend. No. 2 to the Secured MSR Facility, dated May 22, 2008 [RC00024223].

[9] Amend. No. 3 to the Secured MSR Facility, dated June 2, 2008 [RC00037692].

>    *(4)     Amendment No. 4 (July 25, 2008)[10]*

This amendment provided it would be ResCap's responsibility (as opposed to the Secured MSR Facility Borrowers') to deliver the quarterly compliance certificate and changed the cross-default event of default to refer to a failure to comply with the financial covenants in the Secured Revolver Facility (rather than the JP Morgan 364-Day Facility).

>    *(5)     Amendment No. 5 (October 3, 2008)[11]*

This amendment modified the event of default regarding Servicing Contracts to provide that the occurrence of an adverse servicing event no longer resulted in an immediate event of default; instead, it was only upon notification by AFI (in its sole discretion) to the Secured MSR Facility Borrowers that any such occurrence constituted an event of default, where an adverse servicing event included: (1) the failure of a Secured MSR Facility Borrower to be an approved servicer under any Servicing Contract to which any pledged MSRs relate; (2) a Secured MSR Facility Borrower's failure to service in accordance with any Servicing Contract in any material respect; (3) a Secured MSR Facility Borrower's termination as servicer with respect to any pledged MSRs (subject to certain exceptions); and (4) receipt by a Secured MSR Facility Borrower of a notice from any MBS trustee indicating material breach, default or material non-compliance that AFI reasonably determined may entitle such MBS trustee to terminate such Secured MSR Facility Borrower.  AFI also consented to the modification of certain Servicing Contracts as to which FGIC was a surety provider.  As a condition to the effectiveness of this amendment, a letter agreement regarding the Secured Revolver Facility was entered into, pursuant to which a prepayment of $146.7 million was required to be made under that facility.[12]

>    *(6)     Amendment No. 6 (October 17, 2008)[13]*

Under this amendment, AFI agreed to defer until October 22, 2008, payment of an $84 million borrowing base deficiency (which deficiency had triggered a repayment requirement).  In addition: (1) the collateral "value" for determining the borrowing base with respect to MSRs appears to have been raised to approximately 91% (from 85%), however, determination of the borrowing base was changed to a formula whereby the collateral "value" for MSRs was reduced as the lending commitment under the Secured MSR Facility was reduced (as a result of debt forgiveness, among other things); (2) the maturity date was extended from October 17, 2008 to May 1, 2009; (3) AFI was given the power to negotiate and arrange for the transfer of servicing rights under any Servicing Contract to another asset manager, servicer, special servicer or sub-servicer and to solicit, negotiate and contract with potential backup servicers to either or both of the Secured MSR Facility Borrowers with respect to all or a portion of the Servicing Contracts,

---

[10]   Amend. No. 4 to the Secured MSR Facility, dated July 25, 2008 [RC00037696].

[11]   Amend. No. 5 to the Secured MSR Facility, dated Oct. 3, 2008 [ALLY_0238802].

[12]   *Id*. § 3(b)

[13]   Amend. No. 6 to the Secured MSR Facility, dated Oct. 17, 2008 [ALLY_0238920].

and the Secured MSR Facility Borrowers agreed to resign as servicer following an event of default and the request of AFI; and (4) the Secured MSR Facility Borrowers were required to pledge, no later than November 30, 2008, additional Secured MSR Facility Collateral with a market value of at least $250 million.

### (7)    Amendment No. 7 (December 10, 2008)[14]

Pursuant to this amendment, $451.5 million of the Secured MSR Facility Loans was forgiven as of November 30, 2008, reducing the outstanding principal balance of the Secured MSR Facility to $231 million.  This amendment also changed the collateral "value" for determining the borrowing base with respect to MSRs by reducing the collateral "value" percentage to 25.37% with the potential of further reduction as the lending commitment under the Secured MSR Facility was reduced (as a result of debt forgiveness, among other things).  In addition, this amendment eliminated the covenant of the Secured MSR Facility Borrowers to pledge, no later than November 30, 2008, additional Secured MSR Facility Collateral with a market value of at least $250 million.  This amendment explicitly relieved the Secured MSR Facility Borrowers from making a representation as to their solvency (all previous amendments had provided for a "bring down" of all representations and warranties contained in the Secured MSR Facility, including the solvency representation).[15]

### (8)    Waiver and Guarantee Amendment (May 27, 2009)[16]

In connection with the U.S Treasury's investment in AFI and the related transactions with GM (including the appointment or election of directors), AFI agreed that these transactions would not constitute a change of control or an event of default under the ResCap guarantee issued in connection with the Secured MSR Facility.  This amendment changed the definition of "Change of Control" in the ResCap guarantee to mean the acquisition of ownership, directly or indirectly, beneficially or of record, by any person or group (within the meaning of the Exchange Act) other than GM, Cerberus, the U.S. Treasury, the GM Trusts (trusts established to own stock of AFI), or any purchaser of the beneficial interests in the GM Trusts of membership interests representing a majority of the aggregate ordinary voting power represented by the outstanding capital stock of ResCap, not otherwise approved by AFI.

---

[14]    Amend. No. 7 to the Secured MSR Facility, dated Dec. 10, 2008 [ALLY_0239182].

[15]    *Id.* § 3.

[16]    Waiver and Amendment to Guarantee with respect to the Guarantee dated as of April 18, 2008, by Residential Capital, LLC, in favor of GMAC LLC as lender pursuant to the Secured MSR Facility, dated May 27, 2009 [RC00033220].

### (9)    Amendment No. 8 (March 18, 2009)[17]

Under this amendment (1) the obligations secured by the Secured MSR Facility Collateral were expanded to include (a) the obligations of the ResCap affiliated counterparties under the Master Netting Agreement, (b) the obligations of the ResCap affiliated counterparties under each derivative agreement governing derivative transactions with Ally Investment Management, and (c) the obligations under the Initial Line of Credit Agreement; and (2) the maturity date was extended from May 1, 2009 to June 30, 2009.  The MSR Facility Borrowers again "brought down" all of the representations and warranties contained in the Secured MSR Facility, including the solvency representation (as would be the case with all future amendments).

### (10)    Amendment No. 9 (June 1, 2009)[18]

Under this amendment, the obligations secured by the Secured MSR Facility Collateral were further expanded to include the obligations under the Second Line of Credit Agreement.  In addition, cross-default events of default to each derivative agreement, the Master Netting Agreement, the Initial Line of Credit Agreement and the Second Line of Credit Agreement were added; and, after an event of default, proceeds of the Secured MSR Facility Collateral were required to be allocated as determined by the Omnibus Agent under the Omnibus Security Agreement.

### (11)    Amendment No. 10 (June 12, 2009)[19]

Under this amendment: (1) reports on the borrowing base were required to be delivered weekly (as opposed to monthly) or more frequently if requested by AFI; (2) the interest rate margin was increased from 2.50% to 6.00%; (3) the Secured MSR Facility Borrowers consented to jurisdiction in the state courts of New York (as opposed to just the Southern District of New York); (4) the lending commitment amount was changed and defined to be $400 million *minus* the amount of Secured MSR Facility debt that was forgiven; and (5) the collateral "value" for determining the borrowing base with respect to MSRs was changed by increasing the percentage to 40%, and reducing the percentage as the lending commitment under the Secured MSR Facility was reduced.

### (12)    Amendment No. 11 (June 30, 2009)[20]

This amendment extended the maturity date from June 30, 2009 to July 31, 2009.

---

[17]    Amend. No. 8 to the Secured MSR Facility, dated Mar. 18, 2009 [GOLDIN00003753].

[18]    Amend. No. 9 to the Secured MSR Facility, dated June 1, 2009 [ALLY_0239904].

[19]    Amend. No. 10 to the Secured MSR Facility, dated June 12, 2009 [ALLY_0240208].

[20]    Amend. No. 11 to the Secured MSR Facility, dated June 30, 2009 [RC00033704].

**Appendix V.E.2**, Page 6 of 6

    *(13)  Amendment No. 12 (July 31, 2009)[21]*

  This amendment extended the maturity date from July 31, 2009 to September 30, 2009.

    *(14)  Amendment No. 13 (September 22, 2009)[22]*

  This amendment extended the maturity date from September 30, 2009 to November 30, 2009.

    *(15)  Amendment No. 14 (November 30, 2009)[23]*

  This amendment extended the maturity date from November 30, 2009 to December 31, 2009.

---

[21] Amend. No. 12 to the Secured MSR Facility, dated July 31, 2009 [GOLDIN00095982].

[22] Amend. No. 13 to the Secured MSR Facility, dated Sept. 22, 2009 [GOLDIN00044752].

[23] Amend. No. 14 to the Secured MSR Facility, dated Nov. 30, 2009 [GOLDIN00097683].

> 3.  *Secured Revolver Facility ($3.5 Billion)[24]*
>
>     a.  *Principal Terms*

On June 4, 2008, the Secured Revolver Facility Borrowers (RFC and GMAC Mortgage) and the Secured Revolver Facility Guarantors, entered into the Secured Revolver Facility with AFI, as lender and lender agent, initially evidenced by the Secured Revolver Loan Agreement and when amended and restated on December 30, 2009, evidenced by the A&R Secured Revolver Loan Agreement.  The principal terms of the Secured Revolver Facility, when initially entered into, were as follows:

---

[24]  Secured Revolver Loan Agreement [RC00024234].

12-12020-mg Case 22-11068-JTD Doc 3698-36 Filed 06/13/13 Entered 06/13/13 16:18:28 Appendix
Rec 0513913 Filed 02/03/23 Page 469 of 709
Pg 145 of 385

**Appendix V.E.3**, Page 2 of 12

---

TABLE V.E.3.a
**Secured Revolver Facility ($3.5 Billion) - Principal Terms**
June 4, 2008

| | |
|---|---|
| Closing Date: | June 4, 2008 |
| Borrowers: | RFC and GMAC Mortgage |
| Guarantors: | ResCap<br>GMAC Residential Holding Company, LLC<br>GMAC-RFC Holding Company, LLC<br>Homecomings Financial, LLC<br>Residential Mortgage Real Estate Holdings, LLC<br>Residential Funding Real Estate Holdings, LLC<br>Homecomings Financial Real Estate Holdings, LLC<br>Equity Investment I, LLC<br>Developers of Hidden Springs, LLC<br>DOA Holding Properties, LLC<br>RAHI<br>PATI |
| Lender/Lender Agent: | AFI |
| Facility Type: | Secured revolver and term loan |
| Purpose: | Repayment of ResCap debt existing at closing, asset acquisitions and other working capital purposes |
| Committed Amount: | $3.5 billion |
| Interest Rate: | LIBOR + 2.75% |
| Scheduled Maturity Date: | Revolver: May 1, 2010<br>Term Loan: July 28, 2008 |
| Fees: | Upfront fee of $17.5 million paid to AFI at closing; no commitment fee payable |

*Source: Secured Revolver Loan Agreement [RC00024234].*

---

    b.    *Borrowing Base*

AFI initially committed to make the Secured Revolver Facility Loans to the Secured Revolver Facility Borrowers up to the lesser of $3.5 billion and the then existing borrowing base. The borrowing base was determined by calculating the aggregate "value" of the First Priority Collateral, which as set forth in the chart below, was subject to a discount factor that varied depending on the type of asset.

TABLE V.E.3.b
**Discount Factors Used to Determine Collateral Values**

| | |
|---|---|
| Conforming loans (mortgage loans that conform to the applicable GSE guidelines) | 90% |
| Wet loans (mortgage loans where the related mortgage file has not been delivered to the custodian) | 85% |
| Jumbo loans (mortgage loans that substantially conform to the applicable GSE guidelines) | 80% |
| Servicing P&I advances (Servicing Advances relating to delinquent interest and/or principal) | 80% |
| Servicing T&I advances (Servicing Advances relating to real estate taxes and/or hazard, flood or primary mortgage insurance premiums) | 70% |
| Servicing corporate advances (Servicing Advances relating to preservation of properties, expenses for foreclosure actions and other expenses to maximize collateral value) | 70% |
| 2nd Lien loans and home equity lines of credit held for sale | 50% |
| HLTV Loans (where loan to value ratio > 100%) held for sale | 50% |
| Scratch and dent loans (loans not saleable to the GSEs or in the whole loan and securitization markets in the ordinary course of business as newly originated and non-defective) held for sale | 50% |
| Financial asset-backed securities | 50% |
| Other receivables (receivables due from the FHA or VHA that are more than 90 days delinquent or are in or have completed the foreclosure process) | 50% |
| Assets of ResCap's International Business Group | 50% |
| Assets of ResCap's Business Capital Group | 50% |
| Residual rights (certain residual rights after taking into account senior claims) | 50% |
| 2nd Lien loans and home equity lines of credit held for investment | 50% |
| Scratch and dent Loans held for investment | 50% |
| Kick out loans (loans repurchased from a securitization) | 50% |
| HLTV loans held for investment | 50% |
| Real estate owned property acquired by certain ResCap affiliates through foreclosure or model homes owned by GMAC Model Home Finance, LLC | 50% |
| *Source: Secured Revolver Loan Agreement, Sched. 2.04 [RC00024234].* | |

### c.  Interest and Maturity

Interest on all Secured Revolver Facility Loans accrued at a rate of LIBOR + 2.75% per annum.  The maturity date for the Secured Revolver Facility Term Loan occurred on July 28, 2008, and the maturity date for the Secured Revolver Facility Revolver Loans was initially scheduled to occur on May 1, 2010 (but was subsequently extended).

### d.  Mandatory Prepayment

For a description of mandatory prepayment provisions under the Secured Revolver Facility see Section V.E.3.

### e.    Financial Covenants

There were two financial covenants that applied to ResCap and its Subsidiaries: (1) if Consolidated Liquidity (cash and cash equivalents of ResCap on a consolidated basis, excluding cash and cash equivalents of Ally Bank), on any business day, fell below $750 million, then within one business day, ResCap had to cause Consolidated Liquidity to be raised above $750 million; *provided* that Consolidated Liquidity was never permitted to fall below $450 million; and *provided further* that the aggregate amount of U.S. dollars and short term cash equivalents could never fall below $250 million; and (2) Consolidated TNW (the line item consisting of "equity" on the consolidated balance sheet of ResCap, but excluding the equity of Ally Bank) could not, as of the last business day of any month, be less than $250 million.

### f.    Guarantees

ResCap and the other Secured Revolver Facility Guarantors guaranteed the obligations under the Secured Revolver Facility pursuant to an unconditional guarantee.[25]

### g.    Collateral and Intercreditor Agreements

In connection with the Secured Revolver Facility, the Secured Revolver Facility Borrowers, the Secured Revolver Facility Guarantors and certain Affiliates of the Secured Revolver Facility Borrowers entered into the First Priority Security Agreement, which was subsequently amended and restated on December 30, 2009.

Pursuant to the First Priority Security Agreement,[26] the Secured Revolver Facility Borrowers, the Secured Revolver Facility Guarantors and certain Affiliates of the Secured Revolver Facility Borrowers granted a security interest in favor of the First Priority Collateral Agent, in (with respect to the Secured Revolver Facility Borrowers and the Secured Revolver Facility Guarantors) substantially all of their personal property[27] to secure the obligations owed under the Secured Revolver Facility and related documents, including obligations under the AFI Hedge Agreements.  The First Priority Collateral included the following:

> (1)    financial asset-backed securities, certain Servicing Advances and certain mortgage loans;
>
> (2)    accounts;

---

[25]    Secured Revolver Loan Agreement, Art. XI [RC00024234].

[26]    First Priority Security Agreement [RC00038119].

[27]    Certain grantors under the First Priority Security Agreement (referred to therein as "Equity Pledgors," "FASB Grantors" and "Additional Account Parties") granted liens on a narrow group of assets, including certain deposit accounts and securities accounts, financial assets, certain pledged equity interest and certain pledged notes.

**Appendix V.E.3**, Page 5 of 12

     (3)     chattel paper;

     (4)     commercial tort claims;

     (5)     deposit accounts;

     (6)     documents;

     (7)     financial assets;

     (8)     general intangibles;

     (9)     goods and instruments;

     (10)     intellectual property;

     (11)     certain shares of capital stock and other equity interests;

     (12)     certain pledged notes;

     (13)     letters of credit;

     (14)     money;

     (15)     Servicing Contracts;

     (16)     investment property;

     (17)     all other personal assets and property; and

     (18)     proceeds of the foregoing.

The First Priority Collateral did not include certain Excluded Assets,[28] including: (1) more than 65% of the shares of foreign corporations; (2) any asset (including contracts) to the extent that granting a security interest therein would violate applicable law, result in the invalidation thereof or provide any party with a right of termination or default with respect thereto or with respect to any Bilateral Facility to which such assets were subject; (3) certain intellectual property applications; and (4) proceeds of the foregoing.

---

[28]   First Priority Security Agreement, §1 [RC00038119] (definition of "Excluded Assets").

Prior to being amended and restated, the First Priority Security Agreement was amended (1) on August 14, 2008[29] to, among other things, reflect (a) certain exclusions from the First Priority Collateral relating to obligations under the AFI Hedge Agreements, and (b) to limit the amount of proceeds from First Priority Collateral applied to satisfy the secured obligations (including amounts owed under the Secured Revolver Facility and the AFI Hedge Agreements); (2) on January 14, 2009[30] to amend the collateral schedules to the First Priority Security Agreement, including the list of pledged securities accounts and deposit accounts and the pledged equity interests; and (3) on January 30, 2009[31] to reflect pledges of certain equity interests by DOA Holding Properties, LLC.

The First Priority Collateral securing the obligations owed under the Secured Revolver Facility and the AFI Hedge Agreements also secured, on a second and third lien basis, the obligations owed under the Senior Secured Notes and the Junior Secured Notes, respectively. The lien priority arrangements were set forth in the Intercreditor Agreement.

Under the terms of the Intercreditor Agreement,[32] liens securing the Secured Revolver Facility and the AFI Hedge Agreements were senior and prior to the liens securing the Senior Secured Notes and the Junior Secured Notes. The Intercreditor Agreement provided that the First Priority Collateral Agent controlled the exercise of remedies so long as amounts were outstanding under the Secured Revolver Facility and the AFI Hedge Agreements. Proceeds from the sale or other disposition of the First Priority Collateral were required to be applied to satisfy obligations owing under the Secured Revolver Facility and the AFI Hedge Agreement prior to satisfying amounts owed under the Senior Secured Notes and the Junior Secured Notes.

### h. Accounts

Except for a designated exempted cash reserve account and except for accounts: (1) of special purpose vehicles formed for financing purposes; (2) of independent third parties; (3) established for Bilateral Facilities; and (4) holding funds held on account for, in trust for, or by ResCap or a ResCap Subsidiary as a custodian for any third party, all material bank and securities accounts were required to be subject to a perfected lien in favor of the Collateral Control Agent (Wells Fargo Bank, N.A., acting in its capacity as the collateral agent for each of the First Priority Collateral Agent, the Second Priority Collateral Agent and Third Priority Collateral Agent under the Intercreditor Agreement). In addition, all liquidity reserves (other than up to $250 million permitted to be held in the designated exempted cash reserve account) of

---

[29] First Amend. Agreement to the First Priority Security Agreement, dated Aug. 14, 2008 [ALLY_0051600]. The amendment also reflected numerous additional entities as grantors of liens.

[30] Second Amend. Agreement to the First Priority Security Agreement, dated Jan. 14, 2009 [ALLY_0051671]. The amendment also reflected numerous additional entities as grantors of liens.

[31] Third Amend. Agreement to the First Priority Security Agreement, dated Jan. 30, 2009 [ALLY_0056791].

[32] Intercreditor Agreement [ALLY_0229287].

ResCap and its Subsidiaries were required to be maintained in an account over which the Collateral Control Agent had been granted a perfected lien.

### i.    Amendments to Secured Revolver Facility

The Secured Revolver Facility was amended on ten different occasions before it was amended and restated in December 2009.

### (1)    First Amendment (July 29, 2008)[33]

This amendment, among other things, provided: (1) that AFI's commitment to make Secured Revolver Facility Revolver Loans was permanently reduced to the extent that, within 120 days of the Secured Revolver Facility Borrowers' receipt of cash proceeds from the sale of First Priority Collateral, the Secured Revolver Facility Borrowers failed to reborrow the prepaid amount and either (a) use the reborrowed proceeds to purchase assets qualifying as First Priority Collateral for the Secured Revolver Facility; or (b) designate the sales proceeds as retained proceeds up to the threshold amount of $450 million; and (2) for a broader definition of assets that would qualify as First Priority Collateral that could be purchased with the proceeds of sold First Priority Collateral.

### (2)    Second Amendment (August 14, 2008)[34]

This amendment was entered into in connection with the effectuation of various hedging arrangements between ResCap and AFI.   The Secured Revolver Facility was amended to reflect adjustments to the borrowing base (the borrowing base was reduced to the extent there was hedging exposure in favor of AFI) and required additional prepayments arising from changes in hedging exposure (a separate tranche of Secured Revolver Facility Revolver Loans, called "MTM Revolving Loans", was created that could be drawn by the Secured Revolver Facility Borrowers to make these prepayments).   A new security agreement was entered into for the benefit of AFI as hedge counterparty, and an amendment fee in the amount of $1.056 million was required to be paid by the Secured Revolver Facility Borrowers to AFI.

### (3)    Consent Agreement (October 17, 2008)[35]

Among other things, this agreement provided for the release of First Priority Collateral and guarantees relating to certain ResCap Subsidiaries that were inadvertently joined as parties

---

[33]    Amend. No.1 to the Secured Revolver Loan Agreement, dated July 29, 2008 [RC00038626].

[34]    Amend. No.2 to the Secured Revolver Loan Agreement, dated Aug. 14, 2008 [RC00038642].

[35]    Consent Agreement among Residential Funding Company, LLC, as borrower, GMAC Mortgage, LLC, as borrower, Residential Capital, LLC and certain other affiliates of the borrowers, as guarantors, and GMAC LLC, as lender, initial lender and lender agent, dated Oct.17, 2008 [ALLY_0051462].

to the security documents for the Secured Revolver Facility, and provided for a new requirement for ResCap to deliver, on a weekly basis, a thirteen-week forecast of cash sources and uses.

### (4)    Third Amendment (November 25, 2008)[36]

This amendment provided for a confirmation of the amount of sales made under the Servicing Advance Factoring Agreement and allowed for a short extension of the time period during which proceeds from sales under the Servicing Advance Factoring Agreement did not need to be used to purchase assets that would constitute First Priority Collateral.  For the first time, a reservation of rights provision was included in this amendment, and an analogous provision was included in amendments to the Secured Revolver Facility going forward.

### (5)    Fourth Amendment (December 12, 2008)[37]

This amendment, among other things, (1) provided for a tightening of control on cash by requiring that (a) funds on deposit in the Sales Proceeds Accounts (the accounts into which proceeds from the sale of First Priority Collateral had to be deposited) must be used either to repay Secured Revolver Facility Loans or reinvested in assets that qualified as First Priority Collateral; and (b) certain Sales Proceeds Accounts be designated as "Servicing Advances Accounts" into which proceeds from payments received in respect of Servicing Advances had to be deposited; (2) added a requirement that the Secured Revolver Facility Borrowers track, on a daily basis, the permanent reductions in AFI's commitment to make Secured Revolver Facility Revolver Loans (resulting from mandatory prepayments); and (3) confirmed the reduction of AFI's commitment to $3.1 billion.  As a condition to this amendment, the Secured Revolver Facility Borrowers were explicitly relieved from making a representation as to their solvency.[38]

### (6)    Fifth Amendment (December 31, 2008)[39]

This amendment, among other things: (1) added provisions with respect to the treatment of Reinvestment REO Property (residential property acquired as a result of a foreclosure of residential mortgage assets that were not "Primary Collateral" for the Secured Revolver Facility); (2) modified the definition of "Collateral Dispositions" to account for certain foreclosure exceptions and to recognize the entering into of a new receivables financing agreement with WestLB, AG, New York Branch; and (3) replaced the schedule of Bilateral Facilities (reflecting a reduction in the aggregate number of such facilities).  As a condition to this amendment, the Secured Revolver Facility Borrowers were explicitly relieved from making a representation as to their solvency.[40]

---

[36]    Amend. No.3 to the Secured Revolver Loan Agreement, dated Nov. 25, 2008 [ALLY_0051495].

[37]    Amend. No.4 to the Secured Revolver Loan Agreement, dated Dec. 12, 2008 [ALLY_0051551].

[38]    *Id.* § 4.6(a).

[39]    Amend. No.5 to the Secured Revolver Loan Agreement, dated Dec. 31, 2008 [ALLY_0051574].

[40]    *Id.* § 5.5(a).

### (7)    Sixth Amendment (March 31, 2009)[41]

This amendment modified the affirmative covenant regarding GMAC Mortgage's maintenance of a Peak Score, to change it from only requiring a monthly Peak Score of "Excellent" from Fannie Mae to maintaining either: (1) while Fannie Mae is using the Peak Score system, a monthly Peak Score equating to "Excellent" or better, or after Fannie Mae has implemented a replacement system, a rating reasonably equivalent to a monthly Peak Score of "Excellent" or better (as agreed by AFI and GMAC Mortgage); or (2) an Investor Reporting and Remitting rating from Freddie Mac equating to "Tier 2" or better. In connection with this amendment, the Secured Revolver Facility Borrowers' representation regarding their solvency was made once again (and continued to be made going forward).

### (8)    Waiver and Seventh Amendment (May 27, 2009)[42]

In connection with the U.S Treasury's investment in AFI and the related transactions with GM (including the appointment or election of directors), AFI agreed that these transactions would not constitute a change of control. This amendment changes the definition of "Change of Control" to mean the acquisition of ownership, directly or indirectly, beneficially or of record, by any person or group (within the meaning of the 1934 Act) other than GM, Cerberus, the U.S. Treasury, the GM Trusts (trusts established to own stock of GMAC), or any purchaser of the beneficial interests in the GM Trusts, of capital stock representing a majority of the voting stock of ResCap.

### (9)    Eighth Amendment (May 29, 2009)[43]

This amendment focused on the utilization of proceeds relating to Servicing Advances and the related Servicing Advances Accounts. It provided that: (1) collections on, and net cash proceeds from sales of, Servicing Advances had to be deposited solely into the Servicing Advances Accounts (and no other amounts could be deposited into the Servicing Advances Accounts); (2) collections on (other than net cash proceeds from sales of) Servicing Advances could only be withdrawn from the Servicing Advances Accounts under certain circumstances; and (3) after June 18, 2009, such amounts could only be withdrawn to make Servicing Advances or prepayments of the Secured Revolver Facility. This amendment also: (1) added a consent by the parties to the Secured Revolver Facility to the jurisdiction of the state courts of New York located in Manhattan (there was already a consent to the federal courts located in New York); and (2) acknowledged that June 17, 2009 would mark the end of sales of Servicing Advances under the Servicing Advance Factoring Agreement.

---

[41]   Amend. No.6 to the Secured Revolver Loan Agreement, dated Mar. 31, 2009 [ALLY_0056750].

[42]   Waiver and Seventh Amend. to the Secured Revolver Loan Agreement, dated May 27, 2009 [ALLY_0056765].

[43]   Amend. No.8 to the Secured Revolver Loan Agreement, dated May 29, 2009 [ALLY_0056769].

### (10)    Ninth Amendment (June 30, 2009)[44]

This amendment also focused on the utilization of proceeds relating to Servicing Advances and the related Servicing Advances Accounts.  It provided the Secured Revolver Facility Borrowers with a bit more cash flexibility in that it gave the Secured Revolver Facility Borrowers the ability to use amounts on deposit in the Servicing Advances Accounts for general corporate purposes prior to July 30, 2009 (subject to restrictions, including that the amount withdrawn for general corporate purposes and not redeposited could not exceed $150 million).

### (11)    Tenth Amendment (July 31, 2009)[45]

This amendment also focused on the utilization of proceeds relating to Servicing Advances and the related Servicing Advances Accounts.  It extended the period previously established for utilizing proceeds for general corporate purposes from July 30, 2009 to September 29, 2009.  This amendment also added a replacement of the schedule of Bilateral Facilities (reflecting a reduction in the aggregate number of such facilities).

### j.    A&R Secured Revolver Loan Agreement[46]

On December 30, 2009, the Secured Revolver Loan Agreement was amended and restated, evidenced by the A&R Secured Revolver Loan Agreement.  Outstanding Secured Revolver Facility Revolving Loans in the principal amount of $1.55 billion were converted into term loans (with no change to the May 2010 maturity date) thereby eliminating the Secured Revolver Facility Borrowers' ability to borrow further under the Secured Revolver Facility.  The discount factors used to determine the collateral "value" (for borrowing base purposes) were not changed, but the amendment gave AFI the ability to modify the percentages in its reasonable discretion taking into account estimated collections, market value, legal risks, cost of recovery

---

[44]    Amend. No.9 to the Secured Revolver Loan Agreement, dated June 30, 2009 [RC00033614].

[45]    Amend. No.10 to the Secured Revolver Loan Agreement, dated July 31, 2009 [ALLY_0060330].

[46]    A&R Secured Revolver Loan Agreement [ALLY_0066146]. In connection with the A&R Secured Revolver Loan Agreement, (1) the First Priority Security Agreement was amended and restated on December 30, 2009 (the "A&R First Priority Security Agreement") [EXAM00110381]; and (2) certain Affiliates of ResCap entered into the Real Estate Subsidiary Pledge and Security Agreement and Irrevocable Proxy, dated Dec. 30, 2009 (the "Real Estate Subsidiary Security Agreement") [ALLY_0066748], to provide additional collateral to secure obligations owed under the A&R Secured Revolver Loan Agreement and the obligations owed under the Senior Secured Notes and the Junior Secured Notes.  The assets subject to liens under the A&R First Priority Security Agreement were substantially identical to the assets subject to the liens granted under the First Priority Security Agreement.  The lien granted under the Real Estate Subsidiary Security Agreement was an "all assets" type of lien arrangement, covering similar types of assets subject to the lien granted under the A&R First Priority Security Agreement.  The parties that granted liens under the Real Estate Subsidiary Security Agreement, included, without limitation, DOA Holding Properties, LLC, Equity Investment IV, LLC, GMAC Model Home Finance I, LLC, RFC Construction Funding, LLC, RC Properties I, LLC (and other entities named RC Properties with the roman number from II through XX), DOA Properties I, LLC (and other entities named DOA Properties with the roman number from II through IX).

and other matters customarily considered by commercial lenders when determining advance rates. The interest rate remained at 2.75% above LIBOR, and no upfront fees were charged to the Secured Revolver Facility Borrowers in connection with the amendment and restatement. The representation as to solvency was altered to provide that it would be made by ResCap on a consolidated, rather than an entity by entity, basis. The covenants were modified to, among other things, provide for: (1) a most-favored nations clause that prevented ResCap and its Subsidiaries from entering into (or amending) provisions of other credit facilities relating to solvency, change of control and financial covenants that were less favorable to ResCap (or such Subsidiaries) than the analogous provisions of the Secured Revolver Facility (without causing the Secured Revolver Facility to be amended accordingly); and (2) the delivery to AFI, on a daily basis, of ResCap's liquidity balance roll forward data (a forecast of cash sources and uses for a thirteen-week period). At the time the Secured Revolver Facility was amended and restated, no changes to the financial covenants were made. A specific cross-default to the A&R Line of Credit Agreement was added as an event of default as part of the amendment and restatement. In conjunction with the amendment and restatement of the Secured Revolver Facility, the First Priority Security Agreement, the Second Priority Security Agreement and the Third Priority Security Agreement were also amended and restated[47] on substantially similar terms as their respective predecessor agreements.

### k.  Amendments to A&R Secured Revolver Loan Agreement

After being amended and restated, the Secured Revolver Facility was then amended an additional five times before the Petition Date.

### (1)  First Amendment (April 30, 2010)[48]

This amendment extended the maturity date of the Secured Revolver Facility from May 1, 2010 to April 29, 2011.

### (2)  Second Amendment (August 31, 2010)[49]

This amendment, among other things: (1) provided for the covenant regarding the maintenance of a minimum Peak Score to apply to both Secured Revolver Facility Borrowers (as opposed to just GMAC Mortgage), but a failure to comply with this covenant would only be breached if such failure could reasonably be expected to have a material adverse effect; (2) eliminated the $750 million consolidated liquidity covenant, limiting it to just a $250 million covenant regarding Unrestricted ResCap Liquidity (the unrestricted and unencumbered cash (consisting of solely U.S. dollars) and cash equivalents held by ResCap on a consolidated basis)

---

[47]  A&R First Priority Security Agreement [EXAM00110381]; A&R Second Priority Security Agreement [ALLY_0066445]; A&R Third Priority Security Agreement [ALLY_0066573].

[48]  Amend. No. 1 to the A&R Secured Revolver Loan Agreement, dated Apr. 30, 2010 [ALLY_0069506].

[49]  Amend. No. 2 to the A&R Secured Revolver Loan Agreement, dated Aug. 31, 2010 [ALLY_0074205].

and provided for a most-favored nations clause (such that the Secured Revolver Facility would incorporate any more restrictive financial covenant (or additional financial covenant) contained in a Bilateral Facility; (3) added a similar most-favored nations clause with respect to the consolidated TNW covenant; (4) increased the advance rates for Scratch and Dent Loans[50] from 50% to 76.5%; (5) added an event of default if any Secured Revolver Facility Borrower, Secured Revolver Facility Guarantor or any Subsidiary of either defaulted in the payment or performance of any debt or other obligation that had been guaranteed by AFI for the benefit of a third party; and (6) replaced the schedule of Bilateral Facilities to further reduce the aggregate number of such facilities.

### (3)   Third Amendment (December 21, 2010)[51]

This amendment provided that there could be more than one exempt cash reserve account, but did not change the maximum of $250 million that could be held therein in the aggregate.

### (4)   Fourth Amendment (April 18, 2011)[52]

This amendment (1) modified the covenant regarding Peak Score to provide that the satisfaction by the Secured Revolver Facility Borrowers of two of the following three ratings, as a prime residential mortgage servicer, would satisfy the covenant:  (a) "average" by S&P; (b) "RPS3-" by Fitch; and (c) "SQ3-" by Moody's; and (2) extended the maturity date of the Secured Revolver Facility from April 29, 2011 to April 13, 2012.

### (5)   Fifth Amendment (April 10, 2012)[53]

This amendment extended the maturity date of the Secured Revolver Facility from April 13, 2012 to May 14, 2012.

---

[50]   See Table V.E.3.b for a description of Scratch and Dent Loans.

[51]   Amend. No. 3 to the A&R Secured Revolver Loan Agreement, dated Dec. 21, 2010 [EXAM00110350].

[52]   Amend. No. 4 to the A&R Secured Revolver Loan Agreement, dated Aug. 31, 2010 [ALLY_0074234].

[53]   Amend. No. 5 to the A&R Secured Revolver Loan Agreement, dated Apr. 10, 2012 [EXAM00110372].

4. *Servicing Advance Factoring Facility*[54]

a. *Principal Terms*

On June 17, 2008, the Servicing Advance Factoring Sellers (RFC and GMAC Mortgage), and GMAC CF, as purchaser, entered into the Servicing Advance Factoring Facility. The principal terms of the Servicing Advance Factoring Facility, when initially entered into, were as follows:

TABLE V.E.4.a
**Servicing Advance Factoring Facility - Principal Terms**
June 17, 2008

| | |
|---|---|
| Effective Date: | June 17, 2008 |
| Sellers: | RFC and GMAC Mortgage |
| Purchaser: | GMAC CF |
| Facility Type: | Receivable Sale Transaction |
| Maximum Purchase Amount: | $600 million |
| Term: | One year |

*Source: Service Advance Factoring Agreement [ALLY_0041874].*

b. *Purchase and Sale*

Subject to a $600 million cap, GMAC CF committed to purchase receivables arising from Servicing Advances made by the Servicing Advance Factoring Sellers under certain designated Servicing Contracts. Servicing Advances consisted of (1) P&I Advances (Servicing Advances relating to delinquent interest and/or principal); (2) T&I Advances (Servicing Advances relating to real estate taxes and/or hazard, flood or primary mortgage insurance premiums); and (3) Corporate Advances (Servicing Advances relating to preservation of properties, expenses for foreclosure actions and other expenses to maximize collateral value). On the initial purchase date and on each subsequent date on which the sale and purchase of additional Servicing Advances were settled, the purchase price was determined by multiplying the receivable balance of each of the above-referenced types of Servicing Advances by a discount factor of 85%, subject to certain adjustments. The purchase price of the Servicing Advances could be further adjusted by mutual agreement to reflect fair market value. The obligations to sell and purchase were suspended if the purchase of Servicing Advances would result in the cap amount being exceeded or if GMAC CF and the Servicing Advance Factoring Sellers were not in agreement with adjustments to the purchase price.

---

[54] Servicing Advance Factoring Agreement [ALLY_0041874].

**Appendix V.E.4**, Page 2 of 2

     *c.*    *Receivable Factoring Arrangements*

Upon the occurrence of any Termination Event (events of default under the Servicing Advance Factoring Facility) or Stop Event (suspension, termination, removal or resignation of RFC or GMAC Mortgage as a servicer under a designated Servicing Contract), GMAC CF could immediately cease purchasing receivables.[55]

The Servicing Advance Factoring Sellers continued to service and administer the collection of the Servicing Advances, as agents of GMAC CF, and indemnified GMAC CF with respect to any act or omission by the Servicing Advance Factoring Sellers in their capacity as "Servicers" with respect to the Servicing Advances. With respect to Servicing Advances subject to liens under the Secured Revolver Facility, the Servicing Advance Factoring Sellers were required to deliver lien release documents from AFI, as "Lender Agent" under the Secured Revolver Facility, and Wells Fargo Bank, as First Priority Collateral Agent, including amendments to financing statements evidencing the release of liens for the benefit of the holders of the Junior Secured Notes and the Senior Secured Notes.

     *d.*    *Amendment No. 1 to Servicing Advance Factoring Agreement*[56]

The Servicing Advance Factoring Agreement was amended on October 6, 2008. This amendment (1) required the Servicing Advance Factoring Sellers to notify GMAC CF upon the occurrence of any Stop Event; and (2) provided that the occurrence of one or more Stop Events (whether matured or subject to notice of any cure period) under designated Servicing Contracts representing 5% or more of the purchased Servicing Advances would no longer result in an immediate event of termination under the Servicing Advance Factoring Agreement, unless determined as such by GMAC CF in its sole discretion.

---

[55]   Servicing Advance Factoring Agreement, § 8(b) [ALLY_0041874].

[56]   Amend. No. 1 to the Servicing Advance Factoring Agreement, dated Oct. 6, 2008 [ALLY_0093099].

5.    *Initial Line of Credit Facility*[57]

a.    *Principal Terms*

On November 20, 2008, the Initial Line of Credit Borrowers (PATI and RAHI), and the Initial Line of Credit Guarantors, entered into the Initial Line of Credit Facility. The principal terms of the Initial Line of Credit Facility, when initially entered into, were as follows:

TABLE V.E.5.a
**Initial Line of Credit Facility - Principal Terms**
November 20, 2008

| | |
|---|---|
| Closing Date: | November 20, 2008 |
| Borrowers: | PATI and RAHI |
| Guarantors: | ResCap<br>RFC<br>GMAC Mortgage |
| Lender/Lender Agent: | AFI |
| Facility Type: | Secured revolver |
| Purpose: | Budgeted working capital and general corporate purposes in the ordinary course |
| Committed Amount: | $430 million |
| Interest Rate: | LIBOR + 3.50% |
| Scheduled Maturity Date: | December 31, 2008 |
| Fees: | None |

*Source: Initial Line of Credit Agreement [ALLY_0023145].*

b.    *Borrowing Base*

AFI initially committed to make Initial Line of Credit Loans to the Initial Line of Credit Borrowers, up to the lesser of (1) the then existing borrowing base; and (2) $430 million *minus* the value of collateral posted by AFI as replacement collateral for (a) certain collateral that secured indemnification obligations relating to the purchase and sale of mortgage loans; and/or (b) litigation bonds in connection with the Mitchell litigation. The borrowing base was determined by calculating the aggregate "value" of the Initial Line of Credit Collateral, which, as set forth in the chart below, was subject to a discount factor that varied depending on the type of asset.

---

[57]    Initial Line of Credit Agreement [ALLY_0023145].

12-12020-mg    Case 12-11668-JED    Doc 3698-36    Filed 05/13/13    Doc 05/13/13    Entered 05/13/13 08:13:49    Page 483 of 709    Appendix
Pg 159 of 385

**Appendix V.E.5**, Page 2 of 9

TABLE V.E.5.b
**Discount Factors Used to Determine Collateral Values**

| | |
|---|---|
| Flume No. 8 Note (Secured Zero Coupon Discount Note of Flume (No. 8) Limited dated as of November 14, 2008 | 50% |
| GSAP Class A-1 Preference Shares (100 Class A-1 Preference Shares issued by GMAC Mortgage Servicer Advance Funding Company, Ltd.) and GSAP Class A-2 Preference Shares (100 Class A-2 Preference Shares issued by GMAC Mortgage Servicer Advance Funding Company, Ltd.) | 80% |
| Warehouse loans (loans made by any Initial Line of Credit Guarantor pursuant to (i) the Warehousing Credit and Security Agreement dated as of April 1, 2005 between RFC and First Savings Mortgage Corporation and (ii) the Servicing Secured Facility Agreement (Syndicated) among Provident Funding Associates, L.P., U.S. Bank National Association, JPMorgan Chase Bank, N.A., J.P. Morgan Securities Inc., RFC and other lenders party thereto from time to time) | 50% |

*Source: Initial Line of Credit Agreement, Sched. 2.04 [ALLY_0023241].*

### c.    Funding; Interest and Maturity

The Initial Line of Credit Borrowers were permitted to request Initial Line of Credit Loans only if either or both of the two following ResCap liquidity tests were met: (1) the estimated Unrestricted ResCap Liquidity (unencumbered cash in dollars held in the U.S. by ResCap and its Subsidiaries) on the proposed funding date was less than $250 million and, based on such estimates, after giving effect to an Initial Line of Credit Loan, Unrestricted ResCap Liquidity did not exceed $250 million *plus* a Draw Adjustment Amount (an amount equal to $25 million or a higher amount specified by AFI); or (2) the estimated Consolidated Liquidity (cash and cash equivalents of ResCap on a consolidated basis, excluding cash and cash equivalents of Ally Bank) on the proposed funding date was less than $750 million and, based on such estimates, after giving effect to an Initial Line of Credit Loan, Consolidated Liquidity did not exceed $750 million *plus* the Draw Adjustment Amount. Interest on the Initial Line of Credit Loans accrued at a rate of LIBOR + 3.50% per annum. The maturity date for the Initial Line of Credit Loans was initially scheduled to occur on December 31, 2008 (the facility was subsequently extended numerous times).

### d.    Mandatory Prepayment

Initial Line of Credit Loans were required to be prepaid when (1) the outstanding principal balance exceeded the borrowing base by an amount equal to or greater than $250,000; or (2) the "Liquidity Excess Amount"[58] was greater than or equal to $25 million. If the Liquidity Excess Amount was equal to or in excess of $25 million, the Initial Line of Credit Borrowers were required to prepay the Initial Line of Credit Loans to the extent Unrestricted ResCap Liquidity and Consolidated Liquidity would be equal to or greater than the required threshold

---

[58]    *Id.* § 2.08(c) (the Initial Line of Credit Borrowers were required to determine on a daily basis the amount by which the (1) estimated "Unrestricted ResCap Liquidity" exceeded $250 million; and (2) "Consolidated Liquidity" exceeded $750 million. The "Liquidity Excess Amount" was the greater of the two foregoing calculations).

amounts of $250 million and $750 million, respectively.  The Initial Line of Credit Borrowers were permitted to satisfy prepayment obligations by adding eligible assets consisting of whole mortgage loans to the Initial Line of Credit Collateral.

### e.    Financial Covenants

There were two financial covenants that applied to ResCap and its Subsidiaries:  (1) Consolidated TNW (the line item consisting of equity on the consolidated balance sheet of ResCap, but excluding the equity of Ally Bank) could not, as of the last Business Day of any month, be less than $250 million; and (2) Unrestricted ResCap Liquidity had to be greater than $250 million at all times; however, failure to maintain the required Unrestricted ResCap Liquidity threshold was subject to a ten business day cure period.

### f.    Guarantees

ResCap and the other Initial Line of Credit Guarantors guaranteed the obligations under the Initial Line of Credit Agreement pursuant to an unconditional guarantee.[59]

### g.    Collateral Arrangements

In connection with the Initial Line of Credit Agreement, the Initial Line of Credit Borrowers and the Initial Line of Credit Guarantors entered into the Initial Line of Credit Security Agreement.[60]

Pursuant to the Initial Line of Credit Security Agreement, the Initial Line of Credit Borrowers and the Initial Line of Credit Guarantors granted a security interest in favor of AFI, as lender agent, in specific personal property to secure the obligations owed under the Initial Line of Credit Agreement and the related documents.  Initially, Initial Line of Credit Collateral included the following:

> (1)    certain shares of capital stock and other equity interests;
>
> (2)    certain pledged notes and all assets, rights and property relating thereto;
>
> (3)    dividends and distributions relating to pledged equity interests;
>
> (4)    certain deposit accounts and certain securities accounts;

---

[59]   *Id*. Art. XI.

[60]   Initial Line of Credit Security Agreement [ALLY_0022482].

(5)     certain contribution agreements and all other agreements relating to the pledged Initial Line of Credit Collateral;

(6)     accounts, chattel paper, commercial tort claims, deposit accounts, documents, general intangibles, goods, instruments, investment property, letters of credit and all other personal property related to the pledged Initial Line of Credit Collateral; and

(7)     proceeds of the foregoing.

Prior to the date on which the Initial Line of Credit Security Agreement was replaced with the A&R Initial Line of Credit Security Agreement, the Initial Line of Credit Security Agreement was amended (1) on March 18, 2009[61] to, among other things, (a) reflect the existence of the Omnibus Security Agreement, which agreement also provided for liens securing the obligations under the Initial Line of Credit Agreement, and (b) correspond to the expansion of obligations secured by the Initial Line of Credit Collateral as provided in the fourth amendment to the Initial Line of Credit Agreement;[62] (2) on May 19, 2009[63] to add additional Initial Line of Credit Collateral, particularly European collateral consisting of the GX II Note and the related documents and certain mortgage loans; (3) on June 1, 2009[64] to expand the obligations secured by the Initial Line of Credit Collateral to cover the obligations under the Second Line of Credit Agreement; (4) on June 5, 2009[65] to modify certain defined terms relating to the Initial Line of Credit Collateral, particularly with respect to the GX II Notes; and (5) on June 30, 2009[66] to once again modify certain defined terms relating to the Initial Line of Credit Collateral.

## h.     Amendments to Initial Line of Credit Agreement

The Initial Line of Credit Agreement was amended on seventeen different occasions before it was amended and restated in December 2009.

---

[61]   Amend. No. 1 to the Initial Line of Credit Security Agreement, dated Mar. 18, 2009 [ALLY_0024287].

[62]   See Appendix V.E.5.h.(4) for more detail.

[63]   Amend. No. 2 to the Initial Line of Credit Security Agreement, dated May 19, 2009 [ALLY_0024300].

[64]   Amend. No. 3 to the Initial Line of Credit Security Agreement, dated June 1, 2009 [ALLY_0024317].

[65]   Amend. No. 4 to the Initial Line of Credit Security Agreement, dated June 5, 2009 [ALLY_0024329].

[66]   Amend. No. 5 to the Initial Line of Credit Security Agreement, dated June 30, 2009 [RC00033677].

### (1)    First Amendment (December 22, 2008)[67]

This amendment, among other things, permitted dissolution of: (1) an Initial Line of Credit Borrower or Initial Line of Credit Guarantor if consented to by AFI; and (2) a Subsidiary of an Initial Line of Credit Borrower or Initial Line of Credit Guarantor that was not an Initial Line of Credit Borrower or Initial Line of Credit Guarantor and did not have material assets or hold title to any Initial Line of Credit Collateral.

### (2)    Second Amendment (December 29, 2008)[68]

This amendment, among other things: (1) extended the maturity date from December 31, 2008 to January 31, 2009; (2) in connection with funding requests, increased the Unrestricted ResCap Liquidity threshold from $250 million to $300 million and the Consolidated Liquidity threshold from $750 million to $800 million; and revised the related covenant such that Unrestricted ResCap Liquidity had to be in excess of $300 million at all times; (3) lowered the Liquidity Excess Amount, which triggered mandatory prepayment of the Initial Line of Credit Loans, from $25 million to $0; and (4) required interest to accrue at the default rate upon the failure to make mandatory prepayment of the Initial Line of Credit Loans in connection with a Liquidity Excess Amount.  The concept of the Draw Adjustment Amount, which could be determined by AFI, was eliminated.

### (3)    Third Amendment (January 30, 2009)[69]

This amendment, among other things, extended the maturity date from January 31, 2009 to March 31, 2009.

### (4)    Fourth Amendment (March 18, 2009)[70]

Under this amendment: (1) the obligations secured by the Initial Line of Credit Collateral were expanded to include (a) the obligations of the ResCap affiliated counterparties under the Master Netting Agreement, (b) the obligations of the ResCap affiliated counterparties under each derivative agreement governing derivative transactions with Ally Investment Management, and (c) the obligations under the Secured MSR Facility; and (2) the maturity date was extended from March 31, 2009 to June 30, 2009.  Additionally, this amendment provided for reductions to the borrowing base to the extent there was hedging exposure in favor of AFI.  For the first time, language relating to reservation of rights was included.  This language appears in almost all of the amendments going forward.

---

[67]    Amend. No.1 to the Initial Line of Credit Agreement, dated Dec. 22, 2008 [ALLY_0023114].

[68]    Amend. No.2 to the Initial Line of Credit Agreement, dated Dec. 29, 2008 [ALLY_0023126].

[69]    Amend. No.3 to the Initial Line of Credit Agreement, dated Jan. 30, 2009 [ALLY_0058280].

[70]    Amend. No.4 to the Initial Line of Credit Agreement, dated Mar. 18, 2009 [ALLY_0239662].

**Appendix V.E.5**, Page 6 of 9

### (5)    Fifth Amendment (March 31, 2009)[71]

This amendment modified the affirmative covenant regarding GMAC Mortgage's maintenance of a Peak Score, to change it from only requiring a monthly Peak Score of "Excellent" from Fannie Mae to maintaining either: (1) while Fannie Mae is using the Peak Score system, a monthly Peak Score equating to "Excellent" or better, or after Fannie Mae has implemented a replacement system, a rating reasonably equivalent to a monthly Peak Score of "Excellent" or better (as agreed by AFI and GMAC Mortgage); or (2) an Investor Reporting and Remitting rating from Freddie Mac equating to "Tier 2" or better.

### (6)    Sixth Amendment (May 19, 2009)[72]

This amendment, among other things: (1) required the Initial Line of Credit Borrowers to estimate the amount of U.S. mortgages loans included in the Initial Line of Credit Collateral that had become REO Property (mortgaged properties acquired through foreclosure); (2) eliminated the Initial Line of Credit Borrowers' ability to add additional whole mortgage loans to the Initial Line of Credit Collateral to satisfy mandatory prepayment obligations; (3) added additional European collateral; (4) dropped the collateral "value" for borrowing base purposes to $0 with respect to U.S. mortgage loans that had become REO Properties; (5) provided for the designation of two groups of U.S. mortgage loans to be added to the Initial Line of Credit Collateral; (6) expanded assets eligible for inclusion in the borrowing base to include defaulted assets or assets consisting of financial asset-backed securities, whose ratings by a nationally recognized rating agency had been reduced by more than two levels by such agency; and (7) in connection with eligibility requirements, permitted exceptions relating to irregularities in documentation, origination or underwriting of an asset so long as (a) the related contract was not materially affected, (b) such factors were taken into consideration when determining the value of the asset, and (c) any such exception was disclosed to AFI.

### (7)    Waiver and Seventh Amendment (May 27, 2009)[73]

In connection with the U.S. Treasury's investment in AFI and the related transactions with GM (including the appointment or election of directors), AFI agreed that these transactions would not constitute a change of control. This amendment changed the definition of "Change of Control" to mean the acquisition of ownership, directly or indirectly, beneficially or of record, by any person or group (within the meaning of the Exchange Act) other than GM, Cerberus, the U.S. Treasury, the GM Trusts (trusts established to own stock of GMAC), or any purchaser of the beneficial interests in the GM Trusts of capital stock representing a majority of the voting stock of ResCap.

---

[71]    Amend. No.5 to the Initial Line of Credit Agreement, dated Mar. 31, 2009 [ALLY_0024228].

[72]    Amend. No.6 to the Initial Line of Credit Agreement, dated May 19, 2009 [ALLY_0024239].

[73]    Waiver and Seventh Amend. to the Initial Line of Credit Agreement, dated May 27, 2009 [ALLY_0024269].

### (8)    Eighth Amendment (June 1, 2009)[74]

This amendment was entered into in connection with the Second Line of Credit Agreement, the parallel line of credit facility AFI entered into with the Initial Line of Credit Borrowers and the Initial Line of Credit Guarantors.  The obligations secured by the Initial Line of Credit Collateral were further expanded to include all obligations under the Second Line of Credit Agreement.  Borrowing requests and availability under the Line of Credit Facilities were tied to compliance with the same ResCap liquidity thresholds. The Initial Line of Credit Borrowers had to be in compliance with the ResCap liquidity threshold amounts at all times and were required to make mandatory prepayments under both facilities whenever the Liquidity Excess Amount was greater than $0.  In addition, a cross-default event of default was added with respect to each agreement governing derivative transactions with Ally Investment Management, the Master Netting Agreement, the Secured MSR Facility and the Second Line of Credit Agreement; and proceeds of the Initial Line of Credit Collateral were allocated after an event of default as determined by AFI in its capacity as Omnibus Agent under the Omnibus Security Agreement.  This amendment also provided that Initial Line of Credit Loans could be made up to the lesser of: (1) the aggregate commitment amount reduced to the extent there was hedging exposure in favor of AFI; and (2) the excess, if any, of the then current borrowing base over outstandings under the Second Line of Credit Agreement.

### (9)    Ninth Amendment (June 12, 2009)[75]

This amendment provided the mechanics for adding additional groups of U.S. mortgage loans to the Initial Line of Credit Collateral.

### (10)    Tenth Amendment (June 30, 2009)[76]

This amendment: (1) extended the maturity date from June 30, 2009 to July 30, 2009; and (2) required that funds permitted to be withdrawn from certain collection accounts had to be included in the calculation of the ResCap liquidity threshold amounts. Additionally, in the event ResCap did not have sufficient liquidity to fund its Servicing Advances, upon delivery of a borrowing base report, AFI, in its sole discretion, could agree to provide funding.

### (11)    Eleventh Amendment (July 31, 2009)[77]

This amendment: (1) extended the maturity date from July 31, 2009, to September 30, 2008; and (2) in connection with the determination of ResCap liquidity threshold amounts necessary to be in effect prior to funding requests, required the inclusion of funds permitted to be

---

[74]    Amend. No.8 to the Initial Line of Credit Agreement, dated June 1, 2009 [ALLY_0024273].

[75]    Amend. No.9 to the Initial Line of Credit Agreement, dated June 12, 2009 [ALLY_0028077].

[76]    Amend. No.10 to the Initial Line of Credit Agreement, dated June 30, 2009 [ALLY_0028091].

[77]    Amend. No.11 to the Initial Line of Credit Agreement, dated July 31, 2009 [ALLY_0028108].

withdrawn from the collection and funding account relating to the GSAP Second Amended and Restated Indenture, dated as of March 8, 2006, among GMAC Mortgage Servicer Advance Funding Company, Ltd., as issuer, The Bank of New York, as indenture trustee and GMAC Mortgage and RFC, as servicers. This amendment added an additional group of U.S. mortgage loans to the Initial Line of Credit Collateral and assigned collateral "value" percentages to supporting European assets related to the GX II Note.

*(12)    Twelfth Amendment (September 18, 2009)[78]*

This amendment evidenced AFI's consent to add to the Initial Line of Credit Collateral certain European assets consisting of German Class B Securities[79] owned by GMAC-RFC Investments B.V., an Initial Line of Credit Borrower or Initial Line of Credit Guarantor, HELOC Draws[80] and Dutch mortgage receivables in connection with the GX II Notes.[81]

*(13)    Thirteenth Amendment (September 22, 2009)[82]*

This amendment extended the maturity date from September 30, 2009 to November 30, 2009.

*(14)    Fourteenth Amendment (October 20, 2009)[83]*

This amendment provided that upon delivery of a certain deed of pledge, the collateral "value" for the German Class B Securities would increase from 20% to 100% for borrowing base purposes.

*(15)    Fifteenth Amendment (November 9, 2009)[84]*

This amendment acknowledged delivery of all required documents in connection with the pledge of the German Class B Securities and provided that the German Class B Securities would be valued at 100% for borrowing base purposes.

---

[78]    Amend. No.12 to the Initial Line of Credit Agreement, dated Sept. 18, 2009 [ALLY_0028123].

[79]    See Table V.E.8.b for a description of German Class B Securities.

[80]    See Table V.E.8.b for a description of HELOC Draws.

[81]    See Table V.E.8.b for a description of GX II Notes.

[82]    Amend. No.13 to the Initial Line of Credit Agreement, dated Sept. 22, 2009 [ALLY_0028144].

[83]    Amend. No.14 to the Initial Line of Credit Agreement, dated Oct. 20, 2009 [ALLY_0075363].

[84]    Amend. No.15 to the Initial Line of Credit Agreement, dated Nov. 9, 2009 [ALLY_0075474].

12-12020-mg   Case 22-11068-JTD   Doc 3698-36   Filed 05/13/13   Doc 05/13/13   Entered 05/13/13   Pg 490 of 709   Appendix
Pg 166 of 385

**Appendix V.E.5**, Page 9 of 9

*(16)   Sixteenth Amendment (November 30, 2009)[85]*

This amendment extended the maturity date from November 30, 2009 to December 31, 2009.

*(17)   Seventeenth Amendment (December 16, 2009)[86]*

This amendment evidenced AFI's consent to add to the Initial Line of Credit Collateral (1) an additional group of U.S. mortgage loans; and (2) U.S. mortgage loans insured or guaranteed by the FHA or VA.

---

[85]   Amend. No.16 to the Initial Line of Credit Agreement, dated Nov. 30, 2009 [ALLY_0075482].

[86]   Amend. No.17 to the Initial Line of Credit Agreement, dated Dec. 16, 2009 [ALLY_0075489].

6.     *ResMor Loan Facility*[87]

a.     *Principal Terms*

On November 20, 2008, the ResMor Facility Borrower (GMAC Canada), entered into the ResMor Facility.  The principal terms of the ResMor Facility were as follows:

TABLE V.E.6.a
**ResMor Loan Facility - Principal Terms**
November 20, 2008

| | |
|---|---|
| Closing Date: | November 20, 2008 |
| Borrower: | GMAC Canada |
| Lender: | AFI |
| Facility Type: | Secured term loan |
| Purpose: | To pay then existing debt due to ResCap or any of its subsidiaries |
| Loan Amount: | CND$82 million |
| Interest Rate: | Royal Bank of Canada's Prime Rate plus 3.50% |
| Scheduled Maturity Date: | Earlier of (i) the closing of the purchase by AFI from the ResMor Facility Borrower of the stock of 1020491 Alberta Ltd. and ResMor Capital Corporation and (ii) December 22, 2008 |
| Fees: | None |
| Recourse: | AFI's sole recourse was to the collateral consisting of the securities to be purchased by AFI from the ResMor Facility Borrower |

*Source: ResMor Loan Agreement [RC00025269].*

b.     *Loan and Acquisition*

On November 20, 2008, AFI advanced the ResMor Loan in the amount of CND$82 million under the terms of the ResMor Facility.  On the same date, the ResMor Facility Borrower, as seller, and AFI, as purchaser, entered into the share purchase agreement evidencing the ResMor Sale, pursuant to which AFI agreed to purchase the stock of 1020491 Alberta Ltd. and ResMor.  Upon consummation of the ResMor Sale, the principal amount of the ResMor Loan was set off and applied against the purchase price for the shares in full satisfaction of AFI's purchase obligation, thereby resulting in the full satisfaction of the ResMor Facility Borrower's obligations under the ResMor Facility.

---

[87]     ResMor Loan Agreement [RC00025269].

c.    *Collateral*

The 1020491 Alberta Ltd. and ResMor shares were pledged in favor of AFI to secure the ResMor Facility Borrower's obligations under the ResMor Facility.

d.    *General*

The ResMor Facility appeared to be designed to provide liquidity to GMAC Canada, a ResCap Subsidiary, in advance of the ResMor Sale.  If the ResMor Sale did not close and the obligations under the ResMor Facility were not repaid by December 22, 2008, then AFI could have foreclosed on the 1020491 Alberta Ltd. and ResMor shares held as collateral and become the owner of those entities.  In addition, a cross-default provision under the ResMor Facility was structured such that an event of default under another credit facility or facilities (in excess of $10 million), also constituted an event of default under the ResMor Facility and would have given AFI the ability to foreclose on the shares.

7. *Second Line of Credit Facility*[88]

a. *Principal Terms*

On June 1, 2009, the Second Line of Credit Borrowers (PATI and RAHI) and the Second Line of Credit Guarantors, entered into the Second Line of Credit Facility with AFI, as lender, credit agent and Omnibus Agent. The principal terms of the Second Line of Credit Facility, when initially entered into, were as follows:

TABLE V.E.7.a
**Second Line of Credit Agreement - Principal Terms**
June 1, 2009

| | |
|---|---|
| Closing Date: | June 1, 2009 |
| Borrowers: | PATI and RAHI |
| Guarantors: | ResCap<br>RFC<br>GMAC Mortgage |
| Lender/Lender Agent | AFI |
| Facility Type: | Secured revolver |
| Purpose: | Budgeted working capital and general corporate purposes in the ordinary course |
| Committed Amount: | $370 million |
| Interest Rate: | LIBOR + 3.50% |
| Scheduled Maturity Date: | April 30, 2010 |
| Fees: | None |

*Source: Second Line of Credit Agreement [ALLY_0023953].*

b. *Borrowing Base*

AFI initially committed to make the Second Line of Credit Loans to the Second Line of Credit Borrowers, up to the lesser of: (1) $370 million; and (2) the then existing borrowing base reduced to the extent there was hedging exposure in favor of AFI. The borrowing base was determined by calculating the aggregate "value" of the Second Line of Credit Collateral, which, as set forth in the chart below, was subject to a discount factor that varied depending on the type of asset.

---

[88]  Second Line of Credit Agreement [ALLY_0023953].

**Appendix V.E.7**, Page 2 of 6

TABLE V.E.7.b
**Discount Factors Used to Determine Collateral Values**

| | |
|---|---|
| Flume No. 8 Note (secured zero coupon discount note of Flume (No. 8) Limited dated as of November 14, 2008) | 50% for Group A Loans and 36% for Group B Loans |
| GSAP class A-1 preference shares (100 class A-1 preference shares issues by GMAC Mortgage Servicer Advance Funding Company, Ltd.) and GSAP class A-2 preference shares (100 class A-2 preference shares issued by GMAC Mortgage Servicer Advance Funding Company, Ltd.) | 80% |
| Warehouse loans (loans made by any Second Line of Credit Guarantor pursuant to (i) the Warehousing Credit and Security Agreement dated as of April 1, 2005 between RFC and First Savings Mortgage Corporation and (ii) the Servicing Secured Facility Agreement (Syndicated) among Provident Funding Associates, L.P., U.S. Bank National Association, JPMorgan Chase Bank, N.A., J.P. Morgan Securities Inc., RFC and other lenders party thereto from time to time) | 50% |
| The equity of Equity Investment I, LLC | 15% |
| US mortgage loans (first or second lien residential mortgage loan other than mortgage loans subject to the First Savings repurchase agreement) | 40% of Group A Mortgage Loans and 35% for Group B Mortgage Loans |
| *Source: Second Line of Credit Agreement, Sched. 2.04 [ALLY_0023953].* | |

### c. Funding; Interest and Maturity

The Second Line of Credit Borrowers were permitted to request Second Line of Credit Loans only if either or both of the two following ResCap liquidity tests were met: (1) estimated Unrestricted ResCap Liquidity (unencumbered cash in dollars held in the U.S. by ResCap and its Subsidiaries) on the proposed funding date was less than $300 million and, based on such estimates, after giving effect to both the Second Line of Credit Loans and Initial Line of Credit Loans, Unrestricted ResCap Liquidity did not exceed $300 million; or (2) estimated Consolidated Liquidity (cash and cash equivalents of ResCap on a consolidated basis, excluding cash and cash equivalents of Ally Bank) on the proposed funding date was less than $800 million and, based on such estimates, after giving effect to both the Second Line of Credit Loans and Initial Line of Credit Loans, Consolidated Liquidity did not exceed $800 million. Second Line of Credit Loans could not be made unless the outstandings under the Initial Line of Credit Agreement and the Second Line of Credit Agreement equaled the commitment amount (reduced to the extent there was hedging exposure in favor of AFI) under the Initial Line of Credit. Interest on the Second Line of Credit Loans accrued at a rate of LIBOR + 3.50% per annum. The maturity date for the Second Line of Credit Loans was initially scheduled to occur on June 30, 2009 (the facility was subsequently extended), or earlier upon the disposition by the Second Line of Credit Borrowers and/or Second Line of Credit Guarantors of the collateral pledged

under an MSR facility with Citibank[89] in connection with or following the termination of that facility.[90]

### d.    Mandatory Prepayment

Second Line of Credit Loans were required to be prepaid when: (1) the outstanding aggregate principal balance of the Line of Credit Facilities exceeded the borrowing base by an amount equal to or greater than $250,000; or (2) the Liquidity Excess Amount[91] was greater than or equal to $25 million. If the Liquidity Excess Amount was in excess of $0, the Second Line of Credit Borrowers were required to prepay the Second Line of Credit Loans to the extent Unrestricted ResCap Liquidity and Consolidated Liquidity would be equal to or greater than the required threshold amounts of $300 million and $800 million, respectively.  The Second Line of Credit Borrowers were required to repay the outstandings under the Second Line of Credit Agreement prior to making any payments of principal under the Initial Line of Credit Agreement, except in the event the outstandings under the Initial Line of Credit Agreement exceeded the borrowing base thereunder.  The Second Line of Credit Borrowers were permitted to satisfy prepayment obligations by adding eligible assets consisting of whole mortgage loans to the Second Line of Credit Collateral.

### e.    Financial Covenants

Under the Second Line of Credit Facility there was one financial covenant that applied to ResCap and its Subsidiaries,[92] which was identical to the financial covenant set forth in the Initial Line of Credit Facility.[93]  For more detail see Appendix V.E.5.e.

### f.    Guarantees

ResCap and the other Second Line of Credit Guarantors guaranteed the obligations under the Second Line of Credit Agreement pursuant to an unconditional guarantee.[94]

---

[89]   Loan and Security Agreement between GMAC Mortgage, LLC and Citibank, N.A., dated Sept. 10, 2007 [GOLDIN00044759].

[90]   Second Line of Credit Agreement, Sched. 1.01 [ALLY_0023953] (definition of "Loan Repayment Date").

[91]   Second Line of Credit Agreement, § 2.08(c) [ALLY_0023953] (the Second Line of Credit Borrowers were required to determine on a daily basis the amount by which the (1) estimated "Unrestricted ResCap Liquidity" exceeded $300 million; and (2) "Consolidated Liquidity" exceeded $800 million. The "Liquidity Excess Amount" was the greater of the two foregoing calculations).

[92]   Second Line of Credit Agreement, § 7.02(j) [ALLY_0023953].

[93]   Initial Line of Credit Agreement, § 7.02(j) [ALLY_0023145].

[94]   Second Line of Credit Agreement, Art. XI [ALLY_0023953].

**Appendix V.E.7**, Page 4 of 6

g.    *Collateral Arrangements*

In connection with the Second Line of Credit Agreement, the Second Line of Credit Borrowers and the Second Line of Credit Guarantors entered into the Second Line of Credit Security Agreement,[95] pursuant to which the Second Line of Credit Borrowers and the Second Line of Credit Guarantors granted a security interest in favor of AFI, as lender under the Second Line of Credit Agreement, in specific personal property to secure their obligations under the Second Line of Credit Agreement and the related facility documents.  The liens granted by the Second Line of Credit Borrowers and the Second Line of Credit Guarantors under the Second Line of Credit Security Agreement were on the following assets:

(1)    certain mortgage loans;

(2)    certain shares of capital stock and other equity interests;

(3)    certain pledged notes and all assets, rights and property related thereto;

(4)    dividends and distributions relating to pledged equity interests and pledged notes;

(5)    certain deposit accounts and certain securities accounts;

(6)    certain contribution agreements and all agreements relating to the pledged collateral;

(7)    accounts, chattel paper, commercial tort claims, deposit accounts, documents, general intangibles, goods, instruments, investment property, letters of credit and all other personal property related to the pledged collateral;

(8)    collateral posted under any derivative agreements with Ally Investment Management and all rights under such agreements;

(9)    servicing rights and collateral pledged to secure the Secured MSR Facility, but excluding advances under Servicing Contracts; and

---

[95]    Second Line of Credit Security Agreement [ALLY_0024097].

(10)    proceeds of the foregoing.

The Second Line of Credit Security Agreement was amended: (1) on June 5, 2009[96] to add additional collateral consisting of GX II Notes and related documents; and (2) on June 30, 2009[97] to add additional collateral consisting of a pledged note and a pledged account.

The Second Line of Credit Security Agreement was amended and restated on December 30, 2009 by the A&R Second Line of Credit Security Agreement[98] on terms substantially similar to those in the Second Line of Credit Security Agreement.

### h.    Amendments to Second Line of Credit Agreement

The Second Line of Credit Agreement was amended on ten different occasions before it was amended and restated in December 2009. Each of the amendments to the Second Line of Credit Agreement were entered into on the same dates as, and the provisions corresponded to, the amendments to the Initial Line of Credit Facility; however, the First Amendment and Tenth Amendment to the Second Line of Credit Agreement provided for an increase in the Second Line of Credit Agreement commitment amount as indicated below.

### (1)    First Amendment (June 12, 2009)[99]

This amendment: (1) increased the commitment amount from $370 million to $470 million and (2) provided the mechanics for adding additional groups of U.S. mortgage loans to the Second Line of Credit Collateral.

### (2)    Second Amendment (June 30, 2009)[100]

For a description of the amendments under the Second Amendment see Appendix V.E.5.h.(10).

### (3)    Third Amendment (July 31, 2009)[101]

For a description of the amendments under the Third Amendment see Appendix V.E.5.h.(11).

---

[96]    Amend. No. 1 to the Second Line of Credit Security Agreement, dated June 5, 2009 [ALLY_0024168].

[97]    Amend. No. 2 to the Second Line of Credit Security Agreement, dated June 30, 2009 [ALLY_0026693].

[98]    A&R Second Line of Credit Security Agreement [EXAM00110842].

[99]    Amend. No.1 to the Second Line of Credit Agreement, dated June 12, 2009 [ALLY_0026615].

[100]    Amend. No.2 to the Second Line of Credit Agreement, dated June 30, 2009 [ALLY_0026629].

[101]    Amend. No.3 to the Second Line of Credit Agreement, dated July 31, 2009 [ALLY_0026646].

*(4)      Fourth Amendment (September 18, 2009)[102]*

For a description of the amendments under the Fourth Amendment see Appendix V.E.5.h.(12).

*(5)      Fifth Amendment (September 22, 2009)[103]*

For a description of the amendments under the Fifth Amendment see Appendix V.E.5.h.(13).

*(6)      Sixth Amendment (October 20, 2009)[104]*

For a description of the amendments under the Sixth Amendment see Appendix V.E.5.h.(14).

*(7)      Seventh Amendment (November 9, 2009)[105]*

For a description of the amendments under the Seventh Amendment see Appendix V.E.5.h.(15).

*(8)      Eighth Amendment (November 30, 2009)[106]*

For a description of the amendments under the Eighth Amendment see Appendix V.E.5.h.(16).

*(9)      Ninth Amendment (December 16, 2009)[107]*

For a description of the amendments under the Ninth Amendment see Appendix V.E.5.h.(17).

*(10)      Tenth Amendment (December 21, 2009)[108]*

This amendment increased the commitment amount from $470 million to $670 million.

---

[102]   Amend. No.4 to the Second Line of Credit Agreement, dated Sept. 18, 2009 [ALLY_0026660].

[103]   Amend. No.5 to the Second Line of Credit Agreement, dated Sept. 22, 2009 [ALLY_0026681].

[104]   Amend. No.6 to the Second Line of Credit Agreement, dated Oct. 20, 2009 [GOLDIN00045301].

[105]   Amend. No.7 to the Second Line of Credit Agreement, dated Nov. 9, 2009 [ALLY_0077219].

[106]   Amend. No.8 to the Second Line of Credit Agreement, dated Nov. 30, 2009 [ALLY_0077227].

[107]   Amend. No.9 to the Second Line of Credit Agreement, dated Dec. 16, 2009 [ALLY_0077234].

[108]   Amend. No.10 to the Second Line of Credit Agreement, dated Dec. 21, 2009 [ALLY_0077250].

12-12020-mg   Case 22-11068-JTD   Doc 3698-36   Filed 05/13/13   Rec 05/13/13   Filed 02/03/23   Entered 06/13/13 15:47:13   Page 499 of 709   Appendix
Pg 175 of 385

**Appendix V.E.8**, Page 1 of 9

8.    *A&R Line of Credit Facility*[109]

    a.    *Principal Terms*

On December 30, 2009, the Initial Line of Credit Facility and the Second Line of Credit Facility were amended and restated and consolidated into the A&R Line of Credit Facility by and among the A&R Line of Credit Borrowers (RFC and GMAC Mortgage), the A&R Line of Credit Guarantors and AFI, as lender and lender agent.   Under the A&R Line of Credit Agreement, RAHI and PATI assigned all of their obligations as borrowers under the Initial Line of Credit Agreement and Second Line of Credit Agreement to RFC and GMAC Mortgage, previously, Initial Line of Credit Guarantors and Second Line of Credit Guarantors.   The principal terms of the A&R Line of Credit Facility, when initially entered into, were as follows:

---

[109]   A&R Line of Credit Agreement [ALLY_0240633].

**Appendix V.E.8**, Page 2 of 9

---

TABLE V.E.8.a
**A&R Line of Credit Facility – Principal Terms**
December 30, 2009

| | |
|---|---|
| Closing Date: | December 30, 2009 |
| Borrowers: | RFC and GMAC Mortgage |
| Guarantors: | ResCap |
| | RAHI |
| | PATI |
| | GMAC Holding |
| | RFC Holding |
| | Homecomings Financial |
| | Equity Investment I, LLC |
| Lender/Lender Agent/Omnibus Agent: | AFI |
| Facility Type: | Secured revolver |
| Purpose: | Budgeted working capital and general corporate purposes in the ordinary course |
| Committed Amount: | $1.1 billion |
| Interest Rate: | LIBOR + 2.75% |
| Scheduled Maturity Date: | April 30, 2010 |
| Fees: | None |

*Source: A&R Line of Credit Agreement [ALLY_0240633].*

---

### b. Borrowing Base

AFI initially committed to make the A&R Line of Credit Loans to the A&R Line of Credit Borrowers, up to the lesser of: (1) $1.1 billion; and (2) the then existing borrowing base reduced to the extent there was hedging exposure in favor of AFI. At closing, the aggregate principal amount of A&R Line of Credit Loans outstanding totaled $949,400,000. The borrowing base was determined by calculating the aggregate "value" of the A&R Line of Credit Collateral, which, as set forth in the chart below, was subject to a discount factor that varied depending on the type of asset. The A&R Line of Credit Agreement gave AFI the ability to modify a designated discount factor in its reasonable discretion taking into account estimated collections, market value, legal risks, cost of recovery and other matters customarily considered by commercial lenders when determining advance rates.

**Appendix V.E.8**, Page 3 of 9

---

TABLE V.E.8.b
**Discount Factors Used to Determine Collateral Values**

| | |
|---|---|
| Flume No. 8 Note (secured zero coupon discount note of Flume (No. 8) Limited dated as of November 14, 2008) | 50% for Group A[1] Loans, 36% for Group B Loans, 32% for Group C Loans and 40% for Group D Loans |
| Supporting assets related to the GX II Notes (the note(s) of GX CE Funding H B.V. issued pursuant to the GX II VFLN Agreement by and among ResCap, GX CE Funding II B.V., Stichting Security Trustee GX CE Funding II, GMAC-RFC Investments B.V. and GMAC RFC Nederland B.V.) | 60% for "securities", 30% for "Spanish Participations", 45% for "German Sub Participations" and 70.5% for "Dutch Mortgages" (the supporting assets for GX Notes were defined in the security documentation relating to the GX II Notes) |
| Warehouse loans (loans made by any A&R Line of Credit Guarantor pursuant to (i) the Warehousing Credit and Security Agreement dated as of April 1, 2005 between RFC and First Savings Mortgage Corporation and (ii) the Servicing Secured Facility Agreement (Syndicated) among Provident Funding Associates, L.P., U.S. Bank National Association, JPMorgan Chase Bank, N.A., J.P. Morgan Securities Inc., RFC and other lenders party thereto from time to time) | 50% |
| The equity of Equity Investment I, LLC | 15% |
| US mortgage loans (first or second lien residential mortgage loan other than mortgage loans subject to the Master Repurchase Agreement, dated as of July 1, 2009, between RFC and First Savings Mortgage Corporation) | 40% for Group A Loans, 35% for Group B Loans, 35% for Group C Loans, 54.5% for Group D Loans and 51% for Group E Loans |
| German class B securities (the junior class B notes issued by E-MAC DE 2009-I B.V. to GMAC-RFC Investments B.V. under the German class 13 transaction documents) | 100% |
| Eligible HELOC draws (with respect to certain HELOC securitizations, borrowings made to an obligor on a HELOC funded by GMAC Mortgage constituting an "excluded amount", as determined pursuant to the underlying securitization documents, and meeting eligibility requirements under the A&R LOC Credit Agreement) | 19% |
| Equity interests in PATI Real Estate Holding, LLC and RAHI Real Estate, LLC or any other AFI approved special purpose vehicle with respect to LOC REO Property (residential property in the US acquired as a result of foreclosure of a US mortgage Loan and approved as collateral) in an amount not to exceed, at any time , the lesser of (A) 5% of the total collateral "value" of the borrowing base; and (B) $30 million) | 50% |

[1]   Groups of US Mortgage Loans were designated as being part of a particular "Loan Group" in a Collateral Addition Designation Notice and then identified in a related schedule.

Source: A&R Line of Credit Agreement, Sched. 2.04 [ALLY_0240633].

### c. Funding; Interest and Maturity

The A&R Line of Credit Borrowers were permitted to request A&R Line of Credit Loans only if either or both of the two following ResCap liquidity tests were met: (1) estimated Unrestricted ResCap Liquidity (unencumbered cash in dollars held in the U.S. by ResCap and its Subsidiaries) on the proposed funding date was less than $300 million and, based on such estimates, after giving effect to the A&R Line of Credit Loans, Unrestricted ResCap Liquidity did not exceed $300 million; or (2) estimated Consolidated Liquidity (cash and cash equivalents of ResCap on a consolidated basis, excluding cash and cash equivalents of Ally Bank) on the proposed funding date was less than $800 million and, based on such estimates, after giving effect to the A&R Line of Credit Loans, Consolidated Liquidity did not exceed $800 million. Funds permitted to be withdrawn from certain collection accounts were required to be included in the pre-funding calculations of the ResCap liquidity threshold amounts. Interest on the A&R Line of Credit Loans accrued at a rate of LIBOR + 2.75% per annum. The maturity date for the A&R Line of Credit Loans was initially scheduled to occur on April 30, 2010, but was extended numerous times before the Petition Date.

### d. Mandatory Prepayment

A&R Line of Credit Loans were required to be prepaid when: (1) the outstanding principal balance exceeded the borrowing base by an amount equal to or greater than $250,000; or (2) the Liquidity Excess Amount[110] was greater than or equal to $25 million. If the Liquidity Excess Amount was in excess of $0, the A&R Line of Credit Borrowers were required to prepay the A&R Line of Credit Loans to the extent Unrestricted ResCap Liquidity and Consolidated Liquidity would be equal to or greater than the required threshold amounts of $300 million and $800 million, respectively.

### e. Financial Covenants

There were two financial covenants under the A&R Line of Credit Facility that applied to ResCap and its Subsidiaries,[111] which were identical to the two financial covenants set forth in the Secured Revolver Facility.[112] For more detail see Appendix V.E.3.e.

---

[110] *Id*. § 2.08(c) (the A&R Line of Credit Borrowers were required to determine on a daily basis the amount by which the (1) estimated "Unrestricted ResCap Liquidity" exceeded $300 million; and (2) "Consolidated Liquidity" exceeded $800 million. The "Liquidity Excess Amount" was the greater amount of the foregoing calculations).

[111] *Id*. §§ 7.02(i), 7.02(j).

[112] Secured Revolver Loan Agreement, §§ 7.02(i), 7.02(j) [RC00024234]; A&R Secured Revolver Loan Agreement, §§ 7.02(i), 7.02(j) [ALLY_0066146].

### f. Guarantees

ResCap and the other A&R Line of Credit Guarantors guaranteed the obligations under the A&R Line of Credit Agreement pursuant to an unconditional guarantee.

### g. Collateral Arrangements

In connection with the A&R Line of Credit Agreement, the A&R Line of Credit Borrowers and the A&R Line of Credit Guarantors entered into the A&R Initial Line of Credit Security Agreement.[113] The A&R Initial Line of Credit Security Agreement amended and restated under one agreement the Initial Line of Credit Security Agreement and the Omnibus Security Agreement.

Pursuant to the A&R Initial Line of Credit Security Agreement, the A&R Line of Credit Borrowers and the A&R Line of Credit Guarantors granted a security interest in favor of AFI, as lender agent, Ally Investment Management, and AFI as lender under the Secured MSR Facility, in specific personal property to secure the obligations owed under the A&R Line of Credit Agreement, the Secured MSR Facility and derivative agreements (including the Master Netting Agreement) with Ally Investment Management and the related documents. The liens granted by the A&R Line of Credit Borrowers and the A&R Line of Credit Guarantors (other than Equity Investments I, LLC)[114] under the A&R Initial Line of Credit Security Agreement were on the following assets:

> (1) certain mortgage loans;
>
> (2) certain shares of capital stock and other equity interests;
>
> (3) certain pledged notes and all assets, rights and property related thereto;
>
> (4) dividends and distributions relating to pledged equity interests and pledged notes;
>
> (5) HELOC Excluded Draw Collateral (certain mortgage loan purchase agreements);

---

[113] A&R Initial Line of Credit Security Agreement [EXAM00110733].

[114] Equity Investment 1, LLC, granted a broad lien (and "all assets" type lien) on its assets (including accounts, chattel paper, commercial tort claims, deposit accounts, financial assets general intangibles, goods, instruments, intellectual property letters of credit, money, etc.). A&R Initial Line of Credit Security Agreement, § 2A [EXAM00110733].

(6)    servicing rights and Servicing Contracts, but excluding advances under Servicing Contracts;[115]

(7)    certain deposit accounts and certain securities accounts;

(8)    certain contribution agreements and all agreements relating to the pledged collateral;

(9)    accounts, chattel paper, commercial tort claims, deposit accounts, documents, general intangibles, goods, instruments, investment property, letters of credit and all other personal property related to the pledged collateral;

(10)    collateral posted under any derivative agreements with Ally Investment Management and all rights under such agreements; and

(11)    proceeds of the foregoing.

The A&R Initial Line of Credit Security Agreement was amended on May 14, 2010[116] to: (1) amend certain defined terms; and (2) to add servicing rights and Servicing Contracts as additional collateral.

### h.    *Amendments to A&R Line of Credit Agreement*

The A&R Line of Credit Agreement was amended on seven different occasions before the Petition Date. The eighth amendment to the A&R Line of Credit Agreement constituted the AFI DIP Financing Agreement.

### (1)    *First Amendment (April 30, 2010)[117]*

This amendment extended the maturity date from April 30, 2010 to April 29, 2011.

---

[115]  Servicing rights were added as additional collateral pursuant to the First Amendment to the A&R Initial Line of Credit Security Agreement.

[116]  Amend. No.1 to the A&R Initial Line of Credit Security Agreement, dated May 14, 2010 [RC00026191].

[117]  Amend. No.1 to the A&R Line of Credit Agreement, dated Apr. 30, 2010 [ALLY_0071105].

### (2)    Second Amendment (May 14, 2010)[118]

This amendment, among other things: (1) evidenced AFI's consent to the addition of collateral consisting of certain FHA/VA Loans and REO Property (residential property acquired as a result of a foreclosure); (2) added (a) new events of default relating to a failure by a A&R Line of Credit Borrower to be an approved servicer or maintain rating scores under any Servicing Contract (but, only if such failure could reasonably be expected to result in a material adverse effect), and (b) a new cross-default, which could be triggered in the sole discretion of AFI, as lender agent, relating to the failure of ResCap or its Subsidiaries to make payment of any debt owed to a third party that had been guaranteed by AFI; (3) provided that if under any loan, repurchase or other credit agreement, ResCap and the A&R Line of Credit Borrowers were subject to a Consolidated Liquidity threshold lower than $750 million, then the required Consolidated Liquidity threshold amount of $800 million under the A&R Line of Credit Agreement would be replaced with such lower threshold amount *plus* $50 million; (4) added a similar provision with respect to Unrestricted ResCap Liquidity, whereby the required Unrestricted ResCap Liquidity threshold amount of $300 million under the A&R Line of Credit Agreement would be replaced with a lower threshold amount under such other agreement *plus* $50 million; and (5) divided U.S. Mortgage Loans into two groups (with and without FHA/VA Loans) and increased the discount factor used to determine their collateral "value".

### (3)    Third Amendment (August 31, 2010)[119]

This amendment: (1) eliminated the $800 million Consolidated Liquidity covenant and limited compliance to a $250 million covenant regarding Unrestricted ResCap Liquidity (defined as the unrestricted and unencumbered cash (consisting of solely U.S. dollars) and, included for the first time, cash equivalents held by ResCap on a consolidated basis) and provided for a most-favored nations clause (such that the A&R Line of Credit Agreement would incorporate any more restrictive financial covenant (or additional financial covenant) contained in any Bilateral Facility); and (2) added a similar most-favored nations clause with respect to the consolidated TNW covenant.   Falling below the Unrestricted ResCap Liquidity threshold was the only liquidity test necessary to request funding of A&R Line of Credit Loans.

### (4)    Fourth Amendment (December 23, 2010)[120]

This amendment provided an unsecured $500 million swingline facility to GMAC Mortgage. Swingline loans made under the swingline facility were to accrue interest at a rate of LIBOR + 6.00% per annum.   Payment obligations relating to the swingline loans were the obligations of GMAC Mortgage only.   Requests to fund swingline loans were subject to the same ResCap liquidity tests as the A&R Line of Credit Loans.   Upon the occurrence of a Liquidity

---

[118]   Amend. No.2 to the A&R Line of Credit Agreement, dated May 14, 2010 [ALLY_0071112].

[119]   Amend. No.3 to the A&R Line of Credit Agreement, dated Aug. 31, 2010 [RC00025455].

[120]   Amend. No.4 to the A&R Line of Credit Agreement, dated Dec. 23, 2010 [RC00025467].

**Appendix V.E.8**, Page 8 of 9

Excess Amount, the swingline loans had to be prepaid prior to prepayment of outstanding A&R Line of Credit Loans.  A new mandatory prepayment was required if, on any day, the borrowing base exceeded the principal amount of outstanding A&R Line of Credit Loans by $25 million or more, whereupon prepayment of outstanding swingline loans was required in an amount equal to the lesser of the amount of the swingline loans outstanding and the amount of such excess.

### (5)    Fifth Amendment (April 18, 2011)[121]

This amendment: (1) extended the maturity date from April 29, 2011 to April 13, 2012; and (2) provided for the covenant regarding the maintenance of a minimum Peak Score of "Excellent" from Fannie Mae to apply to both A&R Line of Credit Borrowers (as opposed to just GMAC Mortgage).  However, failure to comply with this covenant was breached only if such failure could reasonably be expected to have a material adverse effect.

### (6)    Sixth Amendment (May 27, 2011)[122]

This amendment evidenced AFI's consent to the addition of collateral consisting of: (1) Freddie Advances (Servicing Advances related to real estate taxes or mortgage insurance premiums and advances to inspect, protect, preserve or repair properties securing defaulted Mortgage Loans or acquired through foreclosure and related to domestic Mortgage Loans or REO Property, made by GMAC Mortgage pursuant to the Consent Agreement, dated May 9, 2011, between GMAC Mortgage and Freddie Mac); and (2) the GMAC Mortgage 2010-1 Certificate (certificate, dated as of June 1, 2010, representing 100% of beneficial interest in a certain GMAC Mortgage Loan Trust).

### (7)    Seventh Amendments (September 29, 2011 and April 10, 2012)[123]

The "first" Seventh Amendment: (1) provided that obligations relating to the swingline loans were secured by the A&R Line of Credit Collateral; (2) added a material adverse effect representation and event of default; and (3) defined the term "Solvent" (although previously used, the term "Solvent" had not been defined).   The "second" Seventh Amendment: (1) extended the maturity date from April 13, 2012 to May 14, 2012; and (2) eliminated the swingline loan facility.

---

[121]   Amend. No.5 to the A&R Line of Credit Agreement, dated Apr. 18, 2011 [RC00025644].

[122]   Amend. No.6 to the A&R Line of Credit Agreement, dated May 27, 2011 [RC00025652].

[123]   Amend. No.7 to the A&R Line of Credit Agreement, dated Sept. 29, 2011 [RC00025831]; Amend. No.7 to the A&R Line of Credit Agreement, dated Apr. 10, 2012 [RC00026655].

i.      *AFI DIP Financing Agreement*[124]

On May 25, 2012, the A&R Line of Credit Borrowers and A&R Line of Credit Guarantors and AFI, as lender and lender agent, pursuant to an eighth amendment to the A&R Line of Credit Agreement, entered into the AFI DIP Financing Agreement. Under the terms of the AFI DIP Financing Agreement, AFI agreed to make post-petition loans to GMAC Mortgage on a non-revolving basis of up to $150 million until the earliest of: (1) the maturity date of the Barclays DIP Agreement; (2) forty-five days after the entry of the interim financing order (May 16, 2012) if a final financing order had not been entered into; (3) the substantial consummation of a reorganization plan; and (4) acceleration of the post-petition loans.  Interest on the post-petition loans accrued at a rate of LIBOR + 4% per annum, with a LIBOR floor of 1.25%.  Post-petition loans were made solely for funding the repurchase of whole loans from Ginnie Mae pools in order to: (1) avoid GMAC Mortgage being in violation of certain delinquency triggers applicable to GMAC Mortgage under Ginnie Mae guidelines; (2) effect foreclosures of related mortgaged properties in connection with HUD claims; and (3) allow for trial modifications under programs implemented by the GMAC Debtors for which the related loans and borrowers were qualified.  GMAC Mortgage was required to establish and to grant a perfected security interest in a specific collection account to hold and utilize the proceeds of the post-petition loans. Repayment of the post-petition loans constituted a super-priority claim and AFI was granted a priming lien in any of the repurchased loans and HUD claims funded with the post-petition loans.  Covenants included, among other things, compliance with the Orders as well as strict adherence to the specified use of proceeds.  New events of default relating to the post-petition loans typically seen in DIP financing facilities were added, including, among other things, a cross-default to the Barclays DIP Financing Agreement.

---

[124]  Debtor-in-Possession Financing Amend. (Eighth Amend. to the A&R Line of Credit Agreement), dated May 25, 2012 [RC00003798].

9.  *BMMZ Repo Facility*[125]

a.  *Principal Terms*

On December 21, 2011, the BMMZ Repo Sellers (RFC and GMAC Mortgage), and ResCap, as guarantor, entered into a repo facility with BMMZ, as buyer, evidenced by the BMMZ Master Repo Agreement.  The principal terms of the BMMZ Repo Facility were as follows:

TABLE V.E.9.a
**BMMZ Repo Facility - Principal Terms**
December 21, 2011

| | |
|---|---|
| Closing Date: | December 21, 2011 |
| Sellers: | RFC and GMAC Mortgage |
| Servicer: | GMAC Mortgage |
| Guarantor: | ResCap |
| Buyer: | BMMZ |
| Facility Type: | Mortgage Loan Repo Facility |
| Committed Amount: | $250 million |
| Interest Rate: | LIBOR + 4.75% |
| Expiration Date: | The earlier of (i) the "Commitment Termination Date" (as defined in the A&R Line of Credit Agreement) and (ii) December 19, 2012 |

*Source:    BMMZ Master Repo Agreement [ALLY_0005646].*

b.  *Purchase and Sale*

Subject to a maximum facility amount of $250 million, BMMZ committed to purchase from GMAC Mortgage and RFC certain mortgage loans.  The mortgage loans consisted of first lien and second lien loans (including adjustable rate mortgage loans and home equity loans) which satisfied certain eligibility criteria (among others, the mortgage loan was secured by a lien on a one to four family residential property, the accuracy of certain representations and warranties regarding the mortgage loan, delivery of related mortgage documentation to the custodian, the mortgage created a valid lien, and the absence of delinquent taxes).  The purchase price for the mortgage loans was determined by multiplying the applicable percentage for the applicable mortgage loan by the lesser of: (1) the market value of such mortgage loan; and (2)

---

[125]  BMMZ Master Repo Agreement [ALLY_0005646]; Pricing Side Letter among BMMZ Holdings LLC, Residential Funding Company, LLC, GMAC Mortgage, LLC and Residential Capital, LLC, dated Dec. 21, 2011 [ALLY_0006236].

the outstanding unpaid principal balance of such mortgage loan. The applicable percentages are set forth below:

---

TABLE V.E.9.b
**Applicable Percentages**

| | |
|---|---|
| **First Lien -** Current Unmodified (a first lien mortgage loan where payments are not delinquent and the mortgage loan (i) has not been modified at any time or (ii) has been modified pursuant to a modification agreement in existence for at least 12 months from the applicable date of determination and for which the mortgagor has not been delinquent in payments at any time in the six months preceding the applicable determination date) | 70% |
| **First Lien -** Current Modified (a first lien mortgage loan where payments are not delinquent and the mortgage loan (i) has been modified pursuant to a modification agreement executed on any applicable date of determination in the preceding 12 months or (ii) which has been modified pursuant to a modification agreement in existence for at least 12 months as determined on any applicable determination date for which the mortgagor has not been delinquent in payments at any time in the six months preceding any determination date) | 60% |
| **First Lien -** Delinquent (a first lien mortgage loan that is 30 days or more delinquent or with respect to which the note related thereto has been permanently lost or destroyed and there exists a lost note affidavit) | 40% |
| **Second Lien -** Current (a second lien mortgage loan where payments are not delinquent) | 60% |
| **Second Lien -** Delinquent (a second lien mortgage loan that is 30 days or more delinquent or with respect to which the note related thereto has been permanently lost or destroyed and there exists a lost note affidavit) | 0% |
| **HELOC -** Current (a home equity revolving line of credit secured by a mortgage or other instrument creating a second lien on the related property and where payments are not delinquent) | 45% |
| **HELOC -** Delinquent (a home equity revolving line of credit secured by a mortgage or other instrument creating a second lien on the related property and where payments are 30 days or more delinquent or with respect to which the note related thereto has been permanently lost or destroyed and there exists a lost note affidavit) | 0% |

*Source: Pricing Side Letter among BMMZ Holdings LLC, Residential Funding Company, LLC, GMAC Mortgage, LLC and Residential Capital, LLC, dated Dec. 21, 2011 [ALLY_0006236].*

---

### c. *Repurchase of Mortgage Loans*

The BMMZ Repo Sellers were required to repurchase the purchased mortgage loans on the earlier of: (1) the repurchase date set forth in the applicable request/confirmation relating to the applicable mortgage loans; and (2) the termination date (the earlier of (a) the Expiration Date,[126] (b) a change of control, or (c) at BMMZ's option, the occurrence of an event of default). The repurchase price to be paid on the repurchase date was the sum of the purchase price paid by BMMZ for the mortgage loans plus the accrued and unpaid interest thereon. In addition, if either the market value or the unpaid principal balance of the purchased mortgage loans was less than the Margin Amount (the amount obtained by the application of the applicable percentages to the repurchase price of the purchased mortgage loans), then BMMZ could require the BMMZ Repo Sellers to make a Shortfall Payment (a payment in an amount equal to such shortfall) to BMMZ.

---

[126] *See* Table V.E.9.a (defining "Expiration Date").

> d.    *Servicing Arrangements; Mortgage Loan Payments into Collection Account*

GMAC Mortgage continued to act as servicer of the purchased mortgage loans with respect to which servicing rights were retained by the BMMZ Repo Sellers.  All payments of principal and interest and certain other payments relating to the purchased mortgage loans were required to be paid into collection accounts, and, on a monthly basis, amounts therein were released from such accounts and applied under a waterfall provision to pay: (1) unpaid expenses, fees and amounts due BMMZ under the BMMZ Master Repo Agreement; (2) any Shortfall Payment; (3) accrued interest; (4) a servicing fee to GMAC Mortgage; and (5) with the balance paid,  to the BMMZ Repo Sellers.

> e.    *Financial Covenants*

Two financial covenants were required to be maintained, which applied to ResCap and its Subsidiaries: (1) Consolidated Liquidity (unrestricted and unencumbered cash and cash equivalents of ResCap on a consolidated basis), on any business day could not be less than $250 million; and (2) Consolidated TNW (the line item consisting of "equity" on the consolidated balance sheet of ResCap) could not, as of the last business day of any month, be less than $250 million.

> f.    *No AFI Setoff Rights*

Neither AFI nor any of its Affiliates that succeed to the rights of BMMZ under the BMMZ Master Repo Agreement could exercise setoff rights granted under the BMMZ Master Repo Agreement with respect to amounts owed them under the A&R Line of Credit Agreement.

> g.    *Guarantee*

ResCap guaranteed the obligations of the BMMZ Repo Sellers under the BMMZ Master Repo Agreement pursuant to an unconditional guarantee.[127]

---

[127]    Master Guarantee of Residential Capital, LLC, in favor of BMMZ Holdings LLC, dated Dec. 21, 2011 [ALLY_0006241].

Appendix V.F.4.a(1), Page 1 of 2

**Health Capital – Historical Financial Statements**
**Historical Balance Sheets** [1]
December 31, 2003 – August 27, 2007
*($ in Thousands, Unaudited)*

| | 2003 | 2004 | As of December 31, 2005 | 2006 | As of 8/27/2007 |
|---|---|---|---|---|---|
| **Assets** | | | | | |
| Cash and cash equivalents | $ 6,433 | $ 4,577 | $ 1,427 | $ 15,354 | $ 1,706 |
| Healthcare lending receivables, net | 331,633 | 399,770 | 593,230 | 761,983 | 885,775 |
| Allowance for credit loss | (6,703) | (9,526) | (16,845) | (16,339) | (20,288) |
| Accounts receivable | 1,798 | 3,142 | 4,849 | 5,201 | 6,266 |
| Intangible assets | 2,385 | 2,385 | 2,385 | 2,385 | 2,385 |
| Other assets | 20 | 19 | 18 | 11 | 1,152 |
| Total assets | $ 335,566 | $ 400,369 | $ 585,065 | $ 768,595 | $ 876,996 |
| **Liabilities and Stockholders' Equity** | | | | | |
| Debt [2] | $ 287,436 | $ 343,057 | $ 514,876 | $ 678,804 | $ 759,321 |
| Other liabilities | 145 | 57 | 1,857 | 1,402 | 233 |
| Total liabilities | 287,581 | 343,113 | 516,734 | 680,206 | 759,553 |
| Net stockholders' equity | 47,985 | 57,256 | 68,331 | 88,389 | 117,443 |
| Total liabilities and stockholders' equity | $ 335,566 | $ 400,369 | $ 585,065 | $ 768,595 | $ 876,996 |

[1] *Health Capital Valuation Analysis, prepared by Houlihan Lokey, dated Sep. 28, 2007 [ALLY_0031246]. ResCap reported the balance of Health Capital's total assets as of August 27, 2007 at $876.8 million. (See Residential Capital, LLC Quarterly Report (Form 10-Q) (Nov. 8, 2007), at 20-21.)*

[2] *Debt was calculated as the difference between total assets and the sum of other liabilities and net stockholders' equity. See Health Capital Valuation Analysis, prepared by Houlihan Lokey, dated Sep. 28, 2007, at ALLY_0031302 [ALLY_0031246].*

Appendix V.F.4.a(1), Page 1 of 2

**Appendix V.F.4.a(1), Page 2 of 2**

**Health Capital – Historical Financial Statements**
**Historical Income Statements [1]**
December 31, 2003 – August 27, 2007
*($ in Thousands, Unaudited)*

| | 2003 | 2004 | Fiscal year ended December 31, 2005 | 2006 | LTM 8/27/2007 |
|---|---|---|---|---|---|
| **Revenues** | | | | | |
| Interest income | $ 15,775 | $ 25,074 | $ 49,641 | $ 60,086 | $ 79,693 |
| Interest expense | (3,547) | (7,280) | (21,067) | (34,713) | (44,864) |
| Provision for losses | (5,738) | (2,798) | (7,310) | 506 | (8,773) |
| Other income [2] | 3,590 | 3,443 | 2,361 | 6,330 | 4,979 |
| Total revenue | 10,080 | 18,440 | 23,625 | 32,208 | 31,034 |
| **Expenses** | | | | | |
| Direct expenses | 4,169 | 5,495 | 8,456 | 6,189 | 6,073 |
| Direct transfers | 661 | 1,255 | 1,143 | 1,074 | 1,802 |
| Indirect transfers | 64 | 141 | 224 | 553 | 492 |
| Enterprise transfers | - | 664 | 735 | 768 | 1,370 |
| Total expenses | 4,894 | 7,556 | 10,559 | 8,583 | 9,736 |
| Pretax income | $ 5,186 | $ 10,884 | $ 13,066 | $ 23,625 | $ 21,298 |

[1] *Health Capital Valuation Analysis, prepared by Houlihan Lokey, dated Sep. 28, 2007 [ALLY_0031246].*

[2] *Consists of loan fee income and investment income. See Health Capital Valuation Analysis, prepared by Houlihan Lokey, dated Sep. 28, 2007, at ALLY_0031303 [ALLY_0031246].*

Appendix V.F.4.a(1), Page 2 of 2

**Health Capital – Summary of Houlihan Lokey's Valuation**
**Summary of Valuation Results**
As of August 27, 2007
*($ in Thousands, Unaudited)*

Equity Value From Operations

| Market Approach | Low | High |
|---|---|---|
| Guideline Publicly Traded Company Method | $ 134,300 | $ 152,200 |
| Guideline M&A Method | 126,600 | 143,800 |
| **Income Approach** | | |
| DCF Method | 120,000 | 160,000 |

Results Summary

| | Low | High |
|---|---|---|
| Equity value from operations [1] | $ 127,000 | $ 152,000 |
| Non-operating assets/Liabilities: | | |
| Add: Cash and cash equivalents balance as of 8/27/2007 | 1,706 | 1,706 |
| Equity value | $ 128,706 | $ 153,706 |
| Plus: Total debt [2] | 759,321 | 759,321 |
| Enterprise value (rounded) | $ 888,000 | $ 913,000 |
| Selected enterprise value (rounded) | | $ 900,500 |
| Implied ratio of enterprise value to adjusted total assets | | 1.03 x |
| Adjusted total asset value as of August 27, 2007 | | $ 876,996 |

[1] Selected as the average of the Guideline Publicly Traded Company Method, Guideline M&A Method, and DCF Method.

[2] Debt was calculated as the difference between total assets and the sum of other liabilities and net stockholders' equity as of July 31, 2007. See Health Capital Valuation Analysis, prepared by Houlihan Lokey, dated Sep. 28, 2007, at ALLY_0031286 [ALLY_0031246].

*Source: Health Capital Valuation Analysis, prepared by Houlihan Lokey, dated Sep. 28, 2007 [ALLY_0031246].*

12-12020-mg  Doc 3698-36   Filed 05/13/13   Entered 05/13/13 ...   Pg 190 of 385
Case 22-11068-JTD   Doc 6139-13   Filed 02/03/23   Page 514 of 709   Appendix

Appendix V.F.4.a(3), Page 2 of 2

**Health Capital – Summary of Houlihan Lokey's Valuation**
**Summary of Key Valuation Assumptions**
*As of August 27, 2007*
*($ in Thousands, Unaudited)*

## Income Approach

### DCF Method

| | | Range | | |
|---|---|---|---|---|
| | | **HL/HZ Inputs** | | **HL/HZ Range** |
| | | Low | High | |
| Number of years in projection period | 3 yr 4 mo | | | |
| Discount rate | | 12.0% | 16.0% | |
| Residual period perpetual growth rate | | N/A | N/A | |
| Residual period exit multiple – P/E | | 7.0x | 11.0x | |
| Indicated value | | | | $ 94,064   $ 166,483 |
| Selected value [1] | | | | $ 120,000   $ 160,000 |

## Market Approach

### Guideline Publicly Traded Company Method

Number of public guideline companies: 6

1 CapitalSource Inc.
2 CIT Group Inc.
3 Financial Federal Corp.
4 Marlin Business Services Corp.
5 NewStar Financial, Inc.
6 Resource Capital Corp.

| Based on 8/27/07 Stock Price | Metric | Mean | Median | HL/HZ Selected Low | HL/HZ Selected High | HL/HZ Range |
|---|---|---|---|---|---|---|
| P/TBVE | $ 115,058 | 1.39x | 1.36x | 1.10x | 1.25x | $ 126,560   $ 143,820 |
| LTM P/E | $ 14,129 | 12.90x | 12.10x | 10.00x | 11.00x | $ 141,290   $ 155,420 |
| Forward P/E | $ 17,910 | 8.50x | 7.60x | 7.50x | 8.50x | $ 134,330   $ 152,240 |
| Indicated value | | | | | | $ 134,300   $ 152,200 |

### Guideline M&A Method

Number of guideline transactions: 13

| | Metric | Mean | Median | HL/HZ Selected Low | HL/HZ Selected High | HL/HZ Range |
|---|---|---|---|---|---|---|
| P/TBVE | $ 115,058 | 1.35x | 1.41x | 1.10x | 1.25x | $ 126,560   $ 143,820 |
| P/E | $ 14,129 | 21.20x | 20.30x | NMF | NMF | N/A   N/A |
| Indicated value | | | | | | $ 126,600   $ 143,800 |

## Asset-Based Approach

| | | |
|---|---|---|
| Indicated value | | N/A   N/A |

[1] *Houlihan did not explain how it selected the $120 million to $160 million range from the range of indicated values of $94 million to $166 million.*

**Resort Finance – Historical Financial Statements**
**Historical Balance Sheets** [1]
December 31, 2005 – June 30, 2008
*($ in Thousands, Unaudited)*

|  | 2005 | As of December 31, 2006 | 2007 | As of 6/30/2008 |
|---|---|---|---|---|
| **Assets** |  |  |  |  |
| Cash and cash equivalents | $ (961) | $ 2 | $ 1,878 | $ 1,364 |
| Accounts receivable | 6,047 | 23,791 | 27,799 | 26,007 |
| Intangible assets | - | - | - | - |
| Lending receivables, net | 672,818 | 1,114,825 | 1,358,430 | 1,457,893 |
| Other assets | 78 | 221 | 1,782 | 3,640 |
| Total assets | $ 677,981 | $ 1,138,838 | $ 1,389,889 | $ 1,488,904 |
| **Liabilities and Stockholders' Equity** |  |  |  |  |
| Total borrowings | $ - | $ 881,990 | $ 978,126 | $ 1,125,000 |
| Deposit liabilities | - | - | - | - |
| Other liabilities | 474 | 15,368 | 15,194 | 14,724 |
| Total liabilities | 474 | 897,358 | 993,320 | 1,139,724 |
| Net stockholders' equity [2] | 677,508 | 241,480 | 396,569 | 349,181 |
| Total liabilities and stockholders' equity | $ 677,981 | $ 1,138,838 | $ 1,389,889 | $ 1,488,904 |

[1] Houlihan Lokey Valuation Analysis of Resort Finance as of June 30, 2008, dated July 24, 2008 [ALLY_0102229].

[2] Net stockholders' equity was calculated as the difference between total assets and total liabilities. See Houlihan Lokey Valuation Analysis of Resort Finance as of June 30, 2008, dated July 24, 2008, at ALLY_0102280 [ALLY_0102229].

Resort Finance – Historical Financial Statements
Historical Income Statements [1]
December 31, 2005 – June 30, 2008
($ in Thousands, Unaudited)

|  | Fiscal year ended December 31, | | | LTM |
|  | 2005 | 2006 | 2007 | 6/30/2008 |
|---|---|---|---|---|
| Interest income | $ 56,805 | $ 88,941 | $ 129,528 | $ 124,793 |
| Interest expense | 27,485 | 51,136 | 75,253 | 85,288 |
| Net interest margin | 29,320 | 37,805 | 54,275 | 39,505 |
| Provision for loan losses | 9 | 6,674 | 5,948 | 4,797 |
| Net interest income after provision | 29,311 | 31,131 | 48,327 | 34,708 |
| Operating expenses | 4,417 | 4,779 | 4,695 | 3,700 |
| Non-interest income (expense) | 4,478 | 2,332 | 3,093 | 948 |
| Pre-tax income (loss) | 29,372 | 28,684 | 46,725 | 31,956 |
| Income taxes (credit) | 11,402 | 10,958 | (45) | 12,782 |
| Net income (loss) | $ 17,970 | $ 17,727 | $ 46,770 | $ 19,174 |

[1] Houlihan Lokey Valuation Analysis of Resort Finance as of June 30, 2008, dated July 24, 2008 [ALLY_0102229].
[2] Assumed 40% tax rate for LTM period. See Houlihan Lokey Valuation Analysis of Resort Finance as of June 30, 2008, dated July 24, 2008, at ALLY_0102281 [ALLY_0102229].

**Appendix V.F.4.c(3)**, Page 1 of 2

**Resort Finance – Summary of Houlihan Lokey's Valuation**
**Summary of Valuation Results**
As of June 30, 2008
*($ in Thousands, Unaudited)*

| Valuation Approach [1] | Metric | HL/HZ Selected | | Low | | High | Debt | Range | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Market Approach** | | | | | | | | | | |
| Guideline Publicly Traded Company Method | | | | | | | | | | |
| P/NBV | $ 349,181 | 0.20x | - | 0.30x | $ 69,836 - | $ 104,754 | $ 1,123,636 | $ 1,193,470 | - | $ 1,228,390 |
| Annualized P/E | 12,262 | 7.00x | - | 8.00x | 85,834 - | 98,096 | 1,123,636 | 1,209,470 | - | 1,221,730 |
| EV/TA | 1,487,540 | 0.65x | - | 0.75x | 966,900 - | 1,115,660 | N/A | 966,900 | - | 1,115,660 |
| Mean | | | | | | | | 1,123,280 | - | 1,188,593 |
| **Asset-Based Approach** | | | | | | | | | | |
| Adjusted Book Value Method | | | | | | | | 1,225,337 | - | 1,255,799 |
| Concluded range of enterprise value from operations [2] | | | | | | | | 1,174,309 | - | 1,222,196 |
| Add: Cash & equivalents | | | | | | | | 1,364 | | 1,364 |
| Less: Deutsche Bank facility | | | | | | | | (375,000) | | (375,000) |
| Less: GMAC facility | | | | | | | | (750,000) | | (750,000) |
| Indicated range of value | | | | | | | | $ 50,673 | - $ | 98,561 |
| Concluded value | | | | | | | | | $ | 74,617 |
| Implied P/NBV | | | | | | | | | | 0.2x |
| Resort Finance book value (6/30/08) | | | | | | | | | $ | 349,181 |

[1] DCF Method and Guideline M&A Method were not utilized to value Resort Finance.
[2] Selected as the average of the Guideline Publicly Traded Company Method and the Adjusted Book Value Method.
Source: Houlihan Lokey Valuation Analysis of Resort Finance as of June 30, 2008, dated July 24, 2008 [ALLY_0102229].

Appendix V.F.4.c(3), Page 1 of 2

Appendix V.F.4.c(3), Page 2 of 2

**Resort Finance – Summary of Houlihan Lokey's Valuation**
**Summary of Key Valuation Assumptions**
As of June 30, 2008
*($ in Thousands, Unaudited)*

| Market Approach | Median | Mean | Range | |
|---|---|---|---|---|
| **Guideline Publicly Traded Company Method** | | | | |
| Number of public guideline companies | 4 | | | |
| 1 CIT Group, Inc. | | | | |
| 2 CapitalSource Inc. | | | | |
| 3 Financial Federal Corp. | | | | |
| 4 NewStar Financial, Inc. | | | | |
| | | | | |
| _Based on 6/30/08 Stock Price_ | | | | |
| P/NBV (FYE) | 0.79x | 0.85x | N/A | N/A |
| P/NBV (trailing) | 0.75x | 0.83x | N/A | N/A |
| P/E (FYE) | 11.3x | 11.3x | N/A | N/A |
| LTM P/E | 11.2x | 11.4x | N/A | N/A |
| Forward P/E | 10.6x | 11.6x | N/A | N/A |
| EV/TA (FYE) | 0.86x | 0.86x | N/A | N/A |
| EV/TA (LTM) | 0.85x | 0.87x | N/A | N/A |
| | | | | |
| _Based on 30-Day Average Stock Price_ | | | | |
| P/NBV | N/A | N/A | N/A | N/A |
| P/TBVE | N/A | N/A | N/A | N/A |
| LTM P/E | N/A | N/A | N/A | N/A |
| Forward P/E | N/A | N/A | N/A | N/A |
| | | | | |
| **Guideline M&A Method** [1] | | | | |
| Indicated value | N/A | N/A | N/A | N/A |
| | | | | |
| **Asset-Based Approach** | | | | |
| Indicated value | | | $ 1,225,337 | $ 1,255,799 |

[1] DCF Method and Guideline M&A Method were not utilized to value Resort Finance.
Source: Houlihan Lokey Valuation Analysis of Resort Finance as of June 30, 2008, dated July 24, 2008 [ALLY_0102229].

Appendix V.F.4.c(3), Page 2 of 2

**Appendix V.F.4.f(4)(a), Page 1 of 2**

**ResMor Trust Company – Summary of Goldin Associates' Fairness Opinion Valuation Analysis**
**ResMor Sale**
As of November 20, 2008
*(C$ in Thousands, Unaudited)*

| | |
|---|---|
| Subject Entity: | ResMor Trust Company ("ResMor") |
| Valuation Date: | 11/20/2008 |
| Document Reviewed: | Draft Goldin Associates Presentation to the Committee of Independent Members of the Board of Directors of Residential Capital, LLC Regarding the Purchase of ResMor Trust Company by GMAC, LLC, dated Dec. 2, 2008 [GOLDIN00127218]. |

**Valuation Approach**

| | Weight | Range | |
|---|---|---|---|
| **Income Approach** | | | |
| DCF Method | 40% | $ 75,700 | $ 85,800 |
| **Market Approach** | | | |
| Guideline Publicly Traded Company Method | | | |
| P/NBV and P/TBVE | 20% | $ 69,100 | $ 85,300 |
| LTM P/E | 20% | $ 81,800 | $ 98,000 |
| Guideline M&A Method | 20% | $ 71,600 | $ 90,700 |
| **Asset-Based Approach** | 0% | $ 51,577 | $ 76,944 |
| Concluded range of value | 100% | $ 74,800 | $ 89,100 |
| Proposed transaction price | | $ 82,000 | |
| Implied P/NBV | | 1.2x | |
| ResMor book value (10/31/08) | | $ 71,095 | |

Appendix V.F.4.f(4)(a), Page 1 of 2

Appendix V.F.4.f(4)(a), Page 2 of 2

**ResMor Trust Company – Summary of Goldin Associates' Fairness Opinion Valuation Analysis**
**ResMor Sale**
As of November 20, 2008
*(C$ in Thousands, Unaudited)*

**Income Approach**

DCF Method (1)

|  |  |  | Range |  |  |
|---|---|---|---|---|---|
| Discount rate | 12.24% |  |  |  |  |
| Number of years in projection period | 5 |  |  |  |  |
| Residual period perpetual growth rate | 4.90% |  |  |  |  |
| Residual period exit multiple – P/E | 8.4x |  |  |  |  |
| Residual period exit multiple – P/NBV | 1.2x | $ 75,683 | $ 85,817 |  |  |

**Market Approach**

Guideline Publicly Traded Company Method

Number of public guideline companies: 6

1 Canada Western Bank (CWB)
2 Laurentian Bank of Canada (LW)
3 Home Capital Group, Inc. (HCG)
4 Equitable Group, Inc. (ETC)
5 Pacific and Western Credit Corp. (PWC)
6 Xceed Mortgage Corp. (XMC)

| Based on 11/19/08 Stock Price | Mean | Median |  | Range |  |
|---|---|---|---|---|---|
| P/NBV | 1.0x | 1.1x | $ 71,095 | $ | 78,204 |
| P/TBVE | 1.0x | 1.1x | $ 69,087 | $ | 75,996 |
| LTM P/E | 7.1x | 7.4x | $ 81,846 | $ | 85,304 |
| Forward P/E | 6.0x | 5.8x | $ 18,497 | $ | 17,881 |

| Based on 30-Day Average Stock Price | Mean | Median |  |  |  |
|---|---|---|---|---|---|
| P/NBV | 1.2x | 1.2x | $ 85,314 | $ | 85,314 |
| P/TBVE | 1.2x | 1.3x | $ 82,905 | $ | 89,813 |
| LTM P/E | 8.5x | 9.3x | $ 97,984 | $ | 107,206 |
| Forward P/E | 7.2x | 7.2x | $ 22,197 | $ | 22,197 |

Guideline M&A Method

Number of guideline transactions: 8

|  | Median | Mean |  |  |  |
|---|---|---|---|---|---|
| P/NBV | 1.0x | 1.3x |  |  |  |
| Indicated value |  |  | $ 71,628 | $ | 90,726 |

**Asset-Based Approach**

| Indicated value |  |  | $ 51,577 | $ | 76,944 |
|---|---|---|---|---|---|

*(1) DCF model utilized the same forecast and discount rate for low, mid and high cases. Three different residual period calculations form the basis for the range: DCF value using the P/E exit multiple is between the low and high value as indicated by the range.*

Appendix V.F.4.f(4)(a), Page 2 of 2

Appendix V.F.4.g(1)(a), Page 1 of 2

**Residential Financial Securities, LLC – Historical Financial Statements**
**Historical Balance Sheets**
December 31, 2005 – February 28, 2009
*($ in Thousands)*

| | As of December 31, | | | | As of 2/28/2009 |
|---|---|---|---|---|---|
| Assets | 2005 | 2006 | 2007 | 2008 | |
| Cash and cash equivalents | $ 72 | $ 2,337 | $ 2,874 | $ 9,424 | $ 12,735 |
| Cash segregated under federal regulations | 1,000 | 1,000 | 6,000 | 1,000 | 1,000 |
| Receivable from brokers and dealers | 5,101 | 138,255 | 3,452 | - | - |
| Receivable from customers | 6,173 | 36,332 | 56,347 | - | - |
| Receivable from affiliates | - | 100,000 | 399 | - | - |
| Trading securities owned, at estimated fair value | 323,163 | 953,276 | 196,670 | 70,305 | 66,222 |
| Trading securities purchased under agreements to resell | 210,836 | 201,649 | 14,527 | - | - |
| Derivative financial instruments | - | 2,288 | (238) | - | - |
| Accrued interest receivable | 1,919 | 5,966 | 1,479 | 1,007 | 845 |
| Current taxes receivable | 1,204 | - | - | - | - |
| Deposits with clearing entities | 1,396 | 767 | 4,436 | 15,036 | 15,036 |
| Total assets | $ 550,864 | $ 1,441,869 | $ 285,946 | $ 96,773 | $ 95,838 |
| Liabilities and Stockholders' Equity | | | | | |
| Payable to brokers and dealers | $ 37,766 | $ 924 | $ 662 | $ - | $ - |
| Payable to customers | - | 454 | 58,217 | - | - |
| Payable to affiliates | 9,084 | 106,847 | 627 | 16 | - |
| Derivative financial instruments | - | - | - | 744 | - |
| Trading securities sold, not yet purchased, at est. fair value | 209,591 | 199,666 | 14,471 | - | - |
| Trading securities sold under agreements to repurchase | 94,675 | 930,471 | 43,156 | - | - |
| Current taxes payable | - | 719 | - | - | - |
| Other liabilities (non-agency hedge) | 9,973 | 6,647 | 425 | - | 258 |
| Subordinated liabilities with affiliates | 100,000 | 100,000 | 100,000 | 50,000 | 51,416 |
| Total liabilities | 461,089 | 1,345,727 | 217,558 | 50,759 | 51,674 |
| Equity | | | | | |
| Member's interest | 32,000 | 32,000 | 34,501 | 34,501 | 34,501 |
| Retained earnings | 57,775 | 64,142 | 33,887 | 11,513 | 9,664 |
| Net stockholders' equity | 89,775 | 96,142 | 68,388 | 46,014 | 44,165 |
| Total liabilities and stockholders' equity | $ 550,864 | $ 1,441,869 | $ 285,946 | $ 96,773 | $ 95,838 |

*Source: Draft Geldin Associates Presentation to the Committee of Independent Members of the Board of Directors of Residential Capital Regarding the Purchase of Residential Funding Securities, LLC and RFC Investments Limited by GMAC, LLC, dated Mar. 18, 2009, at 13 [GOLDMN00132886].*

Appendix V.F.4.g(1)(a), Page 1 of 2

**Appendix V.F.4.g(1)(a), Page 2 of 2**

**Residential Financial Securities, LLC – Historical Financial Statements**
**Historical Income Statements**
December 31, 2005 – February 28, 2009
*($ in Thousands)*

| | 2005 | 2006 | Fiscal Year Ended December 31, 2007 | 2008 | YTD 2/28/2009 |
|---|---|---|---|---|---|
| **Revenues** | | | | | |
| Interest income | $ 32,108 | $ 21,701 | $ 63,148 | $ 12,311 | $ 1,495 |
| Interest expense | 20,258 | 18,367 | 59,117 | 6,646 | 386 |
| Net interest income | 11,850 | 3,334 | 4,031 | 5,665 | 1,109 |
| **Other revenues** | | | | | |
| Underwriting fee income | 23,517 | 22,307 | 9,319 | 32 | - |
| Trading gains and losses, net | (17,865) | 1,820 | (31,842) | (22,691) | (1,943) |
| Total other revenues | 5,651 | 24,127 | (22,523) | (22,660) | (1,943) |
| Total revenues, net of interest expense | 17,502 | 27,461 | (18,492) | (16,995) | (834) |
| Operating expenses | 12,158 | 15,711 | 11,869 | 5,274 | 1,015 |
| Benefit (loss) before income tax expense | 5,344 | 11,750 | (30,361) | (22,268) | (1,849) |
| Income tax expense (benefit) | 1,209 | 5,282 | (106) | 106 | - |
| Net income (loss) | $ 4,135 | $ 6,467 | $ (30,255) | $ (22,374) | $ (1,849) |
| Underwriting activities for ResCap and affiliates: | $14.3 billion | $13.5 billion | $10.3 billion | None | None |

*Source: Draft Goldin Associates Presentation to the Committee of Independent Members of the Board of Directors of Residential Capital Regarding the Purchase of Residential Funding Securities, LLC and RFC Investments Limited by GMAC, LLC, dated Mar. 18, 2009, at 14 [GOLDIN00132386].*

Appendix V.F.4.g(1)(a), Page 2 of 2

**Appendix V.F.4.g(1)(b), Page 1 of 2**

**RFC Investments Limited / RFSC International Limited – Historical Financial Statements**
**Historical Balance Sheets**
December 31, 2005 – February 28, 2009
*($ in Thousands)*

| | | As of December 31, | | | | As of 2/28/2009 |
|---|---|---|---|---|---|---|
| Assets | 2005 | 2006 | 2007 | 2008 | | 2/28/2009 |
| Cash and short-term cash deposits | $ 14,504 | $ 24,794 | $ 29,268 | $ 21,203 | | $ 20,774 |
| Receivable from affiliates – U.S. subsidiaries | - | 42 | 45 | 111 | | - |
| Other accounts receivable | 510 | 65 | 18 | 0 | | 0 |
| Prepaid expenses | 16 | 23 | 26 | 3 | | 5 |
| Fixed assets, net | 13 | 11 | 6 | 2 | | 2 |
| Total assets | $ 15,043 | $ 24,935 | $ 29,364 | $ 21,319 | | $ 20,781 |
| | | | | | | |
| **Liabilities and Stockholders' Equity** | | | | | | |
| Income taxes payable | $ - | $ - | $ 1,576 | $ 3,406 | | $ 3,265 |
| Deferred tax liability – foreign | 988 | 3,148 | 3,056 | - | | - |
| Payable to affiliates – U.S. subsidiaries | - | - | - | - | | 39 |
| Payable to affiliates – non-U.S. subsidiaries | 38 | 662 | 244 | 148 | | 114 |
| Accounts payable | 307 | - | 19 | 8 | | 32 |
| Accrued compensation | 862 | 1,268 | 466 | 237 | | 308 |
| Other accrued expenses | 24 | 23 | 71 | 18 | | 38 |
| Other liabilities | 130 | 151 | (0) | 9 | | 14 |
| Total liabilities | 2,348 | 5,251 | 5,433 | 3,826 | | 3,811 |
| | | | | | | |
| **Equity** | | | | | | |
| Common stock | 8,223 | 8,223 | 8,223 | 8,223 | | 8,223 |
| Retained earnings – beginning balance | 2,262 | 3,913 | 8,800 | 12,569 | | 12,645 |
| Foreign currency translation – gain | 6,486 | 12,590 | 17,304 | 15,164 | | 194 |
| Foreign currency translation – loss | (5,927) | (9,928) | (14,165) | (18,539) | | (3,897) |
| Current period-to-date net income (loss) | 1,651 | 4,887 | 3,769 | 76 | | (194) |
| Net stockholders' equity | 12,695 | 19,685 | 23,930 | 17,493 | | 16,970 |
| Total liabilities and stockholders' equity | $ 15,043 | $ 24,935 | $ 29,364 | $ 21,319 | | $ 20,781 |

*Source: Draft Goldin Associates Presentation to the Committee of Independent Members of the Board of Directors of Residential Capital Regarding the Purchase of Residential Funding Securities, LLC and RFC Investments Limited by GMAC, LLC, dated Mar. 18, 2009, at 26 [GOLDIN00132386].*

Appendix V.F.4.g(1)(b), Page 1 of 2

Appendix V.F.4.g(1)(b), Page 2 of 2

**RFC Investments Limited / RFSC International Limited – Historical Financial Statements**
**Historical Income Statements**
December 31, 2005 – February 28, 2009
*(\$ in Thousands)*

| | 2005 | 2006 | Fiscal Year Ended December 31, 2007 | 2008 | YTD 2/28/2009 |
|---|---|---|---|---|---|
| **Revenue** | | | | | |
| Net interest income | \$ 631 | \$ 905 | \$ 1,462 | \$ 1,406 | \$ 54 |
| Broker fees | 4,862 | 10,046 | 634 | 484 | - |
| Security underwriting fees | - | - | 5,413 | 432 | - |
| Gain (loss) on sale of mortgage loans, net | 37 | 126 | 302 | - | - |
| Securitization deal costs | - | (58) | - | - | - |
| Total net revenue | 5,530 | 11,019 | 7,811 | 2,322 | 54 |
| **Expenses** | | | | | |
| Compensation and benefits | 1,798 | 2,275 | 1,359 | 1,295 | 173 |
| Professional fees | 104 | 90 | 126 | 97 | 13 |
| Data process and telecommunications | 70 | 74 | 93 | 61 | 7 |
| Advertising | 16 | 26 | 15 | 2 | 0 |
| Occupancy | 188 | 259 | 278 | 222 | 26 |
| Other operating expenses | 995 | 1,281 | 779 | 528 | 105 |
| Total expenses | 3,171 | 4,004 | 2,650 | 2,207 | 325 |
| Income (loss) before income tax expense | 2,359 | 7,014 | 5,161 | 115 | (271) |
| Income tax expense (benefit) | 708 | 2,127 | 1,392 | 39 | (77) |
| Net income (loss) | \$ 1,651 | \$ 4,887 | \$ 3,769 | \$ 76 | \$ (194) |

*Source: Draft Goldin Associates Presentation to the Committee of Independent Members of the Board of Directors of Residential Capital Regarding the Purchase of Residential Funding Securities, LLC and RFC Investments Limited by GMAC, LLC, dated Mar. 18, 2009, at 27 [GOLDIN00132386].*

Appendix V.F.4.g(1)(b), Page 2 of 2

**Appendix V.F.4.g(4)(a), Page 1 of 2**

Residential Funding Securities, LLC – Summary of Goldin Associates' Fairness Opinion Valuation Analysis
**US/UK Broker-Dealer Sale**
As of March 18, 2009
*($ in Thousands, Unaudited)*

| Valuation Approach | Weight | Range | |
|---|---|---|---|
| **Income Approach** | | | |
| DCF Method [1] | 0% | N/A | N/A |
| **Market Approach** | | | |
| Guideline Publicly Traded Company Method | | | |
| P/NBV and P/TBVE | 25% | $ 32,700 | $ 48,500 |
| LTM P/E | 0% | N/A | N/A |
| Guideline M&A Method | 5% | $ 70,700 | $ 79,500 |
| **Asset-Based Approach (Adjusted Book Value Method)** | 70% | $ 42,600 | $ 42,600 |
| Concluded range of value | 100% | $ 41,600 | $ 45,900 |
| Proposed transaction price | | $ 43,700 | |
| Implied P/NBV | | 1.0x | |
| Ally Securities NBV (2/28/09) | | $ 44,200 | |

*Source: Draft Goldin Associates Presentation to the Committee of Independent Members of the Board of Directors of Residential Capital Regarding the Purchase of Residential Funding Securities, LLC and RFC Investments Limited by GMAC, LLC, dated Mar. 18, 2009, [GOLDIN00132386].*

*[1] DCF methodology was not utilized to value Ally Securities.*

Appendix V.F.4.g(4)(a), Page 2 of 2

**Residential Funding Securities, LLC – Summary of Goldin Associates' Fairness Opinion Valuation Analysis**
**US/UK Broker-Dealer Sale**
As of March 18, 2009
*($ in Thousands, Unaudited)*

## Market Approach

### Guideline Publicly Traded Company Method

Number of public guideline companies: 10

1 Broadpoint Securities Group (BPSG)
2 Cowen Group (COWN)
3 FBR Capital Markets (FBCM)
4 International Asset Holding (IAAC)
5 Jefferies Group (JEF)
6 JMP Group (JMP)
7 KBW (KBW)
8 Oppenheimer Holdings (OPY)
9 Piper Jaffray Companies (PJC)
10 Thomas Weisen Partners Group (TWPG)

#### Based on 3/17/09 Stock Price

|  | Mean | Median | | Range | |
|---|---|---|---|---|---|
| P/NBV | 0.90x | 0.74x | | N/A | $ 32,700 |
| P/TBVE | 1.10x | 0.80x | $ 48,500 | N/A |
| LTM P/E | N/A | N/A | N/A | N/A |
| Forward P/E | N/A | N/A | N/A | N/A |

#### Based on 30-Day Average Stock Price

|  | Mean | Median | Range | |
|---|---|---|---|---|
| P/NBV | N/A | N/A | N/A | N/A |
| P/TBVE | N/A | N/A | N/A | N/A |
| LTM P/E | N/A | N/A | N/A | N/A |
| Forward P/E | N/A | N/A | N/A | N/A |

### Guideline M&A Method

Number of guideline transactions: 8

|  | Median | Mean | Range | |
|---|---|---|---|---|
| P/NBV | 1.6x | 1.8x | $ 70,700 | $ 79,500 |

Indicated value: $ 70,700 — $ 79,500

## Asset-Based Approach

Indicated value: $ 42,600 — $ 42,600

*Source: Draft Goldin Associates Presentation to the Committee of Independent Members of the Board of Directors of Residential Capital Regarding the Purchase of Residential Funding Securities, LLC and RFC Investments Limited by GMAC, LLC, dated Mar. 18, 2009, [GOLDIN00132386].*

Appendix V.F.4.g(4)(a), Page 2 of 2

Appendix V.F.4.g(4)(b), Page 1 of 2

**RFC Investments Limited – Summary of Goldin Associates' Fairness Opinion Valuation Analysis**
**US/UK Broker-Dealer Sale**
As of March 18, 2009
*($ in Thousands, Unaudited)*

| Valuation Approach | Weight | | Range | |
|---|---|---|---|---|
| Income Approach | | | | |
| DCF Method [1] | 0% | | N/A | N/A |
| Market Approach | | | | |
| Guideline Publicly Traded Company Method | | | | |
| P/NBV and P/TBVE | 25% | $ | 13,000 $ | 19,100 |
| LTM P/E | 0% | | N/A | N/A |
| Guideline M&A Method | 5% | $ | 39,700 $ | 40,600 |
| Asset-Based Approach (Adjusted Book Value Method) | 70% | $ | 16,500 $ | 16,500 |
| Concluded range of value | 100% | $ | 16,800 $ | 18,400 |
| Proposed transaction price | | $ 17,000 | | |
| Implied P/NBV | | 1.0x | | |
| RFCIL NBV (2/28/09) | | $ 17,000 | | |

*Source: Draft Goldin Associates Presentation to the Committee of Independent Members of the Board of Directors of Residential Capital Regarding the Purchase of Residential Funding Securities, LLC and RFC Investments Limited by GMAC, LLC, dated Mar. 18, 2009, [GOLDIN0013386].*
*[1] DCF method was not utilized to value RFCIL.*

Appendix V.F.4.g(4)(b), Page 1 of 2

**Appendix V.F.4.g(4)(b)**, Page 2 of 2

**RFC Investments Limited – Summary of Goldin Associates' Fairness Opinion Valuation Analysis**
**US/UK Broker-Dealer Sale**
As of March 18, 2009
*($ in Thousands, Unaudited)*

**Market Approach**

Guideline Publicly Traded Company Method

Number of public guideline companies    11

1 Arden Partners plc (ARDN)
2 Blue Oar plc (BLUE)
3 Cenkos Securities plc (CNKS)
4 Charles Stanley Group plc (CAY)
5 Collins Stewart plc (CLST)
6 Evolution Group plc (EVG)
7 Numis Corporation plc (NUM)
8 Panmure Gordon & Co. plc (PMR)
9 Shore Capital Group plc (SGR)
10 Walker Crips Group plc (WCW)
11 WH Ireland Group plc (WHI)

| | | | Range | | |
|---|---|---|---|---|---|
| **Based on 3/17/09 Stock Price** | **Mean** | **Median** | | | |
| P/NBV | 0.77x | 0.92x | $ | 13,000 | N/A |
| P/TBVE | 1.03x | 1.12x | | N/A | $ 19,100 |
| LTM P/E | N/A | N/A | | N/A | N/A |
| Forward P/E | N/A | N/A | | N/A | N/A |
| | | | | | |
| **Based on 30-Day Average Stock Price** | | | | | |
| P/NBV | N/A | N/A | | N/A | N/A |
| P/TBVE | N/A | N/A | | N/A | N/A |
| LTM P/E | N/A | N/A | | N/A | N/A |
| Forward P/E | N/A | N/A | | N/A | N/A |
| | | | | | |
| Indicated value | | | $ | 39,700 $ | 40,600 |

Guideline M&A Method

Number of guideline transactions    3

| | **Mean** | **Median** | | | |
|---|---|---|---|---|---|
| P/NBV | 2.34x | 2.39x | | | |
| | | | | | |
| Indicated value | | | $ | 16,500 $ | 16,500 |

**Asset-Based Approach**

*Source: Draft Goldin Associates Presentation to the Committee of Independent Members of the Board of Directors of Residential Capital Regarding the Purchase of Residential Funding Securities, LLC and RFC Investments Limited by GMAC, LLC, dated Mar. 18, 2009. [GOLDIN0013286].*

Appendix V.F.4.g(4)(b), Page 2 of 2

Appendix VI.B.3, Page 1 of 1

**Residential Capital, LLC – Quarterly Solvency Analysis**
**Balance Sheet Test**
**Summary**
**2005 – 2011**
*($ in Millions)*

| | Market Approach [1] | | Asset-Based Approach [2] | | Concluded | Balance Sheet Test |
| | Fair Market Value Surplus / (Deficit) | Weight | Fair Market Value Surplus / (Deficit) | Weight | Fair Market Value Surplus / (Deficit) | Conclusion |
|---|---|---|---|---|---|---|
| 12/31/05 | $ 12,602.0 | 100% | $ 7,464.0 | 0% | $ 12,602.0 | Solvent |
| 03/31/06 | 13,126.1 | 100% | 7,763.5 | 0% | 13,126.1 | Solvent |
| 06/30/06 | 14,590.6 | 100% | 8,404.3 | 0% | 14,590.6 | Solvent |
| 09/30/06 | 13,199.7 | 100% | 8,375.9 | 0% | 13,199.7 | Solvent |
| 12/31/06 | 13,235.3 | 100% | 7,622.1 | 0% | 13,235.3 | Solvent |
| 03/31/07 | 9,706.6 | 100% | 7,173.9 | 0% | 9,706.6 | Solvent |
| 06/30/07 | 10,145.3 | 100% | 7,507.4 | 0% | 10,145.3 | Solvent |
| 09/30/07 | 2,429.6 | 50% | 1,273.8 | 50% | 1,851.7 | Solvent |
| 12/31/07 | (3,760.5) | 50% | 111.8 | 50% | (1,824.4) | Insolvent |
| 03/31/08 | (5,921.7) | 50% | (1,994.9) | 50% | (3,958.3) | Insolvent |
| 06/30/08 | (5,752.0) | 50% | (3,742.1) | 50% | (4,747.1) | Insolvent |
| 09/30/08 | (10,066.3) | 50% | (4,828.8) | 50% | (7,447.6) | Insolvent |
| 12/31/08 | (7,499.4) | 50% | (4,397.3) | 50% | (5,948.4) | Insolvent |
| 03/31/09 | (4,575.5) | 50% | (1,102.5) | 50% | (2,839.0) | Insolvent |
| 06/30/09 | (2,056.8) | 50% | (1,164.7) | 50% | (1,610.7) | Insolvent |
| 09/30/09 | (1,715.4) | 50% | (1,563.6) | 50% | (1,639.5) | Insolvent |
| 12/31/09 | (1,250.5) | 50% | (687.7) | 50% | (969.1) | Insolvent |
| 03/31/10 | (34.8) | 0% | (1,628.0) | 100% | (1,628.0) | Insolvent |
| 06/30/10 | 230.7 | 0% | (1,617.5) | 100% | (1,617.5) | Insolvent |
| 09/30/10 | 447.2 | 0% | (2,544.3) | 100% | (2,544.3) | Insolvent |
| 12/31/10 | 599.6 | 0% | (2,457.7) | 100% | (2,457.7) | Insolvent |
| 03/31/11 | 633.3 | 0% | (2,260.4) | 100% | (2,260.4) | Insolvent |
| 06/30/11 | 460.1 | 0% | (3,587.5) | 100% | (3,587.5) | Insolvent |
| 09/30/11 | (791.8) | 0% | (4,572.3) | 100% | (4,572.3) | Insolvent |
| 12/31/11 | (1,465.1) | 0% | (4,498.1) | 100% | (4,498.1) | Insolvent |

[1] *See Appendix VI.B.4.a(4), at 1.*
[2] *See Appendix VI.B.4.b, at 1.*

Appendix VI.B.3, Page 1 of 1

Appendix VI.B.4.a(4), Page 1 of 61

Residential Capital, LLC – Quarterly Solvency Analysis
Market Approach: Concluded Fair Market Value Surplus/(Deficit)
Summary
2005 – 2011
($ in Millions)

| | [A]<br>Fair Market Value of ResCap Equity (Non-Marketable, Controlling Basis)(1) | [B]<br>Fair Market Value of ResCap Debt(2) | [C] = [A] + [B]<br>Fair Market Value of Invested Capital | [D]<br>Face Value of ResCap Debt(2) | [E] = [C] - [D]<br>Fair Market Value Surplus / (Deficit) |
|---|---|---|---|---|---|
| 12/31/05 | $ 12,478.7 | $ 43,173.3 | $ 55,652.0 | $ 43,050.0 | $ 12,602.0 |
| 03/31/06 | 13,070.6 | 41,672.8 | 54,743.4 | 41,617.3 | 13,126.1 |
| 06/30/06 | 14,753.5 | 43,154.5 | 57,908.0 | 43,317.4 | 14,590.6 |
| 09/30/06 | 13,068.6 | 49,402.0 | 62,470.7 | 49,271.0 | 13,199.7 |
| 12/31/06 | 13,125.7 | 52,711.0 | 65,836.7 | 52,601.4 | 13,235.3 |
| 03/31/07 | 9,843.3 | 46,872.9 | 56,716.1 | 47,009.5 | 9,706.6 |
| 06/30/07 | 10,540.6 | 43,178.0 | 53,718.6 | 43,573.3 | 10,145.3 |
| 09/30/07 | 5,788.9 | 36,284.8 | 42,073.7 | 39,644.1 | 2,429.6 |
| 12/31/07 | 2,270.0 | 28,804.7 | 31,074.7 | 34,835.2 | (3,760.5) |
| 03/31/08 | 1,995.5 | 23,702.0 | 25,697.4 | 31,619.1 | (5,921.7) |
| 06/30/08 | 1,241.0 | 19,134.6 | 20,375.6 | 26,127.6 | (5,752.0) |
| 09/30/08 | 713.4 | 10,992.6 | 11,706.1 | 21,772.4 | (10,066.3) |
| 12/31/08 | 825.9 | 7,668.5 | 8,494.4 | 15,993.9 | (7,499.4) |
| 03/31/09 | 614.5 | 8,591.3 | 9,205.8 | 13,781.3 | (4,575.5) |
| 06/30/09 | 530.7 | 9,391.2 | 9,921.9 | 11,978.7 | (2,056.8) |
| 09/30/09 | 220.2 | 8,566.6 | 8,786.8 | 10,502.2 | (1,715.4) |
| 12/31/09 | 157.3 | 8,501.6 | 8,658.9 | 9,909.4 | (1,250.5) |
| 03/31/10 | 271.7 | 8,863.5 | 9,135.2 | 9,170.0 | (34.8) |
| 06/30/10 | 480.2 | 7,517.3 | 7,997.5 | 7,766.8 | 230.7 |
| 09/30/10 | 508.1 | 6,952.5 | 7,460.7 | 7,013.5 | 447.2 |
| 12/31/10 | 574.0 | 7,016.9 | 7,590.8 | 6,991.2 | 599.6 |
| 03/31/11 | 588.0 | 6,663.9 | 7,251.9 | 6,618.6 | 633.3 |
| 06/30/11 | 498.0 | 6,359.3 | 6,857.4 | 6,397.3 | 460.1 |
| 09/30/11 | 184.9 | 5,111.9 | 5,296.9 | 6,088.7 | (791.8) |
| 12/31/11 | 55.9 | 4,373.8 | 4,429.6 | 5,894.8 | (1,465.1) |

(1) See Appendix VI.B.4.a(4), at 2.
(2) See Appendix VI.B.4.a(4), at 11.

Appendix VI.B.4.a(4), Page 1 of 61

**Residential Capital, LLC – Quarterly Solvency Analysis**
**Market Approach: Fair Market Value of Equity**
**Summary**
**2005 – 2011**
*($ in Millions)*

| | [A]<br>ResCap Book Equity (1)(3) | [B]<br>Selected P/NBV Multiple (2) | [C] = [A] × [B]<br>Fair Market Value of ResCap Equity (Marketable, Minority Basis) | [D] (4)<br>Control Premium | [E] = [C] + [D]<br>Fair Market Value of ResCap Equity (Marketable, Controlling Basis) | [F] = [E] × -5%<br>Private Company Discount of 5% | [G] = [E] + [F]<br>Fair Market Value of ResCap Equity (Non-Marketable, Controlling Basis) (3) |
|---|---|---|---|---|---|---|---|
| 12/31/05 | $ 7,464.0 | 1.60x | $ 11,941.3 | $ 1,194.1 | $ 13,135.4 | ($656.8) | $ 12,478.7 |
| 03/31/06 | 7,763.5 | 1.61x | 12,507.7 | 1,250.8 | 13,758.5 | (687.9) | 13,070.6 |
| 06/30/06 | 8,404.3 | 1.68x | 14,118.2 | 1,411.8 | 15,530.0 | (776.5) | 14,753.5 |
| 09/30/06 | 8,375.9 | 1.49x | 12,505.8 | 1,250.6 | 13,756.4 | (687.8) | 13,068.6 |
| 12/31/06 | 7,622.1 | 1.65x | 12,560.5 | 1,256.0 | 13,816.5 | (690.8) | 13,125.7 |
| 03/31/07 | 7,173.9 | 1.31x | 9,419.4 | 941.9 | 10,361.3 | (518.1) | 9,843.3 |
| 06/30/07 | 7,507.4 | 1.34x | 10,086.7 | 1,008.7 | 11,095.4 | (554.8) | 10,540.6 |
| 09/30/07 | 6,171.6 | 0.99x | 6,093.6 | 0.0 | 6,093.6 | (304.7) | 5,788.9 |
| 12/31/07 | 6,030.1 | 0.40x | 2,389.5 | 0.0 | 2,389.5 | (119.5) | 2,270.0 |
| 03/31/08 | 5,732.9 | 0.37x | 2,100.5 | 0.0 | 2,100.5 | (105.0) | 1,995.5 |
| 06/30/08 | 4,067.5 | 0.32x | 1,306.3 | 0.0 | 1,306.3 | (65.3) | 1,241.0 |
| 09/30/08 | 2,315.4 | 0.32x | 751.0 | 0.0 | 751.0 | (37.5) | 713.4 |
| 12/31/08 | 2,187.4 | 0.40x | 869.4 | 0.0 | 869.4 | (43.5) | 825.9 |
| 03/31/09 | 1,050.0 | 0.62x | 646.8 | 0.0 | 646.8 | (32.3) | 614.5 |
| 06/30/09 | 1,050.0 | 0.53x | 558.6 | 0.0 | 558.6 | (27.9) | 530.7 |
| 09/30/09 | 408.8 | 0.57x | 231.8 | 0.0 | 231.8 | (11.6) | 220.2 |
| 12/31/09 | 275.0 | 0.60x | 165.6 | 0.0 | 165.6 | (8.3) | 157.3 |
| 03/31/10 | 425.7 | 0.67x | 286.0 | 0.0 | 286.0 | (14.3) | 271.7 |
| 06/30/10 | 793.5 | 0.64x | 505.4 | 0.0 | 505.4 | (25.3) | 480.2 |
| 09/30/10 | 858.5 | 0.62x | 534.8 | 0.0 | 534.8 | (26.7) | 508.1 |
| 12/31/10 | 846.2 | 0.71x | 604.2 | 0.0 | 604.2 | (30.2) | 574.0 |
| 03/31/11 | 884.2 | 0.70x | 619.0 | 0.0 | 619.0 | (30.9) | 588.0 |
| 06/30/11 | 772.1 | 0.68x | 524.2 | 0.0 | 524.2 | (26.2) | 498.0 |
| 09/30/11 | 331.1 | 0.59x | 194.7 | 0.0 | 194.7 | (9.7) | 184.9 |
| 12/31/11 | 92.4 | 0.64x | 58.8 | 0.0 | 58.8 | (2.9) | 55.9 |

(1) See Appendix VI.B.4.b, at 38 –40.

(2) See Appendix VI.B.4.a(4), at 3.

(3) As discussed in Section VI of the Report, neither the book value nor the Fair Market Value of ResCap's equity is indicative of solvency.

(4) A control premium of 10% was applied in the valuation of ResCap's equity at each quarterly measurement date from Dec. 31, 2005 through June 30, 2007. A control premium was not warranted for ResCap from Sep. 30, 2007 through the Petition Date for reasons described in Section VI of the Report.

Appendix VI.B.4.a(4), Page 3 of 61

**Residential Capital, LLC – Quarterly Solvency Analysis**
**Market Approach: Fair Market Value of Equity**
**Selected P/NBV Multiple**
2005 – 2011
*($ in Millions)*

| | [A] Guideline Company P/NBV Multiple [1] | [B] Industry P/NBV Multiple [2] | [C] = [A] / [B] Guideline Company Multiple / Industry Multiple | [D] = [A] Concluded P/NBV Multiple |
|---|---|---|---|---|
| 12/31/05 | 1.60x | 1.88x | 85.1% | 1.60x |
| 03/31/06 | 1.61x | 1.83x | 88.0% | 1.61x |
| 06/30/06 | 1.68x | 1.78x | 94.4% | 1.68x |
| 09/30/06 | 1.49x | 1.85x | 80.7% | 1.49x |
| 12/31/06 | 1.65x | 1.71x | 96.4% | 1.65x |
| 03/31/07 | 1.31x | 1.71x | 76.8% | 1.31x |
| 06/30/07 | 1.34x | 1.63x | 82.4% | 1.34x |
| 09/30/07 | 0.99x | 1.52x | 65.0% | 0.99x |
| 12/31/07 | 0.40x | 1.68x | 23.6% | 0.40x |
| 03/31/08 | 0.37x | 1.36x | 26.9% | 0.37x |
| 06/30/08 | 0.32x | 1.01x | 31.8% | 0.32x |
| | | *Average* | 68.3% | |
| | | *Median* | 80.7% | |
| | | *Conclusion* [3] | **70.0%** | |

| | [A] Guideline Company P/NBV Multiple [1] | [B] Industry P/NBV Multiple [2] | [C] Concluded Ratio [4] | [D] = [B] × [C] Concluded P/NBV Multiple |
|---|---|---|---|---|
| 09/30/08 | N/A | 1.02x | 31.8% | 0.32x |
| 12/31/08 | N/A | 1.25x | 31.8% | 0.40x |
| 03/31/09 | N/A | 0.88x | 70.0% | 0.62x |
| 06/30/09 | N/A | 0.76x | 70.0% | 0.53x |
| 09/30/09 | N/A | 0.81x | 70.0% | 0.57x |
| 12/31/09 | N/A | 0.86x | 70.0% | 0.60x |
| 03/31/10 | N/A | 0.96x | 70.0% | 0.67x |
| 06/30/10 | N/A | 0.91x | 70.0% | 0.64x |
| 09/30/10 | N/A | 0.89x | 70.0% | 0.62x |
| 12/31/10 | N/A | 1.02x | 70.0% | 0.71x |
| 03/31/11 | N/A | 1.00x | 70.0% | 0.70x |
| 06/30/11 | N/A | 0.97x | 70.0% | 0.68x |
| 09/30/11 | N/A | 0.84x | 70.0% | 0.59x |
| 12/31/11 | N/A | 0.91x | 70.0% | 0.64x |

[1] See Appendix VI.B.4.a(4), at 4.
[2] Median multiple selected from Ibbotson Associates Statistics for SIC Code 6: Finance, Insurance and Real Estate.
[3] Concluded ratio reflects primarily on the average to appropriately capture the divergence in multiples observed in late 2007 and 2008. This divergence reflects the risk characteristics of the ResCap Guideline Companies relative to the industry.
[4] The relative multiple percentage of 31.8% as of June 30, 2008 was applied for the Sep. 30, 2008 and Dec. 31, 2008 measurement dates to reflect continuing deterioration in the mortgage industry during the second half of 2008.

Appendix VI.B.4.a(4), Page 3 of 61

Appendix VI.B.4.a(4), Page 4 of 61

**Residential Capital, LLC – Quarterly Solvency Analysis**
**Market Approach: Fair Market Value of Equity**
**P/NBV Multiple of ResCap Guideline Companies**
December 31, 2005 – June 30, 2008
*($ in Millions)*

| | ResCap Guideline Companies | | | | | | |
| | Countrywide Financial Corporation [1] | IndyMac Bancorp, Inc. [1] | Washington Mutual, Inc. [1] | Coefficient of Variation | Median P/NBV | Average P/NBV | Selected P/NBV [2] |
|---|---|---|---|---|---|---|---|
| 12/31/05 | 1.60x | 1.64x | 1.56x | 2.7% | 1.60x | 1.60x | 1.60x |
| 03/31/06 | 1.64x | 1.64x | 1.55x | 3.2% | 1.64x | 1.61x | 1.61x |
| 06/30/06 | 1.63x | 1.74x | 1.67x | 3.5% | 1.67x | 1.68x | 1.68x |
| 09/30/06 | 1.43x | 1.51x | 1.54x | 3.8% | 1.51x | 1.49x | 1.49x |
| 12/31/06 | 1.73x | 1.63x | 1.58x | 4.8% | 1.63x | 1.65x | 1.65x |
| 03/31/07 | 1.34x | 1.15x | 1.45x | 11.6% | 1.34x | 1.31x | 1.31x |
| 06/30/07 | 1.45x | 1.05x | 1.53x | 19.3% | 1.45x | 1.34x | 1.34x |
| 09/30/07 | 0.72x | 0.97x | 1.27x | 28.1% | 0.97x | 0.99x | 0.99x |
| 12/31/07 | 0.35x | 0.36x | 0.48x | 17.8% | 0.36x | 0.40x | 0.40x |
| 03/31/08 | 0.24x | 0.45x | 0.40x | 30.1% | 0.40x | 0.37x | 0.37x |
| 06/30/08 | | | 0.32x | NM | 0.32x | 0.32x | 0.32x |
| 09/30/08 | | | | | | | |
| 12/31/08 | | | | | | | |
| 03/31/09 | | | | | | | |
| 06/30/09 | | | | | | | |
| 09/30/09 | | | | | | | |
| 12/31/09 | Purchased by Bank of America 7/1/2008 [3] | | | | | | |
| 03/31/10 | | Filed Chapter 7 7/31/2008 [4] | | | | | |
| 06/30/10 | | | Filed Chapter 11 9/26/2008 [5] | | | | |
| 09/30/10 | | | | | | | |
| 12/31/10 | | | | | | | |
| 03/31/11 | | | | | | | |
| 06/30/11 | | | | | | | |
| 09/30/11 | | | | | | | |
| 12/31/11 | | | | | | | |

[1] See Appendix VI.B.4.a(4), at 5–10.
[2] The average multiple was selected for Dec. 31, 2005 through June 30, 2008.
[3] Bank of America Corporation, Annual Report (Form 10-K) (Feb. 27, 2009), at 17.
[4] IndyMac Bancorp, Inc. Current Report (Form 8-K) (July 31, 2008), at 2.
[5] Declaration of Stewart M. Landefeld in Support of the Debtors' Chapter 11 Petitions and First Day Motions, In re Wash. Mutual, Inc., [Case No. 08-12229; Docket No. 13] at 2.

Appendix VI.B.4.a(4), Page 4 of 61

Appendix VI.B.4.a(4), Page 5 of 61

**Residential Capital, LLC – Quarterly Solvency Analysis**
**Market Approach: Fair Market Value of Equity**
**Guideline Company Multiples**
December 31, 2005
*($ in Millions, except share prices)*

| | [A] | [B] | [C] = [A] × [B] | [D] | [E] = [C] / [D] |
|---|---|---|---|---|---|
| | | **Shares** | | | |
| | | **Outstanding** | **Market Value of** | **Value of** | |
| **December 31, 2005** | **Share Price** [1] | **(in Millions)** | **Equity** | **Book Equity** | **P/NBV** |
| Countrywide Financial Corporation [2] | $ 34.19 | 600.0 | $ 20,515.0 | $ 12,815.9 | 1.60x |
| IndyMac Bancorp, Inc. [3] | 39.02 | 64.2 | 2,506.9 | 1,526.1 | 1.64x |
| Washington Mutual, Inc. [4] | 43.50 | 987.9 | 42,974.3 | 27,616.0 | 1.56x |
| | | | | *Average* | *1.60x* |
| | | | | *Median* | *1.60x* |
| | | | | *Coefficient of Variation* | *2.7%* |

*[1] Bloomberg.*
*[2] Countrywide Financial Corporation, Annual Report (Form 10-K) (Mar. 1, 2006), at F-4.*
*[3] IndyMac Bancorp, Inc., Annual Report (Form 10-K) (Mar. 1, 2006), at F-4.*
*[4] Washington Mutual, Inc., Annual Report (Form 10-K) (Mar. 15, 2006), at 94.*

Appendix VI.B.4.a(4), Page 5 of 61

Appendix VI.B.4.a(4), Page 6 of 61

**Residential Capital, LLC – Quarterly Solvency Analysis**
**Market Approach: Fair Market Value of Equity**
**Guideline Company Multiples**
March 31, 2006 and June 30, 2006
*($ in Millions, except share prices)*

| | [A]<br>Share Price [1] | [B]<br>Shares Outstanding<br>(in Millions) | [C] = [A] × [B]<br>Market Value of<br>Equity | [D]<br>Value of<br>Book Equity | [E] = [C] / [D]<br>P/NBV |
|---|---|---|---|---|---|
| **March 31, 2006** | | | | | |
| Countrywide Financial Corporation [2] | $ 36.70 | 604.8 | $ 22,195.7 | $ 13,506.3 | 1.64x |
| IndyMac Bancorp, Inc. [3] | 40.93 | 65.7 | 2,691.1 | 1,643.5 | 1.64x |
| Washington Mutual, Inc. [4] | 42.62 | 952.8 | 40,609.2 | 26,156.0 | 1.55x |
| | | | | *Average* | *1.61x* |
| | | | | *Median* | *1.64x* |
| | | | | *Coefficient of Variation* | *3.2%* |

| | [A]<br>Share Price [1] | [B]<br>Shares Outstanding<br>(in Millions) | [C] = [A] × [B]<br>Market Value of<br>Equity | [D]<br>Value of<br>Book Equity | [E] = [C] / [D]<br>P/NBV |
|---|---|---|---|---|---|
| **June 30, 2006** | | | | | |
| Countrywide Financial Corporation [5] | $ 38.08 | 610.7 | $ 23,257.2 | $ 14,297.0 | 1.63x |
| IndyMac Bancorp, Inc. [6] | 45.85 | 68.6 | 3,146.2 | 1,804.2 | 1.74x |
| Washington Mutual, Inc. [7] | 45.58 | 956.9 | 43,614.6 | 26,131.0 | 1.67x |
| | | | | *Average* | *1.68x* |
| | | | | *Median* | *1.67x* |
| | | | | *Coefficient of Variation* | *3.5%* |

[1] *Bloomberg.*
[2] *Countrywide Financial Corporation, Quarterly Report (Form 10-Q) (May 10, 2006), at 1.*
[3] *IndyMac Bancorp, Inc., Quarterly Report (Form 10-Q) (Apr. 25, 2006), at 57–58.*
[4] *Washington Mutual, Inc., Quarterly Report (Form 10-Q) (May 10, 2006), at 2.*
[5] *Countrywide Financial Corporation, Quarterly Report (Form 10-Q) (Aug. 7, 2006), at 1.*
[6] *IndyMac Bancorp, Inc., Quarterly Report (Form 10-Q) (July 27, 2006), at 55.*
[7] *Washington Mutual, Inc., Quarterly Report (Form 10-Q) (Aug. 9, 2006), at 2.*

Appendix VI.B.4.a(4), Page 6 of 61

**Appendix VI.B.4.a(4)**, Page 7 of 61

Residential Capital, LLC – Quarterly Solvency Analysis
Market Approach: Fair Market Value of Equity
Guideline Company Multiples
September 30, 2006 and December 31, 2006
*($ in Millions, except share prices)*

| September 30, 2006 | [A]<br>Share Price [1] | [B]<br>Shares<br>Outstanding<br>(in Millions) | [C] = [A] × [B]<br>Market Value of<br>Equity | [D]<br>Value of<br>Book Equity | [E] = [C] / [D]<br>P/NBV |
|---|---|---|---|---|---|
| Countrywide Financial Corporation [2] | $ 35.04 | 616.7 | $ 21,610.9 | $ 15,099.1 | 1.43x |
| IndyMac Bancorp, Inc. [3] | 41.16 | 70.9 | 2,916.5 | 1,937.8 | 1.51x |
| Washington Mutual, Inc. [4] | 43.47 | 939.1 | 40,822.6 | 26,458.0 | 1.54x |
| | | | | *Average* | *1.49x* |
| | | | | *Median* | *1.51x* |
| | | | | *Coefficient of Variation* | *3.8%* |

| December 31, 2006 | [A]<br>Share Price [1] | [B]<br>Shares<br>Outstanding<br>(in Millions) | [C] = [A] × [B]<br>Market Value of<br>Equity | [D]<br>Value of<br>Book Equity | [E] = [C] / [D]<br>P/NBV |
|---|---|---|---|---|---|
| Countrywide Financial Corporation [5] | $ 42.45 | 585.2 | $ 24,841.0 | $ 14,317.8 | 1.73x |
| IndyMac Bancorp, Inc. [6] | 45.16 | 73.0 | 3,297.5 | 2,028.3 | 1.63x |
| Washington Mutual, Inc. [7] | 45.49 | 938.5 | 42,691.4 | 26,969.0 | 1.58x |
| | | | | *Average* | *1.65x* |
| | | | | *Median* | *1.63x* |
| | | | | *Coefficient of Variation* | *4.8%* |

*[1] Bloomberg.*
*[2] Countrywide Financial Corporation, Quarterly Report (Form 10-Q) (Nov. 7, 2006), at 1.*
*[3] IndyMac Bancorp, Inc., Quarterly Report (Form 10-Q) (Nov. 2, 2006), at 62 –63.*
*[4] Washington Mutual, Inc., Quarterly Report (Form 10-Q) (Nov. 9, 2006), at 2.*
*[5] Countrywide Financial Corporation, Annual Report (Form 10-K) (Mar. 1, 2007), at F-3.*
*[6] IndyMac Bancorp, Inc., Annual Report (Form 10-K) (Mar. 1, 2007), at F-4.*
*[7] Washington Mutual, Inc., Annual Report (Form 10-K) (Mar. 1, 2007), at 85.*

Appendix VI.B.4.a(4), Page 7 of 61

Appendix VI.B.4.a(4), Page 8 of 61

**Residential Capital, LLC – Quarterly Solvency Analysis**
**Market Approach: Fair Market Value of Equity**
**Guideline Company Multiples**
March 31, 2007 and June 30, 2007
*($ in Millions, except share prices)*

| March 31, 2007 | [A] Share Price [1] | [B] Shares Outstanding (in Millions) | [C] = [A] × [B] Market Value of Equity | [D] Value of Book Equity | [E] = [C] / [D] P/NBV |
|---|---|---|---|---|---|
| Countrywide Financial Corporation [2] | $ 33.64 | 591.2 | $ 19,888.0 | $ 14,818.4 | 1.34x |
| IndyMac Bancorp, Inc. [3] | 32.05 | 73.6 | 2,358.2 | 2,054.8 | 1.15x |
| Washington Mutual, Inc. [4] | 40.38 | 882.1 | 35,619.6 | 24,578.0 | 1.45x |
| | | | | *Average* | *1.31x* |
| | | | | *Median* | *1.34x* |
| | | | | *Coefficient of Variation* | *11.6%* |

| June 30, 2007 | [A] Share Price [1] | [B] Shares Outstanding (in Millions) | [C] = [A] × [B] Market Value of Equity | [D] Value of Book Equity | [E] = [C] / [D] P/NBV |
|---|---|---|---|---|---|
| Countrywide Financial Corporation [5] | $ 36.35 | 574.2 | $ 20,872.8 | $ 14,385.9 | 1.45x |
| IndyMac Bancorp, Inc. [6] | 29.17 | 73.7 | 2,148.8 | 2,050.4 | 1.05x |
| Washington Mutual, Inc. [7] | 42.64 | 869.7 | 37,085.0 | 24,210.0 | 1.53x |
| | | | | *Average* | *1.34x* |
| | | | | *Median* | *1.45x* |
| | | | | *Coefficient of Variation* | *19.3%* |

[1] Bloomberg.
[2] Countrywide Financial Corporation, Quarterly Report (Form 10-Q) (May 9, 2007), at 1.
[3] IndyMac Bancorp, Inc., Quarterly Report (Form 10-Q) (Apr. 26, 2007), at 59.
[4] Washington Mutual, Inc., Quarterly Report (Form 10-Q) (May 10, 2007), at 2.
[5] Countrywide Financial Corporation, Quarterly Report (Form 10-Q) (Aug. 9, 2007), at 1.
[6] IndyMac Bancorp, Inc., Quarterly Report (Form 10-Q) (July 31, 2007), at 70, 72.
[7] Washington Mutual, Inc., Quarterly Report (Form 10-Q) (Aug. 9, 2007), at 2.

Appendix VI.B.4.a(4), Page 8 of 61

**Residential Capital, LLC – Quarterly Solvency Analysis**
**Market Approach: Fair Market Value of Equity**
**Guideline Company Multiples**
September 30, 2007 and December 31, 2007
*($ in Millions, except share prices)*

| | [A] | [B] Shares Outstanding (in Millions) | [C] = [A] × [B] Market Value of Equity | [D] Value of Book Equity | [E] = [C] / [D] |
|---|---|---|---|---|---|
| **September 30, 2007** | Share Price [1] | | | | P/NBV |
| Countrywide Financial Corporation [2] | $ 19.01 | 576.4 | $ 10,956.9 | $ 15,252.2 | 0.72x |
| IndyMac Bancorp, Inc. [3] | 23.61 | 76.9 | 1,816.8 | 1,870.6 | 0.97x |
| Washington Mutual, Inc. [4] | 35.31 | 862.8 | 30,465.5 | 23,941.0 | 1.27x |
| | | | | *Average* | *0.99x* |
| | | | | *Median* | *0.97x* |
| | | | | *Coefficient of Variation* | *28.1%* |

| | [A] | [B] Shares Outstanding (in Millions) | [C] = [A] × [B] Market Value of Equity | [D] Value of Book Equity | [E] = [C] / [D] |
|---|---|---|---|---|---|
| **December 31, 2007** | Share Price [1] | | | | P/NBV |
| Countrywide Financial Corporation [5] | $ 8.94 | 578.4 | $ 5,171.2 | $ 14,655.9 | 0.35x |
| IndyMac Bancorp, Inc. [6] | 5.95 | 80.9 | 481.3 | 1,343.8 | 0.36x |
| Washington Mutual, Inc. [7] | 13.61 | 863.0 | 11,745.9 | 24,584.0 | 0.48x |
| | | | | *Average* | *0.40x* |
| | | | | *Median* | *0.36x* |
| | | | | *Coefficient of Variation* | *17.8%* |

*[1] Bloomberg.*
*[2] Countrywide Financial Corporation, Quarterly Report (Form 10-Q) (Nov. 9, 2007), at 1.*
*[3] IndyMac Bancorp, Inc., Quarterly Report (Form 10-Q) (Nov. 6, 2007), at 73, 75.*
*[4] Washington Mutual, Inc., Quarterly Report (Form 10-Q) (Nov. 9, 2007), at 2.*
*[5] Countrywide Financial Corporation, Annual Report (Form 10-K) (Feb. 29, 2008), at F-3.*
*[6] IndyMac Bancorp, Inc., Annual Report (Form 10-K) (Feb. 29, 2008), at F-4, F-6.*
*[7] Washington Mutual, Inc., Annual Report (Form 10-K) (Feb. 29, 2008), at 104.*

Appendix VI.B.4.a(4), Page 10 of 61

**Residential Capital, LLC – Quarterly Solvency Analysis**
**Market Approach: Fair Market Value of Equity**
**Guideline Company Multiples**
March 31, 2008 and June 30, 2008
*($ in Millions, except share prices)*

| March 31, 2008 | [A] Share Price [1] | [B] Shares Outstanding (in Millions) | [C] = [A] × [B] Market Value of Equity | [D] Value of Book Equity | [E] = [C] / [D] P/NBV |
|---|---|---|---|---|---|
| Countrywide Financial Corporation [2] | $ 5.50 | 580.6 | $ 3,193.3 | $ 13,155.1 | 0.24x |
| IndyMac Bancorp, Inc. [3] | 4.96 | 87.8 | 435.6 | 959.0 | 0.45x |
| Washington Mutual, Inc. [4] | 10.30 | 876.6 | 9,029.1 | 22,449.0 | 0.40x |
| | | | | Average | 0.37x |
| | | | | Median | 0.40x |
| | | | | Coefficient of Variation | 30.1% |

| June 30, 2008 | [A] Share Price [1] | [B] Shares Outstanding (in Millions) | [C] = [A] × [B] Market Value of Equity | [D] Value of Book Equity | [E] = [C] / [D] P/NBV |
|---|---|---|---|---|---|
| Washington Mutual, Inc. [5] | $ 4.93 | 1,699.3 | $ 8,377.8 | $ 26,086.0 | 0.32x |

[1] Bloomberg.
[2] Countrywide Financial Corporation, Quarterly Report (Form 10-Q) (May 12, 2008), at 1.
[3] IndyMac Bancorp, Inc., Quarterly Report (Form 10-Q) (May 12, 2008), at 72, 74.
[4] Washington Mutual, Inc., Quarterly Report (Form 10-Q) (May 12, 2008), at 2.
[5] Washington Mutual, Inc., Quarterly Report (Form 10-Q) (Aug. 11, 2008), at 2.

Appendix VI.B.4.a(4), Page 10 of 61

**Appendix VI.B.4.a(4)**, Page 11 of 61

Residential Capital, LLC – Quarterly Solvency Analysis
Market Approach: Fair Market Value of Debt
Summary
2005 – 2011
*($ in Millions)*

| | [A]<br>Face Value<br>of Debt [1] | [B]<br>Fair Market Value<br>of Debt [1] | [C] = [B] - [A]<br>Fair Market Value<br>Surplus / (Deficit) | [D] = [B] / [A]<br>Fair Market Value/<br>Face Value |
|---|---|---|---|---|
| 12/31/05 | $ 43,050.0 | $ 43,173.3 | $ 123.3 | 100.3% |
| 03/31/06 | 41,617.3 | 41,672.8 | 55.5 | 100.1% |
| 06/30/06 | 43,317.4 | 43,154.5 | (162.9) | 99.6% |
| 09/30/06 | 49,271.0 | 49,402.0 | 131.0 | 100.3% |
| 12/31/06 | 52,601.4 | 52,711.0 | 109.6 | 100.2% |
| 03/31/07 | 47,009.5 | 46,872.9 | (136.6) | 99.7% |
| 06/30/07 | 43,573.3 | 43,178.0 | (395.3) | 99.1% |
| 09/30/07 | 39,644.1 | 36,284.8 | (3,359.3) | 91.5% |
| 12/31/07 | 34,835.2 | 28,804.7 | (6,030.5) | 82.7% |
| 03/31/08 | 31,619.1 | 23,702.0 | (7,917.1) | 75.0% |
| 06/30/08 | 26,127.6 | 19,134.6 | (6,993.0) | 73.2% |
| 09/30/08 | 21,772.4 | 10,992.6 | (10,779.8) | 50.5% |
| 12/31/08 | 15,993.9 | 7,668.5 | (8,325.4) | 47.9% |
| 03/31/09 | 13,781.3 | 8,591.3 | (5,190.0) | 62.3% |
| 06/30/09 | 11,978.7 | 9,391.2 | (2,587.5) | 78.4% |
| 09/30/09 | 10,502.2 | 8,566.6 | (1,935.6) | 81.6% |
| 12/31/09 | 9,909.4 | 8,501.6 | (1,407.8) | 85.8% |
| 03/31/10 | 9,170.0 | 8,863.5 | (306.5) | 96.7% |
| 06/30/10 | 7,766.8 | 7,517.3 | (249.5) | 96.8% |
| 09/30/10 | 7,013.5 | 6,952.5 | (61.0) | 99.1% |
| 12/31/10 | 6,991.2 | 7,016.9 | 25.6 | 100.4% |
| 03/31/11 | 6,618.6 | 6,663.9 | 45.3 | 100.7% |
| 06/30/11 | 6,397.3 | 6,359.3 | (38.0) | 99.4% |
| 09/30/11 | 6,088.7 | 5,111.9 | (976.7) | 84.0% |
| 12/30/11 | 5,894.8 | 4,373.8 | (1,521.0) | 74.2% |

[1] *See Appendix VI.B.4.a(4), at 12 - 61.*

Appendix VI.B.4.a(4), Page 11 of 61

Appendix V.I.B.4.a(4), Page 12 of 61

**Residential Capital, LLC – Quarterly Solvency Analysis**
**Market Approach: Fair Market Value of Debt**
December 31, 2005 Summary
*($ in Millions, except bond prices)*

| | Face Value [1] | Decimal Price | | Market Value |
|---|---|---|---|---|
| **Secured borrowings:** | | | | |
| Borrowings from affiliate – short-term | $ 1,047.5 | 100.0 | [2] | $ 1,047.5 |
| Borrowings from affiliate – long-term | 4,130.0 | 100.0 | [2] | 4,130.0 |
| Collateralized borrowings in securitization trusts | N/A | N/A | [3] | N/A |
| Secured – short-term | 24,674.0 | 100.0 | [4] | 24,674.0 |
| Secured – long-term | 4,738.6 | 100.0 | [4] | 4,738.6 |
| FHLB – short-term | N/A | N/A | [3] | N/A |
| FHLB – long-term | N/A | N/A | [3] | N/A |
| Subtotal secured borrowings | 34,590.1 | | | 34,590.1 |
| | | | | |
| **Unsecured borrowings:** | | | | |
| Senior unsecured notes – long-term | 5,150.5 | 101.5 | [5] | 5,225.6 |
| Term loans and revolvers – long-term | 1,750.0 | 101.5 | [6] | 1,775.5 |
| Bank lines – short-term | 1,015.3 | 101.5 | [6] | 1,030.1 |
| Other – short-term | 261.8 | 101.5 | [6] | 265.6 |
| Other – long-term | 282.3 | 101.5 | [6] | 286.4 |
| Subtotal unsecured borrowings | 8,459.9 | | | 8,583.2 |
| | | | | |
| Total borrowings | $ 43,050.0 | | | $ 43,173.3 |

[1] *Face value per Residential Capital, LLC, Annual Report (Form 10-K) (Mar. 13, 2007), at 81; Residential Capital Corporation, Annual Report (Form 10-K) (Mar. 28, 2006), at 74.*
[2] *Fair value disclosure per Residential Capital, LLC, Annual Report (Form 10-K) (Mar. 28, 2006), at 135.*
[3] *Debt related to assets not controlled by ResCap.*
[4] *Assumed at par.*
[5] *Weighted average pricing for unsecured notes per Interactive Data Corporation.*
[6] *Assumed pricing equals the pricing of the senior unsecured notes –long-term.*

Appendix V.I.B.4.a(4), Page 12 of 61

**Residential Capital, LLC – Quarterly Solvency Analysis**
**Market Approach: Fair Market Value of Debt**
December 31, 2005 Pricing
*($ in Millions, except bond prices)*

**Residential Capital, LLC Bond Pricing**

| | | | | [A] | [B] | [C] = [A] × [B] |
|---|---|---|---|---|---|---|
| Maturity Date | Coupon | Debt Rank | Amount Outstanding [1] | Price [2] | Relative Percent of Debt Rank | Weighted Average Price |
| 06/29/07 | Floating | Sr Unsecured | $ 1,000 | 100.2 | 19.0% | 19.1 |
| 11/21/08 | Floating | Sr Unsecured | 500 | 100.1 | 9.5% | 9.5 |
| 11/21/08 | 8.125% | Sr Unsecured | 750 | 100.2 | 14.3% | 14.3 |
| 06/30/10 | 6.375% | Sr Unsecured | 2,500 | 101.6 | 47.6% | 48.4 |
| 06/30/15 | 6.875% | Sr Unsecured | 500 | 106.3 | 9.5% | 10.1 |
| | | | $ 5,250 | | 100.0% | 101.5 |

[1] *The Examiner's Financial Advisors recognize that the amount outstanding may differ slightly from the face value due to the timing and availability of data. Source: Bloomberg.*
[2] *Pricing per Interactive Data Corporation.*

**Residential Capital, LLC – Quarterly Solvency Analysis**
**Market Approach: Fair Market Value of Debt**
March 31, 2006 Summary
*($ in Millions, except bond prices)*

| | Face Value [1] | Decimal Price | | Market Value |
|---|---|---|---|---|
| Secured borrowings: | | | | |
| Borrowings from affiliate – short-term | $ 1,085.4 | 100.0 | [2] | $ 1,085.4 |
| Borrowings from affiliate – long-term | 3,630.0 | 100.0 | [2] | 3,630.0 |
| Collateralized borrowings in securitization trusts | N/A | N/A | [3] | N/A |
| Secured – short-term | 22,759.8 | 100.0 | [4] | 22,759.8 |
| Secured – long-term | 4,192.1 | 100.0 | [4] | 4,192.1 |
| FHLB advances – short-term | N/A | N/A | [3] | N/A |
| FHLB advances – long-term | N/A | N/A | [3] | N/A |
| Subtotal secured borrowings | 31,667.3 | | | 31,667.3 |
| | | | | |
| Unsecured borrowings: | | | | |
| Long-term unsecured non-affiliate borrowings | 7,101.4 | 100.8 | [5] | 7,155.1 |
| Short-term unsecured non-affiliate borrowings | 1,098.6 | 100.8 | [6] | 1,106.9 |
| Term loan | 1,750.0 | 99.6 | [7] | 1,743.4 |
| Subtotal unsecured borrowings | 9,950.0 | | | 10,005.5 |
| | | | | |
| Total borrowings | $ 41,617.3 | | | $ 41,672.8 |

[1] Face value per Residential Capital Corporation, Quarterly Report (Form 10-Q) (May 5, 2006), at 15, 39.
[2] Fair value disclosure per Residential Capital Corporation, Annual Report (Form 10-K) (Mar. 28, 2006), at 135.
[3] Debt related to assets not controlled by ResCap.
[4] Assumed at par.
[5] Weighted average pricing for unsecured notes per Interactive Data Corporation.
[6] Assumed pricing equals the pricing of the long-term unsecured non-affiliate borrowings.
[7] Pricing per Thomson Reuters SMintelligence.

**Residential Capital, LLC – Quarterly Solvency Analysis**
**Market Approach: Fair Market Value of Debt**
March 31, 2006 Pricing
*($ in Millions, except bond prices)*

**Residential Capital, LLC Bond Pricing**

| Maturity Date | Coupon | Debt Rank | Amount Outstanding [1] | [A] Price [2] | [B] Relative Percent of Debt Rank | [C] = [A] × [B] Weighted Average Price |
|---|---|---|---|---|---|---|
| 06/29/07 | Floating | Sr Unsecured | $ 1,000 | 100.7 | 14.3% | 14.4 |
| 11/21/08 | Floating | Sr Unsecured | 500 | 101.2 | 7.1% | 7.2 |
| 11/21/08 | 8.125% | Sr Unsecured | 750 | 100.2 | 10.7% | 10.7 |
| 06/30/10 | 6.375% | Sr Unsecured | 2,500 | 100.7 | 35.7% | 36.0 |
| 02/22/11 | 6.000% | Sr Unsecured | 1,500 | 99.2 | 21.4% | 21.3 |
| 06/30/15 | 6.875% | Sr Unsecured | 750 | 104.3 | 10.7% | 11.2 |
| | | | $ 7,000 | | 100.0% | 100.8 |

**Residential Capital, LLC Term Loan Pricing** [3]

| | | | | | | |
|---|---|---|---|---|---|---|
| 07/28/10 | | Unsecured | $ 1,750 | 99.6 | 100.0% | 99.6 |

[1] *The Examiner's Financial Advisors recognize that the amount outstanding may differ slightly from the face value due to the timing and availability of data. Source: Bloomberg.*

[2] *Pricing per Interactive Data Corporation.*

[3] *Pricing per Thomson Reuters SMIntelligence.*

**Residential Capital, LLC – Quarterly Solvency Analysis**
**Market Approach: Fair Market Value of Debt**
June 30, 2006 Summary
*($ in Millions, except bond prices)*

| | Face Value [1] | Decimal Price | | Market Value |
|---|---|---|---|---|
| **Secured borrowings:** | | | | |
| Collateralized borrowings in securitization trusts | N/A | N/A | [2] | N/A |
| Secured – short-term | $ 22,506.8 | 100.0 | [3] | $ 22,506.8 |
| Secured – long-term | 5,730.0 | 100.0 | [3] | 5,730.0 |
| FHLB advances – short-term | N/A | N/A | [2] | N/A |
| FHLB advances – long-term | N/A | N/A | [2] | N/A |
| Subtotal secured borrowings | 28,236.8 | | | 28,236.8 |
| | | | | |
| **Unsecured borrowings:** | | | | |
| Long-term unsecured non-affiliate borrowings | 12,361.9 | 98.9 | [4] | 12,228.1 |
| Short-term unsecured non-affiliate borrowings | 968.7 | 98.9 | [5] | 958.2 |
| Term loan | 1,750.0 | 98.9 | [6] | 1,731.4 |
| Subtotal unsecured borrowings | 15,080.6 | | | 14,917.7 |
| | | | | |
| Total borrowings | $ 43,317.4 | | | $ 43,154.5 |

[1] *Face value per Residential Capital Corporation, Quarterly Report (Form 10-Q) (Aug. 8, 2006), at 17, 43.*
[2] *Debt related to assets not controlled by ResCap.*
[3] *Assumed at par.*
[4] *Weighted average pricing for unsecured notes per Interactive Data Corporation.*
[5] *Assumed pricing equals the pricing of the long-term unsecured non-affiliate borrowings.*
[6] *Pricing per Thomson Reuters SMintelligence.*

Appendix V.I.B.4.a(4), Page 16 of 61

**Residential Capital, LLC – Quarterly Solvency Analysis**
**Market Approach: Fair Market Value of Debt**
June 30, 2006 Pricing
*($ in Millions, except bond prices)*

**Residential Capital, LLC Bond Pricing**

| | | | [A] | | [B] | [C] = [A] × [B] |
| Maturity Date | Coupon | Debt Rank | Amount Outstanding [1] | Price [2] | Relative Percent of Debt Rank | Weighted Average Price |
|---|---|---|---|---|---|---|
| 04/17/09 | Floating | Sr Subordinated | $ 1,000 | 100.0 | 8.0% | 8.0 |
| 06/29/07 | Floating | Sr Unsecured | 1,000 | 100.3 | 8.0% | 8.1 |
| 05/12/08 | Floating | Sr Unsecured | 224 | 100.0 | 1.8% | 1.8 |
| 11/21/08 | Floating | Sr Unsecured | 500 | 100.4 | 4.0% | 4.0 |
| 11/21/08 | 8.125% | Sr Unsecured | 750 | 98.8 | 6.0% | 6.0 |
| 04/17/09 | Floating | Sr Unsecured | 750 | 99.7 | 6.0% | 6.0 |
| 06/30/10 | 6.375% | Sr Unsecured | 2,500 | 98.6 | 20.1% | 19.9 |
| 02/22/11 | 6.000% | Sr Unsecured | 1,500 | 96.9 | 12.1% | 11.7 |
| 05/17/12 | 5.125% | Sr Unsecured | 959 | 98.9 | 7.7% | 7.6 |
| 04/17/13 | 6.500% | Sr Unsecured | 1,750 | 98.1 | 14.1% | 13.8 |
| 05/17/13 | 6.375% | Sr Unsecured | 739 | 99.4 | 6.0% | 5.9 |
| 06/30/15 | 6.875% | Sr Unsecured | 750 | 99.9 | 6.0% | 6.0 |
| | | | $ 12,422 | | 100.0% | 98.9 |

**Residential Capital, LLC Term Loan Pricing [3]**

| | | | | | | |
|---|---|---|---|---|---|---|
| 07/28/10 | | Unsecured | $ 1,750 | 98.9 | 100.0% | 98.9 |

[1] *The Examiner's Financial Advisors recognize that the amount outstanding may differ slightly from the face value due to the timing and availability of data. Source: Bloomberg.*

[2] *Pricing per Interactive Data Corporation.*

[3] *Pricing per Thomson Reuters SMIntelligence.*

**Residential Capital, LLC – Quarterly Solvency Analysis**
**Market Approach: Fair Market Value of Debt**
September 30, 2006 Summary
*($ in Millions, except bond prices)*

| | Face Value [1] | Decimal Price | | Market Value |
|---|---|---|---|---|
| Secured borrowings: | | | | |
| Collateralized borrowings in securitization trusts | N/A | N/A | [2] | N/A |
| Secured – short-term | $ 29,224.0 | 100.0 | [3] | $ 29,224.0 |
| Secured – long-term | 4,547.3 | 100.0 | [3] | 4,547.3 |
| FHLB advances – long-term | N/A | N/A | [2] | N/A |
| Subtotal secured borrowings | 33,771.3 | | | 33,771.3 |
| | | | | |
| Unsecured borrowings: | | | | |
| Long-term unsecured non-affiliate borrowings | 12,764.4 | 101.0 | [4] | 12,894.2 |
| Short-term unsecured non-affiliate borrowings | 985.3 | 101.0 | [5] | 995.3 |
| Term loan | 1,750.0 | 99.5 | [6] | 1,741.3 |
| Subtotal unsecured borrowings | 15,499.7 | | | 15,630.7 |
| | | | | |
| Total borrowings | $ 49,271.0 | | | $ 49,402.0 |

[1] *Face value per Residential Capital, LLC, Quarterly Report (Form 10-Q) (Nov. 7, 2006), at 17, 45.*
[2] *Debt related to assets not controlled by ResCap.*
[3] *Assumed at par.*
[4] *Weighted average pricing for unsecured notes per Interactive Data Corporation.*
[5] *Assumed pricing equals the pricing of the long-term unsecured non-affiliate borrowings.*
[6] *Pricing per Thomson Reuters SMintelligence.*

**Residential Capital, LLC – Quarterly Solvency Analysis**
**Market Approach: Market Value of Debt**
September 30, 2006 Pricing
*($ in Millions, except bond prices)*

**Residential Capital, LLC Bond Pricing**

| Maturity Date | Coupon | Debt Rank | Amount Outstanding [1] | [A] Price [2] | [B] Relative Percent of Debt Rank | [C] = [A] × [B] Weighted Average Price |
|---|---|---|---|---|---|---|
| 04/17/09 | Floating | Sr Subordinated | $ 1,000 | 100.5 | 8.0% | 8.1 |
| 06/29/07 | Floating | Sr Unsecured | 1,000 | 100.5 | 8.0% | 8.1 |
| 05/12/08 | Floating | Sr Unsecured | 224 | 100.0 | 1.8% | 1.8 |
| 11/21/08 | Floating | Sr Unsecured | 500 | 101.1 | 4.0% | 4.1 |
| 11/21/08 | 8.125% | Sr Unsecured | 750 | 100.4 | 6.0% | 6.1 |
| 04/17/09 | Floating | Sr Unsecured | 750 | 100.7 | 6.0% | 6.1 |
| 06/30/10 | 6.375% | Sr Unsecured | 2,500 | 101.2 | 20.1% | 20.4 |
| 02/22/11 | 6.000% | Sr Unsecured | 1,500 | 99.9 | 12.1% | 12.1 |
| 05/17/12 | 5.125% | Sr Unsecured | 951 | 101.0 | 7.7% | 7.7 |
| 04/17/13 | 6.500% | Sr Unsecured | 1,750 | 101.6 | 14.1% | 14.3 |
| 05/17/13 | 6.375% | Sr Unsecured | 749 | 101.2 | 6.0% | 6.1 |
| 06/30/15 | 6.875% | Sr Unsecured | 750 | 103.9 | 6.0% | 6.3 |
| | | | $ 12,423 | | 100.0% | 101.0 |

**Residential Capital, LLC Term Loan Pricing** [3]

| | | | | | | |
|---|---|---|---|---|---|---|
| 07/28/10 | | Unsecured | $ 1,750 | 99.5 | 100.0% | 99.5 |

[1] *The Examiner's Financial Advisors recognize that the amount outstanding may differ slightly from the face value due to the timing and availability of data. Source: Bloomberg.*
[2] *Pricing per Interactive Data Corporation.*
[3] *Pricing per Thomson Reuters SMintelligence.*

**Residential Capital, LLC – Quarterly Solvency Analysis**
**Market Approach: Fair Market Value of Debt**
December 31, 2006 Summary
*($ in Millions, except bond prices)*

| | Face Value [1] | Decimal Price | | Market Value |
|---|---|---|---|---|
| **Secured borrowings:** | | | | |
| Collateralized borrowings in securitization trusts | N/A | N/A | [2] | N/A |
| Secured – short-term | $ 29,065.9 | 100.0 | [3] | $ 29,065.9 |
| Secured – long-term | 6,562.6 | 100.0 | [3] | 6,562.6 |
| FHLB advances – long-term | N/A | N/A | [2] | N/A |
| Subtotal secured borrowings | 35,628.5 | | | 35,628.5 |
| | | | | |
| **Unsecured borrowings:** | | | | |
| Senior unsecured notes – long-term | 12,408.8 | 100.8 | [4] | 12,507.4 |
| Subordinated unsecured note – long-term | 1,000.0 | 100.5 | [5] | 1,005.4 |
| Term loans and revolvers – long-term | 1,750.0 | 99.5 | [6] | 1,741.3 |
| Bank lines – short-term | 756.0 | 100.8 | [7] | 762.0 |
| Bank lines – long-term | 21.8 | 100.8 | [7] | 22.0 |
| Other – short-term | 392.7 | 100.8 | [7] | 395.8 |
| Other – long-term | 643.6 | 100.8 | [7] | 648.7 |
| Subtotal unsecured borrowings | 16,972.9 | | | 17,082.5 |
| | | | | |
| Total borrowings | $ 52,601.4 | | | $ 52,711.0 |

[1] *Face value per Residential Capital, LLC, Annual Report (Form 10-K) (Mar. 13, 2007), at 81.*
[2] *Debt related to assets not controlled by ResCap.*
[3] *Assumed at par.*
[4] *Weighted average pricing for unsecured notes per Interactive Data Corporation.*
[5] *Pricing per Interactive Data Corporation.*
[6] *Pricing per Thomson Reuters SMIntelligence.*
[7] *Assumed pricing equals the pricing of the senior unsecured notes –long-term.*

**Residential Capital, LLC – Quarterly Solvency Analysis**
**Market Approach: Fair Market Value of Debt**
December 31, 2006 Pricing
(*$ in Millions, except bond prices*)

## Residential Capital, LLC Bond Pricing

| | | | | [A] | [B] | [C] = [A] × [B] |
|---|---|---|---|---|---|---|
| Maturity Date | Coupon | Debt Rank | Amount Outstanding [1] | Price [2] | Relative Percent of Debt Rank | Weighted Average Price |
| 04/17/09 | Floating | Sr Subordinated | $ 1,000 | 100.5 | 100.0% | 100.5 |
| 06/29/07 | Floating | Sr Unsecured | $ 1,000 | 100.5 | 7.9% | 7.9 |
| 05/12/08 | Floating | Sr Unsecured | 214 | 100.0 | 1.7% | 1.7 |
| 06/09/08 | Floating | Sr Unsecured | 1,250 | 99.8 | 9.8% | 9.8 |
| 11/21/08 | Floating | Sr Unsecured | 500 | 101.2 | 3.9% | 4.0 |
| 11/21/08 | 8.125% | Sr Unsecured | 750 | 100.5 | 5.9% | 5.9 |
| 04/17/09 | Floating | Sr Unsecured | 750 | 101.0 | 5.9% | 5.9 |
| 06/30/10 | 6.375% | Sr Unsecured | 2,500 | 101.2 | 19.6% | 19.9 |
| 02/22/11 | 6.000% | Sr Unsecured | 1,500 | 99.8 | 11.8% | 11.8 |
| 05/17/12 | 5.125% | Sr Unsecured | 990 | 100.3 | 7.8% | 7.8 |
| 04/17/13 | 6.500% | Sr Unsecured | 1,750 | 101.3 | 13.7% | 13.9 |
| 05/17/13 | 6.375% | Sr Unsecured | 784 | 100.2 | 6.2% | 6.2 |
| 06/30/15 | 6.875% | Sr Unsecured | 750 | 103.7 | 5.9% | 6.1 |
| | | | $ 12,738 | | 100.0% | 100.8 |

## Residential Capital, LLC Term Loan Pricing [3]

| | | | | [A] | [B] | [C] = [A] × [B] |
|---|---|---|---|---|---|---|
| 07/28/10 | | Unsecured | $ 1,750 | 99.5 | 100.0% | 99.5 |

[1] *The Examiner's Financial Advisors recognize that the amount outstanding may differ slightly from the face value due to the timing and availability of data. Source: Bloomberg.*
[2] *Pricing per Interactive Data Corporation.*
[3] *Pricing per Thomson Reuters SMIntelligence.*

Appendix VI.B.4.a(4), Page 22 of 61

**Residential Capital, LLC – Quarterly Solvency Analysis**
**Market Approach: Fair Market Value of Debt**
March 31, 2007 Summary
*($ in Millions, except bond prices)*

| | Face Value [1] | Decimal Price | | Market Value |
|---|---|---|---|---|
| **Secured borrowings:** | | | | |
| Collateralized borrowings in securitization trusts | N/A | N/A | [2] | N/A |
| Secured – short-term | $ 26,358.6 | 100.0 | [3] | $ 26,358.6 |
| Secured – long-term | 3,343.3 | 100.0 | [3] | 3,343.3 |
| FHLB advances – long-term | N/A | N/A | [2] | N/A |
| Subtotal secured borrowings | 29,701.9 | | | 29,701.9 |
| | | | | |
| **Unsecured borrowings:** | | | | |
| Senior unsecured notes – long-term | 12,441.6 | 99.2 | [4] | 12,341.6 |
| Subordinated unsecured note – long-term | 1,000.0 | 99.1 | [5] | 991.3 |
| Term loans and revolvers – long-term | 1,750.0 | 99.4 | [6] | 1,739.1 |
| Bank lines – short-term | 1,251.4 | 99.2 | [7] | 1,241.3 |
| Bank lines – long-term | 23.5 | 99.2 | [7] | 23.3 |
| Other – short-term | 338.4 | 99.2 | [7] | 335.7 |
| Other – long-term | 502.7 | 99.2 | [7] | 498.7 |
| Subtotal unsecured borrowings | 17,307.6 | | | 17,171.0 |
| | | | | |
| Total borrowings | $ 47,009.5 | | | $ 46,872.9 |

[1] *Face value per Residential Capital, LLC, Quarterly Report (Form 10-Q) (May 8, 2007), at 40.*
[2] *Debt related to assets not controlled by ResCap.*
[3] *Assumed at par.*
[4] *Weighted average pricing for unsecured notes per Interactive Data Corporation.*
[5] *Pricing per Interactive Data Corporation.*
[6] *Pricing per Thomson Reuters SMintelligence.*
[7] *Assumed pricing equals the pricing of the senior unsecured notes –long-term.*

Appendix VI.B.4.a(4), Page 22 of 61

**Residential Capital, LLC – Quarterly Solvency Analysis**
**Market Approach: Fair Market Value of Debt**
March 31, 2007 Pricing
*($ in Millions, except bond prices)*

**Residential Capital, LLC Bond Pricing**

| Maturity Date | Coupon | Debt Rank | Amount Outstanding [1] | [A] Price [2] | [B] Relative Percent of Debt Rank | [C] = [A] × [B] Weighted Average Price |
|---|---|---|---|---|---|---|
| 04/17/09 | Floating | Sr Subordinated | $ 1,000 | 99.1 | 100.0% | 99.1 |
| 06/29/07 | Floating | Sr Unsecured | $ 1,000 | 100.1 | 7.8% | 7.8 |
| 05/12/08 | Floating | Sr Unsecured | 217 | 99.3 | 1.7% | 1.7 |
| 6/9/2008 | Floating | Sr Unsecured | 1,250 | 99.0 | 9.8% | 9.7 |
| 11/21/08 | Floating | Sr Unsecured | 500 | 100.2 | 3.9% | 3.9 |
| 11/21/08 | 8.125% | Sr Unsecured | 750 | 99.9 | 5.9% | 5.9 |
| 04/17/09 | Floating | Sr Unsecured | 750 | 99.6 | 5.9% | 5.9 |
| 06/30/10 | 6.375% | Sr Unsecured | 2,500 | 100.0 | 19.6% | 19.6 |
| 02/22/11 | 6.000% | Sr Unsecured | 1,500 | 98.6 | 11.8% | 11.6 |
| 05/17/12 | 5.125% | Sr Unsecured | 1,002 | 97.0 | 7.9% | 7.6 |
| 04/17/13 | 6.500% | Sr Unsecured | 1,750 | 99.1 | 13.7% | 13.6 |
| 05/17/13 | 6.375% | Sr Unsecured | 787 | 96.7 | 6.2% | 6.0 |
| 06/30/15 | 6.875% | Sr Unsecured | 750 | 100.9 | 5.9% | 5.9 |
| | | | $ 12,755 | 99.4 | 100.0% | 99.2 |

**Residential Capital, LLC Term Loan Pricing [3]**

| | | | | | | |
|---|---|---|---|---|---|---|
| 07/28/10 | | Unsecured | $ 1,750 | 99.4 | 100.0% | 99.4 |

[1] The Examiner's Financial Advisors recognize that the amount outstanding may differ slightly from the face value due to the timing and availability of data. Source: Bloomberg.
[2] Pricing per Interactive Data Corporation.
[3] Pricing per Thomson Reuters SMintelligence.

**Residential Capital, LLC – Quarterly Solvency Analysis**
**Market Approach: Fair Market Value of Debt**
June 30, 2007 Summary
*($ in Millions, except bond prices)*

| | Face Value [1] | | Decimal Price | | Market Value |
|---|---|---|---|---|---|
| **Secured borrowings:** | | | | | |
| Collateralized borrowings in securitization trusts | N/A | [2] | N/A | [2] | N/A |
| Secured – short-term | $ 22,065.4 | | 100.0 | [3] | $ 22,065.4 |
| Secured – long-term | 1,758.6 | | 100.0 | [3] | 1,758.6 |
| FHLB advances – long-term | N/A | [2] | N/A | [2] | N/A |
| Subtotal secured borrowings | 23,824.0 | | | | 23,824.0 |
| | | | | | |
| **Unsecured borrowings:** | | | | | |
| Senior unsecured notes – long-term | 15,140.0 | | 97.8 | [4] | 14,800.7 |
| Subordinated unsecured note – long-term | 1,000.0 | | 99.6 | [5] | 995.5 |
| Term loans and revolvers – long-term | 1,750.0 | | 99.4 | [6] | 1,740.2 |
| Bank lines – short-term | 822.2 | | 97.8 | [7] | 803.8 |
| Bank lines – long-term | 25.8 | | 97.8 | [7] | 25.2 |
| Other – short-term | 315.4 | | 97.8 | [7] | 308.3 |
| Other – long-term | 695.9 | | 97.8 | [7] | 680.3 |
| Subtotal unsecured borrowings | 19,749.3 | | | | 19,354.0 |
| | | | | | |
| Total borrowings | $ 43,573.3 | | | | $ 43,178.0 |

[1] *Face value per Residential Capital, LLC, Quarterly Report (Form 10-Q) (Aug. 7, 2007), at 44.*
[2] *Debt related to assets not controlled by ResCap.*
[3] *Assumed at par.*
[4] *Weighted average pricing for unsecured notes per Interactive Data Corporation.*
[5] *Pricing per Interactive Data Corporation.*
[6] *Pricing per Thomson Reuters SMintelligence.*
[7] *Assumed pricing equals the pricing of the senior unsecured notes–long-term.*

**Residential Capital, LLC – Quarterly Solvency Analysis**
**Market Approach: Fair Market Value of Debt**
June 30, 2007 Pricing
*($ in Millions, except bond prices)*

**Residential Capital, LLC Bond Pricing**

| Maturity Date | Coupon | Debt Rank | Amount Outstanding [1] | [A] Price [2] | [B] Relative Percent of Debt Rank | [C] = [A] × [B] Weighted Average Price |
|---|---|---|---|---|---|---|
| 04/17/09 | Floating | Sr Subordinated | $  1,000 | 99.6 | 100.0% | 99.6 |
| 05/12/08 | Floating | Sr Unsecured | $     235 | 99.4 | 1.5% | 1.5 |
| 06/09/08 | Floating | Sr Unsecured | 1,250 | 99.0 | 8.0% | 7.9 |
| 11/21/08 | Floating | Sr Unsecured | 500 | 100.3 | 3.2% | 3.2 |
| 11/21/08 | 8.125% | Sr Unsecured | 750 | 99.1 | 4.8% | 4.7 |
| 04/17/09 | Floating | Sr Unsecured | 750 | 99.8 | 4.8% | 4.8 |
| 05/22/09 | Floating | Sr Unsecured | 1,000 | 99.5 | 6.4% | 6.4 |
| 06/30/10 | 6.375% | Sr Unsecured | 2,500 | 98.7 [3] | 16.0% | 15.7 |
| 09/27/10 | Floating | Sr Unsecured | 813 | 99.5 | 5.2% | 5.2 |
| 02/22/11 | 6.000% | Sr Unsecured | 1,500 | 96.8 | 9.6% | 9.3 |
| 05/17/12 | 5.125% | Sr Unsecured | 1,016 | 94.9 | 6.5% | 6.1 |
| 06/01/12 | 6.500% | Sr Unsecured | 1,250 | 97.6 | 8.0% | 7.8 |
| 04/17/13 | 6.500% | Sr Unsecured | 1,750 | 96.7 | 11.2% | 10.8 |
| 05/17/13 | 6.375% | Sr Unsecured | 804 | 91.6 | 5.1% | 4.7 |
| 07/01/14 | 7.875% | Sr Unsecured | 804 | 98.8 | 5.1% | 5.1 |
| 06/30/15 | 6.875% | Sr Unsecured | 750 | 97.0 | 4.8% | 4.6 |
| | | | $ 15,670 | | 100.0% | 97.8 |

**Residential Capital, LLC Term Loan Pricing [4]**

| Maturity Date | | Debt Rank | Amount Outstanding [1] | [A] Price [2] | [B] Relative Percent of Debt Rank | [C] = [A] × [B] Weighted Average Price |
|---|---|---|---|---|---|---|
| 07/28/10 | | Unsecured | $  1,750 | 99.4 | 100.0% | 99.4 |

[1] The Examiner's Financial Advisors recognize that the amount outstanding may differ slightly from the face value due to the timing and availability of data. Source: Bloomberg.
[2] Pricing per Interactive Data Corporation.
[3] Pricing per Advantage Data Inc.
[4] Pricing per Thomson Reuters SMInteligence.

**Residential Capital, LLC – Quarterly Solvency Analysis**
**Market Approach: Fair Market Value of Debt**
September 30, 2007 Summary
*($ in Millions, except bond prices)*

| | Face Value [1] | Decimal Price | | Market Value |
|---|---|---|---|---|
| Secured borrowings: | | | | |
| Collateralized borrowings in securitization trusts | N/A | N/A | [2] | N/A |
| Secured – short-term | $ 17,475.8 | 100.0 | [3] | $ 17,475.8 |
| Secured – long-term | 2,091.1 | 100.0 | [3] | 2,091.1 |
| FHLB advances – long-term | N/A | N/A | [2] | N/A |
| Subtotal secured borrowings | 19,566.9 | | | 19,566.9 |
| | | | | |
| Unsecured borrowings: | | | | |
| Senior unsecured notes – long-term | 15,518.8 | 83.2 | [4] | 12,904.2 |
| Subordinated unsecured note – long-term | 1,000.0 | 70.0 | [5] | 700.0 |
| Term loans and revolvers – long-term | 1,750.0 | 92.0 | [6] | 1,610.0 |
| Bank lines – short-term | 696.2 | 83.2 | [7] | 578.9 |
| Bank lines – long-term | 32.0 | 83.2 | [7] | 26.6 |
| Other – short-term | 370.0 | 83.2 | [7] | 307.7 |
| Other – long-term | 710.2 | 83.2 | [7] | 590.5 |
| Subtotal unsecured borrowings | 20,077.2 | | | 16,717.9 |
| | | | | |
| Total borrowings | $ 39,644.1 | | | $ 36,284.8 |

[1] *Face value per Residential Capital, LLC, Quarterly Report (Form 10-Q) (Nov. 8, 2007), at 51.*
[2] *Debt related to assets not controlled by ResCap.*
[3] *Assumed at par.*
[4] *Weighted average pricing for unsecured notes per Interactive Data Corporation.*
[5] *Pricing per Interactive Data Corporation.*
[6] *Pricing per Thomson Reuters SMIntelligence.*
[7] *Assumed pricing equals the pricing of the senior unsecured notes–long-term.*

**Residential Capital, LLC – Quarterly Solvency Analysis**
**Market Approach: Fair Market Value of Debt**
September 30, 2007 Pricing
*($ in Millions, except bond prices)*

**Residential Capital, LLC Bond Pricing**

| | | | Amount Outstanding [1] | **[A]** Price [2] | **[B]** Relative Percent of Debt Rank | **[C] = [A] × [B]** Weighted Average Price |
|---|---|---|---|---|---|---|
| Maturity Date | Coupon | Debt Rank | | | | |
| 04/17/09 | Floating | Sr Subordinated | $ 1,000 | 70.0 | 100.0% | 70.0 |
| 05/12/08 | Floating | Sr Unsecured | $ 235 | 93.2 | 1.5% | 1.4 |
| 06/09/08 | Floating | Sr Unsecured | 1,250 | 92.0 | 8.0% | 7.3 |
| 11/21/08 | Floating | Sr Unsecured | 500 | 89.8 | 3.2% | 2.9 |
| 11/21/08 | 8.125% | Sr Unsecured | 750 | 89.5 | 4.8% | 4.3 |
| 04/17/09 | Floating | Sr Unsecured | 750 | 85.0 | 4.8% | 4.1 |
| 05/22/09 | Floating | Sr Unsecured | 1,000 | 85.0 | 6.4% | 5.4 |
| 06/30/10 | 6.375% | Sr Unsecured | 2,500 | 83.0 | 15.9% | 13.2 |
| 09/27/10 | Floating | Sr Unsecured | 821 | 80.0 | 5.2% | 4.2 |
| 02/22/11 | 6.000% | Sr Unsecured | 1,500 | 81.5 | 9.6% | 7.8 |
| 05/17/12 | 5.125% | Sr Unsecured | 1,026 | 79.0 | 6.5% | 5.2 |
| 06/01/12 | 6.500% | Sr Unsecured | 1,250 | 81.0 | 8.0% | 6.4 |
| 04/17/13 | 6.500% | Sr Unsecured | 1,750 | 80.8 | 11.1% | 9.0 |
| 05/17/13 | 6.375% | Sr Unsecured | 810 | 78.0 | 5.2% | 4.0 |
| 07/01/14 | 7.875% | Sr Unsecured | 810 | 80.5 | 5.2% | 4.2 |
| 06/30/15 | 6.875% | Sr Unsecured | 750 | 80.8 | 4.8% | 3.9 |
| | | | $ 15,702 | | 100.0% | 83.2 |

**Residential Capital, LLC Term Loan Pricing [3]**

| | | | Amount Outstanding [1] | **[A]** Price [2] | **[B]** Relative Percent of Debt Rank | **[C] = [A] × [B]** Weighted Average Price |
|---|---|---|---|---|---|---|
| 07/28/10 | | Unsecured | $ 1,750 | 92.0 | 100.0% | 92.0 |

[1] The Examiner's Financial Advisors recognize that the amount outstanding may differ slightly from the face value due to the timing and availability of data. Source: ResCap Executive Liquidity Report, dated Sep. 12, 2007 [CCM0000005938].
[2] Pricing per Interactive Data Corporation.
[3] Pricing per Thomson Reuters SMIntelligence.

Appendix VI.B.4.a(4), Page 27 of 61

**Appendix VI.B.4.a(4)**, Page 28 of 61

**Residential Capital, LLC – Quarterly Solvency Analysis**
**Market Approach: Fair Market Value of Debt**
December 31, 2007 Summary
*($ in Millions, except bond prices)*

| | Face Value [1] | Decimal Price | | Market Value |
|---|---|---|---|---|
| **Secured borrowings:** | | | | |
| Collateralized borrowings in securitization trusts | N/A | N/A | [2] | N/A |
| Secured aggregation facilities | $ 8,402.2 | 100.0 | [3] | $ 8,402.2 |
| Repurchase agreements | 3,645.1 | 100.0 | [3] | 3,645.1 |
| Mortgage servicing rights facilities | 1,444.0 | 100.0 | [3] | 1,444.0 |
| Servicing advances | 791.3 | 100.0 | [3] | 791.3 |
| Debt collateralized by mortgage loans | 1,782.0 | 100.0 | [3] | 1,782.0 |
| FHLB advances | N/A | N/A | [2] | N/A |
| Other | 423.6 | 100.0 | [3] | 423.6 |
| Subtotal secured borrowings | 16,488.2 | | | 16,488.2 |
| **Unsecured borrowings:** | | | | |
| Senior unsecured notes – long-term | 14,550.4 | 65.8 | [4] | 9,576.6 |
| Subordinated unsecured note – long-term | 758.3 | 49.3 | [5] | 373.5 |
| Term loans and revolvers – long-term | 1,750.0 | 86.8 | [6] | 1,518.6 |
| Bank lines – short-term | 278.3 | 65.8 | [7] | 183.2 |
| Bank lines – long-term | 33.2 | 65.8 | [7] | 21.9 |
| Other – short-term | 347.0 | 65.8 | [7] | 228.4 |
| Other – long-term | 629.8 | 65.8 | [7] | 414.5 |
| Subtotal unsecured borrowings | 18,347.0 | | | 12,316.5 |
| Total borrowings | $ 34,835.2 | | | $ 28,804.7 |

[1] *Face value per Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2008), at 81; Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2009), at 96.*
[2] *Debt related to assets not controlled by ResCap.*
[3] *Assumed at par.*
[4] *Weighted average pricing for unsecured notes per Interactive Data Corporation.*
[5] *Pricing per Interactive Data Corporation.*
[6] *Pricing per Thomson Reuters SMIntelligence.*
[7] *Assumed pricing equals the pricing of the senior unsecured notes –long-term.*

Appendix VI.B.4.a(4), Page 28 of 61

**Residential Capital, LLC – Quarterly Solvency Analysis**
**Market Approach: Fair Market Value of Debt**
December 31, 2007 Pricing
*($ in Millions, except bond prices)*

**Residential Capital, LLC Bond Pricing**

| Maturity Date | Coupon | Debt Rank | Amount Outstanding [1] | [A] Price [2] | [B] Relative Percent of Debt Rank | [C] = [A] × [B] Weighted Average Price |
|---|---|---|---|---|---|---|
| 04/17/09 | Floating | Sr Subordinated | $ 1,000 | 49.3 | 100.0% | 49.3 |
| 05/12/08 | Floating | Sr Unsecured | $ 251 | 87.5 | 1.6% | 1.4 |
| 06/09/08 | Floating | Sr Unsecured | 1,250 | 85.5 | 7.9% | 6.7 |
| 11/21/08 | Floating | Sr Unsecured | 500 | 79.5 | 3.1% | 2.5 |
| 11/21/08 | 8.125% | Sr Unsecured | 750 | 79.5 | 4.7% | 3.8 |
| 04/17/09 | Floating | Sr Unsecured | 750 | 71.0 | 4.7% | 3.4 |
| 05/22/09 | Floating | Sr Unsecured | 1,000 | 71.0 | 6.3% | 4.5 |
| 06/30/10 | 6.375% | Sr Unsecured | 2,500 | 64.0 | 15.7% | 10.1 |
| 09/27/10 | Floating | Sr Unsecured | 885 | 58.5 | 5.6% | 3.3 |
| 02/22/11 | 6.000% | Sr Unsecured | 1,500 | 62.3 | 9.4% | 5.9 |
| 05/17/12 | 5.125% | Sr Unsecured | 1,106 | 57.5 | 7.0% | 4.0 |
| 06/01/12 | 6.500% | Sr Unsecured | 1,250 | 61.5 | 7.9% | 4.8 |
| 04/17/13 | 6.500% | Sr Unsecured | 1,750 | 61.5 | 11.0% | 6.8 |
| 05/17/13 | 6.375% | Sr Unsecured | 825 | 56.5 | 5.2% | 2.9 |
| 07/01/14 | 7.875% | Sr Unsecured | 825 | 58.5 | 5.2% | 3.0 |
| 06/30/15 | 6.875% | Sr Unsecured | 750 | 60.5 | 4.7% | 2.9 |
| | | | $ 15,890 | | 100.0% | 65.8 |

**Residential Capital, LLC Term Loan Pricing [3]**

| Maturity Date | Coupon | Debt Rank | Amount Outstanding [1] | [A] Price [2] | [B] Relative Percent of Debt Rank | [C] = [A] × [B] Weighted Average Price |
|---|---|---|---|---|---|---|
| 07/28/10 | | Unsecured | $ 1,750 | 86.8 | 100.0% | 86.8 |

*[1] The Examiner's Financial Advisors recognize that the amount outstanding may differ slightly from the face value due to the timing and availability of data. Source: ResCap Executive Liquidity Report, dated Jan. 7, 2008 [EXAM10055841].*
*[2] Pricing per Interactive Data Corporation.*
*[3] Pricing per Thomson Reuters SMIntelligence.*

**Residential Capital, LLC – Quarterly Solvency Analysis**
**Market Approach: Fair Market Value of Debt**
March 31, 2008 Summary
*($ in Millions, except bond prices)*

| | Face Value [1] | Decimal Price | | Market Value |
|---|---|---|---|---|
| **Secured borrowings:** | | | | |
| Borrowings from parent | $ 655.0 | 100.0 | [3] | $ 655.0 |
| Collateralized borrowings in securitization trusts | N/A | N/A | [2] | N/A |
| Secured – short-term | 12,844.1 | 100.0 | [3] | 12,844.1 |
| Secured – long-term | 593.3 | 100.0 | [3] | 593.3 |
| FHLB advances – short-term | N/A | N/A | [2] | N/A |
| FHLB advances – long-term | N/A | N/A | [2] | N/A |
| Subtotal secured borrowings | 14,092.4 | | | 14,092.4 |
| | | | | |
| **Unsecured borrowings:** | | | | |
| Senior unsecured notes – long-term | 13,874.1 | 53.3 | [4] | 7,396.5 |
| Subordinated unsecured note – long-term | 577.0 | 37.0 | [5] | 213.5 |
| Term loans and revolvers – long-term | 1,750.0 | 73.9 | [6] | 1,292.8 |
| Bank lines – short-term | 233.3 | 53.3 | [7] | 124.4 |
| Bank lines – long-term | 33.7 | 53.3 | [7] | 18.0 |
| Other unsecured – short-term | 432.3 | 53.3 | [7] | 230.5 |
| Other unsecured – long-term | 626.3 | 53.3 | [7] | 333.9 |
| Subtotal unsecured borrowings | 17,526.7 | | | 9,609.6 |
| | | | | |
| Total borrowings | $ 31,619.1 | | | $ 23,702.0 |

[1] *Face value per Residential Capital, LLC, Quarterly Report (Form 10-Q) (May 7, 2008), at 65.*
[2] *Debt related to assets not controlled by ResCap.*
[3] *Assumed at par.*
[4] *Weighted average pricing for unsecured notes per Interactive Data Corporation.*
[5] *Pricing per Interactive Data Corporation.*
[6] *Pricing per Thomson Reuters SMIntelligence.*
[7] *Assumed pricing equals the pricing of the senior unsecured notes–long-term.*

Appendix V.I.B.4.a(4), Page 31 of 61

**Residential Capital, LLC – Quarterly Solvency Analysis**
**Market Approach: Fair Market Value of Debt**
March 31, 2008 Pricing
*($ in Millions, except bond prices)*

## Residential Capital, LLC Bond Pricing

| Maturity Date | Coupon | Debt Rank | Amount Outstanding [1] | Price [2] [A] | Relative Percent of Debt Rank [B] | Weighted Average Price [C] = [A] × [B] |
|---|---|---|---|---|---|---|
| 04/17/09 | Floating | Sr Subordinated | $ 577 | 37.0 | 100.0% | 37.0 |
| 05/12/08 | Floating | Sr Unsecured | $ 244 | 76.0 | 1.6% | 1.2 |
| 06/09/08 | Floating | Sr Unsecured | 1,199 | 79.0 | 7.7% | 6.1 |
| 11/21/08 | Floating | Sr Unsecured | 470 | 68.0 | 3.0% | 2.1 |
| 11/21/08 | 8.125% | Sr Unsecured | 684 | 69.0 | 4.4% | 3.0 |
| 04/17/09 | Floating | Sr Unsecured | 750 | 57.0 | 4.8% | 2.8 |
| 05/22/09 | Floating | Sr Unsecured | 1,000 | 57.0 | 6.5% | 3.7 |
| 06/30/10 | 6.375% | Sr Unsecured | 2,500 | 50.3 | 16.1% | 8.1 |
| 09/27/10 | Floating | Sr Unsecured | 947 | 45.0 | 6.1% | 2.8 |
| 02/22/11 | 6.000% | Sr Unsecured | 1,500 | 49.0 | 9.7% | 4.7 |
| 05/17/12 | 5.125% | Sr Unsecured | 1,184 | 45.5 | 7.6% | 3.5 |
| 06/01/12 | 6.500% | Sr Unsecured | 1,250 | 49.0 | 8.1% | 4.0 |
| 04/17/13 | 6.500% | Sr Unsecured | 1,605 | 48.5 | 10.4% | 5.0 |
| 05/17/13 | 6.375% | Sr Unsecured | 692 | 44.5 | 4.5% | 2.0 |
| 07/01/14 | 7.875% | Sr Unsecured | 720 | 44.5 | 4.6% | 2.1 |
| 06/30/15 | 6.875% | Sr Unsecured | 750 | 48.5 | 4.8% | 2.3 |
| | | | $ 15,494 | | 100.0% | 53.3 |

### Residential Capital, LLC Term Loan Pricing [3]

| | | | | | | |
|---|---|---|---|---|---|---|
| 07/28/10 | | Unsecured | $ 1,750 | 73.9 | 100.0% | 73.9 |

[1] The Examiner's Financial Advisors recognize that the amount outstanding may differ slightly from the face value due to the timing and availability of data. Source: Bloomberg.
[2] Pricing per Interactive Data Corporation.
[3] Pricing per Thomson Reuters SMInteligence.

Appendix V.I.B.4.a(4), Page 31 of 61

**Appendix VI.B.4.a(4),** Page 32 of 61

**Residential Capital, LLC – Quarterly Solvency Analysis**
**Market Approach: Fair Market Value of Debt**
June 30, 2008 Summary
*($ in Millions, except bond prices)*

| | Face Value [1] | Price | | Market Value |
|---|---|---|---|---|
| **Secured borrowings:** | | | | |
| Borrowings from parent | $ 4,700.0 | 100.0 | [3] | $ 4,700.0 |
| Borrowings from affiliate | 971.7 | 100.0 | [3] | 971.7 |
| Collateralized borrowings in securitization trusts | N/A | N/A | [2] | N/A |
| Senior secured notes – long-term | 1,801.4 | 84.0 | [4] | 1,513.2 |
| Junior secured notes – long-term | 5,112.9 | 48.5 | [4] | 2,479.8 |
| Secured – short-term | 8,168.8 | 84.0 | [5] | 6,861.8 |
| Secured – long-term | 79.4 | 84.0 | [5] | 66.7 |
| FHLB advances- long-term | N/A | N/A | [2] | N/A |
| Subtotal secured borrowings | 20,834.2 | | | 16,593.1 |
| | | | | |
| **Unsecured borrowings:** | | | | |
| Senior unsecured notes – long-term | 4,113.3 | 47.1 | [6] | 1,939.2 |
| Subordinated unsecured note – long-term | 205.4 | 69.5 | [4] | 142.8 |
| Bank lines – short-term | 227.4 | 47.1 | [7] | 107.2 |
| Bank lines – long-term | 37.0 | 47.1 | [7] | 17.4 |
| Other unsecured – short-term | 312.9 | 47.1 | [7] | 147.5 |
| Other unsecured – long-term | 397.4 | 47.1 | [7] | 187.4 |
| Subtotal unsecured borrowings | 5,293.4 | | | 2,541.4 |
| | | | | |
| Total borrowings | $ 26,127.6 | | | $ 19,134.6 |

[1] *Face value per Residential Capital, LLC, Quarterly Report (Form 10-Q) (Aug. 8, 2008), at 78.*
[2] *Debt related to assets not controlled by ResCap.*
[3] *Assumed at par.*
[4] *Pricing per Interactive Data Corporation.*
[5] *Assumed pricing equals the pricing of the senior secured notes – long-term.*
[6] *Weighted average pricing for unsecured notes per Interactive Data Corporation.*
[7] *Assumed pricing equals the pricing of the senior unsecured notes – long-term.*

Appendix VI.B.4.a(4), Page 32 of 61

**Residential Capital, LLC – Quarterly Solvency Analysis**
**Market Approach: Fair Market Value of Debt**
June 30, 2008 Pricing
(*$ in Millions, except bond prices*)

**Residential Capital, LLC Bond Pricing**

| Maturity Date | Coupon | Debt Rank | Amount Outstanding [1] | [A] Price [2] | [B] Relative Percent of Debt Rank | [C] = [A] × [B] Weighted Average Price |
|---|---|---|---|---|---|---|
| 05/15/10 | 8.500% | 2nd Lien | $ 1,670 | 84.0 | 100.0% | 84.0 |
| 05/15/15 | 9.625% | 3rd Lien | $ 4,024 | 48.5 | 100.0% | 48.5 |
| 04/17/09 | Floating | Sr Subordinated | $ 205 | 69.5 | 100.0% | 69.5 |
| 11/21/08 | Floating | Sr Unsecured | $ 112 | 87.5 | 2.8% | 2.4 |
| 11/21/08 | 8.125% | Sr Unsecured | 163 | 87.5 | 4.1% | 3.6 |
| 04/17/09 | Floating | Sr Unsecured | 63 | 72.0 | 1.6% | 1.1 |
| 05/22/09 | Floating | Sr Unsecured | 132 | 72.0 | 3.3% | 2.4 |
| 06/30/10 | 6.375% | Sr Unsecured | 1,253 | 42.0 | 31.3% | 13.1 |
| 09/27/10 | Floating | Sr Unsecured | 564 | 51.5 | 14.1% | 7.3 |
| 02/22/11 | 6.000% | Sr Unsecured | 218 | 39.0 | 5.4% | 2.1 |
| 05/17/12 | 5.125% | Sr Unsecured | 173 | 44.5 | 4.3% | 1.9 |
| 06/01/12 | 6.500% | Sr Unsecured | 95 | 39.0 | 2.4% | 0.9 |
| 04/17/13 | 6.500% | Sr Unsecured | 875 | 39.0 | 21.8% | 8.5 |
| 05/17/13 | 6.375% | Sr Unsecured | 80 | 44.5 | 2.0% | 0.9 |
| 07/01/14 | 7.875% | Sr Unsecured | 129 | 44.5 | 3.2% | 1.4 |
| 06/30/15 | 6.875% | Sr Unsecured | 151 | 39.0 | 3.8% | 1.5 |
| | | | $ 4,007 | | 100.0% | 47.1 |

[1] The Examiner's Financial Advisors recognize that the amount outstanding may differ slightly from the face value due to the timing and availability of data. Source: ResCap Executive Liquidity Report, dated June 30, 2008 [EXAM10055944].
[2] Pricing per Interactive Data Corporation.

Appendix VI.B.4.a(4), Page 33 of 61

Appendix VI.B.4.a(4), Page 34 of 61

**Residential Capital, LLC – Quarterly Solvency Analysis**
**Market Approach: Fair Market Value of Debt**
September 30, 2008 Summary
*($ in Millions, except bond prices)*

| | Face Value [1] | Decimal Price | | Market Value |
|---|---|---|---|---|
| **Secured borrowings:** | | | | |
| Borrowings from parent | $ 3,270.6 | 100.0 | [3] | $ 3,270.6 |
| Borrowings from affiliate | 875.0 | 100.0 | [3] | 875.0 |
| Collateralized borrowings in securitization trusts | N/A | N/A | [2] | N/A |
| Senior secured notes – long-term | 1,690.5 | 55.0 | [4] | 929.8 |
| Junior secured notes – long-term | 5,070.0 | 24.0 | [4] | 1,216.8 |
| Secured aggregation facilities | 2,975.0 | 55.0 | [5] | 1,636.3 |
| Repurchase agreements | 687.0 | 55.0 | [5] | 377.9 |
| Mortgage servicing rights facilities | 1,248.0 | 55.0 | [5] | 686.4 |
| Servicing advances | 700.0 | 55.0 | [5] | 385.0 |
| Debt collateralized by mortgage loans | 16.9 | 55.0 | [5] | 9.3 |
| FHLB advances | N/A | N/A | [2] | N/A |
| Other | 335.7 | 55.0 | [5] | 184.6 |
| Subtotal secured borrowings | 16,868.7 | | | 9,571.6 |
| | | | | |
| **Unsecured borrowings:** | | | | |
| Senior unsecured notes – long-term | 4,030.8 | 28.5 | [6] | 1,148.6 |
| Subordinated unsecured note – long-term | 205.5 | 40.0 | [4] | 82.2 |
| Medium-term unsecured notes | 367.1 | 28.5 | [7] | 104.6 |
| Other | 300.3 | 28.5 | [7] | 85.6 |
| Subtotal unsecured borrowings | 4,903.7 | | | 1,421.0 |
| | | | | |
| Total borrowings | $ 21,772.4 | | | $ 10,992.6 |

[1] Face value per Residential Capital, LLC, Quarterly Report (Form 10-Q) (Nov. 10, 2008), at 77.
[2] Debt related to assets not controlled by ResCap.
[3] Assumed at par.
[4] Pricing per Interactive Data Corporation.
[5] Assumed pricing equals the pricing of the senior secured notes–long-term.
[6] Weighted average pricing for unsecured notes per Interactive Data Corporation.
[7] Assumed pricing equals the pricing of the senior unsecured notes–long-term.

Appendix VI.B.4.a(4), Page 34 of 61

**Residential Capital, LLC – Quarterly Solvency Analysis**
**Market Approach: Fair Market Value of Debt**
September 30, 2008 Pricing
*($ in Millions, except bond prices)*

### Residential Capital, LLC Bond Pricing

| Maturity Date | Coupon | Debt Rank | Amount Outstanding [1] | [A] Price [2] | [B] Relative Percent of Debt Rank | [C] = [A] × [B] Weighted Average Price |
|---|---|---|---|---|---|---|
| 05/15/10 | 8.500% | 2nd Lien | $ 1,670 | 55.0 | 100.0% | 55.0 |
| 05/15/15 | 9.625% | 3rd Lien | $ 4,024 | 24.0 | 100.0% | 24.0 |
| 04/17/09 | Floating | Sr Subordinated | $ 205 | 40.0 | 100.0% | 40.0 |
| 11/21/08 | Floating | Sr Unsecured | $ 112 | 85.0 | 2.7% | 2.3 |
| 11/21/08 | 8.125% | Sr Unsecured | 163 | 85.0 | 4.0% | 3.4 |
| 04/17/09 | Floating | Sr Unsecured | 63 | 46.0 | 1.5% | 0.7 |
| 05/22/09 | Floating | Sr Unsecured | 132 | 45.0 | 3.2% | 1.4 |
| 06/30/10 | 6.375% | Sr Unsecured | 1,280 | 23.0 | 31.3% | 7.2 |
| 09/27/10 | Floating | Sr Unsecured | 562 | 28.0 | 13.8% | 3.9 |
| 02/22/11 | 6.000% | Sr Unsecured | 218 | 20.0 | 5.3% | 1.1 |
| 05/17/12 | 5.125% | Sr Unsecured | 167 | 29.5 | 4.1% | 1.2 |
| 06/01/12 | 6.500% | Sr Unsecured | 95 | 20.0 | 2.3% | 0.5 |
| 04/17/13 | 6.500% | Sr Unsecured | 934 | 20.0 | 22.8% | 4.6 |
| 05/17/13 | 6.375% | Sr Unsecured | 78 | 29.5 | 1.9% | 0.6 |
| 07/01/14 | 7.875% | Sr Unsecured | 132 | 29.5 | 3.2% | 1.0 |
| 06/30/15 | 6.875% | Sr Unsecured | 151 | 20.0 | 3.7% | 0.7 |
| | | | $ 4,087 | | 100.0% | 28.5 |

[1] The Examiner's Financial Advisors recognize that the amount outstanding may differ slightly from the face value due to the timing and availability of data. Source: ResCap Executive Liquidity Report, dated Sep. 15, 2008 [EXAM10035954].

[2] Pricing per Interactive Data Corporation.

Appendix V.I.B.4.a(4), Page 35 of 61

**Residential Capital, LLC – Quarterly Solvency Analysis**
**Market Approach: Fair Market Value of Debt**
December 31, 2008 Summary
*($ in Millions, except bond prices)*

| | Face Value [1] | Decimal Price | | Market Value |
|---|---|---|---|---|
| **Secured borrowings:** | | | | |
| Borrowings from parent – short-term | $ 307.4 | 100.0 | [2] | $ 307.4 |
| Borrowings from parent – long-term | 2,356.0 | 100.0 | [2] | 2,356.0 |
| Borrowings from affiliates – long-term | 7.6 | 100.0 | [2] | 7.6 |
| Collateralized borrowings in securitization trusts | N/A | N/A | [3] | N/A |
| Senior secured notes – long-term | 1,672.7 | 55.0 | [4] | 920.0 |
| Junior secured notes – long-term | 5,027.1 | 29.0 | [4] | 1,457.9 |
| Secured aggregation facilities – short-term | 1,316.9 | 55.0 | [5] | 724.3 |
| Repurchase agreements – short-term | 429.2 | 55.0 | [5] | 236.1 |
| Mortgage servicing rights facilities | 528.0 | 55.0 | [5] | 290.4 |
| Servicing advances | 700.0 | 55.0 | [5] | 385.0 |
| Federal Reserve Board Advances – short-term | N/A | N/A | [5] | N/A |
| FHLB advances – long-term | N/A | N/A | [5] | N/A |
| Other | 299.8 | 55.0 | [5] | 164.9 |
| Subtotal secured borrowings | 12,644.7 | | | 6,849.5 |
| **Unsecured borrowings:** | | | | |
| Senior unsecured notes | 2,732.4 | 23.7 | [6] | 646.7 |
| Subordinated unsecured note – long-term | 205.4 | 36.5 | [4] | 75.0 |
| Medium-term unsecured notes | 296.2 | 23.7 | [7] | 70.1 |
| Other – short-term | 112.9 | 23.7 | [7] | 26.7 |
| Other – long-term | 2.2 | 23.7 | [7] | 0.5 |
| Subtotal unsecured borrowings | 3,349.2 | | | 819.0 |
| Total borrowings | $ 15,993.9 | | | $ 7,668.5 |

[1] *Face value per Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2009), at 96; Residential Capital, LLC, Condensed Consolidated Financial Statements for the Periods Ended September 30, 2009 and 2008, dated Sep. 30, 2009, at 21 [EXAM00124278].*
[2] *Fair value disclosure per Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2009), at 179.*
[3] *Debt related to assets not controlled by ResCap.*
[4] *Pricing per Interactive Data Corporation.*
[5] *Assumed pricing equals the pricing of the senior secured notes–long-term.*
[6] *Weighted average pricing for unsecured notes per Interactive Data Corporation.*
[7] *Assumed pricing equals the pricing of the senior unsecured notes–long-term.*

**Residential Capital, LLC – Quarterly Solvency Analysis**
**Market Approach: Fair Market Value of Debt**
December 31, 2008 Pricing
*($ in Millions, except bond prices)*

## Residential Capital, LLC Bond Pricing

| Maturity Date | Coupon | Debt Rank | Amount Outstanding [1] | [A] Price [2] | [B] Relative Percent of Debt Rank | [C] = [A] × [B] Weighted Average Price |
|---|---|---|---|---|---|---|
| 05/15/10 | 8.500% | 2nd Lien | $ 1,574 | 55.0 | 100.0% | 55.0 |
| 05/15/15 | 9.625% | 3rd Lien | $ 4,024 | 29.0 | 100.0% | 29.0 |
| 04/17/09 | Floating | Sr Subordinated | $ 205 | 36.5 | 100.0% | 36.5 |
| 04/17/09 | Floating | Sr Unsecured | $ 63 | 36.5 | 1.6% | 0.6 |
| 05/22/09 | Floating | Sr Unsecured | 132 | 36.5 | 3.5% | 1.3 |
| 06/30/10 | 6.375% | Sr Unsecured | 1,280 | 35.0 | 33.6% | 11.8 |
| 09/27/10 | Floating | Sr Unsecured | 562 | 15.0 | 14.8% | 2.2 |
| 02/22/11 | 6.000% | Sr Unsecured | 218 | 17.0 | 5.7% | 1.0 |
| 05/17/12 | 5.125% | Sr Unsecured | 167 | 16.5 | 4.4% | 0.7 |
| 06/01/12 | 6.500% | Sr Unsecured | 95 | 16.0 | 2.5% | 0.4 |
| 04/17/13 | 6.500% | Sr Unsecured | 934 | 17.0 | 24.5% | 4.2 |
| 05/17/13 | 6.375% | Sr Unsecured | 78 | 16.5 | 2.1% | 0.3 |
| 07/01/14 | 7.875% | Sr Unsecured | 132 | 16.5 | 3.5% | 0.6 |
| 06/30/15 | 6.875% | Sr Unsecured | 151 | 17.0 | 4.0% | 0.7 |
| | | | $ 3,812 | | 100.0% | 23.7 |

[1] *The Examiner's Financial Advisors recognize that the amount outstanding may differ slightly from the face value due to the timing and availability of data. Source: ResCap Executive Liquidity Report, dated Dec. 29, 2008 [EXAM10055973].*
[2] *Pricing per Interactive Data Corporation.*

**Residential Capital, LLC – Quarterly Solvency Analysis**
**Market Approach: Fair Market Value of Debt**
March 31, 2009 Summary
*($ in Millions, except bond prices)*

| | Face Value [1] | | Decimal Price | | Market Value |
|---|---|---|---|---|---|
| Secured borrowings: | | | | | |
| Borrowings from parent | $ 2,409.9 | | 100.0 | (2) | $ 2,409.9 |
| Collateralized borrowings in securitization trusts | N/A | | N/A | (3) | N/A |
| Senior secured notes | 781.6 | | 74.5 | (4) | 582.3 |
| Junior secured notes | 4,389.3 | | 44.0 | (4) | 1,931.3 |
| Secured aggregation facilities | 849.1 | | 74.5 | (5) | 632.6 |
| Repurchase agreements | 335.9 | | 74.5 | (5) | 250.2 |
| Mortgage servicing rights facilities | 844.0 | | 74.5 | (5) | 628.8 |
| Servicing advances | 700.0 | | 74.5 | (5) | 521.5 |
| Other | 282.5 | | 74.5 | (5) | 210.5 |
| Subtotal secured borrowings | 10,592.3 | | | | 7,167.1 |
| | | | | | |
| Unsecured borrowings: | | | | | |
| Senior unsecured notes | 2,667.5 | | 41.5 | (6) | 1,107.8 |
| Subordinated unsecured note – long-term | 190.4 | | 94.0 | (4) | 179.0 |
| Medium-term unsecured notes | 283.5 | | 41.5 | (7) | 117.7 |
| Other | 47.6 | | 41.5 | (7) | 19.8 |
| Subtotal unsecured borrowings | 3,189.0 | | | | 1,424.2 |
| | | | | | |
| Total borrowings | $ 13,781.3 | | | | $ 8,591.3 |

*(1) Face value per Residential Capital, LLC, Quarterly Report (Form 10-Q) (May 11, 2009), at 86.*
*(2) Fair value disclosure per Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2009), at 179.*
*(3) Debt related to assets not controlled by ResCap.*
*(4) Pricing per Interactive Data Corporation.*
*(5) Assumed pricing equals the pricing of the senior secured notes.*
*(6) Weighted average pricing for unsecured notes per Interactive Data Corporation.*
*(7) Assumed pricing equals the pricing of the senior unsecured notes.*

12-12020-mg Case 22-11068-JTD Doc 3098-36 Doc 615-9 Filed 05/13/13 Filed 02/03/23 Entered 05/13/13 09:27:08 Page 568 of 709 Appendix V.I.B.4.a(4), Page 39 of 61

Pg 244 of 385

**Residential Capital, LLC – Quarterly Solvency Analysis**
**Market Approach: Fair Market Value of Debt**
March 31, 2009 Pricing
*($ in Millions, except bond prices)*

**Residential Capital, LLC Bond Pricing**

| Maturity Date | Coupon | Debt Rank | Amount Outstanding [1] | [A] Price [2] | [B] Relative Percent of Debt Rank | [C] = [A] × [B] Weighted Average Price |
|---|---|---|---|---|---|---|
| 05/15/10 | 8.500% | 2nd Lien | $ 782 | 74.5 | 100.0% | 74.5 |
| 05/15/15 | 9.625% | 3rd Lien | $ 4,389 | 44.0 | 100.0% | 44.0 |
| 04/17/09 | Floating | Sr Subordinated | $ 190 | 94.0 | 100.0% | 94.0 |
| 04/17/09 | Floating | Sr Unsecured | $ 56 | 94.0 | 2.1% | 2.0 |
| 05/22/09 | Floating | Sr Unsecured | 119 | 88.0 | 4.5% | 4.0 |
| 06/30/10 | 6.375% | Sr Unsecured | 824 | 46.0 | 31.4% | 14.4 |
| 09/27/10 | Floating | Sr Unsecured | 478 | 30.0 | 18.2% | 5.5 |
| 02/22/11 | 6.000% | Sr Unsecured | 208 | 37.0 | 7.9% | 2.9 |
| 05/17/12 | 5.125% | Sr Unsecured | 131 | 31.5 | 5.0% | 1.6 |
| 06/01/12 | 6.500% | Sr Unsecured | 80 | 37.0 | 3.0% | 1.1 |
| 04/17/13 | 6.500% | Sr Unsecured | 473 | 37.0 | 18.0% | 6.7 |
| 05/17/13 | 6.375% | Sr Unsecured | 53 | 31.5 | 2.0% | 0.6 |
| 07/01/14 | 7.875% | Sr Unsecured | 92 | 32.4 | 3.5% | 1.1 |
| 06/30/15 | 6.875% | Sr Unsecured | 112 | 37.0 | 4.3% | 1.6 |
| | | | $ 2,626 | | 100.0% | 41.5 |

[1] *The Examiner's Financial Advisors recognize that the amount outstanding may differ slightly from the face value due to the timing and availability of data. Source: Bloomberg.*
[2] *Pricing per Interactive Data Corporation.*

Appendix VI.B.4.a(4), Page 40 of 61

12-12020-mg Case 12-11068-JFD Doc 3098-36 Doc 6139 Filed 05/13/13 Filed 02/03/23 Entered 05/13/13 09:13 Page 569 of 709 Appendix
Pg 245 of 385

**Residential Capital, LLC – Quarterly Solvency Analysis**
**Market Approach: Fair Market Value of Debt**
June 30, 2009 Summary
*($ in Millions, except bond prices)*

| | Face Value [1] | Decimal Price | | Market Value |
|---|---|---|---|---|
| Secured borrowings: | | | | |
| Borrowings from parent | $ 2,931.2 | 100.0 | [2] | $ 2,931.2 |
| Collateralized borrowings in securitization trusts | N/A | N/A | [3] | N/A |
| Senior secured notes | 773.2 | 87.0 | [4] | 672.7 |
| Junior secured notes | 2,653.9 | 63.6 | [5] | 1,688.5 |
| Secured aggregation facilities | 683.9 | 87.0 | [6] | 595.0 |
| Repurchase agreements | 61.9 | 87.0 | [6] | 53.9 |
| Mortgage servicing rights facilities | 1,043.0 | 87.0 | [6] | 907.4 |
| Servicing advances | 700.0 | 87.0 | [6] | 609.0 |
| Other | 262.6 | 87.0 | [6] | 228.5 |
| Subtotal secured borrowings | 9,109.7 | | | 7,686.1 |
| | | | | |
| Unsecured borrowings: | | | | |
| Senior unsecured notes | 2,546.8 | 59.4 | [7] | 1,513.6 |
| Medium-term unsecured notes | 307.2 | 59.4 | [8] | 182.6 |
| Outstanding under unsecured facilities | 15.0 | 59.4 | [8] | 8.9 |
| Subtotal unsecured borrowings | 2,869.0 | | | 1,705.1 |
| | | | | |
| Total borrowings | $ 11,978.7 | | | $ 9,391.2 |

[1] *Face value per Residential Capital, LLC, Quarterly Report (Form 10-Q) (Aug. 7, 2009), at 97.*
[2] *Fair value disclosure per Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2009), at 179.*
[3] *Debt related to assets not controlled by ResCap.*
[4] *Pricing per Interactive Data Corporation.*
[5] *Pricing per Advantage Data Inc.*
[6] *Assumed pricing equals the pricing of the senior secured notes.*
[7] *Weighted average pricing for unsecured notes per Interactive Data Corporation and Advantage Data Inc.*
[8] *Assumed pricing equals the pricing of the senior unsecured notes.*

Appendix VI.B.4.a(4), Page 41 of 61

**Residential Capital, LLC – Quarterly Solvency Analysis**
**Market Approach: Fair Market Value of Debt**
June 30, 2009 Pricing
*($ in Millions, except bond prices)*

## Residential Capital, LLC Bond Pricing

| Maturity Date | Coupon | Debt Rank | Amount Outstanding [1] | [A] Price | | [B] Relative Percent of Debt Rank | [C] = [A] × [B] Weighted Average Price |
|---|---|---|---|---|---|---|---|
| 05/15/10 | 8.500% | 2nd Lien | $ 743 | 87.0 | [2] | 100.0% | 87.0 |
| 05/15/15 | 9.625% | 3rd Lien | $ 2,120 | 63.6 | [3] | 100.0% | 63.6 |
| 06/30/10 | 6.375% | Sr Unsecured | $ 824 | 73.0 | [2] | 33.1% | 24.2 |
| 09/27/10 | Floating | Sr Unsecured | 482 | 52.8 | [3] | 19.4% | 10.2 |
| 02/22/11 | 6.000% | Sr Unsecured | 208 | 61.5 | [2] | 8.4% | 5.2 |
| 05/17/12 | 5.125% | Sr Unsecured | 140 | 45.3 | [3] | 5.6% | 2.5 |
| 06/01/12 | 6.500% | Sr Unsecured | 80 | 60.5 | [2] | 3.2% | 1.9 |
| 04/17/13 | 6.500% | Sr Unsecured | 473 | 60.5 | [2] | 19.0% | 11.5 |
| 05/17/13 | 6.375% | Sr Unsecured | 61 | 29.0 | [3] | 2.5% | 0.7 |
| 07/01/14 | 7.875% | Sr Unsecured | 105 | 9.6 | [3] | 4.2% | 0.4 |
| 06/30/15 | 6.875% | Sr Unsecured | 112 | 60.5 | [2] | 4.5% | 2.7 |
| | | | $ 2,486 | | | 100.0% | 59.4 |

[1] The Examiner's Financial Advisors recognize that the amount outstanding may differ slightly from the face value due to the timing and availability of data. Source: Draft ResCap Executive Liquidity Report, dated June 29, 2009 [EXAM10056051].
[2] Pricing per Interactive Data Corporation.
[3] Pricing per Advantage Data Inc.

Appendix VI.B.4.a(4), Page 41 of 61

**Appendix VI.B.4.a(4)**, Page 42 of 61

**Residential Capital, LLC – Quarterly Solvency Analysis**
**Market Approach: Fair Market Value of Debt**
September 30, 2009 Summary
*($ in Millions, except bond prices)*

| | Face Value [1] | Decimal Price | | Market Value |
|---|---|---|---|---|
| **Secured borrowings:** | | | | |
| Borrowings from parent – short-term | $ 613.2 | 100.0 | [2] | $ 613.2 |
| Borrowings from parent – long-term | 1,689.2 | 100.0 | [2] | 1,689.2 |
| Collateralized borrowings in securitization trusts | N/A | N/A | [3] | N/A |
| Senior secured notes – long-term | 764.7 | 89.0 | [4] | 680.6 |
| Junior secured notes – long-term | 2,630.1 | 76.5 | [4] | 2,012.0 |
| Secured aggregation facilities – short-term | 283.8 | 89.0 | [5] | 252.6 |
| Repurchase agreements – short-term | 30.5 | 89.0 | [5] | 27.2 |
| Mortgage servicing rights facilities – long-term | 835.0 | 89.0 | [5] | 743.2 |
| Servicing advances | 700.0 | 89.0 | [5] | 623.0 |
| Other – long-term | 246.7 | 89.0 | [5] | 219.5 |
| Subtotal secured borrowings | 7,793.1 | | | 6,860.4 |
| **Unsecured borrowings:** | | | | |
| Senior unsecured notes – long-term | 2,561.5 | 63.0 | [6] | 1,613.2 |
| Medium-term unsecured notes – long-term | 133.0 | 63.0 | [7] | 83.7 |
| Other – short-term | 13.5 | 63.0 | [7] | 8.5 |
| Other – long-term | 1.1 | 63.0 | [7] | 0.7 |
| Subtotal unsecured borrowings | 2,709.0 | | | 1,706.2 |
| Total borrowings | $ 10,502.2 | | | $ 8,566.6 |

[1] *Face value per Residential Capital, LLC, Condensed Consolidated Financial Statements for the Periods Ended September 30, 2009 and 2008, dated Sep. 30, 2009, at 21 [EXAM00124278].*
[2] *Fair value disclosure per Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2009), at 179.*
[3] *Debt related to assets not controlled by ResCap.*
[4] *Pricing per Interactive Data Corporation.*
[5] *Assumed pricing equals the pricing of the senior secured notes.*
[6] *Weighted average pricing for unsecured notes per Interactive Data Corporation and Advantage Data Inc.*
[7] *Assumed pricing equals the pricing of the senior unsecured notes.*

**Residential Capital, LLC – Quarterly Solvency Analysis**
**Market Approach: Fair Market Value of Debt**
September 30, 2009 Pricing
*($ in Millions, except bond prices)*

## Residential Capital, LLC Bond Pricing

| Maturity Date | Coupon | Debt Rank | Amount Outstanding [1] | [A] Price | | [B] Relative Percent of Debt Rank | [C] = [A] × [B] Weighted Average Price |
|---|---|---|---|---|---|---|---|
| 05/15/10 | 8.500% | 2nd Lien | $ 743 | 89.0 | [2] | 100.0% | 89.0 |
| 05/15/15 | 9.625% | 3rd Lien | $ 2,120 | 76.5 | [2] | 100.0% | 76.5 |
| 06/30/10 | 6.375% | Sr Unsecured | $ 824 | 74.5 | [2] | 33.0% | 24.6 |
| 09/27/10 | Floating | Sr Unsecured | 490 | 52.8 | [3] | 19.7% | 10.4 |
| 02/22/11 | 6.000% | Sr Unsecured | 208 | 69.5 | [2] | 8.4% | 5.8 |
| 05/17/12 | 5.125% | Sr Unsecured | 141 | 48.1 | [3] | 5.7% | 2.7 |
| 06/01/12 | 6.500% | Sr Unsecured | 80 | 64.5 | [2] | 3.2% | 2.1 |
| 04/17/13 | 6.500% | Sr Unsecured | 473 | 64.5 | [2] | 19.0% | 12.2 |
| 05/17/13 | 6.375% | Sr Unsecured | 60 | 40.3 | [3] | 2.4% | 1.0 |
| 07/01/14 | 7.875% | Sr Unsecured | 105 | 30.6 | [3] | 4.2% | 1.3 |
| 06/30/15 | 6.875% | Sr Unsecured | 112 | 64.5 | [2] | 4.5% | 2.9 |
| | | | $ 2,493 | | | 100.0% | 63.0 |

[1] The Examiner's Financial Advisors recognize that the amount outstanding may differ slightly from the face value due to the timing and availability of data. Source: Draft ResCap Executive Liquidity Report, dated Sep. 28, 2009 [EXAM10056078].
[2] Pricing per Interactive Data Corporation.
[3] Pricing per Advantage Data Inc.

**Residential Capital, LLC – Quarterly Solvency Analysis**
**Market Approach: Fair Market Value of Debt**
December 31, 2009 Summary
*($ in Millions, except bond prices)*

| | Face Value [1] | | Decimal Price | | Market Value |
|---|---|---|---|---|---|
| Secured borrowings: | | | | | |
| Borrowings from parent – short-term | $ 343.5 | | 100.0 | [2] | $ 343.5 |
| Borrowings from parent – long-term | 1,545.3 | | 100.0 | [2] | 1,545.3 |
| Collateralized borrowings in securitization trusts | N/A | | N/A | [3] | N/A |
| Senior secured notes – long-term | 756.2 | | 95.0 | [4] | 718.4 |
| Junior secured notes – long-term | 2,564.8 | | 85.0 | [4] | 2,180.1 |
| Secured aggregation facilities – short-term | 242.5 | | 95.0 | [5] | 230.4 |
| Repurchase agreements – short-term | 25.7 | | 95.0 | [5] | 24.4 |
| Mortgage servicing rights facilities – long-term | 811.0 | | 95.0 | [5] | 770.5 |
| Servicing advances – short-term | 700.0 | | 95.0 | [5] | 665.0 |
| Other – long-term | 221.9 | | 95.0 | [5] | 210.8 |
| Subtotal secured borrowings | 7,210.9 | | | | 6,688.3 |
| | | | | | |
| Unsecured borrowings: | | | | | |
| Senior unsecured notes – long-term | 2,547.3 | | 67.2 | [6] | 1,711.7 |
| Medium-term unsecured notes – long-term | 137.6 | | 67.2 | [7] | 92.5 |
| Other – short-term | 13.5 | | 67.2 | [7] | 9.1 |
| Subtotal unsecured borrowings | 2,698.5 | | | | 1,813.3 |
| | | | | | |
| Total borrowings | $ 9,909.4 | | | | $ 8,501.6 |

[1] *Face value per Residential Capital, LLC, Consolidated Financial Statements for the Years Ended December 31, 2009 and 2008, dated Feb. 26, 2010, at 38 [EXAM00124455].*
[2] *Fair value disclosure per id. at 70.*
[3] *Debt related to assets not controlled by ResCap.*
[4] *Pricing per Interactive Data Corporation.*
[5] *Assumed pricing equals the pricing of the senior secured notes.*
[6] *Weighted average pricing for unsecured notes per Interactive Data Corporation and Advantage Data Inc.*
[7] *Assumed pricing equals the pricing of the senior unsecured notes.*

**Residential Capital, LLC – Quarterly Solvency Analysis**
**Market Approach: Fair Market Value of Debt**
December 31, 2009 Pricing
*($ in Millions, except bond prices)*

**Residential Capital, LLC Bond Pricing**

| Maturity Date | Coupon | Debt Rank | Amount Outstanding [1] | [A] Price | | [B] Relative Percent of Debt Rank | [C] = [A] × [B] Weighted Average Price |
|---|---|---|---|---|---|---|---|
| 05/15/10 | 8.500% | 2nd Lien | $ 743 | 95.0 | [2] | 100.0% | 95.0 |
| 05/15/15 | 9.625% | 3rd Lien | $ 2,120 | 85.0 | [2] | 100.0% | 85.0 |
| 06/30/10 | 6.375% | Sr Unsecured | $ 824 | 85.0 | [2] | 32.6% | 27.7 |
| 09/27/10 | Floating | Sr Unsecured | 514 | 46.6 | [3] | 20.3% | 9.5 |
| 02/22/11 | 6.000% | Sr Unsecured | 208 | 80.0 | [2] | 8.3% | 6.6 |
| 05/17/12 | 5.125% | Sr Unsecured | 148 | 46.8 | [3] | 5.9% | 2.7 |
| 06/01/12 | 6.500% | Sr Unsecured | 80 | 70.0 | [2] | 3.2% | 2.2 |
| 04/17/13 | 6.500% | Sr Unsecured | 473 | 70.0 | [2] | 18.7% | 13.1 |
| 05/17/13 | 6.375% | Sr Unsecured | 61 | 38.8 | [3] | 2.4% | 0.9 |
| 07/01/14 | 7.875% | Sr Unsecured | 106 | 30.6 | [3] | 4.2% | 1.3 |
| 06/30/15 | 6.875% | Sr Unsecured | 112 | 70.0 | [2] | 4.4% | 3.1 |
| | | | $ 2,526 | | | 100.0% | 67.2 |

[1] The Examiner's Financial Advisors recognize that the amount outstanding may differ slightly from the face value due to the timing and availability of data. Source: Draft ResCap Executive Liquidity Report, dated Dec. 28, 2009 [EX1AM10056100].

[2] Pricing per Interactive Data Corporation.

[3] Pricing per Advantage Data Inc.

**Appendix VI.B.4.a(4)**, Page 46 of 61

**Residential Capital, LLC – Quarterly Solvency Analysis**
**Market Approach: Fair Market Value of Debt**
March 31, 2010 Summary
*($ in Millions, except bond prices)*

| | Face Value [1] | Decimal Price | | Market Value |
|---|---|---|---|---|
| Secured borrowings: | | | | |
| Borrowings from parent – short-term | $ 48.4 | 100.0 | [2] | $ 48.4 |
| Borrowings from parent – long-term | 1,411.8 | 100.0 | [2] | 1,411.8 |
| Collateralized borrowings in securitization trusts | N/A | N/A | [3] | N/A |
| Senior secured notes – long-term | 747.6 | 98.8 | [4] | 738.3 |
| Junior secured notes – long-term | 2,540.9 | 98.5 | [4] | 2,502.8 |
| Secured aggregation facilities – short-term | 66.6 | 98.8 | [5] | 65.7 |
| Mortgage servicing rights facilities – long-term | 796.0 | 98.8 | [5] | 786.1 |
| Servicing advances – short-term | 700.0 | 98.8 | [5] | 691.3 |
| Other – long-term | 212.0 | 98.8 | [5] | 209.3 |
| Subtotal secured borrowings | 6,523.3 | | | 6,453.7 |
| | | | | |
| Unsecured borrowings: | | | | |
| Senior unsecured notes – long-term | 2,488.3 | 91.1 | [6] | 2,265.6 |
| Medium-term unsecured notes – long-term | 145.0 | 91.1 | [7] | 132.0 |
| Other – short-term | 13.4 | 91.1 | [7] | 12.2 |
| Subtotal unsecured borrowings | 2,646.7 | | | 2,409.8 |
| | | | | |
| Total borrowings | $ 9,170.0 | | | $ 8,863.5 |

[1] *Face value per Residential Capital, LLC, Condensed Consolidated Financial Statements for the Periods Ended March 31, 2010 and 2009 (Unaudited) dated Mar. 31, 2010, at 21 [EXAM00122870].*

[2] *Fair value disclosure per Residential Capital, LLC, Consolidated Financial Statements for the Years Ended December 31, 2009 and 2008, dated Feb. 26, 2010, at 70 [EXAM00124455].*

[3] *Debt related to assets not controlled by ResCap.*

[4] *Pricing per Interactive Data Corporation.*

[5] *Assumed pricing equals the pricing of the senior secured notes.*

[6] *Weighted average pricing for unsecured notes per Interactive Data Corporation and Advantage Data Inc.*

[7] *Assumed pricing equals the pricing of the senior unsecured notes.*

Appendix VI.B.4.a(4), Page 46 of 61

**Residential Capital, LLC – Quarterly Solvency Analysis**
**Market Approach: Fair Market Value of Debt**
March 31, 2010 Pricing
*($ in Millions, except bond prices)*

## Residential Capital, LLC Bond Pricing

| Maturity Date | Coupon | Debt Rank | Amount Outstanding [1] | [A] Price | | [B] Relative Percent of Debt Rank | [C] = [A] × [B] Weighted Average Price |
|---|---|---|---|---|---|---|---|
| 05/15/10 | 8.500% | 2nd Lien | $ 743 | 98.8 | [2] | 100.0% | 98.8 |
| 05/15/15 | 9.625% | 3rd Lien | $ 2,120 | 98.5 | [2] | 100.0% | 98.5 |
| 06/30/10 | 6.375% | Sr Unsecured | 824 | 96.5 | [2] | 33.6% | 32.5 |
| 09/27/10 | Floating | Sr Unsecured | 464 | 91.6 | [3] | 18.9% | 17.4 |
| 02/22/11 | 6.000% | Sr Unsecured | 208 | 95.8 | [2] | 8.5% | 8.1 |
| 05/17/12 | 5.125% | Sr Unsecured | 133 | 87.1 | [3] | 5.4% | 4.7 |
| 06/01/12 | 6.500% | Sr Unsecured | 80 | 96.8 | [2] | 3.3% | 3.2 |
| 04/17/13 | 6.500% | Sr Unsecured | 473 | 96.8 | [2] | 19.3% | 18.7 |
| 05/17/13 | 6.375% | Sr Unsecured | 56 | 47.5 | [3] | 2.3% | 1.1 |
| 07/01/14 | 7.875% | Sr Unsecured | 98 | 30.6 | [3] | 4.0% | 1.2 |
| 06/30/15 | 6.875% | Sr Unsecured | 112 | 91.0 | [2] | 4.6% | 4.2 |
| | | | $ 2,449 | | | 100.0% | 91.1 |

[1] The Examiner's Financial Advisors recognize that the amount outstanding may differ slightly from the face value due to the timing and availability of data. Source: Draft ResCap Executive Liquidity Report, dated Mar. 22, 2010 [EXAM10056125].
[2] Pricing per Interactive Data Corporation.
[3] Pricing per Advantage Data Inc.

Appendix VI.B.4.a(4), Page 48 of 61

**Residential Capital, LLC – Quarterly Solvency Analysis**
**Market Approach: Fair Market Value of Debt**
June 30, 2010 Summary
*($ in Millions, except bond prices)*

|  | Face Value [1] | Decimal Price |  | Market Value |
|---|---|---|---|---|
| Secured borrowings: |  |  |  |  |
| Borrowings from parent – short-term | $ 305.0 | 100.0 | [2] | $ 305.0 |
| Borrowings from parent – long-term | 1,059.3 | 100.0 | [2] | 1,059.3 |
| Collateralized borrowings in securitization trusts | N/A | N/A | [3] | N/A |
| Other short-term borrowings | 753.7 | 98.5 | [4] | 742.4 |
| Other long-term borrowings | 3,888.9 | 98.5 | [5] | 3,830.6 |
| Subtotal secured borrowings | 6,006.9 |  |  | 5,937.3 |
| Unsecured borrowings: |  |  |  |  |
| Other short-term borrowings | 13.4 | 89.8 | [6] | 12.0 |
| Other long-term borrowings | 1,746.5 | 89.8 | [7] | 1,568.0 |
| Subtotal unsecured borrowings | 1,759.9 |  |  | 1,580.0 |
| Total borrowings | $ 7,766.8 |  |  | $ 7,517.3 |

[1] Face value per Residential Capital, LLC, Condensed Consolidated Financial Statements for the Periods Ended June 30, 2010 and 2009 (Unaudited) dated June 30, 2010, at 21 [EXAM00122936].
[2] Fair value disclosure per Residential Capital, LLC, Consolidated Financial Statements for Years Ended December 31, 2009 and 2008, dated Dec. 31, 2009, at 70 [EXAM00124455].
[3] Debt related to assets not controlled by ResCap.
[4] Assumed pricing equals the pricing of the secured other long-term borrowings.
[5] Pricing per Interactive Data Corporation.
[6] Assumed pricing equals the pricing of the unsecured other long-term borrowings.
[7] Weighted average pricing for unsecured notes per Interactive Data Corporation and Advantage Data Inc.

Appendix VI.B.4.a(4), Page 48 of 61

12-12020-mg Case 12-11068-JTD Doc 3098-36 Filed 05/13/13 Doc 6513-9 Filed 02/03/23 Entered 05/13/13 19:27:08 Page 578 of 709 Appendix Pg 254 of 385

Appendix VI.B.4.a(4), Page 49 of 61

**Residential Capital, LLC – Quarterly Solvency Analysis**
**Market Approach: Fair Market Value of Debt**
June 30, 2010 Pricing
*($ in Millions, except bond prices)*

**Residential Capital, LLC Bond Pricing**

| Maturity Date | Coupon | Debt Rank | Amount Outstanding [1] | [A] Price | | [B] Relative Percent of Debt Rank | [C] = [A] × [B] Weighted Average Price |
|---|---|---|---|---|---|---|---|
| 05/15/15 | 9.625% | 3rd Lien | $ 2,120 | 98.5 | (2) | 100.0% | 98.5 |
| 06/30/10 | 6.375% | Sr Unsecured | $ 0 | 99.6 | (3) | 0.0% | 0.0 |
| 09/27/10 | Floating | Sr Unsecured | 419 | 96.6 | (3) | 26.7% | 25.8 |
| 02/22/11 | 6.000% | Sr Unsecured | 208 | 97.8 | (2) | 13.3% | 13.0 |
| 05/17/12 | 5.125% | Sr Unsecured | 120 | 83.4 | (3) | 7.7% | 6.4 |
| 06/01/12 | 6.500% | Sr Unsecured | 80 | 94.0 | (2) | 5.1% | 4.8 |
| 04/17/13 | 6.500% | Sr Unsecured | 473 | 94.0 | (2) | 30.2% | 28.4 |
| 05/17/13 | 6.375% | Sr Unsecured | 56 | 79.0 | (3) | 3.5% | 2.8 |
| 07/01/14 | 7.875% | Sr Unsecured | 97 | 30.6 | (3) | 6.2% | 1.9 |
| 06/30/15 | 6.875% | Sr Unsecured | 112 | 92.0 | (2) | 7.2% | 6.6 |
| | | | $ 1,566 | | | 100.0% | 89.8 |

(1) The Examiner's Financial Advisors recognize that the amount outstanding may differ slightly from the face value due to the timing and availability of data. Source: ResCap Executive Liquidity Report, dated July 5, 2010 [ALLY_PEO_0084328].
(2) Pricing per Interactive Data Corporation.
(3) Pricing per Advantage Data Inc.

**Residential Capital, LLC – Quarterly Solvency Analysis**
**Market Approach: Fair Market Value of Debt**
September 30, 2010 Summary
*($ in Millions, except bond prices)*

| | Face Value [1] | Decimal Price | | Market Value |
|---|---|---|---|---|
| **Secured borrowings:** | | | | |
| Borrowings from parent – short-term | $ 332.0 | 100.0 | [2] | $ 332.0 |
| Borrowings from parent – long-term | 986.8 | 100.0 | [2] | 986.8 |
| Collateralized borrowings in securitization trusts | N/A | N/A | [3] | N/A |
| Other short-term borrowings | 1,139.6 | 100.8 | [4] | 1,148.2 |
| Other long-term borrowings | 3,190.9 | 100.8 | [5] | 3,214.8 |
| Subtotal secured borrowings | 5,649.3 | | | 5,681.8 |
| **Unsecured borrowings:** | | | | |
| Other short-term borrowings | 13.4 | 93.2 | [6] | 12.4 |
| Other long-term borrowings | 1,350.8 | 93.2 | [7] | 1,258.3 |
| Subtotal unsecured borrowings | 1,364.2 | | | 1,270.7 |
| Total borrowings | $ 7,013.5 | | | $ 6,952.5 |

[1] Face value per Residential Capital, LLC, Condensed Consolidated Financial Statements for the Periods Ended September 30, 2010 and 2009 (Unaudited) dated Sep. 30, 2010, at 16 [EXAM00122999].

[2] Fair value disclosure per Residential Capital, LLC, Consolidated Financial Statements for the Years Ended December 31, 2009 and 2008, dated Dec. 31, 2009, at 70 [EXAM00124455].

[3] Debt related to assets not controlled by ResCap.

[4] Assumed pricing equals the pricing of the secured other long-term borrowings.

[5] Pricing per Interactive Data Corporation.

[6] Assumed pricing equals the pricing of the unsecured other long-term borrowings.

[7] Weighted average pricing for unsecured notes per Interactive Data Corporation and Advantage Data Inc.

Appendix VI.B.4.a(4), Page 51 of 61

**Residential Capital, LLC – Quarterly Solvency Analysis**
**Market Approach: Fair Market Value of Debt**
September 30, 2010 Pricing
*($ in Millions, except bond prices)*

**Residential Capital, LLC Bond Pricing**

| Maturity Date | Coupon | Debt Rank | Amount Outstanding [1] | Price [A] | | Relative Percent of Debt Rank [B] | Weighted Average Price [C] = [A] × [B] |
|---|---|---|---|---|---|---|---|
| 05/15/15 | 9.625% | 3rd Lien | $ 2,120 | 100.8 | (2) | 100.0% | 100.8 |
| | | | | | | 100.0% | 100.8 |
| 02/22/11 | 6.000% | Sr Unsecured | $  208 | 100.0 | (2) | 18.0% | 18.0 |
| 05/17/12 | 5.125% | Sr Unsecured | 125 | 93.9 | (3) | 10.8% | 10.2 |
| 06/01/12 | 6.500% | Sr Unsecured | 80 | 100.0 | (2) | 6.9% | 6.9 |
| 04/17/13 | 6.500% | Sr Unsecured | 473 | 100.0 | (2) | 41.0% | 41.0 |
| 05/17/13 | 6.375% | Sr Unsecured | 57 | 93.6 | (3) | 4.9% | 4.6 |
| 07/01/14 | 7.875% | Sr Unsecured | 99 | 30.6 | (3) | 8.6% | 2.6 |
| 06/30/15 | 6.875% | Sr Unsecured | 112 | 101.0 | (2) | 9.7% | 9.8 |
| | | | $ 1,155 | | | 100.0% | 93.2 |

[1] The Examiner's Financial Advisors recognize that the amount outstanding may differ slightly from the face value due to the timing and availability of data. Source: ResCap Executive Liquidity Report, dated Sep. 13, 2010 [ALLY_0383598].
[2] Pricing per Interactive Data Corporation.
[3] Pricing per Advantage Data Inc.

Appendix VI.B.4.a(4), Page 51 of 61

Appendix VI.B.4.a(4), Page 52 of 61

**Residential Capital, LLC – Quarterly Solvency Analysis**
**Market Approach: Fair Market Value of Debt**
December 31, 2010 Summary
*($ in Millions, except bond prices)*

| | Face Value [1] | Decimal Price | | Market Value |
|---|---|---|---|---|
| Secured borrowings: | | | | |
| Borrowings from parent – short-term | $ 681.0 | 100.0 | [2] | $ 681.0 |
| Borrowings from parent – long-term | 845.8 | 100.0 | [2] | 845.8 |
| Collateralized borrowings in securitization trusts | N/A | N/A | [3] | N/A |
| Other short-term borrowings | 955.8 | 101.0 | [4] | 965.4 |
| Other long-term borrowings | 3,153.1 | 101.0 | [5] | 3,184.6 |
| Subtotal secured borrowings | 5,635.7 | | | 5,676.8 |
| | | | | |
| Unsecured borrowings: | | | | |
| Other short-term borrowings | 13.4 | 98.9 | [6] | 13.2 |
| Other long-term borrowings | 1,342.2 | 98.9 | [7] | 1,326.9 |
| Subtotal unsecured borrowings | 1,355.5 | | | 1,340.1 |
| | | | | |
| Total borrowings | $ 6,991.2 | | | $ 7,016.9 |

[1] *Face value per Residential Capital, LLC, Consolidated Financial Statements for the Years Ended December 31, 2010 and 2009, dated Dec. 31, 2010, at 38 [EXAM00123128].*
[2] *Fair value disclosure per Residential Capital, LLC, Consolidated Financial Statements for the Years Ended December 31, 2010 and 2009, dated Dec. 31, 2010, at 57 [EXAM00123128].*
[3] *Debt related to assets not controlled by ResCap.*
[4] *Assumed pricing equals the pricing of the secured other long-term borrowings.*
[5] *Pricing per Interactive Data Corporation.*
[6] *Assumed pricing equals the pricing of the unsecured other long-term borrowings.*
[7] *Weighted average pricing for unsecured notes per Interactive Data Corporation and Advantage Data Inc.*

Appendix VI.B.4.a(4), Page 52 of 61

**Residential Capital, LLC – Quarterly Solvency Analysis**
**Market Approach: Fair Market Value of Debt**
December 31, 2010 Pricing
*($ in Millions, except bond prices)*

**Residential Capital, LLC Bond Pricing**

| Maturity Date | Coupon | Debt Rank | Amount Outstanding [1] | [A] Price | [B] Relative Percent of Debt Rank | [C] = [A] × [B] Weighted Average Price |
|---|---|---|---|---|---|---|
| 05/15/15 | 9.625% | 3rd Lien | $ 2,120 | 101.0 [2] | 100.0% | 101.0 |
| 02/22/11 | 6.000% | Sr Unsecured | $ 208 | 99.5 [2] | 19.7% | 19.6 |
| 05/17/12 | 5.125% | Sr Unsecured | 125 | 97.8 [3] | 11.8% | 11.6 |
| 06/01/12 | 6.500% | Sr Unsecured | 80 | 101.0 [2] | 7.6% | 7.6 |
| 04/17/13 | 6.500% | Sr Unsecured | 473 | 99.0 [2] | 44.8% | 44.4 |
| 05/17/13 | 6.375% | Sr Unsecured | 57 | 96.0 [2] | 5.4% | 5.2 |
| 07/01/14 | 7.875% | Sr Unsecured | 99 | N/A | N/A | N/A |
| 06/30/15 | 6.875% | Sr Unsecured | 112 | 98.3 [2] | 10.6% | 10.4 |
| | | | $ 1,155 | | 100.0% | 98.9 |

*[1] The Examiner's Financial Advisors recognize that the amount outstanding may differ slightly from the face value due to the timing and availability of data. Source: ResCap Executive Liquidity Report, dated Jan. 17, 2011 [ALLY_0193518].*
*[2] Pricing per Interactive Data Corporation.*
*[3] Pricing per Advantage Data Inc.*

**Appendix VI.B.4.a(4),** Page 54 of 61

**Residential Capital, LLC – Quarterly Solvency Analysis**
**Market Approach: Fair Market Value of Debt**
March 31, 2011 Summary
*($ in Millions, except bond prices)*

| | Face Value [1] | | Decimal Price | | Market Value |
|---|---|---|---|---|---|
| Secured borrowings: | | | | | |
| Borrowings from parent – short-term | $ 547.0 | | 100.0 | [2] | $ 547.0 |
| Borrowings from parent – long-term | 792.6 | | 100.0 | [2] | 792.6 |
| Collateralized borrowings in securitization trusts | N/A | | N/A | [3] | N/A |
| Other short-term borrowings | 787.4 | | 100.9 | [4] | 794.3 |
| Other long-term borrowings | 3,331.1 | | 100.9 | [5] | 3,360.2 |
| Subtotal secured borrowings | 5,458.1 | | | | 5,494.1 |
| | | | | | |
| Unsecured borrowings: | | | | | |
| Other short-term borrowings | 13.4 | | 100.8 | [6] | 13.5 |
| Other long-term borrowings | 1,147.1 | | 100.8 | [7] | 1,156.3 |
| Subtotal unsecured borrowings | 1,160.5 | | | | 1,169.8 |
| | | | | | |
| Total borrowings | $ 6,618.6 | | | | $ 6,663.9 |

[1] *Face value per Residential Capital, LLC, Condensed Consolidated Financial Statements for the Periods Ended March 31, 2011 and 2010 (Unaudited), dated Mar. 31, 2011, at 21 [EXAM00122339].*

[2] *Fair value disclosure per Residential Capital, LLC, Consolidated Financial Statements for the Years Ended December 31, 2010 and 2009, dated Dec. 31, 2010, at 57 [EXAM00123128].*

[3] *Debt related to assets not controlled by ResCap.*

[4] *Assumed pricing equals the pricing of the secured other long-term borrowings.*

[5] *Pricing per Interactive Data Corporation.*

[6] *Assumed pricing equals the pricing of the unsecured other long-term borrowings.*

[7] *Weighted average pricing for unsecured notes per Interactive Data Corporation and Advantage Data Inc.*

Appendix VI.B.4.a(4), Page 54 of 61

Appendix VI.B.4.a(4), Page 55 of 61

**Residential Capital, LLC – Quarterly Solvency Analysis**
**Market Approach: Fair Market Value of Debt**
March 31, 2011 Pricing
*($ in Millions, except bond prices)*

## Residential Capital, LLC Bond Pricing

| | | | | | | [A] | | [B] | [C] = [A] × [B] |
|---|---|---|---|---|---|---|---|---|---|
| Maturity Date | Coupon | Debt Rank | | Amount Outstanding [1] | | Price | | Relative Percent of Debt Rank | Weighted Average Price |
| 05/15/15 | 9.625% | 3rd Lien | | $ 2,120 | | 100.9 | [2] | 100.0% | 100.9 |
| 05/17/12 | 5.125% | Sr Unsecured | | $ 136 | | 94.6 | [3] | 15.8% | 14.9 |
| 06/01/12 | 6.500% | Sr Unsecured | | 80 | | 102.0 | [2] | 9.3% | 9.5 |
| 04/17/13 | 6.500% | Sr Unsecured | | 473 | | 103.3 | [2] | 55.0% | 56.8 |
| 05/17/13 | 6.375% | Sr Unsecured | | 59 | | 93.4 | [3] | 6.9% | 6.4 |
| 07/01/14 | 7.875% | Sr Unsecured | | 103 | | N/A | | N/A | N/A |
| 06/30/15 | 6.875% | Sr Unsecured | | 112 | | 101.0 | [2] | 13.0% | 13.2 |
| | | | | $ 964 | | | | 100.0% | 100.8 |

[1] *The Examiner's Financial Advisors recognize that the amount outstanding may differ slightly from the face value due to the timing and availability of data. Source: Draft ResCap Executive Liquidity Report, dated Mar. 21, 2011 [ALLY_0193580].*
[2] *Pricing per Interactive Data Corporation.*
[3] *Pricing per Advantage Data Inc.*

Appendix VI.B.4.a(4), Page 55 of 61

Appendix VI.B.4.a(4), Page 56 of 61

**Residential Capital, LLC – Quarterly Solvency Analysis**
**Market Approach: Fair Market Value of Debt**
June 30, 2011 Summary
*($ in Millions, except bond prices)*

| | Face Value [1] | Decimal Price | | Market Value |
|---|---|---|---|---|
| **Secured borrowings:** | | | | |
| Borrowings from parent – short-term | $ 487.0 | 100.0 | [2] | $ 487.0 |
| Borrowings from parent – long-term | 774.2 | 100.0 | [2] | 774.2 |
| Collateralized borrowings in securitization trusts | N/A | N/A | [3] | N/A |
| Other short-term borrowings | 668.6 | 99.3 | [4] | 663.6 |
| Other long-term borrowings | 3,305.8 | 99.3 | [5] | 3,281.0 |
| Subtotal secured borrowings | 5,235.6 | | | 5,205.8 |
| | | | | |
| **Unsecured borrowings:** | | | | |
| Other short-term borrowings | 13.4 | 99.3 | [6] | 13.3 |
| Other long-term borrowings | 1,148.3 | 99.3 | [7] | 1,140.2 |
| Subtotal unsecured borrowings | 1,161.7 | | | 1,153.5 |
| | | | | |
| Total borrowings | $ 6,397.3 | | | $ 6,359.3 |

[1] Face value per Residential Capital, LLC, Condensed Consolidated Financial Statements for the Periods Ended June 30, 2011 and 2010 (Unaudited) dated June 30, 2011, at 22 [EXAM00122389].

[2] Fair value disclosure per Residential Capital, LLC, Consolidated Financial Statements for the Years Ended December 31, 2010 and 2009, dated Dec. 31, 2010, at 57 [EXAM00123128].

[3] Debt related to assets not controlled by ResCap.

[4] Assumed pricing equals the pricing of the secured other long-term borrowings.

[5] Pricing per Interactive Data Corporation.

[6] Assumed pricing equals the pricing of the unsecured other long-term borrowings.

[7] Weighted average pricing for unsecured notes per Interactive Data Corporation and Advantage Data Inc.

Appendix VI.B.4.a(4), Page 56 of 61

Appendix VI.B.4.a(4), Page 57 of 61

Residential Capital, LLC – Quarterly Solvency Analysis
Market Approach: Fair Market Value of Debt
June 30, 2011 Pricing
(*$ in Millions, except bond prices*)

## Residential Capital, LLC Bond Pricing

| Maturity Date | Coupon | Debt Rank | Amount Outstanding [1] | [A] Price | | [B] Relative Percent of Debt Rank | [C] = [A] × [B] Weighted Average Price |
|---|---|---|---|---|---|---|---|
| 05/15/15 | 9.625% | 3rd Lien | $ 2,120 | 99.3 | [2] | 100.0% | 99.3 |
| | | | | | | | |
| 05/17/12 | 5.125% | Sr Unsecured | $ 141 | 96.0 | [2] | 16.2% | 15.6 |
| 06/01/12 | 6.500% | Sr Unsecured | 80 | 99.9 | [2] | 9.2% | 9.2 |
| 04/17/13 | 6.500% | Sr Unsecured | 473 | 100.8 | [2] | 54.6% | 55.0 |
| 05/17/13 | 6.375% | Sr Unsecured | 61 | 95.6 | [3] | 7.0% | 6.7 |
| 07/01/14 | 7.875% | Sr Unsecured | 106 | N/A | | N/A | N/A |
| 06/30/15 | 6.875% | Sr Unsecured | 112 | 98.9 | [2] | 12.9% | 12.8 |
| | | | $ 973 | | | 100.0% | 99.3 |

[1] *The Examiner's Financial Advisors recognize that the amount outstanding may differ slightly from the face value due to the timing and availability of data. Source: ResCap Executive Liquidity Report, dated June 20, 2011 [ALLY_0193670].*
[2] *Pricing per Interactive Data Corporation.*
[3] *Pricing per Advantage Data Inc.*

Appendix VI.B.4.a(4), Page 57 of 61

Appendix VI.B.4.a(4), Page 58 of 61

**Residential Capital, LLC – Quarterly Solvency Analysis**
**Market Approach: Fair Market Value of Debt**
September 30, 2011 Summary
*($ in Millions, except bond prices)*

| | Face Value [1] | Decimal Price | | Market Value |
|---|---|---|---|---|
| Secured borrowings: | | | | |
| Borrowings from parent – short-term | $ 417.0 | 100.0 | [2] | $ 417.0 |
| Borrowings from parent – long-term | 766.1 | 100.0 | [2] | 766.1 |
| Collateralized borrowings in securitization trusts | N/A | N/A | [3] | N/A |
| Other short-term borrowings | 509.0 | 77.5 | [4] | 394.5 |
| Other long-term borrowings | 3,285.1 | 77.5 | [5] | 2,545.9 |
| Subtotal secured borrowings | 4,977.2 | | | 4,123.5 |
| | | | | |
| Unsecured borrowings: | | | | |
| Other long-term borrowings | 1,111.5 | 88.9 | [6] | 988.5 |
| Subtotal unsecured borrowings | 1,111.5 | | | 988.5 |
| | | | | |
| Total borrowings | $ 6,088.7 | | | $ 5,111.9 |

[1] *Face value per Residential Capital, LLC, Condensed Consolidated Financial Statements for the Periods Ended September 30, 2011 and 2010 (Unaudited) dated Sep. 30, 2011, at 24 [EXAM00122480].*

[2] *Fair value disclosure per Residential Capital, LLC, Consolidated Financial Statements for the Years Ended December 31, 2010 and 2009, dated Dec. 31, 2010, at 57 [EXAM00123128].*

[3] *Debt related to assets not controlled by ResCap.*

[4] *Assumed pricing equals the pricing of the secured other long-term borrowings.*

[5] *Pricing per Interactive Data Corporation.*

[6] *Weighted average pricing for unsecured notes per Interactive Data Corporation and Advantage Data Inc.*

Appendix VI.B.4.a(4), Page 58 of 61

**Residential Capital, LLC – Quarterly Solvency Analysis**
**Market Approach: Fair Market Value of Debt**
September 30, 2011 Pricing
*($ in Millions, except bond prices)*

**Residential Capital, LLC Bond Pricing**

| Maturity Date | Coupon | Debt Rank | Amount Outstanding [1] | [A] Price | [B] Relative Percent of Debt Rank | [C] = [A] × [B] Weighted Average Price |
|---|---|---|---|---|---|---|
| 05/15/15 | 9.625% | 3rd Lien | $ 2,120 | 77.5 | 100.0% | 77.5 |
| | | | | | | |
| 05/17/12 | 5.125% | Sr Unsecured | $ 142 | 85.0 [2] | 16.4% | 13.9 |
| 06/01/12 | 6.500% | Sr Unsecured | 80 | 98.3 [3] | 9.2% | 9.0 |
| 04/17/13 | 6.500% | Sr Unsecured | 473 | 89.6 [3] | 54.6% | 48.9 |
| 05/17/13 | 6.375% | Sr Unsecured | 60 | 94.0 [3] | 6.9% | 6.5 |
| 07/01/14 | 7.875% | Sr Unsecured | 105 | N/A | N/A | N/A |
| 06/30/15 | 6.875% | Sr Unsecured | 112 | 81.6 [3] | 12.9% | 10.6 |
| | | | $ 972 | | 100.0% | 88.9 |

[1] The Examiner's Financial Advisors recognize that the amount outstanding may differ slightly from the face value due to the timing and availability of data. Source: Draft Executive Liquidity Report, dated Sep. 12, 2011 [ALLY_0194061].
[2] Pricing per Interactive Data Corporation.
[3] Pricing per Advantage Data Inc.

**Residential Capital, LLC – Quarterly Solvency Analysis**
**Market Approach: Fair Market Value of Debt**
December 31, 2011 Summary
*($ in Millions, except bond prices)*

| | Face Value [1] | | Decimal Price | | Market Value |
|---|---|---|---|---|---|
| **Secured borrowings:** | | | | | |
| Borrowings from parent – short-term | $ 183.6 | | 100.0 | [2] | $ 183.6 |
| Borrowings from parent – long-term | 755.8 | | 100.0 | [2] | 755.8 |
| Borrowings from affiliates – short-term | 250.0 | | 100.0 | [2] | 250.0 |
| Collateralized borrowings in securitization trusts | N/A | | N/A | [3] | N/A |
| Other short-term borrowings | 323.0 | | 70.0 | [4] | 226.1 |
| Other long-term borrowings | 3,285.6 | | 70.0 | [5] | 2,299.9 |
| Subtotal secured borrowings | 4,798.0 | | | | 3,715.4 |
| | | | | | |
| **Unsecured borrowings:** | | | | | |
| Other long-term borrowings | 1,096.8 | | 60.0 | [6] | 658.4 |
| Subtotal unsecured borrowings | 1,096.8 | | | | 658.4 |
| | | | | | |
| Total borrowings | $ 5,894.8 | | | | $ 4,373.8 |

[1] *Face value per Residential Capital, LLC, Consolidated Financial Statements for the Years Ended December 31, 2011 and 2010, dated Dec. 31, 2011, at 37 [EXAM00122651].*

[2] *Fair value disclosure per Residential Capital, LLC, Consolidated Financial Statements for the Years Ended December 31, 2011 and 2010, dated Dec. 31, 2011, at 57 [EXAM00122651].*

[3] *Debt related to assets not controlled by ResCap.*

[4] *Assumed pricing equals the pricing of the secured other long-term borrowings.*

[5] *Pricing per Interactive Data Corporation.*

[6] *Weighted average pricing for unsecured notes per Interactive Data Corporation and Advantage Data Inc.*

**Residential Capital, LLC – Quarterly Solvency Analysis**
**Market Approach: Fair Market Value of Debt**
December 31, 2011 Pricing
*($ in Millions, except bond prices)*

**Residential Capital, LLC Bond Pricing**

| | | | | [A] | | [B] | [C] = [A] × [B] |
|---|---|---|---|---|---|---|---|
| Maturity Date | Coupon | Debt Rank | Amount Outstanding [1] | Price | | Relative Percent of Debt Rank | Weighted Average Price |
| 05/15/15 | 9.625% | 3rd Lien | $ 2,120 | 70.0 | [2] | 100.0% | 70.0 |
| | | | | | | | |
| 05/17/12 | 5.125% | Sr Unsecured | $ 131 | 50.0 | [2] | 15.4% | 7.7 |
| 06/01/12 | 6.500% | Sr Unsecured | 80 | 69.6 | [3] | 9.3% | 6.5 |
| 04/17/13 | 6.500% | Sr Unsecured | 473 | 60.3 | [3] | 55.4% | 33.4 |
| 05/17/13 | 6.375% | Sr Unsecured | 57 | 50.0 | [2] | 6.7% | 3.4 |
| 07/01/14 | 7.875% | Sr Unsecured | 100 | N/A | | N/A | N/A |
| 06/30/15 | 6.875% | Sr Unsecured | 112 | 69.1 | [3] | 13.1% | 9.1 |
| | | | $ 955 | | | 100.0% | 60.0 |

[1] *The Examiner's Financial Advisors recognize that the amount outstanding may differ slightly from the face value due to the timing and availability of data. Source: ResCap Executive Liquidity Report, dated Dec. 12, 2011 [ALLY_0194152].*

[2] *Pricing per Interactive Data Corporation.*

[3] *Pricing per Advantage Data Inc.*

Appendix VI.B.4.b, Page 1 of 46

Residential Capital, LLC – Quarterly Solvency Analysis
Asset-Based Approach: Adjusted Book Value Method
Summary of ResCap Fair Market Value Surplus/(Deficit)
2005 – 2011
*($ in Millions)*

| | Fair Market Value Surplus / (Deficit) | | |
| | High [1] | Low [1] | Concluded Value |
|---|---|---|---|
| 12/31/05 | $ 7,464.0 | $ 7,464.0 | $ 7,464.0 |
| 03/31/06 | 7,763.5 | 7,763.5 | 7,763.5 |
| 06/30/06 | 8,404.3 | 8,404.3 | 8,404.3 |
| 09/30/06 | 8,375.9 | 8,375.9 | 8,375.9 |
| 12/31/06 | 7,622.1 | 7,622.1 | 7,622.1 |
| 03/31/07 | 7,173.9 | 7,173.9 | 7,173.9 |
| 06/30/07 | 7,507.4 | 7,507.4 | 7,507.4 |
| 09/30/07 | 3,932.6 | (1,385.0) | 1,273.8 |
| 12/31/07 | 2,854.6 | (2,631.1) | 111.8 |
| 03/31/08 | 793.4 | (4,783.1) | (1,994.9) |
| 06/30/08 | (1,180.6) | (6,303.6) | (3,742.1) |
| 09/30/08 | (2,371.7) | (7,286.0) | (4,828.8) |
| 12/31/08 | (2,110.3) | (6,684.2) | (4,397.3) |
| 03/31/09 | (226.9) | (1,978.2) | (1,102.5) |
| 06/30/09 | (350.2) | (1,979.2) | (1,164.7) |
| 09/30/09 | (866.8) | (2,260.5) | (1,563.6) |
| 12/31/09 | (183.9) | (1,191.5) | (687.7) |
| 03/31/10 | (592.2) | (2,663.9) | (1,628.0) |
| 06/30/10 | (498.2) | (2,736.8) | (1,617.5) |
| 09/30/10 | (1,403.6) | (3,685.1) | (2,544.3) |
| 12/31/10 | (1,385.5) | (3,529.9) | (2,457.7) |
| 03/31/11 | (1,243.6) | (3,277.2) | (2,260.4) |
| 06/30/11 | (2,539.0) | (4,635.9) | (3,587.5) |
| 09/30/11 | (3,361.3) | (5,783.2) | (4,572.3) |
| 12/31/11 | (3,386.0) | (5,610.3) | (4,498.1) |

[1] *See Appendix VI.B.4.b, at 5 – 29.*

Appendix VI.B.4.b, Page 1 of 46

**Residential Capital, LLC – Quarterly Solvency Analysis**
**Asset-Based Approach: Adjusted Book Value Method**
**ResCap Asset Value Adjustments**
2005 – 2011
*($ in Millions)*

| | Total Asset Value Adjustment % [1] | |
| | High | Low |
|---|---|---|
| 12/31/05 | 0.0% | 0.0% |
| 03/31/06 | 0.0% | 0.0% |
| 06/30/06 | 0.0% | 0.0% |
| 09/30/06 | 0.0% | 0.0% |
| 12/31/06 | 0.0% | 0.0% |
| 03/31/07 | 0.0% | 0.0% |
| 06/30/07 | 0.0% | 0.0% |
| 09/30/07 | -5.5% | -12.3% |
| 12/31/07 | -6.1% | -13.6% |
| 03/31/08 | -8.0% | -15.7% |
| 06/30/08 | -9.7% | -17.5% |
| 09/30/08 | -10.2% | -18.3% |
| 12/31/08 | -10.8% | -19.0% |
| 03/31/09 | -13.0% | -21.2% |
| 06/30/09 | -12.1% | -20.6% |
| 09/30/09 | -11.6% | -19.8% |
| 12/31/09 | -3.9% | -10.1% |
| 03/31/10 | -3.8% | -10.1% |
| 06/30/10 | -5.1% | -11.9% |
| 09/30/10 | -5.0% | -11.7% |
| 12/31/10 | -4.4% | -11.0% |
| 03/31/11 | -4.0% | -10.4% |
| 06/30/11 | -4.4% | -11.0% |
| 09/30/11 | -5.6% | -12.8% |
| 12/31/11 | -5.2% | -12.1% |

[1] *See Appendix VI.B.4.b, at 5 – 29.*

**Residential Capital, LLC – Quarterly Solvency Analysis**
**Asset-Based Approach: Adjusted Book Value Method**
**ResCap Asset Value Summary – High**
2005 – 2011
*($ in Millions)*

| | Book Value of Total Assets net of Collateralized Borrowings [1] | (High) Net Market Adjustment [1] | Fair Market Value of Assets [1] | Total Liabilities [1] | Fair Market Value Surplus / (Deficit) |
|---|---|---|---|---|---|
| 12/31/05 | $ 62,787.3 | $ 0.0 | $ 62,787.3 | ($55,323.3) | $ 7,464.0 |
| 03/31/06 | 63,137.5 | 0.0 | 63,137.5 | (55,374.0) | 7,763.5 |
| 06/30/06 | 66,955.1 | 0.0 | 66,955.1 | (58,550.8) | 8,404.3 |
| 09/30/06 | 75,394.0 | 0.0 | 75,394.0 | (67,018.1) | 8,375.9 |
| 12/31/06 | 82,287.3 | 0.0 | 82,287.3 | (74,665.2) | 7,622.1 |
| 03/31/07 | 77,212.1 | 0.0 | 77,212.1 | (70,038.2) | 7,173.9 |
| 06/30/07 | 76,723.7 | 0.0 | 76,723.7 | (69,216.3) | 7,507.4 |
| 09/30/07 | 78,329.7 | (4,299.1) | 74,030.6 | (70,097.9) | 3,932.6 |
| 12/31/07 | 73,362.4 | (4,493.0) | 68,869.4 | (66,014.8) | 2,854.6 |
| 03/31/08 | 72,863.1 | (5,829.6) | 67,033.5 | (66,240.1) | 793.4 |
| 06/30/08 | 65,826.8 | (6,371.1) | 59,455.7 | (60,636.3) | (1,180.6) |
| 09/30/08 | 61,048.7 | (6,229.2) | 54,819.5 | (57,191.2) | (2,371.7) |
| 12/31/08 | 55,952.3 | (6,041.9) | 49,910.4 | (52,020.8) | (2,110.3) |
| 03/31/09 | 21,146.0 | (2,740.2) | 18,405.8 | (18,632.7) | (226.9) |
| 06/30/09 | 19,299.8 | (2,343.5) | 16,956.3 | (17,306.5) | (350.2) |
| 09/30/09 | 16,898.5 | (1,954.8) | 14,943.7 | (15,810.5) | (866.8) |
| 12/31/09 | 16,249.8 | (631.3) | 15,618.6 | (15,802.5) | (183.9) |
| 03/31/10 | 15,627.4 | (599.8) | 15,027.5 | (15,619.7) | (592.2) |
| 06/30/10 | 16,567.7 | (846.1) | 15,721.6 | (16,219.8) | (498.2) |
| 09/30/10 | 17,505.9 | (876.9) | 16,629.0 | (18,032.6) | (1,403.6) |
| 12/31/10 | 15,817.1 | (694.5) | 15,123.2 | (16,508.7) | (1,385.5) |
| 03/31/11 | 14,565.5 | (582.3) | 13,983.2 | (15,226.9) | (1,243.6) |
| 06/30/11 | 14,986.2 | (654.9) | 14,331.3 | (16,870.3) | (2,539.0) |
| 09/30/11 | 18,322.3 | (1,032.1) | 17,290.2 | (20,651.5) | (3,361.3) |
| 12/31/11 | 16,011.8 | (826.9) | 15,184.8 | (18,570.8) | (3,386.0) |

[1] See Appendix VI.B.4.b, at 5 – 29.

Appendix VI.B.4.b, Page 4 of 46

12-12020-mg Doc 3098-36 Filed 05/13/13 Entered 05/13/13 17:08:13 Appendix
Pg 270 of 385
Case 12-11068-JTD Doc 6139-13 Filed 02/03/23 Page 594 of 709

**Residential Capital, LLC – Quarterly Solvency Analysis**
**Asset-Based Approach: Adjusted Book Value Method**
**ResCap Asset Value Summary – Low**
2005 – 2011
*($ in Millions)*

| | Book Value of Total Assets net of Collateralized Borrowings [1] | (Low) Net Market Adjustment [1] | Fair Market Value of Assets [1] | Total Liabilities [1] | Fair Market Value Surplus / (Deficit) |
|---|---|---|---|---|---|
| 12/31/05 | $ 62,787.3 | $ 0.0 | $ 62,787.3 | ($55,323.3) | $ 7,464.0 |
| 03/31/06 | 63,137.5 | 0.0 | 63,137.5 | (55,374.0) | 7,763.5 |
| 06/30/06 | 66,955.1 | 0.0 | 66,955.1 | (58,550.8) | 8,404.3 |
| 09/30/06 | 75,394.0 | 0.0 | 75,394.0 | (67,018.1) | 8,375.9 |
| 12/31/06 | 82,287.3 | 0.0 | 82,287.3 | (74,665.2) | 7,622.1 |
| 03/31/07 | 77,212.1 | 0.0 | 77,212.1 | (70,038.2) | 7,173.9 |
| 06/30/07 | 76,723.7 | 0.0 | 76,723.7 | (69,216.3) | 7,507.4 |
| 09/30/07 | 78,329.7 | (9,616.7) | 68,713.0 | (70,097.9) | (1,385.0) |
| 12/31/07 | 73,362.4 | (9,978.7) | 63,383.7 | (66,014.8) | (2,631.1) |
| 03/31/08 | 72,863.1 | (11,406.1) | 61,457.0 | (66,240.1) | (4,783.1) |
| 06/30/08 | 65,826.8 | (11,494.1) | 54,332.7 | (60,636.3) | (6,303.6) |
| 09/30/08 | 61,048.7 | (11,143.5) | 49,905.2 | (57,191.2) | (7,286.0) |
| 12/31/08 | 55,952.3 | (10,615.8) | 45,336.5 | (52,020.8) | (6,684.2) |
| 03/31/09 | 21,146.0 | (4,491.5) | 16,654.5 | (18,632.7) | (1,978.2) |
| 06/30/09 | 19,299.8 | (3,972.4) | 15,327.4 | (17,306.5) | (1,979.2) |
| 09/30/09 | 16,898.5 | (3,348.5) | 13,550.0 | (15,810.5) | (2,260.5) |
| 12/31/09 | 16,249.8 | (1,638.9) | 14,610.9 | (15,802.5) | (1,191.5) |
| 03/31/10 | 15,627.4 | (1,571.6) | 14,055.8 | (16,719.7) | (2,663.9) |
| 06/30/10 | 16,567.7 | (1,974.7) | 14,592.9 | (17,329.8) | (2,736.8) |
| 09/30/10 | 17,505.9 | (2,048.4) | 15,457.5 | (19,142.6) | (3,685.1) |
| 12/31/10 | 15,817.7 | (1,738.9) | 14,078.8 | (17,608.7) | (3,529.9) |
| 03/31/11 | 14,565.5 | (1,515.9) | 13,049.6 | (16,326.9) | (3,277.2) |
| 06/30/11 | 14,986.2 | (1,641.8) | 13,344.4 | (17,980.3) | (4,635.9) |
| 09/30/11 | 18,322.3 | (2,344.1) | 15,978.2 | (21,761.5) | (5,783.2) |
| 12/31/11 | 16,011.8 | (1,941.3) | 14,070.5 | (19,680.8) | (5,610.3) |

[1] *See Appendix VI.B.4.b, at 5 – 29.*

12-12020-mg   Doc 3098-36   Filed 05/13/13   Entered 05/13/13 19:47:59   Appendix
Pg 271 of 385
Case 12-11068-JTD   Doc 6139   Filed 02/03/23   Page 595 of 709

Appendix VI.B.4.b, Page 5 of 46

**Residential Capital, LLC – Quarterly Solvency Analysis**
**Asset-Based Approach: Adjusted Book Value Method**
December 31, 2005
*($ in Millions)*

| Balance Sheet | Book Value of Assets [1] | Collateralized Borrowings in Securitization Trusts [1] | Assets Less Collateralized Borrowings | Asset Value Adjustment [2] High | Asset Value Adjustment [2] Low | Fair Market Value of Assets High | Fair Market Value of Assets Low |
|---|---|---|---|---|---|---|---|
| Cash and cash equivalents | $ 2,267 | $ 0 | $ 2,267 | 0% | 0% | $ 2,267 | $ 2,267 |
| Mortgage loans held for sale | 19,522 | 0 | 19,522 | 0% | 0% | 19,522 | 19,522 |
| Trading securities | 3,896 | 0 | 3,896 | 0% | 0% | 3,896 | 3,896 |
| Available for sale securities | 1,069 | 0 | 1,069 | 0% | 0% | 1,069 | 1,069 |
| Mortgage loans held for investment [3] | 67,893 | 56,098 | 11,795 | 0% | 0% | 11,795 | 11,795 |
| Lending receivables [3] | 13,401 | 0 | 13,401 | 0% | 0% | 13,401 | 13,401 |
| Mortgage servicing rights | 4,015 | 0 | 4,015 | 0% | 0% | 4,015 | 4,015 |
| Accounts receivable | 1,951 | 0 | 1,951 | 0% | 0% | 1,951 | 1,951 |
| Investments in real estate and other | 1,855 | 0 | 1,855 | 0% | 0% | 1,855 | 1,855 |
| Goodwill | 460 | 0 | 460 | 0% | 0% | 460 | 460 |
| Other assets | 2,557 | 0 | 2,557 | 0% | 0% | 2,557 | 2,557 |
| Total assets | $ 118,885 | $ 56,098 | $ 62,787 | 0% | 0% | $ 62,787 | $ 62,787 |
| | | | | | | | |
| Affiliate borrowings [1] | | | | | | (5,177) | (5,177) |
| Other borrowings [1] | | | | | | (42,301) | (42,301) |
| Deposits [1] | | | | | | (4,123) | (4,123) |
| Other liabilities [1] | | | | | | (3,722) | (3,722) |
| Minority interest [1] | | | | | | 0 | 0 |
| Contingent liability [4] | | | | | | 0 | 0 |
| Surplus / (deficit) | | | | | | $ 7,464 | $ 7,464 |

[1] Residential Capital Corporation, Annual Report (Form 10-K) (Mar. 28, 2006), at 94. As discussed in Section VI.B.4.b of the Report, the assets and liabilities of Ally Bank were not deconsolidated.

[2] Estimated market adjustments consider contemporaneous third-party analyses, industry benchmarks (ABX Index, interest rates, etc.) and ResCap fair value disclosures as discussed in Section VI.B.4.b of the Report. The estimated market adjustments reflect that Ally Bank's assets were generally of higher quality than ResCap's assets. If Ally Bank were deconsolidated, the asset value adjustments may differ significantly.

[3] Mortgage loans held for investment and lending receivables are net of allowances. No asset value adjustments were applied as of this date, thus the net amount was deemed to be an appropriate estimation of Fair Market Value.

[4] Refer to Section VI.B.5 of the Report for a discussion of contingent liabilities.

Appendix VI.B.4.b, Page 6 of 46

**Residential Capital, LLC – Quarterly Solvency Analysis**
**Asset-Based Approach: Adjusted Book Value Method**
March 31, 2006
*($ in Millions)*

| Balance Sheet | Book Value of Assets [1] | Collateralized Borrowings in Securitization Trusts [1] | Assets Less Collateralized Borrowings | Asset Value Adjustment [2] High | Low | Fair Market Value of Assets High | Low |
|---|---|---|---|---|---|---|---|
| Cash and cash equivalents | $ 2,234 | $ 0 | $ 2,234 | 0% | 0% | $ 2,234 | $ 2,234 |
| Mortgage loans held for sale | 18,125 | 0 | 18,125 | 0% | 0% | 18,125 | 18,125 |
| Trading securities | 4,262 | 0 | 4,262 | 0% | 0% | 4,262 | 4,262 |
| Available for sale securities | 143 | 0 | 143 | 0% | 0% | 143 | 143 |
| Mortgage loans held for investment [3] | 72,673 | 58,801 | 13,872 | 0% | 0% | 13,872 | 13,872 |
| Lending receivables [3] | 12,410 | 0 | 12,410 | 0% | 0% | 12,410 | 12,410 |
| Mortgage servicing rights | 4,526 | 0 | 4,526 | 0% | 0% | 4,526 | 4,526 |
| Accounts receivable | 1,929 | 0 | 1,929 | 0% | 0% | 1,929 | 1,929 |
| Investments in real estate and other | 2,155 | 0 | 2,155 | 0% | 0% | 2,155 | 2,155 |
| Goodwill | 459 | 0 | 459 | 0% | 0% | 459 | 459 |
| Other assets | 3,023 | 0 | 3,023 | 0% | 0% | 3,023 | 3,023 |
| Total assets | $ 121,938 | $ 58,801 | $ 63,137 | 0% | 0% | $ 63,137 | $ 63,137 |
| Affiliate borrowings [1] | | | | | | (4,715) | (4,715) |
| Other borrowings [1] | | | | | | (41,270) | (41,270) |
| Deposits [1] | | | | | | (5,596) | (5,596) |
| Other liabilities [1] | | | | | | (3,793) | (3,793) |
| Minority interest [1] | | | | | | 0 | 0 |
| Contingent liability [4] | | | | | | 0 | 0 |
| Surplus / (deficit) | | | | | | $ 7,763 | $ 7,763 |

[1] Residential Capital, LLC, Quarterly Report (Form 10-Q) (May 5, 2006), at 3. As discussed in Section VI.B.4.b of the Report, the assets and liabilities of Ally Bank were not deconsolidated.

[2] Estimated market adjustments consider contemporaneous third-party analyses, industry benchmarks (ABX Index, interest rates, etc.) and ResCap fair value disclosures as discussed in Section VI.B.4.b of the Report. The estimated market adjustments reflect that Ally Bank's assets were generally of higher quality than ResCap's assets. If Ally Bank were deconsolidated, the asset value adjustments may differ significantly.

[3] Mortgage loans held for investment and lending receivables are net of allowances. No asset value adjustments were applied as of this date, thus the net amount was deemed to be an appropriate estimation of Fair Market Value.

[4] Refer to Section VI.B.5 of the Report for a discussion of contingent liabilities.

Appendix VI.B.4.b, Page 6 of 46

Appendix VI.B.4.b, Page 7 of 46

**Residential Capital, LLC – Quarterly Solvency Analysis**
**Asset-Based Approach: Adjusted Book Value Method**
June 30, 2006
(*$ in Millions*)

| Balance Sheet | Book Value of Assets [1] | Collateralized Borrowings in Securitization Trusts [1] | Assets Less Collateralized Borrowings | Asset Value Adjustment [2] High | Asset Value Adjustment [2] Low | Fair Market Value of Assets High | Fair Market Value of Assets Low |
|---|---|---|---|---|---|---|---|
| Cash and cash equivalents | $ 1,886 | $ 0 | $ 1,886 | 0% | 0% | $ 1,886 | $ 1,886 |
| Mortgage loans held for sale | 20,439 | 0 | 20,439 | 0% | 0% | 20,439 | 20,439 |
| Trading securities | 4,246 | 0 | 4,246 | 0% | 0% | 4,246 | 4,246 |
| Available for sale securities | 163 | 0 | 163 | 0% | 0% | 163 | 163 |
| Mortgage loans held for investment [3] | 71,392 | 57,597 | 13,794 | 0% | 0% | 13,794 | 13,794 |
| Lending receivables [3] | 14,069 | 0 | 14,069 | 0% | 0% | 14,069 | 14,069 |
| Mortgage servicing rights | 5,094 | 0 | 5,094 | 0% | 0% | 5,094 | 5,094 |
| Accounts receivable | 2,045 | 0 | 2,045 | 0% | 0% | 2,045 | 2,045 |
| Investments in real estate and other | 2,128 | 0 | 2,128 | 0% | 0% | 2,128 | 2,128 |
| Goodwill | 464 | 0 | 464 | 0% | 0% | 464 | 464 |
| Other assets | 2,628 | 0 | 2,628 | 0% | 0% | 2,628 | 2,628 |
| Total assets | $ 124,552 | $ 57,597 | $ 66,955 | 0% | 0% | $ 66,955 | $ 66,955 |
| Borrowings [1] | | | | | | (48,120) | (48,120) |
| Deposits [1] | | | | | | (6,309) | (6,309) |
| Other liabilities [1] | | | | | | (4,122) | (4,122) |
| Minority interest [1] | | | | | | 0 | 0 |
| Contingent liability [4] | | | | | | 0 | 0 |
| Surplus / (deficit) | | | | | | $ 8,404 | $ 8,404 |

[1] Residential Capital, LLC, Quarterly Report (Form 10-Q) (Aug. 8, 2006), at 3. As discussed in Section VI.B.4.b of the Report, the assets and liabilities of Ally Bank were not deconsolidated.

[2] Estimated market adjustments consider contemporaneous third-party analyses, industry benchmarks (ABX Index, interest rates, etc.) and ResCap fair value disclosures as discussed in Section VI.B.4.b of the Report. The estimated market adjustments reflect that Ally Bank's assets were generally of higher quality than ResCap's assets. If Ally Bank were deconsolidated, the asset value adjustments may differ significantly.

[3] Mortgage loans held for investment and lending receivables are net of allowances. No asset value adjustments were applied as of this date, thus the net amount was deemed to be an appropriate estimation of Fair Market Value.

[4] Refer to Section VI.B.5 of the Report for a discussion of contingent liabilities.

Appendix VI.B.4.b, Page 7 of 46

**Residential Capital, LLC – Quarterly Solvency Analysis**
**Asset-Based Approach: Adjusted Book Value Method**
September 30, 2006
($ in Millions)

| Balance Sheet | Book Value of Assets [1] | Collateralized Borrowings in Securitization Trusts [1] | Assets Less Collateralized Borrowings | Asset Value Adjustment [2] High | Asset Value Adjustment [2] Low | Fair Market Value of Assets High | Fair Market Value of Assets Low |
|---|---|---|---|---|---|---|---|
| Cash and cash equivalents | $ 1,978 | $ 0 | $ 1,978 | 0% | 0% | $ 1,978 | $ 1,978 |
| Mortgage loans held for sale | 24,787 | 0 | 24,787 | 0% | 0% | 24,787 | 24,787 |
| Trading securities | 5,034 | 0 | 5,034 | 0% | 0% | 5,034 | 5,034 |
| Available for sale securities | 169 | 0 | 169 | 0% | 0% | 169 | 169 |
| Mortgage loans held for investment [3] | 73,070 | 57,184 | 15,886 | 0% | 0% | 15,886 | 15,886 |
| Lending receivables [3] | 14,189 | 0 | 14,189 | 0% | 0% | 14,189 | 14,189 |
| Mortgage servicing rights | 4,828 | 0 | 4,828 | 0% | 0% | 4,828 | 4,828 |
| Accounts receivable | 2,317 | 0 | 2,317 | 0% | 0% | 2,317 | 2,317 |
| Investments in real estate and other | 2,594 | 0 | 2,594 | 0% | 0% | 2,594 | 2,594 |
| Goodwill | 466 | 0 | 466 | 0% | 0% | 466 | 466 |
| Other assets | 3,146 | 0 | 3,146 | 0% | 0% | 3,146 | 3,146 |
| Total assets | $ 132,578 | $ 57,184 | $ 75,394 | 0% | 0% | $ 75,394 | $ 75,394 |
| Borrowings [1] | | | | | | (55,474) | (55,474) |
| Deposits [1] | | | | | | (6,258) | (6,258) |
| Other liabilities [1] | | | | | | (5,286) | (5,286) |
| Minority interest [1] | | | | | | 0 | 0 |
| Contingent liability [4] | | | | | | 0 | 0 |
| Surplus / (deficit) | | | | | | $ 8,376 | $ 8,376 |

[1] Residential Capital, LLC, Quarterly Report (Form 10-Q) (Nov. 7, 2006), at 5. As discussed in Section VI.B.4.b of the Report, the assets and liabilities of Ally Bank were not deconsolidated.

[2] Estimated market adjustments consider contemporaneous third-party analysis, industry benchmarks (ABX Index, interest rates, etc.) and ResCap fair value disclosures as discussed in Section VI.B.4.b of the Report. The estimated market adjustments reflect that Ally Bank's assets were generally of higher quality than ResCap's assets. If Ally Bank were deconsolidated, the asset value adjustments may differ significantly.

[3] Mortgage loans held for investment and lending receivables are net of allowances. No asset value adjustments were applied as of this date, thus the net amount was deemed to be an appropriate estimation of Fair Market Value.

[4] Refer to Section VI.B.5 of the Report for a discussion of contingent liabilities.

**Residential Capital, LLC – Quarterly Solvency Analysis**
**Asset-Based Approach: Adjusted Book Value Method**
December 31, 2006
*($ in Millions)*

| Balance Sheet | Book Value of Assets [1] | Collateralized Borrowings in Securitization Trusts [1] | Assets Less Collateralized Borrowings | Asset Value Adjustment [2] High | Asset Value Adjustment [2] Low | Fair Market Value of Assets High | Fair Market Value of Assets Low |
|---|---|---|---|---|---|---|---|
| Cash and cash equivalents | $ 2,019 | $ 0 | $ 2,019 | 0% | 0% | $ 2,019 | $ 2,019 |
| Mortgage loans held for sale | 27,007 | 0 | 27,007 | 0% | 0% | 27,007 | 27,007 |
| Trading securities | 4,562 | 0 | 4,562 | 0% | 0% | 4,562 | 4,562 |
| Available for sale securities | 229 | 0 | 229 | 0% | 0% | 229 | 229 |
| Mortgage loans held for investment [3] | 67,928 | 53,300 | 14,628 | 0% | 0% | 14,628 | 14,628 |
| Lending receivables [3] | 14,530 | 0 | 14,530 | 0% | 0% | 14,530 | 14,530 |
| Mortgage servicing rights | 4,930 | 0 | 4,930 | 0% | 0% | 4,930 | 4,930 |
| Accounts receivable | 2,561 | 0 | 2,561 | 0% | 0% | 2,561 | 2,561 |
| Investments in real estate and other | 2,622 | 0 | 2,622 | 0% | 0% | 2,622 | 2,622 |
| Goodwill | 471 | 0 | 471 | 0% | 0% | 471 | 471 |
| Other assets | 8,726 | 0 | 8,726 | 0% | 0% | 8,726 | 8,726 |
| Total assets | $ 135,587 | $ 53,300 | $ 82,287 | 0% | 0% | $ 82,287 | $ 82,287 |
| Borrowings [1] | | | | | | (59,880) | (59,880) |
| Deposits [1] | | | | | | (9,851) | (9,851) |
| Other liabilities [1] | | | | | | (4,374) | (4,374) |
| Minority interest [1] | | | | | | (560) | (560) |
| Contingent liability [4] | | | | | | 0 | 0 |
| Surplus / (deficit) | | | | | | $ 7,622 | $ 7,622 |

[1] Residential Capital, LLC, Annual Report (Form 10-K) (Mar. 13, 2007), at 100. As discussed in Section VI.B.4.b of the Report, the assets and liabilities of Ally Bank were not deconsolidated.

[2] Estimated market adjustments consider contemporaneous third-party analyses, industry benchmarks (ABX Index, interest rates, etc.) and ResCap fair value disclosures as discussed in Section VI.B.4.b of the Report. The estimated market adjustments reflect that Ally Bank's assets were generally of higher quality than ResCap's assets. If Ally Bank were deconsolidated, the asset value adjustments may differ significantly.

[3] Mortgage loans held for investment and lending receivables are net of allowances. No asset value adjustments were applied as of this date; thus the net amount was deemed to be an appropriate estimation of Fair Market Value.

[4] Refer to Section VI.B.5 of the Report for a discussion of contingent liabilities.

**Residential Capital, LLC – Quarterly Solvency Analysis**
**Asset-Based Approach: Adjusted Book Value Method**
March 31, 2007
*($ in Millions)*

| Balance Sheet | Book Value of Assets [1] | Collateralized Borrowings in Securitization Trusts [1] | Assets Less Collateralized Borrowings | Asset Value Adjustment [2] High | Asset Value Adjustment [2] Low | Fair Market Value of Assets High | Fair Market Value of Assets Low |
|---|---|---|---|---|---|---|---|
| Cash and cash equivalents | $ 2,602 | $ 0 | $ 2,602 | 0% | 0% | $ 2,602 | $ 2,602 |
| Mortgage loans held for sale | 22,014 | 0 | 22,014 | 0% | 0% | 22,014 | 22,014 |
| Trading securities | 5,660 | 0 | 5,660 | 0% | 0% | 5,660 | 5,660 |
| Mortgage loans held for investment [3] | 63,590 | 48,790 | 14,800 | 0% | 0% | 14,800 | 14,800 |
| Lending receivables [3] | 12,423 | 0 | 12,423 | 0% | 0% | 12,423 | 12,423 |
| Mortgage servicing rights | 5,108 | 0 | 5,108 | 0% | 0% | 5,108 | 5,108 |
| Accounts receivable | 2,747 | 0 | 2,747 | 0% | 0% | 2,747 | 2,747 |
| Investments in real estate and other | 2,509 | 0 | 2,509 | 0% | 0% | 2,509 | 2,509 |
| Goodwill | 472 | 0 | 472 | 0% | 0% | 472 | 472 |
| Other assets | 8,877 | 0 | 8,877 | 0% | 0% | 8,877 | 8,877 |
| Total assets | $ 126,003 | $ 48,790 | $ 77,212 | 0% | 0% | $ 77,212 | $ 77,212 |

| | High | Low |
|---|---|---|
| Borrowings [1] | (55,323) | (55,323) |
| Deposits [1] | (9,366) | (9,366) |
| Other liabilities [1] | (4,713) | (4,713) |
| Minority interest [1] | (637) | (637) |
| Contingent liability [4] | 0 | 0 |
| Surplus / (deficit) | $ 7,174 | $ 7,174 |

[1] *Residential Capital, LLC, Quarterly Report (Form 10-Q) (May 8, 2007), at 3. As discussed in Section VI.B.4.b of the Report, the assets and liabilities of Ally Bank were not deconsolidated.*

[2] *Estimated market adjustments consider contemporaneous third-party analyses, industry benchmarks (ABX Index, interest rates, etc.) and ResCap fair value disclosures as discussed in Section VI.B.4.b of the Report. The estimated market adjustments reflect that Ally Bank's assets were generally of higher quality than ResCap's assets. If Ally Bank were deconsolidated, the asset value adjustments may differ significantly.*

[3] *Mortgage loans held for investment and lending receivables are net of allowances. No asset value adjustments were applied as of this date, thus the net amount was deemed to be an appropriate estimation of Fair Market Value.*

[4] *Refer to Section VI.B.5 of the Report for a discussion of contingent liabilities.*

**Appendix VI.B.4.b, Page 11 of 46**

**Residential Capital, LLC – Quarterly Solvency Analysis**
**Asset-Based Approach: Adjusted Book Value Method**
June 30, 2007
*($ in Millions)*

| Balance Sheet | Book Value of Assets [1] | Collateralized Borrowings in Securitization Trusts [1] | Assets Less Collateralized Borrowings | Asset Value Adjustment [2] High | Asset Value Adjustment [2] Low | Fair Market Value of Assets High | Fair Market Value of Assets Low |
|---|---|---|---|---|---|---|---|
| Cash and cash equivalents | $ 3,715 | $ 0 | $ 3,715 | 0% | 0% | $ 3,715 | $ 3,715 |
| Mortgage loans held for sale | 19,334 | 0 | 19,334 | 0% | 0% | 19,334 | 19,334 |
| Trading securities | 5,511 | 0 | 5,511 | 0% | 0% | 5,511 | 5,511 |
| Mortgage loans held for investment [3] | 60,969 | 45,122 | 15,847 | 0% | 0% | 15,847 | 15,847 |
| Lending receivables [3] | 10,810 | 0 | 10,810 | 0% | 0% | 10,810 | 10,810 |
| Mortgage servicing rights | 6,041 | 0 | 6,041 | 0% | 0% | 6,041 | 6,041 |
| Accounts receivable | 2,524 | 0 | 2,524 | 0% | 0% | 2,524 | 2,524 |
| Investments in real estate and other | 2,370 | 0 | 2,370 | 0% | 0% | 2,370 | 2,370 |
| Goodwill | 474 | 0 | 474 | 0% | 0% | 474 | 474 |
| Other assets | 10,099 | 0 | 10,099 | 0% | 0% | 10,099 | 10,099 |
| Total assets | $ 121,846 | $ 45,122 | $ 76,724 | 0% | 0% | $ 76,724 | $ 76,724 |
| Borrowings [1] | | | | | | (52,987) | (52,987) |
| Deposits [1] | | | | | | (10,653) | (10,653) |
| Other liabilities [1] | | | | | | (4,806) | (4,806) |
| Minority interest [1] | | | | | | (770) | (770) |
| Contingent liability [4] | | | | | | 0 | 0 |
| Surplus / (deficit) | | | | | | $ 7,507 | $ 7,507 |

[1] Residential Capital, LLC, Quarterly Report (Form 10-Q) (Aug. 7, 2007), at 3. As discussed in Section VI.B.4.b of the Report, the assets and liabilities of Ally Bank were not deconsolidated.

[2] Estimated market adjustments consider contemporaneous third-party analyses, industry benchmarks (ABX Index, interest rates, etc.) and ResCap fair value disclosures as discussed in Section VI.B.4.b of the Report. The estimated market adjustments reflect that Ally Bank's assets were generally of higher quality than ResCap's assets. If Ally Bank were deconsolidated, the asset value adjustments may differ significantly.

[3] Mortgage loans held for investment and lending receivables are net of allowances. No asset value adjustments were applied as of this date, thus the net amount was deemed to be an appropriate estimation of Fair Market Value.

[4] Refer to Section VI.B.3 of the Report for a discussion of contingent liabilities.

**Appendix VI.B.4.b, Page 12 of 46**

**Residential Capital, LLC – Quarterly Solvency Analysis**
**Asset-Based Approach: Adjusted Book Value Method**
September 30, 2007
*($ in Millions)*

| Balance Sheet | Book Value of Assets [1] | Collateralized Borrowings in Securitization Trusts [1] | Assets Less Collateralized Borrowings | Asset Value Adjustment [2] High | Asset Value Adjustment [2] Low | Fair Market Value of Assets High | Fair Market Value of Assets Low |
|---|---|---|---|---|---|---|---|
| Cash and cash equivalents | $ 6,519 | $ 0 | $ 6,519 | 0% | 0% | $ 6,519 | $ 6,519 |
| Mortgage loans held for sale | 14,980 | 0 | 14,980 | 0% | 0% | 14,980 | 14,980 |
| Trading securities | 3,655 | 0 | 3,655 | 0% | 0% | 3,655 | 3,655 |
| Mortgage loans held for investment [3] | 60,772 | 38,224 | 22,548 | -10% | -20% | 20,293 | 18,038 |
| Lending receivables [3] | 8,762 | 0 | 8,762 | -5% | -15% | 8,324 | 7,448 |
| Mortgage servicing rights | 5,547 | 0 | 5,547 | 0% | -10% | 5,547 | 4,992 |
| Accounts receivable | 2,583 | 0 | 2,583 | -5% | -15% | 2,453 | 2,195 |
| Investments in real estate and other | 2,069 | 0 | 2,069 | -15% | -25% | 1,759 | 1,552 |
| Goodwill | 0 | 0 | 0 | 0% | 0% | 0 | 0 |
| Other assets | 11,667 | 0 | 11,667 | -10% | -20% | 10,500 | 9,333 |
| Total assets | $ 116,554 | $ 38,224 | $ 78,330 | -5% | -12% | $ 74,031 | $ 68,713 |
| Borrowings [1] | | | | | | (49,657) | (49,657) |
| Deposits [1] | | | | | | (14,488) | (14,488) |
| Other liabilities [1] | | | | | | (4,794) | (4,794) |
| Minority interest [1] | | | | | | (1,159) | (1,159) |
| Contingent liability [4] | | | | | | 0 | 0 |
| Surplus / (deficit) | | | | | | $ 3,933 | ($1,385) |

[1] *Residential Capital, LLC, Quarterly Report (Form 10-Q) (Nov. 8, 2007), at 3, 11–12. As discussed in Section VI.B.4.b of the Report, the assets and liabilities of Ally Bank were not deconsolidated.*

[2] *Estimated market adjustments consider contemporaneous third-party analyses, industry benchmarks (ABX Index, interest rates, etc.) and ResCap fair value disclosures as discussed in Section VI.B.4.b of the Report. The estimated market adjustments reflect that Ally Bank's assets were generally of higher quality than ResCap's assets. If Ally Bank were deconsolidated, the asset value adjustments may differ significantly.*

[3] *Mortgage loans held for investment and lending receivables are gross of allowance. The use of the gross amounts is consistent with asset analyses performed by third parties.*

[4] *Refer to Section VI.B.5 of the Report for a discussion of contingent liabilities.*

**Residential Capital, LLC – Quarterly Solvency Analysis**
**Asset-Based Approach: Adjusted Book Value Method**
December 31, 2007
*($ in Millions)*

| Balance Sheet | Book Value of Assets [1] | Collateralized Borrowings in Securitization Trusts [1] | Assets Less Collateralized Borrowings | Asset Value Adjustment [2] High | Asset Value Adjustment [2] Low | Fair Market Value of Assets High | Fair Market Value of Assets Low |
|---|---|---|---|---|---|---|---|
| Cash and cash equivalents | $ 4,416 | $ 0 | $ 4,416 | 0% | 0% | $ 4,416 | $ 4,416 |
| Mortgage loans held for sale | 11,998 | 0 | 11,998 | 0% | 0% | 11,998 | 11,998 |
| Trading securities | 2,091 | 0 | 2,091 | 0% | 0% | 2,091 | 2,091 |
| Mortgage loans held for investment[3] | 42,163 | 16,146 | 26,017 | -10% | -20% | 23,415 | 20,813 |
| Lending receivables[3] | 8,892 | 0 | 8,892 | -5% | -15% | 8,447 | 7,558 |
| Mortgage servicing rights | 4,703 | 0 | 4,703 | 0% | -10% | 4,703 | 4,233 |
| Accounts receivable | 3,188 | 0 | 3,188 | -5% | -15% | 3,029 | 2,710 |
| Investments in real estate and other | 1,630 | 0 | 1,630 | -15% | -25% | 1,385 | 1,222 |
| Goodwill | 0 | 0 | 0 | 0% | 0% | 0 | 0 |
| Other assets | 10,429 | 0 | 10,429 | -10% | -20% | 9,386 | 8,343 |
| Total assets | $ 89,508 | $ 16,146 | $ 73,362 | -6% | -14% | $ 68,869 | $ 63,384 |
| Borrowings [1] | | | | | | (46,184) | (46,184) |
| Deposits [1] | | | | | | (13,350) | (13,350) |
| Other liabilities [1] | | | | | | (5,141) | (5,141) |
| Minority interest [1] | | | | | | (1,340) | (1,340) |
| Contingent liability [4] | | | | | | 0 | 0 |
| Surplus / (deficit) | | | | | | $ 2,855 | ($2,631) |

[1] Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2008), at 100, 119, 121. As discussed in Section VI.B.4.b of the Report, the assets and liabilities of Ally Bank were not deconsolidated.

[2] Estimated market adjustments consider contemporaneous third-party analyses, industry benchmarks (ABX Index, interest rates, etc.) and ResCap fair value disclosures as discussed in Section VI.B.4.b of the Report. The estimated market adjustments reflect that Ally Bank's assets were generally of higher quality than ResCap's assets. If Ally Bank were deconsolidated, the asset value adjustments may differ significantly.

[3] Mortgage loans held for investment and lending receivables are gross of allowances. The use of the gross amounts is consistent with asset analyses performed by third parties.

[4] Refer to Section VI.B.5 of the Report for a discussion of contingent liabilities.

Appendix VI.B.4.b, Page 14 of 46

**Residential Capital, LLC – Quarterly Solvency Analysis**
**Asset-Based Approach: Adjusted Book Value Method**
March 31, 2008
*($ in Millions)*

| Balance Sheet | Book Value of Assets [1] | Collateralized Borrowings in Securitization Trusts [1] | Assets Less Collateralized Borrowings | Asset Value Adjustment [2] High | Low | Fair Market Value of Assets High | Low |
|---|---|---|---|---|---|---|---|
| Cash and cash equivalents | $ 4,155 | $ 0 | $ 4,155 | 0% | 0% | $ 4,155 | $ 4,155 |
| Mortgage loans held for sale | 11,798 | 0 | 11,798 | 0% | 0% | 11,798 | 11,798 |
| Trading securities | 1,145 | 0 | 1,145 | 0% | 0% | 1,145 | 1,145 |
| Mortgage loans held for investment [3] | 34,486 | 9,369 | 25,117 | -15% | -25% | 21,350 | 18,838 |
| Lending receivables [3] | 9,214 | 0 | 9,214 | -5% | -15% | 8,754 | 7,832 |
| Mortgage servicing rights | 4,278 | 0 | 4,278 | 0% | -10% | 4,278 | 3,850 |
| Accounts receivable | 3,512 | 0 | 3,512 | -5% | -15% | 3,336 | 2,985 |
| Investments in real estate and other | 1,227 | 0 | 1,227 | -15% | -25% | 1,043 | 920 |
| Goodwill | 0 | 0 | 0 | 0% | 0% | 0 | 0 |
| Other assets | 12,417 | 0 | 12,417 | -10% | -20% | 11,176 | 9,934 |
| Total assets | $ 82,232 | $ 9,369 | $ 72,863 | -8% | -16% | $ 67,034 | $ 61,457 |

| | High | Low |
|---|---|---|
| Borrowings from parent [1] | (655) | (655) |
| Other borrowings [1] | (41,729) | (41,729) |
| Deposits [1] | (15,950) | (15,950) |
| Other liabilities [1] | (6,493) | (6,493) |
| Minority interest [1] | (1,414) | (1,414) |
| Contingent liability [4] | 0 | 0 |
| Surplus / (deficit) | $ 793 | ($4,783) |

[1] Residential Capital, LLC, Quarterly Report (Form 10-Q) (May 7, 2008), at 3, 12 - 13. As discussed in Section VI.B.4.b of the Report, the assets and liabilities of Ally Bank were not deconsolidated.

[2] Estimated market adjustments consider contemporaneous third-party analyses, industry benchmarks (ABX Index, interest rates, etc.) and ResCap fair value disclosures as discussed in Section VI.B.4.b of the Report. The estimated market adjustments reflect that Ally Bank's assets were generally of higher quality than ResCap's assets. If Ally Bank were deconsolidated, the asset value adjustments may differ significantly.

[3] Mortgage loans held for investment and lending receivables are gross of allowances. The use of the gross amounts is consistent with asset analyses performed by third parties.

[4] Refer to Section VI.B.5 of the Report for a discussion of contingent liabilities.

**Residential Capital, LLC – Quarterly Solvency Analysis**
**Asset-Based Approach: Adjusted Book Value Method**
June 30, 2008
*($ in Millions)*

| Balance Sheet | Book Value of Assets [1] | Collateralized Borrowings in Securitization Trusts [1] | Assets Less Collateralized Borrowings | Asset Value Adjustment [2] | | Fair Market Value of Assets | |
|---|---|---|---|---|---|---|---|
| | | | | High | Low | High | Low |
| Cash and cash equivalents | $ 6,578 | $ 0 | $ 6,578 | 0% | 0% | $ 6,578 | $ 6,578 |
| Mortgage loans held for sale | 7,036 | 0 | 7,036 | 0% | 0% | 7,036 | 7,036 |
| Trading securities | 983 | 0 | 983 | 0% | 0% | 983 | 983 |
| Mortgage loans held for investment [3] | 30,962 | 7,900 | 23,062 | -20% | -30% | 18,450 | 16,144 |
| Lending receivables [3] | 8,555 | 0 | 8,555 | -5% | -15% | 8,127 | 7,271 |
| Mortgage servicing rights | 5,417 | 0 | 5,417 | 0% | -10% | 5,417 | 4,876 |
| Accounts receivable | 2,765 | 0 | 2,765 | -5% | -15% | 2,627 | 2,351 |
| Investments in real estate and other | 991 | 0 | 991 | -15% | -25% | 842 | 743 |
| Goodwill | 0 | 0 | 0 | 0% | 0% | 0 | 0 |
| Other assets | 10,440 | 0 | 10,440 | -10% | -20% | 9,396 | 8,352 |
| Total assets | $ 73,727 | $ 7,900 | $ 65,827 | -10% | -17% | $ 59,456 | $ 54,333 |

| | High | Low |
|---|---|---|
| Borrowings from parent [1] | (4,700) | (4,700) |
| Affiliate borrowings [1] | (972) | (972) |
| Other borrowings [1] | (31,149) | (31,149) |
| Deposits [1] | (17,537) | (17,537) |
| Other liabilities [1] | (4,803) | (4,803) |
| Minority interest [1] | (1,475) | (1,475) |
| Contingent liability [4] | 0 | 0 |
| Surplus / (deficit) | ($1,181) | ($6,304) |

*[1] Residential Capital, LLC, Quarterly Report (Form 10-Q) (Aug. 8, 2008), at 3, 13–14. As discussed in Section VI.B.4.b of the Report, the assets and liabilities of Ally Bank were not deconsolidated.*

*[2] Estimated market adjustments consider contemporaneous third-party analyses, industry benchmarks (ABX Index, interest rates, etc.) and ResCap fair value disclosures as discussed in Section VI.B.4.b of the Report. The estimated market adjustments reflect that Ally Bank's assets were generally of higher quality than ResCap's assets. If Ally Bank were deconsolidated, the asset value adjustments may differ significantly.*

*[3] Mortgage loans held for investment and lending receivables are gross of allowances. The use of the gross amounts is consistent with asset analyses performed by third parties.*

*[4] Refer to Section VI.B.5 of the Report for a discussion of contingent liabilities.*

**Residential Capital, LLC – Quarterly Solvency Analysis**
**Asset-Based Approach: Adjusted Book Value Method**
September 30, 2008
*($ in Millions)*

| Balance Sheet | Book Value of Assets [1] | Collateralized Borrowings in Securitization Trusts [1] | Assets Less Collateralized Borrowings | Asset Value Adjustment [2] High | Low | Fair Market Value of Assets High | Low |
|---|---|---|---|---|---|---|---|
| Cash and cash equivalents | $ 6,885 | $ 0 | $ 6,885 | 0% | 0% | $ 6,885 | $ 6,885 |
| Mortgage loans held for sale | 4,153 | 0 | 4,153 | 0% | 0% | 4,153 | 4,153 |
| Trading securities | 868 | 0 | 868 | 0% | 0% | 868 | 868 |
| Mortgage loans held for investment[3] | 29,818 | 7,009 | 22,809 | -20% | -30% | 18,247 | 15,966 |
| Lending receivables[3] | 7,108 | 0 | 7,108 | -5% | -15% | 6,753 | 6,042 |
| Mortgage servicing rights | 4,725 | 0 | 4,725 | 0% | -10% | 4,725 | 4,252 |
| Accounts receivable | 3,446 | 0 | 3,446 | -5% | -15% | 3,273 | 2,929 |
| Investments in real estate and other | 681 | 0 | 681 | -15% | -25% | 579 | 511 |
| Goodwill | 0 | 0 | 0 | 0% | 0% | 0 | 0 |
| Other assets | 10,374 | 0 | 10,374 | -10% | -20% | 9,337 | 8,300 |
| Total assets | $ 68,057 | $ 7,009 | $ 61,049 | -10% | -18% | $ 54,820 | $ 49,905 |
| | | | | | | | |
| Borrowings from parent [1] | | | | | | (3,271) | (3,271) |
| Affiliate borrowings [1] | | | | | | (875) | (875) |
| Other borrowings [1] | | | | | | (28,144) | (28,144) |
| Deposits [1] | | | | | | (18,235) | (18,235) |
| Other liabilities [1] | | | | | | (4,713) | (4,713) |
| Minority interest [1] | | | | | | (1,954) | (1,954) |
| Contingent liability [4] | | | | | | 0 | 0 |
| Surplus / (deficit) | | | | | | ($2,372) | ($7,286) |

[1] Residential Capital, LLC, Quarterly Report (Form 10-Q) (Nov. 10, 2008), at 3, 14 –15. As discussed in Section VI.B.4.b of the Report, the assets and liabilities of Ally Bank were not deconsolidated.

[2] Estimated market adjustments consider contemporaneous third-party analyses, industry benchmarks (ABX Index, interest rates, etc.) and ResCap fair value disclosures as discussed in Section VI.B.4.b of the Report. The estimated market adjustments reflect that Ally Bank's assets were generally of higher quality than ResCap's assets. If Ally Bank were deconsolidated, the asset value adjustments may differ significantly.

[3] Mortgage loans held for investment and lending receivables are gross of allowances. The use of the gross amounts is consistent with asset analyses performed by third parties.

[4] Refer to Section VI.B.5 of the Report for a discussion of contingent liabilities.

**Residential Capital, LLC – Quarterly Solvency Analysis**
**Asset-Based Approach: Adjusted Book Value Method**
December 31, 2008
*($ in Millions)*

| Balance Sheet | Book Value of Assets[1] | Collateralized Borrowings in Securitization Trusts[1] | Assets Less Collateralized Borrowings | Asset Value Adjustment[2] High | Low | Fair Market Value of Assets High | Low |
|---|---|---|---|---|---|---|---|
| Cash and cash equivalents | $ 6,983 | $ 0 | $ 6,983 | 0% | 0% | $ 6,983 | $ 6,983 |
| Mortgage loans held for sale | 2,629 | 0 | 2,629 | 0% | 0% | 2,629 | 2,629 |
| Trading securities | 601 | 0 | 601 | 0% | 0% | 601 | 601 |
| Mortgage loans held for investment[3] | 25,887 | 3,752 | 22,135 | -20% | -30% | 17,708 | 15,494 |
| Lending receivables[3] | 6,608 | 0 | 6,608 | -5% | -15% | 6,277 | 5,617 |
| Mortgage servicing rights[3] | 2,848 | 0 | 2,848 | 0% | -10% | 2,848 | 2,563 |
| Accounts receivable | 3,143 | 0 | 3,143 | -5% | -15% | 2,986 | 2,672 |
| Investments in real estate and other | 536 | 0 | 536 | -15% | -25% | 456 | 402 |
| Goodwill | 0 | 0 | 0 | 0% | 0% | 0 | 0 |
| Other assets | 10,469 | 0 | 10,469 | -10% | -20% | 9,423 | 8,376 |
| Total assets | $ 59,705 | $ 3,752 | $ 55,952 | -11% | -19% | $ 49,910 | $ 45,337 |
| Borrowings from parent[1] | | | | | | (2,663) | (2,663) |
| Affiliate borrowings[1] | | | | | | (8) | (8) |
| Other borrowings[1] | | | | | | (22,636) | (22,636) |
| Deposits[1] | | | | | | (19,862) | (19,862) |
| Other liabilities[1] | | | | | | (4,951) | (4,951) |
| Minority interest[1] | | | | | | (1,901) | (1,901) |
| Contingent liability[4] | | | | | | 0 | 0 |
| Surplus / (deficit) | | | | | | ($2,110) | ($6,684) |

[1] Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2009), at 118, 141, 144. As discussed in Section VI.B.4.b of the Report, the assets and liabilities of Ally Bank were not deconsolidated.

[2] Estimated market adjustments consider contemporaneous third-party analyses, industry benchmarks (ABX Index, interest rates, etc.) and ResCap fair value disclosures as discussed in Section VI.B.4.b of the Report. The estimated market adjustments reflect that Ally Bank's assets were generally of higher quality than ResCap's assets. If Ally Bank were deconsolidated, the asset value adjustments may differ significantly.

[3] Mortgage loans held for investment and lending receivables are gross of allowances. The use of the gross amounts is consistent with asset analyses performed by third parties.

[4] Refer to Section VI.B.5 of the Report for a discussion of contingent liabilities.

12-12020-mg   Doc 3698-36   Filed 05/13/13   Entered 05/13/13 17:08:13   Appendix
Case 22-11068-JTD   Doc 6139   Filed 02/03/23   Page 608 of 709
Pg 284 of 385

Appendix VI.B.4.b, Page 18 of 46

**Residential Capital, LLC – Quarterly Solvency Analysis**
**Asset-Based Approach: Adjusted Book Value Method**
March 31, 2009
*($ in Millions)*

| Balance Sheet | Book Value of Assets [1] | Collateralized Borrowings in Securitization Trusts [1] | Assets Less Collateralized Borrowings | Asset Value Adjustment [2] | | Fair Market Value of Assets | |
|---|---|---|---|---|---|---|---|
| | | | | High | Low | High | Low |
| Cash and cash equivalents | $ 1,706 | $ 0 | $ 1,706 | 0% | 0% | $ 1,706 | $ 1,706 |
| Mortgage loans held for sale | 1,416 | 0 | 1,416 | 0% | 0% | 1,416 | 1,416 |
| Trading securities | 510 | 0 | 510 | 0% | 0% | 510 | 510 |
| Mortgage loans held for investment [3] | 10,428 | 3,415 | 7,014 | -30% | -40% | 4,910 | 4,208 |
| Lending receivables [3] | 1,928 | 0 | 1,928 | -5% | -15% | 1,831 | 1,638 |
| Mortgage servicing rights | 2,159 | 0 | 2,159 | 0% | -10% | 2,159 | 1,943 |
| Accounts receivable | 2,497 | 0 | 2,497 | -5% | -15% | 2,372 | 2,123 |
| Investments in real estate and other | 466 | 0 | 466 | -15% | -25% | 396 | 349 |
| Goodwill | 0 | 0 | 0 | 0% | 0% | 0 | 0 |
| Other assets | 3,450 | 0 | 3,450 | -10% | -20% | 3,105 | 2,760 |
| Total assets | $ 24,561 | $ 3,415 | $ 21,146 | -13% | -21% | $ 18,406 | $ 16,655 |

| | High | Low |
|---|---|---|
| Borrowings from parent [1] | (2,410) | (2,410) |
| Other borrowings [1] | (11,371) | (11,371) |
| Other liabilities [1] | (4,851) | (4,851) |
| Minority interest [1] | 0 | 0 |
| Contingent liability [4] | 0 | 0 |
| Surplus / (deficit) | ($227) | ($1,978) |

[1] *Residential Capital, LLC, Quarterly Report (Form 10-Q) (May 11, 2009), at 3, 15–16.*

[2] *Estimated market adjustments consider contemporaneous third-party analyses, industry benchmarks (ABX Index, interest rates, etc.) and ResCap fair value disclosures as discussed in Section VI.B.4.b of the Report. The estimated market adjustments reflect that Ally Bank's assets were generally of higher quality than ResCap's assets. If Ally Bank were deconsolidated, the asset value adjustments may differ significantly.*

[3] *Mortgage loans held for investment and lending receivables are gross of allowances. The use of the gross amounts is consistent with asset analyses performed by third parties.*

[4] *Refer to Section VI.B.5 of the Report for a discussion of contingent liabilities.*

**Appendix VI.B.4.b**, Page 19 of 46

**Residential Capital, LLC – Quarterly Solvency Analysis**
**Asset-Based Approach: Adjusted Book Value Method**
June 30, 2009
*($ in Millions)*

| Balance Sheet | Book Value of Assets [1] | Collateralized Borrowings in Securitization Trusts [1] | Assets Less Collateralized Borrowings | Asset Value Adjustment [2] High | Asset Value Adjustment [2] Low | Fair Market Value of Assets High | Fair Market Value of Assets Low |
|---|---|---|---|---|---|---|---|
| Cash and cash equivalents | $ 1,189 | $ 0 | $ 1,189 | 0% | 0% | $ 1,189 | $ 1,189 |
| Mortgage loans held for sale | 1,666 | 0 | 1,666 | 0% | 0% | 1,666 | 1,666 |
| Trading securities | 156 | 0 | 156 | 0% | 0% | 156 | 156 |
| Mortgage loans held for investment [3] | 9,503 | 3,641 | 5,863 | -30% | -40% | 4,104 | 3,518 |
| Lending receivables [3] | 1,446 | 0 | 1,446 | -5% | -15% | 1,374 | 1,229 |
| Mortgage servicing rights | 2,752 | 0 | 2,752 | 0% | -10% | 2,752 | 2,477 |
| Accounts receivable | 2,417 | 0 | 2,417 | -5% | -15% | 2,297 | 2,055 |
| Investments in real estate and other | 208 | 0 | 208 | -15% | -25% | 177 | 156 |
| Goodwill | 0 | 0 | 0 | 0% | 0% | 0 | 0 |
| Other assets | 3,603 | 0 | 3,603 | -10% | -20% | 3,243 | 2,883 |
| Total assets | $ 22,940 | $ 3,641 | $ 19,300 | -12% | -21% | $ 16,956 | $ 15,327 |
| Borrowings from parent [1] | | | | | | (2,931) | (2,931) |
| Other borrowings [1] | | | | | | (9,048) | (9,048) |
| Other liabilities [1] | | | | | | (5,328) | (5,328) |
| Minority interest [1] | | | | | | 0 | 0 |
| Contingent liability [4] | | | | | | 0 | 0 |
| Surplus / (deficit) | | | | | | ($350) | ($1,979) |

[1] *Residential Capital, LLC, Quarterly Report (Form 10-Q) (Aug. 7, 2009), at 3, 16 -17.*
[2] *Estimated market adjustments consider contemporaneous third-party analyses, industry benchmarks (ABX Index, interest rates, etc.) and ResCap fair value disclosures as discussed in Section VI.B.4.b of the Report. The estimated market adjustments reflect that Ally Bank's assets were generally of higher quality than ResCap's assets. If Ally Bank were deconsolidated, the asset value adjustments may differ significantly.*
[3] *Mortgage loans held for investment and lending receivables are gross of allowance. The use of the gross amounts is consistent with asset analyses performed by third parties.*
[4] *Refer to Section VI.B.5 of the Report for a discussion of contingent liabilities.*

**Residential Capital, LLC – Quarterly Solvency Analysis**
**Asset-Based Approach: Adjusted Book Value Method**
September 30, 2009
*($ in Millions)*

| Balance Sheet | Book Value of Assets [1] | Collateralized Borrowings in Securitization Trusts [1] | Assets Less Collateralized Borrowings [1] | Asset Value Adjustment [2] High | Asset Value Adjustment [2] Low | Fair Market Value of Assets High | Fair Market Value of Assets Low |
|---|---|---|---|---|---|---|---|
| Cash and cash equivalents | $ 919 | $ 0 | $ 919 | 0% | 0% | $ 919 | $ 919 |
| Mortgage loans held for sale | 1,903 | 0 | 1,903 | 0% | 0% | 1,903 | 1,903 |
| Trading securities | 141 | 0 | 141 | 0% | 0% | 141 | 141 |
| Mortgage loans held for investment [3] | 8,301 | 3,530 | 4,771 | -30% | -40% | 3,340 | 2,863 |
| Lending receivables [3] | 688 | 0 | 688 | -5% | -15% | 654 | 585 |
| Mortgage servicing rights | 2,428 | 0 | 2,428 | 0% | -10% | 2,428 | 2,185 |
| Accounts receivable | 2,475 | 0 | 2,475 | -5% | -15% | 2,351 | 2,104 |
| Investments in real estate and other | 158 | 0 | 158 | -15% | -25% | 135 | 119 |
| Goodwill | 0 | 0 | 0 | 0% | 0% | 0 | 0 |
| Other assets | 3,416 | 0 | 3,416 | -10% | -20% | 3,075 | 2,733 |
| Total assets | $ 20,429 | $ 3,530 | $ 16,899 | -12% | -20% | $ 14,944 | $ 13,550 |
| | | | | | | | |
| Borrowings from parent [1] | | | | | | (2,302) | (2,302) |
| Other borrowings [1] | | | | | | (8,200) | (8,200) |
| Other liabilities [1] | | | | | | (5,308) | (5,308) |
| Minority interest [1] | | | | | | 0 | 0 |
| Contingent liability [4] | | | | | | 0 | 0 |
| Surplus / (deficit) | | | | | | ($867) | ($2,260) |

[1] *Residential Capital, LLC, Condensed Consolidated Financial Statements for the Periods Ended September 30, 2009 and 2008, dated Sep. 30, 2009, at 1, 12, 14 [EXAM00124278].*

[2] *Estimated market adjustments consider contemporaneous third-party analyses, industry benchmarks (ABX Index, interest rates, etc.) and ResCap fair value disclosures as discussed in Section VI.B.4.b of the Report. The estimated market adjustments reflect that Ally Bank's assets were generally of higher quality than ResCap's assets. If Ally Bank were deconsolidated, the asset value adjustments may differ significantly.*

[3] *Mortgage loans held for investment and lending receivables are gross of allowances. The use of the gross amounts is consistent with asset analyses performed by third parties.*

[4] *Refer to Section VI.B.3 of the Report for a discussion of contingent liabilities.*

**Residential Capital, LLC – Quarterly Solvency Analysis**
**Asset-Based Approach: Adjusted Book Value Method**
December 31, 2009
*($ in Millions)*

| Balance Sheet | Book Value of Assets [1] | Collateralized Borrowings in Securitization Trusts [1] | Assets Less Collateralized Borrowings [1] | Asset Value Adjustment [2] High | Asset Value Adjustment [2] Low | Fair Market Value of Assets High | Fair Market Value of Assets Low |
|---|---|---|---|---|---|---|---|
| Cash and cash equivalents | $ 765 | $ 0 | $ 765 | 0% | 0% | $ 765 | $ 765 |
| Mortgage loans held for sale [3] | 5,310 | 0 | 5,310 | 0% | 0% | 5,310 | 5,310 |
| Trading securities | 99 | 0 | 99 | 0% | 0% | 99 | 99 |
| Mortgage loans held for investment [4] | 1,873 | 1,484 | 389 | -5% | -15% | 370 | 331 |
| Lending receivables [4] | 438 | 0 | 438 | -5% | -15% | 416 | 372 |
| Mortgage servicing rights | 2,540 | 0 | 2,540 | 0% | -10% | 2,540 | 2,286 |
| Accounts receivable | 2,547 | 0 | 2,547 | -5% | -15% | 2,420 | 2,165 |
| Investments in real estate and other | 114 | 0 | 114 | -15% | -25% | 97 | 86 |
| Goodwill | 0 | 0 | 0 | 0% | 0% | 0 | 0 |
| Other assets | 3,235 | 0 | 3,235 | -10% | -20% | 2,912 | 2,588 |
| Assets of operations held-for-sale [5] | 2,549 | 1,737 | 812 | -15% | -25% | 691 | 609 |
| Total assets | $ 19,471 | $ 3,221 | $ 16,250 | -4% | -10% | $ 15,619 | $ 14,611 |
| Borrowings from parent [1] | | | | | | (1,889) | (1,889) |
| Other borrowings [1] | | | | | | (8,021) | (8,021) |
| Liabilities of operations held for sale [5] | | | | | | (445) | (445) |
| Other liabilities [1] | | | | | | (5,448) | (5,448) |
| Minority interest [1] | | | | | | 0 | 0 |
| Contingent liability [6] | | | | | | 0 | 0 |
| Surplus / (deficit) | | | | | | ($184) | ($1,192) |

[1] Residential Capital, LLC, Consolidated Financial Statements for the Years Ended December 31, 2009 and 2008, dated Feb. 26, 2010, at 4, 28 – 29 [EXAM00124455].
[2] Estimated market adjustments consider contemporaneous third-party analyses, industry benchmarks (ABX Index, interest rates, etc.) and ResCap fair value disclosures as discussed in Section VI.B.4.b of the Report. The estimated market adjustments reflect that Ally Bank's assets were generally of higher quality than ResCap's assets. If Ally Bank were deconsolidated, the asset value adjustments may differ significantly.
[3] At December 31, 2009, ResCap reclassified a significant portion of HFI loans to HFS and made significant mark-to-market adjustments. Thus, no asset value adjustment was applied.
[4] Mortgage loans held for investment and lending receivables are gross of allowances. The use of the gross amounts is consistent with asset analyses performed by third parties.
[5] Residential Capital, LLC, Consolidated Financial Statements for the Years Ended December 31, 2009 and 2008, dated Feb. 26, 2010, at 24 [EXAM00124455].
[6] Refer to Section VI.B.3 of the Report for a discussion of contingent liabilities.

**Residential Capital, LLC – Quarterly Solvency Analysis**
**Asset-Based Approach: Adjusted Book Value Method**
March 31, 2010
*($ in Millions)*

| Balance Sheet | Book Value of Assets [1] | Collateralized Borrowings in Securitization Trusts [1] | Assets Less Collateralized Borrowings | Asset Value Adjustment [2] High | Low | Fair Market Value of Assets High | Low |
|---|---|---|---|---|---|---|---|
| Cash and cash equivalents | $ 725 | $ 0 | $ 725 | 0% | 0% | $ 725 | $ 725 |
| Mortgage loans held for sale [3] | 5,131 | 0 | 5,131 | 0% | 0% | 5,131 | 5,131 |
| Trading securities | 54 | 0 | 54 | 0% | 0% | 54 | 54 |
| Mortgage loans held for investment [4] | 3,038 | 2,585 | 453 | -5% | -15% | 431 | 385 |
| Lending receivables [4] | 326 | 0 | 326 | -5% | -15% | 309 | 277 |
| Mortgage servicing rights | 2,413 | 0 | 2,413 | 0% | -10% | 2,413 | 2,172 |
| Accounts receivable | 2,778 | 0 | 2,778 | -5% | -15% | 2,640 | 2,362 |
| Investments in real estate and other | 0 | 0 | 0 | -15% | -25% | 0 | 0 |
| Goodwill | 0 | 0 | 0 | 0% | 0% | 0 | 0 |
| Other assets | 2,802 | 0 | 2,802 | -10% | -20% | 2,521 | 2,241 |
| Assets of operations held-for-sale [5] | 11,288 | 10,342 | 945 | -15% | -25% | 804 | 709 |
| Total assets | $ 28,554 | $ 12,927 | $ 15,627 | -4% | -10% | $ 15,028 | $ 14,056 |

| | High | Low |
|---|---|---|
| Borrowings from parent [1] | (1,460) | (1,460) |
| Other borrowings [1] | (7,710) | (7,710) |
| Liabilities of operations held for sale [5] | (806) | (806) |
| Other liabilities [1] | (5,113) | (5,113) |
| Minority interest [1] | 0 | 0 |
| Contingent liability [6] | (530) | (1,630) |
| Surplus / (deficit) | ($592) | ($2,664) |

[1] Residential Capital, LLC, Condensed Consolidated Financial Statements for the Periods Ended March 31, 2010 and 2009 (Unaudited) dated Mar. 31, 2010, at 1, 15 –16 [EXAM00122870].

[2] Estimated market adjustments consider contemporaneous third-party analyses, industry benchmarks (ABX Index, interest rates, etc.) and ResCap fair value disclosures as discussed in Section VI.B.4.b of the Report. The estimated market adjustments reflect that Ally Bank's assets were generally of higher quality than ResCap's assets. If Ally Bank were deconsolidated, the asset value adjustments may differ significantly.

[3] Given the prior market adjustments by ResCap and the state of the mortgage industry, no asset value adjustment was applied to HFS loans.

[4] Mortgage loans held for investment and lending receivables are gross of allowances. The use of the gross amounts is consistent with asset analyses performed by third parties.

[5] Residential Capital, LLC, Condensed Consolidated Financial Statements for the Periods Ended March 31, 2010 and 2009 (Unaudited) dated Mar. 31, 2010, at 11 [EXAM00122870].

[6] Refer to Section VI.B.5 of the Report for a discussion of contingent liabilities.

Appendix VI.B.4.b, Page 23 of 46

**Residential Capital, LLC – Quarterly Solvency Analysis**
**Asset-Based Approach: Adjusted Book Value Method**
June 30, 2010
($ in Millions)

| Balance Sheet | Book Value of Assets [1] | Collateralized Borrowings in Securitization Trusts [1] | Assets Less Collateralized Borrowings | Asset Value Adjustment [2] High | Asset Value Adjustment [2] Low | Fair Market Value of Assets High | Fair Market Value of Assets Low |
|---|---|---|---|---|---|---|---|
| Cash and cash equivalents | $ 621 | $ 0 | $ 621 | 0% | 0% | $ 621 | $ 621 |
| Mortgage loans held for sale [3] | 4,613 | 0 | 4,613 | 0% | 0% | 4,613 | 4,613 |
| Trading securities | 47 | 0 | 47 | 0% | 0% | 47 | 47 |
| Finance receivables and loans [4] | 3,008 | 2,536 | 472 | -5% | -15% | 449 | 401 |
| Mortgage servicing rights | 1,950 | 0 | 1,950 | 0% | -10% | 1,950 | 1,755 |
| Accounts receivable | 2,595 | 0 | 2,595 | -5% | -15% | 2,465 | 2,205 |
| Investments in real estate and other | 0 | 0 | 0 | -15% | -25% | 0 | 0 |
| Goodwill | 0 | 0 | 0 | 0% | 0% | 0 | 0 |
| Other assets | 4,954 | 0 | 4,954 | -10% | -20% | 4,459 | 3,963 |
| Assets of operations held-for-sale [5] | 10,870 | 9,555 | 1,316 | -15% | -25% | 1,118 | 987 |
| Total assets | $ 28,658 | $ 12,091 | $ 16,568 | -5% | -12% | $ 15,722 | $ 14,593 |

| | High | Low |
|---|---|---|
| Borrowings from parent [1] | (1,364) | (1,364) |
| Other borrowings [1] | (6,402) | (6,402) |
| Liabilities of operations held for sale [5] | (985) | (985) |
| Other liabilities [1] | (6,918) | (6,918) |
| Minority interest [1] | 0 | 0 |
| Contingent liability [6] | (550) | (1,660) |
| Surplus / (deficit) | ($498) | ($2,737) |

[1] Residential Capital, LLC, Condensed Consolidated Financial Statements for the Periods Ended June 30, 2010 and 2009 (Unaudited) dated June 30, 2010, at 1 [EXAM00122936].

[2] Estimated market adjustments consider contemporaneous third-party analyses, industry benchmarks (ABX Index, interest rates, etc.) and ResCap fair value disclosures as discussed in Section VI.B.4.b of the Report. The estimated market adjustments reflect that Ally Bank's assets were generally of higher quality than ResCap's assets. If Ally Bank were deconsolidated, the asset value adjustments may differ significantly.

[3] Given the prior market adjustments by ResCap and the state of the mortgage industry, no asset value adjustment was applied to HFS loans.

[4] Finance receivables and loans are gross of allowances. The use of the gross amounts is consistent with asset analyses performed by third parties.

[5] Residential Capital, LLC, Condensed Consolidated Financial Statements for the Periods Ended June 30, 2010 and 2009 (Unaudited) dated June 30, 2010, at 11 [EXAM00122936].

[6] Refer to Section VI.B.5 of the Report for a discussion of contingent liabilities.

Appendix VI.B.4.b, Page 23 of 46

**Residential Capital, LLC – Quarterly Solvency Analysis**
**Asset-Based Approach: Adjusted Book Value Method**
September 30, 2010
*($ in Millions)*

| Balance Sheet | Book Value of Assets [1] | Collateralized Borrowings in Securitization Trusts [1] | Assets Less Collateralized Borrowings | Asset Value Adjustment [2] | | Fair Market Value of Assets | |
|---|---|---|---|---|---|---|---|
| | | | | High | Low | High | Low |
| Cash and cash equivalents | $ 618 | $ 0 | $ 618 | 0% | 0% | $ 618 | $ 618 |
| Mortgage loans held for sale [3] | 5,127 | 0 | 5,127 | 0% | 0% | 5,127 | 5,127 |
| Trading securities | 46 | 0 | 46 | 0% | 0% | 46 | 46 |
| Finance receivables and loans [4] | 3,574 | 3,096 | 478 | -5% | -15% | 454 | 406 |
| Mortgage servicing rights | 1,680 | 0 | 1,680 | 0% | -10% | 1,680 | 1,512 |
| Accounts receivable | 2,526 | 0 | 2,526 | -5% | -15% | 2,399 | 2,147 |
| Investments in real estate and other | 0 | 0 | 0 | -15% | -25% | 0 | 0 |
| Goodwill | 0 | 0 | 0 | 0% | 0% | 0 | 0 |
| Other assets | 6,560 | 0 | 6,560 | -10% | -20% | 5,904 | 5,248 |
| Assets of operations held-for-sale [5] | 471 | 0 | 471 | -15% | -25% | 401 | 354 |
| Total assets | $ 20,602 | $ 3,096 | $ 17,506 | -5% | -12% | $ 16,629 | $ 15,457 |

| | High | Low |
|---|---|---|
| Borrowings from parent [1] | (1,319) | (1,319) |
| Other borrowings [1] | (5,695) | (5,695) |
| Liabilities of operations held for sale [5] | (8) | (8) |
| Other liabilities [1] | (9,531) | (9,531) |
| Minority interest [1] | 0 | 0 |
| Contingent liability [6] | (1,480) | (2,590) |
| Surplus / (deficit) | ($1,404) | ($3,685) |

[1] *Residential Capital, LLC, Condensed Consolidated Financial Statements for the Periods Ended September 30, 2010 and 2009 (Unaudited dated Sep. 30, 2010, at 1 [EXAM00122999].*

[2] *Estimated market adjustments consider contemporaneous third-party analysis, industry benchmarks (ABX Index, interest rates, etc.) and ResCap fair value disclosures as discussed in Section VI.B.4.b of the Report. The estimated market adjustments reflect that Ally Bank's assets were generally of higher quality than ResCap's assets. If Ally Bank were deconsolidated, the asset value adjustments may differ significantly.*

[3] *Given the prior market adjustments by ResCap and the state of the mortgage industry, no asset value adjustment was applied to HFS loans.*

[4] *Finance receivables and loans are gross of allowances. The use of the gross amounts is consistent with asset analyses performed by third parties.*

[5] *Residential Capital, LLC, Condensed Consolidated Financial Statements for the Periods Ended September 30, 2010 and 2009 (Unaudited dated Sep. 30, 2010, at 10 [EXAM00122999].*

[6] *Refer to Section VI.B.5 of the Report for a discussion of contingent liabilities.*

**Residential Capital, LLC – Quarterly Solvency Analysis**
**Asset-Based Approach: Adjusted Book Value Method**
December 31, 2010
*($ in Millions)*

| Balance Sheet | Book Value of Assets [1] | Collateralized Borrowings in Securitization Trusts [1] | Assets Less Collateralized Borrowings | Asset Value Adjustment [2] High | Asset Value Adjustment [2] Low | Fair Market Value of Assets High | Fair Market Value of Assets Low |
|---|---|---|---|---|---|---|---|
| Cash and cash equivalents | $ 672 | $ 0 | $ 672 | 0% | 0% | $ 672 | $ 672 |
| Mortgage loans held for sale [3] | 4,655 | 0 | 4,655 | 0% | 0% | 4,655 | 4,655 |
| Trading securities | 47 | 0 | 47 | 0% | 0% | 47 | 47 |
| Finance receivables and loans [4] | 1,431 | 1,057 | 374 | -5% | -15% | 355 | 318 |
| Mortgage servicing rights | 1,992 | 0 | 1,992 | 0% | -10% | 1,992 | 1,792 |
| Accounts receivable | 2,640 | 0 | 2,640 | -5% | -15% | 2,508 | 2,244 |
| Investments in real estate and other | 0 | 0 | 0 | -15% | -25% | 0 | 0 |
| Goodwill | 0 | 0 | 0 | 0% | 0% | 0 | 0 |
| Other assets | 5,438 | 0 | 5,438 | -10% | -20% | 4,894 | 4,351 |
| Total assets | $ 16,875 | $ 1,057 | $ 15,818 | -4% | -11% | $ 15,123 | $ 14,079 |

| | | High | Low |
|---|---|---|---|
| Borrowings from parent [1] | | (1,527) | (1,527) |
| Other borrowings [1] | | (5,464) | (5,464) |
| Other liabilities [1] | | (7,937) | (7,937) |
| Minority interest [1] | | 0 | 0 |
| Contingent liability [5] | | (1,580) | (2,680) |
| Surplus / (deficit) | | ($1,386) | ($3,530) |

[1] *Residential Capital, LLC, Consolidated Financial Statements for the Years Ended December 31, 2010 and 2009, dated Dec. 31, 2010, at 4 [EXAM0012312$].*
[2] *Estimated market adjustments consider contemporaneous third-party analyses, industry benchmarks (ABX Index, interest rates, etc.) and ResCap fair value disclosures as discussed in Section VI.B.4.b of the Report. The estimated market adjustments reflect that Ally Bank's assets were generally of higher quality than ResCap's assets. If Ally Bank were deconsolidated, the asset value adjustments may differ significantly.*
[3] *Given the prior market adjustments by ResCap and the state of the mortgage industry, no asset value adjustment was applied to HFS loans.*
[4] *Finance receivables and loans are gross of allowances. The use of the gross amounts is consistent with asset analyses performed by third parties.*
[5] *Refer to Section VI.B.3 of the Report for discussion of contingent liabilities.*

**Residential Capital, LLC – Quarterly Solvency Analysis**
**Asset-Based Approach: Adjusted Book Value Method**
March 31, 2011
*($ in Millions)*

| Balance Sheet | Book Value of Assets [1] | Collateralized Borrowings in Securitization Trusts [1] | Assets Less Collateralized Borrowings | Asset Value Adjustment [2] | | Fair Market Value of Assets | |
|---|---|---|---|---|---|---|---|
| | | | | High | Low | High | Low |
| Cash and cash equivalents | $ 719 | $ 0 | $ 719 | 0% | 0% | $ 719 | $ 719 |
| Mortgage loans held for sale [3] | 4,511 | 0 | 4,511 | 0% | 0% | 4,511 | 4,511 |
| Trading securities | 0 | 0 | 0 | 0% | 0% | 0 | 0 |
| Finance receivables and loans [4] | 1,303 | 972 | 331 | -5% | -15% | 315 | 282 |
| Mortgage servicing rights | 2,046 | 0 | 2,046 | 0% | -10% | 2,046 | 1,842 |
| Accounts receivable | 2,602 | 0 | 2,602 | -5% | -15% | 2,472 | 2,212 |
| Investments in real estate and other | 0 | 0 | 0 | -15% | -25% | 0 | 0 |
| Goodwill | 0 | 0 | 0 | 0% | 0% | 0 | 0 |
| Other assets | 4,356 | 0 | 4,356 | -10% | -20% | 3,920 | 3,485 |
| Total assets | $ 15,538 | $ 972 | $ 14,565 | -4% | -10% | $ 13,983 | $ 13,050 |
| | | | | | | | |
| Borrowings from parent [1] | | | | | | (1,340) | (1,340) |
| Other borrowings [1] | | | | | | (5,279) | (5,279) |
| Other liabilities [1] | | | | | | (7,028) | (7,028) |
| Minority interest [1] | | | | | | 0 | 0 |
| Contingent liability [5] | | | | | | (1,580) | (2,680) |
| Surplus / (deficit) | | | | | | ($1,244) | ($3,277) |

[1] Residential Capital, LLC, Condensed Consolidated Financial Statements for the Periods Ended March 31, 2011 and 2010 (Unaudited) dated Mar. 31, 2011, at 2 [EXAM00122339].

[2] Estimated market adjustments consider contemporaneous third-party analyses, industry benchmarks (ABX Index, interest rates, etc.) and ResCap fair value disclosures as discussed in Section VI.B.4.b of the Report. The estimated market adjustments reflect that Ally Bank's assets were generally of higher quality than ResCap's assets. If Ally Bank were deconsolidated, the asset value adjustments may differ significantly.

[3] Given the prior market adjustments by ResCap and the state of the mortgage industry, no asset value adjustment was applied to HFS loans.

[4] Finance receivables and loans are gross of allowances. The use of the gross amounts is consistent with asset analyses performed by third parties.

[5] Refer to Section VI.B.5 of the Report for a discussion of contingent liabilities.

12-12020-mg Doc 3098-36 Filed 05/13/13 Entered 05/13/13 16:57:08 Appendix
Pg 293 of 385
Case 2:11068-JTD Doc 6139-13 Filed 02/03/23 Page 617 of 709

Appendix VI.B.4.b, Page 27 of 46

**Residential Capital, LLC – Quarterly Solvency Analysis**
**Asset-Based Approach: Adjusted Book Value Method**
*June 30, 2011*
*($ in Millions)*

| Balance Sheet | Book Value of Assets [1] | Collateralized Borrowings in Securitization Trusts [1] | Assets Less Collateralized Borrowings | Asset Value Adjustment [2] High | Asset Value Adjustment [2] Low | Fair Market Value of Assets High | Fair Market Value of Assets Low |
|---|---|---|---|---|---|---|---|
| Cash and cash equivalents | $ 664 | $ 0 | $ 664 | 0% | 0% | $ 664 | $ 664 |
| Mortgage loans held for sale [3] | 4,453 | 0 | 4,453 | 0% | 0% | 4,453 | 4,453 |
| Trading securities | 0 | 0 | 0 | 0% | 0% | 0 | 0 |
| Finance receivables and loans [4] | 1,222 | 921 | 302 | -5% | -15% | 286 | 256 |
| Mortgage servicing rights | 1,926 | 0 | 1,926 | 0% | -10% | 1,926 | 1,734 |
| Accounts receivable | 2,484 | 0 | 2,484 | -5% | -15% | 2,360 | 2,111 |
| Investments in real estate and other | 0 | 0 | 0 | -15% | -25% | 0 | 0 |
| Goodwill | 0 | 0 | 0 | 0% | 0% | 0 | 0 |
| Other assets | 5,157 | 0 | 5,157 | -10% | -20% | 4,641 | 4,125 |
| Total assets | $ 15,907 | $ 921 | $ 14,986 | -4% | -11% | $ 14,331 | $ 13,344 |
| | | | | | | | |
| Borrowings from parent [1] | | | | | | (1,261) | (1,261) |
| Other borrowings [1] | | | | | | (5,136) | (5,136) |
| Other liabilities [1] | | | | | | (7,793) | (7,793) |
| Minority interest [1] | | | | | | 0 | 0 |
| Contingent liability [5] | | | | | | (2,680) | (3,790) |
| Surplus / (deficit) | | | | | | ($2,539) | ($4,636) |

[1] *Residential Capital, LLC, Condensed Consolidated Financial Statements for the Periods Ended June 30, 2011 and 2010 (Unaudited), dated June 30, 2011, at 2 [EXAM00122389].*

[2] *Estimated market adjustments consider contemporaneous third-party analyses, industry benchmarks (ABX Index, interest rates, etc.) and ResCap fair value disclosures as discussed in Section VI.B.4.b of the Report. The estimated market adjustments reflect that Ally Bank's assets were generally of higher quality than ResCap's assets. If Ally Bank were deconsolidated, the asset value adjustments may differ significantly.*

[3] *Given the prior market adjustments by ResCap and the state of the mortgage industry, no asset value adjustment was applied to HFS loans.*

[4] *Finance receivables and loans are gross of allowances. The use of the gross amounts is consistent with asset analyses performed by third parties.*

[5] *Refer to Section VI.B.3 of the Report for a discussion of contingent liabilities.*

Residential Capital, LLC – Quarterly Solvency Analysis
Asset-Based Approach: Adjusted Book Value Method
September 30, 2011
($ in Millions)

| Balance Sheet | Book Value of Assets [1] | Collateralized Borrowings in Securitization Trusts [1] | Assets Less Collateralized Borrowings | Asset Value Adjustment [2] High | Asset Value Adjustment [2] Low | Fair Market Value of Assets High | Fair Market Value of Assets Low |
|---|---|---|---|---|---|---|---|
| Cash and cash equivalents | $ 623 | $ 0 | $ 623 | 0% | 0% | $ 623 | $ 623 |
| Mortgage loans held for sale [3] | 4,580 | 0 | 4,580 | 0% | 0% | 4,580 | 4,580 |
| Trading securities | 0 | 0 | 0 | 0% | 0% | 0 | 0 |
| Finance receivables and loans [4] | 1,088 | 836 | 252 | -5% | -15% | 239 | 214 |
| Mortgage servicing rights | 1,330 | 0 | 1,330 | 0% | -10% | 1,330 | 1,197 |
| Accounts receivable | 2,685 | 0 | 2,685 | -5% | -15% | 2,551 | 2,283 |
| Investments in real estate and other | 0 | 0 | 0 | -15% | -25% | 0 | 0 |
| Goodwill | 0 | 0 | 0 | 0% | 0% | 0 | 0 |
| Other assets | 8,853 | 0 | 8,853 | -10% | -20% | 7,967 | 7,082 |
| Total assets | $ 19,159 | $ 836 | $ 18,322 | -6% | -13% | $ 17,290 | $ 15,978 |
| Borrowings from parent [1] | | | | | | (1,183) | (1,183) |
| Other borrowings [1] | | | | | | (4,906) | (4,906) |
| Other liabilities [1] | | | | | | (11,883) | (11,883) |
| Minority interest [1] | | | | | | 0 | 0 |
| Contingent liability [5] | | | | | | (2,680) | (3,790) |
| Surplus / (deficit) | | | | | | ($3,361) | ($5,783) |

[1] Residential Capital, LLC, Condensed Consolidated Financial Statements for the Periods Ended September 30, 2011 and 2010 (Unaudited) dated Sep. 30, 2011, at 2 [EXAM00123480].

[2] Estimated market adjustments consider contemporaneous third-party analyses, industry benchmarks (ABX Index, interest rates, etc.) and ResCap fair value disclosures as discussed in Section VI.B.4.b of the Report. The estimated market adjustments reflect that Ally Bank's assets were generally of higher quality than ResCap's assets. If Ally Bank were deconsolidated, the asset value adjustments may differ significantly.

[3] Given the prior market adjustments by ResCap and the state of the mortgage industry, no asset value adjustment was applied to HFS loans.

[4] Finance receivables and loans are gross of allowances. The use of the gross amounts is consistent with asset analyses performed by third parties.

[5] Refer to Section VI.B.5 of the Report for discussion of contingent liabilities.

Appendix VI.B.4.b, Page 29 of 46

**Residential Capital, LLC – Quarterly Solvency Analysis**
**Asset-Based Approach: Adjusted Book Value Method**
December 31, 2011
*($ in Millions)*

| Balance Sheet | Book Value of Assets [1] | Collateralized Borrowings in Securitization Trusts [1] | Assets Less Collateralized Borrowings | Asset Value Adjustment [2] | | Fair Market Value of Assets | |
|---|---|---|---|---|---|---|---|
| | | | | High | Low | High | Low |
| Cash and cash equivalents | $ 619 | $ 0 | $ 619 | 0% | 0% | $ 619 | $ 619 |
| Mortgage loans held for sale [3] | 4,250 | 0 | 4,250 | 0% | 0% | 4,250 | 4,250 |
| Trading securities | 0 | 0 | 0 | 0% | 0% | 0 | 0 |
| Finance receivables and loans [4] | 1,061 | 830 | 230 | -5% | -15% | 219 | 196 |
| Mortgage servicing rights | 1,233 | 0 | 1,233 | 0% | -10% | 1,233 | 1,110 |
| Accounts receivable | 3,052 | 0 | 3,052 | -5% | -15% | 2,899 | 2,594 |
| Investments in real estate and other | 0 | 0 | 0 | -15% | -25% | 0 | 0 |
| Goodwill | 0 | 0 | 0 | 0% | 0% | 0 | 0 |
| Other assets | 6,628 | 0 | 6,628 | -10% | -20% | 5,965 | 5,303 |
| Total assets | $ 16,842 | $ 830 | $ 16,012 | -5% | -12% | $ 15,185 | $ 14,070 |

| | | |
|---|---|---|
| Borrowings from parent [1] | (1,189) | (1,189) |
| Other borrowings [1] | (4,705) | (4,705) |
| Other liabilities [1] | (9,996) | (9,996) |
| Minority interest [1] | 0 | 0 |
| Contingent liability [5] | (2,680) | (3,790) |
| Surplus / (deficit) | ($3,386) | ($5,610) |

[1] Residential Capital, LLC, Consolidated Financial Statements for the Years Ended December 31, 2011 and 2010, dated Dec. 31, 2011, at 4 [EXAM00122651].

[2] Estimated market adjustments consider contemporaneous third-party analyses, industry benchmarks (ABX Index, interest rates, etc.) and ResCap fair value disclosures as discussed in Section VI.B.4.b of the Report. The estimated market adjustments reflect that Ally Bank's assets were generally of higher quality than ResCap's assets. If Ally Bank were deconsolidated, the asset value adjustments may differ significantly.

[3] Given the prior market adjustments by ResCap and the state of the mortgage industry, no asset value adjustment was applied to HFS loans.

[4] Finance receivables and loans are gross of allowances. The use of the gross amounts is consistent with asset analyses performed by third parties.

[5] Refer to Section VI.B.5 of the Report for a discussion of contingent liabilities.

Appendix VI.B.4.b, Page 29 of 46

Appendix VI.B.4.b, Page 30 of 46

**Residential Capital, LLC – Quarterly Solvency Analysis**
**Asset-Based Approach: Estimated Contingent and/or Unliquidated Liabilities Related to PLS Claims**
2010 – 2011
*($ in Millions)*

|  | 03/31/10 | | 06/30/10 | | 09/30/10 | | 12/31/10 | |
|---|---|---|---|---|---|---|---|---|
|  | Low | High | Low | High | Low | High | Low | High |
| ResCap PLS securitizations (2004 – 2007) [1] | $ 220,988 | $ 220,988 | $ 220,988 | $ 220,988 | $ 220,988 | $ 220,988 | $ 220,988 | $ 220,988 |
| Times: Estimated put-back percentage [2] | 0.50% | 1.00% | 0.50% | 1.00% | 1.00% | 1.50% | 1.00% | 1.50% |
| Estimated total contingent and/or unliquidated liability | 1,105 | 2,210 | 1,105 | 2,210 | 2,210 | 3,315 | 2,210 | 3,315 |
| Less: Balance sheet non-Agency reserves [3] | (575) | (575) | (553) | (553) | (729) | (729) | (633) | (633) |
| Incremental contingent and/or unliquidated liability | 530 | 1,635 | 552 | 1,657 | 1,481 | 2,586 | 1,577 | 2,682 |
| Incremental contingent and/or unliquidated liability, rounded | $ 530 | $ 1,630 | $ 550 | $ 1,660 | $ 1,480 | $ 2,590 | $ 1,580 | $ 2,680 |

|  | 03/31/11 | | 06/30/11 | | 09/30/11 | | 12/31/11 | |
|---|---|---|---|---|---|---|---|---|
|  | Low | High | Low | High | Low | High | Low | High |
| ResCap PLS securitizations (2004 – 2007) [1] | $ 220,988 | $ 220,988 | $ 220,988 | $ 220,988 | $ 220,988 | $ 220,988 | $ 220,988 | $ 220,988 |
| Times: Estimated put-back percentage [2] | 1.00% | 1.50% | 1.50% | 2.00% | 1.50% | 2.00% | 1.50% | 2.00% |
| Estimated total contingent and/or unliquidated liability | 2,210 | 3,315 | 3,315 | 4,420 | 3,315 | 4,420 | 3,315 | 4,420 |
| Less: Balance sheet non-Agency reserves [4] | (633) | (633) | (633) | (633) | (633) | (633) | (633) | (633) |
| Incremental contingent and/or unliquidated liability | 1,577 | 2,682 | 2,682 | 3,787 | 2,682 | 3,787 | 2,682 | 3,787 |
| Incremental contingent and/or unliquidated liability, rounded | $ 1,580 | $ 2,680 | $ 2,680 | $ 3,790 | $ 2,680 | $ 3,790 | $ 2,680 | $ 3,790 |

[1] This included 392 securitizations. See PLS Trust Spreadsheet [EXAM00339947].

[2] The Examiner's Financial Advisors independently estimated and applied a range of put-back percentages as adjusted for probability of realization.

[3] Non-Agency reserves include reserves for potential claims related to PLS, monolines and whole loan purchasers. For purposes of this analysis, the Examiner's Financial Advisors assumed that the entirety of the non-Agency reserves related to potential PLS claims. This assumption results in a conservative estimate of ResCap's potential incremental off-balance sheet liability for PLS representation and warranty-related claims. See Domestic Rep & Warranty Expense Presentation, undated [EXAM00330625].

[4] ResCap's total reserves (Agency and non-Agency) did not materially change from Dec. 31, 2010 through Dec. 31, 2011. Therefore, the Examiner's Financial Advisors held the non-Agency reserves constant at the Dec. 31, 2010 levels throughout fiscal year 2011. Source: Originating & Servicing and Legacy Portfolio & Other Q3 2011 Preliminary Earnings Presentation, dated Oct. 14, 2011, at 5 [EXAM12242367]; Residential Capital, LLC, Consolidated Financial Statements for the Years Ended December 31, 2011 and 2010, dated Dec. 31, 2011, at 66 [EXAM00122651].

Appendix VI.B.4.b, Page 30 of 46

**Residential Capital, LLC**
**Income Statement**
Years Ended 2005 – 2011
*($ in Thousands)*

| | 12 months ended 12/31/05 | 12 months ended 12/31/06 | 12 months ended 12/31/07 | 12 months ended 12/31/08 | 12 months ended 12/31/09 | 12 months ended 12/31/10 | 12 months ended 12/31/11 |
|---|---:|---:|---:|---:|---:|---:|---:|
| **Revenue** | | | | | | | |
| Interest income | $ 5,797,097 | $ 8,169,034 | $ 7,567,883 | $ 4,140,163 | $ 968,392 | $ 918,920 | $ 390,840 |
| Automotive operating lease income | — | — | — | 573,440 | — | — | — |
| Interest expense | 3,872,102 | 6,460,220 | 6,560,846 | 3,894,384 | 988,463 | 750,163 | 433,492 |
| Depreciation expense on automotive operating lease income | — | — | — | 355,628 | — | — | — |
| Impairment of investment in automotive operating leases | — | — | — | 166,535 | — | — | — |
| Net interest income/financing revenue | 1,924,995 | 1,708,814 | 1,007,037 | 297,056 | (20,071) | 168,757 | (42,652) |
| Provision for loan losses | 651,796 | 1,334,084 | 2,595,143 | — | — | — | — |
| Net interest income after provision for loan losses | 1,273,199 | 374,730 | (1,588,106) | 297,056 | (20,071) | 168,757 | (42,652) |
| Gain (loss) on sale of mortgage loans, net | 1,036,669 | 890,216 | (331,731) | (2,003,919) | 264,588 | 650,490 | 222,159 |
| Servicing fees | 1,416,280 | 1,583,674 | 1,790,403 | 1,487,769 | 1,143,509 | 1,035,152 | 839,640 |
| Amortization and impairment of servicing rights | (761,988) | (1,108,052) | (543,651) | (284,435) | (762,393) | 222,571 | (355,715) |
| Servicing asset valuation and hedge gain, net | 17,186 | 483,442 | (747,830) | — | 381,116 | — | 483,925 |
| Net servicing fees | 671,478 | 959,064 | 498,922 | 1,203,334 | 762,232 | 1,257,723 | 967,850 |
| Gain (loss) on investment securities, net | 236,362 | 68,665 | 218,434 | (655,780) | (87,625) | 11,499 | 15,254 |
| Real estate related revenues | 712,174 | 593,040 | 521,088 | (41,257) | (267,236) | 8,832 | — |
| Gain (loss) on extinguishment of debt | — | — | (401,672) | 1,925,368 | 1,735,040 | — | — |
| Gain (loss) on foreclosed real estate | — | — | (542) | (299,206) | (59,354) | 32,764 | (15,803) |
| Gain (loss) on sale of equity investments | — | — | 510,927 | (40,257) | — | — | — |
| Other income | 305,378 | 197,908 | 203,764 | (477,308) | (85,524) | (79,033) | (30,324) |
| Total net revenue | 4,235,260 | 3,072,509 | (368,916) | (91,969) | 1,860,934 | 2,051,032 | 632,559 |
| Provision for loan losses | — | — | — | 2,255,409 | 2,005,542 | (7,289) | 24,021 |
| **Expenses** | | | | | | | |
| Representation and warranty expense, net | — | — | 1,224,580 | 884,039 | 344,017 | 670,452 | 324,070 |
| Compensation and benefits | 1,406,930 | 1,206,339 | 254,071 | 390,256 | 152,520 | 261,785 | 319,602 |
| Professional fees | 212,410 | 273,056 | 202,246 | 152,865 | 131,237 | 73,234 | 204,000 |
| Data processing and telecommunications | 199,849 | 189,152 | 120,241 | 69,372 | 10,610 | 113,966 | 118,549 |
| Advertising | 158,688 | 152,792 | 146,282 | 103,587 | 42,070 | 369 | 79,682 |
| Occupancy | 121,301 | 137,687 | 126,646 | 144,547 | — | 20,125 | 18,162 |
| Restructuring | — | — | 454,828 | 445,951 | — | — | 24,829 |
| Goodwill impairment | — | — | 1,026,726 | — | — | — | — |
| Other | 509,156 | 637,909 | 307,984 | 1,045,133 | 2,450,742 | 386,617 | 349,236 |
| Total expenses | 2,608,334 | 2,596,935 | 3,863,604 | 3,235,750 | 3,131,196 | 1,526,548 | 1,438,130 |
| Income before income tax expense | 1,626,926 | 475,574 | (4,232,520) | (5,583,128) | (3,275,804) | 531,773 | (829,592) |
| Income tax expense (benefit) | 606,300 | (239,173) | 19,790 | (10,171) | 11,976 | 6,914 | 15,471 |
| Net income (loss) from continuing operations | 1,020,626 | 714,747 | (4,252,310) | (5,572,957) | (3,287,780) | 524,859 | (845,063) |
| Income (loss) from discontinued operations | — | — | (94,028) | (38,473) | — | — | — |
| Net income before minority interest | 1,020,626 | 714,747 | (4,346,338) | (5,611,430) | (3,287,780) | 524,859 | (845,063) |
| Minority interest | — | 9,654 | — | — | — | — | — |
| Net income (loss) | 1,020,626 | 705,093 | (4,346,338) | (5,611,430) | (3,287,780) | 524,859 | (845,063) |
| **Discontinued operations** | | | | | | | |
| Income (loss) from discontinued operations before taxes and noncontrolling interest | — | — | — | — | (1,263,689) | 47,067 | — |
| Income tax (benefit) expense | — | — | — | — | (31,068) | (3,149) | — |
| Income (loss) from discontinued operations | — | — | — | — | (1,252,621) | 50,216 | — |
| Net income (loss) | 1,020,626 | 705,093 | (4,346,338) | (5,611,430) | (4,540,401) | 575,075 | (845,063) |
| Less: Net income from discontinued operations attributable to noncontrolling interest | — | — | — | — | 3,430 | — | — |
| Net income (loss) attributable to Residential Capital, LLC | $ 1,020,626 | $ 705,093 | $ (4,346,338) | $ (5,611,430) | $ (4,543,831) | $ 575,075 | $ (845,063) |

*Source: Residential Capital, LLC, Annual Report (Form 10-K) (Mar. 28, 2006); Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2007); Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2008); Residential Capital, LLC, Consolidated Financial Statements for the Years Ended December 31, 2009 and 2008, dated Feb. 26, 2010 [EXAM0012455]; Residential Capital, LLC, Consolidated Financial Statements for the Years Ended December 31, 2010 and 2009, dated Feb. 28, 2011 [EXAM0012458]; Residential Capital, LLC, Consolidated Financial Statements for the Years Ended December 31, 2011 and 2010, dated Mar. 28, 2012 [EXAM0012461].*

Appendix VI.B.4.b, Page 32 of 46

**Residential Capital, LLC**
**Balance Sheet**
Years Ended 2005 - 2011
*($ in Thousands)*

| | 12/31/05 | 12/31/06 | 12/31/07 | 12/31/08 | 12/31/09 | 12/31/10 | 12/31/11 |
|---|---|---|---|---|---|---|---|
| Cash and cash equivalents | $ 2,266,753 | $ 2,018,847 | $ 4,415,913 | $ 6,982,761 | $ 765,261 | $ 672,204 | $ 618,699 |
| Mortgage loans held for sale | 19,521,566 | 27,007,782 | 11,998,236 | 2,628,907 | 5,309,529 | 4,654,907 | 4,249,625 |
| Trading securities | 3,896,008 | 4,562,073 | 2,090,690 | 601,489 | 98,583 | 46,914 | - |
| Available for sale securities | 1,068,937 | 229,469 | - | - | - | - | - |
| Mortgage loans held for investment, net | 67,892,660 | 67,927,951 | 41,330,322 | 24,745,575 | 1,834,827 | 1,313,702 | 1,022,730 |
| Lending receivables, net | 13,401,047 | 14,530,104 | 8,406,495 | 6,005,308 | 304,387 | 117,316 | 38,017 |
| Consumer receivables and loans | - | - | - | - | - | - | - |
| Commercial receivables and loans | - | - | - | - | - | - | - |
| Allowance for loan losses | - | - | - | - | - | (42,810) | (28,616) |
| Mortgage servicing rights, net | 4,015,015 | 4,930,061 | 4,702,862 | 2,847,850 | 2,539,588 | 1,991,586 | 1,233,107 |
| Accounts receivable | 1,951,210 | 2,561,200 | 3,187,913 | 3,143,198 | 2,547,390 | 2,640,059 | 3,051,748 |
| Investments in real estate and other | 1,855,298 | 2,622,149 | 1,629,717 | 536,019 | 114,255 | - | - |
| Goodwill | 459,768 | 471,463 | - | - | - | - | - |
| Other assets | 2,556,830 | 8,726,120 | 10,428,516 | 10,469,464 | 3,235,363 | 5,438,287 | 6,628,152 |
| Assets of operations held-for-sale | - | - | - | - | 2,549,427 | - | - |
| Total assets | $ 118,885,092 | $ 135,586,819 | $ 88,190,664 | $ 57,960,571 | $ 19,298,610 | $ 16,832,165 | $ 16,813,462 |
| **Borrowings:** | | | | | | | |
| Borrowings from parent | $ - | $ - | $ - | $ 2,663,321 | $ 1,888,792 | $ 1,526,775 | $ 1,189,364 |
| Affiliate borrowings | 5,177,462 | 53,299,518 | 16,145,741 | 7,583 | 1,484,197 | 1,057,287 | 830,318 |
| Collateralized borrowings in securitization trusts | 56,097,801 | 59,880,378 | 46,184,150 | 3,752,457 | - | - | - |
| Other borrowings | 42,300,507 | 113,179,896 | 62,329,891 | 22,635,976 | 8,020,571 | 5,464,454 | 4,705,404 |
| Total borrowings | 103,575,770 | 113,179,896 | 62,329,891 | 29,059,337 | 11,393,560 | 8,048,516 | 6,725,086 |
| Deposit liabilities | 4,123,304 | 9,851,026 | 13,349,844 | 19,861,515 | 5,447,802 | - | - |
| Other liabilities | 3,722,048 | 4,374,906 | 5,141,052 | 4,951,065 | 2,182,248 | 7,937,485 | 9,996,026 |
| Liabilities of operations held-for-sale | - | - | - | - | - | - | - |
| Total liabilities | 111,421,122 | 127,404,928 | 80,820,787 | 53,871,917 | 19,023,610 | 15,986,001 | 16,721,112 |
| Minority interest | - | 559,778 | 1,339,760 | 1,901,301 | - | - | - |
| Common stock | 3,367,677 | 3,837,943 | 6,624,344 | 7,872,794 | - | - | - |
| Member's interest | - | - | - | - | 11,324,371 | 11,324,371 | 11,433,776 |
| Preferred membership interests | 3,980,587 | 3,651,935 | - | 806,344 | - | - | - |
| Retained earnings | - | - | - | - | - | - | - |
| Accumulated deficit | 115,706 | 132,235 | (694,756) | (6,461,472) | (11,005,303) | (10,434,497) | (11,279,560) |
| Accumulated other comprehensive income | - | - | 100,529 | (30,313) | (44,068) | (43,710) | (61,866) |
| Total stockholder's equity | 7,463,970 | 7,622,113 | 6,030,117 | 2,187,353 | 275,000 | 846,164 | 92,350 |
| Total liabilities and stockholder's equity | $ 118,885,092 | $ 135,586,819 | $ 88,190,664 | $ 57,960,571 | $ 19,298,610 | $ 16,832,165 | $ 16,813,462 |

*Source: Residential Capital, LLC, Annual Report (Form 10-K) (Mar. 28, 2006); Residential Capital, LLC, Annual Report (Form 10-K) (Mar. 13, 2007); Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2008); Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2009); Residential Capital, LLC, Consolidated Financial Statements for the Years Ended December 31, 2009 and 2008, dated Feb. 26, 2010 [EXAMI00124453]; Residential Capital, LLC, Consolidated Financial Statements for the Years Ended December 31, 2010 and 2009, dated Feb. 28, 2011 [EXAMI00123128]; Residential Capital, LLC, Consolidated Financial Statements for the Years Ended December 31, 2011 and 2010, dated Mar. 28, 2012 [EXAMI00123651].*

Appendix VI.B.4.b, Page 33 of 46

**Residential Capital, LLC**
**Cash Flow Statement**
Years Ended 2005 - 2011
*($ in Thousands)*

| | 12 months ended 12/31/05 | 12 months ended 12/31/06 | 12 months ended 12/31/07 | 12 months ended 12/31/08 | 12 months ended 12/31/09 | 12 months ended 12/31/10 | 12 months ended 12/31/11 |
|---|---|---|---|---|---|---|---|
| **Cash flow from operating activities:** | | | | | | | |
| Net income | $ 1,020,626 | $ 705,093 | $ (4,346,338) | $ (5,611,430) | $ (4,540,401) | $ 575,075 | $ (845,063) |
| Reconciliation of net income to net cash provided by (used in) operating activities: | | | | | | | |
| Amortization and impairment of mortgage servicing rights | | | | | | | |
| Depreciation and amortization | 761,988 | 665,774 | 1,151,147 | 456,394 | 64,731 | 32,975 | 27,245 |
| Accretion of deferred concession on secured notes | 605,579 | | | | (165,743) | (110,009) | (101,113) |
| Provision for loan losses | 651,796 | 1,334,084 | 2,595,143 | 2,255,409 | 2,229,150 | 14,618 | 24,021 |
| Gain on sale of mortgage loans, net | (1,036,669) | (890,216) | 331,731 | 2,003,919 | 50,140 | (482,187) | (222,159) |
| Gain on sale of equity investments | | (414,508) | 542 | 40,257 | | | |
| Net gain on sale of other assets | (41,559) | 17,262 | 275,859 | 597,593 | 327,207 | (24,886) | 16,134 |
| Pension curtailment gain | | | | | | | |
| Goodwill impairment | | (42,630) | | | | | |
| Gain on extinguishment of debt | | | 454,828 | (1,925,368) | (1,735,040) | | |
| Minority interest | | 9,654 | (521,088) | 38,473 | 903,276 | (54,649) | |
| Impairment of held-for-sale businesses | | | 94,028 | | | | |
| (Gain) loss on valuation of derivatives | (148,550) | | 747,830 | 655,780 | 86,613 | (11,499) | |
| (Gain) loss on investment securities | (236,362) | (68,665) | 79,252 | (3,881) | 6,543 | (973) | |
| Equity in earnings of investees in excess of cash received | (137,671) | (85,445) | 1,259,529 | 2,250,127 | 249,210 | 725,351 | 812,435 |
| (Gain) loss on valuation (amortization) of mortgage servicing rights | (86,328) | 819,353 | (115,234,401) | (57,421,291) | (56,700,492) | (70,295,821) | (60,675,667) |
| Originations and purchases of mortgage loans held for sale | (159,280,861) | (176,541,708) | 115,457,868 | 64,587,058 | 56,970,771 | 70,342,416 | 59,613,292 |
| Proceeds from sales and repayments of mortgage loans held for sale | 133,222,847 | 156,424,705 | 175,738 | (25,142) | (65,645) | | (4,636) |
| Deferred income tax | 226,526 | (345,444) | | | | | |
| **Net change in:** | | | | | | | |
| Trading securities | (952,969) | 298,856 | 1,500,310 | 868,267 | 19,759 | 17,596 | 752,588 |
| Accounts receivable | 152,081 | (647,150) | (696,016) | (19,647) | 326,246 | 393,032 | (1,438,938) |
| Other assets | 955,492 | (1,356,070) | (286,171) | 490,310 | (102,787) | (3,755,492) | 2,470,237 |
| Other liabilities | (1,823,082) | 13,383 | 540,630 | (1,486,706) | 1,317,033 | 3,668,161 | 428,376 |
| Net cash provided by (used in) operating activities | (26,147,116) | (20,103,672) | 3,580,421 | 7,750,122 | (759,429) | 433,708 | 428,376 |
| **Cash flow from investing activities:** | | | | | | | |
| Net (increase) in (commercial) lending receivables | (3,974,763) | (1,200,420) | 5,188,500 | 441,482 | 374,626 | 214,989 | 46,432 |
| Net decrease in consumer mortgage finance receivables and loans | | | | | | 2,493,434 | 546,135 |
| Originations and purchases of (consumer) mortgage loans held for investment | (20,081,860) | (15,318,790) | (8,590,547) | (3,961,372) | (805,987) | | |
| Proceeds from sales and repayments of (consumer) mortgage loans held for investment | 27,528,658 | 25,186,643 | 16,931,905 | 5,734,840 | 1,888,134 | | |
| Purchases of available for sale securities | (598,613) | (54,273) | (72,018) | | | | |
| Proceeds from sales and repayments of available for sale securities | 747,215 | 24,328 | 28,605 | | | | |
| Originations and purchases of mortgage servicing rights, net of sales | | (11,780) | | | | | |
| Additions to mortgage servicing rights | (266,589) | | (3,192) | 796,865 | 19,337 | | |
| Sale of mortgage servicing rights | 207,591 | | 563,709 | | | 107,187 | 4,543 |
| Net decrease in investments in real estate and other | (1,249,253) | (1,695,102) | (210,792) | (3,301) | (4,364) | | |
| Purchase of and advances to investments in real estate and other | 923,924 | 1,378,210 | 849,548 | 445,677 | 138,627 | | |
| Proceeds from sales of repossessed, foreclosed and owned real estate | | | | | 875,202 | 404,019 | 108,349 |
| Consolidation of IB Finance Holding Company, LLC | | 251,347 | 103,743 | | | | |
| Acquisitions, net of cash required | (3,988) | (2,551) | | | | | |
| Sale of business unit, net | | | | | | (122,782) | |
| Other, net | 724,699 | 981,459 | 1,176,654 | 1,852,197 | 298,493 | 906,662 | 173,110 |
| Net cash provided by (used in) investing activities | $ 3,957,021 | $ 9,539,071 | $ 15,966,115 | $ 5,306,388 | $ 2,784,068 | $ 4,003,509 | $ 878,569 |

Source: Residential Capital, LLC, Annual Report (Form 10-K) (Mar. 28, 2006); Residential Capital, LLC, Annual Report (Form 10-K) (Mar. 13, 2007); Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2009); Residential Capital, LLC, Consolidated Financial Statements for the Years Ended December 31, 2009 and 2008, dated Feb. 26, 2010 [EX-LM99124455]; Residential Capital, LLC, Consolidated Financial Statements for the Years Ended December 31, 2010 and 2009, dated Feb. 28, 2011 [EX-LM99123728]; Residential Capital, LLC, Consolidated Financial Statements for the Years Ended December 31, 2011 and 2010, dated Mar. 28, 2012 [EX-LM99122613].

Appendix VI.B.4.b, Page 33 of 46

12-12020-mg Doc 3698-36 Filed 05/13/13 Entered 05/13/13 18:13:09 Appendix
Case 2:11-cv-... Doc 6139-13 Filed 02/03/23 ... Page 624 of 709
Pg 300 of 385

Appendix VI.B.4.b, Page 34 of 46

**Residential Capital, LLC**
**Cash Flow Statement**
Years Ended 2005 – 2011
*($ in Thousands)*

| | 12 months ended 12/31/05 | 12 months ended 12/31/06 | 12 months ended 12/31/07 | 12 months ended 12/31/08 | 12 months ended 12/31/09 | 12 months ended 12/31/10 | 12 months ended 12/31/11 |
|---|---|---|---|---|---|---|---|
| Cash flows from financing activities: | | | | | | | |
| Net decrease in borrowings from parent and affiliates | $  - | $  - | $  - | $  4,205,229 | $  (342,135) | $  (362,017) | $  (228,007) |
| Net increase in borrowings from parent | - | - | - | 7,583 | (7,583) | - | - |
| Net decrease in affiliate borrowings | (2,828,433) | (5,177,462) | - | - | - | - | - |
| Net increase in other short-term borrowings | 4,342,935 | 2,730,803 | (13,009,476) | (13,519,025) | (1,742,940) | (830,446) | (386,639) |
| Proceeds from issuance of collateralized borrowings in securitization trusts | 28,361,997 | 19,317,561 | 5,634,817 | - | 229,933 | 232,754 | - |
| Repayments of collateralized borrowings in securitization trusts | (22,682,856) | (22,605,088) | (15,929,834) | (2,892,132) | (1,501,397) | (2,178,383) | (466,636) |
| Proceeds from secured aggregation facilities, long-term | 7,896,054 | 29,071,067 | 12,358,635 | 160,000 | - | - | - |
| Repayments from secured aggregation facilities, long-term | (3,157,448) | (27,942,989) | (17,411,381) | (465,114) | - | - | - |
| Proceeds from other long-term borrowings | 9,625,279 | 14,298,047 | 10,197,770 | 2,993,000 | 1,511,000 | 471,395 | 787,325 |
| Repayments from other long-term borrowings | (210,000) | (568,430) | (5,192,486) | (6,504,710) | (1,709,624) | (2,083,745) | (1,052,703) |
| Extinguishment of long-term borrowing | - | - | - | (2,060,829) | - | - | - |
| Payments of debt issuance costs | (121,413) | (109,680) | (41,370) | (52,999) | (27,278) | - | - |
| Dividends paid | - | (580,752) | - | - | - | - | - |
| Capital contributions to noncontrolling interest entity) | - | - | 2,256,000 | 24,254 | 150,000 | - | - |
| Proceeds from capital contributions | - | - | 898,794 | 284,413 | 600,494 | - | - |
| Disposal of healthcare (subsidiary/businesses) business, net | - | - | - | - | 23,759 | - | - |
| Increase in deposit liabilities | 2,458,334 | 1,742,878 | 3,130,793 | 6,663,121 | 1,629,258 | - | - |
| Net cash provided by financing activities | 23,584,449 | 10,175,955 | (17,169,738) | (11,157,209) | (1,186,513) | (4,750,442) | (1,346,660) |
| Cash and cash equivalents of GMAC (Ally) Bank and ResMor Trust upon sale | - | - | - | - | (6,678,339) | 64,695 | - |
| Effect of foreign exchange rates on cash and cash equivalents | (26,684) | 140,740 | (39,732) | 667,547 | (221,814) | - | (13,790) |
| Net increase (decrease) in cash and cash equivalents | 1,367,670 | (247,906) | 2,397,066 | 2,566,848 | (6,062,027) | (248,530) | (53,505) |
| Cash and cash equivalents reclassified to assets of held-for-sale | - | - | - | - | (155,473) | 155,473 | - |
| Cash and cash equivalents at the beginning of year | 899,083 | 2,266,753 | 2,018,847 | 4,415,913 | 6,982,761 | 765,261 | 672,204 |
| Cash and cash equivalents at the end of year | $  2,266,753 | $  2,018,847 | $  4,415,913 | $  6,982,761 | $  765,261 | $  672,204 | $  618,699 |

*Source: Residential Capital, LLC, Annual Report (Form 10-K) (Mar. 28, 2006); Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 13, 2007); Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2008); Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2009); Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 26, 2010) [EXAM00154435]; Residential Capital, LLC, Consolidated Financial Statements for the Years Ended December 31, 2010 and 2009, dated Feb. 28, 2011 [EXAM00132129]; Residential Capital, LLC, Consolidated Financial Statements for the Years Ended December 31, 2011 and 2010, dated Mar. 28, 2012 [EXAM00132651].*

**Residential Capital, LLC**
**Income Statement**
Quarters Ended 2005 – 2007
($ in Thousands)

| | 3 months ended 12/31/05 | 3 months ended 03/31/06 | 3 months ended 06/30/06 | 3 months ended 09/30/06 | 3 months ended 12/31/06 | 3 months ended 03/31/07 | 3 months ended 06/30/07 | 3 months ended 09/30/07 | 3 months ended 12/31/07 |
|---|---|---|---|---|---|---|---|---|---|
| **Revenue** | | | | | | | | | |
| Interest income | 1,646,002 | 1,863,365 | 2,009,922 | 2,085,558 | 2,210,189 | 2,134,712 | 1,968,730 | 1,886,006 | 1,578,435 |
| Automotive operating lease income | — | — | — | — | — | — | — | — | — |
| Interest expense | 1,218,709 | 1,435,369 | 1,557,894 | 1,703,606 | 1,763,351 | 1,745,184 | 1,656,377 | 1,680,746 | 1,478,539 |
| Depreciation expense on automotive operating lease income | — | — | — | — | — | — | — | — | — |
| Impairment of investment in automotive operating leases | — | — | — | — | — | — | — | — | — |
| Net interest income/net financing revenue | 427,293 | 427,996 | 452,028 | 381,952 | 446,838 | 389,528 | 312,353 | 205,260 | 99,896 |
| Provision for loan losses | 190,000 | 122,733 | 122,604 | 238,723 | 850,024 | 545,009 | 330,418 | 884,213 | 835,503 |
| Net interest income after provision for loan losses | 237,293 | 305,263 | 329,424 | 143,229 | (403,186) | (155,481) | (18,065) | (678,953) | (735,607) |
| Gain (loss) on sale of mortgage loans, net | 249,604 | 267,064 | 374,969 | 236,155 | 11,428 | (234,637) | 173,514 | (569,589) | 298,981 |
| Servicing fees | 369,302 | 374,684 | 386,484 | 401,095 | 421,411 | 447,177 | 452,144 | 451,420 | 439,662 |
| Amortization and impairment of servicing rights | (248,324) | (185,513) | (170,760) | (331,138) | (412,621) | (302,354) | (151,533) | (123,439) | 33,675 |
| Servicing asset valuation and hedge gain, net | (30,885) | (18,429) | 215,724 | 69,757 | 8,790 | 144,823 | 390,611 | 327,981 | 473,337 |
| Net servicing fees | 92,173 | 170,742 | 431,448 | 139,714 | 17,580 | 289,646 | 691,222 | 655,962 | 946,674 |
| Gain (loss) on investment securities, net | (6,685) | 144,195 | 1,468 | 141,729 | (56,103) | 39,934 | (56,474) | (332,511) | (398,779) |
| Real estate related revenues | 185,280 | — | 414,508 | — | — | 131,282 | 137,606 | 23,505 | (73,599) |
| Gain (loss) on extinguishment of debt | — | — | — | — | — | — | — | — | 521,088 |
| Gain (loss) on foreclosed real estate | — | — | — | — | — | — | — | — | (401,672) |
| Gain (loss) on sale of equity investments | — | — | — | — | — | — | — | — | 510,927 |
| Automotive operating lease income | — | — | — | — | — | — | — | — | (98,128) |
| Other income | 77,991 | 54,612 | 50,704 | 38,943 | 53,649 | 145,764 | 109,461 | 46,667 | 96,188 |
| Total net revenue | 835,656 | 941,876 | 1,573,832 | 792,641 | (285,840) | 71,685 | 646,111 | (1,182,900) | 96,188 |
| Provision for loan losses | | | | | | | | | |
| **Expenses** | | | | | | | | | |
| Representation and warranty expense, net | 335,104 | 306,804 | 375,657 | 298,949 | 224,929 | 333,911 | 350,880 | 306,034 | 233,755 |
| Compensation and benefits expense | 68,697 | 56,800 | 62,011 | 74,752 | 79,493 | 57,986 | 57,516 | 57,119 | 81,450 |
| Mortgage fees and penalties | 51,718 | 44,919 | 47,571 | 48,140 | 48,522 | 47,874 | 45,492 | 64,126 | 44,754 |
| Professional fees | 34,619 | 41,748 | 43,404 | 34,396 | 33,244 | 30,420 | 35,097 | 29,700 | 25,024 |
| Data processing and telecommunications | 28,822 | 32,825 | 33,854 | 33,962 | 37,046 | 34,751 | 39,224 | 34,345 | 37,962 |
| Advertising | — | — | — | — | — | — | — | — | — |
| Occupancy | — | — | — | — | — | — | — | — | — |
| Restructuring | — | — | — | — | — | — | — | — | 129,972 |
| Goodwill impairment | — | — | — | — | — | — | — | 226,756 | 126,646 |
| Loss (gain) on foreign currency | — | — | — | — | — | — | — | — | — |
| Depreciation expense on automotive operating lease income | — | — | — | — | — | — | — | — | — |
| Other | 148,969 | 119,313 | 132,560 | 153,471 | 232,556 | 387,489 | 282,509 | 454,828 | 307,984 |
| Total expenses | 667,929 | 602,409 | 695,066 | 643,670 | 655,790 | 892,431 | 810,718 | 1,172,908 | 987,547 |
| Income before income tax expense | 167,727 | 339,467 | 878,766 | 148,971 | (941,630) | (820,746) | (164,607) | (2,355,808) | (891,359) |
| Income tax expense (benefit) | 49,427 | 137,973 | 330,618 | 65,538 | (823,302) | 70,641 | 64,988 | (119,442) | 3,603 |
| Net income before minority interest | 118,300 | 201,494 | 548,148 | 83,433 | (118,328) | (891,387) | (229,595) | (2,236,366) | (894,962) |
| Minority interest | — | — | — | — | 9,654 | 19,089 | 24,401 | 24,561 | 25,977 |
| Net income | 118,300 | 201,494 | 548,148 | 83,433 | (127,982) | (910,476) | (253,996) | (2,260,927) | (920,939) |
| **Discontinued operations:** | | | | | | | | | |
| Income (loss) from discontinued operations before taxes and noncontrolling interest | — | — | — | — | — | — | — | — | — |
| Income tax (benefit) expense | — | — | — | — | — | — | — | — | — |
| Income (loss) from discontinued operations | — | — | — | — | — | — | — | — | — |
| Net income (loss) | 118,300 | 201,494 | 548,148 | 83,433 | (127,982) | (910,476) | (253,996) | (2,260,927) | (920,939) |
| Less: Net income from discontinued operations attributable to noncontrolling interest | — | — | — | — | — | — | — | — | — |
| Net income (loss) attributable to Residential Capital, LLC | 118,300 | 201,494 | 548,148 | 83,433 | (127,982) | (910,476) | (253,996) | (2,260,927) | (920,939) |

Note: Income statements for three months ended December 31 were prepared by calculating the difference between ResCap's full year results and year-to-date results through September 30.
Source: Residential Capital, LLC Quarterly Report (Form 10-Q) (May 5, 2006); Residential Capital, LLC Quarterly Report (Form 10-Q) (Aug. 8, 2006); Residential Capital, LLC Quarterly Report (Form 10-Q) (Nov. 7, 2006); Residential Capital, LLC Quarterly Report (Form 10-Q) (May 8, 2007); Residential Capital, LLC Quarterly Report (Form 10-Q) (Aug. 7, 2007); Residential Capital, LLC Quarterly Report (Form 10-Q) (Nov. 8, 2007); Residential Capital, LLC Annual Report (Form 10-K) (Mar. 28, 2006); Residential Capital, LLC Annual Report (Form 10-K) (Mar. 13, 2007); Residential Capital, LLC Annual Report (Form 10-K) (Feb. 27, 2008).

**Residential Capital, LLC**
**Income Statement**
Quarters Ended 2006 – 2009
*($ in Thousands)*

| | 3 months ended 03/31/08 | 3 months ended 06/30/08 | 3 months ended 09/30/08 | 3 months ended 12/31/08 | 3 months ended 03/31/09 | 3 months ended 06/30/09 | 3 months ended 09/30/09 | 3 months ended 12/31/09 |
|---|---|---|---|---|---|---|---|---|
| **Revenue** | | | | | | | | |
| Interest income | $ 1,216,024 | $ 1,145,683 | $ 954,091 | $ 824,365 | $ 316,419 | $ 291,006 | $ 261,558 | $ 99,409 |
| Automotive operating lease income | 147,274 | 148,522 | 144,949 | 132,695 | - | - | - | - |
| Interest expense | 1,170,396 | 977,027 | 894,505 | 852,456 | 308,666 | 282,041 | 268,256 | 129,500 |
| Depreciation expense on automotive operating lease income | 87,287 | 85,374 | 86,485 | 96,482 | - | - | - | - |
| Impairment of investment in automotive operating leases | - | 92,035 | - | 74,500 | - | - | - | - |
| Net interest income (net financing) revenue | 105,615 | 130,769 | 118,050 | (66,378) | 7,753 | 8,965 | (6,698) | (30,091) |
| Provision for loan losses | | | | | | | | |
| Net interest income after provision for loan losses | 105,615 | 139,769 | 118,050 | (66,378) | 7,753 | 8,965 | (6,698) | (30,091) |
| Gain (loss) on sale of mortgage loans, net | (747,996) | (1,061,505) | (138,177) | (56,241) | 189,380 | (487,414) | 151,339 | 411,283 |
| Servicing fees | 392,072 | 392,055 | 369,444 | 334,198 | 304,077 | 301,626 | 278,218 | 259,588 |
| Amortization and impairment of servicing rights | | | | | | | | |
| Servicing asset valuation and hedge gain, net | 409,503 | (184,850) | (260,822) | (248,266) | (322,083) | (134,301) | (25,289) | (280,720) |
| Net servicing fees | 801,575 | 207,205 | 108,622 | 85,932 | (18,006) | 167,325 | 252,929 | (21,132) |
| Gain (loss) on investment securities, net | (443,820) | (90,064) | (41,898) | (79,998) | (12,200) | (48,839) | (3,430) | (23,185) |
| Real estate related revenues | (27,944) | 18,656 | (24,970) | (6,999) | (34,037) | (224,121) | (4,670) | (4,408) |
| Gain (loss) on extinguishment of debt | 479,544 | 647,075 | 42,199 | 756,550 | 900,324 | 816,904 | | 17,812 |
| Gain (loss) on foreclosed real estate | (85,369) | (74,930) | (49,381) | (89,596) | (44,186) | (34,914) | 6,449 | 13,297 |
| Gain (loss) on sale of equity investments | | | | | | | | |
| Automotive operating lease income | | | | | | | | |
| Other income | (20,285) | (340,489) | (64,655) | (51,879) | (8,019) | (22,906) | (23,367) | (31,232) |
| **Total net revenue** | 61,320 | (554,303) | (50,210) | 451,224 | 981,009 | 175,029 | 372,552 | 332,344 |
| Provision for loan losses | 302,021 | 467,300 | 660,882 | 825,206 | 374,046 | 502,656 | 79,876 | 1,048,964 |
| **Expenses** | | | | | | | | |
| Representation and warranty expense, net | 261,456 | 250,136 | 228,510 | 143,937 | 78,677 | 96,107 | 94,791 | 74,442 |
| Compensation and benefits | 60,833 | 164,735 | 84,709 | 79,979 | 25,658 | 37,696 | 46,265 | 42,901 |
| Mortgage fees and penalties | 40,406 | 40,682 | 36,598 | 35,089 | 32,683 | 36,907 | 31,930 | 29,717 |
| Professional fees | 18,188 | 18,810 | 19,992 | 12,382 | 2,003 | 5,119 | 3,459 | 29 |
| Data processing and telecommunications | 28,193 | 29,017 | 28,204 | 18,173 | 11,633 | 8,666 | 11,345 | 10,426 |
| Advertising | 20,214 | 17,681 | 72,729 | 33,923 | - | - | - | - |
| Occupancy | | | | | | | | |
| Restructuring | | | | | | | | |
| Goodwill impairment | | | | 445,951 | | | | |
| Loss (gain) on foreign currency | | | | | | | | |
| Depreciation expense on automotive lease income | | | | | | | | |
| Other | 608,290 | 754,696 | 688,270 | (55,682) | 418,531 | 330,071 | 728,671 | 973,469 |
| **Total expenses** | (848,991) | (1,776,299) | (1,870,104) | (1,087,734) | 569,185 | 514,566 | 916,461 | 1,130,984 |
| Income before income tax expense | (848,991) | (1,776,299) | (1,870,104) | (1,087,734) | 37,778 | (842,193) | (623,785) | (1,847,604) |
| Income tax expense (benefit) | (28,182) | 111,339 | 4,932 | (98,260) | (18,671) | (1,048) | 24,737 | 6,958 |
| Net income before minority interest | (820,809) | (1,887,638) | (1,875,036) | (989,474) | 56,449 | (841,145) | (648,522) | (1,854,562) |
| Minority interest | 38,281 | (28,119) | 37,135 | (8,824) | - | - | - | - |
| **Net income** | (859,090) | (1,859,519) | (1,912,171) | (980,650) | 56,449 | (841,145) | (648,522) | (1,854,562) |
| **Discontinued operations:** | | | | | | | | |
| Income (loss) from discontinued operations before taxes and noncontrolling interest | | | | | (85,592) | | | (1,198,097) |
| Income tax (benefit) expense | | | | | (32,802) | | | 1,734 |
| Income (loss) from discontinued operations | | | | | (52,790) | | | (1,199,831) |
| **Net income (loss)** | (859,090) | (1,859,519) | (1,912,171) | (980,650) | 3,659 | (841,145) | (648,522) | (3,054,393) |
| Less: Net income from discontinued operations attributable to noncontrolling interest | | | | | 3,430 | | | - |
| **Net income (loss) attributable to Residential Capital, LLC** | $ (859,090) | $ (1,859,519) | $ (1,912,171) | $ (980,650) | $ 229 | $ (841,145) | $ (648,522) | $ (3,054,393) |

Note: Income statements for three months ended December 31 were prepared by calculating the difference between Res Cap's full year results and year-to-date results through September 30.

Source: Residential Capital, LLC, Quarterly Report (Form 10-Q) (May 7, 2008); Residential Capital, LLC, Quarterly Report (Form 10-Q) (Aug. 5, 2008); Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2009); Residential Capital, LLC, Quarterly Report (Form 10-Q) (May 11, 2009); Residential Capital, LLC, Quarterly Report (Form 10-Q) (Aug. 7, 2009); Residential Capital, LLC, Condensed Consolidated Financial Statements for the Periods Ended September 30, 2009 and 2008, dated Sept. 30, 2009 [EX3A0012427S]; Residential Capital, LLC, Consolidated Financial Statements for the Years Ended December 31, 2009 and 2008, dated Feb. 26, 2010 [EX3A0012455].

12-12020-mg   Doc 3098-36   Filed 02/03/23   Entered 02/03/13 19:07:03   Appendix
Pg 303 of 385
Case 2:13-cv-01068-JFD   Doc 65-13   Filed 02/03/23   Page 627 of 709
Appendix VI.B.4.b, Page 37 of 46

**Residential Capital, LLC**
**Income Statement**
Quarters Ended 2010 - 2011
*($ in Thousands)*

| | 3 months ended 3/31/2010 | 3 months ended 06/30/10 | 3 months ended 09/30/10 | 3 months ended 12/31/10 | 3 months ended 03/31/11 | 3 months ended 06/30/11 | 3 months ended 09/30/11 | 3 months ended 12/31/11 |
|---|---|---|---|---|---|---|---|---|
| **Revenue** | | | | | | | | |
| Interest income | $ 294,220 | $ 251,373 | $ 226,728 | $ 146,599 | $ 131,652 | $ 119,478 | $ 119,981 | $ 19,729 |
| Automotive operating lease income | 240,990 | 199,259 | 185,786 | 124,128 | 150,717 | 126,871 | 139,991 | 15,913 |
| Interest expense | | | | | | | | |
| Depreciation expense on automotive operating lease income | 53,230 | 52,114 | 40,942 | 22,471 | (19,065) | (7,393) | (20,010) | 3,816 |
| Impairment of investment in automotive operating leases | | | | | | | | |
| Net interest income/net financing revenue | | | | | | | | |
| Provision for loan losses | | | | | | | | |
| Net interest income after provision for loan losses | 53,230 | 52,114 | 40,942 | 22,471 | (19,065) | (7,393) | (20,010) | 3,816 |
| Gain (loss) on sale of mortgage loans, net | 142,480 | 140,916 | 217,873 | 149,221 | 35,200 | 65,926 | 30,823 | 90,210 |
| Servicing fees | 265,302 | 261,783 | 264,575 | 243,492 | 229,978 | 222,391 | 215,222 | 172,049 |
| Amortization and impairment of servicing rights | | | | | | | | |
| Servicing asset valuation and hedge gain, net | (16,746) | 95,564 | 122,232 | 21,521 | 48,911 | 743 | (365,587) | (19,782) |
| Net servicing fees | 248,556 | 357,347 | 386,807 | 265,013 | 278,889 | 223,134 | (150,365) | 132,267 |
| Gain (loss) on investment securities, net | 8,234 | (2,737) | 2,965 | 3,037 | | | | |
| Real estate related revenues | 6,431 | 2,482 | (424) | 343 | 243 | 160 | 14,851 | |
| Gain (loss) on extinguishment of debt | | | | | | | | |
| Gain (loss) on foreclosed real estate | 10,820 | 19,343 | 3,396 | (795) | (2,702) | 105 | (3,811) | (9,395) |
| Gain (loss) on sale of equity investments | | | | | | | | |
| Automotive operating lease income | | | | | | | | |
| Other income | (33,439) | (25,777) | (13,562) | (6,255) | 5,788 | (4,545) | (35,592) | 4,025 |
| Total net revenue | 436,312 | 543,688 | 637,997 | 433,035 | 298,353 | 277,387 | (164,104) | 220,923 |
| Provision for loan losses | (8,267) | 4,300 | (3,749) | 427 | 5,632 | 1,055 | 1,356 | 15,978 |
| **Expenses** | | | | | | | | |
| Representation and warranty expense, net | 79,112 | 64,592 | 59,342 | 58,739 | 81,676 | 79,962 | 69,206 | 88,758 |
| Compensation and benefits | | | 344,465 | 325,987 | 26,000 | 184,133 | 69,626 | 44,311 |
| Mortgage fines and penalties | | | | | | | | 204,000 |
| Professional fees | 10,418 | 8,956 | 17,468 | 36,392 | 18,962 | 18,870 | 25,548 | 55,169 |
| Data processing and telecommunications | 29,535 | 30,316 | 27,149 | 26,966 | 20,203 | 21,434 | 18,677 | 19,388 |
| Advertising | 670 | 50 | 101 | (452) | 8,747 | 3,938 | 2,398 | 3,079 |
| Occupancy | 165 | 8,923 | 5,566 | 5,471 | 5,633 | 4,491 | 5,899 | 8,896 |
| Restructuring | | | | | | | | |
| Goodwill impairment | | | | | | | | |
| Loss (gain) on foreign currency | | | | | | | | |
| Depreciation expense on automotive lease income | | | | | | | | |
| Other | 202,039 | 163,859 | 92,015 | (71,296) | 82,101 | 75,732 | 81,477 | 109,926 |
| Total expenses | 321,939 | 276,696 | 546,106 | 381,807 | 243,322 | 388,560 | 272,741 | 533,507 |
| Income before income tax expense | 122,640 | 282,692 | 93,640 | 50,801 | 49,309 | (112,228) | (438,201) | (328,562) |
| Income tax expense (benefit) | 6,599 | (3,810) | 6,909 | (2,784) | 8,946 | 408 | 3,440 | 2,677 |
| Net income before minority interest | 116,041 | 266,502 | 88,731 | 53,585 | 40,453 | (112,636) | (441,641) | (331,239) |
| Minority interest | | | | | | | | |
| Net income | 116,041 | 266,502 | 88,731 | 53,585 | 40,453 | (112,636) | (441,641) | (331,239) |
| **Discontinued operations** | | | | | | | | |
| Income (loss) from discontinued operations before taxes and noncontrolling interest | (6,123) | 88,942 | (45,571) | 9,819 | | | | |
| Income tax (benefit) expense | 1 | (8,698) | 5,376 | 172 | | | | |
| Income (loss) from discontinued operations | (6,124) | 97,640 | (50,947) | 9,647 | | | | |
| Net income (loss) | 109,917 | 364,142 | 37,784 | 63,232 | 40,453 | (112,636) | (441,641) | (331,239) |
| Less: Net income from discontinued operations attributable to noncontrolling interest | | | | | | | | |
| Net income (loss) attributable to Residential Capital, LLC | $ 109,917 | $ 364,142 | $ 37,784 | $ 63,232 | $ 40,453 | $ (112,636) | $ (441,641) | $ (331,239) |

Note: Income statements for three months ended December 31 were prepared by calculating the difference between ResCap's full year results and year-to-date results through September 30.
Source: Residential Capital, LLC Condensed Consolidated Financial Statements for the Periods Ended March 31, 2010 and 2009, dated Mar. 31, 2010 [EXAM012370]; Residential Capital, LLC Condensed Consolidated Financial Statements for the Periods Ended June 30, 2010 and 2009, dated June 30, 2010 [EXAM012959]; Residential Capital, LLC Condensed Consolidated Financial Statements for the Periods Ended September 30, 2010 and Sept. 30, 2010 [EXAM012999]; Residential Capital, LLC Condensed Consolidated Financial Statements for the Years Ended December 31, 2010 and 2009, dated Feb. 28, 2011 [EXAM012958]; Residential Capital, LLC Condensed Consolidated Financial Statements for the Periods Ended March 31, 2011 and 2010, dated Mar. 31, 2011 [EXAM012339]; Residential Capital, LLC Condensed Consolidated Financial Statements for the Periods Ended June 30, 2011 and 2010, dated June 30, 2011 [EXAM012389]; Residential Capital, LLC Condensed Consolidated Financial Statements for the Periods Ended September 30, 2011 and 2010, dated Sept. 30, 2011 [EXAM012688]; Residential Capital, LLC Consolidated Financial Statements for the Years Ended December 31, 2011 and 2010, dated Mar. 28, 2012 [EXAM012551].

**Residential Capital, LLC**
**Balance Sheet**
Quarters Ended 2005 – 2007
*($ in Thousands)*

| | 12/31/05 | 03/31/06 | 06/30/06 | 09/30/06 | 12/31/06 | 03/31/07 | 06/30/07 | 09/30/07 | 12/31/07 |
|---|---|---|---|---|---|---|---|---|---|
| Cash and cash equivalents | $ 2,266,753 | $ 2,233,577 | $ 1,885,594 | $ 1,977,842 | $ 2,018,847 | $ 2,602,494 | $ 3,714,646 | $ 6,519,488 | $ 4,415,913 |
| Mortgage loans held for sale | 19,521,566 | 18,124,746 | 20,438,913 | 24,786,757 | 27,007,382 | 22,013,665 | 19,333,920 | 14,979,699 | 11,998,236 |
| Trading securities | 3,896,008 | 4,261,711 | 4,245,623 | 5,033,680 | 4,562,073 | 5,659,922 | 5,510,621 | 3,654,506 | 2,090,690 |
| Available for sale securities | 1,068,937 | 143,166 | 163,080 | 168,605 | 229,469 | - | - | - | - |
| Mortgage loans held for investment, net | 67,892,660 | 72,673,116 | 71,391,876 | 73,070,182 | 67,927,951 | 63,590,182 | 60,969,454 | 59,037,772 | 41,330,322 |
| Lending receivables, net | 13,401,047 | 12,410,206 | 14,069,392 | 14,189,249 | 14,530,104 | 12,423,337 | 10,810,071 | 8,436,517 | 8,406,495 |
| Consumer receivables and loans | - | - | - | - | - | - | - | - | - |
| Commercial receivables and loans | - | - | - | - | - | - | - | - | - |
| Allowance for loan losses | - | - | - | - | - | - | - | - | - |
| Mortgage servicing rights, net | 4,015,015 | 4,526,471 | 5,093,603 | 4,828,025 | 4,930,061 | 5,107,781 | 6,040,774 | 5,547,034 | 4,702,862 |
| Accounts receivable | 1,951,210 | 1,928,680 | 2,044,985 | 2,317,443 | 2,561,200 | 2,747,259 | 2,523,666 | 2,582,505 | 3,187,913 |
| Investments in real estate and other | 1,855,298 | 2,155,077 | 2,127,769 | 2,593,682 | 2,622,149 | 2,509,058 | 2,369,639 | 2,069,176 | 1,629,717 |
| Goodwill | 459,768 | 459,172 | 464,194 | 466,482 | 471,463 | 471,914 | 474,128 | - | - |
| Other assets | 2,556,830 | 3,022,564 | 2,627,545 | 3,146,426 | 8,726,120 | 8,876,974 | 10,098,999 | 11,666,696 | 10,428,516 |
| Assets of operations held-for-sale | - | - | - | - | - | - | - | - | - |
| Total assets | $ 118,885,092 | $ 121,938,486 | $ 124,552,484 | $ 132,578,373 | $ 135,586,819 | $ 126,002,586 | $ 121,845,918 | $ 114,493,393 | $ 88,190,664 |
| **Borrowings:** | | | | | | | | | |
| Borrowings from parent | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Affiliate borrowings | 5,177,462 | 4,715,364 | - | - | - | - | - | - | - |
| Collateralized borrowings in securitization trusts | 56,097,801 | 58,801,030 | 57,597,386 | 57,184,409 | 53,299,518 | 48,790,485 | 45,122,216 | 38,223,889 | 16,145,741 |
| Other borrowings | 42,300,507 | 41,269,836 | 48,120,450 | 55,473,999 | 59,880,378 | 55,322,542 | 52,987,276 | 49,657,090 | 46,184,150 |
| Total borrowings | 103,575,770 | 104,786,230 | 105,717,836 | 112,658,408 | 113,179,896 | 104,113,027 | 98,109,492 | 87,880,979 | 62,329,891 |
| Deposit liabilities | 4,123,304 | 5,595,645 | 6,308,574 | 6,257,663 | 9,851,026 | 9,366,116 | 10,652,603 | 14,488,261 | 13,349,844 |
| Other liabilities | 3,722,048 | 3,793,132 | 4,121,813 | 5,286,429 | 4,374,006 | 4,712,744 | 4,806,427 | 4,793,722 | 5,141,052 |
| Liabilities of operations held-for-sale | - | - | - | - | - | - | - | - | - |
| Total liabilities | 111,421,122 | 114,175,007 | 116,148,223 | 124,202,500 | 127,404,928 | 118,191,887 | 113,568,522 | 107,162,962 | 80,820,787 |
| Minority interest | - | - | - | - | 559,778 | 636,794 | 769,991 | 1,158,876 | 1,339,760 |
| Common stock | - | - | - | - | - | - | - | - | - |
| Member's interest | 3,367,677 | 3,392,958 | 3,412,220 | 3,457,405 | 3,837,943 | 4,337,943 | 4,837,943 | 5,861,684 | 6,624,344 |
| Preferred membership interests | - | - | - | - | - | - | - | - | - |
| Retained earnings | 3,980,587 | 4,169,214 | 4,717,362 | 4,800,795 | 3,651,935 | 2,739,338 | 2,487,110 | 226,183 | (694,756) |
| Accumulated deficit | - | - | - | - | - | - | - | - | - |
| Accumulated other comprehensive income | 115,706 | 201,307 | 274,679 | 117,673 | 132,235 | 96,624 | 182,352 | 83,688 | 100,529 |
| Total stockholder's equity | 7,463,970 | 7,763,479 | 8,404,261 | 8,375,873 | 7,622,113 | 7,173,905 | 7,507,405 | 6,171,555 | 6,030,117 |
| Total liabilities and stockholder's equity | $ 118,885,092 | $ 121,938,486 | $ 124,552,484 | $ 132,578,373 | $ 135,586,819 | $ 126,002,586 | $ 121,845,918 | $ 114,493,393 | $ 88,190,664 |

*Source: Residential Capital, LLC, Annual Report (Form 10-K) (Mar. 28, 2006); Residential Capital, LLC, Quarterly Report (Form 10-Q) (May 5, 2006); Residential Capital, LLC, Quarterly Report (Form 10-Q) (Aug. 8, 2006); Residential Capital, LLC, Quarterly Report (Form 10-Q) (Nov. 7, 2006); Residential Capital, LLC, Annual Report (Form 10-K) (Mar. 13, 2007); Residential Capital, LLC, Quarterly Report (Form 10-Q) (May 8, 2007); Residential Capital, LLC, Quarterly Report (Form 10-Q) (Aug. 7, 2007); Residential Capital, LLC, Quarterly Report (Form 10-Q) (Nov. 8, 2007); Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2008).*

Appendix VI.B.4.b, Page 39 of 46

**Residential Capital, LLC**
**Balance Sheet**
Quarters Ended 2008 – 2009
*($ in Thousands)*

| | 03/31/08 | 06/30/08 | 09/30/08 | 12/31/08 | 03/31/09 | 06/30/09 | 09/30/09 | 12/31/09 |
|---|---|---|---|---|---|---|---|---|
| Cash and cash equivalents | $ 4,154,724 | $ 6,577,853 | $ 6,884,843 | $ 6,982,761 | $ 1,706,499 | $ 1,188,722 | $ 918,503 | $ 765,261 |
| Mortgage loans held for sale | 11,798,322 | 7,035,841 | 4,153,005 | 2,628,907 | 1,415,908 | 1,665,602 | 1,902,541 | 5,399,529 |
| Trading securities | 1,144,917 | 982,668 | 867,590 | 601,489 | 510,285 | 156,050 | 140,767 | 98,583 |
| Available for sale securities | - | - | - | - | - | - | - | - |
| Mortgage loans held for investment, net | 34,000,965 | 30,324,389 | 28,842,249 | 24,745,575 | 9,549,696 | 9,093,211 | 7,874,736 | 1,834,827 |
| Lending receivables, net | 8,809,368 | 8,069,488 | 6,541,539 | 6,005,308 | 1,342,896 | 912,841 | 435,116 | 304,387 |
| Consumer receivables and loans | - | - | - | - | - | - | - | - |
| Commercial receivables and loans | - | - | - | - | - | - | - | - |
| Allowance for loan losses | - | - | - | - | - | - | - | - |
| Mortgage servicing rights, net | 4,277,979 | 5,417,361 | 4,724,561 | 2,847,850 | 2,159,085 | 2,751,996 | 2,427,895 | 2,539,588 |
| Accounts receivable | 3,511,615 | 2,765,428 | 3,445,542 | 3,143,198 | 2,497,344 | 2,417,374 | 2,474,892 | 2,547,390 |
| Investments in real estate and other | 1,226,513 | 990,671 | 681,487 | 536,019 | 465,651 | 207,940 | 158,403 | 114,255 |
| Goodwill | - | - | - | - | - | - | - | - |
| Other assets | 12,417,243 | 10,440,134 | 10,374,471 | 10,469,464 | 3,450,062 | 3,603,338 | 3,416,470 | 3,235,363 |
| Assets of operations held-for-sale | - | - | - | - | - | - | - | 2,549,427 |
| Total assets | $ 81,341,646 | $ 72,603,833 | $ 66,515,287 | $ 57,960,571 | $ 23,097,426 | $ 21,997,074 | $ 19,749,323 | $ 19,298,610 |
| **Borrowings:** | | | | | | | | |
| Borrowings from parent | $ 655,000 | $ 4,700,000 | $ 3,270,583 | $ 2,663,321 | $ 2,409,925 | $ 2,931,169 | $ 2,302,363 | $ 1,888,792 |
| Affiliate borrowings | - | 971,677 | 874,979 | 7,583 | - | - | - | - |
| Collateralized borrowings in securitization trusts | 9,368,625 | 7,900,050 | 7,008,655 | 3,752,457 | 3,414,706 | 3,640,532 | 3,530,007 | 1,484,197 |
| Other borrowings | 41,729,093 | 31,148,980 | 28,143,826 | 22,635,976 | 11,371,395 | 9,047,515 | 8,199,796 | 8,020,571 |
| Total borrowings | 51,752,718 | 44,720,707 | 39,298,043 | 29,059,337 | 17,196,026 | 15,619,216 | 14,032,166 | 11,393,560 |
| Deposit liabilities | 15,949,764 | 17,536,939 | 18,234,788 | 19,861,515 | - | - | - | - |
| Other liabilities | 6,492,546 | 4,803,306 | 4,712,526 | 4,951,065 | 4,851,400 | 5,327,858 | 5,308,323 | 5,447,802 |
| Liabilities of operations held-for-sale | - | - | - | - | - | - | - | 2,182,248 |
| Total liabilities | 74,195,028 | 67,060,952 | 62,245,357 | 53,871,917 | 22,047,426 | 20,947,074 | 19,340,489 | 19,023,610 |
| Minority interest | 1,413,736 | 1,475,410 | 1,954,495 | 1,901,301 | - | - | - | - |
| Common stock | - | - | - | - | - | - | - | - |
| Member's interest | 6,767,003 | 6,788,348 | 6,962,487 | 7,872,794 | 7,540,236 | 8,438,844 | 8,438,844 | 11,324,371 |
| Preferred membership interests | 607,192 | 806,344 | 806,344 | 806,344 | - | - | - | - |
| Retained earnings | - | - | - | - | - | - | - | - |
| Accumulated deficit | (1,709,132) | (3,568,651) | (5,480,822) | (6,461,472) | (6,461,243) | (7,302,388) | (7,950,910) | (11,005,303) |
| Accumulated other comprehensive income | 67,819 | 41,430 | 27,426 | (30,313) | (28,993) | (86,656) | (79,100) | (44,068) |
| Total stockholder's equity | 5,732,882 | 4,067,471 | 2,315,435 | 2,187,353 | 1,050,000 | 1,050,000 | 408,834 | 275,000 |
| Total liabilities and stockholder's equity | $ 81,341,646 | $ 72,603,833 | $ 66,515,287 | $ 57,960,571 | $ 23,097,426 | $ 21,997,074 | $ 19,749,323 | $ 19,298,610 |

Source: Residential Capital, LLC, Quarterly Report (Form 10-Q) (May 7, 2008); Residential Capital, LLC, Quarterly Report (Form 10-Q) (Aug. 8, 2008); Residential Capital, LLC, Quarterly Report (Form 10-Q) (Nov. 10, 2008); Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2009); Residential Capital, LLC, Quarterly Report (Form 10-Q) (May 11, 2009); Residential Capital, LLC, Quarterly Report (Form 10-Q) (Aug. 7, 2009); Residential Capital, LLC, Condensed Consolidated Financial Statements for the Periods Ended September 30, 2009 and 2008, dated Sep. 30, 2009 [EXAM0012427$]; Residential Capital, LLC, Consolidated Financial Statements for the Years Ended December 31, 2009 and 2008, dated Feb. 26, 2010 [EXAM0124455].

**Residential Capital, LLC**
**Balance Sheet**
Quarters Ended 2010 – 2011
*($ in Thousands)*

| | 3/31/2010 | 06/30/10 | 09/30/10 | 12/31/10 | 03/31/11 | 06/30/11 | 09/30/11 | 12/31/11 |
|---|---|---|---|---|---|---|---|---|
| Cash and cash equivalents | $ 725,055 | $ 621,415 | $ 617,808 | $ 672,204 | $ 718,710 | $ 664,466 | $ 622,516 | $ 618,699 |
| Mortgage loans held for sale | 5,130,658 | 4,612,792 | 5,126,729 | 4,654,907 | 4,510,873 | 4,453,227 | 4,580,125 | 4,249,625 |
| Trading securities | 54,071 | 46,799 | 46,039 | 46,914 | - | - | - | - |
| Available for sale securities | | | | | | | | |
| Mortgage loans held for investment, net | 3,007,526 | | | | | | | |
| Lending receivables, net | 244,054 | | | | | | | |
| Consumer receivables and loans | - | 2,793,592 | 3,391,655 | 1,313,702 | 1,211,198 | 1,154,048 | 1,037,319 | 1,022,730 |
| Commercial receivables and loans | - | 214,658 | 181,986 | 117,316 | 92,251 | 68,307 | 50,524 | 38,017 |
| Allowance for loan losses | - | (104,422) | (94,820) | (42,810) | (34,414) | (23,816) | (19,780) | (28,616) |
| Mortgage servicing rights, net | 2,413,218 | 1,950,323 | 1,680,479 | 1,991,586 | 2,046,305 | 1,926,460 | 1,329,874 | 1,233,107 |
| Accounts receivable | 2,778,451 | 2,594,566 | 2,525,647 | 2,640,059 | 2,602,338 | 2,483,894 | 2,685,498 | 3,051,748 |
| Investments in real estate and other | | | | | | | | |
| Goodwill | | | | | | | | |
| Other assets | 2,801,597 | 4,954,096 | 6,560,103 | 5,438,287 | 4,356,026 | 5,156,673 | 8,852,708 | 6,628,152 |
| Assets of operations held-for-sale | 11,287,651 | 10,870,055 | 471,479 | - | - | - | - | - |
| Total assets | $ 28,442,281 | $ 28,553,874 | $ 20,507,105 | $ 16,832,165 | $ 15,503,287 | $ 15,883,259 | $ 19,138,784 | $ 16,813,462 |
| Borrowings: | | | | | | | | |
| Borrowings from parent | 1,460,215 | 1,364,334 | 1,318,794 | 1,526,775 | 1,339,629 | 1,261,203 | 1,183,100 | 1,189,364 |
| Affiliate borrowings | | | | | | | | |
| Collateralized borrowings in securitization trusts | 2,584,746 | 2,536,105 | 3,096,026 | 1,057,282 | 972,206 | 920,845 | 836,222 | 830,318 |
| Other borrowings | 7,709,777 | 6,402,443 | 5,694,705 | 5,464,454 | 5,278,965 | 5,136,093 | 4,905,568 | 4,705,404 |
| Total borrowings | 11,754,738 | 10,302,882 | 10,109,525 | 8,048,516 | 7,590,800 | 7,318,141 | 6,924,890 | 6,725,086 |
| Deposit liabilities | | | | | | | | |
| Other liabilities | 5,113,218 | 6,918,269 | 9,531,012 | 7,937,485 | 7,028,267 | 7,793,027 | 11,882,814 | 9,996,026 |
| Liabilities of operations held-for-sale | 11,148,660 | 10,539,251 | 8,061 | - | - | - | - | - |
| Total liabilities | 28,016,616 | 27,760,402 | 19,648,598 | 15,986,001 | 14,619,067 | 15,111,168 | 18,807,704 | 16,721,112 |
| Minority interest | | | | | | | | |
| Common stock | | | | | | | | |
| Member's interest | 11,324,371 | 11,324,371 | 11,324,371 | 11,324,371 | 11,324,371 | 11,324,371 | 11,324,371 | 11,433,776 |
| Preferred membership interests | | | | | | | | |
| Retained earnings | | | | | | | | |
| Accumulated deficit | (10,899,655) | (10,535,513) | (10,497,729) | (10,434,497) | (10,394,044) | (10,506,680) | (10,948,321) | (11,279,560) |
| Accumulated other comprehensive income | 949 | 4,614 | 31,865 | (43,710) | (46,107) | (45,600) | (44,970) | (61,866) |
| Total stockholder's equity | 425,665 | 793,472 | 858,507 | 846,164 | 884,220 | 772,091 | 331,080 | 92,350 |
| Total liabilities and stockholder's equity | $ 28,442,281 | $ 28,553,874 | $ 20,507,105 | $ 16,832,165 | $ 15,503,287 | $ 15,883,259 | $ 19,138,784 | $ 16,813,462 |

Source: Residential Capital, LLC, Condensed Consolidated Financial Statements for the Periods Ended March 31, 2010 and 2009, dated Mar. 31, 2010 [EXAM00122870]; Residential Capital, LLC, Condensed Consolidated Financial Statements for the Periods Ended June 30, 2010 and 2009, dated June 30, 2010 [EXAM00122936]; Residential Capital, LLC, Condensed Consolidated Financial Statements for the Periods Ended September 30, 2010 and 2009, dated Sept. 30, 2010 [EXAM00122989]; Residential Capital, LLC, Condensed Consolidated Financial Statements for the Years Ended December 31, 2010 and 2009, dated Feb. 28, 2011 [EXAM00123128]; Residential Capital, LLC, Condensed Consolidated Financial Statements for the Periods Ended March 31, 2011 and 2010, dated Mar. 31, 2011 [EXAM00122339]; Residential Capital, LLC, Condensed Consolidated Financial Statements for the Periods Ended June 30, 2011 and 2010, dated June 30, 2011 [EXAM00122898]; Residential Capital, LLC, Condensed Consolidated Financial Statements for the Periods Ended September 30, 2011 and 2010, dated Sept. 30, 2011 [EXAM00122880]; Residential Capital, LLC, Consolidated Financial Statements for the Years Ended December 31, 2011 and 2010, dated Mar. 28, 2012 [EXAM00122651]

**Residential Capital, LLC**
**Cash Flows Statement**
Quarters Ended 2005 - 2007
($ in Thousands)

| | 3 months ended 12/31/05 | 3 months ended 03/31/06 | 3 months ended 06/30/06 | 3 months ended 09/30/06 | 3 months ended 12/31/06 | 3 months ended 03/31/07 | 3 months ended 06/30/07 | 3 months ended 09/30/07 | 3 months ended 12/31/07 |
|---|---|---|---|---|---|---|---|---|---|
| **Cash flow from operating activities:** | | | | | | | | | |
| Net income | $ 118,300 | $ 201,494 | $ 548,148 | $ 83,433 | $ (127,982) | $ (910,476) | $ (253,996) | $ (2,260,927) | $ (920,939) |
| Reconciliation of net income to net cash provided by (used in) operating activities: | | | | | | | | | |
| Amortization and impairment of mortgage servicing rights | 246,324 | 90,666 | 66,123 | 361,150 | 147,835 | 191,553 | 8,379 | 504,219 | 446,996 |
| Depreciation and amortization | 157,345 | 122,733 | 122,604 | 238,723 | 850,024 | 545,009 | 330,418 | 884,213 | 835,593 |
| Accretion of deferred concession on secured notes | | | | | | | | | |
| Provision for loan losses | 190,000 | | | | | | | | |
| Gain on sale of mortgage loans, net | (249,604) | (267,064) | (374,969) | (236,755) | (11,428) | 234,637 | (173,514) | 569,589 | (298,981) |
| Gain on sale of equity investments | | | (414,508) | | | | 542 | | |
| Net gain on sale of other assets | 4,378 | (12,444) | (11,596) | (13,794) | 55,996 | 18,634 | 56,556 | 148,377 | 52,292 |
| Pension curtailment gain | | | | (42,630) | | | | | |
| Goodwill impairment | | | | | | | | 454,828 | |
| Gain on extinguishment of debt | | | | | | | | (521,088) | |
| Minority interest | | | | | 9,654 | 19,889 | 24,401 | 24,561 | 25,977 |
| Impairment of held-for-sale businesses | | | | | | | | | |
| (Gain) loss on valuation of derivatives | (140,810) | 464,733 | 201,739 | (435,893) | (230,579) | (39,934) | 56,474 | 332,511 | 398,779 |
| (Gain) loss on investment securities | (6,685) | 18,429 | (1,468) | (141,729) | 56,103 | (17,226) | (5,954) | 13,355 | 89,077 |
| Equity in earnings in excess of cash received | (44,377) | (32,213) | (33,127) | (10,943) | (9,162) | 261,982 | (445,458) | 705,259 | 737,746 |
| (Gain) loss in valuation of mortgage servicing rights | 103,927 | (134,536) | (104,733) | 768,570 | 350,052 | | | | |
| Originations and purchases of mortgage loans held for sale | (41,424,190) | (35,539,837) | (44,587,067) | (48,435,361) | (47,979,443) | (36,227,342) | (33,244,099) | (27,251,484) | (18,511,476) |
| Proceeds from sales and repayments of mortgage loans held for sale | 18,803,098 | 32,344,307 | 39,650,288 | 38,525,028 | 45,905,082 | 40,181,401 | 34,645,313 | 24,431,254 | 16,199,900 |
| Deferred income tax | 195,684 | 238,705 | 119,994 | 37,204 | (741,347) | (8,323) | (3,336) | (69,331) | 256,728 |
| **Net change in:** | | | | | | | | | |
| Trading securities | (779,204) | 608,865 | 62,006 | (160,466) | (211,549) | (1,260,252) | (54,223) | 1,616,389 | 1,198,396 |
| Accounts receivable | (62,381) | (5,089) | (123,552) | (281,993) | (236,516) | (206,474) | 200,262 | (90,266) | (599,538) |
| Other assets | 231,622 | (159,919) | 464,915 | (250,014) | (1,411,052) | 661,966 | (841,899) | (2,160,407) | 2,054,169 |
| Other liabilities | (853,240) | (645,827) | (38,327) | 888,866 | (191,329) | 332,175 | (9,263) | (18,253) | 235,971 |
| Net cash provided by (used in) operating activities | (23,704,297) | (2,766,997) | (4,453,530) | (9,106,684) | (3,776,541) | 3,776,419 | 290,603 | (2,166,113) | 1,679,512 |
| **Cash flows from investing activities:** | | | | | | | | | |
| Net decrease in lending receivables | (2,080,540) | | (1,689,434) | (43,447) | (489,342) | 1,940,742 | 1,718,540 | 1,523,955 | 5,263 |
| Net decrease in consumer mortgage finance receivables and loans | 1,021,803 | | | | | | | | |
| Originations and purchases of mortgage loans held for investment | (6,452,537) | | (3,234,839) | (3,629,079) | (2,002,335) | (1,814,457) | (2,187,923) | (2,730,908) | (1,857,259) |
| Proceeds from sales and repayments of mortgage loans held for investment | 10,226,281 | 5,852,269 | 6,766,718 | 6,344,119 | 6,223,537 | 5,491,524 | 4,994,758 | 3,650,312 | 2,795,311 |
| Purchases of available for sale securities | (27,710) | (6,575) | (26,383) | (10,083) | (11,232) | | | | (72,018) |
| Proceeds from sales and repayments of available for sale securities | 295,244 | 4,937 | 6,176 | 6,929 | 6,286 | | | | 28,605 |
| Originations and purchases of mortgage servicing rights, net of sales | 929,912 | | | | | | | | |
| Additions to mortgage servicing rights | (266,589) | | (5,520) | (6,252) | (8) | | | (3,192) | |
| Sale of mortgage servicing rights | 207,591 | | | | | | 398,152 | 165,557 | |
| Net decrease in investments in real estate and other | | | | | | | | | |
| Purchases of and advances to investments in real estate and other | (563,820) | (457,688) | (310,860) | (688,839) | (241,715) | (103,754) | (71,428) | (22,587) | (13,023) |
| Proceeds from sales and returns of investments in real estate and other | 262,438 | 194,456 | 768,162 | 233,233 | 183,359 | 222,676 | 196,417 | 200,012 | 230,443 |
| Proceeds from sales of repossessed, foreclosed and owned real estate | | | | | 251,347 | | | | 103,743 |
| Consolidation of IB Finance Holding Company, LLC | | | | | (332) | | | | |
| Acquisitions, net of cash required | (3,988) | | (2,219) | | | | | | |
| Sale of business unit, net | | | | | | | | | |
| Other, net | 308,148 | 55,042 | 268,725 | 334,321 | 323,371 | 142,153 | 339,487 | 1,368,922 | (673,988) |
| Net cash provided by (used in) investing activities | $ 8,733,132 | $ 211,707 | $ 2,540,526 | $ 2,543,902 | $ 4,242,936 | $ 5,878,884 | $ 4,989,851 | $ 4,152,071 | $ 945,309 |

Note: Quarterly cash flows statements were prepared by calculating the difference between ResCap's year-to-date results.
Source: Residential Capital, LLC, Annual Report (Form 10-K) (Mar. 28, 2006); Residential Capital, LLC, Quarterly Report (Form 10-Q) (Aug. 8, 2006); Residential Capital, LLC, Quarterly Report (Form 10-Q) (Nov. 13, 2006); Residential Capital, LLC, Annual Report (Form 10-K) (Mar. 13, 2007); Residential Capital, LLC, Quarterly Report (Form 10-Q) (May 3, 2007); Residential Capital, LLC, Quarterly Report (Form 10-Q) (Nov. 9, 2007); Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2008).

Appendix VI.B.4.b, Page 42 of 46

**Residential Capital, LLC**
**Cash Flow Statement**
Quarters Ended 2005 – 2007
*($ in Thousands)*

| | 3 months ended 12/31/05 | 3 months ended 03/31/06 | 3 months ended 06/30/06 | 3 months ended 09/30/06 | 3 months ended 12/31/06 | 3 months ended 03/31/07 | 3 months ended 06/30/07 | 3 months ended 09/30/07 | 3 months ended 12/31/07 |
|---|---|---|---|---|---|---|---|---|---|
| **Cash flows from financing activities** | | | | | | | | | |
| Net decrease in borrowings from parent and affiliates | $ (1,477,549) | $ (486,342) | $ (4,691,120) | $ — | $ (31,714) | $ (2,242,891) | $ (4,743,248) | $ (4,676,912) | $ (1,346,425) |
| Net increase in borrowings from parent | — | — | — | — | — | — | — | — | — |
| Net decrease in affiliate borrowings | 1,854,718 | (3,280,545) | (799,764) | — | — | — | — | — | — |
| Net increase in other short-term borrowings | 12,215,042 | — | — | 6,842,826 | 1,635,557 | 261,531 | — | — | — |
| Proceeds from issuance of collateralized borrowings in securitization trusts | (5,739,415) | 7,726,261 | 4,446,868 | 5,508,875 | (5,657,850) | (4,795,865) | 961,573 | 2,713,951 | 1,697,762 |
| Repayments of collateralized borrowings in securitization trusts | 7,896,054 | (5,131,505) | (5,858,425) | (5,957,308) | 10,114,674 | 4,016,419 | (4,620,540) | (4,051,356) | (2,462,073) |
| Proceeds from secured aggregation facilities, long-term | (3,157,448) | 4,513,759 | 6,416,406 | 8,026,228 | (7,980,207) | (7,024,998) | 3,304,378 | 4,837,838 | 200,000 |
| Repayments from secured aggregation facilities, long-term | 2,413,429 | (5,141,761) | (5,619,414) | (9,201,607) | 2,462,937 | 1,191,744 | (4,854,876) | (4,330,872) | (1,200,635) |
| Proceeds from secured aggregation facilities, long-term | 58,178 | 3,039,925 | 7,107,287 | 1,687,898 | (161,714) | (499,248) | 5,369,986 | 1,299,040 | 2,337,000 |
| Repayments from secured aggregation facilities, long-term | — | (149,668) | (124,027) | (133,021) | (7,866) | — | (1,289,033) | (865,983) | (2,538,222) |
| Proceeds from other long-term borrowings | — | — | — | — | — | — | — | — | — |
| Repayments from other long-term borrowings | — | — | — | — | — | — | — | — | — |
| Extinguishment of long-term borrowing | — | — | — | — | — | — | — | — | — |
| Payments of debt issuance costs | (121,413) | (35,119) | (47,273) | (19,422) | (580,752) | (6,297) | (20,659) | — | (22,062) |
| Dividends paid | — | — | — | — | — | — | — | — | — |
| Capital contributions to noncontrolling interest entity) | — | — | — | — | — | — | (500,000) | 5,648 | — |
| Proceeds from capital contributions | — | — | — | — | — | 500,000 | 1,000,000 | 1,256,000 | — |
| Disposal of healthcare (subsidiary/businesses) business, net | — | — | — | — | — | — | — | — | — |
| Increase in deposit liabilities | 487,742 | 1,472,341 | 712,929 | (50,911) | (391,481) | (484,910) | 1,286,487 | 898,794 | — |
| Net cash provided by financing activities | 14,429,338 | 2,527,346 | 1,543,467 | 6,703,558 | (598,416) | (9,084,515) | (4,105,932) | 3,835,658 | (1,506,442) |
| Cash and cash equivalents of GMAC Bank and ResMor Trust upon sale | — | — | — | — | — | — | — | 921,806 | (4,841,097) |
| Effect of foreign exchange rates on cash and cash equivalents | (5,091) | (5,232) | 21,464 | (48,518) | 173,026 | 12,859 | (62,370) | (102,922) | 112,701 |
| Net increase (decrease) in cash and cash equivalents | (546,918) | (33,176) | (348,073) | 92,338 | 41,005 | 583,647 | 1,112,152 | 2,804,842 | (2,103,575) |
| Cash and cash equivalents reclassified to assets of held-for-sale | — | — | — | — | — | — | — | — | — |
| Cash and cash equivalents at beginning of year | 2,813,671 | 2,266,753 | 2,233,577 | 1,885,504 | 1,977,842 | 2,018,847 | 2,602,494 | 3,714,646 | 6,519,488 |
| Cash and cash equivalents at end of year | $ 2,266,753 | $ 2,233,577 | $ 1,885,504 | $ 1,977,842 | $ 2,018,847 | $ 2,602,494 | $ 3,714,646 | $ 6,519,488 | $ 4,415,913 |

*Note: Quarterly cash flows statements were prepared by calculating the difference between ResCap's year-to-date results.*

*Source: Residential Capital, LLC, Annual Report (Form 10-K) (Mar. 28, 2006); Residential Capital, LLC, Quarterly Report (Form 10-Q) (May 3, 2006); Residential Capital, LLC, Annual Report (Form 10-K) (Mar. 13, 2007); Residential Capital, LLC, Quarterly Report (Form 10-Q) (May 8, 2007); Residential Capital, LLC, Annual Report (Form 10-K) (Mar. 13, 2007); Residential Capital, LLC, Quarterly Report (Form 10-Q) (Nov. 7, 2006); Residential Capital, LLC, Annual Report (Form 10-K) (Mar. 13, 2007); Residential Capital, LLC, Quarterly Report (Form 10-Q) (May 8, 2007); Residential Capital, LLC, Quarterly Report (Form 10-Q) (Nov. 7, 2007); Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2008).*

Appendix VI.B.4.b, Page 42 of 46

**Residential Capital, LLC**
**Cash Flow Statement**
Quarters Ended 2008 - 2009
($ in Thousands)

| | 3 months ended 03/31/08 | 3 months ended 06/30/08 | 3 months ended 09/30/08 | 3 months ended 12/31/08 | 3 months ended 03/31/09 | 3 months ended 06/30/09 | 3 months ended 09/30/09 | 3 months ended 12/31/09 |
|---|---|---|---|---|---|---|---|---|
| **Cash flow from operating activities:** | | | | | | | | |
| Net income | $ (859,090) | $ (1,859,519) | $ (1,912,171) | $ (980,650) | $ 3,659 | $ (841,145) | $ (648,522) | $ (3,054,393) |
| *Reconciliation of net income to net cash provided by (used in) operating activities:* | | | | | | | | |
| Amortization and impairment of mortgage servicing rights | 340,808 | (23,763) | 65,085 | 74,264 | (5,716) | 48,467 | 18,290 | 3,690 |
| Depreciation and amortization | - | - | - | - | - | (100,982) | (32,301) | (32,460) |
| Accretion of deferred concession on secured notes | - | - | - | - | - | - | - | - |
| Provision for loan losses | 302,021 | 467,300 | 660,882 | 825,206 | 471,766 | 502,656 | 79,876 | 1,174,852 |
| Gain on sale of mortgage loans, net | 747,996 | 1,061,505 | 138,177 | 56,241 | (190,633) | 488,667 | (152,592) | (95,302) |
| Gain on sale of equity investments | - | - | - | 40,257 | - | - | - | - |
| Net gain on sale of other assets | (45,416) | 577,713 | (5,868) | 71,164 | 37,462 | 260,624 | (890) | 30,011 |
| Pension curtailment gain | - | - | - | - | - | - | - | (17,812) |
| Goodwill impairment | (479,544) | (647,075) | (42,199) | (756,550) | (900,324) | (816,904) | - | - |
| Gain on extinguishment of debt | 38,281 | (28,119) | 37,135 | (8,824) | - | - | - | 903,276 |
| Minority interest | - | - | - | - | - | - | - | - |
| Impairment of held-for-sale businesses | - | - | - | - | - | - | - | - |
| (Gain) loss on investment securities | 443,820 | 90,064 | 41,898 | 79,998 | 12,200 | 52,275 | 3,430 | 18,708 |
| (Gain) loss on valuation of derivatives | (1,548) | (3,092) | 311 | 448 | 6,543 | - | - | (849) |
| Equity in earnings of investees in excess of cash received | 629,584 | (687,373) | 587,162 | 1,720,754 | 286,496 | (481,056) | 444,619 | - |
| (Gain) loss on valuation of mortgage servicing rights | (19,998,307) | (17,335,354) | (11,847,416) | (8,640,214) | (9,656,702) | (16,294,484) | (14,970,611) | (15,778,695) |
| Originations and purchases of mortgage loans held for sale | 19,357,813 | 22,373,401 | 13,210,882 | 9,644,062 | 9,632,542 | 16,623,646 | 14,737,858 | 15,976,725 |
| Proceeds from sales and repayments of mortgage loans held for sale | - | - | - | - | - | - | - | - |
| Deferred income tax | (67,591) | 257,093 | (9,112) | (205,532) | (67,155) | (417) | (1,040) | 2,965 |
| *Net change in:* | | | | | | | | |
| Trading securities | 551,770 | 118,265 | 176,615 | 21,617 | 4,314 | 16,565 | 13,363 | (14,483) |
| Accounts receivable | (283,799) | 721,006 | (675,416) | 218,562 | 188,426 | 112,537 | (30,588) | 55,871 |
| Other assets | (35,489) | 1,617,710 | 119,373 | (1,211,284) | 133,984 | (155,659) | 153,980 | (235,092) |
| Other liabilities | 84,555 | (1,993,088) | 224,750 | 197,077 | 71,117 | 107,733 | 664,952 | 473,231 |
| Net cash provided by (used in) operating activities | 1,125,864 | 4,706,674 | 770,088 | 1,147,496 | 27,981 | (477,477) | 279,824 | (589,757) |
| **Cash flow from investing activities:** | | | | | | | | |
| Net increase in lending receivables | (416,304) | 412,833 | 447,333 | (2,380) | (371,511) | 142,563 | 483,653 | 119,921 |
| Net decrease in consumer mortgage finance receivables and loans | - | - | - | - | - | - | - | - |
| Originations and purchases of mortgage loans held for investment | (1,642,308) | (1,331,064) | (662,371) | (325,629) | (224,092) | (214,569) | (204,301) | (163,025) |
| Proceeds from sales and repayments of mortgage loans held for investment | 1,737,721 | 1,780,996 | 1,261,770 | 954,353 | 510,191 | 422,416 | 570,440 | 385,087 |
| Purchases of available for sale securities | - | - | - | - | - | - | - | - |
| Proceeds from sales and repayments of available for sale securities | - | - | - | - | - | - | - | - |
| Originations and purchases of mortgage servicing rights, net of sales | - | - | - | - | - | - | - | - |
| Additions to mortgage servicing rights | 174,112 | - | 310,179 | 312,574 | - | 19,337 | - | - |
| Sale of mortgage servicing rights | - | - | - | - | - | - | - | - |
| Net decrease in investments in real estate and other | - | - | - | - | - | - | - | - |
| Purchase of and advances to investments in real estate and other | (12,320) | (3,382) | (1,150) | 13,551 | (4,100) | (264) | - | - |
| Proceeds from sales of and returns of investments in real estate and other | 112,883 | 143,992 | 103,028 | 85,774 | 42,534 | 18,526 | 44,614 | 32,953 |
| Proceeds from sales of repossessed, foreclosed and owned real estate | - | - | - | - | - | - | 197,425 | 160,957 |
| Consolidation of IB Finance Holding Company, LLC | - | - | - | - | - | 516,820 | - | - |
| Acquisitions, net of cash required | - | - | - | - | - | - | - | - |
| Sale of business unit, net | - | - | - | - | - | - | - | - |
| Other, net | 156,682 | 391,573 | 359,134 | 944,808 | 426,219 | - | 181,394 | 1,241 |
| Net cash provided by (used in) investing activities | $ 110,466 | $ 1,394,948 | $ 1,817,923 | $ 1,983,051 | $ 379,241 | $ 594,468 | $ 1,273,225 | $ 537,134 |

Note: Quarterly cash flow statements were prepared by calculating the difference between Balance Sheet and year-to-date results.
Source: Residential Capital, LLC Quarterly Report (Form 10-Q) (Aug. 8, 2008); Residential Capital, LLC Quarterly Report (Form 10-Q) (Nov. 7, 2008); Residential Capital, LLC Annual Report (Form 10-K) (Feb. 27, 2009); Residential Capital, LLC Quarterly Report (Form 10-Q) (May 7, 2009); Residential Capital, LLC Quarterly Report (Form 10-Q) (May 11, 2009); Residential Capital, LLC Condensed Consolidated Financial Statements for the Periods Ended September 30, 2009 and 2008, dated Sept. 30, 2009 [EXAB00124378]; Residential Capital, LLC Consolidated Financial Statements for the Years Ended December 31, 2009 and 2008, dated Feb. 26, 2010 [EXAB00124453].

Appendix VI.B.4.b, Page 44 of 46

**Residential Capital, LLC**
**Cash Flow Statement**
Quarters Ended 2008 – 2009
*($ in Thousands)*

| | 3 months ended 03/31/08 | 3 months ended 06/30/08 | 3 months ended 09/30/08 | 3 months ended 12/31/08 | 3 months ended 03/31/09 | 3 months ended 06/30/09 | 3 months ended 09/30/09 | 3 months ended 12/31/09 |
|---|--:|--:|--:|--:|--:|--:|--:|--:|
| Cash flows from financing activities: | | | | | | | | |
| Net decrease in borrowings from parent and affiliates | $ 655,000 | $ 4,045,000 | $ (577,876) | $ 83,105 | $ (186,116) | $ 571,243 | $ (628,805) | $ (98,457) |
| Net increase in borrowings from parent | | 971,677 | (96,698) | (867,396) | (7,583) | - | - | - |
| Net increase in affiliate borrowings | - | - | - | - | - | - | - | - |
| Net increase in other short-term borrowings | (3,275,241) | (5,780,654) | (1,862,611) | (2,600,519) | (725,195) | (544,490) | (425,116) | (48,139) |
| Proceeds from issuance of collateralized borrowings in securitization trusts | | | | | | 229,933 | | |
| Repayments of collateralized borrowings in securitization trusts | (994,499) | (756,387) | (656,721) | (484,525) | (348,822) | (416,389) | (402,034) | (334,152) |
| Proceeds from secured aggregation facilities, long-term | 160,000 | | | | | | | |
| Repayments from secured aggregation facilities, long-term | (465,114) | | | | | | | |
| Proceeds from other long-term borrowings | 1,325,000 | 1,080,000 | 570,000 | 18,000 | 711,000 | 521,000 | 157,000 | 122,000 |
| Repayments from other long-term borrowings | (1,342,106) | (2,803,541) | (818,563) | (1,540,500) | (287,404) | (709,939) | (550,933) | (161,348) |
| Extinguishment of long-term borrowing | | (2,060,829) | | | | | | |
| Payments of debt issuance costs | (9,620) | (27,722) | (8,910) | (6,747) | (6,936) | (18,254) | (1,264) | (824) |
| Dividends paid | | | | | | | | (494) |
| Capital contributions (to noncontrolling interest entity) | | 14,264 | (10) | 10,000 | 150,000 | 494 | | 600,494 |
| Proceeds from capital contributions | | | | | | | | |
| Disposal of healthcare (subsidiary/businesses) business, net | | | 163,310 | 121,103 | | 23,759 | | |
| Increase in deposit liabilities | | | 696,525 | 1,778,177 | 1,629,258 | | | |
| Net cash provided by financing activities | 2,604,119 | 1,584,300 | (2,591,554) | (3,489,302) | 928,202 | (342,643) | (1,851,152) | 79,080 |
| Cash and cash equivalents of GMAC Bank and ResMor Trust upon sale | | | | | (6,678,339) | | | |
| Effect of foreign exchange rates on cash and cash equivalents | (155,058) | 55,399 | 310,533 | 456,673 | 66,653 | (292,125) | 27,884 | (24,226) |
| Net increase (decrease) in cash and cash equivalents | (261,189) | 2,423,129 | 306,990 | 97,918 | (5,276,262) | (517,777) | (270,219) | 2,231 |
| Cash and cash equivalents reclassified to assets of held-for-sale | | | | | | | | (155,473) |
| Cash and cash equivalents at beginning of year | 4,415,913 | 4,154,724 | 6,577,853 | 6,884,843 | 6,982,761 | 1,706,499 | 1,188,722 | 918,503 |
| Cash and cash equivalents at end of year | $ 4,154,724 | $ 6,577,853 | $ 6,884,843 | $ 6,982,761 | $ 1,706,499 | $ 1,188,722 | $ 918,503 | $ 765,261 |

*Note: Quarterly cash flows statements were prepared by calculating the difference between ResCap's year-to-date results.*
*Source: Residential Capital, LLC, Quarterly Report (Form 10-Q) (May 7, 2008); Residential Capital, LLC, Quarterly Report (Form 10-Q) (Aug. 8, 2008); Residential Capital, LLC, Quarterly Report (Form 10-Q) (Nov. 10, 2008); Residential Capital, LLC, Annual Report (Form 10-K)*
*(Feb. 27, 2009); Residential Capital, LLC, Quarterly Report (Form 10-Q) (May 11, 2009); Residential Capital, LLC, Quarterly Report (Form 10-Q) (Aug. 7, 2009); Residential Capital, LLC, Condensed Consolidated Financial Statements for the Periods Ended September 30, 2009 and*
*2008, dated Sept. 30, 2009 [EXAM00124378]; Residential Capital, LLC, Consolidated Financial Statements for the Years Ended December 31, 2009 and 2008, dated Feb. 26, 2010 [EXAM00124453].*

**Residential Capital, LLC**
**Cash Flow Statement**
Quarters Ended 2010 - 2011
($ in Thousands)

| | 3 months ended 03/31/10 | 3 months ended 06/30/10 | 3 months ended 09/30/10 | 3 months ended 12/31/10 | 3 months ended 03/31/11 | 3 months ended 06/30/11 | 3 months ended 09/30/11 | 3 months ended 12/31/11 |
|---|---|---|---|---|---|---|---|---|
| **Cash flows from operating activities:** | | | | | | | | |
| Net income | $ 109,917 | $ 364,142 | $ 37,784 | $ 63,232 | $ 40,453 | $ (112,636) | $ (441,641) | $ (331,239) |
| Reconciliation of net income to net cash provided by (used in) operating activities: | | | | | | | | |
| Amortization and impairment of mortgage servicing rights | | | | | | | | |
| Depreciation and amortization | 17,195 | (3,225) | 13,159 | 5,846 | 7,004 | 6,798 | 7,369 | 6,074 |
| Accretion of deferred concession on secured notes | (32,489) | (28,468) | (24,403) | (24,649) | (24,898) | (25,159) | (25,404) | (25,661) |
| Provision for loan losses | (2,452) | 13,697 | 3,639 | (266) | 5,632 | 1,055 | 1,356 | 15,978 |
| Gain on sale of mortgage loans, net | (139,829) | (230,167) | (142,960) | 30,769 | (35,200) | (65,926) | (30,823) | (90,210) |
| Gain on sale of equity investments | | | | (1,041) | | | | |
| Net gain on sale of other assets | (2,030) | (21,375) | (440) | | 3,345 | (605) | 5,747 | 7,647 |
| Pension curtailment gain | | | | | | | | |
| Goodwill impairment | | | | | | | | |
| Gain on extinguishment of debt | | | | | | | | |
| Minority interest | | | | | | | | |
| Impairment of held-for-sale businesses | (3,800) | (94,845) | 43,996 | | | | | |
| (Gain) loss on valuation of derivatives | (8,234) | 3,231 | (2,965) | (3,531) | | | | |
| (Gain) loss on investment securities | (973) | | | | | | | |
| Equity in earnings in excess of cash received | | | | | (2,004) | | | 226 |
| (Gain) loss on valuation of mortgage servicing rights | 162,684 | 504,065 | 324,340 | (265,738) | (36,488) | 130,944 | 608,589 | 109,390 |
| Originations and purchases of mortgage loans held for sale | (14,928,615) | (12,830,183) | (18,244,166) | (24,292,857) | (15,483,820) | (13,254,685) | (15,514,873) | (16,422,289) |
| Proceeds from sales and repayments of mortgage loans held for sale | 14,698,898 | 13,164,978 | 18,122,800 | 24,355,740 | 15,204,714 | 13,170,121 | 15,188,251 | 16,050,206 |
| Deferred income tax | | | | | | | | |
| Net change in: | | | | | | | | |
| Trading securities | 7,198 | 244 | 5,499 | 4,655 | | | | |
| Accounts receivable | 67,645 | 209,207 | 200,369 | (84,189) | 250,806 | 246,419 | 13,678 | 241,685 |
| Other assets | 448,658 | (2,136,439) | (1,773,355) | (294,356) | 1,170,188 | (866,836) | (3,743,698) | 2,001,318 |
| Other liabilities | (183,922) | 1,839,900 | 2,154,018 | (741,835) | (787,829) | 864,624 | 4,062,536 | (1,669,094) |
| Net cash provided by (used in) operating activities | 209,851 | 754,762 | 717,315 | (1,248,220) | 311,903 | 89,575 | 132,867 | (105,969) |
| **Cash flow from investing activities:** | | | | | | | | |
| Net decrease in lending receivables | 58,179 | 109,471 | 21,108 | 26,231 | 11,412 | 10,230 | 17,342 | 7,448 |
| Net decrease in consumer finance receivables and loans | | | | 2,493,434 | 187,378 | 152,195 | 119,872 | 86,690 |
| Originations and purchases of mortgage loans held for investment | (5,853) | (3,136) | (2,872) | 11,861 | | | | |
| Proceeds from sales and repayments of mortgage loans held for investment | 846,239 | 691,640 | 724,167 | (2,262,046) | | | | |
| Purchases of available for sale securities | | | | | | | | |
| Proceeds from sales and repayments of available for sale securities | | | | | | | | |
| Originations and purchases of mortgage servicing rights, net of sales | | | | | | | | |
| Additions to mortgage servicing rights | | | | | | | | |
| Sale of mortgage servicing rights | | | | | | | | |
| Net decrease in investments in real estate and other | | | | 107,187 | 3,085 | 935 | 435 | 88 |
| Purchase of and advances to investments in real estate and other | | | | | | | | |
| Proceeds from sales of and returns of investments in real estate and other | 78,620 | 10,423 | 13,328 | (102,371) | | | | |
| Proceeds from sales of repossessed, foreclosed and owned real estate | 154,022 | 139,784 | 84,062 | 26,151 | 44,363 | 30,431 | 18,576 | 14,979 |
| Consolidation of IB Finance Holding Company, LLC | | | | | | | | |
| Acquisitions, net of cash required | | | | | | | | |
| Sale of business unit, net | | (822) | (341,797) | 219,015 | | | | |
| Other, net | (40,341) | | (40,115) | 987,940 | (9,072) | (8,556) | 43,431 | 147,507 |
| Net cash provided by (used in) investing activities | $ 1,090,866 | $ 947,560 | $ 457,888 | $ 1,507,402 | $ 237,166 | $ 185,035 | $ 199,656 | $ 256,712 |

*Note: Quarterly cash flows statements were prepared by calculating the difference between ResCap's year-to-date results.*

*Source: Residential Capital, LLC Condensed Consolidated Financial Statements for the Periods Ended March 31, 2010 and 2009, dated Mar. 31, 2010 [EXAM0012387B]; Residential Capital, LLC Condensed Consolidated Financial Statements for the Periods Ended June 30, 2010 and 2009, dated June 30, 2010 [EXAM0012396]; Residential Capital, LLC Condensed Consolidated Financial Statements for the Periods Ended September 30, 2010 and 2009, dated Sept. 30, 2010 [EXAM0012999]; Residential Capital, LLC Consolidated Financial Statements for the Years Ended December 31, 2010 and 2009, dated Feb. 28, 2011 [EXAM0012129]; Residential Capital, LLC Condensed Consolidated Financial Statements for the Periods Ended March 31, 2011 [EXAM0012389]; Residential Capital, LLC Condensed Consolidated Financial Statements for the Periods Ended June 30, 2011 and 2010, dated June 30, 2011 [EXAM0012339]; Residential Capital, LLC Condensed Consolidated Financial Statements for the Periods Ended September 30, 2011 and 2010, dated Sept. 30, 2011 [EXAM0012349]; Residential Capital, LLC Consolidated Financial Statements for the Years Ended December 31, 2011 and 2010, dated Mar. 28, 2012 [EXAM0012651].*

**Appendix VI.B.4.b, Page 46 of 46**

**Residential Capital, LLC**
**Cash Flow Statement**
Quarters Ended 2010 - 2011
*($ in Thousands)*

| | 3 months ended 03/31/10 | 3 months ended 06/30/10 | 3 months ended 09/30/10 | 3 months ended 12/31/10 | 3 months ended 03/31/11 | 3 months ended 06/30/11 | 3 months ended 09/30/11 | 3 months ended 12/31/11 |
|---|---|---|---|---|---|---|---|---|
| **Cash flows from financing activities:** | | | | | | | | |
| Net decrease in borrowings from parent and affiliates | $ (428,576) | $ (95,881) | $ (45,541) | $ (362,017) | $ (187,146) | $ (78,426) | $ (78,103) | $ (228,007) |
| Net increase in borrowings from parent | - | 72,609 | 83,783 | 569,998 | 91,776 | (118,918) | (173,236) | 343,675 |
| Net increase in affiliate borrowings | - | - | - | - | - | - | - | - |
| Net increase in other short-term borrowings | (195,229) | (658,357) | - | (543,421) | (140,203) | (127,247) | (104,203) | (186,261) |
| Proceeds from issuance of collateralized borrowings in securitization trusts | 19,741 | 107,000 | - | - | - | 77,127 | 134,242 | 56,594 |
| Repayments of collateralized borrowings in securitization trusts | (755,848) | (934,225) | - | (250,603) | (796,606) | (85,345) | (135,916) | (94,983) |
| Proceeds from secured aggregation facilities, long-term | - | - | - | - | - | - | - | - |
| Repayments from secured aggregation facilities, long-term | - | - | - | - | - | - | - | - |
| Proceeds from other long-term borrowings | 64,000 | - | - | 441,896 | 519,362 | - | - | - |
| Repayments from other long-term borrowings | (92,443) | - | - | (143,605) | - | - | - | (34,836) |
| Extinguishment of long-term borrowing | - | - | - | - | - | - | - | - |
| Payments of debt issuance costs | - | - | - | - | - | - | - | - |
| Dividends paid | - | - | - | - | - | - | - | - |
| Capital contributions (to noncontrolling interest entity) | - | - | - | - | - | - | - | - |
| Proceeds from capital contributions | - | - | - | - | - | - | - | - |
| Disposal of healthcare (subsidiary/businesses) business, net | - | - | - | - | - | - | - | - |
| Increase in deposit liabilities | - | - | - | - | - | - | - | - |
| Net cash provided by financing activities | (1,388,355) | (1,458,514) | (36,351) | (287,752) | (512,817) | (332,809) | (357,216) | (143,818) |
| Cash and cash equivalents of GMAC Bank and ResMor Trust upon sale | - | - | - | - | - | - | - | - |
| Effect of foreign exchange rates on cash and cash equivalents | 20,527 | (12,238) | - | (27,377) | 10,254 | 3,955 | (17,257) | (10,742) |
| Net increase (decrease) in cash and cash equivalents | 106,828 | (295,556) | (3,855) | (55,947) | 46,506 | (54,244) | (41,950) | (3,817) |
| Cash and cash equivalents reclassified to assets of held-for-sale | (210,468) | 291,949 | - | 110,343 | - | - | - | - |
| Cash and cash equivalents at beginning of year | 765,261 | 725,055 | 621,415 | 617,808 | 672,204 | 718,710 | 664,466 | 622,516 |
| Cash and cash equivalents at end of year | $ 725,055 | $ 621,415 | $ 617,808 | $ 672,204 | $ 718,710 | $ 664,466 | $ 622,516 | $ 618,699 |

*Note: Quarterly cash flows statements were prepared by calculating the difference between ResCap's year-to-date results.*

*Source: Residential Capital, LLC, Condensed Consolidated Financial Statements for the Periods Ended March 31, 2010 and 2009, dated Mar. 31, 2010 [EXM00122870]; Residential Capital, LLC, Condensed Consolidated Financial Statements for the Periods Ended June 30, 2010 and 2009, dated Sept. 30, 2010 [EXM00122999]; Residential Capital, LLC, Condensed Consolidated Financial Statements for the Years Ended December 31, 2010 and 2009, dated Feb. 28, 2011 [EXM00123128]; Residential Capital, LLC, Condensed Consolidated Financial Statements for the Periods Ended March 31, 2011 and 2010, dated Mar. 31, 2011 [EXM00122339]; Residential Capital, LLC, Condensed Consolidated Financial Statements for the Periods Ended June 30, 2011 [EXM00122399]; Residential Capital, LLC, Condensed Consolidated Financial Statements for the Periods Ended September 30, 2011 and 2010, dated Sept. 30, 2011 [EXM00122480]; Residential Capital, LLC, Consolidated Financial Statements for the Years Ended December 31, 2011 and 2010, dated Dec. 28, 2012 [EXM00122651].*

**Appendix VI.E—1, Page 1 of 5**

**GMAC Mortgage, LLC**
**Consolidated Income Statements**
Years Ended December 2003 – 2011
*($ In Thousands)*

| | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 |
|---|---|---|---|---|---|---|---|---|---|
| **Revenue** | | | | | | | | | |
| Interest income | $ 590,195 | $ 418,737 | $ 583,799 | $ 618,598 | $ 622,449 | $ 338,614 | $ 274,608 | $ 220,647 | $ 72,248 |
| Interest expense | 341,394 | 260,370 | 504,404 | 763,091 | 776,288 | 506,105 | 305,060 | 173,307 | 115,548 |
| Net financing revenue | 257,801 | 158,367 | 79,395 | (144,493) | (153,839) | (167,491) | (30,452) | 47,340 | (43,300) |
| **Other revenue** | | | | | | | | | |
| Servicing fees | 835,789 | 869,486 | 969,262 | 1,051,398 | 1,137,956 | 996,966 | 926,635 | 848,755 | 730,876 |
| Amortization and impairment of mortgage servicing rights | - | (775,564) | (539,412) | (718,073) | (320,946) | - | (587,273) | - | (293,416) |
| Servicing asset valuation and hedge activities, net | - | 211,222 | 93,610 | - | - | 237,483 | - | 340,249 | - |
| Total servicing income, net | 835,789 | 305,144 | 523,460 | 333,325 | 817,010 | 1,234,449 | 339,362 | 1,189,004 | 437,460 |
| Gain on mortgage loans, net | 1,057,167 | 438,129 | 313,727 | 246,518 | 38,598 | 231,354 | 517,329 | 298,672 | 163,330 |
| Gain (loss) on investments, net | 58,199 | 68,863 | 130,045 | 119,316 | (369,540) | (257,341) | (44,426) | - | (8,282) |
| Loss on foreclosed real estate | - | - | - | - | - | (6,907) | (11,600) | (5,502) | - |
| Other revenue, net | 58,423 | 59,142 | 77,870 | 96,208 | 97,625 | (84,209) | 161,637 | 102,793 | 91,071 |
| Total other revenue | 2,009,578 | 871,278 | 1,045,102 | 795,367 | 583,693 | 1,117,346 | 962,302 | 1,584,967 | 683,579 |
| Total net revenue | 2,267,379 | 1,029,645 | 1,124,497 | 650,874 | 429,854 | 949,855 | 931,850 | 1,632,307 | 640,279 |
| Provision for loan losses | 89,137 | (5,298) | (1,130) | 1,195 | 24,986 | 134,806 | 745,670 | 5,586 | (2,697) |
| Hedge and asset valuation (gain), net | (401,748) | - | - | - | - | - | - | - | - |
| Amortization and impairment of mortgage servicing rights | 1,555,275 | - | - | - | - | - | - | - | - |
| **Noninterest expense** | | | | | | | | | |
| Compensation and benefits | 290,879 | 215,118 | 329,689 | 292,973 | 310,324 | 312,253 | 279,772 | 238,109 | 304,516 |
| Mortgage fines and penalties | - | - | - | - | - | - | - | - | 204,000 |
| Representation and warranty expense, net | - | - | - | - | - | - | 1,024,294 | 703,719 | 98,614 |
| Professional fees | 39,097 | 41,106 | 55,787 | 62,215 | 41,434 | 37,570 | 38,422 | 54,542 | 94,136 |
| Data processing and telecommunications | 96,160 | 97,867 | 88,478 | 81,484 | 97,842 | 67,131 | 112,366 | 111,030 | 77,955 |
| Occupancy | 38,062 | 37,578 | 41,565 | 48,078 | 47,563 | 36,341 | 27,849 | 22,228 | 26,461 |
| Goodwill impairment | - | - | - | - | 176,726 | - | - | - | - |
| Restructuring | 39,495 | - | - | - | 46,760 | - | - | - | - |
| Supplies and equipment | 104,113 | 126,271 | 126,628 | 110,632 | 79,624 | 46,437 | 10,049 | 360 | 18,160 |
| Advertising | - | - | - | - | - | - | - | - | - |
| Other noninterest expense, net | 95,394 | 209,815 | 191,461 | 184,598 | 277,809 | 393,984 | 1,024,343 | 410,438 | 341,198 |
| Total noninterest expense | 703,200 | 727,755 | 833,608 | 779,980 | 1,078,082 | 893,716 | 2,517,095 | 1,540,426 | 1,165,040 |
| Income(loss) before income taxes | 321,515 | 307,188 | 292,019 | (130,301) | (673,214) | (78,667) | (2,330,915) | 86,295 | (522,064) |
| Income tax provision (benefit) | 110,133 | 144,547 | 125,763 | (780,424) | 16,662 | (21,723) | (7,057) | 9,346 | 5,466 |
| Net income (loss) | $ 211,382 | $ 162,641 | $ 166,256 | $ 650,123 | $ (689,876) | $ (56,944) | $ (2,323,858) | $ 76,949 | $ (527,530) |

*Source: GMAC Mortgage Corporation, Consolidated Financial Statements as of and for the Years Ended December 31, 2004 and 2003 (Restated), dated Mar. 25, 2005 [EXAM00126060]; GMAC Mortgage Corporation, Consolidated Financial Statements as of and for the Years Ended December 31, 2005 (Restated), dated Mar. 30, 2006 [EXAM00231553]; GMAC Mortgage, LLC Consolidated Financial Statements as of and for the Years Ended December 31, 2006 and 2005, dated Mar. 29, 2007 [EXAM00231760]; GMAC Mortgage, LLC Consolidated Financial Statements as of and for the Years Ended December 31, 2007 and 2006, dated Mar. 25, 2008 [EXAM00231945]; GMAC Mortgage, LLC Consolidated Financial Statements as of and for the Years Ended December 31, 2008 and 2007, dated Mar. 25, 2009 [EXAM00126182]; GMAC Mortgage, LLC Consolidated Financial Statements for the Years Ended December 31, 2009 and 2008, dated Mar. 19, 2010 [EXAM00124578]; GMAC Mortgage, LLC Consolidated Financial Statements for the Years Ended December 31, 2010 and 2009, dated Mar. 10, 2011 [EXAM00123214]; GMAC Mortgage, LLC Consolidated Financial Statements for the Years Ended December 31, 2011 and 2010, dated Mar. 28, 2012 [EXAM00132252].*

**GMAC Mortgage, LLC**
**Consolidated Balance Sheets**
Years Ended December 2003 – 2011
*($ in Thousands)*

| Assets | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 |
|---|---|---|---|---|---|---|---|---|---|
| **Current assets** | | | | | | | | | |
| Cash and cash equivalents | $ 237,833 | $ 166,498 | $ 147,829 | $ 84,591 | $ 126,779 | $ 206,558 | $ 125,130 | $ 194,340 | $ 117,303 |
| Investments, trading | 276,018 | 482,187 | 2,098,233 | 1,772,604 | 595,962 | - | - | - | - |
| Investments, available for sale | 88,607 | 1,237,290 | 1,057,361 | 151,492 | 150,194 | - | - | - | - |
| Accounts receivable | 749,694 | 757,374 | 1,088,035 | 986,005 | 1,349,013 | 2,537,805 | 2,409,026 | 2,466,377 | 2,850,059 |
| Mortgage loans held for sale, net | 5,468,819 | 4,498,742 | 4,746,127 | 4,387,668 | 2,382,949 | 604,370 | 2,729,973 | 3,384,115 | 3,105,352 |
| Mortgage loans held for investment, net | 93,756 | 89,932 | 68,973 | 53,907 | 1,323,347 | 1,710,968 | - | - | - |
| Mortgage servicing rights, net | 2,590,622 | 2,682,557 | 3,056,446 | 3,752,733 | 3,395,126 | 1,977,973 | 2,254,269 | 1,827,529 | 1,131,518 |
| Certificated trading securities | - | - | - | - | - | 84,773 | 75,012 | - | - |
| Finance receivables and loans, net | | | | | | | | | |
| Consumer | - | - | - | - | - | - | 239,099 | 241,730 | 205,917 |
| Allowance for loan losses | - | - | - | - | - | - | (13,481) | (16,676) | (10,126) |
| Total finance receivables and loan, net | - | - | - | - | - | - | 225,618 | 225,054 | 195,791 |
| Lending receivables | 513,067 | 630,497 | 847,223 | 1,333 | 182 | - | - | - | - |
| Goodwill | 161,107 | 171,996 | 176,726 | 176,726 | - | - | - | - | - |
| Other assets | 379,011 | 807,594 | 691,526 | 487,613 | 1,287,129 | 2,380,887 | 2,730,572 | 5,172,331 | 6,579,084 |
| Intercompany income taxes receivable | 373,508 | - | - | - | - | - | - | - | - |
| Total assets | $ 10,932,042 | $ 11,524,667 | $ 13,978,479 | $ 11,854,672 | $ 10,610,681 | $ 9,503,334 | $ 10,549,690 | $ 13,269,746 | $ 13,979,107 |

Source: GMAC Mortgage Corporation, Consolidated Financial Statements as of and for the Years Ended December 31, 2004 and 2003 (Restated), dated Mar. 25, 2005 [EXAM0012660]; GMAC Mortgage Corporation, Consolidated Financial Statements as of and for the Years Ended December 31, 2005 and 2004 (Restated), dated Mar. 30, 2006 [EXAM0121551]; GMAC Mortgage, LLC Consolidated Financial Statements as of and for the Years Ended December 31, 2006 and 2005, dated Mar. 29, 2007 [EXAM0121760]; GMAC Mortgage, LLC Consolidated Financial Statements as of and for the Years Ended December 31, 2007 and 2006, dated Mar. 25, 2008 [EXAM0123043]; GMAC Mortgage, LLC Consolidated Financial Statements as of and for the Years Ended December 31, 2008 and 2007, dated Mar. 25, 2009 [EXAM0126182]; GMAC Mortgage, LLC Consolidated Financial Statements for the Years Ended December 31, 2009 and 2008, dated Mar. 19, 2010 [EXAM0124578]; GMAC Mortgage, LLC Consolidated Financial Statements for the Years Ended December 31, 2010 and 2009, dated Mar. 10, 2011 [EXAM0123214]; GMAC Mortgage, LLC Consolidated Financial Statements for the Years Ended December 31, 2011 and 2010, dated Mar. 28, 2012 [EXAM0123252].

Appendix VI.E—1, Page 3 of 5

**GMAC Mortgage, LLC**
**Consolidated Balance Sheets**
Years Ended December 2003 – 2011
*($ in Thousands)*

| | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 |
|---|---|---|---|---|---|---|---|---|---|
| **Liabilities and equity** | | | | | | | | | |
| **Liabilities** | | | | | | | | | |
| Borrowings | | | | | | | | | |
| Borrowings | $ 9,115,730 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Affiliate borrowings | - | 1,690,545 | 3,682,655 | 4,114,680 | 4,078,398 | 3,705,601 | - | - | - |
| Borrowings from Ally Inc. | - | - | - | - | - | - | 1,047,199 | 1,047,009 | 749,163 |
| Borrowings from parent | - | - | - | - | - | - | 358,709 | 515,891 | 17,614 |
| Collateralized borrowings in securitization trusts | - | - | - | - | - | - | - | 112,342 | 39,201 |
| Other borrowings | - | 7,803,068 | 7,778,349 | 5,213,427 | 3,434,309 | 1,532,625 | 1,708,899 | 1,405,020 | 1,243,055 |
| Total borrowings | 9,115,730 | 9,493,613 | 11,461,004 | 9,328,107 | 7,512,707 | 5,238,226 | 3,114,807 | 3,080,262 | 2,049,033 |
| Other liabilities | 1,353,185 | 1,397,887 | 1,742,725 | 1,241,935 | 1,991,336 | 2,580,559 | 4,428,035 | 7,123,490 | 9,337,828 |
| Total liabilities | 10,468,915 | 10,891,500 | 13,203,729 | 10,570,042 | 9,504,043 | 7,818,785 | 7,542,842 | 10,203,752 | 11,386,861 |
| **Equity** | | | | | | | | | |
| Common stock, $250 par value, (1000 shares authorized, issued and outstanding) | 250 | 250 | | | | | | | |
| Capital paid in excess of par value | 570,700 | 570,700 | | | | | | | |
| Common stock, $250 par value, (1000 shares authorized, issued and outstanding) and paid in capital | | | 570,950 | 571,250 | 1,081,049 | | | | |
| Member's interest | - | - | - | - | - | 1,753,841 | 5,378,291 | 5,378,291 | 5,444,219 |
| Retained earnings | (108,585) | 54,056 | 220,312 | 711,587 | 21,711 | - | - | - | - |
| Accumulated other comprehensive income: | | | | | | | | | |
| Unrealized gain on investments, net of tax | 762 | 8,161 | (16,512) | 1,793 | 3,878 | - | - | - | - |
| Accumulated deficit | - | - | - | - | - | (14,381) | (2,338,239) | (2,265,559) | (2,793,089) |
| Accumulated other comprehensive loss | - | - | - | - | - | (54,911) | (33,294) | (46,738) | (58,884) |
| Total equity | 463,127 | 633,167 | 774,750 | 1,284,630 | 1,106,638 | $ 1,684,549 | $ 10,549,600 | 3,065,994 | 2,592,246 |
| Total liabilities and equity | $ 10,932,042 | $ 11,524,667 | $ 13,978,479 | $ 11,854,672 | $ 10,610,681 | $ 9,503,334 | $ 10,549,600 | $ 13,269,746 | $ 13,979,107 |

*Source: GMAC Mortgage Corporation, Consolidated Financial Statements as of and for the Years Ended December 31, 2004 and 2003 (Restated), dated Mar. 25, 2005 [EXAM00126060]; GMAC Mortgage Corporation, Consolidated Financial Statements as of and for the Years Ended December 31, 2005 and 2004 (Restated), dated Mar. 10, 2006 [EXAM00231553]; GMAC Mortgage, LLC Consolidated Financial Statements as of and for the Years Ended December 31, 2006 and 2005, dated Mar. 29, 2007 [EXAM00231760]; GMAC Mortgage, LLC Consolidated Financial Statements as of and for the Years Ended December 31, 2007 and 2006, dated Mar. 25, 2008 [EXAM00232043]; GMAC Mortgage, LLC Consolidated Financial Statements as of and for the Years Ended December 31, 2008 and 2007, dated Mar. 25, 2009 [EXAM00126182]; GMAC Mortgage, LLC Consolidated Financial Statements for the Years Ended December 31, 2009 and 2008, dated Mar. 19, 2010 [EXAM00124578]; GMAC Mortgage, LLC Consolidated Financial Statements for the Years Ended December 31, 2010 and 2009, dated Mar. 10, 2011 [EXAM00123234]; GMAC Mortgage, LLC Consolidated Financial Statements for the Years Ended December 31, 2011 and 2010, dated Mar. 28, 2012 [EXAM00232252].*

Appendix VI.E—1, Page 3 of 5

**Appendix VI.E—1, Page 4 of 5**

GMAC Mortgage, LLC
**Consolidated Cash Flow Statements**
Years Ended December 2003 – 2011
*($ in Thousands)*

| | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 |
|---|---|---|---|---|---|---|---|---|---|
| **Operating activities** | | | | | | | | | |
| Net (loss) income | $ 211,382 | $ 162,641 | $ 166,256 | $ 650,123 | $ (689,876) | $ (56,944) | $ (2,323,858) | $ 76,949 | $ (527,530) |
| Reconciliation of net income to net cash provided by (used in) operating activities | | | | | | | | | |
| Amortization and impairment of mortgage servicing rights | 1,593,642 | 775,564 | 539,412 | 24,758 | (2,799) | 3,847 | (18,080) | 6,378 | 17,062 |
| Depreciation, amortization and impairment | 89,137 | 27,455 | 25,355 | 1,195 | 24,986 | 134,806 | 745,670 | 5,586 | (2,697) |
| Provision for loan losses | (1,057,167) | (438,129) | (1,130) | (246,518) | (38,598) | (231,354) | (517,329) | (298,672) | (163,329) |
| Gain on mortgage loans, net | | 442 | 437 | 232 | 455 | 6,613 | 11,604 | 3,031 | 13,568 |
| Net loss on sale of other assets | (55,723) | (306) | (4,730) | | | | | | |
| Loss (gain) on investments, available for sale | | | | | | | | | |
| Goodwill impairment | | | | | 176,726 | | | | |
| Change in fair value of mortgage servicing rights | (422,706) | 261,370 | (86,328) | 468,221 | 910,095 | 1,485,352 | 87,399 | 606,073 | 750,136 |
| (Gain) loss on valuation derivatives | 466,562 | (301,864) | 229,343 | 90,318 | (581,083) | 77,656 | | | |
| (Gain) loss on investment securities | | | | (119,316) | 369,540 | 257,341 | 44,426 | | |
| Loss on disposal of capital assets | 8,409 | 3,049 | (12,473) | | | | | | |
| Originations and purchases of mortgage loans held for sale | (115,274,630) | (88,846,443) | (90,908,803) | (71,127,965) | (69,418,845) | (54,494,507) | (56,027,797) | (70,106,524) | (60,562,593) |
| Proceeds from sales and repayments of mortgage funds held for sale | 115,845,528 | 89,109,291 | 89,829,710 | 70,563,911 | 69,077,585 | 55,079,308 | 56,033,922 | 69,307,147 | 59,499,770 |
| Deferred income tax | | 558,513 | 386,737 | (514,218) | (1,313) | (6,863) | (2,147) | | |
| Net change in | | | | | | | | | |
| Investments, trading | 89,137 | | (1,612,204) | 1,374,926 | 797,868 | 255,036 | 10,844 | | |
| Amortization and impairment of mortgage servicing rights | 64,630 | (199,254) | | | | | | | |
| Accounts receivable | (47,127) | (5,909) | (338,255) | 85,722 | (329,006) | (1,106,979) | 975,681 | 562,934 | 779,769 |
| Other assets | 742,126 | 895,482 | 1,089,135 | 853,760 | 612,427 | 2,371,709 | (82,061) | (2,697,695) | (1,225,671) |
| Income taxes receivable | (203,109) | | | | (41,110) | | | | |
| Income taxes payable | | | | | | | | | |
| Other liabilities | (785,466) | (1,171,004) | (1,128,654) | (864,897) | | (2,211,003) | 764,771 | 2,235,537 | 2,354,055 |
| Net cash provided by operating activities | $ 1,171,488 | $ 825,600 | $ (2,139,919) | $ 1,240,252 | $ 867,055 | $ 1,564,018 | $ (298,955) | $ (299,166) | $ 932,630 |

Source: GMAC Mortgage Corporation, Consolidated Financial Statements as of and for the Years Ended December 31, 2004 and 2003 (Restated), dated Mar. 25, 2005 [EXAM00126060]; GMAC Mortgage Corporation, Consolidated Financial Statements as of and for the Years Ended December 31, 2005 and 2004 (Restated), dated Mar. 30, 2006 [EXAM00231553]; GMAC Mortgage Corporation, Consolidated Financial Statements as of and for the Years Ended December 31, 2006 and 2005, dated Mar. 29, 2007 [EXAM00231760]; GMAC Mortgage, LLC Consolidated Financial Statements as of and for the Years Ended December 31, 2007 and 2006, dated Mar. 25, 2008 [EXAM00232945]; GMAC Mortgage, LLC Consolidated Financial Statements as of and for the Years Ended December 31, 2008 and 2007, dated Mar. 25, 2009 [EXAM00126182]; GMAC Mortgage, LLC Consolidated Financial Statements for the Years Ended December 31, 2009 and 2008, dated Mar. 19, 2010 [EXAM00124578]; GMAC Mortgage, LLC Consolidated Financial Statements for the Years Ended December 31, 2010 and 2009, dated Mar. 10, 2011 [EXAM00123214]; GMAC Mortgage, LLC Consolidated Financial Statements for the Years Ended December 31, 2011 and 2010, dated Mar. 28, 2012 [EXAM00232152].

**GMAC Mortgage, LLC**
**Consolidated Cash Flow Statements**
Years Ended December 2003 – 2011
*($ in Thousands)*

| | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 |
|---|---|---|---|---|---|---|---|---|---|
| **Investing activities** | | | | | | | | | |
| Decrease (increase) in lending receivables | $ (113,379) | $ (117,508) | $ (217,172) | $ 847,713 | $ 1,169 | $ 182 | $ (378,850) | $ 272,832 | $ 93,699 |
| Net decrease (increase) in consumer mortgage finance receivables and loans | (66,826) | (18,232) | (5,817) | (1,352,448) | (192,373) | (1,728,327) | — | — | — |
| Originations and purchases of mortgage loans held for investment | — | 26,909 | 26,403 | 1,364,496 | 123,469 | 1,574,933 | — | — | — |
| Proceeds from sales and repayments of mortgage loans held for investment | (2,089,289) | (1,064,172) | (592,554) | (42,907) | (23,382) | — | — | — | — |
| Purchases of investments, available for sale | | | | | | | | | |
| Amortization and impairment of mortgage servicing rights | | | | | | | | | |
| Principal paydowns of investments, available for sale | 62,210 | | | | | | | | |
| Proceeds from sales and repayments of investments, available for sale | 4,277,426 | 23,822 | 747,000 | 24,034 | 27,232 | 31,176 | 29,317 | — | — |
| Net purchases of property and equipment | (25,646) | | | | | | | | |
| Purchases of mortgage servicing rights | (1,751,672) | (13,875) | (11,592) | (11,780) | (9,291) | — | — | — | — |
| Sales of mortgage servicing rights | — | — | 207,591 | — | 563,709 | 516,816 | — | — | — |
| Proceeds from sales of repossessed, foreclosed and owned real estate | | | | | | 29,681 | 47,078 | 44,343 | 34,014 |
| Acquisitions, net of cash required | | (11,764) | | | | | | | |
| Other, net | | | | | | 21,647 | 22,928 | 263,334 | 63,383 |
| Net cash used in investing activities | 298,824 | (1,274,830) | 153,859 | 829,108 | 490,533 | 446,108 | (279,527) | 580,509 | 191,096 |
| **Financing activities** | | | | | | | | | |
| Net increase (decrease) in borrowings from affiliates | — | — | 1,992,110 | 432,025 | 463,718 | (23,409) | 68,387 | (190) | — |
| Net decrease in borrowings from Ally Inc. and affiliates | | | | | | | | 157,182 | (231,919) |
| Net (decrease) increase in borrowings from parent | | | | | | | | 165,936 | (498,277) |
| Net increase in other borrowings | | | | | | | 250,393 | (267,348) | (105,258) |
| Proceeds from issuance of collateralized borrowings in securitization trusts | | | | | | | — | 508,000 | 662,932 |
| Repayments of collateralized borrowings in securitization trusts | | | | | | | (1,160,876) | (47,072) | (840,502) |
| Repayments of other long-term borrowings | | | | | | (62,601) | (173,850) | — | — |
| Proceeds from other long-term borrowings | | | | | | | | | |
| Proceeds from capital contributions received in cash | — | — | 300 | 300 | — | — | 1,511,000 | — | — |
| Net increase (decrease) in other short-term borrowings | (1,337,883) | 586,062 | (24,719) | (2,564,923) | (1,779,118) | (1,844,337) | — | (728,641) | (187,739) |
| Net cash used in financing activities | (1,337,883) | 377,883 | 1,967,391 | (2,132,598) | (1,315,400) | (1,930,347) | 495,054 | (212,133) | (1,200,763) |
| Net (decrease) increase in cash and cash equivalents | 134,429 | (71,334) | (18,669) | (63,238) | 42,188 | 79,779 | (81,428) | 69,210 | (77,037) |
| Cash and cash equivalents at beginning of year | 103,404 | 237,832 | 166,498 | 147,829 | 84,591 | 126,779 | 206,558 | 125,130 | 194,340 |
| Cash and cash equivalents, end of year | $ 237,833 | $ 166,498 | $ 147,829 | $ 84,591 | $ 126,779 | $ 206,558 | $ 125,130 | $ 194,340 | $ 117,303 |

*Source: GMAC Mortgage Corporation, Consolidated Financial Statements as of and for the Years Ended December 31, 2004 and 2003 (Restated), dated Mar. 25, 2005 [EXAM0012660H]; GMAC Mortgage Corporation, Consolidated Financial Statements as of and for the Years Ended December 31, 2005 and 2004 (Restated), dated Mar. 30, 2006 [EXAM0023153J]; GMAC Mortgage, LLC Consolidated Financial Statements as of and for the Years Ended December 31, 2006 and 2005, dated Mar. 29, 2007 [EXAM0023176I]; GMAC Mortgage, LLC Consolidated Financial Statements as of and for the Years Ended December 31, 2007 and 2006, dated Mar. 25, 2008 [EXAM0023704J]; GMAC Mortgage, LLC Consolidated Financial Statements as of and for the Years Ended December 31, 2008 and 2007, dated Mar. 25, 2009 [EXAM0012685J]; GMAC Mortgage, LLC Consolidated Financial Statements for the Years Ended December 31, 2009 and 2008, dated Mar. 19, 2010 [EXAM0012457B]; GMAC Mortgage, LLC Consolidated Financial Statements for the Years Ended December 31, 2010 and 2009, dated Mar. 10, 2011 [EXAM0012314]; GMAC Mortgage, LLC Consolidated Financial Statements for the Years Ended December 31, 2011 and 2010, dated Mar. 28, 2012 [EXAM0232252].*

Appendix VI.E—2, Page 1 of 6

**Residential Funding Company, LLC**
**Consolidated Income Statements**
Years Ended December 2003 – 2011
*($ in Thousands)*

| | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 |
|---|---|---|---|---|---|---|---|---|---|
| **Revenue** | | | | | | | | | |
| Interest income | $ 2,707,144 | $ 4,314,906 | $ 4,812,697 | $ 6,651,273 | $ 5,476,412 | $ 1,919,237 | $ 633,105 | $ 695,588 | $ 322,664 |
| Interest expense | 1,064,117 | 2,133,424 | 3,185,432 | 5,152,983 | 4,776,414 | 1,876,752 | 362,420 | 348,515 | 167,113 |
| Net financing revenue | 1,643,027 | 2,181,482 | 1,627,265 | 1,498,290 | 699,998 | 42,485 | 270,685 | 347,073 | 155,551 |
| **Other revenue** | | | | | | | | | |
| Servicing fees | 351,089 | 428,616 | 445,397 | 523,543 | 640,633 | 388,476 | 207,818 | 123,929 | 108,912 |
| Amortization and impairment of servicing rights | - | (227,701) | (222,576) | (382,159) | (218,146) | (410,432) | (175,120) | (117,679) | (62,299) |
| Servicing asset valuation | - | 3,689 | (76,424) | 141,384 | 422,487 | (21,956) | 32,698 | 6,250 | 46,613 |
| Total servicing income, net | 351,089 | 204,604 | 146,397 | 282,768 | 844,974 | (43,912) | 65,396 | 12,500 | 93,226 |
| (Loss) gain on mortgage loans, net | 507,309 | 197,920 | 587,917 | 494,410 | 494,489 | (1,352,127) | (40,588) | 353,864 | 60,419 |
| Loss (gain) on investment securities, net | (293,592) | (4,421) | 108,469 | (50,915) | (378,008) | (178,116) | (43,886) | (170,350) | (7,521) |
| Real estate related revenues, net | - | 185,484 | 248,989 | 215,315 | (153,898) | (336,182) | (267,241) | 8,832 | 15,254 |
| (Loss) gain on foreclosed real estate | - | - | - | (56,966) | (402,966) | (279,946) | (42,500) | 39,017 | 4,594 |
| Gain on extinguishment of debt | - | - | - | - | - | - | - | 663,897 | - |
| (Loss) gain on sale of equity investments | - | - | 4,213 | 414,508 | (542) | (264,423) | (237,810) | - | - |
| Management fees | 188,988 | 411,224 | 204,193 | 92,680 | 67,753 | (2,432,750) | (599,327) | 901,510 | (107,889) |
| Other revenue | 297,187 | 994,711 | 1,300,178 | 1,259,416 | (928,723) | | | | 11,470 |
| Total other revenue | 1,050,981 | 3,176,193 | 2,927,443 | 2,748,706 | (228,725) | (2,390,265) | (599,327) | 1,248,583 | 167,021 |
| Total net revenue | 2,694,008 | | | | 2,473,795 | | | | |
| Provision for credit losses | | | | 1,315,215 | | 1,330,500 | 829,727 | (12,875) | 26,718 |
| Provision for loan losses | 488,531 | 940,247 | 648,762 | | | | | (132,785) | 218,303 |
| **Noninterest expense** | | | | | | | | | |
| Representation and warranty expense, net | 522,153 | | | | | | | | |
| Salaries, commissions and benefits | | 581,623 | 636,443 | 522,515 | 520,393 | 244,026 | 46,198 | 24,142 | 14,966 |
| Compensation and benefits | 80,567 | 69,830 | 85,970 | 78,593 | 78,226 | 65,003 | 10,279 | | |
| Data processing and communications | | | 12,779 | 21,599 | 17,559 | 3,623 | 10 | | |
| Advertising | | | | | | | 566,814 | | |
| Representation and warranty expense, net | 49,420 | 43,709 | 49,237 | 56,274 | 64,825 | 35,247 | 3,206 | | |
| Occupancy and equipment | | | | | 111,627 | | | | |
| Goodwill impairment | | | | | (16,871) | | | | |
| Loss (gain) on foreign currency | | | | | 79,886 | | | | |
| Restructuring | | | | | | | | 16,009 | 19,762 |
| Amortization and valuation adjustments related to capitalized servicing rights | 363,852 | 171,662 | 142,577 | 193,137 | 195,322 | 235,225 | 104,498 | 32,730 | 12,103 |
| Professional fees | | 268,720 | 256,026 | 374,190 | 643,098 | 978,127 | 372,151 | 1,103,556 | 265,134 |
| Other noninterest expense, net | 386,947 | 1,135,544 | 1,183,033 | 1,246,308 | 1,693,065 | 1,561,251 | (2,261,025) | (59,864) | (234,831) |
| Total noninterest expense | 1,402,939 | 1,100,402 | 1,095,649 | 187,183 | (4,395,585) | (5,282,016) | 115,148 | 1,321,322 | (124,831) |
| (Loss) income before income taxes | 802,538 | 411,245 | 380,719 | 356,969 | (162,904) | 61,572 | | 188,160 | (15,136) |
| Income tax (benefit) expense | 302,543 | 689,157 | 714,930 | (169,786) | (4,232,681) | (5,343,588) | (2,377,073) | 1,133,162 | (109,695) |
| Income (loss) from continuing operations, net of tax | 499,995 | | | | | | | | |
| **Discontinued operations** | | | | | | | | | |
| Loss from discontinued operations before income taxes | | | | | | (1,554,777) | | | |
| Income tax expense | | | | | | 31,618 | | | |
| Loss from discontinued operations, net of tax | | | | | | (1,586,395) | | (2,772) | |
| Net income (loss) | $ 499,995 | $ 689,157 | $ 714,930 | $ (169,786) | $ (4,232,681) | $ (6,929,983) | $ (2,234,034) | $ 1,130,390 | $ (109,695) |

Source: Residential Funding Corporation, Consolidated Financial Statements for the Years Ended December 31, 2004 (Restated) and 2003 (Restated), dated Mar. 2, 2005 [EXAM00231148]; Residential Funding Corporation, Consolidated Financial Statements for the Years Ended December 31, 2006 and 2005, dated Mar. 7, 2007 [EXAM00231446]; Residential Funding Company, LLC Consolidated Financial Statements, dated Mar. 18, 2006 [EXAM00231446]; Residential Funding Company, LLC Consolidated Financial Statements for the Years Ended December 31, 2007 and 2006, dated Mar. 26, 2008 [EXAM00231913]; Residential Funding Company, LLC Consolidated Financial Statements for the Years Ended December 31, 2009 and 2008, dated Mar. 19, 2010 [EXAM00124670]; Residential Funding Company, LLC Consolidated Financial Statements for the Years Ended December 31, 2011 and 2010, dated Mar. 28, 2012 [EXAM00232321].

Appendix VI.E—2, Page 2 of 6

**Residential Funding Company, LLC**
**Consolidated Balance Sheets**
Years Ended December 2003 – 2011
*($ in Thousands)*

| | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 |
|---|---|---|---|---|---|---|---|---|---|
| **Assets** | | | | | | | | | |
| Cash and cash equivalents | $ 648,026 | $ 699,506 | $ 488,085 | $ 762,726 | $ 897,834 | $ 768,129 | $ 217,825 | $ 253,146 | $ 391,884 |
| Mortgage loans held-for-sale | 4,547,276 | 7,495,755 | 12,135,082 | 21,621,205 | 7,374,152 | 1,115,326 | 2,575,921 | 1,269,203 | 1,144,273 |
| Trading securities | 3,093,170 | 2,227,600 | 1,782,090 | 2,786,008 | 1,494,843 | 203,573 | 48,518 | - | - |
| Finance receivables and loans, net | | | | | | | | | |
| Consumer ($792,592 and $971,320 fair value elected) | - | - | - | - | - | - | 1,634,330 | 1,071,972 | 816,812 |
| Commercial | - | - | - | - | - | - | 438,166 | 117,316 | 38,017 |
| Allowances for loan losses | - | - | - | - | - | - | (158,900) | (26,135) | (18,490) |
| Total finance receivables and loans, net | - | - | - | - | - | - | 1,913,596 | 1,163,153 | 836,339 |
| Mortgage loans held-for-investment, net | 44,873,613 | 55,472,116 | 61,483,729 | 56,402,547 | 25,061,474 | 8,038,077 | - | - | - |
| Lending receivables, net | 7,540,483 | 8,306,534 | 12,169,600 | 13,137,610 | 5,429,150 | 1,735,274 | - | - | - |
| Mortgage servicing rights, net | 593,685 | 683,435 | 958,569 | 1,177,328 | 1,188,191 | 451,249 | 285,319 | 164,057 | 101,589 |
| Accounts receivable | 819,431 | 1,425,171 | 1,208,407 | 1,506,119 | 1,604,698 | 436,961 | 184,826 | 184,477 | 206,664 |
| Investments in real estate and other | - | 1,397,246 | 1,855,298 | 2,622,149 | 1,629,717 | 536,019 | - | - | - |
| Other investments | 339,666 | - | - | - | - | - | - | - | - |
| Residential real estate, net | 788,276 | - | - | - | - | - | - | - | - |
| Deferred tax asset, net | 373,476 | - | - | - | - | - | - | - | - |
| Goodwill | 111,024 | 116,790 | 117,185 | 128,284 | - | - | - | - | - |
| Receivable from parent | - | - | - | - | - | - | 523,361 | 2,302,250 | 1,844,929 |
| Other assets | 642,094 | 917,103 | 1,645,494 | 2,351,482 | 3,398,605 | 1,744,920 | 442,444 | 196,547 | 195,798 |
| Assets of operations held-for-sale | - | - | - | - | - | - | 2,549,427 | - | - |
| **Total assets** | $ 64,370,220 | $ 78,741,256 | $ 93,843,539 | $ 102,495,458 | $ 48,078,664 | $ 15,029,528 | $ 8,741,237 | $ 5,532,833 | $ 4,721,476 |

*Source: Residential Funding Corporation, Consolidated Financial Statements for the Years Ended December 31, 2004 (Restated) and 2003 (Restated) and 2003 (Restated), dated Mar. 2, 2005 [EXAM00231149]; Residential Funding Corporation, Consolidated Financial Statements for the Years Ended December 31, 2005 and 2004 (Restated), dated Mar. 30, 2006 [EXAM00231446]; Residential Funding Company, LLC Consolidated Financial Statements for the Years Ended December 31, 2006 and 2005, dated Mar. 29, 2007 [EXAM00231642]; Residential Funding Company, LLC Consolidated Financial Statements for the Years Ended December 31, 2007 and 2006, dated Mar. 26, 2008 [EXAM00231913]; Residential Funding Company, LLC Consolidated Financial Statements for the Years Ended December 31, 2008 and 2007, dated Mar. 25, 2009 [EXAM00124088]; Residential Funding Company, LLC Consolidated Financial Statements for the Years Ended December 31, 2009 and 2008, dated Mar. 19, 2010 [EXAM00124070]; Residential Funding Company, LLC Consolidated Financial Statements for the Years Ended December 31, 2010 and 2009, dated Mar. 10, 2011 [EXAM00123277]; Residential Funding Company, LLC Consolidated Financial Statements for the Years Ended December 31, 2011 and 2010, dated Mar. 28, 2012 [EXAM00232321].*

Appendix VI.E—2, Page 2 of 6

**Appendix VI.E—2, Page 3 of 6**

**Residential Funding Company, LLC**
**Consolidated Balance Sheets**
Years Ended December 2003 – 2011
($ in Thousands)

| | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 |
|---|---|---|---|---|---|---|---|---|---|
| **Liabilities and equity** | | | | | | | | | |
| **Liabilities** | | | | | | | | | |
| Borrowings: | | | | | | | | | |
| Borrowings from Ally, Inc. and subsidiaries | $ - | $ - | $ - | $ - | $ - | $ 1,586,035 | $ 841,602 | $ 479,766 | $ 440,230 |
| Borrowings from parent | - | - | - | - | - | 1,201,775 | - | - | - |
| Borrowings from affiliates | 9,672,792 | 8,998,242 | 8,073,433 | 10,532,326 | 9,981,971 | 1,664,930 | - | 211,151 | 281,590 |
| Borrowings from parent and affiliates | - | - | - | - | - | - | 1,814,702 | - | - |
| Collateralized borrowings | 50,404,694 | 50,708,476 | 56,097,801 | 53,299,518 | 16,145,741 | 3,752,457 | 1,484,197 | 944,945 | 791,117 |
| Collateralized borrowings in securitization trusts | - | 13,881,890 | 23,199,754 | 32,174,891 | 14,359,258 | - | - | - | - |
| Other borrowings | 517,326 | - | - | - | - | 2,159,716 | 451,573 | 400,920 | 131,674 |
| Total borrowings | 60,594,812 | 73,588,608 | 87,370,988 | 96,006,735 | 40,486,970 | 10,364,913 | 4,592,074 | 2,036,782 | 1,644,611 |
| Deposit liabilities | - | - | - | - | 521,705 | 639,412 | 2,207,195 | - | - |
| Other liabilities | 1,749,715 | 2,359,100 | 1,982,792 | 2,128,018 | 3,258,454 | 2,055,682 | 1,361,565 | 1,152,075 | 797,400 |
| Liabilities of operations held-for-sale | - | - | - | - | - | - | - | - | - |
| Deferred tax liability, net | - | - | - | - | - | - | - | - | - |
| Reserve for assets sold with recourse | 71,143 | - | - | - | - | - | - | - | - |
| Total liabilities | 62,415,670 | 75,947,708 | 89,353,780 | 98,134,753 | 44,267,129 | 13,060,007 | 8,160,834 | 3,188,857 | 2,442,011 |
| **Equity** | | | | | | | | | |
| Common stock, $1 par; (1,000 shares authorized, issued and outstanding) and paid-in capital | 446,812 | 446,812 | 1,446,812 | 1,777,151 | 5,515,679 | 10,828,896 | 14,089,278 | 14,704,121 | 14,752,930 |
| Member's interest | - | - | - | - | - | - | - | - | - |
| (Accumulated deficit) retained earnings | 1,506,873 | 2,196,030 | 2,910,960 | 2,453,777 | (1,779,257) | (8,885,378) | (13,496,485) | (12,366,095) | (12,475,790) |
| Accumulated other comprehensive income | 865 | 150,706 | 131,987 | 129,777 | 75,113 | 26,003 | (12,390) | 5,050 | 2,325 |
| Total equity | 1,954,550 | 2,793,548 | 4,489,759 | 4,360,705 | 3,811,535 | 1,969,521 | 580,403 | 2,343,196 | 2,279,465 |
| Total liabilities and equity | $ 64,370,220 | $ 78,741,256 | $ 93,843,539 | $ 102,495,458 | $ 48,078,664 | $ 15,029,528 | $ 8,741,237 | $ 5,532,833 | $ 4,721,476 |

Source: Residential Funding Corporation, Consolidated Financial Statements for the Years Ended December 31, 2004 (Restated) and 2003 (Restated), dated Mar. 2, 2005 [EXAM00231149]; Residential Funding Corporation, Consolidated Financial Statements for the Years Ended December 31, 2005 and 2004 (Restated), dated Mar. 16, 2006 [EXAM00231448]; Residential Funding Company, LLC Consolidated Financial Statements for the Years Ended December 31, 2006 and 2005 dated Mar. 29, 2007 [EXAM00231642]; Residential Funding Company, LLC Consolidated Financial Statements for the Years Ended December 31, 2007 and 2006, dated Mar. 26, 2008 [EXAM00231913]; Residential Funding Company, LLC Consolidated Financial Statements for the Years Ended December 31, 2008 and 2007 dated Mar. 25, 2009 [EXAM00230488]; Residential Funding Company, LLC Consolidated Financial Statements for the Years Ended December 31, 2009 and 2008, dated Mar. 19, 2010 [EXAM00230470]; Residential Funding Company, LLC Consolidated Financial Statements for the Years Ended December 31, 2010 and 2009, dated Mar. 10, 2011 [EXAM00123277]; Residential Funding Company, LLC Consolidated Financial Statements for the Years Ended December 31, 2011 and 2010, dated Mar. 28, 2012 [EXAM00232321].

**Appendix VI.E—2,** Page 4 of 6

**Residential Funding Company, LLC**
**Consolidated Cash Flow Statements**
Years Ended December 2003 – 2011
*($ in Thousands)*

| | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 |
|---|---|---|---|---|---|---|---|---|---|
| **Operating activities** | | | | | | | | | |
| Net (loss) income | | | | | | | | | |
| Reconciliation of net income (loss) to net cash provided by (used in) operating activities | $ 499,995 | $ 689,157 | $ 714,930 | $ (169,786) | $ (4,232,681) | $ (6,929,983) | $ (4,611,107) | $ 1,130,390 | $ (109,695) |
| Depreciation and amortization and valuation adjustments | 299,768 | 492,084 | 668,460 | 593,338 | 465,292 | 86,746 | 62,390 | 18,965 | 4,044 |
| Amortization and valuation adjustments of mortgage servicing rights | 441,773 | 227,701 | 222,576 | | | | | | |
| Provision for loan losses | 488,531 | 940,247 | 648,762 | 1,315,215 | 2,473,795 | 1,577,008 | 1,385,760 | 9,032 | 26,718 |
| (Gain) loss on mortgage loans, net | (507,309) | (197,820) | (587,917) | (494,410) | 484,489 | 2,308,148 | 571,525 | (185,561) | (60,419) |
| (Gain) loss on sale of equity investments | | | (4,213) | (414,508) | 542 | | | | |
| Other investment income | (40,245) | | | | | | | | |
| Gain on sale of investments and residential real estate | (27,388) | | | | | | | | |
| Originations and purchases of mortgage loans held-for-sale | (45,877,403) | (34,514,166) | (78,706,145) | (119,574,222) | (67,718,570) | (9,704,900) | (176,839) | (189,297) | (289,713) |
| Net loss (gain) on other assets | | (40,143) | (42,511) | 16,911 | 372,218 | 782,690 | 346,506 | (39,417) | 2,566 |
| Gain on extinguishment of debt | | | | | | | | (663,897) | (4,594) |
| Goodwill impairment | | | | | 111,627 | | | | |
| Recovery of held-for-sale platforms | | | | | | | 701,650 | (54,649) | |
| (Gain) loss on valuation of derivatives | | 15,202 | | 50,915 | 378,068 | 366,567 | 43,227 | | |
| (Gain) loss on investment securities | | 32,274 | (108,469) | (21,970) | 79,252 | (3,881) | 6,543 | (973) | |
| Pension curtailment gain | | | | (85,445) | | | | | |
| Equity in earnings of investees in excess of cash received | | | | | | | | | |
| Loss on valuation of mortgage servicing rights for hedge accounting | | (141,574) | (137,673) | | | | | | |
| Change in fair value of mortgage servicing rights | | 10,299 | | 351,133 | 348,794 | 531,674 | 207,040 | 119,278 | 62,299 |
| Proceeds from sales and repayments of mortgage loans held-for-sale | 40,065,330 | 32,286,106 | 54,677,854 | 98,231,360 | 70,196,954 | 15,493,030 | 887,862 | 1,035,269 | 290,070 |
| **Net change in** | | | | | | | | | |
| Deferred income taxes | (253,704) | 295,941 | (50,928) | 204,000 | (31,724) | 128,595 | 98,081 | 53,620 | (68,987) |
| Accounts receivable | (188,781) | (606,462) | 174,906 | (326,585) | (203,845) | 1,141,054 | 210,933 | (169,472) | (21,363) |
| Investment securities, trading | 633,822 | 836,711 | 553,979 | (995,274) | 699,266 | 645,218 | 28,699 | | |
| Receivable from parent | | | | | | | (42,354) | (1,778,889) | 457,321 |
| Other assets | (105,735) | (2,260) | (352,373) | (563,403) | 3,736,252 | 1,597,321 | 226,399 | (450,723) | (183,815) |
| Other liabilities | 784,542 | 639,661 | (727,775) | (573,928) | (4,103,395) | (1,468,678) | 559,910 | 799,842 | (12,144) |
| Reserve for assets sold with recourse, net of provision | (7,627) | | | | | | | | |
| Net cash provided by operating activities | $ (3,794,431) | $ 962,958 | $(23,056,537) | $(22,457,059) | $ 3,056,334 | $ 6,550,609 | $ 506,225 | $ (366,482) | $ 92,288 |

*Source: Residential Funding Corporation, Consolidated Financial Statements for the Years Ended December 31, 2004 (Restated) and 2003 (Restated), dated Mar. 2, 2005 [EXAM00211149]; Residential Funding Corporation, Consolidated Financial Statements for the Years Ended December 31, 2005 and 2004 (Restated), dated Mar. 30, 2006 [EXAM00231446]; Residential Funding Company, LLC Consolidated Financial Statements for the Years Ended December 31, 2006 and 2005, dated Mar. 29, 2007 [EXAM00231642]; Residential Funding Company, LLC Consolidated Financial Statements for the Years Ended December 31, 2007 and 2006, dated Mar. 26, 2008 [EXAM00231913]; Residential Funding Company, LLC Consolidated Financial Statements for the Years Ended December 31, 2008 and 2007, dated Mar. 25, 2009 [EXAM00234993]; Residential Funding Company, LLC Consolidated Financial Statements for the Years Ended December 31, 2009 and 2008, dated Mar. 30, 2010 [EXAM00234670]; Residential Funding Company, LLC Consolidated Financial Statements for the Years Ended December 31, 2010 and 2009, dated Mar. 16, 2011 [EXAM00232272]; Residential Funding Company, LLC Consolidated Financial Statements for the Years Ended December 31, 2011 and 2010, dated Mar. 28, 2012 [EXAM00232521].*

**Appendix VI.E—2,** Page 4 of 6

**Residential Funding Company, LLC**
**Consolidated Cash Flow Statements**
Years Ended December 2003 – 2011
*($ in Thousands)*

| | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 |
|---|---|---|---|---|---|---|---|---|---|
| **Investing activities** | | | | | | | | | |
| Net (increase) decrease in commercial finance receivables and loans | $ (1,741,343) | $ (796,754) | $ (3,915,076) | $ (1,180,018) | $ 6,359,714 | $ 1,408,833 | $ 935,242 | $ 214,989 | $ 46,432 |
| Net decrease in consumer mortgage finance receivables and loans | - | - | - | - | - | - | 1,301,785 | 2,218,622 | 452,436 |
| Net decrease in investments in real estate and other | - | - | - | - | - | - | 134,263 | 107,187 | 4,543 |
| Originations and purchases of mortgage loans held for investment | (37,168,081) | (37,965,618) | (14,883,776) | (8,285,839) | (3,076,258) | (1,480,483) | - | - | - |
| Proceeds from sales and repayments of mortgage loans held for investment | 10,045,120 | 25,030,805 | 26,836,000 | 23,294,308 | 14,509,194 | 3,783,289 | - | - | - |
| Additions to mortgage servicing rights | (387,657) | (213,765) | (243,405) | - | - | 216,728 | - | - | - |
| Sales of mortgage servicing rights | - | - | - | - | - | - | - | - | - |
| Purchases of equity investments | (209,275) | - | - | - | - | - | - | - | - |
| Purchase of and advances to investments in real estate and other | - | (883,840) | (1,249,253) | (1,695,102) | (210,792) | (3,301) | - | - | - |
| Proceeds from sales of and returns of investments in real estate and other | - | 773,377 | 923,924 | 1,378,210 | 849,548 | 445,677 | - | - | - |
| Proceeds from sale of and returns of equity investments | 72,909 | - | - | - | - | - | - | - | - |
| Proceeds from sale of investments securities, available for sale, net | 12,591 | - | - | - | - | - | - | - | - |
| Repayments of investment securities, held to maturity | 34,710 | - | - | - | - | - | - | - | - |
| Payments for residential real estate | (651,048) | - | - | - | - | - | - | - | - |
| Proceeds from sales of residential real estate | 355,982 | - | - | - | - | - | - | - | - |
| Proceeds from sales of repossessed, foreclosed and owned real estate | - | - | - | - | - | 1,708,646 | 822,075 | 359,676 | 74,335 |
| Proceeds from sale of business units, net | - | - | - | (1,811) | 103,743 | - | - | (122,741) | - |
| Acquisitions, net of cash acquired | (1,599) | - | - | - | - | - | - | - | - |
| Other, net | 228,791 | 251,333 | 718,393 | 1,053,484 | 2,768,207 | (251,432) | 98,389 | 571,717 | 14,436 |
| Net cash provided by investing activities | $ (29,408,900) | $ (13,804,462) | $ 8,186,807 | $ 14,563,232 | $ 21,303,356 | $ 5,827,957 | $ 3,291,754 | $ 3,349,450 | $ 592,182 |

Source: Residential Funding Corporation, Consolidated Financial Statements for the Years Ended December 31, 2004 (Restated) and 2003 (Restated), dated Mar. 2, 2005 [EXAM00231149]; Residential Funding Corporation, Consolidated Financial Statements for the Years Ended December 31, 2005 and 2004 (Restated), dated Mar. 30, 2006 [EXAM00231446]; Residential Funding Company, LLC Consolidated Financial Statements for the Years Ended December 31, 2006 and 2005, dated Mar. 29, 2007 [EXAM00231642]; Residential Funding Company, LLC Consolidated Financial Statements for the Years Ended December 31, 2007 and 2006, dated Mar. 26, 2008 [EXAM00231913]; Residential Funding Company, LLC Consolidated Financial Statements for the Years Ended December 31, 2008 and 2007, dated Mar. 25, 2009 [EXAM00249898]; Residential Funding Company, LLC Consolidated Financial Statements for the Years Ended December 31, 2009 and 2008, dated Mar. 19, 2010 [EXAM00124670]; Residential Funding Company, LLC Consolidated Financial Statements for the Years Ended December 31, 2010 and 2009, dated Mar. 10, 2011 [EXAM00123277]; Residential Funding Company, LLC Consolidated Financial Statements for the Years Ended December 31, 2011 and 2010, dated Mar. 28, 2012 [EXAM00232321].

**Residential Funding Company, LLC**
**Consolidated Cash Flow Statements**
Years Ended December 2003 – 2011
*($ in Thousands)*

| | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 |
|---|---|---|---|---|---|---|---|---|---|
| **Financing activities** | | | | | | | | | |
| Net (decrease) increase in borrowings from Ally Inc. and subsidiaries | $ - | $ - | $ - | $ - | $ - | $ 2,778,555 | $ (410,513) | $ (361,836) | $ 3,941 |
| Net decrease in borrowings from parent | - | - | - | - | - | (3,924,050) | (167,401) | (1,603,551) | 70,439 |
| Net decrease in borrowings from other affiliates | - | - | - | - | - | 1,679,481 | - | - | - |
| Net increase (decrease) in affiliate borrowings | - | (683,477) | 75,539 | 2,426,578 | 3,066,564 | - | - | - | - |
| Net increase (decrease) in other short term borrowings | - | 2,357,138 | 4,132,424 | 6,764,411 | (12,178,357) | (10,609,054) | (1,541,615) | (48,545) | (197,946) |
| Net increase in other collateralized borrowings | 6,818,943 | - | - | - | - | - | - | - | - |
| Net increase in other borrowings | 184,041 | - | - | - | - | - | - | - | - |
| Cash paid for debt issuance costs | (103,836) | - | - | - | - | - | - | - | - |
| Net decrease in notes payable to affiliates | (396,448) | - | - | - | - | - | - | - | - |
| Proceeds from issuance of bonds payable to investors | 33,785,488 | - | - | - | - | - | - | - | - |
| Repayments of bonds payable to investors | (6,741,881) | - | - | - | - | - | - | - | - |
| Proceeds fro issuance of collateralized borrowings in securitization trusts | - | 28,804,811 | 28,361,997 | 19,317,561 | 5,634,817 | - | 229,933 | 66,818 | - |
| Repayments of collateralized borrowings in securitization trusts | - | (17,498,926) | (22,682,856) | (22,605,088) | (15,929,834) | (2,892,132) | (1,501,397) | (1,911,035) | (361,378) |
| Proceeds from secured aggregation facilities, long-term | - | - | 7,896,054 | 29,071,067 | 12,358,635 | 160,000 | - | - | - |
| Repayments from secured aggregation facilities, long-term | - | - | (3,157,448) | (27,942,989) | (17,411,381) | (465,114) | - | - | - |
| Proceeds from other long-term borrowings | - | - | 144,226 | 1,298,382 | 214,575 | - | - | - | - |
| Repayments of other long-term borrowings | - | - | - | - | (841,719) | (332,510) | (183,320) | (13,441) | 1,909 |
| Proceeds from disposal of business, net | - | - | - | - | 898,794 | 163,309 | - | 655,513 | (53,534) |
| Capital contributions | - | - | - | - | 2,595 | - | 494 | - | - |
| Increase in deposit liabilities | - | - | - | - | 153,680 | 269,157 | - | - | - |
| Payments of debt issuance costs | - | (102,618) | (85,232) | (63,498) | (31,225) | (44,593) | (30,688) | - | - |
| Proceeds from sale of business, net | - | - | - | - | - | - | (341,001) | - | - |
| Net cash provided by financing activities | 33,546,307 | 12,876,928 | 14,684,704 | 8,047,994 | (24,062,856) | (13,216,951) | (3,945,508) | (3,216,077) | (536,569) |
| Effect of changes in foreign exchange rates on cash and cash equivalents | 7,317 | 16,056 | (26,395) | 120,474 | (161,726) | 708,680 | (247,302) | 112,957 | (9,163) |
| Net increase (decrease) in cash and cash equivalents | 350,293 | 51,480 | (211,421) | 274,641 | 135,108 | (129,705) | (394,831) | (120,152) | 138,738 |
| Change in cash and cash equivalents of operations held-for-sale | - | - | - | - | - | - | (155,473) | 155,473 | - |
| Cash and cash equivalents, beginning of year | 297,733 | 648,026 | 699,506 | 488,085 | 762,726 | 897,834 | 768,129 | 217,825 | 253,146 |
| Cash and cash equivalents, end of year | $ 648,026 | $ 699,506 | $ 488,085 | $ 762,726 | $ 897,834 | $ 768,129 | $ 217,825 | $ 253,146 | $ 391,884 |

Source: Residential Funding Corporation, Consolidated Financial Statements for the Years Ended December 31, 2004 (Restated) and 2003 (Restated), dated Mar. 2, 2005 [EXAM00231149]; Residential Funding Corporation, Consolidated Financial Statements for the Years Ended December 31, 2005 and 2004 (Restated), dated Mar. 30, 2006 [EXAM00231446]; Residential Funding Corporation, Consolidated Financial Statements for the Years Ended December 31, 2006 and 2005, dated Mar. 29, 2007 [EXAM00231642]; Residential Funding Corporation, Consolidated Financial Statements for the Years Ended December 31, 2007 and 2006, dated Mar. 26, 2008 [EXAM00231913]; Residential Funding Corporation, Consolidated Financial Statements for the Years Ended December 31, 2008 and 2007, dated Mar. 25, 2009 [EXAM00124988]; Residential Funding Corporation, Consolidated Financial Statements for the Years Ended December 31, 2009 and 2008, dated Mar. 19, 2010 [EXAM00124670]; Residential Funding Corporation, Consolidated Financial Statements for the Years Ended December 31, 2010 and 2009, dated Mar. 10, 2011 [EXAM00124988]; Residential Funding Corporation, Consolidated Financial Statements for the Years Ended December 31, 2011 and 2010 (Restated), dated Mar. 28, 2012 [EXAM00232321].

**Appendix VIII.A—1**, Page 1 of 2

### List of RMBS Actions

An "**(AFI)**" designation indicates that the lawsuit names at least one AFI Released Party as a defendant.

1. *Allstate Ins. Co. v. GMAC Mortg. LLC*, Case No. 27-cv-11-3480 (Minn. D. Ct.) **(AFI)**

2. *Assured Guarantee Mun. Corp. v. GMAC Mortg., LLC*, Case No. 12-3776 (S.D.N.Y.) **(AFI)**

3. *Cambridge Place Inv. Mgmt., Inc. v. Morgan Stanley & Co.,* Case No. 10-2741-BLS2 (Mass. Super. Ct.) **(AFI)**

4. *Cambridge Place Inv. Mgmt., Inc. v. Morgan Stanley & Co.,* Case No. 11-0555-BLS2 (Mass. Super. Ct.) **(AFI)**

5. *Charles Schwab Corp. v. BNP Paribas Sec. Corp.,* Case No. CGC-10-501610 (Cal. Super. Ct.)

6. *FDIC v. Ally Sec. LLC*, Case No. D-1-GN-12-002522 (Tex. Dist. Ct.) **(AFI)**

7. *FDIC v. Bear Stearns Asset Backed Sec. I, LLC*, Case No. 12-4000 (S.D.N.Y.) **(AFI)**

8. *FDIC v. CitiGroup Mortg. Loan Trust Inc.,* Case No. CV-2012-901036.00 (Ala. Cir. Ct.) **(AFI)**

9. *FDIC v. Chase Mortg. Fin. Co.,* Case No. 12-6166 (S.D.N.Y.) **(AFI)**

10. *Fed. Home Loan Bank of Indianapolis v. Banc of Am. Mortg. Sec., Inc.*, Case No. 49D05-1010-PL045071 (Ind. Super. Ct.) **(AFI)**

11. *Fed. Home Loan Bank of Boston v. Ally Fin. Inc.,* Case No. 11-10952 (D. Mass.) **(AFI)**

12. *Fed. Home Loan Bank of Chicago v. Banc of Am. Funding Corp.,* Case No. 10-CH-45033 (Ill. Cir. Ct.) **(AFI)**

13. *FGIC v. Ally Fin. Inc.,* Case No. 12-338 (S.D.N.Y.) **(AFI)**

14. *FGIC v. Ally Fin. Inc.,* Case No. 12-339 (S.D.N.Y.) **(AFI)**

15. *FGIC v. Ally Fin. Inc.,* Case No. 12-340 (S.D.N.Y.) **(AFI)**

16. *FGIC v. Ally Fin. Inc.,* Case No. 12-341 (S.D.N.Y.) **(AFI)**

17. *FGIC v. Ally Fin. Inc.,* Case No. 12-780 (S.D.N.Y.) **(AFI)**

18. *FGIC v. Ally Fin. Inc.,* Case No. 12-1601 (S.D.N.Y.) **(AFI)**

19. *FGIC v. Ally Fin. Inc.,* Case No. 12-1658 (S.D.N.Y.) **(AFI)**

20. *FGIC v. Ally Fin. Inc.,* Case No. 12-1818 (S.D.N.Y.) **(AFI)**

21. *FGIC v. Ally Fin. Inc.,* Case No. 12-1860 (S.D.N.Y.) **(AFI)**

22. *FGIC v. GMAC Mortg. LLC*, Case No. 11-9729 (S.D.N.Y) **(AFI)**

**Appendix VIII.A—1**, Page 2 of 2

23. *FGIC v. Residential Funding Co.*, Case No. 11-9736 (S.D.N.Y)

24. *FGIC v. Residential Funding Co.*, Case No. 11-9737 (S.D.N.Y)

25. *FHFA v. Ally Fin. Inc., Case* No. 11-7010 (S.D.N.Y.) **(AFI)**

26. *John Hancock Life Ins. Co. (U.S.A.) v. Ally Fin. Inc.,* Case No. 12-1841 (D. Minn.) **(AFI)**

27. *Mass. Mutual Life Ins. Co. v. Residential Funding Co., LLC,* Case No. 11-30035 (D. Mass.)

28. *MBIA Ins. Corp. v. Residential Funding Co.*, Case No. 603552/2008 (N.Y. Sup. Ct.)

29. *MBIA Ins. Corp. v. GMAC Mortg., LLC*, Case No. 600837/2010 (N.Y. Sup. Ct.)

30. *MBIA Ins. Corp. v. Ally Fin. Inc.,* Case No. 27-cv-12-18889 (Minn. D. Ct.) **(AFI)**

31. *Nat'l Credit Union Admin. Bd. v. Goldman, Sachs & Co.,* Case No. 11-6521 (C.D. Cal.)

32. *Nat'l Credit Union Admin. Bd. v. RBS Sec. Inc.,* Case No. 11-2340 (D. Kan.)

33. *N.J. Carpenters Health Fund v. Residential Capital, LLC,* Case No. 08-8781 (S.D.N.Y.) **(AFI)**

34. *Stichting Pensioenfonds ABP v. Ally Fin. Inc.,* Case No. 27-cv-11-20426 (Minn. Dist. Ct.) **(AFI)**

35. *Union Cent. Life Ins. Co. v. Credit Suisse First Boston Mortg. Sec. Corp.,* Case No. 11-2890 (S.D.N.Y.) **(AFI)**

36. *Watertown Sav. Bank v. Bank of Am. Corp.,* Case No. 651399-2012 (N.Y. Super. Ct.) **(AFI)**

37. *W. Va. Inv. Mgmt. Bd. v. Residential Accredit Loans, Inc.,* Case No. 10-461 (S.D.W.V.)

38. *W. & S. Life Ins. Co. v. Residential Funding Co., LLC*, Case No. A1105042 (Ohio Ct. C.P.) **(AFI)**

**Appendix VIII.A—2**, Page 1 of 1

### List of Non-RMBS Actions

1. *Abraham v. Am. Home Mortg. Serv. Inc.,* Case No. 12-4686 (E.D.N.Y) **(AFI)**

2. *Abucay v. GMAC Mortg. Corp.*, Case No. 11-5523 (D.N.J.) **(AFI)**

3. *Adams v. US Bank NA*, Case No. 12-04640 (E.D.N.Y.) **(AFI)**

4. *Barker v. GMAC Mortg., LLC*, Case No. 11-579 (D.C. Or.) **(AFI)**

5. *Bollinger v. Residential Capital, LLC*, Case No. 10-01123 (W.D.Wash.) **(AFI)**

6. *Chatman Marcus v. GMAC Mortg., LLC*, Case No. 69-2008-90015.11 (Ala. Ct. App.) **(AFI)**

7. *Chao v. Wells Fargo Bank*, Case No. RG12633544 (Cal. Super. Ct.) **(AFI)**

8. *Dennis v. Homecomings Fin., LLC,* Case No. 11-00066 (D. Wyo.) **(AFI)**

9. *Donaldson v. GMAC Mortgage, Inc.*, Case No. 9-3359D (Ga. Super. Ct.) **(AFI)**

10. *Drennen v. Cmty. Bank of N. Va. (In re Cmty. Bank of N. Va. Second Mortg. Lending Practices Litig.)*, Case No. 02-1201, 03-425, 05-688, 05-1386 (W.D. Pa)

11. *Kelly v. American Home Mortgage Holdings, Inc.*, Case No. 12-6240 (E.D.N.Y.)

12. *Kral v. GMAC Mortg., LLC*, Case No. 12-1023 (C.D. Cal.)

13. *Lafitte v. Ally Fin. Inc.*, Case No. 10-2820 (D.S.C.) **(AFI)**

14. *Mitchell v. Residential Funding Corp.*, Case No. WD70210, WD70227, WD70244, WD70263 (W.D. Miss.)

15. *Moore v. GMAC Mortg. LLC*, Case No. 07-04296 (E.D. Pa.) **(AFI)**

16. *Robinson v. Homecomings Fin., LLC*, Case No. 2008-9000007 (Ala. Ct. App.) **(AFI)**

17. *Rothstein. v. GMAC Mortg., LLC, et al.*, Case No. 12-03412 (S.D.N.Y.) **(AFI)**

18. *White v. GMAC Mortg.,* LLC, Case No. 2809-CV-2011 (Pa. Ct. Com. Pl.) **(AFI)**

19. *Kalugin v. Geithner*, Case No. 12-1792 (D.D.C.) **(AFI)**

20. *Kanagacki v. Ally Financial Inc.*, Case No. 12-03955 (C.D. Cal.) **(AFI)**

21. *In re Community Bank of N. Va.*, Case Nos. 02-1201, 03-425, 05-688, 05-1386 (W.D. Pa)

**Arthur J. Gonzalez, Examiner**
*In re Residential Capital, LLC, et al.*
c/o New York University School of Law
40 Washington Square South
New York, NY 10012-1099

September 21, 2012

To: The Parties Listed on Exhibit A
    Attached Hereto

      Re: *In re Residential Capital, LLC, et al*., No. 12-12020 (MG) —
          Request for Submissions Regarding Third-Party Claims

Dear Counsel:

      The purpose of this letter is to solicit submissions from the parties identified herein in connection with my examination of Residential Capital, LLC and its affiliated debtors (collectively, the "Debtors") pursuant to the Bankruptcy Court's Order Directing the Appointment of an Examiner Pursuant to Section 1104(c) of the Bankruptcy Code (the "Examiner Order") [Doc. No. 454] and the Order Approving Scope of Investigation of Arthur J. Gonzalez, Examiner (the "Examination Scope Order") [Doc. No. 925]. In particular, this request relates to paragraph 10(f)(viii) of the Examination Scope Order, which provides for the investigation of the following:

      "[A]ll state and federal law claims or causes of action the Debtors propose
      to release or to be released as part of their plan including . . . (viii) claims
      held by third parties, i.e., parties that are not affiliates of the Debtors,
      against current and former directors and officers of the Debtors and against
      AFI and its insiders including current and former directors, officers, and
      shareholders . . . ." (collectively, the "Third-Party Claims").

      Pursuant to the terms of the Examination Scope Order, I will "(A) investigate the merits of such claims, (B) analyze the sufficiency of the consideration to be provided for such third party releases, and (C) solicit the parties' views concerning the merits of such claims and the potential amount of damages arising from such claims, but . . . will not attempt to independently quantify such damages."

      With these goals in mind, I request the following:

      1.    Please furnish to me through my counsel a paper in the general form of a legal brief (each a "Submission Paper"), setting forth any arguments, analyses and/or supporting documents that you believe may bear meaningfully upon the factual or legal subject matter of my investigation of the Third-Party Claims, including your views concerning the potential amount of damages arising from such claims. I also request that you identify the names and contact information of any parties that you believe I should interview or any lines of inquiry that you believe I should pursue in

12-12020-mg  Doc 3698-36  Filed 05/13/13  Entered 05/13/13 17:58:13  Appendix
Pg 328 of 385

**Appendix VIII.A—3**, Page 2 of 9

Arthur J. Gonzalez, Examiner
c/o New York University School of Law
40 Washington Square South
New York, NY 10012-1099

To:  The Parties Listed on Exhibit A          -2-                    September 21, 2012

connection with my investigation of the Third-Party Claims.  Please note that the Submission Papers should only focus upon the parties you believe may be liable for Third-Party Claims and should <u>not</u> include any discussion of intercreditor disputes, claims that are assertable exclusively against the Debtors or other extraneous issues.  I request that all Submission Papers be transmitted (by both paper and electronic means) to my counsel, Chadbourne & Parke LLP, c/o Seven Rivera, 30 Rockefeller Plaza, New York, NY 10112 (srivera@chadbourne.com).

2.     I request that all Submission Papers and related appendices be submitted to my counsel on or before **Friday, October 12, 2012 at 3:00 p.m. Eastern Time**.  The Submission Papers should be electronically annotated and should contain legal and factual discussions akin to those typically presented in mediations, summary judgment motions or pre-trial briefs.  Your Submission Papers should address all claims and causes of action that you reasonably believe could be asserted by you with respect to the Third-Party Claims; if you believe there are defenses that are likely to be asserted with respect to any such claim(s), you should discuss those anticipated defenses, including why you believe they are or may be non-meritorious.  The appendices submitted with the Submission Papers should include: (i) representative documents on which the factual contentions in the Submission Papers are based and (ii) copies of any unreported opinions cited therein.

3.     The Submission Papers should <u>not</u> <u>exceed</u> 35 pages (which page limit does not include tables of contents, tables of authorities or the contents of the appendices).

4.     The Submission Papers will not be confidential.  I intend to present the Submission Papers, or portions thereof, to the Debtors and to existing or potential adversaries identified therein in order to solicit their substantive responses (the "<u>Responses</u>") to the potential Third-Party Claims you identify and to advance my analysis.  Therefore, I urge you to substantiate your claims to the greatest extent possible in your Submission Papers (just as you would in a litigated matter before a court) and to avoid withholding any relevant information or arguments.[1]  We will similarly share with you the Responses to your Submission Papers.

---

[1]   If you feel that you absolutely cannot present your arguments in the Submission Papers without shielding discrete portions of your Submission Paper or supporting material from disclosure to potential adversaries, please contact my counsel David LeMay at 212-408-5112, and we will attempt to reach an acceptable resolution, if possible.

**Arthur J. Gonzalez, Examiner**
c/o New York University School of Law
40 Washington Square South
New York, NY 10012-1099

To:  The Parties Listed on Exhibit A           -3-                    September 21, 2012

    5.    Please assume that my advisors and I are familiar with the general background of the Debtors' businesses, particularly as it relates to activities such as mortgage loan origination and securitization.  I encourage you to focus on legal analyses and facts and documents that bear on your particular positions with respect to Third-Party Claims.

    6.    It appears to me and my counsel that certain parties' positions are aligned with respect to certain potential Third-Party Claims issues, and my counsel may therefore be contacting you and other similarly situated parties directly in order to suggest joint Submission Papers.  We will encourage joint submissions wherever it appears to us that specific parties' potential Third-Party Claims are similar in nature, even if the parties potentially asserting those claims have different views concerning the appropriate resolution of those claims.  Joint submissions will avoid duplication, promote efficiency and will greatly aid my review.  However, if after conferring in good faith with counsel to the other parties that may be similarly situated, you are unable to submit jointly with them, I will accept individual submissions. Additionally, to the extent that you believe there are parties with potential Third-Party Claims of a nature not represented by the parties listed in Exhibit A hereto, please inform my counsel of the identity of those parties and the types of claims that you believe they may hold.

    7.    I reserve the right to request response and/or reply submissions from the parties where I feel a particular issue has not been adequately addressed or would benefit from targeted rebuttal.  I will notify the parties regarding page limits, deadlines and any other requirements of potential responses and/or replies within a reasonable time after the initial submissions.

    8.    I reserve the right to permit other parties to submit position briefs, and to otherwise modify anything contained in this letter.

    9.    Detailed specifications for the Submission Papers and appendices are set forth in Exhibit B hereto.  Please note that submission of these documents to my counsel should be both in hard copy and electronic form, as more fully described in Exhibit B.

Arthur J. Gonzalez, Examiner
c/o New York University School of Law
40 Washington Square South
New York, NY 10012-1099

To:  The Parties Listed on Exhibit A          -4-                    September 21, 2012

      Thank you in advance for your cooperation and candor with respect to this matter.  If you have any questions regarding the contents of this letter, please contact Howard Seife (212-408-5361) or David LeMay (212-408-5112).

Yours truly,

/s/ Arthur J. Gonzalez

**Arthur J. Gonzalez, Examiner**

AJG/md

## EXHIBIT A

Counsel for Ad Hoc Group of Junior
Secured Noteholders

**White & Case LLP**
J. Christopher Shore
Harrison L. Denman
1155 Avenue of the Americas
New York, New York 10036-2787

**Milbank**
Gerard Uzzi
1 Chase Manhattan Plaza
New York, NY 10005

Counsel for Financial Guaranty
Insurance Company

**Jones Day**
Jayant W. Tambe
Stephen J. Pearson
Howard F. Sidman
222 East 41st Street
New York, NY 10017

Counsel for Wilmington Trust, N.A.

**Cleary Gottlieb Steen & Hamilton, LLP**
Sean A. O'Neal
Thomas J. Moloney
One Liberty Plaza
New York, NY 10006-1470

Counsel for Assured Guaranty
Municipal Corp.

**Susman Godfrey LLP**
Jacob W. Buchdahl
Arun Subramanian
560 Lexington Ave., 15th Floor
New York, NY 10022

Counsel for Rowena L. Drennen

**Walters, Bender, Strohbehn & Vaughn PC**
David M. Skeens
J. Michael Vaughn
R. Frederick Walters
1100 Main St.
2500 City Center Square
Kansas City, MO 64105

Counsel for Federal Housing Finance Agency

**Kasowitz, Benson, Torres & Friedman LLP**
Marc E. Kasowitz
Hector Torres
Christopher P. Johnson
1633 Broadway
New York, NY 10019

Counsel for MBIA Insurance Corp.

**Cadwalader, Wickersham & Taft LLP**
Gregory M. Petrick
Mark C. Ellenberg
One World Financial Center
New York, NY 10281

**Quinn Emanuel Urquhart & Sullivan, LLP**
Peter E. Calamari
51 Madison Ave., 22nd Floor
New York, NY 10010

Counsel for Deutsche Bank National Trust
Company and Deutsche Bank Trust Company
Americas

**Morgan, Lewis & Bockius LLP**
James L. Garrity, Jr.
John C. Goodchild, III
101 Park Avenue
New York, NY 10178-0600

Counsel for The Bank of New York Mellon
Trust Company, N.A.

**Dechert LLP**
Glenn E. Siegel
Craig P. Druehl
1095 Avenue of the Americas
New York, NY 10036-6797

Counsel for Wells Fargo Bank, N.A.

**Alston & Bird LLP**
Martin G. Bunin
John C. Weitnauer
90 Park Avenue
New York, NY 10016

Counsel for Union Central Life Insurance Co.

**Robbins Geller Rudman & Dowd LLP**
John J. Stoia
Steven W. Pepich
655 West Broadway, Suite 1900
San Diego, CA 92101

Samuel H. Rudman
58 South Service Road, Suite 200
Melville, NY 11747

Christopher M. Wood
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104

Counsel for Allstate Insurance Company
and AIG

**Quinn Emanuel Urquhart & Sullivan, LLP**
Susheel Kirpalani
Daniel L. Brockett
51 Madison Ave., 22nd Floor
New York, NY 10010

Counsel for Berkshire Hathaway Inc.

**Munger, Tolles & Olson LLP**
Thomas Walper
Seth Goldman
355 South Grand Ave., 35th Floor
Los Angeles, CA 90071-1560

Counsel for the Triaxx Entities

**Miller & Wrubel PC**
John G. Moon
Charles R. Jacob III
Claire L. Huene
570 Lexington Ave.
New York, NY 10022

Counsel for U.S. Bank National Association

**Seward & Kissel LLP**
Ronald L. Cohen
Arlene R. Alves
One Battery Park Plaza
New York, NY 10004

Counsel for the RMBS Steering Committee

**Gibbs & Bruns LLP**
Kathy D. Patrick
Robert J. Madden
1100 Louisiana, Suite 5300
Houston, TX 77002

**Ropes & Gray LLP**
D. Ross Martin
Keith H. Wofford
1211 Avenue of the Americas
New York, NY 10036-8704

Counsel for the Talcott Franklin Group

**Talcott Franklin PC**
Talcott J. Franklin
208 North Market Street, Suite 200
Dallas, Texas 75202

**Miller, Johnson, Snell & Cummiskey, PLC**
Thomas P. Sarb
Robert Wolford
Calder Plaza Building
250 Monroe Avenue NW, Suite 800
Grand Rapids, MI 49503-2250

**Carter Ledyard & Milburn LLP**
Aaron R. Cahn
Leonardo Trivigno
2 Wall Street
New York, New York 10005

Counsel for John Hancock Life Insurance

**Grant & Eisenhofer PA**
Jay W. Eisenhofer
Geoffrey C. Jarvis
Deborah A. Elman
485 Lexington Ave., 29th Floor
New York, NY 10017

Counsel for the Federal Home Loan Banks

**Keller Rohrback LLP**
Lynn Lincoln Sarko
Derek W. Loser
Amy Williams-Derry
1201 Third Ave., Suite 3200
Seattle, Washington 98101

Gary A. Gotto
3101 North Central Ave., Suite 1400
Phoenix, Arizona 85012

Counsel for Aurelius Capital Management

**Akin Gump Strauss Hauer & Feld LLP**
Fred S. Hodara
Robert A. Johnson
Christopher W. Carty
One Bryant Park
New York, NY 10036-6745

**EXHIBIT B**

**Formatting of Submission Papers and Appendices**

**General Format**

- All Submission Papers and appendices should be submitted to the Examiner in both electronic and hardcopy form.

- Please provide the electronic form of the Submission Papers in both "PDF" and Microsoft Word formats, with no password protection or encryption.

- Legal citations should conform to the latest version of The Bluebook: A Uniform System of Citation.

- Hardcopies of the Submission Papers and appendices should be delivered to the Examiner's counsel as follows:

   o Three copies to Chadbourne & Parke LLP, Attn: Seven Rivera, 30 Rockefeller Plaza, New York, NY 10112.

   o One copy to Mesirow Financial Consulting, Attn: James Feltman, 666 Third Avenue, 21st Floor, New York, NY 10017.

**Margins and Type Face**

- The margins of each page shall be no less than 1 inch on all sides.

- Each Submission Paper should contain a table of contents and table of authorities.

- Text should be no smaller than 12-point type, with the exception of footnotes, which may be no smaller than 10-point type.

- The Submission Papers shall be double-spaced, with the exception of footnotes and block quotations of 50 words or more.

**References to Evidence, Appendices, and Hyperlinking**

- The Submission Papers shall contain references to the documentary evidence that support the factual contentions contained therein, as set forth in an appendix to be provided with each Submission Paper.

- The evidentiary references contained in the PDF version of the Submission Papers shall be electronically hyperlinked to the relevant pages in the related appendix.

- The references and hyperlinking shall point to the particular page or pages of the document that support the factual contention, although the appendix should contain the entire document referenced, so that the Examiner may consider the context in which the referenced materials appear. Where feasible, highlighting specific portions of pages is appreciated, but not required.

- Each appendix shall contain a table of contents, with hyperlinks to the first page of each document contained in the appendix.

- References to any pleadings filed in the case should include a citation to the docket number and a hyperlink to a copy of the pleading, to be set forth in the appendix.

- The PDF version of each Submission Paper may contain hyperlinking in respect of legal citations—and where feasible will be much appreciated by the Examiner—but is not required.

Appendix VIII.A—4, Page 1 of 13

30 Rockefeller Plaza, New York, NY 10112
**tel** 212-408-5100  **fax** 212-541-5369

# CHADBOURNE
## & PARKE LLP

December 21, 2012

To: Potential Holders of Third-Party
Claims (as defined below)

Re:  *In re Residential Capital, LLC, et al.*, No. 12-12020 (MG) (Bankr.
S.D.N.Y.) — Request for Third-Party Claims Damages Quantification

Dear Counsel:

I write on behalf of Arthur J. Gonzalez, court-appointed Examiner (the "Examiner") of Residential Capital, LLC and its affiliated debtors (collectively, the "Debtors"). As you may be aware, the Debtors filed voluntary petitions for Chapter 11 bankruptcy relief on May 14, 2012 in the United States Bankruptcy Court for the Southern District of New York (the "Court") (Case No. 12-12020). The Court subsequently appointed the Examiner to investigate, among other things, (i) all material prepetition transactions between the Debtors and their non-filing parent corporation, Ally Financial Inc. ("AFI"), (ii) the negotiation of certain plan support and settlement agreements with AFI and (iii) the sufficiency of consideration to be provided for certain third-party releases in favor of AFI, its non-debtor subsidiaries and current and former officers and directors of AFI and the Debtors. *See* Order Approving Scope of Investigation of Arthur J. Gonzalez, Examiner (the "Examination Scope Order") [Doc. No. 925] (attached hereto as Exhibit A).

The purpose of this letter is to solicit information in connection with the Examiner's investigation into the consideration to be provided for the proposed third-party releases. In particular, this request relates to paragraph 10(f)(viii) of the Examination Scope Order, which provides for the investigation of the following:

"[A]ll state and federal law claims or causes of action the Debtors propose to release or to be released as part of their plan including . . . (viii) claims held by third parties, i.e., parties that are not affiliates of the Debtors, against current and former directors and officers of the Debtors and against [Ally Financial Inc.] and its insiders including current and former directors, officers, and shareholders . . . ." (collectively, the "Third-Party Claims").

You are receiving this letter because you are party to pending litigation, or have alleged potential claims, against the Debtors or Ally Financial Inc. that the Examiner believes may give rise to Third-Party Claims. The Examiner and his advisors have reviewed pertinent pleadings and are actively investigating such claims.

Donald Schapiro
George E. Zeitlin
Stuart D. Baker
Donald J. Strauber
Richard M. Leder
Edward P. Smith
Whitney I. Gerard
Morton E. Grosz
Leslie J. Schreyer
Charles K. O'Neill
H. Hedley Stothers, Jr.
William G. Cavanagh
Richard Sonkin
Charles E. Hord, III
Chaim Wachsberger
Alan I. Raylesberg
Robert F. Shapiro*
Keith Martin
Daniel J. Greenwald, III
Jaroslawa Z. Johnson*
Abbe David Lowell
Andrew C. Coronios
Dorota Szubielska*
Lawrence Rosenberg
Peter N. Hillman
David M. Raim
Howard Seife
Adrian Mecz
Mary T. Yelenick
Mikhail A. Rozenberg*
J. Allen Miller
Thomas J. Hall
Talbert I. Navia
John Verrill*
David M. LeMay
Peter F. Fitzgerald
John T. Baecher
A. Robert Colby
Thomas J. McCormack
John F. Finnegan
Christopher Cardona*
Marc M. Rossell
William K. Perry
Kenneth W. Hansen*
Andrew A. Giaccia*
N. Theodore Zink, Jr.
Wlodzimierz Radzikowski*
Paul J. Kaufman*
Robert A. Schwinger
Paul L. Weber
Lauren D. Kelly
Andrea N. Satty
Mariusz Stawiarczyk*
Robin O. Ball*
Marc A. Alpert
Douglas M. Fried
William Greason
Martin Thomas*
Marjorie M. Glover
Michelle George*
Michael Socarras*
Claude S. Serfilippi
Anthony M. Roncalli
Dana Frix*
Noam Ayali
Luis Enrique Graham*
Jeffrey A. Robins
Vincent Dunn
Lori S. Hoberman
Lawrence R. Plotkin
Oliver J. Armas
Pamela Marple*
Melanie Willems*
Sey-Hyo Lee
Marian Baldwin Fuerst
Kevin C. Smith
Charez X. Golvala*
Phoebe A. Wilkinson
Boris Otto*
Joy L. Langford*
Sohail Barkatali*
Rohit Chaudhry
Todd E. Alexander
Daniel A. Rabinowitz
Konstantin O. Konstantinov*
Scott D. Berson
Ayse Yüksel
Agnieszka Klich*
Konstantin A. Osipov*
David H. Evans*
Edouard S. Markson
Douglas E. Deutsch
Frank S. Vellucci
Igor Muszynski*
Robin Mizrahi*
Andrew Rosenblatt
Evelyn Lim
Scott Naidech
Dearbhla Quigley*
David Gallai
Eli M. Katz
Seven Rivera
Marissa Leigh Alcala
Benjamin Y. Koenigsberg
Erez Tucner

*not admitted in New York

New York  Washington  Los Angeles  Mexico City  São Paulo  London  Moscow  Warsaw  Kyiv  Istanbul  Dubai  Beijing

CHADBOURNE
& PARKE LLP

To: Potential Holders of Third-Party
    Claims (as defined below)            -2-            **December 21, 2012**

In many cases, however, the amount of damages that may arise from your alleged, or potential, Third-Party Claims is not readily evident from litigation pleadings. Accordingly, the Examiner requests the following:

     1.     Please furnish to the Examiner's counsel a letter of no more than **five single-spaced pages** setting forth your quantification of the damages arising from your existing or potential litigation on account of Third-Party Claims (each a "Damages Letter"). In addition, please advise us of any additional theories of liability not identified in your respective pleadings, if any.

     2.     Please submit all Damages Letters on or before **Friday, January 4, 2013 at 3:00 p.m. (Eastern Time)**. All Damages Letters should be transmitted by electronic means to me (srivera@chadbourne.com) and Michael Distefano (mdistefano@chadbourne.com).

     3.     The Damages Letters will not be maintained as confidential. The Examiner reserves the right to share the Damages Letters, or portions thereof, with other parties in interest in the bankruptcy proceeding, as well as the right to rely on the information contained in the Damages Letters in pursuing his investigation and drafting his report.

     4.     Please assume that the Examiner and his advisors are familiar with the general background of the Debtors' businesses, particularly as it relates to activities such as mortgage loan origination and securitization, as well as the legal theories underlying your claims. We encourage you to focus on the quantification (or range) of your alleged damages and, briefly, the means by which you arrived at that number. To the extent your damages calculations vary depending upon the application of particular legal theories, please explain this variance. Further, please limit your quantification of alleged damages to reasonable estimates.

     5.     The Examiner reserves the right to request additional information from the parties where he feels a particular issue has not been adequately addressed or would benefit from additional information.

CHADBOURNE
& PARKE LLP

To: Potential Holders of Third-Party
   Claims (as defined below)            -3-            **December 21, 2012**

         Thank you in advance for your cooperation and candor with respect to this
matter.  If you have any questions regarding the contents of this letter, please feel free
to contact me at 212-408-5529.

                                        Sincerely Yours,

                                        /s/ Seven Rivera

                                        Seven Rivera

CPAM: 5089919.4

**Appendix VIII.A—4**, Page 4 of 13

**EXHIBIT A**

New York   Washington   Los Angeles   Mexico City   São Paulo   London   Moscow   Warsaw   Kyiv   Istanbul   Dubai   Beijing

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------- x

In re:                                            :     Chapter 11

                                                       :

Residential Capital, LLC, <u>et al.</u>,             :     Case No. 12-12020 (MG)

                                                       :

            Debtors.                         :     Jointly Administered

-------------------------------------------------------- x

### ORDER APPROVING SCOPE OF
### <u>INVESTIGATION OF ARTHUR J. GONZALEZ, EXAMINER</u>

The Court having reviewed the Preliminary Statement of Arthur J. Gonzalez, Examiner, Regarding the Scope and Timing of his Investigation attached hereto as Exhibit "A" (the "<u>Preliminary Statement</u>"); the Court having heard and considered the parties' statements with respect to any disagreements regarding the scope of and timing for the Examiner's investigation (the "<u>Investigation</u>"); the Court being satisfied based on the statements made by the parties at the Chambers conference held on July 24, 2012 that the Preliminary Statement sets forth a reasonable scope of the Investigation; and after due deliberation and sufficient cause appearing therefor; it is hereby

ORDERED that the scope of the Investigation as set forth in the Preliminary Statement is approved; and it is further

ORDERED that within ten (10) days of the entry of this Order, the Examiner shall file a formal work plan that will include, among other information, (i) the Examiner's estimate of fees and expenses to be incurred in connection with the Investigation and (ii) such other matters

**Appendix VIII.A—4**, Page 6 of 13

or information as are customarily included in work plans submitted by examiners appointed in

other chapter 11 cases; and it is further

ORDERED that this order is without prejudice to the Examiner's right to seek

modifications of the scope of the Investigation.

Dated:    July 27, 2012
          New York, New York

<div align="right">

**_/s/Martin Glenn_**
MARTIN GLENN
United States Bankruptcy Judge

</div>

## EXHIBIT A

**CHADBOURNE & PARKE LLP**
Howard Seife
David M. LeMay
N. Theodore Zink, Jr.
30 Rockefeller Plaza
New York, New York 10112
Telephone:   (212) 408-5100
Facsimile:   (212) 541-5369

*Proposed Counsel to the Examiner*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| ---------------------------------------------------------------------------- x | |
| In re: | Chapter 11 |
| Residential Capital, LLC <u>et al.</u>, | Case No. 12-12020 (MG) |
| | Jointly Administered |
| Debtors. | |
| ---------------------------------------------------------------------------- x | |

**PRELIMINARY STATEMENT OF ARTHUR J. GONZALEZ, EXAMINER,**
**REGARDING THE SCOPE AND TIMING OF HIS INVESTIGATION**

TO THE HONORABLE MARTIN GLENN,
UNITED STATES BANKRUPTCY JUDGE:

Arthur J. Gonzalez, the Court-appointed Examiner for Residential Capital, LLC and its

affiliated debtors (collectively, the "<u>Debtors</u>") in the above-captioned cases (the "<u>Chapter 11</u>

<u>Cases</u>"), by his proposed undersigned counsel, hereby submits his preliminary statement

regarding the scope and timing of his investigation.

**Appendix VIII.A—4**, Page 8 of 13

## INTRODUCTION

1.      On June 28, 2012, the Court entered an Order Directing the Appointment

of an Examiner Pursuant to Section 1104(c) of the Bankruptcy Code (the "Examiner Order")

directing the United States Trustee (the "U.S. Trustee") to appoint an examiner (the "Examiner")

in the Chapter 11 Cases.

2.      The Examiner Order directs the Examiner to conduct an investigation (the

"Investigation").

3.      On July 3, 2012, the U.S. Trustee appointed Arthur J. Gonzalez, Esq. as

Examiner in the Chapter 11 Cases and filed (i) a notice of such appointment and (ii) an

application for an Order approving such appointment.

4.      On July 3, 2012, the Court entered an Order approving the appointment of

the Examiner.

5.      In its Memorandum Opinion and Order Granting Berkshire Hathaway's

Motion to Appoint an Examiner Under 11 U.S.C. §1104(c) dated June 20, 2012, the Court noted

that

> The scope, timing and budget for the examiner's investigation will
> be set by the Court after the examiner is appointed and confers
> with other parties in interest. In the first instance, the scope of the
> investigation established by the 2004 Order sets the appropriate
> scope parameter for the investigation, subject to later adjustment if
> necessary.[1]

---

[1]     As used herein, the "2004 Order" shall refer to the Order Authorizing the Official Committee of Unsecured
Creditors to Issue Subpoenas Compelling the Production of Documents and Provision of Testimony by the
Debtors and Others Pursuant to Federal Rule of Bankruptcy Procedure 2004 entered in the Chapter 11 Cases on
June 5, 2012.

**Appendix VIII.A—4**, Page 9 of 13

        6.      On July 11, 2012, the Examiner selected Chadbourne & Parke LLP

("Chadbourne") as his proposed counsel.  Chadbourne filed its Application for Retention as

Examiner's Counsel on July 16, 2012, following discussion with and review by the U.S. Trustee.

        7.      On July 24, 2012, a Chambers conference was conducted by Judge Martin

Glenn at which the Examiner and his counsel and counsel for various parties in interest presented

their respective views regarding the appropriate scope of the Investigation and estimates of the

time necessary to complete the Investigation and prepare a report.

<u>THE EXAMINER'S ACTIVITIES TO DATE</u>

        8.      Beginning on July 18, 2012, the Examiner conducted a series of meetings

and/or telephonic calls with representatives of the Debtors, the Official Committee of Unsecured

Creditors, Berkshire Hathaway, Ally Financial Inc., and certain holders of the Debtors'

unsecured notes.  The principal purpose of these meetings was to learn more about the cases and

to ascertain each party's preliminary views regarding the scope and timing of the Investigation.

The Examiner invited the parties to share their views on these matters, as well as on the legal and

factual issues implicated by the Investigation.

        9.      In addition, the Examiner and his proposed professionals have begun the

Investigation by undertaking various activities including reviewing the various pleadings,

documents and materials relevant to the issues to be investigated.

<u>SCOPE OF EXAMINATION</u>

        10.    As previously noted, the scope of the Investigation in the first instance is

established by the 2004 Order.  Accordingly, after review of the 2004 Order and discussions with

various parties in interest, the Examiner has determined that, at a minimum, he will examine the

following in his report:

**Appendix VIII.A—4**, Page 10 of 13

a. all material prepetition transactions and all material verbal or written agreements or contracts between or among the Debtors on the one hand and any one or more of Ally Financial Inc., f/k/a GMAC LLC, and any of its current and former, direct and indirect affiliates and subsidiaries (collectively, "AFI"), Cerberus Capital Management, L.P. and any of its current and former direct and indirect affiliates and subsidiaries including Cerberus FIM, LLC, Cerberus FIM Investors LLC, and FIM Holdings LLC. (collectively, "Cerberus") and/or Ally Bank, a commercial state non-member bank chartered under the laws of the State of Utah (f/k/a GMAC Bank) ("Ally Bank") on the other hand including (i) material agreements concerning transfers of cash, assets, property, stock, contracts, or other items of value including any servicing agreements, repurchase transactions, exchange offers, hedging arrangements, derivative agreements or contracts, swap agreements or contracts, or foreign exchange agreements or contracts, (ii) any payments, dividends or capital contributions, (iii) any extension of loans or lines of credit including any factoring arrangements, (iv) any debt, or liens related thereto,  or the transfer, assignment, repayment or forgiveness of such debt, (v) any claims and all payments made on account of such claims, and (vi) any transfers of cash, assets, property, stock, contracts, or other items of value (collectively, the "Prepetition Transactions and Agreements");[2]

b. the negotiation and entry into any plan sponsor, plan support, or settlement agreement, the debtor-in-possession financing with AFI, and the stalking horse asset purchase agreement with AFI, and any servicing agreement with Ally Bank (collectively, the "Postpetition Transactions and Agreements");

c. (i) the activities of the Debtors' officers and board of directors (including any subcommittee thereof) concerning (A) the Prepetition Transactions and Agreements, (B) the Postpetition Transactions and Agreements, and (C) the investigation of the validity of claims against AFI, and (ii) the recruitment, compensation and indemnification of the Debtors' officers and the members of the Debtors' board of directors (including any subcommittee thereof);

d. the corporate relationships between or among the Debtors, AFI, Cerberus and/or Ally Bank and the conduct of each of these entities in connection with the Debtors' decisions (i) to file (or to refrain from filing, or delaying the filing of) voluntary petitions under

---

[2]    The Examiner's Investigation of certain of the Debtors' entry into and performance under the "Consent Order," "DOJ/AG Settlement" and "CMP," each as defined and described in paragraphs 86 through 90 of the of the "Affidavit of James Whitlinger, Chief Financial Officer of Residential Capital, LLC, in Support of Chapter 11 Petition and First Day Pleadings," dated May 14, 2012 will be limited to the propriety of the allocation of obligations as among the Debtors and AFI under  the "Consent Order," "DOJ/AG Settlement" and "CMP."

### **Appendix VIII.A—4**, Page 11 of 13

Chapter 11 of the United States Bankruptcy Code, (ii) to pursue (or refrain from pursuing) a sale of substantially all of their assets, and (iii) to enter into the Prepetition Transactions and Agreements and the Postpetition Transactions and Agreements;

e. all state and federal law claims or causes of action of the Debtors against current or former directors and officers of the Debtors, and against AFI and/or its insiders including current and former directors, officers, and shareholders;

f. all state and federal law claims or causes of action the Debtors propose to release or to be released as part of their plan including (i) preference and fraudulent transfer claims, (ii) equitable subordination claims, (iii) alter ego and veil piercing claims, (iv) debt recharacterization claims, (v) constructive trust and unjust enrichment claims, (vi) breach of fiduciary duty and aiding and abetting breach of fiduciary duty claims, (vii) securities law claims, and (viii) claims held by third parties, i.e., parties that are not affiliates of the Debtors, against current and former directors and officers of the Debtors and against AFI and its insiders including current and former directors, officers, and shareholders; and in respect of the claims identified in subclause (viii) of this paragraph f, the Examiner will (A) investigate the merits of such claims, (B) analyze the sufficiency of the consideration to be provided for such third party releases, and (C) solicit the parties' views concerning the merits of such claims and the potential amount of damages arising from such claims, but the Examiner will not attempt to independently quantify such damages;

g. the value of the releases contemplated by the Debtors including the releases by the Debtors' estates of all claims against current or former directors and officers of the Debtors, and against AFI and its insiders including current and former directors, officers, and shareholders, and the proposed releases by third parties of claims against AFI; and

h. other matters affecting the Debtors' assets, liabilities, and financial condition including all intercompany claims and the Debtors' solvency, capital adequacy and ability to pay debts as such debts become due at various dates prior to the Petition Date.

### TIMING OF THE SUBMISSION OF THE EXAMINER'S REPORT

11.    At this juncture, the Examiner anticipates that a substantial amount of time will be expended by his professionals to prepare a report containing the Examiner's findings regarding the Investigation. Based upon his discussion with his counsel and the parties, the Examiner believes that a realistic time frame for the preparation of such a report is six (6)

**Appendix VIII.A—4**, Page 12 of 13

months, subject to adjustment if after meaningful due diligence a different time period appears to
be more reasonable.

## INFORMATION GATHERING

12.     In furtherance of the Investigation, the Examiner will request documents
and other information from various parties including, the Debtors, AFI, Ally Bank and Cerberus
and their respective current and former officers, directors and professionals.  To ensure
compliance with the Examiner's information requests, the Examiner may need to serve
subpoenas on entities that refuse to produce information.  Accordingly, the Examiner intends to
promptly file a motion under rule 2004 of the Federal Rules of Bankruptcy Procedure and seek
authority to serve rule 2004 subpoenas on any entity that may be in possession of information
relevant to the Investigation.  In connection therewith, the Examiner intends to ask the Court to
approve a protocol, including a form confidentiality agreement, that would govern production
from all parties.

## ESTIMATED FEES AND EXPENSES

13.     This statement does not address budget issues for the Investigation.
Subject to the Court's further direction, the Examiner will file a formal work plan that will
include, among other information, the Examiner's estimate of fees and expenses to be incurred in
connection with the Investigation.

[Signature page to follow]

**Appendix VIII.A—4**, Page 13 of 13

Dated:   July 27, 2012
          New York, New York

                            Respectfully submitted,
                            Arthur J. Gonzalez, Examiner


                    *By:* /s/ Howard Seife
                            Chadbourne & Parke LLP
                            Howard Seife
                            David M. LeMay
                            N. Theodore Zink, Jr.
                            30 Rockefeller Plaza
                            New York, New York 10112
                            Telephone:   (212) 408-5100
                            Facsimile:    (212) 541-5369
                            E-mail:   hseife@chadbourne.com

                            Proposed Counsel to the Examiner

Appendix VIII.B—1, Page 1 of 8

**Residential Capital, LLC**
**392 PLS Deal Details**
**2004 – 2007**

| # | Deal Name | Orig. Principal Bal. [a] | Depositor | Sponsor/ Master Servicer | Lead Underwriter | Joint Lead Underwriter | Co-Underwriter [b] | Custodian | Monoline Insurer | Affiliate Originator(s) [d] |
|---|---|---|---|---|---|---|---|---|---|---|
| 1. | 2004-KR1 | $ 630,335,200 | RAMP | GMAC Mortgage | Bear, Stearns & Co. Inc. | | Ally Securities | Escrow Bank USA | | Old GMAC Bank |
| 2. | 2004-AR2 | 596,038,100 | RAMP | GMAC Mortgage | RBS Greenwich Capital | | | Old GMAC Bank | | Old GMAC Bank |
| 3. | 2004-GH1 | 224,099,000 | RAMP | GMAC Mortgage | Bear, Stearns & Co. Inc. | | | Old GMAC Bank | | Old GMAC Bank |
| 4. | 2004-HE1 | 1,259,311,000 | RAMP | GMAC Mortgage | Banc One Capital Markets, Inc | | Ally Securities | Escrow Bank USA | FGIC | Old GMAC Bank |
| 5. | 2004-HE2 | 711,548,000 | RAMP | GMAC Mortgage | Lehman Brothers | | Ally Securities | Escrow Bank USA | Old Republic | Old GMAC Bank |
| 6. | 2004-HE3 | 952,320,000 | RAMP | GMAC Mortgage | Bear, Stearns & Co. Inc. | | Ally Securities | Escrow Bank USA | FSA | Old GMAC Bank |
| 7. | 2004-HE4 | 992,000,000 | RAMP | GMAC Mortgage | Bear, Stearns & Co. Inc. | | Ally Securities | Old GMAC Bank | MBIA | Old GMAC Bank |
| 8. | 2004-HE5 | 700,000,000 | RAMP | GMAC Mortgage | RBS Greenwich Capital | | Ally Securities | Old GMAC Bank | FGIC | Old GMAC Bank |
| 9. | 2004-HLTV1 | 175,000,000 | RAMP | GMAC Mortgage | Bear, Stearns & Co. Inc. | | | Old GMAC Bank | FGIC | Old GMAC Bank |
| 10. | 2004-J1 | 398,864,694 | RAMP | GMAC Mortgage | Banc of America Securities LLC | | | Escrow Bank | MBIA | Old GMAC Bank |
| 11. | 2004-J2 | 398,597,431 | RAMP | GMAC Mortgage | UBS Investment Bank | | | Escrow Bank | MBIA | Old GMAC Bank |
| 12. | 2004-J3 | 348,287,499 | RAMP | GMAC Mortgage | Merrill Lynch & Co. | | | Escrow Bank | MBIA | Old GMAC Bank |
| 13. | 2004-J4 | 597,117,362 | RAMP | GMAC Mortgage | Citigroup | | Ally Securities | Old GMAC Bank | | Old GMAC Bank |
| 14. | 2004-J5 | 549,141,999 | RAMP | GMAC Mortgage | Bear, Stearns & Co. Inc. | | | Old GMAC Bank | | Old GMAC Bank |
| 15. | 2004-J6 | 406,384,031 | RAMP | GMAC Mortgage | Credit Suisse First Boston | | | Old GMAC Bank | | Old GMAC Bank |
| 16. | 2004-TT | 390,956,146 | GMACR | GMAC Mortgage | Bear, Stearns & Co. Inc. | | | Old GMAC Bank | MBIA | GMAC Mortgage & Old GMAC Bank |
| 17. | 2004-SP1 | 233,667,000 | RAMP | RFC | Merrill Lynch & Co. | | | Wells Fargo Bank | | |
| 18. | 2004-SP2 | 144,545,669 | RAMP | RFC | Merrill Lynch & Co. | | Ally Securities | Wells Fargo Bank | | |
| 19. | 2004-SP3 | 360,933,000 | RAMP | RFC | Merrill Lynch & Co. | | Ally Securities | Wells Fargo Bank | | |
| 20. | 2004-RS1 | 201,272,500 | RALI | RFC | Bear, Stearns & Co. Inc. | | Ally Securities | Wells Fargo Bank | | |
| 21. | 2004-QA2 | 365,138,000 | RALI | RFC | RBS Greenwich Capital | | | Wells Fargo Bank | | |
| 22. | 2004-QA3 | 315,254,200 | RALI | RFC | Credit Suisse First Boston | | | Wells Fargo Bank | | |
| 23. | 2004-QA4 | 285,885,200 | RALI | RFC | Ally Securities | | | Wells Fargo Bank | | |
| 24. | 2004-QA5 | 320,188,200 | RALI | RFC | Bear, Stearns & Co. Inc. | | | Wells Fargo Bank | | |
| 25. | 2004-QA6 | 708,773,800 | RALI | RFC | Ally Securities | | | Wells Fargo Bank | | |
| 26. | 2004-QS1 | 316,357,744 | RALI | RFC | RBS Greenwich Capital | | | Wells Fargo Bank | | |
| 27. | 2004-QS10 | 214,339,945 | RALI | RFC | RBS Greenwich Capital | | Ally Securities | Wells Fargo Bank | | |
| 28. | 2004-QS11 | 215,336,840 | RALI | RFC | Credit Suisse First Boston | | | Wells Fargo Bank | | |
| 29. | 2004-QS12 | 419,799,756 | RALI | RFC | RBS Greenwich Capital | | | Wells Fargo Bank | | |
| 30. | 2004-QS13 | 128,649,847 | RALI | RFC | Citigroup | | | Wells Fargo Bank | | |
| 31. | 2004-QS14 | 210,562,696 | RALI | RFC | RBS Greenwich Capital | | Ally Securities | Wells Fargo Bank | | |
| 32. | 2004-QS15 | 211,030,708 | RALI | RFC | Bear, Stearns & Co. Inc. | | Ally Securities | Wells Fargo Bank | | |
| 33. | 2004-QS16 | 528,907,333 | RALI | RFC | RBS Greenwich Capital | | | Wells Fargo Bank | | |
| 34. | 2004-QS2 | 289,122,549 | RALI | RFC | Citigroup | | | Wells Fargo Bank | | |
| 35. | 2004-QS3 | 206,985,957 | RALI | RFC | Citigroup | | Ally Securities | Wells Fargo Bank | | |
| 36. | 2004-QS4 | 316,910,541 | RALI | RFC | RBS Greenwich Capital | | | Wells Fargo Bank | | |
| 37. | 2004-QS5 | 290,284,743 | RALI | RFC | RBS Greenwich Capital | | | Wells Fargo Bank | | |
| 38. | 2004-QS6 | 155,855,277 | RALI | RFC | Bear, Stearns & Co. Inc. | | Ally Securities | Wells Fargo Bank | | |
| 39. | 2004-QS7 | 445,133,848 | RALI | RFC | RBS Greenwich Capital | | | Wells Fargo Bank | | |
| 40. | 2004-QS8 | 268,719,101 | RALI | RFC | Bear, Stearns & Co. Inc. | | Ally Securities | Wells Fargo Bank | | |
| 41. | 2004-QS9 | 104,695,398 | RALI | RFC | Goldman Sachs & Co. | | Ally Securities | Wells Fargo Bank | | |
| 42. | 2004-RS1 | 2,000,000,000 | RAMP | RFC | Deutsche Bank Securities | | | Wells Fargo Bank | | |
| 43. | 2004-RS2 | 1,250,000,000 | RAMP | RFC | Deutsche Bank Securities | | | Wells Fargo Bank | | |
| 44. | 2004-RS3 | 1,400,000,000 | RAMP | RFC | Bear, Stearns & Co. Inc. | | | Wells Fargo Bank | AMBAC | |
| 45. | 2004-RS10 | 1,250,000,000 | RAMP | RFC | Credit Suisse First Boston | | Ally Securities | Wells Fargo Bank | | |
| 46. | 2004-RS11 | 925,000,000 | RAMP | RFC | JPMorgan | | | Wells Fargo Bank | | |
| 47. | 2004-RS12 | 975,000,000 | RAMP | RFC | JPMorgan | Ally Securities | | Wells Fargo Bank | | |
| 48. | 2004-RS2 | 875,000,000 | RAMP | RFC | Citigroup | | Ally Securities | Wells Fargo Bank | | |
| 49. | 2004-RS3 | 600,000,000 | RAMP | RFC | JPMorgan | | Ally Securities | Wells Fargo Bank | | |
| 50. | 2004-RS4 | 1,100,000,000 | RAMP | RFC | Bear, Stearns & Co. Inc. | | Ally Securities | Wells Fargo Bank | | |
| 51. | 2004-RS5 | 1,050,000,000 | RAMP | RFC | Credit Suisse First Boston | | Ally Securities | Wells Fargo Bank | AMBAC | |

[a] Principal balance of offered certificates.

[b] For the purpose of this Appendix, Ally Securities is the only disclosed co-underwriter but, in most cases, securitizations had multiple non-affiliated co-underwriters. Ally Securities participated as a co-underwriter in 131 of ResCap's 392 securitizations.

[c] For the purpose of this Appendix, ResCap and RFI affiliates are disclosed when they originated more than 10% of the loan pool (per Regulation AB § 229.1110, which became effective Jan. 1, 2006.) Non-affiliate originators are not disclosed.

Note:

(A) Blank spaces refer to details that are not applicable or undisclosed.

(B) At the time of the securitizations listed above, Ally Securities was doing business as and disclosed in the prospectus supplement as "GMAC-RFC Securities."

(C) At the time of the securitizations listed above, Ally Bank was doing business as and disclosed in the prospectus supplement as "GMAC Bank."

(D) Escrow Bank and Escrow Bank USA are identified, in the prospectus supplements, as an affiliate of GMAC Mortgage. Effective July 1, 2004, Old GMAC Bank assumed the custodial activities from these two entities.

Source: All of the information contained in this Appendix was extracted from the relevant securitization prospectus supplements using either Bloomberg or Intex. Generally, the relevant information is located on the cover page and/or in the summary section of each prospectus supplement, except for custodial information, which can be found in the pooling and servicing section.

Appendix VIII.B—1, Page 2 of 8

**Residential Capital, LLC**
**392 PLS Deal Details**
**2004 – 2007**

| Deal Name | Orig. Principal Bal. [1] | Depositor | Sponsor/Master Servicer | Lead Underwriter | Joint Lead Underwriter | Co-Underwriter [2] | Custodian | Monoline Insurer | Affiliate Originator(s) [3] |
|---|---|---|---|---|---|---|---|---|---|
| 2004-KS6 | 1,000,000,000 | RAMP | RFC | JPMorgan | | Ally Securities | Wells Fargo Bank | | |
| 2004-KS7 | 1,313,656,000 | RAMP | RFC | Bear, Stearns & Co. Inc. | | Ally Securities | Wells Fargo Bank | | |
| 2004-RS8 | 900,000,000 | RAMP | RFC | Credit Suisse First Boston | | Ally Securities | Wells Fargo Bank | FGIC | |
| 2004-RS9 | 950,000,000 | RAMP | RFC | JPMorgan | | Ally Securities | Wells Fargo Bank | | |
| 2004-RZ1 | 485,000,033 | RAMP | RFC | Bear, Stearns & Co. Inc. | | Ally Securities | Wells Fargo Bank | AMBAC | |
| 2004-RZ2 | 475,000,000 | RAMP | RFC | Banc of America Securities LLC | | Ally Securities | Wells Fargo Bank | FGIC | |
| 2004-RZ3 | 360,000,000 | RAMP | RFC | RBS Greenwich Capital | | Ally Securities | Wells Fargo Bank | | |
| 2004-RZ4 | 273,840,000 | RAMP | RFC | Bear, Stearns & Co. Inc. | | Ally Securities | Wells Fargo Bank | | |
| 2004-SL1 | 613,374,607 | RAMP | RFC | Citigroup | | | Wells Fargo Bank | | |
| 2004-SL2 | 494,754,406 | RAMP | RFC | Credit Suisse First Boston | | | Wells Fargo Bank | | |
| 2004-SL3 | 221,964,111 | RAMP | RFC | Citigroup | | | Wells Fargo Bank | | |
| 2004-SL4 | 205,965,987 | RAMP | RFC | JPMorgan | | | Wells Fargo Bank | | |
| 2004-KS1 | 950,000,000 | RASC | RFC | Bear, Stearns & Co. Inc. | Deutsche Bank Securities | Ally Securities | Wells Fargo Bank | | |
| 2004-KS10 | 976,000,000 | RASC | RFC | Bear, Stearns & Co. Inc. | | Ally Securities | Wells Fargo Bank | | |
| 2004-KS11 | 685,650,000 | RASC | RFC | Credit Suisse First Boston | Ally Securities | | Wells Fargo Bank | | |
| 2004-KS12 | 536,250,000 | RASC | RFC | Credit Suisse First Boston | | Ally Securities | Wells Fargo Bank | | |
| 2004-KS2 | 990,000,000 | RASC | RFC | Banc of America Securities LLC | Bear, Stearns & Co. Inc. | Ally Securities | Wells Fargo Bank | | |
| 2004-KS3 | 675,000,000 | RASC | RFC | Banc of America Securities LLC | Credit Suisse First Boston | Ally Securities | Wells Fargo Bank | | |
| 2004-KS4 | 1,000,000,000 | RASC | RFC | Citigroup | Banc of America Securities LLC | Ally Securities | Wells Fargo Bank | AMBAC | |
| 2004-KS5 | 1,175,000,000 | RASC | RFC | Credit Suisse First Boston | JPMorgan | Ally Securities | Wells Fargo Bank | | |
| 2004-KS6 | 1,000,000,000 | RASC | RFC | Citigroup | Bear, Stearns & Co. Inc. | Ally Securities | Wells Fargo Bank | | |
| 2004-KS7 | 850,000,000 | RASC | RFC | Credit Suisse First Boston | Banc of America Securities LLC | Ally Securities | Wells Fargo Bank | FGIC | |
| 2004-KS8 | 600,000,000 | RASC | RFC | Banc of America Securities LLC | RBS Greenwich Capital | Ally Securities | Wells Fargo Bank | | |
| 2004-KS9 | 600,000,000 | RASC | RFC | Bear, Stearns & Co. Inc. | | Ally Securities | Wells Fargo Bank | FGIC | |
| 2004-H1 | 227,950,000 | RFMSII | RFC | Bear, Stearns & Co. Inc. | | Ally Securities | Wells Fargo Bank | | |
| 2004-H2 | 275,000,000 | RFMSII | RFC | Bear, Stearns & Co. Inc. | | Ally Securities | Wells Fargo Bank | FGIC | |
| 2004-H3 | 220,000,000 | RFMSII | RFC | Bear, Stearns & Co. Inc. | | Ally Securities | Wells Fargo Bank | FGIC | |
| 2004-HS1 | 471,125,000 | RFMSII | RFC | Banc of America Securities LLC | | Ally Securities | Wells Fargo Bank | FGIC | |
| 2004-HS2 | 604,050,000 | RFMSII | RFC | RBS Greenwich Capital | | Ally Securities | Wells Fargo Bank | MBIA | |
| 2004-HS3 | 284,000,000 | RFMSII | RFC | Ally Securities | | Ally Securities | Wells Fargo Bank | MBIA | |
| 2004-PS1 | 100,065,033 | RFMSII | RFC | Ally Securities | | | Wells Fargo Bank | FGIC | |
| 2004-S1 | 306,312,991 | RFMSI | RFC | Citigroup | | Ally Securities | Wells Fargo Bank | | |
| 2004-S2 | 360,357,143 | RFMSI | RFC | Bear, Stearns & Co. Inc. | | | Wells Fargo Bank | Radian | |
| 2004-S3 | 227,780,188 | RFMSI | RFC | Citigroup | | | Wells Fargo Bank | | |
| 2004-S4 | 458,663,279 | RFMSI | RFC | Citigroup | | Ally Securities | Wells Fargo Bank | MBIA | |
| 2004-S5 | 421,986,295 | RFMSI | RFC | JPMorgan | | Ally Securities | Wells Fargo Bank | | |
| 2004-S6 | 525,118,648 | RFMSI | RFC | Merrill Lynch & Co. | | Ally Securities | Wells Fargo Bank | | |
| 2004-S7 | 103,913,545 | RFMSI | RFC | Deutsche Bank Securities | | | Wells Fargo Bank | | |
| 2004-S8 | 309,294,901 | RFMSI | RFC | Citigroup | | Ally Securities | Wells Fargo Bank | | |
| 2004-S9 | 642,878,450 | RFMSI | RFC | Bear, Stearns & Co. Inc. | | | Wells Fargo Bank | | |
| 2005-SA1 | 245,427,200 | RFMSI | RFC | Deutsche Bank Securities | | | Wells Fargo Bank | | |
| 2004-RP1A | 199,473,000 | RAMP | RFC | Deutsche Bank Securities | | | Wells Fargo Bank | | |
| 2005-A1 | 260,774,100 | RAMP | GMAC Mortgage | UBS Investment Bank | | | Old GMAC Bank | | |
| 2005-AF1 | 231,466,322 | RAMP | GMAC Mortgage | Deutsche Bank Securities | | | Old GMAC Bank | | Old GMAC Bank |
| 2005-AF2 | 292,121,700 | RAMP | GMAC Mortgage | Credit Suisse First Boston | | | Old GMAC Bank | | Old GMAC Bank |
| 2005-AR1 | 395,770,100 | RAMP | GMAC Mortgage | UBS Investment Bank | | | Old GMAC Bank | | Old GMAC Bank |
| 2005-AR2 | 453,859,100 | RAMP | GMAC Mortgage | RBS Greenwich Capital | | | Old GMAC Bank | | Old GMAC Bank |
| 2005-AR3 | 518,480,100 | RAMP | GMAC Mortgage | Citigroup | | | Old GMAC Bank | | Old GMAC Bank |
| 2005-AR4 | 381,630,100 | RAMP | GMAC Mortgage | Morgan Stanley | | | Old GMAC Bank | | Old GMAC Bank |
| 2005-AR5 | 592,093,100 | RAMP | GMAC Mortgage | Morgan Stanley | | | Old GMAC Bank | | Old GMAC Bank |
| 2005-AR6 | 585,769,100 | RAMP | GMAC Mortgage | Bear, Stearns & Co. Inc. | | | Old GMAC Bank | | Old GMAC Bank |

[1] Principal balance of offered certificates.

[2] For the purpose of this Appendix, Ally Securities is the only disclosed co-underwriter but, in most cases, securitizations had multiple non-affiliated co-underwriters. Ally Securities participated as a co-underwriter in 131 of ResCap's 392 securitizations.

[3] For the purpose of this Appendix, ResCap and FFI affiliates are disclosed when they originated more than 10% of the loan pool (per Regulation AB § 229.1110, which became effective Jan. 1, 2006.) Non-affiliate originators are not disclosed.

Note:

(A) Blank spaces refer to details that are not applicable or undisclosed.

(B) At the time of the securitizations listed above, Ally Securities was doing business as and disclosed in the prospectus supplement as "GMAC-RFC Securities."

(C) At the time of the securitizations listed above, Ally Bank was doing business as and disclosed in the prospectus supplement as "GMAC Bank."

(D) Escrow Bank and Escrow Bank CSA are identified, in the prospectus supplements, as an affiliate of GMAC Mortgage. Effective July 1, 2004, Old GMAC Bank assumed the custodial activities from these two entities.

Source: All of the information contained in this Appendix was extracted from the relevant securitization prospectus supplements using either Bloomberg or Intex. Generally, the relevant information is located on the cover page and/or in the summary section of each prospectus supplement, except for custodial information, which can be found in the pooling and servicing section.

Appendix VIII.B—1, Page 3 of 8

**Residential Capital, LLC**
**392 PLS Deal Details**
**2004 – 2007**

| Deal Name | Orig. Principal Bal.[1] | Depositor | Sponsor/ Master Servicer | Lead Underwriter | Joint Lead Underwriter | Co-Underwriter[2] | Custodian | Monoline Insurer | Affiliate Originator(s)[3] |
|---|---|---|---|---|---|---|---|---|---|
| 2005-HE1 | 790,255,000 | RAMP | GMAC Mortgage | JPMorgan | | Ally Securities | Old GMAC Bank | FGIC | Old GMAC Bank |
| 2005-HE2 | 1,113,522,000 | RAMP | GMAC Mortgage | RBS Greenwich Capital | | Ally Securities | Old GMAC Bank | FGIC | Old GMAC Bank |
| 2005-HE3 | 963,680,000 | RAMP | GMAC Mortgage | Bear, Stearns & Co. Inc. | | Ally Securities | Old GMAC Bank | AMBAC | Old GMAC Bank |
| 2005-J1 | 522,873,155 | RAMP | GMAC Mortgage | Bear, Stearns & Co. Inc. | | | Old GMAC Bank | | Old GMAC Bank |
| 2005-RP1 | 343,073,000 | RAMP | RFC | Credit Suisse First Boston | Ally Securities | | Wells Fargo Bank | | |
| 2005-RP2 | 301,114,000 | RAMP | RFC | Deutsche Bank Securities | | Ally Securities | Wells Fargo Bank | | |
| 2005-RP3 | 282,542,000 | RAMP | RFC | JPMorgan | | Ally Securities | Wells Fargo Bank | | |
| 2005-SP1 | 828,081,356 | RAMP | RFC | Merrill Lynch & Co. | | Ally Securities | Wells Fargo Bank | | |
| 2005-SP2 | 485,904,100 | RAMP | RFC | RBS Greenwich Capital | | Ally Securities | Wells Fargo Bank | | |
| 2005-SP3 | 284,215,000 | RAMP | RFC | Merrill Lynch & Co. | | Ally Securities | Wells Fargo Bank | | |
| 2005-QA1 | 296,716,000 | RALI | RFC | Deutsche Bank Securities | | | Wells Fargo Bank | | |
| 2005-QO10 | 609,941,900 | RALI | RFC | Citigroup | | | Wells Fargo Bank | | |
| 2005-QA11 | 515,146,300 | RALI | RFC | Deutsche Bank Securities | | | Wells Fargo Bank | | |
| 2005-QA12 | 279,811,100 | RALI | RFC | Citigroup | | | Wells Fargo Bank | | |
| 2005-QO12 | 549,541,100 | RALI | RFC | Deutsche Bank Securities | | | Wells Fargo Bank | | |
| 2005-QO2 | 492,468,900 | RALI | RFC | Ally Securities | | | Wells Fargo Bank | | |
| 2005-QA3 | 491,297,500 | RALI | RFC | Ally Securities | | | Wells Fargo Bank | | |
| 2005-QA4 | 515,241,000 | RALI | RFC | Bear, Stearns & Co. Inc. | | | Wells Fargo Bank | | |
| 2005-QA5 | 236,761,800 | RALI | RFC | Ally Securities | | | Wells Fargo Bank | | |
| 2005-QO6 | 565,100,300 | RALI | RFC | Ally Securities | | | Wells Fargo Bank | | |
| 2005-QA7 | 564,692,000 | RALI | RFC | Merrill Lynch & Co. | | | Wells Fargo Bank | | |
| 2005-QO8 | 510,425,700 | RALI | RFC | Ally Securities | | | Wells Fargo Bank | | |
| 2005-QO9 | 638,123,100 | RALI | RFC | UBS Investment Bank | | | Wells Fargo Bank | | |
| 2005-QO1 | 696,206,300 | RALI | RFC | Deutsche Bank Securities | | | Wells Fargo Bank | | |
| 2005-QO2 | 414,647,100 | RALI | RFC | Goldman Sachs & Co. | | | Wells Fargo Bank | | |
| 2005-QO3 | 488,324,200 | RALI | RFC | Ally Securities | | | Wells Fargo Bank | | |
| 2005-QO4 | 776,257,300 | RALI | RFC | RBS Greenwich Capital | | | Wells Fargo Bank | | |
| 2005-QO5 | 1,245,790,100 | RALI | RFC | Deutsche Bank Securities | | Ally Securities | Wells Fargo Bank | | |
| 2005-QS1 | 212,022,179 | RALI | RFC | Deutsche Bank Securities | | | Wells Fargo Bank | | |
| 2005-QO10 | 262,689,997 | RALI | RFC | RBS Greenwich Capital | | | Wells Fargo Bank | | |
| 2005-QO11 | 211,400,802 | RALI | RFC | Bear, Stearns & Co. Inc. | | | Wells Fargo Bank | | |
| 2005-QO12 | 522,838,706 | RALI | RFC | Deutsche Bank Securities | | Ally Securities | Wells Fargo Bank | | |
| 2005-QO13 | 631,179,926 | RALI | RFC | RBS Greenwich Capital | | | Wells Fargo Bank | | |
| 2005-QO14 | 608,588,123 | RALI | RFC | RBS Greenwich Capital | | Ally Securities | Wells Fargo Bank | | |
| 2005-QO15 | 426,106,550 | RALI | RFC | RBS Greenwich Capital | | Ally Securities | Wells Fargo Bank | | |
| 2005-QO16 | 422,630,173 | RALI | RFC | Citigroup | | Ally Securities | Wells Fargo Bank | | |
| 2005-QO17 | 533,090,754 | RALI | RFC | RBS Greenwich Capital | | Ally Securities | Wells Fargo Bank | | |
| 2005-QO2 | 210,319,776 | RALI | RFC | RBS Greenwich Capital | | | Wells Fargo Bank | | |
| 2005-QO3 | 476,035,300 | RALI | RFC | Bear, Stearns & Co. Inc. | | Ally Securities | Wells Fargo Bank | | |
| 2005-QO4 | 209,941,140 | RALI | RFC | Citigroup | | Ally Securities | Wells Fargo Bank | Radian | |
| 2005-QO5 | 211,356,834 | RALI | RFC | Citigroup | | Ally Securities | Wells Fargo Bank | | |
| 2005-QO6 | 261,829,909 | RALI | RFC | Citigroup | | Ally Securities | Wells Fargo Bank | | |
| 2005-QO7 | 365,353,615 | RALI | RFC | UBS Investment Bank | | Ally Securities | Wells Fargo Bank | | |
| 2005-QO8 | 103,654,895 | RALI | RFC | Bear, Stearns & Co. Inc. | | Ally Securities | Wells Fargo Bank | | |
| 2005-QO9 | 366,341,064 | RALI | RFC | Ally Securities | RBS Greenwich Capital | | Wells Fargo Bank | | |
| 2005-EFC1 | 1,074,195,000 | RAMP | RFC | Ally Securities | Credit Suisse First Boston | | Wells Fargo Bank | | |
| 2005-EFC2 | 679,331,000 | RAMP | RFC | Ally Securities | Credit Suisse First Boston | | Wells Fargo Bank | | |
| 2005-EFC3 | 731,914,000 | RAMP | RFC | Ally Securities | JPMorgan | | Wells Fargo Bank | | |
| 2005-EFC4 | 707,396,000 | RAMP | RFC | Ally Securities | Citigroup | | Wells Fargo Bank | | |
| 2005-EFC5 | 693,333,000 | RAMP | RFC | Ally Securities | Ally Securities | | Wells Fargo Bank | | |
| 2005-EFC6 | 672,696,000 | RAMP | RFC | JPMorgan | | | Wells Fargo Bank | | |

[1] Principal balance of offered certificates.

[2] For the purpose of this Appendix, Ally Securities is the only disclosed co-underwriter but, in most cases, securitizations had multiple non-affiliated co-underwriters. Ally Securities participated as a co-underwriter in 131 of ResCap's 392 securitizations.

[3] For the purpose of this Appendix, ResCap and RFI affiliates are disclosed when they originated more than 10% of the loan pool (per Regulation AB § 229.1110, which became effective Jan. 1, 2006.) Non-affiliate originators are not disclosed.

*Note:*

*(A) Blank spaces refer to details that are not applicable or undisclosed.*

*(B) At the time of the securitizations listed above, Ally Securities was doing business as and disclosed in the prospectus supplement as "GMAC-RFC Securities."*

*(C) At the time of the securitizations listed above, Ally Bank was doing business as and disclosed in the prospectus supplement as "GMAC Bank."*

*(D) Escrow Bank and Escrow Bank CSA are identified, in the prospectus supplements, as an affiliate of GMAC Mortgage. Effective July 1, 2004, Old GMAC Bank assumed the custodial activities from these two entities.*

*Source: All of the information contained in this Appendix was extracted from the relevant securitization prospectus supplements using either Bloomberg or Intex. Generally, the relevant information is located on the cover page and/or in the summary section of each prospectus supplement, except for custodial information, which can be found in the pooling and servicing section.*

**Residential Capital, LLC**
**392 PLS Deal Details**
**2004 – 2007**

| | Deal Name | Orig. Principal Bal.[1] | Depositor | Sponsor/ Master Servicer | Lead Underwriter | Joint Lead Underwriter | Co-Underwriter[1] | Custodian | Monoline Insurer | Affiliate Originators[2] |
|---|---|---|---|---|---|---|---|---|---|---|
| 154 | 2005-EFC7 | 680,175,000 | RAMP | RFC | Ally Securities | Barclays Capital | | Wells Fargo Bank | FGIC | |
| 155 | 2005-NC1 | 870,750,000 | RAMP | RFC | Credit Suisse First Boston | Ally Securities | | Wells Fargo Bank | FGIC | |
| 156 | 2005-RS1 | 975,000,000 | RAMP | RFC | RBS Greenwich Capital | | Ally Securities | Wells Fargo Bank | | |
| 157 | 2005-RS2 | 725,000,000 | RAMP | RFC | RBS Greenwich Capital | Credit Suisse First Boston | Ally Securities | Wells Fargo Bank | | |
| 158 | 2005-RS3 | 724,515,000 | RAMP | RFC | Bear, Stearns & Co. Inc. | | Ally Securities | Wells Fargo Bank | | |
| 159 | 2005-RS4 | 510,037,000 | RAMP | RFC | RBS Greenwich Capital | Credit Suisse First Boston | Ally Securities | Wells Fargo Bank | | |
| 160 | 2005-RS5 | 490,000,000 | RAMP | RFC | Bear, Stearns & Co. Inc. | | Ally Securities | Wells Fargo Bank | | |
| 161 | 2005-RS6 | 1,178,400,000 | RAMP | RFC | Credit Suisse First Boston | Ally Securities | | Wells Fargo Bank | | |
| 162 | 2005-RS7 | 485,500,000 | RAMP | RFC | Banc of America Securities LLC | | Ally Securities | Wells Fargo Bank | | |
| 163 | 2005-RS8 | 651,368,000 | RAMP | RFC | RBS Greenwich Capital | | Ally Securities | Wells Fargo Bank | | |
| 164 | 2005-RS9 | 1,179,000,000 | RAMP | RFC | Bear, Stearns & Co. Inc. | Credit Suisse First Boston | | Wells Fargo Bank | FGIC | |
| 165 | 2005-RZ1 | 199,974,000 | RAMP | RFC | RBS Greenwich Capital | | | Wells Fargo Bank | | |
| 166 | 2005-RZ2 | 323,670,000 | RAMP | RFC | RBS Greenwich Capital | | | Wells Fargo Bank | | |
| 167 | 2005-RZ3 | 340,025,000 | RAMP | RFC | Bear, Stearns & Co. Inc. | | | Wells Fargo Bank | | |
| 168 | 2005-RZ4 | 407,263,000 | RAMP | RFC | Bear, Stearns & Co. Inc. | | | Wells Fargo Bank | | |
| 169 | 2005-SL1 | 365,173,500 | RAMP | RFC | Ally Securities | | | Wells Fargo Bank | | |
| 170 | 2005-SL2 | 163,118,406 | RAMP | RFC | Ally Securities | | | Wells Fargo Bank | | |
| 171 | 2005-AHL1 | 463,670,000 | RASC | RFC | Ally Securities | | | Wells Fargo Bank | | |
| 172 | 2005-AHL2 | 434,239,000 | RASC | RFC | Ally Securities | | | Wells Fargo Bank | | |
| 173 | 2005-AHL3 | 485,750,000 | RASC | RFC | Ally Securities | | | Wells Fargo Bank | | |
| 174 | 2005-EMX1 | 783,200,000 | RASC | RFC | Ally Securities | Banc of America Securities LLC | | Wells Fargo Bank | | |
| 175 | 2005-EMX2 | 614,026,000 | RASC | RFC | Ally Securities | Banc of America Securities LLC | | Wells Fargo Bank | | |
| 176 | 2005-EMX3 | 674,450,000 | RASC | RFC | Ally Securities | Credit Suisse First Boston | | Wells Fargo Bank | | |
| 177 | 2005-EMX4 | 492,597,000 | RASC | RFC | Ally Securities | Barclays Capital | | Wells Fargo Bank | | |
| 178 | 2005-EMX5 | 380,000,000 | RASC | RFC | Ally Securities | | | Wells Fargo Bank | FGIC | |
| 179 | 2005-KS1 | 708,840,000 | RASC | RFC | Credit Suisse First Boston | Ally Securities | | Wells Fargo Bank | | |
| 180 | 2005-KS10 | 1,285,956,000 | RASC | RFC | JPMorgan | Ally Securities | | Wells Fargo Bank | | |
| 181 | 2005-KS11 | 1,319,290,000 | RASC | RFC | Credit Suisse First Boston | Ally Securities | | Wells Fargo Bank | | |
| 182 | 2005-KS12 | 1,117,225,000 | RASC | RFC | Banc of America Securities LLC | RBS Greenwich Capital | Ally Securities | Wells Fargo Bank | | |
| 183 | 2005-KS2 | 543,400,000 | RASC | RFC | Credit Suisse First Boston | RBS Greenwich Capital | | Wells Fargo Bank | | |
| 184 | 2005-KS3 | 401,455,000 | RASC | RFC | RBS Greenwich Capital | | | Wells Fargo Bank | | |
| 185 | 2005-KS4 | 399,883,000 | RASC | RFC | Credit Suisse First Boston | | | Wells Fargo Bank | | |
| 186 | 2005-KS5 | 392,606,000 | RASC | RFC | JPMorgan | | | Wells Fargo Bank | | |
| 187 | 2005-KS6 | 587,158,000 | RASC | RFC | Citigroup | | | Wells Fargo Bank | | |
| 188 | 2005-KS7 | 387,600,000 | RASC | RFC | JPMorgan | Ally Securities | | Wells Fargo Bank | | |
| 189 | 2005-KS8 | 1,165,800,000 | RASC | RFC | JPMorgan | | | Wells Fargo Bank | | |
| 190 | 2005-KS9 | 477,750,000 | RASC | RFC | JPMorgan | | | Wells Fargo Bank | | |
| 191 | 2005-S1 | 461,189,645 | RFMSI | RFC | Bear, Stearns & Co. Inc. | | | Wells Fargo Bank | | |
| 192 | 2005-S2 | 259,535,195 | RFMSI | RFC | Goldman Sachs & Co. | | Ally Securities | Wells Fargo Bank | FGIC | |
| 193 | 2005-S3 | 182,545,288 | RFMSI | RFC | Citigroup | | Ally Securities | Wells Fargo Bank | | |
| 194 | 2005-S4 | 257,539,881 | RFMSI | RFC | Ally Securities | | | Wells Fargo Bank | | |
| 195 | 2005-S5 | 256,944,473 | RFMSI | RFC | Bear, Stearns & Co. Inc. | | | Wells Fargo Bank | Assured | |
| 196 | 2005-S6 | 410,795,358 | RFMSI | RFC | Citigroup | | | Wells Fargo Bank | | |
| 197 | 2005-S7 | 309,385,434 | RFMSI | RFC | Credit Suisse First Boston | | | Wells Fargo Bank | FGIC | |
| 198 | 2005-S8 | 309,843,505 | RFMSI | RFC | Ally Securities | | Ally Securities | Wells Fargo Bank | | |
| 199 | 2005-S9 | 364,215,996 | RFMSI | RFC | Bear, Stearns & Co. Inc. | | | Wells Fargo Bank | | |
| 200 | 2005-SA1 | 292,853,100 | RFMSI | RFC | Bear, Stearns & Co. Inc. | | | Wells Fargo Bank | | |
| 201 | 2005-SA2 | 497,260,200 | RFMSI | RFC | Credit Suisse First Boston | | | Wells Fargo Bank | | |
| 202 | 2005-SA3 | 668,808,300 | RFMSI | RFC | Goldman Sachs & Co. | | | Wells Fargo Bank | | |
| 203 | 2005-SA4 | 841,347,200 | RFMSI | RFC | RBS Greenwich Capital | | | Wells Fargo Bank | | |
| 204 | 2005-SA5 | 351,266,300 | RFMSI | RFC | Ally Securities | | | Wells Fargo Bank | | |

[1] Principal balance of offered certificates.

(1) For the purpose of this Appendix, Ally Securities is the only disclosed co-underwriter but, in most cases, securitizations had multiple non-affiliated co-underwriters. Ally Securities participated as a co-underwriter in 131 of ResCap's 392 securitizations.

(2) For the purpose of this Appendix, ResCap and RFI affiliates are disclosed when they originated more than 10% of the loan pool (per Regulation AB § 229.1110, which became effective Jan. 1, 2006.) Non-affiliate originators are not disclosed.

Note:

(A) Blank spaces refer to details that are not applicable or undisclosed.

(B) At the time of the securitizations listed above, Ally Securities was doing business as and disclosed in the prospectus supplement as "GMAC-RFC Securities."

(C) At the time of the securitizations listed above, Ally Bank was doing business as and disclosed in the prospectus supplement as "GMAC Bank."

(D) Escrow Bank and Escrow Bank USA are identified, in the prospectus supplements, as an affiliate of GMAC Mortgage. Effective July 1, 2004, Old GMAC Bank assumed the custodial activities from these two entities.

Source: All of the information contained in this Appendix was extracted from the relevant securitization prospectus supplements using either Bloomberg or Intex. Generally, the relevant information is located on the cover page and/or in the summary section of each prospectus supplement, except for custodial information, which can be found in the pooling and servicing section.

**Residential Capital, LLC**
**392 PLS Deal Details**
**2004 – 2007**

| | Deal Name | Orig. Principal Bal. [1] | Depositor | Sponsor/ Master Servicer | Lead Underwriter | Joint Lead Underwriter | Co-Underwriter [2] | Custodian | Monoline Insurer | Affiliate Originator(s) [3] |
|---|---|---|---|---|---|---|---|---|---|---|
| 205 | 2005-H1 | 240,000,000 | RFMSII | RFC | Bear, Stearns & Co. Inc. | | Ally Securities | Wells Fargo Bank | FGIC | |
| 206 | 2005-H2 | 240,000,000 | RFMSII | RFC | Bear, Stearns & Co. Inc. | | | Wells Fargo Bank | | |
| 207 | 2005-H3 | 224,887,200 | RFMSII | RFC | Ally Securities | | | Wells Fargo Bank | | |
| 208 | 2005-HS1 | 853,750,000 | RFMSII | RFC | Credit Suisse First Boston | Bear, Stearns & Co. Inc. | Ally Securities | Wells Fargo Bank | FGIC | |
| 209 | 2005-HS2 | 577,062,500 | RFMSII | RFC | Banc of America Securities LLC | Banc of America Securities LLC | Ally Securities | Wells Fargo Bank | FGIC | |
| 210 | 2005-HSA1 | 278,847,000 | RFMSII | RFC | Banc of America Securities LLC | | | Wells Fargo Bank | FGIC | |
| 211 | 2006-AR1 | 502,050,100 | RAMP | GMAC Mortgage | Goldman Sachs & Co. | | | Old GMAC Bank | | GMAC Mortgage & Old GMAC Bank |
| 212 | 2006-A82 | 368,146,200 | RAMP | GMAC Mortgage | Ally Securities | | Ally Securities | Old GMAC Bank | | GMAC Mortgage & Old GMAC Bank |
| 213 | 2006-H1 | 1,274,150,000 | RAMP | GMAC Mortgage | JPMorgan | | | Old GMAC Bank | FGIC | GMAC Mortgage & Old GMAC Bank |
| 214 | 2006-H2 | 626,240,000 | RAMP | GMAC Mortgage | RBS Greenwich Capital | | Ally Securities | Old GMAC Bank | FGIC | GMAC Mortgage & Old GMAC Bank |
| 215 | 2006-H3 | 1,142,334,000 | RAMP | GMAC Mortgage | JPMorgan | | Ally Securities | Old GMAC Bank | FGIC | GMAC Mortgage & Old GMAC Bank |
| 216 | 2006-H4 | 1,136,222,000 | RAMP | GMAC Mortgage | Bear, Stearns & Co. Inc. | | Ally Securities | Old GMAC Bank | MBIA | GMAC Mortgage & Old GMAC Bank |
| 217 | 2006-HI5 | 1,244,450,000 | RAMP | GMAC Mortgage | RBS Greenwich Capital | | Ally Securities | Ally Bank | FGIC | GMAC Mortgage & Ally Bank |
| 218 | 2006-HLTV1 | 229,865,170 | RAMP | GMAC Mortgage | Bear, Stearns & Co. Inc. | | Ally Securities | Ally Bank | FGIC | |
| 219 | 2006-J1 | 546,153,384 | RAMP | GMAC Mortgage | Citigroup | | Ally Securities | Ally Bank | | GMAC Mortgage & Ally Bank |
| 220 | 2006-RP1 | 292,950,000 | RAMP | RFC | RBS Greenwich Capital | | | Wells Fargo Bank | | |
| 221 | 2006-RP2 | 316,981,000 | RAMP | RFC | Credit Suisse | | | Wells Fargo Bank | | |
| 222 | 2006-RP3 | 290,391,000 | RAMP | RFC | RBS Greenwich Capital | | Ally Securities | Wells Fargo Bank | | |
| 223 | 2006-RP4 | 357,267,000 | RAMP | RFC | Ally Securities | | Ally Securities | Wells Fargo Bank | | |
| 224 | 2006-SP1 | 275,935,000 | RAMP | RFC | Merrill Lynch & Co. | | Ally Securities | Wells Fargo Bank | | |
| 225 | 2006-SP2 | 348,115,000 | RAMP | RFC | Merrill Lynch & Co. | | | Wells Fargo Bank | | |
| 226 | 2006-SP3 | 291,802,000 | RAMP | RFC | Credit Suisse First Boston | Ally Securities | | Wells Fargo Bank | | |
| 227 | 2006-SP4 | 303,911,000 | RAMP | RFC | Lehman Brothers | Ally Securities | | Wells Fargo Bank | | |
| 228 | 2006-QA1 | 593,155,000 | RALI | RFC | Merrill Lynch & Co. | | | Wells Fargo Bank | | |
| 229 | 2006-QA10 | 375,502,000 | RALI | RFC | Ally Securities | | | Wells Fargo Bank | | Homecomings Financial |
| 230 | 2006-QA10 | 372,431,000 | RALI | RFC | Ally Securities | | | Wells Fargo Bank | | GMAC Mortgage & Homecomings Financial |
| 231 | 2006-QA2 | 386,027,100 | RALI | RFC | Citigroup | | | Wells Fargo Bank | | Homecomings Financial |
| 232 | 2006-QA3 | 398,498,000 | RALI | RFC | Deutsche Bank Securities | Deutsche Bank Securities | | Wells Fargo Bank | | Homecomings Financial |
| 233 | 2006-QA4 | 309,442,000 | RALI | RFC | Goldman Sachs & Co. | | | Wells Fargo Bank | | GMAC Mortgage & Homecomings Financial |
| 234 | 2006-QA5 | 694,084,100 | RALI | RFC | Morgan Stanley | | | Wells Fargo Bank | | GMAC Mortgage & Homecomings Financial |
| 235 | 2006-QA6 | 622,965,000 | RALI | RFC | Goldman Sachs & Co. | | | Wells Fargo Bank | | GMAC Mortgage & Homecomings Financial |
| 236 | 2006-QA7 | 588,151,000 | RALI | RFC | Ally Securities | | | Wells Fargo Bank | | GMAC Mortgage & Homecomings Financial |
| 237 | 2006-QA8 | 795,053,000 | RALI | RFC | Credit Suisse First Boston | | | Wells Fargo Bank | | GMAC Mortgage & Homecomings Financial |
| 238 | 2006-QA9 | 369,193,000 | RALI | RFC | Goldman Sachs & Co. | | | Wells Fargo Bank | | GMAC Mortgage & Homecomings Financial |
| 239 | 2006-QH1 | 337,933,000 | RALI | RFC | Goldman Sachs & Co. | | | Wells Fargo Bank | | |
| 240 | 2006-QO1 | 881,346,100 | RALI | RFC | Goldman Sachs & Co. | | | Wells Fargo Bank | AMBAC | Homecomings Financial |
| 241 | 2006-QO10 | 889,857,000 | RALI | RFC | Bear, Stearns & Co. Inc. | | | Wells Fargo Bank | | Homecomings Financial |
| 242 | 2006-QO2 | 665,486,000 | RALI | RFC | Goldman Sachs & Co. | | | Wells Fargo Bank | | Homecomings Financial |
| 243 | 2006-QO3 | 648,433,000 | RALI | RFC | Goldman Sachs & Co. | | | Wells Fargo Bank | | Homecomings Financial |
| 244 | 2006-QO4 | 843,226,000 | RALI | RFC | RBS Greenwich Capital | | | Wells Fargo Bank | XL Capital | Homecomings Financial |
| 245 | 2006-QO5 | 1,071,587,000 | RALI | RFC | UBS Investment Bank | | | Wells Fargo Bank | | Homecomings Financial |
| 246 | 2006-QO6 | 1,290,297,000 | RALI | RFC | Goldman Sachs & Co. | | | Wells Fargo Bank | | Homecomings Financial |
| 247 | 2006-QO7 | 1,542,440,000 | RALI | RFC | UBS Investment Bank | | | Wells Fargo Bank | | Homecomings Financial |
| 248 | 2006-QO8 | 1,288,119,000 | RALI | RFC | Lehman Brothers | | | Wells Fargo Bank | | Homecomings Financial |
| 249 | 2006-QO9 | 890,657,000 | RALI | RFC | Lehman Brothers | | | Wells Fargo Bank | | Homecomings Financial |
| 250 | 2006-QS1 | 319,795,465 | RALI | RFC | Bear, Stearns & Co. Inc. | | | Wells Fargo Bank | | Homecomings Financial |
| 251 | 2006-QS10 | 527,197,330 | RALI | RFC | Deutsche Bank Securities | | | Wells Fargo Bank | | Homecomings Financial |
| 252 | 2006-QS11 | 742,487,542 | RALI | RFC | Credit Suisse Securities (USA) LLC | | | Wells Fargo Bank | | GMAC Mortgage & Homecomings Financial |
| 253 | 2006-QS12 | 534,254,761 | RALI | RFC | Merrill Lynch & Co. | | Ally Securities | Wells Fargo Bank | | Homecomings Financial |
| 254 | 2006-QS13 | 613,546,697 | RALI | RFC | Barclays Capital | | Ally Securities | Wells Fargo Bank | | GMAC Mortgage & Homecomings Financial |
| 255 | 2006-QS14 | 743,878,961 | RALI | RFC | | | | Wells Fargo Bank | | GMAC Mortgage & Homecomings Financial |

Note:

(1) Principal balance of offered certificates.

(2) For the purpose of this Appendix, Ally Securities is the only disclosed co-underwriter but, in most cases, securitizations had multiple disclosed non-affiliated non-underwriters. Ally Securities participated in 131 of ResCap's 392 securitizations.

(3) For the purpose of this Appendix, ResCap and RFI affiliates are disclosed when they originated more than 10% of the loan pool (per Regulation AB § 229.1110, which became effective Jan. 1, 2006.) Non-affiliate originators are not disclosed.

Note:

(A) Blank spaces refer to details that are not applicable or undisclosed.

(B) At the time of the securitizations listed above, Ally Securities was doing business as and disclosed in the prospectus supplement as "GMAC-RFC Securities."

(C) At the time of the securitizations listed above, Ally Bank was doing business as and disclosed in the prospectus supplement as "GMAC Bank."

(D) Escrow Bank and Escrow Bank GSA are identified, in the prospectus supplements, as an affiliate of GMAC Mortgage. Effective July 1, 2004, Old GMAC Bank assumed the custodial activities from these two entities.

*Source: All of the information contained in this Appendix was extracted from the relevant securitization prospectus supplements using either Bloomberg or Intex. Generally, the relevant information is located on the cover page and/or in the summary section of each prospectus supplement, except for custodial information, which can be found in the pooling and servicing section.*

Appendix VIII.B—1, Page 6 of 8

**Residential Capital, LLC**
**392 PLS Deal Details**
**2004 – 2007**

| | Deal Name | Orig. Principal Bal.[1] | Depositor | Sponsor/Master Servicer | Lead Underwriter | Joint Lead Underwriter | Co-Underwriter[2] | Custodian | Monoline Insurer | Affiliate Originator(s)[3] |
|---|---|---|---|---|---|---|---|---|---|---|
| 256 | 2006-QS15 | 551,036,625 | RALI | RFC | UBS Investment Bank | | | Wells Fargo Bank | | GMAC Mortgage & Homecomings Financial |
| 257 | 2006-QS16 | 741,550,739 | RALI | RFC | RBS Greenwich Capital | | | Wells Fargo Bank | | GMAC Mortgage & Homecomings Financial |
| 258 | 2006-QS17 | 530,024,465 | RALI | RFC | Merrill Lynch & Co. | | Ally Securities | Wells Fargo Bank | | GMAC Mortgage & Homecomings Financial |
| 259 | 2006-QS18 | 1,164,635,393 | RALI | RFC | Deutsche Bank Securities | | | Wells Fargo Bank | | GMAC Mortgage & Homecomings Financial |
| 260 | 2006-QS2 | 871,269,169 | RALI | RFC | Deutsche Bank Securities | | | Wells Fargo Bank | | GMAC Mortgage & Homecomings Financial |
| 261 | 2006-QS3 | 958,193,146 | RALI | RFC | Deutsche Bank Securities | | | Wells Fargo Bank | | Homecomings Financial |
| 262 | 2006-QS4 | 742,857,344 | RALI | RFC | Citigroup | | | Wells Fargo Bank | | Homecomings Financial |
| 263 | 2006-QS5 | 688,897,295 | RALI | RFC | Merrill Lynch & Co. | | Ally Securities | Wells Fargo Bank | | Homecomings Financial |
| 264 | 2006-QS6 | 848,500,819 | RALI | RFC | RBS Greenwich Capital | | | Wells Fargo Bank | | GMAC Mortgage & Homecomings Financial |
| 265 | 2006-QS7 | 530,520,315 | RALI | RFC | Citigroup | | | Wells Fargo Bank | | GMAC Mortgage & Homecomings Financial |
| 266 | 2006-QS8 | 953,783,554 | RALI | RFC | Citigroup | | Ally Securities | Wells Fargo Bank | | Homecomings Financial |
| 267 | 2006-QS9 | 533,593,889 | RALI | RFC | Deutsche Bank Securities | | Ally Securities | Wells Fargo Bank | | Homecomings Financial |
| 268 | 2006-EFC1 | 59,325,000 | RAMP | RFC | Ally Securities | | | Wells Fargo Bank | | |
| 269 | 2006-EFC2 | 383,200,000 | RAMP | RFC | Ally Securities | | | Wells Fargo Bank | | |
| 270 | 2006-NC1 | 536,800,000 | RAMP | RFC | Ally Securities | | | Wells Fargo Bank | | |
| 271 | 2006-NC2 | 737,580,000 | RAMP | RFC | JPMorgan | Deutsche Bank Securities | | Wells Fargo Bank | | |
| 272 | 2006-NC3 | 504,920,000 | RAMP | RFC | Ally Securities | Ally Securities | | Wells Fargo Bank | | |
| 273 | 2006-RS1 | 1,173,600,000 | RAMP | RFC | Credit Suisse First Boston | Ally Securities | | Wells Fargo Bank | | |
| 274 | 2006-RS2 | 785,601,000 | RAMP | RFC | Banc of America Securities LLC | Ally Securities | | Wells Fargo Bank | | |
| 275 | 2006-RS3 | 741,604,000 | RAMP | RFC | RBS Greenwich Capital | | | Wells Fargo Bank | | |
| 276 | 2006-RS4 | 887,538,000 | RAMP | RFC | RBS Greenwich Capital | Ally Securities | Ally Securities | Wells Fargo Bank | | GMAC Mortgage & Homecomings Financial |
| 277 | 2006-RS5 | 382,350,000 | RAMP | RFC | RBS Greenwich Capital | Ally Securities | Ally Securities | Wells Fargo Bank | | GMAC Mortgage |
| 278 | 2006-RS6 | 368,997,000 | RAMP | RFC | Deutsche Bank Securities | | | Wells Fargo Bank | | GMAC Mortgage & Homecomings Financial |
| 279 | 2006-RZ1 | 483,750,000 | RAMP | RFC | RBS Greenwich Capital | | | Wells Fargo Bank | | Homecomings Financial |
| 280 | 2006-RZ2 | 368,625,000 | RAMP | RFC | Bear, Stearns & Co. Inc. | Barclays Capital | | Wells Fargo Bank | | Homecomings Financial |
| 281 | 2006-RZ3 | 688,345,000 | RAMP | RFC | Banc of America Securities LLC | Ally Securities | | Wells Fargo Bank | | Homecomings Financial |
| 282 | 2006-RZ4 | 853,340,000 | RAMP | RFC | Credit Suisse First Boston | Ally Securities | | Wells Fargo Bank | | GMAC Mortgage & Homecomings Financial |
| 283 | 2006-RZ5 | 505,080,000 | RAMP | RFC | Credit Suisse | | | Wells Fargo Bank | | GMAC Mortgage & Homecomings Financial |
| 284 | 2006-EMX1 | 424,600,000 | RASC | RFC | Ally Securities | Citigroup | | Wells Fargo Bank | | |
| 285 | 2006-EMX2 | 550,050,000 | RASC | RFC | Ally Securities | Barclays Capital | | Wells Fargo Bank | | |
| 286 | 2006-EMX3 | 773,600,000 | RASC | RFC | Ally Securities | Citigroup | | Wells Fargo Bank | | |
| 287 | 2006-EMX4 | 661,710,000 | RASC | RFC | Ally Securities | RBS Greenwich Capital | | Wells Fargo Bank | | |
| 288 | 2006-EMX5 | 580,200,000 | RASC | RFC | Ally Securities | Barclays Capital | | Wells Fargo Bank | | |
| 289 | 2006-EMX6 | 620,490,000 | RASC | RFC | Ally Securities | JPMorgan | | Wells Fargo Bank | | |
| 290 | 2006-EMX7 | 495,500,000 | RASC | RFC | Ally Securities | JPMorgan | | Wells Fargo Bank | | |
| 291 | 2006-EMX8 | 698,610,000 | RASC | RFC | Ally Securities | Barclays Capital | | Wells Fargo Bank | | |
| 292 | 2006-EMX9 | 728,840,000 | RASC | RFC | Ally Securities | Barclays Capital | | Wells Fargo Bank | | |
| 293 | 2006-S1 | 840,115,000 | RASC | RFC | RBS Greenwich Capital | JPMorgan | Ally Securities | Wells Fargo Bank | | Homecomings Financial |
| 294 | 2006-S2 | 977,500,000 | RASC | RFC | Ally Securities | | | Wells Fargo Bank | | Homecomings Financial |
| 295 | 2006-KS3 | 1,125,850,000 | RASC | RFC | Citigroup | RBS Greenwich Capital | | Wells Fargo Bank | | Homecomings Financial |
| 296 | 2006-KS4 | 680,761,000 | RASC | RFC | Citigroup | | | Wells Fargo Bank | | Homecomings Financial |
| 297 | 2006-KS5 | 679,700,000 | RASC | RFC | RBS Greenwich Capital | | | Wells Fargo Bank | | Homecomings Financial |
| 298 | 2006-KS6 | 523,655,000 | RASC | RFC | JPMorgan | | | Wells Fargo Bank | | Homecomings Financial |
| 299 | 2006-KS7 | 532,675,000 | RASC | RFC | JPMorgan | | | Wells Fargo Bank | | Homecomings Financial |
| 300 | 2006-KS8 | 535,851,000 | RASC | RFC | Barclays Capital | | | Wells Fargo Bank | | Homecomings Financial |
| 301 | 2006-KS9 | 1,197,119,000 | RASC | RFC | Barclays Capital | | | Wells Fargo Bank | | Homecomings Financial |
| 302 | 2006-S9 | 363,784,732 | RFMSI | RFC | RBS Greenwich Capital | | Ally Securities | Wells Fargo Bank | | Homecomings Financial |
| 303 | 2006-S10 | 1,082,079,770 | RFMSI | RFC | Citigroup | | Ally Securities | Wells Fargo Bank | | GMAC Mortgage & Homecomings Financial |
| 304 | 2006-S11 | 619,488,659 | RFMSI | RFC | Citigroup | | | Wells Fargo Bank | | Homecomings Financial |
| 305 | 2006-S12 | 1,197,400,378 | RFMSI | RFC | RBS Greenwich Capital | | Ally Securities | Wells Fargo Bank | | GMAC Mortgage & Homecomings Financial |
| 306 | 2006-S2 | 259,084,012 | RFMSI | RFC | UBS Investment Bank | | | Wells Fargo Bank | | Homecomings Financial |

[1] Principal balance of offered certificates.

[2] For the purpose of this Appendix, Ally Securities is the only disclosed co-underwriter but, in most cases, securitizations had multiple non-affiliated co-underwriters. Ally Securities participated as a co-underwriter in 131 of ResCap's 392 securitizations.

[3] For the purpose of this Appendix, ResCap and AFI affiliates are disclosed when they originated more than 10% of the loan pool (per Regulation AB § 229.1110, which became effective Jan. 1, 2006.) Non-affiliate originators are not disclosed.

Note:

(A) Blank spaces refer to details that are not applicable or undisclosed.

(B) At the time of the securitizations listed above, Ally Securities was doing business as and disclosed in the prospectus supplement as "GMAC-RFC Securities."

(C) At the time of the securitizations listed above, Ally Bank was doing business as and disclosed in the prospectus supplement as "GMAC Bank."

(D) Escrow Bank and Escrow Bank CS3 are identified, in the prospectus supplements, as an affiliate of GMAC Mortgage. Effective July 1, 2004, Old GMAC Bank assumed the custodial activities from these two entities.

*Source: All of the information contained in this Appendix was extracted from the relevant securitization prospectus supplements using either Bloomberg or Intex. Generally, the relevant information is located on the cover page and/or in the summary section of each prospectus supplement, except for custodial information, which can be found in the pooling and servicing section.*

Appendix VIII.B—1, Page 6 of 8

Appendix VIII.B—1, Page 7 of 8

**Residential Capital, LLC**
**392 PLS Deal Details**
**2004 – 2007**

| | Deal Name | Orig. Principal Bal. [1] | Depositor | Sponsor/ Master Servicer | Lead Underwriter | Joint Lead Underwriter [2] | Co-Underwriter [2] | Custodian | Monoline Insurer | Affiliate Originator(s) [2] |
|---|---|---|---|---|---|---|---|---|---|---|
| 307 | 2006-S3 | 335,748,907 | RFMSI | RFC | Citigroup | | | Wells Fargo Bank | | Homecomings Financial |
| 308 | 2006-S4 | 312,034,000 | RFMSI | RFC | RBS Greenwich Capital | | | Wells Fargo Bank | | Homecomings Financial |
| 309 | 2006-S5 | 674,010,134 | RFMSI | RFC | RBS Greenwich Capital | | | Wells Fargo Bank | | GMAC Mortgage & Homecomings Financial |
| 310 | 2006-S6 | 595,956,340 | RFMSI | RFC | Morgan Stanley | | | Wells Fargo Bank | | GMAC Mortgage & Homecomings Financial |
| 311 | 2006-S7 | 466,833,346 | RFMSI | RFC | RBS Greenwich Capital | | | Wells Fargo Bank | | GMAC Mortgage & Homecomings Financial |
| 312 | 2006-S8 | 413,772,647 | RFMSI | RFC | BNP Paribas Securities Corp. | | | Wells Fargo Bank | | GMAC Mortgage & Homecomings Financial |
| 313 | 2006-S9 | 439,663,894 | RFMSI | RFC | RBS Greenwich Capital | | | Wells Fargo Bank | | GMAC Mortgage & Homecomings Financial |
| 314 | 2006-SA1 | 272,304,100 | RFMSI | RFC | RBS Greenwich Capital | | | Wells Fargo Bank | | Homecomings Financial |
| 315 | 2006-SA2 | 784,980,150 | RFMSI | RFC | Goldman Sachs & Co. | | | Wells Fargo Bank | | GMAC Mortgage & Homecomings Financial |
| 316 | 2006-SA3 | 348,770,100 | RFMSI | RFC | Banc of America Securities LLC | | | Wells Fargo Bank | | GMAC Mortgage & Homecomings Financial |
| 317 | 2006-SA4 | 278,888,100 | RFMSI | RFC | Credit Suisse | | | Wells Fargo Bank | | GMAC Mortgage & Homecomings Financial |
| 318 | 2006-H1 | 214,186,000 | RFMSI | RFC | Bear, Stearns & Co. Inc. | | Ally Securities | Wells Fargo Bank | FGIC | Homecomings Financial |
| 319 | 2006-H2 | 237,390,000 | RFMSI | RFC | Banc of America Securities LLC | | Ally Securities | Wells Fargo Bank | | Homecomings Financial |
| 320 | 2006-H3 | 223,158,000 | RFMSI | RFC | Bear, Stearns & Co. Inc. | | Ally Securities | Wells Fargo Bank | FGIC | GMAC Mortgage & Homecomings Financial |
| 321 | 2006-H4 | 272,693,000 | RFMSI | RFC | Bear, Stearns & Co. Inc. | | Ally Securities | Wells Fargo Bank | FGIC | GMAC Mortgage & Homecomings Financial |
| 322 | 2006-HI4 | 247,469,000 | RFMSI | RFC | | Ally Securities | | Wells Fargo Bank | FGIC | Homecomings Financial |
| 323 | 2006-HI5 | 461,444,000 | RFMSI | RFC | | Ally Securities | | Wells Fargo Bank | FGIC | Homecomings Financial |
| 324 | 2006-HSA2 | 447,900,000 | RFMSI | RFC | | Ally Securities | | Wells Fargo Bank | FGIC | Homecomings Financial |
| 325 | 2006-HSA3 | 201,014,000 | RFMSI | RFC | | Ally Securities | | Wells Fargo Bank | FSA | Homecomings Financial |
| 326 | 2006-HSA4 | 402,118,000 | RFMSI | RFC | | Ally Securities | | Wells Fargo Bank | MBIA | Homecomings Financial |
| 327 | 2006-HSA5 | 295,648,000 | RFMSI | RFC | | Ally Securities | | Wells Fargo Bank | MBIA | Homecomings Financial |
| 328 | 2006-HE1 | 1,185,871,000 | RAMP | GMAC Mortgage | JPMorgan | | | Ally Bank | MBIA | GMAC Mortgage & Ally Bank |
| 329 | 2007-HE1 | 1,240,804,000 | RAMP | GMAC Mortgage | | RBS Greenwich Capital | | Ally Bank | FGIC | GMAC Mortgage & Ally Bank |
| 330 | 2007-HE2 | 550,580,000 | RAMP | GMAC Mortgage | Ally Securities | | | Ally Bank | | GMAC Mortgage & Ally Bank |
| 331 | 2007-RP1 | 334,361,000 | RAMP | RFC | Ally Securities | | | Wells Fargo Bank | FGIC | |
| 332 | 2007-RP2 | 263,289,000 | RAMP | RFC | RBS Greenwich Capital | Ally Securities | | Wells Fargo Bank | | |
| 333 | 2007-RP3 | 340,640,000 | RAMP | RFC | Barclays Capital | Ally Securities | | Wells Fargo Bank | | |
| 334 | 2007-RP4 | 239,164,000 | RAMP | RFC | Lehman Brothers | Ally Securities | | Wells Fargo Bank | | |
| 335 | 2007-SP1 | 346,555,000 | RAMP | RFC | Deutsche Bank Securities | Ally Securities | | Wells Fargo Bank | | |
| 336 | 2007-SP2 | 279,284,000 | RAMP | RFC | RBS Greenwich Capital | Ally Securities | | Wells Fargo Bank | | |
| 337 | 2007-SP3 | 293,114,000 | RAMP | RFC | Credit Suisse | Ally Securities | | Wells Fargo Bank | | |
| 338 | 2007-QA1 | 410,069,000 | RALI | RFC | Ally Securities | | | Wells Fargo Bank | | GMAC Mortgage & Homecomings Financial |
| 339 | 2007-QA2 | 366,984,000 | RALI | RFC | Ally Securities | | | Wells Fargo Bank | | GMAC Mortgage & Homecomings Financial |
| 340 | 2007-QA3 | 882,256,500 | RALI | RFC | Ally Securities | | | Wells Fargo Bank | | GMAC Mortgage & Homecomings Financial |
| 341 | 2007-QA4 | 243,450,000 | RALI | RFC | Ally Securities | | | Wells Fargo Bank | | GMAC Mortgage & Homecomings Financial |
| 342 | 2007-QA5 | 491,200,000 | RALI | RFC | Ally Securities | | | Wells Fargo Bank | | GMAC Mortgage & Homecomings Financial |
| 343 | 2007-QO1 | 522,264,000 | RALI | RFC | Goldman Sachs & Co. | | | Wells Fargo Bank | | Homecomings Financial |
| 344 | 2007-QH1 | 349,425,000 | RALI | RFC | Goldman Sachs & Co. | | Ally Securities | Wells Fargo Bank | | Homecomings Financial |
| 345 | 2007-QH2 | 340,115,000 | RALI | RFC | Goldman Sachs & Co. | | Ally Securities | Wells Fargo Bank | | Homecomings Financial |
| 346 | 2007-QH3 | 397,963,000 | RALI | RFC | Goldman Sachs & Co. | | Ally Securities | Wells Fargo Bank | | Homecomings Financial |
| 347 | 2007-QH4 | 497,503,000 | RALI | RFC | Goldman Sachs & Co. | | Ally Securities | Wells Fargo Bank | | Homecomings Financial |
| 348 | 2007-QH5 | 595,208,000 | RALI | RFC | Merrill Lynch & Co. | | Ally Securities | Wells Fargo Bank | | Homecomings Financial |
| 349 | 2007-QH6 | 346,958,000 | RALI | RFC | Ally Securities | | | Wells Fargo Bank | | Homecomings Financial |
| 350 | 2007-QH7 | 540,449,000 | RALI | RFC | Ally Securities | | | Wells Fargo Bank | | Homecomings Financial |
| 351 | 2007-QH8 | 573,585,400 | RALI | RFC | Credit Suisse Securities (USA) LLC | | | Wells Fargo Bank | | Homecomings Financial |
| 352 | 2007-QO2 | 623,930,000 | RALI | RFC | Deutsche Bank Securities | | | Wells Fargo Bank | | Homecomings Financial |
| 353 | 2007-QO3 | 527,132,000 | RALI | RFC | Ally Securities | | | Wells Fargo Bank | | Homecomings Financial |
| 354 | 2007-QS3 | 296,295,000 | RALI | RFC | Ally Securities | | | Wells Fargo Bank | | Homecomings Financial |
| 355 | 2007-QS4 | 502,837,000 | RALI | RFC | Ally Securities | | | Wells Fargo Bank | | Homecomings Financial |
| 356 | 2007-QS5 | 231,187,000 | RALI | RFC | Ally Securities | | | Wells Fargo Bank | | Homecomings Financial |
| 357 | 2007-QS1 | 1,280,501,451 | RALI | RFC | Citigroup | | Ally Securities | Wells Fargo Bank | | GMAC Mortgage & Homecomings Financial |

[1] Principal balance of offered certificates.

[2] For the purpose of this Appendix, Ally Securities is the only disclosed co-underwriter but, in most cases, securitizations had multiple non-affiliated co-underwriters. Ally Securities participated in 131 of ResCap's 392 securitizations.

[2] For the purpose of this Appendix, ResCap and RFI affiliates are disclosed when they originated more than 10% of the loan pool (per Regulation AB § 229.1110, which became effective Jan. 1, 2006.) Non-affiliate originators are not disclosed.

*Note:*

*(A) Blank spaces refer to details that are not applicable or undisclosed.*

*(B) At the time of the securitizations listed above, Ally Securities was doing business as and disclosed in the prospectus supplement as "GMAC-RFC Securities."*

*(C) At the time of the securitizations listed above, Ally Bank was doing business as and disclosed in the prospectus supplement as "GMAC Bank."*

*(D) Escrow Bank and Escrow Bank CSA are identified, in the prospectus supplements, as an affiliate of GMAC Mortgage. Effective July 1, 2004, Old GMAC Bank assumed the custodial activities from these two entities.*

*Source: All of the information contained in this Appendix was extracted from the relevant securitization prospectus supplements using either Bloomberg or Intex. Generally, the relevant information is located on the cover page and/or in the summary section of each prospectus supplement, except for custodial information, which can be found in the pooling and servicing section.*

Appendix VIII.B—1, Page 7 of 8

Appendix VIII.B—1, Page 8 of 8

Residential Capital, LLC
392 PLS Deal Details
2004 – 2007

| # | Deal Name | Orig. Principal Bal.[1] | Depositor | Sponsor/ Master Servicer | Lead Underwriter | Joint Lead Underwriter | Co-Underwriter[2] | Custodian | Monoline Insurer | Affiliate Originator(s)[3] |
|---|---|---|---|---|---|---|---|---|---|---|
| 358 | 2007-QS10 | 426,607,453 | RALI | RFC | Bear, Stearns & Co. Inc. | | | Wells Fargo Bank | | GMAC Mortgage & Homecomings Financial |
| 359 | 2007-QS11 | 300,036,797 | RALI | RFC | Ally Securities | | | Wells Fargo Bank | | GMAC Mortgage & Homecomings Financial |
| 360 | 2007-QS2 | 529,765,806 | RALI | RFC | Bear, Stearns & Co. Inc. | | Ally Securities | Wells Fargo Bank | | GMAC Mortgage & Homecomings Financial |
| 361 | 2007-QS3 | 957,523,112 | RALI | RFC | RBS Greenwich Capital | | | Wells Fargo Bank | | GMAC Mortgage & Homecomings Financial |
| 362 | 2007-QS4 | 736,484,029 | RALI | RFC | Deutsche Bank Securities | | | Wells Fargo Bank | | GMAC Mortgage & Homecomings Financial |
| 363 | 2007-QS5 | 426,647,013 | RALI | RFC | Citigroup | | | Wells Fargo Bank | | GMAC Mortgage & Homecomings Financial |
| 364 | 2007-QS6 | 796,984,867 | RALI | RFC | Barclays Capital | | Ally Securities | Wells Fargo Bank | | GMAC Mortgage & Homecomings Financial |
| 365 | 2007-QS7 | 792,849,258 | RALI | RFC | Deutsche Bank Securities | | Ally Securities | Wells Fargo Bank | | GMAC Mortgage & Homecomings Financial |
| 366 | 2007-QS8 | 642,305,940 | RALI | RFC | RBS Greenwich Capital | | | Wells Fargo Bank | | GMAC Mortgage & Homecomings Financial |
| 367 | 2007-QS9 | 696,428,029 | RALI | RFC | RBS Greenwich Capital | | Ally Securities | Wells Fargo Bank | | GMAC Mortgage & Homecomings Financial |
| 368 | 2007-RS1 | 478,271,000 | RAMP | RFC | Deutsche Bank Securities | | | Wells Fargo Bank | | GMAC Mortgage & Homecomings Financial |
| 369 | 2007-RS2 | 376,776,000 | RAMP | RFC | Bank of America Securities LLC | Citigroup | Ally Securities | Wells Fargo Bank | | GMAC Mortgage & Homecomings Financial |
| 370 | 2007-RZ1 | 324,339,000 | RAMP | RFC | Bank of America Securities LLC | Credit Suisse | | Wells Fargo Bank | | GMAC Mortgage & Homecomings Financial |
| 371 | 2007-EMX1 | 692,852,000 | RASC | RFC | Ally Securities | | | Wells Fargo Bank | FGIC | |
| 372 | 2007-KS1 | 409,699,000 | RASC | RFC | Merrill Lynch & Co. | | | Wells Fargo Bank | | Homecomings Financial |
| 373 | 2007-KS2 | 961,500,000 | RASC | RFC | JPMorgan | | | Wells Fargo Bank | | Homecomings Financial |
| 374 | 2007-KS3 | 1,270,253,000 | RASC | RFC | JPMorgan | Banc of America Securities LLC | | Wells Fargo Bank | | Homecomings Financial |
| 375 | 2007-KS4 | 235,875,000 | RASC | RFC | JPMorgan | | Ally Securities | Wells Fargo Bank | | Homecomings Financial |
| 376 | 2007-S1 | 519,391,385 | RFMSI | RFC | Credit Suisse | | | Wells Fargo Bank | | GMAC Mortgage & Homecomings Financial |
| 377 | 2007-S2 | 469,355,159 | RFMSI | RFC | Bear, Stearns & Co. Inc. | | | Wells Fargo Bank | | GMAC Mortgage & Homecomings Financial |
| 378 | 2007-S3 | 571,834,504 | RFMSI | RFC | Bear, Stearns & Co. Inc. | | | Wells Fargo Bank | | GMAC Mortgage & Homecomings Financial |
| 379 | 2007-S4 | 312,586,452 | RFMSI | RFC | RBS Greenwich Capital | | | Wells Fargo Bank | | GMAC Mortgage & Homecomings Financial |
| 380 | 2007-S5 | 521,695,689 | RFMSI | RFC | RBS Greenwich Capital | | | Wells Fargo Bank | | Homecomings Financial |
| 381 | 2007-S6 | 702,029,984 | RFMSI | RFC | Citigroup | | Ally Securities | Wells Fargo Bank | | GMAC Mortgage & Homecomings Financial |
| 382 | 2007-S7 | 415,755,302 | RFMSI | RFC | Morgan Stanley | | Ally Securities | Wells Fargo Bank | | GMAC Mortgage & Homecomings Financial |
| 383 | 2007-S8 | 484,161,989 | RFMSI | RFC | Ally Securities | | | Wells Fargo Bank | | GMAC Mortgage & Homecomings Financial |
| 384 | 2007-S9 | 170,566,348 | RFMSI | RFC | Credit Suisse First Boston | | | Wells Fargo Bank | | GMAC Mortgage & Homecomings Financial |
| 385 | 2007-SA1 | 307,349,690 | RFMSI | RFC | Ally Securities | | | Wells Fargo Bank | | GMAC Mortgage & Homecomings Financial |
| 386 | 2007-SA2 | 380,461,300 | RFMSI | RFC | Ally Securities | | | Wells Fargo Bank | | GMAC Mortgage & Homecomings Financial |
| 387 | 2007-SA3 | 360,291,900 | RFMSI | RFC | Ally Securities | | | Wells Fargo Bank | | GMAC Mortgage & Homecomings Financial |
| 388 | 2007-SA4 | 410,157,100 | RFMSI | RFC | Ally Securities | | | Wells Fargo Bank | | GMAC Mortgage & Homecomings Financial |
| 389 | 2007-HI1 | 254,956,000 | RFMSII | RFC | Bear, Stearns & Co. Inc. | | Ally Securities | Wells Fargo Bank | FGIC | GMAC Mortgage & Homecomings Financial |
| 390 | 2007-HSA1 | 546,774,000 | RFMSII | RFC | Ally Securities | Deutsche Bank Securities | | Wells Fargo Bank | MBIA | Homecomings Financial |
| 391 | 2007-HSA2 | 1,231,394,000 | RFMSII | RFC | Ally Securities | RBS Greenwich Capital | | Wells Fargo Bank | MBIA | Homecomings Financial |
| | | 796,432,000 | RFMSII | RFC | Ally Securities | Credit Suisse | | Wells Fargo Bank | MBIA | Homecomings Financial |

[1] Principal balance of offered certificates.

[2] For the purpose of this appendix, Ally Securities is the only disclosed co-underwriter but, in most cases, securitizations had multiple non-affiliated co-underwriters. Ally Securities participated as a co-underwriter in 131 of ResCap's 392 securitizations.

[3] For the purpose of this Appendix, ResCap and AFI affiliates are disclosed where they originated more than 10% of the loan pool per Regulation AB § 229.1110, which became effective Jan. 1, 2006.) Non-affiliate originators are not disclosed.

Note:

(A) Blank spaces refer to details that are not applicable or undisclosed.

(B) At the time of the securitizations listed above, Ally Securities was doing business as, Ally Bank was doing business as and disclosed in the prospectus supplement as "GMAC-RFC Securities."

(C) At the time of the securitizations listed above, Ally Bank was doing business as and disclosed in the prospectus supplement as "GMAC Bank."

(D) Escrow Bank and Escrow Bank USA are identified, in the prospectus supplements, as an affiliate of GMAC Mortgage. Effective July 1, 2004, Old GMAC Bank assumed the custodial activities from these two entities.

Source: All of the information contained in this Appendix was extracted from the relevant securitization prospectus supplements using either Bloomberg or Intex. Generally, the relevant information is located on the cover page and/or in the summary section of each prospectus supplement, except for custodial information, which can be found in the pooling and servicing section.

12-12020-mg    Doc 3098-36    Filed 06/13/13    Entered 06/13/13 09:15:09    Appendix
Case 12-11668-JTD    Doc 613-9    Filed 02/03/23    Page 681 of 709
Pg 357 of 385

Appendix VIII.B—2, Page 1 of 3

**Residential Capital, LLC**
**Ally Securities as Lead and Joint Lead Underwriter on ResCap's PLS Deals**
2004 – 2007

| | Deal Name | Depositor | Sponsor/ Master Servicer | Orig. Principal Bal. [(1)] | Lead Underwriter | Joint Lead Underwriter | Monoline Insurer |
|---|---|---|---|---|---|---|---|
| 1. | 2004-QA4 | RALI | RFC | $ 285,865,200 | Ally Securities | | |
| 2. | 2004-QA6 | RALI | RFC | 708,773,800 | Ally Securities | | |
| 3. | 2004-SL4 | RAMP | RFC | 205,963,987 | Ally Securities | | |
| 4. | 2004-HS3 | RFMSII | RFC | 284,000,000 | Ally Securities | | FGIC |
| 5. | 2004-PS1 | RFMSI | RFC | 100,065,033 | Ally Securities | | |
| 6. | 2005-QA3 | RALI | RFC | 491,297,300 | Ally Securities | | |
| 7. | 2005-QA5 | RALI | RFC | 236,761,800 | Ally Securities | | |
| 8. | 2005-QA6 | RALI | RFC | 565,100,300 | Ally Securities | | |
| 9. | 2005-QA8 | RALI | RFC | 510,425,700 | Ally Securities | | |
| 10. | 2005-QO3 | RALI | RFC | 488,324,200 | Ally Securities | | |
| 11. | 2005-EFC1 | RAMP | RFC | 1,074,195,000 | Ally Securities | RBS Greenwich Capital | |
| 12. | 2005-EFC2 | RAMP | RFC | 679,331,000 | Ally Securities | Credit Suisse First Boston | |
| 13. | 2005-EFC3 | RAMP | RFC | 731,914,000 | Ally Securities | Credit Suisse First Boston | |
| 14. | 2005-EFC4 | RAMP | RFC | 707,796,000 | Ally Securities | JPMorgan | |
| 15. | 2005-EFC5 | RAMP | RFC | 693,318,000 | Ally Securities | Citigroup | |
| 16. | 2005-EFC7 | RAMP | RFC | 698,175,000 | Ally Securities | Barclays Capital | FGIC |
| 17. | 2005-SL1 | RAMP | RFC | 365,173,500 | Ally Securities | | |
| 18. | 2005-SL2 | RAMP | RFC | 163,118,406 | Ally Securities | | |
| 19. | 2005-AHL1 | RASC | RFC | 463,670,000 | Ally Securities | | |
| 20. | 2005-AHL2 | RASC | RFC | 434,239,000 | Ally Securities | | |
| 21. | 2005-AHL3 | RASC | RFC | 488,750,000 | Ally Securities | | |
| 22. | 2005-EMX1 | RASC | RFC | 783,200,000 | Ally Securities | Banc of America Securities LLC | |
| 23. | 2005-EMX2 | RASC | RFC | 614,026,000 | Ally Securities | Banc of America Securities LLC | |
| 24. | 2005-EMX3 | RASC | RFC | 674,450,000 | Ally Securities | Credit Suisse First Boston | |
| 25. | 2005-EMX4 | RASC | RFC | 492,597,000 | Ally Securities | Barclays Capital | |
| 26. | 2005-EMX5 | RASC | RFC | 380,000,000 | Ally Securities | | FGIC |
| 27. | 2005-S4 | RFMSI | RFC | 257,539,881 | Ally Securities | | |
| 28. | 2005-S8 | RFMSI | RFC | 309,843,505 | Ally Securities | | |
| 29. | 2005-SAS | RFMSI | RFC | 351,366,300 | Ally Securities | | |
| 30. | 2005-HI3 | RFMSII | RFC | 224,887,200 | Ally Securities | | |
| 31. | 2005-HSA1 | RFMSII | RFC | 278,847,000 | Ally Securities | Banc of America Securities LLC | FGIC |
| 32. | 2006-AR2 | RAMP | RFC | 368,146,200 | Ally Securities | | |
| 33. | 2006-RP4 | RAMP | GMAC Mortgage | 357,367,000 | Ally Securities | Deutsche Bank Securities | |
| 34. | 2006-QA10 | RALI | RFC | 375,502,000 | Ally Securities | | |
| 35. | 2006-QA11 | RALI | RFC | 372,431,000 | Ally Securities | | |
| 36. | 2006-QA4 | RALI | RFC | 304,442,000 | Ally Securities | | |
| 37. | 2006-QA6 | RALI | RFC | 622,965,000 | Ally Securities | | |
| 38. | 2006-QA7 | RALI | RFC | 588,151,000 | Ally Securities | | |
| 39. | 2006-QA8 | RALI | RFC | 795,053,000 | Ally Securities | | |
| 40. | 2006-EFC1 | RAMP | RFC | 593,225,000 | Ally Securities | Banc of America Securities LLC | |
| 41. | 2006-EFC2 | RAMP | RFC | 383,200,000 | Ally Securities | | |
| 42. | 2006-NC1 | RAMP | RFC | 536,800,000 | Ally Securities | | |
| 43. | 2006-NC3 | RAMP | RFC | 504,920,000 | Ally Securities | Deutsche Bank Securities | |
| 44. | 2006-EMX1 | RASC | RFC | 424,600,000 | Ally Securities | Citigroup | |

[(1)] Principal balance of offered certificates.

Note:

(A) Includes instances when Ally Securities was the lead and joint lead underwriter.

(B) At the time of the securitizations listed above, Ally Securities was doing business as and disclosed in the prospectus supplement as "GMAC-RFC Securities."

Source: All of the information contained in this Appendix was extracted from the relevant securitization prospectus supplements using either Bloomberg or Intex. Generally, the relevant information is located on the cover page and/or in the summary section of each prospectus supplement.

Appendix VIII.B—2, Page 2 of 3

**Residential Capital, LLC**
**Ally Securities as Lead and Joint Lead Underwriter on ResCap's PLS Deals**
2004 – 2007

| Deal Name | Depositor | Sponsor/ Master Servicer | Orig. Principal Bal. (1) | Lead Underwriter | Joint Lead Underwriter | Monoline Insurer |
|---|---|---|---|---|---|---|
| 45. 2006-EMX2 | RASC | RFC | 550,050,000 | Ally Securities | Barclays Capital | |
| 46. 2006-EMX3 | RASC | RFC | 773,600,000 | Ally Securities | Citigroup | |
| 47. 2006-EMX4 | RASC | RFC | 661,710,000 | Ally Securities | RBS Greenwich Capital | |
| 48. 2006-EMX5 | RASC | RFC | 580,200,000 | Ally Securities | Barclays Capital | |
| 49. 2006-EMX6 | RASC | RFC | 620,490,000 | Ally Securities | JPMorgan | |
| 50. 2006-EMX7 | RASC | RFC | 495,300,000 | Ally Securities | JPMorgan | |
| 51. 2006-EMX8 | RASC | RFC | 698,610,000 | Ally Securities | Barclays Capital | |
| 52. 2006-EMX9 | RASC | RFC | 728,840,000 | Ally Securities | Barclays Capital | |
| 53. 2006-KS2 | RASC | RFC | 977,500,000 | Ally Securities | RBS Greenwich Capital | |
| 54. 2006-HI5 | RFMSII | RFC | 247,469,000 | Ally Securities | | FGIC |
| 55. 2007-HE2 | RAMP | GMAC Mortgage | 1,240,884,000 | Ally Securities | RBS Greenwich Capital | FGIC |
| 56. 2007-HE3 | RAMP | GMAC Mortgage | 350,580,000 | Ally Securities | | |
| 57. 2007-QA1 | RALI | RFC | 410,069,000 | Ally Securities | | |
| 58. 2007-QA2 | RALI | RFC | 366,984,000 | Ally Securities | | |
| 59. 2007-QA3 | RALI | RFC | 882,356,800 | Ally Securities | | |
| 60. 2007-QA5 | RALI | RFC | 491,200,000 | Ally Securities | | |
| 61. 2007-QH8 | RALI | RFC | 540,449,900 | Ally Securities | | |
| 62. 2007-QH9 | RALI | RFC | 573,585,400 | Ally Securities | | |
| 63. 2007-QO3 | RALI | RFC | 296,295,000 | Ally Securities | | |
| 64. 2007-QO4 | RALI | RFC | 502,837,000 | Ally Securities | | |
| 65. 2007-QO5 | RALI | RFC | 231,187,000 | Ally Securities | | |
| 66. 2007-QS11 | RALI | RFC | 301,636,797 | Ally Securities | | |
| 67. 2007-EMX1 | RASC | RFC | 692,852,000 | Ally Securities | Credit Suisse | FGIC |
| 68. 2007-S8 | RFMSII | RFC | 484,161,989 | Ally Securities | | |
| 69. 2007-SA1 | RFMSII | RFC | 307,349,600 | Ally Securities | | |
| 70. 2007-SA2 | RFMSII | RFC | 380,461,300 | Ally Securities | | |
| 71. 2007-SA3 | RFMSII | RFC | 360,201,900 | Ally Securities | | |
| 72. 2007-SA4 | RFMSII | RFC | 410,157,100 | Ally Securities | | |
| 73. 2007-HSA1 | RFMSII | RFC | 546,774,000 | Ally Securities | Deutsche Bank Securities | MBIA |
| 74. 2007-HSA2 | RFMSII | RFC | 1,231,394,000 | Ally Securities | RBS Greenwich Capital | MBIA |
| 75. 2007-HSA3 | RFMSII | RFC | 796,432,000 | Ally Securities | Credit Suisse | MBIA |
| 76. 2004-RS12 | RAMP | RFC | 975,000,000 | JPMorgan | | |
| 77. 2004-KS11 | RASC | RFC | 685,650,000 | Credit Suisse First Boston | | |
| 78. 2005-RP1 | RAMP | RFC | 343,073,000 | Credit Suisse First Boston | | |
| 79. 2005-EFC6 | RAMP | RFC | 672,696,000 | JPMorgan | | |
| 80. 2005-NC1 | RAMP | RFC | 870,750,000 | Credit Suisse First Boston | | FGIC |
| 81. 2005-RS6 | RAMP | RFC | 1,178,400,000 | Credit Suisse First Boston | | |
| 82. 2005-KS1 | RASC | RFC | 708,840,000 | Credit Suisse First Boston | | |
| 83. 2005-KS10 | RASC | RFC | 1,285,956,000 | JPMorgan | | |
| 84. 2005-KS11 | RASC | RFC | 1,339,290,000 | Credit Suisse First Boston | | |
| 85. 2005-KS8 | RAMP | RFC | 1,165,800,000 | JPMorgan | | |
| 86. 2005-SP3 | RAMP | RFC | 291,882,000 | Credit Suisse First Boston | | |
| 87. 2006-SP4 | RAMP | RFC | 303,913,000 | Lehman Brothers | | |
| 88. 2006-RS1 | RAMP | RFC | 1,173,600,000 | Credit Suisse First Boston | | |

(1) Principal balance of offered certificates.

Note:

(A) Includes instances when Ally Securities was the lead and joint lead underwriter.

(B) At the time of the securitizations listed above, Ally Securities was doing business as and disclosed in the prospectus supplement as "GMAC-RFC Securities."

Source: All of the information contained in this Appendix was extracted from the relevant securitization prospectus supplements using either Bloomberg or Intex. Generally, the relevant information is located on the cover page and/or in the summary section of each prospectus supplement.

Appendix VIII.B—2, Page 2 of 3

Appendix VIII.B—2, Page 3 of 3

Residential Capital, LLC
Ally Securities as Lead and Joint Lead Underwriter on ResCap's PLS Deals
2004 – 2007

| | Deal Name | Depositor | Sponsor/ Master Servicer | Orig. Principal Bal. [1] | Lead Underwriter | Joint Lead Underwriter | Monoline Insurer |
|---|---|---|---|---|---|---|---|
| 89. | 2006-RS2 | RAMP | RFC | 785,601,000 | Banc of America Securities LLC | Ally Securities | |
| 90. | 2006-RS4 | RAMP | RFC | 887,538,000 | RBS Greenwich Capital | Ally Securities | |
| 91. | 2006-RS5 | RAMP | RFC | 382,590,000 | RBS Greenwich Capital | Ally Securities | |
| 92. | 2006-RZ3 | RAMP | RFC | 688,345,000 | Banc of America Securities LLC | Ally Securities | |
| 93. | 2006-RZ4 | RAMP | RFC | 851,840,000 | Credit Suisse First Boston | Ally Securities | |
| 94. | 2006-HSA1 | RFMSII | RFC | 461,444,000 | Bear, Stearns & Co. Inc. | Ally Securities | FGIC |
| 95. | 2006-HSA2 | RFMSII | RFC | 447,900,000 | Credit Suisse | Ally Securities | FGIC |
| 96. | 2006-HSA3 | RFMSII | RFC | 201,014,000 | RBS Greenwich Capital | Ally Securities | FSA |
| 97. | 2006-HSA4 | RFMSII | RFC | 402,118,000 | Citigroup | Ally Securities | MBIA |
| 98. | 2006-HSA5 | RFMSII | RFC | 295,648,000 | Goldman Sachs & Co. | Ally Securities | MBIA |
| 99. | 2007-RP1 | RAMP | RFC | 334,361,000 | RBS Greenwich Capital | Ally Securities | |
| 100. | 2007-RP2 | RAMP | RFC | 263,289,000 | Credit Suisse | Ally Securities | |
| 101. | 2007-RP3 | RAMP | RFC | 346,640,000 | Barclays Capital | Ally Securities | |
| 102. | 2007-RP4 | RAMP | RFC | 239,164,000 | Lehman Brothers | Ally Securities | |
| 103. | 2007-SP1 | RAMP | RFC | 346,555,000 | Deutsche Bank Securities | Ally Securities | |
| 104. | 2007-SP2 | RAMP | RFC | 279,284,000 | RBS Greenwich Capital | Ally Securities | |
| 105. | 2007-SP3 | RAMP | RFC | 298,114,000 | Credit Suisse | Ally Securities | |
| | | | | $ 57,206,739,098 | | | |

*[1] Principal balance of offered certificates.*

*Notes:*
*(A) Includes instances when Ally Securities was the lead and joint lead underwriter.*
*(B) At the time of the securitizations listed above, Ally Securities was doing business as and disclosed in the prospectus supplement as "GMAC-RFC Securities."*
*Source: All of the information contained in this Appendix was extracted from the relevant securitization prospectus supplements using either Bloomberg or Intex. Generally, the relevant information is located on the cover page and/or in the summary section of each prospectus supplement.*

Appendix VIII.B—2, Page 3 of 3

**Residential Capital, LLC**
**Old GMAC Bank and Ally Bank as Custodian on ResCap's PLS Deals**
2004 – 2007

| | Deal Name | Depositor | Sponsor/ Master Servicer | Custodian | Orig. Principal Bal. [1] | Monoline Insurer |
|---|---|---|---|---|---|---|
| 1. | 2004-AR1 | RAMP | GMAC Mortgage | Escrow Bank USA | $ 630,153,200 | |
| 2. | 2004-KR2 | RAMP | GMAC Mortgage | Old GMAC Bank | 506,018,100 | |
| 3. | 2004-GH1 | RAMP | GMAC Mortgage | Old GMAC Bank | 224,099,000 | |
| 4. | 2004-HE1 | RAMP | GMAC Mortgage | Escrow Bank USA | 1,259,311,000 | FGIC |
| 5. | 2004-HE2 | RAMP | GMAC Mortgage | Escrow Bank USA | 711,548,000 | Old Republic |
| 6. | 2004-HE3 | RAMP | GMAC Mortgage | Escrow Bank USA | 952,320,000 | FSA |
| 7. | 2004-HE4 | RAMP | GMAC Mortgage | Old GMAC Bank | 992,000,000 | MBIA |
| 8. | 2004-HE5 | RAMP | GMAC Mortgage | Old GMAC Bank | 700,000,000 | FGIC |
| 9. | 2004-HLTV1 | RAMP | GMAC Mortgage | Old GMAC Bank | 175,000,000 | FGIC |
| 10. | 2004-41 | RAMP | GMAC Mortgage | Escrow Bank | 398,964,694 | MBIA |
| 11. | 2004-42 | RAMP | GMAC Mortgage | Escrow Bank | 398,997,431 | MBIA |
| 12. | 2004-43 | RAMP | GMAC Mortgage | Escrow Bank | 348,287,499 | |
| 13. | 2004-44 | RAMP | GMAC Mortgage | Old GMAC Bank | 597,117,562 | |
| 14. | 2004-45 | RAMP | GMAC Mortgage | Old GMAC Bank | 549,141,999 | |
| 15. | 2004-46 | RAMP | GMAC Mortgage | Old GMAC Bank | 406,384,031 | |
| 16. | 2004-VFT | GMACR | GMAC Mortgage | Old GMAC Bank | 390,956,146 | MBIA |
| 17. | 2005-AA1 | RAMP | GMAC Mortgage | Old GMAC Bank | 260,774,100 | |
| 18. | 2005-AF1 | RAMP | GMAC Mortgage | Old GMAC Bank | 231,466,322 | |
| 19. | 2005-AF2 | RAMP | GMAC Mortgage | Old GMAC Bank | 292,121,700 | |
| 20. | 2005-AR1 | RAMP | GMAC Mortgage | Old GMAC Bank | 395,770,100 | |
| 21. | 2005-AR2 | RAMP | GMAC Mortgage | Old GMAC Bank | 453,859,100 | |
| 22. | 2005-AR3 | RAMP | GMAC Mortgage | Old GMAC Bank | 518,480,100 | |
| 23. | 2005-AR4 | RAMP | GMAC Mortgage | Old GMAC Bank | 381,630,100 | |
| 24. | 2005-AR5 | RAMP | GMAC Mortgage | Old GMAC Bank | 592,093,100 | |
| 25. | 2005-AR6 | RAMP | GMAC Mortgage | Old GMAC Bank | 585,769,100 | |
| 26. | 2005-HE1 | RAMP | GMAC Mortgage | Old GMAC Bank | 962,325,000 | FGIC |
| 27. | 2005-HE2 | RAMP | GMAC Mortgage | Old GMAC Bank | 1,113,522,000 | FGIC |
| 28. | 2005-HE3 | RAMP | GMAC Mortgage | Old GMAC Bank | 963,680,000 | AMBAC |
| 29. | 2005-J1 | RAMP | GMAC Mortgage | Old GMAC Bank | 522,873,155 | |
| 30. | 2006-AR1 | RAMP | GMAC Mortgage | Old GMAC Bank | 502,050,100 | |
| 31. | 2006-AR2 | RAMP | GMAC Mortgage | Old GMAC Bank | 368,146,200 | |
| 32. | 2006-HE1 | RAMP | GMAC Mortgage | Old GMAC Bank | 1,274,156,000 | FGIC |
| 33. | 2006-HE2 | RAMP | GMAC Mortgage | Old GMAC Bank | 626,240,000 | FGIC |
| 34. | 2006-HE3 | RAMP | GMAC Mortgage | Old GMAC Bank | 1,142,334,000 | FGIC |
| 35. | 2006-HE4 | RAMP | GMAC Mortgage | Old GMAC Bank | 1,136,222,000 | MBIA |
| 36. | 2006-HE5 | RAMP | GMAC Mortgage | Ally Bank | 1,244,459,000 | FGIC |
| 37. | 2006-HLTV1 | RAMP | GMAC Mortgage | Ally Bank | 229,865,170 | FGIC |
| 38. | 2006-J1 | RAMP | GMAC Mortgage | Ally Bank | 546,153,384 | |
| 39. | 2007-HE1 | RAMP | GMAC Mortgage | Ally Bank | 1,185,871,000 | MBIA |
| 40. | 2007-HE2 | RAMP | GMAC Mortgage | Ally Bank | 1,240,884,000 | FGIC |
| 41. | 2007-HE3 | RAMP | GMAC Mortgage | Ally Bank | 350,580,000 | |
| | | | | | $ 26,361,223,393 | |

[1] Principal balance of offered certificates.

*Note:*

*(A) At the time of the securitizations listed above, both Old GMAC Bank and Ally Bank were doing business as and disclosed in the prospectus supplement as "GMAC Bank."*

*(B) Old GMAC Bank was then known as Escrow Bank USA as certified in the prospectus supplements as an affiliate of GMAC Mortgage. Effective July 1, 2004, Old GMAC Bank assumed the custodial activities from these two entities*

*Source: All of the information contained in this Appendix was extracted from the relevant securitization prospectus supplements using either Bloomberg or Intex. Generally, the relevant information is located on the cover page and/or in the summary section of each prospectus supplement, except for custodial information, which can be found in the pooling and servicing section.*

**Appendix VIII.B.1.b(1)**, Page 1 of 3

### 1. *Loan Origination*

The RMBS securitization process begins with an originator marketing a loan product to a borrower.[1]  Based on the originator's criteria for the specific loan product, the originator requires the borrower to provide specific financial information, such as copies of bank statements and income verification.[2]  The originator reviews the financial information, as well as appraisals and other information about the property securing the mortgage, and compares this information to the originator's guidelines for the particular loan product.[3]  This process, applied by the originator, is known as loan underwriting.

Loan underwriting is critical in assessing a borrower's ability to repay a loan as well as the mortgage note holder's ability to recover from the underlying collateral in the event that the borrower defaults.[4]  Accordingly, the originator assesses several metrics that reflect the borrower's repayment ability, such as the value of the mortgaged property, the amount of the loan, and the borrower's credit score and income.[5]  Two ratios typically reviewed as part of the loan-underwriting process are loan-to-value ("LTV") and debt-to-income ("DTI") ratios.[6]  The LTV ratio reflects the relationship between the outstanding principal balance of a mortgage and the value of the mortgaged property.[7]  Lenders use LTV ratios as an indication of the likelihood that they will be repaid in the event of borrower default and foreclosure.[8]  DTI ratios compare a borrower's monthly mortgage obligation combined with other debt (credit cards, insurance, taxes, etc.) to their gross monthly income.[9]  Lenders use this metric to estimate borrowers' ability to repay the underlying mortgages.[10]

---

[1]   MOODY'S INVESTORS SERVICE, DEAL SPONSOR AND CREDIT RISK OF U.S. ABS AND MBS SECURITIES (Dec. 2006), at 9, http://www.moodys.com/sites/products/DefaultResearch/2006200000426039.pdf.

[2]   *See* Daniel J. McDonald & Daniel L. Thornton, *A Primer on the Mortgage Market and Mortgage Finance,* FED. RES. BANK ST. LOUIS REV., Jan./Feb. 2008, at 36, http://research.stlouisfed.org/publications/review/08/01/McD onald.pdf.

[3]   *See id.*

[4]   *See* FRANK J. FABOZZI, THE HANDBOOK OF MORTGAGE BACKED SECURITIES 17 (McGraw-Hill, 6th ed. 2005).

[5]   *See id.* at 17–20.

[6]   *See id.* at 18–19.

[7]   *See id.* at 18.

[8]   *See id.*

[9]   Daniel J. McDonald & Daniel L. Thornton, *A Primer on the Mortgage Market and Mortgage Finance,* FED. RES. BANK ST. LOUIS REV., Jan./Feb. 2008, at 36, http://research.stlouisfed.org/publications/review/08/01 /Mc Donald.pdf.

[10]   *See* FRANK J. FABOZZI, THE HANDBOOK OF MORTGAGE BACKED SECURITIES 19 (McGraw-Hill, 6th ed. 2005).

### 2. *Loan Acquisition*

Originators that do not securitize or hold loans on their balance sheet typically act as a broker or correspondent for a sponsor.[11] Brokers perform the initial borrower review based upon the sponsor's underwriting guidelines but do not make an underwriting decision nor fund the loans.[12] The broker provides the sponsor with a loan package that has already been underwritten in exchange for a brokerage fee.[13] The sponsor funds the loan upon review of adherence to guidelines and acceptance.

Unlike brokers, correspondents both underwrite *and* fund their loans, and then sell the loans to sponsors through a bidding process.[14] With both broker and correspondent lending, in certain circumstances a loan may be underwritten with an exception to the sponsor's standard underwriting guidelines.[15] The approval of a loan containing exceptions to the underwriting guidelines is generally based upon factors that are deemed to compensate for the exception.[16] For example, a high FICO score or low DTI ratio may offset the risk of a loan exceeding LTV guidelines.

Sponsors may utilize "warehouse" lending to finance the purchase of mortgage loans.[17] Warehouse lending typically takes the form of a short-term revolving line of credit that is drawn upon at the time of the loan purchase and repaid once the loan is sold to the end investor.[18] Warehouse lenders' practice of funding loans at the time of loan closing is referred to as "wet

---

[11] *See* THE FINANCIAL CRISIS INQUIRY COMMITTEE, FINAL REPORT OF THE NATIONAL COMMISSION ON THE CAUSES OF THE FINANCIAL AND ECONOMIC CRISIS IN THE UNITED STATES (Jan. 2011), at 88–89, http://www.gpo.gov/fdsys/pkg/GPO-FCIC/pdf/GPO-FCIC.pdf.

[12] CONSUMER FINANCIAL PROTECTION BUREAU, EXAMINATION PROCEDURES MORTGAGE ORIGINATION (Jan. 11, 2012), at 5, http://files.consumerfinance.gov/f/2012/01/Mortgage-Origination-Examination-Procedures.pdf.

[13] *See* FINANCIAL CRISIS INQUIRY COMMISSION, THE FINANCIAL CRISIS INQUIRY REPORT: FINAL REPORT OF THE NATIONAL COMMISSION ON THE CAUSES OF THE FINANCIAL AND ECONOMIC CRISIS IN THE UNITED STATES (Jan. 2011), at 90, http://www.gpo.gov/fdsys/pkg/GPO-FCIC/pdf/GPO-FCIC.pdf.

[14] CONSUMER FINANCIAL PROTECTION BUREAU, EXAMINATION PROCEDURES MORTGAGE ORIGINATION (Jan. 11, 2012), at 5, http://files.consumerfinance.gov/f/2012/01/Mortgage-Origination-Examination-Procedures.pdf.

[15] FINANCIAL CRISIS INQUIRY COMMISSION, THE FINANCIAL CRISIS INQUIRY REPORT: FINAL REPORT OF THE NATIONAL COMMISSION ON THE CAUSES OF THE FINANCIAL AND ECONOMIC CRISIS IN THE UNITED STATES (Jan. 2011), at 169, http://www.gpo.gov/fdsys/pkg/GPO-FCIC/pdf/GPO-FCIC.pdf.

[16] *See id.* at 67.

[17] Warehouse funding may also be utilized by originators (e.g. correspondent lenders, etc.) for purposes of funding loans. *See* Mortgage Bankers Association, *Federal Regulatory Changes Needed to Help Keep Mortgage Capital Flowing through Warehouse Lines of Credit* (Jan. 6, 2010), at 1, http://www.mortgagebankers.org/files/IssueBriefs /2010WarehouseIssueBrief.pdf.

[18] Mortgage Bankers Association, *Federal Regulatory Changes Needed to Help Keep Mortgage Capital Flowing through Warehouse Lines of Credit* (Jan. 6, 2010), at 1, http://www.mortgagebankers.org/files/IssueBriefs/2010 WarehouseIssueBrief.pdf.

## **Appendix VIII.B.1.b(1)**, Page 3 of 3

funding."[19]   Alternatively, warehouse lenders may choose not to fund the loan until it has received the mortgage note and other loan documentation, which is referred to as "dry funding."[20]

Upon purchasing or funding loans, the sponsor places the loans into its inventory.[21] Typically, as a condition of purchase, the sponsor will receive loan level representations and warranties from the broker or correspondent lender.[22] In the event of a breach of the representations and warranties, the sponsor can "put back" a loan to the originator for repurchase or replacement.[23]

---

[19]   *Id.* at 2.

[20]   *Id.*

[21]   *See* CONGRESSIONAL OVERSIGHT PANEL, NOVEMBER OVERSIGHT REPORT: EXAMINING THE CONSEQUENCES OF MORTGAGE IRREGULARITIES FOR FINANCIAL STABILITY AND FORECLOSURE MITIGATION (Nov. 16, 2010), at 14, http://www.gpo.gov/fdsys/pkg/CPRT-111JPRT61835/pdf/CPRT-111JPRT61835.pdf.

[22]   Examples of certain representations and warranties that would accompany a mortgage loan being purchased/sold relate to the underlying property, applicable documentation in the loan file and the loan origination process, among others. AMERICAN SECURITIZATION FORUM, ASF MODEL RMBS REPRESENTATIONS AND WARRANTIES (July 15, 2009), at 4, http://www.americansecuritization.com/uploadedfiles/asf_restart_ repre sentations_rfc_071509.pdf.

[23]   Adam B. Ashcroft & Til Schuermann, *Understanding the Securitization of Subprime Mortgage Credit*, Federal Reserve Bank of New York Staff Reports, Mar. 2008, at 6, http://www.newyorkfed.org/research /staff_reports/ sr318.pdf.

### 1. *Structuring the Securitization*

Structuring a securitization requires isolating and distributing credit risk, usually through various credit enhancement techniques.[1] The structuring process consists of four primary stages: (1) segregating the assets; (2) adding credit enhancement to mitigate risk and improve salability; (3) creating an SPE or trust to hold the assets; and (4) issuing interests in the asset pool (i.e., RMBS).[2]

### a. *Segregating Assets*

The sponsor designates the mortgage loans to be sold to a trust.[3] The selection is carried out to create a portfolio whose performance is not only predictable but also consistent with the target quality of the desired security.[4] Because the sponsor's eventual goal is to securitize the purchased loans and market the RMBS to investors, the sponsor typically works with a lead underwriter that has pre-existing relationships with investors to whom the RMBS will be marketed.[5] The lead underwriter advises the sponsor on the types of loans desired by investors, works with the sponsor to structure the securities, interacts with the third parties associated with the transaction (e.g., rating agencies, legal counsel, diligence firms), assists in the selection of the servicer, trustee and custodian entities, and ultimately sells the RMBS into the market.[6]

Once the lead underwriter and sponsor agree on the types of loans to be securitized, the sponsor selects loans from its inventory to form a preliminary pool.[7] The lead underwriter then contracts with a third-party loan-diligence firm to perform a loan-level review on a portion of the loan pool for adherence to the sponsor's underwriting guidelines and deal parameters.[8] Exceptions to loan underwriting criteria are reviewed by both the lead underwriter and sponsor,

---

[1] COMPTROLLER OF THE CURRENCY ADMINISTRATION OF NATIONAL BANKS, ASSET SECURITIZATION, COMPTROLLER'S HANDBOOK (Nov. 1997), at 12-13, http://www.occ.gov/publications/publications-by-type/comptrollers-handbook/assetsec.pdf.

[2] *Id.* at 13.

[3] *Id.* at 14.

[4] *Id.*

[5] *Id.* at 12.

[6] *See* NICOLA CETORELLI & STAVROS PERISTIANI, THE ROLE OF BANKS IN ASSET SECURITIZATION, FRBNY ECON. POL'Y REV., July 2012, at 49, http://www.newyorkfed.org/research/epr/12v18n2/1207peri.pdf.

[7] COMPTROLLER OF THE CURRENCY ADMINISTRATION OF NATIONAL BANKS, ASSET SECURITIZATION, COMPTROLLER'S HANDBOOK (Nov. 1997), at 14, http://www.occ.gov/publications/publications-by-type/comptrollers-handbook/assetsec.pdf.

[8] FINANCIAL CRISIS INQUIRY COMMISSION, THE FINANCIAL CRISIS INQUIRY REPORT: FINAL REPORT OF THE NATIONAL COMMISSION ON THE CAUSES OF THE FINANCIAL AND ECONOMIC CRISIS IN THE UNITED STATES (Jan. 2011), at 165–166, http://www.gpo.gov/fdsys/pkg/GPO-FCIC/pdf/GPO-FCIC.pdf.

**Appendix VIII.B.1.b(3)**, Page 2 of 6

who together decide whether to approve or exclude particular loans from the loan pool.[9]  The parties may allow loans with exceptions to remain in the pool based on the compensating factors discussed in Appendix VIII.B.1.b(1).[10]

### b.  *Credit Enhancement*

The most widely used credit-enhancement features are (1) the senior/subordinate structure; (2) overcollateralization; (3) reserve funds; and (4) bond insurance.[11]  The objective, from the sponsor's viewpoint, is to find the most practical and cost-effective method of credit protection to achieve the desired credit rating and price for the RMBS.[12]  The underwriter, originator or pool sponsor will often negotiate with the rating agencies about the type and size of the credit enhancements in order to obtain an appropriate credit rating.[13]

The *senior/subordinate* structure consists of a senior tranche and one or more subordinate tranches.[14]  The sponsor will typically seek a desirable investment-grade credit rating for the senior tranche, with lower ratings—investment or noninvestment grade—for the subordinate tranches.[15]  The most junior tranche, or the "first-loss piece," will not be rated.[16]  Investors in subordinated tranches require a higher-yield premium to compensate for the greater credit risk exposure relative to the senior tranche.[17]  Additionally, almost all senior/subordinate structures incorporate a shifting-interest structure, which redirects principal prepayments and certain liquidation proceeds disproportionately from the subordinated tranche to the senior tranche

---

[9]  *See* COMPTROLLER OF THE CURRENCY ADMINISTRATOR OF NATIONAL BANKS, ASSET SECURITIZATION, COMPTROLLER'S HANDBOOK (Nov. 1997), at 14, http://www.occ.gov/publications/publications-by-type/comptr ollers-handbook/assetsec.pdf.

[10]  FINANCIAL CRISIS INQUIRY COMMISSION, THE FINANCIAL CRISIS INQUIRY REPORT:  FINAL REPORT OF THE NATIONAL COMMISSION ON THE CAUSES OF THE FINANCIAL AND ECONOMIC CRISIS IN THE UNITED STATES (Jan. 2011), at 166, http://www.gpo.gov/fdsys/pkg/GPO-FCIC/pdf/GPO-FCIC.pdf.

[11]  FRANK J. FABOZZI, THE HANDBOOK OF MORTGAGE BACKED SECURITIES 116 (McGraw-Hill, 6th ed. 2005); Timothy C. Leixner, *Securitization of Financial Assets*, Sept. 1, 1999, at 4–5, http://mx.nthu.edu.tw/~chclin/Cla ss/Securitization.htm.

[12]  *See* COMPTROLLER OF THE CURRENCY ADMINISTRATOR OF NATIONAL BANKS, ASSET SECURITIZATION, COMPTROLLER'S HANDBOOK (Nov. 1997), at 23, http://www.occ.gov/publications/publications-by-type/compt rollers-handbook/assetsec.pdf.

[13]  *Id.*

[14]  FRANK J. FABOZZI, THE HANDBOOK OF MORTGAGE BACKED SECURITIES 117 (McGraw-Hill, 6th ed. 2005).

[15]  *Id.*

[16]  *Id.*

[17]  *Id.* at 188; Timothy C. Leixner, *Securitization of Financial Assets*, Sept. 1, 1999, at 4–5, http://mx.nthu.edu.tw/ ~chclin/Class/Securitization.htm.

according to a specified schedule.[18]  The purpose of the shifting-interest structure is to have sufficient subordinated tranches outstanding to provide coverage for future credit losses.[19]

*Overcollateralization* is achieved when the principal balance of the underlying mortgage loans exceeds the principal balance of the outstanding RMBS.[20]  The purpose of overcollateralization is to create a cushion, in addition to the excess spread, to cover potential loan losses.[21]  The excess spread is generally defined as the difference between the monthly interest received on the underlying mortgage loans minus the interest paid on the RMBS and other monthly fees (e.g., servicing fees, servicer advances, etc.).[22]  Loan losses are absorbed first by any monthly excess spread that may exist, and then by the value of the overcollateralization.[23]  If a transaction is not initially structured with overcollateralization, it will generally build to a specified overcollateralization target in the first few years of the transaction's life.[24]  This is achieved by directing the excess spread to pay down the senior most RMBS until the targeted level of overcollateralization is reached.[25]

*Reserve funds*, which can come in the form of cash reserves or excess spread accounts, can also be used to provide credit enhancement.[26]  Cash reserve funds are straight deposits of cash generated from RMBS sale proceeds which are deposited into money market instruments.[27]  Excess spread accounts involve the monthly allocation of excess spread into a separate reserve account, which acts as the first line of credit support for the deal.[28]

Finally, a sponsor may use a *bond insurer* to provide credit enhancement on a securitization.[29]  The insurer is generally triple-A rated by the rating agencies and provides an irrevocable guaranty for the payment of principal and timely payment of interest on all or a

---

[18]  FRANK J. FABOZZI, THE HANDBOOK OF MORTGAGE BACKED SECURITIES 118 (McGraw-Hill, 6th ed. 2005).

[19]  *Id.*

[20]  FRANK J. FABOZZI, THE HANDBOOK OF NON-AGENCY MORTGAGE-BACKED SECURITIES 210 (Wiley, John & Sons, Inc., 2d ed. 2000).

[21]  *See* FRANK J. FABOZZI, THE HANDBOOK OF MORTGAGE BACKED SECURITIES 120 (McGraw-Hill, 6th ed. 2005).

[22]  FRANK J. FABOZZI, THE HANDBOOK OF NON-AGENCY MORTGAGE-BACKED SECURITIES 209 (Wiley, John & Sons, Inc., 2d ed. 2000).

[23]  *See* FRANK J. FABOZZI, THE HANDBOOK OF MORTGAGE BACKED SECURITIES 121 (McGraw-Hill, 6th ed. 2005).

[24]  *Id.* at 120.

[25]  *See id.* at 121.

[26]  *Id.*

[27]  *Id.*

[28]  *Id.*

[29]  *See* Timothy C. Leixner, *Securitization of Financial Assets*, Sept. 1, 1999, at 5, http://mx.nthu.edu.tw/~chclin/C lass /Securitization.htm.

## Appendix VIII.B.1.b(3), Page 4 of 6

portion of the RMBS.[30]  When bond insurance is being used, loan pool information is provided to the insurer for a due diligence review almost identical to that conducted by the rating agencies.[31] Insured RMBS also typically receive "shadow ratings"—ratings that would have been appropriate absent bond insurance—from the rating agencies.[32]

### c. Creating The SPE/Trust

A PLS issuer is required under the Securities Act to register an RMBS offering; this is generally referred to as a "shelf registration."[33] This process begins with the filing of a disclosure document which consists of two parts: prospectus and prospectus supplement.[34] The prospectus provides such things as general attributes of the securities to be offered off the shelf in the future and a description of the company.[35] The prospectus supplement provides more detailed information on the specific series offering for the investor, such as risk factors relating to the collateral, certificates and credit enhancement structure, and parties involved in the securitization (underwriters, servicer, trustee, custodian, etc.)[36]

Once the assets are pooled together by the sponsor, they are sold to the depositor which pays for the assets with funds raised from the investors purchasing the RMBS issued by the trust.[37]  The transfer of the assets to the depositor takes the form of a "true sale," which removes sponsor ownership from the assets and insulates RMBS investors in the event of a sponsor bankruptcy.[38]

---

[30] *Id.*

[31] Written Testimony of New York Bankers Association, FINANCIAL GUARANTY INSURANCE AND REPRESENTATIONS AND WARRANTIES IN SECURITIZED DEBT TRANSACTIONS 3–5 (Feb. 16, 2011), http://www.nyba.com/wp-content/uploads/2012/08/RMBSTestimony.pdf.

[32] The shadow rating provided by the Rating Agencies is only intended to be used by the guarantor to assess capital requirements. *See* ORGANIZATION FOR ECONOMIC CO-OPERATION AND DEVELOPMENT, CHALLENGES RELATED TO FINANCIAL GUARANTEE INSURANCE (2008), at 95, http://www.oecd.org/finance/financial-markets/45500761.pdf.

[33] U.S. SECURITIES AND EXCHANGE COMMISSION, STAFF REPORT: ENHANCING DISCLOSURE IN THE MORTGAGE-BACKED SECURITIES MARKETS (January 2003), at 21, http://www.sec.gov/news/studies/mortgagebacked.htm.

[34] *Id.*

[35] *Id.*

[36] *Id.*

[37] NICOLA CETORELLI & STAVROS PERISTIANI, THE ROLE OF BANKS IN ASSET SECURITIZATION, FRBNY ECON. POL'Y REV., July 2012, at 48, http://www.newyorkfed.org/research/epr/12v18n2/1207peri.pdf; *see also* CONGRESSIONAL OVERSIGHT PANEL, NOVEMBER OVERSIGHT REPORT: EXAMINING THE CONSEQUENCES OF MORTGAGE IRREGULARITIES FOR FINANCIAL STABILITY AND FORECLOSURE MITIGATION (Nov. 16, 2010), at 14, http://www.gpo.gov/fdsys/pkg/CPRT-111JPRT61835/pdf/CPRT-111JPRT61835.pdf.

[38] *Id.*

**Appendix VIII.B.1.b(3)**, Page 5 of 6

> *d.     Issuing Securities*

Throughout the underwriting process, the securitization deal documents (including supplemental prospectus,[39] indentures, mortgage loan sale and servicing agreements, and insurance and indemnity agreements) are reviewed by all relevant parties, including the lead underwriter, the rating agencies, and, where applicable, the insurer.[40]  The lead underwriter works with the sponsor to provide loan pool information to the rating agencies.[41]  The rating agencies also perform analyses to determine the loss coverage necessary to attain the desired credit rating.[42]  As part of this process, the rating agencies may require the sponsor to add additional collateral to the pool to increase the likelihood that the pool will generate cash flows sufficient to pay investors.[43]  Rating agencies perform a financial/operational review and provide a rating for the sponsor and legal entities associated with the securitization (e.g., servicers, financial guarantor and underwriter).[44]

Based upon final loan-loss analysis, the rating agencies confirm credit enhancement levels and assign ratings.[45]  The bond insurer then approves the final debt structure and assigns their internal credit rating[46] which is used for performance review purposes.[47]

---

[39]   A PLS issuer is required under the Securities Act to register an RMBS offering; this is generally referred to as a "shelf registration".  This process begins with the filing of a disclosure document, or prospectus, outlining attributes of the securities to be offered off the shelf in the future.  The document consists of two parts: prospectus and prospectus supplement.  A prospectus typically provides investors with general information such as collateral type of the RMBS offering and a description of the company.  The prospectus supplement provides more material and detailed information on particular risks for the investor such as specifics on collateral characteristics, certificates and credit enhancement structure, parties involved in the securitization (underwriters, servicer, trustee, custodian, etc.).  See U.S. SECURITIES AND EXCHANGE COMMISSION, STAFF REPORT: ENHANCING DISCLOSURE IN THE MORTGAGE-BACKED SECURITIES MARKETS (January 2003), at 21, http://www.sec.gov/news/studies/mortgagebacked.htm.

[40]   Ian Giddy, Presentation on The Securitization Process, Stern School of Business, New York University, dated 2001, at 39–41, http://people.stern.nyu.edu/igiddy/ABS/absprocess.pdf.

[41]   NICOLA CETORELLI & STAVROS PERISTIANI, THE ROLE OF BANKS IN ASSET SECURITIZATION, FRBNY ECON. POL'Y REV., July 2012, at 49, http://www.newyorkfed.org/research/epr/12v18n2/1207peri.pdf.

[42]   *Id.*

[43]   *Id.*

[44]   *Id.*

[45]   Ian Giddy, Presentation on The Securitization Process, Stern School of Business, New York University, dated 2001, at 41, http://people.stern.nyu.edu/igiddy/ABS/absprocess.pdf.

[46]   The bond insurer's "internal" credit rating can differ from the "shadow" rating assigned by a rating agency. Both ratings represent the individual entities view of the credit risk associated with the securitization.

[47]   Ian Giddy, Presentation on The Securitization Process, Stern School of Business, New York University, dated 2001, at 41, http://people.stern.nyu.edu/igiddy/ABS/absprocess.pdf.

## Appendix VIII.B.1.b(3), Page 6 of 6

On the closing date, the documents are finalized and the rating letters, legal opinions, comfort letters,[48] etc., are delivered to all entities associated with the securitization.[49]  The securities are then transferred, directly or indirectly, from the sponsor to the depositor who deposits them into the trust, which issues the RMBS certificates on behalf of the depositor.[50]  The depositor sells the securities to the underwriter who markets them to investors.[51]  The certificates are sold in either public offerings or private placements, and the net proceeds are remitted to the sponsor.[52]

---

[48]  Letter provided by a public accounting firm which reports the results of an audit of the financial statements included in the registration statement. *See* AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS, COMFORT LETTER PROCEDURES RELATING TO CAPSULE FINANCIAL INFORMATION PRESENTED IN A REGISTRATION STATEMENT PRIOR TO THE ISSUANCE OF THE YEAR-END FINANCIAL STATEMENTS 5 (2005), http://www.thecaq.org/resources/secregs/pdfs/otherguidance/Comfort_Letter_Procedures.pdf.

[49]  Ian Giddy, Presentation on The Securitization Process, Stern School of Business, New York University, dated 2001, at 41, http://people.stern.nyu.edu/igiddy/ABS/absprocess.pdf.

[50]  *See* CONGRESSIONAL OVERSIGHT PANEL, NOVEMBER OVERSIGHT REPORT: EXAMINING THE CONSEQUENCES OF MORTGAGE IRREGULARITIES FOR FINANCIAL STABILITY AND FORECLOSURE MITIGATION (Nov. 16, 2010), at 14, http://www.gpo.gov/fdsys/pkg/CPRT-111JPRT61835/pdf/CPRT-111JPRT61835.pdf.

[51]  MOODY'S INVESTORS SERVICE, DEAL SPONSOR AND CREDIT RISK OF U.S. ABS AND MBS SECURITIES (Dec. 2006), at 5, http://www.moodys.com/sites/products/DefaultResearch/2006200000426039.pdf; s*ee also* CONGRESSIONAL OVERSIGHT PANEL, NOVEMBER OVERSIGHT REPORT: EXAMINING THE CONSEQUENCES OF MORTGAGE IRREGULARITIES FOR FINANCIAL STABILITY AND FORECLOSURE MITIGATION (Nov. 16, 2010), at 14, http://www.gpo.gov/fdsys/pkg/CPRT-111JPRT61835/pdf/CPRT-111JPRT61835.pdf.

[52]  COMPTROLLER OF THE CURRENCY ADMINISTRATION OF NATIONAL BANKS, ASSET SECURITIZATION, COMPTROLLER'S HANDBOOK (Nov. 1997), at 24, http://www.occ.gov/publications/publications-by-type/comptrollers-handbook/assetsec.pdf.

**Residential Capital, LLC, et al.**
**All or Substantially All Analysis**
**Book Value Analysis (Total Assets)**
December 31, 2008
*($ in Millions, rounded)*

| | | ResCap | | | | |
|---|---|---|---|---|---|---|
| | | **2009 Asset Reductions** | | | | |
| | **Book Value** | **Interco. Debt Forgiveness** | | **Sale of** | **Total** | **Pro Forma** |
| **Total Assets** | **12/31/2008** | **RFC** [1] | **GMAC Holding** [1] | **Ally Bank** | **Adjustments** | **12/31/2008** |
| Cash and cash equivalents | $ 563 | $ - | $ - | $ - | $ - | $ 563 |
| Accounts receivable | 49 | - | - | - | - | 49 |
| Intercompany loans receivable: | | | | | | |
| Note receivable from RFC | 3,042 | (1,495) | - | - | (1,495) | 1,547 |
| Note receivable from GMAC Holding | 2,610 | - | (2,520) | - | (2,520) | 90 |
| Subtotal | 5,651 | (1,495) | (2,520) | - | (4,015) | 1,636 |
| Investment in subsidiaries: | | | | | | |
| RFC Holding | 1,970 | - | - | - | - | 1,970 |
| GMAC Holding | 1,819 | - | - | - | - | 1,819 |
| Ally Bank | 1,829 | - | - | (1,829) | (1,829) | - |
| Other | 46 | - | - | - | - | 46 |
| Subtotal | 5,664 | - | - | (1,829) | (1,829) | 3,835 |
| Other assets | 495 | - | - | - | - | 495 |
| Total assets | $ 12,422 | $ (1,495) | $ (2,520) | $ (1,829) | $ (5,844) | $ 6,578 |

% Change in Assets    -47.0%

| | | ResCap | | | | |
|---|---|---|---|---|---|---|
| | | **2009 & 2010 Asset Reductions** | | | | |
| | **Book Value** | **Interco. Debt Forgiveness** | | **Sale of** | **Total** | **Pro Forma** |
| **Total Assets** | **12/31/2008** | **RFC** [1] | **GMAC Holding** [1] | **Ally Bank** | **Adjustments** | **12/31/2008** |
| Cash and cash equivalents | $ 563 | $ - | $ - | $ - | $ - | $ 563 |
| Accounts receivable | 49 | - | - | - | - | 49 |
| Intercompany loans receivable: | | | | | | |
| Note receivable from RFC | 3,042 | (2,110) | - | - | (2,110) | 932 |
| Note receivable from GMAC Holding | 2,610 | - | (2,520) | - | (2,520) | 90 |
| Subtotal | 5,651 | (2,110) | (2,520) | - | (4,630) | 1,021 |
| Investment in subsidiaries: | | | | | | |
| RFC Holding | 1,970 | - | - | - | - | 1,970 |
| GMAC Holding | 1,819 | - | - | - | - | 1,819 |
| Ally Bank | 1,829 | - | - | (1,829) | (1,829) | - |
| Other | 46 | - | - | - | - | 46 |
| Subtotal | 5,664 | - | - | (1,829) | (1,829) | 3,835 |
| Other assets | 495 | - | - | - | - | 495 |
| Total assets | $ 12,422 | $ (2,110) | $ (2,520) | $ (1,829) | $ (6,459) | $ 5,963 |

% Change in Assets    -52.0%

[1] Includes RFC and GMAC Holding subsidary intercompany receivables forgiven by ResCap.
Source: Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2009), at 215; ResCap HoldCo Balance Sheets Analysis, prepared by ResCap [EXAM00345975]; ResCap –
Intercompany Transactions – Draft Presentation, prepared by Morrison Foerster and FTI Consulting, dated Apr. 4, 2013 [EXAM00345894].

**Appendix VIII.C.6.c**, Page 2 of 4

Residential Capital, LLC, et al.
**All or Substantially All Analysis**
**Book Value Analysis (Operating Assets)**
December 31, 2008
*($ in Millions, rounded)*

| Operating Assets | Book Value 12/31/2008 | Interco. Debt Forgiveness RFC [1] | Interco. Debt Forgiveness GMAC Holding [1] | Sale of Ally Bank | Total Adjustments | Pro Forma 12/31/2008 |
|---|---|---|---|---|---|---|
| | | | **ResCap** | | | |
| | | | **2009 Asset Reductions** | | | |
| Intercompany loans receivable: | | | | | | |
| Note receivable from RFC | $ 3,042 | $ (1,495) | $ - | $ - | $ (1,495) | $ 1,547 |
| Note receivable from GMAC Holding | 2,610 | - | (2,520) | - | (2,520) | 90 |
| Subtotal | 5,651 | (1,495) | (2,520) | - | (4,015) | 1,636 |
| Investment in subsidiaries: | | | | | | |
| RFC Holding | 1,970 | - | - | - | - | 1,970 |
| GMAC Holding | 1,819 | - | - | - | - | 1,819 |
| Ally Bank | 1,829 | - | - | (1,829) | (1,829) | - |
| Other | 46 | - | - | - | - | 46 |
| Subtotal | 5,664 | - | - | (1,829) | (1,829) | 3,835 |
| Total operating assets | $ 11,315 | $ (1,495) | $ (2,520) | $ (1,829) | $ (5,844) | $ 5,471 |

% Change in Assets    -51.6%

| Operating Assets | Book Value 12/31/2008 | Interco. Debt Forgiveness RFC [1] | Interco. Debt Forgiveness GMAC Holding [1] | Sale of Ally Bank | Total Adjustments | Pro Forma 12/31/2008 |
|---|---|---|---|---|---|---|
| | | | **ResCap** | | | |
| | | | **2009 & 2010 Asset Reductions** | | | |
| Intercompany loans receivable: | | | | | | |
| Note receivable from RFC | $ 3,042 | $ (2,110) | $ - | $ - | $ (2,110) | $ 932 |
| Note receivable from GMAC Holding | 2,610 | - | (2,520) | - | (2,520) | 90 |
| Subtotal | 5,651 | (2,110) | (2,520) | - | (4,630) | 1,021 |
| Investment in subsidiaries: | | | | | | |
| RFC Holding | 1,970 | - | - | - | - | 1,970 |
| GMAC Holding | 1,819 | - | - | - | - | 1,819 |
| Ally Bank | 1,829 | - | - | (1,829) | (1,829) | - |
| Other | 46 | - | - | - | - | 46 |
| Subtotal | 5,664 | - | - | (1,829) | (1,829) | 3,835 |
| Total operating assets | $ 11,315 | $ (2,110) | $ (2,520) | $ (1,829) | $ (6,459) | $ 4,856 |

% Change in Assets    -57.1%

[1] Includes RFC and GMAC Holding subsidiary intercompany receivables forgiven by ResCap.
Source: Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2009), at 215; ResCap HoldCo Balance Sheets Analysis, prepared by ResCap [EXAM00345975]; ResCap – Intercompany Transactions – Draft Presentation, prepared by Morrison Foerster and FTI Consulting, dated Apr. 4, 2013 [EXAM00345894].

Appendix VIII.C.6.c, Page 3 of 4

**Residential Capital, LLC et al.**
**All or Substantially All Analysis**
**Fair Market Value Analysis (Total Assets)**
December 31, 2008
*($ in Millions, rounded)*

**ResCap**

| Total Assets | Book Value 12/31/2008 | FMV Adjustments [1] | FMV 12/31/2008 | 2009 Asset Reductions — Interco. Debt Forgiveness RFC [2] | GMAC Holding [2] | Sale of Ally Bank | Total Adjustments | Pro Forma 12/31/2008 |
|---|---|---|---|---|---|---|---|---|
| Cash and cash equivalents | $ 563 | $ - | $ 563 | $ - | $ - | $ - | $ - | $ 563 |
| Accounts receivable | 49 | | 49 | | | | | 49 |
| Intercompany loans receivable: | | | | | | | | |
| Note receivable from RFC | 3,042 | (3,042) | - | | | | | - |
| Note receivable from GMAC Holding | 2,610 | (2,610) | - | | | | | - |
| Subtotal | 5,651 | (5,651) | - | | | | | - |
| Investment in subsidiaries: | | | | | | | | |
| RFC Holding | 1,970 | (1,970) | - | | | | | - |
| GMAC Holding | 1,819 | (1,819) | - | | | | | - |
| Ally Bank [3] | 1,829 | (1,237) | 592 | | | (592) | (592) | - |
| Other | 46 | (46) | - | | | | | - |
| Subtotal | 5,664 | (5,072) | 592 | | | (592) | (592) | - |
| Other assets | 495 | - | 495 | | | | | 495 |
| Total assets | $ 12,422 | $ (10,723) | $ 1,699 | $ - | $ - | $ (592) | $ (592) | $ 1,107 |
| | | | | | | % Change in Assets | | -34.8% |

**ResCap**

| Total Assets | Book Value 12/31/2008 | FMV Adjustments [1] | FMV 12/31/2008 | 2009 & 2010 Asset Reductions — Interco. Debt Forgiveness RFC [2] | GMAC Holding [2] | Sale of Ally Bank | Total Adjustments | Pro Forma 12/31/2008 |
|---|---|---|---|---|---|---|---|---|
| Cash and cash equivalents | $ 563 | $ - | $ 563 | $ - | $ - | $ - | $ - | $ 563 |
| Accounts receivable | 49 | | 49 | | | | | 49 |
| Intercompany loans receivable: | | | | | | | | |
| Note receivable from RFC | 3,042 | (3,042) | - | | | | | - |
| Note receivable from GMAC Holding | 2,610 | (2,610) | - | | | | | - |
| Subtotal | 5,651 | (5,651) | - | | | | | - |
| Investment in subsidiaries: | | | | | | | | |
| RFC Holding | 1,970 | (1,970) | - | | | | | - |
| GMAC Holding | 1,819 | (1,819) | - | | | | | - |
| Ally Bank [3] | 1,829 | (1,237) | 592 | | | (592) | (592) | - |
| Other | 46 | (46) | - | | | | | - |
| Subtotal | 5,664 | (5,072) | 592 | | | (592) | (592) | - |
| Other assets | 495 | - | 495 | | | | | 495 |
| Total assets | $ 12,422 | $ (10,723) | $ 1,699 | $ - | $ - | $ (592) | $ (592) | $ 1,107 |
| | | | | | | % Change in Assets | | -34.8% |

[1] Fair-value adjustments made to ResCap's intercompany loans receivable and investment in subsidiaries balances. See Section VI.E.2. Remaining assets assumed to equal book value for purposes of this analysis.
[2] Includes RFC and GMAC Holding subsidiary intercompany receivables forgiven by ResCap.
[3] For purposes of this analysis, the midpoint of the range of value for the IB Finance Preferred Interests and the remaining IB Finance Class M Shares (non-marketable, non-controlling) at January 30, 2009 was utilized. See Appendix V.A.2.d.(6).
Source: Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2009), at 215; ResCap HoldCo Balance Sheets Analysis, prepared by ResCap [EXAMN0345975]; ResCap – Intercompany Transactions – Draft Presentation, prepared by Morrison Foerster and FTI Consulting, dated Apr. 4, 2013 [EXAMN0345894].

Appendix VIII.C.6.c, Page 3 of 4

Appendix VIII.C.6.c, Page 4 of 4

**Residential Capital, LLC, et al.**
**All or Substantially All Analysis**
**Fair Market Value Analysis (Operating Assets)**
December 31, 2008
*($ in Millions, rounded)*

| Operating Assets | Book Value 12/31/2008 | FMV Adjustments (1) | FMV 12/31/2008 | ResCap 2009 Asset Reductions — Interco. Debt Forgiveness — RFC (2) | ResCap 2009 Asset Reductions — Interco. Debt Forgiveness — GMAC Holding (2) | Sale of Ally Bank | Total Asset Adjustments | Pro Forma 12/31/2008 |
|---|---|---|---|---|---|---|---|---|
| Intercompany loans receivable: | | | | | | | | |
| Note receivable from RFC | $ 3,042 | $ (3,042) | $ - | $ - | $ - | $ - | $ - | $ - |
| Note receivable from GMAC Holding | 2,610 | (2,610) | - | - | - | - | - | - |
| Subtotal | 5,651 | (5,651) | - | | | | | |
| Investment in subsidiaries: | | | | | | | | |
| RFC Holding | 1,970 | (1,970) | - | - | - | - | - | - |
| GMAC Holding | 1,819 | (1,819) | - | - | - | - | - | - |
| Ally Bank (3) | 1,829 | (1,237) | 592 | - | - | (592) | (592) | - |
| Other | 46 | (46) | - | - | - | - | - | - |
| Subtotal | 5,664 | (5,072) | 592 | - | - | (592) | (592) | - |
| Total operating assets | $ 11,315 | $ (10,723) | $ 592 | $ - | $ - | $ (592) | $ (592) | $ - |
| | | | | | | % Change in Assets | | -100.0% |

| Operating Assets | Book Value 12/31/2008 | FMV Adjustments (1) | FMV 12/31/2008 | ResCap 2009 & 2010 Asset Reductions — Interco. Debt Forgiveness — RFC (2) | ResCap 2009 & 2010 Asset Reductions — Interco. Debt Forgiveness — GMAC Holding (2) | Sale of Ally Bank | Total Asset Adjustments | Pro Forma 12/31/2008 |
|---|---|---|---|---|---|---|---|---|
| Intercompany loans receivable: | | | | | | | | |
| Note receivable from RFC | $ 3,042 | $ (3,042) | $ - | $ - | $ - | $ - | $ - | $ - |
| Note receivable from GMAC Holding | 2,610 | (2,610) | - | - | - | - | - | - |
| Subtotal | 5,651 | (5,651) | - | | | | | |
| Investment in subsidiaries: | | | | | | | | |
| RFC Holding | 1,970 | (1,970) | - | - | - | - | - | - |
| GMAC Holding | 1,819 | (1,819) | - | - | - | - | - | - |
| Ally Bank (3) | 1,829 | (1,237) | 592 | - | - | (592) | (592) | - |
| Other | 46 | (46) | - | - | - | - | - | - |
| Subtotal | 5,664 | (5,072) | 592 | - | - | (592) | (592) | - |
| Total operating assets | $ 11,315 | $ (10,723) | $ 592 | $ - | $ - | $ (592) | $ (592) | $ - |
| | | | | | | % Change in Assets | | -100.0% |

(1) *Fair-value adjustments made to ResCap's intercompany loans receivable and investment in subsidiaries balances. See Section VI.E.2.*
(2) *Includes RFC and GMAC Holding subsidiary intercompany receivables forgiven by ResCap.*
(3) *For purposes of this analysis, the midpoint of the range of value for the IB Finance Preferred Interests and the remaining IB Finance Class M Shares (non-marketable, non-controlling) at January 30, 2009 was utilized. See Appendix V.A.2.d.(6).*
*Source: Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2009), at 215; ResCap Hold Co Balance Sheets Analysis, prepared by ResCap [EXAM00345975]; ResCap – Intercompany Transactions – Draft Presentation, prepared by Morrison Foerster and FTI Consulting, dated Apr. 4, 2013 [EXAM00345894].*

# Appendix VIII.D.1, Page 1 of 2

**Alleged RMBS Claims Damages**
*($ in Millions)*

| RMBS Claims | |
|---|---|
| **Party/Action** | **Damages** |
| AIG, Allstate, MassMutual, and Prudential | $1,500.0 [1] |
| Assured Guaranty Municipal Corp. | $80.2 [2] |
| Cambridge Place Investment Management | $39.1 [3] |
| FDIC (in its capacity as receiver for Citizens National Bank, Strategic Capital Bank, Colonial Bank, and Guaranty Bank) | Undisclosed [4] |
| Federal Home Loan Bank of Boston | $153.2 |
| Federal Home Loan Bank of Indianapolis | $23.0 |
| Federal Home Loan Bank of Chicago | $75.3 [5] |
| FHFA | Undisclosed [6] |
| FGIC | $1,850.0 [7] |
| Huntington Bancshares | $58.5 [8] |
| John Hancock Life Insurance | $138.0 [9] |
| MBIA Insurance Company | $2,000.0 [10] |
| National Credit Union Administration Board, as liquidating agent of U.S. Central Federal Credit Union and Western Corporate Federal Credit Union | $293.0 [11] |
| New Jersey Carpenters Health Fund and New Jersey Carpenters Vacation Fund | Undisclosed |
| Stichting Pensioenfonds ABP | $25.2 [12] |
| The Union Central Life Insurance Company | $30.8 [13] |
| West Virginia Investment Management Board | $9.2 [14] |
| Plaintiffs in Western & Southern Life Ins. Co. v. RFC, No. A1105042 (Ohio C.P.) | $30.0 [15] |
| **Total** | **$6,305.5 [16]** |

[1] AIG, Allstate, MassMutual and Prudential Joint Submission Paper, dated Oct. 17, 2012, at 1.

[2] Damages Letter from J. Buchwald (Jan. 3, 2013).

[3] Proof of Claim No. 5305, filed Nov. 16, 2012 [Case No. 12-12051]; Proof of Claim No. 12-12052] [Case No. 12-12053].

[4] Damages Letter from K. Matthews (Feb. 6, 2013). The FDIC declined the Examiner's Professionals' request for damages information, in part, because the "FDIC-Receivers intend to object to any provision in the Debtors' plan that attempts to bar them from proceeding with their claims against Ally Securities or any non-debtor affiliate" under 12 U.S.C. § 1821(d). Id. at 2.

[5] Federal Home Loan Banks of Boston, Chicago, and Indianapolis Joint Submission Paper, dated Oct. 19, 2012, at 34.

[6] FHFA Letter, dated Oct. 12, 2012, at 2. The FHFA declined to provide information regarding its damages, stating that "any plan that attempts to impose nonconsensual releases on FHFA would be seeking relief prohibited by applicable non-bankruptcy law and, thus, would be unconfirmable." Id.

[7] Proof of Claim No. 4868, filed Nov. 16, 2012 [Case No. 12-12019]; Proof of Claim No. 4870, filed Nov. 16, 2012 [Case No. 12-12020]; Proof of Claim No. 4871, filed Nov. 16, 2012 [Case No. 12-12032];

[8] Damages Letter from M. Morris (Oct. 25, 2012), at 3.

[9] Damages Letter from M. Morris (Oct. 25, 2012), at 3.

[10] MBIA Submission Paper, dated Nov. 9, 2012, at 1. MBIA alleges that it is "entitled to rescissory damages in excess of $2 billion arising from its fraudulent inducement claims against the Debtors for which the Ally Defendants are jointly and severally liable." See id. at 34. Consistent with the Examiner Scope Approval Order, the Investigation has not attempted to independently quantify MBIA's damages and therefore the Examiner offer's no conclusion with respect to the proper basis of calculating MBIA's damages.

[11] Proof of Claim No. 2626, filed Nov. 8, 2012 [Case No. 12-12052]; Proof of Claim No. 2627, filed Nov. 8, 2012 [Case No. 12-12052]; Proof of Claim No. 2628, filed Nov. 8, 2012 [Case No. 12-12052]; Proof of Claim No. 2629, filed Nov. 8, 2012 [Case No. 12-12052]; Proof of Claim No. 2630, filed Nov. 8, 2012 [Case No. 12-12052]; Proof of Claim No. 2631, filed Nov. 8, 2012 [Case No. 12-12052]; Proof of Claim No. 2632, filed Nov. 8, 2012 [Case No. 12-12052]; Proof of Claim No. 2633, filed Nov. 8, 2012 [Case No. 12-12052]; Proof of Claim No. 2634, filed Nov. 8, 2012 [Case No. 12-12052]; Proof of Claim No. 2635, filed Nov. 8, 2012 [Case No. 12-12061]; Proof of Claim No. 2636, filed Nov. 8, 2012 [Case No. 12-12052]. The NCUAB has not asserted claims directly against the AFI Defendants, but it has asserted similar fraud-based claims against the Debtors. See Compl., Natl Credit Union Admin. Bd. v. Goldman, Sachs & Co., Case No. 11-06521, Docket No. 1 (C.D. Cal. Aug. 9, 2011); Compl., Natl Credit Union Admin. Bd. v. RBS Sec. Inc., Case No. 11-02340, Docket No. 1 (D. Kan. June 20, 2011).

[12] Damages Letter from M. Morris (Oct. 25, 2012), at 3.

[13] Proof of Claim No. 4813, filed Nov. 16, 2012 [Case No. 12-12052]; Proof of Claim No. 4814, filed Nov. 16, 2012 [Case No. 12-12019]; Proof of Claim No. 4815, filed Nov. 16, 2012 [Case No. 12-12020]

[14] Damages Letter from K. Mayer (Oct. 4, 2012) [Case No. 12-12019]; The West Virginia Investment Management Board estimate of $92 million is based on a recission damages theory. Id at 2-3. Plaintiffs assert that if their damages are calculated using a benefit-of-the-bargain method, they have damages of approximately $5.6 million. Id. at 3.

[15] Damages Letter from S. Fitzgerald (Jan. 9, 2013), at 2.

[16] Plus undisclosed and unliquidated amounts.

**Alleged Non-RMBS and Unsecured Noteholder Damages**
*($ in Millions)*

| Non-RMBS Claims | | Unsecured Noteholder Causes of Action | |
| --- | --- | --- | --- |
| Party/Action | Damages | Party/Action | Damages |
| Plaintiffs in Abraham v. Am. Home Mortg. Serv., No. 12-4686 (E.D.N.Y.) and Kelly v. Am. Home Mortg. Serv., No. 12-6240 (E.D.N.Y.) | Undisclosed [17] | Wilmington Trust, solely in its capacity as Indenture Trustee to the Unsecured Notes | $1,000.0 [25] |
| Plaintiffs in Bollinger v. Residential Capital LLC, No. C10-1123 (W.D. Wash.) | $6.2 [18] | Total | $1,000.0 |
| Plaintiffs in Donaldson v. GMAC Mortgage, No. SU-CV-3359-D (Super. Ct. Ga.), Chatman v. GMAC Mortgage, No. CV 2008-900015 (Cir. Ct. Ala.), and Robinson v. Homecomings Financial, No. CV 2008-9000007 (Cir. Ct. Ala.) | Undisclosed [19] | | |
| Plaintiffs in Rothstein v. GMAC Mortgage, No. 12-3412 (S.D.N.Y.) | $971.0 [20] | | |
| William and Eileen White | $0.3 [21] | | |
| Plaintiffs in Dennis v. Homecomings Fin., LLC, No. 11-00066 (D. Wyo.) | $0.0 [22] | | |
| Plaintiffs in Lafitte v. Ally Fin. Inc., No. 10-2820 (D.S.C.) | >$5.0 [23] | | |
| Total | $982.5 [24] | | |

[17] *Damages Letter from P. Berwick (Jan. 2, 2013). The plaintiffs in Abraham and Kelly declined the Examiner's Professionals' request for damages information because they felt that the request was prejudicial to their litigation interests and they objected "to the possible release of Plaintiff's claims when they are not party to the bankruptcy as, inter alia, ALLY has not filed for bankruptcy; there has been no valid subpoena seeking information, and there has been no Order from the U.S. District Court for the Eastern District of New York." Id. at 2.*

[18] *Damages Letter from M. Helland (Jan. 4, 2013), at Ex. 1.*

[19] *Damages Letter from N. Armstrong (Jan. 21, 2013). The plaintiffs in Donaldson, Chatman, and Robinson informed the Examiner's Professionals that "[g]iven the putative class nature, and the status of discovery, [they] are unable to provide a quantification of damages at this time." Id. at 1.*

[20] *Damages Letter from M. Strauss (Jan. 11, 2013), at 1.*

[21] *Damages Letter from A. Katunich (Jan. 4, 2013), at 5*

[22] *Proof of Claim No. 2327, filed Nov. 5, 2012 (Case No. 12-12032)*

[23] *See Notice of Removal, Lafitte v. Ally Fin. Case No. 10-02820, Docket No. 1, at 4 (D.S.C. Nov. 1, 2010) (Plaintiffs pleading at least $5.0 million threshold under Class Action Fairness Act).*

[24] *Plan undisclosed and unliquidated amounts.*

[25] *See Wilmington Trust Submission Paper, dated Mar. 8, 2013, at 32.*

Appendix X, Page 1 of 10

List of Complete Citations for Exhibits With Truncated Citations

| Exhibit Number | Bates Number | Citation |
|---|---|---|
| III.J.3.c—1 | EXAM00176483 | FTI Presentation to the Board of Residential Capital, LLC, dated Apr. 5, 2012, at 5 [EXAM00176483]. |
| III.J.3.c—1 | EXAM00128214 | Notes of P. West (Apr. 5, 2012), at EXAM00128218 [EXAM00128214]. |
| III.J.3.c—1 | RC40020521 | Draft Settlement Agreement, dated Apr. 30, 2012, at RC40020541 [RC40020521]. |
| III.J.3.c—1 | RCES00001556 | See E-mail from T. Goren (May 3, 2012) [RCES00001556]. |
| III.J.3.c—1 | RCES00001573 | Blackline Draft Settlement Agreement, dated May 3, 2012, at 6 [RCES00001573]. |
| III.J.3.c—1 | ALLY_0334556 | E-mail from G. Lee to T. Devine (May 4, 2012) [ALLY_0334556]. |
| III.J.3.c—1 | EXAM00002973 | E-mail from T. Marano to M. Carpenter (May 6, 2012) [EXAM00002973]. |
| III.J.3.c—1 | CCM00444794 | Evercore, Kirkland & Ellis, and Mayer Brown Project Rodeo Discussion Materials, dated Apr. 4, 2012, at CCM00444815; CCM00444842 [CCM00444794]. |
| III.J.3.c—1 | CCM00449220 | E-mail from N. Ornstein to L. Nashelsky and G. Lee (May 2, 2012) [CCM00449220]. |
| III.J.3.c—1 | CCM00449236 | Blackline Draft Settlement Agreement, dated May 2, 2012, at 6 [CCM00449236] (attached to E-mail from N. Ornstein to L. Nashelsky and G. Lee (May 2, 2012) [CCM00449220]). |
| III.J.3.c—1 | RCES00001506 | E-mail from M. Meltzer to L. Nashelsky and G. Lee (May 4, 2012) [RCES00001506]). |
| III.J.3.c—1 | RCES00001523 | Draft Settlement Agreement, dated May 4, 2012, at 6 [RCES00001523] (attached to E-mail from M. Meltzer to L. Nashelsky and G. Lee (May 4, 2012) [RCES00001506]). |
| III.J.3.c—1 | ALLY_0021383 | E-mail from L. Nashelsky to R. Schrock (May 5, 2012) [ALLY_0021383]. |
| III.J.3.c—1 | RCES00002361 | E-mail from A. Grossi to L. Nashelsky, J. Tanenbaum, and G. Lee (Apr. 19, 2012) [RCES00002361]. |
| III.J.3.c—1 | RCES00002362 | Summary Discussion of Ally Financial Inc. Support For a ResCap Chapter 11 Plan of Reorganization, dated Apr. 19, 2012, at 1 [RCES00002362] (attached to E-mail from A. Grossi to L. Nashelsky, J. Tanenbaum, and G. Lee (Apr. 19, 2012) [RCES00002361]). |
| III.J.4.d—4 | EXAM00176409 | Centerview and FTI Discussion Materials Presentation, dated Apr. 25, 2012, at 7-11 [EXAM00176409]. |
| III.J.4.d—4 | EXAM00176337 | Centerview and FTI Discussion Materials Presentation, dated May 2, 2012, at 7-11 [EXAM00176337]. |
| III.J.4.d—4 | EXAM00178949 | Centerview and FTI Discussion Materials Presentation, dated May 3, 2012, at 7-11 [EXAM00178949]. |
| III.J.4.d—4 | CCM00565465 | E-mail from T. Devine to M. Carpenter (May 8, 2012), at CCM00565465 [CCM00565465]. |
| III.J.4.d—4 | EXAM00176421 | Centerview and FTI Discussion Materials Presentation, dated May 7, 2012, at 7-9 [EXAM00176421] (attached to E-mail from M. Renzi to G. Lee and T. Devine (May 8, 2012) [EXAM00176420]). |
| III.J.4.d—4 | EXAM00176548 | Centerview and FTI Discussion Materials Presentation, dated May 9, 2012, at 3-4 [EXAM00176548]. |
| III.J.4.d—4 | EXAM00180187 | E-mail from K. Patrick to G. Lee (May 7, 2012) [EXAM00180187]. |
| III.J.4.d—4 | N/A | Int. of K. Patrick, Mar. 18, 2013, at 94:9-95:19, 172:8-177:4. |
| V.B.12.a()—1 | EXAM00344891 | Bank Flow HFI Portfolio, dated Jan. 2008 [EXAM00344891]. |
| V.B.12.a()—1 | EXAM00344892 | Bank Flow HFI Portfolio, dated May 2007 [EXAM00344892]. |
| V.B.12.a()—1 | EXAM00344893 | Bank Flow HFI Portfolio, dated Nov. 2007 [EXAM00344893]. |
| V.B.12.a()—1 | EXAM00344894 | Bank Flow HFI Portfolio, dated Feb. 2008 [EXAM00344894]. |
| V.B.12.a()—1 | EXAM00344895 | Bank Flow HFI Portfolio, dated Dec. 2007 [EXAM00344895]. |
| V.B.12.a()—1 | EXAM00344896 | Bank Flow HFI Portfolio, dated Sep. 2007 [EXAM00344896]. |
| V.B.12.a()—1 | EXAM00344897 | Bank HFI Swap [EXAM00344897]. |
| V.B.12.a()—1 | EXAM00344898 | Bank Flow HFI Portfolio, dated Oct. 2007 [EXAM00344898]. |
| V.B.12.a()—1 | EXAM00344899 | Bank Flow HFI Portfolio, dated Aug. 2007 [EXAM00344899]. |
| V.B.12.a()—1 | EXAM00344900 | Bank Flow HFI Portfolio, dated Mar. 2008 [EXAM00344900]. |
| V.B.12.a()—1 | EXAM00344901 | Bank Flow HFI Portfolio, dated June 2007 [EXAM00344901]. |
| V.B.12.a()—1 | EXAM00344902 | Bank Flow HFI Portfolio, dated July 2007 [EXAM00344902]. |
| V.B.12.a(2) | EXAM00338641 | 2006 Monthly Sum of Sum [EXAM00338641]. |
| V.B.12.a(2) | EXAM00338642 | 2007 Monthly Sum of Sum [EXAM00338642]. |

Appendix X, Page 1 of 10

List of Complete Citations for Exhibits With Truncated Citations

| Exhibit Number | Bates Number | Citation |
|---|---|---|
| V.B.12.a(2) | EXAM00338643 | 2008 Monthly Sum of Sum [EXAM00338643]. |
| V.B.12.a(2) | EXAM00338644 | 2009 Monthly Sum of Sum [EXAM00338644]. |
| V.B.12.a(2) | EXAM00338645 | 2010 Monthly Sum of Sum [EXAM00338645]. |
| V.B.12.a(2) | EXAM00338646 | 2011 Monthly Sum of Sum [EXAM00338646]. |
| V.B.12.a(2) | EXAM00338647 | 2012 Monthly Sum of Sum [EXAM00338647]. |
| V.B.12.a(2) | N/A | Meeting with J. Whitlinger in Ft. Washington, PA (Mar. 29, 2013). |
| V.B.12.b(1)—7 | EXAM00232592 | MSR Rollforward YTD 2011, dated Dec. 31, 2011 [EXAM00232592]. |
| V.B.12.b(1)—7 | EXAM00233968 | MSR ARB Interest Expense Allocation, dated Mar. 31, 2012 [EXAM00233968]. |
| V.B.12.b(1)—7 | N/A | Ally Financial Inc., Quarterly Report (Form 10-Q) (May 6, 2011), at 32, 34. |
| V.B.12.b(1)—7 | N/A | Ally Financial Inc., Quarterly Report (Form 10-Q) (Aug. 9, 2011), at 33, 35. |
| V.B.12.b(1)—7 | N/A | Ally Financial Inc., Quarterly Report (Form 10-Q) (Nov. 4, 2011), at 35, 37. |
| V.B.12.b(1)—7 | N/A | Ally Financial Inc., Annual Report (Form 10-K) (Feb. 28, 2012), at 62, 168. |
| V.B.12.b(1)—7 | N/A | Ally Financial Inc., Quarterly Report (Form 10-Q) (Apr. 27, 2012), at 33. |
| V.B.12.b(1)—7 | N/A | Bank of America Corporation, Quarterly Report (Form 10-Q) (May 5, 2011), at 33, 120. |
| V.B.12.b(1)—7 | N/A | Bank of America Corporation, Quarterly Report (Form 10-Q) (Aug. 4, 2011), at 39, 129. |
| V.B.12.b(1)—7 | N/A | Bank of America Corporation, Quarterly Report (Form 10-Q) (Nov. 3, 2011), at 43,144. |
| V.B.12.b(1)—7 | N/A | Bank of America Corporation, Annual Report (Form 10-K) (Feb. 23, 2012), at 46, 154. |
| V.B.12.b(1)—7 | N/A | Bank of America Corporation, Quarterly Report (Form 10-Q) (May 3, 2012), at 34, 122. |
| V.B.12.b(1)—7 | N/A | JP Morgan Chase & Co., Quarterly Report (Form 10-Q) (May 6, 2011), at 150. |
| V.B.12.b(1)—7 | N/A | JP Morgan Chase & Co., Quarterly Report (Form 10-Q) (Aug. 9, 2011), at 161. |
| V.B.12.b(1)—7 | N/A | JP Morgan Chase & Co., Quarterly Report (Form 10-Q) (Nov. 8, 2011), at 170. |
| V.B.12.b(1)—7 | N/A | JP Morgan Chase & Co., Annual Report (Form 10-K) (Feb. 29, 2012), at 269. |
| V.B.12.b(1)—7 | N/A | JP Morgan Chase & Co., Quarterly Report (Form 10-Q) (May 10, 2012), at 145. |
| V.B.12.b(1)—7 | N/A | Citigroup Inc., Quarterly Report (Form 10-Q) (May 5, 2011), at 132. |
| V.B.12.b(1)—7 | N/A | Citigroup Inc., Quarterly Report (Form 10-Q) (Aug. 5, 2011), at 152. |
| V.B.12.b(1)—7 | N/A | Citigroup Inc., Quarterly Report (Form 10-Q) (Nov. 4, 2011), at 153. |
| V.B.12.b(1)—7 | N/A | Citigroup Inc., Annual Report (Form 10-K) (Feb. 24, 2012), at 224. |
| V.B.12.b(1)—7 | N/A | Citigroup Inc., Quarterly Report (Form 10-Q) (May. 4, 2012), at 143. |
| V.B.12.b(1)—7 | N/A | Wells Fargo & Co., Quarterly Report (Form 10-Q) (May 6, 2011), at 93–94. |
| V.B.12.b(1)—7 | N/A | Wells Fargo & Co., Quarterly Report (Form 10-Q) (Aug. 5, 2011), at 115–116. |
| V.B.12.b(1)—7 | N/A | Wells Fargo & Co., Quarterly Report (Form 10-Q) (Nov. 6, 2011), at 109–110. |
| V.B.12.b(1)—7 | N/A | Wells Fargo & Co., Annual Report (Form 10-K) (Feb. 28, 2012), at 171–172. |
| V.B.12.b(1)—7 | N/A | Wells Fargo & Co., Quarterly Report (Form 10-Q) (May 8, 2012), at 96–97. |
| V.B.12.b(1)—7 | N/A | U.S. Bancorp, Quarterly Report (Form 10-Q) (May 6, 2011), at 42. |
| V.B.12.b(1)—7 | N/A | U.S. Bancorp, Quarterly Report (Form 10-Q) (Aug. 8, 2011), at 47. |
| V.B.12.b(1)—7 | N/A | U.S. Bancorp, Quarterly Report (Form 10-Q) (Nov. 4, 2011), at 52. |
| V.B.12.b(1)—7 | N/A | U.S. Bancorp, Annual Report (Form 10-K) (Feb. 23, 2012), at 94–95. |
| V.B.12.b(1)—7 | N/A | U.S. Bancorp, Quarterly Report (Form 10-Q) (May 7, 2012), at 49–50. |
| V.B.12.b(1)—7 | N/A | The PNC Financial Services Group, Inc., Quarterly Report (Form 10-Q) (May 9, 2011), at 116. |
| V.B.12.b(1)—7 | N/A | The PNC Financial Services Group, Inc., Quarterly Report (Form 10-Q) (Aug. 8, 2011), at 140. |
| V.B.12.b(1)—7 | N/A | The PNC Financial Services Group, Inc., Quarterly Report (Form 10-Q) (Nov. 8, 2011), at 140. |
| V.B.12.b(1)—7 | N/A | The PNC Financial Services Group, Inc., Annual Report (Form 10-K) (Feb. 29, 2012), at 160. |
| V.B.12.b(1)—7 | N/A | The PNC Financial Services Group, Inc., Quarterly Report (Form 10-Q) (May 9, 2012), at 116. |

12-12020-mg   Doc 3698-36   Filed 05/13/13   Entered 05/13/13 18:13   Appendix
Pg 378 of 385
Case 12-11668-3TD   Doc 6139-13   Filed 02/03/23   Page 702 of 709

Appendix X, Page 3 of 10

**List of Complete Citations for Exhibits With Truncated Citations**

| Exhibit Number | Bates Number | Citation |
|---|---|---|
| V.B.12.b(1)—7 | N/A | SunTrust Banks, Inc., Quarterly Report (Form 10-Q) (May 6, 2011), at 20. |
| V.B.12.b(1)—7 | N/A | SunTrust Banks, Inc., Quarterly Report (Form 10-Q) (Aug. 9, 2011), at 20–21. |
| V.B.12.b(1)—7 | N/A | SunTrust Banks, Inc., Quarterly Report (Form 10-Q) (Nov. 4, 2011), at 24. |
| V.B.12.b(1)—7 | N/A | SunTrust Banks, Inc., Annual Report (Form 10-K) (Feb. 24, 2012), at 130–131. |
| V.B.12.b(1)—7 | N/A | SunTrust Banks, Inc., Quarterly Report (Form 10-Q) (May, 4, 2012), at 23. |
| V.B.12.b(1)—8 | EXAM00232592 | MSR Rollforward YTD 2011, dated Dec. 31, 2011 [EXAM00232592]. |
| V.B.12.b(1)—8 | EXAM00233968 | MSR ARB Interest Expense Allocation, dated Mar. 31, 2012 [EXAM00233968]. |
| V.B.12.b(1)—8 | N/A | Ally Financial Inc., Quarterly Report (Form 10-Q) (May 6, 2011), at 32, 34. |
| V.B.12.b(1)—8 | N/A | Ally Financial Inc., Quarterly Report (Form 10-Q) (Aug. 9, 2011), at 33, 35. |
| V.B.12.b(1)—8 | N/A | Ally Financial Inc., Quarterly Report (Form 10-Q) (Nov. 4, 2011), at 35, 37. |
| V.B.12.b(1)—8 | N/A | Ally Financial Inc., Annual Report (Form 10-K) (Feb. 28, 2012), at 62, 168. |
| V.B.12.b(1)—8 | N/A | Ally Financial Inc., Quarterly Report (Form 10-Q) (Apr. 27, 2012), at 33. |
| V.B.12.b(1)—8 | N/A | Bank of America Corporation, Quarterly Report (Form 10-Q) (May 5, 2011), at 33, 120. |
| V.B.12.b(1)—8 | N/A | Bank of America Corporation, Quarterly Report (Form 10-Q) (Aug. 4, 2011), at 39, 129. |
| V.B.12.b(1)—8 | N/A | Bank of America Corporation, Quarterly Report (Form 10-Q) (Nov. 3, 2011), at 43,144. |
| V.B.12.b(1)—8 | N/A | Bank of America Corporation, Annual Report (Form 10-K) (Feb. 23, 2012), at 46, 154. |
| V.B.12.b(1)—8 | N/A | Bank of America Corporation, Quarterly Report (Form 10-Q) (May 3, 2012), at 34, 122. |
| V.B.12.b(1)—8 | N/A | JP Morgan Chase & Co., Quarterly Report (Form 10-Q) (May 6, 2011), at 150. |
| V.B.12.b(1)—8 | N/A | JP Morgan Chase & Co., Quarterly Report (Form 10-Q) (Aug. 9, 2011), at 161. |
| V.B.12.b(1)—8 | N/A | JP Morgan Chase & Co., Quarterly Report (Form 10-Q) (Nov. 8, 2011), at 170. |
| V.B.12.b(1)—8 | N/A | JP Morgan Chase & Co., Annual Report (Form 10-K) (Feb. 29, 2012), at 269. |
| V.B.12.b(1)—8 | N/A | JP Morgan Chase & Co., Quarterly Report (Form 10-Q) (May 10, 2012), at 145. |
| V.B.12.b(1)—8 | N/A | Citigroup Inc., Quarterly Report (Form 10-Q) (May 5, 2011), at 132. |
| V.B.12.b(1)—8 | N/A | Citigroup Inc., Quarterly Report (Form 10-Q) (Aug. 5, 2011), at 152. |
| V.B.12.b(1)—8 | N/A | Citigroup Inc., Quarterly Report (Form 10-Q) (Nov. 4, 2011), at 153. |
| V.B.12.b(1)—8 | N/A | Citigroup Inc., Annual Report (Form 10-K) (Feb. 24, 2012), at 224. |
| V.B.12.b(1)—8 | N/A | Citigroup Inc., Quarterly Report (Form 10-Q) (May 4, 2012), at 143. |
| V.B.12.b(1)—8 | N/A | Wells Fargo & Co., Quarterly Report (Form 10-Q) (May 6, 2011), at 93–94. |
| V.B.12.b(1)—8 | N/A | Wells Fargo & Co., Quarterly Report (Form 10-Q) (May, 5, 2011), at 115–116. |
| V.B.12.b(1)—8 | N/A | Wells Fargo & Co., Quarterly Report (Form 10-Q) (Nov. 6, 2011), at 109–110. |
| V.B.12.b(1)—8 | N/A | Wells Fargo & Co., Annual Report (Form 10-K) (Feb. 28, 2012), at 171–172. |
| V.B.12.b(1)—8 | N/A | Wells Fargo & Co., Quarterly Report (Form 10-Q) (May 8, 2012), at 96–97. |
| V.B.12.b(1)—8 | N/A | U.S. Bancorp, Quarterly Report (Form 10-Q) (May 6, 2011), at 42. |
| V.B.12.b(1)—8 | N/A | U.S. Bancorp, Quarterly Report (Form 10-Q) (Aug. 8, 2011), at 47. |
| V.B.12.b(1)—8 | N/A | U.S. Bancorp, Quarterly Report (Form 10-Q) (Nov. 4, 2011), at 52. |
| V.B.12.b(1)—8 | N/A | U.S. Bancorp, Annual Report (Form 10-K) (Feb. 23, 2012), at 94–95. |
| V.B.12.b(1)—8 | N/A | U.S. Bancorp, Quarterly Report (Form 10-Q) (May 7, 2012), at 49–50. |
| V.B.12.b(1)—8 | N/A | The PNC Financial Services Group, Inc., Quarterly Report (Form 10-Q) (May 9, 2011), at 116. |
| V.B.12.b(1)—8 | N/A | The PNC Financial Services Group, Inc., Quarterly Report (Form 10-Q) (Aug. 8, 2011), at 140. |
| V.B.12.b(1)—8 | N/A | The PNC Financial Services Group, Inc., Quarterly Report (Form 10-Q) (Nov. 6, 2011), at 140. |
| V.B.12.b(1)—8 | N/A | The PNC Financial Services Group, Inc., Annual Report (Form 10-K) (Feb. 29, 2012), at 160. |
| V.B.12.b(1)—8 | N/A | The PNC Financial Services Group, Inc., Quarterly Report (Form 10-Q) (May 9, 2012), at 116. |
| V.B.12.b(1)—8 | N/A | SunTrust Banks, Inc., Quarterly Report (Form 10-Q) (May 6, 2011), at 20. |

Appendix X, Page 4 of 10

List of Complete Citations for Exhibits With Truncated Citations

| Exhibit Number | Bates Number | Citation |
|---|---|---|
| V.B.12.b(1)—8 | N/A | SunTrust Banks, Inc., Quarterly Report (Form 10-Q) (Aug. 9, 2011), at 20–21. |
| V.B.12.b(1)—8 | N/A | SunTrust Banks, Inc., Quarterly Report (Form 10-Q) (Nov. 4, 2011), at 24. |
| V.B.12.b(1)—8 | N/A | SunTrust Banks, Inc., Annual Report (Form 10-K) (Feb. 24, 2012), at 130–131. |
| V.B.12.b(1)—8 | N/A | SunTrust Banks, Inc., Quarterly Report (Form 10-Q) (May, 4, 2012), at 23. |
| V.B.12.b(1)—8 | EXAM00231553 | GMAC Mortgage Corporation Consolidated Financial Statements as of and for the years ended December 31, 2005 and 2004 (Restated), at 2, 52 [EXAM00231553]. |
| V.B.12.b(1)—8 | EXAM00232043 | GMAC Mortgage, LLC Consolidated Financial Statements, as of and for the years ended December 31, 2007 and 2006, at 2 [EXAM00232043]. |
| V.B.12.b(1)—8 | EXAM00234189 | GMAC Mortgage, LLC Consolidated Financial Statements, as of and for the years ended December 31, 2009 and 2008, at 5 [EXAM00234189]. |
| V.B.12.b(1)—8 | EXAM00234281 | GMAC Mortgage, LLC Consolidated Financial Statements, as of and for the years ended December 31, 2011 and 2010, at 5 [EXAM00234281]. |
| V.B.12.b(1)—8 | RC00034535 | GMAC Bank Consolidated Financial Statements as of December 31, 2008 and 2007, at 2 [RC00034535]. |
| V.B.12.b(1)—8 | EXAM00231149 | Residential Funding Corporation Consolidated Financial Statements for the Years Ended December 31, 2004 and 2003 (Restated), at 2 [EXAM00231149]. |
| V.B.12.b(1)—8 | EXAM00231642 | Residential Funding Company, LLC Consolidated Financial Statements for the Years Ended December 31, 2006 and 2005, at 2 [EXAM00231642]. |
| V.B.12.b(1)—8 | EXAM00124988 | Residential Funding Company, LLC Consolidated Financial Statements for the Years Ended December 31, 2008 and 2007, at 2 [EXAM00124988]. |
| V.B.12.b(1)—8 | EXAM00232592 | MSR Rollforward YTD 2011, dated Dec. 31, 2011 [EXAM00232592]. |
| V.B.12.b(1)—8 | N/A | SunTrust Banks, Inc., Quarterly Report (Form 10-Q) (Nov. 4, 2011), at 24. |
| V.B.12.b(1)—8 | N/A | SunTrust Banks, Inc., Annual Report (Form 10-K) (Feb. 24, 2012), at 130–131. |
| V.B.12.b(1)—8 | N/A | SunTrust Banks, Inc., Quarterly Report (Form 10-Q) (May, 4, 2012), at 23. |
| V.B.12.b(2)—2 | EXAM00231553 | GMAC Mortgage Corporation Consolidated Financial Statements as of and for the years ended December 31, 2005 and 2004 (Restated), at 2, 52 [EXAM00231553]. |
| V.B.12.b(2)—2 | EXAM00232043 | GMAC Mortgage, LLC Consolidated Financial Statements, as of and for the years ended December 31, 2007 and 2006, at 2 [EXAM00232043]. |
| V.B.12.b(2)—2 | EXAM00234189 | GMAC Mortgage, LLC Consolidated Financial Statements, as of and for the years ended December 31, 2009 and 2008, at 5 [EXAM00234189]. |
| V.B.12.b(2)—2 | EXAM00234281 | GMAC Mortgage, LLC Consolidated Financial Statements, as of and for the years ended December 31, 2011 and 2010, at 5 [EXAM00234281]. |
| V.B.12.b(2)—2 | RC00034535 | GMAC Bank Consolidated Financial Statements as of December 31, 2008 and 2007, at 2 [RC00034535]. |
| V.B.12.b(2)—2 | EXAM00231149 | Residential Funding Corporation Consolidated Financial Statements for the Years Ended December 31, 2004 and 2003 (Restated), at 2 [EXAM00231149]. |
| V.B.12.b(2)—2 | EXAM00231642 | Residential Funding Company, LLC Consolidated Financial Statements for the Years Ended December 31, 2006 and 2005, at 2 [EXAM00231642]. |
| V.B.12.b(2)—2 | EXAM00124988 | Residential Funding Company, LLC Consolidated Financial Statements for the Years Ended December 31, 2008 and 2007, at 2 [EXAM00124988]. |
| V.B.12.b(2)—2 | EXAM00232592 | MSR Rollforward YTD 2011, dated Dec. 31, 2011 [EXAM00232592]. |
| V.I.C.4.b(3)—2 | N/A | Residential Capital Corporation, Annual Report (Form 10-K) (Mar. 28, 2006), at 95. |
| V.I.C.4.b(3)—2 | N/A | Residential Capital, LLC, Annual Report (Form 10-K) (Mar. 13, 2007), at 101. |
| V.I.C.4.b(3)—2 | N/A | Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2008), at 101. |
| V.I.C.4.b(3)—2 | N/A | Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2009), at 119. |
| V.I.C.4.b(3)—2 | EXAM00124455 | Residential Capital, LLC Consolidated Financial Statements for the Years Ended December 31, 2009 and 2008, dated Feb. 26, 2010, at 5 [EXAM00124455]. |
| V.I.C.4.b(3)—2 | EXAM00123128 | Residential Capital, LLC Consolidated Financial Statements for the Years Ended December 31, 2010 and 2009, dated Feb. 28, 2011, at 5 [EXAM00123128]. |
| V.I.C.4.b(3)—2 | EXAM00122651 | Residential Capital, LLC Consolidated Financial Statements for the Years Ended December 31, 2011 and 2010, dated Mar. 28, 2012, at 5 [EXAM00122651]. |
| V.I.C.4.c(3) | ALLY_0272658 | ResCap Daily Liquidity Rollforward, dated July 1, 2008 [ALLY_0272658]. |
| V.I.C.4.c(3) | ALLY_0273141 | ResCap Investment Balance Rollforward, dated July 28, 2008 [ALLY_0273141]. |
| V.I.C.4.c(3) | CERB018489 | ResCap Daily Liquidity Rollforward, dated Dec. 28, 2007 [CERB018489]. |

12-12020-mg   Doc 3698-36   Filed 05/13/13   Entered 05/13/13 18:13:09   Appendix
Case 22-11668-JTD   Doc 653-13   Filed 02/03/23   Page 704 of 709
Pg 380 of 385

Appendix X, Page 5 of 10

List of Complete Citations for Exhibits With Truncated Citations

| Exhibit Number | Bates Number | Citation |
|---|---|---|
| VI.C.4.c(3) | EXAM10609907 | ResCap Daily Liquidity Rollforward, dated Jan. 31, 2008 [EXAM10609907]. |
| VI.C.4.c(3) | EXAM10612983 | ResCap Daily Liquidity Rollforward, dated Apr. 10, 2008 [EXAM10612983]. |
| VI.C.4.c(3) | RC40012763 | ResCap Liquidity Update, dated Oct. 15, 2007, at RC40012768 [RC40012763]. |
| VI.C.4.c(5) | ALLY_0080946 | ResCap Daily Liquidity Rollforward, dated May 4, 2009 [ALLY_0080946]. |
| VI.C.4.c(5) | ALLY_0272658 | ResCap Daily Liquidity Rollforward, dated July 1, 2008 [ALLY_0272658]. |
| VI.C.4.c(5) | ALLY_0273141 | ResCap Daily Investment Balance Rollforward, dated July 28, 2008 [ALLY_0273141]. |
| VI.C.4.c(5) | CERB018489 | ResCap Daily Liquidity Rollforward, dated Dec. 28, 2007 [CERB018489]. |
| VI.C.4.c(5) | EXAM10609907 | ResCap Daily Liquidity Rollforward, dated Jan. 31, 2008 [EXAM10609907]. |
| VI.C.4.c(5) | EXAM10612983 | ResCap Daily Liquidity Rollforward, dated Apr. 10, 2008 [EXAM10612983]. |
| VI.C.4.c(5) | RC40012763 | ResCap Liquidity Update, dated Oct. 15, 2007, at RC40012768 [RC40012763]. |
| VI.C.4.c(5) | ALLY_0081503 | ResCap Daily Liquidity Rollforward, dated June 29, 2009 [ALLY_0081503]. |
| VI.C.4.c(5) | ALLY_0275088 | ResCap Daily Liquidity Rollforward, dated Sep. 15, 2008 [ALLY_0275088]. |
| VI.C.4.c(5) | ALLY_0275797 | ResCap Daily Liquidity Balance Rollforward, dated Oct. 27, 2008 [ALLY_0275797]. |
| VI.C.4.c(5) | ALLY_0276886 | ResCap Daily Liquidity Balance Rollforward, dated Dec. 1, 2008 [ALLY_0276886]. |
| VI.C.4.c(5) | ALLY_0280277 | ResCap Daily Liquidity Balance Rollforward, dated Apr. 27, 2009 [ALLY_0280277]. |
| VI.C.4.c(5) | ALLY_0283223 | ResCap Daily Liquidity Balance Rollforward, dated July 27, 2009 [ALLY_0283223]. |
| VI.C.4.c(5) | ALLY_0284342 | ResCap Daily Liquidity Balance Rollforward, dated Aug. 24, 2009 [ALLY_0284342]. |
| VI.C.4.c(5) | ALLY_0285555 | ResCap Daily Liquidity Balance Rollforward, dated Sep. 28, 2009 [ALLY_0285555]. |
| VI.C.4.c(5) | CCM00028777 | ResCap Daily Liquidity Balance Rollforward, dated Mar. 2, 2009 [CCM00028777]. |
| VI.C.4.c(5) | CCM00028940 | ResCap Daily Liquidity Balance Rollforward, dated Mar. 23, 2009 [CCM00028940]. |
| VI.C.4.c(5) | CCM00029223 | ResCap Daily Liquidity Balance Rollforward, dated Apr. 6, 2009 [CCM00029223]. |
| VI.C.4.c(5) | CCM00059068 | ResCap Daily Liquidity Balance Rollforward, dated Feb. 2, 2009 [CCM00059068]. |
| VI.C.4.c(5) | CCM00109218 | ResCap Daily Liquidity Balance Rollforward, dated Dec. 29, 2008 [CCM00109218]. |
| VI.C.4.c(5) | EXAM00114686 | ResCap Daily Liquidity Balance Rollforward, dated Oct. 26, 2009 [EXAM00114686]. |
| VI.C.4.c(5) | EXAM00114687 | ResCap Daily Balance Liquidity Rollforward, dated Dec. 28, 2009 [EXAM00114687]. |
| VI.C.4.c(5) | EXAM00114688 | ResCap Daily Liquidity Balance Rollforward, dated Jan. 25, 2010 [EXAM00114688]. |
| VI.C.4.c(5) | EXAM00114689 | ResCap Daily Liquidity Balance Rollforward, dated Mar. 29, 2010 [EXAM00114689]. |
| VI.C.4.c(5) | EXAM00114690 | ResCap Daily Liquidity Balance Rollforward, dated Apr. 26, 2010 [EXAM00114690]. |
| VI.C.4.c(5) | EXAM00114692 | ResCap Daily Liquidity Balance Rollforward, dated June 28, 2010 [EXAM00114692]. |
| VI.C.4.c(5) | EXAM00114694 | ResCap Daily Liquidity Balance Rollforward, dated Aug. 30, 2010 [EXAM00114694]. |
| VI.C.4.c(5) | EXAM00114695 | ResCap Daily Liquidity Rollforward, dated Sep. 27, 2010 [EXAM00114695]. |
| VI.C.4.c(5) | EXAM00114696 | ResCap Liquid Cash Rollforward, dated Oct. 25, 2010 [EXAM00114696]. |
| VI.C.4.c(5) | EXAM00114698 | ResCap Liquid Cash Rollforward, dated Dec. 6, 2010 [EXAM00114698]. |
| VI.C.4.c(5) | EXAM00114700 | ResCap Daily Liquid Cash Rollforward, dated Feb. 21, 2011 [EXAM00114700]. |
| VI.C.4.c(5) | EXAM00114702 | ResCap Daily Liquid Cash Rollforward, dated Apr. 11, 2011 [EXAM00114702]. |
| VI.C.4.c(5) | EXAM00114704 | ResCap Daily Liquid Cash Rollforward, dated June 20, 2011 [EXAM00114704]. |
| VI.C.4.c(5) | EXAM00114706 | ResCap Daily Liquid Cash Rollforward, dated Aug. 22, 2011 [EXAM00114706]. |
| VI.C.4.c(5) | EXAM00114708 | ResCap Daily Liquid Cash Rollforward, dated Nov. 1, 2011 [EXAM00114708]. |
| VI.C.4.c(5) | EXAM00114709 | ResCap Daily Liquid Cash Rollforward, dated Dec. 1, 2011 [EXAM00114709]. |
| VI.C.4.c(5) | EXAM00114711 | ResCap Daily Liquid Cash Rollforward, dated Feb. 1, 2012 [EXAM00114711]. |
| VI.C.4.c(5) | EXAM00114713 | ResCap Daily Liquid Cash Rollforward, dated Apr. 2, 2012 [EXAM00114713]. |
| VI.C.4.c(5) | EXAM00114715 | ResCap Daily Liquid Cash Rollforward, dated May 11, 2012 [EXAM00114715]. |
| VI.C.4.c(5) | EXAM10158701 | ResCap Daily Liquidity Rollforward, dated Jan. 31, 2008 [EXAM10158701]. |

Appendix X, Page 6 of 10

List of Complete Citations for Exhibits With Truncated Citations

| Exhibit Number | Bates Number | Citation |
|---|---|---|
| VI.C.4.c(5) | EXAM10667290 | ResCap Daily Liquidity Rollforward, dated July 31, 2008 [EXAM10667290]. |
| VI.C.4.c(5) | LAZ-RSCP-XMR00002342 | ResCap Daily Liquidity Balance Rollforward, dated June 8, 2009 [LAZ-RSCP-XMR00002342]. |
| VI.C.4.d | N/A | Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2009), at 89, 90, 208. |
| VI.C.4.d | N/A | Residential Capital, LLC, Quarterly Report (Form 10-Q) (Aug. 7, 2009), at 65. |
| VI.C.4.d | EXAM00124455 | Residential Capital, LLC Consolidated Financial Statements for the Years Ended December 31, 2009 and 2008, dated Feb. 26, 2010, at 43 [EXAM00124455]. |
| VI.C.4.d | EXAM00122651 | Residential Capital, LLC Consolidated Financial Statements for the Years Ended December 31, 2011 and 2010, dated Mar. 28, 2012, at 39 [EXAM00122651]. |
| VI.C.4.d | RC00025831 | 7th Amend. to A&R Line of Credit Agreement, § 2.01 [RC00025831]. |
| VI.C.4.d | RC00026655 | 7th Amend. to A&R Line of Credit Agreement, § 2.3 [RC00026655]. |
| VI.C.4.e(1) | N/A | PHILIP KIBEL & JOHN J. KRIZ, MOODY'S, RATING ACTION: MOODY'S ASSIGNS BAA2 ISSUER RATING TO RESIDENTIAL CAPITAL CORPORATION; RATING OUTLOOK IS NEGATIVE (June 9, 2005). |
| VI.C.4.e(1) | N/A | PHILIP KIBEL & JOHN J. KRIZ, MOODY'S, RATING ACTION: MOODY'S DOWNGRADES RESIDENTIAL CAPITAL'S SENIOR DEBT TO BAA3; RATING OUTLOOK IS NEGATIVE (Aug. 24, 2005). |
| VI.C.4.e(1) | N/A | PHILIP KIBEL & JOHN J. KRIZ, MOODY'S, RATING ACTION: MOODY'S DOWNGRADES RESCAP TO BA1, FROM BAA3; RATINGS REMAIN ON REVIEW DOWN (Aug. 16, 2007). |
| VI.C.4.e(1) | N/A | CRAIG A. EMRICK & BRIAN L. HARRIS, MOODY'S, RATING ACTION: MOODY'S DOWNGRADES RESCAP TO BA3, FROM BA1; OUTLOOK NEGATIVE (Nov. 1, 2007). |
| VI.C.4.e(1) | N/A | ROBERT YOUNG & CRAIG A. EMRICK, MOODY'S, RATING ACTION: MOODY'S DOWNGRADES RESCAP TO B2; OUTLOOK NEGATIVE (Feb. 5, 2008). |
| VI.C.4.e(1) | N/A | ROBERT YOUNG & CRAIG A. EMRICK, MOODY'S, RATING ACTION: MOODY'S DOWNGRADES RESCAP TO CAA1; RATINGS ON REVIEW DOWN (Apr. 23, 2008). |
| VI.C.4.e(1) | N/A | ROBERT YOUNG & CRAIG A. EMRICK, MOODY'S, RATING ACTION: MOODY'S DOWNGRADES RESCAP TO CA; RATING UNDER REVIEW DOWN (May 2, 2008). |
| VI.C.4.e(1) | N/A | ROBERT YOUNG & CRAIG A. EMRICK, MOODY'S, RATING ACTION: MOODY'S DOWNGRADES RESCAP TO C (Nov. 20, 2008). |
| VI.C.4.e(1) | N/A | MARK L. WASDEN & ROBERT YOUNG, MOODY'S, RATING ACTION: MOODY'S UPGRADES ALLY FINANCIAL TO B1, RESCAP TO CA (Feb. 7, 2011). |
| VI.C.4.e(1) | N/A | MARK L. WASDEN & ROBERT F. YOUNG, MOODY'S, RATING ACTION: MOODY'S DOWNGRADES RESCAP UNSECURED TO C; AFFIRMS ALLY AT B1 (Apr. 18, 2012). |
| VI.C.4.e(1) | N/A | CHRISTOPHER D. WOLFE & Philip S. Walker, FITCH, FITCH ASSIGNS 'BBB' & 'F2' RATINGS TO RESIDENTIAL CAPITAL CORP. (June 9, 2005), http://www.fitchratings.com/creditdesk/press_releases/detail.cfm?print=1&pr_id=164498. |
| VI.C.4.e(1) | N/A | CHRISTOPHER D. WOLFE ET AL., FITCH, FITCH DOWNGRADES GMAC & RESCAP; OUTLOOK REMAINS NEGATIVE (Sept. 26, 2005). |
| VI.C.4.e(1) | N/A | CHRISTOPHER D. WOLFE ET AL., FITCH, FITCH UPGRADES GMAC LLC TO 'BB+' & RESCAP TO 'BBB'; OUTLOOK POSITIVE (Nov. 30, 2006), http://www.fitchratings.com/creditdesk/press_releases/detail.cfm?print=1&pr_id=326772. |
| VI.C.4.e(1) | N/A | CHRISTOPHER D. WOLFE ET AL., FITCH, AMEND: FITCH LOWERS COUNTRYWIDE IDR TO 'BBB+' & RESCAP TO 'BB+'; INDYMAC ON WATCH NEGATIVE (Aug. 16, 2007), http://www.fitchratings.com/creditdesk/press_releases/detail.cfm?print=1&pr_id=365172. |
| VI.C.4.e(1) | N/A | CHRISTOPHER D. WOLFE & VINCENT ARSCOTT, FITCH, FITCH DOWNGRADES RESCAP'S L-T IDR TO 'BB-'; REMAINS ON WATCH NEGATIVE (Mar. 3, 2008), http://www.fitchratings.com/creditdesk/press_releases/detail.cfm?print=1&pr_id=408395. |
| VI.C.4.e(1) | N/A | CHRISTOPHER D. WOLFE & VINCENT ARSCOTT, FITCH, FITCH DOWNGRADES RESCAP'S IDR TO 'C' ON DDE; REMAINS ON WATCH NEGATIVE (May 2, 2008), http://www.fitchratings.com/creditdesk/press_releases/detail.cfm?print=1&pr_id=419155. |

**List of Complete Citations for Exhibits With Truncated Citations**

| Exhibit Number | Bates Number | Citation |
|---|---|---|
| VI.C.4.c(1) | N/A | CHRISTOPHER D. WOLFE & VINCENT ARSCOTT, FITCH, FITCH DOWNGRADES RESCAP'S IDRs TO 'D' ON DISTRESSED DEBT EXCHANGE (June 5, 2008), http://www.fitchratings.com/creditdesk/press_releases/detail.cfm?print=1&pr_id=422813. |
| VI.C.4.c(1) | N/A | MOHAK RAO & PETER SHIMKUS, FITCH, FITCH UPGRADES RESCAP'S IDR TO 'B'; OUTLOOK STABLE (Feb. 3, 2011), http://www.fitchratings.com/creditdesk/press_releases/detail.cfm?print=1&pr_id=680221. |
| VI.C.4.c(1) | N/A | MOHAK RAO & JUSTIN FULLER, FITCH, FITCH DOWNGRADES RESCAP'S IDR TO 'CCC' (Nov. 11, 2011), http://www.fitchratings.com/creditdesk/press_releases/detail.cfm?print=1&pr_id=733364. |
| VI.C.4.c(1) | N/A | MOHAK RAO & NATHAN FLANDERS, FITCH, FITCH DOWNGRADES RESCAP'S IDR TO 'C'; PLACES ALLY FINANCIAL'S 'BB-' IDR ON RATING WATCH NEGATIVE (Apr. 18, 2012), http://www.fitchratings.com/creditdesk/press_releases/detail.cfm?print=1&pr_id=747746. |
| VI.C.4.c(1) | N/A | MOHAK RAO & NATHAN FLANDERS, FITCH, FITCH DOWNGRADES RESCAP'S IDR TO 'D'; MAINTAINS RATING WATCH NEGATIVE ON ALLY (May 15, 2012), http://www.fitchratings.com/creditdesk/press_releases/detail.cfm?print=1&pr_id=749864. |
| VI.C.4.c(1) | N/A | VICTORIA WAGNER ET AL., S&P, RESEARCH UPDATE: RESIDENTIAL CAPITAL CORP. ASSIGNED 'BBB-' / A-3' RATINGS (June 9, 2005). |
| VI.C.4.c(1) | N/A | JOHN K. BARTKO ET AL., S&P, RESEARCH UPDATE: RESIDENTIAL CAPITAL LLC RATING RAISED TO 'BBB'; REMOVED FROM CREDITWATCH; OUTLOOK NEGATIVE (Nov. 27, 2006). |
| VI.C.4.c(1) | N/A | JOHN K. BARTKO ET AL., S&P, RESEARCH UPDATE: RESIDENTIAL CAPITAL LLC RATING LOWERED TO 'BBB-'; OUTLOOK REVISED TO STABLE (May 2, 2007). |
| VI.C.4.c(1) | N/A | JOHN K. BARTKO ET AL., S&P, RESEARCH UPDATE: RESIDENTIAL CAPITAL LLC RATINGS OFF WATCH NEG, LOWERED TO 'BB+ / B' FROM 'BBB- / A-3'; OUTLOOK NEG (Nov. 1, 2007). |
| VI.C.4.c(1) | N/A | RICHARD BARLEY, REUTERS, S&P CUTS GMAC, RESCAP RATINGS, OUTLOOK NEGATIVE (Feb. 22, 2008). |
| VI.C.4.c(1) | N/A | ROBERT SCHULZ & GREGG LEMOS STEIN, S&P, RESEARCH UPDATE: GENERAL MOTORS 'B / B-3' CCR STAYS ON WATCH NEG ON RATING ACTIONS ON GMAC, RESIDENTIAL CAPITAL (Apr. 24, 2008). |
| VI.C.4.c(1) | N/A | JOHN K. BARTKO ET AL., S&P, RESEARCH UPDATE: RESIDENTIAL CAPITAL LLC DOWNGRADED TO 'CC'; STILL ON CREDITWATCH NEGATIVE (May 2, 2008). |
| VI.C.4.c(1) | N/A | JOHN K. BARTKO ET AL., S&P, RESEARCH UPDATE: RESIDENTIAL CAPITAL LLC RATING LOWERED TO 'SD' FROM 'CC'; REMOVED FROM CREDITWATCH NEGATIVE (June 4, 2008). |
| VI.C.4.c(1) | N/A | JOHN K. BARTKO & ADOM ROSENGARTEN, S&P, RESEARCH UPDATE: RESIDENTIAL CAPITAL LLC RATING RAISED TO 'CCC+ / C'; OUTLOOK NEGATIVE (July 15, 2008). |
| VI.C.4.c(1) | N/A | JOHN K. BARTKO ET AL., S&P, RESEARCH UPDATE: GMAC LLC AND RESIDENTIAL CAPITAL LLC RATINGS LOWERED; OUTLOOKS NEGATIVE (Nov. 7, 2008). |
| VI.C.4.c(1) | N/A | JOHN K. BARTKO & ADOM ROSENGARTEN, S&P, RESEARCH UPDATE: GMAC LLC, RESIDENTIAL CAPITAL LLC RATINGS LOWERED, ON CREDITWATCH NEGATIVE (Nov. 20, 2008). |
| VI.C.4.c(1) | N/A | JOHN K. BARTKO & ERNEST D. NAPIER, S&P, RESEARCH UPDATE: GMAC LLC, RESIDENTIAL CAPITAL LLC RATINGS LOWERED TO 'SD' FROM 'CC'; TAKEN OFF CREDITWATCH (Dec. 31, 2008). |
| VI.C.4.c(1) | N/A | JOHN K. BARTKO ET AL., S&P, RESEARCH UPDATE: GMAC LLC AND RESIDENTIAL CAPITAL LLC RATINGS RAISED TO 'CCC / C'; OUTLOOK NEGATIVE (Feb. 4, 2009). |
| VI.C.4.c(1) | N/A | JOHN K. BARTKO & VIKAS JHAVERI, S&P, RESEARCH UPDATE: GMAC INC., RESIDENTIAL CAPITAL LLC RATINGS RAISED TO 'B' FROM 'CCC'; OUTLOOK STABLE (Jan. 27, 2010). |
| VI.C.4.c(1) | N/A | BRENDAN BROWNE & JOHN K. BARTKO, S&P, RESEARCH UPDATE: ALLY FINANCIAL INC., RESIDENTIAL CAPITAL RATINGS RAISED TO 'B+' FROM 'B' (May 4, 2011). |
| VI.C.4.c(1) | N/A | BRENDAN BROWNE & JOHN K. BARTKO, S&P, RESEARCH UPDATE: RESIDENTIAL CAPITAL LLC RATING LOWERED TO 'CCC' AND PLACED ON CREDITWATCH NEGATIVE (Nov. 10, 2011). |
| VI.C.4.c(1) | N/A | BRENDAN BROWNE & JOHN K. BARTKO, S&P, RESEARCH UPDATE: RESIDENTIAL CAPITAL LLC DOWNGRADED TO 'CC'; RATINGS REMAIN ON CREDITWATCH NEGATIVE (Feb. 10, 2012). |

List of Complete Citations for Exhibits With Truncated Citations

| Exhibit Number | Bates Number | Citation |
|---|---|---|
| VI.C.4.e(1) | N/A | TOM G. CONNELL & BRENDAN BROWNE, S&P, RESEARCH UPDATE: RESIDENTIAL CAPITAL LLC DOWNGRADED TO 'SD' FROM 'CC' ON MISSED INTEREST PAYMENT (Apr. 18, 2012). |
| VI.C.4.e(1) | N/A | TOM G. CONNELL & BRENDAN BROWNE, S&P, RESEARCH UPDATE: RESIDENTIAL CAPITAL LLC RATINGS LOWERED TO 'D' AFTER CHAPTER 11 FILING (May 17, 2012). |
| VI.C.4.f(1)—1 | EXAM10055830 | Draft ResCap Executive Liquidity Report, dated Dec. 31, 2007 [EXAM10055830]. |
| VI.C.4.f(1)—1 | EXAM10055877 | ResCap Executive Liquidity Report, dated Mar. 31, 2008 [EXAM10055877]. |
| VI.C.4.f(1)—1 | EXAM10055944 | ResCap Executive Liquidity Report, dated June 30, 2008 [EXAM10055944]. |
| VI.C.4.f(1)—1 | EXAM10055957 | ResCap Executive Liquidity Report, dated Oct. 6, 2008 [EXAM10055957]. |
| VI.C.4.f(1)—1 | EXAM10055973 | ResCap Executive Liquidity Report, dated Dec. 29, 2008 [EXAM10055973]. |
| VI.C.4.f(1)—1 | EXAM10056015 | ResCap Executive Liquidity Report, dated Mar. 30, 2009 [EXAM10056015]. |
| VI.C.4.f(1)—1 | EXAM10056051 | Draft ResCap Executive Liquidity Report, dated June 29, 2009 [EXAM10056051]. |
| VI.C.4.f(1)—1 | EXAM10056078 | Draft ResCap Executive Liquidity Report, dated Sep. 28, 2009 [EXAM10056078]. |
| VI.C.4.f(1)—1 | EXAM10056100 | Draft ResCap Executive Liquidity Report, dated Dec. 28, 2009 [EXAM10056100]. |
| VI.C.4.f(1)—1 | EXAM10056125 | Draft ResCap Executive Liquidity Report, dated Mar. 22, 2010 [EXAM10056125]. |
| VI.C.4.f(1)—1 | ALLY_PEO_0084328 | ResCap Executive Liquidity Report, dated July 5, 2010 [ALLY_PEO_0084328]. |
| VI.C.4.f(1)—1 | ALLY_0383598 | ResCap Executive Liquidity Report, dated Sep. 13, 2010 [ALLY_0383598]. |
| VI.C.4.f(1)—1 | ALLY_0297477 | ResCap Executive Liquidity Report, dated Dec. 6, 2010 [ALLY_0297477]. |
| VI.C.4.f(1)—1 | ALLY_0193580 | ResCap Executive Liquidity Report, dated Mar. 21, 2011 [ALLY_0193580]. |
| VI.C.4.f(1)—1 | ALLY_0193670 | ResCap Executive Liquidity Report, dated June 20, 2011 [ALLY_0193670]. |
| VI.C.4.f(1)—1 | ALLY_0194078 | Draft ResCap Executive Liquidity Report, dated Oct. 10, 2011 [ALLY_0194078]. |
| VI.C.4.f(1)—1 | ALLY_0194181 | ResCap Executive Liquidity Report, dated Jan. 16, 2012 [ALLY_0194181]. |
| VI.C.4.f(1)—1 | ALLY_0194266 | ResCap Executive Liquidity Report, dated Apr. 16, 2012 [ALLY_0194266]. |
| VI.C.4.f(1)—2 | EXAM10055830 | Draft ResCap Executive Liquidity Report, dated Dec. 31, 2007 [EXAM10055830]. |
| VI.C.4.f(1)—2 | EXAM10055877 | ResCap Executive Liquidity Report, dated Mar. 31, 2008 [EXAM10055877]. |
| VI.C.4.f(1)—2 | EXAM10055944 | ResCap Executive Liquidity Report, dated June 30, 2008 [EXAM10055944]. |
| VI.C.4.f(1)—2 | EXAM10055957 | ResCap Executive Liquidity Report, dated Oct. 6, 2008 [EXAM10055957]. |
| VI.C.4.f(1)—2 | EXAM10055973 | ResCap Executive Liquidity Report, dated Dec. 29, 2008 [EXAM10055973]. |
| VI.C.4.f(1)—2 | EXAM10056015 | ResCap Executive Liquidity Report, dated Mar. 30, 2009 [EXAM10056015]. |
| VI.C.4.f(1)—2 | EXAM10056051 | Draft ResCap Executive Liquidity Report, dated June 29, 2009 [EXAM10056051]. |
| VI.C.4.f(1)—2 | EXAM10056078 | Draft ResCap Executive Liquidity Report, dated Sep. 28, 2009 [EXAM10056078]. |
| VI.C.4.f(1)—2 | EXAM10056100 | Draft ResCap Executive Liquidity Report, dated Dec. 28, 2009 [EXAM10056100]. |
| VI.C.4.f(1)—2 | EXAM10056125 | Draft ResCap Executive Liquidity Report, dated Mar. 22, 2010 [EXAM10056125]. |
| VI.C.4.f(1)—2 | ALLY_PEO_0084328 | ResCap Executive Liquidity Report, dated July 5, 2010 [ALLY_PEO_0084328]. |
| VI.C.4.f(1)—2 | ALLY_0383598 | ResCap Executive Liquidity Report, dated Sep. 13, 2010 [ALLY_0383598]. |
| VI.C.4.f(1)—2 | ALLY_0297477 | ResCap Executive Liquidity Report, dated Dec. 6, 2010 [ALLY_0297477]. |
| VI.C.4.f(1)—2 | ALLY_0193580 | ResCap Executive Liquidity Report, dated Mar. 21, 2011 [ALLY_0193580]. |
| VI.C.4.f(1)—2 | ALLY_0193670 | ResCap Executive Liquidity Report, dated June 20, 2011 [ALLY_0193670]. |
| VI.C.4.f(1)—2 | ALLY_0194078 | Draft ResCap Executive Liquidity Report, dated Oct. 10, 2011 [ALLY_0194078]. |
| VI.C.4.f(1)—2 | ALLY_0194181 | ResCap Executive Liquidity Report, dated Jan. 16, 2012 [ALLY_0194181]. |
| VI.C.4.f(1)—2 | ALLY_0194266 | ResCap Executive Liquidity Report, dated Apr. 16, 2012 [ALLY_0194266]. |
| VI.C.4.f(2)—1 | N/A | Residential Capital, LLC, Annual Report (Form 10-K) (Mar. 13, 2007), at 101. |
| VI.C.4.f(2)—1 | N/A | Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2008), at 101. |
| VI.C.4.f(2)—1 | N/A | Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2009), at 119. |

Appendix X, Page 8 of 10

Appendix X, Page 9 of 10

**List of Complete Citations for Exhibits With Truncated Citations**

| Exhibit Number | Bates Number | Citation |
|---|---|---|
| VI.C.4.f(2)—1 | EXAM00124455 | Residential Capital, LLC Consolidated Financial Statements for the Years Ended December 31, 2009 and 2008, dated Feb. 26, 2010, at 5 [EXAM00124455]. |
| VI.C.4.f(2)—1 | EXAM00123128 | Residential Capital, LLC Consolidated Financial Statements for the Years Ended December 31, 2010 and 2009, dated Feb. 28, 2011, at 5 [EXAM00123128]. |
| VI.C.4.f(2)—1 | EXAM00122651 | Residential Capital, LLC Consolidated Financial Statements for the Years Ended December 31, 2011 and 2010, dated Mar. 28, 2012, at 5 [EXAM00122651]. |
| VI.C.4.f(2)—1 | EXAM00295529 | ResCap 2009 Business Plan Review, dated Mar. 26, 2009, at EXAM00295546 [EXAM00295529]. |
| VI.C.4.f(2)—1 | RC40012974 | 2006 ResCap Plan, dated Jan. 31, 2006, at RC40013021 [RC40012974]. |
| VI.C.4.f(2)—1 | RC40012214 | ResCap 2007–2009 Operating Plan Review, dated Dec. 2006, at RC40012386 [RC40012214]. |
| VI.C.4.f(2)—1 | RC40007361 | ResCap Global Debt Restructuring Due Diligence Presentation, dated Mar. 17, 2008, at RC40007389 [RC40007361]. |
| VI.C.4.f(2)—1 | RC40015763 | ResCap Preliminary 2010–2012 Business Plan, dated Mar. 19, 2010, at RC40015782 [RC40015763]. |
| VI.C.4.f(2)—1 | RC40017167 | ResCap Preliminary 2011–2013 Business Plan, dated Dec. 22, 2010, at RC40017189 [RC40017167]. |
| VI.C.4.f(3)(a) | N/A | Residential Capital Corporation, Annual Report (Form 10-K) (Mar. 28, 2006), at 94. |
| VI.C.4.f(3)(a) | N/A | Residential Capital, LLC, Annual Report (Form 10-K) (Mar. 13, 2007), at 100. |
| VI.C.4.f(3)(a) | N/A | Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2008), at 100. |
| VI.C.4.f(3)(a) | N/A | Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2009), at 118. |
| VI.C.4.f(3)(a) | EXAM00124455 | Residential Capital, LLC Consolidated Financial Statements for the Years Ended December 31, 2009 and 2008, dated Feb. 26, 2010, at 4 [EXAM00124455]. |
| VI.C.4.f(3)(a) | EXAM00123128 | Residential Capital, LLC Consolidated Financial Statements for the Years Ended December 31, 2010 and 2009, dated Feb. 28, 2011, at 4 [EXAM00123128]. |
| VI.C.4.f(3)(a) | EXAM00122651 | Residential Capital, LLC Consolidated Financial Statements for the Years Ended December 31, 2011 and 2010, dated Mar. 28, 2012, at 4 [EXAM00122651]. |
| VI.C.4.f(3)(a) | EXAM00329293 | ResCap Trial Balance Spreadsheet, dated Dec. 31, 2006 [EXAM00329293]. |
| VI.C.4.f(3)(a) | EXAM00329329 | ResCap Trial Balance Spreadsheet, dated Dec. 31, 2007 [EXAM00329329]. |
| VI.C.4.f(3)(a) | EXAM00231095 | ResCap Trial Balance Spreadsheet, dated Dec. 31, 2008 [EXAM00231095]. |
| VI.C.4.f(3)(b)—1 | N/A | Residential Capital Corporation, Annual Report (Form 10-K) (Mar. 28, 2006), at 95. |
| VI.C.4.f(3)(b)—1 | N/A | Residential Capital, LLC, Annual Report (Form 10-K) (Mar. 13, 2007), at 101. |
| VI.C.4.f(3)(b)—1 | N/A | Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2008), at 101. |
| VI.C.4.f(3)(b)—1 | N/A | Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2009), at 119. |
| VI.C.4.f(3)(b)—1 | EXAM00124455 | Residential Capital, LLC Consolidated Financial Statements for the Years Ended December 31, 2009 and 2008, dated Feb. 26, 2010, at 5, 24 [EXAM00124455]. |
| VI.C.4.f(3)(b)—1 | EXAM00123128 | Residential Capital, LLC Consolidated Financial Statements for the Years Ended December 31, 2010 and 2009, dated Feb. 28, 2011, at 5 [EXAM00123128]. |
| VI.C.4.f(3)(b)—1 | EXAM00122651 | Residential Capital, LLC Consolidated Financial Statements for the Years Ended December 31, 2009 and 2008, dated Feb. 26, 2010, at 5, 9 [EXAM00122651]. |
| VI.C.4.f(3)(b)—2 | N/A | Residential Capital Corporation, Annual Report (Form 10-K) (Mar. 28, 2006), at 95. |
| VI.C.4.f(3)(b)—2 | N/A | Residential Capital, LLC, Annual Report (Form 10-K) (Mar. 13, 2007), at 101. |
| VI.C.4.f(3)(b)—2 | N/A | Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2008), at 101. |
| VI.C.4.f(3)(b)—2 | N/A | Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2009), at 119. |
| VI.C.4.f(3)(b)—2 | EXAM00124455 | Residential Capital, LLC Consolidated Financial Statements for the Years Ended December 31, 2009 and 2008, dated Feb. 26, 2010, at 5, 24 [EXAM00124455]. |
| VI.C.4.f(3)(b)—2 | EXAM00123128 | Residential Capital, LLC Consolidated Financial Statements for the Years Ended December 31, 2010 and 2009, dated Feb. 28, 2011, at 5 [EXAM00123128]. |

**List of Complete Citations for Exhibits With Truncated Citations**

| Exhibit Number | Bates Number | Citation |
|---|---|---|
| VI.C.4.f(3)(b)—2 | EXAM00122651 | Residential Capital, LLC Consolidated Financial Statements for the Years Ended December 31, 2009 and 2008, dated Feb. 26, 2010, at 5, 9 [EXAM00122651]. |
| VI.C.4.f(4)(c) | N/A | Residential Capital, LLC, Quarterly Report (Form 10-Q) (Nov. 8, 2007), at 41. |
| VI.C.4.f(4)(c) | N/A | Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2009), at 90. |
| VI.C.4.f(4)(c) | N/A | Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2009), at 90. |
| VI.C.4.f(4)(c) | N/A | Residential Capital, LLC, Quarterly Report (Form 10-Q) (Nov. 10, 2008), at 42. |
| VI.C.4.f(4)(c) | N/A | Residential Capital, LLC, Quarterly Report (Form 10-Q) (Aug. 8, 2008), at 39. |
| VI.C.4.f(4)(c) | N/A | Residential Capital, LLC, Quarterly Report (Form 10-Q) (Nov. 10, 2008), at 42. |
| VI.C.4.f(4)(c) | N/A | Residential Capital, LLC, Annual Report (Form 10-K) (Feb. 27, 2009), at 90. |
| VI.C.4.f(4)(c) | N/A | Residential Capital, LLC, Quarterly Report (Form 10-Q) (Nov. 10, 2008), at 42. |
| VI.C.4.f(4)(c) | N/A | Residential Capital, LLC, Quarterly Report (Form 10-Q) (May 11, 2009), at 56. |
| VI.C.4.f(4)(c) | N/A | Residential Capital, LLC, Quarterly Report (Form 10-Q) (Aug. 7, 2009), at 13. |
| VI.C.4.f(4)(c) | N/A | Residential Capital, LLC, Quarterly Report (Form 10-Q) (Aug. 7, 2009), at 64. |
| VI.C.4.f(4)(c) | N/A | Affidavit of James Whitlinger, Chief Financial Officer of Residential Capital, LLC, in Support of Chapter 11 Petitions and First Day Pleadings [Docket No. 6], at 40. |
| VIII.D.5.b | FHFA-AS-0314592 | Residential Funding Securities Corporation Financial Statements and Supplementary Schedules December 31, 2004, dated Feb. 24, 2005, at 2 [FHFA-AS-0314592]. |
| VIII.D.5.b | FHFA-AS-0314471 | Residential Funding Securities Corporation Financial Statements and Supplementary Schedules December 31, 2005, dated Mar. 14, 2006, at 2 [FHFA-AS-0314471]. |
| VIII.D.5.b | FHFA-AS-0314430 | Residential Funding Securities, LLC Financial Statements and Supplementary Schedules December 31, 2006, dated Feb. 26, 2007, at 2 [FHFA-AS-0314430]. |
| VIII.D.5.b | FHFA-AS-0314450 | Residential Funding Securities, LLC Financial Statements and Supplementary Schedules December 31, 2007, dated Feb. 28, 2008, at 2 [FHFA-AS-0314450]. |
| VIII.D.5.b | FHFA-AS-0314492 | Residential Funding Securities, LLC Financial Statements and Supplementary Schedules December 31, 2008, dated Feb. 27, 2009, at 2 [FHFA-AS-0314492]. |
| VIII.D.5.b | FHFA-AS-0314518 | Residential Funding Securities, LLC Financial Statements and Supplementary Schedules December 31, 2009, dated Feb. 26, 2010, at 2 [FHFA-AS-0314518]. |
| VIII.D.5.b | FHFA-AS-0314542 | Residential Funding Securities, LLC Financial Statements as of and for the Year Ended December 31, 2010, Supplementary Schedules as of Year Ended December 31, 2010 and Independent Auditors' report, dated Feb. 25, 2011, at 3 [FHFA-AS-0314542]. |
| VIII.D.5.b | FHFA-AS-0314565 | Ally Securities, LLC Financial Statements as of and for the Year Ended December 31, 2011, Supplementary Schedules as of Year Ended December 31, 2011 and Independent Auditors' report, dated Feb. 24, 2012, at 3 [FHFA-AS-0314565]. |
| VIII.D.5.b | ALLY_0424625 | Ally Securities, LLC Financial Statements as of and for the Year Ended December 31, 2012, Supplementary Schedules as of Year Ended December 31, 2012 and Independent Auditors' report, dated Feb. 28, 2013, at 3 [ALLY_0424625]. |