# <u>EXHIBIT 2</u>

**Form of Embed Business Purchase Agreement**

Auction Draft of February 6, 2023

**STOCK PURCHASE AGREEMENT**

**by and between**

**WEST REALM SHIRES, INC.**

and

**[BUYER]**[1]

**Dated as of [●], 2023**

---

[1] **Note to Buyer**:  Please provide evidence that the Buyer is a creditworthy entity.  If the Buyer is an acquisition vehicle, the Seller will require a parent guaranty or equity commitment letter naming the Seller as an express third-party beneficiary.

**TABLE OF CONTENTS**

**Page**

**ARTICLE I**

**PURCHASE AND SALE; PAYMENT; CLOSING; CLOSING DELIVERIES**

1.1     Purchase and Sale .................................................................................................2
1.2     Time and Place of Closing....................................................................................2
1.3     Deliveries at Closing.............................................................................................2
1.4     Closing Statement .................................................................................................3
1.5     [Assumption and Assignment of Certain Contracts.............................................4

**ARTICLE II**

**REPRESENTATIONS AND WARRANTIES OF THE SELLER**

2.1     Ownership of Shares and Subsidiary Interests.....................................................5
2.2     Organization, Good Standing and Qualification...................................................5
2.3     Capitalization of the Company .............................................................................6
2.4     Authority; Approval..............................................................................................6
2.5     Governmental and Self-Regulatory Organization Filings; No Violations............6
2.6     Litigation...............................................................................................................7
2.7     Employee Benefits ................................................................................................7
2.8     Labor Matters........................................................................................................8
2.9     Compliance with Laws; Licenses, Permits and Authorizations...........................9
2.10    Material Contracts.................................................................................................9
2.11    Real Property ......................................................................................................10
2.12    Taxes ...................................................................................................................10
2.13    Intellectual Property; Information Technology; Data Privacy............................11
2.14    Brokers and Finders ............................................................................................12
2.15    Absence of Certain Business Practices ..............................................................12
2.16    No Other Representations or Warranties ............................................................13

**ARTICLE III**

**REPRESENTATIONS AND WARRANTIES OF THE BUYER**

3.1     Organization, Good Standing and Qualification.................................................13
3.2     Authority; Approval............................................................................................14
3.3     Governmental and Self-Regulatory Organization Filings; No Violations..........14
3.4     Litigation.............................................................................................................15
3.5     Compliance with Laws .......................................................................................15
3.6     Available Funds ..................................................................................................15
3.7     Investment Intent ................................................................................................15
3.8     Brokers and Finders ............................................................................................15

3.9     No Other Representations or Warranties ...................................................................16

## ARTICLE IV

## COVENANTS

4.1     Interim Operations of the Company ........................................................................17
4.2     Cooperation and Efforts to Consummate Transactions; Status Updates ...........................19
4.3     Regulatory Filings/Approvals ................................................................................19
4.4     Third-Party Consents ...........................................................................................22
4.5     Access and Reports .............................................................................................23
4.6     Publicity ...........................................................................................................23
4.7     Employee Benefits ..............................................................................................24
4.8     Confidentiality ...................................................................................................25
4.9     Tax Matters .......................................................................................................25
4.10    Further Assurances..............................................................................................26
4.11    Maintenance of Books and Records ........................................................................26
4.12    Intercompany Arrangements..................................................................................26
4.13    Seller Guarantees ...............................................................................................27
4.14    Use of Seller Marks; Intellectual Property................................................................27

## ARTICLE V

## BANKRUPTCY MATTERS

5.1     Competing Transactions .......................................................................................28
5.2     Bankruptcy Court Filings......................................................................................29
5.3     Sale Order .........................................................................................................29

## ARTICLE VI

## CONDITIONS

6.1     Conditions to Each Party's Obligation to Consummate the Transactions..........................30
6.2     Conditions to Obligation of the Buyer.....................................................................31
6.3     Conditions to Obligations of the Seller....................................................................31
6.4     Frustration of Closing Conditions...........................................................................32

## ARTICLE VII

## TERMINATION

7.1     Termination........................................................................................................32
7.2     Effect of Termination; Reverse Termination Fee; Purchase Price Deposit .......................34

**ARTICLE VIII**

**MISCELLANEOUS AND GENERAL**

| | | |
|---|---|---|
| 8.1 | Survival | 36 |
| 8.2 | Entire Agreements; Amendment; Waiver | 36 |
| 8.3 | Expenses | 36 |
| 8.4 | Counterparts | 37 |
| 8.5 | Governing Law | 37 |
| 8.6 | Specific Performance | 37 |
| 8.7 | Submission to Jurisdiction; Consent to Service of Process; Waiver of Jury Trial | 37 |
| 8.8 | Notices | 38 |
| 8.9 | Severability | 39 |
| 8.10 | Assignment; Third-Party Beneficiaries | 39 |
| 8.11 | Fiduciary Obligations | 40 |
| 8.12 | Interpretation; Construction | 40 |

<u>EXHIBITS</u>

Exhibit A – Definitions
Exhibit B – Form of Sale Order
[Exhibit C – Form of Assumption and Assignment Agreement]

<u>SCHEDULES</u>

[Schedule 1.5(a): Assigned Contracts]
Seller Disclosure Schedule

## STOCK PURCHASE AGREEMENT

THIS STOCK PURCHASE AGREEMENT (including the Exhibits and Schedules hereto, each as amended or restated from time to time, this "Agreement"), dated as of [●], 2023 (the "Execution Date"), is made by and between West Realm Shires, Inc., a Delaware corporation (the "Seller") and [●], a [*jurisdiction of organization*] [*entity type*] (the "Buyer").  The Seller and the Buyer are collectively referred to as the "Parties" and individually as a "Party."

## RECITALS

**WHEREAS**, as of the Execution Date, the Seller owns all of the issued and outstanding shares of capital stock of Embed Financial Technologies Inc., a Delaware corporation (the "Company") (each, a "Share", and collectively, the "Shares");

**WHEREAS**, the Company owns all of the outstanding limited liability company interests of (i) Embed Clearing LLC, a Delaware limited liability company ("Embed Clearing"), and (ii) Embed Crypto LLC, a Delaware limited liability company ("Embed Crypto" and, together with the Company and Embed Clearing, the "Target Entities," and such limited liability company interests, the "Subsidiary Interests");

**WHEREAS**, on November 11, 2022 and November 14, 2022, the Seller and certain of its Affiliates, not including the Target Entities (collectively, the "Debtors") commenced voluntary proceedings under Chapter 11 of the Bankruptcy Code by filing petitions for relief in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), which cases were consolidated as *In re FTX Trading Ltd., et al.* (Case No. 22-11068 (JTD)) (the "Bankruptcy Proceeding");

**WHEREAS**, on January 12, 2023, the Bankruptcy Court entered an order (the "Bid Procedures Order") approving bid procedures for the sale of certain assets of the Debtors, including the Shares (the "Bid Procedures"), establishing procedures for the Debtors to award stalking horse bid protections in connection with the Seller's entry into a stalking horse purchase agreement (the "Bid Protections"), scheduling an auction (an "Auction") for, and a hearing (a "Sale Hearing") to approve, the sale of the Shares, approving the form and manner of notices of Auction and Sale Hearing and approving contract assumption and assignment procedures, among other things;

**WHEREAS**, the Seller desires to sell to the Buyer, and the Buyer desires to purchase from the Seller, all of the Shares, in a sale authorized by the Bankruptcy Court pursuant to, *inter alia*, sections 105 and 363 of the Bankruptcy Code, in accordance with the other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the Local Rules of Bankruptcy Practice and Procedure of the Bankruptcy Court, all upon the terms and subject to the conditions set forth in this Agreement and subject to entry of the Sale Order;

**WHEREAS**, prior to the execution of this Agreement, the Buyer has delivered to [●] (the "Escrow Agent") a deposit in the sum of $[●]² (the "Deposit Amount" and the account into which such deposit is made, the "Escrow Account"); and

**WHEREAS**, the Seller and the Buyer desire to make certain representations, warranties, covenants and agreements in connection with this Agreement.

**NOW**, **THEREFORE**, in consideration of the premises, and of the representations, warranties, covenants and agreements contained herein, the Parties agree as follows:

# ARTICLE I

## PURCHASE AND SALE; PAYMENT; CLOSING; CLOSING DELIVERIES

1.1    Purchase and Sale.  Upon the terms and subject to the conditions set forth in this Agreement, the Seller agrees to sell, assign, convey, transfer and deliver to the Buyer, and the Buyer agrees to purchase and accept from the Seller, all of the Shares, free and clear of any Liens (other than any transfer restrictions imposed by federal and state securities Laws and Permitted Encumbrances), at the Closing for an aggregate amount in cash equal to $[●] (the "Purchase Price"), subject to adjustment pursuant to Section 1.4.

1.2    Time and Place of Closing.  The closing of the purchase and sale provided for in this Agreement (the "Closing") will take place at [9:00] a.m., Eastern Time, at the offices of Sullivan & Cromwell LLP, 125 Broad Street, New York, NY 10004 or remotely via electronic exchange of documents and signatures, on the [third (3rd)] Business Day following the satisfaction or, to the extent permitted by applicable Law, waiver of the last condition in Article VI to be satisfied or waived (other than those conditions that by their nature are to be satisfied at the Closing, but subject to the fulfillment or, to the extent permitted by applicable Law, waiver of those conditions) or at such other time and place as the Buyer and the Seller mutually agree (the "Closing Date").

1.3    Deliveries at Closing.

(a)    By the Seller.  Upon the terms and subject to the conditions set forth in this Agreement, at the Closing (or at such later time as may be specified below), the Seller shall deliver or cause to be delivered to the Buyer:

(i)    a duly executed "certificate of non-foreign status," in a form reasonably acceptable to the Buyer, that complies with the requirements of Treasury Regulation Section 1.1445-2(b); provided, however, that the Buyer's sole right if the Seller fails to provide such certificate shall be to make an appropriate withholding under Section 1445 of the Code;

---

² **Note to Draft**: To be 10% of the total consideration constituting the "Good Faith Deposit" contemplated by the Bid Procedures.

(ii)    an IRS Form W-9, to the extent required to satisfy any withholding or reporting obligation with respect to payments made under this Agreement;

(iii)    the certificate or certificates representing the Seller's Shares, duly endorsed in blank by the record holder thereof or accompanied by duly executed stock power(s) endorsed in blank by the record holder thereof;

(iv)    [duly executed counterpart(s) to one or more assumption and assignment agreements with respect to the Assigned Contracts, substantially in the form attached hereto as <u>Exhibit C</u>, (each, an "<u>Assumption and Assignment Agreement</u>");][3]

(v)    a counterpart to a joint instruction to the Escrow Agent, instructing the Escrow Agent to release the Deposit Amount to the Seller; and

(vi)    the certificate contemplated by <u>Section 6.2(c)</u>.

(b)    <u>By the Buyer</u>.  Upon the terms and subject to the conditions set forth in this Agreement, at the Closing, the Buyer shall deliver or cause to be delivered:

(i)    a counterpart to a joint instruction to the Escrow Agent, instructing the Escrow Agent to release the Deposit Amount to the Seller;

(ii)    by wire transfer of immediately available funds to the Seller, an amount equal to the Closing Date Payment;

(iii)    [duly executed counterpart(s) to the Assumption and Assignment Agreements;] and

(iv)    the certificate contemplated by <u>Section 6.3(c)</u>.

1.4    <u>Closing Statement</u>.  No later than four Business Days prior to the Closing Date, the Seller shall prepare and deliver to the Buyer a statement (the "<u>Estimated Closing Statement</u>"), together with supporting documentation used by the Seller in calculating the amounts set forth therein, setting forth a good faith estimate of the Cash (the "<u>Acquired Cash Amount</u>") and Indebtedness (the "<u>Closing Indebtedness Amount</u>") of the Target Entities as of the Closing.   The Seller shall (x) consider in good faith any potential adjustments to the Estimated Closing Statement delivered by the Buyer to the Seller and (y) address any arithmetic or calculation errors with respect to the Estimated Closing Statement presented by Buyer, in each case, no later than two Business Days prior to the Closing Date, and shall reissue a statement with such revisions that the Seller has determined are appropriate (the "<u>Final Closing Statement</u>") to the Buyer within one Business Day prior to the Closing Date; <u>provided</u> that if the Buyer and the Seller fail to mutually agree upon revisions to the Estimated Closing Statement on or prior to the second (2nd) Business Day prior to the Closing Date, then (x) neither the Buyer nor the Seller shall delay the Closing because of such failure, (y) any revisions to the Estimated Closing Statement mutually agreed between the

---

[3]    **Note to Draft**: Buyer to indicate whether it intends to assume any of the Retention Agreements, which are the only agreements related to the Embed business that are held by WRS or any affiliate (other than the Target Entities).

Buyer and the Seller shall be used in determination of the Final Closing Statement and the Closing Date Payment, and (z) as to any other items, the amounts set forth in the Final Closing Statement as determined by the Seller, without any adjustment, shall be the amounts used in the determination of the Closing Date Payment (and which shall be paid by the Buyer to the Seller at Closing), and the Buyer shall have no further recourse with respect thereto.

1.5    [4][Assumption and Assignment of Certain Contracts.

(a)    Subject to the provisions of this Section 1.5, section 365 of the Bankruptcy Code, the Bid Procedures Order and applicable Order(s) of the Bankruptcy Court authorizing the assumption and assignment of such Contracts, at the Closing, the Seller shall assign to the Buyer, and the Buyer shall assume, the entirety of the Seller's right, title and interest in and to each Contract listed on Schedule 1.5(a) as of the Closing with respect to which an order has been entered by the Bankruptcy Court (which may be the Sale Order) authorizing the assumption and assignment of such Contract (such Contracts collectively, the "Assigned Contracts").

(b)    The Buyer shall pay all Cure Costs in respect of the Assigned Contracts, which shall not be the obligation, liability or responsibility of the Seller.  The Buyer has delivered evidence of the Buyer's ability to comply with section 365 of the Bankruptcy Code, including adequate assurances of any future performance, in connection with the assumption and assignment of the Assigned Contracts designated as of the Execution Date.

(c)    The Debtors filed with the Bankruptcy Court on February 6, 2023, a notice (the "Assignment Notice") in the form approved by the Bid Procedures Order and served such Assignment Notice by first-class mail (and/or by email, as applicable) on each non-Debtor contract counterparty (each, a "Counterparty") to those certain executory contracts that the Seller may, in its discretion, assume and assign in connection with the Transactions.  In accordance with the Bid Procedures Order, the Seller shall request that, by virtue of the Seller providing 14 days' (or such other notice period as required by the Bid Procedures Order) prior notice of its intent to assume and assign any Assigned Contract, the Bankruptcy Court deem any Counterparty to such Assigned Contract that does not file an objection with the Bankruptcy Court during such notice period to have given any necessary consent to the assumption of the Assigned Contract by the Seller and assignment to the Buyer.

(d)    The Seller shall use its commercially reasonable efforts to obtain one or more Orders of the Bankruptcy Court, which Order(s) shall be in form and substance reasonably acceptable to the Buyer, and shall reflect the terms and conditions set forth herein, to assume and assign the Assigned Contracts to the Buyer on the terms set forth in this Section 1.5.

(e)    At or following the Closing, the Seller may, at any time at its discretion, reject any Contracts to which the Seller or any of its Affiliates (not including the Target Entities) is a party, including any Contracts that may be related to the businesses of the Target Entities.]

---

[4]        **Note to Draft**: Buyer to indicate whether it intends to assume any of the Retention Agreements.

## ARTICLE II

## REPRESENTATIONS AND WARRANTIES OF THE SELLER

Except as set forth in the corresponding sections or subsections of the disclosure schedule delivered to the Buyer by the Seller prior to or simultaneous with the execution of this Agreement (the "Seller Disclosure Schedule"), the Seller represents and warrants to the Buyer as follows:

2.1     Ownership of Shares and Subsidiary Interests.

(a)     The Seller is the sole record and beneficial owner of the Shares.  The Seller has good and valid title to all such Shares, free and clear of all Liens (other than any transfer restrictions imposed by federal and state securities Laws and Permitted Encumbrances), and upon delivery by the Seller of such Shares at the Closing, good and valid title to such Shares will pass to the Buyer.

(b)     The Company is the sole record and beneficial owner of the Subsidiary Interests.  The Company has good and valid title to all such Subsidiary Interests, free and clear of all Liens (other than any transfer restrictions imposed by federal and state securities Laws).  Other than Embed Clearing and Embed Crypto, the Company has no Subsidiaries.

2.2     Organization, Good Standing and Qualification.

(a)     The Seller (i) is a corporation duly organized, validly existing and in good standing under the Laws of the State of Delaware, (ii) has all requisite corporate or similar power and authority to own, pledge or dispose of the Shares and to carry on its business as presently conducted and (iii) is qualified to do business and, to the extent such concept is applicable, is in good standing as a foreign corporation or other legal entity in each jurisdiction where the ownership, leasing or operation of its assets or properties or conduct of its business requires such qualification, except in the case of clauses (ii) or (iii) where the failure to be so qualified or in good standing, or to have such power or authority, would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect or reasonably be expected to prevent, materially delay or materially impair the consummation of the Transactions.

(b)     The Target Entities (i) are legal entities duly organized, validly existing and in good standing (or the equivalent) under the Laws of their jurisdiction of organization, (ii) have all requisite corporate or limited liability company or similar power, as applicable, and authority to own, lease and operate its properties and assets and to carry on its business as presently conducted and (iii) are qualified to do business and, to the extent such concept is applicable, are in good standing as a foreign corporation or other legal entity in each jurisdiction where the ownership, leasing or operation of its assets or properties or conduct of its business requires such qualification, except in the case of clauses (ii) or (iii) where the failure to be so qualified or in good standing (or the equivalent), or to have such power or authority, would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect or reasonably be expected to prevent, materially delay or materially impair the consummation of the Transactions.  The Seller has made available to the Buyer complete and correct copies of the Target Entities' certificates of

incorporation and bylaws or comparable governing documents, each as amended, prior to the Execution Date ("Organizational Documents"), and each as so delivered is in full force and effect.

