```
 1                    UNITED STATES BANKRUPTCY COURT
                          DISTRICT OF DELAWARE
 2

 3   IN RE:                         .  Chapter 11
                                    .
 4   FTX TRADING LTD., et al.,      .  Case No. 22-11068 (JTD)
                                    .
 5                                  .  (Jointly Administered)
                                    .
 6                                  .  Courtroom No. 5
                                    .  824 Market Street
 7             Debtors.             .  Wilmington, Delaware 19801
                                    .
 8                                  .  Wednesday, February 15, 2023
     . . . . . . . . . . . . . . .     10:00 a.m.
 9
                          TRANSCRIPT OF HEARING
10                BEFORE THE HONORABLE JOHN T. DORSEY
                    UNITED STATES BANKRUPTCY JUDGE
11
     APPEARANCES:
12
     For the Debtor:           Adam Landis, Esquire
13                             LANDIS RATH & COBB LLP
                               919 Market Street, Suite 1800
14                             Wilmington, Delaware 19801

15                             James L. Bromley, Esquire
                               SULLIVAN & CROMWELL LLP
16                             125 Broad Street
                               New York, NY 10004
17

18

19   (APPEARANCES CONTINUED)

20   Audio Operator:           Danielle R. Gadson

21   Transcription Company:    Reliable
                               The Nemours Building
22                             1007 N. Orange Street, Suite 110
                               Wilmington, Delaware 19801
23                             Telephone: (302)654-8080
                               Email:  gmatthews@reliable-co.com
24
     Proceedings recorded by electronic sound recording,
25   transcript produced by transcription service.
```

APPEARANCES (CONTINUED):

For the Debtors:          Matthew Lunn, Esquire
                          YOUNG CONAWAY STARGATT & TAYLOR LLP
                          Rodney Square
                          1000 North King Street
                          Wilmington, Delaware 19801

For JPLS Bahamas:         Christopher Shore, Esquire
                          WHITE & CASE LLP
                          1221 6th Avenue
                          New York, New York 10020

1                                    INDEX

2   MOTION:                                                          PAGE

3
    Agenda
4   Item 6:  Motion of the United States Trustee for                 4
                Entry of an Order Directing the Appointment
5               of an Examiner
6               [D.I. 176; Filed 12/1/22]

7            Court's Ruling:                                         5

8   Agenda
    Item 5:  Motion for an Order Granting the Committee              17
9               Leave and Permission to File the Reply of
                the Official Committee of Unsecured Creditors
10              to Objection of the United States Trustee to
                the Application for an Order Authorizing the
11              Retention and Employment of FTI Consulting,
                Inc., as Financial Advisor to the Official
12              Committee of Unsecured Creditors
                [D.I. 697, filed on February 13, 2023]
13
             Court's Ruling:                                        21
14

15

16  EXHIBITS:                                                       PAGE

17  Brian Simms Declarations                                        20

18  Sophia Rolle-Kapousouzoglou Declaration                         20

19  JPL Exhibit 5 Order from Supreme Court of the Bahamas           20

20

21

22

23

24

25

1          (Proceedings commence at 10:07 a.m.)

2          (Call to order of the Court)

3          THE COURT: Good morning, everyone.  Thank you.

4    Please be seated.

5          Mr. Landis.

6          MR. LANDIS:  Good morning, Your Honor.  May I

7    please the Court, Adam Landis, for the record, from Landis

8    Rath & Cobb, on behalf of FTX Trading Ltd., and its

9    affiliated debtors.

10          Your Honor, we are here today with two agendas.  I

11    don't know if the Latin for that is agendum, but we are here

12    with two agendas; one in the FTX Trading Ltd., case and one

13    in the FTX Digital Markets case.  Nothing is contested, Your

14    Honor, on either agenda.

15          With respect to the FTX Trading agenda, and we have

16    spoken with counsel to the joint provisional liquidators, we

17    thought we would go forward with the FTX Trading Chapter 11

18    agenda first. We filed a second amended agenda last night

19    noting that the committee had filed certificates of counsel

20    with respect to the professional retentions that had been

21    contested by the U.S. Trustee.

22          I note that, I think, as we were standing here this

23    morning Your Honor signed the orders for FTI and Jefferies.

24          THE COURT:  Yes.

25          MR. LANDIS:  So, unless Your Honor has question

1  with respect to anything on the agenda, we believe we can

2  move right to item number six which is the Court's ruling

3  with respect to the United States Trustees motion to appoint

4  an examiner.

5          THE COURT:  Okay.  I don't have any questions.  So,

6  we can go ahead.

