# EXHIBIT C

**Cumberland Declaration**

{1368.002-W0070210.}

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |

### DECLARATION OF BRIAN CUMBERLAND IN SUPPORT OF MOTION OF DEBTORS FOR ENTRY OF AN ORDER AUTHORIZING AND APPROVING THE DEBTORS' KEY EMPLOYEE RETENTION PLAN

I, Brian Cumberland, hereby declare under penalty of perjury:

1.  I am a Managing Director at Alvarez & Marsal North America, LLC ("A&M"), a restructuring advisory services firm specializing in interim management, crisis management, turnaround consulting, operational due diligence, creditor advisory services and financial and operational restructuring.

2.  I am an expert in executive and management compensation with over 20 years of experience in the field. I received my bachelor's degree in Business Administration from the University of Texas, my Juris Doctor from St. Mary's School of Law, and my Master of Law in taxation from the University of Denver. Before joining A&M, I led KPMG's Compensation and Benefits Group for the Southwest United States, and was a member of KPMG's National Tax Practice in Washington, D.C.

3.  Since joining A&M in 2006, my responsibilities have primarily involved consulting with corporate clients on executive and non-executive compensation. I have worked

---

[1] The last four digits of FTX Trading Ltd.'s tax identification number are 3288. Due to the large number of debtor entities in these chapter 11 cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.

with numerous Fortune 1000 companies and am frequently retained by these companies to advise on their compensation strategies, programs and pay levels. I have participated in the development and design of over 100 incentive plans for companies inside and outside of chapter 11. In the last 10 years, I have assisted debtors and creditors in over 50 chapter 11 cases on compensation matters, including key employee incentive and retention plans. I have testified before courts regarding such programs on over 20 occasions either through live testimony or a declaration.

4. During the last 10 years, I have written the following articles: *Coronavirus's Impact on Executive and Board of Director Compensation*, American Bankruptcy Institute Journal, June 2020; *Board Compensation in Times of Distress: Preparing for the Road Ahead*, AIRA Journal Volume 33, No. 1, June 2020; *Clearing the Air: The IRS Issues Proposed Regulations under Section 162(m)*, Tax Advisor Weekly, May 7, 2020; *Preparing for Board Compensation in Times of Distress*, National Association of Corporate Directors, April 28, 2020; *Coronavirus Crisis Raises Executive Compensation Concerns*, Tax Advisor Weekly, March 24, 2020; *The Fog Has Lifted: The IRS Issues Proposed Regulations under Section 162(m)*, Tax Advisor Weekly, February 19, 2020; *Key Findings of the 2019/2020 Executive Change in Control Report*, Tax Advisor Weekly, January 22, 2020; *2019/2020 Executive Change in Control Report*, January 2020; *Latest Trends in Compensation Practices at the Top U.S. Oil and Gas E&P Companies*, Tax Advisor Weekly, December 4, 2019; *2020 Oil and Gas Exploration & Production (E&P) Incentive Compensation Report*, December 2019; *Latest Trends in Compensation Practices at the Top U.S. Oil and Gas Oilfield Services Companies*, Tax Advisor Weekly, October 31, 2019; *2020 Oil and Gas Oilfield Services Incentive Compensation Report*, October 2019; *Trends in Bankruptcy Compensation*, AIRA Journal, Vol. 32, No. 2, 2019; *An Introduction to the World of Bankruptcy Compensation*, Tax Advisor Weekly, February 28, 2019; *Hardship Distribution Guidance Issued by the IRS*, Tax Advisor Weekly,

