# EXHIBIT B

## Agreement

**PURCHASE AND SALE AGREEMENT**

**by and among**

**COTTONWOOD GROVE LIMITED,**

**FTX TRADING LTD.,**

**FTX VENTURES LTD.**

and

**MYSTEN LABS, INC.**

**Dated as of March 22, 2023**

4894-9735-3299 v.8
4154-9117-7542.12

This PURCHASE AND SALE AGREEMENT (including the Exhibits and Schedules hereto, each as amended or restated from time to time, this "Agreement"), dated as of March 22, 2023, is made by and among Cottonwood Grove Limited, a company incorporated under the laws of Hong Kong, FTX Trading Ltd., a company established under the laws of Antigua and Barbuda, and FTX Ventures Ltd., a BVI Business Company (each a "Seller" and together "Sellers") and Mysten Labs, Inc., a Delaware corporation ("Purchaser"). All of the signatories to this Agreement are collectively referred to as the "Parties" and individually as a "Party."

## Recitals

WHEREAS, on November 11, 2022 and November 14, 2022, Sellers and certain of their Affiliates (collectively, the "Debtors") commenced voluntary proceedings under Chapter 11 of Title 11 of the United States Code (11 U.S.C. §§ 101, *et seq.*, as amended, the "Bankruptcy Code") by filing petitions for relief in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), which cases are being jointly administered for procedural purposes as *In re FTX Trading Ltd., et al.* (Case No. 22-11068 (JTD)) (the "Bankruptcy Proceeding");

WHEREAS, each Seller holds the preferred equity or token warrant interests, as applicable, next to such Seller's name on Schedule A (each such interest, an "Interest" and collectively, the "Interests") in or with the entities set forth on Schedule A and desires to (i) sell, assign and transfer to Purchaser its Interests pursuant to section 363 of the Bankruptcy Code, and (ii) assume and assign pursuant to section 365 of the Bankruptcy Code or sell, assign and transfer pursuant to section 363 of the Bankruptcy Code, if and to the extent applicable, to Purchaser, all of Seller's interests in the Operative Documents (as defined below), in accordance with the applicable provisions of the Bankruptcy Code and the Bankruptcy Rules, and as applicable, withdraw from, no longer be party to, and be released and discharged from all obligations under the applicable Operative Documents, all upon the terms and subject to the conditions set forth in this Agreement;

WHEREAS, the board of directors or other applicable governing body of each Seller has determined that it is advisable and in the best interests of Sellers' estates and the beneficiaries of such estates to consummate the Transactions pursuant to the Sale Order and has approved this Agreement;

WHEREAS, Sellers intend to seek the entry of the Sale Order by the Bankruptcy Court approving this Agreement and authorizing Sellers to consummate the Transactions upon the terms and subject to the conditions set forth herein and in the Sale Order;

WHEREAS, Sellers desire to sell and Purchaser desires to purchase all of the Interests pursuant to section 363 and 365 of the Bankruptcy Code; and

WHEREAS, the Parties acknowledge and agree that the Transactions are being made at arm's length and in good faith and without intent to hinder, delay or defraud creditors of any Seller or its Affiliates and each Seller acknowledges that the consideration to be paid is fair value and reasonably equivalent value for the acquisitions by Purchaser.

NOW, THEREFORE, in consideration of the premises and of the mutual representations, warranties, covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

# ARTICLE 1

## PURCHASE AND SALE OF INTERESTS

1.1     <u>Purchase and Sale of Interests</u>. Pursuant to sections 105, 363 and 365 of the Bankruptcy Code and upon the terms and subject to the conditions set forth in this Agreement, at the Closing, each Seller agrees to sell, assign, convey, transfer and deliver to Purchaser, and Purchaser agrees to purchase and accept from such Seller, all of such Seller's right, title and interest in, to and under the Interests, free and clear of any Liens (other than Permitted Encumbrances) for an amount in cash equal to the Aggregate Purchase Price, pursuant to <u>Section 1.3</u>.

1.2     <u>Assumption and Assignment of Operative Documents</u>.

(a)     Subject to the provisions of sections 363 and 365 of the Bankruptcy Code, if and to the extent applicable, and the Sale Order, Seller shall assign to Purchaser, and Purchaser shall assume, all of Seller's right, title and interest in and to the applicable Operative Documents as of the Closing.

(b)     Purchaser shall be responsible for all Cure Costs, if any, in respect of the Operative Documents, which shall not be the obligation, liability or responsibility of Seller. Purchaser has delivered evidence of Purchaser's ability to comply with section 365 of the Bankruptcy Code, including adequate assurances of any future performance, in connection with the assumption and assignment of the Operative Documents.

1.3     <u>Purchase Price</u>. The aggregate purchase price (the "<u>Aggregate Purchase Price</u>") shall be $96,250,000 in cash for the Interests and the interests of Sellers in the Operative Documents.  The Parties agree to allocate the Aggregate Purchase Price among the Sellers and Interests as set forth on <u>Schedule A</u>.

1.4     <u>Liabilities</u>. From and after the Closing Date, and upon the terms and subject to the conditions set forth in this Agreement and the Transfer Documents, Purchaser shall assume and perform the duties and obligations of each Seller with respect to the applicable Interests acquired by Purchaser at the Closing Date under the Operative Documents and the Transfer Documents in accordance with the terms of such agreements. Any liabilities for Taxes, fees or other governmental charges attributable to the Interests or the ownership of the Interests by Purchaser shall be the responsibility of Purchaser.

1.5     <u>Closing</u>. The closing of the Transactions (the "<u>Closing</u>") will take place at 9:00 a.m., Eastern Time, at the offices of Sullivan & Cromwell LLP, 125 Broad Street, New York, NY 10004 or remotely via electronic exchange of documents and signatures on the second Business Day following the date on which all of the conditions to closing specified in <u>Article 5</u>

4894-9735-3299 v.8
4154-9117-7542.12

are satisfied or waived, or at such other time as Purchaser and each Seller shall agree in writing (the "Closing Date"). Upon the Closing, all applicable Seller Parties shall be deemed to have withdrawn from and no longer be parties to any of the Operative Documents.

1.6     Deliveries at Closing. At the Closing, upon satisfaction or waiver of the conditions set forth in Article 5 hereof:

(a)     Purchaser will (i) pay the Aggregate Purchase Price to Sellers in accordance with Section 1.3 by wire transfer of immediately available funds pursuant to the instructions delivered by Sellers to Purchaser prior to the Closing Date; (ii) pay to the Foundation or applicable counterparty an amount equal to the Cure Costs not included in the Aggregate Purchase Price, if any, by wire transfer of immediately available funds pursuant to the instructions delivered by Seller to Purchaser prior to the Closing Date; and (iii) deliver to Sellers a counterpart to the Transfer Documents, duly executed by Purchaser or its applicable Affiliates party thereto;

(b)     each Seller shall deliver to Purchaser a counterpart to the Transfer Documents, duly executed by such Seller or its applicable Affiliates party thereto;

(c)     each Seller and Purchaser shall deliver to the other Party each of the other documents and instruments required to be delivered pursuant to the terms of this Agreement or any Transfer Documents; and

(d)     each Seller shall deliver to Purchaser an accurate, executed and complete U.S. Internal Revenue Service Form W-8BEN-E.

## ARTICLE 2

## REPRESENTATIONS AND WARRANTIES

2.1     Representations and Warranties of Sellers. Each Seller hereby represents and warrants to Purchaser that:

(a)     Authorization. Such Seller is an entity duly organized or incorporated and validly existing in good standing (to the extent such concept is applicable) under the laws of its jurisdiction of organization or incorporation. Subject to entry of the Sale Order and any other Order entered by the Bankruptcy Court applicable to the Transactions, such Seller has the requisite power and authority to enter into, execute and deliver this Agreement and the Transfer Documents to which such Seller is a party and to perform all of the obligations to be performed by it hereunder and thereunder. Subject to entry of the Sale Order and any other Order entered by the Bankruptcy Court applicable to the Transactions, this Agreement and the Transfer Documents to which it is a party have been or, when executed, will be duly authorized, executed and delivered by it, and constitute or, when executed, will constitute a valid and binding obligation of such Seller, enforceable against it in accordance with its terms.

(b)     Title to Interests. Such Seller owns all right, title and interest in and to the Interests as provided on Schedule A, free and clear of all Liens other than Permitted Encumbrances and Liens created by or through Purchaser or any of its Affiliates.

4894-9735-3299 v.8
4154-9117-7542.12

(c)    No Conflicts. Subject to entry of the Sale Order and any other Order entered by the Bankruptcy Court applicable to the Transactions, the execution and delivery of this Agreement and the Transfer Documents to which it is a party and the performance or consummation of the Transactions by such Seller do not conflict with, result in a breach or violation of, or result in the creation of a Lien on any of the Interests owned by such Seller under the terms or provisions of (i) its organizational documents or memorandum and articles of association (as applicable), (ii) any contract that is material to the value of the Interests, or (iii) any statute or any order, rule or regulation of any court or governmental agency or body having jurisdiction over it or its property, except, in each case, for such conflicts, violations, defaults and accelerations that would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(d)    Certain Conduct. Except pursuant to this Agreement, such Seller has not (i) sold, assigned, transferred, delivered or otherwise disposed of all or any portion of the Interests held by such Seller, (ii) converted, exchanged or redeemed all or any portion of the Interests, (iii) exercised or taken any action in anticipation of exercising any Token Warrant Agreement, or (iv) agreed to do any of the foregoing.

(e)    Independent Appraisal. Without limiting any representation or warranty of Purchaser or Sellers in this Agreement or any Transfer Document, each Seller acknowledges that Purchaser and Sellers may be in possession of material, nonpublic information relating to the Foundation and Purchaser. Such Seller further acknowledges and agrees that Purchaser has no obligation to disclose to such Seller any such material, nonpublic information except as may be required for a representation and warranty of Purchaser hereunder to be accurate and correct.

(f)    Broker's Fee; No Public Offering. No Person or entity acting on behalf of such Seller or under the authority of such Seller shall be entitled to any broker's, finder's, or similar fee or commission in connection with the Transactions, other than the financial advisors retained by such Seller in the Bankruptcy Proceeding.

(g)    No Other Representations or Warranties.

(i)    Except for the representations and warranties contained in this Section 2.1 and in any Transfer Documents, no Seller nor any other Person makes any other express or implied representation or warranty with respect to the Transactions, and each Seller disclaims any other representations or warranties, whether made by such Seller, any Affiliate of such Seller or any of such Seller's or its Affiliates' respective representatives.

(ii)    Such Seller acknowledges and agrees that, except for the representations and warranties expressly set forth in Section 2.2 and any Transfer Documents, (i) neither Purchaser nor any other Person has made any express or implied representation or warranty with respect to, or otherwise in connection with, the Transactions or with respect to the accuracy or completeness of any other information provided, or made available, to such Seller in connection with the Transactions and such Seller has not relied on any representation or warranty other than those expressly set forth in Section 2.2 and any Transfer Documents; and (ii) such Seller has not executed or

4

authorized the execution of this Agreement or entered into the Transactions in reliance upon, and hereby specifically disclaims reliance upon, any promise, statement, projection, forecast, representation or warranty whatsoever made or omitted to be made to such Seller or any of its Affiliates, or their respective representatives. Such Seller acknowledges and agrees that, except for the representations and warranties expressly set forth in Section 2.2 and any Transfer Documents, Purchaser, on behalf of itself, its subsidiaries and Affiliates (x) expressly disclaims and negates any representation or warranty, expressed or implied, at common law, by statute or otherwise, with respect to the business, operations, assets, liabilities and conditions (financial or otherwise) of the Foundation, Purchaser or with respect to the applicable Interests (including any express or implied warranty of merchantability or fitness for a particular purpose) and (y) disclaims all liability and responsibility for any representation, warranty, projection, forecast, statement or information made, communicated or furnished (orally or in writing) to such Seller or its Affiliates or representatives (including any opinion, information, projection or advice that may have been or may be provided to such Seller by any representative of Purchaser or any of its Affiliates). Such Seller acknowledges and agrees that Purchaser makes no representations or warranties to such Seller regarding the probable success or profitability of the Foundation or Purchaser.

2.2     Representations and Warranties of Purchaser. Purchaser hereby represents and warrants to each Seller that:

(a)     Authorization. Purchaser is an entity duly organized and validly existing in good standing under the laws of its jurisdiction of organization.  Purchaser has the requisite power and authority to enter into, execute and deliver this Agreement and the Transfer Documents and to perform all of the obligations to be performed by it hereunder and thereunder. This Agreement and the Transfer Documents to which it is a party have been or, when executed, will be duly authorized, executed and delivered by it, and constitute or, when executed, will constitute a valid and binding obligation of Purchaser, enforceable against it in accordance with its terms.

