# **EXHIBIT C**

**Mendelsohn Declaration**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>FTX TRADING LTD., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 22-11068 (JTD)<br><br>(Jointly Administered) |

**DECLARATION OF BRUCE MENDELSOHN IN SUPPORT OF
MOTION OF DEBTORS FOR ENTRY OF AN ORDER (I) AUTHORIZING AND
APPROVING SALE OF DEBTORS' INTERESTS IN MYSTEN LABS, INC. AND SUI
TOKEN WARRANTS FREE AND CLEAR OF ALL LIENS, CLAIMS, INTERESTS
AND ENCUMBRANCES; (II) AUTHORIZING AND APPROVING DEBTORS' ENTRY
INTO, AND PERFORMANCE UNDER, THE PURCHASE AND SALE AGREEMENT;
(III) AUTHORIZING AND APPROVING ASSUMPTION AND ASSIGNMENT OF
THE SUI TOKEN WARRANTS AND (IV) GRANTING RELATED RELIEF**

I, Bruce Mendelsohn, hereby declare as follows:

1. I am a Partner in the Advisory Group at Perella Weinberg Partners L.P. ("PWP"), a financial advisory firm that maintains an office at 767 5th Avenue, New York, New York 10153, and the Debtors' investment banker. PWP is a full-service investment banking firm providing strategic and financial advisory services, including with respect to mergers and acquisitions, capital raising and restructuring transactions across a broad range of industries. PWP and its professionals have extensive experience with respect to the reorganization and restructuring of distressed companies, both out of court and in Chapter 11 proceedings.

2. I have been employed as a Partner of PWP since January 2016. I received a Bachelor of Arts degree in 1984 from Emory University and a Master of Business

---

[1] The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and 4063 respectively. Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.

{1368.002-W0070345.}

Administration in 1989 from the Wharton School at the University of Pennsylvania.

3. Prior to joining Perella Weinberg Partners, I was a Partner at Goldman Sachs where I worked from May 1998 to June 2015 and most recently served as Head of the Americas Restructuring Group and part of the U.S. Leveraged Finance team. I was named a Partner at Goldman Sachs in 2010. From 2006 to 2008, I served as Chief Underwriting Officer for North America, where I was a member of Goldman Sachs' Firmwide Capital Committee and its Special Situations Specialty Lending Investment Committee. I served as Global Head of the Special Assets and Bank Debt Portfolio groups from 2000 to 2008, and started at Goldman Sachs in the Securities Division where I spent two years working on the distressed bond and bank loan proprietary trading desks. Prior to Goldman Sachs, I worked for UBS and MJ Whitman in restructuring and distressed securities, and began my career in finance at Lehman Brothers.

4. In addition to working with the Debtors in the above-captioned cases (the "Chapter 11 Cases"), my experience includes representing companies, boards, creditors, and other stakeholders in a variety of situations across a broad range of industries, including the chapter 11 cases of: American Tire Distributors, Bonanza Creek, Breitburn Energy, Bristow Group, California Resources Corporation, Chesapeake Energy, Cineworld Group, Crossmark Holdings, Eco-Bat Technologies, Fieldwood Energy, Garret Motion, iHeart Communications, LATAM Airlines, Memorial Production Partners, Pacific Drilling, Sanchez Energy Corporation, Seadrill, Sears, Video Equipment Rental Corporation, Windstream, and 21st Century Oncology, among others. In addition, while at Goldman Sachs, I was involved in the following bankruptcy cases: Bridge Information Systems, Brothers Gourmet Coffees, Calpine, CRC Communications, Focal Communications, General Growth Properties, Lehman Brothers, Network Plus, Nextel International, Orchard Supply, Qwest Communications and 360 Networks.

5. I submit this declaration (this "<u>Declaration</u>") in support of the *Motion of Debtors For Entry of an Order (i) Authorizing and Approving Sale of Debtors' Interests in Mysten Labs, Inc. and SUI Token Warrants Free and Clear of all Liens, Claims, Interests and Encumbrances; (ii) Authorizing and Approving Debtors' Entry Into, and Performance Under, The Purchase and Sale Agreement, (iii) Authorizing and Approving Assumption and Assignment of The SUI Token Warrants and (iv) Granting Related Relief* (the "<u>Motion</u>").[2]

6. Except as otherwise indicated, all facts set forth in this Declaration are based upon: (i) my personal knowledge, information and belief, or my opinion based upon experience, knowledge and information concerning FTX Trading Ltd. and its affiliated debtors and debtors-in-possession (collectively, the "<u>Debtors</u>"); (ii) information learned from my review of relevant documents; and/or (iii) information supplied by members of the Debtors' management, employees of PWP working directly with me or under my supervision, direction or control, and/or from the Debtors' other professionals and advisors.

