**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re:<br><br>FTX TRADING LTD., et al.,[1]<br><br>            Debtors. | )<br>)  Chapter 11<br>)<br>)  Case No. 22-11068 (JTD)<br>)<br>)  (Jointly Administered)<br>)<br>)  **Ref. Docket No. 964**<br>)<br>)  **Hearing Date: April 12, 2023 at 1:00 p.m. (ET)**<br>) |

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO MOTION OF SAMUEL BANKMAN-FRIED FOR RELIEF FROM THE AUTOMATIC STAY, TO THE EXTENT APPLICABLE, TO PERMIT INSURERS TO ADVANCE AND/OR REIMBURSE DEFENSE COSTS AND FEES UNDER DIRECTORS AND <u>OFFICERS INSURANCE POLICIES</u>**

The Official Committee of Unsecured Creditors (the "<u>Committee</u>") appointed in the chapter 11 cases (the "<u>Chapter 11 Cases</u>") of the above-captioned debtors and debtors-in-possession (the "<u>Debtors</u>"), by and through its undersigned counsel, hereby submits this objection (the "<u>Objection</u>") to the *Motion of Samuel Bankman-Fried for Relief from the Automatic Stay, to the Extent Applicable, to Permit Insurers to Advance and/or Reimburse Defense Costs and Fees under Directors and Officers Insurance Policies* [Docket No. 964] (the "<u>Motion</u>"), and in support thereof, respectfully states as follows:

---

[1] The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and 4063 respectively. Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification number is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.

**PRELIMINARY STATEMENT**[2]

1.     Directors and officers insurance policies exist to protect the company and its directors and officers in situations where they make honest decisions in the ordinary course of the business. This is not that case. Through the Motion, Samuel Bankman-Fried seeks this Court's approval to allow the exhaustion of the WRS Debtors' D&O Policies to fund Defense Costs incurred by the alleged perpetrator of one of the largest criminal frauds in the last decade. As set forth more fully below, this Court should decline Mr. Bankman-Fried's request.

2.     Initially, the automatic stay plainly prevents Mr. Bankman-Fried from making a claim for "the reimbursement and payment of his Defense Costs in connection with the Pending Claims." (Motion at ¶ 24.) Numerous courts both within and outside of this district have recognized that where, as here, a D&O insurance policy provides coverage not only to the directors and officers, but to the enterprise as well, the proceeds of such policies are property of the debtors' bankruptcy estates and are protected by the automatic stay.

3.     Moreover, Mr. Bankman-Fried has not met his burden to show that cause exists to lift the automatic stay pursuant to section 362(d) of the Bankruptcy Code. The D&O Policies at issue are "wasting" policies, and the WRS Debtors and Mr. Bankman-Fried share entitlement to the $10 million in available coverage. Thus, for every dollar extended by the insurance carrier to Mr. Bankman-Fried's Defense Costs, there is one less dollar to pay the WRS Debtors' covered Losses. In that regard, the Debtors will suffer a material prejudice to the extent the stay is lifted. Mr. Bankman-Fried, however, will not be prejudiced upon denial of his Motion because he is requesting coverage for excluded conduct under the D&O Policies that (at best) he would be obligated to

---

[2]   Capitalized terms used in this Preliminary Statement that are not defined shall have the meanings ascribed to them later in the Objection or in the Motion, as applicable.

reimburse upon being found liable for the improper acts or guilty of the crimes of which he is accused. The balance of the equities clearly favors the Debtors here, weighing against any finding that cause exists to lift the automatic stay. For these reasons, and the reasons set forth more fully herein, the Court should deny the Motion.

## BACKGROUND

### A. Case Background

4.      On November 11, 2022 and, with respect to Debtor West Realm Shires Inc. ("WRS" and with its subsidiaries, the "WRS Debtors"), November 14, 2022 (collectively, the "Petition Date"), the Debtors filed with the Court voluntary petitions for relief under title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq*. (the "Bankruptcy Code"). The Debtors have continued to operate and manage their businesses as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5.      On December 15, 2022, the U.S. Trustee appointed the Committee pursuant to section 1102(a)(1) of the Bankruptcy Code. *See Notice of Appointment of Committee of Unsecured Creditors* [Docket No. 231].

