## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| *In re:* | ) | Chapter 11 |
| | ) | |
| FTX TRADING LTD., *et al.*,[1] | ) | Case No. 22-11068 (JTD) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Hearing Date:** |
| | ) | **April 12, 2023 1:00 p.m.** |
| | ) | **Obj. Deadline:** |
| | ) | **April 5, 2023 4:00 p.m.** |

## MOTION OF THE JOINT PROVISIONAL LIQUIDATORS FOR A DETERMINATION THAT THE U.S. DEBTORS' AUTOMATIC STAY DOES NOT APPLY TO, OR IN THE ALTERNATIVE FOR RELIEF FROM STAY FOR FILING OF THE APPLICATION IN THE SUPREME COURT OF THE COMMONWEALTH OF THE BAHAMAS SEEKING RESOLUTION OF NON-US LAW AND OTHER ISSUES

---

[1] The last four digits of FTX Trading Ltd.'s tax identification number are 3288.  Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the debtors (the "**U.S. Debtors**") and the last four digits of their federal tax identification numbers is not provided here.  A complete list of such information may be obtained on the website of the U.S. Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ........................................................................ 1

JURISDICTION, VENUE, AND PREDICATES FOR RELIEF.................................. 9

BACKGROUND ............................................................................................ 9

     A.     History of the FTX International Platform ............................................ 9

     B.     The SCB Revokes FTX Digital's License and Commences FTX Digital's Provisional Liquidation......................................................................... 15

     C.     Non-U.S. Law Customer Issues.......................................................... 16

     D.     The English, Bahamas, And Antiguan Laws Applicable To The Non-U.S. Law Customer Issues ........................................................................... 19

     E.     The Next Procedural Steps In The Bahamian Liquidation After the Joint Provisional Liquidators File the Application....................................... 20

     F.     The Cooperation Agreement................................................................ 21

     G.     The U.S. Debtors' Lawsuit Against FTX Digital and the JPLs............ 22

RELIEF REQUESTED .................................................................................... 25

ARGUMENT ................................................................................................. 26

I.     The Filing and Prosecution Of The Application Is A Normal, Expected Predicate For Cooperation Between This Court And The Bahamas Court Regarding The Resolution Non-U.S. Law Customer Issues........................................................................ 26

II.     The Automatic Stay Does Not Apply to Filing or Prosecution of the Application ......... 30

III.     In the Alternative, The Court Should Lift the Automatic Stay to Allow the JPLs to File the Application and Initiate a Cross-Border Protocol................................. 34

     A.     The Three Prong Balancing Test Weighs In Favor of Lifting the Stay ............... 35

           1. Resolving the Foreign Law Customer Questions in The Bahamas Does Not Prejudice the U.S. Debtors ................................................................. 35

           2. The Hardship to the JPLs by Maintenance of the Stay Considerably Outweighs the Hardship to the U.S. Debtors.......................................................... 40

           3.The Merits Weigh In Favor of Lifting the Stay................................ 41

     B.     Considerations of Comity Also Support Lifting or Modifying the Stay .............. 42

NOTICE....................................................................................................... 48

NO PRIOR REQUEST ............................................................................................................. 48

CONCLUSION......................................................................................................................... 48

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Aranha v. Eagle Fund, Ltd. (In re Thornhill Glob. Deposit Fund Ltd.)*,

    245 B.R. 1 (Bankr. D. Mass. 2000) ......................................................................39

*Arkwright–Boston Mfrs. Mut. Ins. Co. v. City of New York*,

    762 F.2d 205 (2d Cir. 1985)...................................................................................44

*Drauschak v. VMP Holdings Ass'n, L.P. (In re Drauschak)*,

    481 B.R. 330 (Bankr. E.D. Pa. 2012) .............................................................35, 43

*Finanz AG Zurich v. Banco Economico S.A.*,

    192 F.3d 240 (2d Cir. 1999)...................................................................................44

*In re A & D Care, Inc.*,

    90 B.R. 138 (Bankr. W.D. Pa. 1988) .....................................................................37

*In re Abeinsa Holding, Inc.*,

    Case No. 16-10790 (KJC), 2016 WL 5867039 (Bankr. D. Del. Oct. 6, 2016).......35

*In re Advanced Cellular Sys.*,

    235 B.R. 713 (Bankr. D.P.R. 1999)........................................................................44

*In re Breitburn Energy Partners L.P.*,

    571 B.R. 59 (Bankr. S.D.N.Y. 2017)......................................................................40

*In re Calpine Corporation*,

    Case No. 05-60200 (CGM) (Bankr. S.D.N.Y. 2005) .............................................29

*In re Cenargo Int'l, PLC*,

    294 B.R. 571 (Bankr. S.D.N.Y. 2003)....................................................................44

*In re DHP Holdings II Corp.*,

    435 B.R. 220 (Bankr. D. Del. 2010) .......................................................................37

*In re Downey Fin. Corp.*,

    428 B.R. 595 (Bankr. D. Del. 2010) ........................................................................35

*In re FairPoint Commc'ns, Inc.*,

    462 B.R. 75 (Bankr. S.D.N.Y. 2012) ......................................................................38

*In re Int'l Admin. Servs., Inc.*,

    211 B.R. 88 (Bankr. M.D. Fla. 1997) ....................................................................46

*In re Lafayette Radio Elecs. Corp.*,

    8 B.R. 973 (Bankr. E.D.N.Y. 1981)........................................................................44

*In re Levitz Furniture*,

    267 B.R. 516 (Bankr. D. Del. 2000) ......................................................................42

*In re Mark Scott Constr., LLC*,

    Case No. 03-36440 (HCD), (Bankr. N.D. Ind. Apr. 23, 2004) ..............................40

*In re Nat'l Steel Corp.*,

    316 B.R. 287 (Bankr. N.D. Ill. 2004) ....................................................................33

*In re Noranda Aluminum, Inc.*,

    549 B.R. 725 (Bankr. E.D. Mo. 2016).............................................................32, 33

*In re Nortel Networks, Inc.*,

    532 B.R. 494 (Bankr. D. Del. 2015) ................................................................27, 28

*In re Northshore Mainland Servs., Inc.*,

    537 B.R. 192 (Bankr. D. Del. 2015) ........................................................39, 44, 46

*In re Old Carco LLC*,

    406 B.R. 180 (Bankr. S.D.N.Y. 2009).............................................................32, 33

*In re PG & E Corp.*,

    Case No. 19-30088 (DM), 2019 WL 3889247 (Bankr. N.D. Cal. Aug. 16, 2019)..................40

*In re Railyard Co.*,

    562 B.R. 481 (Bankr. D.N.M. 2016) .......................................................................33

*In re Scarborough St. James Corp.*,

    535 B.R. 60 (Bankr. D. Del. 2015) ..............................................................35, 36, 37

*In re SCO Grp., Inc.*,

    395 B.R. 852 (Bankr. D. Del. 2007) ............................................................... passim

*In re Soundview Elite, Ltd.*,

    503 B.R. 571 (Bankr. S.D.N.Y. 2014) ..................................................28, 29, 45, 46

*In re Spanish Cay Co., Ltd.*,

    161 B.R. 715 (Bankr. S.D. Fla. 1993) .......................................................38, 43, 45

*In re Tribune Co.*,

    418 B.R. 116 (Bankr. D. Del. 2009) .....................................................................39

*In re Williams*,

    144 F.3d 544 (7th Cir. 1998) ............................................................................47, 48

*In re Williams*,

    88 B.R. 187 (Bankr. N.D. Ill. 1988) ...............................................................38, 48

*Int'l Tobacco Partners, Ltd. v. Ohio (In re Int'l Tobacco Partners, Ltd.)*,

    462 B.R. 378 (Bankr. E.D.N.Y. 2011) ............................................................40, 43

*Mar. Elec. Co., Inc. v. United Jersey Bank*,

    959 F.2d 1194 (3d Cir. 1991) ...............................................................................31

*Matter of Culmer*,

    25 B.R. 621 (Bankr. S.D.N.Y. 1982) ....................................................................39

*Matter of Rexene Prod. Co.*,

    141 B.R. 574 (Bankr. D. Del. 1992) .....................................................................42

*Maxwell Commc'n. Corp. v. Barclays Bank (In re Maxwell Commc'n. Corp.)*,

    170 B.R. 800 (Bankr. S.D.N.Y. 1994) .......................................................................44

*Pursifull v. Eakin*,

    814 F.2d 1501 (10th Cir. 1987) ...............................................................................43

*Railroad Comm'n v. Pullman Co.*,

    312 U.S. 496 (1941) ..................................................................................................38

*Stonington Partners v. Lernout & Hauspie Speech Prods N.V.*,

    310 F.3d 118 (3d Cir. 2002) .....................................................................................44

*Thompson v. Magnolia Petroleum Co.*,

    309 U.S. 478 (1940) ..................................................................................................38

*Thors v. Allen*,

    Civ. Nos. 16-2224 (RMB), 16-2225 (RMB), 2016 WL 7326076 (D.N.J. Dec. 16, 2016) ......39

## STATUTES AND RULES

11 U.S.C. 362(a)(1), (a)(3) ...................................................................................... passim

11 U.S.C. § 362(d) .................................................................................................. passim

28 U.S.C. § 157 ................................................................................................................9

28 U.S.C. § 1334 .............................................................................................................9

28 U.S.C. § 1409(a) ........................................................................................................9

28. U.S.C. § 1410 ............................................................................................................9

Bankruptcy Code § 1520 ................................................................................................1

Bankruptcy Rule 2002 ..................................................................................................48

Digital Assets and Registered Exchanges Act of 2020 ........................................ passim

Federal Rule of Bankruptcy Procedure 4001 .................................................................9

International Business Company Act, CAP. 222 of Antigua ..........................................10

Local Rules "Guidelines for Communication and Cooperation Between Courts in Cross-Border
  Insolvency Matters" .............................................................................................27

Local Rules of Bankruptcy Rule 9013-1(f) ...............................................................9

Local Rules Rule 4001-1 ...............................................................................9, 48

Non-U.S. Law ........................................................................................... passim

Section 362(a)(2) ........................................................................................31

Section 362(a)(4) and (a)(5) ..........................................................................31

Section 362(a)(6) ........................................................................................31

Section 362(a)(7) ........................................................................................31

Section 362(a)(8) ........................................................................................31

## MISCELLANEOUS

Decrypt, *FTX Relocates from Hong Kong to Bitcoin-Friendly Bahamas* (Sept. 24, 2021),
  https://decrypt.co/81834/ftx-relocates-hong-kong-bitcoin-friendly-bahamas .................42, 43

Neil Hartnell, *FTX to hire more than 100 Bahamians for Crypto Work*, The Tribune (October 19,
  2022), http://www.tribune242.com/news/2022/oct/19/ftx-hire-more-100-bahamians-crypto-
  work/ .............................................................................................12, 13

Nelson Wang, *FTX Moves Headquarters From Hong Kong to Bahamas*, Coindesk (Sept. 27,
  2021), https://www.coindesk.com/business/2021/09/24/ftx-moves-headquarters-from-hong-
  kong-to-bahamas-report/ ....................................................................................13

Ray Testimony at 1:17:30-1:19:00 (Dec. 13, 2022),
  https://www.youtube.com/watch?v=YQdvfBZ0VbQ&t=5172s ......................................16, 47

Wall Street Journal, 'This Company Was Uniquely Positioned to Fail:' FTX Group CEO John
  Ray Testimony, YOUTUBE, at 21:25-22:00 (Dec. 13, 2022),
  https://www.youtube.com/watch?v=YQdvfBZ0VbQ&t=5172s ...........................................10

Brian C. Simms KC, Kevin G. Cambridge, and Peter Greaves, the Joint Provisional Liquidators and Foreign Representatives (the "**the JPLs**") of FTX Digital Markets Ltd. ("**FTX Digital**") submit this motion (the "**Motion**") seeking (i) a determination that the automatic stay does not apply to the proposed filing of the directions application (the "**Application**") to be issued in the Supreme Court of The Bahamas (the **"Bahamas Court"**) or in the alternative, (ii) granting relief from the automatic stay pursuant to Section 362(d)(1) of the Bankruptcy Code in order to allow the JPLs to file the Application in the Bahamas Court.  The JPLs request that this Court enter the Order, substantially in the form attached hereto as **Exhibit 1.**  In support of the Motion, the JPLs rely upon and incorporate by reference the *Declaration of Metta MacMillan-Hughes KC* ("**MacMillan-Hughes Declaration**") and the *Declaration of Peter Greaves* ("**Greaves Declaration**") filed simultaneously herewith.  A copy of the Application is attached as Exhibit A-1 to the Greaves Declaration.

