**EXHIBIT 7**

**In re Calpine Corp., Case No. 05-60200 (CGM) (Jul. 24, 2007) [Docket No. 5749]**

1

```
1    UNITED STATES BANKRUPTCY COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ---------------------------------------x
3      In the Matter of
                                      Case No.
4      CALPINE CORPORATION, et al.,           05-60200
5                          Debtors.
     ---------------------------------------x
6
7    IN THE COURT OF QUEEN'S BENCH OF ALBERTA
     JUDICIAL DISTRICT OF CALGARY
8    ---------------------------------------x
9    In the Matter of
10   THE COMPANIES' CREDITORS ARRANGEMENT ACT,  Action No.
          R.S.C. 1985, c. C-36, AS AMENDED      0501-17864
11              AND IN THE MATTER OF
     CALPINE CANADA ENERGY LIMITED, et al.,
12
                               Applicants.
13   ---------------------------------------x
14                      July 24, 2007
                        United States Custom House
15                      One Bowling Green
                        New York, New York 10004
16
17           Joint Hearing with Canadian Judge in re:  Debtors'

     Motion for an Order to Approve Global Settlement with
18
     Calpine Canadian Debtors and Other Relief; Approval of Bond
19
     Sale; Debtors' Emergency Motion with Respect to CCAA
20
     Proceedings; Debtors' Partial Objection to Proof of Claim.
21
22   B E F O R E:
23              HON. BURTON R. LIFLAND,
                          U.S. Bankruptcy Judge
24              - and -
25              HON. B.E.C. ROMAINE,
                          Queen's Bench Justice
```

2

U.S.  A P P E A R A N C E S:


         KIRKLAND & ELLIS LLP

     Attorneys for the Debtors,
                 Calpine Corp, et al.
                 200 East Randolph Drive
                 Chicago, Illinois 60601
         BY:    DAVID R. SELIGMAN, ESQ.,
                 TODD F. MAYNES, P.C.,

                 RICHARD M. CIERI, ESQ.,
                     153 East 53rd Street
                     New York, New York 10022

                 THOMAS A. CLARE, ESQ.
                     655 Fifteenth Street N.W.
                     Washington, D.C. 20005


         AKIN GUMP STRAUSS HAUER & FELD LLP
                 Attorneys for Official Committee  of
                 Unsecured Creditors
                 590 Madison Avenue
                 New York, New York 10022

           BY:  DAVID F. STABER, ESQ.,
                 PHIL DUBLIN, ESQ.,
                 MICHAEL S. STAMER, ESQ.


         FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP
         Attorneys for Equity Committee
                 One New York Plaza
                 New York, New York 10004
         BY:    GARY L. KAPLAN, ESQ.,
                 ADRIAN E. FELDMAN, ESQ.

3

```
 1    U.S.  A P P E A R A N C E S (Continued):
 2
 3
             PAUL WEISS RIFKIND WHARTON & GARRISON LLP
 4
         Attorneys for Unofficial Committee of
 5                Second Lien Debt Holders
                  1285 Avenue of the Americas
 6                New York, New York 10019
 7       BY:    ELIZABETH R. McCOLM, ESQ.,
                SAMANTHA A. AMDURSKY, ESQ.
 8
 9
10       GOODMANS LLP
11                Solicitors for Calpine Canada Energy
                  Limited, Calpine Canada Power Ltd., Calpine
12                Canada Energy Finance ULC, Calpine Energy
                  Services Canada LTD., Calpine Canada
13                Resources Company, Calpine Canada Power
                  Services Ltd., Calpine Canada Energy
14                Finance II ULC, Calpine Natural Gas
                  Services Limited and 3094479 Nova Scotia
15                Company
                  250 Yonge Street
16                Toronto, Ontario M5B 2M6
17       BY:    BRENDAN D. O'NEILL
18
19
20       WILMER CUTLER PICKERING HALE and DORR LLP

         Attorneys for the Canadian Debtors
21                399 Park Avenue
                  New York, New York 10022
22
         BY:    PHILIP D. ANKER, ESQ.,
23                JAMES H. MILLAR, ESQ.
24
25
```

4

1   U.S.  A P P E A R A N C E S (Continued):

2

3

        KELLEY DRYE LLP

4

            Attorneys for HSBC as Indentured Trustee

5               for the ULC1 Notes

                101 Park Avenue

6               New York, New York 10178

7       BY:    GEOFFREY W. CASTELLO, ESQ.,

                ERIC R. WILSON, ESQ.

8

9

10      YOUNG CONAWAY STARGATT & TAYLOR, LLP

11            Attorneys for M&T as Indentured Trustee for

              the ULC2 Notes

12            1000 West Street

        Wilmington, Delaware 19801

13

        BY:    IAN S. FREDERICKS, ESQ.

14

15

16      KASOWITZ, BENSON, TORRES & FRIEDMAN LLP

17      Attorneys for Ad Hoc Committee of ULC1

              Note Holders

18            1633 Broadway

              New York, New York 10019

19

        BY:    RICHARD F. CASHER, ESQ.

20

21

22      KRAMER LEVIN NAFTALIS & FRANKEL LLP

23            Attorneys for ULC2 Ad Hoc Committee

              1777 Avenue of the Americas

24            New York, New York 10036

25      BY:    KENNETH H. ECKSTEIN, ESQ.

5

U.S.   A P P E A R A N C E S (Continued):


        LENCZNER SLAGHT ROYCE SMITH GRIFFIN LLP

     Canadian Counsel for the US Debtors
                130 Adelaide Street West
                Toronto, Canada M5H 3P5

        BY:    MONIQUE JILESEN


C A N A D I A N   A P P E A R A N C E S:



        LENCZNER SLAGHT ROYCE SMITH GRIFFIN LLP

     Canadian Counsel for the US Debtors
                130 Adelaide Street West
                Toronto, Canada M5H 3P5

        BY:    PETER H. GRIFFIN
               PETER J. OSBORNE



        McCARTHY TETRAULT LLP

     Solicitors for the Attorneys for Canadian
                Debtors
                3300, 421-7th Avenue S.W.
                Calgary, Alberta T2P 4K9
        BY:   LARRY B. ROBINSON, Q.C.,

6

1    C A N A D I A N    A P P E A R A N C E S (Continued):
2
3
             GOODMANS LLP
4
                     Solicitors for the Applicants and
5                    CCAA Parties
                     250 Yonge Street
6                    Toronto, Ontario M5B 2M6
7        BY:    JAY A. CARFAGNINI,
                FRED MEYERS,
8               JOSEPH PASQUARIELLO,
                BRIAN F. EMPEY
9
10
11           THORNTON GROUT FINNIGAN LLP
12               Solicitors for the Ad Hoc Committee of
                 Creditors of Calpine Resources Company
13               3200-100 Wellington Street West
                 Toronto, Ontario M5K 1K7
14
         BY:    ROBERT I. THORNTON,
15              JOHN I. FINNIGAN,
                RACHELLE F. MONCUR
16
17
18           PEACOCK LINDER & HALT LLP
19               Counsel for the Calpine Power L.P.
                 1800,350 7th Avenue S.W.
20               Calgary, Alberta T2P 39N
21       BY:    PETER T. LINDER,
                EMI R. BOSSIO
22
23
24
25

7

C A N A D I A N   A P P E A R A N C E S (Continued):

FASKEN MARTINEAU

        Counsel for the OCUC/CH11
        350 – 7th Avenue SW
        Calgary, Alberta T2P 3N9

   BY:   RINUS de WAAL

    AKIN GUMP STRAUSS HAUER & FELD
        Counsel for the OCUC/CH11
        1700 Pacific Avenue
        Suite 4100
        Dallas, TX 75201-4675

   BY:   SARAH A. SCHULTZ, ESQ.

    BORDEN LADNER GERVAIS
        Counsel for the Ernst & Young, Inc.
        400 Third Avenue S.W.
        Calgary, Alberta, Canada T2P 4H2
   BY:   PATRICK T. McCARTHY, Q.C.
        JOSEF G.A. KRUGER

C A N A D I A N   A P P E A R A N C E S (Continued):

8

FRASER MILNER CASGRAIN LLP
       Counsel for the Unofficial Committee of
              Second Lien Holders; Alliance Pipeline
              100 King Street West
              Toronto, Ontario M5X 1B2

    BY:  NEIL RABINOVITCH,
         JOE MARIN,
         QUINCY SMITH

    STRIKEMAN ELLIOTT LLP
         Attorneys for ULC2 Trustee
         199 Bay Street
         Toronto, Ontario M5L 1B9
    BY:  SEAN F. DUNPHY,
         ELIZABETH PILLON

    DAVIES WARD PHILLIPS & VINEBERG LLP
              Counsel for the Lehman Brothers
    First Canadian Place
              Toronto, Ontario M5X 1B1
    BY:  JAY A. SWARTZ

C A N A D I A N   A P P E A R A N C E S (Continued):

9

ELROD PLC

     Attorneys for the TransCanada and Nova Gas

       Transmission

       500 North Akard Street

       Dallas, Texas 75201

BY:  DAVID W. ELROD, ESQ.,

     DOUGLAS McCLAIN, ESQ.

A L S O   P R E S E N T:

HOWARD GORMAN - ULC1 Ad Hoc

NATHAN LANCE - for the ULC1 indentured trustee

DAVID JOHNSTON - Alix Partners

10

P R O C E E D I N G S:

1

2                        JUDGE LIFLAND:  Please be seated.

3                        THE CLERK:  It's the clerk from Calgary we

4        are ready to commence.

5                        JUDGE LIFLAND:  Good afternoon.

6                        MR. SELIGMAN:  Good afternoon, your Honor.

7                        JUDGE LIFLAND:  This is the joint hearing

8        before The Court of Queen's Bench of Alberta and the U.S.

9        Bankruptcy Court for the Southern District of New York.

10                       While not the first of such joint hearings,

11       it is the latest to recognize that debtors with assets and

12       creditors and insolvency proceedings in more than one state

13       have an urgent need for cross-border cooperation and

14       coordination, and the supervision and administration of

15       their assets and affairs.

16                       At the very least, these joint proceedings

17       contemplated by court approved protocols, provide the forum

18       for cross-border access and recognition for the stake

19       holders on both sides of the border.  And I, for the New

20       York court, welcome all the stakeholders in Canada as well

21       as recognizing those here in the US.

22                       It's my understanding that the parties have

23       agreed on a scheduling of the presentation; is that

24       correct?

25                       MR. SELIGMAN:  David Seligman for the US

11

1    debtors, your Honor, that is correct.

2              JUDGE LIFLAND:  Do you want to be heard on

3    that, Mr. Seligman?

4              MR. SELIGMAN:  Yes, your Honor.

5              Your Honor, Seligman on behalf of the

6    United States debtors in the Chapter 11 cases of Calpine

7    Corporation, case number 05-60200 --

8              JUDGE LIFLAND:  Can Mr. Seligman be heard?

9              JUSTICE ROMAINE:  Yes, we can hear Mr.

10   Seligman.  Thank you.

11             MR. SELIGMAN:  Thank you, your Honor.

12             We are here this afternoon on a motion for

13   a global settlement between the United States and Canadian

14   debtors and certain other parties.  We are also here

15   pursuant to that cross-border insolvency protocol for

16   Calpine Corporation and its affiliates approved by the

17   United States court an April 12, 2007, and by the Canadian

18   court on April 4, 2007.

19             Your Honor, I was going to turn to some of

20   the logistical matters, including the order that the

21   parties have agreed to, if I can proceed?

22             JUDGE LIFLAND:  Certainly.

23             MR. SELIGMAN:  Your Honor, just as a

24   logistical matter for the people in the courtroom, the

25   clerk admonished us previously, just to make sure that

1     there is --

2                     JUDGE LIFLAND:  May I just interrupt a

3     moment?

4                     MR. SELIGMAN:  Sure.

5                     JUDGE LIFLAND:  There seems to be some

6     background speaking that's coming across the loudspeakers.

7                     JUSTICE ROMAINE:  Okay.  Judge Lifland, I

8     don't think there's any noise from this court that I can

9     detect.  I do want to tell you, though, that your voice is

10    not coming across as clearly, perhaps, as we would like it.

11    We can hear Mr. Seligman clearly, but not you.

12                    JUDGE LIFLAND:  Well, I'll try to swallow

13    the microphone.

14                    JUSTICE ROMAINE:  Okay, thank you.

15                    MR. SELIGMAN:  Your Honor, just for

16    everyone here in the courtroom, the check admonish to

17    admonished the people here to please keep background noise

18    to a minimum because the microphones are very sensitive.  I

19    will do my best, and I would everyone else who is speaking

20    here today to make sure that they are speaking slowly and

21    clearly, and also being cognizant of the proceedings in the

22    Canadian court, to the extent that there needs to be an

23    interruption or a pause in the proceedings.

24                    I would also ask that people make sure to

25    state their names clearly every time they speak for the

13

1   benefit of the court reporters.

2          Your Honor, in the spirit of comedy and

3   cooperation, the US debtors and the Canadian debtors had

4   met with each other and discussed the orders of proceedings

5   for this morning, particularly in light of the objections

6   that had come in.  And we had prepared a suggested schedule

7   that had been previously provided to both the US court as

8   well as the Canadian court, and I would like to outline

9   that process for this morning.

10         JUDGE LIFLAND:  I'm going to interrupt for

11  a moment.  There may be no conversation in each of the

12  courtrooms, but if there are open telephone lines, that may

13  be the source of the conversations.

14         JUSTICE ROMAINE:  Okay.  Mr. Robinson?

15         MR. ROBINSON:  My Lady, I don't have any

16  technical knowledge at all, but perhaps I could suggest,

17  with the indulgence of the folks on our line, that we put

18  this telephone on mute.

19         JUSTICE ROMAINE:  Let's do that.

20         MR. ROBINSON:  Let's see if that solves the

21  problem.

22         JUSTICE ROMAINE:  Okay, we'll try that,

23  Judge Lifland, and hopefully that will help.

24         JUDGE LIFLAND:  Thank you.

25         JUSTICE ROMAINE:  It is muted already.

14

1    MR. ROBINSON:  Mr. Seligman, does that make

2    a difference in your courtroom?

3    MR. SELIGMAN:  Well, I guess we'll see.  Is

4    that better, Judge Lifland?

5    A VOICE:  The fact that no one on the line

6    will be able to hear this proceeding --

7    MR. ROBINSON:  We went the wrong way.  I

8    guess we could ask the folks --

9    JUSTICE ROMAINE:  But they won't hear you,

10   Mr. Robinson.

11   MR. ROBINSON:  I'm sorry, I've demonstrated

12   my ignorance already.  But perhaps we could ask the people

13   that are listening in to our proceedings by telephone to

14   mute their lines, unless they need to speak, and see if

15   that solves the problem of interference in Judge Lifland's

16   courtroom.

17   JUSTICE ROMAINE:  Thank you.  And

18   unfortunately none of these people are able to respond to

19   that request because of the way we've set it up, but, Judge

20   Lifland, if you can see if that will make a difference.

21   JUDGE LIFLAND:  It sounds already as if

22   they've got the message.

23   JUSTICE ROMAINE:  Okay, thank you.

24   MR. SELIGMAN:  Your Honor, the way that we

25   had suggested to proceed this morning was for the US

15

1   debtors to make some introductory remarks followed by the

2   Canadian debtors making similar introductory remarks with

3   respect to the motion.  We will then come back to the US

4   court for the US debtors to make their presentations,

5   submissions and evidence, if necessary, with respect to the

6   motion.  And then refer it to the Canadian court to have

7   the Canadian debtors make their submissions.

8                   With each pair of submissions, we would

9   also include statements in support or statements of non

10  opposition to the settlement agreement before the courts

11  this morning.  We would then come back to the US court to

12  consider objections to the settlement agreement there.

13                  And just to pause on that for a moment,

14  your Honor, there are basically four objections filed to

15  the settlement.  One filed by the ULC1 trustee, one filed

16  by the ULC2 trustee, one filed by the Canadian income fund,

17  and one filed by what we will refer to ass the CCRC

18  committee.

19                  The objection of the ULC21 indentured

20  trustee is really the only substantive objection to the

21  settlement on the US side, i.e. that there is perhaps a

22  violation of US law.  The other three objections really go

23  to the aspect of the settlement that may be allegedly

24  violative of Canadian law, and is really more appropriately

25  directly, in our opinion, to the Canadian court.  So we

1    envision that there will be argument with respect to the

2    ULC1 indentured trustee followed by perhaps free statements

3    by the other objectors, to the extent they want to make a

4    statement here in this court understanding that perhaps the

5    balance or the majority of their presentations will be made

6    in the Canadian court.

7                        Once we have done that, your Honor, then I

8    think we will have then completed our submissions and the

9    responses and the replies in both courts, and it will be up

10   to the courts to entertain any questions or comments, and

11   then we can proceed from there.

12                       The one other point I did want to make was

13   with respect to the ULC1 indentured trustee's objection.

14   There has been some continuing dialogue right before the

15   hearing and is going on right now.  I think that, depending

16   on where we are at that particular moment, we may ask that

17   you put that objection off until after the Canadian

18   objectors make their submissions to the Canadian court to

19   give more opportunity to perhaps reach a resolution and to

20   consider their objection, to the extent it still remains,

21   at the end of the process.

22                       If that's acceptable to your Honor and My

23   Lady, that's how we would like to proceed this morning.

24                       JUDGE LIFLAND:  That's acceptable to this

25   court.

17

1    Madam Justice.

2    JUSTICE ROMAINE:  Thank you, Judge Lifland.

3    And I want to say first thank you for your words of welcome

4    and your words with respect to the importance of this

5    cross-border proceeding, words that I certainly agree with.

6    I would like to welcome you, the US debtors, and the US

7    stake holders to these proceedings in the Court of Queen's

8    Bench of Alberta.

9    Having said that, I will turn to Mr.

10   Robinson and Mr. Meyers to respond to what Mr. Seligman has

11   said with respect to the procedure before us this

12   afternoon.

13   Mr. Robinson?

14   MR. ROBINSON:  For the record, Larry

15   Robinson of McCarthy Tetrault for the Canadian debtors.

16   My Lady, your Honor, we have received from

17   Mr. Seligman the proposed outline of schedule of

18   submissions on behalf of the Canadian applicants.  That

19   schedule, we think, is a logical approach and we are in

20   agreement with that schedule and in fact have indicated to

21   your Ladyship in the past of this hearing that that is the

22   order that we would be recommending to this court as well.

23   The only addition I would make is that, as

24   is customary in Canadian proceedings, given the existence

25   of our monitor, at the conclusions of the applications by

18

1    the Canadian debtors and statement of support for the

2    Canadian debtors, we would propose that the monitor make

3    any submissions it wishes to make with respect to the

4    applications before objections are commenced by folks.

5                    JUSTICE ROMAINE:  Thank you.  Does anybody

6    else wish to address procedure?

7                    Thank you.  Judge Lifland, we are back to

8    you.

9                    JUDGE LIFLAND:  Thank you, Madame Justice.

10                   Mr. Seligman, you may start your

11   presentation.

12                   MR. SELIGMAN:  Thank you, your Honor.

13                   Your Honor, just before I proceed this

14   morning, if it's acceptable with your Honor, I would like

15   to introduce just a couple of people in the courtroom

16   before we proceeded, just for the benefit of the Canadian

17   court.

18                   JUDGE LIFLAND:  Certainly.

19                   MR. SELIGMAN:  Your Honor, with me this

20   afternoon from Kirkland and Ellis is Thomas Clare and Todd

21   Maynes who are here.  They may be speaking to your Honor

22   this morning, hopefully not, if we can resolve everything,

23   but we'll see where we go on that front.  I also did want

24   to introduce Monique Jilesen of the law firm of Lenczner

25   Slaght.  She is Canadian counsel to the US debtors, and I'm

19

1    sure is familiar to the Canadian court already.

2                    I also would like to introduce David

3    Johnston, managing debtor at Alix Partners.  Mr. Johnson

4    has been instrumental throughout this process of trying to

5    reach a resolution with the Canadian debtors and had

6    personally daily involvement from the business and from the

7    financial side to try to bring this settlement to where it

8    is today.

9                    I would also like to just introduce Melissa

10   Brown and Jim Mine from Calpine Corporation.  Melissa Brown

11   is treasurer and senior vice president of strategy and

12   financial analyses, as well as Jim Mine, who is vice

13   president of structuring, who have both been very involved

14   and instrumental in the efforts to bring this settlement

15   agreement to fruition.

16                    I would also like just to mention, your

17   Honor, that there is some other business pertaining to

18   Calpine.  There may be some people in the courtroom who may

19   have to leave in a couple of hours, I just want to

20   apologize in advance and ask for the court's indulgence in

21   the event that people may have to leave the courtroom for

22   other matters.

23                    Let me step back and just ask that if there

24   are other people in the courtroom sitting at counsel's

25   table who will perhaps be presenting something to the court

20

1    this morning to make their appearances on the record.

2              MR. STABER:  Your Honor, My Lady, David

3    Staber of Akin Gump Straus Hauer and Feld, counsel to the

4    unsecured creditors' committee.

5              MR. KAPLAN:  Gary Kaplan from Fried, Frank,

6    Harris, Shriver and Jacobson here on behalf of the official

7    equity committee.

8              MS. McCOLM:  Good afternoon, Elizabeth

9    McColm from Paul, Weiss, Rifkind, Wharton and Garrison on

10   behalf of the second lien committee.

11             MR. ECKSTEIN:  Good afternoon, your Honor,

12   My Lady, Kenneth Eckstein of Kramer Levin representing the

13   ad hoc committee of CCRC creditors.

14             MR. ANKER:  Good afternoon, Judge Lifland

15   and My Lady.  Philip Anker and James Millar of WilmerHale,

16   and Brendan O'Neill of Goodmans, counsel appearing today in

17   New York on behalf of the Canadian debtors.

18             MR. CASHER:  Good afternoon, your Honor and

19   My Lady.  Richard Casher of Kasowitz, Benson, Torres and

20   Friedman on behalf of the ad hoc committee of ULC1 note

21   holders.

22             MR. CASTELLO:  Good afternoon your Honor

23   and My Lady, Geoffrey Castello of Kelley Drye and Warren

24   for the ULC1 indentured trustee, HSBC.

25             MR. FREDERICKS:  Good afternoon, your

1  Honor, My Lady.  Ian Fredericks of Young Conaway Stargatt

2  and Taylor, US counsel to Manufacturers and Traders Trust

3  Company in its role as indentured trustee.

4          JUDGE LIFLAND:  Hopefully you people will

5  keep all your interventions as briefly as that.

6          MR. SELIGMAN:  Your Honor, moving to the

7  substance of the presentations this morning, your Honor a

8  lot of the detailed background has been laid out in a

9  variety of paper before your Honor and before My Lady.  So

10  I will briefly summarize the settlement motion and a little

11  bit of background for the benefit of the court and the

12  various people in the courtroom this morning.

13          I think what I want to talk about today,

14  your Honor, are some of the key issues that the US debtors

15  and the Canadian debtors, at least from our perspective,

16  are struggling with since the conception of these

17  insolvency cases, how they attempted to reconcile or

18  address those issues, how they ultimately resolved those

19  issues, and how, from at least the US debtors' perspective,

20  and I'm sure the Canadian debtors would agree, how the

21  ultimate resolution is in the best interest of the estates,

22  their creditors, and the variety of stakeholders who have

23  played significant roles in these proceedings.

24          This case truly has some unique and

25  interesting aspects to them.  If we go back to December

22

1    20th, 2005 the date that the US debtors filed their Chapter

2    11 petitions and the date that the CCAA applicants and CCAA

3    parties commenced the proceedings in Calgary, you have a

4    recently unique situation where you have, on the one side

5    of the border, the US debtors which are in the process of

6    reorganizing with significant assets.  At the same time you

7    have a number of Canadian subsidiaries that were in some

8    senses operating but in some senses already not operating,

9    but they also had, relative to their size, significant

10   assets, mostly in the form of intangibles.

11                Stepping back even further, prior to toe

12   time of filing Calpine Corporation viewed itself as a

13   whole.  So a lot of times there were joint bank accounts,

14   there were employees, professionals, et cetera, who viewed

15   the company as a whole and conducted a lot of business from

16   the perspective of the company as a whole.  And this is

17   important, your Honor, because a lot of the work that has

18   been done since the petition date has been to try to

19   understand a lot of the intercompany accounting and

20   intercompany reconciliations that were ultimately resolved

21   and set forth in the settlement agreement.  You also have a

22   unique situation where you have most, not necessarily all,

23   but most of the creditors of the Canadian debtors also

24   having guarantees from Calpine Corporation.

25                So after the initial filing on December

23

1   20th, 2005, there was a period of stabilization of

2   operations provided -- that were improved upon by the

3   automatic stay here in the US proceeding and by the stay in

4   the initial order in the Canadian proceedings, but soon

5   thereafter the companies -- both sets of debtors began

6   struggling with a variety of issues.  We lay them out in

7   the papers.  I just wanted to highlight five issues, a very

8   big issues for your Honor, because those are the critical

9   big points that we see from our perspective.

10                  Number one, ULC hybrid note structure.

11  This was approximately 2 billion dollars of debt financing

12  raised through the Canadian debtors, we've called the ULC1

13  bond debt, where there were approximately 12 billion

14  dollars or more of claims filed against the US debtors by

15  their bond holders, the trustee, the indentured trustee for

16  the Canadian debtors.  There was a significant issue about

17  how the US debtors were going to obtain clarity so that

18  they could move forward with their plan of reorganization.

19  How were they going to address all of the variety of issues

20  that came to light as a result of this complex, hybrid

21  financing.  How would the claims objection be handed?

22  Would they be handled in this or the court, or how would

23  the claims that were alleged against the Canadian debtors

24  be handled, and what kind of joint proceeding, if any,

25  could there be.  That you issue number one.

24

1           Issue number two were the 360 million

2    dollars approximately of ULC bonds that have been

3    repurchased by the US debtors, and in a variety of

4    transactions ended up in the name of the Canadian debtors

5    prepetition.  The Canadian debtors wanted to sell those

6    bonds, and it's been the subject of a number of proceedings

7    and motion practice before the Canadian court, to maximize

8    value to their estate.

9           The US debtors had a number of issues with

10   respect to the bond sale, principally they had concerns

11   that that bond sale may be avoidable and subject to a

12   502(d) defense or another avoidance action under 550.  That

13   presented a variety of issues, not only on the substance

14   but also an on procedure.  How would those claims be

15   handled?  Would they be viewed as assets to be in handled

16   in front of the Canadian court, or would they be viewed as

17   claims objections to be handled in the US court?  That was

18   an issue that was very important to be reconciled, and the

19   parties tried to work in a way to maximize value to both.

20          The third issue is the Greenfield project

21   facility, which this court I'm sure is familiar with having

22   approved a variety of motions with respect to the

23   Greenfield facility.  That is a very significant project

24   for the US debtors.  It's over a thousand megawatts, one of

25   the biggest megawatt power facilities that the US debtors

25

1    have.

2                    There were a number of issues associated

3    with Greenfield.  Number one, there was a small piece of

4    the ownership interest held by the Canadian debtors.

5                    Number two, there was an avoidance action

6    commenced by the Canadian debtors against some non debtor

7    subsidiaries of the US debtors alleging that a transfer of

8    a portion of that interest prepetition was also an

9    avoidable action in the Canadian court.

10                   Third, this wasn't simply an action that

11   could languish for a period of time because the project was

12   in the process of every couple of months needing equity

13   contributions both from the US debtors and their joint

14   venturer, Mitsui.

15                   Every time that an equity contribution was

16   due, there was the issue of could Mitsui exercise certain

17   of its buyout rights to buy out the United States debtors'

18   interest at a discount.  So that was an extra issue that we

19   were facing that took a great issue of timing.

20                   And finally, your Honor, there was the

21   issue of at some point the project could not survive an

22   equity contributions alone but needed third party

23   financing, and who could we get as a lender to come in and

24   loan money to this facility with all the cloud of the

25   litigation, the partial interest held by the Canadian

26

1    debtors, and how could we resolve that in a way to maximize

2    value, unlock the project, and let it be financed.

3                    Next, your Honor, was the issue of

4    literally hundreds of millions, if not billions of

5    intercompany claims between the two estates.  As I

6    mentioned earlier, prior to the petition date Calpine was

7    viewed as a whole and the accounting record were not

8    necessarily the best.  There needed to be a lot of work

9    done to reconcile down to the penny a lot of these

10   intercompany claims.  People had to look back to original

11   wire transfers and other documentation to recreate the

12   books and to establish who made transfers to whom.

13                   And as a result of that there was over a

14   billion dollars of claims asserted by the Canadian debtors

15   against the US debtors, and I believe over 200 million

16   dollars of claims asserted by the US debtors against the

17   Canadian debtors, and they couldn't be offset, because it

18   was against a different debtor correspondingly.  So that

19   was another issue that had to be resolve.

20                   And finally, your Honor, there was the

21   issue of what I will refer to as the guaranteed claims,

22   which are the claims asserted against the Canadian debtors,

23   they are also guaranteed by the US debtors.  Principally

24   amongst these I put in this category; the ULC2 bonds, which

25   was originally about a 550 million dollars or so issuance

27

1    of bonds.  The third party bonds are now at about 350

2    million.  That was a claim asserted against the Canadian

3    debtors but also guaranteed by the US debtors, as well as

4    there were also a number of trade claims, a number of

5    contracted pipeline rejection claims asserted against the

6    Canadian debtors that were also guaranteed by the US

7    debtors.

8             The parties faced a difficult dilemma of

9    how do we resolve those claims.  There could be the

10   Canadian court that would adjudicate the primary claims,

11   but then how we would deal with the guaranteed claim that

12   would be asserted against the US debtors?  There is

13   different rules in each jurisdiction about who has rights

14   and standing to participate in claims objections.

15            So faced with these five primary issues, as

16   well as a variety of other issues set forth and resolved in

17   the settlement agreement, the parties started working very

18   diligently as far back as around Thanksgiving of last year

19   to try and see if we could move the process forward,

20   resolve these issues, and, as we sometimes refer, unlock

21   the estates and let them go on their merry way.

22            And the statement today is a product of

23   approximately seven months of intense, hard work to unlock

24   the estates.  And it was simultaneously conducted with

25   negotiations between the US debtors and the ULC1 ad hoc

28

1    committee of bond holders to try and resolve their issues

2    about the ULC1 hybrid note.  And it wasn't just the debtors

3    talking, both sets of debtors talked to their various stake

4    holders to try to get input from their various stake

5    holders.

6                    I had a lot of meetings with them and their

7    creditors over the course of time.  I can certainly speak

8    from the US debtors' perspective, we had our official

9    committees and our unofficial committee in the loop

10   constantly as we were going through the process.  And in

11   addition there was the role of the court appointed monitor,

12   Ernst and Young, who participated in a variety of these

13   meetings to get something done.

