**EXHIBIT A-2**

**Fifth Affidavit In Support of Application**

**COMMONWEALTH OF THE BAHAMAS**                    **2022**

**IN THE SUPREME COURT**                    **COM/com/00060**

**COMMERCIAL DIVISION**


**IN THE MATTER OF the Digital Assets and Registered Exchanges Act, 2020 (as amended)**

**AND IN THE MATTER OF the Companies (Winding Up Amendment) Act, 2011**

**AND IN THE MATTER OF FTX DIGITAL MARKETS LTD.**

(A Registered Digital Asset Business)

---

### FIFTH AFFIDAVIT OF BRIAN C. SIMMS KC

---

I, **BRIAN SIMMS KC,** of 3 Bayside Executive Park, West Bay Street and Blake Road, Nassau, N.P., The Bahamas make Oath and Say as follows:

**Introduction**

1.    Kevin G. Cambridge, Peter Greaves, and I are the duly appointed joint provisional liquidators ("**JPLs**" or "**Joint Provisional Liquidators**") of FTX Digital Markets Ltd. ("**FTX DM**"), a company incorporated in the Commonwealth of The Bahamas and operating as a digital assets business under the Digital Assets and Registered Exchanges Act, 2020 (as amended) (the "**DARE Act**").

2.    I make this affidavit in support of the JPLs' application for directions pursuant to the Companies Liquidation Rules, 2019, O.4, r.5(2) in relation to a number of issues that have arisen concerning the rights and obligations of FTX DM as explained in more detail below.

3.    The facts and matters referred to herein are, unless otherwise stated, within my own knowledge or are obtained from documents in my possession or the legal team at Lennox Paton or investigations carried out by, or on behalf of, the JPLs in relation to the affairs of FTX DM and are true to the best of my knowledge, information and belief.  Those investigations are on-going.  Nothing in this affidavit is intended to, or does, waive any legal professional or other privilege of FTX DM.

4.    There is now produced and shown to me marked **"BCS-1"** a paginated bundle of documents to which I shall refer in the course of my affidavit. References to page numbers in this affidavit are references to page numbers in the said paginated bundle unless otherwise stated. The directions sought by the JPLs concern (i) the parameters of the FTX DM estate; (ii) the rights and obligations of the JPLs in relation to the FTX DM estate;  (iii) who the users/customers of FTX DM are; (iv) the nature of the rights and obligations of the users/customers of FTX DM, including in particular are the FTX DM customer creditors of FTX DM or beneficiaries of assets held on any trust by FTX DM; and (v) the relationship of the users/customers of FTX DM to each other and/or other creditors or stakeholders of FTX DM.

5.    The directions sought by the JPLs are central to the provisional liquidation of FTX DM. In the absence of directions from this Honourable Court the provisional liquidation cannot be satisfactorily progressed as required by the orders made by this Honourable Court.

6.    The JPLs acknowledge that one or more of the issues raised by this Summons may touch on issues arising in the estates of the Chapter 11 Debtors and that they may seek the determination of those issues in the Delaware Bankruptcy Court. Should a conflict arise between directions given to the JPLs by this Honourable Court in relation to the FTX DM estate and any determination by the Delaware Bankruptcy Court in relation to the Chapter 11 Debtor estates, it may be necessary in due course for judicial communications to take place between this Honourable Court and the Delaware Bankruptcy Court pursuant to the Judicial Insolvency Network or other guidelines in order to resolve any conflict.

7.    At this stage, however, the JPLs seek directions in relation to the further conduct of the provisional liquidation of FTX DM and on matters which are overwhelmingly likely to be governed by English law, the laws of The Bahamas or possibly the laws of Antigua and

Barbuda. The issues are complex and might well be subject to appeal from this Honourable Court to, eventually, the Privy Council. The Privy Council is the final court of appeal from the Courts of The Bahamas and Antigua and Barbuda. Rulings of the Privy Council on English law are also, in effect, final, because the justices of the Privy Council also sit as justices of the Supreme Court of England, Wales and Northern Ireland and, therefore, are highly unlikely to reach different conclusions on the same issues. The JPLs desire that the issues raised by this Summons are determined by this Honourable Court, being the Court with the conduct of the provisional liquidation of FTX DM and the Court from which, if necessary, an appeal will ultimately lie to the Privy Council with final authority to determine these issues.

8. The JPLs have had several conversations with Counsel for the Securities Commission of The Bahamas (the "**SCB**") in relation to when the JPLs would make an application to determine the ownership of the digital assets currently held by the SCB. The SCB has been concerned about the administrative costs of holding the digital assets and wishes to have the ownership issue resolved.

9. The Supplemental Order of the Court filed on 21 November 2022 in a separate Action brought by the SCB (Supreme Court Action No. Com/com/  of 2022) provided that the SCB shall be regarded as acting as trustee in the administration of trust assets within the meaning of the Trustee Act, for the benefit of the clients and/or creditors of FTX DM, pending directions for the continued safe custody of the said assets issued by this Honourable Court to the JPLs and/or the Commission in the proceeding for the winding-up of FTX DM or further order.

10. The JPLs consider that in the event an application by the SCB was made it would be likely to cover a narrower range of issues than the Summons, leading to a fragmentation of issues and possible duplication. Accordingly, another reason for the issue of this Summons now is to address issues of concern to the SCB which the SCB desire to be resolved.

## Background

11. FTX DM is a company within the meaning of the Companies (Winding Up Amendment) Act, 2011 and is in provisional liquidation in the Commonwealth of The Bahamas pursuant to a petition for the winding up of FTX DM presented on 10 November 2022 by

SCB which was accompanied by an application to appoint a provisional liquidator. On 10 November 2022 the Honourable Mr. Chief Justice Winder of the Supreme Court of the Commonwealth of The Bahamas made an order appointing me as a provisional liquidator of FTX DM. On 14 November 2022, on my application the Honourable Mr. Chief Justice Winder appointed Mr. Kevin G. Cambridge and Mr. Peter Greaves as additional provisional liquidators. The orders of appointment are at **BCS-1**, pages **[1] to [8]**).

12.     At the time of appointment of the JPLs, FTX DM was registered to provide, and was providing, services on an on-line "*cryptocurrency derivatives exchange*" platform, (the "**FTX International Platform**").   FTX DM has been registered to provide such services since 10 September 2021.

