## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |
| | **Ref. No. 669** |

### SUPPLEMENTAL DECLARATION OF RUPERT GEOFFREY DANGAR BELL

I, Rupert Geoffrey Dangar Bell, declare under penalty of perjury:

1.     I am an Attorney-at-Law in the Cayman Islands with the firm, Walkers, of 190 Elgin Avenue, George Town, Grand Cayman KY1-9001, Cayman Islands (the "Firm"), where I am a Partner in the Insolvency and Dispute Resolution group.

2.     On February 8, 2023, in compliance with the *Order Authorizing Procedures to Retain, Compensate and Reimburse Professionals Utilized in the Ordinary Course of Business*, I submitted a declaration in support of the Firm's retention as an Ordinary Course Professional [D.I. 669] (the "Original Declaration").[2]

3.     As set forth in paragraph 6 of the Original Declaration, the Firm is prohibited from publicly disclosing current and former clients by Cayman Islands law. Specifically, the Firm and Attorneys-at-Law at the Firm owe duties of confidentiality to clients: the Firm and Attorneys-at-Law at the Firm must at all times maintain and protect the

---

[1]     The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and 4063 respectively.  Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.

[2]     Capitalized terms not otherwise defined herein are to be given the meanings ascribed to them in the Original Declaration.

confidentiality of the affairs of present or former clients, unless otherwise allowed or required by Cayman Islands law and/or applicable rules of professional conduct. This duty exists as an obligation under common law, confidentiality and data protection legislation as well as under professional conduct principles / rules.

4.       English law is generally considered as persuasive authority in the Cayman Islands. There are a significant number of English case law authorities in respect of the scope of the common law duty of confidentiality owed by lawyers to their clients and former clients. For these purposes, I refer only to a small number of relevant examples below:

A.    Prior to the development of the law of confidence, it was recognised that the relationship between lawyers and their clients attracted obligations of confidentiality. See *Taylor v Blacklow* (1836) 3 Bing. N.C. 235, in which Gaselee J stated:

> "... the first duty of an attorney is to keep the secrets of his client. Authority is not wanted to establish that proposition ...".

B.    In *Rakusen v Ellis, Munday & Clarke* [1912 R. 390], W. H. Cozens-Hardy M.R. stated that: "*a solicitor will be restrained from disclosing information confidentially obtained from a client*"; "*when a solicitor consents to act for a client he expects to receive his full confidence and learn his secrets, and he under an implied obligation not to use or put himself in a position to use that confidence to the prejudice of the client*"; and "*A solicitor can be restrained as a matter of absolute obligation and as a general principle from disclosing any secrets which are confidentially reposed in him*". In the same case, Fletcher Moulton L.J. stated that: "*the degree of confidential character of the relation between the client and his solicitor and of the communications made by the client and his solicitor is in the eyes of the law the very highest – so high that the solicitor is absolutely privileged and*

*cannot be made to state what has passed between him and his client. To that extent the*

*solicitor is made, as it were, a part of his client for the purpose of those communications…*

*[the Court] can fix a standard of behavior of its own officers which is higher than it would*

*be practicable to exact from persons in other types of confidential relations."*

C.    Professional advisors such as attorneys owe a strict duty of confidence requiring more than

merely taking all reasonable steps to keep relevant information confidential. It is not

limited to the duty not to communicate the information to a third party. It is a wider duty

not to misuse it, i.e., without the consent of a client or former client to make any use of it

or to cause any use to be made of it by others otherwise than for the client's benefit. See

*Prince Jefri Bolkiah v KPMG* [1999] 2 A.C. 222, Millet J stated:

> *"Whether founded on contract or equity, the duty to preserve confidentiality is*
>
> *unqualified. It is a duty to keep the information confidential, not merely to take all*
>
> *reasonable steps to do so. Moreover, it is not merely a duty not to communicate the*
>
> *information to a third party. It is a duty not to misuse it, that is to say, without the*
>
> *consent of the former client to make any use of it or to cause any use to be made of*
>
> *it by others otherwise than for his benefit. The former client cannot be protected*
>
> *completely from accidental or inadvertent disclosure. But he is entitled to prevent*
>
> *his former solicitor from exposing him to any avoidable risk; and this includes the*
>
> *increased risk of the use of the information to his prejudice arising from the*
>
> *acceptance of instructions to act for another client with an adverse interest in a*
>
> *matter to which the information is or may be relevant."*

D.    Finally, a lawyer's duty of confidentiality to a client survives the end of their retainer: *see*

*Wilson v Rastall* (1792) 4 Term Rep. 753, Buller J stated:

*"... I thought that the privilege of not being examined to such points was the privilege of the party, and not of the attorney: and that the privilege never ceased at any period of time. In such a case it is not sufficient to say that the cause is at an end; the mouth of such a person is shut forever."*

5.       The Cayman Islands Confidential Information Disclosure Act ("CIDA") provides that confidential information may be disclosed in certain circumstances.  Relevantly, Section 3 of CIDA provides that disclosure of confidential information (defined as "*includes information, arising in or brought into the Islands, concerning any property of a principal, to whom a duty of confidence is owed by the recipient of the information*") "*shall not constitute a breach of the duty of confidence and shall not be actionable at the suit of any person*" if:

A.       made in compliance with directions of the Grand Court of the Cayman Islands (the "Grand Court") (made in respect of an application by such 'disclosing party' to the Grand Court for directions);

B.       made with the consent, express or implied, of the principal;

C.       to a constable of the rank of inspector or above investigating a criminal offence committed or alleged to have been committed in the Cayman Islands; and/or

D.       to the Cayman Islands Monetary Authority, the Cayman Islands Financial Reporting Authority and/or the Cayman Islands Anti-Corruption Commission, in accordance with relevant Cayman Islands laws.

6.       CIDA also provides for an exemption relating to the disclosure of information in compliance with an Order of the Cayman Mutual Legal Assistance Authority pursuant to the Mutual Legal Assistance (United States of America) Act (2015 Revision), which gives effect to the terms of the treaty between the United States of America and the United

Kingdom of Great Britain and Northern Ireland, including the Cayman Islands, dated the 3rd July 1986, relating to the mutual legal assistance in criminal matters (the "Treaty"). It is my understanding that the information requested to be provided by the Firm, in connection with the provision of services to the Debtors, regarding clients and former clients of the Firm, does not fall within the scope of the Treaty.

7. Moreover, pursuant to the Code of Conduct for Cayman Islands Attorneys-at-Law, the Firm and/or Attorneys-at-Law at the Firm are required to adhere to certain principles in the course of their conduct. For example, in respect of confidentiality:

A. Rule 1.02: "*The relationship between practitioner and client is one of confidence and trust which must never be abused.*"

B. Rule 1.06: "*Except in the specific circumstances contemplated by statute, an attorney has a duty to hold in strict confidence all information concerning the business and affairs of the client acquired in the course of the professional relationship and may not divulge such information*" save in certain circumstances, for example, where disclosure is required by law or the attorney has an overriding duty to a court of tribunal.

C. Rule 4.05: "*An attorney may not, without the specific consent of a client, give any interview or make any public statement involving the confidential information of a client, whether or not the client's involvement is a matter of public knowledge.*"

8. Attached hereto as Exhibit A are copies of the above referenced case law authorities, Cayman Islands' laws and Cayman Islands' professional conduct rules that prohibit the Firm and/or Attorneys-at-Law at the Firm from publicly disclosing current and former clients. The Firm is prohibited from making these disclosures not just in a public filing, but to the Debtors, the

Court and to the U.S. Trustee.  Therefore, filing the disclosures "under seal" or in redacted form would still result in a violation of Cayman Islands' law and professional conduct rules.

9.      In the absence of an Order of the Grand Court and/or express client consent, the Firm would be in breach of its common law duties and professional obligations if it were to disclose the information requested.  If any such disclosure was made, the Firm and/or Attorneys-at-Law at the Firm will potentially face litigation risk, including damages and injunctive relief, as well as potentially other regulatory / professional conduct proceedings.

10.     Notwithstanding that the Firm is prohibited from disclosing current and former clients, the Firm did obtain the key parties-in-interest list (the "PII List") from the Debtors and searched the database it maintains for the purpose of performing conflicts check.  As set forth in the Original Declaration, the Firm's search of the database did not identify any conflict of interests in relation to the parties-in-interest with respect to the Firm being engaged in representing the Debtors in connection with the Services.  The Firm does not represent any of the parties-in-interest on the PII List in connection with these Chapter 11 Cases.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: March 30ᵀᴴ, 2023          _____

**RUPERT GEOFFREY DANGAR BELL**

# EXHIBIT A

TAYLOR *v.* BLACKLOW.   Nov. 8, 1836.

[S. C. 3 Scott, 614 ; 2 Hodges, 224 ; 6 L. J. C. P. 14.   Discussed and applied,
*Barber* v. *Stone*, 1881, 50 L. J. C. P. 298.]

Defendant, an attorney, being employed to raise money on mortgage for Plaintiff,
disclosed to the proposed lender certain defects in Plaintiff's title, per quod Plaintiff
was subjected to divers actions at the suit of the proposed lender, was delayed in
obtaining the money he wanted, and compelled to give a higher rate of interest:
Held, that this was a breach of duty for which an action lay against Defendant,
notwithstanding he had been the attorney of the proposed lender before his retainer
by the Plaintiff.

The declaration stated, that before and at the several times hereinafter mentioned
the Defendant was an attorney, to wit, an attorney of the Court of Common [236]
Pleas at Westminster ; and the Plaintiff then claimed to be lawfully entitled to and
interested in a certain estate, to wit, in certain messuages, buildings, lands, tenements,
and premises with the appurtenances in the county of Kent ; and before and at the
time of the committing of the grievance by the Defendant as hereinafter mentioned
was desirous to borrow and obtain an advance of money, to wit, the sum of 4000l.,
by way of mortgage of and security upon the said estate and premises ; whereof the
Defendant, before and at the time of the committing of the grievance by him com-
mitted as hereinafter stated, had notice : and thereupon, heretofore, to wit, on the
2d of March 1833, the Defendant, so being such attorney as aforesaid, represented
to the Plaintiff that he had a client who would advance the said sum of 4000l. on
sufficient security and at a moderate rate of interest, to wit, at the rate of 4 per cent.
per annum for interest on the same ; and the Plaintiff, at the request of the Defendant,
retained and employed the Defendant as such attorney, to use due endeavours to
obtain and procure the said sum of 4000l. on such mortgage for the Plaintiff, for
reasonable reward to the Defendant in that behalf ; and the Plaintiff at the request
of the Defendant then delivered to the Defendant as such attorney, and in pursuance
of the said retainer, divers, to wit, six abstracts of and relating to the title of the
Plaintiff, of in and to the said estate and premises, and certain other documents also
relating to the same, to wit, a statement of the number of acres of which the said
estate consisted, and the names of the tenants and occupiers of the same ; and there-
upon and by means of the premises the Defendant afterwards, and before the com-
mitting of the grievance by the Defendant as hereinafter mentioned, to wit, on, &c.,
as such attorney of and for the Plaintiff as aforesaid, discovered and ascertained that
there was a certain defect in and objection to the legal right and [237] title of the Plaintiff
to the said estate and premises, to wit, that in two of the title deeds of and relating
to the said estate and premises a part of the said estate and premises, to wit, sixty
acres thereof, and certain messuages, buildings, and improvements thereon, had not
been sufficiently conveyed to or for the use or benefit of the Plaintiff; and that by
reason and on account thereof a certain other person, to wit, John Henry Taylor the
brother of the Plaintiff then had in point of law a legal right to such part of the said
estate and premises, and to recover the possession of the same, although in justice
and equity the beneficial interest in the whole of the said estate and premises then
belonged to the Plaintiff; and by reason of the premises, and under and by virtue of
the said retainer and employment, it then became and was the duty of the Defendant
not voluntarily or unnecessarily to divulge and communicate the said defect in and
objection to the legal right and title of the Plaintiff to the said estate and premises

to the said J. H. Taylor or to any other person, and not to instigate or cause to procure to be commenced or prosecuted any action or proceeding for the recovery of the said estate and premises, or any part thereof, from the Plaintiff, for or by reason or on account of such discovery of the Defendant by the means aforesaid : nevertheless the Defendant so being such attorney as aforesaid, but not regarding his duty as such attorney, nor his duty in the premises under and by virtue of his said retainer and employment, but contriving, and craftily and subtilly intending to injure and annoy the Plaintiff, and to cause and procure a great part of the said estate and premises, to wit, the said sixty acres thereof, and the said messuages, buildings, and improvements thereon to be recovered from him by unjust, vexatious, and improper proceedings, heretofore, to wit, on, &c., dishonourably, wrongfully, and unjustly, and for the sake of fees and **[238]** unjust reward in that behalf, in violation of his duty as such attorney, and contrary to his said duty in the premises, and in violation of good faith, voluntarily and unnecessarily divulged and communicated the said defect in and objection to the legal right and title of the Plaintiff to the said estate and premises to the said J. H. Taylor, and then wrongfully, maliciously, dishonourably, and oppressively contriving and intending as aforesaid, instigated and caused and procured divers, to wit, four actions of ejectment respectively on the demise of the said J. H. Taylor to be commenced against divers, to wit, twelve tenants of the now Plaintiff, of certain parts of the said estate and premises of the now Plaintiff. And the said now plaintiff having as landlord duly appeared and defended the said actions of ejectment, the now Defendant prosecuted the same ; and also wrongfully, maliciously, unjustly, and oppressively caused and procured a certain other action by and in the name of the said J. H. Taylor against the now Plaintiff to be commenced and prosecuted for a certain pretended cause of action, to wit, the cutting down and converting certain timber before then growing on the said estate and premises of the now plaintiff. And the now Defendant, further contriving and intending as aforesaid, also then wrongfully and maliciously, unjustly, and oppressively instigated and caused and procured to be commenced and prosecuted, in the name of the said J. H. Taylor, against the now Plaintiff, divers, to wit, four other actions for the recovery of certain sums of money claimed to be due from the now Plaintiff ; which, but for such instigation and causing and procuring of the now Defendant, would not have been so commenced or prosecuted. And the now Defendant, further contriving as aforesaid, then falsely and maliciously instigated and persuaded, and caused and procured the said J. H. Taylor to commence and prosecute against the now **[239]** Plaintiff a certain untenable suit in the Exchequer for setting aside the conveyance to the now Plaintiff of his said estate of and in the said premises, and which was afterwards, to wit, on the 9th of July 1834, according to equity and justice, dismissed with costs, to be paid by the said J. H. Taylor. And the now Plaintiff in order to obtain relief in the premises, was heretofore, in Hilary term, in the fourth year of our now King, forced and obliged to file, and did file and prosecute his certain bill of complaint against the said J. H. Taylor in the Court of Exchequer for relief in the premises, and in order to obtain an injunction against the prosecution of the said actions of ejectment ; and was also then forced and obliged to apply to the said Court of Exchequer for relief against the said now Defendant. By means of which said breach of duty, and of the said false, deceptive, fraudulent, and malicious conduct of the now Defendant in the premises, the now Plaintiff was forced and obliged to incur and did incur great trouble of mind and body, and great expense of his monies, to wit, to the amount of 2000l., in defending and resisting the said unjust and vexatious proceedings, and in obtaining and enforcing, and in endeavouring to obtain and enforce, by due and lawful ways and means, relief against the same, and other unlawful, oppressive, and unjust proceedings of the now Defendant in the premises. And by means and in consequence of the said J. H. Taylor having become and being insolvent and unable to pay the costs of the said vexatious proceedings, so instigated and caused and procured by the now Defendant to be instituted and prosecuted in his name as aforesaid, the now Plaintiff was unable to recover or obtain payment or satisfaction of or from the said J. H. Taylor of the said costs, and he was wholly unable to pay or satisfy the same ; and the now Plaintiff was by means of the said malicious, unjust, vexatious, and improper conduct of **[240]** the now Defendant greatly harassed, oppressed, vexed, and impoverished, and otherwise greatly injured : and also by means of the premises the now Plaintiff was hindered and prevented from raising and procuring the said money

or other money on mortgage of the said estate and premises for a long time, to wit, from thence until the 20th of January 1836, and was then by reason of the premises forced and obliged to raise and procure on mortgage and security of the said estate and premises, a much larger sum of money than the said sum of 4000l., to wit, the sum of 6000l., and at a greater rate of interest than at and after such rate of 4 per cent. per annum, to wit, after the rate of 4l. 10s. per cent. per annum for each and every 100l. thereof : to the damage of the now Plaintiff of 2000l.

Plea. That before and at the time when the Defendant represented to the Plaintiff that the Defendant had a client who would advance the said sum of 4000l. on sufficient security and at interest, and before and at the time when the Plaintiff delivered to the Defendant the said abstracts and other documents relating to the said estate and premises, and before and at the time when the Defendant discovered and ascertained that there was a certain defect in and objection to the legal right and title of the Plaintiff to the said estate and premises, and before and at the time when the Defendant divulged and communicated the said defect in and objection to the legal right and title of the Plaintiff to the said estate and premises to J. H. Taylor, the Defendant was the attorney and solicitor of and for the said J. H. Taylor, and had been and was retained and employed by him as such attorney and solicitor generally and in relation to his affairs ; whereof the Plaintiff had notice ; and there-upon it became and was the duty of the Defendant, as such attorney and solicitor of and for the said J. H. Taylor, **[241]** to divulge and communicate the said defect in and objection to the legal right and title of the Plaintiff to the said estate and premises to the said J. H. Taylor, and he did on that account, and without malice or any violation of good faith at the said time, when, &c. divulge and communicate .the said defect in and objection to the legal right and title of the Plaintiff to the said estate and premises to the said J. H. Taylor, with a view and in order that he might claim and recover the said estate and premises from the Plaintiff, if lawfully entitled thereto, as he then appeared and was believed by the Defendant to be ; and that thereupon the said J. H. Taylor did then retain and employ the Defendant as such attorney, to take due and proper proceedings to try and investigate the said right and claim of the said J. H. Taylor, and to recover the said estate and premises for him, and to bring and prosecute the said actions and suits in the declaration mentioned respectively : whereupon the Defendant did as such attorney, and under the said retainer and without malice to the Plaintiff, advise the said J. H. Taylor to bring and prosecute, and the Defendant as such attorney under the said retainer, did bring and prosecute the said several actions and suits in the declaration mentioned in that behalf : and that, the Defendant was ready to verify.

Demurrer ; for that although the Defendant in and by his plea confessed and admitted that he was retained and employed by the Plaintiff to act for him as his attorney in the premises, and that under and by virtue of that retainer and employ-ment the Defendant discovered and ascertained the said defect in and objection to the legal right and title of the Plaintiff to the said estate and premises, but that in justice and equity the beneficial interest in the whole of the said estate and premises then belonged to the **[242]** Plaintiff,—and although the Defendant had in and by his said plea confessed and admitted that it was his duty, under and by virtue of the said retainer and employment, not voluntarily or unnecessarily to divulge or com-municate the said defect and objection to the said J. H. Taylor, or to any other person, nor to instigate or cause or procure any action or proceeding for the recovery of the said estate or any part thereof,—yet the Defendant had attempted to defend and justify his said illegal conduct upon and under colour of a wholly untenable ground and pretence ; and also, for that although the said plea was pleaded in bar to the whole declaration, yet the said plea did not state or shew any defence, or legal or sufficient justification in excuse of or for the said statement and cause of action against the Defendant, for or in respect of his having so wrongfully, maliciously, and dishonourably instigated and caused and procured the said actions of ejectment to be commenced and prosecuted, and the said other action to be commenced and prosecuted, for the said pretended cause of action, to wit, the cutting down and converting the said timber, or of or for the Defendant having so wrongfully and maliciously, unjustly, and oppressively, instigated, and caused, and procured to be commenced and prosecuted, in the name of the said J. H. Taylor, against the Plaintiff the said other actions, and having falsely and maliciously instigated and persuaded,

TAYLOR *v.* BLACKLOW

and caused and procured the said J. H. Taylor to commence and prosecute against the Plaintiff the said untenable suit in the Exchequer.

*Kelly* for the Plaintiff. This action lies against the Defendant, for he has been guilty of a breach of duty, attended with pecuniary loss to his client. It was as much his duty to conduct the business of the mort-**[243]**-gage with fidelity as to conduct an action with skill. In Com. Dig. Action on the case for deceit, A. 5, it is laid down that an action on the case for a deceit, lies, "if a man, being intrusted in his profession, deceive him who intrusted him; or, if a man retained of counsel become afterwards of counsel with the other party in the same cause, or discover the evidence or secrets of the cause. So, if an attorney act deceptive to the prejudice of his client; as if by collusion with the demandant he make default in a real action, whereby the land is lost." Lord Lyndhurst, upon the investigation of the present case in the Court of Chancery, described the Defendant's conduct as a breach of professional duty; and the delay occasioned to the plaintiff in obtaining his money was a special damage, which is as much the subject of an action as special damage occasioned by words not otherwise actionable. In *Cholmondeley* v. *Clinton* (19 Ves. 261) an attorney was restrained, under circumstances similar to the present, from acting for the opposite party.

*Jervis* contrà. The circumstances stated in the declaration do not disclose a legal duty for the breach of which an action lies. The disclosures made by the Defendant he would not, in his character of attorney, have been privileged to withhold in a court of justice. The privilege of withholding communications made by a party to a witness is the privilege of the client, and is confined to what passes between the client and his attorney, in the capacity of attorney. In *Wilson* v. *Raṣtall* (4 T. R. 753), it was laid down that the privilege is confined to counsel, solicitors, and attornies, when acting in their respective characters: Buller J. saying, "The nature of this kind of privilege is, that the attorney shall not be permitted to disclose, in any action, that which has been **[244]** confidentially communicated to him." So in *Cobden* v. *Kendrick* (4 T. R. 431), it was held, that an attorney was not restrained, by any rule of law, from giving evidence of a conversation between him and his client, touching the justice of his suit, after a writ of inquiry executed on an interlocutory judgment, and a compromise thereupon; for the purpose of the suit having been obtained, the communication could not be said to have been made, by way of instruction, for conducting his cause: and in Buller's N. P. 284 it is laid down, that to this privilege "there are some exceptions; first, as to what such persons knew before the retainer; for, as to such matters, they are clearly in the same situation as any other person; secondly, to a fact of his own knowledge, and of which he might have had knowledge, without being counsel or attorney in the cause: as suppose him witness to a deed produced in the cause, he shall be examined to the true time of execution." In *Walker* v. *Wildman* (6 Madd. 47), it was held, that the privilege of solicitor and client extended to all communications for professional advice, but not to employment in matters not professional; and in *Bramwell* v. *Lucas* (2 B. & C. 745), Abbott J. says, "Whether the privilege extends to all confidential communications between attorney and client or not, there is no doubt that it is confined to communications, and to communications to the attorney in his character of attorney. A question for legal advice may come within the description of a confidential communication, because it is part of the attorney's duty, as attorney, to give legal advice; but a question for information as to matter of fact, as to a communication the attorney has made to others, where the communication might have been made by any other person as well as an attor-**[245]**-ney, and where the character or office of attorney has not been called into action, has never been held within the protection and is not within the principle upon which the privilege is founded." In *Moore* v. *Terrell* (4 B. & Adol. 870), the Court forbore to decide whether communications touching a mortgage were confidential or not. *Cholmondeley* v. *Clinton* only shews that an attorney is not permitted voluntarily to enter into the interest of his client's opponent; but he may do so if dismissed, which would not be permitted if the duty of secrecy were such as is assumed in this declaration. In *Robinson* v. *Mullett* (4 Price, 353), it was held, that a solicitor who had acted to a certain extent only for parties, Defendants in an amicable suit in chancery, would not be restrained from acting in a cause by bill filed by some of those Defendants, on behalf of themselves, against others of them, the solicitor making affidavit, that he was not confidentially possessed of any secrets

which might be used to the prejudice of such other Defendants, or had knowledge of any facts unknown to his clients. In *Beer* v. *Ward* (1 Jac. 77), the Court, on motion to restrain a solicitor from giving evidence of confidential matters, refused to interfere: the propriety of his being examined being left to the consideration of the Court before which he might appear as a witness. In *Bricheno* v. *Thorp* (1 Jac. 300), the Lord Chancellor qualified the rule laid down in *Cholmondeley* v. *Clinton.* In *Grissell* v. *Peto* (9 Bingh. 1), where the Court refused to restrain the Defendant's attornies from acting in the cause, on the ground that they had obtained a knowledge of the Plaintiff's case in the course of a Chancery suit in which they had been acting in conjunction with the Plaintiff, and in which the Defendant had no interest, the Defendant's attornies deposing, **[246]** that, in that suit, they acted also for the Defendant, the Court did not advert to the legal liability of the attorney.  So in *Roberson* v. *Marriott* (2 Cr. & Mee. 183), where an attorney had been employed in a cause, and was afterwards discharged by his client, not on the ground of misconduct, the Court would not restrain him from acting for the opposite party, unless it clearly and distinctly appeared that he had obtained information in his former character which it would be prejudicial to the cause of his former client to communicate.  It may be conceded, however, that there are cases in which the courts may interfere to restrain an attorney from acting, or may punish him for improper communications ; *Bolton* v. *Corporation of Liverpool* (1 Mylne & Keen, 88).  But the power of the Court to punish does not necessarily imply a legal liability to the client.  Here, the Defendant was attorney for the mortgagee, as well as for the mortgagor : the mortgagor, being aware of that circumstance, must have anticipated that there would be no concealment of his affairs ; and under such circumstances the Court cannot draw the line between the conflicting duties which the Defendant was called on to discharge.

Kelly in reply.  The disclosure complained of in the declaration was not one which the Defendant could have been compelled to make in the character of a witness ; but if it were otherwise that would not be an answer to this action ; for it might be allowable to disclose that on compulsion which it would be a breach of duty to communicate voluntarily.  In *Moore* v. *Terrell*, however, Lord Denman inclined to think that a knowledge of a party's title, obtained by an attorney in the course of his employment, would fall within the rule of privileged communications in its narrow sense ; and Parke J. says **[247]** (p. 876), "In *Greenough* v. *Gaskell* (1 Mylne & Keen, 98), the Lord Chancellor consulted with Tindal C. J., Lord Lyndhurst, and myself, and we all thought the client's privilege extended much beyond communications in respect of a suit."  But in *Cromack* v. *Heathcote* (2 B. & B. 4), where an attorney being requested to draw an assignment of goods refused, and the deed was drawn by another, the validity of the deed being afterwards questioned, on the ground of fraud, in an action against the sheriff, in which the attorney first applied to was not employed, it was held, that the communication made to that attorney was professional, and that evidence of the fraud proposed to be given through him was properly rejected.  The cases in equity were all applications to the discretion of the Court, and have no bearing upon the question of liability in respect of a duty.

TINDAL C. J.  This case, as it has been argued, depends on the existence of the right of action as disclosed in the declaration ; and it appears to us that the Plaintiff is entitled to maintain his action, notwithstanding the Defendant's plea.  Cases have been cited and discussed on the part of the Defendant, to shew that the disclosures which he has made, are such as if called as a witness he would not have been privileged to withhold.  It is not necessary for us to decide that question ; though, if it were, the cases of *Moore* v. *Terrell* and *Cromack* v. *Heathcote* go a long way to set it at rest ; it is enough to say that the complaint against the Defendant, in the terms of the declaration, is, that dishonourably, wrongfully, and unjustly, and for the sake of fees and unjust reward in that behalf, in violation of his duty as an attorney, contrary to his duty in the premises, and in violation of good faith, he voluntarily and **[248]** unnecessarily divulged the defect in the title of the Plaintiff : it stands clear therefore of any question with respect to disclosures which the Defendant might have been called on to make on compulsion.  It is alleged to have been his duty not voluntarily or unnecessarily to divulge the said defect in the Plaintiff's title : and it was most clearly his duty not to disclose any defect in his client's title.  Instead of faithfully discharging that duty, when his client's deeds are put into his hands for the purpose of raising

3 BING. (N. C.) 249.

money, he discloses defects of title to the very person who was about to lend. It is argued that he was also employed on the part of the proposed lender, and was actuated by a sense of justice towards him. There may be persons also who have not sufficient firmness to take a decided course under such circumstances; but if the Defendant thought he had a conflicting duty towards his several employers, it would have been an easy course to deliver back the deeds to the Plaintiff, and to consider his lips sealed with a sacred silence as to the whole of their contents: however, he thought proper to disclose the defects in his client's title to one who thereupon brought actions and filed bills in Chancery against the Plaintiff. In consequence of this disclosure, the Plaintiff sustained the temporal injury of the costs and expenses of those suits. There has been therefore a breach of duty on the part of the Defendant, attended with temporal injury on the part of the Plaintiff, and there is no ground for saying that an action does not lie for such an injury, incurred by a breach of duty. If there were any doubt, an answer would be found in the authority cited from Comyn's Digest. It is urged that the Plaintiff was himself aware that the Defendant was employed also by the party to whom he made the disclosures. I cannot see how that circumstance affords an answer to this action, unless it be considered in the light of a waiver; **[249]** but as the Plaintiff could never have expected that defects in his title should be disclosed by his own attorney, his knowledge of the Defendant's intercourse with the other party cannot be taken to operate as a waiver.

GASELEE J. It is not important to the decision of this cause, whether the communication which the Defendant made was one which he would have been authorized to withhold in a witness-box or not; for the first duty of an attorney is to keep the secrets of his client. Authority is not wanted to establish that proposition; but, if it were, the passage cited from Comyn's Digest is sufficient.

VAUGHAN J. I am of the same opinion. There can be no doubt the Defendant has been guilty of a gross breach of a great moral duty; and the law is never better employed than in enforcing the observance of moral duties. I think, however, that the contents of these deeds were a privileged communication, which the Defendant could not have been compelled to disclose. The law has been laid down too narrowly on that head by the counsel for the Defendant.

BOSANQUET J. I forbear to express any opinion on the question whether the particulars of the Plaintiff's title were not a privileged communication, because the decision of that question is not necessary to the determination of this case: but when the Defendant was employed to raise money, it was his duty to keep the secrets of his employer, and, having divulged them, he has violated his duty and subjected himself to an action at law.

Judgment for the Plaintiff.

RAKUSEN *v.* ELLIS, MUNDAY & CLARKE.                    C. A.

[1912 R. 390.]                              1912

*March* 16, 18,

*Injunction—Solicitor — Acting against former Client — Confidential Informa-*        19.
*tion—Members of same Firm—Discharge of Solicitor—Firm Name.*

M. and C. were the only partners in a firm of solicitors named
E. M. & C. and were in the habit of doing business separately and
without any knowledge of each other's clients. R. consulted M. with
reference to an action for wrongful dismissal which he desired to
commence against a company. He then changed his solicitors and
issued his writ, and the matter was referred to arbitration, the proceed-
ings in which were still in progress. C. was away at the time and knew
nothing of the consultations between R. and M., and whilst the arbitra-
tion was going on he was appointed under the name of E. M. & C. to
act as solicitor for the company in the arbitration. R. applied for an
injunction to restrain E. M. & C. from acting for the company :—

*Held*, that there was no general rule that a solicitor who had acted
for some person either before or after the litigation began could in no
case act for the opposite side ; the Court must be satisfied in each case
that mischief would result from his so acting ; that there could be no
danger of any breach of confidence if C. acted for the company ;
and (reversing the decision of Warrington J.) that the injunction must
be refused.

Decision of Hall V.-C. in *Little* v. *Kingswood Collieries Co.* (1882) 20
Ch. D. 733 ; 47 L. T. 323, overruled.

