### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re<br><br>FTX TRADING LTD., *et al.*,<br><br>Debtors. | Chapter 11<br>Case No. 22-11068-JTD<br>(Jointly Administered)<br><br>Re: 1137<br><br>Objection Deadline:<br>April 5, 2023 at 4:00 p.m. (ET)<br><br>Hearing Date:<br>April 12, 2023 at 1:00 p.m. (ET) |

### MEDIA INTERVENORS' OBJECTIONS TO (I) MOTION OF THE AD HOC COMMITTEE OF NON-US CUSTOMERS TO FILE UNDER SEAL A VERIFIED STATEMENT AND DECLARATION (D.I. 1137), AND (II) EXTENSION OR CONTINUANCE OF THE REDACTION DEADLINE

Media Intervenors—Bloomberg L.P., Dow Jones & Company, Inc., The New York Times Company and The Financial Times Ltd—hereby object to (1) the motion of the Ad Hoc Committee of Non-US Customers (herein the "Committee") to file under seal its Rule 2019 Statement and the declaration of one of its members, D.I. 1137; and (2) any extension or continuance of the 90-day period during which the Court has permitted the names of FTX's customer-creditors to remain sealed in Debtors' filings, D.I. 545.[1]

### BACKGROUND

1.   On November 11, 2022, Debtors petitioned for relief under Chapter 11 of the Bankruptcy Code.  D.I. 1. On November 19, 2022, Debtors moved for leave to file a consolidated Creditor Matrix containing the names and addresses of their creditors.  D.I. 45 at 3–4, ¶ 6.

---

[1] FTX Trading Ltd.'s and Alameda Research LLC's tax identification numbers are 3288 and 4063, respectively. Due to the large number of debtor entities in these Chapter 11 cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.

Simultaneously, Debtors sought leave pursuant to 11 U.S.C. § 107(b)(1) to redact the names and addresses of their customers in all publicly filed versions of the Creditor Matrix and Consolidated Top 50 Creditors List and Schedules and Statements.  D.I. 45 at 5–6, ¶ 12.

2.    On December 9, 2022, Media Intervenors moved to intervene for the limited purpose of opposing the redaction of the creditors' names. Media Intervenors' motion set forth their objections to Debtors' proposed redactions.  D.I. 196.

3.    On December 12, 2022, the U.S. Trustee filed objections to, in relevant part, Debtors' proposed redaction of their creditors' names.  D.I. 200.

4.    On December 19, 2022, the Court granted Media Intervenors' motion to intervene. D.I. 255.

5.    On January 8, 2023, Debtors filed a reply to the objections of Media Intervenors and the U.S. Trustee.  D.I. 407. In support, Debtors proffered the declaration of Kevin M. Cofsky (the "Cofsky Declaration").  D.I. 411. On reply, Debtors limited their request to seal the names of *some* creditors to a period of six months, subject to extension.  D.I. 407 at 5, ¶ 10. Debtors maintained, however, their request to permanently redact the names of customers "who are citizens of countries protected by the GDPR."[2]  *Id.* at ¶ 30.

6.    On January 11, 2023, the Court held a hearing (the "Second Day Hearing") on, *inter alia*, Debtors' request to redact the names of their customers, at which the Court heard testimony from Mr. Cofsky. D.I. 489. On January 20, 2023, the Court entered an order (the "Redaction Order") granting final relief as to some portions of Debtors' sealing request and interim relief as to other portions.  D.I. 545. The Court authorized Debtors "to redact the addresses and email

---

[2] Debtors also sought to "reserve all rights with respect to seeking to permanently redact names of creditors who are citizens of other countries with similar laws if subsequently advised by counsel to be necessary."  D.I. 407 at 12 n.9.

addresses of their creditors and equity holders who are natural persons from any filings." *Id.* at ¶ 5. The Court also authorized Debtors, pursuant to 11 U.S.C. § 107(b)(1), to redact the names of "all customers," and the "addresses and email addresses of customers who are not natural persons," for a period of 90 days—*i.e.*, until April 20, 2023 (the "Redaction Deadline"). D.I. 545 ¶ 4. Finally, the Court authorized Debtors to redact the names and addresses of "any creditors or equity holders" who are "natural persons and who are protected by the GDPR" until the Redaction Deadline. *Id.* at ¶ 6.

7.    On March 22, 2023, the Committee moved to file under seal (1) the statement required by Rule 2019 of the Federal Rules of Bankruptcy Procedure (the "Rule 2019 Statement"); and (2) a declaration prepared by one of the Committee's members in support of sealing the Committee's Rule 2019 statement (the "Member Declaration"). D.I. 1137. By its motion, the Committee sought the Court's leave to redact the names of its members from the Committee's Rule 2019 Statement.

8.    Additionally, in support of its motion to seal its Rule 2019 Statement, the Committee filed a declaration prepared by Philip James, D.I. 1139, referred to in its motion as the "Philips Declaration." *See* D.I. 1137 ¶ 2.

9.    The Committee proffered no other evidence in support of sealing the Member Declaration.

10.    Objections to the Committee's motion to seal are due by 4:00 P.M. on April 5, 2023; a hearing on the motion is set for 1:00 P.M. on April 12, 2023. D.I. 1137.

11.    On March 24, 2023, the Committee publicly filed redacted versions of its Rule 2019 statement, D.I. 1156, and the Member Declaration, D.I. 1157.

## ARGUMENT

12.    The First Amendment to the Constitution of the United States and the Bankruptcy Code guarantee the press and public a presumptive right of access to bankruptcy filings.  Litigants

who seek to overcome the public's right of access to bankruptcy filings and seal information that is presumptively public bear a heavy burden to justify such secrecy. Here, Debtors previously sought to seal the names of all creditors who are also customers of FTX Trading Ltd. ("FTX"), prompting entry of the Redaction Order; the Committee, for its part, now seeks to seal the names of all of its members, a group of "non-U.S." customer-creditors. Debtors and the Committee— who rely on substantially overlapping arguments and evidence—have failed to carry their burden to justify continued sealing. In particular, the evidence they rely on fails to establish that the names of FTX's customer-creditors constitute confidential commercial information under § 107(b)(1) and fails to establish that disclosing the names of FTX's individual customer-creditors would expose those individuals to an "undue risk of identity theft or other unlawful injury" pursuant to § 107(c).

13.  As detailed herein, the purported justifications for sealing the names of the Committee members, like Debtors' proffered justifications for sealing their entire list of both institutional and individual creditors, are so broad that they elude any limiting principle; if permanent sealing of the names of bankruptcy participants were permissible on the grounds advanced by Debtors and the Committee, then sealing customers' names would be routine in virtually every bankruptcy proceeding—a result wholly incompatible with the public's long-recognized constitutional and statutory rights of access to bankruptcy filings.

