1                UNITED STATES BANKRUPTCY COURT
                      DISTRICT OF DELAWARE

2

```
3  IN RE:                        .  Chapter 11
                                 .  Case No. 22-11068 (JTD)
4  FTX TRADING LTD. et al.,      .
                                 .  (Jointly Administered)
5              Debtors.          .
                                 .
6  . . . . . . . . . . . . . . . .
                                 .
7  AUSTIN ONUSZ, CEDRIC KEES     .  Adversary Proceeding
   VAN PUTTEN, NICHOLAS J.       .  No. 22-50513 (JTD)
8  MARSHALL and HAMAD DAR, on    .
   behalf of themselves and all .
9  others similarly situated,    .
                                 .
10                 Plaintiffs,   .
                                 .
11       v.                      .
                                 .
12 WEST REALM SHIRES INC., WEST  .
   REALM SHIRES SERVICES INC.    .
13 (D/B/A FTX US), FTX TRADING   .
   LTD., ALAMEDA RESEARCH LLC,   .
14 SAM BANKMAN-FRIED, ZIXIAO     .
   WANG, NISHAD SINGH and        .
15 CAROLINE ELLISON,             .
                                 .
16                 Defendants.   .
                                 .
17 . . . . . . . . . . . . . . . .
                                 .
18 ALAMEDA RESEARCH LTD.; FTX    .  Adversary Proceeding
   TRADING LTD.,                 .  No. 23-50084 (JTD)
19                               .
                   Plaintiffs,   .
20                               .
        -against-                .
21                               .
   VOYAGER DIGITAL, LLC; HTC     .  Courtroom No. 5
22 TRADING, INC.,                .  824 Market Street
                                 .  Wilmington, Delaware 19801
23                 Defendants.   .
                                 .  Wednesday, April 12, 2023
24 . . . . . . . . . . . . . . . .  1:01 p.m.
```

25                              (CONTINUED)

```
 1                      TRANSCRIPT OF HEARING
                 BEFORE THE HONORABLE JOHN T. DORSEY
 2                  UNITED STATES BANKRUPTCY JUDGE

 3
    APPEARANCES:
 4
    For the Debtors:         Adam G. Landis, Esquire
 5                           LANDIS RATH & COBB, LLP
                             919 Market Street
 6                           Suite 1800
                             Wilmington, Delaware 19801
 7
                             -and-
 8
                             Andrew G. Dietderich, Esquire
 9                           Brian D. Glueckstein, Esquire
                             SULLIVAN & CROMWELL, LLP
10                           125 Broad Street
                             New York, New York 10004
11
    For Samuel L.
12  Bankman-Fried:           Gregory T. Donilon, Esquire
                             MONTGOMERY MCCRACKEN WALKER
13                             & RHOADS, LLP
                             1105 North Market Street
14                           Suite 1500
                             Wilmington, Delaware 19801
15
16                           Edward L. Schnitzer, Esquire
                             437 Madison Avenue
17                           24th Floor
                             New York, New York 10022
18
19  (APPEARANCES CONTINUED)

20  Audio Operator:          Jermaine Cooper, ECRO

21  Transcription Company:   Reliable
                             The Nemours Building
22                           1007 N. Orange Street, Suite 110
                             Wilmington, Delaware 19801
23                           Telephone: (302)654-8080
                             Email:  gmatthews@reliable-co.com
24
    Proceedings recorded by electronic sound recording,
25  transcript produced by transcription service.
```

APPEARANCES (CONTINUED):

For OKCoin and OKEx:        Jeffrey S. Sabin, Esquire
                           VENABLE LLP
                           1270 Avenue of the Americas
                           New York, New York 10020


For BlockFi, Inc.:         Derek C. Abbott, Esquire
                           MORRIS, NICHOLS, ARSHT
                             & TUNNELL, LLP
                           1201 North Market Street
                           Suite 1600
                           Wilmington, Delaware 19801

For the Official
Committee of
Unsecured Creditors:       Kristopher M. Hansen, Esquire
                           Kenneth Pasquale, Esquire
                           PAUL HASTINGS, LLP
                           200 Park Avenue
                           New York, New York 10166

1                                    INDEX

2    MOTIONS:                                                        PAGE

3    Agenda
     Item 9:     Motion of Debtors for Entry of an Order                19
4                Extending the Exclusive Periods During Which
                 Only the Debtors May File a Chapter 11 Plan
5                and Solicit Acceptances Thereof [D.I. 846,
                 filed on March 10, 2023]
6
                 Court's Ruling:                                        25
7
     Agenda
8    Item 10:    Motion of Samuel Bankman-Fried for Relief from         25
                 the Automatic Stay, to the Extent Applicable,
9                to Permit Insurers to Advance and/or Reimburse
                 Defense Costs and Fees under Directors and
10               Officers Insurance Policies [D.I. 964, filed
                 on March 15, 2023]
11
                 Court's Ruling:                                        52
12
     Agenda
13   Item 14:    Status Conference Regarding March 14, 2023             53
                 Hearing [Emergent Fidelity Technologies Ltd.,
14               Case No. 23-10149]

15

16   Transcriptionist's Certificate                                    56

17

18

19

20

21

22

23

24

25

1      (Proceedings commenced at 1:01 p.m.)

2              THE CLERK:  All rise.

3              THE COURT:  Good afternoon, everyone.  Thank you.

4              Please be seated.

5              MR. LANDIS:  Good afternoon, Your Honor --

6              THE COURT:  Mr. Landis?

7              MR. LANDIS:  -- and may I please the Court?  Adam

8  Landis from Landis Rath & Cobb, counsel to FTX Trading, Ltd.

9  and the associated debtors.

10              Your Honor, we filed an amended agenda in the case

11  today, noting that Items 1 through 5 are adjourned; Items 6

12  through 8, 11, 12, and 13 have been resolved with orders

13  entered, for which we thank Your Honor for taking care of

14  that.  We only have three matters going forward:  Number 9,

15  with respect to the debtors' request for an extension of

16  their exclusive periods to file and solicit a plan of

17  reorganization; Number 10, the stay relief motion; and

18  Number 14, which is a status conference, with respect to

19  Emergent.

20              Before we head into the agenda proper,

21  Mr. Dietderich would like to address the Court with an update

22  as to matters since we've last appeared at an omnibus

23  hearing.

24              THE COURT:  Okay.  Thank you.

25              Mr. Dietderich?

1    MR. DIETDERICH:  Thank you.  Good afternoon, Your

2  Honor.  Andy Dietderich for the debtors; with me is my

3  partner Brian Glueckstein.

4    I think we have a presentation.  Does it -- do I

5  press it forward?  That's not it.

6    (Laughter)

7    THE COURT:  Remove that person from Zoom, please.

8  Thank you.

9    Can we bring that up for everybody in the

10 courtroom?

11   (Pause)

12   MR. DIETDERICH:  There is it.  Good.  So, thank

13 you.

14   Your Honor, it's been three months since we were

15 before you at an omnibus hearing.  We'd like to thank Your

16 Honor for the efficient manner in which the cases have been

17 conducted so far.  The Court has entered more than 38 orders

18 on certification of counsel, including 30 orders that

19 reflected negotiated solutions with stakeholders.  As a

20 result, the debtors have been able to focus almost entirely

21 on the business of the case, rather than court appearances.

22   The first months of the case have been

23 extraordinarily busy and productive.  There's an overwhelming

24 number of ongoing workstreams and novel issues in every

25 discipline.  Today, the situation has been stabilized and the

1  dumpster fire is out, and as I will explain in a moment, we

2  anticipate filing a plan of reorganization in July.

3        I would like to spend some time on a case update

4  for the Court.  First, and perhaps most important, our assets

5  available for stakeholder recovery.  Our estate consists of

6  many investments, businesses, and causes of action that have

7  not yet been monetized.  Valuing these now is impossible;

8  however, we are tracking distributable assets:  Cash, Class

9  A, or Category A cryptocurrency, which we defined in previous

10 submissions, and securities.

11        Here's a chart of these assets at petition date

12 value, including cash receivables from the settlements and

13 transactions recently approved by the Court.  We now stand at

14 $6.2 billion, an increase of $800 million from my update to

15 the Court in January.  This increase in value is more

16 significant if we take into account current asset pricing.

17        On this next slide, at current prices, our

18 distributable assets have increased to $7.3 billion, a $1.9

19 billion increase from my January briefing.  What goes up can

20 go down.  Prices will fluctuate during these cases.

