1   UNITED STATES BANKRUPTCY COURT

2   DISTRICT OF DELAWARE

3

4

5   In re:                          :

                                    :    Chapter 11

6   FTX TRADING LTD.,               :

                                    :    Case No. 22-11068-jtd

7                                   :

            Debtors.                :    (Jointly Administered)

8   _____     :

9

10

11

                                    United States Bankruptcy Court

12

                                    824 North Market Street

13

                                    Wilmington, Delaware

14

                                    January 20, 2023

15

                                    10:04 AM - 12:10 PM

16

17

18

19

20

    B E F O R E :

21

    HON JOHN T. DORSEY

22

    U.S. BANKRUPTCY JUDGE

23

24

    ECRO OPERATOR:  JERMAINE COOPER

25

1    HEARING re Motion of Debtors for Entry of Interim and Final

2    Orders (I) Authorizing the Debtors to Maintain a

3    Consolidated List of Creditors in Lieu of Submitting a

4    Separate Matrix for Each Debtor, (II) Authorizing the

5    Debtors to Redact or Withhold Certain Confidential

6    Information of Customers and Personal Information of

7    Individuals and (III) Granting Certain Related Relief.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sonya Ledanski Hyde

```
 1   A P P E A R A N C E S :

 2

 3   LANDIS RATH & COBB

 4        Co-Counsel to the Debtors

 5        919 N. Market Street, Suite 1800

 6        Wilmington, DE 19801

 7

 8   BY:  ADAM LANDIS

 9

10   SULLIVAN & CROMWELL

11        Attorneys for FTX

12        1700 New York Avenue, Suite 700

13        Washington, D.C. 20006

14

15   BY:  JIM BROMLEY

16        BRIAN GLUECKSTEIN

17

18   FERRY JOSEPH

19        Attorneys for Warren Winter and Richard Brummond

20        1521 Concord Pike, Suite 202

21        Wilmington, DE 19803

22

23   BY:  JACK MCLAUGHLIN

24

25
```

1   THE HODA LAW FIRM PLLC

2        Attorneys for Warren Winter and Richard Brummond

3        12333 Sowden Road, Suite B, PMB 51811

4        Houston, TX 77080

5

6   BY:  MARSHAL HODA

7

8   UNITED STATES DEPARTMENT OF JUSTICE

9        Attorneys for the U.S. Trustee

10       844 King Street, Suite 2207, Lockbox 35

11       Wilmington, DE 19801

12

13  BY:  JULIET SARKESSIAN

14

15  ALSO PRESENT:

16  ROBERT LIEFF

17  DANIEL EGGERMANN

18  ADAM GOLDBERG

19  MARTIN SOSLAND

20  RYAN SIMS

21  DAN MOSS

22  CATHERINE CHOE

23  BRENDAN SCHLAUCH

24  JOSHUA OLIVER

25  ETHAN TROTZ

1    MAX DAWSON

2    STANTON MCMANUS

3    RUTH RAMJIT

4    SCOTT COUSINS

5    SCOTT JONES

6    DEBBIE FELDER

7    TAMARA MANN

8    MARK HURFORD

9    LILY YARBOROUGH

10   DIMITRIS HATZISARROS

11   CHRIS LAMB

12   JEFFREY MARGOLIN

13   JASON DIBATTISTA

14   RICK PHILIPS

15   GIHOON JUNG

16   IAN SILVERBRAND

17   MICHAEL DELANEY

18   SAMEEN RIZVI

19   VANYA FIAD

20   JASMINE BALL

21   ROHAN GOSWAMI

22   LAUREN WALKER

23   GABRIELA URIAS

24   ALEXANDER STEIGER

25   CHRISTOPHER STAUBLE

1    DANIEL O'BRIEN

2    ANDREW HELMAN

3    SAL LEE

4    ANDREW ENTWISTLE

5    JOSHUA PORTER

6    ROBERT CAPPUCCI

7    CAROLINE SALLS

8    VLADIMIR JELISAVCIC

9    MATTHEW LIVINGSTON

10   SUSAN GRUMMOW

11   ANDREW PERRY

12   SAM ALBERTS

13   CLAUDE MONTGOMERY

14   MARK CALIFANO

15   DOUGLAS HENKIN

16   MAEGAN QUEJADA

17   EVELYN MELTZER

18   TURNER WRIGHT

19   LAWRENCE LAROSE

20   RICK ANIGIAN

21   NORMAN PERNICK

22   PETER CURLEY

23   KENNEITH FRIEDMAN

24   AUTUMN HIGHSMITH

25   CHRISTIAN JENSEN

1    LAYAL MILLIGAN

2    MATTHEW GOLD

3    ANDY LE

4    BECKY YERAK

5    AUSTIN VINY

6    ABIGAIL RYAN

7    ROMA DESAI

8    M. SHANE JOHNSON

9    MEGAN YOUNG-JOHN

10   RONALD HOWARD

11   LAUREN LUNDY

12   ANDREW GOUDSWARD

13   STEPHANIE WICKOUSKKI

14   RANDALL CHASE

15   BRIAN STOUT

16   JAMES GARVEY

17   MIKE LEGGE

18   JIUN-WEN TEOH

19   JOHN MELKO

20   MICHAEL GODBE

21   CHRISTIANA JOHNSON

22   DAVID LEE

23   JAMES BAILEY

24   DIETRICH KNAUTH

25   STEVEN CHURCH

1    GREGORY DONILON

2    QUINCY CRAWFORD

3    AMELIA POLLARD

4    ROBERT JOHNSON

5    JESSICA MAGEE

6    WARREN GLUCK

7    ALEX ENGLANDER

8    SAMN SENECZKO

9    ROBERT WASSERMAN

10   THOMAS DAVIS

11   TAYLOR HARRISON

12   PAT QUINN

13   M. LIAM

14   TAN LI

15   ANDREW SCURRIA

16   PHILIP BRENDEL

17   NEGISA BALLUKU

18   KENNETH PERKINS

19   MATTHEW GOLDSTEIN

20   STEPHANIE ASSI

21   ALEX MORE

22   K. JOHN SHAFFER

23   AMANDA SCHAEFER

24   LOREN HARMAN

25   DAVID YAFFE-BELLANY

1   STEPHANIE AERTS

2   LIBBY LEWIS

3   ALEXANDER SAEEDY

4   MATTHEW HARVEY

5   DAVID FINGER

6   NICK BUGDEN

7   CURTIS MILLER

8   KENNETH AULET

9   BRIANA RICHARDS

10   CHEYENNE LIGON

11   NICHOLAS SABATINO

12   VINCE SULLIVAN

13   SHIRA WEINER

14   WILLIAM FOSTER

15   TIMOTHY WILSON

16   MONICA PERRIGINO

17   MICHAEL JACOBS

18   NIKOLAOS CHAGIAS

19   MARK WENZEL

20   RASHA EL MOUATASSIM BIH

21   MADELINE PRINCE

22   DANIEL FRIEDBERG

23   MATEO ACEVES

24   KELLY O'GRADY

25   DENNIS O'DONNELL

1    MITHCELL SUSSMAN

2    JAKE HUANG

3    KUMANAN RAMANATHAN

4    REX CHATTERJEE

5    KEVIN HERNANDEZ

6    YAN LI

7    AMIR ZANJANI

8    JAMES MURPHY

9    BRIA COUSINS

10   DAWN GIEL

11   KIRTAN MEHTA

12   ROBERT HUNT

13   MAXIMILIANO SERAFIN LARRIBA HERRANZ

14   BRYAN PODZIUS

15   VICTOR SCOTT

16   LEO CARLSON

17   THOMAS BRAZIEL

18   WARREN WINTER

19   PAT RABBITTE

20   JEREMY RYAN

21   ALEX SIMM

22   ANDREW GLANTZ

23   RAHUL SHARMA

24   NAVEEN PARMAR

25   DAVID HOLLEIGH

1   MICHELE WAN

2   CRYSTAL KIM

3   DAVID QUIROLI

4   STEVE BUNNELL

5   BILL SCHATZ

6   BENNETT SILVERBERG

7   SCOTT HARTMAN

8   JULIA FOSTER

9   AHMED ABD EL-RAZEK

10   BRIAN LOUGHNANE

11   BRIAN PETROZAK

12   DAVID SHIM

13   JORDAN GAGLIONE

14   LAURA HANEY

15   RYAN BEIL

16   ALISON AMBEAULT

17   ERIN DIERS

18   SAMY SOLIMAN

19   DANIEL KAMENSKY

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2            CLERK:  All rise.

3            THE COURT:  Good morning, everyone.  Thank you.

4    Please be seated.

5            Mr. Landis?

6            MR. LANDIS:  Good morning, Your Honor, and may it

7    please the Court.  For the record, Adam Landis from Landis

8    Rath & Cobb, Delaware co-counsel to the Debtors, FTX Trading

9    Limited and the companion cases.

10           Your Honor, we filed this morning a second amended

11   agenda at Docket 547.  The amended agenda reflects a number

12   of matters that have been consensually resolved and orders

13   have been entered.  Matter number four on the agenda is the

14   Alvarez and Marsal application for retention.  An order has

15   been entered on that.

16           Matter number five is the AlixPartners

17   application.  A certification of counsel has been filed and

18   the parties are in agreement with respect to the form of

19   order.

20           Matter number six is the Kroll retention for which

21   an order has been entered.

22           Matter number seven is the Quinn Emanuel

23   application for retention for which a certification of

24   counsel has been filed.

25           Those matters --

1          THE COURT:  I did enter those, both the

2    AlixPartners and the Quinn Emanuel.

3          MR. LANDIS:  Thank you, Your Honor.  And really

4    it's through the good offices of the United States Trustee

5    back and forth negotiations and discussions on a very

6    cooperative basis, the Creditors' Committee weighing in, for

7    which we are grateful on those efforts and we don't have a

8    need to go forward with respect to those.

