**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |
| | **Ref. No. 233, 487, 1341 & 1342** |

**DECLARATION OF BRUCE MENDELSOHN IN SUPPORT OF ENTRY OF THE ORDER (I) APPROVING THE LEDGERX BUSINESS PURCHASE AGREEMENT, (II) APPROVING THE SALE OF THE LEDGERX BUSINESS FREE AND CLEAR OF ALL LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES, (III) AUTHORIZING ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND (IV) GRANTING RELATED RELIEF**

I, Bruce Mendelsohn, hereby declare as follows:

1. I am a Partner in the Advisory Group at Perella Weinberg Partners L.P. ("PWP"), a financial advisory firm that maintains an office at 767 5th Avenue, New York, New York 10153, and the Debtors' investment banker. PWP is a full-service investment banking firm providing strategic and financial advisory services, including with respect to mergers and acquisitions, capital raising and restructuring transactions across a broad range of industries. PWP and its professionals have extensive experience with respect to the reorganization and restructuring of distressed companies, both out of court and in Chapter 11 proceedings.

2. I have been employed as a Partner of PWP since January 2016. I received a Bachelor of Arts degree in 1984 from Emory University and a Master of Business Administration in 1989 from the Wharton School at the University of Pennsylvania.

---

[1] The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and 4063 respectively. Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.

3. Prior to joining Perella Weinberg Partners, I was a Partner at Goldman Sachs where I worked from May 1998 to June 2015 and most recently served as Head of the Americas Restructuring Group and part of the U.S. Leveraged Finance team. I was named a Partner at Goldman Sachs in 2010. From 2006 to 2008, I served as Chief Underwriting Officer for North America, where I was a member of Goldman Sachs' Firmwide Capital Committee and its Special Situations Specialty Lending Investment Committee. I served as Global Head of the Special Assets and Bank Debt Portfolio groups from 2000 to 2008, and started at Goldman Sachs in the Securities Division where I spent two years working on the distressed bond and bank loan proprietary trading desks. Prior to Goldman Sachs, I worked for UBS and MJ Whitman in restructuring and distressed securities, and began my career in finance at Lehman Brothers.

4. In addition to working with the Debtors in the above-captioned cases (the "Chapter 11 Cases"), my experience includes representing companies, boards, creditors, and other stakeholders in a variety of situations across a broad range of industries, including the chapter 11 cases of: American Tire Distributors, Bonanza Creek, Breitburn Energy, Bristow Group, California Resources Corporation, Chesapeake Energy, Cineworld Group, Crossmark Holdings, Eco-Bat Technologies, Fieldwood Energy, Garrett Motion, iHeart Communications, LATAM Airlines, Memorial Production Partners, Pacific Drilling, Sanchez Energy Corporation, Seadrill, Sears, Video Equipment Rental Corporation, Windstream, and 21st Century Oncology, among others. In addition, while at Goldman Sachs, I was involved in the following bankruptcy cases: Bridge Information Systems, Brothers Gourmet Coffees, Calpine, CRC Communications, Focal Communications, General Growth Properties, Lehman Brothers, Network Plus, Nextel International, Orchard Supply, Qwest Communications and 360 Networks.

