**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |
| | **Obj. Deadline: May 10, 2023 at 4:00 p.m. ET**<br>**Hearing Date: May 17, 2023 at 1:00 p.m. ET** |

**MOTION OF DEBTORS FOR ENTRY OF AN ORDER AUTHORIZING**
**IMPLEMENTATION OF A KEY EMPLOYEE INCENTIVE PLAN**

FTX Trading Ltd. and its affiliated debtors and debtors-in-possession

(collectively, the "Debtors") hereby submit this motion (this "Motion") for entry of an order,

substantially in the form attached hereto as Exhibit A (the "Order"), pursuant to sections 363(b)

and 503(c)(3) of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy

Code") and rule 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"),

authorizing and approving the Debtors' Key Employee Incentive Plan (as expressly set forth in

paragraphs 19-25 of the Motion, the "KEIP"). In support of the Motion, the Debtors rely upon

the *Declaration of Edgar W. Mosley II in Support of Motion of Debtors for Entry of an Order*

*Authorizing and Approving the Debtors' Key Employee Incentive Plan* (the "Mosley

Declaration"), attached hereto as Exhibit B, and the *Declaration of Brian Cumberland in Support*

*of Motion of Debtors for Entry of an Order Authorizing and Approving the Debtors' Key*

---

[1] The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and 4063 respectively. Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX. The principal place of business of Debtor Emergent Fidelity Technologies Ltd is Unit 3B, Bryson's Commercial Complex, Friars Hill Road, St. John's, Antigua and Barbuda.

*Employee Incentive Plan* (the "Cumberland Declaration"), attached hereto as Exhibit C, and respectfully state as follows:

## Preliminary Statement

1.      Debtor FTX Japan Holdings K.K., a Japanese company (the "Company"), is the holding company for its wholly-owned subsidiaries (i) Debtor FTX Japan K.K. ("FTX Japan"), which operates a registered cryptocurrency exchange providing residents of Japan the ability to trade crypto and crypto derivatives, and (ii) Debtor Quoine Pte Ltd. ("FTX Singapore"), which operates a cryptocurrency exchange in Singapore under exemption while its license application is being processed.  FTX Japan is subject to the regulatory supervision of the Financial Services Agency of Japan (the "JFSA") and is registered as a Crypto-Asset Exchange Service Provider and Type I Financial Instruments Business Operator.  Previously known as Liquid Group Inc., the Company was acquired in April 2022 by Debtor FTX Trading Ltd., which continues to directly own 100% of the equity interests of the Company.

2.      During these Chapter 11 Cases, the Debtors are working to maximize the value of their estates for the benefit of the Debtors' creditors and stakeholders.  To this end, as previously announced, the Debtors are considering a sale of all or substantially all of the assets of the Company (a "Transaction").  Alternatively, in the process of the Debtors seeking to restart the Debtors' operations, the Debtors may determine to include the cryptocurrency exchange of Japan in the restart/reboot of the FTX international exchanges (such determination and implementation of a restart/reboot of the FTX.com exchange in connection with a chapter 11 plan, a "Reorganization").

3.      To effectuate a successful, value-maximizing Transaction during the pendency of these Chapter 11 Cases, and to alternatively to ensure the Debtors' continued success upon the occurrence of a Reorganization, the Debtors require the knowledge, skills and

intensive support and efforts of the Company.  In particular, seven employees of the Company have been identified as critical to these efforts (the "KEIP Participants").  The KEIP Participants have the institutional knowledge, specialized skillsets and critical relationships with regulators and Company employees that are necessary to maximize the going concern value of the Company or to restart the Debtors' exchange.

4.      In recent months, the KEIP Participants have demonstrated a track record of (i) engaging effectively with regulators, (ii) stabilizing the Company's workforce, (iii) operating efficiently and (iv) making significant progress towards the Company's goal of either pursuing a Transaction or resuming exchange operations.  *See* Mosley Decl. ¶ 8.  Because of the KEIP Participants' tremendous efforts, the Company was able to resume withdrawals from users' accounts on February 21, 2023—a critical feat, given that these capabilities are essential to the Company's ability to operate and to maintain and maximize its going concern value.  *See id.* at ¶ 8.

5.      Despite the KEIP Participants' diligent efforts and the attendant successes in recent months, the Company and the KEIP Participants have faced significant challenges, which risk the success of the Debtors' efforts in effectuating a Transaction or Reorganization.  *See id.* at ¶ 9.  Notwithstanding these difficulties, the KEIP Participants have diligently continued to perform their duties to the Company.  *See id.* at ¶ 9.

6.      The KEIP is also necessary in light of the Debtors' inability to compensate the KEIP Participants through other means.  The Debtors do not have the authority at this time to pay any incentive compensation, and the Debtors' cryptocurrency and equity-based compensation programs have little or no value and have ceased since the commencement of these Chapter 11 Cases.  *See* Cumberland Decl. ¶ 17.  Although the Debtors have obtained

authority from the Court to implement a key employee retention program (the "KERP"), the

Debtors currently do not expect that any of the Company's employees will be included as KERP

participants.  *See id.* at ¶ 17.  Absent the implementation of the KEIP, the KEIP Participants will

have fewer compensation opportunities than they historically had, at a time when they are

working more, particularly considering the pressures and demands of these Chapter 11 Cases and

their efforts in connection with a potential Transaction or Reorganization.  *See id.* at ¶ 17.

       7.      The Company's unique position led the Debtors to determine that

implementation of an incentive program is necessary with respect to employees critical to the

Company's Transaction and Reorganization efforts.  Given the regulatory regime in Japan, the

Company requires the efforts of the KEIP Participants to enable it to comply with the JFSA's

laws and regulations with respect to segregated asset balances and for the Company to

expeditiously return customer assets, in turn ensuring the Company's overall continued

operations and value.  *See* Mosley Decl. ¶ 10.  The Company's continued operations and value as

a going concern are critical to the administration of these Chapter 11 Cases and to the

preservation of optionality in connection with any potential sale process as well as in connection

with pursuing a Reorganization.  *See id.* at ¶ 6.  For these reasons, the Debtors believe that the

KEIP is critical and in the best interest of the Debtors and their estates to effectuate a value-

maximizing Transaction or Reorganization.  Accordingly, the Debtors request Court

authorization to implement an incentive plan for the KEIP Participants, generally on the terms

described herein.  As of the date of this filing, the Debtors are continuing to discuss the final

terms of the KEIP with the Committee, and the Debtors hope to reach a consensual resolution in

advance of the hearing.

