# **EXHIBIT B**

**Mosley Declaration**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |

### DECLARATION OF EDGAR W. MOSLEY II IN SUPPORT OF MOTION OF DEBTORS FOR ENTRY OF AN ORDER AUTHORIZING AND APPROVING THE DEBTORS' KEY EMPLOYEE INCENTIVE PLAN

I, Edgar W. Mosley II, hereby declare under penalty of perjury:

1. I am a Managing Director at Alvarez & Marsal North America, LLC ("A&M"), a restructuring advisory services firm specializing in interim management, crisis management, turnaround consulting, operational due diligence, creditor advisory services and financial and operational restructuring.

2. I have more than 20 years of restructuring and distressed investment experience across various industries, including oil & gas, manufacturing, transportation, automotive, retail, industrial construction, telecommunications, healthcare and consumer products. I have a Bachelor's Degree from Harvard University, and have been recognized as a Certified Insolvency and Restructuring Advisor by the Association of Insolvency and Restructuring Advisors, where I served on the board from 2019 until 2020.

---

[1] The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and 4063 respectively. Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX. The principal place of business of Debtor Emergent Fidelity Technologies Ltd is Unit 3B, Bryson's Commercial Complex, Friars Hill Road, St. John's, Antigua and Barbuda.

4890-5874-4152 v.8

-2-

3. Since joining A&M, I have been involved in numerous Chapter 11 restructurings including Seadrill Limited (2020 and 2017), Valaris plc, Diamond Offshore Drilling, Inc., Imerys Talc America, White Star Petroleum, Southcross Energy, Magnum Hunter Resources, Exide Technologies (where I served as the Chief Restructuring Officer) and Visteon Corporation.

4. I submit this declaration (the "Declaration") in support of the *Motion of Debtors for Entry of an Order Authorizing and Approving the Debtors' Key Employee Incentive Plan* (the "Motion").[2] I am not being compensated separately for this testimony other than through payments received by A&M as an advisor retained by FTX Trading Ltd. and its affiliated debtors and debtors-in-possession (collectively, the "Debtors"). Except as otherwise indicated herein, all of the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by A&M professionals involved in advising the Debtors in these Chapter 11 Cases or information provided to me by the Debtors. If called upon to testify, I could and would testify to the facts set forth herein on that basis. I am authorized to submit this Declaration on behalf of the Debtors.

5. During these Chapter 11 Cases, the Debtors are working to maximize the value of their estates for the benefit of Debtors' creditors and stakeholders. To this end, the Debtors are considering a sale of all or substantially all of the assets of the Company (a "Transaction"), pursuant to section 363 of the Bankruptcy Code, to maximize the value of the Debtors' estates for the benefit of Debtors' creditors and stakeholders. Alternatively, in the process of the Debtors seeking to restart the Debtors' operations, the Debtors may determine to include the cryptocurrency exchange of Japan in the restart/reboot of the FTX international

---

[2] Capitalized terms not otherwise defined herein are to be given the meanings ascribed to them in the Motion.

exchanges (such determination and implementation of a restart/reboot of the FTX.com exchange in connection with a chapter 11 plan, a "Reorganization").

6. The sale process has been postponed to allow the exchange to be in a position to restart the business with regulatory approval, which would maximize the value attainable in a Transaction. As of the date of the Motion, a significant number of investors have indicated interest in acquiring the Company, and the pace of inbound inquiries has increased as the Company's operational status has progressed. At the same time, the Company's continued operations and value as a going concern are critical to the administration of these Chapter 11 Cases and to the preservation of optionality in connection with any potential sale process as well as in connection with pursuing a Reorganization.

7. To facilitate a potential Transaction, the Company's management, including the KEIP Participants, are continuously working with PWP to market the Company to investors, develop marketing materials, populate the data room and meet with potential buyers.

8. The KEIP Participants have stepped up in their roles and have engaged effectively with regulators, endeavored to stabilize the Company's workforce and operate the Company efficiently and have made significant progress towards the Company's goal of either pursuing a Transaction or resuming exchange operations. As a result of the KEIP Participants' diligence, the Company was able to resume withdrawals from users' accounts on February 21, 2023, which was a critical achievement, because these capabilities are necessary for the Company to be able to operate and to maintain and maximize its going concern value.

9. Since the upheaval that the Debtors faced beginning in November 2022 and the commencement of these Chapter 11 Cases, the KEIP Participants have faced significant challenges that risk the success of the Debtors' efforts in effectuating a Transaction or

Reorganization. Despite these challenges, the KEIP Participants have diligently continued to perform their duties to the Company.

