# EXHIBIT C

## Cumberland Declaration

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |

### DECLARATION OF BRIAN CUMBERLAND IN SUPPORT OF MOTION OF DEBTORS FOR ENTRY OF AN ORDER AUTHORIZING AND APPROVING THE DEBTORS' KEY EMPLOYEE INCENTIVE PLAN

I, Brian Cumberland, hereby declare under penalty of perjury:

1.  I am a Managing Director at Alvarez & Marsal North America, LLC ("A&M"), a restructuring advisory services firm specializing in interim management, crisis management, turnaround consulting, operational due diligence, creditor advisory services and financial and operational restructuring.

2.  I am an expert in executive and management compensation with over 20 years of experience in the field. I received my bachelor's degree in Business Administration from the University of Texas, my Juris Doctor from St. Mary's School of Law, and my Master of Law in taxation from the University of Denver. Before joining A&M, I led KPMG's Compensation and Benefits Group for the Southwest United States, and was a member of KPMG's National Tax Practice in Washington, D.C.

---

[1] The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and 4063 respectively. Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX. The principal place of business of Debtor Emergent Fidelity Technologies Ltd is Unit 3B, Bryson's Commercial Complex, Friars Hill Road, St. John's, Antigua and Barbuda.

3.   Since joining A&M in 2006, my responsibilities have primarily involved consulting with corporate clients on executive and non-executive compensation. I have worked with numerous Fortune 1000 companies and am frequently retained by these companies to advise on their compensation strategies, programs and pay levels. I have participated in the development and design of over 100 incentive plans for companies inside and outside of chapter 11. In the last 10 years, I have assisted debtors and creditors in over 50 chapter 11 cases on compensation matters, including key employee incentive and retention plans. I have testified before courts regarding such programs on over 20 occasions either through live testimony or a declaration.

4.   During the last 10 years, I have written the following articles: *Coronavirus's Impact on Executive and Board of Director Compensation*, American Bankruptcy Institute Journal, June 2020; *Board Compensation in Times of Distress: Preparing for the Road Ahead*, AIRA Journal Volume 33, No. 1, June 2020; *Clearing the Air: The IRS Issues Proposed Regulations under Section 162(m)*, Tax Advisor Weekly, May 7, 2020; *Preparing for Board Compensation in Times of Distress*, National Association of Corporate Directors, April 28, 2020; *Coronavirus Crisis Raises Executive Compensation Concerns*, Tax Advisor Weekly, March 24, 2020; *The Fog Has Lifted: The IRS Issues Proposed Regulations under Section 162(m)*, Tax Advisor Weekly, February 19, 2020; *Key Findings of the 2019/2020 Executive Change in Control Report*, Tax Advisor Weekly, January 22, 2020; *2019/2020 Executive Change in Control Report*, January 2020; *Latest Trends in Compensation Practices at the Top U.S. Oil and Gas E&P Companies*, Tax Advisor Weekly, December 4, 2019; *2020 Oil and Gas Exploration & Production (E&P) Incentive Compensation Report*, December 2019; *Latest Trends in Compensation Practices at the Top U.S. Oil and Gas Oilfield Services Companies*, Tax Advisor Weekly, October 31, 2019; *2020 Oil and Gas Oilfield Services Incentive Compensation Report*, October 2019; *Trends in Bankruptcy Compensation*, AIRA Journal, Vol. 32,

