IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re<br>FTX Trading Ltd., et al.,<br>*Debtors*. | Chapter 11<br>Case No. 22-11068-JTD<br>(Jointly Administered)<br><br>Re: 1324<br><br>Objection Deadline:<br>May 4, 2023 at 4:00 p.m. (ET)<br><br>Hearing Date:<br>May 17, 2023 at 1:00 p.m. (ET) |

**MEDIA INTERVENORS' OBJECTIONS TO THE
JOINT MOTION OF THE DEBTORS AND THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS FOR AN ORDER AUTHORIZING THE MOVANTS TO
REDACT OR WITHHOLD CERTAIN CONFIDENTIAL INFORMATION OF
CUSTOMERS AND PERSONAL INFORMATION OF INDIVIDUALS**

Media Intervenors -- Bloomberg L.P., Dow Jones & Company, Inc., The New York Times Company and The Financial Times Ltd. -- hereby object to the joint motion of the Debtors and the Official Committee of Unsecured Creditors (together, "Movants") for an order authorizing them to redact or withhold certain confidential information of customers and personal information of individuals, D.I. 1324.[1]  Because of the substantial overlap between the arguments made in support of Movants' instant motion and the arguments made by the Ad Hoc Committee of Non-US Customers in support of their motion to seal, D.I. 1137, Media Intervenors hereby incorporate by reference their objections to the motion of the Ad Hoc Committee of Non-US Customers, including their objections to any extension or continuance of the redaction deadline. D.I. 1226.

---

[1] FTX Trading Ltd.'s and Alameda Research LLC's tax identification numbers are 3288 and 4063, respectively. Due to the large number of debtor entities in these Chapter 11 cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.

## BACKGROUND

1.  On November 11, 2022, Debtors petitioned for relief under Chapter 11 of the Bankruptcy Code. D.I. 1. On November 19, 2022, Debtors moved for leave to file a consolidated Creditor Matrix containing the names and addresses of their creditors. D.I. 45 at 3–4, ¶ 6. Simultaneously, Debtors sought leave pursuant to 11 U.S.C. § 107(b)(1) to redact the names and addresses of their customers in all publicly filed versions of the Creditor Matrix and Consolidated Top 50 Creditors List and Schedules and Statements. D.I. 45 at 5–6, ¶ 12.

2.  On December 9, 2022, Media Intervenors moved to intervene for the limited purpose of opposing the redaction of the creditors' names; Media Intervenors' motion set forth their objections to Debtors' proposed redactions. D.I. 196.

3.  On December 12, 2022, the U.S. Trustee filed objections to, in relevant part, Debtors' proposed redaction of their creditors' names. D.I. 200.

4.  On December 19, 2022, the Court granted Media Intervenors' motion to intervene. D.I. 255.

5.  On January 8, 2023, Debtors filed a reply to the objections of Media Intervenors and the U.S. Trustee, D.I. 407, accompanied by the declaration of Kevin M. Cofsky (the "Cofsky Declaration"). D.I. 411. On reply, Debtors limited their request to seal the names of *some* creditors to a period of six months, subject to extension. D.I. 407 at 5, ¶ 10. Debtors maintained, however, their request to permanently redact the names of customers "who are citizens of countries protected by the GDPR."[2]  *Id.* at ¶ 30.

---

[2] Debtors also sought to "reserve all rights with respect to seeking to permanently redact names of creditors who are citizens of other countries with similar laws if subsequently advised by counsel to be necessary." D.I. 407 at 12 n.9.

