## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) |
|  | ) Chapter 11 |
|  | ) |
|  | ) Case No. 22-11068 (JTD) |
|  | ) |
| FTX TRADING LTD., et al.,[1] | ) (Jointly Administered) |
|  | ) |
|  | ) **Ref. Docket No. 1192** |
| Debtors. | ) |
|  | ) **Hearing Date: May 17, 2023 at 1:00 p.m. (ET)** |
|  | ) |

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO MOTION OF THE JOINT PROVISIONAL LIQUIDATORS FOR A DETERMINATION THAT THE U.S. DEBTORS' AUTOMATIC STAY DOES NOT APPLY TO, OR IN THE ALTERNATIVE FOR RELIEF FROM STAY FOR FILING OF THE APPLICATION IN THE SUPREME COURT OF THE COMMONWEALTH OF THE BAHAMAS SEEKING <u>RESOLUTION OF NON-US LAW AND OTHER ISSUES</u>**

---

[1]    The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and 4063, respectively.  Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification number is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.

## Table of Contents

Page(s)

PRELIMINARY STATEMENT ............................................................................................ 1

BACKGROUND ................................................................................................................. 5

   A.   Creation of the International Exchange ..................................................................... 5

   B.   The International Exchange Terms of Service............................................................ 6

   C.   FTX Trading Creates FTX DM .............................................................................. 7

   D.   The Purported Migration of the International Exchange's Customers ........................... 10

   E.   The Chapter 11 and 15 Cases............................................................................... 12

   F.   FTX DM Repeatedly Avails Itself of This Court's Jurisdiction....................................... 13

   G.   The Adversary Proceeding, Application and the Instant Motion ..................................... 15

OBJECTION..................................................................................................................... 16

   I.   The Automatic Stay Precludes the JPLs from Filing and Prosecuting the Application ... 16

   II.   Cause Does Not Exist to Lift the Automatic Stay ......................................................... 20

       a.   The Debtors Would Suffer Significant Prejudice if the Application Were to be Litigated in the Bahamas ....................................................................................... 21

       b.   The JPLs Will Suffer No Hardship if the Motion is Denied.................................. 25

       c.   The JPLs Will Not Prevail on the Merits............................................................. 26

   III.   Considerations of Comity Do Not Change the Above Conclusions................................. 27

CONCLUSION.................................................................................................................. 31

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases**

*In re Am. Classic Voyages, Co.,*
   298 B.R. 222 (D. Del. 2003) ...............................................................................................25

*In re Calpine Corp.,*
   354 B.R. 45 (Bankr. S.D.N.Y. 2006) ..................................................................................22

*In re DBSI, Inc.,*
   432 B.R. 126 (Bankr. D. Del. 2010) ...................................................................................25

*In re Downey Fin. Corp.,*
   428 B.R. 595 (Bankr. D. Del. 2010) ...................................................................................21

*In re Elpida Memory, Inc.,*
   No. 12-10947 CSS, 2012 WL 6090194 (Bankr. D. Del. Nov. 20, 2012) ..............................27

*In re French,*
   303 B.R. 774 (Bankr. D. Md. 2003) ....................................................................................28

*In re Howrey LLP,*
   492 B.R. 19 (Bankr. N.D. Cal. 2013) ..................................................................................19

*In re Kaiser Aluminum Corp., Inc.,*
   315 B.R. 655 (D. Del. 2004) ................................................................................................18

*In re Lyondell Chem. Co.,*
   543 B.R. 428, 460 (Bankr. S.D.N.Y. 2016) .........................................................................23

*In re Majestic Star Casino, LLC,*
   No. ADV. 10-50841 (KG), 2010 WL 2540457 (Bankr. D. Del. Apr. 24, 2010) ...................24

*Mar. Elec. Co. v. United Jersey Bank,*
   959 F.2d 1194 (3d Cir. 1991) ...............................................................................................18

*McCartney v. Integra Nat. Bank N.,*
   106 F.3d 506 (3d Cir. 1997) .................................................................................................22

*Midlantic Nat. Bank v. New Jersey Dep't of Env't Prot.,*
   474 U.S. 494 (1986) ..............................................................................................................16

*In re Nat'l Steel Corp.,*
   316 B.R. 287 (Bankr. N.D. Ill. 2004) ..................................................................................20

*In re Noranda Aluminum, Inc.*,
   549 B.R. 725 (Bankr. E.D. Mo. 2016) ...................................................................................25

*In re Nortel Networks Corp.*,
   426 B.R. 84 (Bankr. D. Del. 2010) ................................................................................26, 29

*In re Nortel Networks Inc.*,
   No. 09-10138-KG, 2010 WL 3075760 (D. Del. Aug. 5, 2010) .............................................27

*In re Old Carco LLC*,
   406 B.R. 189 (Bankr. S.D.N.Y. 2009) ...................................................................................20

*In re Peregrine Sys., Inc.*,
   No. 02-12740 (JFK), 2005 WL 2401955 (D. Del. Sept. 29, 2005) .......................................17

*In re Railyard Co., LLC*,
   562 B.R. 481 (Bankr. D.N.M. 2016) .....................................................................................25

*Remington Rand Corp.-Delaware v. Bus. Sys. Inc.*,
   830 F.2d 1260 (3d Cir. 1987) ................................................................................................30

*In re RNI Wind Down Corp.*,
   348 B.R. 286 (Bankr. D. Del. 2006) ......................................................................................25

*In re Samson Res. Corp.*,
   559 B.R. 360 (Bankr. D. Del. 2016) ................................................................................23-24

*In re Scarborough St. James Corp.*,
   535 B.R. 60 (Bankr. D. Del. 2015) ........................................................................................22

*In re SCO Grp., Inc.*,
   395 B.R. 852 (Bankr. D. Del. 2007) ............................................................................ *passim*

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec., LLC*,
   460 B.R. 106 (Bankr. S.D.N.Y. 2011) ...................................................................................18

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
   474 B.R. 76 (S.D.N.Y. 2012) ...........................................................................................22, 24

*In re Solar Tr. of Am., LLC*,
   No. 12-11136(KG), 2015 WL 1011548 (Bankr. D. Del. Jan. 12, 2015) ...........................27-28

*In re Soundview Elite, Ltd.*,
   503 B.R. 571 (Bankr. S.D.N.Y. 2014) ...................................................................................28

*In re Trib. Co.*,
   418 B.R. 116 (Bankr. D. Del. 2009) ......................................................................................25

*In re W.R. Grace & Co.*,
  No. 01 01139 JFK, 2007 WL 1129170 (Bankr. D. Del. Apr. 13, 2007) ......................... 24-25

*In re Windhaven Top Ins. Holdings, LLC*,
  636 B.R. 596 (Bankr. D. Del. 2021) ..................................................................................25

*Zazzali v. 1031 Exchange Group LLC (In re DBSI, Inc.)*,
  467 B.R. 309 (Bankr. D. Del. 2012) ............................................................................. 22-23

**Statutes**

11 U.S.C. § 105..........................................................................................................................22

11 U.S.C. § 362.................................................................................................................. *passim*

**Other Authorities**

*Ad Hoc Committee of Non-US Customers of FTX.com v. FTX Trading Ltd., et al.*,
  Adv. Proc. No. 22-50514 (Bankr. D. Del.) ..........................................................................7

*Alameda Research LLC, et al. v. FTX Digital Markets Ltd., et al.*,
  Adv. Proc. No. 23-50145 (Bankr. D. Del.) .............................................................. *passim*

Bethany Biron, *FTX founder Sam Bankman-Fried donated $40 million to political
  campaigns leading into the midterms, leaving some concerned about crypto's
  place in Washington, report says*,
  BUS. INSIDER, Nov. 20, 2022, available at
  https://www.businessinsider.com/ftx-sam-bankman-fried-donated-millions-
  democrats-report-2022-11.........................................................................................29

*CFTC v. Bankman-Fried et al.*,
  Case No. 22-cv-10503 (S.D.N.Y.)......................................................................................30

*CFTC v. Singh*,
  Case No. 23-cv-01684 (S.D.N.Y.)......................................................................................30

Morgan Chittum, *Who is Ryan Salame, the FTX exec, Republican mega-donor,
  and New England restaurateur who blew the whistle on FTX?*,
  BUS. INSIDER, Dec. 20. 2022, available at
  https://markets.businessinsider.com/news/currencies/ryan-salame-ftx-exec-
  republican-mega-donor-new-england-restauranteur-2022-12 ................................29

Nik Popli, *Here's What We Know About Sam Bankman-Fried's Political
  Donations*,
  TIME, Dec. 14, 2022, available at https://time.com/6241262/sam-bankman-
  fried-political-donations/ ...........................................................................................29

Rob Price, Dakin Campbell, Jack Newsham, and Darius Rafieyan, *Mr. Crypto Goes to Washington*,
    BUS. INSIDER, Dec. 4, 2022, available at
    https://www.businessinsider.com/sam-bankman-fried-ftx-crypto-lobbying-
    campaign-donations-congress-biden-2022-12 ......................................................................29

*Onusz, et al. v. FTX Trading Ltd., et al.*,
    Adv. Proc. No. 22-50513 (Bankr. D. Del.) .............................................................................7

