## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |
|  | **Ref. Nos. 1192 & 1213** |
|  | **Obj. Deadline:  May 3, 2023 at 4:00 p.m. (ET)** |
|  | **Hearing Date:  May 17, 2023 at 1:00 p.m. (ET)** |

### DEBTORS' OBJECTION TO MOTION OF THE JOINT PROVISIONAL LIQUIDATORS FOR A DETERMINATION THAT THE U.S. DEBTORS' AUTOMATIC STAY DOES NOT APPLY TO, OR IN THE ALTERNATIVE FOR RELIEF FROM STAY FOR FILING OF THE APPLICATION IN THE SUPREME COURT OF THE COMMONWEALTH OF THE BAHAMAS SEEKING RESOLUTION OF NON-US LAW AND OTHER ISSUES

---

[1]   The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification numbers are 3288 and 4063 respectively.  Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.  The principal place of business of Debtor Emergent Fidelity Technologies Ltd is Unit 3B, Bryson's Commercial Complex, Friars Hill Road, St. John's, Antigua and Barbuda.

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................1

BACKGROUND .................................................................................7

    A.    The Debtors and Their Chapter 11 Cases ...............................7

    B.    FTX Trading and FTX DM....................................................8

    C.    The JPLs' Violations of the Automatic Stay .........................11

    D.    The Cooperation Agreement and Chapter 15 Recognition Order .........................12

    E.    The Debtors' Adversary Proceeding and the JPLs' Motion for Stay Relief..........14

ARGUMENT .....................................................................................15

I.    THIS COURT MUST DECIDE WHAT IS PROPERTY OF THE DEBTORS' CHAPTER 11 ESTATES ...............................................15

II.    THE AUTOMATIC STAY APPLIES TO THE JPLS' PROPOSED BAHAMAS LITIGATION......................................................................20

    A.    The Proposed Application Significantly Impacts the Debtors' Rights..............21

    B.    The Proposed Application Seeks to Control the Debtors' Property.................23

III.    THE JPLS HAVE NOT CARRIED THEIR BURDEN TO ESTABLISH CAUSE FOR STAY RELIEF...............................................25

    A.    Stay Relief Would Prejudice the Debtors and Their Estates .................26

    B.    The JPLs Fail to Identify Any Distinct Hardship ..................32

    C.    The JPLs Have Failed to Establish any Probability of Prevailing on the Merits.................34

    D.    The JPLs' Unclean Hands Weigh Against Granting Relief from the Stay...........37

    E.    Principles of Comity Do Not Provide Any Basis for Stay Relief.........................38

CONCLUSION...................................................................................41

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*In re Advanced Elecs., Inc.*,
283 F. App'x 959 (3d Cir. 2008) ...........................................................................20

*In re Am. Home Mortg. Holdings, Inc.*,
386 F. App'x 209 (3d Cir. 2010) ...........................................................................36

*In re Am. Home Mortg. Holdings, Inc.*,
401 B.R. 653 (D. Del. 2009) ..................................................................................38

*In re Arcapita Bank B.S.C.(c)*,
575 B.R. 229 (Bankr. S.D.N.Y. 2017) ...........................................................16, 40

*In re B.C.I. Finances Pty Ltd.*,
583 B.R. 288 (Bankr. S.D.N.Y. 2018) ..................................................................17

*In re Bozel S.A.*,
434 B.R. 108 (Bankr. S.D.N.Y. 2010) ..................................................................17

*In re Brosnahan*,
324 B.R. 199 (Bankr. W.D.N.Y. 2005) .................................................................19

*In re Calpine Corporation*,
No. 05-60200 (Bankr. S.D.N.Y. 2005) ..................................................................18

*In re Computer Commc'ns, Inc.*,
824 F.2d 725 (9th Cir. 1987) .................................................................................37

*Const. Bank* v. *Tubbs*,
68 F.3d 685 (3d Cir. 1995).....................................................................................21

*In re Cont'l Airlines*,
138 B.R. 442 (D. Del. 1992)...................................................................................15

*In re Denby-Peterson*,
941 F.3d 115 (3d Cir. 2019)...................................................................................23

*In re Drauschak*,
481 B.R. 330 (Bankr. E.D. Pa. 2012) ...................................................................39

*In re Elpida Memory, Inc.*,
2012 WL 6090194 (Bankr. D. Del. Nov. 20, 2012) ..............................................20

*In re Fruit of the Loom, Inc.*,
   407 B.R. 593 (Bankr. D. Del. 2009) ...................................................31

*In re Fugazy Exp., Inc.*,
   982 F.2d 769 (2d Cir. 1992) ..........................................................38

*In re Gucci*,
   126 F.3d 380 (2d Cir. 1997) ..........................................................22

*In re Int'l Admin. Servs., Inc.*,
   211 B.R. 88 (Bankr. M.D. Fla. 1997) ............................................40

*In re Int'l Tobacco Partners, Ltd.*,
   462 B.R. 378 (Bankr. E.D.N.Y. 2011) ..........................................40

*In re Jarvis*,
   242 B.R. 172 (Bankr. S.D. Ill. 1999) ............................................19

*In re Kaiser Aluminum Corp., Inc.*,
   315 B.R. 655 (D. Del. 2004) ...........................................21, 22, 24

*In re Klarchek*,
   508 B.R. 386 (Bankr. N.D. Ill. 2014) ...........................................21

*In re LaRoche Indus., Inc.*,
   312 B.R. 249 (Bankr. D. Del. 2004) ..............................................31

*In re Linear Elec. Co., Inc.*,
   852 F.3d 313 (3d Cir. 2017) ......................................................25, 37

*In re Lyondell Chem. Co.*,
   543 B.R. 428 (Bankr. S.D.N.Y. 2016) ..........................................17

*Maaco Enterprises, Inc.* v. *Corrao*,
   1991 WL 255132 (E.D. Pa. Nov. 25, 1991) ...................................22

*McCartney* v. *Integra Nat. Bank N.*,
   106 F.3d 506 (3d Cir. 1997) .............................................22, 28, 33

*Nikimiha Sec. Ltd.* v. *Trend Grp. Ltd.*,
   646 F. Supp. 1211 (E.D. Pa. 1986) ..............................................36

*In re Noranda Aluminum, Inc.*,
   549 B.R. 725 (Bankr. E.D. Mo. 2016) ..........................................25

*In re Nortel Networks Inc.*,
   2010 WL 3075760 (D. Del. Aug. 5, 2010) ....................................39

*In re Nortel Networks, Inc.*,
   532 B.R. 494 (Bankr. D. Del. 2015) ...................................................................18

*In re Northshore Mainland Servs., Inc.*,
   537 B.R. 192 (Bankr. D. Del. 2015) ...................................................................39

*In re O'Dowd*,
   233 F.3d 197 (3d Cir. 2000) .............................................................................24

*In re Old Carco LLC*,
   406 B.R. 180 (Bankr. S.D.N.Y. 2009) ..............................................................25

*Pac. Emps. Ins. Co.* v. *Glob. Reinsurance Corp. of Am.*,
   693 F.3d 417 (3d Cir. 2012) .............................................................................35

*In re Paul J. Paradise & Assocs., Inc.*,
   249 B.R. 360 (D. Del. 2000) .............................................................................17

*In re Premier Operations*,
   294 B.R. 213 (S.D.N.Y. 2003) ..........................................................................22

*Pursifull* v. *Eakin*,
   814 F.2d 1501 (10th Cir. 1987) ........................................................................39

*In re Railyard Co., LLC*,
   562 B.R. 481 (Bankr. D.N.M. 2016) ................................................................25

*In re Rochester Drug Coop., Inc.*,
   2021 WL 1093966 (Bankr. W.D.N.Y. Mar. 22, 2021) ......................................32

*In re Roy Nielsen Hafen*,
   616 B.R. 570 (B.A.P. 10th Cir. 2020) ...............................................................28

*In re Scarborough-St. James Corp.*,
   535 B.R. 60 (Bankr. D. Del. 2015) ..............................................................29, 30

*In re SCO Group, Inc.*,
   395 B.R. 852 (Bankr. D. Del. 2007) .................................................................29

*In re Soundview Elite, Ltd.*,
   503 B.R. 571 (Bankr. S.D.N.Y. 2014) ..............................................................18

*In re The Fairchild Corp.*,
   2009 WL 4546581 (Bankr. D. Del. 2009) .........................................................37

*In re THG Holdings LLC*,
   604 B.R. 154 (Bankr. D. Del. 2019) ............................................................20, 25

*In re Tribune Co.*,
 418 B.R. 116 (Bankr. D. Del. 2009) ........................................................25, 34

*In re Trump Ent. Resorts, Inc.*,
 534 B.R. 93 (Bankr. D. Del. 2015) ................................................................23

*Wells Fargo Bank, N.A.* v. *Am. Home Mortg. Inv. Corp.*,
 2008 WL 4753342 (Bankr. D. Del. Oct. 30, 2008) ......................................17

*Matter of Williams*,
 144 F.3d 544 (7th Cir. 1998) ........................................................................40

*In re Williams*,
 305 B.R. 618 (Bankr. D. Conn. 2004) ..........................................................22

## Statutes

11 U.S.C. § 362 ................................................................................... *passim*

11 U.S.C. § 541 ...........................................................................................1, 23

11 U.S.C. § 1121 ...............................................................................................7

28 U.S.C. 1334(e)(1) ..................................................................................15, 28

## Other Authorities

Angus Berwick, *Exclusive: FTX's Former Top Lawyer Aided U.S. Authorities in
 Bankman-Fried Case*, REUTERS (Jan. 5, 2023) .............................................9

*Update by the Joint Provisional Liquidators of FTX Digital Markets Ltd. ("FTX
 Digital")*, PwC.com (Dec. 15, 2022), available at
 https://www.pwc.com/bs/en/press-releases/update-by-the-joint-provisional-
 liquidators-of-ftx-digital-markets-limited.html ...........................................12

*Model Law on Cross-Border Insolvency*, United Nations Commission on
 International Trade Law, *available at*
 https://uncitral.un.org/en/texts/insolvency/modellaw/cross-
 border_insolvency/status ..............................................................................20

FTX Trading Ltd. ("FTX Trading"), Alameda Research LLC, Alameda Research Ltd., and their affiliated debtors and debtors-in-possession (collectively, the "Debtors") hereby submit this objection (the "Objection") to the *Motion of the Joint Provisional Liquidators for a Determination that the U.S. Debtors' Automatic Stay Does Not Apply to, or in the Alternative for Relief from Stay for Filing of the Application in the Supreme Court of the Commonwealth of The Bahamas Seeking Resolution of Non-US Law and Other Issues* [D.I. 1192] (the "Motion" or "Mot.").[2]  In support of the Objection, the Debtors respectfully state as follows:

## PRELIMINARY STATEMENT

1.      The JPLs seek relief from the automatic stay to pursue a declaration from a Bahamas Court that billions of dollars in assets controlled by the Debtors and which they intend to distribute through their plan of reorganization confirmed by this Court belong to FTX DM.  The JPLs offer no evidence as to why seeking such a declaration from a Bahamas Court—rather than this Court—would be in the interests of the millions of FTX creditors.  Accordingly, the JPLs' Motion must be denied.

