## Exhibit A

**SPA**

**Execution Version**

---

# SHARE PURCHASE AGREEMENT

**BY AND AMONG**

**FTX CANADA INC.**

**- and -**

**FTX TRADING LTD.**

**- and -**

**PATENO PAYMENTS INC.**

**DATED AS OF JUNE 14, 2022**

---

# TABLE OF CONTENTS
### (continued)

**Page**

ARTICLE 1 CERTAIN DEFINITIONS ................................................................. 1
   1.1    Certain Definitions ............................................................... 1
   1.2    Interpretation ....................................................................... 11

ARTICLE 2 PURCHASE AND SALE ................................................................. 12
   2.1    Purchase and Sale ................................................................ 12
   2.2    Closing of the Transactions Contemplated by this Agreement ......................... 12
   2.3    Deliveries at the Closing. ....................................................... 12
   2.4    Purchase Price. ................................................................... 14
   2.5    Deposit ............................................................................ 14
   2.6    Preparation and Delivery of Initial Statement of Adjustments ......................... 14
   2.7    Closing Date Payments ......................................................... 15
   2.8    Preparation and Delivery of Closing Date Financial Statements ....................... 15
   2.9    Objection to Closing Date Financial Statements ............................... 15
   2.10   Net Working Capital Adjustment ................................................. 16

ARTICLE 3 REPRESENTATIONS AND WARRANTIES OF THE SELLER ....................... 17
   3.1    Organization and Qualification ................................................. 17
   3.2    Authority ........................................................................... 17
   3.3    Consents and Approvals; No Violations ....................................... 18
   3.4    Title to the Shares ............................................................... 18
   3.5    Capitalization ..................................................................... 18
   3.6    No Subsidiaries .................................................................. 19
   3.7    Financial Statements ............................................................ 19
   3.8    Absence of Certain Developments ............................................. 19
   3.9    Compliance with Applicable Laws. ............................................. 20
   3.10   Regulatory Compliance ......................................................... 20
   3.11   Title to Assets .................................................................... 20
   3.12   Bank Accounts ................................................................... 20
   3.13   Powers of Attorney .............................................................. 20
   3.14   Real Property .................................................................... 20
   3.15   Tax Matters ...................................................................... 20
   3.16   Intellectual Property. ............................................................ 23
   3.17   Material Contracts. .............................................................. 24
   3.18   Insurance ......................................................................... 26
   3.19   Litigation ......................................................................... 26
   3.20   Employment Matters. ........................................................... 26
   3.21   Transactions with Affiliates .................................................... 27
   3.22   Governing Documents .......................................................... 27
   3.23   Seller Litigation ................................................................. 27
   3.24   Residency ........................................................................ 28
   3.25   Brokers ........................................................................... 28

**TABLE OF CONTENTS**
(continued)

**Page**

ARTICLE 4 REPRESENTATIONS AND WARRANTIES OF THE BUYER ........................ 28
    4.1     Organization and Qualification ................................................................ 28
    4.2     Authority ................................................................................................ 28
    4.3     Consents and Approvals; No Violations .................................................. 28
    4.4     Litigation ............................................................................................... 29
    4.5     Sufficiency of Funds ............................................................................. 29
    4.6     Investment Canada Act .......................................................................... 29
    4.7     Brokers ................................................................................................. 29

ARTICLE 5 TERMINATION ............................................................................... 29
    5.1     Termination ........................................................................................... 29
    5.2     Effect of Termination ............................................................................ 30
    5.3     Other Rights and Remedies ................................................................... 31

ARTICLE 6 COVENANTS .................................................................................. 31
    6.1     Conduct of Business Prior to Closing .................................................... 31
    6.2     Access for Investigation ........................................................................ 33
    6.3     Notice of Certain Matters ...................................................................... 34
    6.4     Confidentiality ...................................................................................... 34
    6.5     Actions to Satisfy Closing Conditions ................................................... 35
    6.6     Public Announcements .......................................................................... 36
    6.7     Indemnification of Directors and Officers. ............................................ 36
    6.8     Documents and Information ................................................................... 37
    6.9     Non-Competition, Non-Solicitation and Non-Disparagement. ............... 37
    6.10    Tax Matters. .......................................................................................... 39
    6.11    Disclosure of Personal Information. ....................................................... 41
    6.12    Exclusivity ............................................................................................ 42
    6.13    Updates to Seller Disclosure Schedules ................................................ 42

ARTICLE 7 CONDITIONS TO CONSUMMATION OF THE TRANSACTIONS
               CONTEMPLATED BY THIS AGREEMENT .................................. 43
    7.1     Conditions to the Obligations of the Buyer ........................................... 43
    7.2     Conditions to the Obligations of the Seller ............................................ 44

ARTICLE 8 INDEMNIFICATION ......................................................................... 45
    8.1     Indemnification by Seller ...................................................................... 45
    8.2     Indemnification by Buyer ...................................................................... 45
    8.3     Time Limitations. .................................................................................. 46
    8.4     Limitation on Damages .......................................................................... 46
    8.5     Materiality ............................................................................................. 46
    8.6     Third Party Claims. ............................................................................... 47
    8.7     Exclusion of Other Remedies ................................................................ 47
    8.8     Duty to Mitigate ................................................................................... 47
    8.9     One Recovery ........................................................................................ 48

# TABLE OF CONTENTS
## (continued)

**Page**

| | | |
|---|---|---|
| 8.10 | Tax Treatment of Indemnification Payments. | 48 |
| 8.11 | Limitations. | 48 |
| ARTICLE 9 MISCELLANEOUS | | 48 |
| 9.1 | Release | 48 |
| 9.2 | Entire Agreement; Assignment; Amendment | 48 |
| 9.3 | Notices | 49 |
| 9.4 | Governing Law | 50 |
| 9.5 | Fees and Expenses | 50 |
| 9.6 | Construction | 50 |
| 9.7 | Annexes, Exhibits and Schedules | 50 |
| 9.8 | Parties in Interest | 51 |
| 9.9 | Extension; Waiver | 51 |
| 9.10 | Severability | 51 |
| 9.11 | Counterparts; Facsimile Signatures | 51 |
| 9.12 | Acknowledgments. | 51 |
| 9.13 | WAIVER OF JURY TRIAL | 52 |
| 9.14 | Jurisdiction and Venue | 53 |
| 9.15 | Remedies | 53 |
| 9.16 | Waiver of Conflicts; Privilege. | 54 |
| 9.17 | Non-Recourse | 55 |
| 9.18 | Parent Guarantee | 55 |

SCHEDULES

Schedule 1.1 – Furniture and Fixtures
Schedule 2.4(a)(ii) – Closing Date Indebtedness
Schedule 2.5 – Excess Working Capital Calculation

EXHIBITS

Exhibit A – Bill of Sale and Conveyance Agreement
Exhibit B – Employment Agreement
Exhibit C – Transition Services Agreement
Exhibit D – Amending Agreements

## SHARE PURCHASE AGREEMENT

This **SHARE PURCHASE AGREEMENT** (this "**Agreement**"), dated as of June 14, 2022, is made by and among FTX Canada Inc., a corporation existing under the Laws of the Province of Alberta (the "**Buyer**"), FTX Trading Ltd., a corporation existing under the Laws of Antigua and Barbuda  (the "**Parent Guarantor**"), and Pateno Payments Inc., a corporation existing under the Laws of the Province of Alberta (the "**Seller**"). The Seller and the Buyer shall be referred to herein from time to time collectively as the "**Parties**".

**RECITALS:**

**WHEREAS**, the Seller beneficially owns and controls all of the issued and outstanding shares in the capital of the Company (collectively, the "**Shares**").

**WHEREAS**, the Seller has agreed to sell the Shares to the Buyer and the Buyer has agreed to purchase the Shares from the Seller on the terms and conditions of this Agreement.

**WHEREAS**, the Seller has agreed to sell certain Furniture and Fixtures to the Buyer and the Buyer has agreed to purchase the Furniture and Fixtures from the Seller on the terms and conditions of this Agreement.

**NOW, THEREFORE**, in consideration of the premises and the mutual promises contained herein and for other good and valuable consideration, the receipt and sufficiency of which are acknowledged, the Parties, intending to be legally bound, agree as follows:

## ARTICLE 1
## CERTAIN DEFINITIONS

1.1     **Certain Definitions**. As used in this Agreement, the following terms have the respective meanings set forth below.

"**11.10 Notice**" has the meaning set forth in Section 6.5(b).

"**Affiliate**" means, with respect to any Person, any other Person who directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person. The term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by Contract or otherwise, and the terms "controlled" and "controlling" have meanings correlative thereto.

"**Agreement**" has the meaning set forth in the preamble to this Agreement.

"**Alternative Transaction**" has the meaning set forth in Section 6.12.

"**Amended Services Agreements**" has the meaning set forth in Section 7.1(h).

"**Amending Agreements**" has the meaning set forth in Section 7.1(h).

- 2 -

"**Anti-Corruption Laws**" means all applicable laws, regulations, statutes, measures and orders relating to the prevention of corruption and bribery, including the *Corruption of Foreign Public Official Act* (Canada) and the *Freezing Assets of Corrupt Foreign Officials Act* (Canada).

"**Anti-Money Laundering and Sanctions Laws**" means the *Proceeds of Crime (Money Laundering) and Terrorist Financing Act* (Canada) and all regulations made thereunder and all guidelines published by the Financial Transactions and Reports Analysis Centre of Canada, Section 83.05 of the *Criminal Code* (Canada) and all other federal legislation aimed at the prevention and detection of money laundering and terrorist financing, the *Special Economic Measures Act* (Canada) and all regulations made thereunder and all other federal legislation which imposes economic sanctions on one or more designated Persons or entities.

"**Articles**" means the Articles of the Company, as in effect from time to time.

"**Assessment**" has the meaning set forth in Section 6.10(c)(vi).

"**Asset Purchase Price**" has the meaning set forth in Section 2.4(b).

"**Bankruptcy and Equity Exceptions**" has the meaning set forth in Section 3.2.

"**Base Purchase Price**" means the amount of $12,500,000.

"**Bill of Sale and Conveyance Agreement**" means the Bill of Sale and Conveyance Agreement between the Buyer and the Seller in the form set out as Exhibit A.

"**Books and Records**" means books and records of the Company, including financial, corporate, operations and sales books, records, books of account, sales and purchase records, lists of suppliers and customers, formulae, business reports, plans and projections and all other documents, surveys, plans, files, records, assessments, correspondence, and other data and information, financial or otherwise, including all data, information and databases stored on computer-related or other electronic media, in each case solely related to the Company.

"**Breach of Security Safeguards**" means the actual theft, loss of, unauthorized access to, alteration or compromise of, unavailability of, or unauthorized disclosure or other unauthorized Processing of Personal Information.

"**Business Day**" means a day, other than a Saturday or Sunday, on which commercial banks in Calgary, Alberta are open for the general transaction of business.

"**Buyer**" has the meaning set forth in the preamble to this Agreement.

"**Buyer Indemnified Parties**" has the meaning set forth in Section 8.1.

"**Buyer's Knowledge**" means, as it relates to the Buyer, as of the applicable date, the knowledge of each of Daniel Friedberg, Can Sun and Claire Zhang, after reasonable inquiry of their respective direct reports and, for purposes of Section 8.11 only, after review of any due diligence reports or other written communications sent to such individuals by McCarthy Tétrault LLP in connection with its due diligence review of the Company; provided that such individual, for the sake of clarity and avoidance of doubt, shall not have any personal liability or obligations regarding such knowledge.

- 3 -

"**Claim**" means each action, application, claim, suit, grievance, proceeding, complaint, examination, audit, investigation, assessment, reassessment or other proceeding, whether of a legal, contractual, administrative or arbitral nature, and whether brought, commenced, initiated, opened or filed by a Governmental Entity or other Person.

"**Closing**" has the meaning set forth in Section 2.2.

"**Closing Date**" has the meaning set forth in Section 2.2.

"**Closing Date Excess Working Capital**" has the meaning set forth in Section 2.8(a).

"**Closing Date Financial Statements**" has the meaning set forth in Section 2.8(a).

"**Closing Date Indebtedness**" means the Indebtedness, determined without duplication and on a basis consistent with Schedule 2.4(a)(iii), as of the Closing Date.

"**Closing Date Transaction Expenses**" means the Transaction Expenses as of the Closing Date.

"**Company**" means Bitvo Inc., a corporation existing under the Laws of the Province of Alberta.

"**Company Counsel**" means Osler, Hoskin & Harcourt LLP.

"**Company Intellectual Property**" means all Intellectual Property Rights owned or purported to be owned by the Company.

"**Company Material Adverse Effect**" means any Effect that, individually or in the aggregate with all other Effects, (A) would or would reasonably be expected to prevent or materially delay or impair the Company from consummating the transactions contemplated under this Agreement or performing its obligations under this Agreement or (B) has had or would reasonably be expected to be materially adverse to the assets (including intangible assets), liabilities, financial condition, business, or continuing results of operations of the Company; provided, however, that with respect to the foregoing clause (B), none of the following (or the results thereof) shall be taken into account, either alone or in combination, in determining whether a Company Material Adverse Effect has occurred: (i) conditions generally affecting the economy or credit, securities, crypto currency, currency, financial, banking or capital markets (including any disruption thereof and any decline in the price of any security or any market index), including any interest rates, crypto currency prices, and currency exchange rates (and any changes therein), (ii) any weather related event, natural disaster or act of God, (iii) any national or international political or social conditions, including the commencement, continuation or escalation of armed hostilities, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack, (iv) changes in IFRS or accounting standards (or the interpretation thereof) after the date hereof, (v) changes in any Laws or binding directives issued by any Governmental Entity, in each case, after the date hereof, (vi) any change that is generally applicable to any or all of the industries or markets in which the Company operates, (vii) the public announcement, pendency or consummation of the transactions contemplated by this Agreement, (viii) any failure by the Company to meet any internal or published projections, forecasts or revenue or earnings predictions for any period ending on or after the date of this Agreement; provided, that this clause (viii) shall not prevent a determination that any facts underlying such failure to meet such projections, forecasts or predictions have resulted in a Company Material Adverse Effect (to the

- 4 -

extent such facts are not otherwise excluded from this definition of Company Material Adverse Effect), (ix) any plague, epidemic, pandemic or outbreaks of illness (including the COVID-19 pandemic) or other health crisis or public health event in any jurisdiction in which the Company operates, or (x) the taking of any action expressly required by this Agreement, including the completion of the transactions contemplated hereby, except in the case of clauses (i), (ii), (iii), (iv), (v) and (vi) to the extent that any such Effect has had or would reasonably be expected to have a disproportionate adverse impact upon the assets, liabilities, financial condition, business, or continuing results of operations of the Company relative to other affected participants in any or all of the industries or markets in which the Company operates.

"**Company Registered IP**" has the meaning set forth in Section 3.16(a).

"**Company Systems**" has the meaning set forth in Section 3.16(d).

"**Confidentiality Agreement**" means the Non-Disclosure Agreement between the Parent Guarantor and the Company dated as of April 11, 2022.

"**Contract**" means any legally binding agreement, contract, subcontract, indenture, deed of trust, note, bond, mortgage, lease, sublease, concession, franchise, license, commitment, guarantee, sale or purchase order, undertaking or other arrangement or understanding.

"**COVID Relief Legislation**" means any COVID relief law, administrative policy or concession of any Governmental Entity, or program offered, funded or sponsored by any Governmental Entity.

"**Crypto Assets**" means bitcoin, ether, crypto currency and anything commonly considered a crypto asset, digital or virtual currency, or digital or virtual tokens, that are not themselves securities or derivatives.

"**CSA**" has the meaning set forth in Section 6.5(b).

"**Data Room**" has the meaning set forth in Section 1.2.

"**Data Security Requirements**" means, collectively, all of the following to the extent relating to the Processing of Personal Information applicable to the Company: (i) the Company's internal and publicly-facing policies, and procedures; (ii) all applicable Laws (including, for certainty, the *Personal Information Protection and Electronic Documents Act* (Canada) (and substantially similar privacy laws of a Canadian province) and *An Act to promote the efficiency and adaptability of the Canadian economy by regulating certain activities that discourage reliance on electronic means of carrying out commercial activities, and to amend the Canadian Radio-television and Telecommunications Commission Act, the Competition Act, the Personal Information Protection and Electronic Documents Act* (Canada), and any applicable regulations promulgated under the foregoing statutes; and (iii) Contracts to which the Company is a party or by which it is otherwise bound.

"**Deposit**" means the sum of (i) $2,000,000; plus (ii) interest earned on the amount set out in (i) pursuant to Section 2.5.

"**Disclosed Personal Information**" has the meaning set forth in Section 6.11(a).

- 5 -

"**Disclosure Requirements**" has the meaning set forth in Section 6.10(e).

"**Effect**" means any change, effect, event, fact, inaccuracy, development, occurrence or circumstance.

"**Employee Plans**" means any health, welfare, retiree benefit, supplemental unemployment benefit, fringe benefits, bonus, profit sharing, option, stock appreciation, savings, insurance, incentive, incentive compensation, deferred compensation, death benefits, termination, retention, change in control, severance, share purchase, share compensation or any other any other share or equity-based compensation, disability, pension, retirement or supplemental retirement plans and other employee or director compensation or benefit plans, policies, trusts, funds, agreements or arrangements for the benefit of any employee, or any dependents or beneficiaries of an employee, whether registered, unregistered, funded or unfunded; provided that, notwithstanding the foregoing, "Employee Plans" shall not include any statutory benefit plans which an employer is required to participate in or comply with, including any benefit plan administered by any federal or provincial government and any benefit plans administered pursuant to applicable health, tax, workplace safety insurance, and employment insurance legislation.

"**Employment Agreement**" means the Employment Agreement between the Company and Pamela Draper in the form set out as <u>Exhibit B</u>.

"**Equity Securities**" means, with respect to a Person (i) any share, share capital, capital stock, partnership, membership, joint venture or similar interest in such Person, (ii) any securities (including debt securities) directly or indirectly convertible into or exchangeable or exercisable for any share, share capital, capital stock, partnership, membership, joint venture or similar interest, or containing any profit participation features, (iii) any rights, warrants or options directly or indirectly to subscribe for or to purchase any share, share capital, capital stock, partnership, membership, joint venture or similar interest, or securities containing any profit participation features, or to subscribe for or to purchase any securities (including debt securities) convertible into or exchangeable or exercisable for any share, share capital, capital stock, partnership, membership, joint venture or similar interest, (iv) any share appreciation rights, phantom share rights, other rights the value of which is linked to the value of any securities or interests referred to in clauses (i) through (iii) above or other similar rights or (v) any securities (including debt securities) issued or issuable with respect to the securities or interests referred to in clauses (i) through (iv) above in connection with a combination of shares, recapitalization, merger, consolidation or other reorganization.

"**Escrow Agent**" means TSX Trust Company or such other Person as may be appointed as escrow agent by mutual agreement of the Seller and the Buyer.

"**Escrow Agreement**" means the escrow agreement entered into among the Seller, the Buyer and the Escrow Agent dated on the date hereof.

"**Estimated Excess Working Capital**" has the meaning set forth in Section 2.6(a).

"**Excess Working Capital**" means, as of any time: (i) the excess working capital of the Company, calculated in accordance with Form 31-103F1 – *Calculation of Excess Working Capital*; <u>plus</u> (ii) current assets of the Company not readily convertible into cash (e.g., prepaid expenses), <u>plus</u> (iii) market risk of the Company, calculated in accordance with the instructions set out in Schedule 1

- 6 -

to Form 31-103F1, in each case prepared in accordance with IFRS on a basis consistent with the Financial Statements, a sample calculation of which is attached as Schedule 2.5.

"**Financial Statements**" has the meaning set forth in Section 3.7.

"**Fraud**" means, with respect to the making of any representation or warranty in this Agreement or any Transaction Document, or in any certificate delivered pursuant to this Agreement or any Transaction Document, an act, committed by a Person, with intent to deceive another Person, or to induce another Person to enter into this Agreement or any of the other Transaction Documents or consummate any of the transactions contemplated hereby or thereby and requires (i) a false representation of fact made by such Person; (ii) such Person had knowledge that such representation was false; (iii) such false representation caused such other Person to act; and (iv) such other Person suffered Losses by reason of such false representation.

"**Furniture and Fixtures**" means the assets listed in Schedule 1.1.

"**Governing Documents**" means the legal document(s) by which any Person (other than an individual) establishes its legal existence or which govern its internal affairs. For example, the "Governing Documents" of a corporation are its articles of incorporation or certificate of incorporation, as applicable, and by-laws, the "Governing Documents" of a limited partnership are its limited partnership agreement and certificate of limited partnership and the "Governing Documents" of a limited liability company are its operating agreement and certificate of formation.

"**Governmental Entity**" means, with respect to any Person, any national, federal, provincial, state or local governmental, legislative, regulatory or administrative authority, bureau, ministry, tribunal, agency, division, instrumentality or commission or any judicial or arbitral body having jurisdiction over such Person.

"**GST/HST**" means the goods and services tax and harmonized sales tax payable under the *Excise Tax Act* (Canada).

"**IFRS**" means International Financial Reporting Standards as issued by the International Accounting Standards Board and as adopted by the Canadian Institute of Chartered Accountants.

"**Indebtedness**" means, as of any time, without duplication, the outstanding principal amount of, and accrued and unpaid interest on, any obligations of the Company constituting indebtedness for borrowed money and includes intercompany Indebtedness owing by the Company to the Seller; excluding, for certainty, (a) any liabilities deducted in the calculation of Excess Working Capital, and (b) any Transaction Expenses.

"**Indemnified Party**" has the meaning set forth in Section 8.8.

"**Independent Auditor**" has the meaning set forth in Section 2.9(b).

"**Initial Closing Indebtedness**" has the meaning set forth in Section 2.6(a).

"**Initial Purchase Price**" has the meaning set forth in Section 2.6(a).

"**Initial Statement of Adjustments**" has the meaning set forth in Section 2.6(a).

- 7 -

"**Initial Transaction Expenses**" has the meaning set forth in Section 2.6(a).

"**Intellectual Property Rights**" means any and all intellectual property arising under the Laws in any jurisdiction, including intellectual property rights in the following: (i) all patents and patent applications, including any reissues, divisionals, continuations, continuations-in-part and extensions and counterparts thereof; (ii) registered and unregistered trademarks, service marks, trade dress, trade names, brand names, logos, slogans and Internet domain names, social media identifiers and accounts, and registrations, applications for registration and renewals thereof, together with all of the goodwill associated with any of the foregoing; (iii) industrial designs and copyrights (including rights in Software) and registrations, applications for registration, and renewals thereof; and (iv) trade secrets confidential and proprietary know-how, inventions (whether or not patentable) and discoveries.

"**Investment Canada Act**" means the *Investment Canada Act* (Canada), RSC 1985, c. 28 (1st Supp).

"**Latest Balance Sheet**" has the meaning set forth in Section 3.7(a)(ii).

"**Law**" means any law, act, statute, code, ordinance, rule, regulation, guidance, bulletins, judgment, injunction, order, writ, directive, policy published administrative position, or decree of any Governmental Entity.

"**Lease Agreement**" means the Green Office Space Lease dated August 18, 2021 between K5 500 4th Avenue SW Inc. and Canadian Property Holdings (Alberta) Inc. (together, as Landlord) and the Company and Seller (together, as Tenants).

"**Lien**" means any mortgage, pledge, security interest, encumbrance, lien, Claim, charge, right of first refusal, voting trust or agreement, transfer restriction, preemptive right or any other similar restriction or limitation. For the avoidance of doubt, the term "Lien" shall not be deemed to include any non-exclusive license of Intellectual Property Rights granted in the ordinary course of business.

"**Losses**" means, whether actual or latent, all losses, damages (excluding, except in each case to the extent actually payable in respect of a Third Party Claim, any loss of profit and special, indirect, consequential, punitive, aggravated and exemplary damages), liabilities, costs, fines, penalties, fees or expenses, including reasonable fees and expenses of lawyers, accountants and other experts and professionals.

"**Material Contracts**" has the meaning set forth in Section 3.17(a).

"**Material Permit**" has the meaning set forth in Section 3.9.

"**Minimum Threshold**" has the meaning set forth in Section 8.4(a)(i).

"**NI 31-103**" has the meaning set forth in Section 6.5(b).

"**Non-Party Affiliates**" has the meaning set forth in Section 9.16.

"**Objection Notice**" has the meaning set forth in Section 2.9(a).

- 8 -

"**Open Source Software**" means Software that is distributed as "free software", "open source software" or under similar licensing or distribution terms.

"**ordinary course**" means, with respect to an action to be taken by the Company, that such action is consistent with the past practices of the Company and is taken in the ordinary course of the normal day-to-day operations of the business of the Company.

"**Outside Date**" means October 14, 2022, or such later date as the Seller and the Buyer may agree in writing.

"**Parent Guarantor**" has the meaning set forth in the preamble to this Agreement.

"**Parties**" has the meaning set forth in the preamble to this Agreement.

"**Permitted Liens**" means (i) Liens for Taxes, assessments or other governmental charges or levies not yet due and payable or which are being contested in good faith by appropriate proceedings and for which appropriate reserves have been established in the Financial Statements and in accordance with IFRS, (ii) Liens granted to any lender at the Closing in connection with any financing by the Buyer of the transactions contemplated hereby, (iii) any privilege in favor of any licensor for obligations or acts, the performance of which is required under any Contract, so long as the payment of or the performance of such other obligation or act is not delinquent and provided that such liens or privileges do not materially adversely affect the use or value of the property affected thereby, (iv) Liens incurred or deposits made in the ordinary course of business in connection with workers' compensation, unemployment insurance or other types of social security, and (v) restrictions on transfer under applicable securities laws and pursuant to the terms of the Governing Documents.

"**Permitted Removal**" has the meaning set forth in Section 9.16(f).

"**Person**" means an individual, partnership, limited partnership, limited liability partnership, corporation, limited liability company, unlimited liability company, joint stock company, unincorporated organization or association, trust, joint venture, association, Governmental Entity or other similar entity, whether or not a legal entity.

"**Personal Information**" means any information relating to an identified or identifiable natural person including any information that is regulated or protected by one or more Laws related to privacy or data protection.

"**Platform**" means the proprietary trading platform of the Company that permits clients to purchase, sell and hold Crypto Assets.

"**Privileged Deal Communications**" has the meaning set forth in Section 9.16(d).

"**Post-Closing Tax Period**" means any taxable period (and the portion of any Straddle Period) commencing after the Closing Date.

"**Pre-Closing Tax Period**" means any taxable period (and the portion of any Straddle Period) ending on or before the Closing Date.

"**Pre-Closing Taxes**" means all Taxes of, imposed on, asserted against, payable by, or attributable to the Company or the Seller, or any Taxes for which the Company or the Seller is otherwise liable, with respect to any Pre-Closing Tax Period;

"**Proceeding**" has the meaning set forth in Section 3.19.

"**Process**" means to collect, use, modify, retrieve, disclose, store, delete, and/or manage Personal Information.

"**Purchase Price**" has the meaning set forth in Section 2.4.

"**Refund**" has the meaning set forth in Section 6.10(d).

"**Related Parties**" has the meaning set forth in Section 3.21.

"**Related Party Agreements**" has the meaning set forth in Section 3.21.

"**Related Party Financing**" has the meaning set forth in Section 3.21.

"**Releasees**" has the meaning set forth in Section 9.1.

"**Residual Communication**" has the meaning set forth in Section 9.16(f).

"**Restricted Period**" has the meaning set forth in Section 6.9.

"**Securities Authority**" means, with respect to any Person, collectively each applicable securities commission or securities regulatory authority having jurisdiction over the applicable Person, which, for greater certainty, shall include, but is not limited to, the Alberta Securities Commission, Ontario Securities Commission and the Investment Industry Regulatory Organization of Canada.

"**Seller**" has the meaning set forth in the preamble to this Agreement.

"**Seller Disclosure Schedule**" has the meaning set forth in Article 3.

"**Seller Fundamental Representations**" means the representations and warranties made in Sections 3.1 (*Organization and Qualification*), 3.2 (*Authority*), 3.3 (*Consent and Approvals; No Violations*), 3.4 (*Title to Shares*), 3.5 (*Capitalization*), 3.6 (*No Subsidiaries*), 3.24 (*Residency*), 3.25 (*Brokers*).

"**Seller Indemnified Parties**" has the meaning set forth in Section 8.2.

"**Seller's Knowledge**" means, as of the applicable date, the knowledge of each of Pamela Draper and Brenda Krause, after reasonable inquiry of their respective direct reports; provided that such individual, for the sake of clarity and avoidance of doubt, shall not have any personal liability or obligations regarding such knowledge.

"**Shares**" has the meaning set forth in the recitals to this Agreement.

- 10 -

"**Software**" means any and all computer programs, including software implementations of algorithms, models and methodologies, whether in source code, executable code, binary code, or object code.

"**Straddle Period**" means any taxable period that begins on or before the Closing Date and ends after the Closing Date.

"**Subsidiary**" means, with respect to any Person, any corporation, company, limited liability company, partnership, association, or other business entity of which (i) if a corporation or a company, a majority of the total voting power of shares of stock or other shares entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers, or trustees thereof is at the time owned or controlled, directly or indirectly, by such Person or one or more of the other Subsidiaries of such Person or a combination thereof or (ii) if a limited liability company, partnership, association, or other business entity (other than a corporation or a company), a majority of the partnership or other similar ownership interests thereof is at the time owned or controlled, directly or indirectly, by such Person or one or more Subsidiaries of such Person or a combination thereof and for this purpose, a Person or Persons own a majority ownership interest in such a business entity (other than a corporation or a company) if such Person or Persons shall be allocated a majority of such business entity's gains or losses or shall be a, or control any, managing director or general partner of such business entity (other than a corporation or a company). The term "Subsidiary" shall include all Subsidiaries of such Subsidiary.

"**Tax Act**" means the *Income Tax Act* (Canada) R.S.C. 1985 c. 1 (5th Supplement).

"**Tax Contest**" has the meaning set forth in Section 6.10(c)(ix).

"**Taxes**" means with respect to any Person, all supranational, national, federal, provincial, state, local or other taxes, duties, imposts, levies, assessments, tariffs and other charges imposed, assessed or collected by a Governmental Entity, including income taxes, branch taxes, profits taxes, capital gains taxes, gross receipts taxes, windfall profits taxes, value added taxes, severance taxes, ad valorem taxes, property taxes, capital taxes, net worth taxes, production taxes, sales taxes, use taxes, licence taxes, excise taxes, franchise taxes, environmental taxes, transfer taxes, withholding or similar taxes, payroll taxes, employment taxes, employer health taxes, government pension plan premiums and contributions, social security premiums, workers' compensation premiums, employment/ unemployment insurance or compensation premiums and contributions, stamp taxes, occupation taxes, premium taxes, alternative or add-on minimum taxes, GST/HST, customs duties or other taxes, fees, penalties, assessments, reassessments or charges of any kind whatsoever imposed or charged by any Governmental Entity, including all interest, fines, additions to tax or additional amounts imposed by any Governmental Entity, and "**Tax**" means any one of such Taxes.

"**Tax Return**" means all returns, reports, declarations, elections, notices, filings, forms, statements and other documents (whether in tangible, electronic or other form) and including any amendments, schedules, attachments, supplements, appendices and exhibits thereto, made, prepared, filed or required to be made, prepared or filed by Law in respect of Taxes.

"**Taxing Authority**" means any Governmental Entity imposing or administering Taxes, charged with the collection of Taxes or otherwise having jurisdiction with respect to any Tax.

- 11 -

"**Third Party Claim**" has the meaning set forth in Section 8.6.

"**Transaction Documents**" means, collectively, this Agreement, the Transition Services Agreement, the Employment Agreement, the Amending Agreements, the Escrow Agreement, the Bill of Sale and Conveyance Agreement and all other agreements and certificates to be entered into in connection with Closing and the transactions contemplated by this Agreement.

"**Transaction Expenses**" means, with respect to the Company, (a) all fees, expenses and disbursements of legal counsel, investment bankers, accountants, and other third-party advisors incurred by the Company in connection with the transactions contemplated by this Agreement, (b) any stay, sale, retention, transaction or change of control bonuses, payments or payouts, severance payments, or any amounts similar to any of the foregoing, payable by the Company to any current or former employee, officer, director or other service provider pursuant to any agreement in place by the Seller, the Company or any of their Affiliates with such Person existing immediately prior to Closing or as otherwise required by Law or agreed to by the Seller or any of its Affiliates, and (c) all broker's, finder's or similar fees incurred by the Company in connection with this Agreement and the transactions contemplated hereby.

"**Transition Services Agreement**" means the Transition Services Agreement between the Company and the Seller in the form set out as <u>Exhibit C</u>.

## 1.2    Interpretation

Unless otherwise indicated to the contrary herein by the context or use thereof: (i) the words, "herein," "hereto," "hereof" and words of similar import refer to this Agreement as a whole, including the Annexes, Schedules and Exhibits, and not to any particular section, subsection, paragraph, subparagraph or clause contained in this Agreement; (ii) masculine gender shall also include the feminine and neutral genders, and vice versa; (iii) words importing the singular shall also include the plural, and vice versa; (iv) the words "include", "includes" or "including" shall be deemed to be followed by the words "without limitation"; (v) all references to Articles, Sections, Annexes, Exhibits or Schedules are to Articles, Sections, Annexes, Exhibits and Schedules of this Agreement; (vi) the word "or" is disjunctive but not necessarily exclusive; (vii) the words "writing", "written" and comparable terms refer to printing, typing and other means of reproducing words (including electronic media) in a visible form; (viii) references to any Contract are to that Contract as amended, modified or supplemented from time to time in accordance with the terms hereof and thereof; provided that with respect to any Contract listed on the Schedules, only such amendments, modifications or supplements (other than such amendments, modifications or supplements that are immaterial) made available to the Buyer or listed in the appropriate schedule at the time of delivery to the Buyer shall be given effect for purposes of the representations and warranties set forth in this Agreement; (ix) references from or through any date mean, unless otherwise specified, from and including or through and including, respectively; (x) the words "dollar" or "$" shall mean United States dollars; (xi) the word "day" means calendar day unless Business Day is expressly specified; (xii) any amounts denominated in currency other than the lawful money of Canada on any date of determination shall be deemed to be presented in such currency in a manner consistent with the historical accounting practices of the Company with respect to the reporting of such currency; (xiii) references to any Law shall be deemed to refer to such Law as amended from time to time and to any rules or regulations promulgated thereunder; and (xiv) the words "provided", "made available" and other similar expressions mean, when used in reference to documents or other materials required to be provided or made available to the

- 12 -

Buyer, to the extent posted to the electronic data room hosted by Firmex for "Project Liftoff" (the "**Data Room**"), at least two Business Days prior to the execution and delivery of this Agreement. If any action under this Agreement is required to be done or taken on a day that is not a Business Day (including the giving of any notice) or if the period during which any action or notice is required expires on a date which is not a Business Day, then the date for giving such notice or taking such action (and the expiration date of such period during which notice is required to be given or action taken) shall be the next date which is a Business Day.

## ARTICLE 2
## PURCHASE AND SALE

2.1    **Purchase and Sale**. Upon the terms and subject to the conditions set forth in this Agreement, at the Closing:

(a)    the Buyer shall purchase, acquire and accept from the Seller, and the Seller will sell, assign, transfer, convey and deliver to the Buyer, all of the Shares free and clear of all Liens; and

(b)    the Buyer shall purchase, acquire and accept from the Seller, and the Seller will sell, assign, transfer, convey and deliver to the Buyer, all of its right, title and interest in and to the Furniture and Fixtures.

2.2    **Closing of the Transactions Contemplated by this Agreement**. The closing of the transactions contemplated by this Agreement (the "**Closing**") shall take place remotely by telephonic or electronic delivery or release of documents at 8:00 a.m. (Calgary time) three Business Days after all conditions set forth in Article 7 are satisfied or waived by the applicable Party (other than those conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions at such time), or such other date or at such other time or place as is agreed to in writing by the Buyer and the Seller (such date, the "**Closing Date**").

2.3    **Deliveries at the Closing.**

(a)    **Deliveries by the Seller**. At or prior to the Closing, the Seller shall deliver to the Buyer:

(i)    transfer powers or other instruments of transfer of the Shares held by the Seller, duly executed by the Seller in favor of the Buyer or as it may direct;

(ii)    certificate(s) representing the Shares and any other documents which may be required to give good title to the Shares and to enable the Buyer to procure registration of such Shares in its name or as it may direct;

(iii)    a certificate of an authorized officer of the Seller, dated as of the Closing Date, to the effect that the conditions specified in Section 7.1(a) and Section 7.1(b) have been satisfied by the Seller as of the Closing;

(iv)    a copy of the Bill of Sale and Conveyance Agreement, duly executed by the Seller;

- 13 -

(v)     a copy of the Transition Services Agreement, duly executed by the Seller; and

(vi)    a copy of each Amending Agreement, duly executed by the Seller.

