## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| *In re:* | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |
|  | **Re: Docket Nos. 1192, 1408 & 1409** |

## OMNIBUS REPLY OF THE JOINT PROVISIONAL LIQUIDATORS OF FTX DIGITAL MARKETS LTD. TO OBJECTIONS TO THE MOTION FOR A DETERMINATION THAT THE U.S. DEBTORS' AUTOMATIC STAY DOES NOT APPLY TO, OR IN THE ALTERNATIVE FOR RELIEF FROM STAY FOR FILING OF THE APPLICATION IN THE SUPREME COURT OF THE COMMONWEALTH OF THE BAHAMAS SEEKING RESOLUTION OF NON-US LAW AND OTHER ISSUES

---

[1] The last four digits of FTX Trading Ltd.'s tax identification number are 3288.  Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the debtors (the "**U.S. Debtors**") and the last four digits of their federal tax identification numbers is not provided here.  A complete list of such information may be obtained on the website of the U.S. Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.

## PRELIMINARY STATEMENT[2]

1.      As the court-appointed officers in FTX Digital's provisional liquidation, the JPLs need at this time to ask their supervising Court for guidance on several critical points of English, Antiguan and Bahamian law that are fundamental to the administration of FTX Digital's provisional liquidation.

2.      As the only court-appointed estate fiduciaries in that provisional liquidation, the JPLs cannot abdicate their obligation to administer the FTX Digital estate to the U.S. Debtors who (along with the Committee) are only estate fiduciaries in these Ch. 11 Cases, not the provisional liquidation.  Nor can the JPLs simply accept the U.S. Debtors' assumption that all customers of FTX were, at all times customers of the U.S. Debtors and that all assets held by the U.S. Debtors from customers belong to the U.S. Debtors as well.  The Debtors cannot assume those issues away; they are complicated legal questions that must be answered by a court.  Nor can they properly refuse to engage, as the U.S. Debtors have done for months, on any form of consensual cross-border protocol.  Thus, the JPLs ask that they be allowed to submit the Application to the Bahamas Court so that this Court and the Bahamas Court can work together in order to ensure an efficient and cooperative path to resolution of these questions.

3.      In opposition, the U.S. Debtors and the Committee take the extreme position that this Court should act as if the Bahamian Court does not exist. *See Debtors' Objection to the Motion*, Case No. 22-11068 [Dkt. No. 1409] (the "**U.S. Debtors' Obj.**"); *The Official Committee of Unsecured Creditors' Objection to the Motion*, Case No. 22-11068 [Docket No. 1408] (the "**Committee Obj.**").    To support their position, the U.S. Debtors make a number of

---

[2] In support of this Reply, the JPLs rely upon and incorporate by reference the Declaration of Brett Bakemeyer, dated May 12, 2023 filed simultaneously herewith (the "**Bakemeyer Declaration**").

unsubstantiated and self-serving allegations.  The U.S. Debtors claim that: (a) FTX Digital was a "façade" behind which Mr. Bankman-Fried's "fraudulent scheme could operate;" (b) that despite their representations to the contrary in this Court, there never were *any* customers of FTX Digital, and (c) that the JPLs would like to "fill [the FTX Digital estate] with property taken from the Debtors." U.S. Debtors' Objection ¶¶ 3, 8, 26.

4.      Cutting through the U.S. Debtors' rhetoric, it is clear that they do not dispute many of the fundamentals underlying the Motion.  The Non-U.S. Law Customer Issues *are* important to both estates.  The Bahamas Court has held that resolution of the "the issues raised by [FTX Digital's] officers, the JPLs, in the proposed [Application] is *fundamental* to the progress of the provisional liquidation of [FTX Digital] in this Honorable Court."  Motion ¶ 44.  (Emphasis added).  The U.S. Debtors and the Committee have stated that these issues are central to the U.S. Debtors' estates. U.S. Debtors' Obj. ¶ 64; Committee Obj. ¶ 9.  Likewise, at this point the U.S. Debtors and the JPLs agree that these issues must be decided by this Court or the Bahamas Court. In other words, no one is advocating that these issues need to be arbitrated or addressed in an English Court.  There is no dispute that the Non-U.S. Law Customer Issues are governed by Non-U.S. law.  No objecting party has even cited to a single customer contract governed by U.S. law. Finally, despite the misplaced rhetoric around who the JPLs are and what they are trying to do here, no objector contests that this Court should revoke recognition of the JPLs as the appropriate foreign representatives for FTX Digital in the United States and that the Bahamas Court is the appropriate forum for addressing all issues affecting that estate.

5.      Given these key facts, cross-border cooperation is the only sensible way forward in these cases.  Cooperation is consistent with the principles of comity embedded in Chapter 15, and the Cooperation Agreement approved by this Court and the Bahamas Court. *Notice of Entry Into*

*Agreement Regarding Mutual Cooperation*, Case No. 22-11068 [Dkt. No. 402-1] (the

"**Cooperation Agreement**").  It is also the only way to avoid duplicative litigation.

6.      A cross-border protocol is also necessary to allow both insolvency cases to proceed

expeditiously.  The JPLs were hopeful that the Cooperation Agreement could provide an adequate

framework to allow both cases to proceed without getting bogged down in disputes.

Unfortunately, the U.S. Debtors have made a practice of not honoring the Cooperation Agreement.

In the four short months since executing the Cooperation Agreement, the U.S. Debtors have

somehow managed to breach every single commitment they made:

| U.S. Debtors' Commitment in the Cooperation Agreement | U.S. Debtors' Breaching Conduct |
|---|---|
| FTX DM shall be primarily responsible for recovering value from (a) the assets and property in the name of FTX DM, including without limitation, all real and personal property and bank and security accounts in the name of FTX DM, regardless of where located. Cooperation Agreement, ¶ 4. | Actively obstructing the JPLs efforts to recover FTX Digital's funds seized by the U.S. Government[3] and asserting avoidance claims against FTX Digital, "to confirm that the [U.S.] Debtors stand first in line to recover this cash asset to the extent it is ever released by the government . . . ." U.S. Debtors' Obj. ¶ 49. |
| FTX DM shall be primarily responsible for recovering value from; (b) the approximately $45 million of USDT currently frozen in The Bahamas. *Id*. | Contesting the ownership of the Tether |
| The Parties agree that either a liquidation proceeding with respect to PropCo will be opened in the Bahamas Court to run concurrently with the pending Chapter 11 case of PropCo. *Id*. ¶ 15. | Alleging that acts the JPLs have taken with respect to FTX Property Holdings Ltd. are violations of the automatic stay when they take a necessary enabling step prior to beginning proceedings for the agreed liquidation proceedings in the Bahamas and forcing the JPLs to abandon those proceedings. U.S. Debtors' Obj. ¶ 66. |

---

[3] Apr. 12, 2023 Hr'g. Tr. At 10:7-10 ("We also appreciate the U.S. criminal authorities working in parallel with us to secure assets. This includes approximately 100 million in cash in the name of FTX Digital").

| | |
|---|---|
| The JPLs (or any other person appointed as liquidator of Propco reasonably acceptable to the Chapter 11 Debtors) shall take the lead in managing the properties, determining the appropriate strategy for monetization of the properties, identifying buyers and conducting the market process. *Id.* | Actively interfering with the JPLs efforts to manage and monetize the real property in The Bahamas |
| The Parties will work together in good faith during the next six months (commencing on the date hereof) in coordination with appropriate stakeholders in their respective proceedings to develop alternatives for the potential sale, reorganization or other monetization of (a) the international FTX.com platform (the *"International Platform")* and (b) cryptocurrency held or managed by the Chapter 11 Debtors in accordance with this Agreement and associated with the International Platform ( and not traceable to customers of FTX US). *Id.* ¶ 6. | Excluding the JPLs from discussions regarding options to restart the FTX International Platform.[4] |
| The Parties will share information in their possession concerning the matters contemplated by this Agreement. *Id.* ¶ 22. | Refusing to provide the JPLs with FTX Digital's own data, including communications and documents of FTX Digital's employees. |
| The Parties will propose procedures for court-to-court communication based on international best practices and acceptable to each of the U.S. Bankruptcy Court and The Bahamas Court. *Id.* ¶ 18. | Refusing to engage with the JPLs to propose a protocol for court-to-court communication between this Court and the Bahamas Court |
| The Parties shall work in good faith. *Id.* ¶¶ 6, 8, 9, 11, 20, 23, | The U.S. Debtors have not been acting in good faith. |

7.    In short, the prospect of awaiting open cooperation with the U.S. Debtors is a dim one at best, leaving it to this Court and the Bahamas Court to sort it out. The Motion is the necessary first step in that process, and the Court should grant it.

