# EXHIBIT B

A

Court of Appeal

# Habibsons Bank Ltd *v* Standard Chartered Bank (Hong Kong) Ltd

[2010] EWCA Civ 1335

B   2010 Oct 11, 15;                                               Rix, Moore-Bick LJJ
    Nov 24

*Contract — Validity — Alteration of written instrument — Purchase of loan by way of trade confirmation and transfer certificate — Settlement date within transfer certificate altered unilaterally — Whether alteration rendering underlying agreement void*

C

In September 2008 the parent company of the defendant bank offered the claimant bank a share in a loan which had been advanced to a Dutch bank. The claimant agreed to purchase the share of the loan offered. A trade confirmation form and transfer certificate were created for the purpose, providing for a settlement date and transfer date of 8 October 2008. It having been noticed that the trade ought to have been carried out by the defendant, on 6 October a new trade confirmation form

D   in the name of the defendant, which recorded the transaction on the terms of the Loan Market Association Standard Terms and Conditions for Par Trade Transactions, was sent to the claimant by e-mail. The new form and the transfer certificate provided for a settlement date of 16 October 2008. The claimant signed the documents and returned them by fax. However, at 10.20 pm on 6 October a Dutch court made, with immediate effect, an administration order in respect of the Dutch bank under which administrators appointed by the court were put in charge of

E   the Dutch bank's affairs. The Dutch bank was insolvent and was unable to meet its obligations, including repayment of the loan. On 8 October the claimant received a request that the settlement date be brought forward to 10 October but it refused to agree to the change. However, later on that day the claimant also received a copy of a transfer certificate bearing a settlement date of 10 October 2008, someone at the defendant bank having apparently copied or reprinted the transfer certificate bearing the signature of the claimant and altered it by using correction fluid. On 8 October

F   the claimant made a formal objection to the transaction in accordance with the Loan Market Association rules and instructed its agent not to proceed without further instructions. However, on 15 October the agent signed the transfer certificate which the claimant had returned on 6 October and which correctly reflected the transaction entered into on that date. The claimant continued to dispute the transaction and did not pay the amount due in settlement of the purchase agreement, but the defendant recouped the sum due to it by way of set-off from one of the claimant's accounts held

G   at the defendant's New York branch. The claimant issued proceedings seeking the return of the sum paid out of that account for the purchase of the loan and subsequently sought permission to amend its particulars of claim. The draft amended particulars alleged, inter alia, that the agreed settlement date in the transfer certificate had been unilaterally altered by use of correction fluid from 16 October to 10 October, by or on behalf of the defendant, and pleaded that the proposed trade had thereby itself been rendered void, but contained no allegation of fraud or

H   misconduct. The judge refused permission to amend, and as a consequence the claim stood struck out by virtue of an earlier order of the court.

On the claimant's application for permission to appeal against the refusal of permission to amend—

*Held,* granting permission to appeal but dismissing the appeal, that, where an instrument which created obligations was rendered void by an alteration, the

obligations to which it gave rise were also rendered void, but that, where parties   A
entered into a contract under which a written instrument signed by both parties but
not itself giving rise to the obligations was to be used for the purposes of carrying out
the contract or some aspect of it, unauthorised alteration of the instrument in some
material respect, while capable of invalidating the instrument itself, would not
automatically render the underlying transaction void; that a distinction was therefore
to be drawn between documents which contained or evidenced the transaction itself,
such as the trade confirmation, and documents which were required to carry the   B
transaction into effect, such as the transfer certificate; that, although the alteration of
a document the effect of which was to bring forward the date at which a transaction
was to be completed and payment made was on its face a material alteration, and the
alteration of the settlement date had rendered the certificate itself void, the mere fact
of the alteration was not sufficient to render the transaction as a whole void; and that,
accordingly, absent fraud or misconduct, the contract itself had not been discharged
and the judge had been entitled to refuse permission to amend the pleadings to assert   C
that it had been, and, since none of the ways in which the claimant had sought to put
its case had any real prospect of success, the claim as a whole stood struck out ( post,
paras 34–35, 38, 46, 47).

*Suffell v Bank of England* (1882) 9 QBD 555, CA and *Raiffeisen Zentralbank
Österreich AG v Crossseas Shipping Ltd* [2000] 1 WLR 1135, CA considered.

*Pigot's Case* (1614) 11 Co Rep 26b distinguished.

*Per curiam.* Whether the matter is raised on an application to strike out under   D
CPR r 3.4, on an application for summary judgment under CPR Pt 24 or on an
application for permission to amend, the court will not allow a party to pursue a case
which has no real prospect of success, because to do so is unfair to the other party and
leads to nothing but a waste of costs and valuable court time ( post, paras 12, 47).

Decision of Cooke J [2010] EWHC 702 (Comm) affirmed.

