# **EXHIBIT C**

**Mendelsohn Declaration**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |

**DECLARATION OF BRUCE MENDELSOHN IN SUPPORT OF**
**MOTION OF DEBTORS FOR ENTRY OF AN ORDER (I) AUTHORIZING AND**
**APPROVING SALE OF DEBTORS' INTERESTS IN SCHF CAYMAN, L.P. FREE AND**
**CLEAR OF ALL LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES;**
**(II) AUTHORIZING AND APPROVING DEBTORS' ENTRY INTO, AND**
**PERFORMANCE UNDER, THE PURCHASE AND SALE AGREEMENT;**
**(III) AUTHORIZING AND APPROVING ASSUMPTION AND ASSIGNMENT OF**
**CERTAIN CONTRACTS; AND (IV) GRANTING RELATED RELIEF**

I, Bruce Mendelsohn, hereby declare as follows:

1.      I am a Partner in the Advisory Group at Perella Weinberg Partners L.P.

("PWP"), a financial advisory firm that maintains an office at 767 5th Avenue, New York, New

York 10153, and the Debtors' investment banker.  PWP is a full-service investment banking firm

providing strategic and financial advisory services, including with respect to mergers and

acquisitions, capital raising and restructuring transactions across a broad range of industries.

PWP and its professionals have extensive experience with respect to the reorganization and

restructuring of distressed companies, both out of court and in Chapter 11 proceedings.

---

[1]     The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and 4063 respectively.  Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.  The principal place of business of Debtor Emergent Fidelity Technologies Ltd is Unit 3B, Bryson's Commercial Complex, Friars Hill Road, St. John's, Antigua and Barbuda.

2.      I have been employed as a Partner of PWP since January 2016.  I received

a Bachelor of Arts degree in 1984 from Emory University and a Master of Business

Administration from the Wharton School at the University of Pennsylvania.

3.      Prior to joining Perella Weinberg Partners, I was a Partner at Goldman

Sachs where I worked from May 1998 to June 2015 and most recently served as Head of the

Americas Restructuring Group and part of the U.S. Leveraged Finance team.  I was named a

Partner at Goldman Sachs in 2010.  From 2006 to 2008, I served as Chief Underwriting Officer

for North America, where I was a member of Goldman Sachs' Firmwide Capital Committee and

its Special Situations Specialty Lending Investment Committee.  I served as Global Head of the

Special Assets and Bank Debt Portfolio groups from 2000 to 2008, and started at Goldman Sachs

in the Securities Division where I spent two years working on the distressed bond and bank loan

proprietary trading desks.  Prior to Goldman Sachs, I worked for UBS and MJ Whitman in

restructuring and distressed securities.  I began my career at Lehman Brothers.

4.      In addition to working with the Debtors in the above-captioned cases (the

"Chapter 11 Cases"), my experience includes representing companies, boards, creditors, and

other stakeholders in a variety of situations across a broad range of industries, including the

chapter 11 cases of:  American Tire Distributors, Bonanza Creek, Breitburn Energy, Bristow

Group, California Resources Corporation, Chesapeake Energy, Cineworld Group, Crossmark

Holdings, Eco-Bat Technologies, Fieldwood Energy, Garret Motion, iHeart Communications,

LATAM Airlines, Memorial Production Partners, Pacific Drilling, Sanchez Energy Corporation,

Seadrill, Sears, Video Equipment Rental Corporation, Windstream, and 21st Century Oncology,

among others.  In addition, while at Goldman Sachs, I was involved in the following bankruptcy

cases:  Bridge Information Systems, Brothers Gourmet Coffees, Calpine, CRC Communications,

Focal Communications, General Growth Properties, Lehman Brothers, Network Plus, Nextel International, Orchard Supply, Qwest Communications and 360 Networks.

5.      I submit this declaration (this "Declaration") in support of the *Motion of Debtors For Entry of an Order (i) Authorizing and Approving Sale of Debtors' Interests in SCHF Cayman, L.P. Free and Clear of all Liens, Claims, Interests and Encumbrances, (ii) Authorizing and Approving Debtors' Entry Into, and Performance Under, The Purchase and Sale Agreement, (iii) Authorizing and Approving Assumption and Assignment Certain Contracts and (iv) Granting Related Relief* (the "Motion").[2]

6.      Except as otherwise indicated, all facts set forth in this Declaration are based upon:  (i) my personal knowledge, information and belief, or my opinion based upon experience, knowledge and information concerning FTX Trading Ltd. and its affiliated debtors and debtors-in-possession (collectively, the "Debtors"); (ii) information learned from my review of relevant documents; and/or (iii) information supplied by members of the Debtors' management, employees of PWP working directly with me or under my supervision, direction or control, and/or from the Debtors' other professionals and advisors.

