```
 1                    UNITED STATES BANKRUPTCY COURT
                           DISTRICT OF DELAWARE
 2

 3   IN RE:                     .  Chapter 11
                                .
 4   FTX TRADING LTD., et al.,  .  Case No. 22-11068 (JTD)
                                .
 5             Debtors.         .  (Jointly Administered)
     . . . . . . . . . . . . . .
 6   AUSTIN ONUSZ, CEDRIC KEES  .
     VAN PUTTEN, NICHOLAS J.     .
 7   MARSHALL AND HAMAD DAR, ON  .
     BEHALF OF THEMSELVES AND ALL.
 8   OTHERS SIMILARLY SITUATED,  .
                                .
 9                              .
               Plaintiffs,      .
10                              .
        v.                      .  Adv. Pro. No. 22-50513 (JTD)
11                              .
     WEST REALM SHIRES INC., WEST.
12   REALM SHIRES SERVICES INC.  .
     (D/B/A FTX US), FTX TRADING .
13   LTD., ALAMEDA RESEARCH LLC, .
     SAM BANKMAN-FRIED, ZIXIAO   .  Courtroom No.  5
14   WANG, NISHAD SINGH AND      .  844 King Street
     CAROLINE ELLISON,           .  Wilmington, Delaware 19801
15                              .
               Defendants.      .  Thursday, June 8, 2023
16   . . . . . . . . . . . . . .    9:00 a.m.

17                     TRANSCRIPT OF HEARING
                BEFORE THE HONORABLE JOHN T. DORSEY
18                UNITED STATES BANKRUPTCY JUDGE

19   APPEARANCES:

20   For the Debtors:         Adam Landis, Esquire
                              LANDIS RATH & COBB LLP
21                            919 Market Street, Suite 1800
                              Wilmington, Delaware 19801
22

23

24   (APPEARANCES CONTINUED)

25   Audio Operator:          Jermaine Cooper, ECRO
```

```
1   Transcription Company:   Reliable
                             The Nemours Building
2                            1007 N. Orange Street, Suite 110
                             Wilmington, Delaware 19801
3                            Telephone: (302)654-8080
                             Email:  gmatthews@reliable-co.com
4
    Proceedings recorded by electronic sound recording,
5   transcript produced by transcription service.

6   _____

7

    APPEARANCES (CONTINUED):
8
    For the Debtors:         Andrew Dietderich, Esquire
9                            Brian Glueckstein, Esquire
                             SULLIVAN & CROMWELL LLP
10                           125 Broad Street
                             New York, New York 10004
11
    For JPLs:                Christopher Shore, Esquire
12                           WHITE & CASE LLP
                             1221 6th Avenue
13                           New York, New York 10020

14                           Jason Zakia, Esquire
                             WHITE & CASE LLP
15                           111 South Wacker Drive
                             Suite 5100
16                           Chicago, Illinois 60606

17  For the U.S. Trustee:    Juliet Sarkessian, Esquire
                             OFFICE OF THE UNITED STATES TRUSTEE
18                           844 King Street, Suite 2207
                             Lockbox 35
19                           Wilmington, Delaware 19801

20  For the Ad Hoc
    Committee of
21  Customers and
    Creditors of FTX:        Jeffrey Sabin, Esquire
22                           VENABLE LLP
                             151 West 42nd Street
23                           48th Floor
                             New York, New York 10036
24

25
```

1  <u>APPEARANCES CONTINUED</u>:

2  For the Official
   Committee of
3  Unsecured Creditors:        Kenneth Pasquale, Esquire
                               PAUL HASTINGS LLP
4                              200 Park Avenue
                               New York, New York 10166
5
   For Bloomberg L.P.:         David Finger, Esquire
6                              FINGER & SLANINA, LLC
                               One Commerce Center
7                              1201 N. Orange Street
                               7th Floor
8                              Wilmington, Delaware 19801

9                              KatieLynn Townsend, Esquire
                               REPORTERS COMMITTEE FOR
10                               FREEDOM OF THE PRESS
                               1156 15th Street NW
11                             Suite 1020
                               Washington, DC 20005
12
   For the Ad Hoc
13 Committee of Non-US
   Customers of FTX:           David Wender, Esquire
14                             EVERSHEDS SUTHERLAND
                               999 Peachtree Street, NE
15                             Suite 2300
                               Atlanta, Georgia 30309
16

17

18

19

20

21

22

23

24

25

1

INDEX

2

MOTION:                                                               PAGE

3

4   Agenda
    Item 4:   Motion of Debtors for Entry of an Order            7
5             Authorizing Implementation of a Key
              Employee Incentive Plan
6             [D.I. 1359, filed on April 26, 2023

7   Agenda
    Item 10:  Motion of Debtors for Entry of an Order
8             (A) Authorizing the Debtors to File
              Certain Information Contained in Exhibits
9             A and A-1 to the Revised Order Authorizing
              Implementation of a Key Employee Incentive
10            Plan Under Seal and (B) Granting Related
              Relief [D.I. 1561, filed on June 2, 2023]
11
              Court's Ruling:                                    7
12

13  Agenda
    Item 8:   Motion of the Joint Provisional Liquidators        8
14            for a Determination that the U.S. Debtors'
              Automatic Stay Does Not Apply to, or in the
15            Alternative for Relief from Stay for Filing
              of the Application in the Supreme Court of
16            the Commonwealth of the Bahamas Seeking
              Resolution of Non-US Law and Other Issues
17            [D.I. 1192, filed on March 29, 2023]

18            Court's Ruling:                                    137

19  Agenda
    Item 9:   Joint Motion of the Debtors and the Official       138
20            Committee of Unsecured Creditors for an
              Order Authorizing the Movants to Redact or
21            Withhold Certain Confidential Information of
              Customers and Personal Information of
22            Individuals
              [D.I. 1324, filed on April 20, 2023]
23
              Court's Ruling:
24

25

1                              INDEX

2 WITNESSES CALLED
  BY THE JPL'S:                                    PAGE
3
        PETER GREAVES
4       Direct examination by Mr. Zakia              11
        Cross-examination by Mr. Glueckstein         19
5       Cross-examination by Mr. Pasquale            36
        Cross-examination by Mr. Sabin               41
6       Redirect examination by Mr. Zakia            43

7
  WITNESSES CALLED
8 BY THE DEBTORS:                                   PAGE

9       EDGAR MOSLEY, II
        Direct examination by Mr. Glueckstein        48
10      Cross-examination by Mr. Zakia               56
        Redirect examination by Mr. Glueckstein      78
11
        KEVIN COFSKY
12      Direct examination by Mr. Glueckstein       140
        Direct examination by Mr. Wender            153
13      Cross-examination by Ms. Sarkessian         154
        Cross-examination by Ms. Townsend           162
14

15 EXHIBITS:                                        PAGE

16 JTX 1 through 54                                   9

17 Peter Greaves Declaration                         11

18 Metta MacMillan-Hughes KC Declaration             47

19 Edgar Mosley Declaration                          49

20

21

22

23

24

25

1          (Proceedings commence at 9:05 a.m.)

2          (Call to order of the Court)

3               THE COURT:  Good morning, everyone.  Thank you.

4  Please be seated.

5               MR. LANDIS:  Good morning, Your Honor.

6               THE COURT:  Good morning.

7               MR. LANDIS:  And may it please the Court, Adam

8  Landis from Landis, Rath & Cobb, here on behalf of FTX

9  Trading Limited and its affiliated debtors.

10              Your Honor, the parties are mindful of the limited

11 time we have in court today.  I understand Your Honor needs

12 to leave the bench at 2, and --

13              THE COURT:  No later than 2.

14              MR. LANDIS:  No later than 2.

15              THE COURT:  I'm going to push through, there will

16 be no lunch break.  We'll just push through until we get to

17 some time between 1:30 and 2 --

18              MR. LANDIS:  Terrific, Your Honor.

19              THE COURT:  -- whenever there's a convenient break

20 point.

21              MR. LANDIS:  And we aim to use the time as

22 efficiently as possible.

23              Based on the parties' travel plans -- a lot of

24 people have come a long way for this hearing today -- the

25 parties have determined to go forward first, with Your

1 Honor's permission, with Item Number 8, which is the JPLs'

2 motion for a declaration regarding the automatic stay; or, in

3 the alternative, lifting the stay, and we would move

4 everything else to the back of the agenda.

5 Those items that need to go to the back of the

6 agenda are Item Numbers 7 and 9, which are sealing motions.

7 We also have on the agenda Item 4 and 10.  Item 4

8 is the KEIP, which had no objections and we filed a request

9 to have the order signed.  But we also have Item 10, which is

10 the KEIP sealing order.  Objections were due at the hearing

11 in connection with that, but we have not heard about any

12 objections that were going to be raised, so we wanted to see

13 if that -- those matters could be dispatched before we got

14 going.  But if not, we're content to have them moved to the

15 back of the agenda and dealing with them -- deal with them

16 there.

17 THE COURT:  Yeah, we can deal with the KEIP.  It

18 was submitted under COC, so that --

19 MR. LANDIS:  Correct.

20 THE COURT:  -- that order will be entered.

21 Is there any objection to the sealing motion?

22 (No verbal response)

23 THE COURT:  Hearing no objection, I will enter

24 that order, as well.

25 MR. LANDIS:  Okay.  With that, Your Honor, I will

1  cede the podium to counsel to the JPLs.

2           I will note that we did submit a pretrial order

3  yesterday, a proposed pretrial order that would govern the

4  conduct of this hearing and, again, aiming towards efficiency

5  in trying to get everything done to help people to be here

6  and witnesses to be on and to get out of Dodge, as it were.

7           THE COURT:  Okay.  Thank you, Mr. Landis.

8           MR. LANDIS:  Thank you, Your Honor.

9           MR. ZAKIA:  Good morning, Your Honor.

10          THE COURT:  Good morning.

11          MR. ZAKIA:  Jason Zakia of White & Case on behalf

12 of the JPLs.

13          As counsel indicated, we have conferred with

14 counsel for the debtor, the committee, and the other parties

15 and have a proposed process to go forth today, with the

16 Court's permission, and I'd just like to lay that out for

17 you.

18          First, we -- the parties have agreed to waive

19 openings and proceed directly to the evidence.

20          THE COURT:  Okay.

21          MR. ZAKIA:  With respect to the evidence, the

22 parties have agreed to 40 -- sorry -- 54 joint exhibits,

23 which were submitted along with the pretrial order, to which

24 there were no objections.  And with the Court's permission,

25 we would jointly offer those into evidence.

1          THE COURT:  Okay.  Is there any objection?

2     (No verbal response)

3          THE COURT:  They're admitted without objection.

4     (JTX-1 through JTX-54 received in evidence)

5          MR. ZAKIA:  All right.  There were a handful of

6  exhibits that the debtors had offered over which there were

7  some objections.  My understanding from counsel to the

8  debtors are those are withdrawn, so we don't need to address

9  those.

10          THE COURT:  Okay.

11          MR. ZAKIA:  And then, with regard to the

12  witnesses, Your Honor, there are three, two for the JPLs and

13  one for the debtors.

14          In an effort to keep this as efficient, but yet as

15  effective as possible, the agreement is -- so we have two

16  witnesses, one is -- one of JPLs' is Mr. Peter Greaves, who

17  will be subject to cross-examination.  We would propose to

18  offer his declaration, but still do a brief direct, hitting a

19  few points.  But by offering the declaration, that direct can

20  be truncated.

21          And then we have a second witness, who is our

22  foreign law, Bahamian law expert, who I understand will not

23  be subject to any cross-examination, although she's present

24  should the Court have any questions.  And we would propose to

25  offer -- to do her testimony simply by the declaration,

1  unless the Court has questions for her.

2           THE COURT:  Okay.

3           MR. ZAKIA:  And the debtors have one witness, Mr.

4  Mosely.  Similar to Mr. Greaves, he will be subject to cross,

5  and so I believe they intend to both offer the declaration

6  and a direct.  But putting in the declaration, that direct

7  can be truncated.

8           THE COURT:  Okay.

9           MR. ZAKIA:  So, if that works with the Court, we

10 would proceed to the JPLs' first witness and call Mr. Peter

11 Greaves.

12          THE COURT:  Okay.  Mr. Greaves, come forward

13 please.  Please take the stand and remain standing.

14          THE ECRO:  Please raise your right hand.  Please

15 state your full name and spell your last name for the court

16 record please.

17          THE WITNESS:  Peter James Greaves, G-r-e-a-v-e-s.

18 PETER GREAVES, WITNESS FOR THE JOINT PROVISIONAL LIQUIDATORS,

19 AFFIRMED

20          THE ECRO:  You may be seated.

21          THE WITNESS:  Your Honor.

22          THE COURT:  Okay.  You may proceed.

23          MR. ZAKIA:  Thank you, Your Honor.

24          As I indicated, Mr. Greaves submitted a

25 declaration, it can be found at Docket Number 1194 -- in

1  support of the JPLs' motion, and we would offer that

2  declaration into evidence at this time.

3          THE COURT:  Any objection?

4      (No verbal response)

5          THE COURT:  It's admitted without objection.

6      (Greaves Declaration received in evidence)

7          MR. ZAKIA:  Thank you, Your Honor.

8                  DIRECT EXAMINATION

9  BY MR. ZAKIA:

10  Q    Mr. Greaves, good morning.

11  A    Good morning.

12  Q    Could you please introduce yourself to the Court and

13  tell us what you do for a living, sir?

14  A    Yes.  Good morning, Your Honor.  My name is Peter James

15  Greaves.  I am a partner in PricewaterhouseCoopers based in

16  Hong Kong, and my role there is to lead PwC's insolvency and

17  restructuring practice across Asia Pacific.

18  Q    And roughly how large is the group that you lead at

19  PricewaterhouseCoopers?

20  A    Across Asia, it's several hundred partners and staff.

21  Q    And how long have you worked as a restructuring

22  professional?

23  A    I think I'm in year 33.

24  Q    And do you have any special licenses that you use in the

25  course of your job as a restructuring professional?

1  A    I'm licensed as an insolvency practitioner to take -- to

2  take formal appointments, such as liquidations,

3  administration, receiverships, et cetera, licensed in the

4  U.K.

5  Q    Now could you describe for us, please, sir, the types of

6  jurisdictions and the various jurisdictions in which you've

7  worked over the course of your career?

8  A    Yes.  I've worked on cases in a large number of

9  jurisdictions, maybe -- maybe 20 or more.  But -- but in a

10 smaller number of countries, I've taken appointments, and

11 they tend to be jurisdictions that follow common law of have

12 their insolvency law based on U.K. law, in order that there's

13 commonality with those systems.

14 Q    Now, over the course of your career, could you just

15 describe for the Court the experience you've had with

16 liquidations or provisional liquidations under the English

17 system?

18 A    Yes.  As mentioned, I -- I've been involved in a number

19 of different formal appointments, varying slightly by

20 jurisdiction, but liquidations, I think I would have been

21 involved in, you know, perhaps a hundred or more over my

22 career so far.

23 Q    And could you describe for us, please, sir, under the

24 English system, what the duties of a liquidator are?

25 A    Yes.  At its simplest, it's to investigate and establish

1    the assets of an estate and, on other side of the tally, to

2    investigate and establish the creditors, the liabilities of

3    the estate, and to try and match those with -- with the other

4    side.

5    Q    Now is -- prior to your work on the FTX Digital Markets

6    case, had you ever served as a liquidator in any case in the

7    Bahamas?

8    A    I have not.

9    Q    And could you please describe for me what the

10   requirements are or qualifications for a liquidator or a

11   provisional liquidator to serve in the Bahamas?

12   A    Yes.  To take a -- to present oneself to the Court as

13   being able to take such an appointment, the practitioner

14   needs to be locally based and locally experienced or have a

15   qualification or a license recognized by the Supreme Court of

16   the Bahamas.  And the U.K. license that I hold qualifies.  I

17   think there are maybe two more, maybe Canada and Australia,

18   as well, allow one to take appointments in -- in the Bahamas.

19   Q    Now I'd like to shift a little bit to talk about this

20   particular engagement.

21        Who appointed you to your role as a joint provisional

22   liquidator for the Estate of FTX Digital Markets?

23   A    The appointment was made by the -- the Supreme Court of

24   the Bahamas.

25   Q    And when did that occur?

1  A    I was appointed on Monday, the 14th of November, 2022.

2  Q    Prior to your appointment as a joint provisional

3  liquidator for FTX Digital Markets, did you have any

4  connection or involvement with FTX or any of its affiliates?

5  A    No.  None whatsoever, no.

6  Q    Prior to your appointment as a joint provisional

7  liquidator, did you have any connection or involvement with

8  any of the founders of FTX?

9  A    No, I did not.

10 Q    Now could you please describe for the Court, generally,

11 what, if any, fiduciary duties you have in your role as a

12 joint provisional liquidator and who those duties may run to?

13 A    Yes.  The provisional liquidators are supervised by the

14 appointing court.  The primary fiduciary duty is to the

15 creditors of the -- of the company or creditors of the

16 company.

17 Q    Now, as a joint provisional liquidator for FTX Digital

18 Markets, what is it -- what is your goal?  What is it that

19 you're trying to accomplish?

20 A    At the risk of repeating slightly an earlier question, I

21 -- I would -- I would summarize as trying to establish the --

22 the nature and quantum of assets caught within the perimeter

23 of the estate as of the date of insolvency and to establish

24 and make contact with the creditors of the estate.

25 Q    Now what brings us here today is an application that the

1  JPLs would like to file in the Supreme Court of the Bahamas.

2     Could you describe for the Court what that application

3  is?

4  A   Again, it relates to the two main points that I just

5  mentioned.  But we are looking for guidance from the Bahamas

6  Court on how we may proceed.  The provisional liquidators are

7  very much expected to make their own decisions as far as

8  possible, if it's within the duties accorded to them by the

9  law and the order appointing them.  But if the liquidators

10  reach a stage where they need to take directions, then we're

11  obliged to do that by referring to the Bahamas Court.

12     And that's what this application relates to.  It's

13  seeking directions on a number of points critical to the

14  execution of our roles.

15  Q   And I think you said two of things that you try to

16  identify as a joint provisional liquidator are assets and

17  liabilities of the estate.

18     Could you give the Court an example of a specific

19  matter related to the assets of FTX Digital Markets from

20  which you require direction from the Bahamian Court?

21  A   Yes.  The -- without necessarily going through all of

22  them, the assets that, from the records we have, appear to be

23  in the estates or likely in the estate, if the asset were

24  cash in bank accounts, potentially digital assets.  And then

25  there's some real property and -- and other "chattel assets,"

1  I describe them as.  There are questions around who those

2  assets belong to.

3        And if I take the example of cash, the cash that was in

4  the name of FTX Digital at the outset of the insolvency were

5  principally in two types of accounts:

6        Either accounts that appeared to be operated for

7  general expenses and were either marked as such or not marked

8  in any particular way at all;

9        And there are other accounts that we took over that are

10 marked "for the benefit of," not necessarily stating who they

11 were held for the benefit -- benefit of, but the assumption

12 is that they may be held in trust for the benefit of

13 customers.

14       And until we can establish, A, that those cash assets,

15 for example, sit within the perimeter of the estate -- and it

16 appears that they do, they're in accounts in the name of the

17 entity -- and until we can establish on what basis they're

18 held, whether they're held as a general asset of the estate

19 or on trust for the beneficiaries -- which appear may be the

20 customer or customers -- then we -- we can't proceed.

21 Q   Now shifting to the other side of the leather -- ledger.

22 Could you give the Court an example of an issue with respect

23 to the liabilities of the FTX Digital Markets estate from

24 which you would like to seek or need to seek guidance from

25 the Bahamian Court?

1  A     Yes.  The -- I suppose the principal challenge that we

2  are facing or the collective estates are facing is that it's

3  unclear from the evidence we have available to us to what

4  extent customer relationships transferred or -- or migrated

5  to FTX Digital from FTX Trading.  We see evidence that

6  strongly suggests to us that that is likely to have happened.

7  But again, in order to proceed, we need guidance from a court

8  and -- and to get some input into that.

9  Q     Now, in the 33 years that you have worked as a

10 restructuring professional and in the 100 cases in which

11 you've been involved in a liquidator, have you ever before

12 sought permission from a foreign court in order to go to the

13 appointing court to seek direction?

14 A     I have not needed to.  I don't -- I don't recall a time

15 when I've had to do that, no.

16 Q     So can you explain why you're doing that here?

17 A     We -- the -- the JPLs prepared this application for the

18 reasons I've explained, and we shared that information with

19 the debtors under the corporation agreement, to let them know

20 what we're intending to do.  And that drew a two prong

21 response:

22       Firstly, an adversary proceeding was filed in this

23 court very quickly thereafter.

24       And secondly, we were put on notice that the debtors

25 believe that we would be willfully breaching the stay if we

1  proceeded with that application.  So, certainly speaking for

2  myself -- but I think I speak for all three JPLs, I was

3  motivated not to fall afoul of -- of such a breach, if that

4  were the case.

5  Q    Now could you explain to Judge Dorsey what, if any,

6  consequences would follow for the JPLs and for the

7  provisional liquidation in the Bahamas if the JPLs are not

8  able to file the application for which you're seeking

9  permission?

10 A    From a very practical perspective, we can't do our jobs.

11 And to -- yeah, to describe that another way, we can't

12 fulfill our duties.  We're -- we're unable to do the two

13 basic things I described at the outset, which is having

14 clarity around the assets within the estate and -- and who

15 they -- who they might belong to.

16 Q    Now I just want to make sure I understand a little more

17 about the duties that you have as a provisional liquidator,

18 as you understand them.

19      Let's say you woke up this morning and decided you

20 wanted to make your life a lot easier and save us all a lot

21 of time.  Do you, as a JPL, have the power or the authority

22 to just give up and close the provisional liquidation?

23 A    No.  No, I do not.

24 Q    Do you, as a JPL, have the authority to just give up on

25 the effort to identify customers and agree that, to the

1  extent any customers migrated to FTX Digital Markets, you

2  would send them back to FTX Trading or some other entity?

3  A    No such discretion without -- without the permission of

4  the Court or the agreement of the Court, of the Bahamas

5  Court, to do so.

6  Q    And you know, we're here in Delaware, it's a lovely

7  city.  Judge Dorsey is an excellent judge.

8       Do you have the authority as a JPL to just agree that

9  you are going to take your directions from a U.S. Court,

10 rather than the Bahamian Court, on any of these issues?

11 A    I do not, no.  The -- the duties we have are set out in

12 statutes and supplemented in the order appointing us and

13 there -- there is no such discretion or power.

14 Q    And under the Bahamian law, you are required to take

15 direction from which court?

16 A    The Supreme Court of the Bahamas.

17 Q    Thank you.

18       MR. ZAKIA:  Your Honor, at this point, we would

19 rest on his declaration for the rest of his direct testimony

20 and I have no further questions at this time.

21       THE COURT:  Okay.  Thank you.

22       Cross.

23       MR. GLUECKSTEIN:  Thank you, Your Honor.  Good

24 morning.

25                    CROSS-EXAMINATION

1  BY MR. GLUECKSTEIN:

2  Q    Good morning, Mr. Greaves.

3  A    Good morning, Mr. Glueckstein.

4         MR. GLUECKSTEIN:  For the record, Brian

5  Glueckstein of Sullivan & Cromwell on behalf of the FTX

6  Chapter 11 debtors before this Court.

7  BY MR. GLUECKSTEIN:

8  Q    Mr. Greaves, you are not a lawyer, correct?

9  A    I am not a lawyer.  That is correct, yes.

10 Q    And you're not offering any legal opinions in any part

11 of your testimony, either in your declaration or in your

12 testimony this morning?

13 A    I, myself, am not, no.

14        THE WITNESS:  Sorry, Your Honor.

15 Q    And Mr. Greaves, you, Mr. Simms, and Mr. Cambridge are

16 charged to act jointly as provisional liquidators with

17 respect to FTX Digital Markets, correct?

18 A    Yes, that's correct.

19 Q    In terms of day-to-day work, you personally are more

20 involved in the financial analysis and digital asset issues

21 or aspects of the assignment, correct?

22 A    That -- that is correct.  Not to the exclusion of any

23 other area, but -- that I would say that they're the areas

24 that I spend more time in than others.

25 Q    And Mr. Greaves, with respect to as -- well, as you sit

1  here today, the current unrestricted cash position of FTX

2  Digital Markets is approximately $1 million or so.  Is that

3  correct?

4  A    That -- that's correct.

5  Q    And the other cash that's currently controlled by the

6  JPLs is in "for benefit of" accounts.  Is that correct?

7  A    Yes, that -- that's right, or accounts where we can see

8  that the activity that went on in the account looks like it

9  may have been for the benefit of customers.

10 Q    And FTX Digital Markets has unpaid accrued expenses that

11 have been incurred in connection with the work that you and

12 your team are doing that it exceeds the $1 million that you

13 have on hand, correct?

14 A    That is correct, yes.

15 Q    And in fact, you estimate that amount to be somewhere in

16 the -- currently, in the five-to-ten-million-dollar range of

17 unpaid expenses, correct?

