UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE: | . Chapter 11 |
| | . Case No. 22-11068 (JTD) |
| FTX TRADING LTD. *et al.,* | . |
| | . (Jointly Administered) |
| Debtors. | . |
| | . |
| . . . . . . . . . . . . . . . . . | . |
| | . |
| AUSTIN ONUSZ, CEDRIC KESS VAN | . Adversary Proceeding |
| PUTTEN, NICHOLAS J. MARSHALL | . No. 22-50513 (JTD) |
| and HAMAD DAR, on behalf of | . |
| themselves and all others | . |
| similarly situated, | . |
| | . |
| Plaintiffs, | . |
| | . |
| v. | . |
| | . |
| WEST REALM SHIRES INC., WEST | . |
| REALM SHIRES SERVICES INC. | . |
| (D/B/A FTX US), FTX TRADING | . |
| LTD., ALAMEDA RESEARCH LLC, | . |
| SAM BANKMAN-FRIED, ZIXIAO WANG, | . |
| NISHAD SINGH, and CAROLINE | . |
| ELLISON, | . |
| | . |
| Defendants. | . |
| | . |
| . . . . . . . . . . . . . . . . . | . |
| | . |
| ALAMEDA RESEARCH LLC, ALAMEDA | . Adversary Proceeding |
| RESEARCH LTD., FTX TRADING | . No. 23-50145 (JTD) |
| LTD., WEST REALM SHIRES, INC., | . |
| and WEST REALM SHIRES, INC., | . |
| | . |
| Plaintiffs, | . |
| | . |
| v. | . |
| | . |
| FTX DIGITAL MARKETS LTD., BRIAN | . Courtroom No. 5 |
| C. SIMMS, KEVIN G. CAMBRIDGE, | . 824 Market Street |
| and PETER GREAVES, and J. DOES | . Wilmington, Delaware 19801 |
| 1-20, | . |
| Defendants. | . Friday, June 9, 2023 |
| . . . . . . . . . . . . . . . . . | . 9:30 a.m. |

```
 1                    TRANSCRIPT OF CONTINUED HEARING
                 BEFORE THE HONORABLE JOHN T. DORSEY
 2                  UNITED STATES BANKRUPTCY JUDGE

 3   APPEARANCES:

 4   For the Debtors and
     Debtors-in-Possession:   Adam G. Landis, Esquire
 5                            LANDIS RATH & COBB, LLP
                              919 Market Street
 6                            Suite 1800
                              Wilmington, Delaware 19801
 7
                              -and-
 8
                              Brian D. Glueckstein, Esquire
 9                            SULLIVAN & CROMWELL, LLP
                              125 Broad Street
10                            New York, New York 10004

11   For the US Trustee:      Juliet M. Sarkessian, Esquire
                              OFFICE OF THE UNITED STATES TRUSTEE
12                            UNITED STATES DEPARTMENT OF JUSTICE
                              844 King Street
13                            Suite 2207, Lockbox 35
                              Wilmington, Delaware 19801
14
     For the Ad Hoc
15   Committee of Non-US
     Customers of FTX.com:    David A. Wender, Esquire
16                            EVERSHEDS SUTHERLAND (US), LLP
                              999 Peachtree Street, NE
17                            Suite 2300
                              Atlanta, Georgia 30309
18

19   (APPEARANCES CONTINUED)

20   Audio Operator:          Jermaine Cooper, ECRO

21   Transcription Company:   Reliable
                              The Nemours Building
22                            1007 N. Orange Street, Suite 110
                              Wilmington, Delaware 19801
23                            Telephone: (302)654-8080
                              Email:  gmatthews@reliable-co.com
24
     Proceedings recorded by electronic sound recording,
25   transcript produced by transcription service.
```

1   <u>APPEARANCES (CONTINUED)</u>:

2   For the Ad Hoc
    Committee of Customers
3   and Creditors of FTX
    Trading Ltd., *et al.*:      Jeffrey S. Sabin, Esquire
4                                VENABLE, LLP
                                 151 West 42nd Street
5                                New York, New York 10036

6   For the Official
    Committee of
7   Unsecured Creditors:         Kenneth Pasquale, Esquire
                                 Isaac Sasson, Esquire
8                                PAUL HASTINGS, LLP
                                 200 Park Avenue
9                                New York, New York 10166

10  For the Media
    Intervenors:                 KatieLynn B. Townsend, Esquire
11                               REPORTERS COMMITTEE FOR FREEDOM OF
                                   THE PRESS
12                               1156 15th Street, NW
                                 Suite 1020
13                               Washington, DC 20005

14  For the Joint
    Provisional Liquidators
15  of Emergent Fidelity
    Technologies, Ltd.:          Jason N. Zakia, Esquire
16                               WHITE & CASE, LLP
                                 111 South Wacker Drive
17                               Suite 5100
                                 Chicago, Illinois 60606

18

19

20

21

22

23

24

25

1                                INDEX

2    MOTIONS:                                                    PAGE

3    Agenda
     Item 7:    The Ad Hoc Committee of Non-US Customers of        7
4               FTX.com's Motion to File Under Seal (I) the
                Verified Statement of Eversheds Sutherland
5               (US) LLP and Morris, Nichols, Arsht & Tunnell
                LLP Pursuant to Bankruptcy Rule 2019 and (II)
6               the Declaration in Support of the Ad Hoc
                Committee of Non-US Customers of FTX.com's
7               Motion to File Under Seal the Verified
                Statement of Eversheds Sutherland (US) LLP and
8               Morris, Nichols, Arsht & Tunnell LLP Pursuant
                to Bankruptcy Rule 2019
9               [D.I. 1137, filed on March 22, 2023]

10              Court's Ruling:                                  156

11   Agenda
     Item 8:    Motion of the Joint Provisional Liquidators       7
12              for a Determination that the U.S. Debtors'
                Automatic Stay Does Not Apply to, or in the
13              Alternative for Relief from Stay for Filing of
                the Application in the Supreme Court of the
14              Commonwealth of the Bahamas Seeking Resolution
                of Non-US Law and Other Issues
15              [D.I. 1192, filed on March 29, 2023]

16              Court's Ruling:                                  156

17   Agenda
     Item 9:    Joint Motion of the Debtors and the Official      7
18              Committee of Unsecured Creditors for an Order
                Authorizing the Movants to Redact or Withhold
19              Certain Confidential Information of Customers
                and Personal Information of Individuals
20              [D.I. 1324, filed on April 20, 2023]

21              Court's Ruling:                                  156

22

23

24

25

1                                    INDEX

2   MOTIONS:                                                    PAGE

3   Agenda
    Item 10:   Motion of Debtors for Entry of an Order (A)        7
4              Authorizing the Debtors to File Certain
               Information Contained in Exhibits A and A-1 to
5              the Revised Order Authorizing Implementation
               of a Key Employee Incentive Plan Under Seal
6              and (B) Granting Related Relief
               [D.I. 1561, filed on June 2, 2023]
7
               Court's Ruling:                                  156
8
    Agenda
9   Item 11:   Summons and Notice of Pretrial Conference in      7
               an Adversary Proceeding
10             [Alameda Research LLC et al. v. FTX Digital
               Markets Ltd., et al., Adversary Case No. 23-
11             50145 (JTD) - Adv. D.I. 3, filed on March 24,
               2023]
12
               Court's Ruling:                                  156
13

14

15

16

17

18

19

20

21

22

23

24

25

1                            INDEX

2

WITNESSES CALLED
3  BY THE DEBTORS:                              PAGE

4       JEREMY A. SHERIDAN

5       Direct examination by Mr. Sasson            13

6       Cross-examination by Mr. Wender             28

7       Cross-examination by Ms. Sarkessian         34

8       Cross-examination by Ms. Townsend           47

9       Redirect examination by Mr. Sasson          83

10

11                         EXHIBITS

12 DEBTORS' EXHIBITS:                             PAGE

13 A - Jeremy Sheridan CV                          12

14 I - Celsius pleadings                           12

15 J - Celsius transcript                          12

16

17 DECLARATIONS:                                  PAGE

18 1) Declaration of Jeremy A. Sheridan           12

19

20 Transcriptionists' Certificate                 175

21

22

23

24

25

1          (Proceedings commence at 9:30 a.m.)

2                THE COURT:  Thank you.  Please be seated.

3                MR. LANDIS:  Good morning, Your Honor.

4                THE COURT:  Good morning.

5                MR. LANDIS:  And may it please the Court, Adam

6    Landis from Landis, Rath & Cobb on behalf of FTX Trading

7    Limited and its affiliated debtors.

8                Your Honor, we're back on the agenda to finish up

9    what we started yesterday in connection with Numbers 7 and 9.

10                I can report to you, Your Honor, that the parties,

11   last night, did have conversations with respect to the JLPs'

12   lift-stay or request that the stay doesn't apply.  There has

13   been no resolution or narrowing of issues sufficient for you

14   not to rule, so the parties would request that you go ahead

15   and rule.

16                We don't know if you'd like to go ahead with

17   Items 7 and 9 first, or if Your Honor --

18                THE COURT:  Yes.

19                MR. LANDIS:  -- would like to.

20                THE COURT:  Let's finish up the agenda and then

21   we'll come back to that.

22                MR. LANDIS:  Okay.  Fantastic.  So then we can

23   resume where we were with the sealing motion.

24                THE COURT:  Okay.

25          (Participants confer)

1          MR. SASSON:  Good morning, Your Honor.

2          THE COURT:  Good morning.

3          MR. SASSON:  Isaac Sasson for the Official

4  Committee of Unsecured Creditors on the sealing motion.

5          Your Honor, I think where we left yesterday we

6  were going to call our second witness this morning, Mr.

7  Jeremy Sheridan.  So, with your permission, we'd like to do

8  that.

9          THE COURT:  Okay.  Mr. Sheridan, come forward.

10  Please take the stand and remain standing for the oath.

11          THE ECRO:  Please raise your right hand.  Please

12  state your first name and spell your last name for the court

13  record, please.

14          THE WITNESS:  My name is Jeremy Sheridan, last

15  name S-h-e-r-I-d-a-n.

16      JEREMY SHERIDAN, WITNESS FOR THE COMMITTEE, AFFIRMED

17          THE ECRO:  You may be seated.

18          Your Honor.

19          MR. SASSON:  May --

20          THE COURT:  You may proceed.

21          MR. SASSON:  Thank you, Your Honor.

22          As a preview, Mr. Sheridan filed a declaration in

23  support of the sealing motion at Docket Number 1325.  We'd

24  like to admit that declaration as his direct testimony and

25  supplement it with a brief direct, as well, this morning.  My

1  understanding is there are no objections, though the parties

2  reserve the right to cross Mr. Sheridan.

3          THE COURT:  Okay.  Is there any objection to the

4  entry of the declaration?

5          MS. SARKESSIAN:  Your Honor, I do not object to

6  the procedure of introducing the declaration, but there are

7  two portions of it that I do have an objection to, based on

8  hearsay.

9          THE COURT:  Okay.

10          MS. SARKESSIAN:  If I may approach?

11          THE COURT:  Yep.

12          MS. SARKESSIAN:  I mean approach --

13          THE COURT:  Let me --

14          MS. SARKESSIAN:  -- the podium.

15          THE COURT:  -- hear the --

16          MR. LANDIS:  Yep.

17          THE COURT:  Yes, the podium.

18          MS. SARKESSIAN:  Thank you, Your Honor.  For the

19  record, Juliet Sarkessian on behalf of the U.S. Trustee.

20          So, in Paragraph 18 of Mr. Sheridan's declaration,

21  he has a discussion of what happened in the Celsius case,

22  when then references certain documents that were filed.  We

23  do not object to the Celsius documents that were filed on the

24  docket being admitted, but we -- I do object to this witness'

25  testifying about the contents because the contents speak to

1   them -- for themselves and I don't believe this gentleman has

2   any involvement with personal knowledge of the Celsius case.

3           THE COURT:  Which joint exhibit is the

4   declaration?

5           MR. SASSON:  Your Honor, it's not a joint exhibit.

6   It's exhibit ...

7       (Pause)

8           MR. SASSON:  It's Exhibit I or exhibit -- it's at

9   Docket Number 1570.

10          THE COURT:  Okay.  I'm going to need a copy

11  because I don't have it in front of me.

12          MR. SASSON:  Okay.  May I approach?

13          THE COURT:  Yes.

14      (Participants confer)

15          THE COURT:  And which paragraph are you on now,

16  Ms. Sarkessian?

17          MS. SARKESSIAN:  Paragraph 18, Your Honor.

18      (Participants confer)

19          MR. SASSON:  Oh, it's Paragraph 18 of Tab 1,

20  exhibits, Tab 1.

21      (Pause)

22          THE COURT:  Okay.  And I'm sorry.  State your

23  objection.  What's the basis for the objection?

24          MS. SARKESSIAN:  My objection is, while we do not

25  object to the actual court filings in Celsius on this issue

1  coming in, I do object to this gentleman's testimony about

2  the contents, which speak to themselves.  And I also don't

3  believe Mr. Sheridan has any personal knowledge about what

4  happened in Celsius.  But if I'm wrong about that, I can be

5  corrected.

6              THE COURT:  Okay.

7              MR. SASSON:  Your Honor, Mr. Sheridan is

8  testifying in his expert capacity as to the general knowledge

9  of what happened in the Celsius case.  He's allowed to rely

10 on the fact that it occurred and he's drawn suppositions from

11 that fact.

12             THE COURT:  I agree.  The objection is overruled.

13             MS. SARKESSIAN:  The next one, Your Honor, relates

14 to Paragraph 21 of Mr. Sheridan's declaration.  And this

15 relates to the first two sentences, which, again, appear to

16 be statements that are based on newspaper reports.

17             Now, to the extent that it's based on his personal

18 experience -- and the last piece of the paragraph talks about

19 his experience and I do not object to that.  But the first

20 two sentences appear to be testimony based on what is in

21 articles, newspaper articles, and we object to that as

22 hearsay.

23             THE COURT:  Okay.  Well, again, I think he's

24 relying on that as an expert witness to inform his opinion,

25 so I'll overrule the objection.

1        MS. SARKESSIAN:  Thank you, Your Honor.

2        MR. SASSON:  And --

3        THE COURT:  So the declaration is admitted.

4     (Sheridan Declaration received in evidence)

5        MR. SASSON:  Thank you, Your Honor.

6        And just for housekeeping purposes, in terms of

7  the exhibits to the declaration, we've spoken with counsel,

8  and we're only seeking at this point to admit:

9        Exhibit A, which is Mr. Sheridan's CV;

10        Exhibit I, which are the Celsius pleadings;

11        And Exhibit J, the Celsius transcript.

12        The rest of the exhibits are just referenced to

13  aid the reader in Mr. Sheridan's declaration.

14        THE COURT:  Okay.

15     (Sheridan Declaration Exhibits A, I, and J received in

16  evidence)

17        MS. TOWNSEND:  I just want to make it express --

18        THE COURT:  You have to go to the microphone,

19  please.

20        MS. TOWNSEND:  Thank you, Your Honor.  Katie

21  Townsend on behalf of the media intervenors.

22        I just wanted to make it express that we, of

23  course, reserve the right to rely on any of the exhibits that

24  are relied by Mr. Sheridan and are attached to the

25  declaration for impeachment purposes.

1          THE COURT:  Of course, yep.

2          MR. SUMMERS:  Thanks.

3          MR. SASSON:  Your Honor, and with that, may I

4  approach and hand Mr. Sheridan a copy of the declaration --

5          THE COURT:  Yes.

6          MR. SASSON:  -- and exhibits?

7          THE WITNESS:  Thanks.

8                    DIRECT EXAMINATION

9  BY MR. SASSON:

10  Q     Good morning, Mr. Sheridan.

11  A     Good morning, sir.

12  Q     Mr. Sheridan, can you please describe briefly your

13  educational background?

14  A     My education, I have a Bachelor's Degree from the

15  University of Arizona in Criminal Justice, as well as a

16  Master's Degree from the University of Arizona in Public

17  Administration, with a criminal justice emphasis.

18  Q     And do you have any specialty certifications?

19  A     Yes, sir.  As it relates to this matter, I am chain

20  analysis reactor certified, which is the analytical tool for

21  blockchain analysis, developed by CHAINALYSIS.

22       I have expert certifications from the Blockchain

23  Council, which are cryptocurrency auditor, cryptocurrency

24  expert, and blockchain expert.

25       I have a certificate from Carnegie Mellon University

1  for chief information security officer.

2       I have a certificate from Columbia Business School of

3  Executive Education, blockchain for business.

4       I am a certified information security manager through

5  the Information Systems Audit and Control Association.

6       I also have two certificates from the Global

7  Information Assurance Corporation in information security

8  governance and leadership.

9  Q    And I think you mentioned that these relate to this

10 matter.  So all of these -- all of these certificates

11 specifically relate to what sort of type of experience?

12 A    Digital assets, blockchain, cryptocurrency, information

13 security, and cyber security.

14 Q    All right.  And could you just please summarize your

15 employment history since you graduated?

16 A    Since I graduated from college, I spent a year as a

17 juvenile corrections officer, 4 years as a police officer, 24

18 years with the United States Secret Service, 1 years as the

19 Vice President of Regulatory Affairs for a private digital

20 asset infrastructure company, and the past 3 months with FTI

21 Consulting.

22 Q    And for everyone's benefit, what relation does the

23 Secret Service have to cyber currency -- to cryptocurrency or

24 cybercrime or just criminal investigations generally?

25 A    The Secret Service has statutory authorization to

1  conduct investigations into financial crimes of all types.

2       As a result of that legal authority, as well as being

3  one of two agencies listed in the -- with specific statutory

4  authority in the Computer Fraud and Abuse Act, us and the

5  FBI -- the Secret Service and the FBI, we are legally

6  empowered to investigate financial crimes, ranging from

7  traditional financial crimes to digital financial crimes.

8  Q    And at the Secret Service, did you work in that

9  capacity, in investigation of financial crimes?

10 A    Yes, sir.  Throughout my 24 career -- twenty-four-year

11 career, in a variety of capacities.

12 Q    And so do you have experience with investigating cyber-

13 based crimes?

14 A    Yes, sir.

15 Q    How long have you investigated cyber-based crimes?

16 A    During my 24 years with the Secret Service, I spent

17 times in an investigative role, in total it would be 7 years

18 as a non-supervisory agent and then another 7 years as a

19 supervisory agent.

20 Q    And as part of your investigation of cyber-based

21 crimes, do you have any experience investigating crimes that

22 relate to block -- the blockchain or cryptocurrency

23 generally?

24 A    Yes, sir.

25 Q    And how much experience do you have there?

1  A      Blockchain and digital assets would be approximately

2  four years.

3  Q      And have you ever testified before?

4  A      I have testified as an expert witness in front of the

5  United States Congress on three separate occasions, twice in

6  front of the House of Representatives and once in front of

7  the U.S. Senate.

8  Q      And what was the nature of that testimony?

9  A      Those were related to blockchain digital asset and

10  cryptocurrency investigations.

11  Q      Thank you.

12         And do you possess any security clearances?

13  A      I have a top secret SCI security clearance.

14  Q      And what institution granted you that clearance?

15  A      Through the United States Government, I believe it's

16  the Department of Justice.

17  Q      All right.  And I think -- I believe you had mentioned

18  this earlier.  But where are you currently employed?

19  A      With FTI Consulting.

20  Q      And what is your title at FTI?

21  A      I'm a Managing Director.

22  Q      And how long have you held that title?

23  A      For three months.

24  Q      And what are your day-to-day job responsibilities as a

25  managing director?

1  A     So I lead our investigations function within FTI.  And

2  in that capacity, I lead teams of blockchain and digital

3  asset investigators, forensic analysts, consultants who

4  engage in a variety of investigative capacities, everything

5  from theft, fraud, scam, market valuation, track and trace,

6  and -- and other functions related to digital assets.

7  Q     All right.  And in your capacity as advisor in FTI,

8  have you become familiar with the facts of this case?

9  A     Yes, sir.

10  Q     Okay.  So just moving on more generally.

11        Based on your experience investigating crimes and

12  cybercrimes, do bad actors typically target holders of

13  cryptocurrency?

14  A     Yes, sir.

15  Q     Why is that?

16  A     I think, largely, it's due to the nature of the asset

17  itself.  Cryptocurrency is extremely valuable.  It is global

18  and near instantaneous in its transfer.  It is pseudo-

19  anonymous.  And the transactions are irreversible.  So, as a

20  result, it provides opportunity for criminal actors as both

21  means and method to execute criminal schemes.

22  Q     And do you have any direct experience with bad actors

23  targeting holders of cryptocurrency?

24  A     Yes, sir.

25  Q     And without going through everything that was said in

1  your declaration, can you just briefly summarize some of that

2  experience?

3  A      Yes.  So, in both my investigative role with the United

4  States Secret Service, in my private sector capacity in

5  regulatory affairs, specifically our customer base, as well

6  as in my current role with FTI in investigative functions, I

7  have led and been part of investigations that relate to the

8  types of schemes I've outlined in my declaration:

9        Business email compromises that target cryptocurrency

10  holders by means of email communications purporting to be a

11  legitimate business communication;

12        Pig butchering, where specific individuals are targeted

13  based on their name and fooled into investing cryptocurrency

14  in incremental ways, in order to increase the amount of funds

15  that will be taken from that individual;

16        Romance scams where individuals are targeted and lured

17  into sending cryptocurrency to criminal actors;

18        Phishing attempts, where, you know, fraudulent emails,

19  texts, or other communications are used to deliver malware or

20  malicious payloads to user networks for the purpose of

21  unauthorized access and account or cryptocurrency credential

22  harvesting;

23        A variety of different criminal schemes that -- that

24  I've been involved in.

25  Q      All right.  Just to focus on one, pig butchering, for

1   example.  Would it be easier or harder to target someone if

2   you were -- wanted to facilitate pig butchering if they were

3   already a holder of cryptocurrency?

4   A     It's much easier if they are already a holder.  By

5   nature of that scheme, if you're involved with cryptocurrency

6   as the method of profit, if someone doesn't have a

7   cryptocurrency account or is unfamiliar with the operations

8   of cryptocurrency transactions, you have to instruct them on

9   that, guide them through setting up the account, explain the

10  basics of the technology to them and so forth.

11        Whereas, if that individual is already active in the

12  space, if -- that barrier is removed and you can get right to

13  the true elements of the -- the crime, which are getting them

14  to deposit assets into fraudulent accounts.

15  Q     Got it.

16        And are crimes involving blockchain and/or

17  cryptocurrency different than those involving traditional

18  fiat currency?

19  A     Yes, they are different.

20  Q     And how so?

21  A     Well, one, as the reasons I listed in one of your

22  previous questions, the nature of the technology itself is --

23  is the primary reason.

24        But there is also an element of distance between the

25  criminal actors and the targets in these cases.  Many of the

1  criminal actors, the majority of the criminal actors we

2  encounter are, in this case -- in these cases, organized

3  groups, highly competent, often foreign actors that take

4  advantage of their targets who may not be as sophisticated in

5  the technology and use that to their advantage to prevent

6  detection or identification or judicial consequence or -- or

7  retrieval of funds.

8  Q    And certain objectors have argued that cryptocurrency

9  users are, in fact, more sophisticated and so are less likely

10  to fall prey to cybercrimes.  Do you agree with that

11  statement?

12  A    I do not agree with that characterization.  I think, by

13  the very nature of the data shown and the amount, both in

14  valuation and volume of cryptocurrency fraud scams and crimes

15  that continue to occur, it demonstrates a lack of

16  sophistication a high -- high volume of users.

17       I also think that there is a mantra in digital asset

18  investing, cryptocurrency investing, of not your keys, not

19  your crypto, which is meant to say that, if you don't possess

20  your private keys singularly in some type of cold storage

21  or -- or non-online type of -- of mechanisms or storage

22  device, then you don't truly have access to your crypto.

23       And what we see most consistently is that the crimes

24  that are occurring are people who surrender their keys to an

25  exchange or other platform or through a lot of the schemes

1   that I've identified.  They surrender their keys by -- by

2   being fooled into doing so or by some type of investment

3   approach by them because they're focused on the return and,

4   you know, promises of -- of quick profit from -- from their

5   investments, which is not truly what the technology and the

6   assets are -- how they're intended to function, in terms of a

7   security protocol and a secure mechanism of possessing

8   private keys.

9   Q     And in your opinion, FTX users specifically, would they

10  be an easier or a harder target for cyber criminals?

11  A     My assessment is they would be an easier target.  This

12  population of users was specifically marketed to as an easier

13  and less technical customer, which it appears attracted a

14  very high volume of those individuals, who, in fact,

15  surrender their keys, as I described earlier, to the exchange

16  and did not truly have the full security control of their

17  accounts.

18        I think, by nature of their focus solely on the return

19  on the investment, as opposed to the security of the

20  investment, these individuals do not demonstrate a high level

21  of technical awareness or security focus related to their

22  assets.

23  Q     And when you see "these individuals," are you talking

24  about all the individuals on FTX?

