## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |
| ALAMEDA RESEARCH LLC, FTX TRADING LTD., WEST REALM SHIRES, INC., and WEST REALM SHIRES SERVICES INC. (d/b/a FTX.US), | Adv. Pro. 23-_____ (JTD) |
| Plaintiffs, | **COMPLAINT** |
| v. | |
| DANIEL FRIEDBERG, | |
| Defendant. | |

Debtors and debtors in possession Alameda Research LLC ("Alameda"), FTX Trading Ltd. ("FTX"), West Realm Shires, Inc. ("WRS"), and West Realm Shires Services Inc. (d/b/a FTX.US) ("FTX US") (together, "Plaintiffs") in the above-captioned Chapter 11 cases (the "Chapter 11 Cases"), file this complaint to recover damages caused by breaches of fiduciary duties, legal malpractice, and other wrongdoing, and to recover fraudulent transfers. Plaintiffs allege the

---

[1] The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and 4063 respectively. Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX. The principal place of business of Debtor Emergent Fidelity Technologies Ltd is Unit 3B, Bryson's Commercial Complex, Friars Hill Road, St. John's, Antigua and Barbuda.

following based upon personal knowledge as to themselves and their acts based upon their investigation to date, and upon information and belief as to all other matters.

## PRELIMINARY STATEMENT

1.    Samuel Bankman-Fried ("Bankman-Fried") and a group of insiders, including Defendant Daniel Friedberg ("Friedberg"), Zixiao "Gary" Wang ("Wang"), Nishad Singh ("Singh") and Caroline Ellison ("Ellison") (collectively, the "FTX Insiders")  orchestrated a vast fraudulent scheme to profit at the expense of the Debtors in these Chapter 11 Cases (the "Debtors" or the "FTX Group") and their creditors.

2.    From 2017 through FTX's implosion in November 2022, Friedberg advised Bankman-Fried, his trusted inner circle, and the FTX Group on legal and compliance matters and significant transactions, ignored the FTX Group's glaring lack of internal controls, and served as a "fixer" tasked with, among other things, paying off whistleblowers who threatened to expose the true fraudulent nature of the FTX Group enterprise.

3.    Friedberg had long advised Bankman-Fried and the FTX Group, including while he was a partner at the FTX Group's principal outside law firm, Law Firm-1.  Friedberg formally joined the FTX Group in January 2020—simultaneously serving as *both* the Chief Compliance Officer of the FTX US exchange and the General Counsel of Bankman-Fried's so-called crypto hedge fund, Alameda.  Friedberg thus was in a unique position to gain, and on information and belief did gain, deep insight into the FTX Group's convoluted organizational structure, abject lack of internal controls, and dubious business practices.

4.    As has been detailed extensively in criminal indictments, prior complaints filed in civil lawsuits, and reports filed and issued by the FTX Debtors, far from generating genuine profits, the exponential growth and purported success of the FTX Debtors were, in fact, fueled by a host

{1368.002-W0071411.}

of reckless and fraudulent practices perpetrated by, and for the benefit of, the FTX Insiders.  These practices included, among others, billions of dollars of wildly speculative and unhedged bets in crypto assets and frenzied investment in hundreds of imprudent "ventures," all paid for using commingled and misappropriated funds.

5.     Under the cloak of this wide-ranging con game, Friedberg and others facilitated the routing of billions of dollars in purported profits of the FTX Group to the FTX Insiders, and their families, friends, and other acquaintances through purported personal "loans," bonuses, "investments," and all other means of transfer, including real estate purchases and hundreds of millions of dollars in charitable and political contributions.  Friedberg himself personally r received millions of dollars in unjustified bonuses and other compensation.

6.     While the wholesale raiding of customer exchange deposits and the channeling of billions of dollars of FTX Group assets through so-called lending, investments, political contributions, and donations was concealed from the outside world, it was facilitated by Friedberg and other FTX Insiders.

7.     In the course of enabling and participating in this scheme, Friedberg directed the preparation of bank account opening documents with false statements, silenced whistleblowers, and supported the fraudulent transfers that enriched Bankman-Fried and other FTX Insiders contrary to the interests of the entities to which Friedberg owed fiduciary duties.

8.     Existing records document that Friedberg himself was rewarded for his 22 months of "service" to Alameda and the FTX US exchange with cryptocurrency worth tens of millions of dollars, as well as handsome monetary compensation and a bonus in excess of $3 million—

fraudulent transfers that Plaintiffs now seek to recover, along with any additional undocumented transfers Friedberg received.

9.      Friedberg had a duty to place the interests of Alameda, FTX, WRS, and FTX US above the interests of himself and the other FTX Insiders who were indiscriminately siphoning funds from those entities.  Friedberg breached that duty by enabling the raiding of these entities of billions of dollars for his own benefit and the benefit of Bankman-Fried and the other FTX Insiders.

10.      As General Counsel of Alameda and FTX and Chief Compliance/Regulatory Officer of FTX, FTX US, and WRS, Friedberg also had a duty to these entities to ensure appropriate internal controls, risk mitigation, and compliance.  Friedberg breached those duties by knowingly failing to implement – and in fact obstructing the implementation – of virtually any of the systems or internal controls that would be necessary to properly run the FTX Group's business and by directly contributing to the FTX Group's lack of internal controls.

11.      By this action, Plaintiffs seek to recover damages caused by breaches of Friedberg's fiduciary duties, legal malpractice, and other wrongdoing, and to recover all amounts fraudulently transferred to Friedberg, including any cryptocurrency, bonuses, and any other things of value.

## **RELEVANT PARTIES**

12.      Debtor Alameda is a Delaware limited liability company that had operations in the United States, Hong Kong, and The Bahamas.  Bankman-Fried and Gary Wang co-founded Alameda in or around October 2017 and were its sole equity owners, with Bankman-Fried owning 90% and Wang owning 10%.  Bankman-Fried was the CEO of Alameda from its inception until in or around October 2021.  At all relevant times, however, Bankman-Fried retained substantial control over Alameda.

13.      Debtor FTX Trading Ltd. is incorporated under the law of Antigua and Barbuda.

{1368.002-W0071411.}

14.     Debtor West Realm Shires, Inc. is a Delaware corporation that is 52.99% owned by Bankman-Fried, 16.93% owned by Wang, 7.83% owned by Nishad Singh, and 22.25% owned by other shareholders.  It began operations in or around January 2020.

15.     Debtor West Realm Shires Services Inc., doing business as FTX.US, is a Delaware corporation and a wholly-owned subsidiary of West Realm Shires, Inc.

16.     Defendant Daniel Friedberg is an attorney licensed in the State of Washington. Prior to joining the FTX Group, Friedberg advised Alameda while in private practice, starting in 2017.  In January 2020, Friedberg left private practice and formally joined the FTX Group.  At the FTX Group, Friedberg held many titles, including General Counsel of Alameda and FTX and Chief Compliance/Regulatory Officer of FTX, FTX US, and WRS.

## JURISDICTION AND VENUE

17.     This Court has original jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b) because it relates to the Chapter 11 Cases, brought under title 11 of the United States Code (the "Bankruptcy Code").

18.     Counts VI through XI are "core" proceedings which may be heard and determined by the Court pursuant to 28 U.S.C. § 157(b)(2).  Counts I through V are non-core, but are related to the Chapter 11 Cases.

