## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |

| | |
|---|---|
| FTX TRADING LTD., ALAMEDA RESEARCH LLC, ALAMEDA RESEARCH LTD., NORTH DIMENSION INC., COTTONWOOD GROVE LTD. and WEST REALM SHIRES, INC., | |
| Plaintiffs, | |
| -against- | Adv. Pro. No. 23-_____ (JTD) |
| SAMUEL BANKMAN-FRIED, ZIXIAO "GARY" WANG, NISHAD SINGH and CAROLINE ELLISON, | |
| Defendants. | |

**COMPLAINT FOR AVOIDANCE AND RECOVERY OF TRANSFERS AND OBLIGATIONS PURSUANT TO 11 U.S.C. §§ 105, 544, 548 AND 550, AND DEL. CODE ANN. TIT. 6, §§ 1304 AND 1305, FOR BREACHES OF FIDUCIARY DUTIES, FOR AIDING AND ABETTING BREACHES OF FIDUCIARY DUTIES, FOR KNOWING ASSISTANCE IN BREACHES OF FIDUCIARY DUTIES, FOR WASTE OF CORPORATE ASSETS, FOR AIDING AND ABETTING WASTE OF CORPORATE ASSETS, FOR CONVERSION, FOR DISALLOWANCE OF CLAIMS PURSUANT TO 11 U.S.C. § 502, AND FOR EQUITABLE SUBORDINATION OF CLAIMS PURSUANT TO 11 U.S.C. § 510(c)(1)**

---

[1] The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and 4063 respectively. Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX. The principal place of business of Debtor Emergent Fidelity Technologies Ltd is Unit 3B, Bryson's Commercial Complex, Friars Hill Road, St. John's, Antigua and Barbuda.

Plaintiffs FTX Trading Ltd. ("FTX"), Alameda Research LLC ("Alameda LLC"), Alameda Research Ltd. ("Alameda"), North Dimension Inc. ("North Dimension"), Cottonwood Grove Ltd. ("Cottonwood") and West Realm Shires, Inc. ("WRS") (together, "Plaintiffs"), through their undersigned counsel, for their Complaint against Samuel Bankman-Fried, Zixiao "Gary" Wang, Nishad Singh and Caroline Ellison (together, "Defendants") allege the following based upon personal knowledge and upon their investigation to date as to themselves and their own acts, and upon information and belief as to all other matters:

## NATURE OF THE CASE

1.      This action seeks to recover damages caused by Defendants' breaches of their fiduciary duties and to avoid and recover unlawful transfers of hundreds of millions of dollars that Defendants misappropriated from the estates of the above-captioned debtors and debtors-in-possession (collectively, the "Debtors" and each a "Debtor").  Defendants abused their control over the FTX Group[2] to commit one of the largest financial frauds in history.  Beginning shortly after inception of the FTX Group, Defendants misappropriated Debtor funds on a continuous basis to finance luxury condominiums, political and "charitable" contributions, speculative investments and other pet projects that inured to the benefit of Defendants rather than the Debtor entities that paid for them.

2.      Defendants intentionally operated the FTX Group, as an integrated whole, without recognizing corporate formalities and separateness, in a manner that placed their own interests above those of the companies they were charged with managing.  They created an environment

---

[2]     The FTX Group comprises four silos:  (a) a group composed of Plaintiff and Debtor WRS and its Debtor and non-Debtor subsidiaries; (b) a group composed of Plaintiffs and Debtors Alameda, Alameda LLC and their Debtor subsidiaries; (c) a group composed of Debtor Clifton Bay Investments LLC, Debtor Clifton Bay Investments Ltd., Debtor Island Bay Ventures Inc. and Debtor FTX Ventures Ltd.; and (d) a group composed of Plaintiff and Debtor FTX Trading Ltd. and its Debtor and non-Debtor subsidiaries.

in which a handful of employees had virtually limitless power to direct transfers of fiat currency and cryptocurrency and to hire and fire employees, with no effective oversight and no checks on how they exercised those broad powers.  Defendants rejected advice to put appropriate operational and governance controls in place at the FTX Group, exposing the exchanges to harm from both external bad actors and Defendants' own misconduct.  They commingled and misused corporate and customer funds, lied to third parties about the business of the FTX Group, joked internally about their tendency to lose track of millions of dollars in assets and impulsively bought companies with misappropriated funds without conducting any due diligence.  Their misconduct caused the FTX Group to collapse, to the great detriment of customers, creditors and shareholders.

3.      Plaintiffs bring this action for breaches of fiduciary duty, aiding and abetting breaches of fiduciary duty, knowing assistance in breaches of fiduciary duties, waste of corporate assets, aiding and abetting waste of corporate assets, conversion, intentional and constructive fraudulent transfer, and equitable subordination pursuant to Sections 105, 502, 510, 544, 548 and 550 of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), and Sections 1304 and 1305 of Title 6 of the Delaware Code, Del. Code Ann. tit. 6, §§ 1304(a)(1)-(2) and 1305, to avoid and recover from Defendants, or from any other person or entity for whose benefit the transfers were made or obligations incurred, all transfers of property of Plaintiffs and all obligations of Plaintiffs to Defendants made prior to the commencement of the above-captioned bankruptcy cases (collectively, the "Chapter 11 Cases" and each a "Chapter 11 Case") by the Debtors.

4.      On November 11 and November 14, 2022 (as applicable, the "Petition Date"), the Debtors filed with the United States Bankruptcy Court for the District of Delaware (the "Court")

voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.  No trustee has been appointed for Plaintiffs or any other Debtor in the Chapter 11 Cases, and the Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.  Joint administration of the Chapter 11 Cases was authorized by the Court by an order entered on November 22, 2022 [D.I. 128]. Accordingly, Plaintiffs have the authority to file this Complaint to commence, and thereafter to prosecute, this proceeding.

5.      As detailed herein, fraudulent transfers worth over a billion dollars were made for the benefit of Defendants during the period February 2020 to November 2022.  All of the transfers are avoidable under the Bankruptcy Code and/or Title 6 of the Delaware Code.

6.      Pursuant to Section 502(d) of the Bankruptcy Code, Plaintiffs also seek to disallow and equitably subordinate any and all claims filed or held by Defendants in these Chapter 11 Cases unless and until Defendants have relinquished to Plaintiffs all property that Defendants received in transfers determined by the Court to be avoidable and recoverable under the Bankruptcy Code.

7.      During the course of this proceeding, Plaintiffs may learn (through formal discovery or otherwise) of additional transfers made, or obligations incurred, to Defendants that are avoidable under the Bankruptcy Code.  Indeed, because of the state of the Debtors' records and the near-complete control that Defendants were able to exercise over those records prior to the filing of the Chapter 11 Cases, the Debtors expect to discover additional avoidable transfers and obligations, as well as other claims, and expressly reserve the right to amend this complaint or file additional actions against Defendants, as appropriate, to protect the interests of their estates.

## THE PARTIES

8.      Plaintiff FTX is a corporation registered in Antigua and Barbuda.  Its principal place of business was in Nassau, Bahamas.  FTX did business as "FTX.com," a global exchange that offered customers the ability to trade cryptocurrencies and cryptocurrency-related derivatives.  FTX is 80% owned by Paper Bird Inc., a Delaware corporation that is wholly-owned by Bankman-Fried.  The remaining 20% is owned by hundreds of minority shareholders, including FTX Group employees—many of whom received substantial portions of their compensation in the form of equity—and various investment funds.

9.      Plaintiff Alameda is a British Virgin Islands company limited by shares.  It is a wholly-owned subsidiary of Alameda LLC.

10.     Plaintiff Alameda LLC is a Delaware limited liability company that is 90% owned by Bankman-Fried and 10% owned by Wang.

11.     Plaintiff North Dimension is a Delaware corporation.  It is a wholly-owned subsidiary of Alameda LLC.

12.     Plaintiff Cottonwood is a Hong Kong corporation.  It is a wholly-owned subsidiary of Alameda.

13.     Plaintiff WRS is a Delaware corporation that is 52.99% owned by Bankman-Fried, 16.93% owned by Wang, 7.83% owned by Singh and 22.25% owned by other minority shareholders, including WRS employees and outside investors.

14.     Defendant Samuel Bankman-Fried, often referred to as "SBF," is one of the founders of the FTX Group.  He co-founded Alameda LLC in 2017 and served as its Chief Executive Officer through late 2021.  During 2019, he founded FTX.  In 2020, he established a separate group of operating entities that operated a digital asset exchange for U.S. persons ("FTX

US").  At all relevant times, Bankman-Fried was the ultimate majority owner, and effectively controlled the operations, of Plaintiffs and their affiliated Debtors.

15.     Defendant Zixiao "Gary" Wang was a co-founder of FTX and its former Chief Technology Officer.  Wang was also the Chief Technology Officer of WRS.

16.     Defendant Nishad Singh was the former Director of Engineering at FTX.  Singh was also the Chief Security Officer and Chief Engineer of WRS.

17.     Defendant Caroline Ellison was the Co-Chief Executive Officer of Alameda LLC from August 2021 until September 2022, when she was named the sole CEO and director.  From September 6, 2022 to the Petition Date, Ellison also served as a director of Alameda.

## JURISDICTION AND VENUE

18.     This a proceeding commenced pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure because, at a minimum, it seeks, among other things, to recover money or property belonging to the Debtors' Chapter 11 estates.  Fed. R. Bankr. P. 7001(1).

19.     This proceeding relates to the Chapter 11 Cases filed with this Court on the Petition Date.

20.     The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157(a), 1334(a) and 1367(a), and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.

21.     This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b), and the Court may enter final orders herein.

22.     Venue of this adversary proceeding in this District is proper pursuant to 28 U.S.C. § 1409, and is consistent with the interests of justice, judicial economy and fairness.

23.     The statutory predicates for the relief requested herein are Sections 105(a), 502(d), 510, 544, 548 and 550 of the Bankruptcy Code and Sections 1304 and 1305 of Title 6 of the Delaware Code.

24.     Pursuant to Rule 7008-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware, Plaintiffs consent to the entry of final orders and judgments by the Court on these claims to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

## FACTUAL ALLEGATIONS

**I.    Defendants' Scheme to Defraud the FTX Group's Customers, Creditors and Shareholders**

25.     Prior to the Petition Date, the FTX Group operated cryptocurrency exchanges and trading businesses.  As explained in the First Day Declarations (defined below), the FTX Group faced a severe liquidity crisis that necessitated the filing of these Chapter 11 Cases on an emergency basis on November 11 and 14, 2022.  Additional factual background relating to the FTX Group's businesses and the commencement of these Chapter 11 Cases is set forth in the *Declaration of John J. Ray III in Support of Chapter 11 Petitions and First Day Pleadings* [D.I. 24], the *Declaration of Edgar W. Mosley II in Support of Chapter 11 Petitions and First Day Pleadings* [D.I. 57], the *Supplemental Declaration of John J. Ray III in Support of First Day Pleadings* [D.I. 92] and the *Supplemental Declaration of Edgar W. Mosley II in Support of First Day Pleadings* [D.I. 93] (collectively, the "First Day Declarations").

26.     Defendants used their close control over the FTX Group's businesses and systems to perpetrate a massive fraud—squandering the FTX Group's assets on, among other things,

luxury homes, political and "charitable" contributions, and various investments that would inure

to the benefit of Defendants rather than the corporate entities that had paid for them.

27.     Defendants funded much of this spending through Alameda, which, at

Defendants' direction, unlawfully diverted billions of dollars in assets belonging to FTX.com,

the principal international cryptocurrency exchange operated by the FTX Group, to the

Defendants' pet projects.  In doing so, Defendants defrauded FTX.com's customers, creditors

and shareholders, and violated their fiduciary duties and numerous laws.

28.     Prior to their resignations or terminations amidst FTX's collapse, Defendants held

virtually all of the top executive positions at the collective FTX Group, which did not have any

independent board of directors or board of managers overseeing those executives.  Bankman-

Fried was the CEO of FTX until the Petition Date, was the sole director of Alameda until

September 6, 2022, and was previously the CEO and sole director of WRS.  Even after formally

stepping down as the sole director of Alameda on September 6, 2022, Bankman-Fried continued

to exercise substantial control over Alameda.  Wang served as the Chief Technology Officer at

both FTX and WRS.  Singh served as the Director of Engineering at both FTX and WRS as well

as serving as Chief Security Officer at WRS.  Ellison was the co-CEO of Alameda LLC from

August 2021 until September 2022, when she was named the sole CEO and director.  Ellison was

also a director of Alameda from September 6, 2022 until the Petition Date.

29.     Defendants' conduct is currently the subject of criminal proceedings initiated by

federal prosecutors and actions or investigations brought by the Securities and Exchange

Commission, the Commodity Futures Trading Commission and a host of state and international

regulators.  All of the Defendants, except for Bankman-Fried, have pleaded guilty to crimes

perpetrated through the very practices that underlie this action.  On December 19, 2022, Wang

and Ellison pleaded guilty to multiple felonies, including wire fraud, conspiracy to commit wire

fraud, conspiracy to commit commodities fraud and conspiracy to commit securities fraud;

Ellison also pleaded guilty to conspiracy to commit money laundering.  *See* Min. Entry, Dec. 19,

2022, *United States* v. *Bankman-Fried*, 22-cr-00673 (S.D.N.Y. 2022).  On February 28, 2023,

Singh pleaded guilty to the same felonies as Ellison as well as conspiracy to make unlawful

political contributions and defraud the Federal Election Commission.  *See* Min. Entry, Feb. 28,

2023, *United States* v. *Bankman-Fried*, 22-cr-00673 (S.D.N.Y. 2022).  At all times prior to the

Petition Date, Defendants collectively held majority stakes in FTX, Alameda and WRS and

exercised exclusive control over the actions of those entities.

  30. In connection with his plea, Wang admitted that in 2019 he made "certain changes

to the [FTX.com] code" to give Alameda "special privileges on the FTX platform," including to

allow Alameda unfettered use of assets on the FTX.com exchange, even while Alameda

maintained negative balances in its own holdings of fiat (*i.e.*, government-issued) currencies and

cryptocurrencies.  Plea Tr. 24:6-10, *United States* v. *Wang*, 22-cr-00673 (S.D.N.Y. 2022), ECF

No. 21.  Using these "special privileges," Defendants frequently caused Alameda to spend large

amounts of Debtors' funds for their own personal benefit.

  31. Bankman-Fried has repeatedly, and publicly, stated that Alameda operated as "a

wholly separate entity" from FTX.com.  Annie Massa et al., *Sam Bankman-Fried and Alameda

CEO Caroline Ellison Spoke About Red Flags at FTX 3 Months Before It Collapsed.  Here's

What They Said – and How They Lied*, Fortune (Nov. 18, 2022, 5:58 AM),

https://fortune.com/2022/11/18/sam-bankman-fried-alameda-ceo-caroline-ellison-spoke-red-

flags-ftx-3-months-before-it-collapsed-what-said-how-lied/.  Ellison was quoted as saying that

"[w]e keep them [FTX and Alameda] quite separate in terms of day-to-day operations."  *Id.*  In

reality, however, Defendants routinely, and secretly, used Alameda to loot "several billion

dollars" from FTX.com using the "special privileges," thereby defrauding FTX.com's creditors.

Plea Tr. 28:23-29:2, *United States* v. *Singh*, 22-cr-00673 (S.D.N.Y. 2022), ECF No. 102; Plea

Tr. 24:6-10, *United States* v. *Wang*, 22-cr-00673 (S.D.N.Y. 2022), ECF No. 21.

32.     Bankman-Fried also conspired with Ellison and others to divert funds to Alameda

that were intended to be deposited at FTX.com before they reached the exchange, so that

Defendants could use those funds to benefit themselves.  Beginning in 2019 and continuing

through 2022, Bankman-Fried caused FTX.com customers to deposit funds into bank accounts

controlled by Alameda and then North Dimension, without disclosing to the banks that held

those accounts or to FTX.com customers the nature of the arrangement between FTX.com

Alameda and North Dimension.  *See* Superseding Indictment ¶ 18, *United States* v.

*Bankman-Fried*, 22-cr-00673 (S.D.N.Y. 2022), ECF No. 115.

33.     In April 2021, Bankman-Fried ink-signed a sham "Payment Agent Agreement,"

that was falsely backdated by nearly two years.  An outside law firm was asked to prepare the

intercompany agreement for the sole purpose of providing it to an external auditor that had been

retained to prepare an audited financial statement of FTX in connection with a contemplated

initial public offering ("IPO") of the company.  A senior FTX attorney directed that the

agreement state that "FTX gets first dibs on Alameda's cash," an apparent attempt to paper over

the fact that there were no existing limitations on Alameda's ability to spend FTX exchange

customers' cash for its own purposes.  The draft agreement the law firm subsequently provided

stated that Alameda provided "cash management" services for FTX, and that assets of FTX held

by Alameda pursuant to the agreement would be deemed a loan to Alameda.  Beginning in

March 2021, the same FTX attorney prepared another version of the sham agreement that did not

reflect any loan to Alameda, which stated Alameda provided mere "payment services" pursuant to which it would "complete payments . . . as directed by FTX from time to time" and receive assets from FTX "to be held and/or transferred . . . as quickly as commercially possible." In reality, Alameda never transferred and had no intention of transferring customer deposits to FTX at all.

