# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) ) ) ) Chapter 11 ) |
| FTX TRADING LTD., et al.,[1] | ) Case No. 22-11068 (JTD) ) |
| | ) (Jointly Administered) |
| Debtors. | ) ) ) |

## STATEMENT OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS IN RESPECT OF THE DEBTORS' DRAFT PLAN OF REORGANIZATION AND ACCOMPANYING TERM SHEET

The Official Committee of Unsecured Creditors (the "Committee") appointed in the chapter 11 cases (the "Chapter 11 Cases") of the above-captioned debtors and debtors-in-possession (the "Debtors"), by and through its undersigned counsel, hereby submits this statement in respect of the Debtors' *Draft Plan of Reorganization and Accompanying Term Sheet* [Docket No. 2100] and respectfully states as follows:

1. Earlier tonight, the Debtors filed their template for a plan of reorganization, with a descriptive term sheet (the "Debtors' Plan"). Unfortunately, what was supposed to be a watershed moment for these bankruptcy cases—the filing of a plan of reorganization *preceded by* robust, good faith negotiation and collaboration—is anything but. In response to the Committee's statement with respect to the Debtors' first exclusivity extension motion, the Debtors promised the

---

[1] The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and 4063, respectively. Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification number is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.

Court and the public that they would provide a "roadmap" on "where the chapter 11 cases are going and how long it will take to get there," and represented that they would work "with the UCC on the development of a plan of reorganization and the successful conclusion of these cases to the maximum benefit to all stakeholders."[2]  At the accompanying hearing, the Debtors pledged to file a plan in July, preceded by "plan discussions" with key case constituents.  Although filed on the last day in July—thus meeting their stated deadline and creating the appearance of progress—the Debtors' Plan, instead, was unilaterally proposed and largely ignores the Committee's suggestions that were raised (but *not* negotiated) during these "discussions."  Put simply, the Debtors chose to publicly file their *ideas* for a plan.[3]  In doing so, the Debtors did not have a single call or meeting with the members of the Committee to discuss the terms of the Debtors' Plan, notwithstanding the Committee's repeated requests to do so (as is the norm in chapter 11 cases).

2.      As the Committee has explained to the Debtors on a number of occasions, the Committee believes that the millions of customers and creditors whose votes are necessary to confirm a plan require a plan that (i) places control of the post-reorganization entities in the hands of qualified parties with relevant experience in the cryptocurrency markets, and who are selected by the Committee (as the representative of the creditors) and not the Debtors, (ii) creates a regulatory-compliant recovery token (or tokens) and facilitates a re-started FTX exchange to enhance creditor recoveries, and (iii) properly allocates value to the creditors most injured by the fraud that occurred.  Although there are myriad other issues in the Debtors' Plan to be negotiated,

---

[2]  *See Debtors' Response to the Statement and Reservation of Rights of Official Committee of Unsecured Creditors Regarding Motion of Debtors for entry of an Order Extending the Exclusive Periods During Which Only The Debtors May File a Chapter 11 Plan and Solicit Acceptances Thereof* [Docket No. 1243] at ¶¶ 8, 9, 11.

[3]  At the Committee's request, the Debtors included language in the term sheet accompanying the Debtors' Plan that acknowledges the need for negotiations on certain material issues, some of which are described below, that will drive customer and creditor recoveries and which must be resolved for there to be any hope of Committee and creditor support for a plan of reorganization.

these three points are the Committee's main gating items; the Committee is extremely disappointed that the Debtors have not engaged with the Committee on these issues nor yet discussed them with its members to appreciate their import.

3. As with the plan, the Committee has, since the commencement of these cases, sought to avoid unnecessary litigation (and the attendant legal fees) by working tirelessly in the background, prioritizing consensus-building over infighting, and pushing the Debtors to take steps to maximize the value of these estates. For example, the Committee has requested for many months that the Debtors invest a portion of their almost $2.6 billion cash balance in short-term treasury notes in order to generate greater income for the estates and partially offset the professional fees in these cases. Citing risks that are otherwise commonly addressed in chapter 11 cases, the Debtors have not moved forward on this front.

4. The Committee has also urged the Debtors for months to engage in a proper, staking, hedging and monetization process for its vast coin holdings and provided the Debtors with a blueprint to do so. Only recently have the Debtors advanced the monetization concepts. And, the Debtors have deployed questionable strategies with respect to the sale of certain of their Venture investments, until the Committee objected and the Debtors relented.

5. For so long as the Debtors have exclusivity, it is their right to file and pursue confirmation of the Debtors' Plan during such time. The Chapter 11 Cases are, however, on track to be among the most expensive in history, with more than $330 million spent on professional fees through the first eight months of these cases. With a monthly professional fee burn rate of over $50 million, these cases cannot afford a unilateral plan approach. The Debtors must understand that their customers and creditors will not vote in favor of a plan that is imposed on them without the substantive input and recommendation of the Committee, their fiduciary representative.

The current approach will simply wind up causing more delay and incurring greater fees, and the Committee will then have no choice but to take the steps necessary to advance a confirmable plan in these cases for which customers and creditors will actually vote in favor.

6.  All of this said, the Committee appreciates the Debtors' representation of their willingness to amend their plan to reflect the product of negotiations with the Committee, and the Committee intends to take the Debtors up on their offer.  As the Committee has told the Debtors repeatedly, the Committee remains ready to negotiate a plan that customers and creditors can support.  This will take willingness on the part of the Debtors to listen and engage and not attempt to substitute their judgment for that of the parties who truly know and understand the cryptocurrency markets.

[*Remainder of page left intentionally blank*]

| | |
|---|---|
| Dated: July 31, 2023<br>Wilmington, Delaware | YOUNG CONAWAY STARGATT & TAYLOR, LLP<br><br>*/s/ Robert F. Poppiti, Jr.*<br>Matthew B. Lunn (No. 4119)<br>Robert F. Poppiti, Jr. (No. 5052)<br>1000 North King Street<br>Wilmington, DE 19801<br>Telephone: (302) 571-6600<br>Facsimile: (302) 571-1253<br>Email: mlunn@ycst.com<br>         rpoppiti@ycst.com<br><br>-and-<br><br>PAUL HASTINGS LLP<br><br>Kristopher M. Hansen\*<br>Kenneth Pasquale\*<br>Erez Gilad\*<br>Gabriel E. Sasson\*<br>Isaac S. Sasson\*<br>200 Park Avenue<br>New York, NY 10166<br>Telephone:  (212) 318-6000<br>Facsimile:  (212) 319-4090<br>Email: krishansen@paulhastings.com<br>         kenpasquale@paulhastings.com<br>         erezgilad@paulhastings.com<br>         gabesasson@paulhastings.com<br>         isaacsasson@paulhastings.com<br><br>*\*Admitted pro hac vice*<br><br>*Counsel to the Official Committee of Unsecured Creditors* |