**<u>Exhibit B</u>**

**Settlement Agreement**

EXECUTION VERSION

SETTLEMENT AND STOCK EXCHANGE AGREEMENT

BY AND BETWEEN

IEX GROUP, INC.,

WEST REALM SHIRES INC.

AND

FTX TRADING LTD.

dated as of

July 31, 2023

# TABLE OF CONTENTS

**Page**

Article I Stock Exchange ...................................................................................................... 2

Section 1.1    Exchange of the FTX Shares and the Transferred IEX Shares.................. 2
Section 1.2    The Closing................................................................................................ 2
Section 1.3    Deliveries at the Closing ........................................................................... 2
Section 1.4    Withholding Rights .................................................................................... 3

Article II Representations and Warranties of FTX .................................................................. 3

Section 2.1    Organization, Qualification and Corporate Power..................................... 3
Section 2.2    Authorization ............................................................................................. 3
Section 2.3    Non-contravention ..................................................................................... 3
Section 2.4    Brokers' Fees ............................................................................................ 4
Section 2.5    Transferred IEX Shares............................................................................. 4
Section 2.6    Independent Appraisal .............................................................................. 4
Section 2.7    No Other Representations or Warranties .................................................... 4

Article III Representations and Warranties of IEX.................................................................. 5

Section 3.1    Organization and Corporate Power............................................................ 5
Section 3.2    Capitalization ............................................................................................ 5
Section 3.3    Authorization ............................................................................................. 5
Section 3.4    Noncontravention....................................................................................... 5
Section 3.5    Brokers' Fees ............................................................................................ 6
Section 3.6    FTX Shares ................................................................................................ 6
Section 3.7    Independent Appraisal .............................................................................. 6
Section 3.8    Financial Statements ................................................................................. 6
Section 3.9    No Other Representations or Warranties .................................................... 6

Article IV Additional Agreements .......................................................................................... 7

Section 4.1    Bankruptcy Matters.................................................................................... 7
Section 4.2    Alternative Transactions; Non-Solicitation ............................................... 8
Section 4.3    Transaction Orders..................................................................................... 8
Section 4.4    Sale Process of the Retained IEX Shares.................................................... 8
Section 4.5    Expenses .................................................................................................... 10
Section 4.6    Press Releases and Announcements ........................................................... 10
Section 4.7    Further Assurances..................................................................................... 10
Section 4.8    Confidentiality/Termination of Prior Agreements...................................... 10
Section 4.9    Remedy for Breach .................................................................................... 10
Section 4.10   Release ...................................................................................................... 11

4853-8071-0762 v.15

Article V Certain Tax Matters ....................................................................... 12

    Section 5.1    Tax Matters ....................................................... 12

Article VI Conditions to Closing .................................................................. 12

    Section 6.1    Mutual Condition ............................................... 12
    Section 6.2    Conditions to the Obligation of IEX ................ 12
    Section 6.3    Conditions to the Obligation of FTX ............... 13

Article VII Termination ................................................................................ 13

    Section 7.1    Grounds for Termination .................................. 13
    Section 7.2    Effect of Termination ....................................... 14

Article VIII Miscellaneous ........................................................................... 14

    Section 8.1    Amendment ....................................................... 14
    Section 8.2    Waiver .............................................................. 14
    Section 8.3    No Survival of Representations and Warranties or Covenants ................ 14
    Section 8.4    Submission to Jurisdiction ............................... 15
    Section 8.5    Notices ............................................................. 15
    Section 8.6    Entire Agreement ............................................. 16
    Section 8.7    Third-Party Beneficiaries ................................ 16
    Section 8.8    No Assignment; Binding Effect ....................... 16
    Section 8.9    Headings .......................................................... 16
    Section 8.10    Severability .................................................... 17
    Section 8.11    Governing Law ............................................... 17
    Section 8.12    Tax Advice ..................................................... 17
    Section 8.13    Waiver of Trial by Jury ................................... 17
    Section 8.14    Construction ................................................... 17
    Section 8.15    Rules of Construction ..................................... 18
    Section 8.16    Counterparts, Delivery by PDF....................... 18
    Section 8.17    Authorized Signatories................................... 18

Article IX Definitions .................................................................................. 18

Exhibit A.........................................................................Exchange and Settlement Order

DocuSign Envelope ID: 2D5D234D-3D3E-42A2-08A3-A82PBD39PC3E

## SETTLEMENT AND STOCK EXCHANGE AGREEMENT

**This SETTLEMENT AND STOCK EXCHANGE AGREEMENT** (this "<u>Agreement</u>") is made as of July 31, 2023, by and between FTX Trading Ltd., a company established under the laws of Antigua and Barbuda ("<u>FTXT</u>"), West Realm Shires Inc. ("<u>WRS</u>" and, together with FTXT, collectively with any of their successors or assigns, "<u>FTX</u>" and each, an "<u>FTX Entity</u>"), and IEX Group, Inc., a Delaware corporation ("<u>IEX</u>"). The signatories to this Agreement are collectively referred to as the "<u>Parties</u>" and individually as a "<u>Party</u>". Capitalized terms used and not otherwise defined herein have the meanings set forth in <u>Article IX</u> below.

## RECITALS

**WHEREAS**, pursuant to a Share Exchange Agreement, dated as of March 18, 2022, as amended as of May 17, 2022, by and among FTX and IEX, WRS acquired 1,570,142 shares of Common Stock, $0.01 par value per share, of IEX (the "<u>IEX Shares</u>") and IEX acquired 5,663,211 shares of Common Shares, par value US$0.0000026 per share, of FTXT (the "<u>FTXT Shares</u>") and 49,234,136 shares of Class A Common Stock, $0.00001 par value per share (the "<u>WRS Shares</u>" and, together with the FTXT Shares, the "<u>FTX Shares</u>"), of WRS (the "<u>Prior Transaction</u>");

**WHEREAS**, IEX has asserted that the FTX entities fraudulently induced IEX into entering into the Share Exchange Agreement by, among other things, making false statements during the negotiations therefor and by making knowingly false representations in the Share Exchange Agreement and at the closing thereof;

**WHEREAS**, on November 11, 2022 and November 14, 2022, FTX and certain of its Affiliates (collectively, the "<u>Debtors</u>") commenced voluntary proceedings under Chapter 11 of Title 11 of the United States Code (11 U.S.C. §§ 101, *et seq.*, as amended, the "<u>Bankruptcy Code</u>") by filing petitions for relief in the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>"), which cases are being jointly administered as *In re FTX Trading Ltd., et al.* (Case No. 22-11068 (JTD)) (the "<u>Bankruptcy Proceedings</u>");

**WHEREAS**, WRS asserts that it continues to own the IEX Shares and IEX continues to own the FTX Shares;

**WHEREAS**, IEX has asserted that the IEX Shares are not property of the WRS bankruptcy estate nor any of the other Debtors' estates;

**WHEREAS**, the Parties desire to effect an exchange of all the FTX Shares for 991,542 of the IEX Shares (the "<u>Transferred IEX Shares</u>") pursuant to Sections 105 and 363 of the Bankruptcy Code and Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>");

**WHEREAS**, the Parties desire that FTX will retain 578,600 of the IEX Shares (the "<u>Retained IEX Shares</u>");

**WHEREAS**, the Parties desire that, promptly following the Bankruptcy Court's approval of the Exchange and Settlement Order, IEX and FTX will, commence a sale process for the Retained IEX Shares, as provided in this Agreement, including by soliciting IEX's existing

4853-8071-0762 v.15

DocuSign Envelope ID: 2D5D234D-3D3E-42A2-08A3-A82PBD39PC3E

shareholders and certain other targets, including those mutually agreed between the Parties as of the date hereof, subject to a sale order by the Bankruptcy Court; and

**WHEREAS**, FTX and IEX desire to make certain representations, warranties, covenants and agreements in connection with the Transactions and also prescribe various conditions to the Transactions.

**NOW, THEREFORE**, in consideration of the premises, representations and warranties and mutual covenants contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto agree as follows:

# ARTICLE I
# STOCK EXCHANGE

**Section 1.1    Exchange of the FTX Shares and the Transferred IEX Shares**.  Subject to the approval of this Agreement under Sections 105 and 363 of the Bankruptcy Code in accordance Rule 9019 of the Bankruptcy Rules and entry of the Exchange and Settlement Order, and upon the terms and conditions set forth in this Agreement:

(a)    FTX agrees to (i) transfer to IEX, and IEX agrees to receive from FTX, at the Closing, all of the Transferred IEX Shares free and clear of any liens (other than restrictions on transfer under applicable federal and state securities laws) and (ii) settle and release the Released Claims as set forth in Section 4.10.

