**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re<br><br>FTX TRADING, LTD., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 22-11068 (JTD)<br><br>(Jointly Administered) |

**STATEMENT OF THE AD HOC COMMITTEE OF NON-US CUSTOMERS OF FTX.COM REGARDING THE DEBTORS' DRAFT PLAN OF REORGANIZATION AND ACCOMPANYING TERM SHEET**

The Ad Hoc Committee of Non-US Customers of FTX.com (the "Ad Hoc Committee" or the "Committee"), currently comprised of 40 members holding nearly $900 million in aggregate claims against the above-captioned debtors and debtors in possession (collectively, the "Debtors"),[2] hereby submits this statement regarding the Debtors' *Draft Plan of Reorganization and Accompanying Term Sheet* [D.I. 2100] (the "Draft Plan")[3] and the *Statement of the Official Committee of Unsecured Creditors in Respect of the Debtors' Draft Plan of Reorganization and Accompanying Term Sheet* [D.I. 2103] (the "Official Committee Statement") and respectfully states as follows:

---

[1]     The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification numbers are 3288 and 4063, respectively. A complete list of the debtors and the last four digits of their federal tax identification numbers may be obtained at https://cases.ra.kroll.com/FTX.

[2]     As set forth in the *Amended Verified Statement of Eversheds Sutherland (US) LLP and Morris, Nichols, Arsht & Tunnell LLP pursuant to Bankruptcy Rule 2019* [D.I. 2144], as a result of the Court's order requiring disclosure of the Ad Hoc Committee members' personally identifiable information [D.I. 1858], the Ad Hoc Committee's membership decreased significantly.  The Ad Hoc Committee welcomes all FTX.com customers that are willing to comply with the disclosure requirements established by the Court and standard terms of engagement set forth in the Ad Hoc Committee's bylaws.

[3]     Capitalized terms used but not defined herein shall have the definitions set forth in the Draft Plan.

## *The Ad Hoc Committee's Role in These Chapter 11 Cases*

1.      The Ad Hoc Committee's public role in these chapter 11 cases has been limited since the filing of its adversary proceeding seeking a determination on the ownership of customer assets held on the FTX.com exchange.[4]  The Committee has nonetheless worked tirelessly behind the scenes, closely observing the progress of these cases, amassing tremendous support from diversely-situated FTX.com customers, and engaging in constructive dialogue with both the Debtors and the Official Committee of Unsecured Creditors (the "Official Committee").  The culmination of these efforts contributed to the recent filing of the Debtors' Draft Plan, an event of significant importance that now prompts us to articulate our perspective publicly.

2.      While we value the work and views of the Debtors, the Official Committee, and other stakeholder groups in the cases, the unique position of the Ad Hoc Committee as an independent, singular representative of the largest and most aggrieved stakeholder group in these cases cannot be overstated.  The Ad Hoc Committee's members include individuals, investment funds, asset managers, liquidity providers, secondary purchasers, payment processors and other conduit intermediaries, from over a dozen countries around the world.  We represent leading crypto-industry natives, novice retail investors, and many in between.  Many of our members have no familiarity with a chapter 11 process, yet others have an established track record of maximizing value in chapter 11 proceedings through their deep restructuring expertise and experience.  Approximately a third of our members hold a claim of less than $1 million and over a third of our members hold a claim of more than $10 million.

---

[4]      *See Complaint for Declaratory Judgment*, Adv. Pro. No. 22-50514 [Adv. D.I. 1] (the "Complaint") and related *Ad Hoc Committee of Non-US Customers of FTX.com's Motion for Partial Summary Judgment* [Adv. D.I. 10] (the "Summary Judgment Motion").

3.       By bringing together these diverse viewpoints and experiences within the FTX.com customer base, the Ad Hoc Committee is able to provide a balanced, deliberate perspective to ensure that the misappropriation of FTX.com customer funds is properly addressed and value maximized for the benefit of all FTX.com customers, without losing sight of the underlying complexity of individual customer interests.

