## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |
| | **Hearing Date: September 13, 2023 at 1:00 p.m. ET**<br>**Objection Deadline: September 6, 2023 at 4:00 p.m. ET** |

**DEBTORS' MOTION FOR ENTRY OF AN ORDER AUTHORIZING AND APPROVING (I) GUIDELINES FOR THE SALE OR TRANSFER OF CERTAIN DIGITAL ASSETS, (II) THE SALE OR TRANSFER OF SUCH DIGITAL ASSETS IN ACCORDANCE WITH SUCH GUIDELINES FREE AND CLEAR OF ANY LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES, (III) THE DEBTORS' ENTRY INTO, AND PERFORMANCE UNDER, POSTPETITION HEDGING ARRANGEMENTS, INCLUDING GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS IN CONNECTION THEREWITH AND (IV) THE DEBTORS TO STAKE CERTAIN DIGITAL ASSETS**

FTX Trading Ltd. and its affiliated debtors and debtors-in-possession

(collectively, the "Debtors") hereby submit this motion (this "Motion") for entry of an order,

substantially in the form attached hereto as Exhibit A (the "Order"), pursuant to sections 105(a),

363 and 364 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy

Code"), rules 2002 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy

Rules") and rules 2002-1 and 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of

the United States Bankruptcy Court for the District of Delaware (the "Local Rules") authorizing

and approving, (i) guidelines for the sale or transfer of certain Digital Assets (as defined below),

(ii) the sale or transfer of such Digital Assets in accordance with such guidelines free and clear of

---

[1] The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and 4063 respectively. Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX. The principal place of business of Debtor Emergent Fidelity Technologies Ltd is Unit 3B, Bryson's Commercial Complex, Friars Hill Road, St. John's, Antigua and Barbuda.

any liens, claims, interests and encumbrances, (iii) the Debtors' entry into, and performance under, postpetition hedging arrangements, including granting liens and superpriority administrative expense claims in connection therewith and (iv) the Debtors to stake certain Digital Assets.  In support of this Motion, the Debtors submit the concurrently filed declarations of Edgar W. Mosley II attached hereto as <u>Exhibit B</u> (the "<u>Mosley Declaration</u>"), and of Stephen J. Kurz attached hereto as <u>Exhibit C</u> (the "<u>Kurz Declaration</u>"), which are incorporated herein by reference and the Debtors respectfully state as follows:

<u>**Preliminary Statement**</u>

1.     A substantial amount of the Debtors' assets include, among other things, coins, tokens and other digital assets (collectively, the "<u>Digital Assets</u>").  Digital asset markets are characterized by extreme and unpredictable price movements.  This volatility exposes the Digital Assets to downward price swings and may limit the Debtors from maximizing the value of the estates and effectively preparing for potential dollarized distributions to creditors.  The Debtors submit that proactively mitigating the risk of these volatile markets will best protect the value of the Debtors' Digital Assets, thereby maximizing the return to creditors and promoting an equitable distribution of funds in a potential plan of reorganization.  It also is prudent for the Debtors to obtain authority to conduct any sales of Digital Assets at this time in order to preserve flexibility in advance of plan confirmation and time transactions so as to minimize any potential negative effects on market prices.

2.     Accordingly, the Debtors have developed a comprehensive management and monetization plan for their Digital Assets that will reduce exposure to market volatility and prepare for potential dollarized distribution to creditors.  Pursuant to this management and

monetization plan, the Debtors, in consultation with the Committee and the Ad Hoc Committee of Non-US Customers of FTX.com (the customer adversary plaintiffs prosecuting *Onusz, et al.* v. *West Realm Shires Inc., et al.,* Case No. 22-50513 (JTD) (Bankr. D. Del.)) (the "Ad Hoc Committee"), will retain a registered investment adviser (an "Investment Adviser") with specialized knowledge in digital asset markets to assist the Debtors in maximizing the value of their existing Digital Assets.[2]  The Debtors anticipate that the use of an Investment Adviser will provide several key benefits.  For example, use of an Investment Adviser will allow the Debtors to retain greater anonymity during Digital Asset sales, mitigating the risk of other market participants anticipating sales by the Debtors and adversely affecting the pricing of the sales. Similarly, the Debtors expect that the Investment Adviser's expertise will be crucial in assessing the timing, trading venues and counterparties of potential transactions.  In implementing the management and monetization plan, the Debtors and the Investment Adviser will work in accordance with tailored investment guidelines.

3.    Generally, the investment guidelines will provide for sales of certain of the Debtors' Digital Assets over time and for the hedging of the Debtors' Bitcoin and Ether prior to sale.  Sales of Digital Assets for cash will limit exposure to market volatility.  Hedging of Bitcoin and Ether—two digital assets for which there is a liquid hedging market—will provide a means to lessen the Debtors' exposure to adverse price movements in Bitcoin and Ether prior to their sale.  Additionally, the Debtors will stake certain of their Digital Assets in order to generate passive yield.  The Debtors submit that executing this management and monetization plan

---

[2]    The Debtors have concurrently filed the *Debtors' Motion for an Order Authorizing FTX Trading Ltd. to Enter Into, and Perform its Obligations Under, the Investment Services Agreement*, pursuant to which the Debtors seek to enter into an investment services agreement with Galaxy Digital Capital Management LP.

represents a sound exercise of the Debtors' business judgment and will benefit creditors and stakeholders by mitigating market risk and preparing the estate for plan distributions. Accordingly, the Debtors submit that approval of this Motion is in the best interests of their estates and all stakeholders.

