```
 1                     UNITED STATES BANKRUPTCY COURT
                            DISTRICT OF DELAWARE
 2

 3   IN RE:                          .   Chapter 11
                                     .   Case No. 22-11068 (JTD)
 4   FTX TRADING LTD. et al.,        .
                                     .   (Jointly Administered)
 5                 Debtors.          .
                                     .
 6   . . . . . . . . . . . . . . . . .
                                     .
 7   ALAMEDA RESEARCH LLC, ALAMEDA   .   Adversary Proceeding
     RESEARCH LTD., FTX TRADING      .   No. 22-50145 (JTD
 8   LTD., WEST REALM SHIRES, INC.,  .
     and WEST REALM SHIRES SERVICES, .
 9   INC.,                           .
                                     .
10                 Plaintiffs,       .
                                     .
11        v.                         .
                                     .
12   FTX DIGITAL MARKETS LTD., BRIAN .
     C. SIMMS, KEVIN G. CAMBRIDGE,   .
13   and PETER GREAVES, and J. DOES  .
     1-20,                           .
14                 Defendants.       .
                                     .
15   . . . . . . . . . . . . . . . . .
                                     .
16   FTX DIGITAL MARKETS LTD., BRIAN .
     C. SIMMS, KEVIN G. CAMBRIDGE,   .
17   and PETER GREAVES,              .
                                     .
18                 Counterclaim      .
                   Plaintiffs,       .
19                                   .
          v.                         .
20                                   .
     ALAMEDA RESEARCH LLC, et al.,   .
21                                   .
                   Counterclaim      .
22                 Defendants.       .
     . . . . . . . . . . . . . . . . .
23

24

25                           (CONTINUED)
```

```
1   ALAMEDA RESEARCH LTD., WEST      .  Adversary Proceeding
    REALM SHIRES, INC., and WEST     .  No. 23-50379 (JTD)
2   REALM SHIRES SERVICES, INC.      .
                                     .
3                   Plaintiffs,      .
                                     .
4       v.                           .
                                     .
5   ROCKET INTERNET CAPITAL PARTNERS .
    II SCS, ROCKET INTERNET CAPITAL  .
6   PARTNERS (EURO), II SCS, GFC     .
    GLOBAL FOUNDERS CAPITAL GMBH,    .
7   GFC GLOBAL FOUNDERS CAPITAL      .
    GMBR & CO. BETEILINGUNGS KG NR.  .
8   1, WILLIAM HOCKE LIVING TRUST    .
    and 9YARDS CAPITAL INVESTMENTS   .
9   II LP,                           .
                                     .
10                  Defendants.      .
                                     .
11  . . . . . . . . . . . . . . . .  .
                                     .
12  ALAMEDA RESEARCH LTD., WEST      .  Adversary Proceeding
    REALM SHIRES, INC., and WEST     .  No. 23-50380 (JTD)
13  REALM SHIRES SERVICES, INC.,     .
                                     .
14                  Plaintiffs,      .
                                     .
15      v.                           .
                                     .
16  MICHAEL GILES, et al.,           .
                                     .
17                  Defendants.      .
                                     .
18  . . . . . . . . . . . . . . . .  .
                                     .
19  ALAMEDA RESEARCH LTD., WEST      .  Adversary Proceeding
    REALM SHIRES, INC., and WEST     .  No. 23-50381 (JTD)
20  REALM SHIRES SERVICES, INC.,     .
                                     .
21                  Plaintiffs,      .
                                     .
22      v.                           .
                                     .
23  SAMUEL BANKMAN-FRIED, NISHAD     .
    SINGH, and ZIXIAO "GARY WANG,    .
24                                   .
                    Defendants.      .
25  . . . . . . . . . . . . . . . .  .
```

```
 1  FTX TRADING LTD. and MACLAURIN   .  Adversary Proceeding
    INVESTEMENTS LTD.,               .  No. 23-50437 (JTD)
 2                                   .
                    Plaintiffs,      .
 3                                   .
        v.                           .
 4                                   .
    LOREM IPSUM UG, PATRICK GRUHN,   .
 5  ROBIN MATZKE, and BRANDON        .  Courtroom No. 5
    WILLIAMS,                        .  824 Market Street
 6                                   .  Wilmington, Delaware 19801
                    Defendants.      .
 7                                   .  Wednesday, August 23, 2023
    . . . . . . . . . . . . . . . .  .  1:02 p.m.
 8
                        TRANSCRIPT OF HEARING
 9              BEFORE THE HONORABLE JOHN T. DORSEY
                  UNITED STATES BANKRUPTCY JUDGE
10
    APPEARANCES:
11
    For the Debtors and
12  Debtors-in-Possession:   Adam G. Landis, Esquire
                             LANDIS RATH & COBB, LLP
13                           919 Market Street
                             Suite 1800
14                           Wilmington, Delaware 19801

15                           -and-

16                           Brian D. Glueckstein, Esquire
                             SULLIVAN & CROMWELL, LLP
17                           125 Broad Street
                             New York, New York 10004
18

19  (APPEARANCES CONTINUED)

20  Audio Operator:          Dana L. Moore, ECRO

21  Transcription Company:   Reliable
                             The Nemours Building
22                           1007 N. Orange Street, Suite 110
                             Wilmington, Delaware 19801
23                           Telephone: (302)654-8080
                             Email:  gmatthews@reliable-co.com
24
    Proceedings recorded by electronic sound recording,
25  transcript produced by transcription service.
```

1   APPEARANCES (CONTINUED):

2   For the US Trustee:          Juliet M. Sarkessian, Esquire
                                 UNITED STATES DEPARTMENT OF JUSTICE
3                                OFFICE OF THE UNITED STATES TRUSTEE
                                 J. Caleb Boggs Federal Building
4                                844 King Street
                                 Suite 2207, Lockbox 35
5                                Wilmington, Delaware 19801

6   For the Official
    Committee of
7   Unsecured Creditors:         Kris M. Hansen, Esquire
                                 Gabriel Sasson, Esquire
8                                PAUL HASTINGS, LLP
                                 200 Park Avenue
9                                New York, New York 10166

10  For the Ad Hoc
    Committee of Non-US
11  Customers of FTX.com:        Erin E. Broderick, Esquire
                                 EVERSHEDS SUTHERLAND (US), LLP
12                               227 West Monroe Street
                                 Suite 6000
13                               Chicago, Illinois 60606

14

15

16

17

18

19

20

21

22

23

24

25

1                                    INDEX

2    MOTIONS:                                                    PAGE

3    Agenda
     Item 15:   Update regarding Chapter 11 Cases.                6
4

5    Agenda
     Item 16:   Motion of Debtors for an Order Authorizing and   54
6               Approving Procedures for Settling Certain
                Existing and Future Litigation Claims and
7               Causes of Action [D.I. 2137, filed on August
                2, 2023]
8
                Court's Ruling:                                  95
9

10

11   DECLARATIONS:                                               PAGE

12   1) Declaration of Edward Mosley                             54

13   Transcriptionists' Certificate                             102

14

15

16

17

18

19

20

21

22

23

24

25

1         (Proceedings commence at 1:02 p.m.)

2         (Call to order of the Court)

3              THE COURT:  Good morning, everyone.  Thank you.

4   Please be seated.  Afternoon, I'm sorry.  It's afternoon

5   already.

6              MR. LANDIS:  Good afternoon, Your Honor, and may

7   it please the Court.  Adam Landis from Landis, Rath & Cobb on

8   behalf of the FTX Trading Limited family of debtors.

9              THE COURT:  Has everyone signed in?  I've got more

10  people here.  I've only got five people on my list of people

11  here.

12        (Participants confer)

13             THE COURT:  Do we have another list?

14             MR. LANDIS:  May I approach, Your Honor?

15             THE COURT:  yes.

16             MR. LANDIS:  We do have another list.

17             THE COURT:  All right.  Okay.  Go ahead,

18  Mr. Landis.

19             MR. LANDIS:  Thank you, Your Honor.

20             We're here today for our omnibus hearing.  And

21  you'll note from the agenda that Items 1 through 8 have been

22  continued, Items 9 through 14 have been resolved, leaving us

23  with two matters going forward.  The first is a Chapter 11

24  case update and the second is our settlement procedures

25  motion, which has been objected to by the United States

1   Trustee.

2            I am going to yield the podium to Mr. Glueckstein,

3   who will take it away with Number 15.

4            THE COURT:  Okay.

5            MR. GLUECKSTEIN:  Good afternoon, Your Honor.

6            THE COURT:  Afternoon.

7            MR. GLUECKSTEIN:  For the record, Brian

8   Glueckstein, Sullivan & Cromwell, for the debtors.

9            And we do want to thank the Court for entering a

10  number of orders on resolved matters prior to today's

11  hearing.

12           We did want to provide the Court and stakeholders

13  an update on the case since it's been a little bit of time

14  before we last appeared for an omnibus hearing before Your

15  Honor.

16           Your Honor, the debtors continue to make

17  significant progress every day moving these historic Chapter

18  11 cases forward on every front.  Led by Mr. Ray, the debtors

19  and their team of professionals remain laser-focused on, one,

20  maximizing the value of these estates for creditors through

21  asset recovery efforts, prosecuting legal claims; and, two,

22  distributing that value to creditors through a confirmed plan

23  of reorganization.

24           And Your Honor, notwithstanding some recent

25  rhetoric from the committee, these cases have seen the

1  debtors build consensus and resolve most issues

2  constructively and efficiently, which has resulted in most of

3  the work taking place outside the purview of this courtroom

4  and Your Honor.  I, therefore, want to take a few minutes to

5  provide an overview for stakeholders and the Court of the

6  significant developments in both of these areas over the past

7  few months and what is coming next.

8          We do have -- I did prepare a few demonstrative

9  slides to aid the discussion, if we can bring those up.

10       (Participants confer)

11          MR. GLUECKSTEIN:  Your Honor, this slide is kind

12  of an update of -- a lot of these slides are kind of an

13  update of slides we've shown previously.  But this slide

14  shows the continued progress of the debtors' asset recovery

15  efforts, along with those assets known at this point to be

16  recovered and currently held by the United States Government.

17          At current asset pricing, which reflects some

18  volatility in the cryptocurrency markets, the debtors today

19  have approximately 7 billion of assets that are marshaled and

20  available for distribution from the estates, including

21  approximately 2.7 billion in cash assets.

22          You can go to the next slide.

23          Some of the recent significant events since we've

24  last been before Your Honor are included in this slide.  And

25  to highlight a few, Your Honor:

1          In June, we filed the second interim report of Mr.

2   Ray to the board, detailing the extent to which the FTX

3   group, from its inception, commingled customer deposits and

4   corporate funds, and how Mr. Bankman-Fried and the other

5   founders misused those funds at will for speculative trading,

6   investments, the purchases of luxury properties, and

7   political and other donations for personal gain.

8          The debtors recently filed their 2022 federal tax

9   returns for all of the FTX debtors, a herculean task given

10  the starting state of the information on the petition date

11  and the information that was necessary to file those returns.

12  And that's a significant milestone given the claims that have

13  been asserted by the IRS in these cases preliminarily.

14         The debtors have continued to successfully

15  rationalize its workforce, exit contracts and leases.

16         We've launched an online customer portal for

17  filing customer claims in connection with the upcoming

18  customer bar date, which, as Your Honor knows, is set for

19  September 29th.  Thousands of new claims are being submitted

20  daily through the portal.  The portal allows customers to

21  also review their balances as of the petition date and their

22  historical transaction history.

23         The debtors are currently pursuing a sale process

24  for the FTX.com exchange, which is ongoing, and for which

25  there is significantly in -- significant interest.  We know

1 this is an important issue for the creditors' committee and

2 many creditors of these estates.

3           The debtors have been able to return over $150

4 million of customer segregated funds at FTX Japan, pursuant

5 to local law.

6           And on July 31st, the debtors filed their draft

7 framework plan of reorganization, which I will talk more

8 about in a few moments.

9           Go to the next slide, please.

10          On this slide, Your Honor, we go through -- there

11 are a few -- it shows some of the detail about the debtors'

12 continued progress on major areas of the case.

13          In this column, the first column, there's numbers

14 here around asset management and the debtors' continued work

15 in this area.  The board of directors continues to monitor

16 exposures to the fluctuation of cryptocurrency markets.  And

17 we've spent significant time with the committee on a plan for

18 managing and monetizing the debtors' cryptocurrency holdings.

19          The second column here highlights very significant

20 progress the debtors have been able to make in recent months

21 through their investigation process and turning that prod --

22 work product into actionable litigation claims.  To highlight

23 a few:

24          We have stated before, Your Honor, that we will

25 hold accountable those individuals responsible for FTX's

1 collapse and we will pursue recovery of funds improperly

2 transferred away from the debtors pre-petition, and we have

3 started to do that.  If funds are not returned voluntarily,

4 we will pursue them through litigation.

5         The debtors filed a forty-eight-count action

6 against Mr. Bankman-Fried and other insiders for breach of

7 fiduciary duty and to avoid various transfers.

8         The debtors have also filed significant fraudulent

9 transfer actions and related claims:

10         Claims relating to the K5 investment to recover

11 over $700 million;

12         Claims relating to the purchase of Embed Financial

13 in the months prior to bankruptcy to recover approximately

14 $300 million;

15         A three-hundred-million-dollar action relating to

16 FTX Europe;

17         A seventy-five-million-dollar action relating to

18 an investment in Latona.

19         The debtors, also last week, filed a motion that

20 will be heard at the September omnibus hearing seeking

21 approval of an important settlement with the Genesis debtors

22 and their affiliates that will return significant value to

23 the estate and avoids litigating difficult issues involving

24 dueling debtors, given their Chapter 11 cases pending in New

25 York.

1      The debtors continue to analyze the multitude of

2  potential preference claims and expect to soon file a number

3  of large preference actions to return value back to these

4  estates.  The litigation recovery efforts will continue in

5  parallel with the plan confirmation process and our asset

6  recovery work.

7      There's also been significant M&A and venture book

8  activity over the past few months, highlighted by the LedgerX

9  sale and monetizing interest in Sequoia Heritage.  That work

10  continues, as well, with many more investments still to be

11  monetized.

12      That brings us to the next slide, Your Honor,

13  which is Slide 5.  And this depicts our plan time line.

14      As the debtors continue to bring in value, we are

15  working very hard to get that value into the hands of

16  creditors as soon as possible.  Back in April, Your Honor,

17  Mr. Dietderich provided an update to the Court in which he

18  detailed an aspirational plan confirmation time line that

19  looks extremely similar to the one that's set forth on this

20  slide.

21      The non-customer claims bar date occurred on July

22  31st, and the customer and government claims bar date is

23  coming up on September 29th.

24      Importantly, the debtors filed their draft plan of

25  reorganization on July 31st as targeted.  The framework for

1  that draft plan and termsheet was discussed at length over

2  the course of months with the committee's professionals and

3  also with counsel to creditor groups such as the Ad Hoc

4  Committee of Non U.S. Creditors.

5          The debtors and their professionals shared

6  mountains of data and analyses with the committee's

7  professionals and held dozens of calls and meetings in which

8  legal and economic issues were discussed, and those

9  discussions informed the draft plan and termsheet that was

10 filed in July.  But as we have said previously, the primary

11 purpose of filing the draft plan was to provide a transparent

12 basis for negotiations among diverse stakeholders of which

13 the committee is one, but certainly not the only one.

