# <u>EXHIBIT 4</u>



EXECUTION VERSION

Galaxy Digital · 300 Vesey Street, New York, NY 10282
contact@galaxy.com · (+1) 212.390.9216
Galaxy Digital · 300 Vesey Street, New York, NY 10282
contact@galaxy.com · (+1) 212.390.9216

September [●], 2023

FTX Trading Ltd.
Friar's Hill Road, Mandolin Place
Saint John's, AG-04, Antigua and Barbuda
c/o John Ray III

Re:    Amended and Restated Services Agreement

Dear Mr. Ray:

This amended and restated services agreement (together with all exhibits, schedules, appendices and annexes hereto,attached hereto or referenced herein, including the Term Sheet (as defined below), in case, as amended, supplemented or modified to the extent set forth herein and in any Approval Order (as defined below), this "**Agreement**"), dated as of the date hereof and effective as of the date the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") approvesenters an order approving FTX Trading Ltd.'s (the "**Client**") entry into this Agreement (the "**Approval Order**" and the date on which the Approval Order is entered by the Bankruptcy Court and the parties have duly executed this Agreement, the "**Effective Date**"), confirms the terms under which the Client in Chapter 11 cases jointly administered under Case No. 22-11068 (JTD) (the "**Chapter 11 Cases**") in the Bankruptcy Court has engaged Galaxy Digital Capital Management LP (the "**Investment Manager**" or "**Galaxy**" and, together with the Client, the "**Parties**") to provide investment manager services with respect to certain Assets deemed to constitute an account (the "**Account**") of the Client; provided that any beneficiary of, or parties subsequently joined to, this Agreement, as contemplated by Section 16(i), shall be entitled to the rights afforded to the Client.  "**Services**" as used in this Agreement shall refer to any and all services to be performed by the Investment Manager hereunder.

1.    **Appointment of Investment Manager.**  As of the Effective Date and on the terms and subject to the conditions set forth herein, the Client hereby appoints the Investment Manager as investment manager of the Account for the purposes described herein; provided that the Investment Manager shall not be obligated to provide any of the Services contemplated hereunder, and the Client shall not be bound by any provision hereunder, until the Bankruptcy Court has (i) entered the Approval Order and (ii) entered the Monetization Order (as defined below), each in accordance with Section 11 hereof.

2.    **Designation of Digital Assets.**  Digital assets"**Digital Assets**" means digital assets or Cryptocurrency in which transactions are verified and records are maintained by a system using cryptography, including Stablecoins, digital coins, and Tokens, including security

tokens, utility tokens, and governance tokens. [1] The Client's Digital Assets shall be designated as follows.

(a) <u>Excluded Assets</u>.  The "**Excluded Assets**" are the ~~digital assets~~Digital Assets designated as such in ~~writing by~~the Term Sheet (as defined below), and any other Digital Assets that the Client ~~to~~and Investment Manager ~~from time to time.~~agree in writing pursuant to Section 2(e).

(b) <u>Hedging Assets</u>.  The "**Hedging Assets**" are Bitcoin (~~("~~**BTC**~~")~~") and Ether (~~("~~**ETH**~~).~~") and any other Digital Assets that the Client and Investment Manager agree in writing pursuant to Section 2(e).

(c) <u>Liquidation Assets</u>.  The "**Liquidation Assets**" are all ~~digital assets~~Digital Assets in the Account that are not Excluded Assets~~ or Hedging Assets.~~, and any other Digital Assets that the Client and Investment Manager agree in writing pursuant to Section 2(e), provided that as of the date of this Agreement, BTC and ETH are not Liquidation Assets, and shall not become Liquidation Assets unless re-designated pursuant to Section 2(e) hereof.

(d) <u>Assets</u>.  The term "**Assets**" shall refer to the Hedging Assets and Liquidation Assets and shall not include the Excluded Assets.

(e) <u>Re-designation</u>.  The Parties may agree in writing to re-designate any particular ~~digital asset as an Excluded Asset, a Hedging Asset or a Liquidation Asset.~~Digital Asset as an Excluded Asset, a Hedging Asset and/or a Liquidation Asset, including, but not limited to, in response to a request for re-designation by the Official Committee of Unsecured Creditors appointed in the Chapter 11 Cases (the "**UCC**") or the Ad Hoc Committee of Non-US Customers of FTX.com in the Chapter 11 Cases (the "**AHC**"); provided, however, that the Investment Manager shall agree in writing to any re-designation requested by the Client unless the Investment Manager determines, in a commercially reasonable manner and consistent with its ordinary business practices, that such re-designation would be outside of Investment Manager's operational capability or ordinary business practices or contrary to applicable law and regulation. The Client shall be solely responsible for ensuring that, at all times, the designation of Hedging Assets ~~and~~, Liquidation

---

[1]      "**Stablecoins**" are any tokens, wrapped tokens or coins where the value is pegged to another asset class, such as a fiat currency or gold, to stabilize its price and that can be redeemed or converted at a fixed, predefined rate to that asset class by its issuing entity (e.g. Tether and USD Coin).  For the avoidance of doubt, the temporary suspension of redemptions or conversions by the issuing entity of the coin or token into fiat shall not result in a change in classification of the token or coin.

"**Token**" means a unit of Cryptocurrency.

"**Cryptocurrency**" means a fungible and transferable digital representation of units in which encryption techniques and a blockchain are used to regulate the generation of digital units and verify the transfer of assets pursuant to a protocol using cryptography.

#97243610v31
4877-0963-3653 v.11

Assets and Excluded Assets is in compliance with any applicable requirements under any order entered by the Bankruptcy Court.

(f)     Digital Assets. In the event that the qualification of a particular digital asset as a Digital Asset is unclear, the Parties, the UCC and the AHC will come to a mutual understanding in good faith regarding whether such asset qualifies as a Digital Asset.

3.     **Investment Program.**

(a)     Mandate. The Investment Manager shall have the mandate to liquidatemanage the Liquidation Assets into fiat currency or stablecoins and hedge exposureAssets in the Account, subject in all respects to the Hedging Assets, in each case in a manner agreed to by the Client Investment Guidelines. For the purposes hereof, the "**Investment Guidelines**" means Sections 3(b), 3(c) and 3(d) of this Agreement and the Investment Manager in Section 2 and Section 3 of the that certain August 23, 2023 draft of Token Management and Monetization Term Sheet, which dated as of August 23, 2023 (as the same may be amended, restated and/or supplemented from time to time by written agreement of the Parties (the "**Investment Program**")., subject in each case to any order of the Bankruptcy Court, the "**Term Sheet**"). In the event of any term of conflict between the aforementioned Token Monetization Term Sheet conflicts withInvestment Guidelines and any other express term of this Agreement, the terms and provisions of this Agreementthe Investment Guidelines shall control to the extent of such conflict. For the avoidance of doubt, for purposes of Galaxy's responsibilities hereunder, the Investment ProgramGuidelines shall terminate upon the termination of this Agreement pursuant to its terms.

(b)     Sales. Notwithstanding any other provision of this Agreement, Investment Manager may not sell Assets in the Account that are not Liquidation Assets; provided, however, the physical delivery of an asset in the Account to settle an options transaction permitted under the Investment Guidelines shall be permitted hereunder. Investment Manager shall temporarily halt sales of a particular Liquidation Asset on a temporary basis upon a written instruction from Client to do so (i) due to potential litigation, regulatory or enforcement concerns, (ii) due to tax-related matters or (iii) otherwise in extenuating circumstances.

(c)     Hedges. Notwithstanding any other provision of this Agreement, but subject to the Investment Guidelines, with respect to Hedging Assets in the Account, Investment Manager (A) may enter into transactions (i) for the purpose of hedging the Hedging Assets or (ii) for the purposes of generating premium through the use of options; *provided* that such transactions consist only of put or call options on such assets and (B) shall not enter into transactions for the purpose of hedging any asset in the Account that is not a Hedging Asset.

(b)(d)   No Appointment for Excluded Assets. The Investment Manager shall have no

3

responsibility or authority pursuant to this Agreement with respect to the Excluded Assets, other than the limited responsibility contemplated in Section 4(c)(ii), which, for the avoidance of doubt, does not constitute discretionary authority or result in Investment Manager owing fiduciary duties to Client in relation to the Excluded Assets. For the avoidance of doubt, notwithstanding the fact that Stablecoins may be classified as Excluded Assets, Investment Manager may hold or use Stablecoins in connection with its mandate under this Agreement, for example by receiving Stablecoins as consideration of the sale of a Liquidation Asset or buying Stablecoins in order to settle derivatives transactions permitted hereunder pursuant to the terms thereof.

(c)(e)   Discretion and Fiduciary Duties. Investment Manager shall have discretionary authority under such appointment, subject to the Approval Order (as defined herein) and), the Monetization Order, the Investment Guidelines and the supervision of the Board of Directors of the Client and its affiliate affiliated debtors and debtors-in-possession (the "**Board**") and"), acting through their legal and financial representatives (the "**Representatives**") through the meetings and reporting contemplated under Section 4(f) of this Agreement, to manage the Investment Program of the Assets Assets in the Account in accordance with and subject to the Investment Guidelines, with such discretion to be exercised at all times and in all circumstances in accordance with the Investment Manager's duties to the Client and any order entered by the Bankruptcy Court approving Client's entry into this Agreement, the Investment Guidelines and the Investment Manager's acceptance of such appointment.  In the course of providing the services contemplated by this Agreement, the Investment Manager shall owe and discharge its fiduciary duties owed to the Client, including the duties: (1) to act in good faith and in the best interest of the Client (it being understood that Investment Manager has similar duties to other advisory clients, which duties may conflict with the duties owed to Client); (2) of loyalty to the Client; (3) to provide full and fair disclosure to the Client of all material facts; (4) to employ reasonable care to avoid misleading the Client, avoid or disclose material conflicts of interest; and(5) to act in a manner agreed to between Investment Manager and the Client, and (6) to exercise each of its powers under this Agreement consistent with the care, skill and diligence applied by the Investment Manager in its capacity as a registered investment advisor to third party investment funds and other clients.

(d)(f)   Sub-Advisors. Unless otherwise contemplated by this Agreement, Investment Manager may not delegate or assign any of its investment advisory functions or responsibilities under this Agreement to any third party without the prior written consent of the Client; provided that any engagement of a service provider to perform any functions or responsibilities referenced in this Section 3(d)3(f) shall be on arms-length terms consistent with generally accepted market practice.

(e)(g)   Power of Attorney.

4

(i)     Investment Manager shall be authorized to provide Services on behalf of any Client Beneficiary (defined below) only after such Client Beneficiary has (A) become a party to this Agreement, as required under <u>Section 16(i)</u> and (B) appointed Investment Manager with full power of substitution, as the Client Beneficiary's true and lawful attorney-in-fact to carry out its responsibilities under this Agreement, including, but not limited to, the authority to take the actions set forth in clauses (A)-(D) in <u>Section ~~3(e)(ii),~~<u>3(g)(ii),</u></u> as required under <u>Section 10(b)(ix)</u>.

(ii)    The Client hereby appoints the Investment Manager, with full power of substitution, as the Client's true and lawful attorney-in-fact to carry out its responsibilities under this Agreement, <u>and with</u> the authority<u>, subject to the Approval Order and the Investment Guidelines,</u> to (A) execute hedges <u>and certain derivatives</u> with respect to the Hedging Assets held in the Account, (B) ~~buy,~~ buy, sell, exchange, convert, swap, stake, redeem and otherwise trade in any ~~digital assets~~<u>Digital Assets</u> which constitute or will constitute all or any portion of the Account, provided that Investment Manager will be authorized to buy assets only in connection with hedging activities to be performed by Investment Manager under this Agreement <u>in accordance with the Investment Guidelines,</u> (C) give instructions to the Custodian with respect to such transactions; and (D) enter into agreements or transactions <u>necessary</u> to effect the foregoing.

