```
                    UNITED STATES BANKRUPTCY COURT
                       DISTRICT OF DELAWARE

                                  .  Chapter 11
IN RE:                            .
                                  .  Case No. 22-11068 (JTD)
FTX TRADING LTD, et al,           .
                                  .  824 Market Street
                                  .  Wilmington, Delaware 19801
                Debtors.          .
. . . . . . . . . . . . . . . .   .  Wednesday September 13, 2023
ALAMEDA RESEARCH, LLC, et al, .
                                  .  Adv. Proc. No. 23-50145(JTD)
        vs.                       .
                                  .
FTX DIGITAL MARKETS LTD.,         .
et al.                            .
. . . . . . . . . . . . . . . .   .
ALAMEDA RESEARCH, LLC, et al, .
                                  .  Adv. Proc. No. 23-50381(JTD)
        vs.                       .
                                  .
SAMUEL BANKMAN-FRIED, et al.  .
. . . . . . . . . . . . . . . .   .
FTX TRADING, LTD., et al,         .
                                  .  Adv. Proc. No. 23-50437(JTD)
        vs.                       .
                                  .
LOREM IPSUM UG, et al.            .
. . . . . . . . . . . . . . . .   .
(Continued)
```

                          TRANSCRIPT OF HEARING
                 BEFORE THE HONORABLE JOHN T. DORSEY
                    UNITED STATES BANKRUPTCY JUDGE

```
Audio Operator:            Electronically Recorded
                           by Jermaine Cooper, ECRO

Transcription Company:     Reliable
                           1007 N. Orange Street
                           Wilmington, Delaware 19801
                           (302)654-8080
                           Email:  gmatthews@reliable-co.com
```

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

```
ALAMEDA RESEARCH LTD., et al, .
                                 . Adv. Proc. No. 23-50411(JTD)
          vs.                    .
                                 .
MICHAEL KIVES, et al.            .
. . . . . . . . . . . . . . . . .
FTX TRADING, LTD., et al,        .
                                 . Adv. Proc. No. 23-50448(JTD)
          vs.                    .
                                 .
SAMUEL BANKMAN-FRIED, et al.     .
. . . . . . . . . . . . . . . . .
```

APPEARANCES:

| | |
|---|---|
| For the Debtors: | Kimberly A. Brown, Esq.<br>LANDIS, RATH & COBB, LLP<br>919 Market Street, Suite 1800<br>Wilmington, Delaware 19801 |
| | Andrew G. Dietderich, Esq.<br>Brian D. Glueckstein, Esq.<br>Alexa J. Kranzley, Esq.<br>SULLIVAN & CROMWELL, LLP<br>125 Broad Street<br>New York, New York 10004 |
| For the U.S. Trustee: | Juliet Sarkessian, Esq.<br>Benjamin Hackman, Esq.<br>Jonathan Lipshie, Esq.<br>OFFICE OF THE U.S. TRUSTEE<br>844 King Street, Suite 2207<br>Wilmington, Delaware 19801 |
| For the Official Committee<br>of Unsecured Creditors: | Matthew Lunn, Esq.<br>YOUNG, CONAWAY, STARGATT<br> & TAYLOR, LLP<br>Rodney Square<br>1000 North King Street<br>Wilmington, Delaware 19801 |
| | Kenneth Pasquale, Esq.<br>Eriz Gilad, Esq.<br>PAUL HASTINGS, LLP<br>200 Park Avenue<br>New York, New York 10166 |

(Appearances Continued)

APPEARANCES:  (Continued)

Fee Examiner:                    Katherine Stadler, Esq.
                                 GODFREY & KAHN, S.C.
                                 One East Main Street, Suite 500
                                 Madison, Wisconsin 53703

For the Fee Examiner:            Mark Hancock, Esq.
                                 GODFREY & KAHN, S.C.
                                 One East Main Street, Suite 500
                                 Madison, Wisconsin 53703

For the SEC:                     Therese Scheuer, Esq.
                                 SECURITIES AND EXCHANGE
                                  COMMISSION
                                 100 F. Street, NE
                                 Washington, D.C. 20549.

For GreenLight:                  Andrew Brown, Esq.
                                 POTTER, ANDERSON & CORROON, LLP
                                 1313 North Market Street
                                 6th Floor
                                 Wilmington, Delaware 19801

For the Ad Hoc Committee:        Matthew Harvey, Esq.
                                 MORRIS, NICHOLS, ARSHT
                                  & TUNNELL, LLP
                                 1201 North Market Street
                                 16th Floor
                                 Wilmington, Delaware 19899

For Samuel Bankman-Fried:        Marc Phillips, Esq.
                                 MONTGOMERY, MCCRACKEN, WALKER
                                  & RHOADS, LLP
                                 1105 North Market Street
                                 15th floor
                                 Wilmington, Delaware 19801

For Rioscience and 4J
Therapeutics:                    Michael DeBaecke, Esq.
                                 ASHBY & GEDDES, PA
                                 500 Delaware Ave, Suite 8
                                 Wilmington, Delaware 19801

(Appearances Continued)

APPEARANCE VIA ZOOM:

For the Platform Life
Science Defendants:              Alan Kornfeld, Esq.
                                 PACHULSKI, STANG, ZIEHL
                                  & JONES, LLP
                                 919 North Market Street
                                 17th Floor
                                 Wilmington, Delaware 19899

<u>INDEX</u>

<u>Page</u>

DEBTORS' MOTION FOR ENTRY OF AN ORDER AUTHORIZING          12
AND APPROVING (I) GUIDELINES FOR THE SALE OR TRANSFER
OF CERTAIN DIGITAL ASSETS, (II) THE SALE OR TRANSFER OF
SUCH DIGITAL ASSETS IN ACCORDANCE WITH SUCH GUIDELINES
FREE AND CLEAR OF ANY LIENS, CLAIMS, INTERESTS, AND
ENCUMBRANCES, (III) THE DEBTORS' ENTRY INTO AND
PERFORMANCE UNDER POST-PETITION HEDGING ARRANGEMENTS,
INCLUDING GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE
EXPENSE CLAIMS IN CONNECTION THEREWITH, AND (IV) THE
DEBTORS TO STAKE CERTAIN DIGITAL ASSETS


DEBTORS' MOTION FOR AN ORDER AUTHORIZING FTX             26
TRADING LTD. TO ENTER INTO AND PERFORM ITS OBLIGATIONS
UNDER THE INVESTMENT ADVISOR AGREEMENT


PRETRIAL CONFERENCE IN ALAMEDA v. PLATFORM/23-50444       28


INTERIM FEE APPLICATIONS                                 39

1     (Proceedings commence at 1:01 p.m.)

