**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | Jointly Administered |
|  | **Hearing Date: October 19, 2023 at 10:00 a.m.** |
|  | **Objection Deadline: October 5, 2023 at 4:00 p.m.** |

**MOTION OF ISLAND AIR CAPITAL AND PAUL F. ARANHA**
**FOR RELIEF FROM THE AUTOMATIC STAY,**
**TO THE EXTENT APPLICABLE, AND RELATED RELIEF**

Island Air Capital ("IAC") and its beneficial owner, Paul F. Aranha (jointly with IAC, the "Movants"), by and through their undersigned counsel, file this motion (the "Motion") before the United States Bankruptcy Court for the District of Delaware (the "Court") for entry of an order, pursuant to section 362(d)(1) of title 11 of the United States Code (the "Bankruptcy Code"), finding that the Aircraft[2] are not estate property, such that the automatic stay is not applicable to the Aircraft. In the alternative, Movants seek an order, pursuant to section 362(d)(1) of the Bankruptcy Code, granting relief from the automatic stay to use, operate, preserve, maintain, and, if Movants desire to do so, sell the Aircraft. Finally, in the event that the Court does not grant relief from stay, Movants seek an order, pursuant to sections 362(d)(1), 550(e), and 361 of the

---

[1] The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and 4063 respectively. Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.

[2] This, and other capitalized terms used prior to the Factual Background, are defined therein.

Bankruptcy Code, granting Movants (a) liens on the Aircraft pursuant to section 550(e) to the extent of their improvements on the Aircraft and (b) adequate protection for continued care of the Aircraft to the appropriate standard of care, and related relief.   In support of the Motion, Movants rely on the *Declaration of Paul F. Aranha in Support of Motion Island Air Capital and Paul F. Aranha for Relief from the Automatic Stay, to the Extent Applicable, and Related Relief* (the "<u>Declaration</u>"), a copy of which is attached hereto as **<u>Exhibit A</u>**, and respectfully state as follows:

## <u>PRELIMINARY STATEMENT</u>

1.      IAC owns the Legacy and the Global, two airplanes that they purchased using financing provided from FTX.  The Aircraft Loan was in the form of an unsecured, no-interest loan agreed to in a handshake deal between FTX's then-CEO Sam Bankman-Fried and IAC's beneficial owner, Mr. Aranha.

2.      The Government has taken the position that both Aircraft are subject to forfeiture as property purchased with the proceeds of fraud, and the Global has been in the Government's custody since February 2023.  The Debtors have taken the position that they own the Aircraft, asserting they lack evidence that the FTX funds used to purchase the Aircraft were in fact loans.

3.      Movants recognize that litigation of the Debtors' and Government's claims will not be resolved for some time.  In the meantime, however, there is an urgent and unavoidable question of ongoing financial responsibility for the Aircraft, particularly the Legacy, while the above-described proceedings are pending.  The instant Motion is aimed at addressing that question.

4.      The question of financial responsibility is not one that can be deferred.  The Aircraft are sensitive and expensive assets that, if not maintained under the proper standard of care, will rapidly lose value.  Aviation regulations require that owners perform and fully document ongoing regular inspections, maintenance, and repairs.  Failure to meet these requirements will render the

Aircraft virtually unsellable.  At the same time, meeting these requirements is extraordinarily expensive.

5.    To date, Movants alone have borne these substantial costs, at their own risk and expense, because as the Aircraft's owner, they were responsible for doing so.  Movants also had to retain and pay attorneys to address the Government's forfeiture interest in the Aircraft.  If Movants did not own the planes, it would not have been in Movants' interest to expend any of these funds.  And if the planes belonged to the estate, Movants would have expected that, sometime in the weeks or at most months after FTX's collapse, the Debtors would have mentioned that they claim to own the planes and either sought return of the Aircraft or made arrangements for their care and/or sale.

6.    That is not what happened.  Despite knowing about Movants' plans for the Aircraft since early December 2022, the Debtors remained silent on the topic of ownership for eight months.  They said nothing on December 7, 2022, when attorneys for the Joint Provisional Liquidators for FTX Digital Markets, at the behest of the Debtors, interviewed Mr. Aranha for 90 minutes about the Aircraft, TIA's business dealings with FTX, and Mr. Aranha's plans to sell the Global.  They said nothing on January 31, 2023, when the JPL, again on behalf of the Debtors, asked Mr. Aranha for ownership information and other documentation about the Aircraft.  They said nothing on February 2, 2023, when Mr. Aranha provided the requested documentation and told the JPL about his plans to operate the Legacy and sell the Global in order to repay the remainder of the Aircraft Loan.  They said nothing on May 1, 2023, when Movants contacted the Debtors' attorneys for their help in reaching an agreement with the Government to preserve and maximize the Global's value by selling it quickly.  And they said nothing during Movants' exchanges with the Debtors' counsel thereafter.

7.      It was not until August 7, 2023—after Movants had expended millions of their own dollars on the Aircraft—that the Debtors first asserted to Movants that the Aircraft were property of the estate.  After belatedly asserting ownership, the Debtors still refused to bear any of the burden of that ownership.  For example, the Debtors declined to assure Movants they would be reimbursed or compensated for their ongoing costs.  The Debtors said they wanted the Aircraft sold but refused to agree to bear the substantial expense of preparing the Aircraft for sale.  They also declined to discuss payment of an essential engine maintenance program maintained by Rolls Royce, even after Rolls Royce threatened cancellation of the program, which would immediately erode the value of the Aircraft by millions of dollars.  Instead, they have been content to permit Movants to continue shouldering all of the risk and expense, as if Movants were the owners of the Aircraft.

