# EXHIBIT A

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| | ) |
| FTX TRADING LTD., *et al.*,[1] | ) Case No. 22-11068 (JTD) |
| | ) |
| Debtors. | ) Jointly Administered |
| | ) |
| | ) **Hearing Date: October 19, 2023 at 10:00 a.m.** |
| | ) **Objection Deadline: October 5, 2023 at 4:00 p.m.** |
| | ) |

**DECLARATION OF PAUL F. ARANHA IN SUPPORT OF
MOTION OF ISLAND AIR CAPITAL AND PAUL F. ARANHA
FOR RELIEF FROM THE AUTOMATIC STAY,
IF APPLICABLE, AND RELATED RELIEF**

1.      I, Paul F. Aranha, am a Bahamian businessman and aviator who has resided in The Commonwealth of The Bahamas for my entire life.  I am an experienced pilot. I hold a master's in business administration specializing in Airline Finance from Embry-Riddle Aeronautical University.  In 2012, I founded Trans Island Airways ("TIA"), a Bahamian charter flight company that operates the Aircraft, among other planes.  I am also the beneficial owner of Island Air Capital ("IAC, and, together with myself, "Movants"), which owns two of the airplanes, a Global and a Legacy (the "Aircraft"), that TIA operates.

2.      I make this declaration in support of the *Motion of IAC and Paul F. Aranha forRelief From the Automatic Stay, if Applicable, and Related Relief* (the "Motion"),[2] which seeks

---

[1]      The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and 4063 respectively. Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.

[2]      Capitalized terms used but not defined in this Declaration have the meanings ascribed to them in the Motion.

a determination that the Aircraft are not estate property, such that the automatic stay is not applicable, or, in the alternative, seeks relief from the automatic stay to use, operate, preserve, maintain and, if appropriate, to sell the Aircraft.

**I.        Purchase and Financing of the Global and the Legacy**

3.        My relationship with the Debtors began when I started flying Sam Bankman-Fried ("SBF") to and from the Bahamas in 2021 and grew into a business partnership from there.

**A.        TIA's Flight Service for FTX and IAC's Purchase of the Aircraft**

4.        From approximately October 2021, TIA provided more than $15 million worth of private charter and cargo flights, customized plane upgrades and other services to SBF and other FTX executives, employees, business associates, guests, family, and friends (the "Flight Services"). By January 2022, the volume of the Flight Services TIA was providing to FTX required additional planes. FTX did not wish to own planes, and TIA's business model supported the acquisition of additional aircraft, so FTX agreed with me that I would purchase the planes. FTX would finance the purchase of those planes with an unsecured, no-interest loan (the "Aircraft Loan"), to which SBF agreed in a handshake deal with me.

5.        The first airplane IAC bought to service FTX was a Bombardier Global BD700-1A11 (the "Global"). IAC bought the Global and acquired title to it on March 2, 2022, for $15,900,000. Copies of the title documents (the "Global Title") reflecting IAC as the buyer on the Bill of Sale and as the Owner on the Bahamian Certificate of Registration are attached to this Declaration as Exhibits 1 and 2.

6.        The second airplane IAC bought to service FTX's business was an Embraer Legacy EMB-135BJ (the "Legacy" and jointly with the Global, the "Aircraft") on August 4, 2022, for $12,545,000. Copies of the title documents (the "Legacy Title," and together with the Global Title,

the "Aircraft Title"), showing IAC as the buyer on the Bill of Sale and as the Owner on the

Bahamian Certificate of Registration are attached to this Declaration as Exhibits 3 and 4.

7.      For both Aircraft, I obtained approval from FTX for the purchases, and (as my other

lenders have done) FTX wired the deposits and balances directly into escrow.  The wires originated

from Alameda Research and North Dimension.  I was unaware of, and had no reason to suspect,

the fraud at FTX, and I had no reason to question the source of funds FTX used to finance the

Aircraft.

