## Exhibit A

**Settlement and Plan Support Agreement**

THIS SETTLEMENT AND PLAN SUPPORT AGREEMENT IS NOT AN OFFER OR ACCEPTANCE WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE.  ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.  NOTHING CONTAINED IN THIS SETTLEMENT AND PLAN SUPPORT AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED IN THIS AGREEMENT, DEEMED BINDING ON ANY OF THE PARTIES TO THIS AGREEMENT.

## *SETTLEMENT AND PLAN SUPPORT AGREEMENT*

This SETTLEMENT AND PLAN SUPPORT AGREEMENT (including all exhibits, annexes, and schedules attached to this agreement in accordance with Section 13.2 hereof, this "**Agreement**") is made and entered into as of October 16, 2023 (the "**Execution Date**"), by and among the following parties (each of the following described in sub-clauses (i) through (vi) of this preamble, a "**Party**," and, collectively, the "**Parties**"):

(i)     FTX Trading Ltd. and its affiliated debtors and debtors in possession (collectively, the "**Debtors**");

(ii)    the undersigned members of the Ad Hoc Committee (as defined herein), including each member of the Executive Committee of the Ad Hoc Committee, that have executed and delivered counterpart signature pages to this Agreement, a Joinder or a Transfer Agreement, in each case, to counsel to (i) the Debtors; (ii) the Class Action Claimants (as defined herein); and (iii) the Official Committee (as defined herein) (the "**Supporting Ad Hoc Committee Members**");

(iii)   the undersigned members of the Class Action Claimants that have executed and delivered counterpart signature pages to this Agreement, a Joinder or a Transfer Agreement, in each case, to counsel to (i) the Debtors; (ii) the Ad Hoc Committee; and (iii) the Official Committee (the "**Supporting Class Action Claimants**");

(iv)   the Official Committee, solely in its representative capacity; and

(v)    other holders of Claims (as defined herein) who become party hereto from time to time pursuant to a Joinder or a Transfer Agreement (which may be executed by counsel to such holders on their behalf) (together with the Supporting Ad Hoc Committee Members, and the Supporting Class Action Claimants, the "**Supporting Creditors**" and with the Official Committee the "**Supporting Parties**").

## *RECITALS*

**WHEREAS**, on November 11 and November 14, 2022 (as applicable, the "**Petition Date**"), the Debtors commenced voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "**Bankruptcy Code**"), which are being jointly administered under the caption *In re FTX Trading Ltd.*, *et al.*, Case No. 22-11068 (JTD) (Bankr.

D. Del. Nov. 11, 2023) (the "**Chapter 11 Cases**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**");

WHEREAS, on December 27, 2022, the Class Action Claimants commenced an adversary proceeding against the Debtors in *Onusz, et al.* v. *West Realm Shires Inc., et al.*, Adv. Pro. No. 22-50513 (JTD) [D.I. 321] (the "**First Customer Property Action**"), alleging that customers of FTX.com and FTX.US had as of the Petition Date a property interest in certain fiat currency and digital assets that the Debtors assert to be property of their estates;

WHEREAS, on December 29, 2022, members of the Ad Hoc Committee commenced an adversary proceeding against the Debtors in *Ad Hoc Committee of Non-US Customers of FTX.com* v. *FTX Trading, Ltd., et al.*, Adv. Pro. No. 22-50514 (JTD) [D.I. 328] (the "**Second Customer Property Action**" and, together with the First Customer Property Action, the "**Customer Property Actions**"), alleging that customers of FTX.com had as of the Petition Date a property interest in certain fiat currency and digital assets that the Debtors assert to be property of their estates;

WHEREAS, the Debtors informed the parties to the Customer Property Actions that they dispute the allegations of the plaintiffs in the Customer Property Actions and have asserted certain defenses with respect to the allegations of the plaintiffs in the Customer Property Actions;

WHEREAS, the Debtors have sought consensual extensions of the time to respond to the Customer Property Actions in order to seek a consensual solution of the novel legal, factual and equitable issues raised;

WHEREAS, on July 31, 2023, the Debtors filed the *Joint Chapter 11 Plan of Reorganization of FTX Trading Ltd. and Its Debtor Affiliates* [D.I. 2100] (the "**Initial Draft Plan**"), which Initial Draft Plan has been discussed among the Debtors and the Parties;

WHEREAS, since the time of filing the Initial Draft Plan, the Parties and the Debtors have engaged in good faith, arm's-length negotiations, including without limitation at plan meetings on September 11-12, 2023 and October 11-12, 2023, regarding the terms of an amended chapter 11 plan of reorganization to be proposed by the Debtors (the "**Amended Plan**"), which Amended Plan (a) reflects the consensual settlement of disputes related to the Customer Property Actions; (b) reflects the consensual settlement of certain disputes concerning the Initial Draft Plan;  and (c) shall, where applicable, contain the terms and conditions set forth in and be consistent in all respects with, the term sheet attached as **Exhibit A** hereto (such term sheet, as may be amended pursuant to the Agreement, including all exhibits thereto, the "**Term Sheet**," and such transactions on the terms and conditions described in this Agreement, the "**Restructuring Transactions**");

WHEREAS, each Party has an interest in avoiding the cost and expense that would be associated with litigation of the novel legal, factual and equitable issues raised;

**WHEREAS**, without any admission by any Party, the Parties desire to settle all disputes relating to the Customer Property Actions through the Amended Plan and to express to each other their mutual support and commitment with respect to the Amended Plan and the Restructuring Transactions in order to facilitate the consensual emergence of the estates of the Debtors from chapter 11; and

**WHEREAS**, the Parties have agreed to take certain actions in support of the Proposed Settlement and the Restructuring Transactions on the terms and conditions set forth in this Agreement;

**NOW, THEREFORE**, in consideration of the covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

*AGREEMENT*

1.       *Definitions and Interpretation.*

1.1.    <u>Definitions</u>.  The following terms shall have the following definitions:

"**<u>Ad Hoc Committee</u>**" means the ad hoc group of individuals, funds, or accounts managed, advised, or sub-advised by funds that hold Dotcom Customer Entitlement Claims, and that is represented by the Ad Hoc Committee Advisors.

"**<u>Ad Hoc Committee Advisors</u>**" means Eversheds Sutherland (US) LLP, Morris, Nichols, Arsht & Tunnell LLP, and Rothschild & Co US Inc., and any other special and local counsel and advisors providing advice to the Ad Hoc Committee in connection with the Proposed Settlement and the Restructuring Transactions.

"**<u>Ad Hoc Committee Expense Reimbursement Order</u>**" means the order contemplated by the Debtors' motion initially filed at Docket No. 2238 as shall be amended or any other order of the Bankruptcy Court authorizing the Debtors to pay the reasonable and documented fees and expenses of the Ad Hoc Committee Advisors in form and substance reasonably satisfactory to the Debtors and the Required Ad Hoc Parties.  Notwithstanding anything in this Agreement to the contrary, the Official Committee's rights and remedies with respect to the motion initially filed at Docket No. 2238, as shall be amended, are expressly reserved.

"**<u>Affiliate</u>**" means, with respect to any specified Entity, any other Entity directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Entity.  For purposes of this definition, "control" (including, with correlative meanings, the terms "controlling," "controlled by," and "under common control with"), as used with respect to any Entity, shall mean the possession, directly or indirectly, of the right or power to direct or cause the direction of the management or policies of such Entity, whether through the ownership of voting securities, by agreement, or otherwise.

"**Agreement**" has the meaning set forth in the preamble to this Agreement and, for the avoidance of doubt, includes all the exhibits, annexes, and schedules attached to this Agreement in accordance with Section 13.2 hereof.

"**Agreement Effective Date**" means the date on which the conditions set forth in Section 2 hereof have been satisfied or waived in accordance with this Agreement.

"**Agreement Effective Period**" means, with respect to a Party, the period from the Agreement Effective Date to the Termination Date applicable to that Party.

"**Alternative Restructuring Proposal**" means any inquiry, proposal, offer, bid, term sheet, discussion, or agreement with respect to a sale, disposition, new-money investment, restructuring, reorganization, merger, amalgamation, restart, acquisition, consolidation, dissolution, debt investment, equity investment, liquidation, tender offer, recapitalization, plan of reorganization, share exchange, business combination, or similar transaction involving any one or more Debtors or the debt, equity, or other interests in any one or more Debtors that in each case is inconsistent with, or an alternative to, this Agreement or one or more of the Restructuring Transactions.

"**Amended Plan**" means the amended plan of reorganization to be filed by the Debtors, as may be further amended or supplemented in accordance with the terms set forth herein.

"**Avoidance Actions**" means any and all actual or potential avoidance, recovery, subordination, or other Claims, causes of action, or remedies that may be brought by or on behalf of the Debtors, their estates, or other parties in interest under sections 502, 510, 542, 544, 545, 547 through 553, and 724(a) or other applicable sections of the Bankruptcy Code or under similar or related local, state, federal, or foreign statutes and common law, including fraudulent transfer laws.

"**Bankruptcy Code**" has the meaning set forth in the recitals to this Agreement.

"**Bankruptcy Court**" has the meaning set forth in the recitals to this Agreement.

"**Business Day**" means any day other than a Saturday, Sunday, or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state of New York.

"**Cause of Action**" means any action, Claim, cause of action, Avoidance Actions, controversy, demand, right, action, lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license, and franchise of any kind or character whatsoever, whether known, unknown, contingent or noncontingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, in contract or in tort, in law or in equity, or pursuant to any other theory of law.

"**Chapter 11 Cases**" has the meaning set forth in the recitals to this Agreement.

"**Claim**" means, with respect to any Debtor, the meaning ascribed to it in section 101(5) of the Bankruptcy Code. For the avoidance of doubt, the term "Claim" includes Customer Entitlement Claims.

"**Class Action Claimants**" means the putative class representatives named as plaintiffs represented by Entwistle & Cappucci LLP in the adversary proceeding of *Onusz, et al.* v. *West Realm Shires Inc., et al.*, Case No. 22-50513 (JTD) (Bankr. D. Del.) [D.I. 321].

"**Confirmation Order**" means the order entered by the Bankruptcy Court confirming the Amended Plan.

"**Customer Entitlement Claim**" means any Claim of any kind or nature whatsoever (whether arising in law or equity, contract or tort, under the Bankruptcy Code, federal or state law, rule or regulation, common law or otherwise) held by any Person or Entity against any of the Debtors, in each case arising out of or related to any cash, digital assets or other assets held by such person or entity in an account on any FTX Exchange as of the Petition Date.

"**Debtors**" has the meaning set forth in the preamble to this Agreement.

"**Definitive Documents**" means all of the definitive documents implementing the Proposed Settlement and the Restructuring Transactions, including those set forth in Section 3 hereof.

"**Disclosure Statement**" means the disclosure statement with respect to the Amended Plan.

"**Dotcom Customer Entitlement Claim**" means any Customer Entitlement Claim against the FTX.com Exchange.

"**Entity**" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

"**Estimation Motion**" means the motion to be filed by the Debtors in these Chapter 11 Cases estimating, determining or otherwise setting the value or conversion rate of the Debtors' digital assets and any related replies, declarations and supplements filed by the Debtors in connection therewith.

"**Estimation Order**" means the order approving the Estimation Motion or any other order of the Bankruptcy Court authorizing the Debtors to estimate, determine or otherwise set the value or conversion rate of the Debtors' digital assets.

"**Execution Date**" has the meaning set forth in the preamble to this Agreement.

"**Executive Committee of the Ad Hoc Committee**" means the executive committee of the Ad Hoc Committee.

"**FTX.com Exchange**" means the FTX.com trading platform.

"**FTX Exchange**" means any exchange or trading platform operated by a Debtor as of the Petition Date.

"**Joinder**" means a joinder to this Agreement substantially in the form attached to this Agreement as **Exhibit C**.

"**Law**" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court).

"**Majority Supporting Ad Hoc Parties**" means, at any time, the Supporting Ad Hoc Committee Members constituting both (a) the Required Ad Hoc Parties and (b) the Supporting Ad Hoc Committee Members holding greater than 50% in amount of the Dotcom Customer Entitlement Claims at Petition Date Value held by all Supporting Ad Hoc Committee Members at such time.

"**Milestones**" means the milestones set forth in Section 4 hereof.

"**New Corporate Governance Documents**" means all documents, agreements and disclosures concerning, or relating to governance of the Reorganized Debtors or the wind down of the Debtors' estates.

"**Official Committee**" means the statutory committee appointed pursuant to section 1102 of the Bankruptcy Code by the office of the United States Trustee in these Chapter 11 Cases on December 15, 2022, as may be reconstituted from time to time, solely in such capacity.

"**Offshore Exchange Company**" means, if applicable, a new company in a jurisdiction outside of the United States that will operate a "rebooted" offshore exchange platform not available to U.S. investors.

"**Parties**" has the meaning set forth in the preamble to this Agreement.

"**Person**" means any natural person, corporation, limited liability company, professional association, limited partnership, general partnership, joint stock company, joint venture, association, company, trust, bank, trust company, land trust, business trust or other organization, whether or not a legal entity, and any governmental authority.

"**Petition Date**" has the meaning set forth in the recitals to this Agreement.

"**Petition Date Value**" means the value of any Claim set forth in U.S. Dollars as of the Petition Date.

"**Plan Effective Date**" means the date upon which (a) the Confirmation Order has been entered by the Bankruptcy Court, (b) all conditions precedent to the effectiveness of the Amended Plan have been satisfied or are expressly waived in accordance with the terms thereof, as the case may be, (c) the transactions to occur on the Plan Effective Date pursuant to the Amended Plan become effective or are consummated, and (d) the substantial consummation (as defined in section 1101 of the Bankruptcy Code) of the Amended Plan occurs.

