## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*, | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |

## APPENDIX TO MOTION OF PATRICK GRUHN,
## ROBIN MATZKE, AND LOREM IPSUM UG TO DISMISS
## BANKRUPTCY CASE OF MACLAURIN INVESTMENTS, LTD.

Parties-in-interest Patrick Gruhn, Robin Matzke, and Lorem Ipsum UG submit this appendix in support of the *Motion to Dismiss Bankruptcy Case of Maclaurin Investments, Ltd.*:

| Tab No. | Item |
|---|---|
| 1. | Alameda Ventures Ltd. Certificate of Incorporation |
| 2. | Certificate of Incorporation of Change of Name to Maclaurin Investments Ltd. |
| 3. | Memorandum of Association and Articles of Association of Maclaurin Investments Ltd. |
| 4. | Declaration of Edith Wong with Exhibits |

*[Signature Page Immediately Follows]*

Respectfully submitted,

Dated:  October 27, 2023
Wilmington, Delaware

*/s/ Laura Davis Jones*
Laura Davis Jones (DE Bar No. 2436)
Peter J. Keane (DE Bar No. 5503)
PACHULSKI STANG ZIEHL & JONES LLP
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19801
Telephone:    (302) 652-4100
Facsimile:     (302) 652-4400
Email:          ljones@pszjlaw.com
                   pkeane@pszjlaw.com

THE DALEY LAW FIRM LLC
Darrell Daley (admitted *pro hac vice*)
Samantha Neal (admitted *pro hac vice*)
4845 Pearl East Circle, Suite 101
Boulder, Colorado 80301
Telephone: (303) 479-3500
Email: Darrell@daleylawyers.com
            Samantha@daleylawyers.com

- and -

MORRISON COHEN LLP
Joseph T. Moldovan (admitted pro hac vice)
Heath D. Rosenblat (admitted pro hac vice)
Jason P. Gottlieb (admitted pro hac vice)
Michael Mix (admitted pro hac vice)
909 Third Avenue, 27th Floor
New York, New York 10022
Telephone: (212) 735-8600
Facsimile: (212) 735-8708
Email: jmoldovan@morrisoncohen.com
            hrosenblat@morrisoncohen.com
            jgottlieb@morrisoncohen.com
            mmix@morrisoncohen.com

*Counsel to Lorem Ipsum UG, Patrick Gruhn, and Robin Matzke*

# Tab 1





REGISTRAR OF INTERNATIONAL
BUSINESS COMPANIES
CERTIFIED TRUE COPY

2 5 SEP 2023

REGISTRAR OF INTERNATIONAL
BUSINESS COMPANIES

## Republic of Seychelles
### INTERNATIONAL BUSINESS COMPANIES ACT, 2016
#### (Act 15 of 2016)

# *Certificate of Incorporation*

THIS IS TO CERTIFY that, having satisfied all the requirements in respect of incorporation under the International Business Companies Act, 2016,

**Alameda Ventures Ltd**

is incorporated in the Republic of Seychelles as an International Business Company,

on this **23ʳᵈ** day of **December 2019**

Given at Victoria, Seychelles.



*Company No:* 217617

REGISTRAR OF INTERNATIONAL BUSINESS COMPANIES

## APOSTILLE

**(Convention de la Haye du 5 Octobre 1961)**

1. **Country:**   **REPUBLIC OF SEYCHELLES**

   **This public document**

2. **has been signed by**   **RANDOLF SAMSON**

3. **acting in the capacity of**   **REGISTRAR**

4. **bears the seal/stamp of**   **REGISTRAR OF INTERNATIONAL BUSINESS COMPANIES, REPUBLIC OF SEYCHELLES**

### Certified

5. **at**   VICTORIA        6        02ND OCTOBER 2023

7. **by**   M-A. BARBE, DEPUTY REGISTRAR, SUPREME COURT

8. **No.**   9823 OF 2023

9. **Seal/Stamp**              10. **Signature**

# Tab 2





REGISTRAR OF INTERNATIONAL
BUSINESS COMPANIES
**CERTIFIED TRUE COPY**

2 6 SEP 2023

REGISTRAR OF INTERNATIONAL
BUSINESS COMPANIES

## Republic of Seychelles
### INTERNATIONAL BUSINESS COMPANIES ACT, 2016
### (Act 15 of 2016)

*Certificate of Incorporation of Change of Name*

THIS IS TO CERTIFY that,

**Alameda Ventures Ltd**

has changed its name and is now incorporated under the name of

**Maclaurin Investments Ltd.**

on this **26**<sup>th</sup> day of **September 2022**

Given at Victoria, Seychelles.



for REGISTRAR OF INTERNATIONAL BUSINESS COMPANIES

*Company No:* 217617





## APOSTILLE

**(Convention de la Haye du 5 Octobre 1961)**

1. **Country:**     **REPUBLIC OF SEYCHELLES**

    **This public document**

2. **has been signed by**       **RANDOLF SAMSON**

3. **acting in the capacity of**    **REGISTRAR**

4. **bears the seal/stamp of**       **REGISTRAR OF INTERNATIONAL BUSINESS COMPANIES, REPUBLIC OF SEYCHELLES**

### Certified

5. **at    VICTORIA        6        02ND OCTOBER 2023**

7. **by    M-A. BARBE, DEPUTY REGISTRAR, SUPREME COURT**

8. **No.  9822  OF 2023**

9. **Seal/Stamp**              **10. Signature**

# Tab 3

SEYCHELLES

THE INTERNATIONAL BUSINESS COMPANIES ACT 2016

**MEMORANDUM OF ASSOCIATION**

**AND**

**ARTICLES OF ASSOCIATION**

**OF**

**Maclaurin Investments Ltd.**

REGISTRAR OF INTERNATIONAL
BUSINESS COMPANIES
REPUBLIC OF SEYCHELLES

2 6 SEP 2022

A COMPANY LIMITED BY SHARES

Company registration no: 217617

This document replaces in its entirety the Company's original
Memorandum and Articles of Association dated the 23rd day of December 2019

Incorporated in Seychelles the 23rd day of December 2019
As amended on the 26th day of September 2022

Registered Agent: STERLING TRUST & FIDUCIARY LIMITED
F20, 1st Floor, Eden Plaza, Eden Island, Republic of Seychelles



REGISTRAR OF INTERNATIONAL
BUSINESS COMPANIES
CERTIFIED TRUE COPY

2 6 SEP 2023

REGISTRAR OF INTERNATIONAL
BUSINESS COMPANIES

2

THE INTERNATIONAL BUSINESS COMPANIES ACT 2016

## MEMORANDUM OF ASSOCIATION

### OF

**Maclaurin Investments Ltd.**

(the "**Company**")

REGISTRAR OF INTERNATIONAL
BUSINESS COMPANIES
REPUBLIC OF SEYCHELLES

2 6 SEP 2022

1.    **DEFINITIONS AND INTERPRETATION**

1.1    In the Memorandum and the Articles, if not inconsistent with the context:

"**Act**" means the International Business Companies Act 2016 and includes any regulations made under the Act;

"**Articles**" means the attached articles of association of the Company as amended from time to time;

"**authorised capital**", in relation to the Company, means the maximum amount of share capital that it is authorised by the Memorandum to issue;

"**beneficial owner**" means, for the purposes of Article 9 and 10, as defined in Article 9.3;

"**Board**" means the board of directors of the Company from time to time;

"**bonus Share**" means a Share issued for no consideration to an existing Shareholder, which shall be treated in all respects as having been a fully paid Share on issue;

"**Chairman of the Board**" means as defined in Article 13;

"**charge**" means any form of security interest, including, without limitation, a charge, by way of fixed or floating charge, a mortgage, a pledge or a hypothecation, over property, wherever situated, other than an interest arising by operation of law;

"**Distribution**", in relation to a distribution by the Company to a Shareholder:

(a)    means the direct or indirect transfer of an asset, other than Shares, to or for the benefit of the Shareholder, or the incurring of a debt to or for the benefit of the Shareholder, in relation to Shares held by the Shareholder, and whether by means of the purchase of an asset, the purchase, redemption or other acquisition of Shares, a transfer of indebtedness or otherwise, and includes a Dividend; but

(b)    does not include a distribution by way of a distribution of assets to Shareholders on the Company's winding up;

"**Dividend**" means every Distribution of the Company's assets to its Shareholders, except Distributions by way of:

(a)    an issue of Shares as bonus Shares;

REGISTRAR OF INTERNATIONAL
BUSINESS COMPANIES
CERTIFIED TRUE COPY

2 6 SEP 2023

REGISTRAR OF INTERNATIONAL
BUSINESS COMPANIES

3

(b)    a redemption or purchase of any of the Company's own Shares or financial assistance for a purchase of the Company's own Shares; or

(c)    a reduction of Share capital;

"**listed company**" means, for the purposes of Article 9 and 10, a company whose securities are listed on a recognised exchange or a company which is a subsidiary of a body corporate, partnership or trust whose securities are listed on a recognised exchange;

"**Member**" means a Shareholder;

"**Memorandum**" means this Memorandum of Association of the Company as amended from time to time;

"**ordinary resolution**" means:

(a)    a resolution passed at a meeting of Shareholders on a show of hands by in excess of half of the Shareholders who, being entitled to do so, vote in person or by proxy on the resolution; or

(b)    a resolution passed at a meeting of Shareholders on a poll taken by Shareholders representing in excess of half of the total votes of the Shareholders who, being entitled to do so, vote in person or by proxy on the resolution; or

(c)    a resolution passed and consented to in writing by Shareholders representing in excess of half of the total votes of the Shareholders entitled to vote on the resolution;

"**person**" includes an individual, a corporation, a foundation, a trust (acting by its trustees), the estate of a deceased individual, a partnership and an unincorporated association of persons;

"**pledge**" means any form of security interest, including a pledge, a charge or a hypothecation over one or more shares in a company, other than an interest arising by operation of law, and "**pledged**", "**pledgee**" and "**pledgor**" shall be construed accordingly;

"**recognised exchange**" means a securities exchange licensed under the Securities Act 2007, a recognised overseas securities exchange as defined in the Securities Act 2007 or any other exchange that is a member of the World Federation of Exchanges;

"**Register of Beneficial Owners**" means as defined in Article 9.1;

"**Register of Charges**" means as defined in Article 16.2;

"**Register of Directors**" means as defined in Article 11.25;

"**Register of Members**" means as defined in Article 2.7;

"**Registrar**" means the Registrar as defined in the Act;

"**resolution of directors**" means:

