## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*, | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |

## APPENDIX TO MOTION OF PATRICK GRUHN, ROBIN MATZKE, AND LOREM IPSUM UG TO DISMISS BANKRUPTCY CASE OF FTX TRADING, LTD.

Parties-in-interest Patrick Gruhn, Robin Matzke, and Lorem Ipsum UG submit this appendix in support of the *Motion to Dismiss Bankruptcy Case of FTX Trading, Ltd.*:

| Tab No. | Item |
|---|---|
| 1. | FTX Trading Inc. Certificate of Incorporation |
| 2. | Articles of Incorporation of FTX Trading Ltd. filed January 18, 2022 |
| 3. | General By-Law of FTX Trading Ltd. filed January 18, 2022 |
| 4. | Declaration of Craig Jacas with Exhibits |

*[Signature Page Immediately Follow]*

Respectfully submitted,

Dated:  October 27, 2023
Wilmington, Delaware

/s/ Laura Davis Jones
Laura Davis Jones (DE Bar No. 2436)
Peter J. Keane (DE Bar No. 5503)
PACHULSKI STANG ZIEHL & JONES LLP
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19801
Telephone:     (302) 652-4100
Facsimile:      (302) 652-4400
Email:          ljones@pszjlaw.com
                pkeane@pszjlaw.com

THE DALEY LAW FIRM LLC
Darrell Daley (admitted *pro hac vice*)
Samantha Neal (admitted *pro hac vice*)
4845 Pearl East Circle, Suite 101
Boulder, Colorado 80301
Telephone: (303) 479-3500
Email: Darrell@daleylawyers.com
            Samantha@daleylawyers.com

- and -

MORRISON COHEN LLP
Joseph T. Moldovan (admitted pro hac vice)
Heath D. Rosenblat (admitted pro hac vice)
Jason P. Gottlieb (admitted pro hac vice)
Michael Mix (admitted pro hac vice)
909 Third Avenue, 27th Floor
New York, New York 10022
Telephone: (212) 735-8600
Facsimile: (212) 735-8708
Email: jmoldovan@morrisoncohen.com
            hrosenblat@morrisoncohen.com
            jgottlieb@morrisoncohen.com
            mmix@morrisoncohen.com

*Counsel to Lorem Ipsum UG, Patrick*
*Gruhn, and Robin Matzke*

# Tab 1

**IBC No.: 17180**



**ANTIGUA AND BARBUDA**
**FINANCIAL SERVICES REGULATORY COMMISSION**

# CERTIFICATE OF INCORPORATION

## FTX TRADING LTD.

The undersigned **HEREBY CERTIFIES**, pursuant to Section 9 of the International Business Corporations Act, Cap. 222, of the Revised Laws of Antigua and Barbuda, that the above named company was incorporated under the laws of Antigua and Barbuda and has complied with all the requirements of the said Act.

**Chief Executive Officer**
*Financial Services Regulatory Commission*

**REGISTERED AT: ST. JOHN'S ANTIGUA, ON APRIL 02, 2019**

# Tab 2

## ANTIGUA AND BARBUDA

### International Business Corporations Act, CAP. 222
### A Company Limited by Shares

### ARTICLES OF INCORPORATION
### OF
### FTX TRADING LTD.

As last amended on October 18, 2021



### ARTICLE I

The name of the company is FTX Trading Ltd. (the **"Company"**).

### ARTICLE II

### REGISTERED OFFICE AND AGENT

The Registered Agent of the Company shall be **CORPORATE & TRUST SERVICES (CARIBBEAN) LIMITED**, whose office is situated at Lower Factory Road, in the city of Saint John's, Antigua and Barbuda, the said office shall be the Registered Office of the Company.

### ARTICLE III

### CAPITAL

The Share Capital of the Company shall be 808,087,056 registered shares divided into 755,438,749 shares of US$0.0000026 each par value common shares, which shall be designated **"Common Shares,"** and 52,648,307 shares of preferred shares US$0.0000026 each par value, of which 0 shall be designated **"Series A Preferred Shares"**, 38,532,578 shall be designated **"Series B Preferred Shares"**, 3,220,729 shall be designated **"Series B-1 Preferred Shares"** and 10,895,000 shall be designated **"Series C Preferred Shares"** (the Series A Preferred Shares, the Series B Preferred Shares, the Series B-1 Shares and the Series C Preferred Shares are collectively referred to herein as the **"Preferred Shares"**). Both classes of shares may be issued in series and the directors shall have the authority to fix the number of shares in, or to determine the designation of, and the rights, privileges, restrictions and conditions attaching to, the shares of each series.

The Company shall have the power to increase or reduce said capital, and to issue any part of its capital as special privilege, or subject to any postponement of rights, or to any conditions or restrictions; and so that unless the conditions of issue shall otherwise expressly declare, every issue of shares, whether declared to be preference or otherwise, shall be subject to the power therein contained.

The following is a statement of the designations and the powers, privileges and rights, and the qualifications, limitations or restrictions thereof in respect of each class of shares of the Company.

A.    COMMON SHARES

1.    General. The voting, dividend and liquidation rights of the holders of the Common Shares are to the extent set forth herein subject to and qualified by the rights, powers and preferences of the holders of the Preferred Shares.

2.    Voting. The holders of the Common Shares are entitled to one vote for each share of Common Shares held at all meetings of shareholders (and written actions in lieu of meetings). The number of authorized shares of Common Shares may be increased or decreased (but not below the number of shares thereof then outstanding) by (in addition to any vote of the holders of one or more series of preferred shares that may be required by the terms of these Articles) the affirmative vote of the holders of shares of the Company representing a majority of the votes represented by all outstanding shares of the Company entitled to vote in accordance with the International Business Corporations Act.

B.    PREFERRED SHARES

1.    Dividends.

**JAN 1 8 2022**

**FILED**

The Company shall not declare, pay or set aside any dividends on shares of any other class or series of capital equity of the Company unless (in addition to the obtaining of any consents required elsewhere in these Articles) the holders of the Preferred Shares then outstanding shall first receive, or simultaneously receive, a dividend on each Preferred Share in an amount at least equal to (i) in the case of a dividend on Common Shares or any class or series that is convertible into Common Shares, that dividend per Preferred Shares as would equal the product of (A) the dividend payable on each share of such class or series determined, if applicable, as if all shares of such class or series had been converted into Common Shares and (B) the number of Common Shares issuable upon conversion of a Preferred Share, in each case calculated on the record date for determination of holders entitled to receive such dividend or (ii) in the case of a dividend on any class or series that is not convertible into Common Shares, at a rate per Preferred Share determined by (A) dividing the amount of the dividend payable on each share of such class or series of capital equity by the original issuance price of such class or series of capital equity (subject to appropriate adjustment in the event of any share dividend, share split, combination or other similar recapitalization with respect to such class or series) and (B) multiplying such fraction by an amount equal to the applicable Original Issue Price; provided that, if the Company declares, pays or sets aside, on the same date, a dividend on shares of more than one class or series of capital equity of the Company, the dividend payable to the holders of Preferred Shares pursuant to this Section 1 shall be calculated based upon the dividend on the class or series of capital equity that would result in the highest Preferred Share dividend. The **"Original Issue Price"** shall mean, with respect to the Series A Preferred Shares, $0.18972 per share, with respect to the Series B Preferred Shares, $26.21 per share, with respect to the Series B-1 Preferred Shares, $36.41 per share and with respect to the Series C Preferred Shares, $46.3518 per share in each case subject to appropriate adjustment in the event of any dividend, share split, combination or other similar recapitalization with respect to the Preferred Shares.

The Company when paying dividends to the Shareholders in accordance with the provisions set forth herein may make such payment either in cash or in shares of the Company,

2

with such amount of dividend to be set forth in the sole discretion of the Board of Directors of the Company. Further, the Company shall only declare, pay or set aside any dividends in fiscal years during which the Company is profitable, and, in no case shall dividends be declared, paid or set aside other than in accordance with the laws of Antigua and Barbuda.

        2.        Liquidation, Dissolution or Winding Up; Certain Mergers, Consolidations and Asset Sales.

        2.1      Preferential Payments to Holders of Preferred Shares. In the event of any voluntary or involuntary liquidation, dissolution or winding up of the Company or Deemed Liquidation Event, the holders of Preferred Shares then outstanding shall be entitled to be paid out of the assets of the Company available for distribution to its shareholders before any payment shall be made to the holders of Common Shares by reason of their ownership thereof, an amount per share equal to the greater of (i) one times the applicable Original Issue Price, plus any dividends declared but unpaid thereon, or (ii) such amount per share as would have been payable had all Preferred Shares been converted into Common Shares pursuant to Section 4 immediately prior to such liquidation, dissolution, winding up or Deemed Liquidation Event (the amount payable pursuant to this sentence is hereinafter referred to as the "**Preferred Share Liquidation Amount**"). If upon any such liquidation, dissolution or winding up of the Company or Deemed Liquidation Event, the assets of the Company available for distribution to its shareholders shall be insufficient to pay the holders of Preferred Shares the full amount to which they shall be entitled under this Subsection 2.1, the holders of Preferred Shares shall share ratably in any distribution of the assets available for distribution in proportion to the respective amounts which would otherwise be payable in respect of the shares held by them upon such distribution if all amounts payable on or with respect to such shares were paid in full.

        2.2      Payments to Holders of Common Shares. In the event of any voluntary or involuntary liquidation, dissolution or winding up of the Company or Deemed Liquidation Event, after the payment of all preferential amounts required to be paid to the holders of Preferred Shares in accordance with Section 2.1, the remaining assets of the Company available for distribution to its shareholders shall be distributed among the holders of shares of Common Shares, pro rata based on the number of shares held by each such holder.

        2.3      Deemed Liquidation Events.

        2.3.1    Definition. Each of the following events shall be considered a "**Deemed Liquidation Event**" unless the holders of at least a majority of the outstanding Preferred Shares (voting together as a single class) (the "**Requisite Holders**") elect otherwise by written notice sent to the Company prior to the effective date of any such event:



FINANCIAL SERVICES REGULATORY COMMISSION

JAN 1 8 2022

FILED

(a)    a merger or consolidation in which

        (i)    the Company is a constituent party or

        (ii)   a subsidiary of the Company is a constituent party and the Company issues shares in its capital pursuant to such merger or consolidation,

3

except any such merger or consolidation involving the Company or a subsidiary in which the capital equity of the Company outstanding immediately prior to such merger or consolidation continue to represent, or are converted into or exchanged for shares of capital equity that represent, immediately following such merger or consolidation, at least a majority, by voting power, of the capital equity of (1) the surviving or resulting Company; or (2) if the surviving or resulting Company is a wholly owned subsidiary of another Company immediately following such merger or consolidation, the parent Company of such surviving or resulting Company ; or

          (b)    the sale, lease, transfer, exclusive license or other disposition, in a single transaction or series of related transactions, by the Company or any subsidiary of the Company of all or substantially all the assets of the Company and its subsidiaries taken as a whole, or the sale or disposition (whether by merger, consolidation or otherwise) of one or more subsidiaries of the Company if substantially all of the assets of the Company and its subsidiaries taken as a whole are held by such subsidiary or subsidiaries, except where such sale, lease, transfer, exclusive license or other disposition is to a wholly owned subsidiary of the Company; provided, however, that in no event shall a sale, lease, transfer, exclusive license or other disposition, in a single transaction or series of related transactions of one or more digital assets, or any similar transaction, be considered a Deemed Liquidation Event.

### 2.3.2   Effecting a Deemed Liquidation Event.

          (a)    The Company shall not have the power to effect a Deemed Liquidation Event referred to in Subsection 2.3.1(a)(i) unless the agreement or plan of merger or consolidation for such transaction (the "**Merger Agreement**") provides that the consideration payable to the shareholders of the Company shall be allocated among the holders of capital equity of the Company in accordance with Subsections 2.1 and 2.2.

          (b)    In the event of a Deemed Liquidation Event referred to in Subsection 2.3.1(a)(ii) or 2.3.1(b), if the Company does not commence the winding-up of the Company under the International Business Corporations Act within ninety (90) days after such Deemed Liquidation Event, then: (i) the Company shall send a written notice to each holder of Preferred Shares no later than the ninetieth (90th) day after the Deemed Liquidation Event advising such holders of their right (and the requirements to be met to secure such right) pursuant to the terms of the following clause; (ii) to request the repurchase of such Preferred Shares, and (iii) if the Requisite Holders so request in a written instrument delivered to the Company not later than one hundred twenty (120) days after such Deemed Liquidation Event, the Company shall use the consideration received by the Company for such Deemed Liquidation Event (net of any retained liabilities associated with the assets sold or technology licensed, as determined in good faith by the Board of Directors of the Company), together with any other assets of the Company available for distribution to its shareholders, all to the extent permitted by Antigua law governing distributions to shareholders (the "**Available Proceeds**"), on the one hundred fiftieth (150th) day after such Deemed Liquidation Event, to repurchase all outstanding Preferred Shares at a price per share equal to the Preferred Share Liquidation Amount. Notwithstanding the foregoing, in the event of a repurchase pursuant to the preceding sentence, if the Available Proceeds are not sufficient to repurchase all outstanding Preferred Shares, the Company shall ratably repurchase each holder's Preferred Shares to the fullest extent of such Available Proceeds and shall repurchase the remaining shares as soon as it may lawfully do so under Antigua law governing

FINANCIAL SERVICES
REGULATORY COMMISSION

JAN 1 8 2022

FILED

distributions to shareholders. The provisions of Section 6 shall apply, with such necessary changes in the details thereof as are necessitated by the context, to the repurchase of the Preferred Shares pursuant to this Subsection 2.3.2(b). Prior to the distribution or repurchase provided for in this Subsection 2.3.2(b), the Company shall not expend or dissipate the consideration received for such Deemed Liquidation Event, except to discharge expenses incurred in connection with such Deemed Liquidation Event or in the ordinary course of business.

2.3.3    Amount Deemed Paid or Distributed. The amount deemed paid or distributed to the holders of capital equity of the Company upon any such merger, consolidation, sale, transfer, exclusive license, other disposition or repurchase shall be the cash or the value of the property, rights or securities paid or distributed to such holders by the Company or the acquiring person, firm or other entity. The value of such property, rights or securities shall be determined in good faith by the Board of Directors of the Company.

2.3.4    Allocation of Escrow and Contingent Consideration. In the event of a Deemed Liquidation Event pursuant to Subsection 2.3.1(a)(i), if any portion of the consideration payable to the shareholders of the Company is payable only upon satisfaction of contingencies (the **"Additional Consideration"**), the Merger Agreement shall provide that (a) the portion of such consideration that is not Additional Consideration (such portion, the "**Initial Consideration**") shall be allocated among the holders of capital equity of the Company in accordance with Subsections 2.1 and 2.2 as if the Initial Consideration were the only consideration payable in connection with such Deemed Liquidation Event; and (b) any Additional Consideration which becomes payable to the shareholders of the Company upon satisfaction of such contingencies shall be allocated among the holders of capital equity of the Company in accordance with Subsections 2.1 and 2.2 after taking into account the previous payment of the Initial Consideration as part of the same transaction. For the purposes of this Subsection 2.3.4, consideration placed into escrow or retained as holdback to be available for satisfaction of indemnification or similar obligations in connection with such Deemed Liquidation Event shall be deemed to be Additional Consideration.

3.    Voting.

3.1    General. On any matter presented to the shareholders of the Company for their action or consideration at any meeting of shareholders of the Company (or by written consent of shareholders in lieu of meeting), each holder of outstanding Preferred Shares shall be entitled to cast the number of votes equal to the number of whole Common Shares into which the Preferred Shares held by such holder are convertible as of the record date for determining shareholders entitled to vote on such matter. Except as provided by law or by the other provisions of these Articles, holders of Preferred Shares shall vote together with the holders of Common Shares as a single class.

3.2    Election of Directors. The holders of record of the Common Shares, exclusively and as a separate class, shall be entitled to elect the total number of directors of the Company. Any director elected as provided in the preceding sentence may be removed without cause by, and only by, the affirmative vote of the holders of the shares of the ~~holders of Shares of~~ capital shares entitled to elect such director or directors, given either at a special meeting of such shareholders duly called for that purpose or pursuant to a written consent of shareholders. If the

5

FINANCIAL SERVICES
RECALIBRATION COMMISSION

JAN 1 8 2022

FILED

holders of Common Shares fail to elect a sufficient number of directors to fill all directorships for which they are entitled to elect directors, voting exclusively and as a separate class, pursuant to the first sentence of this Subsection 3.2, then any directorship not so filled shall remain vacant until such time as the holders of the Common Shares elect a person to fill such directorship by vote or written consent in lieu of a meeting; and no such directorship may be filled by shareholders of the Company other than by the shareholders of the Company that are entitled to elect a person to fill such directorship, voting exclusively and as a separate class. At any meeting held for the purpose of electing a director, the presence in person or by proxy of the holders of a majority of the outstanding shares of the class or series entitled to elect such director shall constitute a quorum for the purpose of electing such director. Except as otherwise provided in this Subsection 3.2, a vacancy in any directorship filled by the holders of any class or series shall be filled only by vote or written consent in lieu of a meeting of the holders of such class or series or by any remaining director or directors elected by the holders of such class or series pursuant to this Subsection 3.2.

3.3     Protective Provisions. At any time when at least fifty percent (50%) of the aggregate number of originally issued Series B Preferred Shares, Series B-1 Preferred Shares and Series C Preferred Shares are outstanding, the Company shall not, either directly or indirectly by amendment, merger, consolidation, recapitalization, reclassification, or otherwise, do any of the following without (in addition to any other vote required by law) the written consent or affirmative vote of the Requisite Holders given in writing or by vote at a meeting, consenting or voting (as the case may be) separately as a class, and any such act or transaction entered into without such consent or vote shall be null and void ab initio, and of no force or effect:

3.3.1     amend, alter or repeal any provision of these Articles in a manner that adversely affects the powers, preferences or rights of the Series B Preferred Shares, Series B-1 Preferred Shares or Series C Preferred Shares (or any series thereof);

3.3.2     (i) create or authorize the creation of or issue any new class or series of shares or any other security convertible into or exercisable for any equity security (by reclassification, amendment or alteration of any existing security, or otherwise), having liquidation rights senior to or on parity with the Series B Preferred Shares, Series B-1 Preferred Shares or Series C Preferred Shares, or (ii) increase the authorized number of shares of Preferred Shares or any additional class or series of capital stock of the Company unless the same ranks junior to the Preferred Shares with respect to its rights, preferences and privileges;

3.3.3     liquidate, dissolve or wind-up the business and affairs of the Company, effect any merger or consolidation or any other Deemed Liquidation Event, or consent to any of the foregoing, in each case, unless the holders of Preferred Shares receive at least one times the applicable Original Issue Price; or

3.3.4     pay or declare any dividend or make any distribution on, any shares of capital stock of the Company other than (i) dividends or distributions on the Preferred Shares as expressly authorized herein, (ii) dividends or other distributions payable on the Common Shares solely in the form of additional shares of Common Shares and (iii) dividends or other distributions paid on any shares of capital stock of the Company in an amount necessary for permit the holders of such capital stock to pay all of the U.S. federal, state and local income tax liabilities



REGISTERED SERVICES

JAN 1 8 2022

FILED

6

attributable to such holder of capital stock's ownership of such shares of capital stock, as determined in good faith by the Board of Directors of the Company.

4. Optional Conversion.

The holders of the Preferred Shares shall have conversion rights as follows (the "**Conversion Rights**"):

4.1 Right to Convert.

4.1.1 Conversion Ratio. Each share of Preferred Shares shall be convertible, at the option of the holder thereof, at any time and from time to time, and without the payment of additional consideration by the holder thereof, into such number of fully paid and non-assessable Common Shares as is determined by dividing the applicable Original Issue Price by the applicable Conversion Price (as defined below) in effect at the time of conversion. The "**Conversion Price**" shall initially be equal to $0.18972 with respect to the Series A Preferred Shares, $26.21 with respect to the Series B Preferred Shares, $36.41 with respect to the Series B-1 Preferred Shares and $46.3518 with respect to the Series C Preferred Shares. Such applicable Conversion Price, and the rate at which Preferred Shares may be converted into Common Shares, shall be subject to adjustment as provided below.

4.1.2 Termination of Conversion Rights. In the event of a liquidation, dissolution or winding up of the Company or a Deemed Liquidation Event, the Conversion Rights shall terminate at the close of business on the last full day preceding the date fixed for the payment of any such amounts distributable on such event to the holders of Preferred Shares.

4.2 Fractional Shares. No fractional Common Shares shall be issued upon conversion of the Preferred Shares. In lieu of any fractional shares to which the holder would otherwise be entitled, the Company shall pay cash equal to such fraction multiplied by the fair market value of a share of Common Shares as determined in good faith by the Board of Directors of the Company. Whether or not fractional shares would be issuable upon such conversion shall be determined on the basis of the total number of Preferred Shares the holder is at the time converting into Common Shares and the aggregate number of Common Shares issuable upon such conversion.

4.3 Mechanics of Conversion.

4.3.1 Notice of Conversion. In order for a holder of Preferred Shares to voluntarily convert Preferred Shares into Common Shares, such holder shall (a) provide written notice to the Company's transfer agent at the office of the transfer agent for the Preferred Shares (or at the principal office of the Company if the Company serves as its own transfer agent) that such holder elects to convert all or any number of such holder's Preferred Shares and, if applicable, any event on which such conversion is contingent and (b), if such holder's shares are certificated, surrender the certificate or certificates for such Preferred Shares (or, if such registered holder alleges that such certificate has been lost, stolen or destroyed, a lost certificate affidavit and agreement reasonably acceptable to the Company to indemnify the Company against any claim that may be made against the Company on account of the alleged loss, theft or destruction of such

7

certificate), at the office of the transfer agent for the Preferred Shares (or at the principal office of the Company if the Company serves as its own transfer agent). Such notice shall state such holder's name or the names of the nominees in which such holder wishes the Common Shares to be issued. If required by the Company, any certificates surrendered for conversion shall be endorsed or accompanied by a written instrument or instruments of transfer, in form satisfactory to the Company, duly executed by the registered holder or his, her or its attorney duly authorized in writing. The close of business on the date of receipt by the transfer agent (or by the Company if the Company serves as its own transfer agent) of such notice and, if applicable, certificates (or lost certificate affidavit and agreement) shall be the time of conversion (the "**Conversion Time**"), and the Common Shares issuable upon conversion of the specified shares shall be deemed to be outstanding of record as of such date. The Company shall, as soon as practicable after the Conversion Time (i) effect a compulsory repurchase of the specified Preferred Shares and the issuance of the number of full Common Shares issuable upon such conversion in accordance with the provisions hereof through updating, or causing to be updated, the register of members of the Company , (ii) issue and deliver to such holder of Preferred Shares, or to his, her or its nominees, a certificate or certificates for the number of full Common Shares issuable upon such conversion in accordance with the provisions hereof and a certificate for the number (if any) of the Preferred Shares represented by the surrendered certificate that were not converted into Common Shares, (ii) pay in cash such amount as provided in Subsection 4.2 in lieu of any fraction of a share of Common Shares otherwise issuable upon such conversion and (iii) pay all declared but unpaid dividends on the Preferred Shares converted.

        4.3.2   Reservation of Shares. The Company shall at all times when the Preferred Shares shall be outstanding, reserve and keep available out of its authorized but unissued capital equity, for the purpose of effecting the conversion of the Preferred Shares, such number of its duly authorized Common Shares as shall from time to time be sufficient to effect the conversion of all outstanding Preferred Shares; and if at any time the number of authorized but unissued Common Shares shall not be sufficient to effect the conversion of all then outstanding shares of the Preferred Shares, the Company shall take such corporate action as may be necessary to increase its authorized but unissued Common Shares to such number of shares as shall be sufficient for such purposes, including, without limitation, engaging in best efforts to obtain the requisite shareholder approval of any necessary amendment to these Articles. Before taking any action which would cause an adjustment reducing the Conversion Price below the then par value of the Common Shares issuable upon conversion of the Preferred Shares, the Company will take any corporate action which may, in the opinion of its counsel, be necessary in order that the Company may validly and legally issue fully paid and non-assessable Common Shares at such adjusted applicable Conversion Price.

        4.3.3   Effect of Conversion. All Preferred Shares which shall have been surrendered for conversion as herein provided shall no longer be deemed to be outstanding and all rights with respect to such shares shall immediately cease and terminate at the Conversion Time, except only the right of the holders thereof to receive Common Shares in exchange therefor, to receive payment in lieu of any fraction of a share otherwise issuable upon such conversion as provided in Subsection 4.2 and to receive payment of any dividends declared but unpaid thereon.

        4.3.4   No Further Adjustment. Upon any such conversion no adjustment to the applicable Conversion Price shall be made for any declared but unpaid dividends

8

FINANCIAL SERVICES
REGULATORY COMMISSION
JAN 1 8 2022
FILED

on the Preferred Shares surrendered for conversion or on the Common Shares delivered upon conversion.

4.3.5   Taxes. The Company shall pay any and all issue and other similar taxes (if any) that may be payable by the Company in respect of any issuance or delivery of Common Shares upon conversion of Preferred Shares pursuant to this Section 4. The Company shall not, however, be required to pay any tax which may be payable in respect of any transfer involved in the issuance and delivery of Common Shares in a name other than that in which the Preferred Shares so converted were registered, and no such issuance or delivery shall be made unless and until the person or entity requesting such issuance has paid to the Company the amount of any such tax or has established, to the satisfaction of the Company , that such tax has been paid.

4.4   Adjustments to Conversion Price for Diluting Issues.

4.4.1   Special Definitions. For purposes of this Article III, the following definitions shall apply:

(a)   **"Option"** shall mean rights, options, debentures or warrants to subscribe for, purchase or otherwise acquire Common Shares or Convertible Securities.

(b)   **"Series C Original Issue Date"** shall mean the date on which the first share of Series C Preferred Shares was issued.

(c)   **"Convertible Securities"** shall mean any evidences of indebtedness, shares or other securities directly or indirectly convertible into or exchangeable for Common Shares, but excluding Options.

(d)   **"Additional Common Shares"** shall mean all Common Shares issued (or, pursuant to Subsection 4.4.3 below, deemed to be issued) by the Company after the Series C Original Issue Date, other than (1) the following Common Shares and (2) Common Shares deemed issued pursuant to the following Options and Convertible Securities (clauses (1) and (2), collectively, **"Exempted Securities"**):



(i)   Common Shares, Options or Convertible Securities issued as a dividend or distribution on Preferred Shares;

(ii)   Common Shares, Options or Convertible Securities issued by reason of a dividend, share split, split-up or other distribution on Common Shares that is covered by Subsection 4.5, 4.6, 4.7 or 4.8;

(iii)   Common Shares or Options issued to employees or directors of, or consultants or advisors to  the Company or any of its

9

subsidiaries or affiliates pursuant to a plan, agreement or arrangement;

(iv)    Common Shares or Convertible Securities actually issued upon the exercise of Options or Common Shares actually issued upon the conversion or exchange of Convertible Securities, in each case provided such issuance is pursuant to the terms of such Option or Convertible Security;

(v)    Common Shares, Options or Convertible Securities issued to banks, equipment lessors or other financial institutions, or to real property lessors, pursuant to a debt financing, equipment leasing or real property leasing transaction;

(vi)    Common Shares, Options or Convertible Securities issued to suppliers or third party service providers in connection with the provision of goods or services;

(vii)    Common Shares, Options or Convertible Securities issued pursuant to the acquisition of another Company by the Company whether by merger, stock purchase, exchange of shares, purchase of substantially all of the assets or other reorganization or to a joint venture agreement; and

(viii)    Common Shares, Options or Convertible Securities issued in connection with sponsored research, collaboration, technology license, development, OEM, marketing, endorsement or other similar agreements or strategic partnerships.



4.4.2    No Adjustment of Conversion Price. No adjustment in the applicable Conversion Price shall be made as the result of the issuance or deemed issuance of Additional Common Shares if the Company receives written notice from the Requisite Holders agreeing that no such adjustment shall be made as the result of the issuance or deemed issuance of such Additional Common Shares.

4.4.3    Deemed Issue of Additional Common Shares.

(a)    If the Company at any time or from time to time after the Series C Original Issue Date shall issue any Options or Convertible Securities (excluding

10

Options or Convertible Securities which are themselves Exempted Securities) or shall fix a record date for the determination of holders of any class of securities entitled to receive any such Options or Convertible Securities, then the maximum number of Common Shares (as set forth in the instrument relating thereto, assuming the satisfaction of any conditions to exercisability, convertibility or exchangeability but without regard to any provision contained therein for a subsequent adjustment of such number) issuable upon the exercise of such Options or, in the case of Convertible Securities and Options therefor, the conversion or exchange of such Convertible Securities, shall be deemed to be Additional Common Shares issued as of the time of such issue or, in case such a record date shall have been fixed, as of the close of business on such record date.

(b)    If the terms of any Option or Convertible Security, the issuance of which resulted in an adjustment to the applicable Conversion Price pursuant to the terms of Subsection 4.4.4, are revised as a result of an amendment to such terms or any other adjustment pursuant to the provisions of such Option or Convertible Security (but excluding automatic adjustments to such terms pursuant to anti-dilution or similar provisions of such Option or Convertible Security) to provide for either (1) any increase or decrease in the number of Common Shares issuable upon the exercise, conversion and/or exchange of any such Option or Convertible Security or (2) any increase or decrease in the consideration payable to the Company upon such exercise, conversion and/or exchange, then, effective upon such increase or decrease becoming effective, the applicable Conversion Price computed upon the original issue of such Option or Convertible Security (or upon the occurrence of a record date with respect thereto) shall be readjusted to such applicable Conversion Price as would have obtained had such revised terms been in effect upon the original date of issuance of such Option or Convertible Security. Notwithstanding the foregoing, no readjustment pursuant to this clause (b) shall have the effect of increasing the applicable Conversion Price to an amount which exceeds the lower of (i) the applicable Conversion Price in effect immediately prior to the original adjustment made as a result of the issuance of such Option or Convertible Security, or (ii) the applicable Conversion Price that would have resulted from any issuances of Additional Common Shares (other than deemed issuances of Additional Common Shares as a result of the issuance of such Option or Convertible Security) between the original adjustment date and such readjustment date.

(c)    If the terms of any Option or Convertible Security (excluding Options or Convertible Securities which are themselves Exempted Securities), the issuance of which did not result in an adjustment to the applicable Conversion Price pursuant to the terms of Subsection 4.4.4 (either because the consideration per share (determined pursuant to Subsection 4.4.5) of the Additional Common Shares subject thereto was equal to or greater than the applicable Conversion Price then in effect, or because such Option or Convertible Security was issued before the Series C Original Issue Date), are revised after the Series C Original Issue Date as a result of an amendment to such terms or any other adjustment pursuant to the provisions of such Option or Convertible Security (but excluding automatic adjustments to such terms pursuant to anti-dilution or similar provisions of such Option or Convertible Security) to provide for either (1) any increase in the number of Common Shares issuable upon the exercise, conversion or exchange of any such Option or Convertible Security or (2) any decrease in the consideration payable to the Company upon such exercise, conversion or exchange, then such Option or Convertible Security, as so amended or adjusted, and the Additional Common Shares subject thereto (determined in the manner provided in Subsection 4.4.3(a) shall be deemed to have been issued effective upon such increase or decrease becoming effective.

FINANCIAL SERVICES.
REGULATORY COMMISSION

JAN 18 2023

FILED

(d)     Upon the expiration or termination of any unexercised Option or unconverted or unexchanged Convertible Security (or portion thereof) which resulted (either upon its original issuance or upon a revision of its terms) in an adjustment to the applicable Conversion Price pursuant to the terms of Subsection 4.4.4, the applicable Conversion Price shall be readjusted to such applicable Conversion Price as would have obtained had such Option or Convertible Security (or portion thereof) never been issued.

(e)     If the number of Common Shares issuable upon the exercise, conversion and/or exchange of any Option or Convertible Security, or the consideration payable to the Company upon such exercise, conversion and/or exchange, is calculable at the time such Option or Convertible Security is issued or amended but is subject to adjustment based upon subsequent events, any adjustment to the applicable Conversion Price provided for in this Subsection 4.4.3 shall be effected at the time of such issuance or amendment based on such number of shares or amount of consideration without regard to any provisions for subsequent adjustments (and any subsequent adjustments shall be treated as provided in clauses (b) and (c) of this Subsection 4.4.3). If the number of Common Shares issuable upon the exercise, conversion and/or exchange of any Option or Convertible Security, or the consideration payable to the Company upon such exercise, conversion and/or exchange, cannot be calculated at all at the time such Option or Convertible Security is issued or amended, any adjustment to the applicable Conversion Price that would result under the terms of this Subsection 4.4.3 at the time of such issuance or amendment shall instead be effected at the time such number of shares and/or amount of consideration is first calculable (even if subject to subsequent adjustments), assuming for purposes of calculating such adjustment to the applicable Conversion Price that such issuance or amendment took place at the time such calculation can first be made.

4.4.4     Adjustment of Conversion Price Upon Issuance of Additional Common Shares. In the event the Company shall at any time after the Series C Original Issue Date issue Additional Common Shares (including Additional Common Shares deemed to be issued pursuant to Subsection 4.4.3), without consideration or for a consideration per share less than the applicable Conversion Price in effect immediately prior to such issue, then the applicable Conversion Price shall be reduced, concurrently with such issue, to a price (calculated to the nearest one-hundredth of a cent) determined in accordance with the following formula:

$$CP_2 = CP_1 * (A + B) \div (A + C).$$

For purposes of the foregoing formula, the following definitions shall apply:

(a)     "$CP_2$" shall mean the applicable Conversion Price in effect immediately after such issue of Additional Common Shares

(b)     "$CP_1$" shall mean the applicable Conversion Price in effect immediately prior to such issue of Additional Common Shares;

(c)     "A" shall mean the number of Common Shares outstanding immediately prior to such issue of Additional Common Shares (treating for this purpose as outstanding all Common Shares issuable upon exercise of Options and the conversion of Preferred Shares, in each case, outstanding immediately prior to such issue but excluding any



FINANCIAL SERVICES
REGULATORY COMMISSION

JAN 1 8 2022

FILED

12

Common Shares issuable upon conversion or exchange of any other Convertible Securities then outstanding);

(d)  "B" shall mean the number of Common Shares that would have been issued if such Additional Common Shares had been issued at a price per share equal to $CP_1$ (determined by dividing the aggregate consideration received by the Company in respect of such issue by $CP_1$); and

(e)  "C" shall mean the number of such Additional Common Shares issued in such transaction.

4.4.5  Determination of Consideration. For purposes of this Subsection 4.4, the consideration received by the Company for the issue of any Additional Common Shares shall be computed as follows:

(a)  Cash and Property: Such consideration shall:

(i)  insofar as it consists of cash, be computed at the aggregate amount of cash received by the Company, excluding amounts paid or payable for accrued interest;

(ii)  insofar as it consists of property other than cash, be computed at the fair market value thereof at the time of such issue, as determined in good faith by the Board of Directors of the Company; and



(iii)  in the event Additional Common Shares are issued together with other shares or securities or other assets of the Company for consideration which covers both, be the proportion of such consideration so received, computed as provided in clauses (i) and (ii) above, as determined in good faith by the Board of Directors of the Company .

(b)  Options and Convertible Securities. The consideration per share received by the Company for Additional Common Shares deemed to have been issued pursuant to Subsection 4.4.3, relating to Options and Convertible Securities, shall be determined by dividing:

(i)  The total amount, if any, received or receivable by the Company as consideration for the issue of such Options or Convertible Securities, plus the minimum aggregate amount of additional consideration (as set forth in the instruments relating thereto,

13

without regard to any provision contained therein for a subsequent adjustment of such consideration) payable to the Company upon the exercise of such Options or the conversion or exchange of such Convertible Securities, or in the case of Options for Convertible Securities, the exercise of such Options for Convertible Securities and the conversion or exchange of such Convertible Securities, by

(ii)     the maximum number of Common Shares (as set forth in the instruments relating thereto, without regard to any provision contained therein for a subsequent adjustment of such number) issuable upon the exercise of such Options or the conversion or exchange of such Convertible Securities, or in the case of Options for Convertible Securities, the exercise of such Options for Convertible Securities and the conversion or exchange of such Convertible Securities.

FINANCIAL SERVICES
REGULATORY COMMISSION

JAN 1 8 2022

FILED

4.4.6    Multiple Closing Dates. In the event the Company shall issue on more than one date Additional Common Shares that are a part of one transaction or a series of related transactions and that would result in an adjustment to the applicable Conversion Price pursuant to the terms of Subsection 4.4.4, then, upon the final such issuance, the applicable Conversion Price shall be readjusted to give effect to all such issuances as if they occurred on the date of the first such issuance (and without giving effect to any additional adjustments as a result of any such subsequent issuances within such period).

4.5    Adjustment for Share Splits and Combinations. If the Company shall at any time or from time to time after the Series C Original Issue Date effect a subdivision of the outstanding Common Shares, the applicable Conversion Price in effect immediately before that subdivision shall be proportionately decreased so that the number of Common Shares issuable on conversion of each share of such series shall be increased in proportion to such increase in the aggregate number of Common Shares outstanding. If the Company shall at any time or from time to time after the Series C Original Issue Date combine the outstanding Common Shares, the applicable Conversion Price in effect immediately before the combination shall be proportionately increased so that the number of Common Shares issuable on conversion of each share of such series shall be decreased in proportion to such decrease in the aggregate number of Common Shares outstanding. Any adjustment under this subsection shall become effective at the close of business on the date the subdivision or combination becomes effective.

4.6    Adjustment for Certain Dividends and Distributions. In the event the Company at any time or from time to time after the Series C Original Issue Date shall make or issue, or fix a record date for the determination of holders of Common Shares entitled to receive,

14

a dividend or other distribution payable on the Common Shares in additional Common Shares, then and in each such event the applicable Conversion Price in effect immediately before such event shall be decreased as of the time of such issuance or, in the event such a record date shall have been fixed, as of the close of business on such record date, by multiplying the applicable Conversion Price then in effect by a fraction:

(1)    the numerator of which shall be the total number of Common Shares issued and outstanding immediately prior to the time of such issuance or the close of business on such record date, and

(2)    the denominator of which shall be the total number of Common Shares issued and outstanding immediately prior to the time of such issuance or the close of business on such record date plus the number of Common Shares issuable in payment of such dividend or distribution.

Notwithstanding the foregoing (a) if such record date shall have been fixed and such dividend is not fully paid or if such distribution is not fully made on the date fixed therefor, the applicable Conversion Price shall be recomputed accordingly as of the close of business on such record date and thereafter the applicable Conversion Price shall be adjusted pursuant to this subsection as of the time of actual payment of such dividends or distributions; and (b) that no such adjustment shall be made if the holders of Preferred Shares simultaneously receive a dividend or other distribution of Common Shares in a number equal to the number of Common Shares as they would have received if all outstanding Preferred Shares had been converted into Common Shares on the date of such event.

4.7    Adjustments for Other Dividends and Distributions. In the event the Company at any time or from time to time after the Series C Original Issue Date shall make or issue, or fix a record date for the determination of holders of Common Shares entitled to receive, a dividend or other distribution payable in securities of the Company (other than a distribution of Common Shares in respect of outstanding Common Shares) or in other property and the provisions of Section 1 do not apply to such dividend or distribution, then and in each such event the holders of Preferred Shares shall receive, simultaneously with the distribution to the holders of Common Shares, a dividend or other distribution of such securities or other property in an amount equal to the amount of such securities or other property as they would have received if all outstanding Preferred Shares had been converted into Common Shares on the date of such event.

4.8    Adjustment for Merger or Reorganization, etc. Subject to the provisions of Subsection 2.3, if there shall occur any reorganization, recapitalization, reclassification, consolidation or merger involving the Company in which the Common Shares (but not the Preferred Shares) is converted into or exchanged for securities, cash or other property (other than a transaction covered by Subsections 4.4, 4.6 or 4.7), then, following any such reorganization, recapitalization, reclassification, consolidation or merger, each share of Preferred Shares shall thereafter be convertible in lieu of the Common Shares into which it was convertible prior to such event into the kind and amount of securities, cash or other property which a holder of the number of Common Shares of the Company issuable upon conversion of one share of Preferred Shares immediately prior to such reorganization, recapitalization, reclassification, consolidation or merger would have been entitled to receive pursuant to such transaction; and, in

15



JAN 1 8 2022

FILED

such case, appropriate adjustment (as determined in good faith by the Board of Directors of the Company ) shall be made in the application of the provisions in this Section 4 with respect to the rights and interests thereafter of the holders of the Preferred Shares, to the end that the provisions set forth in this Section 4 (including provisions with respect to changes in and other adjustments of the applicable Conversion Price) shall thereafter be applicable, as nearly as reasonably may be, in relation to any securities or other property thereafter deliverable upon the conversion of the Preferred Shares. For the avoidance of doubt, nothing in this Subsection 4.8 shall be construed as preventing the holders of Preferred Shares from exercising any dissenters rights to which they are otherwise entitled under the Companies Act, nor shall this Subsection 4.8 be deemed conclusive evidence of the fair value of the Preferred Shares in any such proceeding.

4.9    Certificate as to Adjustments. Upon the occurrence of each adjustment or readjustment of the applicable Conversion Price pursuant to this Section 4, the Company at its expense shall, as promptly as reasonably practicable but in any event not later than ten (10) days thereafter, compute such adjustment or readjustment in accordance with the terms hereof and furnish to each holder of Preferred Shares a certificate setting forth such adjustment or readjustment (including the kind and amount of securities, cash or other property into which the Preferred Shares is convertible) and showing in detail the facts upon which such adjustment or readjustment is based. The Company shall, as promptly as reasonably practicable after the written request at any time of any holder of Preferred Shares (but in any event not later than ten (10) days thereafter), furnish or cause to be furnished to such holder a certificate setting forth (i) the applicable Conversion Price then in effect, and (ii) the number of Common Shares and the amount, if any, of other securities, cash or property which then would be received upon the conversion of Preferred Shares.

4.10    Notice of Record Date. In the event:

(a)    the Company shall take a record of the holders of its Common Shares (or other capital equity or securities at the time issuable upon conversion of the Preferred Shares) for the purpose of entitling or enabling them to receive any dividend or other distribution, or to receive any right to subscribe for or purchase any shares of any class or any other securities, or to receive any other security; or

(b)    of any capital reorganization of the Company, any reclassification of the Common Shares of the Company, or any Deemed Liquidation Event; or

(c)    of the voluntary or involuntary liquidation or winding-up of the Company,

then, and in each such case, the Company will send or cause to be sent to the holders of the Preferred Shares a notice specifying, as the case may be, (i) the record date for such dividend, distribution or right, and the amount and character of such dividend, distribution or right, or (ii) the effective date on which such reorganization, reclassification, consolidation, merger, transfer, liquidation or winding-up is proposed to take place, and the time, if any is to be fixed, as of which the holders of record of Common Shares (or such other capital equity or securities) at the time issuable upon the conversion of the Preferred Shares) shall be entitled to exchange their Common Shares (or such other capital equity or securities) for securities or other property deliverable upon

16

such reorganization, reclassification, consolidation, merger, transfer, liquidation or winding-up, and the amount per share and character of such exchange applicable to the Preferred Shares and the Common Shares. Such notice shall be sent at least ten (10) days prior to the record date or effective date for the event specified in such notice.

            5.     Mandatory Conversion.

            5.1     Trigger Events. Upon either (a) a Qualified IPO (as defined below), (b) a Qualified SPAC Transaction (as defined below) or (c) a Qualified Direct Listing Transaction (as defined below) or (d) the date and time, or the occurrence of an event, specified by vote or written consent of the Requisite Holders (the time of such closing or the date and time specified or the time of the event specified in such vote or written consent is referred to herein as the **"Mandatory Conversion Time"**), then (i) all outstanding Preferred Shares shall automatically be converted into Common Shares, at the then effective conversion rate as calculated pursuant to Subsection 4.1.1 and (ii) such shares may not be reissued by the Company.

            5.2     For purposes of this Section 5, the following definitions shall apply:

            5.2.1     A **"Qualified IPO"** means the closing of a firm commitment underwritten public offering with a price of at least 150% of the Series C Preferred Share Conversion Price and gross proceeds to the Company of not less than $400 million.

            5.2.2     A **"Qualified SPAC Transaction"** means a transaction or series of transactions which constitute the acquisition of the Company by, or merger of the Company with, a special purpose acquisition company or a new holding company (each, a **"SPAC"**) and which results in the surviving entity being listed on NASDAQ or other internationally recognized stock exchange (the **"Applicable Exchange"** and the transaction, the **"SPAC Transaction"**) provided that either: (i) the proposed SPAC Transaction ascribes a per share equity valuation of the Common Shares immediately prior to the SPAC Transaction (assuming conversion of all securities convertible into Common Shares immediately prior to the SPAC Transaction and exercise of all issued and outstanding options to purchase Common Shares) that is at least equal to 110% of the Conversion Price of the Series C Preferred Shares; or (ii) the Company's Common Shares has an average daily closing price on the Applicable Exchange at the end of any calendar month of at least 150% of the Series C Preferred Share Conversion Price with respect to all trading days occurring within such calendar month.

            5.2.3     A **"Qualified Direct Listing Transaction"** means the Company's voluntary registration of its common stock with the SEC and listing the Applicable Exchange, provided that the Company's Common Shares has an average daily closing price on the Applicable Exchange at the end of any calendar month of at least 150% of the Series C Preferred Share Conversion Price with respect to all trading days occurring within such calendar month.

            5.3     Procedural Requirements. All holders of record of Preferred Shares shall be sent written notice of the Mandatory Conversion Time and the place designated for mandatory conversion of all such Preferred Shares pursuant to this Section 5. Such notice need not be sent in advance of the occurrence of the Mandatory Conversion Time. Upon receipt of such notice, each holder of Preferred Shares in certificated form shall surrender his, her or its certificate

FINANCIAL SERVICES
REGULATORY COMMISSION
JAN 1 8 2022

FILED

17

or certificates for all such shares (or, if such holder alleges that such certificate has been lost, stolen or destroyed, a lost certificate affidavit and agreement reasonably acceptable to the Company to indemnify the Company against any claim that may be made against the Company on account of the alleged loss, theft or destruction of such certificate) to the Company at the place designated in such notice. If so required by the Company, any certificates surrendered for conversion shall be endorsed or accompanied by written instrument or instruments of transfer, in form satisfactory to the Company, duly executed by the registered holder or by his, her or its attorney duly authorized in writing. All rights with respect to the Preferred Shares converted pursuant to Subsection 5.1, including the rights, if any, to receive notices and vote (other than as a holder of Common Shares), will terminate at the Mandatory Conversion Time (notwithstanding the failure of the holder or holders thereof to surrender any certificates at or prior to such time), except only the rights of the holders thereof, upon surrender of any certificate or certificates of such holders (or lost certificate affidavit and agreement) therefor, to receive the items provided for in the next sentence of this Subsection 5.2. As soon as practicable after the Mandatory Conversion Time and, if applicable, the surrender of any certificate or certificates (or lost certificate affidavit and agreement) for Preferred Shares, the Company shall (a) effect a compulsory repurchase of all outstanding Preferred Shares and the issuance of the number of full Common Shares issuable upon such conversion in accordance with the provisions hereof through updating, or causing to be updated, the register of members of the Company, (b) issue and deliver to such holder, or to his, her or its nominees, a certificate or certificates for the number of full Common Shares issuable on such conversion in accordance with the provisions hereof and (c) pay cash as provided in Subsection 4.2 in lieu of any fraction of a share of Common Shares otherwise issuable upon such conversion and the payment of any declared but unpaid dividends on the Preferred Shares converted.

6.    Non-Redeemable Preferred Shares. The Preferred Shares are not redeemable at the option of any holder thereof.

7.    Waiver. Any of the rights, powers, preferences and other terms of the Preferred Shares set forth herein may be waived on behalf of all holders of Preferred Shares by the affirmative written consent or vote of the holders of at least a majority of the Preferred Shares then outstanding. Notwithstanding the foregoing, any rights, powers, preferences and other terms specific and unique to (i) Series B Preferred Shares may not be waived without the affirmative written consent or vote of the holders of at least a majority of the outstanding Series B Preferred Shares, (ii) Series B-1 Preferred Shares may not be waived without the affirmative written consent or vote of the holders of at least a majority of the outstanding Series B-1 Preferred Shares and (iii) Series C Preferred Shares may not be waived without the affirmative written consent or vote of the holders of at least a majority of the outstanding Series C Preferred Shares.

8.    Notices. Any notice required or permitted by the provisions of this Article III to be given to a holder of Preferred Shares shall be mailed, postage prepaid, to the post office address last shown on the records of the Company, or given by electronic communication, and shall be deemed sent upon such mailing or electronic transmission.

<div style="text-align:center">

**ARTICLE IV**

**BOARD OF DIRECTORS**

</div>



FINANCIAL SERVICES
REGULATORY COMMISSION

JAN 1 8 2022

FILED

18

The powers of the Company shall be exercised by the Board of Directors of the Company, which shall be empowered to name one or more Managing Directors. Subject to any restrictions in the appointing resolution, an act of a Managing Director shall bind the Company as if said act had been approved by the Board of Directors. Only a member of the Board of Directors shall serve as a Managing Director. The Company shall have a minimum of 1 and a maximum of 11 directors.

## ARTICLE V

**CORPORATE PURPOSE**

The objects for which the Company is established are:

a) Software Platform; and all business activities permitted by the laws of the State of Antigua and Barbuda other than International Banking, Trust and Insurance, Betting and Bookmaking or any activity which requires a Licence under the International Business Corporations Act.

b) To acquire and deal with any property, real or personal, to erect any buildings, and generally to do all acts and things which, in the opinion of the Company or the Directors, may be conveniently or profitably, or usefully acquired and dealt with, carried on, erected or done by the Company in connection with said property.

c) To generally have and exercise all powers, rights and privileges necessary and incident to carrying out properly the objects herein mentioned.

## ARTICLE VI

**EXISTENCE**

The Company shall have perpetual existence unless sooner dissolved in accordance with the laws of the Antigua and Barbuda. The date on which corporate existence shall begin is the date on which these Articles of Incorporation are filed with the Director of International Business Corporations of Antigua and Barbuda.

## ARTICLE VII

**LIABILITY OF SHAREHOLDERS**

The liability of a shareholder is limited to the amount, if any, unpaid on the shares held or subscribed to by said shareholder.

## ARTICLE VIII

**INDEMNIFICATIONS**

The Company shall indemnify any and all of its Directors, officers, employees or agents or former Directors, officers, employees or agents or any person or persons who may have served at its request as a Director, officer, employee or agent of another corporation, partnerships, joint venture, trust or other enterprise in which it owns capital shares or of which it is a creditor, to the full extent permitted by law. Said indemnification shall include, but not limited to, the expenses, including

19

REGULATORY COMMISSION

JAN 1 8 2022

FILED

the cost of any judgements, fines settlements and counsel's fees, actually and necessarily paid or incurred in connection with any action, suit or proceeding, whether civil, criminal, administrative or investigative, and any appeals thereof, to which any such person or his legal representative may be a party or may be threatened to be made a party by reason of his being or having been a Director, officer, employee or agent as herein provided. The foregoing right of indemnification shall not be exclusive of any rights to which any Director, officer, employee or agent may be entitled as a matter of law or which he may be lawfully granted.

## ARTICLE IX

### CHARTER CONTINUANCE

The Company is authorised to transfer its charter to any jurisdiction, which permits continuation of a foreign corporation.

### SECURITIES

No Securities of the Company will be distributed to the public in the Antigua and Barbuda in contravention of Section 365 of the International Business Corporations Act, 1982.

## ARTICLE XI

### INCORPORATORS

The name and address of the Company's incorporators are:

**ARTHUR G. B. THOMAS**
Clarkes Hill
St. John's
Antigua

**LISA M. JOHN-WESTE**
English Harbour
St. Paul's
Antigua

**REGISTERED**

Dated this 20th Day of January, 2022 at St. John's, Antigua

20



# **Tab 3**

* * *

ANTIGUA AND BARBUDA

INTERNATIONAL BUSINESS CORPORATIONS ACT CAP. 222

GENERAL BY-LAW

As last amended on March 19, 2019

TABLE OF CONTENTS

| | Chapter |
|---|---|
| INTERPRETATION | 1 |
| REGISTERED OFFICE | 2 |
| SEAL | 3 |
| DIRECTORS | 4 |
| BORROWING POWERS OF DIRECTORS | 5 |
| MEETINGS OF DIRECTORS | 6 |
| REMUNERATION OF DIRECTORS | 7 |
| SUBMISSION OF CONTRACTS OF SHAREHOLDERS | 8 |
| FOR THE PROTECTION OF DIRECTORS AND OFFICERS | 9 |
| INDEMNITIES TO DIRECTORS AND OFFICERS | 10 |
| OFFICERS | 11 |
| SHAREHOLDERS' MEETINGS | 12 |
| SHARES | 13 |
| TRANSFERS OF SHARES AND DEBENTURES | 14 |
| DIVIDENDS | 15 |

FINANCIAL SERVICES
REGULATORY COMMISSION

JAN 1 8 2022

FILED

21

| | |
|---|---|
| VOTING IN OTHER COMPANIES | 16 |
| INFORMATION AVAILABLE TO SHAREHOLDERS | 17 |
| NOTICES | 18 |
| CHEQUES, DRAFTS AND NOTES | 19 |
| EXECUTION OF INSTRUMENTS | 20 |
| SIGNATURES | 21 |
| FINANCIAL YEAR | 22 |
| INITIAL DIRECTORS | 23 |

FINANCIAL SERVICES
REGULATORY COMMISSION

JAN 1 8 2022

FILED

## ANTIGUA AND BARBUDA
## INTERNATIONAL BUSINESS CORPORATIONS ACT Cap. 222

### A COMPANY LIMITED BY SHARES
### GENERAL BY-LAW (NO. 1)

A by-law relating generally to the conduct of the affairs of **FTX TRADING LTD.** (hereinafter called the "Company")

**BE IT ENACTED** as the general by-law of the Company as follows:

1.    **INTERPRETATION**

1.1.    In this by-law and all other by-laws of the Company, unless the context otherwise requires:

(a)    "Act" means the International Business Corporations Act 1982 as from time to time amended and every statute substituted therefor and, in the case of such substitution, any references in the by-laws of the Company to provisions of the Act shall be read as references to the substituted provisions therefor in the new statute or statutes;

(b)    "Regulations" means any Regulations made under the Act, and every regulation substituted therefor and, in the case of such substitution, any references in the by-laws of the Company to provisions of the Regulations shall be read as references to the substituted provisions therefor in the new regulations;

(c)    "By-Laws" means any by-law of the Company from time to time in force;

(d)    all terms contained in the by-laws and defined in the Act or the Regulations shall have the meanings given to such terms in the Act or the Regulations; and

(e)    the singular includes the plural and the plural includes the singular; the masculine gender includes the feminine and neuter genders; the word "person" includes bodies corporate , companies, partnerships, syndicates, trusts and any association of persons; and the word "individual" means a natural person.

## 2.   **REGISTERED OFFICE**
2.1   The registered office of the company shall be in Antigua and Barbuda at such address as the directors may fix from time to time by resolution.

## 3.   **SEAL**
3.1   The common seal of the Company shall be such as the directors may by resolution from time to time adopt.

## 4.   **DIRECTORS**
4.1   Powers: Subject to any unanimous shareholder agreement, the business and affairs of the Company shall be managed by the directors
4.2   Number: There shall be not less than 1 and no more than 11 directors.

4.3   Election: Directors shall be elected by the shareholders on a show of hands unless a ballot is demanded in which case such election shall be by ballot.

4.4   Tenure: Unless his tenure is sooner determined, a director shall hold office from the date on which he is elected or appointed until his resignation, death or removal, or the close of the annual meeting of the shareholders next following but he shall be eligible for re-election if qualified.

4.4.1.  A director who is also an officer shall continue to be a director until he ceases to be an officer.

4.4.2.  A director shall cease to be a director:
   (a)   if he becomes bankrupt or compounds with his creditors or is declared insolvent;
   (b)   if he is found to be of unsound mind; or
   (c)   if by notice in writing to the Company he resigns his office and any such resignation shall be effective at the time it is sent to the Company or at the time specified in the notice whichever is later.

4.4.3   The shareholders of the Company may, by ordinary resolution passed at a special meeting of the shareholders, remove any director from office and a vacancy created by the removal of a director may be filled at the meeting of the shareholders at which the director is removed.

4.5   Committee of Directors: The directors may appoint from among their number a committee of directors and subject to section 80 of the Act may delegate to such committee any of the powers of the directors.

## 5.   **BORROWING POWERS OF DIRECTORS**
5.1   The directors may from time to time:

FINANCIAL SERVICES REGULATORY COMMISSION

JAN 1 8 2022

FILED

23

(a)   borrow money upon the credit of the Company;

(b)   issue, reissue, sell or pledge debentures of the Company

(c)   subject to section 53 of the Act, give a guarantee on behalf of the Company to secure performance of an obligation of any person; and

(d)   mortgage, charge, pledge or otherwise create a security interest in all or any property of the Company, owned or subsequently acquired, to secure any obligation of the Company.

5.2.   The directors may from time to time by resolution delegate to any officer of the Company all or any of the powers conferred on the directors by paragraph 5.1 hereof to the full extent thereof or such lesser extent as the directors may in any such resolution provide.

5.3.   The powers conferred by paragraph 5.1 hereof shall be in supplement of and not in substitution for any powers to borrow money for the purposes of the Company possessed by its directors or officers independently of a borrowing by-law.

## 6.   **MEETINGS OF DIRECTORS**

6.1   Place of Meeting: Meeting of the directors and of any committee of the directors may be held within, or outside Antigua and Barbuda, at a place to be determined by the Board of Directors.

6.2   Notice: A meeting of the directors may be convened at any time by any director or the Secretary, when directed or authorised by any director. Subject to subsection 76 (1) of the Act the notice of any such meeting need not specify the purpose of or the business to be transacted at the meeting. Notice of any such meeting shall be served in the manner specified in paragraph 18.1 hereof not less than two days (exclusive of the day on which the notice is delivered or sent but inclusive of the day for which notice is given) before the meeting is to take place. A director may in any manner waive notice of a meeting of the directors and attendance of a director at a meeting of the directors shall constitute a waiver of notice of the meeting except where a director attends a meeting for the express purpose of objecting to the transaction of any business on the grounds that the meeting is not lawfully called.

6.2.1   It shall not be necessary to give notice of a meeting of the directors to a newly elected or appointed director for meeting held immediately following the election of directors by the shareholders or the appointment to fill a vacancy among the directors.

6.3   Quorum: The presence of a majority of the then current directors shall constitute a quorum for the transaction of business and, notwithstanding any vacancy among the directors; a quorum may exercise all the powers of the directors. No business shall be transacted at a meeting of directors unless a quorum is present. If a quorum shall fail to attend any meeting, a majority of those present may adjourn the meeting to another place, date or time without further notice thereof.



FINANCIAL SERVICES
REGULATORY COMMISSION

**JAN 1 8 2022**

FILED

24

6.3.1 A director may, if all the directors consent, participate in a meeting of directors or of any committee of the directors by means of such telephone or other communications facilities as permit all persons participating in the meeting to hear each other and a director participating in such a meeting by such means is deemed to be present at that meeting.

6.4 Voting: Questions arising at any meeting of the directors shall be decided by a majority of votes. In case of an equality of votes the chairman of the meeting in addition to his original vote shall have a second or casting vote.

6.5 Resolution in lieu of meeting: Notwithstanding any of the foregoing provisions of this by-law a resolution in writing signed by all the directors entitled to vote on that resolution at a meeting of the directors or any committee of the directors is as valid as if it had been passed at a meeting of the directors or any committee of the directors.

## 7. REMUNERATION OF DIRECTORS

7.1 The remuneration to be paid to the directors shall be such as the directors may from time to time determine and such remuneration may be in addition to the salary paid to any officer or employee of the Company who is also a director. The directors may also award special remuneration to any director undertaking any special services on the Company's behalf other than the routine work ordinarily required of a director and the confirmation of any such resolution or resolutions by the shareholders shall not be required. The directors shall also be entitled to be paid their travelling and other expenses properly incurred by them in connection with the affairs of the Company.

## 8. SUBMISSION OF CONTRACTS OR TRANSACTIONS TO SHAREHOLDERS FOR APPROVAL

8.1 The directors in their discretion may submit any contract, act or transaction for approval or ratification at any annual meeting of the shareholders or at any special meeting of the shareholders called for the purpose of considering the same and, subject to the provisions of section 89 of the Act, any such contract, act or transaction that is approved or ratified or confirmed by a resolution passed by a majority of the votes cast at any such meeting (unless any different or additional requirement is imposed by the Act or by the Company's articles or any other by-law) shall be as valid and as binding upon the Company and upon all the shareholders as though it had been approved, ratified or confirmed by every shareholder of the Company.

FINANCIAL SERVICES REGULATORY COMMISSION
JAN 1 8 2022

## 9. FOR THE PROTECTION OF DIRECTORS AND OFFICERS

9.1 No director or officer of the Company shall be liable to the Company for:-

(a) the acts, receipts, neglects or defaults of any other director or employee or for joining in any receipt or act for conformity;

(b) any loss, damage or expense incurred by the Company through the insufficiency or deficiency of title to any property acquired by the Company or for or on behalf of the Company;

FILED

(c)     the insufficiency or deficiency of any security in or upon which any of the monies of or belonging to the Company shall be placed out or invested;

(d)     any loss or damage arising from the bankruptcy, insolvency or tortuous act of any person, including any person with whom any monies securities or effects shall be lodged or deposited;

(e)     any loss, conversion, misapplication or misappropriation of or any damage resulting from any dealings with any monies, securities or other assets belonging to the Company;

(f)     any other loss, damage or misfortune whatever which may happen in the execution of the duties of his respective office or trust or in relation thereto; unless the same happens by or through his failure to exercise the powers and to discharge the duties of his office honestly and in good faith with a view to the best interests of the Company and in connection therewith to exercise the care, diligence and skill that a reasonably prudent person would exercise in comparable circumstances.

9.2     Nothing herein contained shall relieve a director or officer from the duty to act in accordance with the Act or regulations made thereunder or relieve him from liability for a breach thereof.

9.2.1   The directors for the time being of the Company shall not be under any duty or responsibility in respect of any contract, act or transaction whether or not made, done or entered into in the name or behalf of the Company, except such as are submitted to and authorised or approved by the directors.

9.2.2   If any director or officer of the Company is employed by or performs services for the Company otherwise than as a director or officer or is a member of a firm or a shareholder, director or officer of a body corporate which is employed by or performs services for the Company, the fact of his being a shareholder, director of officer of the Company shall not disentitle such director or officer or such firm or body corporate, as the case may be from receiving proper remuneration for such services.

## 10.    **INDEMNITIES TO DIRECTORS AND OFFICERS**

10.1    Subject to section 97 of the Act, except in respect of an action by or on behalf of the Company to obtain a judgement in its favour, the Company shall indemnify a director or officer of the Company, a former director or officer of the Company or a person who acts or acted at the Company's request as a director or officer of a body corporate of which the Company is or was a shareholder or creditor, and his personal representatives, against all costs, charges and expenses, including an amount paid to settle an action or satisfy a judgement, reasonably incurred by him in respect of any civil, criminal or administrative action or proceeding to which he is made party by reason of being or having been a director or officer of such company, if:

(a)     he acted honestly and in good faith with a view to the best interests of the Company; and

REGULATORY COMMISSION

JAN 1 8 2022

FILED

26

(b)    in the case of a criminal or administrative action or proceeding that is enforced by a monetary penalty, he had reasonable grounds for believing that his conduct was lawful.

## 11.    **OFFICERS**

11.1    Appointment: The directors shall as often as may be required appoint a Secretary and, if deemed advisable, may as often as may be required appoint any or all of the following officers: a Chairman, a Deputy Chairman, a President, one or more Vice-Presidents, a Treasurer, one or more Assistant Secretaries or one or more Assistant Treasurers. A director may be appointed to any office of the Company but none of the officers except the Chairman, the Deputy Chairman, the President and Vice-President need be a director. Two or more of the aforesaid offices may be held by the same person. In case and whenever the same person holds the offices of Secretary and Treasurer he may but need not be known as the Secretary-Treasurer. The directors may from time to time appoint such other officers and agents as they deem necessary who shall have such authority and shall perform such duties as may from time to time be prescribed by the directors.

11.2    Remuneration: The remuneration of all officers appointed by the directors shall be determined from time to time by resolution of the directors. The fact that any officer or employee is a director or shareholder of the Company shall not disqualify him from receiving such remuneration as may be determined.

11.3    Powers and Duties: All officers shall sign such contracts, documents or instruments in writing as require their respective signatures and shall respectively have and perform all powers and duties incident to their respective offices and such other powers and duties respectively as may from time to time be assigned to them by the directors.

11.4    Delegation: In case of the absence or inability to act of any officer of the Company or for any other reason that the directors may deem sufficient the directors may delegate all or any of the powers of such officer to any other officer or to any director.

11.5    Chairman: A chairman shall, when present, preside at all meetings of the directors, and any committee of the directors or the shareholders.

11.6    Deputy Chairman: If the Chairman is absent or is unable or refuses to act, the Deputy Chairman (if any) shall, when present, preside at all meetings of the directors, and any committee of the directors, or the shareholders.

11.7    President: A President shall be the Chief Executive Officer, Managing Director, of the Company and shall exercise such powers and have such authority as may be delegated to him by the directors in accordance with the provisions of section 80 of the Act. He shall be vested with and may exercise all the Powers and shall perform all the duties of a Chairman and Deputy Chairman if none be appointed or if the Chairman and the Deputy Chairman are absent or are unable or refuse to act.

FINANCIAL SERVICES
REGULATORY COMMISSION

JAN 1 8 2022

FILED

27

11.8 Vice-President: A Vice President or, if more than one, the Vice-Presidents, in of order seniority, shall be vested with all the powers and shall perform all the duties of the President in the absence or inability or refusal to act of the President.

11.9 Secretary: The Secretary shall give or cause to be given notices for all meetings of the directors, any committee of the directors and the shareholders when directed to do so and shall have charge of the minute books and seal of the Company and, subject to the provisions of paragraph 14.1 hereof, of the records (other than accounting records) referred to in section 130 of the Act.

11.10 Treasurer: Subject to the provisions of any resolution of the directors, a Treasurer shall have the care and custody of all the funds and securities of the Company and shall deposit the same in the name of the Company in such bank or banks or with such other depository or depositories as the directors may direct. He shall keep or cause to be kept the accounting records referred to in section 132 of the Act. He may be required to give such bond for the faithful performance of his duties as the directors in their uncontrolled discretion may require but no director shall be liable for failure to require any such bond or for the insufficiency of any such bond or for any loss by reason of the failure of the Company to receive any indemnity thereby provided.

11.11 Assistant Secretary and Assistant Treasurer: The Assistant Secretary or, if more than one, the Assistant Secretaries in order of seniority, and the Assistant Treasurer or, if more than one, the Assistant Treasurers in order of seniority, shall respectively perform all the duties of the Secretary and the Treasurer, respectively, in the absence or inability or refusal to act of the Secretary or the Treasurer, as the case may be.

11.12 General Manager or Manager: The directors may from time to time appoint one or more General Manager or Managers and may delegate to him or them full power to manage and direct the business and affairs of the Company (except such matters and duties as by law must be transacted or performed by the directors or by the shareholders) and to employ and discharge agents and employees of the Company or may delegate to him or them any lesser authority. A General Manager or Manager shall conform to all lawful orders given to him by the directors of the Company and shall at all reasonable times give to the directors or any of them all information they may require regarding the affairs of the Company. Any agent or employee appointed by the General Manager or Manager may be discharged by the directors.

11.13 Vacancies: If the office of any officer of the Company becomes vacant by reason of death, resignation, disqualification or otherwise, the directors by resolution shall, in the case of the Secretary, and may, in the case of any office, appoint a person to fill such vacancy.

## 12. SHAREHOLDERS' MEETINGS

12.1 Annual Meeting: Subject to the provisions of section 102 of the Act, the annual meeting of the shareholders shall be held on such day in each year and at such time and place as to be determined by the directors.



FINANCIAL SERVICES
REGULATORY COMMISSION

JAN 1 8 2022

FILED

28

12.2 Special Meetings: Special meetings of the shareholders may be convened by order of the Chairman, the Deputy Chairman, the President, Vice-President or by the directors at any date and time and at any place within Antigua and Barbuda or, if all the shareholders entitled to vote at such meeting so agree, outside the Antigua and Barbuda.

12.2.1 The directors shall on the requisition of the holders of not less than five percent of the issued shares of the Company that carry a right to vote at the meeting requisitioned, forthwith convene a meeting of shareholders, and in the case of such requisition the following provisions shall have effect:

(1)     The requisition must state purposes of the meeting and must be signed by the requisitionist and deposited at the Registered Office, and may consist of several documents in like form each signed by one or more of the requisitionists.

(2)     If the directors do not, within twenty-one days from the date of the requisition being so deposited, proceed to convene a meeting, the requisitionists or any of them may themselves convene the meeting, but any meeting so convened shall not be held after three months from the date of such deposit.

(3)     Unless subsection (3) of section 120 of the Act applies, the directors shall be deemed not to have duly convened the meeting if they do not give such notice as is required by the Act within fourteen days from the deposit of the requisition.

(4)     Any meeting convened under this paragraph by the requisitions shall be called as nearly as possible in the manner in which meetings are to be called pursuant to the by-laws and Division E of the Act.

(5)     A requisition by joint holders of shares must be signed by all such holders.

12.3 Notice: A notice stating the day, hour and place of meeting shall be given by serving such notice on each shareholder entitled to vote at such meeting, on each director and on the auditor of the Company in the manner specified in paragraph 18.1 hereof, not less than fifteen days or more than sixty days before the date of the meeting.

12.4 Waiver of Notice: A shareholder and any other person entitled to attend a meeting of shareholders may in any manner waive notice of a meeting of shareholders and attendance of any such person at a meeting of shareholders shall constitute a waiver of notice of the meeting except where such person attends a meeting for the express purpose of objecting to the transaction of any business on the grounds that the meeting is not lawfully called.

12.5 Omission of Notice: The accidental omission to give notice at any meeting or any irregularity in the notice of any meeting or the non-receipt of any notice by any shareholder, director or the auditor of the Company shall not invalidate any resolution passed or any proceedings taken at any meeting of the shareholders.

12.6 Votes: Every question submitted to any meeting of shareholders shall be decided in the first instance by a show of hands unless a person entitled to vote at the meeting has demanded a ballot and, if the articles so provide, in the case of an equality of votes the Chairman of the meeting shall on a ballot have a casting vote in addition to any votes to which he may be otherwise entitled.

29

FINANCIAL SERVICES
REGULATORY COMMISSION

JAN 1 8 2022

FILED

12.6.1. At every meeting at which he is entitled to vote, every shareholder, proxy holder or individual authorised to represent a shareholder who is present in person shall have one vote on a show of hands. Upon a ballot at which he is entitled to vote, every shareholder, proxy holder or individual authorised to represent a shareholder shall, subject to the articles, have one vote for every share held by the shareholder.

12.6.2 At any meeting unless a ballot is demanded, a declaration by the Chairman of the meeting that a resolution has been carried or carried unanimously or by a particular majority or lost or not carried by a particular majority shall be conclusive evidence of the fact.

12.6.3 When the Chairman, the Deputy Chairman, the President and the Vice-President are absent, the persons who are present and entitled to vote shall choose another director as Chairman of the meeting; but if no director is present or all the directors present decline to take the chair, the persons who are present and entitled to vote shall choose one of their number to be Chairman.

12.6.4 A ballot, either before or after any vote by a show of hands, may be demanded by any person entitled to vote at the meeting. If at any meeting a ballot is demanded on the election of a Chairman or on the question of adjournment it shall be taken forthwith without adjournment. If at any meeting a ballot is demanded on any other question or as to the election of directors, the vote shall be taken by ballot in such manner and either at once, later in the meeting or after adjournment as the Chairman of the meeting directs. The result of a ballot shall be deemed to be the resolution of the meeting at which the ballot was demanded. A demand for a ballot may be withdrawn.

12.6.5 If two or more persons hold shares jointly, one of those holders present at a meeting of shareholders may, in the absence of the other, vote the shares; but if two or more of those persons who are present, in person or by proxy vote, they must vote as one on the shares jointly held by them.

12.7 Proxies: Votes at meetings of shareholders may be given either personally or by proxy or, in the case of a shareholder who is a body corporate or association, by an individual authorised by a resolution of the directors or governing body of that body corporate or association to represent it at meetings of shareholders of the Company.

12.7.1 A proxy shall be executed by the shareholder or his attorney-in-fact authorised in writing and shall not be valid after the expiration of eleven months from the date thereof unless otherwise provided in the proxy.

12.7.2 A person appointed by proxy need not be a shareholder.

12.7.3 Subject to the provisions of sections 13-15 inclusive of the Regulations a proxy may be in the following form or as near thereto as circumstances require or permit:



FINANCIAL SERVICES
REGULATORY COMMISSION

JAN 1 8 2022

FILED

30

The undersigned shareholder of_____ hereby appoints_____ of_____
_____ , or failing him,_____ of_____ as the nominee of the
undersigned to attend and act for the undersigned and on behalf of the undersigned at the
meeting of the shareholders of the said Company to be held on the_____ day of
_____202_ and at any adjournment or adjournments thereof in the same manner, to the
same extent and with the same powers as if the undersigned were present at the said
meeting or such adjournment or adjournments thereof.

Dated this _____ day of _____ 202_

Signature of shareholder

_____

12.8    Adjournment: The Chairman of any meeting may with the consent of the meeting adjourn
the same from time to time to a fixed time and place and no notice of such adjournment
need be given to the shareholders unless the meeting is adjourned by one or more
adjournments for an aggregate of thirty days or more in which case notice of the adjourned
meeting shall be given as for an original meeting. Any business that might have been
brought before or dealt with at the original meeting in accordance with the notice calling
the same may be brought before or dealt with at any adjourned meeting for which no notice
is required.

12.9    Quorum: Subject to the Act, and except in the case of a Company having only one
shareholder a quorum for the transaction of business at any meeting of the shareholders
shall not consist of fewer than one- third of the shares entitled to vote thereat, or a duly
appointed proxy holder or representative of a shareholder so entitled. If a quorum is present
at the opening of any meeting of the shareholders, the shareholders present or represented
may proceed with the business of the meeting notwithstanding a quorum is not present
throughout the meeting. If a quorum is not present within 30 minutes of the time fixed for
a meeting of shareholders, the persons present and entitled to vote may adjourn the meeting
to a fixed time and place but may not transact any other business.

12.10   Resolution in lieu of meeting: Notwithstanding any of the foregoing provisions of this by-
law a resolution in writing signed by all the shareholders entitled to vote on that resolution
at a meeting of the shareholders is subject to section 119 of the Act as valid as if it had
been passed at a meeting of the shareholders.

13.    **SHARES**
13.1    Allotment and Issuance: Subject to the Act, the articles and any unanimous shareholder
agreement, shares in the capital of the Company may be allotted and issued by resolution
of the directors at such times and on such terms and conditions and to such person or class
of persons as the directors determine.

JAN 1 8 2022

FILED

31

13.2    Certificates: Share certificates and the form of share transfer shall (subject to section 138 of the Act) be in such form as the directors may by resolution approve and such certificates shall be issued in registered form only and signed by a Chairman or a Deputy Chairman or a President or a Vice-President and the Secretary or an Assistant Secretary holding office at the time of signing.

13.2.1  The directors or any agent designated by the directors may in their or his discretion direct the issuance of a new share or other such certificate in lieu of and upon cancellation of a certificate that has been mutilated or in substitution for a certificate claimed to have been lost, destroyed or wrongfully taken, on payment of such reasonable fee and on such terms as to indemnity, re-imbursement of expenses and evidence of loss and of title as the directors may from time to time prescribe, whether generally or in any particular case.

## 14.    **TRANSFER OF SHARES AND DEBENTURES**

14.1    Transfer: The shares or debentures of a Company may be transferred by a written instrument of transfer signed by the transferor and naming the transferee.

14.2    Registers:    Registers of shares and debentures issued by the Company shall be kept at the registered office of the Company or at such other place in the island of Antigua as may from time to time be designated by resolution of the directors.

14.3    Surrender of Certificates:    Subject to Section 136 of the Act, no transfer of shares or debentures shall be registered unless or until the certificate representing the shares or debentures to be transferred has been surrendered for cancellation.

14.4    Shareholder indebted to the Company:    If so provided in the articles, the Company has a lien on a share registered in the name of a shareholder or his personal representative for a debt of that shareholder to the Company. By way of enforcement of such lien the directors may refuse to permit the registration of a transfer of such share.

## 15.    **DIVIDENDS**

15.1    The directors may from time to time by resolution declare and the company may pay dividends on the issued and outstanding shares in the capital of the Company subject to the provisions (if any) of the articles and sections 51 and 52 of the Act.

15.1.1  In case several persons are registered as the joint holders of any shares, any one of such persons may give effectual receipts for all dividends and payments on account of dividends.

## 16.    **VOTING IN OTHER COMPANIES**

16.1    All shares or debentures carrying voting rights in any other body corporate that are held from time to time by the Company may be voted at any and all meetings of shareholders, debenture holders (as the case may be) of such other body corporate and in such manner and by such person or persons as the directors of the Company shall from time to time



32

determine. The officers of the Company may for and on behalf of the Company from time to time:

(a)     execute and deliver proxies; and

(b)     arrange for the issuance of voting certificates or other evidence of the right to vote; in such names as they may determine without the necessity of a resolution or other action by the directors.

## 17.     **INFORMATION AVAILABLE TO SHAREHOLDERS**

17.1    Except as provided by the Act, no shareholder shall be entitled to any information respecting any details or conduct of the company's business which in the opinion of the directors it would be inexpedient in the interest of the Company to communicate to the public.

17.2    The directors may from time to time, subject to rights conferred by the Act, determine whether and to what extent and at what time and place and under what conditions or regulations the documents, books and registers and accounting records of the Company or any of them shall be open to the inspection of shareholders and no shareholder shall have any right to inspect any document or book or register or accounting record of the Company except as conferred by statute or authorised by the directors or by a resolution of the shareholders.

## 18.     **NOTICES**

18.1    Method of giving notice: Any notice or other document required by the Act, the Regulations, the articles or the by-laws to be sent to any shareholder, debenture holder, director or auditor may be delivered personally or sent by prepaid mail or cable or electronic communication or telex to any person at his latest address or electronic mail address as shown in the records of the Company or its transfer agent and to any such director at his latest address or electronic mail address as shown in the records of the Company or in the latest notice filed under section 74 of the Act, and to the auditor at his business address or electronic mail address.

18.2    Waiver of notice: Notice may be waived or the time for the notice may be waived or abridged at any time with the consent in writing of the person entitled thereto.

18.3    Undelivered notices: If a notice or document is sent to a shareholder or debenture holder by prepaid mail in accordance with this paragraph and the notice or document is returned on three consecutive occasions because the shareholder or debenture holder cannot be found, it shall not be necessary to send any further notices or documents to the shareholder or debenture holder until he informs the Company in writing of his new address.

18.4    Shares and debentures registered in more than one name: All notices or other documents with respect to any shares or debentures registered in more than one name shall be given to whichever of such persons is named first in the records of the Company and any notice



JAN 1 8 2022

FILED

33

or other documents so given shall be sufficient notice of delivery to all the holders of such shares or debentures.

18.5 Persons becoming entitled by operation of law: Subject to section 184 of the Act every person who by operation of law, transfer or by any other means whatsoever becomes entitled to any share is bound by every notice or other document in respect of such share that, previous to his name and address being entered in the records of the Company is duly given to the person from whom he derives his title to such share.

18.6 Deceased Shareholders: Subject to section 141 of the Act, any notice or other document delivered or sent by prepaid mail, cable or telex or left at the address of any shareholder as the same appears in the record of the Company shall, notwithstanding that such shareholder is deceased, and whether or not the Company has notice of his death, be deemed to have been duly served in respect of the shares held by him (whether held solely or with any other person) until some other person is entered in his stead in the records of the Company as the holder or one of the holders thereof and such service shall for all purposes be deemed sufficient service of such notice or document on his personal representative and on all persons, if any, interested with him in such shares.

18.7 Signature to notices: The signature of any director or officer of the Company to any notice or document to be given by the Company may be written, stamped, typewritten or printed or partly written, stamped, typewritten or printed.

18.8 Computation of time: Where a notice extending over a number of days or other period is required under any provision of the articles or the by-laws the day of sending the notice shall, unless it is otherwise provided, be counted in such number of days or other period.

18.9 Proof of service: where a notice required under paragraph 18.1 hereof is delivered personally to the person to whom it is addressed or delivered to his address as mentioned in paragraph 18.1 hereof, service shall be deemed to be at the time of delivery of such notice.

18.9.1 Where such notice is sent by post, service of the notice shall be deemed to be effected forty-eight hours after posting if the notice was properly addressed and posted by prepaid mail.

18.9.2 Where the notice is sent by cable or telex, service is deemed to be effected on the date on which the notice is so sent.

18.9.3 A certificate of an officer of the Company in office at the time of the making of the certificate or of any transfer agent of shares of any class of the Company as to facts in relation to the delivery or sending of any notice shall be conclusive evidence of those facts.

## 19. **CHEQUES, DRAFTS AND NOTES**



FINANCIAL SERVICES
REGULATORY COMMISSION

JAN 1 8 2022

FILED

34

19.1 All cheques, drafts or orders for the payment of money and all notes and acceptances and bills of exchange shall be signed by such officers or persons and in such manner as the directors may from time to time designate by resolution.

## 20. EXECUTION OF INSTRUMENTS

20.1 Contracts, documents or instruments in writing requiring the signature of the Company may be signed by:

(a) a Chairman, a Deputy Chairman, a President or a Vice-President together with the Secretary or the Treasurer; or

(b) any one Director, and all contracts, documents and instruments in writing so signed shall be binding upon the Company without any further authorization or formality. The directors shall have power from time to time by resolution to appoint any officers or persons on behalf of the Company either to sign certificates for shares in the Company and contracts, documents and instruments in writing generally or to sign specific contracts, documents or instruments in writing.

20.1.1. The common seal of the Company may be affixed to contracts, documents and instruments in writing signed as aforesaid or by any officers specified in paragraph 20.1 hereof.

20.1.2 Subject to section 125 of the Act, a Chairman, a Deputy Chairman, a President or a Vice-President together with the Secretary or the Treasurer; or any two directors shall have authority to sign execute (under the seal of the Company or otherwise) all the instruments that may be necessary for the purpose of selling,
assigning, transferring, exchanging, converting or conveying any such shares, stocks, bonds, debentures, rights, warrants or other securities.

## 21. SIGNATURES

21.1 The signature of a Chairman, a Deputy Chairman, a President, a Vice-President, the Secretary, the Treasurer, an Assistant Secretary or an Assistant Treasurer or any director of the Company or of any officer or person, appointed pursuant to paragraph 20 hereof by resolution of the directors may, if specifically authorised by resolution of the directors, be printed, engraved, lithographed or otherwise mechanically reproduced upon any certificate for shares in the Company or contract, document or in writing, bond, debenture or other security of the Company executed or issued by or on behalf of the Company. Any document or instrument in writing on which the signature of any such officer or person is so reproduced shall be deemed to have been manually signed by such officer or person whose signature is so reproduced and shall be as valid to all intents and purposes as if such document or instrument in writing had been signed manually and notwithstanding that the officer or person whose signature is so reproduced has ceased to hold office before the date on which such document or instrument in writing is delivered or issued.

REGULATORY COMMISSION

JAN 1 8 2022

FILED

35

## 22.   **FINANCIAL YEAR**
22.1   The directors may from time to time by resolution establish the financial year of the Company.

## 23.   **INITIAL DIRECTORS**
23.1   The initial Board of Directors shall be composed of the following members:

## **CORPORATE & TRUST SERVICES (CARIBBEAN) LIMITED**



# Tab 4

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*, | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |

## <u>DECLARATION OF CRAIG JACAS</u>

I, CRAIG L. JACAS, pursuant to 28 U.S.C. § 1746, do hereby declare and state as follows:

1.      I am an Attorney-at-Law, licensed to practise law in both Antigua and Barbuda, as well as Jamaica. Currently, I serve as the Managing Partner of Stapleton Chambers, a specialised law firm located in Antigua and Barbuda.

2.      I was retained by The Daley Law Firm LLC, counsel for Patrick Gruhn ("**Gruhn**"), Robin Matzke ("**Matzke**"), and Lorem Ipsum UG, to provide an opinion regarding the law of Antigua and Barbuda, including the Antiguan International Business Corporations Act ("**IBCA**"), applicable to the above captioned bankruptcy case of Plaintiffs FTX Trading Ltd. ("**FTXT**"). To that end, I submit this declaration ("**Declaration**"). Specifically, I was asked to address the validity under Antiguan Law of the Omnibus Authority given by Samuel Bankman-Fried, a director of FTXT, focusing on whether a sole director at the material time had the power or authority to and/or was effective in delegating certain authority and making certain appointments by virtue of that authority.

A. **Personal Background**

3.      As for my educational background, I obtained my Bachelor of Laws (LLB) with First Class Honours from the University of the West Indies, Mona Campus, in 2013. Thereafter, I obtained a Legal Education Certificate (LEC) in 2015 from the Norman Manley Law School, Mona, Jamaica, and a Master of Laws (Commercial & Corporate Law), with Distinction also from the University of the West Indies, Mona Campus, in September 2023.

4.      I am a fully qualified attorney-at-law and advocate licensed to practice in Antigua and Barbuda, including before the Eastern Caribbean Supreme Court ("**ECSC**") and the Eastern Caribbean Court of Appeal ("**Court of Appeal**"). Historically, the jurisdictions within CARICOM received the English common law within their legal systems upon attaining independence.

5.      All formal training and certification at the LLB and LEC levels is focused on the common law. As a consequence, a considerable part of my legal training and experience is in the English common law. Therefore, I have the requisite qualifications to assist the Court and provide expert opinions on the laws of Antigua and Barbuda, as well as the effect and operation of the common law. Attached to this Declaration as Exhibit A is my curriculum vitae.

6.      As a trial attorney, I have acted as lead counsel on several High Court and Court of Appeal matters over the years of my practice, including matters of a foreign element similar to the instant matter.

B. **Structure of Antiguan Courts and Law**

7.      It is my understanding that United States courts generally apply the law of the state of incorporation to claims involving the internal affairs of corporations. FTXT, as alleged by the Plaintiffs in the Complaint (Complaint, ¶ 14), was incorporated in Antigua and; thus, Antiguan law governs matters of its corporate governance and internal affairs.

8.      Under Antiguan law, the IBCA governs the relationship between an Antiguan corporation, the corporation's directors and officers, and the corporation's shareholders. This means that all claims between these parties related to the internal affairs of the corporation arise under the IBCA. The common law (including English common law) does not supplant the IBCA; rather, the common law compliments and supplements the IBCA in the case of any ambiguity.

9.      Though English common law may be used for interpretative guidance in instances of ambiguity, the causes of action between an Antiguan corporation, its directors and officers, and the corporation's shareholders arise under the IBCA, not common law. Thus, where a cause of action does not arise under the IBCA, it is not cognizable under Antiguan law.

10.      The salient principles in this Declaration are derived from the laws of Antigua and Barbuda, and, where applicable, English or Commonwealth case law and legal treatises. By way of relevant background, the hierarchical structure of the ECSC is comprised of the High Court and the Court of Appeal. The first Superior Court available for redress under the IBCA is the High Court.

11.      A party aggrieved by a decision of the High Court may appeal to the second superior court, the Court of Appeal. Further, a party aggrieved by the decision of the ECSC may appeal the decision to Antigua's final appellate court, the United Kingdom Privy Council.

12.      Where no binding authority exists from the United Kingdom Privy Council on any point of law, decisions of superior courts of other Commonwealth jurisdictions or the United Kingdom may provide persuasive guidance to High Court judges in Antigua and Barbuda. The Superior Courts of the other Commonwealth jurisdictions are the High Court of the Commonwealth of Dominica, the Supreme Court of Grenada, the High Court of Saint Kitts and Nevis, the High Court of Saint Lucia, and the High Court of Saint Vincent & the Grenadines.

13. In preparing this declaration, I consulted the IBCA, the Interpretation Act (codifying statutory interpretation principles), case law, and scholarly works related to the relevant statutes. Additionally, I also reviewed and considered relevant pleadings and motions filed in this matter. My conclusions are set forth below.

**C.**     **Factual Allegations**

14. The following alleged facts are relevant to my analysis of the applicable law:

a. On November 11, 2022 ("**Petition Date**"), FTXT filed its petition ("**Petition**") for relief under the Bankruptcy Code with the United States Bankruptcy Court for the District of Delaware ("**Court**"). [D.I. 1.]

b. The Petition was signed by John J. Ray III ("**Ray**") as Chief Executive Officer of FTXT and by Adam G. Landis of the law firm Landis Rath & Cobb LLP as attorney for FTXT. (*Id.*)

c. Ray claims to have had authority to file the Petition by virtue of an Omnibus Corporate Authority dated November 10, 2022 ("**Omnibus Authority**"), a copy of which was filed with the Petition as required by Del. Bankr. L.R. 1002-1(b).  [D.I. 1, page 12 of 23].

d. The Omnibus Authority states in relevant part:

> I, Samuel Benjamin Bankman-Fried, as controlling owner, director, officer, manager or other authorized person with respect to West Realm Shires Inc., Paper Bird Inc., Hilltop Technology Services LLC, Cedar Grove Technologies Services, Ltd., FTX Trading Ltd., Alameda Research LLC And Clifton Bay Investments LLC (the "Top Companies"), and all of their directly and indirectly owned subsidiaries (together with the Top Companies, the "FTX Group"), hereby authorize, instruct and consent to the following corporate actions with respect to all members of the FTX Group:
> (i)     the appointment of John J. Ray III ("the CEO") as Chief Executive Officer with plenary authority to exercise all powers and authority capable of delegation to an officer under applicable law, including without limitation in connection with a voluntary filing for protection from creditors under Title 11 of the United States Code and any restructuring and insolvency-related proceeding

that may be appropriate or necessary, or may be commenced by third parties, with respect to all members of the FTX Group;

*****

(iv) the appointment of Stephen Neal (if willing to serve) as Chairman of the Board, to the extent applicable law permits me to so designate him as such, and one to three other individuals chosen by the CEO and not affiliated with me or the CEO as new directors of FTX Trading Ltd. . . .

e.   The Omnibus Authority was signed, electronically, only by Bankman-Fried.

f.   Pursuant to the Omnibus Authority, Ray accepted the position as Chief Executive Officer of the debtors in the early morning hours of November 11, 2022. *Declaration of John J. Ray III in Support of Chapter 11 Petitions and First Day Pleadings* ("Ray Dec."), ¶ 1 [D.I. 24]. Ray understood that by the Omnibus Authority he "was delegated all corporate powers and authority under applicable law, including the power to appoint independent directors and commence these Chapter 11 Cases on an emergency basis." (Ray Dec., ¶ 44.)

g.   The Omnibus Authority was drafted by attorney Andrew Dietderich of Sullivan & Cromwell. *Supplemental Declaration of Andrew G. Dietderich in Support of Debtors' Application for an Order Authorizing the Retention and Employment of Sullivan & Cromwell LLP as Counsel to the Debtors and Debtors-In-Possession Nunc Pro Tunc To The Petition Date*, ¶ 23 ("**Dietderich Supp. Dec.**") [D.I. 51.]

h.   FTXT had four directors as of the Petition Date: (a) Arthur Thomas; (b) Corporate & Trust Services Limited; (c) Nishad Singh; and (d) Samuel Bankman-Fried. (*FTX Trading's amended Statement of Financial Affairs* filed August 31, 2023, [D.I. 2297], Statement 28, page 81 of 82.)

i.   FTXT's pre-petition board of directors did not pass a resolution authorizing the filing of the Petition, either at a meeting or by consent in lieu of a meeting. Dietderich states he recommended and prepared the Omnibus Authority because "there was not time to hold over 100

5

board meetings for companies whose records were both incomplete and unfamiliar to [Sullivan & Cromwell]." (Dietderich Supp. Dec., ¶ 23.)

      j.      Bankman-Fried signed the Omnibus Authority at approximately 4:30 a.m. on Friday, November 11, 2022. *Motion of Debtors for Entry of an Order (I) Modifying Certain Creditor List Requirements; (II) Authorizing The Debtors To Serve Certain Parties By E-Mail; And (III) Granting Related Relief* [D.I. 9, ¶2].

      k.      As described by Dietderich, its author, the Omnibus Authority "appointed Mr. Ray CEO of all of the Debtors, transferred to him all of Mr. Bankman-Fried's corporate authority and authorized Mr. Ray to decide if and when the Debtors should commence chapter 11 proceedings." (Dietderich Supp. Dec., ¶ 23.)

      l.      After his appointment as CEO, Ray – not Bankman-Fried or the FTX board of directors – made the decision to file the Petition. (Dietderich Supp. Dec., ¶ 5.) Authorizing the chapter 11 filings of the Debtors, including FTXT, was, according to Ray, his first "official act" as CEO. (Ray Dec., ¶ 2.)

      **D.**      **Applicable Antiguan Law**

      15.      As stated, I have been asked to identify and address Antiguan Law applicable to the validity of the Omnibus Authority given by Samuel Bankman-Fried, one of the four directors of FTXT, focusing on whether as a director at the material time he had the power or authority and/or was effective in delegating certain authority and making certain appointments by virtue of that authority.

16.     At common law, a company incorporated by or under a statute possesses only those powers and rights which are expressly or impliedly authorized by that statute.[1]

17.     The IBCA contains extensive provisions designed to legislate rules defining corporate capacity and rules governing the exercise of corporate powers.

18.     The directors of an IBCA corporation exercise the powers of the company and direct the management of the business of the corporation. IBCA, § 60.[2] These powers may be restricted by the articles of the corporation. IBCA, § 62. A quorum of directors may exercise the powers of the directors. IBCA, § 75(2).

19.     In exercising their powers, directors of an Antiguan IBCA company are bound to adhere to the company's articles and bylaws. IBCA § 95(2) ("Every director and officer of a corporation must comply with this Act and the regulations and with the articles and by-laws of the corporation and any unanimous shareholder agreement relating to the corporation.") No provision in a contract, the articles of a corporation, its by-laws or any resolution, may relieve a director of the corporation from the duty to act in accordance with the IBCA or the company's regulations. IBCA, § 95(3).

20.     Under Antiguan law "*the directors* of the corporation" may designate and appoint officers (such as a CEO). IBCA § 93(a) (italics added); s*ee also* IBCA § 64(3)(d) (noting that after a certificate of incorporation is issued, *the directors* may hold a meeting to "appoint officers".) The board of directors can only do so at a meeting at which a quorum is present. IBCA, § 75(2) ("a quorum of directors may exercise all the powers of the directors".)

---

[1]     Particularly, in *Ashbury Railway Carriage and Iron Co Ltd v Richie* (1875) LR 7 HL 653, 639 Eng HL, per Lord Selbourne, attached as <u>Exhibit B</u>.

[2]     Relevant excerpts of the IBCA are attached as <u>Exhibit C</u>.

21.     The IBCA does not address a U.S. style bankruptcy filing. It does, however, address "arrangements." Under the IBCA, "arrangements" include acts constituting a reorganization, liquidation or dissolution of a company. IBCA, § 175(a). Because a company can only act through its directors, seeking an arrangement requires a resolution of the directors authorizing the arrangement. Thus, only the board of directors, through a proper resolution, has the authority to approve a voluntary bankruptcy filing.

22.     Directors who act in excess of the restrictions in the articles of the company act in breach of their express duties as directors to comply with the IBCA and the articles and by-laws of the company. Actions taken by directors in contravention of the IBCA or the company's articles or bylaws are beyond the director's authority. IBCA, § 62. *See also,* Rolled Steel Products (Holdings) Ltd v. British Steel & Corp and others.[3]

23.     Based on the foregoing statements of law, and the statement of facts, in my opinion, under Antiguan law, including the IBCA, Bankman-Fried lacked authority to appoint Ray as CEO of FTXT and he could not unilaterally delegate the directors' right to determine whether FTXT should file bankruptcy. The Omnibus Authority could not and did not grant Ray the authority and power to file the Petition for FTXT

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on October 26, 2023.

/s/_____
Craig L. Jacas
Stapleton Chambers
Stapleton House, Suite #2
P.O. Box 2891
St. John's, Antigua

---

[3] [1985] 3 All ER 52, attached as Exhibit D.

# Exhibit A

# CRAIG L. JACAS

St. John's, Antigua and Barbuda |+1(268) 562-7185 | craig.jacas@stapletonchambers.com
www.stapletonchambers.com

## PROFESSIONAL HISTORY

Partner (Managing), *01/06/2023 - present*

Stapleton Chambers **–** St. John's, Antigua and Barbuda

- Provided outstanding service in corporate and commercial law to entities and individuals, promoting effective and lasting business relationships.

- Oversaw firm's day-to-day administrative operations, provided guidance to support staff, and enforced compliance with local regulations.

- Chaired partner meetings to drive discussion of matters important to firm operations, keeping discourse on-topic and moving at an efficient pace.

- Spoke with peers to verify task completion, meeting tight deadlines and schedules.

- Conducted legal research and conferred with colleagues with subject matter expertise to develop strategies and arguments in preparation for presentation of cases.

Legal Officer, *03/2021 to 05/2022*

The University of the West Indies (on secondment) **–** Kingston, Jamaica

- Handled complex legal issues using sound judgment, integrity, business acumen and decisiveness. Monitored new legislation and regulatory changes that impacted the University and Corporate and Commercial Law, to advise the Vice-Chancellery accordingly.

- Managed and supervised document database to maintain litigation records.

- Reviewed legal publications and performed database searches to identify laws and court decisions relevant to pending cases.

- Negotiated and drafted bilateral and multilateral MOUs.

- Coordinated and collaborated with Counsel in the Legal Unit by working together on important legal issues.

- Translated complex legal issues into understandable terms.

- Met tight deadlines and effectively managed multiple priorities using strong organizational skills.

Contributing Author, *05/2020 to present*

William H. Byrnes & Robert J. Munto, International Trust Laws and Analysis

- Applied established research and organizational skills, writing and reviewing comprehensive content on trust and company laws of Antigua and Barbuda.

- Conducted exhaustive research to support arguments and generate substantial content for publications.

- Managed multiple deadlines, working directly with publication leadership to reach quarterly goals.

Legal Consultant, *11/2017 to 12/2018*

Local Organising Committee, WWT20 2018 Cricket Tournament – St. John's, Antigua and Barbuda

- Minimized risk exposure through careful advice on business operations and strategic plans.

- Apprised Committee of potential risks and costs associated with each course of action.

- Vetted and negotiated multilateral MOU on all elements of the tournament including matters related to Intellectual Property, Safety, and Data Protection among others.

Associate Attorney, *09/2015 to 05/2022*

Stapleton Chambers – St. John's, Antigua and Barbuda

- Advocated for clients before court in oral argument by presenting facts and evidence in most favourable light.

- Conducted legal research and conferred with colleagues with subject matter expertise to develop strategies and arguments in preparation for presentation of cases.

- Developed strategies to resolve cases in client's best interest.

- Filed timely case pleadings to meet firm deadlines.


Adjunct Tutor, *09/2013 to 07/2015*

The University of the West Indies **–** Kingston, Jamaica

- Evaluated and revised lesson plans and course content to achieve student-centered learning.

- Arranged syllabus, developed schedule, and determined reading list for varied courses simultaneously, giving students appropriate time to complete assignments and absorb information.

- Contributed to staff and administrative meetings to discuss course progress and scheduling. Assisted students to develop effective study skills and techniques.

- Courses taught: Law of Corporate Management, Company Law, and General Principles of Private International Law, Equitable Remedies, Real Property Law and Criminal Law.


EDUCATION

- LLM (Corporate & Commercial Law), with Distinction (09/2023)
  The University of The West Indies - Mona, Jamaica

- Legal Education Certificate: Law (09/2015)

  Norman Manley Law School - Kingston, Jamaica

- Bachelor of Laws (First Class Honours): (11/2013)

  The University of The West Indies - Kingston, Jamaica

CERTIFICATIONS

Corporate Governance

The University of the West Indies (Mona), LLM Course, 2021

Focused, at an advanced level, on the principal legal and economic questions facing corporations in light of the recent scandals involving high profile corporations.

Among the topics considered were:

- The theories of corporate governance and the justification for good governance against the background of recent financial scandals;
- The allocation of powers within a company vis-a-vis the powers and duties of directors; Corporate Control;
- Governance of corporate groups and small businesses; The Company and its constituencies i.e. shareholders, creditors etc.; and
- The role of auditors.

PROFESSIONAL ORGANISATIONS AND MEMBERSHIPS

- CARIBONO - a network of professionals offering pro bono services for underserved communities across the Caribbean.
- Antigua and Barbuda Bar Association
  Jamaica Bar Association

BAR ADMISSIONS

- Antigua and Barbuda
- Jamaica

# Exhibit B



⊕ Ashbury Railway Carriage and Iron Co Ltd v Riche

Overview   |   (1875) LR 7 HL 653,   |   44 LJ Ex 185,   |   24 WR 794,   |   **33 LT 450**,   |   **[1874-80] All ER Rep Ext 2219**

---

# ⊕ Ashbury Railway Carriage and Iron Company Limited v Riche [1874-80] All ER Rep Ext 2219

Also reported: LR 7 HL 653; 44 LJ Ex 185; 33 LT 450; 24 WR 794

HOUSE OF LORDS

THE LORD CHANCELLOR (CAIRNS), LORDS CHELMSFORD, HATHERLEY, O'HAGAN AND SELBORNE

1, 3, 4, 8 JUNE 1875

**Company — Contracts ultra vires — Memorandum of association — Ratification — Power of meeting to bind absent shareholders — Companies Act 1862 (25 & 26 Vict c 89), ss 6, 8, 11, 12, 14, 50.**

By the Companies Act 1862 the memorandum of association is made the charter of incorporation of a limited company, defining its position with reference to the outside public, and putting it in the position of a statutory corporation, without giving it all the common law rights and powers inherent in a corporation; so that all acts and contracts beyond the scope of the memorandum are *ultra vires* of the company, wholly void, and incapable of ratification; and the insertion of a clause in the articles of association purporting, to give power to extend the company's business beyond the objects expressed or implied in the memorandum is wholly nugatory.

Mere absence from a meeting of shareholders is not sufficient of itself to raise a presumption that the absentee assents to the proceedings of such meeting even if actual knowledge of its object be brought home to him.

The appellant company was incorporated under the Act, the object of the association being as stated in the memorandum, "To make, sell, or lend on hire… all kinds of railway plant … to carry on the business of mechanical engineers, and general contractors". The directors entered into a contract with the respondent to employ him, through the medium of a *société anonyme* which they were to form in Belgium, to construct a railway there, and they agreed to pay certain sums to the *société* for that purpose. The company afterwards repudiated the contract as being *ultra vires.*

In an action brought by the respondent to recover damages for its non-fulfilment:

Held: (1) (affirming the court below upon this point) that the contract was *ultra vires,* for the words "general contractors" must be limited by the context. But (reversing the judgment of the court below) (2) that, being beyond the scope of the memorandum of association, the contract was incapable of ratification by the shareholders. (3) That there was no evidence that it had been in fact so ratified.

## Notes

Followed: *Re Peter Lalor Home Building Co-operative Society Limited*; *Tuckman v Dunlop*, [1958] VR 165; [1958] ALR 574.

Ashbury Railway Carriage and Iron Company Limited v Riche [1874-80] All ER Rep Ext 2219, [1874-80] All ER Rep Ext 2219

---

Applied: *Blenheim Borough and Warau River Board v British Pavements (Canterbury) Ltd*, [1940] NZLR 564. Referred: *Taupiri Coal Mines Ltd v R*, [1943] NZLR 446. Applied: *Tauranga Borough v Tauranga Electric-power Board*, [1944] NZLR 155.

Referred: *Gibson v Barton* (1875) LR 10 QB 329; *Stone v Yeovil Corpn* (1976) 24 WR 1073; *Hope v International Financial Society* (1876) 4 Ch D

----------------------------------------------------------------    *[1874-80] All ER Rep Ext 2219 at 2220*

327. Considered: *Cree v Somervail* [(1879) 4 App Cas 468](#) ↗. Explained and considered: *Attorney-General v Great Eastern Railway* (1880) 5 App Cas 473; p 1459, ante. Referred: *Re West of England Bank* (1880) 14 Ch D 317; *Re Dronfield Silkstone Coal Co* (1880) 17 Ch D 76. Considered: *Re Coltman; Coltman v Coltman* (1881) 19 Ch D 64; *Guinness v Land Corpn of Ireland* (1882) 22 Ch D 349. Referred: *Re German Date Coffee Co* (1882) 20 Ch D 169; [1881-5] All ER Rep 372; *London & North Western Railway v Price* (1883) 11 QBD 485. Considered: *London Financial Association v Felk* (1884) 26 Ch D 107. Distinguished: *Mellis v Shirley and Freemantle Local Board of Health* (1885) 54 LJQB 408. Applied: *Wenlock v River Dee Co* (1885) 10 App Cas 354; [1881-5] All ER Rep Ext 1244. Referred: *Ashbury v Watson* (1885) 30 Ch D 376; *Re South Durham Brewery Co* (1885) 31 Ch D 261; *Trevor v Whitworth* (1887) 12 App Cas 409; [1886-90] All ER Rep 46. Followed: *Re Walker and Hacking* (1887) 57 LT 763. Considered: *Re London Celluloid Co (Bayley and Hanbury's Cases)* (1888) 59 LT 109. Referred: *Re Patent Ivory Manufacturing Co; Howard v The Company* (1888) 38 Ch D 156. Applied: *Southwark & Vauxhall Water Co v Dickenson* (1889) 5 TLR 251. Referred: *Re Railway Time Tables Publishing Co (Sandy's Case)* (1889) 61 LT 94; [1886-90] All ER Rep Ext 1375; *Ooregum Gold Mining Co of India v Roper*, [1892] AC 125. Considered: *Balkis Consolidated Co v Tomkinson*, [1893] AC 396; [1891-4] All ER Rep 982. Referred: *Foster v London Chatham & Dover Railway Co*, [1895] 1 QB 711; [1891-4] All ER Rep Ext 1361; *Re Borax Co; Foster v Borax Co*, [1901] 1 Ch 326. Applied: *London County Council v Attorney-General*, [1902] AC 165. Referred: *Re Walker and Smith* (1903) 72 LJ Ch 572; *Corbett v South Eastern & Chatham Railway Co*, [1906] 2 Ch 12. Considered: *Attorney-General v Mersey Railway*, [1907] 1 Ch 81; *Re Kingsbury Collieries and Moore's Contract*, [1907] 2 Ch 259. Referred: *Attorney-General v West Gloucestershire Water Co* (1909) 25 TLR 650. Considered: *British South Africa Co v De Beers Consolidated Mines*, [1910] 1 Ch 354; *Amalgamated Society of Railway Servants v Osborne*, [1910] AC 87. Referred: *Attorney-General v Leicester Corpn* (1910) 103 LT 214; [1908-10] All ER Rep 1002. Considered: *Re Birkbeck Permanent Benefit Building Society*, [1912] 2 Ch 183. Referred: *Re Doecham Gloves*, [1913] 1 Ch 226; *Sinclair v Brougham*, [1914] AC 398; [1914-15] All ER Rep 622; *Re Woking Urban District Council (Basingstoke Canal) Act*, [1914] 1 Ch 300; *Dundee Harbour Trustees v Nicol*, [1915] AC 550. Considered: *Bonanza Creek Gold Mining Co v R*, [1916] 1 AC 566; [1916-17] All ER Rep 999. Referred: *Bowman v Secular Society*, [1917] AC 406; [1916-17] All ER Rep 1; *County Hotel & Wine Co v London & North Western Railway*, [1918] 2 KB 251; [1918-19] All ER Rep Ext 1388; *Kensington and Knightsbridge Electric Lighting Co v Notting Hill Electric Lighting Co* (1918) 87 LJKB 565; *Jenkin v Pharmaceutical Society of Great Britain*, [1921] 1 Ch 392. Considered: *Attorney-General v Fulham Corpn*, [1921] 1 Ch 440. Referred: *Deuchar v Gas Light & Coke Co*, [1924] 2 Ch 426; *Attorney-General v Leeds Corpn*, [1929] 2 Ch 291; *British Trawlers' Federation Ltd v London & North Eastern Railway Co*, [1933] 2 KB 14; *Attorney-General v Racecourse Betting Control Board*, [1935] Ch 34; *Winnipeg (City) v Canadian Pacific Railway Co*, [1953] 2 All ER 988; *British Transport Commission v Westmorland County Council*, [1956] I All ER 321. Applied: *Charles Roberts & Co Ltd v British Railways Board*, [1964] 3 All ER 651; *Bell Houses Ltd v City Wall Properties Ltd*, [1965] 3 All ER 427.

See Halsbury's Laws of England, 3rd ed, vol 6, p 415 (doctrine of *ultra vires*).

## Cases referred to:

*Dent's Case* (1873) 8 Ch App 768; 28 LT 888.

----------------------------------------------------------------    *[1874-80] All ER Rep Ext 2219 at 2221*

*East Anglian Railway Co v Eastern Counties Railway Co* (1851) 21 LJCP 23.

Ashbury Railway Carriage and Iron Company Limited v Riche [1874-80] All ER Rep Ext 2219, [1874-80] All ER Rep Ext 2219

---

*Evans v Smallcombe* (1868) 19 LT 207; LR 3 HL 249.

*Hawkes v Eastern Counties Railway Co* (1855) 5 HL Cas 331.

*Houldsworth v Evans* (1868) 19 LT 211; LR 3 HL 263.

*Phosphate of Lime Co v Green* (1871) LR 7 CP 43; 25 LT 636.

*Spackman v Evans* (1868) 19 LT 151; LR 3 HL 171.

### Also referred to in argument:

*Bagge's Case* (1851) 20 LJ Ch 229.

*Bargate v Shortridge* (1855) 5 HL Cas 297.

*Foss v Harbottle* (1843) 2 Hare 461.

*Gage v Newmarket Railway* (1852) 21 LJQB 398.

*R v Arnaud* (1846) 16 LJQB 50.

*Straffon's Executors, Re* (1852) 22 LJ Ch 194.

---

This was a proceeding in error from a judgment of the Court of Exchequer Chamber, affirming a judgment of the Court of Exchequer upon a special case stated by an arbitrator in an action brought by the respondent under the following circumstances:--

The company was incorporated under the Companies' Act 1862. Clause 3 of the memorandum of association was as follows: "3. The objects for which the company is established are, to make, or sell, or lend on hire railway carriages and waggons, and all kinds of railway plant, fittings, machinery, and rolling stock; to carry on the business of mechanical engineers and general contrators; to purchase, lease, work, and sell mines, minerals, land and buildings; to purchase and sell, as merchants, timber, coal, metals, or other materials, and to buy and sell any such materials on commission or as agents." By the articles of association the business of the company might be extended to objects beyond those expressed or implied in the memorandum of association by a special resolution, but no such resolution was ever passed. Riche had obtained a concession from the Belgian Government to make a railway from Antwerp to Tournay, and the directors of the company entered into a contract with him, the purport of which was to take over the concession, to establish a *société anonyme,* to raise money for constructing the railway, to pay towards the funds of the *société* and to take bonds or shares in exchange and to give to Riche the business of supplying the iron and the rolling stock. Money difficulties arose, and the shareholders, becoming aware of the contract, appointed a committee of investigation, which reported that it was *ultra vires* altogether. The shareholders, however, permitted the accounts to pass, amicable arrangements were recommended, and a deed, dated 24 December 1867, was executed, by which the directors were, as between themselves and the shareholders, compelled to take upon themselves the burthen of the contract with Riche, the company consenting to allow their name to be used in legal proceedings. Afterwards Riche, finding that the contract was not duly performed commenced this action, insisting that whatever arrangements might have been made between the directors and the shareholders, the company was liable to him. The Court of Exchequer held that the contract was *ultra vires,* but Martin and Channell, BB, thought that it could be, and had been ratified by the shareholders, and gave judgment for the plaintiff, Bramwell, B, dissenting. Error was brought, and the Court of Exchequer Chamber was equally divided, Blackburn, Brett, and

---------------------------------------------------------------

Grove, JJ, being of the same opinion as the majority of the Court of Exchequer, Keating, Archibald, and Quain, JJ, taking the opposite view. The judgment accordingly stood affirmed, and error was brought to the House of Lords.

Ashbury Railway Carriage and Iron Company Limited v Riche [1874-80] All ER Rep Ext 2219, [1874-80] All ER Rep Ext 2219

The material facts are set out above and in the Lord Chancellor's judgment.

*Watkin Williams, QC,* and *Cohen, QC,* for the plaintiffs in error (the company).

Giffard, QC, Benjamin, QC, and W G Harrison for the defendant in error.

8 JUNE 1875

**THE LORD CHANCELLOR (CAIRNS):**

The history and progress of the action out of which the present appeal arises, is not, I must say, creditable to our legal system. There was not in the case any fact in dispute, and the only questions which arose were questions of law, or questions perhaps as to the proper inference to be drawn from facts as to which there was no dispute.

The action was commenced in the month of May, 1868. The litigation appears to have been active and continuing, and yet seven years have been consumed, and the result up to the present time is this; that, in the Court of Exchequer, two out of three Judges were of opinion that the plaintiff should have judgment; and when the case came before the Exchequer Chamber it was heard before six Judges, three of whom were of opinion that the plaintiff was entitled to judgment, the other three thinking the defendant was entitled to judgment. The result, therefore, was that the judgment of the Court of Exchequer was affirmed. But for this difference of opinion amongst the learned Judges, I should have said that the real questions of law which arise in the case, questions which appear to me to be sufficient altogether to dispose of the case, were of an extremely simple character.

The action was brought by the plaintiffs, who are contractors in Belgium, to recover damages for the breach of an agreement entered into between the plaintiff and the appellants, the Ashbury Railway Carriage and Iron Company, limited. This company was established under the Joint-Stock Companys Act of 1862, and I think it will be therefore necessary to consider, with some minuteness, some of the leading provisions of that Act of Parliament. But in the first place it may be convenient to ascertain the purposes for which this company was formed, and also the nature of the contract for breach of which the action was brought. The purposes for which a company established under the Act of 1862 is formed, are always to be looked for in the memorandum of association of the company. The memorandum of association of this Ashbury Railway Carriage and Iron Company, limited, declares that it was formed for these objects. [His Lordship here read paragraph 3 of the memorandum of association printed above.] Part of the argument at your Lordships' bar was as to the meaning of two of the words used in this part of the agreement, the words "general contractors." As it appears to me, upon all ordinary principles of construction, those words must be referred to the part of the sentence which immediately precedes them. The sentence which I have read is divided into four classes of words. First, the selling, or lending railway carriages, waggons, and all kinds of railway plant, fittings, machinery, and rolling stock. That is an

------------------------------------------------------------------

*[1874-80] All ER Rep Ext 2219 at 2223*

object *sui generis* and complete in the specification which I have read. Secondly, to carry on the business of mechanical engineers and general contractors. That, again, is the specification of an object complete in itself, and according to the principles of construction, the term "general contractors" would be referred to that which goes immediately before, and would indicate the making generally of contracts connected with the business of mechanical engineers, such contracts as mechanical engineers are in the habit of making and are in their business required, or find it convenient to make for the purpose of carrying on their business. The third is to purchase, lease, work and sell mines, minerals, land, and buildings. That is an object pointing to the working and acquiring of mineral property, and the generality of the two last words, "land and buildings," is limited by the purpose for which land and

buildings are to be acquired. "Leasing working and selling of mines and minerals." The fourth head is purchasing and selling timber, coal, or metals, or other materials; buying and selling any such materials on commission as agents. That requires no commentary. If the term "general contractors" is not to be interpreted as I have stated, the consequence would be this, that it would stand absolutely without any limit of any kind. It would authorize the making, therefore, of contracts of any and every description, and the memorandum in place of specifying the particular kind of business, would virtually point to the carrying on of business of any kind whatsoever, and would therefore be altogether unmeaning.

That being the object for which the company professes, by the memorandum of association, to be incorporated, I now turn to examine the contract upon which the present action is brought. I may relieve your Lordships from any lengthened exposition of the nature of that contract by referring you to the description given of it by Bramwell, B, in the Court of Exchequer, which appears to me accurately to describe the general nature of the agreement. Bramwell, B, states this: "The substance of those contracts," that is the contract upon which the action is brought, and two other contracts which are inseparably connected with them--"the substance of those contracts was this, Gillon and Poeters Baertson had obtained a right to make a railway in Belgium. This right the defendants' directors supposed to be valuable to its owners. That is to say the line could be constructed for such a certain sum, and a *société anonyme* could be constituted, with shareholders to take its shares to such an amount as would give a large sum over the cost of construction. The benefit of this the directors wished to obtain for the defendant company, and to do so they purchased the concession. This was their main object. But the plaintiff had a contract with the concessionaries to construct the line, and to accomplish the object of the directors it was necessary or desirable, or they thought it was, that they should agree with the plaintiff that they, the defendant company, would constitute a *société anonyme,* and, as the plaintiff went on with the work, that they would pay into the hands of the *société anonyme* proportionate funds. The directors accordingly entered into two contracts in the name of the defendant company; one with the concessionnaires to purchase the concession; the other with the plaintiff to furnish the *société anonyme* with funds, the latter being auxiliary to the former; and they paid the concessionnaires £26,000, part of the price. Now whatever may be the meaning of 'carrying on the business of mechanical engineers and general contractors', to my mind it clearly does not include the making of either of these contracts. It could only do so by holding that the words

------------------------------------------------------------------

'general contractors' authorized generally the making of any contract, and this they certainly do not do."

I agree entirely both with the description given by Bramwell, B, of the nature of the contract upon which the present action is brought, and with the conclusion at which he arrives, that a contract of this kind was not within the memorandum of association. In point of fact it was not a contract in which, as the memorandum of association implies, the limited company were to be employed; they were the employers. They purchased the concession of a railway, an object not at all within the memorandum of association, and having purchased that they employed, or they contracted to pay as a person employed, the plaintiff in the present action. That was reversing entirely the old hypothesis of the memorandum of association, and was the making of a contract foreign to, and not included within its compass. Now those being the results of the documents to which I have referred, I will ask your Lordships to consider the effect of the Joint Stock Companies Act of 1862 (25 & 26 Vict c 89) upon this state of things; and here I cannot but regret that in the Court of Exchequer the accurate and precise bearing of that Act upon the present case appears to me to have been entirely overlooked or misapprehended, and in the Court of Exchequer Chamber the weight which was given to the provisions of the Act appears to me to have entirely fallen short of that which ought to have been given to it. The Act of Parliament to which I am referring is the Act which put upon its present footing the regulation of joint stock companies, and more especially those joint stock companies who were to be authorized to trade with a limit to their liability. The objects of the provision under which that system of limiting a liability was incorporated were provisions not merely for the benefit of the shareholders for the time being of the company, but were also intended to provide for the interests of two other very important bodies, in the first place those who might become shareholders in succession to the shareholders for the time being; and secondly the outside public, and more particularly those who might be creditors of companies of this kind. I shall now refer to some of the clauses of

that Act, and as I do so I would observe that there is a very marked and entire difference between the two documents which form the title deeds of companies of this description, I mean the memorandum of association on the one hand and the articles of association on the other. With regard to the memorandum, as has often been pointed out, although it appears to have been somewhat overlooked in the present case, the memorandum of association is, as it were, the charter and the limitation of the powers of any company established under the Act. With regard to the articles of association, these play a part subsidiary to the memorandum. They accept the memorandum as the charter of incorporation of the company, and proceed to define the duties, rights, and powers of the governing body as between themselves and the company at large, and the mode and form in which the business of the company is to be carried on, and in which changes in the internal regulations of the company must from time to time be made. With regard, therefore, to the memorandum of association, if you find anything which, goes beyond it, or is not warranted by it, the question will arise whether that which is done is intra *vires* not of the directors of the company, but of the company itself. With regard to the articles of association, if you find anything which, still keeping within the memorandum is a violation of, or is in excess of the articles, the question will arise whether that is anything more than an act *extra vires* of the directors,

------------------------------------------------------------------

*[1874-80] All ER Rep Ext 2219 at 2225*

but *intra vires* of the company. Now the clause of the Act to which it is necessary to refer in the first place is the 6th clause. This is the first section which speaks of the incorporation of the company; but your Lordships will observe that it does not speak of that incorporation as the creation of a corporation with inherent common law rights, such rights as are by the common law possessed by every corporation, without any other limit than would, by the common law be assigned; but it speaks of a company being incorporated with reference to a memorandum of association, and you are referred thereby to the provisions which subsequently are to be found on the subject of that memorandum. The next clause which is material is the 8th. Thereby the memorandum which the persons are to sign as the preliminary to the incorporation of the company must state the objects for which the proposed company is to be established, and the company is to come into existence for those objects alone. Then the 11th section provides "The memorandum of association shall bear the same stamp as if it were a deed." Your Lordships will observe, therefore, that it is to be a covenant in which every member of the company is to covenant that he will observe the conditions of the memorandum, one of which is that the objects for which the company is established are those mentioned in the memorandum, and that he will not only observe that, but will observe it subject to the provisions of this Act. Well, but the very next provision in the Act is that contained in the 12th section. The covenant, therefore, is not merely that every member will observe the conditions upon which the company is established, but that no change shall be made by the company in those conditions; and if there is a covenant that no change shall be made in the objects for which the company is established, I apprehend that that includes an engagement that no object shall be pursued by the company or attempted to be obtained by the company in practice, except the object which is mentioned in the memorandum of association. Now, if that is so, if that is the condition upon which the corporation is established, it is, I apprehend, a mode of incorporation which contains in it both that which is affirmative and that which is negative. It states affirmatively the ambit and extent of vitality and power which by law is given to the incorporation, and it states, if it were necessary to state, negatively, that nothing shall be done beyond the ambit, and that no attempt shall be made to use the corporate life for any other purpose than that which is so specified. Now, with regard to the articles of association, I will ask your Lordships to observe how completely the character of the legislation is altered. The 14th section deals with those articles. It provides that the body of shareholders are to be masters of the regulations which, always keeping within the outside limit allowed by law, they may deem expedient for the internal management of the company. In connexion with that section must be taken the 50th section of the Act. Of the internal regulations of the company, therefore, the company are absolute masters; and, provided they pursue the course marked out in the Act, holding a general meeting and obtaining the consent of the company, they may alter those regulations from time to time. But all must be done subject to the conditions contained in the memorandum of association. That is to override and overrule any provisions of the articles which may be at variance with it. The memorandum of association is as it were the area beyond which the action of the company cannot go, but inside that area they may make such regulations for their own government as they think fit. That reference to the Act will enable me to dispose of a provision in the articles of association in the present

Ashbury Railway Carriage and Iron Company Limited v Riche [1874-80] All ER Rep Ext 2219, [1874-80] All ER
Rep Ext 2219

--------------------------------------------------------------------

case which was hardly dwelt upon in argument, but which I refer to that it may not be supposed to have been overlooked. I refer to No 4 of the articles of association of this company, which is in these words: "An extension of the company's business beyond or for other than the objects or purposes expressed or implied in the memorandum of association. shall take place only in pursuance of a special resolution." In point of fact no resolution for the extension of the business of the company was come to in this case; but even if it had been come to it would have been nugatory and inefficacious. There was in this 4th article an attempt to do the very thing which by the Act of Parliament was prohibited to be done, to claim and arrogate to the company a power, under the guise of internal regulation, to go beyond the objects or purposes expressed or implied in the memorandum. Now bearing in mind the difference which I thus take the liberty of pointing out between the memorandum and the articles, we arrive at once at all which appears to me to be necessary for the purpose of deciding this case. I have used the expression *extra vires* and *intra vires.* I prefer that expression very much to one which occasionally has been used in the judgments in the present case-the expression illegality. In a case such as your Lordships have now to deal with, it is not a question whether the contract sued upon involves that which is *malum prohibitum* or *malum in se,* or is a contract contrary to public policy, and illegal in that sense. I assume the contract in itself to be perfectly legal; to have nothing in it obnoxious to any of the powers involved in the expressions which I have used. The question is not the illegality of the contract, but the competency and power of the company to make the contract. I am of opinion that this contract was, as I have said, entirely beyond the objects of the memorandum of association. If so if was thereby placed beyond the powers of the company to make the contract. If so it is not a question whether the contract ever was ratified or not ratified. If it was a contract void at its beginning it was void for this reason--because the company could not make the contract. If every shareholder of the company had been in this room, and every shareholder of the company had said, "That is a contract which we desire to make, which we authorize the directors to make, to which we sanction the placing the seal of the company," the case would not have stood in any different position to that in which it stands now. The company would thereby by unanimous assent have been attempting to do the very thing which by the Act they were prohibited from doing. But if the company *ad ante* could not have authorized a contract of this sort being made, how could they subsequently have sanctioned the contract after in point of fact it had been made? Mr Benjamin endeavoured to contend that when a company had found that something had been done by the directors which ought not to have been done, they might be authorized to make the best they could of a difficulty into which they had thus been led, and therefore might acquire a power to sanction the contract being proceeded with. I am unable to sanction that suggestion. It appears to me it would be perfectly fatal to the whole scheme of legislation to which I have referred, if you were to hold, in the first place, that directors might do that which even the company could not do, and that then the company, finding out what had been done, could sanction subsequently what they could not have authorized antecedently. If this be the point of view of the Act of Parliament, it reconciles, as it appears to me, the opinion of all the judges of the Court of Exchequer Chamber, because I find that Blackburn, J, whose judgment was concurred in by two other judges, says, "I do not entertain any doubt

--------------------------------------------------------------------

that if on the true construction of the statute creating the corporation, it appears to be the intention of the Legislature, expressed or implied, that the corporation shall not enter into a particular contract, every court, whether of law or equity, is bound to treat a contract entered into contrary to the enactment as illegal, and therefore wholly void, and to hold that a contract wholly void cannot be ratified." That sums up and exhausts the whole case. I am of opinion beyond all doubt on the true construction of the statute of 1862 creating the corporation, that it was the intention of the Legislature, not implied but actually expressed, that the corporation should not enter, having regard to this memorandum of association, into a contract of this description. If so, according to the words of Blackburn, J, every court whether of law or equity, is bound to treat that contract, entered into contrary to the enactment, I will not say as illegal, but as wholly void, and to hold also that a contract wholly void cannot be ratified. That relieves me, and if your Lordships agree with me, relieves your Lordships from any question of ratification. I am bound to say that if ratification had to be considered, I have found in this case no evidence which to my mind is at all sufficient to prove ratification, but I desire to say that I do not wish to found my opinion upon any question of ratification. This

Ashbury Railway Carriage and Iron Company Limited v Riche [1874-80] All ER Rep Ext 2219, [1874-80] All ER
Rep Ext 2219

contract in my judgment could not have been ratified by the unanimous assent of the whole corporation. I have only
to add that I observe some cases have been referred to here, cases of the *Agriculturist Cattle Insurance Company,*
in your Lordship's House *(Spackman v Evans; Evans v Smallcombe; Houldsworth v Evans* (1868), 19 LT 151, 207,
211; LR 3 H L 171, 249, 263), and the case of the *Phosphate of Lime Company v Green* in the Court of Common
Pleas (1871, 25 LT 636; LR 7 CP 43), as if they had some bearing on the present question. Those cases have a
bearing on some of the observations with which I have troubled your Lordships. They are cases which illustrate
extremely well what I have said just now, that the articles of association of a company of this kind are the document
which defines the powers of directors, as between themselves and the company In those cases the whole question
was whether the directors had gone beyond the powers which were entrusted to them, and by which their authority
was limited under the articles of association. In no one of these cases was there any question as to whether the
power of the company had been exceeded. Those cases have no application whatever to the present case. For
these reasons I submit to your Lordships and move that the judgment in the present case should be reversed, and
judgment be entered for the defendants.


**LORD CHELMSFORD:**

The question upon this appeal is whether the appellants are liable upon a contract entered into with the respondent,
or whether that contract being *ultra vires* cannot be enforced against them. The appellants are limited company,
incorporated under the "Companies Act 1862," by which "any seven or more persons associated for any lawful
purpose, may, by subscribing their names to a memorandum of association, form an incorporated company, with or
without limited liability. The 8th section prescribes what the memorandum of association shall contain, and,
amongst other things, the objects for which the proposed company is to be established. By the 12th section power
is given to modify the memorandum of association in certain particulars, but the section adds, "save as aforesaid no
alteration shall be made by any company in the conditions contained in its memorandum of association." The
memorandum by which the present

--------------------------------------------------------------------

*[1874-80] All ER Rep Ext 2219 at 2228*

company was incorporated described its objects with great particularity. The only part of it to which attention need
be directed is that which states that one of the objects of the company was "to carry on the business of mechanical
engineers and general contractors." The learned counsel for the respondent sought to give a very wide meaning to
the words "general contractors," but he admitted that they required some limitation, contending, however, that they
extended at least to the business of constructing rail-ways. It appears to me that the generality of the expression is
limited by its association with the words "mechanical engineers," and that it ought to be confined to contracts
connected with that business. The contract upon which the question arises was entered into under the following
circumstances. [His Lordship then went fully into the facts of the case, and continued:] Is this an object for which the
company was incorporated by the memorandum of association? Great stress is laid in the argument for the
respondent upon the opinion of Blackburn, J. He considered the contract entered into by the company with Messrs
Riche not to be *ultra vires* on the ground that at common law a corporation could bind itself to do anything to which
a natural person could bind himself, and could deal with its property as a natural person could deal with his own;
and that if a general power to contract is an incident of a corporation, which it requires an indication of intention in
the Legislature to take away, he said that he saw no such indication in the Act. It would be different he added. If
negative words had been used and it had been said that the company should not do any other acts than those
necessary for the purpose for which it is formed. Now the incorporation of a company with limited liability is entirely
a creature of the statute. It was necessary, not only for the protection of those who might join such companies, but
also of persons who might enter into contracts with them, that the privilege of creating them should only be obtained
upon conditions which should be made known to the public, The Legislature, therefore, required that the objects for
which the proposed company was to be established should be contained in a memorandum of association, which,
when signed and registered, is to form the incorporated company. Whether, if there had been nothing in the Act
except this clause as to the formation of companies, they would not have been restrained from entering into
contracts as to other objects than those contained in the memorandum of association, is a question which it is

Ashbury Railway Carriage and Iron Company Limited v Riche [1874-80] All ER Rep Ext 2219, [1874-80] All ER Rep Ext 2219

unnecessary to consider, because there is a clause which imposes that restriction in the most express terms. Blackburn, J, observed that he saw no indication in the statute to take away the general power or contracting incident to corporations: but he afterwards, in mentioning the 12th section, said, "It provides in express negative words that, save as aforesaid, no alteration shall be made in the conditions contained in the memorandum of association." I do not know how stronger words than these could be used to prohibit a company formed under the statute from entering into any contract for any object beyond those mentioned in the memorandum. Among the articles of association of the company, there is one, the 4th, "that an extension of the company's business beyond or for other than the objects or purposes expressed or implied in the memorandum of association, shall take place only in pursuance of a special resolution." This article is entirely nugatory. I agree in what was held by Lord Selborne, LC, in *Dent's Case* (1873, 28 LT 888; 8 Ch App 768) that under the 10th section of the Act articles of association professing to confer authority upon a company beyond the limited extent allowed by the Act are simply void.

------------------------------------------------------------------

The real description of the contract entered into by the company is an engagement to supply the contractors for the construction of a Belgian Railway with the funds necessary to enable them to execute their contract. This is clearly not within any of the objects described in the memorandum of association, and the contract is *ultra vires,* and therefore not voidable, but absolutely void. The learned counsel for the respondent, after arguing against the conclusion that the contract was *ultra vires,* contended that it having been in part performed, and the money of the company having been paid in respect of it, the shareholders, in order to have the benefit of their money so misapplied, had a right to abstain from objecting to the contract, which might then be enforced against the company; and he enforced his argument by urging the distinction between an illegal Act, and an Act which it is beyond the power of the directors to do. This argument is really directed to the question whether the contract was completed by being ratified by the shareholders, the consideration of which will introduce another question whether it was in point of fact ratified. The contract with Messrs Riche is in exactly the same position as if no contract at all had been made, and therefore the ratification of it is not possible. If there had been an actual ratification it could not have given life to a contract which had no existence in itself, but at the utmost it would have amounted to a sanction by the shareholders to the act of the directors which, if given before the contract was entered into could not have made it valid as it does not relate to an object within the scope of the memorandum of association. The cases of *Spackman v Evans, Evans v Smallcombe,* and *Houldsworth v Evans (supra),* which were cited in argument, did not reach the present case. But, assuming the consent of the shareholders would in this case have had the effect of giving life to a still-born contract, no such consent was ever given. A ratification of the contract could only have been established by proof of the acquiescence of each and every shareholder, with full knowledge of the character of the act of the directors. It was argued on the part of the respondent that each shareholder having had notice of meetings of the company at which arrangements were made with respect to the mode of dealing with the contract, having had the means of knowledge of the transactions, if he chose to absent himself from the meeting, must be bound by the resolutions of the shareholders present. But I apprehend, as Lord Cranworth said in *Houldsworth v Evans (supra),* in joint stock companies absent shareholders should never be bound to do anything more than to assume that the directors are doing their duty. I confess it seems to me that in every case of a ratification by shareholders of an act *ultra vires* of the directors, there ought to be not a mere presumption of assent from notice of the unauthorized act, and absence from a meeting called to legalise it, but proof of the actual assent of each shareholder. But, however this may be, the present case is widely different from the one supposed. I am clearly of opinion in this case that the absent shareholders had no knowledge conveyed to them of the proposed business of the meeting, and that means of knowledge, or the presumption of knowledge, is not sufficient to raise an implication of assent, and therefore if the contract of the directors with Messrs Riche had been capable of ratification, there is no proof whatever that it was ever ratified. I agree that the judgment of the Exchequer Chamber ought to be reversed.

**LORD HATHERLEY:**

Ashbury Railway Carriage and Iron Company Limited v Riche [1874-80] All ER Rep Ext 2219, [1874-80] All ER Rep Ext 2219

I am of the same opinion. I must confess it appears to me that the case is really reduced to one of a very simple

---------------------------------------------------------------
*[1874-80] All ER Rep Ext 2219 at 2230*

character, and the question amounts merely to this: What is the true construction of the Act of Parliament with reference to the memorandum of association, and the powers conferred upon companies associated upon the limited principle, subject to that memorandum? As regards the first question of fact, namely, whether or not the agreement in question upon which the suit has been actually commenced by Messrs Riche, be one within the memorandum of association, it appears to me to be scarcely capable of argument. How it could possibly be brought within any of the terms contained in that memorandum, even with the aid of the ingenious arguments that we have heard at the bar, it is very difficult to conceive, because it was admitted by those upon whom the burden was thrown of showing that the memorandum of association would cover it, that the words "general contractors" must have some limit. It could not be contended that under those words the company were at liberty to contract for anything in the world. The expression must be limited, in some degree at least, by the words that precede it. I need say no more with reference to whether or not the contract in question, which is a contract to furnish and their company altogether, the *société anonyme* of Brussels, with money, from time to time, in order to carry into effect the works of a railway, is to be considered a contract within the scope of the memorandum of association of the Ashbury Company. The only other point in the case independent of the Act of Parliament, is the question of ratification. I confess I concur with the opinion which has already been expressed by your Lordships that there is not anything amounting to confirmation, if it were necessary to decide that point. I do not dwell upon it because I am of opinion that no amount of ratification or confirmation by individual shareholders could give validity to the contract in question. That depends upon the Act of Parliament, which is the real point in the case. When you consider that this Act was passed with the view of enabling persons to carry on business on principles which were up to that time wholly unknown in the general conduct of mercantile affairs in this country, when you consider that the general principle of partnership was that every person entering into any partnership whatsoever thereby subjected, before this description of legislation had been entered upon, the whole of his property, whatever it might be, to the demands of his creditors, it is impossible not to feel that when these legislative enactments, which gave power to depart from that principle upon certain conditions to be expressed in the Act of Parliament by which companies would be framed with that view, came to be made, it was necessary that the public, that is the persons dealing with a limited company, should be protected, as well as the shareholders themselves. Accordingly your Lordships will find throughout the whole of the Act a plain and marked distinction drawn between the interest of the shareholders *inter se,* and the interest which the public have in seeing that the terms of the Act are construed in such a manner as to protect them in dealing with companies of this description. The mode of protection adopted seems to have been this: the Legislature said, you may meet altogether, and form yourselves into a company, but in doing that you must tell all who may be disposed to deal with you the objects for which you have been associated. They will trust to that memorandum of association, and they will see that you have the power of carrying on business in such a manner as it specifies, to be limited, 'however, by the extent of the shares, that is to say, the money you may contribute for the purpose of carrying on that business. You must state the amount of the capital which you are about to invest in it, and you must

---------------------------------------------------------------
*[1874-80] All ER Rep Ext 2219 at 2231*

state the objects for which you are associated, so that the persons dealing with you will know that they are dealing with persons who can only devote their means to a given class of objects, and who are prohibited from devoting their means to any other purpose. Throughout the Act that purpose is apparent. With regard to the amount of capital, which is one point that I have referred to, the Act did give a special power of variation. But with regard to the memorandum of association, that is carefully protected by the 12th section. It is provided that whatever other things you may do in the way of variation, a certain limited power of alteration being given to you, no such power shall you have as to the objects specified in the memorandum of association. That being so, one turns to the views expressed by the learned judges who have decided that the contract which has been entered into in this case is one by which the company have been bound. Turning to the reasons upon which they have based that opinion, one

Ashbury Railway Carriage and Iron Company Limited v Riche [1874-80] All ER Rep Ext 2219, [1874-80] All ER Rep Ext 2219

finds them very clearly expressed in the judgment of Blackburn, J. His view appears to be this: True it is that the objects to which the common seal was applied in this case by the corporation may not be such as the directors could justify to their corporators; but then the corporation was called into being, and when the corporation was called into being you had an entity which could act by its common seal, just as any physical entity might act through his contract. Having created that entity you cannot say the contract is void, whatever may be the consequence which may enure to the persons who are affected by the act of the directors in affixing the common seal. Whatever acts they may have to complain of you cannot say that the act is void as against the persons who claim the benefit of that common seal, the power of affixing which you conferred upon them by making them a corporation. Then he cites passages from Lord Coke and Plowden, to show that when once you have given being to such a body as this, you must be taken to have given to it all the consequences of its being called into existence, unless by express negative words you have restricted the operation of the acts of the being you have so created. Now I think when this proposition is applied to the objects of this present Act of Parliament it must be clearly seen, not only that the entity which this corporation called into existence for the purpose of trading with limited liability, has by affirmative words those objects which are specified in the memorandum of association, as the objects for which it was called into being, but also that you find express negative words providing that "save as aforesaid no alterations shall be made in the conditions contained in the memorandum of association?' That is a distinct limitation by way of negative of the powers and authorities which you have conferred upon this entity. You say, we confer upon this corporate body the power of acting according to their memorandum, and we also say that that memorandum shall never be changed. I think it is far too nice a refinement to say that that is not equivalent to saying in so many words, the objects of the memorandum are your objects, and no other ever shall or can be your objects. I think that the Legislature had in view distinctly the object of protecting outside dealers and contractors with this limited company from the funds of the company being applied, or from a contract being entered into by the company for any other objects whatever than those mentioned in the memorandum, which the Legislature thought should remain for ever unchanged. It is quite true, as was said in the argument, that those same gentlemen who signed the memorandum might, the next hour, if they liked, go into another room, and frame a new object of business besides those specified in the memorandum they had

------------------------------------------------------------------

already agreed to. But it would be a perfectly new company in that case, and neither as regards their shareholders, nor still more as regards the general body of the public, have they the power or authority under the Act to combine together, as a corporation with limited, liability, to carry on business for any other purpose whatever than that specified in the memorandum of association. Mr Benjamin, feeling the pressure of the case in reference to the act which has been done, endeavoured to put this before us: *Fieri non debuit, sed factum valet.* He said, suppose I have to concede that the original contract was invalid, still the subsequent arrangements by which the company endeavoured to make the best they could of the difficult situation, in which their directors have placed them, might be taken to be valid. It may have been done, not for the purpose of evading the Act of Parliament, but rather the contrary, to bring' things back to such a state and condition as the law would allow, and to make the best of what had been the misfortune of the company. I apprehend that no such principle can be adopted as that the directors having committed an unlawful act, and then having taken the proper course, as it appears to me, in proposing, as they did by the instrument of 24 December 1867, to take the whole burden and responsibility upon themselves, the very proper act which they then did could give any validity whatever to that supposed contract. I apprehend that the true construction of that deed is this, that the deed provides that whatever rights the company might have acquired in consequence of the directors dealing with this property, or in consequence of strangers dealing with them, and attempting to take advantage of the contract, knowing that the moneys of the company had been employed in a manner which was *ultra vires,* that those rights should not be enforced. When a stranger has taken money of a company which ought to have been applied in one way, knowing that it ought to be so applied, and has applied it in another way, that money is earmarked for the original purpose, and can be followed as against the stranger, with any advantages that he may have derived in consequence of the improper contract which has been made. That being the case, I should read that instrument as an admission on the part of the company that, repudiating and rejecting altogether the contract, if they had any rights whatever of the description that I have mentioned, they would not exercise them. Perhaps, however, it is unnecessary for me to enter into that point, considering that I hold

Ashbury Railway Carriage and Iron Company Limited v Riche [1874-80] All ER Rep Ext 2219, [1874-80] All ER
Rep Ext 2219

upon this contract that it was one which no body of shareholders had power to ratify, it being by the 12th section of the Act illegal and void, as being contrary to the purpose for which, and for which only, power and authority was given by the Legislature, any other purpose being, according to my view of the case, expressly and distinctly prohibited by the clauses that I have referred to.

**LORD O'HAGAN:**

I am of the same opinion. The case depends for its result on the answers to three questions: First, were the contracts in dispute *ultra vires* of the directors? Secondly, was it possible to ratify them through the action of the shareholders? Thirdly, were they, in fact, so ratified? On the first question I think, notwithstanding the very ingenious reasoning of the counsel for the respondents, that the contracts in question were clearly *ultra vires* of the directors of the company. I cannot agree with the contention that the memorandum of association is not to be interpreted according to the ordinary rules of construction; and so construed it seems to me quite plain that the words "general contractors" cannot be held to indicate the possession by the persons so described of unlimited powers to

-----------------------------------------------------------------

*[1874-80] All ER Rep Ext 2219 at 2233*

enter into any sort of contract. Taken with the description of the company contained in the first paragraph of the memorandum, and the immediate context, which identifies them with "mechanical engineers," and points distinctly to the boundaries of their action, the rule *noscitur a sociis* was never more clearly applicable, and its reasonable application was never more clearly necessary, if we would give any practical effect to the memorandum in connexion with the Act under which it was framed. That Act gave certain privileges and imposed certain conditions, and one of them was that the memorandum of association should specify the objects of men seeking to trade with limited liability, for the manifest purpose that those objects should be clear and definite, and known precisely to all who might have dealings with the company. But if in a case like this it were competent for persons making and registering such a memorandum to segregate particular words, as "contractor" and "merchant," and insist that their generality should be confined neither by the declared purpose of the formation of the company, nor by the conterminous phraseology, nor by the manifest reason of the thing, the purpose of the Act would be defeated, and the favour given by it would be enjoyed without fulfilment of the condition properly imposed for the public benefit. Having, therefore, no doubt that the action of this company was *ultra vires,* I have as little that there was no valid ratification of the impeached contracts. Again, we must keep in mind the purpose of the legislation with which we are dealing. It was, as I have said, to give a privilege upon a condition, and the privilege was to be enjoyed upon the terms and with the limitations indicated in the memorandum of association. That memorandum when put upon record was to be for contractors, for creditors, and for all the world, a trustworthy indication of the exact character, purposes, and powers of the company described in it; and the admission of an authority in shareholders to warrant action inconsistent with that character, antagonistic to those purposes, and beyond those powers, would seem to encourage evasion of the statute, to abrogate the condition while continuing the privilege, and so to give the benefit without the burthen. By the memorandum the general community are to judge of the association; but how can it do so if shareholders proposing to bind a corporation by resolutions, perhaps effective between the shareholders themselves, altogether ignore the terms of it, and authorize dealings quite beyond the scope of its contemplation? It is plain that if the ratification for which the respondents contend could validly affirm the contracts on which they rely, there is no amount of divergence from the original object of the company which might not have been approved, no extension of the limits prescribed by the memorandum which might not have been effected by a simple resolution of all the shareholders. And if this be so, I cannot think that a conclusion pregnant with consequences so very serious can properly be sustained. I think it is not warranted by the statute, which equally condemns it by negative and affirmative provisions, and any such ratification as is relied on, being in clear contravention of the purpose and the letter of the law, should, in my opinion, be held void and illegal. This disposes of the second question, and concludes the case; but it is right to say, on the third point, that, whatever may be the possibility and impossibility of legal ratification, I do not think any ratification was, in fact, accomplished by the shareholders. Assuming the

contracts to have been *ultra vires,* we must cast on the respondent the onus of showing that they were validly ratified, and it appears to me that he has wholly failed to do so. I find no evidence to satisfy me either

---------------------------------------------------------------- *[1874-80] All ER Rep Ext 2219 at 2234*

that the absent shareholders had, in the language of Willes, J, in the case of the *Phosphate of Lime Company v Green* (1871, LR 7 CP 43; 25 LT 636) "full knowledge of the character of the acts to be adopted, or the intention to adopt them at all events, or under whatever circumstances;" or, indeed, to adopt them at all. On all the points arising in the case I am, therefore, clearly of opinion that the appellants are right, and that the appeal should be allowed.

**LORD SELBORNE:**

The action in this case is brought upon a contract not directly or indirectly to execute any works, but to find capital for a foreign railway company in exchange for shares and bonds of that company. Such a contract, in my opinion, was not authorized by the memorandum of association of the Ashbury Company. All your Lordships, and all the judges in the courts below, appear to be so far agreed. But this in my judgment is really decisive of the whole case. I only repeat what Lord Cranworth stated to be settled law in *Hawkes v Eastern Counties Railway Company* (1855, 5 HL Cas 331), when I say that a statutory corporation, created by Act of Parliament, for a particular purpose, is limited as to all its powers by the purpose of its incorporation as defined in that Act. The present and all other companies incorporated by virtue of the Companies Act of 1862, appear to me to be statutory corporations within this principle. The memorandum of association is, under that Act, their fundamental law, and they are incorporated only for the objects and purposes expressed in that memorandum. The object and policy of those provisions of the statute which prescribe the conditions to be expressed in the memorandum, and make these conditions, except in certain points, unalterable, would be liable to be defeated if a contract under the common seal, which on the fact of it transgresses the fundamental law, were not held to be void and *ultra vires* of the company, as well as beyond the power delegated to its directors or administrators. It was so held in the case of the *East Anglian Railway Company* (1851, 21 LJCP 23) and in the other cases upon Railway Acts which were approved by this House in *Hawkes' Case (supra),* and I am unable to see any distinction, for this purpose, between statutory corporations under Railway Acts and statutory corporations under the Companies Act of 1862. I cannot agree with the view of the judges who were for affirming the judgment in the Court of Exchequer Chamber. I think that contracts for objects and purposes foreign to, or inconsistent with the memorandum of association are *ultra vires* of the corporation itself. And it seems to me far more accurate to say that the inability of such companies to make such contracts rests on an original limitation and circumscription of their powers by the law and for the purposes of their incorporation, than that it depends upon some express or implied prohibition, making acts unlawful which otherwise they would have had a legal capacity to do. This being so, it necessarily follows that where there could be no mandate there cannot be any ratification, and that the assent of all the shareholders can make no difference when a stranger to the corporation is suing the company itself in its corporate name upon a contract under the common seal. No agreement of shareholders can make that a contract of the corporation which the law says cannot and shall not be so. If, however, this contract could have been susceptible of confirmation or ratification by the universal consent of all the shareholders, I should have been of opinion that there was here no evidence whatever to go to a jury of any such confirmation or ratification. What was relied upon consists entirely of resolutions passed

---------------------------------------------------------------- *[1874-80] All ER Rep Ext 2219 at 2235*

at certain general meetings of the shareholders and a deed executed pursuant to those resolutions. But there is no evidence whatever that they were communicated to any shareholder who was not present at those meetings, by notice, either beforehand or afterwards. The notices under which these meetings were convened contained nothing from which any shareholder could be led to suppose that it was in contemplation to enter into or adopt on the part of the company any contract or arrangement in excess of the ordinary powers of the company, as represented by the shareholders assembled at a duly constituted general meeting. There is no obligation upon any shareholder

Ashbury Railway Carriage and Iron Company Limited v Riche [1874-80] All ER Rep Ext 2219, [1874-80] All ER Rep Ext 2219

receiving such notices either to attend the meetings or to make inquiries as to what is proposed to be done at them, in order to protect himself from being bound by acts or contracts *ultra vires* of any general meeting. He will, of course, be bound by all that the general meeting can do as to the matters mentioned in the notices within their powers, but he cannot, in his absence and without his knowledge, be taken to consent that they shall bind him by any resolutions or acts in excess of those powers, whether such acts or resolutions do or do not relate to the particular business for the transaction of which those meetings were called together.

Judgment of the Exchequer Chamber reversed, and judgment entered for the plaintiffs in error (defendants).

C E MALDEN, BARRISTER-AT-LAW

**End of Document**

# Exhibit C

# CHAPTER 222

## THE INTERNATIONAL BUSINESS CORPORATIONS ACT

Arrangement of Sections
Section

1. Short title.
2. Interpretation.
**3.** Proscribed enterprises.
4. International trade or business.

### Part I — Constitution of Corporations

### Division A: Incorporation

5. Incorporation.
6. Formalities.
7. Required votes.
8. Documentation.
9. Certificate of incorporation.
10. Effective date.
11. Corporate name.
12. Reserved name.
13. Name change.
14. Continued name.
15. Name revocation.
16. Assigned name.
17. re-incorporation contracts.

### Division B: Corporate Capabilities

18. Capacity and powers.
19. Powers reduced.
20. Validity of acts.
21. Notice not presumed.
22. No disclaimer allowed.

Section

23. Contracts of corporation.
24. Bills, notes.
25. Power of attorney.
26. Coporate seal.

### Division C: Share Capital

27. Nature of shares.
28. If only one class.
29. Share classes.
30. Share issue.
31. Consideration.
32. Stated capital accounts.
33. Series shares.
34. Pre-emptive rights.
35. Conversion privileges.
36. Reserve shares.
37. Own shares.
38. Exceptions.
39. Acquisition of own shares.
40. Other acquisition.
41. Redeemable shares.
42. Donated shares.
43. Voting thereon.
44. Stated capital reduction.
45. Stated capital adjustment.
46. Cancellation of shares.
47. Presumption re own shares.
48. Changing share class.
49. Debt obligations.
50. Share purchase contract.
51. Prohibited dividend.
52. Payment of dividend.
53. Illicit loans by corporation.
54. Permitted gifts.
55. Prejudicial circumstances.
56. Permitted loans.
57. Enforcement of illicit loans.
58. Immunity of shareholders.
59. Lien on shares.

## Division D: Management of Corporations

Section

60. Duty to manage corporation.
61. Number of directors and residence
62. Restricted powers.
63. By-law powers.
64. Organisational meeting.
65. Disqualified directors.
66. No qualification required.
67. Election of directors.
68. Termination of office.
69. Resignation of director.
70. Removal of director.
71. Right to notice.
72. Filling vacancy.
73. Numbers changed.
74. Notice of change.
75. Directors' meetings.
76. Notice and waiver.
77. Adjourned meeting.
78. One director board.
79. Telephone participation.
80. Delegation of powers.
81. Validity of acts.
82. Meeting by resolution.
83. Liability for share issue.
84. Liability for other acts.
85. Contribution for judgment.
86. Recovery by action.
87. Defence to liability.
88. Time limit on liability.
89. Interests in contracts.
90. Interest declaration.
91. Avoidance of nullity.
92. Setting aside contract.
93. Designation of offices, etc.
94. Borrowing powers.
95. Duty of care.
96. Dissenting to resolutions.
97. Indemnifying director, etc.
98. For derivative actions.
99. Right to indemnity.

**LAWS OF ANTIGUA AND BARBUDA**

Section

100. Insurance of directors, etc.
101. Court approval of indemnity.

### Division E: The Shareholders

102. Place of meetings.
103. Attendance at meetings.
104. Calling meetings.
105. Record date of shareholders.
106. Statutory date.
107. Notice of record date.
108. Notice of meeting.
109. Special business.
110. Waiver of notice.
111. List of shareholders.
112. Examination of list.
113. Quorum at meetings.
114. Right to vote share.
115. Representative of other body.
116. Joint shareholders.
117. Voting method at meetings.
118. Ballot.
119. Resolution in writing.
120. Requisitioned shareholders meeting.
121. Court-called meeting.
122. Court review of controversy.
123. Pooling agreement.
124. Unanimous shareholder agreement.
125. Extra-ordinary transaction.
126. Registrant's duty.
127. Governing prohibition.

### Division F: Corporate Records

128. Registered office.
129. Notice of address.
130. Records of corporation.
131. Trust notices.
132. Other records.
133. Records form.
134. Duty of care for records
135. Access to records.

Section

171. Horizontal short-form amalgamation.
172. Articles of amalgamation.
173. Certificate of amalgamation.
174. Re-organisation.
175. Arrangements.
176. Continuation as corporation.
177. Extended period.
178. Amending instrument.
179. Articles of continuance.
180. Certificate of continuance.
181. Non-continuance effect.
182. Continuing imported corporations.
183. Certificate of continuance.
184. Application for continuance.
185. Conditions precedent.
186. Import option.
187. Export option.
188. Preservation of rights.
189. Various shares.
190. Effect of discontinuance.
191. Dissent by shareholder.
192. Demand for payment.
193. Suspension of rights.
194. Offer to pay for share.
195. Application to court.
196. Joined parties.
197. Court powers.
198. Interest.
199. Recourse of dissenting shareholder.

## Division J: Civil Remedies

200. Definitions.
201. Derivative actions.
202. Preliminary requirements.
203. Court powers.
204. Oppression restrained.
205. Staying action.
206. Interim costs.
207. Rectification of records.
208. Directions for Director.
209. Refusal by Director.

(*d*) to a subsidiary body corporate of the corporation; and

(e) to employees of the corporation or any of its affiliates

- (i)  to enable or assist them to purchase or erect living accommodation for their own occupation,

- (ii)  in accordance with a plan for the purchase of shares of the corporation or any of its affiliates to be held by a trustee, or

- (iii)  to enable or assist them to improve their education or skills, or to meet reasonable medical expenses.

**57.**   A contract made by a corporation contrary to section 53 may be enforced by the corporation or by a lender for value in good faith without notice of the contravention.    *Enforcement of illicit loans.*

**58.**   The shareholders of a corporation are not, as shareholders, liable for any liability, act or default of the corporation except under subsection (5) of section 44, subsection (2) of section 124 or subsection (5) of section 312.    *Immunity of shareholders.*

**59.**   (1) Subject to this Act, the articles of a corporation may provide that the corporation has a lien on a share registered in the name of a shareholder or his legal representative for a debt of that shareholder to the corporation including an amount unpaid in respect of a share issued by a corporation on the date it was continued under this Act.    *Lien on shares.*

(2) A corporation may enforce a lien referred to in subsection (1) in accordance with its by-laws.

## DIVISION D: MANAGEMENT OF CORPORATIONS

### DIRECTORS AND OFFICERS

**60.**   Subject to any unanimous shareholder agreement, the directors of a corporation must    *Duty to manage corporation.*

(*a*) exercise the powers of the corporation directly or indirectly through the employees and agents of the corporation, and

(*b*) direct the management of the business and affairs of the corporation.

**Number of directors and residence.**

**61.**   A corporation must have at least one director, but a director need not be a natural person. In the case of banking, trust or insurance corporations at least one director must be a citizen and resident of Antigua and Barbuda of a corporation licensed under this Act to carry on an International Trust Business.

**Restricted powers.**

**62.**   If the powers of the directors of a corporation to manage the business and affairs of the corporation are in whole or in part restricted by the articles of the corporation, the directors have all the rights, powers and duties of the directors to the extent that the articles do not restrict those powers; but the directors are thereby relieved of their duties and liabilities to the extent that the articles restrict their powers.

**By-law powers.**

**63.**   (1) Unless the articles, by-laws or an unanimous shareholder agreement otherwise provide, the directors of a corporation may by resolution make, amend, or repeal any by-laws for the regulation of the business or affairs of the corporation.

(2) The directors of a corporation must submit a by-law, or any amendment or repeal of a by-law, made under subsection (1) to the shareholders of the corporation at the next meeting of shareholders after the making, amendment or repeal of the by-law; and the shareholders may, by ordinary resolution, confirm, amend or reject the by-law, amendment or repeal.

(**3**) A by-law, or any amendment or repeal of a by-law, is effective from the date of the resolution of the directors making, amending or repealing the by-law until

(*a*) the by-law, amendment or repeal is confirmed, amended or rejected by the shareholders pursuant to subsection (2), or

( *b* ) the by-law, amendment or repeal ceases to be effective pursuant to subsection *( 4 );*

and, if the by-law, amendment or repeal is confirmed or amended by the shareholders, it continues in effect in the form in which it was confirmed or amended.

*( 4 )* When a by-law, or an amendment or repeal of a by-law is not submitted to the shareholders as required by subsection (2) or is rejected by the shareholders, the by-law, amendment or repeal ceases to be effective; and no subsequent resolution of the directors to make, amend or repeal a by-law having substantially the same purpose or effect is effective until the resolution is confirmed, with or without amendment, by the shareholders.

(5) A shareholder who is entitled to vote at an annual meeting of shareholders may make a proposal to make, amend or repeal a by-law.

**64.** *( 1 )* At the time of sending articles of incorporation of a corporation to the Director, the incorporators must send him, in the prescribed form, a notice of the names of the directors of the corporation and the name and address of the corporation's resident agent for service of process who must be a resident of Antigua and Barbuda; and the Director must file the notice. **Organisational meeting.**

(2) Each director named in the notice referred to in subsection *( 1 )* holds office as a director of the corporation from the issue of the certificate of incorporation of the corporation until the first meeting of the shareholders of the corporation.

(**3**) After the issue of the certificate of incorporation of a corporation, a meeting of the directors of the corporation must be held at which the directors may

( *a* ) make by-laws;

( *b* ) adopt forms of share certificates and corporate records;

( *c* ) authorise the issue of shares;

( *d* ) appoint officers;

(e) appoint an auditor, if required, to hold office until the first annual meeting of shareholders;

(*f*) make banking arrangements; and

(*g*) transact any other business.

(4) An incorporator or a director may call the meeting of directors referred to in subsection (3) by giving by post not less than five days notice of the meeting to each director and stating in the notice the time and place of the meeting.

(5) Subsection (3) does not apply to a corporation to which a certificate of amalgamation has been issued under section 173.

**Disqualified directors.**

**65.** (1) When, on the application of the Director, it is made to appear to the court that a person is unfit to be concerned in the management of a corporation, the court may order that, without the prior leave of the court, he may not be a director of the corporation or, in any way, directly or indirectly, be concerned with the management of the corporation for such period

(a) beginning

(i) with the date of the order, or

(ii) if the person is undergoing, or is to undergo, a term of imprisonment and the court so directs, with the date on which he completes that term of imprisonment or is otherwise released from prison,

and

(*b*) not exceeding five years,

as may be specified in the order.

(2) In determining whether or not to make an order under subsection (1), the court must have regards to all the circumstances that it considers relevant including any previous convictions of the person in Antigua and Barbuda or elsewhere for an offence involving fraud or dishonesty or in connection with the promotion, formation or management of any body corporate.

**75.** (1) The directors of a corporation shall hold the annual meeting of directors within Antigua and Barbuda and unless otherwise provided in the articles or by-laws, any other meeting of directors may be held at any place upon such notice as the by-laws require.

*Directors' meetings.*

(2) Subject to the articles or by-laws, a majority of the number of directors or minimum number of directors required by the articles constitutes a quorum at any meeting of directors; and, notwithstanding any vacancy among the directors, a quorum of directors may exercise all the powers of the directors.

**76.** (1) A notice of a meeting of the directors of a corporation must specify any matter referred to in subsection (2) of section 80 that is to be dealt with at the meeting; but, unless the by-laws of the corporation otherwise provide, the notice need not specify the purpose of or the business to be transacted at the meeting.

*Notice and waiver.*

(2) **A** director may, in any manner, waive a notice of a meeting of directors; and attendance of a director at a meeting of directors is a waiver of notice of the meeting by the director except when he attends the meeting for the express purpose of objecting to the transaction of any business on the grounds that the meeting is not lawfully called.

**77.** Notice of an adjourned meeting of directors need not be given if the time and place of the adjourned meeting is announced at the original meeting.

*Adjourned meeting.*

**78.** Where a corporation has only one director; that director may constitute a meeting.

*One director board.*

**79.** (1) Subject to the by-laws of a corporation, a director may, if all the directors of the corporation consent, participate in a meeting of directors of the corporation or of a committee of the directors by means of such telephone or other communication facilities as permit all persons participating in the meeting to hear each other. Such a meeting will be deemed to have been held within Antigua and Barbuda so long as at least one director is present in Antigua and Barbuda during the meeting.

*Telephone participation.*

Case 22-11068-JTD    Doc 3400-2    Filed 10/27/2

**92.** When a director or officer of a corporation fails Setting aside to disclose, in accordance with section 89 or 90, his interest contract. in a material contract made by the corporation, the court may, upon the application of the corporation or a shareholder of the corporation, set aside the contract on such terms as the court thinks fit.

## OFFICERS OF THE CORPORATION

**93.** Subject to the articles or by-laws of a corpora- Designation of tion or any unanimous shareholder agreement, offices etc.

(*a*) the directors of the corporation may designate the offices of the corporation, appoint natural persons of full capacity as officers, specify their duties and delegate to them powers to manage the business and affairs of the corporation, except powers to do anything referred to in subsection (2) of section 80;

(*b*) a director may be appointed to any office of the corporation; and

(c) two or more offices of the corporation may be held by the same person.

## BORROWING POWERS OF DIRECTORS

**94.** (1) Unless the articles or by-laws, or any Borrowing unanimous shareholder agreement relating to the corpora- powers. tion otherwise provide, the articles of a corporation are presumed to provide that the directors of the corporation may, without authorisation of the shareholders,

(*a*) borrow money upon the credit of the corporation;

(*b*) issue, re-issue, sell or pledge debentures of the corporation;

(c) subject to section *53,* give a guarantee on behalf of the corporation to secure performance of an obligation of any person; and

(*d*) mortgage, charge, pledge, or otherwise create to secure any obligation of the corporation a security interest in all or any property of the corporation that is owned or subsequently acquired by the corporation.

**LAWS OF ANTIGUA AND BARBUDA**

**54**    **CAP.** *222) International Business Corporations*

*(2)* Notwithstanding subsection *(2)* of section *80* and paragraph *(a)* of section *93,* unless the articles or by-laws of, or any unanimous shareholder agreement relating to, a corporation otherwise provide, the directors of the corporation may by resolution delegate the powers mentioned in subsection *(1)* to a director, a committee of directors or an officer of the corporation.

*(3)* For the purposes of this Act "security interest" means any interest in or charge upon any property of a corporation, by way of mortgage, bond, lien, pledge or other means, that is created or taken to secure the payment of an obligation of the corporation.

## DUTY OF DIRECTORS AND OFFICERS

**Duty of care.**    **95.** (1) Every director and officer of a corporation in exercising his powers and discharging his duties must

*(a)* act honestly and in good faith with a view to the best interests of the corporation; and

*(b)* exercise the care, diligence and skill that a reasonably prudent person would exercise in comparable circumstances.

*(2)* Every director and officer of a corporation must comply with this Act and the regulations and with the articles and by-laws of the corporation and any unanimous shareholder agreement relating to the corporation.

*(3)* Subject to subsection **(3)** of section *124,* no provision in a contract, the articles of a corporation, its by-laws or any resolution, relieves a director or officer of the corporation from the duty to act in accordance with this Act or the regulations, or relieves him from liability for a breach of this Act or the regulations.

**Dissenting to resolutions.**    **96.** *(1)* A director of a corporation who is present at a meeting of the directors or of a committee of directors of the corporation consents to any resolution passed or action taken at that meeting, unless

*(a)* he requests that his dissent be or his dissent is entered in the minutes of the meeting,

(5) Upon receipt of articles of re-organisation for a corporation, the Director must issue a certificate of amendment in accordance with section *327*.

(6) A re-organisation of a corporation becomes effective on the date shown in the certificate of amendment and its articles of incorporation are amended accordingly.

*(7)* A shareholder of a corporation is not entitled to dissent under section 191 if an amendment to the articles of incorporation of the corporation is effected under this section.

## ARRANGEMENTS

**175.** *(1)* In this section, "arrangements" includes    Arrangements.

(*a*) an amendment of the articles of a corporation;

(*b*) an amalgamation of two or more corporations;

(*c*) a division of the businesses carried on by a corporation;

(*d*) a transfer of all or substantially all the property of a corporation to another body corporate in exchange for property, money or securities of the body corporate;

(*e*) an exchange of securities held by security holders of the corporation for property, money or other securities of the corporation, or property, money or securities of another body corporate;

(*f*) a liquidation and dissolution of a corporation; and

(*g*) any combination of the activities described in paragraphs (*a*) to (*f*).

*(2) For* the purposes of this section a corporation is insolvent when

(*a*) it is unable to pay its liabilities as they become due, or

(*b*) the realisable value of the assets of the corporation are less than the aggregate of its liabilities and stated capital of all classes.

**LAWS OF ANTIGUA AND BARBUDA**

98      **CAP. 222)**   *International Business Corporations*

(3) Where it is not practicable for a corporation that is not insolvent to effect a fundamental change in the nature of an arrangement under any other provision of this Act, the corporation may apply to the court for an approval of an arrangement proposed by the corporation.

(4) In connection with an application under this section, the court may make in any interim or final order it thinks fit,

(a) an order determining the notice to be given to any interested person or dispensing with notice to any person other than the Registrar;

(*b*) an order requiring a corporation, in such manner as the court directs, to call, hold and conduct a meeting of shareholders or debenture holders or holders of options or rights to acquire shares in the corporation;

(c) an order permitting a shareholder to dissent under section 191; or

(*d*) an order approving an arrangement as proposed by the corporation or as amended in such manner as the court may direct.

(5) An applicant under this section must give the Director notice of the application; and the Director may appear and be heard in person or by counsel.

(6) After an order referred to in paragraph (6) of subsection (4) has been made, articles of arrangement in the prescribed form must be sent to the Director together with the documents required by sections 74 and 129, if applicable.

## EXISTING OFF-SHORE COMPANIES

**Continuation as corporation.**

**176.** (1) Subject to subsection (2), an existing off-shore company must, within one year after the commencement of this Act or any extended period granted under section 177, apply to the Director, by articles of continuance in the prescribed form, set out in Schedule II, for a certificate of continuance under this Act.

# Exhibit D

# Rolled Steel Products (Holdings) Ltd v British Steel Corp and others

*a*

COURT OF APPEAL, CIVIL DIVISION

LAWTON, SLADE AND BROWNE-WILKINSON LJJ

12, 13, 14, 19, 20, 21, 27, 28, 29 MARCH, 2, 3, 4 APRIL, 11 JUNE 1984

*b*

*Company – Memorandum of association – Ultra vires – Objects clause – Distinction between company's objects and director's powers – Distinction between acts ultra vires the company and directors' acts in excess of their power – Test for determining ultra vires acts.*

*Company – Objects clause – Construction – Borrowing power declared as an object – Power to lend money and give guarantees – Company owing debt to second company which owed much larger debt to third party – Debt to third party personally guaranteed by director of company – Company giving guarantee of payment of debt owed to third party in return for loan to pay off its debt to second company – Company thereby assuming liability under guarantee for amount greater than debt owed by it – Whether guarantee within company's objects clause – Whether guarantee given for unauthorised purpose – Whether guarantee should be set aside.*

*c*

*d*

The plaintiff was a company which carried on business as wholesalers of steel, mainly to motor vehicle manufacturers. The two directors were S and his father, S being the majority shareholder and the balance of the shares being held by a trust set up by S for the benefit of his children. Clause 3(K) of the plaintiff company's memorandum of association empowered it to 'lend and advance money or give credit to such persons, firms, or companies and on such terms as may seem expedient . . . and to give guarantees or become security for any such persons, firms, or companies'. S formed another company (SSS Ltd) and on behalf of that company entered into an agreement with C Ltd, a steel producing company, for SSS Ltd to act as distributor of coil and cut steel for C Ltd (which was later taken over by the British Steel Corp (BSC)). Under the agreement C Ltd agreed to supply SSS Ltd with coil and cut steel and SSS Ltd agreed to set up a steel service centre from which customers would be supplied. S arranged for the plaintiff company to set up the steel service centre with some £400,000 borrowed from SSS Ltd. The plaintiff company purchased a site and erected the steel service centre from which SSS Ltd commenced operations by purchasing large stocks of coil and cut steel on credit from C Ltd. SSS Ltd thereby incurred a debt to C Ltd which eventually amounted to some £860,000, a sum substantially in excess of its only significant asset, namely the debt of £400,000 owed to it by the plaintiff company. When SSS Ltd failed to respond to pressure to reduce the debt BSC, acting for C Ltd, became alarmed and first obtained a personal guarantee of the debt by S and then proposed that the plaintiff company guarantee SSS Ltd's debt to C Ltd. The plaintiff company was known to have sufficient assets (including other land (the Rainham site) valued at £850,000) to meet the debt. As a result a scheme was devised whereby C Ltd agreed not to press SSS Ltd for repayment of the debt and further agreed to lend the plaintiff company the amount required to pay its debt to SSS Ltd (which SSS Ltd was in turn to repay to C Ltd) in return for the plaintiff company agreeing to guarantee the debt owed by SSS Ltd to C Ltd and to sell the Rainham site by a specified date and use the proceeds to repay the debt, failing which the plaintiff company would issue a debenture over all its assets in favour of C Ltd. A board meeting of the plaintiff company was held on 22 January 1969 at which S and his co-director passed the necessary resolution approving the financial rearrangement and authorising the execution of the guarantee and debenture. S did not declare at that meeting that he had personally guaranteed SSS Ltd's debt to C Ltd. Under art 17 of the plaintiff company's articles of association a director who declared his interest in a contract with the company was entitled to vote as part of the quorum of two directors required for board meetings. Following the passing of the resolution and various payments by banker's draft, the debt owed to C Ltd was effectively passed from SSS Ltd to the plaintiff company (which executed a guarantee in favour of C Ltd) and S's liability under his

*e*

*f*

*g*

*h*

*j*

personal guarantee was proportionately reduced. When the Rainham site was not sold
*a* by the specified date the plaintiff company executed a debenture in favour of C Ltd, and
when a demand for the repayment of the debt was not met C Ltd appointed a receiver
under the debenture. The receiver eventually managed to sell the Rainham site for
sufficient to pay to BSC the amount secured by the debenture and interest, the total
payment being £1,148,078. However, after payment of other preferential debts, there
was insufficient left to meet the unsecured liabilities of the plaintiff company. In those
*b* circumstances the plaintiff company brought an action against, among others, BSC and
the receiver (the defendants) seeking a declaration that the guarantee and debenture were
void and claiming repayment of the sum paid over to BSC by the receiver. The plaintiff
company contended, inter alia, (i) that neither the guarantee nor the debenture was a
deed duly authorised or executed by the plaintiff company, because S's failure to disclose
his interest (namely that his own guarantee would be reduced) at the meeting of the
*c* plaintiff's directors on 22 January 1969 to authorise the financial rearrangement meant
that he was disqualified from voting at that meeting, which was consequently inquorate,
(ii) that the guarantee and debenture were both ultra vires the plaintiff company and
void, and (iii) that the directors of the plaintiff company had acted in bad faith in entering
into the financial rearrangement, which fact was known to BSC and therefore BSC held
money received from the plaintiff company as a constructive trustee and the defendants
*d* were liable in equity to replace that money. At the trial the defendants were permitted,
after the evidence had been completed, to raise the defence that C Ltd had been entitled
to assume that the board resolution of 22 January 1969 was duly passed at a properly
constituted meeting of the plaintiff company's directors and in accordance with its
articles. A similar application by the defendants to raise the defence that the shareholders
of the plaintiff company had consented to the transaction was refused by the judge. In
*e* giving judgment the judge held (i) that the plaintiff company's claim that the guarantee
and debenture had not been duly authorised failed in the face of the defence that the
plaintiff company was to be assumed to have properly performed acts which it was
within its constitution to carry out, but (ii) that the guarantee and debenture had been
given by the plaintiff company for an unauthorised purpose, which fact BSC had been
aware of, and that the plaintiff company was therefore entitled to have those transactions
*f* set aside and the money repaid. The defendants appealed against that finding. The
plaintiff company cross-appealed on the ground that the defendants should not have been
permitted to raise the defence that the plaintiff company was to be assumed to have
properly performed its acts.

**Held** – The appeal of BSC and the receiver would be dismissed and the cross-appeal of
*g* the plaintiff company would be allowed, for the following reasons—
    (1) The defence that a company could be assumed to have properly performed acts
which were within its constitution was not an absolute and unqualified rule of law
applicable in all circumstances but only applied in favour of persons dealing with the
company in good faith, that being a matter of fact which was capable of being disproved
by evidence that the defendant knew of the irregularity in the company's procedures or
*h* if the circumstances were such as to put the defendant on inquiry which he failed duly
to make. Since C Ltd was to be taken as knowing that the resolution of 22 January 1969
would not be valid unless S declared his personal interest in the guarantee and debenture
C Ltd was, on the facts, not entitled to assume, without making further inquiry, that S
had in fact declared his interest, and therefore, if C Ltd wished to raise the defence that
the resolution had been passed at a properly constituted meeting of the directors of the
*j* plaintiff company and at which proper disclosure of S's interest had been made, C Ltd
was required to plead the point so that the plaintiff company had the opportunity of
adducing evidence and cross-examining in rebuttal. Since application to amend the
defence in order to plead the point had not been made until after the evidence had been
completed, with the result that the plaintiff company had not been given an opportunity
to rebut it in evidence or cross-examination, the amendment should not have been
allowed. For the same reason, the judge had rightly refused to allow the defendants to
raise the shareholders' consent defence after the evidence had been completed. There was

therefore no defence to the plaintiff company's claim that neither the debenture nor the guarantee were properly authorised deeds of the plaintiff company, which was *a* accordingly entitled to disclaim them as having been made without its authority and not being duly executed (see p 67 *b c*, p 70 *f* to p 71 *b*, p 76 *h j*, p 77 *c* to *j*, p 78 *c d* and *j* to p 79 *b* and *d* to *f*, p 90 *g* to *j*, p 92 *a b*, p 95 *j* and p 96 *f g*, post); *Royal British Bank v Turquand* [1843–60] All ER Rep 435 and *Morris v Kanssen* [1946] 1 All ER 586 considered.

(2) In order to be ultra vires a company transaction had to be done in excess of, or outside, the capacity of the company and not merely in excess or abuse of the powers of *b* the company exercised by the directors. Accordingly, whether a transaction was ultra vires depended solely on the construction of the memorandum of association and whether the transaction fell within the objects of the company, properly construed; and a transaction which was within the objects of the company or which was capable of being performed as reasonably ancillary or incidental to the objects was not ultra vires merely because the directors carried out the transaction for purposes which were not within the *c* memorandum of association. Moreover, since the directors of a company were held out by the company as having ostensible authority to bind the company to transactions which, expressly or impliedly, fell within the powers conferred by the memorandum, a person dealing in good faith with the company was entitled to assume that the directors were properly exercising their powers for the purposes of the company and was further entitled to hold the company to the transaction. However, if the company entered into a *d* transaction which, although intra vires as being within its objects, was in excess or an abuse of the directors' powers the transaction could be set aside at the instance of the shareholders; and a person dealing with the company who had notice, whether actual or constructive, that the transaction had been entered into in excess or abuse of the directors' powers could not hold the company to the transaction and would be accountable as a constructive trustee for any money or property received by him from the company. The *e* power of the plaintiff company, under cl 3(K) of its memorandum, to lend and advance money 'on such terms as may seem expedient' was only a power and not a separate object and, furthermore, was a power which could only be used for the furtherance of the objects of the company. Since the guarantee and the debenture had been entered into in furtherance of purposes which were not authorised by the company's memorandum and were therefore beyond the authority of the directors and since that fact was known to *f* C Ltd the plaintiff company was entitled to disclaim those transactions (see p 80 *a* to *d*, p 81 *a* and *d* to *h*, p 83 *e* to *h*, p 85 *g* to p 86 *e*, p 87 *d* to *g*, p 90 *g* to *j*, p 91 *c d*, p 92 *c* to *f* and *h* to p 93 *b d e* and *h* to p 94 *d*, p 95 *j* and p 96 *f g*, post); *Charterbridge Corp Ltd v Lloyds Bank Ltd* [1969] 2 All ER 1185, *Re Halt Garage (1964) Ltd* [1982] 3 All ER 1016, *Re Horsley & Weight Ltd* [1982] 3 All ER 1045 applied; *Re David Payne & Co Ltd, Young v David Payne & Co Ltd* [1904] 2 Ch 608 explained; *Re Introductions Ltd, Introductions Ltd v National* *g* *Provincial Bank Ltd* [1969] 1 All ER 887 considered; dictum of Eve J in *Re Lee Behrens & Co Ltd* [1932] All ER Rep at 890–891 disapproved.

(3) The principle that, if the directors applied the company's funds in breach of the fiduciary duty they owed to the company, a third party who received the funds with knowledge, whether actual or constructive, of the directors' breach thereby became a constructive trustee of the misapplied funds for the company applied where the relevant *h* misapplication of the company's assets by the directors consisted of an application of the company's funds either for purposes not authorised by the company's memorandum or for purposes in breach of the company's articles of association. Since the plaintiff company's directors had acted in breach of its articles and their own fiduciary duty in purporting to authorise and execute the guarantee and debenture and since BSC and the receiver had had notice of that when they received assets from the plaintiff company, *j* BSC and the receiver accordingly held those assets as constructive trustees on behalf of the plaintiff company (see p 73 *h j*, p 74 *a b*, p 76 *c*, p 88 *a* to *e*, p 90 *g* to *j*, p 91 *h j*, p 94 *d* to *f*, p 95 *j* and p 96 *f g*, post); *Belmont Finance Corp v Williams Furniture Ltd (No 2)* [1980] 1 All ER 393 applied.

(4) The appropriate relief was a declaration that the guarantee and debenture were not the deeds of the plaintiff company and that the appointment of the receiver was null and

void. However, it was a principle of equity that where a third party's money was obtained

*a* by an agent's unauthorised act and applied for the benefit of the agent's principal the principal was liable to restore the money even though the third party knew the agent was not authorised to obtain or receive the money. Accordingly, it would be inequitable for the plaintiff company to be repaid the amount paid to SSS Ltd (to enable SSS Ltd to repay C Ltd) since although that payment was an unauthorised act by the directors the sum involved had been borrowed from C Ltd and the plaintiff company remained under

*b* an obligation to repay that sum to C Ltd (see p 89 *a* and *c* to *f*, p 90 *g* to *j*, p 94 *f g*, p 95 *j* and p 96 *f g*, post); *Reversion Fund and Insurance Co Ltd v Maison Cosway Ltd* [1913] 1 KB 364 applied.

Decision of Vinelott J [1982] 3 All ER 1057 reversed in part.

**Notes**

*c* For general principles affecting powers and duties of directors, see 7 Halsbury's Laws (4th edn) paras 496–510, for liabilities of directors, see ibid paras 516–527, and for cases on the subject, see 9 Digest (Reissue) 490–494, 2927–2962.

For the meaning of 'ultra vires', see 7 Halsbury's Laws (4th edn) para 705, for acts ultra vires a company, see ibid paras 706–708, and for cases on the power of companies in regard to guarantees, see 9 Digest (Reissue) 682–683, 4058–4062.

*d*

**Cases referred to in judgments**

*A-G's Reference (No 2 of 1982)* [1984] 2 All ER 216, [1984] QB 624, [1984] 2 WLR 447, CA.

*Ashbury Rly Carriage and Iron Co (Ltd) v Riche* (1875) LR 7 HL 653.

*e Belmont Finance Corp v Williams Furniture Ltd (No 2)* [1980] 1 All ER 393, CA.

*Charterbridge Corp Ltd v Lloyds Bank Ltd* [1969] 2 All ER 1185, [1970] Ch 62, [1969] 3 WLR 122.

*Cotman v Brougham* [1918] AC 514, [1918–19] All ER Rep 265, HL.

*Halt Garage (1964) Ltd, Re* (1978) [1982] 3 All ER 1016.

*Hampshire Land Co, Re* [1896] 2 Ch 743.

*f Horsley & Weight Ltd, Re* (1980) [1982] 3 All ER 1045, [1982] Ch 442, [1982] 3 WLR 431, CA.

*Introductions Ltd, Re, Introductions Ltd v National Provincial Bank Ltd* [1969] 1 All ER 887, [1970] Ch 199, [1969] 2 WLR 791, CA; *affg* [1968] 2 All ER 1221.

*Lands Allotment Co, Re* [1894] 1 Ch 616, [1891–94] All ER Rep 1032, CA.

*Lee Behrens & Co Ltd, Re* [1932] 2 Ch 46, [1932] All ER Rep 889.

*g Mahony (Public Officer of National Bank of Ireland) v East Holyford Mining Co Ltd* (1875) LR 7 HL 869, [1874–80] All ER Rep 427.

*Morris v Kanssen* [1946] 1 All ER 586, [1946] AC 459, HL.

*Multinational Gas and Petrochemical Co v Multinational Gas and Petrochemical Services Ltd* [1983] 2 All ER 563, [1983] Ch 258, [1983] 3 WLR 492, CA.

*Payne (David) & Co Ltd, Re, Young v David Payne & Co Ltd* [1904] 2 Ch 608, CA.

*h Reversion Fund and Insurance Co Ltd v Maison Cosway Ltd* [1913] 1 KB 364, CA.

*Royal British Bank v Turquand* (1856) 6 E & B 327, [1843–60] All ER Rep 435, 119 ER 886, Ex Ch.

*Russell v Wakefield Waterworks Co* (1875) LR 20 Eq 474.

*Salomon v A Salomon & Co Ltd* [1897] AC 22, [1895–9] All ER Rep 33, HL.

*Smith (Howard) Ltd v Ampol Petroleum Ltd* [1974] 1 All ER 1126, [1974] AC 821, [1974] 2

*j* WLR 689, PC.

*Somerset, Re, Somerset v Earl Poulett* [1894] 1 Ch 231, CA.

*Transvaal Lands Co v New Belgium (Transvaal) Land and Development Co* [1914] 2 Ch 488, [1914–15] All ER Rep 987, CA.

*Underwood (A L) Ltd v Bank of Liverpool and Martins* [1924] 1 KB 775, [1924] All ER Rep 230, CA.

*York Corp v Henry Leetham & Sons Ltd* [1924] 1 Ch 557, [1924] All ER Rep 477.

**Cases also cited**

*A-G for Canada v Standard Trust Co of New York* [1911] AC 498.                    *a*
*Anglo-Overseas Agencies Ltd v Green* [1960] 3 All ER 244, [1961] 1 QB 1.
*Baker (G L) Ltd v Medway Building and Supplies Ltd* [1958] 3 All ER 540, [1958] 1 WLR
    1216, CA.
*Bamford v Bamford* [1968] 2 All ER 655, [1970] Ch 212; *affd* [1969] 1 All ER 969, [1970]
    Ch 212, CA.
*Duomatic Ltd, Re* [1969] 1 All ER 161, [1969] 2 Ch 365.                              *b*
*EBM Co Ltd v Dominion Bank* [1937] 3 All ER 555, PC.
*Express Engineering Works Ltd, Re* [1920] 1 Ch 466, CA.
*Fine Industrial Commodities Ltd, Re* [1955] 3 All ER 707, [1956] Ch 256.
*Hely-Hutchinson v Brayhead Ltd* [1967] 3 All ER 98, [1968] 1 QB 549, CA.
*Holder v Holder* [1966] 2 All ER 116, [1968] Ch 353; *rvsd in part* [1968] 1 All ER 665,
    [1968] Ch 353, CA.                                                               *c*
*Home and Colonial Insurance Co, Re* [1930] 1 Ch 102, [1929] All ER Rep 231.
*Ideal Bedding Co Ltd v Holland* [1907] 2 Ch 157.
*Imperial Mercantile Credit Association v Coleman* (1873) LR 6 HL 189.
*James v May* (1873) LR 6 HL 328.
*Johnson (B) & Co (Builders) Ltd, Re* [1955] 2 All ER 775, [1955] Ch 634, CA.
*Land Credit Co of Ireland, Re* (1869) LR 4 Ch App 460.                              *d*
*Newman (George) & Co, Re* [1895] 1 Ch 674, CA.
*Parker & Cooper Ltd v Reading* [1926] Ch 975, [1926] All ER Rep 323.
*Rolls-Royce Ltd, Re* [1974] 3 All ER 646, [1974] 1 WLR 1584.
*VGM Holdings Ltd, Re* [1942] 1 All ER 224, [1942] Ch 235, CA.

**Appeal**                                                                           *e*
The defendants, British Steel Corp (BSC) and Mr Vivian Rupert Vaughan Cooper,
appealed against the judgment of Vinelott J ([1982] 3 All ER 1057, [1982] Ch 478) on
2 December 1981 whereby he held that the plaintiff, Rolled Steel Products (Holdings)
Ltd (RSP), was entitled to a declaration that a guarantee dated 22 January 1969 made
between RSP and Colvilles Ltd (a company whose rights liabilities and obligations vested
in BSC) be set aside and moneys paid under it be repaid to RSP with interest. RSP cross-   *f*
appealed against the decision of the judge in the course of the trial to allow the defendants
to raise certain matters of defence which had not been pleaded. The facts are set out in
the judgment of Slade LJ.

*Allan Heyman QC* and *T M Stockdale* for the defendants.
*Andrew Morritt QC* and *Charles Aldous* for RSP.
                                                                                     *g*
                                                            *Cur adv vult*

11 June. The following judgments were delivered.

**SLADE LJ** (giving the first judgment at the invitation of Lawton LJ). This is an appeal
by British Steel Corp (BSC) and Mr Vivian Rupert Vaughan Cooper, who were two of the   *h*
defendants in two consolidated actions, from an order of Vinelott J made on 23 March
1983. There is also a cross-appeal from the order by Rolled Steel Products (Holdings) Ltd
(RSP), which was the plaintiff in the action.
    The appeal and cross-appeal raise important questions of principle concerning, inter
alia, the capacity and powers of companies incorporated under the Companies Acts and
the powers and authority of their directors. Section 9(1) of the European Communities   *i*
Act 1972, which may be important when such questions nowadays fall to be considered
as between a company and persons dealing with it in good faith, had not become law
when the transactions in issue in the present case were effected. For the purposes of this
present judgment s 9(1) therefore requires no further attention.
    The trial of these consolidated actions lasted for about 19 days and ended on or about
7 April 1981. Judgment was given by Vinelott J on 2 December 1981 (see [1982] 3 All
ER 1057, [1982] Ch 478). There then followed a number of disputes concerning the

*a*  detailed terms required to give effect to this judgment. The matter having been brought back to the judge for the resolution of these disputes, he delivered a further judgment for this purpose on 23 March 1983, following which the order now under appeal was drawn up.

The judgment of 2 December 1981 (some parts of which are now reported (see [1982] 3 All ER 1057, [1982] Ch 478)) occupies nearly one hundred pages of transcript, and sets out very carefully and comprehensively the long and involved history of this case. Since various important findings of fact are challenged, I cannot avoid a similar, if briefer, *b* recital of this history.

The plaintiff, RSP, which is now in liquidation, was a company which had been incorporated in 1954 under the Companies Act 1948 and had carried on the business of importing and selling steel in the United Kingdom. Its main customers were motor manufacturers. At all material times Mr Alexander Ilytch Shenkman (Mr Shenkman) *c* held 51% of the issued share capital, the remaining 49% being held by the trustees of a settlement made by Mr Shenkman for the benefit of his children (the trustee-shareholders). Its directors were Mr Shenkman and his father, Mr Ilya Michael Shenkman. The trustee-shareholders were Mr Wills, who was a former business associate of Mr Shenkman, and the senior trustee, Mr Hibbert, a senior employee of British Petroleum, and Mr Perkins, a retired solicitor.

*d*  Clause 3 of the memorandum of association of RSP listed a number of objects, including the following:

'(A)  To carry on business as exporters and importers of, and manufacturers of, and dealers in, and buying and selling agents for, iron, steel, copper, bronze, aluminium, lead, tin, zinc, antimony and other metal goods of all descriptions and home and foreign and dominion and colonial goods, merchandise and produce of *e* all descriptions . . .

(K)  To lend and advance money or give credit to such persons, firms, or companies and on such terms as may seem expedient, and in particular to customers of and others having dealings with the Company, and to give guarantees or become security for any such persons, firms, or companies.

(L)  To borrow or raise money in such manner as the Company shall think fit, *f* and in particular by the issue of Debentures or Debenture Stock (perpetual or otherwise), and to secure the repayment of any money borrowed, raised, or owing, by mortgage, charge, or lien upon the whole or any part of the Company's property or assets (whether present or future), including its uncalled Capital, and also by a similar mortgage, charge, or lien to secure and guarantee the performance by the Company of any obligation or liability it may undertake.'

*g*  The objects clause ended with the following words:

'It is hereby expressly declared that each Sub-Clause of this Clause shall be construed independently of the other Sub-Clauses hereof, and that none of the objects mentioned in any Sub-Clause shall be deemed to be merely subsidiary to the objects mentioned in any other Sub-Clause.'

*h*  The articles of association of RSP contained, inter alia, the following provisions:

'17.  Provided that a Director declares his interest in a contract or arrangement or proposed contract or arrangment with the Company in manner provided by Section 199 of the Act he shall be counted in the quorum at any meeting of Directors at which the same is considered and shall be entitled to vote as a Director in respect *j* thereof.

18. (a)  The quorum necessary for the transaction of the business of the Directors may be fixed by the Directors, and unless so fixed, shall, be two . . .'

At all material times Mr Shenkman owned the entire issued capital of another company, Scottish Steel Sheet Ltd (SSS). In July 1961 RSP approached Colvilles Ltd (Colvilles), a company engaged in the production of steel, with a proposal that SSS, which Mr Shenkman had formed for the purpose, would act as sole distributor in southern

England of coil and cut steel sheet produced by Colvilles. Mr Shenkman further planned
to develop a steel service centre which SSS would operate and Colvilles would supply    *a*
with coil. The centre itself would supply the customers.

RSP acquired a leasehold site for the steel service centre at Rainham, Essex, but its
erection at that site was not proceeded with. Instead, in 1964 RSP acquired a leasehold
site at Andover and began to build a new steel service centre there with moneys
amounting to about £400,000 borrowed, from SSS. Though the judge said that the sum
owed by RSP to SSS did not carry interest, it appears that it may have carried interest at    *b*
5% per annum. Meantime, RSP retained the Rainham site.

SSS began to purchase coil and cut steel on credit from Colvilles. Its principal customer
was Fords. The account of SSS with Colvilles fell more and more into arrears. In October
1966 Mr Shenkman agreed to reduce and keep the sum owed by SSS to below £400,000.
In July 1967 Colvilles was renationalised and its shares were vested BSC. By November
1967 the indebtedness of SSS to Colvilles amounted to £820,000, of which £420,000 was    *c*
overdue. In December 1967 Mr Shenkman was told that the arrangement by which the
sheet steel was sold through SSS would be ended and that Colvilles would in the future
sell to Fords direct. Once SSS lost the arrangement with Fords, it would have no income
until the new steel service centre became operative; completion of the steel service centre
was scheduled for July 1968 at the earliest. Mr Shenkman was also told in December
1967 that he must take immediate steps to reduce the indebtedness of SSS to Colvilles to    *d*
£400,000, and produce a programme for the elimination of the balance after a 60-day
credit period had expired.

By April 1968 Mr Shenkman had still failed to reduce the debt. Colvilles accordingly
reported the matter to the legal services department. Mr Edwards, the head of that
department, decided that the best solution for Colvilles and BSC would be for Mr
Shenkman to execute an immediate and binding guarantee of the whole indebtedness of    *e*
SSS, which by then amounted to about £860,000. On 2 May 1968 Mr Shenkman entered
into a guarantee of this nature. Fifteen days later, on 17 May 1968, Colvilles served on
SSS a statutory demand pursuant to s 222 of the 1948 Act for payment of the sum of
£868,000, then claimed to be due from SSS.

The judge's findings as to the events between June and November 1968 are, I think,
accurately and well summarised in the Law Reports, which summary I gratefully adopt    *f*
([1982] Ch 478 at 482):

> 'By June 1968 British Steel Corporation doubted whether Mr. Shenkman's 51 per
> cent. interest in the plaintiff and his other assets were sufficient to meet the debt due
> from S.S.S. It was decided to offer Mr. Shenkman 14 days to agree to the voluntary
> liquidation of S.S.S. or failing that a petition would be presented to wind up the
> company. A meeting was arranged for that purpose on September 11 but, between    *g*
> September 3 and 11, it occurred to Mr. Hands, assistant to Mr. Edwards in the legal
> services department, that a solution would be to persuade Mr. Shenkman to procure
> the plaintiff to guarantee the debt due from S.S.S. The only significant asset of S.S.S.
> was the debt owed to it by the plaintiff and the plaintiff had sufficient assets to meet
> that debt. He wrote to Mr. Shenton of Lovell White & King, solicitors to the
> corporation, stating that he had it in mind to propose to Mr. Shenkman's advisers    *h*
> that the British Steel Corporation would agree to a liquidator of S.S.S. not pressing
> the claim against the plaintiff if the plaintiff guaranteed the debt due from S.S.S. to
> Colvilles. Mr. Shenton consulted with Mr. Arthur Figgis of counsel. He advised that
> the plaintiff had power to give a guarantee even for a larger sum than the debt owed
> by the plaintiff to S.S.S. He advised that the sum should not be so large as to make it
> plain that the plaintiff could not meet its obligations under the guarantee and pay    *i*
> its creditors 20s. in the £. He added that he did not think the plaintiff's directors
> would be advised by their legal advisers to grant a guarantee considerably in excess
> of the plaintiff's debt to S.S.S. and suggested it should be limited to £400,000.'

I pause to say two things. First, it is readily intelligible why those advising Colvilles
should have been anxious to obtain a guarantee by RSP of the indebtedness of SSS, since,

while RSP appeared to have a substantial surplus of assets over liabilities, SSS was known
by them to be insolvent and the personal guarantee of Mr Shenkman was known not to
be nearly sufficient to cover the indebtedness. Second, as he explained in a note of
26 September 1968, the reason why Mr Figgis recommended a limit of £400,000 being
placed on the guarantee was that that appeared at the time to be the limit of RSP's excess
of assets over liabilities, on the basis of the information he had been given as to the value
of the Rainham land. He added that he was concerned that BSC should not be a party to
inducing RSP's directors to do that which, on the figures known to BSC, would involve a
breach of the duties of RSP's directors.

I return to the summary in the Law Reports ([1982] Ch 478 at 482–483):

> 'On October 9, 1968, Mr. Edwards wrote to Mr. Dyson of Montague Cox &
> Cardales, solicitors to Mr. Shenkman, stating that he could only advise Colvilles to
> refrain from taking immediate action if (1) there was a prompt payment of
> £100,000 both on October 17 and November 17 (which were sums claimed from
> Mr. Shenkman under his guarantee); (2) the plaintiff gave a guarantee of the full
> amount owing by S.S.S. with a limit of liability of £400,000, payments to be made
> at a minimum of £50,000 a month starting on December 17 but on the basis that
> claims would also be made against Mr. Shenkman and, if he paid, the plaintiff would
> not be expected to pay as well; and (3) the appointment of a nominee of Colvilles to
> the board of the plaintiff within one week after, but not before, the giving of the
> guarantee by the plaintiff. There were a number of meetings and Mr. Dyson sought
> the advice of Mr. Balcombe Q.C. Mr. Dyson then informed Mr. Hands that Mr.
> Balcombe had advised that for the plaintiff to give a guarantee in excess of the sum
> owed to S.S.S. would be an act of gross misfeasance on the part of the directors, that
> the plaintiff could properly give a guarantee in the sum owed to S.S.S. provided it
> was given some consideration for payment under the guarantee and that Mr.
> Balcombe had expressed surprise at the appointment of a director nominated by the
> British Steel Corporation after the guarantee had been given. On November 13,
> 1968, Colvilles obtained summary judgment under Order 14 against Mr. Shenkman
> for £100,000 due on October 17. It gave notice to Mr. Shenkman for the payment
> under his guarantee of the entire indebtedness of S.S.S. It also started bankruptcy
> proceedings against him and served a statutory demand on S.S.S.'

On 28 November 1968 Messrs Foster & Cranfield (Fosters) wrote to Mr Dyson advising
that, if the Rainham land were to be sold, a price in the region of £850,000 could
reasonably be anticipated and that, if the sale proceeded by tender, RSP could expect to
enter into a contract by 29 January.

On 29 November 1968 Mr Dyson had a meeting with Mr Edwards, which was held at
the office of Messrs Lovell White & King 'in order to keep up the pressure' (as Mr
Edwards recorded in a memorandum). The meeting saw the genesis of the proposals
which were eventually implemented on 22 January 1969 and are now under attack. At
the meeting Mr Dyson reported Fosters' advice and made it clear that Mr Shenkman, for
his part, wanted Colvilles paid entirely out of the proceeds. He explained that, while it
might be two years before the assessment was made, he had advised that the sale might
attract tax of as much as £200,000. He said that he himself would prefer that only
£500,000 was paid over, since he 'had in mind the possible risk of a subsequent claim by
a liquidator that such a payment was a fraudulent preference, or perhaps even a
misfeasance'. The agreed note of the meeting records that Mr Edwards commented
that—

> 'for his part, British Steel Corporation would prefer that the debt to Colvilles were
> wholly discharged, notwithstanding these possibilities on the assumption that
> everything possible would be done to reduce the risks.'

Mr Dyson then said that there would be no difficulty in RSP paying a part of the debt
owed by SSS equal to the sum owed to SSS by RSP. As regards the balance, Mr Dyson
went on to explain a scheme which he had in mind under which the trustee-shareholders

would agree to the payment, on receipt of certain compensation. Later, at the same meeting, Mr Edwards made new proposals, which are of great importance because they were subsequently implemented. These were that (a) a sum equal to the debt owed by RSP to SSS should be lent to RSP by Colvilles, (b) RSP should use this sum in repaying the debt owed to it by SSS, (c) SSS should in turn use this sum to repay part of the debt owed by it to Colvilles, and (d) RSP would guarantee the balance of the SSS debt to Colvilles. The agreed note of the meeting records that 'it was left that Mr Dyson would consider the proposals put forward by Mr Edwards with his clients and with counsel to see how it can be implemented'. In this context the judge observed:

'It is to my mind quite clear that the purpose of consulting counsel was not to seek advice whether these proposals were or were not in the interest of RSP. The question was whether a scheme could be devised and approved by counsel under which the trustees would be given something in exchange for agreeing a payment out of the assets of RSP which it was not in the interest of RSP to make.'

On the evidence, this inference seems to me irresistible.

During the course of December 1968 Mr Dyson, who must have found himself in a difficult position in having as his clients both the trustee-shareholders and Mr Shenkman, who was facing an imminent threat of bankruptcy, was busy trying to devise a scheme with the object of providing some compensation for the trustee-shareholders. Arrangements for offering the Rainham land for sale by tender were meantime put in hand. In a letter to Mr Shenton of 5 December 1968 Mr Dyson stressed that, whatever method was used to transfer the debt from SSS to RSP, a transfer of the debt so far in excess of the amount owed by RSP to SSS 'inevitably has something of the characteristics of a misfeasance'. He went on to point out that it was therefore 'essential' that the trustee-shareholders should approve the transaction. He said that he and Mr Shenkman must 'reserve the right to have the benefit of the views of counsel on the scheme which we propose putting to the trustees for approval'.

In letters to Mr Shenton of 19 December 1968 Mr Dyson explained that any scheme involving the repayment of Colvilles out of the proceeds of sale of the Rainham land would be complex and delicate and that, whatever method was adopted, the trustee-shareholders must approve what was to be done. He said that a scheme was at that moment before the trustees for their consideration.

On 30 December Mr Dyson wrote to Mr Shenton to stress that no documents could be executed until—

'all the interested persons at this end have given their consent, and the views of Counsel have been obtained, if the present decision to seek such views is adhered to.'

In the event, counsel was not instructed by Mr Dyson. Mr Shenton replied on 1 January 1969 objecting that Mr Dyson's clients had had 'since the 29th November to consider and approve a system under which my clients' debt will be discharged from monies which your clients say will be raised on the sale of the Rainham land', and had also had since that date to consider 'the short term arrangements for security which were agreed to by you on the 29th November'. He said that he hoped to tender engrossments of the necessary documents before the end of the week, that the return of the documents executed and completed would be required within ten days thereafter and his clients would expect on or before that date an approved scheme under which payment would be made to them in full satisfaction of their debt, failing all of which the bankruptcy petition and the winding-up petition against SSS would be filed and presented forthwith.

Mr Dyson replied on 2 January 1969 that 'the senior trustee [Mr Wills] has given me this morning his views on the scheme' and that the only outstanding problem was that one of the co-trustees was frequently out of the country.

On 3 January 1969 Mr Dyson wrote to another of the trustee-shareholders, Mr Perkins, a long letter setting out an outline scheme, which he said that Mr Wills was prepared to approve, subject to his co-trustees' approval. The scheme in brief provided for RSP to sell its lease of the Andover factory for full value and to be put into liquidation; it would be

*a* arranged that in the liquidation the trustees would get the proceeds of sale of the Andover lease and the shares of SSS, while Mr Shenkman would get the benefit of the debt of £400,000 due from SSS to RSP, against which would be set off a debt of £200,000 owed by him to SSS. One of the obstacles which Mr Dyson said had to be surmounted was—

> 'that the trustees, whose only concern can be their own trust fund must somehow be properly compensated for an otherwise unwarrantable depreciation in the value of one of the trust assets.'

*b* On 6 January 1969 Mr Dyson spoke to Mr Maunsell of Lovell White & King and discussed, among other things, ways of possibly saving stamp duty on the debenture which RSP was to give to Colvilles. Mr Maunsell's note records that Mr Dyson commented that the timetable envisaged was unreasonable—

*c* > 'since on the advice that he had received from Mr. J. Balcombe [of counsel] in conference, he was being asked to advise the Company to do an act which was probably ultra vires the Company and would constitute a misfeasance by its directors. He said, however, that in the circumstances, in order to avoid a very particular situation, he would be prepared to advise the directors and the Company to do it, provided that the shareholders of the Company consented to it.'

*d* Mr Dyson then pointed out that one of the trustees was in Switzerland and that he could not guarantee that he would reply before 16 January. Also, on 6 January 1969, Mr Shenton wrote to Mr Dyson enclosing, inter alia, copies of a draft board resolution of RSP authorising the transactions. He said that on completion he would require, inter alia, production of a certified copy of this resolution.

*e* On 10 January Mr Dyson told Mr Maunsell that he had spoken to two of the three trustee-shareholders who were agreeable to proceeding. Figures of indebtedness as between SSS and Colvilles (£784,532 15s 4d) and as between RSP and SSS (£401,448) were finally agreed.

On 16 January 1969 the terms of a proposed agreement, guarantee and debenture were finally agreed. By then it had been agreed that the debenture should be signed and held in escrow until 17 February 1969 in the hope that by that date the sale of the *f* Rainham land would have been achieved, the debenture would be unnecessary and stamp duty would be saved.

On 17 January 1969 Mr Maunsell confirmed that Colvilles and BSC had agreed to defer completion until 22 January.

On 21 January 1969 a meeting attended by Mr Dyson, Mr Hawkings and at least two of the trustee-shareholders, Mr Wills and Mr Perkins, took place. Mr Dyson's evidence *g* was that the meeting was called because the scheme outlined by him in earlier correspondence could not be put into operation in the time available. As to this meeting, the judge said:

> 'Mr Dyson in his evidence said, and I accept, that he could not remember whether Mr Shenkman or his father were there or whether Mr Hibbert had then returned from Switzerland.'

*h* The judge went on to say that it is probable, although not certain, that Mr Hibbert was present. This is not quite accurate because Mr Dyson's evidence had been that Mr Perkins and Mr Hibbert were present at the meeting and that he 'presumed' Mr Wills had been there too. On the available evidence the probabilities certainly seem to point to all the three trustees having been there. For, in the telephone conversation of 22 January 1969, *j* noted by Mr Maunsell, Mr Dyson told him that 'the trustees had agreed to the arrangements provided Mr. Shenkman gave him certain obligations secured on his shares'.

On 22 January 1969 RSP executed three documents, namely: (1) a guarantee (the guarantee), by which it was recited that SSS owed Colvilles the sum of £383,084 15s 4d and RSP guaranteed to Colvilles the repayment by SSS of all moneys and liabilities then due or becoming due to Colvilles by SSS; (2) an agreement (the agreement), by which it

was recited that RSP was indebted to Colvilles in the sum of £401,488 and that RSP had guaranteed the debt of £383,084 15s 4d due from SSS to Colvilles, and RSP agreed that, unless it had before 17 February 1969 entered into a binding contract for the sale of the freehold interest in the Rainham land for a sum which, after discharging any existing charges, would leave the sum of £784,532 15s 4d (the aggregate of the debt due from RSP and SSS to Colvilles), with interest and, unless all the sums due from RSP and SSS to Colvilles had been paid before 1 March 1969, it would issue to Colvilles a debenture in the form of the agreed draft; (3) a debenture (the debenture) which created fixed and floating charges over all the assets of RSP and was delivered to RSP's solicitors on 22 January 1969 as an escrow.

The agreement and the debenture provided for interest to be paid on the total sum of £784,532 15s 4d at 1% above bank rate for the time being.

The execution of these three documents had been preceded by a meeting of the board of directors of RSP, also held on 22 January 1969. It was attended by its only directors, Mr Shenkman and his father, Mr Ilya Shenkman. The minutes of this meeting record that it had been reported to the board that RSP had agreed with Colvilles (1) that 'in consideration of Colvilles not demanding immediate repayment of all sums due to it from' SSS, RSP would guarantee the liabilities of SSS to Colvilles, and (2) that Colvilles had agreed to advance £401,448 to RSP (being a sum equal to the debt agreed to be owed by RSP to SSS). The minutes record a resolution that the transactions reported to the board be approved and that the documents put before the board be approved and executed by RSP, as to the guarantee and the agreement for delivering to Colvilles' solicitors on receipt of the advance, and as to the debenture to be held in escrow for delivery in the circumstances described in the agreement.

As the judge found as a fact that, under arrangements already made, the proposed advance of £401,448 by Colvilles to RSP could only be used to discharge the liability of RSP to SSS, and in turn could only be used by SSS towards payment of the sum owed by SSS to Colvilles, the transactions proposed at the meeting of 22 January 1969, if approved, would thus clearly benefit Mr Shenkman, if only because the loan of £401,448 would be used in a manner which would indirectly reduce his liability under his guarantee of 2 May 1968. However, the minutes of that meeting do not record any declaration by him of this guarantee, pursuant to art 17 of RSP's articles of association.

Also, on 22 January 1969, an account was opened with RSP's bankers, Midland Bank, for the benefit of RSP, and a banker's draft for £401,448 drawn on Colvilles was paid into that account. The sum was immediately transferred to an account with Midland Bank, opened in the name of SSS. A banker's draft was then drawn on that account in favour of Colvilles' solicitors, to whom the guarantee and the agreement were also delivered.

On 23 January Mr Dyson wrote to Mr Wills a long letter referring to the trustee-shareholders' decision to give their consent to the execution of the guarantee in exchange for an indemnity by Mr Shenkman secured by a charge on his shares of RSP. Mr Dyson commented:

'It is quite obvious that the Trustees must receive suitable compensation, but before knowing what is suitable we must establish precisely what it is that they have lost, and precisely the value of what it is that they may come to receive in exchange.'

From this letter of 23 January, the judge drew the following inference, which seems to me fully justified:

'It is, I think, clear from this letter that what was contemplated at the meeting on 21 January was that an indemnity in wide terms would be given by Mr Shenkman to the trustees secured on his shares of RSP and that it would continue in operation until some other arrangement could be made under which the trustees would be given compensation acceptable to them in recompense for the diminution in value of their shares in RSP consequent on the giving of the guarantee or, if no such arrangement were made, until the excess of the amount paid by RSP to Colvilles

a    over the liability of RSP to SSS had been made good by SSS or Mr Shenkman or one of the Andover companies (the shares of which remained held by or by a company owned by Mr Shenkman and his wife).'

It is also clear, however, that even the details of the proposed indemnity had not been worked out by 23 January, let alone the details of the possible longer term arrangements. In the events that happened, so far as the evidence shows, no indemnity was ever executed by Mr Shenkman and no arrangements made for compensating the trustee-shareholders.

b    By 17 February 1969 the Rainham land had still not been sold. The debenture was accordingly delivered on that date to Colvilles, which, under its terms, was entitled to give notice demanding immediate payment of the moneys thereby secured on or after 1 April and, if the moneys were not paid, to appoint a receiver.

On 12 March 1969 Colvilles made a demand for payment on 1 April 1969 of the full amount secured by the debenture. Also, on 12 March, Colvilles issued a writ against Mr
c    Shenkman claiming the balance of the sum due under his guarantee. On 25 March 1969 it applied for summary judgment on this claim.

On 2 April 1969, the sum secured by the debenture not having been paid, Colvilles appointed Mr Cooper receiver and manager of RSP. He is the second appellant, and we have been told that, for the purposes of the appeal, he has been given an indemnity by BSC.

d    On 16 March 1970 SSS went into compulsory liquidation. On 18 March 1970 Mr Shenkman was adjudicated bankrupt. On 29 March 1970, by virtue of the Steel Companies (Vesting) Order 1970, SI 1970/430, BSC succeeded to all the assets and obligations of Colvilles. During the receivership the Andover land was sold.

In October 1972, after protracted efforts, the receiver sold the Rainham land for £1,025,000. On 29 October 1973 RSP went into compulsory liquidation.

e    Between the date of his appointment and 31 December 1973, in full discharge of the moneys secured by the debenture (including interest) the receiver paid to BSC sums totalling £1,005,347, and also accounted to the Inland Revenue for £93,731 in respect of tax deducted from interest paid to BSC. The receiver retained the sum of £50,000 in respect of his fees and expenses as receiver and manager and then accounted to the liquidator of RSP for the surplus of the moneys received by him, £47,778. This surplus
f    is insufficient to meet the other unsecured liabilities of RSP. The three sums of £1,005,347, £92,731 and £50,000 referred to above amount in the aggregate to £1,148,078.

*The pleadings*

By a writ issued on 25 March 1975 and a statement of claim served on 31 December
g    1975 RSP brought an action against BSC, Mr Cooper, the trustee in bankruptcy of Mr Shenkman, and Mr Ilya Shenkman, seeking, inter alia, (1) as against BSC and Mr Cooper, a declaration that the guarantee, the debenture and the purported appointment of Mr Cooper as receiver and manager were in each case void and of no effect, (2) as against BSC and Mr Cooper, payment to RSP of the sum of £1,148,078 as money had and received to the use of the plaintiff with interest, (3) alternatively, as against all four defendants, a
h    declaration that they were jointly and severally liable to repay to RSP with interest the sum of £1,148,078 'as moneys of the plaintiff which have been misapplied', (4) an order (a) in the case of BSC, Mr Cooper and Mr Ilya Shenkman, for payment, and (b) in the case of Mr Shenkman, leave to prove in the bankruptcy for such sums as he might be declared liable to repay to the plaintiff.

Mr Ilya Shenkman died in 1976. His personal representatives were added as fifth and
j    sixth defendants by an order to carry on, but took no part in the proceedings.

On 11 December 1976 RSP issued a writ against Mr Shenkman's trustee in bankruptcy seeking similar relief. By an order dated 3 November 1977 the two actions were consolidated; it was further ordered that the statement of claim served on 31 December 1975 should stand as the statement of claim in the consolidated proceedings. Mr Shenkman and his trustee in bankruptcy took no part in the proceedings before the judge, but the trustee agreed to be bound by any order that might be made.

Under the statement of claim the relief will be seen to be sought on three principal grounds.

(1) Neither the guarantee nor the debenture is the deed of RSP, because it was not duly executed by RSP. This point, which will be referred to in this judgment as 'the no due authorisation point', is reflected particularly in paras 8, 12 and 13 of the statement of claim. The basis of this submission as pleaded is that Mr Shenkman was personally interested in the arrangements constituted by the transactions and documents of 22 January 1969 but, so it is said, at the board meeting of RSP held on 22 January 1969, did not disclose his interest in the manner required by s 199 of the Companies Act 1948. Colvilles, it is asserted, knew of these arrangements, of Mr Shenkman's personal interest therein, and that the board meeting was attended by only two directors.

(2) If, contrary to RSP's submission, the guarantee and the debenture were the deeds of RSP, each of them was ultra vires and void. This point (the ultra vires point) is reflected particularly in paras 11 and 13 of the statement of claim. Paragraph 11 asserts that—

'The said arrangements were made not for the purposes or benefit of RSP but for the purposes or benefit of Mr. Shenkman and Colvilles and were not and could not have seemed to be expedient in the interests of RSP.'

(3) If, contrary to RSP's submission, the guarantee and the debenture were the deeds of RSP and were intra vires RSP, Mr Shenkman and Mr Ilya Shenkman were acting in bad faith and in breach of their duties as directors of RSP in purporting, on behalf of RSP, to borrow the sum of £401,448 and in authorising the execution by RSP of the guarantee and the debenture. Colvilles and Mr Cooper knew that the property purported by charge by the debenture was the property of RSP and knew, or ought to have known, that the sum of £401,448 had purportedly been borrowed, and the guarantee and debenture executed, not for the purposes or benefit of RSP but in bad faith and in breach of their duties as directors. In the circumstances, it is claimed, the sum of £1,148,978 represents moneys of RSP which have been misapplied and the defendants, except Mr Shenkman's trustee in bankruptcy, are liable in equity to replace them. This claim is embodied in para 15 of the statement of claim. It will be seen that its essence is that in regard to the relevant transactions the two directors had been acting in breach of their fiduciary duties to RSP and that BSC and Mr Cooper, having received the moneys with actual or constructive knowledge of this breach, took them as constructive trustees. I will call this 'the constructive trust point'.

On 2 March 1976 BSC and Mr Cooper served a defence to this statement of claim which, as to the crucial allegations made by RSP, amounted to little more than a traverse. They admitted that Colvilles knew that the board meeting of 22 January 1969 had been attended by only two directors, of whom Mr Shenkman was one, but made no further admissions in regard to the no due authorisation point, and indeed affirmatively asserted (in para 11) that the guarantee and debenture had been duly executed. As to the ultra vires point, they simply denied that those two documents had been executed ultra vires. Their answer to the constructive trust point, beyond an admission that Colvilles and Mr Cooper knew that the property charged by the debenture was the property of RSP, was likewise a simple traverse.

It is to be observed that the defence as pleaded did not contain any suggestion of two further pleas which have subsequently featured prominently in this case.

(1) The allegation that all the shareholders in RSP (that is to say Mr Shenkman and the trustee-shareholders) consented to the granting of the guarantee and the debenture (the shareholders' consent point).

(2) The assertion that, even if the board resolutions of 22 January 1969 had not been duly passed in accordance with the articles of association of RSP, nevertheless Colvilles was unaware of this and was entitled to assume that they had been duly passed ('the *Turquand* point': see *Royal British Bank v Turquand* (1856) 6 E & B 327, [1843–60] All ER Rep 435).

*The course of the trial before Vinelott J*

a    On this state of the pleadings, the trial of the action began before Vinelott J on 9 March 1981. I shall have to refer to the course of the trial in some detail, because this gives rise to two issues which, though they might be described as 'pleading points', could both be of fundamental importance to the outcome of these proceedings.

On 9 March counsel for RSP began his opening, which lasted for five days. On that first day he drew attention to the fact that the defence to the no due authorisation point

b    was simply the allegation that the transactions had been approved, and properly approved, by the board at a meeting held on 22 Janaury. On 12 March he made it plain that he derived his understanding of the defendants' case from their pleadings 'because . . . I have been told nothing else'. On 13 March he observed that the *Turquand* point was not pleaded and was not in issue in the present case, and that he had therefore ignored it. *Neither the judge nor counsel for the defendants expressed any dissent from this statement.*

c    Also, on 13 March, counsel for RSP pointed out once more that the only pleaded defence was that the transactions were properly approved at a properly constituted board meeting on 22 January, and that the shareholders' consent point was not raised and was therefore not relevant. There then followed a discussion between the judge and counsel as to the position that would arise if the shareholders' consent *was* relevant and as to the extent to which shareholders could ratify intra vires acts in the case of a company which

d    was of doubtful solvency. But at the end of this discussion on 13 March 1981 the judge said: '*the point is not an uninteresting one but it does not arise because it is not pleaded*' (my emphasis). Counsel for the defendants did not, at that time, assert the contrary.

That was how matters had been left when, on 13 March 1981, the judge began hearing the oral evidence. This extended over 12 working days. RSP's first witness was Mr Dyson, whose evidence was heard on 13, 16, and 17 March. During the course of cross-

e    examining him on 16 March counsel for the defendants asked him certain questions apparently designed to elicit the fact (if it was a fact) that the trustee-shareholders had given their consent in respect of the relevant resolutions of 22 January 1969 at a meeting held on 21 January 1969. In re-examination of this witness on 17 March 1981 counsel for RSP asked some questions as to the information which had been available to the trustee-shareholders on 21 January 1969, but explored this matter of consent no further

f    than this.

Counsel for RSP then called Mr Shenkman, whose evidence continued over 17, 18, 19, 20 and 23 March 1981. During the course of his cross-examination of Mr Shenkman on 23 March, counsel for the defendants embarked on a similar line of questioning concerning the consent of the trustee-shareholders. On this occasion it evoked a strong protest from counsel for RSP that he was being put in a very difficult position. He again

g    pointed out that the shareholders' consent point had not been pleaded, and that it was not open to the defendants on their pleading. The judge, without ruling on the point, said that he was not going to bar this line of questioning. Counsel for RSP did not examine or re-examine Mr Shenkman on this issue.

Counsel for the defendants, without opening his case, began calling his witnesses later on 23 March 1981. Their evidence extended over 24, 25, 26, 30 and 31 March. The

h    defendants' principal witness was Mr Edwards. When, on 25 March, counsel began to lead evidence from him relating to the consent of the trustee-shareholders, counsel for RSP objected, and did not thereafter cross-examine Mr Edwards on this evidence.

By the time the evidence closed, no application had been made by the defendants to amend their pleadings in any respect and no intimation had been given that they intended to apply to amend their defence, so as to raise either the shareholders' consent

j    point or the *Turquand* point. Counsel for RSP told us that, in view of what had occurred during the opening, his belief had been, throughout the hearing of the evidence, that the latter point was not going to be relied on by BSC or Mr Cooper.

On 31 March counsel for defendants began his address on their behalf. During the course of it he made it plain that, notwithstanding what had occurred during counsel for RSP's opening, he did seek to rely on both the *Turquand* point (which, he submitted, did

not require to be specifically pleaded), and the shareholders' consent point. On 1 and
2 April counsel for the defendants continued his submissions. On the morning of 2 April, **a**
after some discussion and argument on the points, the judge ruled that both these points
required to be pleaded and asked counsel whether he was going to apply to amend the
defence, to which he replied that he was. At 2 pm that day counsel handed in his two
proposed amendments. The first, which constituted a proposed addition to para 6 of the
defence and raised the *Turquand* point, reads as follows:

> 'If, which is denied, the resolutions passed at the Board meeting of RSP on 22nd **b**
> January 1969 were not validly passed these Defendants are entitled to rely upon the
> ostensible authority of the directors of RSP to enter into and to execute the Guarantee
> and the Debenture and upon the certified extract of the minutes of such board
> meeting signed by Mr. Shenkman.'

The second, which consisted of a proposed addition to para 11 of the defence and raised **c**
the shareholders' consent point, reads as follows:

> 'In support of such averment these Defendants will rely upon the fact that the
> granting of the Guarantee and the Debenture had been approved by all the
> shareholders in RSP prior to the execution thereof.'

The judge then proceeded to hear submissions from counsel for the defendants in support **d**
of his application for leave to amend and from counsel for RSP in opposition to it. He
eventually said that he was going to rule on the application on the following Monday
morning, 6 April.

When 6 April came, counsel for RSP handed in a draft reply and draft request for
further and better particulars which, he said, the plaintiff would like to put in if the
defendants got leave to amend. In the event, the judge intimated that he did not intend **e**
at that stage to rule on the application for leave to amend, but would deal with it in his
final judgment, giving reasons for his decision. Counsel's reply was:

> 'In that case I will treat the matter both for the purpose of argument on law and
> fact, as though your Lordship has given leave to amend although your Lordship has
> not in fact done so.'
**f**

Matters were left thus when the argument concluded on 7 April 1981.

*The judgment of Vinelott J of 2 December 1981*

On 2 December 1981 Vinelott J gave his judgment, and dealt with the principal issues
that arose for his decision as follows.

**g**

(1) *As to the no due authorisation point*

The only board meeting of RSP of which any evidence had been produced at the
hearing before Vinelott J was the purported board meeting of 22 January 1969 attended
by only Mr Shenkman and Mr Ilya Shenkman. Furthermore, Mr Shenkman's evidence
was that there had been no meeting of the board before 22 January at which the
desirability of RSP giving a guarantee had been considered. The judge accepted this **h**
evidence. Although it was not admitted in their defence, it was conceded on behalf of
BSC and Mr Cooper at the trial that Mr Shenkman was personally interested in the
transactions of loan, guarantee and debenture referred to in para 6 of the statement of
claim. For the purposes of the no due authorisation point, the meeting of 22 January
1969 was thus the only relevant board meeting.

At the trial counsel's main argument for the defendants in this context had been that **i**
RSP had not proved that no declaration of Mr Shenkman's interest had been made at the
meeting of the directors of RSP in compliance with s 199 of the Companies' Act 1948.
But Mr Shenkman's evidence was that he had made no declaration of his interest at the
meeting of 22 January 1969 or any earlier meeting. And the judge accepted this evidence
without hesitation.

Counsel's alternative argument was that, even if no such express declaration was made

*a* at a formal meeting of the directors of RSP, the existence of Mr Shenkman's guarantee must have been known to Mr Ilya Shenkman and discussed between him and Mr Shenkman on earlier occasions, and that in these circumstances no express declaration was necessary. The judge rejected this submission because he did not think there was any sufficient evidence that Mr Ilya Shenkman did know that Mr Shenkman had entered into a personal guarantee of the whole of SSS's debt to Colvilles.

*b* It necessarily followed from these findings, though the judge did not expressly so state, that the resolution which the board of RSP purported to pass on 22 January 1969 authorising the execution of the guarantee and the debenture had not been regularly passed in accordance with arts 17 and 18(a) of the articles of association of RSP, because there had been no proper quorum of directors voting on the resolution inasmuch as Mr Shenkman was not entitled to vote on it; it was not a formally valid resolution. It also followed that the claim made in para 13 of the statement of claim, that neither the

*c* guarantee nor the debenture was or is the deed of the company, was prima facie well founded in law.

The judge, in his judgment, then proceeded to refer to counsel's application to amend the defence to plead the *Turquand* point. In this context, having pointed out that he had already ruled at the trial that an amendment was necessary to raise this point, he quoted the proposed amendment and said:

*d*
> 'It appears to me that, in so far as it is sought to rely on the ostensible authority of the directors of RSP, this amendment is far too wide. The question I have to decide is whether BSC should be allowed to amend the defence to claim that Colvilles was entitled to rely on the resolution as a formally valid resolution, that is, as a resolution passed at a properly constituted board of directors at which, Mr Shenkman and Mr Ilya Shenkman, having been the only directors present, a proper disclosure of Mr
*e* Shenkman's interest had been made. I have found this a very difficult question, but after some hesitation I have come to the conclusion that I should allow an amendment in these terms.'

Inasmuch as the judge described the draft amendment as, in one respect at least, 'far too wide', I do not understand him as having given leave to BSC and Mr Cooper to amend

*f* their defence in the terms proposed. I take his words as merely meaning (1) that he was giving leave to amend the defence to plead that 'Colvilles was entitled to rely on the resolution as a resolution passed at a properly constituted board of directors at which, Mr Shenkman and Mr Ilya Shenkman having been the only directors present, a proper disclosure of Mr Shenkman's interest had been made', and (2) that he was prepared to decide the case on the footing that such amendment had actually been made.

*g* However, having described the proposed amendment as 'far too wide', the amendment which the judge by inference permitted was in one respect itself a wider one than the draft, since it asserted that Colvilles were entitled to rely on the resolution as one passed at a properly constituted board, at which 'a proper disclosure of Mr Shenkman's interest had been made'. This was, no doubt, in answer to a point which had been raised by counsel for RSP in regard to the amendment proposed by BSC, namely that 'the certified

*h* extract of the minutes' of the board meeting, referred to in that proposed amendment, contained no mention of any declaration of interest, and therefore did not apparently comply with the articles of RSP.

The judge, by necessary implication, found that Colvilles knew of Mr Shenkman's personal interest at the relevant time. However, having permitted amendment of the defence in the manner which I have described, he decided (by necessary implication

*j* though, I think, not in terms) that the defence based on the rule in *Royal British Bank v Turquand* (1856) 6 E & B 327, [1843–60] All ER Rep 435 embodied in such amendment wholly defeated RSP's first claim based on the no due authorisation point.

(2) *As to the ultra vires point and the constructive trust point*

In his opening before the judge, counsel for RSP accepted that, if this first claim failed, there could be no objection to the advance by Colvilles to RSP of the sum of £401,448 or

the use of that money to discharge the debt owed by RSP to SSS and that, on that footing, the debenture (and, in consequence, the appointment of the receiver thereunder) would *a* be valid to the extent of that advance. The judge, in proceeding to consider the plaintiff's ultra vires and constructive trust points, therefore treated them as limited, in the case of the debenture, to the extent of the sum guaranteed. He thus proceeded on the footing that the loan of £401,448 and the debenture, at least to the extent of that sum, were a valid transaction or document.

The judge, in setting out his conclusions, drew no specific distinction between the *b* ultra vires point and the constructive trust point. Instead, he drew a rather different distinction between two types of ultra vires, namely what he called 'ultra vires in the narrow sense' and 'ultra vires in the wider sense'. After a careful review of the authorities relating to ultra vires, he expressed the opinion that, even when the question in dispute relates to 'the capacity of a company to enter into a given transaction', the phrase ultra vires may be used (a)— *c*

> 'in a narrow sense to describe a transaction which is outside the scope of the powers expressed in the memorandum of association of a company or which can be implied as reasonably incidental to the furtherance of the objects thereby authorised.'

and (b) in a 'wider sense' so as— *d*

> 'to describe a transaction which, although it falls within the scope of the powers of a company, express or implied, is entered into a furtherance of some purpose which is not an authorised purpose [ie not a purpose authorised by the company's memorandum of association].'

(See [1982] 3 All ER 1057 at 1076, [1982] Ch 478 at 497.)

Vinelott J went on to say that a transaction which is ultra vires in the 'wider sense' is *e* incapable of being made binding on the company by the assent of all the members, since 'The members cannot authorise the use of the company's property for a purpose other than the purposes which the company is authorised to pursue by its memorandum of association'. This, he suggested, is the reason why a transaction which is ultra vires in the 'wider sense' is equated with one which is ultra vires in the 'narrow sense' (see [1982] 3 All ER 1057 at 1077, [1982] Ch 478 at 499). *f*

On the other hand, there is, he considered, a crucial difference between the two types of transaction, that is to say (a) a transaction which is ultra vires in the narrow sense is altogether void and cannot confer rights on third parties, whereas (b)—

> 'a transaction which is ultra vires in the wider sense may confer rights on a third party who can show that he dealt with the company in good faith and for valuable consideration and did not have notice of the fact that the transaction, while *g* ostensibly within the powers, express or implied, of the company, was entered into in furtherance of a purpose which was not an authorised purpose.'

(See [1982] 3 All ER 1057 at 1077, [1982] Ch 478 at 499.)

The judge regarded it as clear that, notwithstanding the separate objects provision at the end of cl 3 of RSP's memorandum of association, sub-cl (k) is 'a power ancillary to, *h* and to be exercised when expedient in furtherance of the objects of the company and is not to be construed as an independent object' (see [1982] 3 All ER 1057 at 1078, [1982] 478 at 500).

Having decided that he was dealing with mere ancillary powers, not independent objects, of RSP, the judge concluded that the main questions which he had to consider in the context of ultra vires were (i) whether the guarantee and, to the extent of the sum *j* guaranteed, the debenture, were given by RSP 'in furtherance of the objects of RSP, in the sense of its substantive objects or purposes, or for some purpose not authorised by the memorandum of association of RSP . . .', and, if the latter was the case, (ii) whether Colvilles and BSC had notice of the fact (see [1982] 3 All ER 1057 at 1078, [1982] Ch 478 at 500).

As to the first of these questions, his conclusion on the evidence was that, after Fosters'
*a*  advice had been received at the end of November—

> 'everybody on the RSP side proceeded on the footing that the transactions
> proposed would not only be for the purposes or in the interests of RSP, but would
> be positively injurious to it.'

He found the following facts:

*b*        '... the conclusion is inescapable that of the directors of RSP Mr Shenkman at
least knew that the proposals accepted on behalf of RSP on 19 December and
implemented on 22 January involved, to the extent of the guarantee of the liability
of SSS in excess of the debt due from RSP to SSS and to that extent the debenture, a
gratuitous disposition on the part of RSP which could not be justified as something
done for the purposes or in the interests of RSP.'

*c*
(See [1982] 3 All ER 1057 at 1080, [1982] Ch 478 at 503.)
     As to the second of these main questions, his finding of fact on the evidence was that—

> 'Colvilles and BSC knew that the guarantee and, to the extent of the sum
> guaranteed, the debenture, were not entered into by RSP for any purpose of RSP
> but were a gratuitous disposition of the property of RSP and were entered into by
*d*  > RSP for the benefit of SSS and Mr Shenkman personally.'

(See [1982] 3 All ER 1057 at 1082, [1982] Ch 478 at 507.)
     In relation to the receiver, the judge found as a fact that, when Mr Cooper took
possession of the assets of RSP as receiver, he had knowledge of facts from which it should
have been apparent to him that the giving of the guarantee was ultra vires RSP in the
*e*  wider sense and also a breach of duty by the directors of RSP (see [1982] 3 All ER 1057 at
1085, [1982] Ch 478 at 511).
     Essentially, therefore, as I read his judgment, he found liability established against BSC
and Mr Cooper because RSP had acted ultra vires 'in the wider sense' in regard to the
relevant transactions and they had received the relevant assets of RSP with knowledge
that the relevant transactions were entered into in furtherance of purposes which were
*f*  not authorised purposes of RSP.

     (3)  *As to the shareholders' consent point*
     The judge concluded that it would not be right to allow the first two defendants to
amend their defence to plead the shareholders' consent point (see [1982] 3 All ER 1057
at 1083, [1982] Ch 478 at 507).
*g*      However, he went on to express the view that, even if the documents executed on
22 January 1969 had been executed with the consent of all the shareholders of RSP, this
consent, subject to one possible qualification, would not have provided any defence to
RSP's claim. The reason, in his opinion, stemmed from the general principle that
shareholders, 'even acting unanimously, cannot ratify or make binding on a company a
transaction which is ultra vires whether in the narrow or in the wider sense' (see [1982]
*h*  3 All ER 1057 at 1083–1084, [1982] Ch 478 at 508–509). He accepted that the doctrine
of ultra vires will not prevent the shareholders of a company, by unanimous agreement,
from disposing, as they please, of profits available for distribution to shareholders by way
of dividend. However, he considered that this qualification to the general rule was
irrelevant on the facts, since on the evidence it appeared that RSP did not have profits
available for distribution to its shareholders equal to the amount of the guarantee of the
*j*  indebtedness of SSS (see [1982] 3 All ER 1057 at 1084–1085, [1982] Ch 478 at 510).

     (4)  *The judge's conclusion*
     The judge's ultimate conclusion thus was that—

> 'the guarantee and, to the extent of the sum guaranteed, the debenture, were

executed by RSP to the knowledge of Colvilles for a purpose other than the purposes
authorised by the memorandum of association of RSP and RSP is entitled to have
the guarantee set aside and to require BSC to repay the sum guaranteed with
interest.'

(See [1982] 3 All ER 1057 at 1085, [1982] Ch 478 at 510.)

*The issues on the appeal and the cross-appeal*

BSC and Mr Cooper now appeal from this judgment, asking that the order made
against them be wholly set aside and the action as against them be dismissed. RSP cross-
appeals, claiming, in effect, that, in all the circumstances, the judge should not have
permitted the defendants to take the *Turquand* point, but that, even if he was right in
doing so, it afforded them no defence in law on the evidence adduced at the trial.

Though a large number of subsidiary points have been raised and argued on both
sides, I think that the principal issues that have fallen for decision on this appeal have
resolved themselves to seven: (1) the 'shareholders' consent' point; (2) the judge's finding
that, of the directors of RSP, at least Mr Shenkman had abused his powers in entering
into the relevant transactions; (3) the judge's finding of knowledge of such abuse on the
part of Colvilles, BSC and Mr Cooper; (4) the 'no due authorisation' and the *Turquand*
points; (5) the ultra vires point; (6) the constructive trust point; (7) the relief (if any) to
be granted to RSP. The first, second, third, fifth and sixth points are raised by the notice
of appeal. The fourth is raised by the notice of cross-appeal. The last is raised by both
notices.

*The shareholders' consent point*

One of the grounds of appeal of BSC and Mr Cooper was that the judge erred in
refusing them leave to amend their defence to raise the shareholders' consent point. At
an early stage in his address to this court, counsel for RSP pointed out that a number of
other issues would become relevant only if we considered that this contention was well
founded. We therefore heard full argument from both sides at that stage on the
submission that the judge erred in refusing the defendants leave to amend so as to take
this point.

At the conclusion of this argument, we gave our decision that the amendment to
para 11 of the defence, which was requested towards the end of the trial, was rightly
refused by the judge in the exercise of his discretion. We said that we would give our
reasons when we came to give our judgment on the appeal as a whole.

For the following reasons, among others, I do not see how the exercise of the judge's
discretion in refusing leave to amend to raise this point can be faulted.

(1) In my opinion, it should at all material times have been obvious to the legal
advisers of BSC and Mr Cooper that the point required pleading, if it was to be taken at
all.

(2) These defendants have, in my opinion, given this court no sufficient justification
or excuse for their failure to apply to make the amendment until the seventeenth day of
the trial, after the evidence had closed.

(3) I am satisfied that, if the point had been put in issue by an appropriate amendment,
in examining or cross-examining a number of witnesses before the court, RSP's counsel
would have wished to explore a number of matters relevant to the consent of the trustee-
shareholders, eg (a) had they in truth all been present at the meeting on 21 January
1969? (b) had the trustee who was previously abroad returned to this country? (c) were
their alleged consents informed consents given with knowledge of all relevant facts? (d)
how were the consents given? (e) if the consents were given subject to certain conditions,
what precisely were those conditions and were they ever fulfilled? and (f) what legal
advice did they have? This list of relevant questions could be greatly expanded.

(4) In my opinion, having regard to the course and conduct of the trial, as outlined
above, a substantial injustice would have been caused to RSP if the amendment had been
allowed when the application was at long last made on 2 April. Up to that time, having

clearly and specifically drawn attention to the point, RSP's counsel had, in my opinion,
*a* been fully entitled to conduct their client's case on the footing that this was not a live
issue in the proceedings. In conducting it, they were not obliged to cover the contingency
that the defendants' counsel might see fit, at some undisclosed future time, to apply for
the requisite leave, when they had given no intimation that they intended to make such
application.

*b* *The judge's findings against the directors of RSP*
I have already summarised the judge's ultimate findings of fact against the directors of
RSP and Mr Shenkman in particular. In taking us through the judgment in considerable
detail for the purpose of disputing these ultimate findings, counsel for the defendants
was able to point to scarcely any errors in his findings of primary fact. He submitted,
however, that, in making these ultimate findings of fact, the judge had drawn entirely
*c* the wrong inferences.
The substance of his full and careful argument in this context may, I think, be
summarised as follows. The fortunes of RSP and SSS were closely interconnected. Both
were managed by Mr Shenkman. He held all the shares in SSS and 51% of the shares in
RSP. By January 1969 the steel service centre being erected on the land at Rainham
belonging to RSP was beginning to operate. Though SSS had, by that date, ceased trading,
*d* it had been carrying on business as steel stockholders from premises at Wickford. Mr
Shenkman knew, so long as SSS remained in being, its losses might be available for tax
purposes in connection with the steel service centre, since it might be used as the
purchasing company for the centre. As at 22 January 1969 SSS owed £784,532 to BSC,
and RSP itself owed £401,448 to SSS. If RSP had not entered into the guarantee in
January 1969, BSC would have forthwith exercised its rights against Mr Shenkman and
*e* SSS by putting him into bankruptcy and SSS into liquidation, thereby removing any
possibility of taking advantage of its useful tax losses in connection with the Andover
service centre. If BSC had taken this course that would have been the end of the centre,
from which RSP, as the holders of the site on which this purpose-built factory was
situated, stood to benefit. Furthermore, the bankruptcy of Mr Shenkman and the
liquidation of SSS would have been likely to lead to the collapse of the group as a whole,
*f* including the liquidation of RSP, since the liquidator of SSS would have had to enforce
the rights of SSS as creditor against RSP. On the other hand, as at 22 January 1969, Mr
Shenkman, the trustee-shareholders, Mr Dyson and BSC and all others concerned believed
that the projected sale of the Rainham land was likely to be successful. If the sale had
been successful, the transactions of that date, so the argument runs, would have bought
invaluable time, not only for Mr Shenkman personally, but for the benefit of the group
*g* as a whole, and RSP in particular. In this event, as Mr Shenkman envisaged, RSP could
have lent sufficient money to SSS to enable it wholly to discharge its indebtedness to
Colvilles. Once Colvilles had been paid off, there was a real possibility that the prosperity
of the group could be restored by profits from the steel service centre.
The judge, counsel for the defendants alleged, attached quite insufficient weight to all
these important considerations. In his submission, at the time when the decision to enter
*h* into the transactions of 22 January 1969 was taken, there was an honest and reasonable
belief, on the part of Mr Shenkman, shared by the trustee-shareholders and Mr Dyson,
that those transactions were on balance in the best commercial interests of RSP. True it
is that Mr Balcombe QC had advised Mr Dyson that for RSP to give a guarantee of the
debt in an amount in excess of the amount owed by RSP to SSS would be an act of gross
misfeasance, but Mr Balcombe, so it was said, had not been adequately instructed, in
*j* particular because the need to save Mr Shenkman from bankruptcy in order to save the
group as a whole from collapse had not been explained to him.
In counsel's submission, the judge, in finding that Mr Shenkman knew that the
proposals implemented on 22 January 1969 involved a gratuitous disposition which
could not be justified as something done for the purposes of or in the interests of RSP,
was substituting his own judgment and business acumen for that of Mr Shenkman, Mr
Dyson and the trustee-shareholders. Though in the witness box Mr Shenkman appeared

to make certain admissions as to the inexpediency, perhaps even impropriety, of the transactions viewed from the point of view of RSP, this, in counsel's submission, was only with the advantage of hindsight. As to January 1969, it was submitted, Mr Shenkman had an honest and not unreasonable belief that the transactions were on balance in the best interests of RSP; and this means that he cannot have been acting in abuse of this powers as director or in breach of his fiduciary duties to RSP in entering into them.

As an exercise in ex post facto justification and rationalisation, the defendants, in my view, have made out what is superficially quite a strong case in justification of the transactions entered into by Mr Shenkman and his co-director of RSP on 22 January 1969. With all due respect to their counsel's argument, however, this, in my judgment, bears little relation to the realities of the matter viewed as at that date.

The plain facts were that the directors of RSP, in entering into the arrangements of 22 January 1969 (as they must have well understood), were effectively (i) eliminating the indebtedness of RSP to SSS, (ii) permitting Colvilles to be substituted for SSS as creditor in respect of the sum of £401,448 and (iii) (more importantly) exposing RSP to an entirely new liability of £383,084, representing the outstanding liability of SSS to Colvilles after the debt of £784,532 had been reduced by repayment of the sum of £401,448. Furthermore, though Mr Shenkman's evidence was that he was confident that creditors of RSP would not be prejudiced by the arrangements, in view of RSP's assets position, he must, in my opinion, have been well aware that the transactions exposed RSP to at least an appreciable risk of insolvency. Counsel for RSP took us through a draft composite statement of affairs of Mr Shenkman and his companies, as at 31 July 1968, which was in evidence at the trial, with a view to showing that the undertaking by RSP of the additional liability of nearly £385,000 actually rendered it insolvent. Counsel for the defendants challenged the correctness of this conclusion, which necessarily involved the assessment of certain imponderables. I do not find it necessary to decide whether the transactions of 22 January 1968 as at that date actually pushed RSP over the brink into insolvency on an assets basis. Much was likely to depend on the amount of the potential liability to tax which would arise on the sale of the Rainham land alone. Mr Dyson had estimated it might be as high as £200,000, though Mr Edwards had suggested it would be less. What is, in my opinion, plain on the evidence is that at the very least they would have pushed RSP (a hitherto quite substantial company if viewed on the assets basis) at least perilously close to insolvency, if Mr Dyson's estimate of the tax liability proved well founded, and that Mr Shenkman (and indeed Mr Edwards) must have been well aware of this.

The directors of RSP had already been advised by Mr Balcombe, correctly in my opinion, that for RSP to give a guarantee of a debt in an amount in excess of the amount owed by RSP to SSS would be an act of gross misfeasance on the part of the directors of RSP. As I interpret the evidence, they did not require Colvilles to give any consideration at all to RSP for the new guarantee. Though I think all parties contemplated that in practice Colvilles would not enforce its rights against SSS, or its newly acquired rights against RSP until after the outcome of the hoped for sale of the Rainham land was known in mid-February, Colvilles entered into no binding commitment to this effect. Counsel stressed the fact that, as part of the arrangments, Colvilles gave up the right to custody of the certificates for Mr Shenkman's shares in RSP which it had held for the past few months, for the purpose of preventing him from disposing of his shareholding. This was to enable him to deal with these shares, if he thought fit, for the benefit of the trustee-shareholders by way of compensation. I cannot, however, see that this arrangement conferred any benefit on RSP itself. The judge was, I think, right in describing the grant of the new guarantee as 'gratuitous' on the part of RSP (see [1982] 3 All ER 1057 at 1082, [1982] 478 at 507).

Even if it were correct for present purposes to assess the propriety or otherwise of this gratuitous transaction from a solely objective point of view, I think that the compensating potential advantages for RSP itself were minimal. Though much emphasis was placed in argument on the benefits which it might have stood to gain from the Andover steel

centre, situated on its property, it was not the intention that RSP itself should participate

*a* at all in the future profits, if any, of the steel centre business. The centre was occupied by a company in which Mr and Mrs Shenkman were the sole shareholders. It was intended that this company would be granted a tenancy of the centre and that it would receive the profits of the business, subject only to such profits as Mr and Mrs Shenkman might agree to divert to the trustee-shareholders of RSP. As to the suggestion that a useful breathing space was bought for the benefit of RSP so as to enable it to pay its debts to SSS, all parties

*b* concerned as at January 1969 contemplated that the sale of the Rainham land would probably have gone through successfully by mid-February, leaving RSP with amply sufficient cash to discharge the £401,000 debt. There was no practical possibility that SSS, or a liquidator of SSS, would enforce its debt in the meantime. The eventuality against which RSP really needed protection was that of the sale of the Rainham land *not* going through successfully, so that it had no liquid assets with which to pay the debt.

*c* The arrangements of 22 January gave it no protection at all against this risk. As to the suggestion that the commercial interests of RSP required the presence of Mr Shenkman, as a non-bankrupt working director in the group, I can find no solid evidence whatever to support it.

In my judgment, however, it is not correct to judge the propriety of the transactions of 22 January 1969 from a solely objective point of view. In deciding whether they

*d* constituted an abuse of the directors' powers, the motives of Mr Shenkman are of great importance: see e g *Howard Smith Ltd v Ampol Petroleum Ltd* [1974] 1 All ER 1126, [1974] AC 821 and *Re Halt Garage (1964) Ltd* [1982] 3 All ER 1016 at 1032. I have been able to detect no suggestion in the evidence that Mr Shenkman considered that the prospects of future benefits from the Andover steel centre, or the need to buy time, or the need to save himself from bankruptcy, or any other factor, rendered the proposals which were

*e* ultimately implemented on 22 January beneficial from the point of view of RSP (as opposed to SSS or Mr Shenkman personally). On the contrary, as soon as the scheme was mooted, his legal adviser, Mr Dyson, fully realised that it 'inevitably had something of the characteristics of a misfeasance' (as he had said in his letter to Mr Shenton of 5 December 1968). But, he considered that this would not matter if the consent of the trustee-shareholders was obtained, whose consent, in the same letter, he described as

*f* 'essential'. During the succeeding weeks his efforts were directed to devising a scheme so that, as he put it in his letter to Mr Perkins of 3 January 1969, the trustees should somehow be properly compensated for an 'otherwise unwarrantable depreciation in the value of the trust assets'. Mr Shenkman's personal attitude was that he would agree with almost anything that BSC proposed to remove the pressure on him, so long as it was lawful. After various other schemes for compensating the trustee-shareholders had been

*g* mooted, the proposal which Mr Dyson ultimately put to them was that they should be given a personal indemnity secured on Mr Shenkman's personal shareholding in RSP (the terms of which indemnity were never agreed) coupled with a hope that they would in due course be given some interest, unspecified, in the Andover steel centre. So far as the evidence shows, no further advice from counsel was sought by Mr Shenkman or Mr Dyson from Mr Balcombe or any other counsel in regard to the proposals implemented

*h* on 22 January. I infer that they were well aware that the advice was likely to be that, at least in default of the consent of the trustee-shareholders, these proposals would involve a gross misfeasance.

Thus, in my opinion, there was abundant evidence to justify the judge's finding of fact that at the material time everybody on the RSP side proceeded on the footing that the transactions proposed would not only not be for the purposes or in the interests of RSP,

*j* but would be positively injurious to it.

We were referred to a number of decisions which indicate that it is open to the shareholders in a company by unanimous agreement to consent to or ratify acts which would otherwise be a misfeasance on the part of the directors, so as to validate them for all purposes, provided that such acts are within the company's corporate capacity and do not involve a fraud on the company's creditors; I will revert briefly to these authorities later in this judgment. However, since it is not open to the defendants in the present case

to assert that the consent of the trustee-shareholders was in fact obtained, this line of authority has no relevance in the present context.

*a*

For the reasons stated, I can see no grounds whatever for displacing the judge's finding that, of the directors of RSP, at least Mr Shenkman knew that the proposals implemented on 22 January involved, to the extent of the guarantee of the liability of SSS in excess of the debt due from RSP to SSS, and to that extent the debenture, a gratuitous disposition on the part of RSP which could not be justified as someting done for the purposes of or in the interests of RSP.

*b*

*The judge's findings of fact against Colvilles, BSC and Mr Cooper*

The judge, as I have said, also found as facts that Colvilles and BSC knew that the guarantee and, to the extent of the sum guaranteed, the debenture, were not entered into by RSP for any purpose of RSP, but were a gratuitous disposition of the property of RSP and were entered into by RSP for the benefit of SSS and Mr Shenkman personally.

*c*

The first two defendants, faced with the difficult task of challenging these findings of fact, have sought to do so on the following lines. Mr Edwards's evidence indicated that he thought the guarantee was capable of being in the interests of RSP, for the reasons discussed above. But, most important of all, he knew that the directors of RSP were throughout being advised by a competent solicitor, Mr Dyson, and he did not expect that Mr Dyson would advise or permit them to do anything which was improper or unlawful.

*d*

The judge did not find that Mr Shenkman and his co-director were acting dishonestly in giving the guarantee. Colvilles had no reason to suppose that they were acting dishonestly. Mr Edwards did rely, and was entitled to rely, so the argument runs, on Mr Dyson giving RSP the correct advice.

This submission has some superficial force, if no further attention is paid to the particular facts of the case. In considering it, however, I start from the facts as they were on 6 January 1969. In his telephone conversation with Mr Maunsell of Messrs Lovell White & King on that day, to which I have already referred, Mr Dyson is recorded as having said that—

*e*

'on the advice that he had obtained from Mr. J. Balcombe [of counsel] in conference, he was being asked to advise the company to do an act which was probably ultra vires the company and would constitute a misfeasance by its directors.'

*f*

He is also recorded as having said that—

'in the circumstances in order to avoid a very particular situation, he would be prepared to advise the directors and the company to do it, provided that the shareholders of the company consented to it.'

*g*

Mr Edwards in cross-examination accepted that this conversation had been reported to him, that it was plain to him at that stage that the only advice that Mr Dyson had received was through Mr Balcombe, and that he knew Mr Balcombe's advice had been that the giving of the guarantee would be a 'gross misfeasance'.

From 6 January onwards Colvilles and BSC were thus on clear notice that the advice from counsel, which Mr Dyson had received, was that the giving of the proposed guarantee would be a gross misfeasance on the part of the directors of RSP. I have already concluded that the giving of the guarantee was indeed a misfeasance. How then can it be asserted that Colvilles and BSC were not on notice of this misfeasance which occurred when the relevant transactions were concluded on 22 January 1969?

*h*

One point which Mr Edwards frequently emphasised in the course of his evidence was that he always expected Mr Dyson to get the opinion of counsel confirming the propriety of the proposed transactions and that it was contemplated that Mr Dyson would do this.

*j*

It is certainly true that, at the meeting of 29 November 1968, when Mr Edwards first made the relevant proposals, Mr Dyson talked about consulting counsel and that, in a subsequent letter to Mr Shenton, Mr Dyson indicated his continuing present intention to seek the views of counsel. Nevertheless, the inference which the judge drew was that the manifest purpose which Mr Dyson would have had in mind, if he had proceeded

with his intention to consult counsel, was simply whether a scheme could be devised and

*a* approved by counsel under which the trustee-shareholders would be given something in exchange for agreeing a payment out of the assets of RSP which it was not in the interests of RSP to make. So far as the evidence shows, no one representing Colvilles asked Mr Dyson at any time between 6 January and 22 January 1969 whether he had obtained further advice from counsel as to the propriety of the proposed transaction from the point of view of RSP and its directors and, during this period, Mr Dyson never represented

*b* that he had obtained or would obtain advice on this question. Mr Edwards, in his evidence, never said that, as at 22 January 1969, he believed that Mr Dyson had actually obtained any further advice of this nature. Nor, in my opinion, on the evidence would he have had any reasonable grounds for such belief. There is, I think, no evidence that, during or after the telephone conversation of 6 January with Mr Maunsell, Mr Dyson ever represented that he was intending to seek further advice from counsel as to the

*c* propriety of the proposed transactions; indeed, the whole tenor of that conversation had been to the contrary effect. During the whole of January Mr Dyson was presenting to those representing Colvilles the obtaining of consents of the trustee-shareholders, not advice from counsel, as the major step which still required to be taken on his side.

While the judge apparently did not feel able to accept Mr Edwards's evidence that he was throughout anxious that there should be no impropriety on the part of the directors

*d* of RSP, I am sure that Mr Edwards, as a trained lawyer, and Colvilles' solicitors would at least have been anxious that any avoidable risks of impropriety should be avoided so far as possible. For they would well have realised that the taint of any such impropriety could well affect Colvilles' own rights under the transactions. Nevertheless, Colvilles' position was already a difficult one, as a creditor of an insolvent company SSS in a sum of nearly £800,000, with a debt secured only by the wholly inadequate security of Mr

*e* Shenkman's personal guarantee. It is, therefore, perhaps not wholly surprising that Mr Edwards's and Colvilles' solicitors should have been prepared to advise Colvilles to enter into the relevant transactions, which were potentially highly beneficial to it, provided that all reasonable steps were taken to reduce the risks of the consequences of any misfeasance on the part of the directors of RSP, which might be involved, and provided that they did not consider that there would be any fraud on the creditors of RSP. The

*f* effect of Mr Edwards's evidence, as I have said, was that he himself did not believe the proposals would render RSP insolvent.

One of the steps taken by Mr Dyson to reduce these risks was his attempt to procure the consent of the trustee-shareholders. As a further or alternative argument in this context, counsel for the defendants submitted in effect that: (i) Mr Dyson from December 1968 onwards had frequently told Colvilles that the consent of the trustee-shareholders

*g* was necessary and would be obtained; (ii) in his telephone conversation with Mr Maunsell of 22 January 1969, Mr Dyson had told him that 'the trustees had agreed to the arrangements, provided that Mr. Shenkman gave him certain personal obligations secured on his shares'; (iii) Colvilles and BSC were entitled to assume, and did assume, that the consents of the trustee-shareholders had been duly given in respect of these arrangements; (iv) these consents, if given, would have avoided or cured any impropriety

*h* on the part of the directors of RSP which the transactions of 22 January 1969 would otherwise have involved; and (v) for this reason, if no other, Colvilles and BSC were not on notice that these arrangments involved any impropriety on the part of the directors of RSP.

I do not think I need dwell on this argument, because the reasons for rejecting it, when viewed cumulatively, are, in my opinion, overwhelming. It was not pleaded. It was not,

*j* I understand, argued in the court below. Though Mr Edwards said in evidence that he though that the consent of the trustee-shareholders had been obtained, he did not, as I read his evidence, ever suggest that he himself ever thought that this consent by itself sufficed to render the proposals proper ones for the directors of RSP to adopt. Nor did any other witness called on behalf of the defendants suggest that anyone representing Colvilles took this view. No one from Colvilles' solicitors was called to depose to any such opinion. In any event, the information given on the telephone to Mr Maunsell on

22 January 1969 had been that the trustee-shareholders had agreed 'provided that Mr. Shenkman gave him certain personal obligations secured on his shares'. So far as the *a* evidence shows, no inquiry was directed to Mr Dyson to ascertain whether the consent had been conditional and, if so, whether the condition had been fulfilled. Though a certified copy of the relevant resolutions of the directors of RSP was requested by Colvilles' solicitors, no similar request was made for a copy of any written consent of the trustee-shareholders.

In short, this new point is, in my opinion, in every sense an afterthought on the part *b* of the defendants, which played no substantial part in Colvilles' and BSC's thinking at the material time, and does not avail them on this appeal. I do not, therefore, find it necessary to deal with counsel's submission for RSP that, even if Colvilles had believed that the relevant consents had been obtained, they could not reasonably have supposed that the consents would render the transactions proper in law.

For the reasons which I have given, and for the further reasons given by the judge, *c* which I do not think have been refuted in any material respect, I think there was abundant evidence to justify his finding of fact as to the knowledge of Colvilles and BSC.

There has been no serious challenge to the judge's finding of knowledge against Mr Cooper, on the footing that the last-mentioned findings are justified and, in my opinion, that finding also must stand.

*d*

*The no due authorisation and Turquand's case points*

Mr Shenkman unquestionably had a personal interest in the proposed guarantee and debenture which fell for consideration at the board meeting of RSP on 22 January 1969. Under art 17 of RSP's articles of association he was entitled to vote as a director in regard to these transactions and to be counted in the quorum of two directors required by *e* art 18(a), notwithstanding his personal interest, if, but only if, he declared his interest 'in manner provided by section 199 of the Companies Act 1948'. The manner provided by that section is this. Under s 199(1) the director has to declare 'the nature of his interest at a meeting of the directors of the company'. Section 199(2), so far as material, provides:

> 'In the case of a proposed contract the declaration required by this section to be *f* made by a director shall be made at the meeting of the directors at which the question of entering into the contract is first taken into consideration . . .'

The judge, as I have said, accepted the evidence of Mr Shenkman that (i) there had been no meeting of the board of RSP before 22 January 1969 at which the desirability of RSP giving a guarantee had been considered and (ii) Mr Shenkman had made no declaration of his personal interest at the board meeting of 22 January 1969. I can see no *g* grounds for challenging either of these findings of fact. Mr Shenkman and Mr Ilya Shenkman were the only two directors present and voting at the last-mentioned board meeting. So far as this point may be relevant, the judge found that there was no sufficient evidence that Mr Ilya Shenkman knew that Mr Shenkman had entered into a personal guarantee of the whole of the SSS debt to Colvilles, and I can see no grounds for disturbing that finding.

*h*

In these circumstances, on the facts as found by the judge, it is, in my opinion, clear that the no due authorisation point as pleaded in the statement of claim is well founded in law, and the only averment pleaded in the unamended defence in answer to that point, namely that 'the guarantee and the debenture were duly executed by RSP', is *not* well founded in law.

The only remaining questions in this context are whether the judge was right (1) by *j* his judgment to give leave to amend the defence so as to plead that Colvilles was entitled to rely on the resolution as a resolution passed at a properly constituted board of directors at which Mr Shenkman and Mr Ilya Shenkman, having been the only directors present, a proper disclosure of Mr Shenkman's interest had been made and, if so, (2) to decide that this amendment provided a complete answer in law to the claim against the defendants, in so far as that claim was founded on the no due authorisation point.

*a*
The possible relevance of the *Turquand* point in the present context is obvious. The following statement of the rule taken from 5 Halsbury's Laws (2nd edn) p 423, para 698 was approved by the House of Lords in *Morris v Kanssen* [1946] 1 All ER 586 at 592, [1946] AC 459 at 474 per Lord Simonds:

*b*
'. . . persons contracting with a company and dealing in good faith may assume that acts within its constitution and powers have been properly and duly performed, and are not bound to inquire whether acts of internal management have been regular.'

Later in his speech Lord Simonds pointed out the rationale of the rule ([1946] 1 All ER 586 at 592, [1946] AC 459 at 475):

*c*
'The wheels of business will not go smoothly round unless it may be assumed that that is in order which appears to be in order.'

However, s 9(1) of the European Communities Act 1972 apart, persons dealing with a company registered under the Companies Acts must be taken not only to have read both the memorandum and articles of a company, but to have understood them according to their proper meaning: see *Palmer's Company Law* (23rd edn, 1982) vol 1, para 28–02 and the cases there cited.

*d*
Colvilles and BSC, therefore, must be taken to have known that, under the articles of RSP, a quorum of two was required for the transaction of the business of its directors, and of the provisions of those articles relating to the declaration of a personal interest. They were well aware of the personal interest of Mr Shenkman in the transactions proposed on 22 January 1969.

*e*
The signed minutes of the board meeting of that day, a copy of which was subsequently supplied to Colvilles' solicitors (and, indeed, had been drafted by them), made no mention whatever of any declaration of a personal interest by Mr Shenkman. Since Colvilles and their legal advisers must be taken to have had knowledge of the relevant provisions of RSP's articles, they must also be taken to have known that the resolution could not have been validly passed *unless Mr Shenkman had duly declared his personal interest at that board meeting or a previous board meeting.*

*f*
If, therefore, the defendants are to be allowed both to take and succeed on the *Turquand* point, this must mean that, in the circumstances subsisting in late January 1969, they were *as a matter of law* entitled to assume (contrary to the fact and without further inquiry) that Mr Shenkman had duly declared his personal interest either at the board meeting of 22 January 1969 or at some previous board meeting of RSP.

*g*
This contention might well have been unanswerable if the rule in *Royal British Bank v Turquand* (1856) 6 E & B 327, [1843–60] All ER Rep 435 were an absolute and unqualified rule of law, applicable in all circumstances. But, as the statement of the rule quoted above indicates, it is not. It is a rule which only applies in favour of persons dealing with the company in good faith. If such persons have notice of the relevant irregularity, they cannot rely on the rule.

*h*
Thus, in *Transvaal Lands Co v New Belgium (Transvaal) Land and Development Co* [1914] 2 Ch 488, [1914–15] All ER Rep 987 the plaintiff company's articles, while enabling a director to be interested as a member of another company with which the plaintiff company was contracting, required that the director should disclose the nature of his interest and should not vote in respect of any contract in respect of which he was concerned. The provisions of this article were not observed when a contract was entered into by the directors of the plaintiff company when they resolved to enter into a contract with the defendant company, which had full notice of this irregularity. The Court of Appeal held that the plaintiff company had the right to rescind the contract.

*j*
Furthermore, even if persons contracting with a company do not have actual knowledge that an irregularity has occurred, they will be precluded from relying on the rule, if the circumstances were such as to put them on inquiry which they failed duly to make. As Lord Simonds in *Morris v Kanssen* [1946] 1 All ER 586 at 592, [1946] AC 459 at 475 pointed out:

'But the maxim has its proper limits . . . It is a rule designed for the protection of
those who are entitled to assume, just because they cannot know, that the person
with whom they deal has the authority which he claims. This is clearly shown by
the fact that the rule cannot be invoked if the condition is no longer satisfied, i.e., if
he who would invoke it is put upon his inquiry. He cannot presume in his own
favour that things are rightly done if inquiry that he ought to make might tell him
that they were wrongly done.'

Counsel for the defendants submitted that Lord Simonds's observation was confined
to the particular facts of the case before him where the party seeking to take advantage
of the rule was a director of the company and therefore under a duty to see that its
transactions were effected in a regular manner (see [1946] 1 All ER 586 at 593, [1946] AC
459 at 476). I do not, however, read Lord Simonds's statement of principle as confined in
this manner. The decision of this court in *A L Underwood Ltd v Bank of Liverpool and
Martins* [1924] 1 KB 775, [1924] All ER Rep 230, which was cited in *Morris v Kanssen*, in
my opinion, illustrates that the very nature of a proposed transaction may put a person
on inquiry as to the authority of the directors of a company to effect it, even if he has no
special relationship with the company. Whether, in any given case, the person dealing
with the company is put on inquiry must depend on all the particular circumstances.

It follows, therefore, that, in my opinion, the judge was right in holding that the rule
in *Turquand*'s case is not a mere plea of law, which does not have to be pleaded. The plea
asserting 'entitlement to rely etc' is a plea of mixed fact and law. It may well be that, as
counsel for the defendants submitted, once the point has been properly pleaded, it shifts
the onus of proof, so that the presumption of regularity stands until rebutted: see *Mahony
(Public Officer of National Bank of Ireland) v East Holyford Mining Co Ltd* (1875) LR 7 HL
869, [1874–80] All ER Rep 427. In my opinion, however, it was at very least incumbent
on the defendants, if they wished to take the point, to plead in the alternative that, even
if (which they denied) the resolution of 22 January 1969 had not been duly passed, they
did not know of this irregularity and were entitled to rely on it as one which had been
duly passed. This would have been a conventional plea by way of confession and
avoidance, which would have put the plaintiff's legal advisers on notice that they had to
adduce evidence, if they could, to show actual or constructive knowledge of the relevant
facts, on the part of Colvilles and BSC or their legal advisers, and to explore these matters,
so far as possible, in cross-examination of the defendants' witnesses.

As matters stood, RSP and its legal advisers had been given no such notice whatever,
either by way of pleading or by way of less formal warning, that the *Turquand* point was
going to be taken until 31 March 1981, after the evidence had been closed. When, on
2 April, there was full argument whether the amendment should be allowed, counsel for
RSP pointed out that he had not cross-examined Mr Edwards on this line at all and that,
if he had done so or if he had opened the point, the defendants might have been obliged
to call Mr Shenton and his assistant Mr Hoare, which they did not do.

When he came to give judgment, the judge rejected the possibility that, if the defence
had been properly pleaded, the evidence might have taken a different course, as 'fanciful'.
Not only did he give the defendants leave to amend to raise the *Turquand* point; he also
decided that it afforded a complete answer to the otherwise unanswerable 'no due
execution' point raised by RSP. In so doing, he made no specific finding of fact as to
Colvilles' state of knowledge. But, I think that, by necessary implication, he found as a
fact that Colvilles neither knew nor ought to have known that Mr Shenkman had failed
duly to declare his personal interest.

This court will always be slow to interfere with the exercise of his discretion by a trial
judge in relation to the amendment of pleadings. For my part, however, with great
respect to the judge, I feel no doubt that he erred in the exercise of his discretion in
dealing with this point in the way in which he did. I am far from satisfied that counsel's
complaints as to the handicaps in which the course of the proceedings had placed him in
relation to the adduction of evidence were 'fanciful'. Though, for obvious reasons, these
matters were never ventilated in evidence, I suspect, for example, that cross-examination

of Mr Edwards, as a well-trained lawyer, could well have elicited admissions sufficient to
*a* indicate that Colvilles and BSC, through their legal advisers, were sufficiently put on
inquiry, in the relevant sense, whether Mr Shenkman had duly declared his interest. If,
therefore, the onus were to be regarded as falling on RSP to establish that Colvilles and
BSC had actual or constructive knowledge of the breach of the articles of RSP, I do not
think that RSP was given a fair and adequate opportunity to establish this.

If, on the other hand, this onus is to be regarded as falling on the defendants, I do not
*b* see how it can be said that they have discharged it, since they called no evidence from Mr
Edwards, or anyone else, to the effect that they believed that the requisite declaration of
interest by Mr Shenkman had been made. The certified extract of the minutes of the
board meeting of RSP which were supplied to Colvilles suggested quite the contrary.

Counsel for the defendants submitted that the judge was the best person to judge
whether the allowance of the amendment at such a late stage in the trial would truly
*c* prejudice RSP. He went on to submit that, if there had been real potential prejudice of
this nature, RSP's counsel could, and should, have 'insisted' on an immediate ruling by
the judge and, if the amendment had been allowed, could have sought an adjournment
as far as necessary. He submitted that it would be unjust to the defendants to disallow
the amendment at this stage, when it is too late for Mr Edwards to be recalled to give
further evidence on this point. However, in the light of the course of the trial which I
*d* have described, I think that the defendants' submission that it was incumbent on RSP's
counsel (not counsel who was seeking to take the *Turquand* point) to 'insist' on an earlier
ruling was, to put it at its lowest, a bold one. By the time that the judge came to give
judgment, it was, in my respectful opinion, far too late to allow the *Turquand* point to be
taken by amendment. If the point was to be taken at all by the defendants' counsel, some
warning of this should at very latest have been given during RSP's counsel's opening at
*e* the trial, before the start, rather than after the conclusion, of the hearing of the evidence.

It follows that, in my opinion, RSP's cross-appeal succeeds, and there is no defence to
the 'no due authorisation point'. Neither the debenture nor the guarantee were the deeds
of RSP, which is entitled wholly to disclaim them as having been made without its
authority, and not duly executed. I will revert to the further consequences of this
conclusion when I come to the question of relief.

*f*

*The ultra vires point*

For many years, the phrase 'ultra vires' has from time to time been used by company
lawyers in two senses. Primarily it is used to describe acts which are beyond the *capacity*
of a company. As is pointed out by the editors of *Gore-Browne on Companies* (43rd edn,
1977) para 3–1, the phrase is also sometimes used to describe acts which are not beyond
*g* the capacity of the company but simply beyond the *authority* of either the board of
directors or a majority of the shareholders.

In many instances, the sense in which the phrase is being used is far from clear.
However, I think it plain that paras 11 and 13 of the statement of claim in this case, in
alleging that each of the guarantee and the debenture were 'ultra vires and void', were
intended to allege that their execution was beyond the *corporate capacity* of RSP, on the
*h* grounds that they were executed not for the purposes or benefit of RSP but for the
purposes or benefit of Mr Shenkman.

Subject to a point relating to the true construction of the words 'as may seem expedient'
in cl 3(K) of the memorandum of association, there is no doubt that these two transactions
fell within *the letter* of cll 3(K) and (L) of the memorandum. Accordingly, two important
points of principle which arise in the present context may be expressed thus. Is a
*j* transaction which falls within the letter of the powers conferred on a company
incorporated under the Companies Acts, but is effected for a purpose not authorised by
its memorandum of association, properly to be regarded as being beyond the corporate
capacity of the company? Apart from s 9(1) of the European Communities Act 1972, is
such a transaction capable of conferring rights on a third party dealing with the company
and, if so, in what circumstances?

The legal personality of a company incorporated under the Companies Acts exists only for the purpose of its incorporation, as defined in the objects clause, which have to be set out in its memorandum of association in the manner required by s 2(1)(c) of the Companies Act 1948. It does not, however, follow that any act is beyond its capacity unless expressly authorised by its objects clause. Any such company is treated as having implied powers to do any act which is reasonably incidental to the attainment or pursuit of any of its express objects, unless such act is expressly prohibited by the memorandum: see *Re Horsley & Weight Ltd* [1982] 3 All ER 1045 at 1050–1051, [1982] Ch 442 at 448 per Buckley LJ. Strictly, therefore, it is not essential for the memorandum to insert any reference at all to mere powers, as distinct from objects. Indeed, in *Cotman v Brougham* [1918] AC 514 at 522–523, [1918–19] All ER Rep 265 at 269–270 Lord Wrenbury deprecated the widespread practice of introducing what should properly be called mere powers in memorandum, as opposed to articles of association, though he confessed that, when a junior at the Bar, he himself had had to yield to it after 'a vain struggle'.

The statutory requirement that the objects of a company shall be specified in the memorandum marks one important difference between objects and powers. In my judgment, however, whether a particular transaction, carried out in purported exercise of an express or implied power contained in a company's memorandum of association, is within the capacity of the company must still depend on the true construction of that memorandum.

Correctly, therefore, in my opinion, counsel's argument for the defendants has focused attention in the present context on the wording of the memorandum of RSP. His first submission has been that the guarantee was intra vires RSP as a matter of corporate capacity because the provisions of cl 3(K) of the memorandum of RSP, read together with the closing words of that clause, set out a separate independent object, which RSP was capable of carrying on as such, and that the execution of the guarantee fell within that provision.

If this submission as to the construction of cl 3(K) were well founded, I think the suggested conclusion would follow and that, while the relevant transactions might have involved breaches of duty on the part of the directors of RSP, there would be no possible question of their having been beyond its corporate capacity. For the recent decision of this court in *Re Horsley & Weight Ltd* has made clear, if this was not clear before, that—

'the doing of an act which is expressed [by the company's memorandum] to be, and is capable of being, an independent object of the company cannot be ultra vires, for it is by definition something which the company is formed to do and so must be intra vires.'

(See [1982] 3 All ER 1045 at 1051, 1055, 1055–1056, [1982] Ch 442 at 449, 454, 455 per Buckley, Cumming-Bruce and Templeman LJJ.)

Furthermore, I think this decision also shows that this same principle applies whether or not the transaction in question is of a gratuitous nature:

'The objects of a company do not need to be commercial; they can be charitable or philanthropic; indeed, they can be whatever the original incorporators wish, provided that they are legal. Nor is there any reason why a company should not part with its funds gratuitously or for non-commercial reasons if to do so is within its declared objects.'

(See [1982] 3 All ER 1045 at 1052, [1982] Ch 442 at 450 per Buckley LJ.)

In the light of the observations of Buckley LJ in *Re Horsley & Weight Ltd* [1982] 3 All ER 1045 at 1053–1054, [1982] Ch 442 at 452, of Pennycuick J in *Charterbridge Corp Ltd v Lloyds Bank Ltd* [1969] 2 All ER 1185 at 1190–1191, [1970] Ch 62 at 69–71 and of Oliver J in *Re Halt Garage (1964) Ltd* [1982] 3 All ER 1016 at 1028–1030, the three tests of ultra vires suggested by Eve J in an often-cited passage in his judgment in *Re Lee Behrens & Co Ltd* [1932] 2 Ch 46 at 51–52, [1932] All ER Rep 889 at 890–891 should, in my opinion, now be recognised as being of no assistance, and indeed positively misleading, when the relevant question is whether a particular gratuitous transaction is

*a*  within the company's corporate capacity. To this extent, the tests should, I think, be finally laid to rest, though they may well be helpful in considering whether or not in any given case directors have abused the powers vested in them by the company.

The question whether cl 3(K) of RSP's memorandum contains a separate independent object of the company is purely one of construction of that memorandum. The decision of the House of Lords in *Cotman v Brougham* [1918] AC 514, [1918–19] All ER Rep 265 requires that, in answering it, full force must be given, so far as possible, to the provision

*b*  at the end of cl 3 of the memorandum, which directs that each sub-clause shall be construed independently of the other sub-clauses. I accept counsel's submission for the defendants that cl 3(K) must be treated as containing a substantive object unless either (i) the subject matter of this sub-paragraph is by its nature incapable of constituting a substantive object (as was the power to borrow in *Re Introductions Ltd, Introductions Ltd v National Provincial Bank Ltd* [1969] 1 All ER 887, [1970] Ch 199), or (ii) the wording of

*c*  the memorandum shows expressly or by implication that the sub-clause was intended merely to constitute an ancillary power only: see, for example, the observations of Buckley J in the latter case at first instance ([1968] 2 All ER 1221 at 1224).

Counsel has submitted, and I agree, that there is no reason in principle why a company should not be formed for the specific purpose, inter alia, of giving guarantees, whether gratuitous or otherwise, rather unusual though such an object might be.

*d*  Attention, however, has to be directed to the particular wording of cl 3(K). The authority to give guarantees and become security conferred by the second limb of the sub-clause is not an unrestricted authority. It is merely an authority to give guarantees or become security for 'any such persons, firms or companies'. The six words just quoted echo the words of the first limb of the sub-clause, which authorise the company to—

*e*      'lend and advance money or give credit to such persons, firms or companies and on such terms as may seem expedient, and in particular to customers of and others having dealings with the Company . . .'

The phrase 'as may seem expedient' necessarily implies that there is some criterion by which expediency is to be tested. The only possible criterion, in my opinion, can only

*f*  mean 'as may seem expedient for the furtherance of the objects of the company'. The references in cl 3(K) to the giving of credit and to customers of and persons having dealings with the company, make it additionally clear that the sub-clause in its context was intended to comprise merely a series of ancillary powers. It follows that, in my opinion, the power to give guarantees and become security, which are the relevant powers in the present case, are not to be construed as independent objects of RSP and the

*g*  judge was right in so holding. Correspondingly, I think he was right to reject the defendants' argument that the relevant transactions were intra vires RSP, in so far as that argument was based on the hypothesis that the powers conferred by cl 3(K) were independent objects of RSP.

What, then, is the position if (as I have concluded) the power to give guarantees and to become security are to be regarded as mere powers ancillary to the objects of RSP? Even

*h*  on this footing, RSP, in executing the guarantee and the debenture, was performing acts of a nature which, at least seemingly, it was expressly authorised by cll 3(K) and (L) of its memorandum to perform. The particular exercises of these powers were, on the face of them, well *capable of* falling within the objects of RSP.

The judge, as I have read his judgment, accepted that these transactions were capable of falling within the scope of the wording of the powers conferred on RSP by its

*j*  memorandum. Nevertheless, he considered that there is a general principle of company law that a transaction, which ostensibly falls within the scope of the wording of a company's memorandum but is in fact entered into for some purpose not authorised by that memorandum, will be ultra vires the company in what he called the 'wider sense', and will confer rights on another party only if he can show that he dealt with the company in good faith and did not have notice that the transaction was entered into for an unauthorised purpose (see [1982] 3 All ER 1057 at 1077, [1982] Ch 478 at 499). It was

primarily on the basis of this principle that the judge ultimately held the defendants in
the present case liable to restore the moneys which they had received.                    *a*

As Lord Selborne said in *Ashbury Rly Carriage and Iron Co (Ltd) v Riche* (1875) LR 7 HL
653 at 693:

> '. . . a statutory corporation created by Act of Parliament for a particular purpose,
> is limited, as to all its powers, by the purposes of its incorporation as defined in that
> Act.'                                                                                     *b*

Strict logic might therefore appear to require that any act purported to be done by a
company in purported exercise of powers ancillary to its objects conferred on it by its
memorandum of association, whether express or implied, (eg a power to borrow) would
necessarily, and in every case, be beyond its capacity and therefore wholly void if such act
was in fact performed for purposes other than those of its incorporation. However, the
practical difficulties resulting from such a conclusion for persons dealing with a company   *c*
carrying on a business authorised by its memorandum, would be intolerable. As
Buckley J put it, in regard to a power to borrow, in *Re David Payne & Co Ltd, Young v
David Payne & Co Ltd* [1904] 2 Ch 608 at 613:

> 'A corporation, every time it wants to borrow, cannot be called upon by the lender
> to expose all its affairs, so that the lender can say, "Before I lend you anything I must
> investigate how you carry on your business, and I must know why you want the       *d*
> money, and how you apply it, and when you do have it I must see you apply it in
> the right way." It is perfectly impossible to work out such a principle.'

The *David Payne* decision, in my opinion, indicates the proper alternative approach. In
that case, the company concerned had express power under its memorandum of
association 'to borrow and raise money for the purposes of the company's business'. It   *e*
borrowed money and issued a debenture to secure the loan. Its liquidator claimed that
the debenture was ultra vires and void because there was evidence that the borrowing
had not in fact been made for the purposes of the company's business. Buckley J in his
judgment considered the force of the phrase 'for the purposes of the company's business'.
He asked the question (at 612):

> '. . . is it a condition attached to the exercise of the power that the money should   *f*
> be borrowed for the purposes of the business, or is that a matter to be determined as
> between the shareholders and the directors?'

In the course of answering this question he said:

> 'A corporation cannot do anything except for the purposes of its business,
> borrowing or anything else; everything else is beyong its power, and is ultra vires.   *g*
> So that the words "for the purposes of the company's business" are a mere expression
> of that which would be involved if there were no such words.'

This passage has been frequently echoed in later cases and, perhaps not surprisingly,
has on occasions been read as referring to the capacity of the company. However, I think
that, in using the phrase 'ultra vires' in this particular context, Buckley J can only have   *h*
meant 'ultra vires the directors'. This, in my opinion, is made clear by what followed.
He accepted that, if the phrase 'for the purpose of the company's business' was a condition
attached to the exercise of the power, a loan would be ultra vires and void if the condition
had not been complied with. He did not, however, regard it as such a condition; in his
view it did no more than state the obvious. In these circumstances, his conclusion was as
follows (at 613):                                                                           *j*

> 'If this borrowing was made, as it appears to me at present it was made, for a
> purpose illegitimate so far as the borrowing company was concerned, that may very
> well be a matter on which rights may arise as between the shareholders and directors
> of that company. It may have been a wrongful act on the part of the directors. But I
> do not think that a person who lends to the company is by any words such as these
> required to investigate whether the money borrowed is borrowed for a proper

*a*  purpose or an improper purpose. The borrowing being effected, and the money passing to the company, the subsequent application of the money is a matter in which the directors may have acted wrongly; but that does not affect the principal act, which is the borrowing of the money.'

In these circumstances, he held that the defendants—

*b*  'who have paid this money and taken this debenture without notice that the money was going to be applied as it was, are not affected by anything arising in regard to that.'

(See [1904] 2 Ch 608 at 614.)

The most relevant passages in the judgments of the Court of Appeal in the *David Payne* case are cited in Vinelott J's judgment and I will not repeat them. Vaughan Williams and
*c*  Cozens-Hardy LJJ expressly approved the manner in which Buckley J had approached the problem. Vaughan Williams LJ expressly, and the other members of the court implicitly rejected the borrower's first argument that, since the debenture was not issued to raise money for the purposes of the company, it was ultra vires altogether 'in such a sense that nothing could make it right' (see [1904] 2 Ch 608 at 615). All three members of the court considered that the plaintiff company could succeed if, but only if, it showed
*d*  that, at the time of the loan, the lending company knew that the money was going to be applied by the borrowers for an improper purpose and that this had not been proved.

The one crucially important point to which Buckley J and the Court of Appeal in *Re David Payne & Co Ltd* did not expressly advert is the basis on which the lenders would have lost their security if they had known of the improper purpose for which the moneys lent were going to be applied. The basis is, in my opinion, this. The directors of the
*e*  borrowing company in fact had no authority from the company to take the loan and grant the debenture because these transactions were not effected for the purposes of the company. Nevertheless, as a general rule, a company incorporated under the Companies Acts holds out its directors as having ostensible authority to do on its behalf anything which its memorandum of association, expressly or by implication, gives the company the capacity to do. In *Re David Payne & Co Ltd* the company's memorandum gave it the
*f*  capacity to borrow. As a matter of construction of the company's memorandum, the court was not prepared to construe the words 'for the purposes of the company's business' as limiting its corporate capacity, but construed them simply as limiting the authority of the directors. In the absence of notice to the contrary, the lenders would thus have been entitled to assume, on the authority of the principle in *Royal British Bank v Turquand* (1856) 6 E & B 327, [1843–60] All ER Rep 435, and on more general principles of the
*g*  law of agency, that the directors of the borrowing company were acting properly and regularly in the internal management of its affairs and were borrowing for the purposes of the company's business (see eg *Re Hampshire Land Co* [1896] 2 Ch 743, a decision of Vaughan Williams J which was cited in the *David Payne* case; see also *Bowstead on Agency* (14th edn, 1976) pp 241–242 and the cases there cited). However, a party dealing with a company cannot rely on the ostensible authority of its directors to enter into a particular
*h*  transaction, if he knows they in fact have no such authority because it is being entered into for improper purposes. Neither the rule in *Turquand's* case nor more general principles of the law of agency will avail him in such circumstances (see *Bowstead* p 243). The various passages in the judgments in both courts in the *David Payne* case which refer to the extent of the lender's obligation (if any) to inquire as to the purposes for which the loan is to be used, in my opinion, are not directed at all to the corporate capacity of the
*j*  borrowing company: they are directed to the right of the lender to rely on the ostensible authority of the borrower's directors.

In *Re Introductions Ltd* [1969] 1 All ER 887, [1970] Ch 199 the Court of Appeal again had to consider the validity of debentures granted by a company as security for a loan. The company under a sub-cl (N) of its memorandum of association had a general ancillary power to borrow money and to issue debentures to secure its repayment. But this power was not an independent object of the company. As Harman LJ put it ([1969] 1 All ER

887 at 889, [1970] Ch 199 at 210): '. . . borrowing is not an end in itself and must be for
some purpose of the company . . .' The power was not expressed in terms to be exercisable *a*
only 'for the purposes of the company' but, following the reasoning of Buckley J in *Re
David Payne & Co Ltd* [1904] 2 Ch 608 at 612 the court held that the words necessarily
had to be implied. The company had borrowed money from a bank and granted
debentures to secure the loan. But the only business carried on by it was that of pig-
breeding, which was a purpose not authorised by its memorandum of association. On
the liquidation of the company, a question arose as to the validity of the debentures. *b*
Harman LJ, who gave the leading judgment, after deciding that the power to borrow
conferred by the memorandum was a mere ancillary power not an independent object,
proceeded to cite ([1969] 1 All ER 887 at 890, [1970] Ch 199 at 210) the following
passage from the speech of Lord Parker in *Cotman v Brougham* [1918] AC 514 at 521,
[1918–19] All ER Rep 265 at 269:

> 'A person who deals with a company is entitled to assume that a company can do *c*
> everything which it is expressly authorized to do by its memorandum of association,
> and need not investigate the equities between the company and its shareholders.'

This passage, it will be seen, closely echoes some of the language used by Buckley J in his
judgment in the *David Payne* case and is, I think, an expression of the rule in *Turquand's*
case and the more general principles of agency to which I have already referred. *d*
    Harman LJ went on to say ([1969] 1 All ER 887 at 890, [1970] Ch 199 at 210):

> 'I would agree that if the defendant bank did not know what the purpose of the
> borrowing was *it need not enquire*, but it did know, and I can find nothing in *Cotman*
> v. *Brougham* to protect it notwithstanding that knowledge.' (My emphasis.)

The words 'it need not enquire', in my opinion, make it clear that Harman LJ did not *e*
regard the borrowing as having been beyond the *capacity* of the company. However, he
then went on to point out that the *David Payne* decision shows that the protection
afforded by the principle stated by Lord Parker affords no protection to a lender who
knows that the money is intended to be misapplied. The absence of any express provision
in the company's memorandum of association requiring the loan to be applied for the
purposes of the company, in his judgment, did not improve the bank's position, since *f*
such a provision would fall to be implied anyway. He concluded ([1969] 1 All ER 887 at
890, [1970] Ch 199 at 211):

> 'This borrowing was not for a legitimate purpose of the company; the bank knew
> it and *therefore* cannot rely on its debenture.' (My emphasis.)

    As I read his judgment, therefore, Harman LJ reached his decision that the bank could *g*
not rely on the debentures following the ratio of the *David Payne* decision, that is to say,
not because they had been granted by the company in excess of its corporate capacity,
but because the bank knew that the directors of the company, in purporting to grant
them, had exceeded the authority conferred on them by the company by entering into
the transaction for purposes other than the company's corporate purpose.
    Russell LJ, in a very short judgment ([1969] 1 All ER 887 at 890, [1970] Ch 199 at *h*
211), reached the same conclusion but by rather a different route from that of Harman
LJ. As I read his judgment, his view was that the borrowing and execution of the
debentures were ultra vires the company as a matter of corporate capacity because it was
an implicit condition attached to the power to borrow contained in the company's
memorandum that moneys should not be borrowed for use *in an undertaking ultra vires
the company*. Since the sole undertaking of that company was the pig-breeding business, *j*
which was beyond the company's corporate capacity, the loans taken for use in that
business were likewise inevitably beyond its corporate capacity. I read Russell LJ's
decision as being limited to the facts of that particular case and not in any way conflicting
with my interpretation of the *David Payne* decision.
    It follows that, in my opinion, the decisions of this court in *Re David Payne & Co Ltd*
and *Re Introductions Ltd*, on their true analysis, lend no support to RSP's submission that

the relevant transactions in the present case were beyond the corporate capacity of RSP

*a* simply because they were effected for improper purposes not authorised by its memorandum of association. Nor does this argument derive any support from the powerful judgment of Pennycuick J in *Charterbridge Corp Ltd v Lloyds Bank Ltd* [1969] 2 All ER 1185 at 1189, [1970] Ch 62 at 69, where one finds the following statement of principle:

*b*        'Apart from authority, I should feel little doubt that where a company is carrying out the purposes expressed in its memorandum, and does an act within the scope of a power expressed in its memorandum, that act is an act within the powers of the company. The memorandum of a company sets out its objects and proclaims them to persons dealing with the company and it would be contrary to the whole function of a memorandum that objects unequivocally set out in it should be subject to some implied limitation by reference to the state of mind of the parties concerned. Where

*c*        directors misapply the assets of their company, that may give rise to a claim based on breach of duty. Again, a claim may arise against the other party to the transaction, if he has notice that the transaction was effected in breach of duty. Further, in a proper case, the company concerned may be entitled to have the transaction set aside. But all that results from the ordinary law of agency and has not of itself anything to do with the corporate powers of the company.'

*d*
     Pennycuick J, having subsequently proceeded to review the authorities cited to him, apparently saw no reason to qualify this statement of the law and neither do I. I respectfully agree with it in its entirety and would regard the principles stated in *Re David Payne & Co Ltd* as giving effect to the 'ordinary law of agency'.
     I also respectfully agree with the following observations made by Oliver J, after an

*e* extensive review of the authorities, in *Re Halt Garage (1964) Ltd* [1982] 3 All ER 1016 at 1029–1030:

        'I cannot help thinking, if I may respectfully say so, that there has been a certain confusion between the requirements for a valid exercise of the fiduciary powers of directors (which have nothing to do with the capacity of the company but everything to do with the propriety of acts done within that capacity), the extent to which

*f*        powers can be implied or limits be placed, as a matter of construction, on express powers, and the matters which the court will take into consideration at the suit of a minority shareholder in determining the extent to which his interests can be overridden by a majority vote. These three matters, as it seems to me, raise questions which are logically quite distinct but which have sometimes been treated as if they demanded a single, universal answer leading to the conclusion that, because a power

*g*        must not be abused, therefore, beyond the limit of propriety it does not exist.'

     My conclusions from these authorities on these questions of principle may be summarised as follows. (1) The basic rule is that a company incorporated under the Companies Acts only has the capacity to do those acts which fall within its objects as set out in its memorandum of association or are reasonably incidental to the attainment or

*h* pursuit of those objects. Ultimately, therefore, the question whether a particular transaction is within or outside its capacity must depend on the true construction of the memorandum. (2) Nevertheless, if a particular act (such as each of the transactions of 22 January 1969 in the present case) is of a category which, on the true construction of the company's memorandum, is *capable* of being performed as reasonably incidental to the attainment or pursuit of its objects, it will not be rendered ultra vires the company

*j* merely because in a particular instance its directors, in performing the act in its name, are in truth doing so for purposes other than those set out in its memorandum. Subject to any express restrictions on the relevant power which may be contained in the memorandum, the state of mind or knowledge of the persons managing the company's affairs or of the persons dealing with it is irrelevant in considering questions of corporate capacity. (3) While due regard must be paid to any express conditions attached to or limitations on powers contained in a company's memorandum (eg a power to borrow

only up to a specified amount), the court will not ordinarily construe a statement in a memorandum that a particular power is exercisable 'for the purposes of the company' as *a* a condition limiting the company's corporate capacity to exercise the power: it will regard it as simply imposing a limit on the authority of the directors (see *Re David Payne & Co Ltd* [1904] 2 Ch 608). (4) At least in default of the unanimous consent of all the shareholders (as to which see below), the directors of a company will not have *actual* authority from the company to exercise any express or implied power other than for the purposes of the company as set out in its memorandum of association. (5) A company *b* holds out its directors as having *ostensible* authority to bind the company to any transaction which falls within the powers expressly or impliedly conferred on it by its memorandum of association. Unless he is put on notice to the contrary, a person dealing in good faith with a company which is carrying on an intra vires business is entitled to assume that its directors are properly exercising such powers for the purposes of the company as set out in its memorandum. Correspondingly, such a person in such circumstances can hold the *c* company to any transaction of this nature. (6) If, however, a person dealing with a company is on notice that the directors are exercising the relevant power for purposes other than the purposes of the company, he cannot rely on the ostensible authority of the directors and, on ordinary principles of agency, cannot hold the company to the transaction.

In the present case I construe the words 'as may seem expedient' in cl 3(K) of RSP's *d* memorandum not as limiting the corporate capacity of RSP but as simply imposing a limit on the authority of its directors. To adapt the wording of Harman LJ in *Re Introductions Ltd* [1969] 1 All ER 887 at 890, [1970] Ch 199 at 210 following *Re David Payne & Co Ltd* [1904] 2 Ch 608, the guarantee and pro tanto the debenture were not executed for a legitimate purpose of RSP; Colvilles and BSC knew it and, therefore, cannot rely on the guarantee and pro tanto the debenture. All this results from the *e* ordinary law of agency, not from the corporate powers of RSP. The relevant transactions in the present case, in my opinion, were not beyond its corporate capacity.

The judge explained that the reason why he regarded a transaction which is within the powers, express or implied, of a company but which is entered into for a purpose which is not authorised by its memorandum of association as equated with one which is ultra vires in the narrow sense as 'that such a transaction like a transaction which is ultra vires *f* in the narrow sense is incapable of being made binding on the company even by the assent of all the members' (see [1982] 3 All ER 1057 at 1077, [1982] Ch 478 at 499). We have had the benefit of extensive argument as to the extent (if any) to which the assent of all the members of a company is capable of binding it to a transaction of this nature. Since the shareholders' consent point is not open to BSC and Mr Cooper on the facts of the present case, I wish to make only the following few (obiter) observations in the *g* context of this argument. First, if an act is beyond the corporate capacity of a company, it is clear that it cannot be ratified. As against the company itself, 'An ultra vires agreement cannot become intra vires by means of estoppel, lapse of time, ratification, acquiescence, or delay' (see *York Corp v Henry Leetham & Sons Ltd* [1924] 1 Ch 557 at 573, [1924] All ER Rep 477 at 485 per Russell J). However, the clear general principle is that any act that falls within the corporate capacity of a company will bind it if it is done with *h* the unanimous consents of all the shareholders or is subsequently ratified by such consents (see eg *Salomon v A Salomon & Co Ltd* [1897] AC 22 at 57, [1895–9] All ER Rep 33 at 51 per Lord Davey, *Re Horsley & Weight Ltd* [1982] 3 All ER 1045 at 1055, [1982] Ch 442 at 454 per Buckley LJ and *Multinational Gas and Petrochemical Co v Multinational Gas and Petrochemical Services Ltd* [1983] 2 All ER 563, [1983] Ch 258). This last-mentioned principle certainly is not an unqualified one. In particular, it will not enable *j* the shareholders of a company to bind the company itself to a transaction which constitutes a fraud on its creditors (see eg *Re Halt Garage (1964) Ltd* [1982] 3 All ER 1016 at 1037 per Oliver J). But none of the authorities which have been cited to us have convinced me that a transaction which (i) falls within the letter of the express or implied powers of a company conferred by its memorandum and (ii) does not involve a fraud on its creditors and (iii) is assented to by all the shareholders will not bind a fully solvent

company merely because the intention of the directors, or the shareholders, is to effect a

*a*   purpose not authorised by the memorandum. The recent decision of this court in the *Multinational* case seems to me to point to a contrary conclusion (see also *A-G's Reference (No 2 of 1982)* [1984] 2 All ER 216 at 223, [1984] QB 624 at 640 per Kerr LJ). However, none of these matters relating to ratification, in my opinion, call for decision on this appeal. I have touched on them only because they weighed with the judge and have been covered fully in argument.

*b*   Whether or not in 1969 the consent or ratification of all the shareholders was incapable of rendering the transactions of 22 January 1969 binding on RSP, I myself think that the concept of ultra vires 'in the wider sense' embodied by the judge in his judgment carries with it some risk of confusion. If confusion is to be avoided, it seems to me highly desirable that, as a matter of terminology, the phrase 'ultra vires' in the context of company law should for the future be rigidly confined to describing acts which are

*c*   beyond the corporate capacity of a company. Transactions entered into by a company, such as those considered in *Re David Payne & Co Ltd* [1904] 2 Ch 608, and those under consideration in the present case, cannot, in my opinion, be properly regarded as beyond its corporate capacity (and, therefore, ex hypothesi wholly void) if they are capable of conferring rights on a third party, albeit only on a third party who dealt with the company in good faith and without notice that they were being entered into in

*d*   furtherance of improper purposes.

To sum up, my conclusions on the ultra vires point are these. The relevant transactions of 22 January 1969 were not beyond the corporate capacity of RSP and thus were not ultra vires in the proper sense of that phrase. However, the entering into the guarantee and, to the extent of the sum guaranteed, the debenture was beyond the authority of the directors, because they were entered into in furtherance of purposes not authorised by

*e*   RSP's memorandum. Despite this lack of authority, they might have been capable of conferring rights on Colvilles if Colvilles had not known of this lack of authority. Colvilles, however, did have such knowledge and so acquired no rights under these transactions. Even if the no due authorisation point discussed earlier in this judgment were not open to RSP, because Mr Shenkman *had* duly declared his interest at the relevant board meeting, RSP could disclaim these transactions, which its directors had carried out

*f*   on its behalf, as being unauthorised, inasmuch as they were carried out for improper purposes. The practical relevance of the no due authorisation point discussed in an earlier section of this judgment is that it enables RSP also to disclaim the borrowing of the £401,448 and the *whole* (as opposed to part only) of the security given by the debenture (as having been in each case entered into by the directors without its authority) and also to attack the validity of the receiver's appointment.

*g*

*The constructive trust point*

I now turn much more briefly to the constructive trust point. Buckley LJ stated the relevant principle thus in *Belmont Finance Corp v Williams Furniture Ltd (No 2)* [1980] 1 All ER 393 at 405 in a judgment with which Goff and Waller LJJ agreed:

*h*     'A limited company is of course not a trustee of its own funds: it is their beneficial owner; but in consequence of the fiduciary character of their duties the directors of a limited company are treated as if they were trustees of those funds of the company which are in their hands or under their control, and if they misapply them they commit a breach of trust (*Re Lands Allotment Co* [1894] 1 Ch 616 at 631, 638, [1891–94] All ER Rep 1032 at 1034, 1038 per Lindley and Kay LJJ). So, if the directors of a

*j*     company in breach of their fiduciary duties misapply the funds of their company so that they come into the hands of some stranger to the trust who receives them with knowledge (actual or constructive) of the breach, he cannot conscientiously retain those funds against the company unless he has some better equity. He becomes a constructive trustee for the company of the misapplied funds. This is stated very clearly by Jessel MR in *Russell v Wakefield Waterworks Co* (1875) LR 20 Eq 474 at 479, where he said: "In this Court the money of the company is a trust fund, because

it is applicable only to the special purposes of the company in the hands of the agents
of the company, and it is in that sense a trust fund applicable by them to those  *a*
special purposes; and a person taking it from them with notice that it is being
applied to other purposes cannot in this Court say that he is not a constructive
trustee".'

The *Belmont* principle thus provides a legal route by which a company may recover its
assets in a case where its directors have abused their fiduciary duties and a person
receiving assets as a result of such abuse is on notice that they have been misapplied. The  *b*
principle is not linked in any way to the capacity of the company: it is capable of applying
whether or not the company had the capacity to do the acts in question.

Furthermore, the *Belmont* principle must, in my opinion, be equally capable of
applying in a case where the relevant misapplication of the company's assets by the
directors has consisted either (a) of an application for purposes not authorised by its
memorandum or (b) an application in breach of the company's articles of association (eg  *c*
pursuant to a board resolution passed at an inquorate meeting of the directors).

From the findings of fact of the judge, with which I see no reason to disagree for
reasons already stated, I think it clear that (a) the directors of RSP were acting in breach
of RSP's articles of association and of their fiduciary duties to RSP in purporting to
authorise and in executing the guarantee and debenture, and (b) BSC and Mr Cooper had  *d*
notice of these facts when they respectively received the relevant assets.

It must follow, in my opinion, that the constructive trust point is well founded and
that RSP is entitled to relief on this ground as well as on the additional grounds to which
I have already referred.

*e*

*The relief to be granted*

Finally, I turn to consider the relief to be granted to RSP. The judge, having found in
favour of RSP on the ultra vires and constructive trust points, ordered in effect that the
guarantee be set aside. He further ordered that BSC and the receiver and, to the extent of
the assets coming to their hands as personal representatives, the fifth and sixth defendants,
were jointly and severally liable to pay to RSP (a) the sum of £383,084·77 (being the  *f*
principal amount received by BSC in discharge of the guarantee out of the proceeds of
sale of RSP's assets realised by the receiver), and, in addition, (b) all interest paid by the
receiver to BSC under the terms of the agreement and the debenture of 22 January 1969
in respect of the principal amount secured by the guarantee and (c) the amount for which
the receiver accounted to the Inland Revenue in respect of tax deducted therefrom. In
the exercise of his discretion he also ordered payment of interest on the above-mentioned  *g*
sums and a number of accounts and inquiries. He also gave RSP liberty to prove in Mr
Shenkman's bankruptcy for various sums payable under the order.

The details of the judge's order of 23 March 1983 were finally settled after his second
judgment of that date.

One important matter which had to be dealt with in this judgment was the mode of
calculation of the interest payable on the sums recoverable by RSP. This interest element  *h*
has proved to be very large in amount, particularly since the judge in effect ordered that,
as to a major part of these sums, RSP is entitled to compound interest. However, neither
the defendants' notice of appeal nor RSP's cross-appeal raises any issue of detail in regard
to the form of the order relating to interest or otherwise. As to the form of the order,
each of them raises just one major point of principle.

RSP for its part seeks wider relief than that granted by the order on the footing that its  *i*
no due authorisation point is to be accepted and the defendants' *Turquand* point is to be
rejected. On this footing, the notice of cross-appeal seeks (1) a declaration that the
guarantee, the debenture and the purported appointment of Mr Cooper was and is in
each case void and of no effect and (2) payment to RSP of the sum of £1,148,078·15 as
money had and received to the use of RSP with interest under the Law Reform
(Miscellaneous Provisions) Act 1934.

*a*   As to (1) my present view is that the appropriate form of relief is a declaration that each of the agreement, guarantee and debenture was not and is not the deed of RSP and that the purported appointment of Mr Cooper was and is void and of no effect. A declaration in this form would leave open the question whether the guarantee and debenture had effect to the extent of exposing the directors of RSP who executed it to some personal liability to Colvilles.

*b*   As to (2) the manner in which the sum of £1,148,078·15 is arrived at appears from the last sentence in the opening section of this judgment. Counsel for RSP, however, submitted in effect that, if RSP succeeded on the no due authorisation point, the existing order should remain but there should be added to it, first, an order for payment to RSP of an additional sum of £401,448 plus interest and, second, a declaration that BSC is entitled to prove in the liquidation of RSP for this sum but without interest. He further submitted that the sum of £50,000 retained by the receiver should be repaid.

*c*   As at present advised, I do not think that an order in the form suggested by counsel would do equity. The effect of my conclusion on the no due authorisation point is that the directors of RSP, purporting to act on behalf of RSP but without its authority, have borrowed a sum of £401,448 from Colvilles. This particular sum, however, was immediately applied by the directors of RSP for the benefit of RSP in discharging the liability of RSP to SSS. The result was that the aggregate liabilities of RSP remained the same, save for the obligation to pay interest to Colvilles at a rate higher than that (if any) which had been agreed with SSS. A general principle of equity, as I understand it, is that, where, by an unauthorised act of an agent, the money of a third party is obtained and applied for the benefit of the principal, the principal is liable to restore such money to the extent that it has been so applied, even though the third party knew that the agent was not authorised to obtain or receive the money (see *Bowstead on Agency* (14th edn, 1976) p 330 and *Reversion Fund and Insurance Co Ltd v Maison Cosway Ltd* [1913] 1 KB 364). It seems to me, therefore, that RSP was at all material times under an obligation to repay the £401,448 to Colvilles or BSC and that RSP cannot now seek redress against the defendants on the basis that the sum of £401,448 was improperly paid to BSC.

*f*   However, as I understand the position, the receiver repaid to BSC not only the capital sum of £401,448, but interest on this sum as provided by the agreement and debenture. I do not see how BSC can justify the receipt and retention of this interest element if the agreement and debenture are not binding on RSP. My present view, therefore, is that the judge's order should be varied so as to include an order for payment of this interest element, plus the £50,000 retained by the receiver in respect of fees and expenses, together with interest on those two respective sums, but not the sum of £401,448 itself.

*g*   I now turn to the point of principle raised by BSC and Mr Cooper as to the form of the order. If a surplus remains in the hands of the liquidator of RSP after all its liabilities and the costs, charges and expenses of the liquidation have been discharged, that surplus will fall to be distributed among the shareholders of RSP who, so far as the evidence shows, are still the trustee-shareholders, and Mr Shenkman. He, I understand, has now obtained his discharge from bankruptcy. Since Mr Shenkman was an active participant in the relevant breaches of trust by the directors of RSP and the trustee-shareholders, according to the defendants' submission, consented to those breaches of trust, counsel for the defendants submitted that it would be inequitable if there were any possibility of the order made by the court resulting in the receipt by Mr Shenkman or the trustee-shareholders of any part of the assets repaid by BSC and the receiver to RSP pursuant to the order. He therefore sought, and obtained from this court, leave to amend the notice of appeal by raising a point not pleaded or argued in the court below. The submission is in effect that the order should place a limit on the liability of BSC and the receiver, so as to provide that the aggregate amount which falls to be paid by BSC and the receiver to RSP, including interest, is not to exceed a sum sufficient to enable the liquidator of RSP to discharge in full the liabilities, costs, charges and expenses already mentioned.

This submission is based on the principle exemplified by the decision of this court in *Re Somerset, Somerset v Earl Poulett* [1894] 1 Ch 231, which deals with the position of beneficiaries who have instigated or consented to a breach of trust. At least, in so far as it

is directed against Mr Shenkman, I have much sympathy with it. In the context of this
litigation, he seems to me to have no merits whatever, except that the judge thought     *a*
him an honest witness. However, in my view, it is impossible for this court to accede to
the submission for these two reasons, if no others. First, for the reasons already given,
BSC and the receiver cannot on this appeal be heard to say that the trustee-shareholders
did in fact consent to the transactions. Second, Mr Shenkman's trustee in bankruptcy has
a clear interest in this point. He elected to take no part in the proceedings in the court
below and this court on the basis of, respectively, the pleadings and the notice of appeal   *b*
in its original form, neither of which made any reference at all to the possibility of the
defendants' liability being limited in this manner. In these circumstances, I do not think
that by its order this court can properly place the suggested limit on such liability which
might enure to the detriment of the trustee in bankruptcy and the creditors whom he
represents.

Counsel requested that, even if this court did not feel able to restrict the defendants'   *c*
liability, it should, after directing appropriate inquiries as to what is due to the creditors
of RSP in respect of capital and interest and in respect of the costs, charges and expenses
of the liquidation, direct an issue to be tried as between (1) BSC and the receiver, (2) the
trustee-shareholders, (3) Mr Shenkman and (4) Mr Shenkman's trustee in bankruptcy.

For my part, however, I do not think it could be right for this court to make such a   *d*
direction in the absence of Mr Shenkman and the trustee in bankruptcy, who have had
no notice whatever that the point was going to be raised on this appeal or the trustee-
shareholders who are not even parties to the proceedings. While I have in principle some
sympathy with the point, the furthest that I feel the court can and should go to assist BSC
and the receiver is to add a proviso to the order to the effect that (i) the order for payment
thereby made shall not prejudice or affect the respective rights (if any) of BSC, Mr
Shenkman, Mr Shenkman's trustee in bankruptcy or the other shareholders in RSP as   *e*
between themselves to participate in the moneys paid; (ii) the liquidator of RSP shall not
distribute any moneys so paid to Mr Shenkman or his trustee in bankruptcy or the other
shareholders in RSP without giving (say) 21 days' prior written notice to BSC's solicitors
of the intention to make such distribution. I should, perhaps, make it clear that, while
BSC and the receiver have not been permitted to raise the shareholders' consent point on
this appeal, there will, in my opinion, be nothing to prevent them from raising the point   *f*
for what it is worth in the liquidation of RSP or in any other proceedings.

The decision in *Reversion Fund and Insurance Co Ltd v Maison Cosway Ltd* [1913] 1 KB
364 was not cited in the course of argument before this court. For this reason, if no other,
I think the parties must be given the opportunity to present argument to us, if they wish
to do so and think it will serve a useful purpose, as to the precise form of relief to be
granted in the light of our conclusions on the substantive issues.   *g*

Subject to this, (1) I would dismiss the appeal of BSC and the receiver, (2) I would allow
the cross-appeal of RSP, (3) I would vary the judge's order so as to include (a) a declaration
that each of the agreement, the guarantee and the debenture of 22 January 1969 was not
and is not the deed of RSP, (b) a declaration that the purported appointment of Mr
Cooper as receiver was and is void and of no effect, (c) an order for payment or repayment
of (i) the interest element received by BSC from the receiver in respect of the £401,448,   *h*
(ii) the £50,000 received by the receiver, (iii) interest on these two last mentioned sums,
(d) a proviso of the nature which I have already indicated, and (4) I would in all other
respects uphold the judge's order.

**BROWNE-WILKINSON LJ.** I have had the advantage of reading the judgment of
Slade LJ, with which I agree. I add my own views only on the ultra vires and constructive   *j*
trust points which, despite s 9 of the European Communities Act 1972, are still of some
general importance.

The judge drew a distinction between two meanings of ultra vires which he called the
'narrow sense' and the 'wider sense'. As I understand his judgment, he treated ultra vires
in the narrow sense as covering any transaction outside the express or implied powers of
a company stated in its memorandum of association and ultra vires in the wider sense as

covering a transaction which, although within such powers, is entered into in furtherance
*a*  of 'some purpose which is not an authorised purpose' (see [1982] 3 All ER 1057 at 1076,
[1982] 1 Ch 478 at 497). Although it is not entirely clear, he appears to have treated
transactions which are ultra vires in his narrow sense as being wholly void as opposed to
those which are ultra vires in the wider sense, which are capable of conferring rights on
third parties who have no notice of the invalidity (see [1982] 3 All ER 1057 at 1077,
[1982] Ch 478 at 499). He then apparently held that the guarantee by RSP was ultra vires
*b*  in the wider sense and, since BSC had notice of that fact, it was unenforceable by BSC.

   In my judgment, much of the confusion that has crept into the law flows from the use
of the phrase 'ultra vires' in different senses in different contexts. The reconciliation of
the authorities can only be achieved if one first defines the sense in which one is using
the words 'ultra vires'. Because the literal translation of the words is 'beyond the powers',
there are many cases in which the words have been applied to transactions which,
*c*  although within the capacity of the company, are carried out otherwise than through the
correct exercise of the powers of the company by its officers; indeed, that is the sense in
which the judge seems to have used the words in this case. For reasons which will appear,
in my judgment, the use of the phrase 'ultra vires' should be restricted to those cases
where the transaction is beyond the capacity of the company and therefore wholly void.

   A company, being an artificial person, has no capacity to do anything outside the
*d*  objects specified in its memorandum of association. If the transaction is outside the
objects, in law it is wholly void. But the objects of a company and the powers conferred
on a company to carry out those objects are two different things: see *Cotman v Brougham*
[1918] AC 514 esp at 520, 522, [1918–19] All ER Rep 265 esp at 268, 269 per Lord Parker
and Lord Wrenbury. If the concept that a company cannot do anything which is not
authorised by law had been pursued with ruthless logic, the result might have been
*e*  reached that a company could not (ie had no capacity) to do anything otherwise than in
*due* exercise of its powers. But such ruthless logic has not been pursued and it is clear that
a transaction falling within the objects of the company is capable of conferring rights on
third parties even though the transaction was an abuse of the powers of the company: see
eg *Re David Payne & Co Ltd, Young v David Payne & Co Ltd* [1904] 2 Ch 608. It is therefore
established that a company has capacity to carry out a transaction which falls within its
*f*  objects even though carried out by the wrongful exercise of its powers.

   In my judgment, for this purpose the position of a company is analogous to that of a
human being who has fiduciary powers. If two trustees convey trust property in breach
of trust, the conveyance is not void. As human beings they have the capacity to transfer
the legal estate: their capacity to transfer flows from their status as human beings not
from the powers conferred on them as trustees. Even if their powers under the trust
*g*  instrument did not authorise the conveyance, the legal estate will vest in the transferee.
Beneficiaries under the trust would be entitled, if they learnt in time, to restrain the
execution of such conveyance in excess of the powers of the trustees. If the beneficiaries
only discovered the position after the conveyance, the transferee, if he took with notice,
would be personally liable as a constructive trustee and the property conveyed could be
recovered: but the conveyance would not be a nullity. So in the case of a limited
*h*  company, if a transaction falls within the objects of the company (and is therefore within
its capacity) it is effective to vest rights in a third party even if the transaction was carried
out in excess or abuse of the powers of the company. If the members of the company
learn of what is proposed in time, they will be able to restrain such transaction; if they
only discover the facts later, their remedy lies against those who have wrongly caused the
company to act in excess or abuse of the company's powers. If a third party has received
*j*  the company's property with notice of the excess or abuse of powers, such third party
will be personally liable as a constructive trustee and the company will be able to recover
the property: see *Belmont Finance Corp v Williams Furniture Ltd (No 2)* [1980] 1 All ER
393.

   However, the analogy between companies and trustees is not complete. As an artificial
person, a company can only act by duly authorised agents. Apart from questions of
ostensible authority, directors like any other agents can only bind the company by acts

done in accordance with the formal requirements of their agency, e g by resolution of the board at a properly constituted meeting. Acts done otherwise than in accordance with these formal requirements will not be the acts of the company. However, the principles of ostensible authority apply to the acts of directors acting as agents of the company and the rule in *Royal British Bank v Turquand* (1856) 6 E & B 327, [1843–60] All ER Rep 435 establishes that a third party dealing in good faith with directors is entitled to assume that the internal steps requisite for the formal validity of the directors' acts have been duly carried through. If, however, the third party has actual or constructive notice that such steps had not been taken, he will not be able to rely on any ostensible authority of the directors and their acts, being in excess of their actual authority, will not be the acts of the company.

The critical distinction is, therefore, between acts done in excess of the capacity of the company on the one hand and acts done in excess or abuse of the powers of the company on the other. If the transaction is beyond the capacity of the company it is in any event a nullity and wholly void; whether or not the third party had notice of the invalidity, property transferred or money paid under such a transaction will be recoverable from the third party. If, on the other hand, the transaction (although in excess or abuse of powers) is within the capacity of the company, the position of the third party depends on whether or not he had notice that the transaction was in excess or abuse of the powers of the company. As between the shareholders and the directors, for most purposes it makes no practical difference whether the transaction is beyond the capacity of the company or merely in excess or abuse of its power: in either event the shareholders will be able to restrain the carrying out of the transaction or hold liable those who have carried it out. Only if the question of ratification by all the shareholders arises will it be material to consider whether the transaction is beyond the capacity of the company since it is established that, although all the shareholders can ratify a transaction within the company's capacity, they cannot ratify a transaction falling outside its objects.

In this judgment I therefore use the words 'ultra vires' as covering only those transactions which the company has no capacity to carry out, i e those things the company cannot do at all as opposed to those things it cannot properly do.

The two badges of a transaction which is ultra vires in that sense are (1) that the transaction is wholly void and (consequentially) (2) that it is irrelevant whether or not the third party had notice. It is therefore in this sense that the transactions in *Re David Payne & Co Ltd* [1904] 2 Ch 608 and *Charterbridge Corp Ltd v Lloyds Bank Ltd* [1969] 2 All ER 1185, [1970] Ch 62 were held not to be ultra vires. The distinction between the capacity of the company and abuse of powers was also drawn by Oliver J in *Re Halt Garage (1964) Ltd* [1982] 3 All ER 1016 at 1034. I consider the reasoning of the decision in *Re Lee Behrens & Co Ltd* [1932] 2 Ch 46, [1932] All ER Rep 889 to be wrong for the reasons given by Pennycuick J in the *Charterbridge* case [1969] 2 All ER 1185 at 1190–1191, [1970] Ch 62 at 70–71: the decision itself can only be justified (if at all) on the footing that the widow who was granted a pension had notice of the impropriety of the grant. The only other case which, at first sight, is difficult to reconcile with my views is *Re Introductions Ltd, Introductions Ltd v National Provincial Bank Ltd* [1968] 2 All ER 1221; *affd* [1969] 1 All ER 887, [1970] Ch 199, CA, which I will consider later.

For these reasons, in considering a claim based on ultra vires, the first step must be to determine what are the objects (as opposed to the powers) of a company. Not all activities mentioned in the objects clause are necessarily objects in the strict sense: some of them may only be capable of existing as, or on their true construction are, ancillary powers: see *Cotman v Brougham* [1918] AC 514, [1918–19] All ER Rep 265 and *Re Introductions Ltd*. And this may be the position even if the memorandum of association contains the usual 'separate objects' clause: such a clause is not capable of elevating into an object of the company that which is in essence a power: see *Re Introductions Ltd*.

If, on construction of the objects clause, the transactions fall within the objects (as opposed to the powers), it will not be ultra vires since the company has the capacity to enter into the transaction. If the objects clause contains provisions (whether objects or powers) which show that a transaction of the kind in question is within the capacity of

*a*     the company, that transaction will not be ultra vires. Sometimes the drafting of the memorandum and articles may be such that they put third parties on notice of the fact that certain things can only properly be done subject to certain conditions being satisfied. If the third party is put on notice in this way, he will not be able to rely on any exercise of the power which he knew or ought to have discovered did not comply with such conditions. But a provision that a power can be exercised only 'for the purposes of the company's business' does not require a third party to satisfy himself that the power is in
*b*     fact being exercised for that purpose.

      In my judgment, the propositions in the last two paragraphs accord with the decisions in *Re David Payne & Co Ltd* [1904] 2 Ch 608 and *Charterbridge Corp Ltd v Lloyds Bank Ltd* [1969] 2 All ER 1185, [1970] Ch 62. As Slade LJ has pointed out, in the *David Payne* case the objects clause of the company stated expressly that the power to borrow was 'for the purposes of the company's business'; yet the borrowing (which was not in fact for the
*c*     purpose of the company's business) was held not to be ultra vires. Buckley J plainly treated the provision as a power not an object (see [1904] 2 Ch 608 at 612). Vaughan Williams LJ held that the fact that the validity of the debenture depended on whether or not the lender had knowledge of the impropriety showed that the transaction was not ultra vires. Moreover, it was held that, knowledge being a necessary requirement to render the loan unenforceable, the lender was not put on inquiry whether the money
*d*     was being borrowed for the purposes of the company's business, notwithstanding that the power to borrow was expressly limited to borrowing for those purposes (see [1904] 2 Ch 608 at 615). That case, therefore, is clear authority for two propositions: (1) that where there is a power to borrow for the purposes of the company's business (even if contained in the objects clause) and the borrowing is made otherwise than for those purposes, the borrowing is not void as being ultra vires; and (2) a third party is not put
*e*     on notice by an express requirement that the power is only exercisable for the purposes of the company's business.

      The main difficulty in reconciling the authorities is *Re Introductions Ltd* [1969] 1 All ER 887, [1970] Ch 199. In my judgment, however, the decision in that case accords with the views I have expressed. The bank seeking to enforce the debenture had actual knowledge that the company was going to use the borrowed moneys for a purpose (pig
*f*     breeding) which was wholly outside its main objects. The provision relating to borrowing in the memorandum of association was construed as being an ancillary power to borrow for the purposes of the company's business. Accordingly, the lender had actual notice of all the facts necessary to appreciate that the borrowing was in excess of the powers, ie an abuse of powers. It is to be noted that in the Court of Appeal judgments the transaction is nowhere categorised as ultra vires and void. Indeed, as Slade LJ has pointed out, the
*g*     Court of Appeal held that the liability of the bank depended on the fact that it had notice. Buckley J at first instance described the borrowing as being ultra vires: but, in my judgment, this was merely an unguarded use of language since he also regarded the bank's knowledge of the facts as being a crucial element rendering the debenture unenforceable (see [1968] 2 All ER 1221 at 1225). In my judgment, *Re Introductions Ltd* is not a decision relating to ultra vires in the strict sense: it is an example of a case in
*h*     which a third party has entered into a transaction with a company with actual notice that the transaction was an abuse of power and accordingly could not enforce the transaction against the company.

      I summarise my conclusions as follows. (1) To be ultra vires, a transaction has to be outside the capacity of the company, not merely in excess or abuse of the powers of the company. (2) The question whether a transaction is outside the capacity of the company
*j*     depends solely on whether, on the true construction of its memorandum of association, the transaction is capable of falling within the objects of the company as opposed to being a proper exercise of the powers of the company. (3) Notwithstanding the fact that the provision authorising the company to enter into the particular transaction is found in the objects clause and there is a provision requiring each paragraph to be construed as a separate object, such provision may be merely a power (and not an object) if either it is incapable of existing as a separate object or it can only be construed as a power ancillary

to the other objects in the strict sense. (4) If a transaction falls within the objects (and therefore the capacity) of the company, it is not ultra vires the company and accordingly *a* it is not absolutely void. (5) If a company enters into a transaction which is intra vires (as being within its capacity) but in excess or abuse of its powers, such transaction will be set aside at the instance of the shareholders. (6) A third party, who has notice (actual or constructive) that a transaction, although intra vires the company, was entered into in excess or abuse of the powers of the company, cannot enforce such transaction against the company and will be accountable as constructive trustee for any money or property *b* of the company received by the third party. (7) The fact that a power is expressly or impliedly limited so as to be exercisable only 'for the purposes of the company's business' (or other words to that effect), does not put a third party on inquiry whether the power is being so exercised, ie such provision does not give him constructive notice of excess or abuse of such power.

Applying those principles to the present case, in my judgment, no question of ultra *c* vires arises. For the reasons given both by the judge and by Slade LJ the provisions of cl 3(k) of the memorandum of association of RSP do not constitute a separate object but can only be construed as a power. RSP had the capacity to enter into the transactions involving the giving of guarantees and could properly have done so if they had been expedient in the interests of RSP's business. If BSC had known no more than that RSP was purporting to give the guarantee as being expedient for RSP's business, the transaction *d* would have been unimpeachable as against BSC.

But, as the judge and Slade LJ have demonstrated, BSC had actual knowledge of facts which showed that the giving of the guarantee and the debenture was an abuse of powers by the directors of RSP since the transaction was not even considered to be for the benefit of RSP. The borrowing by RSP from BSC of the £401,448 was formally invalid since such borrowing was not approved by a quorate board meeting of RSP and the defence *e* based on the rule in *Turquand's* case (1856) 6 E & B 327, [1843–60] All ER 435 was neither pleaded or established. BSC had constructive knowledge of this formal invalidity. Accordingly, BSC and the receiver are accountable as constructive trustees for all the moneys of RSP received by them with such notice.

As to the relief to be granted, my views accord with those of Slade LJ. In particular, as at present advised, I agree with him that *Reversion Fund and Insurance Co Ltd v Maison* *f* *Cosway Ltd* [1913] 1 KB 364 appears to establish that RSP is not entitled to recover the principal of £401,448 since the sum borrowed was used to discharge the indebtedness of RSP to SSS. However, the parties, if they wish, must have an opportunity to present further argument on the relief to be given.

Finally, I have not formed any view on the difficult problems which arise when shareholders' consent to a transaction which (though intra vires) is an excess or abuse of *g* the powers of the company. I therefore must not be taken to be either approving or disapproving the views on this point expressed by Slade LJ.

**LAWTON LJ.** Stripped of its legal complications, many of which were caused by the way the trial judge dealt with the defendants' applications to amend the pleadings, this case raises issues of fact. When the evidence is looked at in the round, there is revealed an *h* unattractive story of a fairly common kind which shows how some business men manipulate limited liability companies to avoid their financial liabilities and what other business men are driven to do in order to get paid what they are entitled to receive.

In the 1960s Mr Alexander Shenkman (Mr Shenkman) was an entrepreneur. He had ideas for selling steel on a large scale but no capital with which to set up a suitable selling organisation. He did what many entrepreneurs do: he used other people's money. Unlike *j* some entrepreneurs, he used no deception to get it. He did not need to do so (and, on the judge's findings, he probably did not want to do so) because of the way Colvilles Ltd (Colvilles) (then an independent steel company) went about their business of producing and selling steel. They seem to have been more interested in selling their steel than of being paid the price for it. The result was that, by the beginning of 1968, they had sold and delivered to Mr Shenkman's order a vast quantity of steel and were owed just under

£800,000 for it. When they began to press for the debt to be paid they became aware of
*a* the legal problems which faced them. Mr Shenkman had operated behind a screen of
small limited liability companies in which he and family interests controlled all the
shares. The company which owed Colvilles this huge debt, Scottish Steel Sheet Ltd (SSS),
had no assets. Mr Shenkman himself had very few. What assets there were (and they
were fairly substantial) were in another company, Rolled Steel Products (Holdings) Ltd
(RSP), which had had no dealings with Colvilles but into which Mr Shenkman had
*b* syphoned by way of a loan about £400,000 of SSS's money which that company should
have paid to Colvilles in discharge of its debts. Mr Shenkman owned 51% of RSP shares.
The trustees of a settlement in favour of his children owned the remaining 49%.
     When in 1968 the defendants, British Steel Corp (BSC), took over Colvilles under the
nationalised legislation they were faced with a difficult debt collecting problem. By the
late autumn of 1968 they had these options: they could make Mr Shenkman bankrupt
*c* for defaulting on a personal guarantee which he had given on 2 May 1968 for SSS's debts.
A bankruptcy order would have vested Mr Shenkman's shares in RSP in his trustee but,
on the most optimistic assessment, less than about half of SSS's debts would be recovered.
The second option was to put SSS into liquidation and get the liquidator to press RSP to
repay £400,000 which it had borrowed from SSS. Once again, the best which could have
been attained was the repayment of this sum; and the chances of getting it were poor, as
*d* the only worthwhile asset RSP had was some land at Rainham which had been valued at
about £800,000 if sold over a longish period but which would almost certainly bring in
much less if there were a forced sale. Anyway, a sale of any kind was sure to generate a
substantial liability on RSP for corporation tax arising from capital gains as the land had
been bought for £8,000.
     BSC had to solve this problem: how could they link Mr Shenkman and SSS's liabilities
*e* to RSP's assets? Their own legal adviser, Mr Edwards, considered the problem, as did
their experienced solicitors and counsel instructed by them. All, of course, knew that in
law RSP was a separate legal entity from Mr Shenkman and SSS and that those who
directed the affairs of RSP (and, as BSC knew, they were Mr Shenkman and his father)
had to do so in the interests RSP and not of Mr Shenkman himself or SSS. If they did not,
any transactions carried out in breach of trust would be at least voidable, and might be
*f* void if, on the correct construction of RSP's memorandum of association, there were
limitations on the powers of RSP to borrow money or give guarantees.
     The scheme which was devised to attach Mr Shenkman and SSS's liabilities to RSP's
assets has been described in detail by Slade LJ in his judgment. This scheme was designed
to enable BSC to strip RSP of nearly all its assets and what was left over was likely to be
successfully claimed by the Inland Revenue for corporation tax. Such a scheme, approved
*g* by RSP's directors on 22 January 1969 could not possibly have been for the benefit of
RSP, and BSC, through their advisers, knew that it was not. In my judgment, BSC
regarded RSP as an alias for Mr Shenkman. He owed them money under the guarantee
he had given in May 1968. They felt justified in tearing away RSP's corporate veil which
hid him from his creditors. I have much sympathy for BSC. They were being kept out
of their money by the legal fiction that RSP was not Mr Shenkman. Unfortunately for
*h* them it is a legal fiction which has been recognised by the law for over a hundred years.
It is said to have helped the growth of innumerable new businesses. The fact that limited
liability has all too often enabled many to enrich themselves at the expense of those who
have given credit to the companies they control is the price the business world has to pay
for the potentiality for growth and convenience which goes with limited liability. In my
judgment, BSC will have to pay that price. What Mr Shenkman and his father did on
*j* 22 January 1968 by giving the guarantee was a misfeasance and BSC knew it was. The
legal consequences of what happened are set out in Slade LJ's judgment, with which I
agree.
     I wish, however, to add a comment about the pleading points which have had to be
considered in this appeal. From the way they were raised by counsel and dealt with by
the trial judge I was left with the impression that neither the judge nor defending
counsel appreciated as fully as they should have done the need for precision and

expedition when dealing with pleading points. My recent experience in this court shows that some counsel and judges are not giving pleadings the attention which they should. Pleadings are formal documents which have to be prepared at the beginning of litigation. They are essential for the fair trial of an action and the saving of time at trial. The saving of time keeps down the costs of litigation. A plaintiff is entitled to know what defences he has to meet and a defendant what claims are being made against him. If the parties do not know, unnecessary evidence may be got together and led or, even worse, necessary evidence may not be led. Pleadings regulate what questions may be asked of witnesses in cross-examination. When counsel raises an objection to a question or a line of questioning, as counsel for RSP did on a number of occasions, the trial judge should rule on it at once. He should not regard the objection as a critical commentary on what the other side is doing. If the judge does not rule, counsel should ask him to do so. If a line of questioning is stopped because it does not relate to an issue on the pleadings, counsel should at once consider whether his pleadings should be amended. If he decides that they should, he should forthwith apply for an amendment and should specify precisely what he wants and the judge should at once give a ruling on the application. The principles on which amendments should be allowed are well known and are set out in the current edition of the *The Supreme Court Practice*. Judicial insistence on precision in pleading should not take the courts back to the days when the successful taking of pleading points sometimes resulted in a denial of justice. The judge's powers of adjourning and ordering the payment of costs thrown away should stop this happening.

With regret, I fell it necessary to make one more comment about the way the judge conducted this case. At the outset of this appeal counsel for the defendants invited our attention to the fact that the submissions of counsel ended on 7 April 1982 but judgment was not delivered until 2 December 1982. He submitted that this long, and in my experience unprecedented, delay resulted in the judge making material findings which were not justified by the evidence. I am not satisfied that this was so. But the fact that responsible and experienced counsel, acting for a public corporation, felt it incumbent on him to make this submission shows that long delays in delivering judgment can cause disquiet and suspicion amongst litigants who lose, and those who win may feel they have been deprived of justice far too long. Delays of this length should not occur unless there are compelling reasons why they should; and if there are such reasons, it would be prudent of a judge to refer to them briefly. In this case, for all we know, there may have been such reasons. We have kept in mind that the parties had a most patient hearing and that the judge must have kept a very full note to deliver the judgment he did.

For these reasons and the reasons given in Slade LJ's judgment, I would dismiss this appeal, allow the cross-appeal and grant the relief suggested by Slade LJ.

*Appeal dismissed. Cross-appeal allowed.*

Solicitors: *Lovell White & King* (for the defendants); *Herbert Smith & Co* (for RSP).

Mary Rose Plummer    Barrister.