# EXHIBIT 1

**Alameda Research (Bahamas) Ltd**

18 Veridian Corporate Center, Western Road, New Providence, the Bahamas

11th April 2022

Ross Rheingans-Yoo
Nassau, New Providence
The Bahamas

**Re: Offer of Employment**

Dear Ross,

1.  **Offer and Conditions.**

    (a)  It is with great pleasure that we extend to you this offer ("**Offer**") to join Alameda Research (Bahamas) Ltd ("**Company**"). The material terms of the Offer are set forth in this letter agreement ("**Agreement**"). For greater certainty, effective upon commencement of your employment with the Company you will be employed solely by the Company and no longer employed by such prior employer entity.

    (b)  The Offer and your employment with the Company shall be at all times subject to the following key terms and conditions. Notwithstanding the terms of paragraph 8 of this Agreement, if you have not or are unable to continue compliance with these key terms and conditions ("**Key Terms**"), your employment with the Company may be immediately terminated:

        (i)  your being lawfully free to commence employment and having on commencement, and maintaining throughout your employment, a work permit, visa or other permission (if applicable) necessary to enable you to work for the Company. It is your duty to immediately notify the Company should your entitlement to reside and work in the Bahamas changes;

        (ii)  your obtaining (or obtaining shortly after your Start Date (as defined below)) and continuing to maintain all applicable licenses and registrations with regulatory bodies as the Company shall determine are required or necessary for your position. It is your duty to immediately notify the Company if your license and registration status changes;

        (iii)  your continued compliance with all applicable policies and procedures of the Company applicable to employees, and all applicable policies and procedures of the Company's affiliates notified to you (e.g., compliance policies of group

1

companies, to the extent applicable to your work), each as amended from time to time;

(iv) your continued compliance with, and in all your actions not having caused the Company or any of its affiliates or any other employee or contractor to breach or contravene, all or any rules, regulations and requirements of any regulatory body, code of conduct or statutory provision to which you, the Company or any of its affiliates or any other employee or contractor is from time to time subject to;

(v) your continued compliance with the Prevention of Bribery Act of The Bahamas and other relevant laws relating to the prevention of bribery or corrupt action that may be in force in any relevant jurisdiction, and any guidelines, regulations or rules related thereto and as amended from time to time; and

(vi) satisfactory completion of the background or credit check investigation described in paragraph 11 hereof.

2.    **Title and Duties.**

(a)    The Company will employ you as Trader & Investment Associate. You will initially report to Caroline Ellison, while performing such duties and responsibilities as may be assigned to you from time to time. The Board of Directors (the "**Board**") may from time to time assign to you a first point of contact for communication with the Board.

(b)    Subject to compliance with all applicable laws, the Company reserves the right and has the sole discretion to amend, modify, terminate or interpret any of its current policies, practices and benefits at any time, and thereby modify the terms and conditions of your employment at any time, on reasonable notice where applicable.

(c)    You may be requested to, and by entering into this Agreement you agree to, work for an affiliate of the Company, or for any other client entity as the Company may request. You acknowledge that the Company's clients have affiliated entities with offices around the globe. Although the Company may require you to perform duties for any member of the Company's clients in these or other locations and may require you to travel to other locations from time to time, you will at all times remain an employee of the Company and your compensation shall be paid by the Company. Any services you may provide to any of the Company's clients are provided by you as an employee of the Company and your services for such Company's clients are provided on behalf of the Company.

(d)    You will perform all acts, duties and obligations and comply with such reasonable orders as may be assigned by the Company and which are consistent with your job title. The Company may require you to undertake additional duties of another position, either in addition to or instead of your normal duties, it being understood that you will

not be required to perform duties which are not reasonably within your skill, experience or capabilities.

(e) You are required to devote your full time, attention and abilities to your job duties during working hours, and to act in the best interest of the Company at all times. You shall not, without the prior written consent of the Company, in any way directly or indirectly on your own account or for the benefit of a third party (i) be engaged or employed in, (ii) concerned with (in any capacity whatsoever), or (iii) provide services to: (x) any other business or organization that operates a cryptocurrency or futures trading business or exchange platform, or (y) any other business or organization where it is, or is likely to be, in conflict with the interest of the Company or where it may adversely affect the effective or efficient discharge of your duties.

(f) During your probationary period of three (3) months, your employment may be terminated with no notice (and no payment in lieu). Upon completion of your probationary period, either party may terminate your employment in accordance with paragraph 8 of this Agreement.

3. **Start Date.** Your start date of employment shall be on March 1st, 2022, or such other date agreed in writing between you and the Company ("**Start Date**"). If you fail to commence your employment on this Start Date for any reason, including a failure to satisfy the Key Terms set forth in paragraph 1 of this Agreement, this Offer shall lapse immediately; except that the Company may, on short notice to you, adjust your Start Date to an earlier or later date based on the time taken to process and/or issue your work visa.

4. **Compensation.**

(a) *Salary.* As compensation for your services, you will receive an annual gross salary at a rate of US$100,000.00 equivalent in B$, payable in accordance with the Company's regular local payroll processes, but not less frequently than monthly, in arrears ("**Base Salary**").

(b) *Bonus.* You may be eligible to receive a discretionary bonus from time to time in an amount as may be determined by the Company in its sole and absolute discretion and subject to applicable withholdings. Payment of a discretionary bonus in any given period does not entitle you to any such bonus in any subsequent period. Any discretionary bonus awarded to you in writing by the Company will generally be paid to you on the same date such bonuses are paid to all employees generally, so long as you remain an active employee in compliance with your agreements with the Company and have neither given nor received notice of termination prior to the bonus payment date. Nothing herein shall be construed to obligate the Company to give you or otherwise guarantee a bonus for any period.

(c) **Sign-on Bonus.** You will receive a sign-on bonus, payable on or before your start date, to be paid as follows

    (i)     US$350,000 equivalent in B$;

    (ii)    an option to purchase 32,822 shares of Class A common stock of West Realm Shires Inc. (dba FTX US) ("**FTX US Option**") ; and

    (iii)   an option to purchase 1,618 shares of common stock of FTX Trading Ltd ("**FTX Option**" and together with the FTX US Option, collectively the "**Options**") .

The Options are subject to board approval of West Realm Shires Inc. and FTX Trading Ltd, respectively. The exercise price will be established by the board of directors of both companies after review of the applicable valuation. Both Options will be a non-incentive stock option subject to the terms and conditions of the applicable equity incentive plan and the stock option notice and agreement, and shall each vest over four years (monthly) with a one-year cliff, subject to continuous vesting on the applicable vesting dates.

5. **Taxes.**

(a) You are fully responsible for the payment of any salaries tax or income tax in the Bahamas or elsewhere arising from the payments received pursuant to this Agreement. All amounts payable to you by the Company shall be subject to applicable statutory deductions and withholdings required by the Company under local law.

(b) The Company shall deduct from your salary and any bonus (if deduction applicable) which you may be awarded any amounts which the Company is entitled, authorized and/or obligated under the laws of The Bahamas to deduct, such as contributions to the National Insurance Board ("**NIB**"). The Company further reserves the right to deduct any sums owed by you to the Company.

(c) You agree and acknowledge that if you are obligated to declare or file income or other taxes or governmental fees or other withholdings in any other jurisdiction (e.g. income tax, social security / national insurance in your country of citizenship or prior residence), it is your responsibility to report and pay such amounts and to make any required interim filings or payments. Without limiting the foregoing, you agree that the Company may (but is not required to) report, deduct and/or withhold any such amounts with respect to your compensation from time to time.

(d) Without limiting your obligations, if any time you are (with the written consent of the Company) concurrently employed by any other entity controlled by or under common control with the Company, you agree that the Company and/or any other such entity may, but is not required, to make aggregated withholdings.

6.    **Representations.**

(a)    You represent and warrant that on the Start Date and thereafter you are free to accept employment hereunder without any contractual or other restrictions, express or implied, with respect to any of your prior employers including but not limited to any post-termination obligations in respect to non-compete or non-solicitation restrictions or of any contract or agreement with or other obligation to any third-party binding on you.

(b)    You warrant that you have made full and complete disclosure to the Company of all material facts, matters and documents relating to your employment (if any) with your existing or former employer.

(c)    You represent that you have not entered into, and hereby agree not to enter into, any agreement, whether written or oral, in conflict with your employment with the Company.

(d)    You represent that you have not taken or otherwise misappropriated and you do not have in your possession or control any confidential or proprietary information belonging to any individuals or entities you provided services to, including any prior employers, or connected with or derived from your services provided to such individuals or entities. You represent that you have returned to all individuals or entities you provided services to, including prior employers, any and all such confidential or proprietary information. You further acknowledge that the Company has informed you that you are not to use or cause the use of such confidential or proprietary information in any manner whatsoever in connection with your employment by the Company. You agree that you will not use or disclose any confidential or proprietary information of your former employer or employers or that you obtained from a source other than the Company, or any materials or documents you obtained under obligations of confidentiality imposed by reason of any of your relationships, if any, unless such materials or documents are generally available to the public or you have written authorization from such present or former employer or source for the possession and unrestricted use of such materials in connection with your employment by the Company.

(e)    You represent that you are not currently a party to any pending or threatened litigation with any former employer or business associate.

(f)    You shall indemnify, defend and hold harmless the Company and its affiliates and its or their respective directors, officers, principals and agents from any and all liabilities, claims, costs, damages or expenses arising from any breach of the representations and warranties and covenants in this clause 6.

7. **Benefits.**

(a) ***Benefit Plans.*** Upon completion of your probationary period, you may be eligible to, and may, at your election, participate in the Company's employee benefit plans and medical insurance plans (if any, from time to time), subject to applicable terms, conditions, exclusions and limitations as set forth in the relevant documentation and policies governing such plans from time to time in force (together, "**Benefit Plans**"). The Company's Benefit Plans are subject to amendment, change or modification, including elimination, from time to time, at the Company's sole discretion. For greater certainty, the Company does not currently have any employee benefit plans or medical insurance plans.

(b) ***Annual Leave.*** Your annual leave entitlement will be in accordance with the Company's vacation practices applicable to employees, as amended from time to time, subject to the minimum annual leave requirements of the Employment Act of The Bahamas, as may be amended from time to time (the "**Employment Laws**").

(c) ***Sick Leave.*** You must inform the Company as soon as possible if you will be or are absent from work by reason of sickness or injury. If you are absent for four or more consecutive working days, you must provide a medical certificate or other evidence acceptable to the Company. Sick pay will be paid in accordance with the Employment Laws.

8. **Termination.**

(a) ***Notice.*** Subject to paragraph 2(f) regarding the probationary period, either you or the Company may terminate your employment by giving not less than thirty (30) days' notice in writing to terminate your employment ("**Notice Period**"). The last day of the Notice Period is the effective date of termination ("**Termination Date**"). All licences, access and other rights held by you as an employee of the Company will be terminated upon the Termination Date, provided that the Company reserves the right to terminate your access earlier at its sole discretion for security reasons.

(b) ***Payment in Lieu.*** The Company may choose, in its discretion, to provide payment of your salary for not less than thirty (30) days in lieu of notice, calculated in accordance with the Employment Laws ("**Payment in Lieu**"). If Payment in Lieu is elected, you will be requested to return all Company property as set forth in paragraph 8(f) below and will immediately be prohibited from coming to the Company's premises or performing services on the Company's behalf. You will cease to be an employee on the day the Company serves notice that it elects Payment in Lieu and such date will become your Termination Date for the purposes of this Agreement.

(c) ***Garden Leave.*** The Company may elect to place you on garden leave for all or any portion of the Notice Period, during which period you may be prohibited from coming

to the Company's premises or performing services on the Company's behalf or communicating with any employees, clients or suppliers of the Company ("**Garden Leave**"). During Garden Leave, you will remain an employee of the Company and continue to be bound by the remaining terms of this Agreement until the Termination Date, receiving your Base Salary and applicable statutory benefits and participating in the Company's Benefit Plans, and the Company may by written notice to you require that you come to the Company's premises and/or transition your duties or otherwise perform services on the Company's behalf on an intermittent basis. You must remain contactable at all times during normal business hours. For the avoidance of doubt, Garden Leave may be elected for a portion of the Notice Period and Payment in Lieu for the remainder, with the effect that your Termination Date may be sooner.

(d)  *Suspension.* Subject to compliance with all applicable laws, you may be suspended and required not to attend work while the circumstances of any complaint of suspected misconduct against you is being investigated by the Company and pending the outcome of any disciplinary hearing. During the suspension period, you will be paid your base salary.

(e)  *Key Terms.* The Company reserves the right to terminate your employment without any Notice Period or Payment in Lieu if you are found guilty of gross misconduct, persistent unpunctuality, neglect of duty, and/or material breach of any of the terms of your employment including the Key Terms. The Company may terminate your employment without notice or pay in lieu based on grounds for summary dismissal as set out in the Employment Act of The Bahamas.

(f)  *Company Property.* Upon termination of your employment, you must immediately return to the Company, in accordance with its instructions, all equipment including but not limited to, correspondence, records, specifications, software, disks, models, notes, reports and other documents and any copies or duplicates thereof and any other property belonging to the Company (including Company car, keys, credit cards, phone and other computer equipment, and office passes) which are in your possession or under your control. You must also irretrievably erase any information relating to the affairs of the Company or its employees, clients or suppliers from computer or other digital devices or storage, including remote storage, to the extent technically possible. You must, if so required by the Company, confirm in writing that you have complied with your obligations under this paragraph and provide reasonable evidence of compliance as may be requested.

(g)  *Post Termination Date.* Prior to accepting employment with any person, firm, corporation or other entity during your employment by the Company or any of its affiliates or any period thereafter that you are subject to any of the Protective Covenants (as defined in paragraph 10 below), you shall notify the prospective employer in writing of your obligations under such provisions.

**9.    Confidentiality and Invention Assignment**

(a)    You agree that, during and after the term of your employment with the Company and regardless of when such information was disclosed to you, you will hold in a fiduciary capacity for the benefit of the Company, and shall not, at any time, disclose to any person or entity, or use, except as necessary in connection with the performance of your duties and responsibilities for the Company, any non-public information pertaining to the Company or its affiliates or any client or supplier of the Company or its affiliates, their business, their affiliates, any person or entity directly or indirectly controlling the Company or its affiliates or any or supplier client of the Company or its affiliates or their current or prospective customers, clients, suppliers and/or business partners ("**Confidential Information**"), including, but not limited to: (i) information relating to trade secrets, ideas, inventions (whether patentable or not, and whether or not patent protection has been applied for or granted), patents, patent applications, improvement, developments, discoveries, logos, know how, processes, utility models, mask work rights, copyrights, trademarks (whether registered or unregistered), service marks and other proprietary rights; (ii) existing and proposed products, software, computer programs (including source codes and object codes), services or arrangements, prices, sales and marketing information/plans, designs, financing information, business plans, projections and forecasts, policies and strategies, contracts, mailing lists, techniques, operations methods, current and potential customers, clients, suppliers and business partners, revenues, costs and expenses, financial information and/or financial data and any other matters relating to the business of the Company or its affiliates or any client or supplier of the Company or its affiliates and their current or prospective customers, clients and business partners; and (iii) any information the disclosure of which may adversely affect the good name, reputation, image or goodwill of the Company or its affiliates, any client or supplier of the Company or its affiliates or their business.  Without limitation as to the forms that Confidential Information may take, you acknowledge that Confidential Information may be contained in tangible material such as writings, drawings, samples, electronic media, or computer programs, or may be in the nature of **unwritten knowledge or know-how**.

(b)    If pursuant to applicable law, regulation or legal process, you are requested or required to disclose any Confidential Information, unless prohibited by an Order of the Courts of The Bahamas, you will provide the Company with prompt notice of such request(s) or requirement(s) to enable the Company to seek an appropriate protective order or other appropriate remedy and/or waive compliance with the provisions of this Agreement. If an Order of the Courts of The Bahamas prohibit you from advising the Company of the existence and/or contents of the Order, you shall supply to the Court only the legally required Confidential Information.  When the Company becomes aware of the existence and/or content of an Order of the Courts, and a protective order or other remedy is not obtained by the Company or the Company waives compliance

with the provisions of this Agreement, you shall (i) furnish only that portion of the Confidential Information which is legally required to be furnished; and (ii) use your best efforts to obtain a protective order or other assurance, at the reasonable cost and expense of the Company, which shall be approved by the Company in advance, that confidential treatment will be accorded such Confidential Information.

(c)     You shall not make, use or permit to be made or used any notes, memoranda, papers, drawings, specifications, programs, digital data or other materials of any nature relating to any matter within the scope of the business of the Company or any client or supplier of the Company or concerning any of their dealings or affairs otherwise than for the benefit of the Company or its affiliates or the clients of the Company or its affiliates. You acknowledge and agree that all of the foregoing shall be and remain the sole and exclusive property of the Company or the clients of the Company. Immediately upon the termination or cessation of your services to the Company, or at any time upon the Company's request, you shall deliver all of the foregoing, and all copies thereof to the Company and shall not retain any copies thereof (in any form or on any medium whatsoever, including without limitation, on any computer hard drive).

(d)     As a condition of employment, you must also sign and abide by the Company's standard "Employee Invention Assignment Agreement" attached hereto as <u>Exhibit A</u> with no inventions excluded ("**Invention Assignment Agreement**").

10.     **Protective Covenants.**

(a)     Subject to any written regulations issued or revised by the Company from time to time which may be applicable, neither you nor any member of your family, nor any company or business entity in which you or they have an interest, is entitled to receive or obtain, directly or indirectly, any payment, discount, rebate, commission or other benefit from any third parties in respect of any business transacted (whether by you or not) by or on behalf of the Company or any client or supplier of the Company and if you, or any member of your family or any company or business entity in which you or they have an interest, directly or indirectly, obtain any such payment, discount, rebate, commission or other benefit you will forthwith account to the Company or clients or suppliers of the Company for the amount received or the value of the benefit so obtained.

(b)     You hereby further agree that you shall not, directly or indirectly, for your benefit or for the benefit of any other person (including, without limitation, an individual or entity), or knowingly assist any other person to:

    i. during your employment with the Company, in any manner, directly or indirectly,

(A) Solicit (as hereinafter defined) or attempt to Solicit the employment or services of any person who provided services to the Company, whether as an employee, an independent contractor or consultant, or as a supplier, or hire any such person; or

(B) Solicit or attempt to Solicit any person who is an employee of the Company to resign from such entity or to apply for or accept employment with any other person or entity; or

   ii. during your employment with the Company, Solicit or attempt to Solicit or otherwise attempt to establish any business relationship (in connection with any business in competition with the Company) with any limited partner, investor, person, firm, corporation or other entity that is or was a customer, investor, business partner, client or employee of any such entity or Sponsored Fund, or prospective customer, investor, business partner or client, of the Company or Sponsored Fund, or interfere with or damage (or attempt to interfere with or damage) any relationship between the Company and their respective clients, suppliers, investors, business partners, customers or employees.

For purposes of this Agreement, the term "**Solicit**" means any direct or indirect communication of any kind whatsoever, regardless of by whom initiated, inviting, advising, encouraging or requesting any person or entity, in any manner, to take or refrain from taking any action and "**Sponsored Fund**" means any investment fund, investment vehicle, managed account or other initiative (to be sponsored by the Company or any of its affiliates).