2.3    Capitalization of the Company.

(a)    The authorized capital stock of the Company consists of 100 Shares, of which 100 Shares were outstanding and no Shares were issued and held by the Company in its treasury, in each case, as of the date of this Agreement. All of the outstanding Shares and Subsidiary Interests have been duly authorized and are validly issued, fully paid and, to the extent applicable, nonassessable. The Company does not have outstanding any bonds, debentures, notes or other obligations, the holders of which have the right to vote (or convert into or exercise for securities having the right to vote) with the stockholders of the Company on any matter. Except for this Agreement, the Shares are not subject to any voting trust agreements, proxies or other Contracts with respect to the voting, purchase, repurchase, dividend rights, disposition or transfer of the Shares.

(b)    There are no preemptive or other outstanding rights, options, warrants, agreements, arrangements or commitments under which the Company is or may become obligated to sell, or giving any Person a right to acquire or in any way dispose of, any of the Shares or Subsidiary Interests or any securities or obligations exercisable or exchangeable for, or convertible into, the Shares or Subsidiary Interests, and no securities or obligations evidencing such rights are authorized, issued or outstanding. Except for this Agreement and the Company's Organizational Documents, the Seller is not a party to any Contracts with respect to the voting, purchase, dividend rights, disposition or transfer of the Shares.

2.4    Authority; Approval. Subject to the issuance of the Sale Order and any other Order required by the Bankruptcy Court in connection with the Transactions:

(a)    the Seller has all requisite corporate or similar power and authority and has taken all organizational or similar action necessary in order to execute, deliver and perform its respective obligations under this Agreement and the other Transaction Documents to which it is or will become a party; and

(b)    this Agreement has been duly executed and delivered by the Seller and, assuming that this Agreement constitutes the legal, valid and binding obligation of the Buyer, is a legal, valid and binding agreement of the Seller, enforceable against the Seller in accordance with its terms, subject to bankruptcy, insolvency, fraudulent conveyance, preferential transfer, reorganization, moratorium and similar Laws relating to or affecting creditors' rights and to general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law) (the "Equitable Exception").

2.5    Governmental and Self-Regulatory Organization Filings; No Violations.

(a)    Other than the expirations of waiting periods and the filings, notices, reports, consents, registrations, approvals, Permits and authorizations required, as applicable, (i) under the HSR Act, (ii) under FINRA Rule 1017 and (iii) with respect to the Required Notices, and subject to the issuance of the Sale Order and any other Order required by the Bankruptcy Court in connection with the Transactions, no expirations of waiting periods under applicable Antitrust

Laws are required and no notices, reports or other filings are required to be made by the Seller or the Company with, nor are any consents, registrations, approvals, Permits or authorizations required to be obtained by the Seller or the Company from, any Governmental Entity or Self-Regulatory Organization in connection with the execution, delivery and performance of this Agreement and the other Transaction Documents by the Seller or the Company or the consummation of the Transactions; provided, however, that no representation or warranty is made with respect to waiting periods, authorizations, consents, registrations, Permits, approvals, notices, reports or filings with any Governmental Entity or Self-Regulatory Organization that, if not obtained or made, would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(b)     The execution, delivery and performance of this Agreement and the other Transaction Documents by the Seller does not, and the consummation of the Transactions will not, conflict with, or result in any breach or violation of or default (with or without notice, lapse of time, or both) under, or give rise to any right of termination, cancellation or acceleration of any obligation under, or result in the creation of a Lien on any of the Shares or assets of the Target Entities under any provision of (i) the Organizational Documents of the Target Entities, (ii) subject to the Sale Order or any other Order required by the Bankruptcy Court in connection with the Transactions, any Material Contract or (iii) subject to the Sale Order or any other Order required by the Bankruptcy Court in connection with the Transactions and assuming (solely with respect to performance of this Agreement and the other Transaction Documents and consummation of the Transactions) compliance with the matters referred to in Section 2.5(a), any Laws to which the Target Entities are subject, except, in the case of clauses (ii) and (iii) above, for any breach, violation, default, termination, cancellation, acceleration or creation that would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

2.6     Litigation.  Except for the general pendency of the Bankruptcy Proceeding and Actions that would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, as of the date hereof, there are no Actions pending or, to the Knowledge of the Company, threatened against Seller or any of the Target Entities with respect to the Shares or the ownership or operation of the assets (including the Subsidiary Interests) of the Company.

2.7     Employee Benefits.

(a)     Section 2.7(a) of the Seller Disclosure Schedule sets forth a correct and complete list of each material Benefit Plan.

(b)     With respect to each material Benefit Plan, the Seller has made available to the Buyer, to the extent applicable (and, with respect to each material Benefit Plan that is provided by a professional employer organization ("PEO"), to the extent in Seller's possession after reasonable request to the PEO), correct and complete copies of (i) the Benefit Plan document, including any amendments thereto, (ii) a written description of such Benefit Plan if such plan is not set forth in a written document, and (iii) all material correspondence to or from any Governmental Entity received in the last year with respect to any such material Benefit Plan.

(c)     Except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (i) each Benefit Plan (including any related trusts) has been

established, operated and administered in compliance in all material respects with its terms and applicable Laws, including ERISA and the Code, and (ii) there are no pending or, to the Knowledge of the Company, threatened claims (other than routine claims for benefits) or proceedings by a Governmental Entity by, on behalf of or against any Benefit Plan or any trust related thereto.

(d)    With respect to each ERISA Plan, if any, the Seller has made available to the Buyer, to the extent applicable, correct and complete copies of (i) the most recent summary plan description together with any summaries of all material modifications thereto, and (ii) the most recent IRS determination, opinion letter or advisory letter.

(e)    Each ERISA Plan, if any, that is intended to be qualified under Section 401(a) of the Code has been determined by the IRS to be qualified under Section 401(a) of the Code and, to the Knowledge of the Company, nothing has occurred that would adversely affect the qualification or tax exemption of any such Benefit Plan.

(f)    Neither the Target Entities nor any ERISA Affiliate, has contributed (or had any obligation of any sort) in the last six (6) years to a plan that is subject to Section 412 of the Code or Section 302 or Title IV of ERISA.

(g)    Neither the execution and delivery of this Agreement nor the consummation of the Transactions could, either alone or in combination with another event, (i) entitle any Employee to material severance pay or any material increase in severance pay, or (ii) accelerate the time of payment or vesting, or materially increase the amount of compensation due to any such Employee.

(h)    This Section 2.7 constitutes the exclusive representations and warranties of the Seller with respect to employee benefits.

2.8    Labor Matters.

(a)    The Target Entities are not a party to or bound by any collective bargaining agreement or other agreement with a labor union or like organization, and, to the Knowledge of the Company, there are no activities or proceedings by any individual or group of individuals, including representatives of any labor organizations or labor unions, to organize any employees of the Target Entities, except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(b)    There is no pending, and, to the Knowledge of the Company, there has not been any threatened, strike, lockout, slowdown, work stoppage, unfair labor practice or other material labor dispute, or material arbitration or grievance that may interfere with the business activities of the Company except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.  Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, the Target Entities are in compliance with all applicable Laws respecting labor, employment and employment practices, terms and conditions of employment, wages and hours and occupational safety and health.

(c)     This <u>Section 2.8</u> constitutes the exclusive representations and warranties of the Seller with respect to labor matters.

2.9     <u>Compliance with Laws; Licenses, Permits and Authorizations</u>.

(a)     To the Knowledge of the Company, and except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, the business of the Target Entities is in compliance with all Laws and Self-Regulatory Organization rules applicable to the Company's business.

(b)     The Company has made available to Buyer complete copies of Company Broker-Dealer's Uniform Application for Broker-Dealer Registration on Form BD, reflecting all amendments thereto to the date of this Agreement ("<u>Form BD</u>").

(c)     No exemptive orders, "no-action" letters or similar exemptions or regulatory relief have been obtained, nor are any requests pending therefor, by or with respect to the Target Entities or any officer, director, partner or employee of the Target Entities in connection with the business of the Target Entities.

(d)     The Company Broker-Dealer is a member of the DTC, IEX, Nasdaq, NSCC and OCC.

(e)     No representation or warranty is given under this <u>Section 2.9(e)</u> with respect to Taxes, ERISA, labor or employment Laws, which matters are covered exclusively under <u>Section 2.7</u> or <u>Section 2.8</u> and <u>Section 2.12</u>.

2.10    <u>Material Contracts</u>.

(a)     Section 2.11(a) of the Seller Disclosure Schedule sets forth a complete list of each of the following Contracts to which any of the Target Entities is a party or by which the Target Entities are bound (each, a "<u>Material Contract</u>") (other than Benefit Plans and Leases):

(i)     Contract creating an indebtedness for borrowed money of the Target Entities or to the mortgaging or pledging of, or otherwise placing a Lien on (other than a Permitted Lien), any of their respective assets or its securities;

(ii)    Contract containing covenants that restrict the right of any of the Target Entities to (A) engage in any business activity, (B) engage in any line of business or compete with any Person, or (C) conduct any activity in any geographic area;

(iii)   Contract under which it has advanced or loaned any other Person any amounts in excess of $100,000;

(iv)    Contract involving the settlement of any Action or threatened Action against a Target Entity (A) which will (x) involve outstanding payment obligations of a Target Entity, due and payable after April 30, 2023, and in excess of $250,000 or (y) impose monitoring or reporting obligations on a Target Entity to any other Person outside the ordinary course of

business or (B) with respect to which conditions precedent to the settlement have not been satisfied;

(v)     Contract relating to the acquisition or sale of a business (or any material portion thereof) by the Target Entities, whether or not consummated, for aggregate consideration under such Contract in excess of $5,000,000 pursuant to which any earn-out, indemnification or deferred or contingent payment obligations remain outstanding that would reasonably be expected to involve payments by or to a Target Entity of more than $250,000 after the date hereof (in each case, excluding for the avoidance of doubt, acquisitions or dispositions of supplies, equipment, properties or other assets that are obsolete, worn out, surplus or no longer used or useful in the conduct of the business); or

(vi)    Contract whereby Seller or its Subsidiaries (other than the Target Entities) is a party with respect to the operations of the business of the Company.

(b)     Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, each Material Contract is valid, binding and enforceable against the Seller or the applicable Target Entity and, to the Knowledge of the Company, each other party thereto, and is in full force and effect, except as may be limited by the Equitable Exception.  There is no breach or violation of, or default under, any such Material Contract by the Seller or the applicable Target Entity and no event has occurred that, with the lapse of time or the giving of notice or both, would constitute a default thereunder by the Seller or the applicable Target Entity, in each case except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

2.11    Real Property.

(a)     The Company does not own any real property.

(b)     Section 2.11(b) of the Seller Disclosure Schedule sets forth a complete list of all real property leased or subleased to the Target Entities (collectively, the "Leased Real Property") and a list of all leases (the "Leases") entered into by the Company with respect to the Leased Real Property.  Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, (i) the Company has a valid leasehold interest in all Leased Real Property, free and clear of all Liens other than Permitted Encumbrances and (ii) to the Knowledge of the Company, there exists no default or event of default (as applicable) under the Leases.

2.12    Taxes.  Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, the Company (a) has prepared in good faith and duly and timely filed (taking into account any extension of time within which to file) all income and other material Tax Returns required to be filed and all such filed Tax Returns are complete and accurate in all material respects, (b) has paid all Taxes that are shown as due on such filed Tax Returns, (c) has complied in all material respects with all applicable Laws relating to the withholding of Taxes and have duly and timely withheld and paid over to the appropriate Tax authority all amounts required to be so withheld and paid over under all applicable Laws with respect to any employee, creditor or third party, except with respect to matters contested in good

-10-

faith or immaterial amounts and (d) has not waived any statute of limitations with respect to Taxes or agreed to any extension of time with respect to a Tax assessment or deficiency (other than pursuant to extensions of time to file Tax Returns obtained in the ordinary course of business) which would have effect after the Closing Date.  As of the Execution Date, there are no pending audits, examinations, investigations or other proceedings in respect of Taxes.  The Company has not, in the past two years, received a written claim made by any Tax authority asserting that the Company is or may be subject to taxation in a jurisdiction in which the Company does not file Tax Returns.  The Company has not participated in a "reportable transaction" within the meaning of Treasury Regulation Section 1.6011-4(b)(1).  Notwithstanding anything herein to the contrary, the representations and warranties in this <u>Section 2.12</u> refer only to the past activities of the Company and are not intended to serve as representations to, or a guarantee of, nor can they be relied upon for, or with respect to, the availability of Tax attributes or Taxes with respect to any taxable periods (or portions thereof) beginning after, or Tax positions taken after, the Closing Date.

2.13 <u>Intellectual Property; Information Technology; Data Privacy</u>.

(a)  Section 2.13(a) of the Seller Disclosure Schedule identifies the Company Registered IP as of the date of this Agreement.  Except as would not reasonably be expected to have a Material Adverse Effect, all such Company Registered IP, taken as a whole, is subsisting and, other than Company Registered IP constituting applications or Internet domain names, to the Knowledge of the Company, valid and enforceable.

(b)  Except as has not resulted in, and would not reasonably be expected to result in, individually or in the aggregate, a Material Adverse Effect, the Target Entities collectively own or have sufficient and valid rights to use all Intellectual Property used in their conduct of their business as currently conducted.

(c)  Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, (i) the Target Entities, taken together, exclusively own all right, title and interest in and to all Company Intellectual Property, free and clear of all Liens except for Permitted Encumbrances and (ii)  no Company Intellectual Property is subject to any Action or Order challenging the validity or enforceability thereof, or the Company's ownership or rights therein, except for claims rejected or refused in connection with the prosecution of any Company Registered IP.

(d)  Except as has not resulted in, and would not reasonably be expected to result in, individually or in the aggregate, a Material Adverse Effect, (i) the Target Entities' conduct of their business as presently conducted does not infringe, misappropriate or otherwise violate the Intellectual Property of any third party, and (ii) since January 1, 2022, the Target Entities have not received any written claim, notice, invitation to license or similar communication alleging any such infringement, misappropriation or other violation of Intellectual Property by the Target Entities.

(e)  Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, (i) to the Knowledge of the Company, no third party is infringing, misappropriating or otherwise violating any Company Intellectual Property, and (ii)

since January 1, 2022, none of the Target Entities have asserted or threatened in writing any Action against any Person alleging any such infringement, misappropriation or violation.

(f)     Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, the Target Entities have not embedded, used or distributed any Software that is licensed pursuant to any "open source" or similar license (or any Software that includes or links to any such open source or similarly licensed Software) in conjunction with any material proprietary Software included within the Company Intellectual Property in a manner that requires, as a result of how such licensed Software is distributed, made available, or used, that any of the Target Entities (i) disclose or distribute any proprietary source code for such proprietary Software, (ii) license or otherwise make available any such proprietary Software on a royalty-free basis or (iii) grant any rights to any Person to decompile, reverse-engineer or make derivative works of such proprietary Software.

(g)     Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, the Company IT Assets (i) operate and perform as required by the Target Entities to operate their business, and (ii) have not malfunctioned or failed since January 1, 2022.  To the Knowledge of the Company, since January 1, 2022, there has been no unauthorized access to or unauthorized use of any Company IT Assets, or any information stored therein or transmitted thereby, in each case, in a manner that would reasonably be expected to result in, individually or in the aggregate, a Material Adverse Effect .

(h)     The Company has in place commercially reasonable measures designed to (i) protect the security of the Company IT Assets (and the information stored or contained therein or transmitted thereby) from unauthorized use and access by third parties, and (ii) protect all Personal Information controlled by the Target Entities from and against any anticipated threats or hazards and against any Security Incident.

(i)     To the Knowledge of the Company, since January 1, 2022, (i) no Person has gained unauthorized access to or misused any Personal Information in a manner that, individually or in the aggregate, has resulted in an obligation for the Target Entities to notify any affected individuals, Governmental Entity or other third party, and (ii) except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, the Target Entities have not received any written notice (including any enforcement notice), letter or complaint alleging, or providing notice of any investigation concerning, any Security Incident or any noncompliance by the Target Entities with any applicable Privacy Laws.

2.14     <u>Brokers and Finders</u>.  Except for fees and expenses payable to Perella Weinberg Partners LP by the Debtors, there are no fees or expenses payable by the Seller or the Company to any investment banker, broker, finder or other intermediary that has been retained by or is authorized to act on behalf of the Seller in connection with the Transactions.

2.15     <u>Absence of Certain Business Practices</u>.

As of the date of this Agreement, (a) except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, the Target Entities are, to the Knowledge of the Company, in compliance with all applicable Specified Business Conduct

Laws and (b) since January 1, 2022, none of the Target Entities has (i) received written notice of or made a voluntary, mandatory or directed disclosure to any Governmental Entity relating to any actual violation of any Specified Business Conduct Law or (ii) been a party to or the subject of any pending or, to the Knowledge of the Company, threatened Action or investigation by or before any Governmental Entity related to any actual violation of any Specified Business Conduct Law, except, in each case, to the extent any such notice, disclosure, Action or investigation would not reasonably be expected to have a Material Adverse Effect on the Company.

2.16    No Other Representations or Warranties.

(a)    Except for the representations and warranties contained in this Article II, neither the Seller nor any other Person makes any other express or implied representation or warranty with respect to the Seller, the Target Entities, the Shares, the Subsidiary Interests or the Transactions, and the Seller disclaims any other representations or warranties, whether made by the Seller, any of its respective Affiliates or any of its or their respective Representatives.  Except for the representations and warranties contained in this Article II, the Seller, on behalf of itself, the Company and their respective Subsidiaries and Affiliates (i) expressly disclaims and negates any representation or warranty, expressed or implied, at common law, by statute or otherwise, with respect to the business, operations, assets, liabilities and conditions (financial or otherwise) of the Target Entities or with respect to the Shares (including any express or implied warranty of merchantability or fitness for a particular purpose) and (ii) disclaims all liability and responsibility for any representation, warranty, projection, forecast, statement or information made, communicated or furnished (orally or in writing) to the Buyer or its Affiliates or Representatives (including any opinion, information, projection or advice that may have been or may be provided to the Buyer by any Representative of the Seller or any of its Affiliates).  The Seller makes no representations or warranties to the Buyer regarding the probable success or profitability of the Target Entities.  The disclosure of any matter or item in any Schedule hereto will not be deemed to constitute an acknowledgment that any such matter is required to be disclosed or is material or that such matter could result in a Material Adverse Effect.