7          So, this is the ruling on the motion to appoint an

8  examiner. The United States Trustee moved for the appointment

9  of an examiner in these cases pursuant to Section 1104(c)(1)

10 and (c)(2) of the Bankruptcy Code.  Section 1104 provides

11 that if a Chapter 11 Trustee is not appointed in a case then

12 at any time prior to confirmation of a plan:

13          "On request of a party in interest or the United

14 States Trustee, and after notice and a hearing, the Court

15 shall appoint an examiner to conduct such an investigation of

16 the debtor, as is appropriate, including an investigation of

17 allegations of fraud, dishonesty, incompetence, misconduct,

18 mismanagement, or irregularity in the management of the

19 debtor if (I) such appointment is in the interest of the

20 creditors, and any equity security holders, and other

21 interests of the estate, or (II) the debtors fixed liquidated

22 unsecured debts other then debts for goods, services, or

23 taxes, or owing to an insider exceed $5 million."

24          The Trustee, joined by several state regulatory

25 authorities, argues that because there are allegations of

1    massive fraud alleged against the debtors prepetition

2    management the appointment of an examiner is in the best

3    interest of the debtor's creditors and other interest holders

4    under 1104(c)(1).

5         The Trustee also argues that even if I conclude the

6    requirements of 1104(c)(1) have not been met, I am required

7    to appoint an examiner under 1104(c)(2) because three of the

8    debtors meet the debt threshold or the debtors do not, for

9    the purposes of this motion, contest the debt limit with

10   regard to the remaining debtors.

11        The debtors, the committee, general unsecured

12   creditors, and the joint provisional liquidators or FTX

13   Digital Markets Ltd., appointed in the provisional

14   liquidation proceeding pending in the Bahamas, object to the

15   appointment of an examiner arguing that given the

16   investigations being conducted by the debtors and the

17   committee, as well as various federal law enforcement and

18   regulatory agencies, there is no need to appoint an examiner

19   to conduct yet another costly investigation that would slow

20   the progress of these cases.  Moreover, the objectors argue

21   that, contrary to the Trustees position, appointment of an

22   examiner is not mandatory under 1104(c)(2) even if the debt

23   threshold is met.

24        For the reasons I will explain, I agree with the

25   objectors and will deny the motion to appoint an examiner.

1          These cases have been described as unique, unusual,

2   highly complex, and unprecedented to name just a few of the

3   adjectives applied to them, and they have certainly lived up

4   to that billing.  A multi-billion dollar company built over

5   the course of just a few years.  A spectacular crash with

6   billions worth of assets missing, allegations of gross

7   mismanagement and massive fraud leading to criminal

8   indictments and investigations by numerous federal agencies.

9          Behind that backdrop sit the creditors and the

10  customers of the debtors; individuals and entities that

11  trusted the management of the company with a relatively new

12  type of asset, cryptocurrency, as well as those who did

13  business with the debtors on a day to day basis.  This case

14  is about making sure that those parties get back as much

15  value as possible from the debtor's estates.

16          That process began immediately prior to the filing

17  of cases with the appointment of Mr. Ray as the new CEO of

18  the debtors.  Although appointed by the previous CEO, Mr.

19  Bankman-Fried, who is currently under federal indictment,

20  there is no question that Mr. Ray is completely independent

21  of prior management and the company seems appointed to lead.

22          Mr. Ray is the consummate professional, highly

23  qualified with decades of experience in taking control of

24  companies in dire financial condition.  Mr. Ray, in turn,

25  appointed four independent directors to three silos of debtor

1  entities to assist him in determining what happened, how to

2  sort out the financial condition of the debtors, and return

3  as much value as possible to creditors and customers.

4       Each of the four directors are also highly

5  qualified professionals with no prior connection with the

6  debtors or the debtor's prior management.  Mr. Ray also

7  insured that all prior senior management of the debtors were

8  removed; two of whom have been indicted and plead guilty to

9  various crimes involving the management of the debtors.

10  Although some prior officers of the debtors remain in place,

11  there is no indication they were involved in any wrongdoing,

12  and according to Mr. Ray all have been stripped of any

13  decision making authority.

14       Mr. Ray has also retained a group of highly

15  qualified experts to assist in sorting through the debtor's

16  poorly maintained records.  In many instances records don't

17  exist at all because the recordkeeping was neglected by prior

18  management.  Mr. Ray testified that those experts, among

19  other things, are accessing the debtor's extremely vulnerable

20  electronic information containing crypto-assets that have

21  already suffered hacking incidents both pre and post-petition

22  before controls could be restored.  Those hacks resulted in

23  the possible loss of hundreds of millions, if not billions of

24  dollars' worth, of crypto-assets.

25       He further testified that he has been informed by

1  those experts that given additional persons access to the

2  data creates the risk of further inadvertent disclosure or

3  hacking of information that could lead to additional losses.

4  Indeed, even committee counsel indicated that while they are

5  working closely with the debtors in conducting investigations

6  into what happened, the committee is not requesting direct

7  access to the debtor's data due to those risks.