January 30, 2019; *2019 Oil and Gas Exploration & Production (E&P) Incentive Compensation Report*, January 2019; *The World of Bankruptcy Compensation for Key Employees*, American Bankruptcy Journal, January 2019; *2019 Oilfield Service Incentive Compensation Report*, December 2018; *Latest Trends in Compensation Practices at the Top U.S. Oil and Gas Oilfield Services Companies*, Tax Advisor Weekly, December 11, 2018; *The Increased Value of the Nonqualified Deferred Compensation Plan*, Tax Advisor Weekly, September 24, 2018; *IRS Issues Guidance on Section 162(m) $1 million Compensation Deduction Limitation*, Tax Advisor Weekly, August 22, 2018; *2018 Oil and Gas Exploration & Production (E&P) Incentive Compensation Report*, January 2018; *Latest Trends in Compensation Practices at the Top U.S. Oil and Gas Oilfield Services Companies*, Tax Advisor Weekly, February 23, 2018; *2018 Oilfield Service Incentive Compensation Report*, December 2017; *2017 Year-End Planning Opportunity Related to Executive Compensation Changes in the Proposed Tax Legislation*, December 12, 2017; *2017/2018 Executive Change in Control Report*, November 15, 2017; *PEO Employment Tax Compliance - Buyer Be Aware*, Tax Advisor Weekly, October 3, 2017; *Options for Providing Major-Disaster Assistance to Employees*, Tax Advisor Weekly, September 19, 2017; *An Approach to Executive Compensation for the Transition from a Private to Public Company*, Tax Advisor Weekly, May 9, 2017; *Pay Programs: Retailers Need to be Informed and Be Proactive*, Chainstoreage.com Article, May 9, 2017; *Executive Compensation Arrangements: E&P Companies Continue to Walk The Line*, Oil & Gas Financial Journal, April 17, 2017; *Memo to Hurting Retailers: Redo Comp Plans ASAP*, CFO.com Newsletter, April 12, 2017; *The Changing Landscape in Executive Compensation Governance*, Tax Advisor Weekly, April 8, 2017; *Retail Compensation Programs - Be Informed and Be Proactive*, Tax Advisor Weekly, March 26, 2017; *Legislative and Regulatory Changes Will Require Increased CFO Involvement With Incentive Compensation in 2017*, Tax Advisor Weekly, March 6, 2017; *Individual Employment Agreements Under ERISA*, Tax Advisor Weekly, February 15, 2017; *Latest Trends in*

-3-

*Compensation Practices at the Top U.S. Oil and Gas E&P Companies*, Tax Advisor Weekly, February 6, 2017; *New Accounting Rules for Stock-Based Compensation Are Coming... Is Early Adoption Right for You?*, Tax Advisor Weekly, June 2, 2016; *Mind the Gap: Executive Compensation In the Energy Sector*, Oil & Gas Financial Journal, April 2016; *2016 Oil and Gas Exploration & Production (E&P) Incentive Compensation Report*, April 2016; *Compensation Practices at the Top U.S. Oil and Gas E&P Companies Report*, Tax Advisor Weekly, March 29, 2016; *Employment Tax Considerations for Restricted Stock Units That Vest on Retirement*, Tax Advisor Weekly, March 2, 2016; *Despite Strong Winds, Golden Parachutes Still Holding Steady*, Tax Advisor Weekly, February 17, 2016; *Executive Compensation in the Energy Sector Is Seriously Suffering. What's the Relief?*, Tax Advisor Weekly, January 19, 2016; *2015-2016 Executive Change in Control Report*, January 2016; *IRS Restricts Informal Correction of 409A Document Failures*, Tax Advisor Weekly, June 30, 2015; *Top 10 Payroll Mistakes Companies Make*, Tax Advisor Weekly, March 27, 2015; *Oil and Gas Exploration & Production (E&P) Incentive Plan Design Report*, February 2015; *Incentive Compensation at the Top 100 U.S. Oil and Gas E&P Companies*, Tax Advisor Weekly, February 17, 2015; *KEIP: Key Employees Motivated in Bankruptcy and Beyond*, Tax Advisor Weekly, September 9, 2014; *Will Congress Push for More Say On (Exec) Pay?*, Tax Advisor Weekly, June 10, 2014; *Deferred No Longer - Here Come Deferred Compensation Audits*, Tax Advisor Weekly, August 26, 2014; *Golden Parachutes Still Mean Big Bucks for Executives*, Tax Advisor Weekly, March 11, 2014; *2013-2012 Executive Change in Control Report*, January 2014; *End-of-Year Compensation Planning Opportunities*, Tax Advisor Weekly, November 27, 2013; *Transfer Pricing: Don't be an Easy Target, Think About Your Equity Arrangements*, Tax Advisor Weekly, October 9, 2013; *Chipping Away at Deductions on Employee Compensation*, Tax Advisor Weekly, July 23, 2013; *Bankruptcy Compensation Survey - Post-BAPCPA*, Tax Advisor Weekly, March 26, 2013.