(b)     No Conflicts. The execution and delivery of this Agreement and the Transfer Documents to which it is a party and the performance or consummation of the Transactions by Purchaser do not (i) conflict with or result in a breach or violation of the terms or provisions of its organizational documents, (ii) result in the breach or violation of any of the terms or provisions of, or constitute a default under, or accelerate the performance required by the terms of any indenture, mortgage, deed of trust, loan agreement or any other agreement or instrument to which it is a party or by which it is bound or (iii) conflict with or result in a breach or violation of the terms or provisions of any statute or any order, rule or regulation of any court or governmental agency or body having jurisdiction over it or its property, except, in each case, to the extent that such conflicts, violations, defaults or accelerations would not, individually or in the aggregate, materially hinder, delay or impair the performance of its obligations under this Agreement and the Transfer Documents. The execution and delivery by Purchaser of this Agreement and the Transfer Documents to which it is a party and the performance by Purchaser of its obligations hereunder and thereunder will not require any registration, filing, consent or approval under any Law, rule, regulation, judgment, order, writ, decree, permit or license, or any consent or approval of any other party to Purchaser's constituent documents, or any other

5

contract, agreement, instrument, commitment or restriction binding upon Purchaser, except for the Sale Order, any consent of the Foundation and any post-Closing filings required by Law. Purchaser has complied with all applicable provisions and requirements of the Operative Documents in connection with the performance and consummation of the Transactions.

(c)    <u>Independent Appraisal</u>.  Without limiting any representation or warranty of Purchaser or Sellers in this Agreement or any Transfer Document:

(i)    Purchaser acknowledges that it and Sellers may be in possession of material, nonpublic information relating to the Foundation and Purchaser. Purchaser further acknowledges and agrees that Sellers have no obligation to disclose to Purchaser any such material, nonpublic information except as may be required for a representation and warranty of Sellers hereunder to be accurate and correct.

(ii)    Purchaser acknowledges that it is experienced and sophisticated with respect to transactions of the type contemplated by this Agreement, and that, in consultation with experienced counsel and advisors of its choice, it has made its own due diligence analysis, credit analysis and decision to buy the Interests, and that it is responsible for making its own evaluation of any information about the Interests, the Foundation, Purchaser or Sellers that it may receive either directly from the Foundation, Purchaser or Sellers, and that none of the Sellers nor any Affiliate, partner, employee, officer or director thereof (A) makes any representation or warranty or gives any undertaking of any kind, express or implied, as to, or accepts or assumes any responsibility or liability of any kind for, the accuracy, reliability, adequacy, completeness or reasonableness of any such information or any assumptions upon which such information is based except as specifically set forth in this Agreement or (B) shall be under any obligation to provide access to or advise Purchaser or any other Person of the existence of any additional information or to review, update or correct any inaccuracy in any information about the Interests, the Foundation or Sellers (or any assumptions upon which such information is based) supplied by it or by any Person or be otherwise liable to Sellers or any other Person with respect to any such information or assumptions, except as specifically contemplated in this Agreement.

(d)    <u>Accredited Investor; Qualified Purchaser</u>. Purchaser is an "accredited investor" within the meaning of Rule 501 of Regulation D of the Securities Act of 1933, as amended and a "qualified purchaser" within the meaning of Section 2(a)(51)(A) of the Investment Company Act of 1940, as amended, and the rules promulgated thereunder.

(e)    <u>No Resale</u>. Purchaser's purchase of the Interests is for its own account for investment and not with a view to the distribution or resale thereof, except in compliance with the Securities Act of 1933, as amended, and applicable state securities laws.

(f)    <u>Broker's Fee</u>. No Person or entity acting on behalf of Purchaser or under the authority of Purchaser shall be entitled to any broker's, finder's, or similar fee or commission in connection with the transactions contemplated by this Agreement.

4894-9735-3299 v.8
4154-9117-7542.12

(g)    <u>Adequate Assurance of Future Performance</u>. To the extent required by the Bankruptcy Code or other Laws, Purchaser will be able to provide (and shall provide), at Closing or on such earlier date as is designated by the Bankruptcy Court, adequate assurance of its future performance of the applicable requirements regarding assignment of the rights and obligations under the Operative Documents to Purchaser in satisfaction of section 365(f)(2)(B) of the Bankruptcy Code. Purchaser acknowledges and agrees that, if it becomes necessary to provide any additional assurances of its future performance under the Bankruptcy Code or other Laws, Purchaser shall perform all actions and bear all such costs and expenses as may be necessary or advisable in connection with its obligations under this <u>Section 2.2(g)</u> without recourse to Seller.

(h)    <u>No Other Representations or Warranties</u>.

(i)    Except for the representations and warranties contained in this <u>Section 2.2</u> and any Transfer Documents, neither Purchaser nor any other Person makes any other express or implied representation or warranty with respect to the Transactions, and Purchaser disclaims any other representations or warranties, whether made by Purchaser, any Affiliate of Purchaser or any of Purchaser's or its Affiliates' respective representatives.

(ii)    Purchaser acknowledges and agrees that, except for the representations and warranties expressly set forth in <u>Section 2.1</u> and any Transfer Documents, (i) no Seller nor any other Person has made any express or implied representation or warranty with respect to, or otherwise in connection with, the Transactions or with respect to the accuracy or completeness of any other information provided, or made available, to Purchaser in connection with the Transactions and Purchaser has not relied on any representation or warranty other than those expressly set forth in <u>Section 2.1</u> and any Transfer Documents; (ii) Purchaser has not executed or authorized the execution of this Agreement or entered into the Transactions in reliance upon, and hereby specifically disclaims reliance upon, any promise, statement, projection, forecast, representation or warranty whatsoever made or omitted to be made to Purchaser or any of its Affiliates, or their respective representatives, including any such promise, statement, projection, forecast, representation or warranty as to the condition, value, quality or prospects of the Foundation or Purchaser, or their respective assets or liabilities, including the Operative Documents, or any part thereof; and (iii) the Interests are being transferred "as is," "where is" and "with all faults." Purchaser acknowledges and agrees that, except for the representations and warranties expressly set forth in <u>Section 2.1</u> and any Transfer Documents, each Seller, on behalf of itself, its subsidiaries and Affiliates (x) expressly disclaims and negates any representation or warranty, expressed or implied, at common law, by statute or otherwise, with respect to the business, operations, assets, liabilities and conditions (financial or otherwise) of the Foundation, Purchaser or with respect to the applicable Interests (including any express or implied warranty of merchantability or fitness for a particular purpose) and (y) disclaims all liability and responsibility for any representation, warranty, projection, forecast, statement or information made, communicated or furnished (orally or in writing) to Purchaser or its Affiliates or representatives (including any opinion, information, projection or advice that may have been or may be provided to Purchaser by any representative of such Seller or any of its Affiliates). Purchaser acknowledges and agrees

7

that no Seller makes any representations or warranties to Purchaser regarding the probable success or profitability of the Foundation or Purchaser.

(iii)    Purchaser acknowledges and agrees that the enforceability of this Agreement against Sellers is subject to entry of the Sale Order and any other Order entered into by the Bankruptcy Court applicable to the Transactions.

# ARTICLE 3

# COVENANTS

3.1    <u>Tax Matters</u>. Each Seller and Purchaser shall cooperate with each other in good faith in connection with (a) preparing and timely filing Tax returns relating to the Interests; (b) the conduct of any audit, litigation, adjustment, or other proceeding relating to the Interests; (c) with respect to the Tax treatment of the Transactions, including any necessary allocation of Aggregate Purchase Price for Tax purposes; and (d) using commercially reasonable efforts to obtain any certificate or other document from any Governmental Entity as may be necessary to mitigate, reduce or eliminate any Tax (including withholding or deduction in respect of Taxes) that could be imposed with respect to the Transactions. With respect to the Foundation, Seller and Purchaser shall, with respect to the Interests, (i) not request the Foundation to make, any Tax election with retroactive effect to Tax periods (or portions thereof) on or prior to the Closing Date (for the avoidance of doubt, excluding any Tax election which may be made by the Foundation without Seller's or Purchaser's (as applicable) consent or approval), (ii) request the Foundation to enter into, any voluntary disclosure or similar agreement or program with a Governmental Entity with respect to Tax periods (or portions thereof) on or prior to the Closing Date, which, in each of case (i) and (ii), could reasonably be expected to materially adversely and disproportionately impact the other party, without the prior written consent of the other party (not to be unreasonably withheld, conditioned, or delayed).  All Transfer Taxes, if any, incurred in connection with the consummation of the transactions contemplated by this Agreement shall be borne by Purchaser. If Purchaser reasonably believes that it is required to deduct and withhold from the payment of any amounts payable to Sellers hereunder under applicable Law, Purchaser shall notify each Seller at least ten (10) Business Days before any such payment subject to withholding.  The Parties intend that no amounts payable hereunder shall be treated as giving rise to distributions under Section 301 of the Code (including by reason of Section 305 of the Code) (such treatment, "<u>Intended Tax Treatment</u>"). Except as otherwise required by a change in applicable Law, the Parties shall not report the Transactions, or withhold or deduct U.S. federal withholding tax from amounts payable pursuant to this Agreement, inconsistently with the Intended Tax Treatment.  To the extent any amounts are deducted or withheld in respect of Taxes from amounts payable under this Agreement, such amounts shall be treated for all purposes under this Agreement as having been paid to the Person to whom such amounts would otherwise have been paid. If either Party reasonably believes that it is required to deduct and withhold from the payment of any amounts payable to the other Party hereunder under applicable Law, the withholding Party shall (a) notify the other Party at least 10 Business Days before the Closing Date  that it is required by applicable Law to withhold from any amount payable to the other Party under this Agreement and (b) reasonably cooperate with the other Party and use

8

commercially reasonable efforts to minimize or eliminate the amount of any Taxes required to be deducted and withheld under applicable Law.

3.2     Due Diligence Cooperation. Subject to Section 4.2(a), until the earlier of (a) the Closing Date and (b) the consummation of an Alternative Transaction, Purchaser shall continue to cooperate with any reasonable diligence requests from the Seller Parties in a manner consistent with its recent cooperation with the Seller Parties in their efforts to monetize the Interests; provided, for the avoidance of doubt, that Purchaser shall not be required to make available any information to any potential purchaser that (i) is reasonably believed to be a direct competitor of Purchaser or any of its Affiliates or (ii) has not entered into a confidentiality agreement for the benefit of Purchaser under terms that are not materially less restrictive than the terms of the Confidentiality Agreement; provided, further, that the foregoing proviso does not apply to the list of third parties agreed previously between Purchaser and Sellers.

3.3     Confidentiality. Each Seller and Purchaser acknowledges that the Confidentiality Agreement remains in full force and effect in accordance with its terms, which terms are incorporated herein by reference, and agrees to be bound thereby in the same manner and to the same extent as if the terms had been set forth herein in full except that Sellers shall be permitted to disclose the terms of this Agreement.  For the avoidance of doubt, Sellers are expressly permitted to disclose this Agreement, any Transfer Documents and, in each case, any exhibits and schedules thereto with the Bankruptcy Court as necessary or advisable in connection with the Transactions.

## ARTICLE 4

## BANKRUPTCY MATTERS

4.1     Bankruptcy Court Filings.

(a)     No later than March 22, 2023, Sellers or their applicable Debtor Affiliates shall (i) file with the Bankruptcy Court one or more motions (the "Sale Motions"), along with the proposed Sale Order, (A) seeking approval of the sale of the Interests to Purchaser and (B) fixing the time, date and location of the hearing to approve the consummation of the Transactions (the "Sale Hearing"); (ii) notify, as required by the Bankruptcy Code and the Bankruptcy Rules, all parties entitled to notice of such motions and orders, as modified by orders in respect of notice which may be issued at any time and from time to time by the Bankruptcy Court, and such additional parties as such Purchaser may reasonably request, and (iii) use commercially reasonable efforts to obtain Bankruptcy Court approval of the Sale Order.  In addition to the consultation rights set forth in Section 4.1(c) herein, Purchaser shall have the right to review in advance the Sale Motions.

(b)     Sellers and Purchaser shall (i) appear in the Bankruptcy Court if reasonably requested by the other Party or required by the Bankruptcy Court in connection with the Transactions and (ii) keep the other reasonably apprised of the status of material matters related to the Agreement, including, upon reasonable request promptly furnishing the other with copies of notices or other communications received from the Bankruptcy Court or any other party with respect to the Transactions.

4894-9735-3299 v.8
4154-9117-7542.12

(c)    The Parties shall consult with each other regarding pleadings that any of them intends to file with the Bankruptcy Court in connection with, or which might reasonably affect the Bankruptcy Court's approval of the Sale Order.  Sellers shall promptly provide Purchaser and its outside legal counsel with copies of all notices, filings and orders of the Bankruptcy Court that any Seller has in their possession (or receives) pertaining to the Sale Order, or related to any of the Transactions, but only to the extent such papers are not publicly available on the docket of the Bankruptcy Court or otherwise made available to Purchaser and its outside legal counsel.  No Seller shall seek any modification to the Sale Order with respect to the Transactions by the Bankruptcy Court or any other Governmental Entity of competent jurisdiction to which a decision relating to the Bankruptcy Proceeding has been appealed, in each case, without the prior written consent of Purchaser (not to be unreasonably withheld, conditioned or delayed).

(d)    If any order of the Bankruptcy Court relating to this Agreement shall be appealed by any Person (or a petition for certiorari or motion for rehearing, re-argument or stay shall be filed with respect thereto), Sellers agree to, and agrees to cause their Debtor Affiliates to, use their commercially reasonable efforts, to defend against such appeal, petition or motion, and Purchaser agrees to cooperate reasonably in such efforts. Each Party hereby agrees to use its commercially reasonable efforts to obtain an expedited resolution of such appeal.