7. I am over the age of 18 and authorized to submit this Declaration on behalf of the Debtors. I am not being compensated for this testimony other than through payments to be received by PWP as a professional the Debtors have retained; none of those payments are specifically payable on account of this testimony. If I were called upon to testify, I could and would testify competently to the facts set forth in this Declaration.

A. **<u>A Sound Business Justification Exists for the Sale.</u>**

8. I believe that Sellers' entry into the Agreement represents a sound exercise of the Debtors' business judgment and is in the best interests of the Debtors, their estates,

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Motion.

{1368.002-W0070345.}    -3-

creditors and other parties-in-interest.

### B. The Sale Will Produce the Highest and Best Offer.

9. The contractual "go-shop" provisions in the Agreement will allow the Debtors to continue to market the Interests and ensure that the Sale Transaction is the highest and best value available for the Interests.

10. PWP was engaged by the Debtors effective November 16, 2022 to provide financial advisory, restructuring, financing and sale services to the Debtors during these Chapter 11 Cases. PWP has assisted the Debtors in their exploration and evaluation of strategic alternatives to maximize the value of, and monetize, their diverse, global assets. This has included a review of documents regarding the Debtors' businesses and investments, discussions with management of the Debtors, discussions with businesses in which the Debtors have made investments, and coordinating and initiating discussions with potential purchasers.

11. Following a strategic review, the Debtors decided to monetize the Interests through a private sale process in consideration of, among other things, the existence of an offer for the Interests from Purchaser-Subject Company at an attractive value, which value is almost equal to the value that the Debtors paid for such Interests, and the stated desire from Purchaser-Subject Company to move quickly with a potential transaction or it would otherwise deploy its capital for other opportunities. In evaluating this sale, the Debtors also considered the value of the Interests and the uncertainty as to whether the potential value of the Interests could be preserved for the duration of these Chapter 11 Cases. Pursuant to the Letter of Intent delivered by Purchaser-Subject Company on March 16, 2023 (the "<u>Offer Letter</u>"), the Purchaser-Subject Company's offer expires on April 27, 2023.

12. PWP assisted the Debtors in a pre-signing marketing process to solicit potential acquirers of the Interests. Such outreach parties included well-known crypto focused

venture capital firms, some of which were existing investors in the Subject Company. In total, as of the date of this Declaration, PWP reached out to 15 potential acquirers throughout the process and engaged with a subset of them who expressed interest.

13. Following PWP's marketing campaign for the Interests, the Debtors received requests for additional information from 7 parties, 6 of whom executed non-disclosure agreements and were provided access to information on the Interests. By the execution of the Agreement, the Debtors had received indications of interest from 5 other prospective purchasers of the Interests.

14. The Debtors negotiated certain "go-shop" provisions in the Agreement which will allow the Debtors to continue marketing the Interests, including to any prospective purchasers who receive notice of the Sale Transaction and the Agreement. Such provision allows the Debtors to solicit higher or better offers from any third party up until the date that a Sale Order is entered by the Court.

15. Once the Debtors were satisfied they had negotiated the best deal possible with the Purchaser-Subject Company, the Debtors determined that it was in the best interest of their estates and their constituents to proceed with Purchaser-Subject Company and work toward executing a mutually-agreeable transaction, with the expectation that the Debtors will continue marketing the Interests over the course of the coming weeks to confirm that no higher and better offer exists.

16. After extensive arms'-length negotiations, Sellers and Purchaser-Subject Company entered into that certain Purchase and Sale Agreement, dated as of March 22, 2023 (the "Agreement"), whereby Purchaser-Subject Company agreed to purchase the Interests for aggregate consideration of $96,250,000.00 (the "Purchase Price").

17. Based on my experience, involvement in the process and review of available alternatives, it is my opinion that there is no better or higher offer currently available for the Interests, and that the Agreement facilitates the Debtors seeking a higher or better offer, or confirming that none exists prior to consummation of the Agreement. I believe that all interested persons and entities have been or will be afforded a full, fair and reasonable opportunity to (i) make a higher or better offer to purchase the Interests, and (ii) object or be heard with respect to the Sale Motion.

C. **The Sale Will Produce a Fair and Reasonable Price for the Interests.**

18. I believe that the Purchase Price for the Interests contemplated by the Agreement is fair and reasonable. The Debtors, with the assistance of PWP, ensured that sale of the Interests would reflect their fair market value by marketing the Interests and conducting arm's-length negotiations.