6.      Additional factual background relating to the Debtors' businesses and the commencement of these Chapter 11 Cases is set forth in the *Declaration of John J. Ray III in Support of Chapter 11 Petitions and First Day Pleadings* [Docket No. 24], the *Declaration of Edgar W. Mosley II in Support of Chapter 11 Petitions and First Day Pleadings* [Docket No. 57], the *Supplemental Declaration of John J. Ray III in Support of First Day Pleadings* [Docket No. 92], and the *Supplemental Declaration of Edgar W. Mosley II in Support of First Day Pleadings* [Docket No. 93].

**B. The D&O Insurance Policies**

7. Effective as of July 15, 2022, WRS entered into that certain (i) Relm Insurance Ltd. Private Company Management Liability Declarations, Policy No. RILPDO3922022 (the "Relm D&O Policy"), issued by Relm Insurance Ltd. ("Relm"); and (ii) Excess Claims Made Directors and Officers Liability Insurance, Policy No. B0146ERUSA2201490 (the "Beazley Excess Policy," and with the Relm D&O Policy, the "D&O Policies"),[3] which provided up to $10 million, on a combined basis, in insurance coverage for any covered "Loss"[4] incurred by WRS and certain of its subsidiaries and affiliates, and directors and officers.

8. The D&O Policies provide four different types of insurance coverage, known as "Side A," "Side B," "Side C," and "Side D" coverage. Specifically, Side A covers Losses incurred by the WRS Debtors' directors and officers, Side B covers indemnification payments made by the WRS Debtors to their directors and officers, Side C covers costs incurred by the WRS Debtors themselves, and Side D covers derivative demand investigations. (*See* Relm D&O Policy, Declarations at Item 8 Coverage Schedules; General Terms and Conditions § I.)

9. The D&O Policies are "wasting" policies, such that, subject to certain deductibles, each Side shares equally in the $10 million pool of available coverage. In that regard, an insurance payout to a director or officer under Side A would reduce the funds available to the WRS Debtors under their Side B, C, or D coverage. (*See id.* at § IV.H ("If the applicable Limit of Liability under this Policy is exhausted by payment of Loss, the Insurer's obligations, including without limitation any duty to defend, shall be completely fulfilled and extinguished. Except with respect to Section XIX

---

[3] The Relm D&O Policy is annexed to the Motion at Ex. B.

[4] "Loss means: 1. with respect to any Liability Coverage Part, the amounts defined as Loss in such Coverage Part; and 2. with respect to any Non-Liability Coverage Part, the amounts covered under such Coverage Part." (Relm D&O Policy, General Terms and Conditions at § II.V.)

of these General Terms and Conditions (Payment Priority), the Insurer is entitled to pay Loss as it becomes due and payable by the Insureds, without consideration of other future payment obligations.").)

10. Given the overlapping coverages, the D&O Policies include a limited payment priority provision, which requires the payment of certain covered Losses under Side A prior to any payments under Sides B, C, or D. Specifically:

> If the Loss due and owing by the Insurer under a Liability Coverage Part exceeds the then-remaining Limit of Liability applicable to such Loss, the Insurer shall pay such Loss, subject to the applicable Limits of Liability, in the following priority:
>
> (a) First, the Insurer shall pay such Loss which is Non Indemnifiable Loss incurred by Insured Persons;
>
> (b) Second, the Insurer shall pay all other Loss covered under the Liability Coverage Part.

(Relm D&O Policy, General Terms and Conditions at § XIX.) Critically, the payment priority provision only applies if the Loss exceeds the "then-remaining Limit of Liability applicable to such Loss[.]" Thus, the payment priority provision applies where (x) the Losses due and owing exceed the policies' Limit of Liability and (y) multiple parties are demanding payment related to the *same* Loss.