## PRELIMINARY STATEMENT

1.      On November 10, 2022 (the day before these Chapter 11 Cases were filed), FTX Digital became a debtor in provisional liquidation under the control and supervision of the Bahamas Court (the **"Provisional Liquidation"**).  On February 15, 2023, this Court recognized FTX Digital's Provisional Liquidation as the "foreign main proceeding" and the JPLs as the duly appointed "foreign representatives" of the FTX Digital estate in the United States.  *See* Case No 22-11217, Order Granting Recognition, Docket No. 129.  In connection with that recognition, this Court granted, among other things, "all relief and protection" afforded to foreign main proceedings under section 1520 of the Bankruptcy Code, including but not limited to section 362 of the Code.

2.      In their now-recognized Provisional Liquidation, the JPLs are tasked with, among other duties, the duty to maintain the value of the assets of FTX Digital for the benefit of all of

FTX Digital's customers and creditors.  Of course, given the admitted "complete absence of trustworthy financial information" for the FTX enterprise, determining which assets and which creditors map to which FTX entity is far from an easy task.  *Declaration of John J. Ray III in Support of the Chapter 11 Petitions and First Day Pleadings* [Docket No. 24] ("**First Day Declaration**") ¶ 5.  Thus, from the outset of their appointments, the JPLs have actively sought (i) to identify which persons or entities were or are FTX Digital's accountholders, customers, and creditors, (ii) to determine the legal relationship between FTX Digital and those who are identified as such, and (iii) to recover assets for all FTX Digital's stakeholders to be distributed in accordance with Bahamian law and procedure.  Greaves Decl. ¶ 8.  These issues relating to the identification and protection of FTX Digital's accountholders, customers, and creditors, (the "**Non-U.S. Law Customer Issues**"), are highly complex and turn on key questions of the laws of the Bahamas, Antigua & Barbuda ("**Antigua**") and England.  Indeed, the Provisional Liquidation cannot materially progress further unless the Non-U.S. Law Customer Issues are resolved.

3.      To that end, the JPLs now seek to file the Application in the Bahamas Court to provide the Bahamas Court with the predicate jurisdiction to answer those Non-U.S. Law Customer Issues necessary to advance FTX Digital's Provisional Liquidation.  Because none involve U.S. law, and none of the parties affected are U.S. entities or citizens, the JPLs believe these issues are most efficiently resolved by the Bahamas Court, which routinely considers and applies the Non-U.S. laws at issue.  But, the issue of exactly which court is the best court to decide exactly what question is an issue for another day.  For now, the JPLs seek only to invoke the jurisdiction of the Bahamas Court to allow for the process of cross-border judicial coordination and resolution to unfold.

4.       Importantly, the answers to the Non-U.S. Law Customer Issues are not monolithic. Certain customers and accountholders of the FTX enterprise were indisputably FTX Digital's customers, as the U.S. Debtors admitted in their first day hearing. *See, Hr'g Tr. November 22, 2022*, 26:13-18. ("[A]pproximately 6 percent [of International Customers] were customers of FTX Digital Markets Limited, the Bahamian entity that is under the jurisdiction of the joint provisional liquidators.").[2]  Certain other customers of the FTX enterprise might be accountholders or customers of FTX Trading Ltd. ("**FTX Trading**"), which is a U.S. Debtor before this Court.  The ultimate legal question is how to sort the entire FTX international account holder and customer constituency – do they map to FTX Digital, to FTX Trading, or to both?  But the question at bar is not even who will decide those issues but how we will go about deciding who will decide.

5.       In accordance with the court-approved cooperation agreement between the JPLs and the U.S. Debtors (the "**Cooperation Agreement**"),[3] the JPLs sought for months to jointly tee up that issue with the U.S. Debtors.  Having had no engagement on the topic, the JPLs sent the U.S. Debtors' counsel a draft of the Application on March 9, 2023 (*see* Greaves Decl. Ex. E.) They then held a telephonic conference with Mr. Ray and his counsel on March 15 in an attempt to discuss a cooperative framework for resolution to all the Non-U.S. Law Customer Issues, in accordance with this Court's Local Rules and the Cooperation Agreement.  By these efforts, the JPLs intended to frame a process, described more fully below, in which the two courts with uncontested jurisdiction over the issues – this Court and the Bahamas Court – can resolve which

---

[2] For the avoidance of doubt, and as discussed further below, the JPLs do not agree that only 6% of the International Customers are customers of FTX Digital.

[3] *See* Settlement And Cooperation Agreement dated January 6, 2023, Case No. 22-11068, Docket No. 402, Exhibit 1.

questions would be addressed in which court, as is common practice in cross-border insolvencies like these.

6.      The reaction of the U.S. Debtors to that concept has been, regrettably, frosty. During the meet and confer, they asserted that the mere filing of the Application in the Bahamas would be viewed as a wilful breach of FTX Trading's automatic stay and a material breach of the Cooperation Agreement, both of which would entitle the U.S. Debtors to relief in this Court.  At the same time, the U.S. Debtors asserted that (1) none of the Non-U.S. Law Customer Issues could or should ever be litigated, given that in their view the FTX enterprise operated as one economic entity and (2) any litigation over the Non-U.S. Law Customer Issues would be so severely value-destructive that it would "torpedo" the U.S. cases.  Days later, the U.S. Debtors immediately made an abrupt unexplained about-face on both of these points and, without ever having had a discussion with the JPLs on the topic, filed an adversary proceeding against FTX Digital, each of the JPLs, and John Does 1-20 (the "**Adversary Proceeding**").   In that Adversary Proceeding, the U.S. Debtors allege (without any specificity) that the creation and entire operation of the FTX Digital estate was an intentionally fraudulent scheme and that therefore, neither the recognized JPLs nor the Bahamas Court in the recognized foreign main proceeding should ever be entitled to any deference, comity, or indeed good standing in this Court.  Adv. Pro. No. 23-50145 (JTD).  The U.S. Debtors' campaign to disenfranchise the JPLs and the Bahamas Court needs to stop.

7.      To be clear, the filing of the Adversary Proceeding was made in direct violation of the Cooperation Agreement and FTX Digital's own automatic stay which came into effect when this Court issued FTX Digital's recognition order.  The JPLs will address the consequences of the U.S Debtors' breaches in subsequent pleadings.  But for now, and as discussed below, the U.S.

Debtors, in advancing the most un-comitous of agendas in their own cases, seriously misunderstand the extent of section 362 of the Code.

8.      ***First***, as set forth in Section I, *infra*, the filing of the Application is merely the expected predicate for any cooperation between this Court and the Bahamas Court regarding the resolution of Non-U.S. Law Customer Issues.  Far from portending doom, as the U.S. Debtors have decried, the filing of the Application only begins the legal proceedings in the Bahamas so that this Court and the Bahamas Court may then start to coordinate on deciding legal issues critical to both FTX Digital and FTX Trading's respective proceedings, if agreeable to both Courts.  A subsequent comprehensive protocol may then be adopted which will allow for a coordinated claims-distribution process to achieve the goals of both the JPLs and the U.S. Debtors consistent with how the two courts decide.  In all cases, both courts will be involved in the restructuring of the FTX enterprise, likely for years to come, so establishing an initial judicial protocol to coordinate between the proceedings (once the Bahamian Application is filed) is necessary if only to manage costs that are already spiralling out of control and to ensure judicial efficiency.

9.      ***Second,*** as set forth in Section II, *infra*, the automatic stay in the Chapter 11 Case of FTX Trading does not apply to the filing of the Application.  While section 362 is broad, it does not reach so far as to ban the recognized JPLs from asking their own court, which oversees their own recognized foreign main proceeding for guidance on issues central to their insolvency process. This is exactly what the JPLs are seeking to do by the Application – to invoke the jurisdiction of the Bahamas Court, which has the control and supervision of the JPLs and the Provisional Liquidation, to determine the issues of (a) whether the contracts entered into by "FTX customers" using the FTX International Platform prior to the U.S. Debtors' petition date, were novated from FTX Trading to FTX Digital, (b) whether these customers therefore migrated to FTX Digital;

(c) whether digital assets or fiat transferred by customers of the FTX International Platform or presently held in the name of FTX Digital were virtual assets or fiat of FTX Digital in law and, if so, (d) whether such digital assets or fiat are held by FTX Digital in trust for the benefit of its customers, and (e) who is the counterparty in respect of perpetual futures contracts.  That's it. None of these issues are deserving of the U.S. Debtors' histrionic allegations that the JPLs' views are "baseless" and only are being interposed to serve "fiduciaries with no constituency but themselves."  Adv. Pro. No. 23-50145 (JTD), Docket No. 1 ¶ 3.

10.    ***Third***, as discussed in Section III, *infra*, even if the U.S. automatic stay were found to apply to bar the JPLs' seeking to determine for whom they serve as fiduciaries, the Court should lift the stay in the Chapter 11 Cases to allow the JPLs to file the Application and invoke the jurisdiction of the Bahamas Court.  There is no legitimate reason for the U.S. Debtors to prevent the Bahamas Court from ever obtaining jurisdiction over any of the threshold Non-U.S. Law Customer Issues, particularly while the U.S. Debtors are spending tens of millions of dollars a month on professionals based on the untested legal assumption that the money that they are spending is benefitting their own customers.  In short, lifting the stay would allow the Bahamas Court presiding over the Provisional Liquidation, which regularly considers similar issues of English, Antiguan, and Bahamian law, to begin to address fundamental questions in a timely and efficient manner to the benefit of all stakeholders, without impinging on this Court's jurisdiction over the U.S. Debtors' cases.

11.    When one moves past the inevitable and unfortunate rhetoric that has emanated (and will presumably continue to emanate) from the U.S. Debtors' counsel in New York, the U.S. Debtors cannot possibly be prejudiced by the Bahamas Court answering any of the Non-U.S. Law Customer Issues.  It is the only court which has both the U.S. Debtors and FTX Digital in

proceedings before it and which is familiar with the applicable law.  By contrast, the FTX Digital

estate and the JPLs would be significantly prejudiced if this Court were to maintain a stay (to the

extent it even applies), effectively stopping FTX Digital's Provisional Liquidation until the JPLs

learn from this Court the identity of their own creditors or their own estate's assets via application

of non-U.S. law in a cumbersome, foreign-law-expert-driven process.  Plainly, considerations of

comity and judicial economy support lifting the stay by allowing the key issues of English,

Antiguan, or Bahamian law to be resolved by the court that regularly applies those substantive

laws particularly where its rulings will have far-reaching implications for bankruptcies of

cryptocurrency companies across the entire Commonwealth.

12.     ***Finally***, and contrary to the U.S. Debtors' threats, the Cooperation Agreement does

not prevent the JPLs from advancing the Provisional Liquidation of FTX Digital by submitting the

Application to the Bahamas Court.  On the contrary, it expressly identifies and prescribes a known,

disclosed dispute over customer mapping.  Three months ago, at the first day hearing, counsel for

the U.S. Debtors represented to the Court that (1) "94% of the customers on the FTX international

platform" were customers of FTX Trading Limited; (2) the remaining 6% were customers of FTX

Digital, and (3) while FTX Trading "planned" to migrate its customers to the Bahamian debtor

FTX Digital, it failed to do so prior to filing.  *Hr'g Tr. November 22, 2022*, 26:13-27:1.  At that

same hearing, FTX Digital's JPLs flagged for this Court that they did not agree with the U.S.

Debtors' factual assertions regarding the migration.  *Id.* 57:3-8.[4]  With those positions staked out,

---

[4] Noting the problem of non-engagement, the JPLs raised the customer migration issue again on February
15, 2023, at the hearing about the recognition of FTX Digital's Provisional Liquidation as FTX Digital's
foreign main proceeding.  *Hr'g Tr. February 15, 2023*, 27:25-28:7 (noting that "determining whether
customers were customers of U.S. debtors or Digital is going to be critical to any distribution scheme . . .
[And that] . . . There are unresolved legal and factual issues as to the nature of the customers' deposits
whether they're held in trust, [and] whether they're general unsecured claims . . . .").  Counsel for the U.S.
Debtors acknowledged that, "the issues as to whether assets belong in the Bahamian estate or in the U.S.
estate are open issues . . . ." about which the parties have a live dispute.  *See id.* 30:10-24 ("And so, the

the Cooperation Agreement expressly provides that the parties "will work together and in good faith to determine ownership of assets that are subject to competing claims and to ensure that any court process(es) relating to an adjudication of any dispute are conducted as efficiently as possible."  Cooperation Agreement ¶ 11.  For months, the JPLs, through counsel, in good faith, sought to engage the U.S. Debtors to address an efficient legal mechanism for resolving the Non-U.S. Law Customer Issues.  The U.S. Debtors have never actually engaged, and instead have simply proceeded to administer their cases and expend material resources as if no accountholder or customer ever migrated, ultimately initiating a litigation in breach of FTX Digital's chapter 15 stay and the Cooperation Agreement.

13.    In sum, the JPLs submit that the proper procedure here, involving two affiliated debtor estates in separate bankruptcy proceedings in two jurisdictions both of whom need intervention to resolve common legal and factual issues affecting the proceedings, is for the respective debtors to invoke the jurisdiction of each of their courts and have the two courts resolve which court will answer which issues under which procedures.  It is not, as the U.S. Debtors posit, to simply have this Court ignore all concepts of comity based on veiled insinuations that the JPLs and their Bahamas Court cannot be trusted with interpreting non-U.S. laws in a proceeding that this Court has already recognized as legitimate.