14                   So, your Honor, eventually we reached

15   settlement on the global resolution that we were presenting

16   to your Honor today.  And it resolves virtually all issue

17   between the two estates.  And to the extent it doesn't

18   resolve an issue, it creates a process for resolution of an

19   issues.  So we really do believe that it provides maximum

20   value both substantively and from a process perspective for

21   both the estates.

22                   And I was going to highlight, your Honor,

23   just for a moment, a couple of the benefits of the

24   settlement agreement.  But I did just want to mention to

25   your Honor that this settlement agreement was the result of

29

1    months of back and forth, if you will, horse trading.

2    There were a lot of different pieces.  There was some give

3    and take on one issue and give and take on another issue.

4            It should be viewed as a collective whole.

5    We refer to in our motion that this is somewhat akin to a

6    jigsaw puzzle, and if you take out one piece it's not a

7    compete picture anymore.  And that's very important,

8    because some of the people here today may suggest that one

9    issue should be tweaked or a that issue should be tweaked,

10    when in reality it was a comprehensive whole, and if you

11    change one piece you've to got to change the whole

12    settlement agreement.

13            So what were the primary benefits for those

14    five major issues that we were talking about?  Well, as to

15    the ULC hybrid note issues, we resolved the issue by

16    basically allowing a claim by the ULC1 bond holders in the

17    amount of nominally of 3 and a half billion dollars, with

18    the understanding that they could never collect more than

19    principal, pre and post petition accrued interest, plus

20    some fees and expenses.  This reduced the claims register

21    from 12 billion down to three and a half, but in our

22    modeling purposes we could use, as we set forth in the

23    settlement agreement, approximately 2.3; so approximately a

24    10 billion dollar reduction in the claims register, and

25    absolute clarity on this issue from our perspective of

30

1   allowing us, among other things, to move forward with the

2   plan of reorganization process. And we filed a plan that

3   may not have been able to be filed with this issue if we

4   didn't have some clarity on this issue.

5            Secondly, we have issue of the repurchase

6   bonds. There's been an agreement to let the Canadian

7   debtors sell those bonds in the open market and fund

8   distributions on account of claim in the Canadian

9   proceedings.

10           As part of that, and this is number 3, the

11  US debtors are resolving all of their various objections

12  and avoidance action claims that they would have against

13  the Canadian debtors in return for a 75 million dollar cash

14  payment from the bond sale proceeds. And, your Honor, this

15  is important, because from our perspective we don't just

16  view this as a claim like every other Canadian creditor may

17  have. There are rights as to these bonds, in our opinion

18  we felt were as to a race, as to an escrow, so we had

19  really superior structural priority rights that are being

20  settled by the 75 million dollars.

21           We also, as we originally set forth in our

22  502(d) claim objection, we had rights as to the Salten

23  proceeds, which were about 230 million dollars of money

24  repatriated up through the Canadian process sitting at

25  CCRC, which is one of the Canadian debtors.

31

1        The US debtors and the Canadian debtors had

2    agreed a long time ago that to the extent the US debtors

3    had any claims with respect to any of the proceeds of those

4    claims, and we believe that our avoidance action was

5    against one of those claims, that we would have structural

6    priority that would be senior to any of the creditors of

7    CCRC so that in a sense we would get paid first.

8        Number 4, as to Greenfield.  The Greenfield

9    issue is resolved.  There is going to be a withdrawal of

10    the avoidance action against the US debtors and their

11    subsidiaries with respect to that; that will allow us to

12    fully move forward with the facility unencumbered by any of

13    the clouds that were existing before.

14        Number 5, all of the intercompany claims

15    have been fixed and resolved.  There is a schedule attached

16    to the motion and the settlement agreement which lays out

17    in detail all the various claims back and forth that are

18    going to be allowed and how they are going to be allowed,

19    so that issue is resolved.

20        And finally there is a process in place to

21    resolve the so called guaranteed claims.  We have agreed

22    with respect to those guarantee claims that are going to be

23    adjudicate, that they will be adjudicated in front of the

24    Canadian courts, and that the US debtors and their official

25    committees will have the opportunity to have standing and

32

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

to participate in that litigation.  That gave us and our

committees comfort that we could litigate that issue in

Canada and not revisit the issue in this court.

In addition, with respect to the ULC2

bonds, as laid out in the pleadings, we have agreed that

there's enough money and that they should be paid in full.

There is some disagreement as to the exact amounts that are

owed, but we've agreed to reserve some money set aside, to

the extent that we can't pay what they say they are owed,

and we will litigate those issues letter.

One issue that may come up, perhaps, are

the ULC2's argument for make whole, and we have both agreed

that that would be an issued to be dealt with by this

court, given that it's an indenture governed by New York

law, and given the state of the law in the US as far as

make wholes and given your Honor's recent experience in

this case regarding make wholes.

So we think that from the US debtors'

perspective, it solves all of the major issues that we were

grappling with, from our perspective it brings a

significant amount of cash into the estate, assuming that

all the Canadian creditors get paid in full, there will

also be, perhaps, a significant return on equity to the US

estate, which is additional funding money, there is the

Greenfield issue resolved, there is the claims pool being

33

1  reduced by billions of dollars, and there is the unlocking

2  of the estates and allowing the process to move forward.

3           Your Honor, let me pause here for a second,

4  and I was going to move to just process for a second in

5  terms of how we talk to our stakeholders about the

6  settlement, but I wanted to pause here and just ask your

7  Honor, we do have Mr. Johnston here who would be prepared

8  to testify as to the benefits of the settlement and a

9  little bit of the background of the settlement.

10          We have a proffer that we would be willing

11 to put on for your Honor that would take 15 minutes to

12 read.  If your Honor would like, we are happy to go forward

13 and introduce that proffer.  If your Honor feels that based

14 upon the record before you that that would be duplicative

15 of the presentation this morning, we can move on.

16          JUDGE LIFLAND:  Frankly I think it would be

17 duplicative.  I've got about two feet of papers in front of

18 me, and I've had about 48 or more hours to plow through

19 them.  It might be redundant, unless somebody wants to have

20 the proffer and go through that exercise.  I do not find it

21 necessary.

22          MR. SELIGMAN:  Thank you, your Honor.  We

23 just wanted to give your Honor the opportunity.

24          With that, let me just briefly mention that

25 as far as dialogue with our committees, and I think that

34

1   you'll hear the same thing from the Canadian debtors, there

2   was a process in place to keep our committees at least

3   updated on this process as it was developing and as we were

4   having negotiations with the Canadian debtors.  And even

5   before, well in advance of filing of motion, we spoke to

6   our various stakeholders to have them comfortable with what

7   was going on.

8               One of the things between Alix Partners and

9   the monitor was what we called a distribution model, which

10  kind of laid out how we thought the funds would ultimately

11  flow, and that was one of the things we used to talk to our

12  creditors and stakeholders about the process.

13              Just to remind your Honor of some of the

14  dates here.  The term sheet between the US debtors and

15  Canadian debtors was signed May 13, and May 17 a press

16  release.

17              MR. ANKER:  AK was filed with respect to

18  the term sheet, so that was the first opportunity that

19  people were on notice publically about this settlement.  It

20  wasn't until over a month later that the motion was filed,

21  during which time we were talking to all of our various

22  stakeholders; with the motion we attached a draft form of

23  the settlement agreement.

24              As set forth in the motion, we would file

25  and did file by July 9th, a final version of that global

35

1   settlement agreement.  That was not only published in

2   various newspapers across North America, it was also served

3   on all of the bond holders for the ULC1 holders, it was

4   also put on the depository trust lens system, and it was

5   also put on the Calpine Corporation Chapter 11 website.

6   And again, during this entire process there were continuing

7   discussions going on.

8              Over the past several weeks there has been

9   continuing dialogue, and there has been some minor

10  modifications agreed to between the debtors and their US

11  constituents with respect to the implementation of the

12  settlement agreement.  And just as housekeeping matter I

13  just want to identify those briefly for your Honor, and

14  this is reflected in a black line and settlement agreement

15  and proposed order that was signed on Friday to put

16  everyone on notice as to what those changes are.

17             These changes were, just the big picture,

18  were essentially to ensure that as the US debtors were

19  implementing a settlement agreement on their side of the

20  border, that they were going to be constantly keeping their

21  committees and the official and unofficial committees in

22  the loop as to the process.  And to the extent that they

23  were going to be needing to give consent on various issues

24  or sign-off on various issues, that they could talk with

25  the committee's before doing so.

1   And so essentially we've agreed in general

2   to consult with the committees, and when I say committees,

3   I'm talking about the equity committee, the creditors'

4   committee, and the ad hoc committee of second lien holders.

5   The debtors have agreed to generally consult with the

6   committees on matters related to the implementation of the

7   settlement agreement, whenever the US debtors have to

8   consent or give approval on any issues, the US debtors have

9   agreed to give notice to the committees and to provide

10  relevant documentation to the committees.

11  With respect to any settlement of the

12  guaranteed claims that we spoke about before, the US

13  debtors have agreed to gave reasonable notice to the

14  committees and an opportunity to comment on any such

15  settlement.  And to the extent that the committees believe

16  that it's inappropriate they can object, and then we can

17  come before your Honor to determine whether that particular

18  settlement, from only in the US debtors' perspective, would

19  be in or not in the debtors' reasonable business judgment.

20  We have also agreed with the ad hoc

21  committee that certain transfers of property under the

22  settlement agreement would not be made unless there was a

23  context of a confirmed plan of reorganization.  We have

24  also confirmed with the ad hoc committee that this

25  transaction will not effect whatever lien rights they have

37

1   against the US debtors.  And finally, because the ad hoc

2   committee is not a participant in the guaranteed claims

3   litigation, that we would basically continue to talk to

4   them and provide them with relevant documentation as we are

5   going through that process.

6               As a housekeeping matter, we just also

7   recently agreement with the committees on an additional

8   point about implementation of the settlement, and I just

9   want to read this into the record for your Honor.  If

10   you'll bear with me, it will take about a minute.

11               The debtors would like to make a clarifying

12   statement for the record with respect to the proposed

13   settlement that reflects an understanding between the US

14   debtors, the creditors' committee the equity committee, and

15   the ad hoc committee of second lien holders.  As your Honor

16   may recall, last year the Canadian debtors decided to

17   repatriate the proceeds from the sale of the Salten Energy

18   Center in the UK which resided in a bank account of a UK

19   subsidiary of CCRC, one of the Canadian debtors.

20               The repatriation required the proceeds to

21   flow through entities in Luxembourg, the Channel Islands

22   and the UK to ensure that intercompany obligations were

23   paid off along the way.  At the time the Canadian and US

24   debtors cooperated in establishing a plan to structure the

25   repatriation of the fund in such a way to honor the

38

1   original transaction thereby avoiding the incurrence of

2   additional taxes not originally contemplated.  This

3   repatriation plan was successfully executed and the Salten

4   proceeds now reside at CCRC and will be able to be used to

5   fund distribution to the Canadian debtors' creditors to

6   creditors as contemplated in the settlement before the

7   court this afternoon.

8           The Canadian global settlement presents

9   similar issues.  The flow of funds in the global settlement

10  will travel through several entities paying off

11  intercompany obligations along the way.  The most

12  significant among these is Calpine Corporations'

13  satisfaction of the claims of the bond holders through the

14  ULC1 hybrid note structure described in the motion.

15          This fund should flow well, among other

16  things, be structured to minimize any negative tax

17  consequences to the CCAA and US estates and to assure

18  compliance with US and Canadian tax laws.  Your Honor, as

19  you will note in section 2.6 of the settlement agreement

20  obligates the parties to use commercially reasonable

21  efforts to cooperatively implement, perform, and execute

22  the terms of the agreement in a manner that is mutually

23  beneficial for both the US debtors and Canadian debtors,

24  while retaining the same economic benefits of the

25  agreement.

39

1      Your Honor, the US debtors have been

2   working with their tax advisors to develop a structuring

3   plan for implementing a settlement agreement, particularly

4   the satisfaction of the ULC1 obligations throughout the

5   hybrid note structure that will honor Section 2.6 of the

6   settlement agreement; and the final version of that

7   structure was shared with the official committees and the

8   ad hoc committees on July 23rd.  The US debtors intend to

9   implement that settlement agreement substantially in

10  accordance with the structuring plan; however, any

11  implementation actions are proposed to be taken under this

12  agreement by any party that deviates materially from this

13  July 23rd structuring plan.

14      The US debtors have agreed to provide ten

15  business days prior written notice of any such proposed

16  action to the official committees and the ad hoc committee

17  of second lien holders, and shall consult with those three

18  committees regarding such actions.  If any of those three

19  committees object to such proposed actions by the US

20  debtors by providing written notification of such objection

21  within ten business days from the date of the US debtors'

22  providing written notice of such actions, then the US

23  debtors have agreed to seek a determination from this

24  court, that is the US court, on an expedited basis that

25  such proposed actions by the US debtors are the product of

40

1    reasonable exercise of the US debtors business judgment,

2    provided, however, that this expedited process will provide

3    all parties in interest, including each of the three

4    committees, with an opportunity to object to the proposed

5    modifications to the structuring plan.

6              Your Honor, I apologize to the length of

7    that, but that was agreed upon language with respect to the

8    three committees.

9              Your Honor, in conclusion, for all the

10   reasons that we've set forth in the motion, and based on

11   the presentation this morning, we believe that at least

12   from the US debtors' perspective, the settlement is in the

13   best interest of the creditors, a sound exercise of the

14   debtors' business judgment, clearly confers a substantial

15   benefit on all concerned and should be approved.

16             With that, your Honor, unless your Honor

17   has any questions, I would propose to turn it over to those

18   individuals who wish to makes a statement or in support or

19   a statement of non opposition to the motion, at which time

20   we would turn it over to the Canadian court.

21             JUDGE LIFLAND:  We'll turn it over to the

22   Canadian court.

23             MR. SELIGMAN:  Should we hear statements in

24   support, or do you want us to --

25             JUDGE LIFLAND:  Well, that's in violation

41

1    of your proposed order of presentation, but on an ad hoc

2    basis it does make a lot of sense to hear your supporters

3    at the same time.

4                    MR. SELIGMAN:  Thank you, your Honor.

5                    JUDGE LIFLAND:  Go ahead.

6                    MR. STABER:  Your Honor and My Lady, David

7    Staber on behalf of the official committee of unsecured

8    creditors of Calpine Corp. and its jointly administered US

9    debtors.

10                   Your Honor, recognizing the number of

11   parties appearing here and your admonition, I have deleted

12   by a third my comments, as brief as they were.

13                   Early in this case the creditors' committee

14   was very concerned that the cross-border issues between the

15   US and Canada, particularly the hybrid note structure

16   impediment to confirmation, we became involved early in the

17   process, hiring Canadian counsel, studying the underlying

18   documents, and working with the US debtors on these issues.

19   Based on that background and our conversations with the

20   debtor, we believe that the settlement is reasonable and

21   appropriate and will help the parties move forward to

22   completion for reorganization in these cases.

23                   And with that, your Honor, and my promise

24   to be brief, I'll be seated.

25                   JUDGE LIFLAND:  Thank you.

1              MR. KAPLAN:  Your Honor and My Lady, Gary

2   Kaplan from Fried Frank.

3              Your Honor, the equity it committee filed a

4   brief statement in support of the debtors' motion.  I too

5   will be extraordinarily brief.  For all the reasons that

6   the debtors laid out in their motion papers and for the

7   reasons that Mr. Seligman discussed on the record today,

8   the equity committee is supportive of the settlement.

9              One other thing I would be remiss if I

10  didn't say, I've often been very critical, your Honor, of

11  the debtors.  On this issue I do have to give credit to the

12  debtors that they have been very good at keeping their

13  constituents in the loop throughout, and we are very happy.

14  Obviously we are supportive of the settlement, and we also

15  appreciate the process that was run to get to this

16  settlement.

17              MS. McCOLM:  Your Honor and My Lady,

18  Elizabeth McColm from Paul, Weiss, Rifkind, Wharton and

19  Garrison on behalf of the second lien committee to Calpine

20  Corporation.

21              Your Honor, similar to the official

22  committee of unsecured creditors and the equity committee,

23  the debtors have kept the second lien committee in the loop

24  over the past few months throughout the negotiation

25  process, and we are grateful to the debtors for that.

43

1          Your Honor, it's suffice to say that the

2   second lien committee believes that the settlement

3   presented here today is in the best interest the US

4   debtors' estates and should be approved.

5          JUDGE LIFLAND:  Does anyone else want to be

6   heard in support of?

7          MR. ANKER:  Your Honor and My Lady, Philip

8   Anker, US counsel for the Canadian debtors.  Your will

9   obviously hear and My Lady will hear much more from the

10  counsel for the Canadian debtors in Canada.  But I did want

11  to give one minute of a US perspective.

12          As I heard Mr. Seligman, I agreed with so

13  much of what he said, and I yet I disagreed with a little,

14  and what I disagreed about I think is significant.  As he

15  was describing if there had been litigation what the US's

16  position would have been, I kept saying to myself, no, we

17  would have argued this, no, we would have argued that.

18          It would have been an extraordinarily

19  complicated and involved process.  There would have been,

20  as Mr. Seligman noted, major issues of jurisdiction, which

21  court should decide what.  There would have been, had the

22  avoidance claims been brought, all sorts of issues about

23  were the transfers, by way of example, made from one US

24  debtor to another?  Does an action have to be brought by

25  one US debtor against another as a predicate?  Would

44

1    separate counsel be needed?  Can you avoid that through

2    substantive consolidation?  What issues would have that

3    raised about whether substantive consolidation would or

4    would not have been appropriate?

5                     I think, one thing that everyone in this

6    courtroom can agree upon is that that litigation would have

7    taken enormous time.  I would have been hopefully that I

8    could have persuaded your Honor, if your Honor were to

9    decide the issues as a matter of law that we would have

10   been right on some issues, but I'm smart enough and I've

11   been around the block long enough to know that there would

12   have been issues that would have required discovery and a

13   long complicated process.  And at the end, while that might

14   have personally benefited me and my law firm and benefited

15   other professionals, who would it would not have benefited

16   are the creditors of these two estates.

17                     This process in the US, and from what I'm

18   the told about the process in Canada, is, at its core,

19   designed to maximize recoveries and lead to a fair and

20   equitable distribution to creditors, and that is what this

21   will do.  Your Honor is well aware of what the US debtors'

22   projections are and their plans for the recoveries.  The

23   Canadian debtors believe that this will lead to payment in

24   full to the vast majority of their creditors.

25                     This is, certainly from a US perspective, I

45

1    think a remarkable accomplishment, and I certainly can

2    second and verify Mr. Seligman's comments that this

3    required extraordinary numbers of meetings and hard work of

4    a lot of professionals, and he's absolutely right when he

5    says it's a jigsaw us puzzle.  There was give and take an

6    every element here.

7                    So from a US perspective, the Canadian

8    debtors support the motion of the US debtors here.

9                    JUDGE LIFLAND:  Thank you for those very

10   brief remarks, counselor.  But you also remind me that

11   you've appeared before me, and some of the same colloquy

12   took place and it became the bully pulpit for me to

13   admonish everybody about the need to enter into protocols

14   so that we can get to a day like today, where all of those

15   very complex issues could be viewed in a different light

16   and a different perspective, with coordination and

17   cooperation being the watch word which turned out to be --

18   well, I can't prejudge the hearing today, but it does

19   appear that the parties have, at least those who are in

20   support of the settlement, have come together as a unit.

21                    MR. CASHER:  Your Honor and My Lady Richard

22   Casher of Kasowitz Benson for the ad hoc committee of ULC1

23   note holders.

24                    Just by way of a quick status report, we

25   obviously filed very lengthy papers in support of the

46

1    motion today, your Honor.  Our group, which had directed --

2    issued a written direction to the ULC1 indentured trustee,

3    consists of 12 note holders.  We've been negotiating with

4    HSBC over their objection.  We believe we've reached

5    agreement with HSBC concerning their objection, which

6    essentially has resulted in a revised form of a direction

7    and indemnity letter having been agreed upon.

8              We are waiting for final sign-off by one of

9    the 12 note holders, and we expect hopefully to receive

10   that shortly.  And when we do so, we will report that to

11   both courts.

12             JUDGE LIFLAND:  Thank you, sir.

13             MR. SELIGMAN:  Your Honor, I just wanted to

14   note on that.  Obviously the US of debtors need to see the

15   language, but hopefully we can resolve that issue.

16             And with that, your Honor, the US debtors

17   have completed their submissions.  And unless your Honor

18   has questions, we would request that you turn it over to

19   the Canadian court.

20             JUDGE LIFLAND:  I'm sure My Lady is

21   anxiously awaiting to hear from our constituency.

22             JUSTICE ROMAINE:  Anxious but patiently,

23   Judge Lifland.  So we will now turn things over to you, Mr.

24   Robinson, to make the opening statement and presentation on

25   behalf of the Canadian debtors.

1          MR. ROBINSON:  Thank you, My Lady and your

2    Honor.  For the record, Larry B. Robinson of McCarthy

3    Tetrault co-counsel for the Canadian debtors.

4          Following Mr. Seligman's lead, given the

5    significance of this application from Canadian debtors'

6    review, I would like to take a moment to make some

7    introductions with respect to the Canadian team that are in

8    court today, starting with Mr. Tobey Austin.

9          Mr. Austin is the director of the Canadian

10   debtors who has met the charge.  He is the client that we

11   often forget about that we have reported to and has been

12   instrumental in the structure of this transaction for us.

13   With me from McCarthy Tetrault, my partner, Sean Collins.

14          The settlement agreement was put together

15   between Mr. Austin and the Goodman team, our co-counsel

16   lead by Mr. Carfagnini, who is at the table with me, and

17   Mr. Meyers, Fred Meyers of Goodman's, who will be making

18   the application on behalf of the Canadian applicants, Mr.

19   Brian Empey is in the courtroom, Mr. Joseph Pasquariello is

20   in the courtroom, Brendan O'Neil, another member of that

21   team of Goodmans is in the New York courtroom already.

22          This deal could not have come together

23   without the assistance of the monitor's staff, Mr. Narfason

24   and Mr. Fun, who are in the courtroom.  They, working with

25   Alix Partners, who I know were of great assistance to the

48

1    US debtors, were very instrumental in bringing us to today

2    hopefully through today.  Their counsel, Pat McCarthy and

3    Josef Kruger are in the courtroom as well.  In addition,

4    and not the least is Mr. Jay Swartz from Davies Ward

5    Phillips and Vineberg who represents Lehman Brothers, who

6    had a key role to play in the bond sale, presumably debt,

7    to that point.

8              We concur with the order of proceedings as

9    set up earlier with the introductions.  And the with these

10   additions on our side, I will turn over to other parties in

11   courtroom to introduce themselves.  I don't know if they

12   wish to mention numbers of their teams, but there are a

13   number of parties here speaking for and against.

14             And following those introductions, Mr.

15   Meyers will make the application on behalf of the Canadian

16   debtors.

17             JUSTICE ROMAINE:  Thank you.

18             Mr. Thornton, do you wish to lead the

19   charge on the opposition introductions?

20             MR. THORNTON:  Thornton, initial R, counsel

21   for the informal CCRC committee, and assisted here today by

22   Mr. Finnigan and Ms. Moncur.

23             JUSTICE ROMAINE:  Mr. Dunphy?

24             MR. DUNPHY:  Thank you, My Lady.  Sean

25   Dunphy here for the ULC trustee.  Ms. Pillon is with us as

49

1    well, and I guess we'll save our comments for when it's

2    time.

3                  JUSTICE ROMAINE:  Thank you.  Mr. Linder?

4                  MR. LINDER:  My Lady, Peter Linder on

5    behalf of Calpine Power Limited Partnership, along with my

6    colleague, Emi Bossio, and we will have some comments in

7    response.

8                  JUSTICE ROMAINE:  Yes, thank you.  Mr.

9    Gorman and Mr. Smith?

10                 MR. GORMAN:  My Lady and your Honor, Howard

11    Gorman on behalf of the ULC ad hoc committee, and we will

12    be speaking in support of the application in due course.

13                 JUSTICE ROMAINE:  Thank you.

14                 MR. SMITH:  My Lady and your Honor, Quincy

15    Smith on behalf of Alliance Pipeline.

16                 JUSTICE ROMAINE:  Thank you.

17                 MR. McCLAIN:  My Lady, Douglas McClain for

18    the TransCanada Pipeline.  Also with me is David Elrod from

19    the Elrod Trial Attorney firm in Dallas.

20                 JUSTICE ROMAINE:  Thank you.

21                 MR. GRIFFIN:  My Lady, your Honor, Peter

22    Griffin for the US debtors.

23                 JUSTICE ROMAINE:  Thank you, Mr. Griffin.

24                 MR. LANCE:  Nathan Lance Canadian counsel

25    for the ULC1 indentured trustee.

50

1          JUSTICE ROMAINE:  Okay.  Thank you.

2          Do we have everyone introduced?

3          Thank you then.  Mr. Meyers?

4          MR. MEYERS:  Thank you, My Lady.  Good

5    afternoon your Honor.  My name is Fred Meyers, counsel for

6    the Canadian Calpine debtors, and I rise today on behalf of

7    the Canadian debtors seeking orders of this court approving

8    and authorizing the Canadian debtors to enter into the

9    global settlement agreement approving the sale by CCRC of

10   its ULC1 notes, and also not to be forgotten, seeking

11   extension of these proceeding.

12          I want to start off very briefly dealing

13   with the sale of the ULC1 notes.  That motion is an

14   integral component of the global settlement agreement and

15   is part of the value maximizing process that has been

16   created to fit the nature of the market for those

17   particular assets.

18          JUSTICE ROMAINE:  Mr. Meyers, can I stop

19   you just for a moment?

20          We have the sound turned very loudly in

21   order to hear the US side.  Could I just ask, Madam Clerk,

22   that we turn it down just a little bit, and when we need to

23   we'll turn it back up, that might make it a little better

24   here.

25          Go ahead, Mr. Meyers.

51

```
 1                     MR. MEYERS:  The process that we have
 2     proposed for the sale of the ULC1 notes is actually quite
 3     complex and it occupies a fair amount of material,
 4     including seeking a sealing order for the supplemental
 5     affidavit of Mr. Sholvat from Lehman Brothers.  That
 6     affidavit discloses pricing issues that need to be sealed
 7     in order to protect the integrity of the value maximizing
 8     process.
 9                     Out of all the briefs that we have
10     received, there has not been any opposition, that we've
11     seen, with respect to the bond sale aspect of the motion.
12     So I don't propose to spend any time on it, My Lady, except
13     to note that it's a key element to the global settlement,
14     designed to bring in sufficient funds to see to the payment
15     of all of the Canadian creditors as best as possible.
16                     In our bench brief, that is perhaps too
17     long to be called a brief, we've summarized the benefits of
18     the global settlement agreement, and I'm going to try to
19     follow that section roughly.  The bench brief is in the
20     first volume of the binders behind Tab 3 -- Tab 2, excuse
21     me, and I'm going to start at paragraph 20.
22                     The first benefit that has been identified
23     by the Canadian debtors from the global settlement
24     agreement is the reduction in claims against the Canadian
25     estates, something in the order of 7.4 billion dollars in
```

52

1    claims against the Canadian debtors are gone, because other

2    claims from those same creditors are going to be paid in

3    full.  ULC1 note claims, for example, are simply moved out

4    of the estate into the United States.  Of the 21.7 billion

5    dollars of claims identified by the monitor in its 23rd

6    report, it look like all are going to be paid in full, with

7    a possible exception of 25 thousand dollars at CCEL, and

8    that's a matter that we are working on as part of the

9    future structuring.  And it's really an incredible outcome.

10   It's certainly a long way from where this case began.

11                  The monitor has identified the possibility

12   of another 25 million dollars of potential creditor

13   shortfall at the CESCA subsidiary, and those are claims

14   that are not guaranteed by the US debtors, that are held

15   principal by the pipe lines, TransCanada Pipeline, Limited,

16   CCEL, and Alliance.  Those are the creditors who are most

17   on the bubble or on the cusp of the recovery, and who

18   compared the result of the finance anticipated end result.

19   Their counsel is here today to support the deal, or at

20   least not to oppose the global settlement agreement.

21                  So even though you hear from others,

22   particularly the fund, who seek to raise the risk of non

23   payment, as is identified in their materials, My Lady

24   should be clear that they are not speaking on behalf of

25   themselves but purporting to speak on behalf of others who

53

1   do not oppose, and in some cases actively support the
2   settlement.  CCEL and Alliance themselves together make up
3   between 23 and 24 million of the 25 million potential
4   shortfall.

5                   There are other creditors as well.  At
6   CCRC, we tend to only talk about the ULC2 note holders or
7   CESCA.  There are direct creditors.  West Coast is here
8   with a 66 million dollar claim under CCRC.  I understand
9   that they are going to support the deal because they would
10  like to get paid in full under the ULC2 note holders.

11                  Equally important, since I don't mean to
12  minimize anyone's role, but there is another party who is
13  integral and whose recommendation will play a heavy weight
14  on or have any weight on My Lady, not a question of the
15  monitor, who is, of course, an independent officer.  They
16  have been highly involved, as My Lady has heard and seen in
17  the materials.  They worked on the models, the distribution
18  analysis that's so carefully and fully outlined in the 23rd
19  report.  The monitor has given a clear and powerful support
20  for the global settlement agreement.  Paragraph 3 of its
21  23rd report says, "in fact, these global settlement
22  agreement provides the maximum recovery available to the
23  debtors."  Those are strong words from the court monitor
24  and the monitor's recommend is an important element in our
25  request today for approval.

54

1        By decreasing the claims, we, of course,

2   wanted to maximize realization.  Part of the production of

3   claims is a 2 billion dollar claim of CCEL against CCRC

4   that is going to be subordinated by the US debtors.  And

5   you'll hear much reference, I suspect, to the US debtors as

6   equity holders, but in fact they have creditor interest as

7   well of their own and subrogated claims.  And here we

8   understand that as part of the global settlement agreement,

9   they are going to subordinate those claims.  And as the

10  monitor can confirm, no money will go to CCEL by equity

11  holders until all the Canadian creditors and CCRC are paid

12  in full, either in Canada or through their guarantees.  And

13  that's confirmed in paragraph 7 of the draft order.

14        The monitor predicts that the US debtors

15  stand to receive between 176 and 369 million dollars on

16  distributions above the 75 million dollar settlement

17  benefit.  That's a substantial flow of money to the equity

18  holders due to this transaction, but it means first that

19  the Canadian creditors of CCRC are paid, because that's the

20  provision of the order and of the global settlement

21  agreement, either paid from the claims or paid through the

22  guarantees of the US.

23        The second benefit that we've identified,

24  starting at paragraph 22 of our bench brief, is the

25  maximization of realization.  And that's principally, but

55

1   not completely deals with the sale of CCRC's ULC1 notes.

2   In order to get to the position to sell those notes, we've

3   had to resolve the bond differentiation claims advanced in

4   this court by the US debtors.  The US debtors had to remove

5   their objections to the ULC claims under the guarantees.