13.     On 11 and 14 November 2022, companies (other than FTX DM) in the FTX group (the "**Chapter 11 Debtors**"), filed in the United States Bankruptcy Court for the District of Delaware (the "**Delaware Bankruptcy Court**") voluntary petitions (the "**Chapter 11 Cases**") for relief under title 11 of the United States Code 11 U.S.C. §§101 *et seq* (the "**US Bankruptcy Code**"). The names of the Chapter 11 Debtors are contained in Annex A at pages **[9]-[11]** of Exhibit **BCS-1** and a group structure chart of the FTX group prepared by the US Debtors (not the JPLs) is at page **[12]** of Exhibit **BCS-1.**

**The Summons for Directions**

14.     There are a number of issues pertaining to the rights of FTX DM, including in respect of its customers (the "**customers**",  "**Customers**", or "**Users**"), which give rise to issues of fact and law in respect of which the JPLs respectfully seek this Court's guidance.

15.     The directions sought are as follows:

(1)     How the amendment of the applicable FTX Terms of Service (the "**ToS**") dated 28 February 2022 (the "**Feb ToS**") was effected (if it was) into the form of the ToS dated 13 May 2022 (the "**May ToS**"), and if so from what date did such amendment take effect?

(2)     What is the applicable governing law by which the questions set out at paragraph (1) fall to be determined?

(3)    Whether, in the events that have happened, on a proper construction of the applicable FTX ToS, and applying the applicable governing law:

    (a)    Users of the FTX International Platform were migrated to FTX DM as from the effective date of the May ToS for each such User (or any other date, and if so which);

    (b)    those Services listed in Schedules 2, 3, 4, 5 6 and 7 to the May ToS (the "Schedules") were from that effective date (or any other date, and if so which) provided by FTX DM under the May ToS;

    (c)    the rights and/or obligations in respect of the Account(s) for each User (each as defined in the relevant ToS) were from that effective date (or any other date, and if so which) rights and/or obligations of FTX DM under the May ToS (in whole or in part, and if in part, in what part);

    (d)    digital assets and/or fiat transferred by Users to the FTX International Platform were from that effective date (or any other date, and if so which) assets and/or fiat of FTX DM in law (whether transferred before or after that date); and

    (e)    digital assets and/or fiat presently held, or as may be held in the future, in the name of FTX DM are assets and/or fiat of FTX DM in law?

(4)    In what capacity does FTX DM hold any digital assets and/or fiat ("asset"). In particular:

    (a)    what is applicable governing law ;

    (b)    does FTX DM hold such assets for its own account or on trust;

    (c)    if FTX DM holds any such assets on trust:

        (i)    what assets are subject to the trust;

        (ii)    how much flexibility does FTX DM as trustee have, for example:

          (A)      is there a requirement to segregate that asset;

          (B)      is there a right to use that asset for any purpose;

    (iii)      is the trust over a fluctuating pool of assets for the benefit of all Users of FTX DM as co-owners as well as FTX DM itself to the extent that any of its assets are within such pool;

    (iv)      does each User have the right to trace their property into specific assets held on trust; and

    (v)      what rights do Users have against FTX DM in respect of shortfalls in the assets held on trust; and

  (d)      can cryptocurrency and/or fiat be held by FTX DM as bailee?

(5)      Whether the counterparty in respect of perpetual future contracts who transacted on the FTX International Platform on or after 13 May 2022 was FTX DM, a User or someone else (and if so who)?

(6)      For the purposes of determining the questions set out at paragraphs (1) to (5), a direction pursuant to CPR Part 21.4, that one or more persons who have an interest in the determination of the questions in this Summons be appointed for the purposes of making representations to the Court.

16.     This affidavit is divided into the following sections:

(1)      Brief overview of digital assets

(2)      The history of FTX.com

(3)      Transfer of fiat to (or from) the FTX International Platform (before migration)

(4)      Transfer of digital assets to (or from) the FTX International Platform

(5)      FTX private keys

(6)      Transactions in digital assets on the FTX International Platform

(7)     Migration to The Bahamas (including incorporation of FTX DM and its registration under the Digital Assets and Registered Exchanges Act, 2020 ("**DARE Act**")

(8)     FTX customer KYC update

(9)     Company bank accounts used for the FTX International Platform

(10)    Amendments to the Feb ToS

(11)    Role of FTX DM in relation to the Specified Services

(12)    Obligor in respect of Users' Accounts

(13)    Owner of assets (digital assets and fiat/account debts)

(14)    Rights of owner to use such assets

(15)    Nature of the rights of Users

(16)    Appointment of representative parties.

17.    Certain of the matters summarised above are dependent upon legal analysis. This affidavit does not seek to set out the detail of that legal analysis, but indicates the broad outlines of it, which will be expanded upon in due course.

18.    At this time the JPLs have access to limited information but we envisage obtaining more information in relation to FTX DM held on Amazon Web Services ("**AWS**") and Google Workspace servers, currently in the control of the Chapter 11 Debtors or one or more of them. While the Chapter 11 Debtors have recently shared substantial data pursuant to the Cooperation Agreement entered into by the JPLs and the Chapter 11 Debtors dated 6 January 2023 and approved by this Court on 10 February 2023, such data is still being evaluated. This process may take another month. Unfortunately, the Chapter 11 Debtors have not yet made available any of FTX DM's emails or slack messages to which the JPLs believe they are entitled. Pending receipt and consideration of further information from the Chapter 11 Debtors, this affidavit sets out the factual position to the best of the JPLs' present understanding. Upon receipt and review of the further information that the JPLs

7

expect the Chapter 11 Debtors will make available to them, the JPLs anticipate further evidence being filed in relation to the matters which are the subject of this affidavit.

**(1) Brief overview of digital assets**

19.   Digital assets are increasingly important in modern society. They are used for an expanding variety of purposes — including as valuable things in themselves, as a means of payment, or to represent or be linked to other things or rights — and in growing volumes, *See* pages [x]-[x] of Exhibit **"BCS-1"**.

20.   Perhaps the most well-known digital asset is Bitcoin. Although often spoken about as if it were a "coin", it is at base just a ledger entry – a ledger entry on a public electronic ledger maintained on a decentralised basis by a self-defining group of computers which co-ordinate with one another through the application of particular software code. That code aims to ensure that in practice there is only one accurate copy of the ledger, which is achieved through cryptography and the application of "game theory". The ledger is made up of blocks of data comprising transactions in Bitcoin, and when new transactions occur they are gathered together in a new block of data which then supersedes the previous one in the chain, with one block in the Bitcoin blockchain being added approximately every 10 minutes. The ledger of Bitcoin transactions is therefore commonly called a "blockchain", and transactions in Bitcoin reflected in that ledger are commonly called "on-chain" transactions.