APPEAL from a decision of Warrington J.

Prior to February, 1910, Samuel Rakusen, the plaintiff, was
carrying on business in co-partnership with his brother Hyman
Rakusen. In March, 1910, they sold the business to a company
called S. & H. Rakusen, Limited. It was alleged by S. Rakusen
that it was part of the arrangement that he should be appointed,
and he was in fact appointed, sales manager and traveller for the
company at a salary of 550*l.* a year. In June, 1911, the company
gave him three months' notice to determine his employment.
He consulted Mr. Munday, a partner in the defendants' firm of
Ellis, Munday & Clarke, solicitors, as to his position, had
several interviews with him, and gave him much confidential
information in regard to the matters in dispute between him and
the company. In October, 1911, he changed his solicitors and

CHANCERY DIVISION.    **[1912]**

C. A.

1912

RAKUSEN

*v.*

ELLIS,
MUNDAY
& CLARKE.

issued a writ in an action against the company for wrongful dismissal, and the dispute was referred to arbitration. It was stated that the arbitration was now in progress and five sittings had already been held. In March, 1912, Ellis, Munday & Clarke were appointed solicitors to act for the company in the arbitration proceedings. S. Rakusen thereupon commenced proceedings against Ellis, Munday & Clarke, and now applied for an injunction to restrain them from acting for the company in the arbitration.

Messrs. J. H. Munday and P. Clarke were the only two partners in the firm of Ellis, Munday & Clarke, and the evidence shewed that they were in the habit of doing business separately and without any knowledge of each other's clients, and that each of them had the exclusive services of some of their clerks. Clarke had never seen the plaintiff till March 11, 1912, was away for his vacation at the time when the plaintiff consulted Munday, knew nothing whatever about these consultations, and had never seen any of the papers or proceedings therein. On a previous occasion he had acted as solicitor for one of the shareholders of the company, who asked him to appear for him in the arbitration, and eventually, during the progress of the arbitration, he was asked to act for the company, whose solicitors were unable to give the requisite time and attention to the proceedings. The managing director, secretary, and solicitor of the company in a joint affidavit said that the services of Clarke were required by the company and that no confidential information would be given by him to the company, and that they had not communicated with any member of his firm other than Clarke.

When the case came on before Warrington J. two undertakings were offered by the defendants, namely, an undertaking by Munday in no way to act in the arbitration proceedings or say anything about his consultations with the plaintiff, and further an undertaking that Clarke's name should alone appear on the papers as solicitor for the company, and not the name of the firm. In the Court of Appeal the company offered to undertake not to consult Munday in any way.

Warrington J. held that the principle had been laid down that a solicitor, having once been employed to act for a man, should

not act against him in the same matter ; and although there was no imputation of any kind on Messrs. Munday and Clarke and no danger of their doing anything improper, they must be restrained from acting as the company's solicitors in the arbitration proceedings.

Messrs. Munday and Clarke appealed.

C. A.

1912

RAKUSEN
*v.*
ELLIS,
MUNDAY
& CLARKE.

*W. H. Cozens-Hardy*, for the appellants. A solicitor will be restrained from disclosing information confidentially obtained from a client, but there is no general principle that a solicitor who has acted for a client in a particular matter cannot, under any circumstances, act for the opposite party in the same matter: Cordery on Solicitors, 3rd ed. p. 110. It depends on the circumstances of each case. The Court has also to see that the client's choice of a solicitor is not fettered. Here there is no danger of any information obtained by Munday from Rakusen being handed over to Clarke. The existence of such a principle would work great hardship in small towns where there were few solicitors, especially if the retainer of one partner is considered equivalent to the retainer of the firm. The question is whether there is any danger of the disclosure of secrets : *Little* v. *Kingswood Collieries Co.*, per Jessel M.R. (1)   Warrington J. relied on *Earl Cholmondeley* v. *Lord Clinton* (2), where the solicitor had discharged himself in the middle of the litigation ; explained by Lord Eldon in *Bricheno* v. *Thorp* (3), and in *Beer* v. *Ward.* (4) A case for an injunction must be made out: *Robinson* v. *Mullett* (5) ; *Johnson* v. *Marriott* (6) ; *Davies* v. *Clough* (7) ; *Parratt* v. *Parratt* (8) ; *Rawlinson* v. *Moss.* (9)   No ground has been shewn for restraining the appellants or either of them from acting for the company. They always do business separately, and the fact that a client who instructs a firm is entitled to the services of every member of the firm is not conclusive.

*Cave, K.C.*, and *Harold Simmons*, for Rakusen.   There is no

(1) 20 Ch. D. 733, 742 ; 47 L. T. 323, 325.

(2) (1815) 19 Ves. 261 ; Coop. G. 80.

(3) (1821) Jac. 300.

(4) (1821) Jac. 77.

(5) (1817) 4 Price, 353.

(6) (1833) 2 Cr. & M. 183.

(7) (1837) 8 Sim. 262.

(8) (1848) 2 De G. & Sm. 258.

(9) (1861) 30 L. J. (Ch.) 797.

CHANCERY DIVISION.

C A.
1912
RAKUSEN
v.
ELLIS,
MUNDAY
& CLARKE.

personal charge against the appellant firm or any member of it, but we rely on the general principle. The result of the cases is that where a solicitor has acted for a client in any particular matter he cannot subsequently act against him in the same matter, nor can his partner do so. These proceedings are all in the same matter. When a solicitor consents to act for a client he expects to receive his full confidence and learn his secrets, and he is under an implied obligation not to use or put himself in a position to use that confidence to the prejudice of the client. If he agrees to act for a second client that client is also entitled to know all that he as his solicitor knows, and the solicitor is there-fore bound not to reveal the secrets of the first client at the same time that it is his duty to tell all he knows to the second client. The Court will take care that its officer does not put himself in such a position. A clerk is in a different position, for there is no contractual relationship between him and the client. We agree that in this case no wrong will be done intentionally, but information may leak out through some of the appellants' clerks, and the principle should be supported. We are not dealing with them as individuals, but as a firm, and we submit that the only safe rule is to forbid such conduct by a firm : *Norton* v. *Cooper.* (1) How can we tell whether undertakings are observed? The fact that the solicitor has discharged himself has no bearing on the rule : *Hutchins* v. *Hutchins* (2) ; *Biggs* v. *Head.* (3) The judgment in *Earl Cholmondeley* v. *Lord Clinton* (4) was not founded on particular facts, but on a general rule.

No reply was called for.

COZENS-HARDY M.R. It is of vast importance that there should be no doubt thrown on the true position of solicitors in matters of this kind or of the jurisdiction of the Court over solicitors. Solicitors have great privileges and they have corresponding duties. Of their privileges a greater instance cannot be furnished than the absolute privilege which is given to them in the matter of giving evidence of communications which they make to their clients or their clients make to them. We

(1) (1856) 3 Sm. & Giff. 375.      (3) (1837) Sau. & Sc. 335.
(2) (1825) 1 Hog. 315.           (4) 19 Ves. 261 ; Coop. G. 80.

expect and indeed we exact from solicitors, who are our officers, a higher standard of conduct than we can enforce against those who are not our officers. A solicitor can be restrained as a matter of absolute obligation and as a general principle from disclosing any secrets which are confidentially reposed in him. In that respect it does not very much differ from the position of any confidential agent who is employed by a principal. But in the present case we have to consider something further. It is said that in addition to the absolute obligation not to disclose secrets there is a general principle that a solicitor who has acted in a particular matter, whether before or after litigation has commenced, cannot act for the opposite party under any circumstances; and it is said that that is so much a general rule and the danger is such that the Court ought not to have regard to the special circumstances of the case.

I do not doubt for a moment that the circumstances may be such that a solicitor ought not to be allowed to put himself in such a position that, human nature being what it is, he cannot clear his mind from the information which he has confidentially obtained from his former client; but in my view we must treat each of these cases, not as a matter of form, not as a matter to be decided on the mere proof of a former acting for a client, but as a matter of substance, before we allow the special jurisdiction over solicitors to be invoked, we must be satisfied that real mischief and real prejudice will in all human probability result if the solicitor is allowed to act.

Let me take the circumstances of the present case. There was a dispute between the plaintiff, Mr. Rakusen, and the company as to whether he had been wrongfully dismissed. The firm of Ellis, Munday & Clarke were consulted by Mr. Rakusen on that point. The services of the firm were dispensed with some day in October last. I have seen the bill of costs which was rendered by the firm and which has been wholly or partially paid. It is quite clear that there was some confidential information furnished by Mr. Rakusen to the member of the firm, Mr. Munday, who, and who alone, was consulted in the matter; and if this had been a case of Mr. Munday having obtained from the plaintiff, who said that he had been wrongfully dismissed, confidential

C. A.

1912

RAKUSEN
*v.*
ELLIS,
MUNDAY
& CLARKE.

Cozens-
Hardy M.R.

CHANCERY DIVISION.          [1912]

C. A.

1912

RAKUSEN

*v.*

ELLIS,

MUNDAY

& CLARKE.

Cozens-

Hardy M.R.

information bearing upon the circumstances or the alleged justification of the wrongful dismissal, and if it had been a case of Mr. Munday afterwards appearing in the action for the defendants, speaking for myself, I should have said that that was a case in which he was putting himself in a position in which he could not as an honest man discharge his duty to the defendants without consciously or unconsciously availing himself of information which he had obtained while acting for Mr. Rakusen. That would be a typical case in which a person ought not to be allowed to put himself in a position in which he could not clear his mind from the knowledge he had obtained. I cannot bring myself to doubt that any respectable solicitor would in those circumstances have said at once, "I am very sorry I cannot act for you because I am familiar with the circumstances alleged by the other side, which circumstances have been communicated to me confidentially." But what are the facts here? The communications all took place with Mr. Munday. At that time Mr. Clarke was away for his vacation out of the country and he knew nothing about it. He had never seen Mr. Rakusen. He had not had any communication with him, and was really a complete stranger to the matter. Before the writ was issued, Messrs. Ellis, Munday & Clarke had ceased to be solicitors for Mr. Rakusen, and in those circumstances is there any reason why Mr. Clarke, who was allowed to watch and attend proceedings in the arbitration (for I ought to say the action was referred to arbitration) and was allowed to attend on behalf of a shareholder before the arbitrator for some days—is there any reason why he should not be allowed to act as and to appear as solicitor for the company? In my opinion there is no substance whatever in the objection. There is no prejudice, there is no mischief, and having regard to the undertaking which was offered that although the solicitors on the record for the company are now Ellis, Munday & Clarke that should . be changed and Mr. Clarke should alone be the solicitor on the record, I can see no ground for granting the injunction.

But it is right that I should say a few words upon the authorities which have been cited to us. It has been said "this is settled law since Lord Eldon's time in *Earl*

*Cholmondeley* v. *Lord Clinton.*" (1)  I have read and re-read that case, and in my opinion it lays down no such principle. It was, as explained by Lord Eldon in a subsequent case, *Bricheno* v. *Thorp* (2), a case in which a solicitor, one of the members of the firm, in the middle of a litigation discharged himself and went over to the other side.  It was a question of breach of contract and not merely a breach of duty, and Lord Eldon and the judges he consulted really decided that case on a ground which is not now treated by counsel on either side, and I think is properly not treated by them, as conclusive of the matter. Lord Eldon proceeded on the footing that the solicitor could not by discharging himself in the middle of a suit deprive the client of the right which he had by the contract of retainer to the services of that solicitor.

Now our attention has been called to other cases.  There is the case in the Exchequer of *Johnson* v. *Marriott* (3), which is absolutely inconsistent with the general rule which has been relied upon.  There the Court of Exchequer declined to discharge a rule which had been obtained for a change of solicitors from one side to the other on the ground that there was no evidence shewn of any material circumstances which would justify it. But then it is said Hall V.-C. in *Little* v. *Kingswood Collieries Co.* (4) has laid down some principles which are sound in law and which ought to govern the Court.  No doubt Hall V.-C. did lay down some principles, particularly in one passage I will read, which require consideration : " where the second transaction flows out of the first, and from the nature of the dispute, is so connected with it as I consider this to be, the new client ought not to employ that particular solicitor in the transaction, and the solicitor ought not to accept the employment, and the case is then one in which at the instance of the former client the solicitor ought upon general principles of equity to be restrained from so acting."  Hall V.-C. seems to have thought that the mere fact that the solicitor had once advised or acted in an early stage of the same matter ought to prevent him from ever acting for the other side quite irrespective of the circumstances of the

C. A.

1912

RAKUSEN
*v.*
ELLIS,
MUNDAY
& CLARKE.

Cozens-
Hardy M.R.

(1) 19 Ves. 261 ; Coop. G. 80.          (3) 2 Cr. & M. 183.
(2) Jac. 300.                          (4) 20 Ch. D. 733, 740; 47 L. T. 323.

C. A.
1912

RAKUSEN
*v.*
ELLIS,
MUNDAY
& CLARKE.

Cozens-
Hardy M.R.

case. That case went to the Court of Appeal, and although the decision was not formally overruled, the view of the Vice-Chancellor was obviously not adopted by the Court of Appeal, for the appellant's counsel were stopped at a certain stage of the argument and counsel for the respondent were heard for the plaintiff, and the Court then suggested a compromise. Jessel M.R. said (1) he thought the order of Hall V.-C. went further than any previous case, even than the cases in Ireland, to two of which cases our attention has been called. Then " his Lordship intimated that, although there was no law that, because a solicitor had acted for a person, he might not afterwards act against him, it was not to be supposed that he was at liberty to disclose the secrets of his former client to his opponent in the subsequent proceedings, and that the Court could always, on general principles, restrain a solicitor who threatened to disclose secrets." The Court of Appeal there laid down a distinction between an absolute duty not to disclose secrets and a duty which is not absolute but dependent on circumstances, namely, a duty not to act for an opposite party in the same litigation. The Court went further, they sanctioned a compromise, indeed they suggested a compromise, under which the solicitor was to continue to act in the litigation contrary to the injunction which was granted by Hall V.-C. I therefore think his decision is not an authority binding on this Court on the point. There is such an intimation of opinion as to render it easy for me to say, as I do say, that I think the judgment of Hall V.-C. went further than can be warranted either on principle or on authority, and that it ought not to be followed.

In my opinion, without going through the other authorities to which our attention has been called, the injunction granted by Warrington J. must be discharged; but I do not wish quite to leave it there. Warrington J. has said, and it has been admitted on both sides here, that we are dealing with solicitors of the highest position and whose honour and integrity are beyond any imputation. No possibility of the disclosure of secrets has ever been suggested, but Warrington J. merely bases his judgment on this, that it has been frequently said in this Court that a solicitor

(1) 47 L. T. 323, 325.

is an officer of the Court and cannot be allowed to put himself into a position in which his duty to his present client may conflict with his duty to his past client. With great respect to Warrington J. I think that goes a great deal too far. Many busy solicitors in this country would find it impossible to carry on their business at all if that was the true rule. I think solicitors of the highest honour and integrity may frequently be perfectly able to act in the same matter for a new client, and at the same time may be perfectly able to avoid disclosing secrets without putting any strain upon their memory, conscience, or integrity.

In my opinion the order of Warrington J. must be discharged and this appeal should be allowed.

FLETCHER MOULTON L.J. I am of the same opinion. Before dealing with the case before us I wish to say a few words upon the rights of the parties and the action of the Courts in cases in which there is no question of solicitor and client but in which the feature of confidential relationship is to be found. In almost all businesses there must be persons in such a confidential relation to the employers or to the people who are employed by them for purposes connected with the business, that the knowledge which they acquire is not knowledge at their own disposal but consists substantially of the secrets of their employer. Such employments come to an end sometimes at the choice of the master, sometimes at the choice of the servant, and thereupon difficulties necessarily arise, because the person who is no longer in employment still has in his breast secrets which are the property of his past employer. The view that the law takes of the rights of the parties in that position is too clear to be disputed. The employee is quite free to go into the service of people who may be the rivals or the opponents of his former master. The law does not say that the possession of those secrets shall cripple his work, or sterilize it. He may go into employment quite inconsistent with the employment which he had in the past. All that the law says is: You shall not disclose or put at the service of your new employer the secrets that belong to your old employer.

C. A.

1912

RAKUSEN
v.
ELLIS,
MUNDAY
& CLARKE.

Cozens-
Hardy M.R.

C. A.

1912

RAKUSEN

*v.*

ELLIS,
MUNDAY
& CLARKE.

Fletcher
Moulton L.J.

Now we come to the special case of the employment of a solicitor by a client. In my opinion the fundamental principle remains the same as in other cases of confidential employment, and I accept with regard to this the dictum (because it was not embodied in a formal judgment) of Jessel M.R. when he says (1) "that, although there was no law that, because a solicitor had acted for a person, he might not afterwards act against him, it was not to be supposed that he was at liberty to disclose the secrets of his former client to his opponent in the subsequent proceedings, and that the Court could always, on general principles, restrain a solicitor who threatened to disclose secrets." That is the law with regard to all confidential employment, and it applies therefore to confidential employment of a solicitor by a client. But although the fundamental law is not different its application is widely different in degree, and for two reasons. In the first place the degree of the confidential character of the relation between the client and his solicitor and of the communications made by the client to the solicitor is in the eyes of the law the very highest— so high that the solicitor is absolutely privileged and cannot be made to state what passed between him and his client. To that extent the solicitor is made, as it were, a part of his client for the purposes of those communications. The second reason is that the Court is not bound to accept in that case the standard of sensibility which it may feel is all that it can enforce on people in general who are in confidential relations one with the other. It can fix a standard for the behaviour of its own officers which is higher than it would be practicable to exact from persons in other types of confidential relations. I think, therefore, that in deciding the question of what the action of a solicitor may be, although the Court does not start fundamentally from a different rule, the decisions it gives may be different in many cases from the decisions which it would give were it appealed to in an action between persons who were not in the position of solicitor and client but nevertheless had been in contractual relations involving confidential communications. That being my view of the law, one thing becomes clear. The Court must act in each case according to the circumstances of the case. If there is a

(1) 47 L. T. 323, 325.

distinction between the solicitor and other persons confidentially
employed it is one of degree based on one of those two con-
siderations that I have mentioned, and the moment that it is
agreed that it is one of degree it means that we must look at the
facts of the case and apply to them the fundamental principles
of the law modified by those considerations.

As a general rule the Court will not interfere unless there be
a case where mischief is rightly anticipated.  I do not say that it
is necessary to prove that there will be mischief, because that is
a thing which you cannot prove, but where there is such a
probability of mischief that the Court feels that, in its duty as
holding the balance between the high standard of behaviour
which it requires of its officers and the practical necessities of
life, it ought to interfere and say that a solicitor shall not act.
Now in the present case there is an absolute absence of any
reasonable probability of any mischief whatever.  It is an
attempt to induce the Court to move, on the most purely technical
grounds, in a matter in which it ought to deal with realities.
The client consulted Mr. Munday only and nobody acquired any
knowledge of any communication confidential or otherwise to
Mr. Munday other than that gentleman himself.  Mr. Clarke, his
partner, was away at the time, and it is admitted that he did
not even know that Mr. Munday had been consulted, and a
fortiori knew nothing whatever of the communications which
were made to him, and he is willing to undertake not to make
any inquiries or obtain any information from his partner with
regard to the matter.  Nobody pretends that this gentleman
will not act up to that undertaking, and if we were to say that
he—not his firm, but that he—was not to act, in my opinion we
should be abusing the power that we certainly possess of directing
what the officers of the Court should and should not do.  For
these reasons, though I think that it was a mistake to suggest
that the name of the firm should formally appear on the pro-
ceedings as the solicitors of the company, I see no reason what-
ever why Mr. Clarke should not act for them, and I am satisfied
that no mischief whatever will come from it.

I do not intend to deal at length with the authorities that
have been cited.  But I wish to point out that the decision in

C. A.

1912

RAKUSEN
*v.*
ELLIS,
MUNDAY
& CLARKE.

Fletcher
Moulton L.J.

C. A.
1912

RAKUSEN
*v.*
ELLIS,
MUNDAY
& CLARKE.

Fletcher
Moulton L.J.

*Earl Cholmondeley* v. *Lord Clinton* (1) must be read with the authoritative explanations of it which were given by the Lord Chancellor in *Beer* v. *Ward* (2) and *Bricheno* v. *Thorp* (3), and as so read, in my opinion, it will not have the effect which was given to it by the learned judge in the Court below. With regard to *Hutchins* v. *Hutchins* (4), one of the Irish cases, I think that the decision in that case is based on a misunderstanding of the decision in *Earl Cholmondeley* v. *Lord Clinton* (1), and with regard to *Biggs* v. *Head* (5) it is quite clear there there had already been, in the opinion of the Court, a breach of the confidential relations.

For these reasons I think the appeal ought to be allowed.

BUCKLEY L.J.   There is a general principle, applicable not to solicitors only but to confidential agents of all kinds, that confidential information shall not be used against the principal from whom, or for whom, and in whose employment, it has been obtained.   There is no general rule that a solicitor who has acted in a particular matter for one party shall not under any circumstances subsequently act in that matter for his opponent. Whether he will be restrained from so acting or not depends on the particular circumstances.   Of course he will be restrained from communicating confidential information, but the respondents contend that when there is no danger of this happening the solicitor will still be restrained from acting.   Further they maintain a still larger proposition and assert that this extends to the partner (who knows nothing of the matter) of the solicitor who from his previous employment does know something.

In my opinion neither of these propositions can be maintained. In some of these cases the injunction sought has been an injunction to restrain the new client from employing the solicitor and an injunction to restrain the solicitor from acting.   In the present case the injunction is asked only against the solicitor, but it must not be forgotten that such an injunction if granted has just the same effect so far as the client is concerned as if the

(1) 19 Ves. 261; Coop. G. 80.          (3) Jac. 300.
(2) Jac. 77.                            (4) 1 Hog. 315.
(5) Sau. & Sc. 335.

C. A.

1912

RAKUSEN

*v.*

ELLIS,

MUNDAY

& CLARKE.

Buckley L.J.

injunction were granted against him also. He cannot obtain the services of that solicitor. The question then involves the consideration of the circumstances under which a client is to be prevented from obtaining the services of a particular solicitor. The circumstances I think are these: the jurisdiction is a jurisdiction to restrain the solicitor from giving the new client any assistance against the old client by reason of knowledge acquired as solicitor for the old client. If to ensure that result it is shewn to be reasonably necessary to restrain the employment of the solicitor by the new client the injunction will be granted, but on no other ground could such an injunction be granted as against the client.

Mr. Cave has asserted this general principle, which he says is to be found in the authorities—that when a solicitor has acted for a client in a particular matter he, or his partners, cannot act against that client in anything relating to that matter, and that this is true irrespective of the particular circumstances of the case. I am of opinion that there is no such principle. There is no law that because a solicitor has acted for a person he may not afterwards act against him in the same matter. It depends on circumstances whether he shall be allowed to act or not. The learned judge from whom this appeal is brought has said: "It has been frequently said in this Court that a solicitor as an officer of the Court cannot be allowed to put himself into a position in which his duty to his present client may conflict with his duty to his past client; and I think the principle which has been laid down by the Courts is that in such a case as that the Court does not inquire what information the solicitor may have or what information he may communicate. He is presumed to have been in confidential relationship with his client and he will not be allowed to put himself into confidential relationship with another client opposed to his first client." With great deference to the learned judge I think that is erroneous in point of law.

The cases I think have established this, that as between the Court and the solicitor who is the officer of the Court there is the most ample jurisdiction to restrain any mischief resulting from the communication of confidential information obtained in the employment of one man to his detriment in the employment of

C. A.

1912

RAKUSEN
*v.*
ELLIS,
MUNDAY
& CLARKE.

Buckley L.J.

another man. As regards *Earl Cholmondeley* v. *Lord Clinton* (1), I think the best summary of the result of that case is to be found in Lord Eldon's own statement of it in *Bricheno* v. *Thorp* (2) that " the case of *Earl Cholmondeley* v. *Lord Clinton* (1) was no more than this. A gentleman discharged himself from being solicitor for Lord Clinton, and the question was, whether the Court would permit him to turn his back on his client, and to go into the service of the person against whom he had been employed." When *Earl Cholmondeley* v. *Lord Clinton* (1) is carefully read it will be found that Lord Eldon and the judges whom he consulted were all basing themselves upon this as being in their opinion the one cardinal feature of that case, that the solicitor had discharged himself; and they, I think, drew the inference that having discharged himself he was going into the employment of the new client with the result, or the possible result, or the anticipated result, that there would be a breach of the confidential duties which he owed to his former client. Of course he owes his former client the duty not to disclose that which he has learned confidentially, but there is no duty in the solicitor to abstain from serving another client in that matter if there is no breach of that confidence.

The only other case to which I wish to refer is *Little* v. *Kingswood Collieries Co.* (3) It seems to me that the principles upon which Hall V.-C. there purported to act were so shaken by that which was decided in the Court of Appeal that the judgment of Hall V.-C. cannot be relied upon. It will be noticed that the case gives a final blow to any such doctrine as Mr. Cave propounded, that the solicitor cannot act under any circumstances because there the Court approved a compromise under which he was, under circumstances, to act. That therefore cannot be improper and wrong. It seems to me, from the fact that the appellants' counsel were stopped, from the observations which were made, although made to some extent in the course of the argument, and from the compromise which the Court approved, plainly to follow that the principles for which Mr. Cave has argued here are principles which cannot be maintained. I may

(1) 19 Ves. 261; Coop. G. 80.          (2) Jac. 300, 301.

(3) 20 Ch. D. 733; 47 L. T. 323.

add that the question whether the solicitor was discharged or has discharged himself is not a governing or even a material question, except so far as it may throw light upon the question whether confidence is likely to be abused.

There is only one further matter which I wish to mention. The learned judge was proceeding on this footing, and we are proceeding on this footing, that in this case danger of communication of secrets will not arise. Those are the learned judge's words. In that state of facts it appears to me that an injunction is impossible. The whole basis of the jurisdiction to grant the injunction is that there exists, or, I will add, may exist, or may be reasonably anticipated to exist, a danger of a breach of that which is a duty, an enforceable duty, namely, the duty not to communicate confidential information; but directly the existence or possible existence of any such danger is negatived, the whole basis and substructure of the possibility of injunction is gone. I think that the order ought to be discharged.

C. A.

1912

RAKUSEN
*v.*
ELLIS,
MUNDAY
& CLARKE.

Buckley L.J.

Appeal allowed.

NOTE. No undertaking was in fact directed either by Warrington J. or by the Court of Appeal, but Mr. Clarke's name was at once substituted for that of the firm as solicitor for the company.

Solicitors: *Ellis, Munday & Clarke; B. A. Woolf & Co.*

H. C. R.

222

respondent, that the rule can operate to the advantage of the A
untruthful or malicious or revengeful or self-interested or even
demented police informant as much as of one who brings information
from a high-minded sense of civic duty. Experience seems to have
shown that though the resulting immunity from disclosure can be
abused the balance of public advantage lies in generally respecting it."

In this case, whilst the immunity may on occasions benefit a malicious B
investigator or informant, I consider that the balance of public advantage
lies in allowing it to the defendants.

I would dismiss the appeal.

*Appeal dismissed.*

C
*Solicitors: Jeffrey Green Russell; Treasury Solicitor; Crockers Oswald
Hickson.*

[Reported by Shiranikha Herbert, Barrister]

D

_____

[HOUSE OF LORDS]                                                      E

PRINCE JEFRI BOLKIAH    .    .    .    .    .    .    Appellant

AND

KPMG (a firm) .    .    .    .    .    .    .    .    Respondents

1998  Nov. 9, 10, 11; 18;        Lord Browne-Wilkinson, Lord Hope of Craighead,  F
      Dec. 18                    Lord Clyde, Lord Hutton and Lord Millett

*Accountant or Auditor—Accountant—Conflict of interest—Confidential
information—Duty to former client—Plaintiff retaining accountants
to provide litigation support services—Disclosure of confidential
information relating to plaintiff's financial affairs—Accountants
subsequently undertaking work for party with interests adverse to* G
*plaintiff—Whether duty to former client to prevent risk of disclosure
of confidential information—Whether "Chinese walls" adequate
safeguard—Whether plaintiff entitled to injunction restraining
accountants from acting for new client*

The defendants, a firm of chartered accountants, were the
auditors for an investment agency established to hold and manage
the general reserve fund and the external assets of the Government  H
of Brunei. In 1996 the plaintiff, the then chairman of the agency,
was involved in major litigation relating to his financial affairs
and he retained the defendants to provide forensic accounting
services and litigation support. In the course of that work the

**2 A.C.**                    Bolkiah v. KPMG (H.L.(E.))

A    defendants performed many tasks usually undertaken by solicitors, and were given access to highly confidential information concerning the extent and location of the plaintiff's assets. The litigation was settled in March 1998 and thereafter the defendants undertook no further work for the plaintiff. Around the same time the plaintiff was removed from his position as chairman of the agency. In June 1998 the Government of Brunei appointed a finance task force to conduct an investigation into the activities of

B    the agency during the period when the plaintiff had been its chairman. The agency retained the defendants to investigate the whereabouts of certain assets which were suggested to have been used by the plaintiff for his own benefit. The defendants took steps to protect the plaintiff's confidentiality by ensuring that the personnel who had been on the team assisting with the plaintiff's litigation were not on the team working on the agency's

C    investigation, and by attempting to create an information barrier within its forensic accounting department so as to prevent the flow of information between the two teams. The plaintiff commenced an action for breach of confidence against the defendants and sought an interlocutory injunction restraining them from acting for the agency. The judge granted the injunction, holding that although the defendants had an honest intention not

D    to disclose confidential information the barrier established by them was inadequate to deal with inadvertent disclosure. The Court of Appeal discharged the injunction on the grounds that there was no evidence that the plaintiff would suffer real prejudice unless there was an injunction and that a continuation of the injunction would set an unrealistic standard for the protection of confidential information.

E    On the plaintiff's appeal:—

*Held,* allowing the appeal, that where it was established that solicitors, or accountants providing litigation services such as those provided by the defendants, were in possession of information confidential to a former client which might be relevant to a matter in which they were instructed by a subsequent client the court should intervene to prevent the information from coming into the hands of anyone with an adverse interest unless it was

F    satisfied that there was no real risk of disclosure; that since it had been established that the defendants were in possession of confidential information the burden was on them to show that there was no risk that the information would come into the possession of those acting for the other party; that although there was no rule of law that "Chinese walls" or other similar arrangements were insufficient to eliminate the risk, unless special

G    measures were taken information moved within a firm and the court would restrain the defendants from acting for a new client unless it was satisfied on clear and convincing evidence that effective measures had been taken to ensure that no disclosure would occur; that in order to be effective arrangements had to be an established part of the organisational structure of the firm and the ad hoc arrangements made by the defendants were inadequate

H    in the circumstances to prevent the risk of inadvertent disclosure; and that, accordingly, since the defendants had not discharged the burden of showing there was no real risk that information confidential to the plaintiff might unwittingly or inadvertently come into the possession of those working on the agency

**Bolkiah v. KPMG (H.L.(E.))**                                    |1999|

investigation, the injunction would be granted (post, pp. 226F–G,   A
227G–H, 234C–H, 235D–F, 237A, F–238A, E–239D, F–240A).

*Rakusen v. Ellis, Munday & Clarke* [1912] 1 Ch. 831, C.A.
disapproved.

Decision of the Court of Appeal reversed.