14.  Public access is of the utmost importance here. The seismic collapse of FTX, and the catastrophic losses suffered by millions of its customers, has ignited intense public interest in the U.S. legal system's approach to the burgeoning and largely unregulated cryptocurrency market— with this case at the center. Yet the sealing of the names of FTX's creditors to date has significantly impeded reporting on, and analysis of, these proceedings, leaving the public—and creditors—

largely in the dark as to the United States' enforcement of its bankruptcy laws in the crypto context. This undermines a bedrock purpose of the strong presumption of public access applicable in bankruptcy matters: to "foster[] confidence among creditors regarding the fairness of the bankruptcy system." *In re Crawford*, 194 F.3d 954, 960 (9th Cir. 1999).

15.   Even to the extent temporary sealing, as provided for in the Redaction Order, was appropriate at the outset of this case, additional and ongoing sealing is not warranted.  Months have passed since the Redaction Order. The Redaction Deadline is approaching, but Debtors have yet to proffer additional evidence in support of continued redaction, and the Committee's arguments for further sealing fall far short. In the meantime, the press, members of the public, and other creditors remain stymied in their efforts to monitor these proceedings.

16.   Accordingly, and for the reasons herein, the Court should (1) deny the Committee's motion to redact the names of its members in its Rule 2019 Statement and (2) decline to extend or continue the Redaction Deadline.

A.   **BANKRUPTCY PROCEEDINGS ARE PRESUMPTIVELY PUBLIC, AND PROPONENTS OF SEALING BEAR A HEAVY EVIDENTIARY BURDEN.**

17.   A strong presumption of openness applies to all judicial records.  *See Nixon v. Warner Commc'n, Inc.*, 435 U.S. 589, 597–98 (1978).  This presumption "is at its zenith when issues concerning the integrity and transparency of bankruptcy court proceedings are involved." *In re Food Mgmt. Grp., LLC*, 359 B.R. 543, 553 (Bankr. S.D.N.Y. 2007). Thus, "[d]uring a chapter 11 reorganization, a debtor's affairs are an open book, and the debtor operates in a fish bowl." *In re Alterra Healthcare Corp.*, 353 B.R. 66, 73 (Bankr. D. Del. 2006). This openness is "fundamental to the operation of the bankruptcy system and is the best means of avoiding any suggestion of impropriety that might or could be raised." *In re Bell & Beckwith*, 44 B.R. 661, 664 (Bankr. N.D. Ohio 1984).

18.   The presumption of public access is particularly strong when, as here, the public has a heightened interest in the subject matter of the proceedings.  *See, e.g., In re Nat'l Prescription Opiate Litigation*, 927 F.3d 919, 933 (6th Cir. 2019) (outside the bankruptcy context, requiring disclosure of a database subject to a stipulated protective, given the public's "substantial interest" in the data). *See also* D.I. 196 ¶¶ 1–3 (describing public interest in the present matter).

19.   Section 107 of the Bankruptcy Code, which codifies the presumption of public access, "is rooted in . . . the common law and buttressed by the First Amendment." *Crawford*, 194 F.3d at 960. While the statute contains certain enumerated exemptions, 11 U.S.C. § 107(b)–(c), bankruptcy "[c]ourts have zealously upheld the public's right to access and narrowly construed the[m]." *In re Celsius Network, LLC*, 644 B.R. 276, 288 (Bankr. S.D.N.Y 2022) (citing *In re Anthracite Cap., Inc.*, 492 B.R. 162, 176 (Bankr. S.D.N.Y. 2013)).  The provision reflects the clear intent of Congress to make all records in bankruptcy cases publicly available in all but specific, narrow circumstances.  *In re Orion Pictures Corp.*, 21 F.3d 24, 26 (2d Cir. 1994).  "That information might 'conceivably' or 'possibly' fall within a protected category is not sufficient to seal documents." *In re FiberMark, Inc.*, 330 B.R. 480, 506 (Bankr. D. Vt. 2005).

20.   Parties seeking to file bankruptcy records under seal bear a heavy evidentiary burden. *Celsius*, 644 B.R. at 292 ("The strong public policy of transparency and public disclosure in bankruptcy cases requires very narrow exceptions and only on strong evidentiary showings."). Conclusory statements that a debtor will be harmed by the disclosure of presumptively public information do not satisfy this burden.  *E.g., In re Itel Corp.*, 17 B.R. 942, 943-944 (Bankr. 9th Cir. 1982); *In re Purdue Pharma LP*, 632 B.R. 34, 40 (Bankr. S.D.N.Y. 2021) (holding that a "request under § 107(b)(1) should be supported by specific evidence, not argument or conclusory

statements in a declaration, to establish the exception"). Instead, the moving party must provide

specific, particularized evidence of harm that rises above mere speculation. *See id.*

21.  Opponents of sealing—including members of the press and public—must have the

opportunity to challenge any evidence adduced by the proponents of sealing, including the

opportunity to cross-examine declarants. *See*, *e.g.*, *Purdue Pharma,* 632 B.R. at 40 (giving media

intervenors "the opportunity to cross-examine Messrs. Lynam and Vellucci on their Declarations

at an evidentiary hearing"); *United States v. Timon*, 2021 WL 276964 at *2 (N.D.N.Y. Jan. 7,

2021) (denying a party's motion seeking permission for witness testimony to be presented by

declaration in lieu of live testimony, as it would "deprive Defendants the opportunity to cross-

examine these witnesses"). "In order for a declaration to be considered by the Court, the declarant

must be in court, subject to cross-examination at the trial." *In re Heckencamp*, 110 B.R. 1, 3

(Bankr. C.D. Cal. 1989). Absent such an "opportunity to confront a declarant the evidence is

inadmissible." *In re Shangri-La Nursing Center, Inc.*, 31 B.R. 367, 370 (Bankr. E.D.N.Y. 1983);

*see also In re DBSI, Inc.*, 405 B.R. 698, 704 (Bankr. D. Del. 2009) (declining to consider the

declaration of a declarant whom the opposing party was not provided an opportunity to cross-

examine).

22.  Significant here, the strong presumption of public access to bankruptcy proceedings

attaches to the identities of creditors.  11 U.S.C. § 521(a) ("The debtor shall file a list of

creditors."); Fed. R. Bankr. P. 1007(a) ("[T]he debtor shall file with the petition a list containing

the name and address of each entity included or to be included on Schedules D, E/F, G, and H.").

Indeed, courts have recognized that public access to creditor lists in bankruptcy proceedings is

especially important because, *inter alia*, conferral among creditors is an integral part of the Chapter

11 reorganization process, and such conferral is frustrated when creditors' identities are sealed.

*See In re Foundation for New Era Philanthropy*, 1995 WL 478841, \*6 (Bankr. E.D. Pa. 1995).

*See also In re MorAmerica Financial Corp.*, 158 B.R. 135, 137 (Bankr. N.D. Ia. 1993) ("An open record…enhances the likelihood that creditors will confer among themselves as to their best alternatives in this reorganization case. The ability to campaign among one's fellow creditors is an important ability in a bankruptcy case. Sealing of creditor lists inhibits that ability.").