21        As we will discuss in a moment, one of the

22 important tasks of the debtors is being a good and prudent

23 custodian of $7.3 billion of asset value.  We will be

24 increasing distributable assets, hopefully dramatically, as

25 the case progresses, but it's also important for us not to

1   lose what we have now.

2        Next, Your Honor, I'd like to review some

3   significant events by subject matter.  The first is our

4   investigative work.  In addition to everything else, the

5   debtors are conducting an extraordinarily complicated

6   forensic investigation, in coordination with multiple law

7   enforcement agencies in the United States and around the

8   world.  Early on in this case, the Board of Directors decided

9   it was in the interests of the estate to expend the resources

10  necessary to create a centralized collection of information

11  under the debtors' control and to make this information

12  available to law enforcement agencies in a transparent and

13  reliable manner.  The debtors believe that this cooperation

14  has, and will continue to benefit the estates economically,

15  especially as we approach the formation of a plan and the

16  coordination of the distribution of estate property with a

17  distribution of property subject to criminal forfeiture.

18  Government cooperation is in our financial interests.

19        The investment has been substantial.  Over 1.3

20  terabytes of data has been collected and compiled.  Much of

21  the information has been provided only to government

22  authorities, sometimes directly and sometimes in summary

23  presentations.  The debtor is limited in what it can say

24  publicly and provide to certain parties in interest because

25  of the pending government investigations; however, the

1  debtors were able to publish earlier this week, the first

2  interim report of Mr. Ray, the independent director; a report

3  that focuses on control failures at the FTX Group prior to

4  filing.

5          The gist of this report is clear:  Mr. Bankman-

6  Fried repeatedly, pervasively, and often persuasively, lied

7  to stakeholders and the customers and creditors in order to

8  maintain the digital con game.  The FTX exchanges appeared to

9  the user as legitimate, in fact, superficially, they appeared

10 to process trades and information more quickly and

11 conveniently than competitors.  The app worked beautifully,

12 but in truth, it was a facade, a digital Potemkin village, or

13 perhaps more apt, a video game.  Behind the user interface,

14 there was no correspondingly sophisticated reality, no

15 equivalent process for segregating assets or reconciling

16 trades, no reliable relationship between the positions

17 reflected in the online game and the underlying positions

18 held in the real world.

19         The debtors are working on a second report that

20 will focus on the violation of basic principles of asset

21 segregation.  The debtors will endeavor to make these reports

22 available on a rolling basis and hope they will facilitate

23 the common understanding necessary for productive plan

24 discussions.

25         Other developments include the guilty pleas of

1  Mr. Singh, joining Mr. Wang Ms. Ellison.  Those who have pled

2  guilty also have agreed to provide assistance to the

3  government and Mr. Wang, in particular, has provided material

4  assistance to the debtors, as well, helping us locate

5  additional assets.  And we've seen additional charges against

6  Sam Bankman-Fried.

7        We also appreciate the U.S. criminal authorities

8  working in parallel with us to secure assets.  This includes

9  approximately 100 million in cash in the name of FTX Digital

10 Markets, as well as the often-discussed HOOD stock.

11        From the debtors' perspective, Your Honor, we see

12 no tension between the debtors and the U.S. Attorney as to

13 whether particular assets are recovered by the U.S. Attorney

14 or by the debtors.  In this case, we believe victims entitled

15 to restitution and creditors entitled to a distribution in

16 Chapter 11 are functionally equivalent.  We will continue to

17 work with the U.S. Attorney on this basis.

18        Operationally, we reconciled customer balances

19 across an incredible 10 million accounts.  We have a

20 considerable cost and expense fortified, the AWS security

21 environment.  We've retained a core team of continuing

22 employees and Your Honor has approved a KERP.  We've

23 rationalized our use of office space and our footprint and,

24 importantly, we have returned cryptocurrency to customers in

25 Japan by opening for withdrawals.

1          Japan has a cryptocurrency regulatory environment

2  that was responsive to the Mt. Gox insolvency.

3  Cryptocurrency generally must be kept in segregated cold

4  storage and customers have a clear ownership right in the

5  cryptocurrency under Japanese law.  As a result, Japan is the

6  one place in the world where cryptocurrency was actually kept

7  segregated by FTX and the segregation was never broken.

8          The debtors also have been working very hard to

9  open withdrawals of segregated cash in Cyprus, where there

10  are different, but also effective, customer protections with

11  respect to cash deposits.  These jurisdictions, however, are

12  notable exceptions.  Everywhere else the situation, as to

13  customer rights and asset segregation, is unclear.

14          Accounting and tax are things normally taken for

15  granted by lawyers, but the debtors, now, are not reviewing

16  balance sheets because there are no reliable balance sheets;

17  instead, the debtors have been building balance sheets from

18  primary source material.  That material includes banking

19  records, AWS, the included environment, QuickBooks, and a

20  category of unstructured data, which is accountant speak for

21  emails, text, and even chatroom entries.  The initial fruits

22  of this effort were the reports the debtors made public on

23  customer shortfalls on the exchanges and the schedules and

24  statements filed only last month.

25          Efforts now underway include recreation of

1  intersilo and interdebtor transactions, led by our financial

2  advisor Alvarez & Marsal; the development of historical

3  financial statements, led by a team of forensic accountants

4  at AlixPartners, in efforts to put the debtors in a position

5  to file accurate tax returns, led by Ernst & Young.

6          As I mentioned previously, one of the important

7  tasks of the debtors is managing $7.3 billion in effectively

8  liquid assets.  Over 75 percent of our cash is in 345(a)

9  compliant accounts, which in the current banking environment,

10  the protections of 345 seem especially prudent.  About

11  $500 million of our cash is held outside of 345(a) compliant

12  accounts, pursuant to our cash management order.  We continue

13  to examine whether or not we can move more of that cash

14  into 345(a) accounts.

15          Our cryptocurrency, the debtors hold 1.6 billion

16  in cryptocurrency at current market values in cold storage,

17  controlled by the debtors.  The remaining Category A

18  cryptocurrency is staked or on third-party exchanges and we

19  may migrate that into cold storage over time, but it's

20  impractical to do it at the current moment.  The Board is

21  monitoring all of these exposures, taking expert advice on

22  cryptocurrency custody and security risks and discussing the

23  risks involved and potential alternatives with the Committee

24  and other stakeholders.

25          These assets will continue to grow.  Avoidance

1  actions and other outbound litigation will be an important

2  source of recovery for creditors.  Actions so far include our

3  $460 million settlement with Modulo, a 53 million cash

4  settlement with Dell Tech, avoidance actions against three

5  other Chapter 11 debtors.  These include a $445 million

6  administrative preference claim into the Voyager bankruptcy

7  and substantial claims against BlockFi and Genesis.  These

8  early avoidance actions are the tips of the icebergs.  We

9  have reviewed substantially all of the historical off-chain

10  transactions by the debtors at this point, all the

11  transactions that we believe may be avoidable.  And the facts

12  of these suggest compelling causes of action relating to

13  several billion dollars of lost value.  We also are advancing

14  our work to review preferential transactions on the exchanges

15  themselves.  Finally, in addition to -- oh, the Grayscale,

16  which we've commenced, and then, finally, turnover actions.

17            One of the most difficult issues that we faced is

18  that we continue to discover assets of the debtors that were

19  held by nominee owners on behalf of Alameda and FTX.  One

20  example is the Court's recent authorization of the turnover

21  of an account at OKCoin, including over $150 million of

22  cryptocurrency held in the name of an individual, but

23  belonging to Alameda.  We'd like to thank the dozens of

24  exchanges and other parties that have been cooperating with

25  us in these activities.

1          We also have many valuable assets to sell.  The

2   Court has approved the $96 million sale of our position in

3   Mysten Labs and the $45 million sale of a position in certain

4   Sequoia funds.

5          We've received -- we have a, as I said before, a

6   very substantial set of venture book investments.  We have

7   now reviewed substantially all of those investments and are

8   trying to decide the path forward on a venture investment-by-

9   venture investment basis.

10         The *de minimis* asset sale procedures that have

11  been approved by the Court, we've used for $5 million of

12  proceeds so far, although, there are dozens of transactions

13  under discussion.

14         And then, finally, we have ongoing sale processes

15  announced that have yet to reach their conclusion.  These

16  include the transactions that we've noticed -- that we've

17  mentioned before, as well as token investments and other

18  stray investments of various sorts.