9          There is a status conference at the end of the

10   agenda that we'll have.  But the only item that is on the

11   agenda that will need to be heard today is the Sullivan &

12   Cromwell retention application.  And for that, I will cede

13   the podium to Mr. Bromley.

14         THE COURT:  Okay.  Thank you.

15         And before you begin, Mr. Bromley, let me just

16   remind those on the Zoom call that this is a formal court

17   proceeding even though you are participating by Zoom.  So

18   please leave your audio turned off and your video turned off

19   unless you are recognized to speak.

20         And with that, Mr. Bromley, go ahead.

21         MR. BROMLEY:  Good morning, Your Honor.  May it

22   please the Court.  Jim Bromley of Sullivan & Cromwell on

23   behalf of the FTX debtors.  Your Honor, thank you very much

24   for taking time today.

25         And I want to first describe the resolution that

1   we've achieved with the Office of the United States Trustee.

2           The Office of the United States Trustee had two

3   objections to the retention of Sullivan & Cromwell.  The

4   first was that there was inadequate disclosure and the

5   second had to do with the scope of the services that

6   Sullivan & Cromwell as well as Quinn Emanuel and

7   AlixPartners would provide.

8           We have been in conversations with the Office of

9   the U.S. Trustee for three weeks.  We've received a first

10  inquiry with respect to our application on the 27th of

11  December.  The application was filed on the 21st of

12  December.  And as is common in large Chapter 11 cases, we

13  have been in constant contact with the Office of the United

14  States Trustee going back and forth with questions and

15  answers and focusing on issues that the U.S. Trustee had

16  identified with respect to disclosure.

17          I am happy to report, Your Honor, that

18  notwithstanding the fact that when we sat here last time we

19  were not yet in agreement with the U.S. Trustee, we have

20  been able to bring that across the finish line.  We have

21  also been able to bring across the finish line a resolution

22  with the Office of the United States Trustee to take the

23  scope issue, which related to the three applications that

24  were originally on today and to move them off and to reserve

25  rights with respect to scope and effectively deal with any

1    issues after the examiner motion, which was scheduled for

2    the 6th of February.

3              In connection with the disclosure issues with the

4    Office of the United States Trustee, we have filed in the

5    past couple of days two supplemental declarations of Mr.

6    Andrew Dietderich, one of my partners at Sullivan &

7    Cromwell.  Mr. Dietderich had submitted the original

8    declaration supporting the Sullivan & Cromwell application.

9    And the second, very fulsome declaration which was filed a

10   couple of days ago was the product of conversations that we

11   have been having with the Office of the U.S. Trustee.

12             When we filed that, we were able to get on the

13   phone with the U.S. Trustee, Ms. Sarkessian, and answer a

14   few additional questions which we then submitted a further

15   supplemental declaration of Mr. Dietderich yesterday.

16             So with that, Your Honor, we have been able to

17   resolve any issues that the Office of the U.S. Trustee had

18   with respect to Sullivan & Cromwell's disclosures.

19             I would like to note in the context of that, Your

20   Honor, that one of the first things that we did when we were

21   talking to Ms. Sarkessian was discuss the fact that Mr. Ron

22   Miller, a former partner of ours at Sullivan & Cromwell, is

23   employed at FTX US as the general counsel.  That's West

24   Realm Shires is the entity.

25             And that was not called out specifically in the

1    original declaration.  It is now called out.  Mr. Miller was

2    listed as a party in Schedule 1 to Mr. Dietderich's original

3    declaration, but we have called out with very clear

4    specificity in a supplemental declaration Mr. Miller as well

5    as Mr. Wilson, a former associate of ours, who also has a

6    role at FTX.  With those call-outs, the Office of the U.S.

7    Trustee is satisfied with that disclosure with respect to

8    Mr. Miller and Mr. Wilson.

9          And in retrospect, Your Honor, we should have gone

10   further in the original declaration, but the fact is we were

11   engaged in conversations with Ms. Sarkessian from December

12   27th with respect to this.

13          So there is also in the context of our recent

14   filing a statement, the declaration of Ms. Kranzley, another

15   one of my partners, with respect to back and forth between

16   the U.S. Trustee's Office and Sullivan & Cromwell.  In the

17   context of that, Ms. Sarkessian wanted me to clarify that

18   there was a set of emails that were provided as exhibits to

19   Ms. Kranzley's declaration.  And what was not noted in those

20   emails, because it didn't appear in the emails, was that

21   there was not a response to an email that Ms. Sarkessian had

22   sent earlier, just as a matter of clarification.

23          So with these statements and the declarations, the

24   two supplemental declarations that have been filed, it is

25   our understanding that the U.S. Trustee's Office is

1    satisfied with the disclosures.  That's reflected in the

2    form of order that has been submitted to the Court.

3            THE COURT:  Before you move on, let me just -- Ms.

4    Sarkessian, do you want to...

5            MS. SARKESSIAN:  Thank you, Your Honor.  For the

6    record, Juliet Sarkessian on behalf of the U.S. Trustee.  We

7    are resolved with Sullivan & Cromwell.  I just want to

8    clarify that the application and the initial application of

9    Mr. Dietderich did not mention any connection with Mr.

10   Miller.  Yes, he was listed as a party in interest on a, you

11   know, 15-page party in interest list, but there was no

12   disclosure whatsoever about Sullivan & Cromwell having any

13   connection with him, let alone that he was the individual

14   who actually brought Sullivan & Cromwell to the attention of

15   the Debtors when Mr. Miller had been a partner at Sullivan &

16   Cromwell.  He left and he went in-house to FTX US and at

17   that point introduced Sullivan & Cromwell.  That is in the

18   supplemental declaration, but there was no information at

19   all about -- excuse me, about Mr. Miller in the original.

20           And so we certainly appreciate Sullivan & Cromwell

21   recognizing that that is something that absolutely should

22   have been included in the original declaration.  And I also

23   want to clarify that was certainly not the only additional

24   disclosure we asked for.  There was quite a bit more.  And

25   you'll see that the first supplemental declaration that was

1   filed was -- I think it was 81 paragraphs, something of that

2   nature.  Some of that was in response to Mr. -- I think with

3   respect to other objectors.  But a good piece of that was

4   disclosure that we asked for.  So it was not just that one

5   piece, it was quite a bit.  And we did work with them and we

6   are glad that they made those additional disclosures and we

7   were able to resolve that issue.  Thank you, Your Honor.

8            THE COURT:  Thank you, Ms. Sarkessian.

9            I see Mr. McLaughlin has stood up.  Do you have

10  anything with regard to the resolution with the U.S.

11  Trustee?

12           UNIDENTIFIED SPEAKER:  No, Your Honor.

13           THE COURT:  Okay.  Why don't we wait.  Mr.

14  Bromley, why don't you go ahead.  And then I'll turn to Mr.

15  McLaughlin.

16           MR. BROMLEY:  Thank you, Your Honor.  Now that

17  we've resolved the issues with the Office of the U.S.

18  Trustee and noting that the Unsecured Creditors' Committee

19  has filed statements of support, the only objection that is

20  -- there are two objections that are remaining, from a Mr.

21  Winter and a Mr. Brummond.  They are represented by counsel

22  here today.  I would just like to before we get going on

23  that, Your Honor, just give a short preview of the issues.

24  And then I understand that they have certain things that

25  they would like to say.

1         Your Honor, with respect to the matter before you

2    today, we have two witnesses.  We have Mr. Ray and Mr.

3    Dietderich.  They have both submitted declarations and

4    supplemental declarations.  And in Mr. Dietderich's case, a

5    second supplemental declaration.  We believe that the

6    disclosure issues have been fully resolved.  We have been,

7    as I noted, in constant contact with the Office of the U.S.

8    Trustee and exchanged voluminous amounts of information.  We

9    believe that the disclosure that has been filed and the

10   supplemental disclosure is fully sufficient.

11        As Mr. Ray mentions in his declaration, what we're

12   talking about here, Your Honor, is a need to move on.  One

13   of the things that the Debtors have been facing generally in

14   these cases is assault by Twitter.  It is very difficult,

15   Your Honor, to cross-examine a tweet, particularly tweets

16   that are being issued by individuals who are under criminal

17   indictment and whose travel is restricted, so to speak.

18        THE COURT:  I have the benefit of not being on

19   Twitter, so I have no idea what people are saying on Twitter

20   about this case.

21        MR. BROMLEY:  Well, Your Honor, to a certain

22   extent you are brought into it because of the objections

23   that reference those things.  And it is frankly difficult in

24   these circumstances to try to respond to all of those things

25   all at once.  And so we have decided not to do so.  Our view

1    is that the issue should be addressed in court in a formal

2    manner and that those who have things to say should come to

3    Court and say those things.  Subject to cross-examination,

4    subject to the rules of the court.  And that is the way that

5    we intend to proceed.

6          With respect to the application, Your Honor, I do

7    note that there was a declaration, a document filed on the

8    Court's docket last night, that is characterized as a

9    declaration by an individual who is a former legal officer

10   within the FTX group.

11         I know that Mr. Winter and Mr. Brummond's counsel

12   have requested that this hearing be adjourned as a result of

13   that filing.  And, Your Honor, we are opposed to any such

14   adjournment.  We've already gone 70 days into these cases.

15   An enormous amount of work has been done.  There has already

16   been an adjournment of these retention applications.  We

17   believe, Your Honor, that it is imperative that we put this

18   stage of the case, the retention of professionals, aside,

19   complete that, and move on to the next stage.