5. I submit this declaration (this "Declaration") in support of the *Motion of Debtors for Entry of Orders (I)(A) Approving Bid Procedures, Stalking Horse Protections and the Form and Manner of Notices for the Sale of Certain Businesses, (B) Approving Assumption and Assignment Procedures and (C) Scheduling Auction(s) and Sale Hearing(s) and (II)(A) Approving the Sale(s) Free and Clear of Liens, Claims, Interests and Encumbrances and (B) Authorizing Assumption and Assignment of Executory Contracts and Unexpired Leases* [D.I. 233] (the "Motion")[2] and entry of an order, a proposed form of which is attached as Exhibit B to the *Notice of (I) Successful Bidder for the LedgerX Business and (II) Filing of the LedgerX Business Purchase Agreement* filed at D.I. 1342, (a) approving Debtor Ledger Holdings Inc.'s ("Seller") entry into, and performance under, (i) the Interest Purchase Agreement, dated as of April 25, 2023 (the "Purchase Agreement"), by and among Seller, M 7 Holdings, LLC, a Delaware limited liability company ("Buyer") and, solely for purposes set forth therein, Miami International Holdings, Inc., a Delaware corporation, whereby Seller agreed, among other things, to sell 100% of the membership interests of non-Debtor LedgerX LLC ("LedgerX") (such equity interests, the "LedgerX Interests") to Buyer, to assume and assign to Buyer the contracts on Section 1.6(a) of the Seller Disclosure Schedule (as defined in the Purchase Agreement) (the "Assumed Contracts"), to assign to LedgerX the contracts listed on Section 1.6(j) of the Seller Disclosure Schedule (the "Non-Executory Assigned Contracts" and, together with the Assumed Contracts, the "Assigned Contracts") and to sell the claims set forth in Section 5.3(a) of the Purchase Agreement (the "Acquired Claims") and the claims set forth in Section 5.3(b) of the Purchase Agreement (the "Coverage Claims" and, together with the LedgerX Interests, the

---

2 Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Motion.

Assigned Contracts and the Acquired Claims, the "LedgerX Business") on the terms and subject to the conditions set forth in the Purchase Agreement (the "Sale Transaction") and (ii) the Sale Transaction and (b) granting related relief.

6. Except as otherwise indicated, all facts set forth in this Declaration are based upon: (i) my personal knowledge, information and belief, or my opinion based upon experience, knowledge and information concerning FTX Trading Ltd. and its affiliated debtors and debtors-in-possession (collectively, the "Debtors"); (ii) information learned from my review of relevant documents; and/or (iii) information supplied by members of the Debtors' management, employees of PWP working directly with me or under my supervision, direction or control, and/or from the Debtors' other professionals and advisors.

7. I am over the age of 18 and authorized to submit this Declaration on behalf of the Debtors. I am not being compensated for this testimony other than through payments to be received by PWP as a professional the Debtors have retained; none of those payments are specifically payable on account of this testimony. If I were called upon to testify, I could and would testify competently to the facts set forth in this Declaration.

**A. A Sound Business Justification Exists for the Sale Transaction.**

8. I believe that Seller's entry into the Purchase Agreement represents a sound exercise of the Debtors' business judgment and is in the best interests of the Debtors, their estates, creditors and other parties-in-interest.

**B. The Sale Transaction Will Produce the Highest and Best Offer.**

9. Based on my experience, I believe the Debtors have thoroughly and fairly marketed the LedgerX Business and conducted the related sale process in good faith pursuant to the Bid Procedures and this Court's order approving the Bid Procedures and granting certain related relief [D.I. 487] (the "Bid Procedures Order").

10. PWP was engaged by the Debtors effective November 16, 2022 to provide financial advisory, restructuring, financing and sale services to the Debtors during these Chapter 11 Cases. PWP has assisted the Debtors in their exploration and evaluation of strategic alternatives to maximize the value of, and monetize, their diverse, global assets. This has included a review of documents regarding the Debtors' businesses and investments, discussions with management of the Debtors and their affiliates, discussions with businesses in which the Debtors have made investments, and coordination and initiation of discussions with potential purchasers.

11. Following a strategic review, the Debtors decided, in their business judgment, to pursue a broad marketing process for the LedgerX Business in consideration of, among other things, the following: the potential value of the LedgerX Business; uncertainty as to whether the potential value of the LedgerX Business could be preserved for the duration of these Chapter 11 Cases given the resources required to operate and grow the LedgerX Business in accordance with LedgerX's business plan and regulatory requirements; the related inability of the Debtors to access operating cash and restricted cash of the LedgerX Business absent a sale; the relative independence of the LedgerX Business from the rest of the Debtors' operations, holdings and investments; and significant interest from potential acquirers, including unsolicited inbound interest.