8.      Under the KEIP, each KEIP Participant may earn up to two payments.
*See* Cumberland Decl. ¶ 8.  A KEIP Participant will earn the first payment if the Company
maintains its operative licenses, resumes its exchange operations (*i.e.*, resumption of the spot
exchange), and the KEIP Participant has remained continuously employed by the Company, in
each case through December 31, 2023.  *See id.* at ¶ 9.  A KEIP Participant will earn the second
payment upon the earlier of:  (i) a Reorganization; or (ii) the consummation of a Transaction,
subject to continued employment through the effectiveness of a chapter 11 plan or the
consummation of a Transaction.  *See id.* at ¶ 10.

9.      All awards granted under the KEIP will be subject to forfeiture and
recoupment if there is a subsequent final determination that the recipient of the award engaged in
wrongdoing.  *See id.* at ¶ 8.  **No** amounts will be paid under the proposed KEIP to any of Samuel
Bankman-Fried, Gary Wang, Nishad Singh or Caroline Ellison, or to any person known by the
Debtors to have a familial relationship with any such individual.

## Background

10.     On November 11 and November 14, 2022 (as applicable, the "Petition
Date"), the Debtors filed with the United States Bankruptcy Court for the District of Delaware
(the "Court") voluntary petitions for relief under the Bankruptcy Code.  The Debtors continue to
operate their businesses and manage their properties as debtors-in-possession pursuant to
sections 1107(a) and 1108 of the Bankruptcy Code.  Joint administration of the Debtors' cases
(these "Chapter 11 Cases") was authorized by the Court by entry of an order on November 22,
2022 [D.I. 128].  On December 15, 2022, the Office of the United States Trustee for the District
of Delaware (the "U.S. Trustee") appointed an Official Committee of Unsecured Creditors (the
"Committee") pursuant to section 1102 of the Bankruptcy Code [D.I. 231].

11.     Additional factual background relating to the Debtors' businesses and the commencement of these Chapter 11 Cases is set forth in the *Declaration of John J. Ray III in Support of Chapter 11 Petitions and First Day Pleadings* [D.I. 24], the *Declaration of Edgar W. Mosley II in Support of Chapter 11 Petitions and First Day Pleadings* [D.I. 57], the *Supplemental Declaration of John J. Ray III in Support of First Day Pleadings* [D.I. 92] and the *Supplemental Declaration of Edgar W. Mosley II in Support of First Day Pleadings* [D.I. 93].

## Facts Specific to the Relief Requested

### I.    The Pursuit of a Reorganization or a Transaction

12.     The Debtors, including the Company, may pursue either a Reorganization or a Transaction pursuant to section 363 of the Bankruptcy Code.  To facilitate a potential Transaction, the Company's management, including the KEIP Participants, have been working, and continue to work, with Perella Weinberg Partners ("PWP") to market the Company to investors and prepared a detailed pitch book for investors to highlight the Company's licenses, financials, business and technological capabilities.  *See* Mosley Decl. ¶ 7.  The KEIP Participants have assisted in developing the marketing materials, populating the data room and taking introductory management meetings with potential buyers.  *See id.* at ¶ 7.  In parallel, the KEIP Participants have focused on restarting withdrawals to best position the business.  *See id.* at ¶ 15.

13.     The potential sale process has been postponed to allow the exchange to be in a position to restart the business with regulatory approval, which would maximize the value attainable in a Transaction.  As of the date hereof, a significant number of investors have indicated interest in acquiring the Company, and the pace of inbound inquiries has increased as the Company's operational status has progressed.  At the same time, the Debtors are considering a potential Reorganization, which would require the Company to continue operating in an efficient and profitable manner.

14.     Critical to the success of a Reorganization or a Transaction is the Company maintaining its licenses as a Crypto-Asset Exchange Service Provider and Type I Financial Instruments Business Operator under the Payment Services Act and the Financial Instruments and Exchange Act of Japan, respectively (the "Japanese Licenses"), which are instrumental to the Company's operations because, absent such licenses, the Company will be unable to legally operate a spot and derivatives crypto exchange in Japan.  These licenses generally take two or more years to obtain, and, as a result, few operators in Japan possess both licenses, distinguishing the Company from many of its competitors.  As such, these licenses are critical to the Company's continued operations as part of a Reorganization, and similarly, much of the investor interest in effectuating a Transaction relies on the Company's maintenance of its status as a dual licensee.

15.     The Company's status as dual licensee with the Japanese Licenses is at risk due to two orders issued by the JFSA on November 10, 2022 – one of which remains in effect (as issued on November 10, 2022).  *See* Mosely Decl. ¶ 12.  The Company cannot resume its exchange operations and preserve its Japanese Licenses without the JFSA lifting these two orders.  *Id.*  The Company's management team, including the KEIP Participants, has been in ongoing discussions with the JFSA.  The JFSA has indicated that it will not lift the remaining order until it is confident that the Company has met, and will continue to meet, regulatory requirements with respect to its operations.  *Id.*  Absent the prompt return of user assets and resumption of exchange operations, there is a high likelihood that the Company's Japanese Licenses will be revoked or suspended, likely hindering the Company's profitability and ability to participate in a Reorganization while simultaneously reducing investors' interest in consummating a Transaction and substantially harming the Company's going concern value.  *Id.*

As such, it is critical that the Company's status as a dual licensee is maintained and its relationships with Japanese regulators are preserved.

16.     In order to maximize the value of any Transaction or success of a Reorganization, it is crucial that the Company's key employees are incentivized to perform optimally.

## II.    The Key Employee Incentive Plan

17.     The Debtors have retained Alvarez & Marsal North America LLC ("A&M") as restructuring and compensation consultants to assist the Debtors with, among other things, developing, reviewing and analyzing the KEIP to ensure that the KEIP Participants' goals are aligned with maximizing creditor and stakeholder recoveries during these Chapter 11 Cases. *See* Cumberland Decl. ¶ 13.  The Debtors, with the assistance of A&M, and through consultation with the Committee, have developed the KEIP, the implementation of which the Debtors believe is in the best interest of the Debtors and their estates, and to further the Debtors' goal of facilitating a Reorganization or effectuating a Transaction during these Chapter 11 Cases.