10. The regulatory landscape in which the Company operates uniquely positioned the Company and led the Debtors to determine that the KEIP was essential to the Company's Transaction and Reorganization efforts. Japan's regulatory regime necessitates that the KEIP Participants are able to ensure that the Company complies with the JFSA's laws and regulations with respect to segregated asset balances and for the Company to expeditiously return customer assets, in turn ensuring the Company's overall continued operations and value.

11. Based on my discussions with the Company's management and other external advisors, I understand that critical to the success of a Reorganization or a Transaction is the Company maintaining its Japanese Licenses, for without these licenses, the Company cannot legally operate a spot and derivatives crypto exchange in Japan. These licenses generally take two or more years to obtain and few operators in Japan have both licenses, which distinguishes the Company from many of its competitors. As such, the maintenance of these licenses is critical to the Company's continued operations as part of a Reorganization, and similarly, much of the investor interest in effectuating a Transaction relies on the Company's maintenance of its status as a dual licensee.

12. Additionally, the Company cannot resume its exchange operations and preserve its Japanese Licenses without the JFSA lifting its stoppage orders, one of which remains in effect (as issued on November 10, 2022). The JFSA has indicated to the Company's management throughout their ongoing discussions that the JFSA will not lift the remaining order until it is confident that the Company has met, and will continue to meet, regulatory requirements with respect to its operations. Absent the prompt return of user assets and

-5-

resumption of exchange operations, there is a high likelihood that the Company's Japanese Licenses will be revoked or suspended, likely hindering the Company's profitability and ability to participate in a Reorganization while simultaneously reducing investors' interest in consummating a Transaction and substantially harming the Company's going concern value. Based on my discussions with the Company's management and other external advisors, I understand that it is critical that the Company's status as a dual licensee is maintained and its relationships with Japanese regulators are preserved.

13. In developing the KEIP, the Debtors and management, with assistance from A&M, identified the key employees and other service providers that would participate in the KEIP. In doing so, and to manage the cost of any contemplated incentive program, the Debtors carefully considered the demands of the Company's business operations, including the need to maintain the Company's status as a dual licensee, and any potential Reorganization or sales process to ensure that only those employees who are essential to the success of a potential Reorganization or Transaction would participate in the KEIP. Based on these efforts, the Debtors determined that each of the KEIP Participants is critical and these individuals' efforts and performance during these Chapter 11 Cases will have the greatest impact on the Debtors' ability to preserve and maximize value for stakeholders. I believe that incentivizing the KEIP Participants is critical given that the KEIP Participants are tasked not only with their customary duties but also the additional responsibilities associated with maximizing the value of the Company and spearheading the sale process as well as taking on the added responsibilities of their departed colleagues, including the 25 Company service providers who departed or were terminated between the Petition Date and March 31, 2023.

14. The seven KEIP Participants' institutional knowledge, industry experience and specialized skills are essential to maximize the Company's value through the administration of these Chapter 11 Cases and during a Transaction or Reorganization. The KEIP Participants include the Company's COO, CPO, CFO, Head of Operations, CCO, Data Scientist and Front End Engineer. The KEIP Participants perform integral functions for the Company, including serving as the leaders of the Company's compliance efforts, liaising with regulators and serving as the technical leads of the Company, and in such positions, they serve in various critical roles, including performing functions related to the Debtors' ability to ensure the return of users' assets, resume operations as an exchange, effectively respond to regulatory inquiries and effectuate a successful Reorganization or Transaction. I understand that, to efficiently and effectively run the Company to ensure a potential Reorganization and to maximize the total value of a potential Transaction, the KEIP Participants will need to be incentivized to manage expenses and negotiate with bidders during the sales process.

15. The KEIP Participants have diligently worked to, among other things, (i) respond to significant regulatory scrutiny and liaise with regulators, (ii) reduce costs, (iii) make great progress towards resuming user withdrawals and (iv) retain certain employees and contractors during a period of significant uncertainty and Debtor workforce-wide attrition.

16. Based on the facts and circumstances articulated herein, I believe that it is important to incentivize the KEIP Participants to ensure a potential Reorganization and to maximize the total value of a potential Transaction. The KEIP was carefully designed and negotiated by Mr. Ray, his leadership team, and their advisors, including me and my team at A&M, and was a product of several rounds of negotiations with the Committee and its advisors,

-7-

to fairly achieve this objective. I believe the KEIP meets the Debtors' objectives and its approval is in the best interests of the Debtors' estates.

      Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information and belief.

Dated: April 26, 2023                           /s/ *Edgar W. Mosley II*
                                                       Edgar W. Mosley II
                                                       Alvarez & Marsal North America, LLC
                                                     Managing Director