No. 2, 2019; *An Introduction to the World of Bankruptcy Compensation*, Tax Advisor Weekly, February 28, 2019; *Hardship Distribution Guidance Issued by the IRS*, Tax Advisor Weekly, January 30, 2019; *2019 Oil and Gas Exploration & Production (E&P) Incentive Compensation Report*, January 2019; *The World of Bankruptcy Compensation for Key Employees*, American Bankruptcy Journal, January 2019; *2019 Oilfield Service Incentive Compensation Report*, December 2018; *Latest Trends in Compensation Practices at the Top U.S. Oil and Gas Oilfield Services Companies*, Tax Advisor Weekly, December 11, 2018; *The Increased Value of the Nonqualified Deferred Compensation Plan*, Tax Advisor Weekly, September 24, 2018; *IRS Issues Guidance on Section 162(m) $1 million Compensation Deduction Limitation*, Tax Advisor Weekly, August 22, 2018; *2018 Oil and Gas Exploration & Production (E&P) Incentive Compensation Report*, January 2018; *Latest Trends in Compensation Practices at the Top U.S. Oil and Gas Oilfield Services Companies*, Tax Advisor Weekly, February 23, 2018; *2018 Oilfield Service Incentive Compensation Report*, December 2017; *2017 Year-End Planning Opportunity Related to Executive Compensation Changes in the Proposed Tax Legislation*, December 12, 2017; *2017/2018 Executive Change in Control Report*, November 15, 2017; *PEO Employment Tax Compliance - Buyer Be Aware*, Tax Advisor Weekly, October 3, 2017; *Options for Providing Major-Disaster Assistance to Employees*, Tax Advisor Weekly, September 19, 2017; *An Approach to Executive Compensation for the Transition from a Private to Public Company*, Tax Advisor Weekly, May 9, 2017; *Pay Programs: Retailers Need to be Informed and Be Proactive*, Chainstoreage.com Article, May 9, 2017; *Executive Compensation Arrangements: E&P Companies Continue to Walk The Line*, Oil & Gas Financial Journal, April 17, 2017; *Memo to Hurting Retailers: Redo Comp Plans ASAP*, CFO.com Newsletter, April 12, 2017; *The Changing Landscape in Executive Compensation Governance*, Tax Advisor Weekly, April 8, 2017; *Retail Compensation Programs - Be Informed and Be Proactive*, Tax Advisor Weekly, March 26, 2017; *Legislative and Regulatory Changes Will Require Increased CFO

*Involvement With Incentive Compensation in 2017*, Tax Advisor Weekly, March 6, 2017; *Individual Employment Agreements Under ERISA*, Tax Advisor Weekly, February 15, 2017; *Latest Trends in Compensation Practices at the Top U.S. Oil and Gas E&P Companies*, Tax Advisor Weekly, February 6, 2017; *New Accounting Rules for Stock-Based Compensation Are Coming... Is Early Adoption Right for You?*, Tax Advisor Weekly, June 2, 2016; *Mind the Gap: Executive Compensation In the Energy Sector*, Oil & Gas Financial Journal, April 2016; *2016 Oil and Gas Exploration & Production (E&P) Incentive Compensation Report*, April 2016; *Compensation Practices at the Top U.S. Oil and Gas E&P Companies Report*, Tax Advisor Weekly, March 29, 2016; *Employment Tax Considerations for Restricted Stock Units That Vest on Retirement*, Tax Advisor Weekly, March 2, 2016; *Despite Strong Winds, Golden Parachutes Still Holding Steady*, Tax Advisor Weekly, February 17, 2016; *Executive Compensation in the Energy Sector Is Seriously Suffering. What's the Relief?*, Tax Advisor Weekly, January 19, 2016; *2015-2016 Executive Change in Control Report*, January 2016; *IRS Restricts Informal Correction of 409A Document Failures*, Tax Advisor Weekly, June 30, 2015; *Top 10 Payroll Mistakes Companies Make*, Tax Advisor Weekly, March 27, 2015; *Oil and Gas Exploration & Production (E&P) Incentive Plan Design Report*, February 2015; *Incentive Compensation at the Top 100 U.S. Oil and Gas E&P Companies*, Tax Advisor Weekly, February 17, 2015; *KEIP: Key Employees Motivated in Bankruptcy and Beyond*, Tax Advisor Weekly, September 9, 2014; *Will Congress Push for More Say On (Exec) Pay?*, Tax Advisor Weekly, June 10, 2014; *Deferred No Longer - Here Come Deferred Compensation Audits*, Tax Advisor Weekly, August 26, 2014; *Golden Parachutes Still Mean Big Bucks for Executives*, Tax Advisor Weekly, March 11, 2014; *2013-2012 Executive Change in Control Report*, January 2014; *End-of-Year Compensation Planning Opportunities*, Tax Advisor Weekly, November 27, 2013; *Transfer Pricing: Don't be an Easy Target, Think About Your Equity Arrangements*, Tax Advisor Weekly, October 9, 2013; *Chipping Away at Deductions on Employee Compensation*, Tax Advisor

Weekly, July 23, 2013; *Bankruptcy Compensation Survey - Post-BAPCPA*, Tax Advisor Weekly, March 26, 2013.