6. On January 11, 2023, the Court held a hearing (the "Second Day Hearing") on, *inter alia*, Debtors' request to redact the names of their customers, at which the Court heard testimony from Mr. Cofsky. D.I. 489. On January 20, 2023, the Court entered an Order (the "Redaction Order") granting final relief as to some portions of Debtors' sealing request and interim relief as to other portions. D.I. 545. The Court authorized Debtors "to redact the addresses and email addresses of their creditors and equity holders who are natural persons from any filings." *Id.* at ¶ 5. The Court also authorized Debtors, pursuant to 11 U.S.C. § 107(b)(1), to redact the names of "all customers," and the "addresses and email addresses of customers who are not natural persons," for a period of 90 days (the "Redaction Period")—*i.e.*, until April 20, 2023 (the "Redaction Deadline"). D.I. 545, ¶ 4. Finally, the Court authorized Debtors to redact the names and addresses of "any creditors or equity holders" who are "natural persons and who are protected by the GDPR" until the Redaction Deadline. *Id.* at ¶ 6.

7. On March 22, 2023, the Ad Hoc Committee of Non-US Creditors (the "Non-US Creditors") filed its own motion to seal, seeking to redact the names of its members in certain filings required by the Bankruptcy Code. D.I. 1137. The Non-US Creditors' motion made arguments under 11 U.S.C. § 107(b)(1) and § 107(c). *Id.* The Non-US Creditors' arguments under § 107(b) were substantially identical to those brought by Debtors, while the Non-US Creditors' arguments under § 107(c) expanded on those brought by Debtors. *Id.*

8. Media Intervenors timely objected to the Non-US Creditors' motion to seal (the "April 5 Objections"). D.I. 1226. In their April 5 Objections, Media Intervenors explained that there was no basis in the record for either (i) extending the 90-day Redaction Period pursuant to § 107(b)(1), or (ii) finding that public access to the names of FTX's customer-creditors would expose them to undue risk of identity theft or other unlawful injury pursuant to § 107(c). *Id.*

9. On April 20, 2023, Movants filed a motion to (i) extend the Redaction Period for an additional 90 days pursuant to § 107(b)(1); (ii) permanently seal the names of FTX's individual customer-creditors pursuant to § 107(c); and (iii) permanently seal the names of FTX's individual customer-creditors subject to certain non-U.S. privacy laws.  D.I. 1324.

10. Movants proffered no new evidence in support of their arguments for redaction under § 107(b) and foreign law.  In support of their argument for redaction under § 107(c), they submitted the declaration of Jeremy A. Sheridan (the "Sheridan Declaration"), accompanied by several hundred pages of exhibits.  D.I. 1325, 1325-1.

## ARGUMENT

### A.  THE RECORD DOES NOT ESTABLISH THAT THE NAMES OF FTX'S CUSTOMER-CREDITORS CONSTITUTE CONFIDENTIAL COMMERCIAL INFORMATION UNDER § 107(B).

11. Movants seek a 90-day extension of the Redaction Period pursuant to 11 U.S.C. § 107(b)(1), which permits bankruptcy courts to protect information constituting "a trade secret or confidential research, development, or commercial information."  *Id.*; D.I. 1324, ¶ 21-22.  To establish that the names of FTX's customer-creditors constitute confidential commercial information, Movants rely on the testimony given by Mr. Cofsky at the Second Day Hearing.  *Id.*  There, Mr. Cofksy testified that if FTX's customer-creditors' names were disclosed, competitors might be able to find their contact information and woo them away from FTX, thereby reducing the value of Debtors' estate.  Tr. of Second Day Hrg. 33:19–36:3.

12. The Court previously deemed this evidence sufficient to warrant sealing the names of FTX's customer-creditors for 90 days—a time period calculated to maintain the status quo while Debtors explored potential valuations of FTX's assets.  D.I. 545.  For the reasons stated in the

April 5 Objections, Mr. Cofsky's testimony does not justify further or continued sealing.  *See* D.I.
1226, ¶ 26–38.