Press Release, House Financial Services Committee, *McHenry, Waters Announce December Hearing to Investigate FTX Collapse*,
    Nov. 16, 2022, available at
    https://financialservices.house.gov/news/documentsingle.aspx?DocumentID=
    408471.........................................................................................................................................30

*SEC v. Bankman-Fried*,
    Case No. 22-cv-10501 (S.D.N.Y.) ..........................................................................................30

*SEC v. Ellison et al.*,
    Case No. 22-cv-10794 (S.D.N.Y.) ..........................................................................................30

*SEC v. Singh*,
    Case No. 23-cv-01691 (S.D.N.Y.) ..........................................................................................30

*Seventh Affidavit of Kevin Cambridge (1st Joint Provisional Liquidators' Interim Report)*,
    Feb. 8, 2023, available at https://www.pwc.com/bs/fdm...........................................................9

*United States v. Bankman-Fried*,
    Case No. 22-cr-00673 (S.D.N.Y.) ...........................................................................................30

The Official Committee of Unsecured Creditors (the "Committee") appointed in the chapter 11 cases (the "Chapter 11 Cases") of the above-captioned debtors and debtors-in-possession (the "Debtors"), by and through its undersigned counsel, hereby submits this objection (the "Objection") to the *Motion of the Joint Provisional Liquidators for a Determination that the U.S. Debtors' Automatic Stay Does Not Apply to, or in the Alternative for Relief from Stay for Filing of the Application in the Supreme Court of The Commonwealth of The Bahamas Seeking Resolution of Non-US Law and Other Issues* [Docket No. 1192][2] (the "Motion"), and, in support thereof, respectfully states as follows:

## PRELIMINARY STATEMENT[3]

1.      The directors and officers of the Debtors serve as fiduciaries of their respective Debtors' estates.  As Joint Provisional Liquidators and Foreign Representatives (the "JPLs") of FTX Digital Markets Ltd. ("FTX DM"), Brian C. Simms KC, Kevin G. Cambridge, and Peter Greaves claim to serve as fiduciaries to the FTX DM Bahamian liquidation estate.  Both the JPLs and the Debtors have publicly acknowledged their respective fiduciary duties and intent to act in the best interests of their creditors, including, most importantly, the same customers of the International Exchange.  Yet here we are.  Nearly six months into these Chapter 11 Cases, the JPLs are again forcing the Debtors and the Committee to squander significant estate resources to respond to the JPLs' game of jurisdictional tug of war that in no way will benefit creditors.  The

---

[2]    References to "Ch. 15 Docket No." refer to docket entries in the Chapter 15 Case (as defined below); references to "Adv. Proc. Docket No." refer to docket entries in the Adversary Proceeding (as defined below); references to "Docket No." refer to docket entries in the Chapter 11 Cases.

[3]    Capitalized terms used in this Preliminary Statement and not defined herein shall have the meanings ascribed to them later in the Objection or in the Motion, as applicable.

JPLs' Motion thus ignores the interests of the very customers of the International Exchange to whom they attest to have a fiduciary duty.

2.      Indeed, that FTX DM is in an independent Bahamian liquidation proceeding is merely a function of the haste in which proceedings against that entity were commenced; FTX DM would otherwise have been another of the more than one hundred debtors before this Court.  The fact that a separate proceeding for FTX DM is pending in the Bahamas does not change the fact that FTX DM, at bottom, is just another of the many FTX entities that may have intercompany claims against, and obligations to, others in the FTX structure.

3.      Given the Debtors' and JPLs' overlapping fiduciary duties, the Committee was hopeful that there could have been a consensual resolution to the issues among the parties.  It is now unfortunate and clear that litigation is necessary to resolve those issues, and equally clear that such litigation must take place in this Court.  At its core, the Application that the JPLs seek to file in the Bahamas will result in a needless waste of **_both_** estates' resources, to the detriment of the customers of the International Exchange -- the creditors that the JPLs claim to protect.  The Motion must be denied.

* * * * *

4.      By their Motion, the JPLs seek authority to file a directions application (the "Application") in the Bahamas that would allegedly "provide the Bahamas Court with the predicate jurisdiction to answer those Non-U.S. Law Customer Issues **_necessary_** to advance [FTX DM's] Provisional Liquidation."  (Motion at ¶ 3 (emphasis added).)  Therein lies the central tension in the Motion.  Although the JPLs frame their requested relief as a "**_necessary_**" determination of certain "Non-U.S. Law Customer Issues", the reality is anything but.  As set forth in more detail below, when the breadth of the "directions" sought in the Application is juxtaposed

with the statements and actions by the JPLs in these Chapter 11 Cases, it is clear that the Application will have severe and prejudicial effects on the estates of FTX Trading and the other Debtors, a patent and preventable violation of the automatic stay.

5. To be sure, the Committee has no objection to the JPLs doing what is truly necessary to liquidate their estate. If the JPLs were only seeking to determine who their creditors are, the Committee might not be objecting today. Indeed, the best result for the customers of the International Exchange -- to whom both the JPLs and the Debtors claim the same duty -- is for the JPLs to simply deem all customers of the International Exchange creditors of FTX DM and distribute accordingly the limited assets FTX DM has in its possession. It seems obvious that no customer would object to having a claim against both FTX DM and FTX Trading, nor to receiving a recovery from both estates until each customer is made whole. A protocol could then surely be agreed upon to effectuate such a distribution among the parties. Unfortunately, that is not the process requested in the Motion.

6. Instead, the JPLs seek in the Motion this Court's permission to litigate in the Bahamas questions that concern property of the Debtors' estates -- including questions concerning who owns the assets that make up the International Exchange. Such relief would be antithetical to the chapter 11 process and precisely the circumstance against which the automatic stay was designed to protect.

7. *First*, notwithstanding the JPLs' protestations to the contrary, the automatic stay bars the JPLs from seeking a determination from the Bahamas Court on the Application. Among other things, the Application seeks a determination that "digital assets and/or fiat transferred by Users to the FTX International [Exchange] were . . . assets and/or fiat of FTX DM[.]" (*See* Application at 3(d).) Inasmuch as those "digital assets and/or fiat" currently belong to, and are in

3

the possession of, FTX Trading, answering the questions raised in the Application will inevitably result in the Bahamas Court determining questions concerning property in the possession of the Debtors, the archetypal act section 362 is meant to prohibit. Simply stated, permitting the JPLs to file and litigate the Application would allow a foreign court to issue significant rulings concerning property of FTX Trading's estate, determinations that only this Court, as the court overseeing the bankruptcy case of FTX Trading, has the jurisdiction to make.

8.    *Second*, the JPLs have not met their burden to prove any of the factors courts analyze when deciding whether cause exists to lift the automatic stay. Initially, regardless of the Court's ruling on the Motion, the "directions" that the JPLs seek from the Bahamas Court will need to be determined *de novo* by this Court under the terms of the Cooperation Agreement and Recognition Order. Therefore, lifting the stay would subject the Debtors to time-consuming, needless, and duplicative litigation in the Bahamas, prejudicing the estate. Likewise, the JPLs would suffer no hardship by litigating in this Court the questions raised in the Application. The Debtors have already commenced an adversary proceeding to address the pertinent questions raised in the Application. Moreover, as set forth below, the JPLs have consistently availed themselves of this Court's jurisdiction in the Chapter 11 Cases, and thus any claims of hardship in litigating before this Court fail under the weight of the JPLs' own actions. Last, with respect to the underlying merits of the litigation that the JPLs seek to commence, the JPLs have not shown that FTX DM held title to any of the International Exchange's assets, including its customer accounts. The alleged migration of customer accounts from FTX Trading to FTX DM upon which the JPLs so heavily rely was, at best, an aspirational plan. As set forth below, the Committee has seen no evidence, and none is provided in the Motion, that the ambitious timeline and milestones set forth in the Migration Plan were met.

9.      *Third*, considerations of comity do not support lifting of the stay.  As explained below, although a court exercising its discretion may consider comity when analyzing whether to lift the automatic stay in favor of a foreign proceeding, considerations of comity are inapplicable where, as here, that foreign proceeding will address issues concerning property that are central to the bankruptcy estate.  Similarly, the existence of cross-border protocols in other bankruptcy cases has no relevancy here, where a foreign debtor is seeking a determination that property in the possession of a U.S. debtor belongs to it.

10.     For these reasons, and for the additional reasons described in more detail below, the Motion should be denied.

## BACKGROUND

### A.  Creation of the International Exchange

11.      In November 2017, Samuel Bankman-Fried and Zixiao "Gary" Wang founded Alameda Research LLC, a cryptocurrency-focused hedge fund incorporated in Delaware. (*See Supplemental Declaration of John J. Ray III in Support of First Day Pleadings* [Docket No. 92] ("Supp. First Day Decl."), Schedule 1.)   Seeing the opportunity to create a global cryptocurrency trading exchange, in April 2019, Mr. Bankman-Fried, Mr. Wang, and Nishad Singh incorporated FTX Trading Ltd. ("FTX Trading") in Antigua and Barbuda, where it remains incorporated.  (Motion at ¶ 20.)  FTX Trading is the owner of, and ultimate parent company of the entities that hold, FTX.com, the trade name for the business conducted by FTX Trading (the "International Exchange").  (*See Declaration of John J. Ray III in Support of Chapter 11 Petitions and First Day Pleadings* [Docket No. 24] ("First Day Decl.") at ¶ 33.)  The International Exchange commenced operations in May 2019 as a digital asset trading platform and exchange, which allows

its users to buy, sell, exchange, hold, or otherwise transact in digital assets through the FTX.com website.  (*Id.*)

12.     Originally, the International Exchange was headquartered in Hong Kong, though FTX Trading had employees worldwide.  (Motion at ¶ 20.)  The International Exchange grew quickly after its launch, and prior to the Petition Date (as defined below) was one of the largest cryptocurrency exchanges in the world, with around $15 billion of assets on the platform by the end of 2021.  (First Day Decl. at ¶ 35.)