2.      These Chapter 11 Cases are different than other "cross-border" cases where material property was in the custody of different estates or where creditors were divided amongst the jurisdictions.  Virtually all property distributable to FTX creditors (other than property seized by the U.S. government) is currently in the custody of the Debtors, property of the Debtors' estates under section 541 of the Bankruptcy Code, subject to the *in rem* jurisdiction of this Court, and protected by the automatic stay imposed by section 362(a) of the Bankruptcy Code.  There is no material property in the custody of the JPLs.  The Debtors believe, consistent with the JPLs' prior disclosures, that the aggregate amount of assets in the JPLs' custody today includes less than

---

[2]   Terms not defined shall have the meaning ascribed to them later in this Objection or otherwise as defined in the Motion.

$30 million of liquid assets (rapidly being spent on professional fees), and copies of customer data and information legally owned and provided by the Debtors as to which the JPLs now seek to exploit. These assets comprise less than one-half of one percent of the $7.3 billion of liquid assets held by the Debtors today.

3.      Similarly, creditors are not competing with each other to recover on claims across jurisdictions. 100% of the customers of the FTX.com exchange who suffered losses will have claims against the Debtors. The Debtors have spent months reviewing available information about FTX.com and have determined that there is no colorable basis to deny any customer's claim against the Debtors on the theory that such customer was secretly novated and sent to FTX DM. The JPLs' primary evidence to the contrary is the Debtors' own initial assumption that 6% of FTX.com customers were customers of FTX DM. But once the Debtors dug into the underlying facts and available information, this was proven incorrect.

4.      FTX Trading was at all times the sole owner and operator of the exchange. FTX Trading was also the primary counterparty to the 2022 Terms of Service. As such, the 2022 Terms of Service are replete with references to FTX Trading and mention FTX DM only in the schedules for Specified Services, which Specified Services do not include custody of cash or cryptocurrency. Moreover, the Debtors separately are responsible to customers for economic losses on a litany of fraud and other non-contractual claims. As a result, and after consultation with the Committee, the Debtors have no intention of today "novating" or "migrating" any customer away from FTX Trading and will ensure all FTX.com customers receive fair and equal treatment in this Court through a chapter 11 plan of reorganization.

5.      Since the Debtors control all distributable value subject to the oversight of this Court, and are responsible to all FTX creditors, the Debtors do not intend to seek any relief

from the Bahamas Court in connection with the confirmation or implementation of their plan of reorganization (other than as separately agreed with respect to the Debtor FTX Property Holdings Ltd.).  Instead, the Debtors are moving directly to plan formation discussions with stakeholders, and have announced publicly their intention to file a preliminary plan of reorganization in July 2023.

6.      The Debtors' declination of more extensive assistance from the Bahamas Court is not a sign of disrespect, but a recognition of the unique facts of these Chapter 11 Cases and the imperative that they be overseen by this Court in a centralized manner without unnecessary delay or jurisdictional complication.  This has been the Debtors' and the Committee's position since the outset of these Chapter 11 Cases, and it is reflected in the FTX DM chapter 15 Recognition Order and the Cooperation Agreement.  Both the Recognition Order and the Cooperation Agreement expressly reject the concept of concurrent jurisdiction and preserve the ability of this Court to determine property of the Debtors' estates, enforce the automatic stay, and address other core issues *de novo* and without deference to any other court.

7.      This Court's exercise of its exclusive jurisdiction over the Debtors' property is especially critical for these Chapter 11 Cases because the JPLs are not alone in asserting an interest in property.  Two separate groups of customers have filed adversary proceedings in this Court alleging that customers have an interest in property—claims that compete with those of the JPLs.  These groups have both agreed to defer litigation in favor of participating in plan discussions.  The JPLs too are welcome to participate in plan discussions.  But like these other parties, the JPLs will ultimately have the burden of proof in the Adversary Proceeding and the plan confirmation process.

8.      Instead of participating with the economic stakeholder here, through their Motion the JPLs request this Court allow them to proceed separately in a venue of their choosing. The JPLs dress up their request as nothing more than a question about the scope of the FTX DM estate, but this is a fiction.  The assets at issue *in rem* property of the Debtors.  The contracts at issue are with FTX Trading.  The JPLs seek judicial determinations with respect to core property of the estate and customer entitlement matters that, if successful, would require enforcement in this Court, not in The Bahamas.  The JPLs Motion is about the estate of FTX DM only to the extent that the estate of FTX DM is virtually empty and the JPLs would like to fill it with property taken from the Debtors.  The Motion, indeed, begs the question of why the JPLs would go to such efforts to re-route billions of dollars of claims to FTX DM with its paucity of assets.

9.      The JPLs' Motion is, at heart, a request for a change of venue on some of the most core matters for these Chapter 11 Cases, attempting to deliver on Samuel Bankman-Fried's stated objective to have The Bahamas "win a jurisdictional battle vs Delaware."[3]  And the sole basis offered for a venue change is that the governing law of the asserted property interest is non-United States law.  This is no basis at all.  This Court resolves questions involving foreign law all the time and does not need to obtain a non-binding opinion from the Bahamas Court on matters that do not even involve Bahamian law.  Further, assuming *arguendo* that a Bahamas Court was more skilled in applying English law than this Court, contract law governs only part of the questions raised by customer entitlement claims in these Chapter 11 Cases.  Customer entitlement claims also implicate *equitable* claims and defenses that will be decided by this Court under Delaware state law and U.S. federal *bankruptcy* law.

---

[3]    Kelsey Piper, *VOX*, Sam *Bankman-Fried Tries to Explain Himself*, Nov. 16, 2022, available at https://www.vox.com/future-perfect/23462333/sam-bankman-fried-ftx-cryptocurrency-effective-altruism-crypto-bahamas-philanthropy.

10.     Seen as what it actually is, the Motion must be denied on its merits after balancing the three factors typically analyzed by Courts in this District when considering requests for stay relief.  The JPLs fail to meet their high burden of showing the necessary "cause" because the prejudice to the Debtors and their creditors resulting from litigation proceeding in the Bahamas Court far exceeds any hardship to the JPLs from litigating in this Court like everyone else.

11.     The Proposed Application presents a direct challenge to ownership of the property held *in rem* by the Debtors and expected to be distributed to their creditors.  Due process and common sense require that issues so core to these Chapter 11 Cases regarding the nature of customer entitlements, holding and tracing of assets, and asset distribution should be determined by this Court, in a centralized proceeding where the Debtors' millions of customers and creditors can be represented and have a meaningful opportunity to participate.  Meanwhile, to participate in parallel litigation in The Bahamas about property of the estates of these Chapter 11 Cases would require all of the Debtors' stakeholders to unnecessarily hire a new set of counsel and participate in a different court with different procedures and appellate processes.

12.     In contrast, the JPLs fail to identify any hardship they would face if the Motion is denied and they must make their case for a property right in the first instance in this Court.  The JPLs are actively participating in the Debtors' Chapter 11 Cases.  Any argument that they are burdened by an inability to proceed in the Bahamas Court at the time of their choosing is a red herring.  With all material property controlled by the Debtors and protected by the automatic stay, there is nothing for the JPLs to do in the Bahamas Court unless and until this Court determines that some of the assets of the Debtors actually do belong to FTX DM and that the best interests of creditors is served by turning over such assets to FTX DM.

13.    The JPLs also fail to establish any probability of prevailing on the merits of the underlying dispute.  The plain language of the 2022 Terms of Service makes clear that the FTX.com customer relationship remained with FTX Trading, the owner and operator of FTX.com, and that FTX DM provided at most certain Specified Services.  But more fundamentally, there is no evidence or indication of any kind that notice was provided to FTX Trading customers of the so-called "migration" of any part of their account relationship to FTX DM, or that any novation ever was consented to or effectuated.  At bottom, the Debtors have seen no evidence that any migration that may have been intended ever happened for any customer.  And any attempt to have done so in the months leading up to Mr. Bankman-Fried's fraud being revealed was part and parcel of the fraud itself.

14.    The JPLs' actions to date violating the automatic stay further weigh against granting relief from it now.  From informed acquiescence to the Securities Commission of The Bahamas' post-petition seizure of certain of the Debtors' assets, to using the Debtors' customer information to solicit individual customers for personal information, to opening their own claims portal, the JPLs have demonstrated an intention to ignore and evade the jurisdiction of this Court. They should not be rewarded with relief from the automatic stay.

15.    Finally, the JPLs' efforts to appeal to principles of comity are unavailing. The JPLs concede, as they must, that this Court need not defer to any determinations made by the Bahamas Court concerning the questions raised in the Proposed Application.  Further, there is no parallel foreign proceeding that seeks to answer *both* of the related questions the Debtors must adjudicate:  the nature of the Debtors' property and the validity of the Debtors' avoidance claims stemming from the alleged criminal conduct of Samuel Bankman-Fried and his co-conspirators. It is this Court that has had extensive knowledge of these Chapter 11 Cases, and can resolve all

matters in connection with the Adversary Proceeding and/or the plan confirmation process.  The Motion should be denied.

## **BACKGROUND**

### A.    **The Debtors and Their Chapter 11 Cases**

16.    On November 11, 2022 and on November 14, 2022 (as applicable, the "Petition Date"), the Debtors filed with the Court voluntary petitions for relief under title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq*. (the "Bankruptcy Code").  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  Joint administration of these Chapter 11 Cases was authorized by the Court by entry of an order on November 22, 2022 [D.I. 128].  On December 15, 2022, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed an Official Committee of Unsecured Creditors (the "Committee") pursuant to section 1102 of the Bankruptcy Code [D.I. 231].

17.    Additional factual background relating to the Debtors' businesses and the commencement of these chapter 11 cases (the "Chapter 11 Cases") is set forth in the *Declaration of John J. Ray III in Support of Chapter 11 Petitions and First Day Pleadings* [D.I. 24], the *Declaration of Edgar W. Mosley II in Support of Chapter 11 Petitions and First Day Pleadings* [D.I. 57], the *Supplemental Declaration of John J. Ray III in Support of First Day Pleadings* [D.I. 92], and the *Supplemental Declaration of Edgar W. Mosley II in Support of First Day Pleadings* [D.I. 93].

18.    The Debtors remain within their exclusive periods provided by section 1121 of the Bankruptcy Code, which recently were extended to September 7, 2023 to file a plan of reorganization, and November 6, 2023 to solicit a plan of reorganization.  (*Order Extending the*

*Exclusive Periods During Which Only the Debtors May File a Chapter 11 Plan and Solicit Acceptances Thereof* [D.I. 1276].)