(b)    **Deliveries by the Company**. At or prior to the Closing, the Seller shall cause the Company to deliver to the Buyer the following documents:

(i)     reasonably current good standing certificates (or equivalent documents) for the Company, issued by the applicable governing body of such entity's jurisdiction of formation;

(ii)    a certificate of an authorized officer of the Company, dated as of the Closing Date, certifying to (i) a true, correct and complete copy of the Governing Documents of the Company, together with all amendments thereto, and (ii) the resolutions of the board of directors of the Company authorizing the transfer of the Shares;

(iii)   evidence of repayment in full from Atlantis Financial Corp. in respect of its loan to the Company and evidence of discharge of registrations 19053157837 and 19053157870 registered against the Company by Atlantis Financial Corp. at the Alberta Personal Property Registry;

(iv)   a copy of the Transition Services Agreement, duly executed by each of the Company;

(v)     a copy of each Amending Agreement, duly executed by the Company; and

(vi)    a copy of the Employment Agreement, duly executed by each of Pamela Draper and the Company.

(c)    **Deliveries by the Buyer**. At or prior to the Closing, the Buyer shall make the payments required by Section 2.4 and shall have delivered to the Company the following documents:

(i)     reasonably current good standing certificates (or equivalent documents) for the Buyer, issued by the applicable governing body of such entity's jurisdiction of formation;

(ii)    a copy of the Bill of Sale and Conveyance Agreement, duly executed by the Buyer;

(iii)   a certificate of an authorized officer of the Buyer, dated as of the Closing Date, certifying to (i) a true, correct and complete copy of the Governing Documents of the Buyer, together with all amendments thereto, and (ii) the resolutions of the board of directors of the Buyer, authorizing the execution, delivery and performance of this Agreement and the consummation of the transaction contemplated hereby; and

- 14 -

    (iv)    a certificate of an authorized officer of the Buyer, dated as of the Closing Date, to the effect that the conditions specified in Section 7.2(a) and Section 7.2(b) have been satisfied.

**2.4**    **Purchase Price.**

    (a)    The amount payable by the Buyer for the Shares (the "**Purchase Price**"), shall be:

        (i)    the Base Purchase Price;

        (ii)    <u>less</u> the amount of Closing Date Indebtedness, if any;

        (iii)    <u>less</u> the amount of the Closing Date Transaction Expenses, if any;

        (iv)    <u>plus</u> the amount of Closing Date Excess Working Capital.

    (b)    The amount payable by the Buyer for the Furniture and Fixtures shall be $125,000 (the "**Asset Purchase Price**").

**2.5**    **Deposit**. The Deposit shall be held by the Escrow Agent in an interest-bearing account with interest to accrue to the account of the Buyer. Upon Closing, the Deposit shall be credited to the Buyer and paid to the Seller on account of the Purchase Price. The costs of the Escrow Agent will be borne equally by the Buyer and the Seller. Each of the Purchaser and the Seller covenant to execute a joint written direction pursuant to the Escrow Agreement required to cause the Deposit to be disbursed in accordance with the provisions of this Agreement.

**2.6**    **Preparation and Delivery of Initial Statement of Adjustments**

    (a)    The Parties acknowledge that it is not possible to determine the Purchase Price until the Closing Date Financial Statements are accepted and approved in accordance with Section 2.10. Accordingly, not more than 10 and no fewer than three Business Days prior to the Closing Date, the Seller shall prepare and deliver to the Buyer a balance sheet of the Company as at the Closing Date (the "**Initial Statement of Adjustments**"), setting forth a good faith estimate of (A) the Excess Working Capital as at the Closing Date (the "**Estimated Excess Working Capital**"); (B) any Transaction Expenses unpaid at Closing (the "**Initial Transaction Expenses**"); and (C) any Indebtedness unpaid at Closing (the "**Initial Closing Indebtedness**"). The "**Initial Purchase Price**" shall be an amount equal to:

        (i)    the Base Purchase Price; <u>less</u>

        (ii)    the Initial Closing Indebtedness; <u>less</u>

        (iii)    the Initial Transaction Expenses; <u>plus</u>

        (iv)    the Estimated Excess Working Capital.

- 15 -

**2.7     Closing Date Payments**

At the Closing, the Deposit will be released to the Seller and the Buyer will pay:

(a)     the Initial Purchase Price less the Deposit to the Seller by wire transfer of immediately available funds to the account of the Seller's counsel or other account designated by the Seller in writing;

(b)     the Asset Purchase Price to the Seller by wire transfer of immediately available funds to the account of the Seller's counsel or other account designated by the Seller in writing;

(c)     to each lender designated by the Seller on the Initial Statement of Adjustment, to an account designated in a payoff letter provided by such lender, the amount of the Closing Date Indebtedness due to such lender; and

(d)     to each Person designated by the Seller on the Initial Statement of Adjustment, to an account designated in an invoice or other direction provided by such Person, the amount of the Closing Date Transaction Expenses due to such Person.

**2.8     Preparation and Delivery of Closing Date Financial Statements**

(a)     As soon as reasonably practicable after, and in no event later than 60 days after, the Closing Date, the Buyer shall prepare and deliver to the Seller a balance sheet of the Company as at the Closing Date (the "**Closing Date Financial Statements**"), showing the Excess Working Capital as at the Closing Date (the "**Closing Date Excess Working Capital**"), prepared on a basis consistent with the Financial Statements and the Initial Statement of Adjustments. The Closing Date Financial Statements will include a calculation of the Purchase Price, the Closing Date Excess Working Capital, the Closing Date Indebtedness and the Closing Date Transaction Expenses. The Buyer and the Seller shall cooperate fully in the preparation of the Closing Date Financial Statements.

(b)     If the Buyer fails to timely deliver the Closing Date Financial Statements in accordance with Section 2.8(a), the Initial Statement of Adjustments shall be deemed to be the Closing Date Financial Statements.

**2.9     Objection to Closing Date Financial Statements**

(a)     **Delivery of Objection Notice –** If the Seller objects in good faith to any aspect of the Closing Date Financial Statements, the Seller shall give written notice of such objection to the Buyer (the "**Objection Notice**") within 30 days after the delivery to the Seller of the Closing Date Financial Statements. The Objection Notice shall, for each such objection, set out the reasons for the Seller's objection as well as the amount in dispute and reasonable details of the calculation of such amount. If the Seller does not so notify the Buyer within such 30-day period, the Seller will be deemed to have accepted and approved the Closing Date Financial Statements, which will be deemed final, conclusive and binding upon the Parties.

- 16 -

(b) **Resolution of Disputes** – The Buyer shall give the Seller and its representatives reasonable access to the Books and Records used in the preparation of the Closing Date Financial Statements to enable the Seller to exercise its rights under this Section 2.9(b). The Seller and the Buyer shall attempt to resolve all matters in dispute set out in the Objection Notice within 15 days of receipt of the Objection Notice by the Buyer. Any items in dispute not resolved within such 15-day period shall be referred as soon as possible after the end of such period by the Seller and the Buyer to MNP LLP, or such other independent auditing firm appointed by the Buyer and the Seller (the "**Independent Auditor**"). The Independent Auditor shall act as expert and not as arbitrator and shall be required to determine the items in dispute that have been referred to it as soon as reasonably practicable but in any event not later than 30 days after the date of referral of the dispute to it. In making its determination, the Independent Auditor will only consider the issues in dispute placed before it. The Seller and the Buyer shall provide or make available all documents and information as are reasonably required by the Independent Auditor to make its determination. The determination of the Independent Auditor shall be final and binding on the Parties and the Closing Date Financial Statements shall be (or not be) adjusted in accordance with such determination.

(c) **Audit Expenses** – The fees and expenses of the Independent Auditor in acting in accordance with this Section 2.9 shall be borne by the Buyer, on the one hand, and the Seller, on the other hand, based on the inverse of the percentage that the Independent Auditor's determination (before such allocation) bears to the total amount of the disputed items as originally submitted to the Independent Auditor. For example, should the disputed items total in amount to $1,000 and the Independent Auditor awards $600 in favour of the Buyer's position, 60% of the costs of the Independent Auditor's review would be borne by the Seller and 40% of the costs would be borne by the Buyer.

(d) **Payment in Accordance with Determination** – Within 10 days after resolution, by agreement of the Buyer and the Seller, of the dispute that was the subject of the Objection Notice or, failing such resolution, within 10 days after the final determination of the Independent Auditor, each of the Seller and the Buyer shall pay the amounts owed by the Seller or the Buyer, as applicable, as a result of such resolution or final determination, in each case in accordance with Section 2.10.

## 2.10   Net Working Capital Adjustment

Subject to Section 2.9, within 10 days after delivery by the Buyer to the Seller of the Closing Date Financial Statements:

(a) if the Purchase Price, as finally determined and set out in the Closing Date Financial Statements, is less than the Initial Purchase Price then the Seller shall pay to the Buyer an amount equal to such difference by wire transfer of immediately available funds within two Business Days after the date of final determination of the Purchase Price; and

(b) if the Purchase Price, as finally determined and set out in the Closing Date Financial Statements, is greater than the Initial Purchase Price, then the Buyer shall pay or

- 17 -

cause to be paid to the Seller (at the direction of the Seller) the amount of such difference by wire transfer of immediately available funds within two Business Days after the date of final determination of the Purchase Price;

provided, however, that no adjustment shall be made to the Purchase Price pursuant to this Section 2.10 if the adjustment otherwise determined in accordance with Section 2.10(a) or 2.10(b) is less than $5,000.

## ARTICLE 3
## REPRESENTATIONS AND WARRANTIES OF THE SELLER

As a material inducement to the Buyer to enter into this Agreement, the Seller represents and warrants to the Buyer, except as set forth in the corresponding sections or subsections of the disclosure schedule supplied by the Seller to the Buyer (the "**Seller Disclosure Schedule**") and dated as of the date hereof (or any other section or subsection of the Seller Disclosure Schedule to which the relevance of such disclosure is reasonably apparent on its face), that each statement contained in this Article 3 is true and correct as of the date hereof and as of the Closing Date:

**3.1    Organization and Qualification**

(a)    The Company is a corporation, duly organized, validly existing and in good standing under the *Business Corporations Act* (Alberta). The Company has the requisite corporate power, capacity and authority to own, lease and operate its material assets and properties and to carry on its businesses as presently conducted. There is no pending, or to the Seller's Knowledge, threatened, action for the dissolution, liquidation or insolvency of the Company.

(b)    Neither the nature of the Company's business nor the location or character of the assets owned or leased by the Company requires the Company to be registered, licensed or otherwise qualified as an extra-provincial or foreign corporation in any jurisdiction other than in jurisdictions where it is duly registered, licensed or otherwise qualified for such purpose.

**3.2    Authority**. Each of the Seller and the Company has the requisite corporate power and authority to execute and deliver each Transaction Document to which it is a party and to consummate the transactions contemplated thereby. The execution and delivery of each Transaction Document to which it is a party, the performance of the Seller's and the Company's respective obligations set forth in such Transaction Documents and the consummation of the transactions contemplated thereby have been duly authorized by all necessary corporate action on the part of the Company and the Seller, and no other proceeding on the part of the Company or the Seller is necessary to authorize each Transaction Document to which it is a party or to consummate the transactions contemplated thereby. This Agreement has been duly executed and delivered by the Seller and constitutes, and each of the other Transaction Documents to which the Seller or the Company will be a party upon execution and delivery by the Seller or the Company, as applicable, will constitute, a valid, legal and binding obligation of the Seller and the Company, as applicable (assuming that each Transaction Document upon its execution and delivery will be, duly and validly authorized, executed and delivered by the other parties hereto or thereto), enforceable against the Seller or the Company, as applicable, in

- 18 -

accordance with its terms, except to the extent that enforceability may be limited by (i) applicable bankruptcy, insolvency, arrangement, fraudulent conveyance, assignment and preference, reorganization, moratorium or other laws affecting the enforcement of creditors' rights generally and (ii) the availability of equitable remedies, including specific performance, which is subject to the discretion of the court before which any proceeding thereof may be brought (together, the exceptions in clauses (i) and (ii), the "**Bankruptcy and Equity Exceptions**").

3.3      **Consents and Approvals; No Violations**. Except as set forth on Schedule 3.3 of the Seller Disclosure Schedule, assuming the truth and accuracy of the representations and warranties of the Buyer set forth in Section 4.3, no notice to, filing with, or authorization, consent or approval of any Governmental Entity is necessary for the execution, delivery or performance of this Agreement by the Seller or the consummation by the Seller and the Company of the transactions contemplated hereby, except for (i) those the failure of which to obtain or make is not and would not reasonably be expected to be, individually or in the aggregate, material to the Company or to the Seller's ownership of the Shares and would not reasonably be expected to prevent, materially delay or materially impair the ability of the Seller or the Company to consummate the transactions contemplated hereby and (ii) those that may be required solely by reason of the Buyer's (as opposed to any other third party's) participation in the transactions contemplated hereby. Except as set forth on Schedule 3.3 of the Seller Disclosure Schedule, neither the execution, delivery and performance by the Seller or the Company of any Transaction Document to which it is a party nor the consummation by the Seller or the Company of the transactions contemplated thereby will (a) conflict with or result in any breach of any provision of the Seller's or the Company's Governing Documents, (b) result in a violation or breach of, or cause acceleration or constitute (with or without due notice or lapse of time or both) a default (or give rise to any right of termination, cancellation or acceleration) under, any of the terms, conditions or provisions of any Material Contract to which the Seller is a party or any Material Contract to which the Company is a party, (c) violate any Law applicable to the Seller, the Company or any of the Company's material properties or assets, or (d) result in the creation of any Lien upon any of the properties, rights or assets of the Company, which, in the case of any of clauses (b), (c) and (d) above, is or would reasonably be expected to be, individually or in the aggregate, material to the Company or adversely affect the Seller's ownership of the Shares.

3.4      **Title to the Shares**. As of immediately prior to the Closing, the Seller will own of record and beneficially all of the Shares, and the Seller will have good and valid title to such Shares, free and clear of all Liens. The Seller is not a party to (a) any option, warrant, purchase right, or other Contract or commitment that could require the Seller to sell, transfer or otherwise dispose of any Shares (other than this Agreement) or (b) any voting trust, proxy or other Contract with respect to the voting of any Shares.

3.5      **Capitalization**. The Shares comprise all of the Company's issued and outstanding Equity Securities. The Shares are held beneficially and of record by the Seller. All Shares have been duly authorized and validly issued, are fully-paid and non-assessable, are in compliance with applicable securities Laws, and are free and clear of any Liens (other than restrictions on transfer under applicable securities Laws and the Articles). The Company has no liability or obligation to pay any dividend or other distributions or obligations to

- 19 -

make any payment in respect of any Shares. There are no voting trusts, proxies or other agreements or understandings with respect to the voting of any securities of the Company.

**3.6**  **No Subsidiaries**. The Company does not directly or indirectly own any equity or similar interest in, or any interest convertible into or exchangeable or exercisable for, at any time, any equity or similar interest in, any Person.

**3.7**  **Financial Statements**.

(a)  Schedule 3.7 of the Seller Disclosure Schedule sets forth true and complete copies of the following financial statements (such financial statements, collectively, the "**Financial Statements**"):

(i)  the unaudited financial statements of the Company for the fiscal year ended December 31, 2020, consisting of a balance sheet as at such date and statements of earnings and retained earnings and cash flows for the period then ended; and

(ii)  the unaudited financial statements of the Company for the fiscal year ended December 31, 2021, consisting of a balance sheet as at such date (the "**Latest Balance Sheet**") and statements of earnings and retained earnings and cash flows for the period then ended.

(b)  Except as set forth on Schedule 3.7 of the Seller Disclosure Schedule, the Financial Statements (i) have been prepared in accordance with IFRS applied on a consistent basis throughout the periods covered thereby except as may be indicated in the notes thereto, and (ii) fairly present, in all material respects, the financial position of the Company as of the dates thereof and the results of operations of the Company for the periods then ended.

(c)  The Company does not have any liabilities of any kind, whether accrued, contingent, absolute, determined, determinable or otherwise, other than (i) liabilities disclosed, reserved or otherwise provided for in the Latest Balance Sheet (including the notes thereto), (ii) liabilities disclosed in the Seller Disclosure Schedule, (iii) liabilities incurred in the ordinary course of business since the date of the Latest Balance Sheet, (iv) liabilities incurred in connection with the transactions contemplated by this Agreement or any other Transaction Document or (v) any other liabilities or obligations which are not and would not reasonably be expected to be, individually or in the aggregate, material to the Company.

**3.8**  **Absence of Certain Developments**. During the period beginning on the date of the Latest Balance Sheet and ending on the date of this Agreement, (a) there has not been any event, change, occurrence or circumstance that has had or would reasonably be expected to have, individually or in the aggregate, a Company Material Adverse Effect, and (b) except as set forth on Schedule 3.8 of the Seller Disclosure Schedule, the Company has conducted its

- 20 -

business in the ordinary course substantially consistent with past practices in all material respects.

**3.9**    **Compliance with Applicable Laws**.

(a)    Except as set forth on Schedule 3.9(a) of the Seller Disclosure Schedule: (i) the Company holds all material permits, licenses, approvals, certificates and other authorizations of and from all, and have made all declarations and filings with, Governmental Entities necessary for the lawful conduct of its business in all material respects as presently conducted (each, a "**Material Permit**"); (ii) the Company has been, and currently is, in material compliance with all such Material Permits; (iii) the Company is, and at all times has been, in compliance with all applicable Laws, except for instances of noncompliance that would not be material to the Company; and (iv) the Company is, and at all times has been, in compliance in all material respects with all Anti-Corruption Laws and Anti-Money Laundering and Sanctions Laws.

(b)    The Company has made application to the Securities Authorities for registration as a restricted dealer and for related exemptive relief and, as of the date of this Agreement: (i) such application is pending, (ii) such application is in good standing and (iii) the Company has responded to all material inquiries and requests for information made by the Securities Authorities in connection with such application.

**3.10**    **Regulatory Compliance**. The Company is in compliance in all material respects with the terms and conditions of its registration as a restricted dealer under applicable securities Laws including the terms and conditions of the order of the Alberta Securities Commission Re Bitvo Inc. dated April 25, 2022.

**3.11**    **Title to Assets**. Except as would not reasonably be expected to be material to the Company, the Company has title to, or a valid license interest in, all of the material tangible and intangible assets used in the conduct of the business of the Company as currently conducted. All of such assets are free from any Liens (other than Permitted Liens).

**3.12**    **Bank Accounts** . Schedule 3.12 of the Seller Disclosure Schedule sets forth a complete list of all financial institutions in which the Company maintains any depository account, trust account or safety deposit box and the names of all Persons authorized to draw on or who have access to such accounts or safety deposit boxes.

**3.13**    **Powers of Attorney** . Except as set forth on Schedule 3.13 of the Seller Disclosure Schedule, there are no outstanding powers of attorney granted by the Company to any other Person to bind the Company to any Contract, liability or obligation.

**3.14**    **Real Property** . As of the date hereof, except as set forth on Schedule 3.14 of the Seller Disclosure Schedule, the Company does not own or lease any real property.

**3.15**    **Tax Matters**. Except as set forth on Schedule 3.15 of the Seller Disclosure Schedule:

(a)    The Company, in all material respects, has duly and timely made or prepared all Tax Returns required to be made or prepared by it, has duly and timely filed all Tax

- 21 -

Returns required to be filed by it with the appropriate Governmental Entity and has duly, completely and correctly reported all income and all other amounts and information required to be reported thereon.

(b)     The Company, in all material respects, has duly and timely paid all Taxes, including all instalments on account of Taxes for the current year, that are due and payable by it.

(c)     The Company has not requested, offered to enter into or entered into any agreement or other arrangement, or executed any waiver, providing for any extension of time within which (i) to file any Tax Return covering any Taxes for which the Company is or may be liable; (ii) to file any elections, designations or similar filings relating to Taxes for which the Company is or may be liable; (iii) the Company is required to pay or remit any Taxes or amounts on account of Taxes; or (iv) any Governmental Entity may assess or collect Taxes for which the Company is or may be liable.

(d)     There are no material proceedings, investigations, audits or Claims now pending or threatened against the Company in respect of any Taxes and there are no material matters under discussion, audit or appeal with any Governmental Entity relating to Taxes.

(e)     The Company, in all material respects, has duly and timely withheld all Taxes and other amounts required by Law to be withheld by it (including Taxes and other amounts required to be withheld by it in respect of any amount paid or credited or deemed to be paid or credited by it to or for the account or benefit of any Person, including any employees, officers or directors and any non-resident Person), and has duly and timely remitted to the appropriate Governmental Entity such Taxes and other amounts required by Law to be remitted by it.

(f)     The Company, in all material respects, has duly and timely collected, reported and remitted all amounts on account of any sales, value-added or transfer taxes, including GST/HST and provincial or territorial sales Taxes, required by Law to be collected, reported and remitted by it and has duly and timely reported and remitted to the appropriate Governmental Entity any such amounts required by Law to be remitted by it.  All input tax credits claimed by the Company for GST/HST purposes were calculated and claimed in all material respects in accordance with applicable Law.

(g)     The Company is duly registered for GST/HST purposes.

(h)     The Company is not a party to, bound by or obligated under (i) any Tax sharing or Tax indemnity agreement or arrangement (other than customary Tax sharing or Tax indemnification provisions contained in commercial agreements entered into in the ordinary course of business not primarily relating to Taxes) or (ii) any agreement or arrangement under which the Company may be required to make material payments with respect to any Tax benefits (whether actual or deemed) or Tax assets, including transaction Tax benefits arising from a prior transaction.

- 22 -

(i)    The Shares are not "taxable Canadian property" for the purposes of the Tax Act.

(j)    There are no Liens on any of the assets of the Company that arose in connection with any failure (or alleged failure) of the Company to pay or remit any Tax when due.

(k)    To the Seller's Knowledge, the Company has not been required to file any Tax Return with, and has never been liable to pay any Taxes to, any Governmental Entity outside Canada or any Governmental Entity in Canada with which it was not duly registered for such purposes. No claim has ever been made by a Governmental Entity in a jurisdiction where the Company does not file Tax Returns or is not registered for Tax purposes that the Company is or may be subject to the imposition of any Tax by that jurisdiction or required to file a Tax Return in that jurisdiction.

(l)    The Company has not made, prepared and/or filed any elections, designations or similar filings relating to Taxes or entered into any agreement or other arrangement in respect of Taxes or Tax Returns that has effect for any Post-Closing Tax Period.

(m)    The terms and conditions made or imposed in respect of every transaction (or series of transactions) between the Company and any non-resident Person with whom the Company was not dealing at arm's length within the meaning of the Tax Act do not differ from those that would have been made between Persons dealing at arm's length for purposes of the Tax Act. Records or documents that meet the requirements of subparagraphs 247(4)(a) to (c) of the Tax Act have been made and obtained by the Company with respect to all material transactions between the Company and any non-Canadian resident Person with whom the Company was not dealing at arm's length within the meaning of the Tax Act.

(n)    There are no rulings, advance pricing agreements, or other agreements relating to the Company which may affect its liability for Taxes for any Post-Closing Tax Period.

(o)    The Company has not (i) made an application for, and received, a refund under section 125.7 of the Tax Act, nor (ii) applied for or received any other Tax-related relief under any COVID Relief Legislation, including but not limited to a reduction of any amount otherwise required to be remitted in respect of any government pension plan or employment or parental insurance program, which refund in (i) or relief in (ii) would  be required to be repaid, whether in whole or in part, by the Company to the applicable Governmental Entity after the Closing Date;

(p)    All capital dividends, as that term is defined in subsection 83(2) of the Tax Act, have been properly paid the Company and the Company has no liability for Tax under subsection 184(2) of the Tax Act.

(q)    The Company has not made an "excessive eligible dividend designation" as defined in subsection 89(1) of the Tax Act, in respect of a dividend paid or deemed to be paid by a provision of the Tax Act.

(r)    The Company is not a non-resident of Canada for purposes of the Tax Act.

- 23 -

**3.16    Intellectual Property**.

(a)    Schedule 3.16(a) of the Seller Disclosure Schedule sets forth a true and complete list of all Company Intellectual Property that has been registered, or for which applications for registration have been filed, by or on behalf of the Company (collectively, the "**Company Registered IP**").

(b)    Except as set forth on Schedule 3.16(b) of the Seller Disclosure Schedule, to the Seller's Knowledge, there have been no Proceedings (including opposition, cancellation or other proceedings) brought against the Company, the Company has not received any written notice of any Proceeding and the Company has not received written notice that any Proceedings have been threatened against the Company by any Person, in each case, (i) alleging that the Company Intellectual Property has infringed, misappropriated or otherwise violated any Intellectual Property Rights of any Person, or (ii) challenging the validity, use, ownership, enforceability, patentability or registrability of any Company Registered IP. To Seller's Knowledge, neither the use of the Company Intellectual Property, on its own or in combination with any licensed Intellectual Property, nor the conduct of the business of the Company infringes, misappropriates, or otherwise violates the Intellectual Property Rights of any other person. To Seller's Knowledge, no infringement, misuse or misappropriation of the Company Intellectual Property has occurred or is occurring.

(c)    All developers involved in the creation of any material Company Intellectual Property, at the time they created or developed such Company Intellectual Property, were either full-time employees of the Company or were contractors of the Company, all of which assigned all rights in the Company Intellectual Property to the Company pursuant to written agreements and such developers waived their moral rights in and to such Company Intellectual Property.

(d)    The Company uses commercially reasonable efforts to protect the confidentiality, integrity and security of the hardware equipment and software components of the information management, technology and computer systems, including the Platform, owned or operated by the Company (collectively, the "**Company Systems**"), and all information stored or contained therein or transmitted thereby from any unauthorized use, access, interruption or modification by third parties. The Company Systems have been maintained and supported in all material respects in accordance with prudent industry practices.

(e)    To the Seller's Knowledge, there has been no, and there currently is no material Breach of Security Safeguards involving the Processing of Personal Information by or on behalf of the Company or that are protecting the Company Systems. The Company and the conduct of its business are in compliance in all material respects with, and at all times have been in compliance in all material respects with, all Data Security Requirements, and neither the Seller nor the Company has received any notices or threats from any third party (including any Governmental Entity) regarding any Proceeding relating to any material contravention of Data Security Requirements.

- 24 -

**3.17    Material Contracts**.

(a)    Except as set forth on Schedule 3.17(a) of the Seller Disclosure Schedule (each such Contract listed or required to be so listed, and each Contract of the type described in the subclauses below to which the Company becomes a party or by which the Company becomes bound after the date of this Agreement, collectively, the "**Material Contracts**") and except for this Agreement, as of the date of this Agreement, the Company is not a party to or bound by:

(i)    any Contract creating or governing a partnership or joint venture or any Contract relating to any profit sharing, capital commitment, joint development, ownership or operation, strategic alliance, or similar arrangement, including any shareholders' or voting agreement relating to the Shares;

(ii)    any employment agreement, severance or similar Contract, or consulting agreement, with any former (to the extent the Company has any ongoing or prospective liability) or current officer, employee, director, independent contractor or dependent contractor of the Company;

(iii)    any Contract (A) granting exclusive rights to any Person or containing a covenant materially restricting in any manner or expressly limiting the freedom of the Company or any of its Affiliates (including, after the Closing, the Buyer or any of its Affiliates) to engage in any activity, market or line of business in any geographic area or the internet or to compete with any Person in any material respect, (B) which, by its terms, limits the ability of the Company or its Affiliates (including, after the Closing, the Buyer or any of its Affiliates) to incur Indebtedness, to guarantee or otherwise become responsible for the Indebtedness of any other Person or to create Liens, in each case, in any material respect, (C) requiring the Company or its Affiliates (including, after the Closing, the Buyer or any of its Affiliates) to purchase a minimum amount, or applicable percentage, of products or services or (D) providing for exclusive dealings, a right of first refusal, a right of first offer, "most favored nation" status or other similar requirement in favor of any Person (other than the Company);

(iv)    any Contract under which the Company has directly or indirectly created, incurred, assumed, or guaranteed any Indebtedness (or as a result of which any of the Company's assets have become subject to any Lien (other than Permitted Liens)), in each case, involving Indebtedness having an initial outstanding principal amount in excess of $100,000 (other than any (x) intercompany Indebtedness between the Company and the Seller that has been repaid in full, and (y) issued but undrawn letters of credit);

(v)    any Contract under which the Company has, directly or indirectly, made any advance, loan, guarantee, extension of credit or capital contribution to, or other investment in, any Person pursuant to which any liability remains outstanding, in each case, other than (A) any accounts receivable incurred in the ordinary course of business, (B) intercompany Indebtedness between

- 25 -

only the Company and the Seller that has been repaid in full, and (C) any Contract that does not involve a principal obligation guaranteed by the Company, or a principal amount advanced, loaned, or otherwise contributed to any Person, in excess of $25,000;

(vi)     any Contract that is a settlement, conciliation or similar agreement with (A) any Governmental Entity or (B) any other third party pursuant to which, in the case of this clause (B), the Company will be required, after the date of this Agreement, to satisfy any monetary or material non-monetary obligations;

(vii)    any Contract that is a lease, sublease or similar Contract with any Person under which the Company is lessee of, or holds or uses, any real property, machinery, equipment, vehicle or other tangible personal property owned by any Person and such lease, sublease or similar Contract provides for annual payments by the Company in excess of $50,000;

(viii)   any agent, sales representative, referral, marketing or distribution agreement or any other agreement that requires payment by or to the Company or referral fees, commissions or other monetary or non-monetary compensation in respect of a referral;

(ix)     any Contract providing for the license, transfer or sale of any of the Company's assets other than in the ordinary course of business consistent with past practice;

(x)      any Contract pursuant to which (A) the Company grants any right or license to Company Intellectual Property material to the Platform to any Person (other than non-exclusive licenses granted to customers or vendors of the Company in the ordinary course of business) or (B) the Company obtains the right to use any Company Intellectual Property material to the Platform (excluding licenses for commercial off the shelf computer software or data services that are available on non-discriminatory pricing terms or Open Source Software);

(xi)     any Contract with a Related Party (other than director and officer indemnification agreements, copies of which have been provided to the Buyer); or

(xii)    any Contract or commitment to agree to do any of the foregoing not disclosed pursuant to clauses (i) through (xi) above.

(b)     Each Material Contract is valid and binding on the Company and enforceable in accordance with its terms against such Company (subject to the Bankruptcy and Equity Exceptions). The Company has not received written notice of any breach or default under any Material Contract and neither the Company nor, to the Seller's Knowledge, any other party to any Material Contract is in material breach or material default of such Contract.

- 26 -

(c)     The Company has made available to the Buyer true and correct copies of all written Material Contracts and provided summaries of oral Material Contracts (if any).

**3.18**   **Insurance**. Schedule 3.18 of the Seller Disclosure Schedule contains a list of all insurance policies of the Seller covering the assets, business, equipment, properties, operations, employees, officers and directors (in their respective capacities as such) of the Company as of the date of this Agreement, including insurer, policy number and effective dates.

**3.19**   **Litigation**. Except as set forth on Schedule 3.19 of the Seller Disclosure Schedule, there is no and there has not at any time been any suit, litigation, arbitration, action, charge, Claim, complaint, grievance, proceeding, audit, inquiry or investigation (in each case, whether civil, criminal, administrative, investigative or informal) commenced, brought or conducted by or before any Governmental Entity (each, a "**Proceeding**") pending or, to the Seller's Knowledge, threatened against the Company or any of the assets or properties of the Company, or pending or threatened in writing by the Company against any other Person, in each case (i) that seek any material injunctive relief or (ii) that, individually or in the aggregate, would otherwise reasonably be expected to be material to the Company. The Company is not and has not at any time been subject to any judgment, writ, injunction, ruling, decree or order that, individually or in the aggregate, is or would reasonably be expected to be material to the Company.

**3.20**   **Employment Matters.**

(a)     Except as set forth on Schedule 3.20(a) of the Disclosure Schedule, the Company does not (i) employ or engage, either directly or indirectly (including by way of a common or joint employment relationship), and has not at any time employed or engaged any employee, either directly or indirectly (including by way of a common or joint employment relationship), (ii) have any offers of employment pending or contemplated, or (iii) have any outstanding commitment to hire or offer employment to any individual.

(b)     The Company does not, either directly or indirectly (including by way of a common or joint employment relationship), sponsor, administer, or contribute to, and does not have any obligation, either directly or indirectly (including by way of a common or joint employment relationship), to contribute to, or liability under or in respect of, and has not at any time, either directly or indirectly (including by way of a common or joint employment relationship), sponsored, administered, or contributed to, and has not had any obligation, either directly or indirectly (including by way of a common or joint employment relationship), to contribute to, or liability under or in respect of, any Employee Plan, and the Company has not at any time made any commitment, promise, or undertaking to adopt, establish, sponsor, administer, contribute to, or otherwise acquire any obligation or liability in respect of, any Employee Plan.

(c)     The Company is not, either directly or indirectly (including by way of a common or joint employment relationship), (i) a party to, nor is engaged in any negotiations with respect to, any collective bargaining, union agreement, employee association agreement, project labour agreement or similar Contract, or (ii) subject to any actual or, to the Seller's Knowledge, threatened application for certification or

- 27 -

bargaining rights or letter of understanding or related successor employer application, and there have not been any such activities or disputes or proceedings within the last two years.

(d)     The Company has properly classified all individuals it engages or has previously engaged as independent or dependent contractors, consultants or service providers, as applicable, for purposes of taxes and all Laws and has not received any notice from any Person or Governmental Entity disputing employee or independent or dependent contractor classification or any actual or, to the knowledge of the Company, threatened complaint or claim from any independent or dependent contractor, consultant or other service provider alleging that it is an employee or dependent contractor.

(e)     The Company has not received any notice from any Person or Governmental Entity alleging employer status (including common or joint employer status) or any actual or, to the knowledge of the Company, threatened complaint or claim from any Person alleging that the Company is or was an employer (either directly or indirectly (including by way of a common or joint employment relationship)).

3.21     **Transactions with Affiliates**. Schedule 3.21 of the Seller Disclosure Schedule sets forth all Contracts or arrangements (other than Governing Documents) between (i) the Company, on the one hand, and (ii) any shareholder, director or officer, former director or officer or employee of, or any other Person not dealing at arm's length with, the Company or the Seller (collectively, the Persons in this subclause (y), the "**Related Parties**") (the "**Related Party Agreements**"). Except as set forth on Schedule 3.21 of the Seller Disclosure Schedule, the Company does not owe any debt to a Related Party, and has not received a guarantee from, or had its debt or other obligations assumed by, a Related Party, and no Related Party has guaranteed or assumed any liability of any kind for any debt incurred by the Company (any such debt, guarantee or assumption of obligations or liability, a "**Related Party Financing**").

3.22     **Governing Documents**. The Company has made available to the Buyer accurate and complete copies of the Governing Documents and minute books of the Company, including all amendments thereto. The minute books of the Company have been maintained in all material respects in accordance with applicable Law and contain true, correct and complete copies of the Company's Governing Documents, minutes of meetings of its board of directors and committees thereof and of its shareholders and written resolutions of its directors and shareholders, including resolutions of the directors and shareholders ratifying decisions made by the directors and shareholders not otherwise recorded in the corporate records.

3.23     **Seller Litigation**. As of the date of this Agreement, there is no Proceeding pending or, to the Seller's Knowledge, threatened in writing against the Seller which would, individually or in the aggregate, have an adverse effect on the Seller's ownership of the Shares. The Seller is not subject to any outstanding order, writ, injunction or decree that would,

- 28 -

individually or in the aggregate, have an adverse effect on the Seller's ownership of the Shares.

3.24   **Residency**. The Seller is not a non-resident of Canada within the meaning of the Tax Act.

3.25   **Brokers**. No Person, other than INFOR Financial Inc., Blue Deer Capital Partners Inc. or their respective Affiliates, is entitled to any broker's, finder's, financial advisor's or investment banker's fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of the Company or the Seller for which the Company or the Buyer could become obligated after the Closing.

**ARTICLE 4**
**REPRESENTATIONS AND WARRANTIES OF THE BUYER**

As a material inducement to the Seller to enter into this Agreement, the Buyer represents and warrants to the Seller that each statement contained in this Article 4 is true and correct as of the date hereof and as of the Closing Date:

4.1   **Organization and Qualification**. The Buyer is a corporation, duly organized, validly existing and in good standing under the Laws of the jurisdiction of its formation.