---

[4] Apr. 12, 2023 Hr'g, Tr. 17:15-18.

I.    **THE FILING OF THE APPLICATION IS A NECESSARY PREDICATE FOR COOPERATION BETWEEN THIS COURT AND THE BAHAMAS COURT FOR RESOLUTION OF NON-U.S. LAW CUSTOMER ISSUES**

8.    As noted, there is no dispute that the questions in the Application include factual and legal issues that are integral to both estates, that these questions need to be decided by some court, and that none of them are governed by U.S. law.

9.    In these circumstances, the two courts with jurisdiction should coordinate based on a cross-border protocol.  Motion ¶¶ 49-63.  This should not be controversial.  This Court has recognized FTX Digital's provisional liquidation as its foreign main proceeding.  *Order Granting Recognition of Foreign Main Proceeding and Certain Related Relief*, Case No. 22-11217 [Dkt. No. 129] (the "**Recognition Order**").  Chapter 15 expressly directs this Court to "cooperate to the *maximum extent possible* with a foreign court." 11 U.S.C. § 1525(a).[5]  (Emphasis added).  Cooperation does not mean automatic deference on issues concerning both estates, but it does mean that this Court should not proceed without consultation with the Bahamas Court.  As the Third Circuit explained, "Chapter 15 also encourages communication and cooperation with foreign courts, and authorizes our courts to communicate directly with foreign courts." *In re ABC Learning Ctrs. Ltd.*, 728 F.3d 301, 306 (3d Cir. 2013).  Additionally, the Cooperation Agreement, which both courts approved, provides that "the Chapter 11 cases and the provisional liquidation of [FTX Digital] shall proceed in parallel. The Parties will propose procedures for court-to-court

---

[5] Cooperation would be required even if the Court had not entered the Recognition Order.  *See Awal Bank, BSC v. HSBC Bank USA (In re Awal Bank, BSC)*, 455 B.R. 73, 81-82 (Bankr. S.D.N.Y. 2011) ("Even if there is no order of recognition, § 1525 provides that a court in a plenary case in the United States 'shall cooperate to the maximum extent possible with a foreign court or a foreign representative, either directly or through the trustee.'") (Citations omitted).  *See also,* 8 Collier on Bankruptcy ¶ 1525.01 (16th ed. 2023) ("The dictates of section 1525 are often followed without any reference to the statutory provision, which does not require recognition to be applicable.").

communication based on international best practices and acceptable to each of the U.S. Bankruptcy Court and The Bahamas Court." *See* Cooperation Agreement, ¶ 18.

10.     Yet, the U.S. Debtors and the Committee now argue there should be *zero* coordination between the Courts on issues critical to FTX Digital's liquidation, and that this Court should answer all of the Non-U.S. Law Customer Issues to the exclusion of the Bahamas Court. In support of their position the U.S. Debtors raise a number of flawed arguments:

11.     *First*, the U.S. Debtors argue that this Court should decide all the Non-U.S. Law Customer Issues because they affect the U.S. Debtors' property, over which this Court has exclusive jurisdiction. U.S. Debtors' Obj. ¶¶ 41-42.  The U.S. Debtors miss the point.  The JPLs have never disputed that this Court will ultimately determine what is and is not property of the U.S. Debtors' estates. Motion ¶ 74; *see also* Cooperation Agreement ¶ 12 (recognition under Chapter 15 would not require this Court to defer to any decision in the Bahamian Liquidation Proceeding, with respect to any matter raised by the Chapter 11 Debtors before the Court with respect to property of the estate U.S. Debtors). Just like the Bahamas Court will ultimately determine what is and is not property of FTX Digital's estate.  Cooperation Agreement ¶ 13 ("recognition in the Bahamas Court would not require the Bahamas Court to defer to the decisions of any foreign court . . . with respect to property of the estate of FTX DM . . . .").  But before either court can make those determinations, someone needs to resolve threshold legal issues of non-U.S. law.  This Court should coordinate with the Bahamas Court on how that is done.

12.     *Second*, the U.S. Debtors argue that "most of the Non-U.S. Law Customer Issues are matters of English Law, not Bahamas law, and in any event, application of foreign law in a bankruptcy proceeding is not a sufficient basis to require this Court's abstention, because bankruptcy courts are competent to apply foreign law."  U.S. Debtors' Obj. ¶ 44.  The JPLs have

never argued that this Court is incompetent to interpret foreign law. Rather, the JPLs simply point

out that the Bahamas Court should play a role in resolving these issues because (i) it is the best

Court to apply Bahamas Law; (ii) it is more familiar with English law than this Court; (iii) it gives

the parties recourse to the Privy Council – which is the final authority on English, Bahamian, and

Antiguan law.

13.     The U.S. Debtors' authorities are not to the contrary. In fact, *In re Lyondell Chem.*

*Co.*, 543 B.R. 428, 460 (Bankr. S.D.N.Y. 2016) squarely supports the JPLs' position and highlights

the risks of an expert-driven proceeding in this Court. The U.S. Debtors cite *Lyondell*, for the

proposition that bankruptcy courts often hear and apply evidence of English law or other foreign

law. U.S. Debtors' Obj. ¶ 44 (characterizing *Lyondell* as "finding Luxembourg law not so unusual

to render the task too difficult and that "largely similar briefing [on Luxembourg law] would

presumably be necessary in either [Luxembourg or the United States]"). But in *Lyondell* the court

dismissed one count of a complaint based on Luxembourg law because the experts provided

conflicting and insufficient opinions, and barely allowed the other count to survive (while the

requiring both sides to submit supplemental foreign law declarations). *Id.* at 446-48. The court,

at various points highlighted the litany of issues caused by the foreign expert declarations. Such

problems, including conflicting interpretations of foreign laws, are more likely here, where there

are novel issues of foreign law. *See LaSala v. UBS, AG*, 510 F.Supp.2d 213, 233-34 (S.D.N.Y.

2007) ("It is inadvisable for this Court to decide a case where legal experts disagree about critical

points in the application of foreign law... It is even more inadvisable for this Court to decide issues

of Swiss law that both experts agree are unsettled.").[6]

---

[6] The U.S. Debtors' other cases are also distinguishable. *Wells Fargo Bank NA v. Am. Home Mort. Inv. Corp.*, dealt with a simple issue of contract interpretation, not with complex and novel issues relating to cryptocurrency. *Wells Fargo Bank NA v. Am. Home Mort. Inv. Corp.*, 2008 WL 4753342, at *4-7 (Bankr. D. Del. Oct. 30, 2008) (applying English principles of contract interpretation to plain language of trust

14.    *Third*, the U.S. Debtors argue that "certain disputed issues, including arguments about constructive trust, will involve consideration of equitable principles that this Court, sitting in Delaware and applying Delaware choice of law rules, will apply to decide the relative recoveries of all the chapter 11 stakeholders (including the JPLs) . . . ." U.S. Debtors' Obj. ¶ 45.  But the Non-U.S. Law Customer Issues do not merely concern FTX Digital's recoveries on its claims against the U.S. Debtors.  They also concern questions of constructive trust in FTX Digital's provisional liquidation, including whether assets in FTX Digital's name (including assets in the Bahamas) are held in trust for customers.