The following cases are referred to in the judgment of Moore-Bick LJ:   E

*Argo Fund Ltd, The v Essar Steel Ltd* [2005] EWHC 600 (Comm); [2006] 1 All
   ER (Comm) 56; [2005] 2 Lloyd's Rep 203
*Carlill v Carbolic Smoke Ball Co* [1893] 1 QB 256, CA
*Goodridge v Macquarie Bank Ltd* [2010] FCA 67; 265 ALR 170
*Howgate and Osborn's Contract, In re* [1902] 1 Ch 451
*Lombard Finance Ltd v Brookplain Trading Ltd* [1991] 1 WLR 271; [1991] 2 All ER
   762, CA   F
*Master v Miller* (1791) 4 Durn & E 320
*Pigot's Case* (1614) 11 Co Rep 26b
*Raiffeisen Zentralbank Österreich AG v Crossseas Shipping Ltd* [2000] 1 WLR
   1135; [2000] 3 All ER 274; [2000] 1 All ER (Comm) 76, CA
*Sellin v Price* (1867) LR 2 Ex 189
*Suffell v Bank of England* (1882) 9 QBD 555, CA

                                                                                 G

The following additional case was cited in argument:

*R (Mercury Tax Group Ltd) v Revenue and Customs Comrs* [2008] EWHC 2721
   (Admin); [2009] STC 743

The following additional cases, although not cited, were referred to in the skeleton
arguments:
                                                                                 H
*Cobbold v Greenwich London Borough Council* (unreported) 9 August 1999; [1999]
   CA Transcript No 1406, CA
*Equitable Life Assurance Society v Ernst & Young* [2003] EWCA Civ 1114; [2003]
   2 BCLC 603, CA
*Flexitallic Group Inc v T & N Ltd* (unreported) 19 December 2001, Jules Sher QC

A  *Global Multimedia International Ltd v Ara Media Services (Abu-Aljadail, Part 20 defendants)* [2006] EWHC 3612 (Ch); [2007] 1 All ER (Comm) 1160
*Henderson v Henderson* (1843) 3 Hare 100
*Johnson v Gore Wood & Co* [2002] 2 AC 1; [2001] 2 WLR 72; [2001] 1 All ER 481, HL(E)
*Landfast (Anglia) Ltd v Cameron Taylor One Ltd* [2008] EWHC 343 (TCC); 117 Con LR 53

B  *Law Debenture Trust Corpn (Channel Islands) Ltd v Lexington Insurance Co* [2002] EWCA Civ 1673; [2003] CPLR 115, CA
*Lexi Holdings plc v DTZ Debenham Tie Leugn Ltd* [2010] EWHC 2290 (Ch)
*Oil & Minerals Development Corpn v Sajjad* (unreported) 3 December 2001, Morrison J
*Thurrock Borough Council v Secretary of State for the Environment, Transport and the Regions* [2001] CP Rep 55; [2001] 1 PLR 94, CA

C  **APPLICATION** for permission to appeal

By a claim form issued on 4 February 2009 in the Chancery Division, the claimant, Habibsons Bank Ltd, claimed against the defendant, Standard Chartered Bank (Hong Kong) Ltd, repayment of a sum which had been deducted from one of its bank accounts by the defendant, ostensibly in order to obtain a sum due to the defendant as the agreed purchase price under a

D  contract between the parties by which the claimant had agreed to purchase from the defendant a loan which had been advanced by the defendant to a third party. On 30 April 2009 the action was transferred to the Commercial Court of the Queen's Bench Division and the defendant applied for an order striking out the claim or, in the alternative, for summary judgment. By an application notice issued on 20 July 2009 the claimant applied, inter alia, for

E  permission to amend its particulars of claim, in order to reflect its claim that there had been a unilateral alteration of the applicable transfer certificate with the result that both the document itself and the underlying contract were rendered void. On 20 August 2009 Teare J ordered that the claim be struck out, but that the order should not take effect before the hearing of the claimant's application to amend, or further order. On 30 March

F  2010 Cooke J refused permission to make any of the amendments sought and the claim therefore stood dismissed pursuant to the earlier order of Teare J.

By an appellant's notice dated 14 April 2010 the claimant sought permission to appeal on the grounds, inter alia, that the judge had erred in concluding that the proposed appeal had no real prospect of success, and in particular in finding that, in the absence of fraud, the rule in *Pigot's Case*

G  (1614) 11 Co Rep 26b had no application. On 2 June 2010, the Court of Appeal (Etherton LJ) ordered that there be an oral hearing of the application with an appeal to follow if permission were granted.

The application was heard on 11 October 2010 before Rix, Moore-Bick and Patten LJJ and judgment reserved. By an application on notice, heard on 15 October 2010, the claimant applied for Patten LJ to recuse himself from

H  taking further part in determining the application, and he withdrew. The court (Rix and Moore-Bick LJJ) determined that they would continue to determine the application of 11 October 2010, for reasons to be given later.

The facts relevant to the appeal are stated in the judgment of Moore-Bick LJ.

*Teresa Rosen Peacocke* (instructed by *Hugh Cartwright & Amin*) for the claimant*.

There was a material alteration of the applicable transfer certificate without the consent of the obligor so that the purported trade is to be treated as avoided and the whole transaction as rendered ineffective: see *Pigot's Case* (1614) 11 Co Rep 26b and *R (Mercury Tax Group Ltd) v Revenue and Customs Comrs* [2009] STC 743. An alteration is "material" if it adversely affects the utility of an instrument for ordinary business purposes, even although it does not affect the contractual or other rights of the parties to the instrument: see *Raiffeisen Zentralbank Österreich AG v Crossseas Shipping Ltd* [2000] 1 WLR 1135 and *Suffell v Bank of England* (1882) 9 QBD 555. Under the rule in *Pigot's Case* if an instrument which creates obligations is rendered void by alteration so are the obligations to which it gives rise. The altered instrument having been rendered vod by alteration, to seek to distinguish an instrument creating obligations from a document effecting such obligations confuses an executed contract with an executory contract. Morever, each copy of the transfer certificate is treated as an original, so that as a result of the alteration of one copy the transaction as a whole becomes void. The fact that no fraud or misconduct is alleged does not affect the application of the rule in *Pigot's Case*. [Reference was also made to *Master v Miller* (1791) 4 Durn & E 320; *Sellin v Price* (1867) LR 2 Ex 189; *In re Howgate and Osborn's Contract* [1902] 1 Ch 451 and *Lombard Finance Ltd v Brookplain Trading Ltd* [1991] 1 WLR 271.]