7.      I am over the age of 18 and authorized to submit this Declaration on behalf of the Debtors.  I am not being compensated for this testimony other than through payments to be received by PWP as a professional the Debtors have retained; none of those payments are specifically payable on account of this testimony.  If I were called upon to testify, I could and would testify competently to the facts set forth in this Declaration.

---

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Motion.

A.    **A Sound Business Justification Exists for the Sale.**

8.      PWP was engaged by the Debtors effective November 16, 2022 to provide financial advisory, restructuring, financing and sale services to the Debtors during these Chapter 11 Cases.  PWP has assisted the Debtors in their exploration and evaluation of strategic alternatives to maximize the value of, and monetize, their diverse, global assets.  This has included a review of documents regarding the Debtors' businesses and investments, discussions with management of the Debtors, discussions with businesses in which the Debtors have made investments, and coordinating and initiating discussions with potential purchasers.

9.      Seller has a capital commitment to the Subject Company of $100,000,000, of which, to date, Seller has contributed $25,000,000. Following a strategic review, the Debtors decided to monetize the Interests through a private sale process in consideration of, among other things: the number of interests owned by the Debtors in various fund, venture and other investment assets; the potential value of the Interests; the uncertainty as to whether the potential value of the Interests could be preserved for the duration of these Chapter 11 Cases; outstanding and any potential future Capital Calls, including that putting aside any default interest that has accrued and could be required to be paid as discussed below, the investment would require the Debtors to invest an additional $75,000,000 of cash from the estate for a prolonged period of time given the nature of the investment; the potential diminution in the value of the Interests as a result of Capital Calls imposed on limited partners; the potential that the Debtors could be subject to certain default remedies; and the transfer restrictions associated with the Interests.

10.     In particular, on December 20, 2022, the Subject Company issued a Capital Call to the Seller in the amount of $25,000,000.  Seller failed to make such Capital Call payment and was notified by the Subject Company that it would be deemed a "Defaulting Limited Partner" under the Twelfth Amended and Restated Limited Partnership Agreement of

SCHF Cayman, L.P. (the "LPA").  The LPA provides that while a limited partner remains in default on a Capital Call, any applicable interests accrue interest at a default rate equal to, for each full day in respect of which a Defaulting Limited Partner has not satisfied its outstanding capital contribution obligations, an annual rate of interest equal to the sum of: (a) seventeen and a half percent (17.5%) and (b) such day's three-month London Interbank Offered Rate (provided that the annual default rate for any particular day shall not be less than eighteen percent (18%)). In addition, the LPA sets forth a number of remedies against any Defaulting Limited Partner upon such a default, many of which apply automatically or are useable at the discretion of the general partner of the Subject Company (the "General Partner"), including reduction in profit participation, forfeiture of all capital accounts and a required redemption at a significant discount.  The General Partner has informed the Debtors that, as of June 30, 2023, when the sale is expected to close, approximately $3,100,000 of default interest and other fees will have accrued.

11.     In addition, I understand that the Debtors have been informed by the General Partner that an additional $25,000,000 Capital Call is expected to be made by the General Partner and is expected to be due on July 3, 2023, which could further cause diminution in the value of the Interests if Seller is not able to pay the Capital Call, including that default interest would also accrue on this additional unfunded Capital Call amount.

12.     Under the terms of the Agreement, Purchaser has agreed to pay the defaulted Capital Call, as well as the default interest owed to the Subject Company, as a cure cost in order to assume Seller's interest in the LPA and for there no longer to be a default with respect to the Interests.  It is my belief that the Debtors determined to sell the Interests after careful consideration of the terms of the Agreement.  Further, given the defaulted Capital Call and the

anticipated future Capital Calls, I believe that Seller's decision to market and sell the Interests at this time and its entry into the Agreement represents a sound exercise of the Debtors' business judgment, and is in the best interests of the Debtors, their estates, creditors, and other parties in interest.