18 A    Yes, that is correct.

19 Q    And Mr. Greaves, the only cryptocurrency that the JPLs

20 currently control is an estimated $200,000 or so of illiquid

21 coins that are in a single wallet, correct?

22 A    That's correct, yes.

23 Q    And the only basis to believe that those cryptocurrency

24 assets actually belong to FTX Digital Markets is that an

25 employee gave you the keys to those assets and stated as

1  much, correct?

2  A    That is correct, yes.

3  Q    Okay.  And you have not been able to independently

4  verify that those assets belong to FTX Digital Markets.

5  A    No, I have not.

6  Q    Otherwise, the JPLs control minimal other liquid assets

7  today, correct?

8  A    That's right.  Other assets within our estate are no

9  longer or not currently within our control.

10  Q    Mr. Greaves, you testified this morning that the JPLs

11  would -- the consequences of the bankruptcy stay remaining in

12  place would be that the JPLs, including yourself, would not

13  be able to do your jobs, as you put it, correct?

14  A    Yes, that's correct.

15  Q    Okay.  With respect to -- you also testified this

16  morning that you don't have the power to take -- in your

17  view, take directions from this Court with respect to

18  questions of assets of the FTX group estates, correct?

19  A    Yes, that's correct.

20  Q    And would you agree with me, sir, that this Court is

21  capable of considering and answering the same questions with

22  respect to ownership of assets and liabilities that are

23  raised in your proposed application?

24  A    I have no doubt of the ability or capability of the

25  Court to do that.  My point is just that I'm not allowed to

1  seek that guidance.

2  Q    But if the Court -- if this Court were to deny the

3  motion today and the automatic stay stays in place, and this

4  Court were to provide answers to the questions, you would, in

5  fact, have answers to the questions as to who owns which

6  assets and liabilities, correct?

7  A    I'd still be obliged to go to the Bahamas Court to seek

8  directions and get guidance on -- on the position, whatever -

9  - whatever this Court found.

10  Q    And you would be able to do that at a later date armed

11  with the findings of this Court as to those assets, same

12  assets and liabilities, which of -- those of which have been

13  determined to be assets of the Chapter 11 debtors, correct?

14  A    I disagree with that.  I -- we're already hamstrung in

15  this case for various reasons and haven't been able to

16  achieve as much in the first seven months as I said we would

17  have expected or -- or what I think is commensurate with our

18  duties.  So, to accede to further delay whist a court --

19  another court comes to a decision, when I do not have the

20  power to make that position, I don't think is a tenable

21  position for the JPLs.

22  Q    And the question was a little bit different, Mr.

23  Greaves.

24       Notwithstanding your stated need to move forward now,

25  if this Court were to make determinations with respect to

1  property of the estate as between the Chapter 11 debtors and

2  FTX Digital Markets, you would then be able to go, with

3  permission of this Court, to the Bahamas Court and seek

4  directions at that point, couldn't you?

5  A    In theory, I could.  But I don't believe that that is in

6  keeping with the duties that I've been charged with.

7  Q    Have you made any requests to the Court in the Bahamas

8  to permit this Court to decide the issues that are presented

9  in the Chapter 11 debtors' adversary proceeding?

10 A    I have not, for fear of the consequences that I

11 mentioned earlier because we were put on notice by the

12 debtors.

13 Q    And I think you testified in your statements this

14 morning, Mr. Greaves.  But you are familiar with the

15 adversary proceeding complaint that was filed by the Chapter

16 11 debtors before this Court, correct?

17 A    I have read it, yes.

18 Q    And in fact, the FTX Debtors have asked this Court to

19 address the issues the JPLs raised in the adversary

20 proceeding complaint with respect to assets and liabilities

21 of the -- of both estates, correct?

22 A    Yeah, I -- I understand that the adversary proceeding

23 will need to be heard in due course if it's not dealt with

24 otherwise, and I believe, from reading it, that it deals with

25 similar -- or issues that cross over.

1      My point is a different one, that I'm -- that's a

2   separate proceeding here and I still have to deal with my own

3   court in the Bahamas and report to it and seek directions

4   from the Bahamas Court.

5   Q    And it's your understanding, Mr. Greaves, that,

6   irrespective of what happens with respect to the motion

7   pending today, the FTX Debtors' adversary proceeding will

8   proceed before this Court, correct?

9   A    I assume that it will, yes.

10  Q    And you have no objection to that adversary proceeding

11  and the issues contained therein proceeding before this

12  Court, correct?

13          MR. ZAKIA:  Objection.  Your Honor.  The pleadings

14  in that case speak for themselves.  We filed a motion to

15  dismiss.  So I don't know if counsel is trying to get the

16  witness to opine on how that's going to get resolved, but we

17  do have a motion to dismiss that case pending.

18          MR. GLUECKSTEIN:  I am not asking him to opine on

19  the legal issues, Your Honor.  I was simply asking whether,

20  from the -- from a process standpoint, whether Mr. Greaves,

21  as a JPL, has any objection to proceedings continuing before

22  Your Honor.

23          THE COURT:  You can answer it the best you can.

24          THE WITNESS:  Thank you.

25          From a nonlegal perspective, Mr. Glueckstein, just

 1  going back to how you originally phrased the question, I

 2  don't agree with what's asserted in the -- personally, in my

 3  capacity as a JPL, do not agree with what is asserted in the

 4  adversary proceeding.

 5         But non-lawyerly -- lawyerly understanding of that

 6  proceeding is that it will be dealt with in this Court,

 7  unless it is dealt with in some other way, unless it is

 8  either dismissed or -- or there's some other way of it being

 9  dealt with.  I understand that to be the case.

10  BY MR. GLUECKSTEIN:

11  Q    One of the other things you testified about this

12  morning, Mr. Greaves, and in your declaration, concerns what

13  you referred to as the "liabilities side" and "contacting

14  customers."  Do you recall that?

15  A    Yes.

16  Q    The JPLs have actually sent two notices to approximately

17  2.3 million FTX.com customers, requesting those customers

18  provide contact details to you through a website, correct?

19  A    Yes.  The intention of sending that note was to reach

20  out to FTX Digital customers for the purpose of letting them

21  know that the provisional liquidation is entrained and

22  requesting them to submit contact details.

23  Q    And it's true, Mr. Greaves, correct?  That the JPLs used

24  contact information for these 2.3 million customers obtained

25  from a file that was pulled from an employee commuter --

1  computer in the JPLs' possession.

2  A    That is correct, yes.

3  Q    And the JPLs did not do anything to vet that list as to

4  whether those names on it were customers of FTX Digital

5  Markets before reaching out to those 2.3 million people in

6  January of 2023, correct?

7  A    The vetting that we carried out was to look at the file.

8  And it was marked as a list of customers.  It was on the

9  machine of an FTX Digital employee.  And in discussions with

10  employees, remaining employees, it -- it seemed to us that it

11  was the best record that we have or had.  But I believe it's

12  still the best record that we have of potential creditors of

13  FTX Digital.  And the duty that we have is to reach out to

14  potential creditors.

15       And in all circumstances, being starved of other data,

16  which I firmly believe belongs to the estate of FTX Digital,

17  we did, indeed, take the decision to proceed to reach out,

18  per our duties, to contact potential creditors.

19  Q    But in fact, Mr. Greaves, you don't have information to

20  know, one way or the other, whether any employee from whose

21  that file was extracted was an employee solely of FTX Digital

22  Markets or is an employee of FTX Digital Markets and other

23  entities in the FTX group, correct?

24  A    I have some idea.  I am -- there are certain employees

25  I'm aware of who were double- or triple-hatted.  They had

1  roles with one or more entity.

2      There were other employees who, from the payroll

3  records, I can see were only ever employed by FTX Digital.

4  And I suppose the largest category of the latter would be

5  those hired into the group for the first time after the

6  creation of Digital, of FTX Digital, in the Bahamas.  I

7  personally think it would be very unlikely that they would

8  have been previously employed by other FTX group companies

9  and highly unlikely that they were also employees of other

10 group companies.

11 Q    Did you -- from whose computer was this list came?

12 A    I don't recall, sitting here, which -- which of the

13 employees it was on.

14 Q    Do you know whether you did an analysis to determine

15 definitively whether the employee's machine from whose that

16 file was extracted was an employee of FTX Digital Markets?

17 A    Yes.  I -- I think the way we looked at -- from memory,

18 the way we looked at the machines in our possession -- and

19 just by way of background, there were a number of laptops and

20 desktops in the office site when we took over -- we were

21 careful to divide them up in -- between employees of FTX

22 Digital and, as far as we were aware, non-employees.  And

23 there were, indeed, computers for employees of other group

24 companies in -- to use the terminology of these proceedings,

25 in different silos, not actually in the FTX.com silo.

1 Q    As you sit here today, Mr. Greaves, you do not know

2 whether anyone of the 2.3 million people on the list to whom

3 you sent creditors is, in fact, a creditor -- that you sent

4 notices is, in fact, a creditor of FTX Digital Markets,

5 correct?

6 A    And that's precisely one of the questions I want to ask

7 the Bahamas Court.  I -- I need help to understand that.  I

8 have reason to believe that they are likely to be FTX Digital

9 creditors, but I need help in deciding that.

10 Q    Okay.  But before getting that answer, you have put two

11 mailings out to 2.3 million people suggesting that they might

12 be creditors of FTX Digital Markets, correct?

13 A    That's right, in accordance with my duties.

14 Q    And to date, there have been approximately 46,000

15 individuals who have registered at your website.  Is that

16 correct?

17 A    That might be slightly out of date, but yes, I think

18 forty, forty-five, 50,000, so far.

19 Q    You testified this morning that -- and in your

20 declaration that, in your view, it is "likely" -- I believe

21 is the term you used this morning -- that there are cash and

22 digital assets, potentially other assets in the estate of FTX

23 Digital Markets, correct?

24 A    That's correct.

25 Q    You also testified that you believe that customers have

1   moved or migrated prior to filing for liquidation from FTX

2   Trading to FTX Digital Markets, correct?

3   A    That's right.

4   Q    And you've reached that conclusion based on a five-page

5   document called a "migration plan" that's attached -- that

6   was attached to your declaration, interviews with a handful

7   of employees, and publicly available announcements, correct?

8   A    They're certainly three of the pieces of evidence or

9   factors that helped me form the view that you set out a

10  little while ago.

11  Q    All right.  So, other than those three pieces, have --

12  what other pieces of evidence have you identified and

13  reviewed that allow you to testify that it is likely that

14  customers moved to Digital Markets?

15  A    I -- this may not be exhaustive, but let me -- let me

16  try and try to keep it brief.

17       If I -- if I have to use as a crutch the chronology, I

18  take it Digital was set up in July of 2021.  It began to both

19  hire new employees and take transfers for existing group

20  employees onto its payroll based on the Bahamas.

21       In September 2021, it was licensed by the Securities

22  Commission of the Bahamas.  And I understand the purpose of

23  the license was allow -- to allow it to provide services and

24  operate the international exchange.

25       I understand that the migration plan was part of that

1    application, looking at the date of it.  I'll come back to

2    the migration plan in a moment.

3        By November 2021, bank accounts were opened in the name

4    of FTX Digital.  That continued through until, I think,

5    January.  There are a number of accounts, both in the U.S.

6    and overseas, in a number of denominations.

7        And the hard -- piece of hard evidence that we do have

8    -- we are denuded over full details of -- of the platform,

9    but we do have -- we put together the pieces of the puzzle to

10   look at bank statements for the accounts that I've just

11   spoken to, and they indicate payment flows from customers,

12   many, many, many transactions, you know, perhaps millions of

13   transactions in the period from January -- or certainly the

14   intense period of January of '22 through to November, when

15   FTX Digital failed.  And in aggregate, those customer flows,

16   receipts and payments, looked to be in the order of 13

17   billion U.S. Dollars.  So bank statement evidence, I -- I

18   would -- I would include, as well.

19       Mr. Glueckstein referred to conversations with -- with

20   employees.  Again, many of the employees had left by the time

21   we were appointed, but some fairly key ones remained.  The

22   then co-CEO and COO was still available to us.  I'm not

23   referring to Mr. Bankman-Fried.  And she was able to give a

24   view on migration, migration of customers between FTX Trading

25   and -- and FTX Digital, and also to point out that a KYC

1   exercise, know your customer exercise, was carried out per

2   the migration plan.

3        As Mr. Glueckstein says, the migration plan is a fairly

4   short document, five pages.  But it refers to a GAAP analysis

5   of the KYC requirements needed to comply with the -- with the

6   license granted in the Bahamas.  And I understand that there

7   was a lot of activity in -- during 2022 to contact customers,

8   let them know of the intention to migrate their contracts

9   from Trading to Digital and, for the purposes of that, to

10  seek additional evidence from a KYC perspective.

11       The reason for that is that the prior requirements were

12  less onerous.  So -- so, before the Bahamian license, FTX was

13  required to have evidence on file of -- for institutional

14  customers of the details of ultimate benefit -- beneficial

15  ownership -- ownership for 25 percent and above.  The

16  requirement for the Bahamas license was 10 percent and above.

17       So there was a telephone campaign -- I believe with

18  messages, as well, but we don't have access to those -- to

19  reach out to customers to achieve that and put the -- the --

20  the supplemental KYC information on file.

21       I fear that I've perhaps not exhausted the signposts

22  that lead me to believe that there's a question to be

23  answered on migration.  The -- but -- but I will stop, other

24  than just mentioning one more, which is -- I'm not a lawyer,

25  but the terms of service dated 13 May, 2022 also make it very

1  clear to a layman's reading and understanding that the

2  majority of the services were to be provided by FTX Digital

3  from that date.

4      And it's our understanding, not least from evidence

5  provided by the debtors, that those terms of service were

6  posted on the website and it would -- would have been

7  publicly available to customers and the world at large.

8      And indeed, when customers, after the new terms of

9  service, wired funds to the platform, the international

10 platform, it's my understanding that they saw a popup on

11 their screen that -- that let them know that they were no

12 longer sending money to an Alameda affiliate, but would

13 actually be sending funds to an account in the name of FTX

14 Digital.

15     To my mind, all of those things lead me to think I need

16 to go and get some help from the Court and perhaps other --

17 other experts in -- to determine what that all means.

18 Q    Mr. Greaves, you -- everything you just walked through,

19 you don't have documentation showing a customer ever saw a

20 popup when they deposited money, correct?

21 A    I have some evidence of that, but I -- the place where I

22 want to look for it, the debtors have denied us access.

23 Q    You have not -- you are not aware, as contemplated by

24 the migration plan, of FTX Digital Markets reporting to the

25 Securities Commission of the Bahamas any number of customers

1  that had been migrated from FTX Trading to FTX Digital,

2  correct?

3  A    I do not have confirmation of that, no.

4       (Pause in proceedings)

5  Q    As you sit here today, you do not know whether any

6  customer actually migrated from FTX Trading to FTX Digital

7  Markets, correct?

8  A    As I sit here today, my strong personal and professional

9  view is that there's a body of evidence that suggests that

10 they did.  I'd like, if it's possible, to see more evidence

11 and, if that isn't possible, to seek directions from the

12 Bahamas Court on whether migration happened.

13 Q    And if this Court answers the questions posed in the

14 adversary proceeding with respect to which customers, if any,

15 are customers of FTX -- of the FTX Debtors or FTX Digital

16 Markets, you will have that answer, correct?

17 A    I -- I'm not -- I'm not asking this Court to do anything

18 or not do anything and I'm not trying to prevent the debtors

19 from making any application in this Court.  We're represented

20 here, we're in the Chapter 15 proceedings.  All I'm saying

21 is, unless the Bahamas Court instructs me otherwise, I do not

22 have discretion to not go to the Bahamas Court.

23 Q    If this Court, Mr. Greaves, leaves the automatic stay in

24 place, you will have fulfilled your duties because you asked

25 to go to the Bahamas Court, correct?

1  A    I believe my duty is to go to the Bahamas Court.  And as

2  I said, whilst we're supervised and under court guidance, in

3  my experience, courts, including the Bahamas Courts, will

4  expect officeholders to use their tenacity and their

5  professional experience to get as far as they can.

6       I think that's the situation we're in.  And I,

7  personally, would like comfort from the Court that appointed

8  me that I'm not falling afoul of any of my duties.

9  Q    If this Court were to rule that it was going to

10 determine the issues set forth in the adversary proceeding

11 prior to any modification of the stay, you will have done

12 your job in discharge of your duties, correct?

13 A    That may be very helpful if that happened, but I'd still

14 have to go to the Bahamas Court.  I'm personally just failing

15 to see how I can not seek directions from the Bahamas Court,

16 and that's the question, I'm -- I'm trying to ask.

17 Q    Okay.  Thank you.

18       MR. GLUECKSTEIN:  No further questions, Your

19 Honor.

20       THE COURT:  Okay.  Thank you.

21       Any other cross?

22       MR. PASQUALE:  Yes, Your Honor.  Ken Pasquale from

23 Paul Hastings for the official creditors' committee.

24

25

1                        CROSS-EXAMINATION

2  BY MR. PASQUALE:

3  Q     Good morning, Mr. Greaves.

4  A     Good morning, Mr. Pasquale.

5  Q     Mr. Greaves, you said a number of different times in

6  your testimony so far that the application is to seek

7  direction from the Bahamas Court, correct?

8  A     Correct.

9  Q     And that there are certain questions you want to raise

10 with the Bahamas Court, correct?

11 A     Yes, that's right.

12 Q     But isn't it correct that what you really want to do in

13 the Bahamas Court is commence litigation to answer those

14 questions, isn't that right?

15 A     I wouldn't agree with that characterization, no.  That

16 could potentially be a consequence of the application, but I

17 don't know. I am certainly of the -- perhaps even those in

18 the building, I am the least qualified from a legal

19 perspective to form a view on that.

20 Q     Doesn't the application itself raise -- if you would,

21 you have as part of your declaration -- let me make sure I

22 reference the right exhibit, its Exhibit A-1 to your

23 declaration.  There is a section of the proposed application

24 that speaks toa appointment of representative creditors.  Are

25 you aware of that?

1          UNIDENTIFIED SPEAKER:  (Inaudible).

2          MR. PASQUALE:  Oh, I assumed he had one.  Okay.

3          UNIDENTIFIED SPEAKER:  (Inaudible).

4          MR. PASQUALE:  Yeah, let's do that.

5          THE WITNESS:  Thank you.  I believe I recall it,

6  but I think --

7          MR. PASQUALE:  I'm sorry.

8          THE WITNESS:  No, no, no. I think it would be

9  prudent for me to refamiliarize myself.

10          MR. PASQUALE:  Apologies, Your Honor.

11          THE WITNESS:  Happy to look at your copy if it

12  helps.

13          MR. PASQUALE:  Mine is marked up.

14          UNIDENTIFIED SPEAKER:  Your Honor, can I approach

15  the witness?

16          THE COURT:  Sure.

17          THE WITNESS:  Thank you.

18          MR. PASQUALE:  Thank you.

19          THE COURT:  Is this also Exhibit 8 in the joint

20  exhibits?

21          MR. PASQUALE:  I don't think it is, Your Honor. I

22  think that is just the summons.

23          UNIDENTIFIED SPEAKER:  No. I think it is, Your

24  Honor.

25          MR. PASQUALE:  Our binder didn't have it.

1          UNIDENTIFIED SPEAKER:  It looks like its Joint

2   Exhibit 8.

3          THE COURT:  Okay. I've got it.  Thank you.

4          MR. PASQUALE:  Thank you, Your Honor.

5   BY MR. PASQUALE:

6   Q    Mr. Greaves, I'm looking at your declaration, just to

7   be consistent. It's Exhibit A-1.  Is that the application

8   that you proposed to submit to the Bahamian Court?

9   A    Mr. Pasquale, I apologize.  In the bundle I've got the

10  -- yes, I apologize.  It is.  I have it.  A-1 is the

11  application.

12  Q    You do have it?

13  A    Apologies.

14  Q    Let me ask you to turn to page 27 of that application.

15         THE COURT:  Okay.  So, its not Joint Exhibit 8

16  because there is no --

17         MR. PASQUALE:  It is not, Your Honor.

18         THE COURT:  Joint Exhibit 8 only has five pages.

19         MR. PASQUALE:  Joint Exhibit 8 just has the

20  summons.

21         THE COURT:  Yeah.

22         THE WITNESS:  So, I believe that was my confusion,

23  Your Honor. Am I referring to page 27 of the affidavit

24  supporting the summons?

25         MR. PASQUALE:  Correct.

1              THE WITNESS:  Thank you. I am almost there.

2              MR. PASQUALE:  So, Your Honor, to be clear, I

3   don't know if you have it in front of you its Exhibit A-2 is

4   the fifth affidavit in support of application.  Its Exhibit

5   A-2 to Mr. Greaves declaration.

6              MR. GLUECKSTEIN:  Your Honor, not to complicate

7   matters further here, if I may, though, that document is

8   attached to Mr. Greaves declaration.  But that proposed

9   affidavit is not in evidence at this hearing because it is of

10  no evidentiary value and there is no dispute about that.  So,

11  I think that is why you only the summons which states the

12  claims to be brought.  That was moved into evidence this

13  morning as part of the joint exhibit list, but that affidavit

14  is not in evidence at this hearing that Mr. Pasquale is

15  referring to now.

16             THE COURT:  All right.

17             MR. PASQUALE:  Thank you, Mr. Glueckstein.

18             THE COURT:  I assume it's being used for

19  impeachment purposes.

20             MR. PASQUALE:  It is, Your Honor.

21             THE COURT:  Okay.

22             MR. PASQUALE:  I will try to ask a couple of

23  questions. I am not seeking to put the document into

24  evidence.

25             So, thank you, Mr. Glueckstein.  Thank you, Your

1  Honor.

2  BY MR. PASQUALE:

3  Q    So, I think we're together, Mr. Greaves, you're page

4  27, Section 16?

5  A    I am.

6  Q    It says appointment of representative creditors?

7  A    Yes.

8  Q    Does that section propose various litigation to answer

9  certain of the questions that you proposed to raise with the

10  Bahamian Court?

11  A    I will just read it again, if you don't mind, to

12  myself.

13  Q    Yes.

14      (Pause)

15  A    Mr. Pasquale, I have read down to the end of 114.  My

16  understanding of this section is that its describing

17  potential steps once the application is made to the Bahamian

18  Court.  And as has been established, I shouldn't talk to how

19  proceedings run in the Bahamian Court. It is not my area of

20  specialty, but I understand that its likely that such matters

21  would be -- the Bahamian Court would be assisted in its

22  understanding of these matters in giving directions by

23  seeking to hear the position of creditors or customers.  That

24  is my understanding of this section.

25  Q    And those creditors have not yet appeared in the

1 Bahamian case?

2 A      Not in the sense that I understand it. I don't believe

3 that creditors -- I can't be certain, but my recollection is

4 that creditors have not appeared in the Bahamas case.

5 Q      And you understand -- do you understand, Mr. Greaves,

6 that my client, the official committee of unsecured

7 creditors, and these debtors' Chapter 11 cases represent the

8 interest of, among others, all of the customers of the

9 international exchange?

10 A      I do understand that to be the position of the UCC.

11          MR. PASQUALE:  Thank you.  No further questions,

12 Your Honor.

13          THE COURT:  All right.  Thank you.

14                    CROSS-EXAMINATION

15 BY MR. SABIN:

16 Q      Good morning, Mr. Greaves.

17 A      Good morning.

18 Q      I am Jeff Sabin from Venerable LLP who represents a

19 group of ad hoc international customers who filed a statement

20 in partial support of your motion.  I will be very brief.  I

21 have three questions.

22          First, do you believe it is within your duties to

23 negotiate a protocol for other arrangements for the Bahamas

24 Court and/or this Court to decide the non-US law customer

25 issues as you define them in your draft application?

1  A     My understanding or believe is that that would be a

2  matter for the Courts, the Court or Courts.  I could

3  certainly imagine that that would require input from the

4  JPLs.

5  Q     If this Court were to decide to order or to suggest a

6  procedure for a joint hearing of this Court and the Bahamas

7  Court to adjudicate those non-US customer issues, would you

8  be in favor?

9  A     I would be guided by the Court that appointed me.  But

10 if I take the spirit of the question, I'm interested in

11 finding the answers.  So, I would like to make the

12 application to the Bahamas Court.  I don't think I then get

13 to influence how the two Courts decide to work together.

14 Q     Finally, would -- if that were to happen, a suggestion

15 of a joint hearing, would that meet your duties as you

16 understand it?

17 A     If the Bahamas Court were able to confirm that

18 (indiscernible) or satisfy the threshold for us to carry out

19 our duties then we could live with that.

20         MR. SABIN:  Thank you, sir.

21         THE COURT:  Anyone else wish to cross before I go

22 back for redirect?

23     (No verbal response)

24         THE COURT:  Okay.  Redirect.

25         MR. ZAKIA:  Thank you, Your Honor.

1                         REDIRECT EXAMINATION

2   BY MR. ZAKIA:

3   Q     Just briefly, Mr. Greaves.  Mr. Glueckstein asked you

4   some questions concerning a communication that the JPL's sent

5   to the 2.3 million customers identified on the customer list.