25  A     I wouldn't be able to speak to all individuals, but

1   as -- the majority of the population certainly appears to

2   have willfully surrendered their keys and their access to

3   their accounts in the investment approach.

4   Q     Okay.  Switching gears for a second.

5         In your experience, would simply having an individual's

6   name, but not their home address or email address, be enough

7   for a bad actor to identify them and perpetuate a cybercrime?

8   A     Yes, sir.  I think that is the entry into that ability.

9   Q     Why is that?

10  A     I don't think, in today's day and age, people exist

11  solely as names.  Names are connected to a wealth of

12  information that is available in publicly available places

13  that is provided voluntarily or just by recordkeeping

14  mechanisms of these individuals.

15        And I also think criminal actors in the cyber space

16  related to digital asset crimes are very well versed in non-

17  surface web methodologies that provide a host of information

18  about individuals.

19        And what I mean by that is, you know, the surface web

20  is 4 percent of what you and I see in our daily lives of

21  Google and other publicly available search engines.  The

22  other 96 percent is deep web or dark web marketplaces that

23  traffic in illicit -- you know, illicitly obtained

24  information about individuals that can be, as a fee-for-

25  service, used to link individual names to actual people,

1  provided -- using information that is already available on --

2  in these dark web marketplaces.

3  Q     Let's say, for example, you had my name, but nothing

4  else.  How would you go about correlating other personally

5  identifiable information?

6  A     So I would do it in those two broad lines of effort:

7        In the publicly available public records that are --

8  list your name, use that corroborate and correlate to any

9  online profile or persona that you have created.  These are

10 the more voluntary ways that you've done, through your social

11 media profile, everything from Facebook to LinkedIn to

12 Instagram.

13       I would then delve into the dark web options that have

14 these fee-for-service trafficking in personal information and

15 start to build my portfolio of you with those methods and

16 start to identify you as an individual beyond just your name.

17 Q     And would that be difficult to do?

18 A     Not in my opinion, sir.

19 Q     Why not?

20 A     Because of the volume of information that is out there

21 in publicly available records, in the information that is

22 voluntarily provided by most everyday people, as well as the

23 volume of information that has been released on the dark web

24 through the -- the number of large volume hacks that have

25 occurred, everything from the Target to LinkedIn to Yahoo to

1  Marriott.  There is a very high volume of personally

2  identifiable information for purchase on the dark web that

3  can be used to connect individuals from their public online

4  digital fingerprint.

5  Q    Now, to add to that hypothetical, let's say you also

6  knew that I was a cryptocurrency user.  Would that make it

7  easier or harder to find out other personally identifiable

8  information about me?

9  A    Yeah.  Any piece of information helps to make that

10 picture clearer, especially financial information, especially

11 cryptocurrency information because it is publicly available

12 on the blockchain and you can research transactions using

13 publicly available and free tracking methods.

14      So, if I know that you're involved in cryptocurrency, I

15 can start to research you through different exchanges,

16 different communications you've put out, different purchases,

17 understand what your spending profiles are, understand what

18 type of tokens you utilize, see what you're posting online

19 about your activities related to cryptocurrency, and then

20 start to actually search on the blockchain for specific

21 transactions that match up with time lines, amounts,

22 transactions that you may be communicating.

23 Q    And just to add to the hypothetical, let's say you knew

24 that, not only that I was a cryptocurrency user, but I was an

25 FTX user and the coins I had held in my account as of the

1  petition date.  Would that make it easier or harder?

2  A     Yeah, any piece of information makes it easier.  So

3  knowing what exchanges you're involved in, the types of

4  coins, the dates you're transacting, all of those add a level

5  of specificity that will help to verify you are, in fact, the

6  person that I am researching in these other venues.

7  Q     All right.  Are you generally familiar with the Celsius

8  Chapter 11 cases?

9  A     Yes, sir.

10  Q     And based on what you know about the case, can you

11  describe what happened to the Celsius retail customers when

12  the individual names were disclosed?

13  A     Yes, sir.  Those names were compiled and placed into a

14  interactive, searchable Excel spreadsheet that was put online

15  through Celsiusnetworth.com.  Once that spreadsheet got --

16  was -- was put online, anyone was able to access it, identify

17  the individuals, identify the amounts associated with them,

18  and conduct research from that spreadsheet.

19  Q     And did anything else occur in Celsius with respect to

20  personally identifiable information?

21  A     I know there were multiple reported incidents of

22  phishing, business email compromise, other types of criminal

23  schemes that targeted the individuals listed in -- in that

24  spreadsheet or in those names that were released.

25  Q     And based on your experience, do you believe that

1    similar attempts would occur here if the individual customer

2    names were publicly disclosed?

3    A      Yes, sir.

4    Q      And do you perceive a higher or lower risk of attacks

5    in this case than the Celsius case?

6    A      I think there's a much higher risk related to this case

7    because of the prominence of the case, the notoriety of the

8    case, and also where the industry is at this particular time

9    in the overall market.

10         Backed by -- you know, I think one that's very

11   different about the cryptocurrency environment is the crypto

12   Twitter nature of ow information is communicated in realtime,

13   instantaneously, and with a focus and intensity that doesn't

14   exist in other markets.

15   Q      All right.  Putting aside the cryptocurrency bankruptcy

16   cases, just generally, between a cryptocurrency bankruptcy

17   case and a regular Chapter 11 case or even this case and a

18   regular Chapter 11 case, do you perceive a higher or lower

19   risk to cyber schemes and attacks on personally identifiable

20   information?

21   A      Again, much higher in this case by nature of -- of the

22   crypto Twitter universe, as I explained it.  There -- there

23   is not a bankruptcy twitter club or -- or population, if you

24   will.  There is not a Best Buy Twitter handle.  There --

25   there is crypto Twitter, and that feeds information and

 1  really accelerates the way that different approaches and

 2  perspectives are shared.

 3       And I think there's also a much higher visibility in

 4  this case than other bankruptcy proceedings.

 5  Q    All right.  And last couple of questions.

 6       In your experience, will disclosure of customer names

 7  in these bankruptcy cases subject customers to significant

 8  harm?

 9  A    Yes, sir.

10  Q    And just last question.

11       Are -- according to some objectors, crypto users are

12  just like anyone else and, to quote:

13            "Sometimes scammers target them and that is just a

14  fact of life."

15       Do you agree that subjecting yourself to constant scams

16  and potential harm is just something that everyone needs to

17  live with?

18  A    No, not at all, sir.  And I think that -- that type of

19  casual and dismissive approach to this being just something

20  that happens is -- is not reflective of the true harm it

21  causes.

22       And particularly in this case, for the reasons

23  outlined, cryptocurrency itself, the high profile nature of

24  FTX, the crypto Twitter highlighting and -- and exacerbation

25  of the events here, as well as the way the industry does not

1  have similar protections, backstops, centralized regulatory

2  structures or a really level of protection that -- that

3  traditional finance or -- or other schemes may have makes

4  this a much more significant risk of harm to those involved.

5  Q    Thank you, Mr. Sheridan.

6         MR. SASSON:  Your Honor, no further questions at

7  this time.

8         THE COURT:  Okay.  Thank you.

9         Does anyone else wish to ask questions in support?

10        MR. WENDER:  Yes, Your Honor.

11        THE COURT:  Go ahead.

12        MR. WENDER:  Good morning, Your Honor.  For the

13 record, David Wender with Eversheds Sutherland on behalf of

14 the Ad Hoc Committee of Non U.S. Customers.

15                    CROSS-EXAMINATION

16 BY MR. WENDER:

17 Q    Good morning, Mr. Sheridan.

18 A    Good morning, sir.

19 Q    Just -- hopefully just a few questions.

20        The good portion of your declaration and testimony

21 today focused on the potential harm to individuals.  That

22 same harm is also subjected to on corporations and business

23 entities, correct?

24 A    Possibly, sir.  Yes, sir.

25 Q    And in fact, in your declaration, you talk about that

1  you have experience on ways that businesses are also impacted

2  by this.  Is that correct?

3  A    Yes, sir.

4  Q    In fact, Exhibit P to your declaration -- and if you

5  need to look at it, although I'm just going to -- it really

6  Paragraph 23 -- talks about the biggest data breaches of the

7  21st Century.  Those were all companies, right?

8  A    That's correct, sir.

9  Q    And Exhibit Q, where it talked about the biggest crypto

10 heists, those are also companies, not individuals, right?

11 A    The crypto heist one I don't have off memory.  Can you

12 refer to --

13 Q    It's Exhibit Q.  And I -- and it -- and it's not --

14 I -- just looking at it quickly, and I can even highlight it,

15 as well.  It said 17 biggest crypto heists of all time, and

16 it's Exhibit Q to your declaration.  And it lists MT Gox or

17 Gox -- I never pronounce that correctly.  That's an entity,

18 right?

19 A    (No verbal response.)

20 Q    And if I went through all of them, I don't see an

21 individual's name there.

22            MR. SASSON:  It's Tab 18.

23            MR. WENDER:  Huh?

24            MR. SASSON:  Tab 18.

25 BY MR. WENDER:

1  Q      Tab 18.  Sorry.

2  A      Okay.

3  Q      I apologize.  I had it tabbed by letter.

4  A      The -- the only distinction I would make, sir, is that

5  I think, while the data breaches are companies, the crypto

6  heists are of wallets within those companies that are

7  associated with individuals.  And that may be just parse of

8  words, but --

9  Q      Yeah.

10 A      -- they --

11 Q      But --

12 A      -- they were held in centralized locations of

13 exchanges, so --

14 Q      Yeah.  But those affected entities, but then also, in

15 turn, potentially their customers, there are individuals and

16 other entities in subparts, right?

17 A      Yes, sir.

18 Q      Because, when hackers attack a business entity, they go

19 after the business information at times, correct?

20 A      Yes, sir.

21 Q      And then also, for example, customer lists of their own

22 people, employees, and the like.  So individual information

23 is also, at times, attacked by hackers when they go after

24 corporate entities.

25 A      Yes, sir.

1  Q      Fair?  Great.

2         And then -- and you talked about here, where it's the

3  involvement of individuals and their names were such that

4  people could identify them and be able to target them more

5  specifically.

6         Now, if a customer had to list both their name, their

7  address, and their holdings, that would make it an easier

8  target, right?

9  A      Significantly, yes.

10 Q      Okay.  Thank you for that.

11        Now -- and so -- and you talked about business email

12 compromise earlier in part of your declaration.  So, in a

13 business email compromise, are they more effective if someone

14 first obtains access to a corporate network?  Does that

15 question make sense?

16 A      It makes sense.  I would say -- I wouldn't classify the

17 business email compromise as more effective.  I would

18 classify account spoofing as more effective.  It's -- it's a

19 different scheme.

20        But if the point of your question is the business

21 nature, if you obtain access to, as I've seen in cases I've

22 investigated, the domain name server of the business, you can

23 then spoof that domain and redirect potential users of that

24 domain to fraudulent locations.

25 Q      First, correct for -- thank you for correcting my

1  question and making it more expert.  I'm not an expert, but

2  thank you for that.

3       But then it is easier in that situation to, once you

4  spoof -- to use your term, hopefully correctly -- then you

5  can get access to individual information and their assets in

6  furtherance of their hacking or schemes.  Is that correct?

7  That happens at times?

8  A    Yes, sir.

9  Q    Okay.  Thank you.

10          MR. WENDER:  Nothing further.

11          THE WITNESS:  Yes, sir.

12          THE COURT:  Anyone else in support?

13       (No verbal response)

14          THE COURT:  Okay.  Cross.

15       (Pause)

16          MS. SARKESSIAN:  Good morning, Your Honor.  This

17  is water, not coffee.  I just --

18          THE COURT:  That's fine.

19          MS. SARKESSIAN:  I don't want you to be worried

20  I'm like spilling things.

21          THE COURT:  Coffee and water both spill, but

22  that's okay.

23       (Laughter)

24          MS. SARKESSIAN:  Well, all right.  It does less

25  harm, I suppose, if it's just water.

1           Okay.  For the record again, Juliet Sarkessian on

2   behalf of the U.S. Trustee.

3           Your Honor, before I commence my cross, I think --

4   and maybe I missed this.  But it's my understanding that Mr.

5   Sheridan is being offered as an expert witness.  I'm just not

6   sure that that was distinctly, expressly stated, and I just

7   want the record to be clear on that if that is the case.

8        (Participants confer)

9           MR. SASSON:  Your Honor, it doesn't need to be

10  stated, but yes, he is.

11          THE COURT:  Okay.  Well, normal procedure would

12  be, if you had an expert, you qualify them, I say that

13  they're an expert witness, and then you get to elicit the

14  testimony from them.  You didn't follow that, but that's

15  fine.

16          I don't have any issues.  I think his

17  qualifications are absolutely clear that he's an expert in

18  this field, so I have no problem with recognizing him as an

19  expert in the field.

20          MR. SASSON:  Thank you, Your Honor.

21          MS. SARKESSIAN:  Yes, Your Honor.  I'm not

22  objecting to him being an expert.  I just wanted the record

23  to be clear that that was how he was being offered.

24          THE COURT:  Yeah.

25          MS. SARKESSIAN:  Thank you.

1                          CROSS-EXAMINATION

2   BY MS. SARKESSIAN:

3   Q      Okay.  Sir, I have -- let me start -- I have a few --

4   first of all, good morning.

5   A      Good morning, ma'am.

6   Q      I have a few questions.  I'm going to start with your

7   declaration.  And really, this is for -- I'm asking questions

8   so I can better understand, have better clarity.

9          The first thing -- and I'm not sure how significant

10  this is -- but you talk about, in Paragraph 4, you say at the

11  last sentence:

12              "I possess a Top Secret/Sensitive Compartmented

13  Information security clearance."

14         And my question is:  Is that -- you're no longer

15  working for the Government, correct?

16  A      I'm sorry, ma'am?

17  Q      You're no longer an employee of the Government.  Is

18  that correct?

19  A      That's correct.

20  Q      So do you still have the Top Secret/Sensitive

21  Compartmented Information security clearance?

22  A      Yes, ma'am.

23  Q      And how long will that last for?

24  A      Another three and a half years.  It's -- you go through

25  five-year periodic updates.

1   Q      Uh-huh.   Which I am familiar with, I --

2   A      Yeah.

3   Q      -- since I'm a government employee.

4   A      Yes, ma'am.

5   Q      Okay.

6   A      Mine was shortly before I retired, and so just based on

7   the time line.

8   Q      Okay.   Thank you.

9          (Pause)

10  Q      Okay.   With respect to -- if you could maybe turn to

11  Paragraph 10 of your declaration, please.

12  A      Yes, ma'am.

13  Q      Okay.   So the first sentence says:

14          "[The] odds of success for identify and asset

15  theft crimes are increased even further if they are committed

16  against vulnerable persons, such as the debtors' customers in

17  these Chapter 11 cases" --

18          Do you see that?

19  A      Yes, ma'am..

20  Q      So my question is:   How about individuals who are not

21  customers of the debtors, but are other types of creditors in

22  these cases?   Would knowing that such an individual was a

23  creditor of FTX, not a customer, but it's some other type of

24  creditor, would that make it more likely that they could be a

25  victim of identity theft than any other person?

1  A      If I knew someone was a creditor in some other

2  proceeding, I would need to know the full circumstances.

3       The line of thought behind that statement in

4  Paragraph 10 is based on my knowledge of FTX, the amounts

5  involved, the steep and contradictory way in which that

6  exchange went from the most prominently secure and qualified

7  custodian to a -- one that was accused of, you know,

8  committing acts of fraud with customer funds.

9       I think, when an individual invests in something that

10  they are very are very confident in, that turns out to be the

11  exact opposite of that set of circumstances and there is high

12  valuation involved, that creates an opportunity and a

13  vulnerability that could be exploited.

14  Q      All right.

15  A      So I would need to know the full circumstances of the

16  other situations you're asking me about.

17  Q      Right.  Because what you just testified to would apply

18  just to actual customers of FTX, correct?

19  A      The way I have it described, yes.

20       (Pause)

21  Q      Okay.  Would you please turn to Paragraph 15 of your

22  declaration, please, which deals with the term "pig

23  butchering"?

24  A      Yes, ma'am.

25  Q      So -- and this question may relate to some other

1  provisions in your declaration, as well.

2       But do you have an under -- I assume you know what a

3  "cold wallet" is, correct?

4  A    Yes, ma'am..

5  Q    Okay.  Could you explain what that is?

6  A    It is a wallet that is not connected to online

7  functionality.  So, as I referenced earlier, you can store

8  your wallet information and your private key, public key,

9  seed phrase, and wallet addresses in a medium, usually a USB-

10 type device, that is not connected to online internet.

11 Q    Do you have an understanding of whether, in these

12 cases, the debtors' current management has transferred all

13 customer accounts into cold wallets?  I may not be saying it

14 exactly correctly.  But do you have an understanding about

15 that?

16 A    I do not know what storage methods are being used by

17 FTX.  Is that what you're asking me?

18 Q    Yes.

19 A    I do not know how they are storing customer funds.

20 Q    If customer funds are being -- in any situation, are

21 being stored in a cold wallet, does that make it more

22 difficult for a bad actor to access that account, even if

23 they have the person's name?

24 A    To access the funds in the wallet?

25 Q    Yeah.  Their funds --

1 A      Cold --

2 Q      -- in the account.

3 A      Yes, ma'am.  Cold wallet storage is a much more secure

4 way to store digital assets.

5 Q      Okay.  So, if a bad actor, even if they knew the name

6 of a customer, they would not be able to break into a cold

7 wallet to steal money out of the customer account.  Is that

8 correct?

9 A      I wouldn't characterize it that way because many of the

10 cryptocurrency frauds involve manipulation of individuals.

11 And once you know that individual and can engage with them,

12 you can manipulate them into accessing their cold wallet,

13 putting it in a warm or hot state online, and then harvest

14 their credentials, conduct, you know, these type of schemes

15 by having them bring their cold wallet into a hot or warm

16 state.

17 Q      Okay.  Are you talking -- when you're talking about

18 individuals that the wrongdoer is contacting, do you mean

19 somebody who's an actual customer, that they're getting that

20 customer -- they're manipulating the customer to get access

21 to the cold wallet?

22 A      Yes, in a general -- in a general sense.

23        If the customer doesn't have access and can't get their

24 cold wallet --

25 Q      That manipulation would not work, correct?

1  A     Yes.  If you -- if the customer can't get their funds,

2  you can't manipulate them into using their funds -- or

3  submitting their funds for criminal purposes.  That's

4  correct.

5  Q     Thank you.

6        Now you had -- and I'm jumping now for a minute to your

7  live testimony today.

8        You testified -- I think you testified that FTX

9  customers, prior to the bankruptcy, had turned over keys to

10 their account to wrongdoers.  Did I understand that

11 correctly?

12 A     No, ma'am.

13 Q     Okay.  All right.  So you don't have any knowledge as

14 to, prior to the bankruptcy, whether any FTX customers were

15 the victim of some, you know, wrongdoing, where they were

16 manipulated into turning over their keys or any other way to

17 access their accounts?

18 A     I do not have information about specific FTX customers.

19       (Pause)

20 Q     Okay.  And if we could please turn to Paragraph 20 of

21 your declaration, please.  And it concerns SIM swapping.

22 A     Yes, ma'am.

23 Q     And then, if you could go down to -- well, I won't

24 focus you on any particular sentence.

25       But this -- SIM swapping has to do with cell phones,

1  correct?

2  A    Yes, ma'am.

3  Q    Okay.

4  A    "SIM swapping" it's --

5  Q    SIM --

6  A    -- referred --

7  Q    -- swapping.

8  A    Yes, ma'am.

9  Q    Okay.  Does this method work if the individual who has

10 an account, again, does not have access to it because it's in

11 a cold wallet?

12 A    So I think the distinction I would make is that the

13 specific funds in that cold wallet, the answer would be the

14 same as your previous question, they would not be -- if the

15 target does not have access to those funds because they're in

16 a cold wallet that the target cannot obtain.  However, you

17 know, there are other criminal schemes that could be executed

18 beyond those specific funds if that individual had assets in

19 other wallets, other hot wallets, or other locations.

20 Q    Paragraph 22, if you could please turn to paragraph 22

21 of your declaration.

22 A    Yes, ma'am.

23 Q    So the first sentence says, "Beyond the potential for

24 physical harm, emotional distress, cyber threats, kidnaping,

25 stalking, and bullying that could occur, malefactors could

1  likely determine the physical address of the debtors'

2  customer as a result of disclosure of individual customer

3  names."  Do you see that?

4  A     Yes, ma'am.

5  Q     My question is, with respect to the physical address,

6  is it any easier to find a person's physical address knowing

7  that they happen to a customer of FTX, as opposed to getting

8  the physical address of any other person?

9  A     I think that whatever the source of information is,

10 whether it's a customer of FTX or others, the description

11 related to this is the harm that would come because they're a

12 customer of FTX and this -- for ease of communicating the

13 idea, this crypto-Twitter idea about very public, vocal,

14 elevated, and heightened type of instant communication

15 surrounding cryptocurrency holders, cryptocurrency events,

16 especially events of this nature and magnitude.

17 Q     Okay.  So, just to be clear, the fact that somebody was

18 a customer of FTX, coupled with just their name, does not

19 make it easier for a wrongdoer to find their physical address

20 as opposed to any other individual who's not a customer of

21 FTX?

22 A     I think, if you have the fact that they're a member

23 of -- or, excuse me, a customer of FTX, that's a piece of

24 information.  If I simply have your name and no other

25 information versus having your name and you're a customer of

1  FTX, coupled with the amount of your account transaction

2  volume with the type of token that you're engaging with in

3  FTX or utilizing as a customer, those pieces of -- every

4  piece of information is an asset in my investigation to

5  identify you.

6       So a customer of FTX, yes, that's a piece of

7  information that I now can use to research chat forums,

8  transactions on the block chain, other types of investigative

9  material related specifically to cryptocurrency that may be

10  of value to help me identify you, as opposed to just name and

11  no cryptocurrency engagement whatsoever.

12  Q    Right, I understand what you're saying, but I don't

13  think you're actually -- I don't know that you've actually

14  answered my question.  My question is very simple.

15  A    Okay.

16  Q    For somebody who's a wrongdoer, is it easier to find an

17  individual's physical address knowing that they're an FTX

18  customer than some other individual who's not an FTX

19  customer?

20  A    Yes, ma'am.

21  Q    It is easier to find their physical address just

22  knowing that they're an FTX customer?

23  A    Yes, ma'am.

24  Q    Explain to me how that is?  Not other information, but

25  just their address, their physical address.

1    A        And I'll try and explain a different way.  I apologize

2    if in my previous answer I didn't.  Knowing you an FTX -- so

3    I would not stop there with the name Jeremy Sheridan and FTX

4    customer.  If my investigation stopped there, I would submit

5    that your question is, yes, that wouldn't help me at all, but

6    knowing that you're an FTX customer, I know you're going to

7    be involved in cryptocurrency, I know you're going to have

8    involvement in other transactions related to cryptocurrency.

9    You may be involved in cryptocurrency chat forums, you may be

10   involved in other exchanges, you may be involved in crypto

11   Twitter, I will use that as an investigative lead to start to

12   build that profile of you because I know you're a customer of

13   FTX and you have engaged in cryptocurrency transactions, as

14   opposed to just the name Jeremy Sheridan, it gives me a piece

15   of investigative information that I will build upon.  That's

16   the way criminals or as an investigator I identify you is by

17   taking those pieces of information and corroborating them to

18   other pieces of information to build you as a person.

19   Q        But isn't one of the benefits of cryptocurrency is

20   supposed to be that it's anonymous and that you're not

21   revealing your address or even many times your email address

22   in doing these crypto transactions, isn't that correct?

23   A        I think anonymity in cryptocurrency is a misconception.

24   Q        Okay.

25   A        It is pseudo-anonymous, but it is also publicly-

1   available, accessed, digital, cryptographic transactions that

2   occur in public, open space that anyone can access at any

3   time.  So it is in many ways contrary to anonymity.

4   Q     I understand.  Now, I want to go to your -- the live

5   testimony this morning in response to Counsel for the Ad Hoc

6   Committee and he asked you some questions about harm to

7   corporations who are customers, but he also asked you -- if I

8   understand correctly, he was tying together a situation in

9   which a corporation is the FTX customer -- not the employees

10  of the corporation, but the corporation is an FTX customer,

11  and that that can result in some harm to the employees of

12  that company even if they are not themselves FTX customers.

13  Is that correct?

14  A     I answered those questions based on customers of that

15  company, not employees of that company.  Is that your

16  question?

17  Q     Oh, customers of -- customers of a company that's

18  customers of FTX?

19  A     If a company is a customer of FTX --

20  Q     Then who is it that's going to be harmed other than the

21  customer of FTX?