19.     In accordance with Rule 7008-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware, Plaintiffs confirm their consent to the entry of a final order or judgment by the Court in connection with this adversary proceeding to the extent that it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

{1368.002-W0071411.}

20.     Venue is proper in this district pursuant to 28 U.S.C. § 1409(a).

## FACTUAL BACKGROUND

## I.     THE FTX GROUP'S FOUNDING

21.     The formation of Alameda and the FTX Group has been fully detailed in various indictments and prior pleadings. *See, e.g.,* Superseding Indictment ¶ 15, ECF No. 80, *United States v. Bankman-Fried*, 22-cr-00673 (S.D.N.Y. 2022)

22.     In short, in November 2017, Bankman-Fried, Wang, and Tara Mac Aulay co-founded Alameda, which they described as a quantitative trading firm focusing on cryptocurrency.[2]  Alameda's initial focus was arbitrage trading—exploiting price differences between cryptocurrencies (mainly Bitcoin) in the United States and Japan, where Bitcoin traded at a roughly 10–20% premium.

23.     As the price gaps exploited by Alameda closed, Alameda attempted to generate profits by making highly speculative bets on cryptocurrency.  Alameda failed to maintain appropriate records and did not implement sufficient internal controls or risk management.  Indeed, multiple former high-level FTX Group executives have stated publicly they left the FTX Group due to risk management, governance, and compliance concerns.  These executives include Tara Mac Aulay, co-founder of Alameda, and Brett Harrison, the former President of FTX US.

24.     Bankman-Fried and Wang created FTX.com, a cryptocurrency exchange in 2019.

25.     FTX.com quickly became one of the largest digital asset exchanges in the world. Following the initial success of FTX.com, in January 2020, Bankman-Fried followed up by

---

[2]   Friedberg was already advising the FTX Group as a partner at Law Firm-1 at the time Mac Aulay resigned from Alameda in 2018.

{1368.002-W0071411.}

founding FTX US (FTX.US, and together with FTX.com, the "Exchanges"), a digital asset exchange for U.S.-based customers.

26.     The Exchanges were extraordinarily successful in attracting customers and their cash, cryptocurrency, and other assets.  By 2021, the Exchanges claimed to hold approximately $15 billion in assets on their platforms and to transact $16 billion in daily trading volume.  As of January 2022, FTX.com was valued at $32 billion, and FTX.US at $8 billion.

27.     As the world learned in November 2022, in reality the Exchanges served as piggy banks from which Bankman-Fried and the FTX Insiders funded billions of dollars in recklessly speculative and unhedged trading by Alameda and funded billions more in purported "venture" investments, real estate purchases, purported personal "loans," charitable and political contributions and all manner of other transfers designed to benefit themselves by buoying their life-styles, lining their own and their families' and friends' pockets, and ingratiating themselves with numerous business prospects and potential allies.

## II.    FRIEDBERG JOINS THE FTX GROUP AS A TOP EXECUTIVE

28.     From the FTX Group's earliest days, Friedberg served as a key advisor to Sam Bankman-Fried and his companies.  From 2017 to 2019, while a partner at Law Firm-1, Friedberg worked closely with Bankman-Fried and the FTX Group, providing legal advice in connection with general corporate and tax matters, including the formation of specific subsidiaries.  During that time, Joe Bankman, Bankman-Fried's father, urged Bankman-Fried and others to give Friedberg a central role and to keep Friedberg "in the loop . . . so we have one person on top of everything."

29.     In January 2020, after two years of serving as the FTX Group's primary contact at Law Firm-1, Friedberg was handpicked by Bankman-Fried to join the FTX Group.  On January

{1368.002-W0071411.}

24, 2020, Bankman-Fried offered him the dual positions of General Counsel of Alameda and Chief Compliance Officer of FTX US, with compensation of a salary of $300,000, a signing bonus of $1.4 million, and an award of 8% equity in FTX US.  On January 29, 2020, Friedberg signed the formal offer letter.

30.     In his 22 months at the FTX Group, Friedberg held numerous titles, including Executive Vice President and Chief Regulatory/Compliance Officer of FTX US and WRS, General Counsel of Alameda and Alameda Research Ventures Ltd., and Chief Regulatory Officer and General Counsel of FTX.

31.     Friedberg also served as the Secretary for the Board of Directors at several FTX Group entities including FTX Digital Markets Ltd., FTX Property Holdings Ltd., and FTX US. Friedberg was also an officer of FTX Digital Markets Ltd., and FTX US, and served on the Risk and Compliance Committee of FTX US's Board of Directors.

32.     Friedberg's responsibilities included managing risk and overseeing all legal needs for the FTX Group.  As Friedberg confirmed in a recent sworn declaration, he "oversaw all lawyers—as needed—to efficiently deliver legal services to . . . Alameda, [FTX] and FTX US."[3] Friedberg was indeed considered one of the key decisionmakers within the FTX Group and was routinely identified as a member of the senior executive team.

33.     Friedberg owed fiduciary duties to Alameda, FTX, WRS, and FTX US, where he was employed as a high-ranking legal and/or compliance officer.  These fiduciary duties, at a minimum, meant that Friedberg owed duties of care, loyalty, and good faith to those entities.  As

---

[3]     Friedberg Declaration, ECF No. 198-2, *Garrison v. Bankman-Fried et al.*, No. 1:22-cv-23753 (S.D. Fla. May 11, 2023).

{1368.002-W0071411.}

part of those broader duties, Friedberg also had a duty to minimize the risk the FTX Group faced from control failures.

34.     Friedberg was well compensated.  Bankman-Fried offered Friedberg an annual base salary of $300,000, a $1.4 million signing bonus, performance-based annual bonuses, and an 8% equity stake in FTX US.  In addition, Bankman-Fried promised Friedberg "consideration of small portions of equity in futures [sic] ventures" in which Friedberg was significantly involved.  The majority of Friedberg's salary was paid by Alameda, and a small portion was paid by FTX US.

35.     In July 2020, the FTX Group caused Friedberg to be granted 102,321,128 Serum tokens, a digital currency launched by the Solana Foundation in 2020.  At the time, the Solana Foundation's members included Alameda.  At the time of Plaintiff's bankruptcy filing the value of Serum was estimated at $.33 per token, and therefore Friedberg's Serum holdings were worth $33,765,972.20.  Upon information and belief, Friedberg did not provide the FTX Group with any consideration for these tokens.

36.     In June 2021, Friedberg received a $3,007,451.30 cash bonus payment from Alameda (the "2021 Alameda Bonus").

37.     The FTX Debtors are continuing to investigate asset transfers that were not documented or were structured to avoid detection, and reserve the right to amend this pleading to include and avoid any such transfers made to Friedberg.

## III.     FRIEDBERG'S BREACHES OF FIDUCIARY DUTIES AND MISCONDUCT

38.     Friedberg breached his fiduciary duties, aided and abetted others' breaches, committed legal malpractice, and caused corporate waste by (a) participating in and aiding and abetting Bankman-Fried's and the other FTX Insiders' diversion of funds and fraud; (b) whitewashing complaints by whistleblowers alleging misuse and commingling of FTX Group

{1368.002-W0071411.}

assets and other related misconduct; and (c) failing to implement any meaningful oversight, internal controls, or checks.

A.    **Friedberg Actively Assists in the Diversion of Funds from the FTX Group for the Benefit of the Insiders**

1.    **Friedberg Directs the Creation of North Dimension, a Vehicle for Commingling and Misappropriating Debtor Funds**

39.    After FTX.com launched in or around April 2019, it needed to establish bank accounts in which its customers could deposit fiat currency for credit to their FTX.com accounts. The funds in these accounts, however, were in fact commingled and ultimately used by the FTX Insiders to back highly speculative, unhedged, cryptocurrency trading and fund hundreds of so-called "venture investments," as well as to make purported personal "loans," bonuses, real estate purchases, and charitable and political contributions.

40.    At that time many U.S. banks were reluctant to do business with cryptocurrency companies, particularly cryptocurrency exchanges. Bankman-Fried had tried, unsuccessfully, to open a bank account for FTX in or around January 2020.