34.    In the days leading up to the Petition Date, Bankman-Fried supplied potential investors with a purported Alameda balance sheet that included a liability of $8 billion in a "Hidden, poorly internally labled [sic] 'fiat@' account." *Id.* ¶ 56. However, Bankman-Fried "well knew" that this liability reflected "FTX customer fiat deposits accepted into Alameda's bank accounts that had not been maintained for the benefit of customers or repaid to FTX[.]" *Id.* ¶ 57. Defendants used these funds "to make investments in the name of Bankman-Fried and his associates, rather than in the name of Alameda." *Id.* ¶ 26.

35.    Defendants were aware at all relevant times of the "special privileges on the FTX platform" that allowed Alameda to "borrow" billions of dollars from FTX.com in order to, *inter alia*, finance "loans" from Alameda to Defendants. Ellison admitted that from 2019 through 2022 she was aware of this arrangement, which she described as "permitt[ing] Alameda access to an unlimited line of credit without being required to post collateral . . . pay interest . . . or being subject to margin calls or FTX.com's liquidation protocols." Plea Tr. 27:11-15, *United States* v. *Ellison*, 22-cr-00673 (S.D.N.Y. 2022), ECF No. 19. Ellison also "understood that FTX would need to use customer funds" to make many of its investments, *id.* at 28:1-4, and admitted that many investments "were done in the name of Alameda instead of FTX in order to conceal the source and nature of those funds." *Id.* at 28:22-29:1.

36.     In the days leading up to the Petition Date, Ellison messaged Bankman-Fried that she "had an increasing dread of this day that was weighing on me for a long time, and now that it's actually happening it just feels great to get it over with[,] one way or another." *See* Superseding Indictment ¶ 53, *United States* v. *Bankman-Fried*, 22-cr-00673 (S.D.N.Y. 2022), ECF No. 115.

## II.     Defendants Were Top Officers and Directors and Had Access to Confidential Information Allowing Them to Carry Out Their Schemes.

37.     By virtue of their positions as top FTX Group officers and/or directors, Defendants were privy to confidential, non-public information concerning the FTX Group, its operations, practices, finances and present and future business prospects.  Because of this access, each of the Defendants knew or had access to the facts specified in this Complaint, and knew that multiple related-party transactions, commingling of customer and non-customer funds, fraudulent conduct, and other events adverse to the FTX Group were occurring under their watch and had not been disclosed to the public.  Indeed, in most instances, they specifically directed that these activities and other events occur.

38.     Defendants, as directors and/or officers of the FTX Group, owed fiduciary duties—including duties of care, loyalty, good faith, fair dealing and oversight—to the FTX Group.  As a result of these duties, Defendants were required (among other things) (a) to competently manage the FTX Group in a fair, just and equitable manner; (b) to act in furtherance of the best interests of the FTX Group; (c) to govern the FTX Group in a manner that benefited it and its stakeholders and not their personal interests; (d) to refrain from abusing their positions of control, power, prestige and profit; (e) not to favor their own interests at the expense of the FTX Group or usurp the FTX Group's corporate opportunities; (f) to avoid and prevent corporate waste and unnecessary expense; and (g) to engage in proper oversight of the FTX Group,

including by implementing adequate controls and addressing "red flags" that arose within their area of authority.

### III.    Defendants Breached Their Fiduciary Duties by Intentionally Failing to Implement Appropriate Management and Governance Controls.

39.    Defendants intentionally failed to implement management and governance controls in order to facilitate their fraudulent schemes and misappropriation of Debtor funds. With isolated exceptions, entities within the FTX Group lacked experienced finance, accounting, human resources, information security, or cybersecurity leadership or personnel, and lacked any internal audit function whatsoever. As senior executives of the FTX Group entities, Defendants were responsible for ensuring that proper safeguards were in place to prevent fraud and other wrongdoing. Defendants utterly failed to carry out these responsibilities: rather than implementing internal controls that would prevent fraud and other wrongdoing, Defendants actively participated in such misconduct. In so doing, Defendants breached their fiduciary duties of loyalty and oversight (among others).

40.    Efforts to clarify corporate responsibilities and enhance compliance were rejected and resulted in retaliation. For example, Brett Harrison, for a short time the President of FTX US—one of the few senior executive roles not filled by Defendants—resigned following a protracted disagreement with Bankman-Fried and Singh over the lack of appropriate formal management structure and lack of experienced senior executives at FTX US. Similarly, an Alameda lawyer was summarily terminated, less than three months after being hired, after discovering and raising concerns that Alameda LLC owned North Dimension and that Defendants were using North Dimension accounts to fund FTX exchange customers' withdrawals. The attorney began asking questions about this practice, as he understood that

Alameda was a proprietary trading firm that was not involved in handling exchange customer

funds and did not have a license to act as a money services business.

41.    Additionally, under Defendants' leadership, the FTX Group lacked an adequate

accounting system.  A majority of entities within the FTX Group did not prepare financial

statements of any kind.  Those entities that did prepare financial statements used QuickBooks

accounting software and relied on a hodgepodge of Google documents, Slack communications,

shared drives, Excel spreadsheets and other non-enterprise solutions to manage their assets and

liabilities.  QuickBooks was designed for use by small and mid-sized businesses, new businesses

and freelancers.  QuickBooks was not designed to meet the needs of a large and complex

business like the FTX Group, which handled billions of dollars of securities, fiat currency and

cryptocurrency transactions across multiple continents and platforms.

42.    Moreover, intercompany and insider transfers were often recorded in QuickBooks

in a manner inconsistent with the apparent purpose of such transfers.  For example, tens of

millions of dollars' worth of transfers to Bankman-Fried in 2021 and 2022 were documented by

purported promissory notes, but were recorded on the general ledger as "Investments in

Subsidiaries: Investments-Cryptocurrency."

43.    As a result of Defendants' purposeful failures to implement proper controls, and

the inherent limitations of QuickBooks for use in a large and complex business, the FTX Group

did not maintain accurate financial records.  This made it easier for Defendants to misappropriate

assets and made it much more difficult for others to detect Defendants' wrongdoing.

44.    In an internal communication, Bankman-Fried boasted that Alameda was

"hilariously beyond any threshold of any auditor being able to even get partially through an

audit," adding:

Alameda is unauditable. I don't mean this in the sense of "a major accounting firm will have reservations about auditing it"; I mean this in the sense of "*we* are only able to ballpark what its balances are, let alone something like a comprehensive transaction history.["] We sometimes find $50m of assets lying around that we lost track of; such is life.

45.    Although the FTX Group consisted of many separate entities, all were controlled by Defendants.  Transfers of funds among those entities were not properly documented, and often deliberately obfuscated by Defendants, rendering tracing of funds extremely challenging. To make matters worse, Slack, Signal and other ephemeral methods of communication were frequently used to communicate approvals.  Signal and Telegram were at times utilized for communications with both internal and external parties with "disappearing messages" enabled, rendering later review of the communications impossible.  Expenses and invoices of the FTX Group were submitted on Slack and were approved by "emoji."  These ephemeral messaging systems were used to procure approvals for tens of millions of dollars of transfers, leaving only informal and unreliable records of such transfers, or no records at all.

46.    Defendants' failure to implement controls extended to digital asset management, information security and cybersecurity—matters of vital importance to Plaintiffs' businesses. For example, Plaintiffs had no dedicated personnel in the specialized discipline of cybersecurity, instead letting Singh and Wang oversee the FTX Group's cybersecurity needs despite their lack of training or experience in that discipline.  Defendants also caused the FTX Group to fail to implement basic, widely-accepted security controls to protect crypto assets, such as maintaining digital assets in "cold" wallets that are not connected to the Internet to guard against hacking, rather than in Internet-connected "hot" wallets.

47.    Defendants' willful failure to establish adequate controls throughout the FTX Group constitutes misconduct that was both a breach of fiduciary duties in itself as well as a tool

to enable Defendants to engage in additional breaches, including the intentional acts of fraud for

which Defendants now face federal prosecution.

**IV.    Defendants Breached Their Fiduciary Duties by and Through Their Commingling of Corporate and Customer Assets.**

48.    At Defendants' direction, the FTX Group portrayed itself as the vanguard of

customer protection efforts in the crypto industry.  Bankman-Fried publicly claimed to support

federal legislation to safeguard consumers' digital assets, and touted the FTX exchanges'

purported procedures to protect fiat currency and crypto deposits, including in testimony he

provided to the U.S. Senate.  The image that Defendants sought to portray of the FTX Group as

the customer-focused leader of the digital age was a mirage.  In fact, at Defendants' direction,

the FTX Group commingled customer deposits and corporate funds, and misused and

misappropriated them with abandon.

49.    To evade restrictions and due diligence requirements imposed by banks, and to

avoid registering as a money services business (with associated regulatory requirements that

FTX sought to avoid), Defendants caused the FTX Group to funnel customer deposits and

withdrawals in fiat currency through Alameda's preexisting bank accounts, and made

misrepresentations to banks about the purpose for which it was using those Alameda accounts.

Indeed, Bankman-Fried picked the name "Alameda Research" because it did not sound like a

cryptocurrency firm, telling one online interviewer:  "If we named our company Sh*tcoin Day

Traders, Inc., like, [bank compliance officials] would probably reject us."  As Bankman-Fried

cynically acknowledged in another interview in 2021:

> Especially in 2017, if you named your company like "We Do Cryptocurrency
> Bitcoin Arbitrage Multinational Stuff," no one's going to give you a bank account
> . . . .  [T]hey're just going to be like . . . we've been warned about companies with
> this name.  You know, you're going to have to go through the enhanced [due
> diligence] process.  And I don't want to bother with that right now; it's almost
> lunchtime . . . .  But everyone wants to serve a research institute.

50.     By 2020, certain of Alameda's banks began raising questions about Alameda's wire activity and/or rejecting wires to or from Alameda.  Rather than come clean, Defendants continued to lie.  For example, after a bank representative informed Alameda that he "noticed references to 'FTX,'" and asked if Alameda's account would "be[] used to settle trades for their derivatives exchange platform (FTX Trading)," an Alameda employee—at the direction of a senior FTX Group executive—falsely responded that "customers occasionally confuse FTX and Alameda" but that "[a]ll incoming/outgoing wires are to settle trades with Alameda Research." In reality, at Defendants' direction, Alameda extensively commingled customer and non-customer funds and used its accounts for customer-related transfers.  Subsequently, in a further effort to avoid bank scrutiny, Defendants caused the FTX Group to incorporate North Dimension as a new entity with the sole purpose of enabling the FTX Group to obtain bank accounts through which it could operate the FTX exchange.

51.     As with the Alameda accounts, Defendants allowed customer and non-customer funds to be commingled in the North Dimension accounts.  Once banks began to question the relationship between North Dimension and FTX, Bankman-Fried and other senior executives again modified their scheme, this time directing FTX customers to deposit funds into other bank accounts within the FTX Group.  The FTX Group used funds in these accounts, like funds in other commingled accounts, for many purposes, including the cycling of money to and from customers to meet withdrawal requests as well as to make various investments, donations and expenditures for Defendants' benefit.

52.     At Defendants' direction, Alameda also relied on a special exception in the software code base for the exchanges—called the *allow_negative* privilege—which enabled Defendants to cause Alameda to borrow customers' crypto assets using collateral that did not

exist, and ultimately to steal billions of dollars of customers' crypto assets without their

knowledge. Defendants also made other modifications to the code base that enabled Alameda to

borrow up to $65 billion on FTX.com and avoid liquidation even while in a net-negative

position, effectively enabling Alameda to borrow without limit on FTX.com. As a result,

Defendants exposed unwitting exchange customers to Alameda's substantial, undisclosed credit

risk, which grew exponentially as Alameda secretly came to dominate all borrowing on the

exchange.

53.    Unsurprisingly, Defendants were pleased to have access to virtually unlimited

borrowing. In one exchange, an Alameda developer informed its senior executives that:

> until we reach a solution with FTXUS, please be careful about setting FTXUS
> borrowing [ ] very high. we were like 5% BTC drop away from liquidation . . . .
> i've reached out to them so they will set up a situation like our ftx borrowing1 sub
> [the Borrowing Subaccount], which will not get liq[uidate]d.

Ellison responded with a "claps" emoji.

54.    As of the Petition Date, Defendants had caused the FTX Group to misappropriate

billions of dollars in customer and Debtor assets. From the inception of the FTX.com exchange,

the FTX Group commingled customer deposits and corporate funds, and misused them with

abandon. By August 2022, Bankman-Fried, Wang, Singh and Ellison privately estimated that

the FTX.com exchange owed customers more than $8 billion in fiat currency that it could not

repay. To hide the shortfall, Defendants created a sham customer account on FTX.com that they

referred to as "our Korean friend's account." Although media outlets have focused on their

estimate in August 2022 of a cash liability of $8.9 billion, reflected in the sham "Korean friend"

account, Defendants' estimate was at times even higher. In March 2022, for example, Ellison

estimated in private notes that FTX.com had a cash deficit alone of more than $10 billion.

55.     Their commingling and theft of customer assets enabled Defendants to spend profligately on political and "charitable" donations, venture investments and acquisitions, and the purchase of luxury real estate, all for Defendants' own benefit.

**A.     Political and "Charitable" Donations Using Commingled Funds**

56.     Bankman-Fried, Singh and another FTX Group senior executive made more than $100 million in political donations, occasionally funded via purported "loans" from the FTX Group, but often funded through transfers of commingled funds under Defendants' control without any pretense of a lending arrangement.

57.     For example, on November 19, 2021, Singh made a $500,000 contribution to a Political Action Committee ("PAC") called People for Progressive Governance, which was formed by the president of Bankman-Fried's super PAC, Protect our Future.  Singh made this contribution using commingled funds he received from Alameda.  Specifically, on November 17, 2021, Defendants caused Alameda to transfer $1 million to Singh's personal bank account.  Two days later, Singh transferred $500,000 from his personal bank account to the PAC.

58.     Between October 2021 and May 2022, Bankman-Fried directed at least $35 million in donations to Guarding Against Pandemics Inc. ("GAP"), the majority of which originated from Alameda accounts containing commingled customer and non-customer funds.  GAP was a tax-exempt entity with the stated mission of mitigating global pandemic-related risks.  GAP and its associated political action committee—Guarding Against Pandemics PAC—were run by Bankman-Fried's younger brother, Gabriel Bankman-Fried, and frequently funded pet projects of the Bankman-Fried brothers that, needless to say, did nothing to prevent pandemics.

59.     In February 2021, Defendants announced the establishment of the FTX Foundation (a/k/a FTX Philanthropy), a purported charity that served little purpose other than to enhance the public stature of Defendants.  It certainly did not advance the business objectives of

the FTX Group in any discernible way.  In addition to receiving transfers of commingled funds, the FTX Foundation also regularly directed the payment of "grants" directly from FTX Group bank accounts that held commingled customer and corporate funds.

60.    The FTX Foundation's projects were frequently misguided and sometimes dystopian.  For example, on May 19, 2022, the FTX Foundation authorized a $300,000 grant to an individual to "[w]rite a book about how to figure out what humans' utility function is (are)," and transferred the funds to this individual from a North Dimension bank account.  Similarly, on June 30, 2022, the FTX Foundation funded a $400,000 grant (wired directly from an account in the name of North Dimension) to an entity that posted animated videos on YouTube related to "rationalist and [Effective Altruism] material," including videos on "grabby aliens."  "Effective altruism" is a philosophical and social movement to which Defendants and their friends purported to adhere.

61.    One memo exchanged between Gabriel Bankman-Fried and an officer of the FTX Foundation describes a plan to purchase the sovereign nation of Nauru in order to construct a "bunker / shelter" that would be used for "some event where 50%-99.99% of people die [to] ensure that most EAs [effective altruists] survive" and to develop "sensible regulation around human genetic enhancement, and build a lab there."  The memo further noted that "probably there are other things it's useful to do with a sovereign country, too."

### B.    Venture Investments and Acquisitions

62.    Bankman-Fried also squandered FTX Group resources on a variety of speculative venture-capital investments and corporate acquisitions, with little to no due diligence.

63.    For example, as alleged in detail in *Alameda Research Ltd.* v. *Kives*, No. 23-50411 (Bankr. D. Del. June 22, 2023) [D.I. 1679], an adversary proceeding filed in the Chapter 11 Cases, Bankman-Fried caused the FTX Group to invest $700 million in K5 Global Holdings

LLC and its affiliates, which were managed by former Hollywood talent agent Michael Kives and his colleague Bryan Baum, neither of whom had an established track record in asset management. Kives and Baum each pocketed $125 million of that "investment," with the remainder going to a grab-bag of venture investments having no synergy with the FTX Group's business—ranging from Musk's SpaceX and The Boring Company, to a celebrity-backed tequila business, to a software company run by Baum's brother. No due diligence was conducted into, and no financial advisor was retained in connection with, these "investments," which were made at materially inflated valuations to the detriment of the FTX Group.

64.     Likewise, as alleged in detail in *Alameda Research Ltd.* v. *Giles*, No. 23-50380 (Bankr. D. Del. May 17, 2023) [D.I. 1503], an adversary proceeding filed in the Chapter 11 Cases, Bankman-Fried caused the FTX Group to pay more than $236 million to acquire Embed Financial Technologies Inc. This purchase price was based on little more than Embed's founder's assertion that a $220 million enterprise value would "enable [him] to get a deal over the line with investors," and Bankman-Fried's apparent hope that Embed could accelerate the FTX Group's expansion into conventional securities markets. But the FTX Group neither retained a financial advisor nor performed any meaningful due diligence into Embed's purported value or the utility of Embed's technology. That decision harmed the FTX Group, which grossly overpaid for Embed and its virtually worthless software platform.