(b)    IEX agrees to (i) transfer to WRS and FTXT, and WRS and FTXT agree to receive from IEX, at the Closing, all of the respective WRS Shares and FTXT Shares, free and clear of any liens (other than restrictions on transfer under applicable federal and state securities laws) and (ii) settle and release the Released Claims as set forth in Section 4.10 (the transactions contemplated by clauses (a) and (b), together, the "Exchange Transactions").

**Section 1.2    The Closing**.  The closing of the Exchange Transactions (the "Closing") shall take place remotely via electronic exchange of documents and signatures on the second (2nd) Business Day following the date on which all of the conditions to closing specified in Article VI are satisfied or waived, or on such other date as is mutually agreed by FTX and IEX, provided that the Closing shall take place no later than five (5) days after the entry of the Exchange and Settlement Order.  The date of the Closing is herein referred to as the "Closing Date."  The Closing shall be deemed to occur at 12:01 a.m. New York time on the Closing Date.

**Section 1.3    Deliveries at the Closing**.  At the Closing, upon satisfaction or waiver of the conditions set forth in Article VI hereof:

(a)    FTX shall deliver, or cause to be delivered, to IEX a stock power, duly executed by FTX, effecting the transfer of the Transferred IEX Shares to IEX.

(b)    IEX shall deliver, or cause to be delivered, to WRS and FTXT a stock power, duly executed by IEX, effecting the transfer of the respective WRS Shares and FTXT Shares to, or as directed by, WRS and FTXT.

4853-8071-0762 v.15

(c)       Each of FTX and IEX shall deliver to the other Party such other documents and instruments required to be delivered pursuant to the terms of this Agreement or necessary to effectuate the exchange of FTX Shares and Transferred IEX Shares.

**Section 1.4      Withholding Rights**. The Parties intend that no amounts payable hereunder shall be treated as giving rise to distributions under Section 301 of the Code (such treatment, "Intended Tax Treatment"). Except as otherwise required by a change in applicable Law, the Parties shall not report the Transactions, or withhold or deduct from amounts payable pursuant to this Agreement, inconsistently with the Intended Tax Treatment. If either Party reasonably believes based on the advice of a nationally recognized accounting or law firm that it is required under applicable Law to deduct and withhold from the payment of any amounts payable to the other Party hereunder under applicable Law, the withholding Party shall (a) use commercially reasonable efforts to notify the other Party at least ten (10) Business Days before the Closing Date that it is required by applicable Law to withhold from any amount payable to the other Party under this Agreement and (b) reasonably cooperate with the other Party to minimize or eliminate the amount of any Taxes required to be deducted and withheld under applicable Law.

## ARTICLE II
## REPRESENTATIONS AND WARRANTIES OF FTX

Each FTX Entity, jointly and severally, represents and warrants to IEX as follows:

**Section 2.1      Organization, Qualification and Corporate Power**. Such FTX Entity is an entity duly organized or incorporated and validly existing in good standing (to the extent such concept is applicable) under the laws of its jurisdiction of organization. Such FTX Entity has all requisite corporate power and corporate authority to carry on the businesses in which it is engaged and to own and use the properties owned and used by it.

**Section 2.2      Authorization**. Subject to entry of the Exchange and Settlement Order, each FTX Entity has all requisite corporate power and corporate authority to execute, deliver and perform its obligations under this Agreement and the other agreements (other than the Retained Shares Sale Agreement) to be entered into by such FTX Entity in connection with the Exchange Transactions. Subject to entry of the Exchange and Settlement Order and the Sale Order, this Agreement and the other agreements to be entered into by each FTX Entity in connection with the Transactions have or will be duly executed and delivered by such FTX Entity and constitute valid and binding obligations of such FTX Entity, enforceable against such FTX Entity in accordance with their respective terms, subject to rules of Law governing specific performance, injunctive relief and other equitable remedies (the "Equitable Remedies Exception").

**Section 2.3      Non-contravention**. Subject to entry of the Exchange and Settlement Order and the Sale Order, and except as would not reasonably be expected to prevent, materially delay or materially impair the consummation of the Exchange Transactions or the Sale Plan, neither the execution and delivery by such FTX Entity of this Agreement or any other agreements to be entered into by each FTX Entity in connection with the Exchange Transactions or the Sale Plan, will (a) conflict with or violate any provision of the organizational documents of such FTX Entity, (b) require on the part of such FTX Entity any notice to or filing with, or any permit, authorization, consent or approval of, any Governmental Entity, (c) assuming that any consents,

notices and approvals required under the IEX Organizational Documents are made or have been obtained, conflict with, result in a breach of, constitute (with or without due notice or lapse of time or both) a default under, result in the acceleration of obligations under, create in any party the right to accelerate, terminate, modify or cancel, or require any notice, consent or waiver under, any material Contract, to which FTX is a party or by which it is bound or to which any of its assets are subject, (d) violate any Order, writ, injunction, decree, statute, rule or regulation applicable to FTX or any of its properties or assets, or (e) result in the imposition of any lien or security interest upon any assets of FTX.

**Section 2.4    Brokers' Fees**.  Neither FTX Entity has any liability or obligation to pay any fees or commissions to any broker, finder or agent with respect to the Transactions that will not be borne by such FTX Entity.

**Section 2.5    Transferred IEX Shares**.  WRS holds of record all of the Transferred IEX Shares, free and clear of any liens and any other restrictions on transfer (other than pursuant to the IEX Organizational Documents and restrictions on transfer under applicable federal and state securities laws).

**Section 2.6    Independent Appraisal**.  Each FTX Entity acknowledges that it is experienced and sophisticated with respect to transactions of the type contemplated by this Agreement, and that in consultation with experienced counsel and advisors of its choice, it has made its own due diligence analysis, credit analysis and decision to exchange the FTX Shares for the Transferred IEX Shares, and that it is responsible for making its own evaluation of any information about the IEX Shares or IEX that it may receive from IEX, and that none of IEX or any Affiliate, partner, employee, officer or director thereof makes any representation or warranty or gives any undertaking of any kind, express or implied, as to, or accepts or assumes any responsibility or liability of any kind for, the accuracy, reliability, adequacy, completeness or reasonableness of any such information or any assumptions upon which such information is based except as specifically set forth in this Agreement.

**Section 2.7    No Other Representations or Warranties**.

(a)    Except for the representations and warranties contained in this Article II, each FTX Entity has not made any other express or implied representation or warranty with respect to, or otherwise in connection with, the FTX Shares, the IEX Shares, FTX or any of its respective businesses, operations, assets, liabilities, conditions (financial or otherwise) or prospects in connection with this Agreement or the Transactions, and such FTX Entity disclaims any other representations or warranties, whether made by such FTX Entity, any Affiliate of such FTX Entity or any of such FTX Entity's or its Affiliates' respective representatives.

(b)    Each FTX Entity acknowledges and agrees that, except for the representations and warranties expressly set forth in Article III, neither IEX nor any other Person has made any express or implied representation or warranty with respect to, or otherwise in connection with, the Transactions or with respect to the accuracy or completeness of any other information provided, or made available, to such FTX Entity in connection with the Transactions, and such FTX Entity has not relied on any representation or warranty other than those expressly set forth in Article III.

-4-

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF IEX

IEX represents and warrants to each FTX Entity as follows:

**Section 3.1    Organization and Corporate Power**.  IEX is a corporation duly organized, validly existing and in corporate good standing under the Laws of the State of Delaware.  IEX is duly qualified to conduct business under the Laws of each jurisdiction in which the nature of its business or the ownership or leasing of its properties requires such qualification.  IEX has all requisite corporate power and corporate authority to carry on the businesses in which it is engaged and to own and use the properties owned and used by it.

**Section 3.2    Capitalization**.

(a)    Schedule 3.2 sets forth the authorized and issued capitalization of IEX as of the date of this Agreement.

(b)    The Retained IEX Shares represent approximately 5% of the issued and outstanding shares of IEX as of the Closing, on a fully diluted basis and after giving effect to this Agreement and the Transactions.

(c)    All of the Retained IEX Shares (i) have been duly authorized and validly issued and are fully paid and nonassessable, and (ii) were issued in compliance with all applicable state and federal laws concerning the issuance of shares.

**Section 3.3    Authorization**.  Subject to entry of the Exchange and Settlement Order, IEX has all requisite corporate power and corporate authority to execute, deliver and perform its obligations under this Agreement and the other agreements to be entered into by IEX in connection with the Exchange Transactions and the Sale Plan.  This Agreement and the other agreements to be entered into by IEX in connection with the Exchange Transactions have been duly executed and delivered by IEX and constitute valid and binding obligations of IEX, enforceable against it in accordance with their respective terms, subject to the Equitable Remedies Exception.  Except as would not reasonably be expected to prevent, materially delay or materially impair the consummation of the Exchange Transactions or the Sale Plan, IEX has made or obtained, or will have or obtain, all consents, notices and approvals required under the IEX Organizational Documents.