4.       The Ad Hoc Committee is distinct from the Official Committee, which has an obligation to represent **all** unsecured creditors with diverse and often competing interests.  As an independent representative of the FTX.com customers, the Ad Hoc Committee's sole focus is maximizing value for distribution to FTX.com customers, whose claims differ fundamentally from those of other creditors given the proprietary interests they have arising from the indisputable misappropriation of FTX.com customer funds.  The Ad Hoc Committee, while aligned with the Official Committee on many fronts, including maximizing estate value for the benefit of all stakeholders, has a different reaction to the Draft Plan than that expressed by the Official Committee.

### *The Ad Hoc Committee's Perspective on the Plan Process*

5.       As an initial matter, the Debtors filed the Draft Plan on the timeline they promised, largely in response to the Official Committee's insistence that the Debtors commit to an expedited plan timeline to maintain their exclusive statutory right to propose a plan.[5]  The Official Committee now complains that "the Debtors chose to publicly file their *ideas* for a plan."  Respectfully, that is precisely what the Debtors are entitled and expected to do at this juncture.  The Debtors have acknowledged that the Draft Plan is a proposed *initial* construct and have expressly identified a

---

[5]       *See Statement and Reservation of Rights of Official Committee of Unsecured Creditors Regarding Motion of Debtors for Entry of an Order Extending the Exclusive Periods During Which Only The Debtors May File a Chapter 11 Plan and Solicit Acceptances Thereof* [D.I. 1227].

number of key issues that remain subject to negotiation with the Official Committee, the Ad Hoc Committee, and other stakeholders.

6. Importantly, the Ad Hoc Committee recognizes that the Draft Plan is constructed as a global settlement meant to resolve *the* core tension in these cases: the indisputable misappropriation of FTX.com customer funds and need for equitable redress for FTX.com customers against the admitted challenges in identifying and tracing those customer funds given the Debtors' commingling of assets and poor financial records. The Draft Plan certainly does not incorporate all of the positions advanced by the Ad Hoc Committee and discussed with the Debtors over the last several months, but we nonetheless appreciate the Debtors' efforts to find a pathway to equitable distribution without resorting to protracted and costly litigation by filing the Draft Plan with the stated intention to solicit feedback from relevant stakeholders and amend the Draft Plan based on the feedback they receive. We are, therefore, just at the starting point, with an express acknowledgment that significant stakeholder involvement and input is required before a final plan of reorganization is filed by year end.

7. The Ad Hoc Committee wholeheartedly agrees with the Official Committee that there cannot be a "unilateral plan approach," but there also cannot be a "bilateral" plan demanded by the eight members of the Official Committee without additional stakeholder input. More importantly, the Draft Plan does not contemplate a unilateral approach. In fact, the Debtors have made clear that "the Draft Plan and Draft Term Sheet are—as is clear on their face—drafts" and that the Debtors hope parties will "constructively engage" in plan negotiations "to achieve the optimal result for all those impacted by FTX's fall."[6]

---

[6] *Debtors' Response to the Statement of the Official Committee of Unsecured Creditors* [D.I. 2143], ¶ 9, 11.

8.      To be clear, the Ad Hoc Committee believes that any plan put up for confirmation that does not reflect meaningful stakeholder input would present a Hobson's choice to customers and creditors: accept an undesirable outcome or risk tremendous value destruction through litigation in hopes of forcing the parties back to the drawing board.   By inviting stakeholders to provide feedback early in the process, the Debtors are acting to avoid undue delay and excessive costs to the estates.   To be sure, there is a cost to this approach as the magnitude of the Debtors' and Official Committee's professional fees demonstrate.   However, the Ad Hoc Committee strongly prefers a path of reasonable compromise, creative problem solving, and objective cost-benefit analysis in deciding the ultimate plan construct to be voted on in these cases.

9.      That all said, the Official Committee has undoubtedly had a longer and more involved negotiation process with the Debtors than has been afforded to the Ad Hoc Committee to date.   We accordingly recognize that it may have legitimate frustrations with respect to lack of available information sharing and the lack of direct negotiations among principals over the last several months.   We recognize the dynamics inherent in any chapter 11 process, the limitations of broad disclosure in these cases in particular, and would rather focus on expectations of an improved communications process going forward now that appropriate stakeholders are around the table.