## Background

4.     On November 11 and November 14, 2022 (as applicable, the "Petition Date"), the Debtors filed with the United States Bankruptcy Court for the District of Delaware (the "Court") voluntary petitions for relief under the Bankruptcy Code.  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  Joint administration of the Debtors' cases (the "Chapter 11 Cases") was authorized by the Court by entry of an order on November 22, 2022 [D.I. 128].  On December 15, 2022, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed an Official Committee of Unsecured Creditors (the "Committee") pursuant to section 1102 of the Bankruptcy Code [D.I. 231].

5.     Additional factual background relating to the Debtors' businesses and the commencement of these Chapter 11 Cases is set forth in the *Declaration of John J. Ray III in Support of Chapter 11 Petitions and First Day Pleadings* [D.I. 24], the *Declaration of Edgar W. Mosley II in Support of Chapter 11 Petitions and First Day Pleadings* [D.I. 57], the *Supplemental Declaration of John J. Ray III in Support of First Day Pleadings* [D.I. 92] and the *Supplemental Declaration of Edgar W. Mosley II in Support of First Day Pleadings* [D.I. 93].

## Jurisdiction

6.      The Court has jurisdiction to consider this Motion pursuant to 28 U.S.C.

§§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District

Court for the District of Delaware, dated February 29, 2012.  This matter is a core proceeding

pursuant to 28 U.S.C. § 157(b).  Venue is proper in the Court pursuant to 28 U.S.C. §§ 1408 and

1409.  The statutory predicates for the relief requested herein are sections 105(a), 363 and 364 of

the Bankruptcy Code, Bankruptcy Rules 2002 and 6004 and Local Rules 2002-1 and 6004-1.

Pursuant to rule 9013-1(f) of the Local Rules, the Debtors consent to the entry of a final order or

judgment by the Court in connection with this Motion to the extent it is later determined that the

Court, absent consent of the parties, cannot enter final orders or judgments consistent with

Article III of the United States Constitution.

## Facts Specific to the Relief Requested

### I.      Digital Asset Management and Monetization Program

7.      The Debtors propose to utilize the Digital Assets to create and preserve

value for the Debtors' estates in three ways:  (i) monetizing them pursuant to certain guidelines,

after determining in the reasonable exercise of their business judgment that sales pursuant to

such guidelines are in the best interest of their estates, through an Investment Adviser

("Investment Adviser Sales"), (ii) generating yield, including through call overwriting and

derivatives trading, and hedging against potential downside exposure through certain hedging

arrangements (the "Hedging Arrangements") and (iii) staking certain Digital Assets to earn

passive yield ("Staking Method" and, together with Investment Adviser Sales and the Hedging

Arrangements, the "Management and Monetization Program").  The Management and

Monetization Program will be executed pursuant to the Management and Monetization

Guidelines (as defined below), and will provide the Debtors with a means to effectively and efficiently monetize the Digital Assets and preserve, and, potentially increase, the value of the estates in preparation for potential dollarized distribution to creditors.

8.      In the digital asset markets (similar to markets for traditional assets), any information that becomes public is rapidly incorporated into market prices. *See* Kurz Declaration at ¶5. Thus, if the Debtors publicly announced any proposed Digital Asset sales in advance, sophisticated market participants would use such information to their benefit and, necessarily, to the Debtors' and, ultimately, their creditors' detriment. *See* Kurz Declaration at ¶5. For example, if the Debtors publicly announced that they intended to sell a large amount of one Digital Asset, other market participants would be incentivized to take advantage of that knowledge, for example by short selling to benefit from a subsequent decrease in price. In an effort to mitigate this risk, the Debtors are seeking authorization to sell their Digital Assets through an Investment Adviser registered with the Securities and Exchange Commission. The use of the Investment Adviser—given its experience in selling Digital Assets—will help further minimize the threat of inadvertent information leakage. The Investment Adviser would be prohibited from executing transactions and taking any other actions that are not permitted by the Management and Monetization Guidelines (unless any such action has been specifically agreed upon in writing by the Debtors after consultation with the Consulting Professionals (as defined below)), or otherwise not in the best interests of the Debtors pursuant to applicable law and consistent with the Investment Adviser's professional standards and duties.

9.      Additionally, the Debtors are seeking authorization to hedge the Debtors' Bitcoin and Ether through an Investment Adviser by, for example, buying or selling call or put

options.  Hedging Bitcoin and Ether will allow the Debtors to limit potential downside risk prior

to the sale of such Bitcoin or Ether.  The Debtors have determined in consultation with their

advisors that hedging of other Digital Assets pending sale is unlikely to be a cost effective way

to manage price risk.