14         The plan termsheet identified several open issues

15 that the debtors know they need feedback on from that diverse

16 group of stakeholders.

17         If we can look at Slide 6.

18         We show here these are items that were noted in

19 the filing we made on July 31st and include many key issues

20 still to be negotiated, including:

21         The amount of property to be allocated to exchange

22 shortfall claims against the general pool of assets;

23         The decision and manner in which the FTX.com

24 exchange is sold or reorganized;

25         The post-effective-date claims transfer process;

1          Governance issues with respect to the offshore

2    exchange, venture trust, and other entities contemplated in

3    the plan.

4          These are important issues, Your Honor, many of

5    which are intercreditor issues to which different creditors

6    and creditor groups have different views.  That is precisely

7    why the debtors solicited feedback from those groups broadly.

8    And that process, Your Honor, is working.  We are per -- we

9    are receiving that feedback.  The level of engagement from

10   the committee, customer groups, and other stakeholders is

11   high and largely constructive.

12         If we can go back to the time line on Page 5 -- on

13   Slide 5 here.

14         The next step, Your Honor, from today in our plan

15   process is meetings that we have scheduled with the UCC, the

16   ad hoc committee, and other stakeholders that are currently

17   scheduled for early September in these cases.  Those initial

18   hands -- all-hands meetings, currently scheduled for

19   September 11th and 12th, are very important to permit the

20   sharing of positions, identify issues, and begin in earnest

21   the process of negotiating the plan of reorganization both

22   with the debtors and amongst stakeholders.  Your Honor, that

23   is the job of the debtors:  To lead those negotiations and to

24   build consensus around the plan.  And we believe we'll be

25   able to do that.

1          On Slide 7, we've shown here as detailed an

2    agenda.  We expect to have a comprehensive discussion over

3    these multi-day meetings on a wide range of topics with

4    stakeholders, some of whom have not been at the table until

5    recently.

6          If we can go back to the time line on Slide 5.

7          September, obviously, Your Honor, will be an

8    important month.

9          As noted, the deadline to file customer claims is

10   September 29th.

11         Mediation with the Bahamas JPLs is moving forward

12   and is expected to occur in September.

13         The rest of this time line includes an amended

14   plan and disclosure statement to be filed by the end of the

15   year, with a disclosure statement hearing in early 2024 and a

16   plan confirmation hearing no later than the second quarter of

17   2024.

18         THE COURT:  Mr. Glueckstein, I'm going to pause

19   you for a moment here.

20         Do we know what's going on with the Zoom here?

21      (Court and court personnel confer)

22         THE COURT:  Can we get these people off?

23      (Pause in proceedings)

24         THE COURT:  There we go.  And can you give me

25   hosting rights, too, please?  Thank you.

1          Okay.  I'm sorry, Mr. Glueckstein.  Go ahead.

2          MR. GLUECKSTEIN:  No problem, Your Honor.  Thank

3 you.

4          THE COURT:  I don't know if you could see it up

5 there, but we had someone put a white board up on the Zoom

6 call.

7          MR. GLUECKSTEIN:  I usually can, but only with the

8 slides, I actually can't this time.

9          But Your Honor, we remain on track for the

10 schedule that's depicted here on this slide.  And those dates

11 significantly, in our view, we have not needed to push them

12 back at all from what we unveiled in the case time line in

13 April.  We are, of course, always looking for ways to further

14 expedite matters, but we believe this time line remains

15 necessary and appropriate at this point.

16          The other last point I want to note on this time

17 line, which is noted here, that I want to briefly address is

18 the mediation of customer claims and other plan issues,

19 which, of course, is the subject of a motion filed by the

20 committee to compel immediate plan mediation.  That's not

21 before the Court today.  We obviously re -- the debtors

22 reserve their rights with respect to that motion.  But this

23 time line does reflect that, in our time line, we do

24 contemplate mediation occurring, likely in October, as

25 necessary.

1           And while the committee's motion is -- as I say,

2  is not being heard today, I must note that the debtors, of

3  course, are supportive of plan mediation as part of this

4  process, if necessary, but only after the issues are

5  crystalized and it is clear that the parties cannot resolve

6  them through a good faith negotiation without the assistance

7  of a mediator.  Premature mediation doesn't do anybody any

8  good and, in the debtors' view, only would waste resources

9  and is a recipe for failure.

10           The debtors, of course, have discussed, in

11  connection with this schedule and the upcoming meetings,

12  mediation with the UCC professionals and those representing

13  the ad hoc committee, as well as the class action plaintiffs

14  in these cases.  In fact, the debtors have made a proposal

15  for how to structure mediation in phases and are the ones who

16  proposed expanding the scope of Judge Fitzgerald's mandate to

17  address plan disputes beyond those involving only FTX Digital

18  Markets.

19           The committee's filing of the motion and recent

20  rhetoric is unfortunate, particularly given that the

21  committee's professionals have supported our time line until

22  last week.  The debtors have worked tirelessly to develop and

23  achieve consensus with the committee and all stakeholders

24  throughout these cases and will continue to do so.  The fact

25  is, at this point, the committee has not made any practical

1  proposal to move up this time line as depicted here on

2  Slide 5.  Although we, of course, remain open to discussions

3  if they have such suggestions.

4         In the meantime, the debtors look forward to

5  continued engagement with all stakeholders and providing the

6  Court a further update on the plan process at the next

7  omnibus hearing scheduled for September 13th.

8         Thank you, Your Honor.  That's all I have by way

9  of update.  I'm happy to answer any questions that the Court

10 may have.

11        THE COURT:  No questions at this time.

12        Mr. Hansen, do you want to have an opportunity to

13 respond.

14        MR. HANSEN:  I do, Your Honor.  Thank you.

15        Thank you, Your Honor.  Kris Hansen with Paul

16 Hastings on behalf of the Official Committee of Unsecured

17 Creditors.

18        Your Honor, first, the creditors' committee wants

19 the Court to understand that it does appreciate the efforts

20 of the debtors and their professionals to move the cases

21 forward to advance things like the schedules and bar date,

22 the plan termsheet, and the numerous other items that

23 Mr. Glueckstein just referred to.  There are many areas in

24 which the committee and the debtors have been collaborating,

25 especially at the professional level.

1        That said, Your Honor, I am compelled to respond

2   to a few things today:

3        First, there have been a number of unfounded

4   attacks by the debtors on the integrity of the committee

5   members themselves, and it's unfortunate.

6        The debtors have repeatedly made reference to

7   committee members conflicts of interest arising from their

8   status as market makers and the debtors have treated the

9   committee members with a misplaced mistrust since the

10  beginning of the cases, using, in our view, the poor excuses

11  of potential information leaks and self-interest to deprive

12  committee members of the access to information that they need

13  to carry out their fiduciary duties and help the debtors in

14  areas where they lack experience and the level of expertise

15  that the committee members themselves have.

16        The debtors, however, cannot point to an instance

17  of leaked confidential information by committee members or

18  any real self-interest in the actions of those members.  I

19  would urge the Court to ignore these attacks as a thinly

20  veiled attempt to divert the Court's attention from the fact

21  that the debtors are not truly engaging with the committee

22  members, as you asked them to do after the first exclusivity

23  extensions, and that the committee members need in order to

24  do their jobs.

25        I'd also ask the Court to ignore this new mantra

1  that we're hearing, that it is the ad hoc committee, not the

2  creditors' committee, that contains the real customers in

3  these cases.

4           As the Court knows, the official committee was

5  appointed by the United States Trustee as a statutory

6  representative for all unsecured creditors in the case.  The

7  goal was to have a diverse collection of parties that were

8  represented of the millions of different types of customers

9  and creditors of the debtors, and which is precisely what the

10  official committee has.

11          And while the committee, official committee,

12  appreciate the ad hoc committee's role in these cases, it's

13  important to note that the parties on the ad hoc committee,

14  who, in their latest 2019, hold almost half of their

15  aggregate claims, are investment funds who bought the

16  customer claims in the secondary market, not customers whose

17  assets were stolen by FTX.  To be sure, the committee does

18  include a number of members who were original customers and

19  who were victimized by the fraud.

20          It's important to also understand, Your Honor,

21  that the aggregate claims held by the ad hoc committee are in

22  the eight-hundred-and-fifty-million-dollar range, and the

23  claims held by the official committee members themselves are

24  around $700 million, contrary to the debtors' assertion that

25  the ad hoc committee holds a multiple of the claims of the

1  official committee members.  And it's not really important
2  anyway because the official committee has its statutory role.
3           It's also important to view the statements
4  regarding the ad hoc committee's import through a few
5  different lenses, Your Honor, one of which is -- and I'm sure
6  you'll see it soon to be filed -- an agreement between the
7  debtors and the ad hoc committee that has existed since late
8  April or early May, to seek reimbursement of the fees for the
9  professionals of the ad hoc committee, to the extent that
10 they engaged in good faith negotiations on a plan and held
11 their customer litigation in abeyance.
12          Moving to the cases themselves, Your Honor, they
13 are extremely expensive.  They've now moved to a pace of
14 almost $50 million a month in fees, with literally hundreds
15 of lawyers, financial advisers, and bankers working on them
16 practically full-time.  The debtors really have no revenue-
17 producing operations and only minimal investment returns, so
18 every dollar spent in the case is essentially a dollar that
19 creditors don't receive.  At approximately a million and a
20 half dollars a day in expenses, every day counts.
21          For its part, the committee has been doing its
22 job, despite the challenges in the relationship between its
23 members and the debtors.  In an effort to capitalize on the
24 debtors' vast digital currency holdings and to try to
25 generate some income to offset the fees of the case, as

1  Mr. Glueckstein pointed out, the committee members and

2  professionals put together a painstaking risk management plan

3  for the hedging and monetization of the debtors' coins, and

4  worked with the debtors and pushed them very hard to advance

5  that process.

6         The committee delivered that initial coin proposal

7  in April.  It's August and the debtors are now filing the

8  motion to undertake that process, unfortunately, right at the

9  point where the digital currency markets are seeing a broad

10  selloff.  And the adviser being selected by the debtors to

11  assist them in the process was vetted by and recommended to

12  the debtors by the committee members themselves over the

13  debtors' alternative choices, which we believe to have less

14  relevant experience and whose services would have been far

15  more expensive.

16         The committee also pushed the debtors to invest in

17  short-term Treasuries to obtain a higher interest rate than

18  it receives through its accounts at Western Alliance.  The

19  committee started this effort in March when the debtors were

20  receiving minimal interest on their cash.  The debtors

21  responded and renegotiated their banking arrangements, and

22  now disclose that they are receiving approximately four

23  percent interest on their investments, which is a gross

24  number, and it's certainly far better, but it is still a

25  point and a half less than the average yield on short-term

1   Treasury notes at this point in time and the committee still

2   hopes that the debtors can find a way to diversify their

3   investments and increase the yield on their large cash

4   holdings to try to offset fees in the case.

5           The committee also pushed the debtors to launch

6   the FTX 2.0 process and to move it quickly to avoid the fast-

7   moving efforts of other market participants like Coinbase and

8   Gemini to fill the void that was left by the collapse of

9   FTX.com.  While that process is underway, it has not moved as

10  quickly as the debtors or the committee prefer, and, to date,

11  the committee has been troubled by the nondisclosure to the

12  committee members of the names of the interested parties and

13  the details of the proposals that they have submitted.  While

14  we're working with the debtors to try to put more process

15  protections in place -- and mind you, Your Honor, process

16  protections that we don't believe are necessary than the

17  robust confidentiality protections in the committee bylaws,

18  to which the debtors are express third party beneficiaries,

19  we hope that the normal type of access provided to committee

20  members in most Chapter 11 cases will follow, so that the

21  committee members can directly participate in the process and

22  help create more value for the estate.

23          Again, Your Honor, I really have to stress that

24  this concern that the members of the committee might have

25  some self-interest in connection with that sale process is

1  not accurate at all and it should never be used to try to

2  prevent the committee members from being helpful in that

3  process.  We all have a common goal of trying to get the best

4  result.

5         The committee has also evaluated the debtors'

6  efforts to sell assets, and supported them at times and

7  pushed back at them at times where it believes that value was

8  left on the table or it was not the right time to sell.  For

9  example, as you know, Your Honor, the committee objected to

10 the Sequoia Heritage sale and we would up, through

11 negotiations, saving the estate approximately $1.35 million

12 in penalties on the sale and improving the net proceeds

13 thereof by about seven and a half percent.  It's a drop in

14 the bucket, but it was something.

15        Similarly, the committee did not believe that the

16 debtors should sell one of their crown jewel assets, which

17 was their investment in the AI company named Anthropic, and

18 the committee appreciates that the debtors agreed to

19 ultimately step back from that sales process in the wake of

20 additional investments in the market in Anthropic at higher

21 valuations, and the market's continued investment in its

22 primary competitor, OpenAI, the owner of ChatGPT at truly

23 dizzying valuations.

24        Here, importantly, Your Honor, is where a

25 fundamental difference in perspective between the committee

1    and the debtors arises.  The debtors have the view with

2    respect to their venture book that the customers never

3    consented to their deposits being used to acquire assets, and

4    so those assets should be monetized quickly and at the best

5    price available, even sometimes at below the purchase price

6    in order to create more cash to ultimately distribute to

7    creditors.

8          The creditors committee believes that we are where

9    we are and that assets have inherent value, whether people

10   originally wanted to invest in them or not, and that we're

11   looking at an estate that's comprised of those assets, and

12   that this case is ultimately about driving up the ultimate

13   creditor recoveries such that, if an asset is worth more if

14   it is held for a longer duration, it should be.  Anthropic,

15   again, is a good example.  FTX investment therein could be

16   worth a multiple of its original investment and lead to

17   better creditor recoveries over time.

18         The IEX transaction is another good example, and a

19   good example of committee and debtor collaboration where

20   their combined efforts led to a better negotiated outcome

21   than IEX initially wanted.

22         The committee has also worked with the debtors in

23   connection with a number of actions that the debtors have

24   commenced seeking to grow the estate's value.  Specifically,

25   the committee has worked with the debtors collaboratively on

1 their investigation of prepetition professionals and banks,

2 serving multiple joint 2004 motions, joining the meet-and-

3 confers, and allowing the debtors to take the lead where

4 appropriate to avoid duplicative efforts and additional fees.

5 And the UCC has been lockstep with the debtors in their

6 attempt to deal with the Bahamian JPL's unfounded attempts to

7 wrest control of FTX.com property.  Indeed, until mid-July

8 and, depending upon the team, until today, the UCC advisers

9 have had a constructive dialogue with the debtors' litigation

10 team on the various investigations and causes of action

11 brought to date.

12          The committee also took, as you know, Your Honor,

13 the laboring oar in connection with the sealing of customer

14 information where it believes in the virtue of its position

15 and it's glad that the Court agreed.