**4.      Management Services to be Performed; Duties and Restrictions on Investment Manager.**

(a)     <u>Management of Assets</u>. In executing its responsibilities under the Investment ~~Program~~<u>Guidelines</u>, the Investment Manager shall also have the authority and responsibility, under the supervision of the Board or its Representatives, to:

(i)     <u>subject to Section <u>3(a)</u> above and the Investment Guidelines,</u> cause the Account to buy, sell, swap, redeem, manage, stake, hold, exchange, convert and otherwise trade in ~~any and all financial instruments (including, without limitation, digital assets, swaps, futures contracts, commodities and forward contracts and derivatives)~~<u>financial instruments</u> (the "**Transactions**") as the Investment Manager may select, including engaging to the extent necessary and prudent (in the judgment of the Investment Manager) with respect to such financial instruments, utilizing such financial instruments in accordance with the express objectives of the Board; <u>provided that, with respect to staking, Investment Manager shall (i) be permitted to stake any Hedging or Liquidation Assets and (ii) only stake through private validator services offered by BitGo Trust Company, Inc. (or an affiliate thereof) (which, for the avoidance of doubt, may include private validator services of an affiliate of Investment Manager) or Coinbase Custody Trust Company, LLC (or an affiliate thereof);</u>

5

(ii)    provide advice to the Board and its Representatives with respect to the Account, including recommendations concerning, and identification of, Assets;

(iii)    monitor the Assets held in the Account;

(iv)    determine from time-to-time which Liquidation Assets in the Account should be retained or sold, what contracts should be entered into by the Account, and perform any research or diligence related thereto as appropriate;

(v)    subject to the limitations set forth in this Agreement, (including the Investment Guidelines), exercise all rights, powers, privileges and other incidents of ownership or possession with respect to the Assets held in the Account;

(vi)    supervise the preparation and review of all documents required to complete any investment by the Account;

(vii)    act on behalf of the Account in all matters necessary or incidental to the management of the Assets held in the Account;  and

(viii)    provide strategic and financial planning to the Client and its Representatives, including advice on utilization of any Assets held in the Account.

(b)    <u>Provision of General Services by the Investment Manager to the Account</u>.  The Investment Manager may, to the extent requested by the Board or its Representatives, provide support services to the Account, including certain administrative, accounting, client services and any other appropriate services, as contemplated by this Agreement and in accordance with the express written instructions and policies of the Client.  Subject to the terms and conditions of this Agreement, (including the Investment Guidelines), the Investment Manager shall perform and render support services to the Account, including, without limitation, the following:

(i)    Subject to the requirements of <u>Section 4(d)</u>, to the extent advisable or requested by the Client or its Representatives, select brokers, dealers, banks, counterparties and other intermediaries, including affiliates of the Investment Manager, by or through whom any transactions will be executed or carried out and open, maintain and close accounts with such entities on behalf of the Account;

(ii)    subject to <u>Section 5(a)</u>, enter into and execute agreements, make payments and incur obligations on behalf of the Account in furtherance of the Investment Manager's duties hereunder; and

6

(iii)     provide general administrative and operational services to the Account.

(c)     <u>Other Responsibilities</u>.

(i)     The Investment Manager shall be responsible for decisions to (A) select trading intermediaries or counterparties and (B) for negotiation of commission rates or other compensation for trading intermediaries or counterparties, subject to the requirements of <u>Section 4(d)</u>. The Investment Manager shall also, at the request of the Client, provide testimony as required in connection with the Bankruptcy Court's review of the Approval Order and Monetization Order. —The Investment Manager's primary consideration in effecting a transaction or series of transactions (directly or through a trading intermediary) for the Account will be Best Execution (as defined below).

(ii)     The Investment Manager shall provide the Client, UCC and AHC with general market commentary as the Investment Manager deems appropriate, which may include market commentary on the Excluded Assets.

(iii)     For purposes of this Agreement, "**Best Execution**" shall mean Investment Manager's obligation to seek and obtain the most favorable terms reasonably available for executing a Transaction on behalf of the Client or for the Client's Account, taking into consideration a variety of factors, including: (A) the best price available, net of fees and commissions; (B) the reliability, integrity, regulatory compliance and financial condition of the trading intermediary or counterparty (including the use of Galaxy Trading (as defined below)); (C) the size of, and difficulty, in executing the order with reference to a variety of factors (including price, costs, speed, likelihood of execution, settlement, size, liquidity, nature of the order, market volatility, impact to the overall market and any other relevant considerations); and (D) the value of the expected contribution of the trading intermediary or counterparty to the investment performance of the Client on a continuing basis. In fulfilling its duty of Best Execution, Investment Manager may, where appropriate, consider the potential market impact of showing the Transaction to multiple counterparties, aiming to achieve the most advantageous overall outcome for the Client while balancing the need for efficient execution and minimizing any potential adverse effects on market liquidity or price movements. The determination of Best Execution shall be made in good faith and in accordance with applicable laws, regulations and industry standards.

(d)     <u>Trading Partner Selection; Galaxy Parental Guaranty</u>.

(i)     For each Transaction entered into on behalf of the Client (other than transactions which the Investment Manager determines, consistent with its duties under this Agreement, including its fiduciary duties and its Best Execution obligation, to effect on an exchange providing for trading

<div align="center">7</div>

between counterparties that are anonymous to one another,) the Investment Manager shall diligently select one or more potential brokers or counterparties (each a "**Trading Partner**") through the "**Trading Counterparty Selection Process**". The Trading Counterparty Selection Process shall involve consideration of various factors, including, but not limited to, each Trading Partner's expertise, reputation, execution capabilities, access to liquidity, market presence, cost efficiency, and execution quality and reliability, with a focus on obtaining the most competitive quotes and execution terms by soliciting bids from multiple Trading Partners. Subject to Section 4(d)(ii), Investment Manager shall solicit quotes from two or more Trading Partners for any transaction, unless, despite Investment Manager's use of reasonable best efforts to solicit quotes from two or more Trading Partners (i.e. for the avoidance of doubt, meaning two or more counterparties and/or two or more brokers) for any transaction, only one quote is available. Transactions not executed on an exchange shall be subject to market-standard trading documentation (which may be, e.g., with respect to over-the-counter derivatives, the ISDA Master Agreement) and on terms consistent with the Investment Manager's best practices for its customers, it being understood that Client shall have the opportunity (but not the obligation) to examine and reasonably comment on any such trading documentation.

(ii)    Notwithstanding the foregoing, the Client acknowledges that circumstances may arise where soliciting quotes from multiple Trading Partners might not be consistent with Best Execution. For example, soliciting quotes from multiple Trading Partners might risk signaling an imminent significant trade to the market that could potentially impact trade execution quality and cost, thus potentially prejudicing the Client's interests and undermining Best Execution. In the event that the Investment Manager determines, in its reasonable discretion and in good faith, and consistent with its duty of Best Execution, that it is in the best interest of the Client to limit the process of soliciting quotes from multiple Trading Partners under such circumstances, the Investment Manager may choose to select and execute Transactions through a single Trading Partner (which, for the avoidance of doubt, may include selecting Galaxy Digital Trading Cayman LLC, an affiliate of the Investment Manager ("**Galaxy Trading**"), and if through Galaxy Trading, then pursuant to the Cryptocurrency Purchase and Sale Agreementa cryptocurrency purchase and sale agreement (in the case of spot Transactions) (such agreement, the "**CPSA**") or ISDA 2002 Master Agreement (in the case of over-the-counter derivatives Transactions) (together with the Schedule and Credit Support Annex, if any, thereto, the "**ISDA**") (the CPSA and the ISDA, collectively, the "**Cryptocurrency Purchase and Sale Agreements**") on terms to be agreed by Client and Investment Manager, each acting in good faith (it being understood that failing to agree to the Cryptocurrency Purchase and Sale AgreementAgreements shall have no effect on Investment Manager's

8

obligation to seek Best Execution).

(iii)    The selection of a single Trading Partner under the circumstances described in <u>Section 4(d)(ii)</u> shall be subject to the following conditions:

(A)    The decision to choose a single Trading Partner shall be based on a thorough assessment of its advantages for the execution of Client's Transaction, consistent with Best Execution and Investment Manager's obligation to act in the best interest of the Client.

(B)    The Investment Manager shall document the reasons and justification for selecting a single Trading Partner, which documentation shall detail the selection criteria, due diligence conducted and all communications related to the selection to provide transparency and accountability for the decision-making process and ensure that the selection is made in the best interest of the Client.

(C)    In the selection of Galaxy Trading, the Investment Manager is bound by its fiduciary duties (including duties of care and loyalty) and Best Execution obligation to the Client. The Investment Manager will only select a single Trading Partner if it reasonably believes that that doing so is in the best interest of the Client.

(iv)    The Investment Manager shall regularly review and assess the Trading Counterparty Selection Process to ensure that it remains consistent with industry best practices and regulatory requirements. Any updates or changes to the selection process shall be communicated to the Client in accordance with the terms of this Agreement and applicable regulations.

(v)    Consistent with applicable law, Client hereby authorizes the Investment Manager to enter into "agency cross transactions" effected by an affiliate of the Investment Manager ("**Galaxy Affiliate**") acting as broker for both the Account and for the party on the other side of the transaction, in accordance with applicable law and subject to compliance with Investment Manager's applicable conflicts policies and procedures, as consistently applied. The Investment Manager shall only enter into such agency cross transactions if the Investment Manager reasonably believes that doing so is in the best interest of the Client. The Client understands and agrees that the Investment Manager or such Galaxy Affiliate may receive commissions from, and have a potentially conflicting division of loyalties and responsibilities regarding, both parties to such agency cross transactions. Investment Manager understands and agrees that the Client's grant of authority to the Investment Manager to effect agency cross transactions for the Client is terminable at will without penalty, effective upon receipt by the Investment Manager of written notice from the Client.

(vi)    The Investment Manager may only select Galaxy Trading or any of its

9

affiliates (a "**Galaxy Trading Partner**") as a Trading Partner for a Transaction if the obligations of the Galaxy Trading Partner in connection with such Transaction are guaranteed (the "**Galaxy Parental Guaranty**") by Galaxy Digital Holdings LP ("**Guarantor**"), the ultimate parent of the Investment Manager (and Galaxy Trading and each of their affiliates). Guarantor has provided the Investment Manager with a guaranty in the form attached as Exhibit A hereto, which the Parties agree shall constitute an acceptable Galaxy Parental Guaranty for this purpose.

(e)     <u>Information Barriers Restrictions</u>.

(i)     *Commitment to Information Barriers*: The Investment Manager, along with its employees, agents, and representatives (collectively, the "**Investment Management Professionals**"), shall fully comply with the information barrier restrictions under its compliance policies and procedures as they may be amended from time to time (the "**Information Barrier Restrictions**") and shall deliver to the Client copies of any subsequent versions of such compliance policies and procedures as well as any amendments or updates to such compliance policies and procedures as soon as reasonably practicable. These Information Barrier Restrictions are in place to prevent any unauthorized use or disclosure of Confidential Information (as defined in <u>Section 14</u> hereunder) received from the Client or its Representatives under this Agreement.