2     (Call to order of the Court)

3          THE COURT:  Good afternoon, everyone.  Thank you.

4     Please be seated.

5          MS. BROWN:  Your Honor, I see there is another

6     sign-in sheet with some names on here that may not have

7     gotten up to you.  May I approach?

8          THE COURT:  Can you hand that up?  Yes, that would

9     be great.  Thank you.

10          MS. BROWN:  Thank you.

11          THE COURT:  Thank you.

12          MS. BROWN:  Sure.

13     (Pause in proceedings)

14          MS. BROWN:  Good afternoon, Your Honor.  May it

15     please the Court, Kim Brown from Landis, Rath & Cobb,

16     appearing today on behalf of FTX Trading Limited and its

17     various debtor affiliates.

18          Your Honor, as set forth in the recently filed

19     amended agenda, there are several matters that have been

20     adjourned; those are Items 1 through 5.

21          Items 6 through 11 have been resolved with the

22     matters submitted under certification of counsel.

23          There are, however, three items where orders have

24     not been entered yet.  Those consist of:

25          Item 8, the debtors' fifth contract rejection

1    order;

2            Item Number 10, the interim fee application of

3    Morgan Lewis as counsel to the Emergent Debtor;

4            And Item Number 11, the case management order in

5    the FTX Trading v. Samuel Bankman-Fried adversary.

6            THE COURT:  I just --

7            MS. BROWN:  We're hap --

8            THE COURT:  I just entered that order before I took

9    the bench.

10           MS. BROWN:  Wonderful.  Thank you, Your Honor.

11           So that leaves us with:

12           Item Number 12, which is the coin monetization

13   motion;

14           Item 13, which is a related -- motion related to

15   the investment advisory agreement;

16           Item Number 14, the status conference in the

17   Alameda Research v. Platform Life Sciences adversary;

18           And finally, Item Number 15, which is the interim

19   fee application.  And that has been submitted also under

20   certification of counsel.  But if Your Honor has any

21   questions, we are, of course, available --

22           THE COURT:  I'm --

23           MS. BROWN:  -- and ready to answer.

24           THE COURT:  I'm still waiting for the -- I haven't

25   received the report from the fee examiner; so, once I get

1    that, I'll be able to --

2            MS. BROWN:  Certainly.

3            THE COURT:  Yeah.

4            MS. BROWN:  We will ensure that that report is

5    transmitted over to you momentarily.

6            And Your Honor, unless you'd prefer otherwise, at

7    this time I'll cede the podium over to Mr. Dietderich, who

8    will be providing a case update.

9            THE COURT:  Okay.  Thank you.

10           MS. BROWN:  Sure.

11           MR. DIETDERICH:  Good afternoon, Your Honor.

12           THE COURT:  Good afternoon.

13           MR. DIETDERICH:  Andy Dietderich, Sullivan &

14   Cromwell.

15           I have, I think qualified good news, or the

16   beginnings of good news, I hope.

17           We, as Mr. Glueckstein mentioned at the last

18   omnibus hearing, are now, after filing our draft plan July

19   31, in what I would call the "active stage" of plan

20   discussions and negotiation.

21           We released publicly, on Monday morning, a fairly

22   comprehensive deck of materials about the debtors' situation

23   and case, consistent with what we've tried to do in the case,

24   periodically providing more -- kind of more comprehensive

25   public reporting than I think has been standard for debtors,

1    given the number of people who are following what we do.

2              We had meetings, as I think Mr. Glueckstein

3    mentioned, over the last two days, with stakeholders in New

4    York City.  Those meetings were very well attended.  We had:

5              Representatives of the Official Committee of

6    Unsecured Creditors;

7              Representatives of our ad hoc group of non-U.S.

8    customers;

9              The class action plaintiffs, who filed the

10   adversary complaint on customer property issues, were there,

11   as well, representing both U.S. and non-U.S. customers in

12   that adversary.

13             We had principals, we had advisors.

14             The ad hoc group itself had over $850 million of

15   claims represented at the meeting.  And if you were to

16   include clams by the others, it's well over a billion dollars

17   of customer claims, in particular, represented in those

18   conversations.

19             We talked about a range of issues that were raised

20   in the draft plan, soliciting feedback on its structure and

21   also the specific kind of study questions we do of everyone.

22   And I'm happy to say we have consensus on many issues,

23   including general plan structure.  There's still open issues,

24   of course.  But we also have consensus, I think, on having a

25   next meeting with the group to try to resolve those open

1    points.

2         We also, I think, have broad consensus on the time

3    table for the case, which is, as previously disclosed by the

4    debtors, still aiming to file an amended plan and disclosure

5    statement in the fourth quarter of this year, marching

6    towards solicitation in the first quarter of next year, and

7    hopefully confirmation as early as -- as early as the fourth

8    -- as the beginning of the second quarter.

9         Those were constructive conversations and I think

10   we really -- our sense, as the debtors, is that people made a

11   lot of progress.  Obviously, lots of different opinions on

12   intercreditor issues, in particular, but as I said, a broad

13   consensus on -- that we at least had the right general

14   approach with some variables and some moving pieces to be

15   filled in.

16        The JPLs were not at those plan meetings yet, but

17   we also are -- I'm pleased to report we've had -- from the

18   debtors' perspectives, have had very constructive discussions

19   with the JPLs.

20        So we're looking to have meetings with both the

21   JPLs and with the other stakeholders in the coming weeks.

22   And hopefully, we'll spend the rest of September and October

23   trying to get everyone on the same page, so that we can file

24   a plan that is roughly consensual, hopefully, with most of

25   the people you've heard from so far in the case.

1          Judge Fitzgerald has been very helpful.  She is,

2     effectively, on call and available to the extent we need her

3     in mediation, both for the JPL and for plan issues.  I'm

4     uncertain at this time whether we will need her or not, but

5     we certainly have discussed schedule with her and timetable

6     with her and available dates, so we'll have that capacity in

7     October, as well, if it's a part of the picture.

8          So I wanted to report that.  Again, no concrete

9     news, no great announcement.  But I think we -- at least from

10    the debtors' perspective, we think this process of trying to

11    be inclusive and maximizing public information has been --

12    we've had two very good days.

13          THE COURT:  Okay.

14          MR. DIETDERICH:  So thank you, Your Honor.

15          THE COURT:  All right.  Thank you.

16          MR. DIETDERICH:  I'll cede the podium to Ms.

17    Kranzley, who I think will talk about the coin monetization

18    motion, unless, Ken, you'd to speak.