8.      The Debtors should not be permitted to take advantage of Movants with their belated strategic claim that they own the Aircraft.  Movants are not sitting on billions of dollars; they are a modest charter flight operator in the Bahamas trying to run a business while increasingly focused on two of their grounded Aircraft.  It is both patently unfair and impossible to expect and demand that Movants continue to fund the mounting expenses of the Aircraft without any protection.

9.      This Motion thus addresses an unusual situation.  The Debtors' (disputed) assertion that they own the Aircraft necessitates this Court's intervention before Movants can fly, maintain, preserve, or even touch the Aircraft.  This limbo jeopardizes the value of the Aircraft and exposes Movants to unreasonable risk.  Therefore, if the Court declines to decide now who actually owns the planes, Movants are entitled to relief from the automatic stay to use, operate, preserve, maintain, and, if Movants desire to do so, sell the Aircraft.  At a minimum, Movants seek relief to

place liens on the Aircraft in the amount expended to date to care for the planes, as well as adequate protection of the value of those liens and for the ongoing maintenance of the Legacy at the appropriate standard of care.

## JURISDICTION, VENUE, AND STATUTORY PREDICATE

10.    This Court has jurisdiction over these Chapter 11 Cases and this matter under 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference from the United States District Court for the District of Delaware, dated February 29, 2012.    This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(G).

11.    Venue of these Chapter 11 Cases in this district is proper under 28 U.S.C. §§ 1408 and 1409.

12.    Pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedures of the United States Bankruptcy Court for the District of Delaware, Movants consent to the entry of a final order or judgment by the Court in connection with this Motion to the extent it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgment consistent with Article III of the United States Constitution.

13.    The statutory predicates for the relief requested herein are sections 362(d)(1), 550(e), and 361 of the Bankruptcy Code.

## FACTUAL BACKGROUND

### I.    The Chapter 11 Cases

14.    On November 11, 2022, and with respect to Debtor West Realm Shires, Inc., on November 14, 2022 (collectively, the "Petition Date"), each of the Debtors filed with the Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections

1107(a) and 1108 of the Bankruptcy Code.   These Chapter 11 Cases are being jointly administered for procedural purposes only.

## II.     Movants' Purchase and Financing of the Global and the Legacy

15.     Movants' relationship with the Debtors began when Mr. Aranha started flying Sam Bankman-Fried ("SBF") to and from the Bahamas in 2021 and grew into a business partnership from there.  (Decl. ¶ 3.)  Mr. Aranha is a Bahamian businessman and aviator, who has resided in The Commonwealth of The Bahamas for his entire life.  He is an experienced pilot and holds a master's in business administration specializing in Airline Finance from Embry-Riddle Aeronautical University.  In 2012, Mr. Aranha founded Trans Island Airways ("TIA"), a Bahamian charter flight company that operates the Aircraft, among other planes.  He is also the beneficial owner of IAC.  (*Id.* ¶1.)

### A.     TIA's Flight Service for FTX and IAC's Purchase of the Aircraft

16.     From approximately October 2021, TIA provided more than $15 million worth of private charter and cargo flights, customized plane upgrades and other services to SBF and other FTX executives, employees, business associates, guests, family, and friends (the "Flight Services").  By January 2022, the volume of the Flight Services TIA was providing to FTX required additional planes.  FTX did not wish to own planes, and TIA's business model supported the acquisition of additional aircraft, so FTX agreed with Mr. Aranha that he would purchase the planes.  (*Id.*  ¶ 4.)  FTX would finance the purchase of those planes with an unsecured, no-interest loan (the "Aircraft Loan"), to which SBF agreed in a handshake deal with Mr. Aranha.  (*Id.*)

17.     The first airplane IAC bought to service FTX was a Bombardier Global BD700-1A11 (the "Global").  IAC bought the Global and acquired title to it on March 2, 2022, for $15,900,000.  (*Id.* ¶ 5.)  Copies of the title documents (the "Global Title") reflecting IAC as the

buyer on the Bill of Sale and as the Owner on the Bahamian Certificate of Registration are attached to the Declaration as Exhibits 1 and 2.

18.     The second airplane IAC bought to service FTX's business was an Embraer Legacy EMB-135BJ (the "Legacy" and jointly with the Global, the "Aircraft").  on August 4, 2022, for $12,545,000.  (*Id.* ¶ 6.)   Copies of the title documents (the "Legacy Title," and together with the Global Title, the "Aircraft Title"), showing IAC as the buyer on the Bill of Sale and as the Owner on the Bahamian Certificate of Registration are attached to the Declaration as Exhibits 3 and 4.