8.      FTX requested upgrades to the Aircraft, such as state-of-the-art wifi and entirely

new interiors.  TIA arranged for the requested upgrades and other necessary maintenance to be

performed at a facility in Florida promptly after IAC bought the Aircraft.  Neither Aircraft was

ever used for any of the Flight Services—the Aircraft were unavailable during the upgrades, which

were still in progress in November 2022 when FTX collapsed.  In other words, no one associated

with FTX ever flew on the Global or the Legacy.

**B.      The Aircraft Loan Agreements With FTX**

9.      On March 22, 2022, a few weeks after the Global purchase, I met in person with

SBF to discuss the FTX/TIA business relationship and to discuss the specifics of the financing

arrangements for the Aircraft purchases.  At the meeting, SBF suggested that I repay the Aircraft

Loan using an account at FTX opened in my name (the "Customer Account").  In addition to assets

I deposited into the Customer Account, FTX could pay for the Flight Services by depositing

payments into the Customer Account.  Per SBF, all of the funds in the Customer Account,

including any trading gains, would be applied to the Aircraft Loan.[3]  If I suffered trading losses, it

---

[3]      The Debtors informed me that, as of March 30, 2023, the Customer Account, among
other assets, includes 3 Bitcoin (the current approximate value of which is $83,665),
6,338,923 USDT aka "Teather", and $4,565,900 USD in the Customer Account.  Based on

would simply take me longer to repay the Aircraft Loan. I agreed.

10.      Although using the Customer Account in this manner to pay off the Aircraft Loan was not typical, I had no reason for concern. TIA was in possession of both Aircraft, and IAC held the Aircraft Title. While TIA does not normally provide charter and other flight services to customers on credit, I was willing to offer credit to FTX, because FTX was also the lender for the Aircraft that I owned. In addition, by the time of the Aircraft purchases, FTX Ventures and I had signed a term sheet committing FTX Ventures to a $17 million dollar equity investment in TIA (the "FTX Ventures Deal"). The signed March 16, 2022 term sheet is attached to this Declaration as Exhibit 5. Thus, at the time of the Aircraft Loan, SBF and FTX were poised to become my business partners and joint owners of TIA (and thus joint owners of the Aircraft).

11.      The Aircraft Loan agreement was not documented, but this was not unusual for me, as I have financed other aircraft purchases in the past based on oral agreements. SBF did not ask for interest on the Aircraft Loan. In exchange, I agreed there would be no changes to FTX Ventures' prior valuation of TIA.

12.      After the March 22 meeting with SBF, I used the funds earned from providing the Flight Services to rapidly pay down the Aircraft Loan. TIA regularly invoiced FTX for the Flight Services, and FTX promptly (usually the same day it received an invoice) transferred payment on the invoices into the Customer Account or as I otherwise directed. Copies of the Flight Services invoices, with descriptions supporting each charge, have already been provided to the Debtors. As with the Aircraft purchases, I had no reason to question that the assets FTX placed in the Customer Account to pay for Flight Services belonged to FTX.

13.      In early November 2022, FTX's financial problems came to light. I was warned to

---

information and belief, I am one of largest Bahamian victims of the SBF's cryptocurrency fraud.

withdraw my funds from FTX, and I had multiple opportunities to do so before FTX suspended activity in my account.  I did not because I was committed to repay the Aircraft Loan to FTX.

## II.    Post-Petition Events

### A.    The Impact of the FTX Bankruptcy Proceedings on Me and IAC

14.    As of the Petition Date, approximately $11 million toward repayment of the Aircraft Loan was on deposit in the Customer Account.  Additionally, as of the Petition Date, the Debtors owed TIA approximately $2.6 million for unpaid Flight Services, bringing the balance of the Aircraft Loan to $14,845,000, down from $28,445,000, within only eight months.  The speed of this loan repayment was not typical; usually the amortization period for my other aircraft financings has been around 10 years.  Here, because of FTX's investment in TIA and the no-interest loan, I committed to paying back the Aircraft Loan quickly.