"**Plan Supplement**" means the compilation of documents and forms of documents, schedules, and exhibits to the Amended Plan that may be filed by the Debtors with the Bankruptcy Court, including, without limitation, the New Corporate Governance Documents.

"**Proposed Settlement**" has the meaning set forth in Section 5.1 of this Agreement.

"**Qualified Marketmaker**" means an entity that (a) holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers Claims (or enter with customers into long and short positions in Claims), in its capacity as a dealer or market maker in Claims and (b) is, in fact, regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

"**Reorganized Debtor**" means a Debtor, or any successor or assign thereto, by merger, reorganization, consolidation, or otherwise, on and after the Plan Effective Date, which Reorganized Debtors may be the Wind Down Estates (as defined in the Initial Draft Plan).

"**Required Ad Hoc Parties**" means a majority in number of the members of the Executive Committee of the Ad Hoc Committee.

"**Required Class Action Claimants**" means the Supporting Class Action Claimants holding at least 66% of the Claims measured by the Petition Date Value held by all Supporting Class Action Claimants.

"**Required Consenting Creditors**" means the Required Ad Hoc Parties, the Required Class Action Claimants and the Official Committee.

"**Restricted Period**" means the period commencing as of the date each Supporting Party, as applicable, executes this Agreement until the Termination Date as to such Supporting Party.

"**Restructuring Transactions**" has the meaning set forth in the recitals to this Agreement.

"**Solicitation Commencement Date**" means the date by which the Debtors shall have commenced solicitation of votes to accept or reject the Amended Plan.

"**Solicitation Materials**" means all solicitation materials in respect of the Amended Plan.

"**Supporting Ad Hoc Committee Members**" has the meaning set forth in the Preamble to this Agreement.

"**Supporting Creditors**" has the meaning set forth in the Preamble to this Agreement.

"**Supporting Parties**" has the meaning set forth in the Preamble to this Agreement.

"**Take-Back Interests**" means non-cash consideration in the form of equity securities, tokens or other interests in the Offshore Exchange Company or rights to invest in such equity securities, tokens or other interests.

"**Term Sheet**" has the meaning set forth in the recitals to this Agreement.

"**Termination Date**" means the date on which termination of this Agreement as to a Party is effective in accordance with Sections 11.1, 11.2, 11.3 and 11.4 hereof.

"**Transfer**" means to sell, resell, reallocate, use, pledge, assign, transfer, hypothecate, participate, donate, or otherwise encumber or dispose of, directly or indirectly (including through derivatives, options, swaps, pledges, tokenization, forward sales, or other transactions).

"**Transfer Agreement**" means an executed transfer agreement providing, among other things, that a transferee is bound by the terms of this Agreement and substantially in the form attached to this Agreement as **Exhibit B**.

"**United States Trustee**" means the United States Trustee for Region Three.

"**U.S. Customer Entitlement**" means any Customer Entitlement Claim against the FTX US Exchange.

1.2.    Interpretation.  For purposes of this Agreement:

(a)    in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neutral gender shall include the masculine, feminine, and the neutral gender;

(b)    capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form;

(c)    unless otherwise specified, any reference in this Agreement to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions;

(d)    unless otherwise specified, any reference in this Agreement to an existing document, schedule, or exhibit shall mean such document, schedule, or exhibit, as it may have been or may be amended, restated, supplemented, or otherwise modified from time to time; notwithstanding the foregoing, any capitalized terms in this Agreement that are defined with reference to another agreement are defined with reference to such other agreement as of the date of this Agreement, without giving effect to any termination of such other agreement or amendments to such capitalized terms in any such other agreement following the date of this Agreement;

(e)    unless otherwise specified in this Agreement, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If any payment, distribution, act or deadline under the Amended Plan is required to be made or performed or occurs on a day that is not a Business Day, then the making of such payment or distribution, the performance of such act, or the occurrence of such deadline shall be deemed to be on the next succeeding Business Day, but shall be deemed to have been completed or to have occurred as of the required date.

(f)      unless otherwise specified, all references in this Agreement to "Sections" are references to Sections of this Agreement;

(g)      the words "herein," "hereof," and "hereto" refer to this Agreement in its entirety rather than to any particular portion of this Agreement;

(h)      captions and headings to Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Agreement;

(i)      references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable limited liability company Laws;

(j)      the use of "include" or "including" is without limitation, whether stated or not;

(k)      all references to "$" and "dollars" will be deemed to refer to United States currency unless otherwise specifically provided; and

(l)      the word "or" shall not be exclusive.

2.       ***Effectiveness of this Agreement.***   This Agreement shall become effective and binding upon each of the Parties at 12:00 a.m., prevailing Eastern Time, on the Agreement Effective Date, which is the date on which all of the following conditions have been satisfied or waived in accordance with this Agreement:

(a)      the Debtors shall have executed and delivered counterpart signature pages of this Agreement to counsel to the (i) the Ad Hoc Committee; (ii) the Class Action Claimants; and (iii) the Official Committee;

(b)      a majority in number of the Executive Committee of the Ad Hoc Committee shall have executed and delivered counterpart signature pages of this Agreement to (i) the Debtors; (ii) the Class Action Claimants; and (iii) the Official Committee;

(c)      each of the Supporting Class Action Claimants shall have executed and delivered counterpart signature pages of this Agreement to counsel to each of (i) the Debtors; (ii) the Ad Hoc Committee; and (iii) the Official Committee; and

(d)      counsel to the Official Committee shall have executed and delivered a counterpart signature page of this Agreement to counsel to (i) the Debtors; (ii) the Ad Hoc Committee; and (iii) the Class Action Claimants.

3.       ***Definitive Documents.***

3.1.    The Definitive Documents implementing the Proposed Settlement and the Restructuring Transactions shall include the following (in each case, and any order, or amendment or modification of any order, entered by the Bankruptcy Court related to the below items):

(a)    the Amended Plan (and all exhibits and schedules attached thereto), including any "Definitive Documents" as defined therein and not explicitly so defined herein;

(b)    the Disclosure Statement;

(c)    the Plan Supplement;

(d)    the Solicitation Materials and all ballots, solicitation procedures and other documents and instruments related thereto;

(e)    the order of the Bankruptcy Court approving the Disclosure Statement and the Solicitation Materials;

(f)    the Confirmation Order and pleadings in support of entry of the Confirmation Order incorporated by reference therein;

(g)    such agreements, motions, pleadings, briefs, applications, orders, and other filings with the Bankruptcy Court prior to the Plan Effective Date related to the Reorganized Debtors (including any documents in connection with Take-Back Interests and the Offshore Exchange Company);

(h)    the Ad Hoc Committee Expense Reimbursement Order, and any pleadings incorporated by reference therein;

(i)    any material agreement, order or documents incorporated therein resolving the Debtors' disputes with Brian C. Simms KC, Kevin G. Cambridge, and Peter Greaves, in their capacity as the duly appointed Joint Provisional Liquidators of FTX Digital Markets Ltd.; and

(j)    any other material agreements, motions, pleadings, briefs, applications, orders, and other filings with the Bankruptcy Court implementing the Proposed Settlement and the Restructuring Transactions.

3.2.    Each Party's commitment to this Agreement remains subject to the negotiation and completion of the Definitive Documents that (a) upon completion, contain terms, conditions, representations, warranties, and covenants not inconsistent with the terms of this Agreement, as they may be modified, amended, or supplemented in accordance with Section 12 hereof, and (b) are otherwise in form and substance reasonably acceptable to (i) such Party, (ii) in the case of the Supporting Ad Hoc Committee Members, the Required Ad Hoc Parties or (iii) in the case of the Supporting Class Action Claimants, the Required Class Action Claimants.

4.    ***Milestones.***

4.1.    The following Milestones shall apply as conditions to the commitments of the Supporting Parties under this Agreement unless extended or waived in writing by the Required Ad Hoc Parties, the Required Class Action Claimants and the Official Committee (as applicable):

(a)    The Debtors shall have filed the Amended Plan, the Disclosure Statement (with information describing the KYC process and applicable deadlines), the Estimation Motion, a motion seeking approval of the Disclosure Statement, and the Solicitation Materials no later than December 16, 2023;

(b)    The Bankruptcy Court shall have entered an order approving the Solicitation Materials and the Disclosure Statement no later than March 1, 2024;

(c)    The Bankruptcy Court shall have entered the Confirmation Order no later than June 1, 2024; and

(d)    The Plan Effective Date shall have occurred no later than July 1, 2024.

4.2.    The foregoing Milestones are solely for purposes of providing termination rights and other protections to the Ad Hoc Committee, the Class Action Claimants and the Official Committee.  The Debtors and each Supporting Party intend to proceed to confirmation and effectiveness of the Amended Plan as promptly as reasonably possible.

5.    ***Settlement of Customer Property Actions***

5.1.    <u>Settlement of the Customer Property Actions</u>.  In full and final settlement and satisfaction of the Customer Property Actions, the Debtors, the Ad Hoc Committee, the Class Action Claimants and the Official Committee agree to settle on the Plan Effective Date (a) all claims and causes of action against the Debtors that are asserted or could have been asserted in the complaints filed in each of the Customer Property Actions on the terms set forth in the Amended Plan and (b) any potential objection any Party may have to such settlement on such terms (together, the "<u>Proposed Settlement</u>").

5.2.    <u>Resolution of the Customer Property Actions</u>.  No later than seven (7) days after the Plan Effective Date, the Required Ad Hoc Parties and the Required Class Action Claimants shall withdraw with prejudice their respective Customer Property Actions, as applicable. Between the Agreement Effective Date and the dismissal of the Customer Property Actions, the Customer Property Actions shall be voluntarily stayed and all actions held in abeyance pending the Bankruptcy Court's consideration of confirmation of the Amended Plan; *provided* that such stay may be terminated by the Required Ad Hoc Parties or Required Class Action Claimants upon termination of their respective obligations under this Agreement in accordance with Section 11.

6.    ***Commitments of the Supporting Parties.***

6.1.    <u>Supporting Creditors' Affirmative Commitments</u>.  During the Agreement Effective Period, each of the Supporting Creditors severally, and not jointly, agrees to:

(a)    support the Proposed Settlement and the Restructuring Transactions and vote and exercise any powers or rights available to it (including in any creditors' meeting or in any process requiring voting or approval to which they are legally entitled to participate), in each case in favor of any matter requiring approval to the extent necessary to implement the Proposed Settlement and the Restructuring Transactions;

(b)      negotiate in good faith and use commercially reasonable efforts to support the timely execution, approval and implementation of Definitive Documents consistent with Section 3.2;

(c)      negotiate in good faith upon reasonable request of any other Party any modifications to the Proposed Settlement and the Restructuring Transactions that are necessary to satisfy any conditions to, or address any legal, financial, or structural impediment that may prevent, hinder, impede or delay, the consummation of the Proposed Settlement and the Restructuring Transactions, in each case to the extent such modifications can be implemented without any material adverse effect on such Party; and

(d)      cooperate with and assist the other Parties in obtaining additional support for the Proposed Settlement and the Restructuring Transactions from other stakeholders and to consult with the Debtors regarding the status and the material terms of any negotiations with other stakeholders that are not party to this Agreement (including, for the avoidance of doubt, giving the Debtors notice and a reasonable opportunity to coordinate with the other Parties in advance of any outreach or communications to stakeholders that are not party to this Agreement).

6.2.    Supporting Creditors' Negative Commitments.  During the Agreement Effective Period, each Supporting Creditor severally, and not jointly, agrees that it shall not, directly or indirectly, and shall not direct any other Entity to:

(a)      object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Proposed Settlement or Restructuring Transactions;

(b)      knowingly pursue, propose, file, support, solicit support for or vote for any Alternative Restructuring Proposal;

(c)      file any motion, pleading, or other document with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is not consistent with this Agreement, the Amended Plan, the Proposed Settlement or the Restructuring Transactions;

(d)      subject to Section 5 hereof, initiate or continue (including initiating or continuing on its behalf) any litigation or proceeding of any kind with respect to the Chapter 11 Cases, this Agreement, the Proposed Settlement or the Restructuring Transactions contemplated in this Agreement against the Debtors or the other Parties other than (i) with respect to the amount, validity, valuation or allowance of Claims held by such Supporting Creditor or its affiliates; (ii) to enforce this Agreement or any Definitive Document; (iii) to litigate any Preference Exposure to the extent the Preference Settlement is not accepted (each as defined in the Term Sheet); (iv) to initiate or continue any litigation against any party that is not a Party to this Agreement; or (v) as otherwise expressly permitted under this Agreement; or

(e)      subject to Section 5 hereof, object to, delay, impede, or take any other action to interfere with the Debtors' ownership and possession of their assets (including, for the

avoidance of doubt, digital assets), wherever located, or interfere with the automatic stay arising under section 362 of the Bankruptcy Code.

6.3.    Supporting Creditors' Commitments with Respect to Chapter 11 Cases.

(a)    During the Agreement Effective Period, each Supporting Creditor that is entitled to vote to accept or reject the Amended Plan, severally, and not jointly, agrees that it shall:

(i)    vote each of its Claims against the Debtors to accept the Amended Plan by delivering its duly executed and completed ballot accepting the Amended Plan on a timely basis following the Solicitation Commencement Date and its actual receipt of the Solicitation Materials;

(ii)    to the extent it is permitted to elect whether to opt out of the releases set forth in the Amended Plan, elect not to opt out of the releases set forth in the Amended Plan by timely delivering its duly executed and completed ballot(s) designating that it does not opt out of the releases; and

(iii)    not change, withdraw, amend, or revoke (or cause to be changed, withdrawn, amended, or revoked) any vote or election referred to in clauses (a)(i) and (a)(ii) above.