(a)    a resolution passed at a meeting of directors of the Company by the affirmative vote of in excess of half of the directors present at the meeting who were present at the meeting and entitled to vote on the resolution; or

REGISTRAR OF INTERNATIONAL BUSINESS COMPANIES
CERTIFIED TRUE COPY
2 6 SEP 2023
REGISTRAR OF INTERNATIONAL BUSINESS COMPANIES

4

(b)    a resolution passed and consented to in writing by directors of the Company representing in excess of half of the total votes of directors entitled to vote on the resolution and without the need for any notice;

"Seal" means any seal which has been adopted as the common seal of the Company;

"Securities", in relation to the Company, means as defined in section 2(1) of the Securities Act 2007, including Shares and debt obligations of every kind of the Company and options, warrants and other rights to acquire Shares or the Company's debt obligations;

"Share" means a par value share issued or to be issued by the Company;

"share capital", in relation to the Company, means the sum of the aggregate par value of all the issued and outstanding par value shares of the company and shares with par value held by the Company as Treasury Shares and the amounts as may be from time to time transferred from surplus to share capital by a resolution of the directors;

"Shareholder" means a person whose name is entered in the Company's Register of Members as the holder of one or more Shares or fractional Shares;

"special resolution" means:

(a)    a resolution passed at a meeting of Shareholders on a show of hands by not less than two-thirds of the Shareholders who, being entitled to do so, vote in person or by proxy on the resolution; or

(b)    a resolution passed at a meeting of Shareholders on a poll taken by Shareholders representing not less than two-thirds of the total votes of the Shareholders who, being entitled to do so, vote in person or by proxy on the resolution; or

(c)    a resolution passed and consented to in writing by Shareholders representing not less than two-thirds of the total votes of the Shareholders entitled to vote on the resolution;

"surplus", in relation to the Company, means the excess, if any, at the time of the determination, of total assets of the Company over the sum of its total liabilities, as shown in the books of account plus its share capital;

"Treasury Share" means a Share that was previously issued but was repurchased, redeemed or otherwise acquired by the Company and not cancelled; and

"written" or any term of like import includes all forms of writing, including (but not limited to) information generated, sent, received or stored by electronic, electrical, digital, magnetic, optical, electromagnetic, biometric or photonic means, including electronic data interchange, electronic mail, telegram, telex or telecopy, and "in writing" shall be construed accordingly.

1.2    In the Memorandum and the Articles, unless the context otherwise requires a reference to:

(a)    an "Article" is a reference to a clause of the Articles;

(b)    a "Clause" is a reference to a clause of the Memorandum;

(c)    the Act or other legislation is a reference to the Act or other legislation as extended, applied, amended or re-enacted and includes any subordinate legislation; and



REGISTRAR OF INTERNATIONAL BUSINESS COMPANIES

CERTIFIED TRUE COPY

2 6 SEP 2023

REGISTRAR OF INTERNATIONAL BUSINESS COMPANIES

5

(d)    the singular includes the plural and vice versa and the masculine gender shall include the feminine and the neuter.

1.3    Any words or expressions defined in the Act shall have the same meaning in the Memorandum and Articles unless otherwise required by the context or unless otherwise defined in this Memorandum or the Articles.

1.4    Headings are inserted for convenience only and shall be disregarded in the construction of or the interpretation of the Memorandum and Articles.

2.    NAME

2.1    The name of the Company is Maclaurin Investments Ltd.

2.2    Subject to Clause 2.3, the Company may amend its Memorandum and Articles to change its name by ordinary resolution or resolution of directors.

2.3    A change of the Company's name takes effect from the date of the certificate of change of name issued by the Registrar following registration of a certified copy or extract of the resolution referred to in Clause 2.2 filed in accordance with the Act.

3.    TYPE OF COMPANY

3.1    The Company is:



REGISTRAR OF INTERNATIONAL
BUSINESS COMPANIES
CERTIFIED TRUE COPY

2 6 SEP 2023

REGISTRAR OF INTERNATIONAL
BUSINESS COMPANIES

(a)    an international business company (as defined in the Act);

(b)    a company limited by shares (as defined in the Act);

(c)    a par value company (as defined in the Act); and

(d)    not authorised to issue no par value shares.

3.2    The liability of a Shareholder arising from the Shareholder's holding of any Share is limited to the amount (if any) unpaid on it.

4.    REGISTERED AGENT IN SEYCHELLES

4.1    The Company's registered agent is STERLING TRUST & FIDUCIARY LIMITED of F20, 1st Floor, Eden Plaza, Eden Island, Republic of Seychelles.

4.2    Subject to Clause 4.3, the Company may amend its memorandum to change its registered agent by ordinary resolution or resolution of directors.

4.3    A change of the Company's registered agent takes effect from the date of the registration by the Registrar of the certified copy or extract of the resolution referred to in Clause 4.2 filed in accordance with the Act.

5.    REGISTERED OFFICE

5.1    The registered office of the Company is located at F20, 1st Floor, Eden Plaza, Eden Island, Republic of Seychelles.

5.2    Subject to Clauses 5.3 and 5.4, the Company may amend its Memorandum to change the location of its registered office by ordinary resolution or resolution of directors.

6

5.3     The Company's registered office shall be the same address as the principal place of business in Seychelles of its registered agent.

5.4     A change of the Company's registered office takes effect on the registration by the Registrar of the certified copy or extract of the resolution referred to in Clause 5.2 filed in accordance with the Act.

### 6.     CAPACITY AND POWERS

6.1     Subject to the Act and any other written law of Seychelles, the Company has, irrespective of corporate benefit:

    (a)     full capacity to carry on or undertake any business or activity, do any act or enter into any transaction; and

    (b)     for the purposes of paragraph (a), full rights, powers and privileges.

6.2     There are no limitations on the business that the Company may carry on other than as referred to in Clause 7.

### 7.     LIMITATIONS ON THE COMPANY'S BUSINESS

7.1     The Company shall not:

    (a)     subject to Clause 7.2, carry on business in Seychelles;

    (b)     own an interest in immovable property situated in Seychelles, or a lease of immovable property situated in Seychelles otherwise than as referred to in section 5(3)(f) of the Act;

    (c)     carry on banking business (as defined in the Financial Institutions Act 2004) in or outside Seychelles;

    (d)     carry on insurance business (as defined in the Insurance Act 2008):

        (i)     in Seychelles; or

        (ii)     outside Seychelles unless it is licensed or otherwise legally able to do so under the laws of each country outside Seychelles in which it carries on such business;

    (e)     carry on business providing international corporate services, trustee services or foundation services (as defined in the International Corporate, Trustee and Foundation Service Providers Act 2016) except:

        (i)     to the extent permitted under the International Corporate, Trustee and Foundation Service Providers Act 2016; and

        (ii)     in the case of carrying on such business outside Seychelles, if the company is licensed or otherwise legally able to do so under the laws of each country outside Seychelles in which it carries on such business;

    (f)     carry on securities business (as defined in the Securities Act 2007):



REGISTRAR OF INTERNATIONAL
BUSINESS COMPANIES
CERTIFIED TRUE COPY

2 6 SEP 2023

REGISTRAR OF INTERNATIONAL
BUSINESS COMPANIES

7

    (i)     in Seychelles; or

    (ii)    outside Seychelles unless it is licensed or otherwise legally able to do so under the laws of each country outside Seychelles in which it carries on such business;

  (g)    carry on business as a mutual fund (as defined in the Mutual Fund and Hedge Fund Act 2008) unless it is licensed or otherwise legally able to do so under the Mutual Fund and Hedge Fund Act 2008 or under the laws of a recognized jurisdiction (as defined in the Mutual Fund and Hedge Fund Act 2008); or

  (h)    carry on gambling business (as defined in the Seychelles Gambling Act 2014), including interactive gambling business:

    (i)     in Seychelles; or

    (ii)    outside Seychelles unless it is licensed or otherwise legally able to do so under the laws of each country outside Seychelles in which it carries on such business.

7.2    For the purposes of Clause 7.1(a) and the Act, the Company shall not be treated as carrying on business in Seychelles by reason only that:

  (a)    it opens and maintains an account with a bank licensed under the Financial Institutions Act 2004;

  (b)    it engages the services of or otherwise deals with counsel, attorneys-at-law, accountants, book-keepers, international corporate service providers, trustee service providers, foundation service providers, mutual fund administrators or managers, securities dealers, investment advisers or other similar persons carrying on business in Seychelles;

  (c)    it prepares or maintains its books and records within Seychelles;

  (d)    it holds meetings of its directors or Shareholders, or passes written consent resolutions of its directors or Shareholders, in Seychelles;

  (e)    it concludes or signs contracts in Seychelles, and exercises in Seychelles all other powers, so far as may be necessary for the carrying on of its business outside Seychelles;

  (f)    it holds shares, debt obligations or other securities in a company incorporated under the Act or the Companies Act 1972;

  (g)    it has any interest or entitlement as a beneficiary of a foundation registered under the Foundations Act 2009;

  (h)    it has any interest or entitlement as a beneficiary of a trust registered under the Trusts Act 2016;

  (i)    it has any interest in a partnership registered under the Limited Partnerships Act 2003;

  (j)    it operates as a licensed mutual fund under the Mutual Fund and Hedge Fund Act 2008;



REGISTRAR OF INTERNATIONAL
BUSINESS COMPANIES
CERTIFIED TRUE COPY

2 6 SEP 2023

REGISTRAR OF INTERNATIONAL
BUSINESS COMPANIES

8

<table>
<tr><td>(k)</td><td>shares, debt obligations or other securities in the company are owned by a resident person;</td></tr>
<tr><td>(l)</td><td>it is listed on a licensed securities exchange under the Securities Act 2007;</td></tr>
<tr><td>(m)</td><td>it holds a licence under the International Trade Zone Act 1995; or</td></tr>
<tr><td>(n)</td><td>subject to the provisions of the International Corporate, Trustee and Foundation Service Providers Act 2016, any of its directors are resident persons.</td></tr>
</table>

7.3    The Company may own or manage a vessel registered in Seychelles under the Merchant Shipping Act 1992 and the vessel may visit or be situated in Seychelles waters, provided that the Company shall not carry on any business in Seychelles in contravention of Clause 7.1(a), including, without limitation, fishing, charter or tourism business involving the vessel.

## 8.    AUTHORISED CAPITAL

8.1    The Shares shall be issued in the currency of the US Dollar.

8.2    The authorised capital of the Company is USD 100.00 divided into 10,000 Ordinary shares of par value USD 0.01 each.