11. **Background Check.** You agree that the Company may conduct a thorough background investigation including, if applicable, a credit check to the extent permitted by local law. You agree to execute all documents necessary or proper to enable the Company to conduct such investigation and provide all necessary and proper documentation to the Company to verify your identity, credit status, and employment eligibility under applicable law, including any required immigration status documentation necessary for you to be lawfully employed by the Company. Furthermore, you agree that your employment hereunder is contingent upon, and subject to satisfactory completion and the results of the background investigation and/or credit check described in the preceding sentence and the Company's verification of your identity and employment eligibility, in each case, in a manner acceptable to the Company in its sole and absolute discretion.

12. **Equal Opportunity.** The Company is an equal opportunity employer and does not permit discrimination or harassment on the grounds of sex, race, pregnancy, marital or family status, or disability. Personal information obtained by the Company for the purposes of employment will be subject to the provisions of the Data Protection (Privacy of Personal Information) Act. The Company will comply with its statutory obligations regarding the personal data

including sensitive personal data of its employees for the legitimate business purposes under this Agreement.

13. **Notices.** You may give written notices pursuant to this Agreement to your supervisor as identified in paragraph 2 of this Agreement. The Company may give written notices pursuant to this Agreement to you personally, by leaving such written notice on your desk or by email to your company-assigned email address or personal email address the Company may have on record. Notices may also be given by either party by letter addressed to the party at (in the case of the Company) its registered office for the time being and (in the case of the employee) his or her last known address and any notice given by letter shall be deemed to have been given at the time at which the letter would be delivered in the ordinary course of post or, if delivered by hand, upon delivery, and upon service by post it shall be sufficient to prove that the letter was properly addressed and posted. It is your duty to inform the Company and ensure your personal contact details are up-to-date at all times.

14. **Miscellaneous.**

   (a)   This Agreement, the Invention Assignment Agreement and the policies and procedures referred to in paragraph 1 contain the entire understanding of the parties in respect of the subject matter contained herein and therein. In executing this Agreement, you represent that you have not relied on any representation or statement not set forth in this Agreement, the Invention Assignment Agreement and the said policies and procedures, and you expressly disavow any reliance upon any such representations or statements.

   (b)   All rights, remedies and benefits expressly provided for in this Agreement are cumulative and are not exclusive of any rights, remedies or benefits provided for by law or in this Agreement, and the exercise of any remedy by a party hereto shall not be deemed an election to the exclusion of any other remedy (any such claim by the other party being hereby waived).

   (c)   The failure of a party to this Agreement to insist upon strict adherence to any term hereof on any occasion shall not be considered a waiver of such party's rights or deprive such party of the right thereafter to insist upon strict adherence to that term or any other term of this Agreement.

   (d)   This Agreement, and all of your rights and duties hereunder, shall not be assignable or delegable by you. Any purported assignment or delegation by you in violation of the foregoing shall be null and void ab initio and of no further force and effect. This Agreement may be assigned by the Company to any affiliate thereof or to a person or entity which is an affiliate or successor in interest to all or substantially all of the business operations or assets of the Company. Upon such assignment, the rights and obligations of the Company hereunder shall be become the rights and obligations of such affiliate person or entity.

(e)    You shall provide reasonable cooperation in connection with any regulatory or legal action or proceeding (or any appeal from any action or proceeding) which relates to events occurring during your employment. Notwithstanding the generality of the foregoing, reasonable cooperation shall not require that you waive any applicable privilege or immunity. This provision shall survive any termination of this Agreement.

(f)    In the event that you breach any provision of the Protective Covenants section, the Company's obligation to make or provide payments or benefits under the Compensation or Benefits provisions will cease, except for Compensation or Benefits that the Company is required by law to pay to you. Furthermore, subject to applicable law, the Company will be entitled to an accounting and repayment of all profits, compensation, bonuses, commissions, remunerations or benefits which you directly or indirectly have realized and/or may realize as a result of, growing out of or in connection with any such violation.

(g)    The various provisions and paragraphs of this Agreement are severable and if any provision or paragraph or identifiable part thereof is held to be invalid or unenforceable by any court of competent jurisdiction, then such invalidity or unenforceability will not affect the validity or enforceability of the remaining provisions, paragraphs or identifiable parts thereof in this Agreement.

(h)    If any of the Protective Covenants provisions is held to be unenforceable by reason of it extending for too great a period of time or over too great a geographic area or by reason of it being too extensive in any other respect, the parties agree (i) such provision shall be interpreted to extend only over the maximum period of time for which it may be enforceable and/or over the maximum geographic areas as to which it may be enforceable and/or over the maximum extent in all other respects as to which it may be enforceable, all as determined by the court making such determination and (ii) in its reduced form, such covenant shall then be enforceable, but such reduced form of covenant shall only apply with respect to the operation of such covenant in the particular jurisdiction in or for which such adjudication is made. Each of the covenants and agreements contained in the Protective Covenants paragraph is separate, distinct and severable. The unenforceability of any provision of the Protective Covenant paragraph shall not affect the validity or enforceability of any other Protective Covenant or any other provision of this Agreement. The temporal duration of the Protective Covenants shall not expire, and shall be tolled, during any period in which you are in violation of any of such covenants, and all such restrictions shall automatically be extended by the period of your violation of any such restrictions.

(i)    The rights of the parties to terminate, rescind, or agree any amendment, waiver, variation or settlement under or relating to this Agreement, or any term of this Agreement, are not subject to the consent of any third party.

(j)    This Agreement and any non-contractual obligations arising from or connected with it shall be governed by and construed in accordance with the Laws of Bahamas. This provision is concerned with any dispute, controversy, claim or difference of any kind whatsoever which arises out of or is related to this Agreement or any breach of this Agreement (a "**Dispute**") other than a breach of the Protective Covenants hereof. Each of the Company and you agree to attempt to resolve any Dispute by discussions and consultations in good faith for a period of fourteen (14) days after written notice has been sent by registered mail by one party to the other party ("**Consultation Period**"). If the Dispute remains unresolved upon expiration of the Consultation Period, then the parties will attempt to settle it by mediation in The Bahamas ("**Mediation**"). If the Dispute remains unresolved following Mediation, each of the parties irrevocably to arbitration under the laws of The Bahamas.

(k)    Notwithstanding paragraph 14(j), if you commit a breach or are about to commit a breach of any of the Protective Covenants provisions hereof, the Company, its affiliates and any of their respective directors, officers, principals and agents shall have the right to employ the resolution procedure outlined in 14(j) above or to have this Agreement specifically enforced by any court or arbitral tribunal having equity jurisdiction without being required to post bond or other security and without having to prove the inadequacy of the available remedies at law, it being acknowledged and agreed that any such breach or threatened breach will cause irreparable injury to the legitimate business interests of the Company, its affiliates and injury to any of their respective directors, officers, principals and agents and that money damages will not provide an adequate remedy to any such party. In addition, the Company, its affiliates or any of their respective directors, officers, principals and agents may take all such other actions and remedies including injunctive relief available to it under law or in equity and shall be entitled to such damages as it can show it has sustained by reason of such breach. The existence of any claim, demand, action or cause of action that you may have against the Company, its affiliates or any of their respective directors, officers, principals and agents, whether predicated on this Agreement or otherwise, shall not constitute a defense to the enforcement by the Company, its affiliates or any of their respective directors, officers, principals and agents of the Protective Covenant paragraph hereof.

*[the remainder of this page is intentionally blank]*

You may seek independent legal advice at your own cost regarding these terms if you so wish. If you agree with the terms of this Agreement and accept this Offer, please sign and date this Agreement in the space provided below to indicate your acceptance. We look forward to you joining the team. This Agreement may be signed in counterparts, each of which shall be deemed an original, with the same effect as if the signatures thereto and hereto were upon the same instrument. This Agreement will become binding when one or more counterparts hereof, individually or taken together, will bear the signatures of all the parties reflected hereon as the signatories.

Sincerely,

Alameda Research (Bahamas) Ltd

By: _Caroline Ellison_

Name: Caroline Ellison
Title: Co-CEO

AGREED AND ACCEPTED AS OF  _2022-04-11_  .

Ross Rheingans-Yoo
......................................

Ross Rheingans-Yoo

DocuSign Envelope ID: 6F5E6808-B922-4BD9-9022-C5818F42FEDE

## Exhibit A

### Employee Invention Assignment Agreement

### EMPLOYEE INVENTION ASSIGNMENT AGREEMENT

In consideration of, and as a condition of my employment with Alameda Research (Bahamas) Ltd (the *"Company"*), I, as the *"Employee"* signing this Employee Invention Assignment Agreement (this *"Agreement"*), hereby represent to the Company, and the Company and I hereby agree as follows:

1. **Purpose of Agreement.** I understand that the Company and its affiliates, including but not limited to Alameda Research Ltd (BVI), a limited company organised and existing under the laws of the British Virgin Islands (*"AR LTD"*), and its group companies, are engaged in a continuous program of research, development, production and/or marketing in connection with its current and projected business and that it is critical for the Company and its affiliates to preserve and protect its proprietary information, its rights in certain inventions and works and in related intellectual property rights anywhere in the world to the extent permitted by law. Accordingly, I am entering into this Agreement, whether or not I am expected to create inventions or other works of value for the Company. As used in this Agreement, *"Inventions"* means inventions, improvements, designs, original works of authorship, formulas, processes, compositions of matter, computer software programs, databases, mask works, confidential information and trade secrets and includes anything wholly or partially created by me during the course of my employment whether or not during working hours or using the Company's premises or resources and whether or not recorded in material form.

2. **Relationship to AR LTD.** I understand that all Inventions and other work product that I develop are being developed by the Company for AR LTD. Accordingly, I consent to and will do anything necessary for the assignment of all such works by the Company to AR LTD, and I understand and acknowledge that AR LTD is the owner of all of the Inventions or other intellectual property created by me in my course of employment. I further understand that AR LTD is a third party beneficiary to this Agreement and has the full right to directly enforce any rights of the Company under this Agreement.

3. **Disclosure of Inventions.** I will promptly disclose in confidence to the Company, or to any person designated by it, all Inventions that I make, create, conceive or first reduce to practice, either alone or jointly with others, during the period of my employment, whether or not in the course of my employment, and whether or not patentable, copyrightable or protectable as trade secrets.

4. **Work for Hire; Assigned Inventions.** I acknowledge and agree that any copyrightable works prepared by me within the scope of my employment will be "works made for hire" under the Copyright Act of The Bahamas and that the Company will be considered the author and owner of such copyrightable works. I agree that all Inventions that I make, create, conceive or first reduce to practice during the period of my employment, whether or not in the course of my employment, and whether or not patentable, copyrightable or protectable as trade secrets, and that (i) are developed using equipment, supplies, facilities or trade secrets of the Company; (ii) result

from work performed by me for the Company; ~~or (iii) relate to the Company's business or actual or demonstrably anticipated research or development~~ (the "*Assigned Inventions*"), will be the sole and exclusive property of the Company. 

5.    **Excluded Inventions and Other Inventions**. Attached hereto as Exhibit A is a list describing all existing Inventions, if any, that may relate to the Company's business or actual or demonstrably anticipated research or development and that were made by me or acquired by me prior to the Effective Date (as defined below), and which are not to be assigned to the Company ("*Excluded Inventions*"). If no such list is attached, I represent and agree that it is because I have no rights in any existing Inventions that may relate to the Company's business or actual or demonstrably anticipated research or development. For purposes of this Agreement, "*Other Inventions*" means Inventions in which I have or may have an interest, as of the Effective Date or thereafter, other than Assigned Inventions and Excluded Inventions. I acknowledge and agree that if, in the scope of my employment, I use any Excluded Inventions or any Other Inventions, or if I include any Excluded Inventions or Other Inventions in any product or service of the Company or if my rights in any Excluded Inventions or Other Inventions may block or interfere with, or may otherwise be required for, the exercise by the Company of any rights assigned to the Company under this Agreement, I will immediately so notify the Company in writing. Unless the Company and I agree otherwise in writing as to particular Excluded Inventions or Other Inventions, I hereby grant to the Company, in such circumstances (whether or not I give the Company notice as required above), a perpetual, irrevocable, nonexclusive, transferable, world-wide, royalty-free license to use, disclose, make, sell, offer for sale, import, copy, distribute, modify and create works based on, perform, and display such Excluded Inventions and Other Inventions, and to sublicense third parties in one or more tiers of sublicensees with the same rights.

6.    **Exception to Assignment.** I understand that the Assigned Inventions will not include, and the provisions of this Agreement requiring assignment of inventions to the Company do not apply to, any invention for which collectively no equipment, supplies, facility or trade secret information of the Company was used and which was developed entirely on my own time, unless the invention (i) relates (A) directly to the business of the Company or (B) to the Company's actual or demonstrably anticipated research or development, or (ii) results from any work performed by me for the Company.

7.    **Assignment of Rights.** I agree to assign, and do hereby irrevocably transfer and assign, to the Company: (i) all of my rights, title and interests in and with respect to any Assigned Inventions; (ii) all patents, patent applications, copyrights, mask works, rights in databases, trade secrets, and other intellectual property rights, worldwide, in any Assigned Inventions, along with any registrations of or applications to register such rights; and (iii) to the extent assignable, any and all Moral Rights (as defined below) that I may have in or with respect to any Assigned Inventions. I also hereby forever waive and agree never to assert any Moral Rights I may have in or with respect to any Assigned Inventions and any Excluded Inventions or Other Inventions licensed to the Company under Section 5, even after termination of my employment with the Company. "*Moral Rights*" means any rights to claim authorship of a work, to object to or prevent the modification or destruction of a work, to withdraw from circulation or control the publication or distribution of a work, and any similar right, regardless of whether or not such right is denominated or generally referred to as a "moral right."

8. **Assistance.** I will assist the Company in every proper way to obtain and enforce for the Company all patents, copyrights, mask work rights, trade secret rights and other legal protections for the Assigned Inventions, worldwide. I will not attempt to register nor patent any Assigned Inventions unless requested to do so by the Company. I will execute and deliver any documents that the Company may reasonably request from me in connection with providing such assistance. My obligations under this section will continue beyond the termination of my employment with the Company; provided that the Company agrees to compensate me at a reasonable rate after such termination for time and expenses actually spent by me at the Company's request in providing such assistance. I hereby appoint the Secretary of the Company as my attorney-in-fact to execute documents on my behalf for this purpose. I agree that this appointment is coupled with an interest and will not be revocable.

9. **Physical Property.** All documents, supplies, equipment and other physical property furnished to me by the Company or produced by me or others in connection with my employment will be and remain the sole property of the Company. I will return to the Company all such items when requested by the Company, excepting only my personal copies of records relating to my employment or compensation and any personal property I bring with me to the Company and designate as such. Even if the Company does not so request, I will upon termination of my employment return to the Company all Company property, and I will not take with me or retain any such items or copies or duplicates thereof.

10. **No Breach of Prior Agreements.** I represent that my performance of all the terms of this Agreement and my duties as an employee of the Company will not breach any invention assignment, proprietary information, confidentiality, non-competition, or other agreement with any former employer or other party. I represent that I will not bring with me to the Company or use in the performance of my duties for the Company any documents or materials or intangibles of my own or of a former employer or third party that are not generally available for use by the public or have not been legally transferred to the Company.

11. **Employment.** I understand that this Agreement is not a fixed term contract of employment. I understand that my employment can be terminated at any time, with or without notice and with or without cause, for any reason or for no reason, but in accordance with my Offer of Employment and applicable local law. I acknowledge that any statements or representations to the contrary are ineffective, unless put into a writing signed by the Company. I further acknowledge that my participation in any stock option or benefit program is not to be construed as any assurance of continuing employment for any particular period of time.

12. **Company Opportunities; No Conflicting Activities.** During the period of my employment, I will at all times devote my best efforts to the interests of the Company, and I will not, without the prior written consent of the Company, engage in, or encourage or assist others to engage in, any other employment or activity that: (i) would divert from the Company any business opportunity in which the Company can reasonably be expected to have an interest; (ii) would directly compete with, or involve preparation to compete with, the current or future business of the Company; or (iii) would otherwise conflict with the Company's interests or could cause a disruption of its operations or prospects.

13.    **Use of Name & Likeness.** I hereby authorize the Company to use, reuse, and to grant others the right to use and reuse, my name, photograph, likeness (including caricature), voice, and biographical information, and any reproduction or simulation thereof, in any form of media or technology now known or hereafter developed, both during and after my employment, for any purposes related to the Company's business, such as marketing, advertising, credits, and presentations to the extent permitted by local laws.

14.    **Notification.** I hereby authorize the Company, during and after the termination of my employment with the Company, to notify third parties, including, but not limited to, actual or potential customers or employers, of the terms of this Agreement and my responsibilities hereunder.

15.    **Injunctive Relief.** I understand that a breach or threatened breach of this Agreement by me may cause the Company to suffer irreparable harm and that the Company and any third party beneficiary will therefore be entitled to injunctive relief to enforce this Agreement in any court of competent jurisdiction, anywhere in the world.

16.    **Governing Law; Severability.** This Agreement is intended to supplement, and not to supersede, any rights the Company may have in law or equity with respect to the duties of its employees and the protection of its trade secrets. This Agreement shall be construed in accordance with and governed by the laws of The Bahamas without giving effect to any principles of conflict of laws that would lead to the application of the laws of another jurisdiction. If any provision of this Agreement is invalid, illegal or unenforceable in any respect, such provision will be enforced to the maximum extent possible, given the fundamental intentions of the parties when entering into this Agreement. To the extent such provision cannot be so enforced, it will be stricken from this Agreement and the remainder of this Agreement will be enforced as if such invalid, illegal or unenforceable provision had never been contained in this Agreement.

17.    **Counterparts.** This Agreement may be executed in any number of counterparts, each of which when so executed and delivered will be deemed an original, and all of which together will constitute one and the same agreement.

18.    **Entire Agreement.** This Agreement and the documents referred to herein constitute the entire agreement and understanding of the parties with respect to the subject matter of this Agreement, and supersede all prior understandings and agreements, whether oral or written, between the parties hereto with respect to such subject matter.

19.    **Amendment and Waiver.** This Agreement may be amended only by a written agreement executed by each of the parties to this Agreement. No amendment or waiver of, or modification of any obligation under, this Agreement will be enforceable unless specifically set forth in a writing signed by the party against which enforcement is sought. A waiver by either party of any of the terms and conditions of this Agreement in any instance will not be deemed or construed to be a waiver of such term or condition with respect to any other instance, whether prior, concurrent or subsequent.

20.    **Successors and Assigns; Assignment.** Except as otherwise provided in this Agreement, this Agreement, and the rights and obligations of the parties hereunder, will bind and

benefit the parties and their respective successors, assigns, heirs, executors, administrators, and legal representatives. The Company may assign any of its rights and obligations under this Agreement. I understand that I will not be entitled to assign or delegate this Agreement or any of my rights or obligations hereunder, whether voluntarily or by operation of law, except with the prior written consent of the Company.

21.    **Further Assurances.**  The parties will execute such further documents and instruments and take such further actions as may be reasonably necessary to carry out the purposes and intent of this Agreement. Upon termination of my employment with the Company, I will execute and deliver a document or documents in a form reasonably requested by the Company confirming my agreement to comply with the post-employment obligations contained in this Agreement.

22.    **Acknowledgement.**  I certify and acknowledge that I have carefully read all of the provisions of this Agreement and that I understand and will fully and faithfully comply with this Agreement.

23.    **Effective Date of Agreement**. This Agreement is and will be effective on and after the first day of my employment by the Company, which is the "*Effective Date*".

**Alameda Research (Bahamas) Ltd**

By: *Caroline Ellison*
    198B1A7CC5A74E7...