(b)    The Seller acknowledges and agrees that, except for the representations and warranties expressly set forth in Article III, neither the Buyer nor any other Person has made any express or implied representation or warranty with respect to the Transactions or with respect to the accuracy or completeness of any other information provided, or made available, to the Seller in connection with the Transactions and the Seller has not relied on any representation or warranty other than those expressly set forth in Article III.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES OF THE BUYER

The Buyer hereby represents and warrants to the Seller as follows:

3.1    Organization, Good Standing and Qualification.  The Buyer is a [*entity type*] duly organized, validly existing and in good standing under the Laws of [*jurisdiction of organization*].  The Buyer has all requisite [corporate][limited liability company] or similar power and authority to own, lease and operate its properties and assets and to carry on its business as

presently conducted and is qualified to do business and, to the extent such concept is applicable, is in good standing as a foreign legal entity in each jurisdiction where the ownership, leasing or operation of its assets or properties or conduct of its business requires such qualification, in each case, except where the failure to be so qualified or in good standing or to have such power or authority, would not, individually or in the aggregate, reasonably be expected to prevent, materially delay or materially impair the consummation of the Transactions.

3.2    <u>Authority; Approval</u>.

(a)    The Buyer has all right, power and authority to enter into and perform its obligations under this Agreement and the other Transaction Documents to which it is or will become a party and has all requisite [corporate][limited liability company] or similar power and authority and has taken all organizational action necessary in order to execute, deliver and perform its obligations under this Agreement and the other Transaction Documents to which it is or will become a party and to consummate the Transactions.  No additional corporate or shareholder authorization or consent is required in connection with the execution, delivery and performance by the Buyer of this Agreement or any of the Transaction Documents to which it is or will become party.

(b)    This Agreement has been duly executed and delivered by the Buyer and, when executed and delivered by the Seller, will constitute a legal, valid and binding agreement of the Buyer enforceable against the Buyer in accordance with its terms, subject to the Equitable Exception.

3.3    <u>Governmental and Self-Regulatory Organization Filings; No Violations</u>.

(a)    Other than the expirations of waiting periods and the filings, notices, reports, consents, registrations, approvals, permits and authorizations required (i) under the HSR Act and (ii) [●][5], no expirations of waiting periods under applicable Antitrust Laws are required and notices, reports or other filings are required to be made by the Buyer with, nor are any consents, registrations, approvals, permits or authorizations required to be obtained by the Buyer from, any Governmental Entity or Self-Regulatory Organization in connection with the execution, delivery and performance of this Agreement by the Buyer or the consummation of the Transactions, except those that the failure to make or obtain would not, individually or in the aggregate, reasonably be expected to prevent, materially delay or materially impair the consummation of the Transactions.

(b)    The execution, delivery and performance by the Buyer of this Agreement does not, and the consummation of the Transactions will not, conflict with, or result in any breach or violation of, or default (with or without notice, lapse of time or both) under, or give rise to any right of termination cancellation or acceleration of any obligations under, or result in the creation of a Lien on any of the assets of the Buyer under any provision of (i) the certificate of incorporation, by-laws or comparable governing documents of the Buyer, (ii) any Contract binding upon the Buyer, or (iii) assuming (solely with respect to the performance of this Agreement and consummation of the Transactions) compliance with the matters referred to in <u>Section 3.3(a)</u>, any

---

[5]    **Note to Buyer**: Please populate all applicable filings, notices, approvals and consents that will be required under applicable law or with respect to any SROs.

-14-

Law to which the Buyer is subject, except, in the case of <u>clauses (ii)</u> and <u>(iii)</u> above, for any such breach, violation, default, termination, cancellation, acceleration or creation that would not, individually or in the aggregate, reasonably be expected to prevent, materially delay or materially impair the consummation of the Transactions.

3.4    <u>Litigation</u>.  As of the Execution Date, there are no Actions pending or threatened in writing against the Buyer or any of its Affiliates, including, for the avoidance of doubt, Actions by a Governmental Entity or Self-Regulatory Organization, that would reasonably be expected to prevent, materially delay or materially impair the consummation of the Transactions.  As of the Execution Date, the Buyer is not a party to or subject to the provisions of any material Order that would, individually or in the aggregate, reasonably be expected to prevent, materially delay or materially impair the consummation of the Transactions.

3.5    <u>Compliance with Laws</u>. The Buyer is in compliance with all Laws and any Self-Regulatory Organization rules applicable to the Buyer, except as would not, individually or in the aggregate, reasonably be expected to prevent, materially delay or materially impair the ability of the Buyer to consummate the Transaction.

3.6    <u>Available Funds</u>.[6]  The Buyer has cash on hand or existing credit facilities and immediately available funds sufficient to pay or cause to be paid the Closing Date Payment and satisfy all of its obligations under this Agreement and any other fees and expenses required to be paid by the Buyer in connection with the Transactions, and to effect the Transactions and has furnished to the Seller written evidence thereof.  Upon the consummation of the Transactions, (a) the Buyer will not be insolvent as defined in section 101 of the Bankruptcy Code, (b) the Buyer will not be left with unreasonably small capital, (c) the Buyer will not have incurred debts beyond its ability to pay such debts as they mature and (d) the capital of the Buyer will not be impaired.

3.7    <u>Investment Intent</u>.  The Buyer is financially sophisticated and understands that the Shares have not been registered under the securities Laws of any jurisdiction, including the Securities Act, and may only be transferred pursuant to registration or an applicable exemption under all applicable Laws.  The Buyer is acquiring the Shares for its own account, for the purpose of investment only and not with a view to, or for sale in connection with, any distribution thereof in violation of applicable Law.  The Buyer has not, directly or indirectly, offered the Shares to anyone or solicited any offer to buy the Shares from anyone, so as to bring such offer and sale of the Shares by the Buyer within the registration requirements of the Securities Act or the securities Laws of any other jurisdiction.  The Buyer is an "accredited investor" within the meaning of Rule 501 under the Securities Act, and the Shares that the Buyer receives hereunder shall be received only on behalf of itself and not for the account or benefit of any other person or entity.

3.8    <u>Brokers and Finders</u>.  Neither the Buyer nor any of its Subsidiaries, nor any of their respective directors or employees (including any officers) has employed any broker, finder or investment bank or has incurred or will incur any obligation or liability for any brokerage fees, commissions or finders fees in connection with the Transactions.

---

[6]    **Note to Buyer**:  Appropriate representations to be included if Buyer requires debt or equity financing.

3.9    <u>No Other Representations or Warranties</u>.

(a)    Except for the representations and warranties contained in this <u>Article III</u>, neither the Buyer nor any other Person makes any other express or implied representation or warranty with respect to the Transactions, and the Buyer disclaims any other representations or warranties, whether made by the Buyer, any Affiliate of the Buyer or any of the Buyer's or its Affiliates' respective Representatives.

(b)    The Buyer acknowledges and agrees that, except for the representations and warranties expressly set forth in <u>Article II</u>, (i) no Seller nor any other Person has made any express or implied representation or warranty with respect to, or otherwise in connection with, the Transactions or with respect to the accuracy or completeness of any other information provided, or made available, to the Buyer in connection with the Transactions and the Buyer has not relied on any representation or warranty other than those expressly set forth in <u>Article II</u>, (ii) the Buyer has not executed or authorized the execution of this Agreement or any of the other Transaction Documents or entered into the Transactions in reliance upon, and hereby specifically disclaims reliance upon, any promise, statement, projection, forecast, representation or warranty whatsoever made or omitted to be made to the Buyer or any of its Affiliates, or their respective Representatives, including any such promise, statement, projection, forecast, representation or warranty as to the condition, value, quality or prospects of the Target Entities, or their respective assets or liabilities, [including the Assigned Contracts], or any part thereof; and (iii) the Shares are being transferred "as is", "where is" and "with all faults".  the Buyer acknowledges and agrees that, except for the representations and warranties expressly set forth in <u>Article II</u>, the Seller, on behalf of itself, the Company and their respective Subsidiaries and Affiliates (x) expressly disclaims and negates any representation or warranty, expressed or implied, at common law, by statute or otherwise, with respect to the business, operations, assets, liabilities and conditions (financial or otherwise) of the Target Entities or with respect to the Shares (including any express or implied warranty of merchantability or fitness for a particular purpose) and (y) disclaims all liability and responsibility for any representation, warranty, projection, forecast, statement or information made, communicated or furnished (orally or in writing) to the Buyer or its Affiliates or Representatives (including any opinion, information, projection or advice that may have been or may be provided to the Buyer by any Representative of the Seller or any of its Affiliates).  The Buyer acknowledges and agrees that the Seller makes no representations or warranties to the Buyer regarding the probable success or profitability of the Target Entities.

(c)    The Buyer (directly or through its Affiliates or Representatives) is an informed and sophisticated purchaser, and has engaged expert advisors that are experienced in the evaluation and acquisition of companies such as the Target Entities, as contemplated hereunder. The Buyer (directly or through its Affiliates or Representatives) has undertaken such investigation as it has deemed necessary to enable it to make an informed and intelligent decision with respect to the execution, delivery and performance of this Agreement and each of the Transaction Documents to which it is or will be a party, and the consummation of the transactions contemplated hereby or thereby.  The Buyer confirms that the Seller has provided the Buyer with the opportunity to ask questions of the officers and employees of the Seller and its Affiliates and to acquire additional information about the Target Entities.

(d)    The Buyer acknowledges that it has conducted to its satisfaction an independent investigation of the business, operations, assets, liabilities and conditions (financial or otherwise) of the Company. In making its determination to proceed with the Transaction, Buyer has relied solely on (i) the results of its own independent investigation and (ii) the representations and warranties of Seller expressly and specifically set forth in Article II.

(e)    The Buyer acknowledges and agrees that the enforceability of this Agreement against the Seller is subject to entry of the Sale Order.

## ARTICLE IV

## COVENANTS

4.1    Interim Operations of the Company.

(a)    Except (i) as otherwise expressly required or permitted by this Agreement, (ii) as required by applicable Law (including COVID-19 Measures), (iii) as authorized by any Order of the Bankruptcy Court, which Order is consistent with this Agreement or (iv) as otherwise set forth in Section 4.1 of the Seller Disclosure Schedule, during the period from the Execution Date to the earlier of the Closing Date and the termination of this Agreement in accordance with Article VII, the Company shall use commercially reasonable efforts to conduct its business and operations in the ordinary course of business.

(b)    Notwithstanding Section 4.1(a), except (1) as otherwise expressly required or permitted by this Agreement, (2) as required by applicable Law (including COVID-19 Measures), (3) as authorized by any Order of the Bankruptcy Court, which Order is consistent with this Agreement or (4) as otherwise set forth in Section 4.1 of the Seller Disclosure Schedule the Seller shall cause the Company not to, without the prior written consent of the Buyer (which consent shall not be unreasonably withheld, conditioned or delayed; provided that such consent shall be deemed to have been given if the Company does not receive the Buyer's response within three (3) Business Days following the Buyer's receipt of the Company's written request for such response) undertake any of the following actions:

(i)    adopt any change in the Target Entities' Organizational Documents;

(ii)    merge or consolidate with any other Person, or restructure, reorganize, dissolve or completely or partially liquidate or otherwise enter into any agreements or arrangements imposing material changes or restrictions on its assets, operations or business;

(iii)    acquire assets outside of the ordinary course of business from any other Person with a value or purchase price in the aggregate in excess of $250,000, or acquire any business or Person, by merger or consolidation, purchase of substantially all assets or equity interests or by any other manner, in each case, in any transaction or series of related transactions;

(iv)    other than pursuant to Contracts to which any of the Target Entities are a party that are in effect as of the Execution Date, transfer, sell, lease, license, mortgage,

pledge, surrender, encumber, divest, cancel, abandon, fail to maintain or allow to lapse or expire or otherwise dispose of any of its material assets, properties, operations, product lines, businesses or interests therein, except for (A) sales or other dispositions of obsolete assets in the ordinary course of business (including the expiration or lapse of Intellectual Property in the ordinary course of business) and (B) licenses, covenants not to sue and similar rights granted under or with respect to Company Intellectual Property in the ordinary course of business consistent with past practice;

(v)      issue, sell, pledge, dispose of, grant, transfer, encumber or authorize the issuance, sale, pledge, disposition, grant, transfer or encumbrance of, any Shares, Subsidiary Interests, or securities convertible or exchangeable into or exercisable for any shares of such capital stock, or any options, warrants or other rights of any kind to acquire any shares of such capital stock;

(vi)      reclassify, split, combine, subdivide or redeem, purchase or otherwise acquire, directly or indirectly, any of its capital stock or securities convertible or exchangeable into or exercisable for any shares of its capital stock;

(vii)      declare, set aside, make or pay any dividend or other distribution, payable in stock, property or otherwise, with respect to any of its capital stock or enter into any agreement with respect to the voting of its capital stock; provided that the foregoing shall not limit or restrict in any way a dividend or other distribution of cash held by the Target Entities that is not Restricted Cash;

(viii)      create or incur any Lien (other than a Permitted Encumbrance) on any assets of the Target Entities that are material to any of the Target Entities;

(ix)      make any loans, advances, guarantees or capital contributions to or investments in any Person (other than the Target Entities) in excess of $100,000 in the aggregate;

(x)      make any changes with respect to its accounting policies or procedures, except as required by changes in Law or GAAP;

(xi)      waive, release, assign, settle or compromise any material Action relating to the Target Entities to the extent that such waiver, release, assignment, settlement or compromise imposes any binding obligation or restriction, whether contingent or realized, on the Shares and/or the Buyer;

(xii)      except as required pursuant to the terms of any Benefit Plan in effect as of the Execution Date, or as otherwise required by applicable Law, (A) materially increase the compensation or consulting fees, bonus, pension, welfare, fringe or other benefits, severance or termination pay of any directors, officers or employees, (B) grant any new awards, or amend or modify the terms of any outstanding awards, under any Benefit Plan, (C) hire any Employee with an annual salary or wage rate or consulting fees in excess of $150,000 or (D) terminate the employment of any Employee with an annual salary or wage rate or consulting fees in excess of $150,000 other than for cause; or

(xiii)   agree, authorize or commit to do any of the foregoing.

(c)      Nothing contained in this Agreement (i) is intended to give the Buyer, directly or indirectly, the right to control or direct any of the Target Entities' business or operations prior to the Closing Date or (ii) shall operate to prevent or restrict any act or omission by Seller or the Target Entities the taking of which is required by applicable Law or any Contract or Benefit Plan by which any of the Target Entities is bound as of the Execution Date.  Prior to the Closing Date, Seller shall exercise, consistent with the terms and conditions of this Agreement, complete control and supervision over the Target Entities' business and operations.

4.2     Cooperation and Efforts to Consummate Transactions; Status Updates.

(a)      Cooperation and Efforts.  Upon the terms and subject to the conditions set forth in this Agreement, the Seller and the Buyer shall cooperate with each other and use (and shall cause their respective Affiliates and Subsidiaries to use) their respective commercially reasonable efforts to (i) take or cause to be taken all actions reasonably necessary or advisable on their part under this Agreement to consummate the Transactions as promptly as reasonably practicable in accordance with the Bid Procedures, (ii) execute, acknowledge and deliver in proper form any further documents, certificates, agreements and other writings, and take such other action as such other Party may reasonably require, in order to effectively carry out the intent of the Transaction Documents, (iii) make or cause to be made all registrations, filings, notifications, submissions and applications with, to give all notices to and to obtain any consents, governmental transfers, approvals, orders, qualifications and waivers from any Governmental Entity or Self-Regulatory Organization necessary for the consummation of the Transactions, (iv) not take any action prior to the Closing that would reasonably be expected to prevent, materially impair or materially delay the consummation of the Transactions, except to the extent such action is otherwise expressly contemplated by this Agreement or the Bid Procedures, (v) cooperate with the other Party and take such actions as such other Party may reasonably request in connection with the consummation of the Transactions and (vi) cause the fulfillment at the earliest practicable date of all of the conditions to their respective obligations to consummate the Transactions.

(b)      Status Updates.  Subject to applicable Laws and as required by any Governmental Entity, the Seller and the Buyer shall each keep the other apprised of the status of matters relating to the consummation of the Transactions, including promptly furnishing the other with copies of material or substantive notices or other communications (or where no such copies are available, a reasonably detailed description thereof) received by any Party, as the case may be, or any of its Subsidiaries or Affiliates, from any third party and/or any Governmental Entity with respect to the Transactions.

4.3     Regulatory Filings/Approvals.[7]

(a)      Submission of Filings and Notices.

---

[7]      **Note to Draft**: Section 4.3 subject to modification depending on the profile of the bidder, including with respect to making additional filings.

(i)     <u>Exchanging Information</u>.  The Seller and the Buyer shall each, upon request by the other, furnish the other with all information concerning itself, its Subsidiaries, directors, officers, stockholders and, to the extent necessary, its Affiliates, and such other matters as may be reasonably necessary or advisable in connection with any statement, filing, notice or application made by or on behalf of the Parties or any of their respective Subsidiaries or, to the extent necessary, Affiliates to any Governmental Entity or Self-Regulatory Organization in connection with the Transactions.

(ii)     <u>Initial Submissions</u>.

(A)     <u>FINRA</u>.  The Seller shall, and as applicable shall cause the Company Broker-Dealer to, prepare and file as promptly as reasonably practicable after the Execution Date all documentation to effect all necessary notices, reports and other filings and to obtain as promptly as practicable all consents, clearances, registrations, approvals, permits and authorizations necessary or advisable to be obtained from any Governmental Entity or Self-Regulatory Organization (including all approvals and consents to the extent required from FINRA as required by FINRA Rule 1017 or otherwise) in order to consummate the Transactions.  The Seller and the Company shall provide Buyer with a reasonable opportunity to review and comment upon any such application (which comments the Seller and the Company shall consider in good faith) prior to the filing thereof with FINRA (the "<u>Continuing Membership Application</u>").  Buyer shall, and shall cause its Affiliates to, cooperate with the Seller and the Company in preparing the Continuing Membership Application, including by promptly making available additional information as requested by Seller, or at Seller's direction, the Company Broker-Dealer, including relating to its business, assets, properties or ownership, and information as to financing sources and plans for maintaining the Company Broker-Dealer's net capital at or above minimum requirements, as may be requested by FINRA and by taking such other actions requested by FINRA in connection with the Continuing Membership Application.  Seller, or at Seller's direction, the Company Broker-Dealer, on the one hand, and Buyer, on the other hand, shall respond promptly to all requests or inquiries from FINRA for additional documentation or information in connection with the Continuing Membership Application. The Seller or the Company shall promptly apprise Buyer of the occurrence and substance of each communication from or to FINRA with respect to the Continuing Membership Application.