8           There is no question that an examiner or a Chapter

9  11 Trustee, for that matter, appointed pursuant to Section

10  1104 would have the same attributes as Mr. Ray and the

11  independent directors.  That person would be independent with

12  no connection to the debtors or the debtors prior management.

13  That person would need to be qualified -- would need to be as

14  qualified and as experienced as Mr. Ray and that person would

15  retain qualified and experienced professionals to assist with

16  the investigation.

17           There is no question that if an examiner was

18  appointed here the cost of the examination, given the scope

19  suggested by the Trustee at the hearing, would be in the tens

20  of millions of dollars and would likely exceed $100 million.

21  Contrary to the suggestion of the Trustee, the debtors and

22  the committee could not merely sit idly by while a months

23  long investigation unfolded leading to exponential costs to

24  the estate which would have to be borne by the creditors.

25           While the debtors may ultimately have billions of

1  dollars' worth of assets to distribute, creditors will likely

2  not come close to recovering the full amount of their losses

3  and it may take some time to recover anything as the debtors

4  and the committee work to claw back as much as the assets as

5  possible.

6          Given the facts and circumstances of this highly

7  unique case I have no doubt that the appointment of an

8  examiner would not be in the best interests of the creditors.

9  There are already multiple investigations underway by

10  incredibly competent and independent parties.  Requiring

11  creditors to bear the burden of yet another investigation

12  does not comport with the requirements of Section 1104(c)(1)

13  or the general scheme of the bankruptcy code; that is to

14  maximize to recovery to creditors.

15          It is important to keep in mind that while we talk

16  about the cost of an investigation being born by the debtors

17  we are actually talking about the cost being born by the

18  creditors.  Every dollar spent in these cases on

19  administrative expenses is a dollar less to the creditors;

20  therefore, I will deny the request to appoint an examiner

21  under 1104(c)(1).

22          The Trustee argues, however, that even if I

23  conclude that the appointment of an examiner is not in the

24  best interests of the creditors, I am still obligated to

25  appoint one as mandated by Section 1104(c)(2) because the

1  debtors met the debt threshold or, at least, do not contest

2  that they do for purposes of this motion.  Even the Trustee

3  concedes, however, that a Bankruptcy Court has some

4  discretion in determining whether or not an examiner must be

5  appointed under 1104(c)(2), for example, for a motion to

6  appoint an examiner is being used by a creditor to obtain an

7  advantage in plan negotiations.  In other words, the Trustee

8  agrees there are times when the appointment of an examiner

9  would not be appropriate under 1104(c)(2).

10         To be sure there is a split of authority over

11  whether 1104(c)(2)leaves any discretion on the appointment of

12  an examiner, Courts that hold there is no discretion

13  concentrate on the language in 1104 that states:

14         "The Court shall appoint an examiner if the debtor

15  meets the debt requirements of (c)(2)."

16         Those Courts either ignore the additional language

17  of 1104 that states: "To conduct such an investigation of the

18  debtors as is appropriate" or conclude that the language only

19  means the Court can direct the scope and nature of an

20  examination after an examiner is appointed.  For example, see

21  In Re Revco, 898 F.2d 498 at 501, Sixth Circuit (1990).  The

22  Court held appointment is mandatory, but: "The Bankruptcy

23  Court retains broad discretion to direct the examiner's

24  investigation including its nature, extent, and duration."

25         The Sixth Circuit is the only Circuit Court of

1  Appeals to consider the issue.  Other courts have concluded

2  that the as appropriate language in 1104(c) permits a

3  Bankruptcy Court to deny the appointment of an examiner in

4  limited circumstances even if the debtor meets the debt

5  requirements of (c)(2).

6          Examples are In Re Residential Capital LLC, 474

7  B.R. 112, 117, Bankruptcy SDNY (2012); In Re Dewey & LeBoeuf,

8  478 B.R. 627, 629, Bankruptcy SNDY (2012); In Re Shelter

9  Resources, 35 B.R. 304, 305, Bankruptcy Northern District of

10 Ohio (1983); In Re Gilman Services, 46 B.R. 322, 327,

11 Bankruptcy District of Massachusetts (1985); In Re Erickson

12 Retirement Communities LLC, 425 B.R. 309 at 312, Bankruptcy

13 Northern District of Texas (2010); In Re GHR Companies, Inc.,

14 43 B.R. 165, 170, Bankruptcy District of Massachusetts

15 (1984).