5.  I have familiarized myself with the terms of the proposed key employee retention plan (the "KERP") for FTX Trading Ltd. and its affiliated debtors and debtors-in-possession (collectively, the "Debtors"), gathered relevant market data on retention plans in chapter 11 cases and analyzed whether the KERP is consistent with typical market practice.

6.  I submit this declaration (the "Declaration") in support of the *Motion of Debtors for Entry of an Order Authorizing and Approving the Debtors' Key Employee Retention Plan* (the "Motion").[2]  I am not being compensated separately for this testimony other than through payments received by A&M as an advisor retained by the Debtors.  Except as otherwise indicated, I have personal knowledge of all facts in this Declaration, which are based on my review of the Debtors' business and compensation practices, my research into compensation practices for similarly situated companies, my research into the designs of retention-based plans approved in recent chapter 11 proceedings, my experience in developing similar plans and information supplied to me by the Debtors' management team and the Debtors' other advisors.  If called upon to testify, I could and would testify competently to the facts and opinions set forth in this Declaration.  I am authorized to submit this Declaration on behalf of the Debtors.

7.  Prior to the Petition Date, the Debtors' compensation structure for employees included bonus opportunities and compensation tied to the Debtors' proprietary cryptocurrency token and/or equity grants.  In connection with these Chapter 11 Cases, the Debtors have ceased these incentive opportunities and have suspended the practice of compensating employees in proprietary cryptocurrency tokens and/or equity.  As a result, many of the Debtors' employees are receiving less compensation than they historically received.  Specifically, the Debtors' employees have, on average, experienced an approximately 30%

---

[2]  Capitalized terms not otherwise defined herein are to be given the meanings ascribed to them in the Motion.

reduction in their total annual compensation.

8. Under the terms of the proposed KERP, the KERP Participants will have the opportunity to earn three cash payments, with (i) one-fourth paid upon the earlier of September 30, 2023 and the Debtors' emergence from these chapter 11 cases ("Emergence"), (ii) one-fourth paid upon the earlier of March 31, 2024 and Emergence and (iii) one-half paid upon Emergence, in each case subject to the KERP Participants remaining employed by, and in good standing with, the Debtors. The aggregate KERP payment amounts payable to each identified KERP Participant will range from 17% to 94% of the KERP Participant's salary on an annualized basis, with an average KERP payment of 38% of annualized salary, assuming an 18-month retention period.

9. If the employment of a KERP Participant is terminated without cause or due to the KERP Participant's death or disability, the KERP Participant will receive a *pro rata* payment of the unpaid portion of the KERP Participant's award. If the qualifying termination of employment occurs between the second and third KERP award payment dates, the terminated KERP Participant's *pro rata* payment will be calculated based on the amount of time worked between the second payment date and September 30, 2024 (which is six months after the second payment date). If a KERP Participant is terminated for cause or voluntarily terminates employment, that employee will not be entitled to any unpaid KERP payment. The Debtors will retain the authority to cancel or withhold any unpaid KERP award, and recoup any KERP payments paid, to any KERP Participant with respect to whom there is a subsequent final determination that the individual engaged in wrongdoing. Amounts granted to KERP Participants that are forfeited or withheld for any reason will revert to the pool from which the KERP award was originally granted for reallocation by the Debtors, which may be to a newly

4882-8314-2226 v.4

identified KERP Participant who replaces the terminated employee as a KERP Participant.