4.2    Non-Solicitation; Alternative Transaction.

(a)    Consummation of the Transactions are subject to approval by the Bankruptcy Court and the consideration by the Debtors and the Bankruptcy Court of higher or better competing bids.  From and after the date hereof until the date that the Sale Order is entered by the Bankruptcy Court or other court of competent jurisdiction (the "Sale Order Date"), Sellers and their Debtor Affiliates shall be permitted to cause their respective representatives and Debtor Affiliates to (i) initiate contact with, or solicit or encourage submission of any inquiries, proposals or offers by, any Person (in addition to Purchaser and its Affiliates, agents and representatives) with respect to an Alternative Transaction, and (ii) respond to any inquiries or offers to purchase all or any part of the Interests (whether in combination with other assets of the Sellers and the other Debtors or otherwise) and perform any and all other acts related thereto which are required or permitted under the Bankruptcy Code, any Order entered by the Bankruptcy Court applicable to the Transactions or other applicable Law, including supplying information relating to Purchaser, the Foundation and the Interests to prospective purchasers, subject to the terms of the Confidentiality Agreement; *provided* that no Seller nor its Debtor Affiliates shall make available any such information to the extent subject to confidentiality obligations under the Confidentiality Agreement and obtained from Purchaser or its Affiliates without giving prior written notice to Purchaser (A) briefly describing the information to be made available and (B) stating that the Person to whom such information is being made available (x) is not reasonably believed to be a direct competitor of Purchaser or any of its Affiliates and (y) has entered into a confidentiality agreement for the benefit of Purchaser under terms that are not materially less restrictive than the terms of the Confidentiality Agreement; provided, further, that the foregoing proviso does not apply to the list of third parties agreed previously between Purchaser and Sellers.

4894-9735-3299 v.8
4154-9117-7542.12

(b)    In the event the Debtors identify an Alternative Transaction that is expected to be entered into, Sellers shall provide written notice to Purchaser specifying the price and other material terms of such Alternative Transaction at least two (2) Business Days prior to entering into any definitive agreement with respect thereto. Purchaser shall have the right, in its sole and absolute discretion, but not the obligation, after receiving such notice to submit to Sellers an alternative offer to purchase the Interests, and Sellers shall consider in good faith whether such offer submitted by Purchaser is a higher and better offer.

(c)    From and after the Sale Order Date, other than as set forth herein, Sellers and their representatives shall not (i) solicit, initiate, knowingly facilitate or knowingly encourage the submission of, or any inquiries with respect to, any Alternative Transaction by a third party; (ii) participate in any discussions or negotiations with a third party regarding, or furnish to any third party any information or data with respect to, or otherwise cooperate in any way with respect to, a proposed Alternative Transaction; or (iii) enter into any letter of intent, memorandum of understanding, acquisition agreement or other agreement, arrangement or understanding that contemplates an Alternative Transaction with respect to all or a portion of the Interests; provided, that Sellers, may, in connection with any bona fide proposal related to an Alternative Transaction received by any Seller without any violation of clause (i) above furnish information and data to a third party and take any other action referred to in clause (ii) above, if: (A) Sellers determine in good faith, in consultation with the Committee, that such proposal constitutes a higher or otherwise better offer for all or any portion of the Interests; and (B) Sellers give Purchaser prompt written notice of such Sellers' intention to furnish information or data to or to engage in negotiations or discussions with the third party submitting such proposal; provided, however, that Sellers shall not furnish any additional information and data during such period to a third party with which Sellers had engaged in discussions or negotiations with respect to an Alternative Transaction after the date of this Agreement and prior to the Sale Order Date.

4.3    Sale Order.

(a)    Subject to Section 4.2 and Section 7.8, Sellers and Purchaser shall take all actions as may be reasonably necessary to cause the Sale Order to be issued, entered and become a Final Order, including furnishing affidavits, declarations or other documents or information for filing with the Bankruptcy Court. Purchaser agrees that it will promptly take such actions as are reasonably requested by Sellers to assist in obtaining entry of the Sale Order and a finding of adequate assurance of future performance by Purchaser, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Purchaser under this Agreement and demonstrating that Purchaser is a "good faith" buyer under section 363(m) of the Bankruptcy Code.

(b)    The Sale Order shall, among other things, (i) approve, pursuant to sections 105, 363 and 365 of the Bankruptcy Code, (A) the execution, delivery and performance by the Sellers of this Agreement, (B) the sale of the Interests to Purchaser on the terms set forth herein and free and clear of all Liens (other than Permitted Encumbrances), and (C) the performance by Sellers and Purchaser of their obligations under this Agreement; (ii) find that (A) Purchaser is a "good faith" buyer within the meaning of section 363(m) of the Bankruptcy Code and (B) Purchaser is not a successor to any of the Sellers and; (iii) grant Purchaser the protections of

11

section 363(m) of the Bankruptcy Code; and (iv) be in a form reasonably satisfactory to Purchaser.

## ARTICLE 5

## CONDITIONS TO CLOSING

5.1    <u>Mutual Conditions</u>. The respective obligations of each Seller and Purchaser to effect the Closing are subject to the Bankruptcy Court having entered the Sale Order on or prior to the Closing Date.

5.2    <u>Conditions to the Obligation of Purchaser</u>. The obligation of Purchaser to effect the Closing is subject to the satisfaction or waiver by Purchaser of the following additional conditions on or prior to the Closing Date:

(a)    The representations and warranties of each Seller contained in this Agreement shall be true and correct (without giving effect to any materiality qualifiers, including "Material Adverse Effect," contained therein) as of the Closing Date as though made on and as of such date (except to the extent that any such representation and warranty expressly speaks as of an earlier date, in which case such representation and warranty shall be true and correct as of such earlier date), except where the failure of any such representations and warranties to be so true and correct would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect; and

(b)    Each Seller shall have performed in all material respects all obligations required to be performed by them under this Agreement on or prior to the Closing Date.

5.3    <u>Conditions to the Obligation of Sellers</u>. The obligation of each Seller to effect the Closing is subject to the satisfaction or waiver by such Seller of the following additional conditions on or prior to the Closing Date:

(a)    The representations and warranties of Purchaser contained in this Agreement shall be true and correct (without giving effect to any materiality qualifiers, including "Material Adverse Effect," contained therein) as of the Closing Date as though made on and as of such date (except to the extent that any such representation and warranty expressly speaks as of an earlier date, in which case such representation and warranty shall be true and correct as of such earlier date); and

(b)    Purchaser shall have performed in all material respects all obligations required to be performed by it under this Agreement on or prior to the Closing Date.

## ARTICLE 6

## TERMINATION

6.1    <u>Grounds for Termination</u>. This Agreement may be terminated at any time:

(a)    by mutual agreement of Sellers and Purchaser;

4894-9735-3299 v.8
4154-9117-7542.12

(b)        by Sellers, on the one hand, or Purchaser, on the other hand, if the Closing has not occurred by April 27, 2023 (the "Termination Date"); provided, that the right to terminate this Agreement pursuant to this Section 6.1(b) shall not be available to any Party that has breached in any material respect its obligations under this Agreement in any manner that shall have proximately contributed to the failure of the Closing to have occurred on or prior to the Termination Date;

(c)        by Sellers, on the one hand, or Purchaser, on the other hand, if there is in effect a Final Order of a Governmental Entity of competent jurisdiction, enjoining or otherwise prohibiting the consummation of the Transactions (it being agreed that the Parties will promptly appeal any adverse determination which is not non-appealable and pursue such appeal in accordance with their respective obligations under this Agreement unless and until this Agreement is terminated pursuant to this Section 6.1);

(d)        by Sellers, if Purchaser shall have breached or failed to perform in any material respect any of its covenants or other agreements contained in this Agreement, or any of their representations and warranties shall have become untrue after the date hereof, which breach or failure to perform or be true (i) would give rise to the failure of a condition set forth in Section 5.1 and Section 5.3 and (ii) is not curable or, if curable, is not cured within the earlier of (A) five (5) days after written notice thereof is given by Sellers to Purchaser and (B) the Termination Date; provided, that Sellers shall not have the right to terminate this Agreement pursuant to this Section 6.1(d) if Sellers are then in material breach of any of its representations, warranties, covenants or other agreements hereunder and such material breach would give rise to the failure of a condition set forth in Section 5.1 and Section 5.2;

(e)        by Purchaser, if Sellers shall have breached or failed to perform in any material respect any of their covenants or other agreements contained in this Agreement, or any of its representations and warranties shall have become untrue after the date hereof, which breach or failure to perform or be true (i) would give rise to the failure of a condition set forth in Section 5.1 and Section 5.2, and (ii) is not curable or, if curable, is not cured within the earlier of (A) five (5) days after written notice thereof is given by Purchaser to Sellers and (B) the Termination Date; provided, that Purchaser shall not have the right to terminate this Agreement pursuant to this Section 6.1(e) if Purchaser is then in material breach of any of its representations, warranties, covenants or other agreements hereunder and such material breach would give rise to the failure of a condition set forth in Section 5.1 and Section 5.3;

(f)        automatically, if Sellers enter into a definitive agreement with a third party with respect to an Alternative Transaction, subject to the notice rights set forth in Section 4.2(b); or

(g)        by Sellers, if Sellers or the board of directors (or similar governing body) of any Seller determines that proceeding with the Transactions or failing to terminate this Agreement would be inconsistent with its or such Person's or body's fiduciary duties.

6.2        Effect of Termination. If this Agreement is terminated as permitted by Section 6.1:

(a)      no Party will have any liability or further obligation to the other Party pursuant to this Agreement; provided, however, that (i) the agreements of Sellers and Purchaser set forth in Section 3.3 and Section 7.5 shall survive such termination; and (ii) no such termination shall relieve any Party of any liability or damages to the other Party resulting from any knowing and intentional material breach of this Agreement;

(b)      Purchaser shall return to Sellers all documents, work papers and other material of Sellers relating to the transactions contemplated hereby, whether obtained before or after the execution hereof or certify that such documents have been destroyed; and

(c)      the provisions of the Confidentiality Agreement will continue in full force and effect.

## ARTICLE 7

## OTHER MATTERS

7.1      Waiver, Amendment. Any provision of this Agreement may be amended or waived, but only if an amendment or waiver is in writing and signed, in the case of an amendment, by each Party or, in the case of a waiver, by the Party or Parties that would have benefited by the provision had it not been waived.

7.2      Remedies. No failure to exercise, and no delay in exercising, any right, remedy, power or privilege under this Agreement by any Party will operate as a waiver of such right, remedy, power or privilege, nor will any single or partial exercise of any right, remedy, power or privilege under this Agreement preclude any other or further exercise of such right, remedy, power or privilege or the exercise of any other right, remedy, power or privilege.

7.3      No Survival of Representations and Warranties or Covenants. No representations or warranties, covenants or agreements in this Agreement or in any instrument delivered pursuant to this Agreement shall survive beyond the Closing Date, except for covenants and agreements that by their terms are to be satisfied after the Closing Date, which covenants and agreements shall survive until satisfied in accordance with their terms.  Following the Closing, in no event shall Sellers or Purchaser have any recourse against the other or the Purchaser Parties or Seller Parties, respectively with respect to any representation, warranty, covenant or agreement made by Seller or Purchaser, as applicable, in this Agreement or in any other document contemplated hereby, or in any certificate delivered hereunder or thereunder, except with respect to claims for breaches of covenants and agreements that by their terms are to be satisfied after the Closing Date.

7.4      Mutual Release. From and after the Closing, upon the terms and subject to the conditions set forth herein:

(a) Each Seller, on behalf of itself and its estate, shall be deemed to have waived, discharged, settled, compromised and released any and all claims, causes of actions (including all avoidance actions), liens, rights and remedies it has, had or may have against the Purchaser Parties in respect of the acquisition or ownership of Interests as of the Closing, including with

respect to the terms of the Operative Documents and any alleged breach thereof, whether known or unknown, liquidated or unliquidated, contingent or non-contingent, except as set forth in this Agreement and to enforce the obligations set forth herein to effectuate the terms of this Agreement; provided, however, that nothing in this Agreement shall be construed as a release, waiver, compromise, or settlement of any other claims Purchaser may have against any Debtors or their estates arising prior to the Bankruptcy Proceeding.

(b) Purchaser shall be deemed to have waived, discharged, settled, compromised and released any and all claims, causes of actions, liens, rights and remedies it has, had or may have against the Seller Parties as of the Closing in respect of the acquisition or ownership of Interests, including with respect to the terms of the Operative Documents and any alleged breach thereof, whether known or unknown, liquidated or unliquidated, contingent or non-contingent, except as set forth in this Agreement and to enforce the obligations set forth herein to effectuate the terms of this Agreement; provided, however, that nothing in this Agreement shall be construed as a release, waiver, compromise, or settlement of any other claims Purchaser may have against any Debtors or their estates arising prior to the Bankruptcy Proceeding. Purchaser hereby agrees that the Seller Parties are automatically released and discharged from all obligations, covenants and agreements under the Operative Documents, in each case without further action of any party, and all applicable Seller Parties shall be deemed to have withdrawn from and no longer be parties to any such Operative Documents.