19. The Purchase Price is equal to approximately 95% of the amount FTX Ventures Ltd. had originally invested in the Preferred Stock of Purchaser-Subject Company, plus approximately 100% of the amount Sellers paid for the SUI Token Warrants.

20. Pursuant to the Agreement, the Purchase Price is subject to higher or better offers from any third party in the form of an "Alternative Transaction", and a "fiduciary out" which provides that the Agreement can be terminated by the boards of directors (or similar governing bodies) of Sellers if it is determined to be inconsistent with the fiduciary duties of the boards of directors (or similar governing bodies). If an Alternative Transaction is received by the Debtors, Sellers have the right, but not the obligation, to terminate the Agreement upon entering into a definitive agreement with respect to such Alternative Transaction.

21. I believe that a longer process or the implementation of formal bidding procedures for the sale of the Interests would not have resulted in a higher or better value to the

estate. A private sale enabled the Debtors to avoid the additional costs, expenses, time and risks associated with a formal bidding and sale process. In addition, selling the Interests now will enable the Debtors to further avoid any expenses relating to the Interests, and protects the Debtors against the risk of potential decline in value of the Interests. I believe that selling the Interests in a private sale is the most efficient and cost-effective means of minimizing costs to the estate while maximizing the value for the benefit of the estate.

22. In my role as the Debtors' financial advisor, I reviewed the Agreement and based on my experience, believe the Agreement is the result of extensive, arm's-length and good-faith negotiations between the parties, and that such negotiations were free of any collusion.

### D. The Sale of the Interests Should be Made Free and Clear of Any Liens, Including Successor Liability.

23. Purchaser-Subject Company is not a successor to or substantial continuation of the Debtors or their estates and there is no continuity of enterprise between Purchaser-Subject Company and the Debtors as a result of any action taken in connection with the Sale Transaction. It is my understanding that Purchaser-Subject Company is not holding itself out to the public as a continuation of the Debtors based on the Sale Transaction or the Agreement. The Sale Transaction does not amount to a consolidation, succession, merger, or de facto merger of Purchaser-Subject Company and the Debtors and/or the Debtors' estates.

24. Moreover, I believe that not transferring the Interests free and clear of all Liens (other than Permitted Encumbrances) would adversely affect the Debtors' efforts to maximize the value of the Interests. I believe that Purchaser-Subject Company would not have entered into the Agreement and would not consummate the transactions contemplated thereby if

the sale of the Interests was not free and clear of all Liens (other than Permitted Encumbrances), or if Purchaser-Subject Company would, or in the future could, be liable for any such interests.

### E. The Assumption and Assignment of the SUI Token Warrants Should be Approved.

25. My view is that no reasonable purchaser would acquire the SUI Token Warrants without the assignment of the SUI Token Warrants, and their assumption and assignment is essential to inducing the best offer for the SUI Token Warrants.

26. Because I do not believe that the Debtors could obtain the benefits of the sale of the SUI Token Warrants without agreeing to assume and assign the SUI Token Warrants and having any Cure Costs related thereto paid by Purchaser-Subject Company, it is my belief that the assumption and assignment of the Sui Token Warrants is a sound exercise of the Debtors' business judgment.

### F. The Mutual Release Should be Approved.

27. It is my belief that the mutual release of all claims, causes of actions (including all avoidance actions), liens, rights and remedies entered into by Sellers and Purchaser-Subject Company in respect of the acquisition or ownership of the Interests, including with respect to the terms of the Operative Documents and any potential breach thereof, should be approved. It is my belief that the inclusion of the mutual release among Sellers and Purchaser-Subject Company pursuant to section 7.4 of the Agreement is a necessary and integral part of Purchaser-Subject Company's consummation of the Sale Transaction and the scope of such mutual release is appropriately tailored under the facts and circumstances. The mutual release is: (a) in exchange for the good and valuable consideration provided by Sellers and Purchaser; (b) a good faith settlement and compromise of the claims, causes of action, Liens, rights and remedies released by such releases; (c) in the best interests of the Debtors and all holders of claims and

interests; (d) fair, equitable and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any of the Debtors or their estates asserting any claim or cause of action (including all avoidance actions) released pursuant to such release.

28. Accordingly, for the foregoing reasons, I believe that the Agreement represents the highest and best offer for the Interests and that the sale of the Interests to Purchaser-Subject Company pursuant to the Agreement will provide a greater recovery for the Debtors' estates than would be provided by any other reasonably available alternative.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: March 22, 2023

*/s/ Bruce Mendelsohn*
Bruce Mendelsohn
Partner
Perella Weinberg Partners L.P.