11. Moreover, as is typical for D&O policies, the D&O Policies include certain exclusions for bad acts committed by the WRS Debtors and their directors and officers. Among other things, the D&O Policies exclude coverage for claims:

- "based upon, arising out of or attributable to (i) the actual purchase or sale, or offer or solicitation of an offer to purchase or sell, any public equity securities, including Coin Offerings, by the Company or an Outside Entity, or (ii) the actual or alleged violation of any federal, state, local or foreign law relating to public equity securities" (Relm D&O Policy, D&O Coverage at § IV.H);

- "based upon, arising out of, attributable to, in whole or in part, or directly or indirectly resulting from or in consequence of the concealment, disguise, conversion or transfer

5

- of Criminal Property as defined in S.340 of the Proceeds of Crime Act 2002, or with any act, error or omission facilitating the acquisition, retention, use or control of such Criminal Property" (*id.* at § IV.J); and

- related to (a) "any deliberately fraudulent act or omission, or any willful violation of any law, statute or regulation committed by such Insured," or (b) "such Insured gaining any personal financial profit, remuneration or financial advantage to which such Insured was not legally entitled," but this exclusion only applies "if evidenced by a final, non-appealable adjudication adverse to such Insured in the underlying proceeding . . . ." (*Id.* at § IV.C.)

Thus, the D&O Policies exclude any claims for a Loss arising from violations of securities laws, violations of money laundering laws, and any willful or fraudulent acts or omissions. If the insurer makes a payment for a Loss that is later determined to have been made on account of excluded conduct, the D&O Policies require the insured to reimburse the insurer for such payments. (*See id.*, General Terms and Conditions at § IV.H.) However, if such reimbursement is not made, the payments made on account of such excludable conduct will nevertheless exhaust the remaining coverage available under the D&O Policies. (*Id.*)

### C. Mr. Bankman-Fried's Massive and Calculated Fraud

12. As is by now well known to the Court, from 2019 until November 2022, Mr. Bankman-Fried, along with his co-conspirators (who have already plead guilty to a variety of crimes), allegedly used the FTX entities to perpetrate a criminal fraud, whereby they misused customer funds to finance Alameda Research LLC ("Alameda Research"), which ultimately lost billions of dollars under Mr. Bankman-Fried's direction and supervision.

13. Indeed, as alleged in the Government's thirteen count superseding indictment, Mr. Bankman-Fried is accused of having conspired to and engaged in a scheme to commit wire fraud on FTX Trading Ltd. ("FTX Trading") customers; conspired to and engaged in a scheme to defraud FTX Trading customers; conspired to and engaged in a scheme to commit securities fraud on FTX Trading investors; conspired to and engaged in a scheme to commit fraud on Alameda Research's

6

lenders; conspired to commit bank fraud; conspired to operate an unlicensed money transmitting business; conspired to commit money laundering; conspired to make unlawful political contributions and to defraud the FEC; and conspired to violate the anti-bribery provisions of the Foreign Corrupt Practices Act.  (*See* Superseding Indictment, *United States v. Bankman-Fried*, No. 22-cr-00673 (LAK) (S.D.N.Y. Mar. 28, 2023), ECF No. 115.)  In addition, as Mr. Bankman-Fried acknowledges, not fewer than sixteen different proceedings related to his alleged malfeasance are pending against or otherwise involve Mr. Bankman-Fried.  (*See* Motion at ¶ 16.)

**OBJECTION**

14.     The Motion should be denied for two reasons.  First, contrary to Mr. Bankman-Fried's contentions, the proceeds of the D&O Policies are property of the Debtors' estates and, accordingly, the automatic stay bars Mr. Bankman-Fried from seeking reimbursement and/or payment of his Defense Costs.  Second, no cause exists to modify the automatic stay.