14.    The JPLs therefore ask this Court to declare that the automatic stay does not apply to the Application, or, alternatively, to lift the stay and allow the JPLs to file the Application in The Bahamas without prejudice to entry of a judicial protocol whereby the two involved courts –

---

statement that Mr. Shore has made in that regard are statements that the U.S. debtors reserve all their rights on and, frankly, disagree with many of them.").

the U.S. and The Bahamas – jointly and collaboratively determine which court will address which of the many Non-U.S. Law Customer Issues that are framed below.

## JURISDICTION, VENUE, AND PREDICATES FOR RELIEF

15.     This Court has jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012 (Sleet, C.J.).   This is a core proceeding under 28 U.S.C. § 157(b)(2).

16.     Under Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware, the JPLs consent to the entry of a final judgment or order with respect to this Motion if it is determined that this Court lacks Article III jurisdiction to enter such final order or judgment absent consent of the parties.

17.     Venue in this district for this proceeding and for this Motion is proper under 28 U.S.C. §§ 1408 and 1409.

18.     The statutory predicates for this relief are 11 U.S.C. § 362(d), Federal Rule of Bankruptcy Procedure 4001, and Rule 4001-1 of the Local Rules.

## BACKGROUND

19.     By the Application, the JPLs seek to invoke the jurisdiction of the Bahamas Court to obtain directions as to the Non-U.S. Law Customer Issues.  We set forth below those facts most relevant to the Application in particular to make clear just why the Non-U.S. Law Customer Issues are so important for FTX Digital's Provisional Liquidation and just why the Bahamas Court must be involved.

### A.     History of the FTX International Platform

20.     FTX Trading was incorporated on April 2, 2019, and is a company organized under the International Business Company Act, CAP. 222 of Antigua.  Greaves Decl. ¶ 9.  Immediately

following its formation, FTX Trading was headquartered, along with the rest of the FTX group of companies ("**FTX Group**"), in Hong Kong, China.  *Id.*  The FTX International Platform never carried on any business in a market served by FTX U.S.  Greaves Decl. ¶ 11.

21.    Initially, FTX Trading was responsible for running FTX's international digital asset exchange platform — the platform through which FTX did business with somewhere between 2.5 million to upwards of 7.4 million customers, all located outside the United States ("**International Customers**").  Greaves Decl. ¶ 10.  U.S. persons were <u>not</u> permitted to trade on FTX.com, and therefore the JPLs believe that none of the customers affected by the Application are U.S. citizens.[5] Greaves Decl. ¶ 11.  So, again, the Application does not affect the rights of any customer of FTX who was bound by a customer agreement governed by U.S. law.

22.    At first, most of the International Customers entered into contracts with FTX Trading accepting FTX Trading's terms of service (the "**2019 Terms of Service**").  Greaves Decl. Exhibit C.  Antiguan law governs the 2019 Terms of Service. [6]  2019 Terms of Service ¶ 27.

23.    The migration of International Customers from FTX Trading was a direct product of the shifting regulatory environment facing FTX.  As the U.S. Debtors' counsel stated at the first day hearings, "[i]n November of 2020, the Bahamas passes the DARE Act, a digital assets act, which is intended to encourage the relocation of crypto businesses to the Bahamas.  In July of 2021, FTX Digital Markets, the Bahamian single debtor, is formed.  And in September of 2021,

---

[5] *See* Wall Street Journal, 'This Company Was Uniquely Positioned to Fail:' FTX Group CEO John Ray Testimony,    YOUTUBE,    at    21:25-22:00    (Dec.    13,    2022), https://www.youtube.com/watch?v=YQdvfBZ0VbQ&t=5172s.  ("**Ray Testimony**"); *see also* First Day Declaration ¶ 33 ("The FTX.com platform is not available to U.S. Users").

[6] As discussed further below, Antigua, like the Bahamas, is a legal system based on the English system, with the ultimate appeal court being the Judicial Committee of the Privy Council consisting of a five-judge panel of justices of the Supreme Court of the United Kingdom.

Mr. Bankman-Fried announces that FTX Digital Markets is going to be registered with the Securities Commission of the Bahamas."). *Hr'g Tr. November 22, 2022*, 23:10-17. To explain further, at FTX's inception, no jurisdiction had a sufficiently regulated exchange system for the sought-after institutional funds that FTX's founders wished to attract. Greaves Decl. ¶ 10. Then, on December 14, 2020, the Commonwealth of The Bahamas enacted a licensing and regulatory regime for the digital asset industry pursuant to the Digital Assets and Registered Exchanges Act of 2020 ("**DARE Act**"). Greaves Decl. ¶ 12.

24.     Following the enactment of the DARE Act, the FTX Group openly moved the headquarters of its business operations from Hong Kong to The Bahamas. Greaves Decl. ¶¶ 12-14. Up until the filing of the Adversary Proceeding, there was never any insinuation that the movement of the FTX enterprise to The Bahamas was anything other than a legitimate attempt to take advantage of a new regulatory scheme. Indeed, that movement was from a market that was largely unregulated as to virtual assets (Hong Kong) to one with a detailed regulatory regime (The Bahamas).

25.     By July 22, 2021, FTX Digital had been incorporated in the Bahamas. Greaves Decl. ¶ 12. That same month, at least 38 individuals, including the co-founders, senior management, and key employees from entities that employed FTX International Platform employees started the transition to move from Hong Kong to The Bahamas and their employment contracts were transferred to FTX Digital. Greaves Decl. ¶ 14. Before the appointment of the JPLs, FTX Digital employed 83 individuals, most of whom resided in The Bahamas. *Id.* It was suggested that 700 FTX employees would eventually work and live in The Bahamas.[7]

---

[7] *See* Neil Hartnell, *FTX to hire more than 100 Bahamians for Crypto Work*, The Tribune (October 19, 2022) ("**Bahamas Tribune Article**").

26.    In August 2021, more than a year prior to the FTX bankruptcies, FTX Digital prepared a document called "FTX Digital Markets Limited Customer Migration Plan" ("**Migration Plan**") approved by FTX Digital's then-CEO, Ryan Salame, stating an objective "*to migrate customers to its [i.e. FTX Digital's] business from FTX* [Trading]."  Greaves Decl. Ex. B.

27.    The Migration Plan envisioned that users of the FTX international exchange platform (the "**FTX International Platform**") would accept new terms of service, and that the migration would be complete by 2023, with all "institutional" users being migrated by Q2 2022. Migration Plan at p 5.  The Migration Plan's staged transfer of International Customers started with high volume users and ended with lower volume users.  *Id*.  High volume institutional users were to be migrated under the Migration Plan by Q1 2022, other institutional users by Q2 2022, "low risk" (i.e., users with low know your customer ("KYC") risk profiles) individual users by Q3 2022, and "medium risk" and "high risk" individual users by Q4 2022 and Q1 2023, respectively. *Id*.  Explicit in the Migration Plan is that users' entire experience would be controlled and overseen by FTX Digital.  *Id.* ("The ultimate objective is a *smooth transition from a user experience perspective*. Front end and back end systems *should also reflect a shift of activity to FDM as smoothly as possible*, subject to regulatory considerations.") (emphasis added).[8]

---

[8] *See id.* at p 4 ("The CEO and CO will engage with FTX customer support and marketing in order to ensure both FTX and FDM are aligned on the transition, from messaging to the operational execution."); *id.* at p 4-5 ("Customers who will be migrated from FTX to FDM will be required to accept new terms of service and the sharing of information from FTX to FDM prior to onboarding. As the migration commences, customers will be notified of the change and will be given a period of 90 days to raise any queries, comments, or concerns to the centralised customer support team, before accepting the new terms of service and sharing of information or withdrawing their funds. If customers do not actively accept the new terms of service or the sharing of information within 90 days and do not remove all of their funds, they will be assumed to have accepted the new terms of service and be migrated."); *id.* at p 4("This policy outlines FDM's approach to the migration of customers from FTX Trading Limited (FTX). In developing this policy, FDM has considered the operational, technical and regulatory aspects of its approach to the migration.").

28.    On September 10, 2021, in advance of the Migration Plan, FTX Digital was registered as a digital asset business under the DARE Act, becoming the only FTX Group entity regulated to run the FTX International Platform for most of the products on the platform.  Greaves Decl.¶ 15.  FTX Digital remains the only FTX entity that was ever licensed as such.  *Id.* ¶ 12.  By September 24, 2021, FTX Trading officially confirmed that it had moved its headquarters from Hong Kong to the Bahamas.[9]

29.    A month later, The Bahamas Tribune reported on the FTX Group's expansive, long term plans to center its enterprise in The Bahamas. Bahamas Tribune Article, *supra note* 7. The Tribune reported that FTX's headquarters would be located on a "4.95 acre site…will feature two boutique hotel buildings" and that "[o]ther planned facilities include an athletic and wellness area; a theatre; auditorium; conference centre; café/restaurant; retail; a daycare centre; and 'vertical farm'." *Id.*  It further announced that, "Large events will also be held at the conference centre and auditorium on a quarterly basis, which are expected to draw up to 800 additional guests to the site. The campus is expected to be fully built-out by 2025." *Id.*

30.    Between November 2021 and June 2022, FTX Digital opened bank accounts in its name ("**FTX Digital Accounts**") that were used to receive and send fiat currency from and to International Customers.   Greaves Decl. ¶ 17.   Starting in January 2022, it was clear that International Customers were using the FTX Digital Accounts to deposit and withdraw fiat to and from their accounts on the International Platform.  *Id.*  From January 20, 2022 through November 12, 2022, the FTX Digital Accounts maintained in FTX Digital's name had receipts of $13.4 billion

---

[9] Nelson Wang, *FTX Moves Headquarters From Hong Kong to Bahamas*, Coindesk (Sept. 27, 2021), https://www.coindesk.com/business/2021/09/24/ftx-moves-headquarters-from-hong-kong-to-bahamas-report/.

and outflows of the same amount. *Id*. From January 20, 2022 through October 31, 2022, the institutional International Customer account in FTX Digital's name had receipts of $9.2 billion and withdrawals of $8.9 billion. *Id*.

31.    On May 13, 2022, six months before any FTX bankruptcy, new International Customer terms of service ("**2022 Terms of Service**") were uploaded to the FTX.com site. Greaves Decl. Ex. D. The governing law of the 2022 Terms of Service is English law. 2022 Terms of Service ¶ 38.11. Customers' acceptance of those terms – like many terms of service in a digital age – were automatic upon use. By logging into his, her or its account and using any of the services on the FTX International Platform, an International Customer would be deemed to accept the 2022 Terms of Service. *Id.* ¶ 22.1. These Terms of Service explicitly specified that FTX Digital was the "Service Provider" for nearly all digital asset product lines offered on the FTX International Platform, and permitted FTX Trading to novate its position under the Terms of Service to another party, including FTX Digital.[10] *Id.* ¶ 37.2; Schedules 2-7.[11] Although the U.S. Debtors try to diminish the role of the Service Provider (Adv. Pro. No. 23-50145 (JTD), Docket No. 1 ¶ 38 ("FTX DM had a limited mandate and a limited balance sheet, merely providing certain 'Specified Services' as a 'Service Provider' under the New Terms of Service."), it was actually the Service Provider with control over the accounts according to the "Specified Service description" and

---

[10] A "Service Provider" is defined as "the entity specified in a Service Schedule as responsible for providing the Specified Service referred to in that Service Schedule." 2022 Terms of Service § 1.1.

[11] Per the 2022 Terms of Service, FTX Trading remained the service provider for the NFT Market (Schedule 11) and the NFT Portal (Schedule 12) (together, the "**Unregulated Services**") because the DARE Act did not permit the Unregulated Products to be migrated to FTX Digital. Greaves Decl. ¶ 16. FTX Trading also remained the service provider for the leveraged tokens spot market (Schedule 8), the BVOL/iBVOL volatility market (Schedule 9) (the "**Other Services**" and together with the Unregulated Services, the "**Remaining FTX Trading Services**"). Based on the information available to the JPLs to date, the Remaining FTX Trading Services that stayed with FTX Trading represented no more than 10% of the business on the FTX International Platform.

"Service Provider" descriptions in each of the Schedules.  2022 Terms of Service, Schedules 2-7; *see e.g.* Schedule 6 ("The Volatility Market is a trading platform on which you can trade Daily MOVE Volatility Contracts, Weekly MOVE Volatility Contracts and Quarterly MOVE Volatility Contracts (collectively, MOVE Volatility Contracts) with other Users, with or without leverage…This Specified Service forms part of the Services and is provided by FTX Digital Markets Ltd.").  In other words, if an International Customer accessed his account on or after May 13, 202, FTX Digital became the Service Provider for a customer on the FTX International Platform and was the entity with control over that customer's account and its deposits.