6   We've been trying, as My Lady knows, for almost a year to

7   get to this point.  The CCRC committee says in their brief,

8   they should have been cooperating throughout, but that's

9   what makes lawsuits, parties disagree.  And I've heard Mr.

10  Anker and Mr. Seligman talk about potential litigation in

11  the United States; I thought I understood that there were

12  real objections filed and real deposition notices with

13  respect to those objections.

14              At paragraph 26 of our brief, we note that

15  in the March 5th application before this court brought by

16  the CCRC committee, the committee complained that six

17  months had passed since the August 31, 2006 order

18  authorizing and directing the sale of the CCRC ULC1 notes

19  at issue, and yet the notes remained unsold and pointed out

20  that they could not be sold until the US debtors' market

21  claims were adjudicated.  And its bench brief for the April

22  4th, 2007 application, the CCRC committee said, it is

23  inerrantly that the CCAA proceedings can proceed to

24  conclusion without the bond differentiation claims, among

25  others, being resolved, unless the bond differentiation

1   claims are resolved, the CCRC ULC1 bonds can not be

2   realized and distributed.  The global settlement agreement

3   resolves those claims.

4              The fund then objects while a part of that

5   is releasing a 575 million dollar claims of CCEL up into

6   PCH, an American debtor.  But again, in picking one piece

7   "to look at," they ignore the other pieces that the US

8   agreement to subordinate the 2 billion dollar claim back

9   into CCRC.  The 180 million dollars of cash that's going to

10  come down in intercompany claims into Canada, the US

11  debtors' agreement to remove their preference claims

12  against the Salten proceeds, removal of the BEC's and US

13  objections to the notes, subrogation of 50 million dollars

14  to CESCA, all aimed at designed to ensure that the Canadian

15  debtors are paid here or in the Unites States.

16              The third principle I want to spend a

17  moment on is the elimination of litigation, which is dealt

18  with in paragraph 37 -- 27 of our brief.  Not just the

19  BEC's, the bond differentiation trend litigation, but also

20  it's the Salten proceeds, there were claims being made,

21  those were preferential potentially in the United States,

22  that's over 250 million dollars in cash at CCRC.  The

23  hybrid note structure that we heard about, the litigation

24  and the complexity that would have been involved in that

25  claim.  The Greenfield litigation.  And with respect to the

57

1   Quintana 575 million dollar claim that's been released, the

2   CCRC committee says why don't you just make them pay it,

3   because you owe 2 billion back, and under the rule ensuring

4   liability, before somebody can get money, they have to pay

5   the money.  Well, it doesn't apply to a Nova Scotia limited

6   liability company.  And how does Cherry and Bolty apply the

7   partnership claims in the subsidiary, to raise one issue,

8   rises a whole host of litigation issues that have all been

9   resolved.

10           The global settlement agreement is first

11  and foremost a settlement of claims between the US and

12  Canadian estates.  And in our submission you can't simply

13  isolate one issues, and even to make another an example to

14  make the facts, is the 75 million dollar settlement that we

15  are the US -- excuse me, 75 million dollar payment that we

16  are making to the US, of course that's a payment that's not

17  priority distribution but rather we understand that in

18  selling the CCRC ULC1 notes free of bond differentiation

19  claims and US objections, there will be an increased

20  recovery through decreased market discounts.

21           In addition, we are settling at least five

22  significant pieces of litigation with the US, and in return

23  we are giving a 75 million dollar charge which will be a

24  charge on the proceeds of the note sale, so it's only going

25  to be paid ones we have a successful note sale, and it will

58

be paid at the same time as the ULC2 notes are paid after
the bond sale -- the note sale.

The 75 million is, in essence, a net share
of the benefit of certainty in all of these matters.  You
may recall in February when HCP bought the income fund, HCP
being the current fund, some creditors complained, at the
time, that HCP's offer had effectively declined by the 25
million dollars distributed during the bid process, and you
were told by the funds counsel that was the price of
certainty, because the fund wanted to litigate with us over
whether our management agreements could be terminated.  And
My Lady accepted in your decision that it was reasonable
for a debtor to share value to setoff claims to obtain
certainty; whether we call the 75 million dollar payment a
piece of sharing of the upside of having a clean bond sale,
or we call it a net payment of 90 million to the US,
offsetting against the 15 million dollar payment on
Greenfield, which is in the monitor's finding report, we
could call it a 200 million dollar payment to the US and
125 million dollar sale of the savings on Greenfield, or
offset on Greenfield, it doesn't matters.  It's a net 75
million dollar payment which is part of a bigger plan that
sees money go to the US through equity on the basis that
Canadian creditors are paid.  And the monitor says that
maximizes realization, and we submit its completely

59

1  correct.

2  Turning then to the last benefit that I'll

3  spend time on, although there are others, is treatment of

4  guaranteed claims, which is dealt with starting at

5  paragraph 34 of our packet.  We understand in common law

6  that a guarantor has a right of standing in a claim between

7  a debtor and a creditor.  It's clear in the textbooks the

8  creditor sues the debtor, it can sue the guarantor in the

9  same claim, the proper parties.  The guarantor has the

10  right to be there and to raise defenses.  But the problem

11  in our case is the US debtor has a stake, so our creditors

12  can't come and sue the debtor and the guarantor in the same

13  claim.  And under the texts it's equally clear, if you sue

14  the debtor, the debtor sues a creditor and not the

15  guarantor, the guarantor is not bound by the outcome; it

16  prevents collusion between the debtor and the creditor.

17  So we have two claims with the guarantor

18  not being bound by the outcome in the most inefficient and

19  expensive process.  And so our creditors face the prospect

20  of having to deal with a trial here, and then a trial in

21  the US.  And under the global settlement agreement, the US

22  debtors will acknowledge their guarantees unconditionally,

23  they will admit to the claims, so that all that will be

24  needed is an evaluation hearing.

25  The US debtors also agree that guaranteed

1   claims that could be claims in the US cases against US

2   debtors, will be heard in a unified, single proceeding

3   before this honourable court.  We have to give credit where

4   credit is due; after a tussle last April, the US debtors

5   have certainly stepped up with to the mark, with the

6   assistance and perhaps gentle nudges of the courts, which

7   have not been lost on the parties, but as part of the

8   global settlement agreement, we are all recognizing the

9   efficiency of having a single court hearing on the issue of

10   quantum; we don't even need to worry about liability.

11           Now, you may have read in some of the

12   briefs that -- the CCRC committee's briefs, the complaint

13   that they weren't at the table with the US actually

14   drafting the document, and it's true.  Mr. Austin, in his

15   cross examination, when the trust was filed?

16           JUSTICE ROMAINE:  Yes, it was.  Thank you.

17           MR. MEYERS:  Mr. Strausser said the

18   settlement was estate to estate, the CCRC and the United

19   States wasn't at the table either, each estate was acting

20   for its stakeholders.  How many people can one have at the

21   actual bargaining table before it becomes impractical and

22   nothing gets done.  But they weren't fully involved, the

23   ULC1s put in a term sheet that resulted in a deal.  Mr.

24   Austin said the ULC2s put in a term sheet for the fund.

25   That didn't resolve the deal, but at the end of the day we

61

1  ended up getting a the deal that incorporated many of the

2  terms of their term sheet and they are all listed in

3  paragraph -- that's sort of the last paragraph of our reply

4  brief, including among the terms sought by these baggaged

5  funds and the ULC2 creditors was in fact the very terms

6  that I'm rely relying on now, the single guarantee in

7  Canada -- hearing in Canada.

8                I was going to turn, My Lady, to a brief

9  which is a submission on the law, I don't know if My Lady

10 feels the need to hear it at this point or it's better

11 saved.

12               JUSTICE ROMAINE:  Let's save it and see

13 where we get.  Okay.

14               MR. MEYERS:  In summary, My Lady, this is

15 an estate to estate settlement, no one is being crammed

16 unilaterally, we are in a joint hearing to bring to

17 fruition months of efforts spurned with the assistance of

18 both courts last April.  The ULC1 is going to be paid in

19 full, the ULC2 is going to be paid in full, the fund is

20 going to be paid in full, assets are maximized, enough

21 so -- enough assets are going to be realized so as to allow

22 payments into the US once the Canadian creditors are paid.

23 The creditors at risk support it on their votes.

24 Perfection, of course, is never the test, nor is formal

25 equality.  The test is fairness and reasonableness.

62

1        All of these matters are linked in our

2   submission, but the settlement agreement provides all of

3   the benefits that I've enumerated, unlocks the estates,

4   allows us to move forward.  And on that basis we seek

5   approval of the global settlement and bond sale, the

6   threshold amount referred to in the -- by a confidential

7   affidavit which has to be sealed, and of course I'll speak

8   to you later perhaps about an extension.

9        JUSTICE ROMAINE:  Thank you, Mr. Meyers.

10   And I should, as a housekeeping matter, tell you that I

11   have not received a copy of the confidential Lehman

12   affidavit as of yet.  At an appropriate time --

13        MR. MEYERS:  Very shortly.

14        JUSTICE ROMAINE:  Okay.

15        Mr. Carfagnini, did you wish to speak?  No?

16        Does anyone else in wish to speak in favor

17   of the settlement agreement?

18        MR. GORMAN:  Yes, My Lady and your Honor.

19   Howard Gorman again on behalf of the ULC1 ad hoc creditor

20   committee.

21        I think it's significant to recall the

22   overwhelming size of the ULC1 claim in Canada.  It's in

23   excess of 2.5 billion dollars flowing through the various

24   companies, which, without the guarantee or intercompany

25   claims from the United States, overwhelms the remaining

63

1   Canadian assets.

2               My Lady, in your, and, your Honor, in your

3   three or four binders or two feet of materials, there is a

4   three page entry of the ULC1 note holders with respect to

5   the approval of the plan, and it's a scant three pages.

6   I've been on holiday, and it seemed to me that one needn't

7   swing hard with the driver when faced with the beginning

8   cut, and that is --

9               JUSTICE ROMAINE:  I don't understand that,

10  Mr. Gorman, I think you'll have to explain that.

11              MR. GORMAN:  I think we need Justice

12  Delvecchio to explain that analogy, My Lady.

13              My Lady, the absence of applications

14  throughout this process have been to maximize recovery of

15  assets, and we've heard from the commercial trust, we've

16  heard from the ULC2 before their convergence under the CCRC

17  and since, that the ULC1 people should be forced with a

18  choice.  You want this plead in the Canadian assets, which

19  would be the notes, the Salten proceeds, and the money in

20  the accounts, or do you want to pursue the guaranteed

21  claims, both the initial guarantee and the guarantees under

22  the hybrid note structure.  And in the spring of this year,

23  after significant negotiations, we gave the CCRC creditors

24  what they asked for, which was we moved from looking at the

25  Canadian assets, other than intercompany accounts, to a

64

1    resolution where we would focus our attention on recoveries

2    from CORPX and the US debtors under the guaranteed plan.

3    And this became sort of the lynchpin for the unlocking that

4    has occurred.  There is a significant benefit for other

5    Canadian creditors in that Salten proceeds, the CCRC note

6    proceeds, our part of the settlement, and that's what's

7    occurred.

8                With respect to the timing, and should

9    things be delayed in the implementation of the settlement,

10   I remind My Lady that we started fighting with the CCRC

11   notes last summer when they were trading at about half of

12   what the current potential marketing plan is, and at that

13   time the trust and ULC2s were adamant, don't wait, let's

14   get the sale process going.  It now can proceed in a timely

15   manner to maximize the recoveries, otherwise with respect

16   to the Calpine estate so as to satisfy the settlement, our

17   client now, they didn't want to be at risk last year, I

18   don't think anyone also wanted to be at risk this year, and

19   don't let a creditor who still has some contingent claims

20   get too much leverage in the process by derailing this

21   significant settlement achievement.

22               With respect to the ULC1 holders, I think

23   it's significant to note, and the numbers are in paragraph

24   8 of the brief, that over 55 percent of one series and 59

25   percent of the other series of bonds have negotiated with

65

1    its ULC1 trustee to provide the letters of direction and

2    the required indemnity, and significantly no ULC1 note

3    holder has filed any opposition to this plan.  You have a

4    predominant creditor supporting the settlement agreement,

5    and that's the stage we are at because we've got the

6    settlement agreement that is supported.  Let's move it

7    forward, and let's move these estates forward by

8    implementing a settlement, getting the extension, and

9    getting the notes sold at the appropriate time at the

10   appropriate price.  Thank you.

11              JUSTICE ROMAINE:  Thank you, Mr. Gorman.

12              Mr. Smith?

13              MR. SMITH:  My Lady and your Honor, Quincy

14   Smith of Fraser Milner Casgrain.  I speak for Alliance

15   Pipeline who are a 30 million dollar creditor of CESCA.

16   They have reviewed the material and are happy to support

17   Mr. Meyers' application for approval of the global

18   settlement.

19              I also speak as agent for Mr. Salard as

20   solicitor for Westpoint Energy, who are a 67 million dollar

21   creditor, he said 66 of CCRC.  They also have reviewed the

22   material and support Mr. Meyers application for approval.

23              Thank you.

24              JUSTICE ROMAINE:  Thank you, Mr. Smith.

25              MR. McCLAIN:  My Lady, Douglas McClain for

1    TransCanada Pipeline and Nova Gas Transmission.

2                    As we have not appeared in that in these

3    proceedings before, it may be of some benefit to give you

4    some sense of TransCanada's position in both the CCAA

5    Canadian proceedings, and also in the US Chapter 11

6    proceedings.  In the Canadian proceedings between

7    TransCanada and Nova they have collectively undiscounted

8    claim exceeding one hundred million dollars.  These claims

9    arise out of transportation agreements which have been

10   rejected by the debtor.

11                   In the US Chapter 11 proceedings,

12   TransCanada and Nova have guaranteed claims against the US

13   debtor arising out of these same contracts which were at

14   issue in the Canadian proceedings.

15                   Additionally, TransCanada has subsidiaries,

16   Portland Natural Gas Transmission, and GTN or Gas

17   Transmission North, which between them have undiscounted

18   claims in excess of 725 million dollars US.

19                   So collectively in both proceedings

20   TransCanada is a significant creditor.  With the exception

21   of small guarantee amounts and amounts which were small

22   amounts which were secured by letters of credit,

23   TransCanada's claims are substantially unsecured, and its

24   position in both proceedings is basically as an unsecured

25   creditor.

67

1          Having regard to the application before the

2     court, it clearly resolves a host of issues and provides a

3     basis for resolving others.  With respect to TransCanada's

4     position as a substantial unsecured creditor, both

5     TransCanada and Nova have properly considered the motion

6     and have no objection to the relief there is being sought

7     on this motion by the Canadian Calpine debtors.

8          Thank you.

9          JUSTICE ROMAINE:  Thank you, Mr. McClain.

10         Does anyone else wish to speak in favor of

11    approval of the settlement agreement before the monitor

12    speaks?  Perhaps Mr. McCarthy; Mr. Griffith?  Thank you.

13         MR. GRIFFIN:  Thank you, My Lady.  Peter

14    Griffin for the US debtors, your Honor.

15         The US debtors are obviously pleased to be

16    both in the US court and Canadian court in support of this

17    global settlement agreement.  I can see that the US debtors

18    were uniquely positioned to participate in and deliver this

19    result in conjunction with the Canadian debtors as,

20    obviously, not only equity holder, but subordinating

21    creditor and creditor of the Canadian estate.

22         It goes without saying, and we've heard

23    much about it and you see it in the material of the

24    benefits.  My respectful submission of this settlement

25    agreement are obvious.  It is an agreement which resolves

68

1    much, delivers solutions or the method to arrive at a

2    solution on an expedited basis, unlocks value and

3    facilitates moving forward with respect to these estates.

4    And there are time, My Lady, in any estate or series of

5    estates, when there is the potential for a great step

6    forward, and this is indeed one of those, which has been

7    reached by virtue of this agreement.  And it is for that

8    reason that you can see it so exhaustively, and properly

9    reviewed by the monitor in the 23rd report to give you the

10   type of analysis of all of the stakeholders expect and

11   deserve and are pleased to receive from the monitor as to

12   the obvious benefits of the settlement.

13                    At the end of the day, in my respectful

14   submission, this is the very sort of facilitated forward

15   looking result which the jurisdiction of this court exists

16   to support and endorse approval.

17                    JUSTICE ROMAINE:  Thank you Mr. Griffin.

18                    MR. GRIFFIN:  My Lady, can I deal with one

19   other point.  I was a bit dismayed to see this afternoon

20   that we were sitting with a jury.  I would caution you to

21   relieve no issue in this application.

22                    JUSTICE ROMAINE:  Two facts to be founded.

23                    MR. DeWAAL:  My Lady, your Honor, Rinus

24   deWaal of the committee of unsecured creditors in the US

25   proceedings.

69

1     As you've heard from Mr. Staber in the US

2  courtroom, we support the application.  For the reasons

3  that have been stated with we think that's the way that it

4  should go, and we, for that reason, support this.

5     JUSTICE ROMAINE:  Thank you, Mr. DeWaal.

6     MR. RABINOVITCH.  Good afternoon, your

7  Honor.  Neil Rabinovitch for the second lien committee.

8  Just to echo what my colleague Ms. McColm said in the US

9  court, we are delighted that some very very complicated

10  issues have been resolved between the two estates, and we

11  are very pleased and hopeful the settlement will proceed,

12  and that both estates can move expeditiously to

13  distributing funds to their creditors.  Thank you.

14     JUSTICE ROMAINE:  Thank you, Mr.

15  Rabinovitch.

16     Does anyone else before I call upon counsel

17  for the monitor?

18     Thank you.  Mr. McCarthy?

19     MR. McCARTHY:  My Lady and your Honor, we

20  have all of the submissions from the monitor are contained

21  in the many pages of the report, the 23rd report that you

22  have before you.  Having experience with Judge Lifland and

23  you, My Lady, I am confident that both of you have read

24  every word of all of that.

25     On that assumption, I don't intend to say

70

1   any more than obviously that the monitor does recommend

2   this arrangement.  And, secondly, that it is, as has

3   previously been said in my submission, a credit to the

4   debtors in the US and Canada, and if I may is so on behalf

5   of my client, a credit to the work done by Neil Narfason

6   and Mary McDonald and their staff in interfacing, and in

7   some case mediating the many issues that you see in the

8   complex agreement before you.

9                    And, your Honor, if you have any questions

10  on the monitor's report, I'd be happy to answer them.  And

11  again, My Lady, if you have any, I would be happy to answer

12  them as well.

13                    JUSTICE ROMAINE:  I have none.  Judge

14  Lifland?

15                    JUDGE LIFLAND:  I have none except to

16  observe the monitor's report was the most quoted in all the

17  submissions that I've received.

18                    JUSTICE ROMAINE:  I guess that's a

19  complement.

20                    MR. McCARTHY:  Thank you, your Honor, My

21  Lady.

22                    JUSTICE ROMAINE:  Mr. Meyers?

23                    MR. MEYERS:  My Lady, I wonder if I can

24  just hand up the register the confidential supplemental

25  affidavit.

1          JUSTICE ROMAINE:  Thank you.

2          I guess, Judge Lifland, we will go back to

3     you for the next step.

4          JUDGE LIFLAND:  Certainly.

5          JUSTICE ROMAINE:  Thank you.

6          MR. SELIGMAN:  Your Honor, we would next

7     like to turn to any objections to the settlement lodged in

8     the US proceedings.

9          With respect to the ULC1 indentured

10    trustee, we've been making continued progress there, and to

11    allow that process to continue without necessarily having

12    arguments made on that aspect, I would ask that if we can

13    reserve on that issue until after the Canadian objections

14    are heard, I think hopefully that will facilitate that

15    process and focus on resolution rather than in this area of

16    the argument.

17         JUDGE LIFLAND:  Well, it's my understanding

18    that the ULC1 trustee's objection are the only objection

19    that's really going to the merits of the settlement.  And

20    if that's in the process of possibly being resolved, we can

21    defer that argument and pass it back to the Canadian court.

22         MR. SELIGMAN:  Your Honor, I just didn't

23    know if any of the other objectors wanted to make a

24    statement here.  On behalf of the equity, I notice Mr.

25    Eckstein rising.

05-60200-cgm   Case 22-10943-JTD   Doc 308-8   Filed 08/30/02   Entered 08/29/23 07 12:20:18   Page 73 of 213   Main Document
Pg 72 of 212

72

1          MR. ECKSTEIN:  Good afternoon, your Honor.

2          JUDGE LIFLAND:  Retrieving the gavel.

3          MR. ECKSTEIN:  Good afternoon, your Honor.

4   Kenneth Eckstein of Kramer Levin, counsel for the ad hoc

5   committee of CCRC creditors which consists of both of the

6   ULC2 bond holders and the CLP income fund.

7          Your Honor, I would certainly find it much

8   easier to join the chorus of parties who are complementing

9   the court, complementing the company, and complementing

10  each other for achieving such an outstanding outcome.

11  Regrettably --

12         JUDGE LIFLAND:  I knew there was a but.

13         MR. ECKSTEIN:  Regrettably, we are not in

14  the same position, although I do think it's important to

15  share the perspective that there is an additional hero, I

16  think, in the case, in addition to, I believe, the efforts

17  that the court did bring to ensure that there was a

18  protocol and a process, and that is the market.  The fact

19  of the matter is, as some of the parties have indicated, a

20  year ago we had all of these issues pending in this case

21  and there was no ability to reach resolution.  As your

22  Honor recalls, there was a strong desire to have the bonds

23  sold, and for some reason that was not accomplishable.

24         Today, with the power markets where they

25  are, with the Calpine debt at a level where I believe the

73

1   parties are expecting to only be disputing the computations

2   of postpetition interest and make wholes, there is an

3   ability to somehow smooth over a multitude of problems.

4   And there's no question that the proposed settlement today

5   takes advantage of the market, and certainly does so

6   effectively by suggesting that everybody has figured out a

7   way to get paid in full.  And if in fact that were true for

8   my constituency, I probably would also be standing here and

9   join the chorus of support.

10          The fact of the matter is, your Honor,

11  unfortunately while the parties suggest that we will be

12  paid in full, I did hear Mr. Seligman acknowledge that in

13  fact with respect to the ULC2 bonds and CLP income fund,

14  our claims have not yet been resolved.  There are financial

15  disputes that remain open, for some reason the parties did

16  not see fit to try to bring those to foreclosure before

17  today.  And unfortunately we stand here today being told

18  that we shouldn't worry that at some time in the future

19  they will get to our claims and resolve those.

20          The income fund claim is called a disputed

21  claim.  It's a 500 million dollar contract claim that we

22  are told may get resolved at some point in time.  It's not

23  great comfort to us, your Honor, to simply be told that we

24  can possibly look to a guarantee if there are no funds in

25  Canada to resolve those claims.  We don't know what that

74

1    guarantee will be worth, maybe it will be worth what it's

2    worth today, maybe it will be would this less.

3                    Your Honor will note that with respect to

4    ULC1, they were willing to live only with their guarantee

5    because they reached an agreement to backstop that

6    guarantee with two-thirds of an additional claim in the US.

7    We don't have the benefit of that arrangement, your Honor,

8    so therefore we have to rely solely upon our rights.

9                    Your Honor, we are not suggesting that a

10   global resolution is not in order, we are not suggesting

11   that the sale of the ULC1 bonds are not in order.  What we

12   are concerned about, and I will defer to Mr. Thornton in

13   Canada who is going to make the substantive arguments, we

14   believe that where there has not a full consensus in a

15   proceeding, whether it's in the US or in Canada, the right

16   way to proceed is to submit a resolution to the creditors

17   for a vote and let the creditors speak through a plan of

18   reorganization as to whether or not they do or do not want

19   to support this resolution.

20                   In the absence of a complete consensus, we

21   believe that there is a responsibility on the part of the

22   debtors and an obligation imposed upon the proceeding to

23   rely upon the process that we have both in the US and in

24   Canada, which is creditor vote.  Let the creditors

25   determine whether in fact they do want to support this.

75

1  And in the process of the vote, and in the process of a

2  confirmation proceeding, you would, I would expect, be able

3  to work through the claims and we would have the

4  opportunity over the next several weeks and months, which I

5  think is what the debtors suggest, to both resolve the ULC2

6  claims and resolve the income fund claim so that we can

7  determine whether in fact we will be paid in full, or

8  whether or not in fact it's appropriate to allow monies to

9  leave Canada into the United States prematurely.  Because

10  right now the suggestion is that before the ULC2 claims are

11  paid, before the income funds claim has even be

12  adjudicated, 75 million dollars of funds will move from

13  Canada to the US, and whether that's in respect of a debt

14  or in respect of equity, we would submit that that is not

15  permitted or authorized under the bankruptcy process.

16          So, your Honor, that is the perspective of

17  my constituency, since we are standing really from the

18  perspective of the guaranteed claims, I think it's

19  appropriate to let Mr. Thornton articulate the Canadian

20  issue, which I believe governs both the ULC2 rights and the

21  income fund rights.  Thank you, your Honor.

22          JUDGE LIFLAND:  Thank you, Mr. Eckstein.

23          MR. FREDERICKS:  Your Honor, Ian Fredericks

24  on behalf of the ULC2 indentured trustee.

25          I would also like to allow my Canadian

76

1    counsel, Mr. Dunphy, to speak first to the issues, because

2    I believe they involve primarily Canadian issues, and then,

3    to the extent anything else is necessary, I request that

4    the court allow me to speak in after Mr. Dunphy has

5    concluded.

6              JUDGE LIFLAND:  We'll play it out,

7    Counselor.

8              MR. SELIGMAN:  Your Honor, if I could just

9    respond briefly pursuant to schedule, and I'm going to

10   defer to Canadian counsel for the Canadian debtors to speak

11   to the issues of Canadian Bankruptcy Law, I'm not proposing

12   to be an expert in that area.

13             Just one or two clarifying notes.  Mr.

14   Eckstein spoke about the lack of clarity or timing of

15   payment of the ULC2 bonds.  I think that what's been set

16   forth and what the documents contemplate, that as soon as

17   there is distribution to anybody, it's going to include

18   distributions to the ULC2 bondholders, and Canadian counsel

19   for the Canadian debtors can confirm that.

20             There hasn't been agreement on the exact

21   amounts of the interest because it's very clear that you

22   have an issue of currencies in pounds and currencies in

23   Euros, and there's different conventions about how you

24   calculate interest, but it's literally a couple million

25   dollars difference on a 350 million dollar issuance.

1     There is an issue of a make whole of

2     perhaps almost 50 million dollars alleged.  I think

3     everyone has agreed it's going to be paid out -- what's

4     agreed to is going to be paid out; what's not agreed to,

5     that 50 million dollars in the make whole, the couple

6     million dollars in interest, that's going to be reserved,

7     so there shouldn't be any issue as to the ULC2 note holders

8     getting paid in full whatever their claims are ultimately

9     determined to be.  It's not going to be an issue.  They

10    continue raise that issue, but I just want to make it clear

11    for your Honor.

12    As to the issue of the CLP claims, when

13    it's going to be decided and the lack of clarity on that

14    point, just to remind your Honor that in the Canadian

15    debtors' replied bench brief they did lay out a proposed

16    schedule for resolving that claim.  I won't go through the

17    schedule, but do note that they contemplate a hearing in

18    the last week of October or the first week of November with

19    respect to that hearing.  I think all parties have an

20    interest in getting the claim adjudicated quickly and

21    promptly, and the fact that the parties have worked

22    together on the issues between the Canadian debtors and US

23    debtors to agree upon a schedule to resolve that claim as

24    soon as possible as indicated before, speaks volumes to the

25    process.

78

1     As to the third point raised by Mr.

2 Eckstein, again, as to whether this should be put to a vote

3 or not under Canadian law, I'll defer to my colleague in

4 the Canadian proceedings to address that.

5     JUDGE LIFLAND:  Do I understand, then,

6 what's contemplated, at least the principal amount of 350

7 million dollars will be paid?

8     MR. SELIGMAN:  That's my understanding that

9 that will be paid upon the bond sale, that there will

10 presumably be an application --

11     JUDGE LIFLAND:  Leaving only the issue of

12 make whole and interest differentials.

13     MR. SELIGMAN:  That's correct, your Honor.

14     MR. FREDERICKS:  Respectfully, your Honor,

15 Ian Fredericks again in response to Mr. Seligman's comments

16 that involve the 350 million dollars, I believe that he's

17 speaking of only speaks to the ULC2 bonds that are held by

18 third parties.  There is the issue, as indentured trustee,

19 that certain of these bonds are held by Canadian

20 affiliates, and the indentured trustee's position is that

21 we have not been provided proof that these bonds have been

22 canceled or otherwise satisfied.  And before our claim can

23 be compromised, one of the issues -- we don't believe our

24 issuance can be compromised.  Before the settlement can be

25 approved, either the US debtors, Canadian debtors, or

79

1   someone else needs to provide us with proof that these

2   bonds have been canceled, or they also need to pay us on

3   account of those bonds as well.  So with we don't believe

4   that the 350 million, or payment of the 350 million dollars

5   resolves our claims, or comes close to paying it in full.

6                   JUDGE LIFLAND:  Thank you, Counselor.

7                   MR. SELIGMAN:  Your Honor, just with

8   respect to that, and I'll defer to the Canadian counsel to

9   address the issue.  But, yes, there are bonds held by the

10  Canadian debtors, whether they are treated cancelled or

11  there's a round trip of funds, economically it's not going

12  to make a difference, and I will leave it to the monitor

13  and to counsel for the Canadian debtors to speak to the

14  issue, but I don't think there's an issue of dispute of

15  making sure that the third party bond holds will be paid.

16                   JUDGE LIFLAND:  Very well.

17                   MR. ECKSTEIN:  Your Honor, at the risk of

18  leaving the record open, there are a number of other

19  categories and claims that will need to be resolved that

20  are not yet resolved, and I didn't want to omit those from

21  at least being mentioned on the record.

22                   JUDGE LIFLAND:  My only inquiry was, in

23  concept, of the principle amount of the bonds is a bond

24  payment.

25                   MR. ECKSTEIN:  I understand fully what it

80

1      says --

2                      JUDGE LIFLAND:  We'll pass over to the

3      Canadian court at this point.

4                      MR. SELIGMAN:  Thank you, your Honor.

5                      JUDGE LIFLAND:  My Lady?

6                      JUSTICE ROMAINE:  Thank you, Judge Lifland.

7                      Mr. Meyers, Mr. Robinson, before I call on

8      Mr. Thornton, does anybody wish to address the question has

9      just been raised in the United States proceedings about

10     what happens to the ULC2 bonds held by the Canadian

11     debtors.

12                     MR. MEYERS:  Yes, thank you, My Lady.  It's

13     good of the trustee to be concerned about our bonds, we

14     are, too.  And there's an obligation that My Lady heard

15     about earlier to deal with the structure and a tax

16     efficient way of those issues are being considered, whether

17     the bond should merely be cancelled or whether the bonds

18     should flow through.