21.   An on-chain transaction of, for example, the transfer of one Bitcoin from X to Y will at its simplest involve the following: X's Bitcoin will be recorded on the ledger as being held at a particular "public address" specified on the blockchain. That public address (sometimes called a "public key") is a string of 64 hexidecimal characters (0-9 and A-F), which does not name X. However, X can prove to Y that X owns that Bitcoin because X controls the "private key" necessary to authorise transactions in that Bitcoin held at that public address. The "private key" is like a password, and is another string of 64 hexidecimal characters. To effect the transaction, Y will give X the "public address" to which Y wishes the Bitcoin to "move" – that is, so that the next published block on the blockchain then shows that that Bitcoin is no longer held at the public address to which X controls the relevant private key, but is now held at another public address, being the public address nominated by Y. One assumes that Y controls the relevant private key of the public address nominated by Y (although it could be possible for Y to "give it away"

8

by transferring it to a public address to which a third party controls the private key).[1] Once X has the public address nominated by Y, then X can authorise that "transfer" (the publication of a new block with Bitcoin being recorded on the ledger as being held at the public address nominated by Y) by "signing" the transaction through application of X's private key. This is discussed further, in relation to the FTX International Platform, in Section 6 below.

22.    In practice, parties can and do also agree to transfer digital assets between themselves without involving the blockchain at all – often referred to as "off-chain" transactions. So, for example, X may simply agree by contract to transfer X's Bitcoin to Y. There is a question as to how this contract would be performed, but it would be possible for X to provide control over the private key relating to the public address at which that Bitcoin is recorded on the ledger to Y, so that Y then controls the relevant private key (for instance, if the private key is saved onto a usb drive, X could physically transfer the usb drive to Y). This is discussed further, in relation to the FTX International Platform, in Section 6 below.

23.    The question as to whether Bitcoin, and other digital assets like it, are "property" for the purposes of law, and if so, who owns such property, are questions of legal analysis which are beyond the scope of this affidavit. However, currently the weight of English judicial authority and commentary (including influential analyses by the Law Commission of England and Wales) is that digital assets like Bitcoin are "property". Moreover, English and some Commonwealth case law recognises that it is property which can be held on trust – that is, it is property which satisfies the "first certainty" of the "three certainties" for the voluntary creation of a trust: it is subject-matter which is sufficiently certain to be able to be held on trust.

24.    However, it is thought that the relevant private key is not itself property but is just a piece of information (the relevant 64 hexidecimal string) that gives access to the property that is the digital asset.

25.    In this affidavit, I use the term "**digital assets**" to refer to what is commonly called "cryptocurrency", "cryptotokens", "cryptocoins", "tokens", "coins" and "virtual assets",

---

[1] If Y did not want to "give it away" but simply got his public address wrong by mistake, such that Y does not control the private key of the incorrectly specified public address, then Y would "lose" the Bitcoin entirely.

and all tokens or coins accepted on the FTX International Platform, including FTT and Serum, two particular tokens created by entities related to FTX DM.

26.    Fiat currency – that is, currencies issued by (or under the authority of) sovereign states – will be referred to as "**fiat**".

### (2) The history of FTX.com

27.    FTX Trading Ltd ("**FTX Trading**") was incorporated on 2 April 2019, and is a company organized under the International Business Company Act, CAP. 222 of Antigua and Barbuda (the "**Antigua Act**"). At page **[13]** of Exhibit **"BCS-1"** is a copy of FTX Trading's Certificate of Incorporation.

28.    Immediately following its formation, FTX Trading was then based in the Hong Kong Special Administrative Region of China ("**HKSAR**"), where the FTX group was headquartered. Its business was the provision of the FTX International Platform on the FTX.com website.

29.    By 2021, a US version of the FTX Platform (the "**US Platform**") had been created which was directed towards US users, as the original FTX Platform barred US users (and users from certain other jurisdictions). The original FTX platform, running via the FTX.com website, therefore became the digital asset exchange platform for all users located outside the United States (the FTX International Platform). Based on analysis of platform data reviewed to date, by 2022, over 9 million customers had Accounts on the FTX International Platform and on the US Platform, with most (possibly more than 7.5 million) being customers of the FTX International Platform. Issues arising from this Summons concern only the FTX International Platform.

30.    The FTX International Platform permitted non-U.S. customers to engage in various trading activities, including spot trading of supported digital assets, spot margin trading, settlement of over-the-counter (or "off-exchange") trades directly between users, trading in various derivative contracts, including futures (including in particular "**perpetual futures**"), call and put options, so-called "volatility" contracts (the value of which was tied to the overall price movements during a specified period for specified assets), "leveraged" tokens (i.e., tokens evidencing leveraged positions in relation to a futures contract), "volatility" tokens and trading in "non-fungible tokens" or NFTs, *See pages [x]-[x]* of Exhibit **"BCS-1"**

31.  A description of how trades were carried out on the FTX International Platform is given in Section 6 below.

32.  An early description of the FTX International Platform is that set out in the FTX White Paper dated 25 June 2019 at pages **[14]-[22]** of Exhibit **"BCS-1"**.

33.  Prospective users of the FTX International Platform would have to register on the FTX.com website.  US customers were not able to open accounts on the FTX International Platform, therefore the FTX International Platform never provided services to US customers.  The process of that registration entailed such registered users accepting the then-current ToS.

34.  Those ToS referred to accounts maintained on the FTX International Platform in those Users' names into which both fiat and digital assets could (subject to the following) be credited or debited ("**Accounts**").

35.  The earliest ToS did not permit Users to transfer fiat to the FTX International Platform. The Accounts therefore would only have credits recorded in digital assets.  At pages **[23]-[41]** of Exhibit **"BCS-1"** is a copy of the earliest ToS from March 2020.  That is not surprising since, originally FTX Trading did not have a fiat bank account to which users of the FTX International Platform could be directed when transferring fiat.

36.  By amendment to the ToS dated 3 December 2021, FTX Trading stated that the FTX International Platform did then "support" various fiat.  At pages **[42]-[59]** of Exhibit **"BCS-1"** is a copy of the 3 December 2021 ToS.