The following cases are referred to in the opinion of Lord Millett:

*Carindale Country Club Estate Pty. Ltd. v. Astill* (1993) 115 A.L.R. 112   B
*Kelly v. Cooper* [1993] A.C. 205; [1992] 3 W.L.R. 936, P.C.
*MacDonald Estate v. Martin* (1990) 77 D.L.R. (4th) 249
*National Mutual Holdings Pty. Ltd. v. Sentry Corporation* (1989) 22 F.C.R. 209
*Rakusen v. Ellis, Munday & Clarke* [1912] 1 Ch. 831, C.A.
*Russell McVeagh McKenzie Bartleet & Co. v. Tower Corporation* (unreported),
    25 August 1998, C.A. New Zealand
*Solicitors, In re A Firm of* [1997] Ch. 1; [1996] 3 W.L.R. 16; [1995] 3 All E.R.   C
    482

The following additional cases were cited in argument:

*D. & J. Constructions Pty. Ltd. v. Head* (1987) 9 N.S.W.L.R. 118
*Johnson v. Marriott* (1833) 2 C. & M. 183
*Lee (David) & Co. (Lincoln) Ltd. v. Coward Chance* [1991] Ch. 259; [1990]   D
    3 W.L.R. 1278; [1991] 1 All E.R. 668
*Little v. Kingswood Collieries Co.* (1882) 20 Ch.D. 733, C.A.
*Mallesons Stephen Jacques v. KPMG Peat Marwick* (1990) 4 W.A.R. 357
*Solicitors, In re A Firm of* [1992] Q.B. 959; [1992] 2 W.L.R. 809; [1992] 1 All
    E.R. 353, C.A.
*Solow v. W. R. Grace & Co.* (1993) 597 N.Y.S.2d 361
*Tekni-Plex Inc. v. Meyner and Landis* (1995) 632 N.Y.S.2d 565
*Unioil International Pty. Ltd. v. Deloitte Touche Tohmatsu* (1997) 17 W.A.R. 98   E
*United States ex rel. Cherry Hill Convalescent Centre Inc. v. Healthcare Rehab
    System Inc.* (1997) 994 F.Supp. 244
*Weglarz v. Bruck* (1984) 470 N.E.2d 21

APPEAL from the Court of Appeal.

This was an appeal by leave of the House of Lords (Lord Browne-   F
Wilkinson, Lord Steyn and Lord Clyde) granted on 29 October 1998 by
the plaintiff, Prince Jefri Bolkiah, from a decision of the Court of Appeal
on 19 October 1998 (Lord Woolf M.R. and Otton L.J., Waller L.J.
dissenting) allowing an appeal by the defendants, KPMG (a firm), from
an order dated 15 September 1998 of Pumfrey J. granting the plaintiff's
application for an interlocutory injunction restraining the defendants, until
trial of the plaintiff's action against the defendants for breach of confidence   G
or further order, from acting for the Brunei Investment Agency in an
investigation into its financial affairs during the period of the plaintiff's
chairmanship of the agency.

The facts are stated in the opinion of Lord Millett.

*Gordon Pollock Q.C., Richard Meade* and *James Collins* for the plaintiff.   H
The plaintiff's submissions address primarily the position of solicitors.
That is the context in which cases like the present usually arise, and is the
situation considered in the authorities. The position of forensic accountants

**2 A.C.**                        **Bolkiah v. KPMG (H.L.(E.))**

A    when performing functions in many ways identical to those performed by solicitors, does not differ.

The decision in *Rakusen v. Ellis, Munday & Clarke* [1912] 1 Ch. 831 that there was no rule of law preventing a solicitor who had acted for a client from subsequently acting against him and that the court should only intervene where mischief was rightly anticipated, has been taken to mean that a risk of breach of confidence is a necessary condition for intervention.

B    *Rakusen's* case was based on exceptional circumstances which are unlikely to arise today and should not be followed.

The relationship between a solicitor and his client is crucial to the proper conduct of litigation and to the ability of those needing legal advice to obtain it. If a client cannot have confidence that what he tells his solicitor remains a secret he will not feel able to be candid and the quality

C    of advice received will suffer. A public perception that solicitors may change sides in a dispute will lead those not directly involved to form the view that they cannot safely be frank with their solicitors.

Commence and the legal profession have developed significantly since 1912 when *Rakusen's* case was decided. Communication and travel are now far easier and more solicitors are available to be consulted. Firms are larger and communications within them are much more advanced so that

D    information is more freely available.

A client is entitled to be protected against a real risk of breach of confidentiality, namely, a risk which is not fanciful. Chinese walls do not provide adequate protection and present a risk of a breach of confidentiality. A fiduciary must not expose his client to avoidable risk. Whether a risk is avoidable or not depends on the facts. Only in the

E    exceptional case where the risk of breach of confidentiality can a fiduciary act for both clients.

A solicitor must not accept a retainer to act adversely to a former client in a matter closely related to the work he did for that client, and there is no requirement that the former client has to prove that there is a likelihood of the misuse of his confidential information. Other common law jurisdictions impose absolute bars on the solicitor in this situation.

F    [Reference was made to *David Lee & Co. (Lincoln) Ltd. v. Coward Chance* [1991] Ch. 259; *In re A Firm of Solicitors* [1992] Q.B. 959; *In re A Firm of Solicitors* [1997] Ch. 1; *Weglarz v. Bruck* (1984) 470 N.E.2d 21; *Tekni-Plex Inc. v. Meyner and Landis* (1995) 632 N.Y.S.2d 565; *Solow v. W. R. Grace & Co.* (1993) 597 N.Y.S.2d 361; *United States ex rel. Cherry Hill Convalescent Centre Inc. v. Healthcare Rehab System Inc.* (1997) 994

G    F.Supp. 244; *D. & J. Constructions Pty. Ltd. v. Head* (1987) 9 N.S.W.L.R. 118; *Mallesons Stephen Jacques v. KPMG Peat Marwick* (1990) 4 W.A.R. 357; *Carindale Country Club Estate Pty. Ltd. v. Astill* (1993) 115 A.L.R. 112 and *Russell McVeagh McKenzie Bartleet & Co. v. Tower Corporation* (unreported), 25 August 1998, C.A. New Zealand.]

The judge was entitled, on the evidence, to grant an injunction. The Court of Appeal had no grounds for interfering with his decision.

H    *David Donaldson Q.C., Ali Malek Q.C.* and *David Quest* for the defendants. If *Rakusen v. Ellis, Munday & Clarke* [1912] 1 Ch. 831 was rightly decided, accountants cannot be in a worse position than solicitors. The Court of Appeal was building on cases prior to *Rakusen's* case: see

226

*Little v. Kingswood Collieries Co.* (1882) 20 Ch.D. 733 and *Johnson v.*   A
*Marriott* (1833) 2 C. & M. 183.

This case concerns not only the interests of a former client, but also the
interests of the new client. The choice of many clients is limited to a few
firms which have the necessary expertise.

The rule suggested by the plaintiffs would result in overkill. The growth
of large firms has made it more feasible, not less feasible, to maintain a
separation of information by segregating large groups of personnel.   B
Accountants have a different background from solicitors and are trained
not to discuss their work. Unlike solicitors, accountants are not precluded
ethically from acting for clients with opposing interests. Accountancy firms
have a culture of confidentiality internally and Chinese walls are an
accepted means of preventing a flow of information. Ultimately it is a
question of fact whether they are effective. [Reference was made to *David*   C
*Lee & Co. (Lincoln) Ltd. v. Coward Chance* [1991] Ch. 259; *In re A Firm
of Solicitors* [1992] Q.B. 959; *Unioil International Pty. Ltd. v. Deloitte
Touche Tohmatsu* (1997) 17 W.A.R. 98; *Mallesons Stephen Jacques v.
KPMG Peat Marwick* (1990) 4 W.A.R. 357 and *MacDonald Estate v.
Martin* (1990) 77 D.L.R. (4th) 249.]

Even if the rule contended for by the plaintiff were adopted and
applicable to forensic accountants it would not preclude the defendants   D
from acting in this investigation. There would remain the operation of
discretion in the light of the circumstances. The judge was wrong to say
that whatever procedures were put in place there was a risk of disclosure
of confidential information. He did not even address the culture of
accountancy firms, the nature of the information and the fact that there
was no question of the deliberate misuse of information.   E

*Pollock Q.C.* replied.


Their Lordships took time for consideration.


18 November. Their Lordships allowed the appeal and granted an
injunction for reasons to be given later.
  F

18 December. LORD BROWNE-WILKINSON. My Lords, shortly after
the conclusion of the argument in this case we gave judgment allowing the
appeal and granting an injunction, saying that we would give our reasons
at a later date. I have had the advantage of reading in draft the speech to
be given by my noble and learned friend, Lord Millett. It fully sets out the
reasons which led me to allow the appeal and grant the injunction.   G


LORD HOPE OF CRAIGHEAD. My Lords, I have had the advantage of
reading in draft the speech which has been prepared by my noble and
learned friend, Lord Millett. For the reasons which he has given, with
which I agree, I also was in favour of allowing the appeal and granting the
injunction.

I consider that the nature of the work which a firm of accountants   H
undertakes in the provision of litigation support services requires the court
to exercise the same jurisdiction to intervene on behalf of a former client
of the firm as it exercises in the case of a solicitor. The basis of that

2 A.C.                    Bolkiah v. KPMG (H.L.(E.))          Lord Hope of Craighead

A    jurisdiction is to be found in the principles which apply to all forms of
employment where the relationship between the client and the person with
whom he does business is a confidential one. A solicitor is under a duty
not to communicate to others any information in his possession which is
confidential to the former client. But the duty extends well beyond that of
refraining from deliberate disclosure. It is the solicitor's duty to ensure that
the former client is not put at risk that confidential information which the
B    solicitor has obtained from that relationship may be used against him in
any circumstances.

Particular care is needed if the solicitor agrees to act for a new client
who has, or who may have, an interest which is in conflict with that of the
former client. In that situation the former client is entitled to the protection
of the court if he can show that his solicitor was in receipt of confidential
C    information which is relevant to a matter for which the solicitor is acting,
against the former client's interest, for a new client. He is entitled to insist
that measures be taken by the solicitor which will ensure that he is not
exposed to the risk of careless, inadvertent or negligent disclosure of the
information to the new client by the solicitor, his partners in the firm, its
employees or anyone else for whose acts the solicitor is responsible.

As for the circumstances in which the court will intervene by granting
D    an injunction, it will not intervene if it is satisfied that there is no risk of
disclosure. But if it is not so satisfied, it should bear in mind that the
choice as to whether to accept instructions from the new client rests with
the solicitor and that disclosure may result in substantial damage to the
former client for which he may find it impossible to obtain adequate
redress from the solicitor. It may be very difficult, after the event, to prove
E    how and when the information got out, by whom and to whom it was
communicated and with what consequences. In that situation everything is
likely to depend on the measures which are in place to ensure that there is
no risk that the information will be disclosed. If the court is not satisfied
that the measures will protect the former client against the risk, the proper
course will be for it to grant an injunction.

As my noble and learned friend has shown in his careful analysis of
F    the facts in this case, KPMG have been unable to demonstrate that they
can provide the protection to which Prince Jefri is entitled in order to
ensure that there is no risk that confidential information which they have
acquired from him will be disclosed to those engaged on Project Gemma.
The terms of the injunction are designed to protect him against that risk,
while enabling KPMG to continue to provide services to B.I.A. as its
G    auditors.

LORD CLYDE.    My Lords, I have had the advantage of reading in draft
the speech prepared by my noble and learned friend, Lord Millett. The
reasons which he fully sets out are those which led me to allow the appeal
and grant the injunction.

H    LORD HUTTON.    My Lords, I have had the advantage of reading in
draft the speech prepared by my noble and learned friend, Lord Millett.
The reasons which he fully sets out are those which led me to allow the
appeal and grant the injunction.

LORD MILLETT.   My Lords, the question in this appeal is whether, and $\quad$ A
if so in what circumstances, a firm of accountants which has provided
litigation support services to a former client and in consequence has in its
possession information which is confidential to him can undertake work
for another client with an adverse interest. The question has become of
increased importance with the emergence of huge international firms with
enormous resources that operate on a global scale and offer a
comprehensive range of services to clients. $\quad$ B

Some time after the conclusion of the argument your Lordships gave
their unanimous opinion that the appeal should be allowed and stated that
they would give their reasons later. I now give my reasons for allowing the
appeal.

*The facts* $\qquad$ C

Your Lordships have been supplied with an agreed statement of facts.
It is the principal though not the only source from which the following
summary is derived.

The respondents ("KPMG") are a large and well known English firm
of chartered accountants with associated but separate firms around the
world. Their London office employs almost 5,000 staff and has at least 350 $\quad$ D
partners working from different offices. The staff of the forensic accounting
department alone numbers more than 100. KPMG are the auditors to
between 20 and 25 per cent. of all listed companies in the United
Kingdom. They are one of the five largest firms of accountants not merely
in this country but in the world.

Ever since the Brunei Investment Agency ("the B.I.A.") was established
in 1983 KPMG have undertaken the annual audit of its core funds. The $\quad$ E
B.I.A. was formed to hold and manage the General Reserve Fund of
the Government of Brunei and its external assets and to provide the
Government with money management services. The exact size of its core
funds is secret but they are valued in many billions of dollars. In the last
three years, KPMG have undertaken over 6,000 hours per year of
chargeable time on the audit. The engagement partner responsible for the
audit work was Mr. Peter Harrison. The affairs of the B.I.A. are secret $\quad$ F
and under its governing Act unauthorised disclosure is a criminal offence.
The B.I.A. did not authorise the disclosure in these proceedings of the
details of KPMG's relationship with it until after the hearing at first
instance, and this has caused KPMG difficulties in the presentation of
their case which have led to adverse criticism of their apparent lack of
candour. In addition to their audit work, KPMG also carried out $\quad$ G
associated advisory and consultancy work for the B.I.A. On average, about
4,000 hours a year of chargeable time is spent on this work. A long and
close working relationship between the B.I.A. and KPMG has resulted.

The appellant ("Prince Jefri") is the third and youngest brother of the
Sultan of Brunei. Until March 1998 he enjoyed a very close relationship
with the Sultan. He is a former Minister of Finance and was for many
years the chairman of the B.I.A. He is, however, no longer in favour. He $\quad$ H
has recently been removed from his position as chairman of the B.I.A.,
and partners of Arthur Andersen have taken control of his companies as
executive managers under powers conferred by emergency decrees.

229

A    Over the years numerous large transfers of capital ("the special transfers") were made out of the core funds. The destination and use of these transfers did not form part of KPMG's audit. KPMG were required to accept an annual representation from the Board of the B.I.A. (of which Prince Jefri was chairman) that the transfers were made on behalf of or for the benefit of the Brunei Government and accordingly carried out no further investigation of them.

B    Over a period of 18 months between 1996 and 1998 KPMG were also retained by one of Prince Jefri's companies on his behalf and at his request to undertake a substantial investigation in connection with major litigation (the "Manoukian litigation") in which he was personally involved. The investigation, which was given the code name Project Lucy, was mainly conducted by KPMG's London forensic accounting department, though their taxation department was also involved. The engagement partner on Project Lucy was Mr. Adam Bates.

C    Project Lucy involved the forensic accounting department in the provision of extensive litigation support services in the course of which they performed tasks usually undertaken by solicitors. They investigated the facts, interviewed witnesses with or without solicitors being present, searched for documents, took part in conferences, including telephone conferences, with counsel and in the absence of solicitors, drafted subpoenas, reviewed draft pleadings and prepared ideas for cross-examination. They took instructions and obtained information directly from Prince Jefri's own staff without the intervention of solicitors.

D    In the course of Project Lucy, as well as a number of other personal assignments which they undertook for Prince Jefri, KPMG were entrusted with or acquired extensive confidential information concerning Prince Jefri's assets and financial affairs. In particular they became privy to a substantial volume of information concerning the identity of his assets, their location, the legal structure of their ownership, the identity and structure of corporate and other vehicles used by Prince Jefri to hold assets, and the manner and financing of their purchase. Altogether some 168 KPMG personnel, 12 of whom were partners and 81 of whom were assistant managers or above, worked on assignments for Prince Jefri between 1996 and 1998. KPMG were paid approximately £4·6m. for their work.

E    

F    

G    Project Lucy was subject to a degree of security, but the effectiveness of the steps taken by KPMG to keep the work confidential is disputed. After January 1997 Project Lucy was accorded a separate area within the forensic accounting department, and after July 1997 it was housed in rooms on a separate floor with restricted access. Team members were forbidden to take work home to avoid the risk of papers being stolen or mislaid. In briefings Mr. Bates stressed to members of the team that Project Lucy was exceptionally confidential and should not be discussed outside the team.

H    The Manoukian litigation was settled in March 1998, and thereafter no further work was undertaken on Project Lucy. KPMG were formally instructed to discontinue the project on 14 May 1998. Following the settlement of the litigation the Inland Revenue served notices under section 20B(1) of the Taxes Management Act 1970 on KPMG in respect

230
**Lord Millett**  Bolkiah v. KPMG (H.L.(E.)) [1999]

of information in their possession relating to the Manoukians. All  A
documents in the possession of KPMG's tax department were gathered
together and delivered to their solicitors in March 1998. Thereafter KPMG
were involved in only two relatively minor assignments on behalf of Prince
Jefri, and work on these had also ceased by the middle of May 1998.

In June 1998 the Government of Brunei appointed a finance task force
to conduct an investigation into the activities of the B.I.A. On 16 June
1998 Mr. Harrison was summoned by the Ministry of Finance to Brunei  B
where he attended a meeting with the task force. He had been requested
to co-operate with the task force, and he explained the nature of his firm's
audit of the core funds and what little KPMG as auditors knew of the
special transfers. He was asked to assist the task force in establishing the
position of the core funds as at 31 May 1998 and to prepare a summary
of movements on the core funds since the establishment of the B.I.A. in  C
1983. These movements included the special transfers. All the information
necessary to perform this task was capable of being extracted from the
audited accounts and the auditors' working papers. The work was carried
out by members of the audit team and was covered by an engagement
letter negotiated by KPMG and eventually dated 2 July 1998. KPMG
reported to the task force on this project on 8 July 1998. KPMG are  D
plainly correct in maintaining that the work thus far was a natural
extension of their audit function.

In the meantime, however, Mr. John Ellison, a partner in the forensic
accounting department, was approached on 2 July on behalf of the B.I.A.
and asked whether KPMG would be able to assist the task force in
carrying out further investigations into the destination and the present
location of the money which had been the subject of the special transfers.  E
On 3 July 1998 Mr. Ellison, Mr. Harrison and another partner
Mr. Michael Fowle met to consider whether KPMG could properly accept
these instructions. The meeting was attended by KPMG's solicitors.
Mr. Ellison had spoken by telephone to Mr. Bates beforehand and
discussed the matter with him. The view was taken that there was no
conflict of interest as KPMG had ceased to act for Prince Jefri more than
two months previously and there was no longer a client relationship with  F
him. It was concluded that the B.I.A.'s instructions could properly be
accepted, but that it would be necessary to establish special arrangements
to provide additional protection against the use or disclosure of confidential
information relating to Prince Jefri which was still in KPMG's possession.

On 8 July 1998 the B.I.A. formally instructed KPMG to provide
assistance in connection with the investigation of the withdrawal of assets  G
from the B.I.A. by means of the special transfers. It was at about this time
that it became clear that the assignment was at least in part adverse to
Prince Jefri's interests. The work was covered by an engagement letter
dated 13 August 1998. This required KPMG to assist in establishing the
extent of the withdrawal of funds, the use made of the withdrawn funds,
the assets acquired with them, the present location of such assets, and the
identity of the persons or entities now controlling them. KPMG were  H
instructed to work with the B.I.A.'s legal advisers in obtaining evidence
and where appropriate to trace, secure and recover assets belonging to the
B.I.A. both in Brunei and overseas.

**2 A.C.**                    **Bolkiah v. KPMG (H.L.(E.))**                    **Lord Millett**

A    This further assignment was given the code name Project Gemma and Mr. Harrison was appointed as the lead partner. He had never been in receipt of any confidential information relating to Prince Jefri's business, financial or personal affairs. Although he was to head the project, this was clearly not simply an extension of the audit; it would involve the tracing and recovery of assets and might well lead to civil and even criminal proceedings against Prince Jefri. It would be undertaken by members of

B    the forensic accounting department and would be likely to involve them in the provision of litigation support services. It must have been obvious, and indeed is common ground, that some at least of the confidential information obtained by or provided to KPMG in the course of Project Lucy was or might be relevant to Project Gemma. It must also have been obvious, and again is common ground, that in relation to Project Gemma

C    the interests of the B.I.A. were adverse to those of Prince Jefri. KPMG did not inform Prince Jefri of their new assignment, nor did they seek his consent to their acceptance of the project.

KPMG employed some 50 people on Project Gemma, 11 of whom had previously been engaged on work for Prince Jefri. Most of them worked in Brunei but never more than 15 at a time. KPMG contends that none of the 11 was in possession of information confidential to Prince Jefri.

D    Over 7,500 hours were spent on work for the B.I.A. between 18 June and 15 September when Pumfrey J. granted an injunction to restrain KPMG from continuing with work on Project Gemma. A large number of transactions then still remained to be investigated. KPMG allege that the work which they had already undertaken, based on information provided to them by the B.I.A., had already demonstrated that very substantial

E    sums had been paid to or for the benefit of Prince Jefri from funds of the B.I.A. and appeared to have been used to acquire assets for himself or for entities which he controlled.

When KPMG accepted instructions in relation to Project Gemma, Mr. Ellison gave instructions that an information barrier (popularly known as a "Chinese wall") should be put in place within the forensic accounting department, and special arrangements were established from 3 July 1998

F    to protect the confidentiality of information in the possession of KPMG which related to Prince Jefri. These arrangements had two components. First, the selection of staff was intended to ensure that nobody who was in possession of such information was permitted to work on Project Gemma. Secondly, steps were taken to avoid the risk of such information becoming available to those working on Project Gemma in the future. It

G    was made clear at a meeting on 3 July 1998 that no one who was in possession of any confidential information deriving from Project Lucy could work on Project Gemma. Staff were appointed to Project Gemma only after confirming that they had no material prior involvement with Prince Jefri and were not in possession of any information which was confidential to him. Staff who had done work of a minor administrative nature on Project Lucy were permitted to work on Project Gemma but

H    only after KPMG had satisfied themselves that they were not in possession of confidential information relating to Prince Jefri. Most of the work on Project Gemma was carried out in Brunei. Work in London was done in a separate project room with restricted access in a building separate from

232

that which houses the forensic accounting department. Since the services    A
of the notices by the Inland Revenue the documentary records of Project
Lucy had been in the possession of KPMG's solicitors and were not
available to those working on Project Gemma. Separate computer file
servers were used for Project Gemma, and all electronic information
relating to Project Lucy was deleted from KPMG's servers.

In order to confirm the effectiveness of these arrangements, all Project
Gemma staff were interviewed by KPMG's solicitors about their knowledge    B
of Project Lucy. All those interviewed confirmed on affidavit that they
were not in possession of confidential information acquired from Prince
Jefri whether in the course of Project Lucy or otherwise. The solicitors
attempted to contact all the personnel who had worked on Project Lucy
or the other projects for Prince Jefri. One hundred and forty-six persons
were contacted and confirmed that they had not discussed confidential    C
matters outside the team. Twenty-three could not be traced because they
were no longer employed by KPMG.

*The decisions below*

In the course of the hearing before Pumfrey J. KPMG offered a
voluntary undertaking not to use or disclose any information about Prince
Jefri's affairs acquired in the course of Project Lucy. KPMG submitted    D
that this was sufficient to protect Prince Jefri's interests and was the only
relief to which he was entitled.

For its part the B.I.A. acknowledged that it was not entitled to require
KPMG to make use for its benefit of any information which was
confidential to Prince Jefri. It protested that an order which prevented
KPMG from continuing to work on Project Gemma would cause    E
unnecessary disruption to the investigations being carried on in Brunei.
KPMG confirmed its assertion that a replacement could not readily be
found since only a limited number of firms possess the necessary skills and
resources to undertake an investigation of the magnitude required. The
B.I.A. added that it was reluctant to increase the number of people and
organisations in possession of information which was confidential to the
B.I.A. It expressed particular concern at the prospect that an injunction    F
might prevent KPMG from completing the audit of the core funds for
1997.

This evidence was challenged by Prince Jefri. It does appear that
Arthur Andersen were already retained to carry out certain work for the
Government of Brunei (though not for the B.I.A.), and that following the
grant of the injunction by Pumfrey J. the scope of their instructions was    G
extended to include some at least of the matters covered by Project
Gemma.

The judge found that KPMG had taken all the steps which could be
expected to minimise or avoid disclosure of confidential information. He
declined to impute to KPMG and their staff anything other than an
honest intention not to disclose confidential information and said that he
was satisfied that they would do their best to fulfil their obligations. These    H
findings have not been challenged. But the judge took the view that he
was bound by authority to approach any question of the adequacy of the
protective measures which KPMG had adopted with a very critical eye.

2 A.C.                    Bolkiah v. KPMG (H.L.(E.))                    Lord Millett

A   He said that the intrinsic difficulty with Chinese walls was that, while they were well adapted to deal with foreseeable or deliberate disclosure of information, they were not well adapted to deal with disclosure which was accidental, inadvertent or negligent. He was firmly of the view that a former client should not be exposed to the risk of such disclosure unless there were powerful reasons for saying that he should. No such reasons existed in the present case. Accordingly he granted an injunction which restrained KPMG from continuing to carry out work on or covering the same subject matter as Project Gemma.

B

In the Court of Appeal the majority (Lord Woolf M.R. and Otton L.J.) did not accept, at least in the case of accountants, that there was inevitably a risk of disclosure or that Chinese walls were incapable of removing any real risk. Favouring the approach adopted by the Court of Appeal of New Zealand in *Russell McVeagh McKenzie Bartleet & Co. v. Tower Corporation* (unreported), 25 August 1998, Lord Woolf M.R. (with whose approach Otton L.J. agreed) identified three questions for consideration: (i) whether there was confidential information which if disclosed was likely to affect Prince Jefri's interests adversely; (ii) whether there was a "real or appreciable risk" that the confidential information would be disclosed; and (iii) whether the nature and importance of the former fiduciary relationship meant that the confidential information should be protected by an order of the kind sought. These questions were to be answered on the evidence, balancing the different interests involved and remembering that the issues would inevitably overlap. Taking into account the facts that as chairman of the B.I.A. Prince Jefri was aware when he retained KPMG that they had a long standing relationship with the B.I.A. as their auditors and that this would involve them in providing related accountancy services, and that Prince Jefri would have been aware that the B.I.A. would be put to inconvenience and expense if his retainer were to interfere with their use of KPMG's services, Lord Woolf M.R. considered that KPMG's duty should be limited to making reasonable efforts to protect Prince Jefri's confidential information and that it was not reasonable for Prince Jefri to require KPMG to be dismissed unless he "really would suffer serious damage" if they were not. On the evidence Lord Woolf M.R. was not satisfied that Prince Jefri would suffer any "real prejudice" if the injunction were discharged. When the undertaking which KPMG had offered was also taken into account, he said, the balance was clear. The continuation of the injunction would "set an unrealistic standard for the protection of confidential information" which would create unjustified impediments in the way large international firms conduct their business.

C

D

E

F

G

*The law*

The issues raised in these proceedings have not previously been considered by your Lordships' House. The controlling authority in England hitherto has been the decision of the Court of Appeal in *Rakusen v. Ellis, Munday & Clarke* [1912] 1 Ch. 831. The facts of that case were unusual. It concerned a small firm of solicitors with only two partners who carried on what amounted to separate practices, each with his own clients, without

H

Lord Millett                        Bolkiah v. KPMG (H.L.(E.))                        [1999]

any knowledge of the other's clients and with the exclusive services of    A
some of the clerks. The plaintiff consulted one of the partners in relation
to a contentious matter. After he had terminated his retainer, the other
partner, who had never met the plaintiff and was not aware that he had
consulted his partner, was retained by the party opposite in the same
matter. The judge granted an injunction to restrain the solicitor from
acting. The Court of Appeal found that there was no risk of disclosure of
confidential information and discharged the injunction.                     B

The case is authority for two propositions: (i) that there is no absolute
rule of law in England that a solicitor may not act in litigation against a
former client; and (ii) that the solicitor may be restrained from acting if
such a restriction is necessary to avoid a significant risk of the disclosure
or misuse of confidential information belonging to the former client. Like
most of the later authorities, the case was concerned with the duties of a   C
solicitor. The duties of an accountant cannot be greater than those of a
solicitor, and may be less, for information relating to his client's affairs
which is in the possession of a solicitor is usually privileged as well as
confidential. In the present case, however, some of the information obtained
by KPMG is likely to have attracted litigation privilege, though not
solicitor–client privilege, and it is conceded by KPMG that an accountant   D
who provides litigation support services of the kind which they provided
to Prince Jefri must be treated for present purposes in the same way as a
solicitor.


*The basis of the jurisdiction*

In *Rakusen's* case the Court of Appeal founded the jurisdiction on the   E
right of the former client to the protection of his confidential information.
This was challenged by counsel for Prince Jefri, who contended for an
absolute rule, such as that adopted in the United States, which precludes a
solicitor or his firm altogether from acting for a client with an interest
adverse to that of the former client in the same or a connected matter. In
the course of argument, however, he modified his position, accepting that   F
there was no ground on which the court could properly intervene unless
two conditions were satisfied: (i) that the solicitor was in possession of
information which was confidential to the former client and (ii) that such
information was or might be relevant to the matter on which he was
instructed by the second client. This makes the possession of relevant
confidential information the test of what is comprehended within the        G
expression "the same or a connected matter." On this footing the court's
intervention is founded not on the avoidance of any perception of possible
impropriety but on the protection of confidential information.

My Lords, I would affirm this as the basis of the court's jurisdiction to
intervene on behalf of a former client. It is otherwise where the court's
intervention is sought by an existing client, for a fiduciary cannot act at
the same time both for and against the same client, and his firm is in no   H
better position. A man cannot without the consent of both clients act for
one client while his partner is acting for another in the opposite interest.
His disqualification has nothing to do with the confidentiality of client

2 A.C.                    **Bolkiah v. KPMG (H.L.(E.))**                    **Lord Millett**

A    information. It is based on the inescapable conflict of interest which is inherent in the situation.

This is not to say that such consent is not sometimes forthcoming, or that in some situations it may not be inferred. There is a clear distinction between the position of a solicitor and an auditor. The large accountancy firms commonly carry out the audit of clients who are in competition with one another. The identity of their audit clients is publicly acknowledged.

B    Their clients are taken to consent to their auditors acting for competing clients, though they must of course keep confidential the information obtained from their respective clients. This was the basis on which the Privy Council decided *Kelly v. Cooper* [1993] A.C. 205 in relation to estate agents.

Where the court's intervention is sought by a former client, however,

C    the position is entirely different. The court's jurisdiction cannot be based on any conflict of interest, real or perceived, for there is none. The fiduciary relationship which subsists between solicitor and client comes to an end with the termination of the retainer. Thereafter the solicitor has no obligation to defend and advance the interests of his former client. The only duty to the former client which survives the termination of the client relationship is a continuing duty to preserve the confidentiality of

D    information imparted during its subsistence.