23.  Indeed, the docket in this matter reveals several examples of immense transfers of funds involving anonymized creditors (who may or may not be members of the Committee):

Case 22-11068-JTD    Doc 1025    Filed 03/15/23    Page 43 of 65

Debtor Name:  Alameda Research LLC

Case Number:  22-11066 (JTD)

**Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy**

**SOFA Question 3:** Certain payments or transfers to creditors within 90 days before filing this case

| Creditor Name & Address | Check or Wire Number | Payment Date | Reason For Payment | Amount Paid |
|---|---|---|---|---|
| | | 10/19/2022 | Services | $94,517.43 |
| | | 10/21/2022 | Services | $627.27 |
| | | 11/07/2022 | Services | $6,567.80 |
| | | | **SUBTOTAL** | **$433,968.58** |
| NAME ON FILE ADDRESS ON FILE | | 08/16/2022 | Other- Loan Principal and/or Interest | $180,000,000.00 |
| | | | **SUBTOTAL** | **$180,000,000.00** |

Debtor Name:  Alameda Research LLC                                                                          Case Number:  22-11066 (JTD)

**Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy**

**SOFA Question 13:** Transfers not already listed on this statement

| Creditor Name and Address | Description of Property | Relationship to Debtor | Date | Amount |
|---|---|---|---|---|
| Bankman-Fried, Samuel<br>ADDRESS ON FILE | Cash Payment | Founder | 01/05/2021 | $500,000.00 |
| Bankman-Fried, Samuel<br>ADDRESS ON FILE | Cash Payment | Founder | 01/15/2021 | $500,000.00 |
| Friedberg, Daniel<br>ADDRESS ON FILE | Cash Transfer | Officer | 06/15/2021 | $3,007,451.30 |
| NAME ON FILE<br>ADDRESS ON FILE | Cash Transfer in the name of<br>Samuel Bankman-Fried | | 10/01/2021 | $20,000,000.00 |
| Mount Olympus Capital LP<br>9 LAGORCE CIR<br>MIAMI BEACH, FL 33141-4519 | Cash Investment in Mount<br>Olympus Capital LP for the benefit<br>of SGN Albany (100% owned by<br>Sam, Gary, Nishad, and Alameda<br>Research Ltd.) | | 06/07/2022 | $100,000,000.00 |
| NAME ON FILE<br>ADDRESS ON FILE | Cash Transfer in the name of<br>Nishad Singh | | 08/16/2021 | $1,000,000.00 |
| NAME ON FILE<br>ADDRESS ON FILE | Cash Transfer in the name of<br>Samuel Bankman-Fried | | 06/16/2021 | $1,000,000.00 |
| NAME ON FILE<br>ADDRESS ON FILE | Cash Transfer in the name of<br>Samuel Bankman-Fried | | 07/20/2021 | $2,000,000.00 |

Responses to this question do not currently include all transfers of cryptocurrency, other digital assets or other assets.

Debtor Name:  FTX Trading Ltd.                                                                          Case Number:  22-11068 (JTD)

**Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy**

**SOFA Question 4:** Payments or other transfers of property made within 1 year before filing this case that benefited any insider

| Creditor Name and Address | Relationship to Debtor | Total Amount or Value | Dates | Reason for Payment or Transfer |
|---|---|---|---|---|
| Corporate & Trust Services<br>Limited<br>LOWER FACTORY ROAD PO<br>BOX 990<br>ST JOHNS,<br>ANTIGUA & BARBUDA | Director | $20,833.33 | 12/17/2021 | Cash Payment |
| Corporate & Trust Services<br>Limited<br>LOWER FACTORY ROAD PO<br>BOX 990<br>ST JOHNS,<br>ANTIGUA & BARBUDA | Director | $20,833.33 | 11/15/2021 | Cash Payment |
| Ellison, Caroline<br>ADDRESS ON FILE | Director/Officer | $500,000.00 | 01/20/2022 | Cash Payment |
| Ellison, Caroline<br>ADDRESS ON FILE | Director/Officer | $1,000,000.00 | 01/12/2022 | Cash Payment |
| NAME ON FILE<br>ADDRESS ON FILE | Officer | $5,000,000.00 | 09/09/2022 | Cash Payment |
| NAME ON FILE<br>ADDRESS ON FILE | Officer | $3,750,000.00 | 05/27/2022 | Cash Payment |
| NAME ON FILE<br>ADDRESS ON FILE | Officer | $15,973,337.50 | 05/05/2022 | Cash Payment |
| NAME ON FILE<br>ADDRESS ON FILE | Officer | $17,360,000.00 | 04/13/2022 | Cash Payment |
| NAME ON FILE<br>ADDRESS ON FILE | Officer | $41,666,671.88 | 11/23/2021 | Cash Payment |
| NAME ON FILE<br>ADDRESS ON FILE | Director | $844,662.00 | 04/13/2022 | Cash Payment |
| NAME ON FILE<br>ADDRESS ON FILE | Director | $49,989.36 | 07/21/2022 | Cash Payment |

24.  As a result of this sealing, not only are members of the press and public unable to scrutinize these transactions—other creditors are unable to inquire with their fellow creditors about the nature of these transfers, underscoring that some creditors stand to benefit tremendously from sealing, while others, benefitting little, are left in the dark.  Continued sealing, including the names of the Committee members, will only compound these harms.

**B.    NEITHER THE COMMITTEE NOR DEBTORS HAVE ESTABLISHED THAT CONTINUED SEALING IS PERMISSIBLE UNDER SECTION 107(B)(1).**

**i.    Debtors' proffered evidence, on which the Committee largely relies, does not establish that the names of FTX's customers constitute confidential commercial information.**

25.  Section 107(b)(1) permits a court to protect information constituting "a trade secret or confidential research, development, or commercial information."   11 U.S.C. § 107(b)(1). "Commercial information" means "information which would cause 'an unfair advantage to competitors by providing them information as to the commercial operations of the debtor.'" *Celsius,* 644 B.R. at 288. Commercial information need not be a trade secret, but it must be "so critical to the operations of an entity seeking the protective order that its disclosure will unfairly benefit the entity's competitors." [3]  *Id.* at 289 (quoting *In re Barney's Inc.*, 201 B.R. 703, 708-09

---

[3] The Committee contends that this Court has already "ruled that the names of the Debtors' customers may remain sealed from public view pursuant to § 107(b) of the Bankruptcy Code because the customers' identities qualify as a 'trade secret' of the Debtors." D.I. 1337 ¶ 10 (citing Tr. of Second Day Hrg. 102:25–103:5). That is misleading. In context, the Court's statement simply acknowledges that, in the bankruptcy context, it goes without saying that a company may be able to prove that their customer list is protected under § 107(b).  Tr. of Second Day Hrg. 102:25–103:5. But that general observation does not speak to the specific circumstances here, in which all customers are also creditors.  *Id.* Indeed, Debtors have not argued that the names of FTX's customers are trade secrets. *See generally* D.I. 45, D.I. 405. And the Redaction Order, which permitted only *temporary* redaction of customer names, not only contains no reference to trade secrets, *see generally* D.I. 545, but would make little sense if the Court had, in fact, made the finding the Committee says it did.

(Bankr. S.D.N.Y. 1996). *See also Alterra*, 353 B.R. at 75–76. In addition, disclosure must "reasonably be expected to cause the entity commercial injury." *Id.* at 75.