19         So, where is all this going?  We stand here today

20  in the middle of April.  In the second quarter, the debtors

21  complete the 90-day review period we set for internal

22  discussions concerning the continued operation of the

23  exchanges; discussions, in which the Committee has been an

24  active participant.  We'll be discussing next steps and

25  alternatives for the potential restart or recapitalization of

1 the exchange, conventional ideas and novel ideas with the

2 Committee and other stakeholders over the coming weeks.

3           We also are going to start plan discussions later

4 this quarter.  Our goal is to file with the Court a

5 preliminary plan of reorganization in July.  We would like to

6 set a bar date promptly.  Our current expectation is that we

7 will set a non-customer bar date at the end of July.  Our

8 customer bar date requires the creation of a bespoke claims

9 portal and raises a number of complicated issues.  We're

10 preparing the portal in consultation, again, with the

11 Committee, and want to have an operating demo to run through

12 prior to launch, so we anticipate the customer bar date, like

13 the government bar date, will be at the end of September.

14 That's a bifurcated bar date process, but it allows us at

15 least to get the information that we're going to yield -- the

16 non-customer bar date would yield.  This is, in part, because

17 the level of information we have about non-customer claims

18 is, let's just say, will be benefited by the bar date process

19 as we start to decide.  We have a pretty good idea now of the

20 nature of customer claims against the estate, but the nature

21 of non-customer claims, we have a lot less certainty and so

22 we bifurcated the bar date so we could approach the plan

23 process having a better sense of how significant are non-

24 customer claims, in particular, loan counterparty and other

25 claims into Alameda.

1    We're aiming to have a disclosure statement filed

2    in the fourth quarter, a disclosure statement hearing in the

3    first quarter of 2024, a plan solicitation motion that

4    bridges the quarters, and finally, plan confirmation in the

5    second quarter of 2024.  Now, these are, of course, an

6    aspirational calendar, but we believe it's a sensible

7    calendar and we believe the filing of a plan early is

8    important, given the nature of the case.  So far in the case,

9    we have avoided serious litigation with economic parties.

10    As we've considered internally at great length,

11    the central legal issues in the cases, such as the nature of

12    customer entitlements, the distinction or lack of distinction

13    between legal entities, they all raise significant equitable,

14    as well as legal questions.  The same is true for stakeholder

15    assertions of constructive trust; a phrase that we've heard,

16    Your Honor, from dozens of different stakeholders all across

17    the capital structure, seeking to elevate their own claim.

18    The debtors believe that discussion, settlement,

19    and if necessary, litigation of all of these issues will be

20    easier if we first table a plan of reorganization that shows

21    all stakeholder and potential litigants the big picture of

22    how they and others will be treated.  We need to show

23    stakeholders that plan first and resolve disputes about the

24    plan second, given our facts.  Throughout this process,

25    asset-recovery efforts will continue.

1          That's all I have, Your Honor, but we wanted to

2   make sure that we, at least, were able to tell Your Honor and

3   stakeholders not just something about the history of what's

4   accomplished, but a roadmap going forward.

5          So absent questions from Your Honor, I'll turn to

6   today's agenda.

7          THE COURT:  Let me just ask a question about the

8   exchange restart.  What does that entail?  How will it work?

9   Do customers, will they be able to withdraw funds or their

10  coin that's being held on the exchange?  What's the

11  anticipation of how that's going to be playing out?

12          MR. DIETDERICH:  The short answer is we don't know

13  yet.  So, the -- there's two exchanges, of course.  There's

14  actually more than two exchanges.  There's two primary

15  exchanges:  dot com and the U.S. Exchange.  The options being

16  considered include a restart of the exchange from an

17  operational and a functional perspective.  It is likely that

18  requires the raising of significant capital.

19          There's a question posed whether the estate's

20  capital should be used for that or whether it should be

21  third-party capital.  There were some people that look at it

22  as an M&A transaction:  Can we dispose of the assets,

23  including the going-concern value of the estate, for proceeds

24  to the estate and distribute those proceeds?  There were

25  possibilities that customers could have an option to take a

1  part of their proceeds in, you know, that they would

2  otherwise receive in cash from the estate, and receive some

3  kind of interest in the exchange going forward.  There are as

4  many opinions on this, I think, as there are professionals

5  involved in the case, and that's a lot.  So it's a very --

6  you know, I don't think we have an answer at this time.

7         What we have committed to do, as we spent the last

8  about 90 days, that 90-day period we gave to kind of the

9  initial consideration of this expiring, and we're going to

10 sit down with the Committee and other stakeholders and think

11 about it.

12        There's also a sequence and a timing question.

13 So, there are some to believe that if there's anything to be

14 done with the exchange, it should be done quicker -- as

15 quickly as possible, which might imply some kind of 363 or

16 other architecture.  And others, you know, that believe,

17 perhaps, the exchange should be coupled with other assets, as

18 opposed to just being, you know, the exchange itself.

19        So a long-winded way to say, Your Honor, that all

20 options are on the table, but we don't have any particular

21 path forward at this time.

22        THE COURT:  Does there need to be a resolution of

23 the -- I know there's litigation pending about whether coin

24 that's being held in the exchange is property of the estate

25 or is it customers' property?  Does that need to be resolved

1  before we can reopen the exchange?

2          MR. DIETDERICH:  No, I don't think so.  I think

3  that it depends on the nature of the structure of that

4  transaction, okay, and that's, again, one of the things that

5  we're thinking about is, if we want to do something with the

6  exchange in advance of what I think is already an aggressive

7  timeline for the plan, as opposed to waiting to resolve, when

8  we resolve the plan, then I think we're all going to have to

9  get together and come up with a way to monetize, if you will,

10  the estate's investment -- the value the estate has in the

11  exchange in a way that is without prejudice to the plan

12  issues, but there's obviously the relationship.

13          THE COURT:  All right.  Thank you.

14          MR. DIETDERICH:  So, on the agenda today, Your

15  Honor, we only have three items, as I think Mr. Landis

16  mentioned.  The first item, Agenda 9, is exclusivity.  Then,

17  we have Mr. Bankman-Fried's motion for relief from the

18  automatic stay.  And then a status conference discussion in

19  the Emergent case is Agenda Item 14.

20          So, Your Honor, I'll turn to the exclusivity

21  motion, filed at 846.  The debtors' request to extend the

22  exclusivity period by six months is unopposed.  The Committee

23  did file a statement, to which we responded, and absent

24  questions from the Court, we'd ask that the motion be

25  entered.

1              THE COURT:  Okay.  I don't have any questions.

2              Did the Committee want to be heard on this?

3              MR. HANSEN:  We would like to, Your Honor, yes.

4    Thank you.

5              Your Honor, Kris Hansen with Paul Hastings on

6    behalf of the Official Committee.  I'll try to make this

7    brief, Your Honor.

8              The Committee's stated that was filed in

9    connection with exclusivity was accurate and not misleading.

10   It was direct and aimed at helping the Court to try to

11   understand the Committee's frustrations to date.  It was also

12   aimed at holding the debtors to their newly minted timeline

13   and their commitment to be more transparent with Committee

14   members than they have been to date.

15             Unfortunately, the debtors filed a surprisingly

16   insecure response that the Committee believes is disingenuous

17   in some ways, and we have no choice but to correct the

18   record.  As we noted in our statement, the primary issue the

19   Committee has had with the debtors is their lack of trust and

20   engagement at the Committee member level.  The debtors' own

21   exhibit highlights their concern.  Of the 1,636 documents

22   provided to the Committee, as listed on the exhibit, only 21

23   of them, 1.3 percent of the total, were seen by the members

24   of the Committee as designated as "nonprofessional-eyes

25   only."  Of those 21, 2 were the so-called "UCC reports" that

1 the debtors referred to a few times in their response.

2        To be clear, those are not really UCC reports.

3 They were debtor documents that were shared with the members

4 of the Committee on the same day that they were released to

5 the public and accompanied by two of the three meetings that

6 were listed on the debtors' exhibit, which were walk-throughs

7 of the documents hours before they were publicly released on

8 January 17th and March 2nd.

9        Obviously, if the Committee members had been given

10 advance access to the decks, they could have asked more

11 intelligent questions, made the calls more productive, and

12 provided valuable input on those presentations.  But they

13 were not provided with that opportunity, despite the requests

14 of the Committee professionals to do so.

15        The only other meeting of the three that are

16 referenced in the deck happened on March 30th after the

17 Committee delivered the debtors a draft reservation of rights

18 on exclusivity that was far more strident than the one that

19 it ultimately filed.  At the time of the delivery of the

20 draft document, the Committee requested a case timeline and a

21 meeting with Mr. Ray.