20         Now, we do know that we have an examiner motion

21   that's been filed by the U.S. Trustee, and we will deal with

22   that on February 6th.  But the fact is, Your Honor, if there

23   is an adjournment made as a result of the filing by Mr.

24   Friedberg, which followed hot on the heels of two very long

25   and rambling tweets that were filed by Mr. Bankman-Fried or

```
1    that -- not filed, I'm sorry, Your Honor, but posted and
2    cited by objectors.  I think it's virtually certain that
3    such activity is going to continue and that if we simply
4    agree to adjourn something today or Your Honor decided that
5    it was appropriate, we would simply be faced by additional
6    attacks on Twitter and additional random things that are
7    filed.
8            Now, with respect to Mr. Friedberg's filing, that
9    filing is not on behalf of any particular party.  Mr.
10   Friedberg claims to be a creditor, but he doesn't style it
11   as an objection.  It was filed last.  It was filed --
12   frankly, it's a little bizarre if you sit down and read it.
13   But, Your Honor, our view is that it has no place in the
14   court, it should be stricken from the record, and the
15   hearing should go forward with the two witnesses that we
16   have to the extent that counsel for Mr. Winter and Mr.
17   Brummond have any questions.
18           THE COURT:  Let me hear from Mr. McLaughlin.  It
19   was his motion to continue the hearing.
20           MR. MCLAUGHLIN:  Good morning, Your Honor.  For
21   the record, Jack McLaughlin of Ferry Joseph on behalf of
22   Warren Winter and Richard Brummond, two objecting creditors.
23   Your Honor, if I may introduce to the Court my co-counsel.
24   With me today in court is Marshal Hoda of the Hoda Law Firm
25   of Houston, Texas and Patrick Yarborough of Foster
```

1    Yarborough, also of Houston.  They are lead counsel in this

2    matter.

3            Mr. Hoda will be speaking on behalf of our

4    position today first with regard to the emergency ex parte

5    motion to continue the hearing vis-á-vis the Sullivan

6    Cromwell application, and then on any argument the Court

7    will take on the application proper.

8            THE COURT:  Okay.  Thank you.

9            MR. MCLAUGHLIN:  Thank you, Your Honor.  By the

10   way, both have been admitted pro hac vice.

11           MR. HODA:  Good morning, Your Honor.  May it

12   please the Court.  My name is Marshal Hoda.  I represent the

13   individual objectors in this matter, Mr. Warren Winter and

14   Mr. Richard Brummond.  I appreciate the privilege of being

15   able to appear before this Court pro hac vice today.

16           I would like to first address the emergency motion

17   for an adjournment that we filed yesterday.

18           Your Honor, I am here on behalf of two individual

19   depositors on the FTX and FTX US exchanges who collectively

20   lost access to approximately $400,000 in assets as a result

21   of the FTX collapse.

22           My clients have objected to the appointment of

23   Sullivan & Cromwell as the Debtor's lead counsel because

24   they have grave concerns about the firm's lack of

25   transparency in its mandatory disclosures and its ability to

1    lead an objective investigation into the FTX Group's

2    prepetition activities.

3            Yesterday, we filed an emergency motion for

4    adjournment of the hearing on Sullivan & Cromwell's

5    application that's set to go forward this morning.  And

6    that's what I'll speak about first.

7            I would like to start with a brief statement of

8    the chronology which is helpful for context here.  Sullivan

9    & Cromwell filed its application to be appointed under

10   Section 327 on December 21st, 2022.  As we point out in our

11   papers and as Ms. Sarkessian noted a moment ago, the

12   original declaration of Mr. Dietderich that accompanied that

13   application said essentially nothing about Sullivan &

14   Cromwell's prepetition work, legal work for the FTX Group

15   entities and disclosed that Sullivan & Cromwell had in fact

16   performed eight-and-a-half million dollars approximately of

17   legal work for the FTX Group entities, but said only, and I

18   quote, that that work had been "with respect to acquisition

19   transactions and specific regulatory inquiries relating to

20   certain U.S. business lines."  Nothing more.

21           Further, Mr. Dietderich's declaration did not

22   disclose numerous other connections between Sullivan &

23   Cromwell and the Debtors and the Debtor's attorneys as it

24   expressly required under Bankruptcy Rule 2014, including

25   that a former Sullivan & Cromwell partner, Mr. Ryne Miller,

1    was the general counsel at FTX US and one of the highest-

2    ranking legal officers in the FTX group before its collapse.

3            Accordingly, we filed an objection on behalf of

4    Mr. Winter on January 4th and later filed an amended

5    objection that set out additional information about Sullivan

6    & Cromwell's relationship with the Debtors available in the

7    public record that was not reflected in Sullivan &

8    Cromwell's disclosures.

9            The U.S. Trustee also filed an objection at that

10   time, pointing out that Sullivan & Cromwell's disclosures

11   were "wholly insufficient to evaluate whether Sullivan &

12   Cromwell satisfies the Bankruptcy Code's conflict-free and

13   disinterestedness standards."

14           As you've heard today, that has apparently been

15   resolved.  But that was the U.S. Trustee's opinion as well

16   as ours at the time of the filing of the original Dietderich

17   declaration.

18           On January 17th, less than 72 hours ago, Mr.

19   Dietderich submitted his supplemental declaration in support

20   of Sullivan & Cromwell's retention.  That declaration sets

21   out 34 pages of additional disclosures and exhibits relating

22   to Sullivan & Cromwell's connections with the Debtors.

23           Yesterday, less than 24 hours ago, Mr. Dietderich

24   submitted his second supplemental declaration, adding more

25   facts to the mix.  Finally, last night, Sullivan & Cromwell

1   submitted a revised proposed order changing the details of

2   its proposed retention in this case.

3           Your Honor, we submit that this chronology shows

4   gamesmanship.  As both my clients and the U.S. Trustee

5   recognized, Mr. Dietderich's original declaration was wholly

6   inadequate to satisfy Sullivan & Cromwell's disclosure

7   obligations.  There is no excuse for a firm with the

8   resources available to Sullivan & Cromwell to wait until

9   less than 72 hours before the hearing on its application to

10  make any substantive disclosures about its prepetition work

11  for the Debtors and crucial disclosures concerning its own

12  former partner's employment as one of the top legal officers

13  of the FTX Group.

14          Nevertheless, Your Honor, we were prepared to go

15  ahead with the hearing today and make our arguments based on

16  the facts available to us.  Then, yesterday afternoon around

17  two p.m., a bombshell was lobbed into the docket in the form

18  of the Friedberg declaration that you've heard about.

19          Mr. Friedberg, described in Mr. Dietderich's

20  supplemental declaration as, "The senior legal officer of

21  the FTX Group", submitted a 17-page declaration setting out

22  what he described as "additional information about potential

23  claims that the Debtors have against Sullivan & Cromwell,

24  false statements made by Sullivan & Cromwell, as well as

25  other misconduct."

1          To be clear, Your Honor, as we stated in our

2     emergency motion, we had absolutely nothing to do with this

3     declaration.  I confirm that my clients did not, either.

4     Although styled as being offered in support of the amended

5     objection we submitted, the declaration was prepared and

6     submitted without any solicitation or input from us

7     whatsoever.  We were as surprised by it as anyone else.

8          That said, the allegations in the Friedberg

9     declaration are as relevant as they are explosive.  The

10    declaration outlines several claims Mr. Friedberg believes

11    the bankruptcy estate has against Sullivan & Cromwell.  It

12    also outlines what the declaration characterizes as false

13    statements in the Dietderich declarations and inappropriate

14    conduct, alleged inappropriate conduct, by former Sullivan &

15    Cromwell partner and high-ranking FTX Group legal officer,

16    Ryne Miller.  Crucially, the Friedberg declaration also

17    avers that its author would testify competently to the facts

18    set out there if given the opportunity.

19          Your Honor, we don't purport to vouch for the

20    accuracy of any of the facts, allegations I should say, set

21    out in Mr. Friedberg's declaration.  Frankly, like everyone

22    else, we've hardly had time to process them.  But what's

23    clear is that the matters raised in the Friedberg

24    declaration are central to the question of whether Sullivan

25    & Cromwell meets the standard for retention under Section

1    327 and has made the appropriate disclosures under

2    Bankruptcy Rule 2014.  We believe it's in the best interest

3    of our clients and all stakeholders to have additional time

4    to arrange testimony, secure a deposition, and to otherwise

5    get to the bottom of this unexpected development.

6            To sum up on the emergency motion, I'll note that

7    as the Court is of course aware, the bankruptcy system

8    depends on the self-policing conduct of lawyers in making

9    robust, timely disclosures.  The failure to get this right

10   at the outset can result in a lot of pain down the road.  We

11   believe the chronology we've laid out is sufficient reason

12   for an adjournment and that there will be no prejudice to

13   any one by adjourning the hearing on Sullivan & Cromwell's

14   application for a brief period as the Court sees fit,

15   perhaps to the February 6th omnibus hearing only a few weeks

16   from now.  Surely Sullivan & Cromwell can continue its work

17   in the meantime and no harm will come to the estate.

18            With that, Your Honor, I conclude my argument on

19   the emergency motion.  I would be happy to take any

20   questions the Court has.

21            THE COURT:  No questions.  Mr. Bromley, any

22   response?

23            MR. BROMLEY:  Yes, Your Honor.  I take issue with

24   much of what Mr. Hoda says.

25            The exercise that Sullivan & Cromwell went through

1    in crafting the supplemental disclosure is exactly the

2    exercise that large firms who are debtors counsel go through

3    in every large case.  Right?  We sat down with the Office of

4    the U.S. Trustee for weeks going through information

5    requests supplementing the disclosure.