12. In addition to responding to inbound interests and proactive outreaches to potential acquirers for the LedgerX Business, PWP assisted the Debtors in developing bid and auction procedures to govern the sale of the LedgerX Business and ensure that any sale of the LedgerX Business would be for the highest or otherwise best value. On December 15, 2022, the Debtors filed the Motion seeking approval of, among other things, the Bid Procedures, and on

January 12, 2023, this Court entered the Bid Procedures Order. The final Bid Procedures were the result of arm's-length negotiations among the Debtors, the U.S. Trustee and the Consulting Professionals. Based on my experience, the Bid Procedures were substantively and procedurally fair and provided a full, fair and reasonable opportunity for parties to make an offer to purchase the LedgerX Business.

13. I believe that the Debtors and their advisors have complied in good faith with the Bid Procedures Order and the Bid Procedures in connection with the marketing process of the LedgerX Business. In accordance with the Bid Procedures and the Bid Procedures Order, the Debtors afforded all interested parties a reasonable time and opportunity to conduct due diligence on the LedgerX Business and submit qualifying bids. The Debtors also provided potential purchasers whom the Debtors determined were Potential Bidders and reasonably capable of making a qualifying bid, including having provided proof of financial capacity, with confidential information to enable them to make an informed judgment on whether to bid on the LedgerX Business. Over the past several months, the Debtors and their advisors received interest from approximately 87 parties regarding an acquisition of the LedgerX Business. These included unsolicited inbounds as well as targeted and proactive outreach by PWP on behalf of the Debtors to a mix of potential strategic buyers and financial sponsors. 44 of the parties that expressed interest in the LedgerX Business executed non-disclosure agreements and were provided with access to a first-round virtual data room with an overview of information regarding LedgerX's operations as Potential Bidders. 24 of the Potential Bidders met with management and/or received responses to diligence requests and numerous of these parties held one or more calls with the Debtors' advisors in furtherance of their respective diligence efforts. Six Potential Bidders submitted indications of interest for the LedgerX Business or portions

thereof and were provided with access to additional diligence materials through a virtual data room. That virtual data room was comprehensive, supplemented throughout the marketing process, and ultimately contained over 1,100 diligence items. Throughout the marketing and sale process, the Debtors, with the assistance of PWP and the Debtors' other advisors, actively engaged with interested parties, responded to a significant number of diligence requests and duly considered all indications of interest and bids received based on the merits of each.

14. The Debtors' marketing process yielded two bids, which the Debtors, in consultation with the Consulting Professionals, deemed to be Qualified Bids in accordance with the Bid Procedures, one of which was the Qualified Bid submitted by Buyer. The Debtors twice extended the scheduled date of the Auction as permitted under the Bid Procedures. During the additional time and as permitted by the Bid Procedures, the Debtors sought to improve the terms of the two Qualified Bids as well as generate additional Qualified Bids through continued marketing and engagement with other parties that had submitted indications of interest and other interested parties.

15. On March 31, 2023, the Debtors filed the *Notice of Auction for LedgerX Business* [D.I. 1211] and provided notice to each of the two Qualified Bidders of an auction to be held on April 4, 2023. On April 4, 2023, advisors to the Debtors and each of the Qualified Bidders met in person and conducted arm's-length negotiations in efforts to improve the terms of each Qualified Bidder's bid. The Debtors negotiated the terms of Buyer's bid with Buyer and its advisors, including, among other things, with respect to the scope of claims that Buyer sought to acquire with respect to all shareholders of (including Guarantor), and persons otherwise affiliated with, Seller prior to Debtor West Realm Shires Inc.'s acquisition of Seller. The Debtors were unable to reach satisfactory terms with Buyer on the scope of claims sought to be acquired and

certain other provisions in the purchase agreement on April 4, 2023. On April 4, 2023, the Debtors also were unable to reach satisfactory terms, including with respect to price and deal certainty, with the other Qualified Bidder (referred to as "Bidder B").