### A.    KEIP Participants

18.     The seven KEIP Participants' institutional knowledge, industry experience and specialized skills are essential to maximize the Company's value through the administration of these Chapter 11 Cases and during a Transaction or Reorganization.  The KEIP Participants include the Company's Chief Operating Officer (the "COO"), and Chief Product Officer (the "CPO"), Chief Financial Officer (the "CFO"), Head of Operations, Chief Compliance & Risk Officer (the "CCO"), Data Scientist and Front End Engineer.  The KEIP Participants perform integral functions for the Company, including serving as the leaders of the Company's compliance efforts, liaising with regulators and serving as the technical leads of the Company. *See* Mosley Decl. ¶ 14.

B. <u>The KEIP Awards</u>

19.     Under the KEIP, the KEIP Participants may earn up to two payments on the terms provided herein.  *See* Cumberland Decl. ¶ 8.  The award opportunities for each KEIP Participant are summarized in the table below:

| KEIP Participant | License & Restart Award | Transaction or Reorganization Award* | |
| --- | --- | --- | --- |
| | | Percentage of Transaction Award Pool** | Reorganization Award |
| COO | $450,000 | 34.7% | $450,000 |
| CPO | $231,000 | 17.8% | $231,000 |
| CCO | $200,000 | 15.4% | $200,000 |
| CFO | $124,000 | 9.6% | $124,000 |
| Data Scientist | $107,000 | 8.3% | $107,000 |
| Head of Operations | $107,000 | 8.3% | $107,000 |
| Front End Engineer | $78,000 | 6.0% | $78,000 |

*\* Either the Transaction Award or the Reorganization Award may be earned, not both, as discussed in more detail below.*

*\*\* Total does not reconcile due to rounding.*

i.     *License & Restart Awards*

20.     Each KEIP Participant will earn the first KEIP payment (the "<u>License & Restart Award</u>") on December 31, 2023 if:  (i) the Company has maintained its operative licenses as a Crypto-Asset Exchange Service Provider and Type I Financial Instruments Business Operator under the Payment Services Act and the Financial Instruments and Exchange Act of Japan; (ii) the Company has resumed its exchange operations (*i.e.*, resumption of the spot exchange); and (iii) the KEIP Participant has remained continuously employed by the Company.  *See id.* at ¶ 9.  If earned, each KEIP Participant will be entitled to the License & Restart Award set forth in the table above within 60 days after December 31, 2023.  *See id.* at ¶ 9.

21.     If a KEIP Participant's employment is terminated without cause by the Debtors or due to the KEIP Participant's death or disability after the License & Restart Award

has been earned, but prior to the applicable payment date, then the KEIP Participant will remain entitled to receive the License & Restart Award on the regularly scheduled payment date.  If a KEIP Participant's employment is terminated without cause by the Debtors or due to the KEIP Participant's death or disability before the License & Restart Award has been earned, then the KEIP Participant will receive a *pro rata* payment of the KEIP Participant's License & Restart Award which shall be paid on the regularly scheduled payment date.  If any KEIP Participant's employment with the Company terminates on or prior to December 31, 2023 for any reason other than as specified in the preceding two sentences, or after December 31, 2023 for cause, then the terminated KEIP Participant will forfeit the right to receive any License & Restart Award.  *See id.* at ¶ 9.  Any forfeited award may be reallocated to the remaining KEIP Participants by the Debtors, in consultation with management and subject to the consent of the Committee; *provided*, that no individual KEIP Participant's License & Restart Award will be greater than $450,000. See *id.* at ¶ 9.

ii.    *Transaction or Reorganization Awards*

22.    Each KEIP Participant will earn the second KEIP payment (the "Transaction or Reorganization Award") upon the earlier of:  (i) the consummation of a Transaction (the "Transaction Award") or (ii) the Reorganization (the "Reorganization Award"), in each case subject to the continued employment of the KEIP Participant through the applicable Transaction or Reorganization that triggers the payment.  *See id.* at ¶ 10.

23.    If a Transaction occurs prior to a Reorganization, then the KEIP Participants will earn the Transaction Awards.  *See id.* at ¶ 10.  If earned, the Transaction Awards will be payable to each applicable KEIP Participant within 60 days of the closing of the Transaction.  *See id.* at ¶ 10.  The aggregate amount payable to the KEIP Participants in respect

of the Transaction Awards will be determined based on a progressive scale tied to the net

Transaction proceeds as follows: (i) 1% of the first $25,000,000 net Transaction proceeds; *plus*

(ii) 2% of the net Transaction proceeds that are between $25,000,000 and $87,500,000; *plus* (iii)

6% of the net Transaction proceeds in excess of $87,500,000 (the "Transaction Award Pool").

*See id.* at ¶ 10. If a Transaction occurs and the conditions for the Transaction Awards to become

payable are satisfied, the Debtors will allocate the Transaction Award Pool among the KEIP

Participants who have earned a Transaction Award in accordance with the percentages reflected

in the table above. *See id.* at ¶ 10.

24.    If the Reorganization occurs before a Transaction, then, alternatively, each

KEIP Participant who remains employed will earn a Reorganization Award in accordance with

the table above. *See id.* at ¶ 11. If earned, the Reorganization Award will be payable to each

applicable KEIP Participant within 60 days of the Reorganization. *See id.* at ¶ 11. For the

avoidance of doubt, the KEIP Participants may **not** receive both a Transaction Award and a

Reorganization Award. *See id.* at ¶ 11.

25.    If a KEIP Participant's employment is terminated without cause by the

Debtors or due to the KEIP Participant's death or disability after the Transaction or

Reorganization Award has been earned, but prior to the applicable payment date, then the KEIP

Participant will remain entitled to receive the Transaction or Reorganization Award on the

regularly scheduled payment date. If a KEIP Participant's employment is terminated without

cause by the Debtors or due to the KEIP Participant's death or disability before the Transaction

or Reorganization Award has been earned, then the KEIP Participant will receive a *pro rata*

payment of the earned portion of the KEIP Participant's Transaction or Reorganization Award

which shall be paid on the regularly scheduled payment date. Except as otherwise provided

herein, if any KEIP Participant's employment with the Company terminates prior to a

Transaction or a Reorganization for cause or due to the KEIP Participant's resignation, then the

terminated KEIP Participant will forfeit the right to receive any Transaction or Reorganization

Award. *See id.* at ¶ 12.  Any forfeited award may be reallocated to the remaining KEIP

Participants by the Debtors, in consultation with management and subject to the consent of the

Committee; *provided*, that no individual KEIP Participant's Transaction Award will be greater

than 34.7% of the Transaction Award Pool or Reorganization Award will be greater than

$450,000. *See id.* at ¶ 12.