5. I have familiarized myself with the terms of the proposed key employee incentive plan (the "KEIP") for FTX Trading Ltd. and its affiliated debtors and debtors-in-possession (collectively, the "Debtors"), gathered relevant market data on incentive plans in chapter 11 cases and analyzed whether the KEIP is consistent with typical market practice.

6. I submit this declaration (the "Declaration") in support of the *Motion of Debtors for Entry of an Order Authorizing and Approving the Debtors' Key Employee Incentive Plan* (the "Motion").[2]  I am not being compensated separately for this testimony other than through payments received by A&M as an advisor retained by the Debtors.  Except as otherwise indicated, I have personal knowledge of all facts in this Declaration, which are based on my review of the Debtors' business and compensation practices, my research into compensation practices for similarly situated companies, my research into the designs of incentive-based plans approved in recent chapter 11 proceedings, my experience in developing similar plans and information supplied to me by the Debtors' management team and the Debtors' other advisors.  If called upon to testify, I could and would testify competently to the facts and opinions set forth in this Declaration.  I am authorized to submit this Declaration on behalf of the Debtors.

7. The Debtors and their management, after multiple rounds of negotiations with the Committee, with the assistance of their advisors, developed the KEIP to further the Debtors' goal of facilitating a Reorganization or effectuating a Transaction during these Chapter 11 Cases.

---

[2]  Capitalized terms not otherwise defined herein are to be given the meanings ascribed to them in the Motion.

8. Under the KEIP, the KEIP Participants may earn up to two payments. The award opportunities for each KEIP Participant, which were determined based on the KEIP Participants' individual contributions to the business, are summarized in the table below. All awards granted under the KEIP will be subject to forfeiture and recoupment if there is a subsequent final determination that the recipient of the award engaged in wrongdoing.

| KEIP Participant | License & Restart Award | Transaction or Reorganization Award* | |
|---|---|---|---|
| | | Percentage of Transaction Award Pool** | Reorganization Award |
| COO | $450,000 | 34.7% | $450,000 |
| CPO | $231,000 | 17.8% | $231,000 |
| CCO | $200,000 | 15.4% | $200,000 |
| CFO | $124,000 | 9.6% | $124,000 |
| Data Scientist | $107,000 | 8.3% | $107,000 |
| Head of Operations | $107,000 | 8.3% | $107,000 |
| Front End Engineer | $78,000 | 6.0% | $78,000 |

*Either the Transaction Award or the Reorganization Award may be earned, not both, as discussed in more detail below.*

*\*\* Total does not reconcile due to rounding.*

9. A KEIP Participant will earn the first KEIP payment (the "License & Restart Award") on December 31, 2023 if: (i) the Company has maintained its operative licenses as a Crypto-Asset Exchange Service Provider and Type I Financial Instruments Business Operator under the Payment Services Act and the Financial Instruments and Exchange Act of Japan; (ii) the Company has resumed its exchange operations; and (iii) the KEIP Participant has remained continuously employed by the Company. If earned, each KEIP Participant will be entitled to the License & Restart Award set forth in the table above within 60 days after December 31, 2023. If a KEIP Participant's employment is terminated without cause by the Debtors or due to the KEIP Participant's death or disability after the License & Restart Award has been earned on December 31, 2023, but prior to the applicable payment date, then the KEIP

Participant will remain entitled to receive the License & Restart Award on the regularly scheduled payment date.  If a KEIP Participant's employment is terminated without cause by the Debtors or due to the KEIP Participant's death or disability before the License & Restart Award has been earned, then the KEIP Participant will receive a *pro rata* payment of the KEIP Participant's License & Restart Award which shall be paid on the regularly scheduled payment date.  If any KEIP Participant's employment with the Company terminates on or prior to December 31, 2023 for any reason other than as specified in the preceding two sentences, or after December 31, 2023, but before payment of the License & Restart Award, for cause, then the terminated KEIP Participant will forfeit the right to receive any License & Restart Award.  Any forfeited award may be reallocated to the remaining KEIP Participants by the Debtors, in consultation with management and subject to the consent of the Committee; *provided*, that no individual KEIP Participant's License & Restart Award will be greater than $450,000.