13.  To start, Mr. Cofksy's testimony provides no basis for the continued sealing of Debt-
ors' top 50 creditors or its institutional creditors.  Even if, *arguendo*, the record was sufficient to
establish that FTX's customer-creditor list *as a whole* constituted confidential commercial infor-
mation within the meaning of § 107(b)(1)—which it is not—Movants have made no showing that
the names of the relatively small subset of customers that comprise FTX's top 50 creditors consti-
tute confidential commercial information.  D.I. 1226, ¶ 47-48.  Thus, even if the Court permits
Movants to redact the names of most of FTX's customer-creditors for an additional 90 days pur-
suant to § 107(b)(1), it should nevertheless hold that the public's presumptive right of access is not
overcome as to (a) the names of FTX's customers who are also among Debtors' top 50 creditors;
or (b) at minimum, the names of FTX's *institutional* customers who are among Debtors' top 50
creditors.

14.  That said, the Court should not extend the Redaction Deadline at all.  Mr. Cofsky's
testimony -- the crux of Movants' evidence in support of redaction—was based on a transparently
unreliable experiment: his staff selected a handful of FTX's customer-creditors—fewer than 20
with non-generic names -- and ran unspecified internet searches that they believed led them to
some unspecified form of contact information for more than half of those customer-creditors.  Tr.
of Second Day Hrg. 33:19–36:3. Mr. Cofsky did not testify that he or his staff validated the results
of this experiment -- *e.g.*, by determining whether they had located accurate, current contact infor-
mation for the individuals they had searched for, or whether they had, in fact, located contact
information for the correct individuals.  *See id*.

15.  At most, Mr. Cofsky's testimony establishes that if FTX's approximately nine million customer-creditors were named in public filings, an unknown number of unidentified competitors of FTX might Google (or otherwise search for) an unknown number of them in an attempt to discover their contact information; in doing so, these unknown competitors might succeed in discovering the contact information of an unknown percentage of FTX's individual creditors with non-generic names—some or all of whom may also be FTX customers, and some or all of whom, if customers at all, may *already* be customers of competing crypto exchanges.  This is speculation all the way down. The public's presumptive right of access to bankruptcy filings, 11 U.S.C. § 107(a), cannot be overcome by such conjecture. *In re Purdue Pharma LP*, 632 B.R. 34, 40 (Bankr. S.D.N.Y. 2021) (holding that a "request under § 107(b)(1) should be supported by specific evidence, not argument or conclusory statements in a declaration, to establish the exception").

16.  As Media Intervenors explained in their April 5 Objections, D.I. 1226, ¶ 31–34, the issue presented here is strikingly similar to the one faced by the Bankruptcy Court for the Southern District of New York in *In re Celsius Network, LLC*, 644 B.R. 276, 282 (Bankr. S.D.N.Y 2022). The debtors in *Celsius* -- a cryptocurrency exchange and affiliated entities -- argued that if the names of their customer-creditors were "publicly disclosed[,] their competitors would gain a 'significant competitive advantage by having access to the complete list of the Debtors' worldwide customer base,' which 'would significantly decrease the value of the customer list as an asset in any future potential asset sale.'"  *Id.*  The court disagreed, noting two logical gaps fatal to the debtors' arguments.  First, the court observed that the debtors' activity "ha[d] not won many fans among [d]ebtors' customers" and that the "[d]ebtors' business model [had] substantially changed." *Id.* at 291.  Second, the debtors "fail[ed] to address with evidence whether creditors who deposited crypto assets with the [d]ebtors also maintain accounts with the [d]ebtors' competitors."  *Id.* at

292.  The same reasoning applies here and should lead to the same result.  *See* D.I. 1226, ¶ 32–39 (explaining the applicability of *Celsius* and other analogous caselaw).

17.  Accordingly, and for the reasons set forth in Media Intervenors' April 5 Objections, the record fails to establish that the names of FTX's customers—and especially the names of FTX's customers who are also among Debtors' top 50 creditors—constitute confidential commercial information within the meaning of § 107(b)(1).  Continued sealing of those names is, therefore, unwarranted.