**B.  The International Exchange Terms of Service**

13.     At all times, use of the International Exchange was governed by the FTX.com Terms of Service (the "FTX Terms of Service"), which was and is an agreement by and between all of the International Exchange customers and FTX Trading.  (*See Declaration of Peter Greaves in Support of the Motion of the Joint Provisional Liquidators for a Determination that the U.S. Debtors' Automatic Stay Does Not Apply to, or in the Alternative for Relief from Stay for Filing of the Application in the Supreme Court of The Commonwealth of The Bahamas Seeking Resolution of Non-US Law and Other Issues* ("Greaves Decl.") [Docket No. 1194, Ex. C, Ex. D].)  Initially, the FTX Terms of Service was governed by Antiguan law (Motion at ¶ 22; Greaves Decl., Ex. C at § 27), though, the FTX Terms of Service was amended and restated over the years.  As of the Petition Date, the use of the International Exchange was subject to the May 13, 2022 Terms of Service (the "May 2022 Terms of Service"), which was governed by English law.  (Motion at ¶ 31; Greaves Decl., Ex. D at § 38.11)  Neither the initial nor May 2022 FTX Terms of Service were governed by Bahamian law.  (Motion at ¶¶ 22, 31.)

14.     To operate the International Exchange, FTX Trading engaged certain contractors -- including FTX DM -- which provided services for customers of the International

Exchange. These contractors were each deemed a "Service Provider" under the FTX Terms of Service.[4] At all times, any assets held by the International Exchange's customers were deposited or maintained by FTX Trading's Amazon Web Services cloud environment, all transaction fees were paid to FTX Trading, and the only counterparty with whom a customer had a direct contractual relationship was FTX Trading.[5] (*See Debtors' Objection to Emergency Motion (I) For Relief from Automatic Stay and (II) To Compel Turnover of Electronic Records Under Sections 542, 1519(A)(3), 1521(A)(7) and 1522 of the Bankruptcy Code* [Docket No. 335] (the "Debtors' Turnover Motion Objection") at ¶¶ 17, 19.)

### C. FTX Trading Creates FTX DM

15.    In July 2021, in response to certain changes to the Bahamian regulatory environment, FTX DM was incorporated in the Commonwealth of The Bahamas ("the Bahamas"). (Motion at ¶¶ 23, 25.) Upon incorporation, FTX DM became one of the scores of other subsidiaries existing in the FTX group of companies, many of which, like FTX DM, were ultimately 100% owned by FTX Trading. (Supp. First Day Decl., Schedule 1.) Indeed, FTX Trading was the ultimate parent company to approximately 50 different corporate entities incorporated throughout the world, including Delaware, Turkey, Singapore, Seychelles, Gibraltar, Hong Kong, and Switzerland, among other jurisdictions. (*Id.*)

16.    On September 10, 2021, FTX DM was registered as a "digital asset business" under the Bahamian Digital Assets and Registered Exchanges Act of 2020. (Motion at ¶ 28.) At the

---

[4]    The FTX Terms of Service define "Service Provider" as "the entity specified in a Service Schedule as responsible for providing the Specified Service referred to in that Service Schedule." (Greaves Decl., Ex. D, Schedule 1 at § 1.1.)

[5]    Two adversary proceedings have been filed against FTX Trading -- not FTX DM -- by users of the International Exchange regarding the construction and application of the FTX Terms of Service. (*See Onusz, et al. v. FTX Trading Ltd., et al.*, Adv. Proc. No. 22-50513 (Bankr. D. Del.), [Docket No. 1] at ¶ 103 ("FTX.com likewise provided its 'FTX Terms of Service' – between non-U.S. Customers and FTX Trading . . . ."); *Ad Hoc Committee of Non-US Customers of FTX.com v. FTX Trading Ltd., et al.*, Adv. Proc. No. 22-50514 (Bankr. D. Del.), [Docket No. 1] at ¶ 2 ("FTX Trading Ltd. . . . owned and controlled the FTX.com platform.").)

time of registration, FTX DM was registered as a "Digital Asset Service Provider", and ***not*** as a Digital Token Exchange.  (*Id.*)

17.     Shortly after FTX DM's registration, FTX Trading and FTX DM entered into a Services Agreement, under which FTX DM as "Contractor" was to provide "certain services" to FTX Trading as "Principal."  Like a typical subcontractor or intercompany relationship, through the Services Agreement, FTX Trading paid FTX DM a fee for its services, and FTX DM in turn agreed that anything created by FTX DM during the course of their engagement was done for the benefit of, and owned by, FTX Trading.  Specifically, under section 5.2 of the Services Agreement:

> [a]ny works, inventions or other Intellectual Property Rights created or developed by Contractor [*i.e.*, FTX DM] in connection with the performance of the Services or this Agreement, including any modifications to, embodiments of and derivative works based upon the products and/or Confidential Information, (collectively, the "***Works***") and any Intellectual Property Rights therein ***will be the sole and exclusive property of Principal*** [*i.e.*, FTX Trading].

(*See* Services Agreement[6] at § 5.2.).   The Services Agreement, in turn, defined "Intellectual Property Rights" to include, *inter alia*, "Internet or World Wide Web domain names or URLs," as well as "proprietary rights in technology, including software, all source and object code, algorithms, architecture, structure, display screens, layouts, inventions, development tools and all documentation and media constituting, describing or relating to the above, including, without limitation, manuals, memoranda, records, business information, anywhere in the world."  (*Id.* at § 1.2.)  Thus, under the terms of the Services Agreement, everything regarding the International Exchange was and is owned by FTX Trading; FTX DM was simply a contractor employed by FTX Trading to aid its operations.

---

[6]     A copy of the Services Agreement is annexed as **Exhibit A** to the  *Declaration of Kenneth Pasquale in Support of Objection of the Official Committee of Unsecured Creditors to Motion of the Joint Provisional Liquidators for a Determination that the U.S. Debtors' Automatic Stay Does Not Apply to, or in the Alternative for Relief from Stay for Filing of the Application in the Supreme Court of The Commonwealth of The Bahamas Seeking Resolution of Non-US Law and Other Issues*, filed contemporaneously herewith (the "Pasquale Decl.")

18.     Other than performing certain ministerial functions for FTX Trading, from July 2021 until approximately May 2022, FTX DM sat dormant.  (Motion at ¶ 31.)  In the May 2022 FTX Terms of Service, FTX DM was listed as a Service Provider for certain specified services.  (*Id*.)  Critically, neither FTX DM, nor any other Service Provider (or other entity within the FTX corporate structure), was a counterparty to the FTX Terms of Service.

19.     As contemplated by the May 2022 Terms of Services and the FTX DM Services Agreement, FTX DM's revenue came primarily from FTX Trading and/or other related parties.  The Committee is not aware of any payments for services made by customers of the International Exchange (or any third party) to FTX DM.  (Debtors' Turnover Motion Objection at ¶ 19.)  Rather, in total, FTX DM earned approximately $604,000 net income during calendar year 2021 and approximately $5.17 million net income through the first three quarters of 2022.  (*Id.*)  By contrast, FTX Trading generated over $1 billion in third party revenue during the calendar year 2021, and over $700 million in third-party revenue during the first three quarters of 2022.  (*Id.* at ¶ 17.)

20.     Consistent with its role as an intercompany service provider, FTX DM currently has limited assets in its possession.  Specifically, as acknowledged by the JPLs in their First Interim Report and Accounts (*Seventh Affidavit of Kevin Cambridge (1st Joint Provisional Liquidators' Interim Report)*), Feb. 8, 2023, available at https://www.pwc.com/bs/fdm ("First Interim Report and Accounts"), FTX DM's assets consist of:

- $219.5 million in cash, comprised of:
    - $21.5 million in cash on hand;
    - $54.5 million in cash "pending transfer to the control of the JPLs"; and
    - $143.2 million in cash that has been seized by the United States Department of Justice;
- $3 million tangible ancillary assets (including a vehicle fleet for employees based in the Bahamas and office furniture and equipment);

- $256.3 million in alleged receivables related to property owned by FTX Property Holdings Ltd., a U.S. debtor; and

- $19.9 million in alleged receivables from Alameda Research Ltd., another U.S. debtor.

(First Interim Report and Accounts at 4.3.1, 4.3.2, 4.3.3 and 8.2.2.)  Notably, the JPLs do not have control over any digital assets, though they have requested title to certain digital assets held in trust by the Securities Commission of The Bahamas (the "SCB") for the benefit of customers of the International Exchange.  (*Id.* at 4.4.1.)  Put simply, though the JPLs claim that FTX DM holds over half a billion dollars in assets (*id.* at 4.3.1, 4.3.2, 4.4.3 and 4.4.1), in reality, FTX DM holds only $21.5 million in cash and $3 million in tangible ancillary assets.