19.     On April 12, 2023, the Debtors provided an update to the Court and stakeholders, during which counsel for the Debtors disclosed that the Debtors' estates currently have in their possession $7.3 billion of assets available to be distributed to creditors.  (Apr. 12, 2023 Hr'g Tr. 7:17-19.)   Among other things, the Debtors are beginning discussions with stakeholders regarding a plan of reorganization, and strive to file with the Court a preliminary plan of reorganization in July 2023.  (*Id.* at 15:3-5.)

### B.     FTX Trading and FTX DM

20.     The history of the Debtors is relatively short.  Samuel Bankman-Fried and Zixiao "Gary" Wang founded Alameda Research LLC ("Alameda Research") in November 2017. (Mosley Decl. Ex. A.)  Mr. Bankman-Fried, Mr. Wang, and Nishad Singh founded FTX Trading (a/k/a FTX.com) in April 2019 and West Realm Shires Services, Inc. (d/b/a, FTX US) in January 2020.  (Mosley Decl. Exs. B, C.)  Caroline Ellison became co-CEO of Alameda Research in 2021, and the sole CEO of Alameda Research upon the resignation of Samuel Trabucco in August 2022. Mr. Singh resigned, and Mr. Bankman-Fried, Ms. Ellison and Mr. Wang had their employment terminated, all in November 2022.

21.     Upon its creation in April 2019, FTX Trading operated an exchange and trading platform which allowed customers to buy, sell, exchange, hold, or otherwise transact in digital assets, use the FTX Application Programming Interface, and use any other services through the FTX.com website (the "Site").

22.     The relationship between customers and FTX Trading was governed by the 2019 and 2020 Terms of Service (the "Original Terms of Service").  (Mosley Decl. Exs. D, E.) The Original Terms of Service were provided by FTX Trading and all services were contemplated

-8-

to be provided by FTX Trading.  (*Id.*, pmbl.)  In addition, FTX Trading owns the Site, and all cryptocurrency customer accounts for the Site were maintained on the AWS cloud environment pursuant to a license with Alameda Research.

23.     The history of FTX DM is even shorter.  FTX DM existed as a corporate entity for just over 16 months prior to the Petition Date.  It was incorporated in The Bahamas on July 22, 2021.  (Mosley Decl. Ex. F.)  At all times, FTX DM was a wholly-owned subsidiary of FTX Trading.  (*Id.*)  Shortly after formation, FTX DM submitted an Application for Registration as Digital Asset Business (the "Registration Application") to the Securities Commission of The Bahamas (the "Commission").  (*Id.* Ex. G.)  The Registration Application listed Mr. Bankman-Fried as the Beneficial Owner, Director, and Chairman of FTX DM; Daniel Friedberg as the corporate secretary;[4] and Ryan Salame as Director, CEO, and President.  (*Id.*)

24.     The Registration Application to operate as a Digital Asset Service Provider (but not a Digital Token Exchange) was approved by the Commission on September 20, 2021.  FTX DM began "operations" on May 13, 2022 and continued for just under six months—from May 13, 2022 to November 10, 2022—before the fraud was revealed by international investors and FTX DM was shut down by the Commission.

25.     FTX DM's entire existence fell within the scope of the criminal conspiracy to which Mr. Bankman-Fried's co-conspirators have already pled guilty.  Indeed, its very formation and existence was in furtherance of that conspiracy.  From at least 2019 and through November 2022, Mr. Bankman-Fried, Mr. Wang, Mr. Singh, and Ms. Ellison variously used funds

---

[4]     Mr. Friedberg also served as the Chief Compliance Officer of FTX Trading and the General Counsel of Alameda Research.  Mr. Friedberg was previously implicated in fraudulent activities related to his role as General Counsel of Excapsa Software, which operated the Ultimate Bet online poker website.  *See* Angus Berwick, *Exclusive: FTX's Former Top Lawyer Aided U.S. Authorities in Bankman-Fried Case*, REUTERS (Jan. 5, 2023), https://www.reuters.com/business/finance/ftxs-former-top-lawyer-aided-us-authorities-bankman-fried-case-2023-01-05/.

from FTX Trading, FTX DM, and other FTX entities to prop up Alameda Research, which sustained billions of dollars in trading losses.  All of this was done under Ms. Ellison's and Mr. Bankman-Fried's direction.  (Adv. Compl. ¶¶ 22–29 (citing guilty pleas).)

26.     In addition to committing fraud to directly sustain Alameda Research, Mr. Bankman-Fried (and/or others acting at his direction) created FTX DM as a façade behind which his fraudulent scheme could operate in The Bahamas away from the oversight and prying eyes of American regulators and courts.

27.     In furtherance of the scheme, in May 2022, Mr. Bankman-Fried (and/or others acting at his direction) secretly introduced new terms of service for FTX Trading customers (the "2022 Terms of Service") without altering the front page of the document or otherwise distinguishing the new terms from the old.  (*See* Mosley Decl. Ex. H.)  The 2022 Terms of Service annexed schedules to allegedly give FTX DM a role as one of several "service providers" that provided "Specified Services" in the day-to-day operations of FTX Trading.  (*Id.* at 31–52.)  The "Specified Services" to be provided by FTX DM all involved providing technology to facilitate certain transactions on the FTX.com platform with other customers.  The "Specified Services" did not include trading as principal or entering into privity of contract with any customer with respect to any trade.  (*Id.*)

28.     On November 10, 2022, the Commission filed a petition for provisional liquidation of FTX DM in the Supreme Court of The Bahamas (the "Bahamas Court").  The Bahamas Court granted the petition and appointed Brian Simms as the provisional liquidator.  On November 14, 2022, the Bahamas Court entered an order appointing Kevin G. Cambridge and Peter Greaves as additional liquidators.  Collectively, Simms, Cambridge, and Greaves are the JPLs.

C.    **The JPLs' Violations of the Automatic Stay**

29.    From the moment of appointment, the JPLs have repeatedly violated the automatic stay provided to the Debtors.  On the evening of November 11, 2022, while Debtors were in the process of securing their digital assets, it became clear that the Debtors' systems were being accessed by one or more unidentified and unauthorized actors.  On the evening of November 12, 2022, the Debtors observed the movement of primarily a large volume of formerly non-circulating FTT tokens—the native cryptocurrency of the FTX.com exchange—from a cryptocurrency wallet that the Debtors previously had used to release additional FTT tokens into circulation.  (*See* Mosley Decl. ¶ 14.)

30.    The Commission—after the filing and public announcement of the Chapter 11 Cases—instructed Messrs. Bankman-Fried and Wang to transfer hundreds of millions of dollars' worth of previously non-circulating FTT tokens as well as other digital assets to cold storage under the control of the Commission.  (*See* Mosley Decl. Ex. I (responding to a Slack inquiry regarding a "large FTT mint/transfer," Wang reported that he "was directed by bahamas [*sic*] regulators to transfer the FTT").)  Mr. Simms, who was copied on all correspondence in his capacity as JPL, was involved at every step.

31.    On November 12, 2022, after obtaining the Debtors' assets, "the Commission sought an additional order from the Supreme Court of The Bahamas for authority under the DARE Act to transfer *all digital assets of FTX* into digital wallets under the exclusive control of the Commission for the benefit of clients and creditors of [FTX DM]."  (Mosley Decl. Ex. J (emphasis added).)  The November 12 order was obtained on an *ex parte* basis and under seal.

32.    Also on November 12, 2022, the Commission sent a letter to the CEO of Tether International Limited, which held cryptocurrency accounts on behalf of the Debtors and

FTX DM, with the subject line "Lifting of Freeze and Accounts for and/or in the name of FTX Digital Markets Limited and ***Related Parties***."  (Mosley Decl. Ex. K (emphasis added).)  The letter instructed Tether to "burn [destroy] the tether coins that were frozen and simultaneously mint new tether coins for the equivalent amount and transfer all USDT coins" to the Commissions' wallet.  (*Id.*)  No notice was given to the Debtors.

33.     On November 13, 2022, Mr. Bankman-Fried sent an email to Ms. Rolle, copying Mr. Simms, stating that he understood the Commission "moved almost all of the assets last night!" (emphasis in original), but also indicating that their access to AWS was suspended before the remainder could be transferred.  (Mosley Decl. Ex. L.)  Ms. Rolle replied, asking Mr. Bankman-Fried to provide details on the assets that could not be transferred.  Mr. Wang replied with a list of those assets.  (*Id.*)  Mr. Simms was again copied on every correspondence.

34.     The JPLs have continued unabated in their attempts to cloud title to the Debtors' assets and cause confusion among creditors.  On December 15, 2022, the JPLs announced a claims portal and resolution procedure separate from the Debtors' forthcoming bar date motion and claims procedures.[5]  In addition, the JPLs used the Debtors' customer data, received pursuant to a non-disclosure agreement, to solicit individual customers for personal information.  (Mosley Decl. ¶ 21.)

### D.     The Cooperation Agreement and Chapter 15 Recognition Order

35.     On January 6, 2023, the Debtors and the JPLs entered into an agreement to cooperate in so far as possible to accomplish their common goals, including maximizing recoveries to customers and other creditors (the "Cooperation Agreement") [D.I. 402-1], which was approved

---

[5]     *Update by the Joint Provisional Liquidators of FTX Digital Markets Ltd. ("FTX Digital")*, PwC.com (Dec. 15, 2022), *available at* https://www.pwc.com/bs/en/press-releases/update-by-the-joint-provisional-liquidators-of-ftx-digital-markets-limited.html.

by this Court and the Bahamas Court.  The Cooperation Agreement does not resolve the parties'

disputes arising out of or related to the user agreements or other arrangements relating to FTX.com.

(Cooperation Agreement ¶ 10.)  The Debtors primary commercial purpose for entering into the

Cooperation Agreement was to protect the value of real estate in The Bahamas held by FTX

Property Holdings Ltd. ("PropCo Debtor"), a Debtor, and to ensure that these properties could be

sold in a consensual process.

36.     The Cooperation Agreement resolved the Debtors' objections to chapter 15

recognition of the FTX DM liquidation proceedings by this Court, despite the Debtors concerns

expressed previously with the violations of the automatic stay by the JPLs.  In doing so, the Debtors

negotiated for critical language in the chapter 15 recognition order entered by this Court (the

"Recognition Order")[6] stating that *nothing* "requires the Court in the Chapter 11 Cases to defer to

any decision in the Bahamian Liquidation Proceeding with respect to (or alter the Court's *de novo*

or other applicable standard of review of) any matter raised by the Chapter 11 Debtors before the

Court in the Chapter 11 Cases with respect to property of the estate of the Chapter 11 Debtors

(including without limitation the scope of property of the estate [or] the application or extension

of the automatic stay . . . )."  (Recognition Order ¶ 9.)

37.     The Cooperation Agreement similarly provides that recognition under

Chapter 15 "would not require the U.S. Bankruptcy Court to defer to the decisions of any foreign

court . . . with respect to property of the estate of the Chapter 11 Debtors."  (Cooperation

Agreement ¶ 12.)  The Cooperation Agreement also provides a corresponding paragraph stating

that recognition of the Chapter 11 Cases in The Bahamas would not require the Bahamas Court to

defer to any decisions of any foreign court relating to any matter raised by the JPLs in the Bahamas

---

[6]     Order Granting Recognition of Foreign Main Proceeding and Certain Related Relief, *In re FTX Digital Markets Ltd.*, No. 22-11217 (JTD) (Feb. 15, 2023) [Ch. 15 D.I. 129].