4.2   **Authority**. The Buyer has all necessary organizational power and authority to execute and deliver each Transaction Document to which it is a party, the performance by the Buyer of its obligations set forth in such Transaction Documents and to consummate the transactions contemplated thereby. The execution and delivery of each Transaction Document to which the Buyer is a party and the consummation of the transactions contemplated thereby have been duly authorized by all necessary organizational action on the part of the Buyer and no other proceeding (including by its shareholders) on the part of the Buyer is necessary to authorize each Transaction Document to which the Buyer is a party or to consummate the transactions contemplated thereby. This Agreement has been duly executed and delivered by the Buyer and constitutes, and each of the other Transaction Documents to which the Buyer will be a party upon execution and delivery by the Buyer will constitute, a valid, legal and binding obligation of the Buyer (assuming that this Agreement has been, and each other Transaction Document upon its execution and delivery will be, duly and validly authorized, executed and delivered by the other parties hereto or thereto), enforceable against the Buyer in accordance with its terms, except to the extent that enforceability may be limited by the Bankruptcy and Equity Exceptions.

4.3   **Consents and Approvals; No Violations**. Assuming the truth and accuracy of the representations and warranties of the Seller set forth in Section 3.3 and other than with respect to the 11.10 Notice, no notices to, filings with, or authorizations, consents, permits, designations or approvals of any Governmental Entity are necessary for the execution, delivery or performance of any of the Transaction Documents to which the Buyer is or will be a party or the consummation by the Buyer of the transactions contemplated thereby. Other than with respect to the 11.10 Notice, neither the execution, delivery and performance by the Buyer of any of the Transaction Documents to which the Buyer is a party nor the consummation by the Buyer of the transactions contemplated thereby will (a) conflict with or result in any breach of any provision of the Buyer's Governing Documents, or (b) violate any Law of any Governmental Entity having jurisdiction over the Buyer and

its Subsidiaries or any of their material properties or assets which would or would reasonably be expected to, individually or in the aggregate, prevent or materially delay the consummation of the transactions contemplated thereby.

**4.4    Litigation**. There is no Proceeding pending or, to the Buyer's Knowledge, threatened against the Buyer which would adversely affect the Buyer's performance under the Transaction Documents or otherwise prevent or materially delay the consummation of the transactions contemplated thereby. The Buyer is not subject to any outstanding order, writ, injunction or decree that would adversely affect the Buyer's performance under the Transaction Documents or otherwise prevent or materially delay the consummation of the transactions contemplated thereby.

**4.5    Sufficiency of Funds**. The Buyer has sufficient cash on hand or other sources of immediately available funds to enable it to pay all amounts payable by it hereunder and consummate the transactions contemplated by this Agreement.

**4.6    Investment Canada Act**. The Buyer is a trade agreement investor within the meaning of the Investment Canada Act.

**4.7    Brokers**. No Person is entitled to any broker's, finder's, financial advisor's or investment banker's fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of the Buyer or any of its respective Affiliates.

**ARTICLE 5**
**TERMINATION**

**5.1    Termination**

This Agreement may be terminated on or prior to the Closing Date:

    (a)    by the written agreement of the Buyer and the Seller;

    (b)    by the Buyer, if the Seller breaches any of the Seller's representations, warranties or covenants contained in this Agreement such that the conditions set forth in Section 7.1 are incapable of being satisfied, provided that the Buyer is not then in breach of this Agreement such that any condition in Section 7.2 is incapable of being satisfied on or before the Outside Date, and provided further that the Buyer may not terminate this Agreement under this Section 5.1(b) unless such breach remains uncured for 10 Business Days after written notice of such breach is given to the Seller by the Buyer;

    (c)    by the Seller, if the Buyer breaches any of the Buyer's representations, warranties or covenants contained in this Agreement such that the conditions set forth in Section 7.2 are incapable of being satisfied, provided that the Seller is not then in breach of this Agreement such that any condition in Section 7.2 is incapable of being satisfied on or before the Outside Date, and provided further that the Seller may not terminate this Agreement under this Section 5.1(c) unless such breach

- 30 -

remains uncured for 10 Business Days after written notice of such breach is given to the Buyer by the Seller;

(d)     by either the Buyer or the Seller if the Closing Date shall not have occurred or on before the Outside Date, except that the right to terminate this Agreement under this Section 5.1(d) shall not be available to: (i) the Buyer, if its failure to fulfill any of its obligations or breach of any of its representations and warranties under this Agreement has been the cause of, or resulted in, the failure of the Closing Date to occur by the Outside Date or (ii) the Seller, if its failure to fulfill any of the Seller's obligations or breach of any of the Seller's representations and warranties under this Agreement has been the cause of, or resulted in, the failure of the Closing Date to occur by the Outside Date; or

(e)     by either the Buyer or the Seller if, after the date of this Agreement, there shall be enacted or made applicable any Law or order that prohibits or makes illegal the consummation of the transactions contemplated by this Agreement and, in the case of an order, such order shall have become final and non-appealable,

in each case, with immediate effect upon delivery of written notice of termination or upon entering into a mutual agreement, as the case may be.

**5.2**     **Effect of Termination**

(a)     If this Agreement is terminated by the Seller or the Buyer under Article 5, all further rights and obligations of the Parties under this Agreement shall terminate immediately except: (a) in respect of any breach of this Agreement arising prior to such termination, and (b) that the provisions of Article 5 and Sections 2.5 *[Deposit]*, 6.4 *[Confidentiality]*, 9.5 *[Fees and Expenses]* and 9.15 *[Remedies]* shall survive such termination and continue in full force and effect.

(b)     In the event of termination of this Agreement by the Seller pursuant to Section 5.1(c), or pursuant to Section 5.1(d) where the failure by the Buyer to fulfill any of its obligations or the breach by the Buyer of any of its representations and warranties under this Agreement has been the cause of, or resulted in, the failure of the Closing Date to occur by the Outside Date, then the Deposit and any accrued interest thereon shall be released to the Seller without prejudice to the rights and remedies available to the Seller under this Agreement.

(c)     In the event of termination of this Agreement by either the Buyer or the Seller pursuant to Section 5.1(d) (other than in the circumstances described in Section 5.2(b)) where the condition set forth in Section 7.1(c) or 7.2(c) has not been satisfied due to:

(i)     the objection of the applicable Securities Authorities to the Buyer's acquisition of control of the Company, or

(ii)     approval from the CSA of the 11.10 Notice pursuant to Section 6.5(b) not having been obtained on terms acceptable to the Buyer or the Seller, as applicable, each acting reasonably,

then 50% of the Deposit shall be released to the Seller and 50% of the Deposit shall be released to the Buyer, and in such circumstance the interest received by the Seller shall be deemed to have accrued for the account of the Seller, in each case without prejudice to the rights and remedies available to such Parties under this Agreement; provided that if any such termination occurs following the extension of the Outside Date beyond October 14, 2022 by agreement in writing of the Seller and the Buyer, then 100% of the Deposit shall be released to the Seller, and in such circumstance the interest received by the Seller shall be deemed to have accrued for the account of the Seller, without prejudice to the rights and remedies available to the Seller under this Agreement and no portion of the Deposit will be released to the Buyer.

(d)     In the event of termination of this Agreement in any other circumstances, the Deposit and any accrued interest thereon shall be returned in full, without deduction or set-off, to the Buyer.

**5.3     Other Rights and Remedies**

The provisions of this Article 5 are in addition to any other rights and remedies available to a Party in respect of the breach by any other Party of any of its obligations under this Agreement. Nothing in this Article 5 shall be deemed to release any Party from any liability for any breach by such Party of the terms and conditions of this Agreement or impair the right of any Party to compel specific performance by any other Party of its obligations under this Agreement.

**ARTICLE 6**
**COVENANTS**

**6.1     Conduct of Business Prior to Closing**

During the period from the date of this Agreement to the Closing, except as otherwise expressly contemplated by this Agreement or with the prior written consent of the Buyer (such consent not to be unreasonably withheld, conditioned, or delayed), the Seller will cause the Company to:

(a)     **Conduct Business in the Ordinary Course** – conduct business in the ordinary course, consistent with past practice, except as required by this Agreement or as otherwise expressly contemplated by this Agreement;

(b)     **Conduct Business in Compliance with Law** – conduct business in compliance in all material respects with the terms and conditions of its registration as a restricted dealer under applicable securities Laws including the terms and conditions of the order of the Alberta Securities Commission Re Bitvo Inc. dated April 25, 2022;

(c)     **Maintain the Business** – use commercially reasonable efforts to maintain and preserve intact the current organization and business of the Company and preserve the rights, goodwill and relationships of its customers and others having business relationships with the Company;

(d)     **Advise of Changes** – promptly advise the Buyer in writing of any fact or any change in the business, operations, affairs, assets, liabilities, capitalization, financial condition or prospects of the Company that would reasonably be expected

- 32 -

to result in any of the conditions precedent of the Buyer set out in Section 7.1 not being met prior to the Outside Date; and

(e)    **Restricted Activities** – not:

(i)    take or omit to take any action that would reasonably be expected to result in a Company Material Adverse Effect;

(ii)    acquire or agree to acquire by the Company in any manner (whether by merger, amalgamation, consolidation, equity purchase, asset purchase, or otherwise) any other Person or business other than the acquisition of assets in the ordinary course of business consistent with past practice;

(iii)    adopt any amendments to the Governing Documents of the Company;

(iv)    sell, license, lease, assign, grant interests in, transfer, abandon, fail to renew, or otherwise dispose of any material assets of the Company outside of the ordinary course of business consistent with past practice;

(v)    liquidate or dissolve the Company;

(vi)    (A) enter into any Contract or other arrangement that would constitute a Material Contract (other than entry into Material Contracts in the ordinary course of business consistent with past practice), (B) amend or modify any Material Contract (other than in the ordinary course of business consistent with past practice, to exercise renewals in the ordinary course of business consistent with past practice prior to the expiration of such Material Contract), (C) waive any material benefits under any Material Contract or grant any consent or release in respect of any matters related to any Material Contract, (D) terminate (either partially or completely) or cancel any Material Contract (other than terminations in the ordinary course of business upon the expiration of such Material Contract); or (E) cause or permit any acceleration of any material terms under any Material Contract;

(vii)    impose or permit to exist any new encumbrance (other than Permitted Liens) upon any assets of the Company, whether tangible or intangible;

(viii)    make any change in accounting principles by the Company, except as required by applicable Law or IFRS;

(ix)    incur, assume or guarantee any Indebtedness or make or provide any loans or advances (other than Indebtedness incurred, assumed or guaranteed in the ordinary course of business consistent with past practice);

(x)    recruit, hire or engage any employee, make any promise, commitment or offer of any kind to recruit, hire or engage any employee at any time in the future, or enter into any form of employment-related Contract;

(xi)    establish, sponsor, administer, contribute to, or otherwise acquire any obligation or liability in respect of, any Employee Plan;

(xii)     engage or enter into or amend any Contract or other arrangement with an independent or dependent contractor, consultant or other service provider or make any promise, commitment or offer of any kind to engage an independent or dependent contractor, consultant or other service provider at any time in the future except, in each case, for arrangements entered into in the ordinary course of business that are not, individually or in the aggregate, material to the Company;

(xiii)     institute, settle, cancel or compromise any Proceeding;

(xiv)     authorize, issue, sell or otherwise dispose of any Equity Securities of the Company;

(xv)     make or change any Tax election, change an annual accounting period, adopt or change any Tax accounting method, file any amended Tax Return, settle any Tax Claim or assessment, waive or agree to extend the statute of limitations for the assessment of any Tax, surrender any right to claim a refund of Taxes or otherwise take any similar action;

(xvi)     declare, set aside or pay any dividend or make any other distribution with respect to shares or other equity interests in the capital of the Company (whether in cash or in kind);

(xvii)     directly or indirectly redeem, purchase or otherwise acquire any of Equity Securities of the Company; or

(xviii)     authorize or enter into any agreement, Contract or commitment to do any of the foregoing or authorize, take or agree to take (or fail to take) any action with respect to the foregoing.

**6.2     Access for Investigation**

(a)     The Seller shall cause the Company to permit the Buyer, its Affiliates, and its and their representatives, between the date of this Agreement and the Closing Date, to have reasonable access during normal business hours and upon reasonable advance notice to the Company to all the Books and Records.

(b)     Notwithstanding the foregoing, the Seller shall not be obligated to (i) provide, or cause to be provided, such access or information to the extent that doing so would (A) violate applicable Law, (B) violate an obligation of confidentiality owing to a third party, or (C) reasonably jeopardize the protection of a solicitor-client privilege, or (ii) disclose minutes of the deliberations of the Company's board of directors (or any committee of any such board) in connection with the transactions contemplated by this Agreement, or the evaluation of possible alternatives to the transactions contemplated by this Agreement, or any materials provided to such boards of directors (or any such committee) in connection with such deliberations.

(c)     Notwithstanding the foregoing, without the prior written consent of the Seller, the Buyer shall not contact, and shall cause its Affiliates and its and their respective

representatives not to contact, any of the employees, suppliers, customers, clients or financing sources of the Company or the Seller with respect to the transactions contemplated by this Agreement or otherwise outside of the ordinary course of business of the Buyer, such Affiliates, or such representatives, as applicable.

**6.3     Notice of Certain Matters**

Prior to the Closing, each of the Buyer and the Seller shall promptly notify the other of:

(a)     any notice or other communication from (i) any Governmental Entity in connection with this Agreement or the transactions contemplated by this Agreement, including, for certainty, any communication related to the covenant set out in Section 6.5(b), or (ii) any Person (x) alleging that the consent of such Person is or may be required in connection with the transactions contemplated by this Agreement, or (y) threatening (in writing), requesting (in writing) or delivering an order restraining or enjoining the execution of any Transaction Documents or the consummation of the transactions contemplated by this Agreement;

(b)     the occurrence of any event that would reasonably be expected to result in the failure of one or more of the conditions to Closing set out in Article 7 to be met by the Outside Date; and

(c)     (i) with respect to the Company, any Proceeding (including, for this purpose, by or before a Taxing Authority) commenced relating to the Company that, if pending on the date of this Agreement, would have been required to have been disclosed pursuant to Section 3.19, and (ii) with respect to the Buyer, any Proceedings (including, for this purpose, by or before a Taxing Authority) commenced relating to the Buyer that, if pending on the date of this Agreement, would have been required to have been disclosed pursuant to Section 4.4.

**6.4     Confidentiality**

(a)     Notwithstanding the execution of this Agreement, the Parties acknowledge that the Confidentiality Agreement remains in full force and effect pursuant to its terms, except to the extent reasonably necessary for any of the Parties to enforce any of its respective rights under this Agreement. The Confidentiality Agreement is hereby terminated effective as of the Closing.

(b)     From and after the Closing, the Seller shall, and shall cause each of its Affiliates and each of its and their respective representatives to, keep confidential all information relating to the Company (including all Personal Information of the employees), other than information that:

(i)     is part of the public domain;

(ii)     becomes part of the public domain other than as a result of a breach of these provisions by the Seller;

(iii)    can be demonstrated to have been known or available to such Person before receipt of such information from the other Party or independently developed by such Person;

(iv)    was received in good faith after Closing from a Person who was lawfully in possession of such information free of any obligation of confidentiality; or

(v)    the Seller or any of its Affiliates is required to disclose pursuant to applicable Law or stock exchange rules.

(c)    From and after the Closing, the Seller and the Buyer shall, and shall cause each of their Affiliates and each of its and their Affiliates' representatives to, keep confidential this Agreement, the Transaction Documents and all information disclosed to it in connection with the transactions contemplated by this Agreement by or on behalf of another Party and relating to another Party, except information that:

(i)    is part of the public domain;

(ii)    becomes part of the public domain other than as a result of breach of these provisions;

(iii)    can be demonstrated to have been known or available to such Person before receipt of such information from the other Party or independently developed by such Person;

(iv)    was received in good faith from a Person who was lawfully in possession of such information free of any obligation of confidence; or

(v)    either the Seller, the Buyer or any of their respective Affiliates is required to disclose pursuant to applicable Law or stock exchange rules.

**6.5    Actions to Satisfy Closing Conditions**.

(a)    During the period from the date of this Agreement until the Closing, and subject to the terms and conditions of this Agreement, each of the Parties shall use commercially reasonable efforts to take or cause to be taken all actions and to do or cause to be done all things necessary under the terms of this Agreement, any Transaction Document or applicable Laws to cause the satisfaction of the conditions set forth in Article 7 and to consummate the transactions contemplated by this Agreement, including using their respective commercially reasonable efforts to obtain all authorizations, consents, permits, waivers or other approvals of all Governmental Entities that may be or become necessary for the execution and delivery of, and the performance of its obligations pursuant to, this Agreement and the other Transaction Documents, and the consummation of the transactions contemplated by this Agreement, and the Parties shall reasonably cooperate with each other with respect to each of the foregoing.

- 36 -

(b)    Notwithstanding the generality of the foregoing, the Seller shall promptly submit an application to the Canadian Securities Administrators ("**CSA**") for regulatory pre-approval of the transaction contemplated by this Agreement under Section 11.10 of National Instrument 31-103 - *Registration Requirements, Exemptions and Ongoing Registrant Obligations* ("**NI 31-103**") promptly following the date hereof (the "**11.10 Notice**"). The Buyer will prepare the draft 11.10 Notice and will provide the Seller with opportunity to review and comment on the draft 11.10 Notice prior to filing. The Seller will keep the Buyer apprised of, and provide the Buyer with opportunity to participate in, all communications with the CSA relating to the 11.10 Notice. The Seller will cooperate with the Buyer to work diligently to obtain CSA approval of the 11.10 Notice. All filing fees payable in connection with the 11.10 Notice shall be borne by the Buyer.

**6.6**    **Public Announcements**. The Buyer and the Seller shall consult with one another and seek one another's approval (not to be unreasonably withheld, conditioned or delayed) before issuing any press release, or otherwise making any public statements, with respect to the transactions contemplated by this Agreement and shall not issue any such press release or make any such public statement prior to such consultation and approval; provided, that any Party may make any such press release or public statement which it in good faith believes is necessary or advisable in connection with any requirement of Law or the rules or regulation of any applicable exchange, it being understood and agreed that, to the extent not prohibited by Law, each Party shall provide the other Party with copies of any such announcement in advance of such issuance and consider in good faith the comments provided to such disclosing Party by the Buyer or the Seller. Nothing herein shall prevent any of the Parties from making any internal announcements to their respective employees to the extent such disclosures are not inconsistent in any material respect with the Parties' prior public disclosures regarding the transactions contemplated hereby.

**6.7**    **Indemnification of Directors and Officers.**

(a)    The Buyer agrees that all rights to indemnification, exculpation and advancement of expenses now existing in favor of the directors and officers of the Company, as provided in the Company's Governing Documents as of the date of this Agreement or otherwise in any written agreement with the Company in effect as of the date hereof and made available to the Buyer with respect to any matters occurring prior to the Closing Date, shall survive the transactions contemplated by this Agreement and shall continue in full force and effect for a period of six years following the Closing and that the Buyer shall, from and after the Closing Date, cause the Company to perform and discharge the Company's obligations to provide such indemnification, exculpation and advancement of expenses. To the maximum extent permitted by applicable Law, such indemnification shall be mandatory rather than permissive, and the Buyer shall, from and after the Closing Date, cause the Company to advance expenses in connection with such indemnification as provided in the Company's Governing Documents or other applicable agreements. The indemnification, liability limitation, exculpation or advancement of expenses provisions of the Company's Governing Documents provided to the Buyer shall not be amended, repealed or otherwise modified after the Closing Date in any manner that would adversely affect the rights thereunder of individuals who, as of

the Closing Date or at any time prior to the Closing Date, were directors or officers of the Company, unless such modification is required by applicable Law.

(b)    Without limiting any additional rights that any director or officer may have under any Contract or the Company's Governing Documents, from and after the Closing Date, the Buyer shall, and shall cause the Company to, to the fullest extent permitted under applicable Law as in effect from time to time, indemnify and hold harmless Pamela Draper against any and all losses in connection with any Proceeding or investigation, whether civil, criminal, administrative or investigative, arising out of or pertaining to the fact that she is or was a director or officer of the Company or arising out of actions taken (or failed to be taken) by her at the request of the Company, including any and all such losses arising out of or relating to this Agreement or the transactions contemplated hereby, for a period of six years after the Closing Date. The Buyer or the Company shall promptly advance expenses to Pamela Draper, as incurred, to the fullest extent permitted under applicable Law as in effect from time to time; provided, that she provides an undertaking to repay such advance if it is determined by a final and non-appealable judgment of a court of competent jurisdiction that she is not entitled to indemnification. Neither the Buyer nor the Company shall settle, compromise or consent to the entry of any judgment in any actual or threatened Proceeding or investigation in respect of which indemnification has been or could be sought by a Person hereunder unless such settlement, compromise or judgment includes an unconditional release of such Person from all liability arising out of such Proceeding or investigation. Neither the Buyer nor the Company shall have any obligation hereunder to any Person when and if a court of competent jurisdiction shall ultimately determine (and such determination shall have become final and non-appealable) that the indemnification of such Person in the manner contemplated hereby is prohibited by applicable Law.

(c)    The directors and officers of the Company entitled to the indemnification, liability limitation, exculpation and insurance set forth in this Section 6.7 are intended to be third party beneficiaries of this Section 6.7. This Section 6.7 shall survive the consummation of the transactions contemplated by this Agreement and shall be binding on all successors and assigns of the Buyer.

**6.8**    **Documents and Information**. After the Closing Date, the Buyer and the Company shall, until the seventh anniversary of the Closing Date, retain all books, records and other documents pertaining to the business of the Company in existence on the Closing Date and make the same available for inspection and copying by the Seller (at the Seller's expense) during normal business hours of the Company upon reasonable request and upon reasonable notice. No such books, records or documents shall be destroyed after the seventh anniversary of the Closing Date by the Buyer, the Company or any of its Subsidiaries, without first advising the Seller in writing and giving the Seller a reasonable opportunity to obtain possession thereof. This Section 6.8 shall not apply to Taxes or Tax matters, which are the subject of Section 6.10(b).

**6.9**    **Non-Competition, Non-Solicitation and Non-Disparagement**.

(a)    **Non-Competition**. In order to preserve and protect the goodwill inherent in the Company sold to the Buyer pursuant to this Agreement, for a period commencing

- 38 -

on the Closing Date and ending on the date that is two years following the Closing Date (the "**Restricted Period**"), the Seller shall not, and shall not or permit its Affiliates and representatives to, in any jurisdiction in Canada, directly or indirectly, engage in, invest in, own, manage, operate, finance, control, permit its name to be used by, act as a consultant to, render services to, otherwise assist or guarantee the obligations of any Person that engages in, owns, invests in, operates, manages, controls or is planning to do any of the foregoing in any business, operation, endeavour, opportunity or any other activity that is, directly or indirectly, a registered crypto asset trading platform in Canada (a "**Competitive Business**"). Notwithstanding the foregoing, nothing herein shall prohibit the Seller or its Affiliates and representatives from (i) being a passive owner of not more than two percent (2%) of the outstanding stock of any class of securities of a publicly traded entity that is engaged in a Competitive Business, provided such Person has no active participation in the business of such entity, (ii) performing any services for Buyer or the Company, (iii) granting any prizes or awards of cash, services or mentoring through a competitive process to successful applicants that operate in the fintech industry, or (iv) providing payment services.

(b)   **Non-Solicitation**. For the duration of the Restricted Period, the Seller shall not, and shall not cause or permit its Affiliates and representatives to, directly or indirectly, (i) solicit for employment or induce or attempt to induce or encourage any employee or independent consultant of the Company or Buyer or any of their respective Affiliates (such employees and independent consultants, the "**Restricted Persons**") to leave the employ of or consulting relationship with the Company or Buyer or any of their respective Affiliates, or in any way interfere with the relationship between the Company or Buyer or any of its Affiliates and any such Restricted Person, (ii) hire, employ or enter into a consulting relationship with any Restricted Person, including during the time such Restricted Person is such an employee or independent consultant for such entities, or for the twelve (12) months thereafter, or (iii) in any way interfere with the relationship between (including, without limitation, inducing such Person to cease doing registered crypto asset trading platform business in Canada with, or materially reducing such registered crypto asset trading platform business in Canada with, the Company or Buyer or any of their respective Affiliates or making any negative statements or communications about the Company or Buyer or any of their respective Affiliates) any Person that (A) is a customer, supplier, licensee or business relation of the Company or Buyer or any of its Affiliates at the date hereof, (B) was a customer of the Company or Buyer or any of it Affiliates at any time within 12 months prior to the date hereof, or (C) has been pursued as a prospective customer by or on behalf of the Company or Buyer or any of its Affiliates at any time within 12 months prior to the date hereof, and whom the Company or Buyer or any of their respective Affiliates has not determined to cease all such pursuit. Notwithstanding the foregoing, nothing in this Agreement shall prohibit the Seller or any other Person from making a general, public solicitation for employment, or using an employee recruiting or search firm to conduct a search, that does not specifically target employees or consultants of the Company or Buyer or any of their respective Affiliates or hiring any Restricted Person after such person has been terminated by the Company or Buyer or any of their respective Affiliates.

(c)     **Non-Disparagement**. From and after the Closing Date:

    (i)     the Seller shall not, and shall not cause or permit its Affiliates and representatives to, directly or indirectly, make or cause to be made any statement or communicate any information (whether oral or written) that disparages or harms the reputation of the Company or the Buyer or any of their respective Affiliates or Person who are former, present or future directors, officers, equity holders, executives or related Persons of the Company or Buyer or any of their respective Affiliates; and

    (ii)    the Buyer shall not, and shall not cause or permit its Affiliates (including the Company) and representatives to, directly or indirectly, make or cause to be made any statement or communicate any information (whether oral or written) that disparages or harms the reputation of the Seller or any of its Affiliates or Person who are former, present or future directors, officers, equity holders, executives or related Persons of the Seller or its Affiliates.

**6.10**   **Tax Matters**.

(a)     **Tax Elections**. The election under subsection 256(9) of the Tax Act shall not be made in respect of the Company's return of income under Part I of the Tax Act for its taxation year ending by virtue of the Closing unless requested by the Seller or consented to by the Seller.

(b)     **Books and Records; Cooperation**. The Buyer, on the one hand, and the Seller, on the other hand, shall, at the sole expense of the requesting Party provide the other Party with such assistance (including access to Tax Returns or other records) as may be reasonably requested in connection with the preparation, review or filing of any Tax Return or any audit or other examination by any Taxing Authority, or any other judicial or administrative proceeding or Claim, in each case, to the extent solely relating to Taxes or Tax Returns of the Company for Pre-Closing Tax Periods. Notwithstanding anything to the contrary in this Agreement, (i) this Section 6.10(b) shall not apply to any dispute or threatened dispute between the Parties and (ii) in no event shall the Buyer or any of its Affiliates be required to disclose or provide access or information relating to any consolidated, combined, affiliated, aggregate, unitary, group or similar Tax Return that includes the Buyer or any of its Affiliates (other than the Company).

(c)     **Taxes.**

    (i)     The Buyer shall cause the Company to duly and timely make or prepare all Tax Returns required to be made or prepared by it and to duly and timely file all Tax Returns required to be filed by it for any period that ends on or before the Closing Date and for which Tax Returns have not been filed as of such date.

    (ii)    The Buyer shall also cause the Company to duly and timely make or prepare all Tax Returns for any Pre-Closing Tax Period required to be filed by the Company after the Closing Date.

- 40 -

(iii) Tax Returns required to be prepared by the Buyer for any Pre-Closing Tax Period shall be submitted in draft form to the Seller at least 30 days before the date on which such Tax Returns are required by Law to be filed with the relevant Governmental Entity. The Seller shall, subject to Law, have the right to require the Buyer to make reasonable changes to any such Tax Return by communicating such changes in writing to the Buyer at least 15 days before the date on which such Tax Return is required by Law to be filed with the relevant Governmental Entity. The Buyer shall make, or cause to be made, such changes required by the Seller and file only such Tax Return on or before the date on which it is required by Law to be filed with the relevant Governmental Entity.

(iv) For purposes of this Agreement, in the case of any Taxes that are imposed and are payable for a Straddle Period, the portion of such Taxes attributable to the portion of such Tax period ending as of the Closing Date (i) in the case of any property or ad valorem Taxes, shall be deemed to be the amount of such Tax for the entire Tax period multiplied by a fraction the numerator of which is the number of days in the Tax period ending on the Closing Date and the denominator of which is the number of days in the entire Straddle Period, and (ii) in the case of all other Taxes, will be deemed equal to the amount which would be payable as computed on a closing of the books basis if the relevant Tax period ended on the Closing Date.

(v) The Buyer shall, and shall cause the Company to, inform the Seller of any written audit inquiries received with respect to the representations and warranties that relate to Tax matters and could give rise to a Claim against the Seller under this Agreement. The failure of the Buyer to give the Seller the notice required by this Section with respect to any Claim relating to Tax matters shall not relieve the Seller of its obligations with respect to such Claim except to the extent such failure actually and materially prejudices the Seller.

(vi) If, at any time, the Company receives an assessment, a reassessment, an indication in writing that an assessment or reassessment is being considered or proposed or any other notice in writing relating to an amount to which the representations and warranties relating to Tax matters may relate and that in turn could give rise to a Claim against the Seller under this Agreement (an "**Assessment**"), the Buyer shall cause the Company, as applicable, to deliver to the Seller within 30 days of receiving the Assessment, a copy of the Assessment on the assumption that the Assessment is valid and binding.

(vii) The Seller shall have the right, at its own expense and employing counsel of its own choice, to contest any Assessment. In such event, the Buyer shall have the right to retain its own counsel but the fees and expenses of such counsel shall be at the expense of the Buyer.

(viii) Except with the consent of the Seller, the Buyer shall not, and shall not permit the Company, to take any action or agree to any settlement with

respect to an Assessment that could give rise to a Claim against the Seller under this Agreement.

(ix)     The Seller and the Buyer shall, at the requesting party's expense (i) each provide the other with such assistance as may reasonably be requested by any of them in connection with the preparation of any Tax Return, the investigation and defense of any Tax audit or administrative or court proceeding relating to Tax Returns (a "**Tax Contest**"), or as may be reasonably requested with respect to the purchase of insurance or similar coverage for liabilities related to Taxes, and (ii) each retain and provide the other with any records or other information related to any Pre-Closing Tax Period which may be relevant to such Tax Return, Tax Contest, or insurance purchase for a period of six years after the Closing Date, or any longer period as may be required by any Law or Governmental Entity.

(d)     **Refunds**. If a refund of Taxes (to the extent not reflected on the Closing Date Financial Statements) is received by or credited to the account of the Company in respect of the Pre-Closing Tax Period (a "**Refund**"), the Purchase Price will be increased by an amount equal to the Refund (net of Taxes, costs or expenses incurred in connection with the Refund) and the Buyer will pay to the Seller such amount within 10 days of receipt of the Refund.

(e)     **Tax Disclosure**. If, at any time after the Closing Date, the Buyer or the Seller determines, or becomes aware that an "advisor" has determined, that the transactions contemplated by this Agreement are subject to the reporting nor notification requirements under the Tax Act (the "**Disclosure Requirements**"), the Buyer or the Seller, as the case may be, will promptly inform the other Party of its intent, or its advisor's intent, to comply with the Disclosure Requirements and the Parties will cooperate with respect to preparing and filing any applicable information returns and/or notifications.

**6.11    Disclosure of Personal Information.**

(a)     The Parties confirm that the Personal Information disclosed in connection with this Agreement (the "**Disclosed Personal Information**") is necessary for the purposes of determining if the Buyer shall proceed with the transactions contemplated by this Agreement.

(b)     The Buyer shall not collect, use or disclose the Disclosed Personal Information for any purposes other than those related to determining if it shall proceed with the transactions contemplated by this Agreement, the performance of this Agreement, or the consummation of the transactions contemplated by this Agreement.

(c)     The Buyer shall protect the confidentiality of all Disclosed Personal Information in a manner consistent with security safeguards appropriate to the sensitivity of the information.

(d)     If the transactions contemplated by this Agreement do not proceed, the Buyer shall return to the Company or, at the Seller's request, destroy in a secure manner, the

- 42 -

Disclosed Personal Information (and any copies) within a reasonable period of time.

(e)    Following the consummation of the transactions contemplated by this Agreement, the Parties shall not collect, use or disclose the Disclosed Personal Information for any purposes other than the carrying on of the business of the Company (with use or disclosure of the Disclosed Personal Information being restricted to those purposes for which the information was initially collected or for which additional consent was or is obtained) or as otherwise permitted or required by applicable Laws. The Parties shall protect the confidentiality of all Disclosed Personal Information in a manner consistent with security safeguards appropriate to the sensitivity of the information and shall give effect to any withdrawal of consent with respect to the Disclosed Personal Information.

**6.12    Exclusivity**.

From the date of this Agreement through the earlier of the Closing Date or the valid termination of this Agreement, the Seller shall not (and the Seller shall cause each of its respective Affiliates, including the Company, not to, and shall cause each of their respective representatives of the foregoing acting on any of their behalf not to), directly or indirectly: (a) solicit, initiate, facilitate, participate in or encourage the submission of, any proposal or offer from any Person (other than the Buyer and its Affiliates) relating to the acquisition (whether by merger, direct and indirect asset purchase and sale, transfer, offer, investment, restructuring, reorganization, consolidation or other business combination or otherwise) by any Person (other than the Buyer or Affiliates thereof) of, or issuance by the Company of, any Shares or Equity Securities of, the Company or any material portion of its consolidated assets or of the business of the Company, or any special dividend, recapitalization or similar transaction (any of the foregoing, an "**Alternative Transaction**"); or (b) participate in any discussions or negotiations regarding, furnish or make available any information with respect to or in connection with, or assist or participate in any other manner any effort or attempt by any Person (other than the Buyer and its Affiliates and representatives) to do any of the foregoing. The Seller shall, and shall cause its Affiliates and any of the respective representatives of the foregoing acting on any of their behalf to, immediately discontinue and terminate any and all existing discussions or negotiations with, or the provision of any non-public information to, any Person (other than with the Buyer, or the Buyer's Affiliates and representatives) with respect to, or that could reasonably be expected to lead to, an Alternative Transaction.

**6.13    Updates to Seller Disclosure Schedules** .

From time to time prior to the Closing Date, the Seller may, at its option and in its sole discretion, supplement or amend (including by adding a new qualification with respect to any representation or warranty that was not previously qualified by information disclosed in a Seller Disclosure Schedule) and deliver updates to the Seller Disclosure Schedules as a result of any new facts or new material information provided that such facts or material information must relate to facts or circumstances that arose entirely after the date hereof and provided further that such updates shall be permitted to be posted to the Data Room up to that date that is three Business Days prior to the Closing Date. Where any new or conflicting material information comes to the attention of Seller, it shall provide notice to the Buyer prior to or concurrently with any such update to the Seller Disclosure Schedules. The Buyer shall not be obligated to accept any such amendment or

supplement, and receipt by the Buyer of any such amendment or supplement shall not be deemed to be a waiver or release by the Buyer of any provision of this Agreement prior to Closing, including Section 5.1; provided that, if Closing occurs three Business Days or more after the receipt of a notice required by this Section 6.14, the Seller Disclosure Schedules, and any related representation or warranty, in question shall be deemed to be amended or supplemented, and qualified, as of the Closing Date for all purposes under this Agreement by any disclosure updates posted to the Data Room, and for which notice to the Buyer was provided, in accordance with the foregoing.