15.    *Fourth*, the U.S. Debtors argue that these Chapter 11 Cases implicate many disparate jurisdictions, and centralizing issues before this Court's jurisdiction is the only way to efficiently manage the proceedings.  U.S. Debtors' Obj. ¶ 45.  On this, the U.S. Debtors could not be more wrong.  This Court unilaterally "centralizing" issues key to the provisional liquidation of an entity that is not in a chapter 11 case without consultation with the Bahamas Court in which its proceeding is actually pending, creates a very high risk of duplicative, never-ending litigation.  FTX Digital's provisional liquidation was filed by the Bahamian regulator – the SCB – and involves a host of third parties (including 45,281 creditors that have submitted claims in that proceeding).  If this Court bars the JPLs from putting the Non-Foreign Law Customer Issues before the Bahamas Court, and unilaterally proceeds to address them in the adversary, other parties will invariably raise those same or similar issues.  If the two courts proceed without coordination, then both estates will be forced to litigate the same issues at the same time in two venues, with the risk

---

agreement, with the benefit of a clear and succinct statement of the law from a variety of English Court decisions).  The Australian law issue in *In re B.C.I. Finances Pty Ltd.*, was less clear but that decision dealt with recognition of a chapter 15 proceeding and whether certain claims could be considered assets under Section 109; notably, no party sought any involvement from the Australian Court here. *In re B.C.I Fins. Pty Ltd.*, 583 B.R. 288, 296-304 (Bankr. S.D.N.Y. 2018).

of disparate rulings (as the Committee, correctly points out). That is not the best outcome.[7] All

of this could be avoided by the kind of cross-border cooperation that is routine in similar cases.[8]

16.    *Fifth*, the U.S. Debtors argue that the United States Government has seized certain

accounts held in FTX Digital's name (the "Accounts") and that this Court must adjudicate the U.S.

Debtors avoidance claims as to the Accounts. In a separate pleading, the JPLs will address how

the U.S. Debtors' actions against the Accounts violate the chapter 15 stay and the Recognition

Order, and constitute a willful breach of the Cooperation Agreement. For now, the JPLs note that

before determining whether the funds in the Accounts are subject to avoidance, this Court will first

---

[7] This risk of duplicative and fragmented proceedings is the reason why the opposition of the Customer Adversary Plaintiffs to the Motion is flawed. The JPLs sympathize with the Customer Adversary Plaintiffs' concern about any delays to these cases, and share their focus on distributing assets to customers. *See Customer Adversary Plaintiffs' Opposition to the Motion of Joint Provisional Liquidators Regarding the Automatic Stay and Application to the Supreme Court of the Bahamas on Non-US Law, and Joinder in Debtors'* Objection, Case No. 22-11068 [Dkt. No. 1412 ¶ 3]. The U.S. Debtors' actions will almost certainly guarantee parallel competing litigation and delays.

[8] The U.S. Debtors attempt to distinguish this case from cases that used a cross-border protocol, such as *Nortel*, *Calpine* and *Soundview*, based on several arguments that fail. First the U.S. Debtors argue that this is not a normal case "where some property is in one debtor's control and other property is in the control of a foreign entity" – because the U.S. Debtors are administering estates containing $7.3 billion in liquid assets while the JPLs currently control around $ 30 million of assets. U.S. Debtors' Obj. ¶ 46. That argument assumes that the U.S. Debtors own all the customers and all the property (which the JPLs do not concede and this Court has not yet decided). That one estate is bigger than the other does not erase the principles underlying cooperation. The U.S. Debtors also argue that *Nortel, Soundview, and Calpine* concerned debtors with distinct creditor bodies, while this case does not. U.S. Debtors' Obj. ¶¶ 46-47. The courts in *Nortel*, *Calpine*, and *Soundview* did not consider the existence of distinct bodies of creditors as a factor when adopting a cross-border protocol. Motion of Canadian Debtors for Entry of an Order Pursuant to 11 U.S.C. § 105(a) Approving Cross-Border Court-To-Court Protocol, *In re Calpine Corp.,* Case No. 05-60200 (CGM) (Bankr. S.D.N.Y. Apr. 5, 2007) [ECF No. 4242] (developing a cross-border protocol due in part to the duplicative nature of the issues and claims arising in both the U.S. and Canadian insolvency proceedings); *In re Nortel Networks, Inc.*, 532 B.R. 494, 531–32 (Bankr. D. Del. 2015) (adopting cross-border protocol without requiring that the U.S. and foreign debtor entities demonstrate distinct or separate creditors); Declaration of Alphonse Fletcher, Jr., Pursuant to Local Rule 1007-2, *In re Soundview Elite Ltd*., Case No. 13-13098(LGB) (Bankr. S.D.N.Y. Sept. 24, 2013) [ECF No. 2] (expressly confirming that all six jointly administered debtors organized under the laws of the Cayman Islands have "the same managers, same shareholders and same creditors"). Even if this Court determines that it should be an important consideration, FTX Digital may very well have creditors distinct from the U.S. Debtors. In fact, that is one of the questions raised in the Application (and the adversary proceeding).

need to know whether FTX Digital holds a significant proportion of them on trust for the benefit of FTX Digital's customers.  This court is not a superior forum to The Bahamas for resolving whether – under Bahamian and English law – funds sitting in a debtor's account are held in trust for third parties, and whether they are part of FTX Digital's bankruptcy estate.  The U.S. Debtors have not explained why this Court (and only this Court) should attempt to answer that question to the exclusion of the court overseeing the Bahamas proceedings.

17.     *Sixth*, the U.S. Debtors also argue that the United States Government has an interest in the disposition of any assets of FTX Digital, and that deference to other proceedings should be withheld where "appropriate to avoid the violation of the laws, public policies, or rights, of the citizens of the United States."  U.S. Debtors' Obj. ¶ 50.  The U.S. Debtors do not identify what laws or public policies would be violated if the Bahamas Court addresses issues of Bahamian, Antiguan, and English law, central to FTX Digital's bankruptcy.[9]  The Application will not interfere with the prosecution of crimes against SBF and his co-conspirators.

18.     *Finally*, the U.S. Debtors argue that there are concerns in granting comity here because the Bahamas is not a signatory to the Model Law on Cross-Border Insolvency or the Model Law on Recognition and Enforcement of Insolvency-Related Judgments.  U.S. Debtors' Obj. ¶ 50.  The U.S. Debtors do not articulate the nature of their concerns or why they matter here.[10]  The Bahamas Court has shown a willingness to cooperate with the U.S. proceedings by approving the Cooperation Agreement, granting recognition to the U.S. Debtors' Ch. 11 Cases, and waiting to

---

[9] None of the cases cited by the U.S. Debtors in support of their argument support the proposition that public policy considerations support this Court barring the JPLs from filing the Application.

[10] As noted in the Motion, courts across the country regularly grant comity to Bahamian insolvency proceedings.  Motion ¶¶ 82, 84.  *See also, In re Northshore Mainland Svcs., Inc.,* 537 B.R. 192, 206 (Bankr. D. Del. 2015) (granting comity to Bahamian insolvency proceeding and noting that there is "no evidence that the Bahamian laws contravene the public policy of the United States.")

address issues that are central to FTX Digital's provisional liquidation while JPLs confirm that this Court's stay does not extend to the Application. Had the U.S. Debtors actually believed their arguments, they should have raised them before consenting to recognition.