*Christopher Harris* (instructed by *Hogan Lovells*) for the defendant.

Where parties enter into a contract under which a written instrument signed by both parties, which does not itself give rise to the obligations, is used to carry out the contact or some aspect of it, the unauthorised alteration of the instrument in some material respect can invalidate it but nothing in the authorities suggests that that automatically renders the underlying tranaction void, although it may do if the alteration amounts to conduct entitling the other to treat the contract as discharged. The rule in *Pigot's Case* does not apply since (i) there is no allegation of fraud or improper conduct; (ii) no use has been made of the altered document; and (iii) the alteration to the applicable instrument does not go to the obligations undertaken but to the effecting of those obligations.

*Rosen Peacocke* replied.

The court took time for consideration.

24 November 2010. The following judgments were handed down.

**MOORE-BICK LJ**

1 This is an appeal against the order of Cooke J [2010] EWHC 702 (Comm) refusing the appellant permission to amend its particulars of claim. As a consequence of that refusal the claim stands dismissed under an order made by Teare J on 20 August 2009 [2009] EWHC 2686 (Comm).

---

* *Reporter's note.* For the application made on 15 October only, *Teresa Rosen Peacocke* was led by *Richard de Lacy QC*.

* **Corrigendum:**
Page 946: At C, line commencing "altered": "vod" should read "void".
At E, line commencing "used to": "contact" should read "contract";
line commencing "tranaction": word should be "transaction".

A   *Background*

2   The proceedings arose out of the insolvency in September or early October 2008 of a Dutch bank, NV De Indonesische Overzeese Bank, generally known as Indover Bank ("Indover"). On 9 May 2008 Indover entered into a facility agreement with a number of lenders under which it borrowed sums totalling US$117,500,000 for a period of one year. 
B   Standard Chartered Bank (Hong Kong) Ltd ("SCB (HK)") was one of the original lenders. The facility took the form of a typical syndicated loan agreement, under which an agent was appointed to perform various tasks on behalf of the parties. The agent in this case was a German bank, Bayerische Landesbank ("BL").

3   As is usual in such cases, the facility agreement provided for the transfer by the original parties of all or part of their rights to third parties. In 
C   effect, they were given the power to sell the whole or part of their interests in the loan to other banks, thus taking advantage of the secondary market in loans of this kind. The facility agreement provided:

> "26 *Changes to the parties*
> "26.1 Assignments and transfers by the lenders.
D   > "Subject to this clause 26, a lender (the 'existing lender') may: (a) assign any of its rights; or (b) transfer by novation any of its rights and obligations under any finance document to another bank or financial institution . . . which is regularly engaged in or established for the purpose of making, purchasing or investing in loans, securities or other financial assets ('the new lender').
> "26.2 Conditions of assignment or transfer
E   > "(a) The consent of the borrower is not required for an assignment or transfer by a lender . . . (c) An assignment will only be effective on: (i) receipt by the agent of written confirmation from the new lender . . . that the new lender will assume the same obligations to the other finance parties as it would have been under if it was an original lender; (ii) the performance by the agent of all necessary '*know your customer*' or other 
F   similar checks relating to any person that it is required to carry out in relation to such assignment to a new lender . . . (d) A transfer will only be effective if the procedure set out in clause 26.5 (*Procedure for transfer*) is complied with."
> "26.5 Procedure for transfer
> "(a) . . . a transfer is effected in accordance with paragraph (c) below when the agent executes an otherwise duly completed transfer certificate 
G   delivered to it by the existing lender and the new lender. The agent shall, subject to paragraph (b) below, as soon as reasonably practicable after receipt by it of a duly completed transfer certificate appearing on its face to comply with the terms of this agreement, execute that transfer certificate. (b) The agent shall only be obliged to execute a transfer certificate . . . once it is satisfied it has complied with all necessary '*know 
H   your customer*' or similar other checks under all applicable laws and regulations in relation to the transfer to such new lender. (c) On the transfer date . . . (iv) the new lender shall become a party as a 'lender'."

4   The agreement provided for a form of transfer certificate and the "transfer date" was defined as the later of the proposed transfer date

948
Habibsons Bank Ltd v Standard Chartered Bank (HK) Ltd (CA)            [2011] QB
Moore-Bick LJ

specified in the transfer certificate and the date on which the agent executed   A
the transfer certificate.

    5  On 22 September 2008 Standard Chartered Bank (the parent company of SCB (HK)) offered Habibsons Bank ("Habibsons") a share in the Indover loan. In the event Habibsons agreed to purchase US$2m of the loan and a trade confirmation form and transfer certificate were created for that purpose. They provided for a settlement date and transfer date of 8 October 2008. However, someone at Standard Chartered Bank realised   B
that the trade should have been carried out by SCB (HK) as the party to the facility agreement. As a result on 6 October a new trade confirmation form in the name of SCB (HK) was sent to Habibsons by e-mail. The trade confirmation form recorded a transaction on the terms of the Loan Market Association Standard Terms and Conditions for Par Trade Transactions ("the LMA conditions"). Habibsons signed the documents and returned   C
them by fax to an address in Hong Kong, as requested. It seems likely that they were not received until some time on 7 October local time. Both the new trade confirmation and the transfer certificate provided for a settlement date of 16 October; there was also an alteration to the settlement price to take account of the later date.