    **B.**  <u>**The Sale Will Produce the Highest and Best Offer.**</u>

    13.  Based on my experience, I believe the Debtors have thoroughly and fairly marketed the Interests and conducted the related sale process in good faith.

    14.  PWP assisted the Debtors in their marketing process to solicit potential investors in the Interests. Given the various rights of the Subject Company and the General Partner against limited partners, including the consent rights over potential transferees, and rights that the Subject Company has more generally to require withdrawal of limited partners in certain circumstances (even if such limited partners are not in default), the Debtors determined that any potential sale of the Interests would need to be conducted with the General Partner's cooperation and consent.

    15.  Throughout February and March 2023, the Debtors, with the assistance of PWP, worked with the General Partner to design a marketing and sales process for the Interests that would market the Interests in an efficient and competitive manner. The General Partner agreed to assist PWP in its search for potential acquirers. Aside from potential acquirers suggested by the General Partner, PWP generated a proprietary list of an additional 43 potential acquirers. In their discretion, the General Partner reviewed the list and approved 6 of the potential acquirers. I understand that the General Partner required that any potential acquirers must (a) demonstrate that the subscribing entity has the requisite capital to fund the acquisition of the Interests, cure the defaulted Capital Call and other cure costs, and fund the other anticipated capital calls in an amount and structure that are acceptable to the General Partner,

(b) be aligned with the Subject Company regarding the long-term nature of the fund, (c) not engage in a comparable direct investment strategy which would be seen as a competitive and (d) have no public performance requirements for underlying investments. Further, I understand that the General Partner spoke with the several potential acquirers to ensure that the nature of the fund was well understood.  In addition, the General Partner only permits transfers of limited partnership interests on the last day of a calendar quarter, which timing information was communicated to potential acquirers.

16.     Such potential acquirers included third-party investors such as pension funds, insurance asset managers and sovereign wealth funds who typically invest as limited partners in these types of assets.  In total, PWP reached out to 9 potential acquirers that were approved by the General Partner and engaged with a subset of them who expressed interest.  The Debtors received requests for additional information from 4 parties, all but one of whom executed non-disclosure agreements and were provided access to information on the Interests. Of such parties, the Debtors only received a firm indication of interest from Purchaser. Throughout the marketing process, the Debtors have consulted at length with the Official Committee of Unsecured Creditors (the "Committee") and their advisors, including providing weekly updates on the status of the marketing process for the potential transaction.  The Debtors also shared copies of the indication of interest and mark-ups of the Agreement submitted by Purchaser with the Committee's advisors significantly in advance of any anticipated sale date and continued to provide updates and information on the sale process.  However, the Committee has informed the Debtors that some of its members believe the Subject Company is a good investment and that they would prefer the Debtors to keep it, either funding the capital calls or litigating the necessity to do so with the Subject Company.  The Debtors have considered the

Committee's views carefully, but believe proceeding with the sale is the only approach in the best interests of the estate. To date, the Committee has not given its consent to the proposed sale.

17.     Given the time constraints noted above, including the requirement that a sale of the Interests can only be effected on the last day of a calendar quarter (i.e., June 30) and the Capital Call that is expected to be due on July 3, 2023, the Debtors determined that it was in the best interest of their estates and their constituents to proceed with Purchaser and work expeditiously toward executing a mutually-agreeable transaction, based on the Purchaser's superior offer and ability to execute the Sale Transaction within a short time frame, and the Purchaser's financial wherewithal to fund the Debtor's unpaid and future Capital Calls. After arms'-length negotiations, Seller and Purchaser entered into that certain Purchase and Sale Agreement, dated as of June 8, 2023 (the "Agreement"), whereby Purchaser agreed to purchase the Interests for aggregate consideration of $18,200,000 (the "Purchase Price") and to fund cure costs to the Subject Company.

18.     Based on my experience, involvement in the bidding process and review of available alternatives, it is my opinion that there is currently no transactable better or higher offer available for the Interests. I believe that interested persons and entities have been or will be afforded a full, fair and reasonable opportunity to (i) make a higher or better offers to purchase the Interests, and (ii) object or be heard with respect to the Sale Motion.