6   Could you just tell us what was the purpose of that

7   communication?

8   A     Yes.  Simply to do our best with the tools we have

9   available to satisfy the duty of identifying and contacting

10  our creditors.  It was the only list we had available at the

11  time.  As was mentioned, that the two letters that have gone

12  so far explain the nature of our appointment, explained what

13  we were not appointed over.

14        I am making it very clear of the existence of the 134

15  debtor proceedings before this Court.  And inviting those who

16  may believe that their creditors of FTX Digital. I have had

17  people reaching out to me -- you know, customers reaching out

18  asserting that they are.  So, the purpose was to invite them

19  to log their basic contact details on our case website.  I

20  believe at the moments its main address and email.  So, that

21  was the purpose of the contact.

22  Q     Are communications such as this unusual steps for you

23  to take in your role as a liquidator?

24  A     No.  Its primary duty 101, if I was looking after an

25  entity with four or five creditors, I might not put up a

1  website.  In this case the evidence suggests that the number

2  is far, far greater then that.  So, reaching out

3  electronically and having a basic claims website with

4  information and frequently asked questions would be very

5  normal.

6  Q     Have the JPLs ever represented to anyone that they have

7  any authority to act on behalf of the U.S. Chapter 11 debtor?

8  A     I certainly have not and I am not aware that any of the

9  JPL's have.

10  Q     And in the communications that you sent to customers

11  have you taken any steps to explain that you do not have

12  authority to act and are not acting on behalf of any of the

13  U.S. Chapter 11 debtors?

14  A     Yes, we have.  I believe that we have made that as

15  clear as possible.  And, where counterparties, creditors or

16  even debtors have reached out to us it's clear or reasonably

17  clear to me that they should be reaching out to the debtors.

18  I have passed on the contact details and explained why I

19  can't deal with their query.

20  Q     Now shifting topics, Mr. Glueckstein asked you about

21  the unrestricted cash position of the JPLs.  Do you remember

22  that?

23  A     I remember, yes.

24  Q     Okay.  I think you told him that with regard to cash

25  that wasn't held for the benefit of customers or arguably

1  held for the benefit of customers, your current balance was

2  less than $1 million?

3  A    Yes.  I don't know the exact number but I think that

4  would be, you know, a few hundred thousand dollars left.

5  Q    Will it be possible for the JPLs to take any steps to

6  fund their efforts on behalf of the administration the

7  provisional liquidation given that cash situation?

8  A    Only with permission of the Bahamas Court.

9  Q    And what would you need permission from the Bahamas

10 Court to do in order to accomplish that?

11 A    I can think of two scenarios.  The order appointing us

12 and the statutory duties and powers laid out in the act, in

13 the Bahamas basically divides up powers that the JPLs have

14 between those that they can carry out themselves and those

15 for which they need leave, or sanction, or approval of the

16 Court.

17      In that latter bucket I can think of -- within the

18 power of the JPLs to make such an application would be to

19 seek permission to borrow funds. That would be permissible

20 with sanction of the Bahamas Court.  And it would also be

21 possible, to my mind, to make an application to the Bahamas

22 Court for a determination on whether the funds thought

23 possibly or likely to be held in trust for customers were,

24 indeed, trust funds or, otherwise, were generally available

25 to carry out the estate.

1    I would say that second one is a core plank of the

2   application that we're actually making.

3   Q    And if you were prevented from the automatic stay from

4   making that application what, if any, consequences would

5   there be for the joint provisional liquidation?

6   A    You know, I am not going to stop trying to do my job

7   and fielding inquiries, which we still receive, you know,

8   hundreds each month.  But in terms of substantially moving

9   this forward we would not be able to carry out our duties and

10  not be able to -- never mind complete the provisional

11  liquidation, we wouldn't even be able to do our basic roles.

12  Q    So, if you were to follow the course that Mr.

13  Glueckstein suggested and not make any applications to the

14  Bahamian Court while you litigate with the debtors for

15  however long, what would be the impact on the JPLs cash

16  position as that occurred?

17  A    Well, we have already committed expenditure beyond the

18  funds that we have.  So, we would be in an impossible

19  situation.

20        MR. ZAKIA:  Thank you.  Your Honor, no further

21  questions.

22        THE COURT:  Thank you.  Thank you, Mr. Greaves.

23  You may step down.

24      (Witness excused)

25        MR. ZAKIA:  Your Honor, our next witness is our

1   foreign law expert, Metta MacMillan-Hughes KC.  She submitted

2   a declaration at Docket No. 1193.  My understanding from the

3   debtors is they do not intend to cross her; therefore, we

4   were not going to do a direct.  We would stand on the

5   declaration.  She is in Court and available to answer any

6   questions that the Court or any other party may have.  But,

7   unless you have any questions I would just offer her

8   declaration at this time.

9           THE COURT:  Okay.  Any objection?

10          UNIDENTIFIED SPEAKER 1:  No objection, Your Honor.

11          UNIDENTIFIED SPEAKER 2:  No objection, Your Honor.

12          THE COURT:  The declaration is admitted without

13   objection.

14      (Macmillan-Hughes KC declaration received into

15   evidence)

16          THE COURT:  I don't have any questions. Does

17   anyone else wish to ask the witness any questions?

18      (No verbal response)

19          MR. ZAKIA:  Thank you, Your Honor.

20          THE COURT:  Thank you.

21          MR. ZAKIA:  So, that completes the evidentiary

22   portion of the JPL's case.  So, at this time we would rest.

23          THE COURT:  Thank you.

24          MR. GLUECKSTEIN:  Good morning, again, Your Honor.

25   Brian Glueckstein of Sullivan & Cromwell for the debtors.

1          As Mr. Zakia previewed this morning, the debtors

2  have one witness this morning and we would like to call Mr.

3  Edward Mosley to the stand.

4          THE COURT:  Mr. Mosley, please come forward, take

5  the stand, and remain standing.

6          THE CLERK:  Please raise your right hand.  Please

7  state your full name and spell your last name for the Court

8  record, please.

9          MR. MOSLEY:  Edgar William Mosley, II, M-O-S-L-E-

10  Y.

11          EDGAR MOSLEY, II, DEBTOR WITNESS, SWORN

12          THE CLERK:  You may be seated.  Your Honor.

13          MR. GLUECKSTEIN:  All right.  Your Honor, may I

14  approach the witness and hand him a copy of his declaration?

15          THE COURT:  Yes.

16          MR. GLUECKSTEIN:  Does Your Honor need a copy?

17          THE COURT:  No -- well, were these included in the

18  joint exhibits?

19          MR. GLUECKSTEIN:  They were numbered, Your Honor.

20  It's numbered as Joint Exhibit 39.

21          THE COURT:  Okay.  I have it.  Thank you.

22                    DIRECT EXAMINATION

23  BY MR. GLUECKSTEIN:

24  Q     Good morning, Mr. Mosley.

25  A     Good morning.

1  Q      Is the declaration that is in front marked as Joint

2  Exhibit No. 39 the declaration that you submitted to this

3  Court in connection with your testimony this morning?

4  A      Yes, it is.

5            MR. GLUECKSTEIN:  Your Honor, Mr. Mosley's

6  declaration was filed at Docket 1411.  And we would ask that

7  it be moved into evidence.

8            THE COURT:  Any objection?

9            UNIDENTIFIED SPEAKER:  No objection.

10            THE COURT:  It's admitted without objection.

11        (Mosley declaration received into evidence)

12  BY MR. GLUECKSTEIN:

13  Q      Mr. Mosley, can you give the Court a brief background

14  of your experience as a restructuring professional?

15  A      Sure. I have over 20 years of experience doing

16  restructurings, corporate side, mostly on the company side.

17  Most of the time they're in Chapter 11 proceedings of some

18  sort, but I do, do some out of Court.  I have worked at

19  Alvarez & Marsal since 2008.  And in general, I do some of

20  our larger more complex cases.

21  Q      Can you please describe for the Court your current

22  responsibilities at Alvarez & Marsal with respect to the

23  Chapter 11 debtors?

24  A      Sure.  I oversee a team of professionals who I organize

25  into various work streams.  Those work streams are, you know,

1  wide.  We do cash.  So, part of the job there is to not only

2  secure, but also to project cash balances for the various

3  debtors.  In addition, we have a crypto team who are charged

4  with identifying and securing the crypto and digital assets

5  of the estate.  That is more complicated than it seems

6  because, as part of the debtor's operations prepetition,

7  there were balances held at third party exchanges.  So, we

8  are in the midst of trying to get all those digital assets

9  back.

10        In addition, there is a claims process that I oversee

11  where we are setting up a claims portal and working with the

12  claims agent on a process of how we will take and use the

13  information as part of the bar date for the claims of the

14  various entities.

15        Another big work stream for us right now is that the

16  plan formation structure and the financial analysis around

17  various plan structures.  There are -- we have a multitude of

18  work streams, but those are the big ones that I think are

19  relevant to the question.

20  Q    And are you the lead professional at Alvarez & Marsal

21  on all those work streams for the Chapter 11 debtors?

22  A    Correct.  I lead the entire team.

23  Q    Mr. Mosley, if you could just briefly look at your

24  declaration that is in front of you at Paragraph 20.

25  A    I'm there.

1  Q    You have a statement there with respect to that states:

2       "The debtors are not aware of any customers of FTX DM

3  who are not also creditors of FTX Trading or other debtors."

4       Do you see that?

5  A    I do.

6  Q    And that is your testimony as set forth in your

7  declaration at Paragraph 20, correct?

8  A    Correct.

9  Q    Mr. Mosley, could you please explain to the Court, in a

10  bit more detail, what you are saying in that statement,

11  intending in that statement?

12  A    No problem.  In the case of the international or .com

13  exchange that set of customer claims is the one in question.

14  The JPLs have said that some portion of that exchange is

15  their customer with the remainder being with the debtors at

16  FTX Trading.

17       In fulfilling our duties when we think about if one or

18  more customers of the .com exchange were, indeed Digital

19  Markets customers I don't think that the US debtors would be

20  able to say that a migration of that customer did not allow

21  that customer to make a claim with Trading. I say that

22  because, you know, first and foremost, the terms of service,

23  the counterparty is FTX Trading, which is the debtor.

24  Further, I do believe that all of the customers have or will

25  have the ability to make a fraud claim against the debtors.

1  That claim would go against FTX Trading.

2       I don't think that somehow migrating a customer to

3  Digital Markets would absolve the debtors of that claim. So,

4  thus, in my opinion, any claims brought by customers against

5  Digital Markets those same customers would have a claim

6  against our debtors.

7  Q    Mr. Mosley, if you could turn to Paragraph 21 of your

8  declaration.

9  A    I'm there.

10 Q    You discuss, in Paragraph 21, of your declaration

11 prejudice to the debtors if the proceedings in the Bahamas

12 Court were to proceed.  Is that right?

13 A    Yes.

14 Q    What types of prejudices do you believe the debtors

15 will suffer if the stay is lifted and the application is

16 filed in the Bahamas Court?

17 A    I think of the types of prejudices in, sort of, three

18 buckets.  There is the additional costs that would be

19 incurred by the estate for having a duplicative litigation on

20 the same topics.  I think of the confusion to our claims

21 process and our overall plan process that would occur.  And

22 the final would be a potential delay in our case. I think

23 there is potential to have, you know, our process delayed in

24 some way.

25 Q    With respect to the cost aspect of the prejudice to the

1  debtors, can you elaborate some for the Court on what you

2  mean in the types of increased costs you are contemplating?

3  A    So, the process of having a litigation in the Bahamas

4  on the same, sort of, issues that are in the adversarial

5  proceedings would require or could require the debtors to get

6  additional legal counsel down in the Bahamas and for whatever

7  sort of local law and rules that are there.

8       All of the professionals that are currently in our case

9  would need to come up to speed on what their duties are and

10 how they will conduct themselves in those Bahamian

11 proceedings.  So, all of that additional work would need to

12 happen.  There would be duplicative cases.  There would be

13 more hearings that folks would have to travel for.  Just in

14 general there would be additional expert testimony required.

15      I don't know if the requirements there are different,

16 but I am told that there are, you know, additional expert

17 witnesses needed.  That isn't just for the debtors.  All of

18 the stakeholders would need to be present; the UCC, the ad

19 hoc committee, any other stakeholders could be required to go

20 down there and make sure that their properly heard in that

21 case.

22 Q    You mentioned a creditor confusion as prejudice.  Can

23 you explain to the Court a little bit more about what you

24 have in mind, in your opinion, with the creditor confusion?

25 A    Some portion of the creditors that are involved in our

1   case will be confused as to which case they need to appear,

2   place a claim in, participate in.  Some may decide to appear

3   in both, some may choose one or the other and may be

4   incorrect at which one they need to be involved in.

5        Having two claims portals up at the same time for the

6   same population of creditors, the ones in question being

7   anyone in the .com exchange, of FTX.com, is clearly confusing

8   for someone who is not doing this for a living.  There will

9   be a set of customers who have no problem with that, but I'm

10  sure there is a set of customers who will be confused in some

11  way.

12  Q    With respect to -- I think the third thing you

13  mentioned, Mr. Mosley, was potential for delay.  What is, in

14  your opinion, a potential delay caused by duplicative

15  proceeding in the Bahamas?

16  A    It's a potential. I'm not saying that it's a required

17  delay, but there could be a delay in our plan process if we

18  need to wait until the Bahamian Court hears the litigation on

19  that issue and then would have to put it in front of Your

20  Honor as well.  Every delay, though, in this case is

21  expensive.  There are a lot of professionals involved and the

22  longer the process takes, the more it costs.  So, the debtors

23  are very focused on trying to shorten the amount of time, any

24  potential delay is one that we take seriously.

25  Q    Mr. Mosley, looking, again, at Paragraph 21 of your

1  declaration there are some bullet points there including the

2  first bullet point that has a description of attempts to

3  cloud title with respect to assets.  Can you give the Court

4  an example of what you are referring to in that first bullet

5  point in Paragraph 21 of your declaration?

6  A      Certainly.

7  Q      This 7.7 billion that's been referenced by the JPL in a

8  few places, most notably in its interim report, in my opinion

9  is misleading. I am not saying that the number is incorrect.

10 I am saying it is choosing to only show one side of the

11 ledger.  In this case these are amounts transferred from

12 Digital Markets to a debtor.  It ignores the fact that there

13 corresponding amounts from debtors to Digital Markets.  Its

14 just taking a gross number and not giving the reader the

15 benefit of the net amount.

16      In fact, its my opinion that if you totaled up the

17 customers amounts that were transferred out, the amounts to

18 FTX Trading, and the amounts to Alameda, and you compared

19 that to the amounts coming in to Digital Markets there was a

20 net inflow into Digital Markets.  But at the very least, the

21 amounts sent out of the 7.7 billion are dwarfed by the

22 amounts required for the customer withdrawals.  The JPL

23 purports are, you know, customers.

24      So amounts sent out to Alameda or Trading that were

25 then sent onto customers I don't view that as amounts due to

1  Digital Markets.  And in the interim report where this number

2  sits, it sits in the receivable section. You know, it

3  intimates that Digital Markets is owed $7.7 billion from the

4  debtors. I feel that is misleading.  They have used that

5  number in lots of places.

6       Once, again, I don't think that its incorrect. You

7  know, I see those transfers.  I think its incomplete and

8  purposely incomplete.  So, that is what I am talking about

9  when I say clouding title to the assets.  They are saying

10 that somehow Digital Markets is entitled to the assets of the

11 debtors.

12          MR. GLUECKSTEIN:  Thank you, Mr. Mosley.  No

13 further questions.

14          THE COURT:  Thank you.  Anyone else want to

15 question in support?

16          UNIDENTIFIED SPEAKER:  No, Your Honor.  Thank you.

17          THE COURT:  Cross.

18                     CROSS-EXAMINATION

19 BY MR. ZAKIA:

20 Q    Mr. Mosley, good morning.

21 A    Good morning.

22 Q    My name is Jason Zakia.  I am one of the lawyers from

23 the JPLs. I am going to ask you a couple of questions if that

24 is okay.

25 A    Yes, sir.

1   Q      So, first of all, I would like to talk to you about the

2   terms of service that you referred to on your direct

3   examination.  There were various different terms of service

4   posted to the FTX.com website at various times.  Is that

5   correct?

6   A      Yes, sir.

7   Q      So the first ones that we are aware of are what, I

8   believe, you referred to as the 2019 terms of service?

9   A      Yes, sir.

10  Q      And when were those posted to the FTX.com website?

11  A      In 2019.

12  Q      And by whom were those terms of service posted to the

13  FTX.com website?

14  A      If you are saying who the counterparty is who posted

15  it, I mean its FTX Trading.  That is the counterparty. If you

16  are asking whether or not its -- you know, who is the actual

17  person who mechanically put it onto the website I don't know

18  who it was.

19  Q      Okay.  So, if I understand correctly, someone acting on

20  behalf of FTX, but the records of the company don't indicate

21  which individual posted the 2019 terms of service to the 2019

22  website -- sorry, to the FTX.com website in 2019, right?

23  A      Correct.  There is just a record of it being put onto

24  the website.

25  Q      And at the time that that happened the CEO of FTX was

1  Sam Bankman-Fried?

2  A     Correct.

3  Q     Okay.  And other then the posting to the website the

4  records of the company don't indicate any separate step or

5  separate notice was given to customers of the 2019 terms of

6  service, correct?

7  A     Correct.

8  Q     Now at some point the 2019 terms of service were

9  replaced by later terms of service conveniently referred to

10  as the 2020 terms of service, is that correct?

11  A     Correct.

12  Q     Okay.  Those were posted to the FTX.com website in

13  2020?

14  A     Correct.

15  Q     And the records of the company are not sufficient for

16  you to be able to know which individual posted the 2020 terms

17  of service to the FTX.com website, correct?

18  A     Correct.

19  Q     At the time that that happened in 2020 the CEO of FTX

20  was Sam Bankman-Fried, right?

21  A     Correct.

22  Q     Now its your understanding that when the 2020 terms of

23  service were posted to the 2000 -- sorry, to the FTX.com

24  website those terms of service replaced the 2019 terms of

25  service?

1  A      Yes.

2  Q      And so the relationship between FTX and its customers

3  was governed by the 2019 terms of service from the time that

4  was posted until the 2020 terms of service were posted,

5  right?

6  A      I am not a lawyer, but, yes, from a business persons

7  perspective, yes.

8  Q      Okay.  You talk about this in your declaration, right?

9  A      Yes, sir.

10 Q      And, in fact, in Paragraph 10 of your declaration you

11 say the relationship between customers and FTX.com Trading

12 platform were governed by the 2019 and 2020 terms of service,

13 right?

14 A      Correct.  I think Paragraph 10 speaks for itself.

15 Q      And you have described for us the process by which

16 those two terms of service were posted to the website and

17 disclosed to customers, right?

18 A      Yes.

19 Q      Now I would like to ask about the 2022 terms of

20 service.  Do you -- the 2022 terms of service are Joint

21 Exhibit 11.  You don't have a copy of that with you, sir, do

22 you?

23 A      No, I do not.  I am familiar with the 2022 terms of

24 service.

25 Q      Okay.  May I approach the witness, Your Honor?

1           THE COURT:  Yes.

2  BY MR. ZAKIA:

3  Q     Sir, I have handed you what's been marked and admitted

4  as Joint Exhibit 11. Is that the 2022 terms of service?

5  A     It appears to be, yes.

6  Q     And these terms of service are dated May 13th, 2022 at

7  the top of page 1?

8  A     They are.

9  Q     And is that the date on or about which these terms of

10  service were posted to the FTX.com website?

11  A     On or about, yes.

12  Q     And am I correct that just like with the 2019, 2020

13  terms of service the records of the company are not

14  sufficient for you to be able to determine which individual

15  posted those terms of service to the website?

16  A     Correct.

17  Q     And you address this in Paragraph 13 of your

18  declaration, right?

19  A     Yes. I am referring to Exhibit H, but that is the 2022

20  terms of service and my declaration.

21  Q     Correct.  And what you say in Paragraph 13 of your

22  declaration is in May of 2022 the records indicate that Mr.

23  Bankman-Fried and/or others acting at his direction

24  introduced new terms of service for the FTX.com customers by

25  posting them to the FTX.com website.  Do you see that?

1  A     Yes.

2  Q     Okay.  And, again, I think you just told me you don't

3  actually know which person at FTX posted these to the

4  website?

5  A     Yeah. I am referring to Mr. Bankman-Fried because he's

6  the CEO of FTX.

7  Q     Okay.  So, the basis for your statement in Paragraph 13

8  of your declaration with regard to the 2022 terms of service

9  were that at the time Mr. Bankman-Fried was the CEO of FTX

10 and so whoever did it must have been working, in your view,

11 at his direction?

12 A     I am saying that -- I am using Mr. Bankman-Fried in

13 that sentence because in his capacity as CEO he was directing

14 the operations of FTX.  So, its his decision to put that on

15 the website.

16 Q     Okay.  Just as he was the CEO directing the operations

17 of FTX with respect to the 2019 and 2020 terms of service at

18 the times that those were posted to the website?

19 A     Correct.

20 Q     And, in fact, sir, as far as the records of the company

21 indicate and as far as you are aware about the process, the

22 mechanical process by which the 2019, 2020 and 2022 terms of

23 service were loaded to the website is the same?

24 A     Mechanically I think its the same.

25 Q     And with respect to the notice given to customers or

1  the lack of separate notice given to customers of the posting

2  of the terms of service that's the same with regard to the

3  2019, 2020, and 2022 terms of service, right?  No difference?

4  A    I don't know -- I think it's a legal determination what

5  is required for --

6  Q    Well, I wasn't asking you what was required.  I was

7  just asking whatever was given was the same for all three?

8  A    Yeah, I wasn't finished.  Sorry.  I am not a lawyer, so

9  I don't have the legal determination of what is required, but

10  I think that mechanically the same notice was given for all

11  three.

12  Q    Now I would like to ask you a couple of questions about

13  Joint Exhibit 11 which is the 2022 terms of service.  I think

14  you told us on your direct testimony that FTX Trading was the

15  counterparty with the customers with respect to the terms of

16  service.  Did I hear you correctly?

17  A    Yes.  In Paragraph 1, FTX Trading is the counterparty

18  to the customer.

19  Q    And you are referring to Paragraph 1 of Joint Exhibit

20  11 which says the following terms and condition of service,

21  together with any documents, expressly incorporated herein

22  constitute an agreement between you and FTX Trading, a

23  company incorporated and registered in Antigua and Barbuda,

24  or a service provider in respect of a specified service.  Is

25  that what you are referring to?

1   A      Yes.

2   Q      Okay.  So, this is an agreement between customers and

3   either FTX Trading or a service provider to the extent there

4   are service providers that will be providing specified

5   services, right?

6   A      Correct.  FTX Trading is the only name in that.  I

7   agree, it does say or service provider.

8   Q      Right.  And you are not a lawyer, and I'm not asking

9   you for any legal opinions as to the legal impact of that,

10  but that is what this provision says.

11  A      Yes.

12  Q      Okay.  And if we look on the next page, Section 1.3 of

13  the 2022 terms of service which is helpfully bolded with the

14  words important, that provision says you acknowledge and

15  agree that any specified service referred to in a service

16  schedule shall be provided to you by the service provider

17  specified in that service schedule.  In such case the

18  specified service shall be provided to you on and subject to

19  the terms with reference in these general terms to FTX

20  Trading being read as a reference to the service provider.

21  Is that correct?

22  A      That is what is says, yes.

23  Q      Okay.  And am I correct, sir, that in the service

24  schedules, which are attached to the 2022 terms of service

25  which are Joint Exhibit 11, FTX Digital Markets is a

1  specified service provider.

2  A     They are one of the service providers, yes.

3  Q     So, for example, if we look at Schedule 2, service

4  schedule, which is the page 32 of 63 on the Court filed copy.

5  Do you have that, sir?

6  A     Yup.

7  Q     FTX Digital Markets Ltd., is identified as a service

8  provider in Schedule 2?

9  A     I see that, yes.

10 Q     Okay.  And in Schedule 3, which is on the Court filed

11 page 33 of 63, in that service schedule FTX Digital Markets

12 is identified as a service provider, right?

13 A     I see that, yes.

14 Q     And if we look at Schedule 4, which is page 35 of 63,

15 FTX Digital Markets is identified as a service provider.  Do

16 you see that?

17 A     Yes.

18 Q     And if we look at Schedule 5, which is -- well, they're

19 all in order, so I'm sure you are following along.  FTX

20 Digital Markets Ltd., is identified as a service provider,

21 right?

22 A     Yes.

23 Q     And if we look at Schedule 6 FTX Digital Markets is

24 identified as a service provider?

25 A     Correct.

1  Q     And if we look at Schedule 7 FTX Digital Markets is

2  identified as a service provider?