22  A     The downstream customers of that company.

23  Q     Okay.  And how is that?

24  A     A company does not exist in a vacuum, in my opinion; it

25  is comprised of customers who engage in the business

1  operations of that company.  So if a company is involved in

2  FTX and through -- I would have to know the circumstances of

3  their business operations, dealings, and connections, but if

4  I could identify individuals who are customers of that

5  company, I could then in similar ways to the individual

6  customer names start to build a profile of those customers

7  and execute similar criminal schemes of the customers of that

8  parent company.

9  Q    So let's say you have two companies.  One is company A,

10 they're a customer of FTX, and you have company B, who's not

11 a customer of FTX.  Both A and B have their own customers.

12 A    Yes, ma'am.

13 Q    Knowing that company A is a customer of FTX, does that

14 make it any easier to figure out who company A's customers

15 are as opposed to company B's customers?

16 A    My answer would be similar to your previous question

17 about individuals, it's another piece of investigative

18 information that possesses publicly-available block chain

19 information about financial transactions that I could

20 potentially use to identify individuals who are engaging in

21 those business activities.

22 Q    When a company is engaging in transactions -- not

23 currently, but prior to bankruptcy was engaging in

24 transactions on the FTX format with cryptocurrency, how is

25 that providing any information about their customers?

1  A     I would have to know the circumstances of it.  In a

2  vacuum, if it's just the company name, it would take

3  additional investigative steps, but similar ways as I've

4  described before, if it's a company that is investing in

5  crypto assets that are being placed on FTX, and then I can

6  investigate that company and identify through open source

7  information or dark web information vulnerabilities in the

8  company, individuals posting about the company, individuals

9  communicating about their crypto transactions with the

10  company, there are possibilities and ways to identify

11  individuals who are engaged in those activities.  It's

12  another layer of distance from an individual.  And speaking

13  without true specifics about all of the details, it's hard to

14  be more concrete, but it is possible to build that type of

15  identification.

16  Q     Isn't it also true it's possible to go -- again, take a

17  company that's not an FTX customer and go to their website,

18  find out things about them, do all of the things that you're

19  talking about on the dark web, and find out information about

20  their customers as well; right?

21          MR. WENDER:  Objection, Your Honor.  He's answered

22  this question two or three times now in different ways.

23          THE COURT:  Overruled.  He can answer again.

24          THE WITNESS:  That is possible, yes.

25          MS. SARKESSIAN:  And I believe those are all of my

1   questions of this witness.  Thank you, Your Honor.

2              THE COURT:  Thank you.

3                        CROSS-EXAMINATION

4   BY MS. TOWNSEND:

5   Q    Good morning, Mr. Sheridan.  My name is Katie Townsend,

6   I'm one of the attorneys representing the news media

7   interveners, *The New York Times*, *The Wall Street Journal*, the

8   *Financial Times*, and Bloomberg, in this matter.

9   A    Good morning, ma'am.

10  Q    I'm going to do something similar to what

11  Ms. Sarkessian did, which is I'm going to start with your

12  declaration and then move to some questions from your live

13  testimony today.

14       You testified that you're the manager director at -- a

15  managing director, excuse me, at FTI Consulting.  Is that the

16  financial adviser for the Official Committee of Unsecured

17  Creditors in this matter?

18  A    FTI Consulting as a whole?

19  Q    Yes.

20  A    Yes.

21  Q    To simplify things, by the way, if I use the phrase

22  official committee, you'll know I'm talking about the

23  Official Committee of Unsecured Creditors; correct?

24  A    Yes, ma'am.

25  Q    And if I use the word or the term individuals, you'll

1  know I'm referring to natural persons and not entities;

2  right?

3  A    Yes, ma'am.

4  Q    Do you know the identities of any individuals who are

5  members of the official committee?

6  A    No, ma'am.

7  Q    Do you know the identities of any individuals who are

8  among debtors' top 50 creditors?

9  A    No, ma'am.

10 Q    Do you know the identities of any individuals who are

11 customers of the debtors whose names have been redacted from

12 the filings in this case?

13 A    No, ma'am.

14 Q    You testified that by combining the name -- well, let

15 me do it this way.  Do you have paragraph 9 of your

16 declaration in front of you?

17      (Pause)

18 A    Yes, ma'am.

19 Q    You testified -- in this paragraph, you state that by

20 combining the name of an individual with other publicly-

21 available sources, a malefactor will be able to harvest a

22 full biography of a person, what you refer to as a dossier.

23 That's true of anyone, isn't it, not just the creditor

24 customers of debtors in this case?

25 A    Is it true that a criminal actor can create a dossier

1  of any individual they're trying to target?

2  Q    Yes.

3  A    Uh, I wouldn't say it's true of anyone.  I think you

4  need corroborating information, which in today's day and age

5  is generally easy to find.  I mean, is there someone who's

6  completely removed themselves from the ability to do that?

7  It's possible.

8  Q    Is that because how much information is available about

9  a person from publicly-available sources varies by person?

10  A    Yes, some people are easier to build that than others,

11  yes.

12  Q    You don't know what, if any, steps any of the customers

13  of the debtors whose names have been redacted from the

14  filings in this case have taken to limit what information is

15  available about them from publicly-available sources; do you?

16  A    I do not.

17  Q    Would you say that a data breach involving an

18  individual's data could increase the likelihood that someone

19  will be targeted by an online scam regardless of whether that

20  individual holds cryptocurrency?

21  A    That's accurate.

22  Q    And information obtained through data breaches

23  involving, I think you gave the examples of Yahoo, LinkedIn,

24  Facebook, Marriott, they're not going to include the data of

25  anyone who didn't use those services; correct?

1  A     I don't know that for sure, what type of data was

2  released in each of those instances.  In other words, if the

3  Facebook data breach involved an individual user plus their

4  contact list, then that would be individuals who are greater

5  than the specific individual whose data was breached.  Does

6  that make sense?

7  Q     That does make sense.  So, if I understand it

8  correctly, to the -- it depends on the nature of the

9  information that was involved in the breach?

10  A     Yes, ma'am.

11  Q     Okay, but -- well, let me say it this way.

12  Hypothetically, if it did not involve -- a data breach of,

13  let's say, Facebook -- did not involve the contact

14  information, an individual's contact information, an

15  individual Facebook user's contact information, would that

16  data breach have captured information of individuals who are

17  not users of Facebook?

18  A     Again, it depends on the nature of the breach.  If the

19  breach involves, you know, into administrator accounts on

20  that individual's profile, then anything that individual has

21  accessed to include other individuals -- you know, if this

22  individual that was targeted serves in a data processing

23  capacity or somehow stores information of other individuals

24  or financial information of other individuals within their

25  network or on their system and that data breach compromised

1  that, in other words, it's not just a data breach about your

2  name or your personally-identifiable information, but it's a

3  data breach of your system and your administrator access to

4  your entire files, then the data breach could be much larger.

5  Q    You don't know what steps, if any, any of the customers

6  of debtors whose names have been redacted in this case have

7  taken to protect information that may have been compromised

8  in a data breach; do you?

9  A    I do not know that information.

10  Q    There are ways for individuals who learn that their

11  information may have been compromised in a data breach to

12  seek to protect that information, aren't there?

13  A    Yes.  The number one rule in protecting yourself online

14  is not to put your name or other identifiable information out

15  there, so yes.

16  Q    Can you take a look at paragraph 10 of your

17  declaration?

18  A    Yes, ma'am.

19  Q    You testified that the odds of success for identity and

20  asset theft crimes are increased if they are committed

21  against vulnerable persons such as the debtors' customers in

22  these Chapter 11 cases whose circumstances provide greater

23  opportunity to or reduced defense against the malefactor.

24       Can you tell me what the basis is for your assertion

25  that any of the debtors' customers are vulnerable persons?

1  A      Similar to my answer before, it is an assessment based

2  on the very quick change that FTX's prominence and purported

3  offerings to customers demonstrated in this case.  In other

4  words, FTX was seen as the pillar and strength and shining

5  star of the cryptocurrency industry and I think it generated

6  a lot of trust, safety, and security in its customer base

7  that was quickly changed based on the nature of this -- of

8  everything that occurred.  And so I think when someone

9  encounters that type of violation, for lack of a better word,

10 they are in what I would consider a vulnerable state,

11 especially in financial circumstances.

12 Q      Okay.  So is it fair to say that it is the fact that

13 they are involved in this bankruptcy proceeding that, in your

14 view, makes however many of the debtors' approximately nine

15 million customers who are individuals more vulnerable to

16 potential scams?

17 A      Can you repeat the question?  I'm sorry.

18 Q      Sure.  I'm trying to do this as best I can.

19        In your view, is it just the fact that these

20 individuals are involved in this bankruptcy proceeding that

21 makes them, in your view, more vulnerable?

22 A      I think the totality of circumstances and

23 considerations in this case make them more vulnerable, this

24 is one element of it.

25 Q      Can you explain that a little bit?  When you say the

1  totality of the circumstances, you're referring to the fact

2  that they're FTX customers only or is there something more?

3       I'm just trying to get to the -- your -- the basis for

4  your understanding as to why these customers are more

5  vulnerable.

6  A     Yes, it is -- if I understand your question correctly,

7  why do I consider these customers more vulnerable, is that --

8  Q     Right.

9  A     Again, because they were in a business and financial

10 situation that was considered to be very secure, very safe,

11 something that would result in a profitable and income-

12 earning opportunity that very quickly, very publicly, very

13 steeply, those circumstances changed to be the exact inverse

14 of that.  And when you, in my opinion, deal with that type of

15 cognitive dissonance between what you expect and what reality

16 presents, it creates a situation in which you may be more

17 willing to seek ways to correct that, and that is an

18 opportunity for criminal actors to take advantage of that

19 perspective, that position, or that mental state, and may

20 make those individuals more vulnerable to the types of

21 cybercrimes I've described.

22 Q     In your view, are all of the something close to nine

23 million customers of FTX equally vulnerable because of their

24 involvement with FTX?

25 A     I think they're all equally vulnerable not necessarily

1  because of this mental state, if you're focused on paragraph

2  10, I think they're all equally vulnerable because of the

3  increased risks in this situation, the circumstances I've

4  described, the nature of cryptocurrency, the public profile

5  of this case, the inflammatory nature of crypto Twitter, the

6  lack of institutional and traditional financial backstops and

7  provisions and protections that are in place.  I think

8  they're equally vulnerable for all of the circumstances, not

9  just what's described in paragraph 10.

10  Q     Well, is paragraph 10 intended to be referring to the

11  customer's mental state?  Because the last sentence of that

12  says some of the debtors' individual customers may be

13  vulnerable due to the monetary losses they have experienced.

14  A     Vulnerability in this specific paragraph, paragraph 10,

15  is a perspective and I wouldn't disagree with the

16  characterization of mental state, but what I mean in that

17  last sentence is that mental state and that perspective of

18  victimization and intent to correct that victimization or

19  recoup from those losses, if your losses are higher or the

20  valuations you have placed at FTX that are now not available

21  to you, I am presenting that that creates a potentially

22  higher level of vulnerability because of the valuations

23  involved.

24  Q     You testified earlier that you don't know the

25  identities of any of the debtors' customers whose names have

1  been redacted from the filings in this case, so is it fair to

2  say that you don't know the financial circumstances of any of

3  those individuals?

4  A    That is correct.

5  Q    In preparing your testimony today, did you -- or your

6  declaration -- did you attempt to determine whether or not

7  being involved in a bankruptcy proceeding outside of the

8  cryptocurrency context makes an individual more vulnerable to

9  attempted identity and asset theft crimes?

10 A    I think those circumstances, in my opinion, are

11 different than this situation because of the cryptocurrency

12 element, so I did not.

13 Q    You did not.

14      Is it fair to say that, in your opinion, the most

15 relevant types of online financial fraud scams here are

16 business email compromise, romance scams, pig butchering,

17 phishing attacks, and account spoofing?

18 A    I don't think you listed SIM swaps, which I would add

19 to that list.

20 Q    Okay.

21 A    That's certainly not an all-inclusive list, I think

22 those are the ones with which I have the most personal

23 experience of conducting investigations related to

24 cryptocurrency schemes, which is why I listed them.

25 Q    Can you look at paragraph 13 of your declaration?  This

1  refers to business email compromise scams.

2  A      Yes, ma'am.

3  Q      Is that sometimes also referred to as an email account

4  compromise?

5  A      I would not refer to it as that.

6  Q      You've never heard that?

7  A      I've heard of email account compromise, but I don't

8  equate it to business email compromise.

9  Q      What's the difference?

10 A      An email account compromise could just be unauthorized

11 access to your individual email for a variety of reasons,

12 maybe not necessarily financially motivated.  It could be

13 just to find information about you, a stalking case or some

14 other way to obtain information on you.  Business email

15 compromise is specifically intended to misrepresent a

16 business transaction or operation in email format and target

17 an individual for the purpose of illicit financial gain.

18 Q      I see, okay.  Can a business email compromise scheme

19 target anyone with an email address?

20 A      Can it target anyone with an email address?

21 Q      Yes.

22 A      Yes.

23 Q      Business email compromise scams are not unique to the

24 cryptocurrency context; correct?

25 A      That is correct.

1  Q     In preparing your declaration or your testimony today,

2  did you review any data or research comparing how often known

3  cryptocurrency holders are targeted with business email

4  compromise scams versus how often individuals who are not

5  known cryptocurrency holders are targeted with that kind of

6  scam?

7  A     I did not make that distinction.

8  Q     And a similar question, but slightly different.  In

9  preparing your declaration or your testimony in this matter,

10 did you review any data or research comparing how often known

11 cryptocurrency holders are victims of business email

12 compromise scam versus non-cryptocurrency holders?

13 A     Again, I didn't make comparison between cryptocurrency

14 holder and non-cryptocurrency holder.  My assessments are

15 based on the cryptocurrency holder information being more

16 substantive and fruitful for identifying individuals for

17 criminal schemes.

18 Q     So you're not aware of any data that shows that

19 cryptocurrency holders are more likely to be victims of

20 business email compromise scams than non-cryptocurrency

21 holders, are you?

22 A     I believe the Chainalysis report does make crypto-

23 specific statistical determinations, but I don't have those

24 memorized or part of --

25 Q     You don't have them memorized?

1   A       -- part of my information, yeah.

2   Q       Why --

3   A       And --

4   Q       -- why don't I show you what I think is what you're

5   referring to, a 2023 crypto crime report dated February 23rd,

6   it was attached as Exhibit E to your declaration?

7   A       Yes, that's what I'm referring to.

8   Q       Do you have a copy of that or do you need a copy of

9   that?

10  A       Yes, ma'am.

11  Q       You do have a copy?

12  A       Yes, ma'am.

13          MS. TOWNSEND:  Your Honor, do you need a copy of

14  this --

15          THE COURT:  I have it.  Thank you.

16      (Pause)

17  BY MS. TOWNSEND:

18  Q       So you indicated that this report -- well, let me ask

19  you this first.  What's chain analysis?

20  A       It's Chainalysis --

21  Q       Chainalysis, excuse me.  What is Chainalysis?

22  A       They are an investigative company that provides data on

23  all types of crypto operations, everything from transactions

24  to criminal activity and in between.  They also are a third

25  party supplier of a blockchain analytics tool called Reactor

1  that I referred to in my credentials, and Reactor is a

2  searchable engine that allows you to identify cryptocurrency

3  transactions and use that for attribution of individual

4  users.

5  Q     Did you have any involvement in the preparation of this

6  report?

7  A     No, ma'am.

8  Q     Is this report one of the documents that you relied on

9  to prepare your testimony in this matter?

10 A     I read this report as part of my job for all functions

11 that I do related to crypto investigations, not specifically

12 for my testimony.

13 Q     Okay.  You indicated that this report has data that

14 shows how often cryptocurrency holders or known

15 cryptocurrency holders are targeted with business email

16 compromise schemes versus non-cryptocurrency holders -- I

17 realize it's a big report, but can you point this to me,

18 this --

19 A     I want to make a clarification on that.

20 Q     Oh, of course.

21 A     This report documents and reports on cryptocurrency

22 crimes, of which business email compromises are one of them,

23 if I believe -- if I remember the category.  From there, it

24 would be possible to make the distinction you're asking me

25 about about business email compromise crimes that involve

1   cryptocurrency, which I would get from this report to DOJ's,

2   the FBI's Bureau of Statistics about business email

3   compromise in general.

4        I wasn't saying that I could --

5   Q    I see.

6   A    -- go to this report and make that distinction.  I

7   could use this report for data in order to then make that

8   distinction.

9   Q    Okay, I misunderstood.  So, sitting here today, you

10  can't speak to the difference between how much more

11  frequently a known cryptocurrency holder is a victim of

12  business email compromise scam than a non-known

13  cryptocurrency holder, can you?

14  A    I could not give you that data.

15  Q    Okay.  Can you turn to Exhibit D of the declaration

16  that you proffered?  And let me know if you -- I think you

17  have a copy of everything -- or you don't have a copy of it?

18  A    Yeah, I just need to know the tab, please.

19  Q    It's -- oh --

20         UNIDENTIFIED SPEAKER:  It's tab 5.

21  BY MS. TOWNSEND:

22  Q    Tab 5.

23  A    Yes, ma'am.

24  Q    Can you tell me what this is?

25  A    This is a business email compromise report as published

1  by -- I think this is an FBI advisory.

2  Q     And is this one of the documents that you relied on in

3  preparing your declaration?

4  A     Yes.

5  Q     If you look at paragraph 13 of your declaration,

6  there's a cite to the -- and I believe a quote from this

7  document in the last sentence of paragraph 13.  Do you see

8  that?

9  A     Yes, ma'am.

10  Q     Okay.  Your declaration, the last sentence reads,

11  "knowledge of the target's personal details is integral to

12  the execution of the scheme," referring to the business email

13  compromise scheme, "such that the Federal Bureau of

14  Investigation's first recommended safeguard against them is

15  to be careful with what information you share online," dot,

16  dot, dot.  Do you see that?

17  A     Yes, ma'am.

18  Q     If you look at the document that you cited to,

19  Exhibit D.

20  A     Yes, ma'am.

21  Q     The last part of that FBI proviso says -- it's the

22  first, I think, bullet point under how to protect yourself.

23        Do you see that?

24  A     Yes, ma'am.

25  Q     And it indicates, by openly sharing -- or it states, be

1  careful with what information you share online or on social

2  media by openly sharing things like pet names, schools you

3  attended, links to family members, and your birthday, you can

4  give a scammer all the information they need to guess your

5  password or answer your security -- or answer your security

6  questions, excuse me.

7       When you stated in your declaration that knowledge of

8  the target's personal details is integral to the execution of

9  a business email compromise scheme, are those the kind of

10  personal details -- pet names, schools attended, birthdays --

11  that you were referring to?

12  A    Those could certainly be helpful in a business email

13  compromise.  Business email compromise details, however, are

14  more related to business activities of the individual,

15  whether they're involved in purchasing a home or, you know,

16  buying a business or selling a business, or conducting any

17  type of online business operations.

18  Q    So different information than what's in the FBI

19  proviso, in your view, or more financial information?

20  A    Yeah.  I mean any information, when you're conducting a

21  criminal scheme, is of value.  So, in my experience, have I

22  seen business email compromise that referenced what the FBI

23  is listing here about personal -- what I would consider

24  personal versus business details, I have not seen that.

25  However, the personal details that are listed here would be

1  used to create what I call the dossier of the individual and

2  from that I could learn their business operations, learn what

3  they're engaged in, and then specifically tailor the business

4  email compromise to more effectively target them.

5       So it is related, it's just not something that would

6  directly be in the business email compromise -- or business

7  email of the business email compromise scheme.

8  Q    Would you say that not -- or being careful about

9  sharing that kind of information online is an online safety

10 tip that's generally applicable to everyone?

11 A    Yes.

12 Q    Let's talk about phishing.  Is it fair to say that

13 phishing is a way to carry out a business email compromise or

14 email account compromise scam?

15 A    Yes, the distinctions and titles and definitions

16 sometimes are overlapping.

17 Q    And phishing involves a bad actor posing as a known or

18 trusted entity through an email, text message, or instant

19 message; right?

20 A    That's correct.

21 Q    A phishing scheme could target anyone who uses email,

22 text messages, or instant messages; correct?

23 A    Yes, it can.

24 Q    It's not unique to the cryptocurrency context, is it?

25 A    It is not unique to cryptocurrency.

1   Q     And, in your professional experience, you've seen

2   successful phishing attacks in the cryptocurrency context and

3   outside the cryptocurrency context; haven't you?

4   A     Yes, ma'am.

5   Q     In preparing your declaration or your testimony in this

6   matter today, did you review any data or research comparing

7   how often known cryptocurrency holders are phishing targets

8   versus how often non-known cryptocurrency holders are

9   phishing targets?

10  A     No, ma'am.

11  Q     And, a similar a question, in preparing your testimony

12  in this matter or your declaration, did you review any data

13  or research comparing how often known cryptocurrency holders

14  are victims of phishing attacks versus how often individuals

15  who are not known cryptocurrency holders are victims of

16  phishing attacks?

17  A     I did not review data; I relied on my personal

18  experience.

19  Q     And, in your personal experience, are known

20  cryptocurrency holders more often victims of phishing attacks

21  than non-known cryptocurrency holders?

22  A     Yes, ma'am, it's a more effective way to generate

23  criminal proceeds because of the circumstances of and nature

24  of the asset, as I described earlier; it's instantaneous,

25  near-instantaneous, it's global, it's valuable, it's pseudo-

1  anonymous, it's irreversible.

2      And so it is both the method and the means in which the

3  majority of criminal schemes in an online sense are conducted

4  in our -- in the bulk of our investigations.

5  Q    So just so I understand your answer, it's your

6  testimony that in your experience you're more likely to be a

7  victim of a phishing attack if you are a known holder of

8  cryptocurrency than if you are not a known holder of

9  cryptocurrency?

10  A    Again, we don't make those distinctions.  What I'm

11  saying is it's more -- the schemes are carried out using

12  cryptocurrency in an overwhelming number of cases because

13  that's how the criminals are paid and that's how the proceeds

14  are transferred.  Whether or not the criminal knows the

15  individual is a known holder or not, we don't make that

16  distinction, similar to the answers I provided before.

17  Q    Okay.  I just wanted to clarify that.

18      Can you look at Exhibit C to your declaration?  And let

19  me know if you need a copy -- or if anyone else needs a copy.

20      (Pause)

21  A    Is that --

22  Q    It's a news article from --

23          UNIDENTIFIED SPEAKER:  It's tab 4.

24  BY MS. TOWNSEND:

25  Q    It's tab 4, I'm sorry.

1  A     Yes, ma'am.

2  Q     This is a news article from December 2022 entitled,

3  "Crypto Users Claim Gemini Email Leak Occurred Much Earlier

4  than First Reported."

5       Is this an article that you relied on in preparing your

6  declaration today -- or your testimony today?  Excuse me.

7  A     I don't recall relying on this heavily.  I think this

8  was included just as a means of example and reference.

9  Q     Okay.  The article reported that after the

10 cryptocurrency exchange, Gemini suffered a data breach, users

11 of that exchange reported receiving phishing emails; is that

12 right?

13 A     That's --

14 Q     Is that your understanding?

15 A     That's correct.

16 Q     Okay.  And that data breach included the customers'

17 email addresses and partial phone numbers, not just their

18 names; is that correct -- or is that your understanding?

19 A     Yes, that's correct.

20 Q     Do you have any information about those phishing

21 attempts related to that Gemini leak other than what is in

22 Exhibit C?

23 A     No, ma'am.

24 Q     You don't know, for example, whether any of those

25 phishing attempts were successful?

1  A    Correct.

2  Q    Can we look at paragraph 17 of your declaration?  And

3  this pertains to account spoofing.

4  A    Yes, ma'am.

5  Q    Is account spoofing another way to carry out a business

6  email compromise or email account compromise scam?

7  A    Again, the distinctions blur because there is email

8  involved in an account-spoofing scheme.  So, by technical

9  definition, you could call it a business email compromise,

10  but the precipitating criminal action of the account spoof is

11  not generally conducted through business email compromise,

12  although it can be.

13  Q    So is it fair to say that account spoofing entails a

14  bad actor disguising an email address, display name, phone

15  number, text message, or website URL to convince the target

16  that the source of a message is legitimate?

17  A    That's accurate.

18  Q    Account spoofing can target anyone who uses a computer

19  or a cell phone; right?

20  A    Yes, ma'am.

21  Q    And it's not unique to the cryptocurrency context; is

22  it?

23  A    No, ma'am.

24  Q    In preparing your testimony, did you review any data or

25  research that compared how often known cryptocurrency holders

1  are targets of account-spoofing scams versus non-known

2  cryptocurrency holders?

3  A    Similar answer as to before, I did not make those

4  distinctions.

5  Q    Okay.  And I'm sorry for the repetition.

6  A    No, just --

7  Q    And, in preparing your testimony, did you review any

8  data or research comparing how often known cryptocurrency

9  holders are victims of account spoofing as opposed to non-

10 cryptocurrency holders?

11 A    No.  Again, in my experience, the majority of victims

12 and targets that we dealt with were cryptocurrency holders by

13 nature of how these crimes are executed.