41.    Friedberg solved this problem by creating shell entities that concealed the involvement of FTX. On August 25, 2020, Friedberg, directed the formation of North Dimension Inc. ("North Dimension"), emailing two of his former Law Firm-1 partners and directing them as follows:

> We need two new subsidiaries asap:
> North Wireless Dimension Inc.
> North Dimension Inc.
>
> Both Delaware corporations
> Owned by Alameda Research LLC
> Disregarded for tax purposes
> . . .

{1368.002-W0071411.}

42.     North Dimension was a shell company with no employees, no legitimate business purpose, and no business operations.  A North Dimension Inc. website later falsely claimed the company sold electronic goods, and did not disclose North Dimension's close affiliation with Alameda or the FTX Group.

43.     By creating North Dimension, Friedberg and Bankman-Fried were able to obscure the relationship between FTX.com and Alameda, and circumvent the extensive due diligence and licensing requirements necessary to open a customer deposit account in the name of FTX.com.

44.     In late 2020, North Dimension applied to open an account with Bank-1.  Because North Dimension was falsely characterized as a trading firm, Bank-1 required North Dimension to complete an Initial Due Diligence Questionnaire for Traders (the "Due Diligence Questionnaire") as part of the application process.  The Due Diligence Questionnaire identified Friedberg as North Dimension's General Counsel and Compliance Officer.

45.     The Due Diligence Questionnaire contained multiple misrepresentations.  For instance, the questionnaire falsely stated that North Dimension "trades on multiple cryptocurrency exchanges worldwide for its own account. . . and participates in direct peer-to peer, OTC purchases and sales with certain third parties for its own account."  On information and belief, Friedberg directed the preparation of this questionnaire and instructed that it be sent to the bank via e-mail on or around December 1, 2020.

46.     In or around April 2021, Bank-1 opened accounts for North Dimension.  The North Dimension bank accounts subsequently received tens of millions of dollars in customer funds from FTX.com.  The funds in these accounts were in fact commingled with other FTX Group funds, and ultimately were used by the FTX Insiders to back highly speculative, unhedged,

cryptocurrency trading and fund hundreds of so-called "venture investments," as well as to make purported personal "loans," bonuses, real estate purchases, and charitable and political contributions.

### 2. Friedberg Devised and Drafted a Sham Intercompany Agreement to Conceal Improper Transfers of Customer Funds

47.     In light of a planned Nasdaq initial public offering ("IPO") of FTX, which required an audit, Friedberg realized that the improper commingling and misuse of FTX customer funds by Alameda might be uncovered.  To conceal these practices, Friedberg conceived of and ultimately drafted a sham intercompany agreement to be provided to the auditors.

48.     In an email to Law Firm-1 in January 2021, Friedberg stated that "[s]ome FTX cash and crypto is held by Alameda for the benefit of FTX customers.  As we wade into the audit, the explanation here is important.  We propose a 'cash management' agreement between the affiliates somehow where FTX gets first dibs on Alameda's cash."

49.     In preparing this agreement, Friedberg was concerned by the possible release of information regarding the inter-woven relationships among the FTX Group entities, which might have shed light on the FTX Insiders' misconduct.  Accordingly, he sent an email to Law Firm-1, asking, "What are the public disclosures that will likely be required with respect to the intercompany relationships between Alameda Group and FTX?  How detailed?"  A Law Firm-1 attorney replied, "Yes, we'll need to disclose of [sic] the material terms of all related party transactions . . . This could be very problematic given that this'd [sic] likely draw in all of our intercompanies, including the FTT docs."

50.     Law Firm-1 proposed to Friedberg that an "Intercompany Treasury Management and Loan Agreement" be entered into under which Alameda would perform "treasury management functions" for FTX.

51.     Friedberg, however, rejected this approach.  On April 12, 2021 Friedberg crafted a so-called "Payment Agent Agreement."  Pursuant to the Payment Agent Agreement—which Friedberg had Bankman-Fried execute—Alameda agreed to provide "payment services" to FTX, in which it would "complete payments . . . as directed by FTX from time to time," and receive assets from FTX "to be held and/or transferred . . . as quickly as commercially possible."

52.     To avoid having to disclose that the FTX Group had commingled customer and non-customer funds, the Payment Agent Agreement further provided that "ownership of the any [sic] assets that FTX provides . . . shall ***remain in FTX***," and FTX retained "the right to require" repayment.

53.     Document metadata reflects that Friedberg created the earliest draft of the agreement in April 2021, but Friedberg then falsely backdated the Payment Agent Agreement two years so that the agreement provided that the Effective Date was June 1, 2019.  Upon information and belief, the document was signed by Bankman-Fried on behalf of both Alameda on FTX Trading on or about April 16, 2021, in ink rather than electronically using DocuSign (as was the typical practice at FTX), to avoid generating an electronic record of the true date of execution.

54.     Friedberg caused the outside auditor to be provided with the false, backdated Payment Agent Agreement.  The auditor then created an audited financial statement of FTX Trading Ltd., which was subsequently provided to potential investors in connection with its $400 million Series C financing that closed in January 2022.  This audited financial statement did not

disclose the true relationship between FTX and Alameda, or the FTX Group's commingling and misuse of customer and non-customer funds.

55.     Contrary to the Payment Agent Agreement, and the audited financial statement that relied upon it, Alameda was not a payment agent, nor did Alameda merely hold and transfer assets as directed by FTX.  In actuality, the FTX Insiders commingled customer and non-customer funds and spent them for their own purposes.

**B.      Friedberg, Bankman-Fried's "Fixer," Whitewashes Complaints of Whistleblowers**

56.     With regard to multiple whistleblower complaints alleging corporate malfeasance, Friedberg served as Bankman-Fried's fixer.  He not only settled the complaints for inflated amounts, in some instances he arranged for the FTX Group to retain the whistleblowers' attorneys post-settlement, thereby buying or otherwise ensuring their silence.

**1.      Friedberg Whitewashes the TransPacific Complaint**

57.     On November 2, 2019, Plaintiff-1, represented by Plaintiffs' Attorney-1, filed a lawsuit against FTX, Alameda, Alameda Research Ltd. (BVI) and FTX Insiders, including Bankman-Fried, Ellison, Wang, and others.

58.     The complaint alleged the defendants engaged in cryptocurrency price manipulation through pump and dump schemes, money laundering, operating an unlicensed money transmitter business, unfair business practices, and violations of the Commodity Exchange Act.

59.     Weeks after it was filed, ███████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████

60.     After ████████████████████████████████ in January 2022, Plaintiffs' Attorney-1 sent Friedberg a letter threatening the possibility of additional adverse action against FTX. Prompted again to buy Plaintiffs' Attorney-1's silence, Friedberg orchestrated a new engagement letter and agreed to pay Plaintiffs' Attorney-1 $1.6 million and $50,000 paid on a monthly basis.

61.     In sum, Friedberg arranged for the FTX Group to pay Plaintiffs' Attorney-1 $3,320,000 through July 2022. Upon information and belief, Plaintiffs' Attorney-1 provided no actual legal services to the FTX Group after signing the engagement letter.

62.     Far from investigating these claims and seeking to remediate any issues identified by that investigation, either before or after becoming an officer of multiple FTX Group entities and a senior legal officer of FTX US and Alameda, Friedberg "fixed" the problem by buying opposing counsel's silence.

### 2.     Friedberg Covers Up Whistleblower-1's Complaint

63.     In December 2021, following her termination, an FTX US employee ("Whistleblower-1"), sent a demand letter alleging (1) "claims that Alameda [was] nothing more than an extension of FTX, used to bolster investor confidence in FTX projects, and in turn drive up the prices of projects FTX had developed or invested in itself," a form of illegal market manipulation and (2) that "details regarding company fundraising and various projects were

{1368.002-W0071411.}

15

disclosed openly" and on Slack channels which allowed "all employees present to make trades on the information prior to public announcements," a form of insider trading.