### C.    Luxury Real Estate in the Bahamas

65.     As has been widely reported, Defendants caused the FTX Group to spend more than $243 million on real estate in the Bahamas, including multi-million dollar luxury properties for Defendants and their friends and families. Defendants funded these real estate purchases from accounts that held commingled customer and corporate funds.

66.     Using these commingled funds, Defendants caused the FTX Group to purchase more than 30 properties, including a $30 million, six bedroom penthouse in the Albany resort community in the Bahamas in January 2022.  The property, known as the Orchid Penthouse, was home to Bankman-Fried, Wang, Singh and Ellison prior to the FTX Group's collapse.  This quarter of a billion in real estate was not necessary for the operations of the FTX Group and conferring such largesse on Defendants and their friends and families was done to the detriment of FTX Group.  Defendants' acquisition of luxury properties is discussed further *infra* ¶¶ 97-99.

**D.      Defendants' Commingling of Assets Caused Direct Harm to the FTX Group.**

67.     Defendants caused Alameda to misappropriate FTX customer funds and borrow against assets that did not exist in order to generate billions of dollars in liquidity for Defendants to use as they saw fit.  While personally benefitting from their fraudulent actions, Defendants caused the FTX Group to incur liability for billions of dollars of debt without proper authorization and without disclosing the self-dealing nature of the transactions.  At the same time, FTX.com's website continued misleadingly to assure customers that the exchange had risk management systems in place that were designed to "protect other users against other accounts' bankruptcy risk."

68.     Defendants' failure to disclose the extent and nature of Alameda's fraudulent borrowing caused enormous damage to the FTX Group, including, but not limited to, loss of goodwill, substantial decrease in value, the inability to borrow to meet necessary financial obligations, and an onslaught of criminal and regulatory investigations, all of which led to the FTX Group filing for bankruptcy protection.

69.     As additional breaches of their duties, Defendants engaged in extensive self-dealing through the fraudulent transfers described below.

## V.   The Avoidable Transfers

### A.   Defendants' Fraudulent Stock Awards

70.   Defendants caused FTX and WRS to issue more than $725 million worth of equity to Bankman-Fried, Wang, Singh and Ellison personally without receiving any value in exchange.

#### 1.   WRS's Fraudulent Transfer of $250 Million Worth of Shares of Class B Common Stock to Bankman-Fried, Wang and Singh

71.   Bankman-Fried, Wang and Singh used their control over the FTX Group to grant themselves additional ownership interests in FTX Group companies for illusory consideration or no consideration at all.

72.   On July 18, 2021, Bankman-Fried, Wang and Singh each executed documents labeled as promissory notes with Alameda.  Through these purported promissory notes, they supposedly "borrowed" the following amounts from Alameda:

- Bankman-Fried:  $170,394,453.07;

- Wang:  $54,431,521.12; and

- Singh:  $25,174,029.05.

73.   Notwithstanding these eye-popping sums of money, none of the purported promissory notes required Bankman-Fried, Wang or Singh to post any collateral.  All three called for interest to accrue at a rate of 1% annually—well below commercial market rates—and none called for any repayment prior to July 18, 2026.  As the CEO of Alameda at the time, Bankman-Fried signed each of the promissory notes—including the one for his own sham loan of more than $170 million—on behalf of Alameda.  None of the Defendants paid back a single dollar on any of these "loans" and they never intended to do so.

74.     On July 19, 2021, the day after the purported promissory notes were signed, Bankman-Fried, Wang and Singh executed Common Stock Purchase Agreements to acquire WRS Class B Common Stock.  Using funds they had caused Alameda to "loan" to them, Bankman-Fried, Wang and Singh collectively agreed to "purchase" 1,637,948 Class B shares in WRS, the holding company for FTX US (the "WRS Class B Transaction").

75.     No funds actually changed hands.  On August 10, 2021, Alameda transferred $250 million in "eMoney"—a substitute for cash and stablecoin used to transact on the FTX exchanges—on the FTX US exchange to accounts in the name of Bankman-Fried, Wang and Singh.  These three FTX insiders then transferred the funds to expenses@ftx.us, an account owned by WRS but controlled by Bankman-Fried.

76.     In short, in exchange for promissory notes that no one ever intended to repay (and on which no payments were ever made), Bankman-Fried, Wang and Singh gave themselves 1,637,948 shares of WRS Class B Common Stock.  Although these shares do not appear to have been transferred before the Chapter 11 Cases were filed, any obligation to provide these shares should be avoided.

### 2.     The Fraudulent Transfer of $477 Million Worth of FTX Common Shares to Singh

77.     On November 15, 2021, Defendants caused FTX to grant Singh 44 million FTX common shares—worth hundreds of millions of dollars—without receiving anything in return (the "FTX Share Transfer").  Nominally, Singh acquired these shares pursuant to an option agreement entitling Singh to purchase up to that amount of shares for $10.86 per share.  The exercise of this option, which conveyed great value to Singh *personally*, should have netted FTX $477,840,000.  Singh, however, paid nothing for the shares.  Instead, he contrived a series of illusory transfers that resulted in his receiving the 44 million shares at no cost to himself.

78.     On the same day Singh received his shares, he executed a promissory note with Alameda for $477,840,000—the precise amount needed to purchase the shares.  But once again no funds changed hands.  Instead, Defendants caused FTX to issue the stock to Singh.  An internal spreadsheet titled "Alameda Research LLC Transaction Report January-December 2021" references a $477,840,000 "loan" to Singh with the "Memo/Description" line "[t]o record stock based compensation for Nishad Singh (To be paid by Alameda)."  On paper, it appeared that Singh promised to pay Alameda, which, in turn, promised to pay FTX, for the shares.  In reality, no one paid for the shares, and no one intended to do so.

79.     The terms of the promissory note from Alameda to Singh reflect the fraudulent nature of the transaction.  Singh was not required to pledge any collateral.  And the note established a ten-year period during which no payments would be due and interest would accrue at only 1.08 percent annually—far below commercial market rates.  Singh never made a single payment on the "loan" and never intended to do so.

**3.     The Fraudulent Transfers of 2.75 Million Call Options on FTX Equity**

80.     Between December 2020 and March 2021, Ellison caused FTX to provide her with 2.75 million valuable FTX call options and provided nothing to FTX in return (the "FTX Option Transfers").  Specifically, on December 29, 2020, Ellison received two million call options on FTX equity into her personal account on the FTX exchange.  Less than three months later, Ellison received another transfer of 750,000 call options on FTX equity into her personal account on the FTX exchange.  Rather than pay for this valuable equity, Ellison appears to have received these options as a "bonus."  Given her extensive misconduct, including participation in the looting of billions of dollars of Debtor assets, Ellison clearly did not deserve any "bonus."  These valuable transfers were thus made without adequate consideration and should be avoided.

### 4.    WRS's Fraudulent Transfer of SAFE Notes to Bankman-Fried

81.    In addition to fraudulently causing WRS to issue stock, as detailed below,

Bankman-Fried also caused WRS to issue him several Simple Agreements for Future Equity

("SAFEs") that granted the right to valuable equity to Bankman-Fried while providing nothing in

return to the Debtor entities.

### a.    WRS's Fraudulent Transfer of $6.05 Million in SAFE Notes to Bankman-Fried

82.    On February 22, 2020, Bankman-Fried executed two SAFE notes with WRS:  one

for $1.05 million and a second for $5 million (the "February WRS SAFE Transactions").

Bankman-Fried was on both sides of the February WRS SAFE Transactions—signing both on

behalf of himself and on behalf of WRS.  Although the first SAFE note was written so as to

create the appearance that Bankman-Fried had purchased the SAFE note directly, the funds used

to make this purchase were in fact provided by Alameda.  On February 24, 2020, Alameda sent

the $1.05 million to Bankman-Fried's personal account.  Bankman-Fried then immediately

transferred that same amount to WRS's bank account.  Unlike in other instances, here, Bankman-

Fried did not even attempt to paper over his fraud as a loan by creating a promissory note

purporting to cover the transfer from Alameda to Bankman-Fried that was used to "purchase"

this equity stake in WRS.

83.    The larger $5 million SAFE note also purported to grant WRS shares to

Bankman-Fried.  But Plaintiffs have been unable to confirm *any* transfers made to WRS to

compensate WRS for this transfer of valuable equity.  Thus, Bankman-Fried received a right to

more than six million dollars of WRS equity while providing nothing in return.  Clearly, there

was no justification for this transfer, given Bankman-Fried's extensive looting of Debtor assets

and other misconduct.

**b.    WRS's Fraudulent Transfer of a $500,000 SAFE Note to Bankman-Fried**

84.    In March 2020, Bankman-Fried caused WRS to issue him another SAFE for $500,000 worth of future equity (the "<u>March WRS SAFE Transaction</u>").  This time, Bankman-Fried did use a pretext of a $500,000 "loan" from Alameda to paper over his fraud.

85.    On March 18, 2020, Bankman-Fried executed the $500,000 promissory note, which was countersigned by Ellison on behalf of Alameda.  Two days later, Bankman-Fried caused WRS to transform his promissory note into a SAFE by having the WRS Board—of which he was the sole member—issue a resolution that "the Line of Credit Promissory Note Convertible into SAFE in the face amount of $500,000 . . . of even date is hereby adopted."  The Board authorization purported to justify the transfer to Bankman-Fried as "in the best interests of the Corporation to obtain funding from its founder."  In fact, this transfer was not in the best interest of WRS because the funds came from Alameda rather than Bankman-Fried.

**B.    Bankman-Fried and Wang Misappropriated Over Half a Billion Dollars of Debtor Assets to Acquire Shares in Robinhood Markets, Inc.**

86.    Between May 6 and May 18, 2022, Bankman-Fried and Wang caused Alameda to provide them—in exchange for illusory and fraudulent "loans"—$546,087,587.10, which they used to acquire Class A shares in Robinhood Markets, Inc. ("<u>Robinhood</u>"), a U.S.-based financial services company (the "<u>Robinhood Loans</u>").

87.    Between January 24 and May 13, 2022, Bankman-Fried and Wang caused Alameda to acquire a total of 56,273,469 Robinhood shares, which were held in Alameda's brokerage account at ED&F Man Commodities Limited.  Between April 30 and May 11, 2022, Bankman-Fried and Wang each executed two promissory notes with Alameda pursuant to which, in the aggregate, Bankman-Fried "borrowed" $491,743,563.39 and Wang "borrowed" $54,638,173.71.

88.     Bankman-Fried and Wang caused these funds to be transferred from Alameda's "info@alameda-research.com" account on the FTX exchange to their personal accounts on the FTX exchange.[3]  They then transferred the funds to the FTX exchange account for Emergent Fidelity Technologies Ltd. ("Emergent"), a holding company wholly owned by Bankman-Fried (90%) and Wang (10%).  On May 6 and again on May 18, 2022, Emergent transferred the funds from its FTX exchange account back to Alameda's "info@alameda-research.com" account on the FTX exchange.[4]

89.     Although Plaintiffs have identified a Stock Purchase Agreement stating that Emergent would pay Alameda for the Robinhood shares, Emergent did not do so.  Rather Bankman-Fried and Wang "bought" the shares from Alameda with the funds they had just misappropriated from Alameda through their sham loans.  In other words, Bankman-Fried and Wang "paid" Alameda with Alameda's own money.  Indeed, as senior FTX Group lawyer Daniel Friedberg described the transaction:  "it is just a round trip - from AR Ltd to Sam/Gary to Emergent back to AR Ltd."  Because Alameda transferred the $546,087,587.10 directly to Bankman-Fried and Wang while receiving only a sham IOU in return, the transfer of funds from Alameda to Bankman-Fried and Wang should be avoided.

90.     Once again, these purported loans did not require Bankman-Fried or Wang to post any collateral, and provided for interest rates that were below commercial market rates.  Nor was Bankman-Fried or Wang obligated to start repaying any of the funds until spring 2027.  The sole authorization for Alameda to extend these "loans" to Bankman-Fried and Wang came from

---

[3]   The amounts transferred from Alameda to Bankman-Fried and Wang were $294,150 less than stipulated in the promissory notes.  Bankman-Fried received $264,734.50 less than stipulated in his promissory notes and Wang received $29,415.50 less than stipulated in his promissory notes.

[4]   The Debtors expressly reserve all rights, claims and defenses concerning the Robinhood shares and Emergent, including with respect to their ownership interest in the Robinhood shares and to avoid the transfers of Robinhood shares from Alameda to Emergent.

Ellison, who—along with Singh—has pled guilty to looting the FTX Group as part of a massive fraud.[5]  On January 6, 2023, the Justice Department seized the entirety of the Robinhood Class A shares and cash in Emergent's brokerage account on the basis that the "seized Assets constitute property involved in violations" of crimes such as "money laundering" and "wire fraud." Incredibly, however, Bankman-Fried still purports to have an ownership interest in the Robinhood shares.  In a January 5, 2023 filing in this Court, Bankman-Fried asserted that "the Robinhood Shares are not property of the FTX Debtors' estates" because Bankman-Fried and Wang "borrowed the funds for Emergent to purchase the Robinhood Shares from Alameda and a set of loans were memorialized in four different promissory notes."  As explained above, that statement was false and misleading.

### C.  Bankman-Fried Misappropriated Debtor Assets to Give $10 Million to His Father.

91.     On January 24, 2022, Bankman-Fried caused an FTX US exchange account in the name of "info@alameda-research.com" containing Debtor assets to transfer $10 million to an FTX US exchange account in his name.

92.     One minute later, Bankman-Fried transferred $10 million from his personal account on the FTX US exchange to his father's personal account on the FTX US exchange (the "Bankman Gift Transfer").  Shortly thereafter, Bankman-Fried's father made six transfers totaling $6,775,000 to his personal accounts at Morgan Stanley and TD Ameritrade, leaving

---

[5]     As part of her guilty plea, in her allocution Ellison admitted that "[w]hile I was co-CEO and then CEO, I understood that Alameda . . . had lent money to Mr. Bankman-Fried and other FTX executives.  I also understood that Alameda had financed these investments with short-term and open-term loans worth several billion dollars from external lenders in the cryptocurrency industry."  Plea Tr. 27:19-25, *United States* v. *Ellison*, 22-cr-00673 (S.D.N.Y. 2022), ECF No. 19.  In other words, Ellison admitted to causing Alameda to make "loans" to Defendants, among other FTX Group executives, with money Alameda was borrowing from unwitting third parties.

$3,225,000 in his FTX US account.  As of the Petition Date, the balance in the father's FTX US account was down to $2,200,000, having sustained losses on cryptocurrency trades.

93.     In an email exchange, Bankman-Fried and his father discussed structuring the $10 million gift as a loan from Alameda to Bankman-Fried.  The Debtors have been unable, however, to identify any promissory note, loan agreement, or other indication that the funds were not simply taken from Alameda by Bankman-Fried to enrich his family.

94.     On information and belief, Bankman-Fried's father has been using this "gift" to finance Bankman-Fried's criminal defense.

**D.     Ellison Misappropriated Debtor Assets to Pay Herself a Bonus of $22.5 Million, Which She Used to Acquire Shares in an Artificial Intelligence Safety and Research Company.**

95.     In late March 2022, Ellison personally invested $10 million in an artificial intelligence safety and research company (the "AI Company"), via an M-SAFE agreement. Despite acquiring the interest in the AI Company in her own name, Ellison used Alameda funds to do so.  Ellison caused Alameda, through a series of convoluted transfers, to transfer $22.5 million to Ellison's personal account on the FTX exchange (the "AI Bonus Transfer"). Specifically, on February 22, 2022, Ellison caused "off_market_ftt," one of Alameda's accounts on the FTX exchange, to transfer $22.5 million to "payroll@alameda-research.com," a separate Alameda account on the FTX exchange.  From there, the funds were transferred to a third account owned by Salameda Limited, a FTX Group related entity, before finally being sent to Ellison's own personal account on the FTX exchange.  On March 29, 2022, Ellison transferred $10 million from her FTX exchange account to her personal bank account.  Ellison's $10 million investment in the AI Company was funded by this transfer of $22.5 million from Alameda, which was provided without any consideration, and which consisted of misappropriated Debtor funds.

**E.    Ellison Misappropriated Debtor Assets to Pay Herself Additional Bonuses of More Than $6 Million.**

96.    Ellison further caused Alameda and one of its subsidiaries to pay her $6,262,529.89 in purported bonuses (the "Cash Bonus Transfers").  On July 23, 2021, Ellison received a payment of $2,512,529.89 into her personal account on the FTX exchange from Cottonwood's "payroll.cottonwoodgrove@alameda-research.com" account.  This transfer included a note stating "S1 2021 Bonus – correct entity pay out."  Subsequently, on September 14, 2022, Ellison received an additional cash payment of $3.75 million.  This time the payment came from Alameda with Ellison again receiving the payment via her personal account on the FTX exchange.  In both instances, these large cash transfers—consisting of misappropriated Debtor funds—were provided with zero consideration, and no "bonus" could possibly be justified given Ellison's extensive misconduct.