**Section 3.4    Noncontravention**.  Subject to entry of the Exchange and Settlement Order and any other Order entered by the Bankruptcy Court applicable to the Transactions, and except as would not reasonably be expected to prevent, materially delay or materially impair the consummation of the Exchange Transactions or the Sale Plan, neither the execution and delivery by IEX of this Agreement or the other agreements to be entered into by IEX in connection with the Exchange Transactions, nor the performance by IEX of its obligations hereunder or thereunder, nor the consummation by IEX of the transactions contemplated hereby or thereby, will (a) conflict with or violate any provision of the charter or bylaws of IEX, (b) require on the part of IEX any filing with, or any permit, authorization, consent or approval of, any Governmental Entity, (c) assuming that any consents, notices and approvals required under the IEX Organizational Documents are made or have been obtained, conflict with, result in breach of, constitute (with or

DocuSign Envelope ID: 2D5D221D-3D35-42A1-88A8-A82DD39BC3E

without due notice or lapse of time or both) a default under, result in the acceleration of obligations under, create in any party any right to accelerate, terminate, modify or cancel, or require any notice, consent or waiver under, any material Contract to which IEX is a party or by which it is bound or to which any of its assets are subject, or (d) violate any Order, writ, injunction, decree, statute, rule or regulation applicable to IEX or any of its properties or assets.

**Section 3.5    Brokers' Fees**.  IEX does not have any liability or obligation to pay any fees or commissions to any broker, finder or agent with respect to the Transactions that will not be borne by IEX.

**Section 3.6    FTX Shares**.  IEX holds of record all of the FTX Shares, free and clear of any liens and any other restrictions on transfer (other than restrictions on transfer under applicable federal and state securities laws).

**Section 3.7    Independent Appraisal**.  IEX acknowledges that it is experienced and sophisticated with respect to transactions of the type contemplated by this Agreement, and that in consultation with experienced counsel and advisors of its choice, it has made its own due diligence analysis, credit analysis and decision to exchange the FTX Shares for the Transferred IEX Shares, and that it is responsible for making its own evaluation of any information about the FTX Shares or FTX that it has or may receive from FTX, and that none of FTX or any Affiliate, partner, employee, officer or director thereof (i) makes any representation or warranty or gives any undertaking of any kind, express or implied, as to, or accepts or assumes any responsibility or liability of any kind for, the accuracy, reliability, adequacy, completeness or reasonableness of any such information or any assumptions upon which such information is based except as specifically set forth in this Agreement or (ii) shall be under any obligation to provide access to or advise IEX or any other Person of the existence of any additional information or to review, update or correct any inaccuracy in any information about the FTX Shares, FTX (or any assumptions upon which such information is based) supplied by it or by any Person or be otherwise liable to FTX or any other Person with respect to any such information or assumptions, except as specifically contemplated in this Agreement.

**Section 3.8    Financial Statements**.  IEX has made available to the FTX Entities its audited financial statements for the fiscal year ended December 31, 2022 (the "IEX Financial Statements").  The IEX Financial Statements have been prepared in accordance with GAAP applied on a consistent basis throughout the periods indicated.  The IEX Financial Statements fairly present in all material respects the financial condition and operating results of IEX as of the dates, and for the periods, indicated therein.  IEX maintains a standard system of accounting established and administered in accordance with GAAP.

**Section 3.9    No Other Representations or Warranties**.

(a)    Except for the representations and warranties contained in this Article III, IEX has not made any other express or implied representation or warranty with respect to, or otherwise in connection with IEX or any of their respective businesses, operations, assets, liabilities, conditions (financial or otherwise) or prospects in connection with this Agreement or the Transactions, and IEX disclaims any other representations or warranties, whether made by IEX, any Affiliate of IEX or any of IEX's or its Affiliates' respective representatives.

4853-8071-0762 v.15

DocuSign Envelope ID: 2D5D221D-3D35-42A3-88A3-A82DD39BC3E

(b)     IEX acknowledges and agrees that, except for the representations and warranties expressly set forth in Article II, neither FTX nor any other Person has made any express or implied representation or warranty with respect to, or otherwise in connection with, the Transactions or with respect to the accuracy or completeness of any other information provided, or made available, to IEX in connection with the Transactions, and IEX has not relied on any representation or warranty other than those expressly set forth in Article II,

(c)     IEX acknowledges and agrees that the enforceability of this Agreement against FTX is subject to entry of the Exchange and Settlement Order and with respect to effecting any Sale Plan, a Sale Order.

## ARTICLE IV
## ADDITIONAL AGREEMENTS

**Section 4.1     Bankruptcy Matters**.

(a)     As promptly as reasonably practicable after the date of this Agreement (and, in any event, within five Business Days), the applicable FTX Entities or their applicable Debtor Affiliates shall (i) file with the Bankruptcy Court a motion in form and substance reasonably acceptable to IEX (the "9019 Motion"), along with the proposed Exchange and Settlement Order, seeking approval of the this Agreement, the Exchange Transactions, the Sale Plan and the settlement of Released Claims, each in a form reasonably acceptable to, IEX; (ii) serve, as required by the Bankruptcy Code and the Bankruptcy Rules, all parties entitled to notice of such motion, as modified by orders in respect of notice which may be issued at any time and from time to time by the Bankruptcy Court; and (iii) use commercially reasonable efforts to obtain Bankruptcy Court approval of the Exchange and Settlement Order.

(b)     IEX shall provide FTX with such information regarding itself and any of its shareholders and Affiliates as FTX may reasonably request in connection with the approval of the Exchange and Settlement Order.  Each Party shall (i) appear in person in the Bankruptcy Court if reasonably requested by any other Party or required by the Bankruptcy Court in connection with the Exchange Transactions and (ii) keep the other Parties reasonably apprised of the status of material matters related to this Agreement, including, upon reasonable request, promptly furnishing the other Parties with copies of notices or other communications received from the Bankruptcy Court or any other Person with respect to the Exchange Transactions.

(c)     The Parties shall consult with each other regarding pleadings that any of them intends to file with the Bankruptcy Court in connection with, or which might reasonably affect, the Bankruptcy Court's approval of the Exchange and Settlement Order.  FTX shall promptly provide IEX and its outside legal counsel with copies of all notices, filings and orders of the Bankruptcy Court that FTX receives pertaining to the Exchange and Settlement Order, or related to any of the Exchange Transactions, but only to the extent such papers are not publicly available on the docket of the Bankruptcy Court or otherwise made available to IEX and its outside legal counsel. FTX shall not seek any material modification to the Exchange and Settlement Order with respect to the Transactions by the Bankruptcy Court or any other Governmental Entity of competent jurisdiction to which a decision relating to the Bankruptcy Proceedings has been

4853-8071-0762 v.15

appealed, in each case, without the prior written consent of IEX (not to be unreasonably withheld, conditioned or delayed).

Section 4.2    **Alternative Transactions; Non-Solicitation**.  From and after the date of this Agreement, other than as set forth herein, FTX shall not, and shall direct its representatives not to:  (i) solicit, initiate, knowingly facilitate or knowingly encourage the submission of, or any inquiries with respect to, any Alternative Transaction by a third party or with respect to the Retained IEX Shares except as set forth in <u>Section 4.4</u>; (ii) participate in any discussions or negotiations with a third party regarding, or furnish to any third party any information or data with respect to, or otherwise cooperate in any way with respect to, an Alternative Transaction or with respect to the Retained IEX Shares except as set forth in <u>Section 4.4</u>; or (iii) enter into any letter of intent, memorandum of understanding, acquisition agreement or other agreement, arrangement or understanding that contemplates an Alternative Transaction or with respect to the Retained IEX Shares except as set forth in <u>Section 4.4</u>.

Section 4.3    **Transaction Orders**.

(a)    Each Party shall take all actions as may be reasonably necessary to cause the Exchange and Settlement Order to be issued, entered and become a Final Order, including furnishing affidavits, declarations or other documents or information for filing with the Bankruptcy Court.  IEX will promptly take such actions as are reasonably requested by FTX to assist in obtaining entry of the Exchange and Settlement Order, including furnishing declarations or other documents or information for filing with the Bankruptcy Court.