10.      Over the last several weeks, the Debtors have actively sought the perspectives of both Ad Hoc Committee professionals and individual members, engaged in constructive dialogue, and remained receptive to alternative solutions to complex and multifaceted issues presented by differing stakeholder interests.   The Ad Hoc Committee needs much more information and analyses to evaluate the Draft Plan and be fully engaged in the plan negotiation process, but we expect significant progress in that regard in the weeks ahead, particularly with the recent engagement of Rothschild & Co as the Ad Hoc Committee's financial advisor.

11.     The Official Committee Statement and the Debtors' response indicate disagreement about the level of negotiations that have occurred to date between the Official Committee members and the Debtors.[7]  Regardless of what has happened in the past, the Debtors have stated that they "hope that the members of the [Official] Committee will constructively engage in these [Plan] negotiations . . . alongside the Ad Hoc Committee, customers and stakeholders holding other views."[8]  For its part, the Ad Hoc Committee has had significant interaction with the Official Committee members and we believe they have valuable industry insights and experience and are well represented by experienced counsel and financial advisors that can advise them in fully participating in a restructuring process.   The Ad Hoc Committee, Official Committee, and the Debtors are all well aware that the vast majority of the stakeholders in these cases have no familiarity with any U.S. legal process let alone with chapter 11, which is all the more reason to actively include them and explain the process in simple terms.

12.     In short, the Ad Hoc Committee is fully committed to working constructively with the Debtors, the Official Committee, and other stakeholders to ensure a fair, transparent, and inclusive negotiation process.  Our role as the representative of the FTX.com customers compels us to advocate for their best interests, but also align with the broader goals of these proceedings for the benefit of all stakeholders.

---

[7]       *See Statement of the Official Committee of Unsecured Creditors in Respect of the Debtors' Draft Plan of Reorganization and Accompanying Term Sheet* [D.I. 2103], ¶ 1 ("[T]he Debtors did not have a single call or meeting with the members of the [Official] Committee to discuss the terms of the Debtors' Plan, notwithstanding the [Official] Committee's repeated requests to do so."); *Debtors' Response to the Statement of the Official Committee of Unsecured Creditors* [D.I. 2143], ¶ 8 ("While it is accurate that the Debtors did not have a meeting with individual members of the Committee on the Draft Plan and Draft Term Sheet in the week leading up to July 31, throughout this period the Debtors engaged on a daily basis with the Committee's professionals.  How much information the [Official] Committee's professionals choose to share with their members is not up to the Debtors.").

[8]       *Debtors' Response to the Statement of the Official Committee of Unsecured Creditors* [D.I. 2143], ¶ 11.

**_The Ad Hoc Committee's Positions on the Draft Plan_**

13.    The Ad Hoc Committee's views on the Draft Plan begin with the fundamental principle that FTX.com customers should receive the value that was stolen from them before distributions are made to general unsecured creditors—both as a matter of law and common sense notions of fairness.

14.    As the Debtors have recognized, the top executives of FTX Trading Ltd. ("FTX") and Alameda Research Ltd. ("Alameda") unlawfully diverted billions of dollars in assets from the FTX.com exchange.[9]  FTX's former Chief Technology Officer, Zixiao "Gary" Wang, who has pleaded guilty to multiple felonies, admitted in connection with his guilty plea that he made "certain changes to the [FTX.com] code" to give Alameda "special privileges on the FTX platform," including to allow Alameda unfettered use of customer assets on the FTX.com exchange, even while Alameda maintained negative balances in its own holdings of fiat (_i.e._, government-issued) currencies and cryptocurrencies.[10]

15.    Moreover, FTX's founder, Samuel Bankman-Fried, conspired with the former Chief Executive Officer of Debtor Alameda Research LLC ("Alameda LLC"), Caroline Ellison, and others to divert funds to Alameda that were intended to be deposited at FTX.com before they reached the exchange.  (Debtors' July Adversary Complaint at ¶ 32).  Beginning in 2019 and continuing through 2022, Bankman-Fried caused FTX.com customers to deposit funds into bank