10.     Finally, the Debtors are seeking authorization to stake certain of their

Digital Assets through an Investment Adviser.  Staking is a method by which digital assets are

typically "locked" in a "proof-of-stake" blockchain "validator node" for a specified period of

time and used to "validate" transactions on such blockchain.  In return for locking such digital

assets on the blockchain, yield is paid to the owners of the staked digital assets (in the form of in-

kind digital assets sometimes referred to as "rewards").  *See* Kurz Declaration at ¶8.  If a

validator node does not perform its validation duties in conformance with the rules of the

relevant blockchain, it may be "slashed," meaning that some amount of the digital asset staked to

that validator node will be forfeited.  *See* Kurz Declaration at ¶8.  Staking assets into the proof-

of-stake system is a way to earn passive interest on certain Digital Assets that would otherwise

remain idle.  *See* Kurz Declaration at ¶8.  The Debtors submit that staking certain Digital Assets

pursuant to the Staking Method will inure to the benefit of the estates—and, ultimately,

creditors—by generating low risk returns on their otherwise idle Digital Assets.

## II.     Management and Monetization Guidelines

11.     Given the differences in market liquidity and the value of each Digital

Asset, as well as the historical volatility of the digital asset markets, the Debtors have developed

guidelines to allow the Debtors, with the assistance of an Investment Adviser, to monetize, hedge

and stake Digital Assets efficiently and at the best time and price.  *See* Mosley Declaration at ¶7.

The Management and Monetization Guidelines will alleviate the cost and delay of filing a

separate motion for each proposed sale or use of Digital Assets and will eliminate any

uncertainty regarding the Debtors' authority to consummate certain sales and transactions. *See*

Mosley Declaration at ¶7. Accordingly, the Debtors seek authority, as a sound exercise of their

business judgment, to execute the Management and Monetization Program pursuant to the

guidelines set forth below (the "Management and Monetization Guidelines"). The Debtors have

consulted with, and received feedback from, the Committee and the Ad Hoc Committee in

connection with the development of the Management and Monetization Guidelines.

    A.    Investment Adviser Sales. With respect to Investment Adviser Sales:

      (a)    the Debtors shall negotiate an investment services agreement with an Investment Adviser and seek Court approval of entry into such agreement and performance of their obligations thereunder;

      (b)    the Debtors are authorized to consummate Investment Adviser Sales using the Court-approved Investment Adviser and are authorized to pay any applicable fees, commissions, expenses and other trading costs without further order of the Court;

      (c)    during each Calendar Week (as defined below), the Debtors are authorized to sell Digital Assets with an aggregate market value not exceeding the Weekly Limit (as defined below) for such Calendar Week[3];

      (d)    the "Weekly Limit" shall be (i) $50 million for the week through Friday in which the Order is entered and (ii) $100 million for each subsequent week beginning on Saturday through Friday (a "Calendar Week"), *provided* that the Debtors (i) may temporarily increase the Weekly Limit to $200 million for a period of one Calendar Week at a time with the prior approval of the Committee and the Ad Hoc Committee without further order of the Court and (ii) may permanently increase the Weekly Limit to $200 million by filing a notice with the Court of such proposed increase. If the Committee or Ad Hoc Committee objects to the Debtors' request to permanently increase the Weekly Limit to $200 million, the following objection procedures shall apply:

---

[3]    For the avoidance of doubt, for purposes of calculating the Weekly Limit the Debtors shall include all Digital Assets sold by the Debtors during the applicable time period, including Bitcoin and Ether.

(i)    the Committee or Ad Hoc Committee's objection must (A) be in writing and state with specificity the basis for objecting and (B) be filed with the Court within five business days after service of the Debtors' notice and served on counsel to the Debtors (collectively, the "Debtors' Counsel"), (1) Sullivan & Cromwell LLP, 125 Broad Street, New York, New York 10004, Attn: Andrew G. Dietderich (dietdericha@sullcrom.com) and Alexa J. Kranzley (kranzleya@sullcrom.com) and (2) Landis Rath & Cobb LLP, 919 N. Market St., Suite 1800, Wilmington, Delaware 19801, Attn: Adam G. Landis (landis@lrclaw.com) and Kimberly A. Brown (brown@lrclaw.com); and

(ii)    if the Committee or Ad Hoc Committee files with the Court and serves on counsel to the Debtors a written objection to the request to increase the Weekly Limit, then such increase may only be executed upon withdrawal of such objection or further order of the Court.

(e)    in the event that the Debtors determine, in their business judgment, to commence sales of Bitcoin, Ether, FTT or certain other insider-affiliated tokens, the Debtors shall provide ten business days' notice to the Committee and the Ad Hoc Committee.  If the Committee or Ad Hoc Committee objects to the Debtors' commencement of such sales of these Digital Assets, the following objection procedures shall apply:

(iii)    the Committee or Ad Hoc Committee's objection must (A) be in writing and state with specificity the basis for objecting and (B) be filed with the Court within the notice period and served on the Debtors' Counsel; and

(iv)    if the Committee or Ad Hoc Committee files with the Court and serves on counsel to the Debtors a written objection to the commencement of sales of any such Digital Assets, then such sales may only be executed upon withdrawal of such objection or further order of the Court.

(f)    any sales of Digital Assets in accordance with the Investment Adviser Sales shall be subject to the terms of such documentation as the Debtors may execute in connection with such transaction, which documentation may (but is not required to) include provisions that the buyers are taking the Digital Assets "as is" and "where is," without any representations or warranties from the Debtors as to the quality or fitness of such Digital Asset and shall be free and clear of all liens, claims, interests and encumbrances, with any such liens, claims, interests and encumbrances

attaching only to the sale proceeds with the same validity, extent and priority as immediately prior to the sale.