16          To give you a little bit of a window into how the

17 committee operates, Your Honor, it meets each week and the

18 committee members and professionals review all open work

19 streams in the case; they make decisions collectively and

20 carefully about how to proceed on the venture assets, the

21 numerous litigation issues, the current 2.0 sale process, the

22 plan discussions and issues, the management of tokens, and

23 the investment of the debtors' cash, among others.  The

24 committee also has a number of subcommittees in place to deal

25 with certain of those larger issues, and they meet on an even

1  more frequent pace.

2          The committee professionals also participated in

3  plan discussions with the debtors and the ad hoc committee in

4  May, and in June and July, with the debtors.  But, as the

5  Court is aware, the committee members were not permitted by

6  the debtors to take part in those discussions, nor were any

7  negotiations had at a principal level, even though I

8  personally asked the debtors repeatedly to do so during the

9  month of July.

10          The point there, Your Honor, was we believed that

11  we can't lose time.  We recognize that the debtors have a

12  timeline, I think that we all want that timeline to be

13  shortened because of how expensive these cases are, and our

14  view was, if the plan structure, which we believed was fairly

15  set at the beginning of July or towards the end of June, was

16  so set, we could bring in the actual committee members, they

17  could meet with the debtors' principals, and we could try to

18  advance what's now supposed to be happening in mid-September

19  into July and possibly through August.  However, at the

20  moment, as you heard from Mr. Glueckstein, the debtors have

21  scheduled kickoff meetings on the plan with principals for

22  September 11th and 12th, six weeks after filing the plan term

23  sheet and ten weeks after arriving at essentially the same

24  terms that are in the plan now, and having ignored our

25  requests to have in-person principal meetings to advance the

1  plan.

2         We also asked if there was the possibility to have

3  meetings towards the end of August or even Labor Day week

4  because, again, Your Honor, every day counts with the amount

5  of fee burn that we have in this case.  Our view is that the

6  debtors and every party in interest in this case simply have

7  to do better because the cost of waiting harms creditor

8  recoveries.

9         Our motion to mediate, which we'll hear at a

10  different time, Your Honor, I just wanted to give you a

11  little background, is a plea to speed things up.  While the

12  debtors cite endless other important tasks, and we agree

13  they're important, we don't believe that any of them are true

14  gating items to resolving the plan and advancing the process

15  where issues can be dealt with along the way to confirmation.

16         We're also fairly frustrated, from the committee

17  perspective, with one of the reasons that has been cited for

18  the delay, Your Honor.  One of the reasons is that the ad hoc

19  committee and the class action plaintiffs need more time to

20  get up to speed and that the debtors said that the timeline

21  was always longer.  Our view is that timelines don't need to

22  drive outcomes.  We all know the general rule of time

23  management.  If you say something will take a day, it takes a

24  day; if you say it will take six weeks, it will take six

25  weeks; unless you do everything you can to try to beat that

1  timeline.  And neither the ad hoc committee nor the class

2  plaintiffs are newcomers to these cases.  In fact, each filed

3  their adversary proceedings essentially at the inception of

4  these cases.

5       The ad hoc committee also participated in plan

6  negotiations in May, and the ad hoc council and certain of

7  its members have been under nondisclosure agreements with the

8  debtors for months, and the debtors have also had immensely-

9  populated virtual data rooms available for parties who are

10  subject to an NDA.  So the committee honestly doesn't

11  understand the need to delay to provide more information to

12  the ad hoc committees and the class action parties.

13       Returning to our mediation request, Your Honor,

14  from a status perspective, the reason we want a mediator

15  there is to help speed things up.  We believe Judge

16  Fitzgerald is very experienced and, even if not in a formal

17  mediation session, she should be at and participate in any of

18  the meetings that the parties have with each other so that,

19  if mediation actually needs to happen -- which we believe it

20  does, the debtors don't, you'll rule on that -- if that needs

21  to happen, Your Honor, there's no lead time, it's already

22  ready to go, and hopefully Judge Fitzgerald being there will

23  help the parties move things along more quickly.

24       In the end, Your Honor, the committee wants to see

25  the cases moved faster to conclusion.  We want to save money

1   and we want to increase creditor recoveries.  We believe that

2   all parties in interest want that.  And we want a

3   collaborative, transparent, and inclusive process between the

4   debtors and the committee members at the principal level.  It

5   is really not a hard ask and it is one that is the norm in

6   most cases.

7           Thank you for taking the time to hear the

8   committee's update, Your Honor.  I'm happy to answer any

9   questions, if you have any.

10          THE COURT:  None at this time.

11          Anyone else want to be heard?

12          MS. BRODERICK:  May it please the Court, Erin

13  Broderick of Eversheds Sutherland on behalf of the Ad Hoc

14  Committee of Non-U.S. Customers of FTX.com.

15          I'd like to begin with an acknowledgment of the

16  invaluable contributions that both the debtors and the

17  official committee have made to get us to where we are today.

18  The filing of the draft plan at the end of July did mark a

19  pivotal turning point in these cases into the plan

20  negotiation phase, and the work undertaken by both the

21  committee and the debtors to lay the foundation cannot be

22  overstated.  While there's certainly significant work left to

23  be done to get to a confirmable and, hopefully, consensual

24  plan by year-end, the ad hoc committee believes that we are

25  generally at the right starting place, with an initial plan

1 construct on the table and the appropriate stakeholders now

2 having a seat to negotiate.

3       The official committee has stressed that the

4 debtors should not pursue a unilateral plan approach, and we

5 wholeheartedly agree.  However, we also wholeheartedly agree

6 with the debtors that the draft plan presents anything but a

7 unilateral approach.  It is an initial construct, which,

8 notably, no stakeholder group, including the official

9 committee, has had opposition to.  The debtors purposely left

10 a number of key inputs open to invite stakeholder feedback

11 and they have expressly committed to amending the plan to

12 accommodate for the feedback that was received.  Indeed, the

13 plan term sheet listed a number of key open items to be

14 negotiated with stakeholder, including the official

15 committee, and that list includes each point of contention

16 raised by the official committee in opposition to the draft

17 plan.

18       In short, we think the debtors have made

19 abundantly clear that the draft plan is a start to an

20 evolving process and negotiations will continue.

21       Instead, the real issue seems to be that the

22 official committee does not trust the debtors to actually

23 take its input into account in an efficient and timely

24 manner, given the history of negotiations that have occurred

25 to date between the official committee and the debtors.  We

1  respect that the official committee has had a much more

2  involved and longer track record with the debtors than has

3  been afforded to the ad hoc committee to date.  We're really

4  not in a position to take sides with respect to what has

5  transpired in the past.  We can represent, however, that over

6  the last several weeks we have had very productive

7  discussions with both the debtors and the official committee

8  regarding open items in the draft plan, as well as predicates

9  to getting to a plan confirmation.

10          The official committee has every right to voice

11  its frustrations and demand improvements to the process going

12  forward, but we'd like to now move forward with the right

13  parties in the room and to proceed on a path of constructive

14  dialogue to narrow the issues in dispute with some

15  compromising creativity and all the necessary stakeholders

16  given an opportunity to participate.  Rather than have

17  discussions hijacked to force a premature resolution of what

18  are, respectfully, fairly limited issues of contention that

19  the official committee has raised with respect to the draft

20  plan.

21          We think it's really important to emphasize that

22  the ad hoc committee is a necessary party to these plan

23  negotiations.  We have over 40 members holding claims of

24  nearly 900 million against the debtors on account of the

25  misappropriation of customer assets from the FTX.com

1   exchange.  It's also worth noting that, prior to the Court's

2   redaction ruling we had over two billion in claims

3   represented by the ad hoc committee, and many forced to

4   resign for fear of disclosure.

5           Our members also represent a diverse cross-section

6   of the FTX.com customer base, from crypto industry pioneers

7   to novice investors, from those that have no Chapter 11

8   familiarity to large investment institutions with deep

9   restructuring expertise.  We speak for both small and large

10  claimholders.  While Mr. Hansen is correct that we have a

11  handful of secondary purchasers, all the rest are original

12  holders.  Our smallest holder has under a hundred thousand in

13  claims.

14          While each member of the official committee is an

15  FTX.com customer, they nonetheless have fiduciary duties to

16  all of the debtors' unsecured creditors, which obviously have

17  differing and conflicting interests in some respects.  As the

18  independent voice of FTX.com customers, we are driven

19  exclusively to maximize the value for FTX.com customers in

20  recognition of their unique legal rights.

21          We believe that the ad hoc committee and the

22  official committee are generally aligned.  However, as an

23  estate fiduciary, the official committee is simply unable to

24  advocate for the FTX.com customers on the key threshold legal

25  issue in these cases of whether the FTX.com exchange assets,

1 including the billions of identifiable value that was

2 misappropriated from the exchange, belong to the estates, or

3 whether the assets should be deemed held in trust for the

4 distribution only to FTX.com customers.

5           Indeed, despite its extremely active role in these

6 cases, the official committee has yet to address the elephant

7 in the room because it cannot do so on behalf of FTX.com

8 customers as an FTX.com fiduciary representing all general

9 unsecured creditors.

10          While there are a multitude of issues that must be

11 resolved to get to confirmation, we do believe there's also a

12 logical sequencing.  Specifically, it makes sense to us for

13 the Bahamian joint liquidators' jurisdictional claims to be

14 addressed first, the customer ownerships issues raised by the

15 ad hoc committee in the class action group to be resolved in

16 the context of a settlement under a plan, and then to tackle

17 the remaining items in dispute, including those raised by the

18 official committee.

19          I'd also like to note that as for the claim that

20 we should not wait for the input of other stakeholders,

21 including the ad hoc committee, because we've had months of

22 robust discussions and a mountain of information provided to

23 us, respectfully, the committee can't have it both ways.

24 They've complained about the lack of negotiations with the

25 debtors, they've complained about the lack of information

1  given, and the ad hoc committee has been given significantly

2  less than the official committee.  But, again, we want to

3  look forward to collaborating with all stakeholders and

4  ensuring that the plan negotiation process is fair,

5  transparent, and inclusive, and to move full-steam-ahead to

6  reach confirmation as soon as possible.

7         Thank you, Your Honor.

8         THE COURT:  Thank you.

9         Anyone else?

10     (No verbal response)

11         THE COURT:  All right.  Well, it's obvious that

12  there's some tension between the parties here, but it's

13  difficult for me sitting here, only seeing the surface of

14  issues, as to what's really going on behind the scenes.  I

15  don't understand the issue of the conflict that the debtors

16  believe some of the committee members have, I'm not sure I

17  understand the conflict -- I think I understand the conflict,

18  but I'd like more explanation of the conflict between the

19  committee's ability to raise issues about FTX.com and the

20  customer issue, whether the assets held that were in FTX.com

21  belong to the customers or they belong to the estate.

22         But I think there definitely needs to be a sharing

23  of information here.  We have NDAs in place, I assume, by

24  everybody; correct?  I mean, everybody are under an NDA,

25  there are consequences for violating an NDA.  So I expect,

1  unless the debtors can tell me why that certain information

2  is not being shared with the committee because of a concern

3  about a conflict of interest, I would need to know more about

4  that and understand why the debtor believes they can't share

5  that information.

6          On the question of -- and I understand there's a

7  huge burn rate here, I get that, it's a big case, a complex

8  case -- I would suspect that a lot of the burn rate at this

9  point has to do with the marshaling of assets and the

10  bringing of litigation against various parties.  I'm not sure

11  that the plan negotiations will lessen that burn rate and

12  there's still going to have to be litigation, there's still

13  going to have to be marshaling of assets.  Obviously,

14  everybody wants to see the plan go forward as quickly as

15  possible because that will help reduce the burn rate to some

16  extent, and to do that on a consensual basis, obviously, is

17  the best way to go instead of having to litigate those issues

18  and spend more money.

19          So, you know, the issue of the mediation is not in

20  front of me.  I understood from the debtors' response to

21  the -- maybe I'm wrong, correct me if I'm wrong -- the

22  debtors' response to the motion to mediate was that the

23  debtors aren't necessarily opposed to it, they just don't

24  think the timeline is right at this point.

25          MR. GLUECKSTEIN:  Your Honor, correct.  As I noted

1   in my remarks, as we -- and we did file a response in

2   response to the motion to shorten -- we embrace mediation,

3   the concept of mediation, Your Honor, you know, we certainly

4   agree.  The disagreement is simply one of timing, right?  The

5   committee filed what they have deemed to be an emergency

6   motion asking -- and in the order, the proposed order they

7   submitted to Your Honor in respect of that motion, they asked

8   for mediation sessions, you know, with a date to be filled in

9   in August.  You know, we're at the 23rd.

10          Our position has been that we want to have debtor-

11  led plan negotiations with stakeholders around the table to

12  crystalize the issues.  The committee has a good sense and

13  they've articulated their issues with the plan, other

14  stakeholders have had less of an opportunity to do so.  We

15  think issues need to be narrowed, and we think that will

16  facilitate a resolution and a consensual plan.

17          We are optimistic, Your Honor, that we will get to

18  a consensual plan in this case, that's my personal view, but

19  we need the opportunity to do that, and our position is just

20  simply that we need to have the opportunity over the course

21  of the next few weeks to have the meetings that are already

22  scheduled on the calendar, identify, discuss, narrow issues,

23  go through the agenda that I outlined on the slide that Mr.

24  Ray has put out to the parties, and allow us to function as

25  the debtor to try to get as far as we can on a plan.  Plan

1  mediation is an important tool and we -- as I said in my

2  earlier remarks, we suggested, given the fact these are all

3  plan-related issues, that Judge Fitzgerald expand her

4  mandate, the committee agreed with that suggestion.

5         So this is simply an issue at this point, Your

6  Honor, as to whether the Court should order mediation

7  immediately versus the parties moving to mediation after a

8  short negotiation period over the next four to six weeks.

9  That's all we're talking about here and I don't think

10  anything Mr. Hansen said this afternoon differs from that.

11         And so, from the debtors' perspective, all we're

12  asking to do is to continue with the process we're on.  We

13  are making progress and despite some of these issues -- and

14  I'll address the information in a moment, Your Honor, based

15  on Your Honor's comments -- we are making significant

16  progress, despite there being a little bit of airing of the

17  grievances here this afternoon, we're making tremendous

18  progress in these cases, including, as Mr. Hansen

19  acknowledged, on the plan and on the framework plan we filed

20  at the end of July.  I understand the committee would like

21  the process to move faster, we all would like the process to

22  move faster, but we believe the correct process is in place.

23         So Your Honor is a hundred percent correct, the

24  only question presented by the motion and the briefing that's

25  already been put in, and more to come on the mediation

1  motion, is simply a question of whether we are going to

2  immediately commence plan mediation or whether we're going to

3  do it on the timeline that we set out after we've had an

4  opportunity to have discussions with the parties.

5            And if I could just -- I wanted to address Your

6  Honor's comments on the information, but --

7            THE COURT:  Yeah, what --

8            MR. GLUECKSTEIN:  -- if you wanted to address --

9            THE COURT:  -- is the debtor withholding

10  information from the committee?