(ii)    *Implementation of Information Barrier Restrictions*: The Investment Management Professionals have implemented, and shall continue to implement, comprehensive physical, electronic, and procedural safeguards to protect the Confidential Information in a manner with consistent with industry best practices. These safeguards include, but are not limited to, the following:

(D)     **Internal and External Communications:** Investment Management Professionals shall adhere to communication restrictions during internal or external communications, which encompass text messages, emails, tweets, Instagram posts, Facebook updates, and other forms of social media. They are prohibited from sharing information about the Services or any Confidential Information received under this Agreement with employees of any other Galaxy business unit, including Galaxy's investment banking, trading, or asset management units not directly retained by the Investment Manager, unless expressly authorized in writing by the Client.

(E)     **Internal Meetings**: Investment Management Professionals shall adhere to communication restrictions during internal meetings, ensuring that information about the Services or any Confidential

10

Information received under this Agreement is not shared with employees of any other Galaxy business unit, including Galaxy's investment banking, trading or asset management not directly retained by Investment Manager ("**Other Galaxy Business Units**"), unless expressly authorized in writing by the Client.

(F)  **Records**: Investment Management Professionals shall not have access to non-public information contained in reports, memoranda, or files prepared or maintained by Other Galaxy Business Units unless they obtain prior written approval from Galaxy's Chief Compliance Officer.

(G)  **Office Space**: The Investment Manager shall ensure that office spaces occupied by Investment Management Professionals have appropriate access controls in place to limit entry to authorized individuals and restrict all personnel of Other Galaxy Business Units.

(H)  **Trading Rooms**: Unless expressly provided under this Agreement or Investment Management Professionals have obtained prior written approval from Galaxy's Chief Compliance Officer, Investment Management Professionals shall be restricted from entering rooms maintained by Other Galaxy Business Units.

(iii)  *Further Details*: As described in Appendix C attached hereto, the measures described hereunder shall include the establishment of robust internal controls and surveillance, strict limitation of access to Confidential Information on a need-to-know basis, and the conduct of regular training programs for all employees regarding the responsible handling of Confidential Information.

(iv)  *Need-to-Know Basis*: The Investment Management Professionals shall restrict the dissemination of Confidential Information within the Galaxy organization to only those employees and representatives who have a genuine need to know such information in order to fulfill the Investment Manager's obligations under this Agreement. These individuals shall be informed of the confidential nature of the information and the obligations set forth in this Section 4(e) and Investment Manager shall use best efforts to ensure that such individuals abide by obligations set forth in this Section 4(e).

(f)  Further Assurances. The Investment Manager further agrees that it:

(i)  will at all times conform, to the best of its knowledge and in good faith, to all applicable rules and regulations applicable to the Investment Manager in its capacity as an advisor to the Client in all material respects and in addition will conduct its activities under this Agreement to the best of its knowledge

11

and in good faith, in accordance with any applicable rules and regulations of any governmental or self-regulatory authority;

(ii)    will report to the Board and its Representatives and will review with Representatives of the Client, on a regular basis and on an ad hoc basis as reasonably requested by the Board, the Client's Assets, as well as the Client's general investment strategies and/or objectives and the performance of the Client's Assets in relation to standard industry indices and general conditions affecting the marketplace, and will provide various other reports from time to time as requested by the Client or its Representatives;

(iii)    will ~~attend standing weekly~~ conduct status calls with the Client and its Representatives, ~~and~~as well as advisors ~~of~~to the ~~Unsecured Creditors Committee (the "UCC")~~ and ~~the Ad Hoc Group,~~AHC, at a minimum on a weekly basis for the first six weeks ~~commencing the week~~immediately after the first completed ~~transaction pursuant to this Agreement~~sale of a Liquidation Asset, and thereafter ~~the cadence will change to~~ on a regular basis (which shall be no less than monthly~~;~~

(iv)(iii)~~will~~ to provide~~, or instruct the Fund Administrator~~ (A) general status updates with respect ~~to provide, written reports no later than five (5) Business Days after the calendar end of each month from the Fund Administrator (as defined below). Such reports shall detail all completed the Services,~~ (B) a summary of the sales and transactions ~~to the Board~~executed as of the date of any such report (including (x) the notional amounts of sales and ~~its Representatives, the UCC~~transactions executed since the last of any such report, and ~~the Ad Hoc Group, and each of their advisors, and shall include the following~~ (y) to date, the aggregate execution information~~: (A) token name, (B) quantity sold, (C)~~ as to the percentage of time weighted average price ~~received~~versus spot pricing for such sales), (C) a discussion of market events since the last of any such report and any impacts to trading and (D) ~~execution type and (E) a summary of the hedging yield generated and/or put options purchased~~a discussion of market outlook and trading environment;

(v)(iv)  will comply with the Investment ~~Program~~Guidelines and any investment guidelines separately agreed between the Investment Manager and the Client in writing from time to time in all respects (subject to the terms of the Approval Order) (except as otherwise instructed by the Client) as they relate to diversification, concentration and portfolio rebalancing of the Client's investments in individual Assets or Asset groups;

(vi)    (v)    will continuously monitor the value of the Assets held in the Account and events relating to the ~~digital asset~~Digital Asset markets in which the Client's Assets trade, and will notify the Client or its

12

Representatives of any market events or other situations as the Investment Manager deems appropriate. In addition, Investment Manager will assist the Client, upon the Client's request, in evaluating the impact that such an event may have on the net asset value of the Client's Assets; and

(vii)   (vi)   will prepare standard reporting and provide regular market commentary with respect to the Client's Account as reasonably requested by Client or its Representatives and will furnish the Board such reports as the Client may reasonably request.

(g)   Reporting Covenants. The Investment Manager further agrees to:

(i)   deliver to the Client, the UCC, the AHC and their advisors no later than five (5) business days after the end of each calendar month to which such reporting relates, monthly written reporting from the Fund Administrator in a commonly accepted file format (.xls if possible) detailing on an aggregated basis all completed Digital Asset transactions (excluding partial trades), including without limitation information on (1) Digital Asset identifiers, (2) the USD value of liquidation proceeds by counterparty on an anonymized basis, which disclosure shall be across all liquidated tokens rather than on a token-by-token basis, (3) quantity sold, (4) average price received, (5) type of execution and (6) period over which trades were executed; and

(ii)   deliver to (x) the Client and (y) the advisors of the UCC and of the AHC (it being understood that such reporting is being provided on a "professional eyes only" basis and shall not be shared with members of the UCC or the AHC) no later than seven (7) business days after the end of each calendar month to which such reporting relates, monthly written reporting from the Fund Administrator in a commonly accepted file format (.xls if possible) detailing on an aggregated basis all completed derivatives transactions, including without limitation information on (1) Digital Asset underlying the transaction, (2) notional quantity, (3) for options, the type (call/put and style), strike price and maturity, (4) trade date, (5) premium received and/or paid as applicable, (6) counterparty (anonymized if necessary) and (7) other commissions (such as brokerage commissions) paid; provided that in the event that there has been a reported data breach at the Client or the advisors of either of the UCC or the AHC and the Investment Manager reasonably believes that it would be in the best interest of the Client to withhold certain information required to be reported under this Section 4(g)(ii) from the Client and the advisors of the UCC and the AHC because of any such data breach, Investment Manager may withhold such information for no longer than 48 hours from the time Investment Manager learns of any such data breach; and

13

(iii)    deliver to (x) the Client and (y) the advisors of the UCC and of the AHC (it being understood that such reporting is being provided on a "professional eyes only" basis and shall not be shared with members of the UCC or the AHC) no later than seven (7) business days after the end of the calendar month to which such reporting relates, written reporting from the Fund Administrator in a commonly accepted file format (.xls if possible) detailing all margin and collateral requirements binding on the Client with respect to all derivatives transactions (e.g., initial margin, maintenance margin and other collateral requirements) and all margin and collateral posted by counterparties for Client's benefit (quantity, value, asset type and organized by counterparty, anonymized if necessary).

5.    **Custody and Management of Account.**

(a)    Custody; Investment Manager Authority.  The Assets held in the Account may be held in the custody of one or more firms designated by Client to provide clearing and custody services for the Assets held in the Account (each such firm, together with any affiliate thereof at which Assets are held, the "**Custodian**"). Any account maintained with such a Custodian shall be in the name of and for the benefit of the Client, and title to all Assets shall remain with the Client. The Custodian shall at all times have custody and/or physical control of the Assets held in the Account unless otherwise directed by the Client. The Investment Manager and the Client do not intend for the Investment Manager to have "custody," for the purposes of the U.S. Investment Advisers Act of 1940, as amended (the "**Advisers Act**"), to the extent applicable, over the Assets held in the Account, and therefore the Investment Manager shall in no event have any authority to (and shall not) instruct the Custodian to transfer cash to itself or any other person, or have or take, or direct any person other than the Custodian to have or take, custody and/or physical control of any Assets in the Account, except in each case instructions to the Custodian to settle bona fide Transactions effected by the Investment Manager for the Account. The Investment Manager shall not have the authority to (and shall not) amend the terms of the Client's custody or clearing arrangements with respect to the Account or appoint an alternate Custodian.

6.    **Aggregation and Allocations.**

(a)    If the Investment Manager determines that it would be in the best interests of the Client to bundle or aggregate trades for the Account with order(s) for the account(s) of one or more other non-affiliated clients of the Investment Manager, the Investment Manager shall execute orders for the Account and for the accounts of such other clients on a fair and equitable basis.  In such situations, the Investment Manager may place orders for the Account and each such other account simultaneously, and in circumstances where (because of prevailing market conditions), all such orders are filled through multiple trades at different prices, the Investment Manager may cause the Account and each such other account to pay or

receive the average of the prices at which the orders were filled, with the transaction costs generally allocated pro rata based on the size of each client's participation in the order.  In the event of a partial fill, allocations may be modified by the Investment Manager, as deemed to be appropriate and fair and equitable, including in order to avoid odd lots or *de minimis* allocations.  If all such orders cannot be executed under prevailing market conditions, the Investment Manager shall allocate the assets traded among the Account and such other accounts in a manner determined by the Investment Manager to be fair and equitable. When orders are not aggregated, trades generally will be processed in the order that they were placed with the counterparties which may result in one client getting more or less favorable price or terms than another or may not be filled entirely or at all or some opportunities for reduced transaction cost of economies of scale may not be achieved.

(b)    Investment Manager will aggregate trades and allocate assets in accordance with its generally applicable policies and procedures with respect to trade aggregation and allocation  (the "**Allocation Policy**"). Investment Manager agrees to provide the Client with advance notice, as soon as reasonably practicable, of any upcoming material revisions, amendments or updates to the Allocation Policy. Notwithstanding anything to the contrary herein, in all events, the Client shall at all times be treated in a manner that is fair and reasonable, considered in relation to the Investment Manager's other clients, as regards the allocation of investment opportunities.

**7.    Fees and Expenses.**

(a)    <u>Management Fees</u>.

(i)    As consideration for Investment Manager's services hereunder, a management fee shall be paid monthly in arrears, within 30 days of the end of the month, and shall be determined as of the last day of each month (such determination date, the "**Management Fee Calculation Date**").