19          MR. PASQUALE:  Quickly, yes.

20          Your Honor, thank you.  Ken Pasquale from Paul

21    Hastings for the official creditors' committee.

22          I think, from the committee's perspective, just

23    reacting to what Mr. Dietderich just said, we believe the

24    meetings were productive and substantive, certainly moving in

25    the right direction.  I think Mr. Dietderich acknowledged

1    there is a lot of wood to chop and all the parties who were

2    at the meeting are starting to do that chopping.

3              I think, from the committee's perspective, Your

4    Honor, the most important item of consensus is that all the

5    parties agreed to expedite the plan process as much as

6    practicable.  What that means for the time line is yet to be

7    seen, but we all agreed the sooner we can get that process

8    rolling, the better.

9              So thank you, Your Honor.

10             THE COURT:  Okay.  Thank you.

11             MS. KRANZLEY:  Good afternoon, Your Honor.

12             I'll address Items Number 12 and 13 on the agenda,

13    which is the coin monetization and the related motion to

14    authorize the debtors' entry and performance into the Galaxy

15    asset management agreement.

16             Your Honor, we filed revised forms of order

17    yesterday evening and this morning.  As you see from both of

18    the revised forms of order --

19             THE COURT:  And this afternoon.

20             MS. KRANZLEY:  Yeah, and this afternoon.  Yes,

21    right before the hearing.

22             I think, as you can see from the orders, there was

23    a lot of redlining, but this is reflective of the fact that

24    we have worked very closely with all of the parties, the U.S.

25    Trustee, the creditors' committee, the ad hoc committee,

1    Galaxy, the SEC, and numerous other parties who reached out,

2    both prior to and after we filed the motion.

3         We're pleased to report that, as far as we're

4    aware, everyone's concerns and questions have been addressed

5    in the form of order that we filed right before this hearing,

6    as well as for the Galaxy retention order, the order that was

7    filed last evening.

8         THE COURT:  And does that include the two *pro se*

9    claimants who filed letters to the Court, which I took as

10   objections to the motion?

11        MS. KRANZLEY:  We have not heard from those *pro se*

12   claimants, they have not reached out to the debtors, and so

13   we have not had any contact with them, other than seeing

14   their letter filed on the docket yesterday evening.

15        THE COURT:  Okay.  I do have a question about the

16   motion as it relates to those objections from the *pro se*

17   claimants because it's a fundamental issue, I think, when the

18   debtors' motion talks about monetizing the debtors' digital

19   assets.

20        Those objections raise a question about whether or

21   not certain digital assets that the debtor holds are the

22   debtors' digital assets.  How is that being addressed by the

23   motion?

24        MS. KRANZLEY:  Your Honor, the debtors' view is

25   that the digital assets that we are selling, which may

1    include the assets that are alleged in those claimants'

2    objections, are assets of the debtors; that, from the

3    debtors' perspective, those claimants have not asserted or

4    demonstrated any evidence or commenced any actions to

5    demonstrate their property interest in that property or the

6    fact that that property interest is traceable specifically to

7    them.

8              We have also had extensive discussions with both

9    the ad hoc committee, as well as the class action plaintiffs,

10   on these points, and our understanding is that they both

11   support the relief that we've requested.

12             THE COURT:  Wasn't there a -- and correct me if I'm

13   wrong.  Wasn't there an adversary proceeding initiated by the

14   ad hoc committee about whether or not the digital assets

15   belonged to the debtors or not?

16             MS. KRANZLEY:  Yeah.  Yes, Your Honor.

17             THE COURT:  And that hasn't been resolved yet.

18             MS. KRANZLEY:  That has not been resolved, Your

19   Honor.  And we understand that they support the relief that

20   we're seeking in this motion.

21             THE COURT:  Well, I'm -- I need to hear from the ad

22   hoc committee.  I don't -- how is that so?  How do I -- how

23   do I say I can enter this order that the debtors can just

24   sell assets that might not belong to them, according to your

25   complaint?

1           MR. HARVEY:  Your Honor, Matthew Harvey from

2    Morris, Nichols, Arsht & Tunnell on behalf of the Ad Hoc

3    Committee of Non-U.S. Customers of FTX.com.

4           Your Honor, I don't -- as the debtor opened the

5    hearing with, there were productive discussions over the past

6    couple of days on the substance and context of a plan, as

7    well as, as the committee highlighted, the timing of a plan.

8    And we are hopeful these issues will be resolved in a value-

9    maximizing way for FTX.com customers in connection with a

10   plan.

11          Without prejudicing those discussions and the

12   confidentiality of those discussions, you know, we are

13   supportive of this motion at this time as a way to preserve

14   and maximize value for the debtors' estates, given the

15   information we've been privy to and given the status of these

16   cases.

17          Now I'll pause, too, Your Honor, and see if my co-

18   counsel, Erin Broderick, who's on the phone, has anything to

19   add on that.

20          THE COURT:  Well, let me ask.  Is there a way to

21   know -- I assume there is because we're talking about crypto

22   assets here, which are supposed to be traceable.  So are

23   these assets traceable to someone who specifically deposited

24   them with FTX Trading?

25          MR. HARVEY:  I'm going to defer to Mr. Dietderich

1    on that because I think he's going to have a stronger view --

2    strong view on it, one way, and then I can respond, as well,

3    Your Honor.

4            THE COURT:  All right.

5            MR. HARVEY:  So I'll cede the podium to the debtor

6    in the first instance, and then I can rise, to the extent

7    further necessary.

8            THE COURT:  Okay.

9            MR. DIETDERICH:  To say that's a good question,

10   Your Honor, would be an understatement.

11           The easiest way to address this is to acknowledge

12   that the customer letters don't actually assert -- identify

13   to us any particular crypto owned by the customers.

14           Generally, as we've said before, customers have

15   deposited -- made deposits on the exchange.  The exchange --

16   when we say "made deposits on the exchange," what we mean is

17   the customer sent usually fiat currency of some sort to the

18   bank, sometimes crypto, but usually fiat currency, and had an

19   app on their phone or a computer terminal that showed them

20   that they had an account to which some cryptocurrency on the

21   -- at least on the screen related.

22           The underlying facts of the situation, as I think

23   we've said publicly and to the Court previously, are that the

24   assets that are available to the debtors as property of the

25   estate do not match what's on the screens with the accounts.

1   So, absent a very specific assertion by customers, there is

2   no way for us to trace individual cryptocurrency to

3   individual customers.  It's all part of one pool.

4           There are assets that are associated with the

5   exchange, what we call the "dot-com customer pool" and the

6   "U.S. pool."  But they don't necessarily match customer

7   entitlements.

8           And there is, of course, most of our assets are not

9   in those pools, but in various other debtors around our

10  structure that also don't match those individual customer

11  entitlements.