19.     For both Aircraft, Mr. Aranha obtained approval from FTX for the purchases, and (as Mr. Aranha's other lenders have done) FTX wired the deposits and balances directly into escrow.  (*Id.* ¶ 7.)  The wires originated from Alameda Research and North Dimension.  (*Id.*)  Mr. Aranha was unaware of, and had no reason to suspect, the fraud at FTX, and he had no reason to question the source of funds FTX used to finance the Aircraft.  (*Id.*)

20.     FTX requested upgrades to the Aircraft, such as state-of-the-art wifi and entirely new interiors.  (*Id.* ¶ 8.)  TIA arranged for the requested upgrades and other necessary maintenance to be performed at a facility in Florida promptly after IAC bought the Aircraft.  (*Id.*)  Neither Aircraft was ever used for any of the Flight Services—the Aircraft were unavailable during the upgrades, which were still in progress in November 2022 when FTX collapsed.  In other words, no one associated with FTX ever flew on the Global or the Legacy.  (*Id.*)

**B.    The Aircraft Loan Agreements With FTX**

21.     On March 22, 2022, a few weeks after the Global purchase, Mr. Aranha met in person with SBF to discuss the FTX/TIA business relationship and to discuss the specifics of the financing arrangements for the Aircraft purchases.  (*Id.* ¶ 9.)  At the meeting, SBF suggested that Mr. Aranha repay the Aircraft Loan using an account at FTX opened in Mr. Aranha's name (the

"Customer Account").  In addition to assets deposited personally by Mr. Aranha into the Customer Account, FTX could pay for the Flight Services by depositing payments into the Customer Account.  (*Id.*)  Per SBF, all of the funds in the Customer Account, including any trading gains, would be applied to the Aircraft Loan.[3]  If Mr. Aranha suffered trading losses, it would simply take him longer to repay the Aircraft Loan.  Mr. Aranha agreed. (*Id.*)

22.    Although using the Customer Account in this manner to pay off the Aircraft Loan was not typical, Mr. Aranha had no reason for concern.  TIA was in possession of both Aircraft, and IAC held the Aircraft Title.  (*Id.* ¶ 10.)  While TIA does not normally provide charter and other flight services to customers on credit, Mr. Aranha was willing to offer credit to FTX because FTX was also the lender for the Aircraft that he owned.  In addition, by the time of the Aircraft purchases, FTX Ventures and Mr. Aranha had signed a term sheet committing FTX Ventures to a $17 million dollar equity investment in TIA (the "FTX Ventures Deal").  (*Id.*)  The signed March 16, 2022 term sheet is attached as Exhibit 5 to the Declaration.  Thus, at the time of the Aircraft Loan, SBF and FTX were poised to become Mr. Aranha's business partners and joint owners of TIA (and thus joint owners of the Aircraft).  (*Id.*)

23.    The Aircraft Loan agreement was not documented, but this was not unusual for Mr. Aranha, who has financed other aircraft purchases in the past based on oral agreements.  SBF did not ask for interest on the Aircraft Loan. In exchange, Mr. Aranha agreed there would be no changes to FTX Ventures' prior valuation of TIA.  (*Id.* ¶ 11.)

24.    After the March 22 meeting with SBF, Mr. Aranha used the funds earned from

---

[3]    According to the Debtors, as of March 30, 2023, the Customer Account, among other assets, includes 3 Bitcoin (the current approximate value of which is $83,665), 6,338,923 USDT aka "Teather", and $4,565,900 USD in the Customer Account.  Based on information and belief, Mr. Aranha is one of largest Bahamian victims of the SBF's cryptocurrency fraud.  (Decl. ¶ 9 n 2.)

providing the Flight Services to rapidly pay down the Aircraft Loan.  (*Id.* ¶12.)  TIA regularly invoiced FTX for the Flight Services, and FTX promptly (usually the same day it received an invoice) transferred payment on the invoices into the Customer Account or as otherwise directed by Mr. Aranha. (*Id.*)  Copies of the Flight Services invoices, with descriptions supporting each charge, have already been provided to the Debtors.  As with the Aircraft purchases, Mr. Aranha had no reason to question that the assets FTX placed in the Customer Account to pay for Flight Services belonged to FTX.  (*Id.*)

25.    In early November 2022, FTX's financial problems came to light.  Mr. Aranha was warned to withdraw his funds from FTX, and he had multiple opportunities to do so before FTX suspended activity in his account.  (*Id.* ¶ 13.)  He did not because he was committed to repay the Aircraft Loan to FTX.  (*Id.*)

## III.    Post-Petition Events

### A.    The Impact of the FTX Bankruptcy Proceedings on Movants

26.    As of the Petition Date, approximately $11 million toward repayment of the Aircraft Loan was on deposit in the Customer Account.  Additionally, as of the Petition Date, the Debtors owed TIA approximately $2.6 million for unpaid Flight Services, bringing the balance of the Aircraft Loan to $14,845,000, down from $28,445,000, within only eight months.  (*Id.* ¶ 14.) The speed of this loan repayment was not typical; usually the amortization period for Mr. Aranha's other aircraft financings has been around 10 years.  Here, because of FTX's investment in TIA and the no-interest loan, Mr. Aranha committed to paying back the Aircraft Loan quickly.  (*Id.*)

27.    After FTX's collapse, and without FTX's business and the pending investment, however, Mr. Aranha had to pivot.  TIA had a business case for operating the Legacy for its current customers, so he returned the Legacy to the Bahamas to prepare it to enter service there.  (*Id.* ¶

15.)  There was no similar need for the Global, however, so Mr. Aranha took steps to sell that plane, with the goal of repaying the balance of the Aircraft Loan.  To improve the plane's market value, Mr. Aranha removed TIA's markings and painted the fuselage white.  He also deregistered the Global from the Bahamian registry and imported the plane into the United States, because U.S.-registered planes typically sell for higher prices.  To do this, IAC retitled the Global to a U.S.-based company, a transaction that was documented and filed with the FAA.  *See* Exhibits 6 - 10 to the Declaration.  Mr. Aranha also arranged with the manufacturer to perform upcoming scheduled inspections and maintenance to bring the Global current, for the purpose of attracting higher offer prices.  (*Id.* ¶ 15.)