15.    After FTX's collapse, and without FTX's business and the pending investment, however, I had to pivot.  TIA had a business case for operating the Legacy for its current customers, so I returned the Legacy to the Bahamas to prepare it to enter service there.  There was no similar need for the Global, however, so I took steps to sell that plane, with the goal of repaying the balance of the Aircraft Loan.  To improve the plane's market value, I removed TIA's markings and painted the fuselage white.  I also deregistered the Global from the Bahamian registry and imported the plane into the United States, because U.S.-registered planes typically sell for higher prices.  To do this, I retitled the Global from IAC to a U.S.-based company.  Copies of documents reflecting that transaction and its filing with the FAA are attached to this Declaration at Exhibits 6-10.  I also arranged with the manufacturer to perform upcoming scheduled inspections and maintenance to bring the Global current, for the purpose of attracting higher offer prices.

16.    These actions had the desired effect.  In early 2023, I received multiple offers for

the Global in excess of $15 million.  Those marketing and sale efforts were interrupted, however,

when the U.S. Marshals Service seized the Global on February 8, 2023, as discussed below.

**B.      Early Cooperation with the Debtors' Inquiries About the Aircraft**

17.      The Debtors have long known of my plans for the Aircraft.  Beginning shortly after

FTX's collapse and until shortly before filing this Motion, I have voluntarily shared information

about the circumstances of the Aircraft purchases, the Aircraft Loan, my dealings with SBF and

FTX, the Flight Services, the proposed FTX Ventures investment in TIA, the use of the Flight

Services and the Customer Account to pay down the Aircraft Loan, and the status of the Aircraft

(including preparations to market and sell the Global), with the Bahamian Joint Provisional

Liquidator ("JPL") for FTX Digital Markets, Brian Simms, with Simms' attorneys, with

Representatives of the Office of the U.S. Attorney for the Southern District of New York (the

"Government"), and with counsel for the Debtors.

18.      Mr. Simms contacted me on December 6, 2022, to tell me that FTX's new CEO,

John Ray, had assigned Mr. Simms to deal with the Aircraft on behalf of the Debtors.  I met with

Mr. Simms' counsel the following day for approximately 90 minutes, during which time I

described the TIA/FTX business relationship, the Flight Services, the Aircraft purchases, and my

plans for the Aircraft.  On February 2, in response to a request from Mr. Simms (which Mr. Simms

represented was on behalf of the Debtors), I provided documents related to the Aircraft Title, the

purchases, the Flight Services, and the FTX Ventures Deal.[4]  I also included a letter clearly

informing the JPL that I had moved the Global from Florida to Connecticut on January 26, 2023,

to prepare it for sale, that I had removed the Global's Bahamian registry, and that the Legacy was

---

[4]      Mr. Simms had requested all related communications with FTX personnel, but those were too voluminous to immediately provide.

6

in the Bahamas.[5]  In an effort to be fully transparent, I also provided Mr. Simms current photos of

the Aircraft and a link to the FlightAware data associated with the Global.[6]  Mr. Simms

immediately confirmed receipt.

19.    At no time during or since my exchanges with Mr. Simms (until August 2023), did

either Mr. Simms or the Debtors inform me that the Debtors claimed to own the Aircraft.

20.    On February 8, 2023, only days after my exchange with Mr. Simms, the

Government seized the Global and shortly thereafter informed me it considered both Aircraft

subject to forfeiture as the proceeds of SBF's fraud.  The Legacy remains in my possession in the

Bahamas, but I have voluntarily restrained the Legacy from flight operations so as not to subject

me to further liability.  Although, since seizing the Global in February 2023, the Government has

threatened to bring a forfeiture action against the Aircraft, to date, the Government has not filed a

civil forfeiture case or included either of the Aircraft in the forfeiture allegations of any indictment,

against SBF or any other party.

C.    **Efforts to Preserve the Aircraft's Value Pending Resolution of the Government Forfeiture Action**

21.    I am confident that the ultimate trier of fact will find that I acted in good faith, that

I was without reason to know the Aircraft were financed with the proceeds of fraud, and that I have

a significant equity interest in the Aircraft, having repaid more than $11 million of the Aircraft

Loan before FTX collapsed.  However, in an effort to avoid costly litigation, my counsel and I

have tried for months to seek a global resolution of competing claims to the assets, without success.