(b)    During the Agreement Effective Period, each Supporting Creditor, severally, and not jointly, agrees that it shall not, directly or indirectly, and shall not direct any other Entity to:

(i)    seek, solicit, propose, support, assist, engage in negotiations in connection with, or participate in the formulation, preparation, filing, or prosecution of any Alternative Restructuring Proposal or object to or take any other action that would reasonably be expected to prevent, interfere with, delay, or impede the solicitation, the approval of the Disclosure Statement, or the confirmation and consummation of the Amended Plan and the Restructuring Transactions; *provided* that nothing in this Section 6.3(b)(i) shall (a) affect any rights of the Debtors set forth in Section 7.3(b) hereof or (b) affect any rights of the Official Committee set forth in Section 6.4(c) hereof;

(ii)    object to, delay, impede, or take any other action to interfere with any motion or other pleading or document filed by the Debtors in the Bankruptcy Court that is not inconsistent with this Agreement.

6.4.    Covenants and Conditions with Respect to the Official Committee

(a)    Affirmative Covenants. During the Agreement Effective Period, the Official Committee agrees to:

(i)    support the Proposed Settlement and the Restructuring Transactions and take all steps reasonably necessary and desirable to support, facilitate, implement, consummate, or otherwise give effect to the Proposed Settlement and the Restructuring Transactions in accordance with this Agreement and/or the Amended Plan, including by

-13-

preparing a letter to be included in the Solicitation Materials in which the Committee recommends that all unsecured creditors support and vote in favor of the Amended Plan;

(ii)     negotiate in good faith and use commercially reasonable efforts to support the timely execution and implementation of Definitive Documents consistent with Section 3.2;

(iii)     negotiate in good faith upon reasonable request of any other Party any modifications to the Proposed Settlement and the Restructuring Transactions that are necessary to satisfy any conditions to, or address any legal, financial, or structural impediment that may prevent, hinder, impede or delay, the consummation of the Proposed Settlement and the Restructuring Transactions; and

(iv)     use commercially reasonable efforts to cooperate with and assist the Debtors in obtaining additional support for the Proposed Settlement and the Restructuring Transactions from the Debtors' other stakeholders.

(b)     During the Agreement Effective Period, the Official Committee agrees that it shall not, directly or indirectly, and shall not direct any other Entity to:

(i)     object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Proposed Settlement and the Restructuring Transactions;

(ii)     take any action that is inconsistent in any material respect with, or is intended to frustrate or impede approval, implementation, or consummation of the Proposed Settlement and the Restructuring Transactions or the Amended Plan; or

(iii)     file any motion, pleading, or other document with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is not consistent with this Agreement, the Amended Plan, the Proposed Settlement or the Restructuring Transactions.

(c)     Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall require the Official Committee to take or refrain from taking any action (including terminating this Agreement under Section 11 hereof) to the extent the Official Committee determines, based on the advice of counsel, that taking or refraining from taking such action, as applicable, would be inconsistent with applicable Law or its fiduciary obligations under applicable Law, provided, however, that subject to the covenants, agreements, and consent rights set forth in the Agreement and the Term Sheet, the Official Committee represents that the Proposed Settlement is fair and reasonable and the Official Committee's agreement thereto is a proper exercise of the Official Committee's fiduciary duties.  The Official Committee shall give prompt written notice (in each case, no later than one (1) Business Day) to counsel to each of the Debtors, the Ad Hoc Committee, the Class Action Claimants of any determination made in accordance with this Section 6.4(c). This Section 6.4(c) shall not impede any Party's right to terminate this Agreement pursuant to Section 11 hereof.

(d)     Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall impair or waive the rights of the Official Committee to assert or raise any objection permitted under this Agreement in connection with the Proposed Settlement or the implementation of the Restructuring Transactions or otherwise.

6.5.    Additional Provisions Regarding the Supporting Parties' Commitments. Notwithstanding anything contained in this Agreement, nothing in this Agreement shall:

(a)     impair or waive the rights of any Supporting Party to appear as a party in interest in any matter to be adjudicated in these Chapter 11 Cases and to object to any relief sought by the Debtors or any other Supporting Party, so long as such appearance and the positions advocated in connection therewith are not inconsistent with this Agreement or have the purpose or effect of delaying, interfering with, impeding, or taking any other action to delay, interfere with or impede, directly or indirectly, the Proposed Settlement or the Restructuring Transactions;

(b)     affect the ability of any Supporting Party to consult with any other party in interest in the Chapter 11 Cases (including the United States Trustee), so long as, in the case of consultation with any party in interest, the appearance, and positions advocated in connection therewith are not inconsistent with this Agreement or have the purpose or effect of delaying, interfering with, impeding, or taking any other action to delay, interfere with or impede, directly or indirectly, the Restructuring Transaction;

(c)     prevent any Supporting Party from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement;

(d)     from and after the Termination Date as to a Supporting Creditor, obligate such Supporting Creditor that is entitled to vote on the Amended Plan to deliver a vote to support the Amended Plan or prohibit a Supporting Creditor from withdrawing or changing such vote;

(e)     bind any Supporting Creditor to accept the Preference Settlement (as defined in the Term Sheet); or

(f)     impair or waive the rights of any Supporting Party with respect to matters not contemplated by the Term Sheet and this Agreement, including, without limitation (i) any claims filed in the Chapter 11 Cases by the Internal Revenue Service, (ii) any matter relating to the provisional liquidation proceedings of FTX Digital Markets Ltd. and any proceedings relating to FTX Property Holdings Ltd.; or (iii) the allocation of the proceeds of property seized or subject to seizure or held by the Department of Justice.

6.6.    Additional Provisions Regarding the Estimation Motion and Estimation Order. This Agreement does not impair or waive any rights of any Supporting Party to object to the Estimation Motion; *provided* that, upon entry of the Estimation Order by the Bankruptcy Court, notwithstanding any objections to the Estimation Motion by any Party, the Estimation Order shall constitute and be considered part of the "Restructuring Transactions" for the purposes of this Agreement.

-15-

6.7.    <u>Additional Provisions Regarding Committee Membership</u>.  No less frequently than every ninety (90) days commencing on the Agreement Effective Date, counsel to (i) the Ad Hoc Committee; and (ii) the Class Action Claimants; shall provide to the Debtors and the Official Committee a list showing each current member of each respective group and the aggregate holdings of claims and interests in the Debtors.

6.8.    <u>Additional Provisions Regarding the Ad Hoc Committee</u>. The Ad Hoc Committee shall use commercially reasonable efforts to see that the Ad Hoc Committee members holding the greater of (i) 75% of Dotcom Customer Entitlement Claims held by members of the Ad Hoc Committee pursuant to its third amended verified statement pursuant to Bankruptcy Rule 2019 and (ii) $750,000,000 of Dotcom Customer Entitlement Claims held by the Ad Hoc Committee measured by the Petition Date Value deliver counterpart signature pages to this Agreement to counsel to the Debtors, the Class Action Claimants and the Official Committee, by December 1, 2023.

7.        ***Commitments of the Debtors.***

7.1.    <u>Affirmative Commitments</u>.  Except as set forth in Section 7.3 hereof, during the Agreement Effective Period, the Debtors agree to:

(a)    support and take all steps reasonably necessary and desirable to consummate the Proposed Settlement and the Restructuring Transactions in accordance with this Agreement;

(b)    to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Proposed Settlement or the Restructuring Transactions contemplated in this Agreement, support and take all steps reasonably necessary and desirable to address any such impediment;

(c)    use commercially reasonable efforts to obtain any and all required governmental, regulatory and/or third-party approvals for the implementation or consummation of the Proposed Settlement and Restructuring Transactions;

(d)    negotiate in good faith and use commercially reasonable efforts to execute and deliver the Definitive Documents and any other required agreements to effectuate and consummate the Proposed Settlement and Restructuring Transactions, as contemplated by this Agreement;

(e)    provide counsel to the Ad Hoc Committee, the Class Action Claimants and the Official Committee, on a "professional eyes only" basis, a reasonable opportunity to review draft copies of all Definitive Documents that the Debtors intend to file with the Bankruptcy Court;

(f)    actively oppose and object to the efforts of any person seeking to object to, delay, impede, or take any other action to interfere with the acceptance, implementation, or consummation of the Proposed Settlement or the Restructuring Transactions (including, if applicable, the filing of timely filed objections or written responses) to the extent such

opposition or objection is reasonably necessary or desirable to facilitate implementation of Proposed Settlement or the Restructuring Transactions;

(g)      timely file a formal objection to any motion filed with the Bankruptcy Court by any Person seeking the entry of an order (i) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code; (ii) dismissing the Chapter 11 Cases; (iii) modifying or terminating the Debtors' exclusive right to file and solicit acceptances of a plan of reorganization; or (iv) for relief that (A) is inconsistent with this Agreement in any respect or (B) would, or would reasonably be expected to, frustrate the purposes of this Agreement, including by preventing the consummation of the Proposed Settlement or the Restructuring Transactions;

(h)      use commercially reasonable efforts to comply with all Milestones;

(i)      use commercially reasonable efforts to seek additional support for the Proposed Settlement and the Restructuring Transactions from their other material stakeholders to the extent reasonably prudent, including without limitation (A) the United States Department of Justice; (B) the Joint Provisional Liquidators for FTX Digital Markets; (C) the Joint Provisional Liquidators for FTX Australia; (D) the Administrator of FTX Europe; (E) regulatory authorities within and outside of the United States; (F) general unsecured creditors of the Debtors; (G) the appropriate parties in the chapter 11 cases of each of *In re Genesis Global Holdco, LLC*, Case No. 23-10063 (SHL) (Bankr. S.D.N.Y.), *In re Voyager Digital Holdings, Inc.*, Case No. 22-10943 (MEW) (Bankr. S.D.N.Y.), *In re BlockFi Inc.*, Case No. 22-19361 (MBK) (Bankr. D.N.J.), *In re Celsius Network LLC*, Case No. 22-10964 (MG) (Bankr. S.D.N.Y.) and *In re Three Arrows Capital, Ltd*, Case No. 22-10920 (MG) (Bankr. S.D.N.Y.); and (H) the non-Debtor affiliates and subsidiaries of the Debtors; and

(j)      negotiate in good faith upon reasonable request of any other Party any modifications to the Proposed Settlement or the Restructuring Transactions that are necessary to address any legal, financial, or structural impediment that may prevent the consummation of the Proposed Settlement or the Restructuring Transactions, in each case to the extent such modifications can be implemented without any adverse effect on the Debtors.

7.2.    <u>Negative Commitments</u>.  Except as set forth in Section 7.3 hereof, during the Agreement Effective Period, the Debtors shall not directly or indirectly:

(a)      object to, delay, impede, or take any other action to interfere with the acceptance, implementation, or consummation of the Proposed Settlement or the Restructuring Transactions;

(b)      take any action that is inconsistent in any material respect with, or is intended to frustrate or impede approval, implementation and consummation of the Proposed Settlement or the Restructuring Transactions described in, this Agreement, the Amended Plan, or the Definitive Documents;

(c)     file any motion, pleading, or Definitive Documents with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is materially inconsistent with this Agreement, the Proposed Settlement or the Restructuring Transactions;

(d)     amend, alter, supplement, restate or otherwise modify any Definitive Document, in whole or in part, in a manner that is materially inconsistent with this Agreement, the Proposed Settlement or the Restructuring Transactions; or

(e)     sell, dispose of, or otherwise dispense with any material assets outside of the ordinary course of business prior to consulting with the Ad Hoc Committee, the Official Committee and the Class Action Claimants and providing information reasonably necessary for the Ad Hoc Committee, the Official Committee and the Class Action Claimants, in each case subject to appropriate confidentiality arrangements, to meaningfully assess the request.

7.3.    <u>Additional Provisions Regarding Debtors' Commitments.</u>

(a)     Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall require a Debtor to take or refrain from taking any action (including terminating this Agreement under Section 11 hereof) to the extent such Debtor determines, based on the advice of counsel, that taking or refraining from taking such action, as applicable, would be inconsistent with applicable Law or its fiduciary obligations under applicable Law.  The Debtors shall give prompt written notice to counsel to each of the Ad Hoc Committee, the Class Action Claimants and the Official Committee of any determination made in accordance with this Section 7.3(a).  This Section 7.3(a) shall not impede any Party's right to terminate this Agreement pursuant to Section 11 hereof.

(b)     Notwithstanding anything to the contrary in this Agreement, upon receipt of an Alternative Restructuring Proposal, the Debtors and their respective directors, managers and advisors or representatives shall have the right to consider, consistent with their fiduciary duties, such Alternative Restructuring Proposal; *provided* that the Debtors shall use reasonable efforts to provide regular updates to the Ad Hoc Committee, the Class Action Claimants and the Official Committee as to the status and progress of such Alternative Restructuring Proposal on a "professional eyes only" basis, unless otherwise agreed.  If the Debtors file a document in the Bankruptcy Court in support of an Alternative Restructuring Proposal, the Debtors will provide notice to the Ad Hoc Committee, the Class Action Claimants and the Official Committee prior to taking any such action.  Upon receipt of such notice, the Required Consenting Creditors shall each have the right to terminate this Agreement solely with respect to themselves.