8.3    The Company may issue fractional Shares and a fractional Share shall have the corresponding fraction of liabilities, limitations, preferences, privileges, qualifications, restrictions, rights and other attributes of a whole Share of the same class of Shares.

## 9.    CLASSES AND SERIES OF SHARES

Subject to Clause 14, the Shares shall be divided into such classes and series as the directors may by resolution of directors determine from time to time and unless so divided shall comprise one class and series of Shares as referred to in Clause 8.2.

## 10.    RIGHTS ATTACHING TO SHARES

10.1    Each issued Share shall confer on its holder:

(a)    the right to one vote at a meeting of the Shareholders or on any resolution of the Shareholders;

(b)    the right to an equal share in any Dividend paid by the Company; and

(c)    the right to an equal share in the distribution of the surplus assets of the Company (remaining after payment of its liabilities) on its liquidation.

10.2    Subject to Article 3, the directors may by resolution of directors redeem, purchase or otherwise acquire all or any of the Shares.

## 11.    REGISTERED SHARES

11.1    The Company shall only issue registered shares.

11.2    The Company shall not, and has no power to: issue a bearer share; convert a registered Share into a bearer share; exchange a registered Share for a bearer share; or convert any other securities into, or exchange any other securities for, bearer shares.

REGISTRAR OF INTERNATIONAL
BUSINESS COMPANIES
CERTIFIED TRUE COPY

2 6 SEP 2023

REGISTRAR OF INTERNATIONAL
BUSINESS COMPANIES

9

12.    **VARIATION OF RIGHTS**

If at any time the Shares are divided into different classes, the rights attached to any class may only be varied, whether or not the Company is in liquidation, with the consent in writing of or by a resolution passed at a meeting by the holders of not less than 50 percent of the issued Shares in that class.

13.    **RIGHTS NOT VARIED BY THE ISSUE OF SHARES PARI PASSU**

The rights conferred upon the holders of the Shares of any class shall not, unless otherwise expressly provided by the terms of issue of the Shares of that class, be deemed to be varied by the creation or issue of further Shares ranking *pari passu* therewith.

14.    **AMENDMENT**

14.1    Subject to Clauses 12 and 14.2 and to Article 7, the Company may amend all or any provisions of its Memorandum or Articles by ordinary resolution or resolution of directors.

14.2    No amendment may be made by resolution of directors:

(a)    to restrict the rights or powers of the Shareholders to amend the Memorandum or Articles;

(b)    to change the percentage of Shareholders required to pass a resolution of Shareholders to amend the Memorandum or Articles;

(c)    in circumstances where the Memorandum or Articles cannot be amended by the Shareholders; or

(d)    to Clauses 10, 11, 12, 13 or this Clause 14.

14.3    An amendment to the Memorandum or Articles only has effect from the date of the registration by the Registrar of the amendment filed in accordance with the Act.

REGISTRAR OF INTERNATIONAL
BUSINESS COMPANIES
CERTIFIED TRUE COPY

2 6 SEP 2023

REGISTRAR OF INTERNATIONAL
BUSINESS COMPANIES

10

**Dated this 26th day of September 2022**

**Certified True Original of the Amended Memorandum of Association**

......................................................................
Signed for and on behalf of
**STERLING TRUST & FIDUCIARY LIMITED**
By Authorised Signatory


......................................................................
**Witness Name: Rebecca Hoareau**
Occupation: Corporate Services Officer
Address: Saint Louis, Mahé, Seychelles

REGISTRAR OF INTERNATIONAL
BUSINESS COMPANIES
REPUBLIC OF SEYCHELLES

2 6 SEP 2022

REGISTRAR OF INTERNATIONAL
BUSINESS COMPANIES
**CERTIFIED TRUE COPY**

2 6 SEP 2023

REGISTRAR OF INTERNATIONAL
BUSINESS COMPANIES

## APOSTILLE

**(Convention de la Haye du 5 Octobre 1961)**

1.  Country:    **REPUBLIC OF SEYCHELLES**

    **This public document**

2.  has been signed by    **RANDOLF SAMSON**

3.  acting in the capacity of    **REGISTRAR**

4.  bears the seal/stamp of    REGISTRAR OF INTERNATIONAL
    BUSINESS COMPANIES, REPUBLIC OF SEYCHELLES

### Certified

5.  at    VICTORIA        6    02ND OCTOBER 2023

7.  by    M-A. BARBE, DEPUTY REGISTRAR, SUPREME COURT

8.  No.  9821  OF 2023

9.  Seal/Stamp              10.  Signature



# Tab 4

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*, | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |

## DECLARATION OF EDITH WONG

I, EDITH WONG, pursuant to 28 U.S.C. § 1746, do hereby declare and state as follows:

1.     I am an Attorney-at-Law, licensed to practice law in Seychelles. Currently, I serve as partner of Chang-Leng and Wong Law Chambers, law firm located in Seychelles.

2.     I was retained by The Daley Law Firm LLC, counsel for Patrick Gruhn ("**Gruhn**"), Robin Matzke ("**Matzke**"), and Lorem Ipsum UG, to provide an opinion regarding the law of Seychelles, including the Seychelles International Business Corporations Act ("**IBCA**")[1], applicable the bankruptcy case of Maclaurin Investments, Ltd. ("Maclaurin") (Case No. 22-11087-JTD) filed November 11, 2022. To that end, I submit this declaration ("**Declaration**"). Specifically, I was asked to address, under Seychelles law, the validity of the Omnibus Authority (defined below) signed by Samuel Bankman-Fried ("**Bankman-Fried**"), a director of Maclaurin, focusing on whether the director at the material time had the power or authority and/or was

---

[1]     The Consolidated IBCA to 20th December 2021 is accessible on the website of the Seychelles Financial Services Authority. Whilst it states in red "This version of the International Business Companies Act is not official and has been granted for convenience only. The Financial Services Authority does not accept any responsibility for its accuracy or entirety. For all purposes of interpreting and applying the law, the official version of the law published in the Official Gazette should be consulted," I confirm that this version can be used and relied upon for the purposes of determining the law because the Official Gazette has only published a hard copy which has never been uploaded electronically onto the Official Gazette website.

This is the link: https://fsaseychelles.sc/component/edocman/legislations/fiduciary/ibc.

Relevant excerpts are attached as Exhibit A.

effective in delegating certain authority and making certain appointments by virtue of that authority.

## A.    PERSONAL BACKGROUND

3.      I obtained my law degree (L.L.B.) from the University of London in August 2013 and a Masters of Law (L.L.M.) from the University of Dundee, Scotland in October 2022.

4.      I am a fully qualified attorney-at-law and advocate licensed to practice in Seychelles including before all the courts and tribunals in Seychelles, including the apex court being the Court of Appeal.

5.      My general practice area is commercial and civil litigation, having practiced this since my call in 2017. I have provided advice on large commercial transactions in Seychelles, as well as providing professional advice on Seychelles commercial law for international clients.

6.      It is my understanding that United States courts generally apply the law of the state of incorporation to claims involving the internal affairs of corporations. Maclaurin is incorporated in Seychelles; and, thus Seychelles law governs matters of its corporate governance and internal affairs.

7.      In preparing this declaration, I have consulted the IBCA, case law, and scholarly works related to the relevant statutes. Additionally, I have also reviewed and considered relevant pleadings and motions filed in this matter. My conclusions are set forth below.

## B.    FACTUALL ALLEGATIONS

8.      The following facts are relevant to my analysis of the applicable law:

a.   On November 11, 2022 ("**Petition Date**"), Maclaurin filed its petition for relief under the Bankruptcy Code ("**Petition**") with the United States Bankruptcy Court for the District of Delaware ("**Court**"). [D.I. 1.]

b.   The Petition was signed by John J. Ray III ("**Ray**"), as the Chief Executive Officer of Maclaurin and by Adam G. Landis of the law firm Landis Rath & Cobb LLP as the attorney for Maclaurin. (Id.)

c.   Ray claims to have had authority to file the Petition by virtue of an Omnibus Corporate Authority dated November 10, 2022 ("**Omnibus Authority**"), a copy of which was filed with the Petition as required by Del. Bankr. L.R. 1002-1(b). [D.I. 1, page 12 of 23].

d.   The Omnibus Authority states in relevant part:

2

I, Samuel Benjamin Bankman-Fried, *as controlling owner, director, officer, manager or other authorized person with respect to* West Realm Shires Inc., Paper Bird Inc., Hilltop Technology Services LLC, Cedar Grove Technologies Services, Ltd., FTX Trading, Ltd., Alameda Research LLC And Clifton Bay Investments LLC (the "Top Companies"), *and all of their directly and indirectly owned subsidiaries* (together with the Top Companies, the "FTX Group"), hereby *authorize, instruct and consent to the following corporate actions* with respect to all members of the FTX Group:

(i)  the appointment of John J. Ray III ("the CEO") as Chief Executive Officer with plenary authority to exercise all powers and authority *capable of delegation to an officer under applicable law*, including without limitation in connection with a voluntary filing for protection from creditors under Title 11 of the United States Code and any restructuring and insolvency-related proceeding that may be appropriate or necessary, or may be commenced by third parties, with respect to all members of the FTX Group;

\*\*\*\*\*

(iv) the appointment of Stephen Neal (if willing to serve) as Chairman of the Board, *to the extent applicable law permits me to so designate him as such*, and one to three other individuals chosen by the CEO and not affiliated with me or the CEO as new directors of Maclaurin Ltd. . . .

(emphasis added.)

e.    The Omnibus Authority was signed, electronically, only by Bankman-Fried.

f.    Pursuant to the Omnibus Authority, Ray accepted the position as Chief Executive Officer of the debtors in the early morning hours of November 11, 2022. Declaration of John J. Ray III in Support of Chapter 11 Petitions and First Day Pleadings ("**Ray Dec.**"). [D.I. 24, ¶ 1]. Ray understood that by the Omnibus Authority he "was delegated all corporate powers and authority under applicable law, including the power to appoint independent directors and commence these Chapter 11 Cases on an emergency basis." (Ray Dec., ¶ 44.)

g.    The Omnibus Authority was drafted by attorney Andrew Dietderich of Sullivan & Cromwell. *Supplemental Declaration of Andrew G. Dietderich in Support of Debtors' Application for an Order Authorizing the Retention and Employment of Sullivan & Cromwell LLP as Counsel to the Debtors and Debtors-In-Possession Nunc Pro Tunc to The Petition Date,* ¶ 23 ("**Dietderich Supp. Dec.**") [D.I. 51.]