Name:    Caroline Ellison

Title:    Co-CEO

Date:    4/11/2022

**Employee:**

Signature

Ross Rheingans-Yoo

Name (Please Print)

CONFIDENTIAL

## **Exhibit A**

### LIST OF EXCLUDED INVENTIONS UNDER SECTION 5

<u>Title</u>                <u>Date</u>                        Identifying Number
                                                    <u>or Brief Description</u>

NONE.

_____ X _____ No inventions, improvements, or original works of authorship

_____ Additional sheets attached

Signature of Employee: _____

Print Name of Employee: Ross Rheingans-Yoo

Date: 2022-04-11

# EXHIBIT 2



# THE COMMONWEALTH OF THE BAHAMAS
# DEPARTMENT OF IMMIGRATION

CLEMENT T. MAYNARD III
CLEMENT T. MAYNARD & COMPANY
P.O. BOX N-7525
G.K. SYMONETTE BUILDING, SHIRLEY STREET
NASSAU, NEW PROVIDENCE, BAHAMAS

Date: **APRIL 30, 2022**

**008265417**

Dear **CLEMENT T. MAYNARD III:**

Please be advised that the following application has been approved:

| | |
|---|---|
| Applicant Name: | **ROSS WILLIAM RHEINGANS - YOO** |
| Nationality: | **AMERICAN** |
| Person UID Number: | |
| Permit Type: | **WORK PERMIT - LONG TERM** |
| Application Reason: | **NEW APPLICANT** |
| Date of Issue: | **30-04-2022** |
| Date of Expiry: | **29-04-2023** |
| Employee Occupation: | **TRADER** |
| Employer(s): | **ALAMEDA RESEARCH (BAHAMAS) LTD.** |
| Fees Owing: | **B$12,500.00** |
| Pickup Location: | **NASSAU IMMIGRATION OFFICE** |
| Fingerprint Capture Required: | **YES** |
| Photo Capture Required: | **NO** |

This approval is granted on the condition that it is accepted no later than thirty (30) days from the date of this letter, otherwise the offer may be withdrawn.

Payment can be made in cash at any Omni Money Transfers and Payments, Sun Cash, Cash N Go, or Kanoo locations. To make payments at these locations, you are required to take along the approval letter or a copy of the invoice sent to you from noreply@finance.gov.bs.

Payment can also be made online with a debit/credit card, by accessing the payment.revenue.gov.bs portal where you will be guided through a five (5) step process. Please ensure that you have a copy of this approval letter as you will need the **Application ID** number to complete the process.

Payment can also be made online with a debit/credit card, by accessing the Immigration website at https://immigration.gov.bs and  then selecting Pay Document Fees. There you will be guided through the payment process. Please ensure that you have a copy of this approval letter as you will need the Surname, Given Name(s), Application Number, and Person UID to complete the process.

Payment can also be made at an Immigration Office by money order or certified cheque payable to Bahamas Public Treasury, or by debit/credit card.

If there are further queries, please call 242-225-5337.

If there are no fees owing, please disregard the foregoing payment information.

Kindly allow seven (7) days following fee payment before contacting the Immigration Department to arrange permit issuance at the designated pickup location.

For applicants who need to verify that entry permission has been granted by The Bahamas to facilitate travel from their home country, an Electronic Entry Permit (EEP) can be provided following payment of fees owing.

If Fingerprint and/or Photo Capture are required, these must be completed before the permit is issued. If the applicant is currently in The Bahamas with legal status, these requirements can be met at the nearest designated Immigration Office. If the applicant will be entering from another country, outstanding biometrics must be submitted at a designated International Airport upon their arrival.

At the time of fee payment and permit issuance, present this notice so that suitable facilitation may be provided.

Be advised that this is only an approval notice and it does not authorize applicant to be employed unless or until they are in possession of a valid work permit issued in the prescribed form by the Director of Immigration.

If the application reason noted above states "New Applicant", the employer must ensure that the applicant is registered with the National Insurance Board and that all related payments thereto remain current.

Employers are reminded that in accepting this approval they are responsible for any expenses associated with the named applicant's repatriation, as well as those of any dependent(s) and payment of any public charge they incur in The Bahamas. Further, employers are to escort to Immigration any employee whose work permit has been canceled or revoked and inform in writing of the termination or resignation such employee(s). Employers are not to withhold at any time, legal identity documents issued to the named bearer.

**Conditions:**     No special conditions.

To effect the renewal of this permit, documentation must be submitted one (1) month prior to the expiration of the current permit.

Yours faithfully,

Director of Immigration

# EXHIBIT 3

# ∍ FIDELITY

Fidelity Bank (Bahamas) Ltd.
51 Frederick St
P.O. Box CB-13139
Nassau, Bahamas
TIN# 22861

**Statement Date**      05/31/2022

FTX Digital Markets Ltd

P O Box N-7525
#27 Veridian Corporate Center
BS

**Account Number** ▮▮▮**0275**      **Starting Balance**      $      84,766,647.79

| Date | Description | Cheque No. | Amount | Balance |
|------|-------------|------------|--------|---------|
| 5/02 | Outgoing Wire Transfer Fee | | -180.00 | 84,766,467.79 |
| 5/02 | Outgoing Wire Transfer Fee | | -180.00 | 84,766,287.79 |
| 5/02 | Outgoing Wire Transfer Fee | | -180.00 | 84,766,107.79 |
| 5/02 | Government Stamp Tax | | -0.40 | 84,766,107.39 |
| 5/02 | Government Stamp Tax | | -0.40 | 84,766,106.99 |
| 5/02 | Government Stamp Tax | | -0.40 | 84,766,106.59 |
| 5/02 | Inter-Bank Wire Transfer Fee | | -22.00 | 84,766,084.59 |
| 5/02 | Inter-Bank Wire Transfer Fee | | -22.00 | 84,766,062.59 |
| 5/02 | Inter-Bank Wire Transfer Fee | | -22.00 | 84,766,040.59 |
| 5/02 | Wt F/O Ea Square Llc | | -18,000.00 | 84,748,040.59 |
| 5/02 | Wt F/O Clarissa Watanabe | | -21,833.34 | 84,726,207.25 |
| 5/02 | Wt F/O Leila Clarke | | -15,083.33 | 84,711,123.92 |
| 5/02 | Trns To Ftx Digital Markets Chq#10140150 | | -2,010,000.00 | 82,701,123.92 |
| 5/03 | Wt F/O Andrea Lincoln | | -17,166.67 | 82,683,957.25 |
| 5/03 | Wt F/O Quianwen Wu | | -10,916.67 | 82,673,040.58 |
| 5/03 | W/T Harry Walker Agency | | -250,000.00 | 82,423,040.58 |
| 5/03 | Wt F/O Adam Yedidia | | -17,166.67 | 82,405,873.91 |
| 5/03 | Inter-Bank Wire Transfer Fee | | -22.00 | 82,405,851.91 |
| 5/03 | Inter-Bank Wire Transfer Fee | | -22.00 | 82,405,829.91 |
| 5/03 | Inter-Bank Wire Transfer Fee | | -22.00 | 82,405,807.91 |
| 5/03 | Inter-Bank Wire Transfer Fee | | -22.00 | 82,405,785.91 |
| 5/03 | Government Stamp Tax | | -0.40 | 82,405,785.51 |
| 5/03 | Government Stamp Tax | | -0.40 | 82,405,785.11 |
| 5/03 | Government Stamp Tax | | -0.40 | 82,405,784.71 |
| 5/03 | Government Stamp Tax | | -0.40 | 82,405,784.31 |
| 5/03 | Outgoing Wire Transfer Fee | | -180.00 | 82,405,604.31 |
| 5/03 | Outgoing Wire Transfer Fee | | -180.00 | 82,405,424.31 |
| 5/03 | Outgoing Wire Transfer Fee | | -180.00 | 82,405,244.31 |
| 5/03 | Outgoing Wire Transfer Fee | | -180.00 | 82,405,064.31 |
| 5/03 | Stamp Tax | | -1.61 | 82,405,062.70 |
| 5/03 | Stamp Tax | | -1.21 | 82,405,061.49 |
| 5/04 | Stamp Tax | | -1.61 | 82,405,059.88 |
| 5/04 | Outgoing Wire Transfer Fee | | -180.00 | 82,404,879.88 |
| 5/04 | Government Stamp Tax | | -0.40 | 82,404,879.48 |
| 5/04 | Inter-Bank Wire Transfer Fee | | -22.00 | 82,404,857.48 |
| 5/04 | Wt F/O Mohamed Bentaleb | | -2,385.02 | 82,402,472.46 |
| 5/05 | W/T F/O Caribbean Neurosurgery | | -250,000.00 | 82,152,472.46 |
| 5/05 | Wt F/O Ross Rheingans Yoo | | -17,666.66 | 82,134,805.80 |
| 5/05 | Inter-Bank Wire Transfer Fee | | -22.00 | 82,134,783.80 |
| 5/05 | Inter-Bank Wire Transfer Fee | | -22.00 | 82,134,761.80 |
| 5/05 | Government Stamp Tax | | -0.40 | 82,134,761.40 |





Fidelity Bank (Bahamas) Ltd.
51 Frederick St
P.O. Box CB-13139
Nassau, Bahamas
TIN# 22861

Statement Date          05/31/2022

Account Number          ███0275

| Date | Description | Amount | Balance |
|------|-------------|--------|---------|
| | FTX Digital Markets Ltd | | |
| 5/05 | Government Stamp Tax | -0.40 | 82,134,761.00 |
| 5/05 | Outgoing Wire Transfer Fee | -180.00 | 82,134,581.00 |
| 5/05 | Outgoing Wire Transfer Fee | -180.00 | 82,134,401.00 |
| 5/05 | Stamp Tax | -0.40 | 82,134,400.60 |
| 5/06 | Stamp Tax | -0.80 | 82,134,399.80 |
| 5/06 | Outgoing Wire Transfer Fee | -180.00 | 82,134,219.80 |
| 5/06 | Outgoing Wire Transfer Fee | -180.00 | 82,134,039.80 |
| 5/06 | Outgoing Wire Transfer Fee | -30.00 | 82,134,009.80 |
| 5/06 | Outgoing Wire Transfer Fee | -30.00 | 82,133,979.80 |
| 5/06 | Outgoing Wire Transfer Fee | -30.00 | 82,133,949.80 |
| 5/06 | Outgoing Wire Transfer Fee | -30.00 | 82,133,919.80 |
| 5/06 | Outgoing Wire Transfer Fee | -35.00 | 82,133,884.80 |
| 5/06 | Outgoing Wire Transfer Fee | -35.00 | 82,133,849.80 |
| 5/06 | Government Stamp Tax | -0.40 | 82,133,849.40 |
| 5/06 | Government Stamp Tax | -0.40 | 82,133,849.00 |
| 5/06 | Government Stamp Tax | -0.40 | 82,133,848.60 |
| 5/06 | Government Stamp Tax | -0.40 | 82,133,848.20 |
| 5/06 | Government Stamp Tax | -0.40 | 82,133,847.80 |
| 5/06 | Government Stamp Tax | -0.40 | 82,133,847.40 |
| 5/06 | Government Stamp Tax | -0.40 | 82,133,847.00 |
| 5/06 | Government Stamp Tax | -0.40 | 82,133,846.60 |
| 5/06 | Inter-Bank Wire Transfer Fee | -22.00 | 82,133,824.60 |
| 5/06 | Inter-Bank Wire Transfer Fee | -22.00 | 82,133,802.60 |
| 5/06 | Inter-Bank Wire Transfer Fee | -22.00 | 82,133,780.60 |
| 5/06 | Inter-Bank Wire Transfer Fee | -22.00 | 82,133,758.60 |
| 5/06 | Inter-Bank Wire Transfer Fee | -22.00 | 82,133,736.60 |
| 5/06 | Inter-Bank Wire Transfer Fee | -22.00 | 82,133,714.60 |
| 5/06 | Inter-Bank Wire Transfer Fee | -22.00 | 82,133,692.60 |
| 5/06 | Inter-Bank Wire Transfer Fee | -22.00 | 82,133,670.60 |
| 5/06 | W/T F/O Oliver Hamilton | -8,583.33 | 82,125,087.27 |
| 5/06 | Wt F/O Adithya Girish | -8,583.33 | 82,116,503.94 |
| 5/06 | Wt F/O Qianwen Wu | -132.08 | 82,116,371.86 |
| 5/06 | Wt F/O Diana Ma | -6,500.00 | 82,109,871.86 |
| 5/06 | Wt F/O Aaron Gillett | -889.81 | 82,108,982.05 |
| 5/06 | Wt F/O Richard Chang | -194.85 | 82,108,787.20 |
| 5/06 | Wt Caroline Ellison | -34,333.34 | 82,074,453.86 |
| 5/06 | Wt F/O Toa Wu | -34,333.34 | 82,040,120.52 |
| 5/09 | Returned Wt F/O Omegarender Llp (Less Fees) | 2,484.43 | 82,042,604.95 |
| 5/09 | Stamp Tax | -3.22 | 82,042,601.73 |
| 5/10 | Trns To Ftx Digital Markets Chq#10140150 | -3,015,000.00 | 79,027,601.73 |
| 5/11 | Wt F/O Man Ho Cheung | -1,111.26 | 79,026,490.47 |
| 5/11 | Wt F/O Jacques Potts | -314.80 | 79,026,175.67 |
| 5/11 | Wt F/O Christian Drappi | -7,541.67 | 79,018,634.00 |
| 5/11 | Wt F/O Sean B Callender & Co. | -7,065,660.74 | 71,952,973.26 |
| 5/11 | Wt F/O Ning, Ting Nicholas | -6,062.28 | 71,946,910.98 |
| 5/11 | Wt F/O Ross Rheingans-Yoo | -17,666.66 | 71,929,244.32 |
| 5/11 | Wt F/O Ross Rheingans-Yoo | -350,000.00 | 71,579,244.32 |
| 5/11 | Inter-Bank Wire Transfer Fee | -22.00 | 71,579,222.32 |



PAGE OMITTED

PAGE OMITTED

PAGE OMITTED

# EXHIBIT 4

# ∃ FIDELITY

Fidelity Bank (Bahamas) Ltd.
51 Frederick St
P.O. Box CB-13139
Nassau, Bahamas
TIN# 22861

Statement Date        06/30/2022

FTX Digital Markets Ltd

P O Box N-7525
#27 Veridian Corporate Center
BS

Account Number ▮▮▮0275        Starting Balance      $     49,364,340.72

| Date | Description | Cheque No. | Amount | Balance |
|------|-------------|-----------|--------|---------|
| 6/01 | Wt F/O Leo Trippi Sa | | -12,212.51 | 49,352,128.21 |
| 6/01 | Wt F/O Michelle Bond | | -400,000.00 | 48,952,128.21 |
| 6/01 | Government Stamp Tax | | -0.40 | 48,952,127.81 |
| 6/01 | Government Stamp Tax | | -0.40 | 48,952,127.41 |
| 6/01 | Internal Transfer Fee | | -11.00 | 48,952,116.41 |
| 6/01 | Inter-Bank Wire Transfer Fee | | -22.00 | 48,952,094.41 |
| 6/01 | Inter-Bank Wire Transfer Fee | | -22.00 | 48,952,072.41 |
| 6/01 | F/O Roshan Daswani | | -12,366.67 | 48,939,705.74 |
| 6/01 | Outgoing Wire Transfer Fee | | -27.50 | 48,939,678.24 |
| 6/01 | Outgoing Wire Transfer Fee | | -27.50 | 48,939,650.74 |
| 6/01 | Stamp Tax | | -0.40 | 48,939,650.34 |
| 6/02 | Stamp Tax | | -0.80 | 48,939,649.54 |
| 6/02 | Outgoing Wire Transfer Fee | | -27.50 | 48,939,622.04 |
| 6/02 | Outgoing Wire Transfer Fee | | -27.50 | 48,939,594.54 |
| 6/02 | Outgoing Wire Transfer Fee | | -27.50 | 48,939,567.04 |
| 6/02 | Outgoing Wire Transfer Fee | | -27.50 | 48,939,539.54 |
| 6/02 | Outgoing Wire Transfer Fee | | -27.50 | 48,939,512.04 |
| 6/02 | Outgoing Wire Transfer Fee | | -27.50 | 48,939,484.54 |
| 6/02 | Outgoing Wire Transfer Fee | | -27.50 | 48,939,457.04 |
| 6/02 | Outgoing Wire Transfer Fee | | -27.50 | 48,939,429.54 |
| 6/02 | Outgoing Wire Transfer Fee | | -27.50 | 48,939,402.04 |
| 6/02 | Outgoing Wire Transfer Fee | | -27.50 | 48,939,374.54 |
| 6/02 | Outgoing Wire Transfer Fee | | -27.50 | 48,939,347.04 |
| 6/02 | Outgoing Wire Transfer Fee | | -27.50 | 48,939,319.54 |
| 6/02 | F/O Aravind Menon | | -36,400.00 | 48,902,919.54 |
| 6/02 | Inter-Bank Wire Transfer Fee | | -22.00 | 48,902,897.54 |
| 6/02 | Inter-Bank Wire Transfer Fee | | -22.00 | 48,902,875.54 |
| 6/02 | Inter-Bank Wire Transfer Fee | | -22.00 | 48,902,853.54 |
| 6/02 | Inter-Bank Wire Transfer Fee | | -22.00 | 48,902,831.54 |
| 6/02 | Inter-Bank Wire Transfer Fee | | -22.00 | 48,902,809.54 |
| 6/02 | Inter-Bank Wire Transfer Fee | | -22.00 | 48,902,787.54 |
| 6/02 | Inter-Bank Wire Transfer Fee | | -22.00 | 48,902,765.54 |
| 6/02 | Inter-Bank Wire Transfer Fee | | -22.00 | 48,902,743.54 |
| 6/02 | Inter-Bank Wire Transfer Fee | | -22.00 | 48,902,721.54 |
| 6/02 | Inter-Bank Wire Transfer Fee | | -22.00 | 48,902,699.54 |
| 6/02 | Inter-Bank Wire Transfer Fee | | -22.00 | 48,902,677.54 |
| 6/02 | Inter-Bank Wire Transfer Fee | | -22.00 | 48,902,655.54 |
| 6/02 | Government Stamp Tax | | -0.40 | 48,902,655.14 |
| 6/02 | Government Stamp Tax | | -0.40 | 48,902,654.74 |
| 6/02 | Government Stamp Tax | | -0.40 | 48,902,654.34 |
| 6/02 | Government Stamp Tax | | -0.40 | 48,902,653.94 |





Fidelity Bank (Bahamas) Ltd.
51 Frederick St
P.O. Box CB-13139
Nassau, Bahamas
TIN# 22861