(B)     <u>HSR and Other</u>. Each of the Seller and the Buyer shall prepare and file as promptly as reasonably practicable all documentation to effect all necessary notices, reports and other filings and to obtain as promptly as practicable all consents, clearances, registrations, approvals, permits and authorizations necessary or advisable to be obtained from any Governmental Entity or Self-Regulatory Organization in order to consummate the Transactions.  Each of the Seller and the Buyer shall make or cause to be made its respective filing pursuant to the HSR Act with respect to the Transactions as promptly as reasonably practicable after the Execution Date and no later than ten (10) Business Days after the Execution Date. The Parties shall use their respective commercially reasonable efforts to obtain

early termination of any applicable waiting period, to the extent early termination is available, from the applicable Governmental Entities.  Whether or not the Transactions are consummated, the Buyer shall be responsible for all fees and payments to any Governmental Entity or Self-Regulatory Organization (including filing fees) incurred in order to obtain any consent, clearance, registration, approval, permit or authorization or any expiration or termination of a waiting period pursuant to this Section 4.3.

(iii)    Subsequent Submissions.  The Parties shall, or shall cause their respective Subsidiaries and Affiliates to, promptly provide all documents requested by any Governmental Entity to the extent reasonably necessary or advisable to obtain as promptly as practicable all consents, registrations, approvals, permits and authorizations necessary or advisable to be obtained from such Governmental Entity in order to consummate the Transactions.

(iv)    Conduct of Interactions with Governmental Entities and Self-Regulatory Organizations.  Subject to applicable Laws relating to the exchange of information, the Parties shall, to the extent practicable, each consult with the other on and consider in good faith the views of the other in connection with, all the information relating to the Buyer or any of its respective Subsidiaries, the Seller or the Target Entities, as the case may be, that appears in any filing made with, or written materials submitted to, any Governmental Entity or Self-Regulatory Organizations in connection with the Transactions.  In exercising the foregoing rights, the Parties shall act reasonably and as promptly as practicable.

(b)    Efforts.

(i)    Notwithstanding anything in this Agreement to the contrary, the Buyer shall, at the Buyer's sole cost, take or cause to be taken, any and all actions and do, or cause to be done, any and all things necessary, proper or advisable to avoid, eliminate and resolve each and every impediment and obtain all consents required to permit the satisfaction of the conditions in Article VI, as promptly as reasonably practicable, including by offering and causing its Affiliates to:

(A)    proffer and agree to sell, divest, lease, license, transfer, dispose of or otherwise encumber, or hold separate pending such disposition, and effectuate such actions with respect to such assets of the Buyer or its Subsidiaries (and the entry into agreements with, and submission to Orders giving effect thereto) no later than 60 days from the date of the Sale Order if such action is reasonably necessary or advisable to avoid, prevent, eliminate or remove the actual, anticipated or threatened (1) commencement of any proceeding in any forum or (2) issuance of any Order that would reasonably be expected to delay, restrain, prevent, enjoin or otherwise prohibit consummation of the Transactions by any Governmental Entity;

(B)    terminate any existing relationships and contractual rights and obligations of the Buyer or its Affiliates with third parties;

(C)     amend or terminate existing licenses or other Intellectual Property agreements and to enter into such new licenses or other Intellectual Property agreements;

(D)     take any and all actions and make any and all behavioral commitments, whether or not they limit or modify the Buyer's or its Affiliates' rights of ownership in, or ability to conduct the business of, one or more of its or their operations, divisions, businesses, product lines, customers or assets; and

(E)     enter into agreements, including with the relevant Governmental Entity, giving effect to the foregoing clauses (A) through (D).

(ii)     Without limiting the generality of the foregoing, the Parties agree to take or cause to be taken, at the Buyer's sole cost, the following actions:

(A)     the prompt use of their respective commercially reasonable efforts to avoid the entry of any permanent, preliminary or temporary injunction or other decree, decision, determination or judgment that would reasonably be expected to delay, restrain, prevent, enjoin or otherwise prohibit consummation of the Transactions;

(B)     the prompt use of their respective commercially reasonable efforts to take, in the event that any Order is entered or issued, or becomes reasonably foreseeable to be entered or issued, in any regulatory proceeding or inquiry of any kind that would make consummation of the Transactions in accordance with the terms of this Agreement unlawful or that would reasonably be expected to delay, restrain, prevent, enjoin or otherwise prohibit consummation of the Transactions, any and all steps (including the appeal thereof, the posting of a bond or, in the case of the Buyer, the taking of the steps contemplated by Section 4.3(b)(i) necessary to resist, vacate, modify, reverse, suspend, prevent, eliminate or remove such actual, anticipated or threatened Order so as to permit such consummation on a schedule as close as possible to that contemplated by this Agreement.

4.4     Third-Party Consents.

(a)     Upon the terms and subject to the conditions set forth in this Agreement, the Seller shall, and shall cause the Company to, use their commercially reasonable efforts to obtain any consents required by any Contracts set forth on Section 4.4(a) of the Seller Disclosure Schedule to which any of the Target Entities is a party from third parties in connection with the consummation of the Transactions at or prior to the Closing.  In connection therewith, the Seller shall not, and shall cause the Company not to, (i) make any payment of a consent fee, "profit sharing" payment or other consideration (including increased or accelerated payments) or concede anything of monetary or economic value, (ii) amend, supplement or otherwise modify any such Contract or (iii) agree or commit to do any of the foregoing, in each case, for the purposes of giving, obtaining and/or effecting any third-party consents without the prior consent of the Buyer.

(b)     Notwithstanding anything to the contrary contained herein, in no event shall any Party or any of their respective Affiliates be required to make any payments, incur any liability,

-22-

commence any litigation or make any concessions to obtain any consents of third parties contemplated by this <u>Section 4.4</u>, and the failure to receive any such consents shall not be taken into account with respect to whether any conditions to the Closing set forth in <u>Article VI</u> shall have been satisfied.

      4.5    <u>Access and Reports</u>.  Subject to applicable Law, upon reasonable advance notice, the Seller shall, and shall cause the Company to, afford the Buyer's officers and other authorized Representatives reasonable access, during normal business hours from the Execution Date to the earlier of the Closing Date and the termination of this Agreement in accordance with <u>Article VII</u>, to the Company's employees, properties, books, contracts and records and, during such period, the Seller shall furnish promptly to the Buyer all information concerning the Target Entities' business, properties and personnel as the Buyer may reasonably request; <u>provided</u> that the foregoing shall not require the Seller (i) to permit any inspection, or to disclose any information, that in the reasonable judgment of the Seller would result in the disclosure of any trade secrets of third parties or violate any of its obligations with respect to confidentiality (if any Law applicable to the Seller requires the Seller to restrict or prohibit access to such information), (ii) to disclose any privileged information of the Seller or Target Entities or (iii) to disclose any information relating to other bids or potential bids for the Shares or any of the Target Entities' assets; and <u>provided</u>, <u>further</u>, that the Buyer and its Representatives shall conduct any such activities (A) at their sole expense and (B) in such a manner as not to interfere unreasonably with the business or operations of the Seller or Target Entities and such access may be limited to the extent the Seller determines in good faith, in light of the COVID-19 Pandemic or COVID-19 Measures, that such access would jeopardize the health and safety of any employee of the Seller or Target Entities.  All information received pursuant to this <u>Section 4.5</u> shall be governed by the terms of the Confidentiality Agreement.

      4.6    <u>Publicity</u>.  Except as required by the Bankruptcy Court in connection with the Bankruptcy Proceeding, with the exception of the initial [joint] press release regarding the Transactions to be issued by the Seller and the Buyer, which shall be in [a] form[s] mutually agreed by the Parties, any disclosure statement that the Debtors may file in connection with the Bankruptcy Proceeding and any public disclosure issued by the Seller, the Company or their respective Affiliates pursuant to their contractual obligations under any confidentiality agreement or as required by Law, the Buyer and the Seller will not issue any press release or public announcement concerning this Agreement or the Transactions without obtaining the prior written approval of the other Party, which approval may not be unreasonably withheld, except that such consent shall not be required in connection with ordinary or required pleadings made by any Debtor in the Bankruptcy Court or if disclosure is otherwise required by applicable Law or by the Bankruptcy Court; <u>provided</u>, <u>however</u>, that the Parties, will use their respective commercially reasonable efforts consistent with such applicable Law or Bankruptcy Court requirement to consult with the other Parties with respect to the text of any such required disclosure

4.7    Employee Benefits.[8]

(a)    The Buyer agrees that the employees of the Target Entities at the Closing who continue to remain employed with the Company, the Buyer, or their Affiliates (the "Continuing Employees") shall, during the period commencing on the Closing Date and ending on the first anniversary of the Closing, be provided with (i) base salary or base wage and target annual cash bonus opportunities that are no less favorable, in the aggregate, than the base salary or base wage and target annual cash bonus opportunities provided by the Company to each such Continuing Employee immediately prior to the Closing, (ii) pension and welfare benefits (including perquisites) that are no less favorable in the aggregate than those provided by the Company to each such Continuing Employee immediately prior to the Closing and (iii) severance benefits that are no less favorable than the greater of either (A) severance benefits provided by the Buyer to its similarly situated employees, or (B) the severance benefits provided by the Company to each such Continuing Employee immediately prior to the Closing.

(b)    The Buyer shall use commercially reasonable efforts to (i) cause any pre-existing conditions or limitations and eligibility waiting periods under any group health plans of the Buyer or its Affiliates to be waived with respect to the Continuing Employees and their eligible dependents, (ii) give each Continuing Employee credit for the plan year in which the Closing occurs towards applicable deductibles and annual out-of-pocket limits for medical expenses incurred prior to the Closing for which payment has been made and (iii) give each Continuing Employee service credit for such Continuing Employee's employment with the applicable Target Entity for purposes of vesting, benefit accrual and eligibility to participate under each applicable benefit plan of the Buyer, as if such service had been performed with the Buyer, except for benefit accrual under defined benefit pension plans, for purposes of qualifying for subsidized early retirement benefits or to the extent it would result in a duplication of benefits.

(c)    Nothing contained in this Agreement is intended to (i) be treated as an amendment of any particular Benefit Plan, (ii) prevent the Buyer or any of its Affiliates from amending or terminating any of their benefit plans or, after the Closing, any Benefit Plan in accordance with their terms, (iii) prevent the Buyer, the Company or any of their Affiliates, after the Closing, from terminating the employment of any Continuing Employee, subject to following adequate procedures under applicable Law and compliance with this Section 4.7, or (iv) create any third-party beneficiary rights in any employee of the Target Entities, any beneficiary or dependent thereof, or any collective bargaining representative thereof, with respect to the compensation, terms and conditions of employment and/or benefits that may be provided to any Continuing Employee by the Buyer, the Company or any of their Affiliates or under any benefit plan which the Buyer, the Company or any of their Affiliates may maintain.

---

[8]    **Note to Draft**: Buyer to include intentions with respect to continuing employees.

4.8    Confidentiality.  The terms of the Confidentiality Agreement, dated [●] (the "Confidentiality Agreement"), between the Seller, the Buyer and the other parties thereto, are hereby incorporated by reference, *mutatis mutandis*, and, notwithstanding anything contained in the Confidentiality Agreement to the contrary, shall continue in full force and effect until the Closing, at which time such Confidentiality Agreement shall terminate with respect to Confidential Information (as defined in the Confidentiality Agreement) regarding the Target Entities.  If, for any reason, the Closing does not occur, the Confidentiality Agreement shall continue in full force and effect in accordance with its terms.  The Buyer acknowledges and understands that this Agreement, before it becomes otherwise publicly available, may be publicly filed in the Bankruptcy Court and further made available by the Seller to prospective bidders and that, except as prohibited herein, such disclosure will not be deemed to violate any confidentiality obligations owing to the Buyer, whether pursuant to this Agreement, the Confidentiality Agreement or otherwise.

4.9    Tax Matters.

(a)    The Seller and the Buyer shall cooperate with each other in good faith in the conduct of any audit or other proceeding with respect to Taxes from Pre-Closing Periods with respect to the Company. The Seller and the Buyer will consult and cooperate on a reasonable basis in preparing and timely filing Tax Returns with respect to Pre-Closing Periods with respect to the Company.  Notwithstanding anything to the contrary in this Agreement, the Seller shall not be required to transfer to the Buyer any books, records or information to the extent they relate to Tax Returns or related records or workpapers concerning a Seller Tax Group, provided that, to the extent such Tax Returns, records or workpapers would otherwise be required to be provided hereunder, and to the extent commercially reasonable, the Seller shall use commercially reasonable efforts to provide portions of such Tax Returns, records or workpapers, or redacted versions thereof, to the extent relating solely to the Company.  For the avoidance of doubt, this Section 4.9 will not require the Company to take any actions that would reasonably be expected to prevent or delay the consummation of the Transactions.

(b)    The Buyer hereby agrees, from and after the Closing, to pay all transfer, documentary, sales, use, stamp, recording, value-added, registration and other similar Taxes and all conveyance fees, recording fees and other similar charges (all including penalties, interest and other charges with respect thereto, collectively "Transfer Taxes") incurred in connection with the consummation of the Transactions.  Such Transfer Taxes shall be paid by the party responsible under applicable Law to pay such Transfer Taxes (with the Buyer advancing Seller its share of such tax at least three (3) days before the tax payment due date).

(c)    Any payment by the Buyer or the Company under this Section 4.9 will be an adjustment to the consideration paid under this Agreement.

(d)    From and after the Closing Date, the Buyer shall not, and shall cause the Company not to, except as otherwise required by applicable Law, without the prior written consent of the Seller (not to be unreasonably withheld, conditioned, or delayed), (i) amend or otherwise modify a Tax Return of the Company for a Pre-Closing Period and (ii) make any Tax election with respect to the Company (including an election under Section 336 or 338 of the Code or any similar provision of foreign, state or local Law) that relates to, or is retroactive to, a Pre-Closing Period,

in each case, to the extent such action could reasonably be expected to have an adverse impact on the Seller. For the avoidance of doubt, the Seller shall have no liability or responsibility for, and shall in no way bear the burden of, Taxes of the Company for any non-Pre-Closing Period.

(e)    The obligations of the Parties set forth in this <u>Section 4.9</u> shall be unconditional and absolute and shall remain in effect without limitation as to time.

4.10    <u>Further Assurances</u>.  The Parties shall execute and deliver, or shall cause to be executed and delivered, such documents and other instruments and shall take, or shall cause to be taken, such further actions as may be reasonably required to carry out the provisions of this Agreement and give effect to the Transactions.

4.11    <u>Maintenance of Books and Records</u>.  After the Closing Date, the Buyer shall, until the sixth (6th) anniversary of the Closing Date, preserve, maintain and retain all books, records, other documents and electronically stored information of and relating to the Company and its business, in existence on the Closing Date (collectively, the "<u>Books and Records</u>") and, subject to compliance with applicable Law, make the same available for inspection and copying by the Seller, any of the Seller's successors or assigns or any trustee in bankruptcy and, in each case, any of their respective Representatives upon reasonable notice and during normal business hours, for any reasonable business purpose or compliance with any obligation under any applicable Law, including for the purposes of (a) the preparation or amendment of Tax Returns, financial or court filings or reports of the Seller and the Debtors, (b) responding to court orders, subpoenas or inquiries, investigations, audits or other proceedings of Governmental Entities, (c) prosecuting and defending any Action or for other like purposes, including claims, objections and resolutions in the Bankruptcy Proceeding and (d) as is necessary to administer, or satisfy their obligations in connection with, the Bankruptcy Proceeding. In addition, the Seller shall be permitted to retain a copy of the Books and Records for the foregoing purposes.

4.12    <u>Intercompany Arrangements</u>.

(a)    The Parties agree that, immediately prior to the Closing, any Intracompany Payables between the Company, on the one hand, and the Seller or any of the other Debtors, on the other hand, shall be fully settled or otherwise deemed cancelled effective as of immediately prior to the Closing.

(b)    Each of the Parties agrees that, immediately prior to the Closing, any contract, commitment or arrangement between the Company, on the one hand, and the Seller or any of the other Debtors, on the other hand, shall be terminated and be of no further force or effect and all obligations thereunder shall be fully satisfied and extinguished, notwithstanding any terms thereof to the contrary.[9]

(c)    Except as provided in <u>Section 4.13</u>, no additional consideration shall be payable by, and no additional amounts shall be owed by, the Buyer or any of its Affiliates to the

---

[9]    **Note to Buyer**: Seller and the Company intend to terminate the existing intercompany line of credit prior to Closing.

Seller or any of its Affiliates (excluding the Target Entities) in connection with the transactions effected pursuant to this <u>Section 4.12</u>.

        4.13    <u>Seller Guarantees</u>. Seller may, at any time prior to the Closing, terminate all guarantees, comfort letters, lines of credit from or commitments by Seller or its Affiliates of obligations of or to the Target Entities, including under the agreements set forth in Section 4.13 of the Seller Disclosure Schedule and for such amounts set forth therein (the "<u>Seller Guarantees</u>") to the extent such Seller Guarantees are not required by any Governmental Entity or Self-Regulatory Organization for the maintenance of any Permits or memberships held by Seller.  To the extent requested or required by any Governmental Entity or Self-Regulatory Organization, Buyer shall, or shall cause one if its Affiliates (to the extent permitted by such Governmental Entity or Self-Regulatory Organization), to enter into guarantees or other commitments as of the Closing, for the benefit of the relevant beneficiary of each applicable Seller Guarantee, with such terms requested or required by any such Governmental Entity or Self-Regulatory Organization.

4.14    <u>Use of Seller Marks; Intellectual Property</u>.