16         Indeed, every bankruptcy judge in this district to

17 consider the issue has concluded that there is discretion;

18 see In Re SA Telecom Inc., Case No. 97-2395-2401, Judge

19 Walsh, March 27th, 1998, Hearing Transcript at 82; In Re

20 Spansion, 426 B.R. 114, 128, Bankruptcy Court District of

21 Delaware (2010), a Judge Shannon decision; In Re Visteon

22 Corporation, No. 09-11786, a Judge Sontchi decision from May

23 12th, 2010, Hearing Transcript at 170; In Re Washington

24 Mutual, Inc., Case No. 08-12229, a Judge Walrath decision,

25 Bankruptcy District of Delaware, May 5th, 2010, Hearing

1  Transcript at 97; and two of my own prior cases In Re Cred

2  Inc., Case No. 20-12836, Bankruptcy District of Delaware,

3  December 12th, 2020, Hearing Transcript at 95, and In Re

4  Mallinckrodt PLC, Case No. 20-12522, November 22nd, 2021,

5  Hearing Transcript 28 through 46.

6         As Judge Glenn posited the question in Residential

7  Capital:

8         "If the as is appropriate language provides such

9  discretion with respect to the nature, extent, and duration

10 of the investigation, then why doesn't the same language

11 provide discretion to just say no to an examiner

12 investigation where it may not be justified on the particular

13 facts and circumstances of the case."

14        That is 474 B.R. at 118.

15        As the Trustee pointed out during argument,

16 ultimately Judge Glenn did appoint an examiner in Residential

17 Capital because (I) no plan had been confirmed; (II) no

18 Trustee had been appointed; (III) the debtor had fixed debts

19 exceeding $5 million; and (IV) investigation was appropriate,

20 and an investigation by the committee had just begun.

21        The first three elements of this analysis are

22 certainly present here, but while one could argue the fourth

23 is also met because the debtors and the committee are in the

24 early stages of their investigations the facts present here

25 are fundamentally different then Residential Capital.

1        First, Judge Glenn recognized in <u>Residential</u>

2  <u>Capital</u> that:

3        "Other than the committee, there is currently no

4  independent party with the ability and authority to fully

5  investigate and analyze the transactions at issue."

6        Judge Glenn emphasized the no independent party in

7  that state.  By contrast, in this case, all the senior

8  managers of the company accused of wrongdoing have been

9  removed and replaced by extremely competent independent

10 professionals led by Mr. Ray with the ability and authority

11 to investigate all claims that might ultimately benefit the

12 creditors in these cases.

13       Moreover, as indicated before, all remaining

14 employees and officers of the debtors that have not been

15 accused of wrongdoing do not possess any decision-making

16 authority.  Mr. Ray has also retained professionals that are

17 fully capable of conducting a thorough investigation.

18       Second, as Judge Glenn recognized, an examiner

19 investigation might not be appropriate when, among other

20 things, the debtors senior management has been indicted; 474

21 B.R. at 118, Footnote 6.  Here, of course, senior management

22 has been indicted; two have plead guilty and a third is

23 scheduled for trial in October.

24       Finally, the issues to be investigated in

25 <u>Residential Capital</u> involved a "Complex constellation of pre

1  and post-bankruptcy transactions involving billions of

2  dollars in transfers and financing among interested parties."

3  That is at 115, Note 3, emphasis on "interested parties."

4          In Residential Capital the allegations were that

5  transfers between the debtors and certain secured creditors

6  benefited the secured creditors to the detriment of unsecured

7  creditors.  Here, there are no secured creditors.  There are

8  only unsecured creditors.

9          Finally, the issues to be investigated in

10 Residential Capital -- excuse me, moreover, while the

11 transfers at issue in Residential Capital were clearly

12 complex commercial transactions, there was no indication that

13 accessing the debtor's financial information would create a

14 risk of further harm to the debtors or their creditors.  By

15 contrast, the uncontroverted testimony during the hearing in

16 this matter established that given the debtor's business and

17 the vulnerability of the debtor's financial data, permitting

18 additional parties access to the financial information would

19 create an increased risk of further loss through inadvertent

20 disclosures or hacking.

21         Therefore, I conclude that under the facts and

22 circumstances of these cases, appointment of an examiner is

23 not needed pursuant to 1104(c)(2) and appointing one would

24 impose an unnecessary burden on the debtors and ultimately

25 the creditors for whose benefit these cases are being

1  pursued.  Contrary to the Trustees position this is not

2  inconsistent with the language of the statute or the

3  legislative history.

4       Congress did not explain the language of the

5  statute itself what it meant by the "as is appropriate"

6  limitation.  As I previously mentioned, many courts have

7  concluded that it means a Bankruptcy Court must always

8  appoint an examiner if the debt limit has been met, but can

9  limit the nature, extent and duration of any examination.

10 Others have concluded that if the Bankruptcy Court can limit

11 the scope and duration it must also mean that the Court can

12 conclude that no examination is needed at all under specific

13 facts and circumstances.

14       Clearly, there is more than one logical conclusion

15 as to the meaning of Section 1104(c).  The legislative

16 history of 1104(c), which at the time of its enactment was

17 1104(b), concluded that:

18       "The standards for the appointment of an examiner

19 are the same as those for the appointment of a Trustee. The

20 protection must be needed and the cost and expense must not

21 be disproportionately high."