10. The KERP's total cost will not exceed $4,027,204. Payments to the 10 identified KERP Participants will range from $45,885 to $341,666 per individual and will not exceed, in the aggregate, $1,417,833. Payments to the estimated 44 KERP Participants who are expected to receive awards out of the Role-Based Pool would range from $17,500 to $96,497 per individual and will not exceed, in the aggregate, $2,109,371. Additionally, any awards to subsequently identified existing and/or new KERP Participants who receive awards out of the Unallocated Pool may not exceed $500,000 in the aggregate, provided that such $500,000 amount will be subject to increase on account of any forfeited KERP awards.

11. In working with the Debtors to develop the proposed KERP, A&M reviewed the design, structure and cost of retention programs implemented by companies of a similar size as measured by total assets. In particular, the Debtors and their advisors analyzed 14 comparable proposed non-insider retention plans approved in chapter 11 cases in 2018 or thereafter (the "KERP Peer Group Plans"). The 14 debtors in the KERP Peer Group Plans included Bluestem Brands, Inc., Celsius Network LLC, Claire's Stores, Inc., Diamond Offshore Drilling, Inc., GNC Holdings, Inc., Hexion Holdings LLC, Legacy Reserves Inc., NPC International, Inc., OneWeb Global Limited, PES Holdings, LLC, PHI, Inc., Sable Permian Resources LLC, Stage Stores, Inc. and Voyager Digital Holdings LLC. The debtors comprised in the KERP Peer Group Plans had assets between approximately one-third and three times the Debtors' assets, as determined based on currently available books and records, and the KERP Peer Group Plans all had 100 or fewer participants.

12. Based on my review of the KERP Peer Group Plans, the cost of the KERP is conservative. The annualized total cost of the KERP, assuming an 18-month retention period,

is between the 25th and 50th percentiles of the KERP Peer Group Plans, and the annualized average cost per participant (assuming 54 participants) and average payment per participant as a percentage of base salary are at or below the 25th percentile. If the period to Emergence, and therefore the retention period under the KERP, extends longer than 18 months, then these percentiles would be lower. In contrast, the 54 expected participants in the KERP represent approximately the 75th percentile of the number of participants in the KERP Peer Group Plans. These relatively low percentiles notwithstanding the relatively larger number of KERP participants illustrate the reasonableness of the program.

13. The structure of the KERP is consistent with the KERP Peer Group Plans. The installment payout feature is consistent with market practice, as most of the KERP Peer Group Plans provided awards through installments. Debtors frequently provide for payment of awards in installments based on multiple retention periods that correspond to a consistent payment schedule (e.g., payments made every three months, quarterly, semi-annually, etc.). Such installment payments provide greater retentive value than annual payments, for award recipients are incentivized to remain employed through the installment payment dates. Many companies choose to attach payments to emergence from Chapter 11 as this ensures retention through the entirety of a restructuring. For example, a number of the KERP Peer Group Plans paid a portion of each award on some combination of scheduled dates and emergence from Chapter 11, including Celsius Network LLC, Claire's Stores, Inc., GNC Holdings, Inc., Sable Permian Resources LLC and Voyager Digital Holdings LLC. In addition, the KERP Peer Group Plans also provide for payment of a portion of the award on an involuntary termination of employment. For example, the Diamond Offshore Drilling, Inc. plan provides for a portion of the key employee retention plan payments to be paid on a *pro rata* basis

based on the amount of time the participant was employed with the debtors.

14. Based on the facts and circumstances articulated herein, I believe that the KERP is reasonable for a company of this size and type. Based on the circumstances presented, I believe that approval of the KERP is in the best interest of the Debtors' estates, their creditors, and all other parties-in-interest.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information and belief.

Dated: March 8, 2023

*/s/ Brian Cumberland*
Brian Cumberland
Alvarez & Marsal North America, LLC
Managing Director