(c) Each Seller and the Purchaser Parties expressly waive and relinquish any and all provisions, rights, and benefits conferred by California Civil Code § 1542 or any similar law of any state or territory of the United States or any principle of common law that is similar, comparable or equivalent to California Civil Code § 1542.

7.5     Expenses. Except as otherwise provided in this Agreement or the Transfer Documents, each of Purchaser, on the one hand, and Sellers, on the other hand, shall bear their own costs and expenses (including brokerage commissions, finders' fees or similar compensation, and legal fees and expenses) incurred in connection with this Agreement, the Transfer Documents and the Transactions.

7.6     Notices. All notices, requests and other communications under this Agreement to a Party will be in writing and will be deemed given (a) on the Business Day sent, when delivered by hand or facsimile transmission (with confirmation) during normal business hours, (b) on the Business Day following the Business Day of sending, if delivered by nationally recognized overnight courier, or (c) on the third (3rd) Business Day following the Business Day of sending, if mailed by registered or certified mail return receipt requested, in each case to such Party at its address (or number) set forth below or such other address (or number) as the Party may specify by notice to the other Party hereto.

If to Sellers:

Cottonwood Grove Limited, FTX Ventures Ltd., and FTX Trading Ltd.
c/o FTX
2600 South Shore Blvd, Suite 300

4894-9735-3299 v.8
4154-9117-7542.12

League City, TX 77573
Attention: Kathryn Schultea
Email: kathyschultea@ftx.com

*With a copy (which shall not constitute notice) to*:

Sullivan & Cromwell LLP
125 Broad Street
New York, NY 10004
Attention: Audra D. Cohen
        Rita-Anne O'Neill
Telephone:  (212) 558-3275
        (310) 712-6698
Email:  cohena@sullcrom.com
      oneillr@sullcrom.com

If to Purchaser:

Mysten Labs, Inc.
379 University Avenue #200
Palo Alto, CA 94301
Attention:  General Counsel
Email: legal@mystenlabs.com

*With a copy (which shall not constitute notice) to*:

Orrick, Herrington & Sutcliffe LLP
51 West 52nd Street
New York, NY 10019
Attention:  Laura Metzger
        Joseph Perkins
Telephone:  (212) 506-5000
Facsimile:  (212) 506-5151
Email: lmetzger@orrick.com
      jperkins@orrick.com

7.7    <u>Specific Performance</u>.

(a)    Each of Sellers, on the one hand, and Purchaser, on the other hand, hereby acknowledge and agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached, and that damages at law may be an inadequate remedy for the breach of any of the covenants, promises and agreements contained in this Agreement, and, accordingly, any Party will be entitled to injunctive relief to prevent any such breach, and to specifically enforce the terms and provisions of this Agreement without the necessity of posting bond or other security against it or proving damages, including without limitation specific performance of such covenants, promises or agreements (including to cause Purchaser to consummate the

16

Transactions and to make the payments contemplated by this Agreement) or an Order enjoining a Party from any threatened, or from the continuation of any actual, breach of the covenants, promises or agreements contained in this Agreement.  The rights set forth in this <u>Section 7.7</u> will be in addition to any other rights which a Party may have at law or in equity pursuant to this Agreement.

(b)      Each of Sellers, on the one hand, and Purchaser, on the other hand, hereby agree not to raise any objections to the availability of the equitable remedy of specific performance to prevent or restrain breaches of this Agreement by Purchaser or any Seller, as applicable, and to specifically enforce the terms and provisions of this Agreement to prevent breaches or threatened breaches of, or to enforce compliance with, the respective covenants and obligations of Purchaser or any Seller, as applicable, under this Agreement all in accordance with the terms of this <u>Section 7.7</u>.

7.8      <u>Fiduciary Obligations</u>. Nothing in this Agreement, or any document related to the Transactions, will require any of the Sellers or any of their directors, officers or stockholders, in each case, in their capacities as such, to take any action, or to refrain from taking any action, to the extent inconsistent with their fiduciary obligations.  For the avoidance of doubt, each Seller retains the right to pursue any transaction or restructuring strategy that, in such Seller's business judgment, will maximize the value of its estate.

7.9      <u>Entire Understanding; No Third-Party Beneficiaries</u>. This Agreement, the Transfer Documents and the Confidentiality Agreement together set forth the entire understanding of the Parties relating to the subject matter of this Agreement and supersede all contemporaneous understandings and prior agreements, written or oral, among the Parties with respect to the subject matter of this Agreement. In the event of any conflict between this Agreement and the Transfer Documents or the Operative Documents, the provisions of this Agreement shall prevail. No representation, warranty, inducement, promise, understanding or condition not set forth in this Agreement has been made or relied on by any Party in entering into this Agreement. Nothing in this Agreement, expressed or implied, is intended to confer on any Person, other than the Parties or their respective successors, any rights, remedies, obligations or liabilities.

7.10      <u>Assignment</u>. Neither this Agreement nor any of the rights, interests or obligations under it may be assigned by any of the Parties (whether by operation of law or otherwise) without the prior written consent of the other Party and any purported assignment in violation of this <u>Section 7.10</u> will be void, except for the following assignments which shall not require any consent and will not be void: (a) assignment to an Affiliate of either Party (<u>provided</u> that such Party remains liable jointly and severally with its assignee Affiliate for the assigned obligations to the other Party) and (b) assignment by Sellers to a succeeding entity following their emergence from the Bankruptcy Proceeding. Subject to the preceding sentence, this Agreement will be binding upon, inure to the benefit of and be enforceable by the Parties to this Agreement and their respective successors and permitted assigns.

7.11      <u>Counterparts</u>. This Agreement may be executed in two or more counterparts, each of which will constitute an original and all of which, when taken together, will constitute one Agreement.

4894-9735-3299 v.8
4154-9117-7542.12

7.12    <u>Severability</u>. If any of the provisions of this Agreement is found to be in violation of Law or unenforceable for any reason, then (a) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision and (b) the remainder of this Agreement and the application of such provision, covenant or restriction to other Persons or circumstances shall not be affected by such invalidity or unenforceability, nor shall such invalidity or unenforceability affect the validity or enforceability of such provision, or the application of such provision, in any other jurisdiction and the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

7.13    <u>No Presumption</u>. Each Seller and Purchaser agree that this Agreement was negotiated fairly between them at arm's length and that the final terms of this Agreement are the product of their negotiations. Each Seller and Purchaser represents and warrants that it has sought and received experienced legal counsel of its own choosing with regard to the contents of this Agreement and the rights and obligations affected hereby. The Parties agree that this Agreement shall be deemed to have been jointly and equally drafted by them, and that the provisions of this Agreement therefore should not be construed against a Party on the grounds that such Party drafted or was more responsible for drafting the provisions.

7.14    <u>Governing Law; Submission to Jurisdiction; Waiver of Jury Trial</u>.

(a)    This Agreement will be governed by and construed in accordance with the internal Laws of the State of Delaware, without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Delaware, and the obligations, rights and remedies of each Seller and Purchaser shall be determined in accordance with such Laws.

(b)    Without limiting any Party's right to appeal any order of the Bankruptcy Court, (i) the Bankruptcy Court will retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the Interests, and (ii) any and all proceedings related to the foregoing will be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court for such purposes and will receive notices at such locations as indicated in <u>Section 7.6</u>; <u>provided</u>, <u>however</u>, that if the Bankruptcy Proceeding has been closed pursuant to section 350 of the Bankruptcy Code, the Parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the District of Delaware, or in the event (but only in the event) that such court does not have subject matter jurisdiction over such Action, in the Supreme Court of the Delaware Court of Chancery, for the resolution of any such claim or dispute. The Parties hereby irrevocably waive, to the fullest extent permitted by applicable Law, any objection which they may now or hereafter have to the laying of venue of any such Action brought in such court or any defense of inconvenient forum for the maintenance of such dispute. Each of the Parties agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.

4894-9735-3299 v.8
4154-9117-7542.12

(c)     Each Seller and Purchaser hereby consent to process being served by any other Party in any Action by delivery of a copy thereof in accordance with the provisions of Section 7.6; provided, however, that such service will not be effective until the actual receipt thereof by the Party being served.

(d)     Each Seller and Purchaser waive any right to trial by jury in any Action regarding this Agreement or any provision hereof.

7.15    Damages. No Party shall have any liability under any provision of this Agreement for any punitive, incidental, consequential, special or indirect damages, including business interruption, loss of future revenue, profits or income, or loss of business reputation or opportunity relating to the breach or alleged breach of this Agreement.

7.16    Interpretation. (a) As used in this Agreement, references to:

(1)     the words "hereby", "hereof", "herein", "hereunder" or words of similar import refer to this Agreement as a whole and not to any particular provision of this Agreement;

(2)     the Preamble, Recitals, Sections or Exhibits refer to the Preamble, a Recital or Section of, or an Exhibit to this Agreement unless otherwise indicated;

(3)     this Agreement refers to this Agreement and the Exhibits to it; and

(4)     all references to "$", "USD" and any currency amounts are in U.S. Dollars unless otherwise specified.

(b)     Wherever this Agreement requires a Party to take an action, the requirement constitutes an undertaking by the Party to cause its subsidiaries, and to use its commercially reasonable efforts to cause its other Affiliates, to take appropriate action in connection therewith.

(c)     Whenever the words "include," "includes" or "including" are used in this Agreement, they will be deemed to be followed by the words "without limitation." Any singular term in this Agreement will be deemed to include the plural, and any plural term the singular. All pronouns and variations of pronouns will be deemed to refer to the feminine, masculine or neuter, singular or plural, as the identity of the Person referred to may require.

(d)     The various captions and headings contained in this Agreement are for reference purposes only and do not limit or otherwise affect any of the provisions of this Agreement.

[Remainder of page intentionally left blank]

19

IN WITNESS WHEREOF, the parties named below have caused this instrument to be duly executed, all as of the day and year first above written.

**SELLERS:**

**COTTONWOOD GROVE LIMITED**

By: _____
        Name:    John J. Ray III
        Title:     Chief Executive Officer

**FTX TRADING LTD.**

By: _____
        Name:    John J. Ray III
        Title:     Chief Executive Officer

**FTX VENTURES LTD.**

By: _____
        Name:    John J. Ray III
        Title:     Chief Executive Officer

IN WITNESS WHEREOF, the parties named below have caused this instrument to be duly executed, all as of the day and year first above written.

**SELLERS:**

**COTTONWOOD GROVE LIMITED**

By: _____
    Name:
    Title:

**FTX TRADING LTD.**

By: _____
    Name:
    Title:

**FTX VENTURES LTD.**

By: _____
    Name:
    Title:

**PURCHASER:**

**MYSTEN LABS, INC.**

By: _____
    Name:    Evan Cheng
    Title:    Chief Executive Officer

**EXHIBIT A**

**DEFINITIONS**

As used in this Agreement, the following terms have the meanings specified in this Exhibit A.

"Action" means any litigation, action, suit, charge, binding arbitration, or other legal, administrative or judicial proceeding.

"Affiliate" means, as to any Person, any other Person that directly or indirectly through one or more intermediaries controls, or is under common control with, or is controlled by, such Person.

"Aggregate Purchase Price" has the meaning set forth in Section 1.3.

"Agreement" has the meaning set forth in the Preamble.

"Alternative Transaction" means the sale, transfer or other disposition of Interests representing at least 30% of the SUI Tokens available under the Token Warrants and at least 30% of the shares of Series B Preferred Stock in Mysten Labs, Inc. in a transaction with a purchaser other than Purchasers and/or their Affiliates.

"Bankruptcy Code" has the meaning set forth in the Recitals.

"Bankruptcy Court" has the meaning set forth in the Recitals.

"Bankruptcy Proceeding" has the meaning set forth in the Recitals.

"Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure and the Local Rules of Bankruptcy Practice and Procedure of the Bankruptcy Court.

"Business Day" means any day other than a Saturday or Sunday or a day on which banks located in the city of New York are authorized or required by statute to close.

"Closing" has the meaning set forth in Section 1.5.

"Closing Date" has the meaning set forth in Section 1.5.

"Code" means the Internal Revenue Code of 1986, as amended.

"Committee" means the Official Committee of Unsecured Creditors as representative for the unsecured creditors of Sellers.

"Confidentiality Agreement" means the Confidentiality Agreement, dated January 20, 2023, between (i) Purchaser and Foundation, and (ii) FTX Trading Ltd., West Realm Shires Inc., Alameda Research LLC, Clifton Bay Investments LLC, Paper Bird Inc. and their respective debtor affiliates.

"Cure Costs" means monetary amounts that must be paid and obligations that otherwise must be satisfied under section 365(b)(1)(A) and (B) of the Bankruptcy Code in connection with the assumption and/or assignment of the Operative Documents, as agreed upon by the Parties or otherwise determined by the Bankruptcy Court.

"Debtor Affiliates" means the Debtors and their respective wholly owned subsidiaries.

"Debtors" has the meaning set forth in the Recitals.