**I.     The Proceeds of the D&O Policy Are Property of the Estate**

15.     The protections of the automatic stay extend to all property of a debtor's estate. 11 U.S.C. § 362(a). Section 541 of the Bankruptcy Code, in turn, defines property of a debtor's estate to include "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1).  With respect to whether proceeds of D&O insurance policies constitute property of a debtor's bankruptcy estate, Delaware courts have recognized that "[w]ho owns the proceeds of an insurance policy presents a . . . complicated issue and requires a . . . careful analysis." *In re SN Liquidation, Inc.*, 388 B.R. 579, 584 (Bankr. D. Del. 2008).  Thus, courts within this district have established "four rules" to determine whether D&O insurance proceeds are property of a debtor's estate:

1. when a debtor's liability insurance policy provides direct coverage to the debtor, the proceeds are property of the estate because the proceeds are payable to the debtor.

2. when the liability insurance policy only provides direct coverage to the directors and officers, the proceeds are not property of the estate.

3. when there is coverage for the directors and officers and the debtor, the proceeds will be property of the estate if depletion of the proceeds would have an adverse effect on the estate to the extent the policy actually protects the estate's other assets from diminution.

4. when the liability policy provides the debtor with indemnification coverage but indemnification either has not occurred, is hypothetical, or speculative, the proceeds are not property of the bankruptcy estate.

*In re Boy Scouts of Am. & Delaware BSA, LLC*, 642 B.R. 504, 572-73 (Bankr. D. Del. 2022) (internal citations and quotation marks omitted). As demonstrated by these rules, the "debtor's interest in the proceeds requires protection from depletion and overrides the interest of the directors and officers." *Id.* (citations omitted). Applying these rules to the D&O Policies, the proceeds of such policies are property of the Debtors' bankruptcy estates.

16. Here, the Debtors are not mere bystanders with respect to the D&O Policies. The policies provide coverage not only to the directors and officers, but also direct coverage to the WRS Debtors, via Sides B, C, and D. (*Supra* at ¶ 8.) Such coverage is not simply limited to the hypothetical or speculative, as alleged in the Motion. (*See* Motion at ¶ 27.) Rather, the WRS Debtors have retained counsel to represent certain of their directors and officers in certain government investigations, WRS has already been sued for breach of fiduciary duty, negligence, and conversion (*see Onusz v. West Realm Shires Inc. et al.*, No. 22-ap-50513 (JTD) (Bankr. D. Del. Dec. 27, 2022), ECF No. 1)), and countless other creditors are expected to assert tort claims against WRS and other Debtors in connection with the bar date process (which has not yet been set). The WRS Debtors have independent entitlement to coverage for costs related to these claims under Sides B and C of the D&O Policies, which coverage would be reduced to the extent the Motion is granted. *See supra* at ¶ 8-9;

8

*see also In re Downey Fin. Corp.*, 428 B.R. 595, 600-01 (Bankr. D. Del. 2010) (explaining how a "wasting" or "burning candle" policy works, where "payment for any Loss covered under the Policy necessarily reduces the amount of proceeds available to cover subsequent Losses").

17. In these circumstances there is no question that the policies and their proceeds are property of the Debtors' estates.[5] *See Boy Scouts*, 642 B.R. at 573 (finding proceeds of policies are property of estate, where, as here, "[d]epletion of the proceeds of these policies would have an adverse effect on the estate"); *SN Liquidation*, 388 B.R. at 584 (finding proceeds of policy were property of estate, where, as here, policy at issue provided coverage to debtors in addition to directors and officers); *In re Pasquinelli Homebuilding, LLC*, 463 B.R. 468, 473 (Bankr. N.D. Ill. 2012) (similar); *In re Beach First Nat'l Bancshares, Inc.*, 451 B.R. 406, 410 (Bankr. D.S.C. 2011) (similar); *In re Sacred Heart Hosp. of Norristown*, 182 B.R. 413, 419-20 (Bankr. E.D. Pa. 1995) ("More important, however, is the fact that the Debtor's own liability exposure is also covered by the D&O Policy. Proceeds available for the Debtor's liability exposure are not segregated from the Proceeds available to the directors and officers. Thus, the Debtor is indeed an insured and has a sufficient interest in the Proceeds as a whole to bring them into the estate.").