32.     Further, any new International Customers who registered with the FTX International Platform after May 13, 2022 became customers of FTX Digital with respect to most of the services offered on the FTX International Platform.  *Id.* ¶ 1.3.

**B.      The SCB Revokes FTX Digital's License and Commences FTX Digital's Provisional Liquidation**

33.     On November 10, 2022, the Securities Commission of The Bahamas ("**SCB**") suspended the registration of FTX Digital under section 19 of the DARE Act.  Greaves Decl. ¶ 6. The SCB was, in fact, the only regulatory body worldwide that took any enforcement action against any FTX entity prior to the U.S. Debtors' petition date.  On November 10, the SCB petitioned the Bahamas Court for the Provisional Liquidation of FTX Digital, which the Bahamas Court granted. *Id.*  The Bahamas Court appointed Brian Simms KC as provisional liquidator.  *Id.*  On November 14, 2022, the Bahamas Court also appointed Kevin G. Cambridge and Peter Greaves as joint provisional liquidators.  *Id.*  Pursuant to the Provisional Liquidation order, the JPLs displaced FTX Digital's officers and directors.  *Id.*

34.     The next day, FTX Trading, along with the other U.S. Debtors, commenced these chapter 11 cases.  To date, FTX Trading has listed over 9 million International Customers on its

creditor matrix, more than 7 million of which they allege used the FTX International Platform.[12] As noted above, the issue of which customers would be mapped to which debtor has been a topic of discussion since the first day hearings, with all parties having reserved all rights to claim a customer as either a FTX Trading or FTX Digital customer. *See supra* ¶ 12.

### C.    Non-U.S. Law Customer Issues

35.    As also noted above, the sorting of account holders or customers will involve a series of legal determinations involving the various terms of service under non-U.S. laws, and then when it comes to customer recoveries, U.S. and Bahamian insolvency laws. All of the legal issues raised by the Application turn on questions of non-U.S. law. MacMillan-Hughes Decl. ¶ 5; Greaves Decl. Ex. A. In general, the Application concerns two overarching questions: 1) whether and to what extent the International Customer contracts were novated/migrated to FTX Digital prior to November 2022; and 2) whether and to what extent assets are held in trust by FTX Digital for the benefit of certain or all of its International Customers. Both issues are critical to the proper administration of FTX Digital's estate, and each raises a host of non-U.S. legal issues; including:

| Illustrative Foreign Law Customer Issues | Governing Law |
|---|---|
| 1.  Interpretation of the customer Terms of Service governing the FTX International Platform, both prior to and subsequent to May 13, 2022.[13] | Antiguan/English[14] |

---

[12] *See* Verification of Creditor Matrix, Case No. 22-11068-JD, Docket No. 574, Jan. 25, 2023; Ray Testimony at 1:17:30-1:19:00 (Dec. 13, 2022), https://www.youtube.com/watch?v=YQdvfBZ0VbQ&t=5172s.

[13] Application ¶¶ 1-3.

[14] 2019 Terms of Service ¶ 27; 2022 Terms of Service ¶ 38.11.

| Illustrative Foreign Law Customer Issues | Governing Law |
|---|---|
| 2. Applicable law regarding the novation/migration of customers from FTX Trading to FTX Digital. [15] | Antiguan/English[16] |
| 3. Whether the plan for novation/migration of the exchange business from FTX Trading to FTX Digital was implemented or legally effective.[17] | Bahamian, English or Antiguan[18] |
| 4. The legal terms of commercial arrangements and documents used in connection with the novation/migration and the enforceability thereof.[19] | Antiguan/English[20] |
| 5. The enforceability of the International Customers' advance consent in the applicable Terms of Service to the novation/migration and transfer of customers. [21] | Antiguan/English[22] |
| 6. The enforceability and effectiveness of amendments to the Terms of Service purportedly effective upon next login and use of the services.[23] | Antiguan/English[24] |

---

[15] Application ¶ 2.

[16] 2019 Terms of Service ¶ 27; 2022 Terms of Service ¶ 38.11.

[17] Application ¶¶ 3(a)-(b).

[18] MacMillan-Hughes Decl. ¶ 5; 2019 Terms of Service ¶ 27; 2022 Terms of Service ¶ 38.11.

[19] Application ¶¶ 1-3(a)-(c).

[20] 2019 Terms of Service ¶ 27; 2022 Terms of Service ¶ 38.11.

[21] Application ¶¶ 2-3(a)-(c).

[22] 2019 Terms of Service ¶¶ 27, 29; 2022 Terms of Service ¶¶ 37, 38.11.

[23] Application ¶¶ 1-3(a)-(c).

[24] 2019 Terms of Service ¶¶ 27-28; 2022 Terms of Service ¶¶ 22, 38.11.

| Illustrative Foreign Law Customer Issues | Governing Law |
|---|---|
| 7. Whether a partial novation of certain Specified Services to FTX Digital (e.g. in respect of the provision of "futures market") while leaving other Specified Services behind (e.g. "leveraged tokens") was permissible under the applicable Terms of Service. [25] | Antiguan/English[26] |
| 8. In what capacity does FTX Digital hold any digital assets or fiat (including what is the applicable law and whether FTX Digital holds these assets/currency as the legal owner for its own account or on trust).[27] | Bahamian/English[28] |
| 9. If FTX Digital holds any digital assets or fiat currency on trust, what assets are subject to the trust; whether FTX Digital, as trustee, had obligations with respect to the segregation or use of the assets); whether the trust is over a fluctuating pool of assets for the benefit of all International Customers of FTX Digital as co-owners; whether  International Customers have any rights to trace their property into specific assets held on trust; what if any rights do International Customers have against FTX Digital in respect of shortfalls in the assets held on trust. [29] | Bahamian/English[30] |
| 10. Whether cryptocurrency or fiat can be held by FTX Digital as bailee[31] | English/Antiguan law/Bahamas[32] |

---

[25] Application ¶¶ 3(a)-(c)

[26] 2019 Terms of Service ¶¶ 27-29, 2022 Terms of Service ¶¶ 1.3, 38.11, Schedules 2-7.

[27] Application ¶¶ 4(a)-(b).

[28] MacMillan-Hughes Decl. ¶ 5; 2019 Terms of Service ¶¶ 22, 27; 2022 Terms of Service ¶¶ 8.2.6., 38.11.

[29] Application ¶ 4(c).

[30] MacMillan-Hughes Decl. ¶ 5; 2019 Terms of Service ¶ 27; 2022 Terms of Service ¶ 38.11.

[31] Application ¶ 4(d).

[32] MacMillan-Hughes Decl. ¶ 5; 2019 Terms of Service ¶ 27; 2022 Terms of Service ¶ 38.11.

| Illustrative Foreign Law Customer Issues | Governing Law |
|---|---|
| 11. Who is the counterparty to the perpetual futures contracts[33] | English law[34] |

### D. The English, Bahamas, And Antiguan Laws Applicable To The Non-U.S. Law Customer Issues

36.     As depicted in the foregoing chart, one or more of English, Antiguan, or Bahamian law govern <u>all</u> of the issues framed by the Application.  The governing law of the 2022 Terms of Service is English Law;[35] the governing law of the terms of the 2019 Terms of Service is Antiguan law.[36]  In addition, certain relevant regulatory and insolvency issues are governed by Bahamian law, as FTX Digital is a Bahamian International Business Company ("IBC") in liquidation. MacMillan-Hughes Decl. ¶ 5.  Trust issues are also likely to be governed by Bahamas, English or Antiguan law, which is also a question that the Bahamas Court will need to adjudicate.  *Id.*

37.     What is most relevant (and perhaps most obvious) is that <u>none</u> of the issues framed in the Application are governed by U.S. law.  The FTX International Platform was not even available to U.S. users.  *See* First Day Declaration, ¶ 33 ("The FTX.com platform is not available to U.S. Users.").  Rather, the 2022 Terms of Service explicitly state, "Our services are not offered to Restricted Persons or persons who have their registered office or place of residence in the United States of America or any Restricted Territory." 2022 Terms of Service at 1.  *See id.* at 6-7 ("In order to be eligible to open an Account or use the Services you must meet the following eligibility

---

[33] Application ¶ 5.

[34] 2022 Terms of Service ¶ 38.11

[35] 2022 Terms of Service ¶ 38.11.

[36] 2019 Terms of Service ¶ 27.

criteria . . . 4.1.4 You do not have your registered office or place of residence in the United States of America or any Restricted Territory.").

38.     As to the non-U.S. laws that are, in fact, applicable here, The Bahamas and Antigua are members of the Commonwealth of Nations – a political association of 56 states, the majority of which are former territories of the British Empire.  MacMillan-Hughes Decl. ¶ 6.  The legal systems of both The Bahamas and Antigua are based on English common law.  *Id.*  Because certain of the legal issues set out in the Application are novel issues (due to the technology surrounding digital assets) of English, Antiguan or Bahamian law, they are likely to generate appeals.  *Id.* ¶ 9.  The final court of appeal for both countries is the Judicial Committee of the Privy Council of the United Kingdom (the "**Privy Council**"), a five-judge revolving panel sitting in London, England made up of Justices of the Supreme Court of the United Kingdom, the latter court being the final court of appeal for appeals from decisions of the courts of the United Kingdom.  *Id.* ¶ 7.  The decisions of the Privy Council are binding in the courts of the territory from which the appeal is made and, are of strong persuasive authority in other territories of the Commonwealth that still allow for appeals to the Privy Council (such as The Bahamas and Antigua) and in the United Kingdom.  *Id.*

**E.     The Next Procedural Steps In The Bahamian Liquidation After the Joint Provisional Liquidators File the Application**

39.     When the JPLs file the Application, the Bahamas Court is expected to schedule a prompt, initial hearing to enter a case management order.  MacMillan-Hughes Decl. ¶ 10.  Among other things, the case management order will address issues such as case scheduling, the filing of any affidavit evidence (and reply evidence), written submissions, and determining who should be notified of the Application (including customers who have already submitted claims in FTX Digital's Claims Portal).  *Id.*  All parties who have an interest in the Application will have the right

20

to appear and be heard individually or in a representative capacity. *Id.* Importantly, if they so choose, the U.S. Debtors may appear and request that the Bahamas Court defer to the U.S. Court for resolution on any issues framed by the Application. *Id.*

40.     Absent any abstention, the JPLs expect that the Bahamas Court will address each of the non-U.S. law questions in an efficient manner. *Id.* ¶ 11. And, while it is difficult to say with certainty how long it will take that Court to rule, the return date for FTX Digital's winding up Petition is August 10, 2023, and the JPLs expect the Court to rule on the Application before this date. *Id.*

41.     The laws of The Bahamas also provide for a robust appeal process following any ruling. *Id.* ¶ 12. All parties in interest, including the U.S. Debtors, if they engage in the Application, will have the opportunity to appeal (or seek leave to appeal) the decision to the Court of Appeal of the Commonwealth of The Bahamas, and ultimately to the Privy Council. *Id.*

**F.     The Cooperation Agreement**

42.     On January 6, 2023, the JPLs and the U.S. Debtors entered into the Cooperation Agreement. The Cooperation Agreement, among other things, (i) provides that the U.S. Debtors and the JPLs will support the Provisional Liquidation of FTX Digital and the Chapter 11 Cases, respectively (¶¶ 12-13); (ii) renders the JPLs responsible for recovering all assets and value of FTX Digital (¶ 4); and (iii) authorizes the JPLs to manage the disposition of property held by Bahamas-based FTX Property Holdings, Ltd. (¶ 15). Both this Court and the Bahamas Court have approved the Cooperation Agreement. Case No. 22-11068, Docket No. 683. Order (Settlement and Co-Operation Agreement), 10, February, 2023, attached hereto as **Exhibit 2**.

43.     By design, the Cooperation Agreement does <u>not</u> compromise any rights or obligations arising from the novation/migration of International Customers to FTX Digital. *See*

Cooperation Agreement ¶ 10.  All rights of the Parties with respect to those issues are expressly preserved.[37]  The Cooperation Agreement also states that "recognition in The Bahamas will not require the Bahamas Court to defer to the decisions of any foreign court (or alter a *de novo* standard of review) relating to any matter raised by the JPLs in The Bahamas Proceedings with respect to property of the estate of FTX Digital (including without limitation the scope of property of the estate, the application or extension of the automatic stay or the compromise or discharge of estate or third party claims in connection with a plan of reorganization)."  *Id.* ¶ 13.  A corresponding provision addresses the role of this Court: "recognition under Chapter 15 would not require the U.S. Bankruptcy Court to defer to the decisions of any foreign court (or alter a *de novo* standard of review) relating to any matter raised by the Chapter 11 Debtors in the Chapter 11 Cases with respect to property of the estate of the Chapter 11 Debtors (including without limitation the scope of property of the estate, the application or extension of the automatic stay or the compromise or discharge of estate or third party claims in connection with a plan of reorganization)." *Id.* ¶ 12.  In other words, the Cooperation Agreement itself contemplates a process by which the two affected courts will themselves have to coordinate on key issues affecting the FTX estates.