19                     In the proposed order there are two

20     provisions of relevance.  Paragraph 34 makes it clear that

21     the 75 million that goes to the United States is at the

22     same time as a payment of CCRC direct creditors, which

23     include the ULC2 bonds.

24                     Secondly, in paragraph 21 we'll be handing

25     up a black line of the order, and one of the black lines it

81

1    has already been added, it's been matriculated to the list,

2    is a -- you saw in schedule B to our reply bench brief,

3    there is actually agreements; the ULC2 note holder's

4    trustee, and our financial advisors and theirs agreed on

5    what the amounts in issues are.  And they are set out in

6    Schedule B.

7                    Those amounts are now contained in the

8    order and will be held, as well as an additional amount to

9    be calculated out in respect of the Canadian debtors' bonds

10   in the event that the bonds are not cancelled.  And we

11   understand that is a straight proportionality.  We know the

12   amount of their bonds, the amount for our bonds is just a

13   percentage increase depending on the bonds.

14                    So the matter is covered; all monies in

15   dispute will be held in escrow for the ULC2 bonds.  They

16   will be paid.

17                    JUSTICE ROMAINE:  Okay, thank you, Mr.

18   Meyers.

19                    Mr. Dunphy, are you starting?

20                    MR. DUNPHY:  Well, just on that point.

21                    JUSTICE ROMAINE:  Okay.

22                    MR. DUNPHY:  Since you asked about it.  And

23   just to be very clear about it, I have other issues of

24   other aspects.  But as trustee, the only thing we know are

25   the bonds that are issued.

1    We are told from reading onerous reports

2  that a certain number are held in Salten LP.  I have taken

3  a number of things on faith in life; I suppose that can be

4  one of them.  And without being a doubting Thomas about it,

5  I just don't know.  And under our trust indenture, when I

6  get a dollar, it tells me exactly how to distribute it.

7  Who gets the first portion; I get the first dollar, but

8  after a few more of those come in, then we start to pass it

9  to the bond holders, and I have to pay all the bondholders

10 pro rata in relation to the bonds the I hold.  And I don't

11 know Salten LP, I don't know how many they own, and if they

12 show up and say cancel these bonds, then they all live

13 happily ever after.

14    I will agree with Mr. Meyers on the make

15 hole; our financial advisors have had a dialogue.  I don't

16 think the order is spot on in terms of catching the issue,

17 but I think we are mostly there, in that if necessary, even

18 in subsequent attendance that issue should be able to be

19 resolved quantum of the make whole amounts, as long as the

20 principal, whatever it is, gets tallied up and socked away,

21 we can deal with that.  And I have something to say about

22 where it gets socked away, but I'll wait to get to that.

23    JUSTICE ROMAINE:  Exactly.  Okay, I'll

24 leave that issue and then turn to Mr. Thornton.  Are you

25 going to be the first speaker?

83

1          MR. THORNTON:  Yes, I am.  Thank you, My

2    Lady.  Good afternoon, your Honor.

3          I'm wondering if we could prevail upon the

4    US court to focus on your Honor rather than the very

5    talented group of gentleman we have in the front row?

6          JUSTICE ROMAINE:  Judge Lifland, do you

7    mind?

8          MR. THORNTON:  Because otherwise I'll be

9    making submissions to Mr. Seligman's empty chair.  And even

10   when he is there to hear them, he hasn't been too receptive

11   of my submissions.  I'm hoping to do better with Judge

12   Lifland.

13         JUSTICE ROMAINE:  Okay.

14         JUDGE LIFLAND:  That's not a problem.

15         JUSTICE ROMAINE:  I'm not sure, Judge

16   Lifland, whether you heard that request.

17         Oh, there you are, okay.  Thank you.

18         MR. THORNTON:  Thank you, your Honor.

19   Thornton, initial R., and we represent the CCRC committee,

20   which is the committee composed of the majority of the

21   third party ULC2 bonds and CLP as since the purchase of

22   that entity earlier this month, and earlier this year in

23   this proceeding.  And because of the breath and diversity

24   of our representation, for your Honor's benefit, we are

25   probably most analogous to what you would refer to as the

84

1   UCC.

2                    In order to facilitate these submissions, I

3   would ask both courts if you would have and handy our bench

4   brief, our book of authorities, the revised settlement

5   agreement which I received Monday, but which I think

6   perhaps the courts received either Friday or over the

7   weekend, and the revised orders which I think are being

8   proposed in Canada and the US which we received in the last

9   day or two.  In addition I will be making reference to the

10  monitor's report.

11

12                   JUSTICE ROMAINE:  I think that takes care

13  of 2 of the 3 volumes, Judge Lifland?

14                   JUDGE LIFLAND:  I think it spans across

15  three of mine.

16                   JUSTICE ROMAINE:  Mr. Meyers, if you have

17  an extra copy that would be useful.

18                        (handing)

19                   JUSTICE ROMAINE:  Thank you.

20                   MR. THORNTON:  The references for both My

21  Lady and your Honor's benefit will not be extensive for

22  this material, but if we have difficulty locating it, I

23  will try to be mindful of that and help.

24                   Now, a lot of work has gone into this

25  settlement.  And there is a lot of benefits for both

85

1   estates in the settlement.  And we are not suggesting that

2   this settlement should simply be thrown out, what we are

3   suggesting is that Canadian law must be complied with

4   before it can be implemented; and that is a key part of our

5   submission.

6            This settlement does not just effect the

7   parties to the settlement, it effects all of the Canadian

8   debtors and every creditor in the Canadian estate.  And

9   that is why the monitor has examined the effects of this

10  settlement upon every Canadian debtor estate and the

11  recoveries of every Canadian debtor.

12            As it happens, there are some estates that

13  get paid in full and some estates that do not, or may not,

14  and that may is very important.  Everyone is optimistic

15  that they will, but what the settlement actual contemplates

16  is they may get paid in full.

17            And what the settlement, in essence, as it

18  happens I should add, I suppose, as a matter of coincidence

19  I'm sure, the creditors we represent, who are at the CESCA

20  level, at the CCEL level, are the estates that are most

21  likely to be subject to a potential compromise, and there

22  are other non economic compromises that are being proposed

23  for the ULC2s, and we will go into those in some detail.

24            But the settlement agreement in its essence

25  represents a balance of risks, of tradeoffs, of negotiated

86

settlement and proposed compromises.  In short, this
settlement is replete with business judgments.  And as
such, under Canadian law, the affected creditors are the
ones who are required to decide whether the compromises,
viewed as a package, are acceptable.

The mechanism required under Canadian law
and the CCAA to discover the answer to that is through a
vote.  And this is not a question of whether or not this is
a good deal, a fair deal, an equitable deal, or, in fact,
as I assume for the purposes of argument is, it's very best
deal that the Canadian debtors and the monitor could
negotiate under the circumstances.  And I can understand
the desire of all of the parties who have spoken here today
and the courts to want to implement it.

But the issue is a question of who decides.
Can the court, this court, decide on its own, and thereby
force this package of compromises upon the creditors, or
must the creditors decide in the usual and recognized way
in Canada?  And I emphasize here that the debtors seek not
just the approval of this settlement to go forward to a
vote of creditors, but an actual implementation of it.

The settlement agreement is a comprehensive
rearrangement of priorities and compromise of claims of the
Canadian creditors.  Can the court impose it, or must it be
put to the creditors?  That is the issue for this court

87

1   today.

2           My Lady, your Honor, I propose to examine

3   four areas of fact and law.  Firstly, we will examine the

4   nature and extent of the compromises being proposed upon

5   three creditor groups, being the ULC2 creditors, the CESCA

6   creditors, and the CCEL creditors.

7           Secondly, we will examine the effect of the

8   approval and implementation now, as asked, what that would

9   have on the creditors and on the vote, and, in our

10  submissions, a subsequent vote to the implementation would,

11  in fact, be rendered meaningless.  I will then examine the

12  jurisdiction of this court, and I will distinguish the

13  jurisdiction under Section 4 where a compromise is proposed

14  to a class of creditors or creditors generally from the

15  supervisory jurisdiction under Section 11.

16          We will also look at the jurisdiction under

17  Section 18.6 to coordinate foreign proceedings, and to

18  inherent jurisdiction to fill in the gaps when the statute

19  is silent.  In so doing, I will then address the cases in

20  all of the bench briefs that have been filed with a view to

21  reconciling them along the bright line that says where

22  compromises are proposed upon a class or classes of

23  creditors, a vote and the protection of that fundamental

24  right must be protected by the CCA Supervisory Court, and

25  distinguished that from cases where there is no such

88

1   compromise being proposed.

2                And lastly, within the statutory

3   jurisdiction, I will propose a way that the court may

4   exercise its discretion within the statutory jurisdiction

5   that is available to this court in a way that promotes the

6   efficient finalization of the administration of the

7   Canadian estates, brings them to an expeditious resolution,

8   and more importantly, maximizes the possibility of

9   salvaging the benefits and all the good work and efforts

10  that have gone into the settlement agreement.

11               First, to the nature of the compromises,

12  and starting with the ULC2 trustee and its beneficiaries

13  the bond holders.  My friend, Mr. Dunphy, will have more

14  submissions on this point, but I note three.

15               Firstly, the amounts were in dispute.  And

16  in the first draft of the settlement agreement that

17  accompanied the motion materials, there were specific

18  amounts in there, and the amounts were in error.  The

19  numbers were changed in the revised agreement, we don't

20  need to go to them actually, but let's just say that there

21  was a significant variance from our point of view.  The

22  ULC2s believe that there is no reason to compromise

23  anything in this estate given their structural priority.

24               And so, when the numbers that were too low

25  and wrong in our opinion first showed up, we were most

1   disturbed about that.  And we were told as well in the

2   bench briefs that every section of the settlement agreement

3   was precious and could not be changed without threatening

4   the picture as a whole.  Well, they changed the numbers;

5   which I raise that only to point out that the settlement

6   agreement is not quite as immutable as the bench briefs

7   would have us believe, and it does show that what can

8   happen when you actually engage with the creditors who are

9   effected to try to clarify things, as should happen in this

10  case and as would happen if there was an establishment of a

11  voting mechanism, that those negotiations could occur.

12              So those amounts have been changed, and

13  there is a hope that there will be funds sufficient to put

14  aside to pay all of the ULC2s in full, to which we say that

15  is a good step in the right direction.  But there are other

16  compromises that are inherent in this settlement agreement

17  as written, and I emphasize the following two.

18              Firstly, there is a release of claims

19  immediately, even though payment is deferred and

20  contingent.  Contingent against at least upon the bond sale

21  and then contingent upon a subsequent court order.  Now the

22  claims specifically that are released are oppression

23  claims, and they are not marker claims.  And for the

24  benefit of Judge Lifland's who may not have this

25  background, prior to Calpine filing for protection in

90

1    Canada, Harbor, which is a bondholder, brought an

2    oppression action in Nova Scotia, which was the

3    jurisdiction of ULC2, to say that certain parties in the

4    Calpine empire were guilt of conduct that was asset

5    stripping, that materially and prejudicially and with

6    oppressive effect, disregarded the interests of the bond

7    holders.  In fact, cash was being stripped out of Canada to

8    feed US needs.

9            Now, there is a judgment that was rendered

10   in the summer before the filing, and that judgment found

11   that CCRC and CORPX were guilty of oppressive conduct.  The

12   claims that have been filed are against CCRC in Canada and

13   against QCH and CORPX in the United States.  QCH was added

14   once we learned through the monitor's reports in this

15   proceedings, that it was intimately involved in the

16   transactions that were oppressive and that stripped the

17   assets out of Canada.

18           Now those claims were filed in accordance

19   with this court's claims procedure order on a timely basis,

20   they were based on an existing judgment and a finding of

21   oppression.  There has been no dispute of those claims, and

22   there has been no judicial determination under the claims

23   process about those claims.  But under the settlement

24   agreement those claims simply vanish, and they vanish

25   before payment.  And here there's an interesting

91

1    distinction in the timing of what happens in the US and in

2    Canada, and this may be inadvertent, but in either way it's

3    prejudicial, and I just want to bring that to your

4    attention.

5              So let us look at the revised order

6    submitted to in the US proceeding.

7              JUSTICE ROMAINE:  I don't have that order

8    in the US proceeding.  I have the Canadian form of order,

9    but go ahead.

10             MR. THORNTON:  Well, it's quite possible to

11   follow along without having the order in front of you.

12             JUSTICE ROMAINE:  Okay.

13             MR. THORNTON:  Paragraph 16 of that order

14   says that, "The claims included in Exhibit G to the

15   settlement agreement are hereby dismissed with prejudice or

16   deemed to be withdrawn with prejudice."  That is, I think,

17   the exact same paragraph as is in the Canadian order in

18   paragraph 9.

19             JUSTICE ROMAINE:  Thank you.

20             MR. THORNTON:  Yes.  In the Canadian order,

21   paragraph 9.

22             Now in the US order where it was paragraph

23   16, if we look at the tiny paragraph, while this is

24   effective in the US order, paragraph 5 says that paragraph

25   16 is effective upon entry of this order.  So that means

92

1   that if this order is given today, our claims are gone

2   today before the bond sale may ever happen, and certainly

3   before any payment.

4                Now with respect to the Canadian order they

5   have, and may I emphasize, that would get rid of the

6   oppression claims against both CORPX and Quintana, QCH,

7   gone.  Now the Canadian side of that equation is the

8   oppression claim against CCRC, and it is actually delayed,

9   under paragraph of the 5 of the Canadian order, to be

10  effective only when the bond sale us occurs, which is

11  little better, but in any event, what it is is a

12  compromise.  It is an extinguishment of rights now before

13  payment, and I ask why?  Why was that so important that

14  that had to be embodied into this settlement agreement?

15  Why couldn't the claims stay upstanding and be dismissed or

16  extinguished upon payment?

17               If they are going to be paid, they should

18  be paid.  But the payment is contingent, and therefore

19  there is some risk.  It may be small, but it is the

20  creditor's risk to choose to accept it or not.  It is their

21  choice, in my submission, My Lady, not the courts.

22               And thirdly, there is a transfer of

23  jurisdiction inherent in the -- embodied in the settlement

24  agreement.  The legal entitlement of the ULC1 trustee and

25  its note holders for their claims, as it stands today, is

1   established by the claims order in this proceeding with

2   respect to claims it has made in this proceeding pursuant

3   to those orders.  And that includes an ability on your

4   part, My Lady, to call Judge Lifland and get advice about

5   US law, to the extent you feel you need to, under the

6   protocols that we have put in place.

7                    But three things under the settlement

8   agreement are transferred to the U.S. Bankruptcy Court.

9   The ULC2's right to make whole payment, to the interest

10  that is in dispute and continues to be in dispute, and

11  certain fees of Harbinger -- of Harbor, pardon me, which I

12  will get to in a minute.

13                   Now this is not a question of which is the

14  better court or the best court, this is a question of is

15  this a compromise of an existing right to people who are

16  non parties to the settlement, and it is.  And let's look

17  it at it from Harbor's points of view.  What is the

18  jurisdiction of the U.S. Bankruptcy Court to its claim

19  which has no connection to the US in any way?  It is a

20  claim for recovery of fees in a Nova Scotia action against

21  Canadian entities, primarily, and that claim is not made

22  against CORPX, not made against any US debtor, and there is

23  no element of a guarantee involved in it.

24                   JUSTICE ROMAINE:  This is the Harbor fees

25  issue.

94

1          MR. THORNTON:  This is the Harbor fees

2    issues.  And furthermore, there is different treatment

3    under the US law of a litigant's fees than there are is

4    Canada.  In Canada, a successful litigant has a reasonable

5    expectation of recovering at least some of their costs

6    against an unsuccessful defendant.  And whether you --

7    pardon me.  And in the US, a party litigant bears their own

8    costs except under extremely unusual circumstances, as I

9    understand it.

10          Now we say that the transfer of this

11    jurisdiction is possibly done with a view to seek different

12    treatment imposed, or we have to prove the entire Canadian

13    law of cost before the US Bankruptcy Court, which does not

14    seem to be a valuable use of anybody's time, and we are not

15    sure why this issue has to be determined there when it's

16    already a claim in this proceeding.  And as you know, in

17    addition to the issue of success, we will be claiming

18    recovery on a quantum meruit basis, since it was that

19    litigation which stoppered up 280 million dollars of

20    Canadian -- of the Salten proceeds so that that asset did

21    not get stripped as a result of the oppressive conduct.

22          So, with the dispute about the amounts, the

23    release of the claims prior to payment, and the transfer of

24    jurisdiction from the rights as they now stand, there are a

25    number of compromises and arrangements that affects ULC2,

95

1   which would be an identifiable class or group of creditors

2   as we would ordinarily classify them in a Canadian

3   proceeding, and that is enough to bring this case, in our

4   submission, within the jurisdiction of Section 4 of the

5   CCAA.

6          But the settlement agreement goes much

7   further, and I do not have to rely on the compromise that's

8   proposed on ULC2, because there are also compromises on the

9   CESCA creditors.  These are of economic significance, it

10  dwarfs the issues relating to ULC2.

11          And I turn now to the monitor's report, in

12  particular to the very important chart on page 15 of the

13  monitor's report.  That chart shows the claims against

14  CESCA.  And it shows, on the right hand side, that's on

15  page 15 at the top, the monitor's 23rd report.  All right.

16          Your Honor and My Lady, you'll note in the

17  column on the extreme right hand side under recovery that

18  there were a range of recoveries specified for intercompany

19  trade creditors, CRA being the Canada Revenue Agency; the

20  CLP tool claims and gas transportation claims that range

21  between 64.7 percent and one hundred percent.  You will

22  also note that the gross claim numbers in the first column

23  shows 500 million dollars of claims, approximately, and

24  recovery in the next column from the CCAA proceeding, that

25  is the proceeding that this court is dealing with, of only

1    324 million dollars.  There is a shortfall of 177 million

2    dollars.  And the monitor notes that it expects 151 or 2 of

3    those millions to be satisfied out of Chapter 11

4    proceeding, but still leaving a shortfall of some 25

5    million dollars at the end of the day.

6                    Now, being forced to rely upon a guarantee,

7    when there is demonstrably sufficient value in Canada to be

8    paid in full, is of itself, in our view, a compromise.  And

9    I pause here to note that the monitor has assumed one

10   hundred percent recovery under the guarantees in the US

11   preceding for the purposes of its analysis.  And the

12   monitor is quite capable of making its own assessments, but

13   that also is a risk analysis and decision for the creditors

14   who are affected there and forced to rely on those

15   guarantees to make.

16                   The fact of the matter is that the

17   recoveries from the US estate, and I emphasize this,

18   particularly with respect to undetermined claims,

19   unliquidated claims, are uncertain.  They are uncertain as

20   to timing, they are uncertain as to amount, and they are

21   uncertain as to the form and value of consideration.  There

22   is much work yet to be done before a plan is confirmed in

23   Chapter 11 and before these claims will see payment from

24   Chapter 11.

25                   But in addition to that compromise, there

97

1    are four others that I would like to bring to the court's

2    attention.  Firstly, there is the US 75 million dollar

3    priority payment of the CCRC.  Secondly, there is the

4    cutoff of CCRC from making claims up into CCEL.  Thirdly,

5    there's the settlement of the Greenfield litigation for 15

6    million that's as a net credit to CCRC as opposed to CESCA.

7    And lastly there's another collateral attacked on your

8    claims process, My Lady.

9                    Now starting first with the US 75 million

10   dollar first charge cash payment, as Mr. Seligman calls it,

11   out of the CCRC estate.  Is that a good deal or not?  Well,

12   it resolves a lot of things, but the US has, as a matter of

13   fact, untested claims in Canada, and we say, after

14   extensive examination, those claims are unmeritorious.

15   Now, is 75 million dollars the right number?  Is it coming

16   from the right place?  We say that is part of the

17   creditors' judgment to accept this compromise as a

18   passenger or not.

19                    Let's look then at the cutoff of CCRC.  And

20   for this we need a bit of explanation.  CESCA is a

21   partnership.  Under Canadian law, the partner is liable for

22   the claims of the partnership.  One of the partners here is

23   CCRC where a lot of the value in the Canadian estate

24   resides.  CCRC, in turn, is wholly owned by CCEL, and CCRC

25   is an unlimited liability corporation.  The key distinction

1   between an unlimited liability corporation and other

2   corporations is that the owners, called members, can be

3   forced to contribute to the assets of the unlimited

4   liability corporate estate until all of the ULC's creditors

5   are paid in full.

6          Now in this case, one of the creditors of

7   CCRC is CCEL, its parent. So under the corporate law that

8   establishes the liability of the member, CCEL is required

9   to contribute enough to CCRC so that CCRC will be able to

10  pay off its own member. That sets up a perfect setup. And

11  my friends say what a great deal it is that that claim has

12  been subordinated. We say that claim doesn't exist because

13  it would be set off in any event.

14          And furthermore, under the general rules as

15  uncharitable as it may be, wherever you have any fund that

16  a person who claims from that fund is owed money by the

17  fund, they have to make good on the claim before they get

18  anything out of it. That is in fact the situation we have

19  here. So whether it's setoff or subordination, the fact of

20  the matter is the creditors of CCRC are the claim up into

21  CCEL, and CCEL has a 575 million dollar intercompany claim

22  owing to it by QCH; we've known that since the monitor's

23  5th report, in appendix B, which is annexed to our bench

24  brief. That at today's values, and now that much QCH is

25  consolidated into the general US estate, is the single

1    biggest assets of the Canadian estate.

2              That asset, under the settlement agreement,

3    is being cut off from being available to the Canadian

4    creditors, because the settlement agreement purports to

5    terminate the member liability of CCEL, which owns that

6    receivable, which otherwise it would be liable to

7    contribute to the estate of CCRC.

8              So let's stop there.  The CESCA creditors,

9    according to the monitor's report, could suffer a shortfall

10   as much in the Canadian estate of 176 million.  Under the

11   settlement agreement, 75 million in cash, 575 million of an

12   intercompany receivable are being taken off the table for

13   the creditors of CESCA.  We say there should be no need for

14   any creditor to be exposed even to the risk of a shortfall

15   when there is something in the neighborhood of 650 million

16   of value going to the US equity holder.

17             Now, these payments are really going on

18   account of the untested and we say unmeritorious claims of

19   the US creditors which should give rise to mere hold up

20   value.  650 million dollars; some hold up, some value.

21             JUSTICE ROMAINE:  So, Mr. Thornton, you are

22   discounting the 7.4 billion dollars of claims that are no

23   longer being made against the Canadian estate as a result

24   of this settlement agreement.

25             MR. THORNTON:  I am not balancing at all

1    the benefits and the burdens in the agreement, because that

2    is an inquiry as to whether this is a good deal or not.

3            What I am pointing out is that to the

4    extent legal rights are compromised upon a class of

5    creditors, that that class must have a vote, and that is a

6    fundamental right under Canadian restructuring law.  And in

7    this case that right can be respected, and we still do not

8    have to throw out this settlement agreement.  And I will

9    get exactly as to how we get there later in my submissions.

10            Now Greenfield.  There is an a trend that

11   that was an inter-billed project, complete with a 20 year

12   power purchase agreement with a promise of material and all

13   municipal regulatory environmental approvals in place.  It

14   was sold six weeks before filing to a non filed US

15   affiliate.  It was transferred from CESCA for a hundred

16   dollars.  It was one of the largest and most obvious

17   fraudulent conveyances I've seen in my 23 years of

18   practice, as I've said in this court previously, and it is

19   a claim for the benefit of the CESCA creditors.  It was

20   CESCA's assets and transfer.

21            Now that claim is to be dismissed.  And

22   under this settlement, there is a release by all Canadian

23   debtors and any creditors who claim through them.  So that

24   action would be dead as a result of this settlement

25   agreement.  And CESCA itself gets nothing on account of it.

1   It is settled by the reduction of a payment that CCRC would

2   otherwise have to make, but more importantly it settled for

3   15 million dollars.

4   Now, who came up with that number?  The

5   parties that implemented that transaction in the first

6   place came up with that number.  And do you have evidence

7   before you to vet that number on its own?  I submit that

8   you do not.  That is an element of the kind of decision a

9   creditor is entitled to make.  In fact there's no whole

10  package worth that, and that is what the creditors should

11  be asked here by way of a vote.

12  And lastly, in terms of particular effect

13  upon Canadian creditors, we look at the adjudication of

14  disputed claims.  The US debtors seeks to do, through the

15  settlement agreement, what you directly denied them on

16  their motion on April 4.  They sought then a change to your

17  claims process order to be allowed to insert themselves

18  into that order, and in effect revoke or rework a notice of

19  dispute or disallowance that the monitor and the company

20  had put forward.

21  You will recall this was in relation to

22  CLP's repudiation claim with respect to the Calgary Energy

23  Center, the monitor and the company allowed that claim in

24  the amount of 142 million.  CLP thinks the claim is much

25  higher, but the US debtors have a theory.  They have a

1    theory that even though the new toll is lower than the old

2    toll, that the net damages claim is actually less than

3    zero.  And I don't think they go so far as to say as the

4    CLP owes CESCA any money, but they do want an opportunity

5    to go at that again, even though they were unsuccessful in

6    asking you to do that directly, and they do that through

7    the provision of Section 2.8A sub 4 on page 22 of the

8    revised settlement agreement.

9              JUSTICE ROMAINE:  I'm sorry, what page?

10             MR. THORNTON:  Page 22.

11             JUSTICE ROMAINE:  Thank you.  Okay.

12             MR. THORNTON:  If you look at sub 4 at the

13   top of that page, and about halfway down, the Canadian

14   guaranteed claims determination order will also provide for

15   the manner of participation in the judicial claims

16   determinations of the guaranteed claims by guarantors who

17   have submitted their guarantee obligations, so it's a long

18   way of saying that includes the US debtor with respect to

19   the CLP claim, to ensure, and this is the meat of it, that

20   such guarantors have all of their rights of participation

21   preserved, including the right to raise and have fully

22   determine any defenses or objections that the Canadian

23   debtor or monitor could have raised to the creditors'

24   claims, notwithstanding any statements of the Canadian

25   debtors position in any notices of revision they have

103

1   issued to date.  Clearly trying to do indirectly what they

2   do could not do directly as determined by this court.

3                   So not only does that represent a

4   compromise of the rights to CLP as they now stand, but is

5   also a collateral attack on both your claims process orders

6   and your order of April 4.

7                   Now the monitor, in page 15 and 16 of its

8   report, also notes that that CLP claim is very important to

9   the CESCA creditor group as a whole.  It is the swing

10  claim.  Depending on how much it is determined that, and I

11  can say that at this point I believe all the parties are

12  agreed that needs to be determined, because I don't believe

13  it will be settled, that that claim is a swing vote, a

14  swing claim which determines whether or not the CESCA

15  creditors get paid in full under this settlement agreement.

16                  Well that's a critical fact among all the

17  CESCA creditors, and having that determined would be of

18  great assistance in determining whether or not there is a

19  compromise being imposed on the CESCA creditors whether

20  they like it or not.  It's a question of whether it needs

21  to go to a vote.  So the determination of that issue, which

22  we are all in agreement should be done as expeditiously as

23  possible, we say should occur under that schedule and be so

24  ordered by you.

25                  So, in summary, the CESCA creditors are

1  exposed to recovery as low as 64 percent.  The size of the

2  CLP claim is a key driver of how much that compromise will

3  be.  In addition, the rights of the CESCA creditors are

4  being compromised in a number of ways, recognizing that

5  there are benefits, recognizing also that we have always

6  maintained that the ULC1 claims, by virtue of the

7  nonrecourse nature of the notes, were not, in fact, through

8  claims as if this chain of assets in Canada, but there are

9  a complete -- the settlement agreement is a complete plan

10  of priorities it sets out who gets what and how from all of

11  the Canadian.  Estates, and that in that regard it is more

12  like a plan outline and does propose compromises to classes

13  of creditors, and therefore must be put to a vote, which we

14  say should happen expeditiously so as to coordinate with

15  the US proceeding and be then in tandem with the resolution

16  of the CESCA claims so it can be determine whether or not

17  there are, in fact, economic compromises to be suffered by

18  the CESCA creditors.

19            JUSTICE ROMAINE:  Mr. Thornton, I just seek

20  to take you up on the table on page 15, of course.  The

21  table shows that the creditors of CESCA who are possibly at

22  risk are the trade creditors in the amount of 1.9 million

23  dollars, and the gas transportation claims creditors in the

24  amount of 23 million dollars.  I don't hear the trade

25  creditors objecting to this approval of the settlement

105

1  agreement today, and I have heard from the gas

2  transportation claimants that they in fact support the

3  settlement.

4                    Where is the risk to your clients?

5                    MR. THORNTON:  You have bought into the

6  argument that there will be recoveries --

7                    JUSTICE ROMAINE:  Perhaps I have.

8                    MR. THORNTON:  -- of one hundred percent

9  from the -- because you've identified the 25 million dollar

10 shortfall.

11                    JUSTICE ROMAINE:  I'm not talking about the

12 guarantees, I'm talking about the shortfall after taking

13 into account the guarantees.

14                    MR. THORNTON:  After taking in the

15 guarantees.  Yes, I'm suggesting that from the point of

16 view of this court and whether or not there are

17 compromises, the mere fact that they are forced to look to

18 guarantees is in itself a compromise.

19                    JUSTICE ROMAINE:  Yes, I understand your

20 point.

21                    MR. THORNTON:  Now jurisdiction comes from

22 two places.  A compromise can be consented to, and if it's

23 consented to, is binding upon that creditors.  But it is

24 not within the jurisdiction of this court to impose a

25 compromise on a class of creditors without a vote of that

1   class, a two-thirds majority of vote in value and a

2   majority in number and a sanction order that says it's a

3   fair and reasonable compromise.

4   What we are doing here is skipping that

5   nasty step of the proposed compromised based on the fact

6   that some people haven't showed up or that some have and

7   they like it.  That's good that they like it, that means

8   that there's a chance that this would actually be voted on

9   and approved, that this is not doomed to fail, but we

10  should go forward to a vote.  But what you cannot say

11  today, My Lady, is that every creditor who is affected by

12  this compromise has signed off on this saying that they

13  accept it.  And without that you must go through the

14  mechanism of having a vote.

15  We wish that they had.  We don't see any

16  reason why they can't.  The vote can happen here within the

17  timelines of what is the economic, legal and practical

18  necessities of this case.

19  The US debtor is not about to emerge from

20  Chapter 11.  I don't believe it's scheduled before the end

21  of December.  We are now at the end of July.  We can have a

22  vote in a couple of months.  We can have a determination of

23  these outstanding claims within that same time period.  We

24  can be done.  We don't need to skip over the fundamentally

25  important Canadian aspect of this restructuring, which is a

1 creditor vote of a proposed compromise. There is no need

2 to try to skip that bit. If this is such a good deal and

3 they have such creditor support, why are they not putting

4 it to a vote? Why are they asking this court to side step

5 and turn on its head the Canadian restructuring law, and

6 that is in essence our submission.