## (3) Transfer of fiat to (or from) the FTX International Platform – the "fiat@ftx.com" account

37.  From a point in time that is presently unclear to the JPLs, but may in fact have pre-dated the 3 December 2021 amendment to the ToS, Users who wished to transfer fiat onto the FTX International Platform were directed to transfer fiat in USD (and possibly other currencies) to an account, or possibly a number of accounts, in the name of Alameda Research Ltd ("**ARL**"), Alameda Research LLC ("**ARLLC**", parent of ARL) or other subsidiaries of ARLLC (the "**Alameda Bank Account**", and the account-holder of that account or those accounts, the "**Alameda Account-holder**").  ARLLC is wholly owned by Sam Bankman-Fried ("**SBF**"), Gary Wang and Nishad Singh (all three, the "**Co-**

11

**founders**"). The Alameda Bank Account was, it seems, maintained with Silvergate Bank.

38. The fiat received in the Alameda Bank Account was not then transferred as a matter of course to FTX Trading. Rather such receipts were simply reflected as debits in an account on the FTX International Platform designated as "**fiat@ftx.com**". It is a matter of legal analysis what that evidences, but it would appear to evidence at least a liquidated debt owing by ARL to FTX Trading. In addition, given the circumstances in which Users transferred fiat to ARL, it is possible that the Alameda Account-holder held such fiat under some form of trust, for FTX Trading and/or those Users.

39. Upon each such receipt of fiat from Users into the Alameda Bank Account, the Alameda Account-holder would notify FTX Trading, so as to enable FTX Trading then to credit the transferor User's Account on the FTX International Platform. It is a matter of legal analysis whether the credits recorded in those Accounts evidenced a liquidated debt owing from FTX Trading to those Users or something more (that is discussed in Section 15 below).

40. Requests from Users to withdraw fiat standing to the credit of their Accounts, would trigger a request to the Alameda Account-holder to transfer that amount back to the User.

41. There is also evidence that an account with Silvergate Bank in the name of West Realm Shires Services Inc ("**West Realm**") was opened in about April 2021 and used to receive USD from at least some Users of the FTX International Platform. (West Realm is a subsidiary of West Realm Shires Inc, 77.75% owned by the Co-founders. West Realm was the operator of the US Platform).

42. In fact, the FTX International Platform treated USD fiat as fungible (interchangeable) with certain USD-linked stablecoins, in particular USDC (USD Coin), BUSD (Binance USD), USDP (USD Paxos), GUSD (Gemini USD) and TUSD (True USD), and a User who had a credit balance in the User's Account in USD fiat, could choose to withdraw the equivalent amount in any of those USD stablecoins, or vice versa.

43. Transfer of fiat to the FTX International Platform from the second half of 2021 is discussed in Section 9 below.

**(4) Transfer of digital assets to (or from) the FTX International Platform**

12

44. When a User wished to transfer digital assets to the FTX International Platform, the User would make a transfer request by selecting various options on the website of the FTX International Platform, and then the code on which the FTX International Platform runs would generate a unique public address on the relevant blockchain for the particular digital asset to be transferred.

45. Upon the digital asset being received at that public address, the code running the FTX International Platform would then credit that User's Account on the FTX International Platform with the same amount of digital assets. (The question of the nature of the User's rights in respect of credit balances in the Account is dealt with in Section 15 below.)

46. Turning back to the public address at which the digital assets were sent by the User: the private key associated with that public address was controlled entirely by code which ran the FTX International Platform and by individuals who, the JPLs' investigations so far reveal, were all based in the HKSAR until they re-located to The Bahamas and became employees of FTX DM in late 2021/early 2022.

47. It would appear that when a User effected an on-chain transfer of a digital asset to that public address generated by the FTX International Platform for the receipt of digital assets, that constituted (at least – but subject to the discussion in Section 15 below) the transfer of full legal title to the digital asset away from that User.

48. Once that digital asset was received at that public address, if the digital asset was something other than Bitcoin, then the balance of each such public address was regularly "swept" into one or more "omnibus accounts" – that is, it was transferred on the relevant blockchain from that initial public address which had been generated for just one User to a public address used by the FTX International Platform for the holding of digital assets of that type from multiple Users. As a consequence, the transferring User's digital assets were then mixed in that "omnibus account".

49. If the digital asset was Bitcoin, however, it would remain in an initial public address (because the transaction costs of a sweep of Bitcoin made it inefficient) but all such public addresses would be treated as if they were a single mixed fund of Bitcoin transferred by any User. Withdrawal requests by a User in respect of Bitcoin would be fulfilled by the transfer of any Bitcoin, not necessarily the same Bitcoin that that User may have originally transferred nor even from the same public address into which that User may

13

have originally transferred Bitcoin. All such public addresses would be controlled by a small number of private keys.[2]

50. Where a User wished to transfer digital assets standing to the credit of the User's Account off the FTX International Platform, the User would have to supply a public address to which that transfer could be made on-chain, and the transaction would be signed by application of the relevant private key held in the FTX International Platform's code.

## (5) FTX private keys

51. The private keys for each of the "omnibus accounts" (at least one for each digital asset type for each blockchain) and each Bitcoin public address would be held on-line in a way in which the code could access, so that transactions requested on the FTX International Platform's website (principally, withdrawal requests) could be automatically executed (and approved by the application of the relevant private key). These "omnibus accounts" and Bitcoin public addresses were regarded as "hot wallets" since their private keys were held on-line.

52. Not all transactions could be executed automatically. The code had some in-built thresholds (such as size of transaction) which would require manual intervention by individuals before the transaction was executed.

53. If the aggregate of digital assets held in these hot wallets exceeded a certain amount, the excess would be transferred into "warm wallets". In practice these warm wallets would only hold Bitcoin, Ether, and FTT since the holding in other digital assets never triggered a transfer out of the hot wallets.

54. The warm wallets were other public addresses on the relevant blockchains, where the relevant private keys were not directly accessible by the code on which the FTX International Platform ran, but the private keys were in the control of the Co-founders. Those private keys were however still kept on line albeit in an encrypted form.

55. There were also "cold wallets" which held excess Bitcoin, Ether and FTT, where again the private keys were only accessible by the Co-founders, albeit that those private keys were (despite the designation as "cold") kept on-line in an encrypted form. The JPLs are still

---

[2] This is technically possible because the public address/private key pair is in fact always generated starting from a private key, and a private key can generate a number of public addresses controlled by the same private key.

investigating how in practice the warm and cold wallets differed from each other in practice.

56.    In practice, if a hot wallet was short of a digital asset which a User had requested be withdrawn, then rather than the warm or cold wallets being drawn on, a "Slack"[3] message would be sent by the FTX settlement team to (among others) Alameda (it is not clear whether this was ARLLC, ARL or another subsidiary of ARLLC), and the Alameda entity would transfer to the hot wallet the requisite quantity of digital assets. It does not appear that a fee was charged for providing this service.

## (6) Transactions in digital assets on the FTX International Platform

57.    Transactions in digital assets on the FTX International Platform, or transactions from fiat to digital assets or digital assets to fiat on the FTX International Platform, would typically be executed simply by way of debit and credit entries to the relevant Users' Accounts on the platform. There would not be any matching transactions on the chain to mirror those recorded in the Accounts.