Accordingly, it is incumbent on a plaintiff who seeks to restrain his former solicitor from acting in a matter for another client to establish (i) that the solicitor is in possession of information which is confidential to him and to the disclosure of which he has not consented and (ii) that the information is or may be relevant to the new matter in which the interest

E    of the other client is or may be adverse to his own. Although the burden of proof is on the plaintiff, it is not a heavy one. The former may readily be inferred; the latter will often be obvious. I do not think that it is necessary to introduce any presumptions, rebuttable or otherwise, in relation to these two matters. But given the basis on which the jurisdiction is exercised, there is no cause to impute or attribute the knowledge of one partner to his fellow partners. Whether a particular individual is in

F    possession of confidential information is a question of fact which must be proved or inferred from the circumstances of the case. In this respect also we ought not in my opinion to follow the jurisprudence of the United States.

G    *The extent of the solicitor's duty*

Whether founded on contract or equity, the duty to preserve confidentiality is unqualified. It is a duty to keep the information confidential, not merely to take all reasonable steps to do so. Moreover, it is not merely a duty not to communicate the information to a third party. It is a duty not to misuse it, that is to say, without the consent of the former client to make any use of it or to cause any use to be made of it

H    by others otherwise than for his benefit. The former client cannot be protected completely from accidental or inadvertent disclosure. But he is entitled to prevent his former solicitor from exposing him to any avoidable risk; and this includes the increased risk of the use of the information to

his prejudice arising from the acceptance of instructions to act for another    A
client with an adverse interest in a matter to which the information is or
may be relevant.

*Degree of risk*

It follows that in the case of a former client there is no basis for
granting relief if there is no risk of the disclosure or misuse of confidential    B
information. This was the ground on which the Court of Appeal discharged
the injunction in *Rakusen's* case [1912] 1 Ch. 831. The test for
disqualification was expressed in different terms by each of the three
members of the court, but the case has been taken to indicate that the
court will not intervene unless it is satisfied that there is a "reasonable
probability of real mischief." This test has been the subject of criticism
both in this country and overseas, particularly in relation to solicitors, and    C
a more stringent test has frequently been advocated: see for example
Professor Finn, "Conflicts of Interest and Professionals" published by the
New Zealand Legal Research Foundation in *Professional Responsibility*,
cited with evident approval by Gummow J. in *National Mutual Holdings
Pty. Ltd. v. Sentry Corporation* (1989) 22 F.C.R. 209. It has been abandoned
in Canada: see *MacDonald Estate v. Martin* (1990) 77 D.L.R. (4th) 249,    D
where it has been replaced by two rebuttable presumptions:
(i) that confidential information will have been communicated by the
former client in the course of the retainer and (ii) that lawyers who work
together share confidences. The clear trend of the authorities is towards a
stricter approach.

My Lords, I regard the criticisms which have been made of the test
supposed to have been laid down in *Rakusen's* case [1912] 1 Ch. 831 as    E
well founded. It imposes an unfair burden on the former client, exposes
him to a potential and avoidable risk to which he has not consented, and
fails to give him a sufficient assurance that his confidence will be respected.
It also exposes the solicitor to a degree of uncertainty which could inhibit
him in his dealings with the second client when he cannot be sure that he
has correctly identified the source of his information.

It is in any case difficult to discern any justification in principle for a    F
rule which exposes a former client without his consent to any avoidable
risk, however slight, that information which he has imparted in confidence
in the course of a fiduciary relationship may come into the possession of a
third party and be used to his disadvantage. Where in addition the
information in question is not only confidential but also privileged, the
case for a strict approach is unanswerable. Anything less fails to give effect    G
to the policy on which legal professional privilege is based. It is of
overriding importance for the proper administration of justice that a client
should be able to have complete confidence that what he tells his lawyer
will remain secret. This is a matter of perception as well as substance. It is
of the highest importance to the administration of justice that a solicitor
or other person in possession of confidential and privileged information
should not act in any way that might appear to put that information at    H
risk of coming into the hands of someone with an adverse interest.

Many different tests have been proposed in the authorities. These
include the avoidance of "an appreciable risk" or "an acceptable risk."

**2 A.C.**                     Bolkiah v. KPMG (H.L.(E.))                     **Lord Millett**

A    I regard such expressions as unhelpful: the former because it is ambiguous, the latter because it is uninformative. I prefer simply to say that the court should intervene unless it is satisfied that there is no risk of disclosure. It goes without saying that the risk must be a real one, and not merely fanciful or theoretical. But it need not be substantial. This is in effect the test formulated by Lightman J. in *In re A Firm of Solicitors* [1997] Ch. 1, 9 (possibly derived from the judgment of Drummond J. in *Carindale Country*

B    *Club Estate Pty. Ltd. v. Astill* (1993) 115 A.L.R. 112) and adopted by Pumfrey J. in the present case.

    I would also reject the approach taken by the New Zealand Court of Appeal in *Russell McVeagh McKenzie Bartleet & Co. v. Tower Corporation*, 25 August 1998 and adopted by the Court of Appeal in the present case. In my opinion the balancing exercise which was undertaken was

C    inappropriate. This is not because the considerations which were thought to militate against the granting of injunctive relief were irrelevant: far from it. It is clearly relevant that Prince Jefri retained KPMG in the knowledge that they were the B.I.A.'s auditors, and that the B.I.A. would be put to inconvenience and expense if his retainer were to prevent it from employing KPMG's services in future. But such considerations are relevant to a different question: whether in the circumstances Prince Jefri must be taken

D    to have consented to KPMG's undertaking the further assignment for the B.I.A. For the reasons I have given, he must be taken to have consented to the acceptance by KPMG of the instructions given to Mr. Harrison in June, for these were a natural extension of the audit. But Project Gemma was a very different matter. Absent such consent, the considerations which the Court of Appeal took into account cannot in my opinion affect the nature and extent of KPMG's duty to protect confidentiality or convert it

E    into a duty to do no more than take reasonable steps to protect it. This would run counter to the fundamental principle of equity that a fiduciary may not put his own interest or those of another client before those of his principal. In my view no solicitor should, without the consent of his former client, accept instructions unless, viewed objectively, his doing so will not increase the risk that information which is confidential to the

F    former client may come into the possession of a party with an adverse interest.

*The adequacy of the protective measures taken by KPMG*

    Once the former client has established that the defendant firm is in possession of information which was imparted in confidence and that the

G    firm is proposing to act for another party with an interest adverse to his in a matter to which the information is or may be relevant, the evidential burden shifts to the defendant firm to show that even so there is no risk that the information will come into the possession of those now acting for the other party. There is no rule of law that Chinese walls or other arrangements of a similar kind are insufficient to eliminate the risk. But the starting point must be that, unless special measures are taken,

H    information moves within a firm. In *MacDonald Estate v. Martin*, 77 D.L.R. (4th) 249, 269 Sopinka J. said that the court should restrain the firm from acting for the second client "unless satisfied on the basis of clear and convincing evidence that all reasonable measures have been taken to

**Lord Millett**                    **Bolkiah v. KPMG (H.L.(E.))**                    |1999|

ensure that no disclosure will occur." With the substitution of the word    A
"effective" for the words "all reasonable" I would respectfully adopt that
formulation.

*Application to the facts of the present case*

Chinese walls are widely used by financial institutions in the City of
London and elsewhere. They are the favoured technique for managing the    B
conflicts of interest which arise when financial business is carried on by a
conglomerate. The Core Conduct of Business Rules published by the
Financial Services Authority recognise the effectiveness of Chinese walls as
a means of restricting the movement of information between different
departments of the same organisation. They contemplate the existence of
established organisational arrangements which preclude the passing of
information in the possession of one part of the business to other parts    C
of the business. In their Consultation Paper on Fiduciary Duties and
Regulatory Rules the Law Commission (1992) (Law. Com. No. 124)
describe Chinese walls as normally involving some combination of the
following organisational arrangements: (i) the physical separation of the
various departments in order to insulate them from each other—this often
extends to such matters of detail as dining arrangements; (ii) an educational    D
programme, normally recurring, to emphasise the importance of not
improperly or inadvertently divulging confidential information; (iii) strict
and carefully defined procedures for dealing with a situation where it is
felt that the wall should be crossed and the maintaining of proper records
where this occurs; (iv) monitoring by compliance officers of the effectiveness
of the wall; (v) disciplinary sanctions where there has been a breach of the
wall.    E

KPMG insist that, like other large firms of accountants, they are
accustomed to maintaining client confidentiality not just within the firm
but also within a particular team. They stress that it is common for a large
firm of accountants to provide a comprehensive range of professional
services including audit, corporate finance advice, corporate tax advice and
management consultancy to clients with competing commercial interests.
Such firms are very experienced in the erection and operation of    F
information barriers to protect the confidential information of each client,
and staff are constantly instructed in the importance of respecting client
confidentiality. This is, KPMG assert, part of the professional culture in
which staff work and becomes second nature to them. Forensic projects
are treated as exceptionally confidential and are usually given code names.
In the present case KPMG engaged different people, different servers, and    G
ensured that the work was done in a secure office in a different building.
KPMG maintain that these arrangements satisfy the most stringent test,
and that there is no risk that information obtained by KPMG in the
course of Project Lucy has or will become available to anyone engaged on
Project Gemma.

I am not persuaded that this is so. Even in the financial services
industry, good practice requires there to be established institutional    H
arrangements designed to prevent the flow of information between separate
departments. Where effective arrangements are in place, they produce a
modern equivalent of the circumstances which prevailed in *Rakusen's* case

239

2 A.C.                      Bolkiah v. KPMG (H.L.(E.))                     Lord Millett

A  [1912] 1 Ch. 831. The Chinese walls which feature in the present case,
however, were established ad hoc and were erected within a single
department. When the number of personnel involved is taken into account,
together with the fact that the teams engaged on Project Lucy and Project
Gemma each had a rotating membership, involving far more personnel
than were working on the project at any one time, so that individuals may
have joined from and returned to other projects, the difficulty of enforcing
B  confidentiality or preventing the unwitting disclosure of information is
very great. It is one thing, for example, to separate the insolvency, audit,
taxation and forensic departments from one another and erect Chinese
walls between them. Such departments often work from different offices
and there may be relatively little movement of personnel between them.
But it is quite another to attempt to place an information barrier between
C  members all of whom are drawn from the same department and have been
accustomed to work with each other. I would expect this to be particularly
difficult where the department concerned is engaged in the provision of
litigation support services, and there is evidence to confirm this. Forensic
accountancy is said to be an area in which new and unusual problems
frequently arise and partners and managers are accustomed to share
information and expertise. Furthermore, there is evidence that physical
D  segregation is not necessarily adequate, especially where it is erected within
a single department.

In my opinion an effective Chinese wall needs to be an established part
of the organisational structure of the firm, not created ad hoc and
dependent on the acceptance of evidence sworn for the purpose by
members of staff engaged on the relevant work.

E
*How should the discretion be exercised?*

In the course of his submissions before your Lordships, counsel for
KPMG submitted that, whether the special transfers were proper or
improper, Prince Jefri was an accounting party in respect of them, and
could not properly refuse to provide the B.I.A. with the information which
F  it was seeking. This may or may not be true, for the information which
the B.I.A. is seeking to obtain would appear to go far beyond what a
recipient of proper payments would be bound to disclose. But even if true,
it does not follow, as counsel for KPMG submitted, that KPMG can
discharge themselves from their duty of confidentiality to their former
client, acting as judges of the question between him and their present
client. The information was imparted to KPMG in confidence, and they
G  are bound to maintain that confidence unless and until they are relieved
of that duty by Prince Jefri's consent or an order of the court obtained at
the suit of the B.I.A.


*Conclusion*

I am not satisfied on the evidence that KPMG have discharged the
H  heavy burden of showing that there is no risk that information in their
possession which is confidential to Prince Jefri and which they obtained in
the course of a former client relationship may unwittingly or inadvertently
come to the notice of those working on Project Gemma. It was for this

240

**Lord Millett**                    **Bolkiah v. KPMG (H.L.(E.))**                    [1999]

reason that I was in favour of allowing the appeal and granting the    A
injunction in the terms proposed.

*Appeal allowed with costs.*
*Injunction granted.*

*Solicitors: Lovell White Durrant; Stephenson Harwood.*                    B

[Reported by SHIRANIKHA HERBERT, Barrister]

———

C

[HOUSE OF LORDS]

DIRECTOR OF PUBLIC PROSECUTIONS  .    .    .  RESPONDENT

                                                                            D
AND

JONES (MARGARET) AND ANOTHER        .    .    .    .  APPELLANTS

1998  Oct. 20, 21;              Lord Irvine of Lairg L.C., Lord Slynn of Hadley,
1999  March 4              Lord Hope of Craighead, Lord Clyde and Lord Hutton

                                                                            E
*Crime—Public order—Trespassory assembly—Order in force prohibiting*
*trespassory assemblies—Peaceful, non-obstructive assembly on high-*
*way—Extent of public's rights of access to highway—Whether*
*assembly trespassory—Public Order Act 1986 (c. 64), ss. 14A,*
*14B(2) (as inserted by Criminal Justice and Public Order Act 1994*
*(c. 33), s. 70)*

The defendants took part in a peaceful, non-obstructive    F
assembly on a highway in respect of which there was in force an
order under section 14A of the Public Order Act 1986,[1] as inserted
by section 70 of the Criminal Justice and Public Order Act 1994,
prohibiting the holding of trespassory assemblies. They were
convicted before justices of taking part in a trespassory assembly
knowing it to be prohibited, contrary to section 14B(2) of the Act
of 1986, as inserted. On appeal, the Crown Court held that there    G
was no case for them to answer on the basis that the holding of a
peaceful, non-obstructive assembly was part of the public's limited
rights of access to the highway and so was not prohibited by the
order. The Divisional Court allowed an appeal by the Director of
Public Prosecutions.
On appeal by the defendants:—
*Held,* allowing the appeal (Lord Slynn of Hadley and Lord
Hope of Craighead dissenting), that (*per* Lord Irvine of    H
Lairg L.C.) the public highway was a public place that the public

[1] Public Order Act 1986, s. 14A, as inserted: see post, p. 252A–E.
S. 14B(2), as inserted: see post, p. 252E.

Case 22-11068-JTD    Doc 1201    Filed 03/30/23    Page 48 of 146

country to sell by a customary measure, it is illegal. The cases of *Noble* v. *Durell* (a), and *Hockin* v. *Cooke* (b), proceeded on the ground that only one measure was permitted to be used throughout the kingdom. The Statutes of Car. 2, which create this offence, are expressed in the most positive terms, and are not repealed by the modern Acts alluded to, which were made for other purposes. All the provisions in these latter Acts have one object in view, the ascertaining of the quantity of corn in the kingdom, and its price; which could not be effected by directing the returns to be made according to the measure in each particular place if those measures varied. It therefore became necessary to direct the inspectors to distinguish in their returns between the one measure and the other: but it cannot be inferred from thence that the Legislature meant to sanction the use of any different measure from that mentioned in the Statutes of Car. 2; but, on the contrary, the policy of abiding by those statutes is apparent even from the modern Acts. The object of the Statutes of Car. 2 was to have only one measure throughout the kingdom; the object of the modern Acts was to ascertain the exact quantity of corn in the country. But as, notwithstanding the penalties inflicted by the former, persons continued to sell by different measures, the purposes of the latter Acts would have been frustrated, if the Legislature had not adapted the provisions of them to the customs of the country: but still the latter Acts left the persons selling by customary measure open to the penalties of the Statutes of Car. 2. Neither is there any foundation for the argument, that by this construction millers and factors are compelled to criminate themselves, by making a return of corn bought by customary measure; because they have the option of buying by statute-measure.

The Court said, that as this was a question of very general concern, they would take time to consider of it.

Lord Kenyon, Ch.J. now delivered the opinion of the Court.—We have hitherto delayed giving judgment in this case, in the hope of discovering that the farmers in general have been acting under a mistake; for it is a matter of notoriety that in different parts of the country corn is sold by different measures, some greater and others less than the Winchester measure. This question depends on the stat. 22 Car. 2, c. 8, and the 22 and **[753]** 23 Car. 2, c. 12. The former imposes a penalty of 40s. on any person who shall sell corn or grain, usually sold by bushel, by any other bushel or measure than the Winchester measure. The stat. 22 & 23 Car. 2, c. 12, recites the former Act; and, in order to enforce it, subjects both the buyer and seller to an accumulative penalty, the value of the corn sold. These Acts of Parliament are expressed in the most positive terms; and it was admitted in the argument that there was no subsequent law which directly repealed them. But several other statutes for the regulation of the corn-trade were referred to, directing returns of the average price of corn to be made, and noticing in those returns a customary measure. These, it was argued, obliquely, though not directly, repealed the Statutes of Charles the Second. We have considered this matter very fully, and are of opinion that the argument does not lead to that conclusion. We cannot get rid of those positive laws by a reference to subsequent statutes, which were passed for another purpose, and which leave the former ones still in force.

Conviction affirmed.

WILSON *against* RASTALL.   Monday, June 18th, 1792.   This Court will grant a new trial in a penal action on account of a mistake or misdirection of the Judge. If any matter be disclosed to an attorney in the cause, he cannot be permitted to give it in evidence, either in that or any other action. It is the privilege of the client and not of the attorney: but such privilege is confined to counsel, solicitors and attornies, when acting in their respective characters.

[Referred to, *Pearce* v. *Foster*, 1885, 15 Q. B. D. 121; *Sharpe* v. *Wakefield* [1891], A. C. 179.]

This action was brought to recover penalties upon the Bribery Act, for bribing voters at the last election for the borough of Newark upon Trent, to vote for one of the candidates. The bribery was charged to have been committed by the defendant

and his agents, among whom was one W. Handley. At the trial before Thomson, B. at the last Nottingham Assizes, W. Handley was called as a witness, who deposed, that previous to the dissolution of Parliament, in the Spring of 1790, he had received letters at Newark from the defendant in London, which he had had notice to produce with his subpœna; he had them not however to produce; but gave this account of them: that as to part, he had restored them to the defendant before his subpœna; as to the rest, he had given them to a Mrs. Elizabeth Handley, at her desire, with a direction to destroy them after she had read them. That he had since endeavoured to procure them again, for the like purpose of destroying them; but she had refused to give them up to him again; and he knew not whether they were destroyed or not. Two of these letters related to the subject of the election. The witness was then asked the contents of these letters; but that was **[754]** objected to, as Mrs. Handley might be called upon to produce the letters, or say what was become of them; and the objection was allowed. Mr. B. Handley, an attorney, was then called, who said, that he had the letters in question, which he had received from Mrs. Handley; and that Mr. W. Handley was at that time under a prosecution for bribery, and he wished to render him what assistance he could: that Mrs. H. had desired him to destroy the letters, but he still kept them. That there was no action now depending against Mr. W. H. but the two years were not yet expired. The letters were not (that he knew of) put into his hands with Mr. W. H.'s privity: but he had kept them with his privity and consent. Mr. W. H. had indeed desired him to destroy them; but he had not done so, for the same reason as he had not complied with the like request from Mrs. H. namely, that he had soon after the election stated, that Mr. W. H. acted only under the direction of Mr. Rastall in the election-business. He further stated, that he was not then concerned in carrying on any suit for W. H.: that he never was attorney in any action of indemnity; that he had been applied to by Mr. W. H. to be concerned, but had declined it, giving as a reason that he was under-sheriff, and a material witness in the cause: that he had not employed W. H.'s attorney for him; but that W. H. had consulted him in his profession as a confidential person; and had applied to him both before and after he had received the letters. He had desired the witness to consult with his attorney; which he had done, as well as with W. H. himself. The letters were communicated to him in consequence of the defendant's consulting him professionally. The witness objected to produce the letters $(a)^1$; and the learned Judge thought he was not bound so to do. Mr. W. Handley, being then called up again and asked as to the contents of those letters, refused to answer the question, as tending to criminate himself; which objection was allowed by the Judge. The plaintiff then went into other evidence (amongst which was parol evidence of those very letters) of the acts of bribery, which were strongly proved, and were not impeached by any contradictory evidence. The jury however found a verdict for the defendant: and a rule nisi was granted to shew cause why there should not be a new trial, on the ground of mistake in the Judge, in considering that B. Handley was **[755]** bound by his character of attorney to withhold the letters required to be produced in evidence. But a doubt being started, whether there was any instance of a new trial having been granted, where the verdict had passed for the defendant in a penal action? the Court desired that point might be looked into.

Erskine, Dayrell, D. P. Coke, Lane, and Clarke, shewed cause against the rule. 1st, they argued against the Court's granting a new trial, on the ground of there being no instance of it in the case of a penal action, where the verdict was for the defendant. This case falls within the same rule as criminal cases, namely, that the defendant shall not be put in jeopardy twice. An action for a penalty is in the nature of a criminal suit, and has always been so considered. It is not within the Statutes of Jeofails. In *Jervois q. t.* v. *Hall* $(a)^2$, which was for a penalty under the game-laws, and where the Judge had refused to admit a parishioner to be a witness, yet the verdict being for the defendant, the Court refused to grant a new trial; Lord Ch. J. Lee saying, that he had never known any instance of it in the case of a penal

---

$(a)^1$ It was understood and argued upon at the Bar, and so assumed by the Court, that the objection made by the witness to the production of the letters, was on the foundation of his character of attorney, by which he conceived himself bound to withhold them.

$(a)^2$ 1 Wils. 17.

**4 T. R. 756**                                    WILSON *v.* RASTALL                                    **1285**

action. The same was held in *Fonnereau* v. *Bennet* (b)¹, in an action on the Bribery
Act, where the verdict was objected to as against evidence ; and the Court condemned
the case in 2 Keb. 226, where the contrary had been ruled. *Seymour q. t.* v. *Day* (c)¹,
*Mattison q. t.* v. *Allanson* (d)¹, *Smith* v. *Frampton* (e), 5 Com. Dig. 135, tit. Pleader (S),
new trial, *R.* v. *Read* (f), *Rex* v. *Fenwick* (g), *R.* v. *Praed* (h), and *R.* v. *Davis* (i), were
cited to the same effect. The only cases in which it ever seems to have been done
are such as are alluded to in *R.* v. *Bear* (k), where the verdict has been obtained by
fraud or practice, want of notice, or the like ; but never in a case like the present,
where a verdict has been given for the defendant on the merits. 2dly, they
contended, that B. Handley, if not the attorney on record, stood in the same
situation both to the defendant and W. Handley ; and therefore could not be called
upon to betray the confidence reposed in him, by the production of the letters in
question. He described himself as the confidential professional adviser of W.
Handley ; and that it was with a view to the protection of his client that he had
possessed himself of the letters ; for as W. Handley would have been liable for any
bribery committed by him, as the agent of the defendant, his interest was **[756]**
directly involved in the production of those letters which were called for, in order to
prove such agency and fix W. Handley's acts upon the defendant. This privilege
exists even where the witness called is not the attorney on the record. In one of
Petrie's causes for bribery, tried a few years ago at Salisbury, Reynolds, who had
been Petrie's attorney, though not so at the time of the trial, was called to prove
something that he had learned in a confidential conversation with Petrie ; but Mr.
J. Buller would not suffer him to give the evidence, and strongly reproached him for
his anxiety to reveal the secrets of his former client. In another point of view too,
B. Handley was bound in conscience not to produce the letters, for at the time of
their delivery, he had undertaken to destroy them ; and as he could not keep them
without a breach of confidence, he ought not to be compelled to produce them ; but
the letters ought to be considered as destroyed. In *Madam du Barre's case,* where
trover was lately brought to recover her jewels from persons who had stolen them in
France, and brought them over here, Lord Kenyon would not permit the person who
had acted as interpreter between the defendants and their attorney to be examined
as to the conversation which was held between them. At any rate, it will be nugatory
to grant a new trial for the sake of having those letters produced ; because they may
be destroyed in the mean time.

Lord Kenyon, Ch.J.—In *Madam du Barre's case,* I considered the interpreter as
standing in the same situation as the attorney himself ; and I said at the trial, "that
he was the organ of the attorney."

Mingay, Garrow, and Brough, contrà, as to the first point, said, that there was a
distinction between this and the cases cited ; for all those where a new trial had been
refused, were either criminal cases, though short of life, such as perjury, or cases of
actions on penal statutes, where the jury had decided, however wrong, upon the whole
merits : but, 1st, this was not a criminal case ; penal actions having been expressly
decided in *Atcheson* v. *Everett* (a)¹ to be civil cases ;—and 2dly, here the error was in the
Judge, who had shut out legal evidence from the jury, and thereby deprived them of
the opportunity of exercising their judgment upon the whole case ; though certainly
even upon this evidence the verdict ought to have been the other way. The only case
which seems to militate against this **[757]** distinction is that of *Jervois* v. *Hall* (a)² ;
but that is a very short note ; and it is very well known that the Court do not lean
in favour of actions on the game laws. But in *Robinson q. t.* v. *Lequesne* (b)², which was
upon an information on seizing certain goods for a fraudulent exportation, and verdict
for defendant, though the new trial was refused on application, yet (the reporter says)
it seems to be admitted, that in a case of this nature a new trial might be granted
if the fact would have admitted of it ; and that the plaintiff's counsel were prepared
with precedents, if they had been called upon to that purpose. So an information in
nature of a quo warranto was considered by the Court in *Rex* v. *Francis* (c)² as a civil
proceeding ; and a new trial was there granted. Again, in *King* v. *Pippett* (d)², which

(b)¹ 3 Wils. 59.          (c)¹ 2 Stra. 899.          (d)¹ 2 Stra. 1238.
(e) 1 Ld. Raym. 62 ; 2 Salk. 644, S. C.          (f) 1 Lev. 9.          (g) 1 Sid. 153.
(h) 4 Burr. 2257.         (i) 1 Show. 336.          (k) 2 Salk. 646 ; and 2 Mod. Cas. 207.
(a)¹ Cowp. 382.          (a)² 1 Wils. 17.          (b)² Bunb. 253.
(c)² Ante, 2 vol. 484.                              (d)² Ante, 1 vol. 235.

was a similar action to the present, the Court set aside the nonsuit, being of opinion that the Judge was mistaken : and upon the same principle they ought to grant a new trial in this case, where by means of his erroneous rejection of a witness the whole matter was not laid before the jury.  On the 2d ground, there is no doubt but that the witness B. Handley would have produced the letters if he had not been prevented by the opinion of the learned Judge, who decided on the ground of B. Handley's being attorney to W. Handley, and that he could not betray the confidence reposed in him.  But in the first place, W. Handley himself expressly declared that he was not his attorney ; and it is plain that he did not get possession of the letters in that character.  Besides, the defendant had one attorney ; and if the privilege could be extended to more than one ; it would be attended with great mischief in cases like the present ; for then all election agents would have their mouths shut.

Lord Kenyon, Ch.J.—Though this motion for a new trial is an application to the discretion of the Court, it must be remembered that the discretion to be exercised on such an occasion is not a wild but a sound discretion, and to be confined within those limits within which an honest man, competent to discharge the duties of his office, ought to confine himself ; and that discretion will be best exercised by not deviating from the rules laid down by our predecessors ; for the practice of the Court forms the law of the Court.  It has been said, however, **[758]** that if we grant a new trial in this case, we shall innovate on the practice of those who have gone before us : but that was more easily asserted than proved ; for there is not a single instance where a new trial has been refused in a case where the verdict has proceeded on the mistake of the Judge.  Where indeed the jury have formed an opinion upon the whole case, no new trial in a penal action has been granted, though the jury have drawn a wrong conclusion : so too, in ordinary, where the damages are small, and the question too inconsiderable to be retried, the Court has frequently refused to send the case back to another jury.  But wherever a mistake of the Judge has crept in, and swayed the opinion of the jury, I do not recollect a single case in which the Court has ever refused to grant a new trial.  All the cases of indictments I lay out of the case, because they are criminal cases, and are exceptions to the general rule.  But I consider this as a civil action.  Then what are the facts here ?  The evidence of B. Handley was rejected on account of a confidence supposed to have been reposed in him by the defendant ; for the witness said the letters were delivered to him in consequence of the defendant's consulting him professionally ; therefore he was not permitted to give evidence, because it was thought that the privilege of his client prevented him.  But in order to see whether or not he were privileged, it is necessary to inquire whether he was in the situation which he assumed to himself.  Was B. Handley in a situation over whose conduct his client had an interest ?  It expressly appears from his own evidence that he was not, nor could be employed as an attorney.  And I have always understood that the privilege of a client only extends to the case of the attorney for him ; though whether or not it ought to be extended farther, I am happy to think may be inquired into in this cause ; for it is a matter of satisfaction to us that every step which we take may be reviewed in another Court, if the defendant choose to tend a bill of exceptions ; and therefore our opinion will not conclude the defendant.  But in order to shew that the privilege extends beyond the case of an attorney and client, a hard case has been pressed upon our feelings, of confidence reposed in a friend.  But if a friend could not reveal what was imparted to him in confidence, what is to become of many cases, even affecting life ; e.g. *Doctor Ratcliff's case* (a)[1].  And if the privilege now claimed extended to all cases and persons, Lord W. Russell died by the hands of **[759]** an assassin, and not by the hands of the law ; for his friend Lord Howard (a)[2] was permitted to give evidence of confidential conversations between them : all good men indeed thought that he should have gone almost all lengths rather than have betrayed that confidence ; but still if the privilege had extended to such a case, it was the business of the Court to interfere and prevent the evidence being given.  I therefore think that this privilege is only allowed in the case of attorney and client.  And it appears to me that B. Handley was not permitted to produce these letters on a supposition, that the privilege of his client prevented him.  But one ground, which has been urged against our granting a new trial on account of the non-production of these

---

(a)[1] 9 St. Tr. 582.                    (a)[2] 3 St. Tr. 715.

**WILSON v. RASTALL** **1287**

letters, is, that before the next trial they may be burned: but in *The Attorney General* v. *Le Merchant* it was determined that parol evidence might be given of letters, which were not produced ; and that too was the case of a penal action.