26. Here, Debtors' evidence in support of sealing the names of their customer-creditors consists of the testimony of Mr. Cofsky.[4] The Committee seeks to redact the names of its members based on the same evidence. *See* D.I. 1137 ¶ 18 ("There is no basis to deny the [Committee] the same relief that the Court has already granted to the Debtors.").[5]

27. The Court deemed Debtors' evidence sufficient to justify sealing the names of FTX's customer-creditors for 90 days—a period calculated to maintain the status quo while Debtors explored potential valuations of FTX's assets. D.I. 545. Debtors' evidence is not, however, sufficient to justify *ongoing* sealing, beyond that 90-day redaction period.

28. During the Second Day Hearing, Mr. Cofksy testified that his staff had selected fewer than 20 FTX customer-creditors with non-generic names and run unspecified internet searches for information about them. Mr. Cofsky's staff believed they were able to locate some unspecified form of contact information for more than half of the customer-creditors thus searched. Tr. of Second Day Hrg. 33:19–36:3. Mr. Cofsky did not testify that he or his staff validated the results of this experiment—*e.g.*, by determining whether they had located accurate, current contact

---

[4] The Declaration of Edgar W. Mosley II in Support of Chapter 11 Petitions and First Day Pleadings ("Mosley Declaration"), D.I. 57, contains two paragraphs regarding the sealing of FTX's customers list. *Id.* ¶¶ 18–19. To Media Intervenors' knowledge, no party has cited either paragraph in support of sealing the names of FTX's customers—appropriately so, as paragraphs 18 and 19 are entirely conclusory. *Id.*; *see also* D.I. 200 (explaining that paragraphs 18 and 19 of the Mosley Declaration provide no support for sealing under § 107).

[5] The Committee incorrectly states that the Court has already permitted Debtors to redact the names of all FTX customers who are natural persons on a *permanent* basis, while permitting redaction of the names of customers who are *not* natural persons only until the Redaction Deadline. D.I. 1137 ¶ 11. The Redaction Order clearly states that "the authorization to redact the names of *all customers*, and to redact the names, addresses and e-mail addresses of customers who are not natural persons, is only until [the Redaction Deadline]." D.I. 545 ¶ 4 (emphasis added).

information for the individuals they had searched, or whether they had, in fact, located contact information for the *correct* individuals. *See id.*

29. Nevertheless, based on this experiment, Mr. Cofksy speculated that if FTX's customer-creditors' names were disclosed, competitors might conduct similar searches and use the results to woo FTX's customers, thereby reducing the value of Debtors' estate. *Id.*

30. Mr. Cofksy's experiment—one based on a non-random sampling and a concededly "[un]sophisticated methodology," Tr. of Second Day Hrg. 50:8–9—fails to establish that FTX's competitors would or could operationalize the names of customer-creditors to Debtors' disadvantage. At most, it establishes that if FTX's approximately nine million customer-creditors were named in public filings, an unknown number of unidentified competitors of FTX might Google (or otherwise search for) an unknown number of them in an attempt to discover their contact information; in doing so, these unknown competitors might succeed in discovering the contact information of an unknown percentage of FTX's individual creditors with non-generic names—some or all of whom may be also be FTX customers, and some or all of whom, if customers at all, may *already* be customers of competing crypto exchanges. This is speculation all the way down. It fails, moreover, to address the numerous customer-creditors of FTX who have self-identified through online statements—including not only individual creditors, but institutional creditors.

31. The issue presented here is strikingly similar to the one faced by the Bankruptcy Court for the Southern District of New York in *Celsius*, 644 B.R. at 282. The debtors in *Celsius*—a cryptocurrency exchange and affiliated entities—sought to seal their creditor list on identical grounds; they argued, *inter alia*, that if the list was "publicly disclosed their competitors would gain a 'significant competitive advantage by having access to the complete list of the Debtors'

worldwide customer base,' which 'would significantly decrease the value of the customer list as an asset in any future potential asset sale.'" *Id.* The court disagreed, noting two logical gaps in the debtors' arguments. First, the court observed that the debtors' activity "ha[d] not won many fans among [d]ebtors' customers" and that the "[d]ebtors' business model [had] substantially changed." *Id.* at 291. Second, the debtors "fail[ed] to address with evidence whether creditors who deposited crypto assets with the [d]ebtors also maintain accounts with the [d]ebtors' competitors." *Id.* at 292.

32. The same reasoning applies here and should lead to the same result. First, the spectacular mismanagement of creditors' crypto assets by FTX certainly has not won many fans among FTX's customers.[6] Debtors' claim that FTX's customer-creditor list is a valuable asset rests on the implicit (and faulty) assumption that FTX's customers represent an especially crypto-friendly segment of consumers—something that might have been true before FTX's collapse cost its customers billions of dollars, but is unlikely to be true now. Indeed, any FTX customers who remain interested in crypto services have likely sought out FTX's competitors on their own initiative, given that FTX's platform has been "disabled." D.I. 1137 ¶ 26. Consequently, it is likely that FTX's competitors have *already* reaped any competitive advantage that FTX's customer list might purportedly confer.

33. Second, as in *Celsius*, the record does not establish that FTX's customers used FTX on an exclusive basis. *Cf.* Tr. of Second Day Hrg. 94:11–13 (statement of Debtors' counsel that

---

[6] *See* Declaration of John J. Ray III in Support of Chapter 11 Petitions and First Day Pleadings at ¶ 5, D.I. 24 ("Never in my career have I seen such a complete failure of corporate controls and such a complete absence of trustworthy financial information as occurred here. From compromised systems integrity and faulty regulatory oversight abroad, to the concentration of control in the hands of a very small group of inexperienced, unsophisticated and potentially compromised individuals, this situation is unprecedented.").

FTX's customers are "certainly free to go to a competitor, self-identify themselves to a competitor, and open an account somewhere else *if they haven't already*") (emphasis added).

34. Significantly, while Mr. Cofsky's testimony at the Second Day Hearing included references to the *Celsius* bankruptcy proceedings, Mr. Cofsky did not testify that disclosing the names of Celsius' customer-creditors in public filings had had a significant effect on the valuation of Celsius' assets; nor have the parties proffered any evidence to that effect. *See* Tr. of Second Day Hrg. 29:9–15.[7]

35. Seeking to avoid the outcome in *Celsius*, Debtors pointed the Court to its earlier determination in *In re Cred*, No 20-12836 (JTD) (Dec. 18, 2020). *See, e.g.*, D.I. 407 ¶ 18. There, the Court permitted the debtor—a Bitcoin concern—to file the names and addresses of its customers under seal. *Cred*, D.I. 277 ¶ 113:23–114:16. Respectfully, Media Intervenors submit that *Cred* is no more binding on this Court than *Celsius*, and for the reasons stated above, the facts of this matter are more similar to those at issue in *Celsius* than those at issue in *Cred*.