22        The debtors did not disclose a case timeline to

23 the Committee professionals at that point, but they did,

24 however, provide a high-level timeline when the call with

25 Mr. Ray took place later.  The debtors' reply would have the

1  Court believe that both, this detailed timeline and the call

2  with Mr. Ray, were products of the debtors' own volition, but

3  they simply were not.  They were prompted by the Committee.

4         And we are pleased with Mr. Dietderich's

5  disclosure of the timeline today.  That's the kind of

6  information that we believe the Court deserves and that we

7  believe the public deserves and that we believe all the

8  creditors and the customers deserve, as well.

9         However, as an example of how the Committee

10  members have been helpful to the debtors, which is not

11  referenced in any of the pleadings, is a situation that

12  unfolded over the weekend after the Silicon Valley Bank

13  failure.  That weekend, Mr. Ray reached out to the Committee

14  professionals and the Committee members and a productive

15  dialogue occurred where the expertise of the Committee

16  members was helpful to the debtors in navigating the unique

17  situation that confronted them, with respect to certain

18  stablecoins.  It was, and remains the Committee's hope that

19  similar interactive "roll up the sleeves and get to work"

20  meetings like those will continue.

21         The Committee also takes issue with what the

22  debtors seem to be trying to convey in their reply as to the

23  Committee's role, which is simply one of administrative

24  oversight.  As the Court knows, that is definitively not what

25  a Creditors Committee is limited to.  Section 1103 of the

1   Code provides for the nonexclusive and expansive list of

2   topics that are appropriate for a Committee, including the

3   investigation of the acts, conduct, assets, liabilities, and

4   financial condition of the debtors, the operation of the

5   debtors' business, and any other matter relevant to the case

6   or the formulation of a plan in order to carry out its role

7   as a fiduciary for all creditors in a Chapter 11 case.

8   Similarly, Section 1109 of the Code permits Committees to be

9   heard on any issue in the case.

10          In the end, Your Honor, the Committee believes

11  that its members have real world, digital asset, and

12  cryptocurrency trading knowledge and expertise that can prove

13  helpful to the debtors in addressing the many issues in these

14  cases and to expedite their conclusion.  The Committee looks

15  forward to the forthcoming plan negotiations and the hard

16  work to be done on the many other tasks that are necessary to

17  achieve its goal.

18          One note on the restart of the exchange, Your

19  Honor.  The Committee does have a subcommittee that is

20  focused exclusively on the restart.  It incorporates many of

21  the concepts that Mr. Dietderich discussed and yesterday we

22  were happy to deliver to the debtors a term sheet on that

23  basis and we look forward to working with them going forward.

24          THE COURT:  Okay.  Thank you.

25          MR. HANSEN:  Thank you, Your Honor.

1          THE COURT:  Mr. Dietderich, any response?

2          Obviously, I expect the debtors and the Committee

3  to cooperate fully and there be a free-flow of information

4  between the two.  I did not appoint an examiner because we

5  have an independent Board of Directors and independent CEO

6  running the debtors, so I expect that there will be an open

7  and free-flow of information.

8          MR. DIETDERICH:  We believe we have and we will

9  continue to try our best on that front.

10          The U.S. Trustee, Your Honor, made, I think, a

11  wise choice:  appoint a single Committee in this case.  And

12  we are, despite our growing asset value, far away from an

13  equity distribution; meaning, that there should be alignment

14  at a fundamental level between the debtors and the Committee.

15  And, certainly, in our relationship with the professionals,

16  we have had what I think is really an open, transparent from

17  our end, very productive working relationship.

18          But we take the feedback into account that we

19  should do a better job of -- maybe, perhaps now that the case

20  is established and some of the security and other

21  informational worries are fading in importance, we can

22  continue to push in involving Committee members directly, not

23  just the professionals, in some of the decisions that we're

24  making.

25          THE COURT:  Okay.  Thank you.

1        Does anyone else wish to be heard on the

2   exclusivity motion?

3        (No verbal response)

4        THE COURT:  All right.  I'm satisfied that the

5   requested relief is appropriate and I will enter the order.

6        Has a form of order been uploaded?

7        MR. DIETDERICH:  Your Honor, I believe it has.  To

8   the extent it has not, I will get it uploaded.

9        THE COURT:  Okay.  Thank you.

10       MR. DIETDERICH:  Thank you, Your Honor.

11       So I believe the next motion, Your Honor, is from

12  Mr. Bankman-Fried's counsel --

13       THE COURT:  Yes.

14       MR. DIETDERICH:  -- so, I will cede the podium.

15       THE COURT:  Okay.

16       MR. DONILON:  Good afternoon, Your Honor.  Gregory

17  Donilon, Montgomery McCracken, on behalf of Samuel Bankman-

18  Fried.  I'm joined by my colleague Edward Schnitzer.  He has

19  been admitted *pro hac vice* in this case and he will be

20  handling Item 10 on the agenda.

21       THE COURT:  Thank you.

22       MR. DONILON:  Thank you, Your Honor.

23       THE COURT:  Mr. Schnitzer?

24       MR. SCHNITZER:  Good afternoon, Your Honor.  For

25  the record, Edward Schnitzer from Montgomery McCracken

1   Walker & Rhoads, on behalf of Samuel Bankman-Fried.

2          We're here today on Mr. Bankman-Fried's motion for

3   relief from the automatic stay to the extent applicable to

4   permit insurers to advance and/or reimburse defense costs and

5   fees under directors and officers insurance policies.  The

6   relief sought is quite customary, as we highlight in

7   paragraph 30 of our motion, including orders entered by this

8   Court in other cases.

9          To be clear, Your Honor, Mr. Bankman-Fried is only

10  seeking an order permitting the insurers to advance or

11  reimburse costs.  He's not seeking an order determining

12  coverage or an order awarding him $10 million.

13         Specifically, Your Honor, paragraph 2 of our

14  proposed order states:

15         The automatic stay imposed under Section 362(a) of

16  the Bankruptcy Code does not apply, or to the extent it does

17  apply, the automatic stay is lifted and modified solely to

18  the extent necessary to permit and authorize Relm & Beazley

19  to evaluate coverage and to make payments under, and in

20  accordance with the terms of the D&O policies to or for the

21  benefit of Mr. Bankman-Fried for the reimbursement and

22  payment of any covered defense costs incurred in connection

23  with the pending claims.

24         Your Honor, also contrary to what some of the

25  objecting parties have claimed, Mr. Bankman-Fried is also not

1  seeking an order to the exclusion of any other insured who

2  might have coverage.  Far from it.  Mr. Bankman-Fried simply

3  sought coverage, since he had no choice after the debtors

4  refused to indemnify him and refused to stipulate to stay

5  relief.  It was not his right or place to seek coverage or

6  stay relief on behalf of any other party, other than himself.

7  They are certainly free to do so as long as they comply with

8  the Bankruptcy Code and the policies.

9        Your Honor, why does Mr. Bankman-Fried need this

10 coverage?  Because he has been named as a defendant or is

11 otherwise involved in criminal, regulatory, civil, and other

12 actions and proceedings that have resulted in, and can be

13 expected to continue to result in significant, unreimbursed

14 legal fees and other expenses.  We identified those actions

15 and proceedings in paragraph 16 of our moving paper and I

16 will not repeat them here.

17        Your Honor, Mr. Bankman-Fried is covered by

18 insurance policies designed to protect against exactly this

19 circumstance.  The policies are structured to provide

20 coverage for defense costs in these circumstances, so that

21 individual insureds like Mr. Bankman-Fried can mount an

22 effective defense.

23        There are two policies relative to this motion.

24 The first is the Relm insurance policy, Relm Insurance

25 private company management liability policy, which was

1   attached to the motion as Exhibit B, and the second policy is

2   the excess claims made directors and officers liability

3   insurance policy, which is attached to the motion as

4   Exhibit C.

5           Your Honor, there are five important parts of

6   those policies that I would like to highlight for the Court

7   and which were highlighted in the opening paragraph of our

8   reply papers.  First, the policies contractually mandate

9   reimbursement by the debtors of expenses incurred by an

10  individual insured as the debtors agreed to indemnify all

11  individual insured persons.  Second, the policies require the

12  insurers to advance defense costs if the debtors refuse, so

13  that the insured can mount the defense.  Third, the policies

14  prioritize payment as to the individual insured, not the

15  debtors, if, quote, "the loss due and owing by the insurer

16  under a liability coverage part exceeds the then-remaining

17  limit of liability applicable to such loss."  Four, the

18  policies provide that a bankruptcy of the company shall not

19  relieve the insurer of its obligations under this policy.