6            The disclosure issues that were raised by Mr. Hoda

7    in his objection were all addressed in the supplemental

8    disclosures from Mr. Dietderich.  We took Mr. Hoda's

9    objection into account, his original objection and his

10   amended objection.  And every single one of the issues that

11   he raised was addressed in the supplemental disclosure.

12           So from a disclosure perspective, the issues that

13   were raised by his clients have been fully addressed.  The

14   question though is, well, what is happening really with

15   respect to this random filing that is made by Mr. Friedberg?

16   Who is Mr. Friedberg and why is he making that?

17           Well, one of the issues that we're facing, Your

18   Honor, is that Sullivan & Cromwell is front and center in

19   connection with what has been going on with the FTX Chapter

20   11 proceedings.  And if you are part of the inner circle at

21   FTX -- and that would include Mr. Friedberg -- then you have

22   concern about the exercise that's going on.  On a daily

23   basis, Sullivan & Cromwell is cooperating with and providing

24   information to federal criminal authorities and regulatory

25   authorities.  The individuals who were at and running and

1    making the decisions that have brought this company to its

2    knees are rightly concerned that the information that is

3    being provided to authorities could lead back to their

4    doorstep.

5            So what we have here, Your Honor, is a gentleman

6    who ran this company into the ground, Mr. Bankman-Fried,

7    sitting in his parents' home in Palo Alto, California with

8    an ankle bracelet on.  Extradited from the Bahamas and

9    charged with multiple crimes by the Southern District of New

10   York U.S. Attorney's Office.

11           And when the U.S. Attorney for the Southern

12   District announced that indictment, what did he say?  One of

13   the greatest frauds in history is what he said.  He also

14   announced that two of the founders, Mr. Wang and Ms.

15   Ellison, had been indicted, pled guilty, and agreed to

16   cooperate.

17           So if you're Mr. Bankman-Fried, or frankly Mr.

18   Friedberg, there's a concern about what's going on and what

19   could happen to them.  They can't throw stones at the U.S.

20   Attorney's Office, but they can throw stones at Debtor's

21   counsel that's providing information to the prosecutors and

22   the regulators.  And that's exactly what's happening.

23           Mr. Hoda failed to note that he had sent me an

24   email saying that he planned to call Mr. Bankman-Fried here

25   as a testifying witness today.  We, the Debtors, and

1   Sullivan and Cromwell are fighting a ghost when we have

2   these accusations that are being made and no opportunity to

3   cross-examine Mr. Bankman-Fried.  Mr. Ray, who is here to

4   testify, gave an interview to the Wall Street Journal this

5   week.  Mr. Bankman-Fried is immediately online criticizing

6   what's been said.  We provided a fulsome presentation to the

7   Official Committee of Unsecured Creditors this week and for

8   disclosure purposes posted that on the Court's docket.  Mr.

9   Bankman-Fried takes it, marks it up, and posts it,

10  criticizing everything that we've done.

11          Mr. Bankman-Fried is behind all of this.  And

12  whenever we moved -- if we were to move this or ever moved,

13  there is in my mind an absolute certainty that he is going

14  to try to do something to get in the way.  He is lashing

15  out.

16          Now, as to Mr. Friedberg, I have to say he's got a

17  checkered past.  It takes a lot of guts for him to put

18  something in writing that says I was the chief compliance

19  officer at FTX.  But if you read the declaration, it's a

20  rambling declaration.  Mr. Friedberg is not here.  We would

21  oppose him testifying.  But this is simply an incendiary

22  device to be thrown into the process.

23          From our perspective, Your Honor, everything that

24  needs to be done in terms of disclosure has been done.

25          THE COURT:  Go ahead.

1             MR. BROMLEY:  And what we need to do now is to

2     proceed with the evidence that is ready to be presented.

3     And if Mr. Hoda has any cross-examination for Mr. Ray or Mr.

4     Dietderich, then we should do that.  But we shouldn't be

5     pushing this off anymore to invite other folks to be filing

6     things at the last moment and disrupting this exercise.

7     This is a court of law.  We should be following the rules.

8     Our application has been on file.  If anyone else wanted to

9     file an objection, they could do so.

10            There are two things that I would note, Your

11     Honor, in terms of numbers.  There are almost 9 million

12     creditors in this case.  Two have objected.  The Creditors'

13     Committee is on board.  The U.S. Trustee's Office is on

14     board after an extensive interaction with the Debtors.

15            I would also note, as my son said last night, he

16     sent me the statistics of the -- of Mr. Bankman-Fried's

17     Substack postings.  12 million views, 1,300 likes.  That's

18     like one person at Lincoln Field sitting in the top-right

19     corner saying go team and the entire rest of the stadium

20     being empty.

21            THE COURT:  All right.  I'm going to deny the

22     motion for a continuance.  The declaration was filed, but

23     Mr. Friedberg didn't file a motion.  He didn't even file a

24     joinder to a motion.  He just filed a declaration saying

25     that he was submitting a declaration in support of somebody

1    else's motion.  That's not an appropriate -- procedurally

2    it's not appropriate.

3            So -- and I've read the declaration, and frankly

4    it's full of hearsay, innuendo, speculation, rumors.  And

5    it's certainly not something I would allow to be introduced

6    into evidence in any event.  And so I will deny the motion

7    for a continuance and we'll go forward with the application.

8    All right?

9            MR. HODA:  Your Honor, if I can just make a note

10   from the record.  I think I would be remiss if I didn't --

11           THE COURT:  You can come up to the...

12           MR. HODA:  I apologize.  I think I would be remiss

13   if I did not note for the record that as Your Honor was

14   speaking just then, Mr. Friedberg appeared twice on the Zoom

15   screen here and waved his hand.  He is apparently in virtual

16   attendance at this meeting.  Again, I feel as though I

17   should apologize for the kind of circus aspect of his

18   showing up in this way.  Again, I am as surprised as anyone

19   by this development.  But I just feel that's a fact that I

20   should note for the record so that it's preserved.

21           THE COURT:  I understand.  I did see him, and I

22   did not recognize him intentionally because, as I said, he

23   has not filed a motion, he has not joined any motion.  He is

24   simply trying to be a witness, I suppose.  But witnesses are

25   not allowed unless they're here live.  So...

1           MR. HODA:  Understood, Your Honor.  As I said,

2    purely noting for the record, we are prepared to go ahead

3    with argument on the application and the objection.  And I

4    will take my seat once again.

5           THE COURT:  Thank you, Mr. Hoda.

6           MR. BROMLEY:  If I may just clarify for a moment.

7    Mr. Hoda, you said you're ready to proceed with argument.

8    Are you intending to cross-examine any witnesses?

9           MR. HODA:  Yes.  With the Court's permission, I

10   would ask to cross-examine Mr. Friedberg if he's here on

11   Zoom.

12          THE COURT:  No.  He can't testify if he's not here

13   in person.

14          MR. HODA:  With that clarification, we do not

15   intend to call any witnesses.  We'll be making arguments on

16   the declarations that are in the record and the arguments

17   that we've made in our objection.

18          THE COURT:  So you're not calling any witnesses

19   and not putting in any evidence.

20          MR. HODA:  No.

21          THE COURT:  All right.

22          MR. HODA:  Just making our arguments based on the

23   declarations.

24          THE COURT:  And so you're going to move the

25   introduction of the declarations.

1          MR. BROMLEY:  Yes, Your Honor.  I would like to

2    move the admission of Mr. Dietderich's original declaration,

3    his first supplemental declaration, and his second

4    supplemental declaration as well as the first declaration of

5    John J. Ray III and the supplemental declaration of John J.

6    Ray III.

7          THE COURT:  Is there any objection?

8          MR. HODA:  No objection, Your Honor.

9          THE COURT:  Those declarations are admitted

10   without objection.

11         MR. BROMLEY:  Thank you.  Your Honor, I will

12   proceed to argument then and reserve the right to respond to

13   Mr. Hoda's arguments as well.

14         Your Honor, these cases were filed 70 days ago.

15   The circumstances of the filing are well known at this

16   point.  Mr. Ray's declaration that was -- the so-called

17   first day declaration which was filed in connection with the

18   hearings that were held on November 22nd are -- is probably

19   the most quoted first day declaration I've ever seen in my

20   33 years of practice.  Indeed, Mr. Ray's first day

21   declaration included language which was quoted in the New

22   York Times top 25 quotes of 2022.

23         What we have here in the FTX situation is, as Mr.

24   Ray said in his supplemental declaration, a dumpster fire.

25   The founders of this company left the company abruptly in

1    early November in a state of chaos.  What has happened as a

2    result of that is that an army of advisors have had to come

3    in and bring order.  That army has been under the direction

4    on a daily basis by Mr. Ray.  As Mr. Ray has said in his

5    declaration, as he said in his testimony before Congress,

6    and as he said in his prepared remarks before Congress, Mr.

7    Ray is a very hands-on leader.  We are in meetings on a

8    regular basis.  Mr. Ray digs deep into the details and he

9    relies on his advisors.

10             The advisors that are leading that charge on the

11   legal front are Sullivan & Cromwell, supplemented by Quinn

12   Emanuel and the Landis Law Firm here in Delaware.  We've

13   recently been joined on the scene by Mr. Hansen and the Paul

14   Hastings firm.  And we have been doing an enormous amount of

15   work.

16             Among the work that we've been doing is to

17   recreate and frankly create from scratch the structure that

18   should have been there from the beginning.  The work that's

19   been done has yielded enormous results.  When we were here

20   on November 22nd, it was fair to say that Mr. Ray and the

21   advisors were still in the earliest stages of trying to

22   develop the information necessary to move these cases

23   forward.

24             Now that we are 70 days into the case, we are

25   much, much further along.  And as Mr. Ray says in his

1    declaration, that could not have been done were it not for

2    the efforts of all the advisors, but in particular Sullivan

3    & Cromwell as lead Debtor's counsel.