16. As a result, the Debtors adjourned, without initiating, the Auction. The Debtors and Bidder B determined shortly thereafter that they would be unable to reach a satisfactory transaction, Bidder B requested the return of its deposit and the Debtors disqualified Bidder B as a Qualified Bidder and refunded Bidder B's deposit. As a result, Buyer was the only remaining Qualified Bidder. Throughout this process, the Debtors consulted with the Consulting Professionals in accordance with the Bid Procedures.

17. Between April 4, 2023 and April 25, 2023, the Debtors continued to engage in bilateral arm's-length negotiations in good faith with Buyer, in consultation with the Consulting Professionals, while also exploring alternative sale transactions, including with Bidder B and other potential acquirors, and other strategic options, including a potential wind-down of the LedgerX Business. The Debtors successfully improved Buyer's bid through extensive negotiations, including with respect to the scope of claims to be acquired as to certain former shareholders of Seller and affiliates and associates of Buyer and its affiliates. The scope of acquired claims contemplated by the Purchase Agreement includes claims against former equityholders of Seller that are associated with Buyer, including Guarantor, and/or are former directors of Seller and/or LedgerX, which equityholders received approximately 37% of the net proceeds from West Realm Shires Inc.'s acquisition of Seller. The Debtors are retaining the right to pursue claims against all other former equityholders of Seller if they so choose. After thoroughly considering Buyer's improved bid against alternatives, in consultation with PWP, the Debtors' other advisors and the Consulting Professionals, the Debtors determined that the bid

from Buyer was the highest or otherwise best bid for the LedgerX Business and declared Buyer as the Successful Bidder.

18. On April 25, 2023, Seller, Buyer and solely for the purposes set forth therein, Guarantor, entered into the Purchase Agreement. A copy of the Purchase Agreement is attached as Exhibit A to the *Notice of (I) Successful Bidder for the LedgerX Business and (II) Filing of the LedgerX Business Purchase Agreement* filed at D.I. 1342. The purchase price for the LedgerX Business as set forth in the Purchase Agreement is $35 million, subject to adjustments described therein. However, when also accounting for the cash distributions from LedgerX to the Debtors in advance of closing the Sale Transaction that is contemplated by the Purchase Agreement, which funds the Debtors would not otherwise be able to receive from LedgerX so long as it continues to operate as a wholly-owned subsidiary of the Debtors, and the anticipated time of closing, the total proceeds to the Debtors resulting from the Sale Transaction is expected to be approximately $50 million.

19. Based on my experience, involvement in the process and review of available alternatives, it is my opinion that there is no higher or otherwise better offer or alternative currently available for the LedgerX Business. I believe that interested persons and entities have been afforded a full, fair and reasonable opportunity to make a higher or otherwise better offer to purchase the LedgerX Business.

### C. The Sale Will Produce a Fair and Reasonable Price for the LedgerX Business.

20. I believe that the purchase price for the LedgerX Business contemplated by the Purchase Agreement is fair and reasonable. The Debtors, with the assistance of PWP, ensured that sale of the LedgerX Business would reflect its fair market value by extensively

marketing the LedgerX Business, including pursuant to the Bid Procedures, and conducting arm's-length negotiations.

21. I believe that any other alternative to the proposed sale of the LedgerX Business to Buyer would not have resulted in a higher or otherwise better value to the estates. Selling the LedgerX Business now will enable the Debtors to receive cash that would otherwise remain on the LedgerX balance sheet in accordance with regulatory requirements and operational needs if LedgerX continued to operate as a subsidiary of the Debtors, avoid further expenses relating to the continued operation or a wind-down of the LedgerX Business and protects the Debtors against the risk of potential decline in value of the LedgerX Business.