C.  Reasonableness of the KEIP

26.    The Debtors, in consultation with their advisors, evaluated whether the

KEIP design, structure and cost are reasonable and consistent with similarly-situated programs

that have been approved in comparable chapter 11 cases.  *See id.* at ¶ 14.  With the assistance of

their advisors, the Debtors designed the KEIP to incentivize the Company's key employees and

to ensure the maximization of the going concern value of the Company.  *See id.* at ¶ 13.  Based

on A&M's and the Debtors' diligence and analysis of comparable key employee incentive

programs, and after the Debtors' significant negotiations with the Committee, the Debtors have

concluded that the proposed KEIP is reasonable and justified under the facts and circumstances

of these Chapter 11 Cases.  *See id.* at ¶ 14.

27.    The Debtors believe that incentivizing the KEIP Participants is critical

given that the KEIP Participants are tasked not only with their customary duties but also the

additional responsibilities associated with maximizing the value of the Company and

spearheading the sale process as well as taking on the added responsibilities of their departed

colleagues, including the 25 Company service providers who departed or were terminated

between the Petition Date and March 31, 2023. *See* Mosley Decl. ¶ 13. The Debtors believe that the KEIP Participants are indispensable to the achievement of the Debtors' goals and are confident that, if properly incentivized, the KEIP Participants will provide immeasurable value to the Debtors' estates, their creditors and all other stakeholders. *See id.* at ¶ 16.

28.     To ascertain the reasonableness of the KEIP, A&M selected a peer group of 12 key employee incentive plans that met the following criteria: (i) companies with prepetition assets of approximately one-third to three-times the Company's assets, (ii) companies in regulated industries, such as technology, energy and pharmaceuticals to take into account the licensing and regulatory landscape for companies engaging in cryptocurrency trading in Japan, (iii) incentive plans with 15 or fewer participants and (iv) incentive plans approved by U.S. bankruptcy courts in 2019 or later (the "KEIP Peer Group Plans").[2] *See* Cumberland Decl. ¶ 14. While the structure of the KEIP Peer Group Plans varies based on the specific circumstances and facts of each case, the general terms and conditions of the KEIP Peer Group Plans are consistent with the KEIP, including the performance metrics aimed at maximizing value and the potential payout amounts. Based on A&M's analysis, the potential stretch cost of the KEIP (assuming a maximum KEIP cost entailing each KEIP Participant's receipt of the License & Restart Awards *plus* either (a) the Reorganization Award or (b) the equivalent Transaction Award based on a sale with assumed net Transaction proceeds of approximately $77,400,000) is at or below the 75th percentile of the market on a total cost, per-KEIP Participant average cost, and cost as a percentage of pre-petition assets basis. *See id.* at ¶ 14. Based on the Debtors' review of comparable incentive plans, the Debtors believe that the total cost of the KEIP is reasonable

---

[2]     Achaogen, Inc., Basic Energy Services, Inc., Endologix, Inc., Fairway Energy, LP, Glansaol Holdings Inc., Liberty Power Holdings, LLC, Lighthouse Resources, Inc., Lilis Energy, Inc., Melinta Therapeutics, Inc., Rockall Energy Holdings LLC, Sienna Biopharmaceuticals, Inc., and Teligent, Inc.

relative to similarly-situated programs and justified under the circumstances of these Chapter 11 Cases. *See id.* at ¶ 14.

29. The KEIP is structured to encourage the KEIP Participants to preserve the value of the Company by maintaining its licenses and working to promptly restart the Company's exchange operations. The KEIP is also designed to incentivize the KEIP Participants to efficiently and effectively run the Company to ensure a potential Reorganization and to maximize the total value of a potential Transaction, which will require KEIP Participants to continue to work with regulators to maintain the Company's licenses, effectuate return of users' assets, manage expenses and negotiate with bidders during the sales process. *See* Mosley Decl. ¶ 12; 14. Moreover, consistent with the KEIP Peer Group Plans, the Debtors limited participation in the KEIP to those in positions that are expected to provide the greatest impact on the Transaction and Reorganization efforts. *See* Cumberland Decl. ¶ 15. As a result, the KEIP is appropriately designed to incentivize KEIP Participants to continue their substantial efforts in operating the Company and in preparation for a Reorganization or a Transaction, both of which require maximizing the value of the Company. *See id.* at ¶ 15.

III.    **The Development of the KEIP**

30. The Debtors, together with their advisors, carefully reviewed multiple iterations of the KEIP, participated in several meetings regarding the parameters of the KEIP, and asked questions of the Debtors' advisors in determining whether to seek approval of the program. *See id.* at ¶ 7; 13. The Debtors and A&M, after several rounds of negotiation with the Committee, as well as the Debtors' legal advisors, designed the KEIP in a reasonable, cost-effective manner to promote the appropriate incentives essential to preserving the value of the Company and for the effectuation of a successful Reorganization or a lucrative Transaction and to the efficient administration of these Chapter 11 Cases. *See id.*

31.    In developing the KEIP, the Debtors, with assistance from A&M, identified the key employees that would participate in the KEIP.  In doing so, and to manage the cost of any contemplated incentive program, the Debtors carefully considered the demands of the Company's business operations, including the need to maintain the Company's status as a dual licensee, and any potential Reorganization or sales process to ensure that only those employees who are essential to the success of a potential Reorganization or Transaction would participate in the KEIP.  Mosley Decl. ¶ 13.  Based on these efforts, the Debtors determined that each of the KEIP Participants is critical to the sale process and is instrumental in maximizing the going concern value of the Company.

32.    In structuring the KEIP, the Debtors' Chief Executive Officer and the COO of the Company, in consultation with the Committee, worked to design a program that would incentivize the KEIP Participants and ensure the maximization of value for the Debtors' estates and for the benefit of its creditors.  *See* Cumberland Decl. ¶ 13.  The Debtors also worked closely with A&M to design a reasonable, cost-effective and genuinely incentive-based program that was comparable to the KEIP Peer Group Plans.  *See id.* at ¶ 13.

## Jurisdiction

33.    The Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper in the Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief requested herein are sections 363(b) and 503(c)(3) of the Bankruptcy Code, Bankruptcy Rule 6004.  Pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), the Debtors consent to the entry of a final order or judgment by

the Court in connection with this Motion to the extent it is later determined that the Court, absent

consent of the parties, cannot enter final orders or judgments consistent with Article III of the

United States Constitution.

**Relief Requested**

34.     By this Motion, the Debtors request entry of the Order, substantially in the

form attached hereto as <u>Exhibit A</u>, authorizing and approving the KEIP and granting related

relief.