        10.     Each KEIP Participant will earn the second KEIP payment (the "<u>Transaction or Reorganization Award</u>") upon the earlier of:  (i) the consummation of a Transaction or (ii) the Reorganization, in each case subject to the continued employment of the KEIP Participant through the applicable Transaction or Reorganization that triggers the payment.  If a Transaction occurs prior to a Reorganization, then the KEIP Participants who remain employed will earn the Transaction Awards.  If earned, the Transaction Awards will be payable to each applicable KEIP Participant within 60 days after the closing of the Transaction.  The aggregate amount payable to the KEIP Participants in respect of the Transaction Awards will be determined based on a progressive scale tied to the net Sale proceeds as follows:  (i) 1% of the first $25,000,000 net Sale proceeds; *plus* (ii) 2% of the net Sale proceeds that are between $25,000,000 and $87,500,000; *plus* (iii) 6% of the net Sale proceeds in excess of $87,500,000

(the "<u>Transaction Award Pool</u>").  The Debtors will allocate the Transaction Award Pool among the KEIP Participants who have earned a Transaction Award in accordance with the percentages reflected in the table above.

11. Alternatively, if the Reorganization occurs before a Transaction, then each KEIP Participant who remains employed will earn a Reorganization Award in accordance with the table above.  If earned, the Reorganization Award will be payable to each applicable KEIP Participant within 60 days of the Reorganization.  For the avoidance of doubt, the KEIP Participants may **not** receive both a Transaction Award and a Reorganization Award.

12. Upon a termination of employment without cause or due to the KEIP Participant's death or disability after the Transaction or Reorganization Award has been earned, but prior to the applicable payment date, the KEIP Participant will remain entitled to receive the Transaction or Reorganization Award on the regularly scheduled payment date.  If a KEIP Participant's employment is terminated without cause by the Debtors or due to the KEIP Participant's death or disability before the Transaction or Reorganization Award has been earned, then the KEIP Participant will receive a *pro rata* payment of the earned portion of the KEIP Participant's Transaction or Reorganization Award which shall be paid on the regularly scheduled payment date.  Except as otherwise provided herein, upon a termination of employment prior to a Transaction or a Reorganization for cause or due to the KEIP Participant's resignation, the terminated KEIP Participant will forfeit the right to receive any Reorganization or Transaction Award.  Any forfeited award may be reallocated to the remaining KEIP Participants by the Debtors, in consultation with management and subject to the consent of the Committee; *provided*, that no individual KEIP Participant's Transaction Award will be greater

than 34.7% of the Transaction Award Pool or Reorganization Award will be greater than $450,000.

13. In structuring the KEIP, the Debtors' Chief Executive Officer and the COO of the Company, in consultation with the Committee, worked to design a program that would incentivize the KEIP Participants and ensure the maximization of value for the Debtors' estates and for the benefit of their creditors. As a product of the negotiation with the Committee, the Debtors and A&M believe that the KEIP is reasonable, cost-effective and genuinely incentive-based program that is comparable to the KEIP Peer Group Plans. With the assistance of their advisors, including my team at A&M, as well as with input from the Committee and the Company's COO, the Debtors designed the KEIP to incentivize the Company's key employees and to ensure the maximization of the going concern value of the Company. Based on A&M's and the Debtors' diligence and analysis of comparable key employee incentive programs, the proposed KEIP is reasonable and justified under the facts and circumstances of these Chapter 11 Cases.

14. To ascertain the reasonableness of the KEIP, A&M selected a peer group of 12 key employee incentive plans that met the following criteria and each of which were recently approved in similar cases in this district as well as others: (i) companies with prepetition assets of approximately one-third to three-times the Company's assets, (ii) companies in regulated industries, such as technology, energy and pharmaceuticals to take into account the licensing and regulatory landscape for companies engaging in cryptocurrency trading in Japan, (iii) incentive plans with 15 or fewer participants and (iv) incentive plans approved by U.S.

bankruptcy courts in 2019 or later (the "KEIP Peer Group Plans").[3] The KEIP Peer Group Plans have varying structures, but the general terms and conditions of the KEIP Peer Group Plans are consistent with the KEIP, including the performance metrics aimed at maximizing value and the potential payout amounts.  Based on A&M's analysis, the potential stretch cost of the KEIP (assuming a maximum KEIP cost entailing each KEIP Participant's receipt of the License & Restart Awards *plus* either (a) the Reorganization Award or (b) the equivalent Transaction Award based on a sale with assumed net sale proceeds of approximately $77,400,000) is at or below the 75th percentile of the market on a total cost, per-KEIP Participant average cost, and cost as a percentage of pre-petition assets basis.  Based on the Debtors' review of comparable incentive plans, the Debtors believe that the total cost of the KEIP is reasonable relative to similarly-situated programs and justified under the circumstances of these Chapter 11 Cases.