**B.    THE RECORD DOES NOT ESTABLISH THAT DISCLOSING THE NAMES OF FTX'S INDIVIDUAL CUSTOMER-CREDITORS WILL SUBJECT THEM TO AN "UNDUE RISK" OF IDENTITY THEFT OR OTHER UNLAWFUL INJURY.**

18.  Movants also seek to permanently redact the names of FTX's individual customer-creditors pursuant to 11 U.S.C. § 107(c).  D.I. 1324-2, ¶ 4.  Under § 107(c), a bankruptcy court may order certain information redacted "for cause"—*i.e.*, if the court finds that disclosure "would create *undue* risk of identity theft or other unlawful injury to the individual or the individual's property."  *Id.* (emphasis added).  Here, no such cause exists.

19.  As Media Intervenors explained in their April 5 Objections, D.I. 1226, ¶ 56, public access to the names of the parties in bankruptcy proceedings does not inherently expose them to an "*undue* risk of identity theft or other unlawful injury." 11 U.S.C. § 107(c) (emphasis supplied); *In re Avaya, Inc.*, 2019 WL 1750908 at *6 (Bankr. S.D.N.Y. 2019) ("If a desire for secrecy or general fear of identity theft constituted cause for redaction, a court would have to seal or redact all personal information in every case.").

20.  Indeed, almost everyone who participates in bankruptcy proceedings does so openly. That is what § 107(a) and the First Amendment require.  *In re Blake*, 452 B.R. 1, 10 (Bankr. D. Mass. 2011) ("[T]he presumption of public access to documents filed in a bankruptcy case is

paramount…"); *In re Anthracite Cap., Inc.*, 492 B.R. 162, 171 (Bankr. S.D.N.Y. 2013) ("A court's ability to limit the public's right to access remains an extraordinary measure that is warranted only under rare circumstances as public monitoring is an essential feature of democratic control") (internal quotation marks omitted); *In re Crawford*, 194 F.3d 954, 960 (9th Cir. 1999) (explaining that the government's interest in ensuring public access to court records "is of special importance in the bankruptcy arena, as unrestricted access to judicial records fosters confidence among creditors regarding the fairness of the bankruptcy system").

21.  What Movants ask is for this Court to recognize a novel and sweeping exception to this requirement of transparency for those bankruptcy proceedings involving cryptocurrency exchanges.  According to Movants, FTX's individual customer-creditors are different because they have chosen to use cryptocurrency.  But there is no legal basis for giving crypto users the ability to participate in bankruptcy proceedings anonymously.  And nothing in the record, including in the Sheridan Declaration, supports such an exception.

22. Movants try but fail to demonstrate that disclosure of the names of crypto users -- including FTX's individual customer-creditors -- would render them more vulnerable to unlawful injury than other named participants in bankruptcies.  Quoting the Sheridan Declaration, Movants assert that "malefactors typically target (x) consumers they believe to be holders of cryptocurrency and (y) consumers who are in a vulnerable state, including because they have sums of money tied up in bankruptcy proceedings."  D.I. 1325, ¶ 8.

23.  The hundreds of pages of whitepapers, news articles, and legal filings attached to the Sheridan Declaration, however, tell a different story.  *See generally* D.I. 1325-1.  They reveal that some wrongdoers *use crypto* to launder money swindled from their victims; critically, however, the methods employed by said wrongdoers are not tailored to, nor uniquely effective against,

crypto users.[3] *See, e.g.*, D.I. 1325-1 at 132 (whitepaper describing scams in which fraudsters use crypto to hide money stolen from victims).  Quite the opposite.

24.  According to Mr. Sheridan's own exhibits, scammers in the crypto context do what they do in most other contexts: convince a trusting or distracted person to click on a malicious link, respond to a phony email, buy into a bogus investment, or send money to a celebrity or invented romantic partner.  *See, e.g.*, *id.* (describing varieties of scams); *id.* at 43 (general overview of "Business Email Compromise" scam, unconnected to cryptocurrency).  Such scams are not new, and crypto users are not unusually vulnerable to them; to the contrary, crypto users tend to be more digitally savvy than the general population and are well-equipped to detect and ignore such scams -- especially when they are warned to be on the lookout for them.  *See, e.g.*, *id.* at 37 (news article explaining that users of the Gemini crypto exchange received, detected, and reported phishing emails).