### D. The Purported Migration of the International Exchange's Customers

21.     Beginning in the summer of 2021, the Debtors considered a plan to migrate certain of their worldwide operations, including certain services provided by the International Exchange, to the Bahamas.  (Motion at ¶¶ 25, 26.)  To that end, sometime prior to August 2021, the FTX Digital Markets Limited Customer Migration Plan (the "Migration Plan") was drafted, with the goal of onboarding certain of the International Exchange's customers to FTX DM by early 2023.  The Migration Plan was just that: a "plan."  It did not effectuate an onboarding of any FTX Trading customer to FTX DM or a novation of any customer accounts.  Rather, the Migration Plan simply set forth a strategy with respect to how to effectuate a migration of FTX Trading customers to FTX DM.  (*Id.* at ¶ 27.)

22.     As part of that strategy, the Migration Plan contemplated providing notice to customers "[a]s the migration commences", a period for customers to "raise any queries, comments, or concerns" with FTX Trading, and the engagement of the FTX DM CEO and CO in FTX customer support and marketing "to ensure both FTX and [FTX DM] are aligned on the transition," among other things.  (*Id.* at ¶ 27 n.8.)  Critically, the Committee has found no evidence

(and the JPLs cite to none) that any such notifications or requirements actually occurred.  For instance, though the Migration Plan intended for there to be a lengthy notification period prior to any customer being migrated from FTX Trading to FTX DM, the Committee is aware of no evidence (and the JPLs cite to none) that any customer was notified that the customer's account had been migrated.  Likewise, though the Migration Plan proposed that customers could opt out of any purported migration, the Committee has seen no evidence (and the JPLs cite none) that any such opt-out period was afforded to a customer.

23.     In fact, the Committee has seen no evidence at all that the Migration Plan was implemented.  To the contrary, though the Migration Plan addressed the migration of high volume institutional users from FTX Trading to FTX DM by Q1 2022, other institutional users by Q2 2022, and individual users by Q3 2022 (Motion at ¶ 27), FTX DM did not commence any operations until the revised FTX Terms of Service went into effect in May of 2022.

24.     The Debtors likewise were not successful in moving their locus of operations to the Bahamas.  While the JPLs contend that "it was suggested that 700 FTX employees would eventually work and live in The Bahamas" (Motion at ¶ 25), FTX DM only employed approximately 83 individuals prior to the Petition Date.  (*Id.*)  Significantly, those few employees who were onboarded to FTX DM maintained a relationship with FTX Trading.  Similar to the assignment provisions included in the FTX DM Services Agreement, as part of FTX DM's employment agreements, each employee simultaneously executed an "Invention Assignment Agreement," which was affixed to their offers of employment, and by which employees expressly agreed to and acknowledged that FTX Trading would maintain ownership of all intellectual property and inventions created while they were employed by FTX DM.  (Adv. Proc. Docket No.

1 at ¶¶ 43-45.)  Among others, each of Messrs. Bankman-Fried, Wang, and Singh executed such

an Invention Assignment Agreement.  (*Id.*)

### E.  The Chapter 11 and 15 Cases

25.    For reasons that are now well known to the Court, on November 11 and 14, 2022

(collectively, the "Petition Date"), the Debtors filed with the United States Bankruptcy Court for

the District of Delaware (the "Court") voluntary petitions for relief under title 11 of the United

States Code, 11 U.S.C. §§ 101 *et seq*. (the "Bankruptcy Code").  The Debtors have continued to

operate and manage their businesses as debtors-in-possession pursuant to sections 1107(a) and

1108 of the Bankruptcy Code.[7]

26.    Immediately prior to the Petition Date, on November 10, 2022, the SCB petitioned

the Supreme Court of The Bahamas (the "Bahamas Court") for the provisional liquidation of

FTX DM, which was subsequently granted.  (Motion at ¶ 33.)  The JPLs were appointed on

November 10 and 14, 2022.  (*Id.*)  But for the SCB's petition, FTX DM would have remained

under the authority of FTX Trading, its parent company, and would have been yet another debtor

among the numerous others in these Chapter 11 Cases.

27.    On November 15, 2022, the JPLs filed a Chapter 15 Petition for Recognition in a

Foreign Proceeding (the "Chapter 15 Petition") in the United States Bankruptcy Court for the

Southern District of New York, seeking recognition of the provisional liquidation of FTX DM in

the Bahamas as a foreign main proceeding.  The case was subsequently transferred on consent to

this Court on November 22, 2022 as *In re FTX Digital Markets Ltd.*, No. 22-11217 (Bankr. D.

---

[7]    Additional factual background relating to the Debtors' businesses and the commencement of these Chapter 11
Cases is set forth in the First Day Decl., the *Declaration of Edgar W. Mosley II in Support of Chapter 11 Petitions
and First Day Pleadings* [Docket No. 57], the Supp. First Day Decl., and the *Supplemental Declaration of Edgar W.
Mosley II in Support of First Day Pleadings* [Docket No. 93].

Del.) (the "Chapter 15 Case"). (*See Agreed to Order to Transfer Venue* [Docket No. 131; Ch. 15 Docket No. 25].)

28.    Upon consent of all parties, this Court granted the Chapter 15 Petition on February 15, 2023, recognizing the Bahamian provisional liquidation as the "foreign main proceeding" for FTX DM pursuant to section 1517 of the Bankruptcy Code. (*See Order Granting Recognition of Foreign Main Proceeding and Certain Related Relief* [Ch. 15 Docket No. 129] (the "Recognition Order") at 4.) Critically, the Recognition Order provides that "[n]othing in [the Recognition Order] . . . requires the Court in the Chapter 11 Cases to defer to any decision in the Bahamian Liquidation Proceeding with respect to (or alter the Court's *de novo* or other applicable standard of review of) any matter raised by the Chapter 11 Debtors before the Court in the Chapter 11 Cases with respect to property of the estate of the Chapter 11 Debtors (including without limitation the scope of property of the estate, the application or extension of the automatic stay or the compromise or discharge of estate or third party claims in connection with a plan of reorganization)[.]" (Recognition Order at ¶ 9.)

## F.    FTX DM Repeatedly Avails Itself of This Court's Jurisdiction

29.    In addition to seeking chapter 15 protection in the United States, FTX DM and the JPLs have repeatedly and consistently availed themselves of this Court's jurisdiction. As this Court is well aware, the beginnings of the Chapter 11 Cases and the Chapter 15 Case were punctuated by FTX DM's litigiousness. By the Committee's count, in addition to the instant Motion, the JPLs have filed at least nine separate requests for relief, responses, or objections with the Court, and have appeared at nearly every one of the hearings in the Chapter 11 Cases to date.[8]

---

[8]    *See, e.g.*, Nov. 22, 2022 Hr'g Tr. [Docket No. 142] at 56:22-59:3 (counsel to JPLs indicating they were working with Debtors regarding information sharing protocol and "may need to come back and address it with [this Court]"); Dec. 14, 2022 Hr'g Tr. [Docket No. 235] at 19:7-22:14 (counsel to JPLs seeking scheduling from this Court regarding motion to dismiss chapter 11 case of FTX Property Holdings Ltd.); Dec. 16, 2022 Hr'g Tr. [Docket No. 251] at 21:5-19

13

30.     Given the initial litigiousness of the JPLs, and seeking to minimize costs to the Debtors' estates, on January 6, 2023, the JPLs and the Debtors entered into a Settlement and Cooperation Agreement.[9]  (*See Notice of Entry into Agreement Regarding Mutual Cooperation* [Docket No. 402; Ch. 15 Docket No. 110], Ex. 1 (the "Cooperation Agreement").)  Both this Court and the Bahamas Court have approved the Cooperation Agreement.  (Motion at ¶ 42.)

31.     The Cooperation Agreement, among other things, (i) provides that the Debtors and the JPLs will support the Provisional Liquidation of FTX DM and the Chapter 11 Cases, respectively (Cooperation Agreement at ¶¶ 12-13); (ii) renders the JPLs responsible for recovering value from "the assets and property in the name of [FTX DM]" (*id.* at ¶ 4); and (iii) renders the Debtors responsible for recovering value from all assets and property not expressly reserved for recovery by FTX DM under the terms of the Cooperation Agreement, including "assets and property not in the name of [FTX DM]." (*Id.* at ¶ 5.)  Critically, like the Recognition Order, the Cooperation Agreement specifically provides that "recognition under Chapter 15 would not require the U.S. Bankruptcy Court to defer to any decisions of any foreign court (or alter a *de novo* standard of review) relating to any matter raised by the Chapter 11 Debtors in the Chapter 11 Cases with respect to property of the estate of the Chapter 11 Debtors (including without limitation the scope of property of the estate, the application or extension of the automatic stay or the compromise or discharge of estate or third party claims in connection with a plan of reorganization)." (*Id.* at ¶ 12.)