Proceedings with respect to property of the estate of FTX DM.  (*Id.* ¶ 13.)  But these documents make clear that the parties did not agree to concurrent proceedings as between the Debtors and FTX DM.  This Court is free to exercise its jurisdiction and adjudicate issues concerning property of the Debtors' estates, and does not need to defer to the Bahamas Court as the Motion requests.

> **E.    The Debtors' Adversary Proceeding and the JPLs' Motion for Stay Relief**

38.    On March 9, 2023, the JPLs continued to pursue their strategy of trying to obtain decisions from the Bahamas Court with respect to issues core to the Debtors and their estates, including with respect to customer entitlements and the Debtors' property, by sending the proposed directions application that they seek to file with the Bahamas Court.  (Greaves Decl. Ex. A-1 (the "Proposed Application").)  During a meet and confer discussion on March 15, 2023, the Debtors made clear to the JPLs—as they have at all times—that the Debtors would not permit critical questions implicating property of the Debtors' estates to be litigated outside of this Court and would instead be filing merits litigation here.

39.    On March 19, 2023, the Debtors filed a Complaint (the "Adversary Complaint") commencing an adversary proceeding, *Alameda Research LLC* v. *FTX Digital Markets Ltd.*, Adv. Pro. 23-50145 (the "Adversary Proceeding").  The Adversary Complaint seeks declaratory relief to dispel the cloud of title resulting from the JPLs' public claims to the Debtors' cryptocurrency, fiat currency, intellectual property, and customer information.  (Adv. Compl. ¶¶ 53–84.)  In addition, the Adversary Complaint asserts, in the alternative, claims to avoid and recover fraudulent transfers of assets to or through FTX DM.  (*Id.* ¶¶ 85–102.)

40.    On March 29, 2023, the JPLs filed their Motion, arguing that the Proposed Application is not subject to the automatic stay, and, in the alternative, for relief from the automatic stay.  (Mot. ¶ 14.)  The JPLs attempt to downplay the scope of the relief being sought through the Motion with statements that they seek only to establish "a cross-border protocol for judicial

cooperation" (*id.* ¶ 48), yet their arguments reflect far more.  In fact, in the same pages, the JPL's admit they "believe these issues are most efficiently resolved by the Bahamas Court" (*id.* ¶ 3), and argue why the Bahamas Court should decide a litany of issues fundamental to the Debtors and their stakeholders.  Make no mistake, the Proposed Application is not a framework for cross-border cooperation but rather a request for an unlimited license to challenge the scope of the Debtors' estates outside of this Court.

## ARGUMENT

I.    **THIS COURT MUST DECIDE WHAT IS PROPERTY OF THE DEBTORS' CHAPTER 11 ESTATES**

41.    The JPLs feign that their Proposed Application is "normal," describing it as an attempt to coordinate the resolution of "various legal and factual issues and how they pertain to the estates under their jurisdiction."  (Mot. ¶¶ 26, 49.)  But the relief requested is quite extraordinary.  The JPLs seek relief from the automatic stay so that *a Bahamas Court* can determine "whether and to what extent the International Customer contracts were novated/migrated to FTX Digital prior to November 2022." (*Id.* ¶ 35.)  In addition, the JPLs seek to have the Bahamas Court determine whether assets currently held by the Debtors' estates actually "are held in trust by FTX Digital for the benefit of certain or all of its International Customers." (*Id.*)

42.    Congress has determined that this Court has *exclusive* jurisdiction over property of the Debtors' estates.  28 U.S.C. ¶ 1334(e)(1).  Given that, the challenges to property of the Debtors' estates interposed by the JPLs are within the core jurisdiction of this Court and implicate some of the most fundamental subjects in these Chapter 11 Cases.  *See In re Cont'l Airlines*, 138 B.R. 442, 445 (D. Del. 1992) ("[t]he determination of what constitutes property of the bankruptcy estate" is one of the core proceedings arising under Title 11 and is inherently an

issue to be determined by the bankruptcy court).  This Court will have the opportunity to resolve the JPLs' claims to the Debtors' assets in the pending Adversary Proceeding and in connection with the forthcoming plan of reorganization.

43.     The Debtors commenced the Adversary Proceeding to advance before this Court these and other disputed issues concerning the Debtors' property rights.  Until resolved in its entirety, none of the issues arising in or relating to the Adversary Complaint should be litigated in The Bahamas.  This sequencing of matters involving property of the Debtors' estates was critical to the Debtors resolving their objection to recognition of the Bahamian Provisional Liquidation and the JPLs, as evidenced by the Court's Recognition Order making clear that *nothing* in that Order requires this Court "to defer to any decision in the Bahamian Liquidation Proceeding with respect to (or alter the Court's *de novo* or other applicable standard of review of) any matter raised by the Chapter 11 Debtors before the Court in the Chapter 11 Cases with respect to property of the estate of the Chapter 11 Debtors . . . ."  (Recognition Order ¶ 9.)  It is thus clear that this Court is the forum contemplated to resolve any claims to property possessed by the Debtors.

44.     The JPLs nevertheless seek stay relief so that questions of what is property of the Debtors' estates, central to the Chapter 11 Cases, can be decided in a foreign court.  The only basis that the JPLs provide for relocating their property disputes with the Debtors is their belief that "these issues are most efficiently resolved by the Bahamas Court, which routinely considers and applies the [foreign] laws at issue."  (Mot. ¶¶ 3, 36–38, 77, 88.)  But most of the foreign law issues that may be considered are matters of English law, not Bahamas law (*id.* ¶ 35), and in any event, application of foreign law in a bankruptcy proceeding is *not* a sufficient basis to require this Court's abstention because bankruptcy "court[s are] competent to apply foreign law." *In re Arcapita Bank B.S.C.(c)*, 575 B.R. 229, 239 (Bankr. S.D.N.Y. 2017) (collecting cases), *aff'd*

*sub nom. In re Arcapita Bank B.S.C.(C)*, 640 B.R. 604 (S.D.N.Y. 2022).  Indeed, bankruptcy courts often hear evidence as to English non-bankruptcy law and apply that law, to the extent relevant to a matter before it.  *See, e.g.*, *Wells Fargo Bank, N.A.* v. *Am. Home Mortg. Inv. Corp.*, 2008 WL 4753342, at *4-7 (Bankr. D. Del. Oct. 30, 2008) (applying English law); *In re Lyondell Chem. Co.*, 543 B.R. 428, 460 (Bankr. S.D.N.Y. 2016) (finding Luxembourg law not so unusual to render the task too difficult and that "largely similar briefing [on Luxembourg law] would presumably be necessary in either [Luxembourg or the United States]); *In re B.C.I. Finances Pty Ltd.*, 583 B.R. 288, 298 (Bankr. S.D.N.Y. 2018) (applying Australian law).  This Court is well-equipped to decide issues of English or of any other foreign law by employing the same familiar tools that U.S. courts routinely use:  reviewing the "plain text of applicable foreign law," considering "expert affidavits," and "assess[ing] experts' opinions" based on the "foreign country's civil law, cases, treatises, and logic."  *In re Bozel S.A.*, 434 B.R. 108, 111 (Bankr. S.D.N.Y. 2010) (internal citations omitted).  The JPLs have failed to explain why the Bahamas Court is more qualified than this Court to answer those questions of foreign law.

45.     In any event, certain disputed issues, including arguments about constructive trust, will involve consideration of equitable principles that this Court, sitting in Delaware and applying Delaware choice of law rules, will apply to decide the relative recoveries of all the chapter 11 stakeholders (including the JPLs) in what the Debtors' CEO has described accurately as an international crime scene.  *See In re Paul J. Paradise & Assocs., Inc.*, 249 B.R. 360, 371 (D. Del. 2000) (noting that under "Third Circuit and Supreme Court law, . . . courts must look to state law to determine whether and when constructive trusts attach in bankruptcy law").  These Chapter 11 Cases implicate many disparate jurisdictions, and centralizing issues before this Court's jurisdiction is the only way to efficiently manage the proceedings.

46.     This is not a "'normal' cross-border insolvency" case  (Mot. ¶ 51) where some property is in one debtor's control and other property is in the control of a foreign entity being administered in a foreign proceeding.  The Debtors are administering estates currently containing $7.3 billion in liquid assets, with potentially billions more of assets that have yet to be recovered or monetized.  In contrast, the JPLs have, at best, assets valued at approximately $30 million under their control—all of which the Debtors assert in the Adversary Complaint are the result of avoidable transfers.  (Mosley Decl. ¶ 19.)  In other words, even assuming the Debtors recover no value beyond their current $7.3 billion of liquid assets, FTX DM controls less than one-half of one percent of global value.  A single month of delay would cost FTX creditors far more than the value of all FTX DM assets.

47.     *In re Nortel Networks, Inc.*, 532 B.R. 494 (Bankr. D. Del. 2015) is instructive, but not for the reasons cited by the JPLs.  *Nortel* involved the use of a cross-border protocol and cross-border hearings where there were creditors of a U.S. debtor *separate* from creditors of a Canadian debtor and the assets at issue were expressly subject to concurrent jurisdiction.  Similarly, both *In re Soundview Elite, Ltd.*, 503 B.R. 571 (Bankr. S.D.N.Y. 2014) and *In re Calpine Corporation*, No. 05-60200 (CGM) (Bankr. S.D.N.Y. 2005) involved separate classes of creditors of a U.S. entity and of a foreign entity.  Conversely here, all customers of the FTX.com international exchange who suffered losses will have claims against the Debtors for those losses, irrespective of any additional incremental claims against FTX DM.  (Mosley Decl. ¶ 20.)  FTX Trading is the only owner and operator of the FTX.com exchange, and is the only transacting party with customers under the various iterations of the FTX.com terms of service.  As a result, the Debtors intend to structure their reorganization plan such that *all* customers of the main FTX.com exchange receive the same ultimate distributions, notwithstanding the

particularities of what services were provided, what iteration of the terms of service governed, or which of the Debtors' subsidiaries provided the service. To the extent the JPLs wish to use assets to make non-ratable distributions to a special subset of FTX.com customers that they can prove have been "novated" in preference to others, the Debtors' reorganization plan will account for that and ensure all similarly situated customers receive the same recovery.

48. The Debtors have embraced concurrent jurisdiction of this Court with other jurisdictions where it makes sense to do so. In Switzerland, a moratorium has been commenced and options for that entity's ultimate resolution are being explored. Indeed, the Debtors and the JPLs negotiated a special arrangement for the PropCo Debtor, which owns significant real property physically located in The Bahamas. (*See* Cooperation Agreement ¶ 15.) However, invoking concurrent jurisdiction of the Bahamas Court with respect to the broader disputes with FTX DM is unnecessary and unwarranted at this time.