## ARTICLE 7
## CONDITIONS TO CONSUMMATION OF THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT

**7.1**    **Conditions to the Obligations of the Buyer**. The obligations of the Buyer to consummate the transactions contemplated by this Agreement are subject to the satisfaction or waiver by the Buyer of the following further conditions:

(a)    the representations and warranties of the Seller contained in Article 3 hereof shall be true and correct in all respects as of the Closing Date as though made on and as of the Closing Date, except (i) to the extent such representations and warranties are made on and as of a specified date (disregarding for such purposes any reference to "as of the date hereof" in the preamble paragraph of Article 3), in which case such representations and warranties shall be true and correct on and as of such specified date or time; or (ii) where the failures of such representation and warranty to be true and correct have not had and would not be reasonably likely to have a Company Material Adverse Effect;

(b)    the Seller shall have performed and complied in all material respects with all covenants required to be performed or complied with by the Seller under this Agreement prior to or on the Closing Date;

(c)    each of the consents, approvals, orders and authorizations of any Person set forth on Schedule 3.3 of the Seller Disclosure Schedule, including the non-objection of the applicable Securities Authorities to the Buyer's acquisition of control of the Company including approval from the CSA of the 11.10 Notice pursuant to Section 6.5(b), shall have been obtained on terms acceptable to the Buyer, acting reasonably;

(d)    no Company Material Adverse Effect shall have occurred during the period commencing on the date of this Agreement and ending on the Closing Date;

(e)    the Seller shall have delivered each of the deliverables set forth in Section 2.3(a);

(f)    the Company shall have delivered each of the deliverables set forth in Section 2.3(b);

(g)    all of the Seller's right, title and interest in the Lease Agreement shall have been assigned from the Seller to the Company and consent of the Landlord with respect to such assignment shall have been obtained by the Seller and the Company;

- 44 -

(h)    each of the Identity Solutions Agreement, Payment Services Provider Program Agreement, Direct Deposit Tracking Program Agreement, the Electronic Funds Transfer Payment Management Agreement and the Interac E-Transfer Services Agreement, each dated January 1, 2020 and between the Company and the Seller, shall have been amended on terms consistent with the amending agreements set forth in <u>Exhibit D</u> (collectively, the "**Amending Agreements**" and such agreements as amended, collectively, the "**Amended Services Agreements**");

(i)    no order, decree or ruling (including by temporary restraining order or preliminary or permanent injunction) issued by any court of competent jurisdiction or other Governmental Entity or other legal restraint or prohibition preventing or rendering unlawful the consummation of the transactions contemplated by this Agreement shall be in effect, and no Proceeding shall be pending wherein an unfavourable order, judgment, decision, determination, decree or ruling would prevent the performance of this Agreement or the consummation of the transactions contemplated by this Agreement, declare unlawful the transactions contemplated by this Agreement or cause such transactions contemplated by this Agreement to be rescinded.

**7.2**    **Conditions to the Obligations of the Seller**. The obligations of the Seller to consummate the transactions contemplated by this Agreement are subject to the satisfaction or waiver by the Seller of the following further conditions:

(a)    the representations and warranties of the Buyer contained in Article 4 hereof shall be true and correct in all respects as of the Closing Date as though made on and as of the Closing Date, except (i) to the extent such representations and warranties are made on and as of a specified date (disregarding for such purposes any reference to "as of the date hereof" in the preamble paragraph of Article 4), in which case such representations and warranties shall be true and correct on and as of such specified date or time; or (ii) where the failures of such representation and warranty to be true and correct would not reasonably be expected to prevent, materially delay or materially impair the ability of the Buyer to consummate the transactions contemplated hereby;

(b)    the Buyer shall have performed and complied in all material respects with all covenants required to be performed or complied with by it under this Agreement prior to or on the Closing Date;

(c)    each of the consents, approvals, orders and authorizations of any Person set forth on Schedule 3.3 of the Seller Disclosure Schedule, including the non-objection of the applicable Securities Authorities to the Buyer's acquisition of control of the Company, shall have been obtained on terms acceptable to the Seller, acting reasonably;

(d)    the Buyer shall have delivered each of the deliverables set forth in Section 2.3(c);

(e)    the Landlord shall have agreed in writing to release the Seller from, or the Buyer shall have agreed in writing to indemnify Seller from, all of its liabilities and

- 45 -

obligations under the Lease Agreement effective on or prior to the Closing Date; and

(f)     no order, decree or ruling (including by temporary restraining order or preliminary or permanent injunction) issued by any court of competent jurisdiction or other Governmental Entity or other legal restraint or prohibition preventing or rendering unlawful the consummation of the transactions contemplated by this Agreement shall be in effect.

## ARTICLE 8
## INDEMNIFICATION

**8.1**     **Indemnification by Seller**. Subject to the other terms and conditions of this Article 8, the Seller shall indemnify the Buyer and its shareholders, employees, directors, officers and representatives (the "**Buyer Indemnified Parties**") against, and shall hold the Buyer Indemnified Parties harmless from and against, any and all Losses incurred or sustained by, or imposed upon, the Buyer Indemnified Parties based upon, arising out of, with respect to or by reason of:

(a)     any inaccuracy in or breach of any of the representations or warranties of the Seller in this Agreement or any Transaction Document, or in any certificate delivered pursuant to this Agreement or any Transaction Document, other than the Seller Fundamental Representations;

(b)     any inaccuracy in or breach of any of the Seller Fundamental Representations;

(c)     any breach or non-fulfillment of any covenant, agreement or obligation to be performed by the Seller or the Company under this Agreement or the Transaction Documents; and

(d)     any Pre-Closing Taxes.

**8.2**     **Indemnification by Buyer**. Subject to the other terms and conditions of this Article 8, the Buyer shall indemnify the Seller and its shareholders, employees, directors, officers and representatives (the "**Seller Indemnified Parties**") against, and shall hold the Seller Indemnified Parties harmless from and against, any and all Losses incurred or sustained by, or imposed upon, the Seller Indemnified Parties based upon, arising out of, with respect to or by reason of:

(a)     any inaccuracy in or breach of any of the representations or warranties of the Buyer in this Agreement or any Transaction Document, or in any certificate delivered pursuant to this Agreement or any Transaction Document; and

(b)     any breach or non-fulfillment of any covenant, agreement or obligation to be performed by the Buyer under this Agreement or the Transaction Documents.

**8.3    Time Limitations.** All representations and warranties contained in this Agreement shall survive Closing and, notwithstanding Closing, shall survive Closing and continue in full force and effect for a period of twelve (12) months after Closing, except that:

> (i)    the Seller Fundamental Representations shall survive Closing and continue in full force and effect until the expiry of any applicable limitation period under applicable Law;

> (ii)    the representations and warranties set out in Section 3.15 shall survive until the date that is ninety (90) days following the expiration of all periods allowed for objecting to or appealing from the final determination of any proceedings relating to any assessment, reassessment or additional assessment by any Governmental Entity in respect of any period ending on or before Closing, taking into account any waivers given by the Company in respect of any taxation year; and

> (iii)    a Claim for any breach of any of the representations and warranties of the Seller or the Company in this Agreement involving Fraud shall survive Closing and continue in full force and effect without limitation of time.

> (b)    If a Claim for indemnification is made before the expiry of the applicable survival period, then the obligation to indemnify for the relevant Losses shall not be prejudiced or otherwise affected by the expiration of the applicable survival period.

**8.4    Limitation on Damages**. The indemnification obligations provided for in Sections 8.1 will be subject to the following limitations:

> (a)    Except with respect to any Fraud:

> > (i)    the Seller shall not be liable for any individual Loss of the Buyer Indemnified Parties pursuant to Section 8.1(a) unless such individual Loss for such breach exceeds $125,000 (the "**Minimum Threshold**"), it being understood that if a common or similar set of occurrences, events or sets of facts results in Losses, such Losses shall be aggregated for the purposes of determining if the Minimum Threshold has been satisfied;

> > (ii)    in no event shall the aggregate amount of all Losses for which the Seller may be liable pursuant to Section 8.1(a) exceed $1,250,000; and

> > (iii)    in no event shall the aggregate amount of all Losses for which the Seller may be liable pursuant to Section 8.1 exceed the Purchase Price.

> (b)    All indemnification payments to be made pursuant to any Claim shall be reduced by any net Tax benefit actually realized by the Buyer Indemnified Party in the year such indemnification payments are made pursuant to the Claim.

**8.5    Materiality**. For purposes of determining the quantum of any Losses arising from a breach of representation or warranty (and not, for greater certainty, for the purpose of determining whether or not any inaccuracy or breach of any representation or warranty has occurred),

each representation and warranty in this Agreement, or in any certificate, schedule, document or other writing delivered by the Seller or the Company pursuant to this Agreement will be read without regard and without giving effect to any qualifications in such representations and warranty referencing the terms "material", "materiality", "Company Material Adverse Effect" or other terms contained in such representation or warranty which has the effect of making such representation and warranty less likely to be breached (as if such word or words were deleted from such representation and warranty); provided however that in no event shall (A) "Material Contract" be read to mean "Contract" and (B) the term "Company Material Adverse Effect" be read out of Section 3.8(a).

8.6     **Third Party Claims.**. If the Buyer receives notice of the assertion or commencement of any action, Claim or other legal proceeding made or brought by any Person who is not a party to this Agreement or an Affiliate of a party to this Agreement or a representative of the foregoing (a "**Third-Party Claim**") with respect to which the Buyer reasonably believes may result in the Seller being obligated to provide indemnification under this Agreement, the Buyer shall give the Seller prompt written notice thereof. The failure to give such prompt written notice shall not, however, relieve the Seller of its indemnification obligations, except and only to the extent that the Seller is materially prejudiced by such failure. Such notice by the Buyer shall describe the Third-Party Claim in reasonable detail, shall include copies of all material written evidence thereof and shall indicate the estimated amount, if reasonably practicable, of the Loss that has been or may be sustained by the Buyer. The Seller shall be entitled, at its expense, to participate in, but not to control, determine or conduct, the defense of such Third-Party Claim. The Buyer shall have the right in its sole discretion to conduct the defense of, and to settle, any such claim and the Seller shall not be entitled to control any negotiation of settlement, adjustment or compromise with respect to any such Third Party Claim; provided, however, that except with the consent of the Seller (such consent not to be unreasonably withheld, conditioned or delayed), no settlement of any such Third-Party Claim with third party claimants shall be determinative of the amount of Losses relating to such matter; provided further, however, that the consent of the Seller with respect to any settlement of any such Third Party Claim shall be deemed to have been given unless the Seller shall have objected within twenty (20) days after a written request for such consent by the Buyer. In the event that the Seller has consented to any such settlement, adjustment or compromise, the Seller shall have no power or authority to object under any provision of this Article 8 to the amount of such settlement, adjustment or compromise.

8.7     **Exclusion of Other Remedies**. This Article 8 constitutes the sole and exclusive remedies of the parties from and after the Closing for recovery of Losses arising out of or relating to this Agreement and the transactions contemplated hereby, except (i) arising from Fraud, fraudulent misrepresentation, or wilful breach (ii) determination of the Purchase Price, and (iii) nothing herein shall restrict the ability of a party to seek non-monetary remedies, including, specific performance or injunctive relief, against any other party in respect of a breach of the covenants set forth in this Agreement.

8.8     **Duty to Mitigate**. Nothing in this Agreement in any way restricts or limits the general obligation at Law of a Party seeking indemnification (the "**Indemnified Party**") to mitigate any Losses (including Losses in an amount below the Minimum Threshold in the case of a Buyer Indemnified Party) which it may suffer or incur by reason of the breach by

- 48 -

the Seller, the Company, or the Buyer, as the case may be, of any representation, warranty, covenant or obligation under this Agreement.

**8.9**     **One Recovery.** Notwithstanding anything else in this Agreement, no Indemnified Party shall be entitled to double recovery for any Losses even though such Losses may have resulted from the breach of more than one of the representations, warranties, covenants and obligations of the Seller, the Company or the Buyer, as the case may be, in this Agreement.

**8.10**   **Tax Treatment of Indemnification Payments.** All indemnification payments made under this Agreement shall be treated by the parties as an adjustment to the Purchase Price for Tax purposes, unless otherwise required by Law.

**8.11**   **Limitations.**. The Seller shall have no obligation to indemnify any of the Buyer Indemnified Parties with respect to matters within the Buyer's Knowledge at the time of Closing.

## ARTICLE 9
## MISCELLANEOUS

**9.1**     **Release**. The Seller, on its own behalf and on behalf of its successors and assigns (individually, a "**Releasor**" and collectively, "**Releasors**") hereby unconditionally and irrevocably releases and forever discharges the Company and its successors and assigns and their respective directors, officers, employees, agents and shareholders (collectively referred to as the "**Releasees**") of and from, and hereby unconditionally and irrevocably waives, any and all manner of actions, causes of action, suits, proceedings, debts, dues, profits, expenses, Contracts, damages, Claims, demands and liabilities whatsoever, in contract or in tort, in Law or equity, which any such Releasors ever had, now has or may at any time in the future have against the Releasees, in each case of any nature (whether absolute or contingent, asserted or unasserted, known or unknown, suspected or unsuspected, primary or secondary, direct or indirect, and whether or not accrued) arising contemporaneously with or before the Closing Date, including any rights to indemnification or reimbursement of the Company whether pursuant to the Company's Governing Documents, Contract or otherwise and whether or not relating to Claims pending on, or asserted after, the Closing Date (collectively, the "**Released Claims**"). The Seller hereby unconditionally and irrevocably covenants and agrees to refrain from, directly or indirectly, asserting any Claim, or commencing or instituting or causing to be commenced any Claim of any kind against any Releasee, based upon any Released Claim and this Section 9.1 shall constitute a complete defense to any Released Claims.

**9.2**     **Entire Agreement; Assignment; Amendment**. This Agreement, together with all Annexes, Exhibits and Schedules hereto, as the same may from time to time be amended, modified, supplemented or restated in accordance with the terms hereof, (a) together with the Confidentiality Agreement, constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all other prior agreements and understandings, both written and oral, among the Parties with respect to the subject matter hereof and (b) shall not be assigned by any Party (whether by operation of law or otherwise) without the prior written consent of the Buyer and the Seller; provided, that the Buyer may, without obtaining the prior written consent of any other Party but upon the delivery of written notice to the Seller (i) collaterally assign its rights and benefits hereunder, in whole

- 49 -

or in part, to any lender providing financing to the Buyer and (ii) assign and delegate some or all of its rights, interests or obligations hereunder or under any Transaction Document to any Affiliate or Subsidiary of the Buyer, which assignment will not relieve the Buyer of any of its obligations under this Agreement or any other Transaction Documents. Any attempted assignment of this Agreement not in accordance with the terms of this Section 9.2 shall be void. This Agreement may be amended or modified only by a written agreement executed and delivered by duly authorized officers of the Buyer and the Seller. This Agreement may not be modified or amended except as provided in the immediately preceding sentence and any amendment by any Party or Parties effected in a manner which does not comply with this Section 9.2 shall be void.

9.3    **Notices**. All notices, requests, Claims, demands and other communications hereunder shall be in writing and shall be given by delivery (and shall be deemed to have been duly given upon receipt) in person, by e-mail, or by reputable overnight courier (postage prepaid) to the other Parties as follow:

To the Buyer:

FTX Canada Inc.
c/o FTX Digital Markets Ltd
27 Veridian Corporate Center
Western Road
Nassau, The Bahamas

Attention:                    Can Sun

E-mail:                       can@ftx.com

with a copy (which shall not constitute notice) to:

McCarthy Tétrault LLP
66 Wellington Street West
Suite 5300, TD Bank Tower Box 48
Toronto, Ontario M5K 1E6

Attention:                    Lori Stein
                              Robert Anton

E-mail:                       lstein@mccarthy.ca
                              ranton@mccarthy.ca


To the Seller:

c/o Digital Commerce Bank
736 Meridian Road NE
Calgary, Alberta T2A 2N7
Attention:                    Jeffrey J. Smith

- 50 -

E-mail:                          jeff@dcbank.ca

with a copy (which shall not constitute notice) to:

Osler, Hoskin & Harcourt LLP
Suite 2700, 225 – 6th Avenue SW
Calgary, Alberta T2P 1N2

Attention:                      Kelsey Armstrong

Email:                          kearmstrong@osler.com

or to such other address as the Party to whom notice is given may have previously furnished to the other Parties in writing in the manner set forth above.

**9.4**     **Governing Law**. This Agreement shall be governed by and construed in accordance with the Laws of the Province of Alberta and the federal Laws of Canada applicable therein, without giving effect to any choice of law or conflict of law provision or rule that would cause the application of the Law of any jurisdiction other than the Province of Alberta.

**9.5**     **Fees and Expenses**. Except as otherwise set forth in this Agreement (including, for the avoidance of doubt, the fees and expenses to be borne by the Buyer in accordance with Section 6.7), all fees and expenses incurred in connection with this Agreement and the transactions contemplated by this Agreement, including the fees and disbursements of counsel, financial advisors and accountants, shall be paid by the Party incurring such fees or expenses.

**9.6**     **Construction**. The headings contained in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement. No Party, nor its respective counsel, shall be deemed the drafter of this Agreement for purposes of construing the provisions hereof, and all provisions of this Agreement shall be construed according to their fair meaning and not strictly for or against any Party and no presumption or burden of proof will arise favoring or disfavoring any Person by virtue of its authorship of any provision of this Agreement.

**9.7**     **Annexes, Exhibits and Schedules**. All Annexes, Exhibits and Schedules, or documents expressly incorporated into this Agreement, are incorporated into this Agreement and are made a part hereof as if set out in full in this Agreement. Any item disclosed in any Schedule referenced by a particular Section in this Agreement shall be deemed to have been disclosed with respect to each other Section in this Agreement if the relevance of such disclosure to such other section is reasonably apparent from the face of such disclosure. The specification of any dollar amount in the representations or warranties contained in this Agreement or the inclusion of any specific item in any Schedule is not intended to imply that such amounts, or higher or lower amounts or the items so included or other items, are or are not material, and no Party shall use the fact of the setting of such amounts or the inclusion of any such item in any dispute or controversy as to whether any obligation, item or matter not described herein or included in a Schedule is or is not material for purposes of this Agreement. Any capitalized term used in any Annex, Exhibit or Schedule

but not otherwise defined therein shall have the meaning given to such term in this Agreement.

**9.8**     **Parties in Interest**. This Agreement shall be binding upon and inure solely to the benefit of each Party and its successors and permitted assigns and, except as provided in Section 6.7 and Section 9.16, nothing in this Agreement, express or implied, is intended to or shall confer upon any other Person any rights, benefits or remedies of any nature whatsoever under or by reason of this Agreement. Notwithstanding the foregoing, each present and former director and officer of the Company is an express third party beneficiary of Section 6.7 and each Non-Party Affiliate is an express third party beneficiary of Section 9.16; provided, that the Seller may amend, modify or waive any provision hereof on behalf of such individuals without their prior consent.

**9.9**     **Extension; Waiver**. The Seller may (a) extend the time for the performance of any of the obligations or other acts of the Buyer contained herein, (b) waive any inaccuracies in the representations and warranties of the Buyer contained herein or in any document, certificate or writing delivered by the Buyer pursuant hereto, or (c) waive compliance by the Buyer with any of the agreements contained herein. The Buyer may (i) extend the time for the performance of any of the obligations or other acts of the Seller contained herein, (ii) waive any inaccuracies in the representations and warranties of the Seller contained herein or in any document, certificate or writing delivered by the Company or the Seller pursuant hereto, or (iii) waive compliance by the Seller with any of the agreements contained herein. Any agreement on the part of any Party to any such extension or waiver shall be valid only if set forth in a written instrument signed on behalf of such Party. The failure of any Party to assert any of its rights hereunder shall not constitute a waiver of such rights.

**9.10**     **Severability**. Whenever possible, each provision of this Agreement will be interpreted in such a manner as to be effective and valid under applicable Law, but if any term or other provision of this Agreement is held to be invalid, illegal or unenforceable under applicable Law, all other provisions of this Agreement shall remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party hereto. Upon such determination that any term or other provision of this Agreement is invalid, illegal or unenforceable under applicable Law, the Parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

**9.11**     **Counterparts; Facsimile Signatures**. This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same agreement. Delivery of an executed counterpart of a signature page to this Agreement by electronic signature, facsimile or scanned pages shall be effective as delivery of a manually executed counterpart to this Agreement.

**9.12**     **Acknowledgments**.

(a)     Except representations and warranties expressly set forth in Article 3 (as qualified by the Seller Disclosure Schedule), the Transaction Documents, or any certificate

- 52 -

delivered pursuant to this Agreement or any Transaction Document, the Seller expressly disclaims any representations or warranties of any kind or nature, express or implied, as to the condition, value or quality of the businesses or assets of the Company and the Buyer has relied solely on its own examination and investigation thereof and the representations and warranties of the Seller made in Article 3, the Transaction Documents and any certificate delivered pursuant to this Agreement or any Transaction Document. Further, the Seller expressly disclaims any other representations or warranties of any kind or nature, legal or contractual, express or implied, notwithstanding the delivery or disclosure to the Buyer or its Affiliates or their respective officers, directors, employees, agents or representatives of any documentation or other information (including any financial projections or other supplemental data).

(b)     The Buyer acknowledges and agrees that it (i) has conducted its own independent review and analysis of, and, based thereon, has formed an independent judgment concerning, the business, assets, condition, operations and prospects of the Company, and (ii) has been furnished with or given access to all information about the Company and its businesses and operations as the Buyer and its Affiliates, representatives and advisors have requested. In entering into this Agreement, the Buyer has relied solely upon its own investigation and analysis and the representations and warranties of the Seller expressly set forth in this Agreement (as qualified by the Seller Disclosure Schedule), the Transaction Documents and any certificate delivered pursuant hereto or thereto, and the Buyer acknowledges that, other than as expressly set forth in Articles 3 of this Agreement (as qualified by the Seller Disclosure Schedule), in any other Transaction Document or any certificate delivered pursuant hereto or thereto, none of the Company, the Seller or any of their respective directors, officers, employees, Affiliates, shareholders, agents, representatives or any other person makes or has made any representation or warranty, either express or implied, including (A) as to the accuracy or completeness of any of the information provided or made available to the Buyer or any of its agents, representatives, lenders or Affiliates prior to the execution of this Agreement and (B) with respect to any projections, forecasts, estimates, plans or budgets of future revenues, expenses or expenditures, future results of operations (or any component thereof), future cash flows (or any component thereof) or future financial condition (or any component thereof) of the Company heretofore or hereafter delivered to or made available to the Buyer or any of its agents, representatives, lenders or Affiliates (whether orally, through certain "data rooms", in management presentations or otherwise). The Buyer acknowledges that the Furniture and Fixtures are being sold pursuant to this Agreement on an "as-is, where-is" basis without representation or warranty as to quality, fitness, merchantability or title.

(c)     Notwithstanding the foregoing in this Section 9.12, nothing herein shall limit the liability of any Party to any other Party for Fraud.

**9.13    WAIVER OF JURY TRIAL**. EACH PARTY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION, OR CAUSE OF ACTION (I) ARISING UNDER THIS

- 53 -

AGREEMENT OR (II) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES IN RESPECT OF THIS AGREEMENT OR ANY OF THE TRANSACTIONS RELATED HERETO, IN EACH CASE, WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER IN CONTRACT, TORT, EQUITY, OR OTHERWISE. EACH PARTY FURTHER AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION, OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY AND THAT THE PARTIES MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

9.14    **Jurisdiction and Venue**. Each of the Parties irrevocably and unconditionally (i) submits to the exclusive jurisdiction of the courts of the Province of Alberta sitting in Calgary, Alberta for the purposes of any suit, action or proceeding arising out of or relating to this Agreement, (ii) agrees that all Claims in respect of such action or proceeding may be heard and determined in any such court and (iii) agrees not to bring any action or proceeding arising out of or relating to this Agreement in any other court. Each of the Parties waives any defense of inconvenient forum to the maintenance of any action or proceeding so brought and waives any bond, surety or other security that might be required of any other Party with respect thereto. Each Party agrees that service of summons and complaint or any other process that might be served in any action or proceeding may be made on such Party by sending or delivering a copy of the process to the Party to be served at the address of the Party and in the manner provided for the giving of notices in Section 9.3. Nothing in this Section 9.14, however, shall affect the right of any Party to serve legal process in any other manner permitted by law. Each Party agrees that a final, non-appealable judgment in any action or proceeding so brought shall be conclusive and may be enforced by suit on the judgment or in any other manner provided by Law.

9.15    **Remedies**. The Parties acknowledge and agree that irreparable harm for which monetary damages, even if available, may not be an adequate remedy, would occur in the event that any Party does not fully and timely perform its obligations under or in connection with this Agreement (including failing to take such actions as are required of it hereunder to consummate the transactions contemplated by this Agreement and the Closing) in accordance with its terms. The Parties acknowledge and agree that (i) the other Parties shall be entitled to seek an injunction, specific performance, or other equitable relief to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof, without proof of damages and without posting a bond, prior to the valid termination of this Agreement, this being in addition to any other remedy to which such other Parties are entitled under this Agreement, and (ii) the right to obtain an injunction, specific performance, or other equitable relief is an integral part of the transactions contemplated by this Agreement and without that right, none of the Parties would have entered into this Agreement. Each Party agrees that it will not oppose the granting of an injunction, specific

- 54 -

performance and other equitable relief on the basis that the other Parties have an adequate remedy at Law.

**9.16**    **Waiver of Conflicts; Privilege**.

(a)    Each of the Parties acknowledges and agrees that Company Counsel has acted as counsel to the Company in connection with the negotiation of this Agreement and consummation of the transactions contemplated hereby.

(b)    The Buyer consents and agrees to, and following the Closing agrees to cause the Company to consent and agree to, Company Counsel representing the Seller after the Closing. The Buyer further consents and agrees to, and agrees to cause the Company following the Closing to consent and agree to, the communication by Company Counsel to the Seller in connection with any such representation of any fact known to Company Counsel arising by reason of Company Counsel's prior representation of the Company.

(c)    In connection with the foregoing, the Buyer irrevocably waives and agrees not to assert, and agrees to cause the Company following the Closing to irrevocably waive and not to assert, any conflict of interest arising from or in connection with (i) Company Counsel's prior representation of the Company and (ii) Company Counsel's representation of the Seller after the Closing.

(d)    The Buyer further agrees, on behalf of itself and, after the Closing, on behalf of the Company, that all communications that are solicitor-client privileged in any form or format whatsoever between or among any of Company Counsel, the Company, the Seller, or any of their respective directors, officers, employees or other representatives that relate in any way to the negotiation, documentation and consummation of the transactions contemplated by this Agreement or any dispute arising under this Agreement (collectively, the "**Privileged Deal Communications**") shall be deemed to be retained and owned collectively by the Seller, shall be controlled by the Seller and shall not pass to or be claimed by the Buyer or the Company and shall remain privileged after the Closing and the privilege and the expectation of client confidence relating thereto shall belong solely to the Seller, shall be controlled by the Seller and shall not pass to or be claimed by the Buyer or the Company.

(e)    Notwithstanding the foregoing, in the event that a dispute arises between the Buyer and/or the Company, on the one hand, and a third party other than the Seller, on the other hand, the Buyer or the Company may assert the solicitor-client privilege to prevent the disclosure of the Privileged Deal Communications to such third party; provided, however, that none of the Buyer or the Company may waive such privilege without the prior written consent of the Seller. In the event that the Buyer and/or the Company are legally required by governmental order or otherwise to access or obtain a copy of all or a portion of the Privileged Deal Communications, then to the extent permitted by applicable Law and advisable in the opinion of the Buyer's counsel, the Buyer shall notify the Seller in writing so that the Seller can seek a protective order (at the sole cost and expense of the Seller) and the Buyer agrees to use all commercially reasonable efforts to assist therewith.

- 55 -

(f)    The Buyer agrees that it will not, and that it will cause the Company following the Closing not to, access or use the Privileged Deal Communications, including by way of review of any electronic data, communications or other information, or by seeking to have the Seller waive the solicitor-client or other privilege, or by otherwise asserting that the Buyer and/or the Company have the right to waive the solicitor-client or other privilege. In furtherance of the foregoing, it shall not be a breach of any provision of this Agreement if prior to the Closing, the Company, the Seller, or any of their respective directors, officers, employees or other representatives takes any action to protect from access or remove from the premises of the Company (or any offsite back-up or other facilities) any Privileged Deal Communications, including by segregating, encrypting, copying, deleting, erasing, exporting or otherwise taking possession of any Privileged Deal Communications (any such action, a "**Permitted Removal**"). In the event that, notwithstanding any good faith attempts by the Seller, or any of its directors, officers, employees or other representatives to achieve a Permitted Removal of any Privileged Deal Communication, any copy, backup, image, or other form or version or electronic vestige of any portion of such Privileged Deal Communication remains accessible to or discoverable or retrievable by the Buyer (each, a "**Residual Communication**"), the Buyer agrees that it will not, and that it shall cause the Company, and their respective directors, officers, employees or other representatives not to, intentionally use or attempt to use any means to access, retrieve, restore, recreate, unarchive or otherwise gain access to or view any Residual Communication for any purpose.

9.17   **Non-Recourse**. All Claims or causes of action (whether in Contract or in tort, in Law or in equity) that may be based upon, arise out of or relate to this Agreement or the other Transaction Documents, or the negotiation, execution or performance of this Agreement or the other Transaction Documents (including any representation or warranty made in or in connection with this Agreement or the other Transaction Documents or as an inducement to enter into this Agreement or the other Transaction Documents), may be made only against the entities that are expressly identified as parties hereto and thereto. No Person who is not a named party to this Agreement or the other Transaction Documents, including any past, present or future Affiliate of the Seller or the Company or any of their respective directors, officers, employees, incorporators, members, managers, partners, shareholders, Affiliates, agents, attorneys or representatives ("**Non-Party Affiliates**"), shall have any liability (whether in Contract or in tort, in Law or in equity, or based upon any theory that seeks to impose liability of an entity party against its owners or Affiliates) for any obligations or liabilities arising under, in connection with or related to this Agreement or such other Transaction Document (as the case may be) or for any Claim based on, in respect of, or by reason of this Agreement or such other Transaction Document (as the case may be) or the negotiation or execution hereof or thereof; and each Party hereto waives and releases all such liabilities, Claims and obligations against any such Non-Party Affiliates.

9.18   **Parent Guarantee.**

(a)    Parent Guarantor shall cause the Buyer to perform all of its obligations under this Agreement and shall be liable jointly and severally with the Buyer to the Seller for the failure of the Buyer to discharge any of its obligations and for the fulfilment of

- 56 -

all of the representations, warranties and other obligations of the Buyer to the Seller under this Agreement or arising in connection with the transactions provided for in this Agreement.

(b)     Parent Guarantor is a corporation duly organized, validly existing and in good standing under the Laws of Antigua and Barbuda and has all requisite corporate power and authority to carry on its business as now being conducted, except where the failure to have such power or authority would not prevent or materially delay the consummation of the transactions contemplated hereby. Parent Guarantor has all necessary corporate power and authority to execute and deliver this Agreement and to perform its obligations set forth in this Agreement. The execution and delivery of this Agreement and the performance of its obligations contemplated hereby have been duly authorized by all necessary corporate action on the part of Parent Guarantor and no other proceeding (including by its shareholders if required on the part of Parent Guarantor) is necessary to authorize this Agreement or to perform its obligations contemplated hereby. This Agreement has been duly executed and delivered by Parent Guarantor and constitutes a valid, legal and binding obligation of Parent Guarantor (assuming that this Agreement has been duly and validly authorized, executed and delivered by the other parties hereto or thereto), enforceable against Parent Guarantor in accordance with its terms. Parent Guarantor has sufficient cash on hand or other sources of immediately available funds to enable it to guarantee all amounts payable by the Buyer under this Agreement.

*[Signature Page follows]*

**IN WITNESS WHEREOF**, each of the Parties has caused this Share Purchase Agreement to be duly executed on its behalf as of the date first written above.

<u>**BUYER:**</u>

**FTX CANADA INC.**

By: _Sam Bankman-Fried_ _____
        Name:  Sam Bankman-Fried
        Title:   CEO

<u>**PARENT GUARANTOR:**</u>

**FTX TRADING LTD.,**
solely in its capacity as the Parent Guarantor

By: _Sam Bankman-Fried_ _____
        Name:  Sam Bankman-Fried
        Title:   CEO

<u>**SELLER:**</u>

**PATENO PAYMENTS INC.**

By: _____
        Name:
        Title:

**IN WITNESS WHEREOF**, each of the Parties has caused this Share Purchase Agreement to be duly executed on its behalf as of the date first written above.

**BUYER:**

**FTX CANADA INC.**

By: _____
  Name:
  Title:

**PARENT GUARANTOR:**

**FTX TRADING LTD.,**
solely in its capacity as the Parent Guarantor

By: _____
  Name:
  Title:

**SELLER:**

**PATENO PAYMENTS INC.**

By: _____
  Name: JEFFREY J. SMITH
  Title: DIRECTOR

Pamela Draper
President & CEO

**EXHIBIT A**
**BILL OF SALE AND CONVEYANCE AGREEMENT**
(the "**Agreement**")

**THIS AGREEMENT** is dated _____, 2022 and made between:

**PATENO PAYMENTS INC.** (the **"Seller"**)

- and -

**FTX CANADA INC.** (the **"Buyer"**)

**WHEREAS** the Seller has agreed to sell, and the Buyer has agreed to purchase, the assets described in Schedule "A" hereto (collectively, the "**Purchased Assets**"), on the terms and conditions set forth in this Agreement.

**NOW THEREFORE** in consideration of the payment by the Buyer to the Seller of the sum of one hundred twenty-five thousand United States dollars ($125,000) and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by the parties, the parties hereto covenant and agree as follows:

1.    The Seller hereby sells, transfers, assigns, sets over and conveys to the Buyer all of the Seller's right, title and interest as of the date hereof in and to the Purchased Assets, and all rights, benefits and advantages whatsoever to be derived therefrom accruing from and after the date hereof to have and to hold the same unto the Buyer absolutely.

2.    The sale of the Purchased Assets to the Buyer is made on an "as is, where is" basis without representation or warranty as to quality, fitness, merchantability or title.

3.    The parties agree that they shall execute and deliver, at the reasonable request of the other, such further assurances as may be necessary to give full effect to the intent and meaning of this Agreement.

4.    This Agreement shall be interpreted in accordance with the laws of the Province of Alberta and the federal laws of Canada applicable therein.

5.    This Agreement shall be binding upon and enure to the benefit of each of the parties hereto and upon their respective successors and assigns.

6.    This Agreement may be executed in counterpart and that the executed counterparts shall together form this Agreement.  Any such executed counterpart may be delivered by facsimile transmission or by email in PDF and will be deemed to be an original document.

**IN WITNESS WHEREOF** the parties hereto have duly executed this Agreement effective as of the date first above written.

**PATENO PAYMENTS INC.**

Per: _____

    Name:

    Title:

**FTX CANADA INC.**

Per: _____

    Name:

    Title:

**SCHEDULE "A"**

**PURCHASED ASSETS**

| Description | | |
|---|---|---|
| *Ten Open Plan Workstations 410-6* | | |
| *Filing & Hi-Top Meeting Tables 410-6 & 410-7* | | |
| *Two Private Offices 410-4 & 410-5* | | |
| *Reception Waiting Area 410-1* | | |
| *Reception Workstation & Filing 410-1* | | |
| *Boardroom 410-2* | | |
| *Huddle Room 410-3* | | |
| *Freight, Delivery and Installation* | | |
| *DCB discount* | | |
| Tenant Improvements | | |
| Pateno TV ( Teams Meeting Room) | | |
| Pateno TV (Breakout Room) | | |
| Teams Meetings Gear/Conference Camera | | |
| Monitors (22) | | |
| Photocopier | | |
| Yealink Desk Phones (6) | | |
| Network Setups (Ubiquiti) | | |
| Office Set up Provectus Business Solutions | | |
| APC Smart UPS (battery backup) | | |
| **Total** | **USD** | **125,000** |

**EXHIBIT B**
**EMPLOYMENT AGREEMENT**

*(See attached)*

# BITVO INC.

[●], 2022

<u>Via Email: pamela_draper@yahoo.com</u>
Pamela Draper
402, 1730 – 5A Street SW
Calgary, AB  T2S 2E9

**Re: Offer of Employment**

Dear Pamela,

1.    **Offer and Conditions.**

(a)    As you know, FTX Canada Inc. ("**FTX Canada**") has or is expected to enter into a share purchase agreement with Pateno Payments Inc. ("**Pateno**") and FTX Trading Ltd. pursuant to which FTX Canada intends to acquire all of the issued and outstanding shares of Bitvo Inc. (the "**Company**").  In connection with this transaction ("**Transaction**"), the Company is pleased to extend to you this offer ("**Offer**") to join the Company, which is conditional upon and will be effective as of the closing of the Transaction ("**Closing**").  To the extent that the Closing does not occur for any reason, this Offer will be null and void and of no force or effect and you shall not commence employment with or have any employment rights or obligations in respect of the Company.

(b)    The material terms of the Offer are set forth in this letter agreement (this "**Agreement**").

(c)    The Offer and your employment with the Company shall be at all times subject to the following key terms and conditions ("**Key Terms**"). If you have not or are unable to continue compliance with these Key Terms , your employment with the Company may be immediately terminated, up to and including for just cause:

(i)    your being lawfully free and eligible to commence employment with the Company and having on commencement, and, where applicable, maintaining throughout your employment, a work permit, visa or other permission necessary to enable you to work for the Company;

(ii)    your obtaining (or obtaining shortly after your Start Date (as defined below)) and continuing to maintain all applicable licenses and registrations with regulatory bodies as the Company shall reasonably determine are required or necessary for your position; and

(iii)    your continued compliance with anti-corruption and anti-bribery laws that may be in force in any relevant jurisdiction, and any guidelines, regulations or rules related thereto and as amended from time to time.