## II. THE AUTOMATIC STAY DOES NOT APPLY TO FILING OR PROSECUTION OF THE APPLICATION

19.    The automatic stay does not bar FTX Digital from filing the Application, to put the Non-U.S. Law Customer Issues before the Bahamas Court. The U.S. Debtors and the Committee have not identified a single case in which the stay has reached so far as to prevent a foreign debtor from seeking its own court's guidance on the nature and extent of the estate's rights and liabilities. Motion ¶¶ 60-62.

20.    The U.S. Debtors and the Committee instead argue that the questions in the Application affect the property of the U.S. Debtors. But none of the cases that the U.S. Debtors or Committee cite apply the automatic stay to bar a foreign debtor from asking its own court who its creditors are or identifying property of its estate.[11]

21.    The "duelling debtor" cases that the JPLs cite in their motion are instructive because they show the bounds and limitations of the automatic stay with respect to another debtor's bankruptcy. Each of those cases allowed a debtor to act within its rights in its own bankruptcy, even though those actions had direct, adverse financial consequences to another debtor's estate. For example, the Court in *Noranda* allowed Noranda to reject its contract with Sherwin, and noted

---

[11] Indeed the only case that the U.S. Debtors and the Committee cite in this argument that involves two bankruptcy estates is *In re Kaiser Aluminum Corp.*, 315 B.R. 655 (D. Del. 2004). *Kaiser* is readily distinguishable. In *Kaiser*, one debtor started an adversary proceeding in its own bankruptcy to recover insurance premiums from an insurance company in which another debtor had an interest. *Id.* at 657-58. By contrast, the Application does not seek turnover of any assets that may or may not be property of the U.S. Debtors. Rather, the JPLs seek answers to threshold legal questions about the scope of FTX Digital's estate.

the leverage that Noranda gained over Sherwin in rejecting the contract: "Sherwin must either discontinue its business, renegotiate a different contract with [Noranda] on terms less attractive to it or alter its refinery to accommodate bauxite from a different seller (which has a different chemical composition). *[Noranda] is sophisticated and understands the leverage derived by rejection of the [supply contract].*" *In re Noranda Aluminum, Inc.*, 549 B.R. 725, 730, n.1 (Bankr. E.D. Mo. 2016) (emphasis added).  Similarly, in *National Steel*, the court permitted the debtor to unilaterally increase the price of its contract with another debtor, which had adverse economic consequences for the latter. *In re Nat'l Steel Corp.*, 316 B.R. 287, 312 (Bankr. N.D. Ill. 2004). The U.S. Debtors misunderstand the import of *National Steel*.  While the opposing debtor's acceptance of the unilateral price increase was important to the court's ruling, the court also found that unilaterally increasing the price of the contract in bankruptcy was permissible, even in light of the automatic stay, because "the rates in the original [contract] were well below the market rate for steel at the time." *Id.*  Thus, the court permitted the unilateral price change in *National Steel* because it was economically advantageous to the debtor, despite the impact on the other counterparty.

22.    Like the debtors in *Noranda*, *Carco*, and *National Steel*, FTX Digital is simply seeking to pursue its rights within its own provisional liquidation.  Unlike the actions in those cases, filing the Application could not have a direct, adverse effect on the U.S. Debtors' estates because any decision by the Bahamas Court would be made in coordination with this Court and would have to be adopted (or not) by this Court.   Thus, the principle underlying the cases apply even more strongly in favor of lifting the stay and allowing the JPLs to file the Application.

### III.   IN THE ALTERNATIVE, THE COURT SHOULD LIFT THE AUTOMATIC STAY TO ALLOW THE JPLS TO FILE THE APPLICATION AND INITIATE A CROSS-BORDER PROTOCOL

23.     If this Court concludes that the stay does apply to the filing of the Application, the Court should lift the stay.  The JPLs have met their burden to establish a case that cause exists to lift the stay, and the U.S. Debtors and the Committee have failed to rebut it.[12]

#### A.   Resolving the Non-U.S Law Customer Issues in The Bahamas Does Not Prejudice the U.S. Debtors

24.     The U.S. Debtors claim that they and their creditors would suffer "immeasurable harm" if the JPLs "pursu[e] shadow proceedings in The Bahamas seeking to adjudicate rights as to the scope and makeup of the Debtors' estates' property[]" because the Application seeks directions regarding "the nature of customer entitlements, holding and tracing of assets, and asset distribution matters."  U.S. Debtors' Obj. ¶ 64.

25.     U.S. Debtors mischaracterize the Application and FTX Digital's provisional liquidation, and the Committee merely parrots their mischaracterization.  The provisional liquidation is not a "shadow proceeding," it is the foreign main proceeding for FTX Digital that has been recognized by this Court under chapter 15.  And the Application says nothing about the tracing of assets or asset distribution matters, and it does not say that the "customer relationships and substantial assets held by the [U.S.] Debtors should be 'held' by FTX [Digital]." U.S. Debtors' Obj. ¶ 64.  The Application primarily seeks to answer threshold questions concerning FTX

---

[12] The Committee's authorities do not prove otherwise.  In both, the court denied stay relief because the movants failed to submit *any* evidence establishing cause. *See In re RNI Wind Down Corp.*, 348 B.R. 286, 299–300 (Bankr. D. Del. 2006) ("[T]he movant did not submit any evidence in support of its Stay Relief Motion."); Apr. 12, 2023 Hr'g Tr. [Dkt. No. 1284] at 52:18-21 ("Mr. Bankman-Fried did not put on any evidence whatsoever as to what, and the balancing of the equities here, what harm is going to occur to him.").  Here, the JPLs have set forth more than sufficient evidence in the Greaves and MacMillan-Hughes declarations to establish a prima facie case and that the balance of the equities tips in their favor. *See Declarations in Support of the Motion*, Case No. 22-11068 [Dkt. Nos. 1194, 1194].

Digital's estate, such as whether the customers migrated and the extent of the estate's assets and liabilities.

26.     The U.S. Debtors give a list of six examples of how "the prejudice to the [U.S.] Debtors and their creditors from the JPLs advancing issues core to the Debtors' Chapter 11 Cases outside of this court are evident from the JPLs' actions to date."  U.S. Debtors' Obj. ¶ 66.  None show any prejudice from lifting the stay (or any prejudice at all).

27.     Three of the examples are basic actions that the JPLs took in the ordinary course of administering the FTX Digital estate.  These include opening a claims portal for the FTX Digital provisional liquidation, filing a public reservation of rights with respect to the U.S. Debtors' settlements, and sending updates about the provisional liquidation to potential creditors (long before the U.S. Debtors provided the JPLs with any data).  U.S. Debtors' Obj. ¶ 66.  The JPLs opened a creditor portal as part of their obligation to identify all creditors of FTX Digital and give them the opportunity to participate in the provisional liquidation.  The JPLs told customers they were being contacted in their capacity as customers of FTX Digital and that the customers may have a claim against the U.S. Debtors as well.  *See Declaration of Edgar Mosley in Support of the U.S. Debtors' Obj.*, Case No. 22-11068 [Dkt. No. 1411] (the "**Mosley Decl.**") Ex. P.  Similarly, the JPLs filed a reservation of rights as to the Voyager settlement in their role as the recognized representatives of the FTX Digital estate in, in order to ensure that the U.S. Debtors do not settle claims that belong to FTX Digital or its customers.  *Reservation of Rights of the Joint Provisional Liquidators of FTX Digital Markets*, Case No. 22-11068 [Dkt. No. 819].  Finally, the JPLs did not "[s]olicit[] information from the [U.S.] Debtors' customers using customer data that is property of the Debtors' estates . . . [and] received under [the] NDA."  U.S. Debtors' Obj. ¶ 66; Mosley Decl. ¶ 22.  As the letter cited by the U.S. Debtors clearly shows, the JPLs sent circulars to customers

on January 6, 2023 – before receiving any data from the U.S. creditors and before entry into the NDA.[13]  The JPLs invited customers to provide contacts information if they wanted to continue to receive communications from the JPLs (which customers could do – or not).  The U.S. Debtors have not identified how this action has prejudiced the U.S. Debtors, beyond identifying a tweet. *See* Mosley Decl. Ex. M.