    6  At 10.20 pm on 6 October 2008 the District Court of Amsterdam made an administration order in respect of Indover under which it declared   D
that it was subject to the provisions of certain emergency regulations made under the Dutch Financial Supervision Act. One effect of those regulations was to put administrators appointed by the court in charge of the bank's affairs. The order took effect immediately on being pronounced. Indover was insolvent and has been unable to meet its obligations, including its obligations under the facility agreement.   E

    7  On 8 October SCB (HK) tried to persuade Habibsons to bring forward the settlement date to 10 October, but Habibsons declined to do so. However, later that day Habibsons received from BL in connection with a request for signature authorisation a copy of a transfer certificate bearing a settlement date of 10 October. Someone at SCB (HK) had apparently copied or reprinted the transfer certificate bearing the signature of Habibsons and had altered it using correction fluid before sending it to BL.   F

    8  On 8 October 2008 Habibsons made a formal objection to the transaction in accordance with the Loan Market Association rules and on 9 October instructed BL not to proceed without further instructions. BL agreed not to do so, but on 15 October it signed the transfer certificate which Habibsons had returned to Hong Kong on 6 October and which correctly reflected the transaction entered into on 6 October. Habibsons   G
none the less continued to dispute the transaction and failed to pay the amount due in settlement. The settlement amount was deducted by Standard Chartered Bank in New York ("SCB (NY)") from funds held in an account maintained with it by Habibsons.

*The proceedings*
   H
    9  On 4 February 2009 Habibsons started these proceedings by Part 8 claim form. Quite why the Part 8 procedure was used is unclear. Since the claim potentially raised issues of fact which, if it were to proceed to trial, would necessitate the service of statements of case, the proceedings ought to have been started under Part 7 of the Civil Procedure Rules. On 30 April

A  2009 the action was transferred to the Commercial Court and an application was made by SCB (HK) for an order striking out the claim, or in the alternative, for summary judgment. Habibsons applied for permission to amend its claim form to join BL and permission to amend its particulars of claim. The applications all came on for hearing before Teare J on 20 August 2009, but in the event he was able to hear argument only in relation to the existing claim and was unable to deal with the application to amend. He
B  ordered [2009] EWHC 2686 (Comm) that the claim be struck out, but that the order should not take effect before the hearing of Habibsons' application to amend, or further order.

10  The matter came back before Cooke J on 26 March 2010. By that time the position had changed to some extent. Habibsons sought permission to serve a different form of particulars of claim and to amend the claim form
C  in order to join as defendants both SCB (NY) and BL. In a reserved judgment delivered on 30 March [2010] EWHC 702 (Comm) the judge refused permission to make any of the amendments and accordingly the claim stood dismissed. On 2 June Etherton LJ directed that there be an oral hearing of Habibsons' application for permission to appeal with appeal to follow if permission were granted.

D  *The appeal*

11  It is necessary to begin by dealing with the approach the court ought to take on an application for permission to amend, since Mrs Rosen Peacocke made a number of criticisms of the way in which the judge dealt with the application. She submitted that he had applied the wrong test when deciding whether to permit the amendments and that his refusal to allow the
E  claimant to plead any part of its case was antithetical to the overriding objective of dealing with cases justly and fairly. She also complained that he had disregarded the principal factors relevant to giving permission to amend at an early stage in the proceedings, namely, whether the defendant can understand the case it has to meet, whether the case to be raised by the amendment is real and arguable, and whether the proposed amendments would cause prejudice to the defendant that cannot be remedied in costs.
F  12  In my view these criticisms of the judge are wholly unfounded. He was well aware of the importance, particularly when an application of this kind is made at an early stage in proceedings, of allowing a claimant to put forward any case that has a genuine prospect of success. The difficulty, as he saw it, was that none of the arguments which Habibsons sought to raise in its amended particulars of claim had any real chance of success. Whether the
G  matter is raised on an application to strike out under CPR r 3.4, or on an application for summary judgment under Part 24, or on an application for permission to amend, the court will not allow a party to pursue a case that has no real prospect of success, because to do is unfair to the other party and leads to nothing but a waste of costs and valuable court time. Nor do I think there is any force in the suggestion that the judge failed to recognise the need to proceed on the assumption that the claimant will be able to establish the
H  facts on which it relies, unless, that is, the contrary is clear. However, every case must be pleaded in sufficient detail to enable the other party to understand the case it has to meet. If a party seeking to amend is unable or unwilling to provide proper particulars of any allegation, it is not right to require the other party to deal with it as best he can. It will be necessary to

return to this question when I come to consider Habibsons' case in relation to the Dutch administration order.                                                                          A

*The transaction*

13   Although agreement was reached on 24 September that Habibsons would purchase US$2m of the Indover loan from Standard Chartered Bank, that agreement was superseded on 6 October when it was realised that the   B
correct seller was SCB (HK). In my view the communications between the parties and the signature and return of a new trade confirmation gave rise to a binding contract between SCB (HK) and Habibsons on the terms set out in it, which included a settlement date of 16 October. Indeed, I did not understand Mrs Rosen Peacocke to suggest otherwise.

14   The precise order of events on 6 and 7 October 2008 is open to   C
debate. Mrs Rosen Peacocke submitted that it was not clear whether the trade confirmation was signed before or after the administration order was made, and if before, whether it had been faxed to Hong Kong before or after the order was made. The trade confirmation was signed on behalf of Habibsons by Mr Syed Mehdi, who had made a statement in support of the application. He does not say when he signed it or when it was faxed to Hong   D
Kong (although he could presumably have done so, if the matter were thought significant), but for reasons I shall explain, I do not think that the precise sequence of events is of any importance.