C.     **The Sale Will Produce a Fair and Reasonable Price for the Interests.**

19.     I believe that the Purchase Price for the Interests contemplated by the Agreement is fair and reasonable. The Debtors, with the assistance of PWP, ensured that sale of the Interests would reflect their fair market value by marketing the Interests and conducting arm's-length negotiations.

20.      In my experience with sales of limited partner interests, it is typical for these interests to be sold at a discount to their latest available capital account values, in particular when overall market conditions are depressed.  Here, the Purchase Price is equal to approximately 75% of the amount of the capital contributions Seller has made to the Subject Company without taking into account any default related payments and 85% taking into account such payments.  Purchaser's offer is the highest or otherwise best offer and would provide the greatest recovery for the Debtors' estates.

21.      Pursuant to the Agreement, the Purchase Price is subject to higher or better offers from any third party in the form of an "Alternative Transaction", and a "fiduciary out" which provides that the Agreement can be terminated by the board of directors (or similar governing body) of Seller if it is determined to be inconsistent with the fiduciary duties of the board of directors (or similar governing body).  If an Alternative Transaction is received by the Debtors, Seller has the right, but not the obligation, to terminate the Agreement upon entering into a definitive agreement with respect to such Alternative Transaction.

22.      I believe that a longer process or the implementation of formal bidding procedures for the sale of the Interests would not have resulted in a higher or better value to the estate.  A private sale enabled the Debtors to avoid the additional costs, expenses and time associated with a formal bidding and sale process.  In addition, selling the Interests now will enable the Debtors to further avoid any operational, carrying or other expenses associated with the Interests, including management fees, default interest and future Capital Calls, and protects the Debtors against the risk of potential decline in value of the Interests.  I believe that selling the Interests in a private sale is the most efficient and cost-effective means of minimizing costs to the estate while maximizing the value for the benefit of the estate.

23.     In my role as the Debtors' financial advisor, I reviewed the Agreement and based on my experience, believe the Agreement is the result of extensive, arm's-length and good-faith negotiations between the parties, and that such negotiations were free of any collusion.

**D.      The Sale of the Interests Should be Made Free and Clear of Any Liens, Including Successor Liability.**

24.     Purchaser is a private equity holding company for Liberty Mutual Insurance, which is the fifth largest global property and casualty insurer based on 2022 gross written premium.  It is my understanding that the Sale Transaction does not involve a consolidation, succession or merger of Purchaser and the Debtors and/or the Debtors' estates.

25.     Moreover, I believe that not transferring the Interests free and clear of all Liens (other than Permitted Encumbrances) would adversely impact the Debtors' efforts to maximize the value of the Interests.  I believe that Purchaser would not have entered into the Agreement and would not consummate the transactions contemplated thereby if the sale of the Interests was not free and clear of all Liens (other than Permitted Encumbrances), or if Purchaser would, or in the future could, be liable for any such interests.

**E.      The Assumption and Assignment of the Operative Documents Should be Approved.**

26.     My view is that no reasonable purchaser would take the Interests without the Operative Documents that the Debtors seek to assume and assign, and their assumption and assignment is essential to inducing the best offer for the Interests.

27.     Because I do not believe that the Debtors could obtain the benefits of the Sale Transaction without agreeing to assume and assign the applicable Operative Documents and having any cure costs related thereto paid by Purchaser, it is my belief that the assumption and assignment of the applicable Operative Documents is a sound exercise of the Debtors' business judgment.

**F.  The Mutual Release Should be Approved.**

28.    It is my belief that a release of all claims, rights, demands, actions, liabilities, obligations and causes of action of any nature, known or unknown by Seller on behalf of itself, its estate, anyone who might claim by or through Seller and Seller's successors and assigns, in favor of the Subject Company, the General Partner and their respective affiliates, and each such person's respective members, partners, agents, directors, officers, stockholders, employees, subsidiaries, predecessors, successors and assigns should be approved.  The inclusion of such release is an integral part of the General Partner's consent to the Sale Transaction and the General Partner would not have consented without it.

29.    Accordingly, for the foregoing reasons, I believe that the Agreement represents the highest and best offer for the Interests and that the sale of the Interests to Purchaser pursuant to the Agreement will provide a greater recovery for the Debtors' estates than would be provided by any other reasonably available alternative.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: June 8, 2023.

/s/ Bruce Mendelsohn
Bruce Mendelsohn
Partner
Perella Weinberg Partners L.P.