3  A     I see that, yes.

4  Q     Okay.  So, at least, with respect to the 2022 terms of

5  service with respect to the specified services identified by

6  each of the -- sorry, with respect to the services addressed

7  by each of the schedules that we just reviewed that provide

8  that FTX Digital Markets will be the service provider these

9  terms of service are an agreement between the customer and

10 FTX Digital Markets, right?

11 A     I don't -- that is a legal determination.  I think that

12 there is more that goes into it. I am not a lawyer though, so

13 I can't really tell you what the legal determination is.  I

14 am happy to agree with you when you point to the document and

15 say that Schedule 1 through 6 or 7 say Digital Markets, but I

16 don't -- I think on our side of the house when we say who is

17 the counterparty we have not made the legal determination

18 that FTX Digital Markets is the counterparty of this

19 agreement.

20 Q     Fair enough.  And you are not offering any legal

21 opinion?

22 A     No.

23 Q     And I didn't mean to ask you for one.

24       Would it be fair to say that from your perspective that

25 is a legal question that you would like to have the answer

1  to?

2  A    That's a legal question for sure and the determination

3  of that question effects a lot of parts of the case.

4  Q    So, it's a question that some Court will need to

5  answer?

6  A    Yes, sir.

7  Q    Okay.  And if we look, last question about this

8  exhibit, its Section 38.11 of Joint Exhibit 11 which Section

9  38.11 of the document is on page 28 of 63.

10  A    I see it.

11  Q    Okay.  The governing law of the 2022 terms of service

12  is English law, correct?

13  A    That is what it says, yes.

14  Q    Now in your declaration, in Section B of your

15  declaration, Paragraphs 14 through 18, you offer some

16  testimony concerning the efforts by the securities commission

17  of the Bahamas to secured digital assets at the time around

18  the bankruptcy filing, right?

19  A    Yes, sir.

20  Q    I just want to be clear, sir, other then the fact that

21  one of the JPLs, Mr. Brian Simms, was copied on one email

22  which you refer to as Exhibit, I believe, L of your

23  declaration you don't have any personal knowledge about what,

24  if any, involvement the JPLs had or didn't have in anything

25  that the securities commission did with regard to the

1  securing of the digital assets, right?

2  A     There is more then one, you know, set of

3  communications, but as attachments to my declaration we only

4  put the one in there.  So, if you are referring to the

5  attachments, I agree, there is only that one attachment.

6  That is the one which Brian Simms was, you know, cc'd on the

7  communication from -- the official communication from the

8  commission to Mr. Sam Bankman-Fried.

9  Q     And you weren't -- you don't have any -- other then

10  things that you have seen in documents, which the Court will

11  consider whatever evidence was admitted, but other then that

12  you don't have any personal knowledge of anything Mr. Simms

13  or anybody did or didn't do with regard to the securing those

14  digital assets, right?

15  A     Correct. I don't have any personal knowledge of it.

16  Q     I would like to talk to you a little bit about

17  prejudice which is some of the testimony that you offered on

18  direct examination in response to Mr. Glueckstein's

19  questions.  One of the things I think you said was the

20  debtors were prejudiced by the decision of the JPLs to

21  establish a claims portal?

22  A     So, what I said in my direct was what are the ways that

23  the debtors could be prejudiced and then inside here there

24  are examples of actions of the JPL that have already effected

25  the debtors.  One of those being the claims portal.

1  Q      And the claims portal exists today, right?

2  A      Yes, sir.

3  Q      Okay.  The filing of the application, which is the

4  subject of this motion, isn't going to create or destroy the

5  claims portal, right?

6  A      I don't know what their plans are.

7  Q      But it exists independent of the application which the

8  JPLs are seeking, I believe, from the automatic stay with

9  respect to it.

10 A      Yeah.  I don't know what they are going to do based on

11 the decision in front of the Court today.

12 Q      Okay.  And with respect to -- well is it your

13 understanding that part of the issue of this hearing is

14 they're asking Judge Dorsey to order the debtors to -- sorry,

15 order the JPLs to take down the claims portal?

16 A      No.  Today is just a lift of stay motion.

17 Q      Okay. I am going to direct your attention to Joint

18 Exhibit 54 and I will hand you a copy.

19           MR. ZAKIA:  May I approach, Your Honor?

20           THE COURT:  Yes.

21 BY MR. ZAKIA:

22 Q      Joint Exhibit 54 is the communication which the JPLs

23 sent to customers which you referred to on your direct

24 examination, is that correct?

25 A      Yeah.  Give me one second, I'm looking for which

1  exhibit it is.

2  Q     Sure.  The exhibit number is on the bottom right hand

3  corner.

4  A     That is the joint exhibit number.  I am looking for the

5  exhibit to my --

6  Q     Oh, okay.

7  A     Okay.

8  Q     If we turn, please, sir, to the second page of Joint

9  Exhibit 54, interaction with the Chapter 11 proceedings this

10 communication states the provisional liquidation process for

11 FTX Digital is running independently of, but in parallel with

12 the ongoing Chapter 11 proceedings in the US, customers of

13 FTX.com who have submitted claims against the entities

14 covered by the US Chapter 11 proceedings are not prevented

15 from registering their details via FTX Digital claims portal

16 and vice versa.  Do you see that?

17 A     I see that.

18 Q     Now, one of the other areas of prejudice that I believe

19 you identified during your direct examination was cost.

20 A     Yes.

21 Q     You haven't completed -- you haven't quantified any

22 estimate of cost, of what it would cost the Chapter 11

23 debtors to litigate the application in the Bahamas; have you?

24 A     I'm referring to there are clearly a set of additional

25 costs that all of the stakeholders inside of our Chapter 11

1  would incur to have duplicate process in the Bahamas.  I

2  don't usually put together professional fee forecasts for

3  other professionals, but, you know, I put together many

4  budgets on, you know, professional fees in various cases.  So

5  I have an understanding of the sort of quantum of those and

6  what we would -- what would be the other impacted

7  professionals that would have to go down there.

8       So, no, I haven't prepared a specific schedule, but

9  I've got -- I have enough knowledge of how professional fee

10 forecasts work to say it's a number.

11 Q    Okay, but my question is have you done anything to

12 quantify what that number is?

13 A    Other than think through what the mechanics would be,

14 no, I haven't put down on paper a forecast.

15 Q    Okay.  And if you haven't quantified what that number

16 is, I assume you haven't compared whatever that number is to

17 the total amount of administrative expenses that have been

18 incurred by estate professionals in the course of this

19 Chapter 11 case?

20 A    For the purpose of me saying that it's prejudice is

21 that it would be additional costs, from my process, for a

22 duplicative set of, you know, matters that would need to be

23 decided by a judge.  So this would be on top of whatever I

24 have in my forecast, so that's why I've said it's additional

25 costs.  I don't compare it to what the administrative burden

1  for the whole case is, I compare it to what would it be

2  versus my base case, which is a Chapter 11.  And so it's

3  clearly on top of because it's the same matters in our

4  adversarial proceeding being heard somewhere else in which I

5  have to do additional things.

6  Q    Could you just give me, what -- if you know, what are

7  the total professional fees incurred by the debtors to date

8  in connection with the Chapter 11 cases?

9  A    I don't have that offhand.  It's part of, you know, the

10 record, though; all of the fee applications are on file, you

11 could go and add those together.

12 Q    Okay.  It's fair to say, whatever the incremental costs

13 of the Bahamian proceedings would be would be fairly small in

14 comparison to the total amount of costs incurred by these

15 estates for professionals so far?

16 A    Any amounts that would be in addition would come right

17 out of the creditors' pocket.  So, maybe it's small in

18 comparison to the total professional fees, but it clearly

19 would mean something to the creditors.

20 Q    And you don't have any experience in legal proceedings

21 in the Bahamas; right?

22 A    No, I've never appeared in the Bahamas.

23 Q    And I think we established you're not a legal expert

24 offering any legal opinions; right?

25 A    I'm not a lawyer, no.

1  Q      So you're certainly not offering any opinions

2  concerning the Bahamian legal process?

3  A      I am not.

4  Q      And one of the things you talked about, which I assume

5  is related to costs, is also delay?

6  A      Yes, sir.

7  Q      Okay.  You don't have any basis to know or opine on how

8  long the Bahamian court would take to dispose of the issues

9  raised in the application; right?

10 A      Yeah, I referenced potential delay, I don't know how

11 long or if.

12 Q      And you don't know how long it might take this Court to

13 deal with any of the overlapping issues in the Chapter 11

14 cases?

15 A      Correct.  It's required, so it's in -- it's built into

16 our timeline.

17 Q      Okay.  And since you don't know how long it would take

18 in the Bahamas and you don't know how long it would take in

19 Delaware, I assume it's fair to say you are not in any

20 position to compare the speed with which the two different

21 courts could address these issues; right?

22 A      I am not in a position to compare the speed between the

23 two courts, no.

24 Q      Okay.  One of the things you addressed, sir, in

25 paragraph 20 -- well, 24 of your declaration deals with an

1  April 27 letter from the bar counsel in the Bahamas to the

2  debtors' Bahamian counsel.  It's Exhibit N to your

3  declaration and is Joint Exhibit 50.  Is that correct?

4  A     Exhibit N, yes.

5  Q     Do you have a copy of that up there with you?

6  A     No.

7  Q     Okay.

8         MR. ZAKIA:  May I approach, Your Honor?

9         THE COURT:  Yes.

10        THE WITNESS:  Thank you.

11 BY MR. ZAKIA:

12 Q     So Joint Exhibit 50, which is Exhibit N to your

13 declaration, who is Peter Maynard?

14 A     Peter Maynard is an attorney at Bay & Devereaux

15 Streets, I guess --

16 Q     Okay.  Is he --

17 A     -- in the Bahamas.

18 Q     Sorry, I didn't mean to interrupt.

19 A     No, I'm done.

20 Q     Is he the debtors' Bahamian counsel?

21 A     Yes.

22 Q     And Jason Maynard, is that a lawyer at Mr. Peter

23 Maynard's firm who also represents the Chapter 11 debtors in

24 the Bahamas?

25 A     I think so.

1  Q     Okay.  And this letter was received by the Bahamian Bar

2  -- sorry, by the debtors' Bahamian lawyers from the Bahamian

3  Bar Association on April 27, 2023?

4  A     Correct.

5  Q     And it concerns the application to have Mr. David

6  William Allison KC specially admitted to appear as counsel of

7  record for the Chapter 11 debtors in the Bahamian

8  proceedings; right?

9  A     Correct, as sort of an expert in sort of King's Counsel

10 type of thing, English law.

11 Q     Right.  And this application was to have him appear as

12 a lawyer in the Bahamian proceedings?

13 A     I'm not familiar with what exactly the application did

14 or didn't require.

15 Q     Okay.  So you don't know what the application filed by

16 the debtors asked for to which this was a response?

17 A     All I know is that we were not allowed under that

18 application to have Mr. David William Allison appear in the

19 Bahamas for us for what we viewed as English law requirements

20 that we needed and that this says that -- I'll let it speak

21 for itself, this document.

22 Q     Okay.  So you knew that the Bahamian proceedings

23 concerned issues of English law and Mr. William Allison is a

24 lawyer based in the United Kingdom?

25 A     I think so, yes.

1  Q     Okay.  And the debtors wanted him to appear in some

2  capacity in the Bahamian proceedings?

3  A     Correct.

4  Q     And this is the response from the Bahamian with regard

5  to that application; right?

6  A     I think so, yes.

7  Q     Okay.  And it says, if we look at the bottom of the

8  first paragraph, "I advised that a usual requirement for

9  Special Calls is canvassing all other local King's Counsel to

10 ascertain their expertise and availability to be retained for

11 the necessary application."

12       Do you see that?

13 A     I do.

14 Q     Do you know what a special call is?

15 A     I don't know, but it's capitalized here.

16 Q     Okay.  Do you know what the canvassing requirements are

17 that are referred to here?

18 A     I don't know what the canvassing requirements are, no.

19 Q     Do you know whether the debtors complied with the

20 canvassing requirements specified in this letter prior to

21 making the application?

22 A     All I know is that the council is not minded at this

23 juncture to approve my firm's application for a special call.

24 Q     Well, you also know that they invited you to provide

25 dates of availability to appear to make oral representations

1  as to why he should be admitted?  Do you know if the debtors

2  ever took up the Bahamian bar's invitation to have that

3  meeting?

4  A    I don't know what's become of this or how far we've

5  pushed it after this.

6  Q    So you don't know whether -- so you don't know whether

7  the debtors complied with the legal requirements to have Mr.

8  Allison admitted, right, you don't know whether that happened

9  one way or the other?

10 A    Correct.

11 Q    And you don't know whether they took up the commission

12 on its invitation to meet to discuss the issue; right?

13 A    Correct.

14 Q    And, as of today, you don't know whether Mr. Allison

15 has or has not been admitted as of today; right?

16 A    Correct, I don't know that.

17 Q    And, just to be clear, if -- well, let's look at your

18 declaration.

19     You say in paragraph 23 that you understood that this

20 application to be similar to a *pro hac vice* motion in the

21 United States.  What is a *pro hac vice* motion in the United

22 States?

23 A    It's just a request to appear in front of a court.

24 Q    Do you know whether in the United States, in this

25 Court, an English lawyer could file a *pro hac vice* motion to

1 appear as counsel of record for the Chapter 11 debtors?

2 A    I'm not a lawyer, no, I don't know.

3 Q    You don't know about that one way or the other; right?

4 A    No, I don't know that.

5 Q    Okay.  Sir, you gave some testimony concerning whether

6 the possibility that customers may or may not have migrated

7 from FTX Trading to FTX Digital Markets; right?

8 A    Please ask the question again.

9 Q    Sure.  Do you recall during your direct examination

10 speaking that one of the issues that is in dispute in this

11 case is whether customers may or may not have migrated from

12 FTX Trading to FTX Digital Markets?

13 A    Correct.

14 Q    Okay.  I want to be clear, you have not, in your

15 capacity as the financial adviser for the debtors, undertaken

16 any effort to search the business records of the debtors for

17 documents that would speak to whether or not that occurred;

18 right?

19 A    No, we have not undertaken an effort to look for

20 documents that may or may not point to completion of a

21 migration plan.

22 Q    Okay.

23         MR. ZAKIA:  Can I have one second, Your Honor?

24         THE COURT:  Sure.

25         MR. ZAKIA:  Thank you.  I have no further

1  questions.

2          THE COURT:  Thank you.

3          Redirect?

4          MR. GLUECKSTEIN:  I'm sorry, Your Honor, I didn't

5  know if there was any other questioning of Mr. Mosley, but

6  I'm happy to redirect.

7                    REDIRECT EXAMINATION

8  BY MR. GLUECKSTEIN:

9  Q    Mr. Mosley, Mr. Zakia showed you what's marked as Joint

10 Exhibit 54, the letter from the Joint Provisional

11 Liquidators.  Do you still have that in front of you?

12 A    I do.

13 Q    Have you reviewed this document in its entirety prior

14 to your testimony today?

15 A    Yes.

16 Q    In your opinion as a restructuring professional, would

17 creditors receiving this type of letter cause confusion as to

18 with whom they should lodge a claim?

19          MR. ZAKIA:  Objection, speculation.

20          THE COURT:  Sustained.

21          MR. GLUECKSTEIN:  I'm asking for his opinion.

22          THE COURT:  Sustained.

23 BY MR. GLUECKSTEIN:

24 Q    Mr. Mosley, Mr. Zakia showed you Joint Exhibit 11,

25 which was the 2022 terms of service.  Do you still have that?

1  A      I do.

2  Q      Mr. Zakia took you through certain schedules annexed to

3  the 2022 terms of service where FTX Digital Markets was

4  referenced; do you recall that?

5  A      I do.

6  Q      Do you have an understanding as to whether custody of

7  cash is a specified service under the 2022 terms of service?

8  A      I don't think it's a separate service that's governed

9  by one of the schedules.  I think that's sort of core to the

10  customer relationship and what we -- you know, what FTX is

11  doing with its customers.  So I think it's -- it definitely

12  does not say that FTX Digital Markets is the service provider

13  for cash custody, if that's the question.

14  Q      It is.  And how about with respect to custody of

15  digital assets and cryptocurrency, are you aware of anything

16  in that document that identifies that being a specified

17  service or being provided by FTX Digital Markets?

18  A      It does not say it's provided by FTX Digital Markets.

19          (Pause)

20              MR. GLUECKSTEIN:  No further questions, Your

21  Honor.

22              THE COURT:  Thank you.

23              Thank you, Mr. Mosley, you may step down.

24              MR. ZAKIA:  Your Honor, I'm sorry, could we have

25  one second before you excuse the witness?

1           THE COURT:  I don't allow recross.

2           MR. ZAKIA:  Okay.  Thank you, Your Honor.

3           THE COURT:  You may step down.

4           Let's take a short recess here.  We'll come back

5    and we'll finish up.  We'll try to plow through the rest of

6    the day.  So let's take a 15-minute recess, we'll come back

7    at 11:15.

8        (Recess taken at 10:59 a.m.)

9        (Proceedings commenced at 11:17 a.m.)

10          THE COURT:  Mr. Shore?

11          MR. SHORE:  Good morning, Your Honor.  Chris Shore

12   from White and Case on behalf of the JPLs.  There have been a

13   lot of papers, exhibits, and testimony filed on this motion,

14   so it's hard to know what the Court sees right now is the key

15   issues to be addressed, so feel free to interrupt me and

16   focus me.  I'm happy to do so.

17          But I want to start by highlighting three

18   overarching points.

19          THE COURT:  Well, I do have -- here's my thinking

20   at this point.

21          MR. SHORE:  Um-hum.

22          THE COURT:  From a practical standpoint, if I

23   allow the JPLs to go to the Bahamas and proceed there, what

24   could possibly happen?  Because regardless of what the Bahama

25   court does, I still have to make the same determination, and

1   I have to do it on my own.

2           MR. SHORE:  Um-hum.

3           THE COURT:  And the assets that we are talking

4   about are all under the interim jurisdiction of this Court.

5   So regardless of what Bahamas decides -- if they decide,

6   yeah, it all goes to digital -- it doesn't go to digital

7   until I say it goes to digital.

8           MR. SHORE:  Um-hum.

9           THE COURT:  So what are we gaining from a

10  practical standpoint by allowing a proceeding to go forward

11  in two different courts on the same exact issue?

12          MR. SHORE:  Okay.  And one -- this is why I wanted

13  to emphasize this point on the narrow scope of the relief and

14  what we're actually seeking because we're not seeking to have

15  dual proceedings.  We're not seeking you to -- to cede your

16  jurisdiction to the other court with respect to any of these

17  issues, unless you deem it appropriate to do so.

18          What we are asking today, and I -- the one thing

19  that has to get done to start that process is to file the

20  application in the Bahamas court.  That leads to another

21  process that will require this Court signing off on it and

22  the Bahamas court signing off on it.  It's either going to

23  come in the form of, one, a consensual protocol by affected

24  parties to say, we agree the following issues should be

25  decided by the Bahamian court.  The Bahamian court should

1   tell Mr. Greaves whether the cash he has on hand, of which he

2   -- the Bahamas court has jurisdiction; not you because it's

3   not property of the Debtors; it's property of the Bahamian

4   court -- can proceed in the Bahamas.

5          The issue of whether or not the terms of service

6   should be voided as a fraudulent conveyance will occur in

7   this Court.  We'll work out a consensual process, and Your

8   Honor will either agree with it or not and say, okay, we get

9   it; this goes here, this goes here, here are the procedures.

10  That's one way of handling it.

11         Another way of handling it is just to have the two

12  courts talk to each other, and that has happened in the past.

13  We have a basket of issues.  The parties can't seem to get

14  out of their own way to discuss whether any of this should

15  occur anywhere else, and we're going to tell you, I, the

16  Chapter 11 court, am going to decide all issues relating to

17  Chapter 5; I'm going to deal with all issues relating to the

18  terms of service as they apply to the accounts of the

19  Debtors, et cetera.  We could do it that way.

20         We could do a hybrid where the parties get as far

21  as possible along the lines of a protocol that allows these

22  two courts to exercise their jurisdiction without running

23  afoul of each other's stay and then come to the Court with a

24  set of procedures and say, we can't decide these four issues;

25  the Debtors take this position; the JPLs take this position;

1    the UCC takes that position; and it's going to need to be

2    sorted out.

3            Or we get to a set of courts digging in.  You say,

4    I am going to handle all issues with respect to all cash

5    around the world, and the Bahamian courts stand down, and the

6    Bahamian court would in a normal setting where we've seen

7    this happen between courts, say, what are you talking about?

8    I'm going to tell my Debtor what to do, and we get into a

9    jurisdictional mess.  That's a bad day for everybody.

10           You heard these issues that are framed by the

11   application.  Is this property of an estate, or is -- are

12   these assets held in trust?  Were the customers who would

13   have rights under U.S. law or Bahamian law with respect to

14   those assets customers of a U.S. debtor or foreign debtor?

15   They have to be resolved, and both courts have jurisdiction

16   over it.

17           It's been no secret that if you allow us to do

18   that -- just file the application, get the parties to talk;

19   if the parties can't talk, the courts will sort it out,

20   rather than go into a jurisdictional war.  It gets -- it gets

21   worked out.  Our position is going to be the Bahamian court's

22   the best court to deal with Bahamian law, English law,

23   Barbudan law, Antigen law because it is -- that's all under

24   the commonwealth, and this Court is best charged with dealing

25   with the Chapter 5 issues.  Or wait, are all these void,

1  right?  Can they be avoided as a fraud?

2          Things like that can be sorted out, and we have

3  never said this Court can't decide any issues.  We've been

4  sitting by the phone waiting for the Debtors to engage and

5  say, there is, in fact, something that can go on in the

6  Bahamian court, whereas their position has been zero can ever

7  happen there.

8          THE COURT:  Well, I'm not inclined to agree with

9  you that this Court should be restricted to deciding the

10  Chapter 5 issues.

11          MR. SHORE:  No -- no, I did not mean that -- I did

12  not mean to say that.  I gave that as an example of -- we --

13  we would certainly not argue that the Bahamian court should

14  be the one addressing the application of Chapter 5.  There

15  are a number of issues that will have to get addressed.

16          THE COURT:  All right.  Yep.

17          MR. SHORE:  And in fact --

18          THE COURT:  No, but what I'm saying is --

19          MR. SHORE:  Yep.

20          THE COURT:  -- this Court has to decide whether or

21  not these assets belong to this Debtor, or do they belong to

22  the Bahamian Debtor?

23          MR. SHORE:  Well, that issue involves a question

24  of English law, as we've laid out in the papers, and this

25  Court is authorized to abstain in favor of the Bahamian court

1  to have the Bahamian court resolve certain issues, and the

2  Bahamian court is authorized to abstain and say Your Honor

3  can do it.  Or you're both authorized to say, we'll hold

4  joint hearings, we'll hear all evidence together, and then we

5  will decide amongst ourselves how the issues are going to be

6  decided.  But the fundamental starting point --

7           THE COURT:  How does that work -- I know we did

8  that in Nortel, and I was involved in the Nortel case, but

9  what do we do -- I mean, a joint hearing and the Bahamian

10  court and I disagree.

11           MR. SHORE:  Um-hum.

12           THE COURT:  So then what happens?  Now I've got in

13  rem jurisdiction over the assets --

14           MR. SHORE:  Yeah.

15           THE COURT:  -- so my decision controls.

16           MR. SHORE:  Your decision would control with

17  respect to the Debtor's property in the United States over

18  which it has accounts, and your jurisdiction would not extend

19  to what Mr. Greaves told you are the assets of DM, which are

20  under DM's control, what are those accounts --

21           THE COURT:  Those are limited.  Very limited

22  assets, yes.

23           MR. SHORE:  But it's not -- it's -- it's not --

24  well, I'm going to get to the practical implication of this,

25  but at the end of the day, if you're going to disagree, and

1   we're going to lead to a jurisdictional squabble, which we're

2   -- I think we should all work as hard as we can to avoid.

3   That's not a good day for anybody.  Wouldn't we rather deal

4   with it upfront than do with Judge Peck did in Lehman, which

5   is allow people to litigate these issues and then say, well,

6   I'm just not recognizing what the English court said.  Sorry.

7   You wasted your time doing it.  That -- that seems to me to

8   be an inefficient process.

9           THE COURT:  Well, that's what I'm trying to avoid,

10  as well.

11          MR. SHORE:  Right.  So -- so it seems to me that

12  starting out at the beginning saying, of course, there's

13  issues that need to be dealt with the Bahamian court.  Mr.

14  Greaves can make an application to say, can I use the money

15  that's on deposit on the basis it's not a trust asset?  Why

16  can't he do that?

17          The Debtors are saying, absolutely not.  You are

18  restricted to the -- on restricted cash right now, and you're

19  going to litigate with me for a year or years over the

20  adversary proceeding with a million dollars in cash.

21          THE COURT:  Well, if the Bahamian court has

22  interim jurisdiction over assets, then they're in the same

23  position with regard to those assets that I am in regard to

24  all the other assets.

25          MR. SHORE:  Correct.  But the Debtors aren't

1  agreeing to that.  The Debtors are saying --

2           THE COURT:  Well, I'll talk to the Debtors about

3  it.