14 Q    I understand; similar answer to the previous types of

15 scams?

16 A    Yes, ma'am.

17 Q    Can you look at paragraph 18 to your declaration?

18 A    Yes, ma'am.

19 Q    This relates to In re Celsius Network, LLC.  Does FTI

20 Consulting have any involvement in the Celsius bankruptcy?

21 A    Not in my practice, I don't know about FTI as a whole.

22 Q    Okay.  So let me ask you this then, do you personally

23 have any involvement in the Celsius bankruptcy?

24 A    No, ma'am.

25 Q    Your declaration states that many Celsius customers

1   became the target of phishing attacks by scammers posing as

2   bankruptcy lawyers, using emails and phone calls.  What's the

3   basis for that statement?

4   A     I'm sorry, can you repeat the question?

5   Q     Sure.  In paragraph 18 of your declaration, you state

6   that many Celsius customers became the target of phishing

7   attacks by scammers posing as bankruptcy lawyers, using

8   emails and phone calls.  What is the basis for that statement

9   in your declaration?

10  A     The referenced attachments to the declaration, both the

11  media reports, as well as the legal documents that were

12  produced following these phishing and other criminal

13  attempts.

14  Q     Is that statement based on anything else?

15  A     Is the statement based on anything else, other --

16  Q     I'm not trying to trick you.  I'm just asking if your

17  knowledge of what's in paragraph 18 is based solely on those

18  exhibits that you cited in your declaration.

19  A     Yes, that's correct.

20  Q     Do you know how many Celsius customers were the targets

21  of those phishing attempts?

22  A     I don't know specifically.

23  Q     Do you know how many of the Celsius customers who were

24  the targets of those phishing attempts were foreign

25  individuals?

1   A       I don't know, ma'am.

2   Q       And do you know how many of those phishing attempts

3   targeting Celsius customers were successful?

4   A       No, ma'am.

5   Q       The exhibits attached to your declaration -- well,

6   strike that.

7           Do you know how debtor's attorneys in the Celsius case

8   became aware of these phishing attempts?

9   A       No.

10  Q       The notices that are attached to your declaration that

11  have been entered into evidence indicate that there were

12  steps taken both by the court and by the parties in the

13  Celsius bankruptcy to notify anyone involved of those

14  phishing attempts, is that your understanding?

15  A       That is my understanding.

16  Q       Do you think that's a prudent step to take?

17  A       I do, but even as referenced in those attempts, there

18  is acknowledgment and admission that they will not reach all

19  customers.  So I think that's a limited approach, at best.

20  Q       But it is an approach that you would -- that you would

21  agree the Court should have taken in that case or that the

22  debtor's counsel should have taken in that case?

23  A       Yes, ma'am.

24  Q       And why is that?

25  A       You have to try and address the problem.

1  Q     And one way to address the problem is to put people on

2  notice that it's possible that they may be the target of

3  phishing attempts?

4  A     That is one way to address the problem, yes.

5  Q     Can you look at paragraph 14 of your declaration?  And

6  I apologize for jumping around a little bit.

7        Romance scams are another common type of online

8  financial fraud; correct?

9  A     Yes, ma'am.

10 Q     And that's when a bad actor pretends to build a

11 romantic relationship with a victim online in order to

12 convince them or guilt them into sending money; right?

13 A     Yes, ma'am.

14 Q     Romance scams can target anyone; correct?

15 A     Yes, ma'am.

16 Q     And they're not unique to the cryptocurrency context;

17 are they?

18 A     No, ma'am.

19 Q     In preparing your testimony in this case, did you

20 review any data or research comparing how often known

21 cryptocurrency holders are targets of romance scams versus

22 how often individuals who are not known cryptocurrency

23 holders are targets of romance scams?

24 A     A similar answer as to before, ma'am, no.

25 Q     And in preparing your testimony did you review any data

1  or research comparing how often known cryptocurrency holders

2  are victims of romance scams versus how often those

3  individuals who are not known cryptocurrency holders are

4  victims of romance scams?

5  A    Similar to before, no, it's just personal experience

6  that the majority of these scams involve cryptocurrency.

7  Q    Can you look at page -- or paragraph, excuse me, 15,

8  the next paragraph?  Pig butchering is another type or common

9  type of online financial fraud, in your view?

10  A    Yes, ma'am.

11  Q    And these are -- is it fair to say that a pig

12  butchering scam that targets a bad actor who forms an online

13  relationship with their target, convinces them to invest in

14  cryptocurrency, and then steals the invested funds?

15  A    Yes, ma'am.

16  Q    Though it involves the use of cryptocurrency to

17  perpetrate the fraud, pig butchering targets individuals who

18  are not known cryptocurrency holders via text message and

19  social media; right?

20  A    I don't have personal experience with that.  Every pig

21  butchering case that I have seen involves cryptocurrency

22  holders by nature of the scheme itself to continue to invest

23  not only in the opportunity, because it takes advantage of

24  cryptocurrency holders, it explains different facets of the

25  industry and leverages this idea of quick returns, high-

1  volume returns, and is facilitated by all of the

2  characteristics of cryptocurrency that I've listed several

3  times in order to be able to be successful.

4  Q    So, in every example of pig butchering that you have

5  personal experience with, the victim, prior to being

6  contacted by the bad actor, already had an existing wallet,

7  cryptocurrency assets; is that accurate?

8  A    The ones that I've investigated.  It is -- if I

9  understand your question, it is possible for that person not

10  to have cryptocurrency and for the bad actor to convince them

11  to set up a cryptocurrency wallet to further facilitate the

12  crime, but that again, by nature, involves cryptocurrency.

13  Q    In those cases that you have dealt with in your

14  personal experience, did the target know that the

15  individual -- strike that, I said it backwards.

16      In those cases that you have dealt with in your

17  personal experience involving pig butchering, did the bad

18  actor know in advance that the target already had

19  cryptocurrency assets?

20  A    I can't testify to that because that is not a focus of

21  our information-gathering or interview of suspects, that's

22  not something we focus on related to the investigation.

23  Q    So you don't know because that isn't something that you

24  would have asked during the investigation --

25  A    That's correct.

1  Q      -- is that right?

2  A      That's correct.

3  Q      Okay.  So, just to make sure I have this right, you

4  don't know if any of those individuals in those pig

5  butchering scams that you've dealt with personally were

6  targeted because they were known cryptocurrency holders?

7  A      We made that conclusion based on who they targeted, but

8  I did not ask the criminal actor specifically that question.

9  Q      I see.  How many such cases have you dealt with in your

10 career?

11 A      Personally or in a leadership position?

12 Q      Personally, so the group of pig butchering cases that

13 we're talking about.

14 A      There have been three cases that I would classify as

15 specific pig butchering.

16 Q      Okay.  What's the most common form of cryptocurrency

17 scam?

18 A      Theft of crypto assets.

19 Q      Are investment scams the most common form of

20 cryptocurrency scam?

21 A      I mean, that's a very broad definition.  Again, I don't

22 make distinctions on most common scam.  Can you be more

23 specific on what you mean by an investment scam?  Maybe I can

24 answer the question then.

25 Q      Sure.  Why don't you take a look at Exhibit E, if you

1   have that handy again, that's the 2023 crypto crime report

2   that was attached to your declaration.

3   A      Yes.

4              UNIDENTIFIED SPEAKER:   Tab 6.

5              MS. TOWNSEND:   Tab 6.   Thank you.

6   BY MS. TOWNSEND:

7   Q      Can you look at page 91 --

8   A      Yes.

9   Q      -- of that?

10  A      Yes.

11  Q      I believe I have the right page -- oh, I apologize, 92.

12  I had the wrong page.   It's 92 at the bottom.

13  A      Yes, ma'am.

14  Q      Does this -- hang on a second.   I want to make sure I'm

15  not pointing you in the wrong direction.

16             THE COURT:   Are you referring to 92 of the report

17  or the page numbers at the top?

18             MS. TOWNSEND:   That is the issue, Your Honor.

19  Thank you.

20  BY MS. TOWNSEND:

21  Q      Yes, can you take a look at page -- it's 47 at the

22  bottom, 91 at the top, I believe.

23         (Pause)

24  A      Yes, ma'am.

25  Q      I apologize.   I think I just have the wrong page for

1 | you and I don't want to tell you the wrong thing.  Give me
2 | one second.
3 | A     I do recall the statistics in this report that --
4 | Q     You do?
5 | A     -- reports investment scams as -- is that what you're
6 | referring to?
7 | Q     That is what I'm referring to and -- well, let me ask
8 | you this first.  You've read this report, using the
9 | definition of investment scam that's utilized in this report,
10 | is it your understanding that investment scams are the
11 | largest or, by far at least, the most -- the largest by
12 | revenue of any type of cryptocurrency scam?  Let me know if I
13 | botched that.
14 | A     I believe -- again, this is going from memory, not
15 | reading off the report, but memory serves that they did
16 | report investment scams as the highest volume and romance
17 | scams being the most damaging per individual victim, I
18 | believe that was those two qualifications were in that same
19 | reference within the report.
20 | Q     How would you -- what's your understanding in terms of
21 | how it's utilized in this report of what an investment scam
22 | is?
23 | A     It's a very wide spectrum from individual token
24 | offerings being minted and presented as an investment
25 | opportunity that those behind that scheme then quickly exit

1  the opportunity with investor funds, it's called a rug-pull,

2  all the way down to the other end of the spectrum to

3  conducting some of the schemes we've identified and discussed

4  today where I manipulate you into a cryptocurrency investment

5  that is either fraudulent or intended to abscond with your

6  funds that you are purportedly investing in cryptocurrency.

7  Q    This report addresses pig butchering separately, it

8  doesn't treat it like an investment scam; right?

9  A    I would not want to testify to the contents of the

10  report with that level of specificity.  It's a lengthy report

11  that I reviewed, but I don't make those types of very

12  specific analyses from the report.

13  Q    Can you look at page 87 of the report?

14           THE COURT:  Before we move on, Ms. Townsend --

15           MS. TOWNSEND:  Yes, Your Honor.

16           THE COURT:  -- let's take a short recess.

17           MS. TOWNSEND:  Of course, Your Honor.

18           THE COURT:  Recess until 11:30, we'll come back.

19           During the break, you're not allowed to talk to

20  anybody about your testimony.

21           THE WITNESS:  Yes, sir.

22       (Recess taken at 11:15 a.m.)

23       (Proceedings resumed at 11:31 a.m.)

24           THE CLERK:  All rise.

25           THE COURT:  Thank you, everyone.  Please be

 1  seated.

 2          Ms. Townsend, you may proceed.

 3          MS. TOWNSEND:  Thank you, Your Honor.

 4          And I don't have much more left.  I think that's

 5  probably good for everyone.

 6                  CROSS-EXAMINATION (Resumed)

 7  BY MS. TOWNSEND:

 8  Q    Can you take a look at Exhibit E, which is Tab 6, I

 9  believe, which is the report that we were talking about

10  earlier.  I used the break time to find the section that I

11  was looking at.  Unsurprisingly, it's entitled "Scams."

12          So if you turn to page 86 at the bottom.

13  A    Yes, ma'am.

14  Q    Do you see the graph in the middle of the page there?

15  A    Yes, ma'am.

16  Q    And that is the amount of yearly -- that reflects the

17  amount of yearly crypto scam revenue, a decrease from 2021 to

18  2022 from 10.9 billion to 5.9 billion; do you see that?

19  A    Yes, ma'am.

20  Q    Do you think that's an accurate assessment?

21  A    Of the decrease?

22  Q    Of -- yes.

23  A    Yes, ma'am.

24  Q    Okay.  Can you look at the next page, page 87.

25  A    Yes, ma'am.

1   Q      And there's a graph in the middle of that page that

2   lists the top 10 crypto scams by revenue in 2022; do you see

3   that?

4   A      Yes, ma'am.

5   Q      The top being TheHyperVerse.net; do you see that?

6   A      Yes, ma'am.

7   Q      What kind of scam is that?

8   A      I did not investigate or research the individual scams,

9   so I could not testify to that.

10  Q      Do you have any reason to doubt the representation in

11  the paragraph below that graph that states:

12          "All 10 of 2022's top scams were investment scams,

13  which is a category dominated overall scam revenue last

14  year."

15  A      I do not have a reason to doubt that.

16  Q      If you look at the next page, page 88, I just wanted to

17  flag this for you.  It indicates a guide to the scam

18  categories we track.

19          Does this reflect a distinction between romance scams

20  and investment scams, for example?

21  A      This analysis does, yes.

22  Q      And does it treat pig-butchering scams as a form of

23  romance scam?

24  A      Yes, it does.

25  Q      You testified earlier today that in your view, and I'm

1  going to paraphrase, because I'm just going on my notes, so

2  if I get something wrong, feel free to correct me, but I

3  understood your testimony to be that the vast majority of FTX

4  consumers didn't demonstrate a high level of sophistication

5  because they fell for, I think the term you used was

6  "investment approach."

7        Can you explain what you meant by that.

8  A    What I was trying to explain with that, my response, as

9  I remember, was to a question about digital asset and crypto

10  technical sophistication.

11        Does that reflect what you're getting at?

12  Q    I understood you to be testifying that you thought FTX

13  consumers, debtors' customers, in particular, were, I think

14  the term you used was "less technical" and the rationale, I

15  think that you gave for that was they fell for investment --

16  they gave up their keys with an investment approach.  And I

17  was hoping you could explain what you meant by that.

18  A    So what I mean by that, the word "fell," I don't know

19  if --

20  Q    I don't think you used that, so go ahead.

21  A    Okay.  When asked the question about technical

22  sophistication of a crypto user, generally users who

23  participate in an exchange are not, by nature, and by

24  default, the most technically sophisticated, because an

25  exchange is designed to be an easier and less-manual way to

1  participate in cryptocurrency offerings and operations.

2        The technical aspect of how an exchange works requires

3  that you are surrendering your private keys to the eventual

4  wallet that your investment goes into, because the exchange

5  holds omnibus accounts and uses the entirety of funds for

6  different business processes.  And by nature of that, they

7  need your keys -- they need the keys to that wallet that

8  receives your funds.

9        As a general rule, the more technically sophisticated

10  and security-conscious crypto user will have a cold storage

11  or maintain possession of their keys at all times.  And I

12  think the second part of that is, my assessment of that is

13  based on -- was based on -- is based on FTX, their marketing

14  approach that specifically highlighted and ease of use and

15  not requiring a high level of technical acumen with digital

16  assets or cryptocurrency.

17  Q    Okay.  Thank you for that clarification.

18        Is that to say that in your view, someone who uses an

19  exchange is -- strike that.  Let me ask it this way.

20        In your experience, is it common for an individual who

21  is a novice in investing in cryptocurrency to hold, say, more

22  than $10 million in an exchange?

23  A    Can you repeat it one more time?

24  Q    Sure.  In your experience, is it common for an

25  individual who is a novice when it comes to cryptocurrency

1  investing to hold, say, $10 million or more in an exchange?

2  A     I wouldn't call that common, based on the amount of

3  crypto involved; I mean, that's a very high volume.  So, you

4  know, our investigations don't involve individuals with one

5  holding of that amount in an exchange.

6  Q     Just to make sure that I'm focused on the piece of my

7  question, would you expect for a person to have that -- an

8  individual to have that volume of investment in an exchange

9  if they had no experience in cryptocurrency?

10  A     I wouldn't expect it, but I wouldn't be surprised by

11  it.  There are individuals, high-net worth individuals who

12  got into cryptocurrency offerings at a very quick pace and

13  were caught up in the promise of cryptocurrency in many

14  circumstances.  So it's not a common practice, but it would

15  not be unheard of.

16  Q     In your experience, have you ever known an individual

17  cryptocurrency investor with a novice, new to cryptocurrency,

18  with $10 million or more in a single exchange?

19  A     Have I had personal experience with those

20  circumstances?

21  Q     Correct.

22  A     I have not.

23  Q     You testified earlier about, I believe you called it --

24  I may mischaracterize this -- the "mental state" of

25  individuals who -- strike that.  Let me restart and be a

1  little clearer.

2      You testified earlier about your views as to general

3  mental state of individuals who may be customers of debtors,

4  whose names are redacted in this case.  Do you think that

5  individuals whose -- who have money potentially tied up in

6  this bankruptcy would be more cautious of investment and

7  other types of scams moving forward?

8  A    I think that's a possibility.

9  Q    In your experience, has being the victim of some form

10 of cybercrime, let's say, made people more wary, more aware,

11 more cautious of potential future scams?

12 A    Yes.

13          MS. TOWNSEND:  No further questions, Your Honor.

14          THE COURT:  Okay.  Thank you.

15          Any other cross?

16      (No verbal response)

17          THE COURT:  Redirect?

18          MR. SASSON:  Your Honor, there's a short redirect.

19                    REDIRECT EXAMINATION

20 BY MR. SASSON:

21 Q    Mr. Sheridan, do you recall the line of questioning

22 from earlier by Ms. Sarkessian, counsel to the U.S. Trustee,

23 regarding moving assets to cold wallets?

24 A    Yes, sir.

25 Q    If FTX moved customer funds to cold wallets, does that

1  mean that those customers don't necessarily have other

2  cryptocurrency in hot wallets elsewhere?

3  A     It does not.

4  Q     So customers -- so a customer can be targeted with

5  respect to their crypto or fiat currency, completely

6  unrelated to the fact that FTX moved their assets to a cold

7  wallet in these bankruptcy cases?

8  A     Yes, sir.  Not only could their other assets be

9  targeted, but their profile would be used to facilitate

10  further criminal schemes; in other words, if an individual is

11  identified as a known cryptocurrency investor, it is possible

12  to identify and use their identity to perpetrate other

13  schemes leveraging that information.

14  Q     And if I were to stipulate to you here today that the

15  FTX debtors have moved, or are in the process of moving all

16  of their cryptocurrency to cold wallets in these bankruptcy

17  cases, does that change your conclusions at all, as set forth

18  in your declaration?

19  A     No, sir.

20  Q     All right.

21         MR. SASSON:  Nothing further, Your Honor.

22         THE COURT:  Thank you.

23         UNIDENTIFIED SPEAKER:  Nothing, Your Honor.

24         THE COURT:  Thank you.  You may step down,

25  Mr. Sheridan.  Thank you.

1          THE WITNESS:  Yes, sir.

2      (Witness excused)

3          MR. GLUECKSTEIN:  I think that concludes the

4  evidence, Your Honor.

5          THE COURT:  Okay.

6          MR. GLUECKSTEIN:  So I think we can move to

7  argument.  I will address first --

8          MS. SARKESSIAN:  Before we move to argument, Your

9  Honor, I just want to have a clarification.  There was an

10 affidavit that was attached to the motion of the Ad Hoc

11 Committee of an individual whose name was redacted.  They

12 have not introduced that person as a witness, so I just want

13 to clarify that that declaration will not be part of the

14 evidence at this hearing.

15         THE COURT:  It is not.

16         UNIDENTIFIED SPEAKER:  It's not, Your Honor.

17         MS. SARKESSIAN:  Thank you, Your Honor.

18         MS. TOWNSEND:  A similar clarification with

19 respect to the declaration of Philip James, which was also

20 attached, I think, as 1139.

21         MR. WENDER:  Just to get this on the record, Your

22 Honor, David Wender with Eversheds, we're not seeking to

23 introduce those.

24         With the evidence submitted by the Committee and

25 certain limitations of bringing an individual here without

1  the protections of hiding their identity, we did not move

2  forward with those and we're relying on the evidence admitted

3  in court today.

4         THE COURT:  All right.  Thank you.

5         That's not -- that declaration is not in evidence

6  either.

7         MR. WENDER:  Thank you, Your Honor.

8         THE COURT:  Go ahead, Mr. Glueckstein.

9         MR. GLUECKSTEIN:  Good morning, Your Honor.  Brian

10  Glueckstein, Sullivan & Cromwell, on behalf of the debtors.

11  Your Honor, by the joint motion that was filed by the debtors

12  and the Committee, the Movants jointly seek to extend the

13  period by which customer names should be redacted from public

14  filings in these cases, unless voluntarily disclosed by those

15  customers.  Your Honor, we submit, and Your Honor's heard

16  evidence on two independent bases to do so.

17         Section 107(b), Your Honor will recall that under

18  Section 107(b), an order was entered in January that

19  permitted the redaction of addresses, any known addresses of

20  the debtors' creditors and equity holders or natural persons

21  on a permanent basis, but limited the redaction of all

22  customer names and names, addresses, and emails of

23  institutional customers for an additional period, pursuant to

24  Section 107(b)(1) of the Bankruptcy Code, subject to

25  extension.

1          The basic premise of the Court's January order was

2    that the debtors' customer lists, including names and contact

3    information for both individuals and institutional customers

4    are an asset of the debtors' estates and a potential source

5    of value for creditors.  Mr. Cofsky, the debtors' investment

6    banker testified again yesterday before Your Honor that that

7    value remains today; in fact, Mr. Cofsky testified that the

8    debtors are actively running a process seeking to determine

9    how to maximize value from the core exchanges of FTX.com and

10   FTX U.S. to a variety of structures that could include their

11   sale as assets or reorganization.

12         The testimony yesterday from Mr. Cofsky was clear

13   that, as the debtors' investment banker, the customer lists

14   containing nine million names is a significant portion of

15   that value in any scenario, including, even, the possibility

16   of selling the customer lists with or without other assets.

17         Mr. Cofsky explained that the customer lists are

18   attractive assets for competitors and operators of other

19   exchanges and also explained why third parties would, in his

20   view, pay the debtors value for them.

21         Mr. Cofsky further described the analysis that he

22   and his team did and testified in his view the immediate

23   disclosure of any names from the customer lists, individual

24   or institutional, would harm the debtors' assets to maximize

25   the value of their assets.  The conclusion of Mr. Cofsky is

1  that a critical component of the strategy to monetize the

2  debtors' assets is the continued confidentiality of the

3  debtors' customer lists.  This testimony was unrefuted by the

4  objectors and amplified, further, the testimony that this

5  Court credited in January in issuing the prior order,

6  authorizing redactions of customer names.

7           Your Honor agreed in granting the original motion

8  that a customer list is something that is available to be

9  protected by Section 107(b) as a trade secret and that the

10  debtors' customer lists in this case met the standard.

11          Nothing has changed about the nature or

12  confidentiality of the debtors' customer lists since that

13  January hearing and we submit they remain protected by

14  Section 107(b).  The debtors are in a position to realize

15  value from these customer lists and exchange assets in

16  significant part because the customer names have been kept

17  confidential to date and the debtors should be permitted more

18  time to complete that process.

19          As Mr. Cofsky further testified yesterday, it is

20  not yet clear at this point, whether the disposition of the

21  customer lists will take place before or in connection with

22  the plan process; nonetheless, guided by the Court's prior

23  ruling, the Movants have only requested at this juncture to

24  formally extend the protection of redacting all customer

25  names under 107(b) for an additional three months from entry

1  of an order, although, it is possible, particularly based on

2  Mr. Cofsky's testimony, that a further extension may prove

3  ultimately necessary.

4         The Movants have been continuing to seek to strike

5  the correct balance to ensure the protection of their assets

6  and customer information and the continued redaction of names

7  is, in our view, appropriate to maintain that value.  This is

8  consistent with the Court's prior ruling in January and prior

9  rulings of this Court, including in the Cred case.

10        Neither the U.S. Trustee, nor the Media Objectors,

11  have offered anything new in opposition to the relief

12  requested under Section 107(b).  They offer no evidence and

13  their briefing merely recycles arguments that this Court

14  rejected in January and has been disproven by Mr. Cofsky's

15  testimony.

16        The Objectors here have no economic stake in the

17  outcome of these Chapter 11 cases and there's not a single

18  creditor or customer who has opposed the relief requested in

19  the motion, despite it being the customers who face the risks

20  both, financial and personal, from the forced, involuntary

21  disclosure of their names.  The Objectors continue to cite to

22  the general principles of the right to public access of

23  records and bankruptcy disclosure requirements.  They have

24  not provided evidence of any specific harm being suffered

25  that requires the disclosure of names and constitutional

1  addresses immediately, nor do they recognize, seemingly, the

2  Court's role in being able to modify those requirements for

3  cause shown, as the Court did with the prior order in

4  January.

5          As the Court and all parties in interest have been

6  able to observe, the debtors have been able to efficiently,

7  effectively, and completely administer these cases while

8  redacting customer names and preserving the integrity of the

9  customer lists.  Notices have been sent, pleadings have been

10  served, claims bar date procedures established, all with the

11  parameters of the relief obtained in the January order and

12  requested today to be extended.

13          Your Honor, we also submit there's no basis, as

14  suggested in the objections, for the Court to carve out

15  selective portions of the debtors' customers from the

16  redaction order, as suggested.  The somewhat arbitrary

17  request by the Media Objectors to reveal the debtors' top 50

18  creditor lists or top 50 institutional customers would

19  actually require disclosure of some of the most valuable

20  names on the list, because those are the customers with the

21  largest account balances, as of the petition date, as

22  Mr. Cofsky discussed yesterday.

23          We submit that would inflict a disproportionate

24  amount of harm and the asset value of the debtors' customer

25  lists and the Media Objectors cite no support for imposing

1   any such conditions.