64.     Although Whistleblower-1's complaint was addressed to the then General Counsel of FTX US, Friedberg ███████████████████████████████████ ███████████

65.     In March 2022, Whistleblower-1 received an extraordinary settlement of ███ ███████ even though she had worked at FTX US for less than two months at an annual salary of $200,000.

66.     Although Whistleblower-1 had been an employee of FTX US, Friedberg caused Alameda – not FTX US – to enter into the settlement agreement with Whistleblower-1 and pay the funds to Whistleblower-1.

67.     In his roles as General Counsel for Alameda and Chief Regulatory Officer of FTX US, Friedberg had a duty to investigate these claims and to remediate any issues identified as a result.  However, instead of investigating Whistleblower-1's claims, Friedberg instead bought Whistleblower-1's silence by paying her exorbitant hush money.

68.     Friedberg not only bought Whistleblower-1's silence with an extraordinary settlement payment, he also bought off Whistleblower-1's lawyers in the same manner that he had previously "fixed" the allegations raised by Plaintiffs' Attorney-1.

69.     Shortly after Whistleblower-1's settlement was executed, Friedberg reached out to Whistleblower-1's law firm to discuss the FTX Group retaining the law firm.  Although by that time the FTX Group had no genuine need to retain Whistleblower-1's lawyers, Friedberg sought to buy them off.

{1368.002-W0071411.}

70.    In April 2022, approximately one month after executing the Whistleblower-1 settlement, Friedberg and Whistleblower-1's attorneys signed an agreement for "general client counseling" at a cost of more than $200,000 per month for five years—a $12 million commitment. In doing so, Friedberg ensured Whistleblower-1's attorneys' silence.

71.    In the six months following execution of the retention agreement with Whistleblower-1's attorneys, the law firm produced only one piece of work product for FTX: a three-page memo with recommendations for FTX US's customer onboarding process, drafted and signed by the law firm's Chief Operating Officer, who did not practice law and never attended law school.

### 3.    Friedberg Fires and Buys Off another Whistleblower

72.    In December 2021, an individual ("Whistleblower-2") was hired as an attorney at the FTX Group.

73.    During his brief tenure at Alameda, Whistleblower-2 became concerned about governance and regulatory issues within the FTX Group.  He was particularly concerned upon learning that Alameda-affiliated entities disbursed funds to customers without the requisite money transmitter licenses, and began asking questions about this activity.

74.    Friedberg then asked to meet with Whistleblower-2 in person, and subsequently terminated Whistleblower-2.

75.    Upon his termination, Whistleblower-2 received a ██████ severance package, even though Whistleblower-2 had worked at Alameda for less than three months.

76.    Again, Friedberg had a duty to investigate concerns raised by Whistleblower-2, who was hired as the senior legal officer of Alameda.  Instead of conducting an investigation and remediating any issues identified thereby, Friedberg terminated Whistleblower-2.

{1368.002-W0071411.}

### C. **Friedberg Fails to Implement Effective Oversight, Internal Controls, and Checks**

77.     Friedberg, as General Counsel and Chief Compliance/Regulatory Officer, was responsible for ensuring that proper safeguards were in place to prevent fraud and other wrongdoing.  Friedberg wholly failed in carrying out these responsibilities.  Rather than implementing appropriate internal controls and checks that would prevent fraud and other wrongdoing, Friedberg actively participated in and facilitated such misconduct.

78.     The FTX Group had a handful of employees (the FTX Insiders and their key associates) with virtually limitless power to direct transfers of fiat currency and crypto assets and to hire and fire employees, with no effective oversight, internal controls, or checks on the exercise of these powers.[4]  Rather than implementing checks and internal controls to stop these individuals from using this power for wrongdoing, Friedberg enabled them, and himself, to wield this power indiscriminately.

79.     Friedberg also failed to establish or maintain any semblance of fundamental financial and accounting controls.  This is particularly shocking given that at its peak, the FTX Group operated in 250 jurisdictions, controlled billions of dollars of assets, engaged in as many as 26 million transactions per day, and had millions of users.

80.     Board oversight was effectively non-existent.  With few exceptions, the FTX Group lacked independent or experienced finance, accounting, human resources, information security, and cybersecurity personnel or leadership.

---

[4]    The other such employees have since pleaded guilty or are under indictment for fraud and other criminal activity in connection with the FTX Group.  *See infra* ¶¶ 111-14.

{1368.002-W0071411.}

81.     Nor was there any effective internal audit function.  Some FTX Group entities did not produce any financial statements.  Some were deemed impossible to audit.  As Bankman-Fried explained in April 2021, while Friedberg was General Counsel of Alameda:

> Alameda is unauditable.  I don't mean this in the sense of "a major accounting firm will have reservations about auditing it"; I mean this in the sense of "*we* are only able to ballpark what its balances are, let alone something like a comprehensive transaction history.  We sometimes find $50m of assets lying around that we lost track of; such is life.  It is hilariously beyond any threshold of any auditor being able to even get partially through an audit."  This is for a number of reasons, many consequences of (a). It is, often, imperative that Alameda be able to operate discreetly; the threshold for giving external disclosure is quite high.

82.     Those entities that did produce financial statements used QuickBooks, Google documents, Slack communications, Excel spreadsheets, and other inadequate means for measuring the level of assets and liabilities held by the FTX Group.  Entries in QuickBooks were often made months after transactions occurred, rendering real-time financial reporting and risk management impossible.

83.     Even when records were made, many were facially inconsistent, entered in batches, or difficult (or impossible) to reconcile with other documentation.  Many such records were also inconsistent with the apparent purpose of the transfers.  For example, an Alameda bank account transferred tens of millions of dollars to a personal bank account of Bankman-Fried in 2021 and 2022.  These transfers were documented in promissory notes as purported loans from Alameda to Bankman-Fried but recorded on the ledger as "Investment in Subsidiaries: Investments-Cryptocurrency."

84.     For transactions recorded in the QuickBooks general ledger that involved digital assets, the ledger often did not record the identity or value of these digital assets and often grouped them in batch entries.  Many of the intercompany transactions were recorded this way, resulting in

accounting records showing colossal intercompany loans across FTX Group entities that are difficult to reconcile with underlying documentation and omit crucial information regarding the source and identity of the digital assets involved.

85.     The extent of these control failures was exemplified when FTX sought to conduct an IPO in early 2021.  Because an IPO would require the preparation of audited financial statements for FTX, Friedberg scrambled to cobble together purported policies and procedures that could be shown to auditors.

86.     Policies were, accordingly, drafted by editing off-the-shelf templates provided by FTX Group's outside accountants, Robert Lee & Associates.  Plaintiffs have found no evidence that employees were ever trained on these policies.

87.     Friedberg, as a top legal and compliance officer for Alameda, FTX, WRS, and FTX US, had a duty to implement adequate internal controls, address the control failures and deficiencies, and mitigate the damage they caused to the companies.  Friedberg knowingly failed to do so and therefore breached his duties and assisted others in breaching theirs.

88.     Friedberg also used Signal, an encrypted messaging application, frequently set to auto-delete sent and received messages, to detail how to execute transfers in the hundreds of millions of dollars to enrich FTX Insiders and directed discussions around sensitive topics or entities to Signal (instead of e-mail, which creates a record).  Friedberg thus encouraged a company culture wherein important details and discussions were hashed out on Signal, preventing accurate record keeping or accountability.

89.     For example, on May 6, 2022, Friedberg directed the following "round trip" transactional maneuver via Signal:

     a.    *First*, \$316 million and \$35 million was sent from Alameda to Bankman-Fried's and Wang's personal ftx.com accounts, respectively, as "founder loans."

     b.    *Second*, Friedberg instructed that the same amount be transferred as "capital contribution[s]" from those personal accounts to emergent@placeholder.com, noting "that this Emergent account is just a placeholder – funds should never stay in there."

     c.    *Third*, Friedberg instructed the same amount should be transferred from emergent@placeholder.com back to Alameda Research Ltd. as a "stock purchase."

     d.    As Friedberg explained, "it is just a round trip - from AR to Sam/Gary to Emergent back to AR Ltd."

     e.    Friedberg further flagged for the employees executing the transactions that "we're going to have to do this a few times over the next few days."