**F.    Bankman-Fried, Wang and Singh Misappropriated Debtor Assets to Purchase Luxury Real Estate for Themselves.**

97.    Bankman-Fried, Wang and Singh also used Debtor assets to purchase luxury condominiums for themselves, on top of the other luxury real estate purchased by the FTX Group for Defendants and their friends and families.  In April 2021, Bankman-Fried, Wang and Singh each entered into agreements to purchase condominium units at an oceanfront complex in The Bahamas.  The website for the complex states that it offers "ultra-luxe" living next to a "spectacular private beach," "large and exclusive" residences that are "meticulously appointed" and have "breathtaking views," and amenities that include an infinity pool, gym and concierge service.

98.    Bankman-Fried, Wang and Singh paid for these condominiums using funds fraudulently transferred from the FTX Group.  Between April and June 2021, Bankman-Fried, Wang and Singh caused FTX to wire the following amounts to Abaco Law Ltd., a firm acting as

intermediary between Bankman-Fried, Wang and Singh and the various property owners:
(1) $2,174,185.73 for the purchase of a unit in Bankman-Fried's name; (2) $1,655,328.11 for the
purchase of a unit in Wang's name; and (3) $1,034,068.73 for the purchase of a unit in Singh's
name (together, the "Real Estate Transactions").

99.     Although FTX had supplied more than $4.8 million to purchase the condominium
units, Bankman-Fried, Wang and Singh had the deeds conveyed to themselves rather than to the
FTX Group entity that paid for the condominiums.

## VI.     The Transfers Were Made When Plaintiffs Were Insolvent, and Defendants Knew It.

100.     "From at least in or about 2019, up to and including in or about November 2022,"
Bankman-Fried "corrupted the operations of the cryptocurrency companies he founded and
controlled . . . through a pattern of fraudulent schemes . . . ."  Superseding Indictment ¶ 1, *United
States* v. *Bankman-Fried*, No. 22-cr-00673 (S.D.N.Y. Feb. 23, 2023), ECF No. 80.

101.     Defendants failed to implement the systems or controls necessary for companies
entrusted with large amounts of customer money or other assets.  At Defendants' direction, the
Debtors concealed their failing financial condition by misappropriating billions of dollars in
cash, cryptocurrency, and other assets from customer accounts.  Defendants accomplished this
through multiple deceptions, including lying to customers about the segregation and safety of
their accounts, and creating a series of secret mechanisms by which assets could be transferred
within the Debtors' capital structure and, ultimately, out of the Debtors' custody.  As alleged in
the indictment, Bankman-Fried's "multi-billion-dollar fraud" was executed "through a series of
systems and schemes that allowed" Bankman-Fried and other FTX executives "to access and
steal FTX customer deposits without detection."  *Id.* ¶ 4.

102.    From the beginning of the FTX.com exchange, funds that customers intended to be deposited on the exchange in fact were deposited—with Defendants' knowledge or assistance—in Alameda or North Dimension bank accounts.  At the same time, although FTX's software code base generally did not allow for an account on the exchange to carry a negative balance, in or around July 2019, Bankman-Fried directed one or more of his co-conspirators or individuals working at their behest to modify the software to permit Alameda to maintain a negative balance in its account on the exchange.

103.    Through these schemes, Defendants caused Alameda to avoid collateralizing its position on the exchange.  Defendants also caused Alameda to maintain a negative balance on the exchange and utilize the exchange to trade and withdraw assets without limit, giving it a virtually unlimited "line of credit" collateralized by the customer deposits on the exchange.  As a result of this tampering, the FTX exchange began running very large deficits.  By March 2022, Ellison privately estimated that the FTX exchange had a cash deficit alone of more than *$10 billion.*

104.    Defendants' misappropriation of funds rendered the Debtors insolvent.  Even without accounting for the distorting effects of the staggering fraud, the Debtors' liabilities exceeded the fair value of their assets, and the Debtors lacked sufficient cash, cryptocurrency and other assets to cover customer accounts and their creditors' claims.  The Debtors continued to operate only by continually concealing and lying to customers and other creditors about their financial condition and their pervasive misuse of customer funds.

105.    Ellison admitted to this conduct in her plea allocution, stating that (a) from 2019 through 2022, Alameda used FTX.com funds to finance investments or repay loans; (b) from July 2022 through at least October 2022, she agreed with Bankman-Fried and others to provide

materially misleading financial statements to Alameda's lenders; and (c) she had understood that Bankman-Fried and others had made investments with funds from FTX.com in the name of Alameda in order to conceal the true source of those funds.  Singh made similar admissions during his plea allocution.

106.    On December 13, 2022, the U.S. Attorney for the Southern District of New York unsealed an eight-count indictment charging Bankman-Fried with federal offenses during the period from 2019 through November 2022, arising out of, among other things, Bankman-Fried's causing Alameda to misappropriate FTX.com funds and Bankman-Fried's misrepresenting to lenders and investors the financial condition of Alameda, FTX.com and FTX US.  The U.S. Attorney for the Southern District of New York filed a superseding indictment on March 28, 2023 that included an additional count for conspiracy to violate the anti-bribery provisions of the Foreign Corrupt Practices Act.

## VII.    The Transfers Involved Multiple Badges of Fraud Evidencing Actual Intent to Hinder, Delay or Defraud Creditors.

107.    As set forth above, multiple badges of fraud recognized by bankruptcy law and Del. Code. Ann. tit. 6, § 1304(b) permeate the transfers made and obligations incurred, including that:

1.    Defendants were friends with one another;

2.    Defendants were insiders of Plaintiffs;

3.    The transfers were part of a scheme to enrich and otherwise benefit Defendants;

4.    Numerous material facts relating to the transfers were concealed;

5.    Defendants removed or concealed Plaintiffs' assets;

6.    The value of the consideration received by Plaintiffs was not reasonably equivalent to the value of the assets transferred or the amount of the obligations incurred; and

7.     Plaintiffs were insolvent when, or became insolvent shortly after, the transfers were made.

\*     \*     \*

## CAUSES OF ACTION

### COUNT ONE
### BREACH OF FIDUCIARY DUTIES UNDER DELAWARE LAW
### (AGAINST ALL DEFENDANTS)

108.   Plaintiffs repeat and reallege the allegations in paragraphs 1 through 107 as if fully set forth here.

109.   As a result of his roles as director of Alameda LLC and director and officer of WRS, Bankman-Fried owed fiduciary duties—including duties of care, loyalty, good faith, fair dealing and oversight—to Alameda LLC and WRS.  Additionally, as the ultimate beneficial owner of Alameda LLC, WRS and North Dimension, Bankman-Fried owed fiduciary duties—including duties of care, loyalty, good faith, fair dealing and oversight—to each company.

110.   As a result of their roles as senior officers of WRS, Wang and Singh also owed fiduciary duties—including duties of care, loyalty, good faith, fair dealing and oversight—to WRS.

111.   As a result of her role as a senior officer and subsequently director of Alameda LLC, Ellison owed fiduciary duties—including duties of care, loyalty, good faith, fair dealing and oversight—to Alameda LLC.

112.   Bankman-Fried, Wang, Singh and Ellison breached their respective fiduciary duties by, among other things:

a.   Failing to implement or cause to be implemented internal controls that would have prevented the wrongdoing alleged herein;

b.   Actively contributing to a lack of experienced management that would have prevented the wrongdoing alleged herein;

c.   Disregarding or otherwise failing to investigate "red flags" regarding Plaintiffs' business activities;

d.   Participating in and enabling a fraudulent scheme to commingle customer and corporate funds that Defendants misappropriated for their personal benefit;

e.   Accepting and facilitating purported personal "loans" that the borrower had no practical ability or intent to repay, and without conducting due diligence on whether the borrower had the ability or intent to repay;

f.   Authorizing and engaging in extensive self-dealing;

g.   Failing to exercise any meaningful oversight over the affairs of Alameda LLC, WRS and North Dimension; and

h.   Abusing or allowing abuse of positions of authority in various FTX Group entities—including Alameda LLC, WRS and North Dimension—for the personal gain of Defendants and to the detriment of the FTX Group.

113.   Bankman-Fried, Wang, Singh and Ellison, in breaching their fiduciary duties as described herein, showed a conscious disregard for the best interests of Alameda LLC, WRS and North Dimension, respectively.

114.   As a direct and proximate result of Bankman-Fried's, Wang's, Singh's and Ellison's breaches of duty, Plaintiffs were damaged in an amount to be determined at trial.

**COUNT TWO**
**AIDING AND ABETTING BREACH OF FIDUCIARY DUTIES UNDER DELAWARE LAW**
**(AGAINST ALL DEFENDANTS)**

115.   Plaintiffs repeat and reallege the allegations in paragraphs 1 through 114 as if fully set forth here.

116.   As directors, officers, and/or controlling shareholders of Alameda LLC, WRS and North Dimension, respectively, Defendants owed fiduciary duties—including duties of care, loyalty, good faith, fair dealing and oversight—to these companies.  Defendants breached these duties for the reasons set forth in paragraphs 108-114.

117.    With knowledge of the foregoing breaches, each Defendant also aided and abetted

the other Defendants' breaches of his or her fiduciary duties by, among other things:

    a.   Failing to implement or cause to be implemented internal controls that would have prevented the wrongdoing alleged herein;

    b.   Actively contributing to a lack of experienced management that would have prevented the wrongdoing alleged herein;

    c.   Disregarding or otherwise failing to investigate "red flags" regarding Plaintiffs' business activities;

    d.   Participating in and enabling a fraudulent scheme to commingle customer and corporate funds that Defendants misappropriated for their personal benefit;

    e.   Accepting and facilitating purported personal "loans" that the borrower had no practical ability or intent to repay, and without conducting due diligence on whether the borrower had the ability or intent to repay;

    f.   Authorizing and engaging in extensive self-dealing;

    g.   Failing to exercise any meaningful oversight over the affairs of Alameda LLC, WRS and North Dimension; and

    h.   Abusing or allowing abuse of positions of authority in various FTX Group entities—including Alameda LLC, WRS and North Dimension—for the personal gain of Defendants and to the detriment of the FTX Group.

118.    As a direct and proximate result of the foregoing, Plaintiffs were damaged in an

amount to be determined at trial.

**COUNT THREE**
**BREACH OF FIDUCIARY DUTIES UNDER ANTIGUA AND BARBUDA LAW**
**(AGAINST DEFENDANTS BANKMAN-FRIED, WANG AND SINGH)**

119.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 118 as if

fully set forth here.

120.    Due their roles as senior officers of FTX, Bankman-Fried, Wang and Singh owed

fiduciary duties—including duties of care, loyalty, good faith, fair dealing and oversight—to

FTX.  Additionally, as a director and the ultimate beneficial owner of FTX, Bankman-Fried

further owed fiduciary duties—including duties of care, loyalty, good faith, fair dealing and oversight—to that company.

121.    Bankman-Fried, Wang and Singh breached their fiduciary duties by, among other things:

    a.   Failing to implement or cause to be implemented internal controls that would have prevented the wrongdoing alleged herein;

    b.   Actively contributing to a lack of experienced management that would have prevented the wrongdoing alleged herein;

    c.   Disregarding or otherwise failing to investigate "red flags" regarding Plaintiffs' business activities;

    d.   Participating in and enabling a fraudulent scheme to commingle customer and corporate funds that Defendants misappropriated for their personal benefit;

    e.   Accepting and facilitating purported personal "loans" that the borrower had no practical ability or intent to repay, and without conducting due diligence on whether the borrower had the ability or intent to repay;

    f.   Authorizing and engaging in extensive self-dealing;

    g.   Failing to exercise any meaningful oversight over the affairs of FTX; and

    h.   Abusing or allowing abuse of positions of authority in various FTX Group entities—including FTX—for the personal gain of Defendants and to the detriment of the FTX Group.

122.    Bankman-Fried, Wang and Singh, in breaching their fiduciary duties as described herein, showed a conscious disregard for the best interests of FTX.

123.    As a direct and proximate result of Bankman-Fried's, Wang's and Singh's breaches of duty, Plaintiffs suffered loss and damage in an amount to be determined at trial.

**COUNT FOUR**
**AIDING AND ABETTING BREACH OF FIDUCIARY DUTIES UNDER**
**ANTIGUA AND BARBUDA LAW**
**(AGAINST ALL DEFENDANTS)**

124.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 123 as if fully set forth here.

125.    As directors, officers and/or controlling shareholders of FTX, Bankman-Fried,

Wang and Singh owed fiduciary duties—including duties of care, loyalty, good faith, fair dealing

and oversight—to FTX.  Bankman-Fried, Wang and Singh breached these duties for the reasons

set forth in paragraphs 119-123.

126.    With knowledge of the foregoing breaches, each Defendant also aided and abetted

Bankman-Fried's, Wang's and Singh's breaches of their fiduciary duties by, among other things:

     a.  Failing to implement or cause to be implemented internal controls that would
have prevented the wrongdoing alleged herein;

     b.  Actively contributing to a lack of experienced management that would have
prevented the wrongdoing alleged herein;

     c.  Disregarding or otherwise failing to investigate "red flags" regarding
Plaintiffs' business activities;

     d.  Participating in and enabling a fraudulent scheme to commingle customer and
corporate funds that Defendants misappropriated for their personal benefit;

     e.  Accepting and facilitating purported personal "loans" that the borrower had no
practical ability or intent to repay, and without conducting due diligence on
whether the borrower had the ability or intent to repay;

     f.  Authorizing and engaging in extensive self-dealing;

     g.  Failing to exercise any meaningful oversight over the affairs of FTX; and

     h.  Abusing or allowing abuse of positions of authority in various FTX Group
entities—including FTX—for the personal gain of Defendants and to the
detriment of the FTX Group.

127.    As a direct and proximate result of the foregoing, Plaintiffs suffered loss and

damage in an amount to be determined at trial.

## COUNT FIVE
## BREACH OF FIDUCIARY DUTIES UNDER BRITISH VIRGIN ISLANDS LAW
## (AGAINST DEFENDANTS BANKMAN-FRIED AND ELLISON)

128.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 127 as if

fully set forth here.

129.    As a result of their roles as directors of Alameda, Bankman-Fried and Ellison owed fiduciary duties to Alameda under common law and the BVI Business Companies Act, 2004—including duties of care, loyalty, honesty, good faith, fair dealing, oversight and to act for a proper purpose—to that company.

130.    Bankman-Fried and Ellison breached their fiduciary duties by, among other things:

a.    Failing to implement or cause to be implemented internal controls that would have prevented the wrongdoing alleged herein;

b.    Actively contributing to a lack of experienced management that would have prevented the wrongdoing alleged herein;

c.    Disregarding or otherwise failing to investigate "red flags" regarding Plaintiffs' business activities;

d.    Participating in and enabling a fraudulent scheme to commingle customer and corporate funds that Defendants misappropriated for their personal benefit;

e.    Accepting and facilitating purported personal "loans" that the borrower had no practical ability or intent to repay, and without conducting due diligence on whether the borrower had the ability or intent to repay;

f.    Authorizing and engaging in extensive self-dealing;

g.    Failing to exercise any meaningful oversight over the affairs of Alameda; and

h.    Abusing or allowing abuse of positions of authority in various FTX Group entities—including Alameda—for the personal gain of Defendants and to the detriment of the FTX Group.

131.    Bankman-Fried and Ellison, in breaching their fiduciary duties as described herein, showed a conscious disregard for the best interests of Alameda.

132.    As a direct and proximate result of Bankman-Fried's and Ellison's breaches of duty, Plaintiffs were damaged in an amount to be determined at trial.

## COUNT SIX
## KNOWING ASSISTANCE IN BREACH OF FIDUCIARY DUTIES UNDER
## BRITISH VIRGIN ISLANDS LAW
## (AGAINST ALL DEFENDANTS)

133.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 132 as if fully set forth here.

134.    As directors of Alameda, Bankman-Fried and Ellison owed fiduciary duties—including duties of care, loyalty, good faith, fair dealing and oversight—to Alameda.  Bankman-Fried and Ellison breached these duties for the reasons set forth in paragraphs 128-132.

135.    With knowledge of the foregoing breaches, each Defendant knowingly assisted and/or failed to prevent Bankman-Fried's and Ellison's breaches of his or her fiduciary duties by, among other things:

a.    Failing to implement or cause to be implemented internal controls that would have prevented the wrongdoing alleged herein;

b.    Actively contributing to a lack of experienced management that would have prevented the wrongdoing alleged herein;

c.    Disregarding or otherwise failing to investigate "red flags" regarding Plaintiffs' business activities;

d.    Participating in and enabling a fraudulent scheme to commingle customer and corporate funds that Defendants misappropriated for their personal benefit;

e.    Accepting and facilitating purported personal "loans" that the borrower had no practical ability or intent to repay, and without conducting due diligence on whether the borrower had the ability or intent to repay;

f.    Authorizing and engaging in extensive self-dealing;

g.    Failing to exercise any meaningful oversight over the affairs of Alameda; and

h.    Abusing or allowing abuse of positions of authority in various FTX Group entities—including Alameda—for the personal gain of Defendants and to the detriment of the FTX Group.

136.    As a direct and proximate result of the foregoing, Plaintiffs were damaged in an amount to be determined at trial.

**COUNT SEVEN**
**WASTE OF CORPORATE ASSETS UNDER DELAWARE LAW**
**(AGAINST ALL DEFENDANTS)**

137.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 136 as if fully set forth here.