(b)    The Exchange and Settlement Order shall, among other things, (i) approve, pursuant to Sections 105 and 363 of the Bankruptcy Code, (A) the execution, delivery and performance by FTX of this Agreement, (B) the exchange of the Transferred IEX Shares for the FTX Shares on the terms set forth herein and free and clear of any liens, claims, interests, and encumbrances and any restrictions on transfer (other than restrictions on transfer under applicable federal and state securities laws), and (C) the performance by FTX of its obligations under this Agreement, and (ii) approve the settlement under Rule 9019 of the Bankruptcy Rules of (a) the claims or causes of action of FTX or its Debtor Affiliates against IEX set forth in <u>Section 4.10</u> and (b) the claims or causes of action of IEX or its Affiliates against FTX or its Debtor Affiliates set forth in <u>Section 4.10</u>.

Section 4.4    **Sale Process of the Retained IEX Shares**.  Promptly after entry of the Exchange and Settlement Order, IEX and FTX shall take the actions set forth in this <u>Section 4.4</u> (the "<u>Sale Plan</u>").

(a)    In consultation with FTX, IEX shall solicit certain of the IEX existing shareholder group ("<u>IEX Shareholders</u>") and IEX and FTX shall jointly solicit certain other mutually agreed targets, including such existing shareholders and third parties agreed as of the date hereof (collectively with the IEX Shareholders, "<u>Third-Party Purchasers</u>") with respect to the potential acquisition by such Third-Party Purchasers of any Retained IEX Shares.  For the avoidance of doubt, all Third-Party Purchasers shall be third parties reasonably acceptable to IEX; provided that the parties acknowledge and agree that (i) any person or entity that, directly or indirectly, owns, invests in, operates, manages, or controls any entity that is a competitor of IEX

or any of its affiliates (including Investors' Exchange LLC), or is a member of Investors' Exchange LLC, shall require the prior written consent of IEX (such consent being in IEX's sole and absolute discretion); and (ii) any person or entity that does not fall within (i) shall require the prior written consent of IEX (such consent not to be unreasonably withheld, conditioned or delayed). A competitor shall include any entity, or any affiliate of such entity, that performs, in whole or in part, similar or related services of IEX or any of its affiliates (including Investors' Exchange LLC), which for the avoidance of doubt shall include, but not be limited to, any entity or any affiliate of such entity, that operates, owns or controls, directly or indirectly, a securities exchange, broker-dealer, commodities exchange or options exchange or an alternative trading system.

(b)      During any solicitation process described in this Section 4.4 and at any time prior to the entry of the Sale Order, (i) Persons other than IEX Shareholders and Third-Party Purchasers that are reasonably acceptable to IEX and that meet the requirements for Third-Party Purchaser set forth in Section 4.4(a) (each such person, a "Qualified Bidder") shall be permitted to make competing offers to purchase the Retained IEX Shares, (ii) FTX and their Debtor Affiliates may respond to any inquiries or offers to purchase all or any part of the Retained IEX Shares by any such Qualified Bidder and (iii) subject to entering a nondisclosure agreement, as provided in this Section 4.4, IEX shall provide such Qualified Bidders reasonable access to information requested such Qualified Bidder.

(c)      Each Party shall promptly advise the other Parties of all qualified offers to purchase the Retained IEX Shares.

(d)      If FTX determines, in its sole discretion, to sell the Retained IEX Shares in respect of an offer received from a Third-Party Purchaser or Qualified Bidder pursuant to definitive documents negotiated between such Third-Party Purchaser or Qualified Bidder and FTX, subject to the entry of the Sale Order, IEX shall:

(i)      Take all actions as may be reasonably requested by the FTX Entities to support the sale and/or FTX's motion seeking any Sale Order to be issued, entered and become a Final Order, including furnishing affidavits, declarations or other documents or information for filing with the Bankruptcy Court.

(ii)      Waive or cause to be waived all transfer or other restrictions related to the Retained IEX Shares to facilitate the sale of any Retained IEX Shares, after which sale all restrictions will continue to apply.

(iii)      Take all actions as may be reasonably necessary for such Third-Party Purchaser or Qualified Bidder to be admitted, joined, or permitted to become a party to the IEX Organizational Documents.

(e)      In the event that FTX determines not to sell the Retained IEX Shares in respect of an offer received from an IEX Shareholder, a Third-Party Purchaser or Qualified Bidder as a result of the process set forth above, then upon FTX's written notice to IEX, the Parties shall begin another joint sale process (consistent with this Section 4.4) for the Retained IEX Shares, which sale process shall be deemed to have been conducted pursuant to the Sale Plan and during

4853-8071-0762 v.15

which IEX and FTX shall take the actions set forth above in the Sale Plan with respect to such subsequent sale process.

(f)     During any Sale Plan and prior to entry of the Sale Order, IEX shall provide reasonable access to information requested by Third-Party Purchasers and Qualified Bidders, subject to such party entering into a nondisclosure agreement that is not materially less restrictive than the form historically used by IEX.

**Section 4.5     Expenses**.  All fees and expenses incurred by a Party, including all legal, accounting, financial advisory, consulting and all other fees and expenses of third parties, in connection with the negotiation and effectuation of the terms and conditions of this Agreement, the Transactions and the Sale Plan shall be the obligation of the respective Party incurring such fees and expenses.  For the avoidance of doubt, the fees and expenses incurred by IEX, including any expenses of its counsel, Morris, Nichols, Arsht, & Tunnell, LLP and Davis Polk & Wardwell LLP, shall be deemed to be incurred only by IEX, and the fees and expenses incurred by FTX, including any expenses of its counsel, Sullivan & Cromwell LLP, shall be deemed to be incurred only by FTX.

**Section 4.6     Press Releases and Announcements**.  No Party shall issue any press release or public announcement relating to the subject matter of this Agreement without the prior written approval of the other Parties; provided, however, that any Party may make any public disclosure it believes in good faith is required by applicable Law (in which case the disclosing Party shall use reasonable efforts to advise and consult with the other Parties and provide them with a copy of the proposed disclosure prior to making the disclosure).

**Section 4.7     Further Assurances**.  Following the Closing, each Party, at the reasonable request of another Party, shall execute and deliver such other instruments and do and perform such other acts and things as may be necessary or desirable for effecting completely the consummation of the Transactions.

**Section 4.8     Confidentiality/Termination of Prior Agreements**.  The terms of the Nondisclosure Agreement, dated as of January 30, 2023, by and between IEX and FTXT (the "NDA") shall remain in effect.  Other than this Agreement and the NDA, all other agreements entered into between IEX and any IEX affiliates and any FTX entity of any FTX Entity affiliates ("Prior Agreements") shall be terminated or IEX shall withdraw from and no longer be a party to such Prior Agreements, as applicable, except the Surviving Prior Agrements.

**Section 4.9     Remedy for Breach**.

(a)     Each Party agrees that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached, and that damages at law may be an inadequate remedy for the breach of any of the covenants, promises and agreements contained in this Agreement, and, accordingly, any Party will be entitled to injunctive relief to prevent any such breach, and to specifically enforce the terms and provisions of this Agreement without the necessity of posting bond or other security against it or proving damages, including specific performance of such covenants (including

Section 4.4 with respect to the Sale Plan), promises or agreements (including to cause FTX or IEX to consummate the Transactions and to make the conveyances contemplated by this Agreement) or an Order enjoining a Party from any threatened, or from the continuation of any actual, breach of the covenants, promises or agreements contained in this Agreement.  The rights set forth in this Section 4.9 will be in addition to any other rights which a Party may have at law or in equity pursuant to this Agreement.

(b)    Each Party shall not raise any objections to the availability of the equitable remedy of specific performance to prevent or restrain breaches of this Agreement by IEX or FTX, as applicable, and to specifically enforce the terms and provisions of this Agreement to prevent breaches or threatened breaches of, or to enforce compliance with, the respective covenants and obligations of FTX or IEX, as applicable, under this Agreement all in accordance with the terms of this Section 4.9.

**Section 4.10    Release**.

(a)    For and in consideration of the FTX Shares to be transferred to FTX under this Agreement, and in consideration of the other covenants and promises hereunder, each FTX Entity, on behalf of itself, its Debtor Affiliates and their respective estates, successors (including Chapter 7 or 11 trustees and liquidating trustees), assigns, heirs and beneficiaries, hereby fully and finally releases, acquits and forever discharges IEX, its Affiliates and its and their officers, directors, employees, shareholders, representatives, agents and attorneys, predecessors, successors and assigns, in their respective capacities (collectively, the "IEX Released Parties"), from any and all actions, debts, claims, counterclaims, demands, liabilities, damages, causes of action, costs, expenses, royalties and compensation of every kind and nature whatsoever, at law or in equity, whether known or unknown, including any avoidance or recovery actions arising under Sections 502, 510, 542, 544, 545, 547, 548, 549, 550, 551, 552, and 553 of the Bankruptcy Code, or under any similar or related state or federal statutes or common law, in each case, that one or more of them had, has, or may have had at any time in the past until and including the Closing in respect of, relating to or arising under the Prior Transaction, the Prior Agreements or the acquisition or ownership of the FTX Shares, in each case, against the IEX Released Parties (the "Released Claims"); provided, however, that nothing in this release shall be construed to release, acquit or discharge any claims or rights that FTX had, has or may have under this Agreement and the other documents and agreements to which FTX is a party in connection with the Transactions.  FTX: (x) represents, warrants and acknowledges that FTX has been fully advised by FTX's attorney of the contents of Section 1542 of the Civil Code of the State of California; and understands the implications thereof; and (y) hereby expressly waives the benefits thereof and any rights that the undersigned may have thereunder.  Section 1542 of the Civil Code of the State of California provides as follows:

> "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY."