---

[9]    _See Adversary Complaint_ filed by Debtors against Samuel Bankman-Fried et al., filed on July 20, 2023, [D.I. 1886] (the "Debtors' July Adversary Complaint"); _see also Adversary Proceeding Complaint_ filed by Debtors against FTX Digital Markets Ltd. et al., filed on March 19, 2023, [D.I. 1119] (A000883-884) ("From at least 2019 and through November 2022, Mr. Bankman-Fried, Mr. Wang, Mr. Singh, and Ms. Ellison (the "Co-Conspirators") variously used Alameda Research, FTX Trading, and FTX DM to engage in a colossal criminal conspiracy.").

[10]    _See_ Debtors' July Adversary Complaint (citing Plea Tr. 24:6-10, _United States v. Wang_, 22-cr-00673 (S.D.N.Y. 2022), ECF No. 21); _see also_ Second Day Hr'g Tr. pp. 8-9 (A000712-713) (Debtors' counsel describing "Alameda backdoor, was a secret way for Alameda to borrow from customers on the exchange without permission," which Wang created through computer code, and which resulted in a $65 billion line of credit from customers to Alameda "to which customers did not consent").

accounts controlled by Alameda and then North Dimension Inc. ("North Dimension"), a wholly-owned subsidiary of Alameda LLC. *Id.* (citing Superseding Indictment at ¶ 18, *United States v. Bankman-Fried*, 22-cr-00673 (S.D.N.Y. 2022), ECF No. 115). FTX.com customer deposits and withdrawals were thus funneled through Alameda's existing bank accounts. *Id.* at ¶ 49. Once diverted to Alameda, these funds were used to "buy planes and houses, throw parties, make political donations, pay for sponsorships, and make personal loans to its founders." Second Day Hr'g Tr. at 9. As John Ray succinctly stated during his Congressional testimony: "This is just taking money from customers and using it for your own purposes . . . . ***This is just plain old embezzlement***." Ray, Congressional Testimony, 1:33 (emphasis added).

16.    As a result of the foregoing, by August of 2022, Bankman-Fried and other top FTX executives privately estimated that the FTX.com exchange owed customers more than $8 billion of property that it could not repay. (Debtors' July Adversary Complaint at ¶ 54). At times, this estimate was even higher. *Id.* In March 2022, for example, Ellison estimated in private notes that FTX.com had a cash deficit alone of more than $10 billion. *Id.* The Debtors have estimated a resulting shortfall of approximately $9 billion in customer assets held on the FTX.com exchange.[11]

17.    Despite the complexities of these cases and the lack of complete financial records, the Debtors have nonetheless been able to entirely reconstruct accurate customer balances consistent with FTX.com ledgers as of the petition date, including the full transactional history associated with each of the over seven million FTX.com accounts, they have mapped out in detail the complex intercompany transfers that occurred through the lifespan of the FTX.com exchange,

---

[11]    *See Notice of Presentation to the Official Committee of Unsecured Creditors: Preliminary Analysis of Shortfalls at FTX Exchanges* [D.I. 792] (the "Shortfall Presentation") at pp. 4, 10.

they have identified deposits and withdrawals into specific Alameda accounts attributed directly to FTX.com customers, and previously disclosed on numerous occasions that a net $8.7 billion intercompany claim is held by FTX on account of transfers made from FTX.com exchange assets that rightfully belonged to FTX.com customers.[12]  In short, the clear factual evidence already available to the public makes clear that FTX.com customers are entitled to the vast majority, if not all, of the distributable value currently being administrated by the Debtors in these cases.