B.    <u>Hedging Arrangements</u>.  With respect to the Hedging Arrangements:

(a)    the Debtors are authorized to enter into calls, puts, forward contracts or other hedging transactions with respect to underlying Eligible Hedging Digital Assets (as defined below) using the Court-approved Investment Adviser and are authorized to pay any applicable fees, commissions, expenses and other trading costs without further order of the Court; and

(b)    "<u>Eligible Hedging Digital Assets</u>" means (i) Bitcoin and Ether and (ii) with the prior approval of the Committee and the Ad Hoc Committee, any additional Digital Assets identified by the Debtors as Eligible Hedging Digital Assets; *provided* that the Debtors shall file a notice with the Court identifying such additional Eligible Hedging Digital Assets.

C.    <u>Staking Method</u>.  With respect to any staking of Digital Assets, the Debtors and the Investment Adviser are authorized to utilize staking options available through their qualified custodians using their respective private validators if the Debtors determine in the reasonable exercise of their business judgment that such activities are in the best interests of their estates.

D.    <u>General Provisions</u>.  With respect to any Digital Assets sold, staked or hedged in accordance with the Management and Monetization Guidelines:

(a)    periodically, but on no less than a monthly basis, general post-trade information will be made available to the firms serving as legal counsel and financial advisor to the Committee and the firms serving as legal counsel and financial advisor to the Ad Hoc Committee (the "<u>Consulting Professionals</u>"), the Committee and the Ad Hoc Committee (the "<u>Post-Trade Information</u>");

(b)    the Debtors will conduct weekly status calls with the Investment Adviser and the Consulting Professionals for the first six weeks following the first completed transaction under the Management and Monetization Program, followed by monthly status calls thereafter; and

(c)    solely with the consent of the Committee and the Ad Hoc Committee, the Debtors may at any time, without further order of the Court, re-designate which Digital Assets may be sold, staked or hedged in accordance with the Management and Monetization Guidelines.

12.     For the avoidance of doubt, the Debtors' reporting and consultation

obligations with respect to the Management and Monetization Program shall terminate following

the effectiveness of a chapter 11 plan.

13.     The Debtors submit that the Management and Monetization Program is

reasonable and designed with the objective of obtaining the best value for the Digital Assets in

an efficient manner and at reduced cost and expense to the estates.  The Debtors further submit

that the Management and Monetization Program satisfies the requirements of section 363 of the

Bankruptcy Code and will maximize value for the benefit of all of the Debtors' stakeholders.

**Relief Requested**

14.     By this Motion, the Debtors request entry of the Order, substantially in the

form attached hereto as <u>Exhibit A</u>, authorizing and approving (i) guidelines for the sale or

transfer of certain Digital Assets, (ii) the sale or transfer of such Digital Assets in accordance

with such guidelines free and clear of any liens, claims, interests and encumbrances, (iii) the

Debtors' entry into, and performance under, postpetition hedging arrangements, including

granting liens and superpriority administrative expense claims in connection therewith and (iv)

the Debtors to stake certain Digital Assets.

**Basis For Relief**

**I.     The Management and Monetization Program and Management and Monetization Guidelines Should Be Approved and Authorized as a Sound Exercise of the Debtors' Business Judgment.**

15.     Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee,

after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business,

property of the estate . . . ."  11 U.S.C. § 363(b)(1).  Courts should authorize a debtor's request

for relief under Bankruptcy Code section 363(b) where a sound business purpose exists for doing

so.  Courts within the Third Circuit have relied upon *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d

Cir. 1983), for the proposition that a debtor must provide a showing of "some articulated

business justification . . . for using, selling, or leasing property outside of the ordinary course of

business . . ."  *See, e.g., In re Olsen,* No. 14-11273, 2017 WL 3311218, at *7 (Bankr. D. N.J.

July 20, 2017) (quoting *In re Lionel Corp.*, 722 F.2d at 1071); *In re Grand Prix Assocs. Inc.*, No.

09-16545 (DHS), 2009 WL 1850966, at *4 (Bankr. D. N.J. June 26, 2009) (citing *In re Lionel

Corp.*, 722 F.2d at 1071); *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 175-76 (D. Del.

1991) (same).  Generally, a court should be deferential to the determination of management, and

where a debtor "articulates a reasonable basis for its business decisions . . . , courts generally will

not entertain objections to the debtor's conduct."  *See In re Filene's Basement, LLC*, 2014 WL

1713416, at *12 (Bankr. D. Del. Apr. 29, 2014) (quoting *In re Johns-Manville Corp.*, 60 B.R.

612, 616 (Bankr. S.D.N.Y. 1986)).

      16.     In evaluating whether a sale under section 363 is justified by a sound

business purpose, courts consider a variety of factors which essentially amount to a business

judgment test.  *See Culp* v. *Stanziale (In re Culp)*, 550 B.R. 683, 697 (D. Del. 2015).  The

business judgment rule shields a debtor's management from judicial second-guessing.  *See In re

Johns-Manville Corp.*, 60 B.R. at 615-16 ("[T]he Code favors the continued operation of a

business by a debtor and a presumption of reasonableness attaches to a debtor's management

decisions.").  Once a debtor articulates a valid business justification, "[t]he business judgment

rule 'is a presumption that in making a business decision the directors of a corporation acted on

an informed basis, in good faith and in the honest belief that the action was in the best interests

of the company.'"  *See In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith* v. *Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)).