11            MR. GLUECKSTEIN:  Your Honor, I'm happy to have

12  conversations, further conversations with Mr. Hansen.  The

13  only information that I think was the subject of the

14  discussion -- and he made -- he said in his comments today

15  the sale process for, you know, the fate of the FTX.com

16  exchange that is still in the relatively early phase has, as

17  I said earlier, there are significant interest from third

18  parties, there's information that's starting to come in on

19  that process to Perella and the other debtor advisers.

20            We have asked for an actual NDA to be signed in

21  connection with receipt of that information, and that process

22  is, if not -- I think is actually complete at this point, but

23  I could be mistaken; if not, it's very close, and then

24  information on that particular issue will be shared.  There

25  has certainly been no general withholding of information from

1  the committee of any kind, and I think Mr. Hansen alluded to

2  in his comments there's a data room that's available that has

3  mountains of information.  And after previous discussions

4  that we've had earlier in the case where we worked through a

5  number of issues with the committee, Mr. Ray directed, you

6  know, all kinds of documents that had been held on a

7  professionals basis to be available to the committee.

8           So I think what the comments today are on a very

9  narrow issue that I believe is actually resolved at this

10  point, but I don't want to speak for Mr. Hansen.  But,

11  certainly from the debtors' perspective, we are not

12  withholding information in any way.

13           THE COURT:  Mr. Hansen?

14           MR. HANSEN:  Thank you, Your Honor.  Again, Kris

15  Hansen with Paul Hastings on behalf of the official

16  committee.

17           In the main, Mr. Glueckstein is right as this is

18  on the dot.com exchange sale process.  So, to give the Court

19  a little bit of color, you know, the debtor went out with

20  kind of an RFP process to try to get proposals in with

21  respect to that asset and, you know, from the committee's

22  perspective, the identities of those parties, the terms of

23  their indications of interest, should be available for the

24  committee members' evaluation.  It's very hard to do your

25  fiduciary duty when you don't have access to that information

1  and only the professionals do, that's one.

2           So what we started to talk about with the debtors

3  was we said, well, our bylaws under which you released all of

4  this previously designated PEO information contained very

5  strict confidentiality provisions and they actually make the

6  debtors a third party beneficiary.  And, you know, the

7  debtors said, well, we want you to sign an NDA nonetheless.

8  And really the reason for the NDA, when you boil it all down,

9  is because they want to insert a no-contact provision in the

10  NDA, which essentially says, listen, you committee members

11  are not permitted to have direct contact with any party,

12  forget about 2.0, any party who demonstrates a written

13  indication of interest with respect to a material asset of

14  the estate, it's just not appropriate.

15           Our response was, how about we ask you if we can

16  speak with them?  If the bidder says yes, you guys can

17  chaperone, it's totally fine.  To date, the answer to that

18  has been no.

19           Beyond that, we also wanted to talk a little bit

20  about the process, right?  There is going to be a clearing of

21  an initial round of parties into a next round, ultimately,

22  hopefully, into a stalking horse, and then an auction

23  process.  In our experience and personally my own experience,

24  both representing debtors and creditors committees, as well

25  as lenders and ad hoc committees, we usually get access to

1  that process, to the parties in that process.  We have a

2  better fundamental understanding of how the decisions are

3  being made and we get to have input on those, especially from

4  a committee perspective, because it's important.  The

5  committee members, again, have a fiduciary duty; they also

6  have unique knowledge within the space.  The answer we got

7  there too was no.

8          And so we started to try to work on a protocol of

9  like let's try to describe how this might work and, candidly,

10  Mr. Dietderich and I said let's just tear that up.  If you

11  want us to sign a nondisclosure agreement, we'll try to get

12  the committee members to sign that.  Again, we don't think

13  it's necessary, but if that's the process you want, we'll do

14  it.  We've got to get the information flowing and then to

15  take it step by step.

16          Obviously, our concern is because the initial

17  answers were no -- and, mind you, we're not at that phase

18  yet, right?  We're not at the phase of selecting a stalking

19  horse, we're not at the phase of basically talking and

20  figuring out who's clearing from first round to second round,

21  but that's going to come up and it's really important for the

22  committee members themselves to participate in that.  That's

23  one example, but, again, it's not just with respect to 2.0,

24  this no-contact provision is far broader than that, it's any

25  indication of interest by a party with respect to a material

1  asset of the debtors, regardless of what that is.  And,

2  again, the understanding there is let's try to work that out.

3          And, you know, when we inquired as to like what is

4  the heightened concern here -- you have the standard concerns

5  which exist in every situation, which are bid chilling and,

6  you know, it's the debtors' process that they need to

7  control, but, obviously, the committee has a duty, so there's

8  always a natural tension, but we were getting a pretty heavy

9  undertone of maybe you have a self-interest in the process.

10 You have market makers -- the debtors' statements that you

11 have market makers on your committee.  I guess that that was

12 a statement to say the market makers are going to try to talk

13 to the parties bidding in 2.0 to see if they can be a market

14 maker on their exchange in the future if they're successful.

15 That's not going to happen.  The members of this committee

16 have a job to do as committee members; they understand that,

17 they recognize what they have to do.

18          And so we think that all of these, you know,

19 basically guardrails that are trying to be put up to

20 basically say what the committee can and cannot do are

21 unfair, they make it hard for us to be able to do our

22 fiduciary duty because, again, we're just professionals, we

23 have to take our guidance from our members, and it just -- it

24 creates a very complex situation, Judge.

25          And there have been some other instances where we

1  have said can we share this with the committee members?  The

2  initial reaction was, no, we worked really hard to get

3  through that and we have gotten it further along.  You know,

4  you'll see a motion from the debtors -- I don't want to say

5  any names, but with respect to coin management and who

6  they've selected.  Sure, I assume, at appropriate times, on a

7  public basis without sharing any private information, I think

8  our members would like to have access to those parties to be

9  able to ensure that they understand what the committee

10  members' views are because they are in that world, right?

11  And the collective professional set here really isn't in that

12  world.

13          So that's that.  I just wanted to address quickly,

14  you know, the conflict that Ms. Broderick brought up, we

15  don't see that at all.  We don't believe that the official

16  committee has any conflict of interest in analyzing and

17  making recommendations with respect to essentially, you know,

18  how you split up the plan proceeds between dot.com customers,

19  U.S. customers, other parties.  I mean, it's -- the debtors

20  and we have been hard at work on those issues constantly.

21  And, candidly, you know, Ms. Broderick said we have yet to

22  make any recommendations, I mean, we have and we've been in

23  dialogue with the debtors.  It's one of our big issues that

24  we think that we can get through pretty quickly and that we

25  can advance the plan.

1            So, you know, that's a flavor, Your Honor.  I know

2    we're digging pretty deep here today, but I wanted to make

3    sure you had a flavor for what's going on.

4            THE COURT:  Where are the committee members on the

5    idea of signing an additional NDA?

6            MR. HANSEN:  We, as professionals, have worked

7    hard with the debtors' professionals to try to negotiate an

8    acceptable form.  We don't love this no-contact provision

9    that's in it.  I think we've recommended to the committee

10   members that they should go ahead and sign it just so that we

11   get it behind us.  If this is really, really critically

12   important to the debtors, our view is, well, let's clear that

13   issue and let's get to the real meat here, which is get us

14   the bidder names, get us the terms of the bids, and then

15   let's talk about what happens in round two.  You know, if --

16   like, for example, one of the protocol provisions was you

17   don't get access to any of the bidders until we pick a

18   stalking horse and we're about to pick a stalking horse, and

19   then you get, basically, to submit questions in advance and

20   then you can have like one call with that stalking horse so

21   they answer those questions in advance.  I mean, it's not an

22   earnings call.  It's a fluid process; this is what our

23   clients have to do.

24           And so our view was, I'm not going to agree to

25   that, but let's all step back, try to build trust and

1  confidence with each other, and see how this process goes.

2  And what we said to the debtors, and they understand this,

3  is, if as we start to move through this process we're not

4  getting the access, we'll either go to the mediator, if she's

5  available and as part of this process -- because, remember,

6  we asked in the motion to expand, if we need to, the

7  mediation help to the 2.0 process -- and then also, if we

8  have to, we'd come back before Your Honor.  It's going to

9  start moving fast at some point.  So of course, you know,

10 it's an imperfect thing to go to a mediator or come to a

11 court.

12          And the other thing I'd say on the mediation

13 front, Judge, I agree with Mr. Glueckstein, it's a question

14 of timing for us and our fear is just that, as everything

15 gets staged, the timeline drags out, you know.  We had

16 thought, honestly, that the disclosure statement was going to

17 be something that, at least in the timeline that was

18 announced before, that we would be doing that before the end

19 of the year, I saw in today's timeline that that's now a

20 January event.  You know, we recognize that, obviously,

21 there's a lot of notice that goes into a disclosure statement

22 like this, but we just had the customer bar date and before

23 that the non-customer bar date.  I think those processes

24 weren't perfect, it's not anybody's fault, you know, the

25 portal had some issues, but like those get fixed regularly,

1 that moved pretty quickly.  So we think there's no reason to

2 delay that.

3          But kind of coming back to the mediation point,

4 I've been involved in a lot of mediations, Your Honor.  Some

5 of them are very formal where the mediator wants to hear from

6 one side, they want to hear from another side, there's kind

7 of a shuttle diplomacy process that plays out.  I've also

8 been in plenty of more fluid mediations where the mediator

9 attends meetings between parties, listens to the parties as

10 they discuss issues, so that the mediator understands what

11 everybody's concerns are, and then the parties use that

12 mediator as a potential sounding board if they feel that they

13 are at kind of a position where they're stuck.

14          We do feel that we're a little bit stuck because,

15 again, we asked to meet with the debtors for the entirety of

16 July; at first, the requests were ignored and, at the end,

17 the debtors told us, I think it was probably two or three

18 days before they filed their plan, you know, we can meet on a

19 Saturday, if you'd like.  And I think our response to that

20 was we're not going to check that box, it's fine.  You can

21 file the plan term sheet and we'll try and talk right away,

22 but can we please meet in August.  Nothing happened for the

23 entirety of August, now we're having our first meetings in

24 mid-September.  It's not early September, it's the 11th and

25 12th, and we're flying people in from all over the world for

1   that.

2          So I think our quest on the side of the mediation

3   is, get Judge Fitzgerald up to speed on these plan issues,

4   let her attend these meetings.  I get it, we're at the end of

5   August now, it's hard to get anything on the calendar for

6   next week or the Labor Day week, it would have been great if

7   we could, but have her attend and have her be a part of the

8   process, so that she can learn and be there and so what we

9   don't have to do -- it's not that big of an additional

10  expense -- so what we don't have to do is wind up talking

11  amongst ourselves, potentially reaching an impasse, then

12  educating the mediator, writing position statements, setting

13  ourselves up for that shuttle diplomacy process that then

14  somehow otherwise delays the plan timeline.  That would be a

15  travesty with the amount of money that's being spent here.

16         And I agree with Your Honor, I don't mean to imply

17  that money is being spent on things that are not important,

18  it is, but it's not going to stop, and the only thing that we

19  feel that will really slow it down or end it, effectively, is

20  getting to confirmation more quickly and getting to the

21  effective date more quickly because then, when we get to the

22  post-reorg date, there's obviously a lot less of courtroom

23  issues, multitude of professionals, et cetera.

24         THE COURT:  Well, let me ask both parties about

25  the information issue.  Are you close to resolving that issue

1   or is that something that you need me to resolve, or is it

2   something that the mediator could get involved in and

3   resolve?  Mr. Glueckstein?

4           MR. HANSEN:  Well, Your Honor, I would say, before

5   Mr. Glueckstein speaks, I think we're close.  I mean, I sent

6   over a couple of comments to the debtor last night on the

7   NDA, they were noncontroversial, I think they're going to be

8   okay with them, and we would recommend that our members sign

9   them.  And the debtors have already committed to them giving

10  the members the information at the initial stage, it's really

11  what comes next.  And I think, to be honest, Judge, we're

12  going to try not to bother you.  I think we've all committed

13  to work with each other to try to get through that process.

14  It's just that I wanted you to have a flavor for that

15  protocol because, if we do run into a situation which is, no,

16  you can't talk to a bidder, period, not even with us being

17  around, we don't think that's appropriate, and so we're going

18  to be right back in front of you or the mediator.

19          So my request would be let us see if we can work

20  it out.  Understand, now you have a bit more of a flavor for

21  what we think we're going to face, and I hope we don't face

22  it.

23          But, Mr. Glueckstein, I'm sorry.

24          THE COURT:  Let me ask one more question, though,

25  Mr. Hansen.  Is this -- this is not information that you

1  think you need to have for the plan negotiation process, is

2  that right, or is it -- or is it?

3           MR. HANSEN:  No, Your Honor, on the plan

4  negotiation process, I think we're good.  Like we, from a

5  creditors committee perspective, are kind of like in violent

6  agreement on a lot of what's in the plan with the debtors.

7  We worked very hard together on that.  There's a few issues

8  that are -- we've highlighted them in our pleading, you know,

9  one is this split between customers and non-customers, let's

10  just call it that -- it's more complex than that, but we'll

11  call it that -- the other one is the use of a recovery right

12  to token or some kind type of tokenized distribution in

13  connection with the plan, and then the other one is post-

14  reorganization governance, which everybody wants to put at

15  the end of the timeline, but it's an important issue for

16  everyone and that's, you know, who comprises a board of

17  directors, who's the actual liquidating trustee, you know,

18  who's in charge of the venture book, you know, the coins that

19  are left over, things like that, the litigation.  That's a

20  pretty integral part of the process.  We have our views; we

21  don't want to air them here, it's not appropriate, we should

22  talk about them with the debtors, but those are the main

23  issues that we had, Your Honor.

24           So, no, I think from an information perspective we

25  have what we need at a committee member level for the plan.

1  The dot.com exchange sale process, it plays into the plan,

2  it's another key asset, and participating in that process on

3  behalf of committee members independently is important for

4  them to be able to carry out their fiduciary duty, but it's

5  also important for them so that they can really, candidly,

6  talk to bidders and understand their view of what a post-

7  reorg exchange looks like, so that they can understand better

8  these issues about recovery tokens and other things.  So they

9  do overlap with it as well.

10           THE COURT:  Okay.  So I'm happy to give the

11  parties then the opportunity to work out the issues on the

12  information-sharing side, so then the only really -- and it's

13  not before me today -- is the mediation of the plan and

14  whether to get Judge Fitzgerald involved now or to wait to

15  see if the parties can work things out.

16           I'm not prejudging anything at this point, but I

17  see a couple of problems with getting Judge Fitzgerald

18  involved now.  One, is it really an official mediation and,

19  if it's not an official mediation, is it covered by the

20  mediation privilege that would be governed by our local

21  rules?  That would be one concern that I have.  And, two, if

22  the parties can work it out on their own, I would rather see

23  that happen than get Judge Fitzgerald involved now, as

24  opposed to maybe, you know, a month from now.

25           But we'll deal with that when we get to the

1 motion, your motion to speed up the mediation process, but

2 those are kind of my initial thoughts to think about as we

3 get to that point.