(A)    The management fee for the Investment Manager's hedging ~~mandate~~<u>of the Hedging Assets</u> (the "**Hedging Fee**") shall be, as of any Management Fee Calculation Date, an amount equal to the product of:

(1)    0.005;

(2)    the number of calendar days in the month of the Management Fee Calculation Date divided by 365; and

(3)    the average USD net asset value of Hedging Assets <u>in the Account</u> for that month;

15

provided that clause (3) shall be calculated for each Hedging Asset for any given month as (w) the sum of the USD value of that Hedging Asset on each calendar day of that month divided by (x) the total number of calendar days in that month. The USD value of each Hedging Asset on a given calendar day shall be calculated as (y) the highest quantity of that Hedging Asset held in the Account on that day times (z) the trading price of that Hedging Asset at 5:30pm (Coordinated Universal Time) on that calendar day using prices quoted by a fund administrator agreed by Client and Investment Manager each acting in good faith (the "**Fund Administrator**").  In the event the Fund Administrator at any given time is unable to quote prices for a Hedging Asset, the Parties shall cooperate in good faith to engage an independent fund administrator reasonably agreeable to each of the Parties to replace the Fund Administrator. An illustrative example of how to calculate the Hedging Fee is set forth on Exhibit B attached hereto.

(B)  The management fee for the Investment Manager's liquidation mandate (the "**Liquidation Fee**", together with the Hedging Fee, the "**Total Management Fee**" and each a "**Management Fee**") shall be, as of any Management Fee Calculation Date, the product of

(1)  0.00075; and

(2)  the ~~total proceeds~~ Total Liquidation Proceeds (defined below) received by the Client in connection with the sale of any Liquidation Assets in the Account for fiat or Stablecoins during the month of the Management Fee Calculation Date~~.~~;

provided that, for the avoidance of doubt, no Liquidation Fee (or any other fee) shall be payable to Investment Manager for (i) the redemption of a Stablecoin for the equivalent amount of fiat currency, (ii) the sale of a Stablecoin for the equivalent amount of fiat currency, or (iii) physical delivery or sale of any Assets in the Account to settle a derivatives transaction.

"**Total Liquidation Proceeds**" shall be defined as the sum of fiat proceeds and, without duplication, the minimum of (i) the standard redemption value of Stablecoin proceeds to fiat currency and (ii) the fiat equivalent value of the Stablecoin proceeds coincident to the receipt of the Stablecoin proceeds, as reasonably determined by the Fund Administrator.

(ii)  If this Agreement is terminated on any date that is not the first business day of a calendar month, the Management Fee Calculation Date shall be the effective date of the termination of this Agreement. The Hedging Fee shall be pro-rated in the event that a Management Fee Calculation Date occurs

16

earlier than the last business day of any calendar month or the Client makes any additions to or withdrawals from the Account during a calendar month.

(iii)    The Parties, with the consent of the UCC and the AHC, may expand the Investment Manager's mandate hereunder, and any fees in relation to that expanded mandate shall be acceptable to the Parties, subject to approval by the Bankruptcy Court.

(iv)    For the avoidance of doubt, Investment Manager shall charge no additional fees with respect to the provision of any staking services; provided that, for the avoidance of doubt, the fact that an Asset is staked shall not change the fees otherwise applicable to that asset under Section 7(a) hereof.

(b)    <u>Invoices</u>. All invoices shall be sent, and all payments shall be made, in accordance with the ~~order entered into by the Bankruptcy Court approving the~~ Approval Order.

(c)    <u>Expenses</u>. The Account shall bear ~~(i)~~ all reasonable and documented out of pocket costs and expenses incurred by the Investment Manager in connection with performing the Services (to the extent the Investment Manager is not reimbursed by the subject of an investment or other third parties), including, without limitation, (1) commissions, interest or other finance charges, custodial and brokerage fees and any other expenses ~~related to~~reasonably necessary or required (as reasonably determined in good faith by the Investment Manager) for the sale or transmittal of the positions in the Account, <u>provided</u> that Client shall not be responsible for any fees paid by Investment Manager to an affiliate thereof engaging in brokerage services to effect a Transaction, ~~and~~ (2) any reasonable and documented fees and expenses of the Investment Manager's outside legal counsel ~~and other advisors incurred in performing~~incurred in connection with the preparation, negotiation, documentation, and approval by the Bankruptcy Court of this Agreement, and (3) any reasonable and documented fees and expenses of the Investment Manager's outside counsel incurred in connection with the Investment Manager's performance of the Services after the Effective Date, <u>provided</u> that Investment Manager shall notify Client prior to engaging ~~any advisors~~outside legal counsel as contemplated by clause (~~2~~)3), and ~~(ii)~~the Account shall bear up to $100,000 ~~for~~(or such higher amount approved by order of the Bankruptcy Court) for the reasonable and documented fees and expenses incurred by the Investment Manager's outside legal counsel ~~before~~after the Effective Date (together, the "**Expenses**"), without further order of, or application to, the Bankruptcy Court by such professional advisor, the Investment Manager or the Client; <u>provided</u> that prior to any such Expenses being due, Investment Manager shall furnish the Client with invoices relating to such Expenses, which shall include supporting documentation setting forth in reasonable detail the nature of the Expenses, the transactions to which such Expenses relate, the calculation thereof (where applicable) and such other information relating thereto as may be reasonably requested by the Client; <u>provided</u>, <u>further</u>, that no outside legal counsel to the Investment Manager shall be required to provide the Client, the UCC or the AHC with individual time detail or a breakdown of tasks by

#97243610v31
4877-0963-3653 v.11

individual. In the event of any termination of this Agreement, whether pursuant to <u>Section 8</u> hereof or otherwise, the Client shall remain obligated to reimburse the Investment Manager for any and all <u>such</u> Expenses accrued up to and including such date of termination.

(d)     <u>Court Approval</u>.  Notwithstanding anything to the contrary herein, the Client (or, if applicable, its chosen designee) shall not pay the Investment Manager any fees or charges accrued under this Agreement unless and until the Bankruptcy Court has entered an order approving the Client's entry into this Agreement and payment of fees and charges accrued under this Agreement.

(e)     <u>Fees and Expenses Generally</u>. The Client's obligation to pay any fee, expense or indemnity set forth herein shall be absolute and unconditional and shall not be subject to any reduction by way of setoff, recoupment or counterclaim. Once paid, no amount paid under this Agreement shall be refundable under any circumstances. Nothing herein shall impact any claims that Client may have against Investment Manager or that Investment Manager may have against Client unrelated to the negotiation of, entry into and performance under this Agreement, and the rights and obligations of the Parties set forth herein. The Parties acknowledge and agree that any fee, expense or indemnity to be paid by Client hereunder may be paid by Client or a designee chosen by Client in its sole and absolute discretion.

**8.     Termination.**

(a)     The Parties may mutually agree to terminate this Agreement at any time, subject to an agreement on the date on which the Agreement will terminate (the "**Termination Date**").

(b)     Investment Manager may terminate this Agreement:

(i)     upon ninety (90) calendar days prior written notice or such shorter period of time as the parties may agree in writing (in each case with email being sufficient); or

(ii)    immediately in accordance with <u>Section 11</u>.

The Client agrees that the providing of any such notice shall not be in violation of the automatic stay provided for under section 362 of title 11 of the United States Code (the "**Bankruptcy Code**") or otherwise.

(c)     The Client may terminate this Agreement:

(i)     upon forty-five (45) calendar days prior written notice or such shorter notice period as the parties may agree in writing (in each case with email being sufficient); or

18

(ii)    with immediate effect at any time for Cause. For this purpose, the term "**Cause**" means (A) a material breach by Investment Manager of this Agreement (provided, that Investment Manager shall have a cure period of thirty (30) days following notice of breach in the case of any such breach that is susceptible of cure, and provided further that such cure period shall be reduced to five (5) days with respect to any repeat material breach after the first occurrence), (B) the commission by Investment Manager of a Disqualifying Action (as defined below) in connection with its duties under this Agreement, (C) Investment Manager (or any of its or its affiliates' respective principals, officers, directors, members, partners, shareholders, agents and employees) being convicted of (including by pleading guilty or nolo contendere to) a felony or becoming subject to any other legal or regulatory sanction, injunction or other limitation on its activities that would materially interfere with the Investment Manager's ability to perform its obligations hereunder or (D) the entry of Investment Manager or any of its affiliates into bankruptcy or insolvency proceedings.

(d)    Termination of this Agreement shall not, however, affect liabilities and obligations under this Agreement or incurred or arising from Transactions initiated under this Agreement prior to the termination date, including the payment of any accrued fees pursuant to Section 7 hereof. Following any termination of this Agreement, the Investment Manager shall work with the Client in good faith to effect a prompt and orderly transition of the Services to the Client or to such third party as the Client shall designate and in a manner consistent with all applicable duties and obligations under all applicable laws, rules and regulations; provided, however, that, following Termination, the Investment Manager will have no obligation to recommend any action with respect to, or to liquidate, the assetsAssets in the Account nor shall the Investment Manager be required to incur any out of pocket expense. Upon Termination, Investment Manager shall follow all instructions of Client with respect to the transition of the Account.

(e)    This Agreement may also terminated by order of the Bankruptcy Court, upon notice and a hearing.

**9.    Limitation of Liability; Exculpation and Indemnification; Other Activities; Force Majeure.**

(a)    Limitation of Liability.

(i)    The Investment Manager does not guarantee the future performance of the Account or any specific level of performance, the success of any investment decision or strategy that the Investment Manager may use, or the success of the Investment Manager's overall management of the Account. The Investment Manager does not provide any express or implied warranty as to the performance or profitability of the Account or any part thereofof the Account or that any specific investment objectives will be successfully met.

19

The Client understands that investment decisions made by the Investment Manager on behalf of the Account are subject to various market, currency, economic, political and business risks, and that those investment decisions will not always be profitable.

(ii)    Except in the cases of willful misconduct, gross negligence, fraud, reckless disregard, material breach of this Agreement, or, in the case of Investment Manager, Investment Manager's operational errors in handling Assets or effecting transactions for the Client's account (each, a "**Disqualifying Action**"), Investment Manager shall not have any liability (whether direct or indirect, in contract or tort or otherwise) for any claims, liabilities, losses, damages, penalties, obligations or expenses of any kind whatsoever, including reasonable attorneys' fees and court costs ("**Losses**") suffered by the Client (1) as the result of any act or omission by the Investment Manager in connection with, arising out of or relating to the performance of the Services or (2) any "passive breach" of the Investment ~~Program~~Guidelines or any investment guidelines separately agreed in writing between the Investment Manager and the Client from time to time arising solely as a result of (x) changes in market value or (y) additions to or withdrawals from the Account or portfolio rebalancing, in each case to the extent not within the control of the Investment Manager. ~~Under no circumstances (including due to gross negligence, bad faith, intentional fraud or willful misconduct) will any Party be responsible for any special, consequential, incidental or exemplary damages or loss hereunder (nor any lost profits, savings or business opportunity).~~ The Investment Manager and any person acting on its behalf shall be entitled to rely in good faith upon information, opinions, reports or statements of legal counsel (as to matters of law) and accountants (as to matters of accounting or tax) and, accordingly, such good faith reliance by a person shall not constitute a Disqualifying Action so long as such counsel or accountant is qualified and was selected and consulted with due care.

(b)    <u>Indemnification</u>.

(i)    ~~The~~Subject to the Approval Order, the Client agrees to indemnify and hold harmless each of the Investment Manager, its affiliates or personnel or any of their respective directors, members, officers, employees, affiliates, secondees, agents, delegates, partners or representatives (each, an "**Indemnified Party**" and collectively, the "**Indemnified Parties**"), against any Losses suffered or incurred by reason of, relating to, based upon, arising from or in connection with (directly or indirectly) (A) the operations, business or affairs of the Client, or any actions taken by the Investment Manager or failure by it to act (even if negligent) in connection with this Agreement, (B) a Disqualifying Action by the Client, or (C) the Client's breach of this Agreement, in each case except to the extent that such Losses are determined by a court of competent jurisdiction, upon entry of a final

judgment, to be attributable to a Disqualifying Action of such Indemnified Party.