12          The -- I think, as Ms. Kranzley said, the most

13  important thing is that, to the extent the customers have an

14  objection to the relief that we're seeking today, the burden

15  is on them to show an interest in property or to specify with

16  particularity what property of our they're actually stating,

17  you know, would belong to them.  And at least on our review

18  of the letters, we don't see an allegation of specificity

19  that we can respond to.

20          Even if they did, however, say I owned exactly --

21  you know, I think I had an account with 27 bitcoin in and

22  thirty-two eighth and three, you know, soul [sic], we still

23  would not necessarily have those underlying assets.  And none

24  of the assets that we have are actually attributable to

25  individual customer names.  It's all part of one big,

1    general, blended pool.

2              So, on that basis -- on that basis, at least our

3    reading of this is that, although there's potentially

4    interesting, I'll call them "constructive trust arguments" on

5    behalf of the customers as a group, when we dispose of

6    cryptocurrency in this motion or otherwise, we will be making

7    sure we have books and records about where it came from.

8              So, if the cryptocurrency was in the customer pool,

9    we'll keep track of that.  And those proceeds will be

10   available to customers, classification in our plan, et

11   cetera, subject to confirmation.  If the crypto is in the --

12   kind of the general pool or Alameda or one of our other

13   debtors, we'll note that and the proceeds will be

14   attributable to that there.

15             So, again, to the extent the customers have an

16   interest in property as a group, we'll be able to say where

17   the proceeds will go.  But we're now to a point where we

18   think there's any evidence whatsoever that a customer has a

19   unique entitlement to the particular cryptocurrency we're

20   selling.

21             We're not, for example, selling NFTs, which are

22   individually unique.  We're only selling these -- you know,

23   these assets that are, at most, kind of a fungible bulk, if

24   that makes sense.

25             THE COURT:  Well, I guess I'm -- I understood from

the beginning of the case that customers could deposit their

crypto assets with the debtor, at least FTX Trading, and that

those -- there was a term of service that said that those

crypto assets remained the assets of the party who was

depositing them and they did not become the property of FTX

Trading.  Is that not correct?

MR. DIETDERICH:  It's not precisely correct.  I

mean, I think people can read the terms of service for the

U.S. and internationally in different ways.  There's

contradictory language in those terms of service, as I think

has been pled in the --

THE COURT:  No, I know there's -- yeah, there's

issues about it.  But my concern is that issue hasn't been

resolved.

MR. DIETDERICH:  Well, no, that issue does not --

that issue has not been resolved.  But when you -- when --

and it is true that customers could deposit cryptocurrency,

just like they could deposit cash.  But whether they were

depositing cash or cryptocurrency, it really just appeared as

a number on a screen.  The underlying assets are not

traceable to the individual customers, if that makes sense.

So it's not like there was each customer -- if you

-- if Sally had deposited three bitcoin, we don't have an

account that says three bitcoin for Sally.  If Joe had

deposited three bitcoin, we don't have an account that says

1    three bitcoin for Joe.  What we have is some bitcoin, some in

2    the customer kind of pool and some in the Alameda pool, but

3    not attributable to individual customers.

4            And so, when we dispose of this, we'll be turning

5    it into cash, effectively, and the cash will be available for

6    distribution pursuant to the plan.  And you know, that's kind

7    of the reality of the situation.

8            If that weren't the reality of the situation, the

9    customer, you know, had a tracing claim, right?  So what is

10   really the allegation here is not that, you know, the

11   bitcoin, which is fungible, which is -- it's more of an

12   allegation of, you know, there's something here that we

13   should trace.  That tracing argument, of course, is infinite

14   in its capacity.  That would apply to every asset in the

15   estate at some level.

16           THE COURT:  But a customer could say I know I have

17   three bitcoin on the exchange, I might not know which

18   particular bitcoin it is, but there's three bitcoin on the

19   exchange that belongs to me.  That's their argument.

20           MR. DIETDERICH:  Right.

21           THE COURT:  And I want it back, I want the bitcoin

22   back, I don't want the cash, I want the bitcoin back because

23   I think that's more valuable to me.

24           MR. DIETDERICH:  Right.

25           THE COURT:  How do I deal with that?

1          MR. DIETDERICH:  Well, I think that, again, I would

2     say that the burden of proof is on the customer to prove an

3     interest in the property, and there's been not -- neither a

4     specific allegation, nor the assertion of an interest in

5     property.

6          THE COURT:  Okay.  Let me hear from the committee

7     because you guys represent these people.  What's the

8     committee's view on all of this?

9          MR. GILAD:  Good afternoon, Your Honor.  Erez Gilad

10    of Paul Hastings on behalf of the official creditor

11    committee.

12         I think it's fair to say that, until now, the

13    committee hasn't adopted a formal view.  We haven't inter-

14    pled, as of yet, in the pending adversary proceeding that

15    Your Honor alluded to earlier.  I would say this:

16         Building off of what counsel just mentioned, the

17    assertion fo a property interest is specific to the specific

18    property held.  So, stated differently, it's a customer-by-

19    customer, account-by-account basis.

20         And just to amplify the point that counsel was

21    making, so far, there's only been one formal pleading as to

22    the assertion of a property interest, which is that suit that

23    was referenced by Your Honor, the adversary proceeding filed

24    by the ad hoc committee.  That group, though, is in support

25    of this motion.  So they are clearly comfortable that, net-

1    net, the relief sought in the motion yields, I would say an

2    incremental value to their position relative to the estate.

3         The overall concern that we have is that the

4    debtors have a substantial, multi-billion-dollar token

5    portfolio available to them right now, and they want to be in

6    a position to maximize that value, to de-risk their token

7    portfolio, and ultimately to dollarize [sic] the tokens, so

8    that they can maximize cash distributions at the end of the

9    case.

10        And in order to preserve -- in order to implement

11   best practices, they retained an investment advisor to do

12   that over an appropriate period of time, utilizing a maximize

13   -- a value-maximizing strategy.  And to do that, we need to

14   begin that process now.

15        Were the debtors forced to wait on the relief

16   that's being requested, they would be forced then, in order -

17   - if they were to try and facilitate cash distributions to

18   the estate, they would be forced to monetize a significant

19   portion of digital assets over a shorter period of time,

20   which we are concerned could result in less optimal pricing.

21        So, from our perspective, we do think the Court has

22   before it the necessary support from the parties that have

23   actually asserted the actual property interest.  And in terms

24   of what is in the overall net benefit of the estate, we do

25   think the relief is appropriate at this time.

1          THE COURT:  Okay.  Thank you.

2          MR. GILAD:  Thank you, Your Honor.

3          THE COURT:  Did the ad hoc committee want to say

4     anything further?