28.    These actions had the desired effect.  In early 2023, Movants received multiple offers for the Global in excess of $15 million.  (*Id.* ¶ 16.)  Those marketing and sale efforts were interrupted, however, when the U.S. Marshals Service seized the Global on February 8, 2023, as discussed below.  (*Id.*)

**B.    Mr. Aranha's Early Cooperation with the Debtors' Inquiries About the Aircraft**

29.    The Debtors have long known of Mr. Aranha's plans for the Aircraft.  Beginning shortly after FTX's collapse and until shortly before filing this Motion, Mr. Aranha has voluntarily shared information about the circumstances of the Aircraft purchases, the Aircraft Loan, his dealings with SBF and FTX, the Flight Services, the proposed FTX Ventures investment in TIA, the use of the Flight Services and the Customer Account to pay down the Aircraft Loan, and the status of the Aircraft (including preparations to market and sell the Global), with the Bahamian Joint Provisional Liquidator ("JPL") for FTX Digital Markets, Brian Simms, with Simms' attorneys, with Representatives of the Office of the U.S. Attorney for the Southern District of New York (the "Government"), and with counsel for the Debtors.  (*Id.* ¶ 17.)

30.     Mr. Simms contacted Mr. Aranha on December 6, 2022, to tell Mr. Aranha that FTX's new CEO, John Ray, had assigned Mr. Simms to deal with the Aircraft on behalf of the Debtors.  Mr. Aranha met with Mr. Simms' counsel the following day for approximately 90 minutes, during which time he described the TIA/FTX business relationship, the Flight Services, the Aircraft purchases, and his plans for the Aircraft.  (*Id.* ¶ 18.)  On February 2, in response to a request from Mr. Simms (which Mr. Simms represented was on behalf of the Debtors), Mr. Aranha provided documents related to the Aircraft Title, the purchases, the Flight Services, and the FTX Ventures Deal.[4]  (*Id.*)  He also included a letter clearly informing the JPL that Movants had moved the Global from Florida to Connecticut on January 26, 2023, to prepare it for sale, that they had removed the Global's Bahamian registry, and that the Legacy was in the Bahamas.[5]  (*Id.*)  In an effort to be fully transparent, Mr. Aranha also provided Mr. Simms current photos of the Aircraft and a link to the FlightAware data associated with the Global.[6]  Mr. Simms immediately confirmed receipt. (*Id.*)

31.     At no time during or since Mr. Aranha's exchanges with Mr. Simms (until August 2023), did either Mr. Simms or the Debtors inform Mr. Aranha that the Debtors claimed to own the Aircraft. (*Id.* ¶ 19.)

32.     On February 8, 2023, only days after Mr. Aranha's exchange with Mr. Simms, the Government seized the Global and shortly thereafter informed Movants it considered both Aircraft

---

[4]     Mr. Simms had requested all related communications with FTX personnel, but those were too voluminous to immediately provide.
[5]     The letter also provided a detailed history of Mr. Aranha's dealings with SBF and others at FTX.
[6]     Had Mr. Aranha wanted to conceal the Global from FTX, the Government, or anyone else, he would not have flown it between two airports in United States with full knowledge of the FAA, imported the plane into the U.S. registry (again, in open view of the FAA), left the tail number on the aircraft, kept the aircraft publicly visible on Flight Tracker, or told the JPL of Movants' plans.

subject to forfeiture as the proceeds of SBF's fraud. (*Id.* ¶ 20.) The Legacy remains in Movants' possession in the Bahamas, but Movants have voluntarily restrained the Legacy from flight operations so as not to subject them to further liability. (*Id.*) Although, since seizing the Global in February 2023, the Government has threatened to bring a forfeiture action against the Aircraft, to date, the Government has not filed a civil forfeiture case or included either of the Aircraft in the forfeiture allegations of any indictment, against SBF or any other party. (*Id.*)

**C.    Mr. Aranha's Efforts to Preserve the Aircraft's Value Pending Resolution of the Government Forfeiture Action**

33.    Movants are confident that the ultimate trier of fact will find that they acted in good faith, that they were without reason to know the Aircraft were financed with the proceeds of fraud, and that they have a significant equity interest in the Aircraft, having repaid more than $11 million of the Aircraft Loan before FTX collapsed.  However, in an effort to avoid costly litigation, Movants have tried for months to seek a global resolution of competing claims to the assets, without success.  The Debtors, claiming their hands are tied due to the Government's pending forfeiture action, to date have refused to discuss a resolution.  Paradoxically, the Government, citing the Debtors' interest in the Aircraft, have said that they cannot resolve Movants' claims without the Debtors' participation, and that any such negotiations must await the conclusion of SBF's October 2023 criminal trial.  In the meantime, the costs of maintaining and preserving the Aircraft continue to mount and will thus impact the net proceeds of any sale. (*Id.* ¶ 21.)