The Debtors, claiming their hands are tied due to the Government's pending forfeiture action, to

---

[5]    The letter also provided a detailed history of my dealings with SBF and others at FTX.

[6]    Had I wanted to conceal the Global from FTX, the Government, or anyone else, I would
not have flown it between two airports in United States with full knowledge of the FAA,
imported the plane into the U.S. registry (again, in open view of the FAA), left the tail number
on the aircraft, kept the aircraft publicly visible on Flight Tracker, or told the JPL of my plans.

date have refused to discuss a resolution.  Paradoxically, the Government, citing the Debtors'

interest in the Aircraft, have said that they cannot resolve my claims without the Debtors'

participation, and that any such negotiations must await the conclusion of SBF's October 2023

criminal trial.  In the meantime, the costs of maintaining and preserving the Aircraft continue to

mount and will thus impact the net proceeds of any sale.

22.    While pressing for a resolution, my counsel and I also urged quick action to try and

contain those costs.  After months of negotiations, some of which the Debtors attended, I secured

an agreement in principle for the Government to return custody of the Global to me so that I could

market and sell that aircraft and deposit the proceeds, net of their costs, with the U.S. Marshals

until the resolution of the forfeiture.  I also obtained an agreement in principle with the Government

that TIA would be permitted to operate the Legacy without restraint, thereby allowing TIA to

recoup some of the ongoing costs of that aircraft while Movants attempted to resolve their claims.

Those agreements have been mooted by the Debtors' newly asserted ownership claims.

**D.    The Debtors' Claims to Ownership of the Aircraft**

23.    While cooperating with the Government, my attorneys and I also have tried

repeatedly to find a practical solution to the issue of the Aircraft with the Debtors, to no avail.

Throughout the spring and summer of 2023, my attorneys contacted the Debtors multiple times to

further facilitate a potential sale of the Global and to discuss a possible resolution.[7]  These

communications were in addition to the dozens of substantive communications and meetings with

the Government, including at least two meetings the Debtors attended with my attorneys, the

Government, and representatives from the U.S. Marshals Service to craft an interlocutory sale

---

[7]    My counsel sent communications to the Debtors on May 1, June 1, June 14, June 29, July
11, and July 25, 2023, inquiring into their position, seeking their assistance, and voluntarily
sharing information with them in the interest of preserving asset value.

agreement for the Global.  My attorneys requested a three-way settlement conference with the Debtors and the Government to find a practical solution, given the ever-increasing costs associated with the Aircraft that, to date, the Debtors have been content to have me bear, in the hopes of finding a path forward.  The Debtors ignored that request.

24.     For the first time, on August 7, 2023, as my attorneys were finalizing with the Government the conditions of the seizure release and interlocutory sale, counsel for the Debtors informed me of their position that the Aircraft are property of the Debtors' estates.  At no time prior to August 2023 had the Debtors ever asserted to me or my attorneys an ownership interest in the Aircraft.  Nor have they ever acted as an owner by, for example, providing me any direction regarding the care and/or disposition of the Aircraft.

**E.      Costs to Maintain and Preserve the Value of the Aircraft**

25.     The Aircraft are sophisticated, sensitive assets that require constant and ongoing care, including frequent inspections, maintenance, and safety checks required by law that, if ignored, will rapidly decrease their market value.  They require highly trained maintenance crews and expensive support equipment to service them.  Due to the strictly regulated nature of airplane service, the parts that go into airplanes are also subject to exacting regulations, making them all the more expensive.[8]  Along those same lines, the governing bodies require that detailed records are kept of any replacement parts installed in airplanes.  These expenses must be paid currently and immediately, and I have done so.  I have also, at their own expense, provided insurance, scheduled inspections and maintenance, paid pilot costs, covered the remaining payments for interior updates (thus avoiding any mechanics liens), and maintained tracking and other subscriptions on both of the Aircraft.  All of these factors amount to substantial and constant capital

---

[8]     For example, a rubber O-ring for the Legacy (the airplane equivalent of a hair-tie) costs $400.

investment by the aircraft's owner, which the Debtors now assert I am not.