(c)     Nothing in this Agreement shall: (i) impair or waive the rights of any Debtor to assert or raise any objection permitted under this Agreement in connection with the implementation of the Proposed Settlement or the Restructuring Transactions; (ii) affect the ability of any Debtor to consult with any Supporting Party, or any other party in interest in the Chapter 11 Cases (including any official committee and the United States Trustee);

or (iii) prevent any Debtor from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement.

8.         ***Transfer of Claims.***

8.1.    Except solely to the extent provided in Section 8.2 or Section 8.3 hereof, this Agreement shall not limit, restrict, or otherwise affect in any way a Supporting Creditor's right, authority, or power to Transfer any Claims, including any right, title, or interest in a Claim.

8.2.    <u>Transfer Restrictions</u>.  During the Restricted Period, and subject to the terms and conditions of this Agreement, each Supporting Creditor agrees, solely with respect to itself, as expressly identified and limited on its signature page or Joinder or Transfer Agreement, and not in any other manner or with respect to any affiliates, not to Transfer any right, title, or interest in a Claim, unless (a) the Transferee is a Party to this Agreement or (b) if the Transferee is not already a Supporting Creditor to this Agreement, the Transferee agrees in writing to be bound by the terms of this Agreement by executing a Transfer Agreement in the form attached to this Agreement by the date of that Transfer.  Any Transfer in violation of this Section 8.2 or Section 8.3 hereof shall be void *ab initio*.  The Transferee shall use commercially reasonable efforts to promptly provide notice of any Transfer made pursuant to this Section 8.2, including the amount and type of Claims transferred, to counsel to the Debtors.

8.3.    <u>Qualified Marketmaker Exceptions</u>.

(a)      Notwithstanding Section 8.2 hereof, a Supporting Creditor may Transfer any right, title, or interest in its Claims to an entity that is acting in its capacity as a Qualified Marketmaker without the requirement that the Qualified Marketmaker execute a Transfer Agreement or be a Party to this Agreement, on the condition that any subsequent Transfer by such Qualified Marketmaker of the right, title or interest in such Claim is to a Transferee that (A) is a Party to this Agreement at the time of such Transfer or (B) becomes a Party to this Agreement on or before the date of such Transfer by executing a Transfer Agreement pursuant to Section 8.2 hereof.  The Transferee (but not, for the avoidance of doubt, a Qualified Marketmaker) shall promptly provide notice of any Transfer made pursuant to this Section 8.3(a) hereof, including the amount and type of Claims transferred, to counsel to the Debtors.

(b)      Notwithstanding Section 8.4 hereof, a Qualified Marketmaker may Transfer any right, title, or interest in any Claims that it acquires from a Party to this Agreement to another Qualified Marketmaker (the "**<u>Transferee Qualified Marketmaker</u>**") without the requirement that the Transferee Qualified Marketmaker execute a Transfer Agreement or be a Party to this Agreement, on the condition that any subsequent Transfer by such Transferee Qualified Marketmaker of the right, title, or interest in such Claims is to a Transferee that (A) is a Party to this agreement at the time of such Transfer  or (B) becomes a Party to this Agreement by the date of settlement of such Transfer by executing a Transfer Agreement pursuant to Section 8.2 hereof.  The Transferee (but not, for the avoidance of doubt, a Qualified Marketmaker) shall promptly provide notice of any Transfer made

-19-

pursuant to this Section 8.3(b), including the amount and type of Claims transferred, to counsel to the Debtors.

(c)    At the time of a Transfer of any Claims to a Qualified Marketmaker:

(i)    if such Claims may be voted in favor of the Amended Plan, the Supporting Creditor to this Agreement must first vote such Claims in accordance with the requirements of this Agreement; and

(ii)    to the extent that a Qualified Marketmaker that is not otherwise a Supporting Creditor to this Agreement is eligible and entitled to vote the Claims acquired pursuant to this Section 8, is not otherwise precluded from voting such Claims in favor of the Amended Plan, and receives a separate ballot for such Claims, such Qualified Marketmaker shall, before the expiration of the Amended Plan voting deadline established by the Bankruptcy Court, vote such Claims in favor of the Amended Plan as contemplated hereunder.

(d)    Notwithstanding Section 8.2 hereof, to the extent that a Supporting Creditor to this Agreement is acting in its capacity as a Qualified Marketmaker, it may Transfer any right, title or interest in any Claim that the Qualified Marketmaker acquires from a holder of such Claim that is not a Supporting Creditor to this Agreement without the requirement that the transferee execute a Transfer Agreement or be a Supporting Creditor hereto.

8.4.    Transfer Agreement.  A Transferee that becomes a Supporting Creditor to this Agreement as provided in this Section 8 shall deliver a copy of the executed Transfer Agreement to counsel to the Debtors in accordance with Section 13.10 hereof within three (3) business days after the date of the Transfer, so long as such Transfer Agreement was executed in accordance with this Agreement.  The Transfer Agreement shall be treated as confidential information and shall not be disclosed without the prior written consent of the Transferee.

8.5.    Effect of Delivery of Transfer Agreement.  By executing and delivering a Transfer Agreement as provided under Sections 8.2(b) and 8.4 hereof, a Transferee:

(a)    becomes and shall be treated for all purposes under this Agreement as a Supporting Creditor to this Agreement with respect to the Transferred Claims and with respect to all other Claims that the Transferee holds and subsequently acquires, subject to Section 8.3(d) hereof;

(b)    agrees to be bound by all of the terms of this Agreement (as such terms may be amended from time to time in accordance with the terms hereof); and

(c)    is deemed, without further action, to make to the other Parties hereto the representations and warranties that the Supporting Creditors to this Agreement make in Section 9 hereof, herein in each case as of the date of the Transfer Agreement.

8.6.    Effect of Transfer; No Liability.  A Supporting Creditor to this Agreement that Transfers any right, title, or interest in any Claims in accordance with the terms of this

Section 8 shall (a) be deemed to relinquish its rights and be released from its obligations under this Agreement solely to the extent of such Transferred Claims and (b) not be liable to any party to this Agreement for the failure of the Transferee, whether or not a Qualified Marketmaker, to comply with the terms and conditions of this Agreement.

8.7.    <u>Additional Claims</u>.  This Agreement shall not limit, restrict, or otherwise affect in any way a Party's right, authority, or power to acquire any Claims in addition to the Supporting Creditor's Claims and such acquired claims shall automatically and immediately upon acquisition by a Supporting Creditor be deemed to be subject to the terms of this Agreement (regardless of when or whether notice of such acquisition is given to counsel to the Debtors, as described below), except as set forth in Section 8.4 above. During the Restricted Period, upon the written request of the Debtors, a Supporting Creditor to this Agreement that acquires additional Claims from an entity that is not a Supporting Creditor to this Agreement shall deliver a current list of its Claims to counsel for the Debtors within ten (10) Business Days after the receipt of such request, and such list shall be treated as confidential information and shall not be disclosed without the prior written consent of such Party to this Agreement.

8.8.    <u>Exception for Pending Trades</u>.  Notwithstanding anything to the contrary herein, a claim Transferred to or by a Supporting Creditor to this Agreement prior to the Agreement Effective Date and that is an open trade on the Agreement Effective Date shall not be subject to, or bound by, the terms and conditions of this Agreement (it being understood that such claim so Transferred to and held by a Party to this agreement for its own account (*i.e.*, not as part of a short transaction, or to be Transferred by the Supporting Creditor under an open trade or any other transaction entered into by such Supporting Creditor prior to, and pending as of the date of, such Supporting Creditor's entry into this Agreement) shall be subject to the terms of this Agreement, as provided in Section 8.6 hereof).

8.9.    <u>Signature Page Limitation</u>.  The Parties understand that the Supporting Creditors may be engaged in a wide range of financial services and businesses, and, in furtherance of the foregoing, the Parties acknowledge and agree that, to the extent a Supporting Creditor expressly indicates on its signature page hereto or on a Joinder that it is executing this Agreement solely on behalf of specific legal entities, investment vehicles, trading desk(s) and/or business group(s) of the Supporting Creditor, the obligations set forth in this Agreement shall apply only to such legal entities, investment vehicles, trading desk(s) and/or business group(s) and shall not apply to any other legal entities, investment vehicles, trading desk(s) and/or business group(s) of the Supporting Creditor unless it separately becomes a party hereto.

9.        ***Representations and Warranties of Supporting Parties.***   Each Supporting Creditor, severally, and not jointly, represents and warrants that, as of the date such Supporting Creditor executes and delivers this Agreement and as of the Agreement Effective Date:

(a)      to the extent a Supporting Creditor is a holder of a Claim, it is the beneficial or record owner of the aggregate principal amount of the Claims or is the nominee, investment manager, or advisor for beneficial holders of the Claims reflected in, and, having made

reasonable inquiry, is not the beneficial or record owner of any Claims other than those reflected in, such Supporting Creditor's signature page to this Agreement or a Transfer Agreement, as applicable (as may be updated pursuant to Section 8 hereof);

(b)     to the extent a Supporting Creditor is a holder of a Claim, it has the full power and authority to act on behalf of, and vote and consent to matters concerning, such Claims;

(c)     to the extent a Supporting Creditor is a holder of a Claim, such Claims are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction (including due to tokenization), right of first refusal, "lock-ups" (including lock-ups in connection with a contractual transfer restriction) or other limitation on disposition, transfer, or encumbrances of any kind, that would adversely affect in any way such Supporting Creditor's ability to perform any of its obligations under this Agreement at the time such obligations are required to be performed;

(d)     to the extent a Supporting Creditor is a holder of a Claim, it has the full power to vote, approve changes to, and transfer all of its Claims referable to it as contemplated by this Agreement subject to applicable Law;

(e)     it has reviewed, or had the opportunity to review, with the assistance of professional and legal advisors of its choosing, all information it deems necessary and appropriate for it to evaluate the financial risks inherent in the Restructuring Transactions and accept the terms of this Agreement;

(f)     to the extent a Supporting Creditor is binding other Parties to this Agreement, such Supporting Creditor has the full power and authority to bind such other Parties to this Agreement; and

(g)     it has knowledge and experience in financial and business matters of this type, that it is capable of evaluating the merits and risks of entering into this Agreement and of making an informed investment decision, and has conducted an independent review and analysis of the business and affairs of the Debtors that it considers sufficient and reasonable for the purposes of entering into this Agreement.

10.     ***Mutual Representations, Warranties, and Covenants.***  Each of the Parties, severally, and not jointly, represents, warrants and covenants to each other Party that, as of the date such Party executes and delivers this Agreement and as of the Agreement Effective Date:

(a)     to extent applicable, it is validly existing and in good standing under the Laws of the state of its organization, and this Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable Laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability;

(b)     except as expressly provided in this Agreement, the Amended Plan, and the Bankruptcy Code, no consent or approval is required by any other Entity in order for it to

effectuate the Proposed Settlement and the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement;

(c)    to extent applicable, the entry into and performance by it of, and the transactions contemplated by, this Agreement do not, and will not, conflict in any material respect with any Law or regulation applicable to it or with any of its articles of association, memorandum of association, or other constitutional documents;

(d)    except as expressly provided in this Agreement, it has (or will have, at the relevant time) all requisite corporate or other power and authority to enter into, execute, and deliver this Agreement and to effectuate the Proposed Settlement and the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement;

(e)    except as expressly provided by this Agreement, it is not party to any restructuring or similar agreements or arrangements with the other Parties to this Agreement that have not been disclosed to all Parties to this Agreement; and

(f)    no Party is considering, or has any agreement or understanding with respect to, any Alternative Restructuring Proposal that has not been disclosed to the Debtors.

11.    ***Termination Events.***

11.1.    <u>Supporting Party Termination Events</u>.  This Agreement may be terminated by: (i) the Majority Supporting Ad Hoc Parties solely with respect to the Supporting Ad Hoc Committee Members; (ii) the Required Class Action Claimants solely with respect to the Supporting Class Action Claimants; (iii) the Official Committee solely with respect to the Official Committee; and (iv) any other holder of Claims who become party hereto from time to time solely with respect to itself; in each case by the delivery to the Debtors of a written notice in accordance with Section 13.10 hereof upon the earliest occurrence of one or more of the following events:

(a)    the breach in any material respect by a Debtor of any of the covenants of such Debtor set forth in this Agreement, which breach remains uncured for ten (10) Business Days after such terminating Supporting Party transmits a written notice in accordance with Section 13.10 hereof detailing any such breach;

(b)    any representation or warranty in this Agreement made by the Debtors shall have been untrue in any material respect when made or shall have become untrue in any material respect, which remains uncured for ten (10) Business Days after the Debtors discover the untrue nature of the representation or warranty;

(c)    the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling, judgment or order that (i) enjoins the consummation of a material portion of the Proposed Settlement or the Restructuring Transactions; and (ii) either (1) such ruling, judgment or order has been issued at the request of any of the Debtors in contravention of any obligations set forth in this Agreement or (2) remains in effect for ten (10) days after such terminating Supporting

-23-

Party transmits a written notice in accordance with Section 13.10 hereof detailing any such issuance; *provided* that this Agreement may not be terminated pursuant to this Section 11.1(c) by any Party (i) that sought or requested such ruling or order in contravention of any obligation set out in this Agreement; or (ii) with respect to any ruling, judgment or order with relating to any Take-Back Interests or Offshore Exchange Company;

(d)    the entry of an order by the Bankruptcy Court, or the filing of a motion or application by any Debtor seeking an order (without the prior written consent of the Required Consenting Creditors), (i) converting one or more of the Chapter 11 Cases of a Debtor to a case under chapter 7 of the Bankruptcy Code or (ii) terminating exclusivity under section 1121 of the Bankruptcy Code;

(e)    the thirtieth (30th) day following the failure to meet any of the Milestones, unless (i) such Milestone has been waived or extended in a manner consistent with this Agreement and (ii) such failure is the result of an act, omission or delay on the part of one or more of the Supporting Parties;

(f)    a Definitive Document is finalized in a manner that is inconsistent with the terms of this Agreement and not reasonably acceptable to the terminating Supporting Parties and such inconsistency remains uncured for ten (10) Business Days after the terminating Supporting Parties transmit a written notice in accordance with Section 13.10 hereof;

(g)    solely with respect to the Supporting Ad Hoc Committee Members, the Bankruptcy Court does not enter the Ad Hoc Committee Expense Reimbursement Order on or prior to December 1, 2023;

(h)    the Bankruptcy Court enters an order denying confirmation of the Amended Plan;

(i)    the Confirmation Order is reversed or vacated, and the Bankruptcy Court does not enter a revised Confirmation Order reasonably acceptable to the terminating Supporting Parties within ten (10) Business Days;

(j)    the Debtors withdraw or modify the Amended Plan, in whole or in part, or publicly announce their intention not to support the Proposed Settlement, the Restructuring Transactions or the Amended Plan;

(k)    the date the Debtors exercise their right, consistent with their fiduciary duties, to not pursue any of the Restructuring Transactions or take any action in reliance on Section 7.3 hereof; and

(l)    solely with respect to the Official Committee, if (x) the Debtors terminate this Agreement pursuant to Section 11.2 hereof or (y) if the Supporting Ad Hoc Committee Members terminate this Agreement pursuant to this Section 11.1.