3

h. Maclaurin had two directors as of the Petition Date: (a) Caroline Ellison ("**Ellison**"); and (b) Bankman-Fried. (Maclaurin's *Amended Statement of Financial Affairs* filed September 1, 2023 (Case No. 22-11087 (JTD)), [D.I. 10, Statement 28, page 58 of 59.]

i. Maclaurin's pre-petition board of directors did not pass a resolution authorizing the filing of the Petition, either at a meeting or by consent in lieu of a meeting. As Dietderich states, he recommended and prepared the Omnibus Authority because "there was not time to hold over 100 board meetings for companies whose records were both incomplete and unfamiliar to [Sullivan & Cromwell]." (Dietderich Supp. Dec., ¶ 23.)

j. Bankman-Fried signed the Omnibus Authority at approximately 4:30 a.m. on Friday, November 11, 2022. *Motion of Debtors for Entry of an Order (I) Modifying Certain Creditor List Requirements; (II) Authorizing The Debtors To Serve Certain Parties By E-Mail; And (III) Granting Related Relief* [D.I. 9, ¶2].

k. As described by Dietderich, its author, the Omnibus Authority "appointed Mr. Ray CEO of all of the Debtors, transferred to him all of Mr. Bankman-Fried's corporate authority and authorized Mr. Ray to decide if and when the Debtors should commence chapter 11 proceedings." (Dietderich Supp. Dec., ¶ 23.)

l. After his appointment as CEO, Ray – not Bankman-Fried or the Maclaurin board of directors – made the decision to file the Petition. (Dietderich Supp. Dec., ¶ 5.) Authorizing the chapter 11 filings of the Debtors, including Maclaurin, was, according to Ray, his first "official act" as CEO. (Ray Dec., ¶ 2.)

## C.    **APPLICABLE SEYCHELLES LAW**

9.    Seychelles international business companies are controlled by the IBCA and their respective memorandum of association and articles of association.[2]

10.    Maclaurin is an international business corporation formed and registered in Seychelles on December 23, 2019. It was originally named Alameda Ventures Ltd., but changed its name to Maclaurin on September 26, 2022.

---

[2]    *Valabhji v Anti-Corruption Commission Seychelles* (MC 82 of 2022) [2023] SCSC 99 (10 February 2023) paragraph 37, attached as <u>Exhibit B</u>.

4

11.    Maclaurin's Memorandum of Association and Articles of Association filed as of September 22, 2022 ("**Articles**"), together with the IBCA, set forth the governing rules and regulations of the company as of the Petition Date.

12.    Under Seychelles law, directors are bound to adhere to the IBCA and the company's articles of association, *Valabhji v Anti-Corruption Commission Seychelles*. It therefore follows that actions taken by directors in contravention of the IBCA and valid articles are void.[3]

13.    The business and affairs of a company are managed by the directors of the company. IBCA, § 128. Whenever a company is authorized to act the act "shall be carried out or caused to be carried out by the directors of the company." IBCA, § 129. This is done by a resolution of the directors that may be passed either (a) at a meeting of directors, or (b) if permitted by the memorandum and articles, as a written resolution. IBCA, § 155(1). Section 155 of the IBCA is however subject to the companies' memorandum and articles of association.

14.    Here, Maclaurin's Articles define a "director resolution" as:

    (a) a resolution passed at a meeting of directors of the Company by the affirmative vote in excess of half of the directors present and entitled to vote on the resolution; or

    (b) a resolution passed and consented to in writing by directors of the Company representing in excess of half of the total votes of directors entitled to vote on the resolution.

Articles, § 1.1 (Definitions and Interpretations.)

15.    The IBCA further provides a company has the power to protect its assets for the benefit of creditors, and in doing so, may cause the company to transfer its assets to a trustee. IBCA, § 33(2)(g), (4). However, such power is expressly limited to exercise by the directors of the company. IBCA § 33(4) ("For the purposes of subsection (2)(g), *the directors* may cause the company to transfer its assets" to a trustee) (emphasis added). The IBCA further prohibits the board of directors from delegating to any other person the power to "approve the company's voluntary winding up." IBCA, § 132(2)(g). Seychelles does not have a bankruptcy code similar to

---

[3]    *See, e.g., Valabhji v Anti-Corruption Commission Seychelles,* paragraph 40 (finding acts of a Seychelles domestic corporation taken in contravention of its memorandum of association and the law to be invalid under the domestic companies act), attached as Exhibit B.

5

the U.S. A transfer for the benefit of creditors and a winding up are the Seychelles corollaries to a bankruptcy law. Both acts require the approval of the company's directors.

16.     Since Maclaurin is a Seychelles international business company, the Omnibus Authority is subject to and only valid as to Maclaurin as allowed by Seychelles law.

17.     The Omnibus Authority purported to do the following: (i) appoint Ray CEO of all of the Debtors; (ii) authorize Ray to decide if and when the Debtors should commence chapter 11 proceedings; (iii) authorize Ray to appoint new directors for any of the Debtors; and (iv) transfer to Ray all of Bankman-Fried's corporate authority. (Dietderich Supp. Dec., ¶ 23.)

18.     Each of these actions were improper under Seychelles law as well as Maclaurin's Articles and; thus, *are void*.[4]

19.     Maclaurin's affairs are to be managed by its directors and any company acts to be taken shall be done by resolution – written or passed at a meeting – consented to by a majority of its directors. Act § 128; Articles § 1.1 (directors' resolution must be "passed and consented to in writing by directors of the Company representing **in excess of half of the total votes of directors entitled to vote** on the resolution….") (emphasis added.)

20.     At the time of the Petition, Maclaurin had two directors – Bankman-Fried and Ellison. Since any act of the board or exercise of director power required a vote in excess of half of the directors (i.e. a majority), any act thus required unanimous consent of *both* Bankman-Fried and Ellison, not Bankman-Fried *only*.

21.     Dietderich admits that no directors' meeting was held around the time the Omnibus Authority was drafted or any time prior to the filing of the Petition. The Omnibus Authority, which is not a resolution and is not signed by both directors, is an improper attempt to exercise and/or delegate the directors' rights and obligations in managing the affairs of the company.

22.     As only one of two directors of Maclaurin, Bankman-Fried did not have the authority to independently "authorize, instruct and consent to" corporate actions for Maclaurin. Such delegation of authority would require unanimous board action.

23.     Moreover, under Seychelles law, only a board of directors has the power to authorize a voluntary winding up of the company. Act, § 132(2)(g). A single director cannot

---

[4]     *See, e.g., Valabhji v Anti-Corruption Commission Seychelles,* paragraph 40, attached as <u>Exhibit B</u>.

authorize such a filing, nor can an officer. This power is solely for the directors and cannot be delegated. *Id.*

24.      Even if a directors' wind-up powers could be delegated, Bankman-Fried can only delegate or authorize Ray to take action that he has the power or authority to take himself. Because Bankman-Fried did not have the power to singularly resolve to file the Petition, neither did Ray.

25.      Further, the Omnibus Authority does not specifically name Maclaurin as a grantee of the power given to Ray. Whilst the chart showing the organization of the structure of the FTX debtors (Ray Dec. last page.) shows that Maclaurin is a wholly owned subsidiary of Alameda Research Ltd, which in turn is wholly owned by Alameda Research LLC, the principles of separate corporate personality of each company requires that Bankman-Fried ought to have specifically identified Maclaurin in the Omnibus Authority. It is not possible under Seychelles law to grant a sweeping power in the manner in which the Omnibus Authority does by virtue of the Act. Section 132A(1)(a) of the Act allows directors to "appoint any person, including a person who is a director, to be an agent of the **company**" (emphasis added) which requires that this delegation must be specific to that company.

26.      In sum, under Seychelles law, the Omnibus Authority could not and did not grant Ray the authority and power to file the Petition for Maclaurin. Under Seychelles law as well as Maclaurin's Articles, Bankman-Fried lacked authority to unilaterally pass a resolution appointing Ray as CEO and to delegate the directors' voluntary wind-up powers.

27.      Based on the foregoing, in my opinion, under Seychelles law, Ray lacked the proper authority to file the Petition.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on October 26, 2023.

Edith Wong
Chang-Leng and Wong Law Chambers
Fourth Floor, The Link, Ile Du Port,
Mahe, Seychelles
(+248) 4-324-122
edith@clw.sc

7

# Exhibit A

*This version of the International Business Companies Act is not official and has been granted for convenience only. The Financial Services Authority does not accept any responsibility for its accuracy or entirety. For all purposes of interpreting and applying the law, the official version of the law published in the Official Gazette should be consulted.*

**CONSOLIDATED TO 20TH DECEMBER, 2021**

**THE INTERNATIONAL BUSINESS COMPANIES ACT, 2016**

*(Act 15 of 2016)*

**ARRANGEMENT OF SECTIONS**

Section

### PART I – PRELIMINARY

1.      Short title and commencement date
2.      Interpretation
3.      Associated companies
4.      Application of this Act

### PART II - COMPANY INCORPORATION

#### Sub-Part I – Types of international business companies

5.      Definition of international business companies
6.      Companies which may be incorporated or continued
7.      Protected cell companies
8.      Limited life companies

#### Sub-Part II – Incorporation of companies

9.      Application to incorporate a company
10.     Incorporation of a company
11.     Effect of incorporation
12.     Annual fee
13.     Memorandum of association
14.     Content of the memorandum of association
15.     Memorandum of company with shares
16.     Memorandum of company with guarantee members
17.     Memorandum may specify objects
18.     Memorandum or articles of limited life company
19.     Language of memorandum
20.     Articles of association
21.     Language of articles

#### Sub-Part III – Amendment and restatement of memorandum or articles

22.     Amendment of memorandum or articles
23.     Registration of amendments to memorandum or articles
24.     Restated memorandum or articles

## PART III - COMPANY NAMES

25.     Requirements as to names
26.     Restrictions on company names
27.     Rights and interests in names
28.     Language of company names
29.     Reservation of names
30.     Change of name
31.     Power to require change of name
32.     Reuse of company name

## PART IV - COMPANY CAPACITY AND POWERS

33      Capacity and powers
34.     Validity of acts of company
35.     Personal liability
36.     Dealings between a company and other persons
37      Contracts generally
38.     Pre-incorporation contracts
39.     Powers of attorney
40.     Company seal
41.     Authentication or attestation

## PART V – SHARES

### Sub-Part I – General

42.     Nature of shares
43.     Share rights
44.     Distinguishing numbers
45.     Series of shares
46.     Par value and no par value shares
47.     Fractional shares
48.     Bearer shares prohibited