Statement Date        06/30/2022

Account Number        ████ 0275

| Date | Description | Amount | Balance |
|------|-------------|--------|---------|
| | FTX Digital Markets Ltd | | |
| 6/02 | Government Stamp Tax | -0.40 | 48,902,653.54 |
| 6/02 | Government Stamp Tax | -0.40 | 48,902,653.14 |
| 6/02 | Government Stamp Tax | -0.40 | 48,902,652.74 |
| 6/02 | Government Stamp Tax | -0.40 | 48,902,652.34 |
| 6/02 | Government Stamp Tax | -0.40 | 48,902,651.94 |
| 6/02 | Government Stamp Tax | -0.40 | 48,902,651.54 |
| 6/02 | Government Stamp Tax | -0.40 | 48,902,651.14 |
| 6/02 | Government Stamp Tax | -0.40 | 48,902,650.74 |
| 6/02 | Internal Transfer Fee | -11.00 | 48,902,639.74 |
| 6/02 | Returned Wt F/O John Paul Rees | 1,260.32 | 48,903,900.06 |
| 6/02 | Wt F/O Leila Clarke | -14,183.33 | 48,889,716.73 |
| 6/02 | Wt F/O Adam Yedidia | -16,266.67 | 48,873,450.06 |
| 6/02 | Wt F/O Andrea Lincoln | -16,266.67 | 48,857,183.39 |
| 6/02 | Wt F/O Tao Wu | -17,166.67 | 48,840,016.72 |
| 6/02 | Wt F/O Caroline Ellison | -15,366.67 | 48,824,650.05 |
| 6/02 | Wt F/O Christian Drappi | -6,141.67 | 48,818,508.38 |
| 6/02 | Wt F/O Elizabeth Lee | -7,000.00 | 48,811,508.38 |
| 6/02 | Wt F/O Oliver Hamilton | -7,183.33 | 48,804,325.05 |
| 6/02 | Wt F/O Qianwen Wu | -10,116.67 | 48,794,208.38 |
| 6/02 | Wt F/O Diana Ma | -27,500.00 | 48,766,708.38 |
| 6/02 | Wt F/O Ross Rheingans-Yoo | -8,233.33 | 48,758,475.05 |
| 6/02 | Wt F/O Weiyi Xia | -23,487.61 | 48,734,987.44 |
| 6/07 | Wt F/O Aditya Baradway | -51,500.00 | 48,683,487.44 |
| 6/07 | Government Stamp Tax | -0.40 | 48,683,487.04 |
| 6/07 | Inter-Bank Wire Transfer Fee | -22.00 | 48,683,465.04 |
| 6/07 | Outgoing Wire Transfer Fee | -27.50 | 48,683,437.54 |
| 6/07 | Stamp Tax | -4.82 | 48,683,432.72 |
| 6/08 | Stamp Tax | -0.40 | 48,683,432.32 |
| 6/09 | Wt F/O Trans Island Airways | -41,650.00 | 48,641,782.32 |
| 6/09 | Wt F/O Solidus Labs | -191,750.00 | 48,450,032.32 |
| 6/09 | Internal Transfer Fee | -11.00 | 48,450,021.32 |
| 6/09 | Government Stamp Tax | -0.40 | 48,450,020.92 |
| 6/09 | Government Stamp Tax | -0.40 | 48,450,020.52 |
| 6/09 | Inter-Bank Wire Transfer Fee | -22.00 | 48,449,998.52 |
| 6/09 | Inter-Bank Wire Transfer Fee | -22.00 | 48,449,976.52 |
| 6/09 | Outgoing Wire Transfer Fee | -27.50 | 48,449,949.02 |
| 6/09 | Outgoing Wire Transfer Fee | -27.50 | 48,449,921.52 |
| 6/09 | F/O Qiu Jin | -21,033.33 | 48,428,888.19 |
| 6/10 | Stamp Tax | -0.80 | 48,428,887.39 |
| 6/10 | Outgoing Wire Transfer Fee | -27.50 | 48,428,859.89 |
| 6/10 | Outgoing Wire Transfer Fee | -27.50 | 48,428,832.39 |
| 6/10 | Outgoing Wire Transfer Fee | -27.50 | 48,428,804.89 |
| 6/10 | Outgoing Wire Transfer Fee | -27.50 | 48,428,777.39 |
| 6/10 | Inter-Bank Wire Transfer Fee | -22.00 | 48,428,755.39 |
| 6/10 | Inter-Bank Wire Transfer Fee | -22.00 | 48,428,733.39 |
| 6/10 | Inter-Bank Wire Transfer Fee | -22.00 | 48,428,711.39 |
| 6/10 | Inter-Bank Wire Transfer Fee | -22.00 | 48,428,689.39 |
| 6/10 | Government Stamp Tax | -0.40 | 48,428,688.99 |



PAGE OMITTED



Fidelity Bank (Bahamas) Ltd.
51 Frederick St
P.O. Box CB-13139
Nassau, Bahamas
TIN# 22861

Statement Date    06/30/2022

Account Number    ███ 0275

| Date | Description | Amount | Balance |
|------|-------------|--------|---------|
|  | FTX Digital Markets Ltd |  |  |
| 6/20 | Wt F/O World Econimic Forum | -310,598.16 | 45,195,192.64 |
| 6/20 | Wt F/O Association Digital Asset Markets Inc | -175,000.00 | 45,020,192.64 |
| 6/21 | Wt F/O Adam Yedidia | -16,266.67 | 45,003,925.97 |
| 6/21 | Wt F/O Andrea Lincoln | -16,266.67 | 44,987,659.30 |
| 6/21 | Wt F/O Clarissa Watanabe | -9,416.67 | 44,978,242.63 |
| 6/21 | Wt F/O Elizabeth Lee | -6,800.00 | 44,971,442.63 |
| 6/21 | Wt F/O Leila Clarke | -14,183.33 | 44,957,259.30 |
| 6/21 | Wt F/O Qianwen Wu | -10,016.67 | 44,947,242.63 |
| 6/21 | Wt F/O Weiyi Xia | -4,431.88 | 44,942,810.75 |
| 6/21 | Wt F/O Adithya Girish | -15,766.67 | 44,927,044.08 |
| 6/21 | Wt F/O Caroline Ellison | -15,366.67 | 44,911,677.41 |
| 6/21 | Wt F/O Christian Drappi | -13,683.33 | 44,897,994.08 |
| 6/21 | Wt F/O Diana Ma | -13,000.00 | 44,884,994.08 |
| 6/21 | Wt F/O Nathaniel Parke | -15,466.67 | 44,869,527.41 |
| 6/21 | Wt F/O Oliver Hamilton | -15,766.67 | 44,853,760.74 |
| 6/21 | Wt F/O Tao Wu | -17,166.67 | 44,836,594.07 |
| 6/21 | Wt F/O William Kauffman | -10,166.67 | 44,826,427.40 |
| 6/21 | Wt F/O Ross Rheingans Yoo | -8,233.33 | 44,818,194.07 |
| 6/21 | Wt F/O Aditya Baradwaj | -17,166.67 | 44,801,027.40 |
| 6/21 | Ftx Payroll June 2022 | -28,100.00 | 44,772,927.40 |
| 6/21 | Government Stamp Tax | -0.40 | 44,772,927.00 |
| 6/21 | Government Stamp Tax | -0.40 | 44,772,926.60 |
| 6/21 | Government Stamp Tax | -0.40 | 44,772,926.20 |
| 6/21 | Government Stamp Tax | -0.40 | 44,772,925.80 |
| 6/21 | Government Stamp Tax | -0.40 | 44,772,925.40 |
| 6/21 | Government Stamp Tax | -0.40 | 44,772,925.00 |
| 6/21 | Government Stamp Tax | -0.40 | 44,772,924.60 |
| 6/21 | Government Stamp Tax | -0.40 | 44,772,924.20 |
| 6/21 | Government Stamp Tax | -0.40 | 44,772,923.80 |
| 6/21 | Government Stamp Tax | -0.40 | 44,772,923.40 |
| 6/21 | Government Stamp Tax | -0.40 | 44,772,923.00 |
| 6/21 | Government Stamp Tax | -0.40 | 44,772,922.60 |
| 6/21 | Government Stamp Tax | -0.40 | 44,772,922.20 |
| 6/21 | Government Stamp Tax | -0.40 | 44,772,921.80 |
| 6/21 | Government Stamp Tax | -0.40 | 44,772,921.40 |
| 6/21 | Government Stamp Tax | -0.40 | 44,772,921.00 |
| 6/21 | Government Stamp Tax | -0.40 | 44,772,920.60 |
| 6/21 | Inter-Bank Wire Transfer Fee | -22.00 | 44,772,898.60 |
| 6/21 | Inter-Bank Wire Transfer Fee | -22.00 | 44,772,876.60 |
| 6/21 | Inter-Bank Wire Transfer Fee | -22.00 | 44,772,854.60 |
| 6/21 | Inter-Bank Wire Transfer Fee | -22.00 | 44,772,832.60 |
| 6/21 | Inter-Bank Wire Transfer Fee | -22.00 | 44,772,810.60 |
| 6/21 | Inter-Bank Wire Transfer Fee | -22.00 | 44,772,788.60 |
| 6/21 | Inter-Bank Wire Transfer Fee | -22.00 | 44,772,766.60 |
| 6/21 | Inter-Bank Wire Transfer Fee | -22.00 | 44,772,744.60 |
| 6/21 | Inter-Bank Wire Transfer Fee | -22.00 | 44,772,722.60 |
| 6/21 | Inter-Bank Wire Transfer Fee | -22.00 | 44,772,700.60 |
| 6/21 | Inter-Bank Wire Transfer Fee | -22.00 | 44,772,678.60 |



PAGE OMITTED

PAGE OMITTED

# EXHIBIT 5

 Silvergate

FTX DIGITAL MARKETS LTD.
VERIDIAN CORP. CNTR,ASTORIA UNIT 27
WSTN DIST OF ISLND OF NEW PROVIDENC
NASSAU, BAHAMAS
BAHAMAS

Page            1 of 3

Account Number:    ******2556
Date                    07/29/22

## STATEMENT SUMMARY AS OF         07/29/22

| Account Name | Account Number | Balance |
|---|---|---|
| ACCOUNT ANALYSIS STANDARD | XXXXXX2556 | 93,227.67 |

| FTX DIGITAL MARKETS LTD. | ACCOUNT ANALYSIS STANDARD | ACCT | ******2556 |
|---|---|---|---|

### Summary of Activity Since Your Last Statement

| | | |
|---|---|---|
| Beginning Balance | 7/01/22 | 14,565.84 |
| Deposits / Misc Credits | 3 | 1,015,466.67 |
| Withdrawals / Misc Debits | 35 | 936,804.84 |
| ** Ending Balance | 7/31/22 | 93,227.67 ** |
| Service Charge | | 378,391.27 |

## Deposits and Other Credits

| Date | Amount | Activity Description |
|---|---|---|
| 7/06 | 500,000.00 | M076C13110M1SW45 |
| | | ORIG:FTX TRADING LIMITED |
| 7/20 | 500,000.00 | M07KD13054A50TD8 |
| | | ORIG:FTX TRADING LIMITED |
| 7/20 | 15,466.67 | M07KL4227H242AVU |
| | | ORIG:FTX DIGITAL MARKETS LTD. |

## Debits and Other Withdrawals

| Date | Amount | Activity Description |
|---|---|---|
| 7/05 | 1,000.00 | M075J170100YK0WY |
| | | BENE:PRIME TRUST LLC |
| 7/12 | 378,391.27 | ANALYSIS ACTIVITY |
| 7/13 | 2,000.00 | M07DJ4102P525XET |
| | | BENE:PRIME TRUST LLC |
| 7/18 | 2,100.00 | M07II5344B340ABQ |
| | | BENE:BRYCE MAGARRO |
| 7/19 | 6,800.00 | M07JL4123875EISB |
| | | BENE:ELIZABETH LEE |
| 7/19 | 9,916.67 | M07JL4126BU442E4 |
| | | BENE:CLARISSA WATANABE |
| 7/19 | 10,016.67 | M07JL4121555EIRC |
| | | BENE:QIANWEN WU |
| 7/19 | 14,183.33 | M07JL4125AP442DG |

 Silvergate

**FTX DIGITAL MARKETS LTD.**
**VERIDIAN CORP. CNTR,ASTORIA UNIT 27**
**WSTN DIST OF ISLND OF NEW PROVIDENC**
**NASSAU, BAHAMAS**
**BAHAMAS**

| | |
|---|---|
| Page | 2 of 3 |
| Account Number: | ******2556 |
| Date | 07/29/22 |

## Debits and Other Withdrawals

| Date | Amount | Activity Description |
|---|---|---|
| | | BENE:LEILA CLARK |
| 7/19 | 15,766.67 | M07JL41249J442CM |
| | | BENE:ADITHYA GIRISH |
| 7/19 | 16,266.67 | M07JL41226B442BH |
| | | BENE:ADAM YEDIDIA |
| 7/19 | 16,266.67 | M07JL4127CQ442EW |
| | | BENE:ANDREA LINCOLN |
| 7/20 | 892.21 | M07KJ2902L452Q1N |
| | | BENE:CLARISSA WATANABE |
| 7/20 | 1,000.00 | M07KJ2900HT52Q0F |
| | | BENE:T'SHAE Y.D. COOPER |
| 7/20 | 2,108.94 | M07KJ2903ME4MY9Q |
| | | BENE:HANG ZHANG |
| 7/20 | 5,692.31 | M07KF2836FD51GWW |
| | | BENE:MAN KAI CHUI |
| 7/20 | 7,166.67 | M07KF28295Y4MM38 |
| | | BENE:PO MAN MARTIN PANG |
| 7/20 | 8,093.00 | M07KF2820NT5XEN5 |
| | | BENE:WEIYI XIA |
| 7/20 | 9,525.64 | M07KF2832A94MM53 |
| | | BENE:CHEUNG MAN HO |
| 7/20 | 10,166.67 | M07KF2827355XER8 |
| | | BENE:WILLIAM KAUFMAN |
| 7/20 | 10,177.42 | M07KF2823Q54MMZD |
| | | BENE:GIRISH BUDHRANI |
| 7/20 | 11,333.33 | M07KF2838I251GYH |
| | | BENE:BALAJI MUDALIYAR |
| 7/20 | 11,400.00 | M07KF2821NE5XENQ |
| | | BENE:HANG ZHANG |
| 7/20 | 15,366.67 | M07KF2806EZ4W9OT |
| | | BENE:CAROLINE ELLISON |
| 7/20 | 15,466.67 | M07KF2822P05XEOB |
| | | BENE:NATHANIEL PARKE |
| 7/20 | 15,766.67 | M07KF28262I4MM18 |
| | | BENE:OLIVER HAMILTON |
| 7/20 | 15,846.15 | M07KF2818IO5XELU |
| | | BENE:MALLIKA CHAWLA |
| 7/20 | 17,166.67 | M07KL4141HM5UDP0 |
| | | BENE:ADITYA BARADWAJ |
| 7/20 | 24,400.00 | M07KF2833BN4MM5U |
| | | BENE:SHUANG ZHANG |
| 7/21 | 8,233.33 | M07LG5742254ZJL9 |

 Silvergate

**FTX DIGITAL MARKETS LTD.**
**VERIDIAN CORP. CNTR,ASTORIA UNIT 27**
**WSTN DIST OF ISLND OF NEW PROVIDENC**
**NASSAU, BAHAMAS**
**BAHAMAS**

Page           3 of 3

Account Number:      ******2556
Date                 07/29/22

## Debits and Other Withdrawals

| Date | Amount | Activity Description |
|------|--------|----------------------|
|      |        | BENE:ROSS RHEINGANS-YOO |
| 7/21 | 11,700.00 | M07LG5743444T5LO |
|      |        | BENE:DIANA MA |
| 7/21 | 13,683.33 | M07LG57456G4T5MD |
|      |        | BENE:CHRISTIAN DRAPPI |
| 7/21 | 17,166.67 | M07LG5744555U7CS |
|      |        | BENE:TAO WU |
| 7/21 | 156,150.00 | M07LJ2035JI4UHQQ |
|      |        | BENE:GEORGE K LERNER |
| 7/28 | 24,504.54 | M07SJ1458IJ7U1F7 |
|      |        | BENE:DESIMONE CONSULTING ENGINEERING D |
| 7/28 | 51,090.00 | M07SG43117N77X4R |
|      |        | BENE:KENCLAIRE ELECTRICAL AGENCIES INC |

## Daily Balance Summary

| Date | Balance | Date | Balance | Date | Balance |
|------|---------|------|---------|------|---------|
| 7/05 | 13,565.84 | 7/13 | 133,174.57 | 7/20 | 375,755.54 |
| 7/06 | 513,565.84 | 7/18 | 131,074.57 | 7/21 | 168,822.21 |
| 7/12 | 135,174.57 | 7/19 | 41,857.89 | 7/28 | 93,227.67 |

MEMBER
F D I C

EQUAL HOUSING
L E N D E R

### *** IMPORTANT INFORMATION accounts for personal, household or consumer use only ***

#### IN CASE YOU SUSPECT ERRORS OR HAVE QUESTIONS ABOUT YOUR ELECTRONIC TRANSACTIONS:

Direct inquiries in writing to us at 4250 Executive Square Suite 300 La Jolla, CA 92037 and phone inquiries to our customer service number 800-595-5856 as soon as you can, if you think your statement or receipt is wrong or if you need more information about a transaction. We must hear from you no later than 60 days after the FIRST statement on which the error or problem appeared was sent to you. Include the following information:

1. Tell us your name and account number.
2. Describe the error or the transaction you are unsure about and explain as clearly as you can why you believe there is an error or why you need more information.
3. Tell us the dollar amount of the suspected error and the date it occurred.

If you notify us verbally, we may require you to send us your complaint or questions in writing within 10 business days. We will generally tell you the results of our investigation within 10 business days after we hear from you. If we need more time, however, we may take up to 45 days to investigate your complaint or question. If we determine that this is necessary, we will provisionally credit your account within 10 business days for the amount you think is in error, so you will have use of the money during the time it takes us to complete our investigation, if we ask you to put your complaint or question in writing and we do not receive it within 10 business days, we may not credit your account. If we determine there was no error, we will send you a written explanation within three business days after we complete our investigation. If the error involves a transaction processed on the Visa® network, your account will be provisionally credited within 5 business days from receipt of notification. You may ask for copies of the documents we used in our investigation.

If you are a new customer and the error or question concerns an electronic transaction that occurred within 30 days after the first deposit to the account was made, we will tell you the results of our investigation within 20 business days after we hear from you. If we need more time, we may take up to 90 days to investigate. In this case, we will credit your account within 20 business days for the amount you think is in error, so that you have use of the money during the time it takes us to complete our investigation.

***For further information regarding your account, please refer to our Deposit Account Agreement and Regulatory Disclosure ("DAARD").***

For any other inquiries concerning your accounts, direct your inquiries in writing to 4250 Executive Square Suite 300 La Jolla, Ca 92037 or phone inquiries to our customer service number 800-595-5856.

---

### *** IMPORTANT INFORMATION for Foreign Currency (FC) accounts only ***

**How to contact us:** You may contact our customer service team by phone at 844-371-3276 or FCAsupport@silvergate.com

**Deposit Account Agreement:** When you opened your account, you agreed to the terms of our Foreign Currency Deposit Account Agreement and applicable fee schedule, which may be amended from time to time. This agreement governs the terms of your deposit account and transactions with Silvergate. FDIC deposit insurance does not insure against loss in the value of your FC Account due to foreign currency fluctuations or any exchange controls Please refer to this agreement for further information about your account. Additional copies of this agreement may be obtained by contacting our customer service team via the contact methods listed above.

**Reporting errors or inquiries related to account transactions:**
You should contact us as soon as you can regarding any suspected errors or questions about a transaction. You may write to us at Silvergate Bank, 4250 Executive Square Suite 300 La Jolla, CA 92037 or email us at FCAsupport@silvergate.com. You must contact us not later than 14 days after the date of the FIRST statement containing the transaction(s) about which you are contacting us. We are not liable to you for disputed or unauthorized transactions, and you agree not to make a claim against us directly. Please include the following information in your written disputes:

1. Give us your name and FC account number.
2. Identify the dollar amount(s) of the transaction(s) you are inquiring about.
3. Explain as clearly as you can the nature of any error you believe may have occurred or why you need more information.