        (a)    The Buyer acknowledges and agrees that Seller and its Affiliates (other than the Target Entities) are retaining all right, title and interest in and to, and except as provided in this <u>Section 4.14</u>, neither Buyer nor any of its Affiliates (including, following the Closing, the Target Entities) will have any right to use, any Trademarks, Internet domain names, or social media handles owned by Seller or any of its Affiliates (other than the Target Entities), including any Trademarks, Internet domain names or social media handles employing or incorporating "FTX", "FTX US" or any derivation, variation, combination, translation or adaptation of any of the foregoing, or any Internet domain name, social media handle or Trademark confusingly similar thereto or embodying any of the foregoing, whether alone or in combination with any other words, name or Trademarks, in each case, whether registered or unregistered (collectively, the "<u>Seller Marks</u>").

        (b)    Solely for a period not to exceed thirty (30) days immediately following the Closing Date (the "<u>Transitional Period</u>"), Seller hereby grants to the Company a limited, royalty-free, non-sublicensable, non-transferrable, non-exclusive right to use and display the Seller Marks used by the Target Entities in the conduct of their business in the ordinary course as of the Closing, solely to continue using and displaying such Seller Marks on materials and media which already display such Seller Marks as of the Closing, solely in the form and manner consistent with form and manner that such marked materials and media are used and displayed as of the Closing Date in furtherance of the Target Entities' business.

        (c)    Buyer and its Affiliates (including the Target Entities) shall:  (i) ensure that all products and services provided in connection with the Seller Marks during the Transitional Period by or on behalf of the Target Entities are of a level of quality equal to or greater than the quality of products and services with respect to which Seller and its Affiliates (including the Target Entities) used the Seller Marks prior to the Closing; (ii) not use any of the Seller Marks in a manner, or in a form or format, inconsistent with the manner used as of the Closing; (iii) as soon as reasonably practicable, but in any case prior to the end of the Transitional Period, replace or destroy all materials (whether tangible or intangible) in its possession or control bearing or incorporating any Seller Marks, and otherwise cease any and all further use and display of any Seller Marks,

including by removing the Seller Marks from any and all letterhead, envelopes, invoices, supplies, labels, product packaging and inserts, websites, promotional materials, marketing collateral, advertisements and other communications media or materials of any kind used in the businesses of the Target Entities; and (iv) at Seller's request, provide appropriate documentation to confirm compliance with the foregoing.  Neither Buyer nor any of its Affiliates (including the Target Entities) shall, at any time, seek to register or apply for any registration of any Seller Mark.  Buyer and its Affiliates (including the Target Entities) agree that all goodwill arising from any use of the Seller Marks by Buyer or its Affiliates (including the Target Entities) shall, as between the Parties, inure solely to the benefit of Seller and its Affiliates.  Buyer shall, and shall cause its Affiliates (including the Target Entities) to, use their reasonable best efforts to avoid any customer confusion as between themselves and Seller or its Affiliates, and will not hold themselves out as continuing to operate the business of Seller or any of its Affiliates or to offer or operate any of its or their products or services.

## ARTICLE V

## BANKRUPTCY MATTERS

5.1    <u>Competing Transactions</u>.

(a)    Consummation of the Transactions are subject to approval by the Bankruptcy Court and the consideration by the Debtors and the Bankruptcy Court of higher or better competing bids.  From and after the date hereof until the Auction is declared closed by the Debtors, the Seller and the other Debtors shall be permitted to cause their respective Representatives and Affiliates to (i) initiate contact with, or solicit or encourage submission of any inquiries, proposals or offers by, any Person (in addition to the Buyer and its Affiliates, agents and representatives) with respect to any transaction (or series of transactions) involving the direct or indirect sale, transfer or other disposition of all, or a material portion of, the Company and/or its assets to a purchaser or purchasers other than the Buyer or effecting any other transaction the consummation of which would be substantially inconsistent with the Transactions (a "<u>Competing Transaction</u>"), and (ii) respond to any inquiries or offers to purchase all or any part of the Company and/or its assets (whether in combination with other assets of the Seller and the other Debtors or otherwise) and perform any and all other acts related thereto which are required or permitted under the Bankruptcy Code, the Bid Procedures Order or other applicable Law, including supplying information relating to the Company and the assets of the Company to prospective purchasers.

(b)    If, upon completion of the Auction, the Seller has agreed to a Competing Transaction, the Seller may select the Buyer as an Alternate Bidder (as defined in the Bid Procedures) or may select another Alternate Bidder as provided in the Bid Procedures.  The Buyer hereby agrees and acknowledges that it shall serve as an Alternate Bidder if so requested and keep its bid to consummate the Transactions on the terms and conditions set forth in this Agreement (as the same may be revised in the Auction) open and irrevocable until this Agreement is otherwise terminated. If the Successful Bidder (as defined in the Bid Procedures) fails to consummate the applicable Competing Transaction with such Successful Bidder as a result of a breach or failure to perform on the part of such Successful Bidder, the Alternate Bidder will be deemed to have the new prevailing bid, and the Seller may consummate the Transactions on the terms and conditions

set forth in this Agreement (as the same may have been improved upon in the Auction) if the Buyer is selected as the Alternate Bidder.

5.2    Bankruptcy Court Filings.

(a)    The Seller shall use its commercially reasonable efforts to file and have entered the Sale Order on or before [●].

(b)    Each of the Seller and the Buyer shall (i) appear in the Bankruptcy Court if reasonably requested by the other Party or required by the Bankruptcy Court in connection with the Transactions and (ii) keep the other reasonably apprised of the status of material matters related to the Agreement, including, upon reasonable request promptly furnishing the other with copies of notices or other communications received from the Bankruptcy Court or any other party with respect to the Transactions.

(c)    The Parties shall consult with each other regarding pleadings that any of them intends to file with the Bankruptcy Court in connection with, or which might reasonably affect the Bankruptcy Court's approval of the Sale Order.  The Seller shall promptly provide the Buyer and its outside legal counsel with copies of all notices, filings and orders of the Bankruptcy Court that the Seller has in its possession (or receives) pertaining to the Sale Order, or related to any of the Transactions, but only to the extent such papers are not publicly available on the docket of the Bankruptcy Court or otherwise made available to the Buyer and its outside legal counsel. The Seller shall not seek any modification to the Sale Order by the Bankruptcy Court or any other Governmental Entity of competent jurisdiction to which a decision relating to the Bankruptcy Proceeding has been appealed, in each case, without the prior written consent of the Buyer (not to be unreasonably withheld, conditioned or delayed).

(d)    If the Sale Order, or any other orders of the Bankruptcy Court relating to this Agreement or the Transactions, are appealed by any Person (or if any petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or reargument shall be filed with respect to the Sale Order or other such order), subject to rights otherwise arising from this Agreement, the Seller shall use commercially reasonable efforts to prosecute such appeal, petition or motion and obtain an expedited resolution of any such appeal, petition or motion.

(e)    Nothing in this Section 5.2 shall prevent the Debtors from modifying the Bid Procedures as necessary or appropriate to maximize value for the Debtors' estate in accordance with their fiduciary obligations.

5.3    Sale Order.

(a)    The Buyer and the Seller shall take all actions as may be reasonably necessary to cause the Sale Order to be issued, entered and become a Final Order, including furnishing affidavits, declarations or other documents or information for filing with the Bankruptcy Court.  The Buyer agrees that it will promptly take such actions as are reasonably requested by the Seller to assist in obtaining entry of the Sale Order and a finding of adequate assurance of future performance by the Buyer, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary

assurances of performance by the Buyer under this Agreement and demonstrating that the Buyer is a "good faith" the Buyer under section 363(m) of the Bankruptcy Code.

(b)    The Sale Order shall, among other things, (i) approve, pursuant to sections 105, [and] 363[, and 365] of the Bankruptcy Code, (A) the execution, delivery and performance by the Seller of this Agreement, (B) the sale of the Shares to the Buyer on the terms set forth herein and free and clear of all Liens (other than Permitted Encumbrances), and (C) the performance by the Seller of its obligations under this Agreement, (ii) find that (A) the Buyer is a "good faith" buyer within the meaning of section 363(m) of the Bankruptcy Code and (B) the Buyer is not a successor to the Seller and (iii) grant the Buyer the protections of section 363(m) of the Bankruptcy Code. The Buyer agrees that it will promptly take such actions as are reasonably requested by the Seller to assist in obtaining entry of the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of demonstrating that the Buyer is a "good faith" purchaser under section 363(m) of the Bankruptcy Code.

## ARTICLE VI

## CONDITIONS

6.1    <u>Conditions to Each Party's Obligation to Consummate the Transactions</u>. The obligation of each Party to consummate the Transactions is subject to the satisfaction or waiver in writing by the Buyer and the Seller, at or prior to the Closing of each of the following conditions:

(a)    <u>Regulatory Approvals and Deliverables</u>.

(i)    (A) The waiting period (and any extension thereof) applicable to the consummation of the Transactions under the HSR Act shall have expired or been earlier terminated, and [(B) the approvals, clearances or expirations of waiting periods set forth in Section 6.1(a) of the Seller Disclosure Schedule[10] will have occurred or been obtained (as applicable)].

(ii)    Either (i) the Company Broker-Dealer shall have received from FINRA the approval of its Continuing Membership Application, or (ii) (A) at least thirty (30) days shall have elapsed following submission of the Continuing Membership Application and (B) the Company shall have notified FINRA that the parties intend to consummate the transaction pursuant to FINRA Rule 1017 prior to the official receipt of FINRA approval.

(b)    <u>Orders</u>.  No court, arbitrator, mediator or other Governmental Entity of competent jurisdiction shall have enacted, enforced, entered, issued or promulgated any Order or Law (whether temporary, preliminary or permanent) that is in effect and has the effect of making the Transactions illegal or otherwise prohibiting consummation of the Transactions.

---

[10]    **Note to Draft**:  Regulatory approvals under consideration.

(c)     Sale Order. The Bankruptcy Court shall have entered the Sale Order, and the Sale Order shall be in full force and effect and not subject to a stay.

6.2     Conditions to Obligations of the Buyer.  The obligation of the Buyer to consummate the Transactions is also subject to the satisfaction or waiver in writing by the Buyer at or prior to the Closing of the following conditions:

(a)     Representations and Warranties.

(i)     The Seller Fundamental Representations shall be true and correct in all material respects as of the Execution Date and as of the Closing as though made on and as of such date and time (except to the extent that any such representation and warranty expressly speaks as of an earlier date, in which case such representation and warranty shall be true and correct as of such earlier date).

(ii)     Other than the Seller Fundamental Representations, all other representations and warranties of the Seller set forth in Article II shall be true and correct (without giving effect to any materiality qualifiers, including "Material Adverse Effect," contained therein) as of the Execution Date and as of the Closing as though made on and as of such date and time (except to the extent that any such representation and warranty expressly speaks as of an earlier date, in which case such representation and warranty shall be true and correct as of such earlier date), except where the failure of any such representations and warranties to be so true and correct would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(b)     Performance of Obligations of the Seller.  The Seller shall have performed and complied in all material respects with all covenants required to be performed by it under this Agreement on or prior to the Closing Date.

(c)     Closing Certificate.  The Buyer shall have received at the Closing a certificate signed on behalf of the Seller by a duly authorized officer (solely in his, her or their capacity as such and not in his, her or their personal capacity, and without personal liability), certifying that the conditions set forth in Section 6.2(a) and Section 6.2(b) have been satisfied.

6.3     Conditions to Obligations of the Seller.  The obligation of the Seller to consummate the Transactions is also subject to the satisfaction or waiver in writing by the Seller at or prior to the Closing of the following conditions:

(a)     Representations and Warranties.

(i)     The representations and warranties of the Buyer set forth in Section 3.1 (*Organization, Good Standing and Qualification*) and Section 3.2 (*Authority; Approval*) shall be true and correct in all material respects as of the Closing as though made on and as of such date and time (except to the extent that any such representation and warranty expressly speaks as of an earlier date, in which case such representation and warranty shall be true and correct as of such earlier date).

-31-

(ii)    The other representations and warranties of the Buyer contained in Article III shall be true and correct (without giving effect to any materiality qualifiers contained therein) as of the Closing Date as though made on and as of such date and time (except to the extent that any such representation and warranty speaks as of an earlier date, in which case such representation and warranty shall be true and correct as of such earlier date), except where the failure of any such representation and warranty to be so true and correct would not, individually or in the aggregate, reasonably be expected to prevent, materially delay or materially impair the ability of the Buyer to consummate the Transactions.

(b)    _Performance of Obligations of the Buyer_.  The Buyer shall have performed and complied with each of the covenants required to be performed by it under this Agreement on or prior to the Closing Date in all material respects.

(c)    _Closing Certificate_.   The Seller shall have received at the Closing a certificate signed on behalf of the Buyer by a duly authorized officer of the Buyer (solely in his, her or their capacity as such and not in his, her or their personal capacity, and without personal liability), certifying that the conditions set forth in Section 6.3(a) and Section 6.3(b) have been satisfied.

6.4    _Frustration of Closing Conditions_.  A Party may not rely on the failure of any condition set forth in Section 6.1, Section 6.2 or Section 6.3, as the case may be, to be satisfied if such failure was due to the failure of such Party to perform any of its obligations under this Agreement.

## ARTICLE VII

## TERMINATION

7.1    _Termination_.  This Agreement may be terminated at any time prior to the Closing:

(a)    by written agreement of the Buyer and the Seller;

(b)    automatically, upon the consummation of a Competing Transaction;

(c)    by either the Buyer or the Seller, by giving written notice of such termination to the other Party, if:

(i)    the Closing has not occurred by 5:00 p.m., prevailing Eastern time, on [●], 2023 (the "Termination Date"), which date may be extended by mutual agreement of the Parties or otherwise pursuant to Section 7.1(d)(ii) or Section 7.1(e)(ii); provided that, if the Closing has not occurred on or before the Termination Date due to a material breach of any covenants or agreements contained in this Agreement by the Buyer or the Seller, as applicable, so as to cause any of the conditions of the other Party, as applicable, set forth in Section 6.1 (_Conditions to Each Party's Obligation to Consummate the Transactions_), Section 6.2 (_Conditions to Obligations of the Buyer_) or Section 6.3 (_Conditions to_

*Obligations of the Seller*) to not be satisfied, as applicable, then such breaching Party may not terminate this Agreement pursuant to this Section 7.1(c)(i);

(ii)    there is in effect a final non-appealable Order of a Governmental Entity of competent jurisdiction enjoining or otherwise prohibiting the consummation of the Transactions (it being agreed that the Parties will promptly appeal any adverse determination which is not non-appealable and pursue such appeal in accordance with their respective obligations under this Agreement unless and until this Agreement is terminated pursuant to this Section 7.1); or

(iii)    the Sale Order is not entered by [●], 2023[11];

(d)    by the Buyer, upon written notice to the Seller:

(i)    if the Buyer is not selected as a Successful Bidder or an Alternate Bidder and (A) ten days have lapsed following the conclusion of the Auction or (B) if later, one day has lapsed since the Sale Hearing;

(ii)    in the event of a material breach by the Seller of any representation or warranty or any covenant or agreement contained in this Agreement that (A) would result in any of the conditions set forth in Section 6.1 (*Conditions to Each Party's Obligation to Consummate the Transactions*) or Section 6.3 (*Conditions to Obligations of the Seller*) not being satisfied if such breach remained uncured as of the Closing and (B) such breach is incapable of being cured prior to the Termination Date or, if capable of being cured, such breach has not been cured within thirty (30) days after the giving of written notice by the Buyer to the Seller of such breach; provided that the Buyer is not then in material breach of any representation, warranty, covenant or agreement contained in this Agreement; provided, further, that in the event that the Buyer provides such written notice to the Seller within thirty (30) days of the Termination Date, then the Termination Date shall be extended until the end of the thirty (30)-day cure period set forth in this Section 7.1(d)(ii); or

(iii)    if, following entry by the Bankruptcy Court of the Sale Order, the Sale Order is materially amended, modified or supplemented without the Buyer's prior written consent or is voided, reversed or vacated (provided that the Buyer shall not be able to terminate this Agreement pursuant to this Section 7.1(d)(iii) if, prior to such termination, the Sale Order shall have become a Final Order).

(e)    by the Seller, upon written notice to the Buyer:

(i)    if the Buyer is not selected as a Successful Bidder or an Alternate Bidder at the conclusion of the Auction, if applicable;

(ii)    in the event of a breach by the Buyer of any representation or warranty or any covenant or agreement contained in this Agreement, that (A) would result in any of the

---

[11]    **Note to Draft**: To be 45 days following the Execution Date

conditions set forth in Section 6.1 (*Conditions to Each Party's Obligation to Consummate the Transactions* or Section 6.2 (*Conditions to Obligations of the Buyer*) not being satisfied if such breach remained uncured as of the Closing and (B) such breach is incapable of being cured prior to the Termination Date or, if capable of being cured, such breach has not been cured within thirty (30) days after the giving of written notice by the Seller to the Buyer of such breach; provided that the Seller is not then in material breach of any representation, warranty, covenant or agreement contained in this Agreement; provided, further, that in the event that the Seller provides such written notice to the Buyer within thirty (30) days of the Termination Date, then the Termination Date shall be extended until the end of the thirty (30)-day cure period set forth in this Section 7.1(e)(ii);

(iii)    (A) if all of the conditions set forth in Section 6.1 (*Conditions to Each Party's Obligation to Consummate the Transactions*) and Section 6.2 (*Conditions to Obligations of the Buyer*) have been satisfied or waived (other than those that, by their nature, are to be satisfied at the Closing, all of which are capable of being satisfied at the Closing), (B) the Seller has irrevocably confirmed by written notice to the Buyer that (1) all conditions set forth in Section 6.3 (*Conditions to Obligations of the Seller*) have been satisfied (other than those that, by their nature, are to be satisfied at Closing) or that it would be willing to waive any unsatisfied conditions in Section 6.3 (*Conditions to Obligations of the Seller*) if the Closing were to occur, and (2) it is ready, willing and able to consummate the Closing and (C) the Buyer fails to consummate the Closing within two Business Days following the date the Closing should have occurred pursuant to Section 1.2; provided, however, that any purported termination by the Buyer pursuant to Section 7.1(c)(i) (*Termination Date*) shall be deemed to be a termination by the Seller pursuant to this Section 7.1(e)(iii) if the Seller is entitled to terminate this Agreement pursuant to this Section 7.1(e)(iii) at the time of such termination; or

(iv)    if the Seller or the board of directors (or similar governing body) of the Seller determines that proceeding with the Transactions or failing to terminate this Agreement would be inconsistent with its or such Person's or body's fiduciary duties.