22       HR Rep No. 95-595, Ninety-Fifth Congress First

23 Section 402 (1977).

24       Thus, the legislative history supports the

25 conclusion that an examiner shall be appointed "as

1  appropriate under the particular circumstances of the case,"

2  but "the protection must be needed."  That legislative intent

3  is met in cases where even though the debt limit of

4  1104(c)(2) is met the evidence establishes and examiner is

5  not needed under the facts and circumstances of a particular

6  case.

7          Therefore, I will sustain the objections and deny

8  the motion to appoint an examiner.  The parties should meet

9  and confer and submit a form of order under certification of

10  counsel.

11          Any questions?

12      (No verbal response)

13          THE COURT:  Next up.

14          MR. LANDIS:  Thank you, Your Honor.

15          I just wanted to go back very briefly to the

16  second amended agenda.  There's an Item 5 that was the

17  committee's motion for permission to file a response to the

18  United States Trustees objection.  I believe that matter is

19  mooted out and the committee is not pressing it, but I

20  didn't, for house keeping purposes, want to just let that

21  hang out on the agenda.  So, you'll probably hear from the

22  committee on that.

23          THE COURT:  It does seem moot.

24          MR. LUNN:  Your Honor, Matthew Lunn from Young

25  Conaway.

1        I believe it's just the motion for relief to file

2   the reply Your Honor.  Simply procedure.  I don't believe the

3   U.S. Trustee had an objection to it.  Housekeeping we can

4   upload a form of order if it's acceptable.

5        THE COURT:  Al right.  We'll go ahead and just

6   enter the order.

7        MR. LANDIS:  Thank you.  I just wanted to make

8   sure that that loose end was tied.  And with that, we can

9   pass the podium over to counsel to the joint provisional

10  liquidators.

11       THE COURT:  All right.

12       MR. SHORE:  Good morning, Your Honor.  Chris Shore

13  from white & Case on behalf of the joint provisional

14  liquidators in the Chapter 15 case now.

15       We're here today seeking recognition of the

16  pending Bahamian liquidation as a foreign proceeding and

17  grating related relief.  Tending in the courtroom today are

18  Brian Simms and Peter Greaves; two of the JPL's.  The third,

19  Kevin Cambridge, unfortunately was unavailable to come today

20  because he has COVID.

21       As for today's agenda, we're happy to report that

22  there's no pending objections to our request for recognition.

23  So, if it's okay with the Court, I'd like to proceed as

24  follows:

25

1        First, I'd like to move in the evidence into the

2   record and request that the Court enter the proposed form of

3   order which we filed on Monday at Docket 125.  Then I'd like

4   to give the Court a fifteen minute status update, not in the

5   way of evidence, but just to give Your Honor a sense of what

6   the JPL's have been doing and give you kind of a six month

7   look forward so you know what's going to be happening in the

8   case.

9        And good news is I don't perceive that we're going

10  to be doing a lot in the fifteen over that time but maybe at

11  the end we can set a further status conference just to let

12  you know what's happening in that proceeding.  And, of

13  course, at any time if Your Honor has questions, I'm happy to

14  answer them or have others assist in the answer.

15        As for the evidence, the verified petition is

16  filed at Docket No. 1 of the Chapter 15.  We have three

17  declarations that we'd like to submit into evidence in

18  support of the application.  Those are the two declarations

19  of Mr. Simms and the declaration of Sophia Rolle-Kap in

20  support of the petition at Dockets 2, 5, and 8.

21        Mr. Simms is here should you have any questions

22  for him.  Ms. Rolle-Kap had to be in the Bahamas yesterday at

23  the recognition of the debtors Chapter 11 cases in the

24  Bahamian proceedings, but she is available via zoom should

25  the court have any questions about the intricacies of

1  Bahamian liquidation law, but I'd like to offer their

2  declarations into evidence as Exhibits 1 to 4 on the exhibit

3  list.  We distributed it to the parties in interest and the

4  C.  And also move into evidence Exhibit 5 which is an order

5  from the Supreme Court of the Bahamas regarding the JPL's

6  ability to commence the Chapter 15 action.

7         THE COURT:  Okay.  Anyone have an objection to

8  introduction of the evidence?

9         MR. BROMLEY:  Your Honor, Jim Bromley from

10  Sullivan & Cromwell on behalf of the Chapter 11 debtors.

11        We do not have an objection to the admission of

12  the evidence with respect to the recognition proceeding, but

13  there are certain aspects of the declarations which we

14  believe go beyond the four corners of the Chapter 15

15  recognition.  So, as long as it's limited just to Chapter 15

16  recognition, just to this hearing, and just to this relief,

17  we have no objection.