"Final Order" means an Order (a) as to which no appeal, leave to appeal, notice of appeal, motion to amend or make additional findings of fact, motion to alter or amend judgment, motion for rehearing or motion for new trial has been timely filed (in cases in which there is a date by which such filing is required to occur), or, if any of the foregoing has been timely filed, it has been disposed of in a manner that upholds and affirms the subject Order in all material respects without the possibility for further appeal thereon, (b) in respect of which the time period for instituting or filing an appeal, leave to appeal, motion for rehearing or motion for new trial shall have expired (in cases in which such time period is capable of expiring), and (c) as to which no stay is in effect.

"Foundation" means the Sui Foundation, a Cayman Islands foundation company.

"Governmental Entity" means any federal, state, provincial, municipal, local or foreign government, governmental authority, regulatory or administrative agency, governmental commission, department, board, bureau, agency, instrumentality, court or tribunal and, for purposes of this Agreement shall include the U.S. Securities and Exchange Commission and any state securities authority or other regulatory authority or organization having jurisdiction over the Debtors, Purchaser or the Foundation.

"Intended Tax Treatment" has the meaning set forth in Section 3.1.

"Interest" and "Interests" has the meaning set forth in the Recitals.

"Law" or "Laws" means any law, statute, legislation, constitution, ordinance, principle of common law, resolution, treaty, convention, rule, regulation, ruling, directive, pronouncement, Order or other legal requirement enacted, issued, promulgated, enforced or entered by a Governmental Entity of competent jurisdiction.

"Lien" means any lien (statutory or otherwise), charge, pledge, mortgage, lease, easement, hypothecation, usufruct, deed of trust, security interest, option, right of use, first offer or first refusal, servitude, restrictive covenant or condition, encroachment, claim, interest, restriction or any other encumbrance, other than, in each case, restrictions on transfer arising solely under applicable federal and any kind of state securities Laws.

"Material Adverse Effect" means any change, development, circumstance, fact or effect that, individually or taken together with any other changes, developments, circumstances, facts or effects is, or would reasonably be expected to be, materially adverse to the financial condition, assets, liabilities, business operations or results of operations of the Foundation or Purchaser;

provided, however, that none of the following, either alone or in combination, shall be deemed to constitute a Material Adverse Effect that is occurring, has occurred or would reasonably be expected to occur: (a) changes, events and occurrences with respect to Purchaser in any respect or in the industries in which the Foundation or Purchaser operate generally, (b) changes, developments, circumstances or facts in or with respect to the economy, credit, capital, securities, digital asset or financial markets or political, regulatory or business conditions in the geographic markets in which the Foundation or Purchaser has operations or its products or services are sold, (c) any change in the price or relative value of any digital currency or cryptocurrency, or any other blockchain-based tokens or assets; (d) any change in existence or legality of any digital currency or cryptocurrency, or any other blockchain-based token or asset, or any halt or suspension in trading of any such digital currency or cryptocurrency on any exchange, (e) macroeconomic factors, interest rates, currency exchange rates, general financial market conditions, any change, development or effect resulting from acts of war (whether or not declared), sabotage, terrorism, military actions or the escalation of any of the foregoing, whether perpetrated or encouraged by a state or non-state actor or actors (other than cyberattacks), any weather or natural disaster, or any outbreak of illness or other public health event (or any measures taken in response thereto) or any other *force majeure* event (except to the extent causing any damage or destruction to or rendering unusable any material facility or property of the Foundation), whether or not caused by any Person (other than the Foundation or any of its Affiliates or representatives), (f) changes in law, generally accepted accounting principles or official interpretations of the foregoing, (g) compliance with this Agreement, including any effect on any Seller resulting from failure to take any action to which Purchaser refused consent under this Agreement, (h) the Transactions or any announcement hereof or the identity of Purchaser, (i) the pendency of the Bankruptcy Proceeding and any action approved by, or motion made before, the Bankruptcy Court, or (j) matters known to or reasonably foreseeable by Purchaser, taking into account the financial condition, business and operations of Sellers, the fact that any Seller is involved in the Bankruptcy Proceeding and the circumstances giving rise to such Bankruptcy Proceeding; it being understood that the failure of Purchaser or the Foundation to achieve internal or external financial forecasts or projections, by itself, will not constitute a Material Adverse Effect.

"Operative Documents" means, with respect to the Foundation, the Token Warrant Agreements and any shareholders agreements, management agreements, bylaws, side letters and other documents and agreements governing the rights and obligations of any Seller as an investor in the Token Warrants, and (ii) with respect to Purchaser, any shareholders agreements, management agreements, bylaws, side letters and other documents and agreements governing the rights and obligations of any Seller as an investor in the equity of Purchaser, including, in each case, any agreement or document set forth in Schedule A.

"Order" means any order, writ, judgment, injunction, decree, rule, ruling, decision, directive, determination, quasi-judicial decision, or award made, issued or entered by or with any arbiter, mediator, or Governmental Entity, whether preliminary, interlocutory or final, including by the Bankruptcy Court in the Bankruptcy Cases.

"Party" or "Parties" has the meaning set forth in the Preamble.

"Permitted Encumbrance" means a restriction on transfer arising solely under applicable federal and state securities Laws and any transfer restrictions set forth in the Operative Documents.

"Person" means any natural person and any corporation, company, partnership (general or limited), unincorporated association (whether or not having separate legal personality), trust or other entity.

"Purchaser" has the meaning set forth in the Preamble.

"Purchaser Parties" means, collectively, (i) Purchaser, (ii) each of the current or former Affiliates of Purchaser, and (iii) each of the current or former officers, directors, employees, equityholders, partners, stockholders, members, direct and indirect owners, managers, advisors, predecessors, successors and assigns of any of the Persons described in clause (i) or clause (ii) of this definition, and each of the Affiliates of any of the Persons described in this clause (iii).

"Sale Hearing" has the meaning set forth in Section 4.1(a).

"Sale Motions" has the meaning set forth in Section 4.2(a).

"Sale Order" means an order entered by the Bankruptcy Court or other court of competent jurisdiction that includes the provisions set forth in Exhibit B hereto, subject to (a) immaterial modifications or clarifications or (b) such other changes to which Purchaser consents (such consent not to be unreasonably withheld, conditioned or delayed).

"Sale Order Date" has the meaning set forth in Section 4.2(a).

"Seller" or "Sellers" has the meaning set forth in the Preamble.

"Seller Parties" means, collectively, (i) each Seller, (ii) each of the current or former Affiliates of such Seller, and (iii) each of the current or former officers, directors, employees, equityholders, partners, stockholders, members, direct and indirect owners, managers, advisors, predecessors, successors and assigns of any of the Persons described in clause (i) or clause (ii) of this definition, and each of the Affiliates of any of the Persons described in this clause (iii).

"Stockholder Consent" means a written consent of the preferred stockholders of Purchaser approving the repurchase of Series B Preferred Stock pursuant to this Agreement.

"Taxes" means all taxes, assessments, charges, duties, fees, levies or other governmental charges, including all federal, state, local and foreign income, profits, franchise, gross receipts, environmental, customs duty, capital stock, severances, stamp, payroll, sales, employment, unemployment, disability, use, property, withholding, excise, production, value added, occupancy and other taxes, duties or assessments of any nature whatsoever, together with all interest, penalties and additions imposed with respect to such amounts and any interest in respect of such penalties and additions.

A-4

"Tax Return" means all returns and reports (including elections, declarations, disclosures, schedules, estimates and information returns) required to be supplied to a Tax authority relating to Taxes.

"Termination Date" has the meaning set forth in Section 6.1(b).

"Token Warrants" means the warrants to purchase SUI Tokens listed on Schedule A.

"Token Warrant Agreements" means the agreements set forth on Schedule A opposite the Foundation, as amended and/or restated to date.

"Transfer Taxes" mean any transfer, documentary, sales, use, stamp, recording, value-added, registration and other similar Taxes and all conveyance fees, recording fees and other similar charges including any interest, penalties and additions imposed with respect to such amount.

"Transactions" means the transactions contemplated by this Agreement.

"Transfer Documents" means any assignment and assumption agreement and other instruments of transfer to be executed by the applicable Seller and Purchaser at the Closing and the agreement among such Seller, Purchaser and the Foundation which relates to the sale, assignment and transfer of the Interests to Purchaser, the admission or joinder (in respect of the Interests) of Purchaser under the Operative Documents, the withdrawal of such Seller from the Operative Documents, and the consent of the Foundation and the Stockholder Consent to the Transactions, in a form reasonably satisfactory to such Seller and Purchaser.

4894-9735-3299 v.8
4154-9117-7542.12

**EXHIBIT B**

**FORM OF SALE ORDER**

B-1

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |
| | **Ref. Nos. ___** |

**ORDER (I) AUTHORIZING AND APPROVING SALE OF DEBTORS' INTERESTS IN MYSTEN LABS, INC. AND SUI TOKEN WARRANTS FREE AND CLEAR OF ALL LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES; (II) AUTHORIZING AND APPROVING DEBTORS' ENTRY INTO, AND PERFORMANCE UNDER, THE PURCHASE AND SALE AGREEMENT; (III) AUTHORIZING AND APPROVING ASSUMPTION AND ASSIGNMENT OF THE SUI TOKEN WARRANTS AND (IV) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of FTX Trading Ltd. and its affiliated debtors

and debtors-in-possession (collectively, the "Debtors"), for entry of an order (this "Sale Order"),

pursuant to sections 105(a), 363, 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004,

6006. 9007, 9008 and 9014 and Local Rules 2002-1, 6004-1 and 9006-1 among other things,

(a) authorizing and approving the sale (the "Sale Transaction") of (i) the Preferred Stock in

Mysten Labs, Inc., a Delaware corporation ("Purchaser-Subject Company") and (ii) the SUI

Token Warrants held by the Debtors free and clear of all liens, claims, interests and

encumbrances in accordance with the terms and conditions set forth in the Agreement;

(b) authorizing and approving the Debtors' entry into, and performance under, the Purchase and

Sale Agreement, dated as of March 22, 2023, a copy of which is attached as Exhibit B to the

---

[1] The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and 4063, respectively. Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.

[2] Capitalized terms not otherwise defined herein are to be given the meanings ascribed to them in the Motion.

Motion (the "Agreement"), between Debtors Cottonwood Grove Limited, a company

incorporated under the laws of Hong Kong; FTX Trading Ltd., a company established under the

laws of Antigua and Barbuda and FTX Ventures Ltd., a BVI Business Company (each a "Seller"

and together "Sellers"), on the one hand, and Purchaser-Subject Company, on the other hand;

(c) authorizing and approving the assumption and assignment of the SUI Token Warrants; and

(d) granting related relief; the Court having held a hearing to approve the Sale Transaction

pursuant to the terms of the Agreement (the "Sale Hearing") to review and consider (i) the

Motion with respect to the Sale Transaction and all relief related thereto, (ii) the Agreement,

(iii) Declaration of Bruce Mendelsohn in Support of the Sale Transaction, and (iv) any objections

thereto that were not resolved prior to the start of the Sale Hearing; and upon the record of the

Sale Hearing and all of the proceedings had before this Court; and objections (if any) to the

Motion, with respect to the sale of the Interests, having been withdrawn or overruled on the

merits; and after due deliberation and good cause appearing therefor;

IT IS HEREBY FOUND AND DETERMINED THAT:[3]

      A.     Jurisdiction and Venue. This Court has jurisdiction over this matter and

over the property of the Debtors' estates, including the Interests to be sold, transferred or

conveyed pursuant to the Agreement, pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended*

*Standing Order of Reference* from the United States District Court for the District of Delaware,

dated February 29, 2012. This Court may issue a final order on the Motion consistent with

Article III of the United States Constitution. Venue is proper pursuant to 28 U.S.C. §§ 1408 and

1409. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).

---

[3] Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact to the fullest extent of the law. *See* FED. R. BANKR. P. 7052.

2

B.    <u>Statutory and Rule Predicates</u>.  The statutory and other legal predicates for the relief requested in the Motion and for the approvals and authorization herein are sections 105(a), 363 and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, 9007, 9008 and 9014 and Local Rules 2002-1, 6004-1 and 9006-1.

C.    <u>Final Order</u>.  This Sale Order constitutes a final order within the meaning of 28 U.S.C. § 158(a).  Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to the extent necessary under Bankruptcy Rule 9014 and rule 54(b) of the Federal Rules of Civil Procedures, as made applicable by Bankruptcy Rule 7054, this Court expressly finds that there is no just reason for delay in the implementation of this Sale Order, and expressly directs entry of judgment as set forth herein and authorizes the closing of the Sale Transaction contemplated hereby without regard to any stay or delay in its implementation.

D.    <u>Sale Notice</u>.  As shown by the affidavits of service filed with this Court and the representations or proffers made on the record at the Sale Hearing, (a) the Debtors have provided due, good, proper, timely, reasonable, adequate, appropriate and sufficient notice of, and sufficient opportunity to object to, the Motion with respect to the Sale Transaction and the relief requested therein (including the Debtors' requested findings with respect to successor liability), the Sale Transaction, assumption and assignment of the SUI Token Warrants and the Cure Costs, if any, and the proposed entry of this Sale Order in compliance with all applicable requirements of the Bankruptcy Code, the Bankruptcy Rules and the Local Rules, (b) such notice was adequate and sufficient under the circumstances of these Chapter 11 Cases, and (c) no other or further notice is necessary or shall be required.