---

[5] For the same reasons, the cases cited in the Motion (*see* Motion at ¶ 27), which each rely on "hypothetical" and "speculative" claims by the debtors are inapposite. In *Downey Financial*, the Court relied on the fact that no indemnification claims for which the debtor would be entitled to coverage under the policy had occurred and that there was no reasonable likelihood that further claims may arise. 428 B.R. at 606-07. Here, however, certain Debtors have already been sued, the Debtors' directors and officers are responding to numerous government investigations, and myriad other claims are certain to be asserted as the cases progress. Likewise, unlike the debtors in *Downey Financial*, the WRS Debtors here are independently entitled to coverage under Sides B and C. *See* 428 B.R. at 606 (recognizing that "[u]nless the Debtor would be entitled to coverage under the Policy, indemnification would not 'adversely affect the Debtor's estate,' because such indemnification would not deplete the Policy proceeds"); *see also In re Allied Digital Techs., Corp.*, 306 B.R. 505, 512 (Bankr. D. Del. 2004) (same). Similarly, in *In re World Health Alternatives, Inc.*, no claims had been made against the debtors such that the debtor's coverage was implicated. *See* 369 B.R. 805, 811 (Bankr. D. Del. 2007). And, in *First Cent. Fin. Corp.*, the entity coverage was found to be hypothetical and failed to provide "some palpable benefit to the estate" where, unlike here, during the eighteen months the bankruptcy case had been pending, no claims had been filed against the debtor which would implicate the narrow scope of the policy's entity coverage and no one had stepped forward to express any interest in suing the debtor. 238 B.R. 9, 17 (Bankr. E.D.N.Y. 1999); *see also SN Liquidation*, 388 B.R. at 584 (distinguishing *Allied Digital* and finding "indemnification is not merely speculative" where defendants "made a formal request for indemnification").

18. Mr. Bankman-Fried argues that the policies' payment priority provisions render any recovery the WRS Debtors may have against the D&O Policies sufficiently remote to put the proceeds outside of section 541's ambit (*see* Motion at ¶¶ 28-29). However, where, as here, an insurance policy does not specifically require that proceeds be first used to exhaust Side A coverage in full prior to payment of other coverage, the proceeds of such policies remain property of the estate, contrary to Mr. Bankman-Fried's contention. *See Pasquinelli Homebuilding*, 463 B.R. at 472-73 (finding proceeds of D&O policy property of estate, notwithstanding existence of payment priority provisions similar to those existent here).

## II. Cause Does Not Exist To Lift the Automatic Stay

19. Inasmuch as the proceeds of the D&O Policies are property of the estate, any claims against the policies are barred by the automatic stay imposed by the Bankruptcy Code. Thus, for the Motion to be granted, Mr. Bankman-Fried must establish a basis to lift the automatic stay. None exists here.

20. Section 362(d)(1) of the Bankruptcy Code provides that on request of a party in interest "and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying or conditioning such stay—(1) for cause, including the lack of adequate protection of an interest in property of such party in interest." 11 U.S.C. § 362(d)(1). In determining whether cause exists, courts "conduct a fact intensive, case-by-case balancing test, examining the totality of the circumstances." *Downey Fin.*, 428 B.R. at 608-09 (citation omitted). In conducting such analysis, courts typically analyze:

> 1. Whether any great prejudice to either the bankrupt estate or the debtor will result from a lifting of the stay;
>
> 2. Whether the hardship to the non-bankrupt party by maintenance of the stay considerably outweighs the hardship to the debtor; and
>
> 3. The probability of the creditor prevailing on the merits.

*Id.* at 609. Each of those factors supports denying the Motion.