### G.    The U.S. Debtors' Lawsuit Against FTX Digital and the JPLs

44.    As discussed above, the JPLs gave the U.S. Debtors advance notice of their intent to file the Application by way of letter dated March 9, 2023. *See* Greaves Decl. Ex. E.  The JPLs did this in an effort to cooperate and coordinate with the U.S. Debtors, with the goal of ensuring an efficient resolution of these important legal issues.  The JPLs also gave advance notice to the

---

[37] The Cooperation Agreement states: "This Agreement does not address or compromise any rights or obligations of any Party arising out of or related to the user agreements or other arrangements relating to the International Platform or any other matter not specifically addressed in this Agreement." Cooperation Agreement ¶ 10.

U.S. Debtors that they would be seeking leave from the Bahamas Court to file this Motion, and counsel for FTX Trading appeared and were heard by the Bahamas Court on this issue at a hearing on March 20, 2023. At that hearing, counsel for the U.S. Debtors did not object to the JPLs' request to file this Motion. The Bahamas Court granted leave on March 21, 2023 (the "**Bahamas Lift Stay Order**"), paving the way for this Motion. Greaves Decl. Ex. H. As set forth in the Bahamas Lift Stay Order, the Bahamas Court expressly recognized that "*the issues raised by [FTX Digital's] officers, the JPLs, in the proposed [Application] is fundamental to the progress of the provisional liquidation of FTX Digital Markets Ltd. in this Honorable Court.*" *Id*. at 2. (emphasis added)

45.    Given the importance of prompt resolution of the Application the JPLs actively sought to engage the U.S. Debtors in discussions around coordinated, efficient, proceedings to resolve the Non-U.S. Law Customer Issues. After a letter campaign on the issue (*see* Greaves Decl. Exs. E-G), on March 15, 2023, the JPLs, their counsel, Mr. Ray and counsel to the U.S. Debtors held a virtual telephonic conference. The call began constructively, and the JPLs explained what it was that they were seeking to do and why it was important to proceed with filing the Application – to fulfill their duty to make a recommendation to the Bahamas Court on whether liquidation or reorganization of FTX Digital will serve the best outcome for FTX Digital's estate, its customers and its creditors. The JPLs explained that they could not progress towards this goal without an understanding of (i) who FTX Digital's customers and creditors are, and (ii) the scope of FTX Digital's rights to its and its customers' assets. Despite the JPLs' efforts to keep the discussion productive, it soon turned unproductive. The U.S. Debtors noted that FTX Digital was the only FTX entity that was not falling in line with their agenda, that the mere filing of the Application would send a "torpedo" into the Chapter 11 Cases, and that the U.S. Debtors would never consent

23

to any jurisdiction other than the U.S. to resolve any Non-U.S. Law Customer Issues. While sensitive to the U.S. Debtors' concerns, the JPLs explained that, as court-appointed fiduciaries, they are duty-bound to serve and cannot abdicate their duties in deference to the professionals of an afflicted entity. The JPLs reiterated their view that the best path forward would be to work together and come up with a consensual protocol to resolve all issues as to whose customers were whose. But, because the U.S. Debtors insisted that all Antiguan, Bahamian and English law issues should not be resolved at all, or should all be resolved by this Court at some unspecified future time, there was no engagement on any consensual protocol for a coordinated resolution of outstanding legal issues. The meeting ended with the U.S. Debtors committing only to think further on the issues discussed.

46.    Without any further engagement, on March 19, 2023, the U.S. Debtors filed the Adversary Proceeding. Adv. Pro. No. 23-50145, Docket No. 1 ("**Adv. Compl.**"). That filing was never substantively discussed with the JPLs, and instead was filed on one hour's notice to one of the JPLs' attorneys. The complaint seeks declaratory judgment on the same issues that the JPLs had been identifying for months and sought to resolve through a consensual cross-border cooperation protocol between the Bahamas and U.S. courts. Among other things, the complaint asks this Court to declare that no customers ever migrated from FTX Trading to FTX Digital under the 2022 Terms of Service and that FTX Digital has no ownership interest of any kind in any cryptocurrency, fiat currency, customer information, or intellectual property associated with the FTX International Platform *at all*.[38]  Adv. Compl. Counts I-IV, ¶¶ 53-87. It also alleges, without any specificity, that every transaction that FTX Digital was involved in during its existence was

---

[38] The complaint concedes that the 2019 and 2022 Terms of Service govern the relationship between customers and FTX Trading (¶ 36), but fails to mention that those documents are governed by Antiguan and English law, respectively.

fraudulent and is subject to avoidance. *Id*. Counts V-VII, ¶¶ 85-98. The complaint then seeks an order that the U.S. Debtors may recover from the FTX Digital estate all such transfers, and interest thereon to the date of payment, as well as the costs of the Adversary Proceeding. *Id.* at 26 (Prayer for Relief No. 6). The complaint specifically references recovering from FTX Digital's accounts at Moonstone Bank and Silvergate Bank, both of which are located in the U.S.

47.     Most inflammatory, the complaint alleges, in contradiction of the U.S. Debtors' prior statements to this Court, that Mr. Sam Bankman-Fried ("**SBF**") moved the FTX enterprise to The Bahamas for the sole purpose of funneling customer deposits and valuable property to The Bahamas, "out of the reach of American regulators and courts." *Id.* ¶ 23. Bizarrely, the U.S. Debtors also allege, for the first time, that FTX Digital's "formation and existence" was in furtherance of FTX's criminal conspiracy (*Id.* ¶ 21) despite the fact that SBF was the same individual who hired the U.S. Debtors' counsel and turned his enterprise over to Mr. Ray. Finally, despite the fact that the SCB was the first regulator to take action against any FTX entity, the U.S. Debtors allege that SBF and those he directed "maintained a close accommodating relationship with Bahamian law enforcement agencies" (*Id.* ¶ 24), that FTX Digital was only "ostensibly regulated by The Bahamas" (*Id.* ¶ 25) and that when operating in The Bahamas, SBF and his cohorts were "outside of the reach of any independent and effective regulatory authority." *Id.* ¶ 5. The JPLs and FTX Digital will respond to the complaint in due course and reserve all rights.

## **RELIEF REQUESTED**

48.     By the Motion, the JPLs respectfully request the Court to enter an order ("**Order**") substantially in the form attached as **Exhibit 1** (i) declaring that the automatic stay does not apply to the filing of the Application or in the alternative (ii) granting relief from the automatic stay

under Section 362(d)(1) of the Bankruptcy Code to allow the JPLs to file the Application and thereby start the process of a cross-border protocol for judicial cooperation.

## ARGUMENT

**I.    The Filing and Prosecution Of The Application Is A Normal, Expected Predicate For Cooperation Between This Court And The Bahamas Court Regarding The Resolution Non-U.S. Law Customer Issues**

49.    As noted above, the resolution of all Non-U.S. Law Customer Issues will require both this Court and the Bahamas Court to coordinate on resolving various legal and factual issues and how they pertain to the estates under their jurisdiction.

50.    This is, of course, not the first time that a U.S. bankruptcy court, supervising the chapter 11 case of a U.S. debtor, has had to coordinate with a non-U.S. court to come to closure on issues affecting that U.S. debtor's estate.  Indeed, U.S. bankruptcy courts have routinely relied on joint protocols in cross-borders cases such as this one, where coordination is necessary in order to prevent conflicts and the waste of estate resources.  This Court's Local Rules expressly provide detailed guidelines for judicial cooperation in parallel cross-border insolvencies, including court-to-court communication in such cases.[39]  *See* Local Rules for the United States Bankruptcy Court for the District of Delaware, Effective February 1, 2023, Part X ("Modalities of Court-to-Court Communication); *see also* Appendix A to the Local Rules "Guidelines for Communication and Cooperation Between Courts in Cross-Border Insolvency Matters" (the "**Guidelines**").  The Guidelines, which "should be considered at the earliest practicable opportunity" state, among other things, that "where a court intends to apply these Guidelines . . . it will need to do so by a protocol

---

[39] While the Local Rules seem to contemplate a single debtor in multiple parallel proceedings, as opposed to closely affiliated debtors in separate proceedings, the same concepts of comity, coordination, and efficiency should apply here, where the U.S. Debtors and FTX Digital were so closely intertwined in their pre-petition operations.

or an order . . ." (Guideline 2) and note that "[i]n the normal case, the parties will agree on a protocol derived from these Guidelines and obtain the approval of each court in which the protocol is to apply." *Id.* n. 3.

51.    Three cases are particularly instructive on how U.S. Courts view what should happen in a "normal" cross-border insolvency.

52.    In *Nortel Networks Inc.*, the U.S. debtors moved, on the petition date, for entry of a cross-border protocol, which established procedures for the coordination of cross-border hearings between the U.S. and Canadian courts. *In re Nortel Networks, Inc.,* 532 B.R. 494, 501–02 (Bankr. D. Del. 2015).    Both the U.S. and Canadian courts approved the protocol and subsequent amendments to the same.    *Id.*    The protocol provided for communication and cooperation between the two courts, without divesting either court from its respective jurisdictions. *Id.* at 531-532.    The protocol provided that the U.S. and Canadian Courts could coordinate to "determine an appropriate process by which the issue of jurisdiction [over specific issues] will be determined" (after submissions from all interested parties).    Order Approving Stipulation of the Debtors and the Official Committee of Unsecured Creditors of Nortel Networks Inc., Et Al., Amending the Cross-Border Court-to-Court Protocol at 7, *In re Nortel Networks Inc.*, Case No. 09-10138 (KG) (Bankr. D. Del. Jun 29, 2009) [Docket No. 990-1], attached hereto as **Exhibit 3**. Where one Court had jurisdiction over a matter that required the application of the law of the jurisdiction of the other Court to determine an issue before it, the Court with jurisdiction could, among other things, hear expert evidence or seek the advice and direction of the other Court. *Id.* at 7-8.    The protocol further provided that the Courts could communicate with each other to determine whether they could arrive at consistent rulings.    *Nortel*, 532 B.R. 494 at 532.

53.     Pursuant to the *Nortel* protocol, the two courts held a 21-day cross-border, joint evidentiary trial on a central issue in the case (the allocation of proceeds from the sale of various Nortel assets and business units).  *Id.* at 499-500.  After the trial, the Courts communicated "in an effort to avoid the travesty of reaching contrary results which would lead to further and potentially greater uncertainty and delay.  Based on these discussions, the Courts have learned that although their approaches to the complex issues differ, they agree upon the result."  *Id.* at 532.  In its decision, the U.S. Court noted that, "one of the reasons the cases have progressed to date is that the Courts have communicated and have arrived at consistent rulings even while exercising their judicial independence."  *Id.*

54.     In *In re Soundview Elite, Ltd.*, the Court *sua sponte* ordered the parties to work together to create a cross-border protocol for cooperation in a case concerning six U.S. debtors and the Cayman winding-up proceedings of three of those U.S. debtors. *In re Soundview Elite, Ltd.*, 503 B.R. 571, 575 (Bankr. S.D.N.Y. 2014).  The Cayman liquidators and certain creditors moved to dismiss the U.S. bankruptcy cases or, alternatively, for relief from the stay.  *Id.*  The debtors, like the U.S. Debtors here, sought to enforce the stay and prevent any activities in the Cayman proceeding.  *Id.*  Based on considerations of comity, the U.S. Court instead lifted the automatic stay to allow the existing Cayman proceedings for three of the debtors to continue, and "if necessary, to entertain similar proceedings for the three Debtors in this Court that do not have JOLs[.]"  *Id.* at 589.  The Court also ordered the parties to create a joint protocol to facilitate the cooperative administration of parallel proceedings in the U.S. and the Cayman Islands. *Soundview*, 503. B.R. at 589.  In so doing, Judge Gerber reasoned that "the Cayman and U.S. courts can and should work together cooperatively, with due comity to each other, to address the needs and concerns of stakeholders."  *Id.* at 595.