7 Now, if they say don't worry there's a vote

8 coming later, I say the train will have left the station.

9 This settlement agreement is, conveniently perhaps, but as

10 point of fact, wrapped together as one big ball. You don't

11 get the benefit of a clean bond sale unless you buy into

12 the structure of settlements and priorities established

13 through CCRC and CCEL, you don't get one without the other.

14 So, is that compromise worth it? Are those

15 benefits worth the burden? In my submission that is

16 exactly the question that our regime suggests must be put

17 to the creditors, and that's what we should do. And we

18 should be quick about it.

19 A vote after the settlement agreement is

20 implemented, a vote after this settlement is implemented

21 would mean nothing. You couldn't unscramble the egg at

22 that point. There is nothing from a military point of

23 view, after the settlement goes through, there is nothing

24 left to be done but bayonet the wounded. And we will see

25 then whether or not these creditors have a shortfall or

1   not.  They should not be asked to take that risk, we don't

2   need to be asked to take the risk, we can determine that

3   beforehand, and we should do so before it's implemented.

4                    Which brings me now to the issue of

5   jurisdiction.  There are four relevant sources of

6   jurisdiction under Canadian restructuring law that possibly

7   come to bear here.  Under Section 11 of the CCAA, you are

8   given jurisdiction to make such order as you consider

9   appropriate on an initial order or any other application.

10  That allows you to impose a broad stay to stabilize the

11  business of companies and do all manner of things that have

12  filled the case books with the appropriate extent of that

13  jurisdiction, and after the initial order, it is the

14  section that gives the jurisdiction to shepherd the process

15  along.

16                   Now where that shepherding process

17  jurisdiction under Section 11 stops, and the jurisdiction

18  under Section 4 begins, is where there is a permanent

19  compromise or arrangement of rights being proposed by the

20  debtor upon the creditors generally or a class of

21  creditors.  There is exactly what Section 4 says.

22                   Section 4 then prescribes what your

23  jurisdiction is.  It says you may, and implicitly may not,

24  choose to put it to a vote of the creditors duly called.

25  What it does not say is that you may decide to implement

1  the transaction and forego the vote.  There is no such

2  authority within the CCAA.

3                    Furthermore, where the statute is specific

4  as to what your discretion is, inherent jurisdiction cannot

5  pour in to fill the gap because there is no functional gap.

6  The statute says what must be done, and that is what we

7  must do in a way that helps the case move forward to a

8  resolution.

9                    Now, there is also jurisdiction under

10 Section 18.6.  18.6 is meant to coordinate foreign

11 proceedings.  And under that section, it is specifically --

12 that section is not so vigorous as to override a

13 fundamental right nor to override the statutory discretion

14 inherent in Section 4.  I will deal with that in length

15 during the course of the cases, as I would like to address

16 the cases.  I would like to address Red Cross, Palladium,

17 Air Canadian Stelco and Phelps, and I will do so in the

18 context of the distinction between of the sale function and

19 the shepherding function under Section 11 with the

20 requirement under Section 4.

21                    Now, in both Red Cross and Palladium there

22 was a sale of substantially all of the assets.  And now I

23 am mindful here that they are both Ontario cases.  And I am

24 mindful of the fragmaster decision from the Alberta Court

25 of Appeals that suggests that perhaps liquidating all the

1   assets is not a jurisdiction that -- that should not be

2   done under the CCAA.  So I will leave my Alberta co-counsel

3   from Peacock Linder to address the fragmaster decision

4   specifically.  But because my friends would submit to you,

5   which submission I submit that they are wrong, that Red

6   Cross and Palladium stand against, me I'll address them

7   anyway, even though they might have been differently

8   decided had they been decided by this case.

9                So in Red Cross there was a sale of

10  substantially all of the assets.  In essence, My Lady, the

11  case stands for the proposition that a debtor may propose

12  to convert its existing assets into cash, and that that

13  exchange does not affect a compromise on anybody, that's a

14  conversion of one asset for another.  So that alone does

15  not amount to a compromise.

16               Now in the Red Cross case one creditor

17  said, don't do that, I want the debtor to consider going

18  concern restructuring.  But Mr. Justice Blair, when he was

19  still at the trial level, held that there was, as a matter

20  of practicality and legality, there was no way the Red

21  Cross could stay in business, that the governments had made

22  the decision that the Red Cross was no longer going to be

23  responsible for the blood supply business in Canada because

24  of the social and political repercussions flowing from the

25  tainted blood scandal which this country so unfortunately

1    faced.  So we found that there was no possibility of that

2    being a realistic possibility, and therefore the fact that

3    that was not being put forward or followed by them could

4    not be viewed as a compromise.

5            So Red Cross and Palladium, sale of all the

6    assets, exchanged the assets for cash, and provided you do

7    so in the right way, as we've learned here already in the

8    agreement sale, that you go through a process, that you are

9    content that there is no unfairness in the process, and

10    that the price is good, all of the sound air principals

11    that we've already debated at length in this part, that

12    court may, under its supervisory jurisdiction down under

13    Section 11, approve theit's conversion of assets.

14            Now in Air Canada, quite a different thing,

15    in Air Canada it negotiated -- Air Canada and its

16    affiliates negotiated a significant agreement with a major

17    constituent, GE.  I had some familiarity with that having

18    been on the team that did that.  It provided a significant

19    amount of exit financing, of new regional jet financing,

20    which was key to Air Canada's business plan, and most

21    importantly it offered a number of compromises on various

22    aircraft as the leading lessor in Air Canada's fleet,

23    approximately 25 percent of the fleet was leased with a GE

24    affiliate.

25            And that GE deal formed a building block to

1    what eventually became Air Canada's plan of arrangement.

2    But, and this is an important distinction, there were no

3    compromises of any other creditors' rights proposed or

4    inherent in the settlement agreement other than those that

5    directly affected GE, the party to the settlement.  It did

6    not purport to compromise the rights of creditors

7    generally, nor any particular class of unsecured creditors,

8    only GE's rights were compromised.

9              And so I would submit to you that in that

10   case Section 4 never entered in.  The parties accepted the

11   compromise, they asked the court to bless the transaction

12   as the building block under the supervisory, shepherding

13   jurisdiction in Section 11, and most importantly, My Lady,

14   they then put it to a vote.  When they actually got enough

15   building blocks together to have a plan, that plan was put

16   to the vote and the deals inherent in the GE agreement

17   became effective upon exit.  As opposed to here, where a

18   comprehensive plan of priorities and compromises are to be

19   effected immediately, without ever having a vote.

20             So then we turn to the similar kind of deal

21   approvals in Stelco.  And again this is a case of interim

22   supervision under Section 11, as both the trial judge and

23   the Ontario Court of Appeals being clear.  There were no

24   compromises or arrangements proposed on any creditors other

25   than those who are parties to the deal.  There were three

1   of them, as I recall.  The first was a collective agreement

2   there had been outstanding which the united steel workers

3   used to great advantage.  It settled deals as between the

4   steel workers and Stelco but didn't effect anybody else.

5   Next, and I can assure you that there were no compromises

6   in there.

7               Secondly, it established how the pensions

8   were to be funded by the government, and the government was

9   a party to that deal, and that did not effect creditors

10  generally, it effected the funding of the pension plan.

11  And lastly they made a deal with Tricap, and Tricap offered

12  exit financing and that was approached.  The only thing

13  that could be worried into a compromise of creditors

14  generally was that the Tricap financing had a break fee,

15  and the court, both at trial and in the Court of Appeals,

16  recognized that the break fee in and of itself was held to

17  be a reasonable one.

18              And I would submit, My Lady, that it is now

19  recognize that it is a cost of doing business of getting in

20  a value enhancing financing transaction that there needs to

21  be a break fee component when you are dealing with an

22  insolvent company.  And the cost that of that value

23  enhancement cannot be viewed responsibly or practically as

24  coming within the meaning of compromise or arrangement of

25  creditors generally within the meaning of Section 4.

1          Now I would like to take you to some of the

2     things that the Ontario Court of Appeals said in Stelco.

3          JUSTICE ROMAINE:  Mr. Thornton, I have

4     copies of these cases in several places; can you perhaps

5     tell me where I can find Stelco?

6          MR. THORNTON:  Yes.  If you look at the ad

7     hoc committee of creditors of Calpine Canada Resources

8     Company, that is at tab 5, My Lady.

9          JUSTICE ROMAINE:  Okay.

10          MR. THORNTON:  No, I am in error.

11          JUSTICE ROMAINE:  Okay.

12          I've got it, found it.  Thank you.  Judge

13     Lifland, are you okay?

14          JUDGE LIFLAND:  Yes, I'm fine.

15          JUSTICE ROMAINE:  Okay.  Thank you.

16          JUDGE LIFLAND:  Does Mr. Thornton have an

17     estimate of how much more time he's reserving?

18          JUSTICE ROMAINE:  I'm sorry, Judge Lifland,

19     I couldn't hear that.

20          JUDGE LIFLAND:  Does the speaker have an

21     estimate of how much more time he's going to spend?

22          JUSTICE ROMAINE:  Mr. Thornton?

23          MR. THORNTON:  Yes, I suspect I would be

24     approximately another 15 to 20 minutes.

25          JUSTICE ROMAINE:  Do you wish to call an

1    adjournments, Judge Lifland?

2            JUDGE LIFLAND:  Why don't we wait until

3    he's finished.

4            MR. THORNTON:  I'm actually having trouble

5    finding my copy of the case.

6            JUSTICE ROMAINE:  It appears that it might

7    be a good time here to call an adjournment.  Would you like

8    to do so?

9            JUDGE LIFLAND:  Sure.

10            JUSTICE ROMAINE:  Okay.  How long do you

11    usually call.

12            JUDGE LIFLAND:  I usually take five

13    minutes.

14            (Laughter)

15            JUSTICE ROMAINE:  20 minutes; is 20 minutes

16    all right?

17            JUDGE LIFLAND:  Sure, 20 minutes.

18            (Whereupon a recess taken)

19            JUSTICE ROMAINE:  Thank you.  Please be

20    seated.

21            JUDGE LIFLAND:  Is everyone refreshed?

22    Please be seated.

23            JUSTICE ROMAINE:  Judge Lifland, we are

24    ready to continue?  Are you ready?

25            JUDGE LIFLAND:  We're ready.

116

1          JUSTICE ROMAINE:  Mr. Thornton?

2          MR. THORNTON:  Thank you, your Honor.

3   Thank you, My Lady.

4          In fact there are two different Stelco

5   cases in two briefs, which was the cause of my confusion.

6          I point you to the reply brief of the US

7   debtors at Tab C.

8          JUSTICE ROMAINE:  Okay, thank you.

9          MR. THORNTON:  So this is the Court of

10  Appeals decision after Justice Farley had approved the

11  interim deals to go forward with a plan and the bondholders

12  objected and said that any such plan was doomed to fail.

13  The Court of Appeals says, at paragraph 18, and I'm quoting

14  paragraph 18 and 19, "In my view the motion's judge have

15  the jurisdiction to make the orders he did authorizing

16  Stelco to enter into the agreements.  Section 11 of the

17  CCAA provides a broad jurisdiction to impose terms and

18  conditions on the granting of the stay.  In my view Section

19  11.4 includes the power to vary the stay and allow the

20  company to enter into agreements to facilitate the

21  restructuring, and I emphasize these following words,

22  provided that the creditors have the final decision under

23  Section 6 whether or not to approve a plan."

24          And then again at paragraph 19, they say,

25  "In my view, provided the other" -- pardon me "provided the

1    orders to do not usurp the rights of the creditors to

2    decide whether to approve the plan, the motion's judge has

3    the necessary jurisdiction to make them.  The orders made

4    in this case do not usurp the Section 6 rights," and for

5    your Honor, that's the right to vote and Section 4 is the

6    right to call a meeting to hold the vote, "of the creditors

7    and do not unduly interfere with the business judgment of

8    the creditors.  The orders move the process along to the

9    point to where the creditors are free to exercise their

10   rights at the creditors' meetings."

11             Now I would submit that what the court is

12   doing in that case is recognizing that the supervisory

13   shepherding jurisdiction under Section 11 runs up against a

14   wall when faced with a compromise proposed to the creditors

15   as we have in this case.

16             In this case, usurping the creditors'

17   rights is exactly what is being proposed as the debtors

18   here are not speaking mere approval of this deal, but

19   actual approval and approval of implementation of it now,

20   and without a creditors vote.  It is the implementation

21   that compromises the rights of the creditors groups here,

22   and that rendered any subsequent vote meaningless for the

23   reasons I have previously described.

24             In both Stelco and Air Canada, the affect

25   upon other creditors of the largest complicated deals put

1  before the courts for interim approval there were delayed

2  in their implementation until after the creditors had their

3  say by way of a vote.  It's ironic that in Stelco the bond

4  holders said, this is doomed to fail so don't you dare send

5  it to a vote.  We are standing here today and saying the

6  debtors are trying to forego that vote please send it to

7  them.

8          Which brings us to the Phillips services

9  case.  Now that case is to be found in our book of

10 authorities, the book of authorities of the ad hoc

11 committee creditors of CCRC, at Tab 3.  Now in that case, a

12 cross-border case where both Canadian debtors and US

13 debtors, as here, and a compromise of rights of Canadian

14 creditors was proposed.  In particular, under a joint plan,

15 some Canadian creditors who had claims against the parent

16 were to be dealt with in the US and not the Canadian plan,

17 and as such, they had no right to vote in the Canadian

18 meeting.

19          And the heart of the decision is in

20 paragraph 38 on page 11.  And I quote it in its entirety.

21 "In my opinion, it is the loss of the right to vote in the

22 Canadian plan which lies at the heart of the present

23 dilemma.  The mere fact that a Canadian creditor's rights

24 are to be dealt with and affected by a single or parallel

25 insolvency in the U.S. Bankruptcy Court, or that the

1     reverse may be the case, a US creditor in a Canadian court,

2     is not necessarily sufficient in itself to undermine the

3     fairness and reasonableness of a proposed plan."  He cites

4     two cases there.

5             "In Canadian insolvency proceedings under

6     the CCAA, however, it is the right to vote on the

7     compromise or arrangement which the debtor company proposes

8     to make with them, which is the central counter part on the

9     part of the creditors to the debtor's right to attempt to

10    make that compromise or arrangement.

11            "In my view, having chosen to initiate and

12    take advantage of the CCAA proceedings, Phillips cannot now

13    evade the implications and statutory requirements of those

14    proceedings by seeking to carve out certain pesky and

15    potentially large contingent claims," and may I stop there

16    to say that if there ever was a perfectly pesky precedent

17    that is, for this case, "as a requirement to be dealt with

18    under a foreign regime where you will be treated less

19    fairly, while at the same time purporting to bind them to

20    the provisions of the Canadian plan, all of this without

21    the right to vote on the proposals."

22            JUSTICE ROMAINE:  In Philips there was a

23    settlement and there was a plan, the two were distinct.

24    And these comments of Justice Blair referred to the plan,

25    did they not?

120

1        MR. THORNTON:  Correct.

2        JUSTICE ROMAINE:  Not the settlement

3   agreement.  And the plan purported to cram down certain

4   creditors.

5        Mr. Dunphy, do you want to address that?

6        MR. DUNPHY:  The plan certainly outlined on

7   what it would say, but it wasn't, I guess, proceeding to

8   votes, and so on and so on.

9        JUSTICE ROMAINE:  Right.  But they wanted

10  something identified clearly as a plan.

11       MR. DUNPHY:  Yes, there was.

12       JUSTICE ROMAINE:  And something identified

13  clearly as a settlement.

14       MR. DUNPHY:  That's correct.

15       JUSTICE ROMAINE:  Okay.

16       MR. THORNTON:  As far as the United States,

17  there was a proposed settlement which was put forward to

18  the court, and various motions as to what should go forward

19  and how.

20       And in my submission it does not what you

21  call it, whether it's got the name plan in the title or

22  not, the word plan does not appear in Section 4.  What

23  Section 4 addresses is whether there are proposed

24  compromises or arrangements.

25       So the fact that we have something called a

121

1    global settlement here, it doesn't call itself a plan, it

2    is certainly not the determination if there are not

3    proposed settlements and compromises.  There are, in fact,

4    many settlements and compromises, as I have suggested in my

5    submissions, and it is up to the creditors to decide that

6    based on this court's jurisdiction to decide whether to put

7    it to a meeting and a vote or not.

8                 MR. DUNPHY:  In paragraph 17 of the

9    decision, Justice Blair says in Philip's perspective the

10   plan filed in both the US and Canada, according to the

11   debtor, so that we are clear to on that.

12                 JUSTICE ROMAINE:  Thank you.

13                 MR. THORNTON:  In my submission it doesn't

14   matter, because in this case what we have is a plan, not so

15   named.

16                 Later at paragraph 42 we have the statement

17   of the law in Canada as I submit it now stands in terms of

18   when and how this court can compromise creditors' rights.

19   And that is to say that the rights of creditors under the

20   CCAA cannot be compromised unless, one, the creditor has

21   been given a right to vote in the appropriate class on the

22   proposed compromise, two, no mention of a plan there, B,

23   that the creditor's vote is in accordance with value

24   ascribed to the claim by a court approved procedure, we

25   have a claims procedure here, C, the class in which the

1   creditor has been appropriately placed as voted by a

2   majority in number and two-thirds in value in favor of the

3   compromise, and, D, the court has sanctioned the compromise

4   on the basis that is fair and reasonable with a

5   considerable deference being given by the court in this

6   regard with respect to the votes of the creditors.

7              Now that is not what is proposed here.

8   What is proposed here is an implementation of a proposed

9   compromise and arrangement which is a comprehensive plan,

10  and it may be a wonderful settlement, but it has not gone

11  through the steps required under Canadian law to effect a

12  compromise, and cannot be simply approved directly by this

13  court.

14             Now, we then turn to issues that are also

15  germane to this case regarding comedy and the jurisdiction

16  under Section 18.6.  And Justice Blair says that the

17  jurisdiction you under 18.6 cannot override the statutory

18  requirement of the vote.

19             And I turn to paragraph 48 of the Philips

20  decision, starting in the middle of the paragraph at the

21  word however, "However, comedy and international

22  cooperation do not mean that one court must cede its

23  authority in jurisdiction over its own process or over the

24  application of the substantive laws of its own jurisdiction

25  whenever any kind of differences between the two

123

1    jurisdictions may arise.  Both the protocol and the

2    provisions of subsection 18.6 sub 2 of the CCAA which gives

3    this court authority, 'to make such orders and grant such

4    relief as it considers appropriate to facilitate, improve

5    or implement arrangements that will result in the

6    coordination of proceedings under the CCAA, any foreign

7    proceeding, confirm this.'

8                "Sub Section 18.6 5 of the CCAA provides

9    that nothing in this section requires the court to make any

10    order."  And he emphasizes that he is not in compliance

11    with the laws of Canada or in the force and the order made

12    by a foreign court.

13                So My Lady, I remember respectfully submit

14    that the Philips case has settled the issue of whether

15    Section 18.6 can be used as a back door through which the

16    jurisdiction clearly demanded in Section 4 where

17    compromises are proposed to be applied, and it can not.

18                In summary, courts' jurisdiction is found

19    and prescribed in Section 4 when a compromise arrangement

20    is proposed.  The discretion provided within that

21    jurisdiction the is to determine whether or not to put the

22    matter to a vote, not to simply implement the compromise

23    directly.

24                No matter how appealing such a compromise

25    might be to this court and the creditors, it is not within

124

1    the jurisdiction of this court to do so.  Such a cramdown

2    cannot be done in Canadian insolvency restructuring.

3                    JUSTICE ROMAINE:  Where do you say the

4    cramdown occurs here with respect to your clients?

5                    MR. THORNTON:  Correct.

6                    JUSTICE ROMAINE:  Where do you say it is

7    occurs here with respect to your clients.

8                    MR. THORNTON:  It occurs with respect to

9    all of the compromises that I have identified which we may

10   accept.  They are 75 million out to the US debtor.  It's

11   cutting off the claims in the CCEL.  It is establishing the

12   foreign court as a jurisdiction to determine rights and

13   entitlements that are now before this court.  They are all

14   of those things, which might be ironed out by the time we

15   actually have a vote, or it may be determined that the size

16   of the CLP claim is such that the CESCA creditors are in

17   fact are not compromised.  But right now there is a

18   settlement being imposed that is at best a maybe in terms

19   of being paid in full from Canada, and that is the

20   cramdown.  That is the matter that must, as a matter of

21   Canadian law, be put to the creditors.

22                    And it can be done, I hasten to add, in a

23   time line that does no violence to the cases that are

24   before this court and the US court.  We can still go

25   forward and do everything that we wish to do.  There is no

125

1     screaming urgency here that requires us to travel upon the

2     Canadian insolvency regime to that requires a vote of

3     potential compromises.

4                     JUSTICE ROMAINE:  So you don't accept the

5     urgency argument with respect to the volatile of the market

6     being the necessity to sell the bonds as quickly as

7     possible.

8                     MR. THORNTON:  Well, as you know, My Lady,

9     we have on our record saying that bonds should have been

10    sold many, many months ago.  Now in a perfect world we

11    would be done now, but the bond market has not been proved

12    as so volatile that we can't wait the extra 60 days that it

13    would take to get this thing to a vote, perhaps 90.

14                     After a year and a half in this proceeding,

15    to suddenly now have everyone jump on the urgency band

16    wagon because they think that's the way to trample over

17    certain pesky creditors that might be standing in their

18    ways demanding a fundamental right like their right to

19    vote, there is no reason to suggest that now, of all times,

20    is this critical 90 day period.

21                     So, My Lady and your Honor, I would submit

22    that the broad compromises that are contained within the

23    settlement agreement is, as hard bargained as they all were

24    and as wonderful a deal as they all might be, still

25    represent particular, potential, or and actual compromises

126

1    classes of the creditors in Canada which requires this

2    court to exercise jurisdiction under Section 4, and not

3    simply implement it under any other jurisdiction, because a

4    vote after the battle is over, the creditors --

5                    JUSTICE ROMAINE:  I think somebody walked

6    over the video camera.

7                    JUDGE LIFLAND:  Somebody is exercising

8    editorial prerogative.

9                    (Laughter)

10                    MR. THORNTON:  I knew you were with me,

11   your Honor.

12                    JUSTICE ROMAINE:  Okay.

13                    MR. THORNTON:  The proposed compromises

14   here would be effective immediately, or forthwith.  There

15   would be no vote.  The battle would be over and the

16   creditors get what's left.  And that's not the kind of

17   creditor protection that is required under the CCAA.  It is

18   required under our regime.  And it is spoken out by Justice

19   Blair in the Philips case, and in the Ontario Court of

20   Appeals in Stelco, and by the Alberta Court of Appeals in

21   fragmaster.

22                    I pause here to mention that the

23   ramification of any decision to the contrary will be

24   important for future Canadian restructures.  This is an

25   important case and an important issue.  Increasingly,

127

1    Canadian restructurings have cross-border implication.  And

2    there are those who believe that many elements of the

3    restructuring statutes of other jurisdictions, particularly

4    of our neighbors to the south, should be incorporated into

5    our CCAA.  And, in fact, some of them are in the

6    legislation which has been passed but not yet proclaimed

7    enforced; however, even those provisions do not include a

8    cramdown provision such as being contemplated here today,

9    nor can they purport to give the court the jurisdiction to

10   forego a creditor vote of an effective class of creditors.

11           The decision in this case that would allow

12   the debtors and the court to implement a compromise or

13   arrangement without a vote over the objection of creditors

14   would have far reaching effects indeed.  In our submission

15   such a change must come from Parliament and not from the

16   court.

17           I turned to turn to the last leg of my

18   submissions, mercifully for some I'm sure, and that has to

19   do with the discretion that this court has under Section 4

20   about how, and how we should go about putting this matter

21   to a vote.  As I have is said, the two large creditor

22   groups which stand opposed today are the ULC2 bondholders

23   and the CESCA creditors, particularly CLP.  The CLP has two

24   large undetermined claims, and those claims can be

25   determined on an expedited base.

1        A significant amount of work has already

2   gone into agreeing on a common model to calculate the

3   amount of the claim depending on various legal theories and

4   inputs, and a litigation timetable has been worked out

5   between the US and Canadian debtors and CLP.  And we would

6   suggest that it would greatly assist the creditors, when

7   coming to a vote, to know what that CESCA claim is, and

8   whether, in fact, they are even being offered a compromise

9   by this settlement.

10        As it now stands it's somewhere between 65

11  and one hundred percent; and that's a range, and that's a

12  potential compromise.  If we determine the claim, we will

13  know with certainty what the compromise is, if any.  It is

14  our submission that it would be towards the lower end of

15  that scale, but that is a matter to be determined in this

16  process fairly and expeditiously, and that will inform the

17  decision.  Likewise, the issues that separate us on the

18  ULC2 trustee's part can also be determined expeditiously

19  and within the time frame that a vote would be allowed.

20        So we say that this is not a case where

21  your discretion should be exercised not to put this to a

22  vote at all.  We do not suggest we throw this agreement out

23  the window, because it is not doomed to fail.  What we

24  suggest that practicality dictates and justice demands is

25  to put the handful of largest claims that are outstanding

1 into an expedited process in parallel with the vote that's

2 required and bring this entire proceeding to its practical

3 conclusion.

4 Lastly, I reemphasize, My Lady, where is

5 the urgency? We have, in fact, been at this, which is not

6 a restructuring but from the Canadian perspective a

7 liquidation, for a year and a half.

8 JUSTICE ROMAINE: Is that all?

9 MR. THORNTON: It just seems like three.

10 The US debtor does not need this cash. They are not

11 despite for this last 75 million dollars to stay in

12 business. They will do quite well. And they would be very

13 happy to receive this before or upon their exit from their

14 proceed I am sure. Time has been generous to this

15 proceeding in that the values have risen. And there is no

16 evidence before you that the bond market is such that it is

17 about to crater such that huge value is going to be lost.

18 So there is no urgency disclosed that would require you to

19 consider for a moment that there is some crisis that should

20 tempt you to eliminate a fundamental right of the Canadian

21 creditors to vote on this proposed compromise inherent in

22 the settlement agreement.

23 In fact, My Lady, it is our submission that

24 the debtors are trying to do this not because they have to,

25 but because of the weight and momentum they think they can.

1   And we say there is no jurisdiction in Canada to do that.

2              So in the end, My Lady, we are asking for a

3   brief delay in the implementation of this agreement and a

4   vote.  And while that vote is being put in place, we should

5   do three things -- pardon me, one is the vote itself; two

6   other things.  One is to direct the ULC creditor

7   entitlements to be determined as expeditiously as possible.

8   And thirdly, that the CLP claims be determined in

9   accordance with the schedule contained in the reply briefs.

10             In all cases that can be by the end of

11  October or the first week of November, creditors will have

12  clarity to know what they are getting, and more importantly

13  what they are not getting and what they are giving up in

14  the settlement agreement, and will be able to make an

15  informed decision, and most importantly, Canadian

16  restructuring law will be respected.

17             Those are our submissions.

18             JUSTICE ROMAINE:  Thank you, Mr. Thornton.

19             Mr. Dunphy?

20             MR. DUNPHY:  My Lady and your Honor, I will

21  be referring to exactly two volumes of things.  To make

22  life a little simple, have I the affidavit of Sean Collins

23  from the 20th of July.  I'm only using that because it has

24  the settlement agreement black lined in it as Exhibit E,

25  and at the tail end it's got the revised draft of the US

1     order that I had a few comments on.  So I'll be turning to

2     that from time to time.

3                I have the affidavit of Jacob Smith, which

4     is the one that we filed on behalf of the ULC2 trustee.

5     And the only thing I'm going to be referring to in that is

6     Article 7 of the trust indenture, the ULC trust indenture

7     in a moment, and then finally our bench brief, but you can

8     get it elsewhere, it's the famous Philips case.  I'm proud

9     to say it's the only case I've ever lost.  But I can show

10    you something were where I've gotten from that.

11                Now I would very much like to join the

12    parade of counsel that is congratulating everyone on the

13    wonderful settlement that they had done.  I'm sure that

14    there was a lot of hard work all around.  My only complaint

15    was that in their excess of enthusiasm they decided to

16    settle my claims too.  And I would very much of appreciated

17    a phone call or two just so we might compare notes.  And I

18    note the contracts between what happened here and what

19    happened in my friend's court.  Mr. Seligman stood up and

20    said he had all these committee and that he was keeping

21    them all up to date, maybe erroneously thought I read into

22    that, but they had probably seen drafts of the settlement

23    agreement once or twice, and maybe put into the order,

24    because I see the revised order has about six paragraphs on

25    the end stipulating that not a single change to the

1   settlement agreement is going to be made without those

2   committees having their say so.  I have nothing like that

3   here reflecting the fact that this material was drafted

4   with a long session in front of a mirror.  It was not

5   drafted by getting dialog with us, and that's where I would

6   submit using my analogy to the Philip case.

7                   We need a level the playing field here.

8   They are close.  They are very close.  This is not, in the

9   abstract, a bad deal.  There are a lot of good things done

10  here, there's been a lot of hard work done.  We are very

11  close, but what we have is, in effect, unilateral deal, and

12  as my friend said a moment ago, relying in part upon the

13  momentum of a deal, let's see what else we can put on the

14  back of the train and get it down the tracks.  And, My

15  Lady, I am saying there are some things you can't do that

16  way.  We can fix them if we had a proper level playing

17  field and a single opportunity for dialogue.  And at the

18  end of my submissions, I will give you a suggested fix, at

19  least for us, which is very simple and they are already all

20  in the documents.  We don't have to do things in a

21  complicated way when it's fairly simple.  I'll leave you in

22  suspense on that for a moment.

23                   Now our main points are that the ULC2

24  trustee, standing as it does in the shoes for all the

25  bondholders, has compromises imposed upon it.  You will see

1  in the settlement agreement and two draft orders that our

2  claim is determined at a number which is less than the face

3  amount of the bonds and which we say is inadequate

4  interest.

5              I'm going to take you to one that's

6  completely unnecessary for that one, but there's more; not

7  only is that claim determined with a without a hearing on

8  the merits, with a subsequent right which, in effect, to

9  revised claim, but it doesn't say that.  It says we have an

10  allowed claim in one paragraph.  Two paragraphs later it

11  says if it's a different number we can fix it.  I guess I

12  read into that that I have some kind of right of appeal,

13  but I'm not sure what it means.

14              But, be that as it may, I have a bunch of

15  other claims.  We have oppression claims filed against CCRC

16  backed by nothing less than a judgment by the Nova Scotia

17  court, and we have claims filed against the US debtor

18  backed by that same judgment.  We have a number of claims

19  filed in the US and Canada, all of which are being

20  dismissed through and thoroughly without a hearing on the

21  merits.  Now is if not though that is not a compromise on

22  my claim without a vote, I don't know what is.

23              JUSTICE ROMAINE:  Well, Mr. Dunphy, it may

24  be that your claims have been recharacterized, but the

25  financial impact is the same, is it not?