58.    Some of the transactions were "futures" which would not involve the spot exchange of fiat or digital asset for other digital assets, but rather were contracts entered into on terms set out on the FTX International Platform's website. The JPLs are still investigating the pattern of trading on the FTX International Platform but at present believe that the "perpetual future" was the service which generated the most income and volume on the FTX International Platform.

59.    It is a question of legal analysis of the May ToS and the LTB Collateral Agreement (defined below), in light of the relevant factual background and any relevant market practice, whether such perpetual futures were contracts between a User and another User, or between a User and FTX DM which provided that service.

60.    What is clear, however, is that futures trading like this required Users to post margin – that is, subject digital assets which they had standing to the credit of their Account to a security arrangement in favour of the counterparty to that futures trade (whoever that counterparty was).

---

[3] Third party messaging service.

61.  On 1 June 2020, FTX Trading and LT Baskets Ltd (a company incorporated in Antigua and Barbuda) ("**LTB**") (now a Chapter 11 Debtor) entered a Collateral Agreement relating to the holding of collateral that Users would have to provide in respect of leveraged and margined products on the FTX International Platform (the "**LTB Collateral Agreement**"). This provides that when a User was required to post margin, FTX Trading would transfer certain tokens to LTB, who would hold them on behalf of the counterparty in whose favour that margin was being posted. It would appear that, once margin was posted and the digital assets transferred to LTB, LTB held them on trust for the User's counterparty. At pages **[141]-[144]** of Exhibit **"BCS-1"** is a copy of the LTB Collateral Agreement.

## (7) Migration to The Bahamas

62.  In 2020, The Bahamas adopted a licensing and regulatory regime for the digital asset industry pursuant to the DARE Act.

63.  On 22 July 2021, FTX DM was incorporated in The Bahamas.

64.  In August 2021, FTX DM prepared a document entitled "FTX Digital Markets Limited Customer Migration Plan" (the "**Migration Plan**"), which stated that the objective was "*to migrate customers to its business from FTX* [Trading]". The Migration Plan envisaged KYC on-boarding and new terms of service. "*Front end and back end systems should also reflect a shift of activity to FDM as smoothly as possible, subject to regulatory consideration*". The Migration Plan also envisaged that users of the FTX International Platform would be required to accept the new terms of service, and that the migration would be complete by 2023, but with all "institutional" users being migrated by Q2 2022. At pages **[145]-[149]** of Exhibit **"BCS-1"** is a copy of the Migration Plan.

65.  On 10 September 2021, FTX DM was registered as a digital asset business under the DARE Act. FTX DM was the only FTX entity licensed to run a digital assets business under the DARE Act and it was licensed to carry out the majority of the products on the FTX International Platform. On 10 November 2022, the SCB suspended FTX DM's registration.

66.  On 20 September 2021, SBF, the 100% owner of Paper Bird Inc, which was the 75% owner of FTX Trading, announced that "FTX" would be moving the headquarters of the FTX International Platform from the HKSAR to The Bahamas. Four days later, SBF re-

16

emphasized the relocation by tagging the official FTX twitter account and stating "[w]*e're really excited to be setting up @FTX_Official's headquarters in the Bahamas*!" At pages **[150]-[151]** of Exhibit **"BCS-1"** are copies of the tweets from SBF.

67.    The incorporation of FTX DM and the move of the Co-founders to The Bahamas was principally in order to bring the FTX International Platform under the regulatory regime of the DARE Act.

68.    The first employee of FTX DM was employed in September 2021.  The Co-founders became employees of FTX DM, as did approximately 80 other individuals working for FTX DM in The Bahamas.

69.    In October 2022, *The Bahamas Tribune* reported that FTX DM's headquarters would be located on a "*4.95 acre site, located between Bayside Executive Park's existing buildings and the Orange Hill Beach Inn, will feature two boutique hotel buildings covering a total 77,000 gross square feet and spanning seven levels, with parking area 51,000 gross square feet in size. Residential and office spaces, also spread over seven levels, will cover 116,000 gross square feet and be accompanied by a 205,000 square feet parking area.*" Additionally, it stated that "[o]*ther planned facilities include an athletic and wellness area; a theatre; auditorium; conference centre; café/restaurant; retail; a daycare centre; and 'vertical farm'.*" At pages **[152]-[153]** of Exhibit **"BCS-1"** is a copy of The Bahamas Tribune article.

70.    The Bahamas Tribune further reported that eventually "*a total of 700 employees will work at the office building, of which 38 are expected to be housed in the boutique hotel and condo hotel. The remaining 662 employees are expected to live off-campus and commute to work.  Large events will also be held at the conference centre and auditorium on a quarterly basis, which are expected to draw up to 800 additional guests to the site.  The campus is expected to be fully built-out by 2025.*" Further, "[t]*he proposed development will include a total of 612 parking spaces: Twenty-five spaces for the hotel, 75 spaces for the condo hotel and the remaining 512 spaces for the office/convention buildings.*"

71.    The Bahamas Tribune stated that the campus headquarters would cost about $60 million, and it published the proposed site plans that had been submitted to the

17

Department of Physical Planning. At page [**154**] of Exhibit **"BCS-1"** is a copy of the proposed site plans.

72.    While this campus development was underway, employees of FTX DM worked from nearby offices at Veridian Corporate Centre.

## (8) FTX customer KYC update

73.    S. 5(1)(a) of the Register of Beneficial Ownership Act 2018 in The Bahamas requires KYC details of UBOs holding interests of 10% or more in a corporate User, whereas before the migration and when FTX Trading was the relevant FTX entity operating in the HKSAR, only KYC details of UBOs of corporate Users who had interests of 25% or more in a User were obtained.

74.    The migration process, therefore, required the manual review of all KYC details held for corporate Users to check whether they already contained KYC for UBOs who had interests of 10% or more (which could incidentally have been obtained when previously obtaining KYC for UBOs with 25% or more).  If KYC records were incomplete, then individual corporate Users were contacted and asked for the additional information.  If that additional information was not forthcoming, then those corporate Users' Accounts should and would (to the best of JPLs' current knowledge) be closed.  There was no possibility of Users remaining Users on the FTX International Platform unless the Bahamian KYC regulations were adhered to.

75.    It would appear that the only purpose behind this KYC updating process was to enable existing Users of the FTX International Platform to become customers of FTX DM.