Buller, J.—This doctrine of privilege was fully discussed in a case before Lord Hardwicke. The privilege is confined to the cases of counsel, solicitor, and attorney ; but in order to raise the privilege, it must be proved that the information, which the adverse party wishes to learn, was communicated to the witness in one of those characters ; for if he be employed merely as a steward, he may be examined. It is indeed hard in many cases to compel a friend to disclose a confidential conversation ; and I should be glad if by law such evidence could be excluded. It is a subject of just indignation where persons are anxious to reveal what has been communicated to them in a confidential manner ; and in the case mentioned, where Reynolds, who had formerly been the attorney of Mr. Petrie, but who was dismissed before the trial of the cause, wished to give evidence of what he knew relative to the subject while he was concerned as the attorney, I strongly animadverted on his conduct, and would not suffer him to be examined : he had acquired his information during the time that he acted as attorney ; and I thought that the privilege of not being examined to such points was the privilege of the party (*b*), and not of the attorney : and that the privilege never ceased at any period of time. In such a case it is not sufficient to say that the cause is at an end ; the mouth of such a person is shut for ever. I take the distinction to be now well settled, that the privilege extends to those three enumerated cases at all [760] times, but that it is confined to these cases only. There are cases, to which it is much to be lamented that the law of privilege is not extended ; those in which medical persons are obliged to disclose the information which they acquire by attending in their professional characters. This point was very much considered in *The Duchess of Kingston's case* (*a*)[1], where Sir C. Hawkins, who had attended the duchess as a medical person, made the objection himself, but was over-ruled and compelled to give evidence against the prisoner. The question therefore here is, whether B. Handley were privileged with respect to any person? As to W. Handley, he certainly was not ; for he said that the witness neither was, nor could be, his attorney ; because he was at that time acting as under-sheriff. Neither was he privileged as to this defendant for the same reason ; and though it was said that the defendant (by W. Handley) consulted him in his profession as a confidential person, the meaning of that was, that as B. Handley was more conversant with business of this kind than those who were not of his profession, W. Handley consulted him, but did not employ him as an attorney. But it was contended, on the part of the plaintiff, that, supposing the witness were privileged in any action in which W. Handley was a party, the privilege did not extend to this action against Rastall. But to that I cannot accede ; for if he were privileged, so as not to be examined to particular points in any action against W. Handley, he could not prove the same facts in an action against any other person ; for the nature of this kind of privilege is that the attorney shall not be permitted to disclose in any action that which has been confidentially communicated to him as an attorney. However, as B. Handley was neither the attorney of W. Handley nor of the defendant, I am of opinion that he was improperly prevented from producing the letters in question. Then, as to the other ground, I know of no case, except that of *Jervois q. t.* v. *Hall*, 1 Wils. 17, in which the Court has ever refused to grant a new trial, which was moved for on account of the mis-direction or mistake of the Judge. And the note of that case in 1 Wils. is much too loose to be relied on. It is not stated whether or not the Court even granted a rule to shew cause : at all events the question was not agitated whether the witness, who was rejected at the trial, might or might not be examined. I think that the witness there was properly rejected, because he was [761] interested (*a*)[2]. But if the Court proceeded on the ground, that the witness was a competent witness, and yet refused to grant a new trial, I think the case itself is not law. The case cited from 2 Str. 1238, by the defendant's counsel,

(*b*) Vid. *Lindsey* v. *Talbot*, Bull. N. P. 284.

(*a*) 11 St. T. 243. See also the examination of Lord Barrington, page 246, 7.

(*a*)[2] But now by the stat. 27 Geo. 3, c. 29, a parishioner may be examined to prove an offence within the parish, though the penalty is given to the poor of the parish, unless the penalty exceed 20*l.*

proves the reverse of that for which it was adduced; for there the Court refused to grant a new trial, "there being no proof of any misbehaviour in the defendant, or tampering with the jury." Now, if on the existence of either of those grounds the Court would have granted a new trial, why should it not be granted where the Judge falls into a mistake? because under such circumstances the cause was not fully before the jury.

Grose, J.—This case has been so fully gone into by my brothers, that it is unnecessary for me to say more than that I agree with them.

Rule absolute.

GOODISSON *against* NUNN.    Tuesday, June 19th, 1792.    A. agreed to sell B. his estate for a certain sum before a particular day, in consideration whereof B. agreed to pay that sum on the day, and on failure to pay 21l.; held, that they were dependent covenants; and that A. could not recover the 211. without shewing a conveyance on his part, or a tender of one.    [8 T. R. 366.    1 East, 203.]

This was an action of debt to recover 21l. on certain articles of agreement, the substance of which was stated in the declaration. The defendant craved oyer of the agreement; by which the plaintiff agreed that he would on or before the 2d of September then next, "by such conveyances, surrenders, assurances, ways, and means in the law, shall reasonably devise, advise, or require (*a*), well and sufficiently grant, sell and release, assign and surrender, or otherwise convey to the defendant all that copyhold tenement lying," &c. In consideration whereof the defendant covenanted to pay to the plaintiff the sum of 210l. on or before the 2d day of September next ensuing; on failure of complying with the before-mentioned agreement the defendant was to pay to the plaintiff the sum of 21l.; and if the plaintiff did not deliver the estate according to the before-mentioned agreement, then he was to pay to the defendant the sum of 21l. It was further agreed between the parties, that the plaintiff should take up the copyhold as follows: (that is to say) "that the plaintiff should take it up either for the defendant or his wife, as they should agree at the time; that the plaintiff should take it up for himself; **[762]** that each party should pay share and share alike towards the expenses attending the taking it up." The defendant then pleaded, 1st, non est factum; 2dly, that the plaintiff did not on or before the 2d day of September next, &c. by such conveyances, assurances, surrenders, ways and means in the law reasonably devised, advised, and required, well and sufficiently grant, sell, and release, assign and surrender, or otherwise convey to the defendant the said premises in the said articles of agreement mentioned, &c. 3dly, that the plaintiff did not on or before the 2d day of September, &c. or at any time since, well and sufficiently grant, sell, and release, assign and surrender, or otherwise convey, to the defendant, the said premises, &c. 4thly, that the plaintiff at the time of the making of the articles, &c. had nothing in the said premises, whereby he could be enabled to grant, &c. to the defendant the said premises, &c.

To the three last pleas the plaintiff demurred generally.

Wood, in support of the demurrer. The two first special pleas are drawn on a supposition that the conveyance by the plaintiff to the defendant is a condition precedent, and that the defendant is not liable on his covenant till the plaintiff has performed the covenant on his part. But, on the true construction of these articles, this was not a condition precedent on the plaintiff's part, but the covenants were mutual and independent: a breach of either of which gives the other party a right of action. If it had been agreed "that the defendant would on a particular day pay the money upon the plaintiff's conveying," that would have made the conveyance a condition precedent to the payment of the money: but here the parties have relied on the mutual covenants which each entered into with the other. Those covenants are general, not depending upon each other. The first is, that the plaintiff shall convey, &c. expressed in the most general terms; in consideration whereof (that is, in consideration of the plaintiff's covenant) the defendant covenanted to pay, &c. in terms equally general. In 1 Rol. Abr. 415, pl. 8, "If by articles of agreement between B. and C. by which B. covenants, for the consideration afterwards to be expressed, to convey certain lands to C. in fee; and after C. covenants on his part,

---

(*a*) The agreement was drawn in this inaccurate manner.

CAYMAN ISLANDS



Supplement No. 2 published with Extraordinary
Gazette No. 56 dated 22nd July, 2016.

**THE CONFIDENTIAL INFORMATION DISCLOSURE LAW, 2016**

**(LAW 23 OF 2016)**

# THE CONFIDENTIAL INFORMATION DISCLOSURE LAW, 2016

## ARRANGEMENT OF SECTIONS

1. Short title
2. Interpretation
3. Disclosure of confidential information
4. Evidence of confidential information directions
5. Rules Committee to make rules for procedure
6. Repeal

CAYMAN ISLANDS

Law 23 of 2016.

I Assent

Helen Kilpatrick

Governor.

15th July, 2016

**A BILL FOR A LAW TO REPEAL THE CONFIDENTIAL RELATIONSHIPS (PRESERVATION) LAW (2015 REVISION); TO PROVIDE FOR THE CIRCUMSTANCES UNDER WHICH CONFIDENTIAL INFORMATION MAY BE DISCLOSED; AND TO PROVIDE FOR INCIDENTAL AND CONNECTED PURPOSES**

ENACTED by the Legislature of the Cayman Islands.

1.    This Law may be cited as the Confidential Information Disclosure Law, 2016.

Short title

2.    In this Law -

Interpretation

"confidential information" includes information, arising in or brought into the Islands, concerning any property of a principal, to whom a duty of confidence is owed by the recipient of the information;

"court" has the meaning assigned to this word in the Evidence Law (2011 Revision);

(2011 Revision)

"normal course of business" means the ordinary and necessary routine involved in the efficient carrying out of the instructions of a principal;

"principal" means a person to whom a duty of confidence is owed;

*The Confidential Information Disclosure Law, 2016*

"property" includes every present, contingent and future interest or claim, direct or indirect, legal or equitable, positive or negative, in any money, moneys worth, realty or personalty, movable or immovable, rights and securities thereover and all documents and things evidencing or relating thereto;

(2013 Revision)   "regulatory laws" has the meaning assigned to these words in section 2 of the Monetary Authority Law (2013 Revision); and

(2015 Revision)   "wrongdoing" has the meaning assigned to it by section 50(2) of the Freedom of Information Law (2015 Revision).

Disclosure of confidential information

3.    (1)   Where a person owes a duty of confidence, the disclosure by that person of confidential information -

    (a)   in compliance with the directions of a court pursuant to section 4;

    (b)   in the normal course of business or with the consent, express or implied, of a principal;

    (c)   to a constable of the rank of inspector or above investigating a criminal offence committed or alleged to have been committed within the Islands;

    (d)   in compliance with an order or search warrant made by the Central Authority pursuant to the Criminal Justice (International Cooperation) Law (2015 Revision);

    (e)   in compliance with an order made by the Cayman Authority pursuant to the Mutual Legal Assistance (United States of America) Law (2015 Revision);

    (f)   in compliance with an order for evidence made by the Grand Court pursuant to the Evidence (Proceedings in Other Jurisdictions) (Cayman Islands) Order, 1978 (S.I 1890/78);

    (g)   to the Monetary Authority, where the disclosure is made pursuant to a duty imposed under the Monetary Authority Law (2013 Revision) or regulatory laws;

    (h)   to the Financial Reporting Authority pursuant to a duty imposed by the Proceeds of Crime Law (2014 Revision) or Terrorism Law (2015 Revision);

    (i)   to the Anti-Corruption Commission pursuant to a duty imposed by the Anti-Corruption Law (2014 Revision); and

    (j)   in accordance with, or pursuant to, a right or duty created by any other Law or Regulation,

shall not constitute a breach of the duty of confidence and shall not be actionable at the suit of any person.

(2015 Revision)

(2015 Revision)

(S.I. 1890/78)

(2013 Revision)

(2014 Revision)

(2015 Revision)

(2014 Revision)

4

*The Confidential Information Disclosure Law, 2016*

(2)    A person who discloses confidential information on wrongdoing, or in relation to a serious threat to the life, health, safety of a person or in relation to a serious threat to the environment, shall have a defence to an action for breach of the duty of confidence, as long as the person acted in good faith and in the reasonable belief that the information was substantially true and disclosed evidence of wrongdoing, of a serious threat to the life, health, safety of a person or of a serious threat to the environment.

4.    (1)    In this section -

Evidence of confidential information directions

"give in evidence" means make a statement, produce a document by way of discovery, answer an interrogatory or testify during or for the purposes of any proceeding; and

"proceeding" means any court proceeding, civil or criminal, and includes a preliminary or interlocutory matter leading to or arising out of a proceeding.

(2)    If a person intends to or is required to give evidence in or in connection with any proceeding being tried, inquired into or determined by any court, tribunal or other authority, whether within or without the Islands and the evidence consists of or contains any confidential information within the meaning of this Law, the person shall apply for directions in accordance with this section before giving that evidence, unless the person has been provided with the express consent of the principal.

(3)    An application for directions under subsection (2) shall be made to and be heard and determined by, a Judge of the Grand Court.

(4)    Notice of an application under subsection (3) shall be served on the Attorney-General and if the Judge so orders, to any person who is a party to the proceedings relating to the application being made.

(5)    The Attorney-General may appear as *amicus curiae* at the hearing of an application under this section and any party on whom notice has been served under subsection (4) is entitled to be heard with respect to the application, either in person or by an attorney-at-law representing the person.

(6)    Upon hearing an application under subsection (3), a Judge shall direct -

(a)    that the evidence be given;
(b)    that some or all of the evidence shall not be given; or

5

*The Confidential Information Disclosure Law, 2016*

     (c)    that the evidence be given subject to conditions which the Judge may specify whereby the confidentiality of the information is safeguarded.

    (7)   In order to safeguard the confidentiality of a document, statement, answer or testimony ordered to be given under subsection (6)(c), a Judge may order -

     (a)    that the divulgence of the document, statement, answer or testimony be restricted to certain persons named by the Judge in the order;

     (b)    that evidence be taken in private in a manner specified by the Judge to ensure privacy; and

     (c)    that the reference to the name, address and description of any person be made by the assignment of alphabetical letters, numbers or symbols representing the name, address and description of the person, the key to which reference shall be provided to restricted persons named by the Judge.

    (8)   A person receiving confidential information by operation of subsection (3) is as fully bound by the duty of confidence, as if the information had been disclosed to the person in confidence by the principal.

    (9)   In considering what order to make under this section, a Judge shall have regard to -

     (a)    whether the order would operate as a denial of the rights of any person in the enforcement of a claim;

     (b)    any offer of compensation or indemnity made to any person desiring to enforce a claim by any person having an interest in the preservation of confidentiality;

     (c)    in any criminal case, the requirements of the interests of justice.

Rules Committee to make rules for procedure

5.   The Rules Committee of the Grand Court may make rules and prescribe forms governing the procedure for applications to the Grand Court under this Law.

6

6.    The Confidential Relationships (Preservation) Law (2015 Revision) is repealed.

Repeal

(2015 Revision)

Passed by the Legislative Assembly the 24th day of June, 2016.

Anthony Eden

Deputy Speaker.

Sharon Smith

Acting Clerk of the Legislative Assembly.

7

CAYMAN ISLANDS



Supplement No. 22 published with Extraordinary Gazette No. 53 of 17th July, 2015.

**MUTUAL LEGAL ASSISTANCE (UNITED STATES OF AMERICA) LAW**

**(2015 Revision)**

Law 16 of 1986 consolidated with Law 19 of 2012.

Revised under the authority of the Law Revision Law (1999 Revision).

Originally enacted-

           Law 16 of 1986-12th September, 1986
           Law 19 of 2012-31st August, 2012.

Consolidated and revised this 2nd day of July, 2015.

*Note (not forming part of the Law):   This revision replaces the 1999 Revision which should now be discarded.*

**MUTUAL LEGAL ASSISTANCE (UNITED STATES OF AMERICA) LAW**

**(2015 Revision)**

**ARRANGEMENT OF SECTIONS**

1.  Short title
2.  Definitions and interpretation
3.  Implementation of the Treaty
4.  Cayman Mutual Legal Assistance Authority
5.  Attorney General and the Director of Public Prosecutions to be notified of request received
6.  Powers ancillary to the execution of a request
7.  Powers to compel witness or for production of evidence
8.  Authentication of official documents
9.  Protection of persons appearing in response to a request
10. Protection of persons disclosing confidential information
11. Restriction on application of Confidential Relationships (Preservation) Law (2015 Revision)
12. Transfer of persons in custody to or from the territory of the other Party
13. Confidentiality with regard to a request
14. Claims for expenses and costs
15. Service of notices and documents
16. Enforcement
17. Repeal of Law 17 of 1984
    Schedule: The Treaty

4

# MUTUAL LEGAL ASSISTANCE (UNITED STATES OF AMERICA) LAW

## (2015 Revision)

1.   This Law may be cited as the Mutual Legal Assistance (United States of America) Law (2015 Revision).

*Short title*

2.   (1)   In this Law-

*Definitions and interpretation*

"Article" means an Article of the Treaty;

"authorised person" means a person authorised under section 8;

"Cayman Authority" means the Cayman Mutual Legal Assistance Authority;

"request" means a request made by one of the Parties to the other Party, in accordance with the terms of the Treaty;

"the Treaty" means the Treaty between the United States of America and the United Kingdom of Great Britain and Northern Ireland, including the Cayman Islands, dated the 3rd July, 1986, relating to the mutual legal assistance in criminal matters, as more particularly set out in the Schedule;

"United States" means the United States of America; and

"United States Authority" means the Central Authority for the United States.

(2)   In this Law, unless the context otherwise requires, any expression which is defined in the Treaty shall have the same meaning as that given to it in the Treaty.

3.   This Law shall apply for the purpose of giving effect to the terms of the Treaty, which has legal effect in the Islands, for the provision of mutual assistance between the authorities in the United States and the Islands, for the suppression of criminal offences of the nature and in the circumstances provided in the Treaty, including any such ancillary civil or administrative proceedings by either of the Parties as are mentioned in paragraph (3)(c) of Article 19.

*Implementation of the Treaty*

4.   For the purpose of Article 2, the Cayman Mutual Legal Assistance Authority shall be the Chief Justice, who shall exercise his functions under the Treaty and this Law acting alone and in an administrative capacity, or another Judge of the Grand Court designated by the Chief Justice to act on his behalf.

*Cayman Mutual Legal Assistance Authority*
*\*See Note 1 on page 28*

5.   Without prejudice to Article 5(4), the Cayman Authority shall notify the Attorney General and the Director of Public Prosecutions immediately a request is received, with particulars thereof, and copies of any documents relating thereto,

*Attorney General and the Director of Public Prosecutions to be notified of request received*

and the Attorney General  and the Director of Public Prosecutions shall be entitled, in a manner analogous to *amicus curiae*, to appear or to take part in any proceedings in the Islands, whether judicial or administrative, arising directly or indirectly from a request received by the Cayman Authority.

Powers ancillary to the execution of a request

6.    (1)    Upon receipt of a request, the competent authorities in the Islands shall execute the request, in accordance with, but subject to, the provisions of the Treaty. Where the execution of a request requires the issue under the law of the Islands of a subpoena, search warrant, order for the seizure of any article or other necessary order by a magistrate, justice of the peace or officer of a court, a certificate given by the Cayman Authority that the issue of any such document or order is required for the purposes of a request to which this Law relates shall be sufficient authority for the issue or making of the same without further enquiry.

(2)    Notwithstanding any other law, if the execution of any request requires the service of any document or order or the seizure of any article in pursuance of any instruction given by the Cayman Authority, any constable of the rank of Inspector or above, if so required by the Cayman Authority, shall assist in such service or seizure to the same extent as he would be required so to do in the case of the service of any document or order issued, or the seizure of any article, on the instructions of the Grand Court, and for that purpose he shall be deemed to have the same powers as if acting in pursuance of directions given by the Grand Court or any officer thereof.

Powers to compel witness or for production of evidence

7.    (1)    Where, in pursuance of the terms of a request, any person is required to testify or to produce in the Islands documentary information, which is in his possession or under his control, the Cayman Authority shall have the same powers as the Grand Court for compelling that person to comply with the request; and if that person wilfully fails or refuses so to do he shall be liable to be dealt with by the Grand Court as if he had failed to comply with an order for a similar purpose issued by the Grand Court.

(2)    A person required to testify or to produce documentary information shall have the right to be represented by an attorney when he does so.

Authentication of official documents

8.    For the purpose of the authentication of any official documents or records of the Islands, as mentioned in Article 9, any person authorised in that behalf by the Attorney General of the Islands shall be deemed to be an authorised person.

Protection of persons appearing in response to a request

9.    Any person who enters the Islands in response to a request made by the Cayman Authority for the appearance of that person in accordance with Article 10, while in the Islands, shall not be subject to service of any process or subjected to any restriction of his personal liberty by reason of any act or conviction in the territory of either of the Parties or of the Contracting Parties prior to his departure

6

from the territory of the United States in conformity with such request, but the immunity provided for by this section shall cease ten days after that person has been notified in writing by the Cayman Authority that his presence is no longer required in the Islands or, if he has earlier left the Islands, that he is not required by the Cayman Authority to return for the purposes of a request.

10.   A person who divulges any confidential information or gives any testimony in conformity with a request shall be deemed not to commit any offence under the Confidential Relationships (Preservation) Law (2015 Revision), or under any other law for the time being in force in the Islands, by reason only of such disclosure or the giving of such testimony; and shall be deemed not to commit any offence under section 13 of the Banks and Trusts Companies Law (2013 Revision) by reason only of such disclosure or the giving of such testimony; and such disclosure or testimony shall be deemed not to be a breach of any confidential relationship between that person and any other person, and no civil claim or action whatsoever shall lie against the person making such disclosure or giving such testimony or against such person's principal or employer by reason of such disclosure or testimony.

Protection of person disclosing confidential information
2015 Revision

2013 Revision

11. Section 4 of the Confidential Relationships (Preservation) Law (2015 Revision) shall be deemed not to apply to confidential information given by any person on the directions of the Cayman Authority given in pursuance of a request.

Restriction on application of Confidential Relationships (Preservation) Law 2015 Revision

12.   (1)   A person who is in lawful custody in the Islands may be transferred to the United States in response to a request for his presence as a witness, if, under Article 11, that person and the Cayman Authority consent to such transfer.

Transfer of persons in custody to or from the territory of the other Party

      (2)   A person transferred under subsection (1) shall be deemed to be in lawful custody during such transfer and during the period in which he is in the United States, and such time shall count for all purposes under the laws of the Islands as if he had been in custody in the Islands.

      (3)   A person who is in lawful custody in the United States and who is transferred to the Islands under Article 11 shall be deemed to be in lawful custody during such transfer and during the period in which he is in the Islands.

      (4)   Any person who is transferred under this section and Article 11 may be released from custody upon such conditions as to bail or otherwise as may be agreed between the Parties, and shall in any event be released no later than the date on which he would have been released if he had not been so transferred.

13.   (1)   If so instructed by the Cayman Authority, the particulars of and all matters relating to a request shall be treated as confidential, and no person who is notified of a request, or is required to take any action, or produce any documents

Confidentiality with regard to a request

7

*Mutual Legal Assistance (United States of America) Law (2015 Revision)*

or supply any information in response to or in relation to any matters to which a request relates, shall disclose the fact of the receipt of such request or any of the particulars required or documents produced to any other person, except that person's attorney and such other persons as the Central Authority may authorise, for a period of ninety days from the date of the receipt of the request, or such further period as he may be notified by the Cayman Authority.

(2)   This section shall be binding on the attorney of any person to whom subsection (1) applies as if he were that person.

Claims for expenses and costs

14.   (1)   Any person in the Islands claiming to be entitled under Article 6 to be reimbursed by the United States Authority in respect of any expenses incurred shall submit his claim to the Cayman Authority for transmission to the United States Authority.

(2)   The Cayman Authority shall have power to tax or make any enquiries to verify the details of any claim submitted under subsection (1) in similar manner to a claim for costs submitted to the Grand Court.

Service of notices and documents

15.   For the purposes of this Law and the Treaty, the service of any notice or document shall be sufficient if delivered by hand or posted by registered post to the registered or other office of the addressee. Affidavit testimony of delivery of the notice or document by hand or supporting the registration certificate shall be deemed sufficient proof of such service.

Enforcement

16.   (1)   A person who, having been required by the Cayman Authority under this Law to produce any documents which are in his possession or under his control, fails so to do, within such time, or any extension thereof, as may be specified by the Cayman Authority by notice, commits an offence and is liable on summary conviction to a fine of ten thousand dollars and to imprisonment for two years.

(2)   A person who, contrary to section 13, informs any person, other than his attorney, of the fact of the issue of a request or of any communication relevant to the matter to which the request relates, commits an offence and is liable on summary conviction to a fine of one thousand dollars and to imprisonment for six months.

(3)   Where any documents or other written information have not been produced in pursuance of a notice served under this Law by the Cayman Authority, any constable of the rank of Inspector or above, acting on the written instructions of the Cayman Authority may apply to any court, magistrate or justice of the peace for the issue of a search warrant to search for and seize any such documents or other written information, and thereupon the court, magistrate or

justice of the peace shall issue a warrant to search for and seize the documents or information concerned. Such warrant, *mutatis mutandis*, shall be in form similar to, and shall confer the same powers of entry, search and seizure as, any search warrant issued under section 25 of the Criminal Procedure Code (2014 Revision).    2014 Revision

(4)   Any documents or other written information seized under a warrant issued under subsection (3) shall be brought immediately to the Cayman Authority to be dealt with according to law.

(5)   A person who, when required so to do in accordance with the instructions given by the Cayman Authority, or any subpoena served upon him, refuses to attend as required or to provide testimony in response to a request, commits an offence and is liable on summary conviction to a fine of five thousand dollars and to imprisonment for one year.

(6)   Subsection (5) is without prejudice to the provisions of any other law with regard to the liability of any person to be dealt with for failure to comply with any subpoena or other order issued by any court, magistrate or justice of the peace and without prejudice to the provisions of any other law with regard to the liability of any person to be dealt with for any unlawful attempt to obtain from any person or body any confidential information; but no person shall be punished both under this section and any other law for an offence relating to the same failure to comply with the same order.

17.   The Narcotics Drugs (Evidence) (United States of America) Law, 1984 shall be repealed on a date to be appointed by the Governor by Proclamation published in the Gazette.    Repeal of Law 17 of 1984
*See note 2 on page 28

# SCHEDULE

## THE TREATY

section 3

Treaty between the United States of America and the United Kingdom of Great Britain and Northern Ireland concerning the Cayman Islands relating to mutual legal assistance in criminal matters.

*Mutual Legal Assistance (United States of America) Law (2015 Revision)*

## ARRANGEMENT OF ARTICLES

**Article**

1.   Scope of Assistance
2.   Central Authorities
3.   Limitations on Assistance
4.   Form and Contents of Requests
5.   Execution of Requests
6.   Costs
7.   Limitations on Use
8.   Taking Testimony and Producing Evidence in the Territory of the Requested Party
9.   Providing Records of Government Agencies
10.  Appearance in the Territory of the Requesting Party
11.  Transferring Persons in Custody for Testimonial Purposes
12.  Location of Persons
13.  Service of Documents
14.  Search and Seizure
15.  Return of Documents and Articles
16.  Proceeds of Crime
17.  Exclusivity
18.  Consultations
19.  Definitions
20.  Ratification, Entry into Force, and Termination

The Government of the United States of America
and
The Government of the United Kingdom of Great Britain and Northern Ireland,
including the Government of the Cayman Islands

Desiring to improve the effectiveness of the law enforcement authorities of both the United States of America and the Cayman Islands in the investigation, prosecution, and suppression of crime through cooperation and mutual legal assistance in criminal matters,

Have agreed as follows:

## Article 1
### Scope of Assistance

1.   The Parties shall provide mutual assistance, in accordance with the provisions of this Treaty, for the investigation, prosecution, and suppression of criminal offences of the nature and in the circumstances set out in this Treaty,

*Mutual Legal Assistance (United States of America) Law (2015 Revision)*

including the civil and administrative proceedings referred to in paragraph 3(c) of Article 19.

2.    For the purposes of paragraph 1, assistance shall include:

  (a)   taking the testimony or statement of persons;
  (b)   providing documents, records, and articles of evidence;
  (c)   serving documents;
  (d)   locating persons;
  (e)   transferring persons in custody for testimony;
  (f)   executing requests for searches and seizures;
  (g)   immobilising criminally obtained assets;
  (h)   assistance in proceedings related to forfeiture, restitution and collection of fines; and
  (i)   any other steps deemed appropriate by both Central Authorities.

3.    This Treaty is intended solely for mutual legal assistance between the Parties. The provisions of this Treaty shall not create any right on the part of any private person to obtain, suppress, or exclude any evidence, or to impede the execution of a request.

## Article 2
## Central Authorities

1.    A Central Authority shall be established by each Party.

2.    For the United States of America, the Central Authority shall be the Attorney General or a person designated by him. For the Cayman Islands, the Central Authority shall be the Cayman Mutual Legal Assistance Authority or a person designated by it.

3.    Requests under this Treaty shall be made by the Central Authority of the Requesting Party to the Central Authority of the Requested Party.

## Article 3
## Limitations on Assistance

1.    The assistance afforded by this Treaty shall not extend to:

  (a)   any matter which relates directly or indirectly to the regulation, including the imposition, calculation, and collection, of taxes, except for any matter falling within subparagraphs 3(d) and (e) of Article 19; or
  (b)   any conduct not punishable by imprisonment of more than one year.

11

*Mutual Legal Assistance (United States of America) Law (2015 Revision)*

2.   The Central Authority of the Requested Party may deny assistance where:

(a)   the request is not made in conformity with the provisions of this Treaty;

(b)   the request relates to a political offence or to an offence under military law which would not be an offence under ordinary criminal law; or

(c)   the request does not establish that there are reasonable grounds for believing:

(i)   that the criminal offence specified in the request has been committed; and

(ii)   that the information sought relates to the offence and is located in the territory of the Requested Party.

3.   The Central Authority shall deny assistance where the Attorney-General of the Requested Party has issued a certificate to the effect that the execution of the request is contrary to the public interest of the Requested Party.

4.   Before denying assistance pursuant to this Article the Central Authority of the Requested Party shall consult with the Central Authority of the Requesting Party to consider whether assistance can be given subject to such conditions as it deems necessary. If the Requesting Party accepts assistance subject to these conditions, it shall comply with the conditions.

**Article 4**
**Form and Contents of Requests**

1.   Requests shall be submitted in writing by the Central Authority of the Requesting Party in such form as may from time to time be agreed between the Central Authorities.

2.   The Request shall include the following:

(a)   the name of the authority conducting the investigation or proceeding to which the request relates;

(b)   the subject matter and nature of the investigation or proceeding for the purposes of which the request is made and in particular the criminal offence or offences for the investigation, prosecution or suppression of which the assistance is requested;

(c)   information concerning the persons involved including, where available, their full names, dates of birth, and addresses;

(d)   the information relied upon in support of the request;

(e)   a description of the evidence, information or other assistance sought; such description shall specify where possible the time period to which any such evidence or information relates;

    (f)   the purpose for which the evidence or information or other assistance is sought; and

    (g)   the identity and presumed location, where known, of any person from whom evidence is sought.

3.    To the extent necessary and possible, a request shall also include:

    (a)   the identity and location of a person to be served, that person's relationship to the proceedings, and the manner in which service is to be made;

    (b)   available information on the identity and whereabouts of a person to be located;

    (c)   a precise description of the place or person to be searched and of the articles to be seized;

    (d)   a description of the manner in which any testimony or statement is to be taken and recorded;

    (e)   a list of questions to be asked of a witness;

    (f)   a description of any particular procedure to be followed in executing the request;

    (g)   information as to the allowances and expenses to which a person asked to appear in the territory of the Requesting Party will be entitled; and

    (h)   any other information which may be brought to the attention of the Requested Party to facilitate its execution of the request.

**Article 5**
**Execution of Requests**

1.    The Central Authority of the Requested Party shall promptly execute any request or, when appropriate, shall transmit it to the authority having jurisdiction to do so. The competent authorities of the Requested Party shall do everything in their power to execute the request. The Courts of the Requested Party shall have jurisdiction to issue subpoenas, search warrants, or other orders necessary to execute the request.

2.    When execution of the request requires judicial or administrative action, the request shall be presented to the appropriate authority by the persons designated by the Central Authority of the Requested Party.

3.    Requests shall be executed in accordance with the laws of the Requested Party except to the extent that this Treaty provides otherwise. However, the method of execution specified in the request shall be followed except insofar as it is prohibited by the laws of the Requested Party.

*Mutual Legal Assistance (United States of America) Law (2015 Revision)*

4.    If execution of the request would interfere with an ongoing criminal investigation or proceeding in the territory of the Requested Party, the Central Authority of that Party may postpone execution or make execution subject to conditions determined necessary after consultations with the Requesting Party. If the Requesting Party accepts the assistance subject to the conditions it shall comply with the conditions.

5.    The Central Authority of the Requested Party shall promptly inform the Central Authority of the Requesting Party of the outcome of the execution of the request. If the request is denied, the Central Authority of the Requested Party shall inform the Central Authority of the Requesting Party of the reasons for the denial.

### Article 6
### Costs

1.    The following expenses, and none other, incurred in executing a request shall be reimbursed by the Requesting Party upon application of the Central Authority of the Requested Party:

    (a)   travel expenses of a witness presenting testimony in the territory of the Requesting Party;

    (b)   fees of expert witnesses retained with the approval of the Central Authority of the Requesting Party;

    (c)   fees of counsel appointed or retained with the approval of the Central Authority of the Requesting Party for a witness giving testimony;

    (d)   reasonable costs of locating, reproducing, and transporting to the Central Authority of the Requesting Party documents or records specified in a request;

    (e)   costs of stenographic reports requested by the Central Authority of the Requesting Party, other than reports prepared by a salaried government employee; and

    (f)   reasonable costs of interpreters or translators.