36. Matters arising outside the cryptocurrency context confirm Media Intervenors' position: courts have routinely rejected sealing requests that were unsupported by specific evidence of concrete commercial harms. In one of the earliest cases analyzing the § 107(b)(1) disclosure exemption for confidential commercial information, *Itel Corp.*, 17 B.R. at 943, the

---

[7] Mr. Cofsky also made reference to his understanding of *In re Voyager Digital Holdings, Inc.*, No. 22-10943 (MEW) (Bankr. S.D.N.Y. July 8, 2022), in which the court granted the debtors' request to redact their customers' personal information, including their names, under § 107(b). *See id.* (D.I. 113). Notably, although Mr. Cofsky testified that he reviewed "the bids that had been submitted in the *Voyager* case," he did not testify that customers' anonymity was among the "incremental elements of value" allocated to each customer by Voyager's potential buyers—much less that disclosing the names of the customers in that case would have significantly affected the "incremental" value assigned to each account. Tr. of Second Day Hearing 29:9–21. Indeed, Mr. Cofsky did not testify as to the number of *Voyager* bids he reviewed or the methodology he employed in assessing the "incremental elements of value" purportedly assigned to customer accounts by potential buyers in that matter. *Id.*

Bankruptcy Appellate Panel of the Ninth Circuit denied a debtor's request to impound its creditor list on the grounds that "various sophisticated investors are attempting to utilize the debtor's financial difficulties to purchase the debtor's debentures from public debenture holders at depressed prices." *Id.* The court concluded that "[w]hile it is conceivable that the identity and addresses of creditors would fall into th[e] category [of commercial information], it is not likely and, in any event, no evidence or contention was presented in this light." *Id.* at 944.

37.    The court drew a similar conclusion in *Purdue Pharma*, 632 B.R. at 40—a bankruptcy matter, like this one, that was the subject of immense public interest.  There, the Sackler family sought to keep the names of certain business counterparties and investment advisors under seal, for fear that disclosure would prompt those individuals to cease or limit business with the Sacklers as a result of negative associational publicity.  The court found that the Sacklers had failed to make the "particularized" showing required or provide "a further description of what the concern is *in real terms*." *Id.* (emphasis added). The court ultimately rejected the Sacklers' sealing request, finding their proffered evidence—newspaper articles—"largely speculative" as to the motivations of those affiliates who had previously terminated business relations "and therefore doubly speculative that still unnamed counterparties that are identified . . . would terminate business relationships upon the release of their names." *Id.* at 44. Here, too, Debtors and the Committee have not made any concrete, non-speculative showing that harm will result from the disclosure of the identities of the customer-creditors.

38.    In some cases, courts have sealed overlapping lists of customers and creditors—but only when the identities of the debtor's customers were the debtor's "primary asset." *See*, *e.g.*, *In re The Frontier Group, LLC*, 256 B.R. 771, 773 (Bankr. E.D. Tenn. 2000) (granting the debtor's sealing request where the debtor, a brokerage agency arranging for physicians to serve in various

client hospitals, demonstrated that its physician list was its "primary asset" and that disclosure would enable competitors "to view the list, identify its contracting physicians, and recruit those physicians away from the [d]ebtor"). For example, in *In re Northstar Energy, Inc.*, 315 B.R. 425, 427-29 (Bankr. E.D. Tex. 2004), a debtor sought to seal its list of investors because "investor procurement functions [we]re *crucial* to its business plan," and "those functions would be severely jeopardized by the unrestricted publication of its investor list." *Id.* (emphasis added). Because disclosure of the debtor's investors would "expose the heart and soul of [its] commercial operations," the court held that the list constituted "confidential commercial information" and granted the debtor's sealing request under § 107(b)(1). *Id.* at 429-30. Here, neither the Committee nor Debtors have proffered evidence that the names of FTX's customers are FTX's "heart and soul." *Id.* Instead, Mr. Cofsky testified that "a significant component of the business is the customers themselves," and that "what the customers choose to do going forward will be a significant driver of value." Tr. of Second Day Hrg. 30:19–23. Customers' choices are, of course, a significant driver of value in most business contexts; this commonplace observation hardly establishes that the anonymity of FTX's customers is essential to the value of FTX's assets.

39.    For at least these reasons, Debtors' proffered evidence—on which the Committee largely relies—fails to establish that the names of FTX's customers constitute confidential commercial information within the meaning of § 107(b)(1); further and continued sealing on the basis of that evidence is unwarranted.

ii.    **The Committee members' preference for anonymity does not render their names confidential commercial information.**

40.    The Committee also advances its own, novel theory for sealing under § 107(b)(1), asserting that its members' names "qualify as 'confidential commercial information'" because "general anonymity" was "a unique feature [of FTX] that the [Committee] Members relied on

when depositing their assets on the platform."  D.I. 1137 ¶ 39.  In support of that theory, the

Committee relies on the Member Declaration, D.I. 1157.  *Id.*

41.  As an initial matter, the Committee's reliance on the Member Declaration as evidence

in support of redacting its Rule 2019 Statement is improper.  The Member Declaration is, itself,

under seal.  The redacted version of the Member Declaration available on the public docket not

only conceals the name of the declarant, but also appears to obscure large swaths of the declarant's

assertions regarding (a) his or her professional qualifications and (b) the injuries that he or she will

purportedly suffer if his or her name is disclosed pursuant to this litigation.  D.I. 1157 ¶¶ 9–11.

This insulates the Member Declaration from any meaningful adversary testing. Media Intervenors

are unable to, for instance, assess the qualifications of the declarant, determine whether the

redacted portions of the Declaration contain factual assertions based on the declarant's personal

knowledge, or challenge the veracity or legal relevance of the redacted portions of the Declaration.

For these reasons, alone, the Court should decline to consider the Member Declaration.  *See, e.g.*,

*In re DBSI, Inc.*, 405 B.R. at 704 (declining to consider the declaration of a declarant whom the

opposing party was not given an opportunity to cross-examine); *Fidelity*, 2012 WL 2317097 at *2

(denying plaintiff's application to seal declarations where the declarations "provide[d] the only

factual basis for plaintiff's assertion[s] and where "[p]ermitting the declarations to be filed under

seal in their entireties would deprive the public of the information it is entitled to, namely, the basis

for this court's decision"; stating "[t]his is not a secret court, and it will not decide this [matter]

based upon secret evidence").

42.  In any event, the Committee's legal argument is baseless.  The Committee asserts that

its members "should not be required to waive their contractual right to confidentiality as a

condition of their participation in these bankruptcy cases to recover their stolen assets."  D.I. 1137

17

¶ 39. But parties who voluntarily avail themselves of the U.S. bankruptcy system by pursuing claims against debtors possess no "contractual right to confidentiality" enforceable against bankruptcy courts or the public. *See In re Avaya, Inc.,* 2019 WL 1750908 at \*7 (Bankr. S.D.N.Y. 2019) (explaining that bankruptcy claimant "waived his privacy rights" by filing claim). *See also* D.I. 142 at 48:1–3 (Debtors' counsel noting that some customer-creditors have "voluntarily come forward and have started to put claims on the docket; that is their prerogative . . . that is self-identification"). Put differently, the public's presumptive right of access to bankruptcy filings, which derives from both the First Amendment and the Bankruptcy Code, cannot be contracted away. *See Samsung Elecs. Co. v. Imperium IP Holdings (Cayman), Ltd.*, No. CV 15-1059, 2017 WL 11573695 at \*3 (D. Del. Aug. 28, 2017) (stating that the parties' "private agreement does not govern [the court's] obligation to ensure public access"). *Cf. San Jose Mercury News, Inc. v. U.S. Dist. Ct.--N. Dist. (San Jose)*, 187 F.3d 1096, 1101 (9th Cir. 1999) (stating that "[t]he right of access to court documents belongs to the public," and parties cannot "bargain that right away" through a stipulated protective order).