20  And five, the policies require the company, in this case, the

21  debtors, to waive and release the automatic stay with respect

22  to the policy or its proceeds, and agree not to oppose or

23  object to any efforts by any insured to obtain relief from

24  the stay.

25          Why are we here, Your Honor?  We are here because

1  Mr. Bankman-Fried asked the debtors to indemnify him as they

2  were required to do under the insurance policies, but the

3  debtors refused to do so.  After being denied this right,

4  Mr. Bankman-Fried, through counsel, asked debtors' counsel to

5  stipulate to relief from the stay, which is also customary in

6  this court, as well as other courts, and, again, the debtors

7  refused to do so.  So, it was in light of that, that we had

8  no choice but to file this motion.

9          Whether the Court concludes that the proceeds of

10  the policies are property of the estate or -- sorry.  Your

11  Honor, whether this Court concludes that the proceeds of the

12  policies are not property of the estate because coverage is

13  likely to be exhausted by Side A claims or if this Court

14  concludes that the proceeds of the policies are potentially

15  property of the estate, stay relief should be granted so that

16  the policies can be used for the purposes that they were

17  obtained:  to provide coverage to individual insured, like

18  Mr. Bankman-Fried.

19          Your Honor, as the Eastern District of New York

20  Bankruptcy Court explained in the First Central Financial

21  case, quote:

22          "D&O policies are obtained for the protection of

23  individual directors and officers . . . in essence and at its

24  core, a D&O policy remains a safeguard of officer and

25  director interests."

1    Your Honor, let me address the elephant in the

2  room.  Yes, Mr. Bankman-Fried has been indicted and is a

3  defendant in multiple lawsuits, but Mr. Bankman-Fried has not

4  been convicted of a crime or found civilly liable, contrary

5  to what the objecting parties may have stated in their

6  papers.  He is subject to an indictment and only that.

7    As this Court is aware, an indictment is not a

8  conviction; it's merely an accusation, no different than a

9  complaint.  Mr. Bankman-Fried, like any other person is, and

10  must be presumed innocent, unless and until found guilty of

11  any criminal wrong.  He is like any other former director or

12  officer of a company that seeks access to a D&O insurance

13  policy to pay for legal fees.  Coverage under those policies

14  for those legal fees does not change simply because some

15  people hope or believe that Mr. Bankman-Fried is guilty.

16    I'd like to address the three responses that were

17  filed, Your Honor.  First, the Committee objection.  As we

18  noted in our reply, we submit that the Committee's objection

19  should be rejected, as they seek relief on behalf of the

20  debtor; relief that the debtor is contractually barred from

21  seeking.  It's something that the debtors recognized in their

22  papers.

23    THE COURT:  Well, let me ask you about that first,

24  because I question whether or not that provision is even

25  enforceable in bankruptcy.  Isn't it void as a public policy

1    issue?  How can a debtor -- how can a company say,

2    prepetition, We're going to agree that if we have property of

3    the estate, we're going to agree to waive our right to seek a

4    stay or we're going to waive our right to object to someone

5    who wants to lift the stay to pursue those assets?

6              It seems to be counterintuitive to the whole

7    purpose of the Bankruptcy Code.

8              MR. SCHNITZER:  Understood, Your Honor.

9              It's like how I believe agreements to make a debt

10   nondischargeable are not necessarily enforceable in a

11   bankruptcy.

12             Your Honor, it's possible.  I will admit, we did

13   not look into it.  The debtors, in their papers, agreed.  It

14   was perhaps was the only thing that they agreed with us on in

15   their papers.

16             Your Honor, it may not be enforceable.  We do not

17   rely upon that.  We rely upon reasons for why stay relief

18   should be granted here.

19             But I did want to note the debtors, like I said,

20   did apparently agree with it, so they, apparently, were

21   comfortable with it and maybe it's because the policy is

22   going forward post-petition, and so you could get into

23   questions there.  But, honestly, I don't know, and we're not

24   relying upon that.  We're not asking you to grant -- we're

25   not asking you to strike all the opposition because of that

1  and grant our relief as effectively unopposed.

2        THE COURT:  Okay.  Well, let me ask you another

3  fundamental question, then.  It has been ruled -- the rule in

4  this court, at least, and I've ruled the same way, that where

5  a debtor is a co-insured under a policy, it is property of

6  the debtor's estate and the debtor here is a co-insured under

7  these policies, correct?

8        MR. SCHNITZER:  Yes, correct, Your Honor.

9        THE COURT:  So, they would be, under precedent in

10 this Court, it is property of the debtors' estate, right?

11        MR. SCHNITZER:  Your Honor, as we set forth in our

12 paper, we believe because of the priority of payments, that

13 Side A will come first.  That there will not be anything

14 left, likely, for the debtors.  And we believe because of

15 that, and there's ample case law to support it, that it's not

16 property of the estate, but as we put in our papers, should

17 this Court conclude otherwise, that is why we also sought

18 relief from the stay, to the extent the proceeds of the

19 policies are found to be property of the estate.

20        They do have a potential interest.  We believe it

21 is contingent and it is less than individual insureds, which

22 includes Mr. Bankman-Fried, but does include other members.

23 But, Your Honor, to the extent you conclude that because of

24 that contingent interest it is property of the estate, that

25 is why we also seek stay relief, Your Honor, as our

1 alternative ground.

2           THE COURT:  Well, doesn't that also contradict

3 your position that you're taking, that the priority of

4 payments, you're saying Mr. Bankman-Fried is not seeking to

5 deplete the $10 million.  He doesn't think -- apparently

6 doesn't think he's going to deplete the $10 million.  So the

7 priority of payment provision hasn't kicked in yet, right?

8           MR. SCHNITZER:  Correct, it has not.  What we

9 are --

10           THE COURT:  Which means anybody can file a claim,

11 including the debtors.

12           MR. SCHNITZER:  Correct.  Anybody who is permitted

13 to under the policies and under any Bankruptcy Code

14 provisions that are applicable, is permitted to submit a

15 claim.  And I would expect that the insurance companies will

16 abide by the policy and review the claims, determine which

17 are appropriate or not, and pay them out as they would do as

18 if there was no bankruptcy proceeding.  If that means that

19 Mr. Bankman-Fried receives reimbursement, obviously, that

20 would be great from our client's perspective.  If it means

21 others also receive reimbursement, I'm sure that is great

22 from their perspective.  If it means the debtors receive some

23 type of reimbursement for some type of cost they incur, that

24 is also possible.

25           The insurer will follow the policies, which is all

1  that we're asking.  We're asking for the right to submit the

2  claim and allow them to go forward, because the insurers have

3  specifically told, and we understand why, as I'm sure does

4  this Court, they have told us they will not look at our

5  claims until stay relief is obtained.

6            THE COURT:  Okay.  Go ahead.

7            MR. SCHNITZER:  Your Honor, you touched on the

8  fact that there are potential other parties on.  That was a

9  point that the Committee made in their objection.

10           Once again, we don't believe that's the basis to

11  deny the motion.  If there are other parties that would like

12  access to the policies, they merely need to comply with the

13  policies and comply with any applicable Code provision.  What

14  I mean by that is, if they are individuals and they are not

15  being, somehow, covered by an ordinary course professional, I

16  suppose they would need to file a motion for relief from the

17  stay, be before this Court, and if it's granted, then they

18  can do, assuming this Court grants the motion that we filed,

19  they would have a right to do it.

20           But our point, Your Honor, is nothing in the

21  relief that we've sought prevents those other parties from

22  doing so and Mr. Bankman-Fried shouldn't be penalized simply

23  because he filed a motion and others have chosen not to.

24           And I will say it surprises us, Your Honor.  We

25  filed this motion a while ago.  If there were these other

1  parties, I don't know understand why they haven't filed

2  something, but that, you know, is their choice.

3          What you heard, Your Honor, in or what you read,

4  Your Honor, I should say, in the debtors' and the Committee's

5  papers is there are these other employees who the debtors

6  have chosen to, it looks like, effectively indemnify and

7  they're going to indemnify them by providing them counsel

8  from Covington & Burling as an ordinary course professional.

9          And they've chosen to do that.  They've chosen not

10 to indemnify Mr. Bankman-Fried and to challenge his right to

11 get reimbursement, but they've now told you that they're

12 going to seek reimbursement under the policies for, at least,

13 some of Covington & Burling's expenses.