4         Mr. Ray makes very clear in his supplemental

5    declaration that any limitation or denial of retention with

6    respect to Sullivan & Cromwell would be extraordinarily

7    detrimental to the interests of creditors and stakeholders

8    in these cases.  And one of the things that we have done, as

9    I noted earlier, is led the interaction with the regulatory

10   and criminal authorities.

11        I've been doing this for a long time, Your Honor,

12   but I have not been involved in a situation where the debtor

13   itself has been treated as a crime scene.  We are inundated

14   on a regular basis by demands from multiple regulatory

15   authorities, federal and state, as well as criminal

16   authorities for all sorts of information on an expedited

17   basis.  The number of priority emails that we get from

18   regulatory and criminal authorities is phenomenal.

19        In close coordination with Mr. Ray, we have been

20   responding on an expedited basis to every one of those

21   requests.  And frankly, Your Honor, I think if it were not

22   for that type of prompt and immediate response, we would not

23   have seen the indictments and the plea agreements that we've

24   seen to date.  There's a lot more to do and the next stage

25   of the case is about to begin.  With us being joined by the

1    Creditors' Committee, we're ready to move on to that next

2    stage.  So I think that the justification for the

3    continuation of the status quo with respect to Sullivan &

4    Cromwell is manifest.  The real question comes down to the

5    legal standard, disinterestedness, and the holding of an

6    adverse interest.

7          The disclosure that we have filed in my experience

8    is the most fulsome disclosure that I have ever seen any

9    debtor's counsel make in any case.  We've gone down to

10   extraordinary levels of detail to matters that are simply of

11   a thousand dollars.  We have listed every one of them out.

12         The concerns that have been raised have said,

13   okay, one, Ryne Miller.  He was a partner of Sullivan &

14   Cromwell and he left the firm and took on a role as the

15   general counsel of FTX.com.  I mean, FTX US.  I'm sorry.

16   And that's West Real Shires is the corporate name.

17         Mr. Wilson was a former associate at Sullivan &

18   Cromwell.  He did not leave Sullivan & Cromwell to go to

19   FTX, he left to go to the Fenwick & West law firm.  Fenwick

20   & West is the law firm that served as general outside

21   counsel to FTX.  From Fenwick & West, he then left and went

22   to FT Ventures.

23         It is true that the firm has done work for certain

24   FTX entities prior to the petition date.  But that in and of

25   itself, as caselaw is clear, is not in and of itself

1    disqualifying.  Indeed, it's virtually unheard of for a

2    major law firm who can handle the type of matters that are

3    raised in a case of this complexity to not have a

4    preexisting relationship.

5          I have been debtor's counsel in multiple cases

6    over 30 years.  I have never been debtor's counsel in a

7    situation where my firm did not have a preexisting

8    relationship with the debtors.  So the mere fact that

9    Sullivan & Cromwell had done work is irrelevant.

10         The question is whether or not any of that work

11   goes to any of the issues that we're facing.  And if so, how

12   would it go to those issues.  Is there anything about the

13   work that we have done in the past or the relationships that

14   we have that would be disqualifying.  And the answer to that

15   is no.

16         As Mr. Dietderich makes clear in his declaration,

17   Sullivan & Cromwell has two types of clients.  Our system,

18   when you fill out a conflicts check when a client comes in,

19   is you have to decide whether or not is this a regular

20   client or is it a particular matters client.  Why is there

21   that distinction?

22         Well, a regular client is a client that we have a

23   longstanding and broad-based relationship with where we do

24   lots of different work for that client over a broad spectrum

25   of matters.  And in most circumstances, those clients have

1    been clients of the firm for years.  In many circumstances

2    for decades.  On the other hand, we have particular matters

3    clients.  A particular matters client is somebody who comes

4    in with a particular matter who asks for advice on a

5    specific matter.

6              Now, why is there that distinction?  Well, in our

7    intake system, a regular client doesn't have to go through

8    the same type of rigorous review that a particular matters

9    client comes in.  Because if we are dealing with one of

10   those major clients -- and even though we're a firm with a

11   long history, believe me, there's not all that many.  You

12   know that that big name client -- and I'm not going to

13   disclose them, but you can imagine who they might be -- we

14   know we don't have to focus as hard on that because it's a

15   big and existing client.

16             Particular matters are different.  And that's what

17   we -- they are folks who come in, they ask for assistance on

18   a particular matter.  It then goes to our intake committee

19   and the intake committee looks at that particular matter, we

20   look at everything that it might touch on and relate to, and

21   we make a decision with respect to that particular matter.

22   Every single matter that came in from FTX, any FTX entity,

23   was a particular matter.

24             Now, one of the things that Sullivan & Cromwell

25   excels in transactional work and regulatory work.  The

1    majority of the work that we did here for FTX fell into

2    those categories.

3              Now, it's also important to look at the timeline

4    of Sullivan & Cromwell's work with FTX.  FTX, as we've told

5    Your Honor, is not an entity that had a long history.  The

6    FTX world started in 2017 with the creation of Alameda, the

7    hedge fund.  Our work with FTX, any FTX entity, started in

8    the summer of 2021.  We had nothing to do with the

9    establishment of Alameda, we had nothing to do with any of

10   Alameda's operations.  We had one matter that Mr. Dietderich

11   was involved in with respect to the Voyager bankruptcy that

12   Alameda was involved in.  But we were not there when Alameda

13   was established, we were not general corporate counsel to

14   Alameda.  We didn't have that type of relationship with

15   Alameda.  We had a particular matters relationship.

16             FTX.com, the international exchange, well, that

17   entity is FTX Trading Limited.  It was established in 2019,

18   two years before Sullivan & Cromwell even came in contact

19   with FTX.

20             FTX US, established in 2019.  Again, two years

21   before Sullivan & Cromwell got involved with FTX.  We did

22   not have anything to do with the creation of these entities,

23   we didn't structure them, we didn't incorporate them.  We

24   didn't act as secretary on board meetings.  We were not

25   general outside counsel with respect to those entities.  We

1    never represented any of the FTX entities in a capital

2    raise.  We never represented them in issuing debt.  We

3    represented them in specific transactional situations, none

4    of which touch on any of the issues that have been raised to

5    date.

6            Now, to the extent that anything comes out that

7    there's a transaction that we may have been involved in

8    might have an issue that needs to be investigated, we of

9    course will not be involved in that.  The Quinn firm is

10   here, the Landis firm is here, and Paul Hastings is here.

11   This is the standard way that large firms deal with these

12   types of issues in cases of this magnitude.  It is not

13   surprising that creditors who are inexperienced with dealing

14   with large corporate bankruptcies might say is that the way

15   it really works.  But, Your Honor, we know that is the way

16   it works.

17           It was very clear to Mr. Ray when he decided, one,

18   to file these Chapter 11 cases, and two, to retain Sullivan

19   & Cromwell as 327(a) counsel that there would be a need for

20   conflicts counsel.  And so he immediately -- the first day

21   or two of his occupying the office of Chief Executive

22   Officer, he reached out to Quinn Emanuel, he interviewed

23   them, and he hired them.

24           Now, we all know the reputation of Quinn Emanuel.

25   This is not a firm that is a walk in the park.  Quinn

1     Emanuel is a well-known, high profile and successful law

2     firm.  It is not all that common, frankly, to have large

3     cases where there's a firm like Sullivan & Cromwell and a

4     firm next to it like Quinn Emanuel.  And Mr. Ray recognized

5     that this was a special case and that he needed to have that

6     type of support.

7              So when you're looking at the question of whether

8     or not there is -- we hold an interest adverse to the

9     estate, the disclosure makes clear that we do not.  There's

10    nothing in the record that indicates that Sullivan &

11    Cromwell holds an interest adverse to the estate, and all of

12    the disclosure demonstrates that we are a disinterested

13    person.

14             Another thing that is raised by the objectors as a

15    problem is the fact that Sullivan & Cromwell was paid for

16    its work before the petition date and that it therefore --

17    the payments therefore somehow constituted preferences that

18    are challengeable under the Pillowtex case.  But we make

19    clear in Mr. Dietderich's declaration every payment that was

20    received within the 90 days, the amount of the payment, and

21    the number of days that the bill remained outstanding.  We

22    reviewed all that with the Office of the United States

23    Trustee.  Your Honor, every one of those payments it's clear

24    was made in the ordinary course.  There was no antecedent

25    debt that was paid off just prior to the filing.  Because

1      that's what the Pillowtex case is about.

2            In that case, the Jones Day firm -- Your Honor, is

3      there a way to -- it's kind of distracting to have -- thank

4      you.  I appreciate that.

5            THE COURT:  You can turn your screen off too if --

6            MR. BROMLEY:  Oh, can I?  That's good.  That's

7      much better.  Thank you.  I was wondering if that was the

8      Jones Day firm.

9            But in the Pillowtex case, the circumstances were

10     all about an acceleration of payments on overdue bills that

11     were made where payments were made on the eve of bankruptcy.

12     That's not what happened here, as Mr. Dietderich's

13     declaration shows in detail every amount, the number of days

14     the amounts were outstanding or the bills were outstanding.

15     So there's no preference issue here, Your Honor.

16            From our perspective, the objections of Mr.

17     Winter and Mr. Brummond are resolved.  There are disclosure

18     questions.  Every one of those questions has been answered.

19     The main thing that they indicate was a lack of clarity with

20     respect to Mr. Miller and Mr. Wilson.  We have given

21     absolute clarity with respect to both of them.  A question

22     with respect to the preference amounts, or the amounts that

23     are payable within the -- that were paid within the

24     preference period.  We go through every single payment,

25     including the time the invoices were outstanding, making it

1    clear that none of them are preferences.  And then what was

2    the other one?