22. In my role as the Debtors' financial advisor, I reviewed the Purchase Agreement and based on my experience, I believe the Purchase Agreement is the result of extensive, arm's-length and good-faith negotiations between the parties thereto, and that such negotiations were free of any collusion.

**D. The Sale of the LedgerX Business Should be Made Free and Clear of Any Liens, Including Successor Liability.**

23. Buyer is not a successor to or substantial continuation of the Debtors or their estates and there is no continuity of enterprise between Buyer and the Debtors as a result of any action taken in connection with the Sale Transaction. It is my understanding that Buyer is not holding itself out to the public as a continuation of the Debtors based on the Sale Transaction or the Purchase Agreement. The Sale Transaction does not amount to a consolidation, succession, merger, or de facto merger of Buyer and the Debtors and/or the Debtors' estates.

24. Moreover, I believe that not transferring the LedgerX Business free and clear of all liens, claims, interests and encumbrances, including any Liens (other than Permitted Encumbrances) would adversely affect the Debtors' efforts to maximize the value of the

LedgerX Business. I believe that Buyer would not have entered into the Purchase Agreement and would not consummate the transactions contemplated thereby if the sale of the LedgerX Business was not free and clear of all liens, claims, interests and encumbrances, including any Liens (other than Permitted Encumbrances), or if Buyer would, or in the future could, be liable for any such interests.

**E. The Sale of Claims Should be Approved.**

25. I believe that a sale of the LedgerX Business other than one providing for the sale and conveyance of the Acquired Claims and Coverage Claims, including any and all claims, liabilities and causes of action that the Debtors have or may have against (a) LedgerX, (b) LedgerX's current and former directors, officers, employees, agents and the predecessors, successors and assigns of each of the foregoing (in each case, solely in their capacity as such), (c) LedgerX's customers, creditors, vendors and other commercial counterparties (in each case, solely in their capacity as such), (d) Buyer, Guarantor and the Affiliates (as defined in the Purchase Agreement) of each of the Buyer and Guarantor and (e) certain other persons who are (A) former equityholders of Seller that are associated with Buyer (including existing or potential customers, investors in, or other commercial counterparties of Buyer and/or its Affiliates), (B) former directors and officers of Seller and/or LedgerX, as applicable, and/or (C) former advisors of Seller (in each case, solely in their capacity as a former equityholder, director, officer and/or advisor of Seller and/or LedgerX, as applicable) (the foregoing parties collectively the "Released Parties"), on the terms and subject to the conditions of the Purchase Agreement, would hinder the Debtors' ability to obtain the consideration provided for in the Purchase Agreement and, thus, would impact materially and adversely the value that the Debtors' estates would be able to obtain for the sale of the LedgerX Business. It is my understanding that the

Released Parties do not include any directors or officers of Debtor West Realm Shires Inc. from the time of its acquisition of Seller and LedgerX.

26. It is my belief that the inclusion of the Acquired Claims and Coverage Claims is a necessary and integral part of Buyer's consummation of the Sale Transaction and Buyer would not have entered into the Purchase Agreement without the inclusion of the Acquired Claims and Coverage Claims. I further believe the scope of the Acquired Claims and Coverage Claims is appropriately tailored under the facts and circumstances. The sale and conveyance of the Acquired Claims and Coverage Claims in connection with the Sale Transaction is in exchange for good and valuable consideration provided by Buyer and in the best interests of the Debtors and their estates.

27. Accordingly, for the foregoing reasons, I believe that the Purchase Agreement represents the highest and best offer for the LedgerX Business and that the sale of the LedgerX Business to Buyer pursuant to the Purchase Agreement will provide a greater recovery for the Debtors' estates than would be provided by any other reasonably available alternative.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: April 25, 2023.

*/s/ Bruce Mendelsohn*
Bruce Mendelsohn
Partner
Perella Weinberg Partners L.P.