**Basis for Relief**

35.     The Debtors respectfully request that the Court authorize and approve the

KEIP because it complies with the requirements of section 363(b) of the Bankruptcy Code as a

valid exercise of the Debtors' business judgment and with the requirements of section 503(c)(3)

of the Bankruptcy Code.

**I.      Implementing the KEIP Constitutes a Proper Exercise of the Debtors' Sound
         Business Judgment Under Section 363(b) of the Bankruptcy Code.**

36.     Section 363(b)(1) of the Bankruptcy Code empowers the Court to

authorize a debtor to "use, sell, or lease, other than in the ordinary course of business, property of

the estate" if the debtor demonstrates a "sound purpose."  11 U.S.C. § 363(b)(1); *see also In re*

*Chateaugay Corp.,* 973 F.2d 141, 143 (2d Cir. 1992) (holding that a judge determining a section

363(b) application must find from the evidence presented a good business reason to grant such

application); *In re Del. Hudson Ry. Co.*, 124 B.R. 169, 179 (D. Del. 1991) (same); *In re*

*Ionosphere Clubs, Inc.*, 100 B.R. 670, 674 (Bankr. S.D.N.Y. 1989) (noting that the standard for

determining a section 363(b) motion is a "good business reason").  A debtor's decision to use,

sell or lease assets outside the ordinary course of business is entrusted to the sound business

judgment of the debtor.  *See In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del.

1999); *In re Global Crossing Ltd.,* 295 B.R. 726, 743 (Bankr. S.D.N.Y. 2003).

37.    In evaluating whether a sound business purpose exists, courts employ the business judgment test.  *See In re Culp*, 550 B.R. 683, 697 (D. Del. 2015); *In re Montgomery Ward Holding Corp.*, 242 B.R. at 152-53.  This test is not an onerous standard and may be satisfied "as long as the proposed action appears to enhance the debtor's estate."  *Crystalin, LLC* v. *Selma Props. Inc. (In re Crystalin, LLC)*, 293 B.R. 455, 463-64 (B.A.P. 8th Cir. 2003) (internal citations omitted).  Courts require only that the debtors "show that a sound business purpose justifies such actions."  *In re Montgomery Ward Holding Corp.*, 242 B.R. at 153 (internal citations omitted); *see also In re Phx. Steel Corp.*, 82 B.R. 334, 335-36 (Bankr. D. Del. 1987).

38.    Moreover, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct."  *In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) (citation omitted); *see also In re AbitibiBowater*, 418 B.R. 815, 831 (Bankr. D. Del. 2009) (finding that the business judgment standard is "not a difficult standard to satisfy").  A court will interfere with the decisions of the board of directors "only if it is made clear that those decisions are, inter alia, clearly erroneous, made arbitrarily, are in breach of the officers' and directors' fiduciary duty to the corporation, are made on the basis of inadequate information or study, are made in bad faith, or are in violation of the Bankruptcy Code."  *In re Farmland Indus., Inc.*, 294 B.R. 855, 881 (Bankr. W.D. Mo. 2003) (citing *In re United Artists Theatre Co.*, 315 F.3d 217, 233 (3d Cir. 2003), *In re Tower Air, Inc.*, 416 F.3d 229, 238 (3d Cir. 2005) (stating that"[o]vercoming the presumptions of the business judgment rule on the merits is a near-Herculean task")).  Although a debtor's discretion is not "without

limit," the court "should not step in and assume a role and responsibility properly placed by the

Code in another's hands." *In re Castre, Inc.*, 312 B.R. 426, 431 (Bankr. D. Colo. 2004); *see also*

*In re Psychometric Sys.*, 367 B.R. 670, 674 (Bankr. D. Colo. 2007) (noting that bankruptcy

courts applying the business judgment rule generally examine whether an "articulated business

justification" exists and whether a debtor's actions are "fair and reasonable" and made in "good

faith").

      39.    In this case, implementation of the KEIP constitutes a proper exercise of

the Debtors' sound business judgment and is in the best interest of the Debtors' estates.  The

KEIP is consistent with the Debtors' fiduciary duties to maximize value and has been

specifically designed by the Debtors, through negotiations with the Committee and with the

assistance of outside professionals, including A&M, to incentivize the KEIP Participants to

preserve and enhance the value of the Company.  Providing a proper incentive for the KEIP

Participants—all of whom have specialized expertise related to the Company's business,

extensive knowledge of the Company's operations and crucial relationships with regulators—is

critical to preserving the value of the Company and facilitating the Reorganization or

maximizing the value attainable in a Transaction.

      40.    Furthermore, the proposed KEIP aligns the interests of the KEIP

Participants and the Debtors' estates.  The KEIP is designed to incentivize optimizing the

Company's value, and the proposed KEIP payments are reasonable.  In their sound business

judgment, and in reliance on the recommendations of their outside professionals, the Debtors

adopted the KEIP to induce the KEIP Participants to continue to assist the Company to maximize

the value of the Company's assets.  Moreover, the scope of the KEIP is fair, reasonable and

narrowly tailored to those employees who have been deemed by the Debtors to be the most

critical to the consummation of a Transaction or the facilitation of the Reorganization.

        41.     The KEIP ensures that the KEIP Participants are incentivized to maximize

the Debtors' performance and sale prospects, which is consistent with similar incentive programs

approved by courts in this jurisdiction. *See In re Rudy's Barbershop Holdings, LLC*, No. 20-

10746 (LSS) (Bankr. D. Del. Apr. 28, 2020) [D.I. 129] (approving key employee incentive plan

basing compensation upon purchase price thresholds achieved in connection with a sale); *In re

Ctr. City Healthcare, LLC*, No. 19-11466 (KG) (Bankr. D. Del. Sep. 24, 2019) [D.I. 779]

(approving key employee incentive plan in which compensation is provided upon the sale of a

debtor, upon signing of an asset purchase agreement or upon the confirmation of a chapter 11

plan); *In re FTD Cos., Inc.*, No. 19-11240 (LSS) (Bankr. D. Del. June 28, 2019) [D.I. 193]

(approving key employee incentive plan in which compensation is based upon the transaction

value of asset sales); *In re Orexigen Therapeutics, Inc.*, No. 18-10518 (KG) (Bankr. D. Del. Apr.

23, 2018) [D.I. 230] (approving key employee incentive plan in which compensation is based

upon (i) the proceeds received in a sale and (ii) the level of operating disbursements from the

company's budget through completion of the bankruptcy process); *In re Agway Farm & Home

Supply, LLC*, No. 22-10602 (JKS) (Bankr. D. Del. Aug. 10, 2022) [D.I. 134] (approving key

employee incentive plan with compensation based upon the proceeds of a successful sales

transaction); *In re Genapsys, Inc.*, No. 22-10621 (BLS) (Bankr. D. Del. Jul. 2022) [D.I. 72]

(approving key employee incentive plan with compensation tied to consideration received upon

the consummation of a sale).