15. Moreover, consistent with the KEIP Peer Group Plans, it is my understanding that the Debtors limited participation in the KEIP to only those in positions that are expected to provide the greatest impact on the Transaction and Reorganization efforts.  As a result, I believe the KEIP is appropriately designed to incentivize KEIP Participants to continue their substantial efforts in operating the Company and in preparation for a Reorganization or a Transaction, both of which require maximizing the value of the Company.

16. The cost of the KEIP is reasonable and can be properly supported by the Debtors in light of their assets, liabilities and earning potential.  The KEIP will cost only a small fraction of the anticipated value that the KEIP Participants are estimated to contribute to a potential Reorganization or the value of a potential Transaction.  The potential cost of the KEIP

---

[3] Achaogen, Inc., Basic Energy Services, Inc., Endologix, Inc., Fairway Energy, LP, Glansaol Holdings Inc., Liberty Power Holdings, LLC, Lighthouse Resources, Inc., Lilis Energy, Inc., Melinta Therapeutics, Inc., Rockall Energy Holdings LLC, Sienna Biopharmaceuticals, Inc., and Teligent, Inc.

(assuming a maximum KEIP cost entailing each KEIP Participant's receipt of the License & Restart Awards *plus* either (a) the Reorganization Award or (b) the equivalent Transaction Award based on a sale with assumed net sale proceeds of approximately $77,400,000) represents approximately 1.5% of the Company's prepetition assets, which is below the 75th percentile when compared to the other incentive plans analyzed by A&M. Further, the KEIP is designed to incentivize KEIP Participants to maximize the assets and earning potential of the Company, thereby benefiting the Debtors' estates. The KEIP is also fair and reasonable, as I understand that it does not unfairly discriminate and is targeted at the Company's key, most critical employees.

17. The Debtors also require the implementation of the KEIP because the Debtors are unable to compensate the KEIP Participants through other means. The Debtors currently lack authority to pay any incentive compensation, and the Debtors' cryptocurrency and equity-based compensation programs have little or no value and have ceased since the commencement of these Chapter 11 Cases. Although the Debtors have obtained authority from the Court to implement a key employee retention program (the "KERP"), the Debtors currently do not expect that any of the Company's employees will be included as KERP participants. Without the KEIP, the KEIP Participants will have fewer compensation opportunities than they historically had, at a time when they are working more, especially in light of their increased roles and heightened demands in connection with the efforts aimed towards a potential Transaction or Reorganization.

18. The Debtors, with the assistance of A&M, conducted thorough due diligence in developing the KEIP. The Debtors developed the KEIP to ensure that the scope and terms of the KEIP are reasonable and appropriate. The Debtors worked with A&M to review the

12 KEIP Peer Group Plans, and compared the approach taken in the KEIP to those taken in the KEIP Peer Group Plans to ensure that the Debtors' proposed program was reasonable and comparable to other programs that have been approved by courts in this district and across the country. To further ensure the reasonableness of the cost, A&M conducted a thorough analysis and confirmed that the potential stretch cost of the KEIP (assuming a maximum KEIP cost entailing each KEIP Participant's receipt of the License & Restart Awards *plus* either (a) the Reorganization Award or (b) the equivalent Transaction Award based on a sale with assumed net sale proceeds of approximately $77,400,000) was at or below the 75th percentile of the market on a total cost, per-KEIP Participant average cost, and cost as a percentage of pre-petition assets basis. Moreover, in structuring the KEIP, the Debtors and management negotiated with the Committee to ensure that the KEIP was reasonable and had the Committee's support. Based on this analysis of the KEIP Peer Group Plans, I believe that the KEIP is consistent with the standards and practices in the industry in general, and with chapter 11 debtors in particular.

19. Based on the facts and circumstances articulated herein, I believe that the KEIP is reasonable for a company of this size and type. Further, based on the circumstances presented, I believe that approval of the KEIP is in the best interest of the Debtors' estates, their creditors, and all other parties-in-interest.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information and belief.

Dated: April 26, 2023                    */s/ Brian Cumberland*
                                                                           Brian Cumberland
                                                                           Alvarez & Marsal North America, LLC
                                                                           Managing Director