25.  Take "pig butchering." This is a cruel and luridly named tactic by which a scammer cultivates a sham friendship with a victim, convinces the victim to invest money in a fake crypto fund, and then makes off with the victim's investment.  *See id.* at 144 (portion of whitepaper describing "pig butchering"); *id.* at 155 (news article describing victims of "pig butchering").

26.  "In most of these schemes," according to Mr. Sheridan, "the malefactor doesn't know their target prior to executing the fraud *and has to persuade them to set up a cryptocurrency wallet*." D.I. 1325, ¶ 15 (emphasis added).  That makes sense, as someone completely unfamiliar with the crypto landscape, who has never created a crypto wallet or used crypto currency, may have

---

[3] Movants do not argue that criminals' use of cryptocurrency makes it inherently risky for FTX's customer-creditors to be identified by name. If they did, the argument would be meritless. FTX's customer-creditors knowingly invested in a novel, volatile, and largely unregulated financial market; they assumed the risks inherent in such investment, and their decision to so invest does not entitle them to anonymity in related bankruptcy proceedings.

difficulty distinguishing between a legitimate investment opportunity and a scam.  But FTX's customer-creditors don't fit that bill: they already have crypto wallets and are "already versed in cryptocurrency." *Id.*

27. Thus, while Mr. Sheridan suggests FTX's customer-creditors are more attractive to "malefactors" running a "pig butchering" scam, *id.*, that is illogical, implausible, and unsupported by Mr. Sheridan's own exhibits.  Common sense compels the opposite conclusion: people who already know their way around the crypto world are *less* susceptible to "pig butchering" and other cons.

28. *Celsius* bears out this point.  Contrary to Movants' assertion, "the disclosure of customer names in *Celsius*" has not "resulted in the exact injury that the court there believed was speculative when initially raised."  D.I. 1324, ¶ 27 n.7.  Instead -- as demonstrated by Movants' own proffered evidence -- some *Celsius* customers have received phishing emails, which they detected and forwarded to Debtors' counsel of record, who duly posted warnings on the public docket.  *See* D.I. 178–198.  When the *Celsius* court learned that one of these would-be phishing scams included a fake court order, the court informed the U.S. Marshalls.  D.I. 1325-1 at 285 ("In light of the fact that they appear to have taken an order of the Court and used it in part, we will also report it to the U.S. Marshall. Ordinarily they wouldn't get involved, the U.S. Marshall wouldn't be involved. But since they seem to be trying to invoke something that the Court did, we'll make sure we call it to their attention promptly as well.").

29. Despite these scam attempts, the record contains *no evidence* that any individuals named in the *Celsius* litigation have fallen victim to theft—either of their identities or their crypto assets.  Little wonder.  Phishing emails (often but not always caught by spam filters) are a ubiquitous feature of the digital world; anyone with an email account knows to be wary of them.  *See,*

*e.g.*, Federal Trade Commission, *How to Recognize and Avoid Phishing Scams* (Sept. 2022), https://consumer.ftc.gov/articles/how-recognize-and-avoid-phishing-scams.  There is no reason to conclude that users of cryptocurrency exchanges are more susceptible to phishing scams than other litigants named in bankruptcy proceedings -- many of whom, like crypto owners, doubtless use the internet to access their bank accounts, credit cards, retirement funds, and other important assets. And, again, common sense suggests that crypto owners, by and large, possess *greater* digital fluency than the average customer or creditor named in bankruptcy court filings and are thus *less* susceptible to phishing attempts.