---

(counsel to JPLs seeking scheduling from this Court regarding Chapter 15 Petition); Jan. 4, 2023 Hr'g Tr. [Docket No. 375] at 7:10-10:3 (counsel to JPLs seeking status conference as to matters pending between Debtors and JPLs); Feb. 6, 2023 Hr'g Tr. [Docket No. 632] at 123:24-131:4 (counsel for JPLs making oral argument before this Court in opposition to U.S. Trustee's motion to appoint an examiner); Feb. 15, 2023 Hr'g Tr. [Docket No. 737] at 26:23-25 (counsel to JPLs acknowledging that they "have been active in the Chapter 11 case").

9     The Committee is not a party to the Cooperation Agreement and was not directly involved in its negotiation.

**G. The Adversary Proceeding, Application and the Instant Motion**

32.    On March 19, 2023, the Debtors filed an adversary proceeding against FTX DM in the Chapter 11 Cases, *Alameda Research LLC, et al. v. FTX Digital Markets Ltd., et al.*, Adv. Proc. No. 23-50145 (Bankr. D. Del.) (the "Adversary Proceeding"), asserting claims for declaratory judgment and, alternatively, for actual and constructive fraudulent transfer, seeking a determination that FTX Trading -- and not FTX DM -- owns the International Exchange's assets, including its customer relationships.

33.    Notwithstanding that the Adversary Proceeding raises issues concerning ownership of the International Exchange and its assets, on March 29, 2023, the JPLs filed the instant Motion seeking permission to file an Application with the Bahamas Court with respect to certain issues ostensibly concerning the FTX DM Bahamian liquidation.  (Motion at ¶ 44.)  Although the JPLs argue that the proposed Application is a routine, non-offensive filing simply seeking a protocol to resolve certain threshold legal issues determinative as to who are FTX DM's creditors, the rulings sought in the Application are far broader than framed.  By way of example only, question 3(d) of the draft Application asks whether digital assets or fiat transferred by customers of the International Exchange -- assets that are currently held by the Debtors in the United States -- are property of FTX DM.  (Greaves Decl., Ex. A-1 at 2.)  Likewise, questions 4(b) and (c) ask whether assets currently held by FTX DM are held in trust for customers of the International Exchange (*i.e.*, FTX Trading's customers).  (*Id.* at 3.)  Said differently, the JPLs request permission from this Court to allow critical issues in these Chapter 11 Cases to be decided by the Bahamas Court, including whether International Exchange customers and assets belong to FTX Trading (where they currently reside) or FTX DM.  (*See* Motion at ¶ 4 ("The ultimate legal question is how to sort

the *entire* FTX international account holder and customer constituency – do they map to FTX [DM], to FTX Trading, or to both?") (emphasis added).)

## OBJECTION

34.     The Motion should be denied for three reasons.  First, the questions raised in the Application concern property of the Debtors' estates and go to the heart of these Chapter 11 Cases; accordingly, the automatic stay bars the JPLs from bringing the Application absent relief from this Court.  Second, the JPLs have not met their burden to show that cause exists to lift the automatic stay.  Third, the principles of comity do not support lifting the stay.

**I.      The Automatic Stay Precludes the JPLs from Filing and Prosecuting the Application**

35.     As a threshold matter, the JPLs take the position that the "mere filing" of the Application will not violate section 362 of the Bankruptcy Code because the Application is not an action against the Debtors nor an act to obtain possession of property against the Debtors' estates. (*See* Motion at ¶¶ 58-60.)  However, as described in more detail below, both the Motion and Application plainly describe that the end result of the Application will be a determination on the merits by the Bahamas Court that unquestionably affects property of the Debtors' estates, triggering the protection afforded by section 362 of the Bankruptcy Code.

36.     The automatic stay is one of the most "fundamental . . . protections" provided to a debtor.  *Midlantic Nat. Bank v. New Jersey Dep't of Env't Prot.*, 474 U.S. 494, 503 (1986). The purpose of the automatic stay is "to prevent certain creditors from gaining a preference for their claims against the debtor; to forestall the depletion of the debtor's assets due to legal costs in defending proceedings against it; and, in general, to avoid interference with the orderly liquidation or rehabilitation of the debtor."  *In re SCO Grp., Inc.*, 395 B.R. 852, 856 (Bankr. D. Del. 2007)

(quoting *Assoc. of St. Croix Condo. Owners v. St. Croix Hotel Corp.*, 682 F.2d 446, 448 (3d Cir. 1982)).

37.     Specifically, section 362 prevents, among other things, "the commencement or continuation . . . of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under [the Bankruptcy Code], or to recover a claim against the debtor that arose before the commencement of the case under [the Bankruptcy Code]," or any "act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate[.]" 11 U.S.C. § 362(a)(1), (3).  The reach of the automatic stay is broad, and "[t]he Third Circuit has held that the automatic stay applies to all actions brought against a debtor, even if the action does not constitute a claim against the debtor and even if the actions are not brought to obtain property of the estate, so long as 'the outcome of the proceeding could conceivably have any effect on the estate being administered in bankruptcy.'"  *In re Peregrine Sys., Inc.*, No. 02-12740 (JFK), 2005 WL 2401955, at *2 (D. Del. Sept. 29, 2005) (citing *Borman v. Raymark Indus., Inc.*, 946 F.2d 1031, 1036 (3d Cir. 1991)).

38.     Seeking to sidestep the breadth of section 362, the JPLs frame the issues addressed in the Application as routine and only about process.  According to the JPLs, they are simply seeking procedural guidance from the Bahamas Court regarding FTX DM's assets and liabilities.  (Motion at ¶¶ 59-60.)  But none of the legal determinations that the JPLs seek will ever matter unless the JPLs ultimately obtain a ruling as to the parties' rights to the property in the possession of the Debtors.[10]

---

[10]     Tellingly, the JPLs argue that "[t]he Application *effectively* seeks" to have the Bahamas Court determine whether any customers are mapped to FTX DM's estate and what rights those customers have in the assets of FTX DM's estate, issues they argue only implicate FTX DM.  (Motion at ¶ 74.)  That simply is not the case.  In addition to the mapping of customers' accounts, the JPLs seek a determination that "digital assets and/or fiat transferred by Users to

39.    Indeed, counsel to the JPLs implicitly admitted as much in the February 15, 2023 hearing on FTX DM's Chapter 15 Petition.  As part of counsel's presentation to the Court, counsel noted that the JPLs believe that FTX DM is a "very large creditor" in these Chapter 11 Cases, that "$5.6 billion was transferred from FTX [DM] custodial accounts to a U.S. debtor, FTX trading, and $2.1 billion was transferred from FTX [DM] custodial accounts to Alameda" and that "[over] the next six months -- we got [to] deal with the customer migration issue" because "[o]bviously, determining whether customers were customers of U.S. debtors or [FTX DM] is going to be critical to any distribution scheme."  (*See* Feb. 15, 2023 Hr'g Tr. [Docket No. 737] at 26:25-28:2.)  That "obvious[]" determination is a zero sum game; any determination that an asset of the International Exchange belongs to FTX DM's estate, by extension, is a determination that that same asset does not belong to the Debtors' estates.

40.    In these circumstances, courts have repeatedly recognized that the automatic stay prevents parties from seeking determination of their legal interests outside of the bankruptcy court. *See In re Kaiser Aluminum Corp., Inc.*, 315 B.R. 655, 658 (D. Del. 2004) (holding that scope of automatic stay is not determined solely by who a party chose to name in collateral proceeding, but rather, like here, "by who is the party with a real interest in the litigation"); *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec., LLC*, 460 B.R. 106, 115 (Bankr. S.D.N.Y. 2011) (voiding action taken by foreign liquidators, where, as here, foreign liquidators sought determinations that affect property of U.S. bankruptcy estate), *aff'd*, 474 B.R. 76 (S.D.N.Y. 2012); *cf. Mar. Elec. Co. v. United Jersey Bank*, 959 F.2d 1194, 1207 (3d Cir. 1991) (finding attempt to obtain a judgment against a debtor outside the bankruptcy court violates stay); *SCO Grp.*, 395 B.R. at 858 (noting

the FTX International [Exchange] were from that effective date (or any other date, and if so which) *assets and/or fiat of FTX DM* in law (whether transferred before or after that date)" (*see* Application at 3(d)).  Those issues directly and patently concern the Debtors' bankruptcy estate.

that "it is the very essence of a bankruptcy court's jurisdiction to decide what is property of the estate").

41.    *In re Howrey LLP*, is instructive.  492 B.R. 19 (Bankr. N.D. Cal. 2013), *aff'd*, No. C 13-02700 SBA, 2014 WL 3899487 (N.D. Cal. Aug. 8, 2014).  In *Howrey*, the trustee of the debtor filed an adversary proceeding to recover certain assets.  *Id.* at 21.  The defendant, in turn, contended that the debtor's partnership agreement established a fundamental legal principle which would resolve the adversary proceeding and sought permission to file a declaratory relief action against the debtor in another forum.  *Id.*  Like here, the defendant argued that its act was not barred by the automatic stay since the defendant was simply seeking declaratory relief, and not seeking to take possession of any property of the debtor's estate.  *Id.* at 22.  The *Howrey* court disagreed, finding that "[a]sserting what could be a case-dispositive defense to . . . a cause of action by taking the initiative in another forum improperly seeks to take control over an asset of this estate[,]" and was thus prohibited by the stay.  *Id.*  Like the collateral action contemplated in *Howrey*, the Application seeks guidance from another forum on a potentially "case-dispositive" issue, and thus, the automatic stay applies.