49. In addition, the United States Attorney for the Southern District of New York (the "U.S. Attorney") has already seized more than $143 million in cash from FTX DM's various bank accounts in the United States, over which the JPLs no longer have any control. The Debtors also have asserted avoidance claims in the Adversary Proceeding to confirm that the Debtors stand first in line to recover this cash asset to the extent it is ever released by the government, and those claims must be adjudicated in this Court. *See In re Brosnahan*, 324 B.R. 199, 207 (Bankr. W.D.N.Y. 2005) (denying stay relief to pursue mortgage foreclosure proceedings because the trustee already commenced adversary proceeding to avoid the mortgage as a fraudulent conveyance); *see also, e.g.*, *In re Jarvis*, 242 B.R. 172, 178 (Bankr. S.D. Ill. 1999) (denying stay relief because creditor's lien on debtor's property was subject to avoidance action as a preference).

50.     The United States also has an interest in the disposition of any assets of FTX DM and prosecuting the crimes allegedly committed by Mr. Bankman-Fried and by his co-conspirators who have pled guilty.[7]  The JPLs' broad invocation of comity ignores the fact that "comity has never meant categorical deference to foreign proceedings;" instead, "deference should be withheld where appropriate to avoid the violation of the laws, public policies, or rights of the citizens of the United States."  *In re Elpida Memory, Inc.*, 2012 WL 6090194, at *8 (Bankr. D. Del. Nov. 20, 2012) (quoting *In re Treco*, 240 F.3d 148, 157 (2d Cir. 2001)).  The concerns are greater here where The Bahamas is not a signatory to either the Model Law on Cross-Border Insolvency[8] or the Model Law on Recognition and Enforcement of Insolvency-Related Judgments.

## II.     THE AUTOMATIC STAY APPLIES TO THE JPLS' PROPOSED BAHAMAS LITIGATION

51.     "The automatic stay is one of the most fundamental protections provided by the Bankruptcy Code" and "[t]he scope of the automatic stay is very broad."  *In re THG Holdings LLC*, 604 B.R. 154, 160 (Bankr. D. Del. 2019) (Dorsey, J.).  It "was designed to prevent certain creditors from gaining a preference for their claims against the debtor; to forestall the depletion of the debtor's assets due to legal costs in defending proceedings against it; and, in general, to avoid interference with the orderly liquidation or rehabilitation of the debtor."  *In re Advanced Elecs., Inc.*, 283 F. App'x 959, 965 (3d Cir. 2008).

52.     The JPLs' Proposed Application would violate these protections.  To establish that neither filing nor prosecuting the Proposed Application would violate

---

[7]     It is important to note Mr. Bankman-Fried was taken into custody in The Bahamas by the Bahamian authorities and extradited to the United States to face charges.  Mr. Bankman-Fried has ***not been charged*** with crimes in The Bahamas.

[8]     *See Status: UNCITRAL Model Law on Cross-Border Insolvency (1997)*, United Nations Commission on International Trade Law, *available at* https://uncitral.un.org/en/texts/insolvency/modellaw/cross-border_insolvency/status.

sections 362(a)(1) and 362(a)(3) of the Bankruptcy Code, the JPLs argue that the Proposed Application "is not an action *against* the U.S. Debtors" and "does not seek to 'obtain possession of property' of the U.S. Debtors' estates or 'to exercise control over property of the estate.'" (Mot. ¶¶ 59–60 (emphasis in original).) Such a hyper-technical reading of sections 362(a)(1) and 362(a)(3) is inconsistent with the broad scope of the automatic stay and the law in the Third Circuit. As such, both arguments fail.

### A.    The Proposed Application Significantly Impacts the Debtors' Rights.

53.    Section 362(a)(1) of the Bankruptcy Code prohibits the "commencement . . . of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title."  11 U.S.C. § 362(a)(1).  Courts in this district have interpreted the language of section 362(a)(1) broadly, finding that the automatic stay applies "to any action or proceeding against an interest of the debtor." *See In re Kaiser Aluminum Corp., Inc.*, 315 B.R. 655, 658 (D. Del. 2004); *see Const. Bank* v. *Tubbs*, 68 F.3d 685, 691–93 (3d Cir. 1995) (holding that the automatic stay applies to "all judicial actions" and "suspends any non-bankruptcy court's authority to continue judicial proceedings," and prevents any party from "undertak[ing] any judicial action material to the claims against the debtor").

54.    In *Kaiser*, the court rejected the type of formalistic reading of section 362(a)(1) that the JPLs are advancing here, finding that "[t]he scope of [the automatic stay] is not determined solely by whom a party chose to name in the proceeding, but rather, by who is the party with a real interest in the litigation." *See Kaiser*, 315 B.R. at 358; *see also In re Klarchek*, 508 B.R. 386, 394 (Bankr. N.D. Ill. 2014) (noting that the "*Kaiser* reasoning" has been adopted by courts in the Seventh, Tenth, and Eleventh Circuits)*.*  Indeed, while "[i]t is universally

acknowledged that an automatic stay of proceedings accorded by § 362 may not be invoked by entities such as sureties, guarantors, co-obligors, or others with a similar legal or factual nexus to the Chapter 11 debtor," *McCartney* v. *Integra Nat. Bank N.*, 106 F.3d 506, 509-10 (3d Cir. 1997), multiple courts have held that the automatic stay "applies . . . to suits the resolution of which may have a significant impact on the debtor." *Maaco Enterprises, Inc.* v. *Corrao*, 1991 WL 255132, at *2 (E.D. Pa. Nov. 25, 1991). Courts have gone so far as applying the automatic stay in cases against non-debtors, where the action would have an adverse impact on the debtor's estate. *In re Gucci*, 126 F.3d 380, 392 (2d Cir. 1997) ("an action taken against a nondebtor which would inevitably have an adverse impact upon the property of the estate must be barred" by sections 362(a)(1) and 362(a)(3)).

55.     Looking only at the caption of the Proposed Application—as the JPLs have asked the Court to do here (*see* Mot. ¶ 59)—ignores the significant impact that a decision on the questions raised in the Proposed Application would have on the Debtors and is the same elevation of "form over substance" that *Kaiser* rejected. *See* 315 B.R. at 657. While the JPLs frame the questions in their Proposed Application as only affecting FTX DM, they obviously and necessarily impact the Debtors by seeking to resolve in The Bahamas issues concerning whether customers of the FTX Debtors novated to FTX DM, and whether assets claimed and held by the Debtors in fact belong to FTX DM. That is the role of this Court, through resolution of the Adversary Proceeding and presiding over the plan confirmation process. *See In re Premier Operations*, 294 B.R. 213, 222 (S.D.N.Y. 2003) (holding that "it is the responsibility of a bankruptcy court [to determine] the rights of a party against a bankruptcy estate"); *In re Williams*, 305 B.R. 618, 620 (Bankr. D. Conn. 2004) (noting that it is "the responsibility of [the Bankruptcy court] to insure fair and equitable treatment of creditors").

56.     The JPLs instead rely on a single case, *Maritime Electric Company, Inc.* v. *United Jersey Bank*, 959 F.2d 1194 (3d Cir. 1991), to justify their position.  (Mot. ¶ 59.)  But that case is inapposite.  There, the Third Circuit considered whether it was appropriate to stay an already-scheduled bench trial, where a debtor co-defendant filed for chapter 13 protection after summary judgement but before the trial commenced.  *Id.* at 1203.  The Third Circuit concluded that the automatic stay did not forbid the district court from deciding issues related to a non-debtor co-defendant's punitive damages liability and the debtor's counter and third party claims (*i.e.*, claims brought by the debtor, not against the debtor).  *Id.* at 1206–07.  Nothing in the Third Circuit's decision supports the reading of section 362(a)(1) that the JPLs advance here.

57.     The questions raised by the JPLs in the Proposed Application necessarily, and substantially, impact the Debtors' interests.  Consequently, the automatic stay is applicable.

**B.     The Proposed Application Seeks to Control the Debtors' Property.**

58.     Section 362(a)(3) of the Bankruptcy Code provides a separate, independent basis to find that the stay applies to the filing and prosecution of the Proposed Application.  That statute prohibits "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3).  "Section 362(a)(3) is generally viewed as a provision designed to prevent the 'dismemberment' of the bankruptcy estate until the bankruptcy process permits either a financial reorganization of the debtor or an orderly liquidation of the assets of the bankruptcy estate."  *In re Trump Ent. Resorts, Inc*., 534 B.R. 93, 102 (Bankr. D. Del. 2015); *see also In re Denby-Peterson*, 941 F.3d 115, 122 (3d Cir. 2019) ("In furtherance of the automatic stay's overarching purpose, Section 362(a)(3) prevent[s] dismemberment of the estate, and enables an 'orderly' distribution of the debtor's assets") (quoting H.R. Rep. No. 95-595, at 341 (1977)).

-23-

59.     Property of the estate protected by section 541(a)(1) of the Bankruptcy Code is broadly defined to include "all legal or equitable interests of the debtor in property as of the commencement of the case."  11 U.S.C. § 541(a)(1); *In re O'Dowd*, 233 F.3d 197, 202 (3d Cir. 2000) (emphasizing "Congress' intent to delineate in broad terms what constitutes property of the estate").  The questions that the JPLs' Proposed Application explicitly contemplate asking the Bahamas Court to adjudicate through "binding directions and declarations" include, among other things, whether "digital assets and/or fiat presently held, or as may be held in the future, in the name of FTX DM are assets and/or fiat of FTX DM in law" and "the rights and/or obligations in respect to the Account(s) for each User . . . under the May ToS . . . ."  (Proposed Application at 3.) Substantially all of the "assets" implicated by the Proposed Application are currently held by the Debtors.

60.     Courts in this district hold that efforts to obtain a declaratory judgement outside of the presiding bankruptcy court relating to the property of a debtor—even indirectly— are acts to exercise control over the debtor's property and are violations of section 362(a)(3).  *See Kaiser*, 315 B.R. at 659 (holding that non-debtor acted to exercise "possession of . . . or to exercise control over property of the estate" where "[non-debtor] essentially seeks a declaratory judgment that any recovery [debtor] might obtain from [third party] must be paid to [non-debtor]").  As a result, the filing and prosecution of the Proposed Application without stay relief would violate section 362(a)(3).

61.     Knowing this, the JPLs attempt to conjure an exception: that "the U.S. automatic stay can[not] act to prohibit a foreign debtor from determining the nature and extent of the liabilities and assets of its own estates."  (Mot. ¶ 60.)  But the JPLs fail to identify a single case—and the Debtors are not aware of any—in which such an "exception" to section 362(a)(3) is

recognized.  The out-of-circuit cases cited by the JPLs are inapposite.  Each addresses unilateral

financial actions made by one debtor that may impact another party in bankruptcy—either rejection

of executory contracts or price increases.[9]  (*Id.* ¶ 61.)  But the JPLs' proposed actions here are very

different.  They seek to commence litigation in The Bahamas that will burden the Debtors and

result in the Bahamas Court making determinations with respect to property of the Debtors' estates

that will directly affect the Debtors' rights and obligations.  The automatic stay imposed by

section 362(a)(3) applies to the JPLs and the Proposed Application.