2.      **Title and Duties.**

(a)     The Company will employ you in the position of Chief Executive Officer. You will report to the Board of Directors of the Company (the "**Board**") while performing such duties and responsibilities as may be assigned to you. The Board reserves the right to change your reporting line at any time and from time to time as it reasonably deems appropriate.

(b)     Subject to compliance with all applicable laws, the Company reserves the right and has the sole discretion to amend, modify, terminate or interpret any of its current policies, practices and benefits at any time, and thereby modify the terms and conditions of your employment at any time.

(c)     You may be requested to, and you agree to, work for subsidiaries or affiliates of the Company from time to time, as the Company may request. You acknowledge that the Company's subsidiaries or affiliates have offices around the globe and as a result, there will be significant travel required as part of your role. Although the Company may require you to perform duties for subsidiaries or affiliates of the Company in these or other locations and may require you to travel to other locations from time to time, you will at all times remain an employee of the Company and your compensation shall be paid by the Company. Any services you may provide to any of the Company's subsidiaries or affiliates are provided by you as an employee of the Company and your services for such Company's clients are provided on behalf of the Company.

(d)     You will perform all acts, duties and obligations and comply with such reasonable orders as may be designated by the Company and which are reasonably consistent with your job title.

(e)     You are required to devote your full time, attention and abilities to your job duties during working hours, and to act in the best interest of the Company at all times, in compliance with all applicable laws as well as all Company policies and legal requirements. During the course of your employment, you shall not, without the prior written consent of the Company, in any way directly or indirectly (i) be engaged or employed in, (ii) concerned with (in any capacity whatsoever), or (iii) provide services to, any other business or organization where it is, or is likely to be, in conflict with the interest of the Company or where it may adversely affect the effective or efficient discharge of your duties.

3.      **Start Date.** Your employment with the Company and this Agreement shall commence effective as of (and conditional upon) the Closing of the Transaction ("**Start Date**"). If you fail to commence your employment on this Start Date for failure to satisfy the Key Terms set forth in paragraph 1 of this Agreement, this Offer shall lapse immediately.  The Company will honor your employment commencement date with the Company, such date being February 19, 2018 (the "**Bitvo Start Date**") for purposes of Section 9(c)(ii) herein or as may be required for determining severance payments pursuant to the Alberta *Employment Standards Code*.

4.      **Compensation.**

(a)     ***Sign-on Bonus***: You shall receive a one-time sign-on bonus in the amount of USD 100,000 net, payable irrevocably in cash within ten (10) days of the Start Date.  This payment (and all other payments, grants, benefits and other forms of remuneration) is conditional upon the Closing of the Transaction.

(b)   ***Salary.*** As compensation for your services, you will receive an annual salary at a rate of USD 200,000 gross per annum, payable in accordance with the Company's regular payroll processes, but not less frequently than monthly, in arrears ("**Base Salary**").

(c)   ***Discretionary Bonus***. You will be eligible for consideration for a discretionary bonus, to be determined at the sole discretion of the Board. The performance objectives upon which any bonus assessment will be based, performance against those objectives and the cadence of any performance review and bonus payment (which is anticipated to be a six (6) month cycle currently), shall be determined by the Board at its sole discretion from time to time and are subject to change.  While the Board retains full discretion to amend the target and to determine whether and what bonus may be payable from time to time, it is currently anticipated that if one hundred percent (100%) of the target performance objectives set by the Board from time to time are met in a particular fiscal year, you will be eligible to receive a bonus payment equivalent to one hundred percent (100%) of your then current Base Salary (which may be divided into partial year payments at the Board's discretion).  Adjustments to that amount for achievement under or over performance from the 100% target, if any, shall be determined at the sole discretion of the Board.  Nothing herein shall be construed to obligate the Company to give you or otherwise guarantee a bonus for any year (or partial year).  Payment of a discretionary bonus in any given year (or partial year) does not entitle you to any such bonus in any subsequent year (or partial year). Any discretionary bonus will be deemed earned and paid to you on the same date such bonuses are paid to eligible employees generally, provided that if the Company terminates your employment without cause within two years of the Start Date, you will be entitled to a bonus payment in respect of the year in which your termination date occurs in an amount equal to 100% of your Base Salary for such year, pro-rated for the number of days in such year up to and including the Termination Date. The value of any such bonus shall be deemed to be inclusive of any statutory vacation pay required by applicable employment standards legislation.  Finally, bonus monies shall not be included in or added to any entitlements to notice of termination, pay in lieu of notice or severance pay unless (and only as) expressly required by the minimum requirements of applicable employment standards legislation.

(d)   ***Performance Incentive.***   You acknowledge and agree that one of the key performance objectives of your employment is the Company's successful licensure to trade derivatives in Canada (the "**Performance Objective**").  In the event that the Company meets the Performance Objective within the first 24 months of your employment following the Start Date, the Company will provide you with a one-time lump-sum performance incentive bonus in the amount of USD 1,000,000 (the "**Performance Incentive Bonus**"), pro-rated in the event that licensure is in less than one hundred percent (100%) of available Canadian provinces.  For clarity, if the Performance Objective is not met within the first 24 months of your employment following the Start Date or if your employment is terminated by the Company for cause or you voluntarily resign your employment with the Company prior to the Performance Objective being achieved, the Performance Incentive Bonus shall be forfeited in its entirety and you shall not be entitled to the same (or any partial payment or any form of compensation or damages in lieu of the same), unless (and only to the extent) expressly required by applicable employment standards legislation.  If the Company terminates your employment without cause in the first 24 months of your employment following the Start Date to prior to the Performance Objective

3

being achieved, you will be entitled to payment of the Performance Incentive Bonus in full, in addition to any other payments you may be entitled to under this Agreement.

(e)    *Option Grant*. In addition, you will eligible for the following awards:

    i.    Subject to board approval of FTX TRADING LTD ("**FTX**") and subject to the terms of the plan and award agreements, FTX will grant you options to purchase 10,000 shares of FTX common stock. The exercise price will be established by the board after review of the applicable valuation. The determination of the above award is based upon an estimated valuation, and FTX may adjust the above if such valuation differs from expected, provided that such adjustment does not negatively impact you.

    ii.    The options granted by FTX (the "**Option**") will be a non-incentive stock option subject to the terms and conditions of the applicable Plan and the stock option notice and agreement, but each Option is expected to include the following vesting schedule:

        (A)    One Quarter (1/4) of the Option will vest and become exercisable one (1) year after the Start Date (the "**Initial Vesting Date**"). For such purposes, the Start Date shall constitute the relevant Vesting Commencement Date for vesting purposes.

        (B)    Following the Initial Vesting Date, One Thirty Sixth (1/36th) of the remaining Option will vest and become exercisable at the end of each month after the Initial Vesting Date until all options have vested at the end of the Four (4) year vesting period.

    iii.    All the above are subject to the respective agreements and continuous active employment on the applicable vesting dates.

    iv.    YOU AGREE THAT THE OPTION IS HIGHLY SPECULATIVE AND MAY BE OF NO VALUE.

5.    **Benefits.**

(a)    *Benefit Plans.* You and your spouse, registered domestic partner and/or eligible dependents, if any, will be eligible to, and may, at your election, participate in the Company's employee benefit plans and medical insurance plans, subject to applicable terms, conditions, exclusions and limitations as set forth in the relevant documentation and policies governing such plans in place and as amended from time to time (together, "**Benefit Plans**"). The Company's Benefit Plans are subject to amendment, change or modification, including elimination, from to time, at the Company's sole discretion and without notice or compensation in lieu of the same to you. The Company bears the contributions to your health insurance.

(b)    *Annual Vacation.* Your annual vacation entitlement is twenty (20) days per calendar year (pro-rated for the remainder of the 2022 calendar year), to be taken at a time or times approved in advance by the Board, acting reasonably. In the event that you do not take all of the vacation to which you are entitled in any year, there will be no right of carry-over unless (and only as) expressly agreed to by the Board or as required by the minimum statutory requirements of

applicable employment standards legislation. All unused vacation which is not permitted to be carried forward and any vacation carry forward which is not used within the subsequent fiscal year will be paid out to you.

(c) **Sick Leave**. You must inform the Company as soon as possible if you will be or are absent from work by reason of sickness or injury. If you are absent for four or more consecutive working days, you must provide a medical certificate or other evidence reasonably acceptable to the Company. Sick pay will be paid in accordance with applicable laws or any daily sickness benefits insurance, if available.

6. **Expenses**.  You will be reimbursed for all reasonable travel, entertainment and other out-of-pocket business expenses actually and properly incurred by you in connection with your job duties and responsibilities hereunder.  For all expenses in respect of which you seek reimbursement, you shall provide the Company all necessary and requested information relating to such expense(s), including receipts.

7. **Deductions and Withholdings.**  All payments and benefits in kind rendered under this Agreement shall be understood as gross amounts, from which all applicable deductions and withholdings will be deducted before payout.

8. **Representations.**

(a) You warrant that (a) you have made full and complete disclosure to the Company of all material facts and documents relating to your employment (if any) with your existing or former employer, and (b) your employment with the Company does not violate or contradict any contractual restrictions, express or implied, with respect to any of your prior employees or any other obligation binding on you.

(b) You represent that you have not entered into, and hereby agree not to enter into, any agreement, whether written or oral, in conflict with your employment with the Company.

(c) You represent that you have not taken or otherwise misappropriated and you do not have in your possession or control any confidential or proprietary information belonging to any individuals or entities you provided services to, including any prior employers, or connected with or derived from your services provided to such individuals or entities. You represent that you have returned to all individuals or entities you provided services to, including prior employers, any and all such confidential or proprietary information. You further acknowledge that the Company has informed you that you are not to use or cause the use of such confidential or proprietary information in any manner whatsoever in connection with your employment by the Company. You agree that you will not use or disclose any confidential or proprietary information of your former employer or employers or that you obtained from a source other than the Company, or any materials or documents you obtained under obligations of confidentiality imposed by reason of any of your relationships, if any, unless such materials or documents are generally available to the public or you have authorization from such present or former employer or source for the possession and unrestricted use of such materials in connection with your employment by the Company.

(d)    You represent that you are not currently a party to any pending or threatened litigation with any former employer or business associate.

(e)    You shall indemnify, defend and hold harmless the Company and its or their respective directors, officers, principals and agents from any and all claims arising from any breach of the representations and warranties and covenants in this paragraph.

9.    **Termination.**

(a)    ***Termination Date***.    For all purposes under this Agreement, the last day of your active employment (which includes any period of working notice and statutory notice under applicable employment standards legislation, if applicable, but excludes any period of non-working notice that exceeds the statutory notice period) is the "**Termination Date**". All licences, access and other rights held by you as an employee of the Company will be terminated upon the Termination Date.

(b)    ***Termination by You on Notice.*** You may terminate your employment by giving three (3) months' notice of resignation in writing to the Board of FTX ("**Resignation Notice Period**"). The Company may elect, at its sole discretion, to waive part or all of this Resignation Notice Period, in which case the Termination Date is accelerated and all entitlements cease thereon (subject only to the provision of your minimum statutory entitlements, if any, pursuant to applicable employment standards legislation).  You acknowledge and agree that such a waiver does not constitute a termination of his Agreement and your employment by the Company.

(c)    ***Termination by the Company.***

i.    The Company may terminate this Agreement and your employment hereunder at any time for just cause if your conduct is such as to constitute just cause for summary dismissal.  In such case, you will be provided with only (i) your accrued entitlements up to the termination date and (ii) your minimum applicable statutory entitlements, if any, to notice (or pay in lieu thereof), severance pay, benefits continuance and otherwise under employment standards legislation.

ii.    The Company may terminate this Agreement and your employment hereunder at any time without cause by providing you with only (i) your accrued entitlements up to the termination date and (ii) a lump-sum severance payment in an amount equal to six (6) months of your Base Salary as at the Termination Date, plus an additional one (1) month of your Base Salary as at the Termination Date for each full year of employment from the Bitvo Start Date to the Termination Date, to a maximum of 24 months.

(d)    ***Reasonableness.***    All amounts and benefits described in paragraph 9 are intended to be inclusive of and fully satisfy your entitlements upon termination pursuant to applicable employment standards legislation.  At no time will you be provided with less than such minimum statutory entitlements, if any.  This Agreement does, however, intend to contract out of any common law amounts or benefits that are in excess of the minimum statutory requirements under applicable employment standards legislation.   You agree that the termination provision above is reasonable and constitutes full and adequate notice and/or

6

compensation to you with respect to the termination of your employment. You therefore understand and agree that upon termination of your employment in compliance with the above termination provision, you will have no right to claim further notice, pay in lieu of notice, damages, severance pay, reinstatement, benefits, or any other compensation from the Company, whether under contract, common law or otherwise.  Notwithstanding any changes in the terms and conditions of your employment which may occur in the future, including any change in position, duties or compensation, the termination entitlements described in paragraph 9 shall continue to be in effect for the duration of your employment unless otherwise agreed to in writing by the Company.

(e)     *Company Property*. Upon termination of your employment, you must immediately return to the Company, in accordance with its instructions, all equipment, correspondence, records, specifications, software, disks, models, notes, reports and other documents and any copies thereof and any other property belonging to the Company (including Company car, keys, credit cards, phone and other computer equipment, and office passes) which are in your possession or under your control. You must, if so required by the Company, confirm in writing that you have complied with your obligations under this paragraph.

(f)     *Post Termination Date*. Prior to accepting employment with any person, firm, corporation or other entity during your employment by the Company or any of its affiliates or any period thereafter that you are subject to any of the Protective Covenants (as defined in paragraph 12 below), you shall notify the prospective employer in writing of your obligations under such provisions.

10.    **Confidentiality**

(a)     You agree that, during and after the term of your employment with the Company and regardless of when such information was disclosed to you, you will hold in a fiduciary capacity for the benefit of the Company, and shall not, at any time, disclose to any person or entity, or use, except as necessary in connection with the performance of your duties and responsibilities for the Company, any non-public information pertaining to the Company or any client of the Company, their business, their affiliates, any person or entity directly or indirectly controlling the Company or any client of the Company or their current or prospective customers, clients, suppliers and/or business partners ("**Confidential Information**"), including, but not limited to: (i) information relating to trade secrets, ideas, inventions (whether patentable or not, and whether or not patent protection has been applied for or granted), patents, patent applications, improvement, developments, discoveries, logos, know how, processes, utility models, mask work rights, copyrights, trademarks (whether registered or unregistered), service marks and other proprietary rights; (ii) existing and proposed products, software, computer programs (including source codes and object codes), services or arrangements, prices, sales and marketing information/plans, designs, financing information, business plans, projections and forecasts, policies and strategies, contracts, mailing lists, techniques, operations methods, current and potential customers, clients, suppliers and business partners, revenues, costs and expenses, financial information and/or financial data and any other matters relating to the business of the Company or any client of the Company and their current or prospective customers, clients and business partners; and (iii) any information the disclosure of which may adversely affect the good name, reputation, image or goodwill of the Company, any client of the Company or their business.

(b)  If pursuant to applicable law, regulation or legal process, you are requested or required to disclose any Confidential Information, you will, subject to any requirement under such applicable law, regulation or legal process not to, provide the Company with prompt notice of such request(s) or requirement(s) to enable the Company to seek an appropriate protective order or other appropriate remedy and/or waive compliance with the provisions of this Agreement. If for any reason such protective order or other remedy is not obtained or the Company waives compliance with the provisions of this Agreement, you shall (i) furnish only that portion of the Confidential Information which is legally required to be furnished; and (ii) use your best efforts to obtain a protective order or other assurance, at the reasonable cost and expense of the Company which shall be approved by the Company in advance, that confidential treatment will be accorded such Confidential Information.

(c)  You shall not make, use or permit to be used any notes, memoranda, papers, drawings, specifications, programs, digital data or other materials of any nature relating to any matter within the scope of the business of the Company or any client of the Company or concerning any of their dealings or affairs otherwise than for the benefit of the Company or the clients of the Company. You acknowledge and agree that all of the foregoing shall be and remain the sole and exclusive property of the Company or the clients of the Company. Immediately upon the termination or cessation of your services to the Company or other business relationship with the Company, or at any time upon the Company's request, you shall deliver all of the foregoing, and all copies thereof to the Company and shall not retain any copies thereof (in any form or on any medium whatsoever, including without limitation, on any computer hard drive) and, upon request of the Company, you shall confirm in writing your compliance with the obligations pursuant to this sentence.

11.  **Intellectual Property Rights.**  It is a condition of this Agreement that you enter into and comply with the Employee Invention Assignment Agreement attached as Schedule "A" and incorporated by reference herein.

12.  **Protective Covenants.**

(a)  Subject to any written regulations issued or revised by the Company from time to time which may be applicable, you will at all times avoid putting yourself in any conflict of interest or what could reasonably be perceived to be a conflict of interest with the Company, and will at all times abide by the fiduciary obligations you owe to the Company.

(b)  You hereby agree that you shall not, during your employment with the Company and for twelve (12) months after the Termination Date, in any manner, directly or indirectly, for your benefit or for the benefit of any other person (including, without limitation, an individual or entity), or knowingly assist any other person to, engage in any activity directly or indirectly competing with the Company or any of its affiliates anywhere in Canada in the field of creating or operating a digital platform for the purchase, sale and payment of digital assets including payment, utility and asset tokens, leveraged tokens, structured financial products, as well as derivatives of the foregoing. In particular, you agree that you will not:

  i.  be partially or fully employed by, or independently render services or advise, a business that develops, produces, distributes or offers the same or similar products

8

and/or services as the Company or any of its affiliates or that advises on such products and/or services; and

ii.    directly or indirectly engage or invest in or establish any business whose products or activities compete in whole or in part with the products or activities of the Company or any of its affiliates; provided, however, that you may invest in or otherwise acquire up to (but not more than) 5% of the voting rights any publicly traded corporation or other publicly traded entity.

(c)    You hereby further agree that you shall not, directly or indirectly, for your benefit or for the benefit of any other person (including, without limitation, an individual or entity), or knowingly assist any other person to

i.    during your employment with the Company and for twelve (12) months after the Termination Date, in any manner, directly or indirectly,

(A)    Solicit (as hereinafter defined) the employment or services of any person who provided services to the Company or any of its affiliates, whether as an employee or as an independent contractor or consultant, and in each case performing services primarily to the Company or any of its affiliates within six (6) months prior to the Termination Date; or

(B)    Solicit any person who is an employee of the Company or any of its affiliates to resign from such entity, or

ii.    during your employment with the Company and for twelve (12) months after the Termination Date, Solicit (in connection with any business in competition with the Company) any limited partner, investor, person, firm, corporation or other entity that, at the Termination Date, you knew (or reasonably had reason to know) to be a customer, investor, business partner, client or employee of any such entity or Sponsored Fund, or prospective customer, investor, business partner or client, of the Company or Sponsored Fund, or attempt to interfere with or damage any relationship between the Company and their respective clients, investors, business partners, customers or employees.

For purposes of this Agreement, the term "**Solicit**" means any direct or indirect communication of any kind whatsoever that is directly or indirectly initiated by you, inviting, advising, encouraging or requesting any person or entity, in any manner, to cease doing business with or to negatively impact their business relationship with the Company, and "**Sponsored Fund**" means any investment fund, investment vehicle, managed account or other initiative (to be sponsored by the Company).

13.    **Equal Opportunity.** The Company is an equal opportunity employer and does not permit discrimination or harassment on any protected grounds. The Company will comply with its statutory obligations, if any, regarding the personal data of its employees.

14.    **Notices.** Written notices required pursuant to this Agreement are to be provided to the Chair of the Board of FTX. The Company may give written notices pursuant to this Agreement to you personally,

by leaving such written notice on your desk or by email to your company-assigned email address. Notices may also be given by either party by letter addressed to the party at (in the case of the Company) its registered office for the time being and (in your case) your last known address and any notice given by letter shall be deemed to have been given at the time at which the letter would be delivered in the ordinary course of post or, if delivered by hand, upon delivery, and upon service by post it shall be sufficient to prove that the letter was properly addressed and posted.

15. **Miscellaneous.**

(a) This Agreement and the Company's policies and procedures in their respective applicable version (as amended from time to time), contain the entire understanding of the parties in respect of the subject matter contained herein and therein. In executing this Agreement, you represent that you have not relied on any representation or statement not set forth herein, and you expressly disavow any reliance upon any such representations or statements.

(b) All rights, remedies and benefits expressly provided for in this Agreement are cumulative and are not exclusive of any rights, remedies or benefits provided for by law or in this Agreement, and the exercise of any remedy by a party hereto shall not be deemed an election to the exclusion of any other remedy (any such claim by the other party being hereby waived).

(c) The failure of a party to this Agreement to insist upon strict adherence to any term hereof on any occasion shall not be considered a waiver of such party's rights or deprive such party of the right thereafter to insist upon strict adherence to that term or any other term of this Agreement.

(d) This Agreement, and all of your rights and duties hereunder, shall not be assignable or delegable by you. Any purported assignment or delegation by you in violation of the foregoing shall be null and void ab initio and of no further force and effect. This Agreement may be assigned by the Company to any affiliate thereof or to a person or entity which is an affiliate or successor in interest to all or substantially all of the business operations or assets of the Company. Upon such assignment, the rights and obligations of the Company hereunder shall be become the rights and obligations of such affiliate person or entity.

(e) You shall provide reasonable cooperation in connection with any regulatory or legal action or proceeding (or any appeal from any action or proceeding) which relates to events occurring during your employment. Notwithstanding the generality of the foregoing, reasonable cooperation shall not require that you waive any applicable privilege or immunity. This provision shall survive any termination of this Agreement.

(f) In the event that you breach any provision of the Protective Covenants section (paragraph 12), the Company's obligation to make or provide payments or benefits under the Compensation or Benefits provisions will cease, except for compensation or benefits that the Company is required by law to pay to you. Furthermore, subject to applicable law, the Company will be entitled to an accounting and repayment of all profits, compensation, commissions, remunerations or benefits which you directly or indirectly have realized and/or may realize as a result of, growing out of or in connection with any such violation.

(g)  The various provisions and paragraphs of this Agreement are severable and if any provision or paragraph or identifiable part thereof is held to be invalid or unenforceable by any court of competent jurisdiction, then such invalidity or unenforceability will not affect the validity or enforceability of the remaining provisions, paragraphs or identifiable parts thereof in this Agreement.

(h)  If any of the Protective Covenants provisions (paragraph 12) is held to be unenforceable by reason of it extending for too great a period of time or over too great a geographic area or by reason of it being too extensive in any other respect, the parties agree (i) such provision shall be interpreted to extend only over the maximum period of time for which it may be enforceable and/or over the maximum geographic areas as to which it may be enforceable and/or over the maximum extent in all other respects as to which it may be enforceable, all as determined by the court making such determination and (ii) in its reduced form, such covenant shall then be enforceable, but such reduced form of covenant shall only apply with respect to the operation of such covenant in the particular jurisdiction in or for which such adjudication is made. Each of the covenants and agreements contained in the Protective Covenants paragraph (paragraph 12) is separate, distinct and severable. The unenforceability of any provision of the Protective Covenant paragraph (paragraph 12) shall not affect the validity or enforceability of any other Protective Covenant or any other provision of this Agreement. The temporal duration of the Protective Covenants shall not expire, and shall be tolled, during any period in which you are in violation of any of such covenants, and all such restrictions shall automatically be extended by the period of your violation of any such restrictions.

(i)  No terms of this Agreement are, or intended to be, enforceable by any person not being a party to it. The rights of the parties to terminate, rescind, or agree any amendment, waiver, variation or settlement under or relating to this Agreement, or any term of this Agreement, are not subject to the consent of any third party.

(j)  This Agreement and any non-contractual obligations arising from or connected with it shall be governed by and construed in accordance with the laws of the Province of Alberta and the laws of Canada applicable therein.

If you agree with the terms of this Agreement and accept this Offer, please sign and date this Agreement in the space provided below to indicate your acceptance. We look forward to you joining the Company team. This Agreement may be signed in counterparts, each of which shall be deemed an original, with the same effect as if the signatures thereto and hereto were upon the same instrument. This Agreement will become binding when one or more counterparts hereof, individually or taken together, will bear the signatures of all the parties reflected hereon as the signatories.

Sincerely,

BITVO INC.


By: _____
     Name:
     Title:

I acknowledge that I have read and understood and I hereby voluntarily accept employment with the Company on the terms and conditions set out in this Agreement. I confirm that no other promises or representations have been made to me other than the terms and conditions set out in this letter. I confirm that this letter replaces and supersedes any and all other written or verbal advertisements, promises, commitments or other representations with respect to my employment with the Company. I acknowledge that I have had a reasonable opportunity to obtain independent legal advice in respect of the terms and conditions set out in this Agreement.  Finally, I acknowledge and confirm that I have not been induced by the Company or its representatives to leave prior employment.

AGREED AND ACCEPTED AS OF June 14, 2022.

Signature:_____

Print Full Legal Name: _____

**SCHEDULE "A"**

**EMPLOYEE INVENTION ASSIGNMENT AGREEMENT**

In consideration of, and as a condition of my employment with Bitvo Inc. (the "***Company***"), I, as the *"**Employee**"* signing this Employee Invention Assignment Agreement (this "***Agreement***"), hereby represent to the Company, and the Company and I hereby agree as follows:

1. **Purpose of Agreement.** I understand that the Company and its affiliates, including but not limited to FTX Trading Ltd., an entity organized under the laws of Antigua and Barbuda ("***FTX***"), and its group companies, are engaged in a continuous program of research, development, production and/or marketing in connection with its current and projected business and that it is critical for the Company and its affiliates to preserve and protect its proprietary information, its rights in certain inventions and works and in related intellectual property rights. Accordingly, I am entering into this Agreement, whether or not I am expected to create inventions or other works of value for the Company. As used in this Agreement, "***Inventions***" means inventions, improvements, designs, original works of authorship, formulas, processes, compositions of matter, computer software programs, databases, mask works, confidential information and trade secrets.

2. **Disclosure of Inventions.** I will promptly disclose in confidence to the Company, or to any person designated by it, all Inventions that I make, create, conceive or first reduce to practice, either alone or jointly with others, during the period of my employment, whether or not in the course of my employment, and whether or not patentable, copyrightable or protectable as trade secrets.

3. **Assigned Inventions.** I acknowledge and agree that any copyrightable works prepared by me within the scope of my employment will be "works made in the course of employment" under the Copyright Act and that the Company will be the owner of such rights, title, and interests in and to the copyrightable works. I agree that all Inventions that I make, create, conceive or first reduce to practice during the period of my employment, whether or not in the course of my employment, and whether or not patentable, copyrightable or protectable as trade secrets, and that (i) are developed using equipment, supplies, facilities or trade secrets of the Company; (ii) result from work performed by me for the Company; or (iii) relate to the Company's business or actual or demonstrably anticipated research or development (the "***Assigned Inventions***"), will be the sole and exclusive property of the Company.

4. **Excluded Inventions and Other Inventions**. Attached hereto as Exhibit A is a list describing all existing Inventions, if any, that may relate to the Company's business or actual or demonstrably anticipated research or development and that were made by me or acquired by me prior to the Effective Date (as defined below), and which are not to be assigned to the Company ("***Excluded Inventions***"). If no such list is attached, I represent and agree that it is because I have no rights in any existing Inventions that may relate to the Company's business or actual or demonstrably anticipated research or development. For purposes of this Agreement, "***Other Inventions***" means Inventions in which I have or may have an interest, as of the Effective Date or thereafter, other than Assigned Inventions and Excluded Inventions. I acknowledge and agree that if, in the scope of my employment, I use any Excluded Inventions or any Other Inventions, or if I include any Excluded Inventions or Other Inventions in any product or service of the Company or if my rights in any Excluded Inventions or Other Inventions may block or interfere with, or may otherwise be required for, the exercise by the Company of any rights assigned to the Company under this Agreement, I will immediately so notify the Company in writing. Unless the Company and I agree otherwise in writing as to particular Excluded Inventions or Other Inventions, I hereby grant to the Company, in such circumstances

13

(whether or not I give the Company notice as required above), a perpetual, irrevocable, nonexclusive, transferable, world-wide, royalty-free license to use, disclose, make, sell, offer for sale, import, copy, distribute, modify and create works based on, perform, and display such Excluded Inventions and Other Inventions, and to sublicense third parties in one or more tiers of sublicensees with the same rights.

5.   **Exception to Assignment.**   I understand that the Assigned Inventions will not include, and the provisions of this Agreement requiring assignment of inventions to the Company do not apply to, any invention for which no equipment, supplies, facility or trade secret information of the Company was used and which was developed entirely on my own time, unless the invention (i) relates (A) directly to the business of the Company or (B) to the Company's actual or demonstrably anticipated research or development, or (ii) results from any work performed by me for the Company.

6.   **Assignment of Rights.**   I agree to assign, and do hereby irrevocably transfer and assign, to the Company:  (i) all of my rights, title and interests in and with respect to any Assigned Inventions; and (ii) all patents, patent applications, copyrights, mask works, rights in databases, trade secrets, and other intellectual property rights, worldwide, in any Assigned Inventions, along with any registrations of or applications to register such rights, such assignment effective upon the creation of each Assigned Invention.  I also hereby forever irrevocably and unconditionally waive and agree never to assert any Moral Rights I may have in or with respect to any Assigned Inventions and any Excluded Inventions or Other Inventions licensed to the Company under Section 5, even after termination of my employment with the Company, such waiver effective upon the creation of each Assigned Invention. "***Moral Rights***" means any rights to claim authorship of a work, to object to or prevent the modification or destruction of a work, to withdraw from circulation or control the publication or distribution of a work, and any similar right, regardless of whether or not such right is denominated or generally referred to as a "moral right."

7.   **Assistance.**  I will assist the Company in every proper way to obtain and enforce for the Company all patents, copyrights, mask work rights, trade secret rights and other legal protections for the Assigned Inventions, worldwide and to waive moral rights therein.  I will execute and deliver any documents that the Company may reasonably request from me in connection with providing such assistance.  My obligations under this section will continue beyond the termination of my employment with the Company; provided that the Company agrees to compensate me at a reasonable rate after such termination for time and expenses actually spent by me at the Company's request in providing such assistance. I hereby appoint the Secretary of the Company as my attorney-in-fact to execute documents on my behalf for this purpose.  I agree that this appointment is coupled with an interest and will not be revocable.

8.   **Physical Property.**  All documents, supplies, equipment and other physical property furnished to me by the Company or produced by me or others in connection with my employment will be and remain the sole property of the Company.  I will return to the Company all such items when requested by the Company, excepting only my personal copies of records relating to my employment or compensation and any personal property I bring with me to the Company and designate as such.  Even if the Company does not so request, I will upon termination of my employment return to the Company all Company property, and I will not take with me or retain any such items.

9.   **No Breach of Prior Agreements.**  I represent that my performance of all the terms of this Agreement and my duties as an employee of the Company will not breach any invention assignment, proprietary information, confidentiality, non-competition, or other agreement with any former employer or other party.  I represent that I will not bring with me to the Company or use in the performance of my duties

for the Company any documents or materials or intangibles of my own or of a former employer or third party that are not generally available for use by the public or have not been legally transferred to the Company.

10. **Company Opportunities; No Conflicting Activities.**  During the period of my employment, I will at all times devote my best efforts to the interests of the Company, and I will not, without the prior written consent of the Company, engage in, or encourage or assist others to engage in, any other employment or activity that: (i) would divert from the Company any business opportunity in which the Company can reasonably be expected to have an interest; (ii) would directly compete with, or involve preparation to compete with, the current or future business of the Company; or (iii) would otherwise conflict with the Company's interests or could cause a disruption of its operations or prospects.

11. **Use of Name & Likeness.**  I hereby authorize and grant to the Company my consent to use, reuse, and to grant others the right to use and reuse, my name, photograph, likeness (including caricature), voice, and biographical information, and any reproduction or simulation thereof, in any form of media or technology now known or hereafter developed, both during and after my employment, for any purposes related to the Company's business, such as marketing, advertising, credits, and presentations.

12. **Notification.**  I hereby authorize the Company, during and after the termination of my employment with the Company, to notify third parties, including, but not limited to, actual or potential customers or employers, of the terms of this Agreement and my responsibilities hereunder.

13. **Injunctive Relief.**  I understand that a breach or threatened breach of this Agreement by me may cause the Company to suffer irreparable harm and that the Company will therefore be entitled to injunctive relief to enforce this Agreement.

14. **Governing Law; Severability.**  This Agreement is intended to supplement, and not to supersede, any rights the Company may have in law or equity with respect to the duties of its employees and the protection of its trade secrets.  This Agreement shall be construed in accordance with and governed by the laws of Province of Alberta and the federal laws of Canada applicable therein.without giving effect to any principles of conflict of laws that would lead to the application of the laws of another jurisdiction.  If any provision of this Agreement is invalid, illegal or unenforceable in any respect, such provision will be enforced to the maximum extent possible, given the fundamental intentions of the parties when entering into this Agreement.  To the extent such provision cannot be so enforced, it will be stricken from this Agreement and the remainder of this Agreement will be enforced as if such invalid, illegal or unenforceable provision had never been contained in this Agreement.

15. **Counterparts.**  This Agreement may be executed in any number of counterparts, each of which when so executed and delivered will be deemed an original, and all of which together will constitute one and the same agreement.

16. **Entire Agreement.**  This Agreement and the documents referred to herein constitute the entire agreement and understanding of the parties with respect to the subject matter of this Agreement, and supersede all prior understandings and agreements, whether oral or written, between the parties hereto with respect to such subject matter.

17. **Amendment and Waiver.**  This Agreement may be amended only by a written agreement executed by each of the parties to this Agreement.  No amendment or waiver of, or modification of any obligation under, this Agreement will be enforceable unless specifically set forth in a writing signed by the party against which enforcement is sought.  A waiver by either party of any of the terms and

conditions of this Agreement in any instance will not be deemed or construed to be a waiver of such term or condition with respect to any other instance, whether prior, concurrent or subsequent.

18. **Successors and Assigns; Assignment.**    Except as otherwise provided in this Agreement, this Agreement, and the rights and obligations of the parties hereunder, will bind and benefit the parties and their respective successors, assigns, heirs, executors, administrators, and legal representatives. The Company may assign any of its rights and obligations under this Agreement.  I understand that I will not be entitled to assign or delegate this Agreement or any of my rights or obligations hereunder, whether voluntarily or by operation of law, except with the prior written consent of the Company.

19. **Further Assurances.**  The parties will execute such further documents and instruments and take such further actions as may be reasonably necessary to carry out the purposes and intent of this Agreement. Upon termination of my employment with the Company, I will execute and deliver a document or documents in a form reasonably requested by the Company confirming my agreement to comply with the post-employment obligations contained in this Agreement.

20. **Acknowledgement.**  I certify and acknowledge that I have carefully read all of the provisions of this Agreement and that I understand and will fully and faithfully comply with this Agreement.

21. **Effective Date of Agreement**.  This Agreement is and will be effective on and after the first day of my employment by the Company, which is [●], 2022 (the "***Effective Date***").

**Bitvo Inc.**                                                    **Employee:**

By:    _____        _____
                                                                          Signature

Name:  _____        _____
                                                                          Name (Please Print)

Title:     _____

16

CONFIDENTIAL

**Exhibit A**

**LIST OF EXCLUDED INVENTIONS UNDER SECTION 5**

| Title | Date | Identifying Number or Brief Description |
|-------|------|----------------------------------------|
|       |      |                                        |

_____ No inventions, improvements, or original works of authorship

_____ Additional sheets attached

Signature of Employee: _____

Print Name of Employee: _____

Date: _____

**EXHIBIT C**
**TRANSITION SERVICES AGREEMENT**

*(See attached)*

**TRANSITION SERVICES AGREEMENT**

by and among

**PATENO PAYMENTS INC.**

and

**BITVO INC.**

dated as of [●], 2022

**TRANSITION SERVICES AGREEMENT**

   This TRANSITION SERVICES AGREEMENT (this "<u>Agreement</u>") is entered into as of [●], 2022 (the "<u>Effective Date</u>"), by Pateno Payments Inc., an Alberta corporation ("<u>Provider</u>") and Bitvo Inc. ("<u>Recipient</u>").  Provider and Recipient are sometimes referred to herein individually as a "<u>Party</u>," and collectively as the "<u>Parties</u>."