28.    Two other examples involve vague accusations that the JPLs "[a]ttempted to cloud title to assets that have been marshalled by the [U.S.] Debtors" and "[p]otentially hindered the marketing process for potentially raising capital for a restructured exchange by directly soliciting investors."  U.S. Debtors' Obj. ¶ 66.  As to the first, the only "attempts to cloud title" the U.S. Debtors point to are a reference in the JPLs' First Interim Report to "$7.7 billion in transfer from FTX DM to FTX Trading or Alameda," and vaguely refer to "other similar statements made by the JPLs in hearings and filings submitted to this Court."  Mosley Decl. ¶ 21 (quotations omitted). Identifying transfers from FTX Digital to certain of the U.S. Debtors is not an attempt to cloud title.  As to the second, the JPLs do not know what the U.S. Debtors are talking about, and the U.S. Debtors have not clarified what marketing process they were referring to, or how the JPLs interfered with it.

29.    A final example involves the JPLs serving a notice to begin a process that the U.S. Debtors agreed to in the Cooperation Agreement.  The JPLs served that notice to begin a liquidation proceeding for PropCo that was expressly contemplated by the Cooperation Agreement.  *See* Cooperation Agreement ¶ 15 ("The Parties agree that ***either a liquidation proceeding with respect to PropCo will be opened in the Bahamas Court*** to run concurrently with the pending Chapter 11 case of PropCo . . . .") (emphasis added).  When the U.S. Debtors objected,

---

[13] Tellingly, the U.S. Debtors do not point to any provision of the NDA that they allege the JPLs breached.

the JPLs withdrew that notice, in a spirit of cooperation.  The U.S. Debtors have not explained how receiving a notice that was withdrawn the same day prejudiced the U.S. Debtors.

30.    Ultimately, the question is not what the JPLs have been doing in the FTX Digital proceeding that is prejudicing the U.S. Debtors.  The question is whether *lifting the stay* would cause prejudice to the U.S. Debtors.  The U.S. Debtors have no answer to that question.

31.    The U.S. Debtors also argue that "equitable considerations" presented alongside the Application need to necessarily be decided under Delaware and Third Circuit law.  Not true. The only connection to the United States or Delaware regarding questions posed in the Application is the fact that the U.S. Debtors filed for bankruptcy here.  The parties at issue (FTX Trading and FTX Digital) are non-U.S. incorporated entities, were headquartered outside the U.S., with management sitting outside the U.S., engaged in business materially outside the U.S., had explicitly non-U.S. customers with customer contracts governed by non-U.S. law.  The U.S. Debtors provide no reasoning as to why, therefore, U.S. equitable principals would apply to issues regarding the questions posed in the Application.

32.    The Bahamas Court also provides sufficient procedural protections.  *See* U.S. Debtors' Obj. ¶ 72.  As made clear by reading the letter from The Bahamas Bar Association, the U.S. Debtors' counsel simply did not follow the Court's rules when filing their application for their King's Counsel to be specially admitted.  This denial would be no different than this Court's clerk's office denying the appearance of a New York qualified attorney who has no local Delaware counsel.

**B.    The Hardship to the JPLs by Maintenance of the Stay Considerably Outweighs the Hardship to the U.S. Debtors**

33.    The JPLs' significant hardship rests in its inability to progress the FTX Digital provisional liquidation as ordered by the Bahamas Court.  The JPLs have duties that they cannot

Case 22-11068-JTD    Doc 1480    Filed 05/12/23    Page 18 of 30

abdicate for the convenience of the U.S. Debtors' professionals or because the U.S. Debtors simply

do not want the Bahamas Court to decide these issues and prefer this Court do so. In order to fulfil

those duties the JPLs must know:

- the identity of the creditors to whom FTX Digital owes (or does not owe) money or assets;

- which money or assets are FTX Digital's;

- how expansive the FTX Digital estate is;

- whether FTX Digital's assets are held in trust on behalf of customers or not;

- who the real party in interest is in prosecuting clawback actions to recover FTX Digital's assets;

- who the real party in interest is when defending against claims brought by customers; and

- whether FTX Digital has any contractual rights against, or owes obligations to, customers who held perpetual futures.

34.     The U.S. Debtors and the Committee argue that there is no harm at to the JPLs of

litigating the central issues in FTX Digital's provisional liquidation in the United States. U.S.

Debtors' Obj. ¶ 75; Committee Obj. ¶ 52. Not true.

35.     There is significant harm to FTX Digital in having its provisional liquidation

effectively moved to this Court, with no consultation or involvement of the Bahamas Court. FTX

Digital is not a Chapter 11 Debtor. It is a Bahamian entity, with its own ongoing provisional

liquidation, commenced by the Bahamas Securities Commission, overseen by the Bahamas Court,

and recognized by this Court. As discussed above, both this Court and the U.S. Court have

approved a Cooperation Agreement that specifically provides that the two proceedings will run in

parallel. Cooperation Agreement ¶ 19(a). Forcing FTX Digital to litigate the most fundamental

issues in FTX Digital's bankruptcy about its own assets, liabilities and customers, with no input

from the Bahamas Court would be contrary to the Recognition Order, contrary to the Cooperation Agreement, and would essentially erase FTX Digital's provisional liquidation.

36.     The harm is not the same to the U.S. Debtors if this Court lifts the stay and allows the JPLs to file the Application.

37.     *First*, the JPLs' primary purpose is to seek their court's guidance on an important threshold legal question in order progress FTX Digital's case in the Bahamas.[14]  They are not seeking to take over these Chapter 11 cases – rather, they propose a cooperative process that takes account of any effects on the U.S. Debtors' estates.[15]  Moreover, this Court would have to adopt any decision of the Bahamas Court (or even the Privy Council) before it could affect the U.S. Debtors.  Thus, the integrity of the U.S. Debtors' bankruptcy proceedings and their recourse to their own Court would be preserved throughout the entire process.

38.     *Second*, as the U.S. Debtors repeatedly point out, FTX Digital's estate is smaller than that of the U.S. Debtors.  The U.S. Debtors have taken every step to make that estate even smaller and interfere with the JPLs' efforts to marshal FTX Digital's assets.  A path that creates significant risk of duplicative proceedings and forces FTX Digital to litigate in a forum where they

---

[14] The Committee heavily relies on *In re Howrey LLP* in alleging that the JPLs seek to undermine this Court's authority to hear case dispositive issues, Committee Obj. ¶ 41, but that reliance is misplaced.  Unlike here, the *Howrey* court denied a motion for relief from stay seeking to argue (in part) the merits of an adversary proceeding filed by the chapter 11 trustee against the movants in a different forum.  492 B.R. 19, 21-24 (Bankr. N.D. Cal. 2013) (movant characterized the issue as "fundamental legal principal on which the Adversary Proceeding turn[ed]").  In contrast, the Application seeks cooperation and coordination from this Court and the Bahamas Court so that the Bahamas Court can determine only preliminary issues and that this Court can determine which property belongs to the U.S. Debtors and FTX Digital bankruptcy estates.