15   By its amended particulars of claim Habibsons seeks to recover the amount debited from its account with SCB (NY) on the grounds that the transaction was not completed or was rendered void by the alteration of the transfer certificate.                                                                                                                                           E

*The administration order*

16   The primary basis on which it is said that the transaction was not completed rests on two propositions: (a) that since the transfer of part of the loan involved a partial novation of the facility agreement, it was necessary to obtain Indover's consent to the transaction; and (b) that the effect of the   F
administration order was to vest entire control over the bank's affairs in the administrators, who never gave their consent to it. In the draft amended particulars of claim the matter is pleaded as follows:

> "36. The Dutch administration order was (under relevant European legislation and domestic law) binding upon the parties to the facility agreement and [Habibsons], and had the effect of (a) freezing the assets   G
> of Indover; and (b) prohibiting any transfer by novation of any part of Indover's liabilities under the facility agreement without the agreement of the administrator appointed by the district court on 6 October 2008.
>
> "37. From the date (and in consequence) of the Dutch administration order, SCB (HK) was unable to transfer any part of the Indover loan."

17   The judge described that as an "extraordinary" plea. As he pointed   H
out, it contained no reference to any specific provision or principle of Dutch or European law that would have the consequences pleaded, nor was it supported by any expert evidence, despite the fact that the claimant had had over a year since the judgment of Teare J in which to formulate its case.

A   18  The fact that Habibsons had not produced any expert evidence in support of its case by the time the matter came before the judge is perhaps understandable, given the stage in the proceedings at which the application was being made, but there can be no excuse for the failure to give sufficient particulars of Dutch law to enable the defendant to understand the nature of the case made against it. Moreover, in the light of the judge's criticisms it is surprising that there has been no attempt before us to demonstrate, by

B   reference to expert evidence or otherwise, that the plea is well founded. In the circumstances the judge was entitled, in my view, to hold that the case as pleaded was the best that Habibsons could do and that as such it was inadequate and embarrassing. That remained the position at the time of the hearing of the appeal. Mrs Rosen Peacocke drew our attention to the terms of the administration order and the emergency decree to which Indover

C   became subject, but she was not able to point to any provision of Dutch law which even arguably has the effect alleged in the draft amended pleading. For this reason alone the judge was right in my view to refuse permission to amend in respect of this part of the case.

   19  The matter does not end there, however, because there is in my view no reasonable prospect of persuading a court that the administration order was effective to prevent the novation of the loan. It is trite law that novation,

D   which involves the addition or substitution of a new party to an existing contract, requires the consent of all existing parties as well as that of the new party himself. The only question that arises in this case is whether it was necessary to obtain the specific consent of Indover (and hence, after the administration order, of the administrators) to each transfer of any part of the loan.

E   20  The submission that such consent was required inevitably runs up against the terms of clause 26.2(a) of the facility agreement, which provides that the consent of the borrower is not required for an assignment or transfer by a lender. However, Mrs Rosen Peacocke submitted that that provision was ineffective and in support of her argument drew our attention, as she had that of Cooke J, to *Goodridge v Macquarie Bank Ltd* (2010) 265 ALR 170, in which the Federal Court of Australia held that a provision

F   in a loan agreement entitling the lender to novate the contract in favour of a third party without the consent of the borrower was ineffective to provide the borrower's consent to the novation and amounted to no more than an agreement to agree. However, although at various points the judge appears to be resting his decision on the general principles relating to novation, there are several indications that it was the terms of the agreement that ultimately

G   proved to be decisive, since he referred on more than one occasion to respects in which the effect of a novation was potentially uncertain. Moreover, at para 120, he distinguished cases of unilateral contract, exemplified by *Carlill v Carbolic Smoke Ball Co* [1893] 1 QB 256, on the grounds that the nebulous words of the clause in question did not identify any particular contractual relationship and referred to non-existent future transactions on uncertain and unidentified terms.

H   21  In the present case the commercial purpose of the clause headed "Changes to the parties" is quite clear: it is to enable the lenders to transfer freely their interests in the loan to other banks and financial institutions which regularly engage in investing in assets of this kind. There is no uncertainty about the scope or terms of the contract created by the novation:

952
Habibsons Bank Ltd v Standard Chartered Bank (HK) Ltd (CA)         [2011] QB
Moore-Bick LJ

it gives rise to exactly the same rights and obligations as existed under the    A
original contract, but between different parties.  Any suggestion that
clause 26.2(a) is inconsistent with the general law relating to novation
results from a failure to understand the nature and purpose of clause 26 as a
whole. It does not seek to dispense entirely with the requirement of consent.
All that it seeks to do is to make it clear that transfers may be made in the
manner prescribed in the agreement without needing to obtain the express    B
consent of the borrower to each transfer individually, its consent to all such
transfers (subject to any prescribed restrictions) being contained in the
facility agreement itself.