4           MR. SHORE:  -- it is a stay violation for the

5  Bahamian court to exercise its in rem jurisdiction to decide

6  issues, and this is what the Debtors are really concerned

7  about.  We're going to go through the terms of service with

8  the Bahamian court.  Look, what -- what's going on here?  It

9  says here, this is this; this is this.  And the Bahamian

10  court's going to render a ruling under English law.  The only

11  -- normally, that would not be a problem, but I think the

12  Debtors are reticent of, well, I -- I've appeared in that

13  proceeding, and somebody's going to argue that's res judicata

14  against me when we talk about it in my own case with respect

15  to the ownership of the funds.  We can solve that in a

16  protocol.  That can all be addressed to make sure that we're

17  not running into that problem.

18           But you can't say I don't want the Bahamian court

19  to issue any ruling with respect to what it believes English

20  law means with respect to the cash that is in the Debtor's

21  hands because that might affect my negotiating position in

22  this case or might affect you.  Well, it's not -- you're

23  telling me loud and clear it's not going to affect you.  At

24  the end of the day, you're going to have to come to that

25  decision, and it may be that the English court under English

1  law determines that they're not trust assets, and it may be

2  that you determine under English law with the reference to

3  experts and listening to the experts, you determine they are

4  trust assets, the cash the Debtors have are trust assets.

5  You can't --

6          THE COURT:  Well, one of the benefits is under

7  English law is it's written in English.  So I can read it for

8  myself and understand what it says as opposed to -- I've had

9  cases involving laws of Mexico, where there's a dispute over

10 what the translation of that law is.  But I don't have that

11 problem here.

12         MR. SHORE:  It may -- it may be when we negotiate

13 a protocol that that is the result that people come to.  I do

14 think, having been through it with Bahamian counsel, there

15 are going to be some specific issues with respect to English

16 trust law and whether the language in the document is

17 sufficient to, under English law, confer trust obligations.

18 There're going to be issues with respect to novation under

19 English law and whether English common law provides for the

20 terms of service, as you saw in the testimony today, to be

21 novated such that the customers who access the portal with or

22 without the pop-up became customers according to those terms.

23 So I --

24         THE COURT:  Those are all things I can decide

25 under English law with the use of expert testimony.  And I

1    can read the -- if there's case law, I can read the case law.

2    If there's statutes, I can read the statutes.  I can

3    understand it.

4          MR. SHORE:  I'm not saying you can't.  I'm also

5    saying that it may be that if what ends up happening is we

6    run a proceeding in the Bahamas, and there's an evidentiary

7    record created and there's a read decision created by the

8    English or the Bahamian court applying English law, you might

9    or might not find it persuasive.  Nobody is asking you today

10   to agree to cede any of your jurisdiction or supervisory

11   powers over anything.  The only thing we are asking you today

12   is let us invoke the jurisdiction of the Bahamian court and

13   give us some guidance as to what you want us to do with

14   respect to a protocol.  It can't be that Mr. Greaves is -- is

15   limited to $1 million in cash because he can't go talk to his

16   own court about his own cash.  Or he can't go out and seek to

17   have customers file proofs of claim but based on a

18   determination under English law from the perspective of the

19   DM estate, these are or are not customer and creditors of

20   your estate.

21         The second thing I want to highlight coming out at

22   the beginning, is the notion that -- and I'm hearing a little

23   -- in Your Honor's questioning here -- effectively, the

24   Debtor's position -- and Your Honor's position is what your

25   position is.  But the Debtor's position as articulated in

1    their papers is that the only court that can ever touch these

2    issues, issues of who the customers are, where they map to,

3    and what is the obligation under the terms of service with

4    respect to the cash on hand, can only ever be decided by this

5    Court, and the Bahamian court should never be able to issue a

6    decision, much less hold a hearing with respect to that issue

7    without violating the stay.

8           And look, reading between the lines, 90 percent of

9    the opposition to what we're doing here is based on a

10   disappointment or regret of the existence of the Bahamian

11   proceeding.  And effectively ask this Court to ignore the

12   fact that there is a proceeding with respect to a non-U.S.

13   Debtor proceeding in a recognized foreign-made proceeding

14   undertaken by recognized foreign representatives to determine

15   issues.

16          And I think they're trying to tell you that FTX --

17   and this has been their campaign, I think, since the

18   beginning of the case -- FTX trading is a nullity.  It was

19   just put there to -- to engage in further fraud.

20          If they really wanted to treat the proceeding as a

21   nullity, they shouldn't have consented to jurisdiction.  We

22   have an order that nobody's seeking to vacate or reargue that

23   says that FTX DM is a debtor in a foreign-made proceeding

24   being supervised by foreign representatives who are

25   authorized to come into court, like I am today.

1        So wishing away the proceeding isn't an option

2   here.  We have to deal with the fact that there is a

3   proceeding pending in another court with respect to a Debtor

4   who is not under the general supervisory jurisdiction of this

5   court but rather is sitting in its Chapter 15 capacity.

6        And for all the Debtor's rhetoric about this Court

7   has an unflagging obligation to grab jurisdiction, protect

8   its jurisdiction, assert precedent over all other courts on

9   all other places, that's just not the law.  This is not a --

10  someone coming in and saying I've got a tort case pending in

11  state court, and I want you to let me liquidate my claim

12  there.  This is three proceedings.  An 11, a 15, and a

13  Bahamian proceeding.

14       And there has to be a way to work out issues that

15  can be decided in one case but necessarily might have effects

16  or might not have effects in the other proceeding.  And far

17  from advocating the Debtor's box out at all cost, this is

18  what the federal judiciary says about what's supposed to

19  happen in Chapter 15.  And I emphasize it because the Debtors

20  have tried to write out entirely the notion of cooperation

21  and the fact that we should, at all costs, be trying to avoid

22  the loggerheads between two courts.

23       This is from the U.S. Courts Gov website,

24  bankruptcy basics on Chapter 15.  The purpose of Chapter 15

25  and the model law on which it is based is to provide

1  effective mechanisms for dealing with insolvency cases

2  involving debtors, assets, claimants, and other parties of

3  interest involving more than one country.

4          This general purpose is realized through five

5  objectives specified in the statute, and the first one is to

6  promote cooperation between the United States courts and

7  parties of interest and the courts and other competent

8  authorities of foreign countries involved in cross-border

9  insolvency cases.

10         There has to be some cooperation.  And we're just

11  not willing to accept the notion that where we should go here

12  is what the Debtors are advocating, zero cooperation.  You

13  take jurisdiction over all issues, every -- any -- any other

14  court that tries to exercise its jurisdiction over its own

15  debtor takes a back seat, and if they do anything, it's a

16  stay violation by the JPLs, anybody who argues the case, and

17  by the court that issues the ruling in that case.  That is

18  not cooperation.

19         One final overarching point.  There's a lot of

20  insinuation and attack on the JPLs and how they've dealt with

21  -- how they have dealt with what Mr. Ray has described as the

22  dumpster fire.  Unless the Court has questions, I don't

23  intend to spend a lot of time defending the JPLs.  They are

24  not, as the papers insinuate, meddling kids seeking to

25  interfere with some master plan.

1           As you saw with Mr. Greaves, they are experienced

2    professionals trying to fulfill their fiduciary duties under

3    difficult circumstances like the absence of definitive

4    records and answers with clear instructions, and they're

5    proceeding as recognized foreign representatives and

6    recognized foreign-made proceeding.

7           Two, I'm not going to defend the fees that were

8    spent anymore than ask the Debtors to defend their $225

9    million to date.  This is an expensive process due to no

10   fault of Mr. Ray or the JPLs.  I'm not asking you to decide

11   nor do you need to decide on this motion who's breaching the

12   cooperation agreement, if anybody.  That's an issue for

13   another day.  For today, the evidentiary record is clear and

14   uncontested that, one, the JPLs repeatedly tried to engage

15   the Debtors in good faith to discuss a protocol.  And two,

16   they gave the Debtors advanced notice of the filing, where

17   they threatened a stay violation and then used that breathing

18   space to file their own adversary proceeding.

19           The notion that the -- we should proceed with this

20   proceeding because it's before you now is an issue that's

21   going to have to be decides, among other things, as we

22   pointed out in our motion to dismiss.  It's a violation of

23   the Chapter 15 stay on their part to -- to move forward with

24   that adversary proceeding because that one is clearly seeking

25   to avoid the digital's interest in assets in the United

1  States, the Moonstone Silver Date accounts.

2          So the -- the basis for saying we're not going to

3  lift the stay, and we're going to proceed here because we

4  have a first filed proceeding that has teed up the issue is

5  one in dispute.

6          Finally, with respect to the Debtors' unclean

7  hands argument, given Mr. Mosley's testimony on cross, it's

8  hard to see how any actions by the JPLs to set up a claims

9  portal or by the Bahamian court to ask that they re-file a

10  pro hoc was -- was anything wrong, much less rose to the

11  extent that -- that the JPLs have somehow forfeited their

12  right to proceed on the lift stay motion.

13          On the contrary, I think the record is clear that

14  the JPLs have assiduously complied with the stay, and I think

15  it's clear that the Debtors are using it offensively here.  I

16  -- I don't see any explanation for the questions on how much

17  -- the cash the JPLs have other than a -- a pointing out that

18  the Debtors can use the stay here to strangle the JPLs' case.

19  I mean, it's clear.  I mean, I think the -- the point is, is

20  that, just to be clear, we hold the -- the automatic stay.

21  If the judge enforces it, you're not going to be able to even

22  fight.

23          So onto the argument.  In the papers, we defended

24  our starting position that the stay does not apply to the

25  filing of the application -- just the filing of the

1   application, the indication of the Court's jurisdiction

2   without deciding what issues are going to be decided there or

3   this Court, and what are the procedures on which they're

4   going to be decided?

5           THE COURT:  Well, what control do the JPLs have

6   once the application is filed, and the Bahamian court says,

7   well, this is what you've got to do?  I want it -- I want to

8   decide.  Bahamian judge says, I want to decide whether or not

9   these assets that are located in the United States belong to

10  the Bahamian entity?

11          MR. SHORE:  I -- I have not -- my motion has not

12  sought leave for the Bahamian court to issue --

13          THE COURT:  Well, I'm asking you what the Bahamian

14  court could do on its own.

15          MR. SHORE:  Well, the Bahamian court can do on its

16  own what Your Honor can do on your own without calling up the

17  Bahamian court with respect to the adversary proceeding.  You

18  don't have to call them up and say how am I going to decide

19  this issue.

20          But what I'm advocating here is there needs to be

21  a process set up.  And if that means we have to go to the

22  Bahamian court and say, we're filing the application, but for

23  the next two weeks, we're going to try to -- or one week, or

24  four days, going to try to hammer out a means of making sure

25  that the courts aren't leading to conflicting results, and if

1  not, you're going to have to pick up the phone, and -- and

2  talk to Chief Justice Winder (phonetic) and work it out, or -

3  - otherwise we are going down this process with conflicting

4  results.

5         And the Debtors, to be clear, the Debtors don't

6  get this on prejudice.  Debtors always have to go to the

7  Bahamas court.  There's no question.  Even if they won the

8  case, they convince Your Honor, based on evidence from

9  competent witnesses that all of the customers stayed with

10  digital.  That -- that FTX DM was set up as a fraud, as a

11  nullity, and everything about it should be voided.  There's

12  still property in the Bahamas in the form of the real

13  property and the cash and crypto.  Including the crypto being

14  held by the Bahamian Securities Commission.  They still have

15  to go get that.

16         Setting up a process in which one court says I

17  don't care what you think, I'm going to decide this issue,

18  isn't going to foster comity on the other side to say, okay,

19  well, I'll not return these assets.  I don't -- so they're

20  going to have to go there anyway.  We should just get out in

21  front of it and come up with a means of solving your problem.

22  If we can't solve the problem, you're going to solve it

23  because both courts have jurisdiction over their debtors and

24  have to decide issues with respect to the terms of service,

25  and the nature and extent of the interests and the cash.  It

1  has to happen.

2          So -- but I -- leave aside that this stay doesn't

3  apply.  We're here.  We did review the evidentiary record.

4  Let me argue the -- why the stay should be lifted again just

5  to allow the application to be filed and work out a

6  cooperation agreement either consensually or nonconsensually

7  with the courts.

8          There are three elements:  prejudice to the JPLs,

9  prejudice to the Debtors, and a determination that the

10  dispute is not frivolous or useless.  I'll take those in

11  reverse order on the probability of prevailing on the merits.

12          I know the Debtors want to jump down the road on

13  the merits of the underlying dispute, and Your Honor has

14  heard something on the merits of the underlying dispute.

15  Actually, that the issue is will it advance the process to

16  allow the JPLs to invoke the jurisdiction of their courts,

17  subject -- subject to the determination.

18          Nothing's going to happen in that proceeding

19  that's going to affect the US Debtors without further order

20  of this court.  Just sets up the process.  I think the

21  Debtors should be directed, because they have an obligation

22  both under the code and under the cooperation agreement, to

23  negotiate that in good faith.  I think they do have to show

24  up to a meeting and say, okay, I'll consider this; I'll

25  consider that.  Not just fiat it in a different use of the

1  word fiat.

2          But that's -- that's where we need to get.  And we

3  have a -- Mr. Green's made it clear.  He can file an

4  application, Bahamas court can take the application, and then

5  the two courts can start to communicate.  Otherwise you're

6  picking up the phone, talking to Chief Justice Winder, and

7  he's saying I don't have anything in front of me.  Same thing

8  you would respond if the Debtors hadn't filed the adversary

9  proceeding.  We've got to tee it up in both courts.

10          But the record, with respect to the underlying

11  merits, if really the issue to be addressed is, is -- is this

12  a live dispute or is this just a waste of time.  The record

13  is clear on three points.  One, this is a live dispute that's

14  been around since Day 1.  And is now framed by the Debtors in

15  the adversary proceeding as a legit case or controversy.

16          In other words, they think the dispute is live

17  enough over whose customers are whose and what are the

18  interests in the cash being held by the respective Debtors is

19  live enough to bring a declaratory judgment action before

20  you.

21          Two, the 2022 terms of service exist just as they

22  did in prior iterations as Mr. Mosley made clear.  And they

23  made clear.  I don't need to walk you through the documents.

24  They made clear that FTX Digital was in privity of contract

25  with customers who used services.  And the important

1  paragraph says where you read FTX Digital as applying to or

2  you were talking about specific services with the service

3  provider, cross out FTX trading and put in FTX Digital.  That

4  is a live dispute.

5          And then three, you heard from both Mr. Mosley and

6  Mr. Greaves that the money flowed consistent with those

7  terms.  Mr. Greaves described it more fully in Paragraph 17

8  of the declaration how $13.4 billion of cash flowed through

9  accounts in the name of FTX Digital.  In other words,

10  customers' money was held by FTX Digital in accounts owned by

11  FTX Digital -- again, whether or not that was set up as a

12  fraud and can all be avoided is an issue that's way down the

13  line, and would have to be addressed in the context of --

14  with respect to the Debtor's cause of action under Chapter 5

15  to void all these things.  That will proceed in the United

16  States.  Okay.  I'm not going to argue otherwise.  I don't

17  think the Bahamian court has the ability to apply Chapter 5

18  law and avoid the transaction.  Okay?

19          But it has to -- as I keep saying, it has to be

20  worked out.  But this -- this is not what we're doing.  The

21  Court does not need to decide to determine -- to decide

22  whether to lift the stay whether or not customers did or did

23  not migrate.  It's a question of whether the position that's

24  been taken is frivolous or useless.

25          I want to point out one thing on the voiding of

1   all of this and the inconsistency the Debtors are taking.

2   One of the provisions in the 2022 terms of service is 8.2.6.

3   That's the provision that for the first time created the

4   trust relationship between the party named FTX Digital -- or

5   it's FTX trading, and the customers.  When -- when the DOJ

6   talks about the fraud, or -- or Mr. Ray (phonetic) testifies

7   about the fraud -- he stole money, customer money.  That's

8   the 2022 terms of service.

9          So voiding that contract is something that a lot

10  of people are going to have an interest in addressing.  So

11  we're going to have to deal with that in the context of the

12  protocol.

13         Again, all this leads to, at the end of the day,

14  either a consensual sorting of issues or a nonconsensual one

15  imposed by the two courts that we're just trying to set up so

16  that we don't litigate in multiple proceedings and then have

17  the Bahamas court say, too bad, I'm not -- I'm not enforcing

18  that in the Bahamas, or this court saying, too bad, I'm not

19  enforcing this in the United States.

20         That seems to me to be the waste of time that can

21  be solved if experienced professionals sit down with the

22  model rules in this court and the -- and the precedents out

23  there and say these are the issues that need to be done.

24  Here are the participants.  The committee should be entitled

25  to intervene in the Bahamas proceeding.  Okay.  The Debtors

1 shall be able to make a new application for pro hoc vice for

2 their lawyer to appear.  Okay.

3          This has to be done in the Bahamas on the

4 following schedule.  This has to be done in the United States

5 on the following schedule.  Present it to you.  Present it to

6 Chief Justice Winder.  Are you both okay with this?

7          If we're not -- right?  If you, at the end of the

8 day, say, under no circumstances am I letting the Bahamas --

9 am I ever abstaining to the Bahamas on this issue, then at

10 least we know now, as opposed to running down the road and

11 litigating this issue only to have the Bahamas court say, I

12 don't care what the US court says, or you say, I don't care

13 what the Bahamas court says.

14          The prejudice to the -- the Debtors.  I want to

15 focus on the concept of legally cognizable prejudice.  The

16 Debtors may be insecure about having this court coordinate

17 with the Bahamas court, but I don't understand the legally

18 cognizable prejudice of having the two courts talk to each

19 other.  It's not -- Your Honor is not being asked to give up

20 any jurisdiction, any supervisory power.  You can have a

21 conversation and say we've got to get to the bottom of this

22 terms of service, who's whose customer, who's -- how are

23 these funds being held.  How are my funds -- my Debtor's

24 funds being held; how are your Debtor's funds being held?

25 We've got to get to the bottom of it.

1          We can do it as a joint proceeding; we can do it

2    not as a joint proceeding.  You decide it all; the Bahamas --

3    the Bahamian court may say, you know what?  I don't want to

4    deal with any of these issues.  You may say there's no chance

5    I'm going to be determining whether or not Mr. Greaves under

6    Bahamian law can spend money that is in the accounts.

7          I think there's going to be things where everybody

8    is going to easily agree, and it may get difficult in the

9    middle, but because it's difficult doesn't mean we should

10   push it down the road and deal with it later, particularly in

11   a case where costs are big.

12         So the -- the legally cognizable prejudice it --

13   it just isn't there.  All -- all of this about how the

14   proceedings might play out, we can't appear in the Bahamas,

15   the -- the committee can't have a creditor representative,

16   all that should be worked out.  And can be worked out in the

17   context of a cross border protocol.  No -- you're not being

18   asked to decide those issues today.  And with it -- with

19   respect to the Debtors' notion wealth, the Bahamas is

20   obviously, because the Bahamas doesn't have nuclear weapons,

21   they're not entitled to the same deference we would give to

22   France.

23         That's not -- first of all, that's just not the

24   case.  Chapter 15 applies to any Debtor.  But more

25   importantly, this Court has already recognized on a

1  consensual order the Bahamas proceeding as the foreign-made

2  proceeding and the JPLs as authorized representatives in the

3  United States.  The issue of whether -- whether due process

4  can be fulfilled there, or expenses can be controlled, or

5  whether or not the -- anything can go on in the Bahamas at

6  all is an answer -- is a question that's already been

7  answered in a recognition order.

8         Finally, on prejudice to the JPLs; what happens if

9  Mr. Greaves can't file the application?  He can't invoke the

10  jurisdiction of his court to get an answer.  I've got cash

11  sitting here, can I spend it?  Or I've got an obligation --

12  fiduciary obligation to determine who my customers are, track

13  them down, and provide notice of my proceeding.  What happens

14  if he can't do that?

15         The testimony, I think is clear, from today and in

16  his declaration.  One, the JPLs are appointed by the Bahamas

17  court with specific fiduciary and other duties, and specific

18  powers.  They are a creature of the court.  Two, one duty is

19  to seek directions where the estate needs resolution of legal

20  issues affecting the assets or liabilities.  Got an

21  obligation to go to the court and seek instructions.

22         Three, there are issues facing the digital estate

23  with respect to what is its property, what of that property

24  is held in trust, and who are the customers who are entitled

25  to share in the assets, either specifically their assets held

1  in trust or nonspecifically as a general creditor?  And they

2  can't, as the -- the questioning made clear, just ignore

3  their duties.  They can't close the case.  I -- I get it.

4        The Debtors -- we -- we all woke up tomorrow, and

5  the Debtors were faced with a situation, the SCB never acted.

6  It never exercised its police powers to close down that

7  business and start a provisional liquidation.  And Mr. Ray

8  had come in and had filed that entity here?  Okay.  That --

9  that -- I guess that might be more efficient.  It might not

10 be more efficient.  I don't know.  But we can't wish it away.

11       They have specific obligations to go to their

12 court, and the Debtors are saying they can't.  The Debtors

13 are putting them in a fiduciary trap and asking Your Honor to

14 order that trap where they have obligations to fulfill, and

15 they can't get comfort from their court that listening to the

16 United States or listening to Mr. Dietderich is a fulfillment

17 of their fiduciary duty.  They can't just say, you know what?

18 Let's just re-migrate all the customers back.  They can't

19 say, let's just send all our cash over.  They can't say,

20 let's just release all of our claims to -- for the return of

21 the billions of dollars that flowed out of the digital

22 accounts to the US accounts.  They can't.

23       Practically speaking, in a proceeding that we

24 can't wish away, there are processes that need to be filed,

25 and I'll say it one last time.  This Court recognized that

1  proceeding as the foreign main proceeding and legitimized the

2  Bahamian court and the proceeding as a proper use of Chapter

3  15.

4          So I -- I'm going to say this one last time, too.

5  We are not, and have never asked the court, nor am I

6  advocating now -- we didn't write it in the papers, we're not

7  asking it -- for it in the order granting the stay -- asked

8  to do anything other than lift the stay to allow the filing

9  of the application subject to the term that nothing's

10 happening with respect to the Debtor's property or the

11 Debtor's rights without further order of this court.  And

12 quite frankly, I do think we need an order directing the

13 Parties to work in good faith to take that first step.

14         No one's asking you to walk the whole staircase,

15 and -- and move down this process.  But I think it is a valid

16 use and probably an important use of the US Debtor's assets

17 right now, and the JPL's assets -- this isn't free -- to find

18 out at the beginning, can we just avoid the position we --

19 nobody wants to put a court in?

20         We don't want to put you in the position, we don't

21 want to put the Bahamian court in the position of saying, you

22 know what?  I'm not buying into this.  I am not ever going to

23 enforce an order of the Bahamian court or the Bahamian court

24 saying I'm never going to enforce an order of the United

25 States court that says that FTX DM was void from the start.

1   So we got to make -- got to take the step.  Parties should be

2   asked to, on a near term basis, negotiate in good faith to

3   get to that protocol, and if we can't decide it, to come back

4   to Your Honor on some other basis and say, this is what we

5   think the protocol should be.

6           And then we can address the issues of, well,

7   that's not really right.  I -- you're asking Judge Dorsey to

8   give up his jurisdiction over an issue relating to the 2022

9   service -- terms of service, Your Honor, we don't think you

10  should do it.  And you may say, I'm not approving that part

11  of the protocol.  I think where we get is we're going to have

12  to have joint hearings on the terms of service and the

13  migration.

14          THE COURT:  Thank you.

15          MR. SABIN:  Your Honor, Jeff Sabin from Venable,

16  who is representing the ad hoc group, who issued a statement

17  in partial support.  I want to answer your two questions that

18  are vexing you.

19          First, if it were to be quickly because our

20  clients, like others here, are international customers who

21  are worried about one thing, maximizing their recovery in as

22  short a period of time as possible, if there were to be even

23  perhaps before you were to make a decision here, a call with

24  two judges, okay, who certainly everyone in this room

25  respects for what they do, to talk to each other and say, you

1  know what, yes, we can have joint hearings.  We can focus the

2  issues.  We can even decide amongst ourselves right now that,

3  if we were to disagree, maybe we'll have a discussion on

4  appointing a third who would be, effectively, the final

5  arbiter of those issues.

6        Anything that we can do, pragmatically -- and I

7  think you have the power to do this -- that's what we are

8  otherwise pushing for, and we're pushing for it for all the

9  reasons that all parties seem to say, which is we need to get

10  to an understanding of the facts relevant to these key issues

11  of law to move this case forward.

12        Thank you, Your Honor.

13        THE COURT:  Thank you.

14        Does anyone else wish to speak in support of the

15  motion?

16        MR. DIETDERICH:  I can almost say good afternoon,

17  Your Honor.  Andy Dietderich of Sullivan & Cromwell for the

18  debtors.

19        Your Honor, we're six months into these cases and

20  the JPLs still do not accept the premise that the cases are

21  really in Delaware.  This is not a motion for court-to-court

22  communication, it's not a motion for protocol, it's not a

23  motion to ask you to call the Bahamas judge, it's a motion to

24  transfer venue on the central issues of this case to another

25  court.  It's not a motion to dismiss the cases, but it is, if

1 granted, a motion to gut them, and we know this because

2 that's what they wrote down.