2           Similarly, the United States Trustee requests

3   certain exceptions for insider of the debtors and when

4   customers would be identified in other filings in other

5   capacities.  The U.S. Trustee, likewise, offers no

6   justification for these carve-outs, pursuant to

7   Section 107(b).  The U.S. Trustee ignores the debtors' file

8   under seal, unredacted versions of all filings and the U.S.

9   Trustee has that information, to seek Court approval as

10  permitted by the order of any individual names it thinks need

11  to be disclosed.

12          Indeed, the debtors themselves, we have already

13  addressed a legitimate concern on this issue by generally

14  disclosing the names of former directors and officers who

15  might have been customers, but have been publicly identified,

16  such as Mr. Bankman-Fried and his inner circle.

17          Second, the U.S. Trustee offers no legal basis for

18  drawing the further distinction that compromising a portion

19  of the customer lists be determined protected information

20  under Section 107(b).  The debtors, in consultation with the

21  Committee, have determined that the continued redaction of

22  customer names for all purposes, thus protects the customers

23  from being identified and poached.  And there is no

24  justification presented to put those names into the record of

25  the Chapter 11 cases in any capacity.  We submit, Your Honor,

1    that under 107(b), the objections of the continued redaction

2    of the customer names, pursuant to that statute, should be

3    overruled.

4           I'm not going to address the substance of

5    Section 107(c); I'll leave that for the Committee's counsel

6    to address, but I will just note, Your Honor, from the

7    debtors' perspective, that we agree this relief is

8    appropriate under the circumstances.  Mr. Sheridan's

9    testimony confirms that the disclosure of individual names

10   will expose those customers to a very real risk of harm.

11   That's precisely the type of harm that Section 107(c) is

12   designed to protect against.

13          I think Mr. Sheridan this morning further

14   amplified the uniqueness of this situation presented by these

15   cases, which we have discussed before Your Honor previously.

16   If granted, Section 107(c) would permanently seal the

17   individual customer names, separate and apart from the relief

18   sought under Section 107(b).

19          Finally, Your Honor, we do address in your

20   briefing the debtors' position that the Court can and should

21   continue to permit the redaction of names and addresses of

22   the individual creditors; creditors who are not customers,

23   but who might be protected by the GDPR, and to the extent to

24   Japan, based on a review of the plain statutory language as

25   set forth.

1          If the other relief is granted, as requested in

2    this motion by the Movants, this is mere incremental relief

3    impacting individual, non-customer creditors in their

4    protected jurisdictions, who are most likely employees.

5    There is no need, in our view, to deviate from the

6    longstanding practice in this district to permit redactions

7    to comply with the GDPR to ensure that the debtor avoids the

8    risk of substantial fines or more in local jurisdictions.

9          The concern here, Your Honor, is not one of making

10   a finding of whether local data-privacy laws or U.S.

11   bankruptcy law trump.  On the facts of this case, again,

12   assuming -- we're just making the assumption for purposes of

13   argument -- the other relief is granted, we're talking about

14   a very narrow set of additional relief and the concern, of

15   course, is that irrespective of any findings of this Court,

16   that authorities in those local jurisdictions would seek to

17   take action against the debtors in these cases.

18          And as a result, Your Honor, we would ask, based

19   on the language set forth in the papers, that that small

20   incremental relief be granted as part of the package

21   requested today.  With that, Your Honor, subject to any

22   questions, I will turn it over to the Committee to

23   address 107(c).

24          THE COURT:  Thank you.

25          MR. PASQUALE:  It's still barely the morning, Your

1  Honor.  Good morning.  Ken Pasquale from Paul Hastings for

2  the Creditors Committee.

3          Your Honor, this Court previously recognized at

4  the prior hearing on these issues that Section 107(c)

5  contemplates sealing individual customer names, among other

6  types of personally identifying information, and the Court

7  referenced that, as does the statute, Section 1028(d) of the

8  Criminal Code, which specifies that type of personally

9  identifying information, including names.  So there's no

10 question that 107(c) provides the Court with the authority to

11 grant the relief requested in the joint motion.

12          Now, to be clear, and I say this in hearing some

13 of Ms. Sarkessian's questions, the requested relief in our

14 proposed order under 107(c) is to seal individual customer

15 names; it is not to seal creditor names, and, in fact,

16 creditor identities who are not customers have already been

17 disclosed by the debtors in the schedules.

18          Your Honor, the evidence before the Court today is

19 persuasive and completely uncontroverted, that there is a

20 significant risk to debtors' customers if their names are

21 disclosed, the debtors' customers in this case.  This is a

22 crypto bankruptcy case.  Mr. Sheridan testified about harms

23 to crypto bankruptcy customers in this case.  Not about other

24 cases, not about non-crypto cases, nothing to do with what we

25 are discussing today.

1        The objecting parties, Your Honor, quite

2   cavalierly, dismiss the risk of harm faced by the debtors'

3   individual customers, saying it's not undue risk; it's just

4   risk that everyone faces.

5        In their objection, the media parties, in

6   particular, appeal to "common sense" as the basis for many of

7   their positions.  But common sense, whatever their view is of

8   that, is not evidence and neither the Media Objectors, nor

9   the United States Trustee have presented any evidence to Your

10  Honor to contradict Mr. Sheridan's opinions and the proof in

11  the record.

12       Your Honor, just one example of that is the

13  experience in the Celsius bankruptcy cases.  We heard

14  questions today, and there was argument raised in their

15  objections, that, well, there's no proof that anyone fell for

16  those scams.  Well, no proof that people did not, either.

17  And the mere fact that they occurred, I mean, just dismissing

18  that risk, I find troubling and insensitive.

19       Once the genie is out of the bottle, Your Honor,

20  you can't put it back in and the risk will remain, should

21  names be disclosed, as occurred in the Celsius case, to those

22  customers forever.  That's a very significant risk.  That is

23  undue harm on the record before the Court.

24       Mr. Sheridan's testimony demonstrates that the

25  risk to FTX cryptocurrency exchange customers, in particular,

1    is significant given the nature of these cases and given the

2    nature of cryptocurrency.  Here, disclosing the names of the

3    debtors' customers would enable malefactors to match the name

4    with the value of the customers' assets on the exchange.

5          That information has already been disclosed on the

6    schedules anonymously, and so those who want to take the

7    time -- and as in Celsius, we know people will do this -- and

8    match the names with the value on the exchange; very much

9    akin to if a person's identity was disclosed with their bank

10   account holdings.  And as Mr. Sheridan explains, that would

11   cause significant harm to those customers.  It would enable a

12   malefactor to have that additional information to use the

13   dark web and other sources to identify and target those

14   individuals.

15         Further, Your Honor, it is illogical and

16   completely unsupported, again, no evidence presented, for the

17   Media Objectors to argue that crypto customers are

18   particularly savvy and would not likely fall for any of these

19   scams.  Well, as Mr. Sheridan testified, if that were the

20   case, the data wouldn't be what it is.  We wouldn't have the

21   volume of losses in the crypto space as a result of such

22   schemes.

23         Further, as Mr. Sheridan noted, and we all know

24   publicly, that FTX marketed to the mass market,

25   advertisements during the Super Bowl a couple of years ago

1   and the like, which, as we cite in our reply papers, with

2   particular focus on how easy it is and how you don't need to

3   know anything to invest in cryptocurrency.  There are

4   approximately nine million customer accounts; certainly,

5   those are not all savvy investors who would not be subject to

6   the types of scams that Mr. Sheridan testified about.

7           Finally, Your Honor, our burden on this motion is

8   not as the objectors contend, to show that there must be

9   certainty of undue risk.  That's not the law and, in fact, no

10  support is offered in the objecting -- excuse me -- the

11  objectors' submissions in that regard.

12          To the contrary, in the Access to 2019 Statements

13  case, the Delaware District Court on an appeal held, quote:

14          "Section 107(c) references risk and assessment of

15  risk is forward-looking, while a specific potential harm must

16  be identified, the standard does not require evidence of

17  injury having occurred in the past or under similar

18  circumstances."  That's 585 B.R. 733, 751.

19          The debtors and Committee on our joint motion have

20  more than met our burden of proof showing the specific

21  potential harms that the debtors' individual customers face

22  from disclosure of their names.  Avoiding that harm, Your

23  Honor, keeping that genie in the bottle, far outweighs the

24  policy of open disclosure in these cases, in these

25  circumstances.

1          And, Your Honor, I'd be remiss without noting that

2  on Wednesday of this week, the Judge Shannon held in the

3  Bittrex cryptocurrency bankruptcy case that:

4          The sealing of creditors' names, individual

5  creditors' names was appropriate under 107(b) and 107(c), and

6  finding as to 107(c), that the crypto industry's primary

7  purpose of allowing immediate, instantaneous, and effectively

8  untraceable transfers of value differentiates it from other

9  industries and gives rise to more material risk of loss and

10  injury to creditors.

11          The same rationale applies here, Your Honor, and

12  we respectfully request that the joint motion be granted.

13  Thank you.

14          THE COURT:  Okay.  Thank you.

15          MR. WENDER:  Good afternoon, Your Honor.  David

16  Wender on behalf of the Ad Hoc Committee of Non-U.S.

17  Customers, and, Your Honor, I'll be brief.

18          As required by the Bankruptcy Rules, the Ad Hoc

19  Committee was required, its lawyers were required to file a

20  statement by name, address, and holdings of its individual

21  members.  The Ad Hoc Committee filed its motion to seal and

22  redact that information, Judge, anticipating, hopefully, that

23  the debtors would file their motions, which the joint motion

24  was forthcoming.  We've joined in that because we seek the

25  same relief.

1          And in hearing Mr. Glueckstein's argument and some

2   of the testimony -- some of the closings already, is that to

3   ensure that a situation, we not voluntarily filed the 2019

4   required by the Code, that our requirements to file 2019,

5   which we actually supplemented earlier this week with new

6   members, are similarly protected, such that our members, and

7   even other customers who join other committees, or who might

8   be obligated under the Code to submit information, are not

9   forced to disclose information that's valuable to the

10  debtors.  They could generate value for recoveries later.

11         And it would disclose personally identifiable

12  information themselves and, in fact, we heard testimony,

13  potentially their customers.

14         And so I think that under both, 107(b) and 107(c),

15  the filings of the Ad Hoc Committee, for example, disclosing

16  under 2019 and similarly required filings, is not voluntary

17  disclosures of who we are, should be similarly protected.

18         Thank you, Your Honor.

19         THE COURT:  All right.  Thank you.

20         MS. SARKESSIAN:  And I can say good afternoon,

21  Your Honor.  Again, for the record, Juliet Sarkessian, on

22  behalf of the U.S. Trustee.

23         The debtors seek authority to redact from all

24  papers, filed or to be filed with this Court, the following

25  information, three categories:  number one, the names,

1    addresses, and email addresses of all customers, whether they

2    be natural persons or legal entities; number two, the names,

3    addresses, and email addresses of all creditors, be they

4    customers or not, or equity holders, that are natural

5    persons, if they are citizens of the United Kingdom, the

6    European Union, or Japan, and are covered by the EU or U.K.

7    General Data Protection Regulation, GDPR, or certain Japanese

8    laws; and the third category are the addresses and the email

9    addresses of customers and other creditors or equity holders,

10   who are individuals, regardless of their citizenship.

11            Your Honor, that last piece of it, Your Honor did

12   grant that in the order of January 20 on a permanent basis.

13   The other two categories were just for 90 days and we are now

14   back with a motion that the debtors, then -- actually, the

15   Movants, the debtors and the Committee, filed in April to

16   extend.  Well, the motion is to extend the categories for

17   another 90 days, but there's a little bit of a conflict,

18   because part of what they propose in the order is, on the one

19   hand, it says 90 days, but for customers who are natural

20   persons, there's another paragraph, paragraph 3, that is a

21   permanent redaction of their names.  So paragraph 2 says it's

22   for 90 days.  Paragraph 3 says it's permanent for you're a

23   customer who's a natural person.

24            My understanding, what was explained to me is

25   while paragraph 2 relates to 107(b) and paragraph 3 relates

1   to 107(c), the audience needs to be -- regardless, if Your

2   Honor is going to grant it, it has to be clear whether it's

3   permanent or for another 90 days.  That's certainly what we

4   would ask, that it be clear.

5           The documents that would be subject to these

6   redactions include documents that are the core of a

7   bankruptcy proceeding, that any debtor who is seeking

8   bankruptcy protection must file, including the creditor

9   matrix, statements of assets and liabilities, statement of

10  financial affairs, claims register, proofs of claim,

11  disclosures of professionals, such as the professionals'

12  connections with parties in interest who may be customers,

13  and then, of course, the Bankruptcy Rule 2019 statements, as

14  well as affidavits of service and many other documents.

15          It is black-letter law that bankruptcy proceedings

16  must be transparent and that transparency requires that

17  pleadings that are filed are filed on the public docket and

18  viewable by creditors, other parties in interest, and the

19  public, in general, unless certain enumerated exceptions

20  apply.

21          And, again, this is especially true for

22  information that's on, say, the schedules of assets and

23  liabilities, as well as the statement of financial affairs,

24  and very important in that statement of financial affairs is

25  the transfers within the one year that the debtors made to

1  insiders, and I'll go into more detail about that later, but

2  right now, except for Mr. Bankman-Fried's name and a few, you

3  know, three or four, of what the debtor believes are his

4  closest associates, the rest of the names of insiders who are

5  customers, be they individuals or be they institutions, have

6  been redacted.

7          So the grounds that the debtors assert -- excuse

8  me, the Movants assert for their position -- there's three --

9  to the extent that the persons or entities are customers,

10  they view their names being released as the equivalent of a

11  customer list that has value, either to sell or as part of a

12  reorganization.  And then, separately, under 107(c), as to

13  those customers or creditors who were natural persons --

14  wait, I just want to get clarification here.  I'm sorry.

15          Did counsel for the committee say that you were

16  not seeking to redact the names of creditors who are natural

17  persons if they're not customers?

18          UNIDENTIFIED SPEAKER:  Under 107(c).

19          MS. SARKESSIAN:  Right.  If they're not customers.

20          UNIDENTIFIED SPEAKER:  Under 107(c).

21          MS. SARKESSIAN:  Okay.  You are not seeking that,

22  okay.  And that is based on the idea of identity theft, based

23  on the name, coupled with the fact that they are a customer

24  of FTX or were a customer.  And then the third part of it is

25  those customers or other creditors who are natural persons

1  and are citizens of either, the EU, the U.K., or Japan, and

2  are covered by a foreign privacy law, that the Movants

3  believe prevents their -- or Movants already prevent the

4  disclosure of even their names; although, they have provided

5  no expert testimony whatsoever to interpret these foreign

6  laws.

7          So we're going through each part separately:  the

8  value of a customer list.  On direct, Mr. Cofsky testified

9  that the customer list has value both, in a 363 sale scenario

10 or a reorganization.  On cross-examination conducted by

11 counsel for the Media Objectors, he testified that while he

12 did not know if the customers used platforms of competitors,

13 but to the extent they do, that would degrade the value of

14 those customer names.  Mr. Cofsky also acknowledged that the

15 customers have not been able to use the debtors' platform

16 since November, since this case filed, and testified that the

17 longer that the platform is dormant, the more of the value of

18 the customer degrades, due to the fact that they may be using

19 competing platforms.

20          Now, while Mr. Cofsky may not be aware of how many

21 of FTX's customers use competitor's platforms, the

22 declaration of Mr. Sheridan, which has been admitted into

23 evidence and submitted by the debtors and the Committee to

24 support their motion, states in paragraph 25, quote.

25          "It is my understanding that a vast number of the

1  debtors' customers use other online platforms or exchanges to

2  hold assets, e.g., Coinbase, Metamask, et cetera."

3          Now, with respect to a reorganization situation,

4  Mr. Cofsky testified that he believed that the customer lists

5  would have value in that situation and on my cross-

6  examination -- I'm sorry, excuse me -- on cross-examination

7  by the Media (indiscernible) parties, he testified that he

8  had not conducted any survey or analysis to determine whether

9  the customers would want to stay with the debtors and use

10 their platform if and when the platform ever becomes

11 available again.

12         Now on my cross-examination, I asked Mr. Cofsky

13 why he believed that FTX customers who have had their

14 accounts frozen for now 6 months and potentially more than a

15 year by the time we get to the plan stage, the plan

16 solicitation stage with no access to their cash -- not just

17 their crypto, but no access to their cash or their crypto --

18 would continue to be customers of the debtor in a

19 reorganization.

20         And Mr. Cofsky's testimony in response was that

21 one of the reasons is that the customers would be getting

22 shares of the reorganized debtor, although, he admitted that

23 that was not a certainty.  He also testified it's possible

24 that customers would be getting stock in lieu of being paid

25 in full for what was in their account at the time that it was

1  frozen.

2          There is no way to know at this point, it would be

3  sheer speculation, that these customers having their assets

4  frozen for so long would want to continue to be customers of

5  a reorganized debtor based on the fact that they might be

6  getting stock, potentially in lieu of getting their cash and

7  their crypto, or some portion of the cash and the crypto that

8  was in their account.

9          Now, with respect to 107(c), Mr. Sheridan

10 testified that if the FTX customer accounts are in cold

11 wallets, which we know from (indiscernible) testifying

12 multiple times in this court that all, or almost all, at this

13 point, but I think it's all of the customer accounts are in

14 cold wallets and the customers have no way to access those

15 accounts.

16          Mr. Sheridan testified in that situation, they

17 could not -- customers could not be subject to having the

18 cash or the crypto in their FTX accounts stolen or, you know,

19 transferred over to them in any fashion because the

20 customers, they can't be subject to a scheme to transfer

21 crypto or cash from an account that they have no access to.

22 Now, I do understand, again, that he had testified or, in his

23 declaration, said that the vast majority of these individuals

24 also have accounts on other platforms.

25          And if I understand, it's possible that they could

1   be subject to some type of scam to access their funds on

2   those other platforms, although, again, having been, as Mr.

3   Sheridan testified on cross, having been subject to

4   essentially a scheme or something very bad happening in the

5   FTX case, that they might be more cautious going forward with

6   other schemes that could be pushed on them, with respect to

7   crypto.

8            THE COURT:  Well, just because they're in a cold

9   wallet now doesn't mean -- a scammer could easily contact

10  them, as was done in Celsius, or identifying themselves as

11  counsel to the debtor, saying, We need your keys.  We need to

12  get access to your wallet, so that we can make sure when the

13  time comes, we can release it to you.  And they gave it to

14  them and now the scammer comes back to the Bankruptcy Court

15  and says, you know, those assets are mine.  I've got the

16  keys.  They gave them to me.  I'm the one who gets that money

17  when the time comes to distribute again under the platform.

18           MS. SARKESSIAN:  Well, Your Honor, I guess maybe I

19  misunderstood.  I understood from what the witness said that

20  in platforms like FTX, that the individual doesn't actually

21  have access to their keys; that it's kept by FTX.  Maybe I

22  misunderstood that.

23           THE COURT:  I don't think he said that they don't.

24  He said that might be.  They might have given it to them.  It

25  doesn't mean they don't have access to it themselves, as

 1  well.

 2           MS. SARKESSIAN:  Okay.

 3           THE COURT:  They might have given them over to the

 4  debtors to say, Here's the access to our keys, but I still

 5  have the key, too.  I'm not going to just give it to you.

 6           MS. SARKESSIAN:  You can see how much I know about

 7  cryptocurrency; although, I have to say at this point, I'm

 8  actually very glad that I know very little, frankly.  Well,

 9  I'm sorry, I wish I knew more, without having invested; let

10  me put it that way.  I'm happy that I knew so little that I

11  was scared to invest.

12           So, Your Honor, I think the Celsius situation is

13  obviously very unfortunate and, of course, everybody wants to

14  avoid that type of a situation.  But I think we have very,

15  very sophisticated counsel in this case representing both,

16  the debtors and the Committee, and I feel very confident that

17  they could come up with a way to, you know, prior to, if Your

18  Honor were to deny the motion, to prior to unredacting any

19  information, you know, that the debtor could communicate with

20  their customers in numerous ways to make sure that they were

21  aware that these types of things are possible and to be on

22  high alert and to, you know, sort of have a protocol that,

23  you know, nobody -- anybody that asks for your information,

24  it's not legitimate, other than this method, and the method

25  is there's going to be a bar date set with this Court and

1  you're going to get, you know, in the mail, a bar date

2  notice, a proof-of-claim form, and, you know, I'm sure there

3  are other things that can be done to -- again, there are a

4  lot of sophisticated attorneys here.  I'm sure there's a lot

5  of things that could be done to put out, you know, there

6  could be news releases, even, to warn people so that

7  everybody is on high alert.

8           Does that mean that there's not going to be one

9  person that, you know, that might happen to?  Of course, Your

10  Honor, we don't know that.

11           THE COURT:  Well, there could be many.  Even if

12  you're on high alert, I'm aware of very sophisticated law

13  firms who've been scammed.  It happens.  It doesn't matter

14  how sophisticated you are, how much you're on alert, it can

15  still happen.

16           MS. SARKESSIAN:  And we all get things every day.

17  We all get emails every day that if we clicked on them or

18  clicked on the link, I mean, bad things would happen.  I

19  mean, unfortunately in this society, everybody needs to be on

20  high alert all the time.

21           And, Your Honor, I take your point, of course, but

22  I think that things can be done to have that extra level of

23  protection.  I think in Celsius, I'm assuming there was

24  nothing sent out before this happened.  I know something was

25  after it happened, they sent out notices, but with hindsight

1   now, we know that this is a possibility and we could take

2   steps beforehand to protect, which wasn't done in <u>Celsius</u>,

3   you know, because probably nobody thought this was a

4   possibility.  I understand some of these scams were quite

5   sophisticated; again, it was a very, very unfortunate

6   situation.

7           I also want to mention in this connection, the Ad

8   Hoc Committee's objection makes an argument that, in was in

9   the paragraph 27 of their reply -- I'm sorry, the reply, not

10  the motion -- that if you know that a corporation is a

11  customer -- so, they're trying to, you know, argue why the

12  corporate customer should get protection.  I think under

13  107(c), I believe, is what they were trying to argue.

14          Now, of course, 107(c) does not apply to

15  corporations.  It says right there, "individuals," but they

16  said in their reply that, well, if you knew who the

17  corporation was, you could somehow get access to their -- be

18  able to scam their employees.

19          Now Mr. Sheridan, I think, made it clear in his

20  testimony -- no, I wasn't talking of, no, you can't get to

21  the employees.  You can get to the customers of the customer;

22  in other words, FTX's customer, if you knew who they were,

23  you could maybe get to the customers of the customer, who

24  might be other corporations, depending on what the business

25  is.

1    I don't think there was any clear testimony,

2  honestly, Your Honor -- maybe I just didn't understand it --

3  as to why it would be any easier to find out the customers of

4  some -- of a corporation that's a customer of FTX versus any

5  other corporation, frankly.  I did not think there was clear

6  testimony on that, but, again, no matter what, 107(c) does

7  not apply to anyone who's not an individual.  I understand

8  the argument about the customer list being a valuable asset,

9  and we've separately addressed that, but 107(c) simply does

10  not apply to corporations.

11    Now, I'd like to talk about foreign law.  The

12  Movants say they are not asserting that foreign law should

13  control over U.S. law, but what they're asking the Court to

14  do is effectively that.  They're asking the Court to redact

15  information, much of which is required by the debtors to be

16  filed publicly in bankruptcy cases -- again, schedules and

17  statements of financial affairs, creditor matrix -- where the

18  professionals are required to disclose, as part of their

19  retention applications, arguing that it should not be

20  disclosed for those citizens who are -- so, those individuals

21  who were citizens of these foreign countries, because there's

22  a foreign law and that under that foreign law, that they

23  could, the debtors could potentially, potentially they could

24  be fined.

25    The effect of that is you are giving precedence to

1   the foreign law over U.S. law and the debtors have not come

2   forth with -- the Movants, excuse me -- have not come forward

3   with one example of any situation in which a debtor in a U.S.

4   bankruptcy proceeding was penalized or fined by some foreign

5   authority because they released the names of creditors who

6   were individual citizens of these countries.  And I don't

7   believe they haven't given any example of any other party in

8   any U.S. legal proceeding that was penalized for doing the

9   same.

10          And they do have the burden of proof here and they

11  have failed to provide any expert testimony on foreign law,

12  which they could have done, to support their contention that

13  both, the GDPR and the Japanese law prevent the disclosure of

14  even the names of these individuals without, you know,

15  without addresses or email addresses.

16          They've also failed to provide expert testimony to

17  support their contention that the exceptions -- and there are

18  exceptions both, to the GDPR and the Japanese law that allow

19  for disclosure in connection with legal proceedings -- they

20  have not put forth any expert testimony to support their

21  argument that those exceptions do not apply here.