90.    Rather than establish appropriate record-keeping and internal controls, Friedberg thus encouraged the use—and indeed himself used—tools for obscuring transactions, including between the FTX Group and FTX Insiders.

### D. Friedberg Facilitates the Transfer of Billions of Dollars to FTX Insiders

91.    Friedberg also papered over transfers to FTX Insiders by falsely characterizing them as personal loans to FTX Insiders from Alameda.  Over the span of two short years, Friedberg was involved in more than \$2 billion in such transfers—purported "loans"—from Alameda to FTX Insiders.  None of these "loans" have ever been repaid, nor was there any reason to believe at the time the "loans" were made that they would or could be repaid.  Friedberg had a duty to act in the best interests of the Plaintiffs, and to ensure that proper safeguards were in place to prevent FTX Insiders from looting the company.

92.     Instead of fulfilling his duties, Friedberg actively participated in the misconduct, aiding others' misconduct, and placing the interests of himself and the other FTX Insiders ahead of the Plaintiffs' interests.[5]

93.     Friedberg's involvement with the purported "loans" for FTX Insiders' enrichment included, but is not limited to:

    a.      Editing a promissory note lending tens of millions of dollars to a founder.

    b.      Providing detailed instructions, via Signal, for executing hundreds of millions of dollars in founder loans.

    c.      Recording hundreds of millions of dollars in *other* loans to founders by simply posting them in a Slack channel.

    d.      Confirming details about the founder loans to the FTX Group's accountants.

    e.      Discussing founder loans via Zoom with outside counsel and the FTX Group's accountants.

94.     Because of the size of the loans, Friedberg had an obligation to evaluate the source of funds for these massive transfers, as well as each loan recipient's ability and intent to repay.

95.     Even during the crypto boom, the FTX Insiders could not reasonably have repaid these loans, and no reasonable lender would have loaned such large amounts.

96.     Friedberg also falsely represented to the FTX Group's outside accountant that interest on the loans was paid quarterly.

97.     The FTX Group's outside accountant raised his concern that these loans were not being paid off to FTX Group employees, including Friedberg.

---

[5] Indeed, in a single month, July 2021, promissory notes signed by Bankman-Fried, Singh, and Wang with Alameda amounted to more than $200 million.

{1368.002-W0071411.}

98.     There is no documentation suggesting that at the time these loans were made Friedberg engaged in any discussions about how or when these loans would be repaid or whether the relevant insider had sufficient cash or crypto assets to repay the loan.

99.     In fact, none of the loans discussed in this Complaint was ever repaid, nor upon information and belief was any interest ever paid on the loans, despite Friedberg's false statement to the outside accountants that interest was paid quarterly on the loans.

100.    On information and belief, Friedberg approved and executed each transaction for the sole purpose of the enrichment of FTX Insiders.

101.    The Debtors lost billions of dollars as a result of these improper loans, as well as Friedberg's other breaches of duties and misconduct.

102.    Friedberg's conscious, willful, wanton, and malicious conduct exhibits a reckless disregard for the interests of Debtors and their creditors.

## IV.     THE DEBTORS WERE INSOLVENT AT ALL RELEVANT TIMES AND, WITH FRIEDBERG'S ASSISTANCE, ENGAGED IN NUMEROUS ACTIVITIES TO HINDER, DELAY, AND DEFRAUD CREDITORS

103.    From the very beginning, the Debtors' implosion was inevitable.  As alleged in the indictment of Bankman-Fried, the FTX empire was built on a house of cards.  "[F]rom at least in or about 2019, up to and including in or about November 2022," Bankman-Fried "corrupted the operations of the cryptocurrency companies he founded and controlled . . . through a pattern of fraudulent schemes . . . ."  Superseding Indictment ¶ 1, ECF No. 80, *United States v. Bankman-Fried*, No. 22-cr-00673 (LAK) (S.D.N.Y. Feb. 23, 2023).

104.    The Debtors failed to implement virtually any of the systems or controls necessary for companies entrusted with customer money or other assets.  The Debtors concealed their failing and insolvent state by raiding and misappropriating billions of dollars in cash, cryptocurrency, and

{1368.002-W0071411.}

other assets from customer accounts.  The Debtors and their senior management accomplished this through multiple deceptions, including lying to customers about the segregation and safety of their accounts, and creating a series of secret mechanisms by which assets could be transferred within the Debtors' capital structure and, ultimately, out of the Debtors' custody.  As alleged in the indictment, Bankman-Fried's "multi-billion-dollar fraud" was executed "through a series of systems and schemes that allowed"  Bankman-Fried and other FTX Insiders "to access and steal FTX customer deposits without detection."  *Id.* ¶ 4.

105.    From the beginning of the FTX.com exchange, funds that customers intended to be deposited on the exchange in fact were deposited with Alameda or North Dimension.  At the same time, although the Debtors' exchange software generally did not allow for an account on the exchange to carry a negative balance, in or around July 2019, Bankman-Fried directed one or more of his co-conspirators or individuals working at their behest to modify the exchange software to permit Alameda to maintain a negative balance in its account on the exchange, including modifying settings in the exchange software known as "borrow," "can_withdraw_below_borrow," and "allow_negative."

106.    Through these cheats, Alameda was not only able to evade collateralizing its position on the exchange; Alameda also was able to maintain a negative balance on the exchange and utilize the exchange to trade and withdraw assets without limit, giving it a virtually unlimited "line of credit" collateralized by the customer deposits on the exchange.  As of the commencement of the Chapter 11 Cases, the exchange's software had been tampered with to an extent sufficient to expand Alameda's "line of credit" to $65 billion.  Alameda lacked any ability to repay this line of credit, having spent the money on insider transfers and purported "loans," gifts, and questionable investments.

107.    Nor was the Debtors' insatiable need for funds limited to propping up the Debtors in the face of extreme risk and management failures.  Bankman-Fried and the FTX Insiders  needed funds to pay for billions of dollars in ill-conceived and outright fraudulent transfers.  The Debtors' improper outflows and expenditures are staggering.  Billions of dollars were spent on purported "loans," gifts, and other transfers to Bankman-Fried, other senior management, their friends and families, political contributions, and "investments" made with little or no apparent due diligence.

108.    The Debtors' misappropriation of customer funds rendered them insolvent at all relevant times.  Without even accounting for distorting effects of Bankman Fried's staggering fraud, at all relevant times the Debtors' liabilities far exceeded the fair value of their assets, and the Debtors lacked sufficient cash, cryptocurrency, and other assets to cover customer accounts and their creditor's claims.  The Debtors continued to operate only by continually concealing and lying to customers and other creditors about their financial condition and misuse of customer funds.

## V.    THE DEBTORS FILE FOR BANKRUPTCY AND THE FTX INSIDERS ADMIT TO WRONGDOING

109.    In the early hours of November 11, 2022, Bankman-Fried signed a document turning over control of the FTX Group to John Ray.  Friedberg had resigned two days earlier.

110.    On November 11 and 14, 2022, the Debtors filed for Chapter 11 bankruptcy, commencing the Chapter 11 Cases.

111.    Guilty pleas entered by FTX Insiders have confirmed that they engaged in a fraudulent scheme and other criminal acts in their operation of the FTX Group.

112.    Wang, Ellison, and Singh all entered guilty pleas for, among other things, misappropriating funds.[6]

113.    On December 9, 2022, the U.S. Attorney's Office for the Southern District of New York indicted Bankman-Fried, charging him with wire fraud, as well as participating in conspiracies to commit wire, securities, and commodities fraud, and money laundering.