138.    Defendants were the ultimate decision makers in the day-to-day management of the FTX Group, overseeing various entities and core departments.

139.    By engaging in the conduct described herein, including, but not limited to, authorizing hundreds of millions of dollars in self-dealing transfers, improperly using FTX Group assets for their own benefit and violating the federal securities and commodities laws, each of the Defendants caused or aided others in transferring or diverting Plaintiffs' assets for improper purposes.  These actions were so plainly improper and devoid of any legitimate purpose that no business person of ordinary sound judgment could have concluded that they were proper.

140.    As a direct and proximate result of the foregoing, Plaintiffs were damaged in an amount to be determined at trial.

**COUNT EIGHT**
**AIDING AND ABETTING WASTE OF CORPORATE ASSETS**
**UNDER DELWARE LAW**
**(AGAINST ALL DEFENDANTS)**

141.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 140 as if fully set forth here.

142.    Defendants were the ultimate decision makers in the day-to-day management of the FTX Group, overseeing various entities and core departments.

143.    By engaging in the conduct described herein, including, but not limited to, authorizing hundreds of millions of dollars in self-dealing transfers, improperly using FTX

Group assets for their own benefit and violating the federal securities and commodities laws, each of the Defendants caused or aided others in transferring or diverting Plaintiffs' assets for improper purposes.  These actions were so plainly improper and devoid of any legitimate purpose that no business person of ordinary sound judgment could have concluded that they were proper.

144.    As a direct and proximate result of the foregoing, Plaintiffs were damaged in an amount to be determined at trial.

**COUNT NINE**
**CONVERSION UNDER DELAWARE LAW**
**(AGAINST ALL DEFENDANTS)**

145.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 144 as if fully set forth here.

146.    Defendants had access to and used FTX Group funds for personal purposes that were outside the scope of their authority as officers and directors of FTX Group companies.

147.    By leveraging the lack of independent directors together with their manipulated and inadequate cash management system, Defendants used FTX Group funds to personally benefit themselves and their associates.

148.    Defendants' conversion of FTX Group funds includes, but is not limited to, their misappropriation of millions of dollars of cash from FTX Group companies and their receipt of company stock worth more than $725 million in exchange for no consideration.

149.    Defendants' actions lacked any justification in good faith, sound business judgment or common sense.

150.    Defendants were not legally justified in using corporate funds for personal uses and wrongfully used funds that belonged to Plaintiffs or to which Plaintiffs had superior rights.

151.   Defendants used FTX Group funds for their own benefit and to the exclusion of Plaintiffs' rights to their own monies.

## COUNT TEN
### FRAUDULENT TRANSFERS AND OBLIGATIONS
### PURSUANT TO 11 U.S.C. § 548(a)(1)(A)
### (AGAINST DEFENDANTS BANKMAN-FRIED, WANG AND SINGH)

152.   Plaintiffs repeat and reallege the allegations in paragraphs 1 through 151 as if fully set forth here.

153.   WRS granted $250 million worth of WRS Class B Common Stock on or around July 19, 2021 for the benefit of Bankman-Fried, Wang and Singh.  The WRS Class B Transaction constituted a transfer of property of Plaintiffs, or an obligation to transfer such property in the future.

154.   The WRS Class B Transaction and any obligations incurred pursuant to it to Bankman-Fried, Wang and Singh were made with actual intent to hinder, delay or defraud present or future creditors.

155.   Accordingly, the WRS Class B Transaction and any obligations incurred by Plaintiffs to Bankman-Fried, Wang and Singh should be avoided as fraudulent pursuant to Section 548(a)(1)(A) of the Bankruptcy Code, and Plaintiffs may recover from these defendants all shares transferred pursuant to the WRS Class B Transaction, plus costs and fees to the extent available, for the benefit of Debtors' bankruptcy estates.

## COUNT ELEVEN
### FRAUDULENT TRANSFERS AND OBLIGATIONS
### PURSUANT TO 11 U.S.C. § 548(a)(1)(B)
### (AGAINST DEFENDANTS BANKMAN-FRIED, WANG AND SINGH)

156.   Plaintiffs repeat and reallege the allegations in paragraphs 1 through 155 as if fully set forth here.

157.    WRS granted $250 million worth of WRS Class B Common Stock on or around July 19, 2021 for the benefit of Bankman-Fried, Wang and Singh.  The WRS Class B Transaction constituted a transfer of property of Plaintiffs, or an obligation to transfer such property in the future.

158.    WRS did not receive reasonably equivalent value in exchange for the WRS Class B Transaction and for any obligations incurred by WRS to Bankman-Fried, Wang or Singh.

159.    WRS:  (1) was insolvent on the date of the WRS Class B Transaction and when any obligations in connection with the WRS Class B Transaction were incurred; (2) became insolvent as a result of the WRS Class B Transaction and any obligations incurred in connection with the WRS Class B Transaction; (3) was engaged in a business or a transaction for which any property remaining with the Plaintiff was an unreasonably small capital; or (4) intended to incur, or believed that it would incur, debts that would be beyond the Plaintiff's ability to repay as such debts matured.

160.    Accordingly, the WRS Class B Transaction and any obligations incurred by Plaintiffs to Bankman-Fried, Wang and Singh should be avoided as fraudulent pursuant to Section 548(a)(1)(B) of the Bankruptcy Code, and Plaintiffs may recover from these defendants all shares transferred pursuant to the WRS Class B Transaction, plus costs and fees to the extent available, for the benefit of Debtors' bankruptcy estates.

**COUNT TWELVE**
**FRAUDULENT TRANSFERS AND OBLIGATIONS PURSUANT TO**
**DEL. CODE ANN. TIT. 6, § 1304(a)(1) AND 11 U.S.C. § 544(b)**
**(AGAINST DEFENDANTS BANKMAN-FRIED, WANG AND SINGH)**

161.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 160 as if fully set forth here.

162.    Section 544(b) of the Bankruptcy Code authorizes Plaintiffs to avoid any transfer of an interest in their property or any obligation incurred by them that is voidable under applicable law by a creditor holding an allowable unsecured claim.  Accordingly, fraudulent transfers and obligations are avoidable pursuant to Bankruptcy Code Section 544(b) and other applicable law, including the Delaware Uniform Fraudulent Transfer Act, Del. Code Ann. tit. 6, § 1301, *et seq.*

163.    WRS granted $250 million worth of WRS Class B Common Stock on or around July 19, 2021 for the benefit of Bankman-Fried, Wang and Singh.  The WRS Class B Transaction constituted a transfer of property of Plaintiffs, or an obligation to transfer such property in the future.

164.    The WRS Class B Transaction and any obligations incurred by Plaintiffs to Bankman-Fried, Wang and Singh were made with actual intent to hinder, delay or defraud present or future creditors, including creditors who hold allowable unsecured claims.  The WRS Class B Transaction and any obligations are avoidable by creditors who hold allowable unsecured claims.

165.    Accordingly, the WRS Class B Transaction and any obligations incurred by Plaintiffs to Bankman-Fried, Wang and Singh should be avoided as fraudulent pursuant to Del. Code Ann. tit. 6, § 1304(a)(1) and 11 U.S.C. § 544(b), and Plaintiffs may recover from these defendants all shares transferred pursuant to the WRS Class B Transaction, plus costs and fees to the extent available, for the benefit of Debtors' bankruptcy estates.

**COUNT THIRTEEN**
**FRAUDULENT TRANSFERS AND OBLIGATIONS PURSUANT TO**
**DEL. CODE ANN. TIT. 6, §§ 1304(a)(2), 1305 AND 11 U.S.C. § 544(b)**
**(AGAINST DEFENDANTS BANKMAN-FRIED, WANG AND SINGH)**

166.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 165 as if fully set forth here.

167.    Section 544(b) of the Bankruptcy Code authorizes Plaintiffs to avoid any transfer of an interest in their property or any obligation incurred by them that is voidable under applicable law by a creditor holding an allowable unsecured claim.  Accordingly, fraudulent transfers and obligations are avoidable pursuant to Bankruptcy Code Section 544(b) and other applicable law, including the Delaware Uniform Fraudulent Transfer Act, Del. Code Ann. tit. 6, § 1301, *et seq.*

168.    WRS granted $250 million worth of WRS Class B Common Stock on or around July 19, 2021 for the benefit of Bankman-Fried, Wang and Singh.  The WRS Class B Transaction constituted a transfer of property of Plaintiffs, or an obligation to transfer such property in the future.

169.    WRS did not receive reasonably equivalent value in exchange for the WRS Class B Transaction and for any obligations incurred by Plaintiff WRS to Bankman-Fried, Wang or Singh.

170.    WRS:  (1) was insolvent on the date of the WRS Class B Transaction and when any obligations in connection with the WRS Class B Transaction were incurred; (2) became insolvent as a result of the WRS Class B Transaction and any obligations incurred in connection with the WRS Class B Transaction; (3) was engaged in a business or a transaction for which any property remaining with the Plaintiff was an unreasonably small capital; or (4) intended to incur,

or believed that it would incur, debts that would be beyond the Plaintiff's ability to repay as such debts matured.

171.    The WRS Class B Transaction and any obligations incurred by Plaintiffs to Bankman-Fried, Wang and Singh are avoidable by creditors who hold allowable unsecured claims, including creditors who were creditors before the WRS Class B Transaction and obligations.

172.    Accordingly, the WRS Class B Transaction and any obligations incurred by Plaintiffs to Bankman-Fried, Wang and Singh should be avoided as fraudulent pursuant to 11 U.S.C. § 544(b) and Del. Code Ann. tit. 6, §§ 1304(a)(2), 1305, and Plaintiffs may recover from these defendants all shares transferred pursuant to the WRS Class B Transaction, plus costs and fees to the extent available, for the benefit of Debtors' bankruptcy estates.

**COUNT FOURTEEN**
**FRAUDULENT TRANSFERS AND OBLIGATIONS**
**PURSUANT TO 11 U.S.C. § 548(a)(1)(A)**
**(AGAINST DEFENDANT SINGH)**

173.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 172 as if fully set forth here.

174.    FTX granted $477,840,000 worth of FTX common shares on or around November 15, 2021 for the benefit of Singh.  The FTX Share Transfer was a transfer of property of Plaintiffs.

175.    The FTX Share Transfer and any obligations incurred by Plaintiffs to Singh were made with actual intent to hinder, delay, or defraud present or future creditors.

176.    Accordingly, the FTX Share Transfer and any obligations incurred by Plaintiffs to Singh should be avoided as fraudulent pursuant to Section 548(a)(1)(A) of the Bankruptcy Code,

and Plaintiffs may recover from Singh all shares transferred pursuant to the FTX Share Transfer, plus costs and fees to the extent available, for the benefit of Debtors' bankruptcy estates.

### COUNT FIFTEEN
### FRAUDULENT TRANSFERS AND OBLIGATIONS
### PURSUANT TO 11 U.S.C. § 548(a)(1)(B)
### (AGAINST DEFENDANT SINGH)

177.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 176 as if fully set forth here.

178.    FTX granted $477,840,000 worth of FTX common shares on or around November 15, 2021 for the benefit of Singh.  The FTX Share Transfer was a transfer of property of Plaintiffs.

179.    FTX did not receive reasonably equivalent value in exchange for the FTX Share Transfer and for any obligations incurred by FTX to Singh.

180.    FTX:  (1) was insolvent on the date of the FTX Share Transfer and when any obligations in connection with the FTX Share Transfer were incurred; (2) became insolvent as a result of the FTX Share Transfer and any obligations incurred in connection with the FTX Share Transfer; (3) was engaged in a business or a transaction for which any property remaining with the Plaintiff was an unreasonably small capital; or (4) intended to incur, or believed that it would incur, debts that would be beyond the Plaintiff's ability to repay as such debts matured.

181.    Accordingly, the FTX Share Transfer and any obligations incurred by FTX to Singh should be avoided as fraudulent pursuant to Section 548(a)(1)(B) of the Bankruptcy Code, and Plaintiffs may recover from Singh all shares transferred pursuant to the FTX Share Transfer, plus costs and fees to the extent available, for the benefit of Debtors' bankruptcy estates.

## COUNT SIXTEEN
## FRAUDULENT TRANSFERS AND OBLIGATIONS PURSUANT TO
## DEL. CODE ANN. TIT. 6, § 1304(a)(1) AND 11 U.S.C. § 544(b)
## (AGAINST DEFENDANT SINGH)

182.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 181 as if fully set forth here.

183.    Section 544(b) of the Bankruptcy Code authorizes Plaintiffs to avoid any transfer of an interest in their property or any obligation incurred by them that is voidable under applicable law by a creditor holding an allowable unsecured claim.  Accordingly, fraudulent transfers and obligations are avoidable pursuant to Bankruptcy Code Section 544(b) and other applicable law, including the Delaware Uniform Fraudulent Transfer Act, Del. Code Ann. tit. 6, § 1301, *et seq.*

184.    FTX granted $477,840,000 worth of FTX common shares on or around November 15, 2021 for the benefit of Singh.  The FTX Share Transfer was a transfer of property of Plaintiffs.

185.    The FTX Share Transfer and any obligations incurred by FTX to Singh were made with actual intent to hinder, delay, or defraud present or future creditors, including creditors who hold allowable unsecured claims.  The FTX Share Transfer and any obligations are avoidable by creditors who hold allowable unsecured claims.

186.    Accordingly, the FTX Share Transfer and any obligations incurred by FTX to Singh should be avoided as fraudulent pursuant to Del. Code Ann. tit. 6, § 1304(a)(1) and 11 U.S.C. § 544(b), and Plaintiffs may recover from Singh all shares transferred pursuant to the FTX Share Transfer, plus costs and fees to the extent available, for the benefit of Debtors' bankruptcy estates.

**COUNT SEVENTEEN**
**FRAUDULENT TRANSFERS AND OBLIGATIONS PURSUANT TO**
**DEL. CODE ANN. TIT. 6, §§ 1304(a)(2), 1305 AND 11 U.S.C. § 544(b)**
**(AGAINST DEFENDANT SINGH)**

187.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 186 as if

fully set forth here.

188.    Section 544(b) of the Bankruptcy Code authorizes Plaintiffs to avoid any transfer

of an interest in their property or any obligation incurred by them that is voidable under

applicable law by a creditor holding an allowable unsecured claim.  Accordingly, fraudulent

transfers and obligations are avoidable pursuant to Bankruptcy Code Section 544(b) and other

applicable law, including the Delaware Uniform Fraudulent Transfer Act, Del. Code Ann. tit. 6,

§ 1301, *et seq.*

189.    FTX granted $477,840,000 worth of FTX common shares on or around

November 15, 2021 for the benefit of Singh.  The FTX Share Transfer was a transfer of property

of Plaintiffs.

190.    FTX did not receive reasonably equivalent value in exchange for the FTX Share

Transfer and for any obligations incurred by FTX to Singh.

191.    FTX:  (1) was insolvent on the date of the FTX Share Transfer and when any

obligations in connection with the FTX Share Transfer were incurred; (2) became insolvent as a

result of the FTX Share Transfer and any obligations incurred in connection with the FTX Share

Transfer; (3) was engaged in a business or a transaction for which any property remaining with

the Plaintiff was an unreasonably small capital; or (4) intended to incur, or believed that it would

incur, debts that would be beyond the Plaintiff's ability to repay as such debts matured.

192.     The FTX Share Transfer and any obligations incurred by FTX to Singh are avoidable by creditors who hold allowable unsecured claims, including creditors who were creditors before the FTX Share Transfer and obligations.

193.     Accordingly, the FTX Share Transfer and any obligations incurred by FTX to Singh should be avoided as fraudulent pursuant to 11 U.S.C. § 544(b) and Del. Code Ann. tit. 6, §§ 1304(a)(2), 1305, and Plaintiffs may recover from Singh all shares transferred pursuant to the FTX Share Transfer, plus costs and fees to the extent available, for the benefit of Debtors' bankruptcy estates.

### COUNT EIGHTEEN
### FRAUDULENT TRANSFERS AND OBLIGATIONS
### PURSUANT TO 11 U.S.C. § 548(a)(1)(A)
### (AGAINST DEFENDANT ELLISON)

194.     Plaintiffs repeat and reallege the allegations in paragraphs 1 through 193 as if fully set forth here.

195.     FTX granted 2.75 million call options on FTX equity on or around December 29, 2020 and March 13, 2021 for the benefit of Ellison.  The FTX Option Transfers constituted transfers of property of Plaintiffs, or obligations to transfer such property in the future.

196.     The FTX Option Transfers and any obligations incurred by Plaintiffs to Ellison were made with actual intent to hinder, delay, or defraud present or future creditors.

197.     Accordingly, the FTX Option Transfers and any obligations incurred by Plaintiffs to Ellison should be avoided as fraudulent pursuant to Section 548(a)(1)(A) of the Bankruptcy Code, and Plaintiffs may recover from Ellison any shares or other equity interest transferred pursuant to the FTX Option Transfers, plus costs and fees to the extent available, for the benefit of Debtors' bankruptcy estates.

## COUNT NINETEEN
## FRAUDULENT TRANSFERS AND OBLIGATIONS
## PURSUANT TO 11 U.S.C. § 548(a)(1)(B)
## (AGAINST DEFENDANT ELLISON)

198.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 197 as if fully set forth here.