(b)        IEX, on behalf of itself, its stockholders and Affiliates, and its and their respective successors, assigns, heirs and beneficiaries hereby fully and finally release, acquit and forever discharge FTX, its Debtor Affiliates, and their respective current officers, directors, employees, representatives, agents and attorneys, predecessors, successors and assigns, in their respective capacity (collectively, the "<u>FTX Released Parties</u>"), from any and all actions, debts, claims, counterclaims, demands, liabilities, damages, causes of action, costs, expenses, royalties, and compensation of every kind and nature whatsoever, at law or in equity, whether known or unknown, that IEX had, has, or may have had at any time in the past until and including the Closing in respect of, relating to or arising under the Prior Transaction, the Prior Agreements or the acquisition or ownership of the IEX Shares, in each case, against any of the FTX Released Parties; <u>provided</u>, <u>however</u>, that nothing in this release shall be construed to release, acquit or discharge any claims or rights that IEX had, has or may have under this Agreement and the other documents and agreements to which IEX is a party in connection with the Transactions.  IEX: (i) represents, warrants and acknowledges that it has been fully advised by its attorney of the contents of Section 1542 of the Civil Code of the State of California; and understands the implications thereof; and (ii) hereby expressly waives the benefits thereof and any rights that the undersigned may have thereunder.

(c)        At the consummation of any sale contemplated by the Sale Plan (the "<u>Retained Shares Sale Closing</u>"), IEX and FTX shall enter into a release agreement in respect of the period prior to the Retained Shares Sale Closing on terms substantively similar to the release contained in this <u>Section 4.10</u>.

### ARTICLE V
### CERTAIN TAX MATTERS

**Section 5.1      Tax Matters**. IEX and FTX shall cooperate with each other in good faith in connection with Taxes with respect to IEX and FTX, with respect to the Tax treatment of the Transactions and using commercially reasonable efforts to obtain any certificate or other document from any Governmental Entity as may be necessary to mitigate, reduce or eliminate any Tax (including withholding or deduction in respect of Taxes) that could be imposed with respect to the Transactions. Each Party, as applicable, shall cooperate and, to the extent required by applicable Tax Laws, join in the execution of any such Tax returns or other documentation with respect to Transfer Taxes.

### ARTICLE VI
### CONDITIONS TO CLOSING

**Section 6.1      Mutual Condition**. The respective obligations of each of FTX and IEX to effect the Closing are subject to the Bankruptcy Court having entered the Exchange and Settlement Order.

**Section 6.2      Conditions to the Obligation of IEX**. The obligation of IEX to effect the Closing is subject to the satisfaction or waiver by IEX of the following additional conditions on or prior to the Closing Date:

4853-8071-0762 v.15

(a)    The representations and warranties of each FTX Entity contained in this Agreement shall be true and correct (without giving effect to any materiality qualifiers contained therein) as of the date hereof and as of the Closing Date as though made on and as of such date (except to the extent that any such representation and warranty expressly speaks as of an earlier date, in which case such representation and warranty shall be true and correct as of such earlier date), except where the failure of any such representations and warranties to be so true and correct would not, individually or in the aggregate, reasonably be expected to be material; and

(b)    Each FTX Entity shall have performed in all material respects all obligations required to be performed by it on or prior to the Closing Date under this Agreement.

**Section 6.3    Conditions to the Obligation of FTX**.  The obligation of FTX to effect the Closing is subject to the satisfaction or waiver by FTX of the following additional conditions on or prior to the Closing Date:

(a)    The representations and warranties of IEX contained in this Agreement shall be true and correct (without giving effect to any materiality qualifiers contained therein) as of the date hereof and as of the Closing Date as though made on and as of such date (except to the extent that any such representation and warranty expressly speaks as of an earlier date, in which case such representation and warranty shall be true and correct as of such earlier date), except where the failure of any such representations and warranties to be so true and correct would not, individually or in the aggregate, reasonably be expected to be material; and

(b)    IEX shall have performed in all material respects all obligations required to be performed by it on or prior to the Closing Date under this Agreement.

## ARTICLE VII
## TERMINATION

**Section 7.1    Grounds for Termination**.  This Agreement may be terminated at any time prior to the Closing:

(a)    by mutual agreement of FTX and IEX;

(b)    by either FTX or IEX if the Closing has not occurred within six months of submission of the 9019 Motion (the "Termination Date"); provided, that the right to terminate this Agreement pursuant to this Section 7.1(b) shall not be available to any Party that has breached in any material respect its obligations under this Agreement in any manner that shall have proximately contributed to the failure of the Closing to have occurred on or prior to the Termination Date;

(c)    by either FTX or IEX, if there is in effect a Final Order of a Governmental Entity of competent jurisdiction, enjoining or otherwise prohibiting the consummation of the Transactions;

(d)    by FTX if IEX shall have breached or failed to perform in any material respect any of its covenants or other agreements contained in this Agreement, or any of its

-13-

representations and warranties shall have become untrue after the date hereof, which breach or failure to perform or be true (i) would give rise to the failure of a condition set forth in <u>Section 6.1</u> or <u>Section 6.3</u> and (ii) is not curable or, if curable, is not cured within the earlier of (A) ten (10) days after written notice thereof is given by FTX to IEX and (B) the Termination Date; <u>provided</u>, that FTX shall not have the right to terminate this Agreement pursuant to this <u>Section 7.1(d)</u> if FTX is then in material breach of any of its representations, warranties, covenants or other agreements hereunder and such material breach would give rise to the failure of a condition set forth in <u>Section 6.1</u> or <u>Section 6.2</u>;

(e)     by IEX if FTX shall have breached or failed to perform in any material respect any of its covenants or other agreements contained in this Agreement, or any of its representations and warranties shall have become untrue after the date hereof, which breach or failure to perform or be true (i) would give rise to the failure of a condition set forth in <u>Section 6.1</u> or <u>Section 6.2</u>, and (ii) is not curable or, if curable, is not cured within the earlier of (A) ten (10) days after written notice thereof is given by IEX to FTX and (B) the Termination Date; <u>provided</u>, that IEX shall not have the right to terminate this Agreement pursuant to this <u>Section 7.1(e)</u> if IEX is then in material breach of any of its representations, warranties, covenants or other agreements hereunder and such material breach would give rise to the failure of a condition set forth in <u>Section 6.1</u> or <u>Section 6.3</u>; and

**Section 7.2     Effect of Termination**.  If this Agreement is terminated as permitted by this <u>Article VII</u>, no Party shall have any liability or further obligation to any other Party pursuant to this Agreement; <u>provided</u>, <u>however</u>, that (i) this <u>Section 7.2</u> and the agreements of FTX and IEX set forth in <u>Section 4.5</u> (*Expenses*) shall survive such termination and (ii) no such termination shall relieve any Party of any liability or damages to any other Party resulting from any knowing and intentional material breach of this Agreement, <u>provided</u> <u>further</u>, <u>however</u>, that in the event this Agreement is terminated pursuant to this Article VII, the Parties shall retain all rights, claims, causes of action against each other as if this Agreement never existed.

## ARTICLE VIII
## MISCELLANEOUS

**Section 8.1     Amendment**.  No amendment of any provision of this Agreement shall be valid unless the same shall be in a writing expressly identified as such in an amendment pursuant to this <u>Section 8.1</u> and signed by each of the Parties.

**Section 8.2     Waiver**.  Each Party may, to the extent legally permitted, (i) waive any inaccuracies in the representations and warranties made to such Party contained herein or in any document delivered pursuant hereto and (ii) waive compliance with any of the covenants, agreements or conditions for the benefit of such Party contained herein.  Any agreement on the part of a Party hereto to any such waiver shall be valid only if set forth in an instrument in a writing expressly identified as such a waiver pursuant to this <u>Section 8.2</u> signed on behalf of such Party or Parties, as applicable.  No waiver of any provision hereunder or any breach or default thereof shall extend to or affect in any way any other provision or prior or subsequent breach or default.