18.    The Ad Hoc Committee acknowledges that the Draft Plan implements a creative structure that seeks to resolve a significant number of legal disputes.  The Ad Hoc Committee is open to the simplicity of the proposed holistic approach, yet much turns on establishing an appropriately high priority allocation to FTX.com customers in the waterfall distribution. Furthermore, there are still significant factual inputs that we are awaiting from the Debtors that will inform the analysis.   As such, the Ad Hoc Committee reserves judgment pending further information.   Our preliminary concerns are as follows:

- ***Substantive Consolidation***:  The Draft Plan proposes substantive consolidation of all of the Debtors' estates, except for certain subsidiaries that are solvent and historically separate, along with the cancellation of all intercompany claims. Substantive consolidation of all the Debtors and the cancellation of intercompany claims may risk depriving FTX.com customers of significant value that should be allocated to them.  For instance, it would mean the cancellation of an over $8.7 billion net intercompany claim held by FTX.  Given that John Ray has testified that there is "voluminous" documentation regarding the Debtors' transfer of assets that should allow the Debtors to identify the origins of the misappropriated assets back to FTX.com customer accounts, it is uncertain whether substantive consolidation of ***all*** of the Debtors is warranted.  (Ray, Congressional Testimony, 2:06).  We are, however, open to the concept of substantive consolidation, provided there is a demonstrable basis to do so and that it does not unfairly disadvantage the FTX.com customers.

---

[12]    *See Notice of Filing First Interim Report of John J. Ray III to the Independent Directors on Control Failures at the FTX Exchanges* [D.I 1242] ("First Interim Report") at p. 6; *see Notice of Second Interim Report of John J. Ray III to the Independent Directors: The Commingling and Misuse of Customer Deposits at FTX.com* [D.I. 1704] ("Second Interim Report") at p. 2.

- ***Allocation of Value to the Dotcom Customer Pool:***  The Draft Plan's "Dotcom Customer Pool" is too narrowly drawn.  The Dotcom Customer Pool should also include, at a minimum, cash held by the Dotcom Debtors as of the petition date, all proceeds of any avoidance actions of the Dotcom Debtors, residual value from the Dotcom subsidiaries, and all proceeds of any causes of action belonging to the Dotcom Debtors or FTX.com customers individually (including any DOJ restitution funds to FTX.com customer victims, if distributed through the final plan).

- ***Waterfall of Distributions from the General Pool***:  While we conceptually agree that there should be a priority for the U.S. Exchange Shortfall Claim and the Dotcom Exchange Shortfall Claim (as properly defined) against assets in the General Pool, the Draft Plan does not state what percentage of the General Pool will be available for these claims on a priority basis.  Instead, it states that the Debtors will determine the percentage following negotiations with the "Consulting Parties" and other stakeholders.  While there is a strong basis for 100% of the value from the General Pool to be allocated to customers on a priority basis, we realize that this will be a key negotiation point with the Debtors and other stakeholders.

- ***Disparate Treatment of US and Foreign Customers:***  While FTX US customers and FTX.com customers both suffered from the Debtors' fraud, the FTX.com customers have suffered greater harm. FTX.com was the piggybank for Alameda's misappropriation, not the FTX US exchange.  This is supported by the fact that the FTX US exchange *owes* money to the estates whereas the Dotcom silo Debtors *are owed* more than $8.7 billion from the estates.  As a result, we question whether the *pro rata* sharing of the priority payments between the U.S. Exchange Shortfall Claim and the Dotcom Exchange Shortfall Claim, as proposed in the Draft Plan, is fair and equitable to FTX.com customers.

19.    The Official Committee's most significant opposition to the Draft Plan appears to be the proposed control of the post-reorganization entities and activities, which include (i) operation of a potential offshore exchange, (ii) management of the Debtors' existing ventures portfolio, (iii) monetization of the Debtors' digital asset portfolio, and (iv) administration of the wind-down estate.