17.    Courts have considered the following factors in determining whether a proposed sale satisfies this standard:  (a) whether a sound business justification exists for the sale; (b) whether adequate and reasonable notice of the sale was provided to interested parties; (c) whether the sale will produce a fair and reasonable price for the property and (d) whether the parties have acted in good faith.  *See In re Decora Indus., Inc.*, No. 00-4459 (JJF), 2002 WL 32332749, at *2 (D. Del. May 20, 2002) (citing *In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991)); *see also In re Elpida Memory, Inc.*, No. 12-10947 (CSS), 2012 Bankr. LEXIS 5367, at *18 (Bankr. D. Del. Nov. 16, 2012).

18.    Furthermore, section 105(a) of the Bankruptcy Code provides, in relevant part, that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).

A.    <u>Approval of the Management and Monetization Program Is Justified by Good and Sound Business Justifications.</u>

19.    A sound business purpose for the sale of a debtor's assets outside the ordinary course of business exists where such sale is necessary to maximize and preserve the value of the estate for the benefit of creditors and interest holders.  *See, e.g., In re Mushroom Transp. Co.*, 382 F.3d 325, 339 (3d Cir. 2004) (finding that a debtor had a fiduciary duty to protect and maximize the value of the estate's assets); *In re Lionel Corp.*, 722 F.2d at 1071; *Four B. Corp.* v. *Food Barn Stores, Inc.* (*In re Food Barn Stores, Inc.*), 107 F.3d 558, 564–65 (8th Cir. 1997).

20.    The Debtors submit that the Management and Monetization Program is

designed to maximize the value of each Digital Asset sold, and, accordingly, the value of the

Debtors' estates.  The Debtors' proposed sales of Digital Assets will help prepare the estates for

potential dollarized distributions to creditors while reducing the volatility of the Debtors' current

Digital Asset holdings.  Additionally, sales pursuant to the Management and Monetization

Guidelines will alleviate the cost and delay of filing a separate motion for each proposed sale or

use of Digital Assets and will minimize the costs associated with selling the Debtors' Digital

Assets through the use of streamlined procedures appropriate for the large quantity and different

types of Digital Assets held by the Debtors.

21.     Moreover, sales of Digital Assets will be appropriately limited by

execution type and total value.  The Management and Monetization Guidelines limit the sales of

Digital Assets through an Investment Adviser and allow the Debtors to realize two key benefits.[4]

*First*, if the Debtors attempted to sell large Digital Asset positions directly on an exchange, the

Debtors risk "flooding the market" and depressing the value of such Digital Assets.  *See* Mosley

Declaration at ¶7.  The Management and Monetization Guidelines mitigate this risk by instituting

weekly sale limits.  In addition, the Investment Adviser's experience and trading infrastructure

will allow it to time sales and choose trading venues and counterparties in a way that is intended

to maximize the value of the Digital Assets.  *See* Kurz Declaration at ¶7.  *Second*, if the Debtors

were to directly request quotes from and execute sales with over-the-counter market makers, they

would "tip off" the broader market (and move the market price of the Digital Assets against the

interests of the Debtors).  This is known as "information leakage."  *See* Kurz Declaration at ¶6.

---

[4]     For the avoidance of doubt, the Debtors will seek Court approval to enter into any investment services agreement with an Investment Adviser, and the Debtors will not utilize its services until entry into such agreement is approved by the Court.

By contrast, the Investment Adviser would have strategic expertise in conducting sales while minimizing such "information leakage."  The Investment Adviser would also be prohibited from executing transactions and taking any other actions that are not permitted by the Management and Monetization Guidelines (unless specifically agreed upon in writing by the Debtors after consultation with the Consulting Professionals), or otherwise not in the best interests of the Debtors pursuant to applicable law and consistent with the Investment Adviser's professional standards and duties.  The Management and Monetization Guidelines further provide that for sales of Bitcoin, Ether and certain other insider Digital Assets, ten days' notice will be provided to the Committee and Ad Hoc Committee.

22.     In addition, the digital asset market is volatile, and the value of Digital Assets—and therefore the value of the Debtors' estates—constantly fluctuates.  The Debtors may face stringent time constraints given the volatility of the digital asset markets, and the Management and Monetization Guidelines will permit the Debtors to be responsive to a fast moving market.  Post-Trade Information will also be provided to the Committee, the Ad Hoc Committee and the Consulting Professionals.

23.     Based on the foregoing, the Debtors submit, in their sound exercise of business judgment, that Investment Adviser Sales pursuant to the Management and Monetization Guidelines will maximize the value of Digital Assets for the benefit of all stakeholders and should therefore be approved.