4          MR. HANSEN:  I appreciate that, Your Honor.

5          THE COURT:  Okay.

6          MR. GLUECKSTEIN:  Your Honor, I don't want to

7 belabor it -- Brian Glueckstein for the debtors -- but just

8 to be clear -- and I understand, you know, Mr. Hansen wanted

9 to give the Court a flavor of this and, you know, this is

10 taking place, obviously, on the record, as we understand it,

11 the NDA on the exchange sale process, despite the back and

12 forth and negotiations that happened, is complete, and so the

13 information will proceed to be shared.

14          This issue, we did ask for a formal NDA with

15 respect to this process.  It's highly sensitive sale

16 information, we have been relying on the bylaws for other

17 issues, and these are -- the committee members, I have no

18 doubt, are discharging their fiduciary duties, but they are

19 unrestricted cryptocurrency traders, that is a fact.  They

20 have not agreed to restrict themselves for purposes of

21 trading, and so an NDA that has appropriate use restrictions

22 and the like we thought was critical before people are

23 talking to prospective buyers of assets, customer lists, et

24 cetera.  So we asked for that.  We've obviously had a

25 disagreement, as Your Honor has now heard this afternoon,

1  over the contents of that, I believe that's resolved.

2         So I don't believe that this issue will continue

3  to be one.  Obviously, to the extent we are unable to resolve

4  these issues, the committee, I have no doubt, will come back

5  to Your Honor, but I believe that Your Honor's involvement or

6  a mediator's involvement in the information-sharing issues

7  will not be necessary.

8         THE COURT:  Okay.  Thank you.

9         All right.  So, with that, let's move on to the

10 second agenda item for today.

11        MR. GLUECKSTEIN:  Thank you, Your Honor.  So

12 moving to the --

13        MS. SARKESSIAN:  I'm sorry, Your Honor, would it

14 be possible --

15        THE COURT:  Oh, Ms. Sarkessian, yes.

16        MS. SARKESSIAN:  -- would it be possible to take a

17 five-minute break?  I'm sorry to request it.

18        THE COURT:  Sure, no problem.  We'll take a --

19 let's take a ten-minute recess.  We'll reconvene at 2:15.

20        MS. SARKESSIAN:  Thank you, Your Honor.

21     (Recess taken at 2:03 p.m.)

22     (Proceedings resumed at 2:16 p.m.)

23        THE COURT:  Thank you, everyone.  Please be

24 seated.

25        All right, Mr. Glueckstein, go ahead.

1          MR. GLUECKSTEIN:  Thank you, Your Honor.  Again,

2   for the record, Brian Glueckstein, Sullivan & Cromwell, for

3   the debtors.

4          The only other matter on today's agenda is Item 16

5   on the agenda, which is the debtors' motion for an order

6   authorizing and approving procedures for settling claims and

7   causes of action.

8          Before I get into the motion, Your Honor, the

9   debtors did file a declaration of Edward Mosley at Docket

10  Number 2215-1.  It was Exhibit A to the reply papers we filed

11  over the weekend.  And Mr. Mosley is here in the courtroom

12  today and available for cross-examination.  I would like to

13  request that Mr. Mosley's declaration be admitted into

14  evidence.

15         THE COURT:  Is there any objection?

16      (No verbal response)

17         THE COURT:  It's admitted without objection.

18      (Declaration of Edward Mosley received in evidence)

19         THE COURT:  Anyone wish to cross Mr. Mosley?

20         MS. SARKESSIAN:  Your Honor, Juliet Sarkessian for

21  the U.S. Trustee.  No, we do not have any cross-examination.

22         THE COURT:  Thank you.

23         MR. GLUECKSTEIN:  Your Honor, the debtors through

24  this motion are seeking an order approving and establishing

25  omnibus settlement procedures which would permit the debtors

1  to resolve the large volume of smaller claims, primarily the

2  debtors' avoidance claims in the requisite settlement

3  amounts, but any claims are eligible, and this would allow

4  the debtors to resolve this high volume of claims quickly,

5  efficiently, cost-effectively, up to the settlement value

6  cap.  The alternative, Your Honor, is the need to prepare and

7  file individual motions, pursuant to Rule 9019(a), send

8  notice to creditors, seek approval from this Court for each

9  and every settlement, irrespective of the size of the

10  settlement and the value being returned to the estates.

11        These procedures reflect discussion and input from

12  the creditors committee and the ad hoc committee, who we

13  consulted with prior to filing this motion.

14        As Mr. Mosley states in his declaration, the

15  debtors expect the total number of avoidance claims,

16  including preferences, the recovery of asset transfers, and

17  political and charitable donations, to ultimately number in

18  the thousands.  This is not surprising given the facts and

19  circumstances of these Chapter 11 cases.

20        Mr. Mosley states his view that the administration

21  of the debtors' estates will be facilitated and value-

22  maximized if these settlement procedures are implemented.

23  The only objection to the motion was the one filed by the

24  U.S. Trustee, which we submit should be overruled.

25        Bankruptcy Rule 9019(b) expressly provides that

1  the Court may authorize the debtor to settle classes of

2  claims without a further hearing or notice.  Furthermore,

3  Rule 2002(a)(3), as Your Honor knows, expressly grants the

4  Court discretion to waive any notice of a hearing on approval

5  of a settlement.  The U.S. Trustee ignores the clear

6  authority for the Court to grant this relief that's present

7  in the rules.

8           The U.S. Trustee also ignores in its objection

9  that these types of orders are often granted when case

10  circumstances warrant them, even up to substantial settlement

11  values in appropriate circumstances, and we cite some

12  examples in our papers of cases where limits of settlement

13  value go into the multiple millions of dollars.  And, Your

14  Honor, that makes sense.

15          Here, the debtors have proposed procedures that

16  permit settlements without individual settlement motions only

17  after notice to the official committee and the ad hoc

18  committee of creditors.  Each will have the opportunity to

19  independently ask questions and test the proposed settlements

20  before the debtors proceed with any settlement.  We've

21  agreed, after discussions with the official committee, which

22  is actually somewhat unusual in these procedures adopted by

23  courts in this district, that we will provide notice for

24  every settlement, regardless of how small.  There's no

25  ability for the debtors to settle claims completely on its

1  own.

2           So the idea that we would take a claim that has

3  substantial value and sell it for some low amount and nobody

4  would ever know about it, besides that being a breach of our

5  fiduciary duties, which would never happen, is not possible

6  here.  Every settlement will be noticed to the committee and

7  to the ad hoc committee, and only if they don't have any

8  concerns will we be able to proceed without the

9  administrative expense and burden of noticing all of the

10 creditors and filing an individualized motion under Rule

11 9019(a).

12          These procedures provide an opportunity for the

13 debtors to significantly streamline what would be

14 uncontroversial settlements and bring that value quickly into

15 the estates.  We did carefully review the U.S. Trustee's

16 concerns and after doing so, the debtors determined to make

17 certain modifications that are reflected in the revised

18 settlement procedures contained in the revised order filed at

19 Docket 2215-2, that was filed in connection with the debtors'

20 reply papers.

21          Your Honor, those changes include reducing the cap

22 on the settled value of claims qualifying under these

23 procedures to a maximum of $7 million, adding the U.S.

24 Trustee as a noticed party, with the expectation that the

25 U.S. Trustee will only interpose objections going forward

1    based on merits of the claims and not the notice issues that

2    are raised in the objection today, and specify that the

3    debtors will file for purposes of providing additional

4    transparency into what has been happening with respect to

5    settlements.  We will file monthly reports disclosing claim

6    counterparties and the amounts of settlements that were

7    consummated in the prior month, pursuant to the settlement

8    procedures.

9            Nonetheless, we understand the U.S. Trustee is

10   pursuing their objection, suggesting that no settlement

11   procedures of this order are appropriate without the need --

12   without notice being sent out to a broad set of creditors and

13   much more detailed disclosure on each individual claim that's

14   being settled.

15           We would submit, Your Honor, that that's not

16   required under the rules, and, certainly, under the facts and

17   circumstances of this case, we believe would vitiate the

18   utility for these procedures.  So, absent any questions from

19   the Court, I would happily cede the podium to Mr. Sasson.

20           MR. SASSON:  Good afternoon, Your Honor.  Gabriel

21   Sasson from Paul Hastings on behalf of the Committee.

22           I just rise to support the motion.  As

23   Mr. Glueckstein pointed out, we did negotiate and review the

24   motion and the procedures before they were filed.  We're

25   happy with the terms of the motion and the procedures as they

1  were filed and even happier with the revised version that the

2  debtors filed with the reply.

3       We think that the procedures will promote

4  efficiency, transparency, and minimize the costs in

5  connection with settling these matters.  And, with that,

6  again, just any questions or any further questions from Your

7  Honor, we would support the motion.

8       THE COURT:  Thank you, no questions.

9       Anyone else before I go to the trustee?

10     (No verbal response)

11       THE COURT:  Ms. Sarkessian?

12       MS. SARKESSIAN:  Good afternoon, Your Honor.

13  Juliet Sarkessian, on behalf of the U.S. Trustee.

14       Your Honor, the debtors' motion seeks to set up

15  procedures to settle claims held by the debtors' estates.

16  This does not apply to claims against the debtors.  So, these

17  are estate claims, but they're seeking to settle with no

18  notice to any parties, other than the Official Committee, the

19  Ad Hoc Committee, and now, at my request, they have added the

20  U.S. Trustee.

21       The proposed revisions have made some minor

22  improvements, but they have not addressed the main points of

23  the U.S. Trustee's objection.  The debtors do not cite to one

24  reported decision or even an unreported written opinion that

25  approved this type of procedure.  They have cited a number of

1   orders in this court, as well as other courts, where they say

2   the settlement procedures are like those proposed by the

3   debtor here, but looking at the ones from Delaware, the

4   procedures are not remotely similar to the ones the debtors

5   are proposing here and, in fact, support the notice and

6   objection procedures that the U.S. Trustee is requesting, if,

7   in fact, Your Honor does entertain allowing some type of

8   settlement procedures to go forward.  And I will provide more

9   detail on those cases shortly.

10          So, a big part of the U.S. Trustee's objection is

11  the definition of what kind of claims are going to be subject

12  to this process.  And there's a definition -- small estate

13  claims.  Those are the kinds of claims that they say will be

14  subject.  The definition of that in the motion -- and that

15  has not been changed as far as I can see in any of the

16  revised papers -- is "certain existing and future affirmative

17  litigation claims and causes of action of the debtor and

18  their estates that are relatively small value, compared to

19  the debtors' total asset base."

20          So what was not explained is what "relatively

21  small value, compared to the debtors' total asset base"

22  means.  What is the debtors' total asset base?  What's the

23  numbers the debtors are using for that?  That was not

24  disclosed.  What "relatively small" means was not disclosed.

25          Mr. Mosley's declaration describes the claims that

1   will be subject to this procedure as "smaller in size"

2   without saying as compared to what.

3            The motion also does not disclose how the value of

4   a claim will be calculated in order to determine if it's of

5   small value and who will be doing such calculation.

6            THE COURT:  It's those claims 7 million or less,

7   right?

8            MS. SARKESSIAN:  Well, see, Your Honor, that's the

9   thing.  It's not claims that are valued at 7 million or less.

10  The 7 million is how much is being paid in settlement.  So,

11  regardless of what the claim -- it could be a $100 million

12  claim, if it's being settled for $7 million or less, then

13  these procedures would apply to it.

14           But the motion says the claim also has to qualify

15  as a "small estate claim," but there's no information to

16  figure out how that -- what that determination -- what that

17  definition means.  So, really, what we're left with, Your

18  Honor, is saying some claim that the estate has, as long as

19  it's settled for 7 million or less, which is highly

20  problematic, because, again, it doesn't say what the claim is

21  valued at.  That's one problem.  We need to know what the

22  claim is valued at.  That's extremely important.  It's more

23  important, frankly, than how much is being paid to settle --

24  I shouldn't say "more important" -- those are two pieces that

25  are very, very important.

1          And, then, what that leads into is, you need to

2    know the ratio.  What is the ratio of the amount being paid

3    in settlement to what the claim is valued at?  And of course

4    if you have those two numbers, you can figure out the ratio

5    yourself.

6          THE COURT:  Well, who values the claim?  How are

7    you going to do that?  I mean a litigation claim, you can

8    have, you know, a pro se claimant who says, The debtors owe

9    me a hundred billion dollars and they settle it for a hundred

10   dollars.

11         MS. SARKESSIAN:  No, Your Honor.  These are not

12   claims against the estate; these are claims the estate holds.

13   This process/procedure is only for estate claims against

14   third parties.

15         THE COURT:  You're right.  You're right.  Correct.

16         MS. SARKESSIAN:  So the debtors should, I mean, if

17   they're going to settle a claim, one would hope they have

18   some idea what the value of the claim is that they're

19   settling.  So either they will have filed an adversary

20   proceeding, in which case, again, one would expect they would

21   have some dollar amount that they're seeking.  Certainly, if

22   it's an avoidance claim they would say, How much are they

23   seeking to avoid?

24         If it's not that kind of a claim, again, one would

25   hope with all of the professionals that the debtor has, that

1  before they're settling a claim, they have some estimate of

2  what the value of the claim is, otherwise, how can you settle

3  the claim if you don't know what the value is.

4         And, in fact, I mean, the motion doesn't even

5  indicate that they're going to disclose to the committees

6  what the value of the claim is; only what they're getting in

7  settlement for it.  Now, maybe the committee would come back

8  and say, Well, in order to evaluate these -- the settlement

9  value, we need to know how much the claim is, but that's

10  something that's going on behind closed doors, effectively.

11  It is not being -- it is very clear that nothing will be

12  filed on the record as to the value of the claims that are

13  being settled.

14         What they have -- what the debtors have proposed

15  now, in response to the U.S. Trustee's objection, is that

16  they would file something once a month on the record saying,

17  you know, we settled claims against these parties and for

18  each one, how much they received in settlement.  This would

19  be done after the fact, after the settlement is effectively

20  done and over with.  That doesn't give anybody an opportunity

21  to object if they have a problem with it.  It also doesn't

22  tell them what is the nature of the claim being settled and

23  what's the value of the claim being settled.  All I know

24  is --

25         THE COURT:  I thought the procedures did provide

1  for an opportunity for the noticed parties to object to the

2  settlement before it's actually consummated?

3          MS. SARKESSIAN:  Your Honor, that is only the

4  Committee, the Official Committee and Ad Hoc Committee.

5  Nobody else.

6          THE COURT:  And they've added you to it, as well?

7          MS. SARKESSIAN:  And they've added the U.S.

8  Trustee.

9          There are many other parties in interest in these

10  cases.

11          THE COURT:  Well, there's nine million.  Are they

12  going to give notice to nine million people every time they

13  want to settle a claim?

14          MS. SARKESSIAN:  No, Your Honor, but if it was

15  filed on the ECF, if it was filed on the court docket, then

16  that gives parties a notice.  Anybody who's getting an ECF

17  notice will receive notice.

18          THE COURT:  Individual claimants aren't going to

19  get an ECF notice.

20          MS. SARKESSIAN:  If they file 2002 requests they

21  are.

22          THE COURT:  Well, how many of the nine million

23  have done that?