(ii)     ~~To~~Subject to the Approval Order, to the fullest extent permitted by law, the Client shall, upon the request of any Indemnified Party, advance or promptly reimburse such Indemnified Party's out-of-pocket costs of investigation (whether internal or external), litigation or appeal, including attorneys' fees and disbursements, reasonably incurred in responding to, litigating or endeavoring to settle any claim, action, suit, investigation or proceeding, whether or not pending or threatened, and whether or not any Indemnified Party is a party, arising out of or in connection with or relating to the operations, business or affairs of the or in furtherance of the interests of the Client (a "**Claim**"); *provided* that the affected Indemnified Party shall, as a condition of such Indemnified Party's right to receive such advances and reimbursements, undertake in writing to promptly repay the applicable funds for all such advancements or reimbursements if a final judgment of a court of competent jurisdiction has determined that such Indemnified Party is not then entitled to indemnification under this <u>Section 9</u>.  If any Indemnified Party recovers any amounts in respect of any Claims from insurance coverage or any third-party source, then such Indemnified Party shall, to the extent that such recovery is duplicative, reimburse the Client for any amounts previously paid to it by the Client in respect of such Claims.

(iii)    Notwithstanding anything else contained herein to the contrary, the provisions of this <u>Section 9(b)</u> shall in no way limit the liability of the Guarantor under the Galaxy Parental Guaranty.

(iv)     The right of any Indemnified Party to indemnification as provided herein shall be cumulative of, and in addition to, any and all rights to which such Indemnified Party may otherwise be entitled by contract or as a matter of law or equity and shall extend to such Indemnified Party's successors, assigns and legal representatives.

(v)      Promptly after receipt by an Indemnified Party of notice of any Claim or of the commencement of any action or proceeding involving a Claim, such Indemnified Party shall, if a claim for indemnification in respect thereof is to be made against the Client, give written notice to the Client of the receipt of such Claim or the commencement of such action or proceeding; *provided*, that the failure of any Indemnified Party to give notice as provided herein shall not relieve the Client of its obligations hereunder, except to the extent that the Client is actually prejudiced by such failure to give notice.

(vi)     Each Indemnified Party shall cooperate with the Client and its counsel in responding to, defending and endeavoring to settle any proceedings or Losses that may be subject to indemnification by the Client pursuant to this

#97243610v31
4877-0963-3653 v.11

Section 9(b). Without limiting the generality of the immediately preceding sentence, if any proceeding is commenced against an Indemnified Party, the Client shall be entitled to participate in and to assume the defense thereof to the extent that the Client may wish, with counsel reasonably satisfactory to such Indemnified Party. After notice from the Client to such Indemnified Party of the Client's election to assume the defense thereof, the Client shall not be liable for expenses subsequently incurred by such Indemnified Party without the consent of the Client (which shall not be unreasonably withheld) in connection with the defense thereof. Without the Indemnified Party's consent, the Client will not consent to entry of any judgment in or enter into any settlement of any such action or proceeding which does not include as an unconditional term thereof the giving by every claimant or plaintiff to such Indemnified Party of a release from all liability in respect of such claim or litigation.

(vii)    Nothing herein shall constitute a waiver or limitation of any rights which the Client may have under any applicable securities or commodities laws.

(c)    Force Majeure. The Investment Manager shall not be in default in the performance of its obligations under this Agreement to the extent that the performance of any such obligations is prevented or delayed by any cause which is beyond the ~~reasonable~~ control of the Investment Manager, including without limitation due to any action, policy, rule, regulation or order of any governmental or self-regulatory authority.

(d)    Securities and Commodities Law Compliance.  The Investment Manager reserves the right to take, or refrain from taking, any action hereunder to ensure compliance with all applicable securities and commodities laws, as reasonably determined by the Investment Manager (in consultation with counsel, which may be internal counsel) in its sole and absolute discretion.  No action taken (or refrained from being taken) pursuant to this Section 9(d) shall constitute a breach of the Investment Manager's obligations hereunder.

(e)    Non-Exclusivity; Other Activities.

(i)    It is understood and agreed by the Parties that the appointment of the Investment Manager under this Agreement is on a non-exclusive basis and the Investment Manager may provide investment advisory services to other investment accounts, investment vehicles and other clients, subject to the Investment Manager's compliance with this Agreement and applicable laws and regulations.

(ii)    Subject to Section 1 and Section 6 hereof, nothing in this Agreement shall limit or restrict the Investment Manager and its affiliates, and its and their officers, employees or representatives from buying, selling or trading in any investments for its own account or for the account of any other investment vehicle, investment account or any other client managed or advised by the

22

Investment Manager. ~The Client acknowledges that Galaxy Digital LP is a financial services firm engaged directly and through its subsidiaries and affiliates (collectively, the "**Firm**") in investment banking, investment, trading, financial advisory services, investment management, asset management and other advisory services. The Client understands and acknowledges that the Firm will not be under any duty to disclose to the Client, or use for the benefit of the Client, any confidential or non-public information obtained by it in the course of providing services to any other person or engaging in any other transaction (including as principal) or business activities. In the ordinary course of business activities, the Firm or its personnel may at any time hold long or short positions, and may trade or otherwise effect transactions, for its or their own accounts or the accounts of customers, in any assets or financial instruments, including but not limited to fiat currency, ~~digital assets~~Digital Assets, securities, bank loans and derivatives of the Client or any other party to a transaction or any of their respective affiliates.

10.    **Representations, Warranties and Covenants.**

(a)    <u>General Representations</u>. Each of the Client and the Investment Manager hereby represents and warrants as to itself as follows:

(i)    It has been duly organized and is validly existing and in good standing under the laws of its jurisdiction of organization, with power and authority to own its own properties and conduct its business as currently conducted.

(ii)    This Agreement has been duly authorized, executed and delivered by such Party and constitutes its valid and binding obligation, enforceable in accordance with its terms, subject only to approval by the Bankruptcy Court.

(iii)    The execution, delivery and performance of this Agreement by such Party will not violate or result in any default under such Party's certificate of formation or operating agreement (or equivalent constituent documents), any material contract or agreement to which such Party is a party or by which it or its assets may be bound or, to the best of each Party's knowledge and in good faith, any statute or any rule, regulation or order of any governmental or regulatory authority currently in effect.

(b)    <u>Client's Representations</u>. The Client hereby further represents, warrants and agrees as follows:

(i)    The Client has reviewed and acknowledges the disclosure set forth in Galaxy's Form ADV Part 2, which can be found via the Securities and Exchange Commission's ("**SEC**") website at https://adviserinfo.sec.gov/firm/summary/293908.

23

(ii)     The Client (either alone or together with any advisors retained by the Client in connection with evaluating the merits and risks of entering into this Agreement) has sufficient knowledge and experience in financial and business matters so as to be capable of evaluating the merits and risks of entering into this Agreement and are able to bear the economic risk of the Services, including the risk of a complete loss of the Assets.

(iii)    The Client has been given the opportunity to (A) ask questions of, and receive answers from, the Investment Manager concerning the terms and conditions of the  Services, this Agreement (including for the avoidance of doubt all exhibits, schedules, appendices and annexes hereto) and other matters pertaining to the Investment Manager's management of the Assets in the Account and (B) obtain any additional information which the Investment Manager can obtain without unreasonable effort or expense that is necessary to evaluate the merits and risks of the Services.  The Client has carefully considered and has, to the extent it believes such discussion necessary, discussed with legal, tax, accounting and financial advisors the suitability of entering into this Agreement in light of its particular tax and financial situation and has determined that entering into this Agreement is suitable for itself.

(iv)     The Client agrees to provide, at the time or times prescribed by law and at such time or times as requested, any information, documentation or certification required by law or otherwise requested that the Investment Manager reasonably believes will enable the Investment Manager or any of its respective employees or agents to comply with all applicable anti-money laundering statutes, rules, regulations and policies, including any policies applicable to an investment held or proposed to be held by the Account.

(v)      All Assets held in the Account are property of the estates (within the meaning of section 541 of the Bankruptcy Code) of the Client in the Chapter 11 Cases.

(vi)     Client is an "accredited investor" as that term is defined in Rule 501 of Regulation D promulgated under the Securities Act of 1933, as amended, a "qualified eligible person" as such term is defined under Rule 4.7 promulgated under the U.S. Commodity Exchange Act, as amended (together with the rules and regulations promulgated thereunder, the "**Commodity Exchange Act**") and an "eligible contract participant" as such term is defined in Section 1a(18) of the Commodity Exchange Act.

(vii)    Client is not an "investment company" registered under the 1940 Act.

(viii)   Upon Investment Manager's written request, and to the extent necessary to permit Investment Manager to perform the Services, senior management of the Client, including its Chief Executive Officer and Chief Financial

24

Officer, shall timely make themselves reasonably available to meet with Investment Manager.

(ix)  Before the Effective Date, Client shall use reasonable best efforts to ensure that each Client Beneficiary (A) becomes a party to this agreement as contemplated by Section 16(i) and (B) grants a power of attorney to Investment Manager as contemplated by Section 3(g)(i).

(x)  Client shall promptly notify the Investment Manager of any change in the representations, warranties and covenants set forth herein.

(c)  <u>Investment Manager Representations</u>.  The Investment Manager hereby further represents and warrants that:

(i)  (A) (1) It is an "investment adviser" as such term is defined under the Advisers Act, and is duly registered with the Securities and Exchange Commission ("**SEC**") and (2) it is not required to register in any capacity with the Commodity Futures Trading Commission ("**CFTC**") or National Futures Association ("**NFA**"), (B) maintains and implements internal procedures and policies reasonably designed to comply in all material respects with laws as applicable to the Investment Manager, including the Advisers Act and U.S. securities laws and (C) complies in all material respects with laws as applicable to the Investment Manager, including the Advisers Act and, U.S. securities laws and Commodity Exchange Act.

(ii)  It is duly qualified to do business and is in good standing in each jurisdiction where the conduct of its business requires it to be so qualified and has in effect all federal, state, local and foreign governmental authorizations necessary for it to carry on its business as it is now conducted.

(iii)  In connection with the execution, delivery or performance of this Agreement, Investment Manager is not required to make or obtain, other than the Approval Order, any consents or approvals of, or filings or registrations with, any court, administrative agency or commission or other self-regulatory organization, governmental authority –or instrumentality, including the SEC and CFTC, or with any third party.

(iv)  Neither the Investment Manager nor any "person associated with an investment adviser" (as defined in the Advisers Act) thereof, as applicable, is ineligible pursuant to Section 203 of the Advisers Act to serve as an investment adviser or as an associated person to a registered investment adviser.

(v)  In performing its services and obligations pursuant to this Agreement, the Investment Manager will comply with the Investment ProgramGuidelines, any investment guidelines separately agreed between the Investment Manager and the Client in writing from time to time, and all applicable

25

written supervisory and compliance policies and procedures of Investment Manager in accordance with the terms hereof; provided that any actions taken by Investment Manager prior to the date hereof, in connection with or in preparation for its performance of services and obligation pursuant to this Agreement and for the benefit of the Client, shall also be deemed subject to the representations, duties and obligations of Investment Manager hereunder.