5          MR. HARVEY:  Thank you, Your Honor.  And again, for

6     the record, Matthew Harvey from Morris, Nichols, Arsht &

7     Tunnell on behalf of th ad hoc committee.

8          While we don't necessarily agree with everything

9     the debtors said about the traceability of property interests

10    or the creditors' committee, in the context of where we are

11    with our litigation, including if you -- and Your Honor

12    probably has not studied our complaint, but including that

13    the -- one of the ways in which the complaint is pled is in a

14    -- what I will colloquially call to as a "pool" or a "common

15    pool" trust theory, based on the issues the official

16    committee highlighted about the need to dollarize these

17    assets and liquidate them in a market-favorable way and over

18    an appropriate period, with the assistance and expertise of

19    experts in the area, we are supportive of the motion at this

20    time.

21         THE COURT:  Okay.  All right.  Let me ask, before I

22    come back to you, Mr. Dietderich, I have -- I think one of

23    the *pro se* claimants is on the line here.  He's listed as

24    "Sam Customer."  Are you one of the *pro se* claimants who

25    filed the letter with the Court?

1          (No verbal response)

2               THE COURT:  Mr. Sam, can you hear me?

3          (No verbal response)

4               THE COURT:  He's got his hand raised.

5               Can you give me hosting rights, too, by the way?

6               Okay.  He's not going to answer.

7               All right.  Is the -- are any of the -- are either

8     of the two *pro se* claimants who filed letters with the Court

9     on the line?

10         (No verbal response)

11              THE COURT:  All right.  I hear nothing.

12              Okay.  Mr. Dietderich, back to you.

13              MR. HARVEY:  Your Honor, one thing I would just add

14    -- again, Matthew Harvey from Morris Nichols on behalf of the

15    ad hoc committee, for the record -- is, to the extent that

16    any of the customers, on the line or otherwise, who have had

17    issues with us or reached out to the Court or sent letters,

18    have questions, the counsel to the ad hoc committee and the

19    ad hoc committee's advisors are available for folks to

20    contact and, you know, we're happy to engage with people

21    within the constituency.  That's been part of what we've

22    tried to do.  And we've been very open about taking phone

23    calls that come in.  So I just wanted to get on the record

24    that, if folks are on the line and have questions, they can

25    reach out to me or my co-counsel at Eversheds, and we're

1    happy to engage with those folks.

2              THE COURT:  Okay.  Excellent.  Thank you.

3              MR. DIETDERICH:  Your Honor, I have a couple of

4    practical solutions, if you're -- if possible.

5              So the first is that we think we can do this

6    because the burden, as I said, is on the customer to

7    specifically allege an interest in property, and they have

8    not.

9              We would note that 363(f)(4) allows us to sell

10   property that's subject to a bonafide dispute, so the Code

11   does contemplate the idea that, if property is disputed, the

12   estate can go ahead and sell that over the objection.

13             But again, the -- these customers clearly had

14   notice of today's proceeding, enough notice to write a

15   letter, and they have not even identified the specific

16   property that they're alleging an interest in.  So we think

17   that probably stands.

18             It is possible for us, as the debtor, to

19   potentially identify what crypto would belong to these folks.

20   We have not conducted that process.  But you know, another

21   possibility is to go ahead and do that and potentially carve

22   it out from the relief.  We'd rather not do that because it

23   ends up being a slippery slope that's potentially unfair to

24   other customers.

25             THE COURT:  All right.  Okay.

1          MR. DIETDERICH:  Thank you.

2          THE COURT:  Thank you.

3          All right.  Anything else?

4       (No verbal response)

5          THE COURT:  All right.  Well, then let -- oh.

6   Counsel?

7          MS. KRANZLEY:  I was just going to see if you had

8   any questions about any of the blacklining.

9          THE COURT:  No.  No.

10          MS. KRANZLEY:  Okay.

11          THE COURT:  I did have an opportunity to review it

12   before I took the bench.

13          Well, given that the only outstanding objections

14   are the two letters, which I entered on the docket and took

15   to be objections from certain *pro se* claimants, and neither

16   of those *pro se* claimants have appeared to establish their

17   ownership interest in any particular bitcoin that the debtors

18   might hold or cryptocurrency that the debtors might hold, and

19   that all of the other parties-in-interest have agreed to the

20   form of order that is requested to be entered, I will

21   overrule the two *pro se* objections and I will approve the

22   order.

23          MS. KRANZLEY:  Thank you very much, Your Honor.

24          Your Honor, related to Item Number 12 is Item

25   Number 13, the debtors' motion for authorization to enter

1  into and perform the Galaxy agreement order.  And that was

2  filed last evening, along with the revised version of the

3  investment management agreement.  That, likewise, has and

4  incorporates all of the comments from all the parties.  And

5  so we understand that that resolves everybody's issues and

6  concerns, as well.

7        THE COURT:  Okay.  And I have reviewed that.

8        And anyone else want to be heard on that before we

9  --

10        MS. SARKESSIAN:  Your Honor, for the record, Juliet

11  Sarkessian on behalf of the U.S. Trustee.

12        I do believe that the changes that were made to

13  that order do resolve the U.S. Trustee's issues.

14        I actually rise, primarily, Your Honor, to

15  introduce you to a new trial attorney with our office, his

16  name is John Lipshie.

17        THE COURT:  Welcome.

18        MR. LIPSHIE:  Thank you.

19        MS. SARKESSIAN:  And Your Honor, he will be working

20  on the FTX cases going forward, so you will be seeing him in

21  your courtroom --

22        THE COURT:  Okay.

23        MS. SARKESSIAN:  -- well, of course, and in other

24  cases, as well.

25        THE COURT:  All right.  Thank you.

1          MS. SARKESSIAN:  Thank you, Your Honor.

2          THE COURT:  Thank you.

3          Anyone else wish to be heard?

4          THE COURT:  All right.  I'm satisfied that the

5     motion is appropriate and I will enter that order.

6          MS. KRANZLEY:  Thank you, Your Honor.

7          THE COURT:  Do we have the final versions of those

8     both uploaded on the --

9          MS. KRANZLEY:  Yes, they've been uploaded.

10          THE COURT:  Okay.  We'll get those out.  Okay.

11          Next up?

12          MR. GLUECKSTEIN:  Good afternoon, Your Honor.

13     Brian Glueckstein, Sullivan & Cromwell, for the debtors.

14          The next item on the agenda, Your Honor, is Item

15     14, which is the initial pretrial conference in the Alameda

16     v. Platform Life Sciences, et al adversary proceeding.