34.    While pressing for a resolution, Movants also urged quick action to try and contain those costs.  After months of negotiations, some of which the Debtors attended, Movants secured an agreement in principle for the Government to return custody of the Global to Mr. Aranha so that he could market and sell that aircraft and deposit the proceeds, net of their costs, with the U.S. Marshals until the resolution of the forfeiture.  Movants also obtained an agreement in principle

with the Government that TIA would be permitted to operate the Legacy without restraint, thereby

allowing TIA to recoup some of the ongoing costs of that aircraft while Movants attempted to

resolve their claims.  Those agreements have been mooted by the Debtors' newly asserted

ownership claims.  (*Id.* ¶ 22.)

       **D.**      **The Debtors' Claims to Ownership of the Aircraft**

      35.     While cooperating with the Government, Movants also have tried repeatedly to find

a practical solution to the issue of the Aircraft with the Debtors, to no avail.  Throughout the spring

and summer of 2023, Movants contacted the Debtors multiple times to further facilitate a potential

sale of the Global and to discuss a possible resolution.[7]  These communications were in addition

to the dozens of substantive communications and meetings with the Government, including at least

two meetings the Debtors attended with Movants, the Government, and representatives from the

U.S. Marshals Service to craft an interlocutory sale agreement for the Global.  Movants requested

a three-way settlement conference with the Debtors and the Government to find a practical

solution, given the ever-increasing costs associated with the Aircraft that, to date, the Debtors have

been content to have Movants bear, in the hopes of finding a path forward.  The Debtors ignored

that request.  (*Id.* ¶ 23.)

      36.     For the first time, on August 7, 2023, as Movants were finalizing with the

Government the conditions of the seizure release and interlocutory sale, counsel for the Debtors

informed Movants of their position that the Aircraft are property of the Debtors' estates.  At no

time prior to August 2023 had the Debtors ever asserted an ownership interest in the Aircraft.  Nor

have they ever acted as an owner by, for example, providing any direction regarding the care and/or

---

[7]     Movants' counsel sent communications to the Debtors on May 1, June 1, June 14, June
29, July 11, and July 25, 2023, inquiring into their position, seeking their assistance, and
voluntarily sharing information with them in the interest of preserving asset value.

disposition of the Aircraft.  (*Id.* ¶ 24.)

37.    In essence, the Debtors have taken the position that while the Aircraft belong to them, Movants should bear the financial risk and responsibility for all maintenance, storage, insurance, and other costs of maintaining the Aircraft, as well as all of the considerable expense of preparing and marketing the Aircraft for sale.  Obviously, the Debtors' one-sided posture is unreasonable and unfair to Movants.  As a result of this impasse, the proposed settlement with the Government to sell the Global and operate the Legacy is now on hold.

**E.    Costs to Maintain and Preserve the Value of the Aircraft**

38.    The Aircraft are sophisticated, sensitive assets that require constant and ongoing care, including frequent inspections, maintenance, and safety checks required by law that, if ignored, will rapidly decrease their market value.  They require highly trained maintenance crews and expensive support equipment to service them.  Due to the strictly regulated nature of airplane service, the parts that go into airplanes are also subject to exacting regulations, making them all the more expensive.[8]  Along those same lines, the governing bodies require that detailed records are kept of any replacement parts installed in airplanes.  These expenses must be paid currently and immediately, and Movants have done so.  (*Id.* ¶ 25.)  Movants have also, at their own expense, provided insurance, scheduled inspections and maintenance, paid pilot costs, covered the remaining payments for interior updates (thus avoiding any mechanics liens), and maintained tracking and other subscriptions on both of the Aircraft.  All of these factors amount to substantial and constant capital investment by airplane owners, which the Debtors now assert Mr. Aranha is not.  (*Id.*)

39.    The consequences of this untenable situation are particularly acute for the Legacy.

---

[8]    For example, a rubber O-ring for the Legacy (the airplane equivalent of a hair-tie) costs $400.

As of the date of this motion, more than $800,000 in unavoidable expenses are due for that plane. (*Id.* ¶ 26.) The Legacy is currently in the middle of required maintenance, which needs to be finished. Components and finishings removed for that maintenance are in climate-controlled storage that, together with the fuselage, are taking up 3000 feet of Movants' hangar space. Movants have other needs for the hangar space that the Legacy is occupying. (*Id.*) Even if Movants do not operate the Legacy, that aircraft has significant ongoing monthly costs of at least $66,500, and that figure does not even cover scheduled inspections, maintenance of life-limited parts, or work needed to preserve the Legacy. (*Id.*)

40. The situation is equally untenable regarding the Global. On August 21, 2023, Movants received correspondence from Rolls Royce, providing notice that, absent payment of all amounts due by August 28 (which amount currently exceeds $480,000) on its engine program, Rolls Royce would terminate its contract with respect to the Global. Cancellation of the Rolls Royce engine program would result in the reduction of value of the Global to prospective purchasers by many millions of dollars, because the cost to any purchaser of reinstating the engine program would entail retrospective re-enrollment of the engines in a new warranty program for *all* of the hours accrued on the engine since its manufacture, regardless of the prior coverage. (*Id.* ¶ 27.) Movants informed the Debtors of this urgent situation by email on August 22, 2023. In response, the Debtors only reiterated their assertion of ownership over both Aircraft and expressed support for selling the Aircraft, but declined to engage with Movants on how the ongoing costs of maintaining and preparing the Aircraft for sale would be borne. No payment was ever made to Rolls Royce. (*Id.*)

41. Movants have also expended hundreds of thousands in attorneys' fees in connection with the pending Government forfeiture actions. (*Id.* ¶ 28.)