26.     The consequences of this untenable situation are particularly acute for the Legacy. As of the date of this motion, more than $800,000 in unavoidable expenses are due for that plane. The Legacy is currently in the middle of required maintenance, which needs to be finished. Components and finishings removed for that maintenance are in climate-controlled storage that, together with the fuselage, are taking up 3000 feet of my hangar space.  I have other needs for the hangar space that the Legacy is occupying.  Even if I do not operate the Legacy, that aircraft has significant ongoing monthly costs of at least $66,500, and that figure does not even cover scheduled inspections, maintenance of life-limited parts, or work needed to preserve the Legacy.

27.     The situation is equally untenable regarding the Global.  On August 21, 2023, I received correspondence from Rolls Royce, providing notice that, absent payment of all amounts due by August 28 (which amount currently exceeds $480,000) on its engine program, Rolls Royce would terminate its contract with respect to the Global.  Cancellation of the Rolls Royce engine program would result in the reduction of value of the Global to prospective purchasers by many millions of dollars, because the cost to any purchaser of reinstating the engine program would entail retrospective re-enrollment of the engines in a new warranty program for *all* of the hours accrued on the engine since its manufacture, regardless of the prior coverage.   My attorneys informed the Debtors of this urgent situation by email on August 22, 2023.  In response, the Debtors only reiterated their assertion of ownership over both Aircraft and expressed support for selling the Aircraft, but declined to engage with us on how the ongoing costs of maintaining and preparing the Aircraft for sale would be borne.  No payment was ever made to Rolls Royce.

28.     I have also expended hundreds of thousands in attorneys' fees in connection with the pending Government forfeiture actions.

29.     My business is not limited to owning the Aircraft.  I own and operate a fleet of 8-10 planes providing superior service to a multitude of clients and passengers travelling to and from the Bahamas.  I also manage client-owned aircraft, caring for the managed planes at the highest level of service.  As such, mine and TIA's reputation as a premier airline and aircraft manager in the Bahamas is critical to the success of my ongoing business.  I cannot retain that reputation without properly maintaining TIA's aircraft, including the Global and the Legacy, which means I cannot simply ignore the maintenance schedule and abandon the Aircraft to corrosion.  Accordingly, I have provided upkeep of the Global from the Petition Date until it was seized.  I continue to do so with respect to the Legacy.  Without authority to properly care for the planes, I can provide none of this care, management or representation.

30.     If the Legacy is the Debtors' property, the Debtors owe me $2,531,421 for the Legacy for all of the above-described services since the Petition Date, and the Debtors also owe me $3,397,958 for maintaining and preserving the Global since the Petition Date if the Debtors own the Global.  (*Id.* ¶ _).

**F.      Necessity for Relief from the Court**

31.     After months of unsuccessfully trying to reach a consensual resolution with the Debtors and the Government, I am left with no choice but to seek the Court's assistance to determine the ownership of the Aircraft before the damage is irreversible.  While the Aircraft are, and always have been, IAC's property, the Debtors' ownership claim has left me without a clear path forward; although I cannot see how the Debtors have any color of ownership, I cannot exert control over the Legacy without fear of violating the automatic stay.  Worse yet, the situation has dragged out for so long that both Aircraft run the risk of becoming worthless – the Global due to its seizure and the delay in sale, which has already resulted in the imminent cancellation of the

Rolls Royce contract, and the Legacy due to its potential expulsion from the maintenance facility. This would create significant harm to my business and extinguish my ability to repay the Aircraft Loan.  I stand to lose their considerable investment to preserve and improve the Aircraft unless they are granted relief from the stay, or at the very least, adequate protection.

[*Signature page follows*]

Pursuant to 28 U.S.C. § 1746, I declare under the penalty of perjury, that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: September 20, 2023
New York, New York

PAUL F. ARANHA