11.2.    <u>Debtor Termination Events</u>. The Debtors may terminate this Agreement with respect to all Parties or solely with respect to the applicable Supporting Parties upon prior written notice to counsel to each of the Ad Hoc Committee, the Class Action Claimants

and the Official Committee in accordance with Section 13.10 hereof upon the occurrence of any of the following events:

(a)    the breach in any material respect by one or more Supporting Parties of any of the covenants set forth in this Agreement that would have, or could reasonably be expected to have, an adverse effect on the Restructuring Transactions, which breach remains uncured for ten (10) Business Days after the Debtors transmit a written notice in accordance with Section 13.10 hereof detailing any such breach;

(b)    any representation or warranty in this Agreement made by the Supporting Class Action Claimants, the Official Committee, members of the Executive Committee of the Ad Hoc Committee or any other Supporting Party shall have been untrue in any material respect when made or shall have become untrue in any material respect, which remains uncured for ten (10) Business Days after the Debtors discover the untrue nature of the representation or warranty;

(c)    the board of directors of the Debtors determine, after consulting with counsel, (i) that continuing to pursue any of the Restructuring Transactions in the manner contemplated by this Agreement would be inconsistent with the exercise of its fiduciary duties or applicable Law or (ii) in the exercise of its fiduciary duties, to pursue an Alternative Restructuring Proposal;

(d)    the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling, judgment or order that (i) enjoins the consummation of a material portion of the Proposed Settlement or the Restructuring Transactions and (ii) either (1) such ruling, judgment or order has been issued at the request of any of the Debtors in contravention of any obligations set forth in this Agreement or (2) remains in effect for ten (10) Business Days after such terminating Supporting Party transmits a written notice in accordance with Section 13.10 hereof detailing any such issuance;

(e)    the Ad Hoc Committee fails to see that the Ad Hoc Committee members holding the greater of (i) 75% of Dotcom Customer Entitlement Claims held by members of the Ad Hoc Committee pursuant to its third amended verified statement pursuant to Bankruptcy Rule 2019 and (ii) $750,000,000 of Dotcom Customer Entitlement Claims held by the Ad Hoc Committee measured by the Petition Date Value deliver counterpart signature pages to this Agreement to counsel to the Debtors, the Class Action Claimants and the Official Committee, by December 1, 2023;

(f)    the Required Ad Hoc Parties, the Required Class Action Claimants or the Official Committee terminate this Agreement with respect to themselves in accordance with Section 11.1 hereof;

(g)    the Bankruptcy Court enters an order denying confirmation of the Amended Plan; or

(h)     the Confirmation Order is reversed or vacated, and the Bankruptcy Court does not enter a revised Confirmation Order reasonably acceptable to the Debtors within ten (10) Business Days.

11.3.   <u>Mutual Termination</u>.  This Agreement and the obligations of the Parties hereunder may be mutually terminated by mutual written agreement among the Required Consenting Creditors and the Debtors.

11.4.   <u>Automatic Termination</u>.  This Agreement shall terminate automatically without any further required action or notice immediately after the Plan Effective Date.

11.5.   <u>Effect of Termination</u>. After the occurrence of a Termination Date as to a Party, this Agreement shall be of no further force and effect as to such Party and each Party subject to such termination shall be released from its commitments, undertakings, and agreements under or related to this Agreement and shall have the rights and remedies that it would have had, had it not entered into this Agreement, and shall be entitled to take all actions, whether with respect to the Proposed Settlement, the Restructuring Transactions or otherwise, that it would have been entitled to take had it not entered into this Agreement, including with respect to any and all Claims or Causes of Action.  Any Supporting Creditor withdrawing or changing its vote pursuant to this Section 11.5 shall promptly provide written notice of such withdrawal or change to each other Party to this Agreement and, if such withdrawal or change occurs on or after the Petition Date, file notice of such withdrawal or change with the Bankruptcy Court.  Nothing in this Agreement shall be construed as prohibiting the Debtors or Supporting Party from contesting whether any such termination is in accordance with the terms or to seek enforcement of any rights under this Agreement that arose or existed before a Termination Date.  Except as expressly provided in this Agreement, nothing in this Agreement is intended to, or does, in any manner waive, limit, impair, or restrict any right of any Debtor or the ability of any Debtor to protect and reserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Supporting Party.  No purported termination of this Agreement shall be effective under this Section 11.5 or otherwise if the Party seeking to terminate this Agreement is in material breach of this Agreement.  Nothing in this Section 11.5 shall restrict the Debtors' right to terminate this Agreement in accordance with Section 11.2 hereof.

12.     ***Amendments and Waivers.***

(a)     This Agreement may not be modified, amended, or supplemented, and no condition or requirement of this Agreement may be waived, in any manner except in accordance with this Section 12.

(b)     This Agreement may be modified, amended, or supplemented, or a condition or requirement of this Agreement may be waived, if in writing and signed by: (i) the Debtors; (ii) solely with respect to modifications, amendments, supplements and requirements that materially affect the Supporting Ad Hoc Committee Members, by the Required Ad Hoc Parties; *provided* that modifications, amendments, supplements and requirements that materially adversely affect the Supporting Ad Hoc Committee Members with respect to

the material terms of the Restructuring Transactions shall require the consent of the Majority Supporting Ad Hoc Parties; (iii) solely with respect to modifications, amendments, supplements and requirements that materially affect the Class Action Claimants, by the Required Class Action Claimants; and (iv) the Official Committee, *provided* that any changes to the consent or termination rights of any Party shall require the consent of each affected Party.

(c)      Any proposed modification, amendment, waiver, or supplement that does not comply with this Section 12 shall be ineffective and void *ab initio*.

(d)      The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  No failure on the part of any Party to exercise, and no delay in exercising, any right, power, or remedy under this Agreement shall operate as a waiver of any such right, power, or remedy or any provision of this Agreement, nor shall any single or partial exercise of such right, power, or remedy by such Party preclude any other or further exercise of such right, power, or remedy or the exercise of any other right, power, or remedy.  All remedies under this Agreement are cumulative and are not exclusive of any other remedies provided by Law.

13.       ***Miscellaneous.***

13.1.   <u>Acknowledgements</u>.  Notwithstanding any other provision of this Agreement, this Agreement is not and shall not be deemed to be an offer with respect to any securities or solicitation of votes for the acceptance of a plan of reorganization for purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise.  Any such offer or solicitation will be made only in compliance with all applicable securities Laws, provisions of the Bankruptcy Code, and/or other applicable Law.

13.2.   <u>Exhibits Incorporated by Reference; Conflicts</u>.  Each of the exhibits, annexes, signatures pages, and schedules attached to this Agreement is expressly incorporated into and made a part of this Agreement, and all references to this Agreement shall include such exhibits, annexes, and schedules.   In the event of any inconsistency between this Agreement (without reference to the exhibits, annexes, and schedules attached to this Agreement) and the exhibits, annexes, and schedules attached to this Agreement, this Agreement (without reference to the exhibits, annexes, and schedules thereto) shall govern; *provided* that in the event of any inconsistency between this Agreement and the Term Sheet, the Term Sheet shall govern until such time as the Amended Plan has been confirmed, at which time, the terms and conditions set forth in the Amended Plan, to the extent intended to supersede the Term Sheet, shall govern.

13.3.   <u>Further Assurances</u>.  Subject to the other terms of this Agreement, the Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters specified in this Agreement, as may be reasonably appropriate or necessary, or as may be required by order of the Bankruptcy Court, from time to time, to effectuate the Proposed Settlement and the Restructuring Transactions, as applicable.

13.4.   <u>Complete Agreement</u>.  Except as otherwise explicitly provided in this Agreement, this Agreement constitutes the entire agreement among the Parties with respect to the subject matter of this Agreement and supersedes all prior agreements, oral or written, among the Parties with respect thereto, other than any confidentiality agreement.  The Parties acknowledge and agree that they are not relying on any representations or warranties other than as set forth in this Agreement.

13.5.   <u>GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM</u>.  THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK WITHOUT GIVING EFFECT TO ITS CONFLICT OF LAWS PRINCIPLES.  Each Party to this Agreement agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement, to the extent possible, in the Bankruptcy Court.  Solely in connection with claims arising under this Agreement, each Party to this Agreement: (a) irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court; (b) waives any objection to laying venue in any such action or proceeding in the Bankruptcy Court; and (c) waives any objection that the Bankruptcy Court is an inconvenient forum or does not have jurisdiction over any Party to this Agreement.

13.6.   <u>TRIAL BY JURY WAIVER</u>.  EACH PARTY TO THIS AGREEMENT IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT.

13.7.   <u>Execution of Agreement.</u>  This Agreement may be executed and delivered in any number of counterparts and by way of electronic signature and delivery, each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement.  Except as expressly provided in this Agreement, each Person executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

13.8.   <u>Rules of Construction</u>.  This Agreement is the product of negotiations among the Debtors and the Supporting Parties, and in the enforcement or interpretation of this Agreement, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion of this Agreement, shall not be effective in regard to the interpretation of this Agreement.  The Debtors and the Supporting Parties were each represented by counsel during the negotiations and drafting of this Agreement and continue to be represented by counsel.

13.9.   <u>Successors and Assigns; Third Parties</u>.  This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors and permitted assigns, as applicable.  There are no third-party beneficiaries under this Agreement, and, except as set forth in Section 8, the rights or obligations of any Party under this Agreement may not be assigned, delegated, or transferred to any other Entity.

13.10.  <u>Notices</u>.  All notices hereunder shall be deemed given if in writing and delivered, by electronic mail, courier, or registered or certified mail (return receipt requested), to the following addresses (or at such other addresses as shall be specified by like notice):

(a)     if to the Debtors, to:

Sullivan & Cromwell LLP
125 Broad Street
New York, New York 10004
Attention:  Andrew G. Dietderich, Brian D. Glueckstein and Alexa J. Kranzley
E-mail address:  dietdericha@sullcrom.com, gluecksteinb@sullcrom.com and kranzleya@sullcrom.com

(b)     if to a Supporting Ad Hoc Committee Member, to:

Eversheds Sutherland (US) LLP
227 West Monroe Street, Suite 6000
Chicago, Illinois 60606
Attention:  Erin Broderick
E-mail address:  erinbroderick@eversheds-sutherland.com

Morris, Nichols, Arsht & Tunnell LLP
1201 N. Market Street, 16th Floor
Wilmington, Delaware 19801
Attention: Matthew Harvey
E-mail address:  mharvey@morrisnichols.com

(c)     if to the Official Committee, to:

Paul Hastings LLP
200 Park Avenue,
New York, New York 10166
Attention:  Kris Hansen and Ken Pasquale
E-mail address:  krishansen@paulhastings.com and kenpasquale@paulhastings.com

(d)     if to a Supporting Class Action Claimant, to:

Entwistle & Cappucci LLP
500 W. 2nd Street, Suite 1900
Austin, Texas  78701
Attention:  Andrew J. Entwistle
E-mail address:  aentwistle@entwistle-law.com

Any notice given by delivery, mail, or courier shall be effective when received.

13.11.  <u>Independent Due Diligence and Decision Making</u>.  Each Supporting Party confirms that its decision to execute this Agreement has been based upon its independent investigation of the operations, businesses, financial and other conditions, and prospects of the Debtors.  Each Supporting Party acknowledges and agrees that it is not relying on any representations or warranties other than as set forth in this Agreement.

13.12.  <u>Enforceability of Agreement</u>.  Each of the Parties, to the extent enforceable, waives any right to assert that the exercise of termination rights under this Agreement is subject to the automatic stay provisions of the Bankruptcy Code, and expressly stipulates and consents hereunder to the prospective modification of the automatic stay provisions of the Bankruptcy Code for purposes of exercising termination rights under this Agreement, to the extent the Bankruptcy Court determines that such relief is required.