### Sub-Part II - Issue of shares

49.     Issue of shares
50.     Consideration for shares
51.     Provision for different amounts to be paid on shares
52.     Shares issued for consideration other than money
53.     Time of issue
54.     Consent to issue certain shares
55.     Power to issue shares at a discount
56.     Power of company to pay commissions
57.     Pre-emptive rights

58.     Share certificates

### Sub-Part III – Transfer of shares

59.     Transferability of shares
60.     Transfer of deceased member's share by personal representative
61.     Transfer by operation of law
62.     Transfer of shares
63.     Refusal to register transfer
64.     Loss of instrument of transfer
65.     Time of transfer of share
66.     Transfer of securities through clearing agencies and securities facilities

### Sub-Part IV – Distributions

67.     Meaning of "solvency test"
68.     Meaning of "distribution"
69.     Meaning of "dividend"
70.     Distributions
71.     Cellular and non-cellular distributions by protected cell company
72.     Recovery of distributions made when company did not satisfy solvency test

### Sub-Part V - Redemption and purchase of own shares

73.     Company may redeem or purchase its own shares
74.     Process for redemption or purchase of own shares
75.     Offer to one or more shareholders under section 74(1)(b)
76.     Shares redeemed at the option of a shareholder
77.     Redemptions or purchases deemed not to be a distribution
78.     Treasury shares
79.     Transfer of treasury shares

### Sub-Part VI - Alteration of capital

80.     Alteration of capital of par value companies
81.     Alteration of capital of no par value companies
82.     Forfeiture of shares
83.     Reduction of share capital
84.     Application to Court for order of confirmation
85.     Court order confirming reduction
86.     Registration of order and minute of reduction
87.     Liability of members on reduced shares
88.     Penalty for concealing name of creditor, etc

### Sub-Part VII – Security over shares

89.     Interpretation
90.     Right to pledge shares
91.     Form of pledge of shares
92.     Pledge of shares governed by Seychelles law

93.    Exercising power of sale under a Seychelles law pledge of shares
94.    Pledge of shares governed by foreign law
95.    Application of enforcement monies
96.    Annotating and filing of register of members

### Sub-Part VIII – Conversion of par value shares into no par value shares and vice versa

97.    Conversion of shares in par value companies
98.    Conversion of shares in no par value companies

## PART VI - MEMBERSHIP

### Sub-Part I – Members

99.    Minimum number of members
100.   Requirement for company limited by shares and guarantee
101.   Minors and incapacitated adults
102.   Liability of members
103.   Service on members

### Sub-Part II – Register of members

104.   Register of members
105.   Nature of register
106.   Register of members of listed companies
107.   Inspection of register of members
108.   Rectification of register of members

### Sub-Part III – Members Meetings and Resolutions

109.   Resolutions
110.   Ordinary resolutions
111.   Ordinary resolutions may be required to have a higher proportion of votes
112.   Special resolutions
113.   Special resolutions may be required to have a higher proportion of votes
114.   Convening of members meetings
115.   Notice of meetings of members
116.   Quorum
117.   Attending meeting by telephone or other electronic means
118.   Representation of body corporate at meetings
119.   Jointly owned shares
120.   Proxies
121.   Demand for poll
122.   Written consent resolutions of members
123.   Court may order meeting
124.   Resolution passed at adjourned meeting
125.   Keeping of minutes and resolutions of members
126.   Location of minutes and resolutions of members
127.   Inspection of minutes and resolutions of members

## PART VII - DIRECTORS

### Sub-Part I – Management of companies

128.   Management of company
129.   Carrying out of company obligations by directors
130.   Minimum number of directors
131.   Deemed directors
132.   Committee of directors
132A.  Agents

### Sub-Part II – Appointment, Removal and Resignation of Directors

133.   Eligibility of directors
134.   Appointment of directors
135.   Nomination of Reserve directors
136.   Cessation of nomination of Reserve directors
137.   Removal of directors
138.   Resignation of directors
139.   Appointment of alternate directors
140.   Rights and duties of alternate directors
141.   Emoluments of directors
142.   Continuing liability
143.   Validity of acts of director

### Sub-Part III – Duties of Directors and Conflicts

144.   Duties of directors
145.   Directors of subsidiaries, etc
146.   Avoidance of breach
147.   Reliance on records and reports
148.   Disclosure of interest
149.   Avoidance by company of transactions in which director is interested

### Sub-Part IV – Register of Directors

150.   Register of directors
151.   Inspection of register of directors
152.   Filing of register of directors with Registrar

### Sub-Part V –Directors Meetings and Resolutions

153.   Meetings of director
154.   Notice of meeting of directors
155.   Resolutions of directors
156.   Keeping of minutes and resolutions of directors
157.   Location of minutes and resolutions of directors
158.   Inspection of minutes and resolutions of directors

(b)    does not affect any rights or obligations of the company or render defective any legal proceedings by or against it, and any legal proceedings that might have been continued or commenced against it by its former name may be continued or commenced against it by its new name.

**Power to require change of name**

**31**.(1)  If a company has been incorporated, continued or converted into a company under this Act with, or has changed its name to, a name which, in the opinion of the Registrar, does not comply with sections 25 or 26 the Registrar may —

(a)    within 2 years of that time direct the company by written notice to make an application to change its name or its foreign character name on or before a date specified in the notice, which shall be not less than 30 days after the date of the notice; or

(b)    apply to the Court for, and the Court may grant, an order changing the company's name or its foreign character name, or requiring the company to change such name, to a name acceptable to the Registrar on such terms as the Court thinks fit.

(2)    If a company that has received a notice under subsection (1)(a) fails to file an application to change its name to a name acceptable to the Registrar on or before the date specified in the notice, the Registrar may revoke the name of the company and assign it a new name acceptable to the Registrar.

(3)    Where the Registrar assigns a new name to a company under subsection (2) or pursuant to an order made by the Court under subsection (1)(b), it shall —

(a)    enter the new name in the Register in the place of the former name;

(b)    issue a certificate of change of name to the company; and

(c)    publish the change of name in the *Gazette*.

(4)    A company that fails to comply with a direction given under this section within the period of time specified by the Registrar under subsection (1)(a) commits an offence and is liable on conviction to a fine not exceeding US$10,000.

**Reuse of company names**

**32**.    The Registrar may permit the reuse of company names as provided for in the Fifth Schedule.

## PART IV – COMPANY CAPACITY AND POWERS

**Capacity and powers**

**33**.(1)  Subject to this Act, any other written law and its memorandum and articles, a company has, irrespective of corporate benefit —

(a)    full capacity to carry on or undertake any business or activity, do any act or enter into any transaction; and

(b)    for the purposes of paragraph (a), full rights, powers and privileges.

(2)    Without limiting the generality of subsection (1), subject to its memorandum and articles, subsection (3) and section 48 (*Bearer shares prohibited*), the powers of a company include the power to do any of the following —

(a)    issue and cancel shares and hold treasury shares;

(b)    grant options over unissued shares in the company and treasury shares;

(c)    issue securities that are convertible into shares;

(d)    give financial assistance to any person in connection with the acquisition of its own shares;

(e)    issue debt obligations of every kind and grant options, warrants and rights to acquire debt obligations;

(f)    guarantee a liability or obligation of any person and secure any obligations by mortgage, pledge or other charge, of any of its assets for that purpose; and

(g)    protect the assets of the company for the benefit of the company, its creditors and its members and, at the discretion of the directors, for any person having a direct or indirect interest in the company.

(3)    Paragraphs (a), (b), (c) and (d) of subsection (2) shall not apply to company limited by guarantee.

(4)    For the purposes of subsection (2)(g), the directors may cause the company to transfer any of its assets in trust to one or more trustees, each of which may be an individual, company, association, partnership, foundation or similar entity and, with respect to the transfer, the directors may provide that the company, its creditors, its members or any person having a direct or indirect interest in the company, or any of them, may be the beneficiaries of the trust.

(5)    The rights or interests of any existing or subsequent creditor of the company in any assets of the company are not affected by any transfer under subsection (4), and those rights or interests may be pleaded against any transferee in any such transfer.

**Validity of acts of company**

**34**.(1)  Subject to subsection (2), no act of a company and no transfer of an asset by or to a company is invalid by reason only of the fact that the company did not have the capacity, right or power to perform the act or to transfer or receive the asset.

(2)    The lack or alleged lack of capacity, right or power of a company to perform an act or to transfer or receive an asset may be asserted —

(a)     the company commits an offence and is liable on conviction to a fine not exceeding US$5,000; and

(b)     the aggrieved person may within 90 days from the date of refusal apply to the Court for an order that he should be permitted to inspect the relevant minutes and resolutions or that a copy of such minutes and resolutions be provided to him.

(6)     On an application under subsection (5), the Court may make such order as it considers just.

## PART VII – DIRECTORS

### Sub-Part I – Management of Companies

**Management of company**

**128**. Subject to any modifications or limitations in the company's memorandum or articles —

(a)     the business and affairs of a company shall be managed by, or under the direction or supervision of, the directors of the company; and

(b)     the directors of a company have all the powers necessary for managing, and for directing and supervising, the business and affairs of the company.

**Carrying out of company obligations by directors**

**129**.     Wherever in this Act an obligation or duty is placed on a company or a company is authorised to do any act then unless it is otherwise provided such obligation, duty or act shall be carried out or caused to be carried out by the directors of the company.

**Minimum number of directors**

**130**.(1) A company shall at all times have at least one director appointed in accordance with this Act, except where otherwise provided by another written law of Seychelles.

(2)     Subsection (1) does not apply during the period between the incorporation of the company and the appointment of the first directors.

(3)     Subject to subsection (1), the number of directors of a company may be fixed by, or in the manner provided in, the company's articles.

**Deemed directors**

**131.**     If at any time a company does not have a director, any person who manages, or who directs or supervises the management of the business and affairs of the company is deemed to be a director of the company for the purposes of this Act.

**Committee of directors**

**132.**(1) Subject to the memorandum and articles of the company and to subsection (2), the directors may —

    (a)    designate one or more committees of directors, each consisting of one or more directors; and

    (b)    delegate to the committee one or more of their powers, including the power to affix the common seal of the company.