# EXHIBIT 6

 Silvergate

**FTX DIGITAL MARKETS LTD.**
**VERIDIAN CORP. CNTR,ASTORIA UNIT 27**
**WSTN DIST OF ISLND OF NEW PROVIDENC**
**NASSAU, BAHAMAS**
**BAHAMAS**

Page          1 of 4

Account Number:     ******2556
Date                08/31/22

## STATEMENT SUMMARY AS OF          08/31/22

| Account Name | Account Number | Balance |
|---|---|---|
| ACCOUNT ANALYSIS STANDARD | XXXXXX2556 | 55,160.34 |

| FTX DIGITAL MARKETS LTD. | ACCOUNT ANALYSIS STANDARD | ACCT | ******2556 |
|---|---|---|---|

### Summary of Activity Since Your Last Statement

|  |  |  |
|---|---|---|
| Beginning Balance | 8/01/22 | 93,227.67 |
| Deposits / Misc Credits | 3 | 7,800,000.00 |
| Withdrawals / Misc Debits | 47 | 7,838,067.33 |
| ** Ending Balance | 8/31/22 | 55,160.34 ** |
| Service Charge |  | 287,150.21 |

## Deposits and Other Credits

| Date | Amount | Activity Description |
|---|---|---|
| 8/05 | 500,000.00 | M085J48361W9GQ29 |
|  |  | ORIG:FTX TRADING LIMITED |
| 8/19 | 6,300,000.00 | M08JA4408PICMB02 |
|  |  | ORIG:FTX TRADING LIMITED |
| 8/23 | 1,000,000.00 | M08NG2937EGCBXYQ |
|  |  | ORIG:FTX TRADING LIMITED |

## Debits and Other Withdrawals

| Date | Amount | Activity Description |
|---|---|---|
| 8/03 | 5,167.54 | M083I4211MK688T8 |
|  |  | BENE:HANG ZHANG |
| 8/03 | 10,000.00 | M083I4114FQ61SCW |
|  |  | BENE:HANG ZHANG |
| 8/03 | 21,000.00 | M083K4414H867EAU |
|  |  | BENE:KENSINGTON MANAGEMENT COMPANY |
| 8/08 | 1,300.00 | M088D4226E7A0IH3 |
|  |  | BENE:DIANA MA |
| 8/08 | 68,598.23 | M088D41126XA3LR6 |
|  |  | BENE:DESIGN WITHIN REACH INC |
| 8/09 | 942.00 | M089G04448T9OX0G |
|  |  | BENE:WEST PUBLISHING CORPORATION |
| 8/10 | 492.10 | M08AH4412LUADRFA |
|  |  | BENE:CHEUNG YUK WUN |

 Silvergate

**FTX DIGITAL MARKETS LTD.**
**VERIDIAN CORP. CNTR,ASTORIA UNIT 27**
**WSTN DIST OF ISLND OF NEW PROVIDENC**
**NASSAU, BAHAMAS**
**BAHAMAS**

Page          2 of 4

Account Number:     ******2556
Date                08/31/22

## Debits and Other Withdrawals

| Date | Amount | Activity Description |
|------|--------|----------------------|
| 8/10 | 4,095.32 | M08AH45421B9CMMH |
|      |          | BENE:MALLIKA CHAWLA |
| 8/10 | 15,466.67 | M08AJ1913BD9U1K6 |
|      |           | BENE:NATHANIEL PARKE |
| 8/11 | 287,150.21 | ANALYSIS ACTIVITY |
| 8/12 | 4,812.50 | M08CJ22421N9VHBR |
|      |          | BENE:BRYCE MAGARRO |
| 8/19 | 25,200.00 | M08JC50574VCFXR4 |
|      |           | BENE:MILKEN JONATHAN |
| 8/19 | 6,274,800.00 | M08JD4756DXCCRXI |
|      |              | BENE:PT DATINDO INFONET PRIMA |
| 8/23 | 2,525.00 | M08NK1622O2CPSOD |
|      |          | BENE:BRYCE MAGARRO |
| 8/23 | 4,463.77 | M08NK3332EXCKN15 |
|      |          | BENE:ARMANI FERRANTE |
| 8/23 | 6,800.00 | M08NK4434BHCI6EM |
|      |          | BENE:ELIZABETH LEE |
| 8/23 | 8,233.33 | M08NK44336XCI6DX |
|      |          | BENE:ROSS RHEINGANS-YOO |
| 8/23 | 14,183.33 | M08NK53439GCDOWW |
|      |           | BENE:LEILA CLARKE |
| 8/23 | 15,766.67 | M08NK51307ECK5M3 |
|      |           | BENE:OLIVER HAMILTON |
| 8/23 | 17,166.67 | M08NK4840OQCWQNQ |
|      |           | BENE:TAO WU |
| 8/24 | 237.53 | M08OK0503J1CSOVJ |
|      |        | BENE:HANG ZHANG |
| 8/24 | 1,226.28 | M08OK2420NGBHAPF |
|      |          | BENE:BRUCE DOUGLAS VONCANNON |
| 8/24 | 1,569.62 | M08OK25130LBBU47 |
|      |          | BENE:PENTAGON, INC. |
| 8/24 | 5,692.31 | M08OK124006CTTRY |
|      |          | BENE:MAN KAI CHUI |
| 8/24 | 7,166.67 | M08OK151032B3IGC |
|      |          | BENE:PO MAN MARTIN PANG |
| 8/24 | 9,916.67 | M08O10751KGCQIT6 |
|      |          | BENE:CLARISSA WATANABE |
| 8/24 | 10,166.67 | M08O05418OZCWGM6 |
|      |           | BENE:WILLIAM KAUFMAN |
| 8/24 | 10,177.42 | M08O0565025CM2QQ |
|      |           | BENE:GIRISH BUDHRANI |
| 8/24 | 13,000.00 | M08O0523501CPQU8 |

PAGE OMITTED

PAGE OMITTED

PAGE OMITTED

# EXHIBIT 7

 Silvergate

**FTX DIGITAL MARKETS LTD.**
**VERIDIAN CORP. CNTR,ASTORIA UNIT 27**
**WSTN DIST OF ISLND OF NEW PROVIDENC**
**NASSAU, BAHAMAS**
**BAHAMAS**

Page          1 of 4

Account Number:      ******2556
Date                      09/30/22

## STATEMENT SUMMARY AS OF          09/30/22

| Account Name | Account Number | Balance |
|---|---|---|
| ACCOUNT ANALYSIS STANDARD | XXXXXX2556 | 2,718,509.77 |

| FTX DIGITAL MARKETS LTD. | ACCOUNT ANALYSIS STANDARD | ACCT | ******2556 |
|---|---|---|---|

### Summary of Activity Since Your Last Statement

| | | | |
|---|---|---|---|
| | Beginning Balance | 9/01/22 | 55,160.34 |
| | Deposits / Misc Credits | 2 | 6,100,000.00 |
| | Withdrawals / Misc Debits | 58 | 3,436,650.57 |
| ** | Ending Balance | 9/30/22 | 2,718,509.77 ** |
| | Service Charge | | 351,925.89 |

## Deposits and Other Credits

| Date | Amount | Activity Description |
|---|---|---|
| 9/06 | 1,000,000.00 | M096A51336DFZYHL |
| | | ORIG:FTX TRADING LIMITED |
| 9/09 | 5,100,000.00 | M099B485847G2UZ3 |
| | | ORIG:FTX TRADING LIMITED |

## Debits and Other Withdrawals

| Date | Amount | Activity Description |
|---|---|---|
| 9/01 | 6,858.97 | M091M15185DEQ196 |
| | | BENE:MAN HO CHEUNG |
| 9/01 | 12,000.00 | M091L4159BAEGZDC |
| | | BENE:EXLOG GLOBAL, LLC |
| 9/02 | 7,000.00 | M092G5630P7EB3YO |
| | | BENE:KENSINGTON MANAGEMENT COMPANY |
| 9/06 | 4,601.03 | M096F1641OXF0ZRP |
| | | BENE:ELIZABETH LEE |
| 9/08 | 27,420.00 | M098I5257JMFB5VC |
| | | BENE:BURGOPAK LIMITED |
| 9/08 | 149,400.00 | M098K12295EFN34O |
| | | BENE:EXP US SERVICES INC. |
| 9/09 | 15,000.00 | M099J063947F0GU2 |
| | | BENE:STEVENS AND COMPANY LLC |
| 9/09 | 75,000.00 | M099J0555CSFUCG5 |
| | | BENE:STEVENS AND COMPANY LLC |

 Silvergate

FTX DIGITAL MARKETS LTD.
VERIDIAN CORP. CNTR,ASTORIA UNIT 27
WSTN DIST OF ISLND OF NEW PROVIDENC
NASSAU, BAHAMAS
BAHAMAS

Page            2 of 4

Account Number:    ******2556
Date               09/30/22

## Debits and Other Withdrawals

| Date | Amount | Activity Description |
|------|--------|---------------------|
| 9/12 | 10,432.50 | M09CL31104GFEZNK |
|      |        | BENE:PHONEBOOTHS INC. |
| 9/13 | 331.95 | M09CL31477TFJEY5 |
|      |        | BENE:BALAJI VARADARAJU MUDALIYAR |
| 9/13 | 1,111.32 | M09DH05207VFPQEY |
|      |        | BENE:WEST PUBLISHING CORPORATION |
| 9/13 | 33,800.00 | M09DH045341FL673 |
|      |        | BENE:TRIPACTIONS, INC. |
| 9/13 | 39,052.00 | M09DF57124HF7NFS |
|      |        | BENE:THEATRE PROJECTS CONSULTANTS, INC |
| 9/13 | 250,000.00 | M09DF3827N7G0HRK |
|      |        | BENE:PLAN 17/B |
| 9/13 | 1,680,000.00 | M09DG24420LF2OSW |
|      |        | BENE:PT TRINITI INVESTAMA BERKAT |
| 9/13 | 351,925.89 | ANALYSIS ACTIVITY |
| 9/14 | 219.94 | M09EJ0045BHKPV1B |
|      |        | BENE:GIRISH BUDHRANI |
| 9/14 | 513.14 | M09EM0642LXJOU33 |
|      |        | BENE:MAN KAI CHUI |
| 9/14 | 1,000.00 | M09EF4804BTJFD38 |
|      |        | BENE:PRIME TRUST LLC |
| 9/14 | 1,057.26 | M09EJ0153MTJRHZ8 |
|      |        | BENE:QIANWEN WU |
| 9/14 | 2,403.62 | M09EM0726RPJS3FZ |
|      |        | BENE:PENTAGON, INC. |
| 9/14 | 3,666.09 | M09EM07552WKIASY |
|      |        | BENE:NING NICHOLAS TING |
| 9/16 | 72,726.25 | M09GK2247BRJWBIK |
|      |        | BENE:EXP US SERVICES INC |
| 9/19 | 5,500.00 | M09JI00590CL5G3A |
|      |        | BENE:CHUI MAN KAI |
| 9/19 | 6,800.00 | M09JH40443QLQIVJ |
|      |        | BENE:ELIZABETH LEE |
| 9/19 | 7,166.67 | M09JI014040LUEFP |
|      |        | BENE:PANG PO MAN MARTIN |
| 9/19 | 8,233.33 | M09JH5141C5LDDB6 |
|      |        | BENE:ROSS RHEINGANS-YOO |
| 9/19 | 9,916.67 | M09JH4146CEMYS3H |
|      |        | BENE:CLARISSA WATANABE |
| 9/19 | 10,166.67 | M09JH51008CM6FRS |
|      |        | BENE:WILLIAM KAUFMAN |
| 9/19 | 10,177.42 | M09JI0621Q6L4TQZ |

PAGE OMITTED

PAGE OMITTED

PAGE OMITTED

EXHIBIT 8



Fidelity Bank (Bahamas) Ltd.
51 Frederick St
P.O. Box CB-13139
Nassau, Bahamas
TIN# 22861

Statement Date    09/30/2022

FTX Digital Markets Ltd

P O Box N-7525
#27 Veridian Corporate Center
BS

Account Number ████0275    Starting Balance    $    65,320,568.15

| Date | Description | Cheque No. | Amount | Balance |
|------|-------------|------------|--------|---------|
| 9/01 | Outgoing Wire Transfer Fee | | -27.50 | 65,320,540.65 |
| 9/01 | Government Stamp Tax | | -0.40 | 65,320,540.25 |
| 9/01 | Inter-Bank Wire Transfer Fee | | -22.00 | 65,320,518.25 |
| 9/01 | Wt F/O Sean B Callender & Co | | -4,952,610.45 | 60,367,907.80 |
| 9/01 | Stamp Tax | | -0.40 | 60,367,907.40 |
| 9/02 | Stamp Tax | | -0.40 | 60,367,907.00 |
| 9/05 | Outgoing Wire Transfer Fee | | -27.50 | 60,367,879.50 |
| 9/05 | Government Stamp Tax | | -0.40 | 60,367,879.10 |
| 9/05 | Inter-Bank Wire Transfer Fee | | -22.00 | 60,367,857.10 |
| 9/05 | Wt F/O Iceberg Thermal Inc | | -15,060.65 | 60,352,796.45 |
| 9/06 | Stamp Tax | | -0.40 | 60,352,796.05 |
| 9/08 | Transfer To 10140150 Ftx Digital Markets | | -3,007,500.00 | 57,345,296.05 |
| 9/09 | Government Stamp Tax | | -4.00 | 57,345,292.05 |
| 9/09 | Outgoing Wire Transfer Fee | | -1,175.00 | 57,344,117.05 |
| 9/09 | Inter-Bank Wire Transfer Fee | | -220.00 | 57,343,897.05 |
| 9/09 | Transfer To 10140150 Ftx Digital Markets | | -2,010,000.00 | 55,333,897.05 |
| 9/09 | Stamp Tax | | -0.40 | 55,333,896.65 |
| 9/09 | Wire Transfer For Bonus Payments | | -4,877,668.00 | 50,456,228.65 |
| 9/12 | Stamp Tax | | -0.80 | 50,456,227.85 |
| 9/15 | Outgoing Wire Transfer Fee | | -1,230.00 | 50,454,997.85 |
| 9/15 | Government Stamp Tax | | -3.20 | 50,454,994.65 |
| 9/15 | Inter-Bank Wire Transfer Fee | | -176.00 | 50,454,818.65 |
| 9/15 | Internal Transfer Fee | | -11.00 | 50,454,807.65 |
| 9/15 | S1 2022 Bonus Payments | | -6,155,000.00 | 44,299,807.65 |
| 9/16 | Stamp Tax | | -0.40 | 44,299,807.25 |
| 9/16 | Transfer To 10140150 Ftx Digital Markets | | -2,010,000.00 | 42,289,807.25 |
| 9/20 | Ftx Payroll Sep 2022 | | -54,087.50 | 42,235,719.75 |
| 9/20 | Internal Transfer Fee Sep Payroll | | -66.00 | 42,235,653.75 |
| 9/20 | Stamp Tax | | -0.40 | 42,235,653.35 |
| 9/21 | Returned Wire 09/09/2022 | | 79,916.86 | 42,315,570.21 |
| 9/21 | W/T Man Kai | | -80,000.00 | 42,235,570.21 |
| 9/21 | Stamp Tax | | -0.40 | 42,235,569.81 |
| 9/22 | Stamp Tax | | -0.40 | 42,235,569.41 |
| 9/22 | Transfer To 10140150 Ftx Digital Markets | | -15,137,750.00 | 27,097,819.41 |
| 9/23 | Stamp Tax | | -0.40 | 27,097,819.01 |
| 9/27 | Incoming W/T Fee | | -16.50 | 27,097,802.51 |
| 9/27 | Apple Asia Limited | | 7,999.01 | 27,105,801.52 |
| 9/30 | Ck Maintenance Fee (Business) | | -11.00 | 27,105,790.52 |



PAGE OMITTED

# EXHIBIT 9

 Silvergate

FTX DIGITAL MARKETS LTD.
VERIDIAN CORP. CNTR,ASTORIA UNIT 27
WSTN DIST OF ISLND OF NEW PROVIDENC
NASSAU, BAHAMAS
BAHAMAS

Page          1 of 5

Account Number:      ******2556
Date                  10/31/22

## STATEMENT SUMMARY AS OF      10/31/22

| Account Name | Account Number | Balance |
|---|---|---|
| ACCOUNT ANALYSIS STANDARD | XXXXXX2556 | 1,151,313.55 |

| FTX DIGITAL MARKETS LTD. | ACCOUNT ANALYSIS STANDARD | ACCT | ******2556 |
|---|---|---|---|

### Summary of Activity Since Your Last Statement

| | | | |
|---|---|---|---|
| Beginning Balance | 10/01/22 | 2,718,509.77 | |
| Deposits / Misc Credits | | 5 | 156,598.76 |
| Withdrawals / Misc Debits | | 65 | 1,723,794.98 |
| ** Ending Balance | 10/31/22 | 1,151,313.55 ** | |
| Service Charge | | 347,494.82 | |

## Deposits and Other Credits

| Date | Amount | Activity Description |
|---|---|---|
| 10/04 | 46,967.00 | M0A4K5727PSNJBDQ |
| | | ORIG:BANK OF AMERICA, N.A. |
| 10/12 | 42,844.96 | M0ACI23122RPHW1D |
| | | ORIG:FTX DIGITAL MARKETS LTD. |
| 10/21 | 59,256.00 | M0ALK12298XRE0E0 |
| | | ORIG:BANCO BAC SAN JOSE |
| 10/26 | 7,052.74 | M0AQA1856JPT0H1I |
| | | ORIG:HSBC BANK USA - FDC TAX TEL |
| 10/27 | 478.06 | M0ARB42463XUQPG2 |
| | | ORIG:BANCO BAC SAN JOSE |

## Debits and Other Withdrawals

| Date | Amount | Activity Description |
|---|---|---|
| 10/04 | 74.01 | M0A4D5504PKNCDNT |
| | | BENE:HANG ZHANG |
| 10/04 | 264.05 | M0A4D3352BROR5C2 |
| | | BENE:ALTON H. STORY |
| 10/04 | 2,093.30 | M0A4H5821KNOUYQ1 |
| | | BENE:EMMA D'ALESSIO |
| 10/04 | 2,148.25 | M0A4D5609QHOBTOI |
| | | BENE:ROZALIE CZESANA |
| 10/04 | 7,000.00 | M0A4D5541NUO8DF5 |
| | | BENE:KENSINGTON MANAGEMENT COMPANY |

PAGE OMITTED

 Silvergate

FTX DIGITAL MARKETS LTD.
VERIDIAN CORP. CNTR,ASTORIA UNIT 27
WSTN DIST OF ISLND OF NEW PROVIDENC
NASSAU, BAHAMAS
BAHAMAS

Page         3 of 5

Account Number:     ******2556
Date                10/31/22

## Debits and Other Withdrawals

| Date | Amount | Activity Description |
|------|--------|----------------------|
|      |        | BENE:CHRISTIAN DRAPPI |
| 10/21 | 14,183.33 | M0ALC0104AFS54YT |
|      |        | BENE:LEILA CLARKE |
| 10/21 | 15,366.67 | M0ALC13365RSHMU9 |
|      |        | BENE:CAROLINE ELLISON |
| 10/21 | 15,766.67 | M0ALC12450WSCDD4 |
|      |        | BENE:ADITHYA GIRISH |
| 10/21 | 16,266.67 | M0ALB5145N2SQ5QF |
|      |        | BENE:ADAM YEDIDIA |
| 10/21 | 16,266.67 | M0ALB53133HSSXGR |
|      |        | BENE:ANDREA LINCOLN |
| 10/24 | 498.06 | M0AM4151702S13EE |
|      |        | BENE:GENSLER COSTA RICA, S.R.L. |
| 10/24 | 2,416.67 | M0AM41529BPR2Z5T |
|      |        | BENE:EGE MIHMANLI |
| 10/24 | 4,666.67 | M0AM415268PR2Z4N |
|      |        | BENE:ARMANI FERRANTE |
| 10/24 | 5,961.54 | M0AM4152038SRXFF |
|      |        | BENE:CHUI MAN KAI |
| 10/24 | 5,961.54 | M0AM415279KSRXIB |
|      |        | BENE:BIRAJ PAUDYAL |
| 10/24 | 6,966.67 | M0AM415213VR2Z2M |
|      |        | BENE:PANG PO MAN MARTIN |
| 10/24 | 8,233.33 | M0AM41513OKRGJZN |
|      |        | BENE:ROSS RHEINGANS-YOO |
| 10/24 | 9,877.42 | M0AM415235VSRXGF |
|      |        | BENE:GIRISH BUDHRANI |
| 10/24 | 10,166.67 | M0AM41512NYS13CZ |
|      |        | BENE:WILLIAM KAUFMAN |
| 10/24 | 10,500.00 | M0AM41515QAS13DY |
|      |        | BENE:YILING CHEN |
| 10/24 | 11,333.33 | M0AM415180QRGJ1D |
|      |        | BENE:BALAJI MUDALIYAR |
| 10/24 | 14,000.00 | M0AM415224WR2Z32 |
|      |        | BENE:HANG ZHANG |
| 10/24 | 14,916.67 | M0AM41528AMSRXIR |
|      |        | BENE:ROALIE CZESANA |
| 10/24 | 15,466.67 | M0AM41505RBRGJWW |
|      |        | BENE:NATHANIEL PARKE |
| 10/24 | 15,766.67 | M0AM41508KZS13BQ |
|      |        | BENE:OLIVER HAMILTON |
| 10/24 | 15,966.67 | M0AM41514PQRGJ07 |

PAGE OMITTED

PAGE OMITTED

PAGE OMITTED

EXHIBIT 10

For an overview of the semester, see here.