7.2    Effect of Termination; Reverse Termination Fee; Purchase Price Deposit.

(a)    In the event of termination of this Agreement pursuant to Section 7.1, this Agreement shall become void and of no effect; provided, however, that the provisions set forth in this Section 7.2, Article VIII and in the Confidentiality Agreement shall survive the termination of this Agreement; provided, further, that nothing in this Section 7.2 shall be deemed to release any Party from liability for any material breach of this Agreement prior to termination (which, for the avoidance of doubt, will be deemed to include any failure by either Party to consummate the Closing if and when it is obligated to do so hereunder).

(b)    Other than in the case of a termination to which Section 7.2(c) applies, if this Agreement is terminated prior to the Closing by the Buyer or the Seller pursuant to Section 7.1(c)(i) (*Termination Date*), or (ii) by the Seller pursuant to Section 7.1(e)(ii) (*Breach of Representations and Warranties*) then the Seller shall retain the Deposit Amount, together with all interest thereon.

(c)      If this Agreement is terminated:

(i)      by the Seller pursuant to Section 7.1(c)(iii) (*Sale Order*) because Seller is unable to obtain the Sale Order due primarily to actions by or events or circumstances caused by or relating to the Buyer or any of its Affiliates (including in connection with any Governmental Entity or Self-Regulatory Organization);

(ii)      pursuant to Section 7.1(c)(i) (*Termination Date*), and at the time of such termination, all of the conditions set forth in Article VI (*Conditions*), other than those in Section 6.1(a) (*Regulatory Approvals and Deliverables*) or Section 6.1(b) (*Orders*), in each case, have been satisfied or waived (other than those that, by their nature, are to be satisfied at the Closing, but which conditions remain capable of being satisfied);

(iii)      pursuant to Section 7.1(c)(ii) (*Legal Restraint*) and no willful and material breach by the Seller of its obligations under Section 4.3 has contributed materially to the entry or occurrence of such Order; or

(iv)      pursuant to Section 7.1(e)(iii) (*Buyer Failure to Close*);

then (1) the Buyer will promptly pay the Seller a fee equal to $[●][12] (the "Reverse Termination Fee") in cash, no later than two (2) business days after the date of receipt of any such termination notice, and (2) the Seller shall retain the Deposit Amount, together with all interest thereon.

(d)      Each of the Parties acknowledges and agrees that the agreements contained in this Section 7.2 are an integral part of the Transactions and that, without these agreements, the other Party would not enter into this Agreement.  Each of the Parties further acknowledges that the retention by the Seller of the Deposit Amount and, if applicable, payment by the Buyer of the Reverse Termination Fee, is not a penalty, but rather liquidated damages in a reasonable amount that will compensate the Seller, together with any additional damages to which the Seller may be entitled hereunder, including pursuant to Section 7.2(a), in the circumstances in which such Deposit Amount may be retained by the Seller and/or the Reverse Termination Fee may be payable by the Buyer for the efforts and resources expended and the opportunities foregone while negotiating this Agreement and in reliance on this Agreement and on the expectation of the consummation of the Transactions, which amount would otherwise be impossible to calculate with precision; provided that, for the avoidance of doubt, this Section 7.2(d) shall not limit the rights of the Seller to pursue a grant of specific performance or other equitable relief pursuant to Section 8.6 prior to the termination of this Agreement.

(e)      If this Agreement is terminated for any reason prior to the Closing other than as contemplated by Section 7.2(b) or Section 7.2(c), then the Deposit Amount shall be returned to the Buyer and the Buyer shall have no further recourse against the Seller.

---

[12]      **Note to Draft**: To be 10% of Purchase Price.

(f)       The Deposit Amount shall only constitute property of the Seller in the event that such Deposit Amount is released to the Seller by the Escrow Agent in accordance with the terms of this Agreement and the Escrow Agreement.

(g)       All amounts due hereunder will be payable by wire transfer in immediately available funds to such account as the Seller may designate in writing to the Buyer.  If the Buyer fails to promptly make any payment required in accordance with Section 7.2(c), the Buyer will pay interest on the amount of the payment at the prime rate of Bank of America (or its successors or assigns) in effect on the date the payment was payable in accordance with such sections.

## ARTICLE VIII

## MISCELLANEOUS AND GENERAL

8.1      Survival.  The Parties agree that the representations, warranties, covenants or agreements contained in this Agreement will not survive the Closing (other than with respect to Section 2.16 (*No Other Representations or Warranties*), Section 3.9 (*No Other Representations or Warranties*), Section 4.8 (*Confidentiality*) and this Article VIII), and none of the Parties will have any liability to each other after the Closing for any claim for breach of such representations, warranties, covenants or agreements, detrimental reliance or other right or remedy (whether in contract, in tort or at law or in equity) in respect thereof, in each case, which may be made, or Action instituted, after the Closing.  Notwithstanding the foregoing, the covenants and agreements that by their terms are to be satisfied after the Closing Date shall survive until satisfied in accordance with their terms.  At and at all times after the Closing, in no event shall the Buyer, on the one hand, or the Seller, on the other hand, have any recourse against (a) the Seller or any of the Seller Parties, or (b) the Buyer or any of the Buyer Parties, respectively, in each such case, with respect to any representation, warranty, covenant or agreement made by the Seller or the Buyer, as applicable, in this Agreement or in any other document contemplated hereby, or in any certificate delivered hereunder or thereunder, except with respect to claims for breaches of covenants and agreements that by their terms are to be satisfied after the Closing Date.

8.2      Entire Agreements; Amendment; Waiver.  This Agreement represents the entire understanding and agreement between the Parties with respect to the subject matter hereof and supersedes all prior discussions and agreements between the Parties with respect to the subject matter hereof.  Any provision of this Agreement may be amended or waived if, and only if, such amendment or waiver is in writing and signed, in the case of an amendment, by both the Seller and the Buyer, or in the case of a waiver, by the Party granting the waiver.  No failure or delay by any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by Law.

8.3      Expenses.  Except as otherwise provided in this Agreement and whether or not the Transactions are consummated, all costs and expenses (including fees and expenses of counsel and financial advisors, if any) incurred in connection with this Agreement and the Transactions shall be paid by the Party incurring such costs and expenses.

8.4     Counterparts.  This Agreement may be executed in one or more counterparts (including by facsimile or other electronic means such as ".pdf" or ".jpg" files), each of which shall be deemed an original, and all of which shall constitute one and the same Agreement.

8.5     Governing Law.  This Agreement will be governed by and construed in accordance with the internal Laws of the State of Delaware, without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Delaware, and the obligations, rights and remedies of the Parties shall be determined in accordance with such Laws.

8.6     Specific Performance.

(a)     The Parties agree that irreparable damages would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached, and that damages at law may be an inadequate remedy for the breach of any of the covenants, promises and agreements contained in this Agreement, and, accordingly, any Party will be entitled to injunctive relief to prevent any such breach, and to specifically enforce the terms and provisions of this Agreement without the necessity of posting bond or other security against it or proving damages, including without limitation specific performance of such covenants, promises or agreements (including to cause the Buyer to consummate the Closing and to make the payments contemplated by this Agreement) or an Order enjoining a Party from any threatened, or from the continuation of any actual, breach of the covenants, promises or agreements contained in this Agreement.  The rights set forth in this Section 8.6 will be in addition to any other rights which a Party may have at law or in equity pursuant to this Agreement.

(b)     The Parties hereby agree not to raise any objections to the availability of the equitable remedy of specific performance to prevent or restrain breaches of this Agreement by the Buyer or the Seller, as applicable, and to specifically enforce the terms and provisions of this Agreement to prevent breaches or threatened breaches of, or to enforce compliance with, the respective covenants and obligations of the Buyer or the Seller, as applicable, under this Agreement all in accordance with the terms of this Section 8.6.

8.7     Submission to Jurisdiction; Consent to Service of Process; Waiver of Jury Trial.

(a)     Without limiting any Party's right to appeal any order of the Bankruptcy Court, (i) the Bankruptcy Court will retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the Transactions, and (ii) any and all proceedings related to the foregoing will be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court for such purposes and will receive notices at such locations as indicated in Section 8.8; provided, however, that if the Bankruptcy Proceeding has been closed pursuant to section 350 of the Bankruptcy Code, the Parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the District of Delaware, or in the event (but only in the event) that such court does not have subject matter jurisdiction over such Action, in the

Supreme Court of the Delaware Court of Chancery, for the resolution of any such claim or dispute. The Parties hereby irrevocably waive, to the fullest extent permitted by applicable Law, any objection which they may now or hereafter have to the laying of venue of any such Action brought in such court or any defense of inconvenient forum for the maintenance of such dispute.  Each of the Parties agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.

(b)        Each of the Parties hereby consents to process being served by any other Party in any Action by delivery of a copy thereof in accordance with the provisions of Section 8.8; provided, however, that such service will not be effective until the actual receipt thereof by the Party being served.

(c)        Each Party to this Agreement waives any right to trial by jury in any Action regarding this Agreement or any provision hereof.

8.8    Notices.    All notices and other communications to be given or made hereunder shall be in writing and shall be deemed to have been duly given or made on the date of delivery to the recipient thereof if received prior to 5:00 p.m. in the place of delivery and such day is a Business Day (or otherwise on the next succeeding Business Day) if (a) served by personal delivery or by an internationally recognized overnight courier to the Person or entity for whom it is intended, (b) delivered by registered or certified mail, return receipt requested, or (c) sent by email, as provided in this Section 8.8; provided that the email is confirmed orally or in writing by the recipient thereof (excluding out-of-office replies or other automatically generated responses) or is followed within one Business Day after email by dispatch pursuant to one of the other methods described herein:

To the Seller:

[●]
[●]
Attn:  [●]
Email Address: [●]

With a copy to (which shall not constitute notice):

Sullivan & Cromwell LLP
125 Broad Street
New York, NY 10004-2498
Attn: Mitchell S. Eitel
        Audra D. Cohen
Email Address: eitelm@sullcrom.com
                        cohend@sullcrom.com

To the Buyer:

[●]
[Address]

Attn:            [●]
Email Address: [●]

With a copy to (which shall not constitute notice):

[●]
[*Address*]
Attn:            [●]
Email Address: [●]

or to such other Person or addressees as may be designated in writing by the Party to receive such notice as provided above; provided, however, that copies shall be provided to outside counsel for convenience only, such copies shall not, in and of themselves, constitute notice and the failure to provide any such copy shall not alter the effectiveness of any notice or other communication otherwise duly made or given.

8.9     Severability.  The provisions of this Agreement shall be deemed severable and the invalidity or unenforceability of any provision shall not affect the validity or enforceability of the other provisions hereof.  If any provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction or other authority of competent jurisdiction to be invalid, void or unenforceable, or the application of such provision, covenant or restriction to any Person or any circumstance, is held by a court of competent jurisdiction or other authority to be invalid, void or unenforceable, (a) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision and (b) the remainder of this Agreement and the application of such provision, covenant or restriction to other Persons or circumstances shall not be affected by such invalidity or unenforceability, nor shall such invalidity or unenforceability affect the validity or enforceability of such provision, or the application of such provision, in any other jurisdiction and the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

8.10    Assignment; Third-Party Beneficiaries.  This Agreement will be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns. Nothing in this Agreement will create or be deemed to create any third- party beneficiary rights in any Person or entity not a party to this Agreement.  No assignment of this Agreement or of any rights or obligations hereunder may be made by either the Seller or the Buyer (by operation of law or otherwise) without the prior written consent of the other Parties and any attempted assignment without the required consents will be void; provided, however, that (a) the Buyer may assign some or all of its rights or delegate some or all of its obligations hereunder to one or more Affiliates and (b) the Seller may assign some or all of its rights or delegate some or all of its obligations hereunder to successor entities (including any liquidating trust) pursuant to a Chapter 11 plan confirmed by the Bankruptcy Court, in the case of each of clauses (a) and (b) above, without any other Party's consent.  No assignment or delegation of any obligations hereunder will relieve the Parties of any such obligations.  Upon any such permitted assignment, the references in this Agreement to the Seller or the Buyer will also apply to any such assignee unless the context otherwise requires.

8.11    <u>Fiduciary Obligations</u>.  Nothing in this Agreement, or any document related to the Transactions, will require the Seller or any of its directors, officers or stockholders, in each case, in their capacity as such, to take any action, or to refrain from taking any action, to the extent inconsistent with their fiduciary obligations. For the avoidance of doubt, the Seller retains the right to pursue any transaction or restructuring strategy that, in the Seller's business judgment, will maximize the value of its estates.

8.12    <u>Interpretation; Construction</u>.

(a)    The table of contents and headings herein are for convenience of reference only, do not constitute part of this Agreement and shall not be deemed to limit or otherwise affect any of the provisions hereof.  Where a reference in this Agreement is made to an Exhibit, Section or Schedule, such reference shall be to an Exhibit, Section or Schedule to this Agreement unless otherwise indicated.

(b)    If a term is defined as one part of speech (such as a noun), it shall have a corresponding meaning when used as another part of speech (such as a verb).  The terms defined in the singular have a comparable meaning when used in the plural and vice versa.  The rule known as the *ejusdem generis* rule shall not apply, and, accordingly, general words introduced by the word "other" shall not be given a restrictive meaning by reason of the fact that they are preceded by words indicating a particular class of acts, matters or things.  Unless the context of this Agreement clearly requires otherwise, words importing the masculine gender shall include the feminine and neutral genders and vice versa.  Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation."  The words "hereof," "herein" and "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision of this Agreement.  The word "or" shall not be exclusive.  Currency amounts referenced herein are in U.S. Dollars.  Any capitalized term used in any Schedule or Exhibit but not otherwise defined therein shall have the meaning given to them as set forth in this Agreement.  All accounting terms used herein and not expressly defined herein shall have the meanings given to them under GAAP.  References to "written" or "in writing" include documents in electronic form or transmission by email.

(c)    All capitalized terms in this Agreement (including the Exhibits and Schedules hereto) shall have the meanings set forth in <u>Exhibit A</u> hereto, except as otherwise specifically provided herein.  Each of the other capitalized terms used in this Agreement has the meaning set forth where such term is first defined or, if no meaning is set forth, the meaning required by the context in which such term is used.

(d)    Except as otherwise specifically provided herein, all references in this Agreement to any Law include the rules and regulations promulgated thereunder, in each case as amended, re-enacted, consolidated or replaced from time to time and in the case of any such amendment, re-enactment, consolidation or replacement, reference herein to a particular provision shall be read as referring to such amended, re-enacted, consolidated or replaced provision and shall also include, unless the context otherwise requires, all applicable guidelines, bulletins or policies made in connection therewith; <u>provided</u> that, for purposes of any representations and warranties contained in this Agreement that are made as of a specific date, references to any Law shall be

deemed to refer to such Law as amended as of such date.  Any agreement or instrument referred to herein means such agreement or instrument as from time to time amended, modified or supplemented, including by waiver or consent and all attachments thereto and instruments incorporated therein.

(e)    Whenever this Agreement refers to a number of days, such number shall refer to calendar days unless Business Days are specified.  Whenever any action must be taken hereunder on or by a day that is not a Business Day, then such action may be validly taken on or by the next day that is a Business Day.

(f)    The Parties drafted this Agreement jointly through the exchange of drafts hereof, so no presumption or burden of proof favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement.

(g)    The Seller has set forth information in the Seller Disclosure Schedule in a Section of such Seller Disclosure Schedule that corresponds to the Section of this Agreement to which it relates.  The fact that any item of information is disclosed in any section or subsection of the Seller Disclosure Schedule shall be deemed disclosure with respect to any other section or subsection to which the relevance of such item is reasonably apparent based on a plain reading of such disclosure.  The headings contained in the Seller Disclosure Schedule are for convenience of reference only and shall not be deemed to modify or influence the interpretation of the information contained in the Seller Disclosure Schedule or this Agreement.  The Seller Disclosure Schedule is not intended to constitute, and shall not be construed as, an admission or indication that any such fact or item is required to be disclosed.  The Seller Disclosure Schedule shall  not be deemed to expand in any way the scope or effect of any representations, warranties or covenants described in this Agreement.  Any fact or item, including the specification of any dollar amount, disclosed in the Seller Disclosure Schedule shall not by reason only of such inclusion be deemed to be material, to establish any standard of materiality or to define further the meaning of such terms for purposes of this Agreement and matters reflected in the Seller Disclosure Schedule are not necessarily limited to matters required by this Agreement to be reflected herein and may be included solely for informational purposes; and no Party shall use the fact of the setting of the amounts or the fact of the inclusion of any item in the Seller Disclosure Schedule in any dispute or controversy between the Parties as to whether any obligation, item or matter not described or included in the Seller Disclosure Schedule is or is not required to be disclosed (including whether the amount or items are required to be disclosed as material or threatened) or is within or outside of the ordinary course of business.  No disclosure in the Seller Disclosure Schedule relating to any possible breach or violation of any Contract, Law or Order shall be construed as an admission or indication that any such breach or violation exists or has actually occurred.

[*Signature Page Follows*]

-41-

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed as of the date first written above.

**SELLER:**

**WEST REALM SHIRES, INC.**

By: _____
       Name:
       Title:

**BUYER**:

**[●]**

By: _____
       Name:
       Title:

**EXHIBIT A**

**DEFINITIONS**

As used in this Agreement, the following terms have the meanings specified in this Exhibit A.

"Acquired Cash Amount" has the meaning set forth in Section 1.4.

"Action" means any civil, criminal or administrative action, suit, demand, claim, complaint, litigation, investigation, review, audit, formal proceeding, arbitration, hearing or other similar dispute.

"Affiliate" means, with respect to any Person, any other Person that directly or indirectly through one or more intermediaries controls, is controlled by, or is under common control with, such Person.  As used in this definition, the term "controls" (including the terms "controlled by" and "under common control with") means possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through ownership of voting securities, by contract or otherwise.  Notwithstanding anything to the contrary herein, (a) prior to the Closing, the Company shall not be an "Affiliate" of the Buyer and (b) following the Closing, the Company shall not be an "Affiliate" of the Seller.