18        THE COURT:  All right.  They're admitted without

19  objection subject to the limitation that Mr. Bromley

20  requested.

21     (Evidence received into evidence)

22        MR. SHORE:  As for the motion itself as part of

23  the cooperation agreement that we entered into with the

24  debtors, we agreed to support their application for

25  recognition of the Bahamas.  They agreed to support our

1  application here and we took their comments on the order.  We

2  then reached agreement on language with the DOJ, the U.S.

3  Trustee, and the committee.  So, as I said, the form of

4  order, which has been agreed to by the parties, is at Docket

5  125.

6          I do want to note that there have been a number of

7  informal letters submitted by Mr. Leslie Stewart, a Bahamian

8  citizen.  Specifically, he sent a letter that was docketed in

9  the Chapter 11 cases at Docket 357 and some others.  We don't

10 believe any of them constitute an objection to recognition

11 but wanted to raise this to Your Honor's attention.

12         THE COURT:  I did see those letters and I directed

13 they be put on the docket just because I wanted everyone to

14 be able to see what kind of things that I'm receiving from

15 folks.

16         MR. SHORE:  Yes, Your Honor.  So, unless the Court

17 has any questions, we'd respectfully request that the court

18 enter the amended proposed order and we move to the status

19 update.

20         THE COURT:  Okay.  Anybody wish to be heard on the

21 recognition?

22     (No verbal response)

23         THE COURT:  All right.  Satisfied the relief is

24 appropriate, I will enter the order.

25

1        MR. SHORE:  So, just to -- I wanted to give Your

2   Honor a sense of where the JPL's have been and, as I said,

3   give a kind of six month look forward so you know what's

4   going on and I'll focus on, if you think of the debtors

5   presentation in the silos, FTX Digital is a subsidiary within

6   the FTX international platform, that international silo.

7        Now, the first day presentation may have left the

8   court with the impression that the FTX Digital estate played

9   an undersized role in the saga and I do want to address that

10  because it is actually, from our perspective, a big piece of

11  the puzzle that's going to need to get resolved.

12       At the time of the collapse, Digital employed

13  eighty-four persons including thirty-eight who were

14  transferred over from other FTX debtor entities including a

15  board in key management personnel.  That company was the

16  headquarters in Nassau, Bahamas.  It's one of fifty-two

17  properties that the JPL's have identified in the Bahamas all

18  held in the name of a Chapter 11 debtor in this case, FTX

19  Property Holdings.  Amongst those properties was a deluxe

20  office suite, residential complexes, and accommodations for

21  the employees, and a six acre FTX campus in New Providence,

22  Bahamas.  All of these properties, we seem to think, are

23  worth north of $250 million.  They were financed by FTX

24  Digital and are on FTX's Digital's balance sheet as

25  intercompany receivables.

1    As part of the cooperation agreement, we've agreed

2  with the debtors that the JPL's will take the lead on

3  liquidating that real estate in the Bahamas.  So, there is a

4  big real estate piece in FTX Digital.

5    THE COURT:  There was a motion to dismiss that

6  entity, wasn't there?

7    MR. SHORE:  I thought it was the Turkish

8  proceeding that did get dismembered.

9    THE COURT:  I thought I remembered seeing another

10  one for one of the Bahamian entities.

11    MR. BROMLEY:  Yes, Your Honor.  The properties in

12  the Bahamas are actually owned in fee by a U.S. debtor, and

13  the joint provisional liquidators did file a motion to

14  dismiss that individual proceeding.  That's been resolved --

15    THE COURT:  Okay.

16    MR. SHORE:  Sorry. Yes.  That one has been

17  resolved as part of the corporation agreement.  We're going

18  to go ahead and mark it and sell those assets, and then we're

19  going to have a discussion about where those assets go at a

20  later date, but --

21    THE COURT:  So, I need to put something on the

22  docket to close that out, close that motion out.

23    MR. SHORE:  Okay.  We can address that.

24    So, of the eighty-four employees who were living

25  in the Bahamas at the time, there are sixteen employees who

1   remain working on a variety of forensics matters and

2   assisting with ongoing investigations.  But moving back in

3   time, as Mr. Bromley said at that first day hearing, the FTX

4   international platform was primarily a digital assets trading

5   in exchange platform for not U.S. citizens.

6           To that end, FTX was created -- FTX Digital was

7   created in July 2021 for maintaining -- for the purpose of

8   migrating the business.  And you might remember Mr. Bromley

9   said that the entity was moving around the country and then

10  offshore.  It was all going to be moving to the Bahamas where

11  this giant real estate conglomeration was and then

12  headquarters.  And that was going to allow FTX Group to take

13  advantage of the Bahamas favorable regulatory environment in

14  the newly created DARE Act which you've kind of heard about.