E.    <u>Opportunity to Object</u>.  A fair and reasonable opportunity to object or be heard regarding the relief granted by this Sale Order, including, but not limited to, the

assumption and assignment of the SUI Token Warrants and the Cure Costs (as defined in the Agreement), has been afforded to all interested parties.

F.    <u>No Collusion</u>.  Purchaser-Subject Company is not an "insider" of the Debtors, as that term is defined in section 101(31) of the Bankruptcy Code.  The Agreement and the Sale Transaction were negotiated, proposed and entered into by Sellers and Purchaser-Subject Company without collusion or fraud, in good faith and from arm's-length bargaining positions, and are substantively and procedurally fair to all parties.  Neither the Debtors nor Purchaser-Subject Company has engaged in any conduct that would cause or permit the Agreement or the consummation of the Sale Transaction to be avoided, or costs or damages to be imposed under section 363(n) of the Bankruptcy Code, and accordingly neither the Debtors nor Purchaser-Subject Company has violated section 363(n) of the Bankruptcy Code by any action or inaction.  Specifically, Purchaser-Subject Company has not acted in a collusive manner with any person and the purchase price was not controlled by any agreement among bidders.  The Sale Transaction may not be avoided, and no damages may be assessed against Purchaser-Subject Company or any other party under section 363(n) of the Bankruptcy Code or any other applicable bankruptcy or non-bankruptcy law.

G.    <u>Good Faith of Purchaser-Subject Company</u>.  Purchaser-Subject Company is purchasing the Interests in good faith and for value, and is a good-faith buyer within the meaning of section 363(m) of the Bankruptcy Code.  Purchaser-Subject Company is therefore entitled to all of the protections afforded under section 363(m) and any other applicable or similar bankruptcy or non-bankruptcy law, and otherwise has proceeded in good faith in all respects in connection with this proceeding in that, *inter alia*: (a) Purchaser-Subject Company recognized that the Debtors were free to deal with any other party interested in acquiring the

Interests; (b) Purchaser-Subject Company in no way induced or caused the filing of these

Chapter 11 Cases by the Debtors; (c) all payments to be made, and all other material agreements

or arrangements entered into or to be entered into, by Purchaser-Subject Company in connection

with the Sale Transaction have been disclosed; (d) Purchaser-Subject Company has not violated

section 363(n) of the Bankruptcy Code by any action or inaction; (e) no common identity of

officers, directors or controlling stockholders exists between Purchaser-Subject Company and

Debtors; (f) the negotiation and execution of the Agreement were at arm's length and in good

faith, and at all times each of the Purchaser-Subject Company and Sellers were represented by

competent counsel of their choosing; and (g) the Purchaser-Subject Company has not acted in a

collusive manner with any person.  Purchaser-Subject Company will be acting in good faith

within the meaning of section 363(m) in closing the transactions contemplated by the

Agreement.

        H.     <u>Highest and Best Offer</u>.  The Debtors and their advisors, including,

without limitation, Perella Weinberg Partners LP, have appropriately marketed the Interests, and

a reasonable opportunity has been given to any interested party to make a higher or better offer

for the Interests.  No other person or entity or group of entities has offered to purchase the

Interests for higher or otherwise better value to the Debtors' estates than Purchaser-Subject

Company.  The offer to purchase the Interests made by Purchaser-Subject Company, under the

terms and conditions set forth in the Agreement: (a) was made in good faith; (b) is the highest or

otherwise best offer obtained for the Interests and will provide a greater recovery for the

Debtors' estates than would be provided by any other reasonably available alternative; (c) is for

fair, adequate and sufficient consideration that constitutes reasonably equivalent value for the

Interests being conveyed to Purchaser-Subject Company; (d) is fair and reasonable; (e) is in the

best interests of the Debtors' estates; and (f) would not have been made by Purchaser-Subject Company absent the protections afforded to Purchaser-Subject Company by this Sale Order.

I.      The Debtors' determination that the Sale Transaction, pursuant to the Agreement, provides the highest or otherwise best offer for the Interests, and their related decision to sell the Interests, constitute a reasonable exercise of the Debtors' business judgment. The facts and circumstances described in the Motion and the evidence adduced in connection with the Sale Hearing demonstrate the Debtors' business judgment to sell the Interests to Purchaser-Subject Company at this time, and the Debtors have articulated sound business reasons for consummating the Sale Transaction and for selling the Interests outside of a chapter 11 plan.  Moreover, the sale of the Interests outside of a chapter 11 plan pursuant to the Agreement neither impermissibly restructures the rights of the Debtors' creditors nor dictates the terms of any chapter 11 plan.  The Sale Transaction does not constitute a *sub rosa* chapter 11 plan.  It is a reasonable exercise of the Debtors' business judgment to execute, deliver and consummate the Sale Transaction, subject to this Sale Order.

J.      <u>Fair Consideration</u>.  The consideration provided by Purchaser-Subject Company pursuant to the Agreement constitutes reasonably equivalent value (as those terms are defined in each of the Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act and section 548 of the Bankruptcy Code) and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession or the District of Columbia.

K.      <u>No Successor or Other Derivative Liability</u>.  As a result of any action taken in connection with the Sale Transaction, the Agreement, or this Sale Order:  (a) Purchaser-Subject Company is not a successor to or mere continuation of or substantial continuation of the Debtors or their estates and there is no continuity of enterprise between Purchaser-Subject

Company and the Debtors; and (b) Purchaser-Subject Company shall not be deemed to be holding itself out to the public as a continuation of the Debtors based on the Sale Transaction. Purchaser-Subject Company is not, and shall not be, considered a successor in interest to any of the Debtors or their estates, by reason of any theory of law or equity, and the Sale Transaction does not amount to a consolidation, succession, merger, or de facto merger of Purchaser-Subject Company and the Debtors and/or the Debtors' estates. Purchaser-Subject Company would not have entered into the Agreement if the sale of the Interests were not made free and clear of any successor liability of Purchaser-Subject Company.

L.    Corporate Power and Authority.  As set forth in section 2.1(a) of the Agreement, Sellers (a) have full corporate power and authority to execute and deliver the Agreement and all other documents contemplated thereby, (b) have all corporate authority necessary to consummate the Sale Transaction, and (c) have taken all corporate action and formalities necessary to authorize and approve the Agreement and the consummation of the Sale Transaction.  Sellers' sale of the Interests has been duly and validly authorized by all necessary corporate action.  No consents or approvals, other than those expressly provided for in the Agreement, are required for Sellers to consummate the Sale Transaction.

M.    The Agreement was not entered into for the purpose of hindering, delaying or defrauding creditors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession or the District of Columbia.  Neither the Debtors nor Purchaser-Subject Company are entering into the Sale Transaction fraudulently for the purpose of statutory and common law fraudulent conveyance and fraudulent transfer claims.

N.    Title to Assets.  The transfer of the Debtors' rights, titles and interests to the Interests to Purchaser-Subject Company will be, as of the Closing Date (as defined in the

Agreement), a legal, valid and effective transfer of such rights, titles and interests in the Interests a, which transfer vests or will vest Purchaser-Subject Company with all rights, titles and interests of the Debtors to the Interests free and clear of all Liens (as defined below and in the Agreement), other than Permitted Encumbrances (as defined in the Agreement).  The Agreement is a valid and binding contract between Sellers and Purchaser-Subject Company and shall be enforceable according to its terms.

O.    <u>Satisfaction of Section 363(f) Standards</u>.  The conditions of section 363(f) of the Bankruptcy Code have been satisfied in full, and upon entry of this Sale Order, the Debtors are authorized to transfer all of their rights, titles and interests in and to the Interests free and clear of any interest in the property, other than Permitted Encumbrances.  The Debtors may sell the Interests free and clear of all liens (statutory or otherwise), charges, pledges, mortgages, leases, easements, hypothecations, usufructs, deeds of trust, security interests, options, rights of use, first offer or first refusal, servitudes, restrictive covenants or conditions, encroachments, claims, interests, restrictions, or any other encumbrances of any kind (collectively, "<u>Liens</u>") against the Debtors, their estates or the Interests because, in each case, one or more of the standards set forth in section 363(f)(l)-(5) of the Bankruptcy Code has been satisfied.  Each holder with a Lien on the Interests to be transferred pursuant to the Agreement:  (a) has, subject to the terms and conditions of this Sale Order, consented to the Sale Transaction or is deemed to have consented; (b) could be compelled in a legal or equitable proceeding to accept money satisfaction of such Lien; or (c) otherwise falls within one or more of the other subsections of section 363(f) of the Bankruptcy Code.  Holders of Liens against the Debtors, their estates or the Interests who did not object, or who withdrew their objections, to the Sale Transaction or the Motion, with respect to the sale of the Interests (except with respect to Permitted Encumbrances),

are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code.  All other

holders of Liens are adequately protected by having their Liens, if any, in each instance against

the Debtors, their estates or the Interests, attach to the net cash proceeds of the Sale Transaction

ultimately attributable to the Interests in which such creditor alleges a Lien, in the same order of

priority, with the same validity, force and effect that such Liens had prior to the Sale

Transaction, subject to any claims and defenses the Debtors and their estates may possess with

respect thereto.

        P.      Purchaser-Subject Company would not have entered into the Agreement

and would not consummate the Sale Transaction if the sale of the Interests to Purchaser-Subject

Company were not free and clear of all Liens (other than Permitted Encumbrances), or if

Purchaser-Subject Company or any of the Purchaser Parties (as defined in the Agreement)

would, or in the future could, be liable for any such Lien.  The total consideration to be provided

under the Agreement reflects Purchaser-Subject Company's reliance on this Sale Order to

provide it, pursuant to sections 105(a) and 363 of the Bankruptcy Code, with title to, interest in

and possession of the Interests free and clear of all Liens (other than Permitted Encumbrances).

Not transferring the Interests free and clear of all Liens (other than Permitted Encumbrances)

would adversely impact the Debtors' efforts maximize the value of the estates, and the transfer of

the Interests other than pursuant to a transfer that is free and clear of all Liens (other than

Permitted Encumbrances) would be of substantially less benefit to the Debtors' estates.

        Q.      <u>Mutual Release</u>.  The mutual release of any and all claims, causes of

actions (including all avoidance actions), Liens, rights and remedies in respect of the acquisition

and ownership of the Interests, is a necessary and integral part of the Agreement, and the scope

of the mutual release is appropriately tailored under the facts and circumstances.  The mutual

release is: (a) in exchange for the good and valuable consideration provided by Sellers and Purchaser; (b) a good faith settlement and compromise of the claims, causes of action, Liens, rights and remedies released by such releases; (c) in the best interests of the Debtors and all holders of claims and interests; (d) fair, equitable and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any of the Debtors or their estates asserting any claim or cause of action (including all avoidance actions) released pursuant to such release.

   R. <u>Assumption and Assignment of the SUI Token Warrants</u>.  The Debtors and Purchaser-Subject Company have satisfied, to the extent necessary, the requirements of section 365 of the Bankruptcy Code, including subsections 365(b)(1)(A), 365(b)(1)(B) and 365(f), in connection with the assumption and assignment of the SUI Token Warrants. Purchaser-Subject Company has demonstrated adequate assurance of future performance with respect to the SUI Token Warrants pursuant to sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code.  The assumption and assignment of the SUI Token Warrants pursuant to the terms of this Sale Order is integral to the Agreement and is in the best interests of the Debtors and their estates, and represents the reasonable exercise of sound and prudent business judgment by the Debtors.  The Debtors or Purchaser-Subject Company, as applicable, shall, to the extent necessary, provide compensation or adequate assurance of compensation, which amount will be paid to non-Debtor counterparties to the SUI Token Warrants for any actual pecuniary loss to any such party resulting from a default prior to the date of assumption and assignment with respect to the SUI Token Warrants, within the meaning of sections 365(b)(1)(B) and 365(f)(2)(A) of the Bankruptcy Code.  Except where an applicable SUI Token Warrant is subject to an unresolved objection to the assumption and assignment of such SUI Token Warrant, payment of the Cure Costs, if any, as set forth herein and Purchaser-Subject Company's promise

to perform the obligations under the SUI Token Warrants after the Closing Date shall constitute adequate assurance of future performance within the meaning of sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code.   The Debtors do not need to make a determination on, and reserve all rights with respect to, whether provisions in the SUI Token Warrants that prohibit or restrict assignment of the SUI Token Warrants are enforceable or prohibited pursuant to section 365(f) of the Bankruptcy Code.

   S. To the extent applicable law excuses the non-debtor counterparty from accepting performance to an entity other than the debtor under Section 365(f) of the Bankruptcy Code, then the Debtors have received applicable consent to such assignment under section 365(c)(2).   To the extent applicable, any objections to the Cure Costs are resolved as set forth herein.  To the extent that any counterparty failed to timely object to its applicable Cure Cost or adequate assurance of future performance, such counterparty is deemed to have consented to such Cure Cost and the assignment of its respective SUI Token Warrants to Purchaser-Subject Company.