21.     *First*, the Debtors will suffer prejudice if the stay is lifted. As discussed above, the D&O Policies are "wasting" policies, meaning, any coverage used by Mr. Bankman-Fried will reduce the coverage available to the WRS Debtors. (*See supra* ¶ 9.) There is a reasonable probability that Mr. Bankman-Fried's legal expenses may consume substantial amounts of the coverage availability, thus reducing the amount of any proceeds available to the estate.[6] In that regard, the instant situation is unlike the *Allied Digital* and *Downey Financial* cases relied upon in the Motion, where movants were not seeking stay relief to potentially exhaust coverage under the policies in full. *See Allied Digital*, 306 B.R. at 514 (noting that unlike here, the insureds' defense costs were approximately $200,000 and the company had no possible reimbursable defense costs); *Downey Fin.*, 428 B.R. at 609 (emphasizing that "[t]he Policy provides coverage for up to $10 million, while the Insureds are requesting stay relief to collect ***only*** $880,000 in defense costs") (emphasis added); *cf. Hawaii Structural Ironworkers Pension Tr. Fund v. Calpine Corp.*, No. 06 CIV. 5358 (PKC), 2006 WL 3755175, at *2 (S.D.N.Y. Dec. 20, 2006) (affirming injunction pursuant to section 105(a) of the Bankruptcy Code because continuation of related actions against directors had potential to severely drain debtors' D&O insurance policies and diminish assets of debtors' estates).

22.     *Second*, Mr. Bankman-Fried will suffer no real hardship if the stay is not lifted. Contrary to Mr. Bankman-Fried's protestation in the Motion, his request is not simply for "customary and specifically bargained-for resources to pay attorney fees." (Motion at ¶ 34.) Rather, the D&O Policies specifically exclude coverage for the types of activities that Mr. Bankman-Fried is accused

---

[6] Moreover, WRS's purchase of the D&O Policies in July 2022 may have been done with the actual intent to hinder, delay or defraud their creditors and, if so, is subject to being unwound. *See, e.g.*, *In re Beckman*, 104 B.R. 866, 870-71 (Bankr. S.D. Ohio 1989) (finding that the purchase of life insurance was a fraudulent transfer); *In re Vaniman Int'l, Inc.*, 22 B.R. 166, 180-83 (Bankr. E.D.N.Y. 1982) (similar). To the extent any such claims are viable, any Losses paid out under the D&O Policies may afford defenses to the insurers, limiting the viability of such causes of action, and providing a further basis to deny the Motion.

11

of orchestrating. Indeed, given the exclusions in the policy and the likely inability of Mr. Bankman-Fried to reimburse the insurers for any advanced Defense Costs, the net result of granting the relief sought in the Motion is that the D&O Policies will be exhausted for ***excluded*** Losses, limiting the coverage remaining under the policies for the WRS Debtors. In any event, Mr. Bankman-Fried will not suffer any immediate prejudice upon denial of his Motion. The Committee understands that an additional D&O policy exists between Paper Bird Inc. and Paragon Brokers (Bermuda) Ltd., which, subject to certain exclusions, provides $20 million in coverage to Paper Bird Inc.'s directors and officers, including Mr. Bankman-Fried, and unlike the D&O Policies at issue here, does not have independent Sides B, C, and D coverage. Finally, given the prepetition activities of Mr. Bankman-Fried, the Court should apply little, if any, weight, to the hardship imposed on him by the imposition of the automatic stay. To the contrary, the balance of the equities clearly favors maintaining the stay in these circumstances. *See In re Coletta*, 336 F. App'x 202, 205 (3d Cir. 2009) ("The bankruptcy court is given 'wide latitude' to consider these factors and 'to balance the equities when granting relief from the automatic stay.'") (quoting *In re Myers*, 491 F.3d 120, 130 (3d Cir. 2007) (noting "wide latitude accorded to the Bankruptcy Court to balance the equities when granting relief from the automatic stay")); *In re Irwin*, 457 B.R. 413, 426-27 (Bankr. E.D. Pa. 2011) (finding "court must compare the equities of freeing the creditor from the restraint of the automatic stay so that it may pursue its claim promptly in another forum against the impact that such relief is likely to have on the bankruptcy process" and concluding movant had not met burden of establishing that maintaining stay outweighs potential harm bankruptcy estate would suffer if relief from stay were granted).