55.     In *In re Calpine Corporation,* Case No. 05-60200 (CGM) (Bankr. S.D.N.Y. 2005), Calpine Corporation, and its US affiliates (in chapter 11) were subject to a bond-ownership claim by their Canadian affiliates that were in separate Canadian bankruptcy proceedings. Debtors' Motion for an Order to Approve a Settlement with Calpine Canadian Debtors ("Debtors' Motion to Approve Settlement") at ¶¶ 5-12, *In re Calpine Corp.*, Case No. 05-60200 (CGM) (Jun. 28, 2007) [Docket No. 5113], attached hereto as **Exhibit 4**.  Ultimately, a cross-border protocol was negotiated by the parties and entered by both the Canadian and U.S. courts, which was instrumental in settling the bond-ownership issue. Order Approving Cross-Border Court-to-Court Protocol, *In re Calpine Corp.*, Case No. 05-60200 (CGM) (Apr. 12, 2007) [Docket No. 4309], attached hereto as **Exhibit 5**; Court of Queen's Bench of Alberta Approval of Court-to-Court Protocol, *In re Calpine Corp.*, Case No. 05-60200 (CGM) (Apr. 5, 2007) [Docket No. 4242-3], attached hereto as **Exhibit 6**; Debtors' Motion to Approve Settlement at ¶ 25.  At a joint hearing to approve the settlement, Judge Lifland (in the U.S. Court) and Justice Romaine (in the Canadian Court) emphasized the importance of the cross-border protocol in helping the parties reach resolution, and the value-draining alternative that the parties would have otherwise faced. Transcript of Joint Hearing with Canadian Judge in re Debtors' Motion for an Order to Approve Global Settlement with Calpine Canadian Debtors and other Relief at 207:20-24, *In re Calpine Corp.*, Case No. 05-60200 (CGM) (Jul. 24, 2007) [Docket No. 5749], attached hereto as **Exhibit 7**. (Judge Lifland noting that the settlement and efforts to achieve it "go[es] to demonstrate the desirability of approaching these cross-border matters through a medium of a protocol to allow us all to get access and recognition to our respective courts that way and to appear and be heard appropriately."); *id.* at 45:13-20 (Judge Lifland discussing "the need to enter into protocols so that we can get to a day like today, where all of those very complex issues could be viewed in a different light and a

different perspective, with coordination and cooperation being the watch word which turned out to be --well, I can't prejudge the hearing today, but it does appear that the parties have, at least those who are in support of the settlement, have come together as a unit"); *id*. at 206:18-207:07 (Justice Romaine emphasizing that "the enormous complexity and highly intertwined nature of the issues in this proceeding. The cross-border nature of many of the issues adds to the delicacy of the matter. Given that complexity, it behooves all parties in this court to proceed cautiously and with careful consideration; nevertheless, we must proceed toward the ultimate goal of achieving resolution of the issues. Without that resolution, the Canadian creditors face protractive litigation in both jurisdictions, uncertain outcomes, and continued frustration in unraveling the guardian [sic] knot of intercorporate and interjurisdictional complexities that plagued these proceedings on both sides of the border.").

56.     Each of these cases demonstrates that the overriding principles in successful cross-border disputes should be coordination, comity, and conservation of estate resources.  The filing of the Application is just the necessary first step in that process, and that filing should happen now.

## II.     The Automatic Stay Does Not Apply to Filing or Prosecution of the Application

57.     As the foregoing cases show, rather than using their respective automatic stays to mire the progress of parallel bankruptcy proceedings, courts charged with presiding over cross-border insolvencies tend to favor cooperation and coordination, if only to avoid the chaos and uncertainty of inconsistent rulings on issues that affect their debtors.  Here, however, the U.S. Debtors have claimed that the JPLs' mere filing of the Application, much less its prosecution, would constitute a willful violation of their automatic stay imposed by Section 362.  That is simply not true.

58.    Section 362(a) of the Bankruptcy Code imposes an automatic stay prohibiting, among other things, "the commencement or continuation . . . of a judicial, administrative, or other action or proceeding against the debtor[,]" and "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C. 362(a)(1), (a)(3).  The JPLs' Application is neither.[40]

59.    *First*, Section 362(a)(1) does not apply because the Application is not an action *against* the U.S. Debtors.  *Mar. Elec. Co., Inc. v. United Jersey Bank*, 959 F.2d 1194, 1204 (3d Cir. 1991) ("Although the scope of the automatic stay is broad, the clear language of section 362(a) indicates that it stays only proceedings against a 'debtor' — the term used by the statute itself."). The Application merely frames for the Bahamas Court the issues of: (i) whether the International Customers were migrated to FTX Digital; (ii) if so, when; (iii) if so, what were FTX Digital's obligations to those International Customers; (iv) if the digital assets or fiat were assets of FTX Digital; legally and beneficially; and (v) whether the perpetual futures contracts (which is part of the Services to which only Digital is named as Service Provider under the 2022 Terms) amounted to a contract between or among customers, or between customers and Digital or someone else. These questions can all be answered without necessarily involving FTX Trading.

60.    *Second*, Section 362(a)(3) does not apply because the Application does not seek to "obtain possession of property" of the U.S. Debtors' estates or "to exercise control over property of the estate."  Although courts have interpreted 362(a)(3) broadly, its application is not limitless. The JPLs have identified no case holding that the U.S. automatic stay can act to prohibit a foreign

---

[40] The other subsections of Section 362(a) are inapplicable here: Section 362(a)(2) is not applicable as there is no judgment sought to be enforced; Section 362(a)(4) and (a)(5) are not applicable as there is no lien sought to be created, perfected, or enforced; Section 362(a)(6) is not applicable as there is no act to collect, assess, or recover a claim; Section 362(a)(7) is not applicable as there is no attempt to setoff a debt; Section 362(a)(8) is not applicable as the Application is not a proceeding concerning a tax liability.

debtor from determining the nature and extent of the liabilities and assets of its own estate. Importantly, the Application will not have the effect of transferring or voiding any interest in any property of any U.S. Debtor.  Rather, were there to be any asset transfers that are necessitated by a ruling of the Bahamas Court on any of the Non-U.S. Law Customer Issues, those will have to be addressed in subsequent proceedings involving this Court.

61.    In addressing overlapping insolvency regimes, courts have acknowledged that a debtor taking actions within its rights under the applicable bankruptcy laws does not violate the stay of another debtor – even if those actions have consequences that flow to the other debtor's estate.  Cases involving the rejection of contracts between two debtors help clarify this point.  For example, in *In re Old Carco,* the debtor car-manufacturer did not have to seek relief from the automatic stay in another debtor's bankruptcy case before exercising its right to reject a contract in the debtor car-manufacturer's case, even though the counter-party to the rejected contract was another debtor.  The court held that rejection of the contract was "a fundamental right" of the debtor to not perform its contractual obligations.  *In re Old Carco LLC*, 406 B.R. 180, 211-12 (Bankr. S.D.N.Y. 2009); *see also In re Noranda Aluminum, Inc.*, 549 B.R. 725, 729 (Bankr. E.D. Mo. 2016) (when the debtor sought to reject an executory contract that a debtor in a separate case and court sought to accept, allowing the debtor to reject upon satisfying ordinary business judgment test); *In re Railyard Co.*, 562 B.R. 481, 487 (Bankr. D.N.M. 2016) (following *Old Carco* and *Noranda* and granting stay relief to allow the Chapter 11 Trustee to reject the debtor-landlord's unexpired commercial lease with related company also in bankruptcy, even though related company wished to assume the lease).  In a similar vein, one bankruptcy court held that a unilateral price increase by one debtor, did not necessarily violate the automatic stay of another debtor (the counterparty to the contract).  *In re Nat'l Steel Corp.*, 316 B.R. 287 (Bankr. N.D. Ill. 2004).  *Nat'l*

*Steel* involved a contract for the supply of steel used to make wheels and both supplier and manufacturer had filed their own chapter 11 petitions.  Rather than move to assume or reject the contract, the supplier-debtor unilaterally increased its prices after notifying the debtor-manufacturer that the price increase was necessary to enable it to continue shipping steel.  *Id.* at 297-98.  The manufacturer-debtor opposed the increase but paid the increased price.  *Id.* Thereafter, the manufacturer-debtor moved before the supplier-debtor's court, seeking allowance of an administrative expense and alleging, among other things, that the supplier-debtor had violated the manufacturer-debtor's automatic stay.  *Id.* at 299-311.  The court held that, although the contract was property of both bankruptcy estates, the supplier-debtor did not violate the manufacturer-debtor's automatic stay.  *Id.* at 311.  The court reasoned that, because the contract was not assumed, it was not enforceable, and therefore the supplier-debtor's price increase did not constitute an act to obtain possession of or control over property of the estate in violation of Section 362(a)(3).  *Id.*  Unlike the unilateral financial action that was permitted in *Nat'l Steel*, the Application here merely seeks to obtain clarity on novel issues of Bahamian, Antiguan, and English law that directly affect the FTX Digital estate and its creditors.

62.     The same reasoning extends to the JPLs' attempts, by the Application, to identify creditors that may have claims against <u>their</u> estate, and the determination of the extent of their estate's obligations and liabilities.  It is within any debtor's rights – indeed, it is paramount to any debtor's bankruptcy proceedings – to determine the extent of the debtor's property and its creditor body.  The automatic stay does not function to impede these rights, even if exercising them would "affect" the U.S. Debtors.

63.     Finally, the filing of the Application is not an act to control or take possession of the property of the estate of FTX Trading.  Ultimately, this Court will decide what is, or is not,

property of FTX Trading's estate whether in its own proceeding or by granting comity to the Bahamas Court's process and rulings either on a prospective or post-hoc basis. *In re SCO Grp., Inc.*, 395 B.R. 852, 858 (Bankr. D. Del. 2007) ("[I]t is the very essence of a bankruptcy court's jurisdiction to decide what is property of the estate.").  Asking the Bahamas Court to answer the legal questions that must be resolved before this Court can determine what is and is not property of the U.S. Debtors' estates is not an act to take control over that property.  While the JPLs certainly believe that the Bahamas Court's answer will be persuasive and should be adopted by this Court, this Court will ultimately decide for itself what effect the Bahamas Court's order has in these cases. For all of these reasons, the proper view is that the automatic stay does not apply to the Application at all.[41]

### III.    In the Alternative, The Court Should Lift the Automatic Stay to Allow the JPLs to File the Application and Initiate a Cross-Border Protocol

64.    Section 362(d)(1) provides that upon request of a party in interest and after notice and a hearing, the court may grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay — for cause.  11 U.S.C. § 362(d).  The Bankruptcy Code does not define "cause."  It is a flexible concept that is fact intensive, and must be determined case-by-case upon consideration of the totality of the circumstances. *See In re Scarborough St. James Corp.*, 535 B.R. 60, 67 (Bankr. D. Del. 2015); *see also In re Downey Fin. Corp.*, 428 B.R. 595, 608-09 (Bankr. D. Del. 2010).

65.    This Court has developed a three-prong balancing test for determining whether cause exists to lift the stay:

---

[41] The U.S. Debtors' Adversary Proceeding is a different animal entirely, as it names FTX Digital as a defendant and specifically asserts claims seeking to avoid FTX Digital's interests in its own assets in the United States.  As to that violation, FTX Digital and the JPLs reserve all rights.

(i) Whether any great prejudice to either the bankruptcy estate or the debtor will result from continuation of the civil suit;

(ii) Whether the hardship to the [movant] by maintenance of the stay considerably outweighs the hardship to the debtor; and

(iii) Whether the creditor has a probability of prevailing on the merits.

*In re Scarborough-St. James Corp.*, 535 B.R. at 68.

66.      Courts in the Third Circuit also consider general policies underlying the automatic stay in determining whether to lift it.  *In re Abeinsa Holding, Inc.*, Case No. 16-10790 (KJC), 2016 WL 5867039, at *3 (Bankr. D. Del. Oct. 6, 2016).  These factors can include considerations of comity and the factors supporting mandatory abstention.  *Drauschak v. VMP Holdings Ass'n, L.P. (In re Drauschak)*, 481 B.R. 330, 345-46 (Bankr. E.D. Pa. 2012) (explaining that "[i]ssues of comity and economy may dictate that the non-bankruptcy forum conclude the resolution of . . . [a pending] dispute and the bankruptcy stay should be modified for such purpose" and, "[t]he factors supporting mandatory abstention . . . including judicial economy, would also justify applying the aforementioned exception to modify the automatic stay."); *see also In re SCO Grp., Inc.*, 395 B.R. at 857 (discussing the legislative history of Section 362(d)(1) and the "importance of allowing the case to proceed in the original tribunal so long as there is no prejudice to the estate").

**A.      The Three Prong Balancing Test Weighs In Favor of Lifting the Stay**

**1.      Resolving the Foreign Law Customer Questions in The Bahamas Does Not Prejudice the U.S. Debtors**

67.      The first factor in the balancing test is "[w]hether any great prejudice to either the bankrupt estate or the debtor will result from" the proceeding. *In re SCO Grp., Inc.*, 395 B.R. at 857-58; *see also In re Scarborough-St. James Corp.*, 535 B.R. at 68.

68.      In *Scarborough*, a landlord sought relief from the stay to continue eviction proceedings against the debtor in Michigan state court.  The debtor argued that it would suffer

harm if the Michigan litigation continued because (i) a negative determination of the debtor's lease rights would prejudice it in another appeal and, (ii) the Michigan litigation would distract from and interfere with the debtor's reorganization efforts. *In re Scarborough-St. James Corp.*, 535 B.R. at 68. The *Scarborough* court rejected both arguments, finding that there was no prejudice because the issue of "whether or not the lease was terminated prepetition must be decided in order to determine Debtor's interest in the lease . . . [and] . . .the Michigan Court [was] in a position to make that determination and has familiarity with the parties and the facts of the case." *Id.* The court noted that the debtor's rights were not in jeopardy because it could still "raise in the Michigan Court any and all arguments in support of its position." *Id.* The court held that lifting the stay would not cause the debtor great prejudice.