1        MR. DUNPHY:  No, it's absolutely not, it's

2   all a question of timing.  And this all gets to the nub of

3   the matter.  And I'll take you to it.  Article 7 says, My

4   Lady, how you pay my off.  Because what's really happened

5   -- let's take two steps back and look at this from on high.

6   What the US debtor and Canadian debtor are relying telling

7   you, break out the ticker tape parade, the market has been

8   good to us, and I congratulate them.

9               And as a result, the Canadian estate is

10  totally, if not certainly, probably not asset insolvent any

11  more.  It may have appeared to be asset insolvent when they

12  filed, but what they are telling you is the claims sitting

13  on the books, who owes what to them, there is enough there

14  to pay everyone; they haven't done it yet, but they are

15  saying there is enough.

16              It may be liquidity insolvent, meaning that

17  absent of the sale of the ULC1 bonds they haven't got

18  enough money to pay their creditors right away, and many of

19  them have accelerated claims, but they are telling you they

20  are asset insolvent.

21              And what follows from that, of course, is

22  that now the US debtor says, well, I have the equity left

23  here and all the residual things are mine.  And I have no

24  dispute with that; it is.  I have only dispute with putting

25  the cart before the horse or after the horse; the equity

1    cart belongs behind the creditor horse, not in front of it.

2              So what we are seeing here is, in a dialog

3    between the US debtor and the Canadian debtor, I need not

4    point out wholly owned subsidiaries, in a case where equity

5    has restorative value, we have all of the equity, in

6    effect, being safe.

7              Well, I'll get the 75 million now, I'll get

8    a bunch of your claims against me canceled, and while we're

9    at it, I'm going to cancel, and, My Lady, I will not say

10   recharacterize, they are canceled.  My claims are simply

11   gone.  And in fact they are gone whether or not the

12   settlement agreement ever closes.  They are gone whether or

13   not I'm ever paid out.  They are gone whether or not we

14   have a 1929 again that crashes everything.

15             I'm not standing here telling you that I

16   want to take market risk and volatility risk.  I'm still

17   saying sell the bonds yesterday and pay me thereafter.  My

18   job as trustee is simply to recognize when the obligations

19   on the trust indenture have been satisfied, and they

20   haven't.  There's a road map to do it right in the trust

21   indenture and you don't need my permission to do it.  You

22   just flood me with money; it's easy and it's right in

23   there.  And if there's too much it tells me what to do with

24   it; I give I it back to the company.

25             I'm a trustee; that's what I do.  I hold

1    the money, I find it tells me who is entitled to it and I

2    give it out.  It's right there.  You don't need my

3    permission.  You don't need a court order that says

4    anything.  You don't need to dismiss my claim; you just

5    need to do it.  So rather than say trust us you will be

6    paid, what I say is I'll trust you when I have been paid.

7    And until I have been paid axiomatically, I haven't.  And

8    at the point in time where I haven't and all my claims are

9    flying out a window, that is a compromise.  It is nothing

10   more or less than a compromise.

11                   And, My Lady, there are a lot of things we

12   can do under the CCAA, it affords us a lot of latitude, but

13   not unlimited latitude.  And as I heartedly concur with

14   what my friend said about Section 4 of CCAA.  Look at the

15   definition of court in the CCAA.  My claim can't just be

16   tossed over to another court to be determined, not in the

17   CCAA.  If I'm being paid under the trust indenture,

18   different matter maybe.  If you are looking for advice and

19   direction as a trustee, I might go to the superior court of

20   any province or in the State of New York possibly, but

21   there's a if I needed advice and directions; there's a

22   provision dealing with that.

23                   If I'm being paid under the CCAA, then

24   either give me a vote or pay me out.  And you can't just

25   invent a mechanism to do that.  What they are trying to do

1    is come up with what is, in effect, an insolvency discount,

2    and they are not entitled to that.  It's not like equity is

3    getting paid here.  What they are entitled to do is give me

4    everything I'm owed, and when I'm not owed any more,

5    surprisingly enough I will have no more claims.  So my

6    claim will die a natural death, not a premature one.  They

7    will die a natural death when the trust indenture is

8    discharged.  And there's a specific road map for how you do

9    it in Article 7, and I'll take you to it.

10                    JUSTICE ROMAINE:  Mr. Dunphy, and perhaps

11    this is a question that Mr. Meyers can help me with.

12                    Do I understand today that I'm being told

13    in the Canadian order that the claims are not released

14    until the CLR2 notes have been paid.  Mr Meyers?

15                    MR. MEYERS:  In the Canadian order, the

16    claims are released when the bonds are sold.  And we will

17    have a commitment, an order of the court, requiring us to

18    come back here as soon as practicable to distribute the

19    money.  And that's, of course, when the US will get their

20    75 million as well.

21                    JUSTICE ROMAINE:  Okay.

22                    MR. MEYERS:  The same fund; the same

23    distribution order.  You will order us to come back and

24    bring that motion right on.

25                    JUSTICE ROMAINE:  Okay, thank you.

1      MR. DUNPHY:  And I'm going to get to that

2    since I'm hopscotching all over my submission.

3      JUSTICE ROMAINE:  Go ahead.

4      MR. DUNPHY:  But the US order is patently

5    clear, in paragraph 16 and paragraph 5 of the draft US

6    order said, if memory serves me, those two paragraphs make

7    it of immediate effect so that my claims in the US are

8    evaporated on contact of your pen with that piece of paper,

9    your Honor's pen.  So that's when my claims evaporate in

10   the United States.  My claims in Canada apparently

11   evaporate on the completion of a bond sale, according to

12   the settlement agreement, after which I'm still not paid,

13   nor have I even got a certainty of being paid.  I don't

14   have any money being held in trust for me anywhere that's

15   only for me and not for anyone else.

16      I then have the liberty of sitting back and

17   waiting for the subsequent application, which may or may

18   not be granted, and which may or may not involve different

19   circumstances arising between now and then, which may or

20   may not see me paid.  In other words, while I'll probably

21   be paid, I don't know that I'll be paid.  And it is

22   entirely unnecessary to compromise all of my rights if it

23   is assured that I will be paid.  It is so simple to say to

24   the US debtor and the Canadian debtor both, if you are both

25   telling the court that the reason why you need pay no heed

1   to ULC2 is because they are going to be paid in full, then

2   stop wasting the court's time and mine with a bunch of

3   compromises that you don't need, because, as a matter of

4   law, when I am paid in full, all of those claims fall away.

5   And if it's eminent, if it's going to happen by September

6   30th, from their lips to God's ears, it should happen.

7           But it hasn't happened.  And until it does

8   happen, I would submit Section 4 of the CCAA.  This is not

9   an issue, it cannot pass.  It cannot pass.  When I am paid,

10  then I'm not compromised.  When payment is in futuro and my

11  present, existing claim is evaporated on that hour, minute

12  and day, I have been compromised.  And you need look no

13  farther than Section 4 to say there is no vote that

14  preceded that.  It was not done by my voluntary concession,

15  and therefore my claim, having died an ignoble death on

16  that day, was compromised and it cannot pass under Section

17  4.  There are many things they wish they could do, but

18  that's just not one of them.

19          But as I said, there is an easy way out

20  here because Article 7 tells you how to pay me off.  And

21  I'm a trustee, and I'm used to holding money for other

22  people.  And if it turns out you end up giving me a little

23  bit too much and I have to give a bit back, we can handle

24  that.  And it if it turns out that we have to come back to

25  the court for direction because my financial adviser and

1    the monitor can't agree on the right number or interest,

2    how long can that take?  And will we have an issue on the

3    make whole?  Well, we don't have an issue on the

4    calculation of it, but we do have an issue on the merits of

5    it, and that's what I'm owed by ULC2, a Canadian company.

6             And so, can we come back between now and

7    September 30th to have a hearing on that?  I think we can.

8    Can we get a ruling before then?  I should think so.  Do

9    you need to have all this in the settlement agreement that

10    is jamming me in advance when your whole premises don't

11    listen to him because he's paid?  Absolutely not.  If you

12    are going to pay him anyway, then why insert provisions in

13    there dealing with the ULC2 trustee?  You don't need it.

14    You've got Article 7.  You don't need my consent to

15    discharge the obligations on the trust indenture.

16             I'm a passive preacher.  I just follow

17    orders.  Pay me money, I'm out of here.  It's no discretion

18    on my part, just follow the map that's in Article 7.  And

19    what follows from that follows from it.  What my legal

20    entitlements are more, and unfortunately for them not less;

21    just what it is.

22             And that's the beginning of my end of

23    submissions, quite frankly, it's a little bit in the middle

24    which I'll get to now.

25             The first ask is what do we want?  We want

1   to be paid in full before our claims fall away.  We want

2   not the probability of settlement, but the certainty.  We

3   want to know we have been paid.  I don't want to have a

4   subsequent application to the court to say can I be paid

5   now and find out that revenue in Canada is reassessed.  I

6   don't want to have a subsequent application and find out

7   that some other thing has happened and that values the have

8   plummeted to the floor and who knows what; not my cup of

9   tea.  If that happens I'll live with it, if values do fall,

10  but then I keep all my claims.  If I have three pockets to

11  pick to get paid then so be it.  But until I'm paid, I'm

12  not.

13              So we want to have, as I said, nothing

14  prior to being paid, we want to have any dispute on quantum

15  settled by this court.  Am I telling you that you cannot

16  have a joint hearing as we're having today?  Absolutely

17  not.  If you think it's warranted, it's merited, we can do

18  that.

19              The only justification for having my claims

20  determined in a different court is that the make whole

21  provision is set to be governed my New York law.  Well,

22  guess what?  This settlement agreement is governed by New

23  York law.  Are we to understand by that, that by virtue of

24  having the settlement agreement that any subsequent

25  applications, including, while I'm at it, my getting paid

142

1    have to go now before the U.S. Bankruptcy Court because

2    it's governed by US law?  Not at all.  We have contracts

3    governed by foreign law every day of the week.

4              And the rules of conflicts of law are the

5    law of the forum is presumed to be the same unless there's

6    evidence lead to the contrary.  There's no evidence to

7    suggest that New York law is the issue on the make whole,

8    it's the interplay between the trust indenture and the CCAA

9    where we are in kind of uncharted territory here.  And that

10   is your domain.  It's not what the words mean, it's how you

11   apply those words in the context of the CCAA.  And with all

12   due respect to his Honor, that's not determined under the

13   US Bankruptcy Code, that's determined here.

14             And it's the obligation of a Canadian

15   company, ULC2, under the trust indenture that I'm saying

16   you can't just turn that away.  And under the CCAA, which

17   is the only jurisdiction being invoked here to do all these

18   things, you must determine my claim.  The court is not a

19   different court, it's you.  It's the Alberta court.

20             So I would submit, and my second ask was

21   I'm in this court and I stay in this court.  You can ask

22   for directions.  We can do have joint hearings; I'm all

23   over all of that, but I can't be thrown out.  I'm staying

24   here until you are done with me is my submission.

25             The third ask we have is that any disputed

143

1   sums, and if there appear to be some I won't bore you with

2   the details of that dispute because I'm sure we'll have a

3   chance to do that before you later, but there are some

4   legitimate disputes that add up to a relatively small sum

5   of money compared to the total amounts at issues but

6   there's some real numbers.  There's about 30 odd million on

7   the make whole, and there's three quarters of a million to

8   a million in interest.

9              We were a couple million apart.  We are now

10  about three quarters of a million apart.  We may settle

11  those numbers out with further discussion, or we may need

12  your help.  But our submission is if we are going to have

13  some escrow numbers, I don't want to have anything

14  preparatory in there, anything that may apply for an escrow

15  or anything something.

16              The only condition of my being paid should

17  be my legal entitlement on the resolution of that issue,

18  not whether some subsequent issues occurs and they become

19  asset insolvent again.  If the premise is that we are all

20  asset insolvent, then pay me out and be done with me.  But

21  I'm not losing my claims, and I'm taking the risk that

22  escrow is going to have somebody else putting their nose

23  into it and saying that's my money, too.

24              Article 7 says you pay the trustee, and

25  it's held in trust for the bond holders, and anything left

144

1   over goes back to the company.  There I have absolute

2   certainty that the only thing left to be determined is your

3   ascertainment order, with the assistance of his Honor, if

4   necessary, of how much we are owed.  So I could submit, my

5   third ask is the trustee is should get the money what it's

6   to be paid.

7           But, My Lady and your Honor, we've been

8   told that every term is sacred and nothing can be changed.

9   Much has been changed, including coming most of the way to

10  our interest number.  We are about three quarters of a

11  million apart; we were a couple of a million apart before.

12  So they managed to change those, but they didn't get all

13  the way there.

14          So until the FMB told us an all or nothing

15  deal, I have no option but to say what is a pretty good

16  deal, what an is almost all the way there, I have no

17  objection but to say I'm asking you not to approve it.

18          I'm not a party to the settlement

19  agreement, I have no rights to it under it.  And as I'll

20  take you to in a moment, the settlement agreement is

21  preparatory, which means it's a statement of intent, not a

22  legal obligation.  Because the two parties, and I again

23  remind you, a wholly own subsidiary and parent, are they in

24  a situation where we are now talking about the equity of

25  the parent, can move assets around within those schedules.

1    I'll take you to some of those provisions

2  on their own.  They don't need your consent.  They sure

3  don't need mine.  In fact there's an explicit provision in

4  there that says no one else has any rights under this

5  agreement.  So that's why I'm asking you to say great

6  agreement, just don't make me bear the burden of it if I'm

7  not paid.  If the whole premise of this is on being paid,

8  then just do so.  But if there's a burden to be borne, it's

9  not mine.

10    So let's look at a couple of things where

11  I'll show you there is a lot of discretion built into this

12  agreement, which is worrisome, Section 2.2 sub 1 and 2 of

13  the settlement agreement.  This is basically our get, one

14  of the big gets, which is all the claims the US and

15  Canadian claims.  And you will see when you look at that

16  Section 2.2 sub 1 and 2, that they can.

17    JUSTICE ROMAINE:  I'm sorry, I just got

18  to --

19    MR. DUNPHY:  I just have to get my notes.

20    JUSTICE ROMAINE:  Go ahead.

21    MR. DUNPHY:  Section 2.2 sub 1 and sub 2,

22  says they can move these claims around in those schedules

23  and remove them.  So although I'm being told that these

24  claims are subordinated, so a major benefit is, for

25  example, the US debtors subordinating a bunch of claims in

1   CESCA, but if they decide not to subordinate it tomorrow,

2   then they just remove it from the schedule and put it

3   somewhere else, and they can give the Canadian debtors'

4   consent.  Will they consent?  Probably not.  But can they

5   consent?  Yes.  And is anyone else's consent required to

6   validate their consent?  No.  In fact, the thing says at

7   Section 5.3, "no other party has any rights under this

8   agreement but them."

9               So without your supervision, that could

10  happen.  I am suggesting that shouldn't be the case.

11              The other thing we get from this agreement

12  is things we already have.  Mr. Thornton referred you to

13  the rule on Cherry and Bolty, but we are being told the

14  major benefit of CCEL, a Canadian creditor, or I should say

15  a Canadian debtor, is going to agree to subordinate its

16  claims in CCRC.  Well, that's a purely domestic internal

17  matter.  I don't need the consent of the US debtor for

18  that, so I don't consider that to be a major concession

19  that we got from them in our own estate, and I don't

20  consider it to be anything of great merit, given the fact

21  that Canadian Bankruptcy Law, contributories are obliged to

22  contribute before they can share in the bankrupt estate in

23  the BIA, and we have the rule on Cherry and Bolty as well.

24              Now, the sale of the bonds, I agree.  Sell

25  the bonds.  But if the price is 90 million, I'm no not

1   going to make that decision as to whether that's a good

2   price or not, or 75 million, or whatever they are at.  I am

3   in agreement with my friend that if that's to be done, that

4   that can go elsewhere.  Don't ask me to make that business

5   call.

6               Then I want to refer to the compromises.  I

7   took you to the biggest one, which is Exhibit G.  And

8   Exhibit G says prior to payment in full of my claims, all

9   of my claims in the US and Canadian estates are evaporated.

10  And I submit, I can't be more candid, it simply can't be

11  done.  There is no constitutional jurisdiction do that.

12  You can't dismiss a claim without hearing on the merits.  I

13  filed a claim.  I'm entitled to procedural due process.

14  And two parties sitting in a room somewhere else can't

15  decide for me to settle my claim, and they sure can't do it

16  based on a promise that I have no way of -- that is

17  unsecured, that I will be paid in the future.  It's an

18  unsecured promise.  We've got plenty of those already.

19  Thank you, very much.  Payment I understand.  Promises,

20  I've got a few.

21              Now Mr. Thornton took you through some of

22  the other ones, but I will just point out -- Greenfield

23  we've been through, the limitation on CCRC claims.  Again

24  that's, you know, one of the reasons in which CCRC finds

25  the money to pay us is by paying its intercompany claims.

1   They are being capped.  But the biggest one is our claim.

2             Our claim is being fixed at a number which

3   does not reflect our actual claim amount.  It is less than

4   what you are owed.  And if you look at the paragraph,

5   paragraph 21 fixes my number, and that's res judicata on

6   the day you sign it.  It says what my claim is, yet somehow

7   in paragraph 25 there's a backhanded way that recognizes

8   that it might be readjusted later.  Then don't fix my

9   claim.

10            Why don't you just say nothing on it?  You

11   don't need to fix my claim.  How about we just pay it, and

12   if we need some direction from the court, we'll get it?  We

13   don't need to fix my claim.  Am I appealing it?  Have I got

14   an onus now to say it's not what they say; it's some other

15   number?  What does that mean?  So, it's not their business

16   to sit around a table and fix my claim for me.  That's a

17   compromise.  You can't do that.

18            And as I've said, there is simply no basis

19   in law to send a determination of my claim, under my trust

20   indenture, against my Canadian debtor to the US to be

21   resolved.  It can't be done, because the resolution of the

22   claim in the CCAA, Section 12, and the definition of court

23   is court.  It's you.

24          JUSTICE ROMAINE:  It's not that that aspect

25   is not compromised you are suggesting.

149

1    MR. DUNPHY:  I'm saying it's over the top.

2    I mean it's -- I've got a claim against a Canadian debtor.

3    And let's take a step back.  Remember what the whole

4    premises here, don't listen to him he's going to be paid by

5    anyway.  Well, who is he going to be paid by?  He's going

6    to be paid by the Canadian debtor, of course.  So if I'm

7    going to be paid by the Canadian debtor, and what I'm

8    supposed to take is that I'll probably, for present

9    purposes, as I will certainly be paid.  I'm going to be

10   paid by the Canadian debtor so my guarantees in the US

11   don't matter, so don't worry if you're cancelling all those

12   other superfluous claims in the US.

13   Okay.  Let's follow that reasoning.  That

14   tells me that I have no claim in the US that is ever going

15   to be adjudicated on and result in a payment.  So why again

16   would I be walking down there to get my claim against the

17   Canadian debtor on the premise of the claim resolved in the

18   court of the guarantor, when the whole premise of this

19   exercise is the guarantor is never going to pay me a red

20   cent.

21   Since the premise of your doing all this is

22   the guarantor not going to pay, then why am I in front of

23   the guarantor's court?  In fact, why am I in the U.S.

24   Bankruptcy Court at all?  Because it's not a bankruptcy

25   matter, it's a matter of New York law which is supposed to

<sup></sup>

1     be the superior court or whatever is down there.  That

2     doesn't make any sense.

3              But under the CCAA you just can't do it.

4     There's no basis in law to do it.  The only basis offered

5     up is that it's governed my New York law.  And as I just

6     mentioned to you, lots of things are, including the

7     settlement agreement.  And the logic of that proposition

8     would be that as long as you sign this order you're

9     pointless, because the settlement agreement is governed by

10    New York law, so you better sit down to and let everything

11    else happen somewhere else.

12             That's not the case.  That's not right.

13    And, again, this is one of those things grafted onto the

14    back of a locomotive that they sent off down the hill

15    saying there's so many wheels in this thing that nobody can

16    possibly stop it.  I'm standing up and saying you can't do

17    that.  And if the price is I'm going to have to make you do

18    it again, we'll pay that price.  We're saying, as drafted,

19    we can't stand for the settlement agreement.  It's really

20    close.  It's really close, but whether you negotiate in

21    front of a mirror and not by talking to the effective

22    parties these things happen.  And I submit, with regret,

23    that the only thing for you to do here is to recognize the

24    fact that we are very close, but to tell them to go and

25    take it over the line.

1    There's a couple, just while I'm on the

2    subject of the order I want to point out what I think are

3    two Trojan horses in there.  Paragraph 32 of the US order,

4    and 23 of the Canadian order.  Paragraph 32 of the US order

5    says, "all relief contemplated by the settlement agreement

6    is hereby granted."  Well what does that mean?  Because I

7    have the settlement agreement.  I have a very lengthy order

8    that's implementing various bits and pieces of it, but then

9    I have this one paragraph that says in case we forgot

10   something this implements it anyway.

11              JUSTICE ROMAINE:  I'm sorry, I'm having

12   trouble getting my hands on the Canadian order, Mr. Dunphy.

13              MR. DUNPHY:  Well, the Canadian order I

14   only have one copy of it.

15              JUSTICE ROMAINE:  No, I have a copy of it

16   right here.  What paragraph is it?

17              MR. DUNPHY:  In the US order, it's in the

18   column dated July 20.  It's right at the very back.

19   Unfortunately I have no tabs in mine; it's the very last

20   pages.

21              JUSTICE ROMAINE:  Okay.  And you are

22   looking at what paragraph?

23              MR. DUNPHY:  I'm looking at paragraph 32

24   which is on page 14 of mine at the back.

25              JUSTICE ROMAINE:  Okay, thank you.

1          MR. DUNPHY:  And paragraph 32 says, the

2    failure to mention any provision of the settlement in the

3    settlement agreement are accrued in all the steps -- in all

4    that is contemplated by the settlement, the ULC1

5    settlement, the settlement agreement is hereby granted.  So

6    in case we forgot something, everything else is swept in

7    here.  That's just a Trojan horse.  If it means nothing

8    then I would submit it goes.  If it means something I would

9    very much like someone to tell me exactly what it means.

10          And to the same effect, slightly different,

11   is an arguably bigger Trojan horse, which is the

12   paragraph -- the paragraph over here.  I don't have the

13   tab.  In the Canadian order we have a paragraph that

14   approves the monitor's report that admits.  I don't mind

15   approving the activities of the monitor, we haven't done it

16   in prior attendances, but I'll do it every day if that

17   makes people happy.

18          I don't take issue with the activities of

19   the monitor, but the monitor's report is a breathtaking

20   rendition of a lot of things that have happened.  And I

21   don't want to be arguing at some future court at some

22   future day as to what is implicitly meant by a blanket

23   approval of the monitor's approval report.  His activities,

24   I don't have a problem with, but I'm not in favor of a

25   Trojan horse that I don't understand.

153

1    I've dealt with the subject of an escrow;

2    as I said, an escrow is not the same as being paid.  I

3    don't know that I'm the only one entitled to the funds

4    that's in there.  I do know when it's paid to me, pursuant

5    to Article 7 of the trust indenture, which I'll take to you

6    in a moment, so I don't want to go there.  So let me take

7    you to Article 7 and my suggested resolution, and I'll

8    finish with this, because we are done here.

9    Page 32 of the trust indenture, Article 7,

10   and you'll see that under 7.1, for example, if all

11   outstanding securities of a series become due and payable,

12   you can deposit the money with the trustee.  If you want to

13   prepay there's provisions to do that too.  I say that

14   because I'm told that the holders of my bonds may be in the

15   process of withdrawing the automatic acceleration of their

16   series.  It doesn't matter.  Even if they do, you've got

17   another provision where you can repay it.

18   So they have provisions where you can repay

19   it.  And under this provision, anything leftover goes to

20   the company, and ti says it in a couple of places.  And let

21   me find you one; 7.6, for example.  They can ask for any

22   excess that we are holding and the return of it.  So I'm a

23   trustee.  You get the simplest way to do it, and I'll read

24   you my language at the end, because I am finished, is

25   instead of having my claims being compromised, instead of

154

1  having provisions that say my claim is fixed at dollars

2  bullet when I don't agree with the number, none of that is

3  necessary.  All they needed to do, and all they still need

4  to two do is exactly two paragraphs.

5              Number one, upon payment in full of all

6  amounts owing to the US -- under the ULC2 trust indenture

7  pursuant to Article 7 thereof, all claims filed by the ULC2

8  trustee in the US proceedings or Canadian proceedings shall

9  be withdrawn or satisfied.  Common sense.  I submit it

10  follows law anyway, but if someone needs the comfort of

11  knowing it's in an order, I'm happy to have that in the

12  order.

13              Paragraph 2, the court shall stand seized

14  to provide ULC2 and its trustee with advise and directions

15  regarding the amounts to be paid pursuant to Article 7,

16  proving that this court may, in its discretion, hold a

17  joint hearing.  We're done.  That takes care of all my

18  issues; all of them not, just some, all of them.

19              And with that hopefully simple submission,

20  I will thank you for your time, and your Honor as well,

21  thank you.

22              JUSTICE ROMAINE:  Thank you, Mr. Dunphy.

23              Mr. Linder?

24              A VOICE:  Mr. Linder is not here.  Ms.

25  Bossio will be presenting the matter.

1          JUSTICE ROMAINE:  Okay, Ms. Bossio, go

2    ahead.

3          MS. BOSSIO:  Good afternoon, My Lady.  Good

4    afternoon, your Honor.  My name is Emi Bossio and we are

5    counsel for the Calpine -- excuse me, for Calpine Power

6    L.P., which is also referred to as the fund.  CLP and the

7    fund is a massive creditor in this CCAA application, My

8    Lady.  It has over 483 million dollars in claims, and this

9    morning My Lady reserved a judgment on whether or not there

10   will be an additional proof of claim allowed for an extra

11   30 million dollars.

12          Of those claims, at least 142 million

13   dollars has been acknowledged and admitted by the monitor

14   of the Canadian debtor with respect to the CLP's toll rate

15   claim.

16          CLP is a creditor of CESCA and of CCEL.

17   The monitor's report identifies that the creditors of those

18   companies are at most risk of shortfall.  And in

19   particular, My Lady and your Honor, I take you to the

20   monitor's report at paragraph 28, page 12.  And this is the

21   chart where the monitor summarizes perspective recoveries

22   underneath the proposed settlement agreement.  And what is

23   particularly important about this chart from the

24   perspective to CLP is, first of all, that on a low scenario

25   there's a risk for CESCA creditors, that's CLP's 378

1   million dollars, of a 65 percent recovery.

2                   And if we look above there with respect to

3   CCEL, we see that even on the high recovery scenario,

4   CCEL's creditors, of which CLP is the single largest

5   creditor, will recover 65 pursuant to settlement agreement.

6   On a low recovery it's a 35 percent figure, My Lady.  And

7   this is critical because CLP is a significant, indeed

8   massive creditor of the CCAA applicants.  If we turn first

9   to its claims with CCEL, CLP has two claims already into

10  CCEL and the third which was dealt with this morning.

11                  The first claim is with respect to an

12  contractural indemnity owed by CCEL in its role as manager

13  of CLP's assets.  That is what's called the heat rate

14  claim.  And the current claim has been valued by CLP at

15  over 115 million dollars.  The second claim relates to a

16  potential penalty that is payable by D.C. Hydro, and that

17  amount has not yet been quantified.  And the third claim

18  relates to a recently filed statement of claim by the

19  Canadian Power Developers Group, Inc. which was filed in

20  May, and for which relief was sought this morning to file

21  an additional proof of claims into CCEL in the amount of 30

22  million dollars.

23                  Pursuant to monitor's analyses CCEL's

24  creditors, on the high scenario, this is their best case

25  scenario, would receive 65 percent of their claims.  With

1   respect to the heat ray claim alone, that relates to a 35

2   percent recovery on the low scenario.  That results in a

3   shortfall to CLP of between 40 million to 74 million

4   dollars, My Lady.  If the lead is granted with respect to

5   the claim arising from the statement of claim filed by

6   CPDG, then that shortfall would be in the range of an

7   additional 10.5 to 19.5 million dollars.

8                   With respect to CLP's claims into CESCA,

9   that claims arises as a result of what is referred to as

10  the toll claim.  That was the repudiation by CESCA of a 20

11  years tolling agreement with CLP.  Heat monitor and the CCA

12  debtors have acknowledged that at least 142 million dollars

13  is owing to CLP pursuant to that claim.  Pursuant to its

14  dispute note, CLP values that claim at over 378 million

15  dollars.  Therefore, even the smallest percentage or risk

16  to shortfall in CESCA, My Lady and your Honor, could

17  translate into an extremely significant shortfall.

18                   JUSTICE ROMAINE:  This is all, of course,

19  prior to the operation of the US debtor's guarantees, Ms.

20  Bossio?

21                   MS. BOSSIO:  That's correct.

22                   JUSTICE ROMAINE:  And in fact your client,

23  if in fact the US guarantees are taken into account, would

24  not suffer a shortfall; is that right?

25                   MS. BOSSIO:  My Lady, you bring me to my

1   very next point.

2              There are two issues that I would like to

3   raise with respect to the guarantee.  First of all, the

4   claim that addresses the late filed proof of claim, that

5   was dealt with this morning.  That, as far as CLP is aware,

6   is not a claim that would be guaranteed by the United

7   States debtors.

8              JUSTICE ROMAINE:  Right.

9              MS. BOSSIO:  And as a result, any shortfall

10  in that claim, the entire claim has to be satisfied within

11  the Canadian estates, there would be no recourse in that

12  claim to the United States.  So on the monitor's own

13  numbers, there is potentially a 10 million to 19 million

14  dollar shortfall.

15             Then with respect to the guarantee, the

16  difficulty with the recourse to the guarantee, My Lady, is

17  that as we understand it the recourse is proposed to be

18  paid by way of equity in the US guarantor.  And first of

19  all, obviously, My Lady, that in and of itself is a

20  compromise of CLP's rights.  And with it, in particular, we

21  have difficulties because there is delay associated with

22  the resolution of that guarantee issues, but more

23  fundamentally there is risk associated with the payment of

24  the amounts owing under the guaranteed claims.

25             And specifically, the monitor's report and

1     the CCAA and US debtors settlement are premised on a very

2     fundamental assumption. We've heard the reference to CLP

3     being paid in full, but that assumes that equity is

4     equivalent to cash, My Lady, and that, in our submission,

5     is a flawed assumption. It is not always the case. In

6     particular, there is risk associated with equity, and it is

7     a compromise of the claim to pay a creditor other than in

8     cash. And that's particularly problematic here, where we

9     have Canadian cash assets that are flowing out of the

10     Canadian estate and going into the US estate.

11              And it's flawed to assume, My Lady, that

12     payment in equity equates to full payment, or that it

13     equates to -- it can't relate to payment at all. I'm

14     certain the shareholders of Enron assumed that their equity

15     was as good as cash, or at least would have some cash

16     value. That is not always the case. And that takes us to

17     the fundamental problem with the settlement agreement, and

18     that is that it places the risk on the Canadian creditors,

19     and in particular on CLP. CLP has the risks of the

20     shortfalls, while the certainty is flowing up through to

21     the US equity holders.