## (9) Company bank accounts used for the FTX International Platform

76.    Prior to November 2021, FTX Trading had set up a USD bank account with Signature Bank, which was used to receive and send USD fiat from and to Users of the FTX International Platform, especially in 2022.

77.    However, in or around November 2021, FTX DM (not FTX Trading) opened accounts in USD, CAD, SGD, HKD, EUR, GBP and CHF with Equity Bank Bahamas (the "**Equity Bank Accounts**").  The Equity Bank Accounts were marked as "client accounts", but there is evidence which makes it unclear as to the weight to be put upon those words.

18

However, only the accounts denominated in CAD and GBP appear to have been used, and then only to fund withdrawals. Withdrawals from those Equity Bank Accounts in those currencies were then reflected as debits to that User's Account on the FTX International Platform in the relevant currencies. The JPLs understand that, although the Equity Bank Accounts were opened, they were not used to any significant extent by the FTX International Platform.

78.    In the meantime, in January 2022, FTX DM opened USD bank accounts in its name (the "**USD Silvergate Accounts**") at Silvergate Bank. The USD Silvergate Accounts comprised an account titled the "USD Custodial Account" (the bank statements for which included in their heading: *"For exclusive benefit of its customers"*) and an account titled the "USD Network Account" which was designated to received fiat from those Users who also had a Silvergate account and who participated in Silvergate's "SEN" programme, allowing for immediate transfers from a User's SEN account to the USD Network Account. ("SEN" refers to "Silvergate Exchange Network" and was an account which allowed account holders to send funds immediately, 24 hours a day, to the account of another SEN account holder, such as FTX DM's USD Network Account.)

79.    From January 2022, it appears that the USD Silvergate Accounts began receiving USD fiat from Users of the FTX International Platform, instead of such fiat being sent to the Alameda Bank Accounts.

80.    Credits to the USD Silvergate Account were then reflected as credits to that User's Account in USD, with deposits into either or both the USD Custodial Account and the USD Network Account appearing as a single USD credit balance in the User's Account on the FTX International Platform. It appears, therefore, that the two USD Silvergate Accounts were treated as a single mixed fund of USD.

81.    At some stage prior to April 2022, FTX DM opened accounts with another financial institution in CAD, EUR, GBP and CHF (the "**FI Accounts**", and together with the Equity Bank Accounts and the USD Silvergate Accounts, the "**Digital Accounts**"). The FI Accounts were marked "FBO" without any express designation as to who they were "for the benefit of".

82.    From at least early April 2022 (in respect of the CAD, EUR and GBP accounts) and from early June 2022 (in respect of the CHF account) those FI Accounts began receiving and

19

holding fiat in those currencies from Users of the FTX International Platform and became the primary accounts for the receipt of fiat, although some fiat was still sent to the Alameda Bank Accounts. Credits to the FI Accounts in those currencies were then reflected as credits to that User's Account on the FTX International Platform in the relevant currencies.

83.    It would appear that the intention behind the opening of all of these bank accounts in FTX DM's name was that the existing Users of the FTX International Platform would become customers of FTX DM.

**(10) Amendments to the Feb ToS**

84.    As noted above, the ToS before 3 December 2021 stated that the FTX International Platform did not accept fiat currency. Aside from that change, the ToS remained the same up to and including the ToS dated 28 February 2022 (the Feb ToS). The Feb ToS made reference to the facilities which the JPLs understand were available on the FTX International Platform for many or most customers:

| Services | Clause/page |
|---|---|
| Convert Digital Asset to another Digital Asset | 5/3 |
| Futures Contracts – quarterly or perpetual | 6/4 |
| Leveraged Tokens | 7/4 |

At pages [60]-[78] of Exhibit **"BCS-1"** is a copy of the Feb ToS.

85.    The Feb ToS were expressed to be governed by the laws of Antigua and Barbuda, and contained an arbitration agreement by which the parties agreed to submit to arbitration in accordance with the Antigua and Barbuda Arbitration Act (Cap 33).

86.    On 13 May 2022 the entirely new May ToS were posted on the FTX International Platform's website. The May ToS were clearly intended to replace the Feb ToS in their entirety. The May ToS set out more Services offered to Users (called Specified Services) and identified which of FTX DM, FTX Trading or LTB would be providing them:

| Service Provider | Specified Service | Sched |
|---|---|---|
| FDM | Spot Market | 2 |
| FDM | Spot Margin Trading | 3 |
| FDM | OTC/OEP Portal | 4 |

| FDM | Futures Market | 5 |
| FDM | Volatility Market (Options Contract) | 6 |
| FDM | Volatility Market (MOVE Vol Contracts) | 7 |
| FTXT | Leveraged Tokens Spot Market | 8 |
| FTXT | Volatility Market (BVOL/iBVOL Tokens) | 9 |
| LT Baskets Ltd | Issuing/redeem    Leveraged/BVOL/iBVOL Tokens | 10 |
| FTXT | NFT Market | 11 |
| FTXT | NFT Listing | 12 |

At pages **[79]-[140]** of Exhibit **"BCS-1"** is a copy of the May ToS.

87.  The May ToS were expressed to be governed by English law, and contained an arbitration clause.

88.  It is a question of legal analysis as to whether, and if so when, the May ToS superseded the Feb ToS. That in part turns on whether the May ToS replaced the Feb ToS as a result of legal novation or an amendment or both, and whether that occurred under powers given under the Feb ToS or the May ToS or both.

89.  It would appear that:

(1)  all Users who registered for the first time after 13 May 2022 were bound by (and only ever by) the May ToS;

(2)  Users who had registered before 13 May 2022 were bound by the May ToS from (at the latest) when they first logged onto the FTX International Platform after 13 May 2022 to use any Service;

(3)  Users who had registered before 13 May 2022 but who never logged onto the FTX International Platform to use any Service after 13 May 2022 remained bound by the Feb ToS.

90.  The explanation why some Specified Services appear to have remained with FTX Trading under the May ToS appears to be that the SCB was not willing for FTX DM as a regulated entity to provide those services. For instance, NFTs fell outside the scope of the DARE Act (s. 3(2)(e)).

21

**(11) Role of FTX DM in relation to the Specified Services**

91.    Some of the Services expressly referred to in the Feb ToS are stated in the May ToS to be provided by FTX DM (spot market, futures market, leveraged tokens). The other Specified Services in the May ToS are not referred to in the Feb ToS at all. The JPLs' investigations are on-going as to the extent to which some, or all, of such services not mentioned were nevertheless provided on the FTX International Platform prior to 13 May 2022.

92.    It is a matter of legal analysis whether Services which, under the Feb ToS, were provided by FTX Trading and which under the May ToS were stated to be provided by FTX DM, were transferred to FTX DM, and if so by what means.