2.    A witness who appears in the territory of the Requesting Party pursuant to Article 10 shall be entitled to the same fees and allowances ordinarily accorded to a witness in the territory of the Requesting Party.

3.    A witness who appears in the territory of the Requested Party pursuant to Article 8 shall be entitled to such fees and allowances as shall be agreed between the Central Authorities.

**Article 7**
**Limitations on Use**

1.    The Requesting Party shall not use any information or evidence obtained under this Treaty for any purposes other than for the investigation, prosecution or suppression in the territory of the Requesting Party of those criminal offences stated in the request without the prior consent of the Requested Party.

2.    Unless otherwise agreed by both Central Authorities, information or evidence furnished under this Treaty shall be kept confidential, except to the extent that the information or evidence is needed for investigations or proceedings forming part of the prosecution of a criminal offence described in the request.

3.    The Central Authority of the Requesting Party may request that the application for assistance, its contents and related documents, and the granting of assistance be kept confidential. If the request cannot be executed without breaking confidentiality, the Central Authority of the Requested Party shall so inform the Central Authority of the Requesting Party which shall then determine whether the request should nevertheless be executed.

4.    Except as may be permitted under paragraph 1, any information or evidence obtained under this Treaty which has been made public in the territory of the Requesting Party in a proceeding forming part of the prosecution of a criminal offence described in the request may be used only for the following additional purposes:

    (a)    where a trial results in a conviction for any criminal offence within the scope of this Treaty, for any purpose against the person(s) convicted;

    (b)    whether or not a trial results in the conviction of any person, in the prosecution of any person for any criminal offence within the scope of this Treaty; and

    (c)    in civil or administrative proceedings, only if and to the extent that such proceedings relate to -

      (i)    the recovery of the unlawful proceeds of a criminal offence within the scope of this Treaty from a person who has knowingly received them;

      (ii)    the collection of tax or enforcement of tax penalties resulting from the knowing receipt of the unlawful proceeds of a criminal offence within the scope of this Treaty; or

      (iii)    the recovery *in rem* of the unlawful proceeds or instrumentalities of a criminal offence within the scope of this Treaty.

15

*Mutual Legal Assistance (United States of America) Law (2015 Revision)*

**Article 8**

**Taking Testimony and Producing Evidence in the Territory of the Requested Party**

1.    A person requested to testify or to produce documentary information or articles in the territory of the Requested Party may be compelled to do so in accordance with the requirements of the law of the Requested Party.

2.    If the person referred to in paragraph 1 asserts a claim of immunity, incapacity, or privilege under the laws of the Requesting Party, the evidence shall nonetheless be taken and the claim made known to the Requesting Party for resolution by the authorities of that Party.

3.    The Requesting Party shall furnish information in advance about the date and place of the taking of the evidence pursuant to this Article.

4.    The Requested Party shall authorise the presence of such persons as are specified in the request during the taking of any evidence in the territory of the Requested Party and shall allow persons designated in the request to question the person whose testimony or evidence is being taken.

5.    Documentary information other than official records produced in the territory of the Requested Party pursuant to this Article shall be authenticated by the attestation of a person competent to do so in the manner indicated in Form A appended to this Treaty.

**Article 9**

**Providing Records of Government Agencies**

1.    The Requested Party shall provide the Requesting Party with copies of publicly available records of government departments and agencies in the territory of the Requested Party.

2.    The Requested Party may provide copies of any record or information in the possession of a government department or agency in the territory of that Party but not publicly available to the same extent and under the same conditions as it would be available to its own law enforcement or judicial authorities.

3.    Official records produced pursuant to this Article shall be authenticated by the attestation of an authorised person in the manner indicated in Form B appended to this Treaty. The attestation shall be signed by, and state the official position of, the attesting person, and the seal of the authority executing the request shall be affixed thereto. Authentication of official records shall be carried out

under the provisions of the Convention Abolishing the Requirement of Legalisation for Foreign Public Documents, dated 5 October 1961.

## Article 10
### Appearance in the Territory of the Requesting Party

1.    When the appearance of a person who is in the territory of the Requested Party is needed in the territory of the Requesting Party for the purpose of the execution of a request under this Treaty, the Central Authority of the Requesting Party may request that the Central Authority of the other Party invite the person to appear before the appropriate authority in the territory of the Requesting Party. The response of the person shall be communicated promptly to the Central Authority of the Requesting Party. Such a person shall be under no compulsion to accept such an invitation.

2.    A person appearing in the territory of the Requesting Party pursuant to this Article shall not be subject to service of process or be detained or subjected to any restriction of personal liberty by reason of any acts or convictions in either the territory of the Requesting or Requested Party which preceded his departure from the territory of the Requested Party.

3.    The safe conduct provided for by this Article shall cease ten days after the person has been notified in writing by the appropriate authorities that his presence is no longer required, or if the person has left the territory of the Requesting Party and voluntarily returned to it.

## Article 11
### Transferring Person in Custody for Testimonial Purposes

1.    A person in the custody of the Requested Party who is needed as a witness in connection with the execution of a request in the territory of the Requesting Party shall be transported to the territory of that Party if the person and the Requested Party consent.

2.    A person in the custody of the Requesting Party whose presence in the territory of the Requested Party is needed in connection with the execution of a request under this Treaty may be transported to the territory of the Requested Party if the person and both Parties consent.

3.    For the purpose of this Article:

   (a)    the Receiving Party shall be responsible for the safety and health of the person transferred and have the authority and obligation to

*Mutual Legal Assistance (United States of America) Law (2015 Revision)*

keep the person transferred in custody unless otherwise authorised by the Sending Party;

(b) the Receiving Party shall return the person transferred to the custody of the Sending Party as soon as circumstances permit or as otherwise agreed and in any event no later than the date upon which he would have been released from custody in the territory of the Sending Party; and

(c) the person transferred shall receive credit for service of the sentence imposed in the territory of the Sending Party for time served in the custody of the Receiving Party.

## Article 12
### Location of Persons

1. The Requested Party shall take all necessary measures to locate or identify persons who are believed to be in the territory of that Party and who are needed in connection with the investigation, prosecution or suppression of a criminal offence in the territory of the Requesting Party.

2. The Requested Party shall promptly communicate the results of its inquiries to the Requesting Party.

## Article 13
### Service of Documents

1. The Requested Party shall effect service of any document relating to or forming part of any request for assistance properly made under the provisions of this Treaty transmitted to it for this purpose by the Requesting Party; provided that the Requested Party shall not be obliged to serve any subpoena or other process requiring the attendance of any person before any authority or tribunal in the territory of the Requesting Party.

2. The Requesting Party shall transmit any such request for the service of a document inviting the appearance of a person before an authority in the territory of the Requesting Party to the Requested Party a reasonable time before the scheduled appearance.

3. The Requested Party shall return a proof of service in the manner specified in the request.

## Article 14
## Search and Seizure

1.    A request for assistance pursuant to Article 1 involving the search, seizure and delivery of an article to the Requesting Party shall be executed if it includes the information justifying such action under the laws of the Requested Party.

2.    Every official who has custody of a seized article shall certify the continuity of custody, the identity, and the integrity of its condition. No further certification shall be required. The certificates shall be admissible in evidence in the territory of the Requesting Party as evidence of the truth of the matters set forth therein.

3.    The Requested Party shall not be obliged to provide any item seized to the Requesting Party unless that Party has agreed to such terms and conditions as may be required by the Requested Party to protect third party interests in the item to be transferred.

## Article 15
## Return of Documents and Articles

The Requesting Party shall return any documents or articles furnished to it in the execution of a request under this Treaty as soon as possible unless the Requested Party waives the return of the documents or articles.

## Article 16
## Proceeds of Crime

1.    The Central Authority of one Party may notify the Central Authority of the other Party when it has reason to believe that proceeds of a criminal offence are located in the territory of the other Party.

2.    The Parties shall assist each other to the extent permitted by their respective laws in proceedings related to:

    (a)    the forfeiture of the proceeds of criminal offences;
    (b)    restitution of the victims of criminal offences; and
    (c)    the collection of fines imposed as a sentence for a criminal offence.

**Article 17**
**Exclusivity**

1.    Assistance and procedures set forth in this Treaty shall not prevent one Party from granting assistance to the other Party through the provisions of other international agreements or arrangements which may be applicable.

2.    Subject to the terms of paragraph 1, a Party needing assistance as provided in Article 1 in the investigation, prosecution or suppression of a criminal offence as defined in Article 19 shall request assistance pursuant to this Treaty.

3.    No Party shall enforce any compulsory measure, including a grand jury subpoena, for the production of documents located in the territory of the other Party with respect to any criminal offence within the scope of this Treaty, unless its obligations under the Treaty have first been fulfilled pursuant to paragraph 4 of this Article with respect to a request concerning these documents.

4.    Where denial of a request or unreasonable delay in its execution may be jeopardising the successful completion of an investigation, prosecution or other proceeding, the Central Authority of the Requesting Party shall so inform the Central Authority of the Requested Party in writing. Thereafter, either Contracting Party may give at least 45 days notice in writing to the other Contracting Party that, unless otherwise agreed, the Parties' obligations under this Article shall be deemed to have been fulfilled; provided that in no case shall the obligations under this Article be deemed to have been fulfilled sooner than 90 days after the date of receipt of the request for assistance.

**Article 18**
**Consultations**

1.    The Central Authorities will consult, at times mutually agreed by them, to enable the most effective use to be made of this Treaty. Such consultations shall include such information as may be lawfully disclosed concerning the status and disposition of proceedings utilising documentary information and other evidence secured pursuant to this Treaty.

2.    In any case of difficulty either Central Authority may request the assistance of the Contracting Parties to resolve the difficulty by way of consultation.

**Article 19**
**Definitions**

For the purpose of this Treaty

20

1.    "The Contracting Parties" means the Government of the United States and the Government of the United Kingdom.

2.    "The Parties" means the Government of the United States and the Government of the Cayman Islands.

3.    "Criminal offence" which, except in the case of any matter falling within sub-paragraphs (d) and (e) of this definition, does not include any conduct or matter which relates directly or indirectly to the regulation, imposition, calculation or collection of taxes, but subject always to those exclusions, means:

    (a)  Any conduct punishable by more than one year's imprisonment under the laws of both the Requesting and Requested Parties;

    (b)  "Racketeering" which means -

      (i)  the use or investment, directly or indirectly, knowingly by any person of any part of racketeering income, or the proceeds of such income, in the acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect commerce, including interstate or foreign commerce;

      (ii)  the acquisition or maintenance knowingly by any person through a pattern of racketeering activity or through collection of an unlawful debt, directly or indirectly, of any interest in or control of any enterprise which is engaged in, or the activities of which affect commerce, including interstate or foreign commerce; or

      (iii)  where any person is employed by or associated with any enterprise engaged in, or the activities of which affect commerce, including interstate or foreign commerce, the conduct or participation in the conduct, directly or indirectly, knowingly by that person of the affairs of the enterprise through a pattern of racketeering activity or collection of unlawful debt;

    and in respect of which -

      (A)  "Racketeering income" means any income of any person derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal;

      (B)  "Racketeering activity" means unlawful gambling activity and the act or threat of any other criminal offence (which expression, for the avoidance of doubt, does not include any offence which relates directly or indirectly to the regulation including the imposition,

calculation or collection of any tax) listed in this Article;

(C)   "Pattern of racketeering activity" means at least two acts of racketeering activity, one of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity;

(D)   "Unlawful debt" means a debt -

(1)   incurred or contracted in unlawful gambling activity or which is unenforceable in law in whole or in part as to principal or interest because of laws relating to usury, and

(2)   which was incurred in connection with the business of gambling in violation of the law or the business of lending money or a thing of value at a rate usurious under law, where the usurious rate is at least twice the enforceable rate; and

(E)   "Enterprise" includes any individual partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity;

(c)   "Narcotics trafficking" which means all offences or ancillary civil or administrative proceedings taken by either of the Parties or their agencies connected with, arising from, related to, or resulting from any narcotics activity covered by the Single Convention on Narcotic Drugs, 1961, or the Protocol Amending the Single Convention on Narcotic Drugs, 1961, or any other international agreements or arrangement binding upon both the Parties;

(d)   Wilfully or dishonestly obtaining money, property or valuable securities from other persons by means of false or fraudulent pretences or statements, whether oral or written, regarding or affecting benefits available in connection with the laws and regulations relating to income or other taxes;

(e)   Wilfully or dishonestly making false statements, whether oral or written, to government tax authorities (e.g., wilfully or dishonestly submitting a false income tax return) with respect to any tax matter arising from the unlawful proceeds of any criminal offence covered by any other provision of this definition, except sub-paragraph (f), or wilfully or dishonestly failing to make a report to government tax authorities as required by law in respect of, or to pay the tax due on, any such unlawful proceeds;

(f)   Wilfully or dishonestly failing to make to the Government a report which is required by law to be made to it in respect of an

22

international transfer of currency or other financial transactions connected with, arising from or related to the unlawful proceeds of any criminal offence falling within any provision of this Article, except this sub-paragraph or sub-paragraph (e) above;

(g)  "Insider trading" which means the offer, purchase, or sale of securities by any person while in possession of material non-public information directly or indirectly relating to the securities offered, purchased, or sold, in breach of a legally binding duty of trust or confidence;

(h)  "Fraudulent securities practices", which means the use by any person wilfully or dishonestly of any means, directly or indirectly, in connection with the offer, purchase or sale of any security;

   (i)  to employ any device, scheme, or artifice to defraud;

  (ii)  dishonestly to make any untrue statement of a material fact or to omit to state a material act necessary in order to make the statement made, in light of the circumstances under which it was made, not misleading; or

(iii)  dishonestly to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person;

(i)  "Foreign corrupt practices" which means the corrupt offering, paying, or making of inducements by any person to any foreign official or foreign political party, official thereof or candidate for foreign official office in order to assist such person in obtaining or retaining business for himself or in directing business to any other person;

(j)  Any of the above defined criminal offences, where United States federal jurisdiction is based upon interstate transport, use of the mails, telecommunications or other interstate facilities;

(k)  Such further offences as may from time to time be agreed upon by exchange of diplomatic notes between the United States and the United Kingdom, including the Cayman Islands; and

(1)  Any attempt or conspiracy to commit, or participation as accessory after the fact to, any of the above defined criminal offences.

## Article 20
## Ratification, Entry into Force, and Termination

1.  This Treaty shall be ratified, and the instruments of ratification shall be exchanged at Washington as soon as possible.

*Mutual Legal Assistance (United States of America) Law (2015 Revision)*

2.    This Treaty shall enter into force upon the exchange of instruments of ratification.

3.    The Government of either the United States or the United Kingdom, including the Cayman Islands, may terminate this Treaty by giving three months notice in writing to the other Government at any time.

IN WITNESS WHEREOF the undersigned, being duly authorised thereto by their respective Governments, have signed this Treaty.

DONE in duplicate at Grand Cayman, Cayman Islands this 3rd day of July, 1986.

For the Government of the United Kingdom of Great Britain and Northern Ireland:
TIM EGGAR

For the Government of the United States of America:
RONALD I. SPIERS

For the Government of the Cayman Islands:
PETER LLOYD

## FORM A
## AFFIDAVIT WITH RESPECT TO DOCUMENTS OF A REGULARLY CONDUCTED BUSINESS ACTIVITY

NOTE: AFFIDAVIT MUST BE EXECUTED BY CUSTODIAN OF RECORDS OR SUCH OTHER PERSON WHO CAN EXPLAIN THE RECORD KEEPING PROCEDURE.

I.........................................................................................(Swear) (Affirm) (On Penalty of Perjury) (On My Oath) as follows:

(1)    I am employed by ...........................................................................................

(Name of business, activity, or person from whom documents are sought.)

(2)    ............................................................................................................................

(Name of business, activity, or person from whom documents are sought.)
..........................................................................engages in the regular business of
............................................................................................................................

(Describe business or activity.)

(3)    My official title is...........................................................................................

24

(4)   My duties and responsibilities include: (describe relationship to books and records i.e., custodian of books and records, or supervisor over books and records, etc.)

(5)   As a result of my duties and responsibilities I have knowledge of the manner in which the books and records are kept.

(6)   The attached documents are original (or true copies of original) documents which I obtained from the custody and control of....................................................

.............................................................................................................................

           (Name of business, activity, or person from which documents are sought.)

(7)   The attached documents are: ...........................................................................

.............................................................................................................................

(Description of documents e.g., "Ledger of the checking account of John Doe for the Month of July, 1986.")

(8)   It is a regular practice of this business to make and keep...............................

...........................................................................in the following manner. (Description of documents.)


.............................................................................................................................

(Describe manner in which documents or categories of documents are made and kept.)

(9)   It is the regular practice of the business to base its records upon information transmitted by a person with knowledge of the matters recorded, who are acting in the course of the regularly conducted business activity.

(10)  It is the regular practice of the business to check the correctness of documents of the kind attached hereto.

(11)  It is the regular practice of the business to rely on records of the kind attached hereto.

(12)  The entries on the documents attached hereto were made by persons with knowledge of the matters recorded, or from information transmitted by persons with such knowledge.

(13)  The persons making the entries on the documents or transmitting the information for purposes of recording it were acting in the course of the regularly conducted business or activity.

*Mutual Legal Assistance (United States of America) Law (2015 Revision)*

(14)  The entries on these documents were made at or near the time of the matters recorded, pursuant to a systematic and routine procedure for the conduct of the business.

(15)  The documents attached hereto were kept in the course of the regular activity of this business.

.............................................................          .............................................
            (Date).                                                  (Signature)

Sworn or Affirmed before me a

................................................................................

(notary public, judicial officer, etc.)

this.....................................day of..................................................... , 19........

26

*Mutual Legal Assistance (United States of America) Law (2015 Revision)*

**FORM B**

**ATTESTATION OF AUTHENTICITY OF OFFICIAL RECORDS**

I,. ................................................................................, attest that my position with the Government of .............................................................................

(the United States/the United Kingdom/Cayman Islands)

is.............................................................................................and that in that

(Official Title)

position I am authorised by the law of ..................................................................

(the United States/the United Kingdom/Cayman Islands)

to attest that the documents attached hereto and described below:

(1)   Are true copies of original official records which are authorised by the law of....................................................................................................................

(the United States/the United Kingdom/Cayman Islands)

to be recorded or filed in ......................................................................................

(Name of Public Office of Agency)

which is a public office or agency.

(2)   Set forth matters which are required by the law of the ................................................................................................................................

(the United States/the United Kingdom/Cayman Islands)

to be recorded or filed and reported.

Description of Documents:

..................................................................

Signature

..................................................................

Date

*Mutual Legal Assistance (United States of America) Law (2015 Revision)*

Publication in consolidated and revised form authorised by the Cabinet this 14th day of July, 2015.


Meredith Hew
Acting Clerk of Cabinet


*Notes (not forming part of the Law):*

*1. In notice published in Gazette No. 8 of 19th April, 1993 it was stated that the Chief Justice had, under section 4 of the Law, appointed a named Judge of the Grand Court to act as the Cayman Central Authority commencing 1st March 1993 until further notice. As at 30th June, 2015 no further notice has been published.*

*2.  By Proclamation published in Gazette No. 9 of 26th April, 1999 the Governor gave notice of the repeal of the Narcotic Drugs (Evidence) (United States of America) Law, 1984.*

(Price $ 5.60)

# CODE OF CONDUCT

# FOR

# CAYMAN ISLANDS

# ATTORNEYS-AT-LAW

**CONTENTS**

Introduction ...........................................................................................................................................1
Chapter 1 – Attorneys' Rights, Duties and Responsibilities Generally: Independence of Attorneys:
Conflicts of Interests ..........................................................................................................................1
Rule 1.01 .............................................................................................................................................1
Rule 1.02 .............................................................................................................................................1
Rule 1.03 .............................................................................................................................................1
Rule 1.04 .............................................................................................................................................1
Rule 1.05 .............................................................................................................................................2
Rule 1.06 .............................................................................................................................................2
Rule 1.07 .............................................................................................................................................3
Rule 1.08 .............................................................................................................................................3
Rule 1.09 .............................................................................................................................................3
Rule 1.10 .............................................................................................................................................3
Rule 1.11 .............................................................................................................................................3
Rule 1.12 .............................................................................................................................................4
Rule 1.13 .............................................................................................................................................5
Chapter 2 - Conduct of Practice Generally.........................................................................................5
Rule 2.01 .............................................................................................................................................5
Rule 2.02 .............................................................................................................................................6
Chapter 3 - Relations: Attorneys and Clients .....................................................................................6
Rule 3.01 .............................................................................................................................................6
Rule 3.02 .............................................................................................................................................7
Rule 3.03 .............................................................................................................................................7
Chapter 4 - Information about Legal Services: Dissemination ............................................................8
Rule 4.01 .............................................................................................................................................8
Rule 4.02 .............................................................................................................................................8
Rule 4.03 .............................................................................................................................................8
Rule 4.04 .............................................................................................................................................9
Rule 4.05 .............................................................................................................................................9
Chapter 5 – Anti Money-Laundering and Countering the Financing of Terrorism ............................9
Rule 5.01 .............................................................................................................................................9
Chapter 6 - Relations Between Attorneys .........................................................................................10
Rule 6.01 ...........................................................................................................................................10
Rule 6.02 ...........................................................................................................................................10
Rule 6.03 ...........................................................................................................................................10
Rule 6.04 ...........................................................................................................................................11
Rule 6.05 ...........................................................................................................................................11
Rule 6.06 ...........................................................................................................................................12
Rule 6.07 ...........................................................................................................................................12
Rule 6.08 ...........................................................................................................................................12
Chapter 7 - Relations with Third Parties ...........................................................................................13
Rule 7.01 ...........................................................................................................................................13
Rule 7.02 ...........................................................................................................................................13
Rule 7.03 ...........................................................................................................................................13
Chapter 8 - Court Proceedings and Practice.....................................................................................14
Rule 8.01 ...........................................................................................................................................14
Rule 8.02 ...........................................................................................................................................15
Rule 8.03 ...........................................................................................................................................15
Rule 8.04 ...........................................................................................................................................15
Rule 8.05 ...........................................................................................................................................16

Rule 8.06.................................................................................................................................16
Rule 8.07.................................................................................................................................17
Chapter 9 – Counsel for Defence............................................................................................17
Rule 9.01.................................................................................................................................17
Rule 9.02.................................................................................................................................17
Rule 9.03.................................................................................................................................18
Rule 9.04.................................................................................................................................18
Rule 9.05.................................................................................................................................19
APPENDIX I – IBA International Principles on Conduct for the Legal Profession.....................20

## Introduction

The purpose of this publication is to provide guidance for attorneys-at-law in the Cayman Islands and those who provide Cayman Islands legal advice outside the Cayman Islands (both for the purposes of this publication called "**attorneys**").  It is not exhaustive, but instead seeks to define the bounds within which an attorney can practice the profession. Observance of those bounds, and managing all aspects of practice within them involves the acceptance of the basic principle of professional responsibility.

The Commentary does not add obligations to the 'Rules' (as set out below) but provides guidance for practicing in compliance with the Rules. In this publication words importing the masculine gender include the feminine gender.

## Chapter 1 – Attorneys' Rights, Duties and Responsibilities Generally: Independence of Attorneys: Conflicts of Interests

### Rule 1.01

**An attorney must not conduct himself:**

**(1)**    **dishonestly or otherwise discreditably;**

**(2)**    **so as to prejudice or undermine confidence in the administration of justice or otherwise bring it or the profession into disrepute;**

**(3)**    **in a manner which is unbecoming to the profession or otherwise may be deemed unprofessional; or**

**(4)**    **inconsistently with the proper interests of his client.**

*Commentary:*

*It is not possible to define the circumstances in which an attorney may be held to have acted unprofessionally or otherwise improperly or so as to bring the profession into disrepute, although there are a large number of disciplinary offences that can occur at common law or on breach of statutory laws. Examples could include the solicitation of business from clients of an erstwhile employer; or being found guilty of a criminal offence of whatever nature, including, say, crimes of violence or serious traffic offences where the safety of others is jeopardised.*

### Rule 1.02

**The relationship between practitioner and client is one of confidence and trust which must never be abused.**

### Rule 1.03

**An attorney shall at all times observe and comply with the Legal Practitioners Law (2010 Revision) (the "LPL") as the same may be revised, amended or replaced from time to time.**

*Commentary:*

*An example of this is that an attorney may not aid any person or entity in the practice of Cayman Islands law contrary to the LPL.*

### Rule 1.04

**An attorney's primary duty is to his client, to whom he must act in good faith.  He must at all times and by all proper and lawful means advance and protect his clients' best interests without fear or regard for self-interest.**

1

*Commentary*

(1)   *The professional judgment of an attorney should at all times be exercised within the bounds of the law solely for the benefit of the client and free from compromising influences and loyalties.*

(2)   *The attorney should never seek an advancement of personal interest or position at the expense of a client.*

## Rule 1.05

Where an attorney acts as a director or officer of a company, the fact that he may also be that company's external legal representative in no way diminishes his liability as a director or officer arising under law.  Attorneys should beware of conflicts of interests arising from their simultaneously acting as such and in the event of any such conflicts arising either immediately notify their fellow directors and officers and resign from office or resign as the company's external legal representative.

## Rule 1.06

Except in the specific circumstances contemplated by statute, an attorney has a duty to hold in strict confidence all information concerning the business and affairs of the client acquired in the course of the professional relationship, and may not divulge such information except where:

(1)   the attorney is reasonably seeking to establish or collect his or her fee; or

(2)   the attorney is defending himself or his partners or employees against an allegation by the client of malpractice or misconduct or against a criminal charge; or

(3)   the information is or has become public knowledge; or

(4)   disclosure is required by law; or

(5)   disclosure to the attorney's professional indemnity insurer is required in order to maintain or secure the attorney's cover; or

(6)   the attorney forms the view that there is a serious and imminent risk to the health or safety of the client; or

(7)   the attorney has an overriding duty to a court or tribunal.

*Commentary*

(1)   *Save as set out in statute, confidentiality and privilege of client information are among the prime principles of professional practice.  Such information belongs to the client and not to the attorney. Generally any request by a third party for client information held by an attorney should be referred to the client or refused.*

(2)   *Where an attorney is in possession of information received from joint clients, the consent of both or all the clients is required to waive the duty of confidentiality.*

(3)   *In the event that an attorney is obliged to provide information, documents or other disclosure of his clients affairs by reason of any court order or warrant, the attorney shall assert legal privilege if relevant on behalf of his client and should, unless the order otherwise specifically provides, inform his client of the service of the order or warrant.*

(4)   *In any circumstances where disclosure is justified, an attorney should nonetheless be concerned not to divulge more information than is required of him or her for the purpose.*

(5)     *An attorney practising on his own account or as a partner in a firm may disclose the client's affairs to partners (if any) and employed attorneys and, to the extent necessary, to employed law clerks, legal executives, non legal staff such as secretaries and filing clerks, and to others whose services are utilised by the attorney.*

(6)     *An employed practitioner may always disclose the client's affairs to his or her employer. He should not agree to accept instructions or directions from the client on any other basis.*

(7)     *An attorney's duty continues even after the client has ceased to be the attorney's client. Following the death of the client or former client, the right to confidentiality passes to the client's personal representatives and can be waived only by them.*

(8)     *Difficulties often arise in relation to an attorney's duties when a client becomes insolvent. Upon the liquidation or receivership of the company client, authority is vested in the liquidator or receiver, who is entitled to information and documents relating to the company. Authority to permit disclosure to others thereafter vests in the liquidator or receiver. If an attorney has also acted in the past for directors or shareholders in their personal matters, care must be taken to ensure that confidentiality in respect of such personal matters is maintained.*

(9)     *Information not to be divulged by the attorney in terms of this rule will include the fact of having been consulted or retained by a person, unless the nature of the matter requires such disclosure.*

## Rule 1.07

**An attorney must not undertake to provide a service that he knows or ought to know he is not competent to undertake or for which he does not have the time or opportunity to fulfill.**

## Rule 1.08

**No attorney shall discriminate against or treat unfairly any other attorney by reason of the colour, race, ethnic or national origin, sex or sexual orientation, marital status or religious or ethical belief of that other attorney.**

## Rule 1.09

**No attorney shall permit any disqualified or unqualified person in his employ to hold themselves out as an attorney in contravention of the Law.**

*Commentary*

*A person employed by an attorney as a paralegal, corporate assistant, secretary or employee of the attorney shall not be regarded as a person falling within this Rule if in correspondence it is made clear that such person is not an attorney.*

## Rule 1.10

**Attorneys should have regard to the provisions of the International Principles on Conduct for the Legal Profession promoted by the International Bar Association set out in APPENDIX I and act in the spirit in which it calls upon all lawyers to act. Where, however, there is a conflict between these Rules and those Principles on Conduct for the Legal Profession, these Rules prevail.**

## Rule 1.11

**An attorney must not without the informed consent of such person act or continue to act for any person where there is a conflict of interest between the attorney on the one hand and an existing or prospective client on the other hand; nor similarly may the attorney**

3

**agree to act for any such person when, at the time he takes instructions, it is reasonably foreseeable that such a conflict may arise during the course of his doing so.**

*Commentary*

(1)    *The rule is based on the principle that a person who occupies a position of trust must not permit his personal interests to conflict with the interests of those whom it is that person's duty to protect.*

(2)    *The rule is intended to protect a client in situations where the interest or position of the attorney would or could make the attorney's professional judgement less responsive to the interests of the client.*

(3)    *The existence of a personal interest of an attorney should be disclosed to the client or prospective client irrespective of a perceived lack of conflict and as soon as the attorney becomes aware of it. The attorney should consider carefully whether a personal interest is in any way in conflict with the interests of the client, and refuse to act, or to act further, if there is any such conflict.*

(4)    *An attorney may not enter any financial, business or property transaction with a client if there is a possibility of the fiduciary relationship between practitioner and client being open to abuse by the attorney. This applies even if the attorney does not propose to act for the client in the particular transaction.*

(5)    *The rule will usually apply to any interest or dealing through the attorney's family or relatives or any company, trust, partnership, or other body in which the attorney has or exerts a material measure of control or influence. It will also include interests which are not personal in the strict sense but representative in character such as directorships and trusteeships.*

(6)    *"Informed consent" in this and subsequent Rules means that the person in question understands all the facts and his rights in relation to the issue.  Attorneys should carefully consider recommending that the person takes independent advice so that his consent may be fully informed.*

(7)    *It is difficult to guard against conflicts of interest when clients are represented by different attorneys in the same firm. There is a danger that information may be imparted by one client to an attorney in the firm to which the firm should not have access, having regard to the interest of another client who is represented by a different practitioner in that firm. Firms must establish workable systems to prevent such events occurring.*

(8)    *A potential conflict of interest is a situation which, without care, could well lead an attorney into a breach of fiduciary duty.*

## Rule 1.12

**An attorney shall not act for more than one party in the same transaction or matter without the prior informed consent of both or all parties.**

*Commentary*

(1)    *A conflict of interest does not arise between parties simply because the attorney is acting for more than one of them.*

(2)    *An attorney should exercise careful professional judgement to ensure that a conflict of interest does not exist and is not likely to arise.*

4

**Rule 1.13**

    **(1)**    **As soon as he becomes aware of a conflict or likely conflict of interest among clients, an attorney shall forthwith take the following steps:**

        **(i)**    **advise all clients involved of the areas of conflict or potential conflict;**

        **(ii)**    **advise the clients involved that they should take independent advice as may be appropriate;**

        **(iii)**    **decline to act further for any party in the matter where so acting would or would be likely to disadvantage any of the clients involved unless the parties have given their prior informed consent to the attorney continuing to act.**

    **(2)**    **Unless the relevant parties have given their prior informed consent, it is not acceptable for attorneys in the same firm to continue to act for more than one client in a transaction.  The use of an information barrier such as a "Chinese wall" should be considered carefully and appropriate safeguards adopted with respect to segregating confidential information. Such a device does not overcome a conflict of interest that has already arisen.**

    **(3)**    **Save as hereinafter set out, an attorney must disclose to his client all information received by the attorney in the course of his business which relates to the client's affairs. The exception to this rule is that an attorney should not disclose to a client details of any enquiry or request to such practitioner from a third party to act against or otherwise in connection with that client's interests and the attorney has advised such third party that he cannot assist or act for it or where such disclosure is otherwise prohibited by any law or regulation or by the order of any governmental, judicial authority or agency.**

*Commentary*

*(1)*    *An attorney should take all reasonable steps to prevent a situation arising where confidential information is received on the basis that it is not to be disclosed to a client.*

*(2)*    *As regards the exception to this rule set out above, the attorney may agree with the third party that information relayed to him by it, for the purpose of enabling the attorney to establish whether a conflict of interest may arise in acting for the third party, will not be disclosed to anyone, including any existing client.*


## Chapter 2 - Conduct of Practice Generally

**Rule 2.01**

    **The name of an attorney's firm must be one which is not likely to:**

    **(1)**    **be misleading as to the nature or structure of the firm;**

    **(2)**    **bring the profession into disrepute; or**

    **(3)**    **be unfair to other attorneys or the public.**

*Commentary*

*(1)*    *The reference to firm where appropriate includes references to the business of a sole practitioner.*

(2)  Unless it is already well-established when these Rules come into effect:

   (a)  the name of a firm must be consistent with the requirements of professional standing; and

   (b)  the name of a firm must not be misleading nor should it unfairly describe the firm. It should not, for instance, give an impression to the public that the firm is multi-partnered and broadly based when it is not.  Nor should it falsely suggest patronage of or connection with some person or authority that has no connection with the firm.