43. Relatedly, the Committee contends that its members' names constitute confidential commercial information because its members expected their interactions with FTX to remain anonymous. D.I. 1137 ¶ 39. But the Committee cites no authority whatsoever holding that the test for confidential commercial information under § 107(b)(1) turns on a customer's expectations—and none exists. To the contrary, courts have repeatedly rejected sealing requests based on an individual's "penchant for secrecy." *See In re Avaya, Inc.*, 2019 WL 1750908 at \*6 ("[The claimant's] penchant for secrecy and general fear of identity theft are doubtless shared by a substantial portion of the populace but do not constitute cause for the issuance of a protective order."); *In re MorAmerica Financial Corp.*, 158 B.R. 135 (Bankr. N.D. Iowa 1993) (denying the

debtors' request to seal the names of its creditors "to protect their privacy" on account of "countervailing [policy] considerations"); *In re Bell & Beckwith*, 44 B.R. at 663-64 (finding no basis for sealing as a matter of one's constitutional or civil right to privacy).

44.    The Member Declaration suggests an alternative motive for seeking to seal the names of the Committee members: embarrassment.    The declarant maintains that disclosure of their "personally identifiable information will likely be detrimental to [their] professional career because it will reveal a claim that far exceeds the amounts expected to be held by someone in [their] profession."  D.I. 1157 ¶ 10. *See also id.* ¶ 8 ("The disclosure of my personally identifiable information will also likely negatively affect me professionally and socially."). In other words, the declarant would prefer to keep the extent of their wealth (or former wealth) secret from their friends and colleagues.

45.    The Committee does not argue that the declarant's nebulous fears of social or professional embarrassment render the declarant's identity (or any other Committee member's identity) confidential for purposes of § 107(b)(1).    Nor does the Committee argue that the declarant's identity (or any other Committee member's identity) constitutes "scandalous or defamatory matter" within the meaning of § 107(b)(2).    It could not reasonably do so. "The exception to public disclosure under [Section] 107 was never 'intended to save the debtor or its creditors from embarrassment, or to protect their privacy in light of countervailing statutory, constitutional, and policy concerns.'"  *FiberMark, Inc.*, 330 B.R. at 508–09 (quoting *Itel Corp.*, 17 B.R. at 944). *See also Food Mgmt.*, 359 B.R. at 554 ("Section 107(b) is not intended to save the debtor or creditors from embarrassment."); *In re Motors Liquidation Co.*, 561 B.R. 36, 42 (Bankr. S.D.N.Y. 2016) (stating that "'[m]ere embarrassment, or harm to reputation based on nonscandalous, nondefamatory information' is insufficient" to warrant sealing under Section

107(b)) (citing 2 Collier on Bankruptcy ¶ 107.03[1][b] (Alan N. Resnick & Henry J. Sommer eds.,

16th ed. 2016)).

     **iii.**  **Neither the evidence proffered by the Committee nor the evidence proffered by Debtors establishes that a miniscule subset of FTX's customers, such as the names of the Committee members or of FTX's Top 50 Creditors, constitutes confidential commercial information.**

46.   For the reasons stated above, the record fails to establish that the names of any (let

alone all) of FTX's customers, including the members of the Committee, constitute confidential

commercial information within the meaning of § 107(b)(1).

47.   However, even if, *arguendo*, the evidentiary record were deemed sufficient to justify

the continued sealing of *most* of FTX's customers' names, the record contains no evidence that the

names of narrow and comparatively miniscule subsets of FTX's millions of customers—such as

the names of the Committee members or the names of FTX's top 50 creditors—constitute

confidential commercial information within the meaning of § 107(b)(1).

48.   Debtors' proffered evidence concerns the purported value of sealing FTX's customer-

creditor list *as a whole*; Debtors have proffered no evidence that disclosing the names of FTX's

top 50 creditors who are also customers—while continuing to redact the names of FTX's

approximately nine million other customer-creditors—would appreciably affect the valuation of

FTX's assets.

49.   The Committee has proffered no evidence of its own that would establish that

disclosing the names of the Committee's members who have elected to participate directly in this

proceeding—while continuing to redact the names of FTX's approximately nine million other

customer-creditors—would appreciably affect the valuation of FTX's assets.

50.   Similarly, neither Debtors nor the Committee have proffered evidence that disclosing

the names of only the *institutional* customer-creditors on the top-50 creditors list—while

continuing to redact the names of FTX's individual customer-creditors—would appreciably affect the valuation of FTX's assets.

51.    Therefore, if the Court continues or extends the Redaction Deadline on the basis of § 107(b)(1), the Court should nevertheless find that the public's presumptive right of access is not overcome as to (a) the names of FTX's customers who are also among Debtors' top 50 creditors; (b) the names of the Committee members; or (c) at minimum, the names of FTX's institutional customers who are among Debtors' top 50 creditors.

## C.    THE PARTIES FAIL TO ESTABLISH THAT CONTINUED SEALING OF THE NAMES OF FTX'S CREDITORS IS PERMISSIBLE UNDER SECTION 107(C).

52.    Even when an individual's information is not subject to redaction under § 107(b), a court may order the information redacted "for cause"—*i.e.*, if the court finds that disclosure "would create *undue* risk of identity theft or other unlawful injury to the individual or the individual's property." 11 U.S.C. § 107(c) (emphasis added). The Committee contends that cause exists to redact the names of its individual members pursuant to § 107(c) for two general reasons. *See* D.I. 45 ¶¶ 16–23; D.I. 407 ¶ 23; D.I. 1137 ¶¶ 19–34. First, the Committee asserts that disclosing the names of its individual members would subject them to an undue risk of identity theft or unlawful injury; this argument fails because it is contrary to the weight of authority and unsupported by evidence. Second, the Committee asserts that its members' hypothetical exposure to fines pursuant to the European Union's General Data Protection Regulation ("GDPR") constitutes an undue risk of unlawful injury; this argument fails because it is speculative, fails even to assert the possibility of an injury that is "unlawful"; and seeks to elevate foreign law over the governing laws of the United States.

53.    Debtors, too, assert that cause exists to seal the names of FTX's individual customer-creditors pursuant to § 107(c), D.I. 45 ¶ 17–19, but they recently declined to press that argument

or proffer supporting evidence (while reserving the right to seek redaction under § 107(c) at a future date). D.I. 407 ¶ 23.