14         Why do I point this out, Your Honor?  Because it

15 shows a reason why this instant motion should be granted.  I

16 don't think it would be appropriate to have one set of former

17 employees getting legal counsel, effectively, for free from

18 their perspective, whereas, another set of employees, or in

19 this case, another set of one employee receiving -- having to

20 pay for his own legal counsel and having no right to seek

21 reimbursement.

22         Given this unequal treatment, Your Honor, we

23 believe stay relief should be granted so that Mr. Bankman-

24 Fried is certainly not worse off than these other employees

25 who are getting this benefit of the legal fee.

1          THE COURT:  Well, can I just lift the stay for

2   everybody and say, Go file your claim against the insurance

3   policy.

4          MR. SCHNITZER:  Your Honor, I suppose you could.

5   I would submit that I believe, generally speaking, a motion

6   needs to be filed to seek relief.  A motion was not filed for

7   that.  I believe it's up to those individuals or entities to

8   file that relief.

9          We did go to the trouble -- again, we went through

10  the trouble because the debtors refused to stipulate to it.

11  Had they told us in response to our request for a

12  stipulation, Yes, Mr. Schnitzer, we think stay relief makes

13  sense, how about we make it for all individual insurers, I

14  would have said yes.  I unquestionably would have said yes.

15  I tell you today, I know I would have said yes.  They didn't

16  say that.  They just said, No, go ahead and file your motion.

17  So I did.

18          If this somehow wants to be converted, and I would

19  be more than happy for this to be one of the -- I believe

20  they said there were 30 things, maybe, that they resolved

21  consensually, I would be more than happy for this to be 31,

22  if I'm counting right.  It wasn't yet.  If we can make it

23  number 31 today, tell me where to sign, Your Honor.  I would

24  do so.

25          THE COURT:  Well, maybe I need to send everybody

1   out in the hallway for a little bit to see if you can resolve

2   this motion.

3           But go ahead, finish your argument.  Go ahead.

4           MR. SCHNITZER:  Your Honor, bizarrely, the

5   Committee suggested that Mr. Bankman-Fried will suffer -- the

6   quote is, "will suffer no real prejudice if the stay is not

7   lifted."  It's hard to respond to that claim, because I don't

8   even understand how it can be made, given that Mr. Bankman-

9   Fried is a defendant in multiple civil actions, a defendant

10  in various governmental actions, and he has to pay for all

11  that legal representation out of his own pocket and have no

12  access to insurance proceeds of a policy that's specifically

13  applied to his current predicament.

14          The hardship is clear and multiple courts have

15  recognized that.  By way of example, Your Honor, in Downey

16  Financial Corp., Judge Sontchi stated, quote:

17          "The insureds would suffer a very real and easily

18  identifiable hardship if the stay is not lifted.

19  Specifically, the insureds would have to pay 880,000 in

20  defense costs, as well as any defense costs incurred

21  subsequent to the filing of this motion, out of their own

22  pockets."

23          Your Honor, if I could next move on to the

24  objection filed by the Class Action Plaintiffs, the Onusz

25  objection.  As we stated in our reply, Your Honor, we submit

1  that that objection should be overruled because, (a), they

2  have no standing to seek the funds under the D&O policies;

3  (b), they wrongly placed their interests in potential

4  recoveries in their adversary proceedings ahead of everybody

5  else, including Mr. Bankman-Fried's rights under the D&O

6  policy; and lastly, they falsely claim that Mr. Bankman-Fried

7  has been found liable for, quote, "both civil and criminal

8  unlawful conduct."

9        The simple fact is that it would be patently

10 unfair to allow the class actions to proceed against

11 Mr. Bankman-Fried, but at the same time, deprive him of the

12 right to access the proceeds to defend against these claims.

13 This right to defense was recognized by the Southern District

14 of New York in the MF Global case and also by this Bankruptcy

15 Court in Allied Digital, both of which we cite in paragraph

16 20 of our reply.

17        Lastly, Your Honor, I want to touch upon the

18 debtors' objection.  I already mentioned the stay relief, so

19 I won't repeat that again.  I've already also mentioned the

20 Covington & Burling issue.  I think if there is another basis

21 for accesses to the D&O proceeds, claims should be made.

22        I was a little surprised that the debtors said

23 that it would be both, unfair and inequitable for you to

24 grant this relief.  Again, as we said before, what we think

25 is unfair and unequitable is that Mr. Bankman-Fried was

 1  denied indemnification rights.  He was then denied the

 2  debtors agreeing to a stipulation, and instead, the debtors

 3  have chosen to indemnify certain employees for whatever

 4  reason, and provide them with counsel free of charge, while

 5  at the same time, trying to stop Mr. Bankman-Fried from

 6  having any access to the D&O proceeds.  So, if there's

 7  anything that would be unfair and inequitable, Your Honor, it

 8  would be to deny this motion, with respect to Mr. Bankman-

 9  Fried.

10          Your Honor, in sum, we respectfully request that

11  this Court grant the motion and enter the proposed order that

12  was included with the motion.

13          THE COURT:  Okay.  Thank you.

14          MR. SCHNITZER:  Thank you, Your Honor.

15          THE COURT:  Who wants to go first, the Committee

16  or the debtors?  The Committee.

17          MR. PASQUALE:  Thank you, Your Honor.  Ken

18  Pasquale of Paul Hastings for the Official Committee of

19  Unsecured Creditors.

20          First, Your Honor, let me just very quickly

21  address the point that the Committee shouldn't be heard

22  today.  The Committee is not a party to the policy; we're a

23  party in interest to the case.  There is no reason offered,

24  either in contract or in law, as to why the Committee

25  objection shouldn't be heard.  And I know Your Honor, through

1  your questions, seemed to be recognizing that, but I did want

2  to mention that.

3          I think, Your Honor, one of your questions was

4  right on point, as well, and that is that Mr. Bankman-Fried

5  misinterprets the policy.  The policy here does not provide

6  any priority to the Side A Claimants in the circumstances in

7  which we stand here at the moment.  The priority, if any,

8  only arises under the terms of the policy if a claim is going

9  to, at that point, exhaust the policy.

10          So, there is a sharing of the 10 million in

11  aggregate proceeds between the Side A directors and officers

12  and the debtors under Side B, C, and D of the policy.  And

13  because there is a sharing, Your Honor, as Judge Silverstein

14  explained in the Boy Scouts case very recently:

15          "The debtor's interest in the proceeds requires

16  protection from depletion and overrides the interest of the

17  directors and officers."  That's 642 B.R. 504, 573.

18          So, as we stand here today, it's actually the

19  estates that have a priority to the policy -- to the proceeds

20  of the policy, not the directors and officers.  Given that,

21  Your Honor, and I think, again, your question recognized

22  this, there's no question, as a matter of law and contract,

23  that the proceeds here are property of the estate and

24  Mr. Bankman-Fried, then, has the burden of convincing this

25  Court that stay relief is appropriate.

1      No evidence has been presented by Mr. Bankman-

2  Fried in that regard, and so let me hit those points in

3  particular.  The first, Your Honor, is that -- excuse me, I

4  just lost my place.

5      There is prejudice to the estates if the stay is

6  lifted and Mr. Bankman-Fried is able to access the insurance

7  proceeds for the very simple reason that the debtors will

8  then have to pay the costs of defending various claims in

9  various investigations that are pending now -- it's not

10  hypothetical -- but that are pending at the moment, including

11  the class action complaint that the Movant mentioned in

12  argument and opposed the motion, as well.  So, there's

13  nothing speculative or hypothetical about; that exists today.

14  And absent being able to access this particular policy of

15  these particular debtors, the debtors would -- the assets of

16  the estate would be diminished in that regard.

17      Second, as to the prejudice that Mr. Bankman-Fried

18  claims that he would sustain, again, no evidence has been

19  presented.  And in that regard, more particularly, the motion

20  itself at paragraph 22 references that Mr. Bankman-Fried, by

21  and through counsel, submitted notice letters to various

22  other insurance carriers, including Relm here, but no

23  evidence has been presented as to what other coverage

24  Mr. Bankman-Fried has made claim to and may be receiving.

25      In particular, we mention in our opposition, it's

 1   the Committee's understanding that there is a $20 million D&O

 2   policy of a different debtor, Paper Bird, that does not

 3   contained Side B, C, and D coverage and, thus, the issues

 4   that we're discussing today are not raised.  But as I said,

 5   no evidence in the record in that regard at all.