3              With respect to -- just generally with respect to

4    the matters, a lack of disclosure with respect to the

5    description of matters, Mr. Dietderich goes very carefully

6    through each of the matters and describes them.  Right?

7              So we feel that we have made an enormous amount of

8    disclosure, more than is generally done in these cases.  We

9    recognize that the exercise with the Office of the U.S.

10   Trustee took longer than we would have liked, but we think

11   it was a fulsome and successful exercise.

12             I've had few adversaries -- and I say this

13   respectfully -- as relentless as Ms. Sarkessian.  And I am

14   tired of having dealt with her.  You know?  And I say that

15   with the greatest amount of respect.  We feel that

16   everything that we have put in our disclosure now clearly

17   satisfies the Office of the U.S. Trustee.  And in my mind,

18   that is the highest standard.

19             So, Your Honor, our view is that we have satisfied

20   the disclosure requirements, that there's a clear and

21   convincing argument for the retention of Sullivan &

22   Cromwell, and we ask that the Court enter the order.

23             THE COURT:  Thank you, Mr. Bromley.  Anyone else

24   with to speak in support before we go to the objectors?

25             MR. HANSEN:  Good morning, Your Honor.  Chris

1    Hansen with Paul Hastings, proposed counsel to the Official

2    Committee.

3              Your Honor, we just briefly would say that the

4    Committee stands by the statement that it filed with respect

5    to the Sullivan & Cromwell retention application.  The

6    Committee is satisfied with the disclosures that they have

7    made.  We believe that an order should be entered today

8    approving their retention, and we believe that the failure

9    to do so would be extremely detrimental to these cases for

10   many reasons and absolutely not in the best interest of the

11   estates.

12             As we also said in our statement, Your Honor, the

13   Committee intends to do the job that it's authorized to do

14   under Section 1103(c)(2) of the Code, which is to

15   investigate all of the financial affairs of the Debtors,

16   including all of the fraudulent allegations.  And that also

17   includes the evaluation of all professionals who are

18   involved with the Debtors on a prepetition basis.  But that

19   investigation doesn't need to preclude the retention of

20   Sullivan & Cromwell here today.

21             As we noted in our statement, retention doesn't

22   grant a release.  It allows the cases to move forward with

23   the debtor's chosen counsel and it brings some credibility

24   and structure to the process, and that's what we believe is

25   necessary here.

1          Thank you, Your Honor.

2          THE COURT:  Thank you.  Anyone else?

3          Mr. Sarkessian, do you want to give one last shot

4    to Mr. Bromley?

5          MS. SARKESSIAN:  Your Honor, I will say I take

6    relentless as a compliment.

7          THE COURT:  Okay.  All right.  Let me hear from

8    the objectors.

9          MR. HODA:  Thank you, Your Honor.  Again, Marshal

10   Hoda here on behalf of the objectors, Mr. Warren Winter and

11   Mr. Richard Brummond.

12         Your Honor, our amended objection sets out four

13   reasons why Sullivan & Cromwell should not be approved under

14   Section 327 and Rule 2014.  I'll provide a brief statement

15   of those reasons here and point you to what we believe is

16   good authority on which those reasons are based.

17         For clarity, Your Honor, I will group our four

18   objections into two buckets.  The first is what I call the

19   investigative conflicts bucket.  These objections turn

20   ultimately on the nature of the FTX Groups preparation

21   activities and the effect that context has on the decision

22   to retain Sullivan & Cromwell in this matter.

23         The Debtor's CEO, John Ray III, Mr. John Ray III,

24   respectfully, confirmed in his congressional testimony and

25   in his supplemental declaration that the FTX Group was

1    engaged in "old fashioned embezzlement, just taking money

2    from customers and using it for your own purposes."  This

3    included massive misappropriation of customer funds that

4    were used for improper purposes, including what Mr. Ray

5    described as a $5 billion "spending binge" that FTX Group

6    went on in 2021 and 2022.

7            Given these facts of course, every prepetition

8    transaction must be investigated and every potential estate

9    claim considered.  This includes the actions of the Debtor's

10   current and former executives and the third-party

11   professionals and firms who advised them as the spending

12   spree played itself out.

13           We know from Sullivan & Cromwell's own disclosures

14   that the firm advised the FTX Group in several of the large

15   transactions it made during the spending binge.  We also

16   know that two former Sullivan & Cromwell lawyers were

17   amongst the FTX Groups top ranking legal officers.  Finally,

18   we know that a number of current and former Sullivan &

19   Cromwell clients were amongst the FTX Group's business

20   partners.

21           With this background in mind, the thrust of the

22   investigative objections comes into view.  Sullivan &

23   Cromwell has extensive, actual, and potential conflicts

24   created by the necessity of investigating its own role in

25   the FTX Group's prepetition activities, the activities of

1    former Sullivan & Cromwell lawyers at the top of the FTX

2    Group's internal legal structure, and the activities of

3    various of Sullivan & Cromwell's own current and former

4    clients.

5            I'll just briefly point out some of the

6    authorities we cite on these points, Your Honor.  In

7    particular, the Bohac case and the Git-N-Go case.

8            In Bohac, a Second Circuit decision, the question

9    was whether a lawyer who was "close personal friends and

10   business associates" with the board chairman of the bankrupt

11   entity could serve as counsel when there were questions

12   about the chairman's liability for prepetition participation

13   and fraudulent transactions.

14           The Court held that he could not because "an

15   attorney who has been closely related by professional,

16   business, and personal ties to those whose conduct may now

17   be suspect is evidently in no position to make any objective

18   appraisal of the nature and extent of their involvement."

19           Similarly, in Git-N-Go, the question was whether a

20   law firm that had advised the debtor in various prepetition

21   corporate transactions that had come under suspicion could

22   be appointed as bankruptcy counsel under Section 327.  The

23   court denied the firm's application, writing that having

24   counseled some of the parties in the very transactions that

25   "deserved examination", the firm could not "provide the

1    objective and independent advice regarding the validity or

2    propriety of these transactions as is required for the

3    Debtor's performance of its fiduciary obligations."

4            Your Honor, we believe these cases dictate the

5    result here just as the firms seeking to be retained in

6    Bohac and Git-N-Go were found to be unable to objectively

7    investigate and advise about transactions in which they had

8    personally participated or about the actions of persons with

9    whom they had deep personal and professional ties, Sullivan

10   & Cromwell will not be able to objectively advise the

11   Debtors as to the issues raised by the FTX Group's spending

12   binge and the conduct of former Sullivan & Cromwell lawyers.

13           Next, Your Honor, I'll turn to the other bucket,

14   which is the preference claim.

15           Mr. Dietderich's original declaration revealed a

16   pattern of payments by the FTX Group to Sullivan & Cromwell

17   that showed a marked jump on November 3rd of 2022 just after

18   the FTX crisis began and shortly before the FTX Group

19   declared bankruptcy.

20           In light of the additional disclosures that were

21   offered in the supplemental declaration, some of those

22   concerns have been ameliorated.  We would note that we did

23   not have the benefit of those supplemental disclosures at

24   the time the objection deadline passed.

25           Nevertheless, Mr. Dietderich's supplemental

1      declaration continues to show inconsistencies that we

2      believe require a ruling on the preference issue.  It notes,

3      for instance, Sullivan & Cromwell received a $4 million

4      retainer from the FTX Group on November 9th, more than $2.4

5      million of which was used to pay down unspecified

6      prepetition invoices.

7                   Finally, in the Friedberg declaration for which we

8      have made an offer of proof today, or at least an offer to

9      investigate further, allegations were made that these

10     payments were improperly taken from Sullivan entities in

11     what can only be described as unusual circumstances.

12                  Your Honor, briefly on this point, the cases make

13     clear that the court takes all facts and circumstances into

14     account when considering whether a payment in the preference

15     period was made in the ordinary course of business.  Courts

16     consider factors such as the timing of the payment and

17     whether it constituted a deviation from the pattern of prior

18     payments where there was an ongoing relationship.  The First

19     Jersey Securities case, with which the Court will certainly

20     be familiar, is an archetypical example.

21                  It is also the case under Pillowtex that the

22     preference analysis must be carried out before retention of

23     a firm under Section 327.  Accordingly, we request that the

24     Court issue a ruling on the preference issue as part of its

25     consideration of Sullivan & Cromwell's application.

1          That is the sum and substance of our arguments.  I

2     will leave the Court with one last point before closing.

3          In its reply and in counsel's argument today and

4     various arguments that have been offered in Mr. Ray's

5     declaration and supplemental declaration in support of the

6     retention of Sullivan & Cromwell, many have pointed to the

7     practical benefits of retaining Sullivan & Cromwell because

8     of its existing familiarity with the business and the work

9     that it has already done.

10          With due respect to the work that has been done

11     and due respect to those who have done it, I would point out

12     that the Third Circuit has expressly rejected such arguments

13     are relevant under Section 327.  The important case here is

14     Price Waterhouse.  There, the debtor sought to retain Price

15     Waterhouse as their accountant and financial advisor.  They

16     selected the firm precisely because it had provided them

17     with prepetition services and thus developed expertise

18     regarding their financial affairs and needs.  At the same

19     time, the debtors and Price Waterhouse acknowledged that the

20     firm was a creditor of the Debtors and thus prima facie

21     ineligible for appointment under Section 327.

22          Writing for the Third Circuit, then Judge Alito

23     noted that the debtors had "stressed the practical benefits"

24     of employing Price Waterhouse, but rejected that argument as

25     inconsistent with the plain language of Section 327, which

1    of course as Your Honor knows requires disinterestedness in

2    all cases.  The court held that all professionals must meet

3    the disinterestedness standard and noted "bankruptcy courts

4    cannot use equitable principles to disregard unambiguous

5    statutory language."