42.     Accordingly, the Debtors respectfully submit that the KEIP constitutes a proper exercise of the Debtors' sound business judgment and, thus, should be approved pursuant to section 363(b) of the Bankruptcy Code.

II.     **The KEIP Should be Approved Pursuant to Bankruptcy Code Section 503(c)(3) Because it is Primarily Incentivizing the KEIP Participants and is Neither a Retention Plan nor a Severance Plan.**

43.     The KEIP should also be approved under section 503(c)(3) of the Bankruptcy Code.  The KEIP is (i) closely related to the Debtors' goals, (ii) reasonable in cost in light of the Debtors' assets, liabilities, and projected earnings, (iii) fair, nondiscriminatory and customary in the chapter 11 context and (iv) fully vetted both internally and externally with assistance from the Debtors' advisors, including A&M, as well as by the Committee.  The Debtors submit that sections 503(c)(1) and (2) of the Bankruptcy Code are not applicable under the circumstances.  The KEIP is neither a retention plan governed by section 503(c)(1) nor a severance plan governed by section 503(c)(2).  In addition, even though section 503(c)(3) may be applicable to the KEIP, the KEIP represents a sound exercise of the Debtors' business judgment and is justified by the facts and circumstances of these chapter 11 cases. Accordingly, the KEIP should be approved.

44.     Section 503(c)(1) of the Bankruptcy Code imposes substantial restrictions on retention-based payments to corporate insiders.  Thus, if a proposed compensation plan is purely motivated by retaining a corporate insider, it will have to comply with the rigid requirements of section 503(c)(l).  *See In re Nellson Nutraceutical, Inc.*, 369 B.R. 787, 802 (Bankr. D. Del. 2007) (finding that section 503(c)(l) applies only to retention programs with "the primary purpose of inducing [an employee] to remain with the debtor's business.").  In contrast, incentive-based compensation plans made to such insiders (or other payments made to non-insiders), outside the ordinary course, are approved under section 503(c)(3) if they satisfy the

business judgment rule. *See id.* at 803-804; *see also In re Dana Corp.*, 358 B.R. 567, 574 (Bankr. S.D.N.Y. 2006).

45.     In determining whether an employee bonus plan is incentivizing, courts consider whether the plan is "designed to motivate insiders to rise to a challenge or merely report to work." *In re Hawker Beechcraft, Inc.*, 479 B.R. 308, 313 (Bankr. S.D.N.Y. 2012). This analysis further recognizes that all compensation, to some degree, has a retentive element. *See Glob. Home Prods.*, 369 B.R., 778,768 (Bankr. D. Del. 2007) ("The fact… that all compensation has a retention element does not reduce the Court's conviction that [the] Debtors' primary goal [is] to create value by motivating performance."). However, the focus remains on whether a plan is, on the whole, truly incentivizing in nature by demanding a "stretch" before an award opportunity is achieved. *In re Dana Corp. (Dana II)*, 358 B.R. 567, 581 (Bankr. S.D.N.Y 2006).

46.     The Debtors recognize that merely styling a bonus program as an "incentive" plan does not automatically exempt an insider compensation strategy from the requirements of section 503(c)(1). *See, e.g. In re Residential Capital, LLC*, 478 B.R. 154, 170 (Bankr. S.D.N.Y. 2012) ("The Debtors must show that the KEIP is a 'pay for value' plan that offers incentives based on performance rather than a 'pay to stay' plan."); *In re Hawker Beechcraft, Inc.*, 479 B.R. 308, 313 (Bankr. S.D.N.Y. 2012) ("The Court must examine a proposed KEIP . . . [to] determine whether the proposed targets are designed to motivate insiders to rise to a challenge or merely report to work."). The targets triggering the incentive payments must force the participants to stretch and cannot be compared to "lay-ups" or "free throws" for the ease by which the participants could achieve the targets. *See In re Dana Corp.*, 358 B.R. at 583; *Hawker Beechcraft*, 479 B.R. at 313 n.7.

47.     Here, the primary effect of the KEIP is to incentivize the KEIP

Participants to perform in a manner that will preserve and maximize the value of the Debtors'

estates.  The Debtors' submit that the proposed KEIP is an incentive-based compensation

program.  The KEIP payments, in their entirety, will be paid only to the extent that the Company

achieves certain successes and milestones, including preserving the Company's critical dual

licenses, restarting the Company's exchange operations and contributing to the Debtors'

reorganization or maximizing the value of the Debtors' assets through the sale of the Company.

Further, the Transaction Awards Pool is tied entirely to the consideration received upon the

closing of a Transaction.  As such, the KEIP is designed to motivate the KEIP Participants to

maximize the value of the Company and, in turn, to either facilitate a Reorganization or enhance

the sale price in a Transaction.  The KEIP does not reward the KEIP Participants for "merely

report[ing] to work."  *In re Hawker Beechcraft, Inc.*, 479 B.R. at 313.

48.     Additionally, by rewarding the KEIP Participants a percentage of the

Company's sale value upon the consummation of a Transaction, the KEIP Participants are

incentivized to work diligently to facilitate a Reorganization or Transaction and maximize the

value thereof.  The KEIP Participants serve in various critical roles for the Company, including

performing functions related to the Debtors' ability to ensure the return of users' assets, resume

operations as an exchange, effectively respond to regulatory inquiries and effectuate a successful

Reorganization or Transaction.  *See* Mosley Decl. ¶ 14.  Throughout these Chapter 11 Cases, the

KEIP Participants have devoted considerable time and effort to critical matters including

(i) responding to significant regulatory scrutiny and liaising with regulators, (ii) reducing costs,

(iii) making great progress towards resuming user withdrawals and (iv) retaining certain

employees and contractors during a period of significant uncertainty and Debtor workforce-wide

attrition. *See* Mosley Decl. ¶ 15.  In particular, the KEIP Participants' track record of effectively handling regulatory inquiries from the JFSA in recent months demonstrates the importance of the KEIP Participants' continued commitment to the Company as the Company seeks to lift the orders issued by the JFSA to resume operations and maximize its going concern value.