30.  Crypto owners are like everyone else: sometimes, scammers target them.  If being targeted by phishing emails and other fraud vectors were enough to justify sealing individuals' names under § 107(c), then virtually every individual party to a bankruptcy proceeding could litigate anonymously. Neither the First Amendment nor the Bankruptcy Code permits that outcome. And nothing in the record supports making a special exception for FTX's individual customer-creditors here.[4]

**C.    THERE IS NO LEGAL BASIS FOR REDACTING THE NAMES OF FTX'S INDIVIDUAL CREDITORS PURSUANT TO FOREIGN DATA PRIVACY LAWS.**

31.  Finally, "pursuant to section 105 of the Bankruptcy code," Movants seek to permanently seal the names of individual creditors who are protected by the GDPR and "Japan data privacy laws."  D.I. 1324, ¶ 35; D.I. 1324-2, ¶ 4. But no part of § 105 permits foreign law to

---

[4] "No compelling reason exists to require disclosure of the Individual Customer Names," Movants write. D.I. 1324, ¶ 34. That gets the law backwards. The public has a *presumptive right* to the names of FTX's customer-creditors—a right that flows from both the First Amendment and the Bankruptcy Code. The question is whether Movants have demonstrated a compelling reason for overcoming that right.  They have not.

override the public's qualified right of access to bankruptcy filings under U.S. constitutional and statutory law.

32.   Section 105 states that "[t]he court may issue any order, process, or judgment that is necessary or appropriate *to carry out the provisions of this title*." *Id.* (italics added). Here, the relevant provision of "this title" is 11 U.S.C. 107(a), which provides that "a paper filed in a case under this title and the dockets of a bankruptcy court are public records." *Id.*

33.   The statute is unambiguous: filings made under the Bankruptcy Code are presumptively public. And while there are exceptions to the requirement of openness, those exceptions are set forth entirely in § 107(b) and (c)—not in § 105, the authority cited by Movants. Neither § 107(b) nor § 107(c) permits the sealing of U.S. bankruptcy filings pursuant to foreign law. Movants do not argue otherwise, effectively conceding the point.[5]

34.   Movants' passing invocation of 28 U.S.C. § 959(b) is a red herring. D.I. 1324, ¶ 46. That provision, which appears in a separate title of the U.S. Code, requires a "debtor in possession" to comply with certain laws of U.S. States. 28 U.S.C. § 959(b). It has nothing to do with foreign law, and it most certainly does not provide that when a foreign law conflicts with 11 U.S.C. § 107, the foreign law prevails.

35.   At bottom, Movants desire to avoid "enforcement of the public disclosure requirements of U.S. bankruptcy law[,]" D.I. 1324, ¶ 45, furnishes no basis for sealing. The law of the United States -- constitutional and statutory -- guarantees the public a strong presumptive right to

---

[5] Specifically, Movants do not argue that a financial penalty levied under the GDPR or Japanese law would constitute an "unlawful injury" for purposes of 11 U.S.C. § 107(c). Rightly so. As Media Intervenors have explained, "a penalty imposed by operation of law is not generally thought to be 'unlawful.' It is certainly not like 'identity theft,' the only form of 'unlawful injury' expressly identified in § 107(c)." D.I. 1225 ¶ 55 (citing *McDonnell v. United States*, 579 U.S. 550, 568–69 (2016) ("Under the familiar interpretive canon *noscitur a sociis*, a word is known by the company it keeps.")).

inspect bankruptcy filings. That right cannot be abrogated by a party's assertion of legal obligations under foreign law, including a party's desire to avoid paying fines to which it *might* be subject under foreign law.

## **CONCLUSION**

For the foregoing reasons, as well as those set forth in the April 5 Objections, D.I. 1226, Media Intervenors respectfully request that the Court deny Movants' motion to seal.

Respectfully submitted,

Dated: May 3, 2023

/s/ David L. Finger
David L. Finger (ID #2556)
FINGER & SLANINA, LLC
One Commerce Center
1201 N. Orange St., 7th fl.
Wilmington, DE 19801
(302) 573-2525
dfinger@delawgroup.com

Katie Townsend (pro hac vice)
THE REPORTERS COMMITTEE FOR
FREEDOM OF THE PRESS
1156 15th Street NW, Suite 1020
Washington, DC 20005
202.795.9300
ktownsend@rcfp.org

*Counsel for Media Intervenors*