42.    Finally, the JPLs' contention that the Application is simply "addressing overlapping insolvency regimes" and thus cannot be violative of the stay (*see* Motion at ¶ 61) rings hollow.  Initially, the cases the JPLs cite in support each concern a debtor exercising contractual rights that may affect the estate of another.  (*Id.*)[11]  That is not the case here.  FTX DM is not

---

[11]    Each of the cases cited by the JPLs involves permitting debtors to exercise competing contractual rights in bankruptcy, which is plainly not the case here.  *See In re Noranda Aluminum, Inc.*, 549 B.R. 725, 733 (Bankr. E.D. Mo. 2016) (dealing with "an exceptional case" between two chapter 11 debtors, where one debtor was permitted to reject burdensome contract with other debtor pursuant to its business judgment); *In re Old Carco LLC*, 406 B.R. 180, 211-12 (Bankr. S.D.N.Y. 2009) (involving rejection of contract between two different debtors where such contract rejection was in best interest of debtor's estate); *In re Railyard Co., LLC*, 562 B.R. 481, 489 (Bankr. D.N.M. 2016) (involving rejection of an "unreasonable and unworkable" lease agreement between debtors of different estates, which was permissibly rejected by one debtor under business judgment standard); *In re Nat'l Steel Corp.*, 316 B.R. 287, 311 (Bankr. N.D. Ill. 2004) (holding that unilateral price increase was not "an act to obtain possession of property" of

seeking to exercise its contractual rights as a Service Provider to the International Exchange. Nor is FTX DM seeking to determine its "obligations and liabilities", as the JPLs contend. (*Id.* at ¶ 62) Rather, the JPLs are seeking a determination that the **assets** of FTX Trading -- including customer accounts and deposits -- are actually assets of FTX DM. That is not a "fundamental right" of FTX DM (*see id.* ¶ 61 (citing *In re Old Carco LLC*, 406 B.R. 180, 211-12 (Bankr. S.D.N.Y. 2009))), or a "unilateral" act (*see* Motion at ¶ 61 (citing *In re Nat'l Steel Corp.*, 316 B.R. 287 (Bankr. N.D. Ill. 2004))), as the JPLs would have this Court believe. Rather, the determinations sought by the JPLs in the Application would plainly be an act "to obtain possession of . . . or to exercise control over property of the estate," and thus would be prohibited by the automatic stay. *See Kaiser Aluminum*, 315 B.R. at 659.

## II.    Cause Does Not Exist to Lift the Automatic Stay

43.    Inasmuch as the automatic stay bars the JPLs from filing the Application, to prevail on their Motion, the JPLs must establish cause to lift the automatic stay. None exists here.

44.    Section 362(d)(1) of the Bankruptcy Code provides that on request of a party in interest "and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying or conditioning such stay . . . for cause, including the lack of adequate protection of an interest in property of such party in interest[.]" 11 U.S.C. § 362(d)(1). The JPLs, as the movants, bear the burden to present evidence establishing cause. *See* Apr. 12, 2023 Hr'g Tr. [Docket No. 1284] at 52:16-53:16 (denying motion to lift automatic stay for lack of evidence where movant had not submitted

---

another debtor's estate where contract at issue had not been assumed). Neither the JPLs nor the Debtors are seeking relief with respect to a contract between the FTX Trading and FTX DM estates, and thus the theories underpinning those decisions are plainly inapplicable.

sufficient evidence to show cause); *In re RNI Wind Down Corp.*, 348 B.R. 286, 299 (Bankr. D. Del. 2006), *subsequently aff'd*, 359 F. App'x 352 (3d Cir. 2010) (similar).

45.     In determining whether cause exists, courts conduct a "fact intensive, case-by-case balancing test, examining the totality of the circumstances to determine whether sufficient cause exists to lift the stay." *SCO Grp.*, 395 B.R. at 856.  In conducting such analysis, courts typically analyze:

> 1. Whether any great prejudice to either the bankrupt estate or the debtor will result from a lifting of the stay;
>
> 2. Whether the hardship to the non-bankrupt party by maintenance of the stay considerably outweighs the hardship to the debtor; and
>
> 3. The probability of the creditor prevailing on the merits.

*In re Downey Fin. Corp.*, 428 B.R. 595, 609 (Bankr. D. Del. 2010).  Each of those factors supports denying the Motion.

> *a. The Debtors Would Suffer Significant Prejudice if the Application Were to be Litigated in the Bahamas*

46.     The Debtors will suffer significant prejudice if the stay is lifted and the JPLs have not met their burden of proving otherwise.  As a threshold matter, forcing the Debtors to litigate potentially case-dispositive issues in a foreign forum will be a substantial waste of estate resources, both in terms of the cost of litigating in the Bahamas and the time, effort and distraction that participation in such litigation will engender, thereby prejudicing the Debtors.

47.     The JPLs, principally citing to two cases, argue that litigating in a foreign forum is not prejudicial where that forum may have a nexus to the issues at hand.  (*See* Motion at ¶¶ 68-69.)  Putting aside whether the Bahamas has any nexus to these issues (it does not), the cases relied upon by the JPLs each involve situations where significant foreign litigation had occurred pre-petition and thus those courts were already well-versed in the issues presented.  *See* Motion at

¶¶ 68-69 (citing *SCO Grp.*, 395 B.R. at 859 (lifting stay, where, unlike here, movant had "already prepared extensively for a trial," and thus would be burdened by further delay and the need to prepare again for that trial, while the debtor would only experience "slight" prejudice)); *In re Scarborough St. James Corp.*, 535 B.R. 60, 62-63 (Bankr. D. Del. 2015) (lifting stay where, unlike here, case involved "significant prepetition litigation in both the New York and Michigan state courts" and the parties had been litigating the means of the lease in question for seven years, since 2008).

48.    Here, litigation in the Bahamas concerning the issues raised in the Application has not yet been commenced (and litigation concerning similar issues **has** been commenced in Delaware).  Against this backdrop, courts routinely find that the automatic stay protects debtors from needlessly expending time and money by litigating in foreign forums.  *See In re Windhaven Top Ins. Holdings, LLC*, 636 B.R. 596, 606 (Bankr. D. Del. 2021) (distinguishing *SCO Grp.* and denying motion to lift stay where, as here, litigation in proposed alternate forum had not yet been commenced); *McCartney v. Integra Nat. Bank N.*, 106 F.3d 506, 512 (3d Cir. 1997) (denying relief from stay where debtors "would be forced to expend valuable time, energy and resources defending against . . . litigation that could be settled directly in the bankruptcy court"); *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 474 B.R. 76, 87 (S.D.N.Y. 2012) (enjoining collateral action pursuant to section 105 of Bankruptcy Code because "the Cayman Action would cause extra inconvenience and expense for the Trustee in double litigation, whether or not it also causes delay for the Bankruptcy Court"); *In re Calpine Corp.*, 354 B.R. 45, 50 (Bankr. S.D.N.Y. 2006) (finding debtor would "suffer irreparable harm" if collateral litigation continued because of, among other things, "significant burden and distraction of key employees from its restructuring efforts"); *see also Zazzali v. 1031 Exchange Group LLC (In re DBSI, Inc.)*, 467 B.R. 309, 316

(Bankr. D. Del. 2012) ("Although the Moving Defendants insist that the Trustee should be required to repeatedly litigate issues and facts common to all of the Moving Defendants in countless courts across the United States, fragmented litigation would needlessly require the Trustee to waste precious estate resources retaining local counsel in this litigation in multiple and far-flung jurisdictions.").

49.    Moreover, as the JPLs acknowledge, pursuant to both the Cooperation Agreement and the Recognition Order, any ruling on the Application will be subject to *de novo* review by this Court.  (*See* Motion at ¶ 43.)  Thus, proceeding with the litigation in the Bahamas Court will not save the estates any resources; to the contrary, it would require litigation in a foreign forum that may well be mooted by the outcome of the Adversary Proceeding.[12]  By contrast, the Debtors are currently in possession of the at-issue property -- including the intellectual property to the International Exchange, the customer list, and the associated cryptocurrency and fiat assets -- and that property is subject to this Court's jurisdiction.  Thus, even were the Bahamas Court to rule on the Application, both the Debtors and the JPLs will inevitably have to litigate those same issues before this Court, forcing the Debtors to address duplicative and prejudicial litigation.[13]  *See, e.g.*, *In re Samson Res. Corp.*, 559 B.R. 360, 370 (Bankr. D. Del. 2016) (denying informal motion for

---

[12]    The Committee notes that it would support any efforts by the JPLs to distribute the assets currently in their possession to all customers of the International Exchange, in a structure in which every customer of the International Exchange is given a claim against both estates and could recover directly from each the distributable assets currently in their respective possession.  It is unclear why the Application is a necessary precondition to any such distribution.