## III.    THE JPLS HAVE NOT CARRIED THEIR BURDEN TO ESTABLISH CAUSE FOR STAY RELIEF

62.    The automatic stay is intended to shield debtors from a multiplicity of

litigation at a time when the debtors should be focusing on their restructuring efforts.  *In re Linear*

*Elec. Co., Inc.*, 852 F.3d 313, 323 (3d Cir. 2017). ("The purpose of the automatic stay is to give

breathing room for the development of . . . a plan."); *In re THG Holdings LLC*, 604 B.R. 154, 160

(Bankr. D. Del. 2019) (Dorsey, J.) ("Clearly, the stay is designed to halt all collection efforts in

order to allow the debtor time to reorganize.").

63.    Section 362(d) allows a party to obtain relief from the automatic stay only

"for cause."  11 U.S.C. § 362(d).  As this Court recently explained, in denying a request for stay

relief in this case, "in order to lift the stay, the burden is on the Movant to prove cause" and, among

other things, to "prove that there would be no harm to the bankruptcy estate."  (Apr. 12, 2023 Hr'g

Tr. 52:16–18, 53:1–3.)  Only if the party seeking to modify the stay carries its burden must a debtor

rebut that case for cause.  *In re Tribune Co.*, 418 B.R. 116, 127 (Bankr. D. Del. 2009).   In

---

[9]    *In re Noranda Aluminum, Inc*., 549 B.R. 725 (Bankr. E.D. Mo. 2016), *In re Railyard Co., LLC*, 562 B.R. 481 (Bankr. D.N.M. 2016), and *In re Old Carco LLC*, 406 B.R. 180 (Bankr. S.D.N.Y. 2009) each stand for some form of the proposition that a debtor may reject an executory contract without violating the stay of an unrelated debtor based on conflicting sections in the Bankruptcy Code.  The fourth case cited by the JPLs, *In re National Steel Corp*., found that a debtor which accepted a unilateral price increase by another debtor could not retroactively attack it as a violation of the automatic stay.  316 B.R. 287, 312 (Bankr. N.D. Ill. 2004).

determining whether to grant stay relief, courts in this circuit generally consider the following

three factors in considering the totality of the circumstances:

> (1) Whether any great prejudice to either the bankrupt estate or the
> debtor will result from continuation of the civil suit;
>
> (2) Whether the hardship to the non-bankrupt party by maintenance
> of the stay considerably outweighs the hardship to the debtor; and
>
> (3) Whether the creditor has a probability of prevailing on the
> merits.

*Id*. at 126 (quoting *Izzarelli* v. *Rexene Prods. Co. (In re Rexene Prods. Co.)*, 141 B.R. 574, 576

(Bankr. D. Del.1992)).  The JPLs have not (and cannot) carry their burden of establishing that

cause exists to modify the automatic stay to file the Proposed Application.

### A.    Stay Relief Would Prejudice the Debtors and Their Estates.

64.    The JPLs claim that "resolving the Foreign Law Customer Questions in The

Bahamas does not prejudice the U.S. Debtors."  (Mot. at 35.)  This is false.  The reality is that the

Debtors and their creditors would suffer immeasurable harm by the JPLs pursuing shadow

proceedings in The Bahamas seeking to adjudicate rights as to the scope and makeup of the

Debtors' estates' property.  Indeed, the issues presented in the Proposed Application seek to

answer questions core to these Chapter 11 Cases regarding the nature of customer entitlements,

holding and tracing of assets, and asset distribution matters.  The Proposed Application seeks

"binding directions and declarations" from the Bahamas Court that the 2022 Terms of Service

novated FTX Trading customers and that the customer relationships and substantial assets held by

the Debtors should be "held" by FTX DM.  (*See* Proposed Application at 1–3.)

65.    The Debtors have recently begun the process of developing a plan of

reorganization, in consultation with the Committee and other creditor representatives.  The

Debtors' plan of reorganization will seek to distribute the assets held and that will in the future be

held by the Debtors to their millions of customers—customers who entirely overlap with any customers that FTX DM might have.  (*See* Mosley Decl. ¶ 20.)  To the extent that the plan process will not resolve asset distribution matters, the Debtors have pending the Adversary Proceeding where this Court is poised to resolve any disputes with the JPL regarding whether the $7.3 billion (and counting) of liquid assets held by the Debtors are property of the Debtors' estates.

66.     The prejudice to the Debtors and their creditors from the JPLs advancing issues core to the Debtors' Chapter 11 Cases outside of this court are evident from the JPLs' actions to date.  Already, the JPLs have, among other things:

- Attempted to cloud title to assets that have been marshaled by the Debtors and are available to be distributed to customers and other creditors in a plan of reorganization;

- Interfered with the Debtors' efforts to negotiate settlements with targets of avoidance actions by filing a position statement in response to a stipulation entered into between the Debtors and Voyager Digital Holdings, Inc. and affiliated debtors, asserting that FTX DM may hold the claims and seeking a veto over settlements;

- Announced publicly a claims "portal" and claims resolution procedure that gets ahead of the forthcoming claims bar date and resolution process of the Debtors, creating confusion among stakeholders;

- Solicited information from the Debtors' customers using customer data that is property of the Debtors' estates and believed to be received under NDA with the Debtors;

- Served and were forced to rescind a notice of default with respect to the PropCo Debtor; and

- Potentially hindered the marketing process for potentially raising capital for a restructured exchange by directly soliciting investors.

(*See* Mosley Decl. ¶ 21.)  The Court should not permit the JPLs to expand their campaign into litigation outside of these proceedings with respect to core issues of the Debtors' Chapter 11 Cases.

67.     Judge Wiles' recent decision in the *Voyager* chapter 11 cases is instructive. There, the court cautioned in connection with Celsius Network LLC's motion for leave to file a late proof of claim and lift the automatic stay to commence a preference action against Voyager

Digital, that there is "no way" that a foreign bankruptcy court (and there only foreign in the sense of being before a different judge in the same district) should be making fundamental determinations about a debtor's property and estates. *See In re Voyager Digital Holdings, Inc.*, No. 22-10943, Jan. 4, 2023, Hr'g Tr. [D.I. 921] 103:25, 104:1–9 (Bankr. S.D.N.Y. Jan. 24, 2023) ("[T]o the extent that the Debtors have implied that they wish to make arguments about the withhold accounts and whether they were or were not property and whether prior transfers to the withhold accounts should be treated as preferences, those are issues Judge Glenn [overseeing Celsius's bankruptcy cases] is going to be deciding as to many customers, and if . . . those are going to be issues, or were to be issues in opposition to a claim . . . then there is *no way* I would entertain a separate litigation of those issues in my Court." (emphasis added)).[10]   But this is precisely what would happen if any court other than this Court determined the core matters arising in these Chapter 11 Cases, including determinations of any avoidance actions as to what constitutes property of the Debtors' estates, over which this Court has *exclusive* jurisdiction. *See* 28 U.S.C. § 1334(e)(1); *In re Roy Nielsen Hafen*, 616 B.R. 570, 578 (B.A.P. 10th Cir. 2020) ("The jurisdiction to determine what is property of the bankruptcy estate lies exclusively with the [initial] bankruptcy court."). Indeed, a purpose of section 362 is to ensure the Debtors "not be burdened by [ancillary] litigation when [such] actions impacting upon the [D]ebtor[s'] estate can be settled in the bankruptcy forum." *McCartney* v. *Integra Nat. Bank N.*, 106 F.3d at 511. Doing so, in fact, "is to do violence to the purposes of the automatic stay." *Id.*

68.    As a result, it is paramount that these issues raised in the Proposed Application, which directly impact the Debtors' creditors, be addressed comprehensively before this Court in an organized and efficient manner that avoids piecemeal and serial litigation. That is

---

[10]    Judge Wiles denied Celsius' motion to file a late-filed claim without reaching the automatic stay relief.

precisely why the Debtors are advancing plan discussions and commenced the Adversary Proceeding.  The Debtors should not be forced "to expend valuable time, energy and resources" defending against the adjudication of the Application "that could be settled directly in the bankruptcy court."  *See id.* at 512.

69.     Yet, the JPLs curiously assert that the adjudication of the Proposed Application would only determine the scope of FTX DM's property and would "not ultimately determine what cash or other assets are or are not property of FTX Trading's estate."  (Mot. ¶ 74.) That is a misleading distinction without a difference.  Interpreting the Terms of Service, "mapping" customers to the FTX DM's estates, and determining customers' rights in assets or contracts are all simply different ways of characterizing what is and is not property of the Debtors' estates.  If the Bahamas Court determines any assets should be brought into the FTX DM estates, it would seek to effectuate that ruling with assets currently held by the Debtors.  Adjudication of the Proposed Application is, therefore, more than just "having the jurisdiction of the Bahamas Court invoked to allow that Court and this Court to decide who decides" (*id.* ¶ 71); it is a direct challenge to the authority of the Debtors to administer their estates.  As a result, the determination of what constitutes the Debtors' estates must first be resolved by this Court, either through the previously-filed Adversary Proceeding or confirmation of a plan of reorganization.

70.     The JPLs' reliance on *In re SCO Group, Inc.*, 395 B.R. 852 (Bankr. D. Del. 2007) and *In re Scarborough-St. James Corp.*, 535 B.R. 60, 67 (Bankr. D. Del. 2015), is misplaced. (Mot. ¶¶ 68–69, 72.)  In *SCO Group*, the court specifically noted that "the circumstances surrounding [that] case are unusual," because "the parties were on the door-step of beginning a five-day trial" with respect to prepetition litigation, and "[a]nother court has extensive knowledge of the facts and issues and has already made detailed findings."  *SCO Group*, 395 B.R. at 857.  In

finding that the debtors would face no prejudice from stay relief, the court found that the debtor had already "completed its extensive [non-bankruptcy] trial preparation," and allowing this litigation to conclude would not be burdensome or prejudicial.  *Id.* at 858.  Similarly, in *Scarborough-St. James Corp.*, the parties had been litigating the meaning of various provisions in a property lease for seven years before the creditor sought stay relief.  *Scarborough-St. James Corp.*, 535 B.R. at 62.  Nothing like the facts of those cases is present here.

71.     This Court—not the Bahamas Court—has extensive knowledge of and familiarity with the facts and circumstances of these Chapter 11 Cases.  In addition, there are substantial equitable considerations presented by these Chapter 11 Cases that will need to be resolved by this Court as a matter of Delaware and Third Circuit law.  If stay relief is granted, the Debtors and their stakeholders would have to decide whether to expend significant time and resources litigating duplicative issues implicating the Debtors' property in the Bahamas Court. Any determinations by the Bahamas Court on such issues would not be binding on this Court or the Debtors in accordance with the terms of the Recognition Order (at ¶ 9) and the Cooperation Agreement (at ¶ 12).