W I T N E S S E T H :

   WHEREAS, FTX Canada Inc., an Alberta corporation ("<u>Purchaser</u>"), the Provider and the Recipient have entered into a Share Purchase Agreement, dated as of June 14, 2022 (as amended, modified or supplemented from time to time in accordance with its terms, the "<u>Share Purchase Agreement</u>"), pursuant to which Provider has agreed to sell to Purchaser, and Purchaser has agreed to purchase from Provider, the Shares (as defined in the Share Purchase Agreement); and

   WHEREAS, in furtherance of the transactions contemplated by the Share Purchase Agreement, Provider will provide certain transition services to Recipient in accordance with the terms and conditions set forth herein.

   NOW, THEREFORE, in consideration of the foregoing and the covenants and agreements set forth below and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the Parties agree as follows:

**ARTICLE I**

**DEFINITIONS**

   Section 1.01 <u>Definitions</u>.  Capitalized terms which are used but not defined herein shall have the meanings ascribed to such terms in the Share Purchase Agreement.  As used in this Agreement, capitalized terms which are defined herein shall have the meanings ascribed to them herein, including the following terms which shall have the meanings set forth in this <u>Section 1.01</u>:

   "<u>Abandon</u>" or "<u>Abandonment</u>" means the actual intentional or willful refusal by Provider to provide or perform any material element(s) of the Services in breach of its obligations under this Agreement.

   "<u>Confidential Information</u>" means all confidential or proprietary information and documentation of either Party made available to the other Party under this Agreement, including, without limitation, information that (i) is or becomes publicly available other than as a result of an unauthorized disclosure by the receiving Party or its Affiliates or representatives, (ii) is already in the receiving Party's lawful possession and is not subject to any confidentiality restrictions, but subject, to the extent applicable, to the confidentiality obligations set forth in the Share Purchase Agreement, or (iii) is or becomes available to the receiving Party on a non-confidential basis from a third party source that, to such receiving Party's knowledge after due

LEGAL_CAL:16254709.5

inquiry, is not prohibited from disclosing such information by a legal, contractual or fiduciary obligation.

"Personal Information" means all tangible and intangible information provided or accessed hereunder about present or former clients, customers, employees or other individuals, including name, address, telephone number, email address and any other type of information protected by Applicable Laws governing the collection, use and disclosure of information about individuals.

"Representative(s)" shall mean (a) with respect to Provider, Provider, its Affiliates and each of their respective officers, directors, employees, consultants, contractors and agents, in each case to the extent authorized by Provider to provide Services under this Agreement, and (b) with respect to Recipient, Recipient, its Affiliates and each of their respective officers, directors, employees, consultants, contractors and agents, in each case to the extent authorized to perform any obligations on behalf of Recipient pursuant to this Agreement.

"Third Party" means any Person other than Provider, Recipient or their respective Affiliates or Representatives.

## ARTICLE II

## SERVICES

Section 2.01    General.  Provider shall provide, or cause its Affiliates or their respective Representatives or permitted subcontractors to provide:

(a)      all activities, tasks, services, access to facilities, personnel, equipment, software and hardware and other assistance that were conducted, provided or performed for the Company and its business prior to Closing; and

(b)      any one-time or project services that are reasonably necessary to effect the transfer and transition thereof to Recipient or its Affiliates; provided that such one-time or project services shall be limited to 240 hours of Provider's personnel time during the Term,

(collectively, the "**Services**").

As of the Effective Date, the Services consist of those in Schedule A attached hereto (for clarity, such schedule may be amended or supplemented from time to time by agreement in writing executed by both Parties pursuant to the terms of this Agreement) (such schedule, as may be amended or supplemented, the "Transition Services Schedule").

Section 2.02    Information.  Unless otherwise mutually agreed by the Parties, the Transition Services Schedule and any amendments thereto shall set forth, at a minimum, the following information for each listed Service:

(a)      a general description of the Service to be provided;

(b)      the fees payable by Recipient for such Service; and

(c)      any other terms uniquely applicable to such Service.

Section 2.03   <u>Additional Services</u>.  To the extent it becomes apparent following Closing that any additional activity, task or service that is not then-currently contemplated in the Transition Services Schedule is reasonably required to operate the Company's business and consistent with past practice and falls within the scope of Services set out in Section 2.01(a) or (b) (including, for certainty, any excess hours required to perform a one-time or project service otherwise within the scope of Services set out in Section 2.01(b)) (each an "<u>Additional Service</u>") then, upon request from Recipient, Provider shall provide such Additional Service to Recipient and the Parties will work together in good faith to amend the Transition Service Schedule to document such Additional Service. Any Additional Services so requested by Recipient shall constitute Services under this Agreement and be subject in all respects to the provisions of this Agreement as if fully set forth on the Transition Services Schedule as of the date hereof.

Section 2.04   <u>Cooperation</u>. The Parties shall reasonably cooperate with and assist each other in connection with the Services, including in providing reasonable access to books and records relating to the Services.

Section 2.05   <u>Nature of Services</u>.  Provider shall provide, or procure the provision of, the Services in a professional and workmanlike manner, with a scope, level and quality, consistent with that provided to the Recipient in the twelve (12) months prior to the date of the Share Purchase Agreement.

Section 2.06   <u>Abandonment</u>.  Subject to Provider's rights to terminate the Services in accordance with Section 3.02(a), Provider shall not, during the Term, Abandon any of the Services for which it is responsible.

Section 2.07   <u>Use of Services</u>.  Provider shall not be required to provide the Services to any Person other than Recipient (or its Affiliates), and shall not be required to provide Services in connection with anything other than the operation of the business of the Recipient after the Effective Date.  Recipient shall not, and shall not permit its or any of its Affiliates' employees, agents or representatives to, resell any Services to any Third Party or permit the use of any Services by any Third Party.

Section 2.08   <u>Permits</u>. If Recipient or Provider receive notice of, or otherwise becomes aware of, any inquiry, investigation, examination, audit, proceeding or other action by or on behalf of any governmental entity relating to the Services, Recipient or Provider, as the case may be, shall promptly notify the other Party to this Agreement thereof, whereupon the Parties shall cooperate and act in a commercially reasonable manner to resolve such matter in a mutually satisfactory manner and shall act reasonably in light of the Parties' respective interests in the matter at issue.

## ARTICLE III

## TERM AND TERMINATION

Section 3.01   <u>Term</u>.  Subject to <u>Section 3.02</u>, Provider shall provide, and Recipient shall receive, the Services for the period of six (6) months from the Effective Date (such period, the

LEGAL_CAL:16254709.5

"Initial Service Term"), unless extended for an Extended Service Term as provided in this Section.  Upon termination, the Provider shall no longer be required to provide, and Recipient shall no longer be required to pay service fees in respect of, such Service.  Recipient shall have the option to extend the Initial Service Term for up to three (3) months (such extended term, an "Extended Service Term", and the Extended Service Term together with the Initial Service Term, the "Term"), by giving written notice to Provider no later than thirty (30) days prior to the expiration of the Initial Service Term.  Each Party agrees to use its commercially reasonable efforts to make a transition of each applicable Service to Recipient as promptly as reasonably practicable, but in no event later than the end of the Term.

Section 3.02    Termination.

(a)    Provider may terminate the Services if Recipient fails to pay any undisputed fees that are properly invoiced by Provider and if Recipient fails to cure such non-payment within fifteen (15) days after receiving written notice of the failure. Recipient may terminate the Services or this Agreement in its entirety if Provider commits a material breach of this Agreement and fails to cure such breach within fifteen (15) days after receiving written notice of the breach.  Recipient hereby acknowledges and agrees that any breach by any of its Representatives of any term or condition of this Agreement shall be deemed to be a breach by Recipient of such term or condition.  Provider hereby acknowledges and agrees that any breach by any of its Representatives of any term or condition of this Agreement shall be deemed to be a breach by Provider of such term or condition.

(b)    Upon termination or expiration of this Agreement or the expiration of the Services, each Party shall promptly return to the other Party all of the other Party's materials, property and confidential information. Each of Provider and Recipient shall promptly discontinue all use of the other's information technology systems.  For the avoidance of doubt, neither Party shall be required to return or destroy any information contained in archive or backup copies that are not readily available for, and are not used for, business use.

(c)    The provisions of this Section 3.02, Article IV (for amounts outstanding as of such termination or expiration), and Articles VI through XI, shall survive the termination or expiration of this Agreement.

## ARTICLE IV

## PAYMENT TERMS AND TAX MATTERS

Section 4.01    Charges for Services.  Recipient shall pay Provider the fees set forth on the Transition Services Schedule for the Services (which fees are exclusive of taxes) in Canadian dollars. If any Additional Services are added in accordance with Section 2.03, then such Additional Services shall be provided at a rate of $150.00 per hour of personnel time. All fees shall be invoiced monthly in advance commencing on the Effective Date and payable by Recipient, together with all applicable sales and similar taxes (including GST), within ten (10) days from receipt of the invoice therefor.  During the time any employees of Provider or any of its Affiliates are providing the Services under this Agreement, (x) such employees shall be under the direction, control, and supervision of, Provider or such Affiliate, as applicable, and shall not

be deemed to be employees of Recipient or its Affiliates for any purpose, and (y) Provider or such Affiliate, as applicable, shall be solely responsible for the payment and provision of all wages, bonuses and commissions, employee benefits, including severance and worker's compensation, and the withholding and payment of applicable taxes relating to such employment.

## ARTICLE V

## TRANSITION SERVICE RESPONSIBILITIES

Section 5.01    <u>Responsibilities of Provider</u>.

(a)    Provider will (a) provide Recipient with reasonable access to information and personnel of Provider to the extent reasonably necessary for the Services; and (b) provide reasonable technical assistance to Recipient personnel for purposes of transitioning the Services to the extent specified in the Transition Services Schedule.

(b)    During the Term, Provider agrees to designate and maintain an ongoing primary contact for each Service: (i) with whom Recipient may communicate about current issues, needs, and problem resolution; (ii) who has authority to make prompt technical decisions on Provider's part; (iii) who will be reasonably accessible to Recipient; and (iv) who will remain knowledgeable about Provider's policies and procedures in connection with the provision of the Services.  Such Provider contact is referred to herein as the Provider Business Relationship Manager ("<u>PBRM</u>").  The PBRM shall have regular meetings with the Recipient's personnel, in person or via teleconference, pursuant to a reasonable schedule agreed to by Recipient and PBRM, to discuss the performance of the Parties of their obligations under this Agreement.

(c)    Provider shall perform its obligations under this Agreement in a manner consistent with all Applicable Laws.

Section 5.02    <u>Responsibilities of Recipient</u>.

(a)    During the Term, Recipient agrees to provide Provider with reasonable information and documentation necessary for Provider to perform the Services.

(b)    Recipient shall comply with all Applicable Laws.

## ARTICLE VI

## INTELLECTUAL PROPERTY

Section 6.01    <u>Existing Ownership Rights Unaffected</u>.  Except as set forth in <u>Section 6.02</u>, nothing herein shall be construed to grant either Party any rights of ownership or use of copyrights, patents, trade secrets, trademarks or any other intellectual property or other proprietary rights owned by the other Party or its Affiliates.  Except as set forth in <u>Section 6.02</u>, no license, title, ownership, or other intellectual property or proprietary rights are transferred to Recipient or any Recipient Representative pursuant to this Agreement, and Provider retains all such rights, titles, ownership and other interests in all software, hardware, systems and resources

6

it uses to provide the Services, including any special programs, functionalities, interfaces, or other work product that Provider or its Representatives may develop at Recipient's request to provide the Services, unless otherwise agreed in writing by the Parties.  Recipient shall retain all of its right, title and interest in and to all of Recipient's software, hardware, systems and resources that Provider may use or access in the course of providing the Services hereunder, and, except as set forth in Section 6.02, nothing herein shall be construed to grant any ownership or other right or license in the foregoing to Provider.

Section 6.02    Licenses.  Each Party (the "Licensor"), for itself and on behalf of itself and its Affiliates, hereby grants to the other Party (the "Licensee") a non-exclusive, revocable, non-transferable (except as provided in Section 11.06), non-sublicensable, royalty-free, worldwide license to use any intellectual property of (and any and all improvements, modifications, enhancements or derivative works thereof) of the Licensor and its Affiliates in connection with this Agreement solely to the extent and for the duration necessary for the Licensee to provide or receive the applicable Service under this Agreement.

## ARTICLE VII
## SYSTEM ACCESS AND PRIVACY

Section 7.01    Privacy.  In providing the Services, Provider shall, and shall cause its Affiliates to, comply with Applicable Law and Provider's policy with respect to privacy or data security relative to Personal Information, and shall maintain an information security program in place at least as comprehensive as the information security program in place as of the date hereof.

Section 7.02    Protection and Incidents.  Provider shall take all appropriate administrative, technical and physical safeguards, in each case consistent with past practice, to protect its systems and any data (including Personal Information) of Recipient's in Provider's possession or control against accidental or unlawful destruction or accidental loss, alteration, unauthorized disclosure or access and against all other unlawful forms of processing.  Such measures shall provide a level of security appropriate to the risks represented by the processing and the nature of the data to be protected and consistent with Provider's past practice.  Provider shall give the Recipient notice as soon as reasonably practicable should it be aware of, or reasonably suspect, that any such destruction, loss, alteration, disclosure or access or processing of, or breach of security with respect to, such Recipient's data in Provider's possession or control have occurred and shall: (a) promptly take all steps reasonably necessary to remedy the event and prevent its reoccurrence; and (b) cooperate with Recipient in investigating and responding thereto, including notifying any affected individuals as required by Applicable Law.

## ARTICLE VIII

## CONFIDENTIALITY

Section 8.01    Confidentiality.  Each Party covenants that it will (a) consistent with past practice, accord the Confidential Information of the other Party the same degree of confidential treatment that it accords its similar proprietary and confidential information (and in no event less than a reasonable degree of care), (b) not use such Confidential Information for any purpose,

7

other than those stated in this Agreement, and (c) not disclose such Confidential Information to any Person, unless disclosure to such Person is reasonably necessary in connection with the provision or receipt of any Services and subject to a written confidentiality agreement containing protections comparable to those such Party would apply in connection with a comparable disclosure of its own Confidential Information, but in any event that includes protections no less restrictive than those set forth herein.  Notwithstanding any other provision of this Agreement, a Party may disclose Confidential Information of the other Party, without liability for such disclosure, to the extent the disclosing Party demonstrates that such disclosure is (x) required to be made pursuant to Applicable Law, government authority, duly authorized subpoena, or court order, (y) to be made to a court or other tribunal in connection with the enforcement of such Party's rights under this Agreement or to contest claims between the Parties, or (z) approved by the prior written consent of the other Party.  Each Party will promptly notify the other Party, if it receives a subpoena or otherwise becomes aware of events that may legally require it to disclose Confidential Information of the other Party, and will cooperate with the other Party (at the other Party's expense) to obtain an order quashing or otherwise modifying the scope of such subpoena or legal requirement, in an effort to prevent the disclosure of such Confidential Information.

Section 8.02    Unauthorized Acts.  Each Party shall (a) notify the other Party promptly of any unauthorized possession, use, or knowledge of any Confidential Information by any person which shall become known to it, any attempt by any person to gain possession of Confidential Information without authorization or any attempt to use or acquire knowledge of any Confidential Information without authorization (collectively, "Unauthorized Access"), (b) promptly furnish to the other Party full details of the Unauthorized Access and use reasonable efforts (at such other Party's expense) to assist the other Party in investigating or preventing the reoccurrence of any Unauthorized Access, (c) cooperate with the other Party (at such other Party's expense) in any litigation and investigation against third parties deemed necessary by such Party to protect its proprietary rights, and (d) use commercially reasonable efforts to prevent a recurrence of any such Unauthorized Access.

## ARTICLE IX

## INDEMNIFICATION; LIMITATION ON LIABILITY

Section 9.01    Indemnification.

(a)       Each Party agrees to indemnify, defend and hold harmless the other Party and its Affiliates and their respective directors, officers and employees for any Losses arising from, relating to or resulting from the indemnifying Party's fraud, gross negligence or willful misconduct related to this Agreement or indemnifying party's material breach of this Agreement.

(b)       Each Party shall also indemnify, defend and hold harmless the other for Losses arising from, relating to or resulting from any intellectual property infringement, violation or misappropriation relating to the other Party's use of the intellectual property, software, technology or equipment provided by such Party.

(c)       Recipient shall also indemnify, defend and hold harmless Provider and its Affiliates and their respective directors, officers and employees for any Losses arising from,

LEGAL_CAL:16254709.5

relating to or resulting from or in connection with the provision of the Services, regardless of the sole, joint or concurrent negligence, strict liability, breach of contract or other fault or responsibility of Provider or any other Person or party, except to the extent covered by Provider's indemnification obligations in Section 9.01(a) or (b) above.

(D)    Except as provided in this Section 9.01, Provider shall have no liability to Recipient or any of its Affiliates, and Recipient hereby waives and releases any right to recover from Provider and its Affiliates, under or with respect to this Agreement, or in any way relating to the Services, including for loss or damages sustained, personal injury, economic loss or liabilities incurred of any kind whatsoever relating thereto, regardless of the sole, joint or concurrent negligence, strict liability, breach of contract or other fault or responsibility of Provider or any other Person or party.

Section 9.02    Third Party Claims.  With respect to any third party claim which is subject to indemnification under Section 9.01 (a "Third Party Claim"), the indemnifying Party (the "Indemnifying Party"), shall defend, at its sole expense, the Third Party Claim, provided that the indemnified Party (the "Indemnified Party"), notifies the Indemnifying Party promptly in writing of any Third Party Claim against the Indemnified Party and gives the Indemnifying Party authority, information, and assistance, at the reasonable expense of the Indemnified Party, in defense of the matter. The Indemnified Party's failure or delay in providing such notice to Indemnifying Party under this Section 9.02 does not relieve Indemnifying Party of any liability that Indemnifying Party may have to Indemnified Party, except to the extent that the Indemnifying Party is materially prejudiced by such failure or delay. With respect to any Third Party Claim, the Indemnifying Party will have the right to direct the defense of any claim for which indemnification is sought hereunder; provided that the Indemnified Party may hire legal counsel (at its own cost) to participate in such defense. With respect to any Third Party Claim, no Indemnifying Party may enter into a settlement of any claim subject to Section 9.01 unless the Indemnified Party consents thereto (which consent shall not be unreasonably withheld, conditioned or delayed), or such settlement involves the payment of money damages only and contains a full and complete release of the Indemnified Party and does not include a statement as to or an admission of fault, culpability or a failure to act by or on behalf of the Indemnified Party. Should the Parties both be named as defendants in any Third Party Claim arising out of or relating to this Agreement, the Parties will cooperate with each other in the joint defense of their common interests to the extent permitted by Applicable Laws, and will enter into an agreement for joint defense of the action if the Parties mutually agree that the execution of the same would be beneficial.

Section 9.03    Limitations.

(a)    Except for claims, liabilities or losses arising as a result of: (i) a party's breach of its confidentiality, privacy or data security obligations hereunder; (ii) a party's indemnification obligations under Section 9.01(b); (iii) a party's gross negligence, willful misconduct, or fraud, to the maximum extent permitted by applicable law; or (iv) Provider's breach of Section 2.06 or other willful or intentional cessation of Services by Provider that is not permitted by this Agreement:

(1) neither party will be liable to the other for any lost profits, loss of data, loss of use, cost of cover, business interruption or other special, incidental, direct, indirect, exemplary, punitive or consequential damages, however caused, under any theory of liability, arising from the performance of, or relating to, this agreement regardless of whether such party has been notified of the possibility of, or the foreseeability of, such damages, and

(2) neither party's liability for damages hereunder shall exceed the greater of: (I) twice the amount of the fees paid (or payable) by recipient to provider hereunder in the twelve (12) months prior to the date of the applicable claim, and (II) seventy-five thousand dollars ($75,000).

## ARTICLE X

## FORCE MAJEURE

Section 10.01 <u>Force Majeure</u>. If performance by a Party of any terms or provisions hereof shall be delayed or prevented, in whole or in part, because of or related to any of the following circumstances or events beyond the reasonable control of such Party relying on such circumstance or event: an act of God, strike, lockout, stoppage, slowdown, other industrial disturbance (except with respect to such Party's own workforce), act of the public enemy, war, invasion, riot or other civil unrest, blockade, embargo, insurrection, public riot, shortage of adequate power, transportation facilities, disruption or outage of communications (including the internet or other networked equipment), landslide, lightning, fire, storm, flood, explosion, governmental action, governmental delay, restraint or inaction, and any other cause, whether of the kind specifically enumerated above or otherwise, which is beyond the reasonable control of Provider (each, a "<u>Force Majeure Event</u>"), then (a) the Party shall give written notice to the other Party, (b) the Parties shall promptly confer, in good faith, to agree upon equitable, reasonable action to minimize the impact, on both Parties, of such conditions, and (c) the affected Party shall be excused from its obligations to the extent limited by such Force Majeure Event hereunder during the period such Force Majeure Event continues, and no liability shall attach against it on account thereof.  The affected Party shall not be excused from performance if: (1) the delay or failure to comply with the terms or provisions hereof could have been prevented by reasonable foresight or precautions (including proper planning and execution of a business continuity plan or circumvented through the use of alternate sources, work-around plans or other means); or (2) it fails to use reasonable diligence to remedy the situation and remove the cause and effect of the Force Majeure Event and the erm for the affected Service shall automatically be extended by an additional period of time equal to the length of the interruption caused by such Force Majeure Event (to the extent not remedied by reasonable diligence).  Recipient shall be relieved of the obligation to pay any fees and other amounts for the provision of the Services obligations limited by such Force Majeure Event throughout the duration of such Force Majeure Event.

# ARTICLE XI

# MISCELLANEOUS

Section 11.01  <u>Notices</u>.  Any notice, request or other communication to be given hereunder shall be in writing and shall be delivered personally, sent by registered or certified mail, postage prepaid, by overnight courier with written confirmation of delivery or via email with certification of receipt.  Any such notice shall be deemed given when so delivered personally or emailed (and immediately after transmission confirmed by telephone), if mailed, on the date shown on the receipt therefor, or if sent by overnight courier, on the date shown on the written confirmation of delivery, or by electronic transmission.  Such notices shall be given to the following address or to such changed address as may have been fixed by notice hereunder; provided, however, that any notice of change of address shall be effective only upon receipt thereof.

to Provider:

      c/o Digital Commerce Bank
      736 Meridian Road NE
      Calgary, Alberta T2A 2N7
      Attention: Jeffrey J. Smith
      Email:  jeff@dcbank.ca

with a copy (which shall not constitute notice) to:

      Digital Commerce Bank
      736 Meridian Road NE
      Calgary, Alberta T2A 2N7
      Attention: Summer Bradko
      Email:  summer.bradko@dcbank.ca

to Recipient:
      Bitvo Inc.
      Suite 410, 500 – 4th Avenuw SW
      Calgary, Alberta T2P 2V6
      Attention: Pam Draper
      Email: pam@bitvo.com

with a copy (which shall not constitute notice) to:

      McCarthy Tétrault LLP
      66 Wellington Street West, Suite 5300, TD Bank Tower
      Toronto, ON M5K 1E6
      Attention: Lori Stein & Robert Anton
      E-mail: lstein@mccarthy.ca and ranton@mccarthy.ca

Section 11.02  Entire Agreement; .  This Agreement constitutes the entire agreement among the Parties with respect to the subject matter hereof and, except with respect to the Share Purchase Agreement and the Amended Services Agreements, supersedes all other prior agreements and understandings, both written and verbal, among the Parties with respect to the subject matter hereof. Nothing in this Agreement (including any breach hereof) shall affect any obligation of any Party under the Share Purchase Agreement or the Amended Services Agreements and any conflict between this Agreement and the Share Purchase Agreement or the Amended Services Agreements, as applicable, shall be resolved in favour of the Share Purchase Agreement.

Section 11.03  No Agency. Nothing in this Agreement shall constitute or be deemed to constitute a partnership or joint venture between the Parties or constitute or be deemed to constitute either Party the agent or employee of the other Party for any purpose whatsoever, and neither Party shall have authority or power to bind the other Party or to contract in the name of, or create a liability against, the other Party in any way or for any purpose.

Section 11.04  Amendment; Waiver.  Any provision of this Agreement may be amended or waived if such amendment or waiver is in writing and signed, in the case of an amendment, by each Party hereto (including, in the case of Provider, by Jeffrey J. Smith as authorized signatory of Provider) or, in the case of a waiver, by the Party against whom the waiver is to be effective (including, in the case of Provider, by Jeffrey J. Smith as authorized signatory of Provider). No failure or delay by any Person in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege.

Section 11.05  Waiver of Breach.  The waiver by a Party of a breach or violation by the other Party of any provision of this Agreement shall not operate or be construed as a waiver of any subsequent breach or violation by any Party of the same or any other provision of this Agreement.  No such waiver shall be effective unless in writing signed by the Party claimed to have made the waiver and delivered to the other Party.

Section 11.06  Benefits of Parties; Assignment.  This Agreement shall be binding upon and shall inure to the benefit of the Parties hereto and their respective legal representatives, successors and permitted assigns.  No Party hereto may assign to another Person any of its rights or obligations hereunder without the prior written consent of the other Party hereto.

Section 11.07  Exhibits, Schedules and Instruments.  The Parties agree that each Exhibit, Schedule or other instrument attached to, or delivered pursuant to, this Agreement is part of this Agreement as if fully set forth herein.

Section 11.08  Headings.  The headings of the sections and paragraphs of this Agreement are inserted for convenience of reference only and shall not constitute a part hereof.

Section 11.09  Governing Law.  This Agreement shall be deemed to be made under and be governed, construed and enforced pursuant to the laws of the Province of Alberta and the laws of Canada applicable therein. All actions, suits or proceedings arising out of or relating to this Agreement shall be heard and determined exclusively in the Court of Queen's Bench in the

LEGAL_CAL:16254709.5

Province of Alberta, Canada. Consistent with the preceding sentence, each of the Parties hereto hereby (a) irrevocably submits to the exclusive jurisdiction of the courts in the Province of Alberta for the purpose of any action, suit or proceeding arising out of or relating to this Agreement brought by any Party, (b) irrevocably waives, and agrees not to assert by way of motion, defense or otherwise, in any such action, suit or proceeding, any claim that it is not subject personally to the jurisdiction of the above-named courts, that its property is exempt or immune from attachment or execution, that the action, suit or proceeding is brought in an inconvenient forum, that the venue of the action, suit or proceeding is improper, or that this Agreement may not be enforced in or by any of the above-named courts and (c) irrevocably consent to and grant any such court exclusive jurisdiction over the person of such Parties and over the subject matter of such action, suit or proceeding and agree that mailing of process or other papers in connection with any such action, suit or proceeding in the manner provided in Section 11.01 or in such other manner as may be permitted by applicable Laws shall be valid and sufficient service thereof.

Section 11.10  Multiple Counterparts.  This Agreement may be executed in any number of counterparts and any Party hereto may execute any such counterpart by email, DocuSign or other means of electronic transmission, each of which when executed and delivered shall be deemed to be an original and all of which counterparts taken together shall constitute but one and the same instrument. This Agreement shall become binding when one or more counterparts taken together shall have been executed and delivered by all of the Parties hereto. It shall not be necessary in making proof of this Agreement or any counterpart hereof to produce or account for any of the other counterparts.

Section 11.11  Unenforceability or Invalidity.  The provisions of this Agreement shall be deemed severable and the invalidity or unenforceability of any provision shall not affect the validity or enforceability of the other provisions hereof. if any provision of this Agreement, or the application thereof to any person or any circumstance, is invalid or unenforceable, the remainder of this Agreement and the application of such provision to other persons or circumstances shall not be affected by such invalidity or unenforceability, nor shall such invalidity or unenforceability affect the validity or enforceability of such provision, or the application thereof, in any other jurisdiction.

Section 11.12  Third Parties.  This Agreement is solely for the benefit of (a) Provider and its successors and permitted assigns with respect to the obligations of Recipient under this Agreement and (b) Recipient and its Affiliates and their respective successors and permitted assigns with respect to the obligations of Provider under this Agreement, and this Agreement shall not be deemed to confer upon or give to any other third party any remedy, claim, liability, reimbursement, cause of action or other right.

Section 11.13  Interpretation.  Whenever the context requires, words used in the singular shall be construed to mean or include the plural and vice versa, and pronouns of any gender shall be deemed to include and designate the masculine, feminine or neuter gender.  The words "include," "includes" and "including" and words of similar import shall be deemed to be followed by the words "without limitation." The phrases "the date of this Agreement," "the date hereof" and terms of similar import, unless the context otherwise requires, shall be deemed to refer to the date set forth in the preamble of this Agreement.  Whenever the singular is used

13

herein, the same shall include the plural, and whenever the plural is used herein, the same shall include the singular, where appropriate.

Section 11.14  <u>Expenses</u>.  Except as otherwise expressly provided in this Agreement, whether or not the transactions contemplated by this Agreement are consummated, all direct and indirect costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby shall be borne by the Party incurring such expenses.

[*Signature Page Follows*]

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their respective officers as of the date first set forth above.

**PATENO PAYMENTS INC.**

By: _____
    Name:
    Title:

**BITVO INC.**

By: _____
    Name:
    Title:

**SCHEDULE A**

**TRANSITION SERVICES SCHEDULE**

| General Description of Services | |
| --- | --- |
| Accounting, Finance and Payroll Support | |
| Chief Compliance Officer Services | |
| Legal and Regulatory Services | |
| Operational and Trading Support | |
| IT Technology Support Services | |
| Technology Infrastructure Management and Support | |
| IT Development Support Services | |
| Customer Service Support and Management | |
| Call Center Services and Management | |
| Technology Hosting and Management | |
| Key Vendor Management and Support | |
| Fraud Services and Support | |
| Up to 240 hours for the Term with respect to one-time or project services in accordance with Section 2.01(b) | |
| **Total Fees** | CAD $15,000 per month |

LEGAL_CAL:16254709.5

**EXHIBIT D**
**AMENDING AGREEMENTS**

*(See attached)*

**FIRST AMENDING AGREEMENT TO THE DIRECT DEPOSIT TRACKING PROGRAM AGREEMENT**

**THIS FIRST AMENDING AGREEMENT** (this "**Amendment**") is made as of the ● of ●, 2022 ("**Effective Date**")

**BETWEEN:**

**BITVO INC.**, a company incorporated under the laws of the province of Alberta ("**Bitvo**")

- and -

**PATENO PAYMENTS INC.**, a company incorporated under the laws of the province of Alberta ("**Pateno**", and together with Bitvo, the ("**Parties**"))

WHEREAS:

A.  Bitvo and Pateno entered into a Direct Deposit Tracking Program Agreement dated January 1, 2020, (the "**Agreemen**t");

B.  Bitvo and Pateno have agreed to amend and supplement certain provisions of the Agreement as set forth below;

NOW THEREFORE for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by each of the Parties, the Parties agree as follows:

1.  Capitalized terms used and not defined in this Agreement have the meanings assigned to them in the Agreement.

2.  Recital B. of the Agreement is hereby deleted in its entirety and replaced with the following: "B. Pateno and the Merchant wish to enter into an agreement with respect to providing comprehensive payment services to the Merchant in Canada."

3.  Section 2.2 of the Agreement is hereby deleted in its entirety.

4.  Section 9. Exclusivity of the Agreement is hereby deleted in its entirety.

5.  Section 12.4.1.4 of the Agreement is hereby deleted in its entirety and replaced with the following: "12.4.1.4 if the Merchant provides Pateno with 10 days' written notice of early termination, the Term shall end on the expiry of such 10-day period; provided that the Merchant shall be liable for, and shall continue to pay to Pateno, the Monthly Minimum Fee set forth in Schedule "A" hereto monthly for a period ending January 1, 2027. This Section 12.4.1.4 shall survive the termination of the Agreement."

6.  Section 13 of the Agreement is hereby deleted in its entirety.

7.  The Parties agree to amend the Monthly Minimum Fee set forth in Schedule "A" Fee Schedule under the heading entitled 1. Fees Payable to Pateno in Respect of the Direct Deposit Tracking Program under the table headings *"Monthly Minimum Fee"*

by deleting:

| Monthly Minimum Fee | Waived |
|---|---|

and replacing with:

| Monthly Minimum Fee | $1,000 |
|---|---|

8.  The execution, delivery and performance of this Amendment shall not, except as expressly provided for herein, constitute a waiver or amendment of any default or breach or any provision of, or operate as a waiver or amendment of any right, power or remedy of Pateno under the Agreement or any other document.

9. This Amendment shall be binding upon and shall enure to the benefit of the Parties and their respective legal successors and permitted assigns.

10. This Amendment shall be governed by and construed in accordance with the laws of the Province of Alberta and the federal laws of Canada applicable therein.

11. This Amendment may be executed in two or more counterparts, each of which shall be deemed an original, but all which together shall constitute one and the same agreement. A signature provided by facsimile transmission or other electronic means shall be a valid signature for the purpose of this Amendment.

12. This Amendment will be deemed effective as of the Effective Date. Except as expressly provided in this Amendment, all of the terms and provisions of the Agreement are and will remain in full force and effect and are hereby ratified and confirmed by the Parties. On and after the Effective Date, each reference in the Agreement to "this Agreement," "the Agreement," "hereunder," "hereof," "herein," or words of like import, and each reference to the Agreement in any other agreements, documents, or instruments executed and delivered pursuant to, or in connection with, the Agreement will mean and be a reference to the Agreement as amended by this Amendment.

**IN WITNESS WHEREOF** the Parties have executed this Amendment as of the Effective Date.

**PATENO PAYMENTS INC.**                          **BITVO INC.**


Per: _____                Per: _____
Pamela Draper                                 Jeffrey J. Smith
President & CEO                                Director
                                              **\*I am authorized to bind the corporation.**

**FIRST AMENDING AGREEMENT TO THE ELECTRONIC FUNDS TRANSFER PAYMENT MANAGEMENT AGREEMENT**

**THIS FIRST AMENDING AGREEMENT** (this "**Amendment**") is made as of the ● day of ●, 2022 ("**Effective Date**")

**BETWEEN:**

**BITVO INC.**, a company incorporated under the laws of the province of Alberta ("**Bitvo**")

- and -

**PATENO PAYMENTS INC.**, a company incorporated under the laws of the province of Alberta ("**Pateno**", and together with Bitvo, the ("**Parties**"))

WHEREAS:

A. Bitvo and Pateno entered into an Electronic Funds Transfer Payment Management Agreement dated January 1, 2020, (the "**Agreement**");

B. Bitvo and Pateno have agreed to amend and supplement certain provisions of the Agreement as set forth below;

NOW THEREFORE for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by each of the Parties, the Parties agree as follows:

1. Capitalized terms used and not defined in this Agreement have the meanings assigned to them in the Agreement.
2. Section 2.9 of the Agreement is hereby deleted in its entirety.
3. Section 13. Exclusivity of the Agreement is hereby deleted in its entirety.
4. Section 14. Right of First Refusal is hereby deleted in its entirety.
5. Section 15.6 of the Agreement is hereby deleted in its entirety.
6. Section 17.4.1.5 of the Agreement is hereby deleted in its entirety and replaced with the following: "17.4.1.5 if the Merchant provides Pateno with 10 days' written notice of early termination, the Term shall end on the expiry of such 10-day period; provided that the Merchant shall be liable for, and shall continue to pay to Pateno, the Monthly Minimum Fee set forth in Schedule "A" hereto monthly for a period ending January 1, 2027."
7. Section 18 of the Agreement is hereby deleted in its entirety.
8. The execution, delivery and performance of this Amendment shall not, except as expressly provided for herein, constitute a waiver or amendment of any default or breach or any provision of, or operate as a waiver or amendment of any right, power or remedy of Pateno under the Agreement or any other document.
9. This Amendment shall be binding upon and shall enure to the benefit of the Parties and their respective legal successors and permitted assigns.
10. This Amendment shall be governed by and construed in accordance with the laws of the Province of Alberta and the federal laws of Canada applicable therein.
11. This Amendment may be executed in two or more counterparts, each of which shall be deemed an original, but all which together shall constitute one and the same agreement. A signature provided by facsimile transmission or other electronic means shall be a valid signature for the purpose of this Amendment.
12. This Amendment will be deemed effective as of the Effective Date. Except as expressly provided in this Amendment, all of the terms and provisions of the Agreement are and will remain in full force and effect and are hereby ratified and confirmed by the Parties. On and after the Effective Date, each reference in the Agreement to "this Agreement," "the Agreement," "hereunder," "hereof," "herein," or words of like import, and each reference to the Agreement in any other agreements, documents, or instruments

executed and delivered pursuant to, or in connection with, the Agreement will mean and be a reference to the Agreement as amended by this Amendment.