[15] It is worth noting that the Non-U.S. Law Customer Issues are foundational to the entirety of FTX Digital's provisional liquidation. This is not true of the U.S. Debtors.  For example, these issues do not implicate any of the Chapter 11 Debtors in the U.S. silo.

will be required to take on the additional expense of hiring foreign law experts burdens FTX Digital

and its creditors more than proceeding in The Bahamas burdens the U.S. Debtors.

39.    *Third*, FTX Digital will be harmed by having the Non-U.S. Law Customer Issues

resolved in the U.S. because the rulings in the U.S. adversary cannot bind the International

Customers.  *See* Memorandum in Support of Motion to Dismiss Adversary Proceeding, *Alameda*

*Research LLC et al. v. FTX Digital Mkts. et al*, Case No. 23-50145 (Bankr. D. Del.) [ECF No. 7]

(the "**Motion to Dismiss**").  The Committee and U.S. Debtors' suggestion creates piecemeal serial

litigation in the Bahamas Court against any of FTX Digital's customers who do not accept the

answers of the U.S. Court and argue that they are not bound by them because they were not parties

to the U.S. Debtors' adversary proceeding.  By contrast, in the Bahamas Court there is a process

for appointing representatives to represent the independent interests of the customers.  Motion to

Dismiss ¶¶ 32-35.

40.    The U.S. Debtors claim that "no economic stakeholder has expressed a desire for

proceedings in The Bahamas."  U.S. Debtors' Obj. ¶ 77.  They further argue that there is nothing

to do in the Bahamas "aside from the PropCo Debtor matters that were addressed between the

parties in the Cooperation Agreement."  *Id.*  Not so.  Tens of thousands of customers have

voluntarily submitted their information to the JPLs on the basis that they believe they may have a

claim against FTX Digital's estate.  Moreover, just this week an ad hoc group of customers filed a

statement in support of the JPLs Motion and, pointedly, in support of the JPLs' proposed protocol.

D.I. 1472.  Just because the U.S. Debtors think that there is nothing for them to do in the Bahamas

(with respect to their own cases) does not mean that there is nothing for the JPLs to do, with respect

to FTX Digital's estate.  Like most of the U.S. Debtors' and Committee's arguments, this assumes

a world where the provisional liquidation does not exist.

41.    Finally, the Committee argues that because the JPLs voluntarily sought recognition in the U.S. and otherwise availed themselves of this Court's jurisdiction, the JPLs are not harmed. Committee Obj. ¶ 54.[16]  This turns chapter 15 on its head.  The purpose of recognition of a foreign main proceeding is to have this court assist the foreign court, not displace it.  *See*, *In re Oi S.A.*, 587 B.R. 253, 273 (Bankr. S.D.N.Y. 2018) (recognizing foreign representative's motion to enforce Brazilian reorganization plan and noting that, "the Chapter 15 Court's role is to assist the foreign insolvency proceeding, not to supervise it.").  *See also*, *In re Grand Prix Assocs.*, No. 09-16545 (DHS), 2009 Bankr. LEXIS 1779, at *9 (Bankr. D.N.J. June 26, 2009) ("Sections 1525 and 1527 specifically *require* communication and cooperation between the Court, the BVI Court, and the foreign representative with respect to the supervision and administration of the Foreign Debtors' assets including the approval of agreements related to the coordination of proceedings") (emphasis added); *In re Artimm, S.r.l.*, 335 B.R. 149, 159 (Bankr. C.D. Cal. 2005) ("One of the most important changes introduced by chapter 15 is a mandate that the court cooperate 'to the maximum extent possible' with a foreign court or representative, either directly or through any domestic trustee.") (citations omitted).

## C.    The Merits Weigh In Favor of Lifting the Stay

42.    For the third prong, the JPLs need only show that their claim – asking for a court issued determination on whether migration occurred – is not frivolous.  *In re Levitz Furniture*, 267

---

[16]    The Committee's citation to *Nortel* is misplaced.  In *Nortel*, pension regulators in the U.K. sought to continue litigating important case issues **on behalf of private creditors** after already filing proofs of claim in the U.S. cases.  *In re Nortel Networks Corp.*, 426 B.R. 84, 93 (Bankr. D. Del. 2010).  The JPLs are not seeking relief from the automatic stay to litigate issues on behalf of a singular private creditor constituency – they are simply trying to implement a protocol that will allow for cross-border coordination that will lead to a more efficient administration of the estates.  Indeed, the Lift Stay Motion is not, as the Committee suggests, "inimical" to the efforts to assemble, allocate, and distribute assets – it is in furtherance of that effort.  Given the clear factual differences between *Nortel* and the present cases, the rhetoric from *Nortel* is not applicable.

B.R. 516, 523 (Bankr. D. Del. 2000) ("Defendants have met the third prong, since that merely requires a showing that their claim is not frivolous."). This is a low bar. *In re Tribune Co.*, 418 B.R. 116, 129 (Bankr. D. Del. 2009) (finding declaration detailing specific dates, witnesses and facts, and copy of agreement sufficient "to support a slight showing of the probability of success on the merits"); *Matter of Rexene Prod. Co.*, 141 B.R. 574, 578 (Bankr. D. Del. 1992) ("The required showing [of success on the merits] is very slight[.]").

43.    While the JPLs are not required to prove the merits on this question today, there is substantial evidence that make the question of migration substantively more than what the U.S. Debtors and the Committee call a non-issue.

44.    *First*, although the U.S. Debtors now assert that *no* customers moved to FTX Digital, this is an open issue, as the U.S. Debtors' inconsistent positions make clear.[17] At the First Day hearing, the U.S. Debtors declared 6% of the Dotcom Silo customers were customers of FTX Digital. First Day H'rg Tr., Case No. 22-11068 [Dkt. No. 142] at 26:16. Now, "once the Debtors dug into the underlying facts and available information," (facts and information that the U.S. Debtors control and *continue to* deny the JPLs' access to) the U.S. Debtors declare none migrated. U.S. Debtors' Obj. ¶ 3. The limited discovery that the JPLs have been able to take since the U.S. Debtors' filed their objection undercuts this point. When asked to produce any documents that evidence what caused the U.S. Debtors to change their position, they referred to the FTX Terms of Service (something they had at the first day hearing) and identified nothing else that caused

---

[17] There are also a number of contested factual issues related to migration that the JPLs will address once a process for resolving these issues is in place. These issues include disputes about the extent of FTX Digital's Bahamian operations. For example, while the Committee asks this Court to accept that the FTX Group did not move its locus of operations to the Bahamas (*see e.g.* Committee Obj. ¶ 24, stating that before the petition date FTX Digital "only" employed 83 individuals), those 83 employees accounted for nearly half of the FTX Group's International workforce.

them to change their minds.  Indeed, while the U.S. Debtors agreed to search for such documents,

they did not even know whether any such documents existed.[18]  This alone makes clear that a non-

frivolous dispute exists.

      45.    *Second*, the U.S. Debtors point to the plain language of the 2022 Terms of Service.

U.S. Debtors' Obj. ¶ 86.  But the plain language of the 2022 Terms of Service indicates that FTX

Digital is the proper counterparty to the majority of the International Customers.  The language

states "[t]he following terms and conditions of service . . . constitute an agreement between you

("you", "your" or "User") and FTX Trading Ltd, . . . **or** a Service Provider in respect of a Specified

Service."  2022 Terms of Use (emphasis added).  Section 1.3 of the 2022 Terms of Use state:

> "**IMPORTANT**: You acknowledge and agree that any Specified Service referred
> to in a Service Schedule shall be provided to you by the Service Provider specified
> in that Service Schedule.  **In such case, the Specified Service shall be provided to**
> **you on and subject to the Terms, with references in these General Terms to**
> **"FTX Trading" (or "we", "our" or "us") being read as references to the**
> **Service Provider specified in the Service Schedule**, unless the context provides
> otherwise, and under no circumstances shall any other person, including any
> Affiliate of the Service Provider, be liable to you for the performance of any of the
> Service Provider's obligations under the Terms."