22  Although there has been some discussion in the authorities about the
principles involved, there has hitherto been no real doubt that under English
law a party to a contract may effectively give consent in the contract itself to
a subsequent novation. The point was touched on in *The Argo Fund Ltd v*    C
*Essar Steel Ltd* [2006] 1 All ER (Comm) 56, also a case relating to a
syndicated loan, in which it was common ground between the parties that
terms similar to those of clause 26 in the present case were effective to
achieve the parties' object. The analysis proposed in that case was that of
unilateral contract (see paras 51–52), which I find persuasive. I do not think
that the judge in the *Goodridge* case 265 ALR 170 entirely rejected that as a    D
possibility, since he distinguished *Carlill v Carbolic Smoke Ball Co* [1893]
1 QB 256 on the grounds that the clause he had to consider was too
nebulous, but if he did, I agree with Cooke J [2010] EWHC 702 (Comm)
that the decision does not represent English law. The provisions of clause 26
in this case cannot possibly be described as nebulous and there is no
uncertainty about the terms of the contract to which a novation gives rise.    E

23  By entering into the facility agreement the lenders provided
consideration for a standing offer on the part of Indover to contract by way
of novation with any financial institution of a kind falling within
clause 26.1(b) which might comply with the transfer provisions. As a result
the offer was irrevocable without the consent of all those who were lenders
from time to time. Habibsons does not plead that the effect of the
administration order was to revoke the offer, but in any event it is difficult to    F
see how that order could have done so, given that the contract is governed by
English law.  In my view, therefore, it matters not whether the
administration order was made before or after the contract on 6 October;
nor, for that matter, is it of any significance that the administration order
was on any view made before the transfer certificate was signed by the agent,
since it could not affect rights and obligations arising under the facility    G
agreement as a result of the operation of the transfer mechanism in which
Indover had no further part to play.

*The alteration of the transfer certificate*

24  The following plea is to be found in paras 56 and 57 of the draft
amended particulars of claim:    H

"56. The deliberate alteration of the transfer certificate in material
respects by or on behalf of the obligee, SCB (HK), without the consent of
the obligor, HB, avoided the purported trade and rendered the entire
transaction ineffective.

A "57. Thereafter the proposed trade was completely void and incapable of being effected . . ."

25  The foundation for this contention is what is known as the rule in *Pigot's Case* (1614) 11 Co Rep 26b. The principle is described in *Chitty on Contracts*, 30th ed (2008), vol I, para 25-020 as follows:

B "If a promisee, without the consent of the promisor, deliberately makes a material alteration in a specialty or other instrument containing words of contract, this will discharge the promisor from all liability thereon, even though the original words of the instrument are still legible."

The authorities cited in support (in addition to *Pigot's Case* itself) include *Master v Miller* (1791) 4 Durn & E 320; *Sellin v Price* (1867) LR 2 Ex 189;
C *In re Howgate and Osborn's Contract* [1902] 1 Ch 451 and *Lombard Finance Ltd v Brookplain Trading Ltd* [1991] 1 WLR 271, 274. The rationale for the rule is said to be twofold: that "no man shall be permitted to take the chance of committing a fraud, without running any risk of losing by the event, when it is detected" (*Master v Miller* 4 Durn & E 320, 329); and that "the effect of the alteration renders the deed or instrument no longer the
D deed or instrument of the party charged": *Raiffeisen Zentralbank Österreich AG v Crossseas Shipping Ltd* [2000] 1 WLR 1135, para 15.

26  The judge was satisfied that the altered transfer certificate was sent to the agent at a time when SCB (HK) was hoping to persuade Habibsons to agree to bring forward the settlement date to 10 October and in order to enable the transfer to proceed promptly if Habibsons proved willing to do
E so. When it did not agree, the document was discarded and the transaction was completed using the original transfer certificate containing the settlement date of 16 October. He rejected the argument on the grounds that no use had been made of the altered certificate, which in the event became irrelevant. None the less, Mrs Rosen Peacocke submitted that each copy of the transfer certificate was to be treated as an original and that as a result of the alteration of one copy the transaction as a whole became void.
F 27  *Pigot's Case* 11 Co Rep 26b concerned a claim on a bond given by Henry Pigot in the sum of £60 for the appearance of one George Watkins before the Court of King's Bench to answer a plea of trespass. The jury found that after it had been delivered the bond had been altered by the addition of the name of the Sheriff of Oxford who sought to enforce it. The court held that the alteration of the deed rendered it void and that Pigot was
G entitled to rely on the defence of non est factum. That does not seem surprising since the obligation on which he was sued was contained in the deed itself which had been altered in a material respect. It was no longer the deed executed by Pigot.

28  *Master v Miller* 4 Durn & E 320 concerned a claim on a bill of exchange. The bill had been drawn on 26 March 1788 payable at three months from its date. It was duly accepted by the defendant and indorsed by
H the payee to the plaintiff. While in the payee's hands the date was altered without the defendant's agreement to 20 March, making the bill payable six days earlier. The court held that the principle of *Pigot's Case* applied equally to other instruments, including bills of exchange. Lord Kenyon CJ thought that the policy behind the rule lay in ensuring that no one should be allowed

to take the chance of committing a fraud without running the risk of losing by it if detected. He considered that the rule applied to bills of exchange because he could see no distinction in principle between obligations created by deeds and obligations created by other kinds of written instruments. (In the case of bills of exchange the position is now governed by section 64 of the Bills of Exchange Act 1882 (45 & 46 Vict c 61), which provides that a material alteration of a bill without the assent of the parties renders it void. For this purpose, material alterations include any alteration of the date, the sum payable, the time of payment, the place of payment, and, where a bill has been accepted generally, the addition of a place of payment without the acceptor's assent.)

29   *Sellin v Price* (1867) LR 2 Ex 189 concerned a deed of arrangement made between a bankrupt, a surety and various creditors expressed to be named in a schedule. When the deed was executed it contained no schedule, but one was attached later. The court held that the attachment of the schedule altered the deed in a material particular and rendered it void.

30   In *Suffell v Bank of England* 9 QBD 555 the question arose whether the alteration of serial numbers on a banknote issued by the Bank of England was sufficient to prevent the holder from recovering against the bank. The court held that it did. Brett LJ expressed the view, at p 568, that the rule in *Pigot's Case* applies to written instruments of all kinds and that the rule could be formulated in terms that whenever any instrument is purposely altered by a person in lawful possession of it in a material part of it, the instrument is void for the purpose of enabling any person to sue on it or to defend himself by using it as a direct defence depending on its obligatory force as an instrument.