3          The motion seeks an order from Your Honor granting

4 permission to file the application.  The application seeks a

5 declaration from another court.  The declaration is not

6 advisory, it is not guidance; it is a binding declaration.

7          The other court is asked to decide if FTX Digital

8 Markets owns all rights and obligations related to user

9 accounts at ftx.com.  The other court would decide if FTX

10 Digital Markets owns all digital assets associated with

11 ftx.com.  The other court would decide the nature of customer

12 rights against ftx.com.

13          The other court would decide if the JPLs are a

14 trustee for customers, empowered to collect $11 billion of

15 missing customer entitlements.  The other court would decide

16 the scope of the powers of the JPL as trustee.  The other

17 court would decide how much property is in the trust that

18 it's entrusted the JPLs with in response to the application.

19 The other court would decide if the tracing rules by which

20 the trustee would claw back assets from all of the debtors

21 and from all of the non-debtors, and from any person to which

22 the debtors have made any transfer.

23          This is the worst kind of slippery slope.  An

24 indication of its scope is the short statement filed by the

25 JPLs themselves relating to the Voyager settlement.

1          So this was done March 7th, after our cooperation

2    agreement.  Voyager received a preferential payment, in our

3    view, from Alameda.  From Alameda, Your Honor, not from FTX

4    Trading.  We agreed a procedural stipulation and asked the

5    Court and Judge Wiles to so order.  The JPLs intervened with

6    a short statement.  It said that the JPLs may have an

7    interest in the proceeds received by Voyager, and the JPLs

8    reserved their right to claw that back into FTX DM.

9          I'd like to read what that statement says, if I

10    may.  This is on the docket, Docket 819.  "The joint

11    provisional liquidators expressly reserve the right to file

12    and prosecute proofs of claim against the Voyager debtors,

13    including claims related to payments made by any of the U.S.

14    debtors to the Voyager debtors during the relevant preference

15    periods with funds originating from the Digital estate."

16          And keep in mind they think, in the earlier

17    paragraphs to this pleading, that the money came from Digital

18    Markets and went to Alameda, so therefore they can chase the

19    preference.

20          "The motion should not impact the rights of the

21    joint provisional liquidators to seek to intervene in any

22    mediation or litigation concerning the preference claims.  In

23    short, if there is to be global peace with the Voyager

24    debtors, that peace cannot likely be reached solely in the

25    United States."

1          What the JPLs are asking for is effectively,

2    operationally, concurrent jurisdiction over all of the assets

3    of our estate.  Luckily, they can't have it, and they can't

4    have it because of the global automatic stay.

5          The global automatic stay is why we filed in

6    Delaware in the first place.  This is one of the most complex

7    insolvencies ever filed, it may be the most complex

8    insolvency ever filed, but we have had one saving grave:  we

9    know who calls balls and strikes, we have centralized

10   jurisdiction.  If you take centralized jurisdiction away from

11   us, in light of the complexity of what we face as a debtors'

12   team, we will not be here for years, we may be here for

13   decades.

14         So there are two questions before the Court:  Does

15   the stay apply?  And, if the stay applies, has the movant

16   shown cause to lift the stay to file the application?

17         Now, Your Honor, there can be no serious question,

18   if you actually read the application, that the stay applies

19   to it.  The application seeks determination of ownership of

20   property of the estate.  If this were an action initiated in

21   a Bahamas civil court by a creditor alleging the creditor

22   owned all of the property of the debtor's estate, the action

23   would be stayed, and there's no exception to the scope of the

24   stay for a non-U.S. insolvency proceeding.

25         So the only real question before the Court is

1  whether the movant has carried its burden of showing cause to

2  lift the stay and the heart of that test, as Your Honor

3  knows, is evidence presented as to the balance of harms.  We

4  would submit, Your Honor, that there is in the record obvious

5  evidence of substantial harm to the debtors, their estates,

6  and their creditors if the core issues of this case are moved

7  to the Bahamas.

8          Mr. Mosley testified about expense that cannot be

9  dismissed.  There would be new counsel, travel, additional

10  hearings, not for some discrete contractual issue, but for

11  all of the issues that I mentioned would be raised by the

12  application, including the tracing of the assets and, if you

13  read the filing they made in March, every single cause of

14  action that we would bring on an outbound basis.  Now, he may

15  say today Section 5 is reserved for Your Honor, but that has

16  not been their position to date.

17          And this is redundant.  This expense is dead

18  weight loss because the proceedings would be redundant.  We

19  would be back here litigating in front of Your Honor the same

20  issues anyway.

21          Now, there was reference to the Chapter 15

22  recognition order and I think this is very important.  We

23  consented to Chapter 15 recognition after initially

24  contesting it and we did so because of one provision that we

25  wrote in the recognition order.  And this is in the

1  recognition order in the -- of course on the docket of the

2  other case at 129.  And it says in paragraph 9, "Nothing in

3  this order, or any relief granted hereby, requires the court

4  in the Chapter 11 cases to defer to any decision in the

5  Bahamian liquidation proceeding with respect to or alters the

6  court's *de novo* standard of review on any matter raised by

7  the Chapter 11 debtors before the court in the Chapter 11

8  cases with respect to property of the Chapter 11 debtors,

9  including, without limitation, the scope of property of the

10  estate or the application of the automatic stay."

11         We bargained for that because we expected that

12  this would happen.  We recognized the JPLs because they need

13  representation in the United States to vindicate their

14  rights, but we did not by doing so seed the primacy of the

15  Chapter 11 to determine what is property of this estate and

16  all of the rights that come with that.  If there is something

17  that is not property of our estate over which Digital Markets

18  has custody, then there is a purpose for the Chapter 15 and

19  we fully support that purpose.  We also fully support the

20  Chapter 15 to make sure that we know who can speak for the

21  JPLs in federal court, but that's it.

22         So it is redundant because I can virtually assure

23  you that if we were simply to allow litigation to proceed in

24  the Bahamas and a result of that litigation were to come back

25  here, I think it highly unlikely the debtors would support

1   that judgment.  We might, we don't know what it says, but I

2   think it's highly unlikely.  And not only that, but not only

3   we would have to support it, but every other stakeholder

4   would have to support it because that language benefits not

5   only us, it benefits all of our stakeholders as well.  So the

6   cost is incremental cost, there's no cost savings.

7          And, as I said, this is not just about us, this is

8   about every party in the case that would need to go through

9   the process that we ourselves have not yet completed to get a

10  KC into the Bahamas court to represent us, everyone would

11  have to go through that.

12         And, Your Honor, unlike a lot of the state cases,

13  these aren't sunk costs.  The Bahamian proceeding on these

14  issues is not even at the starting line.  We have no

15  investment in the process there.  Mr. Greaves testified he's

16  not aware of a single creditor appearing in the Bahamian

17  joint liquidation proceeding.  Contrast that to what we've

18  already accomplished in this case to date.

19         But -- but -- something not in the evidence is

20  equally prejudicial and I want to speak to it as a lawyer

21  because venue here is not simply about who decides, but it is

22  about the law they use to decide the question.  And we've

23  been treating the law like it's a fixed thing, but the

24  important principles of law are not fixed at all.

25         What is at issue?  At issue is whether or not they

1   need to come to this Court and ask to establish, with the

2   burden of proof on them under Section 362, that they have an

3   interest in property of the estate.  Congress gave the debtor

4   the benefit of the burden of proof on that question and the

5   first thing that might happen if that question leaves this

6   Court is we lose the burden of proof, but that pales in

7   comparison to the second issue, the question of constructive

8   trust.

9         We've talked a lot about customer property

10  interests.  We've been working through the question of

11  whether customers have a property interest in digital assets

12  or fiat currency for months.  It is a very, very advanced

13  discussion with many different stakeholders.  There's been

14  two separate adversary proceedings filed in this court on

15  that question and they're suspended to permit these

16  discussions to continue.

17        Now, the question to customer property rights has

18  two elements.  The first is contractual, is there a user

19  agreement or another contract that creates a trust or a

20  bailment under contractual law?  We have user agreements

21  under U.S. law, Australian law, Cypriot law, Japanese law,

22  Swiss law, and English law.  We've looked at the question

23  each.  For ftx.com, the question is governed by English law.

24        And the question, the English law question is

25  whether that contract creates an express trust.  We believe

1  the question is straightforward and the answer, after our

2  work, is no, but the matter is not before the Court.  If it's

3  ever litigated, and if the question is even clear enough to

4  be litigated, we believe Your Honor will agree when you hear

5  the evidence, and we clearly believe you're competent to do

6  so, but that's not the interesting question.

7         The interesting question under virtually all of

8  these arrangements is constructive trust and, as a Federal

9  Court sitting in Delaware, Your Honor should apply Delaware

10 conflict-of-law principles.  Under Delaware law, constructive

11 trust is a remedial doctrine and the law of the forum

12 applies.  This means that the substantive law of constructive

13 trust to be applied to all of our creditors who are before

14 you will be Delaware law for all customers and all creditors

15 alleging a constructive trust or a similar equitable property

16 interest.

17        The ad hoc group of customers, I think they're

18 represented here today, pled it this way in the papers before

19 the Court and we agree, there's an English law express trust

20 question for ftx.com and there's a Delaware constructive

21 trust question.

22        Now, the essence of constructive trust, of course,

23 is unjust enrichment, and we're not talking about unjust

24 enrichment of Sam Bankman-Fried, who will not see a penny

25 from these cases.  What we're talking about is potentially

1   unjust enrichment of one customer at the expense of another

2   customer, or customers as a group at the expense of other

3   creditors, or creditors as a group at the expense of other

4   customers.  And we are going to face these issues from,

5   potentially, millions of people, or at least the

6   representatives of millions of people, and it is essential to

7   be fair to all creditors alleging a constructive trust that

8   one set of rules apply and that everybody is treated fairly

9   and equally.  This is lost if we take one particular

10   allegation of a constructive property interest and send it to

11   the Bahamas because we lose the burden of proof selectively,

12   which is supposed to benefit all of our creditors, and all of

13   a sudden we have a constructive trust being alleged under law

14   of a different forum than Your Honor's.

15          Now, this is important.  If you look at docket --

16   Joint Exhibit 7, this is also on the docket at 1193, this is

17   the declaration of Metta MacMillan-Hughes, which was admitted

18   into evidence by the JPLs without objection from us, and I

19   just want to point to one quick provision, which is in

20   paragraph 6.  And in paragraph 6 she says, "In addition,

21   certain regulatory and insolvency issues are governed by

22   Bahamian law," blah, blah, blah, blah, blah, but then she

23   says "trust issues are also likely to be governed by

24   Bahamian, English, or Antiguan law."

25          I think that's probably true.  If the case goes --

1  if venue goes to the Bahamas, those laws will govern trust,

2  constructive as well; if they stay here, Delaware law will

3  govern at least constructive trust.

4        And if that's not enough prejudice, Your Honor, I

5  want to talk about the plan process, and here I have one

6  single slide, if we can put that up.

7        The automatic stay exists for a purpose and the

8  purpose is to allow us to prosecute a plan of reorganization.

9  We have been called ambitious for this timeline, but we

10  intend to try our best to deliver on it.  This is the work

11  ahead and we are well on our way.

12        On the left-hand side is where we generally are

13  today.  Our general bar date is June 30th.  We've set the

14  general bar date of June 30th because we have some visibility

15  into customer claims and less visibility into non-customer

16  entitlement claims, that bar date will give us that

17  visibility.

18        We have undertaken publicly to have a draft plan

19  of reorganization -- not the final, but a draft plan of

20  reorganization filed publicly in July.  We're in discussions,

21  consensual plan discussions already with many stakeholders

22  with respect to that plan of reorganization, including the

23  committee.

24        We have a customer bar date, but importantly, near

25  the end of this year we anticipate having an amended plan and

1   disclosure statement that reflects the benefit of these

2   consensual plan discussions, resolve plan disputes, and

3   confirm a plan in the second quarter of 2024.

4              THE COURT:  Mr. Shore?

5              MR. SHORE:  Your Honor, I have no objection to

6   Counsel talking to you about a plan, but it's not part of the

7   confirmation record -- I'm sorry, the lift-stay motion

8   record.  Mr. Mosley was here and could have testified to any

9   of this, they chose not to do it that way, so I don't think

10  it would -- he can, as I said, talk as he wants, but it

11  shouldn't be part of the evidentiary record and we object to

12  this.

13             THE COURT:  Understood.

14             MR. SHORE:  Okay.

15             THE COURT:  Go ahead.

16             MR. DIETDERICH:  The -- we also, Your Honor, have

17  identified -- and this is important -- we have said in our

18  pleadings that we do not require any relief from the Bahamas

19  for the confirmation of our plan, and that is true, we do not

20  need to go to the Bahamas.  We would love to have a solution

21  to the question of the property company in the Bahamas, which

22  is a debtor, by the way.  The only thing necessary for us to

23  do to sell all of our real estate in the Bahamas and pay 100

24  percent of the proceeds to customers and creditors is for the

25  automatic stay to be respected with respect to that entity,

1  that's it.

2          Now, whether or not the automatic stay will be

3  respected by the one creditor of the property company in the

4  Bahamas, which is Digital Markets, I don't know, but the only

5  thing that's necessary for us to sell the approximately $250

6  million of real estate we have in the Bahamas is for the stay

7  to be respected so that we can do so because that company is

8  a debtor.  And the JPLs have a claim against the debtor, but

9  it is an unsecured claim.

10          The only other property in the Bahamas of which

11  we're aware is a very small amount of operating cash and a

12  little bit of customer FBO cash.  Would we like to include

13  that and distribute that to customers?  Absolutely, but our

14  business judgment is that we would be nuts to link our estate

15  and all of our value to the estate to a process that requires

16  concurrent jurisdiction with the Bahamas simply because we're

17  worried about a relatively modest amount of customer FBO

18  cash.

19          We do need to decide if customers have a property

20  interest, but we need Your Honor to decide that, we don't

21  need the Bahamas court to decide it, and there's nothing in

22  this confirmation plan that involves it.

23          The other important issue we have with Digital

24  Markets is of course who owns the IP and the customer

25  relationships and the goodwill of the business in case we'd

1  like to sell or recapitalize FTX 2.0 in connection with our

2  plan of reorganization.  Is that essential for confirmation?

3  Probably not.  Would we like to do it?  Absolutely.  Do we

4  require any relief from the Bahamas to sell it free and

5  clear?  Under no circumstances.

6        So our answer to this conundrum, we would have a

7  different approach, Your Honor, if we had $5 billion here and

8  $5 billion there, or a different approach if we had not

9  already concluded that we have all of the assets in REM and

10  owe those assets to all of the customers.  Our job is to get

11  assets to customers and creditors as quickly and

12  expeditiously as possible and we cannot, in our business

13  judgment, decide the right way to do that is to invoke

14  concurrent jurisdiction for no practical business purpose.

15        So, again, we would love to have a deal with

16  Digital Markets with respect to what happens to their FBO

17  creditors committee cash, which I understand to be less than

18  a hundred million dollars, and we'd love to have a consensual

19  resolution to the property in the Bahamas, but we do not need

20  it to confirmation and we're not going to put ourselves in a

21  position where we need it for confirmation.

22        Lastly, Your Honor, in terms of prejudice, this

23  issue is not confined to Digital Markets in the Bahamas.

24  Digital Markets is one of approximately 130 subsidiaries --

25  about a hundred debtors, about 130 subsidiaries.  If the stay

1   is lifted for one insolvency case, we can expect petitions to

2   lift it for others.  The Court could decide each motion when

3   it's filed on its merits, but the precedent has been set, and

4   in this case a precedent of global centralization is very,

5   very important to the plan process that we want to conduct.

6           Okay, that's us.  On the other side of the scales,

7   prejudice to the JPLs.  Well, there's virtually no evidence

8   of this in the record.  And Mr. Shore talked about legally

9   cognizable prejudice; I want to focus on exactly that.

10          In some of the papers, there was a reference that

11  the Bahamas proceeding might be quicker, so it could be

12  cheaper.  Well, again, I argue that it's entirely redundant,

13  so any cost is incremental and any cost is a dead weight

14  loss.  But, if it's quicker, one has to ask ourselves, all

15  right, well, if it's quicker, then that has a relationship to

16  whether or not that proceeding will then be respected by Your

17  Honor, ourselves, and the other stakeholders in this process.

18  And I would submit that the alleged defects of slowness in a

19  Federal Court process that gives notice and opportunity to be

20  heard to everybody, as it must, is not legally cognizable

21  harm in a Federal Court.

22          Familiarity with the issues has been mentioned,

23  but, as I said, we see the English law issue as a very

24  discrete issue.  Your Honor has already done a cryptocurrency

25  case, unlike many judges around the world.  Your Honor is

1  familiar with the basic principles thanks to that case and

2  this case and everything else.  We would argue Your Honor is

3  equally capable, if not more capable than the Bahamian judge

4  to deciding an English law question.  But, regardless,

5  speculation about the relative familiarity sets of two judges

6  is not cognizable prejudice that shows cause to lift the

7  stay.

8          Mr. Greaves acknowledged today, acknowledged on

9  the stand today, this Court can hear the issues that concern

10  them, the Court is competent to hear the issues that concern

11  them, and the issues raised in the application, what do they

12  own and who are their creditors, are the same issues as what

13  do we own and what are our creditors, and those are the same

14  issues set forth in the adversary proceeding.  So we are

15  talking about a redundant proceeding.

16          The harm in the record -- and there was evidence

17  of this harm -- the harm in the record is harm to the JPLs as

18  fiduciary; they won't be able to comply with their fiduciary

19  duties.

20          Now, I don't know if that's true or not.  I would

21  think that the JPLs could ask their court to give them

22  comfort that they're not violating their fiduciary duties in

23  a manner that creates some kind of liability regardless of

24  what Your Honor decides.  But, in any event, the JPLs are not

25  here in a personal capacity.  The JPLs are not here to say

1  there's harm to me.  The JPLs are agents, not principals.

2  They represent an estate, they represent creditors.  For harm

3  to be cognizable it can't be harm to the agent, it has to be

4  harm to the principal.

5          There is nothing in the record, no evidence

6  whatsoever of any harm to Digital Markets for litigating the

7  question in front of you, only to the JPLs.  There's no

8  record of harm to any creditor of litigating the matter in

9  front of you, because there can't be because, again, we have

10  the assets and we can give them to all of the creditors

11  immediately without bypassing through the Bahamas.  Zero

12  evidence.  And I would submit that the fiduciary duties of

13  the JPL may require them to come ask your Court to transfer

14  venue to their court, but the fiduciary duties of the JPL do

15  not require you to grant the relief.

16          Finally -- and this is I think important enough,

17  even if it's not express, but there's several references to

18  this throughout the JPL's papers, strongly implied.  They

19  contain many references to actions of the current Bahamian

20  government, the Bahamian regulators, the DARE Act.  And there

21  is another interest here, the Bahamian government may have an

22  interest in the outcome of these cases, an interest in having

23  matters heard in the Bahamas.  You know, there was mention of

24  comity, interest in the regulatory structure, attracting new

25  crypto investments, maybe even in being the host to FTX 2.0.

1  I don't know which way that cuts, Your Honor, but I do know,

2  luckily, you don't need to consider those issues because

3  they're not part of the standard for stay relief.

4           The Bahamian government is not here in front of

5  the Court today.  The Bahamian judiciary as judiciary is not

6  in front of the Court today, the JPLs are and, as they have

7  reminded us many times, the JPLs do not speak for the

8  Bahamian government.

9           So the case law, very, very briefly.  Putting it

10  together, it is really a three-prong test, as Mr. Shore

11  mentions, but with one important caveat.  And if you look at

12  a case, for example, DBSI, Judge Walsh phrased this very

13  nicely, 407 B.R. 159 at 166, three prongs:  Is there great

14  prejudice to the estate if the litigation is allowed to

15  continue?

16           Now, that's an interesting phrase itself because

17  most of these cases are about something that's already been

18  commenced.  This, again, is here and not there, but I think

19  we have put in sufficient evidence that there is indeed great

20  harm if this case loses the benefit of the global automatic

21  stay.

22           So the next prong is, does the movant -- is the

23  hardship to the movant, sorry, consider -- does the hardship

24  considerably outweigh the hardship to the debtors?

25  Considerably outweigh.  Is there considerably more hardship

1   to the JPLs in having to ask this Court to decide that they

2   own property of our estate than being able to get selective

3   treatment and go to the Bahamas and do the same thing?  And I

4   think, clearly, the evidence today has shown that there is

5   not cause to lift the stay on that basis.

6             What's the probability of success on the merits?

7   Well, for today, nobody knows.  Now, we clearly believe that

8   this argument is a difficult one for the JPLs to make

9   because, as Mr. Mosley testified, there may be specified

10  services provided by DM matching trades on an exchange, but

11  custody of crypto, custody of cash were not specified

12  services.

13            And so as Mr. Mosley said, and that reflects many

14  conversations with that on the debtors' side, there's no way

15  we could tell any customer, I'm sorry, all this value we have

16  collected, not for you; you can go to the Bahamas.  We're not

17  in a position to do that for the simple fact that we were the

18  custodian of all of the crypto and all of the digital assets.

19  Our name is at the top of the agreement.  Our name is at the

20  top of the website.  We own the website.  We own the

21  intellectual property and we are completely implicated by

22  this.  And so we decided as a debtor, that there's -- you

23  know, we would love to get rid of some claims by sending them

24  somewhere else, but it's just not fair to do.

25            But there's a fourth kind of quasi-problem and

1  Walsh mentions that in his opinion, and I think it's
2  important; in fact, Mr. Shore mentioned it in an oblique way,
3  as well, which is Walsh writes, Judge Walsh writes, "Courts
4  also place emphasis on whether lifting the automatic stay
5  will impede the orderly administration of the case."  And
6  here, it clearly will.
7          Your Honor, unless you have questions, Your Honor,
8  I will just close by reiterating that we are confident as
9  debtors that we can confirm a plan of reorganization for this
10 case in the second quarter of 2024.  No promise and no
11 guarantees, but that is a path forward that we believe is
12 viable, but only with the full protection of the global
13 automatic stay.  The Movants have not carried their burden to
14 show cause for relief from the stay at this time and, Your
15 Honor, respectfully, the motion should be denied.
16          THE COURT:  One question to address Mr. Shore's
17 argument about the fact that if we proceed here, the JPLs are
18 going to be put at a disadvantage because they don't have
19 access to cash to be able to pay their lawyers and the JPLs
20 to represent their interests here.
21          How do I address that issue?
22          MR. DIETDERICH:  Well, I think you have to ask the
23 question.  We have many people who would like to be paid
24 their fees in this case to represent interests of various
25 clients.  I think the question would be, does a digital

1  markets estate, *in rem*, have access to properties sufficient

2  to pay or, as they've said, I think the first implication

3  they say if the stay were lifted kind of applies if it's not

4  lifted, as well:  Can they get litigation funding?  And can

5  they give, what we would call in the United States, a "DIP"?

6          I don't have any other solutions for that, because

7  any other dollar that we pay them comes out of the creditors'

8  pocket.

9          THE COURT:  Well, he says you're objecting to them

10 even being able to go to the Bahamian Court to ask for that

11 relief, to ask for a DIP, to ask for some kind of access to

12 the cash.  That they do have *in rem* in the Bahamas.

13          MR. DIETDERICH:  Well, Your Honor, if this were a

14 completely different application, right, if the request were

15 not to determine what's property of the estate, but to

16 identify something that we agree is their property and then

17 we're going to ask the Court to access it, then that could --

18 we would obviously have no concern with that.

19          The problem is the only assets to which they

20 pointed, the only assets -- and I -- (indiscernible) if they

21 had something else -- they had operating cash, but it's been

22 spent.  The only other assets we're familiar that they have

23 is the unsecured claim against the property company, which is

24 the debtor, is the little bit of operating cash that they

25 have and a little bit of crypto, and customer FBO cash.

1           And so if the request is, let us go to our

2    Bahamian Court and ask to use customer FBO cash to pay the

3    expenses of the JPL and they'd like to go to their court to

4    ask that question, that does, in fairness, put us in a

5    difficult spot, because those customers are our customers,

6    and I may be an account in their name, but if it was received

7    by them as, effectively, an agent on some combination of our

8    behalf or the customer's behalf and having them spend that

9    money on their own fees is, you know, as I said, will come

10   directly dollar-for-dollar out of customer recoveries.

11           So, we're open-minded, and believe me, we have

12   spent a lot of time negotiating for the JPLs.  We don't mean

13   to give them the stiff-arm.  And we recognize we have the --

14   we do have some Bahamian nexus to this case in terms of the

15   FBO cash and the property company, and we're open-minded.

16           One of the things we have said to them, for

17   example, is that we've had an arrangement where we could

18   jointly monetize the property, recognizing that it was in the

19   Bahamas, even though it's a debtor.  We have yet been able to

20   agree with them on a process that we believe passes

21   Chapter 11 muster for making sure the property could be

22   dispose of in a fair and transparent way to satisfy 363.