22          They also do not explain how the debtors are going

23  to identify which of their customers or other creditors who

24  are citizens of the EU, the U.K., or Japan, are actually

25  citizens of those countries.  In many cases, I mean, the

1  debtors said at the beginning of this case that a lot of

2  cases, they don't even have street addresses for people; they

3  only have email addresses.  But even for those that they do

4  have a street address, that tells you residency and, frankly,

5  it doesn't even necessarily tell you that.  It's just an

6  address that somebody has where, maybe, they get mail.  But

7  even if it's their residence, it doesn't tell you what

8  country they're a citizen of.

9          And I recall that there was some discussion of

10 this in the hearing in January, and I thought that one of the

11 reasons for this other hearing was to give the debtor time to

12 try to figure that out, which of their customers are actually

13 citizens.  Well, we have had no testimony whatsoever on that

14 issue or any explanation of how the debtors are going to

15 determine that question of who's a citizen.  Because if

16 they're not a citizen, I could be living in Japan, I don't

17 think I'm covered by Japanese privacy laws.  I mean, maybe

18 I'm wrong -- again, we don't have any expert here to explain

19 it -- but I don't think it -- I think the -- I don't think

20 the contention is, and I think that the laws actually state

21 that they only apply to citizens.

22         Now, going to the GDPR, again, even though the

23 debtors have the burden of proof here, the Movants have the

24 burden of proof, the motion fails to identify -- and the

25 Movants have not provided any evidence that they have pursued

1   any threshold assessment of the risk of penalization under

2   the GDPR.  There is, for example, no proof that was

3   introduced that the debtors sought consent of any of their EU

4   or U.K. creditors or customers, because that's an exception.

5   If you get their consent, you can disclose the names.  So

6   there's been no evidence that they tried that route.  In

7   addition, and that's under GDPR Article 49(1)(a).

8         The motion also fails to demonstrate that the

9   debtors have made any inquiry with the applicable EU, GDPR

10   supervisory authority, or the U.K. Commissioner about the

11   lawfulness of transferring the names of the EU or U.K.

12   creditors to the U.S., by filing that information in the

13   bankruptcy cases, pursuant to the requirements of the

14   Bankruptcy Code and the Bankruptcy Rules.

15         They could seek a permit from the supervisory

16   authority or the U.K. Commissioner.  They have not indicated,

17   they have not produced any evidence to show that they have

18   done so.  And, particularly, in light of the tenets of the

19   legal claim exception, the exception to allow information to

20   be produced in legal pleadings and the discretion that's

21   expressly given by the GDPR to the debtors' supervisory

22   authority or the U.K. Commissioner, and the strength of the

23   American laws that mitigate in favor of full disclosure in

24   these bankruptcy cases, these types of diligence by the

25   debtors are crucial at this stage of the -- excuse me -- at

1  the implementation of the GDPR and critical to the debtors'

2  faithful fulfillment of their fiduciary duties in this case.

3        All they do is say, Here's the law.  There's a

4  possibility we could be penalized.  We haven't taken any

5  steps.  We -- there are steps that are set forth in the GDPR.

6  We have not taken steps to find out if we actually would be

7  penalized by doing this.  Again, (indiscernible) this falls

8  under the exception.  We could go to our supervisory

9  authority under the GDPR and get that information, go through

10 that process.

11       They have not gone through that process.  All they

12 said is:  There's a possibility we could be penalized,

13 without, again, ever giving any example of any penalization

14 ever happening to any U.S. debtor for disclosing names of

15 citizens of the U.K. or the EU, let alone, Japan.

16       Now, one of the cases that's cited by, I believe,

17 the Ad Hoc Committee in support of their argument in this

18 regard is Forever 21.  Forever 21 was mine.  I was the trial

19 attorney assigned to this case for the U.S. Trustee.

20       They quote -- they have language that they say is

21 a quote from the transcript that quotes redaction of names

22 and addresses.  That quote is not on that page.  It is not in

23 the transcript -- I did a word search -- and repeatedly

24 throughout -- it was Judge Gross' case -- you can see

25 throughout, Judge Gross talks about the addresses, the

1   addresses.

2           That's what -- the debtors were represented by

3   Kirkland & Ellis.  The debtors moved -- their motion was not

4   to redact the names; it was only to redact addresses of

5   citizens of the EU and also addresses of their employees.

6   But putting that aside for the foreign law, it was just

7   addresses.  They did not request the names to be redacted.

8   If you read the transcript, that is clear.  There was no

9   order that was entered that allows for the redaction of names

10  of the citizens of the EU.

11          And one can look at the entire docket, there is no

12  evidence that Forever 21 was ever penalized under the GDPR,

13  for releasing names.  They're right in the creditor matrix.

14  They're in the schedules.  Their -- the addresses were

15  redacted, but the names were not.

16          Now, moving on to Japanese law, in the initial

17  motion that was filed by the debtors, and that was November/

18  December of last year, there's no mention of Japanese law.

19  They just -- I had a paragraph, maybe, on the GDPR.  It said

20  very little.  But there was no mention of Japanese law at

21  all.

22          And the reply on that motion, which was probably

23  filed in early January, was one paragraph that referenced

24  Japanese law.  There were some paraphrases of some portion of

25  it.  There was no translation attached.  There was no -- even

1   a website given to where to find this Japanese law.  Nothing.

2          At the January 20th order that Your Honor entered,

3   there's no reference to Japanese law at all.  There's

4   references to citizens of the U.K. or the EU that are covered

5   by the GDPR and I don't believe Your Honor made any ruling

6   with respect to Japanese law.

7          So, in April, the debtors' motion, then,

8   referenced, again, one paragraph about Japanese law with no

9   reference to where one could find an English translation of

10  this law, which is, of course, relatively -- it's not a one-

11  paragraph law.

12         So the question becomes, so what happened between

13  Your Honor's January 20th order and now?  Have they released

14  the names of these Japanese citizens?  Because if they've

15  already released them -- not for those who are customers.  I

16  understand anybody who's a customer, they have redacted that

17  because they're a customer.  But any creditor who's a

18  Japanese citizen who's not a customer, if they've released

19  that information, pats on their back.  If they haven't, then

20  they've redacted it without Court authority.

21         I don't know what the answer is to that; however,

22  again, when they put in the motion, they did not tell us

23  where one could find an English translation.  So in their

24  reply, the Movants say that the U.S. Trustee did not engage

25  regarding the Japanese law.

1    I can tell you why we didn't engage.  All I had

2  was their paraphrase of tiny portions of it.  It wasn't until

3  the reply that they filed on Monday that they finally gave us

4  a website where we could get the law and it's quite a long,

5  you know, it's not one paragraph.

6    I'm not an expert in Japanese law, of course.  I

7  wish there was one here.  There is not.  But I look at the

8  statute and I see an exception in 27(1) that says, For cases

9  based, there's an exception to the requirements of

10  nondisclosure for cases based on laws and regulations, quote,

11  unquote.

12    The Movants say in their reply, well, that only

13  applies to Japanese laws and regulations, not foreign.  But

14  it doesn't say that.

15    So, again, we're in a situation where this Court

16  is asked to interpret Japanese -- a foreign law with no

17  expert to explain it.  The plain language, I think, says this

18  can be disclosed and, you know, if it's required to be

19  disclosed under laws and regulations.  And it is required to

20  be disclosed under U.S. law.

21    And then the Movants state the reason the Court

22  should consider Japanese laws is because if they do not

23  comply, there could be economic consequences.  To that, they

24  cite to the Japanese Financial Instruments Exchange Act of

25  Japan.  I do not have a translation.  I do not have a website

1    of where to get a translation.  I have no idea what that law

2    is about.  They are the Movants; it is their responsibility

3    to provide the Court and other parties in interest with where

4    to find certified, you know, correct translations of these

5    foreign laws.

6          If the debtors are going to take the position that

7    this Court should consider foreign laws, I think they have it

8    do everything possible to make the -- that information

9    available, not just -- the information and the interpretation

10   of laws.  Because as we know, Your Honor, Your Honor

11   interprets the Bankruptcy Code every day.  It's not just you

12   look at a page and see what it says.  So, we need an accurate

13   translation and we need to have somebody explain the impact

14   of that law and how it's interpreted and how it's applied,

15   and we don't have any of that.

16         Now, as Your Honor knows, in our objection, we

17   said in the alternative, if Your Honor is going to be

18   granting the relief requested, we wanted to have -- we were

19   hoping to have some carve-outs.  The first carve-out has to

20   do with information regarding insiders.

21         The debtors should not be permitted to redact the

22   names of insiders, be they individuals or corporations, on

23   their schedules and SOFAs.  And with respect to non -- you

24   know, corporations or other legal entities, they should not

25   be able to redact addresses, as required by the Bankruptcy

1  Code and the Bankruptcy Rules and the official forms.

2          And it doesn't matter, I mean, whether they're

3  customers or not customers, whatever it is, it shouldn't make

4  any difference.  I mean, this is a case about wrongful

5  transfers that took place prior to the petition date to

6  insiders.  So the statement of financial affairs, you know,

7  one of the critical pieces of it is a disclosure of all

8  transfers made to insiders within the one year prior to

9  bankruptcy.  And some of the names are not redacted and other

10  of the names are.

11          And when I asked why, the answer is, Well, we

12  redacted if they were a customer.  If the insider was a

13  customer, we redacted their name.

14          Okay.  So let's look at that from the legal

15  arguments that they made.  Is that protected under 107(b)?

16          I mean, there has to be a balance, of course, here

17  and the think the balance on the information regarding

18  insiders, I think the balance is very strongly in favor, even

19  if Your Honor feels that they, in general, they've met the

20  requirements of 107(b) or 107(c), in general, that these can

21  be an exception.  What is value of saying, Well, including in

22  our customer lists are insiders.

23          I mean, of course, that's not a big surprise.  I

24  don't think that that's telling anybody something they don't

25  already know, that the insiders of the company may very

1  likely be customers.  So I don't think the value, the

2  incremental value of that information is worth anything,

3  frankly.

4         Now, for those insiders who were individuals,

5  under 107(c), I mean, again, the only thing that you know is

6  that their name, which, if they're an insider, I mean,

7  they're either a director, an officer, or they have some

8  other, you know, significant connection to the debtors.  That

9  information is probably already publicly available somewhere,

10  but even if it isn't, all you're saying is the person's name

11  and they're a customer of the debtors, which, again, is

12  hardly surprising.  I mean, you're not telling somebody

13  that's not easy to guess that insiders of the debtors are

14  likely customers.

15         So it's no the really giving any more information

16  that's what's already out there.  And you have to weigh that

17  the importance of knowing who, again, publicly knowing who --

18  which insiders received one-year transfers from these

19  debtors.  Any of those other constraints have to be

20  overridden by that.

21         Now, the debtors say, let's get to me taking a 341

22  examination, which I haven't been able to do yet, okay,

23  because how do you ask questions when I can't say the

24  person's name?  Your Honor, you have to understand that --

25  and I don't know if Your Honor is aware -- that the schedules

1  and statements filed in this case are thousands and thousands

2  and thousands of pages.  So, you have two sets.  You have the

3  set that was filed on the public record that has the ECF

4  numbers; that is the information that is redacted.  And then

5  you have this other thousands and thousands and thousands of

6  pages of information.  You have to try to match it up.

7          And then let's say I match it up, okay, this

8  unredacted version has a person's name and this redacted

9  version doesn't have the person's name.  Now, how am I going

10 to conduct my questioning in a 341 in a way -- it's public,

11 right.  Creditors can be on, I mean, they're allowed to.

12 They have the right; the 341 is a meeting of creditors.  This

13 is a public examination.  So if the names are redacted, I

14 cannot say the names.

15          The record of this very important examination is

16 going to be, frankly, unintelligible, because we don't know

17 who they're talking about.  And what's going to be -- I don't

18 even know how I can possibly do this.  And, again, this

19 information is so critical in this case where there were

20 these massive -- there's been allegations of massive

21 transfers to insiders prior to the petition date.  This

22 information just cannot be redacted.  The tiny -- whatever

23 tiny value it is to know that an insider of the debtor was a

24 customer or the tiny incremental information about this

25 director or officer of the debtors, you know, was a customer;

1   yeah, again, that's not telling anybody anything they don't

2   already know.

3          And even with respect to other information, not

4   just the one-year transfers, if, for example, there's

5   transfers, there's gifts.  You know, there's been a lot of

6   allegations about some of these gifts that were given, okay,

7   charitable gifts.  Well, who received the charitable gifts?

8   Well, some of the names are redacted.  Why are the names

9   redacted?  They're customers.

10          Oh.  But you can't tell they're a customer by

11  looking at the statement of financial affairs and say, Who

12  did you give gifts to?  You can't tell who's a customer.  I

13  mean, that doesn't tell you they're a customer, just because

14  they got a charitable donation.

15          So, you know, they've created a problem.  They've

16  made their own problem, effectively.  Nobody would have

17  known.  I mean, how could you know?  Just because somebody

18  gets a charitable donation doesn't mean they're a customer,

19  presumably, one would think.

20          So, and there's other examples, Your Honor.  There

21  was a motion that was filed, and I hope I have this

22  correct -- I don't know that it matters that much -- it was a

23  motion, I believe, to reject executory contracts.  And, of

24  course, they have to list the names of who the contractual

25  counterparties are.  Some of the names are redacted.  Some of

1  them weren't and some of them were.

2           When I asked, Why are some of the names redacted?

3  The answer was, Oh, they're customers.

4           Nobody would know they were customers.  I mean,

5  there's no way to know that they were customers.  Until you

6  redacted the names, there was no way to know that they were a

7  customer.

8           This is not -- and it's different than -- with

9  respect to the creditor matrix, and there's been argument

10 there, you can have a creditor matrix.  It doesn't say you're

11 a customer.  But the debtors' argument was that the vast

12 majority of our creditors, the vast, vast, vast majority are

13 customers.

14          But, you know, you have a -- that certainly wasn't

15 true with this motion.  Maybe half the names or less -- I

16 don't remember -- were redacted.  Contract counterparties,

17 some of them are customers.  Some of them aren't.  There's no

18 way to know if you don't redact the names.  So, we also think

19 in that situation, they should not be permitted to redact

20 names.

21          Now, there's also other situations involving the

22 names of insiders, maybe apart from the schedules and

23 statements where if the debtor -- well, the U.S. Trustee

24 would ask, again, if Your Honor is going to grant the motion,

25 generally, is that any time the debtor wants to redact the

1   names of insiders in anything, anything they file, they need

2   to make a separate motion.  It should not be a given that the

3   names of insiders could be redacted.

4          There may be other very important filings in this

5   case where they're referenced to insiders.  In the plan and

6   disclosure statement, are they going to be redacting the

7   names of insiders because they're customers; again, unless

8   it's Sam Bankman-Fried and four other people?

9          I mean, so, it should not be a given.  If it's an

10  insider, they should be required to take that extra step,

11  make a motion, and then we have an opportunity -- then others

12  have an opportunity to respond.

13          THE COURT:  Okay.

14          MS. SARKESSIAN:  And, Your Honor, in the Third

15  Circuit in Cendant Corporation, which is 260 F.3d 183 (2001)

16  said:

17          "The burden is on the party who seeks to overcome

18  the presumption of access to show that the interests in

19  secrecy outweighs the presumption."

20          And I think that that is especially important when

21  we're talking about insiders.

22          And the purpose, when we're talking about

23  schedules and statements of financial affairs, the purpose of

24  requiring the debtors to disclose all their assets,

25  liabilities, and business dealings is to ensure that the

1  creditors have reliable and accurate information that they

2  can rely on to determine the status of the debtors' financial

3  affairs and to trace the debtors' financial history.  That's

4  very important in this case.  That's In re Hayes, 549 B.R.

5  677 (Bankr. D. S. C. 2016).

6         The bankruptcy schedules and statements of

7  financial affairs are designed to elicit certain information

8  necessary for the proper administration and adjudication of

9  these cases.  The balance of the rights and creditors of

10  other parties for information on insiders against the chance

11  under 107(c), the disclosure of just the names would create

12  an "undue risk of identity theft or other unlawful injury,"

13  which is from the statute, and consider that with respect to

14  an officer, director, or insider, who may already have public

15  information linking them to the debtors, almost certainly,

16  again, that balance really shifts in favor of disclosure.

17         And as to insiders who are not natural persons,

18  the balance of whatever value they have as a customer versus

19  the presumption of public access of information about

20  corporate insiders, okay, that should be released.  That has

21  to be released, as well.  I mean, to say that we're going to

22  redact the name of a corporate insider because they're a

23  customer, that balance, again, weighs very strongly in favor

24  of disclosure.

25         Just -- I'm almost done, Your Honor -- with

1   respect to the Ad Hoc Committee if the Court does grant their

2   motion, we would ask the right to reserve the right to later

3   seek their names -- just their names, not what their exact

4   holdings are or anything like that, but just their names --

5   to be unredacted if they become involved in plan negotiations

6   or otherwise take a larger role in this case.

7           And the Ad Hoc Committee says that they, quote,

8   Act in a representative capacity for the interests of all

9   non-U.S. customers, not for their own individual benefit,

10  close quote.  That's paragraph 18, I think, of their reply.

11          That's a reason to disclose the names.  I mean, I

12  think non-U.S. customers have the right to know who is

13  claiming to represent them.  I mean, right now, as far as I

14  know, they have not had a large role in the case, but if they

15  step up and the role becomes greater, just like Your Honor

16  said, the names of the committee members -- the members of

17  the Official Committee of Unsecured Creditors, those names

18  have to be released.  And if you're a corporate committee

19  member, your address has to be released, as well; Your Honor

20  had already ruled that, previously.

21          Similarly, if the Ad Hoc Committee takes a larger

22  role, we would like, again, the opportunity (indiscernible)

23  now, but the opportunity to be able to argue later that that

24  information, the members' names should be released for the

25  same reason that the Committee's information was released.

1          And, actually, in that regard, there's one thing.

2   The proposed order that Your Honor entered on January 20th

3   had a provision stating that the names of the committee

4   members had to be -- could not be redacted.  They had to be

5   released on the top-50 list or whatever the number was in the

6   top creditor list.  But that was actually -- that is not in

7   this order, this proposed order.  So we would certainly ask

8   that that be -- we want that to be clear that those names,

9   just like Your Honor previously ruled, that that would

10  continue to be the case.

11         And just in conclusion, Your Honor, you know, one

12  thing that the debtors argue is that, and, again, the Movants

13  argue is that, well, they're only asking for another 90 days.

14  Although, again, for some, they're asking for permanently,

15  for the customers who are individuals, they want that

16  permanently, but, otherwise, it's just for 90 days.  It's

17  already been 6 months, so another 90 days, now we're at 9

18  months, and debtors' counsel indicated they might ask for a

19  further extension.

20         So, you know, we're -- it's been a long time for

21  this information to remain redacted.  So, again, Your Honor,

22  we believe that the Movants have not met their burden of

23  proof, but especially, again, with respect to information

24  relating to insiders or customers or non-insiders in the

25  context that one could not tell that they were a customer

1  from the context of the disclosure, we think that those

2  exceptions can be made and we think there's a reasonable and

3  important basis to make those exceptions if Your Honor is

4  otherwise inclined to grant the motion.

5           Unless Your Honor has any other questions, my

6  argument is concluded.

7           THE COURT:  Okay.  Thank you.

8           MS. SARKESSIAN:  Thank you.

9           THE COURT:  I don't know about anybody else, but I

10  need a lunch break.  So we're going to -- let's recess until,

11  we'll say 1:30.  We'll come back at 1:30, okay.  Thank you.

12       (Recess taken at 12:49 p.m.)

13       (Proceedings resumed at 1:37 p.m.)

14           THE CLERK:  All rise.

15           THE COURT:  Thank you, everyone.  Please be

16  seated.

17           Ms. Townsend, whenever you're ready.

18  Ms. Townsend?

19           MS. TOWNSEND:  Good afternoon, Your Honor.  Katie

20  Townsend, on behalf of the Media Intervenors:  *The New York*

21  *Times*, *The Wall Street Journal*, Bloomberg LP, and the

22  *Financial Times*.

23           I think it's important to address at the outset

24  the applicable burdens, as well as to address, I think, why

25  the Media Intervenors are here in the first place.  Though, I

1  think it should go without saying -- I'll say it anyway --

2  the shared interests of the Media Intervenors here is

3  straightforward.  They're news organizations and they want to

4  report on what is undeniably a newsworthy bankruptcy stemming

5  from the massive collapse of a prominent cryptocurrency

6  platform.

7          That collapse sent shockwaves, not just for the

8  cryptocurrency industry, but the entire financial industry.

9  And at this point, we don't even know where those shockwaves

10  both, individually and institutionally, have hit the hardest

11  or what institutions may have the largest or no exposure, as

12  a result.  That is a compelling and legitimate interest that

13  the press and the public have in the names of the creditors,

14  also customers, in these Chapter 11 proceedings.

15          And it's a particularly salient point when we're

16  talking about the top-50 unsecured creditors.  That

17  distinction is not -- I think it's, as has been suggested, an

18  arbitrary one.  The top-50 creditors are those institutions

19  and individuals who have the most exposure or have been most

20  affected in this bankruptcy proceeding.  So I think --

21          THE COURT:  Let me ask you a question.  What are

22  your clients going to do with this?  If I say the names have

23  to be redacted -- be released, what are you going to do with

24  that information?

25          MS. TOWNSEND:  You know, I can't speak exactly as

1  to what my clients would do with it.  I assume that the

2  reporters would review that information and they would use it

3  to report on exactly what I said.

4         THE COURT:  But if all I give are the names, what

5  are they going to do?  They're going to go -- the first thing

6  they're going to do is go try to identify who the people are,

7  right?

8         MS. TOWNSEND:  Well, some --

9         THE COURT:  They're not going to report that

10 somebody named Mr. X who lives in Shanghai had a lot of money

11 invested in FTX tokens unless they verify that information.

12 And the only way they can do that is try to figure out who he

13 is.  Who's Mr. X?

14        MS. TOWNSEND:  Well, if we're talking about, Your

15 Honor, about, say, the top-50 creditors.  Let's say we're

16 talking a lot about -- we're talking about some institutional

17 investors.  So in cases like that, I think my clients

18 probably would ask for comment or attempt to evaluate what

19 the impact, potential exposure of that institution, which

20 again could have broader financial impacts.

21        There are also individuals who, frankly, my

22 clients would think would be important to report on.  If

23 Jamie Dimon, for example, someone whose views on what

24 investments are good investments to make, has a lot of

25 exposure in -- from his, let's say -- and, again, I don't

1  know this; this is just a hypothetical -- has some -- is one

2  of the top-50 creditors of FTX, would that be newsworthy?

3  Would that be important for the public at large and people

4  who may consider Jamie Dimon's investment moves to be one

5  they would want to follow, is that relevant?  I think so.

6            So, would my clients report on it?  I wouldn't be

7  here if my clients weren't -- didn't think it was important

8  to understanding the entirety of not just what's happening in

9  this bankruptcy proceeding, but the impact of FTX's collapse,

10  to understand who was potentially hurt the most.  I think we

11  do think that's important and that's why I'm here.

12            So, I think the attempts to paint the news media's

13  motives to inform the reader, its readers, and the public at

14  large about what's happening here, as in how illegitimate, as

15  wrong -- is wrong and I think it should be treated as such.

16  That said, the Media Intervenors' motives aren't really

17  relevant and it isn't the Media Intervenors' obligation, or

18  any of the objectors' obligation to demonstrate specific harm

19  from a failure to disclose that information.  It's not our

20  evidentiary burden, as has been suggested, to demonstrate

21  that we have some other interests beyond an informational

22  interest in that information.

23            The starting point is, as Your Honor knows, the

24  presumption of public access under the First Amendment, and

25  Section 107 of the Bankruptcy Code.  Transparency is the

1  rule.  It's the default in all bankruptcy cases, including

2  bankruptcy cases in the cryptocurrency context.

3         So the debtors, the Official Committee, the Ad Hoc

4  Committee, they bear the burden to demonstrate with evidence,

5  not explanation or conjecture, that all the information they

6  want to redact falls within the scope of either

7  Section 107(b) or 107(c).

8         I want to start with 107(b), which as Your Honor

9  knows, permits the protection of an entity with respect to a

10 trade secret or confidential research, development, or

11 commercial information.  This is a statutory and narrow

12 statutory exception.  It's been interpreted to apply to

13 information that's critical to the operations of an entity

14 and in order for the exception to disclosure to apply

15 in 107(b), the disclosure of information at issue must

16 reasonably be expected to cause the entity commercial injury.

17        We understand why the Court at the second day

18 hearing, would want to take an incremental step to seal the

19 names of FTX's customers and creditors, all of them, for 90

20 days; a time period that we understand was calculated to

21 maintain the *status quo* while defendants -- debtors, rather,

22 explore potential valuations of their assets.  But it's now

23 been more than a month since the expiration of that original

24 90-day redaction period and the debtors haven't given this

25 Court an additional basis to conclude that the names of

1 approximately nine million customers fall within the

2 definition of commercial information and warrant continued

3 redaction.