114.    As alleged in a pending superseding indictment, Bankman-Fried conspired to and actually did commit wire fraud, conspired to and actually did defraud FTX Trading customers, conspired to and actually did commit securities fraud on FTX Trading investors, conspired to and actually did commit fraud on Alameda's lenders, conspired to and actually did commit bank fraud, conspired to operate an unlicensed money transmitting business, conspired to commit money laundering, and conspired to make unlawful political contributions and to defraud the FEC.[7]

---

[6]    Information & Waiver of Indictment, ECF Nos. 6–7, *United States v. Wang*, No. 22-cr-00673 (S.D.N.Y. Dec. 19, 2022); Information & Waiver of Indictment, ECF Nos. 8–9, *United States v. Ellison*, No. 22-cr-00673 (LAK) (S.D.N.Y. Dec. 19, 2022); Superseding Information & Waiver of Indictment, ECF Nos. 90–91, *United States v. Singh*, No. 22-cr-00673 (S.D.N.Y. Feb. 28, 2023).

[7]    Superseding Indictment, *United States v. Bankman-Fried*, No. 22-cr-00673 (S.D.N.Y. Feb. 23, 2023), ECF No. 80.

{1368.002-W0071411.}

## CAUSES OF ACTION

## COUNT I
## Breaches of Fiduciary Duties
### (by all Plaintiffs)

115.     Plaintiffs reincorporate and reallege the allegations set forth in Paragraphs 1 through 114 of the Complaint as though the same were set forth in full herein.

116.     Friedberg owed fiduciary duties of good faith, loyalty, and care to Alameda, FTX, FTX US., and WRS, as a high-ranking corporate and legal officer of each entity.

117.     Friedberg breached his fiduciary duties by, among other things:

    a.     Failing to implement or cause to be implemented internal controls that would have prevented the wrongdoing alleged herein;

    b.     Actively contributing to a lack of internal controls that would have prevented the wrongdoing alleged herein;

    c.     Failing to investigate credible allegations of fraudulent and illegal conduct brought to his attention and to remediate any issues identified by such investigation;

    d.     Participating in and enabling a fraudulent scheme to commingle customer and corporate funds, including through the North Dimension entities, for misuse by the FTX Insiders for their personal benefit;

    e.     Facilitating purported personal "loans" that could not be repaid, and without due diligence as to whether the borrower had the ability or intent to repay or knowing that the borrower did not have the ability to repay and / or did not intend to repay;

    f.     Abusing or allowing abuse of positions in various FTX Group entities for the personal gain of FTX Insiders and to the detriment of the FTX Group; and

    g.     Failing to investigate, and authorizing unreasonable settlements of, whistleblower complaints alleging serious misconduct.

118.     Friedberg failed to exercise any meaningful oversight over the FTX Group's affairs.

119.    Friedberg, in breaching his fiduciary duties of care, loyalty, and good faith, showed a conscious disregard for the best interests of the FTX Group and their creditors.

120.    As a direct and proximate result of Friedberg's breaches of duty, the Plaintiffs were damaged in an amount to be determined at trial.

**COUNT II**
**Aiding and Abetting Breaches of Fiduciary Duties**
**(by all Plaintiffs)**

121.    Plaintiffs reincorporate and reallege the allegations set forth in Paragraphs 1 through 114 of the Complaint as though the same were set forth in full herein.

122.    Bankman-Fried, Wang, Ellison, and other top executives of the FTX Group breached their fiduciary duties by, among other things: (1) secretly diverting funds from FTX and FTX US for their own personal benefit; (2) orchestrating improper purported personal "loans" from the FTX Group for their own personal benefit; and (3) using FTX Group funds to purchase real estate and other assets for their own personal benefit or use.

123.    Friedberg aided and abetted these breaches of duties by, among other things:

a.    Failing to implement or cause to be implemented internal controls that would have prevented the wrongdoing alleged herein;

b.    Actively contributing to a lack of internal controls that would have prevented the wrongdoing alleged herein;

c.    Failing to investigate credible allegations of fraudulent and illegal conduct brought to his attention and to remediate any issues identified by such investigation;

d.    Participating in and enabling a fraudulent scheme, including through North Dimension, to channel millions of dollars in customer funds which were subsequently commingled with other FTX Group funds and misappropriated by the FTX Insiders;

e.    Facilitating purported personal "loans" that could not be repaid, and without due diligence as to whether the borrower had the ability or intent to repay or knowing that the borrower did not have the ability to repay and / or did not intend to repay;

f.  Abusing or allowing abuse of positions in various FTX Group entities for the personal gain of FTX Insiders and to the detriment of the FTX Group; and

g.  Failing to investigate, and authorizing unreasonable settlements of, whistleblower complaints alleging serious misconduct.

124.    As a direct and proximate result of the foregoing, the Plaintiffs were damaged in an amount to be determined at trial.

## COUNT III
## Legal Malpractice / Professional Negligence
## (by all Plaintiffs)

125.    Plaintiffs reincorporate and reallege the allegations set forth in Paragraphs 1 through 114 of the Complaint as though the same were set forth in full herein.

126.    Between January 2020 and November 2022, Friedberg's job function was synonymous with that of a Chief Legal Officer of the FTX Group.

127.    Friedberg was also retained as an attorney by Alameda and FTX US at various times before he became an FTX Insider in January 2020.

128.    During these time periods, Friedberg acted as the attorney of the aforementioned entities and provided legal services and advice to them.

129.    Friedberg owed Plaintiffs a duty to exercise the reasonable skill and knowledge commonly possessed by a member of the legal profession in providing legal services and advice to the Plaintiffs.

130.    Friedberg failed to exercise the reasonable skill and knowledge commonly possessed by a member of the legal profession by:

a.  Failing to implement or cause to be implemented internal controls that would have prevented the wrongdoing alleged herein;

b.  Actively contributing to a lack of internal controls that would have prevented the wrongdoing alleged herein;

{1368.002-W0071411.}

    c.  Failing to investigate credible allegations of fraudulent and illegal conduct brought to his attention and to remediate any issues identified by such investigation;

    d.  Participating in and enabling a fraudulent scheme, including through North Dimension, to channel millions of dollars in customer funds which were subsequently commingled with other FTX Group funds and misappropriated by the FTX Insiders;

    e.  Facilitating purported personal "loans" that could not be repaid, and without due diligence as to whether the borrower had the ability or intent to repay or knowing that the borrower did not have the ability to repay and / or did not intend to repay;

    f.  Abusing or allowing abuse of positions in various FTX Group entities for the personal gain of FTX Insiders and to the detriment of the FTX Group; and

    g.  Failing to investigate, and authorizing unreasonable settlements of, whistleblower complaints alleging serious misconduct.

131.    As a direct and proximate result of the foregoing, the Plaintiffs were damaged in an amount to be determined at trial.

## COUNT IV
## Corporate Waste
### (by all Plaintiffs)

132.    Plaintiffs reincorporate and reallege the allegations set forth in Paragraphs 1 through 114 of the Complaint as though the same were set forth in full herein.

133.    Friedberg facilitated billions of dollars in purported "loans" to FTX Insiders. These purported "loans" had no legitimate business purpose that would benefit Plaintiffs and were made purely for the personal gain of the FTX Insiders. At the time each FTX Insider entered into a personal "loan," Friedberg knew or should have known that each "loan" was not going to be repaid or could not be repaid. The purported "loans" to FTX Insiders transferred billions of dollars of Plaintiffs' corporate assets in exchange for fraudulent promises to repay—no real consideration at all.

{1368.002-W0071411.}

134.     Friedberg participated in and facilitated billions of dollars in purported personal "loans" despite knowing, or being indifferent to the fact, that such funds being transferred were from commingled customer and corporate funds.