199.    FTX granted 2.75 million call options on FTX equity on or around December 29, 2020 and March 13, 2021 for the benefit of Ellison.  The FTX Option Transfers constituted transfers of property of Plaintiffs, or obligations to transfer such property in the future.

200.    FTX did not receive reasonably equivalent value in exchange for the FTX Option Transfers and for any obligations incurred by FTX to Ellison.

201.    FTX:  (1) was insolvent on the dates of the FTX Option Transfers and when any obligations in connection with the FTX Option Transfers were incurred; (2) became insolvent as a result of the FTX Option Transfers and any obligations incurred in connection with the FTX Option Transfers; (3) was engaged in a business or a transaction for which any property remaining with the Plaintiff was an unreasonably small capital; or (4) intended to incur, or believed that it would incur, debts that would be beyond the Plaintiff's ability to repay as such debts matured.

202.    Accordingly, the FTX Option Transfers and any obligations incurred by FTX to Ellison should be avoided as fraudulent pursuant to Section 548(a)(1)(B) of the Bankruptcy Code, and Plaintiffs may recover from Ellison any shares or other equity interest transferred pursuant to the FTX Option Transfers, plus costs and fees to the extent available, for the benefit of Debtors' bankruptcy estates.

## COUNT TWENTY
## FRAUDULENT TRANSFERS AND OBLIGATIONS PURSUANT TO
## DEL. CODE ANN. TIT. 6, § 1304(a)(1) AND 11 U.S.C. § 544(b)
## (AGAINST DEFENDANT ELLISON)

203.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 202 as if fully set forth here.

204.    Section 544(b) of the Bankruptcy Code authorizes Plaintiffs to avoid any transfer of an interest in their property or any obligation incurred by them that is voidable under applicable law by a creditor holding an allowable unsecured claim.  Accordingly, fraudulent transfers and obligations are avoidable pursuant to Bankruptcy Code Section 544(b) and other applicable law, including the Delaware Uniform Fraudulent Transfer Act, Del. Code Ann. tit. 6, § 1301, *et seq.*

205.    FTX granted 2.75 million call options on FTX equity on or around December 29, 2020 and March 13, 2021 for the benefit of Ellison.  The FTX Option Transfers constituted transfers of property of Plaintiffs, or obligations to transfer such property in the future.

206.    The FTX Option Transfers and any obligations incurred by FTX to Ellison were made with actual intent to hinder, delay or defraud present or future creditors, including creditors who hold allowable unsecured claims.  The FTX Option Transfers and any obligations are avoidable by creditors who hold allowable unsecured claims.

207.    Accordingly, the FTX Option Transfers and any obligations incurred by FTX to Ellison should be avoided as fraudulent pursuant to Del. Code Ann. tit. 6, § 1304(a)(1) and 11 U.S.C. § 544(b), and Plaintiffs may recover from Ellison any shares or other equity interest transferred pursuant to the FTX Option Transfers, plus costs and fees to the extent available, for the benefit of Debtors' bankruptcy estates.

## COUNT TWENTY-ONE
## FRAUDULENT TRANSFERS AND OBLIGATIONS PURSUANT TO
## DEL. CODE ANN. TIT. 6, §§ 1304(a)(2), 1305 AND 11 U.S.C. § 544(b)
## (AGAINST DEFENDANT ELLISON)

208.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 207 as if fully set forth here.

209.    Section 544(b) of the Bankruptcy Code authorizes Plaintiffs to avoid any transfer of an interest in their property or any obligation incurred by them that is voidable under applicable law by a creditor holding an allowable unsecured claim.  Accordingly, fraudulent transfers and obligations are avoidable pursuant to Bankruptcy Code Section 544(b) and other applicable law, including the Delaware Uniform Fraudulent Transfer Act, Del. Code Ann. tit. 6, §1301, *et seq.*

210.    FTX granted 2.75 million call options on FTX equity on or around December 29, 2020 and March 13, 2021 for the benefit of Ellison.  The FTX Option Transfers constituted transfers of property of Plaintiffs, or obligations to transfer such property in the future.

211.    FTX did not receive reasonably equivalent value in exchange for the FTX Option Transfers and for any obligations incurred by FTX to Ellison.

212.    FTX:  (1) was insolvent on the dates of the FTX Option Transfers and when any obligations in connection with the FTX Option Transfers were incurred; (2) became insolvent as a result of the FTX Option Transfers and any obligations incurred in connection with the FTX Option Transfers; (3) was engaged in a business or a transaction for which any property remaining with the Plaintiff was an unreasonably small capital; or (4) intended to incur, or believed that it would incur, debts that would be beyond the Plaintiff's ability to repay as such debts matured.

213.    The FTX Option Transfers and any obligations incurred by FTX to Ellison are avoidable by creditors who hold allowable unsecured claims, including creditors who were creditors before the FTX Option Transfers and obligations.

214.    Accordingly, the FTX Option Transfers and any obligations incurred by FTX to Ellison should be avoided as fraudulent pursuant to 11 U.S.C. § 544(b) and Del. Code Ann. tit. 6, §§ 1304(a)(2), 1305, and Plaintiffs may recover from Ellison any shares or other equity interest transferred pursuant to the FTX Option Transfers, plus costs and fees to the extent available, for the benefit of Debtors' bankruptcy estates.

## COUNT TWENTY-TWO
### FRAUDULENT TRANSFERS AND OBLIGATIONS PURSUANT TO DEL. CODE ANN. TIT. 6, § 1304(a)(1) AND 11 U.S.C. § 544(b) (AGAINST DEFENDANT BANKMAN-FRIED)

215.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 214 as if fully set forth here.

216.    Section 544(b) of the Bankruptcy Code authorizes Plaintiffs to avoid any transfer of an interest in their property or any obligation incurred by them that is voidable under applicable law by a creditor holding an allowable unsecured claim.  Accordingly, fraudulent transfers and obligations are avoidable pursuant to Bankruptcy Code Section 544(b) and other applicable law, including the Delaware Uniform Fraudulent Transfer Act, Del. Code Ann. tit. 6, §1301, *et seq.*

217.    WRS issued SAFE notes for $6,050,000 worth of future equity on or around February 22, 2020 for the benefit of Bankman-Fried.  The February WRS SAFE Transactions were a transfer of property of Plaintiffs.

218.    The February WRS SAFE Transactions and any obligations incurred by WRS to Bankman-Fried were made with actual intent to hinder, delay or defraud present or future

creditors, including creditors who hold allowable unsecured claims.  The February WRS SAFE Transactions and any obligations are avoidable by creditors who hold allowable unsecured claims.

219.    Accordingly, the February WRS SAFE Transactions and any obligations incurred by WRS to Bankman-Fried should be avoided as fraudulent pursuant to Del. Code Ann. tit. 6, § 1304(a)(1) and 11 U.S.C. § 544(b), and WRS may recover from Bankman-Fried any shares or other equity interest transferred pursuant to the February WRS SAFE Transactions, plus costs and fees to the extent available, for the benefit of Debtors' bankruptcy estates.

**COUNT TWENTY-THREE**
**FRAUDULENT TRANSFERS AND OBLIGATIONS PURSUANT TO**
**DEL. CODE ANN. TIT. 6, §§ 1304(a)(2), 1305 AND 11 U.S.C. § 544(b)**
**(AGAINST DEFENDANT BANKMAN-FRIED)**

220.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 219 as if fully set forth here.

221.    Section 544(b) of the Bankruptcy Code authorizes Plaintiffs to avoid any transfer of an interest in their property or any obligation incurred by them that is voidable under applicable law by a creditor holding an allowable unsecured claim.  Accordingly, fraudulent transfers and obligations are avoidable pursuant to Bankruptcy Code Section 544(b) and other applicable law, including the Delaware Uniform Fraudulent Transfer Act, Del. Code Ann. tit. 6, § 1301, *et seq.*

222.    WRS issued SAFE notes for $6,050,000 worth of future equity on or around February 22, 2020 for the benefit of Bankman-Fried.  The February WRS SAFE Transactions were a transfer of property of Plaintiffs.

223.    WRS did not receive reasonably equivalent value in exchange for the February WRS SAFE Transactions and for any obligations incurred by WRS to Bankman-Fried.

224.    WRS:  (1) was insolvent on the date of the February WRS SAFE Transactions and when any obligations in connection with the February WRS SAFE Transactions were incurred; (2) became insolvent as a result of the February WRS SAFE Transactions and any obligations incurred in connection with the February WRS SAFE Transactions; (3) was engaged in a business or a transaction for which any property remaining with the Plaintiff was an unreasonably small capital; or (4) intended to incur, or believed that it would incur, debts that would be beyond the Plaintiff's ability to repay as such debts matured.

225.    The February WRS SAFE Transactions and any obligations incurred by WRS to Bankman-Fried are avoidable by creditors who hold allowable unsecured claims, including creditors who were creditors before the February WRS SAFE Transactions and obligations.

226.    Accordingly, the February WRS SAFE Transactions and any obligations incurred by WRS to Bankman-Fried should be avoided as fraudulent pursuant to 11 U.S.C. § 544(b) and Del. Code Ann. tit. 6, §§ 1304(a)(2), 1305, and WRS may recover from Bankman-Fried any shares or other equity interest transferred pursuant to the February WRS SAFE Transactions, plus costs and fees to the extent available, for the benefit of Debtors' bankruptcy estates.

**COUNT TWENTY-FOUR**
**FRAUDULENT TRANSFERS AND OBLIGATIONS PURSUANT TO**
**DEL. CODE ANN. TIT. 6, § 1304(a)(1) AND 11 U.S.C. § 544(b)**
**(AGAINST DEFENDANT BANKMAN-FRIED)**

227.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 226 as if fully set forth here.

228.    Section 544(b) of the Bankruptcy Code authorizes Plaintiffs to avoid any transfer of an interest in their property or any obligation incurred by them that is voidable under applicable law by a creditor holding an allowable unsecured claim.  Accordingly, fraudulent transfers and obligations are avoidable pursuant to Bankruptcy Code Section 544(b) and other

applicable law, including the Delaware Uniform Fraudulent Transfer Act, Del. Code Ann. tit. 6, § 1301, *et seq.*

229.     WRS issued a SAFE for $500,000 worth of future equity on or around March 20, 2020 for the benefit of Bankman-Fried.  The March WRS SAFE Transaction was a transfer of property of Plaintiffs.

230.     The March WRS SAFE Transaction and any obligations incurred by WRS to Bankman-Fried were made with actual intent to hinder, delay or defraud present or future creditors, including creditors who hold allowable unsecured claims.  The March WRS SAFE Transaction and any obligations are avoidable by creditors who hold allowable unsecured claims.

231.     Accordingly, the March WRS SAFE Transaction and any obligations incurred by WRS to Bankman-Fried should be avoided as fraudulent pursuant to Del. Code Ann. tit. 6, § 1304(a)(1) and 11 U.S.C. § 544(b), and WRS may recover from Bankman-Fried any shares or other equity interest transferred pursuant to the March WRS SAFE Transaction, plus costs and fees to the extent available, for the benefit of Debtors' bankruptcy estates.

**COUNT TWENTY-FIVE**
**FRAUDULENT TRANSFERS AND OBLIGATIONS PURSUANT TO**
**DEL. CODE ANN. TIT. 6, §§ 1304(a)(2), 1305 AND 11 U.S.C. § 544(b)**
**(AGAINST DEFENDANT BANKMAN-FRIED)**

232.     Plaintiffs repeat and reallege the allegations in paragraphs 1 through 231 as if fully set forth here.

233.     Section 544(b) of the Bankruptcy Code authorizes Plaintiffs to avoid any transfer of an interest in their property or any obligation incurred by them that is voidable under applicable law by a creditor holding an allowable unsecured claim.  Accordingly, fraudulent transfers and obligations are avoidable pursuant to Bankruptcy Code Section 544(b) and other

applicable law, including the Delaware Uniform Fraudulent Transfer Act, Del. Code Ann. tit. 6, § 1301, *et seq.*

234.    WRS issued a SAFE for $500,000 worth of future equity on or around March 20, 2020 for the benefit of Bankman-Fried.  The March WRS SAFE Transaction was a transfer of property of Plaintiffs.

235.    WRS did not receive reasonably equivalent value in exchange for the March WRS SAFE Transaction and for any obligations incurred by WRS to Bankman-Fried.

236.    WRS:  (1) was insolvent on the date of the March WRS SAFE Transaction and when any obligations in connection with the March WRS SAFE Transaction were incurred; (2) became insolvent as a result of the March WRS SAFE Transaction and any obligations incurred in connection with the March WRS SAFE Transaction; (3) was engaged in a business or a transaction for which any property remaining with the Plaintiff was an unreasonably small capital; or (4) intended to incur, or believed that it would incur, debts that would be beyond the Plaintiff's ability to repay as such debts matured.

237.    The March WRS SAFE Transaction and any obligations incurred by WRS to Bankman-Fried are avoidable by creditors who hold allowable unsecured claims, including creditors who were creditors before the March WRS SAFE Transaction and obligations.

238.    Accordingly, the March WRS SAFE Transaction and any obligations incurred by WRS to Bankman-Fried should be avoided as fraudulent pursuant to 11 U.S.C. § 544(b) and Del. Code Ann. tit. 6, §§ 1304(a)(2), 1305, and WRS may recover from Bankman-Fried any shares or other equity interest transferred pursuant to the March WRS SAFE Transaction, plus costs and fees to the extent available, for the benefit of Debtors' bankruptcy estates.

### COUNT TWENTY-SIX
### FRAUDULENT TRANSFERS AND OBLIGATIONS
### PURSUANT TO 11 U.S.C. § 548(a)(1)(A)
### (AGAINST DEFENDANTS BANKMAN-FRIED AND WANG)

239.     Plaintiffs repeat and reallege the allegations in paragraphs 1 through 238 as if fully set forth here.

240.     Alameda transferred $546,087,587.10 to Bankman-Fried and Wang between May 6 and May 18, 2022 to finance the acquisition of Robinhood shares.  The Robinhood Loans were a transfer of property of Plaintiffs.

241.     The Robinhood Loans were undertaken with actual intent to hinder, delay or defraud present or future creditors.

242.     Accordingly, the Robinhood Loans should be avoided as fraudulent pursuant to Section 548(a)(1)(A) of the Bankruptcy Code, and Plaintiffs may recover from Bankman-Fried and Wang the full amount of the Robinhood Loans, plus interest from the relevant date, and costs and fees to the extent available, for the benefit of Debtors' bankruptcy estates.

### COUNT TWENTY-SEVEN
### FRAUDULENT TRANSFERS AND OBLIGATIONS
### PURSUANT TO 11 U.S.C. § 548(a)(1)(B)
### (AGAINST DEFENDANTS BANKMAN-FRIED AND WANG)

243.     Plaintiffs repeat and reallege the allegations in paragraphs 1 through 242 as if fully set forth here.

244.     Alameda transferred $546,087,587.10 to Bankman-Fried and Wang between May 6 and May 18, 2022 to finance the acquisition of Robinhood shares.  The Robinhood Loans were a transfer of property of Plaintiffs.

245.     Alameda did not receive reasonably equivalent value in exchange for the Robinhood Loans and for any obligations incurred by Alameda to Bankman-Fried and Wang.

246.    Alameda:  (1) was insolvent on the dates of the Robinhood Loans and when any obligations in connection with the Robinhood Loans were incurred; (2) became insolvent as a result of the Robinhood Loans and any obligations incurred in connection with the Robinhood Loans; (3) was engaged in a business or a transaction for which any property remaining with the Plaintiff was an unreasonably small capital; or (4) intended to incur, or believed that it would incur, debts that would be beyond the Plaintiff's ability to repay as such debts matured.

247.    Accordingly, the Robinhood Loans and any obligations incurred by Alameda to Bankman-Fried and Wang should be avoided as fraudulent pursuant to Section 548(a)(1)(B) of the Bankruptcy Code, and Plaintiff may recover from Bankman-Fried and Wang the full amount of the Robinhood Loans, plus interest from the relevant date, and costs and fees to the extent available, for the benefit of Debtors' bankruptcy estates.

## COUNT TWENTY-EIGHT
## FRAUDULENT TRANSFERS AND OBLIGATIONS PURSUANT TO
## DEL. CODE ANN. TIT. 6, § 1304(a)(1) AND 11 U.S.C. § 544(b)
## (AGAINST DEFENDANTS BANKMAN-FRIED AND WANG)

248.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 247 as if fully set forth here.

249.    Section 544(b) of the Bankruptcy Code authorizes Plaintiffs to avoid any transfer of an interest in their property or any obligation incurred by them that is voidable under applicable law by a creditor holding an allowable unsecured claim.  Accordingly, fraudulent transfers and obligations are avoidable pursuant to Bankruptcy Code Section 544(b) and other applicable law, including the Delaware Uniform Fraudulent Transfer Act, Del. Code Ann. tit. 6, § 1301, *et seq.*

250.    Alameda transferred $546,087,587.10 to Bankman-Fried and Wang between May 6 and May 18, 2022 to finance the acquisition of Robinhood shares.  The Robinhood Loans were a transfer of property of Plaintiffs.

251.    The Robinhood Loans and any obligations incurred by Alameda to Bankman-Fried and Wang were made with actual intent to hinder, delay or defraud present or future creditors, including creditors who hold allowable unsecured claims.  The Robinhood Loans and any obligations are avoidable by creditors who hold allowable unsecured claims.