**Section 8.3     No Survival of Representations and Warranties or Covenants**.  No representations or warranties, covenants or agreements in this Agreement or in any instrument

delivered pursuant to this Agreement shall survive beyond the Closing Date, except for Section 4.4 (Sale Plan for Retained Shares), which shall survive the Closing until the Sale Plan is consummated, Section 4.10, which shall survive the Closing indefinitely, and any other covenants and agreements that by their terms are to be satisfied after the Closing Date, including in connection with the Sale Plan, which covenants and agreements shall survive until satisfied in accordance with their terms. Following the Closing, no Party shall have any liability or other obligation of any nature (whether in contract or in tort, in law or in equity or otherwise) with respect to any representation, warranty, covenant or other agreement set forth in this Agreement after the expiration of such representation, warranty, covenant or other agreement.

Section 8.4    Submission to Jurisdiction.  Each Party irrevocably and unconditionally (a) submits to the jurisdiction of the Bankruptcy Court in any action or proceeding arising out of or relating to this Agreement (including any action or proceeding for the enforcement of any arbitral award made in connection with any arbitration of a dispute hereunder); provided, however, that if the Bankruptcy Proceedings have been closed pursuant to Section 350 of the Bankruptcy Code, each Party agrees to unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the District of Delaware, or if (but only if) that such court does not have subject matter jurisdiction over such Action, in the Delaware Court of Chancery, or if the Delaware Court of Chancery does not exercise jurisdiction, the Delaware Superior Court, for the resolution of any such claim or dispute, (b) agrees that all claims in respect of such action or proceeding may be heard and determined in any such court, (c) waives any claim of inconvenient forum or other challenge to venue in such court, and (d) agrees not to bring any action or proceeding arising out of or relating to this Agreement in any other court.  Each Party agrees to accept service of any summons, complaint or other initial pleading made in the manner provided for the giving of notices in Section 8.5, provided that nothing in this Section 8.4 shall affect the right of any Party to serve such summons, complaint or other initial pleading in any other manner permitted by Law.

Section 8.5    Notices.  All notices, requests, demands, consents, instructions or other communications (each, a "Notice") required or permitted hereunder shall be in writing and will be deemed to have been duly given only if sent via e-mail, mailed or delivered to the Parties at the following addresses:

If to IEX, to:

        IEX Group, Inc.
        3 World Trade Center
        175 Greenwich Street
        New York, NY 10017
        Attention: Rachel Barnett

        with a copy (which shall not constitute such Notice) to:
        Morris, Nichols, Arsht & Tunnell LLP
        1201 North Market Street
        Wilmington, Delaware 19801
        Attention:  Derek C. Abbott

If to FTX, to:

> FTX Ventures Ltd.
> 2600 South Shore Blvd, Suite 300
> League City, TX 77573
> Attention:   Kathryn Schultea
> Email:         kathyschultea@ftx.com

> with a copy (which shall not constitute such Notice) to:

> Sullivan & Cromwell LLP
> 125 Broad Street
> New York, NY 10004
> Attention:   Andrew G. Dietderich
>                    Audra D. Cohen
> Telephone:  (212) 558-3830
>                    (212) 558-3275
> Email:         dietdericha@sullcrom.com
>                    cohena@sullcrom.com

All such Notices will be deemed effectively given the earlier of (i) when delivered personally, (ii) at the time of confirmation of e-mail delivery (upon delivery with no error message) or (iii) one Business Day after being deposited with an overnight courier service of recognized standing.  Any Party from time to time may change its address or other information for the purpose of Notices to that Party by giving Notice specifying such change to the other Parties in accordance with this <u>Section 8.5</u>.

**Section 8.6    Entire Agreement**.   This Agreement, the Exhibits and the Schedules hereto, and the documents and other agreements among the Parties hereto referenced herein, constitute the entire Agreement among the Parties with respect to the subject matter hereof and supersede all prior agreements and understanding, both written and oral, among the Parties with respect to the subject matter hereof.

**Section 8.7    Third-Party Beneficiaries**.   The terms and provisions of this Agreement are intended solely for the benefit of each Party hereto and their respective successors or permitted assigns, and it is not the intention of the Parties to confer third-party beneficiary rights, and this Agreement does not confer any such rights, upon any other Person.

**Section 8.8    No Assignment; Binding Effect**.   This Agreement shall be binding upon and inure to the benefit of the Parties named herein and their respective heirs, successors and permitted assigns, but neither this Agreement nor any of the rights or obligations hereunder may be assigned (whether by operation of law, through a change in control or otherwise) by FTX without the prior written consent of IEX, or by IEX without the prior written consent of FTX.

**Section 8.9    Headings**.   The headings and table of contents used in this Agreement have been inserted for convenience of reference only and do not define or limit the provisions hereof.

**Section 8.10    Severability**.  If any provision of this Agreement is held to be illegal, invalid or unenforceable under any present or future Law, and if the rights or obligations of any Party hereto under this Agreement will not be materially and adversely affected thereby, (a) such provision will be fully severable, (b) this Agreement will be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part hereof, (c) the remaining provisions of this Agreement will remain in full force and effect and will not be affected by the illegal, invalid or unenforceable provision or by its severance herefrom and (d) in lieu of such illegal, invalid or unenforceable provision, there will be added automatically as a part of this Agreement a legal, valid and enforceable provision as similar in terms to such illegal, invalid or unenforceable provision as may be possible.

**Section 8.11    Governing Law**.  This Agreement, any other agreements and any other closing documents shall be governed by and construed in accordance with the domestic Laws of the State of Delaware, without giving effect to any choice of law or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Delaware.

**Section 8.12    Tax Advice**.  IEX acknowledges and agrees that it has not received and is not relying upon Tax advice from FTX, and that it has and will continue to consult its own advisors with respect to Taxes.  FTXT and WRS each acknowledges and agrees that it has not received and is not relying upon Tax advice from IEX, and that it has and will continue to consult its own advisors with respect to Taxes.

**Section 8.13    Waiver of Trial by Jury**.  EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT, OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE ACTIONS OF ANY PARTY HERETO IN NEGOTIATION, ADMINISTRATION, PERFORMANCE OR ENFORCEMENT HEREOF, PROVIDED, HOWEVER, THAT IN THE EVENT OF TERMINATION PURSUANT TO ARTICLE VII HEREOF, THE PARTIES SHALL RETAIN WHATEVER RIGHTS THEY HAD PRIOR TO ENTRY INTO THIS AGREEMENT, INCLUDING TO SEEK A JURY TRIAL ON ANY CLAIMS AND CAUSES OF ACTION THE PARTIES HAVE AGAINST EACH OTHER.

**Section 8.14    Construction**.  Unless the context of this Agreement otherwise requires, (i) words of any gender include each other gender and the neuter, (ii) words using the singular or plural number also include the plural or singular number, respectively, (iii) the terms "hereof," "herein," "hereby" and derivative or similar words refer to this entire Agreement as a whole and not to any particular Article, Section or other subdivision, (iv) the terms "Article" or "Section" or other subdivision refer to the specified Article, Section or other subdivision of the body of this Agreement, (v) the words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation," (vi) the word "or" shall be disjunctive, but not exclusive, and (vii) when a reference is made in this Agreement to Exhibits, such reference shall be to an Exhibit to this Agreement unless otherwise indicated.  When used herein, the terms "third party" or "third parties" refers to Persons other than IEX, WRS or FTXT.  Unless stated otherwise, a reference to 'USD$', '$US', 'dollar' or '$' is a reference to U.S. currency.  All amounts hereunder shall be payable in U.S. currency.

**Section 8.15   Rules of Construction**.  The Parties hereto agree that this Agreement is the product of arm's length negotiation between sophisticated Parties and individuals, all of whom were represented by counsel, and each of whom had an opportunity to participate in and did participate in, the drafting of each provision hereof.  Accordingly, ambiguities in this Agreement, if any, shall not be construed strictly or in favor of or against any Party hereto but rather shall be given a fair and reasonable construction without regard to the rule of <u>contra</u> <u>proferentem</u>.

**Section 8.16   Counterparts, Delivery by PDF**.  This Agreement may be executed in any number of counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument.  The exchange of copies of this Agreement and signature pages by email in .pdf or .tif format (and including, without limitation, any electronic signature complying with the U.S. ESIGN Act of 2000, *e.g.*, www.docusign.com), or by any other electronic means intended to preserve the original graphic and pictorial appearance of a document, or by combination of such means, shall constitute effective execution and delivery of this Agreement as to the parties hereto and may be used in lieu of the original Agreement for all purposes.  Such execution and delivery shall be considered valid, binding and effective for all purposes.