20.    We agree with the Official Committee that there is an important post-reorganization role for qualified parties with relevant experience in the cryptocurrency markets.  (Official Committee Statement at ¶ 2).  We also recognize that the proper oversight of all post-confirmation activities can be value maximizing for all stakeholders.  At the same time, we do not agree with

the Official Committee's suggestion that it should be **_solely_** responsible for selecting post-reorganization management.  *See id.*  The Ad Hoc Committee should also be given an opportunity to participate in that process.  Moreover, the Draft Plan appears to leave open the management of the potential offshore exchange and the ventures portfolio, instead vesting control in the Debtors' incumbent management and board of the wind-down estate.  As previously acknowledged, the Official Committee has had far more interaction with the Debtors' team and its professionals and we are open to its perspectives on optimal post-reorganization governance structures.  The apparent power struggle should not be a "gating item" to progressing negotiations on the Draft Plan.  The Ad Hoc Committee looks forward to discussing the appropriate governance structures with both the Debtors and Official Committee and believe that a solution can be achieved through negotiation, or Court intervention, as needed.

21.    The Ad Hoc Committee also generally aligns with the Official Committee in seeking value-accretive, minimal-risk investments of the Debtors' assets, including investment of the Debtors' cash balance in short-term treasury notes.  As the Debtors aptly point out, however, these investment decisions may require relief from the Court.  While the Ad Hoc Committee would like further information to evaluate the appropriate actions to be taken, we would urge the Debtors to seek Court approval, if required, of investment decisions supported by both the Official Committee and Ad Hoc Committee.  But this, again, is not a gating item for progressing negotiations on the Draft Plan.[13]

22.    Having highlighted the above concerns with the Draft Plan, there are aspects of the Draft Plan that the Ad Hoc Committee preliminarily supports.  For instance, we generally support

---

[13]    Similarly, with respect to the Official Committee's last major request for the creation of a regulatory-compliant recovery token to facilitate a re-started FTX exchange, we simply do not have sufficient information to decide the right approach and how the Official Committee's recovery token differs from the Debtors' potential distribution of "Take-Back Interests" under the Draft Plan.

the concept of three separate recovery pools with assets associated with the FTX.com exchange made available only to FTX.com customers, treatment of all FTX.com customers equally irrespective of the type of digital assets held as of the petition date, subordination of the IRS claims and related fines and penalties, and subordination of claims with respect to FTT tokens to general unsecured claims.

23.     Ultimately, however, the final plan must do more to provide fair and equitable treatment of FTX.com customers in light of their relative legal rights and interests compared to other parties.  Given the undeniable fact that billions of dollars of FTX.com customer assets were misappropriated through transfers that the Debtors have been able to attribute to the distributable value of the estates, the FTX.com customers must be allocated the substantial majority of that value.

24.     We urge the Debtors, Official Committee, and other stakeholders to thoughtfully consider these issues in further negotiations.   In the weeks ahead, we will continue to work constructively with the Debtors, Official Committee, and other relevant stakeholders to ensure that the interests of the FTX.com customers are adequately served and estate value is maximized for the benefit of all stakeholders.

Dated:  August 18, 2023

/s/ Jonathan M. Weyand

**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**
Matthew B. Harvey (No. 5186)
Jonathan M. Weyand (No. 6959)
1201 North Market Street, 16th Floor
Wilmington, Delaware 19801
Telephone: (302) 658-9200
Facsimile: (302) 658-3989
mharvey@morrisnichols.com
jweyand@morrisnichols.com

**EVERSHEDS SUTHERLAND (US) LLP**
Erin E. Broderick
227 West Monroe Street, Suite 6000
Chicago, Illinois 60606
Telephone: (312) 724-9006
Facsimile: (312) 724-9322
erinbroderick@eversheds-sutherland.com

David A. Wender
Nathaniel T. DeLoatch
999 Peachtree St NE
Atlanta, GA 30309
Telephone: (404) 853-8000
Facsimile: (404) 853-8806
davidwender@eversheds-sutherland.com
nathanieldeloatch@eversheds-sutherland.com

Peter A. Ivanick
Sarah E. Paul
Jennifer B. Kimble
The Grace Building, 40th Floor
1114 Avenue of the Americas
New York, New York 10036
Telephone: (212) 389-5000
Facsimile: (212) 389-5099
peterivanick@eversheds-sutherland.com
sarahpaul@eversheds-sutherland.com
jenniferkimble@eversheds-sutherland.com

*Counsel for Ad Hoc Committee of Non-US Customers of FTX.com*