B.  <u>The Noticing Procedures Are Reasonable and Appropriate.</u>

24.     The notice and hearing requirements contained in section 363(b)(1) of the Bankruptcy Code are satisfied if, in light of the particular circumstances of a proposed transaction, appropriate notice and an opportunity for a hearing are given.  *See* 11 U.S.C. §

102(1)(A) (defining "after notice and a hearing" to mean such notice and opportunity for a

hearing "as [are] appropriate in the particular circumstances").  Bankruptcy Rules 2002(a)(2),

2002(i) and 2002(k) require that a minimum of 21 days' notice of the proposed sale of property

outside the ordinary course of business be provided by mail to "the debtor, the trustee, all

creditors and indenture trustees," the Committee and the U.S. Trustee unless a debtor shows

"cause." See Fed. R. Bankr. P. 2002(a)(2), 2002(i), 2002(k).  Once the debtor shows "cause,"

however, Bankruptcy Rule 2002(a)(2) authorizes the Court to shorten the generally applicable

21-day notice period and to direct a method of notice other than mail.  *See* Fed. R. Bankr. P.

2002(a)(2).  Moreover, the Court is authorized to limit, even without a prior showing of cause,

notice of asset sales outside the ordinary course of a debtor's business to the Committee and any

creditor or equity holder requesting notice.  *See* Fed. R. Bankr. P. 2002(i).  In addition, the sale

or transfer of property outside the ordinary course of business may be authorized without an

actual hearing if no party in interest timely requests such a hearing.  *See* 11 U.S.C. § 102(1)(B)(i)

(authorizing "an act without an actual hearing if such notice is given properly and if such a

hearing is not requested timely by a party in interest," notwithstanding the statutory requirement

for "notice and a hearing").

        25.    The usual process of obtaining court approval for each Digital Asset sale

or transaction:  (a) would result in costs to the Debtors' estates that may undermine or eliminate

the economic benefits of the underlying transactions, (b) in some instances may hinder the

Debtors' ability to take advantage of opportunities to sell Digital Assets that are available only

for a very limited time and (c) would "tip off" the market by making proposed Digital Asset

sales public, allowing market participants to short sell Digital Assets ahead of the Debtors which

may create a downward price distortion, or otherwise disrupt the Debtors' ability to sell the relevant Digital Asset(s) at a reasonable value.

26.    The Management and Monetization Program complies with the notice and hearing requirements of the Bankruptcy Code, as well as due process, by providing the Committee and the Ad Hoc Committee with opportunity to object to certain Digital Asset sales and limit the total value of Digital Assets sold, in each case pursuant to the Management and Monetization Guidelines.  Additionally, the Debtors submit that notice of this Motion and the Management and Monetization Guidelines contained herein provide sufficient notice to parties-in-interest regarding the sales of and transactions in Digital Assets.  Finally, the Post-Trade Information will be provided to the Committee, the Ad Hoc Committee and the Consulting Professionals.

27.    Based on the foregoing, the Debtors submit that sufficient cause exists to implement the Management and Monetization Guidelines in the Debtors' business judgment, which will improve the efficiency of the sale process for the Digital Assets, thereby maximizing the value of such assets for the benefit of the Debtors' estates and all stakeholders.

## II.    The Digital Asset Sales Should Be Free and Clear of Liens, Claims, Interests and Encumbrances Under Section 363(f) of the Bankruptcy Code.

28.    In the interest of attracting the best offers, the Debtors request authorization to sell the Digital Assets free and clear of any liens, claims, encumbrances and other interests in accordance with section 363(f) of the Bankruptcy Code, with any such liens, claims, encumbrances and other interests attaching to the proceeds of the sale of the Assets.

29.    The sale of estate property free and clear of any interest is governed by section 363(f) of the Bankruptcy Code, which provides:

The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if—

(1)     applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(2)     such entity consents;

(3)     such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4)     such interest is in bona fide dispute; or

(5)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

30.     Section 363(f) of the Bankruptcy Code is drafted in the disjunctive: approval of a proposed sale of assets free and clear of interests requires only that one of the five requirements be satisfied with respect to each such interest.  *See In re Kellstrom Indus., Inc.,* 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("Section 363(f) is written in the disjunctive, not the conjunctive, and if any of the five conditions are met, the debtor has the authority to conduct the sale free and clear of all liens.") (citation omitted).

31.     Furthermore, section 105(a) of the Bankruptcy Code grants the Court broad discretionary powers, providing that "[t]he Court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).  This equitable power may be utilized to effectuate the provisions of section 363(f).  *See, e.g., In re Trans World Airlines, Inc.*, No. 01-0056 (PJW), 2001 WL 1820325 (Bankr. D. Del. 2001), at *8 (highlighting bankruptcy courts' equitable authority to authorize sale of estate assets free and clear).

32.     The Debtors submit that the Management and Monetization Program satisfies the requirements of section 363(f) of the Bankruptcy Code.   To the extent that consent of a lienholder is neither obtained nor deemed to have been obtained, the Debtors submit that with respect to each Digital Asset sale, (i) lienholders could be compelled in a legal or equitable proceeding to accept a monetary satisfaction of their interests; and/or (ii) an interest on any of the Digital Assets is subject to a bona fide dispute.

33.     A sale of the Digital Assets free and clear of claims and interests is necessary to maximize the value of such assets for the benefit of the Debtors' estates and all stakeholders.  If the Digital Assets are not sold free and clear of claims and interests, or if the buyers would, or in the future could, be liable for any such claim or interest, the Debtors would be unable to successfully sell the Digital Assets on an open market and without a significant reduction in price.  Such a sale would provide substantially less value and greatly increase uncertainty and any potential recovery for the Debtors' estates.