24          MS. SARKESSIAN:  Your Honor, I don't know.

25  There's a fairly good number of parties that have filed for

1  2002 notice.  I don't know the exact number.

2            I would like to turn to the cases that --

3            THE COURT:  Would that even be adequate notice?

4  If there's five million people who have filed for ECF

5  notification, how many pleadings get filed in this case on a

6  daily basis?

7            MS. SARKESSIAN:  A lot.

8            THE COURT:  Yeah.

9            MS. SARKESSIAN:  And they're all getting ECF

10  notice of it.

11            Well, Your Honor, I mean, obviously, our position

12  is we don't think that FTX is the kind of case where there

13  should be any kind of truncated notice procedures for

14  settlements of estate claims.  And we're not talking, again,

15  claims against the estate, but estate claims; however, if

16  that is going to be approved, if Your Honor is considering

17  that, at the very least, there should be ECF notice.

18            And this is what's been done.  In the cases that

19  the debtors have cited coming from this Court, that is what's

20  been done.  And I would like Your Honor to take a moment to

21  go through those cases.  I did not pull the New York cases.

22  First of all, the debtors did not attach any of the orders

23  that they are citing to their papers.  They didn't even give

24  the docket numbers.

25            I went to the Delaware cases and I had someone

1  pull the orders.  One of them, building materials case, we

2  couldn't find because the date that was listed for the order

3  was actually a date that was prior to the case being filed.

4  But the other four from Delaware I will address.

5         One of them is one of Your Honor's cases, J&J

6  Sales.  This is an order relating to a motion by Chapter 7

7  Trustee Miller to settle avoidance actions.  I'm not

8  completely clear from the order, but it appears use of the

9  term "avoidance actions," presumably, these are actions that

10  would have been filed, so there would at least be some notice

11  as to what the nature of the claims are.

12         The first category, which would not require any

13  notice to anybody for the trustee to settle, are claims with

14  a value or gross transfers.  So that would be the equivalent

15  of the maximum value of the claims of less than $250,000.

16  That's not the amount being paid in settlement; that's the

17  value of the claim.

18         Then, once the value of the avoidance action goes

19  between $250,000 and $500,000, Your Honor's order required

20  the trustee to file a notice of settlement with the Court and

21  giving parties in interest 10 days to object.  If somebody

22  objected, they would come before Your Honor.  And then if the

23  gross transfer -- any gross transfer in excess of 500,000

24  would have -- would require a 9019 motion.

25         Similarly, in CR Holdings, also cited by the

1  debtors, an order from August 2019 by Judge Silverstein, this

2  was a motion by the debtor for settlement procedures.  It

3  allows settlements of avoidance actions with gross transfers;

4  again, so that would be the maximum value of 75,000 or less,

5  could be done without any further notice or approval of the

6  Court.  If it was between 75,000 and 250,000 of gross

7  transfers, it had to require -- they had to file the notice

8  and give parties in interest a 10-day opportunity to object.

9  If nobody objected, then it would automatically be approved.

10 And then if it's over 250,000, they had to file a 9019

11 motion.

12         And then we have Fresh & Easy.  With Fresh & Easy,

13 it was the Committee that was seeking to settle avoidance

14 actions.  This was an order of Judge Shannon, and there, if

15 the gross amount of the avoidance action was less than

16 $35,000 -- that's what a small claim is, $35,000 -- no

17 further Court approval was needed.  If it was between 35,000

18 and 200,000 -- again, not the settlement payment, but the

19 value of the claim -- in that case, they had to file the

20 notice of settlement procedures.  From the motion, I pulled

21 it.  It was similar to these other cases.  They had to file a

22 notice on the docket and give parties in interest 10 days to

23 object.  If it went over $200,000, they had to file a 9019

24 motion.

25         The last one from Delaware that they cited was FTD

1  Companies from 2019 by Judge Silverstein.  This order, it

2  stated to apply to both, causes of action -- claims against

3  the debtor, as well as causes of action brought by the

4  debtor, but all the wording of the order talks about allowed

5  and disallowed claims.  It talks about a claimant -- clearly

6  somebody other than the debtor, so I think it was really

7  meant to deal with claims against the debtor being settled.

8  But even if it applies both ways, again, you know, the

9  numbers, if a claim was 50,000 or less or 500,000 or less,

10 but the claim was being allowed at only 15 percent, then

11 there was no further requirement.  When you started to get

12 into larger numbers, then they had to serve the 2002 list

13 with the settlement notice to all parties in interest.  Not

14 some -- not just the committee, not just to my -- all parties

15 in interest had a right to object.  And they also specified

16 on the settlement notice what had to go in there.  So, it

17 included -- well, again, they talk about proof of claim,

18 because it seemed to apply mostly to claims against the

19 estate -- but what was the original, asserted amount of the

20 claim?  What's the proposed amount and priority of the

21 settlement?  So, you know, providing more information than

22 what's being proposed here.  And then, again, if it went

23 above a certain amount, they would have to file 9019 motions.

24          Which, by the way, I mean, the debtor can file

25 9019 motions.  They don't have to do a separate one for every

1  single settlement.  I mean, if you had multiple settlements

2  within a period of time, one could file a 9019 motion

3  covering multiple settlements, as long as they gave the

4  relevant information.  That is certainly something the

5  debtors could do here; however, again, because of the nature

6  of this case, and, you know, of course, we remember that this

7  a case that Mr. Ray said came in as a dumpster fire and there

8  are certainly issues.

9          I mean, the claims that the estate holds, not just

10  against the top insiders, but anyone -- professionals, other

11  employees that might have done something or not done

12  something they should have done that caused, in any way, the

13  dumpster fire that this case was -- if the debtor is settling

14  those claims, that should not be behind a firewall; that

15  should be public and not after the fact, after it's settled

16  and done and nobody can object to it, other than the

17  Committee and the Ad Hoc Committee.

18          As the debtors said when they were talking about

19  negotiating the plan, there's a lot of stakeholders in this

20  case.  It's not just the Committee and the Ad Hoc Committee.

21  And, especially when you're talking about numbers as big as a

22  settlement of 7 million and who knows how high the value of

23  the claim is, because that's not even going to be -- that

24  hasn't been disclosed in this motion.  We don't know what

25  that top number is, if there is any top number.

1    All we know is as long as the settlement amount is

2    7 million or less, nobody, other than the two committees is

3    going to know about it until after it's over and done and

4    nobody can object and that is, in this case, given the types

5    of claims the debtors have, that is -- the U.S. Trustee does

6    not believe that that is appropriate.  And it's, again, very

7    different than what we're seeing in the cases that the

8    debtors cited from this jurisdiction.  None of those say:

9    Hey, anything goes.  There's a certain point that they can --

10   again, these are small numbers that we're talking about

11   35,000, 50,000, 75,000 -- that's the value of the claim, not

12   how much is being paid in the settlement -- those are the

13   ones that can be settled without any further notice.  Once

14   you go above those, you have to file the notice.  You have to

15   give 10 days' objection and if nobody objects, it's

16   automatically approved.  It doesn't require Your Honor

17   necessarily to have to sign orders; it would be automatic.

18        But if somebody, you know, objects, then if it

19   cannot be resolved with the debtors and the Committee, then

20   it would be before Your Honor, which is how it should be.  I

21   mean, these are, potentially, very valuable claims of the

22   estate and parties have a right to know what the value of the

23   claim being settled and what the claim is about, especially

24   with respect to those that there's no adversary proceeding.

25        At least if you have an adversary proceeding

1 filed, one could look at the adversary proceeding and say,

2 Okay, I can see what's being asked and who it's against and

3 what the nature is.  But if they're settling claims before an

4 adversary is filed, which I understand is the intention -- it

5 would include those types of claims as well -- then there's

6 no information in the public record to tell whether the

7 settlement is a reasonable one or not.

8 　　　　　And, Your Honor, I would also like to briefly --

9 there are some exclusions that the debtors put in that would

10 not be covered by the settlement procedures and they -- but

11 it does not include every category that the U.S. Trustee

12 believes it should.  They do cover insiders, so that would

13 cover directors and officers.  The only problem with that is

14 sometimes there's a not complete agreement on what qualifies

15 as an officer.  And the most obvious example is vice

16 presidents.  Despite the Foothill decision from this Court

17 many years ago that says if you have an officer title,

18 including VP, you are an insider unless and until proven

19 otherwise.  Most debtors I've found take the position that

20 VPs are not officers.

21 　　　　　But apart from that, their employees,

22 potentially -- if debtors have claims against other employees

23 that do not have officer titles, they may be significant and

24 I think they are of interest.  I mean, we know that things

25 happened in this and we know that people, not only did things

1   they shouldn't have done, but some people did not do things

2   they should have done.  And so the U.S. Trustee believes that

3   all employees, all claims against employees should be

4   excepted out of the settlement procedure, regardless of what

5   the amount is, as well as, of course, directors and officers.

6   And, also, consultants should be added.  They say,

7   "professionals," you know, that includes consultants.  That's

8   wonderful, but it's not completely clear.

9          And by the way, Your Honor, the ratio element, I

10   think, is the most important when it comes to determining

11   whether settlement procedures are appropriate.  All of the

12   cases, you know, there hasn't been any decision that they

13   cited that's on point.  There's not, and I looked in the

14   Third Circuit.  There's not a lot of written decisions on

15   9019(b), however, the debtors cite to Colliers, paragraph

16   9019.03 for proposition.  But what they did not cite to is

17   where Colliers says that when seeking to settle numerous

18   preference actions, quote, The Court could enter into an

19   order authorizing the trustee to settle or compromise any

20   action without further hearing as long as the settlement or

21   compromise in that is not less than a certain percentage of

22   the recovery sought in the complaint, closed quote.  And I

23   think that's the key factor, and that factor was also

24   discussed in the case that we cited to, New Era Philanthropy,

25   which is an Eastern District of Pennsylvania case.

1            So, in sum, Your Honor, the U.S. Trustee believes

2   that the debtors do have options here, instead of these types

3   of truncated procedures like I mentioned, doing 9019 motions

4   that cover settlements of multiple claims.  But if Your Honor

5   is entertaining allowing some type of settlement procedures,

6   the U.S. Trustee believes that there has to be a limit on the

7   value of the claim being settled.  Not just what's being

8   paid, but the value of what's being settled.

9            And, you know, I think that it's up to the debtors

10  to provide that, but I don't believe it should be more than

11  $10 million.  Ten million dollars is a lot of money.

12           You know, with respect to the amount being paid in

13  settlement, I think that's less critical than the value of

14  the claim and the ratio between the value of the claim and

15  the amount being paid.  But, certainly, $7 million is a

16  pretty large amount; again, that's for the amount being paid.

17  But there has to be that ratio in there and I think at the

18  very least, the ratio of what is being paid to the value of

19  the claim, how the debtors value their claim should not be

20  less than 50 percent to be subject to these.  If it's less

21  than 50 percent, then they need to file a motion to explain

22  why they are accepting less than 50 percent.

23           In addition, the notice of the settlements should

24  be filed on the docket and ECF notice will go out in that

25  manner.  That is official notice.  Anyone who signed up for

1   ECF notice will get that notice.  I have no objection to the

2   notice being served on others, but that, I think, is the

3   minimum and it does not require a lot of work of the debtors

4   to file a notice and there should be an objection deadline.

5   That could be filed at the same time they give the

6   information to the Committee and the Ad Hoc Committee, there

7   should be the same objection deadline and it should also

8   include not just the name of the party they're settling with

9   and the amount being paid in settlement, which is what's

10  being proposed by the debtors, but also the value of the

11  claim and the nature of the claim.  What is it?  Is it an

12  avoidance claim?  Is it a breach of contract?  What's the

13  nature and what does the debtor value it at?  And the

14  exclusions should be as I just said, extended so that it

15  includes all employees and consultants, whether or not

16  they're insiders.

17          Now, Your Honor, unless Your Honor has any further

18  questions, that concludes my argument.

19          THE COURT:  Okay.  No questions.  Thank you.

20          MR. GLUECKSTEIN:  Your Honor, Brian Glueckstein,

21  again, for the debtors.

22          A few points in rebuttal.  The debtors made

23  certain changes to the procedures after carefully reviewing

24  the objections by the U.S. Trustee.  Ms. Sarkessian would

25  like to further redline the order, but her real statement was

1   telling and was revealed.  The Office of the United States

2   Trustee's view is that the facts of this case are such that

3   we should have these sorts of procedures, because it's FTX,

4   it's high-profile, there's a lot of parties in interest.

5        The fact that there's a lot of parties in interest

6   and there are a lot of claims, that the volume of claims is

7   massive in this case, screams out for these procedures.  We

8   spent significant time this afternoon in context with the

9   earlier colloquy, discussing the concerns of the creditors

10  about case burn and expenditure in these cases.  It makes no

11  sense, Your Honor, for us to need to come forward,

12  respectfully, with a motion for every single claim,

13  irrespective of value, given that we have thousands upon

14  thousands of potential preference claims that need to be

15  resolved in this case.

16       We have tried to strike the appropriate balance.

17  As I stated earlier, after constructive discussions with the

18  Official Committee, with respect to these procedures, we are

19  giving notice to the noticed parties of every single

20  settlement, irrespective, from first dollar.  If we're

21  settling with somebody for $5, they're getting notice of it.

22  We've eliminated, which all of -- many, if not all of the

23  orders that Ms. Sarkessian referred to, have a category of

24  claims where the debtors, in their business judgment, could

25  settle claims because it's simply not worth the

1  administrative cost.

2          The Committee is here.  They're seated.  The Ad

3  Hoc Committee is here.  And the U.S. Trustee is going to get

4  notice.  If the U.S. Trustee is concerned about a

5  particularized settlement or if the Committee is concerned

6  about the size of the claim versus the settlement, or the

7  ratio that Ms. Sarkessian was talking about, they could

8  have -- we could have those discussions.  And if there's a

9  *bona fide* dispute, they can file an objection and all that

10  does is then have us come forward with a 9019 motion if it

11  can't be resolved.

12          THE COURT:  What's the notice going to include?

13          MR. GLUECKSTEIN:  Your Honor, we did not legislate

14  in the procedures specific requirements because these

15  settlements are not one-size-fits-all, and we had this

16  discussion with the Committee.  We, obviously, are going to

17  have to provide information about the claim.

18          But as Your Honor correctly observed, not every

19  claim is -- this is not simply, we have, you know, a number,

20  necessarily.  We might with a preference claim.  We know the

21  amount.  Here's the amount of the preference.

22          But there are avoidance claims.  There are

23  fraudulent transfer claims.  There are claims that are

24  unliquidated claims.  And, certainly, we have a view, will

25  have a view, as the debtor, of value of claims, but they're

1  going to be --

2          THE COURT:  Will that be included in the notice?

3          MR. GLUECKSTEIN:  I expect it will be.  I expect

4  the Committee is going to ask about what the claim is and

5  what it's worth.  I'm reluctant to just say it will be in

6  the, quote, notice, that we give to them every time, because,

7  again, I don't believe this is one-size-fits-all.

8          And I don't believe this idea of the ratio, as it

9  was being described, of what the claim upside value would be,

10  because again, a litigation claim, you know, you have views

11  of claims, what claims might be worth.  You risk-discount it.