(vi)    The Investment Manager shall furnish to the Client such information regarding the Investment Manager, its affiliates and its personnel as the Client may reasonably request from time to time (A) in connection with the preparation of disclosure documents and/or materials required for regulatory compliance purposes or as required by applicable law or (B) to enable the Client to carry out the actions contemplated by this Agreement.

(vii)   Other than the Approval Order, the Investment Manager has obtained all material governmental, regulatory, self-regulatory and exchange licenses and approvals that are required for the Investment Manager to perform its obligations hereunder.

(viii)  Upon Client's written request, and to the extent necessary to comply with its obligations under this Agreement, senior management of the Investment Manager, including its Global Head of Asset Management and Chief Operating Officer, shall timely make themselves reasonably available to meet with the Board.

(d)     The foregoing representations, warranties and agreements contained in this Section 10 shall continue and remain in effect, being deemed to be restated on an ongoing basis (including in connection with each transaction executed on behalf of the Client), during the term of this Agreement. Each Party shall promptly notify the other Parties of the occurrence of any event or condition that is reasonably likely to make any of the foregoing representations, warranties and agreements materially incomplete, inaccurate, false or misleading.

## 11.    Bankruptcy Court Approval.

The Client shall seek approval of its entry into this Agreement by the Bankruptcy Court pursuant to Section 363 of the Bankruptcy Code. Such motion, the proposed Approval Order, and an accompanying motion seeking approval of the contemplated monetization program and proposed order approving the same (the "**Monetization Order**") shall be provided to the Investment Manager (and its legal representatives) at least five (5) days prior to its filing, the substance and form of each of which must in any event be reasonably acceptable to the Investment Manager. The Investment Manager shall have no obligation to provide services under this Agreement unless and until (a) the Bankruptcy Court enters the Monetization Order and (b) the Bankruptcy Court enters the Approval Order which is reasonably acceptable to the Investment Manager and which Approval Order approves this Agreement in all material respects. Notwithstanding anything herein to the contrary, the

26

Investment Manager shall not be responsible in any respect for the Client's compliance with any Monetization Order and shall not be liable for any breach by the Client of the terms and conditions thereof.; provided that Investment Manager shall be subject to the Monetization Order and Approval Order.

If the Approval Order is not entered on or before September 30, 2023, or is later reversed, materially modified without Investment Manager's consent or set aside for any reason, the Investment Manager may terminate this Agreement immediately. All fees and expenses that come due hereunder (including any indemnities) shall be entitled to priority as administrative expenses under sections 503(b)(1)(A) and 507(a)(2) of the Bankruptcy Code.

The Client will use its best efforts to ensure that, to the fullest extent permitted by law, any confirmed plan of reorganization or liquidation in the Chapter 11 Cases contains typical and customary releases (both from the Client and from third parties, to the maximum extent permitted under applicable law) and exculpation provisions releasing, waiving and forever discharging the Investment Manager, its divisions, affiliates, any person controlling the Investment Manager or its affiliates and their respective current and former directors, officers, partners, managers, members, agents, representatives and employees from any and all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action and liabilities related to the Client or the Services. The terms of this Section are solely for the Investment Manager's benefit and may be waived, in whole or in part, only by the Investment Manager.

12. **Expertise.** The Client acknowledges and agrees that Galaxy's asset management expertise, as well as its ~~digital asset~~Digital Asset markets knowledge, financial skills and risk management capabilities, some or all of which may be required by the Client during the term of the Services, were important factors in determining the amount of the Management Fees set forth herein, and that the ultimate benefit to the Client of the Investment Manager's services hereunder could not be measured merely by reference to the number of hours to be expended by the Investment Manager in the performance of such services. The Client also acknowledges and agrees that the Management Fees (together with any other amounts that come due hereunder) have been agreed upon by the Parties in anticipation that a substantial commitment of time and effort will be required of the Investment Manager and its professionals over the life of the Services and in light of the fact that such commitment may foreclose other opportunities for the Investment Manager, and that the actual time and commitment required of the Investment Manager and its professionals to perform the services hereunder may vary substantially from week to week or month to month, creating "peak load" issues for Galaxy. In addition, given the numerous issues which Galaxy may be required to address in the performance of its services hereunder, its commitment to the variable level of time and effort necessary to address all such issues as they arise and the market prices for its services for engagements of this nature in an out-of-court context, the

Client agrees that the fee arrangements specified under <u>Section 7</u> are commercially reasonable.

13.    **Information; Cooperation.** In connection with the Services, the Client will provide Investment Manager with reasonable access to the Client's Representatives, and will furnish the Investment Manager and cause its Representatives to furnish Investment Manager with such information as the Investment Manager reasonable believes appropriate for the  Services (all such information so furnished being the "**Information**").  The Client recognizes and confirms that the Investment Manager will use and rely primarily on the Information and on information available from generally recognized public sources in performing its services without having independently verified the same.  Neither the Client or the Investment Manager assumes responsibility for the accuracy or completeness of the Information or have any liability therefor.  The Client will promptly notify the Investment Manager if it learns of any material inaccuracy or misstatement in, or material omission from, any Information theretofore delivered to the Investment Manager.  For the avoidance of doubt, all Information shall remain the property of Client and under its control.

The Client agrees to cooperate with the Investment Manager in the performance of its services under this Agreement and, upon Investment Manager's reasonable request, shall provide the Investment Manager with timely access to and use of personnel, facilities, equipment, data and information to the extent necessary to permit the Investment Manager to perform its services under this Agreement.

14.    **Confidentiality.**

(a)    Neither Party shall disclose or use (including, without limitation, for trading purposes) any information, records, investment advice or other information (including any "Information" as defined above) (the "**Confidential Information**") obtained pursuant to this Agreement in any manner whatsoever except as expressly authorized in this Agreement, except: (i) as required by law or in connection with requests for information or documents, subpoena, civil or criminal investigative demand or similar process; (ii) as necessary to effect the terms of this Agreement; (iii) as required to be furnished to any governmental regulatory agency or self-regulating body in connection with any judicial, governmental or other regulatory proceeding; or (iv) as reasonably required by any affiliate of the Client on a need-to-know basis in connection with this Agreement.  Except as expressly set forth herein or otherwise agreed by the Parties in writing, all Confidential Information received by any Party may only be used by such Party in connection with this Agreement.  The foregoing obligations shall not extend to any information to the extent that the party receiving such Confidential Information (the "**Receiving Party**") can demonstrate that such information (A) was at the time of disclosure or, to the extent that such information thereafter becomes through no fault of the Receiving Party, a part of the public domain by publication or otherwise; (B) was already properly and lawfully in the Receiving Party's possession at the time it was received by the Receiving Party free from any obligation of confidentiality, (ccc) was or is lawfully received by the Receiving Party from a third party who was under

28

no obligation of confidentiality to the Party disclosing the Confidential Information (the "**Disclosing Party**") with respect thereto, or (C) is independently developed by the Receiving Party or its independent contractors who did not have access to the Disclosing Party's Confidential Information.

(b)     Notwithstanding anything herein to the contrary, (i)  Client may disclose to any and all persons, without limitation of any kind, as is requested or required in connection with the Chapter 11 Cases and/or transactions or litigation related thereto, including of any plan confirmed by the Bankruptcy Court, Client's U.S. federal income tax treatment and the U.S. federal income tax structure of the transactions contemplated hereby relating to the Client and all materials of any kind (including opinions or other tax analyses) that are provided to it relating to such tax treatment and tax structure; and (ii)  Client may disclose all Confidential Information that is appropriate for the preparation or auditing of Client's financial statements or tax returns to all persons involved in the preparation or auditing of such financial statements or tax returns.  No disclosure of any Confidential Information referenced in clause (i) of the preceding sentence may be made to the extent nondisclosure is reasonably necessary in order to comply with applicable securities laws.  Nothing contained herein shall prohibit or impair the ability of Client or Investment Manager to disclose Confidential Information to the UCC or the AHC.

15.  **Notice of Litigation or Certain Other Events.**  Investment Manager shall promptly notify Client of (a) the institution of any litigation or government proceedings against Investment Manager that if determined adversely would reasonably be expected to have a material adverse effect on Client. (b) any settlement, decree, judgment, award or other material development relating to litigation or proceedings described in clause (a) of this paragraph; (c) the incapacity of Investment Manager that would reasonably be expected to result in a material adverse change to Client; (d) any breach or failure by Investment Manager to perform its material obligations under this Agreement; and (e) the occurrence of Regulatory Event involving Investment Manager.  A "**Regulatory Event**" shall be deemed to occur upon (x) the indictment of Investment Manager of a felony-level criminal offense or the commencement of a securities-related litigation (whether criminal or civil) against Investment Manager or (y) the commencement of an administrative proceeding before, or investigations or actions by, the SEC, the CFTC or any other federal regulatory or self-regulatory agency or any state agency relating to an alleged securities laws violation or commodities laws violation by Investment Manager.  For the avoidance of doubt, the receipt of a "Wells notice," the commencement of an informal inquiry, a regulatory "sweep" or an ordinary audit or exam by the SEC, CFTC or other regulatory body will not be deemed a Regulatory Event.

16.  **Miscellaneous**

(a)     Successors and Assigns.  The provisions of this Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and assigns permitted hereby; *provided* that, this Agreement may not be assigned by either Party without the prior written consent of the other Party.

29

(b)    <u>Amendment</u>.  Other than as described in this Agreement, this Agreement may not be modified or amended except in writing signed by the Parties.  Notwithstanding anything contained herein to the contrary, the prior written consent of the UCC and the AHC (which consent of both the UCC and the AHC shall not be unreasonably withheld or delayed) shall be required for (i) any material amendment, supplement, modification or waiver of this Agreement or (ii) any amendment, supplement, modification or waiver of (A) this Section 16(b), (B) Sections 2, 3 and 7 of this Agreement or (C) the Investment Guidelines.

(c)    <u>Survival</u>.–  No termination of this Agreement shall affect the liabilities and obligations of the Parties arising from or in connection with services performed or transactions initiated prior to such termination.  Without limiting the generality of the foregoing, the provisions of <u>Sections</u> 7 (Fees and Expenses.), 9 (Limitation of Liability; Exculpation and Indemnification; Other Activities; Force Majeure.), 14 (Confidentiality.) and 15 (Notice of Litigation or Certain Other Events) shall survive any termination of this Agreement.

(d)    <u>Entire Agreement</u>.  This Agreement constitutes the entire agreement between the Parties pertaining to the subject matter of this Agreement and supersedes all prior agreements and understandings pertaining to such subject matter.

(e)    <u>Governing Law</u>.  All aspects of the relationship created by this Agreement (including Annex A) shall be governed by and construed in accordance with the laws of the State of New York, applicable to agreements made and to be performed entirely in such State. The parties irrevocably submit to the exclusive jurisdiction of the United States Bankruptcy Court for the District of Delaware with respect to any proceeding arising out of or relating to this Agreement or any transaction in connection herewith.   Client further agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit or in another manner provided by law, and consents to the service of process upon it by the mailing or delivering such service to its agent and authorizes and directs its agent to accept such service. Galaxy and Client (on its own behalf and, to the extent permitted by law, on behalf of its equity holders) waive all right to trial by jury in any action, suit, proceeding or counterclaim (whether based upon contract, tort or otherwise) related to or arising out of the  Services or the performance by Investment Manager of the services contemplated by this Agreement.