17          Your Honor, with respect to this case, we have

18     endeavored, as we've tried to do with all of the adversaries

19     that have been filed so far, and we will continue to do, to

20     negotiate and submit to the Court consensual scheduling

21     orders to obviate the need for unnecessary hearings and

22     conferences before the Court.

23          Your Honor, we're here today because we did submit

24     a proposed case management plan and scheduling order in this

25     adversary proceeding that was negotiated with all defendants

1    and includes all of the necessary initial schedule and

2    milestones.

3         The issue, Your Honor, simply is one of the

4    defendants in the case, Platform Life Sciences, informed us

5    that they would not agree and sign on to the scheduling

6    order.  As we understand it -- and there's a provision that

7    addresses a negotiated briefing schedule that was

8    contemplated in this order -- that Platform Life Sciences

9    intends to file a motion to dismiss on the grounds that the

10   Court lacks personal jurisdiction over this defendant.

11        And as we understand it, they don't want to be

12   bound by the scheduling order and participate in the case

13   with respect to the milestones that are scheduled to start

14   going forward in November.  We have initial disclosures and

15   discovery to commence on November 10th in this adversary

16   proceeding.

17        It's the debtors' position, Your Honor, that the

18   scheduling order provides for a reservation on no waiver of

19   jurisdiction.  We don't believe that this scheduling order

20   binding all parties would prejudice this defendant for any

21   motion that it will make with respect to any of its

22   jurisdictional arguments.

23        We do think it's important that this case stay

24   coordinated with respect to the defendants; that, when we hit

25   these milestones in November, everybody be subject to the

1    initial phases of discovery.

2            The Court, under the schedule that's proposed and

3    that was requested by Platform Life Sciences, would have

4    their motion to dismiss fully briefed by November 20th.  And

5    we know the Court will address that promptly thereafter.  To

6    the extent that that motion is not granted, we don't believe

7    that it makes sense for this defendant to be on a different

8    schedule.

9            So, very simply, Your Honor, we would like and

10   request, respectfully, that the scheduling order be entered

11   in the case, but be done so with respect to all defendants.

12           THE COURT:  Okay.  Thank you.

13           Mr. Kornfeld, I see you raised your hand.  Are you

14   on for Platform Life Sciences?

15           MR. KORNFELD:  I am, indeed, Your Honor.  Thank you

16   so much.  For the record, Alan Kornfeld, Pachulski, Stang,

17   Ziehl & Jones for, actually, two defendants.  There's

18   Platform Life Sciences Canada --

19           THE COURT:  Mr. Kornfeld, I'm going to ask you to

20   maybe -- you're a little hard to hear.  I can hear you okay,

21   but I think other people in the courtroom might not be able

22   to hear you.

23           MR. KORNFELD:  How is this, Your Honor?  Is this

24   better?

25           THE COURT:  No, it's about the same.  You might

1  have to raise the volume on your microphone.

2        MR. KORNFELD:  That's what I'm going to do.

3     (Pause in proceedings)

4        MR. KORNFELD:  How is this, Your Honor?

5        THE COURT:  That's better.

6        MR. KORNFELD:  Thank you so much.

7        So, as I was saying, Your Honor, there are actually

8  two Platform Life Science defendants that are merged together

9  in Paragraph 21 of the complaint.  I represent both of them.

10 There's Platform Life Science Canada and there's Platform

11 Life Sciences Delaware.

12        As Mr. Glueckstein said, usually, a case management

13 order is something that is negotiated, it's resolved, it ends

14 up being noncontroversial.  The situation is different here.

15 And by way of background, let me try and quickly explain why

16 it's different.

17        Platform Life Sciences, as its name implies, is

18 incorporated in Canada.  It's a life science company.  It

19 does medical clinical trials in developing and medium-income

20 countries.  It's designed to provide clinical trials in those

21 countries that, with respect to the world of clinical trials,

22 are marginalized.

23        Platform Life Science Delaware is a wholly owed

24 subsidiary of Platform Life Science Canada.  It has no

25 functional operations other than to operate (indiscernible)

1    processor for 11 U.S. employees.

2         According to the complaint, Platform Life Science

3    Canada received 53,250,000 in funding by wire to its Canadian

4    bank.  The plaintiffs that provided the funding are Alameda,

5    a British Virgin Islands corporation, and FTX, which is an

6    Antiguan and Barbudan corporations.  The transfers to Canada

7    came from Alameda and FTX bank accounts in Antigua, Barbuda,

8    and (indiscernible)

9         No part of the transactions or allegations in the

10   complaint against PLS Canada have a connection to the U.S.

11   The transactions all occurred outside of the U.S.  No acts

12   that give rise to the allegations against PLS Canada happened

13   in the U.S.

14        What we plan to do with respect to motion practice

15   on behalf of PLS Canada is to file a 12(b)(2) motion on

16   Friday, and we will keep the schedule that is set forth in

17   the pretrial order, in the case management order.  And we

18   will complete briefing pursuant to that schedule.  With

19   respect to PLS Delaware, we will file a 12(b)(6) motion.

20        Now how does this background relate to the case

21   management order?  The problem we face is the problem of

22   waiver of the personal jurisdiction defense.  The Third

23   Circuit, in In Re Asbestos Products Liability Litigation, a

24   2019 case, and the Supreme Court in, for example, Insurance

25   Corp. of Ireland v. Compagnie des Bauxites, which is a 1982

1     Supreme Court case -- and for the record, the Asbestos

2     Products Liability Litigation case is at 921 F.3d 98.

3          The Third Circuit explained in that case that the

4     law is clear with respect to personal jurisdiction that words

5     alone are insufficient to preserve a personal jurisdiction

6     defense where conduct indicates waiver.  And defendants can

7     forfeit the defense, even though that conduct is involuntary.

8          And the Court goes on to say, in essence, words

9     don't matter.  Saying I preserve, I want to preserve, I

10    reserve all rights with respect to personal jurisdiction

11    doesn't do it.  The Court said:

12               "Behavior that is consistent with waiver, and which

13               indicates an intent to litigate the case on the

14               merits, is sufficient to constitute waiver,

15               regardless of whether the parties also express an

16               intent to preserve the defense."

17          Well, we've expressed to the debtor the intent to

18    preserve the defense, and we'll express that to the Court in

19    the motion that will be filed on Friday.

20          But turning to the case management order, the case

21    management order explicitly -- not implicitly -- explicitly

22    requires PLS Canada to litigate the case on the merits.  And

23    if we sign on to that case management order, we have

24    indicated the intent to litigate on the merits.  We've

25    (indiscernible) on the merits.  We've said we're going to

1   make initial disclosures, we're going to engage in document

2   discovery, we're going to engage in deposition discovery,

3   we're going to a mediation, we may make a summary judgment

4   motion.  We're litigating on the merits.  And when we sign on

5   to that order, we're indicating an intent to litigate on the

6   merits.