42.     Movants' business is not limited to owning the Aircraft. They own and operate a fleet of 8-10 planes providing superior service to a multitude of clients and passengers travelling to and from the Bahamas. They also manage client-owned aircraft, caring for the managed planes at the highest level of service. As such, their reputation as a premier airline and aircraft manager in the Bahamas is critical to the success of their ongoing business. They cannot retain that reputation without properly maintaining their aircraft, including the Global and the Legacy, which means they cannot simply ignore the maintenance schedule and abandon the Aircraft to corrosion. Accordingly, Movants provided upkeep of the Global from the Petition Date until it was seized. They continue to do so with respect to the Legacy. Without authority to properly care for the planes, Movants can provide none of this care, management or representation. (*Id.* ¶ 29.)

43.     If the Legacy is the Debtors' property, the Debtors owe Movants $2,531,421 for the Legacy for all of the above-described services since the Petition Date, and the Debtors also owe Movants $3,397,958 for maintaining and preserving the Global since the Petition Date if the Debtors own the Global. (*Id.* ¶ 30.)

## F.     Necessity for Relief from the Court

44.     After months of unsuccessfully trying to reach a consensual resolution with the Debtors and the Government, Movants are left with no choice but to seek the Court's assistance to determine the ownership of the Aircraft before the damage is irreversible. While Movants assert that the Aircraft are, and always have been, their property, the Debtors' ownership claim has left Movants without a clear path forward; although Movants cannot see how the Debtors have any color of ownership, Movants cannot exert control over the Legacy without fear of violating the automatic stay. Worse yet, the situation has dragged out for so long that both Aircraft run the risk of becoming worthless—the Global due to its seizure and the delay in sale, which has already

resulted in the imminent cancellation of the Rolls Royce contract, and the Legacy due to its potential expulsion from the maintenance facility. This would create significant harm to Movants' business and extinguish their ability to repay the Aircraft Loan. Movants stand to lose their considerable investment to preserve and improve the Aircraft unless they are granted relief from the stay, or at the very least, adequate protection. (*Id.* ¶ 31.)

<u>**RELIEF REQUESTED**</u>

45.    By this Motion, Movants seek an order determining that the Aircraft are not estate property. However, if the Court is not prepared to make that determination or determines that the Debtors are the rightful owners, Movants seek relief from stay to use, operate, preserve, maintain, and, should Movants so desire, sell the Legacy. In the alternative, Movants are entitled to, and respectfully request that they be granted, a lien against both Aircraft pursuant to section 550(e) of the Bankruptcy Code with respect to the costs to Movants of preserving, maintaining, and improving the Aircraft, and that they be granted adequate protection with respect to their liens. In short, either Movants are the owners of the Aircraft, in which case they should be treated as owners, or the Aircraft are estate property, in which case Movants are entitled to liens and adequate protection with respect to the substantial expenditures they have made and continue to make to benefit the Debtors' assets.

<u>**BASIS FOR RELIEF REQUESTED**</u>

I.    <u>**IAC Owns the Aircraft; There Is No Evidence That the Aircraft Are Estate Property**</u>

46.    Movants purchased the Aircraft and obtained the Aircraft Title. *See supra* ¶¶ 17-18. This itself is sufficient evidence that Movants are the rightful owners of the Aircraft. Moreover, pursuant to U.S. and Bahamian aviation regulations, registration of an aircraft requires the buyer to submit the required evidence of ownership such as the purchase contract or bill of

17

sale, so Movants' registration of the Aircraft is also evidence of their ownership. *See, e.g.,* 14 C.F.R. § 47.11.

47.    But in addition to holding legal title and registration to the Aircraft, Movants have also performed as the owners.  Never doubting their ownership interest, Movants have acted as the Aircraft's rightful owners since the Petition and have done so with the Debtors' knowledge.  They have been solely responsible for the financial outlay required to maintain both Aircraft.  They insured the Aircraft and hired pilots to fly them.  They entered into and paid for programs to maintain the engines.  They had the Aircraft inspected to stay current with the manufacturer's maintenance program as required by regulation. *See supra* ¶¶ 38-40.  After the Global was seized by the U.S. Government, Movants engaged in negotiations with respect to the Global's release and the unfettered operation of the Legacy. *See supra* ¶ 41.  Movants have acted exactly how one would expect an owner to act.

48.    The Debtors, on the other hand, did no such thing.  They knew that Movants were doing all of the above, yet never took steps to assert their putative ownership interest. *See supra* ¶¶ 29-31, 35.  The Debtors never inquired regarding the cost of any of the foregoing or acted to ensure that the Aircraft were properly maintained and preserved; they did not request that they be consulted prior to Movants incurring additional expenses; they never demanded that they be added as a named insured on the insurance policies; and they did not list the Aircraft as assets on any of their Bahamian entities' schedules, despite having amended them in July 2023.  There is, quite simply, no indicia of the Debtors' ownership.