13.13.  <u>Admissibility</u>.  Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating to this Agreement shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms or the payment of damages to which a Party may be entitled under this Agreement.

13.14.  <u>Specific Performance</u>.  It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Supporting Party, and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (without the posting of any bond and without proof of actual damages) as a remedy of any such breach, including an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Supporting Party to comply promptly with any of its obligations hereunder.

13.15.  <u>Several, Not Joint, Claims</u>.  Except where otherwise specified, the agreements, representations, warranties, and obligations of the Parties under this Agreement are, in all respects, several and not joint.

13.16.  <u>Severability and Construction</u>.  If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid, or unenforceable, the remaining provisions shall remain in full force and effect if essential terms and conditions of this Agreement for each Party remain valid, binding, and enforceable.

13.17.  <u>Remedies Cumulative</u>.  All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at Law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

13.18.  <u>Capacities of Supporting Creditors</u>.  Each Supporting Creditor has entered into this agreement on account of all Claims that it holds (directly or through discretionary accounts that it manages or advises) and, except where otherwise specified in this Agreement, shall take or refrain from taking all actions that it is obligated to take or refrain from taking under this Agreement with respect to all such Claims.

13.19.  <u>Email Consents</u>.   Where a written consent, acceptance, approval, or waiver is required pursuant to or contemplated by this Agreement, such written consent, acceptance, approval, or waiver shall be deemed to have occurred if, by agreement between counsel to, as applicable, the Debtors and the Required Consenting Creditors, submitting and receiving such consent, acceptance, approval, or waiver, it is conveyed in writing (including electronic mail) between each such counsel without representations or warranties of any kind on behalf of such counsel.

13.20.  <u>Fees and Expenses</u>.  Each of the Supporting Creditors shall be responsible for their own fees and expenses incurred in connection with this Agreement,  except as may be otherwise expressly contemplated hereby or separately ordered by the Court.

13.21.  <u>Bankruptcy Court Approval</u>.  Each of the Supporting Parties acknowledges that, notwithstanding any other provision of this Agreement, this Agreement has not been approved by the Bankruptcy Court and the obligations of the Debtors herein are enforceable only as conditions and defenses to the obligations of the Supporting Parties and shall not constitute administrative obligations or expenses of the Debtors or their estates except to the extent subsequently approved as such by the Bankruptcy Court.

IN WITNESS WHEREOF, the Parties have executed this Agreement on the day and year first above written.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date specified on the first page of this document.

> **FTX TRADING LTD.,**
> **WEST REALM SHIRES INC.,**
> **ALAMEDA RESEARCH LLC, and**
> **CLIFTON BAY INVESTMENTS,**
> **for themselves and on behalf**
> **of their affiliated debtors and debtors-**
> **in-possession**
>
>
> By * /s/ John J. Ray III* 
>       Name:   John J. Ray III
>       Title:    Chief Executive Officer

[*Supporting Parties' signature pages on file with the Debtors*]

## Exhibit A

**Term Sheet**

EXECUTION VERSION

## FTX
## Draft Plan of Reorganization – Term Sheet

This summary term sheet (the "Term Sheet") is prepared in connection with the Settlement and Plan Support Agreement, dated October 16, 2023 (the "Plan Support Agreement"), among FTX Trading Ltd. and its affiliated debtors and debtors-in-possession (collectively, the "Debtors") and the Parties thereto. The Term Sheet describes certain material terms of an amended joint plan of reorganization (as it may be amended in the future, the "Plan") that the Debtors intend to pursue as contemplated by the Plan Support Agreement. The Term Sheet is provided for convenience and is qualified in its entirety by the Plan Support Agreement. The Term Sheet is intended to amend and supplement the terms contained in the draft *Joint Chapter 11 Plan of Reorganization of the Debtors*, dated July 31, 2023 (the "Initial Draft Plan"), filed with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") at Docket 2100. Unless otherwise expressly agreed to herein or in the Plan Support Agreement, all Parties' rights with respect to revisions or modifications to the terms of the Initial Draft Plan are expressly preserved. The Debtors will consult with the Parties to the Plan Support Agreement on all discretionary actions to be taken by the Debtors described in this Term Sheet and all Parties' rights with respect thereto are expressly reserved, except to the extent set forth in the Plan Support Agreement.[1]

**The Bankruptcy Code requires the Debtors to prepare and circulate a disclosure statement prior to soliciting stakeholder approval of a plan of reorganization. Neither the Initial Draft Plan, this Term Sheet nor any other materials the Debtors may circulate should be regarded as a solicitation of acceptances of a chapter 11 plan for purposes of the Bankruptcy Code. Stakeholders are asked to reserve judgment on all the matters raised by the Plan until the Plan is available and a disclosure statement is prepared and approved by the Bankruptcy Court.**

| I.    Background | |
|---|---|
| **Initial Draft Plan** | The Debtors filed the Initial Draft Plan on July 31, 2023. As discussed at the time, the FTX cases raise unresolved factual questions and novel legal issues that affect many stakeholders. The Debtors decided to file the Initial Draft Plan publicly at a relatively early stage – before the expiration of customer bar dates, the completion of pending investigations, the resolution of important negotiations with key stakeholders and the preparation of a disclosure statement – in order to facilitate creditor feedback and the consensual resolution of certain issues. |

---

[1] Neither this Term Sheet nor the Initial Draft Plan have been approved by the Bankruptcy Court. Nothing contained herein or in the Initial Draft Plan shall constitute an offer, acceptance, commitment, or legally binding obligation of the Debtors or any other party in interest, except for the commitments of the parties to the Plan Support Agreement contemplated therein.

| | Over this period, the Debtors sought input from stakeholders on certain material unresolved issues in the Initial Draft Plan, including, without limitation, how to address and settle a central question in their cases: whether customers of the FTX.com and FTX U.S. exchanges have a property interest or equitable interest in digital assets that are, or at some point were, associated with the exchanges. These matters are the subject of pending adversary proceedings commenced by the Ad Hoc Committee of Non-U.S. Customers of FTX.com (the "Ad Hoc Committee") and the customer adversary plaintiffs prosecuting *Onusz, et al.* v. *West Realm Shires Inc., et al.*, Case No. 22-50513 (JTD). |
|---|---|
| **The Customer Property Settlement** | This Term Sheet updates the Initial Draft Plan for the settlements of the pending adversary proceedings included in the Plan Support Agreement. These settlements include an agreement among the Parties to the Plan Support Agreement with respect to (a) the resolution of the open issues identified by the Debtors when the Initial Draft Plan was filed on July 31, 2023 and (b) a global approach to FTX.com and FTX.US preferences. The Plan Support Agreement has not been approved by the Bankruptcy Court. The Debtors may make changes to the Plan at any time in their discretion prior to the confirmation of the Plan by the Bankruptcy Court, in which case certain commitments of the Parties to the Plan Support Agreement may be terminated as provided therein. |
| **The Plan as a Complex Settlement** | The Plan provides an initial construct for a global settlement and good-faith compromise of an exceptionally large and complicated collection of claims, causes of actions and disputes involving the Debtors, including both claims against the Debtors and intercompany claims by Debtors against other Debtors. Generally speaking, the global settlement involves:<br><br>1. the valuation of claims in USD as of the petition time based on a valuation methodology that will be separately prepared by the Debtors and approved by the Bankruptcy Court;<br>2. resolution of disputes regarding the ownership of the digital assets held on the FTX.com and FTX U.S. exchanges based on the applicable terms of service and trust doctrines;<br>3. the identification of three primary recovery pools, corresponding to segregated assets attributable to |

|  | FTX.com customers, segregated assets attributable to FTX U.S. customers, and other assets that the Debtors contend are not clearly attributable to the FTX.com or FTX U.S. exchanges;<br><br>4. the recognition of special "shortfall" claims by the FTX.com and FTX U.S. exchanges for the benefit of their customers against the pool of general assets, to compensate the exchanges for the unauthorized borrowing and/or misappropriation of assets held on the exchanges;<br><br>5. the cancellation of intercompany claims (other than as represented under the Plan as the Dotcom Intercompany Shortfall Claim, the U.S. Intercompany Shortfall Claim and the Alameda-U.S. Exchange Intercompany Claims) and the substantive consolidation of the estates of substantially all of the Debtors, other than certain excluded non-U.S. entities who are solvent and whose corporate separateness was historically respected;<br><br>6. the subordination of certain claims to the pecuniary losses of customers and creditors;<br><br>7. the subordination and extinguishment of FTT claims in recognition of the equity-like characteristics of FTT, as well as the extinguishment of all other equity interests; and<br><br>8. the liquidation of the estates of the Debtors and the payment of distributions to customers and creditors in cash, subject to certain voluntary elections that may be available to customers in connection with a "reboot" of an Offshore Exchange Company (as defined below) or otherwise. |
|---|---|
| **II.     Debtor Entities** | |
| **Modified Substantive Consolidation** | Under the Plan, the estates of all Debtors other than the Separate Subsidiaries (as defined below) will be substantively consolidated as of the effective date of the Plan for the purposes of voting, confirmation and distributions under the classification system proposed by the Plan.  Substantive consolidation and the classification proposed by the Plan are parts of an integrated settlement and compromise of claims among and against the Debtors. The Plan will not result in the merger or affect the separate legal existence of any Debtor for any other purpose. |

| Separate Subsidiaries | The Debtors may identify certain subsidiaries that are solvent and historically separate ("Separate Subsidiaries"). The Separate Subsidiaries will be excluded from substantive consolidation for purposes of the Plan, and claims against the Separate Subsidiaries will be separately classified and paid in full in cash or otherwise left unimpaired. |
|---|---|
| Dismissed/Excluded Subsidiaries | The Debtors may identify certain subsidiaries that will be excluded from the Plan and whose chapter 11 cases may be dismissed prior to, in connection with, or after confirmation of the Plan or separately resolved. These Debtor subsidiaries will be liquidated and wound down pursuant to local proceedings and will be excluded from the Plan. |
| **III.** | **Classification and Treatment** |
| General | Claims and interests will be classified in classes (each, a "Class") as set forth in Exhibit I hereto. |
| | Administrative claims and certain other special priority claims will not be classified and will be paid in full in cash in accordance with the Bankruptcy Code. |
| Priority Claims (Class 1) | Allowed priority claims will be paid in full in cash or receive such treatment as may be permitted under the Bankruptcy Code. |
| Secured Claims (Class 2) | Allowed secured claims will be paid in full in cash or receive such treatment as may be permitted under the Bankruptcy Code. |
| Separate Subsidiaries (Class 3) | Allowed claims against Separate Subsidiaries will be paid in full in cash, unless another distribution is agreed with the holder of a claim. After all claims against a Separate Subsidiary are paid or resolved, the Separate Subsidiary will be liquidated or sold and the remaining value made available to other Debtors. |
| Dotcom Customer Entitlements (Class 4A) | All customers of FTX.com will constitute a single class, regardless of the type of token or product held and will have a claim in an amount equal to the USD value of their customer entitlements on FTX.com at the petition time (a "Dotcom Customer Entitlement"), to the extent allowed, other than in respect of any NFT or FTT holdings, which |

| | |
|---|---|
| | holdings shall be separately classified and treated as set forth herein.<br><br>Class 4A shall include "replacement" claims by customers of FTX.com who have judgment entered against them for the repayment of any preferential transfers.<br><br>Each holder of an allowed Dotcom Customer Entitlement will receive a *pro rata* share of the Dotcom Customer Pool (defined below). |
| **U.S. Customer Entitlements (Class 4B)** | All customers of FTX U.S. will constitute a single class, regardless of the type of token or product held, and will have a claim in an amount equal to the USD value of their customer entitlements on FTX U.S. at the petition time (a "U.S. Customer Entitlement"), to the extent allowed, other than in respect of any NFT holdings, which holdings shall be separately classified and treated as set forth herein.<br><br>Class 4B shall include "replacement" claims by customers of FTX U.S. who have judgment entered against them for the repayment of any preferential transfers.<br><br>Each holder of an allowed U.S. Customer Entitlement will receive a *pro rata* share of the U.S. Customer Pool (defined below). |
| **NFT Entitlements (Class 4C)** | Holders of non-fungible tokens ("NFTs") as of the petition date will be classified separately. NFTs will be returned in kind to the applicable customer unless the NFT is missing or was destroyed, in which case, depending on the nature of the claimant, the applicable claimant will have a Class 4A claim (if the applicable customer is an FTX.com customer), a Class 4B claim (if the applicable customer is a FTX U.S. customer) or a Class 5 claim (if applicable) for the petition time value of the NFT. |
| **General Unsecured Claims (Class 5)** | Claims of customers or creditors not otherwise classified will be Class 5 claims ("General Unsecured Claims").<br><br>Class 5 is expected to include:<br><br>(a) trade and vendor claims;<br>(b) contract rejection claims against all Debtors;<br>(c) claims by lenders and trading partners of Alameda Research LLC or its direct and indirect subsidiaries (collectively, "Alameda");<br>(d) where avoidance actions (other than with respect to customer entitlements) are successful, |