(2)    Notwithstanding anything in the memorandum or articles of the company, the directors shall not delegate to a committee of directors any power to —

    (a)    amend the memorandum or articles, including to change the registered agent or registered office of the company;

    (b)    designate committees of directors;

    (c)    delegate powers to a committee of directors;

    (d)    appoint or remove directors;

    (e)    appoint or remove an agent;

    (f)    approve a plan or merger, consolidation or arrangement;

    (g)    approve voluntary winding up of the company under Sub-Part II or Sub-Part III of Part XVII; or

    (h)    approve distribution by the company, including to make a determination under section 70(1) or 71(1) that the company will, immediately after a proposed distribution, satisfy the solvency test.

(3)    Subsection (2)(b) and (c) shall not prevent a committee of directors, where authorised by the directors, from appointing a sub-committee and delegating powers exercisable by the committee to the sub-committee.

(4)    The directors who delegate any power under subsection (1) shall be responsible for the exercise of the power by the committee as if the power had been exercised by the directors, unless the directors prove that the exercise of power by the committee was outside the scope of the delegated authority.

## Agents

**132A.** (1) The directors may appoint any person, including a person who is a director, to be an agent of the company.

(2)    Subject to the memorandum or articles of the company, an agent of the company has such powers and authority of the directors, including the power and authority to affix the common seal of the company, as are set forth in the articles or in the resolution of directors appointing the agent, except that no agent has any power or authority to —

(a)    amend the memorandum or articles, including to change the company's registered agent or registered office;

(b)    designate committees of directors;

(c)    delegate powers to a committee of directors;

(d)    appoint or remove directors;

(e)    appoint or remove an agent;

(f)    approve a plan or merger, consolidation or arrangement;

(g)    approve voluntary winding up of the company under Sub-Part II or Sub-Part III of Part XVII;

(h)    approve distributions by the company, including to make a determination under section 70(1) or 71(1) that the company will, immediately after a proposed distribution, satisfy the solvency test;

(i)    fix emoluments of directors; or

(j)    authorise the company to continue as a company incorporated under the laws of a jurisdiction outside Seychelles.

(3)    Where the directors appoint any person to be an agent of the company, they may authorise the agent to appoint one or more substitute or delegate to exercise some or all of the powers conferred on the agent by the company.

(4)    The directors may remove an agent appointed under subsection (1) and may revoke or vary a power conferred on him or her under subsection (2).

### Sub-Part II – Appointment, Removal and Resignation of Directors

**Eligibility of directors**

**133**.(1)    Subject to subsection (2), the company's memorandum and articles and to the provisions of the International Corporate Service Providers Act (Cap 275), a director of a company shall be an individual or a body corporate.

(2)    The following persons shall not be a director of a company —

(a)    an individual who —

(i)    is a minor;

(ii)    is an incapacitated adult; or

(iii)    is an undischarged bankrupt;

at the commencement of the meeting one half of the total number of directors are present in person or by alternate.

**Notice of meeting of directors**

**154.**(1) Subject to a requirement in a company's memorandum or articles for a longer notice period, a director shall be given not less than 2 days' notice of a meeting of directors.

(2)    Notwithstanding subsection (1), subject to the memorandum or articles, a meeting of directors held in contravention of that subsection is valid if all of the directors, or such majority thereof as may be specified in the memorandum or articles entitled to vote at the meeting, have waived the notice of the meeting; and, for this purpose, the presence of a director at the meeting shall be deemed to constitute waiver on his part.

(3)    The inadvertent failure to give notice of a meeting to a director, or the fact that a director has not received the notice, does not invalidate the meeting.

**Resolutions of directors**

**155.**(1) A resolution of directors may be passed —

      (a)    at a meeting of directors; or

      (b)    subject to the memorandum and articles, as a written resolution.

(2)    Subject to the memorandum and articles, a resolution of directors is passed at a meeting of directors by a majority of the votes cast by directors who are present at the meeting and entitled to vote on the resolution.

(3)    A written resolution is a resolution consented to in writing or by telex, telegram, cable or other written electronic communication, without the need for any notice —

      (a)    by such majority of the votes of the directors entitled to vote on the resolution as may be specified in the memorandum or articles; or

      (b)    in the absence of any provision in the memorandum or articles, by all of the directors entitled to vote on the resolution.

(4)    A written resolution —

      (a)    may consist of several documents, including written electronic communications, in like form each signed or assented to by one or more directors and

      (b)    shall be deemed to be passed when the written consent instrument, or the last of several instruments, is last signed or otherwise assented to or on such later date as is specified in the resolution.

**Keeping of minutes and resolutions of directors**

# Exhibit B

**SUPREME COURT OF SEYCHELLES**

**Reportable**
[2023] SCSC
MC82/2022

In the matter between:

**MUKESH VALABHJI**                                    **Applicant**
*(rep. by France Bonte)*

and

**ANTI-CORRUPTION COMMISSION**              **Respondent**
*(rep. by Edmund Vickers)*

| | |
|---|---|
| **Neutral Citation:** | *Mukesh Valabji v Anti-Corruption Commission Seychelles* (MC 82/2022) [2023] SCSC    (10 February 2023) |
| **Before:** | Govinden, CJ |
| **Summary:** | Advancement of Loan to Company Director contrary to section 172 of Companies Ordinance, 1972; Confirmation of section 60(1) notice. |
| **Heard:** | 10 February 2023 |
| **Delivered:** | 10 February 2023 |

**ORDER**

The court confirms the directives of the Respondent in terms of section 60(1) of the Anti-Corruption Act, given in the notices dated 13th December 2021 and further extended on the 13th September 2022 in respect of the bank accounts of Zil Pasyon Resort Limited No. 2100 2060 800 033 and Intelvision Limited No. 0100 2025 754 010, in so far as the purported resolutions by the directors in the aforesaid companies are illegal by virtue of being contrary to section 172 of the Companies Ordinance.

**RULING**

**GOVINDEN CJ**

**FACTS/ BACKGROUND**

[1]    This is a Ruling on an application was filed on the 2nd December 2022 under MC 82 of 2022 by Mr. Mukesh Valabhji (hereafter "the Applicant"), one of the beneficial owners of Zil Pasyon Resort Limited (hereafter "Zil Pasyon") and the sole beneficial owner of Intelvision Limited (hereafter "Intelvision"), who holds 1% shareholding in both companies (hereafter to be referred to together as "the Companies"). The Respondent is the Anti-Corruption Commission Seychelles (hereafter "the Respondent" or "the ACCS") established under the Anti-Corruption Act, 2016 (hereafter "the ACA").

[2]    The Applicant and Mr. Benoiton were arrested by officers of the Respondent on the 18th November 2021 on allegations of violating *inter alia*, the Anti-Money Laundering and Countering the Financing of Terrorism Act, 2020 (hereafter "the AML/CFT Act"), the Penal Code and the ACA, and subsequently charged.

[3]    On the 13th December 2021, the ACCS issued a number of section 60(1) orders against the account of local entities and companies in which the Applicant and Mr. Benoiton have financial interest, and private individual accounts held in their names. These included the bank accounts of Zyl Pasyon and Intelvision, both of which the Applicant is a director, shareholder and ultimate beneficial owner (UBO). These restrictions were extended on 13th September 2022 for a further six months.

[4]    The challenge arose when new invoices were issued and the Applicant sought that same be paid from funds derived from the Companies. The Applicant requires and requests that the Court allow for access to the bank accounts of Zil Pasyon and Intelvision to pay the legal and expert fees, including court fees which are paid through counsel.

[5]    The Respondent queried Applicant's production of resolutions from Intelvision and Zyl Pasyon when the invoice identified Felicite Island Development Limited as the company from which the legal fees are sought to be drawn.

[6]    The Respondent requested that the Court determine whether Applicant's decision to defray his legal costs using funds from these Companies is in compliance with the Companies Act, having regard that the latter have a separate and distinct legal personality from the directors, shareholders or owners.

[7]    In its judgment rendered on 10 November 2022, the Court confirmed that a section 60(1) notice can indeed "*be varied by the Supreme Court in respect of the disbursement of any expense including that of legal fees of a person whose account is subject to the restriction*" in terms of subsection (6).

[8]    The Court referred to Article 19(2)(d) of the Constitution, affirming the accused's right to procure legal representation of their **own choice** and at **own expense**. The Court found that in the event that the ACCS refuses to reverse or vary the directive, that it is still open to the Applicant to approach the Supreme Court in terms of subsection (6).

[9]    The Court further found that Applicant could legally be entitled to pay a legal bill or invoice "*from monies in an account of a legal entity or company in which they hold interest and subject to the limits of those interests and the applicability of the provisions of statutes including the Companies Act.*" The Court said the above was subject to certain conditions.

[10]    Prompted by the 10 November 2022 judgment, Applicant filed his application and prays for the following orders:

　　　a.    An order pursuant to section 60(6) of the Anti-Corruption Act 2016, reversing/varying the directives of the Respondent, given in the notices dated 13th December 2021 which were further extended by the Respondent on the 13th September 2022 in respect of the following bank accounts to allow the Applicant to pay legal fees of the Applicant as per the resolution of Zil Pasyon Resort Limited and Intelvision Limited;

　　　　　i.    Zil Pasyon Resort Limited No. 2100 2060 800 033

ii.      Intelvision Limited No. 0100 2025 754 010;

b.      Such other order as the Court shall deem fit.

## LEGAL ARGUMENTS

### Varying a section 60(1) restriction order

[11]    In terms of **section 60(8) of the ACA**, the Supreme Court may, on hearing of an application under subsection (5) issue one of the following decisions, either:

(a) confirm the directive; or

(b) reverse the directive and consent to the disposal of, or otherwise dealing with, any property specified in the notice, subject to such terms and conditions as it thinks fit; or

(c) vary the directive as it thinks fit.

[12]    The ACA does not specify what determines whether or not the Court confirms or reverses the directive. The facts of this particular case and other cases in other jurisdictions with similar provisions should provide guidance.

### Company as a separate legal entity

[13]    It is indisputable in law, that a company is a legal entity distinct from its members. It was so laid down by the House of Lords in the leading case of ***Salomon v A Salomon & Co Ltd* [1896] UKHL 1, [1897] AC 22**. In the case of ***Umbricht v Golden Flow Pty Ltd* (CS 57 of 2020) [2022] SCSC 41,** the court re-affirmed that a company is vested with a separate legal personality and is therefore separate and distinct from its members and directors. This is true unless the director breaches his duties, and in those circumstances, there might arise the possibility of personal liability. The assumption is that since directors are not liable for the debts of the company, it follows therefore that the company should not be liable for the personal debts of its directors.