Given the overall economic environment, bonuses are likely to be moderately lower than last semester on average.  Still, despite the crash, this is the second strongest semester we've had.

**Do not talk about your bonus with anyone else.**  People usually regret doing so: it almost always makes *at least* one of the people feel bad.

Happy to chat about this!

**Feedback for the semester:**

Your role is obviously a unique one, and a hard one to evaluate.

For instance, you did a great job of jumping into the Alvea situation and pushing to get shit done.  As it turns out, that didn't end up working out, for a confusing set of reasons.

This makes evaluating the semester hard.  I don't pretend to have done a great job of it, and mostly think that there will be a lot more information over time.  Treat compensation this semester as a placeholder as much as anything else, information-wise.

What went well:

1) Bias towards action
2) Getting stuff done
3) Building out relationships
4) Learning a ton about bio
5) The work with Together/Ed

Feedback/things to improve on:

1) Thinking about what the highest EV things to do are
2) Potentially focusing on one or two super valuable things and trying to drive them to conclusion

More generally, there's a question of what the right setup is for you going forward.  Right now you're in a bit of no man's land; I'm managing you, the Future Fund wasn't the right fit, and it's not clear what the right entity/etc. is.

I've been trying to figure out the right home/setup for you and Latona, and my guess is that it's likely to be Guarding Against Pandemics:

1) It's a bio safety org that we fund
2) A lot of what you do is super useful for them
3) You have knowledge which is useful for them, and vice versa
4) Right now GAP is a bit too far/divorced from the on-the-ground bio stuff
5) Thematically, GAP is a great fit:
    a) It should ideally be helpful for GAP to be affiliated with Latona
    b) It should ideally be helpful for Latona to be affiliated with GAP
    c) It makes sense

I've talked with Gabe and Michael, who are excited for this as well.

So, this would mean:

a) You are "affiliated with" GAP
    i) Still figuring out what the right formal entity here is
b) Publicly, you would be "working with" or "partnering with" GAP
    i) We'll nail down actual language
c) You wouldn't be "part of the FTX Foundation", in the same way that GAP isn't, although they money comes from the same place
d) You would still be affiliated with me/FTX to the extent helpful
e) I would still be your primary manager
f) Nothing would change in terms of compensation structure

What are your thoughts on this?

**Bonus Information:**


Your bonus for the first half of 2022 is any linear combination of:

a) $650,000

Or

b) Both:
    i) 12,600 options on FTX Trading LTD, the parent company of FTX International
    ii) 268,000 options on West Real Shires, the parent company of FTX US

(E.g. you could take half of (a) and half of (b).)

On top of the above, you get another $650k of directed grants to any EA-driven cause if you want.

For more context on equity, see here.

EXHIBIT 11

| Name | $ Bonus | FTX Option | FTX US Options |
|------|--------:|-----------:|---------------:|
| Aaron Hawkins | 38,000 | 700 | 15,000 |
| Allen Clark | 12,000 | 200 | 5,000 |
| Collin Sheehan | 18,000 | 300 | 7,000 |
| Felix Okocha | 14,000 | 300 | 6,000 |
| Jacob Halter | 16,000 | 300 | 6,000 |
| Maria Shaikh | 140,000 | 2,500 | 54,000 |
| ShawnDea Dunzy | 14,000 | 300 | 6,000 |
| Sherwayne Allen | 16,000 | 300 | 6,000 |
| Karim Claros | 4,000 | 100 | 2,000 |
| Cheryl Chen | 30,000 | 900 | 6,000 |
| Elizabeth Lee | 69,000 | 2,000 | 14,000 |
| Dicky Hung | 52,000 | 1,500 | 11,000 |
| Cody Li | 52,000 | 1,500 | 11,000 |
| Tracy Hung | 21,000 | 600 | 4,000 |
| Adonis Fernander | 16,000 | 500 | 3,000 |
| Alexis Delancy | 32,000 | 900 | 6,000 |
| Chade Farrington | 37,000 | 1,100 | 7,000 |
| Delaney Ornelas | 46,000 | 900 | 19,000 |
| Fabrizio Cecchettini | 150,000 | 2,900 | 61,000 |
| Tristan Yver | 180,000 | 3,400 | 72,000 |
| Lynn Nguyen | 90,000 | 1,600 | 34,000 |
| Alfarida Mohammed | 190,000 | 3,700 | 77,000 |
| Morgan Eattock | 11,000 | 200 | 4,000 |
| Nate Clancy | 110,000 | 2,000 | 42,000 |
| Mikael Knaussen | 140,000 | 2,700 | 57,000 |
| Ivana Milicic | 100,000 | 1,900 | 40,000 |
| Kiernan Fitzsimmons | 130,000 | 2,500 | 53,000 |
| Stephanie Lennox | 59,000 | 1,100 | 24,000 |
| Andra North | 13,000 | 200 | 5,000 |
| Gonzalo Gutierrez Schoenmakers | 80,000 | 1,600 | 33,000 |
| Chase Branham | 80,000 | 1,500 | 31,000 |
| Sebastian Ramirez | 130,000 | 2,500 | 53,000 |
| Ryan Mendel | 25,000 | 500 | 10,000 |
| Savannah Alberty | 52,000 | 1,000 | 21,000 |
| Megan Mason | 31,000 | 600 | 13,000 |
| Luis Guinand McKinstry | 13,000 | 200 | 5,000 |
| Venu Palaparthi | 13,000 | 200 | 5,000 |
| Ryne Miller | 1,250,000 | 0 | 0 |
| Claire Zhang | 323,800 | 0 | 0 |
| Ashley Sturrup | 48,000 | 1,400 | 10,000 |
| Lavar Ferguson | 17,000 | 500 | 3,000 |
| Johnny Xu | 45,000 | 1,300 | 9,000 |
| Chloe Xu | 90,000 | 2,400 | 17,000 |
| Alex Zheng | 12,000 | 300 | 2,000 |

| | | | |
|---|---|---|---|
| Chris Chen | 140,000 | 4,100 | 29,000 |
| Jessica Xu | 6,000 | 200 | 1,000 |
| Nate Parke | 5,250,000 | 43,700 | 926,000 |
| Tony Qian | 2,100,000 | 0 | 0 |
| Lena Ngoy | 320,000 | 6,100 | 129,000 |
| Alice Zhou | 1,100,000 | 21,400 | 453,000 |
| Stephen Liu | 40,000 | 800 | 16,000 |
| Richard Chang | 850,000 | 16,500 | 350,000 |
| Terence Choo | 1,400,000 | 27,200 | 576,000 |
| John Wu | 800,000 | 0 | 0 |
| David Nyeste | 1,750,000 | 14,600 | 309,000 |
| Charlie Tsang | 1,000,000 | 19,400 | 412,000 |
| Ben Xie | 4,600,000 | 38,300 | 812,000 |
| Ashley Chao | 30,000 | 600 | 12,000 |
| Carlos Mahomar | 120,000 | 2,200 | 47,000 |
| Anton Chan | 130,000 | 2,400 | 51,000 |
| Ross Rheingans-Yoo | 330,000 | 6,300 | 134,000 |
| Emma Shi | 130,000 | 2,400 | 51,000 |
| Boris Wong | 45,000 | 900 | 19,000 |
| Gabrielle Gadi | 110,000 | 2,100 | 45,000 |
| Diana Ma | 100,000 | 1,800 | 39,000 |
| Ricky Sze | 18,000 | 400 | 7,000 |
| Willie Kaufman | 1,280,000 | 10,600 | 225,000 |
| Tao Wu | 700,000 | 5,800 | 124,000 |
| T'Shae Cooper | 250,000 | 4,900 | 103,000 |
| Alfred Culmer | 62,000 | 1,800 | 13,000 |
| Anthony Curtis | 42,000 | 1,200 | 8,000 |
| Brandon McPhee | 42,000 | 1,200 | 8,000 |
| Carlyle Chriswell | 62,000 | 1,800 | 13,000 |
| Jamal Smith | 110,000 | 3,000 | 21,000 |
| Khaija Russell | 11,000 | 300 | 2,000 |
| Kirby Fowler | 42,000 | 1,200 | 8,000 |
| Michael Bain | 42,000 | 1,200 | 8,000 |
| Gustavo Miguel | 161,034 | 0 | 0 |
| Charis Law | 62,000 | 1,800 | 13,000 |
| Sina Nader | 420,000 | 0 | 0 |
| Felix Cheung | 82,600 | 0 | 0 |
| Avi Dabir | 350,000 | 0 | 0 |
| Nathaniel Whittemore | 330,000 | 9,500 | 67,000 |
| Leo Williams | 49,000 | 1,400 | 10,000 |
| Indira Smith | 168,000 | 0 | 0 |
| William Evans | 11,200 | 0 | 0 |
| Freddie Lightbourne | 11,000 | 0 | 0 |
| Bert Scott | 26,600 | 0 | 0 |
| Ian Rosenfield | 49,000 | 1,000 | 20,000 |

PAGE OMITTED

PAGE OMITTED

PAGE OMITTED

PAGE OMITTED

PAGE OMITTED

PAGE OMITTED

PAGE OMITTED

PAGE OMITTED

# EXHIBIT 12

DocuSign Envelope ID: 2090F8B0-E0B3-4FD4-AAA5-3B96620B7E17

**ACTION BY WRITTEN CONSENT**
**OF THE BOARD OF DIRECTORS OF**
**WEST REALM SHIRES INC.**
(a Delaware corporation)


Pursuant to Section 141(f) of the Delaware General Corporation Law (the "***DGCL***"), the undersigned, being the sole member of the Board of Directors (the "***Board***") of West Realm Shires Inc., a Delaware corporation (the "***Company***"), hereby adopt and approve the following resolutions by unanimous written consent (this "***Consent***") without a meeting effective as of the date last executed below (unless otherwise noted in the resolutions).

1. **2020 EQUITY INCENTIVE PLAN POOL INCREASE**

    WHEREAS, it is in the best interests of the Company and its stockholders that the Company amend the Company's Amended and Restated 2020 Equity Incentive Plan (as amended, the "***Plan***") to increase the number of shares of the Company's Common Stock (the "***Common Stock***") reserved and available for issuance thereunder by 158,882,000 shares such that the number of shares available under the Plan shall be equal to 651,334,000 shares (the "***Plan Increase***").

    NOW, THEREFORE, BE IT RESOLVED, that, subject to the approval of the Company's stockholders within the next 12 months, the Plan Increase is hereby adopted and approved.

    RESOLVED FURTHER, that the Incentive Stock Option share issuance limit under the Plan is hereby increased from a total of 984,904,000 shares of Common Stock to 1,302,668,000 shares of Common Stock over the term of the Plan (subject to adjustment as provided in the Plan).

    RESOLVED FURTHER, that the officers of the Company, and each of them with full authority to act without the others are hereby authorized to submit the Plan to the stockholders of the Company for their approval.

2. **APPROVAL OF VALUATION**

DocuSign Envelope ID: 2090F8B0-E0B3-4FD4-AAA5-3D9C620B7E17

WHEREAS, the Board directed Redwood Valuation Partners, LLC (the "*Appraiser*"), together with the assistance of members of the Company's management and personnel, where such Appraiser has significant knowledge and experience or training in performing similar valuations, to prepare a written appraisal valuing the Common Stock as of January 18, 2022 (the "*Valuation Date*") for purposes of complying with Section 409A of the Internal Revenue Code of 1986, and the applicable regulations promulgated thereunder (such Section and regulations, collectively the "*Regulations*", and such valuation, dated January 31, 2022 the "*Valuation*").

WHEREAS, the Company has provided such Appraiser with all financial reports and other documents and materials requested by the Appraiser in order to complete the Valuation.

WHEREAS, the Board is aware that the Appraiser holds itself out to the public as an appraiser and performs appraisals on a regular basis in accordance with the Regulations and, because of the Appraiser's qualifications as described in the written report setting forth the Valuation, the Appraiser is qualified to make appraisals of the type of property that was valued in accordance with the Regulations.

WHEREAS, attached hereto as Exhibit A is the Valuation from the Appraiser, which each member of the Board has reviewed.

WHEREAS, the Board has considered and discussed the Valuation and its methodology, analysis and conclusion as well as the factors deemed relevant in valuing the Company's capital stock, including among other relevant factors, the value of the Company's tangible and intangible assets, the present value of the Company's projected future cash flows, the public trading prices and private sale prices for comparable companies, the Company's capital structure and liquidation model, applicable control premiums and discounts for lack of marketability, the preferences of the Company's preferred stock, the risks inherent in the development and expansion of the Company's product and service offerings, and other risks normally associated with operating a similarly situated business.

NOW, THEREFORE, BE IT RESOLVED, that the Board approves the Valuation and finds the analysis set forth therein and the conclusion reached regarding the valuation of the Company's Common Stock to be reasonable and in good-faith, and hereby determines that the fair market value of the Company's Common Stock as of the Valuation Date is $0.67 per share.

3. **DETERMINATION OF FAIR MARKET VALUE**

RESOLVED, that the Board hereby determines that no "significant event" (as such term is defined in the Regulations) has occurred since the Valuation Date and that the conclusions reached in the Valuation regarding the valuation of the Common Stock are reasonable and have been made in good faith.

RESOLVED FURTHER, that, after reviewing all information available to it, including the Valuation, the early stage of the Company's products and services, the current and budgeted short-term cash position of the Company, the aggregate liquidation preference of the Company's outstanding preferred stock, and the aggregate outstanding

DocuSign Envelope ID: 2090F8B0-E0B3-4FD4-AAA5-3D9C620B7E17

indebtedness of the Company, the Board hereby determines that the current fair market value of the Common Stock is $0.67 per share (the "***Fair Market Value***").

4.  **APPROVAL OF GRANT OF STOCK OPTIONS**

WHEREAS, the Board deems it appropriate at this time to grant stock options to certain of the Company's employees, consultants, directors, and advisors pursuant to the terms and subject to the conditions of the Plan.

NOW, THEREFORE, BE IT RESOLVED, that each of the individuals listed on Exhibit B attached hereto are to be granted a stock option under the Plan to acquire up to that number of shares of Common Stock indicated next to such individual's name on Exhibit B, each such stock option to have a per share exercise price equal to the Fair Market Value, to have a maximum term of 10 years measured from the Grant Date (as defined below), subject to earlier termination following the cessation of such individual's service to the Company, and to vest as set forth on Exhibit B.

RESOLVED FUTHER, that the grant date for each such stock option shall be deemed to be the effective date of this Consent (the "***Grant Date***").

RESOLVED FURTHER, that the Company's officers, or any of them, are hereby authorized and directed to execute in the name and on behalf of the Company a Notice of Stock Option Grant and Stock Option Agreement with each of the individuals to whom a stock option has been granted pursuant to the foregoing resolutions evidencing such option, with the terms set forth in these resolutions and in a form approved by such officer.

RESOLVED FURTHER, that the forms of Notice of Option Grant and Non-Immediately Exercisable Option Agreement (US), Non-Immediately Exercisable Exercise Agreement (US), Notice of Option Grant and Non-Immediately Exercisable Option Agreement (Non-US), and Non-Immediately Exercisable Exercise Agreement (Non-US), attached hereto as Exhibit X, respectively, are hereby approved and adopted, with any such changes thereto as the Company's officers and legal counsel may deem necessary or advisable, including with respect to non-U.S. terms.

RESOLVED FURTHER, that so long as the participant remains employed by the Company or continues to provide services to the Company, each equity award granted shall become vested and, if applicable, exercisable as indicated in the column entitled "Vesting Schedule" as set forth on Exhibit B attached hereto.

RESOLVED FURTHER, that the shares purchased under each option hereby granted shall be subject to the Company's right of first refusal, exercisable in the event that the optionee should decide to sell or otherwise transfer any of the shares purchased under such option prior to the initial public offering of the Common Stock.

RESOLVED FURTHER, that the Company's officers, or any of them, are hereby authorized and directed to take all action and to prepare, execute and deliver all documents that such officer deems necessary or advisable to carry out the intent of these resolutions and evidence the option grants made hereby, including, without limitation, and, at the time each such option is exercised, the appropriate stock certificates

evidencing the purchased Common Stock and any documentation necessary to effect the Company's repurchase rights with respect to such shares.

RESOLVED FURTHER, that any actions taken by the Company's officers prior to the date of the foregoing resolutions that are within the authority conferred thereby are hereby ratified, confirmed and approved as the acts and deeds of the Company.

5. **APPROVAL OF RESTRICTED STOCK AWARDS**

**WHEREAS**, it is in the best interests of the Company and its stockholders to motivate certain employees, advisors and/or consultants listed on Exhibit D attached hereto in the performance of their duties by further compensating these individuals with an opportunity to purchase Common Stock (the "*Restricted Stock Awards*").

**NOW, THEREFORE, BE IT RESOLVED**, that upon receipt of (a) lawful and adequate consideration, payable in cash, and (b) an executed Restricted Stock Purchase Agreement from each purchaser in substantially the form attached hereto as Exhibit C (the "*Restricted Stock Agreement*"), the terms and provisions of which are hereby approved, the Company shall offer for sale, sell and issue to the persons listed on Exhibit D attached hereto the number of shares of Common Stock as set forth beside their respective names on Exhibit D attached hereto (the "*Shares*").