"Agreement" has the meaning set forth in the Preamble.

"Antitrust Laws" means the Sherman Antitrust Act of 1890, the Clayton Act of 1914, the HSR Act and all other U.S. and non-U.S. antitrust, competition or other Laws that are designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade or lessening of competition through merger or acquisition.

"Assigned Contracts" has the meaning set forth in Section 1.5(a).

"Assignment Notice" has the meaning set forth in Section 1.5(c).

"Assumption and Assignment Agreement" has the meaning set forth in Section 1.3(a)(iv).

"Auction" has the meaning set forth in the Recitals.

"Bankruptcy Code" means Title 11 of the United States Code.

"Bankruptcy Court" has the meaning set forth in the Recitals.

"Bankruptcy Proceeding" has the meaning set forth in the Recitals.

"Benefit Plan" means any benefit or compensation plan, program, policy, practice, agreement, contract, arrangement or other obligation, whether or not in writing and whether or not funded, in each case, that is sponsored or maintained by, or required to be contributed to, or with respect to which any potential liability is borne by the Target Entities.  Benefit Plans include, but

A-1

are not limited to, "employee benefit plans" within the meaning of Section 3(3) of ERISA ("<u>ERISA Plans</u>"), employment, consulting, retirement, severance, termination or change in control agreements, deferred compensation, equity-based, incentive, bonus, supplemental retirement, profit-sharing, insurance, medical, welfare, fringe or other benefits or remuneration of any kind.

"<u>Bid Procedures</u>" has the meaning set forth in the Recitals.

"<u>Bid Procedures Order</u>" has the meaning set forth in the Recitals.

"<u>Bid Protections</u>" has the meaning set forth in the Recitals.

"<u>Books and Records</u>" has the meaning set forth in <u>Section 4.11</u>.

"<u>Business Day</u>" means any day other than (a) a Saturday or a Sunday or (b) a day on which banking and savings and loan institutions are authorized or required by Law to be closed in New York, New York, including due to COVID-19 Measures.

"<u>Buyer</u>" has the meaning set forth in the Preamble.

"<u>Buyer Parties</u>" means, collectively, (i) the Buyer, (ii) each of the current or former Affiliates of the Buyer, and (iii) each of the current or former officers, directors, employees, equityholders, partners, stockholders, members, direct and indirect owners, managers, advisors, predecessors, successors and assigns of any of the Persons described in clause (i) or clause (ii) of this definition, and each of the Affiliates of any of the Persons described in this clause (iii).

"<u>Cash</u>" of the Company (or its Subsidiaries, as applicable) as of any date means cash, checks, money orders, marketable securities, short-term instruments and other cash equivalents (including, for the avoidance of doubt, Restricted Cash), funds in time and demand deposits or similar accounts, cash security deposits and other cash collateral posted with vendors, landlords and other parties; <u>provided</u> that Cash shall (without duplication) (x) be increased by checks, drafts and other similar instruments in transit that have been received by, but not deposited into the bank accounts of, the Company or any of its Subsidiaries and (y) be reduced by the aggregate amount of all checks, drafts and other similar instruments issued and outstanding but uncleared as of such time.

"<u>Chapter 11</u>" means Chapter 11 of the Bankruptcy Code.

"<u>Closing</u>" has the meaning set forth in <u>Section 1.2</u>.

"<u>Closing Date</u>" has the meaning set forth in <u>Section 1.2</u>.

"<u>Closing Date Payment</u>" means an amount in cash equal to (i) the Purchase Price, <u>plus</u> (ii) the Acquired Cash Amount (as set forth in the Final Closing Statement), minus (iii) the Closing Indebtedness Amount (as set forth in the Final Closing Statement, <u>minus</u> (iv) the Deposit Amount.

"<u>Closing Indebtedness Amount</u>" has the meaning set forth in <u>Section 1.4</u>.

"Code" means the Internal Revenue Code of 1986.

"Company" has the meaning set forth in the Recitals.

"Company Broker-Dealer" means Embed Clearing LLC.

"Company Intellectual Property" means any and all Intellectual Property owned by any of the Target Entities.

"Company IT Assets" means any and all information technology equipment (including servers, computers and networks) owned or held for use by the Target Entities.

"Company Registered IP" means any Company Intellectual Property that is issued by, registered with, renewed by or the subject of a pending application before the U.S. Patent & Trademark Office or U.S. Copyright Office, or any equivalent or corresponding Governmental Entity anywhere in the world, or Internet domain name registrar.

"Competing Transaction" has the meaning set forth in Section 5.1(a).

"Confidentiality Agreement" has the meaning set forth in Section 4.8.

"Continuing Employees" has the meaning set forth in Section 4.7(a).

"Continuing Membership Application" has the meaning set forth in Section 4.3(a)(ii)(A).

"Contract" means any agreement, undertaking, lease, license, contract, note, bond, mortgage, indenture, arrangement or other obligation.

"Counterparty" has the meaning set forth in Section 1.5(c).

"COVID-19 Measures" shall mean any quarantine, "shelter in place," "stay at home," workforce reduction, social distancing, shut down, closure, sequester, safety or similar Law, directive, guidelines or recommendations promulgated by any industry group or any Governmental Entity, including the Centers for Disease Control and Prevention and the World Health Organization, in each case, in connection with or in response to the COVID-19 Pandemic, including the CARES Act, the Families First Act and any other COVID-19 Pandemic relief measure hereafter adopted by any Governmental Entity.

"COVID-19 Pandemic" means the SARS-Cov2 or COVID-19 pandemic, including any future resurgence or evolutions, mutations or variations thereof and/or any related or associated disease outbreaks, epidemics and/or pandemics.

"Cure Costs" means monetary amounts that must be paid and obligations that otherwise must be satisfied under section 365(b)(1)(A) and (B) of the Bankruptcy Code in connection with the assumption and/or assignment of any Assigned Contract, as agreed upon by the Parties or determined by the Bankruptcy Court pursuant to the procedures in the Bid Procedures Order.

"Debtors" has the meaning set forth in the Recitals.

"Deposit Amount" has the meaning set forth in the Recitals.

"DTC" means the Depository Trust Company.

"Embed Clearing" has the meaning set forth in the Recitals.

"Embed Crypto" has the meaning set forth in the Recitals.

"Employee" means any current or former employee (whether full- or part-time), director, officer or independent contractor (who is a natural person) of the Target Entities.

"Equitable Exception" has the meaning set forth in Section 2.4(b).

"ERISA" means the Employee Retirement Income Security Act of 1974.

"ERISA Affiliate" means all employers (whether or not incorporated) that would be treated together with the Company as a "single employer" within the meaning of Section 414 of the Code.

"ERISA Plans" has the meaning set forth in the definition of "Benefit Plan."

"Escrow Account" has the meaning set forth in the Recitals.

"Escrow Agent" has the meaning set forth in the Recitals.

"Escrow Agreement" means that certain Escrow Agreement, dated as of [●], between the Seller or an Affiliate and the Escrow Agent.[13]

"Estimated Closing Statement" has the meaning set forth in Section 1.4,

"Exchange Act" means the Securities and Exchange Act of 1934.

"Execution Date" has the meaning set forth in the Preamble.

"Final Closing Statement" has the meaning set forth in Section 1.4,

"Final Order" means an Order (a) as to which no appeal, leave to appeal, notice of appeal, motion to amend or make additional findings of fact, motion to alter or amend judgment, motion for rehearing or motion for new trial has been timely filed (in cases in which there is a date by which such filing is required to occur), or, if any of the foregoing has been timely filed, it has been disposed of in a manner that upholds and affirms the subject Order in all material respects without the possibility for further appeal thereon, (b) in respect of which the time period for instituting or filing an appeal, leave to appeal, motion for rehearing or motion for new trial shall

---

[13]     **Note to Draft**: Seller intends to enter into an Escrow Agreement with an escrow agent to govern all potential deposits to be received from bidders.

have expired (in cases in which such time period is capable of expiring), and (c) as to which no stay is in effect.

"FINRA" means the Financial Industry Regulatory Authority.

"Form BD" has the meaning set forth in Section 2.9(b).

"GAAP" means United States generally accepted accounting principles.

"Governmental Entity" means any federal, state, provincial, municipal, local or foreign government, governmental authority, regulatory or administrative agency, governmental commission, department, board, bureau, agency, instrumentality, court or tribunal and, for purposes of this Agreement shall include the SEC and any state securities authority or other regulatory authority or organization having jurisdiction over any of the Target Entities; provided that, for the avoidance of doubt, this definition shall not include any Self-Regulatory Organization.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976.

"Indebtedness" means the following borrowings and indebtedness in the nature of borrowings of the Target Entities (other than intercompany debt between the Company and/or one or more of its Subsidiaries): (a) all indebtedness for borrowed money, (b) all obligations evidenced by notes, bonds, debentures or other similar instruments, (c) obligations for the reimbursement of any obligor on any letter of credit, banker's acceptance or similar transaction, but only to the extent drawn upon at such time, (d) liabilities under capitalized leases, but excluding, for the avoidance of doubt, any liabilities under operating leases, (e) all obligations of a type referred to in clauses (a) through (d) above which the Company or any of its Subsidiaries has guaranteed or for which the Company or any of its Subsidiaries is responsible or liable, directly or indirectly, as obligor, guarantor or otherwise, and (f) all accrued interest, prepayment penalties, make-whole payments and termination or breakage costs or penalties with respect to any indebtedness referred to in clause (a) through (e) above.

"IEX" means Investors' Exchange LLC.

"Intellectual Property" means all intellectual property rights arising in any jurisdiction of the world, including in and to any of the following:  (a) trademarks, service marks, trade dress, trade names, and other indicia of origin, applications and registrations for the foregoing, and all goodwill associated therewith and symbolized thereby ("Trademarks"); (b) patents and patent applications, including divisions, continuations, continuations-in-part and renewal applications, and including renewals, re-examinations, extensions and reissues; (c) trade secrets and proprietary rights in confidential information; (d) copyrights, applications and registrations therefor, and renewals, extensions, restorations and reversions thereof; and (e) Internet domain names.

"Intracompany Payables" means all account, note or loan payables recorded on the books of the Company for goods or services purchased by or provided to the business of the Company, or advances (cash or otherwise) or any other extensions of credit to the Company from the Seller or any of its Affiliates, whether current or non-current.

"IRS" means the Internal Revenue Service.

"Knowledge of the Company" means the actual knowledge of the individuals set forth on Section 1.1 of the Seller Disclosure Schedule.

"Law" or "Laws" means any law, statute, ordinance, common law, rule, regulation, Order or other legal requirement enacted, issued, promulgated, enforced or entered by a Governmental Entity of competent jurisdiction.

"Lease" or "Leases" has the meaning set forth in Section 2.11(b).

"Leased Real Property" has the meaning set forth in Section 2.11(b).

"Lien" means any lien, charge, pledge, mortgage, easement, hypothecation, usufruct, deed of trust, security interest, claim or other encumbrance, other than, in each case, restrictions on transfer arising solely under applicable federal and state securities Laws.

"Material Adverse Effect" means any change, development, circumstance, fact or effect that, individually or taken together with any other changes, developments, circumstances, facts or effects is, or would reasonably be expected to be, materially adverse to the financial condition, assets, liabilities , business operations or results of operations of the Company (taken as a whole); provided, however, that none of the following, either alone or in combination, shall be deemed to constitute a Material Adverse Effect that is occurring, has occurred or would reasonably be expected to occur:

(a)     changes, developments, circumstances or facts in or with respect to the economy, credit, capital, securities, digital asset or financial markets or political, regulatory or business conditions in the geographic markets in which the Company has operations or its products or services are sold;

(b)     changes, developments, circumstances, facts or effects generally affecting the industries, markets or geographical areas in which the Company operates;

(c)     the negotiation, announcement, execution, pendency or performance of this Agreement or the Transactions or the Bankruptcy Proceeding, and any communication by the Buyer or any of its Affiliates of its plans or intentions (including in respect of employees) with respect to any business of the Company, including any loss or threatened loss of, or adverse change, development, circumstance or fact in or with respect to, the relationship of the Company, contractual or otherwise, with customers, employees, labor unions, labor organizations, works councils or similar organizations, suppliers, distributors, financing sources, partners or similar relationship;

(d)     changes in or with respect to applicable accounting standards, including GAAP or in any Law of general applicability after the Execution Date;

(e)     any failure by the Company to meet any internal or public projections or forecasts or estimates of revenues or earnings; provided that any change, development, circumstance, fact or effect underlying such failure may be taken into account in determining

whether a Material Adverse Effect is occurring, has occurred or would reasonably be expected to occur;

(f)     any change, development or effect resulting from acts of war (whether or not declared), sabotage, terrorism, military actions or the escalation of any of the foregoing, whether perpetrated or encouraged by a state or non-state actor or actors (other than cyberattacks), any weather or natural disaster, or any outbreak of illness or other public health event (or any measures taken in response thereto) or any other *force majeure* event (except to the extent causing any damage or destruction to or rendering unusable any material facility or property of the Company), whether or not caused by any Person (other than the Company or any of its Affiliates or Representatives);

(g)     any actions taken or not taken by the Seller or the Company pursuant to this Agreement or with the Buyer's prior written consent or at the Buyer's instruction (except for any obligation to operate in the ordinary course of business or similar obligation);

(h)     any change in the price or relative value of any digital currency or cryptocurrency, or any other blockchain-based tokens or assets;

(i)     any change in existence or legality of any digital currency or cryptocurrency, or any other blockchain-based token or asset, or any halt or suspension in trading of any such digital currency or cryptocurrency on any exchange; or

(j) (i) any Action approved by, motion made before or orders of the Bankruptcy Court or a court of similar jurisdiction or (ii) the fact that the Seller and the other Debtors are operating as debtors-in-possession under the Bankruptcy Court or a court of similar jurisdiction provided, however, that, with respect to clauses (a), (b), (d) and (f) of this definition, such changes, developments or effects shall be taken into account in determining whether a "Material Adverse Effect" is occurring, has occurred or would reasonably be expected to occur to the extent it materially disproportionately and adversely affects the Company (taken as a whole) relative to other companies of similar size operating in the geographic markets in which the Company has operations (in which case only the incremental disproportionate impact may be taken into account, and then only to the extent otherwise permitted by this definition); provided that in no event shall any reasonably anticipated change, development, circumstance, fact or effect arising from the commencement, pendency, conduct or prosecution of the Bankruptcy Proceeding be deemed to constitute or be taken into account in determining whether there has occurred a Material Adverse Effect.

"Material Contract" has the meaning set forth in Section 2.10(a).

"Nasdaq" means Nasdaq Stock Market.

"NSCC" means the National Securities Clearing Corporation.

"OCC" means the Options Clearing Corporation.

"OFAC" means the Office of Foreign Assets Control.

"Order" means any administrative decision or award, decree, injunction, judgment, order, quasi-judicial decision or award, ruling or writ of any arbitrator, mediator or Governmental Entity.

"Organizational Documents" has the meaning set forth in Section 2.2(b).

"Parties" or "Party" has the meaning set forth in the Preamble.

"PEO" has the meaning set forth in Section 2.7(b).

"Permit" means all permits, licenses, franchises, variances, exemptions, orders, certifications, registrations and other authorizations, consents and approvals of all Governmental Entities necessary to conduct business.

"Permitted Encumbrances" means (a) any Liens that are expressly permitted by the Sale Order to remain attached to the Shares following the Closing, (b) any Lien on the Shares that will be expunged, released or discharged at the Closing by operation of the Sale Order and (c) licenses, covenants not to sue and similar rights granted with respect to Intellectual Property.

"Person" means any natural person and any corporation, company, partnership (general or limited), unincorporated association (whether or not having separate legal personality), trust or other entity.

"Personal Information" means any information that that (i) identifies or could reasonably be used to identify an individual or household or (ii) constitutes "personal information," "personal data", "personally identifiable information" or a substantially similar term as defined in applicable Laws concerning the privacy and security of personal information.

"Pre-Closing Period" means all taxable years or other taxable periods that end on or before the Closing.

"Privacy Laws" means any and all applicable Laws relating to privacy and data security, including with respect to the receipt, collection, compilation, use, storage, processing, sharing, safeguarding, security, disposal, destruction, disclosure or transfer of Personal Information, and all applicable Laws requiring notification in connection with a Security Incident.

"Purchase Price" has the meaning set forth in Section 1.1.

"Registered Representative" means an officer, director, employee or agent of the Company or its Subsidiaries that is registered or required to be registered or licensed or required to be licensed as a "principal" or a "representative" (as such terms are defined under FINRA Rule 1220).

"Representative" of a Person means any officer, director or employee of such Person or any investment banker, attorney, accountant or other advisor, agent or representative of such Person.

"Required Notices" means (i) the written notice to the applicable third parties listed on Schedule 4.4 of the Seller Disclosure Schedules, [(ii) advance written notice to the DTC of the Transactions contemplated by this Agreement,] (iii) advance written notice to NSCC of the Transactions contemplated by this Agreement, (iv) advance written notice to the OCC of the Transactions contemplated by this Agreement and (v) advance written notice to Nasdaq of the Transactions contemplated by this Agreement pursuant to Nasdaq Rule 1017.

"Restricted Cash" means cash or cash equivalents that (a) are required to be held as cash or cash equivalents by the Target Entities to satisfy any applicable regulatory or contractual requirements as of such date (including amounts required to be held pursuant to Rule 15c3-1 and Self-Regulatory Organization membership requirements), or (b) the Target Entities are otherwise restricted from dividending or distributing to its shareholders or other equity interest holders prior to the Closing pursuant to applicable Law or Contract, including letters of credit, credit support arrangements, or because such dividend or distribution would be heavily taxed.

"Reverse Termination Fee" has the meaning set forth in Section 7.2(c).

"Sale Hearing" has the meaning set forth in the Recitals.

"Sale Order" means an order entered by the Bankruptcy Court or other court of competent jurisdiction that includes the provisions set forth in Exhibit B hereto, subject to (a) immaterial modifications or clarifications or (b) such other changes to which the Buyer consents (such consent not to be unreasonably withheld).

"SEC" means the United States Securities and Exchange Commission.

"Securities Act" means the Securities Act of 1933.

"Security Incident" means any actual or suspected unauthorized access to, or acquisition, modification, use, destruction, loss or disclosure of any Personal Information maintained by or on behalf of any of the Company or its Subsidiaries.