15          The question that's going to come up in this case

16  is what was the status of that movement between the time that

17  Digital was created and FTX and Digital filed their

18  respective proceedings.  And I'm going to come back to that

19  migration concept in a bit, but I did want to give Your Honor

20  a sense before I get there of how the Bahamian proceeding is

21  going to go along.  The Bahamian proceedings are either

22  voluntary or court supervised.  Ours is court supervised.  To

23  that end, Mr. Simms, Mr. Greaves, and Mr. Cambridge were

24  appointed as joint provisional liquidators.

25

1          They -- the Supreme Court of the Bahamas has

2    exclusive jurisdiction.  Right?  Your Honor has exclusive

3    jurisdiction over assets worldwide of the debtors.  The

4    Supreme Court of the Bahamas is the one that has exclusive

5    jurisdiction over insolvency proceedings and has broad

6    authority to make winding up orders for all types of

7    companies.

8          When a company is being wound up compulsively by

9    the Court, the Court issues an order which describes the

10   steps that the liquidators must take to liquidate the company

11   and the liquidator then -- as the JPL's here have been filing

12   periodic status updates with the Bahamian Court as to have,

13   they're doing on the order laying out their duties.

14         Once appointed, liquidators generally gather

15   assets, distribute the companies' assets to the creditors on

16   a pari passu basis.  They have broad authority to bring and

17   defend lawsuits, file claims, engage in business on behalf of

18   the debtors, so it's best really to think about the JPL's as

19   Chapter 11 debtors.  There are some distinctions, but

20   normally the process runs that way.

21         So, to that end, over the past few months, let's

22   talk about what they've been doing and then I'll come to what

23   needs to get done.  Beginning right from appointment, the

24   JPL's took steps to identify and gain custody of cash.

25   They've identified approximately $143 million of cash held by

1  Silvergate and Moonstone which Your Honor may have heard

2  about.  We filed requests for provisional relief with respect

3  to those funds and then, as the Court knows, the U.S.

4  Department of Justice seized the funds, but the JPL's are an

5  active discussion with the DOJ with respect to the release of

6  the funds and hope to have a consensual resolution on that.

7          The JPL's also established cash management

8  controls to ensure proper stewardship and security over the

9  estate funds, much like the debtors have been doing, and the

10  controls include rolling cash flow forecasts, payment

11  approval controls, anti-money laundering, treasury controls;

12  all the things that you would expect a U.S. Chapter 11

13  Trustee to do.

14          There have been significant efforts, and it's part

15  of their requirements, to communicate with customers and

16  creditors.  The JPL's launched a general informational

17  website and creditor portal website.  They've also sent

18  letters out to approximately 2.4 million of potential

19  customers inviting them to register their contact information

20  in order to receive updates of what's going on.

21          They've also been, much like the U.S. debtors,

22  been in active communication with regulators in the Bahamas

23  and in the U.S., and participating in investigations as well.

24  We have been active in the Chapter 11 case.  I'll get to it.

25  We believe we're a very large creditor in these cases, but,

1  you know, the main goal, which we reached early on in the

2  case, was the cooperation agreement which this Court has

3  approved, and the Bahamian Court has approved.  And it just

4  gives us a framework from which we're going to try and figure

5  out how the two proceedings are going to be done.

6           This is where we are, just to get a sense of the

7  current financial picture, not evidence, but just give Your

8  Honor a sense of the size of what we're talking about.  As I

9  said, there's about $220 million in cash, $143 subject to the

10  DOJ seizure order.  There's the $276 million receivable

11  relating to the property, but so far, the JPL's have traced

12  two major sources of out flows from their accounts in the

13  lead up to the case.  $5.6 billion was transferred from FTX

14  Digital custodial accounts to a U.S. debtor, FTX trading, and

15  $2.1 billion was transferred from FTX Digital custodial

16  accounts to Alameda, another Chapter 11 debtor.

17           So, to get the proper sense of the size here,

18  we're talking about $7.7 billion of cash out flows from the

19  Bahamian estate to the U.S. debtors.  And then we have other

20  tangible assets of about $3 million mostly relating to office

21  furniture, equipment, and the fleet of cars that the

22  employees had in the Bahamas.

23           So, that's where we stand right now.  Over the

24  next six months -- we got a deal with the customer migration

25  issue.  Obviously, determining whether customers were

1   customers of U.S. debtors or Digital is going to be critical

2   to any distribution scheme.  We've got to address the issue

3   of customer trust claims as has happened in many other crypto

4   cases.  There are unresolved legal and factual issues as to

5   the nature of the customers deposits whether they're held in

6   trust, whether they're general unsecured claims, and we're

7   going to need to work through that.

8          We've got open trade contracts that we're going to

9   need to address and see if there can't be a way to

10  restructure the platform, and then as the debtors are doing

11  here, there's a ton of work being done into antecedent

12  transactions.  Not just intercompany, but also with respect

13  to third parties to determines whether those third parties or

14  any of the persons associated with the transactions need to

15  bring money back into the estate.