   T. <u>Waiver of Bankruptcy Rules 6004(h) and 6006(d)</u>.  Good and sufficient reasons for approval of the Agreement and the Sale Transaction have been articulated.  The Debtors have demonstrated both (a) good, sufficient and sound business purposes and justifications and (b) compelling circumstances for the Sale Transaction other than in the ordinary course of business, pursuant to section 363(b) of the Bankruptcy Code before, and outside of, a chapter 11 plan, in that, among other things, the immediate consummation of the Sale Transaction is necessary and appropriate to maximize the value of the Debtors' estates. Accordingly, there is cause to waive or lift the stay contemplated by Bankruptcy Rules 6004(h) and 6006(d) with respect to the Sale Transaction.  To maximize the value of the Interests, it is

essential that the Sale Transaction occur within the time constraints set forth in the Agreement. Time is of the essence in consummating the Sale Transaction and the Debtors and Purchaser-Subject Company intend to close the Sale Transaction as soon as practicable.  Given all of the circumstances of these Chapter 11 Cases and the adequacy and fair value of the Aggregate Purchase Price under the Agreement, the proposed Sale Transaction should be approved.

U.     The consummation of the Sale Transaction and the assumption and assignment of the SUI Token Warrants is legal, valid and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation, sections 105(a), 363(b), 363(f), 363(m) and 365, and all of the applicable requirements of such sections have been complied with in respect of the transaction.

V.     Personally Identifiable Information.  The Sale Transaction does not involve the sale of any personally identifiable information.  Thus, the appointment of a consumer privacy ombudsman pursuant to section 363(b)(1) or section 332 of the Bankruptcy Code is not required with respect to the Sale Transaction.

W.     Legal and Factual Bases.  The legal and factual bases set forth in the Motion and the evidence adduced in connection with the Sale Hearing establish just cause for the relief granted herein.  Entry of this Sale Order is in the best interests of the Debtors and their estates.

IT IS HEREBY ORDERED THAT:

A.     **General Provisions**

1.     The sale of the Interests and the other relief requested in the Motion is granted as set forth herein, and the Agreement and the provisions thereof and the Sale Transaction are approved in their entirety as set forth herein.

2.      All objections, responses, reservations of rights and requests for any continuances concerning the Motion are resolved in accordance with the terms of this Sale Order as set forth in the record of the Sale Hearing.  To the extent any such objections, responses, reservations of rights or requests for any continuances were not otherwise withdrawn, waived, settled, or resolved, such are hereby overruled and denied on the merits.  All interested parties that failed to timely object to the Motion, with respect to the Sale Transaction, are deemed to have consented to the relief granted herein for all purposes, including, without limitation, pursuant to section 363(f)(2) of the Bankruptcy Code.

3.      Notice of the Motion, the Agreement, the sale of the Interests free and clear of all Liens, except Permitted Encumbrances, the Sale Transaction, the assumption and assignment of the SUI Token Warrants and the Cure Costs was fair, equitable, proper, and sufficient under the circumstances and complied in all respects with section 102(1) of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 9007, 9008 and 9014, and the Local Rules 2002-1, 6004-1 and 9006-1.

**B.      Approval of the Agreement**

4.      The Agreement and all of the terms and conditions thereof, including the mutual release, are hereby authorized and approved in all respects.  The failure to specifically include or make reference to any particular provision of the Agreement in this Sale Order shall not impair the effectiveness of such provision, it being the intent of this Court that the Agreement and the Sale Transaction are authorized and approved in their entirety.

5.      Pursuant to sections 363(b) and (f) of the Bankruptcy Code, the Debtors are authorized and empowered to take any and all actions necessary or appropriate to (a) consummate the Sale Transaction to Purchaser-Subject Company in accordance with the terms and conditions of the Agreement, (b) close the Sale Transaction as contemplated in the

13

Agreement and this Sale Order, and (c) execute and deliver, perform under, consummate and implement the Agreement, including the assumption and assignment to Purchaser-Subject Company of the SUI Token Warrants, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Agreement and the Sale Transaction. Purchaser-Subject Company shall not be required to seek or obtain relief from the automatic stay under section 362 of the Bankruptcy Code to enforce any of its remedies under the Agreement or any other sale-related document. The automatic stay imposed by section 362 of the Bankruptcy Code is modified solely to the extent necessary to implement the preceding sentence and the other provisions of this Sale Order; provided, however, that this Court shall retain exclusive jurisdiction over any and all disputes with respect thereto.

6.     This Sale Order shall be binding in all respects upon the Debtors, their estates, all creditors of and holders of equity interests in, the Debtors, any holders of Liens in, against or on all or any portion of the Interests (whether known or unknown), Purchaser-Subject Company and all successors and assigns of Purchaser-Subject Company, the Interests and any trustees, if any, subsequently appointed in these Chapter 11 Cases or upon a conversion to Chapter 7 under the Bankruptcy Code of these Chapter 11 Cases. This Sale Order and the Agreement shall inure to the benefit of the Debtors, their estates and creditors, Purchaser-Subject Company and the respective successors and assigns of each of the foregoing.

**C.     Consummation of the Sale Transaction**

7.     Pursuant to sections 363(b) and 363(f) of the Bankruptcy Code, the Debtors are authorized to transfer all of their rights, titles and interests to the Interests to Purchaser-Subject Company on the Closing Date and such transfer shall constitute a legal, valid, binding and effective transfer of such rights, titles and interests in the Interests and shall vest Purchaser-Subject Company with all of the Debtors' rights, titles and interests in the Interests

14

and, upon the Debtors' receipt of the Aggregate Purchase Price, shall be free and clear of all Liens, claims, interests and encumbrances, including but not limited to, successor or successor-in-interest liability or, any tax liens or mechanic's liens asserted against the Interests, except Permitted Encumbrances, with all Liens to attach to the net cash proceeds ultimately attributable to the property against or in which such Liens are asserted, subject to the terms thereof, with the same validity, force and effect, and in the same order of priority, which such Liens now have against the Interests, subject to any rights, claims and defenses the Debtors or their estates, as applicable, may possess with respect thereto. The provisions of this Sale Order authorizing and approving the transfer of the Interests free and clear of all Liens (other than Permitted Encumbrances) shall be self-executing, and neither the Debtors nor the Purchaser-Subject Company shall be required to execute or file releases, termination statements, assignments, consents, or other instruments in order to effectuate, consummate, and implement the provisions of this Sale Order.

8.      A certified copy of this Sale Order may be filed with the appropriate clerk and/or recorded with the recorder to act to cancel any Liens and other encumbrances of record except Permitted Encumbrances.

9.      If any person or entity which has filed statements or other documents or agreements evidencing Liens in, against or on all or any portion of the Interests shall not have delivered to the Debtors prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of Liens and any other documents necessary for the purpose of documenting the release of all Liens which the person or entity has or may assert with respect to all or any portion of the Interests, the Debtors, Purchaser-Subject Company and each of their respective officers, employees and agents are

hereby authorized and empowered to execute and file such statements, instruments, releases and other documents on behalf of such person or entity with respect to the Interests.

10.     This Sale Order is and shall be effective as a determination that, on the Closing Date, all Liens existing as to the Interests prior to the Closing Date, except Permitted Encumbrances, shall have been unconditionally released, discharged and terminated from the Interests, and that the conveyances described herein have been effected.  This Sale Order is and shall be binding upon and govern the acts of all persons and entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state and local officials and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease; and each of the foregoing persons and entities is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the Sale Transaction.

**D.     <u>Assumption and Assignment of Contracts</u>**

11.     Pursuant to sections 105(a), 363, and 365 of the Bankruptcy Code, and subject to and conditioned upon the Closing, and payment of all Cure Costs, if any, Seller's assumption and assignment to Purchaser-Subject Company of the SUI Token Warrants is hereby approved, and the requirements of section 365(b)(1) of the Bankruptcy Code with respect thereto are hereby deemed satisfied.

12.     Sellers are hereby authorized and directed in accordance with sections 105(a), 363, and 365 of the Bankruptcy Code to (a) assume and assign to Purchaser-Subject Company, effective upon the Closing of the Sale Transaction, the SUI Token Warrants free and

clear of all Liens of any kind or nature whatsoever, except Permitted Encumbrances, and
(b) execute and deliver to Purchaser-Subject Company such documents or other instruments as
Purchaser-Subject Company deems may be necessary to assign and transfer the SUI Token
Warrants to Purchaser-Subject Company.

13.     With respect to the SUI Token Warrants: (a) where a SUI Token Warrant
is an executory contract or unexpired lease of nonresidential real property under section 365 of
the Bankruptcy Code, Sellers may assume each applicable SUI Token Warrant in accordance
with section 365 of the Bankruptcy Code; (b) to the extent applicable law excuses the non-debtor
counterparty from accepting performance to an entity other than the debtor under Section 365(f)
of the Bankruptcy Code, then the Debtors have received applicable consent to such assignment
under section 365(c)(2); (c) Sellers may assign each applicable SUI Token Warrant in
accordance with sections 363 and 365 of the Bankruptcy Code; (d) all other requirements and
conditions under sections 363 and 365 of the Bankruptcy Code for the assignment to and
assumption by Purchaser-Subject Company of each applicable SUI Token Warrant have been
satisfied; (e) the SUI Token Warrants shall be transferred and assigned to, and following the
closing of the Sale Transaction remain in full force and effect for the benefit of, Purchaser, and,
pursuant to section 365(k) of the Bankruptcy Code, upon the Closing and the payment of the
applicable Cure Cost, if any, the Debtors shall be relieved from any further liability with respect
to the SUI Token Warrants after such assignment to and assumption by Purchaser-Subject
Company; and (f) upon the Closing, in accordance with sections 363 and 365 of the Bankruptcy
Code, Purchaser-Subject Company shall be fully and irrevocably vested in all rights, titles and
interests of the Debtors in each applicable SUI Token Warrant, free and clear of any Liens,
except Permitted Encumbrances.

14.     All defaults or other obligations of the Debtors under the SUI Token Warrants arising or that have become due and not paid prior to the Closing that are required to be cured by section 365(b)(1) of the Bankruptcy Code (without giving effect to any acceleration clauses or any default provisions of the kind specified in section 365(b)(2) of the Bankruptcy Code) shall be cured by Purchaser-Subject Company at or before the Closing through the payment of the Cure Costs, if any.  To the extent that any counterparty to an applicable SUI Token Warrant did not object to its Cure Cost or adequate assurance of future performance, such counterparty is deemed to have consented to such Cure Cost and the assumption and assignment of its respective SUI Token Warrant from Sellers to Purchaser-Subject Company.  Purchaser-Subject Company shall enjoy all of the Seller's rights, benefits, and privileges under the applicable SUI Token Warrant as of the Closing without the necessity to obtain any non-Debtor parties' written consent to the assumption or assignment thereof, except to the extent expressly contemplated in the Agreement.  To the extent any counterparty to the SUI Token Warrant failed to timely object to a Cure Cost, such Cure Costs shall be deemed to be finally determined and any such counterparty shall be prohibited from challenging, objecting to or denying the validity and finality of the Cure Cost at any time.

15.     Upon the Debtors' assumption and assignment of the SUI Token Warrants to Purchaser-Subject Company under the provisions of this Sale Order and any additional orders of this Court and payment of any Cure Costs, no default shall exist under any applicable SUI Token Warrant, and no counterparty to any applicable SUI Token Warrant shall be permitted to (a) declare a default by Purchaser-Subject Company under such SUI Token Warrant, or (b) otherwise take action against Purchaser-Subject Company , in each case, as a result of the Debtors' financial condition, bankruptcy or failure to perform any of their obligations under the

applicable SUI Token Warrant.  Each non-Debtor party to an applicable SUI Token Warrant hereby is also forever barred, estopped and permanently enjoined from (i) asserting against Purchaser-Subject Company, Sellers, the Debtors, their estates, or their property, any default or claim arising out of any indemnity obligation or warranties for acts or occurrences arising prior to or existing as of the Closing, or, against Purchaser, Seller, the Debtors, or their estates, any counterclaim, unexercised set-off or any other claim asserted or assertable against the Debtors and (ii) imposing or charging against Purchaser-Subject Company or its Affiliates (as defined in the Agreement) any rent accelerations, assignment fees, increases or any other fees as a result of the Debtors' assumption and assignments to Purchaser-Subject Company of the SUI Token Warrants.  The validity of such assumption and assignments of the SUI Token Warrants shall not be affected by any dispute between the Debtors and the counterparties to the SUI Token Warrants and any disputes regarding the Cure Cost of any applicable SUI Token Warrant.

16.     Upon payment of the applicable Cure Costs, if any, and assignment of the SUI Token Warrants to Purchaser-Subject Company, the Debtors and their estates shall have no further liabilities or obligations with respect to the SUI Token Warrants and all holders of such claims are forever barred and estopped from asserting such claims against the Debtors, their successors or assigns, their property or their assets or estates.

17.     The failure of the Debtors or Purchaser-Subject Company to enforce at any time one or more terms or conditions of the SUI Token Warrants shall not be a waiver of such terms or conditions, or of the Debtors' and Purchaser's rights to enforce every term and condition of the SUI Token Warrants.

19

18.    In the event that the Sale Transaction does not close, none of the SUI

Token Warrants shall be assumed or assigned by virtue of this Sale Order and shall remain

subject to further rejection, assumption and/or assignment in these Chapter 11 Cases.