23. <u>Third</u>, it is unlikely Mr. Bankman-Fried will succeed on the merits of the underlying litigations, thus militating against any finding of cause. Mr. Bankman-Fried attempts to sidestep this

issue by arguing that the "probability of the creditor prevailing on the merits" does not apply here since Mr. Bankman-Fried is not suing the Debtors, but that is not the case here. (*See* Motion at ¶ 31, n. 6.)  As *Downey Financial* makes clear, a court should analyze whether the insured -- here, Mr. Bankman-Fried -- is likely to succeed on the merits of the litigation for which they seek coverage when evaluating whether to lift the automatic stay. *See* 428 B.R at 610 ("The third factor the Court must consider is the probability of the Insureds' success on the merits . . . This factor clearly favors the Insureds because they have already won on the merits—the Securities Class Action has been dismissed, and the case is terminated.").  Although Mr. Bankman-Fried is, of course, entitled to defend against the civil and criminal charges asserted against him, the fact that three of his co-conspirators have already pleaded guilty to numerous crimes implicating Mr. Bankman-Fried cannot be ignored.

24.    Thus, cause does not exist to lift the automatic stay, and the alternative relief in the Motion should be denied.  For these same reasons, this Court should decline to use its powers under section 105 of the Bankruptcy Code to allow Mr. Bankman-Fried to seek payment of, reimbursement of, or otherwise advancement of his Defense Costs under the D&O Policies.

### III. Alternatively, the Court Should Condition Relief from Stay Upon Court Approval of Mr. Bankman-Fried's Fee Statements

25.    Assuming the Court determines that cause exists to lift the automatic stay, the Court should not give Mr. Bankman-Fried unfettered access to the D&O Policies.  Rather, this Court should require Mr. Bankman-Fried to comply with Bankruptcy Rule 2016's compensation requirements and seek approval of any such fees by this Court.  *See In re Arter & Hadden, L.L.P.*, 335 B.R. 666, 674 (Bankr. N.D. Ohio 2005) (recognizing that the Bankruptcy Court "has the authority to impose appropriate conditions upon the relief from the automatic stay" and conditioning modification of the automatic stay "subject to approval of an application for compensation or reimbursement, as provided

by Federal Rule of Bankruptcy Procedure 2016"); *In re Laminate Kingdom LLC*, No. 07-10279, 2008 WL 1766637, at *5 (Bankr. S.D. Fla. Mar. 13, 2008) (granting modification of stay to extent necessary to allow payment of defense costs of directors and officers only upon Court approval, after notice and hearing, and explaining that "in granting the motion for stay relief, the Court conditions the payments of attorney's fees upon approval by the Court upon the filing of an application for compensation and reimbursement as provided by Federal Rule of Bankruptcy Procedure 2016").

## CONCLUSION

WHEREFORE the Committee requests that this Court deny the Motion and grant such other and further relief as the Court finds just and appropriate.

*Remainder of page intentionally left blank*

| | |
|---|---|
| Dated: March 29, 2023<br>Wilmington, Delaware | YOUNG CONAWAY STARGATT & TAYLOR, LLP<br><br>*/s/ Robert F. Poppiti, Jr.*<br>Matthew B. Lunn (No. 4119)<br>Robert F. Poppiti, Jr. (No. 5052)<br>1000 North King Street<br>Wilmington, DE 19801<br>Telephone: (302) 571-6600<br>Facsimile: (302) 571-1253<br>Email: mlunn@ycst.com<br>        rpoppiti@ycst.com<br><br>-and-<br><br>PAUL HASTINGS LLP<br>Kristopher M. Hansen\*<br>Kenneth Pasquale\*<br>Gabriel E. Sasson\*<br>Isaac S. Sasson\*<br>200 Park Avenue<br>New York, NY 10166<br>Telephone: (212) 318-6000<br>Facsimile: (212) 319-4090<br>Email: krishansen@paulhastings.com<br>        kenpasquale@paulhastings.com<br>        gabesasson@paulhastings.com<br>        isaacsasson@paulhastings.com<br><br>\**Admitted pro hac vice*<br><br>*Counsel to the Official Committee of Unsecured Creditors* |