69.     Similarly, in the *SCO* litigation, a creditor moved to lift the stay to continue a lawsuit against the debtors concerning software licensing and copyright issues. *In re SCO Grp., Inc.*, 395 B.R. at 856. The court lifted the stay, finding that the debtors would not be prejudiced because, "the Debtors simply cannot file a confirmable plan of reorganization until they know what liability they have to . . . [the creditor]. The resolution of the issues remaining in the District Court litigation will assist the Debtors, not burden them." *Id.* at 859.

70.     The facts here compel the same result for four reasons:

71.     *First*, the U.S. Debtors cannot be harmed by having the jurisdiction of the Bahamas Court invoked to allow that Court and this Court to decide who decides. The U.S. Debtors consented to jurisdiction in The Bahamas, insisted that they be recognized in that proceeding, and, in fact, have been recognized with full rights of participation. The mere notion, promoted by the U.S. Debtors, that this Court and the Bahamas Court cannot be allowed to talk to one another to explore the contours of an efficient, prompt and coordinated litigation is, frankly, offensive.

72.     *Second*, like the *SCO* and *Scarborough* debtors, the U.S. Debtors are not prejudiced by having the Non-U.S. Law Customer Issues submitted to the Court best positioned to resolve them.  Indeed, the JPLs submit that the Bahamas Court provides a more appropriate forum for deciding these issues because the Bahamas Court is familiar with the applicable English and Commonwealth laws.  This is especially so because the Non-U.S. Law Customer Issues involve largely complex and novel issues of English, Antiguan or Bahamian law relating to cryptocurrency, some of which no court in the Commonwealth has heard before.  MacMillan-Hughes Decl. ¶ 9.  *See In re DHP Holdings II Corp.*, 435 B.R. 220, 227 (Bankr. D. Del. 2010) (holding that state courts are the best forum to decide novel or unsettled issues of state law); *see also In re A & D Care, Inc.*, 90 B.R. 138, 141-42 (Bankr. W.D. Pa. 1988) (non-bankruptcy court more appropriate especially when the controversy arises on unsettled issue of non-bankruptcy law) (collecting cases).[42]  The only alternative – having this Court take jurisdiction over the Non-U.S. Customer Issues – is the least attractive alternative, if only because each party-in-interest on the customer issues, including the JPLs, the U.S. Debtors, the UCC, the Ad Hoc Group of Non-US Customer of FTX, and an unknown number of actual customers would all have to hire and present their own foreign law experts.  In contrast, the expert in The Bahamas – the Court – can provide a clear unconflicting depiction of Bahamas law and, unlike almost everyone else in these Cases (save this Court and the U.S. Trustee), will provide its views free of charge.

---

[42] *See also In re Williams*, 88 B.R. 187, 191 (Bankr. N.D. Ill. 1988) (abstaining from action concerning alleged violation of state insurance laws and reasoning, "[t]he issues are not simple[,]" "[t]he statutes and regulations involved are not clear[,] "[u]nresolved issues of Illinois law are involved[,] and "[s]uch question are best left to the interpretation of an Illinois State judge."); *Railroad Comm'n v. Pullman Co.*, 312 U.S. 496, 501 (1941) (finding Texas state courts were proper forum to determine state law issues that needed to be resolved); *Thompson v. Magnolia Petroleum Co.*, 309 U.S. 478, 483 (1940) (affirming Bankruptcy Court's decision that state court was proper forum to determine oil rights, and therefore, the extent of property of the estate); *In re FairPoint Commc'ns, Inc.*, 462 B.R. 75, 88 (Bankr. S.D.N.Y. 2012) (finding New Hampshire state courts to be better suited to debtor's rights under the New Hampshire Constitution).

37

73.     *Third*, even an ultimate adjudication of the non-U.S. Law Customer Issues in the Bahamas will not prejudice FTX Trading.  As noted, FTX Trading's foreign representative was recognized in the Bahamas, can participate in the Application proceedings, has been involved in the proceedings on the Application to date (through appearing before the Bahamas Court with respect to the Bahamas Lift Stay Order),[43] and will be able to appeal if necessary and if they so choose.  *Cf. In re Spanish Cay Co., Ltd.*, 161 B.R. 715, 724-727 (Bankr. S.D. Fla. 1993) (granting stay relief to allow commencement of Bahamian insolvency proceeding and noting that "[a]pplying the principle of comity and deferring to the Bahamian courts and Bahamian law to govern any insolvency proceeding with respect to this Debtor [was] appropriate [] since (1) the Debtor [was] a Bahamian company and (2) the Debtor's principal asset [was] real property located in the Bahamas.").  The U.S. Debtors will therefore receive notice and will have the right to oppose the Application and be heard on the matter.  Additionally, the laws of The Bahamas provide for due process and a robust appeal process.  MacMillan-Hughes Decl. ¶ 12.  Courts have recognized that the Bahamian bankruptcy laws are in harmony with those of the United States and should be afforded comity.  *See In re Northshore Mainland Servs., Inc.*, 537 B.R. 192 (Bankr. D. Del. 2015) (Winding up Proceeding in the Bahamas was the appropriate forum to adjudicate issues involving the Bahamian Debtor.); *see also Matter of Culmer*, 25 B.R. 621 (Bankr. S.D.N.Y. 1982); *Aranha v. Eagle Fund, Ltd. (In re Thornhill Glob. Deposit Fund Ltd.)*, 245 B.R. 1 (Bankr. D. Mass. 2000) ("The provisions of Bahamian law related to liquidation proceedings are in substantial conformity with our own Bankruptcy Code.").

---

[43] As mentioned in the Greaves Declaration, through counsel, FTX Trading appeared at the hearing on the Bahamas Lift Stay Order and did not oppose the relief sought by the JPLs in getting leave from the Bahamas Court to file this Motion.  Greaves Decl. ¶ 21.

74.     *Fourth and finally*, the U.S. Debtors and this Court will not be prejudiced by the adjudication of the Application because it will not ultimately determine what cash or other assets are or are not property of FTX Trading's estate.  The Application effectively seeks only to have the Bahamas Court determine (1) which customers are mapped to FTX Digital's estate and (2) what right those customers have in the assets of FTX Digital's estate.  Again, courts routinely lift the stay where another court is better positioned to address underlying legal issues, while reserving issues as to how that resolution affects the estate.  *See In re Tribune Co.*, 418 B.R. 116, 128 (Bankr. D. Del. 2009) (lifting the stay to allow a California Action to proceed, which would determine whether debtors held rights in the published comic strip series entitled "Dick Tracy" as the questions to be addressed in the California Action would determine whatever rights the debtors held and thus what assets are property of the estate); *Thors v. Allen*, Civ. Nos. 16-2224 (RMB), 16-2225 (RMB), 2016 WL 7326076, at *8 (D.N.J. Dec. 16, 2016) (affirming bankruptcy court decision to lift stay where the state court was "the more capable and the more proper venue to resolve" an issue of state law "that was throwing a wrench in the ability of the bankruptcy to proceed"); *In re Breitburn Energy Partners L.P.,* 571 B.R. 59, 68 (Bankr. S.D.N.Y. 2017) (affirming decision to lift stay to allow Texas court to determine an issue of unsettled Texas law which would "assist [the bankruptcy] court and ultimately contribute to a resolution of the dispute."); *In re Mark Scott Constr., LLC*, Case No. 03-36440 (HCD), at *4-5 (Bankr. N.D. Ind. Apr. 23, 2004) (granting stay relief where Michigan was the proper locale for litigation because, among other things "the Michigan state trial courts have more expertise concerning the interpretation of Michigan's [laws and regulations]," and the contracts at issue were signed in Michigan and involved land and projects in Michigan), attached hereto as **Exhibit 8**; *In re PG & E Corp.*, Case No. 19-30088 (DM), 2019 WL 3889247, at *2 (Bankr. N.D. Cal. Aug. 16, 2019)

(granting stay because, "relief from stay [would] definitively bring a resolution as to Debtors' liability [], and provide an important data point that most likely [would] facilitate resolution of . . . claims in this case."); *see also Int'l Tobacco Partners, Ltd. v. Ohio (In re Int'l Tobacco Partners, Ltd.)*, 462 B.R. 378, 393 (Bankr. E.D.N.Y. 2011) (implicitly lifting the stay by abstaining in favor of a Massachusetts state court proceeding because it "appears to be the more appropriate forum for determining the preliminary questions: whether [d]ebtor holds a valid assignment under Massachusetts law, and whether that assignment has priority over Ohio's attachment and levy.").

> **2.  The Hardship to the JPLs by Maintenance of the Stay Considerably Outweighs the Hardship to the U.S. Debtors**

75.    The second lift-stay factor is "[w]hether the hardship to the [moving] party by maintenance of the stay considerably outweighs the hardship to the debtor." *In re SCO Grp., Inc.*, 395 B.R. at 857.

76.    In this case, the hardship to FTX Digital if the JPLs cannot adjudicate the Non-U.S. Law Customer Issues in The Bahamas far outweighs the hardship to the U.S. Debtors if the Court lifts the stay.  Indeed, FTX Digital's Provisional Liquidation cannot proceed without resolving:

- the identity of the creditors to whom FTX Digital owes (or does not owe) money or assets;

- which money or assets are FTX Digital's;

- how expansive the FTX Digital estate is;

- whether FTX Digital's assets are held in trust on behalf of customers or not;

- who the real party in interest is in prosecuting clawback actions to recover FTX Digital's assets;

- who the real party in interest is when defending against claims brought by customers; and

- whether FTX Digital has any contractual rights against, or owes obligations to, customers who held perpetual futures.

As the Bahamas Court has already ruled, each of these issues is "fundamental" to the JPLs' mandatory duty to reconcile claims against FTX Digital's estate and affects all aspects of the FTX Digital estate.  Greaves Decl. Ex. H., Bahamas Lift Stay Order, p. 2.

77.    Moreover, a correct, binding determination of the customer questions under Bahamas, English and Antiguan law is critical for this Court to eventually equitably adjudicate FTX Digital's rights in the U.S. Debtors' cases.  *See In re SCO Grp., Inc.*, 395 B.R. at 859 ("[W]ithout a ruling on the Liability Issues . . . [the creditor's] rights in these bankruptcy cases remains undetermined and the value of . . . [the creditor's] claim will remain a troubling issue for the Court . . . [the creditor] . . . and [d]ebtors.").  Indeed, adjudication of the issues within the Application remains fundamental whether done by this Courtbre or by the Bahamas Court.  The only difference is that the Bahamas Court would not normally need experts to apply the laws of its own jurisdiction and the Commonwealth, whereas this Court would necessarily have to hear from hired experts on Bahamas, Antiguan and English law governed issues.  There can be little doubt that if this Court adjudicates these issues, the estates will incur millions more in fees for expert testimony and for U.S. lawyers just to learn the outer bounds of non-U.S. law.  Accordingly, this factor supports lifting the stay.

### 3.    The Merits Weigh In Favor of Lifting the Stay

78.    Finally, the third lift-stay factor considered in the Third Circuit is "[t]he probability of the [movant] prevailing on the merits." *In re SCO Grp., Inc*., 395 B.R. at 857. For this factor, "[t]he required showing is very slight." *Matter of Rexene Prod. Co.*, 141 B.R. 574, 578 (Bankr. D. Del. 1992).  To meet it, the JPLs merely need to show that their claim is not frivolous. *In re Levitz Furniture*, 267 B.R. 516, 523 (Bankr. D. Del. 2000) ("Defendants have met the third prong, since that merely requires a showing that their claim is not frivolous.").

79.     The JPLs clearly exceed that bar here, where there is publicly available documentary evidence that: the FTX Group (1) had a plan to move the international operations to the Bahamas,[44] and (2) began to execute on that plan by, among other things, moving the FTX Group's management team to The Bahamas and establishing the headquarters of the FTX Group there.  Greaves Decl. ¶ 14. The U.S. Debtors have also admitted that at least some International Customers of FTX Trading migrated to FTX Digital, *Hr'g Tr. November 22, 2022*, 26:13-18 ("With respect to the Dotcom Silo – and this is the international silo . . . approximately 6 percent were customers of FTX Digital Markets Limited"), and billions of dollars of International Customer money ran through multiple FTX entities' bank accounts.[45]  Moreover, the U.S. Debtors have conceded that "open" questions exist about whether the migration of other categories of International Customers were completed as a matter of law.  *Hr'g Tr. February 15, 2023,* 30:14-18, 20-21 (U.S. Debtors' counsel stating that "things like assets that were in FTX Digital market accounts, or the migration of customers, and things of that sort.  Those are all open issues" and that "the issues as to whether assets belong in the Bahamian estate or in the U.S. estate are open issues").