22              And it's not for the US debtors and the

23     Canadian debtors to ascribe that list to CLP, in fact in

24     our submission they cannot. They cannot compromise our

25     claims, they cannot import risk to our claims. Those are

1    not matters that can be unilaterally imposed.  The

2    determination to impose shares as a payment on a creditor,

3    that may well be acceptable to a creditor, but it may not,

4    and I will involves risks.  And those risks and that

5    determination is a compromise of the creditor's claim.

6            And as a compromise of the creditor's

7    claim, My Lady, that takes us to the fundamental legal

8    question, which is, given that there are clearly

9    compromises to CLP's claims being proposed, the monitor has

10   acknowledged on a high recovery under CCEL, there is a 65

11   percent recovery.  What jurisdiction is it in the debtors

12   to agree to compromise that claim, and what jurisdiction or

13   discretion is there that exist in this court to approve

14   that settlement agreement which would have the effect of

15   affecting a compromise on to CLP.

16           My Lady, it is clear that there is no

17   jurisdiction, and it's simply not recognized as law that

18   debtors can agree and unilaterally compromise the claims of

19   their creditors.  Compromises may occur under Canadian law,

20   but they must occur under the statute that allows that,

21   which is the Companies' Creditors Arrangement Act, which we

22   are under today, My Lady.  There is not, and it cannot be

23   the case in Canadian law that debtors can unilaterally

24   compromise the claim of their creditors, nor can a

25   settlement bind non parties.  But that's what's purported

161

1  to occur here.  The CCAA attempts to achieve -- does

2  achieve in our submission...

3               (loud background noise)

4               JUSTICE ROMAINE:  The microphone is very

5  delicate.  We seem to be getting some feedback from the

6  telephone and would I ask you to please mute your side of

7  the telephone call.  Thank you.

8               I'm sorry.  Go ahead, Ms. Bossio.

9               MS. BOSSIO:  The CCAA, through its

10 structure and through its framework, provides for a very

11 delicate balancing of the rights of creditors and the

12 rights of debtors.

13              Even though there has been much judicial

14 comments on inherent jurisdiction and flexibilities needed

15 in though process, no amount of flexibility and no amount

16 of inherent jurisdiction can overrule the express

17 requirements of that statute.  And those express

18 requirements are set out through the operation of Section 4

19 and Section 6.  My friends have taken you through that and

20 I won't do that again, but one thing that's very critical

21 about Section 6, My Lady, is that Section 6 deals with the

22 ability of the court to approve a compromise.  And it

23 doesn't speak only of plans of arrangement, but Section 6

24 expressly speaks of any compromise that is to be approved,

25 My Lady.

162

1    The Canadian courts, and in particular our

2    court of appeals master had held that there's no discretion

3    in the courts to approve a compromise of creditors unless

4    and until that has been put to a vote of the creditors.

5    JUSTICE ROMAINE: But specifically, the

6    court held that is the court has no discretion to sanction

7    a plan unless it's been approved, Ms. Bossio; is that

8    correct?

9    MS. BOSSIO: That is correct. But in this

10   case, My Lady, if you have a settlement agreement that has

11   a compromised or plan that has a compromise, in my

12   submission you cannot do indirectly, or through naming

13   something completely different than a plan, achieve what

14   you could not achieve through the statute. It's an

15   indirect and an inappropriate intervention of the statute.

16   One of the difficulties, and what

17   distinguishes the circumstances of a compromise of

18   creditors' rights that we have in this case through some of

19   the authorities that my friends have cited to you that the

20   involve the sale of assets, is that in those circumstances

21   the courts have been very clear about the need to determine

22   to a very open process, a process that ensures that all the

23   creditors understand what is going forward, that there's an

24   open process in the market, so that the best price for the

25   assets can be determined, and that it be transparent so

1   that creditors can ascertain that the best price is being

2   accomplished.

3               What is troubling about this case, My Lady,

4   is that the settlement agreement settles numerous

5   intercompany claims, and those are settled on the basis

6   which creditors have no knowledge and have no

7   understanding.  The intercompany claims have been

8   unascertained, undetermined.  They are uncertain claims.

9   And so, as a creditor, we are left without the process,

10  without the transparency of understanding whether or not,

11  in fact, those intercompany claims have been dealt within a

12  way that's fair to creditors.

13              And in our submission one of the reasons

14  why creditors are given the right to vote, and should not

15  be stripped of the right to vote, is because it forces that

16  accountability on the plan, and it forces that

17  accountability on any compromise.  And that's what's

18  lacking here, My Lady.

19              In summary, My Lady, CLP's claims are

20  significant, and they are at clear risk, according to the

21  monitor's assessment of the settlement agreement,

22  particularly the claims of CCEL will be compromised at 65

23  percent.

24              JUSTICE ROMAINE:  Ms. Bossio, isn't the

25  monitor saying that there is very little risk to the fund,

1    in fact?

2              MS. BOSSIO:  It relies on that, as I

3    understand that report, on an assumption that the

4    guarantees will be available and will be paid.  But again,

5    that relies on the fundamental assumption, first of all,

6    that equity does equate to cash, which is not the case.

7    And secondly, it does not acknowledge the fact that payment

8    in equity is in itself a compromise of a creditor's claim.

9    It can be -- a debtor cannot unilaterally impose the

10   determination that a claim will be paid by equity.  It

11   cannot simply determine that and impose it upon a creditor

12   without the creditor's consent, or in the CCAA context,

13   without a vote of the creditor.  And that is simply where

14   the fundamental problem with the settlement agreement lies,

15   My Lady.

16             In sum, CLP has a statutory right to vote

17   on a compromise of its claims.  The settlement agreement

18   does purport to compromise those claims, and on that basis

19   alone, it's a legal threshold issue that the court, in our

20   respectful submission, lacks the jurisdiction and lacks the

21   discretion to approve a settlement to which CLP is not a

22   party, to which it has not given its consent, and which is

23   compromises its claims.

24             JUSTICE ROMAINE:  Thank you, Ms. Bossio.

25             Is there anyone else here that wishes to

165

1 speak?

2 Judge Lifland, I recall that one of your

3 counsel in the United States, I think it was Mr.

4 Fredericks, wanted to address this after the Canadian

5 creditors had addressed it?

6 Do you want to deal with that?

7 JUDGE LIFLAND: If Mr. Fredericks --

8 MR. FREDERICKS: I'll be very brief, your

9 Honor. If I may just say I that I adopt Mr. Dunphy's

10 arguments. And for the reasons that he stated, and in

11 particular by reason that paragraphs 5 and 16 of the US

12 order proport to dismiss and withdraw, deal with our claims

13 prior to their payment, that this court should decline to

14 approve the settlement at this time.

15 Thank you your Honor. Thank you Madame

16 Justice.

17 JUSTICE ROMAINE: Thank you.

18 Okay then. Mr. Meyers?

19 MR. MEYERS: Thank you, My Lady, your

20 Honor. I'm cognizant of the time, and I'll try to be very

21 brief. In trying to assist Judge Lifland to understand

22 what the CCRC committee, Mr. Thornton analogized himself to

23 an official creditors' committee. I've seen official

24 creditors' committees, and that's not one.

25 MR. DUNPHY: Thank you.

1    JUSTICE ROMAINE:  Excuse me, if you could

2  hold on.  Madam clerk, if you could turn down the sound

3  again?  Thank you.

4          Mr. Meyers, go ahead.

5          MR. MEYERS:  CCRC is an ad hoc committee

6  made up primarily of Harbor and ULC2 note holders, and we

7  only know much about it because of the disclosure that it

8  made in the United States, not even to this court today.

9  But one of the things that makes a difference is there are

10  things official creditors committees won't do.  For

11  example, if I can just read a line from a case, "The burden

12  is upon Harbor to satisfy me to that they are entitled to

13  the relief claim.  And the circumstances of this case they

14  have not fulfilled its burden, and the application for

15  relief is hereby dismissed."  That's the decision of Madame

16  Justice Smith in the oppression remedy in Nova Scotia that

17  Harbor lost.

18          It sounded like --  I was probably wrong

19  but, it sounded like Mr. Thornton was saying that his

20  client won that case.  Now the trustee won, the trustee for

21  the note holders won for a small portion of the note

22  holders who had not bought into the oppression, and the

23  debtors were ordered to hold up about 50 million dollars.

24  Instead today the ULC2 note holders are getting paid in

25  full.

1   　　　　　　　But it goes beyond that, Mr. Thornton then

2   said his claim for costs is being compromised, part of his

3   claim for costs, having not won the litigation, having then

4   brought the derivative action that was tossed out simarily,

5   his costs are being compromised, he said in Schedule G, and

6   he referred you to paragraph 9 of the order.  It says how

7   dare they compromise my --

8   　　　　　　　MR. THORNTON:  I did not make that

9   submission, My Lady, that was the trustee's claims for

10  oppression that were being dismissed in Schedule G.

11  　　　　　　　JUSTICE ROMAINE:  That may be, Mr. Meyers.

12  Go ahead.

13  　　　　　　　MR. MEYERS:  The claims were tossed and not

14  on the schedule.  The trustee's claims against ULC2 are not

15  being released at all.  The oppression claim is, as a

16  trustee as Mr. Dunphy rightly said, can only claim a

17  hundred cents on the dollar, including everything that is

18  made up in the hundred cents on the dollar, and that's

19  what's being paid.  But the suggestion that Harbor won the

20  Nova Scotia litigation, that it has an entitlement to costs

21  that's being released in this proceeding and therefore is

22  subject to compromise, is simply not the facts.

23  　　　　　　　Mr. Thornton questioned the urgency of

24  this.  Incredible coming from the party who's been

25  distracting this pound of flesh throughout.  But in

1   addition to market risks, foreign exchange risks, there's

2   three million reasons per month of interest accrual under

3   the ULC2 notes that continues; not to mention the need to

4   avoid the paralysis that has characterized some of the

5   proceedings because of the difficult issues between the

6   cross-border estates.

7           The global settlement agreement is not a

8   plan of compromise.  It's an asset realization, principally

9   among the debtors.  And the big lie, the big -- that kept

10  coming from all of my friends this afternoon, and I

11  don't -- I'm sorry, that's a terrible, terrible phrase.  I

12  don't mean any intention.

13          JUSTICE ROMAINE:  Okay.

14          MR. MEYERS:  The error that is common to

15  all of their submissions is that they put themselves in the

16  positions of debtor companies.  Mr. Thornton says our

17  claims up into Quintana are being compromised.  The fund is

18  creditor of CESCA.  The fund is not a creditor of Quintana

19  CCEL might be, CCEL might be; CCEL is a debtor, it's not a

20  final.  All claims are recognized as being paid in full or

21  not being touched, not being compromised.

22          Mr. Thornton says in paragraph 34 of his

23  brief that if its established that the settlement can be

24  implement such that all CESCA creditors will recover a

25  hundred percent of their valid claims from the Canadian

1    estates, then implementation of the settlement would not,

2    at this point, effect a compromise of CESCA's creditor

3    claims.  There's no compromise if you are paid a hundred

4    percent.  The fact that asset realization may not yield a

5    hundred cent recovery is not a compromise.

6              These creditors have bought into companies

7    that don't necessarily have the ability to pay them in

8    full.  We are going to realize the assets.  If we realized

9    only 10 cents worth of assets, that's still not a

10   compromise.  What is a compromise is when we come to them

11   and say we want to satisfy your claims for 10 cents.  We

12   are not asking to satisfy their claims today.  There may

13   never be the need for a plan because we hope they are going

14   to be paid in full.  We going to see what happens with the

15   bond sale.  We are going to see what happens with the toll

16   claim.  There may never be a compromise, but if there is

17   one, there will surely be a plan on which they vote.

18              But all Justice Blair said in Philips is

19   you can't compromise claims in a case without a plan.  And

20   Philips was such a different case.  In that case there was

21   a Canadian debtor who also filed in the US.  So it was a

22   Canadian debtor who proposes a plan of arrangement under

23   the CCAA.  And in it it says you, Canadian creditor, go to

24   the US.  It threw a Canadian creditor out of Canada and

25   into a US class that was subject to a cramdown.

170

1       And we've heard the term cramdown used

2   rather loosely today.  Cramdown, as I understand it, and I

3   don't pretend to be an expert on, is a particular section

4   or sections of the US Bankruptcy Code that all plan to be

5   approved even if creditors may opposed.  There is no

6   cramdown here, nobody is being crammed down in any kind of

7   sense.  I doubt anyone was told that you're being thrown

8   into the United States and you are subject to a proceeding

9   that doesn't treat you as well as a Canadian proceeding.

10  All Justice Blair said is that you can't have a Canadian

11  plan for Canadian debtor and not let the Canadian creditors

12  vote on it if you are going to subject it to a worse

13  treatment somewhere else.  And that is not what's happening

14  here.

15      And I have an unfortunate confession to

16  make as well, it's an Ontario, and as much as I respect

17  Justice Blair, it might not settle the law for the whole

18  country.  It could be that My Lady thinks something

19  different, but in any event it has nothing to do with this

20  case, because by settling the intercompany relations among

21  the debtors and their US affiliates, no claim of the funds,

22  no claim of anyones' is being compromised unless it's being

23  paid in full, and in that case, of course, it's not a

24  compromise.

25      So that having the US jurisdiction

1  determine a claim that has a forum of Canadians, it's not a

2  compromise.  Settling the Greenfield litigation, Mr.

3  Thornton said it was a compromise.  It's a settlement of a

4  case by our client against another client.  It's not a

5  compromise of a creditor's claim, it's a settlement.  In

6  Red Cross, also written by Justice Blair, the same judge

7  that wrote Philip, well aware of the difference between

8  Section 11 and Section 4, Section 6 of the CCAA, Justice

9  Blair made it clear that you can't realize on assets and

10  use the court's authority either the discretionary power to

11  stay under Section 11, which includes an injunction to deal

12  with assets realization, or inherent jurisdiction in order

13  to reorganize affairs among the creditor's positions and

14  realize on assets.

15              In Air Canada the restructuring agreement

16  that was approved included a cross collateralization of DIP

17  priority, a priority determination that cost 22 million

18  dollars to the creditors.  Mr. Thornton said it was

19  nothing, it's all just GE, it gave it priority.  One of the

20  things he complains about in this case is there's a

21  priority determination, well that's what was done in Air

22  Canada.

23              In Stelco the pension funding agreements

24  set Stelco's obligations in the future, how much it had to

25  pay, because a priority is deemed trust in future,

1    perfected creditor realization, because there would only be

2    so much value left to give to the creditors.  As long as a

3    transaction is fair and reasonable and does not compromise

4    the creditors' claims, the court has jurisdiction to do it.

5                I want to deal very briefly with something

6    that Mr. Thornton said about the notice of revisions, that

7    this is somehow a collateral attack on what was done April

8    4th, because it's nothing of the sort.  Ms. Bossio tried to

9    say that the debtors have admitted the claims and no

10   supervisions.  Of course that's nothing as far as I know

11   of, we've set an amount of value that we would be prepared

12   to have claims accepted at had there been no notice of

13   dispute filed.

14               And the whole issue on April 4th was we

15   were in an early stage where the notice of revisions had

16   been sent, but no notice of dispute yet, and it's the

17   notice of dispute that triggered the judicial phase, the

18   judicial determination phase.  And in our submission, the

19   fund is simply the author of its own misfortune.  It had

20   the opportunity to deal with us at that time, instead it

21   filed a notice of dispute which results in standing for

22   guarantors.  We talked about that on April 4th.  That if

23   they said that -- I said in particular on April 4th, if he

24   delivers is notice of dispute and we have to bring a

25   motion, Mr. Griffin will have all of his ability at that

1    point to state his client's peace, and hopefully at that

2    point they will have said they are a guarantor.

3                    It was clear on April 4th, once we went

4    into the court proceeding, that the US would come into the

5    process.  And, in fact, My Lady, if I could just quote from

6    your reasons, on balance I think I'm inclined to dismiss

7    the application, that was Mr. Griffin's application

8    opposing the notice of revision.  I believe the claims

9    process should continue as it has continued, and that does

10   preclude, of course, any kind of agreement between the US

11   debtors and the Canadian debtors with respect to US

12   standing with respect to these issues.  There's no

13   collateral attack on the claims procedures order.  It was

14   always intended, and right in your endorsement, that if we

15   got to the judicial phase if they couldn't settle with us,

16   then there was going to have to be an assessments of

17   standing.

18                    Mr. Dunphy's submissions reflect the

19   unfortunate rigidity of the position of a trustee that we

20   saw in the US with ULC1 trustee, and Mr. Dunphy didn't make

21   quibble about it.  He has one thing he can do.  Well, he's

22   going to be paid in full.  He looks at paragraphs 21 and 25

23   of the order and says why are they assessing the amount of

24   my claim?  What is it they are holding for me?  Well, 21

25   cents is the amount that we admit, we agreed we owe him.

05-60200-cgm Case 22-11549-JT Doc 115649-8 Filed 08/30/22 Entered 03/29/23 07:12:39 Page 175 of 213 Main Document
Pg 174 of 212

174

1   And 25 is a court order that we shall establish and fund,

2   as appropriate with consent of the monitor and escrow

3   account or other reserve, for the payment of such amounts

4   to the extent they are disputed.  Well, My Lady is going to

5   order us to establish an escrow in the amount disputed, and

6   we've agreed on all those amounts.

7           So my submission, apart from being the

8   least practical entities involved in these proceeding, the

9   -- sorry.

10          (loud background noise)

11          JUSTICE ROMAINE:  That's okay, Mr. Meyers.

12          MR. MEYERS:  The submissions of the trustee

13  are not correct and not an appropriate response.

14          Then he said why do you have to dismiss

15  some of my claims before I'm paid in full?  And the answer

16  is sitting in the monitor's report.  It's the rock and the

17  hard place we've had through these proceedings.  Everybody

18  claims everywhere.  Markers all over the place.  The

19  monitor says when you drill down and get to who really owes

20  what to who and you flow the money this way it works.  But

21  I can't flow the money until the other claims against those

22  debtors are gone so that we know where the money is going.

23  So as long as there's a practical assurance, an assurance

24  satisfy to My Lady that's fair and reasonable, and to your

25  Honor, as long as there is a practical assurance that these

1    funds are going to be paid, we have to take the other

2    claims out of the way in order to create the flow for the

3    waterfall to come, otherwise it's a chicken and egg, he can

4    never be satisfied because no claims can ever go away until

5    you're paid, and we can't be paid until the claims go away.

6    So it's about five years of litigation instead.

7               Well, what happens if the CCAA debtors

8    change something?  My Lady, they will be here in a flash.

9    And if we've change something before we've committed to

10   you, put in this voluminous material, with the monitor

11   watching every step, everyone will understand what the

12   relief available to it is.

13              As to the referral to the US, just a brief

14   point that Sections 18.6 sub 2 and sub 4 give you ample

15   jurisdiction.  They are not trumped by Section 12 or 4 of

16   the sections in the statute, if anything Sections 18.6 and

17   4 are even more specific, and the later.  Many claims have

18   had Canadian claims to go to the US and US claims go to

19   Canada for resolution.  In our case the US debtors,

20   guaranteed claims which are American claims against an

21   American debtor are coming here?  It's an example of comedy

22   at its best to settle.

23              Subject to my Lady's questions or if your

24   Honor has any questions, those are my submission.

25              JUSTICE ROMAINE:  Mr. Meyers, I have just

1  one question, and that is there seems to be a difference

2  between the Canadian order and the US order with respect to

3  the release of the oppression claims and how that will

4  work.  Am I missing something?  Is there an --

5              MR. MEYERS:  I had understood during the

6  break --

7              JUSTICE ROMAINE:  -- a resolution?

8              MR. MEYERS:  -- that there was a discussion

9  with the US.  I don't know if Mr. Seligman could answer it.

10             JUSTICE ROMAINE:  Perhaps Mr. Seligman

11  could answer it.

12             MR. MEYERS:  Perhaps we can take one moment

13  to look into the issue of that.

14             JUSTICE ROMAINE:  Adjourned.

15             Go ahead, Judge Lifland.

16             JUDGE LIFLAND:  Go ahead, Mr. Seligman, if

17  you can respond.

18             MR. SELIGMAN:  We are in the process, your

19  Honor, of revising the order to try to account for the

20  ULC1's hopefully resolution.  I believe we are trying to

21  pick up that change there.  I just do need to confirm it,

22  but the idea is that they should be completely conforming,

23  so we'll have to just double check it.  But if there's any

24  disparity, there shouldn't be.

25             JUDGE LIFLAND:  Well, you are talking about

1   now only about the ULC1 potential settlement.  What Madam

2   Justice Romaine and I are concerned about is that the

3   orders, assuming that the settlements are approved, are

4   parallel in every respect and do not diverge so that

5   stakeholders have different outcomes depending upon their

6   participation in the orders.

7                  MR. SELIGMAN:  Your Honor, there shouldn't

8   be.  We are just double checking it, but I can represent

9   that the intent is that the orders are exact, and we will

10  go back and comb through the order and double check that

11  all the cross references are the same, but they should be

12  identical.  That was the principal when we were drafting

13  the proposed orders.

14                  JUDGE LIFLAND:  The point that's being made

15  is will the revised order capture the impression that there

16  are different outcomes based upon the way the orders are

17  now?

18                  MR. SELIGMAN:  Yes.  We are in the process

19  of revising them and that we will fix those, to the extent

20  there's any discrepancy, and make sure that the orders are

21  exactly the same in both jurisdictions.  And we will have

22  revised orders that we will make sure to hand up and we

23  will have red lines that shows those corrections.

24                  JUSTICE ROMAINE:  Okay.  Judge Lifland, I'm

25  sorry we are having problems hearing you.  I get the gist

1    of what your questions were from Mr. Seligman's answers.

2              But could I perhaps ask, Mr. Seligman, is

3    the intention that the Canadian order provisions will be

4    the ones that apply here, or is that still under

5    discussion?

6              MR. SELIGMAN:  I apologize, but I just have

7    to double checks the cross references, but they should be

8    identical in both jurisdictions.  So perhaps I can report

9    back to the court on that in a moment, but I just do need

10   to double check, but they should be exactly the same.  I

11   just don't have the latest version of the order right here

12   at counsel's table.

13             JUSTICE ROMAINE:  Okay.

14             MR. THORNTON:  Thornton, initial R.

15             My friend, Mr. Meyers, had mentioned that I

16   misstated something in the Air Canada case.  I want to

17   clarify that less there be any doubt about that.  And, in

18   fact, I believe that Mr. Meyers is in error that the cross

19   collateralization in the Air Canada case for certain

20   aircraft leases in fact was imposed as part of the DIP

21   order earlier on in the piece.  When the large

22   restructuring agreement was put in place there was a

23   further cross collateralization which came into effect upon

24   implementation which was after the exit and after the vote.

25             JUSTICE ROMAINE:  Thank you.

179

1      MR. MEYERS:  I might have --

2      JUSTICE ROMAINE:  Okay.  Mr. Gorman?

3      MR. GORMAN:  Yes, my Land and your Honor,

4  it's Howard Gorman of the ULC1 creditor's committee.

5      I think part of the problem here is the

6  settlement agreement which largely resolves intercompany

7  claims like intercompany assets.  We didn't have a

8  creditors vote when we went to sell the ULC1 bonds that

9  were held by the CCRC.  We had court application.  We've

10  had argument.  We've had court determination.  Similarly,

11  when the B units were sold, it ended up virtually dealing

12  with all of the assets in common, we don't have a creditors

13  vote then, we have the court direction.  The end result is

14  you get the assets, the monitor puts together a

15  distribution amount, and you then have the ranges.

16      If we had a warehouse that sold for a

17  million dollars, the monitor would say we have between 3

18  and 5 million dollars in claims, that means if we sell the

19  warehouse a million dollars you'll get between 33 and 20

20  cents, we'll determine those claims in the future, and if

21  there's a shortfall, we'll have a vote; there's a

22  compromise at that time.

23      What the settlement agreement does is

24  realize the company's assets, and the monitor's report

25  where it says there is a shortfall isn't saying anything

1   more than when looking at the this as the court, as a party

2   looking at the agreement, what the potential outcome is,

3   depending upon how the claims are ultimately resolved.

4           When you hear Mr. Thornton's lists of

5   things that he thinks are being compromised, what

6   jurisdiction claims will be in, how -- from CLP, how they

7   are their shortfall is calculated, that's not anything we

8   get to vote on.  They don't want my 2 billion votes

9   determining where to have their claims heard.  They don't

10  want my 2 billion votes determining what their make whole

11  claim is worth.  And that is why that is not a part of it,

12  that is a further step down the road, and that exactly

13  demonstrates why the settlement agreement is a realization

14  of the assets and it's a step forward to the end, it's not

15  the end.  Thank you.

16          JUSTICE ROMAINE:  Thank you.

17          Judge Lifland, I think we are now over to

18  you.

19          JUDGE LIFLAND:  We have one remaining item,

20  and I'll hear from the parties.  They have been attempting

21  to work out the objection to the settlement filed by HSBC,

22  which I think is the only remaining objection on the

23  merits, other than Mr. Eckstein's comments.

24          MR. SELIGMAN:  Yes, your Honor.  And just

25  to, I want to just clarify.  We did pick up that

181

1    discrepancy between the orders, it was the timing of the

2    effect of the claim which was on schedule G.  This was

3    paragraph 16 of the proposed US order, and at paragraph 5

4    which talks about the date of effectiveness of various

5    provisions.  We have clarified that paragraph 16 is

6    effective upon a date the Canadian debtors and the US

7    debtors have executed and filed certificates with the court

8    advising that all the conditions in the settlement

9    agreement have either been waived or satisfied, et cetera

10   it's in paragraph 5.  So that should now match with the

11   Canadian order.

12              MR. ECKSTEIN:  Your Honor, excuse me can I

13   ask?  I noticed that Mr. Seligman has drafts of the

14   modified order.  I'm assuming I am going to have an

15   opportunity to at least get a copy of the order that's been

16   circulated?

17              JUDGE LIFLAND:  That's a good assumption.

18              MR. ECKSTEIN:  Thank you.

19              MR. SELIGMAN:  Yes.  Your Honor, I believe

20   we are -- if I can could just have one moment your Honor.

21              JUDGE LIFLAND:  Maybe it's appropriate for

22   us to take a five minute recess while we see whether we

23   have a settlement or not.

24              MR. SELIGMAN:  Your Honor, I believe we do,

25   but yes, a five minute recess just to confirm that would be

182

1    good.

2                    JUDGE LIFLAND:  Is that all right, My Lady?

3                    JUSTICE ROMAINE:  Yes, thank you.  Five

4    minutes?

5                    JUDGE LIFLAND:  Yes.

6                    THE CANADIAN CLERK:  Order.

7                    (Recess taken)

8                    JUSTICE ROMAINE:  The Calgary court is

9    ready when New York is.

10                   MS. HEALY:  We just need one moment,

11   please.

12                   JUSTICE ROMAINE:  Sure.

13                   JUDGE LIFLAND:  Remain seated.

14                   Thank you all.

15                   MR. SELIGMAN:  Your Honor, David Seligman,

16   again, on behalf of the US debtors.

17                   Your Honor I do believe we have a

18   settlement of the ULC1 trustee's objection.  The debtors,

19   the ULC1 indentured trustee, as well as the ULC1 ad hoc

20   have agreed upon a revised form of order, as well as some

21   changes to the settlement agreement that would satisfy

22   their objection.

23                   We have delivered those materials to the

24   Canadian debtors.  They still need to look at those and

25   gave their signoff.  I'm hopeful that we will get that,

1     because, again, it just deals with this parochial issues,

2     but we need to get their approval and consent.  So we have

3     also submitted copies of the red line order in the

4     courtroom here for all the parties present.

5              So I feel good enough about where we are

6     that we don't have to proceed with their objection, and we

7     will work we the parties to see if we can come up with a

8     final version of the order and submit it to chambers once

9     we coordinate with Canadian debtors' counsel and get their

10     sign-off on the merit.

11              JUDGE LIFLAND:  I don't exactly follow you,

12     Mr. Seligman.  There's an objection on the record that's

13     not been withdrawn.  It's subject to an approval.  If I

14     hear that it's being withdrawn subject to a pending of that

15     approval, I can react to it.

16              MR. CASTELLO:  Your Honor, Jeff Castello of

17     Kelley Drye and Warren for HSBC --

18              JUDGE LIFLAND:  I can also tell you before

19     you finish that I'm prepared to rule if you can't resolve

20     it in your own way.

21              MR. CASTELLO:  Thank you, your Honor.  HSBC

22     is the indentured trustee under the indenture relating to

23     the ULC1 notes.

24              Subject to what I believe might be one

25     final nit that the Canadian attorneys are going to deal

184

1    with right now, we will withdraw the objection.  And

2    hopefully by tomorrow we will submitted a proposed form of

3    order to the court that everybody has agreed on, if not

4    later on tonight.

5              JUDGE LIFLAND:  Does anybody want to be

6    heard with respect to this conditional withdrawal of the

7    objection?

8              MR. ECKSTEIN:  Your Honor, to the extent

9    the indentured trustee is going to withdraw his objection,

10   I'm assuming that does not effect any position that any

11   individual holder has with respect to the actions being

12   taken by the ad hoc committee.  So to the extent the

13   individual holder is not --

14             JUDGE LIFLAND:  That's the way I would

15   rule, Mr. Eckstein.

16             MR. ECKSTEIN:  So to the extent the

17   individual holder is not participating, they are not bound

18   by the decision of the indentured trustee to give its

19   consent.

20             JUDGE LIFLAND:  Yes.  But I'll note that no

21   individual holder has filed any objection.

22             MR. ECKSTEIN:  I appreciate that, your

23   Honor, but I don't think that there was an obligation

24   necessarily to file an objection or to be bound by the

25   action that's being taken.

1    MR. SELIGMAN:  So with that, your Honor, I

2    believe their objection is withdrawn subject to finalizing

3    some language, which I don't believe we'll have any issues

4    with.

5    And with that, your Honor, we have nothing

6    more on behalf of the US debtors.

7    JUDGE LIFLAND:  Very well.  The objection

8    is considered withdrawn on a contingent basis subject to a

9    final approval.

10    JUSTICE ROMAINE:  I'm sorry, Judge Lifland,

11    I believe Mr. Dunphy wishes to make some statement about

12    the order.

13    MR. DUNPHY:  To clarify at least.  Just to

14    be clear, we obviously haven't seen anything, so we're not

15    buying into the provisions.  We've been told it's a whole

16    package deal, but packages change I guess.  But anything

17    that effects us, I don't know, we haven't seen any changes

18    as accepting a pig and a poke, and the order is supposed to

19    be binding on everyone.  So if there's something there to

20    be seen, I think everyone needs to see it and ascertain

21    whether it affects their position.