93.    It appears, though, that FTX DM was intended to step into the shoes of FTX Trading in respect of those Specified Services allocated to it, to the extent that, prior to the commencement of the May ToS, they had been provided by FTX Trading. FTX DM was not acting, for example, as agent for FTX Trading, which would have been contrary to the entire purpose of the "migration".

**(12) Obligor in respect of Users' Accounts**

94.    As noted above, in practice any credit balance on a User's Account in fiat gave the User the ability to withdraw that fiat and transfer it to an account off the FTX International Platform. Similarly, any credit balance in a digital asset gave the User the ability to request the transfer of that digital asset to a public address, in respect of which the User held the private key. This gives rise to two questions:

    (1)    who is obliged to transfer that fiat or those digital assets, which is the question addressed in this section; and

    (2)    what is the legal nature of that obligation (is it a personal obligation or a proprietary/trust obligation). That is addressed in Section 15 below.

95.    Under the Feb ToS (and its predecessors) there was only one FTX entity which would have been the obligor under Users' Accounts, being FTX Trading.

96.   Under the May ToS there are two principal obligors:  FTX DM or FTX Trading.  In addition LTB is stated to provide token issuance and redemption services for leveraged tokens and BVOL/iBVOL tokens.

97.   It would appear as regards the Accounts that there is a unified obligation in respect of any one User, and therefore the obligations can only sensibly be owed by *either* FTX Trading or FTX DM, not both.  Furthermore, it is apparent that FTX DM assumed the obligations to Users in respect of the Accounts in light of the matrix of facts surrounding the "migration" including (without limitation):

(1)   that the KYC updating process was only necessary if Users were "migrating" to FTX DM, and the core contractual relationship was in respect of Users' Accounts;

(2)   that, while "Accounts" were not part of the Services or Specified Services, nevertheless the majority of the Specified Services under the May ToS were provided by FTX DM, and the most used Specified Service (perpetual futures) was provided by FTX DM under the May ToS;

(3)   that the FTX group intended to move its headquarters from HKSAR to The Bahamas and to bring itself within the regulation of the DARE Act and the SCB and FTX DM was to be the only regulated entity within the FTX group of companies.  It would have been inconsistent with that intention if the important Account obligations were to remain with the unregulated FTX Trading;

(4)   that the AML/CFT Risk Assessment document dated August 2021 stated (page 3) that "*FDM will operate a digital platform*" and the Marketing Policy dated August 2021 stated (page 7) that "*FDM operates one website ...*" which indicates that it is FTX DM that is principally responsible for the FTX International Platform, and hence for (among other things) the Accounts; and

(5)   (as discussed in Section 13 below) that insofar as FTX DM controlled the private keys to the digital assets which had been transferred by Users to the FTX International Platform, it would be assumed to have ownership of all relevant assets. It would, therefore, have been incongruous if FTX DM did not also have the obligation constituted by the Account to transfer equivalent digital assets to the User upon a withdrawal request.  If FTX DM was the obligor in respect of

digital assets standing to the credit of a User's Account, it would have been similarly incongruous if FTX DM was not also the obligor in respect of fiat standing to the credit of a User's Account. All the more so in circumstances where USD fiat was regarded as interchangeable with certain USD-linked stablecoins.

At pages **[155]-[175]** and **[176]-[185]** respectively are copies of the AML/CFT Risk Assessment and Marketing Policy respective.

## (13) Owner of assets (digital assets and fiat/account debts)

98.    It would appear that the legal owner of digital assets is the person who controls the relevant private key. Prior to late 2021 or early 2022, that was clearly FTX Trading. From at least 13 May 2022, it was FTX DM who owned the digital assets in light of the matrix of facts surrounding the "migration" including (without limitation):

(1)    in August 2021, under the name of FTX DM, a "Safeguarding of Assets & Digital Token Management Policy" (the "**Policy Document**") was drafted which assumed that all relevant assets transferred by Users were held by FTX DM (it does not draw a distinction between new Users and existing Users);

(2)    insofar as the private keys were deployed by the code, then FTX DM clearly had authority to use at least that aspect of the code; and

(3)    insofar as the private keys were in the control of individuals who were based in The Bahamas and employed by FTX DM, then FTX DM had control over the private keys for that reason.

At pages **[186]-[195]** of Exhibit **"BCS-1"** is a copy of the Policy Document.

99.    Once FTX DM opened its own bank accounts, fiat from Users was deposited in those accounts and so FTX DM was clearly the legal owner of those deposits as the account-holder.

100.    As noted above, when Users transferred fiat to the Alameda Bank Accounts, that then constituted a debt from ARL to (originally) FTX Trading. The question is whether that cause of action against ARL then transferred to FTX DM. Since (as set out in Section 12

24

above), it would appear that FTX DM became the obligor under the Accounts in place of FTX Trading, it would be inconsistent with that obligation for the ARL debt not also to transfer from FTX Trading to FTX DM.

## (14) Rights of owner to use such assets

101.   FTX DM in fact:

(1)   mixed digital assets or fiat received from Users with other digital assets or fiat received from other Users; and

(2)   used such digital assets and fiat for its own purposes, without segregating them from its own digital assets/fiat.

It would seem that FTX DM, as legal owner, had the right to so deal with those assets, subject to the rights of Users discussed in Section 15 below.

## (15) Nature of rights of Users

102.   This is a key question for Users, as demonstrated by correspondence received from investors.

103.   It is a matter of legal analysis whether Users' rights against the owner of the digital assets and fiat are personal or proprietary, in light of the relevant factual matrix, including the way in which FTX DM used the digital assets and fiat (see Section 14 above).

(1)   If merely personal rights then:

(a)   in the case of fiat credit balances, they would be to pay fiat as a liquidated debt, in the same way as a bank has a personal obligation to pay a depositor;

(b)   in the case of digital asset credit balances, they would be to transfer to the User equivalent digital assets, in the same way as a counterparty to a repo/repurchase agreement has a contractual obligation to transfer equivalent assets under the "off-leg" of that repo.

(2)   If proprietary rights then:

> (a)    in the case of digital assets, it is a matter of legal analysis whether it is possible for Users:
>
>> (i)    to retain full legal and beneficial title, in the same way that a bailor retains full beneficial and legal title to bailed goods; or
>>
>> (ii)    only to retain a beneficial interest, under a trust; and
>
> (b)    in the case of fiat, whether it is a beneficial interest under a trust.