## Rule 2.02

**On a firm's letterhead or email any other publication or literature issued by a firm, or in an advertisement of a firm's services, a firm must ensure that neither the public nor other attorneys are misled about the structure of the firm or the status of any person named in such letterhead or publicity.**

Commentary

(1)  If the names of partners, consultants or associates, or any of them, are shown, their status should be indicated.

(2)  If a person whose name is included is not a partner, consultant or associate, this should be made clear by the use of appropriate expressions such as "legal executive", "office accountant", "paralegal", "corporate assistant", "financial controller", "practice manager", etc.

(3)  A firm must ensure that the public, and other attorneys dealing with a principal or an employee of the firm, know the name and status of the person with whom they are dealing.


## Chapter 3 - Relations: Attorneys and Clients

## Rule 3.01

**An attorney may charge a client for his services no more than that charged on a prior agreed basis or which otherwise is fair and reasonable for the work done, having regard to the interests of both client and practitioner.**

Commentary

(1)  There is no objection in principle to fees calculated on a percentage of the value of the transaction provided that is agreed in advance by the client.

(2)  If not on a prior agreed basis, charges must be fair and reasonable in all the circumstances. Charges by a lawyer for professional work shall be calculated to give a fair and reasonable return for the services rendered, having regard to the interests of both client and lawyer. Charges may take account of all relevant factors, including:

   (a)  the skill, specialised knowledge, and responsibility required

   (b)  the importance of the matter to the client and the results achieved

   (c)  the urgency and circumstances in which the business is transacted

   (d)   the value or amount of any property or money involved

   (e)  the complexity of the matter and the difficulty or novelty of the questions involved

   (f)  the number and importance of the documents prepared or perused

   (g)  the time and labour expended

(h)    the reasonable costs of running a practice.

*The relative importance of the factors set out above will vary according to the particular circumstances of each transaction.*

## Rule 3.02

**An attorney must not receive a reward, whether financial or otherwise, of which a client is unaware, in respect of services rendered to the client, and if he does so without the consent of the client such reward will be treated as held by the attorney on trust for the client.**

*Commentary*

(1)    *Attorneys must at all times make appropriate disclosure to a client of any personal gain by them from a transaction or otherwise from representing that client.*

(2)    *Where an attorney sends an account to a client and that account includes a payment which has been or is to be made to an agency company or other body in which the relevant practitioner, his partner(s) or members of their family has or have an interest, then that interest must be disclosed on the account.*

## Rule 3.03

**An attorney shall keep accounts which clearly and accurately distinguish the financial position between himself and his client.**

*Commentary*

(1)    *Attorneys must at all times ensure that any monies that are held by the attorney on behalf of the client are kept in separate accounts from those accounts which contain monies belonging to the attorney.*

(2)    *The attorney shall, unless otherwise instructed by his client, keep any money held by him on behalf of a client in the account of a bank regulated by a legally constituted regulatory authority in the Cayman Islands or some other legally constituted regulatory authority located in the country in which the attorney is practicing.*

(3)    *An attorney shall indicate in the title or designation of an account that the funds belong to a client of the attorney if the account is one in which the client's money is held in the name of the attorney out of expediency.*

(4)    *An attorney shall at all times maintain clear records to-*

   (a)    *show all the transactions in relation to a client's account;*

   (b)    *show separately in respect of each client, all money received, held or paid by the attorney for or on account of that client and to distinguish the same from any other money received, held or paid by the attorney; and*

   (c)    *to ensure that the attorney is at all times able, without delay, to account to clients for all money received, held or paid by the attorney on behalf of the client.*

(5)    *An attorney shall preserve for at least six years from the date of the last entry therein all accounts, books, ledgers and records maintained in relation to the client's affairs.*

(6)    *An attorney shall not make any payment or withdrawal from money held on behalf of any client except where the money paid or withdrawn is-*

   (a)    *properly required for a payment to or on behalf of the client;*

(bi)     *properly required for or towards payment of a debt due to the attorney from the client or in reimbursement of money expended by the attorney on behalf of the client;*

(c)     *paid or withdrawn on the client's authority; or*

(d)     *properly required for or towards payment of the attorney's costs where a bill of costs has been delivered to the client or other written intimation of the amount of the costs incurred and it has been made clear to the client that the money so paid or withdrawn will be applied to satisfying the bill of costs.*

(7)     *An attorney shall not be deprived of any recourse or right whether by way of lien, set-off, counterclaim, charge or otherwise against moneys standing to the credit of a client's account maintained by that attorney.*


## Chapter 4 - Information about Legal Services: Dissemination

### Rule 4.01

**Advertisements to or any other communications with any person relating to the services of an attorney or of a firm of attorneys must be consistent with the maintenance of proper professional standards.**

*Commentary*

(1)     *The advertisement or communication must not be false, misleading or deceptive, or likely to be so.*

(2)     *The advertisement or communication may indicate a field or fields of practice in which the attorney is prepared to take instructions.*

(3)     *If any advertisement or communication contains or refers to testimonials, endorsements or the like about an attorney or the services offered, the attorney must be able to show on enquiry that such testimonials or endorsements were not provided for monetary or other reward. The genuineness and veracity of any testimonials or endorsements may be tested on enquiry.*

(4)     *The advertisement or communication must not disparage other attorneys, either individually or as a group. For further reference see Rule 4.03.*

(5)     *An attorney may not consent to, nor permit, being mentioned (whether by name or in any other identifiable way), in an advertisement or other promotion by a third party which is misleading in relation to the legal services offered.*

### Rule 4.02

**An attorney must not, in any advertisement to, or any other communication with, any person, claim to be a specialist or to have special expertise or experience in any field or fields of practice unless such claim is true.**

### Rule 4.03

**In offering services other than by normal advertising channels, whether within or outside the Cayman Islands, an attorney must ensure that approaches to persons who are not existing clients, whether or not they are the clients of another attorney, are made in a manner which does not bring the profession or the jurisdiction into disrepute. Such approaches must accord with proper professional standards and must not be misleading or misrepresent the standard of services provided by other attorneys.  Nor may they be**

**intrusive or offensive or disparage other attorneys (whether individually or as a firm or group).**

*Commentary*

(1)    *A direct approach to a potential client should not misrepresent the standard of services provided by other attorneys or firms or by the attorney.*

(2)    *The manner of such approaches, their frequency and surrounding circumstances, may be taken into account in assessing the propriety of the attorney's actions.*

## Rule 4.04

**An attorney must not directly or indirectly offer to or receive from a third party a reward or inducement, whether financial or otherwise, in respect of services rendered or to be rendered to the client.**

*Commentary*

(1)    *A financial arrangement between an attorney and a third party whereby that third party refers work to the attorney, or is recommended by the attorney, is likely to involve a conflict of interest, with an attorney having loyalties to both the client and the third party. That conflict of interest will often be irremediable under Chapter 1/ Rules 1.11 – 1.13.*

(2)    *Although the rule is cast in absolute terms, there is a line to be drawn between two situations. While the offering of direct payments or benefits for the advancing of work is proscribed, it is not intended that the rule should prohibit the usual professional associations that develop between attorneys and third parties, i.e. those associations which may involve social exchanges, the mutual referrals of work, or small gifts. There could, nevertheless, be instances where indirect benefits may create a conflict of interest, or involve a breach of Chapter 1/ Rules 1.11 – 1.13.*

## Rule 4.05

**An attorney may not, without the specific consent of a client, give any interview or make any public statement involving the confidential information of a client, whether or not the client's involvement is a matter of public knowledge.**

## Chapter 5 – Anti Money-Laundering and Countering the Financing of Terrorism

## Rule 5.01

**Each practitioner must observe and comply with regulations issued pursuant to Misuse of Drugs Law (2010 Revision), the Proceeds of Crime Law, 2008 and the Terrorism Law (2009 Revision) and follow any relevant supervisory or regulatory guidance, such as the Money Laundering Regulations (2010 Revision), issued by the Cayman Islands Monetary Authority or the Legal Advisory Council. Each firm of attorneys shall maintain appropriate procedures in accordance with such Regulations for the conduct of relevant financial business.**

*Commentary*

*Failure by an attorney  to observe such Regulations in the conduct of relevant financial business may render him liable to civil or criminal sanctions.*

9

## Chapter 6 - Relations Between Attorneys

### Rule 6.01

**An attorney must promote and maintain proper standards of professionalism in relations with other attorneys.**

*Commentary*

(1)   *An attorney shall treat professional colleagues with courtesy and fairness at all times consistent with an overriding duty to the client.*

(2)   *There are many occasions when an attorney needs to rely on information given by another practitioner. Professionalism demands that such reliance should not be misplaced. Whether the information is given in writing, or orally, or is in the form of an oral or written undertaking, the attorney receiving the information or undertaking is entitled to be able to rely and act on it with impunity.*

(3)   *Wherever possible oral undertakings should be avoided in favour of written undertakings - see Commentary (2) in relation to to Rule 6.06.*

(4)   *While it is not always possible to take telephone calls from another practitioner or to answer emails, text or instant messaging immediately, such calls, emails or messaging should be returned at the earliest opportunity.*

(5)   *It is an invasion of a person's privacy to tape a conversation without that person's consent. It is unprofessional and discourteous for one practitioner to do so in respect of another practitioner or an employee of another practitioner. If an attorney wishes a conversation by telephone or otherwise to be taped, then he or she should first notify the other practitioner or employee so as to give them the opportunity to decline to go ahead with the conversation if they wish.*

### Rule 6.02

**It is only in very exceptional cases that an attorney should communicate either directly or in writing with the client of another practitioner (without the knowledge of or without addressing a copy of such communication to that practitioner) in relation to a matter in which he has reason to believe the other practitioner is still instructed by that client.**

*Commentary*

(1)   *An attorney may suggest to a client that an approach by that client to the other practitioner's client might be appropriate or useful.*

(2)   *If an attorney has tried unsuccessfully for a reasonable period to obtain a response from the other practitioner in a matter, then it may be appropriate for the client of that other attorney to be approached. This action should, however, be regarded as most unusual and be used only in extreme circumstances. In any event, the action should be taken only after advising the other practitioner of the attorney's intention to do so.*

(3)   *In circumstances where the client himself is acting in a professional capacity (e.g. a liquidator of a company), it may be appropriate for lawyers of other clients to communicate with him directly.*

### Rule 6.03

**Unless there are exceptional circumstances, an attorney shall not:**

**(1)    Stop a cheque drawn on such practitioner's account payable to another practitioner; or**

(2)      **Stop a bank cheque payable to another practitioner; or**

(3)      **Cancel or reverse or amend an order for payment made to another practitioner by means of electronic transfer from an attorney's account;**

**once the cheque or printed verification of the electronic transfer instructions has been handed or dispatched to the other practitioner.**

*Commentary*

*The circumstances that would justify stopping such a cheque, or cancelling or reversing or amending such an order for payment, would need to be truly exceptional. Such a step is not likely to be justified in the absence of clearly proper and legal grounds for doing so.*

## Rule 6.04

**A client has an unequivocal right to change one practitioner for another.**

*Commentary*

(1)    *An attorney has no proprietary interest in a client. It is permissible to inquire why a client is changing but it is not permissible to exert influence or pressure on the client to return to the attorney.*

(2)    *On a change of practitioner, an authority to transfer specific documents should be acted upon without undue delay subject only to any lien that the holding practitioner may lawfully claim. It is however recognised that documents may be required for a short time for costing purposes.*

(3)    *Even when an attorney does have a lien over documents, the urgency of a situation may demand that as a matter of courtesy, that practitioner will make the documents available to the client's new adviser on receipt of an appropriate undertaking as to the payment of the attorney's fee..*

(4)    *Efforts should be made in the interests of the former client and of the profession to facilitate the transfer of files on a change of practitioner. There could be circumstances, such as a revision of costs, where delays might occur which would be harmful to the client's interest unless the file was handed to the new practitioner against appropriate undertakings.*

(5)    *A circumstance might arise where the attorney, whose client wishes to change to another practitioner has given undertakings to settle and pay settlement moneys and hand over documents. In such a situation, an attorney should decline to hand over documents and moneys to the new practitioner until he or she receives from the new practitioner a personal written undertaking to honour the terms of the undertaking already made.*

## Rule 6.05

**Immediately upon an attorney becoming aware of a potential claim for negligence that a client may assert against himself or his firm, the attorney must advise the client to seek independent advice in connection with the matter and must inform the client that the attorney can no longer act in the matter, unless the client, either having been independently advised or having deliberately chosen not to take advice and to waive any claim, requests it.**

*Commentary*

(1)    *An attorney is entitled to ensure, while informing the client of the client's rights, that he (the attorney) does not make any statement that may prejudice any insurance cover held by the attorney.*

(2)      *An attorney who is requested to hand the relevant papers to a new practitioner instructed by the client should, as a matter of prudence and at the expense of the client, take copies of relevant papers which may be material in the attorney's defence.*

## Rule 6.06

**Every attorney has an absolute professional duty to honour an undertaking, written or oral, given by him in the course of legal proceedings or in the course of practice; and this rule applies whether the undertaking is given by the attorney personally or by a partner or employee in the course of the practice.**

*Commentary*

(1)      *An attorney's word is his bond.  Further, the honouring of an undertaking involves the joint and several responsibility and liability of all the partners of that practitioner's firm.*

(2)      *While a professional undertaking may be given in writing or orally, it is prudent for attorneys to express an undertaking in writing if it is at all practicable. An oral undertaking has the same effect as one in writing but may raise evidential problems as to its content or existence.*

(3)      *If circumstances require an oral undertaking to be given, it may be that a contemporaneous note, transcript or written confirmation recorded by either practitioner may be necessary as conclusive proof of its existence. If the recipient confirms or accepts the terms of an oral undertaking and these are not promptly repudiated by the giver of the undertaking, this would be likely to constitute sufficient evidence of the existence and terms of the undertaking.*

(4)      *An undertaking should be given expressly and not merely by implication.*

(5)      *An attorney should try to ensure that an undertaking is precise and unambiguous in its terms. An ambiguous undertaking will generally be construed in favour of the recipient.*

(6)      *An attorney may not escape liability on an undertaking by pleading that to honour it would be a breach of a duty owed to the attorney's client.*

(7)      *If a client makes it impossible or impracticable for the undertaking to be honoured, the attorney shall investigate the circumstances and, if appropriate, consider resigning.*

## Rule 6.07

**An attorney who instructs another practitioner in the role of counsel or in any other capacity in any matter shall, unless agreement to the contrary is reached, be responsible personally for the prompt and full payment of the fee of the instructed practitioner.**

*Commentary*

(1)      *An attorney may not delay payment because the client has not paid the amount of the fee to the attorney.*

(2)      *The relationship of the attorney to the instructed practitioner is that of a professional client, who may be looked to for the fee accordingly.*

## Rule 6.08

**Subject always to the rights and duties pertaining to practitioner and client privilege, there is an obligation on every attorney who has grounds to suspect improper acts by another practitioner (including breaches of these Rules) to make a confidential report at the earliest possible time to the Hon. Chief Justice of the Cayman Islands.**

*Commentary*

(1)     *An attorney may receive information in professional confidence from an attorney who is a client. In any such case the attorney/client privilege applies and there is a duty of silence imposed on the attorney. An attorney should where appropriate encourage a client to consent to disclosure to the Hon. Chief Justice of the Cayman Islands unless such encouragement is contrary to the attorney's professional duty to the client.*

(2)     *It is not possible to itemise all the indications there might be of improper conduct on the part of an attorney, but such circumstances as breach of law, the dishonour of cheques, or delay or procrastination in effecting settlements, might be sufficient to indicate that all is not well with the attorney's practice or with the attorney's firm.*

## Chapter 7 - Relations with Third Parties

### Rule 7.01

**An attorney, when acting for a client in a matter where the other party is acting in person, should treat the other party with courtesy and fairness.**

### Rule 7.02

**An attorney who:**

**(1)     instructs another person, for example an accountant, valuer or engineer to prepare an assessment valuation or report or to provide other services; or**

**(2)     engages an expert witness**

**shall, in the absence of any agreement to the contrary, be liable for the prompt payment of the proper fee of the person so instructed, or the witness, as the case may be.**

*Commentary*

(1)     *Except where the matter is funded on legal aid, the attorney is not relieved from liability merely because the client or a third party has not paid the amount of the fee to the attorney. In the absence of agreement with the person so instructed or the witness ("the instructed person"), the attorney has personal responsibility for payment.*

(2)     *Attorneys should be precise as to fee arrangements at the time the instructed person is retained. Where a fee or formula for fixing a fee (e.g. an hourly rate) has been agreed in advance, then that agreed fee or a fee fixed in accordance with that formula will be the proper fee for which the attorney will be responsible under this rule. Otherwise the proper fee is the instructed person's reasonable fee. If there is a dispute about the reasonableness of the fee, the attorney should promptly pay the amount, which the attorney considers reasonable, and attempt to negotiate prompt settlement of any balance.*

(3)     *All fee arrangements with an instructed person should be in writing.*

(4)     *The provisions of this rule will also apply in circumstances where an attorney has made a personal commitment to be responsible for the fees and expenses of a non-expert witness.*

### Rule 7.03

**An attorney must make all reasonable efforts to ensure that legal processes are used for their proper purposes only and that their use is not likely to cause unnecessary**

**embarrassment, distress or inconvenience to another person's reputation, interests or occupation.**

*Commentary*

*Examples of the operation of the rule are:*

(1)    *An attorney should not issue a statutory demand under Section 93 of the Companies Law (2010 Revision) knowing that or being reckless as to whether the debt is bona fide disputed, and should make reasonable inquiry from the client as to the existence of any such dispute.*

(2)    *Ex parte applications should be made by an attorney only if he is satisfied that to do so is both permitted by the Grand Court Rules and that it is impractical or inappropriate to give notice to the persons likely to be affected by the order being sought in the application.*

(3)    *An attorney should not register a caution under Section 127 of the Registered Land Law (2004 Revision) knowing that there is no "unregistrable interest" of the client to be protected pursuant to that Law, and should make reasonable inquiry from the client as to the existence of any such interest.*

(4)    *An attorney, in arranging service of a document on a person, has a clear duty to the client to make all reasonable efforts to effect service promptly or to seek substituted service, but the attorney should also take reasonable steps to avoid in the manner and place of service causing the person served unnecessary embarrassment or damage to his reputation, interests or occupation.*

## Chapter 8 - Court Proceedings and Practice

### Rule 8.01

**The overriding duty of an attorney acting in litigation is to ensure in the public interest that the proper and efficient administration of justice is served. Subject to this, the attorney has a duty to act in the best interests of the client.**

*Commentary*

(1)    *An attorney must never deceive or knowingly or recklessly mislead the court or the tribunal.*

(2)    *The attorney must at all times be courteous to the court or the tribunal.*

(3)    *The attorney, whilst acting in accordance with these duties, must uphold his client's interests without regard for personal interests or concerns.*

(4)    *The attorney has an obligation when conducting a case to put all relevant authorities known to the attorney, whether decided cases or statutory provisions, before the court, whether they support the attorney's case or not.*

(5)    *If a fact or an authority which may affect the judgment in the case is discovered by the attorney some time after the hearing but before the decision has been given, the attorney has a duty to bring it to the attention of the court and to inform or, as the case may be, provide a copy of the reference to the attorney acting for the other party or parties in the matter.*

(6)    *An attorney should not make any statement to the news media relating to proceedings which have not been concluded which may have the effect or may be seen to have the effect of interfering with a fair trial.*

*The following points should be specifically noted:*

14

(i)     *A publication will amount to contempt if it is likely to prejudice the trial or conduct of the action.*

(ii)    *A publication may constitute a contempt if it is likely to interfere with the proper adducing of evidence, either by discouraging witnesses from coming forward or by influencing them in the evidence that they are prepared to give. An example would be a publication attacking or criticising a witness or disparaging a party in proceedings.*

(iii)   *Contempt of court in a civil action extends also to conduct that is calculated to inhibit suitors from availing themselves of their right to have their legal rights determined by the courts. An example would be a publication which is likely to bring pressure to bear on one or other of the parties to an action so as to prevent that party form from prosecuting or defending the action.*

(7)    *Whether or not civil or criminal proceedings are pending or imminent, an attorney must not discuss a client's affairs without his or her consent.*

(8)    *Unless invited to do so by the court or tribunal, an attorney must not assert a personal opinion on fact or law.*

(9)    *Attorneys must not allow their independence and freedom from external pressures to be compromised and they must not themselves compromise their professional standards to appease a client, the court or any third party.*

## Rule 8.02

**An attorney must exercise care in court about naming persons not involved in the proceeding, and must refrain particularly from making merely scandalous or unnecessary allegations against such persons. Further, he should not make statements or ask questions that are merely scandalous or calculated only to insult, vilify, harass, threaten or intimidate a witness or another.**

## Rule 8.03

**Except in cases of urgency or where an ex parte application is justified, an attorney must not discuss the merits of a case or matter with a judge or other presiding officer, either formally or informally, without the consent of the other practitioner; and such discussion should be held only in the presence of the other practitioner unless he or she consents otherwise. In any event, natural justice demands that generally there should not be unilateral communications with a court or other tribunal.**

## Rule 8.04

**An attorney must not attack a person's reputation without good cause nor make any allegation of fraud or dishonesty unless he has clear instructions to do so and has satisfied himself that there is reasonably credible material supporting a prima facie case.**

*Commentary*

(1)    *This rule applies equally both in court during the course of proceedings and out of court by inclusion of statements in documents which are to be filed in the court.*

(2)    *An attorney should not be a party to the filing of a pleading or other court document containing an allegation of fraud, dishonesty, undue influence, duress unless the attorney has first satisfied himself or herself that it is necessary relevant and material and that there is reasonably credible material to support the allegation. For an attorney to allow such an allegation to be made, without*

*the fullest investigation, could be an abuse of the protection which the law affords to the attorney in the drawing and filing of pleadings and other court documents.*

(3)   *An attorney should not permit to be filed or used in proceedings or in evidence an affidavit or witness statement including any statements of fact other than those which he reasonably believes on his instructions would be given in evidence by the witness in live testimony or which are included in the affidavit subject to confirmation by the client as to its accuracy.*

(4)   *An attorney shall not place a witness or prospective witness under any pressure to provide untruthful evidence.*

## Rule 8.05

**An attorney must not act as both advocate and witness in the same matter.**

*Commentary*

(1)   *If there is any reason for an attorney to think that he or she may be required as a witness in a matter, the attorney should decline to act as advocate. This does not necessarily prevent his partners or other colleagues in his firm from doing so, however.*

(2)   *The same principle applies to making an affidavit in a contentious matter where the attorney is acting as advocate.*

(3)   *If, having started to act as advocate, the attorney finds it necessary to make an affidavit in respect of the matter concerned unless it is respectable formal or non contentious nature, then the attorney must immediately retire from the position of advocate, unless the court, in the particular circumstances, directs that it is still appropriate for the attorney to continue to act.*

(4)   *Even where an affidavit might appear to be in respect of a formal or non-contentious fact, it maybe prudent for the attorney to have it made and sworn by some other person.*

(5)   *Where an attorney, having already accepted instructions as advocate, becomes aware that a partner or employee of the attorney might be called as a witness for the client, the attorney must exercise care and professional judgment in deciding whether or not to continue as advocate in the matter.*

(6)   *The constraints expressed above apply to the same extent where an attorney acts as both attorney and advocate.*

## Rule 8.06

**In litigation matters, as in the course of other aspects of practice, an attorney must avoid a conflict of interest.**

*Commentary*

(1)   *In civil proceedings an attorney should ensure that parties with conflicting interests are not represented by the same practitioner, whether or not counsel is or are briefed.*

(2)   *If a remote possibility is identified of a conflict arising, it should generally be avoided by the attorney declining to act unless with the informed consent of both parties and upon clear agreement as to what should happen in the event of a conflict.*

(3)   *The provisions of this rule apply where two or more persons are charged jointly in a criminal matter.*

16

**Rule 8.07**

**An attorney appearing for a party shall not seek or agree to a consent order without the client's authority. The attorney should obtain written instructions**.

*Commentary:*

(1)   *Where an attorney appearing for a party informs the court that he or she consents to an order on behalf of the party, the court and the other counsel and client are entitled to rely on the authority of counsel.*

(2)   *The rule applies whether:*

    (i)   *the client is present and makes no demur; or*

    (ii)   *the client is absent.*

(3)   *Where, unknown to the other party's counsel, an attorney's usual authority has been expressly limited by instructions but the attorney has nevertheless entered into a compromise without authority, the court in its discretion may set aside the compromise and the orders based on it.*

## Chapter 9 – Counsel for Defence

**Rule 9.01**

1.   **On a plea of not guilty the counsel for the defence has a duty to see that the prosecution discharges the appropriate onus to prove the guilt of the accused, and to put before the court any proper defence in accordance with the client's instructions.**

2.   **An attorney may not wantonly or recklessly attribute to another person the crime or offence with which the client is charged.  An attorney may so attribute if it goes to a matter or issue (including the creditability of a witness) which is material to the clients case and it is necessary to do so as part of the Client's case.**

*Commentary*

(1)   *Attorneys should examine the facts that the prosecution seek to prove before advising the client about an appropriate plea. If the client's decision is to plead not guilty, the attorney must act conscientiously in presenting the case for the accused.*

(2)   *Counsel for the defence has the same general duty to the court to disclose all cases and authorities bearing on the matter whether or not they support the defence.*

(3)   *Although an attorney may present a technical defence available to the client, he must not invent or participate in the invention of facts, which will assist in advancing the client's case.*

**Rule 9.02**

**The attorney has, on receiving instructions, a duty to defend a person on a criminal charge, whether or not he has formed a belief or opinion about the guilt or innocence of that person.**

*Commentary*

(1)   *It is not for the attorney to assess the guilt or innocence of the client. That is a matter for the Court or a properly instructed jury. There could well be cases where an attorney feels reasonably*

17

*sure of the client's guilt, but is still under a duty to put the prosecution to proof and is free to submit, if justified, that there is insufficient evidence for a conviction.*

(2)   *If a client tries to put before the court evidence which to the knowledge of his counsel is false the attorney should avail himself of any opportunity to persuade the client to withdraw the evidence failing which he should cease to act.*

## Rule 9.03

1.   **Where an attorney has been instructed to defend a criminal charge and before or after the proceedings have started the client makes a confession of guilt to him, the attorney must bear in mind:**

  (i)   **a trial is for the purpose of finding whether the accused person is guilty or not guilty, and not whether the accused is innocent;**

  (ii)   **it is for the prosecution to call evidence to justify a verdict of guilty;**

2.   **In such circumstances, the attorney may continue to act only if the plea is changed to one of guilty or otherwise within strict limit. An attorney must not put forward a factual case inconsistent with the confession.**

3.   **If the plea is to remain one of not guilty, the attorney may conduct the defence by putting the prosecution to proof, and if appropriate, assert that the prosecution evidence is inadequate to justify a verdict of guilty; but must not raise any matter which suggests that the client has an affirmative defence, for example an alibi. An attorney may, however, proceed with a defence based on a special plea such as insanity, if such a plea appears in his professional opinion to be available.**

*Commentary:*

(1)   *This rule applies to a case where there is a clear confession that the client committed the offence charged.*

(2)   *No rule can deal with doubts raised in advocate's mind after he or she has been instructed to act on a not guilty plea, by inconsistent statements by the client which might suggest to the attorney that the client is guilty. An attorney can deal with such a situation only in the light of all the circumstances and pursuant to his professional judgment and duty as an officer of the Court.*

## Rule 9.04

**An attorney must, in advising the client on a plea, or as to whether or not to give evidence, explain the relevant aspects of the case and seek to ensure that the client makes an informed decision.**

*Commentary*

(1)   *Although an attorney  has a clear duty to advise on a plea, the client has the sole right to make the decision whether to plead guilty or not guilty.*

(2)   *Where the client might have difficulty making a decision on a plea, where he asserts a position inconsistent with a decision to plead guilty or where the client changes his decision to one in which he pleads guilty, it is prudent for the attorney to take written instructions on the plea. To have the client's decision so recorded might well assist the attorney if in the course of the proceedings or on appeal, the client decides to change the plea. It may also be prudent for an attorney to take written instructions as to whether or not the client is to give evidence on his or her own behalf.*

*(3)     In giving advice on a plea, the attorney's clear duty is to the client and the court. The interest of the attorney or any potential benefit to the attorney by way of fee or otherwise, is quite irrelevant to the nature of the plea.*

**Rule 9.05**

**Where an attorney is told by the accused that he or she did not commit the offence, or where the attorney believes that on the facts there should be an acquittal, but for particular reasons the client wishes to plead guilty, he may continue to represent the client, but only after warning the client of the consequences and advising the client that he can act after the entry of the plea only on the basis that the offence has been admitted, and put forward factors in mitigation.**

**APPENDIX I – IBA International Principles on Conduct for the Legal Profession**

# IBA International Principles on Conduct for the Legal Profession

Adopted on 28 May 2011
by the International Bar Association



the global voice of
the legal profession

This Commentary is dedicated
to the memory of Steve Krane,
former President of the New York State Bar,
who assisted greatly with its earlier versions
and sadly died during its final drafting.