54. Both parties correctly limit their arguments under § 107(c) to individual customer-creditors—*i.e.*, customer-creditors who are natural persons. D.I. 47 ¶ 23; D.I. 1137 ¶ 20; *Celsius*, 644 B.R. at 294 (explaining that § 107(c) does not apply to "business entities").

> **i.  The parties fail to establish that disclosing the names of FTX's individual creditors will subject those creditors to an undue risk of identity theft or other unlawful harm.**

55. The Committee contends that "compelled disclosure of an individual's identifying information in bankruptcy filings" "increases" an "inherent risk of identity theft." *Id.* ¶ 21. Relatedly, it asserts that revealing the "Personally Identifying Information" of FTX's individual customers would expose them to a grab-bag of other forms of theft, such as "stealing an online wallet" or "physical robbery." D.I. 1137 ¶ 25. These contentions falter out of the gate.

56. For purposes of § 107(c), the only pieces of "identifying information" at issue here are the names of FTX's individual customers—who, as creditors, are parties to this litigation. It is axiomatic that public access to the names of the parties in bankruptcy proceedings does not inherently expose them to an "*undue* risk of identity theft" or other unlawful harm. 11 U.S.C. § 107(c) (emphasis supplied); *Avaya*, 2019 WL 1750908 at *6 ("If a desire for secrecy or general fear of identity theft constituted cause for redaction, a court would have to seal or redact all personal information in every case.").

57. Indeed, the names of parties to bankruptcy litigation—and all other types of litigation—are public as a matter of course. The annals of the judiciary, including of bankruptcy courts, are awash with the names of debtors, creditors, plaintiffs, defendants, lay witnesses, expert witnesses, bystanders, judges, attorneys, elected officials, U.S. businesses, international businesses, and sundry others. These millions of names are not redacted because identifying the

participants in legal proceedings, including bankruptcy proceedings, is consistent with—and required by—the tradition of openness that is a core feature of this nation's administration of justice. *In re Blake*, 452 B.R. 1, 10 (Bankr. D. Mass. 2011) ("[T]he presumption of public access to documents filed in a bankruptcy case is paramount…"); *Anthracite*, 492 B.R. at 171 ("A court's ability to limit the public's right to access remains an extraordinary measure that is warranted only under rare circumstances as public monitoring is an essential feature of democratic control.") (internal quotation marks omitted); *Crawford*, 194 F.3d at 960 (explaining that the government's interest in ensuring public access to court records "is of special importance in the bankruptcy arena, as unrestricted access to judicial records fosters confidence among creditors regarding the fairness of the bankruptcy system").

58. The Committee identifies no contrary authority. Instead, it cites the transcripts of several hearings, D.I. 1137 ¶ 22, in which bankruptcy courts permitted the redaction of individuals' home and/or email addresses pursuant to § 107(c), but *not* individuals' names.[8]  *In re Art Van Furniture, LLC*, No. 20-10553 (CSS) (Bankr. D. Del. Mar. 10, 2020), Tr. 23:16–18 (Doc. 82) (counsel's explanation that the debtor sought "to redact the home addresses of the employees and customer-creditors of the debtors"); *id.* Tr. 24:6–7 (counsel's statement that "redacting the home addresses, *not the names* of those creditors, will not impinge on the bankruptcy process") (emphasis added); *In re Clover Techs. Grp., LLC*, Case No. 19-12680 (KBO) (Bankr. D. Del. Jan. 22, 2020), Tr. 25:9–10 (Doc. 146) (permitting redaction of individuals' addresses); *In re Forever 21, Inc.*, Case No. 19-12122 (KG) (Bankr. D. Del. Dec. 19, 2019), Tr. 63:2–3 (Doc. 605) (granting

---

[8] Debtors do the same. *See* D.I. 45 ¶¶ 17–19 (citing *In re Charming Charlie Holdings, Inc.*, No. 19-11534 (CSS) (Jul. 11, 2019) (Doc. 4) (motion to seal addresses of debtor's employees); *In re Windstream Holdings, Inc.*, No. 19-22312 (RDD) (Bankr. S.D.N.Y. Mar. 25, 2019), Tr. at 88:6–12, 89:5–8 (Doc. 173) (discussing redaction of employees' home addresses)).

motion to redact creditors' home addresses). Needless to say, these authorities support Media Intervenors' position, not the Committee's.[9]

59. The Committee also relies on *In re Endo Int'l plc*, No. 22-22549 (JLG), 2022 WL 16640880, at *10-12 (Bankr. S.D.N.Y. Nov. 2, 2022), but that unpublished decision is inapposite.[10] In *Endo*, the bankruptcy court for the Southern District of New York permitted redaction of the names of individual U.S. and international claimants because to do otherwise would associate said individuals with "an unfavorable medical condition." *Id.* at *12 (quotation marks omitted). The court added, in dicta, that revealing the names of the individual claimants would "heighten the risk to them of identity theft"—particularly medical identity theft. *Id.* (citing *Attias v. Carefirst, Inc.*, 865 F.3d 620, 628 (D.C. Cir. 2017) (concluding that publication of health insurance customers' names, birth dates, email addresses, and "subscriber ID numbers" created a "substantial risk of identity fraud"); Gregory S. Gaglione, Jr., *The Equifax Data Breach: An Opportunity to Improve Consumer Protection and Cybersecurity Efforts in America*, 67 BUFF. L. REV. 1133, 1212 n.257 (2019) (analyzing *Attias* and describing some consequences of medical identity theft)). The present case is entirely different: doing business with a cryptocurrency exchange does not associate an individual with an "unfavorable medical condition," nor does it have any connection to fraudsters' ability to obtain medical care by impersonating a member of an insurance plan. *See Attias*, 865 F.3d at 628.

---

[9] As noted above, Media Intervenors do not object to the redaction of home and email addresses. D.I. 196 ¶ 18.

[10] The Committee's motion erroneously cites *In re Endo Int'l plc*, No. 22-22549-JLG, 2022 WL **16935997**, at *10–12 (Bankr. S.D.N.Y. Nov. 14, 2022), a decision that does not address redaction. D.I. 1137 ¶ 21.

60.  In *Celsius*, a more pertinent decision, the bankruptcy court for the Southern District of New York held that redacting the names of individual cryptocurrency customers was unwarranted under § 107(c) when, as here, those customers' email and physical addresses were not made public. *Celsius*, 644 B.R. at 294. The Committee makes no effort to distinguish *Celsius*; nor could it. Instead, it attempts to neutralize the decision by asserting that *Celsius* supposedly has led to "severe consequences" for crypto users.  D.I. 1137 ¶ 27. But the Committee's own proffered evidence reveals that *Celsius* has, at worst, led to "certain of the [d]ebtors' customers" receiving an unknown number of ham-fisted, easily detectable phishing emails, which those customers forwarded to the debtors' counsel of record, prompting counsel to post a routine warning on the public docket. *See* Exhibit B to D.I. 1137.