 6          Now, of course, the Court has great discretion and

 7   latitude in determining whether to lift the stay and in

 8   considering balancing the equities.  The Court can consider

 9   in this regard, the charges and claims that are very

10   significant against Mr. Bankman-Fried, his alleged complicity

11   in the very actions that led to these bankruptcy cases, and

12   the fact that three of his closest executives have pleaded

13   guilty to serious crimes.  Those are all relevant facts

14   before the Court today and that's even while recognizing, of

15   course, that Mr. Bankman-Fried has the right to contest those

16   charges and claims.  But the facts still remain of what the

17   charges are as we look at the balance of the equities before

18   Your Honor.

19          Finally, Your Honor, just -- and if the Court is

20   inclined to grant the motion, we would request that the

21   Movant be required to comply with Bankruptcy Rule 2016 and

22   file applications with the Court so that we can -- the

23   estates can monitor what proceeds from these policies are

24   being used and in what manner.

25          So, unless the Court has any other questions,

1  those are the points that I wanted to raise.

2           THE COURT:  Okay.  Thank you.  No questions.

3           MR. PASQUALE:  Thank you, Your Honor.

4           MR. GLUECKSTEIN:  Good afternoon, Your Honor.  For

5  the record, Brian Glueckstein, Sullivan & Cromwell, for the

6  debtors.

7           Your Honor, we filed a response to the motion.  As

8  Your Honor knows, we share the concerns that Your Honor

9  raised about the enforceability of the provision that

10 prevents us from objecting.  We, of course, understood the

11 Committee was going to be objecting to this motion.  We

12 thought it prudent not to necessarily get into a fight with

13 the insurance carriers at this stage.

14          But from our perspective, Your Honor, there are a

15 number of points that Mr. Bankman-Fried has asserted that are

16 inaccurate.  Mr. Pasquale addressed a number of them,

17 particularly how the policy works.  And it is critical here,

18 Your Honor, that the debtors do have coverage under this

19 policy.  We do believe it's an asset of the estate, and we do

20 believe that the debtors today have claims under that policy

21 with respect to Side B and Side C coverage.  So, it's not a

22 hypothetical as to whether there's a real interest here of

23 the debtors, as the Court is considering whether or not to

24 grant stay relief to Mr. Bankman-Fried.

25          The other point raised and articulated, again,

1  today with respect to the fact that we are, as the debtors,

2  choosing certain current and former employees to indemnify

3  and provide counsel to, to cooperate with investigations is,

4  of course, true.  And that's -- Mr. Bankman-Fried's papers

5  make it sound like this was novel and new.  That arrangement

6  was disclosed back in February and in the declaration

7  provided by the Covington firm in connection with their OCP

8  retention in paragraph 5.  It was disclosed very clearly that

9  we had -- the debtors had requested that that firm provide

10 services to represent, quote:

11          "Current and former employees of the debtors in

12 connection with ongoing investigations by the government, as

13 well as related inquiries from counsel to the debtors and

14 third parties."

15          And, of course, Your Honor, that's providing a

16 benefit to the estate.  These are individuals that have

17 information and they're sharing that information with the

18 debtors in connection with the investigations highlighted and

19 walked through by Mr. Dietderich earlier, and with the

20 government.

21          Mr. Bankman-Fried is not in that camp.

22 Mr. Bankman-Fried, of course, is not cooperating with the

23 debtors.

24          There was a suggestion that we forced him to file

25 this motion today.  We did decline to enter into any sort of

1  stipulation as to stay relief.  We have no obligation to do

2  so.

3         Even if the provision in the policy is

4  enforceable, despite the concerns Your Honor raises, it

5  doesn't require us to cooperate with Mr. Bankman-Fried.  It

6  simply states, the language states that we would not impose

7  stay relief, which we have not done.  We do think that,

8  certainly, the question, the debtors, to be clear, have no

9  intention of cooperating with Mr. Bankman-Fried on this or

10 other issues at this time.

11        With respect to the question of, you know, one

12 former officer or director versus others accessing the

13 policy, and we did raise this in our submission, Your Honor,

14 we do think that if the Court is so inclined to access the

15 policy, that Mr. Bankman-Fried should not get a leg up

16 amongst -- among the other potentially insured parties here

17 today.

18        And so, we certainly understand and agree with the

19 points raised by the Committee, but to the extent stay relief

20 is granted, it probably should be granted for all at this

21 point.  Thank you, Your Honor.

22        THE COURT:  Thank you.

23        Anyone else wish to be heard before I go back to

24 Mr. Schnitzer?

25     (No verbal response)

1          THE COURT:  Okay.  Mr. Schnitzer?

2          MR. SCHNITZER:  Thank you, Your Honor.  I'll be

3   brief in responding.

4          Your Honor, first, with respect to what the

5   Committee said, they used the word "sharing," and this was a

6   word that they also used in their motion, which I wanted to

7   highlight.  They want to give Mr. Bankman-Fried nothing and

8   they want to give all the proceeds to somebody else, whether

9   that be Covington, the debtors, or somebody else.  I don't

10  believe that's the definition of sharing.  I don't believe

11  that's the definition of anyone of sharing.  So, I think if

12  you truly want to do what the Committee is asking, which is

13  have this policy shared, the relief sought should be granted.

14          If it's to be in a stipulation where it's granted

15  with respect to an individual insured and then people can

16  file their claim, certainly.  But sharing does not mean all

17  the money goes to everybody except for Mr. Bankman-Fried;

18  that's not sharing.

19          Your Honor, I would also note this goes to their

20  argument on terms of the prejudice to the estate.  They're

21  arguing, basically, that they'd be prejudiced because we

22  would have access to money and they would have, the debtors

23  or the other insureds, would have access to money at the same

24  time.  They're suggesting that, basically, the estate should

25  get all the access to the money first and only if somehow

1  after that, there's leftover, then perhaps, someday, years in

2  this future, you should grant this motion.  That is not what

3  the body of law says on this, Your Honor, and I don't believe

4  that's correct.

5        They also made a point with respect to

6  indemnification and I would just say, Your Honor, any payment

7  of defense costs, and this is from the Allied Digital case,

8  quote:

9        "Any payment of defense costs will remove any

10  indemnification claims any individual defendants would have

11  against Allied Digital."

12        That works for Mr. Bankman-Fried, as well.

13  Mr. Bankman-Fried does have a potential indemnification claim

14  against the debtors.  If he receives reimbursement from the

15  insurance proceeds, that satisfies the claim, same as,

16  perhaps, any of these other individual insureds have.

17        Your Honor, the debtors, again, made this point

18  about these other parties and I just wanted to state

19  something clearly.  They stated in their papers that we

20  inappropriately sought the relief only with respect to the

21  payment of insurance proceeds to Mr. Bankman-Fried.

22        Again, Your Honor, from my perspective as

23  Mr. Bankman-Fried's lawyer, that's all I could do, Your

24  Honor.  I don't believe it's appropriate.  I believe it

25  would, in fact, be unethical for me to file a motion for

1  relief from the stay on behalf of people who I don't know, I

2  can't even identify their names, and who, actually, I

3  believe, are being represent by another law firm, Your Honor.

4  I believe I would be subject to, we'll say, lots of problems,

5  if I did that.  So, I think the suggestion that this was

6  inappropriate, particularly when any party could have filed a

7  motion at any time, including a few minutes before this

8  hearing, Your Honor, that that's not correct.

9           Lastly, Your Honor, the Committee suggests that

10  this should be subject to some sort of fee app.  In support

11  of that, they cite to a 2005 case out of Ohio and a 2008 case

12  from Florida.  Notably, they failed to cite to any case from

13  Delaware.

14           We have seen no case in Delaware that does that.

15  I'm not suggesting that means they don't exist.  As you know,

16  PACER is not the easiest thing to search, so it's possible.

17           I don't believe it's appropriate.  I don't believe

18  it's appropriate, particularly in this case.  Mr. Bankman-

19  Fried is a, as you know, is a defendant in multiple class

20  actions and is a target of multiple government

21  investigations.

22           If he had to file a fee app setting forth what his

23  lawyers are doing for him, you'd either have one of two

24  situations.  We'd either have to reveal his strategy to the

25  people who are trying to proceed against him or we would have

1   to essentially redact almost the entire invoice, such that

2   what you would have before you would look like -- it would

3   look like a bunch of black lines is what it would look like.

4           So, Your Honor, I don't believe it's appropriate.

5   I also believe it shows, really, the true intent here, and

6   that's just to frustrate Mr. Bankman-Fried's ability to

7   defend himself, not only trying to deprive him of the right

8   to proceeds, but then trying to condition it, Well, if you

9   can have a right to proceeds, you should have to file a fee

10  app, something that they didn't suggest with respect to any

11  other individual, something that doesn't govern Covington &

12  Burling right now, as long as their fees are under $200,000.

13  So, it seems like this is, one again, special treatment for

14  Mr. Bankman-Fried.  While, in general, I would say everyone

15  likes to feel special, this is not one of those

16  circumstances, here, where he should be treated differently.