6           We would also note, practically speaking, that

7    with due respect to the work that has been done, given the

8    availability of other large firms, it is not impossible to

9    conceive that Sullivan & Cromwell would be replaced as

10   counsel in this case.  I was told once that when you find

11   yourself in a hole, stop digging.  And perhaps that is what

12   should be done here.

13          Finally, we would note that in response to many of

14   the objections we have raised, Sullivan & Cromwell has noted

15   that it will use conflicts counsel to investigate certain

16   matters in which the firm itself may have been involved or

17   former partners of the firm may have been involved or in

18   which current and former clients of Sullivan & Cromwell may

19   have been involved.

20          I would note, Your Honor, that that limitation

21   appears nowhere in the proposed order, as it was originally

22   submitted or as it was resubmitted last night and that those

23   representations were only made after our objection

24   essentially forced the firm to go on the record about these

25   matters.

1          So we would urge the Court for all those reasons

2   to reject Sullivan & Cromwell's application.  And in the

3   event that the Court does approve the application, we would

4   urge the Court to add language making explicit that in those

5   certain categories that there should be carveouts in which

6   Sullivan & Cromwell will not be involved in investigation.

7          And with that, Your Honor, I would conclude my

8   argument and would be happy to take any questions.

9          THE COURT:  No questions.  Thank you.  Mr.

10  Bromley, any response?

11         MR. BROMLEY:  Your Honor, I just have a couple of

12  minor points in response.

13         With all due respect to Mr. Hoda, it's clear that

14  he has not practiced in bankruptcy court and understands the

15  way things work here.  We have from the very beginning of

16  this case had, from the very moment that Quinn Emanuel was

17  hired, made it clear that they are available to do matters

18  that Sullivan & Cromwell, for one reason or another, might

19  not be able to do.  And to the extent that Sullivan &

20  Cromwell, Quinn Emanuel, and the Landis firm are unable do

21  it and Paul Hastings is unable to do it, there are other

22  firms that would be available to Mr. Ray to do it.  So the

23  mere fact -- and I know we'd like to take credit for the

24  concept of conflicts counsel in bankruptcy cases, but that's

25  been something that's been going on for decades.

1          With respect to the two cases that he cited, Bohac

2     and Git-N-Go, first of all, they are so fundamentally

3     different that it bears repeating or noting.  First of all,

4     they're not Third Circuit controlling precedent.  But the

5     Git-N-Go case, which is a bankruptcy court Northern District

6     of Oklahoma case from 2004, basically what the Court noted

7     was that the debtor's relationship with a client of the

8     proposed debtor's counsel permeates every -- almost every

9     aspect of the case.  Issues of characterization of debt,

10    inequity, of allocation of resources, of the validity and

11    sufficiency of consideration, and the court goes on.  This

12    is a small case with a small firm that had an

13    extraordinarily large client that was a counterparty to the

14    debtor.  That is not the situation that is faced here.

15          The Bohac case is an interesting one as well,

16    because facts make the law.  Right, Your Honor?  And this --

17    well, being a Second Circuit case from 1979, it notes that

18    among other connections, that the partner in the law firm

19    and the individual who control the debtor are the only

20    remaining officers of the debtor.  Even the law firm

21    conceded that the personal ties with the individual who

22    controlled the debtor and the financial stake in the company

23    are unusual.

24          This is not a situation where anyone from Sullivan

25    & Cromwell is on the board of directors or controls this

1   company or had any role in that way, shape, or form.  So

2   with all due respect, Your Honor, we believe the Bohac and

3   Git-N-Go cases are inapposite in this situation.

4          We believe, Your Honor, that we have satisfied all

5   of the requirements of Section 327(a), disinterestedness, of

6   being a disinterested person and not holding an interest

7   adverse to the Debtors.  We believe that the extensive work

8   that we did with the U.S. Trustee's Office to cure problems

9   that they had with respect to the disclosure is an obvious

10  indication that that work has been done and been done

11  successfully.

12          So, Your Honor, we ask that the Court enter an

13  order approving the retention of Sullivan & Cromwell.

14          THE COURT:  Thank you.  All right.  I'm going to

15  take a short recess.  I'll come back and I'll give you my

16  ruling.  Let's take a 30-minute recess.

17          (Recess)

18          CLERK:  All rise.

19          THE COURT:  Thank you.  Please be seated.  All

20  right.

21          Well, the issue before me is the motion to retain

22  Sullivan & Cromwell as counsel for the Debtors in these

23  cases.  Section 327(a) provides that the debtor may retain

24  professionals that do not hold or represent an interest

25  adverse to the estate and that are disinterested persons.

1              Mr. Winter and Mr. Brummond have objected to the

2      retention of Sullivan & Cromwell as counsel to the Debtors

3      based on several issues.  For the reasons I will discuss in

4      a moment, I am going to overrule those objections and

5      approve the retention.

6              First, the objectors argue that because Sullivan &

7      Cromwell represented Debtors prepetition, there is a

8      potential conflict of interest with any of the matters with

9      which Sullivan & Cromwell was involved that might require an

10     investigation.  Of course 1107(b) of the Code tells us that

11     just because a professional is sought to be retained who may

12     have done work for the Debtor prepetition is not

13     automatically disqualifying.

14             In addition, they argue that because two former

15     Sullivan & Cromwell attorneys worked for the Debtors

16     prepetition and because clients of Sullivan & Cromwell may

17     be creditors of the Debtors in these cases that they have a

18     conflict of interest and cannot be retained.

19             As a preliminary matter, there is nothing in the

20     record before me to indicate that any investigation would be

21     required of those transactions with which Sullivan &

22     Cromwell might have been involved.  Moreover, even if they

23     were, Debtors have retained conflict counsel to conduct any

24     investigation that might touch on those issues.

25             There is no evidence of any actual conflict here.

1     To the extent there may be a potential conflict requiring an

2     investigation, for example, of one of the transactions that

3     were involved or an investigation of the attorneys who were

4     former Sullivan & Cromwell attorneys, those are ameliorated

5     -- those are only potential conflicts.  And the Third

6     Circuit has said that a potential conflict is not per se

7     disqualifying.  That's In re Boy Scouts of America, 35 F.4th

8     149, 157 (2022).

9           Here, any potential conflicts are ameliorated by

10    the fact that there is conflicts counsel in place.  And

11    that's something that happens in every large bankruptcy

12    case.  It would be almost impossible to find a case of this

13    size, or even -- this is what we call a super-mega case,

14    even in a mega case even find -- or a large case, it would

15    be difficult to find debtor's counsel that didn't have other

16    clients who might be clients of the debtor's counsel.  But

17    that's why we have conflicts counsel.  It happens all the

18    time.  Not something that is disqualifying.

19          The objectors point me to the Bohac and the Git-N-

20    Go cases to show that where there is a significant

21    relationship with persons involved -- and in this case it

22    would be the two counsel who previously worked for S&C --

23    that there is a disqualifying conflict.  Those cases are

24    significantly different than this case.  Small firms, big

25    cases where it represents a huge amount of their case, for

1    example.  Or, excuse me, a huge amount of their income, for

2    example.

3           And this case is significantly different because

4    here I have Mr. Ray and four independent directors appointed

5    by Mr. Ray who are all consummate professionals, who were

6    not involved in the company's collapse, who did -- and

7    there's no evidence that Mr. Miller or Mr. Wilson are

8    involved in the management of the Debtors at this time.

9    There is simply nothing in the record that would lead me to

10   believe that Mr. Ray and the independent directors would not

11   -- and by the way, they are the ones running the Debtors

12   here, not Sullivan & Cromwell.  Mr. Ray is the one who runs

13   the Debtors.  He makes the decisions with his board.

14           So I have no concerns about any potential

15   conflicts of interest that would require me to disqualify

16   Sullivan & Cromwell in this case.

17           The second basis for the objector's request that I

18   deny the retention is the potential for a preference.  And

19   they point to a $4 million retainer, a portion of which was

20   used to pay prepetition invoices that was given to Sullivan

21   & Cromwell prior to the filing of the bankruptcy.  And the

22   objectors argue this creates a Pillowtex issue showing that

23   Sullivan & Cromwell holds an interest adverse to the

24   Debtors.

25           Mr. Dietderich's testimony, through his

1    declaration, which was unchallenged, clearly shows that

2    based upon the payment history between the Debtors and

3    Sullivan & Cromwell, the payments were made -- the payments

4    made within the 90-day preference period constitute ordinary

5    course payments and therefore would not constitute

6    preferences that would be recoverable by the debtors in

7    these cases.

8            With that, as I said, I'm going to overrule the

9    objection and I will enter the order appointing -- excuse

10   me, approving the retention of Sullivan & Cromwell.

11           Are there any questions?

12           MR. BROMLEY:  None from the Debtors, Your Honor.

13           MR. HODA:  Thank you for hearing us here today,

14   Your Honor.

15           THE COURT:  Thank you.  All right.  Anything else

16   today before we adjourn?  I thought I was going to get out

17   of here.

18           MR. GLUECKSTEIN:  Good morning, Your Honor.  We

19   can, but I think very briefly for --

20           THE COURT:  Oh, we have the status conference.

21           MR. GLUECKSTEIN:  Brian Glueckstein, Sullivan &

22   Cromwell, for the Debtors.  The only other item on the

23   agenda, Your Honor, is just the status conference that the

24   Court requested I think just more by way of an update after

25   the second day hearing last week with respect to the

1    redaction and creditor matrix related issues that were

2    addressed at that hearing.  The Court, and we thank the

3    Court, did enter an order this morning approving that motion

4    on a final basis including the three month authorization to

5    redact information with respect to all customers of the FTX

6    debtors.