49.     As the Debtors move forward in restarting the Company's exchange operations, maintaining the Company as a going concern, and seeking to maximize the value attainable in a Transaction, full involvement of the KEIP Participants is necessary to achieve the best outcome for the Debtors.  Accordingly, it is imperative that the KEIP Participants are appropriately incentivized to maintain the going concern value of the Company and to ensure optimal deal value in a Transaction or optimal Company operations for purposes of a Reorganization.  The Debtors believe that the proposed KEIP will further align incentives between the Debtors' estates and the KEIP Participants who are the key employees of the Company responsible for preserving the value of the Company and facilitating a sale thereof.

50.     Further, although a byproduct of the KEIP may be that the KEIP Participants are encouraged to remain with the Company, that effect does not convert the KEIP into a retention-driven plan.  *See In re Glob. Home Prods., LLC*, 369 B.R. at 786 (finding that proposed incentive plans were "primarily incentivizing and only coincidentally retentive" and noting, "[t]he fact . . . that all compensation has a retention element" did "not reduce the Court's conviction" that the debtors' primary goal in approving the incentive plans was "to create value by motivating performance").  As such, while the KEIP may indirectly cause the KEIP Participants to remain employed, such indirect consequence does not detract from the KEIP's primary purpose—to incentivize the KEIP Participants to maximize value to the Debtors' estates in connection with facilitating a Reorganization or ensuring the completion of a Transaction.

51.    Because the KEIP is an incentive plan, the business judgment rule applies in ascertaining whether the payments should be approved under section 503(c)(3). *See In re Nellson Nutraceutical, Inc.*, 369 B.R. 787, 803-804 (Bankr. D. Del. 2007).  In assessing whether a proposed compensation plan satisfies Bankruptcy Code section 503(c)(3) and the business judgment rule, courts consider the following factors:

  i.    Is there a reasonable relationship between the plan proposed and the results to be obtained, i.e., will the key employee stay for as long as it takes for the debtor to reorganize or market its assets, or, in the case of a performance incentive, is the plan calculated to achieve the desired performance?

  ii.    Is the cost of the plan reasonable in the context of the debtor's assets, liabilities and earning potential?

  iii.    Is the scope of the plan fair and reasonable; does it apply to all employees; does it unfairly discriminate?

  iv.    Is the plan or proposal consistent with industry standards?

  v.    What were the due diligence efforts of the debtor in investigating the need for a plan; analyzing which key employees need to be incentivized; what is available; what is generally applicable in a particular industry?

  vi.    Did the debtor receive independent counsel in performing due diligence and in creating and authorizing the incentive compensation?

*In re Dana Corp.*, 358 B.R. at 574. *See also Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (noting that under normal circumstances, courts defer to a trustee's judgment concerning use of property under section 363(b) when there is legitimate business justification).

52.    The KEIP meets all of the above-listed criteria of the business judgment rule as applied under a section 503(c)(3) analysis.  First, the KEIP is directly related to the Debtors' goal of facilitating a Reorganization or effectuating a Transaction during these Chapter 11 Cases.  It incentivizes the KEIP Participants to maximize the Company's going concern value

through a Reorganization or a closing of a Transaction.  Under the terms of the KEIP, the KEIP

Participants will receive payments based on their award opportunities, which were determined

based on the KEIP Participants' individual contributions to the business.  *See* Cumberland Decl.

¶ 8.  As such, the KEIP Participants' interest in receiving compensation is directly aligned with

the Debtors' interest in a successful Reorganization or closing of a value-maximizing

Transaction, and the KEIP Participants will have to work diligently to receive awards under the

KEIP.

        53.     Second, the cost of the KEIP is reasonable and can be properly supported

by the Debtors in light of their assets, liabilities and earning potential.  The KEIP will cost only a

small fraction of the anticipated value that the KEIP Participants are estimated to contribute to a

potential Reorganization or the value of a potential Transaction.  The potential cost of the KEIP

(assuming a maximum KEIP cost entailing each KEIP Participant's receipt of the License &

Restart Awards *plus* either (a) the Reorganization Award or (b) the equivalent Transaction

Award based on a sale with assumed net Transaction proceeds of approximately $77,400,000)

represents approximately 1.5% of the Company's prepetition assets, which is below the 75th

percentile when compared to the other incentive plans analyzed by A&M.  *See id.* at ¶ 16.

Further, the KEIP is designed to incentivize KEIP Participants to maximize the assets and

earning potential of the Company, thereby benefiting the Debtors' estates.  *See id.* at ¶ 16.

        54.     Third, the KEIP is fair and reasonable because it does not unfairly

discriminate.  *See id.* at ¶ 16.  The KEIP applies only to those employees whose efforts and

performance during these Chapter 11 Cases will have the greatest impact on the Debtors' ability

to preserve and maximize the Company's value.  *See* Mosley Decl. ¶ 13.  Further, under the

KEIP, the incentive payment payable to each KEIP Participant will be determined in accordance

with the predetermined award opportunities and subject to the limits on individual awards. *See*

Cumberland Decl. ¶ 8 – 9.

55.     Fourth, the KEIP is consistent with the standards and practices in the

industry in general and with chapter 11 debtors in particular. *See id.* at ¶ 18.  The Debtors

designed the KEIP with the assistance of A&M, taking into consideration recently approved key

employee incentive plans in similar cases in this district as well as others. *See id.* at ¶ 14.  A&M

reviewed the Key Employee Peer Group Plans and determined that the general terms and

conditions of such Key Employee Peer Group Plans was consistent with the KEIP, including the

performance metrics aimed at maximizing value and the potential payout amounts. *See id.* at ¶

14.  A&M's analysis further confirmed the reasonableness and cost-consciousness of the KEIP,

for the conservative estimate of the cost of the KEIP (assuming that each KEIP Participant earns

the License & Restart Award plus either the Reorganization Award or the Transaction Award

based on assumed net sale price of approximately $77,400,000) is at or below the 75th percentile

of the market on a total cost, per-KEIP Participant basis and on a cost as a percentage of pre-

petition assets basis. *See id.* at ¶ 14.