[13]    The JPLs' argument that litigating the customer issues in the Bahamas Court would save estate resources as "each party-in-interest" would have to hire a foreign law expert to litigate before this Court (*see* Motion at ¶ 72) is a red herring.  Whether the litigation occurs in the Bahamas Court or in this Court, the determination of certain issues will revolve around English or Antiguan law, thus requiring foreign law expertise.  Moreover, and in any event, even if the litigation were to proceed in the Bahamas Court, it will require a combination of U.S., English, Antiguan and Bahamian counsel who will be tasked with analyzing the complicated issues presented in the Application.  *See, e.g.*, *In re Lyondell Chem. Co.*, 543 B.R. 428, 460 (Bankr. S.D.N.Y. 2016) (recognizing that "largely similar briefing [on Luxembourg law] would presumably be necessary in either [Luxembourg or the United States]).  Thus, having the Bahamas Court provide its "views free of charge", as the JPLs cavalierly contend, will not save the estates any resources, especially because (as discussed *infra*), this Court will review *de novo* any such determinations.

relief from automatic stay to hear matter in alternate forum because "the Debtors would suffer extreme prejudice if the Debtors had to re-litigate this matter" in alternate forum after full evidentiary hearing); *Sec. Inv. Prot. Corp.*, 474 B.R. at 87 (denying to lift stay where foreign action would "vexatiously require the Trustee to relitigate claims raised in the adversary proceeding").

50.     Likewise, although the JPLs frame the questions presented as pure questions of law solely implicating Bahamian jurisdiction (*see* Motion at ¶¶ 73, 74), they are anything but.[14] As described above, the ultimate result of the Application is a determination as to whether FTX Trading or FTX DM owns property that all agree is now in the possession of the Debtors. (*Supra* ¶¶ 38-39.)  Courts have routinely enforced the automatic stay where, as here, permitting a foreign action would "directly and significantly interfere" with a debtor's reorganization efforts. *See, e.g.*, *In re Majestic Star Casino, LLC*, No. ADV. 10-50841 (KG), 2010 WL 2540457, at *2 (Bankr. D. Del. Apr. 24, 2010) (enforcing stay where permitting alternate action to proceed would result in debtors advancing defense costs "thereby, at the very least, temporarily diverting much needed funds," and where findings or adverse rulings in alternative action may have a preclusive effect on the debtors' case against movant); *In re W.R. Grace & Co.*, No. 01 01139 JFK, 2007 WL 1129170, at *2 n.7 (Bankr. D. Del. Apr. 13, 2007) ("The most important factor in determining whether to grant relief from the automatic stay to permit litigation to proceed against a debtor in another forum is the effect on such litigation on the administration of the estate. Even slight

---

[14]     In total the JPLs seek to raise *eleven* questions in their Application, which can be boiled down to four categories: (1) how to interpret the FTX Terms of Services; (2) whether certain customer relationships were novated to FTX DM; (3) the capacity by which FTX DM held its digital assets (if any); and (4) who the counterparty to the perpetual futures contracts is.  All of these will require the application of English or Antiguan law, depending on the date of the applicable FTX Terms of Service, or, with respect to the threshold determination of property of the Debtors' estates and related equitable considerations, U.S. bankruptcy law.  At best the JPLs argue that only *four* of the questions implicate Bahamian law, and of those questions, three (*see* Motion at ¶ 35, questions 8-10) are only applicable if a determination is made that FTX DM has an entitlement to the assets of the International Exchange, a determination which is governed by English, Antiguan, and U.S. bankruptcy law.

interference with the administration [of the estate] may be enough to preclude relief in the absence of a commensurate benefit.") (citation omitted).

51.     Finally, contrary to the JPLs' contentions (*see* Motion at ¶ 74) "[b]ankruptcy courts routinely decide disputes involving a variety of subject matters and are often called upon to interpret and apply non-bankruptcy law, including contracts involved in specialized industries[,]" *In re Trib. Co.*, 418 B.R. 116, 129 (Bankr. D. Del. 2009), and thus the Bahamas Court is in no better position than this Court to determine complicated issues of English, Antiguan and U.S. bankruptcy law. *See Windhaven Top Ins. Holdings*, 636 B.R. at 606 ("[A]lthough the Texas court may be more familiar with issues involving the Texas Insurance Code, this court is capable of interpreting and applying non-bankruptcy law, including contracts involving insurance matters."). Indeed, U.S. bankruptcy courts routinely litigate foreign law questions and this Court is more than capable with dealing with questions of contract interpretation.  Thus, the Debtors will suffer prejudice if the stay is lifted and this factor militates in favor of denying the Motion.

> *b. The JPLs Will Suffer No Hardship if the Motion is Denied*

52.     The second factor courts consider when deciding whether to lift the automatic stay is whether the party seeking relief from the stay has shown "that the balance of hardships from not obtaining relief tips ***significantly*** in [its] favor."  *In re Am. Classic Voyages, Co.*, 298 B.R. 222, 225 (D. Del. 2003) (emphasis added) (citation omitted); *see also RNI Wind Down*, 348 B.R. at 299 (same); *In re DBSI, Inc.*, 432 B.R. 126, 132 (Bankr. D. Del. 2010) (same).  The JPLs have provided no evidence that they would suffer "significant[]", if any, hardship if the automatic stay is maintained.  Nor could they.

53.     The JPLs will not suffer any hardship by the maintenance of the stay because, first, substantially the same issues they are raising in the Application can and will be decided by this Court in the Adversary Proceeding.  If the JPLs' intention is to fulfill their obligation to "ensure

the highest and best recoveries for the recognized creditors of the [FTX DM] estate," which requires "first answering the threshold questions asked in the Application and in this Motion" (Motion at ¶ 85), the JPLs should have no concern answering those questions in this Court.

54.     Second, the JPLs voluntarily sought recognition in Delaware of the provisional liquidation of FTX DM, are represented by able U.S. counsel, and have repeatedly and consistently participated in these Chapter 11 Cases.  (*Supra* ¶ 29.)  Having availed themselves of this Court's jurisdiction, the JPLs' efforts to litigate potentially case-dispositive issues in a foreign jurisdiction would be "inimical to the Debtors' effort . . . in a highly complex liquidation to assemble the assets, reduce them to money, allocate those assets among numerous entities in many countries and then distribute the assets" and should not be countenanced.  *See In re Nortel Networks Corp.*, 426 B.R. 84, 93 (Bankr. D. Del. 2010) (refusing to lift stay, where, as here, "we have . . . creditors who have filed claims in this Court and who are seeking to litigate those claims clear of the Court's jurisdiction and the automatic stay").

> ### c. The JPLs Will Not Prevail on the Merits

55.     Finally, the JPLs cannot show that they would be successful on the underlying question of whether the International Exchange customers migrated to FTX DM.  In support, the JPLs claim that they have met their burden here because there is "publicly available documentary evidence that: the FTX Group (1) had a plan to move the international operations to the Bahamas, and (2) began to execute on that plan by, among other things, moving the FTX Group's management team to The Bahamas and establishing the headquarters of the FTX Group there." (Motion at ¶ 79.)  The JPLs therefore confirm that all that ever existed was a plan to migrate the FTX Trading business to the Bahamas.  As set forth above, the Committee has seen no evidence that the plan was ever effectuated (*supra* ¶¶ 22-23), and, to date, the JPLs have cited to none.  This factor thus, too, militates in favor of a finding that cause does not exist here.

### III.   Considerations of Comity Do Not Change the Above Conclusions

56.     Likewise, for the following reasons, the JPLs' plea for comity does not justify lifting the automatic stay.  "Granting comity to judgments in foreign bankruptcy proceedings is appropriate as long as U.S. parties are provided the same fundamental protections that litigants in the United States would receive."  *In re Elpida Memory, Inc.*, No. 12-10947 CSS, 2012 WL 6090194, at *7 (Bankr. D. Del. Nov. 20, 2012).  "While comity is an important consideration, it is also used at the discretion of the Bankruptcy Court.  Comity, in the legal sense, is neither a matter of absolute obligation, on the one hand, nor of mere courtesy and good will, upon the other."  *In re Nortel Networks Inc.*, No. 09-10138-KG, 2010 WL 3075760, at *5 (D. Del. Aug. 5, 2010).

57.     *First*, principles of comity are inapplicable when addressing issues concerning property of the debtor's estate.  The customers and assets the JPLs seek to "trace" to FTX DM (Motion at ¶ 35, question 9), are customers and assets of Debtors before this Court.  The intellectual property that encompasses the International Exchange, including the FTX.com website and "proprietary rights in technology, including software, all source and object code, algorithms, architecture, structure, display screens, layouts, inventions, development tools and all documentation and media constituting, describing or relating to the above, including, without limitation, manuals, memoranda, records, business information, ***anywhere in the world***" belong to FTX Trading.  (*Supra* ¶¶ 17, 24 (emphasis added).)  The core issue being addressed by the Application is whether FTX DM has some entitlement to the property of the International Exchange; property that is of the Debtors' estates.  (*Supra* ¶¶ 38-39.)  While comity allows for "deference to be given to decisions by competent international courts," it does not allow a bankruptcy court to "ignore its own responsibility" to review issues that "directly affect the bankruptcy estate."  *In re Solar Tr. of Am., LLC*, No. 12-11136(KG), 2015 WL 1011548, at *5

(Bankr. D. Del. Jan. 12, 2015).  It is axiomatic that any challenge by the JPLs to property of the Debtors' estates would "directly affect the [FTX Trading] bankruptcy estate[,]" thus making deference to comity inapplicable here.  *See id.*; *see also In re French*, 303 B.R. 774, 783 (Bankr. D. Md. 2003), *aff'd*, 320 B.R. 78 (D. Md. 2004), *aff'd*, 440 F.3d 145 (4th Cir. 2006) (finding U.S. Bankruptcy Court enjoyed primary jurisdiction over property of bankruptcy estate within U.S. Bankruptcy Court's jurisdiction).