72.     Only if this Court determines there is property held by the Debtors that belongs to FTX DM *and* the transaction providing that property is not avoidable, would the Bahamas Court need to become involved with respect to these issues.  As a practical matter, meaningful participation in The Bahamas to determine ownership issues may not even be possible for the Debtors, never mind their millions of stakeholders.  The Bahamas has a closed legal system that makes it difficult to secure appropriate representation.  On March 23, 2023, the Debtors filed an application to have a King's Counsel specially admitted for the purpose of being available to the Debtors for any proceedings in The Bahamas.  After more than a month delay, on April 27,

2023, the Debtors received a letter from The Bahamas Bar Association indicating it is "not minded" to approve the application and requiring further proceedings. (*See* Mosley Decl. Ex. N.)

73.     The JPLs go on to show their true intent, arguing that the Debtors would not be prejudiced by "even an ultimate adjudication" of the issues raised in the Proposed Application since the "Bahamas Court provides a more appropriate forum" because it is "familiar with the applicable English and Commonwealth laws." (Mot. ¶ 72.) The JPLs also argue that the Bahamas Court can answer questions of foreign law "free of charge." (*Id.*) But it strains credulity to believe that forcing the Debtors to defend their property interests implicating complex legal questions in a foreign forum is "free." Litigation in the Bahamas Court would require the Debtors, the Committee, and other parties-in-interest to present their own expert testimony and arguments both in this Court and the Bahamas Court.

74.     And by the JPLs' own characterization, few of the purported non-U.S. legal issues that the JPLs seek to resolve even concern Bahamian law (and even then, only partially). The JPLs descriptions (which the Debtors' disagree with), concern the interaction of Antiguan and English law and their applicability in the novel cryptocurrency context, "some of which no court in the Commonwealth has heard before." (*Id.* ¶¶ 35, 72.) In any event, the significant harm to the Debtors from needing to litigate issues challenging property of their estate outside of this Court are apparent.[11]

---

[11]    The JPLs' cites to abstention cases, which reflect a different equitable analysis, fare no better. (*See* Mot. ¶ 72 & n.42.) Courts have given little weight to the existence of a pending state-court action that deals with the same issues raised in a bankruptcy adversary proceeding. *See, e.g.*, *In re Fruit of the Loom, Inc.*, 407 B.R. 593, 600 (Bankr. D. Del. 2009) (giving "little weight" to state court action in abstention analysis because the movant "agreed to this Court's jurisdiction"); *In re LaRoche Indus., Inc.*, 312 B.R. 249, 254 (Bankr. D. Del. 2004) (giving little weight to pending state court action before the creditor "agreed to the [bankruptcy] Court's jurisdiction" and "the fact that the [creditor] ignored that agreement when it filed the [state-court action] should not be counted in its favor").

### B.    The JPLs Fail to Identify Any Distinct Hardship.

75.    The JPLs also argue that "the hardship to the JPLs by maintenance of the stay considerably outweighs the hardship to the U.S. Debtors." (Mot. at 40.) But the JPLs fail to identify a single hardship they would suffer if the questions of asset ownership and customer entitlements are decided by this Court in the plan process and/or the Adversary Proceeding.

76.    What the JPLs are really arguing is they simply *do not want* this Court to decide these issues and prefer the Bahamas Court do so. Irrespective of the JPLs' motivations, there is no hardship resulting from an inability to litigate disputes with the Debtors in the venue and at the time of the JPLs' choosing, at the expense of the Debtors and their estates. There certainly is no basis to provide relief from the automatic stay on this basis. *See In re Rochester Drug Coop., Inc.*, 2021 WL 1093966, at *4 (Bankr. W.D.N.Y. Mar. 22, 2021) (denying stay relief because permitting a creditor to "jump-the-line" would be "to the detriment of the Estate").

77.    Tellingly, no economic stakeholder has expressed a desire for proceedings in The Bahamas. The JPLs argue that the "Provisional Liquidation cannot proceed without resolving" the questions listed in the Application, and that the Bahamas Court had already deemed these issues "fundamental." (Mot. ¶ 76.) But the JPLs provide no evidence as to why that is true, and, in any event, identify no specific hardship resulting from a delay in those proceedings. As it stands right now, there is little conceivably needed to be done aside from the PropCo Debtor matters that were addressed between the parties in the Cooperation Agreement. Further, all of the customers that the JPLs want to "map" to FTX DM are creditors of the Debtors, and will remain so irrespective of any obligations of FTX DM. (*See* Mosley Decl. ¶ 20.) The Debtors are in possession of, and hold *in rem*, more than $7.3 billion in liquid assets, while the JPLs control approximately $30 million or less. (*Id.* ¶ 19.)

-32-

78.      And contrary to the JPLs' assertion, the Debtor's alleged "U.S.-first position" (Mot. ¶ 85), serves to respect the fundamental purpose of the automatic stay to permit the Debtors to reorganize through a plan of reorganization and "centralize all prebankruptcy civil claims against a debtor in the bankruptcy court." *McCartney*, 106 F.3d at 511.  The issues raised by the JPLs are intimately tied to the Debtors' plan process that is now underway, and overlap with the claims asserted by the Debtors and pending before this Court in the Adversary Proceeding. Moreover, the JPLs cannot be surprised about the Debtors' position because it is specifically provided for in this Court's Recognition Order.  As the JPLs are well aware, the resolution of the Debtors' objection to chapter 15 recognition and the JPLs as foreign representatives was conditioned on the inclusion of language expressly providing that recognition does not require this Court to defer to the Bahamas Court on any matter raised by the Debtors in this Court with respect to property of their estates.  (Recognition Order ¶ 9.)  The same language is included in the Cooperation Agreement as well.  (Cooperation Agreement ¶ 12.)

79.      The JPLs acknowledge, as they must, that "this Court will ultimately decide for itself what effect the Bahamas Court's order has in these cases." (Mot. ¶ 63.)  This Court will adjudicate the Adversary Proceeding and any related plan objections.  The JPLs will have the full and fair opportunity to present their claims and defenses before this Court.  The JPLs thus face no prejudice from the denial of stay relief.

80.      The JPLs further argue that they would face prejudice if the "largely complex and novel issues of English, Antiguan, or Bahamian law relating to cryptocurrency" are not resolved by the Bahamas Court.  (Mot. ¶¶ 72, 76.)  But they offer no evidence as to how or why that would be the case; it is not.  As the JPLs concede, certain issues in dispute are "largely complex and novel," and "some of which no court in the Commonwealth has heard before." (*Id.*

¶ 72.)  The Bahamas is neither England nor Antigua.  Its membership in the Commonwealth is irrelevant to the present debate.  As detailed above, this Court is no less equipped than the Bahamas Court to address foreign law issues, and will be doing so in the context of plan confirmation and the Adversary Proceeding.

81.    On balance, the first two factors weigh strongly in favor of the Debtors and against modifying the stay because allowing litigation in the Bahamas Court at this time would impose substantial prejudice upon the Debtors and their estates, and impede administration of the estates.  The JPLs certainly have not carried their significant burden to show that any hardship to them "considerably outweighs" the hardship to the Debtors.  *Tribune*, 418 B.R. at 126.  The Court need not go further, and the Motion should be denied.

**C.    The JPLs Have Failed to Establish any Probability of Prevailing on the Merits.**

82.    The merits of the property of the estate issues raised by the JPLs in the Proposed Application will be decided by this Court based on a full evidentiary record in the Adversary Proceeding or during the Debtors' plan process.  Furthermore, the Adversary Proceeding alleges that the formation of FTX DM sits at the heart of the fraudulent scheme perpetuated by Mr. Bankman-Fried and his co-conspirators, and thus any transfers to FTX DM are avoidable even if the JPLs had an interest in any of the Debtors' assets.  (Adv. Compl. ¶¶ 22–28.)

83.    Against this backdrop, the JPLs offer only a single paragraph addressing their probability of prevailing on the merits, which is devoid of any legal analysis to support their novation theories.  (*See* Mot. ¶ 79.)  Instead, the JPLs rely entirely on scant circumstantial evidence that Mr. Bankman-Fried and his criminal conspirators intended to move certain operations to The Bahamas, out of the reach of American regulators and courts.  (*See* Mot. ¶ 79 ("[T]he FTX Group (1) **had a plan** to move the international operations to the Bahamas, and (2) began to execute on that plan by, among other things, moving the FTX Group's management team to The Bahamas

and establishing the headquarters of the FTX Group.") (emphasis added).)  Even viewed in the light most favorable to the JPLs, their evidence suggests an *intent* to migrate certain of FTX Trading's *operations* to The Bahamas but falls far short of showing FTX Trading intended to transfer *all of its assets* (or even some portion) to FTX DM, much less that the so-called migration actually occurred.  The JPLs have not carried their burden.

84.     The JPLs merely assert that "'open' questions exist about whether the migration of other categories of International Customers were completed as a matter of law." (Mot. ¶ 79.)  But that is insufficient, and the evidence in any event shows that it is unlikely the JPLs will be able to establish the occurrence of a novation of customers or other interest in the Debtors' property.

85.     *First*, the JPLs argument is premised on the assumption that some of the Debtors' customers have migrated to FTX DM and as a result, FTX DM has customers separate and apart from FTX Trading.  (*Id.*)  While the Debtors did indicate at the First Day Hearing that a small number of customers were customers of FTX DM, the Debtors also were clear that all of their initial statements were preliminary based on the information available at the time.  (Nov. 22, 2022 Hr'g Tr. 26:8-9.)  The Debtors have subsequently learned, as will be established in the Adversary Proceeding, that *no* customers were "moved" to FTX DM to the exclusion of FTX Trading.  Rather, at most, FTX DM started providing certain specific services to certain customers after May 2022 pursuant to the 2022 Terms of Service.

86.     *Second*, a cursory review of the 2022 Terms of Service makes this clear. The Court will first look to the plain language of the 2022 Terms of Service.  *Pac. Emps. Ins. Co.* v. *Glob. Reinsurance Corp. of Am.*, 693 F.3d 417, 426 (3d Cir. 2012) ("If we determine that the language is unambiguous, we follow its plain meaning."); *In re Am. Home Mortg. Holdings, Inc.*,

386 F. App'x 209, 212 (3d Cir. 2010) (quoting *Crown Cork & Seal Tech. Corp.* v. *Cont'l Pet Tech. Inc.*, 232 F. Supp. 2d 294, 298 (D. Del. 2002)) ("Under English law, the words of a contract are interpreted in accordance with their plain and ordinary meaning.").  Even after the amendment to include FTX DM, that document plainly leaves intact the contractual relationship between the customer and FTX Trading, with FTX DM relegated to the role of a "Service Provider in respect of a Specified Service."  (Mosley Decl. Ex. H, pmbl.)  The Terms of Service further states that "FTX Trading's relationship with [the customer] under the Terms is as a trading platform provider only," and that FTX Trading would not act as a "principal or counterparty with respect to trades entered into on the Platform," except that FTX Trading "may act as a counterparty for limited trades made for the purpose of liquidating fees" collected on customer trades.  (*Id.*)  In short, FTX Trading at all times remained (and continues to remain) the principal contractual party with customers.