**IN WITNESS WHEREOF** the Parties have executed this
Amendment as of the Effective Date.

**PATENO PAYMENTS INC.**                          **BITVO INC.**


Per: _____      Per: _____
Pamela Draper                                     Jeffrey J. Smith
President & CEO                                    Director
                                                  **\*I am authorized to bind the corporation.**

**FIRST AMENDING AGREEMENT TO THE INTERAC E-TRANSFER SERVICES AGREEMENT**

**THIS FIRST AMENDING AGREEMENT** (this "**Amendment**") is made as of the ● day of ●, 2022 ("**Effective Date**")

**BETWEEN:**

**BITVO INC.**, a company incorporated under the laws of the province of Alberta ("**Bitvo**")

- and -

**PATENO PAYMENTS INC.**, a company incorporated under the laws of the province of Alberta ("**Pateno**", and together with Bitvo, the ("**Parties**"))

WHEREAS:

    A.   Bitvo and Pateno entered into a Interac e-Transfer Services Agreement dated January 1, 2020, (the "**Agreemen**t");

    B.   Bitvo and Pateno have agreed to amend and supplement certain provisions of the Agreement as set forth below;

NOW THEREFORE for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by each of the Parties, the Parties agree as follows:

1. Capitalized terms used and not defined in this Agreement have the meanings assigned to them in the Agreement.
2. Section 2.9 of the Agreement is hereby deleted in its entirety.
3. Section 12. Exclusivity of the Agreement is hereby deleted in its entirety.
4. Section 13. Right of First Refusal is hereby deleted in its entirety.
5. Section 14.6 is hereby deleted in its entirety.
6. Section 16.4.1.5 is hereby deleted in its entirety and replaced with the following:
   "16.4.1.5 if the Merchant provides Pateno with 10 days' written notice of early termination, the Term shall end on the expiry of such 10-day period; provided that the Merchant shall be liable for, and shall continue to pay to Pateno, the Monthly Minimum Fee set forth in Schedule "A" hereto monthly for a period ending January 1, 2027."
7. Section 17 is hereby deleted in its entirety.
8. The table set forth in Schedule "A" Fee Schedule under the heading entitled 1. Fees Payable to Pateno in Respect of the Interac e-Transfer Services is hereby amended inserting the following rows and footnotes to the existing table:

| Monthly Minimum Fee | $2,000 |
|---|---|

[1]The Monthly Minimum Fee applies to the transaction fees, such that the Client will pay to Pateno an amount equal to the greater of (a) the aggregate Bulk eTransfer – Regular, Bulk eTransfer – Priority, and Real-Time eTransfer (individual) fees and (b) the Monthly Minimum Fee, on a monthly basis.

9. The execution, delivery and performance of this Amendment shall not, except as expressly provided for herein, constitute a waiver or amendment of any default or breach or any provision of, or operate as a waiver or amendment of any right, power or remedy of Pateno under the Agreement or any other document.
10. This Amendment shall be binding upon and shall enure to the benefit of the Parties and their respective legal successors and permitted assigns.
11. This Amendment shall be governed by and construed in accordance with the laws of the Province of Alberta and the federal laws of Canada applicable therein.
12. This Amendment may be executed in two or more counterparts, each of which shall be deemed an original, but all which together shall constitute one and the same agreement. A signature provided by

facsimile transmission or other electronic means shall be a valid signature for the purpose of this Amendment.

13. This Amendment will be deemed effective as of the Effective Date. Except as expressly provided in this Amendment, all of the terms and provisions of the Agreement are and will remain in full force and effect and are hereby ratified and confirmed by the Parties. On and after the Effective Date, each reference in the Agreement to "this Agreement," "the Agreement," "hereunder," "hereof," "herein," or words of like import, and each reference to the Agreement in any other agreements, documents, or instruments executed and delivered pursuant to, or in connection with, the Agreement will mean and be a reference to the Agreement as amended by this Amendment.

**IN WITNESS WHEREOF** the Parties have executed this Amendment as of the Effective Date.

**PATENO PAYMENTS INC.**                     **BITVO INC.**

Per: _____         Per: _____
Pamela Draper                                Jeffrey J. Smith
President & CEO                              Director
                                            **\*I am authorized to bind the corporation.**

**FIRST AMENDING AGREEMENT TO THE IDENTITY SOLUTIONS AGREEMENT**

**THIS FIRST AMENDING AGREEMENT** (this "**Amendment**") is made as of the ● day of ●, 2022 ("**Effective Date**")

**BETWEEN:**

**BITVO INC.,** a company incorporated under the laws of the province of Alberta ("**Bitvo**")

- and -

**PATENO PAYMENTS INC.,** a company incorporated under the laws of the province of Alberta ("**Pateno**", and together with Bitvo, the ("**Parties**"))

WHEREAS:

A.   Bitvo and Pateno entered into an Identity Solutions Agreement dated January 1, 2020, (the "**Agreement**");

B.   Bitvo and Pateno have agreed to amend and supplement certain provisions of the Agreement as set forth below;

NOW THEREFORE for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by each of the Parties, the Parties agree as follows:

1.   Capitalized terms used and not defined in this Agreement have the meanings assigned to them in the Agreement.

2.   Section 6.6. Security Interest of the Agreement is hereby deleted in its entirety.

3.   Section 7.2 of the Agreement is hereby amended inserting the following to the existing Section:

"(d) In addition to the foregoing, the Client shall have the right to terminate this Agreement with 10 days' written notice of termination, in which case the Term shall end on the expiry of such 10-day period. If the Client provides Service Provider notice of early termination, the Client shall be liable for, and shall continue to pay to the Service Provider, the Monthly Minimum Fee set forth in Schedule "A" hereto monthly for a period ending January 1, 2027."

4.   Section 7.4. Termination Payment of the Agreement is hereby deleted in its entirety.

5.   Section 12.2. Exclusivity of the Agreement is hereby deleted in its entirety.

6.   Section 12.3. Right of First Refusal is hereby deleted in its entirety.

7.   Section 12.4. Consumer Price Index; Changes in Law is hereby deleted in its entirety and replaced with the following:

"**12.4 Changes in Law**
If the adoption of any Applicable Law, regulation, treaty or official directive (whether or not having the force of law) or any change therein or in the interpretation or application thereof by any court or by any governmental authority or any other entity charged with the interpretation or administration thereof or compliance by the Service Provider with any request or direction (whether or not having the force of law) of any such court authority or other entity in each case after the Effective Date:

(a)        subjects the Service Provider to, or causes the withdrawal or termination of a previously granted exemption with respect to, any taxes (other than taxes on the Service Provider's overall income or capital), or changes the basis of taxation of payments due to the Service Provider, or increases any existing taxes (other than taxes on the Service Provider's overall income or capital) on payments of principal, interest or other amounts payable by the Client to the Service Provider under this Agreement;

(b)        directly or indirectly affects the cost to the Service Provider of making available any Services (other than changes in taxes on the Service Provider's overall income or capital) or otherwise imposes on

the Service Provider any other condition or requirement affecting this Agreement or any obligation of the Service Provider hereunder;

and the result of (a) or (b) above, in the sole determination of the Service Provider acting in good faith, is:

a.      to increase the cost to the Service Provider of performing its obligations hereunder;

b.      to reduce any amount received or receivable by the Service Provider hereunder or its effective return hereunder; or

c.      to cause the Service Provider to make any payment with respect to or to forego any return on or calculated by reference to, any amount received or receivable by the Service Provider hereunder with respect to provision of the ID Verification Services,

the Service Provider shall determine that amount of money which shall compensate the Service Provider for such increase in cost, payments to be made or reduction in income or return or interest foregone (herein referred to as "Fee Adjustments"). Upon the Service Provider having determined that it is entitled to Fee Adjustments in accordance with the provisions of this Section, the Service Provider shall promptly so notify the Client. The Service Provider shall provide the Client with a photocopy of the relevant law, rule, guideline, regulation, treaty or official directive (or, if it is impracticable to provide a photocopy, a written summary of the same) and a certificate of a duly authorized officer of the Service Provider setting forth the Fee Adjustments and the basis of calculation therefor, which shall be conclusive evidence of such Fee Adjustments in the absence of manifest error. The Client shall pay to the Service Provider within 10 Business Days of the giving of such notice the Service Provider's Fee Adjustments. The Service Provider shall be entitled to be paid such Fee Adjustments from time to time to the extent that the provisions of this Section are then applicable notwithstanding that the Service Provider has previously been paid any Fee Adjustments.

The Service Provider agrees that it will not claim Fee Adjustments from the Client under this Section in respect of any period greater than three (3) months prior to the delivery of notice in respect thereof by the Service Provider, unless the adoption, change or other event or circumstance giving rise to the claim for Fee Adjustments is retroactive or is retroactive in effect.

8.  The table set forth in Schedule "A" Fee Schedule under the heading entitled 1. Fees Payable to Pateno in Respect of the Interac e-Transfer Services is hereby amended inserting the following rows and footnotes to the existing table:

| Monthly Minimum Fee | $1,250 |
|---|---|

[1]The Monthly Minimum Fee applies to the Transaction Fees, such that the Client will pay to Pateno an amount equal to the greater of (a) the aggregate Transaction Fees and (b) the Monthly Minimum Fee, on a monthly basis.

9.  The execution, delivery and performance of this Amendment shall not, except as expressly provided for herein, constitute a waiver or amendment of any default or breach or any provision of, or operate as a waiver or amendment of any right, power or remedy of Pateno under the Agreement or any other document.

10. This Amendment shall be binding upon and shall enure to the benefit of the Parties and their respective legal successors and permitted assigns.

11. This Amendment shall be governed by and construed in accordance with the laws of the Province of Alberta and the federal laws of Canada applicable therein.

12. This Amendment may be executed in two or more counterparts, each of which shall be deemed an original, but all which together shall constitute one and the same agreement. A signature provided by

facsimile transmission or other electronic means shall be a valid signature for the purpose of this Amendment.

13. This Amendment will be deemed effective as of the Effective Date. Except as expressly provided in this Amendment, all of the terms and provisions of the Agreement are and will remain in full force and effect and are hereby ratified and confirmed by the Parties. On and after the Effective Date, each reference in the Agreement to "this Agreement," "the Agreement," "hereunder," "hereof," "herein," or words of like import, and each reference to the Agreement in any other agreements, documents, or instruments executed and delivered pursuant to, or in connection with, the Agreement will mean and be a reference to the Agreement as amended by this Amendment.

**IN WITNESS WHEREOF** the Parties have executed this Amendment as of the Effective Date.

**PATENO PAYMENTS INC.**                          **BITVO INC.**


Per: _____     Per: _____
Pamela Draper                                                 Jeffrey J. Smith
President & CEO                                             Director
                                                                        **\*I am authorized to bind the corporation.**

**FIRST AMENDING AGREEMENT TO THE PAYMENT SERVICES PROVIDER AGREEMENT**

**THIS FIRST AMENDING AGREEMENT** (this "**Amendment**") is made as of the ⬤ day of ⬤, 2022 ("**Effective Date**")

**BETWEEN:**

**BITVO INC.**, a company incorporated under the laws of the province of Alberta ("**Bitvo**")

- and -

**PATENO PAYMENTS INC.**, a company incorporated under the laws of the province of Alberta ("**Pateno**", and together with Bitvo, the ("**Parties**"))

WHEREAS:

    A.   Bitvo and Pateno entered into a Payment Services Provider Agreement dated January 1, 2020, (the "**Agreemen**t");

    B.   Bitvo and Pateno have agreed to amend and supplement certain provisions of the Agreement as set forth below;

NOW THEREFORE for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by each of the Parties, the Parties agree as follows:

1. Capitalized terms used and not defined in this Agreement have the meanings assigned to them in the Agreement.
2. Section 2.9 of the Agreement is hereby deleted in its entirety.
3. Section 11. Right of First Refusal of the Agreement is hereby deleted in its entirety.
4. Section 12.6 of the Agreement is hereby deleted in its entirety.
5. Section 14.4.1.6 is hereby deleted in its entirety and replaced with the following:
   "14.4.1.6 if the Merchant provides Pateno with 10 days' written notice of early termination, the Term shall end on the expiry of such 10-day period; provided that the Merchant shall be liable for, and shall continue to pay to Pateno, the Wallet Fee and Monthly Minimum Fee set forth in Schedule "A" hereto monthly for a period ending January 1, 2027."
6. Section 15 of the Agreement is hereby deleted in its entirety.
7. The execution, delivery and performance of this Amendment shall not, except as expressly provided for herein, constitute a waiver or amendment of any default or breach or any provision of, or operate as a waiver or amendment of any right, power or remedy of Pateno under the Agreement or any other document.
8. This Amendment shall be binding upon and shall enure to the benefit of the Parties and their respective legal successors and permitted assigns.
9. This Amendment shall be governed by and construed in accordance with the laws of the Province of Alberta and the federal laws of Canada applicable therein.
10. This Amendment may be executed in two or more counterparts, each of which shall be deemed an original, but all which together shall constitute one and the same agreement. A signature provided by facsimile transmission or other electronic means shall be a valid signature for the purpose of this Amendment.
11. This Amendment will be deemed effective as of the Effective Date. Except as expressly provided in this Amendment, all of the terms and provisions of the Agreement are and will remain in full force and effect and are hereby ratified and confirmed by the Parties. On and after the Effective Date, each reference in the Agreement to "this Agreement," "the Agreement," "hereunder," "hereof," "herein," or words of like import, and each reference to the Agreement in any other agreements, documents, or instruments

executed and delivered pursuant to, or in connection with, the Agreement will mean and be a reference to the Agreement as amended by this Amendment.

**IN WITNESS WHEREOF** the Parties have executed this Amendment as of the Effective Date.

**PATENO PAYMENTS INC.**                          **BITVO INC.**


Per: _____          Per: _____
Pamela Draper                                    Jeffrey J. Smith
President & CEO                                   Director
                                                 **\*I am authorized to bind the corporation.**



●, 2022

Bitvo Inc.
500 4th Avenue SW, Suite 2500
Calgary, Alberta T2P 2V6

Attention: Jeffrey J. Smith, Director

RE: Bitvo Inc. ("**Bitvo**") Prepaid Card Program Agreement

Dear Jeffrey,

Pateno Payments Inc. ("**Pateno**") is pleased to provide the Services (as defined herein) to Bitvo on the terms and conditions set out below.

This Letter Agreement (the "**Letter Agreement**") comprises the entire agreement between Pateno and Bitvo (collectively, the "**Parties**" and each, a "**Party**"), and supersedes all prior or contemporaneous understandings, agreements, negotiations, representations and warranties, and communications, both written and oral.

Pateno agrees to provide card issuing and transaction processing services to Bitvo for Bitvo's prepaid card program (collectively, the "**Services**"), in consideration of the fees applicable to each respective Service as described in Schedule "A". The Client shall, and promises to pay to Pateno, all such fees and any applicable taxes on such fees (individually and collectively, the "**fees**").

This Letter Agreement may be terminated upon 30 days' written notice of termination to the other Party, and the Term shall end on the expiry of such 30-day period.

Please sign and provide a copy of this Letter Agreement to Pateno signifying your agreement to comply with the terms and conditions contained herein and pursuant hereto.

Should you have any questions or concerns, please contact the undersigned.

Yours truly,

**PATENO PAYMENTS INC.**


Per:    _____
            Pamela Draper
            President and CEO

**ACKNOWLEDGED AND AGREED TO BY BITVO** on _____, 2022.

**BITVO INC.**


Per:    _____
            Jeffrey J. Smith
            Director

**SCHEDULE "A"**

**FEE SCHEDULE**

**1. FEES PAYABLE TO PATENO IN RESPECT OF THE CARD ISSUING PROGRAM**

| Banking Feature | Fee |
|---|---|
| New Program Set Up | Waived |
| BIN Sponsorship Fee per Transaction | $0.04 per transaction |
| PIN Creation Fee | $0.04 per transaction |
| Card Creation Fee | $0.04 per card |
| Card on File Fee | $0.04 per card |
| Card Chargeback Fee | $20.00 each |
| Network Fee | Pass through |
| Transaction Processing Fee | $0.04 per transaction |
| Canada Post Loadhub | $3.25 per load/reload |
| Print on Demand Card Production | Pass through |

[1] Network fees as assessments passed through to Bitvo.
[2] Bitvo earns 100% of the interchange generated.
[3] These prices are inclusive of all applicable taxes and are in effect as at the time of this Letter Agreement.

**SCHEDULE 1.1**
**FURNITURE AND FIXTURES**

| Description | | |
|---|---|---|
| *Ten Open Plan Workstations 410-6* | | |
| *Filing & Hi-Top Meeting Tables 410-6 & 410-7* | | |
| *Two Private Offices 410-4 & 410-5* | | |
| *Reception Waiting Area 410-1* | | |
| *Reception Workstation & Filing 410-1* | | |
| *Boardroom 410-2* | | |
| *Huddle Room 410-3* | | |
| *Freight, Delivery and Installation* | | |
| *DCB discount* | | |
| Tenant Improvements | | |
| Pateno TV ( Teams Meeting Room) | | |
| Pateno TV (Breakout Room) | | |
| Teams Meetings Gear/Conference Camera | | |
| Monitors (22) | | |
| Photocopier | | |
| Yealink Desk Phones (6) | | |
| Network Setups (Ubiquiti) | | |
| Office Set up Provectus Business Solutions | | |
| APC Smart UPS (battery backup) | | |
| **Total** | **USD** | **125,000** |

**SCHEDULE 2.4(a)(ii)**
**CLOSING DATE INDEBTEDNESS**

| **Indebtedness** | |
| --- | --- |
| Intercompany Indebtedness | $[400,000] |
| **Total Indebtedness** | $[400,000] |

**SCHEDULE 2.5**
**EXCESS WORKING CAPITAL CALCULATION**

*(See attached)*

**Bitvo Inc**
Excess Working Capital
June 14 2022

**April 30 2022**

| Description | Form 31-103F1 | Clause 2.8 |
|---|---|---|
| **Total Current Assets** | 20,767,067 | 20,757,067 |
| | | |
| Less Non Liquid Assets | | |
| Prepaids | (142,253) | |
| Inventory - ATM | (91,046) | |
| Inventory - Cash Card | (20,398) | |
| **Adjusted Current Assets** | 20,513,370 | 20,757,067 |
| | | |
| **Current Liabilities** | 19,519,779 | 19,519,779 |
| | | |
| Add Related Party Debt | 91,046 | |
| **Adjusted Current Liabilities** | 19,610,825 | 19,519,779 |
| | | |
| **Net Working Capital** | 902,545 | 1,237,288 |
| | | |
| Less Minimum Capital | (50,000) | (50,000) |
| Less Market Risk | (644,213) | |
| Less Insurance Deductible | (100,000) | (100,000) |
| **Excess Working Capital** | 108,332 | 1,087,288 |

## Exhibit B

**Escrow Agreement**

## CASH ESCROW AGENCY AGREEMENT

**THIS AGREEMENT** is made as of the __14th__ day of June, 2022.

**BETWEEN:**

> **TSX TRUST COMPANY**, a company existing under the laws of Canada (the "**Escrow Agent**")
>
> - and -
>
> **FTX CANADA INC.**, a corporation incorporated under the laws of Alberta ("**Purchaser**")
>
> - and -
>
> **PATENO PAYMENTS INC.**, a corporation incorporated under the laws of Alberta (the "**Vendor**")

**WHEREAS** the Purchaser wishes to deposit $2,000,000 (the "**Escrow Amount**") with the Escrow Agent to be held by the Escrow Agent in accordance with the terms of this Agreement;

**AND WHEREAS** the Purchaser and the Vendor, among others, are parties to a share purchase agreement dated the date hereof (the "**Share Purchase Agreement**") providing for the purchase and sale of all of the shares in the capital of Bitvo Inc.;

**AND WHEREAS** the foregoing statements of fact and recitals are made by the parties hereto other than the Escrow Agent;

**AND WHEREAS** the Purchaser and the Vendor have requested the Escrow Agent to act as escrow agent and the Escrow Agent is willing to act as the escrow agent and to hold, administer and distribute the funds deposited with it in accordance with the terms of this Agreement,

**NOW THEREFORE** for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

### SECTION 1:
### INTERPRETATION

**1.1   Definitions**

The terms used herein shall have the following meanings:

(a)   "**Affiliate**" means affiliated companies within the meaning of the Business Corporations Act (Ontario);

(b)   "**Agreement**", "**this Agreement**", "**the Agreement**", and similar expressions mean this escrow agency agreement;

(c)   "**Authorized Investments**" means short term interest bearing or discount debt obligations issued or guaranteed by the Government of Canada or a Province or a

Canadian chartered bank or trust company (which may include an Affiliate or related party or restricted party of the Escrow Agent), provided that each such obligation is rated at least R1 (middle) by Dominion Bond Rating Service Limited or an equivalent rating by an equivalent rating service;

(d) "**Business Day**" means each day other than a Saturday, Sunday, a statutory holiday in Calgary, Alberta or any day on which the principal chartered banks located in Calgary, Alberta are not open for business during normal banking hours.

## 1.2   Sections and Headings

The division of the Agreement into sections and headings are for the convenience of reference only and shall not affect the interpretation or construction of the Agreement.

## 1.3   Interpretation

In this Agreement, words importing the singular shall include the plural and vice versa, and words importing gender shall include all genders.

**SECTION 2:**
**APPOINTMENT**

## 2.1   Appointment of Escrow Agent

The Purchaser and the Vendor hereby appoint the Escrow Agent to serve as escrow agent and the Escrow Agent hereby agrees to act as escrow agent in accordance with the terms of this Agreement.

**SECTION 3:**
**ESCROW PROVISIONS**

## 3.1   Delivery into Escrow

The Escrow Agent shall establish an account (the "**Escrow Account**") for the purpose of receiving the Escrow Amount. The Purchaser will deliver by wire transfer or other means acceptable to the Escrow Agent the Escrow Amount to the Escrow Account for deposit in escrow. The details of the Escrow Account are provided in Schedule "A" hereto.

The Escrow Agent shall have no liability or responsibility for any property until it is in fact received by the Escrow Agent.

## 3.2   Holding of Escrow Amount

The Escrow Amount, when delivered, will be held by the Escrow Agent in the name of the Purchaser and dealt with in accordance with the provisions of this Agreement.

The parties hereby agree that the Escrow Amount, when delivered, will be held by the Escrow Agent in the Escrow Account and dealt with in accordance with the provisions of this Agreement.

### 3.3    Cash Balances

(a)    Until such time as the Escrow Agent is in receipt of a joint direction from the Purchaser and Vendor to invest the Escrow Amount in Authorized Investments, the Escrow Agent may hold cash balances constituting part or all of the Escrow Amount in an interest bearing account, and may, but need not, invest the same in the deposit department of a Canadian chartered bank and its Affiliates, but the Escrow Agent, its Affiliates or the applicable Canadian chartered bank and its Affiliates shall not be liable to account for any profit to any parties to this Agreement or to any other person or entity other than at a rate, if any, established from time to time by the Escrow Agent, its Affiliates or the Canadian chartered bank and its Affiliates.

(b)    Any joint direction from the Purchaser and Vendor to the Escrow Agent shall be in writing and shall be provided to the Escrow Agent no later than 9:00 a.m. ET on the day on which the investment is to be made. Any such joint direction received by the Escrow Agent after 9:00 a.m. ET or received on a non-Business Day, shall be deemed to have been given prior to 9:00 a.m. ET the next Business Day. Any joint direction from the Purchaser and Vendor for the release of the Escrow Amount must be received prior to 11:00 a.m. ET on the day on which the release of Escrow Amount is to be made. Any such joint direction for the release of Escrow Amount received after 11:00 a.m. ET or on a non-Business Day, will be handled on a commercially reasonable efforts basis and may result in Escrow Amount being released on the next Business Day.

(c)    In the event that the Escrow Agent does not receive a joint direction or receives only a partial direction, the Escrow Agent shall continue to hold cash balances constituting part or all of the Escrow Amount in accordance with (a) above.

(d)    The Escrow Agent shall have no liability for any investment losses, including without limitation any market loss on any investment liquidated prior to maturity in order to make a payment required hereunder.

### 3.4    Release of Escrow Amount

(a)    The parties hereby direct the Escrow Agent to release the Escrow Amount in accordance with a joint written direction substantially in the form attached as Schedule "B" duly executed by each of the Purchaser and the Vendor directing the Escrow Agent to release the Escrow Amount as directed by the Purchaser and the Vendor in such written direction.

(b)    If the Escrow Amount is to be released by way of cheque, the Escrow Agent shall prepare and mail the cheque(s), made payable to the Purchaser or the Vendor, as applicable, representing the Escrow Amount released in compliance with the written joint direction from the Purchaser and the Vendor, within three (3) Business Days of receipt of any such joint direction. All cheques pursuant to this section are to be delivered by courier to the Purchaser or the Vendor, as applicable.

(c)    This Agreement shall terminate upon the distribution of all of the Escrow Amount in accordance with this Agreement.

## SECTION 4:
## REMUNERATION

**4.1    Remuneration**

The Purchaser and the Vendor, each as to an equal share, agree to pay the Escrow Agent's fees in advance, as agreed between the Escrow Agent, the Purchaser and the Vendor, for its services hereunder and the Purchaser and the Vendor, each as to an equal share,  shall pay or reimburse the Escrow Agent upon its request for all reasonable expenses, disbursements and advances incurred or made by the Escrow Agent in the administration of its duties hereunder (including, without limitation, legal fees and expenses and the reasonable compensation and disbursements of all other advisers, agents and assistants not regularly in its employ). The parties hereto agree that if any of the Escrow Agent's fees, expenses and disbursements are in arrears then the Escrow Agent has the right to withhold the release of any Escrow Amount until such fees, expenses and disbursements are paid in full. The parties hereto further agree that any residual fees or expenses incurred by the Escrow Agent after termination of the Agreement will be reimbursed by the Purchaser and the Vendor, each as to an equal share.

## SECTION 5:
## CANNABIS

**5.1    Cannabis Representations**

(a)    The Purchaser and the Vendor will only engage in marijuana-related activities in Canada only in accordance with the *Cannabis Act* (Canada) and all other applicable laws in Canada.

(b)    The Purchaser and the Vendor do not and will not invest or engage (directly or indirectly) in any business or activity that is focused on serving the non-medical marijuana market in Canada or internationally, including the United States unless and until such time as the production and sale of non-medical marijuana becomes legal under Canadian law and the applicable laws in the respective international jurisdiction.

(c)    The Purchaser and the Vendor do not and will not invest or engage (directly or indirectly) in any business or activity that is focused on serving the medical marijuana market in the United States unless and until such time as the production and sale of medical marijuana becomes legal under applicable state and federal laws in the United States.

(d)    The Purchaser and the Vendor do not and will not specifically target or derive (or reasonably expect to derive) revenues or funds from any of the prohibited activities described in (b) and (c), above, unless and until such time that any such activities become legal under all applicable laws in Canada, the United States and internationally, as applicable.

(e)    The Purchaser and the Vendor will provide the Escrow Agent with reasonable prior notice if either decides to engage in any of the activities described in (b), (c) or (d), above, and the Purchaser and the Vendor agree that the Escrow Agent may, in its sole discretion, immediately terminate any contract for services between the Purchaser, the Vendor and the Escrow Agent upon receipt of any information relating

to the Purchaser's or the Vendor's marijuana-related business activities, or as otherwise permitted under any such contract for service.

## SECTION 6:
## TAXES

### 6.1   Tax Obligations

The Purchaser and the Vendor each acknowledge that any and all payments required to be made by the Escrow Agent for or on behalf of the Purchaser under this Agreement will be made free and clear of, and without deduction or withholding for, or on account of, any present or future taxes. The payment of any taxes in connection with any payment made hereunder remain the sole responsibility of the Purchaser and Vendor, as applicable.

The Purchaser and the Vendor each agree to jointly and severally indemnify the Escrow Agent, its directors, officers, employees, Affiliates and agents in connection with services rendered under this Agreement from and against any present or future taxes (except for taxes based on the net income of the Escrow Agent), remittances, fees, duties, assessments or other similar governmental charges (including all interest and penalties thereon and additions thereto) of whatever nature imposed or levied by any government, governmental subdivision, agency or other taxing authority of or in any jurisdiction, including, without limitation, Canada or any province or political subdivision thereof or any authority or agency therein or thereof or any foreign authority having power to tax or sanction, provided such taxes, duties, assessments or charges are not imposed or levied as a result of actions taken by the Escrow Agent in respect of its own business, independent of matters relating to the Purchaser or the Vendor or either of their corporate assets maintained by the Escrow Agent under this Agreement.

## SECTION 7:
## RIGHTS AND DUTIES OF THE ESCROW AGENT

### 7.1   Rights and Duties of Escrow Agent

The Escrow Agent shall not be liable for any action taken or omitted by it, or any action suffered by it to be taken or omitted or for any error of judgment made by it in the performance of its duties under this Agreement excepting only direct loss caused by its own gross negligence, wilful misconduct or fraud. Notwithstanding any other provision of this Agreement, and whether such losses or damages are foreseeable or unforeseeable, the Escrow Agent shall not be liable under any circumstances whatsoever for any (a) breach by any other party of securities law or other rule of any securities regulatory authority, (b) lost profits or (c) special, indirect, incidental, consequential, exemplary, aggravated or punitive losses or damages. Notwithstanding the foregoing or any other provision of this Agreement, in no event shall the liability of the Escrow Agent under or in connection with this Agreement to any one or more parties exceed in aggregate the amount of the annual fee for acting as escrow agent hereunder.

### 7.2   Right Not to Act

The Escrow Agent shall retain the right not to act and shall not be liable for refusing to act if, it is due to a lack of information or instructions or the Escrow Agent, in its sole judgment, acting reasonably, determines that such act is conflicting with or contrary to the terms of this Agreement or the law or regulation of any jurisdiction or any order or directive of any court, governmental agency or other regulatory body.

### 7.3    Retain Experts, Counsel and Advisors

The Escrow Agent may appoint such agents and employ or retain such counsel, accountants, engineers, appraisers or other experts or advisers as it may reasonably require for the purpose of discharging its duties and determining its duties, obligations and rights hereunder and may pay reasonable remuneration for all services performed by any of them, without taxation of costs of any counsel, and shall not be responsible for any misconduct on the part of any of them. The Purchaser and the Vendor shall jointly and severally pay or reimburse the Escrow Agent for any reasonable fees, expenses and disbursements of such counsel, accountants, engineers, appraisers or other experts or advisers.

### 7.4    Reliance on Experts

The Escrow Agent may act and rely and shall be protected in acting and relying in good faith on the opinion or advice of or information obtained from any agent, counsel, accountant, engineer, appraiser or other expert or adviser, retained or employed by the Purchaser, the Vendor or the Escrow Agent, in relation to any matter arising in the performance of its duties under this Agreement.

### 7.5    Express Duties

The Escrow Agent shall have no duties or responsibilities except as expressly provided in this Agreement and shall have no liability or responsibility arising under any other agreement, including any agreement referred to in this Agreement, to which the Escrow Agent is not a party. No trust is intended to be, or is or will be, created hereby and the Escrow Agent shall owe no duties hereunder as a trustee.

### 7.6    Indemnity

In addition to and without limiting any other protection of the Escrow Agent hereunder or otherwise by law, the Purchaser and the Vendor hereby agree, jointly and severally, to indemnify and hold harmless the Escrow Agent and its officers, directors, employees, Affiliates and agents and former officers, directors, employees, and agents harmless from and against any and all liabilities, losses, claims, damages, penalties, actions, suits, demands, levies, costs, expenses and disbursements including any and all reasonable legal and adviser fees and disbursements of whatever kind or nature which may at any time be suffered by, imposed on, incurred by or asserted against the Escrow Agent, whether groundless or otherwise, howsoever arising from or out of any act, omission or error of the Escrow Agent in connection with its acting as Escrow Agent hereunder unless arising from the gross negligence, wilful misconduct or fraud on the part of the Escrow Agent. Notwithstanding any other provision hereof, this indemnity shall survive the removal or resignation of the Escrow Agent and the termination of this Agreement.

In the event that the Escrow Agent shall become involved in any arbitration or litigation relating to the Escrow Amount, the Escrow Agent is authorized to comply with any decision reached through such arbitration or litigation. If the Escrow Agent shall be uncertain as to its duties or rights hereunder or shall receive instructions, claims or demands from any party hereto or from a third person with respect to any matter arising pursuant to this Agreement which, in its opinion, are in conflict with any provision of this Agreement, it shall be entitled to refrain from taking any action authorized and directed hereunder, and in so doing, the Escrow Agent shall not be or become liable in any way to the parties hereto for its failure or refusal to comply with such claims or demands, until it shall be authorized or directed in writing by the parties hereto.

## 7.7    Reliance on Documents, etc.

In the exercise of its rights, duties and obligations hereunder, the Escrow Agent may act and rely, and shall be protected in acting and relying upon any judgment, order, notice, demand, request, waiver, consent, receipt, direction, instruction, certificate, affidavit or other instrument, paper, writing or document (collectively referred to as "**Documents**") furnished to it and purporting to have been executed or issued by any officer or person required to or entitled to execute and deliver to the Escrow Agent any such Documents in connection with this Agreement, not only as to its due execution and the validity and effectiveness of its provisions, but also as to the truth or accuracy of any information therein contained, which the Escrow Agent in good faith believes to be genuine. The Escrow Agent may, in its absolute discretion, require reasonable evidence of the due execution thereof before acting or relying thereon. The Escrow Agent shall in no way be bound to call for further evidence (whether as to due execution, validity or effectiveness, or the jurisdiction of any court, or as to the truth of any fact), and shall not be responsible for any loss that may be occasioned by its failing to do so.

The Escrow Agent shall have the right not to act and shall not be liable for refusing to act unless it has received clear and reasonable documentation that complies with the terms of this Agreement. Such documentation must not require the exercise of any discretion or independent judgment.

## 7.8    Third Party Interests

Each party to this Agreement (in this paragraph referred to as a "representing party"), other than the Escrow Agent, hereby represents to the Escrow Agent that any account to be opened by, or interest to be held by, the Escrow Agent in connection with this Agreement, for or to the credit of such representing party, either (i) is not intended to be used by or on behalf of any third party, or (ii) is intended to be used by or on behalf of a third party, in which case such representing party hereby agrees to complete, execute and deliver forthwith to the Escrow Agent a declaration, in the Escrow Agent's prescribed form or in such other form as may be satisfactory to it, as to the particulars of such third party.

## 7.9    No Assumption of Responsibility

The Escrow Agent shall not by reason of signing this Agreement assume any responsibility or liability for any transaction or agreement between the Purchaser and the Vendor other than the performance of its obligations under this Agreement, notwithstanding any reference herein to such other transactions or agreements.

## 7.10   Anti-Money Laundering

The Escrow Agent shall have the right not to act and shall not be liable for refusing to act under this Agreement if, due to a lack of information or for any other reason whatsoever, the Escrow Agent in its reasonable judgment, determines that such act might cause it to be in non-compliance with any sanctions legislation or regulation or any applicable anti-money laundering or anti-terrorist legislation, regulation or guideline. Should the Escrow Agent, in its reasonable judgment, determine at any time that its acting under this Agreement has resulted in the Escrow Agent being in non-compliance with any sanctions legislation or regulation or any applicable anti-money laundering or anti-terrorist legislation, regulation or guideline, then the Escrow Agent shall have the right to resign on 10 days' written notice to the Purchaser and the Vendor, provided (i) that the written notice shall describe the circumstances of such non-compliance to the extent permitted

under any sanctions legislation or regulation or applicable anti-money laundering or anti-terrorist financing legislation, regulation or guideline; and (ii) that if such circumstances are rectified to the Escrow Agent's satisfaction within such 10 day period, then such resignation shall not be effective.

## 7.11  Not Required to Expend its Own Funds

None of the provisions contained in this Agreement or any supplement shall require the Escrow Agent to expend or risk its own funds or otherwise incur financial liability in performing its duties or in the exercise of any of its rights or powers.

## 7.12  Resignation, Removal and Replacement of the Escrow Agent

The Escrow Agent may resign and be discharged from all further duties and obligations hereunder by giving to the Purchaser and the Vendor thirty (30) days' written notice of the effective date of resignation ("**Effective Date**") or such shorter notice period as may be agreed between the Purchaser, the Vendor and the Escrow Agent. In the event of the Escrow Agent resigning, the Purchaser and the Vendor shall forthwith appoint a successor agent. Failing such appointment by the Purchaser and the Vendor within thirty (30) days from the Effective Date, the Escrow Agent shall return the Escrow Amount to the Purchaser to be held in trust for the Vendor and the duties and obligations of the Escrow Agent under this Agreement shall cease immediately.

Any new escrow agent appointed pursuant to the provisions of this section shall be a corporation authorized to carry on the business of an escrow agent in the province of Alberta. On any new appointment, the new escrow agent shall be vested with the same powers, rights, duties and obligations as if it had been originally named herein as escrow agent, without any further assurance, conveyance, act or deed. The Escrow Agent, upon receipt of payment for any outstanding amounts for its services and expenses then unpaid, shall transfer, deliver and pay over to such successor escrow agent, who shall be entitled to receive, all cash and property on deposit with such predecessor hereunder.