2022 Terms of Use § 1.3 (emphasis added).  In other words, everywhere FTX Trading is used,

FTX Digital must be replaced with respect to the Specified Service.  The U.S. Debtors

conveniently ignore this provision.

---

[18] *See* Bakemeyer Declaration, Exhibit A, at 7 (U.S. Debtors' response to the JPL's request for "Documents
and Communications concerning the U.S. Debtors' 'own initial assumption that 6% of FTX.com customers
were customers of FTX DM' and Your statement that, 'once the Debtors dug into the underlying facts and
available information, this was proven incorrect.'").  Specifically, the U.S. Debtors responded that, "Subject
to and without waiver of the foregoing objections, in response to Request No. 6 the Debtors refer the JPLs
to the FTX Terms of Service, which were attached as Exhibits D, E, and H to the Mosley Decl., and ***will***
***produce non-privileged documents responsive to Request No. 6, if any, following a reasonable search***."
*Id.* (emphasis added).

46.    FTX Digital was clearly a Service Provider for Spot Market services; Spot Margin Trading services; OTC/Off-Exchange Portal services; Futures Market services; and Volatility Market services.  These services make up approximately 90% of the trading on the FTX.com platform.  Therefore, FTX Digital was the counterparty to 90% of the International Platform, including those services in sections 7 (Order Book and Convert) and 8 (Account Funding) of the 2022 Terms of Use.

47.    The 2022 Terms of Use also state that "under no circumstances shall [FTX Trading] be liable to [International Customers] for the performance of any of the Service Provider's obligations under the Terms."  2022 Terms of Use § 1.3.  The JPLs take this contractual liability seriously.

48.    *Third*, the Debtors suggest that the JPLs have "failed to produce any evidence of a single customer being provided notice of or consenting to the 2022 Terms of Service" and that consent for the novation was required.  U.S. Debtors' Obj. ¶ 87.  Again, the proper interpretation of these English law governed documents is not the subject of the Motion.  But consent by or notice to the customers was not required under the 2019 Terms of Service:

> We reserve the right to freely assign or transfer these Terms and the rights and obligations of these Terms, to any third party at any time without notice or consent.

2019 Terms of Service § 29.  Under English law, advance consent provisions such as this are enforceable under English law.  *Habibsons Bank Ltd. v. Standard Chartered Bank (Hong Kong) Ltd.* [2011] QB 943 at 951-52.  Bakemeyer Declaration, Exhibit B.

49.    Finally, while discovery has been extremely limited, it is clear that customers did enter into contracts directly with FTX Digital.  *See* Bakemeyer Declaration Exhibits C - M. Additional discovery is necessary to discover the extent of these contract prior to answering the merits of this question.

**D.     Comity Considerations Are Applicable Here**

50.     The U.S. Debtors' and Committee's arguments about how comity considerations cannot apply here because "there is no parallel proceeding in the Bahamas Court" and "because the JPLs have not filed a motion seeking abstention" put the cart before the horse.  *E.g.*, U.S. Debtors' Obj. ¶¶ 94-95.  The JPLs have proceeded properly by seeking to file the Application so that this Court may have a proceeding to abstain in favor of.  That the Debtors have filed the Adversary Proceeding "first," in violation of FTX Digital's automatic stay, should not prevent the Court's determination that comity principals are applicable here.  Indeed, the JPLs have recently filed their Motion to Dismiss the Adversary Proceeding arguing that that proceeding is void and have asked this Court to abstain in favour of the Bahamas Court in the interpretation of the Terms of Use and migration issues.

51.     Further, the U.S. Debtors' attempt to distinguish the JPLs' authorities, as limited to courts with "substantial knowledge of the relevant non-bankruptcy legal claims" misses the point. U.S. Debtors' Obj. ¶¶ 96-97.  In each case, deference was granted to the court best positioned to address the issues, with a court's prior familiarity with the case being just one of many relevant factors.  *See Pursifull v. Eakin*, 814 F.2d 1501, 1506 (10th. Cir. 1987) (cause to lift the stay existed because (among other things) "the issues involved were matters of state law best decided by the state courts"); *Drauschak v. VMP Holdings Ass'n, L.P. (In re Drauschak)*, 481 B.R. 330, 347 (E.D. Bankr. 2012) (Pennsylvania courts "ha[d] greater expertise in resolving" claims arising under Pennsylvania law); *Int'l Tobacco Partners, Ltd. v. Ohio (In re Int'l Tobacco Partners, Ltd.)*, 462 B.R. 378, 393 (Bankr. E.D.N.Y. 2011) (the Massachusetts Court appeare[d] to be the more appropriate forum for determining the preliminary questions[,]"); *In re Int'l Admin. Servs., Inc.*, 211 B.R. 88, 94-96 (Bankr. M.D. Fla. 1997) (deferring to the Guernsey litigation where money at

issue was in Guernsey, Guernsey had greater interest in regulating entities doing business on its shores, and deference would promote judicial economy and comity).  Here, the JPLs seek resolution of Non-U.S. Law Customer Issues, which concern Bahamian, Antiguan, and English law.

52.     The U.S. Debtors' attempt to distinguish *Matter of Williams*, also fails.  144 F.3d 544 (7th Cir. 1998).  The U.S. Debtors argue that, there, a state court was ready to make a determination that would be accepted by the bankruptcy court, and, here, this Court ultimately determines effect of a Bahamian court order on the Chapter 11 Cases.  U.S. Debtors' Obj. ¶ 97.  The U.S. Debtors fail to mention that the Seventh Circuit also reasoned that the bankruptcy court had "no particular expertise under [a] narrow area of state law [and adjudication there] would not be a particularly efficient use of judicial resources."  *Matter of Williams*, 144 F.3d at 550.  More importantly, the U.S. Debtors' argument conflates multiple issues.  Bankruptcy courts often give deference to non-bankruptcy courts to preliminarily determine non-bankruptcy issues, but that deference is wholly separate from the determination of what constitutes property of the estate in light of the non-bankruptcy court's ruling.  *See e.g.*, *In re Int'l Tobacco Partners, Ltd.*, 462 B.R. at 393 ("[A]t this stage in the litigation, state law questions of the validity of the assignment and priority of interest must be answered before a final § 541 determination can be made.").  Here, the Bahamian court must address preliminary questions of non-U.S. law on which the Bahamas Court has expertise before this Court can reach the question of what constitutes property of the estate.[19]  This is precisely in line with how the JPLs would propose to proceed.