31   In *In re Howgate and Osborn's Contract* [1902] 1 Ch 451 the abstract of title delivered to the purchaser on a sale of freehold property commenced with a mortgage to three persons, of whom the third was described as "William" G. It appeared from the original deed that at some time after its execution the name "William" had been erased and the names "Edward Thomas" substituted. It was proved that the person described as William G was really Edward Thomas G and that the misdescription had been due to inadvertence. The alteration was held not to be material and not to render the deed void.

32   *Lombard Finance Ltd v Brookplain Trading Ltd* [1991] 1 WLR 271 concerned a guarantee of a company's obligations executed by two of its directors. In the document the company was described as "Brookplain Trading Company Ltd", whereas its correct name was "Brookplain Trading Ltd". The guarantee was altered by someone other than the two sureties by deleting the word "Company." One of the directors sought to avoid liability, relying on the rule in *Pigot's Case*. The argument failed because the alteration was not material. As Dillon LJ pointed out, the company referred to in the guarantee must have been the company of which the two sureties were directors and that was Brookplain Trading Ltd. There could not have been another company with the name Brookplain Trading Company Ltd and therefore there was an immaterial misdescription which could have been cured by evidence. The alteration to correct the company's name made no difference.

33   These and other authorities were considered in some detail in *Raiffeisen Zentralbank Österreich AG v Crossseas Shipping Ltd* [2000]

A  1 WLR 1135. In that case a guarantee contained a provision for service of proceedings against the guarantor on an agent, but at the time of execution the name of the agent had not been filled in. Subsequently the creditor inserted the name of an agent for service. The surety sought to avoid liability on the grounds that there had been a material alteration within the scope of the rule in *Pigot's Case*. This court rejected that argument on the grounds that the alteration to the service provision had not altered or accelerated the surety's liability under the guarantee and was therefore immaterial. The discussion of the authorities in that case was directed primarily to the need to establish that the alteration relied on as discharging the instrument is material and what amounts to materiality for these purposes. However, for the purposes of the present case it is sufficient to note that Potter LJ (with whom the other members of the court agreed) considered that the decision in *Suffell v Bank of England* 9 QBD 555 supported the conclusion that, even where an alteration does not affect the contractual or other rights of the parties to the instrument, it may still be regarded as material if it would adversely affect the utility of the instrument when used for an ordinary business purpose.

    34  As the authorities show, the rule in *Pigot's Case* is concerned with the validity of written instruments. It therefore follows that if an instrument which creates obligations is rendered void by the alteration, the obligations to which it gives rise are also rendered void. However, it is not uncommon for parties to enter into contracts under which a written instrument of some kind, signed by both parties, which does not itself give rise to the obligations is to be used for the purposes of carrying out the contract, or some aspect of it. The unauthorised alteration of such an instrument in some material respect could no doubt invalidate it, but one finds nothing in the authorities to suggest that it would automatically render the underlying transaction void. In my view there are good reasons for that. First, unlike the deed or contract in writing, such an instrument does not itself embody the parties' rights and obligations, so the defendant cannot be sued on it directly and, if sued, cannot say "This is not the contract I made". He may, however, say "This is not a good instrument" and challenge its effectiveness. Whether the claimant can at that stage obtain and make use of a valid instrument will depend on the terms of the contract. In many cases it will be too late for him to do so. Moreover, it does not follow that making a material alteration to such an instrument will never result in the discharge of the contract, since the alteration may itself amount to conduct which entitles the other party to treat it discharged.

    35  As the judge emphasised in this case, the draft amended particulars of claim contain no allegation of fraud or misconduct in relation to the altered copy of the transfer certificate. He thought that the altered document had probably been sent to the Agent in connection with negotiations that were going on between Habibsons and SCB (HK) for an earlier settlement date and there is evidence which tends to support that conclusion. Whether that was so or not, however, the case that Habibsons seeks to make is very simple, namely, that the mere fact of the alteration of the document was sufficient to render the transaction as a whole void. For the reasons I have given I am unable to accept that argument. I do not think that there is much doubt that the alteration of a document, the effect of which is to bring forward the date at which a transaction is to be completed and payment

956
**Habibsons Bank Ltd v Standard Chartered Bank (HK) Ltd (CA)**                    [2011] QB
Moore-Bick LJ

made, even by only a few days, is on the face of it a material alteration and I would therefore accept that the alteration of the settlement date in this case rendered that certificate void. It simply did not comply with the contract. However, that is not, as Mrs Rosen Peacocke submitted, to confuse executory and executed contracts; it is to distinguish between documents which contain or evidence the transaction (in this case the trade confirmation) and documents which are required to carry it into effect (the transfer certificate). In the absence of fraud or misconduct of some kind I can see no basis in principle or authority for holding that the contract itself was thereby discharged. On the face of it the opportunity remained to tender a certificate which complied with the parties' agreement, and that is what SCB (HK) in fact did.

*BL's failure to comply with Habibsons' instructions*

36   Habibsons seeks to argue that once it had lodged an objection under the LMA conditions and had expressly instructed BL not to sign the transfer certificate without further instructions, BL had no authority to sign the transfer certificate giving effect to the transaction. It also seeks to argue that BL had no power to sign the transfer certificate because it had not complied with its "know your customer" obligations under clauses 26.2(c) and 26.5(b) of the facility agreement. In my view neither of these arguments has any prospect of success.