23           As soon as we're able to do that, we have told the

24   JPLs that they can pay their expenses of monetizing the

25   property out of the proceeds of the sale of the property, for

1  example.  And there may be other solutions for other property

2  in the Bahamas and we're always happy to talk to them about

3  that.

4          But this application, the application before the

5  Court today is not that question; it's something entirely

6  different.

7          THE COURT:  Okay.  Thank you.

8          MR. PASQUALE:  Good afternoon, Your Honor.  Ken

9  Pasquale from Paul Hastings for the Committee.  I'm going to

10  be very brief.  Mr. Dietderich really hit many, many of the

11  points that I was planning to comment on.

12          But let me start with the last, which was Your

13  Honor's question, specifically, about the loan, but more

14  broadly, about the Bahamian application, and I agree with

15  what Mr. Dietderich just said.  The JPLs can do what they

16  need to do in the Bahamas, subject to the stay.  That doesn't

17  mean everything.  They can take the assets they have, they

18  can try to administer they're estate with those assets.

19          But when they ask, as they do in this motion, to

20  raise and resolve issues that implicate property of the

21  estate, that, they can't do.  That violates the stay for all

22  the reasons that you've heard today.  And if there's any

23  question about it, if you look at Joint Exhibit 8, that's the

24  directions that they're asking for, and Mr. Dietderich hit on

25  this, they're asking for determinations as to property of the

1   estate, but as Your Honor properly mentioned earlier, is this

2   Court's jurisdiction.  It almost is that simple on this

3   application.  And there is no other application before the

4   Court as we stand here today.

5           For all of the talk from the JPLs' counsel,

6   Mr. Shore, about, Well, we really just want a joint protocol.

7   No, it's not the case.  The application shows the contrary.

8           And what is really being sought here, and, again,

9   Mr. Dietderich hit on all of these points, is litigation over

10  property of these estates.  What the Committee is most

11  concerned about, Your Honor, and, frankly, your first

12  question hit on it, is duplication of effort, lack of

13  efficiency, and costs, because the costs of these efforts

14  come out of the creditors.  And when I say, "creditors" in

15  the context of this dispute, we're talking about the

16  customers of the international exchange and they're the same.

17  It's the same people we're fighting about and there's no

18  benefit to any of those customers from all of what's gone on

19  here this morning.

20          This is a jurisdictional tug-of-war and there's no

21  reason for it.  We are here, the Committee, representing all

22  of those creditors, those customers of the international

23  exchange.  The debtors, of course, are here.  All the assets

24  of the estates are here.  And the JPLs are here, through

25  their Chapter 15 process.

1          There is no reason for any of the issues raised by

2   this application to be heard in the Bahamas, so we would ask

3   that the motion be denied.  Thank you, Your Honor.

4          THE COURT:  Thank you.

5          Mr. Shore?

6          MR. SHORE:  Three quick points, Your Honor.

7   Again, Chris Shore from White & Case, on behalf of the JPLs.

8          Let me start with what Mr. Pasquale just did about

9   the customers.  That's the "I wish they weren't there"

10  argument.  It would be -- this would be a lot easier for the

11  customers if there weren't two courts and there was only one

12  court with jurisdiction over issues.

13         I didn't create the problem.  The JPLs didn't

14  create the problem.  There are two jurisdictions right now

15  with worldwide jurisdiction over issues affecting their

16  debtors' estates.  So, to say this isn't helping the

17  customers, I can't do anything about that.  It's just the

18  process that has been put in place that Mr. Greaves and the

19  other JPLs are trying to exercise their duties on.

20         Second, I heard from both counsel, the slippery-

21  slope argument of, Well, what they really want to do,

22  Mr. Pasquale said, it's file and prosecute the action.  We're

23  not asking for that.  And I heard Mr. Dietderich say, Well,

24  if they had just come to us and said, We want access to this,

25  that wouldn't have been a problem.

1           That's contrary to the evidence.  The evidence was

2   in the declarations and in the testimony that the JPLs said,

3   Could we have a discussion about what can go forward in the

4   Bahamas and what can go forward in the United States?

5           And the response was, No, we can't have a

6   discussion about it.  There is zero tolerance for having any

7   issue decided in the Bahamas, and if you file anything there,

8   it will be a willful violation of the stay.

9           So I'm just trying to find a way to allow that

10  conversation to happen.  And let's be clear about what this

11  is.  You keep referring to it, and you're right:  *In rem*

12  jurisdiction.  The Bahamian Court has *in rem* jurisdiction

13  over the following assets:  the cash -- now, they keep saying

14  it's just a modicum of cash.  From our perspective, it leads

15  to the second asset.  The debtors, from our perspective,

16  Trading, stole $6.9 billion of customers funds and sent it to

17  Alameda, who then frittered it away.  But the Bankruptcy or

18  the Bahamas Court has jurisdiction over that claim.  It

19  shares it with you.  You both have worldwide jurisdiction

20  over resolving that issue.

21          They have jurisdiction over the claim into

22  properties.  Those are all assets which are under control of

23  the Bahamian Court.

24          This is what we want, ultimately --

25          UNIDENTIFIED SPEAKER:  He's been talking --

1          THE COURT:  Is there somebody on the line that we

2   need to cut off?

3          THE CLERK:  Yes.

4          THE COURT:  Okay.  Sorry about that.

5          MR. SHORE:  If we file the application and we all

6   have a discussion -- I like the newfound, good faith efforts

7   of the debtors to say, Had they just asked us, we would have

8   given them this.  Have a discussion about that.  What is the

9   problem with us going in and asking for the Bahamian Court to

10  determine whether or not the assets over which that Court has

11  *in rem* jurisdiction, are held in trust, under the law of that

12  forum?

13         The debtors' position, and I hope you heard the

14  delay in Mr. Dietderich's voice in responding to your

15  question on coming up with the right word.  This is what

16  they're worried about.  The Bahamian Court looks at it and

17  says, Under English law -- I'm looking at this -- these

18  assets are held in trust.  And I'm looking at this contract

19  and these are your customers.

20         What they're worried is that somehow affects their

21  estate.  It affects their negotiating position.  It affects

22  their standing in front of this Court.  That somehow this

23  Court is just going to blindly say, Well, the English Court

24  said that, so I'm going to do that.

25         That's -- Your Honor's clearly not going to be

1  doing that.  But the mere fact that the debtors, the

2  prejudice to the debtors is that there will have been a Court

3  that spoke on the 2022 terms and service and said something

4  about it, is not a basis for denying the JPLs from moving

5  forward.

6          Now, we could fix it if we actually sat down and

7  had a discussion over protocol.  We could put in a provision

8  in the order that says, Under no circumstances will any

9  determination made by the Delaware -- by the Bahamas Court

10 have any preclusive or any effect whatsoever in the United

11 States without further order of this Court.

12         Okay.  We could try to seal the proceedings so

13 nobody knows what the English Court ruled.  I don't know.

14         But the position that's been that with the

15 debtors, contrary to their obligations under the cooperation

16 agreement, is those conversations are dead.  You are a

17 deadweight loss.  We don't want to deal with you.  We wish we

18 didn't have to deal with you.  And now, you can't do anything

19 in your case.

20         I'm just trying to avoid -- and I'm being clear --

21 I'm trying to avoid you having to write an order that says,

22 Nothing the Bahamas Court will have -- does, will have any

23 effect in the United States without, first, having a

24 conversation.  Could we fix this somehow?

25         But there's zero prejudice to the debtors, legally

1  cognizable prejudice by having the JPLs go to their Court and

2  say, You've got *in rem* cash.  It is the FTX Digital's cash.

3  I need some rulings about what I can do with that cash or I

4  need some rulings as to whether you would consider these my

5  customers or somebody else's customers.

6           Zero prejudice to the United States debtors if

7  what we do is we put in a provision that says, Nothing that

8  the Bahamas Court does in all of this, will have any effect

9  in the United States.  And if they don't want to appear,

10  then, fine.  I don't care.  They don't have to appear there

11  if that provision is in there.

12           But what I don't want, which is what they're

13  actually doing, which is starving my estate so that they can

14  do, through you enforcing the stay, what they weren't able to

15  do in the normal processes, which is just wish it all away.

16           We're going to get to the litigation.  If the

17  debtors' defense in all of this is, this property was never

18  held in trust under those terms of service because they

19  weren't a service provider on the cash, we'd welcome that

20  litigation.  We'll get to it.  We'll get to it in some court.

21           It's just a question of when we have to put

22  everything on the Bahamas on hold to satisfy the debtors'

23  concern that they really just articulated to you now:  What

24  is the prejudice by having them doing?  Well, it's going to

25  upset the plan process and it could possibly tell people that

1  our view of the contracts is wrong.

2          We could fix that.  But what we can't do is have

3  them use the stay as a sword to deprive us from doing

4  anything on the idea that Your Honor is going to be

5  instructing the JPLs how to treat the property over which you

6  don't have jurisdiction and the customer relationships that

7  they have over which you don't have jurisdiction.

8          So, we're just asking, lift the stay to allow us

9  to file the application.  We're not prosecuting it.  And if

10 what we're talking about is putting a provision in the order

11 that says, And pending further order of the Court, the

12 Bahamian Court shall not take any action.  And if it takes

13 any action, that action will be void.

14         That gives us the opportunity to have a discussion

15 and decide these issues, rather than have the debtors in the

16 evidentiary record say, I'm not talking about it under any

17 circumstances, and then come up in front of Your Honor and

18 try to say, Well, if we'd just discussed this, it all would

19 have been worked out.

20         We can work it out.  I'm not trying to tread on

21 your jurisdiction.  I'm not asking for your jurisdiction to

22 be curtailed in any way, your supervisory powers to be

23 curtailed in any way; I'm just trying to solve this issue

24 without leading to a diplomatic event between the United

25 States and the Bahamas over two courts saying, I'm not

1  listening to the other.

2          Thank you, Your Honor.

3          THE COURT:  All right.  Well, I'm going to think

4  about this overnight.  I'll give you my ruling tomorrow.

5          But I will tell you now that under no

6  circumstances would I ever defer a core jurisdictional issue

7  to a foreign court.  And the core jurisdictional issue here

8  is, whose assets are these?  And they're assets over which I

9  have *in rem* jurisdiction.  And that's something that has to

10 be decided here.

11         I understand the Bahamian Court may have

12 concurrent jurisdiction, but as a practical matter, they

13 don't have access to the assets.  Only I have access to the

14 assets.

15         So I'm going to ask the parties to talk this

16 evening, see if there's any way to resolve the issue based on

17 the arguments that I've heard about what the limitations are

18 on what the JPLs are asking for, and I will think about how

19 I'm going to ultimately rule and I will do that tomorrow at

20 the hearing, okay.

21         COUNSEL:  Thank you, Your Honor.

22         THE COURT:  Do we want anything else to go forward

23 today or do we want to -- we still have a little bit of time.

24 Do we have enough time?

25         UNIDENTIFIED SPEAKER:  May I have a minute, Your

1  Honor?

2           THE COURT:  Sure.

3       (Pause)

4           MR. LANDIS:  Your Honor, for the record, Adam

5  Landis, on behalf of FTX Trading, Ltd.  We'd like to try to

6  get as far as we can on an evidentiary basis on the sealing

7  motions if Your Honor is inclined to let us push through.

8           THE COURT:  Let's go.

9           MR. LANDIS:  Thank you.

10          THE COURT:  All right.

11          MR. GLUECKSTEIN:  Thank you, Your Honor.  Again,

12  for the record, Brian Glueckstein of Sullivan & Cromwell.

13          The next motion, as Mr. Landis indicated, is the

14  joint motion of the debtors and the Committee for an order

15  authorizing redaction of certain confidential information of

16  customers and individuals.

17          We do have -- the parties jointly have two

18  witnesses with respect to this motion:  Mr. Cofsky, the

19  debtors' investment banker who testified on these issues

20  before the Court previously, and Mr. Sheridan.

21          We, as the debtors, would like to call Kevin

22  Cofsky to the stand as the first witness.

23          THE COURT:  All right.  Mr. Cofsky?

24          UNIDENTIFIED SPEAKER:  (Indiscernible.)

25          MR. WENDER:  Sorry, Your Honor.  For the record,

1  David Wender with Eversheds, counsel for the Ad Hoc

2  Committee.

3          And because the motion seeks similar relief, I

4  thought the understanding was, at least, we'd rely on the

5  same evidence and present supplemental argument with respect

6  to the Ad Hoc Committee's motion, as well.

7          MR. GLUECKSTEIN:  Yeah.  I'm sorry, Your Honor.

8          I mean, the Ad Hoc motion is obviously related and

9  so, we did think it made sense to, at least have the Court

10  consider the evidentiary basis and arguments together.

11          THE COURT:  That's fine.

12          MR. WENDER:  Thank you, Mr. Glueckstein.

13          MR. PASQUALE:  Your Honor, if I may?

14          THE COURT:  Yeah.

15          MR. PASQUALE:  Ken Pasquale, again, from Paul

16  Hastings, for the Committee.

17          One thing just so Your Honor is aware of how we

18  planned to split responsibilities on the joint motion, is the

19  debtors will be responsible for the 107(b) presentation and

20  argument and the Committee will be handling the 107(c).

21          THE COURT:  Okay.  Thank you.

22          THE CLERK:  Please raise your right hand.

23          Please state in full, your full name, and spell

24  your last name for the court record, please.

25          MR. COFSKY:  Kevin Michael Cofsky, C-o-f-s-k-y.

1                KEVIN M. COFSKY, DEBTORS' WITNESS, AFFIRMED

2                THE WITNESS:  I do.

3                THE CLERK:  You may be seated.

4                Your Honor?

5                          DIRECT EXAMINATION

6    BY MR. GLUECKSTEIN:

7    Q     Good afternoon, Mr. Cofsky.

8    A     Good afternoon.

9    Q     Mr. Cofsky, can you please provide the Court, as a

10   reminder, with your background and experience.  Please, if

11   you would.

12   A     Yes.  I'm a partner at Perella Weinberg Partners.  I

13   was a graduate from The Wharton School in 1992.  I was an

14   analyst at Houlihan Lokey in the restructuring area for two

15   years before I went to the University of Pennsylvania Law

16   School and the University of Pennsylvania Fels Institute of

17   Government.

18        I practiced law for several years, clerking, as well as

19   a corporate lawyer, Cravath, Swaine & Moore, and then

20   returned to banking and have been focused in the

21   restructuring area since approximately 2001.  And I've been a

22   partner at Perella -- I've been at Perella since 2007 and

23   I've been a partner since 2015.

24   Q     Mr. Cofsky, can you please describe, briefly, for the

25   Court, the scope of work that yourself and your colleagues at

1  Perella Weinberg Partners have being doing, pursuant to your

2  retention in these Chapter 11 cases for the debtors.

3  A    Yes, Perella Weinberg Partners is acting as an

4  investment banker to the debtors in this matter.  A

5  number of wide-ranging areas, including the exploration of

6  the monetization of various assets, as well as working with

7  the other professionals and the management team and the Board

8  and the other stakeholders to evaluate a potential plan of

9  reorganization and the ultimate exit of the Chapter 11 cases.

10 Q    Can you please describe, briefly, your experience in

11 terms of monetization of businesses, including with respect

12 to customer lists over the course of your career.

13 A    Yes, I think we dealt with this in my prior testimony

14 in my declaration.  I have represented a number of companies

15 and businesses with respect to 363 sales and plan of

16 reorganization sales, a number of which involved customers.

17      And as I testified previously and was in my original

18 declaration, my understanding and belief is that the

19 customers have, in this case, material value to the estate.

20      The identities and the lists of those customers and the

21 ability of other competitors to gain knowledge of those

22 customers would be detrimental to the estate.

23      MS. SARKESSIAN:  I'm sorry, can I ask the witness

24 to speak up or maybe bring the microphone a little closer.

25      THE WITNESS:  Yeah, I'm sorry.  I can do that.

1          MS. SARKESSIAN:  I'm just having a little trouble

2 hearing you.

3          THE WITNESS:  Is that better?

4          MS. SARKESSIAN:  Yes.  Oh, much better.  Thank

5 you.

6 BY MR. GLUECKSTEIN:

7 Q    Mr. Cofsky, can you elaborate a bit and explain to the

8 Court your view today, as you sit here today, as to whether

9 you believe there's value in the FTX debtors' customer lists.

10 A    I do.  As I indicated earlier, part of the work that

11 Perella Weinberg Partners is undertaking is an evaluation of

12 the potential to monetize or reorganize the assets of the

13 estate, including the exchange.  The estate has approximately

14 nine million customers and as we evaluate the potential for

15 the treatment of that exchange going forward, we believe that

16 the existing customer base is extraordinarily valuable and

17 we -- our understanding is based on our research and having

18 looked at the costs incurred by other crypto companies,

19 specifically, to solicit customers.

20          We have also already engaged in a significant outreach

21 process, with respect to solicitation of third-party

22 interests in participating in a process to either acquire,

23 invest into, or reorganize the FTX Exchange.  And based on

24 those conversations, again, it's our understanding that the

25 existing customers are extremely valuable and valued by folks

1  who would be interested in investing into a reorganized

2  business.

3  Q    Mr. Cofsky, do you have a view on whether the debtors'

4  customers lists are a potential source of value in a

5  situation where the debtors reorganize versus sell the

6  exchange?

7  A    I think that the existing customers in that list is

8  valuable in both contexts.  To the extent the business would

9  be reorganized, those customers would likely be very

10 interested if they're going to own a portion or a significant

11 portion of the reorganized business, they would be very

12 interested in trading on that exchange to generate

13 incremental equity value, enterprise value for their new

14 holdings of that.

15        Similarly, if the estate monetizes or seeks an

16 investment from third parties into the exchange, that same

17 value would ultimately inure to the benefit of those

18 customers.

19 Q    Do you view the debtors' customers lists as potentially

20 having value on an independent basis?

21 A    I do.  Again, as we have seen in --

22        MS. SARKESSIAN:  Sorry, I'm going to object, just

23 because I don't understand what "independent basis" means.

24        MR. GLUECKSTEIN:  I'm happy to restate the

25 question.

1  BY MR. GLUECKSTEIN:

2  Q    Mr. Cofsky, do you have a view as to whether you might

3  be able, as the debtors' investment banker, to monetize the

4  customer list itself and create value for the estate?

5  A    Yes.  So, I understand the question to be, you've asked

6  me if I think that the identities of the customers and the

7  customer lists would be valuable to the business if it's

8  reorganized and the business by third parties if it is sold

9  or otherwise seeks a third-party investment.

10       I take this question to mean, would the list be

11  valuable if we were unable to sell or chose not to sell

12  and/or were unable or chose not to reorganize, but simply to

13  sell the customer lists.  And I do believe that would be

14  valuable and the basis for that belief is the conversations

15  we've had initially with third parties.

16  Q    You testified on these issues before this Court back in

17  January, with respect to the same questions around sealing

18  the customer lists; do you recall that?

19  A    I recall that, yes.

20  Q    And do you recall, at the time, back in January, you

21  offered testimony to the Court around the question of whether

22  disclosure of the customer lists would jeopardize the

23  debtors' ability to maximize value; do you recall that?

24  A    I do.

25  Q    As you sit here today, do you have a view today as to

1   whether the immediate disclosure of the debtors' customer

2   lists would jeopardize the debtors' ability to maximize

3   value?

4   A     I do.  I believe that releasing that information --

5   that information is valuable, as I said, and I think

6   releasing that information would impair the debtors' ability

7   to maximize the value that it currently possesses.

8   Q     Mr. Cofsky, could you please provide information for

9   the Court as to what you and your team have been doing since

10  January in order to try to begin to realize the value from

11  the customer lists.

12  A     Yes, as I indicated, we have spent considerable time

13  working with the debtors' other professionals, the UCC

14  professionals to evaluate the potential for a reorganization

15  of the exchange, the core exchange, as well as the potential

16  to seek third-party investment into that or to sell that

17  exchange.

18        And as I indicated, we have reached out to a

19  significant number of third parties and have begun the

20  process of discussions with respect to that evaluation

21  process with those third parties.

22  Q     And can you just clarify, when you say the "core

23  exchange," what you're referring to there.

24  A     The international exchange, although, we have also

25  evaluated the U.S. exchange and the potential for that to be

1   reorganized or not.

2   Q     In your view, is there still work remaining to be done,

3   with respect to realizing the future, if any, of the FTX.com

4   Exchange?

5   A     Yes.  There is still significant work to be done.  As I

6   indicated, we have been working hard to evaluate and seek to

7   implement the potential to reorganize that exchange, but

8   there's a lot of work that would need to be done in order to

9   accomplish that; in addition, as I indicated earlier, we have

10  begun the process of discussions with third parties, but

11  we're in the early stages of that process and that will take

12  some time.

13  Q     As you sit here today, do you have any sense as to,

14  generally, how long it might take to complete that process?

15  A     The process may -- it's a great question.  I don't have

16  specificity for you.  The process is uncertain, insofar as

17  we're relying on third-party participation to understand the

18  interest in acquiring or investing into the rehabilitation of

19  that core exchange.

20        We are also, potentially, going to implement that

21  reorganization through a 363 sale or through a plan of

22  reorganization.  So in many ways, the ultimate outcome may be

23  tied to the outcome of this case and it's difficult to

24  determine with specificity exactly when that might be.

25  Q     What is your view with respect to your ongoing process

1  from the immediate disclosure of the debtors' customer lists,

2  if any?

3  A    Can you repeat that question, please?

4  Q    Sure, let me rephrase the question.

5       Do you have a view as to whether your current process

6  would be impacted by the immediate disclosure of the debtors'

7  customer lists?

8  A    Yes, I think it would be negatively impacted,

9  potentially significantly.

10 Q    Mr. Cofsky, in connection with your ongoing analysis,

11 has your -- have you and your team formed a view as to

12 whether competitors would be able to locate and contact the

13 debtors' customers, if only their names were publicly

14 disclosed?

15 A    We have.  I testified briefly on this -- excuse me --

16 in my last testimony.

17      We've gone out and we've looked at the top-200

18 customers to validate what I had testified, with respect to a

19 smaller number of customers.  And with that --

20           MS. SARKESSIAN:  I'm going to object.  Based on

21 his prior testimony, I understand this was not personally

22 done by the witness, so maybe he could clarify to what extent

23 he did this work personally.

24           THE COURT:  Do you want to establish a foundation.

25 BY MR. GLUECKSTEIN:

1  Q      Mr. Cofsky, okay, let's back up a half step.

2         Can you describe your development in the work that

3  you're beginning to talk about with respect to the analysis

4  of customer names in preparation of your testimony.

5  A      Yes.  I personally looked at the spreadsheet that

6  included all of the names and I directed my team to do the

7  research to determine the extent to which they would be able

8  to identify customers on that list, based solely on the

9  customer names.  And I discussed -- it was an iterative

10 process and we talked about the methodology to do that.  And

11 we talked about what information was located and whether that

12 ultimately could be deemed to be an identification or a

13 highly likely identification or something else.

14 Q      Did you --

15             MS. SARKESSIAN:  I would object to any testimony,

16 based on what any other person told this witness and not what

17 he, himself -- if he did the research, it sounds like he did

18 not.  So I object to any testimony that's based upon

19 information that was given to him by another person.

20             MR. GLUECKSTEIN:  Your Honor, I believe Mr. Cofsky

21 should be able to testify with respect to work that was done

22 at his direction, that he was involved with and reviewed as

23 far as the outputs of, and he's prepared to testify about.

24             THE COURT:  I'll overrule the objection.

25             MR. GLUECKSTEIN:  Thank you, Your Honor.

1  BY MR. GLUECKSTEIN:

2  Q    So, Mr. Cofsky, you were talking, you said in

3  furtherance to the discussion that in the testimony you

4  provided in January, you, subsequent to that, commissioned

5  and participated in an analysis of the debtors' top-200

6  customers, correct?

7  A    That's correct.

8       I'm sorry, would you mind if I get some water, please?

9  Q    Oh, sure.  Sure.  Hold on one moment.

10      (Pause)

11          THE COURT:  I never saw such a flurry of activity.

12      (Laughter)

13          MR. GLUECKSTEIN:  There's a lot of people standing

14  at their ready to assist.

15      (Pause)

16          MS. SARKESSIAN:  Can I have the question repeated,

17  because I didn't hear how many customers it was.

18  BY MR. GLUECKSTEIN:

19  Q    Mr. Cofsky, you could please explain for the Court the

20  scope of the analysis that you commissioned with your team on

21  the topic of whether revelation of customer names would be

22  enough for competitors to locate those customers.

23  A    Yes, we looked at the top-200 customers, which I

24  recognize is a subset of the nine million potential

25  customers.  Based on the dollar amount of the claims at

1  petition date, that would represent approximately 2.4 billion

2  of claims, which we thought was a reasonable set of customer

3  names to review.

4  Q    And can you describe for the Court both, the analysis

5  that you did and the findings of that analysis.

6  A    Yes, we did an analysis by looking through Google, but

7  looking through LinkedIn, and by looking through Twitter

8  feeds.  This is not our core area of expertise.  I actually

9  believe that a well-funded and persistent party might be able

10 to gain more confidence, but we wanted to be reasonable with

11 our time.