4          The parties are continuing to rely on the

5 testimony, solely on the testimony of Mr. Cofsky, which he

6 supplemented yesterday, where, respectfully, a little more

7 than he gave this Court back in January.  In fact, I think

8 the debtors and the Official Committee seek to concede that

9 there isn't much more to say at this point.  According to

10 their own joint motion, they have yet to determine how

11 they're going to utilize what they call their "customer

12 lists."

13          They assert that the names of the FTX customers

14 are a potential source of value, but being just a possible

15 source of value isn't enough.  And even assuming that it was,

16 the record doesn't establish the disclosure of the names of

17 FTX's customers or any subset thereof, would destroy that

18 potential value.

19          So, Mr. Cofsky maintains that the debtors'

20 customers base or maybe even just the customer list itself

21 could have potential value in a restructuring or a sale, but

22 he has yet to provide any testimony as to what he thinks that

23 value actually is, that specific value.  And he hasn't given

24 us any real world examples of what value, if any, has been

25 ascribed to a list of names of customers standing alone, or

1   otherwise, in other cryptocurrency transactions, for example.

2            Moreover, the primary concern that Mr. Cofsky has

3   identified, the poaching or potential poaching of FTX's

4   customers by competitors, I think, is particularly misplaced

5   in this context.  We're not talking about some list of

6   exclusive customers.  As counsel for the U.S. Trustee pointed

7   out, the Official Committee is a witness.  Mr. Sheridan

8   testified that a vast number of the debtors' customers use

9   other online platforms or exchanges to hold digital assets;

10  in fact, he testified that it's common for cryptocurrency

11  holders to use multiple wallets or online platforms to store

12  their cryptocurrency assets.

13           So simply put, whether or not one or more of the

14  nine million or so customers with FTX accounts moves to a

15  competitor or is poached by a competitor, assuming they were

16  not already using a competitor platform, which they very well

17  may be, that may have nothing to do at all with whether or

18  not that customer also will continue to use FTX's platform at

19  some restructuring in the event that it continues to exist.

20  That determination is likely to have a lot more to do with

21  how that customer feels about FTX, rather than how it feels

22  about some competitor, because it's not an exclusive

23  relationship.

24           Nor, does the evidence, I think, support a

25  conclusion that it's reasonably to be expected that a

1  competitor could or would effectively use this list of names

2  to attempt to poach customers.  So, Mr. Cofsky testified

3  yesterday that he directed his team to locate through Google,

4  Facebook, or Twitter, some mechanism, including through those

5  platforms themselves, like a Twitter direct message, some way

6  to contact the top-200 customers of FTX and they were able to

7  do so for fewer than half of them.

8        And he testified he thought it was highly unlikely

9  that they identified the right person for only 34 percent of

10  them.  He didn't testify as to whether was any effort to

11  actually validate the results of those -- of that experiment

12  by determining whether or not they had, in fact, located

13  accurate, current contact information for those individuals

14  that they had searched for.  But even his sort of best

15  estimate of whether or not they had done a good job was only

16  34 percent.

17        That experiment, one that I think is based on, not

18  representative, and I think concededly, not a very scientific

19  methodology, fails to establish that FTX's customers could be

20  expected to, or could or would effectively operationalize the

21  names of customers to debtors' disadvantage.

22        Moreover, I think even if we assume that

23  Mr. Cofsky's testimony, which is all this Court has in front

24  of it, was sufficient to establish that the names of all of

25  FTX's roughly nine million creditors who are also customers,

 1  fall within the scope of Section 107(b), there's been no

 2  showing differentiating between different subsets.  I think

 3  there was the suggestion that Mr. Cofsky testified that the

 4  top-200 creditors, that those names would be the most

 5  valuable, but Mr. Cofsky didn't draw distinctions between

 6  specific values for specific subsets of customers.

 7          So there's no showing that a small subset of that

 8  nine million, say, the top-50 creditors, would constitute

 9  confidential, commercial information, that if disclosed,

10  would damage in a serious way, whatever potential value that

11  set of names might have.

12          I think debtors, at this point, have had, and the

13  moving parties, at this point, have had an ample opportunity

14  to attempt to meet their burden to demonstrate that these

15  names are, in fact, a primary or critical asset to their

16  business.  There are extraordinary circumstances and

17  compelling need that warrant, frankly, the extraordinary

18  level of secrecy that they're asking this Court to impose,

19  they have not met that burden, in our view, and under 107(b).

20  So, we would respectfully urge the Court not to extend the

21  redaction deadline on that basis.

22          With respect to 107(c), this is a provision, as

23  Your Honor knows, that permits the Court to protect an

24  individual with respect to the following types of

25  information:  to the extent the Court finds the disclosure of

1   such information would create undue risk of identity theft or

2   other unlawful injury to the individual or the individual's

3   property.

4           As an initial matter, Section 107(c) applies only

5   to the names of creditors, customers who are individuals, not

6   entities.  It's right there expressly in the statutory

7   language.  I don't believe that either the debtors or the

8   Official Committee, from what we can tell, unlike the Ad Hoc

9   Committee, suggest otherwise and take the position that it

10  should apply to the names of entities.

11          But for what it's worth, the Ad Hoc Committee

12  offers no case law to support this sort of expansive view of

13  Section 107(c), as applicable to entities, the names of

14  entities.  So I think any argument here, Your Honor,

15  regarding the application of Section 107(c) should be

16  understood to be relevant only to those creditors, customers,

17  who are individuals, who are natural persons.

18          As to those individuals who are natural persons, I

19  do take issue with the suggestion that I think that's been

20  made a number of times today that Media Intervenors are being

21  dismissive of potential risks of harm to individuals who may

22  be targeted or may be the victims of cybercrime.  The Media

23  Intervenors aren't being dismissive; I think we're being,

24  frankly, realistic.

25          Certainly, as we don't dispute Mr. Sheridan's

1   testimony that criminal actors like cryptocurrency.  It's a

2   means, a method for them to effectuate crime; at the same

3   time, as he testified, his testimony is he suggests there's

4   really no limiting principle to the notion of who can be

5   targeted and who can be a victim of these crimes.

6          He provided no evidence to demonstrate that

7   current cryptocurrency or known cryptocurrency users are more

8   frequently the victims of the various online scams that he

9   testified about or even that they're more frequently the

10  targets of those kinds of scams.  And as he testified,

11  unfortunately, online attacks and cyber threats, stalking and

12  bullying are endemic in today's virtual world.  And it's not

13  just in the cryptocurrency context, but bankruptcy

14  proceedings, in general, have information about creditors who

15  may have a significant amount of money tied up in a

16  bankruptcy who may be vulnerable for that reason.  To the

17  extent we take this argument to its logical conclusion, we're

18  effectively flipping the presumption of access in bankruptcy

19  proceedings on its head.

20         So I do think that there are ways.  And, again,

21  we're not dismissive of these risks, I think the position

22  that we're taking is that any restrictions on the public's

23  right to access here need to be narrowly tailored and that

24  there are alternatives to redacting the names of all of the

25  customers or a subset of those customers, and those

1  alternatives can include things like the types of notices,

2  advanced notices that were sent to customers involved in the

3  Celsius case after the fact.

4         We now have the benefit of the unfortunate

5  incident that occurred in the Celsius case.  We can

6  preemptively, or the Court, counsel, sophisticated counsel

7  representing all the various parties in this case can

8  preemptively inform interested parties, this is a potential

9  risk, that they should be wary and mindful of these kinds of

10 scams.  So there's a benefit to what happened in the Celsius

11 case that can be translated here to help, potentially, alert

12 people to the potential risks that may be out there.

13        There's also just the fact that even if these

14 individual customers were not savvy or aware of the potential

15 risks or of investment scams, they are now.  And as

16 Mr. Sheridan testified, in his experience, individuals tend

17 to become more wary of scams when they have already fallen

18 victim to one.

19        But I want to emphasize, too, Your Honor, I think

20 the evidence, it's difficult because we don't know.  We

21 certainly don't know, but there's also been no testimony

22 about the types of individuals.  And, you know, parties can

23 speculate as to whether or not they're sophisticated or not

24 sophisticated, at different sort of levels of investment in

25 the FTX platform.

1          I think, as Mr. Sheridan testified on cross, I

2     think, you know, when we're talking about the top 50

3     individuals with multimillions of dollars invested in

4     cryptocurrency, I don't think there's -- we have any basis,

5     really -- there's been no evidence to suggest -- that there

6     are novice investors in the cryptocurrency context, that they

7     don't have the means or wherewithal or sophistication to

8     attempt to protect themselves from what, again, are

9     unfortunately ubiquitous, I think, attempts at cybercrime.

10          And, particularly, I did want to emphasize to you

11     a point that I think Mr. Sheridan made in his direct about

12     the cryptocurrency industry generally.  Being a higher-risk

13     investment when it comes to making an individual sort of more

14     susceptible to, or a more -- let me put it this way -- a more

15     desirable target, potentially, for criminals, you know, he

16     indicated that the cryptocurrency industry doesn't provide

17     the sort of traditional level of protection that other

18     financial industries have.

19          I just want to note that, you know, we've talked

20     about the customers as sort of one big group, but, certainly,

21     customers who -- and, particularly, customers who are

22     sophisticated investors in cryptocurrency are well aware of

23     those risks.  They're aware that they're investing in an

24     industry that doesn't have those same protections; an

25     industry where cyber criminals may be more interested in

1   cryptocurrency assets, than other types of assets.

2            And so, again, this isn't to sort of diminish or

3   minimize any risk of, or any harm that a victim of cybercrime

4   suffers when they have cryptocurrency or other assets sold,

5   but I think -- or stolen, but I think to the extent that

6   we're talking about very sophisticated investors, when they

7   invest in a risky type of cryptocurrency investment or they

8   make a risky investment, they understand all the risks that

9   are -- we have to assume they understand the risks that are

10  attached to that investment.

11            I won't spend much time on foreign law because I

12  think counsel for the U.S. Trustee covered that quite well,

13  but I think just to reiterate, and thoroughly, just to

14  reiterate the Media Intervenors' position that I don't think

15  we even need to be talking about the GDPR or the content of

16  any foreign law, because public access to judicial records

17  filed in this bankruptcy proceeding is governed by the

18  Bankruptcy Code, the Bankruptcy Rules, the First Amendment,

19  and related U.S. law that mandates access or presumes access.

20            I think the debtors and the official committee's

21  reliance on Section 105 to argue that the Court should take

22  some additional precautions with respect to what they argue

23  might be the potential application of foreign law is a

24  concession, frankly, that neither Section 107(b), nor 107(c)

25  apply here.  And I would emphasize that Your Honor noted in

1   the January 11th, second day hearing, that the Court would

2   need evidence, expert testimony, something to address the

3   foreign law issues in this case.

4          The debtors, the Ad Hoc Committee, the Official

5   Committee have all had the opportunity to present that

6   evidence and haven't done so.  So, we would state or restate,

7   as we have in our briefing, that we don't think foreign law

8   has any basis or influence on what the Court's obligations

9   are, with respect to access to the records that are filed in

10  this proceeding.

11         And finally, Your Honor, I just want to put this

12  in a little bit of context, because I think one of the things

13  that is most striking and, frankly, most problematic about

14  the arguments that are being made for redaction in this case

15  is the lack of any limiting principle.  I think the debtors,

16  the Official Committee, and the Ad Hoc Committee argue at

17  times, expressly for a rule that would apply in all

18  cryptocurrency bankruptcies, not just this one.

19         We've heard repeatedly, this is a cryptocurrency

20  case.  Much of Mr. Sheridan's evidence turns on, again, the

21  appealability of cryptocurrency to would-be criminals and bad

22  actors.

23         I don't think that the notion of a *per se* rule

24  that permits redaction of all creditors who are also

25  customers in the context -- or who are individuals, to be

1  clear -- under 107(c), but all creditors or customers under

2  the 107(b) context, a *per se* rule that would permit redaction

3  of all of the names of those creditors, customers in every

4  bankruptcy case involving cryptocurrency, I think, is deeply

5  troubling.

6          And I don't think that there's been any evidence

7  to suggest that FTX, these Chapter 11 proceedings are

8  different in some sense or in some way than other bankruptcy

9  proceedings, with respect to the arguments that are being

10 made by the parties.

11          And if you have no further questions for me, Your

12 Honor, I will conclude my argument.

13          THE COURT:  Okay.  Thank you.

14          Mr. Glueckstein, what, exactly -- I just want to

15 make sure I understand what the debtors want to have sealed

16 at this point.  Are we sealing all customers?  Are we sealing

17 customers and creditors?  Are we sealing -- what are we

18 sealing?  What are we asking to be sealed here?

19          MR. GLUECKSTEIN:  What is at issue today,

20 specifically, is the following.  Number one, the sealing of

21 all customer names, pursuant to Section 107(b).  We've

22 requested that for an additional period of 90 days.  That

23 includes all names for all purposes:  individuals and

24 institutional.  Number two, an alternative argument made

25 under Section 107(c).  That argument is requesting that the

1   Court grant the authority to grant -- to redact on a

2   permanent basis, all individual customer names.

3          If that relief is granted, that is, it obviously

4   supersedes the 90-day period with respect to the individual

5   portion under 107(b).  But they're completely separate legal

6   standards, of course, Your Honor, but it does not moot it

7   because we need the request with respect to the institutional

8   customers to preserve the entirety of the customer lists, all

9   the reasons Mr. Cofsky testified about.

10          Those are the primary relief that has been

11   requested.  If that relief is granted today, while there's a

12   lot of focus on an objection from Ms. Sarkessian, the

13   incremental relief, if you think about the entirety of the

14   picture of what's contained in the motion, the incremental

15   relief under what's being termed "the foreign law" questions,

16   would only be non-customers, individual non-customers, the

17   names of those individual non- -- the names and addresses of

18   those individual, non-customers, who would be protected by

19   the GDPR or the Japanese privacy law.  And as I represented

20   to the Court in my argument earlier, if we put all of those

21   pieces together, we believe it has a very limited set of

22   employees in those jurisdictions who are not otherwise

23   customers on the exchange.

24          That's what we're talking about.  Your Honor's

25   order in January already authorized the redaction of

1   individual addresses of customers on a permanent basis.  The

2   U.S. Trustee did not object to that.

3          So the question before the Court is dealing with

4   the names of customers, which is a contentious issue, as Your

5   Honor has heard over the last two days, and the names and

6   addresses of institutional customers that are on our customer

7   list.  And we have obviously taken the customer list question

8   and the monetization of that incrementally, as Your Honor

9   guided us in giving us the initial three-month period, and we

10  have asked for the extension for all the reasons that Mr.

11  Cofsky testified about yesterday.

12          The 107(c) issue, of course, redaction of customer

13  names -- and, again, addresses are already -- of individual

14  customers' names under 107(c), again, the addresses are

15  already permanently redacted -- that is a permanent request

16  and that is new evidence, entirely new evidence that we

17  (indiscernible) before the Court in an evidentiary way that

18  was supported my Mr. Sheridan's testimony and his

19  declaration.

20          THE COURT:  Okay.  Thank you.

21          MR. GLUECKSTEIN:  Just a few points on the

22  specific arguments made, if I could, Your Honor, in rebuttal.

23  And I think it's helpful, and I appreciate the Court's

24  question on focusing on what we're actually talking about

25  here from a relief perspective.

1          The other thing I think it's important for us to

2    step back and focus on is what are we asking?  We are not

3    asking for some *per se* rule that applies to all types of

4    cases.  We're not asking for some *per se* rule that applies to

5    all cryptocurrency cases.

6          Your Honor has been presented with evidence, with

7    respect to the facts of these cases.  Your Honor is also well

8    aware from overseeing these cases since November, of the

9    complexities that these cases present, the sheer size of

10   these cases, and the issues, many of which are novel,

11   presented by these Chapter 11 cases.

12         With respect to 107(b), Your Honor, there's no

13   carve-out in Section 107(b) for media outlets who might want

14   to report on high-profile people that might be on our top-50

15   or top-200 or top-9 million creditor list if the information

16   is protected by the statute as commercial information.

17         Mr. Cofsky did testify yesterday, despite

18   representations made today, that the top-200 creditor list on

19   our creditor list, he testified very clearly in the course of

20   doing his analysis, represents over $2 billion in claims.

21   There's a very significant value represented by that top-200

22   creditors that some subset of which the Media Objectors are

23   asking to be disclosed.

24         Mr. Cofsky also testified very, clearly, in

25   response to questioning on cross-examination, that his

1  opinion, as the debtors' investment banker, is that there is

2  value to the customer names, irrespective of whether the

3  customer has an account on another exchange or not.  And more

4  importantly, or as importantly, I should say, whether the

5  debtors are going to try to reorganize or restart the dot com

6  exchange or sell the customer list as either on its own or a

7  part of a set of assets is still to be determined, as

8  Mr. Cofsky testified.

9         And the premise of his testimony, based on the

10 process that's being conducted now by the debtors, is that

11 competitors, third parties have -- see value in that customer

12 list.  So they're going to put whatever value they put on

13 their list and they're going to do whatever valuation they're

14 going to do as to whether those customers or whatever

15 analysis they might be able to do about whether -- and risk-

16 adjust for those customers being on other exchanges or

17 whatever they might do, but at the end of the day,

18 Mr. Cofsky's clear testimony said his view, as the debtors'

19 investment banker, is that there's value available to these

20 estates by preserving the confidentiality of the customer

21 list, and that's the argument that we've asserted under

22 Section 107(b).

23        There was suggestion about, Well, we can solve

24 lots of problems if we just give notices or give more

25 notices.  I guess that starts to get into 107(c) issues on --

1    I'm sure Mr. Pasquale will have something to say about

2    that -- but as the Court observed during the course of the

3    hearing today, there's certainly limitations to noticing.  I

4    don't think anybody would suggest that just sending out a

5    notice to people is going to solve these problems from that

6    perspective.

7            With respect to the foreign law issues raised,

8    again, this is, you know, this is ancillary to the relief as

9    we've presented it.  Yes, we have not brought foreign law

10   experts in to interpret those statutes.  I think the term

11   which is used in argument by the Media Objectors' counsel,

12   that that relief, that incremental relief is somewhat

13   precautionary.  That is how we've presented it.

14           We don't -- until very recently, that would not

15   have been controversial in this district.  Ms. Sarkessian

16   talked about how we haven't presented a case where there has

17   been a debtor that has been sanctioned under these

18   circumstances.  Until very recently, the U.S. Trustee's

19   Office didn't object to this relief; in fact, we cite in our

20   reply papers, a string cite of cases, including cases by Your

21   Honor where this relief with names and addresses was

22   routinely granted.

23           And we understand, and we understand that there

24   are issues presented and issues that courts have begun to

25   grapple with respect to whether some of these foreign

1  statutes would take precedence over U.S. Bankruptcy law

2  issues.  I don't think, though, Your Honor, under the

3  circumstances, that that precludes this Court in the

4  context -- again, everything that we're doing here -- if Your

5  Honor agrees with the Movants that we are going to be

6  redacting and it's appropriate under the facts of this case

7  to redact the customer lists, to redact the customer names,

8  we submit that the risk that is presented by the plain

9  language of the statute, that we don't need an expert to

10  testify about, is enough to grant that incremental relief.

11  But it is certainly very much ancillary to the relief we're

12  asking for today.

13         And, finally, Your Honor, just in response,

14  because there were suggestions made or intimations made by

15  Ms. Sarkessian, the debtors have complied with the Court's

16  January order, to the letter of that order.  So, we have not

17  made redactions in Japan or any other law that's not covered

18  by that order.  And so, I just wanted to be clear about that,

19  we have -- obviously, that order -- there was an evidentiary

20  hearing to get that order put into place.  There were

21  negotiations over the language in that order, including with

22  the U.S. Trustee's Office, and the Court entered that order

23  in January and that order remains in place.  That was a final

24  order on our first day motion and the motion we're asking for

25  today is, obviously, incremental to that.

1          THE COURT:  Address Ms. Sarkessian's argument that

2   the debtors have redacted the names from other pleadings of

3   customers.

4          MR. GLUECKSTEIN:  We have redacted names of

5   customers from --

6          THE COURT:  She raised the contract rejection

7   motion, the names were redacted in that because the debtors

8   said, Well, they were customers.

9          MR. GLUECKSTEIN:  Well, we have redacted customer

10  names.  I don't know if that was in the motion itself.  I

11  think this mainly occurs in things like affidavits of service

12  and the like.  But we have redacted customer names wherever

13  they have appeared.  We have done that after consultation

14  with the Creditors Committee.

15          We do, you know, it has been our position that

16  customer names should be redacted.  That has been done or

17  that's been authorized, and so we have -- in order to assure

18  that customer names are not in the public domain on the

19  docket of this case in an involuntary way, we have redacted

20  those names wherever they appeared.

21          THE COURT:  Well, here's -- I have a problem with

22  that one.  I have a problem with the issue that if, in fact,

23  there was a motion to reject contracts that included the

24  names of the counterparties to those contracts and some of

25  the names of those counterparties were redacted because

1   they're also a customer of the debtor, that's problematic

2   because no one would know that they were a customer of the

3   debtor unless you redacted it.  They wouldn't know it because

4   they're already redacted from the customer list.  So you

5   can't redact a name from a motion when they're a counterparty

6   to a contract.  I'm just using that as an example.

7          I think one of the other ones she used was

8   charitable donations, parties who receive charitable

9   donations.  You can't just redact their names because they

10  also happen to be a customer because, again, nobody would

11  know that they were a customer.

12         MR. GLUECKSTEIN:  So, I don't recall the contract

13  rejection motion that Ms. Sarkessian is referring to.  I

14  don't recall offhand whether that was in the -- is the

15  scenario that Your Honor is positing.

16         This issue arises mostly in the context, as I

17  said, of things like affidavits of service, where we're

18  serving people who are in capacities where they might also be

19  customers, things like that.

20         But I understand Your Honor's point and we

21  obviously will take -- you know, we will obviously proceed

22  forward with any guardrails that Your Honor imposes upon us.

23         THE COURT:  All right.  Thank you.

24         MR. GLUECKSTEIN:  Thank you.

25         MR. PASQUALE:  Good afternoon, Your Honor.  Ken

1  Pasqual for the Committee.  Just very quickly.

2          I think I've addressed in my prior comments and in

3  the Committee's pleadings, most of the points that were

4  raised in opposition to the motion, but just two things if I

5  may?  First, with respect to the notices that might go out,

6  as Ms. Townsend said, "after the fact," we shouldn't have to

7  deal with "after the fact" attempts to correct information

8  when it is disclosed.  That's the genie example I mentioned

9  earlier.  Once the names are out, no matter how much warning

10 we give people, the harm can be done, as Mr. Sheridan

11 testified.

12          Counsel also argued that customers accepted the

13 risks attached to an investment in cryptocurrency.  Yes, as

14 an investment in cryptocurrency.  They did not accept the

15 risk of an involuntary -- excuse me -- of involuntary

16 disclosure of their names in a bankruptcy case that they

17 didn't expect to happen and certainly didn't accept the risks

18 that such a disclosure would expose them too, again, as

19 Mr. Sheridan testified.

20          That's all I have, Your Honor.  Thank you.

21          THE COURT:  All right.  Thank you.

22          MS. SARKESSIAN:  Your Honor, could I have a moment

23 to speak to counsel for the Ad Hoc Committee before he does

24 his argument?

25          THE COURT:  Okay.  If it will resolve the issue.

1        (Pause)

2            MR. WENDER:  So, Your Honor, for the record, David

3   Wender on behalf of the Ad Hoc Committee.

4            And just to explain the discussion before, there

5   was a little bit of back-and-forth with Ms. Sarkessian and

6   myself as to whether the language came from in our pleading.

7   We referenced the transcript.  That actually was incorrect.

8   It's in the order where we got that quoted language from.

9            Ms. Sarkessian rightly pointed out, basically, it

10  wasn't in the actual transcript.  There's history.  I was not

11  involved in that case, but we got the language from the

12  order.  I don't think that's essential for today, but I just

13  wanted to clarify that it was coming from different places.

14  Neither one of us were attempting to mislead the Court.

15            Now, Your Honor, you asked Mr. Glueckstein what he

16  wanted and since we also have our separate motion, I wanted

17  to answer that question on behalf of the Ad Hoc Committee,

18  because our motion was filed -- first of all, we joined the

19  relief requested in the joint motion, because we think it's

20  appropriate to protect customers.

21            With respect to the Ad Hoc Committee's motion, it

22  was to protect the disclosures in the 2019 statement to

23  redact customer names and addresses.  Ad Hoc Committee

24  members are non-U.S. customers and that information is sought

25  to be protected.

1          The reason why we seek it both under 107(b)

2   and 107(c) in relying on the evidentiary record is a little

3   different because in 2019, and if you looked at the actual

4   redacted 2019 that's on file here, it lists redacted form

5   name, the redacted form address, but it also discloses their

6   economic interests, which is required under 2019, including

7   in certain instances, where they had records of actual,

8   traceable cryptocurrency.