135.     Despite knowing that the loans would not be repaid, Friedberg further misrepresented to FTX Group's accountants that such loans would be paid off quarterly.

136.     Further, Friedberg facilitated and directed the creation of shell companies which had no legitimate business purpose and were designed to enrich FTX Insiders.

137.     As a direct and proximate result of the foregoing, the Plaintiffs were damaged in an amount to be determined at trial.

## COUNT V
### Aiding and Abetting Waste of Corporate Assets
### (by all Plaintiffs)

138.     Plaintiffs reincorporate and reallege the allegations set forth in Paragraphs 1 through 114 of the Complaint as though the same were set forth in full herein.

139.     Friedberg was involved in the day-to-day management of the FTX Group, overseeing all legal services and transactions.

140.     As such, Friedberg was aware of and facilitated the abusive waste of assets by FTX Insiders and sought to conceal the true extent of the underlying fraud and other misconduct by the FTX Insiders.

141.     In his role as General Counsel, Chief Regulatory Officer, and Chief Compliance Officer, and a formal or de-facto officer at FTX Group, Friedberg failed to implement virtually any of the systems or internal controls that are necessary for businesses entrusted with customer assets.

142.    As a direct and proximate result of the foregoing, the Plaintiffs were damaged in an amount to be determined at trial.

### COUNT VI
### Fraudulent Transfer Pursuant to 11 U.S.C. §§ 548(a)(1)(A) and 550
### (by all Plaintiffs)

143.    Plaintiffs reincorporate and reallege the allegations set forth in Paragraphs 1 through 114 of the Complaint as though the same were set forth in full herein.

144.    Friedberg was paid an annual salary of $300,000.  In addition, on June 15, 2021, Plaintiff Alameda paid a $3,007,451.30 bonus (the "2021 Alameda Bonus") to Friedberg.

145.    The aforementioned payments were transfers of property of the Plaintiffs.

146.    Those transfers were made to Friedberg for, and in connection with, Friedberg's and the other FTX Insiders' misconduct as alleged herein.  Thus, the transfers were in furtherance of a fraudulent scheme to hinder, delay, or defraud creditors.

147.    Multiple badges of fraud recognized by bankruptcy law and Del. Code Ann. tit. 6, § 1304(b) permeate the aforementioned transfers, including that:

      a.      The transfers was part of a scheme to enrich and otherwise benefit the FTX Insiders and Friedberg.

      b.      Material facts relating to the transfer were concealed.

      c.      Friedberg removed or concealed Plaintiffs' assets.

      d.      The value of the consideration received by Plaintiffs was not reasonably equivalent to the value of the assets transferred or the amount of the obligations incurred.

      e.      Plaintiffs were insolvent when, or became insolvent shortly after, the transfer was made; and

      f.      The transfer occurred shortly before or shortly after Plaintiffs incurred substantial debts.

148.     Accordingly, the transfers should be avoided as fraudulent pursuant to section 548(a)(1)(A) of the Bankruptcy Code, and Plaintiffs may recover from Friedberg pursuant to section 550 of the Bankruptcy Code the full amount of such transfers, plus interest from the relevant dates, and costs and fees to the extent available, for the benefit of the Debtors' bankruptcy estates.

**COUNT VII**
**Fraudulent Transfer Pursuant to 11 U.S.C. §§ 548(a)(1)(B) and 550**
**(by all Plaintiffs)**

149.     Plaintiffs reincorporate and reallege the allegations set forth in Paragraphs 1 through 114 of the Complaint as though the same were set forth in full herein.

150.     Friedberg was paid an annual salary of $300,000.  In addition, on June 15, 2021, Plaintiff Alameda paid the $3,007,451.30 2021 Alameda Bonus to Friedberg.

151.     The aforementioned payments were transfers of property of the Plaintiffs.

152.     Plaintiffs did not receive reasonably equivalent value in exchange for any of the foregoing payments because Friedberg's conduct as an employee of the Plaintiffs did not provide any benefit to them, but rather centered around acting for the benefit of FTX Insiders and to the Plaintiffs' detriment.

153.     Each of the Plaintiffs (a) was insolvent on the date of the transfer, (b) became insolvent as a result of the transfer; (c) was engaged in a business or a transaction for which any property remaining with the Plaintiffs was an unreasonably small capital; or (d) intended to incur, or believed that it would incur, debts that would be beyond the Plaintiffs' ability to repay as such debts matured.

154.   Accordingly, the transfer should be avoided as fraudulent pursuant to section 548(a)(1)(B) of the Bankruptcy Code, and Plaintiffs may recover from Friedberg pursuant to section 550 of the Bankruptcy Code the full amount of such transfers, plus interest from the relevant dates, and costs and fees to the extent available, for the benefit of the Plaintiffs' bankruptcy estates.

**COUNT VIII**
**Fraudulent Transfer Pursuant to 11 U.S.C. §§ 548(a)(1)(B) and 550**
**(by Alameda Research LLC)**

155.   Plaintiffs reincorporate and reallege the allegations set forth in Paragraphs 1 through 114 of the Complaint as though the same were set forth in full herein.

156.   On June 15, 2021, Plaintiff Alameda paid the $3,007,451.30 2021 Alameda Bonus to Friedberg.  The payment of the 2021 Alameda Bonus to Friedberg was a transfer of property of Alameda.

157.   Plaintiffs received less than reasonably equivalent value in exchange for the transfer.  Because Friedberg was an officer of the Plaintiffs, the transfer was for the benefit of an insider under an employment agreement.  Further, the transfer was not in the ordinary course of business for various reasons, including because Alameda was insolvent at the time the 2021 Alameda Bonus was made and the bonus was for conduct detrimental to Alameda.

158.   Accordingly, the transfer should be avoided as fraudulent pursuant to section 548(a)(1)(B) of the Bankruptcy Code, and Plaintiffs may recover from Friedberg pursuant to section 550 of the Bankruptcy Code the full amount of such transfer, plus interest from the relevant dates, and costs and fees to the extent available, for the benefit of the Debtors' bankruptcy estates.

**COUNT IX**
**Fraudulent Transfer Pursuant to Del. Code Ann. Tit. 6, § 1304(a)(1)**
**and 11 U.S.C. §§ 544(b) and 550**
**(by all Plaintiffs)**

159.    Plaintiffs reincorporate and reallege the allegations set forth in Paragraphs 1 through 114 of the Complaint as though the same were set forth in full herein.

160.    Section 544(b) of the Bankruptcy Code authorizes Plaintiffs to avoid any transfer of an interest in their property that is voidable under applicable law by a creditor holding an allowable unsecured claim.    Accordingly, fraudulent transfers are avoidable pursuant to Bankruptcy Code section 544(b) and other applicable law, including the Delaware Uniform Fraudulent Transfer Act, Del. Code Ann. tit. 6, § 1301, *et seq.*

161.    Friedberg was paid an annual salary of $300,000, a $1.4 million signing bonus, 8% equity in FTX US, and performance-based annual bonuses.  On June 15, 2021, Plaintiff Alameda paid the $3,007,451.30 2021 Alameda Bonus to Friedberg.

162.    The aforementioned payments were transfers of property of the Plaintiffs.

163.    In addition, in July 2020, the FTX Group caused Friedberg to be granted 102,321,128 Serum tokens as well as, potentially, other transfers of cryptocurrencies or assets.

164.    The ability to obtain the Serum tokens was an opportunity of the Plaintiffs because of, among other things, Alameda's membership in the Solana Foundation.    Therefore, that opportunity was property of the Plaintiffs, and the transfer of Serum tokens to Friedberg was a transfer of property of the Plaintiffs.