252.    Accordingly, the Robinhood Loans and any obligations incurred by Alameda to Bankman-Fried and Wang should be avoided as fraudulent pursuant to Del. Code Ann. tit. 6, § 1304(a)(1) and 11 U.S.C. § 544(b), and Plaintiff may recover from Bankman-Fried and Wang the full amount of the Robinhood Loans, plus interest from the relevant date, and costs and fees to the extent available, for the benefit of Debtors' bankruptcy estates.

**COUNT TWENTY-NINE**
**FRAUDULENT TRANSFERS AND OBLIGATIONS PURSUANT TO**
**DEL. CODE ANN. TIT. 6, §§ 1304(a)(2), 1305 AND 11 U.S.C. § 544(b)**
**(AGAINST DEFENDANTS BANKMAN-FRIED AND WANG)**

253.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 252 as if fully set forth here.

254.    Section 544(b) of the Bankruptcy Code authorizes Plaintiffs to avoid any transfer of an interest in their property or any obligation incurred by them that is voidable under applicable law by a creditor holding an allowable unsecured claim.  Accordingly, fraudulent transfers and obligations are avoidable pursuant to Bankruptcy Code Section 544(b) and other applicable law, including the Delaware Uniform Fraudulent Transfer Act, Del. Code Ann. tit. 6, § 1301, *et seq.*

255.    Alameda transferred $546,087,587.10 to Bankman-Fried and Wang between May 6 and May 18, 2022 to finance the acquisition of Robinhood shares.  The Robinhood Loans were a transfer of property of Plaintiffs.

256.    Alameda did not receive reasonably equivalent value in exchange for the Robinhood Loans and for any obligations incurred by Plaintiff Alameda to Bankman-Fried and Wang.

257.    Alameda:  (1) was insolvent on the dates of the Robinhood Loans and when any obligations in connection with the Robinhood Loans were incurred; (2) became insolvent as a result of the Robinhood Loans and any obligations incurred in connection with the Robinhood Loans; (3) was engaged in a business or a transaction for which any property remaining with the Plaintiff was an unreasonably small capital; or (4) intended to incur, or believed that it would incur, debts that would be beyond the Plaintiff's ability to repay as such debts matured.

258.    The Robinhood Loans and any obligations incurred by Alameda to Bankman-Fried and Wang are avoidable by creditors who hold allowable unsecured claims, including creditors who were creditors before the Robinhood Loans and obligations.

259.    Accordingly, the Robinhood Loans and any obligations incurred by Alameda to Bankman-Fried and Wang should be avoided as fraudulent pursuant to 11 U.S.C. § 544(b) and Del. Code Ann. tit. 6, §§ 1304(a)(2), 1305, and Alameda may recover from Bankman-Fried and Wang the full amount of the Robinhood Loans, plus interest from the relevant date, and costs and fees to the extent available, for the benefit of Debtors' bankruptcy estates.

## COUNT THIRTY
## FRAUDULENT TRANSFERS AND OBLIGATIONS
## PURSUANT TO 11 U.S.C. § 548(a)(1)(A)
## (AGAINST DEFENDANT BANKMAN-FRIED)

260.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 259 as if fully set forth here.

261.    Alameda transferred $10 million on January 24, 2022 for the benefit of Bankman-Fried, which he ultimately transferred to his father Allen "Joe" Bankman.  The Bankman Gift Transfer was a transfer of property of Plaintiffs.

262.    The Bankman Gift Transfer was made with actual intent to hinder, delay or defraud present or future creditors.

263.    Accordingly, the Bankman Gift Transfer and any obligations incurred by Plaintiffs to Bankman-Fried should be avoided as fraudulent pursuant to Section 548(a)(1)(A) of the Bankruptcy Code, and Plaintiffs may recover from Bankman-Fried the full amount of the Bankman Gift Transfer, plus interest from the relevant date, and costs and fees to the extent available, for the benefit of Debtors' bankruptcy estates.

## COUNT THIRTY-ONE
## FRAUDULENT TRANSFERS AND OBLIGATIONS
## PURSUANT TO 11 U.S.C. § 548(a)(1)(B)
## (AGAINST DEFENDANT BANKMAN-FRIED)

264.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 263 as if fully set forth here.

265.    Alameda transferred $10 million on January 24, 2022 for the benefit of Bankman-Fried, which he ultimately transferred to his father Allen "Joe" Bankman.  The Bankman Gift Transfer was a transfer of property of Plaintiffs.

266.    Alameda did not receive reasonably equivalent value in exchange for the Bankman Gift Transfer and for any obligations incurred by Alameda to Bankman-Fried.

267.    Alameda:  (1) was insolvent on the date of the Bankman Gift Transfer and when any obligations in connection with the Bankman Gift Transfer were incurred; (2) became insolvent as a result of the Bankman Gift Transfer and any obligations incurred in connection with the Bankman Gift Transfer; (3) was engaged in a business or a transaction for which any property remaining with the Plaintiff was an unreasonably small capital; or (4) intended to incur, or believed that it would incur, debts that would be beyond the Plaintiff's ability to repay as such debts matured.

268.    Accordingly, the Bankman Gift Transfer should be avoided as fraudulent pursuant to Section 548(a)(1)(B) of the Bankruptcy Code, and Plaintiff may recover from Bankman-Fried the full amount of the Bankman Gift Transfer, plus interest from the relevant date, and costs and fees to the extent available, for the benefit of Debtors' bankruptcy estates.

**COUNT THIRTY-TWO**
**FRAUDULENT TRANSFERS AND OBLIGATIONS PURSUANT TO**
**DEL. CODE ANN. TIT. 6, § 1304(a)(1) AND 11 U.S.C. § 544(b)**
**(AGAINST DEFENDANT BANKMAN-FRIED)**

269.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 268 as if fully set forth here.

270.    Section 544(b) of the Bankruptcy Code authorizes Plaintiffs to avoid any transfer of an interest in their property or any obligation incurred by them that is voidable under applicable law by a creditor holding an allowable unsecured claim.  Accordingly, fraudulent transfers and obligations are avoidable pursuant to Bankruptcy Code Section 544(b) and other applicable law, including the Delaware Uniform Fraudulent Transfer Act, Del. Code Ann. tit. 6, § 1301, *et seq.*

271.     Alameda transferred $10 million on January 24, 2022 for the benefit of Bankman-Fried, which he ultimately transferred to his father Allen "Joe" Bankman.  The Bankman Gift Transfer was a transfer of property of Plaintiffs.

272.     The Bankman Gift Transfer was made with actual intent to hinder, delay or defraud present or future creditors, including creditors who hold allowable unsecured claims. The Bankman Gift Transfer and any obligations are avoidable by creditors who hold allowable unsecured claims.

273.     Accordingly, the Bankman Gift Transfer should be avoided as fraudulent pursuant to Del. Code Ann. tit. 6, § 1304(a)(1) and 11 U.S.C. § 544(b), and Plaintiff may recover from Bankman-Fried the full amount of the Bankman Gift Transfer, plus interest from the relevant date, and costs and fees to the extent available, for the benefit of Debtors' bankruptcy estates.

## COUNT THIRTY-THREE
## FRAUDULENT TRANSFERS AND OBLIGATIONS PURSUANT TO
## DEL. CODE ANN. TIT. 6, §§ 1304(a)(2), 1305 AND 11 U.S.C. § 544(b)
## (AGAINST DEFENDANT BANKMAN-FRIED)

274.     Plaintiffs repeat and reallege the allegations in paragraphs 1 through 273 as if fully set forth here.

275.     Section 544(b) of the Bankruptcy Code authorizes Plaintiffs to avoid any transfer of an interest in their property or any obligation incurred by them that is voidable under applicable law by a creditor holding an allowable unsecured claim.  Accordingly, fraudulent transfers and obligations are avoidable pursuant to Bankruptcy Code Section 544(b) and other applicable law, including the Delaware Uniform Fraudulent Transfer Act, Del. Code Ann. tit. 6, § 1301, *et seq.*

276.    Alameda transferred $10 million on January 24, 2022 for the benefit of Bankman-Fried, which he ultimately transferred to his father Allen "Joe" Bankman.  The Bankman Gift Transfer was a transfer of property of Plaintiffs.

277.    Alameda did not receive reasonably equivalent value in exchange for the Bankman Gift Transfer and for any obligations incurred by Alameda to Bankman-Fried.

278.    Alameda:  (1) was insolvent on the date of the Bankman Gift Transfer and when any obligations in connection with the Bankman Gift Transfer were incurred; (2) became insolvent as a result of the Bankman Gift Transfer and any obligations incurred in connection with the Bankman Gift Transfer; (3) was engaged in a business or a transaction for which any property remaining with the Plaintiff was an unreasonably small capital; or (4) intended to incur, or believed that it would incur, debts that would be beyond the Plaintiff's ability to repay as such debts matured.

279.    The Bankman Gift Transfer is avoidable by creditors who hold allowable unsecured claims, including creditors who were creditors before the Bankman Gift Transfer.

280.    Accordingly, the Bankman Gift Transfer should be avoided as fraudulent pursuant to 11 U.S.C. § 544(b) and Del. Code Ann. tit. 6, §§ 1304(a)(2), 1305, and Alameda may recover from Bankman-Fried the full amount of the Bankman Gift Transfer, plus interest from the relevant date, and costs and fees to the extent available, for the benefit of Debtors' bankruptcy estates.

### COUNT THIRTY-FOUR
### FRAUDULENT TRANSFERS AND OBLIGATIONS
### PURSUANT TO 11 U.S.C. § 548(a)(1)(A)
### (AGAINST DEFENDANT ELLISON)

281.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 280 as if fully set forth here.

282.    Alameda transferred $22.5 million on February 22, 2022 for the benefit of Ellison.  The AI Bonus Transfer was a transfer of property of Plaintiffs.

283.    The AI Bonus Transfer and any obligations incurred by Plaintiffs to Ellison in connection with the AI Bonus Transfer were made with actual intent to hinder, delay or defraud present or future creditors.

284.    Accordingly, the AI Bonus Transfer and any obligations incurred by Plaintiffs to Ellison should be avoided as fraudulent pursuant to Section 548(a)(1)(A) of the Bankruptcy Code, and Plaintiffs may recover from Ellison the full amount of the AI Bonus Transfer, plus interest from the relevant date, and costs and fees to the extent available, for the benefit of Debtors' bankruptcy estates.

**COUNT THIRTY-FIVE**
**FRAUDULENT TRANSFERS AND OBLIGATIONS**
**PURSUANT TO 11 U.S.C. § 548(a)(1)(B)**
**(AGAINST DEFENDANT ELLISON)**

285.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 284 as if fully set forth here.

286.    Alameda transferred $22.5 million on February 22, 2022 for the benefit of Ellison.  The AI Bonus Transfer was a transfer of property of Plaintiffs.

287.    Alameda did not receive reasonably equivalent value in exchange for the AI Bonus Transfer and for any obligations incurred by Plaintiff Alameda to Ellison.

288.    Alameda:  (1) was insolvent on the date of the AI Bonus Transfer and when any obligations in connection with the AI Bonus Transfer were incurred; (2) became insolvent as a result of the AI Bonus Transfer and any obligations incurred in connection with the AI Bonus Transfer; (3) was engaged in a business or a transaction for which any property remaining with

the Plaintiff was an unreasonably small capital; or (4) intended to incur, or believed that it would incur, debts that would be beyond the Plaintiff's ability to repay as such debts matured.

289.    Accordingly, the AI Bonus Transfer and any obligations incurred by Alameda to Ellison in connection with the AI Bonus Transfer should be avoided as fraudulent pursuant to Section 548(a)(1)(B) of the Bankruptcy Code, and Plaintiff may recover from Ellison the full amount of the AI Bonus Transfer, plus interest from the relevant date, and costs and fees to the extent available, for the benefit of Debtors' bankruptcy estates.

## COUNT THIRTY-SIX
## FRAUDULENT TRANSFERS AND OBLIGATIONS PURSUANT TO
## DEL. CODE ANN. TIT. 6, § 1304(a)(1) AND 11 U.S.C. § 544(b)
## (AGAINST DEFENDANT ELLISON)

290.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 289 as if fully set forth here.

291.    Section 544(b) of the Bankruptcy Code authorizes Plaintiffs to avoid any transfer of an interest in their property or any obligation incurred by them that is voidable under applicable law by a creditor holding an allowable unsecured claim.  Accordingly, fraudulent transfers and obligations are avoidable pursuant to Bankruptcy Code Section 544(b) and other applicable law, including the Delaware Uniform Fraudulent Transfer Act, Del. Code Ann. tit. 6, § 1301, *et seq.*

292.    Alameda transferred $22.5 million on February 22, 2022 for the benefit of Ellison.  The AI Bonus Transfer was a transfer of property of Plaintiffs.

293.    The AI Bonus Transfer and any obligations incurred by Alameda to Ellison in connection with the AI Bonus Transfer were made with actual intent to hinder, delay or defraud present or future creditors, including creditors who hold allowable unsecured claims.  The AI

Bonus Transfer and any obligations are avoidable by creditors who hold allowable unsecured claims.

294.    Accordingly, the AI Bonus Transfer and any obligations incurred by Alameda to Ellison in connection with the AI Bonus Transfer should be avoided as fraudulent pursuant to Del. Code Ann. tit. 6, § 1304(a)(1) and 11 U.S.C. § 544(b), and Plaintiff may recover from Ellison the full amount of the AI Bonus Transfer, plus interest from the relevant date, and costs and fees to the extent available, for the benefit of Debtors' bankruptcy estates.

## COUNT THIRTY-SEVEN
## FRAUDULENT TRANSFERS AND OBLIGATIONS PURSUANT TO
## DEL. CODE ANN. TIT. 6, §§ 1304(a)(2), 1305 AND 11 U.S.C. § 544(b)
## (AGAINST DEFENDANT ELLISON)

295.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 294 as if fully set forth here.

296.    Section 544(b) of the Bankruptcy Code authorizes Plaintiffs to avoid any transfer of an interest in their property or any obligation incurred by them that is voidable under applicable law by a creditor holding an allowable unsecured claim.  Accordingly, fraudulent transfers and obligations are avoidable pursuant to Bankruptcy Code Section 544(b) and other applicable law, including the Delaware Uniform Fraudulent Transfer Act, Del. Code Ann. tit. 6, § 1301, *et seq.*

297.    Alameda transferred $22.5 million on February 22, 2022 for the benefit of Ellison.  The AI Bonus Transfer was a transfer of property of Plaintiffs.

298.    Alameda did not receive reasonably equivalent value in exchange for the AI Bonus Transfer and for any obligations incurred by Alameda to Ellison in connection with the AI Bonus Transfer.

299.    Alameda:  (1) was insolvent on the date of the AI Bonus Transfer and when any obligations in connection with the AI Bonus Transfer were incurred; (2) became insolvent as a result of the AI Bonus Transfer and any obligations incurred in connection with the AI Bonus Transfer; (3) was engaged in a business or a transaction for which any property remaining with the Plaintiff was an unreasonably small capital; or (4) intended to incur, or believed that it would incur, debts that would be beyond the Plaintiff's ability to repay as such debts matured.

300.    The AI Bonus Transfer and any obligations incurred by Alameda to Ellison in connection with the AI Bonus Transfer are avoidable by creditors who hold allowable unsecured claims, including creditors who were creditors before the AI Bonus Transfer and obligations.

301.    Accordingly, the AI Bonus Transfer and any obligations incurred by Alameda to Ellison in connection with the AI Bonus Transfer should be avoided as fraudulent pursuant to 11 U.S.C. § 544(b) and Del. Code Ann. tit. 6, §§ 1304(a)(2), 1305, and Alameda may recover from Ellison the full amount of the AI Bonus Transfer, plus interest from the relevant date, and costs and fees to the extent available, for the benefit of Debtors' bankruptcy estates.

### COUNT THIRTY-EIGHT
### FRAUDULENT TRANSFERS AND OBLIGATIONS
### PURSUANT TO 11 U.S.C. § 548(a)(1)(A)
### (AGAINST DEFENDANT ELLISON)

302.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 301 as if fully set forth here.

303.    Alameda and Cottonwood collectively transferred $6,262,529.89 on July 23, 2021 and September 14, 2022 for the benefit of Ellison.  The Cash Bonus Transfers were transfers of property of Plaintiffs.

304.    The Cash Bonus Transfers and any obligations incurred by Plaintiffs to Ellison in connection with the Cash Bonus Transfers were made with actual intent to hinder, delay or defraud present or future creditors.

305.    Accordingly, the Cash Bonus Transfers and any obligations incurred by Plaintiffs to Ellison should be avoided as fraudulent pursuant to Section 548(a)(1)(A) of the Bankruptcy Code, and Plaintiffs may recover from Ellison the full amount of the Cash Bonus Transfers, plus interest from the relevant dates, and costs and fees to the extent available, for the benefit of Debtors' bankruptcy estates.

**COUNT THIRTY-NINE**
**FRAUDULENT TRANSFERS AND OBLIGATIONS**
**PURSUANT TO 11 U.S.C. § 548(a)(1)(B)**
**(AGAINST DEFENDANT ELLISON)**

306.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 305 as if fully set forth here.

307.    Alameda and Cottonwood collectively transferred $6,262,529.89 on July 23, 2021 and September 14, 2022 for the benefit of Ellison.  The Cash Bonus Transfers were transfers of property of Plaintiffs.