**Section 8.17   Authorized Signatories**.   Each person or entity who executes this Agreement on behalf of another person or entity represents and warrants that he, she, or it is duly authorized to execute this Agreement on behalf of such person or entity, has the requisite authority to bind such person or entity, and such person or entity has full knowledge of and has consented to this Agreement.

**ARTICLE IX**
**DEFINITIONS**

For purposes of this Agreement, each of the following terms shall have the meaning set forth below.

"<u>Action</u>" means any litigation, action, suit, charge, binding arbitration, or other legal, administrative or judicial proceeding.

"<u>Affiliate</u>" means any affiliate, as defined in Rule 12b-2 under the Securities Exchange Act of 1934, as amended.

"<u>Agreement</u>" has the meaning set forth in the Preamble.

"<u>Alternative Transaction</u>" means the sale, transfer or other disposition of the Transferred IEX Shares in a transaction with a purchaser or transferee other than IEX and/or its Affiliates.

"<u>Bankruptcy Code</u>" has the meaning set forth in the Recitals.

"<u>Bankruptcy Court</u>" has the meaning set forth in the Recitals.

"<u>Bankruptcy Proceeding</u>" or "<u>Bankruptcy Proceedings</u>" has the meaning set forth in the Recitals.

"<u>Bankruptcy Rules</u>" has the meaning set forth in the Recitals.

"<u>Business Day</u>" means any day other than (a) a Saturday or Sunday or (b) a day on which banking institutions located in New York, New York are permitted or required by Law, executive order or governmental decree to remain closed.

"<u>Closing</u>" has the meaning set forth in <u>Section 1.2</u>.

"<u>Closing Date</u>" has the meaning set forth in <u>Section 1.2</u>.

"<u>Code</u>" means the United States Internal Revenue Code of 1986, as amended.

"<u>Contract</u>" means any contract, plan, agreement, license, lease, power of attorney, note, mortgage, loan, evidence of Indebtedness, purchase order, letter of credit, undertaking, covenant, covenant not to compete, instrument, obligation, commitment, understanding, purchase and sales order, statement of work, quotation, executory commitment or other agreement to which any Person is a Party or to which any of the assets of such Person are subject.

"<u>Debtor Affiliates</u>" means the Debtors and their respective wholly owned subsidiaries.

"<u>Debtors</u>" has the meaning set forth in the Recitals.

"<u>Equitable Remedies Exception</u>" has the meaning set forth in <u>Section 2.2</u>.

"<u>Exchange and Settlement Order</u>" means an order entered by the Bankruptcy Court or other court of competent jurisdiction substantially in the form as set forth in <u>Exhibit A</u> hereto, subject to (a) immaterial modifications or clarifications and (b) such other changes to which IEX consents (such consent not to be unreasonably withheld, conditioned or delayed).

"<u>Exchange Transactions</u>" has the meaning set forth in <u>Section 1.1(b)</u>.

"<u>Final Order</u>" means an Order (a) as to which no appeal, leave to appeal, notice of appeal, motion to amend or make additional findings of fact, motion to alter or amend judgment, motion for rehearing or reconsideration or motion for new trial has been timely filed (in cases in which there is a date by which such filing is required to occur), or, if any of the foregoing has been timely filed, it has been disposed of in a manner that upholds and affirms the subject Order in all material respects without the possibility for further appeal or reconsideration thereof, (b) in respect of which the time period for instituting or filing an appeal, leave to appeal, notice of appeal, motion to amend or to make additional findings of fact, motion to alter or amend judgment, motion for rehearing or reconsideration or motion for new trial shall have expired (in cases in which such time period is capable of expiring), and (c) as to which no stay is in effect.

"<u>FTX</u>" has the meaning set forth in the Preamble.

"<u>FTX Entity</u>" has the meaning set forth in the Preamble.

"<u>FTX Released Parties</u>" has the meaning set forth in <u>Section 4.10(b)</u>.

"<u>FTX Shares</u>" has the meaning set forth in the Recitals.

4853-8071-0762 v.15

"<u>FTXT</u>" has the meaning set forth in the Preamble.

"<u>FTXT Shares</u>" has the meaning set forth in the Recitals.

"<u>Governmental Entity</u>" means any federal, state, provincial, municipal, local or foreign government, governmental authority, regulatory or administrative agency, governmental commission, department, board, bureau, agency, instrumentality, court or tribunal and, for purposes of this Agreement shall include the U.S. Securities and Exchange Commission and any state securities authority or other regulatory authority or organization having jurisdiction over the Debtors or IEX.

"<u>IEX</u>" has the meaning set forth in the Preamble.

"<u>IEX Organizational Documents</u>" means (i) the Third Amended and Restated Certificate of Incorporation of IEX, dated January 4, 2016, as amended by the Certificate of Amendment, dated June 26, 2018, the Second Certificate of Amendment, dated October 13, 2021 and the Third Certificate of Amendment, dated May 17, 2022, (ii) the Bylaws of IEX, adopted November 30, 2015, (iii) the Amended and Restated Investors' Rights Agreement, dated May 17, 2022, among IEX, the investors listed on Schedule A thereto and the stockholders listed on Schedule B thereto, (iv) the Amended and Restated Voting Agreement, dated as of May 17, 2022, among IEX and the stockholders of IEX listed on Schedule A, Schedule B and Schedule C thereto, and (v) the Amended and Restated Right of First Refusal and Co-Sale Agreement, dated May 17, 2022, among IEX and the stockholders of IEX listed on Schedule A, Schedule B and Schedule C thereto.

"<u>IEX Released Parties</u>" has the meaning set forth in <u>Section 4.10(a)</u>.

"<u>IEX Shares</u>" has the meaning set forth in the Recitals.

"<u>Indebtedness</u>" means (i) both the current and long-term portions of any amount owed (including all outstanding principal, prepayment premiums, penalties and similar amounts, if any, and accrued but unpaid interest, fees and expenses related thereto) in respect of borrowed money (including convertible indebtedness), (ii) drawn letters of credit, (iii) any amounts owed under capitalized leases, and (iv) any guarantees of obligations of any of the foregoing.

"<u>Intended Tax Treatment</u>" has the meaning set forth in <u>Section 1.4</u>.

"<u>IRS</u>" means the United States Internal Revenue Service.

"<u>Law</u>" means any United States federal, state or local or foreign law, common law, statute, standard, ordinance, code, rule, regulation, resolution or promulgation, or any Order or consent of or by any Governmental Entity, or any permit, license, authorization or similar right granted under any of the foregoing, or any similar provision having the force or effect of law.

"<u>Notice</u>" has the meaning set forth in <u>Section 8.5</u>.

"<u>Order</u>" means any order, writ, judgment, injunction, decree, rule, ruling, decision, directive, determination, quasi-judicial decision, or award made, issued or entered by or with any

DocuSign Envelope ID: 2D5D224D-3D35-42A2-88A8-A82DDD39BC3E

arbitrator, mediator, or Governmental Entity, whether preliminary, interlocutory or final, including by the Bankruptcy Court in the Bankruptcy Proceedings.

"Party" or "Parties" has the meaning set forth in the Preamble.

"Person" means an individual, a partnership, a corporation, an association, a limited liability company, a joint stock company, a trust, a joint venture, an unincorporated organization or a Governmental Entity.

"Prior Transaction" has the meaning set forth in the Recitals.

"Qualified Bidder" has the meaning set forth in Section 4.4(b).

"Released Claims" has the meaning set forth in Section 4.10(a).

"Retained IEX Shares" has the meaning set forth in the Recitals.

"Retained Shares Sale Agreement" means definitive sale documentation for the sale of any Retained IEX Shares that provides that the sale of such Retained IEX Shares is subject to approval by the Bankruptcy Court and the consideration by the Debtor Affiliates and the Bankruptcy Court of higher or better competing bids.

"Sale Order" means an order entered by the Bankruptcy Court or other court of competent jurisdiction that (i) approves, pursuant to Sections 105 and 363 of the Bankruptcy Code, (A) the execution, delivery and performance by the applicable FTX Entity of the Retained Shares Sale Agreement, (B) the sale of the Retained IEX Shares to the applicable purchaser on the terms set forth in the Retained Shares Sale Agreement, and (C) the performance by the applicable FTX Entity of its obligations under the Retained Shares Sale Agreement, (ii) finds that (A) the applicable purchaser to be a "good faith" buyer within the meaning of Section 363(m) of the Bankruptcy Code and (B) the applicable purchaser is not a successor to the applicable FTX Entity and (iii) grants the applicable purchaser the protections of Section 363(m) of the Bankruptcy Code.

"Sale Plan" has the meaning set forth in Section 4.4.