34.     Furthermore, any lien or claim on, in, to or against the Digital Assets existing immediately prior to the sale of any such Digital Assets will attach to the sale proceeds with the same validity, priority, force and effect as it had at such time, subject to the rights and defenses of the Debtors or any party-in-interest.  The Debtors submit that holders of any claim or interest will be sufficiently protected by the availability of the proceeds of the sale to satisfy their claims and interests.  Additionally, to the extent there are any known lien holders on Digital Assets, the Debtors will provide such parties with notice of this Motion as is required pursuant to Bankruptcy Rule 6004.  Absent any objection, a holder of a lien shall be deemed to have consented to such sale, and the relevant Digital Asset may be sold free and clear of such lien.

*See, e.g.*, *Hargrave* v. *Twp. of Pemberton* (*In re Tabone, Inc.*), 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (failure to object to sale free and clear of liens, claims and encumbrances satisfies section 363(f)(2)) (citations omitted); *In re BSA*, 642 B.R. 504, 569 (Bankr. D. Del. 2022) (citing *In re Tabone, Inc.*, 175 B.R. at 858).  Accordingly, the Debtors submit that a sale of any Digital Assets that is free and clear of claims and interests is in the best interests of the Debtors' estates and stakeholders.

III.    **Staking is Ordinary Course in the Debtors' Industry and is Justified By Good and Sound Business Justifications.**

35.    Staking is a way to earn passive interest on certain Digital Assets that would otherwise remain idle.  *See* Kurz Declaration at ¶8.  Although the Debtors believe that staking is within the ordinary course of their business and is consistent with past practice, the Debtors are requesting authorization to stake certain of their Digital Assets out of an abundance of caution.

36.    Section 363(c)(1) of the Bankruptcy Code provides that a debtor in possession may "enter into transactions . . . in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing."  11 U.S.C. § 363(c)(1).  The ordinary course of business standard is intended to allow a debtor-in-possession the "flexibility to engage in ordinary transactions without unnecessary oversight."  *In re Roth Am., Inc.,* 975 F.2d 949, 952 (3rd Cir. 1992).  Furthermore, section 105(a) of the Bankruptcy Code provides the Court broad discretion to issue orders necessary to "carry out the provisions of this title." 11 U.S.C. § 105(a).

37.    The two tests ordinarily applied by the courts to determine whether an action is within the ordinary course of business are the "horizontal test" and the "vertical test."

*In re Roth American, Inc.*, 975 F.2d 949, 952 (3d Cir. 1992). The "horizontal test" focuses on the way businesses operate "from an industrywide perspective." *Id.* at 953. The "vertical test" focuses on the expectations of creditors. *Id.*

38. Here, the horizontal test is satisfied because staking digital assets is a typical arrangement for companies in the cryptocurrency industry to generate passive income, and the Debtors believe that staking certain Digital Assets fall within the standard ordinary course practice of companies in the Debtors' industry.

39. Under the vertical test, creditors' reasonable expectations of a debtor's "ordinary course of business" are based on the debtor's specific prepetition business practices and norms and the expectation that the debtor will conform to those practices and norms while operating as a debtor-in-possession. *In re Garofalo's Finer Foods, Inc.*, 186 B.R. 414, 425 (N.D. Ill. 1995). Accordingly, a fundamental characteristic of an "ordinary" postpetition business transaction is its similarity to a prepetition business practice. *Marshack* v. *Orange Commercial Credit* (*In re Bat'l Lumber & Supply, Inc.*), 184 B.R. 74, 79 (9th Cir. B.A.P. 1995); *In re James A. Phillips, Inc.*, 29 B.R. 391, 394 (S.D.N.Y. 1983). Here, staking Digital Assets is consistent with the Debtors' prepetition practice and is consistent with practice across the cryptocurrency industry. *See* Mosley Declaration at ¶7; Kurz Declaration at ¶8. Accordingly, the Debtors submit that staking is an ordinary course transaction and should be authorized on a postpetition basis pursuant to section 363(c)(1) of the Bankruptcy Code.

40. To the extent that there is any doubt that staking Digital Assets are within the ordinary course of the Debtors' business, the Debtors should be authorized to stake pursuant to section 363(b) of the Bankruptcy Code. Generally, a court should be deferential to the

determination of management, and where a debtor "articulates a reasonable basis for its business decisions . . . , courts generally will not entertain objections to the debtor's conduct." *See In re Filene's Basement, LLC*, 2014 WL 1713416, at *12 (Bankr. D. Del. Apr. 29, 2014) (quoting *In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986)).

41.     The ability to stake a portion of the Debtors' Digital Assets is a substantial way to generate passive income for the Debtors at a lower risk than a traditional loan or investments, allows the Debtors to deploy their Digital Assets and provides a means to ensure revenue and cash-flow stability that, in turn, would enhance the value of the Debtors' estates for the benefit of all their stakeholders.  Accordingly, the Debtors submit that sound business purposes exist for the Debtors to stake certain of their Digital Assets.

## IV.     The Debtors Should Be Authorized to Provide Credit Support and Grant Superpriority Administrative Expense Claims.