12  You think about what a claim is worth, and then you enter

13  into, potentially, a settlement.

14          This idea of the ratio, I respectfully disagree

15  with Ms. Sarkessian, it's not -- this is not the defining

16  factor here.  If we bring forward a 9019 motion, the question

17  is going to be whether it's a reasonable settlement within

18  the range of reasonableness within the debtors' business

19  judgment.

20          And so if the factors of a particularized claim,

21  in our judgment, are appropriate to settle, that's the size

22  of the claim is appropriate.  And, again, the fact that we're

23  giving notice to the committees, and now to the U.S. Trustee,

24  of every single settlement is going to allow those questions

25  to be diligenced.  Some of these -- a lot of these

1  settlements we believe are not going to be, not only not

2  controversial, but they're not going to warrant significant

3  time.  We have people reaching out to us all the time that

4  received political donations, charitable contributions.  They

5  want to return funds.  They might not have all of the funds

6  that were donated or conveyed.  We explore those

7  circumstances.  We want to talk about a settlement.

8          It doesn't -- it's just not sensible to have to

9  come forward with a motion or a detailed notice at the outset

10  of the process.  We then have to serve those parties.

11          THE COURT:  Well, I don't think she's saying you

12  have to do a motion.  I think what she's saying is in the

13  notice that you send -- and she wants it sent -- put on the

14  docket so the ECF notice goes out to anybody who signed up

15  for ECF notice -- but the notice that you send out says the

16  debtors are settling this claim, whatever it is -- preference

17  claim, adversary proceeding, whatever it might be -- we

18  valued the claim at X amount and we've decided to settle it

19  for Y amount.

20          And then if there's no objection to that, then

21  it's automatically approved.  You don't need to come to me.

22  You don't have to file a motion.  You just put a notice on

23  the docket.  This goes out.  If nobody objects, it's going to

24  be entered.  I think that's what she's asking for, which

25  isn't unreasonable.

1         MR. GLUECKSTEIN:  Your Honor, if we -- well, I

2  mean --

3         THE COURT:  You're going to send the notice

4  anyway.  You're going to prepare the notice anyway, so you've

5  got to send the notice to the Committee, the Ad Hoc

6  Committee, the U.S. Trustee.  You just file the same notice

7  on the docket to give ECF notice.

8         MR. GLUECKSTEIN:  Certainly, there's costs

9  associated with the need to serve that notice to the 2002 --

10 the Rule 2002 list of everybody who, you know, who's asked

11 for notice to be served.  So, like --

12        THE COURT:  I don't think she's saying that.

13 She's saying only those who have asked for ECF notice.

14        MR. GLUECKSTEIN:  Well, I mean, I suppose if

15 that's Your Honor's preference, we could do that.  We would

16 need, you know, a waiver of the service requirement to just

17 file it on the docket in that regard.

18        You know, look, there's circumstances where I

19 could see that leading to, you know, in some circumstances,

20 potentially more questions than answers.  Again, the

21 Committee is here and is going to have access to the

22 underlying information to evaluate these settlements.  And

23 this question of whether or not this is a, quote, small

24 claim, on the facts of this case, Mr. Mosley received that it

25 was.  Mr. Mosley has numbers of why this is small compared to

1  the claims.  Obviously, Ms. Sarkessian chose not to cross-

2  examine him, so his testimony is unrefuted.

3         THE COURT:  I don't have any doubt that in the

4  context of this case, you know, a $7 million settlement is a

5  small settlement, but you have to have some understanding of

6  what you believe the claim is worth before you settle, right?

7  I mean, you're not going to settle something unless you say,

8  well, we pegged it at this amount, so we're going to settle

9  it at something for less than that, or we're going to settle

10 for that amount because we think we have a really strong

11 case.

12        So, you got that -- I mean, the idea that you

13 would have to include what the case -- what the debtor

14 believed the value of the claim was and then what the debtor

15 is settling the claim for doesn't seem to be much of a

16 stretch or much work, because you're going to do that anyway.

17        MR. GLUECKSTEIN:  That's correct, Your Honor,

18 although, I can certainly see circumstances where there's

19 some claims where, you know, the debtor is saying, We think

20 this claim is worth X.  In a lot of these cases, it's not

21 going to be -- you know, potentially, with unliquidated

22 litigation claims, you know, it's going to be a range of

23 outcomes, right, if you pursue litigation.  As Your Honor

24 knows, right, of course, we have a claim, we believe it's a

25 *bona fide* claim.  If we win on these five arguments, it might

1  be worth X.  If -- it could be worth a lot less than X and we

2  have to make a judgment, right, as to what an appropriate

3  settlement is.

4         THE COURT:  I mean, the debtor can -- the all

5  you've got to do is say we don't -- the debtor believes the

6  claim was worth no more than X and we're settling it for Y.

7         MR. GLUECKSTEIN:  Certainly, Your Honor.  If Your

8  Honor's preference is to proceed that way, we can certainly

9  include that part of the process.

10        THE COURT:  I think it makes sense.

11        MR. GLUECKSTEIN:  That's fine.

12        THE COURT:  That makes sense.

13        And Ms. Sarkessian, let me just make sure I

14 understand your position.  Am I correct that you're not

15 asking that the 2002 list receive notice; you're saying, Just

16 put it on the docket so that those who receive ECF notice,

17 receive the ECF notice.

18        MS. SARKESSIAN:  Well, Your Honor, it's my

19 understanding that as for anybody who is getting ECF notices

20 is signed up for that, I think that is official service under

21 the Local Rules.

22        THE COURT:  Right.

23        MS. SARKESSIAN:  So I don't object to that, you

24 know, being the service.  I understand there might, I guess,

25 potentially, be people on the 2002 list that are not signed

1   up to get ECF notice.  I don't know if that's the case.  I

2   would imagine if that is the case, it's pretty minimal.

3          Would I prefer them to be served, as well?  Yes,

4   of course, I would, but if we're trying to compromise, then I

5   think that's a fair compromise.

6          THE COURT:  Well, you know, I think we're trying

7   to give fair notice, but also limit the expense here.  So I

8   don't want the debtors to have to send out tens of thousands

9   of notices every time they settle a claim for a hundred

10  dollars.

11         MS. SARKESSIAN:  Understood, Your Honor.

12         THE COURT:  So, I think the order should include

13  that ECF notice is sufficient and waive any notice to parties

14  who have not signed up to ECF notice.

15         MS. SARKESSIAN:  Understood, Your Honor.

16         MR. GLUECKSTEIN:  Your Honor, just to address,

17  briefly, a couple of other points with respect to the scope

18  of the order, we do have language in paragraph 3 that was

19  further clarified.  It made clear the types of claims that

20  are excluded from this and that would not be eligible to

21  these settlement procedures.  It would certainly include

22  claims against insiders, claims against professionals, or any

23  post-petition claim of any kind.

24         You know, Ms. Sarkessian is continuing to ask for

25  all employees.  We do think that hampers the process,

1  particularly now if we're going to be filing this notice.  If

2  there are employees, for example, who have smaller preference

3  claims or the like, I don't see why a general non-officer,

4  non-insider should be ineligible to be part of this process

5  through the procedures that have been outlined.

6          So we think the scope of the order, as revised, is

7  appropriate.

8          THE COURT:  The debtors didn't have that many

9  employees, did they?

10          MR. GLUECKSTEIN:  This is certainly not a company

11  where we had thousands of employees.  I mean, there were --

12  you know, there were a few hundred employees at the time of

13  the petition date and so there are, you know, there are some

14  employees.  But this is a situation where much of the

15  compensation that was provided to, even, employees, was in

16  the form of cryptocurrency and was held on the exchange.  So

17  the fact that employees have claims against the debtor, the

18  fact that an employee might have withdrawn a cryptocurrency

19  within a preference period, for example, so there are claims

20  that, you know, are not Mr. Bankman-Fried and officers and

21  claims that we don't feel need to be treated any differently

22  just because somebody was an employee of the company if they

23  don't meet the standard of being an insider or an officer.

24  And, certainly, if -- you know, these are the types of

25  discussions that I'm sure we will have with the Committee,

1  the Ad Hoc Committee, to the extent there are any questions

2  about any individual.

3          THE COURT:  Okay.  Well, let me ask this question,

4  I have to figure out how to phrase this -- never mind.  Never

5  mind.

6          Given the small number of employees -- oh, here is

7  what I was going to ask.  Ms. Sarkessian, is it the U.S.

8  Trustee's position that there is some number below which no

9  notice would be necessary to settle a claim, as some of the

10 ones that you pointed out in the cases that you cited to me?

11         MS. SARKESSIAN:  Yes, Your Honor.  I mean, if

12 we're talking about, again, a number that's the value of the

13 claim -- not how much is being paid in the settlement, but

14 the value of the claim -- you know, I mean, in the other

15 cases I was looking at, the numbers were, you know, 35,000,

16 50,000.  So, you know, maybe 50,000 and below -- the value of

17 the claim, not how much is being paid in settlement, because

18 that's a totally different issue.

19         But right now, there is no number, as far as --

20 for these procedures, there is no figure that is the figure

21 of the value of the claim.  Right now the value of the claim

22 could be anything and be subject to these procedures.

23         THE COURT:  Well, I don't necessarily have a

24 problem with that, because if the debtors are going to give

25 notice that says, We valued the claim at a hundred million

1  dollars and we're settling it for seven million, that's going

2  to raise a lot of red flags and people are going to start

3  asking questions and there'll probably be objections.

4           MS. SARKESSIAN:  Yes, Your Honor.  I mean, that

5  would be helpful.

6           But in terms of -- I guess, well, one thing I

7  would say in terms of there being a settlement at a dollar

8  amount below which nobody would be noticed, like, even the

9  two committees, I mean --

10          THE COURT:  No, I think the committees would still

11 be noticed --

12          MS. SARKESSIAN:  Okay.

13          THE COURT:  -- and the U.S. Trustee.  Just not

14 going out to the ECF notice.  Because I don't want, you know,

15 these small claims and there might be one creditor out there

16 who wants to object to everything, you know, and that becomes

17 a problem.

18          MS. SARKESSIAN:  I understand, Your Honor.

19          I mean, again, to me, that would be -- to tie it

20 to the amount that's being paid in the settlement I don't

21 think is useful, so I think I would say, you know, if there

22 are claims that are 70 -- if the value of the claim that's

23 held by the estate is 75,000 or less, then maybe that would

24 just go to the two committees and the U.S. Trustee.  I don't

25 think I would have a problem with that.

1          THE COURT:  Okay.

2          MS. SARKESSIAN:  I wouldn't want to tie it to the

3   amount being paid in settlement because I don't think that's

4   the most important figure.

5          THE COURT:  Okay.

6          MS. SARKESSIAN:  Thank you, Your Honor.

7          THE COURT:  I don't know if you had that

8   conversation that I had with Ms. Sarkessian.

9          MR. GLUECKSTEIN:  I did.  I'm trying to -- yes,

10  Your Honor.

11         But I think -- look, we're trying to come up with

12  a -- Your Honor, there's a couple of issues raised here,

13  right, and so Your Honor is asking a question now, whether,

14  you know, there's some number by which we don't have to give

15  notice.  The introduction of the schedule that we've now

16  talked about doing, right, raises issues for us from the

17  perspective of the bid and the ask.

18         When we now say, This is the value of the claim as

19  of the debtor, right, we are now telling the world that we

20  settled some particular claim at, you know, X percent of what

21  we have claimed the value is worth, right, where a lot of

22  times in settlement motions, you try not to, particularly if

23  they're weepy types of claims, you know, we try to make

24  clear -- it's not quite as black and white, right.  So, we're

25  now putting a schedule out there that says we're settling,

1   you know, this type of claim in the litigation with

2   particular defendants at, you know, X percentage.  That's

3   exactly what Ms. Sarkessian wants the world to see.

4           From a litigation perspective, that's challenging,

5   so that does, in our -- in my mind, at least, to the question

6   you were just asking, raise -- re-raises the question, should

7   there at least -- does there, at least, need to be some level

8   we can either settle at or, at least, not have to put this

9   notice out to the world, you know, with particular -- under

10  some particular, you know, amount of money so that we're not

11  compounding the problem on these settlements.

12          So, you know, I understand the desire.  And I

13  agree with Your Honor that from an informational standpoint

14  and our ability to provide the information, we're going to

15  have to have the discussions with the Committee.  We're going

16  to have to have discussions with the ad hocs and with the

17  U.S. Trustee, but noticing everybody, you know, of all of

18  these settlements now at first dollar, which is what we had

19  agreed to do when this process was not going to be playing

20  out on the court docket, does raise this additional issue of,

21  you know, potentially hindering the ability of us to, you

22  know, maximize the value of one claim versus another of

23  similarly situated claims.

24          THE COURT:  Well, that is a good point that if you

25  have similar claims and you're settling one, then other

1 claimants will say, Well, you settled that one for X amount.

2 Why don't you settle mine for more or why do you want more

3 from me?  It does raise a problem.

4          Ms. Sarkessian?

5          MS. SARKESSIAN:  Your Honor, could I -- would you

6 like me to go to the podium?

7          THE COURT:  Either way is fine.  Wherever you're

8 comfortable.

9          MS. SARKESSIAN:  Well, Your Honor, I know that

10 issue comes up, I think, in a lot of Chapter 7 cases with

11 trustees filing, you know, motions to settle.  And I've had

12 situations in which, you know, they're disclosing how much

13 they're getting in settlement, but not how much the claim

14 was.  Now, in those situations, you can pull the avoidance

15 actions and actually look and see yourself.

16          And I've heard that, and it's like, well, in order

17 to determine whether something is reasonable, you have to

18 have both numbers, otherwise, if all you know is how much

19 somebody is paying in settlement and you don't know what the

20 claim is valued at, you have no information.  And creditors

21 don't have the information.

22          So, and you also have the fact that there are many

23 defenses to even just, say, preference actions, right.  You

24 know, we settled this one for less money because there was

25 new value or whatever.  There's various defenses.  So just

1  because they're all avoidance actions doesn't mean that

2  they're all the same.

3        And there's going to be -- I'm sure there will be

4  some preference actions in these cases, but the other types

5  of avoidance actions, the fraudulent transfers, and the like,

6  I think, are not cookie-cutter types of things like

7  preference actions can sometimes be with, you know, with

8  trade vendors, for example.  So, but even in those cases, I

9  mean, you have to balance the right of the creditors and the

10 public to know what's going on in the cases with litigation

11 strategy.

12       And because these -- we don't know what these

13 claims are.  I mean, honestly, when we're saying they're

14 similar claims, I don't know that they're similar claims.  I

15 don't know what the claims are at all -- you can't tell from

16 the motion -- other than there'll be some avoidance.

17 There'll be some non-avoidance.  That's all I know.  So I

18 don't know if they're similar.  I don't even know if they're

19 the same class.  I have no idea.  Maybe the debtors do.