(f)    <u>Severability</u>.  If any provision of this Agreement would be invalid under applicable law, then such provision shall be deemed to be modified to the extent necessary to render it valid while most nearly preserving its original intent.  No provision hereof shall be affected as a result of another provision being held invalid.

(g)    <u>Notices</u>.  All notices under this Agreement (including termination notices pursuant to <u>Section 6</u>) shall be in writing (including by email) and delivered to such addresses or numbers set forth below, or as otherwise specified in writing by any

30

Party to the other Party in writing from time to time.  All notices shall be effective upon receipt.

<div style="margin-left:2em">

To the Investment Manager:     Galaxy Digital Capital Management LP
                                 300 Vesey St., Floor 13
                                 New York, NY 10282
                                 Attn: Steve Kurz
                                 Telephone: (917) 794-0311
                                 Email: steve@galaxy.com
                                 Copy to: compliance@galaxy.com

To the Client:                    FTX Trading Ltd.
                                 Friar's Hill Road, Mandolin Place
                                 Saint John's, AG-04, Antigua and Barbuda
                                 Attn: John Ray III
                                 Email: jray@greylockpartnersllc.com
                                 Copy to: kschultea@rlks.net

</div>

(h)    <u>Waivers; Remedies Cumulative</u>.  Any waiver of any right under this Agreement may be granted only in writing by the person holding the right being waived.  Any such waiver will be effective only in the specific instance given and for the specific purpose for which it is given, and will not apply in any other instance.  A failure or delay in exercising any right under this Agreement will not operate as a waiver of such right, and a single or partial exercise of any right under this Agreement will not preclude any subsequent or further exercise of such right or the exercise of any other right.  The rights and remedies of the Parties hereunder are cumulative and are not exclusive of any rights or remedies that they would otherwise have under this Agreement, at law or in equity.

(i)    <u>Third Party Beneficiaries</u>.  This Agreement is not intended to and shall not be construed to create any rights in any person other than the Client, the Investment Manager and any Indemnified Party (solely with respect to <u>Section 9</u>), except that any entity which owns Assets that are held in the Account (each, a "**Client Beneficiary**") shall be a third party beneficiary of this Agreement with respect to the Assets within the Account that are owned by such affiliate; and the UCC and the AHC shall each be a third party beneficiary of this Agreement solely with respect to any right of consent or consent afforded to the UCC or the AHC, as applicable, hereunder.  Prior to the Effective Date, the Parties shall use reasonable best efforts to add any Client Beneficiary as a party to this Agreement.

(j)    <u>Independent Contractor; No Partnership or Joint Venture</u>.  The Client and the Investment Manager are not partners or joint venturers with each other, and nothing in this Agreement shall be construed to make them such partners or joint venturers or impose any liability as such on any of them.  The Investment Manager's relationship to the Client shall be deemed to be that of an independent contractor.

(k)    <u>Consent to Electronic Delivery</u>. The Client hereby agrees and provides its informed written consent to the Electronic Communication (as defined below) of the Account

<div align="center">31</div>

Information (as defined below) by the Investment Manager, the Custodian, the administrator and/or any other relevant service provider to the Account. "**Account Information**" means any and all notices (including privacy notices), consents or other communications under, in respect of or in connection with this Agreement (including reports delivered pursuant to this Agreement, regulatory communications and other information, including documents required in the future to be delivered to the Client pursuant to the Advisers Act (*e.g.*, the Investment Manager's Form ADV, if any). "**Electronic Communication**" means e-mail delivery, making Account Information available electronically to the Client on an internet site, if applicable, and/or through any other electronic means, including a virtual data room. The Investment Manager, in its sole discretion, may elect which method of delivery it uses with respect to any and all Electronic Communications. The Client hereby acknowledges it is its affirmative obligation to notify the Investment Manager in writing if the its email address provided to the Investment Manager changes.

(l)     <u>Counterparts</u>.  This Agreement may be executed in more than one counterpart (including those delivered by electronic means) all of which counterparts together shall constitute the same instrument.

(m)     <u>Interpretation</u>.

(i)      *Captions; Headings*.  The captions and headings in this Agreement are for convenience of reference only and are not intended to be considered in construing any term or provision of this Agreement.

(ii)     *Exhibits; Appendices*.  Each exhibit, appendix, annex and schedule attached hereto shall be incorporated into and form a part of this Agreement and shall be construed for all purposes hereunder as if it were contained in the body of this Agreement.

(iii)    *Number and Gender*.  In this Agreement, words importing the singular number only shall include the plural and vice versa, and words importing one gender only shall include the other genders.

(iv)     *Inclusive Lists*.  Except where expressly specified to the contrary, in this Agreement the words "include," "including," and "such as" in this Agreement should be read to mean "include without limitation," "including without limitation," and "such as, but without any implied limitation," respectively.

(v)      *Persons; Entities*.  Any reference to a "person" in this Agreement refers to a natural person, partnership (whether general or limited), limited liability company, trust, estate, association, corporation and government (including a country, state, county or any other government subdivision, agency or instrumentality).

32

[*Remainder of Page Intentionally Left Blank*]

#97243610v31
4877-0963-3653 v.11

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their duly authorized representatives.

**CLIENT:**

FTX Trading Ltd.


By:    _____
       Name: John J. Ray III
       Title:   Authorized Signatory



**INVESTMENT MANAGER:**

Galaxy Digital Capital Management LP



By:    _____
       Name: Steve Kurz
       Title:   Authorized Signatory

**Exhibit A**

**FORM OF GALAXY PARENTAL GUARANTY**

#97243610v31
4877-0963-3653 v.11

## GUARANTY

This GUARANTY ("**Guaranty**"), dated as of the date hereof, is made by Galaxy Digital Holdings LP, a Cayman Islands exempted limited partnership (the "**Guarantor**"), in favor and for the benefit of the Client (as such term is defined in the Services Agreement (as defined below) ("**Beneficiary**"). Terms not hereinafter defined shall have meanings set forth in the Services Agreement.

Beneficiary and Galaxy Digital Capital Management L.P. ("**Investment Manager**") have entered into an investment management agreement dated as of [•], pursuant to which Investment Manager will provide certain investment management services with respect to certain assets of Beneficiary (the "**Services Agreement**"). In connection with the rights and obligations granted to Investment Manager pursuant to the Services Agreement, Investment Manager has entered into, on behalf of Beneficiary, a~~the~~ Cryptocurrency Purchase and Sale ~~Agreement~~Agreements, dated as of [•] and the ~~form~~forms of which ~~is~~are attached ~~as~~ hereto, by and between Galaxy Digital Trading Cayman LLC, a limited liability company organized under the laws of the Cayman Islands and/or any of its affiliates that become a "Galaxy Trading Partner" as defined in the Services Agreement (together, "**Galaxy Cayman**" or the "**Obligor**~~")~~")") and Client (the "**Galaxy Trading Agreement**").  In consideration of any indirect or tangential benefits derived by Guarantor from the transactions under the Galaxy Trading Agreement, and in order to induce Beneficiary to enter into the Services Agreement, Guarantor hereby agrees as follows:

1        Guaranty. Guarantor absolutely guarantees, as primary obligor and not merely as surety, the full and punctual payment and performance of all present and future obligations, liabilities, covenants and agreements required to be observed and performed or paid or reimbursed by Obligor with respect to the Assets as set forth under Section 2 of the Services Agreement when the same are due and payable, whether on demand, at stated maturity, by acceleration, early termination or otherwise, in accordance with the terms of the Galaxy Trading Agreement, plus all costs, expenses and fees (including the reasonable fees and expenses of Beneficiary's counsel) in any way relating to the enforcement or protection of Beneficiary's rights hereunder (collectively, the "**Obligations**") provided such Obligations shall not exceed the "**Total Guaranteed Amount**" as defined in Appendix A1 herein. For the avoidance of doubt, the total liability of Guarantor under this Guaranty shall not extend beyond amounts which Beneficiary is entitled to recover under the applicable Galaxy Trading Agreement plus the foregoing expenses and costs of enforcement or protection provided such amounts shall not exceed the Total Guaranteed Amount as defined in Appendix A1 herein.

2        Guaranty Absolute. Guarantor agrees that its obligations under this Guaranty (i) are continuing, unconditional, and absolute, (ii) are irrevocable and shall remain in full force and effect until all Obligations and other amounts payable under this Guaranty and the Galaxy Trading Agreement have been validly, finally, and irrevocably paid or performed in full, and (iii) shall not be discharged or impaired or otherwise affected by, and Guarantor hereby irrevocably waives any defenses to enforcement it may have (now or in the future) by reason of:

(a) Any change in the time, place or manner of payment or performance of, or in any other term of the Obligations, or any rescission, waiver, release, assignment, amendment or other modification of the Galaxy Trading Agreement or any Obligation.

(b) Any taking, exchange, substitution, release, impairment, amendment, waiver, modification or non-perfection of any collateral or any other guaranty for the Obligations, or any manner of sale, disposition or application of proceeds of any collateral or other assets to all or part of the Obligations.

(c) Any default, failure or delay, willful or otherwise, in the performance of the Obligations, the Galaxy Trading Agreement or this Guaranty or in the assertion of any claim against the Obligor or Guarantor by Beneficiary.

(d) The failure of (i) any other guarantor or third party to execute or deliver this Guaranty or any other guaranty or agreement, or the release or reduction of liability of Guarantor or any other guarantor or surety with respect to the Obligations, or (ii) consideration, breach of warranty, payment, performance, statute of frauds, statute of limitations, accord and satisfaction, and usury with respect to the Guaranty, the Galaxy Trading Agreement or any Obligation.

(e) Any claim as to (i) the Galaxy Trading Agreement's, any Obligation's or this Guaranty's validity, regularity or enforceability or the lack of authority of the Obligor to execute or deliver the Galaxy Trading Agreement; (ii) any extension of credit or financial accommodation by Beneficiary to or for the account of the Obligor other than that guaranteed hereunder; (iii) any present or future law, regulation or order of any jurisdiction (whether of right or in fact) or of any agency thereof purporting to reduce, amend, restructure or otherwise affect any term of the Galaxy Trading Agreement or Obligation; (iv) any rights to interpose any counterclaim or offset of any nature and descriptions which it may have or which exist between and among Beneficiary, the Obligor and/or Guarantor except as specifically set forth in the Galaxy Trading Agreement; (v) absence, impairment or loss of any right of reimbursement, contribution or subrogation or any other right or remedy of Guarantor against the Obligor or any other person or collateral securing the Galaxy Trading Agreement or any Obligation; and (vi) any benefit of, and any right to participate in, any collateral given to Beneficiary to secure the payment of all or any part of the Obligations.

(f) any change in the corporate, partnership, limited liability company or other existence, structure or ownership of the Obligor or any insolvency proceeding or other similar proceeding affecting the Obligor or any of its assets, or any resulting release or discharge of any obligation of the Obligor;

(g) the disallowance, under any state or federal bankruptcy, insolvency or similar law, of all or any portion of the claims of Beneficiary for repayment of all or any part of the Obligations;

(h) the existence of any claim, setoff or other rights which Guarantor may have at any time against the Obligor, Beneficiary or any other person, whether in connection herewith or in connection with any unrelated transactions; provided that, notwithstanding any other provisions in this Guaranty, nothing in this Guaranty shall prevent the assertion of any such claim by separate suit or compulsory counterclaim;

#97243610v31
4877-0963-3653 v.11

(i) Any other defense whatsoever which might constitute a defense available to, or discharge of, the Obligor or Guarantor (whether arising in connection with Guarantor's status as surety or otherwise), whether or not the Obligor or Guarantor has any notice or knowledge of any of the foregoing.