7             So, despite the words in a case management order,

8   which arguably, if not somewhat weakly, seem to say there is

9   some preservation of jurisdiction, but it's more -- it's --

10   when you look at the reference, it's more geared

11   (indiscernible) jurisdiction than personal jurisdiction.  But

12   even assuming --

13             UNIDENTIFIED:  (Indiscernible)

14             MR. KORNFELD:  Even assuming the words in the case

15   management order are a reservation of rights, that is not

16   enough.

17             So here's the workable solution to this conundrum

18   that we're in.  We're going to comply with the briefing

19   schedule that is set forth in the case management order.

20   That briefing schedule, subject to the Court's availability,

21   would allow us, again, with court approval, to have a hearing

22   on the motions in the December -- on the December omnibus.

23             Frankly, after that hearing, we can have a status

24   conference.  We can figure out where we are, based on what

25   the Court decides, and either the case, at least with respect

1    to PLS Canada, may be someplace else; or, if it's in this

2    court, we may not have the waiver problem that we would have

3    at the present time.

4         So that's our explanation of why we are where we

5    are here.  And the proposed solution doesn't appear to

6    prejudice the debtors because the case manager with respect

7    to other parties pushes briefing out until later in this

8    year.  The only thing we would really not be doing that is

9    contemplated in the case management order is making our

10   initial disclosure and engaging in the document discovery.

11        Your Honor, I -- that's the reason, again, we are

12   where we are.  I'm happy to answer any questions.

13        THE COURT:  Well, let me hear from the debtors, see

14   what their response is.

15        MR. GLUECKSTEIN:  Thank you, Your Honor.  Brian

16   Glueckstein for the debtors.

17        So I'm not going to respond on the merits of the

18   personal jurisdiction motion.  We'll address that in due

19   course.  Suffice it to say we disagree.  We believe the Court

20   does have jurisdiction over the PLS Defendants.

21        With respect to this issue, Mr. Kornfeld hits on

22   the issue on the head.  We believe that -- and this could be

23   briefed, if Your Honor would like.  But we do believe that

24   the case law is clear that it is a question of what is the

25   level of engagement of the defendant.

1     The schedule that's been sent out here -- and the

2     Third Circuit case in Asbestos Products Liability litigation

3     made very clear, when you read that case, Your Honor, that

4     the facts and circumstances of that case were very unique to

5     that situation.

6     You know, here, the question is whether or not all

7     the defendants will be commencing the litigation, pursuing

8     the initial disclosures, and importantly, starting discovery

9     on schedule.

10    The schedule that's reflected in the motion for the

11    briefing of the 12(b)(2) motion was agreed to in the context

12    of these defendants being part of this schedule.  To the

13    extent that they are not going to be part of this schedule,

14    Your Honor, we would like their motion heard more swiftly and

15    on the schedule -- we would actually propose that they

16    proceed quicker on the schedule proposed -- set forth in the

17    rules.

18    But Your Honor, we think that all defendants should

19    proceed together, document discovery should commence

20    together.  The service and response to document discovery

21    while their motion is being considered by the Court and heard

22    we do not believe waives their defense.  We think that

23    defense is preserved.  And we think that it's important for

24    this case, for all defendants, to -- and for the plaintiffs,

25    to begin moving this case forward in lock step together, Your

1   Honor.  Thank you.

2            THE COURT:  Well, I agree.  I think the motion --

3   Mr. Kornfeld, you said you're going to file your motion to

4   dismiss on Friday, this Friday?

5            MR. KORNFELD:  Yes, Your Honor.  Yes, Your Honor.

6            THE COURT:  Then why can't we move up the -- speed

7   up the briefing and get this heard before the end of October

8   --

9            MR. GLUECKSTEIN:  From --

10           THE COURT:  -- instead of the end of November.

11           MR. GLUECKSTEIN:  From our perspective, Your Honor,

12   that's what we would propose to do.  If -- we think the

13   simplest thing to do is, as we proposed, to have everybody

14   bound by the order and to proceed by the schedule.

15           But I agree, Your Honor.  If the Court and Mr.

16   Kornfeld want the Court to consider their 12(b)(2) motion in

17   advance of the commencement of the schedule, which has a --

18   the kickoff, effectively, to the substantive dates in here is

19   November 10th -- then we would like a briefing schedule that

20   would allow that motion to be considered by the -- as Your

21   Honor says, by the end of October.  Under the rules, we could

22   have it briefed as quickly as October 6th, we could extend

23   that slightly.

24           But we don't want to be in a situation where, if

25   that motion, as we believe it will be, is denied, that this

1     defendant is on a different track.

2             THE COURT:  Okay.  So when are you proposing you

3     would file your response to the motion to dismiss?

4             MR. GLUECKSTEIN:  We could -- I mean, you know,

5     it's 14 days under the rules.  We could do that, Your Honor,

6     we could extend that by a week and extend their reply

7     deadline a week out and get us to the middle of October.  But

8     we are happy to proceed on the schedule that would be

9     provided.  If we want to -- if they file it on Friday, we

10    could respond in 14 days on the 29th.

11            THE COURT:  Okay.  Why don't we do that?  Response

12    in 14 days.  Reply brief would be due when, the 6th?

13            MR. GLUECKSTEIN:  It would be the 6th under the

14    rules, Your Honor, yes.

15            THE COURT:  So we'll do that as the schedule for

16    the briefing on the motion to dismiss for personal

17    jurisdiction.  And we'll have a hearing on -- let's do

18    October 26th.  Well, let's do -- we can do it before that.

19    Let's do October 19th at 10 a.m.

20            I will be kicked out of my courtroom that week

21    because the judges -- we have seven courtrooms and eight

22    judges.  So I'll be -- I'll either be in a different

23    courtroom or we'll do it -- since it's only oral argument, we

24    can do it virtually.  We'll do it that way.

25            MR. GLUECKSTEIN:  That is fine with the debtors,

1    Your Honor.

2              THE COURT:  Okay.

3              MR. KORNFELD:  That's fine with us, Your Honor.

4    Thank you so much.

5              THE COURT:  All right.  And then we'll deal with

6    the scheduling order once we get past the motion.

7              MR. GLUECKSTEIN:  Okay.  That's fine, Your Honor.

8              THE COURT:  Okay.

9              MR. GLUECKSTEIN:  Thank you very much.

10             THE COURT:  All right.

11             MR. KORNFELD:  Thank you, Your Honor.  May I be

12   excused?