49.    Under both the facts and law, Movants are clearly the Aircraft's sole owners and ask that the Court enter an order to that effect.

## II.    Cause Exists to Lift the Automatic Stay Pursuant to Bankruptcy Code Section 362(d)(1)

50.    Should the Court rule either that it cannot determine ownership at this time or that the Debtors have an ownership interest in the Aircraft, Movants seek relief from the automatic stay with respect to the Aircraft, to permit them to use, operate, preserve, maintain, and, if they desire to do so, sell the Aircraft.

51.    Section 362(d)(1) of the Bankruptcy Code provides that "the court shall grant relief from the stay… for cause including the lack of adequate protection of an interest in property." 11 U.S.C. § 362(d)(1).   In the determination of "cause," the moving party bears the initial burden to establish a *prima facie* case, which the party opposing relief must then rebut. *Matter of Rexene Prods. Co.*, 141 B.R. 574, 577 (Bankr. D. Del. 1992).

52.    "Cause" is not defined in the Bankruptcy Code, nor is it defined by the Third Circuit.   "Cause is a flexible concept and courts often conduct a fact intensive, case-by-case balancing test, examining the totality of the circumstances to determine whether sufficient cause exists to lift the stay." *In re SCO Grp., Inc.*, 395 B.R. 852, 856 (Bankr. D. Del. 2007).   The automatic stay "is not meant to be absolute, and in appropriate instances relief may be granted." *Id.*   The Third Court has instructed courts to use "wide latitude" in determining whether to grant relief from stay. *In re Myers*, 491 F.3d 120, 129 (3d Cir. 2007).   "The purpose of the automatic stay is to maintain the status quo that exists at the time of the debtor's bankruptcy filing." *In re APF Co.*, 274 B.R. 408, 417 (Bankr. D. Del. 2001).

53.    Specifically, to establish cause, the party seeking relief from the stay must show that the balance of hardships from not obtaining relief tips significantly in its favor. *See id.* (citing *In re Am. Classic Voyages, Co.*, 298 B.R. 222, 225 (D. Del. 2003)); *see also In re Aleris Int'l, Inc.*, 456 B.R. 35, 47 (Bankr. D. Del. 2011) (applying a hardship balancing test to assess the

existence of "cause").  "The three prongs of the balancing test are (1) whether any great prejudice to either the bankrupt estate or the debtor will result from lifting the stay; (2) whether the hardship to the non-bankrupt party by the maintenance of the stay considerably outweighs the hardship to the debtor if the stay is lifted; and (3) whether it is probable that the creditor will prevail on the merits of its case against the debtor."  *In re Aleris Int'l, Inc.*, 456 B.R. at 47-48.

54.     Here, "cause" exists to lift the stay to use, operate, preserve, maintain, and, if Movants desire to do so, sell the Aircraft, due to the considerable expense and risk to Movants associated with maintaining the status quo.  Denying Movants authority to exercise control over the Aircraft, particularly the Legacy, erodes the value of the Aircraft and denies Movants protection for their large cash expenditure required to maintain the Aircraft over the nine months since the Petition Date and continuing indefinitely into the future.  Moreover, if they are not allowed to do so quickly, there is a very real risk that the Aircraft will be rendered worthless through neglect.  When weighing the potential harm to the Debtors of lifting the stay to the harm to Movants of continuing it, the scale tips heavily in favor of Movants.

55.     Movants have acted consistent with ownership to their great expense, and they are in jeopardy of sustaining permanent losses if they are not allowed to proceed as the Aircraft's owners.  For these reasons, Movants assert that there is more than sufficient cause to lift the automatic stay in their favor.

## III.     If the Aircraft Are Estate Property, Movants Have a Lien Under Bankruptcy Code Section 550(e)

56.     If the Aircraft are estate property that must be turned over to the estate, Movants are entitled to a substantial lien to secure the considerable costs they have incurred to preserve and improve the Debtors' property.  The Bankruptcy Code protects those who make "improvements" to property that is later recovered by the estate through an avoidance action.  Section 550(e) of the

Bankruptcy Code provides that a "good faith transferee…has a lien on the property recovered to secure…the cost, to such transferee, of any improvement made after the transfer."  11 U.S.C. § 550(e)(1).  "Improvement" is defined broadly to include the cost of all physical additions and changes, repairs, payment of taxes and fees, payment of debts secured by liens, and other costs of preservation of the property.  11 U.S.C. § 550(e)(2).  Section 550(e) was enacted to clarify prior law and precedent, under which good faith transferees were not originally guaranteed protection for the improvement, repair, or preservation of the debtor's property.  *See* 5 Collier on Bankruptcy ¶ 548.10 (16th ed. 2023).