|  | "replacement" claims by the creditors who have judgment entered against them for the repayment of the avoidance proceeds; |
|  | (e) claims by customers or creditors of non-debtors (or by their insolvency estates) alleging that one or more Debtors are liable for claims against such non-debtors; |
|  | (f) any foreign tax or other tax claims that are not priority claims; and |
|  | (g) other general unsecured claims. |
|  | Each holder of an allowed General Unsecured Claim will receive a *pro rata* share of General Pool distributions available to Class 5 claims in accordance with the waterfall priorities set forth under "*General Pool Waterfall*" below. |
| **Convenience Classes (Classes 6A-C)** | Holders of claims in a Convenience Class will receive a one-time distribution in cash at a fixed amount to be determined in the Plan. Such amount will be different for each convenience class based on the net present value of projected recoveries for the analogous classes 4A, 4B and 5 at the time of the Plan. |
| **Intercompany Claims/Interests (Classes 7 and 8)** | All intercompany claims and interests (other than as set forth in the Plan) will be compromised and eliminated in the Plan. Claims and interests in Classes 7 and 8 do not include – and the Plan will preserve – the Debtors' investments in non-Debtor subsidiaries and all related claims. Treatment of the intercompany claims and interests with respect to the Dismissed/Excluded Subsidiaries will be determined in connection with the dismissal or resolution of the chapter 11 cases of the Dismissed/Excluded Subsidiaries. |
| **Subordinated Claims (Class 9)** | Class 9 consists of claims for regulatory fines and penalties, U.S. federal and state income or employment taxes, similar foreign taxes and any other claim that has been subordinated on the basis of structural subordination, equitable subordination, laws or policies subordinating recoveries to claims by victims of crime or fraud, or any other grounds available under applicable law. |
| **Subordinated Claims (Class 10)** | Class 10 consists of claims held by any Control Persons, which shall be equitably subordinated pursuant to the Plan |

| | |
|---|---|
| | as permitted under applicable law.[2]  All Class 10 claims will be canceled and extinguished as of the effective date of the Plan and holders will not receive any distribution. |
| **FTT and Equity Classes (Classes 11-14)** | Classes 11, 12, 13 and 14 consist of claims by holders of FTT (whether or not held on any FTX exchange), preferred stock and equity investors in the Debtors and related claims.  All these claims and interests will be canceled and extinguished as of the effective date of the Plan and holders will not receive any distribution. |
| **Valuation** | Where a customer entitlement or other claim reflects an underlying digital asset (other than an NFT), the claim will be liquidated in USD based on the fair market value at the petition time.  The fair market value will be determined based on a matrix (the "Valuation Matrix") attached to an Omnibus Estimation Motion filed by the Debtors in advance of Plan solicitation and prepared with input from independent experts engaged by the Debtors for that purpose. |
| **Customer Preference Settlement** | The Debtors will offer each FTX.com and FTX U.S. customer in its Plan ballot the opportunity to enter into a settlement of potential preference exposure (a "Preference Settlement"), as follows: |
| | 1. The "Settlement Look Back Period" will begin at 12:01 a.m. ET on November 2, 2022, and will end at 10:00 a.m. ET on November 11, 2022. |
| | 2. The "Settlement Percentage" will be 15% for customers of the FTX.com exchange and customers of the FTX U.S. exchange. |
| | 3. The ballot will identify (a) the USD amount (the "Scheduled Claim") of each customer's allowed, scheduled or stipulated Class 4A and Class 4B claim, as applicable, (b) the USD amount (the "Net Preference Exposure") equal to (x) the net aggregate market value of withdrawals by such customer from the applicable FTX exchange during the Settlement Look Back Period *less* (y) the net aggregate market value of deposits by such |

---

[2]    "Control Persons" means (a) Samuel Bankman-Fried, Zixiao "Gary" Wang, Nishad Singh, Caroline Ellison, (b) any person with a familial relationship with any of the individuals listed in (a), or (c) any other person or entity designated by the Debtors as a "Control Person" in consultation with the Official Committee and the Ad Hoc Committee.

customer on the applicable FTX exchange during the Settlement Look Back Period, in each case as determined by the Debtors based on prices at the time of the applicable transfer and (c) the USD amount (the "Preference Settlement Amount") of such customer's Net Preference Exposure multiplied by the applicable Settlement Percentage.  In the event the customer's Net Preference Exposure amount is zero, negative or less than $250,000, such customer's Preference Settlement Amount shall be zero.[3]

4.   Each customer that votes to accept the Plan, does not opt-out of the Plan's releases and has a Scheduled Claim in excess of such customer's Preference Settlement Amount may elect on the ballot to accept the Preference Settlement by reducing such customer's Scheduled Claim, if applicable, by the Preference Settlement Amount.

5.   Each customer, if applicable, that votes to accept the Plan, does not opt-out of the Plan's releases and does *not* have a Scheduled Claim in excess of such customer's Preference Settlement Amount may elect on the ballot to accept the Preference Settlement and to pay the Preference Settlement Amount, *first*, by reducing such customer's Scheduled Claim to zero and, *second*, by making a cash payment for the remaining Preference Settlement Amount to the Debtors on or prior to the effective date of the Plan in an amount equal to the Preference Settlement Amount *minus* the reduced Scheduled Claim (such amount, the "Preference Settlement Shortfall Amount").

6.   All Net Preference Exposure for the period prior to the Settlement Look Back Period will be waived for any customer who accepts the Preference Settlement, and, if applicable, votes to accept the Plan and does not opt-out of the Plan's releases.

7.   A customer's vote with respect to the Plan shall be in the full amount of such customer's Scheduled Claim, irrespective of whether such Scheduled

---

[3]       Illustrative examples of the application of the Preference Settlement are set forth in Exhibit II hereto.

Claim is more or less than the proposed Preference Settlement Amount.

8. The Debtors shall have the right to exclude any preference claim and related defenses against any customer from the Preference Settlement by identifying such preference claim as an "Excluded Preference Claim" by written notice to the customer whose Preference Settlement Amount is affected prior to confirmation, *provided* that the Debtors shall not identify any preference claim as an Excluded Preference Claim unless the Debtors have determined there is a reasonable basis to conclude that, among other things: (a) the preference was received by an insider of any Debtor; (b) the preference was received by a current or former employee of the Debtors or of any current or former affiliate of the Debtors; (c) such customer may have had actual or constructive knowledge of the commingling and misuse of customer deposits and corporate funds; (d) such customer either (x) changed their KYC information to facilitate withdrawals or (y) received manual permission from the Debtors to facilitate withdrawals when withdrawals were otherwise halted; (e) any Debtor has a claim, defense or cause of action against the recipient of the preference (or a subsequent transferee of a claim against the Debtors) or any of its affiliates other than a claim arising under section 547 of the Bankruptcy Code as a result of customer withdrawals from the applicable FTX exchange; or (f) the Preference Settlement Amount for a customer may not reflect the fair value of such Excluded Preference Claim. Any customer notified that their Preference Settlement Amount is affected by an Excluded Preference Claim shall not be eligible for the Preference Settlement (relative to such Excluded Preference Claim) unless such customer and the Debtors separately agree to a modified settlement excluding or compromising the Excluded Preference Claim.

9. For each customer that votes to accept the Plan, does not opt-out of the Plan's releases and accepts the Preference Settlement, the Preference Settlement shall become effective on the effective

<table>
<tr>
<td></td>
<td>date of the Plan and, assuming payment in cash by the customer of any Preference Settlement Shortfall Amount on or prior to the effective date of the Plan, the Preference Settlement shall (i) release the customer from all claims and causes of action arising out of or relating to withdrawals from the applicable FTX exchange and (ii) cancel and extinguish all "replacement" claims that such customer may have against the Debtors for the repayment of any preferential transfers arising out of or relating to withdrawals from the applicable FTX exchange.

10. The Preference Settlement shall not apply with respect to any Excluded Preference Claim and all rights are reserved with respect to Excluded Preference Claims.

11. Claims against non-customers arising under section 547 of the Bankruptcy Code will be unaffected by the Preference Settlement.</td>
</tr>
<tr>
<td colspan="2" align="center"><b>IV.    Recovery Pools</b></td>
</tr>
<tr>
<td><b>Dotcom Customer Pool</b></td>
<td>Each holder of a Dotcom Customer Entitlement will receive a <i>pro rata</i> share (based on relative USD claim value) of the proceeds from a pool of assets associated with the FTX.com exchange (the "<u>Dotcom Customer Pool</u>"), net of distributions to the Dotcom Customer Convenience Class and allocable expenses.

The Dotcom Customer Pool will include:

(a) all fiat in segregated FBO accounts associated with FTX.com on the petition date;
(b) all digital assets in the AWS wallets associated with FTX.com on the petition date;
(c) any hack recoveries relating to digital assets in those wallets (pre- or post-petition);
(d) all recoveries of preferences paid to customers off the FTX.com platform;
(e) all net recoveries from the Bahamian subsidiaries, FTX Digital Markets Ltd. ("<u>FTX DM</u>") or FTX Property Holdings Ltd ("<u>FTX Bahamas Propco</u>"), of any sort, whether from the Debtors' equity interest in those subsidiaries or the settlement of claims against them;</td>
</tr>
</table>

<table>
<tr>
<td></td>
<td>

(f) all net proceeds from the sale, restart, creation or recapitalization of the Offshore Exchange Company, including any cash or other consideration issued or received in connection with the creation of the Offshore Exchange Company, including any capital stock of the Offshore Exchange Company retained by the Debtors for distribution to stakeholders in the Plan; and

(g) a historical shortfall claim against the General Pool (defined below) (the "<u>Dotcom Exchange Shortfall Claim</u>") in an amount equal to the estimated difference between FTX.com aggregate customer entitlements and aggregate FTX.com exchange assets at the petition time, as determined by the Debtors.

No other prepetition creditor will have claims against the Dotcom Customer Pool.

</td>
</tr>
<tr>
<td>

**U.S. Customer Pool**

</td>
<td>

Each holder of a U.S. Customer Entitlement will receive a *pro rata* share (based on relative USD claim value) of the proceeds from a pool of assets associated with the FTX U.S. exchange (the "<u>U.S. Customer Pool</u>"), net of distributions to the U.S. Customer Convenience Class and allocable expenses; *provided* that the *pro rata* shares of U.S. Customer Entitlement holders against the U.S. Customer Pool will be calculated in a manner that respects the status of Alameda as a customer of FTX US.  The distributions to Alameda will be deposited into the General Pool (defined below) for reallocation among all other creditors (including the Dotcom Shortfall Claim).

The "U.S. Customer Pool" will include:

(a) all fiat in segregated FBO accounts associated with FTX U.S. on the petition date;

(b) digital assets in the AWS wallets associated with FTX U.S. on the petition date;

(c) any hack recoveries relating to digital assets in those wallets (pre- or post-petition);

(d) all recoveries of preferences paid to customers off the FTX U.S. platform;

(e) all proceeds from the sale of FTX U.S. or any associated property; and

(f) an historical shortfall claim against the General Pool (defined below) (the "<u>U.S. Exchange Shortfall Claim</u>") in an amount equal to the estimated

</td>
</tr>
</table>

| | |
|---|---|
| | difference between aggregate customer entitlements and aggregate FTX U.S. exchange assets at the petition time, as determined by the Debtors.<br><br>No other creditor will have claims against the U.S. Customer Pool. |
| **General Pool** | The general pool (the "General Pool") will include all property of the estate that is not in the Dotcom Customer Pool, the U.S. Customer Pool or property of a Separate Subsidiary.<br><br>The General Pool will include at least the following and all related proceeds:<br><br>(a) all fiat and digital assets not allocated to the Dotcom Customer Pool, the U.S. Customer Pool or a Separate Subsidiary;<br>(b) all recoveries from non-Debtor subsidiaries (other than FTX DM);<br>(c) all distributable value at the Separate Subsidiaries after payment of Class 3 claims;<br>(d) all preference actions not associated with either FTX.com or FTX US;<br>(e) all other avoidance actions and litigation claims, regardless of the particular Debtor(s) who may bring such actions under applicable law;<br>(f) all net proceeds from the unwinding of the venture book and other investments;<br>(g) the portion of the U.S. Customer Pool corresponding to Alameda's positions on the FTX U.S. platform (the "Alameda-U.S. Exchange Intercompany Claims");<br>(h) the residual interests in the Dotcom Customer Pool and the U.S. Customer Pool (available only when Dotcom Customer Entitlements or U.S. Customer Entitlements, as applicable, are paid in full); and<br>(i) the proceeds from the sale or monetization of all other property of the estate.<br><br>Proceeds in the General Pool will be allocated as discussed under "*General Pool Waterfall*" below. |
| **General Pool Waterfall** | Proceeds in the General Pool will be allocated in the following manner:<br><br>• *first*, to pay administrative expenses and secured and priority claims allocable to the General Pool; |

| | |
|---|---|
| | • *second*, to pay General Convenience Claims as set forth in the Plan; |
| | • *third*, with respect to 66% of the amount next available for distribution from the General Pool, to pay the Dotcom Exchange Shortfall Claim and the U.S. Exchange Shortfall Claim on a *pro rata* basis; |
| | • *fourth*, with respect to the remaining amount available for distribution from the General Pool, to pay General Unsecured Claims, the remaining Dotcom Exchange Shortfall Claim and the remaining U.S. Exchange Shortfall Claim on a *pro rata* basis; and |
| | • *fifth*, to pay Subordinated Claims. |
| | The General Pool waterfall works to establish a modified priority for the U.S. Exchange Shortfall Claim and the Dotcom Exchange Shortfall Claim against assets in the General Pool at the expense of General Unsecured Creditors, providing a mechanism to implement a settlement of potential misappropriation, constructive trust, equitable tracing and other claims by the exchanges against other Debtors for the benefit of exchange customers. |
| **Expense Allocation** | Case expenses and professional fees and expenses as a general matter will be allocated as between the General Pool and the customer pools based on the Debtors' estimate of relative distributable value in each pool as of the date of confirmation of the Plan; *provided* that the Debtors will first allocate to the Dotcom Customer Pool any expenses related to FTX DM or FTX Bahamas Propco or the sale, "reboot" or reorganization of FTX.com. |
| **V. Implementation** | |
| **Offshore Exchange Company** | The property of the Debtors associated with the ownership and operation of FTX.com will be gathered and marketed in a competitive process for the benefit of the Dotcom Customer Pool.  As part of this competitive process, the Debtors may decide to establish in collaboration with third party investors a new company in a jurisdiction outside of the United States to operate a "rebooted" offshore platform not available to U.S. investors (an "<u>Offshore Exchange Company</u>") or enter into a merger or similar transaction. |