[14]    Applicant has produced documents termed as "resolutions" from Intelvision and Zyl Pasyon, where the Applicant serves as director, shareholder and ultimate beneficial owner, and argues that these confer the authority for the Companies to advance certain sums to pay for his legal fees. While the resolutions on the face of it appear to have been properly executed in so far as they are "*in writing, signed by all the directors for the time being entitled to receive notice of a meeting of the directors…*" as per the provisions of **section 73 of the Companies Act**, the question is whether these resolutions qualify the Applicant to access the Companies' funds. The Applicant avers that he is entitled "*not as director, but as a shareholder and ultimate Beneficiary Owner (UBO)*" to have funds "advanced" not "loaned" to him. Authorisation thereto will be determinable as each of the hats worn by the Applicant are examined.

**Directors Duties and Responsibilities**

[15]    The Applicant is, among others things, a director in the Companies in question. It is a long established principle of the law that "*directors represent the mind and will of the company and control what they do. The state of the mind of these managers is the state of the mind of the company and is treated by the law as such*." [Per Lord Denning, in the UK case of **HL Bolton Co Vs TJ Graham and Sons [1956] 3 All ER 624**, page 630.

[16]    A company director stands in a special relationship to the company of which they are an officer. This special position is known as a 'fiduciary position' and the director is known as a 'fiduciary' (**Section 52(3) of the Companies Act**). A fiduciary is required to act in a manner which is legally becoming of their office and which places the interests of the company ahead of their own. **Section 171(1)(c)** makes it clear that directors are to exercise their powers "*in good faith in what they reasonably consider to be the <u>interests of the **shareholders** of the company as a whole</u>*." [Emphasis added]

[17]    In this case the Applicant argues that he has 1% shareholding in both companies. The question, therefore is, given the pre-eminence of **shareholder interests** in section 171(1)(c), whether or not the other shareholders representing 99% of the company shareholding in the companies will not be prejudiced were the funds from these companies repatriated

to pay Applicant's fees. Of significance, on page 5 of his submissions dated 17 January 2023, Mr. Bonte states:

> "*It is submitted that both ZPRL and Intelvision have only 2 shareholders each, each, a corporate one represented by Mr. Kishore Buxani in respect of ZPRL and Mr. Reza Jaro in respect of Intelvision and the other shareholder in the other company being the shareholder himself*"

[18]    Mr. Bonte goes on to explain that both Mr. Buxani and Mr. Jaro are also directors of the two companies, and both have acceded to, and signed the requisite resolutions in favour of the Applicant. The fact that Mr. Buxani and Mr. Jaro each hold 99% of the shares in each company, and the attitude of the co-shareholders in both companies mean that there would not be an inequitable situation for the shareholders of both companies. In the circumstances, section 171(1)(c) would be fulfilled.

[19]    Worthy of note, English law has long recognised that a director's duties are usually owed in the first instance to the company, and not to the members/shareholders, creditors or employees of the company. In such situations, directors have a duty to ensure the well-being, profitability and continued existence of the company. What constitutes directors' duties when a company is foremost, was well summed up on a guidance document on directors' duties[1] based on UK law as follows:

> "*For all directors, your job is not to balance the interests of the company and those of other stakeholders. Instead, after weighing up all the relevant factors, ask yourself which course of action you consider <u>best leads to the success of the company,</u> having regard to the long term. This can sometimes mean that certain stakeholders are adversely affected, but this does not call into question decisions made.*"

[20]    However, in the UK case of ***BTI 2014 LLC  v. Sequana SA and others* [2022] UKSC 25**, the Supreme Court held that directors (particularly in cases of insolvency or when there is a real risk of insolvency) should treat creditors' interests as paramount (that is, in

---

[1] Guidance on Directors' Duties: Section 172 and Stakeholder Considerations, *GC100*, October 2018, 5.

priority to shareholders' interests). Despite these different positions, it is clear that prior to making decisions, directors need to consider all the company's stakeholders and the impact of their decision on them.

**Compliance with Companies Act and other statutes**

[21]    The Applicant argues that the Court is only concerned with compliance with the Companies Act. However, the Court has a duty to ensure compliance with all laws, not just the Companies Act. In the aforementioned 10 November 2022 judgment the Court said in part, that Applicant could be entitled to pay a legal bill or invoice "*from monies in an account of a legal entity or company in which they hold interest and subject to the limits of those interests and the __applicability of the provisions of statutes including the Companies Act__.*"

[22]    Undeniably, the Companies Act is the main piece of legislation governing company law in Seychelles. However, there are other legislation, regulations, guidelines, policies, etcetera, all of which constitute the regulatory framework, which a company as a legal person should adhere to and comply with. All these are laws and violations of which often result in legal punishment, including fines. This explains the increasingly mandatory requirement that financial institutions must have a compliance officer (CO) today.[2] The CO is indispensable in today's companies as they are responsible for assuring that the company can fulfil all its duties under whatever laws and regulations apply to the business. Consequently, proper compliance refers to compliance to all laws and regulations, and should not be viewed narrowly as Applicant's attorney suggests.

[23]    Indisputably, Respondent makes a compelling argument for citing the Companies' directors for breach of section 3(1) of the **Financial Institutions Act, 2004 (hereafter "the FIA")** which proscribes a person engaging in 'banking business" without the requisite licence under section 6. As will be apparent below, both companies' objects do not include lending out money, save in those exceptions provided.

---

[2] Eg, Section 34 of Anti-Money Laundering and Countering the Financing of Terrorism Act, 2020 provides that every reporting entity should appoint a CO.; Section 23 of the Financial Services Authority Act, 2013 calls for the licensee to have a compliance function/CO within its organization;

[24]    Seeing that the Applicant wears different hats in both Intelvision and Zyl Payon, the question is the effect of these designations in his ability to claim title to the companies' funds to pay his legal fees.

**Loan to Applicant as a Director**

[25]    In paragraph 6 of his 11 January 2023 affidavit, the Applicant argues that the monies advanced to him and Mr. Benoiton are "*not loans but advances against monies that will become due to us as we together with others, are Ultimate Beneficial Owners of Zil Pasyon Resort Limited*." Mr. Shah's justification of advancing the loan under section 172 contradicts Applicant's statement here.

[26]    **Section 172 of the Companies Act** states as follows

> "*It <u>shall **not** be lawful for a company to make a loan to any person who is a director</u> of it …:*
>
> <u>*Provided*</u> *that nothing in this section shall apply either:*
>
> *(c) subject to the next following subsection, to anything done to provide a director of the company with funds to meet expenditure incurred or to be incurred by him for the purposes of the company or for the purpose of enabling him <u>properly to perform his duties as an officer of the company</u>; or….*
>
> *2) Paragraphs (b) and (c) of the proviso to subsection (]) <u>**shall not authorise** the making of any loan, or the entering into any guarantee, or the provision of any security, except either (a) **with the prior authorisation of the company given at a general meeting** at which the purposes of the expenditure and the amount of the loan …, as the case may be, are disclosed in the notice</u> calling the meeting and in any advertisement published under section 127(4); or…*"

[27]    Applicant is at pains to argue that the moneys will be "advanced" not "loaned" to him, and demonstrated how the two were not the same. Conceivably, the reason for taking this position is because section 172 clearly prohibits advancing loans to directors, subject to certain exceptions. Respondent correctly addresses the real risk of conflict arising in their

8

exercise of their duty as directors. It would be unreasonable to expect a director (who is also a shareholder) in Applicant's circumstances being objective in the exercise of their duty, when his liberty is at stake- hence the need for management of conflict between duty and interest. This justifies the decision of the court in **Gundelfinger v African Textile Manufacturers Ltd 1939 AD 314.** The court held:

> "*It is an elementary principle of company law, that (apart from explicit power in the articles of association) a director cannot vote for the adoption of a contract or on a matter in which he is an interested party*". [Emphasis added]

[28]    In Seychelles, the above principle is codified in section 52 which requires that not only should directors declare their interest but that, in terms of subsection (2) the director "*shall not vote in respect of any contract or arrangement in which he is interested…*"

[29]    While vehemently rejecting the notion that the desired funds are "loans", in a "*LEGAL OPINION ON LOANS TO DIRECTORS*" prepared by Mr. Kieran Shah dated 11 January 2023, Mr Shah on behalf of the Applicant cites the very section 172(c), and argues that the funds sought in the present circumstances are "*to meet expenditure incurred or to be incurred by him for the purposes of the company or for the purpose of enabling him to properly perform his duties as an officer of the company*". In effect, the Applicant once again agrees that these moneys constitute a loan but are allowable because they fall under this category.

[30]    The question is whether these funds sought to be advanced/loaned to Applicant are really "*for the purposes of the company… enabling him properly to perform his duties.*" Clearly, payment of director's legal fees charged on him on a personal matter does not advance the interests of the company, and therefore, such costs should be borne by him personally. A distinction should be made where a director enters into an agreement on behalf of a company, and when he acts for his own benefit. If it is the former, then the company would be bound to pay the costs of such venture (**see Swiss Reinsurance v General Insurance (1999) SLR 117**)

[31]     Subsection (2) further provides that such funds shall not be advanced save there is prior authorisation given at a general meeting. Subsection (3) provides that if no such prior authorisation is given the loan should be repaid within six months of the next AGM, and that same should be repaid within 2 years of the loan being extended. Applicant's attorney submitted that Applicant, with support from the shareholders of both companies will be able to repay said amounts within a year of accessing same.

[32]     The challenge for Applicant is that, whether or not he has obtained the support or authorisation of shareholders at a general meeting under subsection (c), or under subsection 3, it is immaterial given that the proviso for extending loans to directors has not been met. The fact is what Applicant needs is a loan but there is no legal basis for attaining that loan as he needs the funds for his own personal benefit, not the companies.

[33]     The facts demonstrate that Applicant seeking advancement of funds or a loan, as it rightly is, would be a breach of **section 172 of the Companies Act**. Further, it is a breach of the Financial Institutions Act in so far as both of the companies are not in the money lending business. The Court in its judgment made reference to other legislation apart from the Companies Act when it held: "*subject to the limits of those interests and the applicability of the provisions of statutes including the Companies Act.*" While Applicant professes that the money will not be a loan, he justifies the request on the authority of the very section dealing with loans, fashioned to fit one of the allowable exceptions. Nevertheless, it is clear that the intended transaction is a loan, and in terms of **section 181** of the Companies Act transactions that violate the loan prohibition are void.