RESOLVED FURTHER, that the Shares shall be issued pursuant to the Plan.

**RESOLVED FURTHER**, that the officers of the Company are hereby authorized to cause the Company to offer, sell and issue the Shares to the persons named on Exhibit D attached hereto.

**RESOLVED FURTHER**, that the purchase price of the Shares is $2.285 per share.

**RESOLVED FURTHER**, that the Restricted Stock Awards will be issued in exchange for lawful and adequate consideration as indicated in the column entitled "*Form of Payment*" as set forth on Exhibit D.

**RESOLVED FURTHER**, that the Shares shall be issued pursuant to the Restricted Stock Agreement, which provides for, among other things, the Company to have the right to repurchase then-unvested shares subject to the Restricted Stock Awards (the "*Right of Repurchase*").

**RESOLVED FURTHER**, that the Right of Repurchase will lapse, and the shares subject to the Restricted Stock Awards will vest, in accordance with the vesting schedules as specified on Exhibit D attached hereto and as set forth in each recipient's Restricted Stock Agreement.

**RESOLVED FURTHER**, that the officers of the Company, and each of them with full authority to act without the others, are hereby authorized to execute any and all documents necessary to permit the Company to lawfully offer, sell and issue the Shares to such persons pursuant to the Plan and cause the proper notices and other forms (including consents to service of process) as may be required or advisable to be filed with any applicable securities law regulatory authorities to exempt the offer and sale of

stock authorized hereby, to be prepared, executed by an officer of the Company and filed with the U.S. Securities and Exchange Commission, the California Commissioner of Corporations and any other securities law regulatory authorities as may be applicable, within the time prescribed by law.

**RESOLVED FURTHER**, that upon receipt of a fully executed Restricted Stock Agreement and the full consideration for such shares from a purchaser named in the table above, the Company shall issue to such purchaser the number of shares of Common Stock set forth opposite such purchaser's name, represented by a certificate or certificates properly legended as required by law.

6. **RATIFICATION**

RESOLVED, that the Board hereby ratifies, confirms, approves and adopts all actions previously taken by officers or directors of the Company that are approved by the foregoing resolutions.

7. **ENABLING RESOLUTION**

RESOLVED, that the officers of the Company, and each of them with full authority to act without the others, are authorized to do or cause to be done any and all such further acts and to execute and deliver any and all such additional documents as such officer may deem necessary or appropriate in order to carry into effect the purposes and intent of the foregoing resolutions.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

DocuSign Envelope ID: 2090F8B0-E0B3-4FD4-9AAE-3D9C620B7E17

Any copy, facsimile, .PDF, electronic signature or other reliable reproduction of this action may be substituted or used in lieu of the original writing for any and all purposes for which the original writing could be used.  This action is effective and the resolutions herein are adopted as of the date first set forth above (unless otherwise noted in the resolutions).

Date: _____    10/4/2022

_____

Samuel Bankman-Fried, Director

**Attachments:**

Exhibit A:    Valuation

Exhibit B:    Option Grants

Exhibit C:    Restricted Stock Agreement

Exhibit D:    Restricted Stock Awards

Exhibit X:    Option Grant Documentation

[SIGNATURE PAGE TO WEST REALM SHIRES INC. WRITTEN CONSENT OF THE BOARD OF DIRECTORS]

## __EXHIBIT A__

### Valuation

(Attached)

## EXHIBIT B

## Option Grants

All of the option grants set forth below shall be non-immediately exercisable nonqualified stock options.

| Name | Number of Shares | Vesting Schedule | Vesting Commencement Date |
|---|---|---|---|
| *2022 S1 Grants* | | | |
| Aaron Hawkins | 15,000 | A | Grant Date |
| Allen Clark | 5,000 | A | Grant Date |
| Collin Sheehan | 7,000 | A | Grant Date |
| Felix Okocha | 6,000 | A | Grant Date |
| Jacob Halter | 6,000 | A | Grant Date |
| Maria Shaikh | 54,000 | A | Grant Date |
| ShawnDea Dunzy | 6,000 | A | Grant Date |
| Sherwayne Allen | 6,000 | A | Grant Date |
| Karim Claros | 2,000 | A | Grant Date |
| Cheryl Chen | 6,000 | A | Grant Date |
| Elizabeth Lee | 14,000 | A | Grant Date |
| Dicky Hung | 11,000 | A | Grant Date |
| Cody Li | 11,000 | A | Grant Date |
| Tracy Hung | 4,000 | A | Grant Date |
| Adonis Fernander | 3,000 | A | Grant Date |
| Alexis Delancy | 6,000 | A | Grant Date |
| Chade Farrington | 7,000 | A | Grant Date |
| Delaney Ornelas | 19,000 | A | Grant Date |
| Fabrizio Cecchettini | 61,000 | A | Grant Date |
| Alfarida Mohammed | 77,000 | A | Grant Date |
| Morgan Eattock | 4,000 | A | Grant Date |
| Nate Clancy | 42,000 | A | Grant Date |
| Mikael Knaussen | 57,000 | A | Grant Date |
| Ivana Milicic | 40,000 | A | Grant Date |
| Kiernan Fitzsimmons | 53,000 | A | Grant Date |
| Stephanie Lennox | 24,000 | A | Grant Date |
| Andra North | 5,000 | A | Grant Date |
| Gonzalo Gutierrez Schoenmakers | 33,000 | A | Grant Date |
| Chase Branham | 31,000 | A | Grant Date |
| Sebastian Ramirez | 53,000 | A | Grant Date |
| Ryan Mendel | 10,000 | A | Grant Date |
| Savannah Alberty | 21,000 | A | Grant Date |
| Megan Mason | 13,000 | A | Grant Date |
| Luis Guinand McKinstry | 5,000 | A | Grant Date |
| Venu Palaparthi | 5,000 | A | Grant Date |
| Ashley Sturrup | 10,000 | A | Grant Date |
| Lavar Ferguson | 3,000 | A | Grant Date |
| Johnny Xu | 9,000 | A | Grant Date |

| Name | Number of Shares | Vesting Schedule | Vesting Commencement Date |
|---|---|---|---|
| Chloe Xu | 17,000 | A | Grant Date |
| Alex Zheng | 2,000 | A | Grant Date |
| Chris Chen | 29,000 | A | Grant Date |
| Jessica Xu | 1,000 | A | Grant Date |
| Nate Parke | 926,000 | A | Grant Date |
| Lena Ngoy | 129,000 | A | Grant Date |
| Alice Zhou | 453,000 | A | Grant Date |
| Stephen Liu | 16,000 | A | Grant Date |
| Richard Chang | 350,000 | A | Grant Date |
| Terence Choo | 576,000 | A | Grant Date |
| David Nyeste | 309,000 | A | Grant Date |
| Charlie Tsang | 412,000 | A | Grant Date |
| Ben Xie | 812,000 | A | Grant Date |
| Ashley Chao | 12,000 | A | Grant Date |
| Carlos Mahomar | 47,000 | A | Grant Date |
| Anton Chan | 51,000 | A | Grant Date |
| Ross Rheingans-Yoo | 134,000 | A | Grant Date |
| Emma Shi | 51,000 | A | Grant Date |
| Boris Wong | 19,000 | A | Grant Date |
| Gabrielle Gadi | 45,000 | A | Grant Date |
| Diana Ma | 39,000 | A | Grant Date |
| Ricky Sze | 7,000 | A | Grant Date |
| Willie Kaufman | 225,000 | A | Grant Date |
| Tao Wu | 124,000 | A | Grant Date |
| T'Shae Cooper | 103,000 | A | Grant Date |
| Alfred Culmer | 13,000 | A | Grant Date |
| Anthony Curtis | 8,000 | A | Grant Date |
| Brandon McPhee | 8,000 | A | Grant Date |
| Carlyle Chriswell | 13,000 | A | Grant Date |
| Jamal Smith | 21,000 | A | Grant Date |
| Khaija Russell | 2,000 | A | Grant Date |
| Kirby Fowler | 8,000 | A | Grant Date |
| Michael Bain | 8,000 | A | Grant Date |
| Charis Law | 13,000 | A | Grant Date |
| Nathaniel Whittemore | 67,000 | A | Grant Date |
| Lionel Williams | 10,000 | A | Grant Date |
| Ian Rosenfield | 20,000 | A | Grant Date |
| Alfia White | 20,000 | A | Grant Date |
| Jessica Ferguson Murray | 10,000 | A | Grant Date |
| Valdez Russell | 26,000 | A | Grant Date |
| Ceri Howells | 50,000 | A | Grant Date |
| Darnell Davis | 10,000 | A | Grant Date |
| Torez Hanna | 3,000 | A | Grant Date |
| Zoe Gibson | 3,000 | A | Grant Date |

PAGE OMITTED

PAGE OMITTED

PAGE OMITTED

PAGE OMITTED

PAGE OMITTED

PAGE OMITTED

DocuSign Envelope ID: 2090F8B0-E0B3-4FD4-8AAE-3D9C620B7E17

**Vesting Legends**

Vesting Schedule A:    Vesting over four (4) years, subject to continued service at each vesting event. 1/4th of the shares underlying the stock option shall vest on the one-year anniversary of the Vesting Commencement Date and 1/36th of the remainder shall vest on each subsequent monthly anniversary thereof.

Vesting Schedule B:    Vesting over six (6) years, subject to continued service at each vesting event. 1/3rd of the shares underlying the stock option shall vest on the two-year anniversary of the Vesting Commencement Date and 1/4th of the remainder shall vest on each subsequent annual anniversary thereof.

Vesting Schedule C:    Fully vested at the time of grant.

PAGE OMITTED

PAGE OMITTED

PAGE OMITTED

PAGE OMITTED

# EXHIBIT 13

**ACTION BY UNANIMOUS WRITTEN CONSENT**
**OF THE BOARD OF DIRECTORS OF**
**FTX TRADING LTD.**

The undersigned, being all the members of the Board of Directors (the "*Board*") of FTX Trading Ltd., a company established under the laws of Antigua and Barbuda (the "*Corporation*"), acting without a meeting, hereby adopt the following corporate resolutions and hereby consent to the taking of the actions set forth therein.

1. **APPROVAL OF VALUATION**

WHEREAS, the Board directed Redwood Valuation Partners, LLC (the "*Appraiser*"), together with the assistance of members of the Corporation's management and personnel, where such Appraiser has significant knowledge and experience or training in performing similar valuations, to prepare a written appraisal valuing the Corporation's Common Stock (the "*Common Stock*") as of January 18, 2022 (the "*Valuation Date*") for purposes of complying with Section 409A of the Internal Revenue Code of 1986, and the applicable regulations promulgated thereunder (such Section and regulations, collectively the "*Regulations*", and such valuation, dated January 31, 2022, the "*Valuation*").

WHEREAS, the Corporation has provided such Appraiser with all financial reports and other documents and materials requested by the Appraiser in order to complete the Valuation.

WHEREAS, the Board is aware that the Appraiser holds itself out to the public as an appraiser and performs appraisals on a regular basis in accordance with the Regulations and, because of the Appraiser's qualifications as described in the written report setting forth the Valuation, the Appraiser is qualified to make appraisals of the type of property that was valued in accordance with the Regulations.

WHEREAS, attached hereto as <u>Exhibit A</u> is the Valuation from the Appraiser, which each member of the Board has reviewed.

WHEREAS, the Board has considered and discussed the Valuation and its methodology, analysis and conclusion as well as the factors deemed relevant in valuing the Corporation's capital stock, including among other relevant factors, the value of the Corporation's tangible and intangible assets, the present value of the Corporation's projected future cash flows, the public trading prices and private sale prices for comparable companies, the Corporation's capital structure and liquidation model, applicable control premiums and discounts for lack of marketability, the preferences of the Corporation's preferred stock, the risks inherent in the development and expansion of the Corporation's product and service offerings, and other risks normally associated with operating a similarly situated business.

NOW, THEREFORE, BE IT RESOLVED, that the Board approves the Valuation and finds the analysis set forth therein and the conclusion reached regarding the valuation of the Corporation's Common Stock to be reasonable and in good-faith, and hereby

determines that the fair market value of the Corporation's Common Stock as of the Valuation Date is $14.05 per share.

**2. DETERMINATION OF FAIR MARKET VALUE**

RESOLVED, that the Board hereby determines that no "significant event" (as such term is defined in the Regulations) has occurred since the Valuation Date and that the conclusions reached in the Valuation regarding the valuation of the Common Stock are reasonable and have been made in good faith.

RESOLVED FURTHER, that, after reviewing all information available to it, including the Valuation, the early stage of the Corporation's products and services, the current and budgeted short-term cash position of the Corporation, the aggregate liquidation preference of the Corporation's outstanding preferred stock, and the aggregate outstanding indebtedness of the Corporation, the Board hereby determines that the current fair market value of the Common Stock is $14.05 per share (the "***Fair Market Value***").

**3. APPROVAL OF GRANT OF STOCK OPTIONS**

WHEREAS, the Board deems it appropriate at this time to grant stock options to certain of the Corporation's employees, consultants, directors, and advisors pursuant to the terms and subject to the conditions of the Corporation's 2020 Equity Incentive Plan (U.S.) (the "***US Plan***") and 2020 Equity Incentive Plan (Non-U.S.) (the "***Non-US Plan***" and collectively, the "***Plans***").

NOW, THEREFORE, BE IT RESOLVED, that each of the individuals listed on Exhibit B attached hereto are to be granted a stock option under the Plan indicated on Exhibit B to acquire up to that number of shares of Common Stock indicated next to such individual's name on Exhibit B, each such stock option to have a per share exercise price equal to the Fair Market Value, to have a maximum term of 10 years measured from the Grant Date (as defined below), subject to earlier termination following the cessation of such individual's service to the Corporation, and to vest as set forth on Exhibit B.

RESOLVED FURTHER, that the Corporation's officers, or any of them, are hereby authorized and directed to execute in the name and on behalf of the Corporation a Notice of Stock Option Grant and Stock Option Agreement with each of the individuals to whom a stock option has been granted pursuant to the foregoing resolutions evidencing such option, with the terms set forth in these resolutions and in a form approved by such officer.

RESOLVED FURTHER, that so long as the participant remains employed by the Corporation or continues to provide services to the Corporation, each equity award granted shall become vested and, if applicable, exercisable as indicated in the column entitled "Vesting Schedule" as set forth on Exhibit B attached hereto.

RESOLVED FURTHER, that the grant date for each such option granted pursuant to these resolutions be deemed to be the later of (i) effective date of this Consent and (ii) in the case of consultants, the date that each applicable participant executes a consulting agreement with the Corporation (the "***Grant Date***").

RESOLVED FURTHER, that the shares purchased under each option hereby granted shall be subject to the Corporation's right of first refusal, exercisable in the event that the optionee should decide to sell or otherwise transfer any of the shares purchased under such option prior to the initial public offering of the Common Stock.

RESOLVED FURTHER, that the Corporation's officers, or any of them, are hereby authorized and directed to take all action and to prepare, execute and deliver all documents that such officer deems necessary or advisable to carry out the intent of these resolutions and evidence the option grants made hereby, including, without limitation, and, at the time each such option is exercised, the appropriate stock certificates evidencing the purchased Common Stock and any documentation necessary to effect the Corporation's repurchase rights with respect to such shares.

RESOLVED FURTHER, that any actions taken by the Corporation's officers prior to the date of the foregoing resolutions that are within the authority conferred thereby are hereby ratified, confirmed and approved as the acts and deeds of the Corporation.

## 4. **APPROVAL OF RESTRICTED STOCK AWARDS**

**WHEREAS**, it is in the best interests of the Corporation and its stockholders to motivate certain employees, advisors and/or consultants listed on Exhibit C attached hereto in the performance of their duties by further compensating these individuals with an opportunity to purchase Common Stock (the "*Restricted Stock Awards*").

**NOW, THEREFORE, BE IT RESOLVED**, that upon receipt of (a) lawful and adequate consideration, payable in cash, and (b) an executed Restricted Stock Purchase Agreement from each purchaser in substantially the form previously approved by the Board (the "*Restricted Stock Agreement*"), the terms and provisions of which are hereby approved, the Corporation shall offer for sale, sell and issue to the persons listed on Exhibit C attached hereto the number of shares of Common Stock as set forth beside their respective names on Exhibit B attached hereto (the "*Shares*").

**RESOLVED FURTHER**, that the Shares shall be issued pursuant to the Plans.

**RESOLVED FURTHER**, that the officers of the Corporation are hereby authorized to cause the Corporation to offer, sell and issue the Shares to the persons named on Exhibit B attached hereto.

**RESOLVED FURTHER**, that the purchase price of the Shares is $46.3518 per share.

**RESOLVED FURTHER**, that the Shares shall be issued pursuant to the Restricted Stock Agreement, which provides for, among other things, the Corporation to have the right to repurchase then-unvested shares subject to the Restricted Stock Awards (the "*Right of Repurchase*").

**RESOLVED FURTHER**, that the Right of Repurchase will lapse, and the shares subject to the Restricted Stock Awards will vest, in accordance with the vesting schedules as specified on Exhibit C attached hereto and as set forth in each recipient's Restricted Stock Agreement.

DocuSign Envelope ID: 5B9C60CA-DB2D-45CA-A516-23DB7F8C10E5

**RESOLVED FURTHER**, that the officers of the Corporation, and each of them with full authority to act without the others, are hereby authorized to execute any and all documents necessary to permit the Corporation to lawfully offer, sell and issue the Shares to such persons pursuant to the Plans and cause the proper notices and other forms (including consents to service of process) as may be required or advisable to be filed with any applicable securities law regulatory authorities to exempt the offer and sale of stock authorized hereby, to be prepared, executed by an officer of the Corporation and filed with the U.S. Securities and Exchange Commission, the California Commissioner of Corporations and any other securities law regulatory authorities as may be applicable, within the time prescribed by law.

**RESOLVED FURTHER**, that upon receipt of a fully executed Restricted Stock Agreement and the full consideration for such shares from a purchaser named in the table above, the Corporation shall issue to such purchaser the number of shares of Common Stock set forth opposite such purchaser's name, represented by a certificate or certificates properly legended as required by law.

5.  <u>RATIFICATION</u>

RESOLVED, that the Board hereby ratifies, confirms, approves and adopts all actions previously taken by officers or directors of the Corporation that are approved by the foregoing resolutions.

6.  <u>ENABLING RESOLUTION</u>

RESOLVED, that the officers of the Corporation, and each of them with full authority to act without the others, are authorized to do or cause to be done any and all such further acts and to execute and deliver any and all such additional documents as such officer may deem necessary or appropriate in order to carry into effect the purposes and intent of the foregoing resolutions.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

       This Consent may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original, and such counterparts shall together constitute one and the same document.  This Consent is effective, and the resolutions herein are adopted, as of the date last signed below.

Date: _____ 10/4/2022 _____

_____
Samuel Bankman-Fried, Director

Date: _____ 10/5/2022 _____

_____
Nishad Singh, Director

Date: _____

_____
Arthur Thomas, Director

**Attachments:**

Exhibit A:     Valuation

Exhibit B:     Option Grants

Exhibit C:     Restricted Stock Awards

This Consent may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original, and such counterparts shall together constitute one and the same document.  This Consent is effective, and the resolutions herein are adopted, as of the date last signed below.