"Self-Regulatory Organization" means any self-regulatory organization or authority that is charged with the supervision or regulation of brokers or dealers and for purposes of the agreement shall include DTC, FINRA, IEX, Nasdaq, NSCC and OCC.

"Seller" has the meaning set forth in the Preamble.

"Seller Disclosure Schedule" has the meaning set forth in Article II.

"Seller Fundamental Representations" means Section 2.1(a) (*Ownership of Shares and Subsidiary Interests*), Section 2.2 (*Organization, Good Standing and Qualification*), Section 2.3 (*Capitalization of the Company*), Section 2.4 (*Authority; Approval*) and Section 2.14 (*Brokers and Finders*).

"Seller Guarantees" has the meaning set forth in Section 0.

"<u>Seller Parties</u>" means, collectively, (i) the Seller, (ii) each of the current or former Affiliates of the Seller, and (iii) each of the current or former officers, directors, employees, equityholders, partners, stockholders, members, direct and indirect owners, managers, advisors, predecessors, successors and assigns of any of the Persons described in clause (i) or clause (ii) of this definition, and each of the Affiliates of any of the Persons described in this clause (iii).

"<u>Seller Marks</u>" has the meaning set forth in <u>Section 4.14(a)</u>.

"<u>Seller Tax Group</u>" means any affiliated, consolidated, combined, unitary or similar group for Tax purposes which the Seller or any of its Affiliates is a member, other than such group solely between or among the Target Entities.

"<u>Shares</u>" has the meaning set forth in the Recitals.

"<u>Software</u>" means any and all computer programs, applications, middleware, firmware, microcode and other software, including operating systems, software implementations of algorithms, models and methodologies, and application programming interfaces, in each case, whether in source code, object code or other form or format, including libraries, subroutines and other components thereof, together with input and output formats.

"<u>Specified Business Conduct Laws</u>" means (i) the U.S. Foreign Corrupt Practices Act of 1977 and other applicable anticorruption laws, (ii) all Laws imposing trade sanctions on any Person, including, all Laws administered by OFAC, all sanctions Laws or embargos imposed or administered by the U.S. Department of State, the United Nations Security Council, Her Majesty's Treasury or the European Union and all anti-boycott or anti-embargo Laws and (iii) all Laws relating to the import, export, re-export, transfer of information, data, goods, and technology, including the Export Administration Regulations administered by the U.S. Department of Commerce and the International Traffic in Arms Regulations administered by the U.S. Department of State.

"<u>Subsidiary</u>" means, with respect to any Person, any other Person of which at least a majority of the securities or ownership interests having by their terms ordinary voting power to elect a majority of the board of directors or other Persons performing similar functions is directly or indirectly owned or controlled by such Person and/or by one or more of its Subsidiaries.

"<u>Subsidiary Interests</u>" has the meaning set forth in the Recitals.

"<u>Target Entities</u>" has the meaning set forth in the Recitals.

"<u>Tax</u>" or "<u>Taxes</u>" means, whether disputed or not, (a) any and all U.S. federal, state, local and foreign income, profits, franchise, gross receipts, environmental, customs duty, capital stock, severances, stamp, payroll, sales, employment, unemployment, disability, use, property, withholding, excise, production, value-added, occupancy and other taxes, duties or assessments of any nature whatsoever, together with all interest, penalties and additions imposed with respect to such amounts and any interest in respect of such penalties and additions, (b) any liability for the payment of any amounts of the type described in clause (a) above as a result of being a member of an affiliated, consolidated, combined, unitary or similar group (including any arrangement for group or consortium relief or similar arrangement) for any period and (c) any liability for the

payment of any amounts of the type described in clauses (a) or (b) above as a result of any express or implied obligation to indemnify any other Person or as a result of any obligation under any agreement or arrangement with any other Person with respect to such amounts and including any liability for Taxes of a predecessor or transferor, by Contract or otherwise by operation of Law.

"Tax Return" means any returns and reports (including elections, declarations, disclosures, schedules, estimates and information returns) or any other document required to be supplied to a Tax authority relating to Taxes.

"Termination Date" has the meaning set forth in Section 7.1(c)(i).

"Trademarks" has the meaning set forth in the definition of "Intellectual Property".

"Transaction Documents" means this Agreement and all other ancillary agreements to be entered into by, or documentation delivered by, any Party pursuant to this Agreement.

"Transactions" means the transactions contemplated by this Agreement.

"Transfer Taxes" has the meaning set forth in Section 4.9(b).

"Transitional Period" has the meaning set forth in Section 4.14(b).

**EXHIBIT B**

**FORM OF SALE ORDER**

**[EXHIBIT C**

**FORM OF ASSUMPTION AND ASSIGNMENT AGREEMENT]**

**SCHEDULES**[1]

**to the**

**STOCK PURCHASE AGREEMENT**

**by and between**

**WEST REALM SHIRES INC.**

**and**

**[BUYER]**

**Dated as of [●], 2023**

---

[1]    **Note to Draft**:  Based on auction draft of the Stock Purchase Agreement, dated February, 2023.  The entirety of these Schedules are subject to ongoing review by the Seller and subject to further update in all respects.

# TABLE OF CONTENTS

TABLE OF CONTENTS                                                                                    2

INTRODUCTION                                                                                         3

Schedule 1.1 Knowledge Persons                                                                      5

Schedule 1.5(a) Assigned Contracts                                                                  6

Schedule 2.3 Capitalization of the Company                                                          7

Schedule 2.5 Government and Self-Regulatory Organization Filings; No Violations                     9

Schedule 2.7 Employee Benefit Plans                                                                10

Schedule 2.9 Compliance with Laws, Licenses, Permits and Authorizations                            12

Schedule 2.10 Material Contracts                                                                    13

Schedule 2.11 Real Property                                                                         15

Schedule 2.13 Intellectual Property; Information Technology; Data Privacy                           16

Schedule 4.13 Seller Guarantees                                                                     17

Schedule 6.1(a) Regulatory Approvals                                                                18

## INTRODUCTION

These Schedules (including the attachments hereto, as amended or restated from time to time, these "Schedules") constitute the Seller Disclosure Schedules referred to in that certain Stock Purchase Agreement (the "Agreement"), dated as of [●], 2023, by and between West Realm Shires Inc., a Delaware corporation (the "Seller"), and [BUYER], a [*entity type*] organized under the Laws of [*jurisdiction of organization*] (the "Buyer"). Capitalized terms used but not otherwise defined herein shall have the meaning set forth in the Agreement. Section references are to sections of the Agreement unless otherwise specified.

These Schedules are qualified in their entirety by reference to the specific provisions of the Agreement and do not constitute, and shall not be construed as constituting, representations, warranties or covenants of the Seller, except as and to the extent provided in the Agreement or expressly set forth in a particular Schedule. Each Schedule is intended only to qualify and limit the representations, warranties, covenants and agreements of the Seller contained in the Agreement. The inclusion of any facts, items or information, including dollar amounts, in these Schedules shall not in and of itself be construed as an admission that such fact, item or information (or any non-disclosed fact, item or information of comparable or greater significance) is material to the Seller, individually or taken as a whole, and any such disclosure, including dollar amounts, shall not be deemed an acknowledgment or representation that such facts, items or information are material or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. Therefore, the inclusion of any item in these Schedules shall not be deemed to be an admission or evidence of materiality of such item.

No disclosure in these Schedules relating to any possible or alleged breach or violation of any Law, Contract or other obligation shall be construed as an admission of liability to any third party, or as an admission against any interest of the Seller or its directors or officers. In disclosing the information in these Schedules, the Seller expressly does not waive any attorney-client privilege associated with such information or any protection afforded by the work-product doctrine with respect to any of the matters disclosed or discussed herein. References in these Schedules to any agreement include references to such agreement's exhibits, amendments and schedules. Where the terms of a Contract or other disclosure item have been referenced, summarized or described, such reference, summary or description does not purport to be a complete statement of the terms of such Contract or other disclosure item. Any reference in these Schedules to any Contract is to that Contract as modified, supplemented or amended on or prior to the date hereof.

Disclosure of any particular item in any section or subsection of these Schedules, notwithstanding the omission of appropriate cross-references, shall be deemed to be disclosed for all purposes of the Agreement as long as the relevance of such disclosure to the other sections or sub-sections of the Agreement is reasonably apparent on its face. The introductory language and section headings within these Schedules are inserted for convenience of reference only and will not affect the meaning or interpretation of the Agreement or these Schedules.

The matters disclosed by the Seller in these Schedules: (1) are Confidential Information (as defined in the Confidentiality Agreement); (2) are being disclosed in these Schedules in accordance with the terms and subject to the conditions of the Confidentiality Agreement in all respects; and (3) shall be treated by the Buyer strictly in accordance with the terms of the Confidentiality Agreement.

The Seller does not assume any responsibility to any Person that is not a party to the Agreement for the accuracy of any information contained in these Schedules.

**Schedule 1.1**
**Knowledge Persons**

1. ██████████████
2. █████████████

**Schedule 1.5(a)**
**Assigned Contracts**

[*Buyer to inform Seller of whether it intends to assume the Retention Agreements provided in Folder [●] of the VDR.*]

**Schedule 2.3**
**Capitalization of the Company**

2.3(b)

1. Agreement and Plan of Merger, by and among Embed Financial Technologies Inc., West Realm Shires Inc., Ingrained Merger Sub, Inc., and Shareholder Representative Services LLC, dated June 10, 2022.

2. Support Agreements, by and among Embed Financial Technologies Inc., West Realm Shires Inc., Ingrained Merger Sub, Inc., and each of the following parties, dated June 10, 2022.
    a. Laurence Beal
    b. SWS Holding Company, LLC
    c. Propel Venture Partners US Fund I, L.P.
    d. Rocket Internet Capital Partners (Euro) II SCS
    e. Rocket Internet Capital Partners II SCS
    f. YCC20, L.P.
    g. Y Combinator ES20, LLC
    h. Buckley Ventures, LP
    i. Acrew Capital Fund, L.P.
    j. Acrew Capital Fund (A), L.P.
    k. GFC Global Founders Capital GMBH
    l. Harland Group LLC
    m. Homebrew Ventures III, L.P.
    n. LGF II, L.P.

3. SAFE Liquidation Agreements, by and among Embed Financial Technologies Inc., West Realm Shires Inc., Ingrained Merger Sub, Inc., and each of the following parties, dated June 10, 2022.
    a. Rocket Internet Capital Partners (Euro) II SCS
    b. Rocket Internet Capital Partners II SCS
    c. TI Plateform NLI Venture Limited II
    d. TI Plateform Fund II, LP
    e. Transpose Platform Fintech Fund II, L.P.
    f. SWS Holding Company, LLC
    g. Global Founders Capital GMBH & CO. Beteiligungs KG NR. 1 and Global Founders Capital Verwaltungs GMBH

4. Warrant Cancellation Agreements, by and among Embed Financial Technologies Inc., West Realm Shires Inc., Ingrained Merger Sub, Inc., and each of the following parties, dated June 10, 2022.
    a. Triple Point Private Venture Credit Inc.
    b. Triple Point Venture Lending Fund, LLC
    c. Triple Point Capital LLC

5. Equity Release Agreements, by and among Embed Financial Technologies Inc. and each of the following individuals, dated September 29, 2022.
    a. ████████

b. ██████████

**Schedule 2.5**
**Government and Self-Regulatory Organization Filings; No Violations**

2.5(b)

1. Pursuant to the U.S. Select Merchant Processing Agreement, dated February 11, 2021, by and between Embed Clearing and ███████████████████ ████████████████, Embed Clearing is required to give 30 days' prior written notice of a direct or indirect change of control.

**Schedule 2.7**
**Employee Benefit Plans**

2.7(a)

1. Justworks Group Health & Welfare Plan providing the following benefits:
   a. Medical Insurance (Choice Plus CHNI, CHHO, CHIN, and CHHG options, each through UnitedHealthcare)
   b. Dental Insurance (PPO Low and High options, each through MetLife & Aetna Dental PPO/PDN with PPO II Network)
   c. Vision Insurance (through MetLife & Aetna)
   d. HealthAdvocate Access (Mental Health, Legal, and Financial Advisory Services)
   e. One Medical Access
   f. Teladoc Access
   g. Talk Space Access

2. Paid Holidays Policy.

3. Paid Time Off (PTO) Policy.

4. The following leaves of absence:
   a. Bereavement Leave
   b. COVID-19 Vaccination Leave
   c. Washington Paid Sick Leave
   d. Military Leave
   e. Jury Duty Leave
   f. Time Off to Vote
   g. Pregnancy Disability Leave
   h. Washington Paid Family and Medical Leave
   i. Leave for Victims of Domestic Violence
   j. Other Statutory Leaves

5. Embed Financial Technologies Inc. Employee Handbook

6. Employment Offer Letters, by and between the Company and each of the following individuals (the "Embed Employees"), and all addendums thereto:
   a. ███████████, dated August 7, 2021
   b. ███████████, dated September 7, 2021
   c. ███████████, dated March 7, 2021
   d. ███████████, dated March 15, 2022
   e. ███████████, dated June 24, 2020
   f. ███████████, dated December 30, 2020
   g. ███████████, dated August 7, 2021
   h. ███████████, dated May 22, 2020
   i. ███████████, dated November 24, 2021
   j. ███████████, dated April 9, 2021
   k. ███████████, dated March 25, 2022
   l. ███████████, dated August 7, 2021
   m. ███████████, dated January 28, 2022 and amended April 4, 2022



n. ███████, dated November 9, 2021
o. ███████, dated January 22, 2021
p. ███████, dated February 24, 2021
q. ███████, dated February 12, 2022
r. ███████, dated February 14, 2022
s. ███████, dated October 11, 2020
t. ███████, dated June 5, 2020
u. ███████, dated May 3, 2022
v. ███████, dated January 18, 2022
w. ███████, dated August 7, 2021
x. ███████, dated June 9, 2020
y. ███████, dated August 7, 2021
z. ███████, dated August 7, 2021
aa. ███████, dated August 7, 2021

7.  Proprietary Information and Inventions Assignment, by and between the Company Technologies Inc. and each of the Embed Employees.

8.  Retention Incentive Award Agreements, by and between the Company, West Realm Shires Inc., and each of the following parties, and all addendums thereto:
    a.  Each of the Embed Employees, dated September 30, 2022
    b.  ███████, dated September 30, 2022

9.  Promissory Note and Wage Deduction Authorization, by and between the Company and each of the following individuals:
    a.  ███████, dated September 15, 2021
    b.  ███████, dated September 15, 2021

10. Consulting Agreement, by and between the Company and ███████, dated May 28, 2020 and all addendums thereto.

**Schedule 2.9**
**Compliance with Laws, Licenses, Permits and Authorizations**

2.9(a)

1. In December, 2021,  an employee of the Company who has since been terminated accessed his previous employer's virtual infrastructure to obtain data about customers' average shares and size per trade.  His actions were not at the direction of any other Company employees.  Once this was discovered in July 2022, the Company retained outside legal counsel to conduct an internal review.  Outside counsel contacted the Department of Justice ("DOJ") and learned that both the DOJ and the FBI were investigating the particular employee.  Embed has been voluntarily cooperating with the FBI and DOJ and, to the Knowledge of the Company, is not a target of any investigation.

**Schedule 2.10**
**Material Contracts**

2.10 (a)(i)
1. Revolving Line of Credit Promissory Note in the amount of $40 million, dated September 30, 2022, by and between the Company and West Realm Shires Inc. (the "<u>WRS Line of Credit</u>").
2. ███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
████████████████████████████████

2.10(a)(iii)
1. Consulting Agreement, dated February 13, 2022, by and between Embed Crypto LLC and ██████████████████████████.

2.10(a)(v)
1. Asset Purchase Agreement, dated August 9, 2021, by and between the Company and Technology Outfitter, LLC, and related adoption agreements by and between the Company and each of ███████████████ and Craig ███████████████.
2. Intellectual Property Assignment Agreement, dated August 9, 2021, by and between the Company and Technology Outfitter, LLC.
3. Reference is made to the Agreement and Plan of Merger listed in Schedule 2.3.

2.10(a)(vi)
1. Special Indemnity Agreement, dated September 30, 2022, by and between Michael H. Giles and West Realm Shires Inc.
2. WRS Line of Credit.
3. Reference is made to the Retention Incentive Award Agreements listed in Schedule 2.7.

2.10(b)
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
████████████████████████████████

███████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████

███████████████████████████████████████████████

**Schedule 2.11**
**Real Property**

2.11(b)

1. Lease Agreement, dated March 3, 2022, by and between the Company and BOF DPC Denver West Park 1 LLC.

2. Office Lease, dated June 11, 2020, by and between the Company and 1703 Main Street, LLC, as extended on July 1, 2022.

**Schedule 2.13**
**Intellectual Property; Information Technology; Data Privacy**

2.13(a)

*Trademarks*

> 3.  EMBED, U.S. Serial No. 97760526, unpublished, filed January 19, 2023
> 4.  EMBED, U.S. Serial No. 97760524, unpublished, filed January 19, 2023

*Domain Names*

| Domain Names | Registrar |
| --- | --- |
| www.embed.com | GoDaddy.com, LLC |
| www.embedfi.dev | GoDaddy.com, LLC |
| www.embedfi.com | GoDaddy.com, LLC |
| www.embedbank.com | GoDaddy.com, LLC |
| www.embedclear.com | GoDaddy.com, LLC |
| www.embedcrypto.com | GoDaddy.com, LLC |
| www.embedmoney.com | GoDaddy.com, LLC |
| www.embedbroker.com | GoDaddy.com, LLC |
| www.embedclearing.com | GoDaddy.com, LLC |

2.13(d)

> 1.  On November 30, 2020, the Company received a letter from counsel for LPL Financial LLC ("LPL") advising the Company that a design element in the Company's logo might cause confusion with the logo used by LPL and requesting more information regarding the Company's intended line of business. The Company provided a responsive letter and there has been no further communication.

**Schedule 4.13**
**Seller Guarantees**

1.  WRS Line of Credit.

**Schedule 6.1(a)**
**Regulatory Approvals**

[*Buyer to populate with any and all approvals, clearances or expirations of waiting periods required to consummate the transaction.*]