16         So, as I said, there's a lot of work that needs to

17  be done.  I'm not sure how much of it is going to need the

18  involvement of the Court, but we may be back seeking

19  additional relief from the Court to be able to get all that

20  stuff done.  And unless Your Honor has any questions, I just

21  think we -- it's probably best to set a status conference

22  sometime in the May, June timeframe and come back and kind of

23  tell you where we are on those issues and then give you a

24  look forward again just so you're not wondering what's

25  happening with your Chapter 15 case.

1           THE COURT:  Okay.  I appreciate the update, Mr.

2    Shore.  Why don't we set a status conference for May 17th at

3    10:00 a.m.

4           MR. SHORE:  All right.  Thank you very much, Your

5    Honor.

6           THE COURT:  Thank you.  I appreciate it.

7           Mr. Bromley.

8           MR. BROMLEY:  Your Honor, I just would like to

9    mention a couple things from our perspective.  One, is we did

10   have a hearing yesterday in the Bahamas and the Supreme Court

11   of the Bahamas has agreed to enter an order that would be

12   consistent with the order that Your Honor will enter here to

13   allow the two proceedings -- sets of proceedings to be

14   recognized.  The U.S. proceedings being recognized in the

15   Bahamas, the Bahamian proceedings being recognized here in

16   the United States.

17          THE COURT:  Okay.  I don't know if you're just not

18   speaking into the microphones or if we're --

19          MR. BROMLEY:  No.  I'm sorry.  I'm a little rough

20   today.

21          THE COURT:  Yes.  I know the feeling.

22          MR. BROMLEY:  I wish I could say it was because I

23   was out drinking last night, but I wasn't.

24          THE COURT:  I wasn't either.

25

1    MR. BROMLEY:  Your Honor, just wanted to point out

2 there was a hearing yesterday in the Bahamas.  The Supreme

3 Court of the Bahamas has agreed to enter an order to

4 recognize the Chapter 11 proceedings in the Bahamas so that

5 there will be a coincident recognition in both jurisdictions,

6 right.  So, we'll have a recognition here.  A recognition in

7 the Bahamas.  And the corporation agreement had required that

8 both the orders be entered so they're mutually dependent on

9 each other.

10    The other thing I'd like to say, Your Honor, I

11 hadn't been aware that Mr. Shore was going to make any

12 comments about issues, and one of the things that are coming

13 up.  And I do think that it's important that the Chapter 11

14 debtors also make a statement here.  Many of the points that

15 Mr. Shore mentioned is in terms of things like assets that

16 were in Digital market accounts, or the migration of

17 customers, and things of that sort.  Those are all open

18 issues.

19    The cooperation agreement is a starting point, but

20 the issues as to whether assets belong in the Bahamian estate

21 or in the U.S. estate are open issues.  And so, the statement

22 that Mr. Shore has made in that regard are statements that

23 the U.S. debtors reserve all their rights on and, frankly,

24 disagree with many of them.

25    THE COURT:  Understood.

1        MR. BROMLEY:  Thank you, Your Honor.

2        THE COURT:  Thank you.

3        Anything else?

4     (No verbal response)

5        THE COURT:  Where do we stand on the examiner?

6  You knew what I was going to ask, Mr. Landis.

7        MR. LANDIS:  Thank you, Your Honor.  For the

8  record, Adam Landis from Landis Rath & Cobb on behalf of the

9  Chapter 11 debtors.

10        Yes.  I saw that question coming and I can

11  represent to the Court that the parties have been discussing

12  this periodically.  Sometimes more frequently than others.

13  But there are discussions going back and forth.  We've

14  identified a couple of potential fee examiners and we're

15  trying to come to ground to have an agreement on this rather

16  than submit it to the Court for the Courts determination.

17        So, we're still working on that.  We hope to have

18  it done soon and we do appreciate that the Court is not going

19  to approve any fee applications unless and until a fee

20  examiner is appointed and has an opportunity to review those

21  applications.

22        THE COURT:  Okay.  Thank you.

23        All right anything else?

24     (No verbal response)

25        THE COURT:  Well, it turned out to be a lot

1  shorter hearing than I had anticipated.  I appreciate

2  everyone's cooperation.  I appreciate the updates.

3          We are adjourned.  Thank you.

4      (Proceedings concluded at 10:46 a.m.)

5

6

7

8

9

10

11                      CERTIFICATION

12          I certify that the foregoing is a correct

13  transcript from the electronic sound recording of the

14  proceedings in the above-entitled matter to the best of my

15  knowledge and ability.

16

17  /s/ Mary Zajaczkowski                    February 15, 2023

18  Mary Zajaczkowski, CET-531

19  Certified Court Transcriptionist

20  For Reliable

21

22

23

24

25