**E.    Prohibition of Actions Against Purchaser-Subject Company**

19.    Except as expressly provided for in this Sale Order or the Agreement,

Purchaser-Subject Company shall not have any liability or other obligation or responsibility of

the Debtors arising under or related to the Interests or SUI Token Warrants prior to the Closing.

Purchaser-Subject Company is not a "successor" to the Debtors or their estates by reason of any

theory of law or equity.  Without limiting the generality of the foregoing, and except as

otherwise specifically provided herein or in the Agreement, Purchaser-Subject Company shall

not be liable for any claims against the Debtors or any of its predecessors or affiliates, and

Purchaser-Subject Company shall have no successor or vicarious liabilities of any kind or

character, including, but not limited to, under any theory of antitrust, environmental (subject to

paragraph F.23 below), successor or transferee liability, securities law, tax law, labor law, de

facto merger, mere continuation or substantial continuity, whether known or unknown as of the

Closing Date, now existing or hereafter arising, whether fixed or contingent, whether asserted or

unasserted, whether legal or equitable, whether liquidated or unliquidated, including, but not

limited to, liabilities on account of warranties, environmental liabilities (subject to paragraph

F.23 below), and any taxes arising, accruing or payable under, out of, in connection with, or in

any way relating to the operation of any of the Interests prior to the Closing.  The Sale

Transaction does not amount to a consolidation, merger or de facto merger of Purchaser-Subject

Company, on the one hand, and the Debtors, the Debtors' affiliates and/or the Debtors' estates,

on the other hand, and there is not substantial continuity between Purchaser-Subject Company,

on the one hand, and the Debtors or their affiliates, on the other hand, and there is no common

20

identity between the Debtors or their affiliates, on the one hand, and Purchaser-Subject

Company, on the other hand, and Purchaser-Subject Company is not a mere continuation of the

Debtors or their estates, and Purchaser-Subject Company does not constitute a successor to the

Debtors or their estates.  For purposes of paragraphs 19 to 22 of this Sale Order, all references to

Purchaser-Subject Company shall include the Purchaser Parties.

    20.  All persons and entities, including, but not limited to, all debt security

holders, equity security holders, governmental, tax and regulatory authorities, lenders, trade

creditors, dealers, employees, litigation claimants and other creditors, holding Liens against or in

all or any portion of the Interests (whether legal or equitable, secured or unsecured, matured or

unmatured, contingent or non-contingent, liquidated or unliquidated, senior or subordinate),

arising under or out of, in connection with, or in any way relating to the Debtors or the Interests

prior to the Closing Date or the transactions contemplated by the Agreement, including the

transfer of the Interests to Purchaser-Subject Company and the assumption and assignment of the

SUI Token Warrants, hereby are forever barred, estopped and permanently enjoined from

asserting against Purchaser-Subject Company, its Affiliates, its successors or assigns, their

property or the Interests, such persons' or entities' Liens with respect to the Interests, including,

without limitation, the following actions: (a) commencing or continuing in any manner any

action or other proceeding against Purchaser-Subject Company, its Affiliates, its successors,

assets or properties; (b) enforcing, attaching, collecting or recovering in any manner any

judgment, award, decree or order against Purchaser-Subject Company, its Affiliates, its

successors, assets or properties; (c) creating, perfecting or enforcing any Liens against Purchaser-

Subject Company, its Affiliates, its successors, assets or properties; (d) asserting any unexercised

set-off or right of subrogation against any obligation due Purchaser-Subject Company, its

Affiliates or its successors; (e) commencing or continuing any action, in any manner or place, that does not comply or is inconsistent with the provisions of this Sale Order, or the agreements or actions contemplated or taken in respect thereof or (f) revoking, terminating or failing or refusing to transfer or renew any license, permit or authorization to operate the Purchaser-Subject Company, subject to paragraph 24 below.  On the Closing Date, each creditor is authorized and directed to execute such documents and take all other actions as may be necessary to release Liens in or on the Interests (except Permitted Encumbrances), if any, as provided for herein, as such Liens may have been recorded or may otherwise exist.

21.    All persons and entities are hereby forever prohibited and enjoined from taking any action that would adversely affect or interfere, or that would be inconsistent (a) with the ability of the Debtors and/or Sellers to sell and transfer the Interests to Purchaser-Subject Company in accordance with the terms of the Agreement and this Sale Order, and (b) with the ability of Purchaser-Subject Company to acquire and take possession of the Interests in accordance with the terms of the Agreement and this Sale Order.

22.    Purchaser-Subject Company has given substantial consideration under the Agreement for the benefit of the Debtors and their estates.  The consideration given by Purchaser-Subject Company shall constitute valid and valuable consideration for (a) the releases of any potential Liens as to the Interests pursuant to this Sale Order, which releases as to the Interests shall be deemed to have been given by all holders of Liens in the Interests, except with respect to Permitted Encumbrances, (b) the releases of any potential claims of successor liability against the Purchaser-Subject Company, which releases shall be deemed to have been given by all holders of Liens in or against the Debtors, or the Interests and (c) the releases under the Agreement.  The consideration provided by Purchaser-Subject Company for the Interests under

the Agreement is fair and reasonable and may not be avoided under section 363(n) of the

Bankruptcy Code.

## F.    <u>Other Provisions</u>

   23. Nothing in this Sale Order or the Agreement releases, nullifies, precludes

or enjoins the enforcement of any police or regulatory liability to a governmental unit that any

entity would be subject to as the post-sale owner or operator of property after the date of entry of

this Sale Order.  In addition, nothing in this Sale Order divests any tribunal of any jurisdiction it

may have under police or regulatory law, including the jurisdiction to interpret this Sale Order or

to adjudicate any defense asserted under this Sale Order.

   24. Further, nothing in this Sale Order or Agreement authorizes the transfer or

assignment of any governmental license, permit, registration, authorization or approval, or the

discontinuation of any obligation thereunder, without compliance with all applicable legal

requirements and approvals under police or regulatory law as appropriate.

   25. Notwithstanding anything to the contrary in the Motion, this Sale Order,

or any findings announced at the Sale Hearing, nothing in the Motion, this Sale Order, or

announced at the Sale Hearing constitutes a finding under the federal securities laws as to

whether crypto tokens or transactions involving crypto tokens are securities, and the right of the

United States Securities and Exchange Commission to challenge transactions involving crypto

tokens on any basis are expressly reserved.

   26. The consideration provided by Purchaser-Subject Company to the Debtors

pursuant to the Agreement for the Interests and SUI Token Warrants constitutes reasonably

equivalent value and fair consideration under the Bankruptcy Code, Uniform Fraudulent Transfer

Act, Uniform Fraudulent Conveyance Act and under the laws of the United States, any state,

territory, possession or the District of Columbia.

27.     The Sale Transaction is undertaken by Purchaser-Subject Company without collusion and in good faith, within the meaning of section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale Transaction shall not alter, affect, limit or otherwise impair the validity of the Sale Transaction, including the assumption and assignment of the SUI Token Warrants, unless such authorization and such Sale Transaction were duly stayed pending such appeal at the time of the Closing.  Purchaser-Subject Company is a good faith buyer within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to the full rights, benefits, privileges and protections of section 363(m) of the Bankruptcy Code.  The Debtors and Purchaser-Subject Company will be acting in good faith if they proceed to consummate the Sale Transaction at any time after the entry of this Order.

28.     As a good faith purchaser of the Interests, Purchaser-Subject Company has not entered into an agreement with any other potential bidders, and has not colluded with any other bidders, potential bidders, or any other parties interested in the Interests, and therefore, neither the Debtors nor any successor-in-interest to the Debtors' estates shall be entitled to bring an action against Purchaser-Subject Company, and the Sale Transactions may not be avoided pursuant to section 363(n) of the Bankruptcy Code, and no party shall be entitled to any damages or other recovery pursuant to section 363(n) in respect of the Agreement or Sale Transaction.

29.     Nothing contained in any plan of reorganization or liquidation, or order of any type or kind entered in (a) these Chapter 11 Cases, (b) any subsequent Chapter 7 case into which these Chapter 11 Cases may be converted or (c) any related proceeding subsequent to entry of this Sale Order, shall conflict with or derogate from the provisions of the Agreement or the terms of this Sale Order.  In the event there is a conflict between this Sale Order and the

24

Agreement (or any ancillary agreements executed in connection therewith), this Sale Order shall control and govern.  Likewise, all of the provisions of this Sale Order are non-severable and mutually dependent.  To the extent that this Sale Order is inconsistent with any prior order or pleading with respect to the Motion in these Chapter 11 Cases, the terms of this Sale Order shall control.

30.     Pursuant to Bankruptcy Rules 7062, 9014, 6004(h) and 6006(d), this Sale Order shall be effective and enforceable immediately upon entry, the Debtors and Purchaser-Subject Company are authorized to close the Sale Transaction immediately upon entry of this Sale Order, and the 14-day stay provided in Bankruptcy Rules 6004(h) and 6006(d) is hereby expressly waived and shall not apply.

31.     The failure specifically to include any particular provision of the Agreement in this Sale Order shall not diminish or impair the effectiveness of such provision, it being the intent of this Court that the Agreement be authorized and approved in its entirety; provided, however, that this Sale Order shall govern if there is any inconsistency between the Agreement (including all ancillary documents executed in connection therewith) and this Sale Order.

32.     The Agreement and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto and in accordance with the terms thereof, without further order of this Court, with prior written notice to the Committee, provided that any such modification, amendment or supplement does not have a material adverse effect on the Debtors' estates or any of the Debtors' creditors.  If the Agreement is modified, the Debtors shall file the modified version with the Court.

33.     This Court shall retain exclusive jurisdiction to, among other things, interpret, implement and enforce the terms and provisions of this Sale Order and the Agreement, all amendments thereto and any waivers and consents thereunder and each of the agreements executed in connection therewith to which the Debtors are a party or which has been assigned by the Debtors to Purchaser-Subject Company, and to adjudicate, if necessary, any and all disputes concerning or relating in any way to the Sale Transaction.

34.     The Agreement shall be in full force and effect, regardless of any Debtor's lack of good standing in any jurisdiction in which such Debtor is formed or authorized to transact business.

35.     No bulk sales law, bulk transfer law or any similar law of any state or other jurisdiction (including those relating to taxes other than Transfer Taxes (as defined in the Agreement)) shall apply to the Debtors' conveyance of the Interests or this Sale Order.

36.     The appointment of a consumer privacy ombudsman pursuant to section 363(b)(1) or section 332 of the Bankruptcy Code is not required with respect to the Sale Transaction.

37.     Purchaser-Subject Company is a party-in-interest and shall have the ability to appear and be heard on all issues related to or otherwise connected to this Sale Order, the Sale Transaction, the assumption and assignment of the SUI Token Warrants and any issues related to or otherwise connected to the Agreement and the Sale Transaction.

38.     Nothing in this Sale Order shall affect the obligations of the Debtors, the Purchaser-Subject Company, and/or any transferee or custodian to maintain all books and records that are subject to any governmental subpoena, document preservation letter, or other investigative request from a governmental agency.

39.     Nothing in this Sale Order shall be deemed to waive, release, extinguish or estop the Debtors or their estates from asserting or otherwise impairing or diminishing any right (including any right of recoupment), claim, cause of action, defense, offset or counterclaim in respect of any asset that is not the Interests.

40.     All time periods set forth in this Sale Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

Dated: _____

       Wilmington, Delaware

_____

The Honorable John T. Dorsey
United States Bankruptcy Judge

**SCHEDULE A**

A-1

| Seller | Interests | Counterparty | Operative Documents | Aggregate Purchase Price Allocation |
|---|---|---|---|---|
| Cottonwood Grove Limited | Milestone Warrant to Purchase SUI Tokens, dated August 2, 2022. | Sui Foundation | Milestone Warrant to Purchase SUI Tokens, dated August 2, 2022. | $500 |
| FTX Trading Ltd. | Milestone Warrant to Purchase SUI Tokens, dated August 2, 2022. | Sui Foundation | Milestone Warrant to Purchase SUI Tokens, dated August 2, 2022. | $500 |
| FTX Ventures Ltd. | Warrant to Purchase SUI Tokens, dated August 2, 2022. | Sui Foundation | Warrant to Purchase SUI Tokens, dated August 2, 2022. | $999,999.84 |
| FTX Ventures Ltd. | Warrant to Purchase SUI Tokens, dated August 31, 2022. | Sui Foundation | Warrant to Purchase SUI Tokens, dated August 31, 2022. | $11,315.97 |

A-2

| FTX Ventures Ltd. | 567,045 Shares of Series B Preferred Stock in Mysten Labs, Inc. | Mysten Labs, Inc. | Series B Preferred Stock Purchase Agreement, dated August 2, 2022, as amended by Amendment No. 1 to Series B Preferred Stock Purchase Agreement, dated August 26, 2022. Amended and Restated Investors' Rights Agreement, dated August 2, 2022. Amended and Restated Right of First Refusal and Co-Sale Agreement, dated August 2, 2022. Amended and Restated Voting Agreement, dated August 2, 2022. | $95,237,684.19 |
| FTX Ventures Ltd. | Subsequent Token Rights | Mysten Labs, Inc. | Amended and Restated Token Agreement, dated August 2, 2022, as amended by Amendment No.1. to Amended and Restated Token Agreement, dated October 3, 2022. | $0.00 |

A-3