### B.     Considerations of Comity Also Support Lifting or Modifying the Stay

80.     Finally, in addition to all of the foregoing, where a non-U.S. judicial regime is in play, courts within and outside the Third Circuit have considered the same factors that justify abstention, including considerations of comity, to justify lifting the automatic stay to allow

---

[44] *See* Decrypt, "FTX Relocates from Hong Kong to Bitcoin-Friendly Bahamas", Sept. 24, 2021.  Accessible at:  https://decrypt.co/81834/ftx-relocates-hong-kong-bitcoin-friendly-bahamas

[45] *See* Ray Testimony (1:12:57-1:13:15) (Ray: "Definitely assets of customers in the Dotcom silo were transferred to Alameda, no question."); *see also id.* (43:25-43:30) (Ray: "We can confirm that funds were deposited directly into Alameda as opposed to FTX.com").

litigation to proceed outside the U.S.  *See In re Drauschak*, 481 B.R. at 346; *Pursifull v. Eakin*, 814 F.2d 1501, 1505-06 (10th Cir. 1987) (holding that reasons given by the district court to support abstention constituted sufficient cause for lifting the stay); *In re Spanish Cay Co.*, 161 B.R. at 725 (granting stay relief to allow commencement of Bahamian insolvency proceeding and noting that "[a]pplying the principle of comity and deferring to the Bahamian courts and Bahamian law to govern any insolvency proceeding with respect to this Debtor [was] appropriate [] since (1) the Debtor [was] a Bahamian company and (2) the Debtor's principal asset [was] real property located in the Bahamas."); *see also Int'l Tobacco Partners, Ltd.*, 462 B.R. at 395 (abstaining in favor of a Massachusetts state court proceeding, reasoning that "the interest of justice . . . the interest of comity with State courts [and] respect for State law" tip the scale in favor of abstaining from this matter).  Considerations of comity and judicial economy strongly favor lifting the stay.

81.     *First*, as discussed above, the Bahamas Court will need to decide the Non-U.S. Law Customer Issues in the context of FTX Digital's Provisional Liquidation–the winding-up or restructuring of FTX Digital will not be possible otherwise because the JPLs will not know what customers and what assets FTX Digital has.  This reality – unless addressed through the formation of a cross-border judicial protocol – presents the very real risk for conflicting rulings among this Court, and the Bahamas Court.  This would be an inefficient result, and not an equitable one for creditors of FTX Digital or the U.S. Debtors. [46]

---

[46] *See Arkwright–Boston Mfrs. Mut. Ins. Co. v. City of New York,* 762 F.2d 205, 211 (2d Cir. 1985) (holding that the scales tipped in favor of abstention because the case raised novel issues of state tort and construction law); *see also In re Advanced Cellular Sys.* , 235 B.R. 713, 726-27 (Bankr. D.P.R. 1999) (the court, while ultimately holding that it did not have jurisdiction, observed that it would have to abstain from the adversary proceeding if it had jurisdiction, otherwise it would run the risk of conflicting rulings, piecemeal litigation of the claims, and unequal treatment of claimants);  *In re Lafayette Radio Elecs. Corp.*, 8 B.R. 973, 977 (Bankr. E.D.N.Y. 1981) ("[A]bstention avoids the potential conflict and further avoids duplication by the federal court, of the state court procedures.").

82.     *Second*, Courts have "frequently underscored the importance of judicial deference to foreign bankruptcy proceedings." *In re Northshore Mainland Servs., Inc.*, 537 B.R. at 207 (citing *Finanz AG Zurich v. Banco Economico S.A.*, 192 F.3d 240, 246 (2d Cir. 1999)) (abstaining in favor of Bahamian liquidation proceedings); *see also Stonington Partners v. Lernout & Hauspie Speech Prods N.V.*, 310 F.3d 118, 126 (3d Cir. 2002) ("The principles of comity are particularly appropriately applied in the bankruptcy context because of the challenges posed by transnational insolvencies"); *In re Cenargo Int'l, PLC*, 294 B.R. 571, 592-93 (Bankr. S.D.N.Y. 2003) (noting prior decision in the *Cenargo* matter to dismiss Chapter 11 proceedings in deference to English administration proceedings); *Maxwell Commc'n. Corp. v. Barclays Bank (In re Maxwell Commc'n. Corp.*), 170 B.R. 800, 817-18 (Bankr. S.D.N.Y. 1994) (dismissing avoidance adversary proceeding in favor of Ch. 11 debtor's U.K. bankruptcy proceeding to allow the U.K. court to decide issues of U.K. law where the challenged transfers occurred in England, the debtors were incorporated and executives ran the company out of England, the loans surrounding the transfers were executed in England and English law were to govern any disputes arising out of the transfers. The Court reasoned that, having found that "English law ought govern, [the issue of whether the preferential transfers were avoidable], considerations of comity dictate that these suits be dismissed.").

83.     *In re Soundview,* discussed above, is instructive here.  In that case, the Court lifted the automatic stay based largely on considerations of comity. *In re Soundview Elite, Ltd.,* 503 B.R. at 595. .  Even though the debtors in *Soundview* had pending U.S. bankruptcy proceedings and their principal places of business were in the U.S., the Court ordered the creation of a joint protocol to allow both proceedings to advance cooperatively, balancing the needs of all stakeholders. *Id.* The Court relied on the reasoning of a Cayman decision which embraced "cooperation and

coordination in cross-border insolvency proceedings where the majority of the investigations to be undertaken for the realization of [debtor's] assets are required to be undertaken in the United States, but the claims that the petitioners and … other investors may have against the company will have to be examined and assessed according to the law of the Cayman Islands." *Id.* (internal citations and quotations omitted).

84.    The same reasoning applies even more strongly here where FTX Digital does not have a pending Ch. 11 case, and its place of business was always in The Bahamas.  Moreover, in this case, extending comity to the Bahamas Court is particularly important because cooperation will be necessary for any chapter 11 plan for the U.S. Debtors to be enforced in The Bahamas.  *In re Spanish Cay Co.*, 161 B.R. at 725 (potential for successful chapter 11 reorganization at best questionable because U.S. court orders may be given no effect in Bahamas); *In re Int'l Admin. Servs., Inc.*, 211 B.R. 88, 93 (Bankr. M.D. Fla. 1997) (noting that bankruptcy court lacks the ability to enforce jurisdiction over property located in foreign country without assistance of foreign court).

85.    The U.S. Debtors' U.S.-first position goes squarely against these principles.  As discussed above, the JPLs have court-appointed duties and obligations to the Bahamas Court.  The JPLs' obligation, just like the U.S. Debtors', is to ensure the highest and best recoveries for the recognized creditors of the estate.  But the JPLs cannot produce *any* result for their estate without first answering the threshold questions asked in the Application and in this Motion.  The U.S. Debtors instead invite this Court to support their refusal to engage at all on the Non-U.S. Law Customer Issues and to disregard completely the Bahamian Court overseeing FTX Digital's Provisional Liquidation.  This Court should decline that invitation.  The JPLs have done everything to pay deference and respect to the U.S. Debtors' proceedings and this Court (unlike the liquidators

in *Soundview*, for instance), and this Court should require the U.S. Debtors to do the same for the Bahamas Court and the recognized proceedings before it.

86.     *Third*, the Bahamas Court offers a more appropriate forum for resolving the Non-U.S. Law Customer Issues than the U.S. because International Customers of both FTX Digital and FTX Trading would have expected that disputes relating to the Terms of Service would be resolved outside the U.S., by a court familiar with the applicable English and Commonwealth laws, and the opportunity to appeal as far as the Privy Council.  *In re Northshore Mainland Servs., Inc.*, 537 B.R. at 206 (dismissing chapter 11 cases in light of a provisional liquidation in The Bahamas and observing that "[e]xpectations of various factors –including the expectations surrounding the question of where ultimately disputes will be resolved –are important, should be respected, and not disrupted unless a greater good is to be accomplished").

87.     In that regard, the FTX Group conspicuously relocated its headquarters to The Bahamas in 2021, where the nerve center of its operations and its co-founders were located up until the insolvency proceedings.  Greaves Decl. ¶18.  FTX Trading operated out of The Bahamas before portions of the International Customers were migrated to FTX Digital.  *Id.*  Moreover, as a Bahamian regulated entity, it was part of the public record that FTX Digital was licensed under the DARE Act, putting third parties on notice that the FTX Group's international exchange business was operated out of The Bahamas, and subject to the SCB's regulatory oversight.  By contrast, the FTX International Platform specifically forbade U.S. users from using the platform. Greaves Decl. ¶11.  Moreover, neither FTX Digital nor FTX Trading have a significant creditor body in the United States.  First Day Declaration ¶ 33.[47]

---

[47] There appear to have been a handful of U.S. users that were on the platform improperly.  *See* Ray Testimony 2:10:23-2:10:35 "There was a limited number of [U.S. Users] that invested on the .com which was not the intended use of that Exchange"; *see also id.* at 1:11:20-12:00 ("We don't have those kind of

88.     *Fourth*, the interests of judicial economy would be well-served by lifting the stay where, as here, the alternative is for this Court to decide unsettled, complex and novel issues of Bahamas, English, and Antiguan law, in a proceeding that is already portending to set records for administrative costs.  The decision in *Matter of Williams* is instructive on this point. *In re Williams*, 144 F.3d 544 (7th Cir. 1998). In that case, the Seventh Circuit found that a bankruptcy court did not abuse its discretion by modifying the automatic stay to permit state court action to determine the debtor's interest in a lease and therefore determine "whether the lease had any value that could be assumed under her plan," reasoned that "had the bankruptcy court not modified the stay so that the forcible entry case could go forward, likely it would then have to determine the merits to her right of possession." *Id.* at 550. The bankruptcy court had "no particular expertise under this narrow area of state law," so determining the merits of the debtor's right to possession "would not be a particularly efficient use of judicial resources."   The court therefore concluded that the bankruptcy court did not abuse its discretion in lifting the stay because, among other things, "in a case like this all roads lead to the state court" and that "[the] sooner [the] issues are resolved, the sooner the parties can move on." *Id.*  Just as in *Williams*, the Non-U.S. Law Customer Issues will need to be decided and, as in *Williams*, requiring this Court to wrestle with unsettled issues of foreign law "would not be a particularly efficient use of judicial resources." *Id*.  Here, "all roads lead to" an English-law governed court – and what better than the Bahamas Court, where these issues are already front and center and where both parties can fully participate and be heard.  *Id.* And, indeed, just as in *Williams*, "[the] sooner [the] issues are resolved, the sooner the parties can move on." *Id.*

---

numbers on an investor basis, we have it on a customer basis. But you're talking about less than a couple hundred.")

## NOTICE

89.     The JPLs will provide notice of this Motion to the following parties: (i) counsel to the U.S. Debtors; (ii) Office of the United States Trustee for the District of Delaware; (iii) counsel to the Official Committee of Unsecured Creditors in the Chapter 11 Cases; and (iv) all parties entitled to notice of this Motion pursuant to Bankruptcy Rule 2002 and Local Rule 4001-1(a).  The JPLs submit that, in view of the facts and circumstances, such notice is sufficient and no other or further notice need be provided.

## NO PRIOR REQUEST

90.     No previous request for the requested relief has been made to this or any other Court.

## CONCLUSION

WHEREFORE, for the reasons stated above, the JPLs ask the Court to enter the Order, substantially in the form attached hereto as **Exhibit 1**.

[*Remainder of page intentionally left blank.*]

48

Dated: March 29, 2023

/s/ *Kevin Gross*

**RICHARDS, LAYTON & FINGER, P.A.**          **WHITE & CASE LLP**

Kevin Gross (No. 209)                        Jessica C. Lauria (admitted *pro hac vice*)
Paul N. Heath (No. 3704)                     J. Christopher Shore (admitted *pro hac vice*)
Brendan J. Schlauch (No. 6115)               Brian D. Pfeiffer (admitted *pro hac vice*)
David T. Queroli (No. 6318)                  Mark Franke (admitted *pro hac vice*)
One Rodney Square                            Brandon Batzel (admitted *pro hac vice*)
920 N. King Street                           Brett L. Bakemeyer (admitted *pro hac vice*)
Wilmington, DE 19801                         1221 Avenue of the Americas
Telephone:    (302) 651-7700                 New York, NY 10020
Facsimile:    (302) 651-7701                 Telephone:    (212) 819-8200
gross@rlf.com                                jessica.lauria@whitecase.com
heath@rlf.com                                cshore@whitecase.com
schlauch@rlf.com                             brian.pfeiffer@whitecase.com
queroli@rlf.com                              mark.franke@whitecase.com
                                             brandon.batzel@whitecase.com
                                             brett.bakemeyer@whitecase.com

-and-

                                             Thomas E Lauria (admitted *pro hac vice*)
                                             Richard S. Kebrdle (admitted *pro hac vice*)
                                             200 South Biscayne Boulevard, Suite 4900
                                             Miami, FL 33131
                                             Telephone:    (305) 371-2700
                                             tlauria@whitecase.com
                                             rkebrdle@whitecase.com


                                             *Attorneys for the Joint Provisional Liquidators
                                             of FTX Digital Markets Ltd. (in Provisional
                                             Liquidation)*