22    I can tell you that the truing up of the US

23    and Canadian orders only goes part of the way to addressing

24    the points I've raised.  Our point being it's not enough to

25    promise to be paid, it is to be paid.

186

1    JUSTICE ROMAINE:  I understand.

2    Mr. Robinson, can you help with the issue

3    of the changes?

4    MR. ROBINSON:  I can, My Lady.  For the

5    record Larry Robinson.

6    I understand from the folks in the

7    courtroom that there have been some revised order provision

8    of the proposed Canadian order sent up.  It's being looked

9    at at the moment.  And also a proposed revision to the

10   settlement agreement to deal with this American objection

11   issue.

12   I am feeling awkward here because I'm

13   standing discussing changes to an order when your Ladyship

14   and his Honor have not made a ruling on the applications

15   themselves.  But were I to presume, and it's a presumption,

16   my partner, I apologize if it's an incorrect assumption, I

17   would presume that an order of the sort that we are seeking

18   were to be granted in Canada by your Ladyship, I think we

19   are a bit of time away from indicating to you what changes

20   might be needed to that form from the form that we

21   originally presented to you, all being driven out of this

22   accommodation in the ULC1 trustee's position.

23   I may have simply added to the confusion,

24   but I think that's where we are at the moment.  I don't

25   know what your Ladyship's time is or his Honor's time is,

1   but I suspect where we are at is that the form of order is

2   not driving your decision making process, and I don't know

3   whether, were the applications to be granted, whether we

4   are within ten minutes or half an hour.  I see some

5   nodding.  I think we are probably within ten minutes to

6   half an hour of having a form of order to present to you,

7   and the other parties, obviously, that we believe is a

8   modification simply to address the one point that Mr.

9   Dunphy has addressed with -- I'm sorry, to address the one

10   objection by the ULC1 trustee.  I think that's the status

11   at this point, your Ladyship.  That is all.

12                    MR. LANCE:  My Lady, I may have something

13   to add to that.

14                    JUSTICE ROMAINE:  Mr. Lance?

15                    MR. LANCE:  For the record, I'm Canadian

16   counsel for the US ULC1 indentured trustee, and so I've

17   seen some of these orders that we've been working on all

18   day.

19                    The changes, as far as we're concerned,

20   really address the liability issues to the indentured

21   trustee.  I don't think anyone else is going to have that

22   much interest in them.

23                    JUDGE LIFLAND:  They are internal, as I

24   understand it.

25                    MR. LANCE:  We are close to finishing them.

1              JUSTICE ROMAINE:  I'm sorry.  Judge

2    Lifland?

3              JUDGE LIFLAND:  Those issues, I think, are

4    very internal and parochial to the trustee, so I don't

5    think they go at all to the settlement.  As a matter of

6    fact, however they compromise out and rework their issues,

7    I don't think there is anything that really goes to the

8    merits of the settlement.

9              MR. SELIGMAN:  That's correct, your Honor.

10   If your Honor wishes I can take five, I can take one minute

11   and I can walk through, at least just for the benefit of

12   your Honor, the changes that we have made to the order.

13             JUDGE LIFLAND:  That may be appropriate,

14   because I think it's really much ado about not very much at

15   all.

16             JUSTICE ROMAINE:  Okay, thank you.

17             MR. SELIGMAN:  So, I'll just walk through,

18   I'm looking at a red line here, which -- so I know everyone

19   in the US court has something to look at, but let me just

20   see if I can identify a couple of the changes, again they

21   are parochial.

22             For example, in recital G, on page 3, it

23   should be approximately page 3 of the form of the US

24   proposed order, at the end of the paragraph, and -- excuse

25   me just one second.

1    Your Honor, may I approach and just hand up

2    a copy to your Honor?

3    (Handing)

4    MR. SELIGMAN:  In paragraph G, at the end

5    of the recital on page 3, we just added that the terms of

6    the settlement are embodied and memorialized in a

7    settlement agreement draft which was attached as Exhibit B

8    to the motion.  So again, that just cross references the

9    settlement agreement itself.

10    On page 4 in paragraph L, there are

11    literally some changes to defined terms.  For example,

12    capitalizing the word holders, referring to the approval

13    motions, just cross referencing in definitions that were in

14    the motions, so those, I think, are of no consequence.

15    There is a new paragraph M, as in Mary, on

16    page 4 which just recites that the holders of the majority

17    of the ULC1 bonds have directed the indentured trustee to

18    take certain actions, and those actions include withdrawal

19    of the objection, support of the settlement motion, and a

20    statement in support of the settlement at the settlement

21    hearing.  Also adding provisions that if and when the order

22    should be entered, to execute and deliver the settlement

23    agreement on behalf of all holders of the ULC1 bonds and to

24    execute such other and further documents and to take such

25    further actions as the holders may direct the indentured

1    trustee to take.

2            Further, in paragraph 3 of the proposed

3    order at the bottom of my page 5, we changed the definition

4    of HSBC, and instead to refers to it as the indentured

5    trustee.

6            Paragraph 4 there are some changes to the

7    defined term ancillary documents because it had already

8    been defined earlier.

9            In paragraph 5, that was the conforming

10    change that I spoke about earlier.  We have removed the

11    reference in the first line of paragraph 5 to paragraph 16.

12    That clears up the timing issue that I spoke to you about

13    before.

14            There are some other changes to those

15    paragraph numbers that basically account for the fact that

16    there are some changes in the order of the paragraphs and

17    numbers of the paragraphs in the order.

18            Moving on to page 8 in paragraph 11, there

19    are some clarification of the exculpation that it applies

20    both to the indentured trustee as well as its present and

21    former directors, officers and employees, et cetera, and

22    just clarifies the extent to which the exculpation applies

23    to the schedule.  Instead of just causes of action, claims,

24    et cetera; it refers to causes of action, debts, demands,

25    judgments, et cetera; it's just the standard provisions

1  that you would expect to see in an exculpation.

2                    The next is to paragraph 21 on my page 11.

3  That paragraph basically had an injunction with respect to

4  any claim or cause of action against the US trustee in

5  relation to the CCRC senior notes that also include the

6  indentured trustee.

7                    There's a new paragraph 25 that's been

8  inserted on page 12 that basically copies and pastes

9  language from the settlement agreement, that's the

10  operative provision giving the ULC1 and the indentured

11  trustee the 3 and a half billion dollar claim against the

12  estate.

13                    On page 16, paragraphs 35, 36, 37 and 38,

14  there is just a change to the defined term.  We had

15  referred to the second lien committee, which was the ad hoc

16  committee of second lien holders in the US, instead we

17  refer to it as the Calpine second lien holders.  That was a

18  cross reference to a cash collateral order, we were just

19  using the same definition.  And that's just a defined term

20  issue that we needed to clarify.

21                    And then there's a provision in paragraph

22  42, a new paragraph 42 on page 19, which states that any

23  future plan will incorporate this order in the settlement

24  agreement.

25                    So again, I think that a lot of these

1  changes relate to the agreement between the US debtors, the

2  ULC1 indentured trustee, and the ad hoc committee with

3  respect to the direction of the ULC1 indentured trustee to

4  withdraw its objection and to sign off on settlement

5  agreement.

6          And again, we will circulate this to -- it

7  has been circulated to the Canadian debtors, just dealing

8  with electronic transmissions takes a little while for them

9  to get the latest version.  They have seen interim versions

10  over the course of the hearing, but we understand that they

11  need to give their final sign-off.  We hope that we are

12  able to get that.  We do believe that we will get that.

13  And so we think that we can submit an order when we get

14  those issues clarified, which will hopefully be in the next

15  hour.

16          JUDGE LIFLAND:  Very well.

17          JUSTICE ROMAINE:  Thank you.

18          JUDGE LIFLAND:  Consider the HSBC objection

19  withdrawn.

20          MR. ECKSTEIN:  Your Honor, if I may, having

21  seen this for the first time, these changes, I do want to

22  make one or two observations for the record.

23          I do note paragraph M has the court making

24  a finding that a majority in the aggregate principal amount

25  of the ULC1 bonds is given a direction.  We certainly

1    haven't seen any indication as to what amount of holdings

2    have participated in this process.  We simply have a naked

3    finding that a majority have been given a direction.  I

4    want note that the record is completely absent of any

5    indication that there's a majority.

6              Number two, I think it's significant

7    because paragraph 11 provides for a complete and

8    irrevocable indemnity and release of the trustee by all

9    holders.  And to the extent there is going to be a release

10   with respect to all holders, including those who are not

11   participating in this direction, it's significant, your

12   Honor, to at least have some record and know that there are

13   in fact holders who are giving this direction and who they

14   are, because we don't have any record of that in this case.

15             Thirdly, your Honor, it does say with

16   respect to CCRC, which I think is more on the Canadian

17   side, and I am just curious about the use of the word in

18   paragraph 15, it says "In the event there's an entitlement

19   to accrued interest fees and the like that have not been

20   resolved," it says, "CCRC may establish a fund."  I had

21   understood that they were going to establish a fund.  And

22   it just seems curious to me that the order was using the

23   word may, when at a minimal, if this is going to proceed,

24   it should say that they will establish a funds.  And I

25   would suggest that that modification be considered.

194

1        JUDGE LIFLAND:  Take the last first.

2        MR. SELIGMAN:  What's that?

3        JUDGE LIFLAND:  Take the last observe

4   first.

5        MR. SELIGMAN:  Well, your Honor, that's an

6   issue obviously for the Canadian debtors, but that's not

7   been a change in the proposed order it has always been that

8   way, so I think we can stand on that that was something not

9   raised previously.

10       MR. ECKSTEIN:  Excuse me, your Honor.  We

11   objected to the motion.  I don't think we were expected to

12   fly spec the order.

13       MR. FREDERICKS:  And I also believe that --

14   this is Ian Fredericks for the ULC2 indentured trustee.

15       I also believe that we did raise that in

16   our papers, that the escrow should be established and that

17   it should not be discretionary.  And I believe Mr. Dunphy

18   also addressed that in his submissions.

19       MR. SELIGMAN:  Your Honor, that --

20       JUDGE LIFLAND:  That should not be a deal

21   breaker.

22       MR. SELIGMAN:  Right.  Obviously that is --

23   it's a directive as to CCRC, one of the Canadian debtors.

24   I guess we can deal with that.  Obviously that's not my --

25   that's not the US debtors' issue to sign-off on that.

1     Perhaps we can refer that to Canadian debtors' counsel in a

2     moment.

3              JUDGE LIFLAND:  Well, it's precatory, it's

4     suggested by the US court, but you are correct that is more

5     the for the Canadian debtor to accept.

6              Let's get to the other forms of objection

7     by Mr. Eckstein with respect to wanting to know about the

8     majority.

9              MR. SELIGMAN:  Well, your Honor, the

10     holdings of the ULC1 ad hoc committee, which they allege in

11     their papers they represent a majority, they were filed

12     with this court under seal.  So I think your Honor has them

13     and can take notice of them.

14              JUDGE LIFLAND:  I do have them, Mr.

15     Eckstein.  I do take notice of them, and I do find from

16     those papers they purport to represent the majority.  And

17     they have communicated that, I believe, to the indentured

18     trustee in full detail.

19              MR. ECKSTEIN:  Your Honor, I was not aware

20     of that fact.  And obviously I haven't seen anything that

21     was filed under seal, so I am not in a position to respond

22     to whatever was filed, your Honor.

23              JUDGE LIFLAND:  Is there anything else?

24              MR. SELIGMAN:  I think those were the

25     issues raised by Mr. Eckstein.

1          JUDGE LIFLAND:  With respect to what I have

2    left on my plate, and that is the objections.  One is

3    withdrawn.  To the extent that there are any others, I will

4    rule on the other objections.

5          And perhaps My Lady and I might prepare for

6    about five minutes and then come back and inform you as to

7    how we decide to further proceed.

8          JUSTICE ROMAINE:  Judge Lifland, if I can

9    say, I believe there are a couple of comments to be made

10   with respect to the changes here.  If we can just allow

11   that first.

12          JUDGE LIFLAND:  Certainly.

13          JUSTICE ROMAINE:  Mr. Carfagnini wishes to

14   speak.

15          Go ahead, Mr. Carfagnini.

16          MR. CARFAGNINI:  Jay Carfagnini for the

17   Canadian debtors.  I just want to say there are some

18   changes that are going to have to be made to the Canadian

19   order to conform.  We are happy to take those changes

20   certainly to the US counsel.  And perhaps what would make

21   sense is for the US to appear before Judge Lifland when it

22   suits them and us to submit the orders to you for Canada.

23   These are not, in our view, substantive change, and we are

24   confident by the cooperation that we've received from

25   counsel so far, will be achieved again.

197

1          On the one point raised by Mr. Seligman and

2  Mr. Eckstein about the funding of the escrow, the term will

3  be shall.  We are happy to do that.  That is the intention

4  and always has been.

5          JUSTICE ROMAINE:  Okay.  Anything, Mr.

6  Dunphy?  Mr. Thornton?

7          MR. THORNTON:  No.

8          JUSTICE ROMAINE:  Thank you.

9          Judge Lifland, you are suggesting that we

10  now adjourn for how long?

11          JUDGE LIFLAND:  About five or ten minutes.

12  And we can come back and either rule or advise the people

13  whether there is any need for any further proceeding.

14          JUSTICE ROMAINE:  Okay.  Let's take ten

15  minutes, if you don't mind?

16          JUDGE LIFLAND:  Sure.

17          (Recess taken)

18          THE CLERK:  We are ready in Calgary

19  whenever you are.

20          MS. HEALY:  Okay.

21          JUSTICE ROMAINE:  Thank you.  Please be

22  seated.

23          JUDGE LIFLAND:  Thank you all for your

24  patients.  What happened to the microphone?

25          Can you hear me?

1          JUSTICE ROMAINE:  We can hear you better

2    than we could before.

3          JUDGE LIFLAND:  I understand there was a

4    part missing.

5          JUSTICE ROMAINE:  Of the microphone.

6          JUDGE LIFLAND:  Of the microphone.  I thank

7    you all.

8          (Laughter.)

9          JUSTICE ROMAINE:  It's been a long day,

10    Judge Lifland.

11          JUDGE LIFLAND:  Even longer here.  It's

12    well passed the dinner hour here, who probably spent the

13    last 10 minutes phoning home saying hold dinner for them.

14          We are here in this segment of the

15    proceeding do deal with the settlement that comes under

16    Rule 9019 of the Bankruptcy Code.  And as our Second

17    Circuit Court of Appeals recently noted, there is little

18    doubt that the settlements of disputed claims facilitate

19    the efficient functioning of the judicial systems.  In

20    Chapter 11 bankruptcies, settlements also help clear a path

21    for the efficient administration of the bankruptcy estate,

22    including any eventual plan of reorganization.  Before

23    pre-plan settlements can take effect, however, they must be

24    approved by the Bankruptcy Court pursuant to Bankruptcy

25    Rule 9019.  Motorola, Inc. against Official Committee of

1   Unsecured Creditors known as (In re Iridium Operating LLC)

2   478 F.3d 452,455 Second Circuit 2007 a short time ago.

3                   Bankruptcy Rule 9019 has a "clear

4   purpose....  to prevent the making of concealed agreements

5   which are unknown to the creditors and unevaluated by the

6   court."  Id.  In determining whether to approve a proposed

7   settlement, the court's responsibility is not to decide the

8   numerous issues of law and fact implicated by the

9   settlement "but rather to canvas the issues and see whether

10  the settlement falls below the lowest point in the range of

11  reasonableness."  Cosoff against Rodman (In re W.T. Grant

12  Co.) 699 F2.d 599, 608 (Second Circuit 1983.)

13                  Courts in the Second Circuit have developed

14  standards to evaluate if a settlement as fair and equitable

15  based upon the original framework announced by the United

16  States Supreme Court in TMT Trailer Ferry.  Protective

17  Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc.

18  against Anderson, 390 U.S. 414 (1968).  Those interrelated

19  factors are:  (1) the balance between the litigation's

20  possibility of success and the settlement's future

21  benefits; (2) the likelihood of complex and protracted

22  litigation, with its attended expense, inconvenience, and

23  delay, including the difficulty in collecting on the

24  judgment; (3) the paramount interests of the creditors,

25  including each affected classes' relative benefits and

1   degree to which either creditors do not object to or

2   affirmatively support the proposed settlement; (4) whether

3   other parties in interest support the settlement; (5) the

4   competency and experience of counsel supporting, and the

5   settlement; (6) the nature and breadth of releases to be

6   obtained by officers and directors; and (7) the extent to

7   which the settlement is the product of arms-length

8   bargaining.  In re Iridium Operating LLC 478 F.3rd at

9   461-462 citing TMT Trailer Ferry, 390 U.S. at424.

10              Here the settlement resolves all material

11  disputes between the US debtors and the Canadian debtors

12  without the costly and time consuming cross-border

13  litigation that would otherwise ensue.  The settlement will

14  cause the elimination of billions of dollars of claims

15  against the US debtors' estates, enable the debtors to

16  proceed with the Greenfield Energy Center project and give

17  the debtors a 75 million dollar charge against the net

18  proceeds realized by the Canadian debtors from the sale of

19  the CCRC ULC1 senior notes.  Although the settlement does

20  not resolve the guarantee claims by the fund against the US

21  debtors, it creates a process for resolving those claims.

22  The settlement also provides for an equitable division

23  between the US and Canadian debtors of the proceeds of the

24  sale of Calpine's subsidiary Thomassen Turbine Systems, and

25  may possibly result in a distribution to US debtors on

1   account of their equity interest in certain of the Canadian

2   debtors and allows the US debtors to move forward with the

3   confirmation process.

4               The settlement agreement has universal

5   support in the US by creditors, equity holders, ad hoc

6   committee of second lien debt holders and the note holders.

7   The creditors' committee and the equity committee have both

8   filed statements in support of the settlement.  The only US

9   objection was filed by HSBC as indentured trustee for ULC1

10  notes but that objection was resolved by the parties.  The

11  settlement provides for payment in full of all principal

12  and interest (including compound interest) owing under the

13  ULC1 notes allowing the trustee's claim in the amount of

14  approximately 3.5 billion dollars, which is 1.65 times the

15  filed amount of the trustee's claim for the principal

16  amount of the ULC1 bonds outstanding (i.e. approximately

17  2.12 billion dollars).  The form of currency of the ULC1

18  bondholders will receive in the Chapter 11 cases is an

19  issue to be addressed in the context of plan confirmation,

20  where ULC1 bondholders and others will have the opportunity

21  to vote for or against a plan as provided by the Bankruptcy

22  Code.

23               Holders of a majority of each series of the

24  ULC1 notes have delivered to HSBC a direction and indemnity

25  letter directing HSBC the enter into the settlement

202

1    agreement and indemnifying HSBC against any losses suffered

2    as a result of doing so.  In addition, wide spread notice

3    was given to all note holders directly by mail and through

4    extensive publication and none have objected.

5                    Accordingly, I find that the settlement is

6    fair and equitable, well above the lowest rung in a range

7    of reasonableness, and indeed well within the zone of

8    reasonableness, and indeed is in the best interest of the

9    debtors, their estate, creditors and stakeholders.

10                   And I will entertain the order approving

11   the settlement consistent within the like order to be

12   submitted to Canadian court.

13                   That is my ruling.

14                   JUSTICE ROMAINE:  Thank you, Judge Lifland.

15                   I will give my decision orally with brief

16   reasons, more detailed written reasons will follow later

17   this week dealing more specifically with the various

18   objections raised by the ad hoc committee, the ULC2 trustee

19   and the Fund.

20                   I start by accepting that if the global

21   settlement agreement were a plan of arrangement or

22   compromise, a vote by creditors would be necessary under

23   Canadian law.  However, I am satisfied, after careful

24   analysis of its terms, that the settlement agreement is not

25   a plan compromise or arrangement with creditors.

1       Under the terms of the settlement agreement

2   objecting creditors either will be paid in full and thus

3   not compromised, or will continue to have the same claims

4   against the same entities.  Those claims will be

5   adjudicated, and if they are determined to be valid, the

6   settlement agreement provides a mechanism for their full

7   payment or satisfaction, other than for the possibility of

8   a relatively small deficiency for some creditors of CESCA

9   whose claims are not guaranteed by the US creditors.  Those

10  creditors have not objected to the settlement agreement,

11  and, in fact, the largest group, the gas transportation

12  claimants, have appeared before me today to support the

13  approval of the settlement agreement on the basis that it

14  improves their chances of recovery, resolving as it does,

15  all the major cross-border issues that have impeded the

16  progress of this preceding.

17      I am satisfied that no rights are being

18  confiscated under the settlement.  Some claims are

19  eliminated, but only with the full consent of the parties

20  directly involved in those specific claims.  The existing

21  claims of the ULC trustee are replaced with redesignated

22  claim; however, the financial effect of the redesignated

23  claims is the same.  The ULC2 trustee's right to assert the

24  full amount of its claims remains, and the Canadian debtors

25  and the US debtors have agreed to hold funds in escrow

204

1   sufficient to satisfy the entirety of those claims once

2   settled or judicially determined.

3           It is true that the settlement will have

4   implications for the value of the Canadian estate.  On an

5   overall basis the effect of the settlement on the funds

6   available for distribution to Canadian creditors is

7   positive; however, the settlement also has implications for

8   the funds available to creditors on an entity by entity

9   basis.  Settlements often do affect the size of the estate

10  available for distribution, whether they are settlements of

11  a single issue such as a simple claim of a lien holder or

12  this settlement of the major issues that have impeded the

13  resolution of this very complex cross-border insolvency.

14  Settlements sometimes result in less money being available

15  to non-settling creditors, that is why they require court

16  approval and consideration of whether the settlement is

17  fair, reasonable and beneficial to creditors as a whole.

18          It is clear that court approval of

19  settlements can be, and often is, given over the objections

20  of one or more parties.  The Court's ability to do this is

21  a recognition of its authority to act in the greater good,

22  particularly in the insolvency context.  Viewed against

23  this test, the settlement agreement is a remarkable step

24  forward in resolving this CCAA filing.  It eliminates

25  approximately 7.4 billion dollars in claims against the

205

1    CCAA debtors.  It resolves the major issues between the
2    Canadian debtors and the US debtors that had stalled
3    meaningful progress and asset realization and claims
4    resolution.  Most significantly, it unlocks the Canadian
5    proceeding and provides the mechanism for the resolution by
6    adjudication or settlement of the remaining issues and
7    significant creditor claims and the clarification of
8    priorities.

9              The monitor has concluded, through careful
10   and thorough analysis, that the likely outcome of the
11   implementation of the settlement agreement is payment in
12   full of all Canadian creditors.  As the ad hoc committee of
13   creditors of Calpine Canada Resources Company concedes, the
14   settlement removes the issues that the members of the
15   committee have recognized for many months as the major
16   impediment to progress.

17             The sale of the CCRC ULC1 notes is a
18   necessary precondition to resolution of this matter.  But
19   contrary to the ad hoc committee's submissions, that sale
20   cannot occur otherwise than in the context of a settlement
21   with those parties whose claims directly affect the notes
22   themselves.  I'm satisfied that the settlement agreement is
23   a reasonable and indeed necessary path out of the deadlock.
24   I am persuaded that the settlement agreement provides clear
25   benefits to the Canadian creditors of the CCAA applicants

1   as a whole, and that on an individual basis no creditor is

2   worse off as a result the agreement.  While it does not

3   guaranty full payment of claims, the settlement agreement

4   substantially reduces the risk that this goal will not be

5   achieved.  Crucially the settlement agreement is supported

6   and recommended unequivocally by the monitor who was

7   involved in the negotiations and who has analyzed its terms

8   thoroughly.

9             I am mindful that the settlement agreement

10  is not without risk to the fund; however, that the

11  outstanding risk falls upon the fund does not make the

12  settlement unfair.  As the applicants point out,

13  particularly in the insolvency context, equity is not

14  always equality.  Given the monitor's assessment that the

15  risk of less than full payment to the CESCA creditors is

16  relatively remote, I am satisfied that such risk does not

17  obviate the fairness of the settlement.

18            This settlement agreement is without

19  precedent in this breath and scope.  This is perhaps

20  appropriate given the enormous complexity and highly

21  intwined nature of the issues in this proceeding.  The

22  cross-border nature of many of the issues adds to the

23  delicacy of the matter.  Given that complexity, it behooves

24  all parties in this court to precede cautiously and with

25  careful consideration; nevertheless, we must proceed

1   towards the ultimate goal of achieving resolution of the

2   issues.  Without that resolution, the Canadian creditors

3   face protractive litigation in both jurisdictions,

4   uncertain outcomes, and continued frustration in unraveling

5   the guardian knot of intercorporate and interjurisdictional

6   complexities that plagued these proceedings on both sides

7   of the border.

8              In my view the settlement agreement

9   represents enormous progress, and I commend all parties for

10  the efforts necessary to achieve it.  I'm prepared to

11  approve the settlement agreement.

12              Okay.  Judge Lifland?

13              JUDGE LIFLAND:  Thank you, My Lady.  I,

14  too, would like to express my appreciation to all, both pro

15  and con with respect to the settlement.  I think the

16  advocacy has been excellent, the argument excellent, and

17  the effort that was put in in coordinating and cooperating

18  in order to get to this point and to clarify issues has

19  been rewarding for this side of the bench, as well as, I

20  assume, the others.  And it goes again to demonstrate the

21  desirability of approaching these cross-border matters

22  through the medium of a protocol to allow us all to get

23  access and recognition to our respective courts that way

24  and to appear and be heard appropriately.

25              Thank you all.  And thank you, My Lady.

1       JUSTICE ROMAINE:  Thank you, Judge Lifland.

2           MR. CARFAGNINI:  My Lady, just one last --

3   this is Peter Linder on behalf of the Canadian debtors.

4           Just one last motion that I would like to

5   bring on behalf of all here, and its done both before you

6   and before Judge Lifland.  And in my usual style it's

7   without notice, but I want to bring this notice of thanks

8   on behalf of all participants for hearing us today, and to

9   thank your clerks for assisting us in carrying this joint

10  border joint hearing.

11          JUSTICE ROMAINE:  Thank you, Mr.

12  Carfagnini.

13          MR. LINDER:  My Lady?

14          JUSTICE ROMAINE:  Is this something that

15  Judge Lifland should hear?

16          MR. LINDER:  I believe it is, My Lady.

17          JUSTICE ROMAINE:  Okay.

18          MR. LINDER:  Judge Lifland, Justice

19  Romaine, first of all I would like to support the motion of

20  thanks to both of you for sitting through a very long day

21  and for obviously giving this matter great attention.  It's

22  Peter Linder on behalf of Calpine Power L.P.  And my

23  instructions are immediately seek leave to appeal the order

24  that's been granted today by this court, and to expedite an

25  appeal forward of it.

1        As such, My Lady, under the practice of the

2   court and under Rule 341 of the overall rules court, the

3   practice is first to seek an appeal or to seek a stay of

4   your order on the basis that in the absence of a stay, any

5   appeal would be rendered nugatory.

6        My Lady, as you are likely aware, the test

7   for stay pending appeal is tripartite test.  I have an

8   excerpt for action both under Rule 340 and under Rule 508

9   that perhaps I can just hand up.

10        MR. CARFAGNINI:  Perhaps I can get

11   clarification.  My friend is seeking the stay from this

12   court today, or advising this court that he's going to be

13   seeking a stay from the Court of Appeals.

14        JUSTICE ROMAINE:  Mr. Linder, do you want

15   to answer that?

16        MR. LINDER:  May I answer?

17        JUSTICE ROMAINE:  Go ahead.

18        MR. LINDER:  My Lady, Rule 341 of the

19   overall rules of the court allow us to seek a stay

20   initially from this court, the court that granted the

21   order --

22        JUDGE LIFLAND:  May I interject?

23        As far as I know, the order has not been

24   signed by either court.  And it is, under our procedure,

25   that you appeal from an order.

1    MR. LINDER:  Quite so, your Honor.

2  However, under our practice, we would typically raise this

3  issue at the earliest possible time, and we would seek a

4  stay from the judge that granted the order.

5    JUSTICE ROMAINE:  Two things.  Thank you,

6  Judge Lifland.

7    I think what I would like to do is finish

8  the procedure with respect to the orders and the business

9  that we have today.  I understand the necessity of you

10  bringing your application for a stay quickly.  I doubt that

11  Judge Lifland needs to be part of that, so after we've

12  finished with the orders, let's finish this cross-border

13  joint hearing and then I'll hear you on the stay, Mr.

14  Linder.

15    MR. LINDER:  Thank you, My Lady, that's

16  more than fair.

17    JUSTICE ROMAINE:  Thank you.

18    MR. SELIGMAN:  Your Honor, David Seligman.

19  We're going to finalize the orders and circulate them both

20  to chambers most likely first thing in the morning.  So we

21  will send those over as soon as we are done with those.

22    And I would like to express, Mr. Carfagnini

23  beat me to the punch, but I would like to express my thanks

24  especially to the court and their staff for staying late on

25  a Tuesday.

1               JUDGE LIFLAND:  Very well, thank you all.

2               JUSTICE ROMAINE:  Okay, thank you.  Thank

3  you, Judge Lifland.  And I gather that perhaps I'll see the

4  order in the morning as well, Mr. Meyers?

5               MR. MEYERS:  There's still some changes on

6  the ULC1 provisions of the settlement of the global order.

7  The other two orders, the bond sale and the agreement sale

8  order, have no changes.

9               JUSTICE ROMAINE:  I'm prepared to grant

10  those orders today.

11               Judge Lifland.

12               JUDGE LIFLAND:  As am I.

13               JUSTICE ROMAINE:  Okay.  And I think we're

14  done with the joint portion?

15               JUDGE LIFLAND:  I think this joint hearing

16  is concluded, and I thank you all.

17               JUSTICE ROMAINE:  Thank you, Judge Lifland.

18               (Time noted:  8:00 p.m.)

19

20

21

22

23

24

25

```
 1                    C E R T I F I C A T E

 2

 3    STATE OF NEW YORK        }

                              }     ss.:
 4    COUNTY OF WESTCHESTER    }

 5

 6              I, Denise Nowak, a Shorthand Reporter

 7         and Notary Public within and for the State of

 8         New York, do hereby certify:

 9              That I reported the proceedings in the

10         within entitled matter, and that the within

11         transcript is a true record of such proceedings.

12              I further certify that I am not

13         related, by blood or marriage, to any of the

14         parties in this matter and that I am in no way

15         interested in the outcome of this matter.

16              IN WITNESS WHEREOF, I have hereunto

17         set my hand this _____ day of

18         _____, 2007.

19                    Denise Nowak

20         _____

                    DENISE NOWAK
21

22

23

24

25
```

Digitally signed by Denise Nowak
DN: cn=Denise Nowak, c=US
Reason: I am the author of this document
Date: 2007.08.30 15:15:04 -04'00'