104.    The situation might differ as between the Feb ToS (and previous ToS) and the May ToS.

105.    The Feb ToS do not contain any express reference to Users retaining any proprietary interest in digital assets or fiat once the User has transferred them to the FTX International Platform.

106.    It is presently unclear if and when the Policy Document was published on the FTX website but it states (among other things) that FTX DM "*will ensure that*":

> (1)    "*Customer assets (both fiat and virtual assets) are segregated from its assets*";
>
> (2)    "*All third-party providers are aware that customer funds do not represent property of FDM* [FTX DM] *and are therefore protected from third-party creditors*"; and
>
> (3)    "*All third-party providers are aware that customer assets are held in trust*".

107.    It states that "*Customer monies will be appropriately ring-fenced to protect from: ... The unlikely event FDM becomes insolvent*".

108.    The May ToS introduced cl 8.2.6 which provides:

> "*All Digital Assets are held in your Account on the following basis:*
>
> *(A)* ***Title to your Digital Assets shall at all times remain with you and shall not transfer to FTX Trading****.* ***As the owner of Digital Assets*** *in your Account, you shall bear all risk of loss of such Digital Assets. FTX Trading shall have no liability for fluctuations in the fiat currency value of Digital Assets held in your Account.*

*(B) **None** of the Digital Assets in your Account are **the property of**, or shall or may be loaned to, **FTX Trading**; FTX Trading does not represent or treat Digital Assets in User's Accounts **as belonging to FTX Trading**.*

*(C) You control the Digital Assets held in your Account. At any time, subject to outages, downtime, and other applicable policies (including the Terms), you may withdraw your Digital Assets by sending them to a different blockchain address controlled by you or a third party."*

109.    It is a question of legal analysis whether it is possible to have a bailment of digital assets and whether the May ToS creates a valid bailment of digital assets.

110.    The Policy Document by contrast implies that a trust of both digital assets and fiat is intended. However, it is at present unclear to the JPLs whether the Policy Document was expressly incorporated into any ToS.

111.    It is a question of legal analysis whether, in light of the Policy Document, cl 8.2.6 should be recharacterized as an intention merely to reserve to the Users the beneficial interest, not "title".

112.    By contrast, the May ToS specifically refers to the creation of a trust in one particular, narrow circumstance (cl 9.2). Moreover, the LTB Collateral Agreement might be seen to be inconsistent with FTX Trading (and, to the extent FTX DM steps into FTX Trading's shoes, FTX DM) holding digital assets on trust prior to the relevant User posting them as collateral, since if those digital assets were always held on trust, then the trustee could simply declare that it now held them for the counterparty for so long as the margin had to be posted. It would not be necessary for the digital assets to be transferred to another entity entirely (LTB) to hold on trust for the counterparty.

## (16) Appointment of representative creditors

113.    It may be seen from the description of the various complex issues in this case that this application is one where the Court is likely to be assisted by adversarial argument.

114.    Persons with claims or potential claims against FTX DM will, or may, wish to be heard on the following questions, including whether:

(1)     Users who registered on the FTX International Platform for the first time on or after 13 May 2022 were bound only by the May ToS;

(2)     Users who registered on the FTX International Platform prior to 13 May 2022 and continued to use it after 13 May 2022 were bound by the May ToS from (at the latest) when they first logged onto the FTX International Platform after 13 May 2022 and used any Service;

(3)     Users who had registered prior 13 May 2022 but who never logged onto the FTX International Platform to use any Service after 13 May 2022 remained bound by the Feb ToS;

(4)     The counterparty in respect of perpetual future contracts transacted on the FTX International Platform on or after 13 May 2022 was FTX DM or a User; and

(5)     Any User has a trust claim or other type of proprietary claim against FTX DM.

115.    As to sub-paragraph 114(5) above, certain people have made claims that their assets are held on trust. After this application has been issued the JPLs intend to contact these parties to inquire whether one or more would be prepared to act as a representative party to advance arguments that Users' assets are held on trust by FTX DM and, if yes, the rights and obligations associated with the trust.

116.    As to the appointment of representative parties in relation to the issues identified at sub-paragraphs 114(1) to (4) above, after issue of this Summons, prior to the first hearing of the application the JPLs will seek to engage with appropriate representative parties who might be willing to act in a representative capacity.

117.    In the event that the Court appoints one or more representative parties in relation to certain issues, in order to assist the Court and in the interests of ensuring that all arguments are canvassed before the Court and saving costs, the JPLs would propose advancing arguments against those being advanced by the representative parties. So, for example, the JPLs would advance arguments against the proposition that digital assets and fiat currency are held on trust, alternatively, if there is a trust, the JPLs would advance arguments on the type of trust and the availability or otherwise of tracing. JPLs reserve the right to put an affirmative case on any questions arising from this Summons which the JPLs consider affect issues fundamental to the liquidation including the rights of persons other than Users/Customers.

**118.**   If no representative party is willing to appear on any particular issue the JPLs would seek to address both sides of the argument. It is obviously important for the Court to hear both sides of the argument. It is also important that the Court hears arguments on behalf of unsecured creditors.

## Conclusion

**119.**   There is some urgency in obtaining the directions sought in this Summons. Until directions have been given by this Honourable Court, there will be no clarity as to the rights of Users or of the assets to which FTX DM is entitled. The issues are complicated and are likely to take some time to unravel. Given the sums involved, as indicated above, there are also likely to be one or more appeals from the directions of this Honourable Court. For these reasons the JPLs have made this application without having information that is currently in the control of the Chapter 11 Debtors. However, as information is released by the Chapter 11 Debtors it is anticipated that the factual position will become clearer as the application progresses. If it does, then the JPLs will file further evidence updating the factual position.

**SWORN TO** before me this       )
**[x] day** of **March**, 2023 at       )
Nassau, N.P., The Bahamas       )

...................................................

Before me,

...............................................

**NOTARY PUBLIC**

**COMMONWEALTH OF THE BAHAMAS**

**IN THE SUPREME COURT**

**COMMERCIAL DIVISION**

**2022**

**COM/com/00060**

IN THE MATTER OF the Digital Assets and Registered Exchanges Act, 2020 (as amended)

AND IN THE MATTER OF the Companies (Winding Up Amendment) Act, 2011

AND IN THE MATTER OF FTX DIGITAL MARKETS LTD.
(A Registered Digital Asset Business)

―――――――――――――

**CERTIFICATE**

―――――――――――――

I hereby certify that the attached are true copies of **Exhibits "BCS-1"** referred to in the Fifth Affidavit of Brian Simms KC sworn before me this **15th day** of **March A.D., 2023.**

―――――――――――――――――――

**NOTARY PUBLIC**