The IBA wishes to thank the following for their
contribution to the
International Principles on Conduct for the Legal Profession

**Members of the BIC Policy Committee 2006-2011**

Olufunke Adekoya (Nigeria)
Arturo Alessandri (Chile)
Horacio Bernardes-Neto (Brazil)
Michael Clancy (Scotland)
Alain de Foucaud (France)
Hans-Jürgen Hellwig (Germany)
Philip Jeyaretnam (Singapore)
Tatsu Katayama  (Japan)
Peter Kim (Korea)
Jim Klotz (Canada)
Helge Jakob Kolrud (Norway)
Péter Köves (Hungary)
Michael Kutschera (Austria)
Laurent Martinet (France)
Ed Nally (England)
Margery Nicoll (Australia)
Alejandro Ogarrio (Mexico)
Sam Okudzeto (Ghana)
Mikiko Otani (Japan)
Ken Reisenfeld (USA)
Haji Sulaimain (Malaysia)
Hugh Stubbs (England)
Claudio Visco (Italy)
Sidney Weiss (USA)

**Co-opted member**
Ellyn Rosen (USA)

**Members of the IBA Professional Ethics Committee**
Victoria Rees (Canada)
Paul Monahan (Australia)

**With special thanks to**
Jonathan Goldsmith (Europe)

## Contents

The International Principles                                      5

Commentary on the International Principles                       8

Introduction                                                    9

1   Independence                                               12
2   Honesty, integrity and fairness                            16
3   Conflicts of interest                                      18
4   Confidentiality/professional secrecy                       21
5   Clients' interest                                          25
6   Lawyers' undertaking                                       27
7   Clients' freedom                                           28
8   Property of clients and third parties                      29
9   Competence                                                 30
10  Fees                                                       31

Definitions                                                    33

## International Principles on Conduct for the Legal Profession

Lawyers throughout the world are specialised professionals who place the interests of their clients above their own, and strive to obtain respect for the Rule of Law. They have to combine a continuous update on legal developments with service to their clients, respect for the courts, and the legitimate aspiration to maintain a reasonable standard of living. Between these elements there is often tension. These principles aim at establishing a generally accepted framework to serve as a basis on which codes of conduct may be established by the appropriate authorities for lawyers in any part of the world. In addition, the purpose of adopting these International Principles is to promote and foster the ideals of the legal profession. These International Principles are not intended to replace or limit a lawyer's obligation under applicable laws or rules of professional conduct. Nor are they to be used as criteria for imposing liability, sanctions, or disciplinary measures of any kind.

**1. Independence**

A lawyer shall maintain independence and be afforded the protection such independence offers in giving clients unbiased advice and representation. A lawyer shall exercise independent, unbiased professional judgment in advising a client, including as to the likelihood of success of the client's case.

**2. Honesty, integrity and fairness**

A lawyer shall at all times maintain the highest standards of honesty, integrity and fairness towards the lawyer's clients, the court, colleagues and all those with whom the lawyer comes into professional contact.

### 3. Conflicts of interest

A lawyer shall not assume a position in which a client's interests conflict with those of the lawyer, another lawyer in the same firm, or another client, unless otherwise permitted by law, applicable rules of professional conduct, or, if permitted, by client's authorisation.

### 4. Confidentiality/professional secrecy

A lawyer shall at all times maintain and be afforded protection of confidentiality regarding the affairs of present or former clients, unless otherwise allowed or required by law and/or applicable rules of professional conduct.

### 5. Clients' interest

A lawyer shall treat client interests as paramount, subject always to there being no conflict with the lawyer's duties to the court and the interests of justice, to observe the law, and to maintain ethical standards.

### 6. Lawyers' undertaking

A lawyer shall honour any undertaking given in the course of the lawyer's practice in a timely manner, until the undertaking is performed, released or excused.

### 7. Clients' freedom

A lawyer shall respect the freedom of clients to be represented by the lawyer of their choice. Unless prevented by professional conduct rules or by law, a lawyer shall be free to take on or reject a case.

### 8. Property of clients and third parties

A lawyer shall account promptly and faithfully for and prudently hold any property of clients or third parties that comes into the lawyer's trust, and shall keep it separate from the lawyer's own property.

**9. Competence**

A lawyer's work shall be carried out in a competent and timely manner. A lawyer shall not take on work that the lawyer does not reasonably believe can be carried out in that manner.

**10. Fees**

Lawyers are entitled to a reasonable fee for their work, and shall not charge an unreasonable fee. A lawyer shall not generate unnecessary work.

## Commentary on IBA International Principles on Conduct for the Legal Profession

Adopted by the International Bar Association
at the Warsaw Council Meeting
28 May 2011

## Introduction

1   The lawyer's role, whether retained by an individual, a corporation or the state, is as the client's trusted adviser and representative, as a professional respected by third parties, and as an indispensable participant in the fair administration of justice. By embodying all these elements, the lawyer, who faithfully serves a client's interests and protects the client's rights, also fulfils the functions of the lawyer in society – which are to forestall and prevent conflicts, to ensure that conflicts are resolved in accordance with recognised principles of civil, public or criminal law and with due account of rights and interests, to negotiate and draft agreements and other transactional necessities, to further the development of the law, and to defend liberty, justice and the rule of law

2   The International Principles consist of ten principles common to the legal profession worldwide. Respect for these principles is the basis of the right to a legal defence, which is the cornerstone of all other fundamental rights in a democracy.

3   The International Principles express the common ground which underlies all the national and international rules which govern the conduct of lawyers, principally in relation to their clients. The General Principles do not cover in detail other areas of lawyer conduct, for instance regarding the courts, other lawyers or the lawyer's own bar.

4   The International Principles take into consideration:
    • national professional rules from states throughout the world;

- the Basic Principles on the Role of Lawyers, adopted by the Eighth United Nations Congress on the Prevention of Crime and the Treatment of Offenders, Havana (Cuba), 27 August to 7 September 1990;
- the Universal Declaration of Human Rights.

5   It is hoped that the Principles and this Commentary will be of help, for instance, to bars that are struggling to establish their independence and that of their members in emerging democracies, and to lawyers and bars to understand better the issues arising in cross-border situations as a consequence of conflicting national rules and regulations.

6   It is hoped that the Principles will increase understanding among lawyers, decision makers and the public of the importance of the lawyer's role in society, and of the way in which the principles by which the legal profession is regulated support that role.

7   The IBA urges judges, legislators, governments and international organisations to strive, along with lawyers and bars, to uphold the principles set out in the International Principles. However, no statement of principles or code of ethics can provide for every situation or circumstance that may arise. Consequently, lawyers must act not only in accordance with the professional rules and applicable laws in their own state (and maybe also the rules and laws of another state in which they are practising), but also in accordance with the dictates of their conscience, in keeping with the general sense and ethical culture that inspires these International Principles.

8   The Appendix to this Commentary contains definitions of some of the terms contained in it.

## 1.    Independence

**1.1        General principle**
A lawyer shall maintain independence and be afforded
the protection such independence offers in giving
clients unbiased advice and representation. A lawyer
shall exercise independent, unbiased professional
judgment in advising a client, including as to the
likelihood of success of the client's case.

**1.2        Explanatory note**
It is indispensable to the administration of justice
and the operation of the Rule of Law that a lawyer
act for the client in a professional capacity free
from direction, control or interference. If a lawyer
is not guaranteed independence and is subject to
interference from others, especially those in power,
it will be difficult for the lawyer fully to protect
clients. Therefore, the guarantee of a lawyer's
independence is an essential requirement for the
protection of citizens' rights in a democratic society.
The requirement of independence calls upon the
individual practicing lawyer, government and civil
society to give priority to the independence of the
legal profession over personal aspirations and to
respect the need for an independent legal profession.
Clients are entitled to expect independent, unbiased
and candid advice, irrespective of whether or not the
advice is to the client's liking.

Independence requires that a lawyer act for a client
in the absence of improper conflicting self-interest,
undue external influences or any concern which may
interfere with a client's best interest or the lawyer's
professional judgment.

Circumstances in which a lawyer's independence will
or may be at risk or impaired include:
• the involvement of the lawyer in a business
  transaction with a client absent proper disclosure
  and client consent;

- where the lawyer becomes involved in a business, occupation or activity whilst acting for a client and such an interest takes or is likely to take precedence over the client's interest;
- unless otherwise authorised by law, knowingly acquiring an ownership, possessory or security interest adverse to the client; and
- holding or acquiring a financial interest in the subject matter of a case which the lawyer is conducting, whether or not before a court or administrative body, except, where authorised by law, for contingent fee agreements and liens to secure fees.

The fact that lawyers are paid by a third party must not affect their independence and professional judgement in rendering their services to the client.

Independence of a lawyer requires also that the process for the lawyer's admission to the bar, professional discipline, and professional supervision in general, are organised and carried out in a manner that guarantees that administration of the legal profession is free from undue or improper influence, whether governmental, by the courts or otherwise.

### 1.3    International implications

While the principles of independence of the lawyer and of the legal profession are undisputed in all jurisdictions adhering to, and striving for, the improvement of the Rule of Law, the respective regulatory and organisational frameworks vary significantly from jurisdiction to jurisdiction. In certain jurisdictions, the bars enjoy specific regulatory autonomy on a statutory and sometimes constitutional basis. In others, legal practice is administered by the judicial branch of government and/or governmental bodies or regulatory agencies. Often the courts or statutory bodies are assisted by bar associations established on a private basis. The various systems for the organisation and regulation

of the legal profession should ensure not only the independence of practicing lawyers but also administration of the profession in a manner that is itself in line with the Rule of Law. Therefore, decisions of the Bars should be subject to an appropriate review mechanism. There is an ongoing debate as to the extent to which governmental and legislative interference with the administration and conduct of the legal profession may be warranted. Lawyers and bars should strive for and preserve the true independence of the legal profession and encourage governments to avoid and combat the challenges to the Rule of Law.

Some jurisdictions hold certain types of activities and the handling of certain matters by members of the bar as incompatible with their independent practice; others see no conflict at all. As regards employment of a lawyer admitted to the bar, it is allowed in some jurisdictions and prohibited in others for a lawyer to be employed by another lawyer or a third party (in-house or corporate counsel). Of those jurisdictions that allow a lawyer to be employed, some jurisdictions acknowledge the privileges of a lawyer (protection of independence and confidentiality) only in those cases where the lawyer works for a client other than the lawyer's employer, while other jurisdictions grant this protection also for work performed for the employer.

Differences in jurisdictional approach should be taken into account in cases of cross-border or multi-jurisdictional practice. Every lawyer is called upon to observe applicable rules of professional conduct in both home and host jurisdictions (Double Deontology) when engaging in the practice of law outside the jurisdiction in which the lawyer is admitted to practice. Every international law firm will have to examine whether its entire organisation is in conformity with such rules in every jurisdiction in which it is established or engaged in the provision of legal services. A universally accepted framework for determining proper conduct in the event of

conflicting or incompatible rules has yet to be developed, although certain jurisdictions have adopted conflict of law principles to determine which rules of professional conduct apply in cross-border practice.

## 2.      Honesty, integrity and fairness

**2.1       General principle**

A lawyer shall at all times maintain the highest standards of honesty, integrity and fairness towards the lawyer's clients, the court, colleagues and all those with whom the lawyer comes into professional contact.

**2.2       Explanatory note**

Trust in the legal profession requires that every member of the legal profession exemplifies personal integrity, honesty and fairness.

A lawyer shall not knowingly make a false statement of fact or law in the course of representing a client or fail to correct a false statement of material fact or law previously made by the lawyer. Lawyers have an obligation to be professional with clients, other parties and counsel, the courts, court personnel, and the public. This obligation includes civility, professional integrity, personal dignity, candor, diligence, respect, courtesy, and cooperation, all of which are essential to the fair administration of justice and conflict resolution. Lawyers should be mindful that while their duties are often carried out in an adversarial forum, lawyers should not treat the court, other lawyers, or the public in a hostile manner. Nevertheless, it is also true that there are different standards expected towards the client, the court or a professional colleague since the lawyer has different responsibilities towards each category. The expression of these responsibilities varies jurisdiction by jurisdiction.

**2.3       International implications**

A lawyer who appears before or becomes otherwise engaged with a court or tribunal must comply with the rules applied by such court or tribunal.

Cross-border cooperation between lawyers from different jurisdictions requires respect for the differences that may exist between their respective legal systems, and the relevant rules for the regulation of the legal profession.

A lawyer who undertakes professional work in a jurisdiction where the lawyer is not a full member of the local profession shall adhere to applicable law and the standards of professional ethics in the jurisdiction of which the lawyer is a full member, and the lawyer shall practice only to the extent this is permitted in the host jurisdiction and provided that all applicable law and ethical standards of the host jurisdiction are observed.

## 3.    Conflicts of interest

### 3.1    General principle

A lawyer shall not assume a position in which a client's interests conflict with those of the lawyer, another lawyer in the same firm, or another client, unless otherwise permitted by law, applicable rules of professional conduct, or, if permitted, by client's authorisation.

### 3.2    Explanatory note

Trust and confidence in the legal profession and the rule of law depends upon lawyers' loyalty to clients. Rules regarding conflicts of interest vary from jurisdiction to jurisdiction. The definition of what constitutes a conflict also differs from jurisdiction to jurisdiction, including (but not exhaustively) whether information barriers are permitted at all, and also whether conflict of interest prohibitions cover all the law firm or whether information barriers can help. Generally, a lawyer shall not represent a client if the representation involves a conflict of interest. A conflict of interest exists if the representation of one client will be directly adverse to another client; or there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client, a third person or by a personal interest of the lawyer. Notwithstanding the existence of conflict of interest, in some jurisdictions a lawyer may represent the client if the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client, the representation is not prohibited by law, the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal, and each affected client gives informed consent, confirmed in

writing. A lawyer who has formerly represented a client in a matter or whose present or former firm has formerly represented a client in a matter shall not use information relating to the representation to the disadvantage of the former client except when permitted by applicable law or ethics rules.

In some jurisdictions, certain potentially conflicting situations may be permitted subject to proper disclosure to and, to the extent permitted by applicable law or ethics rules, consent by all parties involved, provided always that disclosure may be made without breaching confidentiality obligations. Without prejudice to additional duties, if a conflict becomes apparent only after the lawyer's work has commenced, some jurisdictions require the conflicted lawyer to withdraw from the case in its entirety and in respect of all clients concerned; others require withdrawal from representing one client only, but not all of them.

In addition, legal and professional conduct conflict of interest must be clearly distinguished from commercial conflict of interest. A lawyer should be entitled to defend the interests of or represent a client in a case even if that client is a competitor or its interests conflict with the commercial interests of another present or former client, not involved or related in that particular case assigned to the lawyer. Also, a lawyer may defend the interests of or represent a client against another client in any circumstance where the latter, whether in negotiating an agreement, or in another legal action or arbitration, has chosen to place its interests for those cases with another lawyer; however, in such cases, the first-mentioned lawyer will have to comply with all other applicable rules of professional conduct, and in particular with rules of confidentiality, professional secrecy and independence.

In upholding the interests of clients, lawyers must not allow their own interests to conflict with or

displace those of their client. A lawyer must not exercise any undue influence intended to benefit the lawyer in preference to that of a client. A lawyer must not accept instructions or continue to act for a client, when the lawyer becomes aware that the client's interest in the proceedings would be in conflict with the lawyer's own interest.

### 3.3        International implications

The differences in national rules on conflicts of interest will have to be taken into account in any case of cross-border practice. Every lawyer is called upon to observe the relevant rules on conflicts of interest when engaging in the practice of law outside the jurisdiction in which the lawyer is admitted to practice. Every international law firm will have to examine whether its entire organisation complies with such rules in every jurisdiction in which it is established and engaged in the provision of legal services. A universally accepted framework for determining proper conduct in the event of conflicting or incompatible rules has yet to be developed, although certain jurisdictions have adopted conflict of law principles to determine which rules of professional conduct apply in cross-border practice.

## 4.   Confidentiality/ professional secrecy

### 4.1   General principle
A lawyer shall at all times maintain and be afforded protection of confidentiality regarding the affairs of present or former clients, unless otherwise allowed or required by law and/or applicable rules of professional conduct.

### 4.2   Explanatory note
The right and duty of a lawyer to keep confidential the information received from and advice given to clients is an indispensable feature of the rule of law and another element essential to public trust and confidence in the administration of justice and the independence of the legal profession.

The principles of confidentiality and professional secrecy have two main features. On the one hand there is the contractual, ethical and frequently statutory duty on the part of the lawyer to keep client secrets confidential. The statutory duty is sometimes in the form of an evidentiary attorney-client privilege; this differs from the lawyer's obligations under applicable rules of professional conduct. Such obligations extend beyond the termination of the attorney-client relationship. Most jurisdictions respect and protect such confidentiality obligations, for example, by exempting the lawyer from the duty to testify before courts and other public authorities as to the information the lawyer has gathered from clients, and/or by affording lawyer-client communications special protection.

On the other hand, there are manifest situations in which the principles of confidentiality and professional secrecy of lawyer-client communications no longer apply in full or in part. Lawyers can not claim the protection of confidentiality when assisting

and abetting the unlawful conduct of their clients. Some jurisdictions also allow or require a lawyer to reveal information relating to the representation of the client to the extent the lawyer reasonably believes it necessary to prevent reasonably certain crimes resulting, for example in death or substantial bodily harm, or to prevent the client from committing such a crime in furtherance of which the client has used or is using the lawyer's services. Recent legislation imposing special duties upon lawyers to assist in the prevention of criminal phenomena such as terrorism, money laundering or organised crime has led to further erosion of the protection of the lawyer's duty of confidentiality. Many bars are opposed in principle to the scope of this legislation. Any encroachment on the lawyer's duty should be limited to information that is absolutely indispensable to enable lawyers to comply with their legal obligations or to prevent lawyers from being unknowingly abused by criminals to assist their improper goals. If neither of the above is the case and a suspect of a past crime seeks advice from a lawyer, the duty of confidentiality should be fully protected. However, a lawyer cannot invoke confidentiality/professional secrecy in circumstances where the lawyer acts as an accomplice to a crime.

Jurisdictions differ on the scope of protection and its geographical extension. In some jurisdictions clients may waive the lawyer's obligation of confidentiality and professional secrecy, but in others clients may not. In some jurisdictions, the obligation can be broken for self-defence purposes in judicial proceedings. Apart from client waiver, such self-defence and any requirements imposed by law, the lawyer's obligation of confidentiality and professional secrecy is usually without time limit. The obligation also applies to assistants, interns and all employed within the law firm. In any event, lawyers shall be under a duty to ensure that those who work in the same law firm, in whatever capacity, maintain the obligation of confidentiality and professional secrecy.

Law firms or associations raise different aspects of the duty of confidentiality and professional secrecy. The basic and general rule must be that any information or fact known by a lawyer in a law firm is held to be known by the entire organisation, even if that organisation is present in different branches and countries. This means that extraordinary measures must be adopted within the organisation if a lawyer is involved in a case that should be considered as strictly confidential even beyond the general standards of the professional secrecy principle.

Lawyers should also take care to ensure that confidentiality and professional secrecy are maintained in respect of electronic communications, and data stored on computers. Standards are evolving in this sphere as technology itself evolves, and lawyers are under a duty to keep themselves informed of the required professional standards so as to maintain their professional obligations.

The extent to which clients may waive the right to confidentiality is subject to differing rules in different jurisdictions. Those rules limiting the ability to waive argue that clients frequently cannot properly assess the disadvantages of issuing such a waiver. Restrictions on waivers are of paramount importance to protect against a court or governmental authority putting inappropriate pressure on a client to waive his or her right to confidentiality.

Finally, lawyers should not benefit from the secrets confided to them by their clients.

### 4.3    International implications

Although there is a clear common goal behind the various regimes governing the duty of confidentiality and its protection, national rules differ substantially. While civil law countries entitle and oblige the lawyer not to testify, and protect the lawyer against search and seizure, common law countries protect the confidentiality of certain attorney-client

communications, even if, for example, privileged correspondence is found with a client suspected of having committed a criminal offence.

Lawyers engaged in cross-border practice and international law firms will have to investigate all rules that may be of relevance and will have to ensure that information to which they gain access and the communication in which they are engaged will in fact enjoy the protection of confidentiality.

Generally, the national rules of all relevant jurisdictions must be complied with (Double Deontology). But national rules sometimes do not address the issue of how to deal with conflicting rules. If the conflicting rules are broadly similar, then the stricter rule should be complied with. There is, however, no universally accepted solution for those cases where the rules contradict each other (for instance secrecy protection versus reporting obligation), although certain jurisdictions have adopted conflict of law principles to determine which rules of professional conduct apply in cross-border practice.

Likewise, national rules as to the ability of a client to waive confidentiality vary, and the applicable rule or rules will have to be determined individually in every case.

A special international consideration arises from the fact that some jurisdictions permit employment of a lawyer admitted to the Bar, while others do not permit employment of in-house counsel. Accordingly, the question arises how jurisdictions that do not recognise in whole or in part the duty of confidentiality on the part of in-house counsel deal with foreign in-house counsel who enjoy that protection in their home jurisdiction.

## 5.    Clients' interests

### 5.1    General principle

A lawyer shall treat client interests as paramount, subject always to there being no conflict with the lawyer's duties to the court and the interests of justice, to observe the law, and to maintain ethical standards.

### 5.2    Explanatory note

This means that lawyers in all of their dealings with the courts, by written or oral form, or by instructing an advocate on the client's behalf, should act with competence and honesty.

Lawyers should serve their clients competently, diligently, promptly and without any conflict to their duty to the court. They should deal with their clients free of the influence of any interest which may conflict with a client's best interests; and with commitment and dedication to the interest of the client. A lawyer should pursue a matter on behalf of a client despite opposition, obstruction or personal inconvenience to the lawyer, and take whatever lawful and ethical measures may be required to vindicate a client's cause or endeavour.

Lawyers should maintain confidentiality. They should also provide all relevant information to their clients, in order to protect their clients' interests and advise them competently, subject to any contrary law or ethics rule.

Lawyers must not engage in, or assist their client with, conduct that is intended to mislead or adversely affect the interest of justice, or wilfully breach the law.

Lawyers' duty to safeguard clients' interests commences from their retainer until their effective release from the case or the final disposition of the whole subject matter of the litigation. During that

period, they are expected to take such steps and such ordinary care as clients' interests may require.

Even if not required by the applicable law of a jurisdiction, it is considered good practice in many jurisdictions for lawyers to ensure that they secure in the interest of their clients adequate insurance cover against claims based on professional negligence or malpractice.

## 6.    Lawyers' undertaking

### 6.1    General principle

A lawyer shall honour any undertaking given in the course of the lawyer's practice in a timely manner, until the undertaking is performed, released or excused.

### 6.2    Explanatory note

A lawyer's undertaking is a personal promise, engagement, stipulation and responsibility, as well as a professional and legal obligation. A lawyer must therefore exercise extreme caution when giving and accepting undertakings. A lawyer may not give an undertaking on behalf of a client if they do not have a prior mandate, unless they are requested to do so by another lawyer representing that client. A lawyer should not give or request an undertaking that cannot be fulfilled, and must exercise due diligence in this regard. This therefore requires that a lawyer has full control over the ability to fulfil any undertaking given. Ideally, a lawyer should provide a written confirmation of an undertaking in clear and unambiguous terms, and in a timely manner – if the lawyer does not intend to accept personal responsibility this should be made clear in the undertaking. Breaches of undertakings adversely affect both the lawyer's own reputation as being honourable and trustworthy, as well as the reputation and trustworthiness of the legal profession as a whole.

In those jurisdictions in which undertakings are not recognised as described here, lawyers should nevertheless exercise the same extreme caution in engaging themselves in the way outlined.

## 7.    Clients' freedom

**7.1    General principle**

A lawyer shall respect the freedom of clients to be represented by the lawyer of their

choice. Unless prevented by professional conduct rules or by law, a lawyer shall be free to take on or reject a case.

**7.2    Explanatory note**

The client may issue an instruction or mandate to the lawyer, instructing the transfer of all papers and files to another lawyer. The lawyer is under an obligation to comply with the instruction or mandate, subject to any lawful right of retention or lien. A lawyer should not withdraw from representation of a client except for good cause or upon reasonable notice to the client, and must minimize any potential harm to the client's interests, and (where appropriate or required) with the permission of the court. A lawyer should do everything reasonable to mitigate the consequences of the change of instructions.

# 8. Protection of property of clients and third parties

### 8.1 General principle

A lawyer shall account promptly and faithfully for and prudently hold any property of clients or third parties that comes into the lawyer's trust, and shall keep it separate from the lawyer's own property.

### 8.2 Explanatory note

A lawyer shall hold property of clients or third parties that is in the lawyer's possession in connection with a representation separate from the lawyer's own business or personal property. Client or third-party funds should be held in a separate bank account and not commingled with the lawyer's own funds. Property other than funds should be identified as such and appropriately safeguarded. Complete records of such funds and other property shall be kept by the lawyer and shall be preserved after termination of a representation to the extent required by applicable law or professional regulations. The lawyer should ascertain the identity, competence and authority of the third person that is transferring the possession of the property or the funds.

Upon receiving funds or other property in which a client or third person has an interest, the lawyer shall promptly notify the client or third person. Except as permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property. A lawyer cannot use a client's property or client's funds in order to set off or compensate any outstanding payment of the lawyers' professional fees or expenses unless so is authorised by law or in writing by the client.

## 9.    Competence

**9.1      General principle**

A lawyer's work shall be carried out in a competent and timely manner. A lawyer shall not

take on work that the lawyer does not reasonably believe can be carried out in that manner.

**9.2      Explanatory note**

As a member of the legal profession, a lawyer is presumed to be knowledgeable, skilled, and capable in the practice of law. Accordingly, the client is entitled to assume that the lawyer has the ability and capacity to deal adequately with all legal matters to be undertaken on the client's behalf or to procure that somebody else either in or outside the law firm will do it.

Competence is founded upon both ethical and legal principles. It involves more than an understanding of legal principles: it involves an adequate knowledge of the practice and procedures by which such principles can be effectively applied, and includes competent and effective client, file and practice-management strategies.

A lawyer must consider the client's suggestion to obtain other opinions in a complex matter or from a specialist, without deeming such requests to be a lack of trust.

## 10.    Fees

### 10.1    General principle

Lawyers are entitled to a reasonable fee for their work, and shall not charge an unreasonable fee. A lawyer shall not generate unnecessary work.

### 10.2    Explanatory note

The basis for the claim of a lawyer to fees for services performed may be contractual or statutory. The lawyer shall make a clear and transparent arrangement on fees with the client jointly with the giving and taking of instructions. If permitted by law or applicable rules of professional conduct, such arrangement may contain an agreement on the limitation of the lawyer's liability.

On whatever basis a fee arrangement is made, it shall be reasonable. Reasonableness is normally determined with a view to the nature of the assignment, its difficulty, the amount involved, the scope of work to be undertaken and other suitable criteria. The lawyer shall strive to achieve the most cost effective resolution of the client's dispute.

The lawyer's invoices shall be submitted in accordance with the agreement with the client and statutory rules, if any.

Where permitted, a lawyer may require the payment of reasonable deposits to cover the likely fees and expenses as a condition to commencing or continuing his or her work. As mentioned in Principle 7, the lawyer may have a lawful right of retention or lien if the client instructs the lawyer to transfer all the papers and files to another lawyer. A lawyer shall also hold separate from the lawyer's own business or personal property any legal fees and expenses that a client has paid in advance, to be withdrawn by the lawyer only as those fees are earned or expenses are incurred. If a dispute arises between the client and the lawyer as to the lawyer's entitlement to withdraw

funds for fees or expenses, then, subject to applicable law, the disputed portion of the funds must be held separate until the dispute is resolved. The undisputed portion of the funds shall be promptly distributed to the client.

If a lawyer engages or involves another lawyer to handle a matter, the responsibility for such other lawyer's fees and expenses shall be clarified among the client and the lawyers involved beforehand. In the absence of such clarification and depending on applicable law the lawyer so having involved another lawyer may be liable for the latter lawyer's fees and expenses.

### 10.3    International implications

When engaging in cross-border practice, the lawyer should investigate whether arrangements on fees, payments of deposits and limitations of liability are permitted under all applicable rules and, if relevant, the rules which govern the responsibility for fees of other lawyers who may become involved. In particular, a contingency fee or *pactum de quota litis* is permitted in certain jurisdictions provided certain requirements are met but prohibited as a matter of public policy in other jurisdictions.

In some jurisdictions, it is not appropriate for a lawyer to ask another lawyer or a third party for a fee, or to pay a fee to another lawyer or a third party for referring work.

## Appendix

**Definitions**

**Bar** An officially recognised professional organisation consisting of members of the legal profession that is dedicated to serving its members in a representative capacity to maintain the practice of law as profession, and, in many countries possessing regulatory authority over the bar in its jurisdiction. Membership in the bar may be compulsory or voluntary.

**Client-lawyer confidentiality** Subject to specific exceptions, the lawyer's ethical duty of confidentiality prohibits a lawyer from disclosing information relating to the representation of or advice given to a client from any source, not just to communications between the lawyer and client, and also requires the lawyer to safeguard that information from disclosure. The principle of confidentiality is greater in scope than the legal professional privilege. Matters that are protected by the legal professional privilege are also protected by the principle of confidentiality; the converse, however, is not true.

**Confirmed in writing** Informed consent provided via a writing from the person from whom such consent is sought or a writing that a lawyer promptly transmits to that person confirming an oral informed consent. The written consent may take the form of a tangible or electronic record. It may consist of handwriting, typewriting, printing, photocopy, photograph, audio or video recording, and electronic communication such as an e-mail or Twitter message.

**Court/tribunal** An entity, whether part of the judicial, legislative or executive branch of government, including an arbitrator in a binding arbitration proceeding, administrative agency or other body,

acting in an adjudicative capacity. This entity acts in an adjudicative capacity when a neutral official, after the presentation of evidence or legal argument by a party or parties, will render a binding legal judgment directly affecting a party's interests in a particular matter.

**Informed consent** Agreement by a person to allow something to happen in response to a proposal by a lawyer after the lawyer has made full disclosure of the facts, material risks of, and reasonably available alternatives to the proposed course of action.

**Knowingly** Actual knowledge of the fact in question. Knowledge may be inferred from the circumstances.

**Legal profession** The body of lawyers qualified and licensed to practice law in a jurisdiction or before a tribunal, collectively, or any organised subset thereof, and who are subject to regulation by a legally constituted professional body or governmental authority.

**Legal professional privilege** An evidentiary privilege that protects a lawyer from being compelled to disclose certain communications between a lawyer and a client in a judicial or other proceeding where a lawyer may be called as a witness.

**Professional secrecy** The handling of information about a client received during the course of the representation from the client or other sources that the lawyer may not be able to disclose, regardless of client consent. This principle is effective in many civil law jurisdictions.

**Reasonable or reasonably** In reference to a lawyer's actions, the level of conduct of a prudent and competent lawyer.

**Reasonably believes or reasonable belief** A belief by a prudent and competent lawyer in a fact or set of facts that is appropriate under the circumstances in which that belief exists.

**Secrets** Information gained by the lawyer in the course of a representation that the client specifically requests that the lawyer not reveal or information the nature of which would be potentially embarrassing or detrimental to the client if revealed.



the global voice of
the legal profession

**International Bar Association**
4th floor
10 St Bride Street
London EC4A 4AD

Tel: +44 (0)20 7842 0090

Fax: +44 (0)20 7842 0091

**www.ibanet.org**