61.  There is nothing "severe" about receiving phishing emails. Far from posing a "unique" risk to cryptocurrency users, D.I. 1137 ¶ 27, phishing emails (often but not always caught by spam filters) are a ubiquitous feature of the digital world; anyone with an email account knows to be wary of them.  *See, e.g.*, Federal Trade Commission, *How to Recognize and Avoid Phishing Scams* (Sept. 2022), https://consumer.ftc.gov/articles/how-recognize-and-avoid-phishing-scams.   The record offers no basis on which to conclude that users of cryptocurrency exchanges are more susceptible to phishing scams than other litigants named in bankruptcy proceedings—many of whom, like cryptocurrency users, doubtless use the internet to access their bank accounts, credit cards, retirement funds, and other important assets.   Indeed, common sense suggests that cryptocurrency users, by and large, possess *greater* digital fluency than the average customer or creditor named in bankruptcy court filings.  It is unsurprising, then, that despite the Committee's breathless reference to "the fallout of the *Celsius* decision," D.I. 1137 ¶ 27, the record contains no

evidence that *any* individuals named in the *Celsius* litigation have fallen victim to theft—either of their identities or their crypto assets.[11]

62.   The same goes for the other forms of theft that, according to the Committee, might befall any of FTX's creditors whose names are made public: "stealing an online wallet," "physical robbery," "theft of private keys," and "SIM swapping."   D.I. 1137 ¶ 25 (capitalization altered). Take the first item on the list: stealing an online wallet.   Quoting the "Philips Declaration," the Committee asserts that "[i]f a criminal knows that a person holds a wallet on a crypto exchange, as they would if the Personally Identifying Information is disclosed, then they will *inevitably* attempt a variety of means to access that wallet and steal the assets."   *Id.* at 10 ¶ 25 (emphasis added). Such speculation cannot possibly overcome the public's statutory and constitutional rights of access to judicial records; after all, one could as well say, "If a criminal knows that a person holds an account with a bank, then they will inevitably attempt a variety of means to access that account and steal the balance."

63.   At bottom, the Philips Declaration contains *no* evidence that known holders of cryptocurrency are appreciably more vulnerable to crime than known holders of any other assets. Instead, it offers only a general list of strategies that some unknown number of unsavory persons

---

[11] As noted above, at the Second Day Hearing, Debtors proffered testimony to the effect that searching the names of individuals on the internet might reveal additional information about them. Tr. of Second Day Hrg. 33:19–34:4. But that is hardly surprising or unique to individual customer-creditors of FTX. Indeed, many people in the modern world—including, presumably, many of FTX's former customers—choose to make at least some personal information available online, often on social and professional networking sites.  *See, e.g.*, D.I. 1139 ¶ 10 ("[I]t is evident how easy it is for anyone, even those without any specialist investigative skills or experience, to find out a significant amount about a person simply by searching their name, using the 'search' function on LinkedIn.").   This circumstance—shared by most individual participants in contemporary bankruptcy matters—does not support redacting the names of individual customer-creditors here. Indeed, it would be perverse if individuals could thwart the public's right of access to bankruptcy filings simply by disclosing information about themselves online and then pointing to the ease with which such personal information can be obtained via internet searches.

may have used an unknown number of times in an effort to target an unknown number of crypto owners with an unknown rate of success.  ECF 1139 ¶ 10. It fails, therefore, to establish cause to seal the names of any of FTX's customer-creditors—including the members of the Committee— pursuant to § 107(c).[12]

### ii.  The hypothetical operation of foreign law provides no "cause" for redaction under 11 U.S.C. § 107(c).

64.  Finally, both Debtors and the Committee assert that disclosing the names of individual creditors subject to the GDPR may subject them to significant fines. This possibility, according to the parties, independently constitutes "cause" for sealing pursuant to § 107(c).  D.I. 405 ¶ 27; D.I. 1137 ¶ 31. It does not.

65.  To start, § 107(c) permits the redaction of judicial records only to ameliorate an "undue risk of *unlawful* injury."  11 U.S.C. § 107(c) (emphasis added). Yet neither Debtors nor the Committee argue that the (hypothetical) imposition of a penalty pursuant to the GDPR would constitute an "unlawful injury."  *Id.* It is easy to see why: a penalty imposed by operation of law is not generally thought to be "unlawful."  It is certainly not like "identity theft," the only form of "unlawful injury" expressly identified in § 107(c).  *See McDonnell v. United States*, 579 U.S. 550, 568–69 (2016) ("Under the familiar interpretive canon *noscitur a sociis*, a word is known by the company it keeps.").  This should end the matter.

---

[12]  Invoking Federal Rule of Bankruptcy Procedure 9037(d), the Committee also seeks a protective order permitting it to redact the names of its members who are business entities.  D.I. 1137 ¶ 42. The Committee offers no legal argument, and proffers no additional evidence, in support of this request; instead, it relies on the arguments and evidence submitted in support of its request to seal the names of its individual members under § 107(c).  *Id.* The arguments and evidence that the Committee marshals in support of its § 107(c) request are even *more* inapt, speculative, and unavailing when applied to business entities (as opposed to individuals). Consequently, there exist no grounds for entry of a protective order under Rule 9037(d).

66. But even if, *arguendo*, a penalty incurred by operation of the GDPR could constitute an "unlawful injury" within the meaning of § 107(c), the likelihood that either party will suffer such an injury is purely speculative. The parties invite the Court to conclude that publicly filing the names of FTX's creditors as required by U.S. law would cause them to incur serious financial penalties under the GDPR, but they adduce no evidence that the GDPR has been, or ever will be, enforced in such a way.

67. Finally, even if, *arguendo*, a penalty incurred by operation of the GDPR could constitute an "unlawful injury" within the meaning of § 107(c), and is deemed more than a mere speculative possibility, sealing would still be unwarranted, because neither Debtors nor the Committee offer any "legal authority explicitly dictating why the [GDPR] should apply to" a bankruptcy case "filed in the United States, or specifically, why [a] foreign law[] would take precedence in a situation where United States law requires the disclosure." *Celsius*, 644 B.R. at 295. Put differently: this Court is neither bound by nor called to adjudicate foreign law; it is bound by and called to adjudicate the law of the United States. The law of the United States—constitutional and statutory—grants the public a strong presumptive right to inspect bankruptcy filings. This right cannot be abrogated by a party's assertion of legal obligations under foreign law, including a party's desire to avoid paying fines to which, under foreign law, it *might* be subject. The entitlement of the press and public in the United States to oversee the workings of bankruptcy courts in this country does not bend to the policy preferences of the European Union.

## <u>CONCLUSION</u>

For the foregoing reasons, Media Intervenors respectfully request that the Court deny the

Committee's motion to seal and decline to extend or continue the Redaction Deadline.

Respectfully submitted,

Dated: April 5, 2023

/s/ David L. Finger
David L. Finger (ID #2556)
FINGER & SLANINA, LLC
One Commerce Center
1201 N. Orange St., 7th fl.
Wilmington, DE 19801
(302) 573-2525
dfinger@delawgroup.com

Katie Townsend (pro hac vice)
THE REPORTERS COMMITTEE FOR
FREEDOM OF THE PRESS
1156 15th Street NW, Suite 1020
Washington, DC 20005
202.795.9300
ktownsend@rcfp.org
*Counsel for Media Intervenors*