17          I would say this, Your Honor, if you do believe

18  some type of notice is appropriate so that this Court is

19  aware and so that, perhaps, other parties are aware, you

20  could do what was done in one of the cases cited by the

21  Committee, and that's the case, In re Beach First National

22  Bancshares.  It's 451 B.R. 406.  In that case, what the Court

23  said is the insurers should review fees paid under the

24  defense cost provisions of the policy to ensure that the

25  costs actually relate only to the defense of the directors

1   and officers and that the fees and expenses were actually

2   incurred and are necessary and reasonable, and, at least five

3   business days prior to disbursing any funds, they should

4   notify -- in that case, it was a trustee -- notify the

5   trustee of the amount of defense costs paid.

6           So, basically, what the Court did in that case is

7   said -- told the insurers, Do your job.  Do what your policy

8   requires you to do and what you were presumably doing before

9   the bankruptcy, and right before, as in five business days,

10  you're going to disburse funds, notify the bankruptcy estate

11  that you're going to (indiscernible) so that people kind of

12  have a running total of what's being done.

13          So, if you believe some type of notice is

14  appropriate so that people kind of know the balance, that, I

15  would suggest is a reasonable solution, which would not get

16  into Mr. Bankman-Fried or anyone else's attorney-client work

17  product and just, you know, general defense strategy issues.

18          Thank you, Your Honor.

19          THE COURT:  All right.  Thank you.

20          All right.  I'm going to take a recess here.  I

21  don't know if there's any willingness or desire for the

22  parties to talk to one another about a potential resolution

23  here.  I mean, the options are I open this up for -- I lift

24  the stay for everybody so people can assert their claim as it

25  comes in and the insurance company will decide who gets paid

1 │ and who doesn't.  Another option would be I don't lift the

2 │ stay, but at the end of the day, at some point in the future,

3 │ parties come forward and say, Well, this is the costs that we

4 │ incurred at this period of time and so we want reimbursement

5 │ under the policy or something to that effect.  And the third

6 │ option is I just deny the motion.

7 │         So, I don't know if -- I'm going to take a recess.

8 │ So you can talk if you want to.  I don't know if I'm going to

9 │ come back and give you a ruling right now -- I may.  I may

10 │ not.  But let's take a recess for -- let's take a recess

11 │ until 2:20 and then I'll come back on the record at that

12 │ time.

13 │         Yes, sir?

14 │         MR. SABIN:  Your Honor, I rise only to correct

15 │ something on the record.  Jeff Sabin from Venable

16 │ representing OKCoin and their affiliate OKEx.

17 │         And I am happy for this Court's approval and for

18 │ all the cooperation that we got from debtors' counsel that

19 │ led to the soon turnover and transfer to these estates of

20 │ more than $160 million, but the information that was

21 │ exchanged was all pursuant to a confidentiality.  The motion

22 │ itself and your order doesn't designate which of the two

23 │ exchanges, otherwise, is turning back what money.

24 │         The accounts themselves are identified in the

25 │ motion.  The order approves it.  And so, I don't want anyone

1  in the press or listening or anything else to say that it was

2  OKCoin, as I think, inadvertently, Mr. Dietderich is

3  referring to, that is returning this particular account that

4  has roughly 150 million.  I just wanted to correct the

5  record.

6            THE COURT:  Okay.  Thank you.

7            All right.  Let's take a recess and we'll come

8  back.  Thank you.

9        (Recess taken at 2:05 p.m.)

10        (Proceedings resumed at 2:29 p.m.)

11            THE COURT:  The Court?

12            MR. GLUECKSTEIN:  Your Honor, I think we've all

13  agreed that, or at least the debtors and the Committee have,

14  and we've advised Mr. Bankman-Fried's counsel that we would

15  just like a ruling from the Court.

16            THE COURT:  Okay.  Well, in order to lift the

17  stay, the burden is on the Movant to prove cause and,

18  frankly, I have zero evidence to establish cause here.

19  Mr. Bankman-Fried did not put on any evidence whatsoever as

20  to what, and the balancing of the equities here, what harm is

21  going to occur to him.  I don't know what other insurance

22  policies he has access to.  I don't know what other assets he

23  has access to privately that would allow him to cover these

24  costs and then recover them later under this policy.  I have

25  nothing to show that there was any cause here.

1           It's also the burden on Mr. Bankman-Fried to prove

2   that there would be no harm to the bankruptcy estate and that

3   has not been done either.

4           And, finally, that he had the probability of

5   success on the merits and I have absolutely no evidence

6   whatsoever on that either.

7           So, at this point, I have no choice, but to deny

8   the motion for lack of evidence.  I'll do so without

9   prejudice.  If Mr. Bankman-Fried wants to come back and put

10  on evidentiary hearing that will establish the elements

11  necessary for me to lift the automatic stay, he's free to do

12  so, but we'll deal with that another day.

13          So, for now, the motion is denied.  The parties

14  should submit a, or Mr. Bankman-Fried's counsel should submit

15  a form of order denying the motion without prejudice, and

16  we'll go from there.

17          Anything else before we adjourn for the day?

18          MR. GLUECKSTEIN:  Thank you, Your Honor.  Again,

19  Brian Glueckstein for the debtors.

20          The only other thing on the agenda today, Your

21  Honor, was Item 14, which was the status conference in the

22  Emergent case.  The parties did submit yesterday afternoon an

23  agreed-upon stipulation --

24          THE COURT:  I did see it, yes.

25          MR. GLUECKSTEIN:  -- that the parties worked

1  through since the hearing in March to address the issues that

2  Your Honor raised at that hearing.  That is now agreed and

3  executed, as Your Honor saw.

4           We will be submitting that, certainly in the FTX

5  case and in the Emergent case, and BlockFi will be doing so

6  in New Jersey in its case to get that formally approved by

7  Your Honor as expeditiously as possible so that those stays

8  can go into effect.  But --

9           THE COURT:  I did see -- I thought -- correct me

10  if I'm wrong, but I thought I had read that it's contingent

11  on both courts approving it?

12           MR. GLUECKSTEIN:  It is, Your Honor.  To be

13  effective, both courts --

14           THE COURT:  Then I probably need to call Judge

15  Kaplan and find out whether he's going to approve it before.

16  We're going to have to do it simultaneously, I guess?

17           MR. GLUECKSTEIN:  I know that -- I'll leave it to

18  BlockFi's counsel, but yeah, I mean, I think from our point

19  of view, we don't, and I think BlockFi is in agreement, that

20  there isn't any anticipated sort of issues there.

21           THE COURT:  I wouldn't think so.

22           MR. GLUECKSTEIN:  But, yeah, we will submit an

23  order to Your Honor with the stipulation and ask that that be

24  entered.

25           Other than that, I don't -- unless there's any

1  other matters in the Emergent case that Your Honor wanted to

2  address, I don't think there's anything from the parties

3  today.

4  THE COURT:  Okay.  Thank you.

5  Anything?  Did you want to say something?  I

6  thought I saw you stand up.

7  MR. ABBOTT:  Yeah, I did, Your Honor.  Derek

8  Abbott of Morris Nichols, here for BlockFi.

9  Your Honor, we're going to submit it

10  expeditiously.  I think all parties would like to see it

11  approved by both courts as quickly as possible, so we'll do

12  whatever we can to make that happen, Your Honor.

13  THE COURT:  Well, just submit it under COC.  I can

14  enter it right away under COC.  I have no problem with it.  I

15  reviewed it.  I think it's appropriate and I would enter the

16  order.  So, once it's submitted to me under COC, I'll do

17  that.

18  MR. ABBOTT:  Will do, Your Honor.  Thank you very

19  much.

20  THE COURT:  Okay.  All right.

21  Thank you all very much.  We are adjourned.

22  COUNSEL:  Thank you, Your Honor.

23  (Proceedings concluded at 2:33 p.m.)

24

25

1                               CERTIFICATION

2            I certify that the foregoing is a correct

3  transcript from the electronic sound recording of the

4  proceedings in the above-entitled matter to the best of my

5  knowledge and ability.

6

7  /s/ William J. Garling                    April 12, 2023

8  William J. Garling, CET-543

9  Certified Court Transcriptionist

10 For Reliable