7            I did want to just address very briefly there were

8    I believe three questions that Your Honor had asked about

9    that we provided an update on today, the first of which was

10   whether confirmation whether the Debtors in providing their

11   creditor matrix and related filings with the court can

12   distinguish between customers and other creditors.

13           The answer to that, Your Honor, is yes.  Our top

14   50 creditor list that's on file had done that with respect

15   to non-customer creditors.  We did file an amended creditor

16   top 50 list last evening for the dot-com silo that

17   unredacted as we discussed at the hearing last week, the

18   publicly-disclosed information about the members of the

19   Official Committee of Unsecured Creditors in addition to any

20   information about the non-customer, non-individual creditors

21   on that list.

22           But let me address very briefly the creditor

23   matrix.  And I know that the Office of the U.S. Trustee is

24   an issue that they are focused on as well.  I think that's

25   where this distinction and the redaction issues is most

1    relevant, at least immediately.

2         Your Honor, the Debtors have now assembled a full

3    creditor matrix that has more than $9.7 million potential

4    creditors on it, including customers.  There are still some

5    potential names being identified.  We do expect, Your Honor,

6    to file, in accordance with the Court's order, a redacted

7    version of the creditor matrix very early next week.  We're

8    targeting Monday now that we have that information.

9         There are a relatively small number of non-

10   customer creditors across the debtor silos, approximately

11   7,000 or so.  So the number we're talking about here, it's a

12   very small percentage that are non-customers.  But there are

13   some such creditors of course where vendors, employees,

14   contract counterparties, loan counterparties, and other

15   creditors who are not customers.

16        Even with in that 7,000, however, there is some

17   significant overlap between what we're calling our customer

18   list and creditors who have relationships with the Debtors

19   in other capacities, including vendors -- I'm sorry,

20   employees, contract counterparties who are also customers of

21   the Debtors.  So anybody who is a customer at all is being

22   redacted.  And obviously the terms that are set forth in the

23   order will be complied with.

24        Your Honor, one thing I do want to note with

25   respect to the creditor matrix -- and I know this is

1    important and this is a practical issue -- the debtors are

2    going to file or are intending to file, as is set forth in

3    the order or are required to file unredacted versions under

4    seal of documents where reactions have been made and to

5    provide those unredacted copies to the Office of the United

6    States Trustee, the Committee, and others as provided for in

7    the order.  And we are going to do that.

8              The issue with respect to the creditor matrix,

9    however, Your Honor, is a practical one that I want to just

10   put on the record.

11             The 9.5-plus million entries on the creditor

12   matrix makes it pretty close to impossible.  I am informed

13   by the technical experts that the full matrix, if we were to

14   put it in kind of a PDF document form would be something

15   like 150,000 pages and would need to be filed as many dozens

16   of separate files due to size limitations and things like

17   that to file it under seal with the Court.

18             As a result, what we are able to do is to provide

19   the matrix in links to about 18 to 20 maxed out Excel files

20   containing about 500,000 rows each to the U.S. Trustee and

21   to the Court so that they can be accessible.  And those

22   files will be hosted by Kroll, our claims agent.  So we will

23   be able to access the full creditor matrix.  But I think as

24   a practical matter, it's not really possible to put the

25   entirety of that nine million names under seal on the docket

1    per se.  But we will be able to make it available to the

2    Court by just linking on the files.  All the other documents

3    that we are redacting names from, customer names from,

4    certainly we will file full unredacted copies under seal.

5                    THE COURT:  Okay.

6                    MR. GLUECKSTEIN:  The second question the Court

7    asked and we just briefly addressed was just to confirm

8    whether full identifying information for the non-individual,

9    non-GDPR, non-customer creditors.  So for the institutions

10   who are not customers, will that information be unredacted

11   and fully provided as required by the bankruptcy rules.  And

12   the answer to that is yes.  As I stated, we will do that

13   with respect to the creditor matrix and on the filings and

14   are in the process of doing that.

15                   The third issue, Your Honor, that you raise that

16   came up in the discussion at the end of the hearing on this

17   motion last week was what the Debtors are able to do in

18   terms of identifying non-customer creditors who need to be

19   redacted under the current order, under the portion of that

20   order permitting redactions to comply with the GDPR.  And on

21   that, Your Honor, I can report that the Debtors do have some

22   ability to identify those non-customer individual creditors

23   who are protected by the GDPR from their books and records,

24   but certainly not all.  For a number of the non-customer

25   individual creditors, the Debtors do not have physical

1    addresses on file that would allow us to identify whether

2    the people are located in one jurisdiction versus another.

3    And what we're intending to do, Your Honor, is to address

4    this in two ways.  Identifying from a combination of the

5    Debtors books and records where we can those individual non-

6    customers that under the current order need to have their

7    names redacted, and we are also intending to give notice to

8    the affected non-customer individual creditors -- it's only

9    about 2,000 people which, you know, it's not insignificant,

10   but compared to the nine-and-a-half million at this time

11   since we're redacting in full all of the customers -- notice

12   and an opportunity to contact the Debtors to provide

13   information to us to effectively self-verify that they are

14   protected by the GDPR and should be redacted.  We expect

15   that process to only take a short period of time, at which

16   point anybody who is not identified and otherwise covered by

17   the order would be unredacted from filings going forward.

18          Lastly, Your Honor, I just want to address briefly

19   there was -- I mentioned that we filed the revised top 50

20   list with respect to the committee members last evening.  We

21   are also evaluating the docket as to any other customers who

22   have appeared in this case who have self-identified as such,

23   to redact those names from redacted filings going forward.

24          There was a letter that was submitted to the Court

25   by counsel for the media objectors on January 18th

1    suggesting, as I read it, that the debtors go much further

2    than that and somehow looked to social media and twitter and

3    third-party websites for statements that would identify

4    customers publicly.  We submit, Your Honor, that that would

5    be impractical and not appropriate.  We think that the way

6    to proceed on this, as we said, if people are free to self-

7    identify, if customers identify themselves or appear in this

8    case, identify themselves as customers, there would be no

9    need obviously for us to redact them any longer.  But we

10   don't think it would be appropriate to have us go out into

11   sources other than this Court's docket to identify those

12   customers and un-redact them.

13            So those were the points I had to address, Your

14   Honor, in response to the questions that the Court raised at

15   the hearing last week.  Happy to answer any questions.

16            THE COURT:  Thank you.  No questions at this time.

17   Let me hear from Ms. Sarkessian.  Anything from the U.S.

18   Trustee?

19            Then I'm going to turn to -- I received a letter

20   from Mr. Finger, who represents the media parties who had a

21   conflict with another hearing downstate today, and he asked

22   to participate by video conference.  And since he's only

23   participating in the status conference portion of this,

24   which according to my chambers procedures can be done

25   virtually, I gave him permission to appear virtually.  So I

1   just want to make sure that everyone understands why I'm

2   doing that.

3           MS. SARKESSIAN:  Yes, Your Honor.  Juliet

4   Sarkessian for the U.S. Trustee.

5           I guess the only question I would -- I appreciate

6   the explanation Debtor's counsel has provided on these

7   issues.  The only question I would have is what they are

8   proposing with respect to the links for the Court.  I don't

9   know if that's satisfactory to the Court or the clerk's

10  office.  But as far as being provided to the U.S. Trustee, I

11  mean, I'm willing to try.  And hopefully that will work.

12  But I don't know if that's -- in terms of what the court

13  record is, whether -- or the creditor matrix whether having

14  those links are sufficient or whether something more is

15  needed or different is needed.

16          THE COURT:  Yeah.  I might need to discuss that

17  with the Clerk's office to see the best way to handle that.

18  150,000 page PDF is a bit too much I think.  But I'll check

19  with the clerk and see what recommendation they can make

20  about how to deal with that.

21          MS. SARKESSIAN:  Thank you, Your Honor.

22          THE COURT:  I appreciate you pointing that out.

23          Mr. Finger, are you on the line?  Not on the line.

24  Okay.

25          On the issue Mr. Glueckstein raised about the

1    requirement for the Debtor to go out and scour social media

2    to see whether or not some customer has self-identified, I

3    think that is a bridge too far.  I don't think you need to

4    undertake that as a part of your obligation to disclose

5    these names.  If someone self-identifies on the record by

6    filing something on the docket, that's obviously a different

7    story.  But I'm not going to make you scour through millions

8    of tweets and whatever else is out there to see if you can

9    find people who self-identified as a customer of FTX.

10                  MR. GLUECKSTEIN:  Thank you, Your Honor.

11    Appreciate that clarification.  And with respect to the

12    creditor matrix, we're happy to speak with the clerk's

13    office and make sure they understand what we're proposing

14    and that it works for the Court.  And if there are other

15    solutions, we're happy to do them.  But it's simply just a

16    practical issue given the volume here we're talking about of

17    what's effectively 9.7 million rows that, you know, can't be

18    just exported to a PDF.

19                  THE COURT:  I understand.

20                  MR. GLUECKSTEIN:  Thank you, Your Honor.

21                  THE COURT:  Okay, thank you.  Anything else before

22    we adjourn?

23                  MR. LANDIS:  Your Honor, for the record, Adam

24    Landis from Landis Rath & Cobb.  We have uploaded to

25    chambers the form or order for the Sullivan & Cromwell

1    retention in the form that's acceptable to the parties.

2              THE COURT:  All right.  We'll get that entered

3    right away.

4              All right, thank you all very much.  We are

5    adjourned.

6              (Whereupon these proceedings were concluded at

7    12:10 PM)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              I N D E X

2

3                             RULINGS

4                                        Page      Line

5    Motion for Continuance, DENIED       24        21

6    Retention, GRANTED                   49        5

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           C E R T I F I C A T I O N

2

3       I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6

7

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  April 24, 2023