56.     Fifth, the Debtors, with the assistance of A&M, conducted thorough due

diligence in developing the KEIP. *See id.* at ¶ 18.  The Debtors developed the KEIP to ensure

that the scope and terms of the KEIP are reasonable and appropriate. *See id.* at ¶ 18.  The

Debtors worked with A&M to review the 12 KEIP Peer Group Plans, and compared the

approach taken in the KEIP to those taken in the KEIP Peer Group Plans to ensure that the

Debtors' proposed program was reasonable and comparable to other programs that have been

approved by courts in this district and across the country. *See id.* at ¶ 18.  To further ensure the

reasonableness of the cost, A&M conducted a thorough analysis and confirmed that the potential

stretch cost of the KEIP (assuming a maximum KEIP cost entailing each KEIP Participant's receipt of the License & Restart Awards *plus* either (a) the Reorganization Award or (b) the equivalent Transaction Award based on a sale with assumed net Transaction proceeds of approximately $77,400,000) was at or below the 75th percentile of the market on a total cost, per-KEIP Participant average cost, and cost as a percentage of pre-petition assets basis. *See id.* at ¶ 18. Moreover, in structuring the KEIP, the Debtors consulted with the Committee to ensure that the KEIP was reasonable and had the Committee's support.

57. Finally, the Debtors received independent counsel in performing due diligence and in creating and authorizing the incentive compensation contemplated by the KEIP. *See id.* at ¶ 7. The Debtors actively sought input from A&M, their legal advisors, and engaged in significant negotiations with the Committee throughout the KEIP development process. *See id.* at ¶ 7.

58. The adoption and implementation of the KEIP represents a sound exercise of the Debtors' business judgment and is necessary for the preservation of going-concern value of the Company and the facilitation of a Reorganization or the maximization of value attainable in a Transaction. The KEIP is critical to the Debtors' resumption of exchange operations, to the maintenance of certain key licenses and to the maximization of the going-concern value of the business. Accordingly, the Debtors submit that the relief requested is essential, appropriate, in the best interests of the estates and should therefore be granted.

59. Courts in this district have routinely granted relief similar to the relief requested herein. *See*, *e.g.*, *In re Agway Farm & Home Supply, LLC*, No. 22-10602 (JKS) (Bankr. D. Del. Aug. 10, 2022) [D.I. 134] (approving key employee incentive plan with compensation based upon the proceeds of a successful sales transaction); *In re Genapsys, Inc.*,

No. 22-10621 (BLS) (Bankr. D. Del. July 25, 2022) [D.I. 72] (approving key employee incentive

plan with compensation tied to consideration received upon the consummation of a sale); *In re*

*RTI Holding Co., LLC*, No. 20-12456 (JTD) (Bankr. D. Del.  Jan. 22, 2021) [D.I. 916]

(approving incentive plan with compensation tied to a successful reorganization or to the receipt

of a bid meeting certain thresholds and the subsequent successful consummation of a sales

transaction); *In re True Religion Apparel, Inc.*, No. 20-10941 (CSS) (Bankr. D. Del. June 22,

2020) [D.I. 364] (approving key employee incentive plan with compensation tied to the

confirmation of a reorganization plan or to the consummation of a sale); *In re Hosp. Acquisition*

*LLC*, No. 19-10998 (BLS) (Bankr. D. Del. June 19, 2019) [D. I. 260] (approving incentive plan

tied to the aggregate gross consideration received through the sale and/or monetization of the

debtors' assets); *In re Achaogen*, No. 19-10844 (BLS) (Bankr. D. Del. May 8, 2019) [D.I. 163]

(approving incentive plan tied to sale proceeds); *In re Rockport Co., LLC*, No. 18-11145 (LSS)

(Bankr. D. Del. June 13, 2018) [D.I. 233] (approving incentive plan to key employees involved

in sale process); *In re Orexigen*, No. 18-10518 (KG) (Bankr. D. Del. Apr. 23, 2018) [D.I. 230]

(approving key employee incentive plan in which compensation is based upon (i) the proceeds

received in a sale and (ii) the level of operating disbursements from the company's budget

through completion of the bankruptcy process); *In re Rentech WP U.S. Inc.*, No. 17-12958 (CSS)

(Bankr. D. Del. Jan. 31, 2018) [D.I. 203] (approving key employee incentive plan with

compensation based upon the value of successful sale transactions); *In re TerraVia Holdings,*

*Inc.*, No. 17-11655 (CSS) (Bankr. D. Del. Aug. 30, 2017) [D.I. 193] (approving incentive plan

with payments based on sale value); *In re NJOY, Inc.*, No. 16-12076 (CSS) (Bankr. D. Del.

Jan. 12, 2017) [D.I.  358] (approving incentive plan tied to sale process milestones); *In re*

*Venoco, LLC*, No. 17-10828 (KG) (Bankr. D. Del. May 25, 2017) [D.I. 200] (approving key

employee incentive plan with compensation partially tied to confirmation of a plan of reorganization).

### Waiver of Bankruptcy Rule 6004(h)

60. Given the nature of the relief requested herein, the Debtors respectfully request a waiver of the 14-day stay under Bankruptcy Rule 6004(h).  Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until expiration of 14 days after entry of the order, unless the court orders otherwise." For the reasons described above, the relief requested is essential to prevent potentially irreparable damage to the Debtors' operations, value and ability to reorganize.

### Notice

61. Notice of this Motion has been provided to: (a) the U.S. Trustee; (b) counsel to the Committee; (c) the Securities and Exchange Commission; (d) the Internal Revenue Service; (e) the United States Department of Justice; (f) the United States Attorney for the District of Delaware; and (h) to the extent not listed herein, those parties requesting notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be provided.

## Conclusion

WHEREFORE, for the reasons set forth herein, the Debtors respectfully request that the Court (a) enter the Order, substantially in the form attached hereto as Exhibit A, and (b) grant such other and further relief as is just and proper.

Dated: April 26, 2023  
       Wilmington, Delaware

**LANDIS RATH & COBB LLP**

*/s/ Kimberly A. Brown*  
Adam G. Landis (No. 3407)  
Kimberly A. Brown (No. 5138)  
Matthew R. Pierce (No. 5946)  
919 Market Street, Suite 1800  
Wilmington, Delaware 19801  
Telephone: (302) 467-4400  
Facsimile: (302) 467-4450  
E-mail: landis@lrclaw.com  
       brown@lrclaw.com  
       pierce@lrclaw.com

-and-

**SULLIVAN & CROMWELL LLP**  
Andrew G. Dietderich (admitted *pro hac vice*)  
James L. Bromley (admitted *pro hac vice*)  
Brian D. Glueckstein (admitted *pro hac vice*)  
Alexa J. Kranzley (admitted *pro hac vice*)  
125 Broad Street  
New York, NY 10004  
Telephone: (212) 558-4000  
Facsimile: (212) 558-3588  
E-mail: dietdericha@sullcrom.com  
       bromleyj@sullcrom.com  
       gluecksteinb@sullcrom.com  
       kranzleya@sullcrom.com

*Counsel for the Debtors and Debtors-in-Possession*