58.     *In re Soundview Elite, Ltd.*, 503 B.R. 571 (Bankr. S.D.N.Y. 2014), which the JPLs cite to extensively in the Motion (Motion at ¶¶ 54, 83), is instructive.  In *Soundview*, while the New York Bankruptcy Court did indeed grant relief from the automatic stay "to allow the [Cayman Joint Official Liquidators ('<u>JOLs'</u>)] to remain in place; to ratify otherwise void acts in the Cayman Islands; and to allow the existing Cayman proceedings to continue—and, if necessary, to entertain similar proceedings for the three Debtors in this Court that do not have JOLs—subject to the implementation of [a] protocol[,]" it specifically declined to lift the stay for matters that were within the core functions of the U.S. debtors.  *See id.* at 589, 595 (noting that it was "desirable ***and in some respects essential*** to give the chapter 11 trustee responsibilities for U.S. investigation, issuance of U.S. subpoenas and U.S. document demands; any U.S. litigation that turns out to be warranted, and any acts that otherwise need to be accomplished within the U.S.") (emphasis added).  Like the court in *Soundview*, the Committee has no issue with the JPLs administering their estate and seeking Bahamas Court approval for same.  However, where a precondition to such administration is a threshold legal determination that necessarily affects these Debtors' estates, deference to comity is not justified.

59.     <u>Second</u>, while the JPLs implore the Court to consider matters of comity (Motion at ¶ 81), they do so while ignoring comity themselves.  The JPLs believe they need an answer to the

issues raised in the Application, but the JPLs ignore that those answers can be obtained in the pending Adversary Proceeding.  Similarly, the JPLs cannot contend that being forced to litigate questions concerning FTX Trading's property in Delaware would result in significant hardship, given their voluntary submission to the jurisdiction of this Court.  (*Supra* ¶¶ 29, 54.)  The JPLs simultaneously claim to have done everything to "pay deference and respect" to these Chapter 11 Cases (Motion at ¶ 85), but they ask this Court to "give the proceedings of [their] choice the respect [they] are unwilling to show to other proceedings in which many debtors and creditors are working tirelessly to formulate a coherent, equitable plan."  *Nortel*, 426 B.R. at 93 (rebuking movants for "implor[ing] this Court to give comity to the U.K. Proceedings [while] themselves ignoring comity").  The principles of comity are simply inapplicable to such a situation.  *See id.* at 96 (declining to lift the stay to allow litigation in foreign proceeding).

60.    *Third*, contrary to the JPLs' contention, the Debtors and their operations are not strangers to the United States.  (Motion at ¶ 86.)  The International Exchange was the brainchild of a Delaware-incorporated cryptocurrency-focused hedge fund, was started by U.S. citizens, and had a founder and CEO who was engaged in a public and extensive lobbying campaign in the U.S.[15],[16] The Debtors' and their insiders' pre-petition activities are being investigated by a number of U.S. government agencies, including the Securities Exchange Commission, the Department of

---

[15]    *See* Nik Popli, *Here's What We Know About Sam Bankman-Fried's Political Donations*, TIME, Dec. 14, 2022, available at https://time.com/6241262/sam-bankman-fried-political-donations/; Rob Price, Dakin Campbell, Jack Newsham, and Darius Rafieyan, *Mr. Crypto Goes to Washington*, BUS. INSIDER, Dec. 4, 2022, available at https://www.businessinsider.com/sam-bankman-fried-ftx-crypto-lobbying-campaign-donations-congress-biden-2022-12; Bethany Biron, *FTX founder Sam Bankman-Fried donated $40 million to political campaigns leading into the midterms, leaving some concerned about crypto's place in Washington, report says*, BUS. INSIDER, Nov. 20, 2022, available at https://www.businessinsider.com/ftx-sam-bankman-fried-donated-millions-democrats-report-2022-11.

[16]    Indeed, the Co-CEO of FTX DM itself, Ryan Salame, was a "New England restauranteur" and a "Republican mega-donor".  *See* Morgan Chittum, *Who is Ryan Salame, the FTX exec, Republican mega-donor, and New England restaurateur who blew the whistle on FTX?*, BUS. INSIDER, Dec. 20. 2022, available at https://markets.businessinsider.com/news/currencies/ryan-salame-ftx-exec-republican-mega-donor-new-england-restauranteur-2022-12.

Justice, the Commodity Futures Trading Commission and a United States congressional committee. (*See SEC v. Bankman-Fried*, Case No. 22-cv-10501 (S.D.N.Y.); *SEC v. Ellison et al.*, Case No. 22-cv-10794 (S.D.N.Y.); *SEC v. Singh*, Case No. 23-cv-01691 (S.D.N.Y.); *United States v. Bankman-Fried*, Case No. 22-cr-00673 (S.D.N.Y.); *CFTC v. Bankman-Fried et al.*, Case No. 22-cv-10503 (S.D.N.Y.); *CFTC v. Singh*, Case No. 23-cv-01684 (S.D.N.Y.); Press Release, House Financial Services Committee, *McHenry, Waters Announce December Hearing to Investigate FTX Collapse*, Nov. 16, 2022, available at https://financialservices.house.gov/news/documentsingle. aspx?DocumentID=408471.)  Moreover, according to the CFTC, "comingled funds, including FTX customer funds, were also furtively used by Bankman-Fried and FTX for extensive marketing and promotional expenses ***in the United States***, including a Super Bowl commercial and the sponsorship of a sports stadium in Miami, Florida[,]" and these "promotional activities were carried out in the U.S. ***to generally promote 'FTX' rather than specifically 'FTX US.'***" (*CFTC v. Bankman-Fried et al.*, Case No. 22-cv-10503 (S.D.N.Y.) [Docket No. 13] at ¶ 58) (emphasis added).)  It was not only conceivable, but probable, that litigation concerning the International Exchange would take place in the United States.

61.    *Fourth*, as set forth above, the Bahamas Court is in no better position to decide the matters raised in the Application than this Court, and this Court will have to review any determination by the Bahamas Court *de novo*. (*Supra* ¶¶ 28, 31.)  Thus, contrary to the JPLs' contentions, "interests of judicial economy" would not be "well-served" by lifting the stay in deference to the Bahamas Court. (*See* Motion at ¶ 88.)[17]

---

[17]    In that same vein, the lack of reciprocity between the Bahamas Court and this Court is a "relevant factor" that should be considered by the Court in deciding whether to grant comity here. *Remington Rand Corp.-Delaware v. Bus. Sys. Inc.*, 830 F.2d 1260, 1273 (3d Cir. 1987) (finding reciprocity "is always a permissible consideration" and "to be a consideration of extreme importance").

62.    *Finally*, the supposed need for a cross-border protocol between this Court and the Bahamas Court is not relevant to the question of whether the stay should be lifted.  Unlike the local rule and cross-border protocols cited by the JPLs in the Motion (Motion at ¶¶ 51-56), the issues at bar do not concern establishing procedures to resolve disputes in cross-border insolvencies involving overlapping processes.  FTX DM is a subsidiary of FTX Trading, and the disputes between the parties exist only because the JPLs were appointed before a chapter 11 case for FTX DM could be filed.  Any alleged overlap between the Debtors and FTX DM is a creature of how the JPLs decided to prosecute FTX DM's Bahamian liquidation -- *i.e.*, it was the JPLs who decided that a precondition to FTX DM's liquidation was the determinations sought in the Application.  There is no need for a cross-border protocol to resolve those issues; this Court already has the jurisdiction to decide all pertinent issues between the parties.

## CONCLUSION

WHEREFORE the Committee requests that this Court deny the Motion and grant such other and further relief as the Court finds just and appropriate.

*Remainder of page intentionally left blank*

Dated: May 3, 2023  
      Wilmington, Delaware

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Robert F. Poppiti, Jr.*

Matthew B. Lunn (No. 4119)  
Robert F. Poppiti, Jr. (No. 5052)  
1000 North King Street  
Wilmington, DE 19801  
Telephone: (302) 571-6600  
Facsimile: (302) 571-1253  
Email: mlunn@ycst.com  
       rpoppiti@ycst.com

-and-

PAUL HASTINGS LLP

Kristopher M. Hansen*  
Kenneth Pasquale*  
Erez Gilad*  
Gabriel E. Sasson*  
Isaac S. Sasson*  
200 Park Avenue  
New York, NY 10166  
Telephone:  (212) 318-6000  
Facsimile:  (212) 319-4090  
Email: krishansen@paulhastings.com  
       kenpasquale@paulhastings.com  
       erezgilad@paulhastings.com  
       gabesasson@paulhastings.com  
       isaacsasson@paulhastings.com

*Admitted pro hac vice*

*Counsel to the Official Committee of Unsecured Creditors*

32