87.     *Third*, the JPLs have failed to produce any evidence of a single customer being provided notice of or consenting to the 2022 Terms of Service, or to shifting their servicing relationship to FTX DM.  The "Customer Migration Plan" cited by the JPLs contemplated notice to customers and a 90 day period to raise any concerns before accepting the new terms of service. (Greaves Decl. Ex. B at 5.)  The Debtors are not aware of any such notice being provided.  (Mosley Decl. ¶ 13.)  To the extent there was any attempt to move any customer relationship to FTX DM, it would have been ineffective due to the lack of notice and being in furtherance of the larger fraud committed on customers.

88.     *Fourth*, the 2022 Terms of Service cannot themselves constitute a novation because customer consent was required.  *See Nikimiha Sec. Ltd.* v. *Trend Grp. Ltd.*, 646 F. Supp. 1211, 1217 (E.D. Pa. 1986) (under English law, novation requires "consent of the parties").  The

concept of novation was first added to the 2022 Terms of Service, which the JPLs acknowledge. ((*See* Greaves Decl. ¶ 16; *compare* Mosley Decl. Ex. D (2019 Terms of Service § 29) (granting only the rights to assign or transfer the contract) *with* Mosley Decl. Ex. H (2022 Terms of Service § 37.2) (adding the right to novate the contract).)  Yet, it defies logic that the same document that purportedly granted the novation right would at the same time secretly constitute a novation of customers absent another independent action to which FTX DM obtained consent.

89.     *Fifth*, the JPLs recite various Specified Services stating that FTX DM allegedly was to provide to customers pursuant to the 2022 Terms of Service, but they ignore that most core services such as the provision of custodial services—including, but not limited to, customer account formation and funding, account management, the receipt and custody of fiat and digital assets, and the redemption of these assets—that remained FTX Trading's responsibilities and not included in any of the Specified Services.  (*See* Mosley Decl. Ex. H § 7 (Order Book and Convert), § 8 (Account Funding).)  In other words, even if the 2022 Terms of Service granted FTX DM the ability to provide Specified Services to the customers, it did not alter the fundamental, custodial relationship between the customers and FTX Trading as the primary contractual parties, or take customers or assets to FTX DM to the exclusion of FTX Trading.

**D.     The JPLs' Unclean Hands Weigh Against Granting Relief from the Stay.**

90.     In deciding whether to grant stay relief, courts "should consider the general polices underlying the automatic stay."  *In re The Fairchild Corp.*, 2009 WL 4546581, at *7 n.43 (Bankr. D. Del. Dec.2009).  The fundamental purpose of the automatic stay is "to give breathing room for the development of . . . a plan."  *In re Linear Elec. Co., Inc.*, 852 F.3d 313, 323 (3d Cir. 2017).  As a result, "[j]udicial toleration of an alternative procedure of self-help and post hoc justification would defeat the purpose of the automatic stay."  *In re Computer Commc'ns, Inc.*, 824 F.2d 725, 731 (9th Cir. 1987).

-37-

91.     As noted, the JPLs' attempt to move critical questions involving customer entitlements and asset recovery to the Bahamas Court interferes with the Debtors' plan formation process that is underway.  The Court should deny stay relief in deference to the plan process, at least for some time, and resolution of the Adversary Proceeding.  Beyond that, the Court should deny stay relief because the JPLs have both themselves taken actions and acquiesced to the Commission's actions (with whom the JPLs are working closely) in violation of the automatic stay.  As set forth above and in the Debtors' prior filings (*see Debtors' Objection to Emergency Motion (I) For Relief from Automatic Stay and (II) to Compel Turnover of Electronic Records* [Chapter 15 D.I. 71]), the Commission seized hundreds of millions of dollars of Debtors' assets after the automatic stay went into effect.

92.     More recently, the JPLs sowed confusion among the Debtors' customers by publicly announcing a claims portal and resolution procedure and used the Debtors' customer data to solicit customer information from individual customers.  (*See supra* n. 4.)  The automatic stay precludes this type of self-help.  *In re Am. Home Mortg. Holdings, Inc.*, 401 B.R. 653, 656 (D. Del. 2009) (affirming denial of stay relief where bankruptcy court considered evidence of movant's self-help); *see also In re Fugazy Exp. Inc.*, 982 F.2d 769, 776-77 (2d Cir. 1992) ("Nothing in the Code suggests that a party is entitled to engage in 'self-help' in derogation of the automatic stay.").  The Court should not countenance the actions of the JPLs and the Commission by providing stay relief.

E.     **Principles of Comity Do Not Provide Any Basis for Stay Relief.**

93.     As an initial matter, the JPLs' reliance on abstention principles to advocate for this Court to defer to the Bahamas Court exposes as false their statements that the stay relief being sought is only so that they can establish a "cross-border judicial coordination" protocol (Mot.

¶ 3), and that the "question at bar is not even who will decide those issues but how we will go about deciding who will decide." (*Id.* ¶ 4.)

94.      "Abstention under § 305 is considered an extraordinary remedy," and the bankruptcy courts must ensure that "the interests of both the debtor and its creditors must be served." *In re Northshore Mainland Servs., Inc.*, 537 B.R. 192, 203 (Bankr. D. Del. 2015). Because the JPLs have not filed a motion seeking abstention, or attempted to make the requisite statutory showing, the Court should give little weight to the argument or cited authorities. Moreover, "the Third Circuit has not decided a case involving comity superseding an automatic stay." *In re Nortel Networks Inc.*, 2010 WL 3075760, at *5 (D. Del. Aug. 5, 2010). Here, comity principles do not support granting the JPLs stay relief.

95.      *First*, even if it was appropriate for another court to address claims with respect to the Debtors' property (it is not), there is no parallel proceeding in the Bahamas Court that could resolve both those issues and the Debtors' avoidance claims pled in the Adversary Proceeding. The Adversary Proceeding will need to be adjudicated here. Furthermore, as discussed, the Recognition Order and the Cooperation Agreement expressly provide that *this Court* retains the right to decide all of these matters impacting the Debtors' property.

96.      The precedents on which the JPLs rely involved deference to foreign or state-court proceedings previously commenced and close to conclusion, and where another court had developed substantial knowledge of the relevant non-bankruptcy legal claims. *See, e.g.*, *In re Drauschak*, 481 B.R. 330, 347–48 (Bankr. E.D. Pa. 2012) (state court litigation had been pending for two years; state court was thus more familiar with the issues and could resolve cross-claims falling outside of the bankruptcy court's jurisdiction; and there was concern about forum-shopping because the *debtor* initially chose to litigate in state court); *Pursifull* v. *Eakin*, 814 F.2d 1501,

1502–03, 1506 (10th Cir. 1987) (Texas state court proceeding was already pending before chapter 11 cases even commenced); *In re Int'l Tobacco Partners, Ltd.*, 462 B.R. 378, 393–94 (Bankr. E.D.N.Y. 2011) (non-debtor defendant already initiated state-court litigation three months before the debtor commenced adversary proceeding, and the debtor failed to first intervene in state court); *In re Int'l Admin. Servs., Inc.*, 211 B.R. 88, 91-93 (Bankr. M.D. Fla. 1997) (deferring to the foreign litigation which the bankruptcy court previously authorized the unsecured creditor's committee to initiate). These cases are inapposite here.

97.     Similarly, the JPLs' specific reliance on *Matter of Williams*, 144 F.3d 544 (7th Cir. 1998), is misplaced. There, the litigation at issue was pending prepetition, and the Seventh Circuit noted that the debtor "ha[d] done everything she could to make sure that the merits of her supposed defenses have not been tested," including by filing her bankruptcy petition "three days before the state court was to hear the merits of any defenses she had." *Id.* at 549–50. In other words, the state court was ready to make its final determination of the state law questions, which "would be accepted by the federal courts." *Id.* at 550. Here, however, the JPLs acknowledge that this Court would decide for itself what effect any order from the Bahamas Court would have on these Chapter 11 Cases. (Mot. ¶ 63.) In other words, none of these cases support the JPLs' contention that comity would allow them to evade the Adversary Proceeding pending before this Court or the forthcoming plan confirmation process, and instead have the Bahamas Court determine what is property of the Debtors' estates.

98.     *Second*, the issues presented in the Proposed Application involving the purported transfer of customers and assets to FTX DM also lie at the heart of the Debtors' avoidance claims asserted in the Adversary Proceeding. (*See* Adv. Compl. ¶¶ 22–29, 85–102.) Here, *In re Arcapita Bank B.S.C.(c)* proves instructive. In that case, the bankruptcy court refused

to dismiss the adversary proceeding brought by the Official Committee of Unsecured Creditors seeking to avoid preferential transfers to a Bahraini bank based on the principle of comity. 575 B.R. at 242. The court rejected the movant's reliance on comity in part because of the "grave concern that the Bankruptcy Code's avoidance and recovery position might cease to be effective at the borders of the United States, thus allowing parties to do an end run of the Code by simply arranging to have the transfer made overseas, thereby shielding them from United States law and recovery by creditors." *Id.* at 241–42 (cleaned up). Because the issues raised in the Proposed Application and the Debtors' intertwined avoidance claims have been properly presented to the Court in the Adversary Proceeding, the Court should decline the JPLs' request to abstain based on international comity. *Id.* at 242 (recognizing the "virtually unflagging obligation" of the federal courts "to exercise the jurisdiction given them" to decline abstention based on comity).

99.     *Finally*, denying the JPLs stay relief does not impair the authority of the Bahamas Court. The Debtors recognize that the Bahamas Court would have a role to the extent that there is property of the Debtors determined by this Court to be property of FTX DM, and for which the transaction conveying that property is not avoidable or otherwise fruits of the crime itself. To the extent any such property is not seized by the U.S. Attorney, only then would the Bahamas Court need to provide for its distribution.

<u>**CONCLUSION**</u>

100.     For the foregoing reasons, there is no cause to modify the stay, and the Motion should be denied.

Dated: May 3, 2023
      Wilmington, Delaware

**LANDIS RATH & COBB LLP**

*/s/ Kimberly A. Brown*
Adam G. Landis (No. 3407)
Kimberly A. Brown (No. 5138)
Matthew R. Pierce (No. 5946)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
E-mail: landis@lrclaw.com
      brown@lrclaw.com
      pierce@lrclaw.com

-and-

**SULLIVAN & CROMWELL LLP**

Andrew G. Dietderich (admitted *pro hac vice*)
James L. Bromley (admitted *pro hac vice*)
Brian D. Glueckstein (admitted *pro hac vice*)
Alexa J. Kranzley (admitted *pro hac vice*)
125 Broad Street
New York, NY 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
E-mail: dietdericha@sullcrom.com
      bromleyj@sullcrom.com
      gluecksteinb@sullcrom.com
      kranzleya@sullcrom.com

*Counsel for the Debtors and Debtors-in-Possession*