## 7.13  Survival

The provisions of this section shall survive for the benefit of the Escrow Agent notwithstanding the resignation or removal of the Escrow Agent or the termination of this Agreement.

## SECTION 8:
## TERM OF AGREEMENT

## 8.1  Term and Termination

This Agreement shall commence on the date hereof and shall terminate pursuant to Sections 3, 5 or 7 hereof or this Section 8.

## 8.2  Termination

Notwithstanding any provisions contained in this Agreement, if the Escrow Agent continues to hold the Escrow Amount in escrow after five (5) years from the date of this Agreement, then the Escrow Agent shall return the Escrow Amount to the Purchaser to be held in trust for the Vendor and the duties and obligations of the Escrow Agent under this Agreement shall cease immediately.

## SECTION 9:
## NOTICES

### 9.1    Notice to the Purchaser

Any notice, demand or other communication to the Purchaser shall be in writing and addressed to the Purchaser as follows:

> FTX Canada Inc.
> c/o FTX Digital Markets Ltd
> 27 Veridian Corporate Center
> Western Road
>
> Nassau, The Bahamas
> Attention:      Can Sun
> Email:          can@ftx.com

### 9.2    Notice to the Vendor

Any notice, demand or other communication to the Vendor shall be in writing and addressed to the Vendor as follows:

> Pateno Payments Inc.
> c/o Digital Commerce Bank
> 736 Meridian Road NE
> Calgary, Alberta T2A 2N7
>
> Attention:      Jeffrey J. Smith
> Email:          jeff@dcbank.ca

### 9.3    Notice to the Escrow Agent

Any notice, direction, demand or other communication to the Escrow Agent shall be in writing and addressed to the Escrow Agent as follows:

> TSX Trust Company
> 301 – 100 Adelaide Street West
> Toronto, Ontario
> M5H 4H1
>
> Attention:      Vice President, Trust Services
> Email:          tmxestaff-corporatetrust@tmx.com

### 9.4    Delivery

Notices given pursuant to this Section 9 may be sent by personal delivery (including courier) during business hours or may be sent by ordinary mail or by facsimile or email. Such notice delivered in accordance with the foregoing shall be deemed to have been delivered at the time of personal delivery, or, if mailed, on the third (3rd) Business Day following the date of the postmark on such notice or, if transmitted by facsimile or email, on the next Business Day following the date of transmission.

Any party may change its address by giving notice to the other parties in the manner set forth in this section.

If, by reason of a strike, lockout or other work stoppage, actual or threatened, involving postal employees any notice to be given to the Escrow Agent or the Purchaser or the Vendor hereunder could reasonably be considered unlikely to reach its destination, such notice shall be valid and effective only if it is delivered, or sent by email transmission.

**SECTION 10:**
**GENERAL**

**10.1  Force Majeure**

No party shall be liable to the other, or held in breach of this Agreement, if prevented, hindered, or delayed in the performance or observance of any provision contained herein by reason of act of God, riots, terrorism, acts of war, epidemics, pandemics, governmental action or judicial order, earthquakes, or any other similar causes (including, but not limited to, mechanical, electronic or communication interruptions, disruptions or failures). Performance times under this Agreement shall be extended for a period of time equivalent to the time lost because of any delay that is excusable under this section.

**10.2  Representation**

Each party represents that it has the power and authority to enter into and perform its obligations under this Agreement, that the person or persons signing this Agreement on behalf of the named party are properly authorized and empowered to sign it and that the Agreement is valid and binding on the party and enforceable against the party in accordance with its terms.

**10.3  Merger, Consolidation or Amalgamation**

This Agreement shall not be assigned by any party hereto without the prior written consent of the other parties hereto. Notwithstanding the foregoing, any corporation into or with which the Escrow Agent may be merged or consolidated or amalgamated, or any corporation resulting therefrom, or any corporation succeeding to the trust business of the Escrow Agent, shall be the successor to the Escrow Agent hereunder without any further act on the Escrow Agent's part or any of the parties hereto.

**10.4  Severability**

If any of the provisions of this Agreement becomes invalid, illegal or unenforceable in any respect under any law, the validity, legality and enforceability of the remaining provisions shall not be affected or impaired.

**10.5  Currency**

All amounts stated herein are expressed in United States dollars.

**10.6  Amendment**

No provision of this Agreement shall be deemed waived, amended or modified by any party unless such waiver, amendment or modification is in writing and signed by the parties hereto.

### 10.7  Entire Agreement

This Agreement constitutes the entire Agreement between the parties and cancels, replaces and supersedes all existing and prior and contemporaneous agreements, understandings and negotiations relating to its subject matter and there are no warranties, representations or agreements among the parties in connection with the subject matter hereof except as specifically set forth and referred to herein.

### 10.8  Counterparts

This Agreement may be executed (including electronically) in any number of counterparts and may be delivered by facsimile transmission or in PDF format delivered by email. Each counterpart, when so executed, shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.

### 10.9  Time of the Essence

Time shall be of the essence.

### 10.10  Successors and Assigns

This Agreement shall enure to the benefit of and be binding upon the parties hereto and their respective successors and permitted assigns. Except as may be otherwise specifically provided herein, no assignment shall be made of this Agreement without the prior written consent of the parties hereto.

### 10.11  Governing Law

This Agreement shall be construed in accordance with and governed by the laws of the province of Alberta and the federal laws of Canada applicable therein, and any actions, proceedings, claims or disputes regarding it shall be resolved by the courts in that province.

[signature page follows]

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the date first written above.

**FTX CANADA INC.**

By: _____
      *Sam Bankman-Fried*
      Name:  Sam Bankman-Fried
      Title:   CEO

By: _____
      Name:
      Title:

**TSX TRUST COMPANY**

By: _____
      Name:
      Title:

By: _____
      Name:
      Title:

**PATENO PAYMENTS INC.**

By: _____
      Name:
      Title:

By: _____
      Name:
      Title:

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the date first written above.

**FTX CANADA INC.**

By: _____
      Name:
      Title:

By: _____
      Name:
      Title:

**TSX TRUST COMPANY**

By: _____
      FF1EF6BD4905439...
      Name:  Mardi McNaughton
      Title:  Corporate Trust Officer

By: _____
      A2DF1A8FD1A04A6...
      Name:  Bolanle Oyelade
      Title:  Corporate Trust Officer

**PATENO PAYMENTS INC.**

By: _____
      Name:
      Title:

By: _____
      Name:
      Title:

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the date first written above.

**FTX CANADA INC.**                                    **TSX TRUST COMPANY**

By: _____          By: _____
     Name:                                              Name:
     Title:                                             Title:

By: _____          By: _____
     Name:                                              Name:
     Title:                                             Title:

**PATENO PAYMENTS INC.**

By: _____
     Name: JEFFREY J. SMITH
     Title: DIRECTOR

By: _____
     Name: Pamela Draper
     Title: President & CEO

**Schedule "A"**

**WIRE TRANSFER INSTRUCTIONS**
**USD FUNDS**

| | |
|---|---|
| **Bank** | **Bank of Montreal** |
| | 100 KING ST WEST |
| | TORONTO, ON M5K1A3 |
| **Institution** | **001** |
| **Transit** | **00022** |
| **SWIFT CODE** | **BOFMCAM2** |
| **Payee** | **TSX TRUST COMPANY** |
| **Reference** | **FTX Canada Inc. – Escrow** |
| | 301 – 100 Adelaide St W |
| | Toronto, ON    M5H 4H1 |
| **Account** | **4677664** |

**Schedule "B"**

**JOINT DIRECTION**

TO:      **TSX TRUST COMPANY**

RE:      **Cash Escrow Agency Agreement dated June _14_, 2022 among FTX Canada Inc., Pateno Payments Inc. and TSX Trust Company (the "Escrow Agreement")**

All capitalized terms used herein will have the meaning ascribed to such terms in the Escrow Agreement.

The undersigned hereby unconditionally and irrevocably direct you as Escrow Agent, in accordance with the Escrow Agreement, to pay the Escrow Amount as follows:

$● to the **[Vendor/Purchaser]** by wire transfer to the following account:

**[Account details]**

**DATED** the _____ day of _____, 2022.

FTX CANADA INC.              PATENO PAYMENTS INC.

Per: _____    Per: _____

      Name:                       Name:

      Title:                         Title:

## Exhibit C

**Termination Notice**

## <u>NOTICE OF TERMINATION</u>

**TO:**          **FTX Canada Inc. (the "Buyer")**

**AND TO:**    **FTX Trading Ltd. (the "Parent Guarantor")**

**RE:**          **Share Purchase Agreement dated as of June 14, 2022 (the "Share Purchase Agreement") among the Buyer, the Guarantor and Pateno Payments Inc. (the "Seller")**

_____

The Seller hereby terminates the Share Purchase Agreement with immediate effect in accordance with Section 5.1(d) of the Share Purchase Agreement.

**DATED** November 15, 2022.

**PATENO PAYMENTS INC.**

By: _____

Name: Jeffrey J. Smith
Title:  Director

Acknowledged this ____ day of _____, 2022:

**FTX CANADA INC.**

By: _____

Name:
Title:

**<u>Exhibit D</u>**

**December 5 Letter**



**PRIVATE AND CONFIDENTIA**L

December 5, 2022

*E-mail Delivered*

FTX Canada Inc.
c/o FTX Digital Markets Ltd.
27 Veridian Corporate Center
Wester Road
Nassau, The Bahamas
**Attention Can Sun**

Delivered Via Email: **can@ftx.com**

**Re:**    **Share Purchase Agreement dated as of June 14, 2022 (the "Share Purchase Agreement") among FTX Canada Inc. ("FTX Canada"), FTX Trading Ltd., and Pateno Payments Inc. ("Pateno")**

This letter is further to Pateno's Notice of Termination of November 15, 2022 and Pateno's entitlement to recover the deposit of USD$2,000,000 (which amount, plus interest earned thereon, is the "**Deposit**") provided by FTX Canada pursuant to the terms of the Share Purchase Agreement.

As you may be aware, the Share Purchase Agreement required that the Closing Date occur on or before the Outside Date, which was initially October 14, 2022 and was extended to November 14, 2022 by agreement in writing between FTX Canada and Pateno. The Closing Date did not occur on or before November 14, 2022 and, pursuant to Section 5.1(d) of the Share Purchase Agreement, Pateno provided written notice of termination of the Share Purchase Agreement, effective November 15, 2022.

The Share Purchase Agreement provides, pursuant to Section 5.2(b) or alternatively Section 5.2(c), that on termination in these circumstances the Deposit must be released to Pateno and obligates FTX Canada and Pateno to execute a joint written direction to cause the Deposit to be disbursed to Pateno. Pateno provided such a joint direction ("**Joint Direction**") to FTX Canada concurrently with sending the written notice of termination and requested that FTX Canada promptly execute the Joint Direction. Unfortunately, and contrary to its clear legal obligations, FTX Canada did not execute the Joint Direction.

We accordingly write to you to request you execute a copy of the Joint Direction, attached to this letter, and provide us with a copy of the same at your earliest convenience and in any event by no later than 5:00 p.m. Calgary Time on December 16, 2022.

If we are not in receipt of an executed Joint Direction at this time, Pateno will be forced to bring an application before the Court of King's Bench of Alberta (to which jurisdiction the parties have irrevocably and unconditionally attorned pursuant to Section 9.14) seeking to have the Deposit released to Pateno We are hopeful that in light of Pateno's clear entitlement to the Deposit the Joint Direction will be provided promptly and the unnecessary time and expense of a Court application can be avoided.

Pateno reserves all of its legal rights at this time and this communication does not sustain or constitute any defence or estoppel in favour of FTX Canada or FTX Trading Ltd. pertaining to the Share Purchase Agreement or their relationship and dealings with Pateno otherwise.

Please do not hesitate to contact the undersigned should you wish to discuss this matter.

Yours Truly,


**Pateno Payments Inc.**


Per:_____

    Jeffrey J. Smith, Director


Cc:     McCarthy Tetrault LLP
        66 Wellington Street West
        Suite 5300, TD Bank Tower Box 48
        Toronto, Ontario M5K 1E6

Attention:     Lori Stein
             Robert Anton

E-mail:      lstein@mccarthy.ca
            ranton@mccarthy.ca

## JOINT DIRECTION

**TO:**        **TSX TRUST COMPANY**

**RE:**        **Cash Escrow Agency Agreement dated June 14, 2022 among FTX Canada Inc., Pateno Payments Inc. and TSX Trust Company (the "Escrow Agreement")**

All capitalized terms used herein will have the meaning ascribed to such terms in the Escrow Agreement.

The undersigned hereby unconditionally and irrevocably direct you as Escrow Agent, in accordance with the Escrow Agreement, to pay the Escrow Amount as follows:

US$2,000,000 plus any accrued interest earned thereon to the Vendor by wire transfer to the account set forth in Appendix 1 hereto.

**DATED** the 15th day of November, 2022.

**FTX CANADA INC.**                          **PATENO PAYMENTS INC.**

Per:                                          Per:
_____                       _____

Name:                                         Name: Jeffrey J. Smith

Title:                                        Title:   Director

# APPENDIX 1

**Pateno Payments Inc. Incoming Wire Transfer Instructions**

| BENEFICIARY | |
|---|---|
| **Beneficiary Name:** | Pateno Payments Inc. |
| **Beneficiary Address:** | 500 4 Ave SW, Suite 410<br>Calgary Alberta<br>T2P 2V6<br>Canada |
| **Beneficiary Account Number** | 723112074429 |

| BENEFICIARY BANK | |
|---|---|
| **Bank Name:** | Connect First Credit<br>Union Ltd. |
| **Bank Address:** | 200 2850 Sunridge Blvd.<br>NE<br>Calgary Alberta<br>TIY 6G2<br>Canada |
| **SWIFT (BIC) Code:** | CUCXCATTCAL |
| **CC Code:** | 089900369 |
| **Institution Number:** | 899 |
| **Transit Number:** | 00369 |

## Exhibit E

**December 16 Letter**

# SULLIVAN & CROMWELL LLP

TELEPHONE: 1-212-558-4000
FACSIMILE: 1-212-558-3588
WWW.SULLCROM.COM

*125 Broad Street*
*New York, New York 10004-2498*

LOS ANGELES • PALO ALTO • WASHINGTON, D.C.

BRUSSELS • FRANKFURT • LONDON • PARIS

BEIJING • HONG KONG • TOKYO

MELBOURNE • SYDNEY

December 16, 2022

Via E-Mail

Kelsey Armstrong
Osler, Hoskin & Harcourt LLP
225 6th Ave. S.W.
Calgary AB T2P 1N2

Re:    Share Purchase Agreement and Escrow Deposit

Dear Ms. Armstrong:

I write on behalf of FTX Trading Ltd. ("FTX Trading") and its affiliated debtors and debtors-in-possession, including FTX Canada Inc. ("FTX Canada") (collectively, the "Debtors"), in connection with the Share Purchase Agreement by and among FTX Canada, FTX Trading, and Pateno Payments Inc. ("Pateno"), dated June 14, 2022 (the "Agreement"), and FTX Canada's $2 million deposit held in escrow by TSX Trust Company (the "Deposit") pursuant to the Cash Escrow Agency Agreement among TSX Trust Company, FTX Canada, and Pateno (the "Escrow Agreement").

We have received a copy of Pateno's purported notice of termination of the Agreement, dated November 15, 2022 ("Termination Notice"), and subsequent demand to release to Pateno the deposit from escrow, dated December 5, 2022 ("December 5 Letter"). The Debtors dispute both that the Termination Notice had any legal effect under the circumstances and there is any basis to release the Deposit to Pateno. In fact, Pateno's actions to date have included violations of the automatic stay imposed pursuant to 11 U.S.C. § 362(a) of the United States Bankruptcy Code ("Bankruptcy Code"), and the Debtors reserve all rights and remedies.

On November 11, 2022, the relevant Debtors each filed petitions pursuant to the Bankruptcy Code with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). The Debtors were protected by Section 362 of the Bankruptcy Code immediately upon filing of their bankruptcy petitions. The Agreement is protected property of the Debtors' estates as of the petition date and not subject to unilateral termination by Pateno. *See* 11 U.S.C. § 541(a) (the Debtors' "estate is comprised of all" of its "property, wherever located and by whomever held"); *In re Broadstripe, LLC*, 402 B.R. 646, 657 (Bankr. D. Del. 2009) ("Executory contracts . . . are considered a form of property of the estate").

-2-

Furthermore, section 3.2 of the Escrow Agreement is clear that the Deposit is being held in the name of FTX Canada. The Deposit is property of the estate subject to the protections of 11 U.S.C. § 362(a). *See, e.g.*, *In re Shapiro*, 124 B.R. 974 (Bankr. E.D. Pa. 1991) (escrow funds deposited in connection a purchase were property of debtor's estate notwithstanding debtor's alleged breach of sale agreement); *In re Sky Group Intern., Inc.*, 108 B.R. 86, 91-92 (Bankr. W.D. Pa. 1989) (holding that property transferred into escrow was property of debtor's estate where creditor's claim arose after bankruptcy filing); *See also Matter of Missionary Baptist Found. of Am., Inc.*, 792 F.2d 502, 506 (5th Cir. 1986) ("where the contingency of the escrow was not fulfilled prior to bankruptcy, the debtor holds an interest in the property"). Any claim that Pateno seeks to assert with respect to the Deposit may only be submitted in the Bankruptcy Court.

We note that the December 5 Letter threatens action before the Court of King's Bench of Alberta, which would constitute a flagrant violation of the bankruptcy stay. 11 U.S.C. § 362(a)(3) (a petition operates as a stay of "any act to obtain possession of property of the estate . . . or to exercise control over property of the estate"). If Pateno moves forward with any impermissible action, the Debtors, as fiduciaries for the bankruptcy estates, will protect their rights by initiating action against Pateno in the Bankruptcy Court. Such action could result in the award of substantial damages and costs. *See* 11 U.S.C. § 362(k)(1); *In re Rodriguez*, 2012 WL 589553, at *4 (Bankr. D.N.J. Feb. 22, 2012) (awarding attorneys' fees to debtor where creditor attempted to collect escrow claims after automatic stay went into effect).

Please let me know if you have any questions or would like to discuss.

Sincerely,

Brian D. Glueckstein

cc:     Evan S. Simpson
        (Sullivan & Cromwell LLP)

        Lori Stein
        Robert Anton
        (McCarthy Tetrault LLP)

        Jeffrey J. Smith
        (Pateno Payments Inc.)

**Exhibit F**

**Originating Application**

**Form 7**
[Rule 3.8]

Clerk's stamp:

JUDICIAL CENTRE OF CALGARY

**FILED**

**Feb 16, 2023**

CS

**by Email**

CLERK OF THE COURT

| | | |
|---|---|---|
| COURT FILE NUMBER | 2301- 02187 | $250.00 COM |
| COURT | COURT OF KING'S BENCH OF ALBERTA | March 2 2023 |
| JUDICIAL CENTRE | CALGARY | |
| APPLICANT | PATENO PAYMENTS INC. | |
| RESPONDENTS | FTX CANADA INC. AND TSX TRUST COMPANY | |
| DOCUMENT | <u>**ORIGINATING APPLICATION**</u> | |
| ADDRESS FOR SERVICE AND CONTACT INFORMATION OF PARTY FILING THIS DOCUMENT | **JENSEN SHAWA SOLOMON DUGUID HAWKES LLP** Barristers 800, 304 - 8 Avenue SW Calgary, Alberta  T2P 1C2 Robert Hawkes KC Email: hawkesr@jssbarristers.ca Phone: 403-571-1544 Fax: 403-571-1528 File: 15786-001 | |

**NOTICE TO RESPONDENTS**: FTX Canada Inc. and TSX Trust Company

This application is made against you.  You are a respondent.

You have the right to state your side of this matter before the master/judge.

To do so, you must be in Court when the application is heard as shown below:

| | |
|---|---|
| Date | March 2, 2023 |
| Time | 2:00 p.m. |
| Where | Calgary Courts Centre Calgary, Alberta |
| Before Whom | The Honourable Justice Jones |

Go to the end of this document to see what else you can do and when you must do it.

**Basis for this claim:**

<u>Parties</u>

1.      The Applicant, Pateno Payments Inc. ("**Pateno**"), is a corporation duly registered pursuant to the laws of Alberta.

2.      The Respondent, FTX Canada Inc. ("**FTX Canada**"), is a corporation duly registered pursuant to the laws of Alberta.

3.      The Respondent, TSX Trust Company ("**Escrow Agent**"), is a corporation duly registered pursuant to the laws of Canada.

<u>Background</u>

4.      Pursuant to a Share Purchase Agreement, dated June 14, 2022, as amended by the parties thereto (as amended, the "**SPA**"), FTX Canada agreed to purchase from Pateno all of the issued and outstanding shares of Bitvo Inc.

5.      The SPA is governed by the laws of Alberta, and the parties to the SPA have irrevocably and unconditionally submitted to the exclusive jurisdiction of the Courts of Alberta in Calgary, Alberta for matters related to the SPA.

6.      The SPA required FTX Canada to provide a deposit in the amount of USD$2,000,000 (which amount, plus interest earned thereon, is the "**Deposit**").

7.      The Deposit was provided by FTX Canada and is held in trust by the Escrow Agent pursuant to the terms of a Cash Escrow Agency Agreement, dated June 14, 2022, between FTX Canada, Pateno, and the Escrow Agent (the "**Escrow Agreement**").

8.      The Escrow Agreement is governed by the laws of Alberta, and the parties to the Escrow Agreement have attorned to the jurisdiction of the Courts of Alberta for matters related to the Escrow Agreement.

9.      The SPA initially provided an outside date for closing of the transaction of October 14, 2022.

10.     The outside date was subsequently extended by agreement to November 14, 2022 (the "**Outside Date**").

11.     On November 11, 2022, Pateno became aware of a form titled "Voluntary Petition for Non-Individuals Filing for Bankruptcy" appearing to have been filed with the United States Bankruptcy Court for the District of Delaware in respect of Alameda Research LLC (the "**US Form**").

12.     The US Form was not provided to Pateno by FTX Canada, but rather came to Pateno's attention through Pateno's communications with third parties.

13.    Pateno's interest in the US Form arose as the document listed "Bitvo, Inc." as an entity that had "filed a petition in the U.S. Bankruptcy Court for the district of Delaware for relief under Title 11 of the United States Code."

14.    Bitvo Inc. was on November 11, 2022, and remains, wholly owned by Pateno, and at no time did Bitvo Inc. authorize or make a filing for protection pursuant to the United States Bankruptcy Code or otherwise seek protection from a court in the United States of America.

15.    Upon becoming aware of the US Form, Bitvo Inc. immediately wrote to the attorney who signed the US Form, advising that Bitvo Inc. was listed on the US Form in error and requiring that the error be corrected immediately, and continued to correspond with the US attorney to address the issue.

16.    As of November 14, 2022, FTX Canada failed to obtain approval from the relevant securities authority, the Alberta Securities Commission ("**ASC**"), to acquire Bitvo Inc., which approval was a condition to closing in favour of Pateno pursuant to the SPA. As Bitvo Inc.is an Alberta corporation, Canadian Securities Administrators' ("**CSA**") approval would be communicated by the ASC after being obtained from the ASC as well as the securities commissions of all provinces and territories in Canada.

17.    There is no prospect that FTX Canada can obtain approval from the ASC nor other CSA constituents.

18.    The transaction contemplated by the SPA failed to close by the Outside Date, and on November 14, 2022 Pateno sent a notice of termination ("**Termination Notice**") of the SPA with immediate effect as of November 15, 2022 (the "**Termination**").

19.    The SPA provides that in the circumstances of the Termination, the Deposit and any interest thereon is to be released to Pateno.

20.    Pursuant to the terms of the SPA, both FTX Canada and Pateno covenanted to execute a joint written direction pursuant to the Escrow Agreement ("**Joint Direction**") to cause the Deposit to be disbursed to Pateno in accordance with the provisions of the SPA.

21.    On November 14, 2022, Pateno provided FTX Canada with a Joint Direction providing for the release of the Deposit to Pateno.

22.    FTX Canada acknowledged receipt of the Termination Notice and Joint Direction but did not respond beyond acknowledging receipt.

23.    On December 5, 2022, a further request was made of FTX Canada to execute the Joint Direction.

24.    On December 16, 2022, counsel for FTX Canada responded stating that FTX Canada had filed a petition pursuant to the United States Bankruptcy Code with the Untied States Bankruptcy Court for the District of Delaware on November 11, 2022 (the "**US Filing**").

25.    The US Filing was not raised by FTX Canada upon receipt of the Termination Notice and Joint Direction on November 14, 2022. More importantly, there have not been, nor are there presently,

any insolvency proceedings in Canada involving FTX Canada. The US Filing was not, and is not, effective in Canada to effect a stay of the rights of Pateno and FTX Canada, which are each Canadian entities, pursuant to contracts that are governed by Canadian law and pursuant to which the parties have attorned to the jurisdiction of the Canadian courts.

26.     The SPA is incapable of being performed pursuant to its terms including, but not limited to, by reason that the Outside Date has passed and required regulatory approval has not been obtained.

27.     Pursuant to the terms of the SPA and Escrow Agreement, Pateno is solely entitled to the Deposit.

28.     In these circumstances, FTX Canada does not have any beneficial interest in the Deposit, and Pateno is the sole beneficiary under the Escrow Agreement.

29.     Notwithstanding this, FTX Canada has refused to direct the Escrow Agent to release the Deposit to Pateno – this refusal is unjustified and serves only to cause Pateno and the Escrow Agent to expend additional cost, effort, and time to ensure the Deposit is released to Pateno.

30.     FTX Canada is not entitled to the Deposit, which Deposit is being held in Trust by the Escrow Agent for the benefit of Pateno.

31.     As Pateno has demonstrated the SPA requires a release of the Deposit to Pateno, the Escrow Agent should be directed to release the Deposit to Pateno.

32.     Such further and other grounds as Pateno may advise and this Honourable Court may permit.

**Remedy sought:**

33.     Pateno respectfully seeks the following relief:

(a)     A declaration that FTX Canada is not entitled to the Deposit;

(b)     An Order that the Escrow Agreement be modified such that Pateno may provide written instructions regarding the release of the Deposit;

(c)     Alternatively, an Order waiving the requirement under the SPA and Escrow Agreement for FTX Canada to instruct the Escrow Agent to release the Deposit to Pateno and permitting Pateno to provide written instructions to the Escrow Agent for release of the Deposit;

(d)     Alternatively, an Order authorizing and directing the Escrow Agent to release the Deposit to Pateno;

(e)     Costs of this Application; and

(f)     Such further and other remedies as this Honourable Court deems just.

**Affidavit or other evidence to be used in support of this application:**

34.     Affidavit of Pamela Draper, sworn February 15, 2023.

35.     Such further and other evidence as counsel may advise and this Honourable Court may permit.

**Applicable Acts and regulations:**

36.    *Alberta Rules of Court*, Alta Reg 124/2010.

37.    *Business Corporations Act*, RSA 2000 c B-9.

38.    *Judicature Act*, RSA 2000 c J-2.

39.    *Trustee Act*, RSA 2000 c T-8.

40.    *Trustee Act*, SA 2022 c T-8.1.

41.    Such further and other Acts and regulations as counsel may advise and this Honourable Court may permit.

---

**WARNING**

You are named as a respondent because you have made or are expected to make an adverse claim in respect of this originating application. If you do not come to Court either in person or by your lawyer, the Court may make an order declaring you and all persons claiming under you to be barred from taking any further proceedings against the applicant(s) and against all persons claiming under the applicant(s). You will be bound by any order the Court makes, or another order might be given or other proceedings taken which the applicant(s) is/are entitled to make without any further notice to you. If you want to take part in the application, you or your lawyer must attend in Court on the date and at the time shown at the beginning of this form. If you intend to give evidence in response to the application, you must reply by filing an affidavit or other evidence with the Court and serving a copy of that affidavit or other evidence on the applicant(s) a reasonable time before the application is to be heard or considered.

---

## Exhibit G

**Request for Adjournment**

McCarthy Tétrault LLP
Suite 4000
421-7th Avenue S.W.
Calgary AB  T2P 4K9
Canada
Tel:  403-260-3500
Fax:  403-260-3501

**Sean Collins**
Partner
Direct Line: (403) 260-3531
Direct Fax: (403) 260-3501
Email: scollins@mccarthy.ca

*Assistant: Katie Hynne*
*Direct Line: (403) 260-3560*
*Email: khynne@mccarthy.ca*

**mccarthy
tetrault**

March 31, 2023

**Via Email (CommercialCoordinator.QBCalgary@albertacourts.ca)**

Court of King's Bench of Alberta
Calgary Courts Centre
22nd Floor, 601 - 5th Street SW
Calgary AB  T2P 5P7

**Attention: The Honourable Mr. Justice R.A. Neufeld**

Honourable Justice:

**Re:    *Pateno Payments Inc. v. FTX Canada Inc. and TSX Trust Company***
**Court File No. 2301-02187**
**Application: April 13, 2023 at 2:00 p.m. before the Honourable Justice R.A.**
**Neufeld (the "Application")**

We are counsel to FTX Canada Inc. ("**FTX Canada**").  For the reasons that follow, FTX Canada seeks an adjournment of the Application until a date subsequent to June 1, 2023.

The Applicant in this matter, Pateno Payments Inc. ("**Pateno**"), commenced the Application with a return date of Thursday, March 2, 2023.  The Originating Application together with Affidavit Number 1 of Pamela Draper were served upon us as agent for service for FTX Canada on Tuesday, February 21, 2023.  On February 25, 2023, counsel to Pateno agreed, at our request, to an initial adjournment of the March 2, 2023 return date.

In support of the within request for the adjournment, FTX Canada notes the following:

1.      On November 11, 2022, FTX Trading Ltd. ("**FTX**") and 101 affiliated debtors, including FTX Canada, each filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court (the "**Bankruptcy Court**") for the District of Delaware (the "**FTX Chapter 11 Proceedings**"). Pateno's claim in the Application relates to circumstances that include Pateno purporting to have asserted remedies against FTX Canada on November 14, 2022 (ie following the commencement of the FTX Chapter 11 Proceedings) that FTX asserts violated U.S. Bankruptcy law and are void.

2.      Messrs. Sullivan & Cromwell LLP, through their New York, NY office are counsel to the Chapter 11 debtors.  The FTX Chapter 11 proceedings involve the global administration of FTX and the affiliated debtor estates.  The FTX Chapter 11 proceedings are complex.



3.      FTX commenced the FTX Chapter 11 Proceedings on an emergency basis, with incomplete books and records, a lack of basic structures, and little understanding of the events necessitating the bankruptcy filing.  FTX is already regarded as one of the largest and most complex corporate frauds in history, with four senior executives having been charged with crimes under U.S. law with three pleading guilty to fraud.  In the face of these challenges, FTX's new management and their advisors have worked to take control of FTX and have made enormous progress in less than 5 months to, among other things, identify and secure over $6 billion of liquid assets, conduct an investigation as to the prepetition events preceding the FTX Chapter 11 Proceedings, and identify and evaluate hundreds of transactions.

4.      FTX has many stakeholders with whom they must consult and discuss issues involving assets in which the FTX estates have an interest, including those raised in the Pateno Application.

5.      One such constituency is the Official Committee of Unsecured Creditors (the "**Committee**") that has been appointed in the FTX Chapter 11 Proceedings. The Committee serves as a fiduciary to unsecured creditors and liaison to FTX to monitor and participate in the administration of the FTX Chapter 11 Proceedings.  The Committee's role includes monitoring the Application.

6.      FTX is working to review and evaluate the issues raised by Pateno in the Application.  FTX also requires time to brief the Committee and other stakeholders on the matters put at issue in the Application.  Once complete, it is anticipated that FTX will provide instructions to counsel that will permit counsel to seek a resolution of this matter, and, if unsuccessful, the requested adjournment will permit FTX Canada to be in a position to substantively respond to the Application.  Any substantive response required from FTX Canada will likely involve not only a response before this Court but also seeking declaratory and other relief from the Bankruptcy Court.

7.      FTX Canada notes that the property in dispute, namely US$2 million, is being held in escrow by TSX Trust Company and cannot be released by the TSX Trust Company without the joint direction of both Pateno and FTX Canada.

8.      FTX Canada submits that there would be minimal prejudice to Pateno in adjourning the Application until June, 2023.  Such minimal prejudice, when balanced against the necessity of both FTX and the Committee (each as fiduciaries) to be afforded additional time to properly discharge their duties, including to ensure that Pateno is not afforded an unlawful advantage over other creditors as a result of Pateno purporting to enforce remedies against FTX Canada in the face of a world-wide stay of proceedings, militates in favour of the requested adjournment.

Pateno opposes the requested adjournment.  We have advised counsel to Pateno that we will deliver this correspondence to the Court and have invited counsel to Pateno to respond to same.

**mccarthy tetrault**

We will make ourselves available to speak to the requested adjournment, should the Court so direct.

Yours truly,

McCarthy Tétrault LLP

Sean Collins

SFC/kh
cc:     Dentons Canada LLP, counsel to Pateno
        Attention: John Regush and David Mann
        Via Email

        Sullivan & Cromwell LLP
         Attention: Evan Scott Simpson, Brian Glueckstein, Julie Petiford, and Alexa Kranzley
        Via Email

        TSX Trust Company
        Via Email

**<u>Exhibit H</u>**

**Agreement RE: Outside Date**

## AGREEMENT RE: OUTSIDE DATE

**THIS AGREEMENT** (this "**Agreement**"), dated as of October 3, 2022, is made by and among FTX Canada Inc., a corporation existing under the Laws of the Province of Alberta (the "**Buyer**"), and Pateno Payments Inc., a corporation existing under the Laws of the Province of Alberta (the "**Seller**"). The Seller and the Buyer shall be referred to herein from time to time collectively as the "**Parties**".

**RECITALS:**

**WHEREAS**, the Parties and FTX Trading Ltd., as Parent Guarantor, entered into a share purchase agreement dated as of June 14, 2022 (the "**Purchase Agreement**") pursuant to which, among other things, the Seller has agreed to sell to the Buyer and the Buyer has agreed to purchase from the Seller all of the issued and outstanding shares in the capital of Bitvo Inc., on the terms and conditions of the Purchase Agreement.

**WHEREAS,** Section 1.1 of the Purchase Agreement defines the term "Outside Date" to mean "October 14, 2022, or such later date as the Seller and the Buyer may agree in writing".

**WHEREAS**, the Parties wish to evidence their agreement that the Outside Date shall be extended to November 14, 2022.

**NOW THEREFORE**, in consideration of the foregoing and for good and valuable consideration, the receipt and sufficiency of which are acknowledged, the Parties, intending to be legally bound, agree as follows:

1.    Capitalized terms used herein and not otherwise defined shall have the meanings given to them in the Purchase Agreement.

2.    The Parties hereby agree that the Outside Date shall be extended to November 14, 2022, or such later date as the Seller and the Buyer may agree in writing.

3.    Except for the foregoing extension to the Outside Date, the Parties acknowledge and confirm that the Purchase Agreement remains in full force and effect, unamended, and, upon the execution of this Agreement, the Purchase Agreement and this Agreement shall be deemed to constitute the entire Purchase Agreement.

4.    This Agreement shall be governed by and construed in accordance with the Laws of the Province of Alberta and the federal Laws of Canada applicable therein, without giving effect to any choice of law or conflict of law provision or rule that would cause the application of the Law of any jurisdiction other than the Province of Alberta.

5.    This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same agreement. Delivery of an executed counterpart of a signature page to this Agreement by electronic

signature, facsimile or scanned pages shall be effective as delivery of a manually executed counterpart to this Agreement.

[***Remainder of page intentionally left blank.***]

LEGAL_CAL:16462523.1

**IN WITNESS WHEREOF**, each of the Parties has caused this Agreement to be duly executed on its behalf as of the date first written above.

**FTX CANADA INC.**

By: _____

DocuSigned by:

*Sam Bankman-Fried*

672DA88132804B9...

Name:  Sam Bankman-Fried

Title:


**PATENO PAYMENTS INC.**

By: _____

Name:

Title:

*Signature Page to Agreement re: Outside Date*

**IN WITNESS WHEREOF**, each of the Parties has caused this Agreement to be duly executed on its behalf as of the date first written above.

**FTX CANADA INC.**

By: _____
       Name:
       Title:

**PATENO PAYMENTS INC.**

By: _____
       Name: JEFF SMITH
       Title: DIRECTOR

LEGAL_CAL:16462523.1