_____

[19]  The U.S. Debtors' reliance on *Arcapita Bank B.S.C.C. v. Bahr. Islamic Bank (In re Arcapita Bank B.S.C.(c))*, 575 B.R. 229 (Bankr. S.D.N.Y. 2017), and the Committee's reliance on *In re Soundview Elite, Ltd.*, 503 B.R. 571 (Bankr. S.D.N.Y. 2014) bear the same result.  In *Arcapita*, the court denied dismissal of a preference adversary proceeding, and in *Soundview*, the bankruptcy court declined to a lift the stay as to issues that were squarely within the expertise of a bankruptcy court. *In re Arcapita Bank B.S.C.(c)*, 575

53.     The Committee also argues that comity principles "do[ ] not allow a bankruptcy court to 'ignore its own responsibility' to review issues that 'directly affect the bankruptcy estate.'" Committee Obj. ¶ 57 (citations omitted).   The Committee and the U.S. Debtors misread the Application.  The JPLs are not asking this Court to ignore its responsibilities – or for the Bahamas Court to decide the allocation of property of the U.S. Debtors' estates.  The JPLs are simply asking this Court to allow them to file the Application so that the two courts can coordinate on resolving the Non-U.S. Law Customer Issues.  Even though the Committee and the U.S. Debtors' pleadings are fraught with the assumption that because they say the International Customers are those of FTX Trading, that it must be true, as discussed above, the answer to this question is not clear.[20]

54.     To the contrary, this Court may not ignore FTX Digital's provisional liquidation and disregard the principles of comity.  *See Stonington Partners v. Lernout & Hauspie Speech Prods*. N.V., 310 F.3d 118, 128 (3d Cir. 2002).  In *Stonington*, the bankruptcy court enjoined a creditor from prosecuting the nature of its claims against the debtor in the debtor's foreign court proceeding, finding that the debtor's chapter 11 proceeding was "the center of gravity."  *Id*. at 122. The Third Circuit reversed the bankruptcy court's ruling stating "our case law unequivocally directs courts to exercise restraint in enjoining foreign proceedings" and to consider the "various comity concerns."  *Id.* at 129.

55.     The remainder of the Committee's arguments: that the JPLs ignore comity themselves (which they clearly do not); that there are other litigations pending about FTX in the

---

B.R. at 241-42; *In re Soundview Elite, Ltd.*, 503 B.R. at 584-87.  Here, the English and Antiguan law-governed issues of migration and novation are not issues of U.S. bankruptcy law.

[20] The Committee cites two cases in support.  *See* Committee Obj. ¶ 57 (citing *In re Solar Tr. of Am. LLC*, No. 12-11136 (KG), 2015 Bankr. LEXIS 76 (Bankr. D. Del. Jan. 12, 2015); *Liebmann v. French (In re French)*, 303 B.R. 774 (Bankr. D. Md. 2003), *aff'd*, 320 B.R. 78 (D. Md. 2004), *aff'd*, 440 F.3d 145 (4th Cir. 2006)).  Neither case involved a concurrent foreign proceeding.

United States; and that these issues exist "only because the JPLs were appointed before a chapter 11 case for FTX DM could be filed," Committee Obj. ¶ 62, do not speak to whether this Court should allow the JPLs to proceed with the Application in the Bahamas Court.[21]

### E. The JPLs Do Not Have Unclean Hands

56. As a last ditch argument, the U.S. Debtors argue that the JPLs should be denied stay relief because the JPLs have taken actions and acquiesced to the Commission's actions in violation of the automatic stay. U.S. Debtors' Obj. ¶ 91. Neither instance of the JPLs' alleged stay violations were actually stay violations. The first, that Brian Simms was cc'd on emails in which the Commission directed digital assets to be removed from the control of SBF and Gary Wang, is not a stay violation. *Pardo v. NYLCare Health Plans, Inc. (In re APF Co.)*, 274 B.R. 408, 417 (Bankr. D. Del. 2001) ("Plaintiffs must show that that NYLCare engaged in conduct which was an affirmative post-petition act manifesting either an exercise of control over property of the estate, or collecting, assessing, or recovering such property in order to demonstrate a stay violation . . . Sections (a)(3) and (a)(6) require more than a mere passive act[.]"). But even if the JPLs were liable for the Commission's actions (they are not), the Commission did not violate the stay. The Commission, an independent Bahamian governmental agency over which Mr. Simms has no control was acting within its police and regulatory powers. 11 U.S.C. § 362(b)(4).

---

[21] Of particular note is the Committee's baseless accusation that the Bahamas Court of lacking reciprocity to this Court. This unwarranted attack on the Bahamas Court could not be further from the truth and lacks any supporting evidence. In fact, through the Motion and Application, the JPLs seek to lay the framework for a protocol that fosters cooperation and efficiency among the Bahamas Court and this Court. The JPLs' efforts to coordinate are the exact opposite of the circumstances in *Remington Rand Corp.-Delaware v. Bus. Sys. Inc.,* where a Dutch insolvency trustee sold property of a U.S. debtor without notice or the opportunity to be heard for the U.S. debtor, nor a grant of relief from the automatic stay from the bankruptcy court. 830 F.2d 1260, 1265-67 (3d Cir. 1987). By the Application, the JPLs do not seek to recover or sell any of the U.S. Debtors' property, except to the extent agreed to or otherwise pursuant to a court order.

57.     In fact, the Debtors have themselves recognized that the commission's actions were appropriate and proper and in the best interests of both estates. Feb. 6, 2023 Hr'g. Tr. at 62:18-21; 63:4-7 ("At the time we didn't fully realize what was transpiring, but there was efforts by the provisional liquidators to also secure assets for the protection of customers […] [w]e were fortunate, of course, that the provisional liquidators were also able to capture some of this value held in custody in the Bahamas that, presumably, could have also been stolen in this time period.").

58.     Second, the JPLs setting up a portal for their creditors is not in violation of the stay, as it is an ordinary course act in the FTX Digital liquidation proceeding. Customers were clearly told that they were being contacted in their capacity as customers of FTX Digital and that the customers may have a claim against the U.S. Debtors as well.  This is not a stay violation.

59.     The cases the U.S. Debtors cite in support are misplaced.  The JPLs took no "self-help" actions here because the JPLs were never trying to collect on a debt owed by the U.S. Debtors or otherwise transfer U.S. Debtor property as was the case in both cases the U.S. Debtors cite.  *See In re Am. Home Mortg. Holdings, Inc*., 401 B.R. 653, 655 (D. Del. 2009), (defendant-creditors sought to recover the improper payment by offsetting the amount from other payments due to it); *In re Fugazy Exp. Inc*., 982 F.2d 769, 767 (2d Cir. 1992) (chairman of board failed to seek bankruptcy court approval of transferring a license post-petition).

## CONCLUSION

60.     For the foregoing reasons, the JPLs respectfully request that this Court grant the Motion.

*[Remainder of page intentionally left blank.]*

Dated: May 12, 2023

/s/ *Brendan J. Schlauch*

**RICHARDS, LAYTON & FINGER, P.A.**      **WHITE & CASE LLP**

Kevin Gross (No. 209)

Paul N. Heath (No. 3704)

Brendan J. Schlauch (No. 6115)

David T. Queroli (No. 6318)

One Rodney Square

920 N. King Street

Wilmington, DE 19801

Telephone:     (302) 651-7700

Facsimile:     (302) 651-7701

gross@rlf.com

heath@rlf.com

schlauch@rlf.com

queroli@rlf.com


-and-

Jessica C. Lauria (admitted *pro hac vice*)

J. Christopher Shore (admitted *pro hac vice*)

Brian D. Pfeiffer (admitted *pro hac vice*)

Mark Franke (admitted *pro hac vice*)

Brandon Batzel (admitted *pro hac vice*)

Brett L. Bakemeyer (admitted *pro hac vice*)

1221 Avenue of the Americas

New York, NY 10020

Telephone:     (212) 819-8200

jessica.lauria@whitecase.com

cshore@whitecase.com

brian.pfeiffer@whitecase.com

mark.franke@whitecase.com

brandon.batzel@whitecase.com

brett.bakemeyer@whitecase.com


Thomas E Lauria (admitted *pro hac vice*)

Richard S. Kebrdle (admitted *pro hac vice*)

200 South Biscayne Boulevard, Suite 4900

Miami, FL 33131

Telephone:     (305) 371-2700

tlauria@whitecase.com

rkebrdle@whitecase.com


*Attorneys for the Joint Provisional Liquidators of FTX Digital Markets Ltd. (in Provisional Liquidation)*