37   The function of the agent under clause 26 of the facility agreement is to act on behalf of the borrower, the existing lenders and the new lender to bring about a transfer of rights and obligations in relation to part of the loan. The mechanism by which that is to be achieved is set out in the facility agreement and is not one that gives the agent a discretion whether to implement it or not. On receipt of a duly completed transfer certificate it must execute it as soon as reasonably practicable, subject only to its right to satisfy itself that it has complied with its duty under any relevant laws to carry out checks on the new lender. Whether it is so satisfied would seem to be a matter for the agent itself, but in any event Habibsons has not identified any respect in which BL had failed to comply with its obligations under any relevant law at the time when it signed the transfer certificate. Any such assertion therefore remains merely speculative and does not give rise to a case that has any real prospect of success. By agreeing to the transaction SCB (HK) and Habibsons both bound themselves to operate the transfer mechanism provided by the facility agreement and to accept the fulfilment by the agent of its functions in accordance with its terms. Subject only to its right to satisfy itself that it had complied with its obligations, the agent was under a duty to execute the transfer certificate and neither party to the transaction could unilaterally revoke its authority to do so. In those circumstances Habibsons' attempt to revoke BL's authority was ineffective, notwithstanding that BL may have agreed to await further instructions.

38   For these reasons I am satisfied that none of the ways in which Habibsons seeks to put its case against SCB (HK) has any real prospect of success.

A   *Claim against BL*

39   Habibsons seeks to amend its claim to join as defendants both BL and SCB (NY). As far as BL is concerned, its primary case rests on the allegation that no duly completed transfer certificate appearing on its face to comply with the terms of the facility agreement was delivered to it, which rests in turn on the allegation that the settlement date in the first transfer
B   certificate delivered to BL on 8 October had clearly been altered. For the reasons given earlier, I do not think that is of any relevance. The transfer certificate that was ultimately executed had been duly completed and corresponded to the terms of the contract. Moreover, it was entirely a matter for BL whether it was satisfied that it had carried out the necessary checks on Habibsons to comply with the requirements of any relevant laws.

C   40   In the alternative Habibsons seeks permission to pursue a case against BL that it acted unlawfully in executing the transfer certificate which correctly reflected the terms of the transaction. This somewhat surprising argument is based on allegations that BL had failed to make adequate enquiries into Indover's solvency before 6 October 2008, failed to share any information it had about Indover with Habibsons, failed to ask Habibsons
D   whether it agreed to its executing the altered transaction certificate and failed to honour its undertaking not to execute any transaction certificate without Habibsons' express authority.

41   The nature of the various obligations which BL is said to have owed to Habibsons in these respects is not spelled out in the draft pleading and it is difficult to understand the case that Habibsons is seeking to make. The judge refused permission to make the amendment on the grounds that even if
E   BL were in breach of an obligation owed to Habibsons, no loss flowed from it since the transaction itself was binding and had to be completed.

42   In my view the judge was right to refuse permission to add a claim against BL. The case against BL is not set out with sufficient clarity in the current draft and it is difficult to see how it can have any real prospect of success. It is quite unclear how a failure on the part of BL to make inquiries
F   about Indover's solvency or its failure to provide such information as it had to Habibsons could have given rise to an actionable wrong. Nor is it clear how the mere undertaking of BL not to execute a transfer certificate could without more have given rise to a legally binding obligation. It is not alleged, for example, that the undertaking was supported by consideration or that Habibsons acted in any way in reliance upon it. However, all that is
G   beside the point, because if, as I think, there is no real prospect of showing that the transaction between Habibsons and SCB (HK) became void and therefore remained enforceable in accordance with its terms, no loss can have been caused by the agent's execution of the transfer certificate.

*Claim against SCB (NY)*

H   43   As in the case of BL, the claim against SCB (NY) proceeds on the assumption that the transaction ceased to be effective so that no debt arose between Habibsons and SCB (HK) that would support the set-off. Since, as I have held, there is no real prospect of showing that the transaction did become void, there can be no real prospect that this claim might succeed.

958
Habibsons Bank Ltd v Standard Chartered Bank (HK) Ltd (CA)         [2011] QB
Moore-Bick LJ

*Costs*

44  The judge ordered Habibsons to pay SCB (HK)'s costs of the application on the indemnity basis. That no doubt reflected his view of the merits of the application and the manner in which the proceedings had been conducted. The grounds of appeal simply allege that there were no grounds for making such an order, but do not give any further particulars of the manner in which the judge erred in the exercise of his discretion. Likewise, in her skeleton argument Mrs Rosen Peacocke submitted that the judge's order was insupportable, but she put forward no detailed reasons in support of her case.

45  On an application of this kind the judge has a generous discretion with regard to costs and if either party intends to challenge the exercise of that discretion it must put forward cogent grounds for doing so. Occasionally the judge's order is so unusual that it appears at first sight to be insupportable, but this is not such a case. This was, after all, Habibsons' second attempt to formulate a case that had a real prospect of success and it had signally failed to do so, while putting SCB (HK) to considerable inconvenience and expense. In my view Habibsons has failed to identify any grounds for interfering with the judge's exercise of his discretion.

*Conclusion*

46  For these reasons I think the judge was right to refuse permission to amend the particulars of claim. Since the issues have been fully argued before us I would give permission to appeal (save in relation to the judge's order as to costs), but I would dismiss the appeal itself.

**RIX LJ**
47  I agree.

*Permission to appeal.*
*Appeal dismissed.*

MATTHEW BROTHERTON, Barrister