12       And the results were, we thought, were compelling.  And

13 the results were that with respect to -- we looked at this

14 from a -- I can describe it on a percentage basis, as well as

15 a dollar number of claims, but the percent of the 200

16 customers that we were able to identify purely on the basis

17 of names, that was approximately 46 percent.  34 percent of

18 those we deemed to be highly likely that we had identified

19 them.  The additional 12 percent, we viewed as likely, but

20 not 100-percent certain.

21       On a dollar basis, we were able to locate in excess of

22 a billion dollars of those claims, which represented, I

23 believe, 30 -- I'm sorry, 42 percent of the 200, the total of

24 $2.4 billion.  That's the greater than a billion dollars of

25 located claims.

1  Q      Mr. Cofsky, the debtors also have customers on their

2  customer lists who, as of the petition date, had a zero-

3  dollar balance, correct?

4  A      Yes.

5  Q      Do you have a view as to whether customers who had a

6  zero-dollar balance on the petition date, would still be

7  valuable names, if publicly revealed?

8  A      Yes, I do.  Our analysis did not go back to determine

9  the extent to which those customers withdrew significant

10  funds prior to the filing.  Our analysis, and what I

11  summarized, related solely to the value of those claims at

12  the petition date.  Obviously, another workstream will be the

13  determination of whether there are preference actions or not,

14  but even beyond that, to the extent that there were customers

15  who, at one time or another add material balances and/or

16  traded significantly on the exchange and generated material

17  value for the exchange, those types of customers would be

18  valuable, I believe, to the exchange going forward.

19       And the customer lists that we're talking about, I

20  think, would be valuable to third parties if they were

21  interested in acquiring that, because, ultimately, they're

22  not focused on whether there's a balance at the time of the

23  filing; they're focused on the extent to which those

24  customers would trade and generate revenue for them going

25  forward.

1  Q    Mr. Cofsky, how did the results of the analysis you did

2  inform you view, if at all, as to whether or not disclosure

3  of the customer names on their own would jeopardize the

4  debtors' ability to maximize value?

5  A    He reinforced that belief.  They validated that belief

6  that those customers could be identified with reasonable

7  effort and that to the extent that the names alone were not

8  redacted and were released, customers would -- clients, other

9  third parties that would otherwise need to expend resources

10 not to solicit those customers and/or would need to

11 compensate the debtor in order to acquire those identities,

12 would no longer have an interest in doing so or would have a

13 lesser, significantly lesser interest in doing so.

14 Q    And does your view as to value of individual -- of

15 customer names include both, individual and institutional

16 customers contained on the customer lists?

17 A    Yes, that's correct.

18        MR. GLUECKSTEIN:  No further questions, Your

19 Honor.

20        THE COURT:  Thank you.

21        Cross?

22        MR. WENDER:  Actually, Your Honor, there's

23 additional, just some additional direct, please?

24        THE COURT:  Oh, go ahead.  Yep.

25        MR. WENDER:  Thank you, Your Honor.  For the

1  record, David Wender with Eversheds Sutherland, counsel for

2  the Ad Hoc Committee of Non-U.S. Customers.

3                    DIRECT EXAMINATION (Continued)

4  BY MR. WENDER:

5  Q     Good afternoon, Mr. Cofsky.

6        Just a few short questions, because you spoke about

7  disclosing the names and how that might impact the value.

8        The disclosure of the names or customer information,

9  either by the debtor or other parties, that would similarly

10 impact value; is that your understanding or belief?

11 A     Yes, my belief is that disclosure of the names,

12 regardless of who disclosed them, would degrade value.

13 Q     This might be a dumb question and I apologize:  Are you

14 familiar with Bankruptcy Rule 2019?

15 A     Not by the number.

16 Q     That's appropriate.

17       It's a rule that requires when customers or creditors

18 act in concert, they have to disclose names, address, and

19 information relative to holdings.

20       If a group of creditors had to disclose their names,

21 their address, and holdings, would that be detrimental to the

22 value of those people, as well, and to the debtor?

23 A     My belief is that disclosure of any customer identities

24 would degrade value.

25 Q     Great.  Thank you.

1          THE COURT:  Now, cross-examination?

2                    CROSS-EXAMINATION

3  BY MS. SARKESSIAN:

4  Q    Good afternoon, sir.  Juliet Sarkessian, on behalf of

5  the U.S. Trustee.  I do have a few questions for you.

6       Now, some of your testimony related to the value of the

7  customer names in a situation in which the debtors

8  reorganized, correct?

9  A    Correct.

10 Q    And based on either what you've heard today or your

11 familiarity with the debtors, do you have an understanding of

12 approximately when the debtors believe they're likely to get

13 a confirmed plan?

14 A    Yes, I have a -- I saw the work plan that was put on

15 the screen earlier.

16 Q    Right.  And it was second quarter, I believe, of next

17 year, correct?

18 A    I believe that's correct, yes.

19 Q    And do you understand whether from the petition date,

20 the customer accounts have all been frozen; is that right?

21 A    That's my understanding.

22 Q    Customers cannot get access to either their

23 cryptocurrency or cash that they have in the accounts; is

24 that right?

25 A    That's my understanding.

1  Q     And is it your understanding that that freeze would

2  continue at least until the plan was confirmed and then went

3  effective?

4  A     I believe that would be the case; that's my

5  understanding.

6  Q     And so that would be more than a year with these

7  accounts being frozen, correct?

8  A     Unfortunately, yes, I think that's the math.

9  Q     Customers can't even get to the cash that they have in

10 the accounts, right?

11 A     I believe that's correct, yes.

12 Q     So, with that in mind, does the fact that those

13 accounts have been frozen that long impact the value of the

14 customer list?  You know what?  I'm sorry, let me withdraw

15 that question.  I forgot that we were talking about

16 reorganization.

17       So, if the debtors reorganized, is it your belief that

18 spite having their accounts frozen for over a year, that the

19 debtors' customers will want to continue with the

20 reorganized -- continue to be customers with the reorganized

21 debtors?

22 A     I do.  I'm also hopeful that we can accomplish an

23 outcome in a shorter period of time, but yes, I believe that

24 at the time at which a reconstituted exchange is able to be

25 stood up and customers have the ability to trade on that, I

1 believe that they will want to do so.

2 Q    Can I ask you why you think that, for somebody who's

3 not been able to get the cash out of their accounts, let

4 alone, crypto, for over a year, that they're going to want to

5 continue with the company that froze their accounts?

6 A    Yes, it's a very good question.  We believe that if an

7 exchange is reorganized, it will be done so in a manner which

8 will be regulatorily complaint, will ensure that the custody

9 of the customer accounts going forward are unambiguously

10 secure, and will provide a trading platform that will be

11 first-class.  And if given the opportunity, from a number of

12 respects to participate on that exchange, as opposed to the

13 exchanges that are currently available to them, they would

14 much prefer to trade on that form of a platform.

15       And significantly, at the moment, and I believe highly

16 likely, the customers will be, by far, the largest creditors

17 of this estate and so if we reorganized the exchange going

18 forward, those customers would be equity owners, potentially,

19 of all, or a significant portion of that reorganized

20 exchange.  And so having the ability to transact on the

21 exchange where they are equity owners, as opposed to

22 transacting on another exchange where they're generating fees

23 for another exchange that they don't own, I think, would be

24 an easy question for them.  I think they would much prefer to

25 transact on an exchange where the fees that they're paying

1  are ultimately benefiting their own equity holders.

2  Q      Is the concept that you're talking about with the

3  customers being equity holders, well, first of all, what

4  percentage of the equity do you think the customers will

5  actually hold?

6           MR. GLUECKSTEIN:  Objection, Your Honor.

7  BY MS. SARKESSIAN:

8  Q      Are we talking about 10 percent or --

9           MR. WENDER:  Objection, Your Honor.  I think we're

10  getting pretty far afield.  And to the extent that we're

11  talking about a plan that's in formation, I'm not sure that's

12  appropriate testimony at this stage.

13           THE COURT:  Yeah, I don't know what the relevance

14  would be at this time.

15           MS. SARKESSIAN:  Well, Your Honor, his testimony

16  was that these customers, these names of customers are

17  valuable if we reorganize --

18           THE COURT:  Uh-huh.

19           MS. SARKESSIAN:  -- with the idea that they're

20  going to stay with the exchange.  And he said one of the

21  reasons that they're going to stay with the exchange is

22  they're going to be equity owners.  That was his testimony.

23           THE COURT:  That's one of the possible outcomes, I

24  think he said.

25           MS. SARKESSIAN:  One of the possible outcomes.  So

1  I'm asking him about that possible outcome.

2          THE COURT:  What's the question?

3          MS. SARKESSIAN:  The question is, when you're

4  saying it's based on -- when you're saying your testimony is

5  based on the assumption that they're going to be equity

6  owners, what percentage of the equity are you anticipating

7  that they would own?

8          THE COURT:  Well, I think that's speculation at

9  this point.

10          MR. GLUECKSTEIN:  Yeah, I would object, Your

11  Honor.  I think Ms. Sarkessian's question does misstate the

12  testimony, but I think this is all speculation at this point.

13          Mr. Cofsky simply testified as to one possible

14  outcome here.

15          THE COURT:  Sustained.

16          MS. SARKESSIAN:  Thank you, Your Honor.

17  BY MS. SARKESSIAN:

18  Q     Let me ask you a different question.

19        Your testimony that these customers would remain -- you

20  believe that these customers would remain with the FTX

21  platform in a reorganization and, therefore, their names are

22  valuable, is that based on an understanding that they would

23  be getting equity in lieu of getting their actual accounts

24  back, the money that's in their actual accounts?

25  A     I would hope that we can recover all of the value that

1  people put on the platform, but that remains uncertain.  And

2  so to the extent that those customers do not receive 100

3  percent of their funds back for any reason, they will have

4  incremental claims.  And it's those claims that I'm referring

5  to, which is the extent to which the estate will have assets

6  to satisfy those claims.

7       And I do want to be clear and also responsive to your

8  question, whether the exchange is reorganized or whether the

9  exchange is sold or whether he ever the exchange is part of a

10  partnership or receives investment from third parties for a

11  portion of the equity, a significant portion of the value of

12  that enterprise going forward, I believe, will be the

13  customers, their identity, and the extent to which they're

14  going to trade on this platform or another platform.

15       So, the questions that you asked were very good, it's

16  just that -- and I apologize for not being able to be more

17  specific, but we're at the early stages of evaluating which

18  one of those potential alternatives, we think will maximize

19  value.

20  Q    I understand there's a lot of suppositions in your

21  testimony, I was just trying to test them just to make sure I

22  fully understand what your testimony was based on.

23       So let me ask a different question.  You testified that

24  you also believe that the names of the customers would be

25  valuable -- that they could be monetized either just in and

1  of themselves, right, a customer list to be sold; is that

2  correct?

3  A    Yes, I think that's one alternative.

4  Q    And then they also could be monetized as part of a 363

5  sale, correct, was that also -- maybe I misstated it.

6  A    Yes, I think those may be the same thing, but selling

7  the customer lists solely or selling assets, together with

8  the customer lists, whether those assets include an exchange

9  or some other package of assets is one possibility I would

10 think.

11 Q    Okay.  And in connection with that, did you have an

12 opportunity to review the declaration of Jeremy Sheridan that

13 has been filed in support of this motion?

14 A    I did not.

15 Q    Okay.

16       MS. SARKESSIAN:  Just one moment, Your Honor.  I'm

17 sorry.

18       (Pause)

19 BY MS. SARKESSIAN:

20 Q    Are you aware whether Mr. Sheridan -- sorry -- are you

21 aware of whether the customers of FTX also used other

22 platforms, other cryptocurrency platforms?

23 A    I am not aware either way.

24 Q    Okay.  Now, I want to go to your testimony about

25 determining that you looked at your -- people you were

1  supervising, you indicated, looked at approximately 200

2  customers to see with just using their names, if more

3  information could be located, correct?

4  A    Yes, we looked at 200, precisely, and the objective was

5  to determine whether we could identify those individuals and

6  locate them.

7  Q    So that was my question, what was the other -- you were

8  looking for -- if you could find addresses, like, street

9  addresses or email addresses or both?

10 A    We wanted to determine using, again, limited resources,

11 which was just Google, LinkedIn, and Twitter, whether we

12 could identify and locate those individuals and find a way to

13 contact them.  And so that was the objective, was to

14 determine the extent to which solely the identities of those

15 individuals would be valuable.  And part of that value is

16 finding a way to actually locate these people and solicit

17 them if you're a competitor and you want to get them to trade

18 on your platform.

19 Q    And so that would be either a street address or an

20 email address or both?

21 A    Or --

22 Q    Or a telephone number?

23 A    Or another way to locate them, for example, on

24 Twitter --

25 Q    Oh, okay.

1  A      -- Facebook, other social media platforms.

2  Q      Now, of those 200, do you know how many of them were

3  individuals versus some type of corporate entity?

4  A      I don't know offhand.  That information was in the

5  spreadsheet, but I don't recall offhand.

6          MS. SARKESSIAN:  Those are all the questions I

7  have for this witness.

8          THE COURT:  Thank you.

9          MR. FINGER:  Good afternoon, Your Honor.

10          THE COURT:  Mr. Finger, good afternoon.

11          MR. FINGER:  David Finger of Finger & Slanina, on

12  behalf of the Media Intervenors.

13          At this time, I'd like to introduce to the Court,

14  Katie Townsend of the Reporters Committee for Freedom of the

15  Press.  She's an attorney with them.  Her admission *pro hac*

16  *vice* has been granted, and with the Court's permission, she

17  will present on behalf of the Media Intervenors.

18          THE COURT:  Okay.  Thank you.

19          MS. TOWNSEND:  Good afternoon, Your Honor.

20                    CROSS-EXAMINATION

21  BY MS. TOWNSEND:

22  Q      Good afternoon, Mr. Cofsky.

23          My name is Katie Townsend.  I'm one of the attorneys

24  representing the Media Intervenors in this matter.  I'll try

25  not to retread any ground that Ms. Sarkessian just covered.

1        But just to clarify, of the -- you have no idea sitting

2   here today how many of debtors' nine million customers are

3   already using a competitor platform; is that correct?

4   A    I do not know that sitting here today; that's correct.

5   Q    Of the top-200 customers that you directed your team to

6   take a look at, you don't know how many of those 200 are

7   already using a competitor platform, do you?

8   A    I do not know that.

9   Q    Does it matter for purposes of the value that you

10  ascribe to the customer base, whether or not those

11  individuals are using, or institutions, are already using

12  another platform?

13  A    To the extent that they are using another platform for

14  a longer period of time, that injection risk to that value.

15  It would degrade that value over time.  It wouldn't eliminate

16  that value, but, sure, we will be competing for those

17  customers.

18  Q    Just to be clear so I understand where the value here

19  is coming from, the value of the customer base is their

20  actual use of the platform, correct?  It's not their name;

21  it's whether or not they have an account on the platform; is

22  that accurate?

23  A    I don't think that's accurate if I understand the

24  question properly.  The customers are on the platform and

25  occur on the list that I reviewed, the nine million

1  customers, because they traded on the platform.  They,

2  therefore, are, because they traded on the platform and

3  generated revenues for the historical exchange, they,

4  therefore, would more likely than not, be folks who are

5  interested in crypto and would trade on crypto on another

6  exchange or on this exchange.

7      And so the identities of these clients as being

8  customers of FTX are valuable to competitors who are looking

9  to attract additional customers to their platform.  And it is

10 much more efficient for them to solicit the customers of FTX

11 directly to trade on their platform, as an example, than it

12 would be to just have a generalized marketing endeavor.

13 Q    But so long as those customers, even if they're trading

14 on that other platform, continue to trade on the FTX

15 platform, that doesn't affect the value of that customer to

16 FTX, does it?

17 A    Yes, it does.

18 Q    How so?

19 A    So, to the extent that we are not currently trading,

20 over time, the longer those customers are on another

21 platform, the greater the risk is.  It doesn't mean that they

22 become worthless, but it means that to the extent that we are

23 reorganizing the platform, and we're well aware of this, and

24 time is a critical issue, and so to the extent that we are

25 able to reorganize the platform in a short amount of time and

1  get these customers an environment that is secure and

2  regulatorily compliant that they can trade on, the less we

3  have to worry about a competing platform.

4        But like any business, to the extent that your

5  customers are utilizing services at a competitor, they're

6  less valuable to you.

7  Q    Let me ask it this way:  If all nine million of the

8  customers who had accounts at the FTX platform stopped using

9  that platform, the value of that asset, that customer base is

10  zero; is that fair to say?

11  A    No.

12  Q    What is the value of that asset if they are no longer

13  using the platform?

14  A    Well, those customers are no longer using the platform

15  today because it doesn't exist.  It doesn't mean that they

16  don't want to use the platform --

17  Q    Okay.

18  A    -- and it doesn't mean that they have declared that

19  they are never going to trade crypto, again.  I think, quite

20  to the contrary, as I said, with only 200 of the top

21  customers, their claims as of the petition date were

22  $2.4 billion.  I think those would be highly valuable

23  potential customers for any platform and people would pay a

24  lot of money to know who those people are and try to get them

25  to trade on their platform.  Whether they're on one platform

1  today, all the other platforms, I'm sure, would like to pay

2  to know who those people are.

3  Q     What's your basis for saying that you're sure that

4  other platforms would pay to know who those people are?

5  A     As was indicated in my original declaration, the other

6  exchanges have programs in place.  They pay money to look for

7  referral programs.  They pay commissions to solicit

8  customers.  So those customers are valuable and finding them

9  is worth paying for.  They've indicated that through their

10 actions.

11        And in our early stages of outreach, with respect to

12 the third-party process, we have received that input, that

13 the customer lists themselves are valuable to people.

14 Q     Have you done any kind of survey of customers to test

15 their views on whether they intend to stay with the platform,

16 whether it's reorganized or sold or continues in some other

17 fashion?

18 A     We have not had a formalized outreach process, but we

19 have had a long engagement and robust process.  The process

20 that I described for the potential reorganization and the

21 third-party outreach is being done, together with the

22 Unsecured Creditors Committee that represents those

23 customers, appeared we have regular conversations with the

24 members of the Committee themselves, who are customers.

25 Q     But you didn't attempt to undertake any other kind of

1  survey or research, in connection -- specific research to

2  ascertain that information, did you?

3  A     I want to make sure I'm -- we haven't undertaken a

4  broad-market analysis, but I want to make sure I'm answering

5  your question.

6         Is that what you're asking?

7  Q     You haven't attempted to specifically identify or do

8  any kind of, like I said, survey to identify how many of the,

9  let's say top-200 customers, would want to stay on --

10 continue to trade on the platform, have you?

11 A     I have not asked that, no.

12 Q     You testified previously that part of the basis for

13 your opinions were bids that you examined in the Celsius

14 bankruptcy; is that right?

15 A     I don't think I said that.

16 Q     I believe you testified on the January 12th, during the

17 January 12th second day hearing, that we also -- and this is

18 just to refresh your recollection:

19        We've also reviewed the bids that have been submitted

20 in the Voyager case and in the Celsius case and took note of

21 the fact that not only were customer assets and lists being

22 acquired in and a value ascribed to the business itself, but

23 that these were actually incremental elements of value, which

24 would be allocated to each customer that went on to the

25 acquirer's platform?

1   Do you recall that testimony?

2   A    I do.  I would prefer if you can put that in front of

3   me, if that's possible, if you're going to ask questions

4   about that.

5   Q    Sure.  If it's helpful, I don't intend to ask questions

6   about the testimony itself, but I did want to ask a little

7   bit about the bids that you've reviewed in the Celsius case.

8   A    I don't know that I said "bids."  I would like to see

9   what I said to make sure that -- I believe it was five months

10  ago and I want to make sure that I'm --

11  Q    Well, let me strike that.

12       Have you reviewed bids in the Celsius bankruptcy case?

13  A    In the Celsius case, yes, I did.

14  Q    Okay.  And there was recently a three-way auction in

15  that are bankruptcy case; is that correct?

16  A    That's correct.

17  Q    Okay.  And that three-way auction involved Fahrenheit,

18  which was the winning bidder; is that correct?

19  A    They have been selected as the highest and the best,

20  but they have not, to my knowledge, been approved by the

21  Bankruptcy Court yet.

22  Q    Okay.  And did you review Fahrenheit's bid in the

23  Celsius bankruptcy?

24  A    I did.  I'm not sure if it's proper for me to be

25  speaking anything further about that in this matter, given

1  the confidentiality agreements I have in that case, but yes,

2  I did.

3  Q    Well --

4          MR. GLUECKSTEIN:  Your Honor, I'm going to object

5  at this point.  Mr. Cofsky has not testified at all today

6  about anything in the record at this hearing with respect to

7  Celsius.  Counsel is now asking him about bids that are

8  pending before another Court that he may have reviewed

9  outside of his engagement for FTX, so I don't see how this is

10 either responsive to his direct testimony or appropriate.

11         MS. TOWNSEND:  Well, Your Honor, he previously

12 testified that part of the basis for his opinions and the

13 opinions that he's offering are bids that he reviewed in the

14 Celsius bankruptcy matter and in the Voyager bankruptcy

15 matter.  There have been some developments in those cases

16 that I think I'm entitled to ask him about, given that he's

17 here to update his testimony on things that he has learned or

18 what has proceeded since the January 11th hearing, so --

19         THE COURT:  Well, I think he testified that he

20 wasn't -- he didn't recall testifying that he had reviewed

21 bids and that's why he wanted to review the actual testimony

22 itself, but you didn't show him, so I'm not going to hold him

23 to that.

24         And if he has confidentiality agreements and he's

25 representing somebody else in connection with the Celsius

 1  case, I'm not going to allow him to violate those

 2  confidentiality agreements.

 3         MS. TOWNSEND:  I'm happy to show him the

 4  testimony, Your Honor.  He's already testified that in those

 5  bids that he reviewed, there was incremental value attached,

 6  not only to the customer base as a whole, but also the

 7  individual customer names.  That's the entire basis of his

 8  testimony, so I would like to explore that to some extent.

 9         THE COURT:  Well, I don't know that it's the

10  entire basis of his testimony, but go ahead.

11         MS. TOWNSEND:  It's the value --

12         MR. GLUECKSTEIN:  Your Honor, it's certainly not

13  the entire basis and it's zero percent of his testimony

14  today.  And the bid that Counsel is asking him about now

15  didn't exist in January.  She's asking about a bid that, by

16  her recitation of this, was just put before the Celsius

17  Bankruptcy Court.

18         So, I renew my relevance objection.

19         THE COURT:  I sustain it.  Let's move on.

20         MS. TOWNSEND:  Just one moment.

21      (Pause)

22         MS. TOWNSEND:  No further questions, Your Honor.

23         THE COURT:  Thank you.

24         Any other cross?

25      (No verbal response)

1          THE COURT:  Redirect?

2          MR. GLUECKSTEIN:  No further questions, Your

3   Honor.

4          THE COURT:  All right.  Thank you.

5          You may step down.  Thank you, Mr. Cofsky.

6          THE WITNESS:  Thank you.

7      (Witness excused)

8          THE COURT:  And now we have Mr. Sheridan.  I'm

9   anticipating he's going to take more than 25 minutes?

10         MR. GLUECKSTEIN:  Yes, Your Honor.

11         THE COURT:  And I hate to leave witnesses --

12         MR. GLUECKSTEIN:  Including the cross-examination,

13  yes.

14         THE COURT:  I hate to leave witnesses hanging

15  overnight if it's not necessary.  And since we're coming back

16  tomorrow morning, why don't we just pick up with Mr. Sheridan

17  in the morning.

18         Anything else we can do in the meantime before we

19  recess for the day?

20         MR. GLUECKSTEIN:  Your Honor, just to clarify,

21  what time would you like to resume tomorrow?

22         THE COURT:  Let's start at 9:30.

23         MR. GLUECKSTEIN:  9:30.  All right.  Thank you

24  very much, Your Honor.

25      (Counsel confers)

1          THE COURT:  All right.  Anything else before we

2   recess?

3          MR. GLUECKSTEIN:  Not from the debtors, Your

4   Honor.  Thank you.

5          THE COURT:  Okay.  Thank you.

6          We'll recess until 9:30 tomorrow morning.

7       (Proceedings concluded at 1:35 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              CERTIFICATION

2              We certify that the foregoing is a correct

3     transcript from the electronic sound recording of the

4     proceedings in the above-entitled matter to the best of our

5     knowledge and ability.

6

7     /s/ William J. Garling                    June 8, 2023

8     William J. Garling, CET-543

9     Certified Court Transcriptionist

10    For Reliable

11

12    /s/ Tracey J. Williams                    June 8, 2023

13    Tracey J. Williams, CET-914

14    Certified Court Transcriptionist

15    For Reliable

16

17    /s/ Mary Zajaczkowski                     June 8, 2022

18    Mary Zajaczkowski, CET-531

19    Certified Court Transcriptionist

20    For Reliable

21

22    /s/ Coleen Rand                           June 8, 2023

23    Coleen Rand, CET-341

24    Certified Court Transcriptionist

25    For Reliable