9          And so, and the reason why I wanted to focus on

10  that and talk about 107(c), again, under 107(b), the debtors

11  in the joint motion say they want to protect those customers

12  because they might be able to obtain value from it.

13         But in 107(c), and people's focused on, well, it

14  only protects individuals, and that's what it references.

15  But if you actually look at the language in 107(c), is it

16  protects the individual if the disclosure would create undue

17  risk to individual or the individual's property.

18         And this, the property that we're talking about

19  is, again, it's the investments of these entities and some of

20  them it's, Oh, there's no evidence, but I'll just state it or

21  single-person LLCs, but their property, we could put at risk.

22  And if you look at the individual and if you look, again,

23  at 107(c), it references 102(d)(7) of Title 18 -- or

24  sorry -- 102(d) of Title 18.

25         And Subsection 7 of that says, any name -- and

1  we're talking about the information protected -- any name or

2  number that may be used alone or in conjunction with other

3  information to identify a specific individual.  And by having

4  this information, you heard the testimony about the ability

5  to trace on the blockchain and the dark web who owns it and

6  who's involved, we think 107 would apply.

7          Whether it's to everybody, maybe since the joint

8  motion isn't seeking that relief, but we think relative, at

9  least to the 2019 statement, that that would apply to

10  protect, so we don't have to come back in 90 days to re-seek.

11          Now, again, we said this in our pleadings, without

12  prejudice to the U.S. Trustee to come and seek disclosure;

13  that reservation is always there for her.

14          So what the Ad Hoc Committee is seeking for is an

15  order clarifying that when we file our 2019 statements, the

16  ones that have already been filed, that we may redact the

17  names and addresses of our individuals -- of our customers

18  that are both, individuals and non-individual members of the

19  Ad Hoc Committee.

20          THE COURT:  What does the Ad Hoc Committee intend

21  to do?

22          MR. PASQUALE:  We are hopeful to be engaging in

23  the process there.  We have attempted, at one point earlier

24  in the case, we've talked about an official committee that

25  didn't go anywhere.  We're trying, hopefully -- and it's

1  early stages -- to hopefully, although, not in a

2  representative capacity, because we're not, but ensure that,

3  and although there is an unsecured committee, we think that

4  there are certain aspects that the Unsecured Creditors

5  Committee cannot fully represent non-U.S. customers, and so

6  we are hopeful that we will be involved in the process.  So

7  what extent?  We will see.

8          To hope that there's a plan that we can, as a

9  voice and someone who can speak to non-U.S. customers can

10  say, we think is in the best interests of all non-U.S.

11  customers, as well, and support that.

12          THE COURT:  All right.  Thank you.

13          MR. PASQUALE:  Thank you, Your Honor.

14          THE COURT:  All right.  Well, here's what I'm

15  going to do.  With regard to the redaction of customer names

16  under 107(b), I think the evidence presented was

17  uncontroverted that customer identification has value.  It

18  has value to the debtors' estates.  And under 107(b), the

19  customer names constitute a trade secret, as I said, back in

20  January.  And as a result, those names can continue to be

21  redacted for an additional 90 days while the debtors continue

22  to seek how they're going to come out of these bankruptcies;

23  if they're going to sell the assets, including the customer

24  lists, or if they're going to reorganize, in which case,

25  they're going to want the customer lists.

1          The fact that the customers might not be exclusive

2   customers, and I don't -- some of them might be.  Some of

3   them might not.  I mean, we've got nine million customers;

4   that's a lot of people.  I have no way to parse that.  I

5   don't think anybody has a way to parse that out.

6          So the best way to deal with the issue is to say

7   that all of the customer names continue to be redacted.

8          The 107(c) issue, Mr. Sheridan introduced very

9   compelling testimony; again, uncontroverted testimony, about

10  how customers can be identified just by a name.  It's

11  something that happens all the time in our society today,

12  given the access to, not just the types of information we all

13  have access to -- Google, Twitter, et cetera -- but the dark

14  web, where there's all kinds of information about individuals

15  that can be found with just a name.

16         And he testified, again, very compellingly, that

17  if they have a name and they are an FTX customer, they can be

18  targeted, and that is what we need to protect here.  It's the

19  customers that are the most important issue here.  I want to

20  make sure that they are protected and they don't fall victim

21  to any types of scams that might be happening out there.

22         So I'm going to grant the motion, as well, to

23  redact customer names under 107(c) for individuals, on a

24  permanent basis.  It obviously does not cover companies or

25  entities.

1          On the foreign law issue, I simply have no

2   evidence to support it.  I know as Mr. Glueckstein pointed

3   out, I've entered orders in the past, but it's always been

4   when there was no objection.  But there's an objection now

5   and it's the right of the U.S. Trustee to make that

6   objection, so I needed to have something to show that there

7   would be harm to these individuals who might be located in

8   the U.K., the European Union, or Japan, that would result in

9   some harm to them, and I have nothing.

10          The statute, itself, at least the GDPR, is not

11   exactly clear to me.  I mean, it says they have to be

12   protected, but I really -- as I said in January, I would have

13   liked to have someone come and testify and tell me that if

14   you order the release of these names, the debtors are subject

15   to subject to some kind of sanctions.

16          I find it hard to believe that a court in the U.K.

17   or the European Union or in Japan, would say, I'm going to

18   sanction the debtors for releasing names when they were

19   ordered to do so by a Court of the United States.  That just

20   doesn't seem to be a potential possibility.  So I'm going to

21   deny the motion to that extent.

22          On the 2019 issue for the Ad Hoc Committee, in is

23   a horse of a different color.  You have an Ad Hoc Committee

24   who wants to participate actively in the case.  As I said

25   with the members of the Unsecured Creditors Committee, if you

1  want to be a member of the Unsecured Creditors Committee, you

2  have to identify yourself because people have a right to know

3  who they're litigating against and they can't do that if they

4  don't know who they are.

5           So I don't think that they are protected

6  under 107(c) or (b), and those names have to be disclosed if

7  they're going to participate.  Now, I understand that you may

8  have had some of your clients sign up for this, with the

9  expectation that I would keep that information sealed, so I'm

10 going to give you an opportunity to go back to your clients

11 and say, The judge said we can't seal these names and

12 information, so we're going to have to disclose it.  Do you

13 still want to be a member of the Committee so that they can

14 have a chance to withdraw if they want to, all right.  So

15 that motion is denied.

16           Any questions about that one?

17           Ms. Sarkessian?

18           MS. SARKESSIAN:  Yes, Your Honor.  I do have a few

19 questions.  Thank you, Your Honor.

20           Again, for the record, Juliet Sarkessian on behalf

21 of the U.S. Trustee.

22           How about redaction of the names of the insiders

23 who happen to be customers, is your ruling -- does your

24 ruling allow them to continue to redact the name of the

25 insiders on statement of financial affairs and other

1  documents?

2          THE COURT:  For now, yes.

3          MS. SARKESSIAN:  Okay, thank you.

4          THE COURT:  They're subject to the 90-day rule.

5          MS. SARKESSIAN:  Even if you cannot determine from

6  the document that they are, in fact, customers?

7          THE COURT:  Well, I mean, the debtor can only

8  redact them if they are a customer, so we're going to have

9  to -- if the debtors are redacting names of insiders who are

10  not customers, that would be a problem.  But I didn't hear

11  they were doing that.

12          MS. SARKESSIAN:  No, Your Honor.  I'm sorry, I

13  misspoke.

14          What I mean is if you look at the document, from

15  the context of it -- okay, here, transfers to insiders --

16  from the context, there's no particular reason to believe

17  that anybody is a customer or not a customer.

18          THE COURT:  Well, that kind of goes back to what I

19  was talking to Mr. Glueckstein about with regard to the

20  charitable donations --

21          MS. SARKESSIAN:  Right.

22          THE COURT:  -- and the motion for assumption or

23  rejection of the contracts.

24          You can't redact a name in some other motion where

25  they are a party to that motion, simply because they're also

1  a customer, because, as I said, nobody would know that

2  they're a customer.  I agree with you on that.

3          MS. SARKESSIAN:  So, Your Honor, if, in the

4  statement of financial affairs, when you look at the

5  transfers to insiders, there's nothing to indicate.  There's

6  no way to know if any of those insiders are customers.

7          So given that fact, is Your Honor ruling that in

8  you cannot tell looking at the statement of financial affairs

9  that these insiders happen to be customers, that they would

10 have to disclose those names?

11         THE COURT:  Yes, they do.

12         MS. SARKESSIAN:  Thank you, Your Honor.

13         And just a final question, Your Honor.  On the

14 redaction of customers who are individuals, their names, is

15 that on a permanent -- Your Honor has it on a permanent

16 basis?

17         THE COURT:  Under 107(c), yes.

18         MS. SARKESSIAN:  Okay.  Thank you, Your Honor.

19         THE COURT:  Okay.

20         MR. WENDER:  Your Honor, really quick, and I

21 apologize.  David Wender, on behalf of the Ad Hoc Committee.

22         In filing an unredacted 2019, is it just the names

23 that have to be unredacted or the addresses, as well?

24 Because under 2019, we have to disclose it.  It's -- provides

25 for the name, the address, and disclose what economic

1  interest.

2          THE COURT:  I think everything has to be disclosed

3  under 2019.

4          MR. WENDER:  Okay.  Thank you for that

5  clarification.

6          THE COURT:  Yeah.

7          Okay.  Any other questions?

8     (No verbal response)

9          THE COURT:  Okay.  All right.

10         That brings us to the main event, I guess,

11 everybody's been waiting for; how I'm going to rule on the

12 application or the motion by the JPLs to lift the automatic

13 stay.

14         I was thinking about this lying in bed at 3

15 o'clock this morning, trying to figure out what I'm going to

16 do with this mess and I was thinking:  What is the more

17 important thing here?  What do I have to consider?  What's

18 the most important thing to consider?

19         Excuse me, I'm having a little trouble with my

20 voice.

21         The most important issue in this case is what's in

22 the best interests of the customers and the creditors,

23 because that's what this case is all about; getting value

24 back to the customers and the creditors.  And that should

25 inform all of my decisions and then, particularly, this

1   decision about how to -- whether or not to lift the automatic

2   stay.

3            So, what are the issues involved here?  And it's a

4   tangle of issues here.  We have who are the customers and

5   whose customers are they?  Are they customers of FTX Trading

6   or other U.S. debtor entities?  Or are they customers of FTX

7   Digital, Inc., the Bahamian entity?  Are the assets at issue

8   held by the U.S. debtors or the Bahamian debtors?  Are they

9   held in trust for the benefit of creditors or do they belong

10  to the estates, the various estates?

11           If the assets are FTX Digital's, and I can make

12  that conclusion at some point during the course of this case,

13  are they subject to a clawback as fraudulent conveyances?

14  And those are issues that also have to be decided in this

15  case.

16           Where are the assets located?  Are they located in

17  the U.S., which gives me *in rem* jurisdiction over them?  Are

18  they located in the Bahamas, which gives the Bahamian Court

19  the *in rem* jurisdiction?

20           As I said yesterday, I'm not going to defer to,

21  and I would not defer to any other court the question of:

22  What constitutes assets of the debtors in the cases before

23  me?

24           And contrary to Mr. Shore's colorful argument,

25  it's not based on the fact that the Bahamas don't have

1   nuclear weapons.  I would do that even if it was France, as I

2   think he referred to.

3          And so the question, then, is, so where can that

4   relief be granted?  This is the only Court that can grant

5   complete relief regarding the assets that are under the

6   jurisdiction of this Court that relate to -- that are being

7   held by the debtors in these cases and that are subject to

8   the question of how to allocate them.  Do they all belong to

9   the U.S. debtors?  Do some of them belong to the Bahamian

10  debtor?

11         At this point, I don't know; that's an open

12  question.

13         Of course, this question about *in rem* jurisdiction

14  begs the question that the assets that are held in the

15  Bahamas, the Bahamian Court has control over them; they have

16  *in rem* jurisdiction.  So, how -- and that Court could make

17  its own decisions about how those assets are going to be

18  distributed and they can complete -- and the Bahamian Court

19  could say, We don't care what the U.S. Court decides; in

20  fact, I think that's what the JPLs argued to me on the first

21  day of this case.  Judge, we don't care if -- the Court in

22  the Bahamas isn't going to care what you do.  They're not

23  going to enforce any of your orders.  I thought that might

24  have been an overstatement, but that's what was said.

25         So, you know, it puts me in an awkward position,

 1 | obviously.  I certainly would have no basis to order the

 2 | Bahamian Court to do or not do anything.  I can't.  I have no

 3 | control over that Court and what they decide to do.

 4 | But because the JPLs are proposing to make a

 5 | filing with the Court in the Bahamas, which, contrary to

 6 | their arguments, goes well beyond merely asking for the

 7 | Bahamian Court to establish protocols.  My reading of the

 8 | application is they're asking the Court to make decisions

 9 | about whose assets are they?  Are they assets of the U.S.

10 | debtors?  Are they assets of the Bahamian debtors?  And not

11 | just the assets located in the Bahamas, but all the assets,

12 | including those located, here in the United States.

13 | So something -- I lost my train of thought

14 | there -- so what the JPLs are doing is they're asking the

15 | Court in the Bahamas for substantive relief that would

16 | absolutely have an effect on the debtors of this case, so

17 | they need to have relief from the automatic stay, because the

18 | assets that are here that are under the control of this Court

19 | and the debtors here, are subject to the jurisdiction of the

20 | Court.

21 | So, have the JPLs met their burden of establishing

22 | the need for relief from the automatic stay?

23 | From the evidence that was introduced at the

24 | hearing the debtors established that there are several forms

25 | of harm as to the U.S. debtors:  the criminal costs

1   associated with litigating the same issues in two different

2   courts.  It's not insubstantial; we're talking millions of

3   dollars.

4           The confusion to creditors who are trying to

5   figure out, am I a creditor in the Bahamas or am I a creditor

6   in the United States?  And those creditors, again, I go back.

7   The first issue, the first concern is, how do we protect the

8   creditors and the customers?  Those creditors, some of them

9   might want to participate, as the Ad Hoc Committee here wants

10  to participate in the case here.

11          Are they going to have to retain counsel down

12  there and participate in both proceedings and increasing the

13  costs to them?  And, by the way, incremental costs for the

14  debtors to appear and the Creditors Committee to appear in

15  the Bahamas, comes out of the pocket of the creditors.  And

16  everything goes back to the creditors, the interests of the

17  creditors.

18          And, finally, the delay in the case.  It's going

19  to take time for both courts to litigate the issues.  And I

20  know there was some discussion about having a combined

21  hearing with the Bahamas and this Court at the same time.

22  I'm not going to opine on that one way or the other at this

23  point.  But I will point out that the cost of doing that are

24  not insubstantial either.

25          As I mentioned yesterday, I was involved in the

1   Nortel case and I know it cost tens of millions of dollars

2   just to set up the infrastructure to be able to have a joint

3   hearing with the Canadian Court.

4           So we're talking about a lot of increased costs

5   that comes out of the pocket of the customers and the

6   creditors.

7           The only harm articulated by the JPLs that I could

8   discern from the testimony is that they can't carry out their

9   fiduciary duties because they can't go to the Bahamian Court

10  ask and for them to decide these issues.  But as the debtors

11  pointed out yesterday in their argument, that's not the issue

12  here.  The harm to the JPLs is not the issue; it's the harm

13  to the customers and the creditors.

14          Now, and finally, just to close out on the

15  standard for prevailing on a motion to lift stay, is

16  prevailing on the merits of the underlying claim.  And that,

17  I don't have any idea at this time.  I have no idea.  It's an

18  open issue.  It's got to be decided.  And there has to be a

19  trial if it can't be resolved.  We have an adversary

20  proceeding pending here.

21          And I know the JPLs have filed a motion to dismiss

22  that, at least partially, on the idea that it was in

23  violation of the agreement between the parties on how to

24  handle the issues between the two courts.  But I would ask

25  the JPLs to reconsider that, because we can't.  We've got to

1  get this case moving and if we're going to be arguing over

2  issues like that, it's not helpful.

3          Because at the end of the day, even if it did

4  violate the agreement between the parties, I'm probably going

5  to allow it to go forward, unless there's some other basis

6  for dismissal.  And I admit I haven't spent a lot of time

7  looking at the motion to dismiss, but if it's only based on

8  the idea that the debtors here violated the agreement between

9  the parties, I might say, Yeah, I'll slap you on the wrist

10 for violating the agreement, but I'm not going to dismiss and

11 have to start all over again.  Let's get the case moving.

12 Let's get those cases moving forward.

13         So on the -- again, prevailing on the underlying

14 issues, I don't know.

15         Now, the JPLs are certainly free to go to the

16 Bahamas Court and tell them what happened here today, advise

17 them of my ruling.  And I don't know what the Bahamian Court

18 will do in response to that, but again, I have no control

19 over the Bahamian Court.  But that might be enough to satisfy

20 their fiduciary obligations.

21         At least they'll go back and say, We tried.  This

22 is how it came out.  We lost and we need to move forward.

23         Now, I do believe, as I mentioned, you know, the

24 *in rem* issue, as between assets here and assets in the

25 Bahamas, obviously, the Bahamian Court is free to ignore any

1   ruling I make, whether or not the assets belong to the U.S.

2   debtors or the Bahamian debtors.  And they can go forward and

3   have their own hearing and make a ruling on how that's going

4   to play out for the assets that they hold.

5          So the case is begging for some kind of a protocol

6   between the parties to resolve that issue alone.  I mean,

7   we're going to end up -- there's a possibility it could end

8   up with inconsistent rulings in both courts and that might

9   happen if we have a protocol or not.

10          But at least I'm going to order the JPLs and the

11   debtors to mediate the issue.  Retain a good mediator,

12   someone with experience in the area, so come up with a way to

13   see if there's any kind of protocols that can be put in place

14   to address these issues.

15          In the meantime, we're going to go forward with

16   the adversary proceeding that I have before me and I want to

17   do it in as expeditious manner as possible, because we're

18   wasting the customers -- or the customers' assets are wasting

19   away every day that we spend in bankruptcy.  So let's try to

20   find a way to cooperate and find a way to resolve these

21   issues.

22          So, for now, I'm going to deny the motion to lift

23   the stay.  Parties should meet and confer and issue a form of

24   order under certification of counsel.

25          Are there any questions?

1          MR. WENDER:  Your Honor, the Committee would just

2   ask to be a party to that mediation, as well.

3          THE COURT:  Absolutely, yes.  Absolutely.

4          MR. WENDER:  Thank you.

5          THE COURT:  Anything else?

6          MR. GLUECKSTEIN:  Thank you very much, Your Honor.

7   That is clear to the debtors.

8          The only other thing just to note before we close,

9   there was on the agenda today, which I think flows well from

10  Your Honor's comments, is an initial scheduling conference in

11  the adversary proceeding between the debtors and FTX Digital

12  Markets.  We have been talking with counsel for FTX Digital.

13  I believe we have agreed on a form of a schedule to move that

14  litigation forward.  I understand we have a pending motion to

15  dismiss, and, of course, Your Honor's comments this

16  afternoon.

17         So, think for purposes of the conference, I think

18  the update to the Court is that we intend to submit that

19  scheduling order for Your Honor's consideration.  That

20  scheduling order is designed, from the debtors' perspective,

21  to ensure that we get to a trial on any of the issues that

22  might need to be tried related to those issues, consistent

23  with our confirmation schedule that Mr. Dietderich laid out

24  yesterday, and I think we have a schedule to do that.

25         THE COURT:  Okay.  Excellent.

1          I don't know if my comments make any difference in

2   what that schedule is going to look like, but you can

3   resubmit it under COC.

4          MR. GLUECKSTEIN:  Thank you, Your Honor.

5          MR. WENDER:  And, Your Honor, just for

6   clarification with the Committee asking, as well, with the Ad

7   Hoc Committee now, at least attempting to, could we at least

8   attempt to participate in that mediation, at least as an

9   observation party, at a minimum?

10          THE COURT:  I think as an observation party,

11  that's a good idea, because, obviously, as I've said, you

12  know, the creditors might want to participate and it's going

13  to depend on what happens in each of the two courts.

14          MR. WENDER:  Thank you, Your Honor.

15          MR. SABIN:  Your Honor, Jeff Sabin from Venable,

16  on behalf of --

17          THE COURT:  Yes, you can participate, poo.

18          MR. SABIN:  Thank you so much.

19      (Laughter)

20          THE COURT:  Okay.  Well, let me throw this out,

21  too, is there any -- are we at a stage now where a mediation

22  of the ultimate issues is possible or do the parties need to

23  engage in some discovery first?

24          MR. GLUECKSTEIN:  Your Honor, I think we should --

25  I should probably confer with counsel for the JPLs.  The

1  debtors have been talking, trying to starting the

2  conversation with the JPLs.  We're obviously very interested,

3  as Mr. Dietderich outlined yesterday, in moving the plan

4  process forward and having an ultimate resolution that would

5  resolve these issues in that context.  We've started that

6  discussion, early stages.  We would love to fold the JPLs

7  into that plan process.

8           To the extent we need to resolve the litigation

9  issues raised in the adversary proceeding, you know, as I

10  said, I think we are certainly hopeful to move that forward

11  expeditiously, but we probably should confer on, you know,

12  the scope of mediation.  That might make some sense.

13           THE COURT:  I would appreciate the parties doing

14  that.  Because I think, in my view -- I mean, you can put

15  forward a proposed plan, but nothing's going to happen until

16  we know the resolution of who owns which assets.  I mean, you

17  can't confirm the plan until we know whose assets they are.

18           So that's -- it seems like the front-running issue

19  here is the litigation; am I wrong?

20           MR. GLUECKSTEIN:  Well, I mean, conceptually, yes,

21  Your Honor, but there are certainly scenarios where if we

22  were -- and this is just a hypothetical, obviously, at this

23  point -- there are certainly scenarios where if the debtors

24  and Digital Markets, as you said at the outset, because it

25  total leads to getting assets to customers, could reach an

1  understanding of how to make that happen, some of those

2  questions might become less important if it was on a

3  consensual basis, right.

4        So there would certainly be ways to distribute

5  assets in both estates, potentially, through a plan process

6  in a consensual manner, but it's too early to put specifics

7  on that.  But I think the premise of Your Honor from the

8  debtors' perspective is absent an agreement with the JPLs on

9  how to administer all of the collective assets, then we would

10 obviously need to decide those issues.

11       THE COURT:  Right.

12       MR. GLUECKSTEIN:  But if we had an agreement on

13 that question, we might not need to.

14       THE COURT:  Right.  That's what I'm trying to get

15 at:  Get an agreement on the issue.

16       MR. ZAKIA:  Your Honor, Jason Zakia of White &

17 Case for the JPLs.

18       I actually agree with Mr. Glueckstein, not on too

19 much, but on a few things, one of which is, I think Your

20 Honor's suggestion concerning the scope of mediation is

21 constructive.  Obviously, we have to consult with our clients

22 in order to give you an official answer, but I think that's

23 something we should consult about.

24       And we absolutely agree with Your Honor's comment

25 that, you know, absent consensual resolution, resolution of

1 these issues, regardless of what court it's going to be

2 resolved in, which is a separate question, but resolution of

3 who owns what assets is going to be an issue that has to be

4 resolved before, you know, any plan process can be concluded.

5          So, I would -- we'll work with the debtors on the

6 order; hopefully, we won't need your help on that one, on a

7 form of order.  And I'll also consult about the scope of the

8 mediation and report back to the Court on whether we can have

9 an agreed scope on that.

10          THE COURT:  Okay.  Excellent.  Thank you.

11          MR. ZAKIA:  Thank you very much.

12          THE COURT:  Anything else for today?

13          MS. SARKESSIAN:  Your Honor, on the -- Your Honor,

14 I'm sorry, it's been a long day -- on the two sealing

15 motions, should counsel a submit a proposed order under COC?

16          THE COURT:  Yes.  Yes, please.

17          MS. SARKESSIAN:  Thank you -- or two proposed

18 orders, I guess.

19          THE COURT:  Two orders, yes.

20          Okay.  Anything else?

21          UNIDENTIFIED SPEAKER:  No, Your Honor.

22          THE COURT:  Okay.  Thank you all very much.

23          We're adjourned.

24          COUNSEL:  Thank you, Your Honor.

25      (Proceedings concluded at 2:45 p.m.)

1                          CERTIFICATION

2           We certify that the foregoing is a correct

3     transcript from the electronic sound recording of the

4     proceedings in the above-entitled matter to the best of our

5     knowledge and ability.

6

7     /s/ William J. Garling                    June 12, 2023

8     William J. Garling, CET-543

9     Certified Court Transcriptionist

10    For Reliable

11

12    /s/ Tracey J. Williams                    June 12, 2023

13    Tracey J. Williams, CET-914

14    Certified Court Transcriptionist

15    For Reliable

16

17    /s/ Coleen Rand                           June 12, 2023

18    Coleen Rand, CET-341

19    Certified Court Transcriptionist

20    For Reliable

21

22

23

24

25