165.    On June 15, 2021, Plaintiff Alameda paid the $3,007,451.30 2021 Alameda Bonus to Friedberg.  The payment of the 2021 Alameda Bonus to Friedberg was a transfer of property of Alameda.  Each of the transfers is avoidable by creditors who hold allowable unsecured claims.

{1368.002-W0071411.}

166.    Those transfers were made to Friedberg for, and in connection with, Friedberg's and the other FTX Insiders' misconduct as alleged herein.  Thus, the transfers were in furtherance of a fraudulent scheme to hinder, delay, or defraud creditors.

167.    Multiple badges of fraud recognized by bankruptcy law and Del. Code Ann. tit. 6, § 1304(b) permeate the 2021 Alameda Bonus, including that:

a.    The transfers was part of a scheme to enrich and otherwise benefit the FTX Insiders and Friedberg.

b.    Material facts relating to the transfer were concealed.

c.    Friedberg removed or concealed Plaintiffs' assets.

d.    The value of the consideration received by Plaintiffs was not reasonably equivalent to the value of the assets transferred or the amount of the obligations incurred.

e.    Plaintiffs were insolvent when, or became insolvent shortly after, the transfer was made; and

f.    The transfer occurred shortly before or shortly after Plaintiffs incurred substantial debts.

168.    Accordingly, the transfers should be avoided as fraudulent pursuant to Del. Code Ann. tit. 6, § 1304(a)(1) and 11 U.S.C. § 544(b), and Plaintiffs may recover from Friedberg pursuant to section 550 of the Bankruptcy Code the full amount of such transfers, plus interest from the relevant dates, and costs and fees to the extent available, for the benefit of the Plaintiffs' bankruptcy estates.

### COUNT X
### Fraudulent Transfer Pursuant to Del. Code Ann. Tit. 6, § 1304(a)(2)
### and 11 U.S.C. §§ 544(b) and 550
### (by all Plaintiffs)

169.    Plaintiffs reincorporate and reallege the allegations set forth in Paragraphs 1 through 114 of the Complaint as though the same were set forth in full herein.

{1368.002-W0071411.}

170.    Section 544(b) of the Bankruptcy Code authorizes Plaintiffs to avoid any transfer of an interest in their property that is voidable under applicable law by a creditor holding an allowable unsecured claim.    Accordingly, fraudulent transfers are avoidable pursuant to Bankruptcy Code Section 544(b) and other applicable law, including the Delaware Uniform Fraudulent Transfer Act, Del. Code Ann. tit. 6, § 1301, *et seq*.

171.    Friedberg was paid an annual salary of $300,000, a $1.4 million signing bonus, 8% equity in FTX US, and performance-based annual bonuses.    On June 15, 2021, Plaintiff Alameda paid the $3,007,451.30 2021 Alameda Bonus to Friedberg.

172.    The aforementioned payments were transfers of property of the Plaintiffs.

173.    In addition, in July 2020, the FTX Group caused Friedberg to be granted 102,321,128 Serum tokens as well as, potentially, other transfers of cryptocurrencies or assets.

174.    The ability to obtain the Serum tokens was an opportunity of the Plaintiffs because of, among other things, Alameda's membership in the Solana Foundation.    Therefore, that opportunity was property of the Plaintiffs, and the transfer of Serum tokens to Friedberg was a transfer of property of the Plaintiffs.

175.    On June 15, 2021, Plaintiff Alameda paid the $3,007,451.30 2021 Alameda Bonus to Friedberg.    The payment of the 2021 Alameda Bonus to Friedberg was a transfer of property of Alameda.

176.    Plaintiffs did not receive reasonably equivalent value in exchange for any of the aforementioned transfers (the "Fraudulent Transfers").    Friedberg's conduct as General Counsel for Alameda did not provide any benefit to Alameda, but rather centered around acting for the benefit of FTX Insiders and to Alameda's detriment.

177.     Each of the Plaintiffs (a) was insolvent on the date that each transfer was made; (b) became insolvent as a result of these transfers; (c) engaged or was about to engage in a business or a transaction for which the remaining assets of the Plaintiff were unreasonably small in relation to the business or transaction; or (d) intended to incur, or believed it would incur, or reasonably should have believed that it would incur debts that would be beyond the Plaintiff's ability to repay as such debts became due.

178.     Each of the transfers is avoidable by creditors who hold allowable unsecured claims, including creditors who were creditors before the transfers.

179.     Accordingly, the transfers should be avoided as fraudulent pursuant to Del. Code Ann tit. 6, §§ 1304(a)(2) and 1305, and 11 U.S.C. § 544(b), and Plaintiffs may recover from Friedberg pursuant to section 550 of the Bankruptcy Code the full amount of such transfers, plus interest from the relevant dates, and costs and fees to the extent available, for the benefit of the Plaintiffs' bankruptcy estates.

## COUNT XI
## Disallowance of Claims Pursuant to 11 U.S.C. § 502(d)
### (by all Plaintiffs)

180.     Plaintiffs reincorporate and reallege the allegations set forth in Paragraphs 1 through 114 and Paragraphs 143 through 179 of the Complaint as though the same were set forth in full herein.

181.     As alleged above, Friedberg is a transferee of transfers avoidable under sections 544 and 548 of the Bankruptcy Code and is a person from whom property is recoverable under section 550 of the Bankruptcy Code.

{1368.002-W0071411.}

182.     By reason of the foregoing facts and pursuant to section 502(d) of the Bankruptcy Code, any claims of Friedberg that have been or will in the future be asserted in the Plaintiffs' Chapter 11 Cases should be disallowed unless and until Friedberg has relinquished to Plaintiffs the property transferred, or has paid the Plaintiffs the value of such transferred property.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in favor of the Plaintiffs and against Defendant and grant the following relief:

(a)     Award Plaintiffs compensatory damages in an amount to be determined at trial;

(b)     Disgorgement of all of Defendant's compensation paid by Plaintiffs;

(c)     Avoid the fraudulent transfers to or for the benefit of Defendant, and direct Defendant to return to Plaintiffs the transferred property or the value thereof, plus pre-judgment and post-judgment interest at the maximum legal rate and to the fullest extent allowed by applicable law, together with attorney's fees and costs;

(d)     Award Plaintiffs punitive damages in an amount to be determined at trial resulting from Defendant's conscious, willful, wanton, and malicious conduct, which exhibits a reckless disregard for the interests of Plaintiffs and their creditors;

(e)     Award Plaintiffs pre-judgment and post-judgment interest at the maximum rate permitted by law or equity;

(f)     Award Plaintiffs' reasonable and necessary attorney's fees and expenses, together with all costs of court, and investigation expenses; and

(g)     Grant Plaintiffs such other and further relief as this Court may deem just and proper.

{1368.002-W0071411.}

Respectfully submitted,

Dated: June 27, 2023
      Wilmington, Delaware

**LANDIS RATH & COBB LLP**

By: */s/ Matthew B. McGuire*
    Adam G. Landis (No. 3407)
    Kimberly A. Brown (No. 5138)
    Matthew B. McGuire (No. 4366)
    Matthew R. Pierce (No. 5946)
    919 Market Street, Suite 1800
    Wilmington, Delaware 19801
    Telephone: (302) 467-4400
    Facsimile: (302) 467-4450
    E-mail: landis@lrclaw.com
           mcguire@lrclaw.com
           brown@lrclaw.com
           pierce@lrclaw.com

*Counsel for the Debtors*
*and Debtors-in-Possession*

-and-

**QUINN EMANUEL URQUHART &**
**SULLIVAN, LLP**
William A. Burck (*pro hac vice*)
1300 I Street NW, Suite 900
Washington, D.C. 20005
(202) 538-8000
williamburck@quinnemanuel.com

Sascha N. Rand (*pro hac vice*)
Katherine A. Lemire (*pro hac vice*)
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000
sascharand@quinnemanuel.com
katherinelemire@quinnemanuel.com

*Special Counsel to the Debtors*