308.    Alameda and Cottonwood did not receive reasonably equivalent value in exchange for the Cash Bonus Transfers and for any obligations incurred by Alameda and Cottonwood to Ellison.

309.    Alameda and Cottonwood:  (1) were insolvent on the dates of the Cash Bonus Transfers and when any obligations in connection with the Cash Bonus Transfers were incurred; (2) became insolvent as a result of the Cash Bonus Transfers and any obligations incurred in connection with the Cash Bonus Transfers; (3) was engaged in a business or a transaction for which any property remaining with the Plaintiff was an unreasonably small capital; or

(4) intended to incur, or believed that it would incur, debts that would be beyond the Plaintiff's ability to repay as such debts matured.

310.    Accordingly, the Cash Bonus Transfers and any obligations incurred by Alameda and Cottonwood to Ellison in connection with the Cash Bonus Transfers should be avoided as fraudulent pursuant to Section 548(a)(1)(B) of the Bankruptcy Code, and Plaintiff may recover from Ellison the full amount of the Cash Bonus Transfers, plus interest from the relevant dates, and costs and fees to the extent available, for the benefit of Debtors' bankruptcy estates.

## COUNT FORTY
### FRAUDULENT TRANSFERS AND OBLIGATIONS PURSUANT TO DEL. CODE ANN. TIT. 6, § 1304(a)(1) AND 11 U.S.C. § 544(b) (AGAINST DEFENDANT ELLISON)

311.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 310 as if fully set forth here.

312.    Section 544(b) of the Bankruptcy Code authorizes Plaintiffs to avoid any transfer of an interest in their property or any obligation incurred by them that is voidable under applicable law by a creditor holding an allowable unsecured claim.  Accordingly, fraudulent transfers and obligations are avoidable pursuant to Bankruptcy Code Section 544(b) and other applicable law, including the Delaware Uniform Fraudulent Transfer Act, Del. Code Ann. tit. 6, § 1301, *et seq.*

313.    Alameda and Cottonwood collectively transferred $6,262,529.89 on July 23, 2021 and September 14, 2022 for the benefit of Ellison.  The Cash Bonus Transfers were transfers of property of Plaintiffs.

314.    The Cash Bonus Transfers and any obligations incurred by Alameda and Cottonwood to Ellison in connection with the Cash Bonus Transfers were made with actual intent to hinder, delay or defraud present or future creditors, including creditors who hold

allowable unsecured claims.  The Cash Bonus Transfers and any obligations are avoidable by creditors who hold allowable unsecured claims.

315.    Accordingly, the Cash Bonus Transfers and any obligations incurred by Alameda to Ellison in connection with the Cash Bonus Transfers should be avoided as fraudulent pursuant to Del. Code Ann. tit. 6, § 1304(a)(1) and 11 U.S.C. § 544(b), and Plaintiff may recover from Ellison the full amount of the Cash Bonus Transfers, plus interest from the relevant dates, and costs and fees to the extent available, for the benefit of Debtors' bankruptcy estates.

**COUNT FORTY-ONE**
**FRAUDULENT TRANSFERS AND OBLIGATIONS PURSUANT TO**
**DEL. CODE ANN. TIT. 6, §§ 1304(a)(2), 1305 AND 11 U.S.C. § 544(b)**
**(AGAINST DEFENDANT ELLISON)**

316.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 315 as if fully set forth here.

317.    Section 544(b) of the Bankruptcy Code authorizes Plaintiffs to avoid any transfer of an interest in their property or any obligation incurred by them that is voidable under applicable law by a creditor holding an allowable unsecured claim.  Accordingly, fraudulent transfers and obligations are avoidable pursuant to Bankruptcy Code Section 544(b) and other applicable law, including the Delaware Uniform Fraudulent Transfer Act, Del. Code Ann. tit. 6, § 1301, *et seq.*

318.    Alameda and Cottonwood collectively transferred $6,262,529.89 on July 23, 2021 and September 14, 2022 for the benefit of Ellison.  The Cash Bonus Transfers were transfers of property of Plaintiffs.

319.    Alameda and Cottonwood did not receive reasonably equivalent value in exchange for the Cash Bonus Transfers and for any obligations incurred by Alameda and Cottonwood to Ellison in connection with the Cash Bonus Transfers.

320.     Alameda and Cottonwood:  (1) were insolvent on the dates of the Cash Bonus Transfers and when any obligations in connection with the Cash Bonus Transfers were incurred; (2) became insolvent as a result of the Cash Bonus Transfers and any obligations incurred in connection with the Cash Bonus Transfers; (3) was engaged in a business or a transaction for which any property remaining with the Plaintiff was an unreasonably small capital; or (4) intended to incur, or believed that it would incur, debts that would be beyond the Plaintiff's ability to repay as such debts matured.

321.     The Cash Bonus Transfers and any obligations incurred by Alameda and Cottonwood to Ellison in connection with the Cash Bonus Transfers are avoidable by creditors who hold allowable unsecured claims, including creditors who were creditors before the Cash Bonus Transfers and obligations.

322.     Accordingly, the Cash Bonus Transfers and any obligations incurred by Alameda and Cottonwood to Ellison in connection with the Cash Bonus Transfers should be avoided as fraudulent pursuant to 11 U.S.C. § 544(b) and Del. Code Ann. tit. 6, §§ 1304(a)(2), 1305, and Alameda and Cottonwood may recover from Ellison the full amount of the Cash Bonus Transfers, plus interest from the relevant date, and costs and fees to the extent available, for the benefit of Debtors' bankruptcy estates.

**COUNT FORTY-TWO**
**FRAUDULENT TRANSFERS AND OBLIGATIONS**
**PURSUANT TO 11 U.S.C. § 548(a)(1)(A)**
**(AGAINST DEFENDANTS BANKMAN-FRIED, WANG AND SINGH)**

323.     Plaintiffs repeat and reallege the allegations in paragraphs 1 through 322 as if fully set forth here.

324.     FTX transferred $4,863,582.57 between April and June 2021 for the benefit of Bankman-Fried, Wang and Singh as part of the Real Estate Transactions.  The Real Estate Transactions constituted transfers of property of Plaintiffs.

325.     The Real Estate Transactions and any obligations incurred by Plaintiffs to Bankman-Fried, Wang and Singh in connection with the Real Estate Transactions were made with actual intent to hinder, delay or defraud present or future creditors.

326.     Accordingly, the Real Estate Transactions and any obligations incurred by Plaintiffs to Bankman-Fried, Wang and Singh in connection with the Real Estate Transactions should be avoided as fraudulent pursuant to Section 548(a)(1)(A) of the Bankruptcy Code, and Plaintiffs may recover from these defendants the full amount of the Real Estate Transactions, plus interest from the relevant date, and costs and fees to the extent available, for the benefit of Debtors' bankruptcy estates.

## COUNT FORTY-THREE
## FRAUDULENT TRANSFERS AND OBLIGATIONS
## PURSUANT TO 11 U.S.C. § 548(a)(1)(B)
## (AGAINST DEFENDANTS BANKMAN-FRIED, WANG AND SINGH)

327.     Plaintiffs repeat and reallege the allegations in paragraphs 1 through 326 as if fully set forth here.

328.     FTX transferred $4,863,582.57 between April and June 2021 for the benefit of Bankman-Fried, Wang and Singh as part of the Real Estate Transactions.  The Real Estate Transactions constituted transfers of property of Plaintiffs.

329.     FTX did not receive reasonably equivalent value in exchange for the Real Estate Transactions and for any obligations incurred by FTX to Bankman-Fried, Wang or Singh in connection with the Real Estate Transactions.

330.    FTX:  (1) was insolvent on the dates of the Real Estate Transactions and when

any obligations in connection with the Real Estate Transactions were incurred; (2) became

insolvent as a result of the Real Estate Transactions and any obligations incurred in connection

with the Real Estate Transactions; (3) was engaged in a business or a transaction for which any

property remaining with the Plaintiff was an unreasonably small capital; or (4) intended to incur,

or believed that it would incur, debts that would be beyond the Plaintiff's ability to repay as such

debts matured.

331.    Accordingly, the Real Estate Transactions and any obligations incurred by

Plaintiffs to Bankman-Fried, Wang and Singh in connection with the Real Estate Transactions

should be avoided as fraudulent pursuant to Section 548(a)(1)(B) of the Bankruptcy Code, and

Plaintiffs may recover from these defendants the full amount of the Real Estate Transactions,

plus interest from the relevant date, and costs and fees to the extent available, for the benefit of

Debtors' bankruptcy estates.

**COUNT FORTY-FOUR**
**FRAUDULENT TRANSFERS AND OBLIGATIONS PURSUANT TO**
**DEL. CODE ANN. TIT. 6, § 1304(a)(1) AND 11 U.S.C. § 544(b)**
**(AGAINST DEFENDANTS BANKMAN-FRIED, WANG AND SINGH)**

332.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 331 as if

fully set forth here.

333.    Section 544(b) of the Bankruptcy Code authorizes Plaintiffs to avoid any transfer

of an interest in their property or any obligation incurred by them that is voidable under

applicable law by a creditor holding an allowable unsecured claim.  Accordingly, fraudulent

transfers and obligations are avoidable pursuant to Bankruptcy Code Section 544(b) and other

applicable law, including the Delaware Uniform Fraudulent Transfer Act, Del. Code Ann. tit. 6,

§ 1301, *et seq.*

334.     FTX transferred $4,863,582.57 between April and June 2021 for the benefit of Bankman-Fried, Wang and Singh as part of the Real Estate Transactions.  The Real Estate Transactions constituted transfers of property of Plaintiffs.

335.     The Real Estate Transactions and any obligations incurred by Plaintiffs to Bankman-Fried, Wang and Singh were made with actual intent to hinder, delay or defraud present or future creditors, including creditors who hold allowable unsecured claims.  The Real Estate Transactions and any obligations are avoidable by creditors who hold allowable unsecured claims.

336.     Accordingly, the Real Estate Transactions and any obligations incurred by Plaintiffs to Bankman-Fried, Wang and Singh in connection with the Real Estate Transactions should be avoided as fraudulent pursuant to Del. Code Ann. tit. 6, § 1304(a)(1) and 11 U.S.C. § 544(b), and Plaintiffs may recover from these defendants the full amount of the Real Estate Transactions, plus interest from the relevant date, and costs and fees to the extent available, for the benefit of Debtors' bankruptcy estates.

## COUNT FORTY-FIVE
### FRAUDULENT TRANSFERS AND OBLIGATIONS PURSUANT TO DEL. CODE ANN. TIT. 6, §§ 1304(a)(2), 1305 AND 11 U.S.C. § 544(b) (AGAINST DEFENDANTS BANKMAN-FRIED, WANG AND SINGH)

337.     Plaintiffs repeat and reallege the allegations in paragraphs 1 through 336 as if fully set forth here.

338.     Section 544(b) of the Bankruptcy Code authorizes Plaintiffs to avoid any transfer of an interest in their property or any obligation incurred by them that is voidable under applicable law by a creditor holding an allowable unsecured claim.  Accordingly, fraudulent transfers and obligations are avoidable pursuant to Bankruptcy Code Section 544(b) and other

applicable law, including the Delaware Uniform Fraudulent Transfer Act, Del. Code Ann. tit. 6, § 1301, *et seq.*

339.    FTX transferred $4,863,582.57 between April and June 2021 for the benefit of Bankman-Fried, Wang and Singh as part of the Real Estate Transactions.  The Real Estate Transactions constituted transfers of property of Plaintiffs.

340.    FTX did not receive reasonably equivalent value in exchange for the Real Estate Transactions and for any obligations incurred by FTX to Bankman-Fried, Wang or Singh in connection with the Real Estate Transactions.

341.    FTX:  (1) was insolvent on the date of the Real Estate Transactions and when any obligations in connection with the Real Estate Transactions were incurred; (2) became insolvent as a result of the Real Estate Transactions and any obligations incurred in connection with the Real Estate Transactions; (3) was engaged in a business or a transaction for which any property remaining with the Plaintiff was an unreasonably small capital; or (4) intended to incur, or believed that it would incur, debts that would be beyond the Plaintiff's ability to repay as such debts matured.

342.    The Real Estate Transactions and any obligations incurred by Plaintiffs to Bankman-Fried, Wang and Singh in connection with the Real Estate Transactions are avoidable by creditors who hold allowable unsecured claims, including creditors who were creditors before the Real Estate Transactions and obligations.

343.    Accordingly, the Real Estate Transactions and any obligations incurred by Plaintiffs to Bankman-Fried, Wang and Singh in connection with the Real Estate Transactions should be avoided as fraudulent pursuant to 11 U.S.C. § 544(b) and Del. Code Ann. tit. 6, §§ 1304(a)(2), 1305, and Plaintiffs may recover from these defendants the full amount of the

Real Estate Transactions, plus interest from the relevant date, and costs and fees to the extent available, for the benefit of Debtors' bankruptcy estates.

## COUNT FORTY-SIX
## PROPERTY RECOVERY PURSUANT TO 11 U.S.C. § 550(a)(1)
## (AGAINST ALL DEFENDANTS)

344.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 343 as if fully set forth here.

345.    As alleged above, Plaintiffs are entitled to avoid each of the transfers addressed herein under Sections 544 and 548 of the Bankruptcy Code.

346.    Because Defendants are the initial transferees or the entities for whose benefit such transfers were made, Plaintiffs may recover from Defendants the full value of the transfers pursuant to 11 U.S.C. § 550(a)(1), plus interest from the transfer dates, and costs and fees to the extent available, for the benefit of the Debtors' bankruptcy estates.

## COUNT FORTY-SEVEN
## DISALLOWANCE OF CLAIMS PURSUANT TO 11 U.S.C. § 502(d)
## (AGAINST ALL DEFENDANTS)

347.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 346 as if fully set forth here.

348.    By reason of the foregoing facts and pursuant to Section 502(d) of the Bankruptcy Code, the claims of Defendants in the Chapter 11 Cases should be disallowed unless and until Defendants have turned over to Plaintiffs the property transferred, or paid Plaintiffs the value of such transferred property, for which the Defendants are liable pursuant to Section 550 of the Bankruptcy Code.[6]

---

[6]    The Debtors reserve all rights and defenses, and the right to object to, the merits of any claim or proof of claim asserted by any Defendant against any of the Debtors.

## COUNT FORTY-EIGHT
## EQUITABLE SUBORDINATION OF CLAIMS PURSUANT TO 11 U.S.C.
## § 510(c)(1) (AGAINST ALL DEFENDANTS)

349.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 348 as if fully set forth here.

350.    By reason of the foregoing facts and pursuant to Section 510(c) of the Bankruptcy Code, the claims of Defendants in the Chapter 11 Cases should be equitably subordinated to the claims of innocent creditors who had no part in the illegal and fraudulent misappropriation of customer funds.

351.    Equitable subordination as requested herein is consistent with the provisions and purposes of the Bankruptcy Code.

## PRAYER FOR RELIEF

WHEREFORE Plaintiffs respectfully pray that this Court:

352.    Enter an order that the transfers addressed herein are avoidable fraudulent transfers under 11 U.S.C. §§ 544, 548 and 550 and Del. Code Ann. tit. 6, §§ 1304, 1305;

353.    Award Plaintiffs (a) return of property to the Debtors' estates that is the subject of the avoidable fraudulent transfers alleged herein; or (b) monetary damages under 11 U.S.C. § 550 reflecting the value of the avoidable transfers alleged herein (plus the value of any additional avoidable transfers Plaintiffs learn, through discovery or otherwise, were made to the Defendants during the Avoidance Period);

354.    Award Plaintiffs monetary damages resulting from all breaches of fiduciary duties and other claims alleged herein;

355.    Enter an order under 11 U.S.C. § 502(d) disallowing any and all claims filed or held by Defendants in the Chapter 11 Cases unless and until Defendants have turned over to Plaintiffs the amount ordered as an award;

356.    Enter an order under 11 U.S.C. § 510(c)(1) subordinating any and all claims filed or held by Defendants in the Chapter 11 Cases to the claims of innocent creditors who had no part in the illegal and fraudulent misappropriation of customer funds;

357.    Award Plaintiffs their attorneys' fees, pre- and post-judgment interests and costs of suit; and

358.    Award Plaintiffs all other relief, at law or equity, to which they may be entitled.

Dated: July 20, 2023
Wilmington, Delaware

**LANDIS RATH & COBB LLP**

*/s/ Matthew B. McGuire*
Adam G. Landis (No. 3407)
Matthew B. McGuire (No. 4366)
Kimberly A. Brown (No. 5138)
Matthew R. Pierce (No. 5946)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
E-mail: landis@lrclaw.com
        mcguire@lrclaw.com
        brown@lrclaw.com
        pierce@lrclaw.com

-and-

**SULLIVAN & CROMWELL LLP**
Steven L. Holley (admitted *pro hac vice*)
Andrew G. Dietderich (admitted *pro hac vice*)
Brian D. Glueckstein (admitted *pro hac vice*)
Christopher J. Dunne (admitted *pro hac vice*)
Jacob M. Croke (admitted *pro hac vice*)
125 Broad Street
New York, New York 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
E-mail: holleys@sullcrom.com
        dietdericha@sullcrom.com
        gluecksteinb@sullcrom.com
        dunnec@sullcrom.com
        crokej@sullcrom.com

*Counsel for the Debtors*
*and Debtors-in-Possession*