"Surviving Prior Agreements" means (i) the Amended and Restated Investors' Rights Agreement, dated as of May 17, 2022, by and among IEX, each of the investors listed on Schedule A thereto and each of the stockholders listed on Schedule B thereto, (ii) the letter agreement re: Investor Rights, dated as of May 17, 2022, from IEX and agreed and accepted by WRS, (iii) the Amended and Restated Voting Agreement, dated as of May 17, 2022, by and among IEX, each stockholder listed on Schedule A thereto and each stockholder listed on Schedule B thereto and (iv) the Amended and Restated Right of First Refusal and Co-Sale Agreement, dated as of May 17, 2022, by and among IEX, the Investors listed on Schedule A thereto, the Key Holders listed on Schedule B thereto and any stockholders of IEX listed on Schedule C thereto.

"Tax" or "Taxes" means any federal, state, local or foreign income, gross receipts, branch profits, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, escheat, environmental, customs duties, capital stock, franchise, profits, withholding, social security, unemployment, disability, real property, personal property, sales, use, transfer,

registration, ad valorem, value added, alternative or add-on minimum or estimated tax or other tax of any kind whatsoever, including any interest, penalty or addition thereto, whether disputed or not and including any obligation to indemnify or otherwise assume or succeed to the Tax liability of any other Person by Law, Contract or otherwise.

"<u>Termination Date</u>" has the meaning set forth in <u>Section 7.1(b)</u>.

"<u>Third-Party Purchasers</u>" has the meaning set forth in <u>Section 4.4(a)</u>.

"<u>Transactions</u>" means the transactions contemplated by this Agreement.

"<u>Transfer Taxes</u>" has the meaning set forth in <u>Section 5.1</u>.

"<u>Transferred IEX Shares</u>" has the meaning set forth in the Recitals.

"<u>WRS</u>" has the meaning set forth in the Preamble.

"<u>WRS Shares</u>" has the meaning set forth in the Recitals.

"<u>9019 Motion</u>" has the meaning set forth in <u>Section 4.1(a)</u>.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first above written.

**FTXT:**

FTX TRADING, LTD.

By: _____
Name: John J. Ray III
Title:  Authorized Signatory

**WRS:**

WEST REALM SHIRES INC.

By: _____
Name: John J. Ray III
Title:  Authorized Signatory

**IEX:**

IEX GROUP, INC.

By: _____

Name:  Brad Katsuyama

Title:  CEO

[*Signature Page to Settlement and Stock Exchange Agreement*]

**Schedule 3.2**

**Capitalization**

[REDACTED]

**Exhibit A**

**Form of Exchange and Settlement Order**

DocuSign Envelope ID: 2D5D224D-3D35-42A2-88A8-A82DD39BC3E

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |
| | Ref No. __ |

### ORDER (A) AUTHORIZING THE DEBTORS TO ENTER INTO
### SETTLEMENT AGREEMENT WITH IEX GROUP, INC., (B) APPROVING
### THE SETTLEMENT AGREEMENT, AND (C) GRANTING RELATED RELIEF

Upon the motion (the "Motion")[2] of FTX Trading Ltd. and its affiliated debtors

and debtors-in-possession (collectively, the "Debtors"), for entry of an order (this "Order")

(a) authorizing the Debtors to enter into a Settlement and Stock Exchange Agreement (the

"Settlement Agreement"), attached as Exhibit B to the Motion, (b) approving the Settlement

Agreement, and (c) granting certain related relief; and this Court having jurisdiction to consider

the Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of*

*Reference* from the United States District Court for the District of Delaware, dated February 29,

2012; and this Court being able to issue a final order consistent with Article III of the United

States Constitution; and venue of these Chapter 11 Cases and the Motion in this district being

proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this matter being a core proceeding pursuant

to 28 U.S.C. § 157(b); and this Court having found that proper and adequate notice of the Motion

and the relief requested therein has been provided in accordance with the Bankruptcy Rules and

---

[1]     The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification numbers are 3288 and 4063, respectively.  Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.  The principal place of business of Debtor Emergent Fidelity Technologies Ltd is Unit 3B, Bryson's Commercial Complex, Friars Hill Road, St. John's, Antigua and Barbuda.

[2]     Capitalized terms not otherwise defined herein are to be given the meanings ascribed to them in the Motion.

DocuSign Envelope ID: 2D5D224D-3D35-42A2-88A8-A82DD39BC3E

the Local Rules, and that, except as otherwise ordered herein, no other or further notice is

necessary; and objections (if any) to the Motion having been withdrawn, resolved or overruled

on the merits; and this Court having found and determined that the relief set forth in this Order is

in the best interests of the Debtors and their estates; and that the legal and factual bases set forth

in the Motion establish just cause for the relief granted herein; and after due deliberation and

sufficient cause appearing therefor;

IT IS HEREBY FOUND AND DETERMINED THAT:[3]

A.      <u>Jurisdiction and Venue</u>.  This Court has jurisdiction over this matter and

over the property of the Debtors' estates, pursuant to 28 U.S.C. §§ 157 and 1334 and the

Amended Standing Order of Reference from the United States District Court for the District of

Delaware, dated February 29, 2012.  This Court may issue a final order on the Motion consistent

with Article III of the United States Constitution.  Venue is proper pursuant to 28 U.S.C. §§ 1408

and 1409.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).

B.      <u>Statutory and Rule Predicates</u>.  The statutory and other legal predicates for

the relief requested in the Motion and for the approvals and authorization herein are sections

105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 9007, and 9019.

C.      <u>Notice</u>.  As evidenced by the certificates of service previously filed with

this Court, proper, timely, adequate, and sufficient notice of the Motion and Hearing, and the

transaction contemplated thereby has been provided in accordance with Bankruptcy Rules

2002, 6004, 9013, and 9019.  The notices described above were good, sufficient, and

appropriate under the circumstances, and no other or further notice of the Motion is or shall  be

---

[3]    Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings
       of fact to the fullest extent of the law.  *See* FED. R. BANKR. P. 7052.

DocuSign Envelope ID: 2D5D224D-3D35-42A2-88A8-A82DD39BC3E

required. The disclosures made by the Debtors concerning the Motion and the Settlement Agreement were good, sufficient, and adequate.

D.    <u>Opportunity to Object</u>.  A fair and reasonable opportunity to object or be heard regarding the relief granted by this Order has been afforded to all interested parties.

E.    <u>Good Faith of IEX and the Debtors</u>.  The Settlement Agreement was negotiated, proposed and entered into by the Debtors and IEX without collusion or fraud, in good faith and from arm's-length bargaining positions.

F.    <u>Settlement Agreement Satisfies Bankruptcy Rule 9019</u>.  The Settlement Agreement and this Order resolve all disputed issues among the Debtors and IEX related to the March 18, 2022 Share Exchange Agreement and related agreements.  Good and sufficient reasons for the approval of the Settlement Agreement have been set forth by the Debtors, and such approval is in the best interests of the Debtors, their estates, creditors, and other parties in interests.  The Debtors' decision to compromise and settle all disputed issues with IEX pursuant to the Settlement Agreement and to grant the releases set for in the Settlement Agreement is a proper exercise of the Debtors' business judgment and is fair and reasonable.  The settlement between the Debtors and IEX falls above the lowest point in the range of reasonable litigation outcomes if the matters resolved pursuant to the Settlement Agreement were litigated.  This Court therefore finds that the Debtors have carried their burden in establishing grounds for approval of the Settlement Agreement under Bankruptcy Rule 9019.

G.    <u>Legal and Factual Bases</u>.  The legal and factual bases set forth in the Motion and the evidence adduced in connection therewith establish just cause for the relief granted herein.  Entry of this Order is in the best interests of the Debtors and their estates.

NOW, THEREFORE, IT IS HEREBY ORDERED THAT:

1.      The Motion is GRANTED as set forth herein.

2.      The Debtors are authorized to enter into the Settlement Agreement.

3.      The terms of the Settlement Agreement are approved in their entirety.

4.      The Debtors are authorized and empowered to execute and deliver such documents, and to take and perform all actions necessary to implement and effectuate the relief granted in this Order and to comply with their obligations under the Settlement Agreement.

5.      On the Closing Date, the IEX Claims shall be resolved and deemed expunged from the Debtors' claims register.

6.      The failure to specifically include or reference any particular term or provision of the Settlement Agreement in this Order shall not diminish or impair the effectiveness of such term or provision.

7.      The requirements set forth in Bankruptcy Rule 6004(a) are waived to the extent applicable.

8.      This Order is immediately effective and enforceable, notwithstanding the possible applicability of Bankruptcy Rule 6004(h) or otherwise.

9.      This Court shall retain jurisdiction with respect to any matters, claims, rights or disputes arising from or related to the Motion or the implementation of this Order.


Dated: _____
        Wilmington, Delaware

_____
The Honorable John T. Dorsey
United States Bankruptcy Judge