42.     Because transactions under Hedging Arrangements are subject to value fluctuations in the ordinary course of business, counterparties to such contracts may, in certain circumstances, require that a debtor's obligation under such contract be secured by various forms of collateral, including the granting of superpriority administrative expense claims and/or the granting of liens on certain unencumbered collateral pursuant to section 364(c)(1) and (2) of the Bankruptcy Code (the "Credit Support").

43.     Section 364 of the Bankruptcy Code authorizes a debtor to obtain "credit" on a superpriority or senior secured basis when obtaining such credit on other terms is unavailable.  11 U.S.C. §§ 364(c) and (d).  Courts generally afford debtors considerable deference to determine, in their business judgment, the terms under which they obtain

postpetition secured credit. *See, e.g.*, *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011); *In re Curlew Valley Assocs.*, 14 B.R. 506, 513–14 (Bankr. D. Utah 1981).

44.     The Debtors therefore request authorization to grant superiority claims and provide all other necessary Credit Support with respect to the Hedging Arrangements, if necessary.  It is general market practice for parties to hedging contracts to be required to provide Credit Support in the ordinary course of business to ensure their performance when they are out-of-the-money.  *See* Kurz Declaration at ¶9.

45.     The relief sought herein represents a fair and efficient mechanism for enhancing the value of the Debtors' estates, while providing counterparties with appropriate inducement to enter into Hedging Arrangements.  The Debtors therefore request authority to provide Credit Support under the Hedging Arrangements; provided, however, that any superpriority administrative expense claims granted to a hedging counterparty shall be subordinate, and junior, to any postpetition intercompany claims pursuant to the *Final Order (I) Authorizing the Debtors to (A) Operate a Postpetition Cash Management System, (B) Maintain Existing Business Forms and (C) Perform Intercompany Transactions, (II) Granting A Partial Waiver of the Deposit Guidelines Set Forth In Section 345(b) and (III) Granting Related Relief* [D.I. 488].

46.     Courts in this circuit routinely grant relief similar to the relief requested herein.  *See, e.g., In re Extraction Oil & Gas, Inc.* Case No. 10-11548 (CSS) (Bankr. D. Del. Jul. 13, 2020) (authorizing debtors to pledge collateral in the form of liens and superpriority claims to hedge counterparties); *In re PES Holdings, LLC*, Case No. 18-10122 (KG) (Bankr. D. Del. Feb.

26, 2018) (same); *In re Samson Resources Corporation,* No. 15-11934 (CSS) (Bankr. D. Del.

Jan. 27, 2017) (same).

### **Bankruptcy Rule 6004(a) and 6004(h)**

47.     The Debtors respectfully request that the Court (a) find that notice of the

Motion is adequate under Bankruptcy Rule 6004(a) under the circumstances and (b) waive the

14-day stay under Bankruptcy Rule 6004(h).  Pursuant to Bankruptcy Rule 6004(h), "[a]n order

authorizing the use, sale, or lease of property other than cash collateral is stayed until expiration

of 14 days after entry of the order, unless the court orders otherwise."  For the reasons described

above, the relief requested is essential to prevent potentially irreparable damage to the Debtors'

operations, value and ability to reorganize.

### **Notice**

48.     Notice of this Motion has been provided to: (a) the U.S. Trustee;

(b) counsel to the Committee; (c) the Securities and Exchange Commission; (d) the Internal

Revenue Service; (e) the United States Department of Justice; (f) the United States Attorney for

the District of Delaware; (g) known holders of liens on Digital Assets; and (h) to the extent not

listed herein, those parties requesting notice pursuant to Bankruptcy Rule 2002.  The Debtors

submit that, in light of the nature of the relief requested, no other or further notice need be

provided.

### **Reservation of Rights**

49.     Nothing contained herein is intended or should be construed as (a) an

admission as to the validity or priority of any claim, equity interest or lien against the Debtors,

(b) a waiver of the Debtors' rights to subsequently dispute such claim, equity interest or lien on

any grounds, (c) a promise or requirement to pay any prepetition claim, (d) an implication or admission that any particular claim is of a type specified or defined in the Motion or the Order, (e) a request or authorization to assume any prepetition agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code, or (f) a waiver of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable law.

## **Conclusion**

WHEREFORE, for the reasons set forth herein, the Debtors respectfully request that the Court (a) enter the Order, substantially in the form attached hereto as <u>Exhibit A</u>, and (b) grant such other and further relief as is just and proper.

Dated: August 23, 2023
      Wilmington, Delaware

**LANDIS RATH & COBB LLP**

*/s/ Kimberly A. Brown*
Adam G. Landis (No. 3407)
Kimberly A. Brown (No. 5138)
Matthew R. Pierce (No. 5946)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
E-mail: landis@lrclaw.com
      brown@lrclaw.com
      pierce@lrclaw.com

-and-

**SULLIVAN & CROMWELL LLP**

Andrew G. Dietderich (admitted *pro hac vice*)
James L. Bromley (admitted *pro hac vice*)
Brian D. Glueckstein (admitted *pro hac vice*)
Alexa J. Kranzley (admitted *pro hac vice*)
125 Broad Street
New York, NY 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
E-mail: dietdericha@sullcrom.com
      bromleyj@sullcrom.com
      gluecksteinb@sullcrom.com
      kranzleya@sullcrom.com

*Counsel for the Debtors and Debtors-in-Possession*