20       But even with similar claims, again, there's

21 different defenses.  There's different issues.  There's

22 different facts.  So the mere fact that the debtors settled

23 one avoidance claim for this amount or this percentage and

24 another for different would be meaningless.  And, again, does

25 that mean there's no disclosure?  Just because, you know,

1  maybe that gives somebody an argument.  You settled these

2  other claims.

3        And, honestly, Your Honor, even with what they're

4  proposing, they propose to file after the fact, a list of the

5  settlements and the amounts received.  Not the value of the

6  claim, but the amounts received.  Well, if they're settling

7  that were actually subject to an avoidance action, if you

8  were a defendant in an avoidance action, you could take that,

9  you could go and pull the complaint, and see the amount

10 sought and you can make the calculation yourself, and then

11 argue, well, you took 10 cents on the dollar on this one, so

12 I shouldn't pay more than that.  So that's always going to be

13 a possibility even with what they propose, but what they

14 propose is notice after the fact when creditors can't object.

15 So, I don't think it's a -- I don't think it's a significant

16 enough element.  The possibility that some avoidance

17 defendants might have some argument looking at what the

18 debtors accepted in other cases, I don't think that's enough

19 to change where I think Your Honor was leaning towards having

20 a notice that gives an objection time and that indicates what

21 the claim is valued at by the debtors, as well as what

22 they're receiving and gives notice, at least, through ECF.  I

23 don't think that's a reason to change that.

24        MR. GLUECKSTEIN:  Your Honor, if I may?  And,

25 again, Brian Glueckstein.

1                The issue -- and I don't want to get into, like,

2       every possible hypothetical -- but Ms. Sarkessian is positing

3       that, well, even in our procedure proposal, people would be

4       able to reverse engineer some things, so it's a little bit

5       different.  To the extent there's an avoidance claim on file,

6       there's a complaint, there are pleadings, there are

7       documents, there's context to the claim.  The problem with

8       what is now being discussed at any -- you know, at first-

9       dollar at every level is, we're putting out a chart that just

10      says, Here's the claim amount and here's the settlement

11      amount.  People can just do math, right.  There's no context

12      to any of it.

13               And so, yes, we were intending to put out for

14      disclosure purposes in our proposed procedures, a settlement

15      amount of all the (indiscernible) settlements after the fact

16      so people could see it that the estate took in, you know, X

17      dollars in the month of August.  And it is true,

18      Ms. Sarkessian is correct, there is not -- under the

19      procedures that we've proposed, there's not an opportunity

20      for every single creditor in the case to come forward and

21      object to the settlements at these values.  The noticed

22      parties have the ability to do that.  They will have -- they

23      have access to information that's not public and that is not

24      on the docket.

25               If the Committee and the debtors don't see eye-to-

1  eye on the value of a settlement in relation to the amount of

2  the claim as we had proposed it, we would have to come

3  forward with a 9019 motion.  And so, you know, I think this

4  is -- I think that Ms. Sarkessian is understating the issue

5  here, because of the fact and what Your Honor asked about as

6  a possible solution here is going to have us filing each time

7  we have a settlement, a notice that says, you know, notice

8  against, you know, Joe Smith, we have a claim for a million

9  dollars and we settled it, you know, for $800,000 and that's

10 just going to be out there for people to know without any

11 context.

12        So, I do think that to the extent Your Honor is

13 leaning in that direction, yes, we can do it, but I think,

14 then, there should be some exemption at least up to some

15 amount at a minimum, where we could get these truly smaller

16 claims resolved in consultation with the noticed parties,

17 without having to notice every creditor on the docket who has

18 access to ECF.  I do think that, you know, at every single

19 dollar level does pose some issues for us.

20        THE COURT:  What level would you propose?

21        You knew I was going to ask that.

22        MR. GLUECKSTEIN:  I did, and, of course, we're all

23 kind of now, you know, adjusting this a little bit on the

24 fly.  But it certainly seems to me, Your Honor, that if the

25 concern is around the claim amount, if the concern that's

1  being expressed by the U.S. Trustee is claim amount, to the

2  extent that Your Honor shares that concern, claim amount

3  versus settlement amount, which, you know, I don't want to

4  re-hash all of this.  We do cite cases where settlement

5  value, as opposed to claim amount is absolutely looked at,

6  but to the extent it's claim amount, then we can put a cap on

7  the claim amount that we're settling for whatever value we

8  settle it at, potentially, under these procedures.

9          But I think we have to have some ability to take

10  claims that are, you know, in the debtors' judgment that we

11  would be disclosing that claim amount up to, you know, some

12  amount -- I don't know -- $5 million, and then we're settling

13  it for something less than that, that we can do without

14  noticing publicly on the docket.  Because I do think we have

15  cases, and Ms. Sarkessian is saying, Well, she doesn't know

16  all the claims we have, but we don't know all the claims we

17  have either, but we know a lot of them now.  And some of the

18  claims that have been filed publicly, that we have filed

19  avoidance actions, that are on the docket of this Court, that

20  name numerous Defendants, some of whom are equity holders,

21  received equity distributions, relatively modest amounts,

22  compared to some of the larger issues in those avoidance

23  actions.  You know, we have claims like that, that have not

24  been filed, right, where we're talking to parties, where we

25  have, potentially, the opportunity to bring money into the

1  estate and resolve those claims without the need to file an

2  adversary proceeding.

3          That's beneficial to the estate.  That's reducing

4  costs.  And, again, the Committee is going to be at the table

5  to vet any of these settlements, as will Ms. Sarkessian,

6  who's going to get notice of these settlements and can ask

7  questions.

8          So, you know, if the concern is claim value versus

9  settlement value, I think we -- I would submit, then, we

10 should consider putting a number that, kind of, is a cap on

11 the claim amount at some number that we could do without

12 filing the public notice, because I think that would, at

13 least, allow us to facilitate some of these settlements that,

14 frankly, we might otherwise have to make a judgment:  do we

15 want to enter into the settlement under these procedures and

16 disclose this ratio or are we just going to file a motion

17 because we want to give more context to the claim, so we

18 might have to do that.

19         THE COURT:  I agree with that.  I think there has

20 to be some amount, claim amount where the debtors can settle

21 without having to do it publicly on the docket.  The question

22 is, what's that number?  That's the difficult part.  How do

23 you put a number on it?  I know Ms. Sarkessian said 75,000.

24 That's way too low in the context of this case.

25         I'm open to suggestions.

1          MR. GLUECKSTEIN:  Well, Your Honor, I mean, again,

2  if we're talking about face value of claims -- I'll call

3  "face value" -- debtors' perceived value of claims, I think

4  to be meaningful here, you know, this is a case that has a

5  lot more zeros than other cases, right, and so I think at a

6  minimum, we need, you know, at least the ability to settle

7  claims that we have valued at, you know, I would think, a few

8  million dollars, $5 million, $3 million, something that gives

9  us a meaningful range to take those claims and resolve them

10  without having to do the public notice process.

11          I would like to have the opportunity to settle

12  claims beyond that amount, if we're talking about two tiers

13  here, of the larger claims up to the $7 million that we

14  proposed of settlement value by doing the notice procedure

15  that's been talked about.  But I think it's critical that we

16  have, at least, a bandwidth that goes -- that has -- you

17  know, that's certainly not $75,000.  I think it's got to

18  be -- it's got to start, you know, with a millions on it to

19  really be meaningful.  We have a lot of those claims in the

20  small, one-to-three, less-than-five-million-dollar range that

21  need to get resolved here.

22          THE COURT:  All right.  I agree with that.  I

23  think it does need to be a much bigger number and I do think

24  the idea that a two-tier approach is appropriate so you can

25  go -- the question is, do we put a cap on the claim amount,

1  as opposed to a settlement amount on the larger claims that

2  can be just noticed to, or they have to be on the docket.

3           So let's say, I agree with you, 3 million or less

4  can with done without notice on the docket, just to the

5  noticed parties, the Committee, the Ad Hoc Committee, and the

6  U.S. Trustee.  Claims -- claim value over something, and then

7  the question is, what's that number going to be?  You want to

8  have settlement amounts of 7 million.

9           MR. GLUECKSTEIN:  I mean, perhaps -- I mean,

10  again, Your Honor, I think for that, we're going to make the

11  disclosure publicly, other people can come forward at that

12  level.  If we're going to say settlements -- up to 7 million

13  in settlement value, I would propose 20 million in claim

14  value.  I mean, that's -- obviously, it would be a settlement

15  at something less than 50 percent, but there's a lot of facts

16  and circumstances here.  We could probably do something a

17  little bit less than that if Your Honor preferred, but that's

18  the number that jumps to my head when there's going to be

19  disclosure.

20           THE COURT:  What about 15 million?

21           MR. GLUECKSTEIN:  I think we could live with that,

22  Your Honor.

23           So, these are for both the 3 million and the 15

24  million, you're talking about claim amounts, the debtors'

25  assessment of claim amount?

1          THE COURT:  Correct.

2          MR. GLUECKSTEIN:  Under 3 million, we could do it

3  on notice to the noticed parties --

4          THE COURT:  Right.

5          MR. GLUECKSTEIN:  -- without on the docket.  And

6  then claim values up to 15 million that we're settling for up

7  to 7, we could file the notice without filing a 9019 motion?

8          THE COURT:  Correct.

9          MR. GLUECKSTEIN:  I think that certainly would

10  work from our perspective.  It gives us, at least, a

11  framework to be able to start to resolve these claims, Your

12  Honor.  And, of course, if for some reason we find we're in a

13  range that's not working, you know, we can always come back.

14          THE COURT:  Yeah.  If you run into problems, I

15  have no problem with revisiting the issue.

16          Yes?

17          MR. SASSON:  Your Honor, Gabe Sasson from Paul

18  Hastings on behalf of the Committee.

19          That framework that Mr. Glueckstein described is

20  acceptable to the Committee, as well.

21          THE COURT:  All right.  Thanks.  Good.

22          So the only remaining question is do we expand

23  this, the exemptions to include all employees?  I don't think

24  that's necessary.  I think we keep it at the officers and

25  directors.

1              In my view, other than banks, I think everybody

2    else would say a vice president is an officer of the company.

3    Banks say they're not, but I mean, everybody else does.  So

4    if it's a vice president, that's an officer of the company.

5    I don't even know if they had any vice presidents, but --

6              MR. GLUECKSTEIN:  Yeah, this was not -- they

7    weren't as formalistic in the titles and the like, so we

8    obviously have made these assessments.  We have filed

9    statements and schedules that include insiders and the like.

10              THE COURT:  All right.  Then I think that resolves

11   everything, right?

12              MS. SARKESSIAN:  Your Honor, can I just ask a

13   clarifying question on that last point?

14              THE COURT:  Yes.

15              MS. SARKESSIAN:  To the extent that there is a

16   settlement with an employee that's not a director or an

17   officer, I would ask that if falls within the -- I guess it

18   would be the three to $15 million value range that they

19   actually had to put it on the notice that's being filed, to

20   please specify that it is a current or former employee of the

21   company.  Because what I see a lot in various documents is

22   it'll say, you know, Settlement with Jim Jones.  And I'm

23   like, who's Jim Jones?

24              So, if it's somebody who's actually an employee,

25   just to give people more notice, this is a former employee or

1  a current employee.  Again, they would have to be within that

2  range.  I mean, if it's less than 3 million, it's not going

3  to go in that notice -- well, it's not going to go into a

4  public notice.  But if they do fall within the three to $5

5  million range that the public notice will be filed, I would

6  ask that they be identified.

7        And, similarly, if there's a settlement with

8  somebody else and it's just an individual, to say --

9  especially if there's not an action filed against the person,

10  to say who that person is, like, was it a consultant?  You

11  know, was it a former professional?  Some type of information

12  of that kind that I hope the debtors would be willing to do.

13        MR. GLUECKSTEIN:  Your Honor, my reaction on

14  that -- and we'll take the Court's guidance on that, if the

15  Court prefers -- by concern about that, I have no problem

16  making that disclosure to Ms. Sarkessian.  On notice on the

17  docket, if we start identifying people as employees, that is,

18  of course, outing them as employees of the company and there

19  is pushback against this company and its employees, whether

20  people are responsible or not.

21        So, you know, if we start characterizing, you

22  know, the settlements, we're adding another layer of

23  disclosure into that notice, I don't know that that's

24  necessary and I have some concerns on the employee issue, but

25  we'll take the Court's guidance on that.

1          THE COURT:  Yeah, I do have some concerns about

2     identifying people on the docket as employees of this

3     company.  I mean, I have no specific evidence to support

4     this, but I know in these types of cases, and I think in this

5     case, in particular, there's a risk of a threat if someone is

6     identified as an employee, so I would say not put that on the

7     docket.  You can put it on the notice to the noticed parties,

8     but not on the docket itself.

9          MR. GLUECKSTEIN:  That's fine, Your Honor.  Thank

10    you.

11         MS. SARKESSIAN:  Thank you, Your Honor.

12         THE COURT:  Does that resolve all the issues?

13    This was an interesting session, a mediation session.

14         MR. GLUECKSTEIN:  We appreciate the Court's

15    guidance on this.  This is actually, from the debtors'

16    perspective, this type of a process is very important to us

17    so that we're able to start to resolve some of these claims

18    that have started to build up but have not warranted, yet,

19    bringing forward motions.  So, this is, you know, we have a

20    lot of people on our team hoping that Your Honor approved

21    some form of this today, so that we can move these forward.

22         THE COURT:  I did notice a few.  I've seen a few

23    settlements come through.

24         MR. GLUECKSTEIN:  There have and those have been

25    quite large --

1          THE COURT:  Yeah.

2          MR. GLUECKSTEIN:  -- and those will continue.

3   And, obviously, there have been some very significant

4   settlements.  As I mentioned earlier, there's one pending

5   before the Court now that'll be heard at the next hearing.

6          There are more, and certainly you had a lot of

7   discussion about this, this is the ultimate question of, this

8   is a large volume of claims and so we need to be able to

9   resolve them, of course, but most of the dollars are in this

10  smaller universe of claims that are going to be outside of

11  these procedures and, of course, we're pursuing those and

12  we're bringing those forward to the extent we can settle

13  them.

14         THE COURT:  Okay.  All right.

15         Anything else before we adjourn?

16     (No verbal response)

17         THE COURT:  All right.  Well, thank you all very

18  much.

19         MR. GLUECKSTEIN:  Thank you, Your Honor.

20         THE COURT:  Have a good rest of the week and I'll

21  see everybody at the next hearing.

22         We're adjourned.

23         COUNSEL:  Thank you, Your Honor.

24     (Proceedings concluded at 3:21 p.m.)

25  CERTIFICATION

1       We certify that the foregoing is a correct

2    transcript from the electronic sound recording of the

3    proceedings in the above-entitled matter to the best of our

4    knowledge and ability.

5

6    /s/ William J. Garling                August 24, 2023

7    William J. Garling, CET-543

8    Certified Court Transcriptionist

9    For Reliable

10

11    /s/ Tracey J. Williams               August 24, 2023

12    Tracey J. Williams, CET-914

13    Certified Court Transcriptionist

14    For Reliable

15

16    /s/ Coleen Rand                     August 24, 2023

17    Coleen Rand, CET-341

18    Certified Court Transcriptionist

19    For Reliable

20

21

22

23

24

25