(j) No failure on the part of Beneficiary to exercise or exercise in full, and no delay in exercising, any right, power or privilege under this Guaranty shall operate as a waiver or preclude any other or further exercise thereof.

3    Certain Waivers; Acknowledgments. Guarantor further acknowledges and agrees as follows:

(a) This Guaranty is a guaranty of payment and performance and not of collection.

(b) This Guaranty is a direct guaranty and independent of the obligations of the Obligor under the Galaxy Trading Agreement. Beneficiary may resort to Guarantor for payment and performance of the Obligations. Beneficiary may, at Beneficiary's option, proceed against Guarantor and Obligor, jointly and severally, or against Guarantor only after having obtained a judgment against Obligor.

(c) Guarantor hereby waives and relinquishes any and all legal and equitable defenses available to a guarantor (other than performance and indefeasible payment in full in cash by the Obligor) and agrees not to assert or take advantage of any such defenses, including, without limitation, presentment, notice of dishonor, demand, protest, prior proceedings (including bankruptcy, insolvency, reorganization, or similar proceedings), order and any notices not provided herein, including any notice of acceptance of this Guaranty, the Galaxy Trading Agreement or any amendments or modifications thereto or incurrence of any Obligation (including that arising from any Transaction arising by way of assignment or transfer) and any other formality or defense with respect to any of the Obligations, the Galaxy Trading Agreement, or this Guaranty. Beneficiary shall not be obligated to file any claim relating to the Obligations, including any claim in the event that Guarantor becomes subject to a bankruptcy, insolvency, reorganization, liquidation, receivership, conservatorship, arrangement or similar proceeding, and any failure of Beneficiary to file any such claim shall not affect Guarantor's obligations hereunder.

4    Subrogation. Guarantor waives and shall not exercise any rights that it may acquire by way of subrogation, contribution, reimbursement, indemnification, exoneration or set-off for payments made under this Guaranty until all Obligations shall have been indefeasibly performed or paid and discharged in full. Should Guarantor have the right, notwithstanding the foregoing, to exercise its subrogation rights prior to complete satisfaction of its obligations under this Guaranty, Guarantor hereby expressly and irrevocably (i) subordinates in favor of Beneficiary any and all rights at law or in equity to subrogation, contribution, reimbursement, indemnification, exoneration or set-off that Guarantor may have prior to the complete satisfaction of its obligations under this Guaranty, and (ii) waives any and all defenses available to a surety, guarantor or accommodation co-obligor until all Obligations shall have been indefeasibly performed or paid and discharged in full.  Guarantor acknowledges and agrees that this subordination is intended to benefit Beneficiary and shall not limit or otherwise affect Guarantor's liability hereunder or the

enforceability of this Agreement, and that Beneficiary and its successors and assigns are intended third party beneficiaries of the waivers and agreements set forth in this Section 4.

5    <u>Reinstatement</u>. The obligations of Guarantor under this Guaranty shall be automatically reinstated if and to the extent that for any reason any payment by or on behalf of the Obligor in respect of the Obligations is at any time rescinded, annulled, avoided, set aside, invalidated, declared to be fraudulent or must be otherwise restored or repaid by any holder of any of the Obligations, whether as a result of any proceedings in bankruptcy or reorganization, equitable cause or otherwise.  The provisions of this Section 5 shall survive termination of this Guaranty.

6    In any action or proceeding involving any provincial, territorial or state corporate law, or any state or federal bankruptcy, insolvency, reorganization or other law affecting the rights of creditors generally, if the obligations of Guarantor under this Guaranty would otherwise be held or determined to be void, invalid or unenforceable, or subordinated to the claims of any other creditors, on account of the amount of its liability under this Guaranty, then, notwithstanding any other provision hereof to the contrary, the amount of such liability shall, without any further action by Guarantor, Beneficiary or any other person, be automatically limited and reduced to the highest amount that is valid and enforceable and not subordinated to the claims of other creditors as determined in such action or proceeding.

7    <u>Representations and Warranties</u>. To induce Beneficiary to enter into the Galaxy Trading Agreement, Guarantor represents and warrants that: (a) Guarantor is a duly organized and validly existing exempted Cayman Islands limited partnership under the laws of the jurisdiction of its organization; (b) this Guaranty constitutes Guarantor's valid and legally binding agreement in accordance with its terms; (c) the execution, delivery and performance of this Guaranty have been duly authorized by all necessary action and will not violate or conflict with any law, order, judgment or decree to which Guarantor or any of its assets may be subject; (d) Guarantor is currently solvent and will not be rendered insolvent by providing this Guaranty; (e) there is no pending or threatened action or proceeding affecting Guarantor before any court, governmental agency or arbitrator that could reasonably be expected to have a material adverse effect on the financial condition of Guarantor or the ability of Guarantor to perform its obligations hereunder and (f) Guarantor's obligations are legal, valid and binding.

8    <u>Notices</u>. All notices, requests, consents, demands and other communications hereunder (each, a "**Notice**") shall be in writing and delivered to the parties at the email addresses set forth herein or to such other address as may be designated by the parties in writing. Except as otherwise provided in this Guaranty, a Notice is effective only (a) (i) if sent by mail, with written confirmation of delivery or (ii) if sent by email, upon receipt of the receiving party; and (b) if the party giving the Notice has complied with the requirements of this section. Guarantor irrevocably waives, to the fullest extent permitted by law, any notice not provided for herein.

9    <u>Assignment</u>. This Guaranty shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns; provided, however, that Guarantor may not, without the prior written consent of Beneficiary, assign any of its rights, powers or obligations hereunder. Beneficiary may not assign this Guaranty and its rights hereunder without the consent of Guarantor. Any attempted assignment in violation of this section shall be null and void.

10      Governing Law; Service of Process. THIS GUARANTY SHALL BE GOVERNED BY AND CONSTRUED UNDER THE LAWS OF THE STATE OF NEW YORK, WITHOUT REFERENCE TO ANY CHOICE OF LAW DOCTRINE. EACH PARTY IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 8 HEREOF AND AGREES THAT NOTHING HEREIN SHALL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY MANNER PERMITTED BY APPLICABLE LAW. THE PARTIES IRREVOCABLY SUBMIT TO THE EXCLUSIVE JURISDICTION OF THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE WITH RESPECT TO ANY PROCEEDING ARISING OUT OF OR RELATING TO THIS GUARANTY OR ANY CONTRACT OR TRANSACTION IN CONNECTION HEREWITH.

11      Waiver of Jury Trial. EACH PARTY HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHTS TO TRIAL BY JURY WITH RESPECT TO ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS GUARANTY OR ANY OF THE OBLIGATIONS HEREUNDER.

12      Cumulative Rights. Each right, remedy and power hereby granted to Beneficiary or allowed it by applicable law or other agreement shall be cumulative and not exclusive of any other, and may be exercised by Beneficiary at any time or from time to time.

13      Certain Taxes. All payments to be made pursuant to this Guaranty shall be made free and clear of any deduction and/or withholding tax unless such deduction or withholding tax is required by applicable law.

14      Severability. If any provision of this Guaranty is to any extent determined by final decision of a court of competent jurisdiction to be unenforceable, the remainder of this Guaranty shall not be affected thereby, and each provision of this Guaranty shall be valid and enforceable to the fullest extent permitted by law.

15      Termination. Notwithstanding anything contained herein to the contrary, and only after payment and/or performance and satisfaction in full of all Obligations accrued pursuant to the Galaxy Trading Agreement, Guarantor may terminate the Galaxy Trading Agreement, whereupon this Guaranty shall be deemed terminated with respect to the Obligations of Galaxy Cayman by the parties hereto, and shall cease to have any force or effect with respect thereto. Any future Obligations created by the Obligor after the termination of the Guaranty with respect to the Obligor shall not be covered by this Guaranty.

16      Guaranty Term. This Guaranty shall be effective until termination pursuant to Section 15 herein.

17      Entire Agreement; Amendments; Headings; Effectiveness. This Guaranty constitutes the sole and entire agreement of Guarantor and Beneficiary with respect to the subject matter hereof and supersedes all previous agreements or understandings, oral or written, with respect to such subject matter. No amendment or waiver of any provision of this Guaranty shall be valid and binding unless it is in writing and signed, in the case of an amendment, by both parties, or in the case of a waiver, by the party against which the waiver is to be effective. Section headings

are for convenience of reference only and shall not define, modify, expand or limit any of the terms of this Guaranty. Delivery of this Guaranty in electronic (i.e., pdf or tif) format shall be effective as delivery of a manually executed original of this Guaranty.

[*Signature Page Follows*]

#97243610v31
4877-0963-3653 v.11

IN WITNESS WHEREOF, each of the undersigned has caused this Guaranty to be duly executed and delivered by its duly authorized signatory as of the day and year first above written.

**GUARANTOR**:

Galaxy Digital Holdings LP

By: _____
Name:
Title:
Date:
Email: compliance@galaxydigital.io

Accepted and agreed to:
**BENEFICIARY**:

FTX Trading Ltd.

By: _____
Name:
Title:
Date:
Email:

A-8

**Appendix A1**

Notwithstanding anything to the contrary provided in the Guaranty dated as of the date hereof, made by Galaxy Digital Holdings LP ("**Guarantor**") in favor and for the benefit of the Client ("**Beneficiary**"), "**Total Guaranteed Amount**" shall mean the aggregate principal amount of the obligations of Guarantor hereunder at any time shall not exceed $800,000,000.00.

Guarantor hereby acknowledges that the Obligations may exceed the amount of such Guarantor's obligation as limited hereby without affecting the liability of Guarantor hereunder.

**GUARANTOR:**

Galaxy Digital Holdings LP

By: _____
Name:
Title:
Date:

Accepted and agreed to:
**BENEFICIARY**:

FTX Trading Ltd.

By: _____
Name:
Title:
Date:
Email

#97243610v17
#97243610v31
4877-0963-3653 v.11

**Appendix A2**

**Form of Cryptocurrency Purchase and Sale ~~Agreement~~Agreements**

[*Parties to mutually agree on form of Cryptocurrency Purchase and Sale ~~Agreement~~Agreements, which will be attached to an executed Guaranty*]

#97243610v17
#97243610v31
4877-0963-3653 v.11

**Exhibit B**

**HEDGING FEE ILLUSTRATIVE EXAMPLE**

| | | | |
|---|---|---|---|
| (1) | Rate | | 0.005 |
| (2) | No. of Days in Month (i.e., October) | | 31 |
| | No. of Days in Year | | 365 |
| | | | 0.084932 |
| (3) | Average USD NAV of Hedging Assets | | |

| | | |
|---|---|---|
| Bitcoin – Avg. USD NAV for Month | | |
| Sum of the USD value on each Day of the Month | $ | 17,360,000,000 |
| No. of Days in Month (i.e., October) | | 31 |
| Bitcoin – Avg. USD NAV for Month | $ | 560,000,000 |
| Ether – Avg. USD NAV for Month | | |
| Sum of the USD value on each Day of the Month | $ | 6,820,000,000 |
| No. of Days in Month (i.e., October) | | 31 |
| Ether – Avg. USD NAV for Month | $ | 220,000,000 |
| Average USD NAV of Hedging Assets | $ | 780,000,000 |

**Hedging Fee**

Hedging Fee = (1) x (2) x (3)

Hedging Fee = 0.005 x 0.084932 x $780,000,000

Hedging Fee for October = $331,~~233~~235

B-1