13             THE COURT:  Yes.  Thank you.

14             MR. KORNFELD:  Thank you.

15             THE COURT:  All right.  Anything else for today?

16             MR. HANCOCK:  Your Honor, very briefly.  Mark

17   Hancock of Godfrey & Kahn on behalf of the fee examiner.

18             Obviously, we have Item 15 on the agenda, which are

19   the interim fee applications.  As Ms. Brown said, there's

20   been a certification of counsel filed.

21             The fee examiner's report was also filed on

22   September 5th at Docket 2427.  I think the agenda didn't have

23   a reference to that.  I'm not sure whether it made it in the

24   electronic binders that debtors provided, but it is there.

25   And I know Ms. Brown can get you a copy of that.

1          I can answer any questions you may have about the

2     fees and/or process.  But the fee examiner is also here and

3     can make a couple of brief remarks here.

4          THE COURT:  If you'd like to, yeah, that would be

5     fine.  I know we're skipping over some of the fee requests

6     this time around, right?  For some reason.

7          MS. STADLER:  Thank you, Your Honor.  Katherine

8     Stadler of Godfrey & Kahn, the fee examiner in these

9     proceedings.

10          Yes, we are skipping over -- or I should say

11     holding in abeyance two interim fee applications because we

12     are in productive discussions with those professionals,

13     exchanging information that may well resolve the concerns

14     that we have articulated.  If that should happen, we will

15     work with local counsel for the debtors to submit appropriate

16     orders under a certification process or in some other way if

17     those issues get resolved.

18          I did want to note, just because we're -- we came

19     all the way here from Wisconsin, that I should stand up and

20     introduce myself and just tell you a little tiny bit about

21     our process.

22          The fee examiner process, in my view, is designed

23     for one primary purpose, and that is to make the Court's job

24     in assessing reasonableness and necessity easier.  If there

25     is anything that we could do that would make that job easier

1    that we are not doing, we are happy to hear that feedback

2    from you, whether that's data, teeing up disputed issues on a

3    realtime basis, reporting formats.  Anything we can do to

4    make that job easier, we're happy to do.

5            The issue of the reserved issues -- and since you

6    didn't get the report for some reason, you probably haven't

7    read about this yet.  But what we attempted to do in our

8    current report is to identify specific issues on which the

9    fee examiner reserves rights to revisit the issue at the

10   conclusion of the case or at a later -- at a later interim

11   fee hearing.

12           The reason for that is because of my assumption --

13   and my dad told me never to do that -- but I assumed that the

14   -- Your Honor and the parties would prefer to have disputed

15   fee issues dealt with when there aren't so many other moving

16   parts in the case.

17           I also believe that there is a decent chance of

18   some of these reserved issues that, watching the case play

19   out over time, could change my view and would alleviate the

20   need for any contested proceeding at all.

21           So, for that reason, we have tried to delineate in

22   our report, with respect to those applications that are

23   recommended for approval, that there are some issues in those

24   applications that we do need to continue to address at an

25   appropriate time.

1          Of course, everyone always has the right to object

2     to a final fee application and all issues are technically

3     always reserved.  But the course of dealing of parties in

4     these Chapter 11 cases tends to be the expectation that

5     issues will be aired and resolved on an interim basis.  Here,

6     the interim fee periods are only 3 months long and our

7     reporting cycle is 45 days.  So it doesn't give a lot of time

8     for a long view of some issues that really require a long

9     view.

10          With that, I just wanted to point out to Your Honor

11     that that's the way we have structured this report and our

12     process.  We're trying to be thorough without being picayune.

13     We're trying to be responsive without being beholden to

14     professionals or anyone else.  And we're trying to be

15     thorough, but not overblown.

16          And if, at any point, we're not walking that line

17     correctly, I hope Your Honor will let us know and know that

18     we will respond appropriately.

19          THE COURT:  Okay.  Thank you.

20          No, I'm happy with the reports that I've seen so

21     far.  I think everything is going appropriately.  And I think

22     your approach is the right approach, so that we don't have to

23     -- you know, we can reserve some of these issues, if we need

24     to, for the long term, as you said, and just so we're not

25     getting jammed up on fee disputes in the middle of other

1    issues that are going on in the case.  So I'm happy with the

2    way things are going.

3              So I'm not sure what happened with the report.  I

4    don't know why I didn't -- it wasn't brought to my attention,

5    I don't know, somehow, but we'll figure that one out.

6              MS. STADLER:  Do you want to address that, Kim?

7              MS. BROWN:  Sure.

8              MS. STADLER:  Okay.  Thank you.  I'll step down.

9    Thank you, Your Honor.

10             THE COURT:  Okay.  Thank you.

11             MS. BROWN:  Good afternoon, Your Honor.  Kim Brown

12   from Landis, Rath & Cobb.

13             The report was submitted in connection with the

14   interim fee binder and index that was provided last

15   Wednesday.

16             THE COURT:  Okay.

17             MS. BROWN:  And I think what might be helpful going

18   forward, if Your Honor would like, perhaps, once the fee

19   report is filed, we submit that separately, and then also

20   include it with respect to the -- you know, the binder, so

21   you have it in both places, but it doesn't get lost in the

22   shuffle.

23             And since the hearing has started, we've also

24   emailed a copy to chambers and included Ms. Stadler and Mr.

25   Hancock on that --

1          THE COURT:  Okay.

2          MS. BROWN:  -- transmission.

3          THE COURT:  All right.  Thank you.  That's fine.

4   That would be -- that would work better, I think.

5          MS. BROWN:  Certainly.

6          THE COURT:  Yeah.

7          MS. BROWN:  Happy to do it.

8          THE COURT:  Because a lot of paper gets filed in

9   this one.

10          MS. BROWN:  I am very aware, Your Honor, and happy

11   to assist chambers however we can.

12          THE COURT:  All right.  Thank you.

13          MS. BROWN:  Thank you.

14          THE COURT:  All right.  Anything else for today?

15      (No verbal response)

16          THE COURT:  All right.  Thank you all very much.  I

17   appreciate the update, I appreciate the arguments of counsel.

18   And we are adjourned.  Everybody have a good weekend.

19          COUNSEL:  Thank you, Your Honor.  Thank you, Your

20   Honor.

21      (Proceedings concluded at 1:51 p.m.)

22                          *****

23

24

25

1         CERTIFICATION

2    I certify that the foregoing is a correct

3 transcript from the electronic sound recording of the

4 proceedings in the above-entitled matter to the best of my

5 knowledge and ability.

6

7

8

9 _____  September 13, 2034

10 Coleen Rand, AAERT Cert. No. 341

11 Certified Court Transcriptionist

12 For Reliable

13

14

15

16

17

18

19

20

21

22

23

24

25