57.    A "good faith transferee" is defined more by describing what a lack of good faith would be.  A lack of good faith imports a failure to deal honestly, fairly, and openly.  *See In re Greenbrook Carpet Co.*, 22 B.R. 86, 90 (Bankr. N.D. Ga. 1982).  To the extent that the Aircraft were purchased using fraudulently obtained funds, there is no allegation, much less evidence, that Movants had any reason to know of such fraud or otherwise lacked good faith.  Indeed, the U.S. Government's willingness to let Movants operate the Legacy pending forfeiture and return custody of the Global to the Movants for sale is a clear indicator of Movants' status as good faith transferees.  Accordingly, if the Aircraft are determined to be estate property, pursuant to section 550(e) of the Bankruptcy Code, Movants have a lien against the Aircraft for the cost of all of the "improvements" (as defined broadly under section 550(e)) made by Movants to the Aircraft.

58.    Movants' section 550(e) lien against the Aircraft is in the amount that they have expended and continue to expend in the improvement and preservation of the Aircraft.  The cost of all physical additions and changes, duties and tariffs, repairs, secured loans, and other costs of preservation of the planes, net of any payments that Movants received for such improvements, total approximately $6 million for both planes.  Movants are entitled to liens on the Aircraft to

secure that amount, plus the minimum $66,500 a month required for the continued preservation of the Legacy at the appropriate standard of care. *See supra* ¶ 39.

**IV.** **Movants Are Entitled to Adequate Protection**

59.     Finally, if the Court declines to grant relief from the stay, Movants are entitled to adequate protection. Adequate protection is required to protect a secured creditor from the loss in value of its collateral due to the automatic stay. "Where property secures an outstanding debt to a creditor, a court may condition such proposed use on a debtor's adequate protection of its secured creditor's interest in the property." *In re Island Helicopter Corp.*, 63 B.R. 515, 520 (Bankr. E.D.N.Y. 1986).

60.      Section 361 of the Bankruptcy Code provides that when adequate protection is required, it may be provided by "requiring the trustee to make a cash payment or periodic cash payments to such entity, to the extent that the stay under section 362 of this title… results in a decrease in the value of such entity's interest in such property." 11 U.S.C. § 361(1).

61.     As discussed above, in the event the Aircraft are deemed estate property, Movants have a section 550(e) lien on the Aircraft in the amount of approximately $6 million (plus a minimum of $65,000 per month for the ongoing maintenance and preservation of the Legacy), for the substantial and necessary improvements (as such term is defined in section 550(e)) that Movants have made to the Aircraft. At a minimum, therefore, Movants are entitled to adequate protection, in the form of liens and cash payments, to protect those liens, as the value of the Aircraft dissipates while the parties' dispute over the Aircraft continues.

**FEDERAL RULE OF BANKRUPTCY PROCEDURE 6004(h)**

62.     Time is of the essence. The Aircraft's carrying costs continue to accumulate to an increasingly larger percentage of the assets' current fair market value. It is only after this matter can be resolved that the needless draining of the value of these assets will cease.

63.     In light of the need to cease expeditiously the accumulation of fees and expenses related to the preservation of the Aircraft's value, Movants request the Court waive the 14-day stay requirement under Federal Rule of Bankruptcy Procedure 6004(h) so the Order is effective immediately upon entry.

## NOTICE AND NO PRIOR REQUEST

64.     Notice of this Motion will be provided to: (i) the Debtors; (ii) the Official Committee of Unsecured Creditors; (iii) U.S. Trustee; (iv) the Securities and Exchange Commission; (v) the Internal Revenue Service; (vi) the United States Department of Justice; (vii) the United States Attorney for the District of Delaware; and (viii) those parties requesting notice pursuant to Bankruptcy Rule 2002.   In light of the nature of the relief requested, Movants submit no further notice is required.

## CONCLUSION

WHEREFORE, Movants respectfully request the Court:

1.     Find that the Aircraft are not property of the estate, such that the automatic stay is not applicable to the Aircraft;

2.     If the Court does not find that the Aircraft are Movants' property, grant Movants relief from the automatic stay to use, operate, preserve, maintain, and, if Movants desire to do so, sell the Aircraft;

3.     If the Court cannot do either of the foregoing, (i) allow Movants to place a lien on the Aircraft in an amount equivalent to that expended for their improvement; and (ii) order adequate protection payments be made to the Movants;

4.     Movants request that the Court waive the 14-day stay requirement under Federal Rule of Bankruptcy Procedure 6004(h) so the Order is effective immediately upon entry; and

5.    Grant such other and further relief as is just and equitable.


Dated: September 21, 2023

**ROBINSON & COLE LLP**


*/s/ Jamie L. Edmonson*
Jamie L. Edmonson (No. 4247)
1201 North Market Street, Suite 1406
Wilmington, DE  19801
Tel:   (302) 516-1700
Fax:   (302) 516-1699
Email: jedmonson@rc.com

**KELLER BENVENUTTI KIM LLP**

Jane Kim (*pro hac vice* pending)
Gabrielle L. Albert (*pro hac vice* pending)
650 California Street, Suite 1900
San Francisco, California 94108
Tel:  (415) 496-6273
Fax:  (650) 636-9251
Email: jkim@kbkllp.com
          galbert@kbkllp.com

**BOERSCH ILLOVSKY LLP**

Sharon E. Frase (*pro hac vice* pending)
1611 Telegraph Avenue, Suite 806
Oakland, California 94612
Tel:  (415) 500-6640
Fax:  (415) 967-3062
Email: sharon@boersch-illovsky.com

*Attorneys for Island Air Capital and Paul F.*
*Aranha*