|  | The Debtors reserve the right not to proceed with an Offshore Exchange Company if the Debtors determine that doing so may delay effectiveness of the remaining components of the Plan, create regulatory concerns or fail to yield material incremental value to holders of Dotcom Customer Entitlements. |
|  | In the event that the operator of the Offshore Exchange Company agrees that the Debtors may appoint members to the board of directors or similar governing body of the Offshore Exchange Company or an affiliated entity, the Debtors have agreed to use such rights as they have *vis à vis* the Offshore Exchange Company to appoint any initial nominees selected jointly by the Ad Hoc Committee and the Official Committee of Unsecured Creditors appointed in these chapter 11 cases (the "<u>Official Committee</u>") in consultation with the Debtors. |
| **Venture Investments** | Either the Wind-Down Estate or a new limited liability company or other vehicle (the "<u>FTX Ventures Company</u>") will hold the Debtors' illiquid venture capital, private company and token investments that (i) are not in the process of being sold at the time of effectiveness of the Plan, (ii) are not subject to any pending or anticipated litigation, or (iii) as otherwise determined by the Debtors, Official Committee and Ad Hoc Committee, are outside the scope of the selected independent manager(s) of the FTX Ventures Company.  The purpose of the FTX Ventures Company will be to make cash distributions to the Wind-Down Estate on a time horizon to be determined based on the nature of its investments. |
|  | The FTX Ventures Company shall be managed by at least one independent manager chosen as soon as reasonably practicable by mutual agreement of the Ad Hoc Committee and the Official Committee in consultation with the Debtors, and who will report to the Oversight Board (defined below). |
|  | The FTX Ventures Company will not issue shares to creditors directly.  Distributions by the FTX Ventures Company will be remitted to the General Pool for distribution to creditors as provided in the Plan. |
| **Wind-Down Estate** | All remaining property of the estates will be maintained as a single wind-down estate (the "<u>Wind-Down Estate</u>").  The plan administrator will report to an independent oversight |

| | board of five members (the "<u>Oversight Board</u>") jointly selected and mutually agreed by the Ad Hoc Committee and the Official Committee, in consultation with the Debtors. |
|---|---|
| | The Wind-Down Estate will manage the business and affairs of the Reorganized Debtors after the effective date. |
| **Distributions** | Distributions other than any non-cash consideration that may be distributed in connection with the creation of the Offshore Exchange Company and NFTs will be made in cash in USD.[4]  Consistent with the Investment Guidelines (as defined in Docket No. 2505), the Debtors will convert digital assets to USD on an ongoing basis prior to the effective date of the Plan with any remaining digital assets to be converted to USD in an orderly manner after the effectiveness of the Plan.  The Debtors will determine the investment principles for the management of cash prior to distribution subject to parameters established in the Plan. |
| | Distributions will not be made on claims held by the recipient of a preference or other avoidable transfer until any related avoidance claim has been settled or resolved by the court.  The Debtors reserve the right to enforce preference and avoidance claims against subsequent transferees to the fullest extent permitted by law. |
| | The Debtors are discussing alternatives related to distributions with potential operators of a successor Offshore Exchange Company.  The Debtors shall not require any creditor to receive distributions through a successor Offshore Exchange Company, but may provide certain creditors with an opportunity to do so voluntarily, subject to appropriate securities law, AML and KYC arrangements. |
| **Potential Early Liquidity Alternatives** | The Debtors also intend to explore alternatives to provide creditors a voluntary election to receive early cash distributions, with the scope and source of funding for such election to be determined in connection with the finalization of the Plan. |
| **Anti-Double Dip** | The Plan is premised on a centralized distribution process in which each holder receives that same recovery as |

---

[4]    The Debtors are discussing whether certain customers may receive non-cash distributions in the form of tokens or e-money issued by or through the Offshore Exchange Company or otherwise.

another similarly-situated holder.  The plan administrator may require any holder of a claim to submit satisfactory evidence that such holder has not requested or received compensation for the same losses underlying such claim in connection with any return of customer property procedures or other judicial or administrative proceeding (including without limitation any proceedings with respect to FTX Australia, FTX DM, FTX Turkey, FTX Europe AG, FTX EU Ltd., Quoine PTE Ltd. or FTX Japan K.K.), and may refrain from making distributions on such claim until such time as satisfactory evidence is obtained or appropriate arrangements are in place ensuring that no holder receives more than any other holder under the Plan after taking into account such other potential recoveries.

As a condition to receiving any distribution in the Plan, the plan administrator may require holders of claims in Classes 4A-C or Class 5 to assign to the plan administrator all right, title and interest in any claim for the same losses that have been or may be made in any other judicial or administrative proceeding relating to the FTX group (including without limitation any claim in any proceeding with respect to FTX Australia, FTX DM, FTX Turkey, or FTX EU).

The Debtors are in active discussions with FTX DM concerning a consensual arrangement for the resolution of FTX DM's potential objections to the Plan and the coordinated reconciliation of claims, and the Debtors may modify the Plan to implement this arrangement prior to confirmation.

**<u>Exhibit I</u>**

**Classification – Summary Chart[5]**

---

[5]         The Debtors' investigation into claims is ongoing and classification is subject to change.

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | Not Entitled to Vote, Deemed to Accept |
| 2 | Other Secured Claims | Unimpaired | Not Entitled to Vote, Deemed to Accept |
| 3 | Separate Subsidiary Claims | Unimpaired | Not Entitled to Vote, Deemed to Accept |
| 4A | Dotcom Customer Entitlements | Impaired | Entitled to Vote |
| 4B | U.S. Customer Entitlements | Impaired | Entitled to Vote |
| 4C | NFT Entitlements | Impaired | Entitled to Vote |
| 5 | General Unsecured Claims | Impaired | Entitled to Vote |
| 6A | Dotcom Convenience Class | Impaired | Entitled to Vote |
| 6B | US Convenience Class | Impaired | Entitled to Vote |
| 6C | General Convenience Class | Impaired | Entitled to Vote |
| 7 | Intercompany Claims | Impaired | Not Entitled to Vote, Deemed to Reject |
| 8 | Intercompany Interests | Impaired | Not Entitled to Vote, Deemed to Reject |
| 9 | Subordinated Claims | Impaired | Entitled to Vote |
| 10 | Equitably Subordinated Claims | Impaired | Not Entitled to Vote, Deemed to Reject |
| 11 | FTT Claims | Impaired | Not Entitled to Vote, Deemed to Reject |
| 12 | Preferred Equity Interests | Impaired | Not Entitled to Vote, Deemed to Reject |
| 13 | Section 510(b) Claims | Impaired | Not Entitled to Vote, Deemed to Reject |
| 14 | Other Equity Interests | Impaired | Not Entitled to Vote, Deemed to Reject |

**Exhibit II**

**Illustrative Preference Scenarios**

**Illustrative Preference Scenarios**

The following illustrative example shows a Scheduled Claim balance and how that is impacted by various Customer Preference Settlement scenarios (below):

| | Scheduled Claim Detail | | |
|---|---|---|---|
| | Per Scheduled Claim (i.e. Portal / Kroll) | Per Valuation Matrix | Claim |
| Token | Illustrative Quantity | Illustrative Price[1] | Total USD |
| Token 1 (Category A) | 500 | $1,265.00 | $632,500 |
| Token 2 (Category B) | 200 | $0.50 | $100 |
| FTT | 100 | $0.00 | $0 |
| Perpetual 3 | 70 | $2.00 | $140 |
| USD | 567,260 | $1.00 | $567,260 |
| | | Scheduled Claim | $1,200,000 |

**Customer Preference Settlement Impact:**   This example will assume that the $1,200,000 Scheduled Claim balance above is the same for Customer A, B, C, D in the Customer Preference Settlement examples below.

| | | Customer Preference Settlement Impact 9 Day Period from 11/2/22 through 11/11/22[2] | | | |
|---|---|---|---|---|---|
| | | Customer A | Customer B | Customer C | Customer D |
| **Preference Settlement Amount:** | | | | | |
| Gross Withdrawals | | $6,300,000 | $5,200,000 | $15,000,000 | $2,000,000 |
| Less: Gross Deposits | | ($5,000,000) | ($5,000,000) | ($5,000,000) | ($5,000,000) |
| **Net Preference Exposure[2]** | *(A)* | **$1,300,000** | **$200,000** | **$10,000,000** | **–** |
| Settlement Percentage | *(B)* | 15% | WAIVED | 15% | NA |
| **Preference Settlement Amount** | *(C) = (A) x (B)* | **$195,000** | **WAIVED** | **$1,500,000** | **NA** |
| | | | | | |
| **Adjusted Scheduled Claim:** | | | | | |
| Scheduled Claim | *(D)* | $1,200,000 | $1,200,000 | $1,200,000 | $1,200,000 |
| Preference Settlement Amount | *(C)* | ($195,000) | WAIVED | ($1,500,000) | NA |
| **Adjusted Scheduled Claim** | *(E) = (D) + (C)* | **$1,005,000** | **$1,200,000** | **–** | **$1,200,000** |
| | | | | | |
| Cash Settlement (Net Negative) | *If (E) is zero, (F) = (C) - (D)* | – | – | $300,000 | – |
| | | | | | |
| *Outcome* | | *Claim of $1.0M* | *Claim of $1.2M; Preference exposure is waived as it is below $250K* | *No claim, Customer C pays Debtors $300K cash settlement* | *Claim of $1.2M* |

**Notes**

1. The pricing assumptions used to estimate the Scheduled Claim Amount above is subject to material change and dependent on the Debtors' forthcoming valuation schedule, as approved by the Bankruptcy Court. The above example is for illustrative purposes to conform to the Debtor's placeholder estimates and includes FTT set to zero and a Category B token discounted by 95%.
2. Preference exposure calculated based on net withdrawal methodology utilizing transaction time pricing for both deposits and withdrawals from November 2, 2022 at 12:01 am ET to November 11, 2022 at 10:00 am ET.  Net Preference Exposure amounts below $250,000 are waived.  For purposes of this illustrative example, pricing source data follows this sequential logic:
   a. Price as of transaction minute, utilizing data from CoinMetrics
   b. Price as of transaction day, utilizing trade data from the FTX.COM exchange from AWS, or Yahoo Finance where trade data is unavailable
   c. Unavailable - a zero value was applied where no pricing data was available

**<u>Exhibit B</u>**

**Form of Transfer Agreement**

### *TRANSFER AGREEMENT*

The undersigned ("**Transferee**") hereby acknowledges that it has read and understands the Settlement and Plan Support Agreement, dated as of October 16, 2023 (the "**Agreement**"),[1] by and among the Debtors and the Supporting Parties, including the transferor to the Transferee of any Claims (each such transferor, a "**Transferor**"), and agrees to be bound by the terms and conditions of the Agreement to the extent the Transferor was thereby bound, and shall be deemed a Supporting Ad Hoc Committee Member, a Supporting Class Action Claimant or a Supporting Creditor, as applicable, under the terms of the Agreement.

The Transferee specifically agrees to be bound by the terms and conditions of the Agreement and makes all representations and warranties contained therein as of the date of the Transfer, including the agreement to be bound by the vote of the Transferor if such vote was cast before the effectiveness of the Transfer discussed in this transfer agreement.

Date Executed:

_____

Name:
Title:

Address:

E-mail address(es):

| Aggregate Amounts Beneficially Owned or Managed on Account of: | |
|---|---|
| Dotcom Customer Entitlement Claims | |
| U.S. Customer Entitlement Claims | |
| Other Claims | |

---

[1] Capitalized terms not used but not otherwise defined in this transfer agreement shall have the meanings ascribed to such terms in the Agreement.

**<u>Exhibit C</u>**

**Form of Joinder**

### *JOINDER*

The undersigned ("**Joinder Party**") hereby acknowledges that it has read and understands the Settlement and Plan Support Agreement, dated as of October 16, 2023 (the "**Agreement**"),[1] by and among the Debtors and the Supporting Parties and agrees to be bound by the terms and conditions thereof to the extent the other Supporting Creditors are thereby bound, and shall be deemed a Supporting Ad Hoc Committee Member, a Supporting Class Action Claimant or a Supporting Creditor, as applicable, under the terms of the Agreement.

The Joinder Party specifically agrees to be bound by the terms and conditions of the Agreement and makes all representations and warranties contained therein as of the date of this joinder and any further date specified in the Agreement.

Date Executed:

_____

Name:
Title:

Address:

E-mail address(es):

| *Aggregate Amounts Beneficially Owned or Managed on Account of:* | |
| --- | --- |
| Dotcom Customer Entitlement Claims | |
| U.S. Customer Entitlement Claims | |
| Other Claims | |

---

[1] Capitalized terms not used but not otherwise defined in this joinder shall have the meanings ascribed to such terms in the Agreement.