**Person Aggrieved by the resolution**

[34]     On the same 17 January 2023 submissions, Applicant's attorney called into question Respondent's challenge of the validity of the resolutions, averring that "*the Respondent … is acting ultra virus of its powers under the Anti-Corruption Act and not in accordance with the Companies Act.*" Mr. Bonte cited section 136(1) of the Companies Act which in effect states that "*within one month after a resolution has been declared to have been passed…any person aggrieved may apply to court for a declaration that the declaration has not been passed…*" Mr. Bonte rightly points out to the fact that in terms of

subsection (2), that the Respondent is not an "aggrieved person", as it is neither a shareholder nor debenture holder as per subsections (a) and (b) respectively.

[35]    Notwithstanding that the Applicant does not have *locus standi* in terms of section 136(2) by virtue of not being an "aggrieved person", the Court has a right to intervene. In the case of ***Zee Entertainment Enterprises Ltd v Invesco Developing Markets Fund & Others* 26th October 2021**,[3] G.S. Patel, J on paragraph 70, held, on the question of challenging company officers who are determined to bring into effect an illegal resolution,:

> "*Sometimes, it happens that a company must be saved from its own shareholders, however well-intentioned. If a shareholder resolution is bound to cause a corporate enterprise to run aground on the always treacherous shoals of statutory compliance, there is no conceivable or logical reason to allow such a resolution even to be considered. Shareholder primacy or dominion does not extend to permitting shareholder-driven illegality. A perfectly legal resolution, if carried, may well result in the diminution of the company's profits or business. That is not a court's concern. But the resolution must be legal. The interpretative question is therefore not over the word 'valid' at all but about the matters proposed to be considered at a requisitioned EGM. And the Court is never foreclosed from considering this*."

[36]    The picture drawn by G.S. Patel, J is similar to the present case, as the shareholders are all in support of this illegal resolution, being contrary to section 172. The above expressions of the court make it clear that the "*court is never foreclosed from considering this*" and will in the present circumstances.

**Compliance with the Companies' Constitutions**

[37]    In effecting their duty, directors are to act within the powers prescribed in the company's articles and memorandum of association, sometimes referred to as the company's constitution. To this end, section 171(1)(a) of the Companies Act states that directors are

---

[3] ial22525-2021 in sl22522-2021-J-F.doc.

> *"(a) to exercise their powers in accordance <u>with this Ordinance</u> and within the limits and subject to the conditions and restrictions established by the company's <u>memorandum and articles</u>;…."* [Emphasis added]

[38]    Once again, reference may be made to the aforementioned section 171(1)(a) which forbids acting outside the confines of the Companies Act and companies' constitutions. Consequently, companies can only do those things set out in their articles of association. More so, by virtue of being public companies, Intelvision and Zyl Pasyon, are subject to more onerous accountability and transparency rules than private companies.[4] This serves to ensure shareholders' (and all stakeholder) interests protection.

[39]    In the case of Zyl Pasyon and Intelvision, the objects of the company are stated in Article 3(a) to (i) and Article 3(a) to (f) of the companies' Articles of Associations respectively. Respondent rightly points out that none of these articles and their sub-articles state can be interpreted to mean that the companies can provide loans or "advance" sums of money, as objects of the companies. According to section 172(d) an exception is:

> *"(d) in the case of a company whose ordinary business includes the lending of money or the giving of guarantees in connection with loans made by other persons, to anything done by the company in the ordinary course of that business."*

[40]    Both companies are not in the business of lending money. Applicant has not submitted any part of the companies' Articles that point to the contrary, which would justify advancing funds to the Applicant as a "director" in the two companies in terms of **section 172(2)(d)**. If the Articles of Association did make such a provision, they would be invalid under section 172, given that money lending does not constitute the business activities of the companies.

**Money advanced to Applicant as "shareholder"?**

---

[4] Van de Walt, Shareholders' Rights in Private and Public Companies in South Africa: An Overview, Weber Wenzel, 01-Dec-2022 accessed online at https://uk.practicallaw.thomsonreuters.com/w-012-0427?transitionType=Default&contextData=(sc.Default)&firstPage=true on 26 January 2023.

[41]   In his 21st November 2022 letters to the Company Secretaries of Intelvision and Zil Pasyon, Mr. Shah alluded to the Companies Act (Cap 40), arguing to the lack of legal prohibition to lend money both to the UBO or shareholder, but that "*the prohibition is against lending money to a director or a person to assist that person (not being an employee or officer of the company) to acquire shares in the company*." Mr. Shah's assertions raise the question of the Applicant's entitlements by virtue of being a shareholder.

[42]   In the case of ***Farm Ag Export v Larue* (1994) SLR 69** it was confirmed that a company has a separate legal personality from that of the directors *and* shareholders, meaning that company funds belong to the company and do not automatically accrue to the shareholder. **Section 2** contains the definition section of different classes of shareholders and states that a shareholder has "*a right to payment of a dividend*." **Section 25** prescribes the manner in which dividends are dispensed as follows:

> "<u>Ordinary business at an annual general meeting</u> *shall consist of the* <u>declaration of dividend</u> *and the approval or rejection of the annual accounts and the directors' and auditors' reports*." [Emphasis added]

[43]   Also relevant is **Section 77** provides for payment of company **profits** thus:

> "<u>A general meeting may by ordinary resolution dispose of the profits of the company by declaring dividends</u>, … to shareholders in the same proportions as a dividend would be paid to them." [Emphasis added]

[44]   On the other hand, the directors may by the power vested on them by **section 78** pay dividends to shareholders in this manner:

> "*The directors may from time to time pay to the shareholders such interim dividends as appear to the directors to be **<u>justified by the profits of the company</u>**.*"

[45]   Section 78 requires directors to make certain enquiries and considerations prior to paying the dividend. "*Justified by the profits of the company*" gives insight into the kind of

13

analysis that needs to be made prior to the directors exercising this responsibility. The Court cannot go into the question of solvency of the companies. It is obvious however that this is an exercise done with prudence and foresight. More so in a situation like the present one where the directors and shareholders are one and the same people, and where the law in terms of **section 82** makes it clear that the directors have a wide discretion on the timing and manner in which dividends are declared and paid:

> "*Any general meeting <u>declaring a dividend</u> or bonus <u>may direct payment of such dividend</u> or …, <u>and the directors shall give effect to such resolution</u>, … as may seem <u>expedient to the directors</u>.*"

[46]    A New Zealand case of ***Kinsela v Russell Kinsela Pty Ltd* (1986) 4 NSWLR 722** concerned a transaction entered into by a company with the approval of the shareholders at a time when it was balance sheet insolvent, and in anticipation of its imminent collapse, for the purpose and with the effect of placing its assets beyond the immediate reach of its creditors. Street CJ distinguished authorities to the effect that shareholder authorisation or ratification validated any *intra vires* act by the directors on the basis that they "*were not intended to, and do not, apply in a situation in which the interests of the company as a whole involve the rights of creditors as distinct from the rights of shareholders.*" (p 730) Hence the significance of the UK position that in cases of insolvency or where the company is likely to become solvent in the near future, consideration should be given to creditors' rights.

[47]    The fact that the companies made a profit is a matter of considerations by the Companies themselves, and subject to the provisions of the Companies Act. The Court will not find it necessary to enquire into this subject given its finding on other issue in this case.

[48]    The Companies are to determine the dividends due to their shareholders, using the same considerations as they have in the past. These amounts to be paid to the companies' shareholders and the shareholders will use these dividends as they please. Such amounts are to be limited to the dividend, not more. Amounts beyond these would be a contravention of the Companies Act. Both Applicant and the other shareholders will employ such amounts as they see fit.

14

**Advancement of funds to Applicant as Ultimate Beneficial Owner (UBO)**

[49]    Applicant also claimed the advance payments as an ultimate beneficial owner. He stated that the advance shall be subject to the condition that they will be repaid within 1 year at a fee of 1%.

[50]    Seychelles enacted the Beneficial Ownership Act, 2020, (hereafter "the BOA") whose main aim is to detect and prevent tax evasion, corruption, money laundering, terrorist financing, and other illicit behaviour involving one or more companies, by seeking disclosure of the identity of the natural person who ultimately benefits in companies. A "beneficial owner" is defined in section 3 of the BOA as:

> "*one or more natural persons who ultimately own or control a customer or the natural person or persons on whose behalf a transaction is being conducted and includes those natural persons who exercise ultimate effective control over a legal person or a legal arrangement*."

[51]    The OECD commentary considers a 'beneficial owner' to be the person '*who has the right to use and enjoy that income*.' The said right is unfettered of any contractual or legal obligation to pass on the income to another person. In the Tax Court of Canada in ***Prevost Car Inc. v. Her Majesty the Queen*, 2008 TCC 231**, which was affirmed by the Federal Court of Appeal, the court herein interpreted the meaning of 'beneficial owner' of dividends under the Canada–Netherlands treaty.

> "*As per the court, 'beneficial owner' is the true owner <u>who receives the dividends for his/her own use and enjoyment</u>, <u>assumes all attributes of the ownership including the risk and control of the dividend</u> and is not accountable to anyone for how the dividend is used*."

[52]    The above definition makes it clear that a beneficial owner's entitlement is, just like in the case of the shareholder, a dividend. The Companies Act is very clear about the requirements and procedures for attainment of the dividend and it is no different here. The dividend, as illustrated above, is acquired through a process and certain procedure is followed. The directors will not out of the blue decide to "reap" or to declare a dividend.

[53]

[54]    I therefore finds that the directors' resolutions in Intevision Limited and Zyl Pasyon Resort Limited are unlawful in so far as they purport to grant loans to the directors, which is prohibited by section 172 of the Companies Act.

[55]    The companies' intended conduct would also violate section 3 of the Financial Institutions Act as the companies do not have the authority to engage in banking business which a "loan" to the director would constitute.

[56]    Applicant is only entitled to a dividend obtained using the usual mechanisms applicable in the Companies Act when a dividend is declared and thereafter paid to the shareholder and/or beneficial owner.

[57]    No other funds are to be extended to the Applicant without derogating on the law.

**[58]**    THEREFORE, from the foregoing I make the following orders;

    1.    The restriction notice is confirmed subject to payment of Applicant's dividends as well as the other shareholders as per the Companies Act and the Articles of Association of Intelvision Limited and Zyl Pasyon Resort Limited as per normal company practice.

    2.    Intelvision Limited and Zyl Pasyon Resort Limited may not pay out any other funds outside the provisions of the law.

    3.    All dividends paid to the shareholders and/or ultimate beneficiary owners may be used by the recipients as they deem fit.

Signed, dated and delivered at Ile du Port on 10th February 2023.


_____

R Govinden CJ