Date: _____          _____
                                                  Samuel Bankman-Fried, Director


Date: _____          _____
                                                  Nishad Singh, Director

Date: *October 5, 2022*                            _____
                                                  Arthur Thomas, Director


**Attachments:**

Exhibit A:       Valuation

Exhibit B:       Option Grants

Exhibit C:       Restricted Stock Awards

DocuSign Envelope ID: 5B9C60CA-DB2D-45CA-A516-835B7F8C10E5

## EXHIBIT A

### Valuation

(Attached)

DocuSign Envelope ID: 5B9C60CA-DB2D-45CA-A516-93DB7F8C10E5

## EXHIBIT B

### Option Grants

All of the option grants set forth below shall be non-immediately exercisable nonqualified stock options.

DocuSign Envelope ID: 5B9C60CA-DD2D-45CA-A519-83B7F0C10E5

| Name | Number of Shares | Vesting Schedule | VCD | Plan |
|---|---|---|---|---|
| *2022 S1 Grants* | | | | |
| Aaron Hawkins | 700 | A | Grant Date | US |
| Allen Clark | 200 | A | Grant Date | US |
| Collin Sheehan | 300 | A | Grant Date | US |
| Felix Okocha | 300 | A | Grant Date | US |
| Jacob Halter | 300 | A | Grant Date | US |
| Maria Shaikh | 2,500 | A | Grant Date | US |
| ShawnDea Dunzy | 300 | A | Grant Date | US |
| Sherwayne Allen | 300 | A | Grant Date | US |
| Karim Claros | 100 | A | Grant Date | US |
| Cheryl Chen | 900 | A | Grant Date | Non-US |
| Elizabeth Lee | 2,000 | A | Grant Date | Non-US |
| Dicky Hung | 1,500 | A | Grant Date | Non-US |
| Cody Li | 1,500 | A | Grant Date | Non-US |
| Tracy Hung | 600 | A | Grant Date | Non-US |
| Adonis Fernander | 500 | A | Grant Date | Non-US |
| Alexis Delancy | 900 | A | Grant Date | Non-US |
| Chade Farrington | 1,100 | A | Grant Date | Non-US |
| Delaney Ornelas | 900 | A | Grant Date | US |
| Fabrizio Cecchettini | 2,900 | A | Grant Date | US |
| Alfarida Mohammed | 3,700 | A | Grant Date | US |
| Morgan Eattock | 200 | A | Grant Date | US |
| Nate Clancy | 2,000 | A | Grant Date | US |
| Mikael Keussen | 2,700 | A | Grant Date | US |
| Ivana Milicic | 1,900 | A | Grant Date | Non-US |
| Kiernan Fitzsimmons | 2,500 | A | Grant Date | US |
| Stephanie Lennox | 1,100 | A | Grant Date | US |
| Andra North | 200 | A | Grant Date | US |
| Gonzalo Gutierrez Schoenmakers | 1,600 | A | Grant Date | US |
| Chase Branham | 1,500 | A | Grant Date | US |
| Sebastian Ramirez | 2,500 | A | Grant Date | US |
| Ryan Mendel | 500 | A | Grant Date | US |
| Savannah Alberty | 1,000 | A | Grant Date | US |
| Megan Mason | 600 | A | Grant Date | US |
| Luis Guinand McKinstry | 200 | A | Grant Date | US |
| Venu Palaparthi | 200 | A | Grant Date | US |
| Ashley Sturrup | 1,400 | A | Grant Date | Non-US |
| Lavar Ferguson | 500 | A | Grant Date | Non-US |
| Johnny Xu | 1,300 | A | Grant Date | Non-US |
| Chloe Xu | 2,400 | A | Grant Date | Non-US |
| Alex Zheng | 300 | A | Grant Date | Non-US |

| Name | Number of Shares | Vesting Schedule | VCD | Plan |
|---|---|---|---|---|
| Chris Chen | 4,100 | A | Grant Date | Non-US |
| Jessica Xu | 200 | A | Grant Date | Non-US |
| Nate Parke | 43,700 | A | Grant Date | US |
| Lena Ngoy | 6,100 | A | Grant Date | US |
| Alice Zhou | 21,400 | A | Grant Date | Non-US |
| Stephen Liu | 800 | A | Grant Date | Non-US |
| Richard Chang | 16,500 | A | Grant Date | US |
| Terence Choo | 27,200 | A | Grant Date | Non-US |
| David Nyeste | 14,600 | A | Grant Date | Non-US |
| Charlie Tsang | 19,400 | A | Grant Date | Non-US |
| Ben Xie | 38,300 | A | Grant Date | US |
| Ashley Chao | 600 | A | Grant Date | US |
| Carlos Mahomar | 2,200 | A | Grant Date | US |
| Anton Chan | 2,400 | A | Grant Date | Non-US |
| Ross Rheingans-Yoo | 6,300 | A | Grant Date | US |
| Emma Shi | 2,400 | A | Grant Date | Non-US |
| Boris Wong | 900 | A | Grant Date | Non-US |
| Gabrielle Gadi | 2,100 | A | Grant Date | Non-US |
| Diana Ma | 1,800 | A | Grant Date | Non-US |
| Ricky Sze | 400 | A | Grant Date | Non-US |
| Willie Kaufman | 10,600 | A | Grant Date | Non-US |
| Tao Wu | 5,800 | A | Grant Date | US |
| T'Shae Cooper | 4,900 | A | Grant Date | US |
| Alfred Culmer | 1,800 | A | Grant Date | Non-US |
| Anthony Curtis | 1,200 | A | Grant Date | Non-US |
| Brandon McPhee | 1,200 | A | Grant Date | Non-US |
| Carlyle Chriswell | 1,800 | A | Grant Date | Non-US |
| Jamal Smith | 3,000 | A | Grant Date | Non-US |
| Khaija Russell | 300 | A | Grant Date | Non-US |
| Kirby Fowler | 1,200 | A | Grant Date | Non-US |
| Michael Bain | 1,200 | A | Grant Date | Non-US |
| Charis Law | 1,800 | A | Grant Date | Non-US |
| Nathaniel Whittemore | 9,500 | A | Grant Date | US |
| Lionel Williams | 1,400 | A | Grant Date | US |
| Ian Rosenfield | 1,000 | A | Grant Date | US |
| Alfia White | 1,000 | A | Grant Date | US |
| Jessica Ferguson Murray | 1,400 | A | Grant Date | Non-US |
| Valdez Russell | 3,700 | A | Grant Date | Non-US |
| Ceri Howells | 7,100 | A | Grant Date | Non-US |
| Darnell Davis | 1,400 | A | Grant Date | Non-US |
| Torez Hanna | 500 | A | Grant Date | Non-US |
| Zoe Gibson | 500 | A | Grant Date | Non-US |

PAGE OMITTED

PAGE OMITTED

PAGE OMITTED

PAGE OMITTED

PAGE OMITTED

PAGE OMITTED

DocuSign Envelope ID: 5B9C69CA-DD2D-45CA-A519-935B7F0C10E5

| Name | Number of Shares | Vesting Schedule | VCD | Plan |
|---|---|---|---|---|
| | | | | |
| *New Hires* | | | | |
| Nayia Ziourti | 10,000 | A | 3/14/2022 | Non-US |
| Jack Shin | 6,874 | A | 10/1/2021 | Non-US |
| Leopold Aschenbrenner | 8,629 | A | 2/16/2022 | US |
| Ashley Sturrup | 500 | A | 1/3/2022 | Non-US |
| Seth Melamed | 28,000 | A | 4/4/2022 | US |
| T'Shae Cooper | 1,000 | A | 3/14/2022 | US |
| Tim Wilson | 100,000 | A | 8/8/2022 | US |
| Andy Fischer | 17,794 | A | 1/1/2022 | US |
| Martin Liebi | 10,000 | A | 7/1/2022 | Non-US |
| Avi Zenilman | 12,944 | A | 3/1/2022 | US |
| Venu Palaparthi | 10,787 | A | 5/23/2022 | US |
| Lauren Remington Platt | 7,500 | C | N/A | US |

**Vesting Schedule**

Vesting Schedule A:    Vesting over four (4) years, subject to continued service at each vesting event. 1/4th of the shares underlying the stock option shall vest on the one-year anniversary of the Vesting Commencement Date and 1/48th of the shares underlying the stock option shall vest on each subsequent monthly anniversary thereof.

Vesting Schedule B:    Vesting over six (6) years, subject to continued service at each vesting event. 1/3rd of the shares underlying the stock option shall vest on the two-year anniversary of the Vesting Commencement Date and 1/4th of the remainder shall vest on each subsequent annual anniversary thereof.

Vesting Schedule C:    Fully vested at the time of grant.

PAGE OMITTED

# EXHIBIT 14

| Name | Email | (full/part time) | location | Blockfolio | Alameda | entity | consolidated | Status | Team | |
|---|---|---|---|---|---|---|---|---|---|---|
| Aaron Hawkins | ███████████ | | FTX US-HQ | | | | FTX US-HQ | | Compliance | |
| Abaas Khorrami | abaas@ftx.us | | | | | | | | | |
| Adaa Jarso | ███████████ | FDM, | | | | | FDM, | | | |
| Adam Jacobs | adamjacobs@ftx.com | | | | | | | | | |
| Adam Jin | adam jin@ftx.com | FDM, | | | | | FDM, | resigned | ventures | |
| Adam Kalinich | | | Remote MA | | | | Remote MA | resigned | Engineering | |
| Adam Yedidia | | FDM, | | | | | FDM, | resigned | dev | |
| Adebayo Juwon | ███████████ | | | | | | | | | |
| Adithya Girish | | | | | Alameda | | Alameda | | Engineering | |
| Aditya Baradwaj | ███████████ | | | | Alameda | | Alameda | resigned | Engineering | |
| Adonis Fernander | a.fernander@ftxdigitalmarkets.com | FDM, 100% | | | | | FDM, 100% | | | |
| Adrienne During | adrienne@ftx.us | | NY Office | | | | NY Office | employed - active | NY Trust Co | |
| Aja Johnson | | | Remote CA | | | | Remote CA | | Good Luck Games | |
| Alan Bankman | | | Remote CA | | | | Remote CA | | FTX Foundation | |
| Alan Wong | alan.wong@ftx.com | | | | | | | | | |
| Alejandro Silva | | | | | | FTX Services Sol | FTX Services Solution | Active | CS | |
| Alex Miao | | | | | Alameda | | | resigned / terminated | Engineering | |
| Alex Walters | alex.w@ftx.com | | | | | FTX Services Sol | FTX Services Solution | Active | CS | |
| Alex Zheng | alex@ftx.com | | | | | | | | | |
| Alexa Dexter | ███████████ | | | | | | | | | |
| Alexis Hanna-Delancy | adelancy@ftxdigitalmarkets.com | FDM, 100% | | | | | FDM, 100% | active | | |
| Alexis Janson | alexis.janson@ftx.us | | Remote WA | | | | Remote WA | | Good Luck Games | |
| Alfarida Mohammed | ███████████ | | Chicago Office | | | | Chicago Office | | Compliance | |
| Alfia White | a.white@ftx.com | | | Blockfolio (100%) | | | Blockfolio (100%) | Active | Design Director | |
| Alfred Culmer | ███████████ | FDM, 100% | | | | | FDM, 100% | | logistics | |
| Alfred Xue | | | Remote NY | | | | Remote NY | resigned | Engineering | |
| Alian Fernandez | alian@ftx.us | | FTX US-HQ | | | | FTX US-HQ | | Payments | |
| Alice Liu | | | | | | | | resigned | | |
| Alice Y. Yiu | alice.yiu@ftx.com | | | | | Salameda | Salameda | Willing to be active, they wo | CS | |
| Alice Zhou | | | | | Alameda | | Alameda | resigned | #N/A | |
| Alison Chung | alison@ftx.com | | | | | | | | | |
| Allen Chen | ███████████ | | | | | | | | | |
| Allen Clark | allen.clark@ftx.us | | Chicago Office | | | | Chicago Office | | Compliance | |
| Allison Chen | ███████████ | | | | | | | | | |
| Allison Paul | | | | | Alameda | | | resigned / terminated | Trading | |
| Ally Xu | ███████████ | | | | | Salameda | Salameda | resigned | CS | |
| Alton Story | | | | | Alameda | | | active | Operations | |
| Alvin Knowles | | FDM, 100% | | | | | FDM, 100% | | | |
| Amy Wu | amy@ftx.com | | | | | | | resigned | ventures | |
| Andra North | ███████████ | | | | | | | | | |
| Andrea Lincoln | andrea@ftx.com | FDM, | | | | | FDM, | resigned | dev | |
| Andrew Croghan | | FDM, | | | | | FDM, | resigned | | |
| Andrew Franklin | | | Chicago Office | | | | Chicago Office | | Customer Support | |
| Andrew Hirschl | | | | | Alameda | | | resigned / terminated | Operations | |
| Andrew Li | | | | | Alameda | | | resigned / terminated | Engineering | |
| Andrew Parnell | parney@ftx.us | | Remote IN | | | | Remote IN | | Good Luck Games | |
| Andrew Rasch | andrew.rasch@ftx.us | | Remote NY | | | | Remote NY | | Good Luck Games | |
| Andy Croghan | | | | | Alameda | | | resigned / terminated | Operations | |

PAGE OMITTED

PAGE OMITTED

PAGE OMITTED

Page Omitted

PAGE OMITTED

P AGE O MITTED

| Name | Email | | | | | | Status | Department |
|---|---|---|---|---|---|---|---|---|
| Ramnik Arora | | FDM, | | | | FDM, | | ventures |
| Ramon Braynen | | FDM, 100% | | | | FDM, 100% | | |
| Renee Angeli Navarro | renee@ftx.com | | | | | | | |
| Renee Navarro | | | Blockfolio (100%) | Blockfolio | Blockfolio (100%)Blo | Active | | Support Specialist |
| Reynaldo Jose Ramirez S | | | | | | | | |
| Reynaldo Ramierz | | | | FTX Services Sol | FTX Services Solution | Active | | CS |
| Richard Chang | | | Alameda | | Alameda | resigned | | #N/A |
| Richard Hu | richard.hu@ftx.com | | | | | | | |
| Ricky Sze | | | Alameda | | Alameda | resigned | | #N/A |
| Rigel Saysip | rigel@blockfolio.com | | Blockfolio (100%) | Blockfolio | Blockfolio (100%)Blo | Active | | Support Specialist |
| Robbie Fung | robbie.fung@ftx.com | | | | | | | |
| Robin Matzke | robin@ftx.com | | | | | employed - active | | CS |
| Rod Cabreza | | | Blockfolio (100%) | | Blockfolio (100%) | Active | | Support Specialist |
| Romella Llauder Militar | romella@blockfolio.com | | Blockfolio (100%) | Blockfolio | Blockfolio (100%)Blo | Active | | Support Specialist |
| Ross Rheingans-Yoo | ross@ftxfoundation.com | | | | | resigned | | |
| Roy Gomez | roy.gomez@ftx.us | | | | | | | |
| Rozalie Czesana | | FDM, | | | FDM, | | active | | investments |
| RuiDong Zhang | | | | | | | | |
| Ryan | | | | FTX US | FTX US | Active | | CS |
| Ryan Baron | | Remote TX | | | Remote TX | | | Customer Support |
| Ryan Mendel | ryan.mendel@ftx.us | Remote GA, Rem | | | Remote GA, Remote | | | IT Security |
| Ryan Salame | | FDM, | | | FDM, | | | |
| Ryne Miller | | NY Office | | | NY Office | employed - active | | Legal |
| Ryo Kakuta | | | | | | | | |
| Ryoji Tanaka | | | | | | | | |
| Sakiko Kojima | | | | | | | | |
| Sam Pardee | sam.pardee@ftx.us | | | | | | | |
| Sam Pepper | | | | FTX Services Sol | FTX Services Solution | Active | | CS |
| Sam Trabucco | | | Alameda | | | resigned / terminated | | Trading |
| Samantha Culaton | | | Blockfolio (100%) | Blockfolio | Blockfolio (100%)Blo | Active | | Support Specialist |
| Samuel Bankman-Fried | | FDM, | | | FDM, | | | |
| Samuel Pardee | | Remote CO | | | Remote CO | | | Good Luck Games |
| Samuel Schetterer | | | Alameda | | | resigned / terminated | | Engineering |
| Satoshi Kitahama | satoshi@ftx.com | | | | | | | |
| Savannah Alberty | | FTX US-HQ | | | FTX US-HQ | | | Events |
| Sayaka | | | Salameda | Salameda | Active | | CS |
| Scott Forrester-Sims | | Remote NY | | | Remote NY | | | Good Luck Games |
| Scott Nagamine | | Remote CA | | | Remote CA | | | Operations |
| Sebastian Conybeare | | | Alameda | | | resigned / terminated | | Engineering |
| Sebastian Ramirez | | | | | | | | |
| Seth Melamed | seth@ftx.com | | | | | | | |
| Shandie Tumaliwan | shandie@blockfolio.com | | Blockfolio (100%) | Blockfolio | Blockfolio (100%)Blo | Active | | Support Specialist |
| Shannon Goerig | shannon@ftx.us | Remote WA | | | Remote WA | | | Good Luck Games |
| ShawnDea Dunzy | | Chicago Office | | | Chicago Office | | | Compliance |
| Sheena Hart | | Remote FL | | | Remote FL | | | Payments |
| Sherwayne Allen | | Chicago Office | | | Chicago Office | | | Compliance |
| Shoko | | | Salameda | Salameda | Active | | CS |
| Shuang (Claire) Zhang | claire.zhang@alameda-research.co | FDM, | | | FDM, | | resigned | | legal |
| Shyan Perera | | | | FTX Services Sol | FTX Services Solution | Active | | CS |
| Sina Nader | | Remote CA | | | Remote CA | resigned | | Business Development |
| Sonia Cheung | sonia.cheung@ftx.com | | | | | | | |
| Sook Yee | | | | | | | | |
| Sophia Dever | | | Alameda | | | resigned / terminated | | Trading |
| Steph Zolayvar | | | Alameda | | | resigned / terminated | | Engineering |
| Stephanie Lennox | | | | | | | | |

PAGE OMITTED

PAGE OMITTED

# EXHIBIT 15

| | |
|---|---|
| **From:** | Darnell Davis[darnell.davis@ftxdigitalmarkets.com] |
| **Sent:** | Thur 12/1/2022 1:50:54 PM (UTC) |
| **Cc:** | Trent, Hudson[htrent@alvarezandmarsal.com] |
| **Bcc:** | ross@ftx.com[ross@ftx.com] |
| **Subject:** | Verification of Employment Status |

Hello, and I hope this email finds you well.
It has recently come to our attention that your employment status has not been verified yet.
Please see note below from Kathy Schultea, new head of HR for FTX for your ease of reference:

**From: Human Resources**

To: All Employees – FTX.com, FTX US, Alameda


We are collecting information to make sure that payroll and benefits can continue with minimal interruption. The company's payroll information may not be complete and we want to make sure we are not missing anyone. To be included without undue delay, please provide the following information to the best of your knowledge, via email to hrteam@ftx.us or hrteam@ftx.com no later than close of business Thursday, November 17th. Thanks very much.


Employee Name:

Work Status: Active or Resigned (*resignation date*)

Employed by which entity name(s) (to the best of your knowledge):

Current Work Location:

If Remote Location provide address:

Supervisor Name:

Job Title:

Hire Date:

Email:

Cell phone:


Please forward the information requested to the email addresses highlighted within the message as soon as you can in order to minimize disruptions to your pay and benefits.

I remain available at this email to answer any questions you may have as best as I can.

Sincerely,

Darnell