**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| *In re*<br><br>FTX TRADING LTD., *et al.*,[1]<br><br>　　　　　　　　Debtors. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | Chapter 11<br><br>Case No. 22-11068 (JTD)<br>(Jointly Administered)<br><br>**Hearing Date:  November 15, 2023, at 1:00 p.m.**<br><br>**Objection Deadline: November 8, 2023, at 4:00 p.m., extended to November 10, 2023 at noon for the U.S. Trustee**<br><br>Re:  D.I. 3373 |

**UNITED STATES TRUSTEE'S OBJECTION TO AMENDED MOTION OF DEBTORS**
**TO ENTER INTO, AND PERFORM THEIR OBLIGATIONS UNDER,**
**THE REIMBURSEMENT AGREEMENTS**

Andrew R. Vara, the United States Trustee for Regions Three and Nine (the "U.S. Trustee"), through his undersigned counsel, files this objection (the "Objection") to the *Amended Motion of Debtors to Enter Into, and Perform Their Obligations Under, the Reimbursement Agreements* [D.I. 3373] (the "Amended Motion"), and respectfully states:

### I.　　PRELIMINARY STATEMENT

1.　　The U.S. Trustee objects to the Debtors' request, pursuant to section 363 of the Bankruptcy Code, for authority to pay the professional fees and expenses of a group of unsecured creditors that call themselves the ad hoc committee of international customers (the

---

[1]　The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification numbers are 3288 and 4063, respectively. Due to the large number of debtor entities in these chapter 11 cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.ra.kroll.com/FTX. The principal place of business of Debtor Emergent Fidelity Technologies Ltd is Unit 3B, Bryson's Commercial Complex, Friars Hill Road, St. John's, Antigua and Barbuda.

"AHC").[2]  The request seeks authority to pay fees and expenses that have already been incurred

for two law firms and an investment banker, for the period May 2023 through October 2023, and

to pay such fees and expenses going forward until the effective date of the Debtors' chapter 11

plan.  Assuming a plan effective date in June of 2024, the total payments could reach

$12,950,000.

2.       The Debtors filed their original *Motion of Debtors to Enter Into, and Perform*

*Their Obligations Under, the Reimbursement Agreements* [D.I. 2238](the "Original Motion") on

August 23, 2023.[3]  The principal purpose of the Debtors' amendment to the Original Motion

appears to be to increase by approximately $2.5 million the maximum amount the Debtors'

estates will be obligated to pay the AHC's professionals.  There is no explanation in the

Amended Motion for such increases.

3.       The U.S. Trustee objects to the Amended Motion on a number of grounds.  First,

section 503(b) of the Bankruptcy Code is the "exclusive avenue for payment of administrative

expenses," *In re Lehman Bros. Holdings, Inc.*, 508 B.R. 283, 289 (S.D.N.Y. 2014), and sections

503(b)(3)&(4) are the specific and sole authority for an estate to pay the professional fees and

expenses of an unsecured creditor.  Those sections require the court to find that the creditor made

a substantial contribution to the case and that the fees and expenses are reasonable. At present, it

is impossible to know if the AHC will make a substantial contribution in these cases.  Therefore,

the Court should deny the Motion as legally improper and premature, both with respect to fees

and expenses already incurred and those to be incurred in the future.

---

[2]     All capitalized terms that are not defined herein shall have the definition set forth in the Motion.

[3]     The U.S. Trustee filed an objection to the Original Motion on September 6, 2023.  *See* D.I. 2443.

4.      The U.S. Trustee recognizes that this Court ruled in *Mallinckrodt* that section 363 of the Bankruptcy Code can be used to pay an ad hoc group's professional fees even if the requirements of section 503(b)(3) & (4) are not met, and that such decision was affirmed by the District Court.  While the U.S. Trustee respectfully disagrees with such view, the relevant facts and circumstances of these cases are significantly different from those of *Mallinckrodt.*

   a.   These cases differ from *Mallinckrodt* because the AHC here is seeking reimbursement of fees and expenses already incurred, and not just prospective fees and expenses.

   b.   In addition, while some members of  the AHC have entered into a plan support agreement with the Debtors, they did so only in mid-October of this year, after the Original Motion was filed, and long after the Petition Date.  In *Mallinckrodt*, the ad hoc committees had entered into restructuring support agreement prior to the bankruptcy case being filed.

   c.   Most significantly, in *Mallinckrodt*, two of the three ad hoc groups were comprised of governmental entities whose interests differed from that of the members of the two official committees the U.S. Trustee appointed in those cases.  In contrast, the members of the AHC in the FTX cases represent *exactly* the same interests as the members of the Official Committee: all of the members of the AHC are customers of the FTX.com exchange, as are all of the members of the Official Committee; all of the members of the AHC are based outside of the United States, which is also true for the majority of the members of the Official Committee; and the members of the AHC include both natural persons and entities, as is true of the members of the Official Committee.

5.      The only material difference between the members of the AHC and those of the Official Committee is that all members of the Official Committee were customers of the FTX.com platform prior to the Petition Date.  In contrast, according to counsel to the AHC, approximately 41 percent of the members of the AHC did not hold interests in any FTX account

as of the Petition Date.  That distinction supports denial of the Motion.  The Debtors' estates should not be paying professional fees of parties who are not victims of the Debtors' pre-petition wrongdoing, but rather are claims traders seeking to use the bankruptcy system to make a profit.

6.      In the Amended Motion, the Debtors assert that the "FTX.com customers' interests are different than, and in some ways may be adverse to, the interests of the general unsecured creditor body."  Am. Mot. ¶ 1.  However, the Debtors do not assert that the Official Committee is not able to adequately represent the interests of FTX.com customers, nor could they, given that the Official Committee is comprised *exclusively* of FTX.com customers. Counsel to the AHC has, however, suggested in statements at Court hearings that AHC's involvement in these cases is necessary to protect the interests of the customers of FTX.com based on the belief that the Official Committee may be conflicted from acting in the best interests of FTX.com customers, because the Official Committee also has a fiduciary duty to represent other general unsecured creditors.  The idea that members of the Official Committee would act against their own self-interests, and those of the other FTX.com customers, because they also have to represent the interests of other general unsecured creditors defies logic.[4] Moreover, for the Motion to be granted, the Debtors must demonstrate that the estates' payment of the professional fees of the AHC "benefits the debtors' estates as a whole, rather than individual creditors or creditor groups," such as the FTX.com customers.  *See In re Mallinckrodt PLC*, No. 21-167, 2022 WL 906459, *4 (D. Del. March 28, 2022) (quoting this Court's bench ruling of January 19, 2021).

---

[4]    If there is a situation in which the interests of one or more of the members of the Official Committee conflict with the interests of general unsecured creditors as a whole, such members should notify counsel to the Official Committee, who in turn should notify the U.S. Trustee, so that proper steps can be taken to address any such conflict.

7.     The Debtors assert, without evidence, that "[w]ithout the Reimbursement Agreements, the Ad Hoc Committee will be unable to retain skilled and experienced advisors." Am. Mot. ¶ 28; *Declaration of John Ray* ("Ray Decl.") [D.I. 3700], ¶ 20.   Given that the vast majority of the members of the AHC appear to be legal entities, rather than natural persons, it seems likely they would have sufficient means and motivation to pay for their professionals, especially with respect to the 41% who voluntarily purchased FTX.com accounts after the Petition Date, likely at a discounted rate.

8.     There are certain other aspects of the relief sought by the Motion to which the U.S. Trustee objects, as detailed in Point IV.D  below.  These include certain problematic terms of the investment banker's engagement agreement.

9.     For the reasons set forth in this Objection, the Motion should be denied.

## II.     JURISDICTION AND STANDING

10.     Pursuant to (i) 28 U.S.C. § 1334, (ii) applicable order(s) of the United States District Court for the District of Delaware issued pursuant to 28 U.S.C. § 157(a), and (iii) 28 U.S.C. § 157(b)(2)(A), this Court has jurisdiction to hear and determine the Motion and this Objection.

11.     Under 28 U.S.C. § 586, the U.S. Trustee is charged with overseeing the administration of Chapter 11 cases filed in this judicial district.  This duty is part of the U.S. Trustee's overarching responsibility to enforce the bankruptcy laws as written by Congress and interpreted by the courts.  *See Morgenstern v. Revco D.S., Inc. (In re Revco D.S., Inc.)*, 898 F.2d 498, 500 (6th Cir. 1990) (describing the U.S. Trustee as a "watchdog").

12.     Under 11 U.S.C. § 307, the U.S. Trustee has standing to be heard on the Motion. *See United States Trustee v. Columbia Gas Sys., Inc. (In re Columbia Gas Sys., Inc.),* 33 F.3d

294, 295-96 (3d Cir. 1994) (noting that U.S. Trustee has "public interest standing" under 11

U.S.C. § 307, which goes beyond mere pecuniary interest).

### III.   FACTUAL BACKGROUND

13.     On or after November 11, 2022, the Debtors filed voluntary chapter 11 petitions

in this Court.

14.     The Debtors continue to operate their business(es) as debtors in possession

pursuant to 11 U.S.C. §§ 1107 and 1108.

15.     The U.S. Trustee appointed the Official Committee on December 15, 2022,

consisting of nine members, all of which were customers of the FTX.com platform.[5]   Of the nine

members, at least seven provided the U.S. Trustee with addresses outside of the United States.

16.     On March 24, 2023, counsel to the AHC filed the *Verified Statement of Eversheds

Sutherland (US) LLP and Morris, Nichols, Arsht & Tunnel LLP Pursuant to Bankruptcy Rule

2019* [D.I. 1156].   On June 7, 2023, counsel to the AHC filed the *Verified First Supplemental

Statement of Eversheds Sutherland (US) LLP and Morris, Nichols, Arsht & Tunnell LLP

Pursuant to Bankruptcy Rule 2019* [D.I. 1580].   On August 9, 2023, counsel to the AHC filed the

*Verified Second Supplemental Statement of Eversheds Sutherland (US) LLP and Morris, Nichols,

Arsht & Tunnell LLP Pursuant to Bankruptcy Rule 2019* [D.I. 2144](the "Current 2019

Statement"), which was filed after entry of this Court's *Order Denying the Ad Hoc Committee of

Non-US Customers of FTX.com's Motion to File Under Seal (I) Verified Statement of Eversheds

Sutherland (US) LLP and Morris, Nichols, Arsht & Tunnell LLP Pursuant to Bankruptcy Rule

2019 and (II) the Declaration in Support of the Ad Hoc Committee of Non-US Customers of*

---

[5]     Two members of the Official Committee have since resigned. *See* D.I. 3685.

*FTX.com's Motion to File Under Seal the Verified Statement of Eversheds Sutherland (US) LLP and Morris, Nichols, Arsht & Tunnell LLP Pursuant to Bankruptcy Rule 2019* [D.I. 1858].

17.    The Current 2019 Statement lists 38 members of the AHC, described as "international customers . . . who hold accounts on the FTX.com platform."  D.I. 2144, ecf p. 1 of 5.  With respect to each member, the Current 2019 Statement lists their name, the address of AHC counsel (Eversheds Sutherland),[6] and the "Dollarized Amount (US$)" of the cryptocurrency, together with any fiat currency, in their account.  *See id.*

18.    The Current 2019 Statement lists the aggregate dollarized amount of all AHC members at slightly below $857 million, which, if accurate, constitutes about 8.5% of the over $10 billion in FTX.com customer claims.  *See* Preliminary Analysis of Shortfalls at FTX.COM and FTX.US, D.I. 792-1, ecf p. 13 of 25.

19.    According to counsel to the AHC, of the 38 members of the AHC, 41 percent were not customers of any of the Debtors as of the Petition Date.  Of that 41 percent, 6 percent were affiliated with an entity that held an interest in one or more FTX accounts as of the Petition Date, and the remaining 35 of the 41 percent were not.

20.    On August 23, 2023, the Debtors filed the Original Motion [D.I. 2238].  That Motion sought authorization for the Debtors to enter into, and perform obligations under, Reimbursements Agreements with of two law firms representing the AHC – Eversheds

---

[6]    The Current 2019 Statement failed to disclose the actual address of any member of the AHC, despite this Court making it clear, in denying AHC's motion to seal, that addresses of the AHC members, as well as names and all other information required by Bankruptcy Rule 2019, "has to be disclosed." *See* Hrg. Tr. 6/9/23 161:20 – 162:3. On September 28, 2023, the U.S. Trustee filed a *Motion to Compel the Ad Hoc Committee of Non-U.S. Customers of FTX.Com to Comply with the Court's Order Concerning the Verified Statement of Eversheds Sutherland (US) and Morris, Nichols, Arsht & Tunnell LLP Pursuant to Bankruptcy Rule 2019* [D.I. 2745], which is scheduled to be heard on the same date as the Debtors' Amended Motion.

Sutherland (US) LLP and Morris, Nichols, Arsht & Tunnell LLP – and the AHC's investment banker, Rothschild & Co. US Inc. ("Rothschild").   The Original Motion included the following financial terms:

(a) The Debtors' estates shall pay to counsel to the AHC up to $500,000 per month, in the aggregate, in reasonable and documents fees from May 1, 2023 through the termination of the Counsel Reimbursement Agreement.  Unused portions of the fee cap for any month may be carried forward on a rolling monthly basis, and any amounts incurred over the cap in any given month can be applied to later periods of reimbursement.  The estates shall also pay all reasonable out-of-pocket expenses (at cost) from May 1, 2023 forward.  Org. Mot. ¶ 11;

(b) The Debtors' estates shall pay to Rothschild $175,000 per month, and a transaction fee of $3.5 million (subject to further Court approval) payable upon the effective date of a confirmed chapter 11 plan.  *See id.* ¶13.  The $3.5 million fee would be due even if the AHC terminated Rothschild, with or without cause, or if Rothschild voluntarily terminated the engagement, with or without cause, provided that the effective date of the plan occurs less than one year after such termination.  *See id.*, Ex. B-2 (Rothschild engagement agreement), Section 6, D.I. 2238-4, ecf page 6 of 18.

(c) The AHC professionals shall comply with the interim compensation order in these cases [D.I. 435], and the AHC's law firms (but not its investment banker) will have their fees and expenses subject to review by the fee examiner.  *See id.* ¶ 31.

21.    On October 25, 2023, the Debtors filed the Amended Motion, which attached a new Reimbursement Agreement between the Debtors and AHC's law firms, dated October 24, 2023, and a redline comparing the new Reimbursement Agreement between the Debtors and AHC's counsel against the original agreement.   *See* Am. Mot., Exs. B-1 and B-4.  The Amended Motion also attached the original engagement agreement between Rothschild and counsel to the

AHC and the members of AHC's Executive Committee, dated July 1, 2023, and an amendment

to the same, as well as a new Reimbursement Agreement between the Debtors and Rothschild

dated October 24, 2023, and a redline comparing the new Rothschild Reimbursement Agreement

against the original one.  *See id.,* Exs. B-2, B-3 and B-5.

22.     The new Reimbursement Agreements include the same provisions as the original

Reimbursement Agreements, except as follows:

> a.   The monthly cap on the amount the Debtors' estates will be obligated to pay
> to the AHC's counsel was decreased from $500,000 to $250,000 a month for
> three months: May, June and July of 2023; was kept at $5000,000 for the
> month of August; was increased from $500,000 to $750,000 for the months of
> September and October 2023; and was increased from $500,000 to $650,000 a
> month for November 2023 through the effective date of a chapter 11 plan.
>
> b.   The transaction fee the Debtors' estates will be obligated to pay to Rothschild
> was increased from what was $3.5 million to $5 million.  The monthly
> payment to Rothschild of $175,000 per month remains the same.
>
> c.   The Debtors are now required to include Rothschild and its related parties as
> beneficiaries of any debtor or third party releases in the plan to the same
> extent that the members of the AHC are beneficiaries of such releases.

*See* Am. Mot., Ex. B-4, p. 3 and Ex. B-5, pp. 2-3.

23.     In the aggregate, the amendments to the Reimbursement Agreements obligate the

Debtors' estates to pay $2.5 million more to the AHC's professionals than what was set forth in

the original Reimbursement Agreements.  There is no explanation in the Amended Motion as to

why such fees were increased.[7]  The amendment to the engagement agreement with Rothschild

sets forth what is described as three additional services it will be providing.  *See* Am. Mot., Ex.

B-2, at ecf page 19 of 26.  Yet it is not clear why these additional services are needed, or why the

AHC needs an investment banker at all, given that the Official Committee, which (like the AHC)

is comprised entirely of customers of FTX.com, has an investment banker (Jefferies LLC), as

well as a financial advisor (FTI Consulting Inc.).

24.     The Amended Motion disclosed that, since the filing of the Original Motion, a

Plan Support Agreement ("PSA") had been entered into between the Debtors, the Official

Committee, certain members of the AHC and the Class Action Plaintiffs.  *See* Am. Mot., ¶¶ 4,

17-19.  A copy of the  PSA is filed at D.I. 3291, Ex. A, but does not include the signature of any

party other than the Debtors.  It is not clear how many of the members of the AHC have signed

the PSA, although Debtors' counsel has represented to counsel to the U.S. Trustee that all

members of the *Executive Committee* of the AHC have executed the PSA, as have all Class

Action Plaintiffs.

25.     The Original Motion and Amended Motion attach the reimbursement agreements,

and the engagement letter with Rothschild, but neither attach the engagement letter with the law

firms whose fees will be reimbursed.[8]

26.     No declaration was attached to, or filed in support of, the Original Motion.  Nor

was any declaration attached to the Amended Motion when it was filed.  However, on November

---

[7]     The $2.5 million figure assumes a chapter 11 plan of the Debtors will be confirmed, and will go effective in June of 2024, as contemplated by the PSA. See D.I. 3291, Ex. A, ¶ 4.1 (d).

[8]     At the request of counsel to the U.S. Trustee, counsel to the AHC provided the U.S. Trustee with copies of their engagement letters.

8, 2023, a few hours after the general objection deadline on the Amended Motion had passed, the

Debtors filed a declaration of their CEO, John Ray, in support of the Amended Motion.   *See* D.I.

3700.

## IV.    ARGUMENT

**A.  Section 503(b) is the Only Code Section Governing the Payment of an Ad Hoc Committee's Fees and Expenses, and Any Request for Substantial Contribution is Legally Premature Before the Case Concludes.**

27.    The proposed payments to the AHC's professionals constitute compensation that

is specifically governed by sections 503(b)(3)(D) and (4) of the Bankruptcy Code.  Section

503(b)(3)(D) provides as follows:

> (b) After notice and a hearing, there shall be allowed administrative expenses . . . including –
>
> . . . .
>
> (3) the actual, necessary expenses, other than compensation and reimbursement specified in paragraph (4) of this subsection, incurred by –
>
> . . . .
>
> (D) a creditor . . . or a committee representing creditors . . . other than a committee appointed under section 1102 of this title, in making a substantial contribution in a case under chapter 9 or 11 of this title;
>
> . . . .
>
> (4) reasonable compensation for professional services rendered by an attorney or an accountant of an entity whose expense is allowable under subparagraph (A), (B), (C), (D), or (E) of paragraph (3) of this subsection, based on the time, the nature, the extent, and the value of such services, and the cost of comparable services other than in a case under this title, and reimbursement for actual, necessary expenses incurred by such attorney or accountant;

11 U.S.C. § 503(b)(3)(D) & (4).

28.    By enacting section 503(b) of the Bankruptcy Code, Congress provided a specific

procedure and standard for the allowance and approval of fees and expenses incurred by ad hoc

committees and others in making a substantial contribution to a case.  *See* 4 Collier on

Bankruptcy at ¶ 503.04 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.) ("Administrative expenses, except ordinary course expenses paid pursuant to sections 363 and 364 of the Code, are allowed only after notice and a hearing and are not 'deemed allowed' but rather must be actually allowed by court order.").  Section 503 imposes detailed requirements that must be met before approval and payment, including the timely filing of a request for payment by the professional, *see* 11 U.S.C. § 503(a); notice and a hearing before the court, *see* 11 U.S.C. § 503(b); a showing that such expenses were "actual" and "necessary," *see* 11 U.S.C. § 503(b)(3); a showing that the creditor, unofficial committee, or indenture trustee has made a "substantial contribution" to the bankruptcy case, *see* 11 U.S.C. § 503(b)(3)(D); and a finding by the court that any compensation paid to an attorney or accountant is "reasonable," s*ee* 11 U.S.C. § 503(b)(4).  Moreover, a party's right to payment under section 503(b) is not automatic; it "depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate." *Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.*), 181 F.3d 527, 535 (3d Cir. 1999).

29.    In the Third Circuit, a creditor makes a "substantial contribution" if, and only if, its efforts provide an "actual and demonstrable benefit to the debtor's estate and the creditors." *Lebron v. Mechem Financial* Inc.*, 27 F.3d 937, 943-44 (3d Cir. 1994) (citation omitted) (quoting *In re Lister*, 846 F.2d 55, 57 (10th Cir. 1988)).  Furthermore, to be compensable under section 503(b)(3)(D), the creditor's activity must have "benefit[ed] the estate as a whole."  *See Lebron*, 27 F.3d at 944.  Activities "which were designed primarily to serve [the applicants'] own interests" are ***not*** compensable, because they "would have been undertaken absent an expectation of reimbursement from the estate."  *Id.*

12

30.     The fact that the payment of professional fees are proposed as part of the

Reimbursement Agreement does not relieve the third-party professionals of their obligation to

comply with the requirements of section 503, which is the "sole source" of authority to pay post-

petition professional fees on an administrative basis.  *Davis v. Elliot Mgmt. Corp. (In re Lehman*

*Bros. Holdings Inc.*), 508 B.R. 283, 290 (S.D.N.Y. 2014).

31.     In *Lehman,* the court roundly rejected an attempt by certain committee members

to circumvent section 503(b)(4) by seeking payment under a "permissive" plan provision that

purported to pay third-party professional fees without regard to whether they could be authorized

under section 503.  As the court explained, plans pay only claims and administrative expenses:

> Although the Bankruptcy Code does not explicitly forbid payments [of]
> professional fees that are not administrative expenses, no such explicit
> prohibition is necessary. Reorganization plans exist to pay claims and
> expenses . . . Therefore, the Individual Members' professional fee expenses
> are either administrative expenses or not, and if the latter, they cannot be paid
> under a plan.

*Id.*at 293.  Indeed, the court recognized that any contrary result "could lead to serious mischief,"

because it would allow plan proponents to distribute the estate's assets without regard to the

Bankruptcy Code's priority scheme.  *Id.*

32.     The allowance of attorney's fees is an exception to "the bedrock principle known

as the American Rule: Each litigant pays his own attorney's fees, win or lose, unless a statute or

contract provides otherwise."  *Baker Botts L.L.P. v. ASARCO LLC*, 576 U.S. 121, 126 (2015)

(internal quotation marks omitted).  The Supreme Court has recognized departures from the

American Rule "only in specific and explicit provisions for the allowance of attorneys' fees

under selected statutes."  *Id*. (internal quotation marks omitted).  "Section 503(b)(3)(D)

represents an accommodation between the twin objectives of encouraging meaningful creditor

participation in the reorganization process and keeping fees and administrative expenses at a minimum so as to preserve as much of the estate as possible for the creditors." *Lebron v. Mechem Fin. Inc.*, 27 F.3d 937, 944 (3d Cir. 1994) (internal quotation marks and citation omitted).

33.     Substantial contribution awards are granted only in "rare and extraordinary circumstances." *Leidos Rng'g, LLC v. KiOR, Inc. (In re KiOR Inc.),* 567 B.R. 451, 459 (internal quotation marks omitted)*; accord RS* Legacy, No. 15-10197, 2016 WL 1084400, at *4 (Bankr. D. Del. March 17, 2016). "[T]he benefit received by the estate must be more than an incidental one arising from activities the applicant has pursued in protecting his or her own interests." *Lebron*, 27 F.3d at 944. Under Third Circuit precedent, there must be a "demonstrable benefit to the debtor's estate and the creditors," *id*. (internal quotation omitted), because of "the concern that administrative claims deplete the bankruptcy estate's assets." *In re Energy Future Holdings Corp.,* No. 19-3492, 2021 WL 957301 at *10 (3d Cir. March 15, 2021). The benefit "must be *actual*, not hypothetical," *id*. (emphasis in original), thus "a hindsight-based analysis of the benefit to the estate requirement is appropriate." *Id*. at *12; *see KiOR*, 567 B.R. at 458 ("The substantial contribution test is applied in hindsight and scrutinizes the actual benefit to the case."). In determining whether a creditor has made a substantial contribution, "the court should weigh the cost of the claimed fees and expenses against the benefits conferred upon the estate which flow directly from those actions." *Hall Fin. Grp., Inc. v. DP Partners Ltd. (In re DP Partners, Ltd.)*, 106 F.3d 667, 673 (5th Cir. 1997).

34.     By its nature, a substantial contribution claim is retrospective only, not prospective. There is no way to approve a substantial contribution claim before a bankruptcy case is largely concluded because no substantial contribution has been made and no claim exists.

14

Moreover, the award of fees and expenses for making a substantial contribution must be reasonable, and that determination cannot be made prospectively either.

35.     At this stage of the case, it is a legal impossibility that anyone could have and prove a substantial contribution claim for reasonable fees and expenses, and the AHC should not be awarded one.  The Bankruptcy Code contains no provision for interim payment of substantial contribution fees and expenses.  Even if it were proper to award fees for a substantial contribution on a prospective basis, payment of the AHC's investment banker's fees and expenses would not be permissible.  Section 503(b)(4) only allows for the reimbursement of fees of attorneys and accountants.  11 U.S.C. § 503(b)(4).  "[T]he language of § 503(b)(4) (unlike § 330(a)(1)), limits compensation to attorneys and accountants only, rather than any professional. Accordingly, reimbursement for Seidman's [the financial advisor's] services must be disallowed."  *Matter of Baldwin-United Corp.*, 79 B.R. 321, 341 (Bankr. S.D. Ohio 1987).  Thus, the fees and expenses of AHC's investment banker can never be awarded under section 503(b)(4) as a matter of law.

**B. The General Provisions of Section 363 Cannot Be Used to Circumvent the Specific Provisions of Section 503(b).**

36.     The United States Supreme Court has held that "in all matters of statutory construction, the court must begin with 'the language itself [and] the specific context in which that language is used.'"  *McNeill v. United States*, 131 S.Ct. 2218 (2011) (*quoting Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997)); *see also Lamie v. United States*, 540 U.S. 526, 534 (2004) ("[W]hen the statute's language is plain, the sole function of the courts – at least where the disposition required by the text is not absurd – is to enforce it according to its terms.").

15

37.    The Supreme Court also has ruled, including when applying the Bankruptcy

Code, that a specific statutory provision governs a general one.  *See, e.g., RadLAX Gateway*

*Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012).  In *RadLAX,* the Supreme Court

recited the well-reasoned rule that:

> We find the debtors' reading of § 1129(b)(2)(A)—under which clause (iii)
> permits precisely what clause (ii) proscribes—to be hyperliteral and contrary
> to common sense.  A well established canon of statutory interpretation
> succinctly captures the problem: "[I]t is a commonplace of statutory
> construction that the specific governs the general."  (citation omitted).  That is
> particularly true where, as in § 1129(b)(2)(A), "Congress has enacted a
> comprehensive scheme and has deliberately targeted specific problems with
> specific solutions."

*Id.* (citation omitted) (emphasis added).[9]

38.    The Third Circuit adheres to this approach.  *See Kannikal v. Attorney General US*,

776 F.3d 146, 1355 (2d Cir. 1996) (citing both *Morales* and *RadLAX* with respect to the

specificity of Title VII's limitations scheme over a more general section of Title VII, stating "[I]t

is a commonplace of statutory construction that the specific governs the general . . .").

39.    The "specific governs the general" canon of statutory interpretation applies here.

Congress targeted a specific problem— payment of reasonable fees and expenses for ad hoc

committees making a substantial contribution—with a specific solution—sections 503(b)(3)(D)

and 503(b)(4) of the Bankruptcy Code.  An ad hoc committee can have its fees and expenses

paid, but only after giving notice to creditors and after proving to a court that it made a

---

[9]    *See also Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1992); *Gozlon-Peretz v. United States*, 498 U.S. 395, 407 (1991) (specific statutory provision normally controls one of more general application); *Bloate v. United States*, 130 S.Ct. 1345, 1353-1354 (2010) (same)); *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 153 (1976) ("Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one, regardless of priority of enactment.") (*quoting Morton v. Mancari*, 417 U.S. 535, 550-51 (1974)).

substantial contribution to a case and that its fees and expenses are reasonable.  The parties

cannot evade the mandatory statutory scheme by agreement: "the federal scheme cannot remain

comprehensive if interested parties and bankruptcy courts in each case are free to tweak the law

to fit their preferences." *Lehman*, 508 B.R. at 294.

40.    Further, the Supreme Court has articulated that a statutory provision should not be

construed to render any other provision of the statute superfluous.  *See Turner v. Rogers*, 131 S.

Ct. 2507, 2522 (2011) ("The fact that one constitutional provision expressly provides a right to

appointed counsel in specific circumstances indicates that the Constitution does not also sub

silentio provide that right far more broadly in another, more general, provision.").

41.    When these traditional principles of statutory construction are applied to the

issues before this Court, the resulting conclusion is that section 503(b) is the only Bankruptcy

Code section which directly addresses payment of professionals for an ad hoc committee and is

the only appropriate statutory provision under which this Court should consider the Motion.  *See*

*Lehman*, 508 B.R. at 294 (committee members seeking repayment of legal fees must seek

reimbursement under sections 503(b)(3)(D) and 503(b)(4)).

42.    The Debtor and the AHC must comply with section 503(b) at the conclusion of

the case when the Court can determine for itself whether a substantial contribution has been

made and whether the compensation sought is reasonable.

**C.  The Motion Cannot be Approved Pursuant to Section 363.**

43.    The U.S. Trustee recognizes that, in *Mallinckrodt*, this Court authorized debtors

to assume prepetition restructuring support agreements, pursuant to section 365, and to enter into

additional restructuring support agreements post-petition pursuant to section 363, which ruling

was upheld by the District Court for the District of Delaware.  *See In re Mallinckrodt PLC,* No. 21-167, 2022 WL 906459 (D. Del. March 28, 2022).

44.    However, even if analyzed under section 363, the Motion must be denied. As courts have recognized, section 363(b) is not a blank check for debtors merely to do whatever they want to do.  *See, In re Lionel Corp.,* 722 F.2d 1063, 1069 (2d Cir. 1983) (holding that section 363(b) does not grant judges carte blanche to use section 363(b) to justify any action and to rule otherwise would have section 363 swallow up other provisions of chapter 11.)  Rather, under section 363, the Debtors must meet their burden to establish that it is within the "sound exercise of their business judgment" to enter into agreements to reimburse the professional fees of the AHC.  *Mallinckrodt PLC,* 2022 WL 906459 at *6.  As set forth below, the Debtors have not met that standard.

45.    In addition, the evidence must establish that the professional fees of the AHC to be reimbursed "will be for work that benefits the debtors' estates as a whole, rather than individual creditors or creditor groups."  *Id.* at *4.  The Debtors have not introduced any such evidence.  To the contrary, the Motion states that the AHC "solely represents the interests of non-US customers of FTX.com" (Am. Mot., ¶ 2), which can fairly be called a particular "creditor group[]."  *Mallinckrodt PLC,* 2022 WL 906459 at *4.

46.    The factual differences between these cases and those of *Mallinckrodt* demonstrate why the Motion should not be granted in these cases even under a section 363 analysis:

> (a)    In *Mallinckrodt,* the composition of the ad hoc committee was significantly different than that of the official committees.  There, the U.S. Trustee had appointed two official committees, one comprised of trade and litigation

unsecured creditors, and the other comprised of opioid claimants. *See Mallinckrodt,* Bankr. Case No. 20-12522 (JTD), D.I. 306 (Notice of Appointment of Committee of Unsecured Creditors) and D.I. 308 (Notice of Appointment of Opioid Related Claimants Committee); *see also Mallinckrodt PLC,* 2022 WL 906459, at * 2.   There were three ad hoc committees, two of which were comprised solely of governmental entities holding opioid-related claims, and one of which was comprised of holders of Mallinckrodt's guaranteed unsecured notes. *See Mallinckrodt,* 2022 WL 906459 at * 1.   There was no similarity between the members of the ad hoc groups and the two official committees, except that the indenture trustee of the guaranteed unsecured notes was a member of the official committee of unsecured creditors.   As stated by the District Court in *Mallinckrodt,* "***[t]he official committees also are not (and do not include among their membership) governmental entities that can help broker broader consensus among other similarly situated public entities***." *Mallinckrodt,* 2022 WL 906459 at *8 (emphasis added).   In contrast, in the FTX cases, all of the members of the AHC and all members of the Official Committee are customers of the same FTX.com platform.

(b) The restructuring support agreements in *Mallinckrodt* were signed by the ad hoc committees prior to the filing of the bankruptcy case, whereas in the FTX cases they were not signed until after the Original Motion was filed, and long after the Petition Date.   In addition, in these cases, it is not clear how many members of the AHC have actually signed the PSA.

(c) In *Mallinckrodt,* the ad hoc committees were seeking payment of prospective fees and expenses only.   Here, the AHC is seeking reimbursement of fees and expenses already incurred for the six month period of May through October, 2023, as well as part of November 2023, in addition to their prospective fees and expenses.   That difference is significant because the District Court in *Mallinckrodt* ruled that this Court was correct that "§§ 363(b) and 365(a) provide the right procedural mechanism[s] through which Debtors may seek to pay the RSA Party professional fees and expenses *on a prospective basis*."

19

*Mallinckrodt,* 2022 WL 906459 at \*6 (emphasis added, internal quotations omitted).  Even the Debtors admit, in their Amended Motion, that it is § 503(b)(4) of the Code which "creates a mechanism for *retrospective payments* to non-estate professionals." Am. Mot. ¶ 23 (emphasis added).

47.    The Debtors seek to justify paying the professional fees of the AHC by posing the AHC as an alternative to negotiating with the "millions of non-US customers of FTX.com . . . or even a large subset of them, [which] would be impractical." Am. Mot. ¶ 26.  However, the Debtors can reach the same result by negotiating with the Official Committee, which is comprised exclusively of members of customers of FTX.com, most of whom are non-US customers like the AHC members.[10]  The Debtors have not, and cannot, establish that it is a "sound exercise of business judgment" to pay the professional fees of two committees who represent the exact same constituency.  In addition, the Ad Hoc Committee is comprised of only 38 persons and entities, which is a tiny fraction of the millions of customers of FTX.com.  To get acceptance of their chapter 11 plan from FTX.com customers, the Debtors will need far more than 38 of them to vote in favor of the plan.

48.    The Debtors have submitted a declaration from their CEO, John Ray, in support of the Amended Motion.  That declaration consists mainly of generalized statements that parrot the standard for section 363 approval, without actually setting forth how such standard is met.  For example, Mr. Ray asserts that the Debtors' entry into the Reimbursement Agreements "are in

---

[10]    The Debtors indicate in the Amended Motion that *non-U.S.* customers of FTX.com will constitute their own class under the plan they currently anticipate pursuing.  *See* Am. Motion, ¶ 2.  However, the Draft Plan of Reorganization – Term Sheet that is attached as Exhibit A to the PSA provides that "[a]ll customers of FTX.com will constitute a single class." D.I. 3291-1, ecf p. 39 of 59 (description of Class 4 A).  The Plan does not propose to treat U.S.-based customers of FTX.com differently than non-U.S. customers of FTX.com.  It is therefore not clear why the Debtors, in the Amended Motion, repeatedly state that the members of the AHC are all non-U.S. persons or entities.

the best interest of the Debtors and the Debtors' estates," and "represents a valid exercise of the Debtors' business judgement," without indicating how or why.  *See* Ray Decl., ¶ 9.  He further asserts that "the professional fees and expenses of the AHC eligible for reimbursement will relate to work that is beneficial to the estate as a whole," without providing any concrete examples of such benefits.  *See id.,* ¶ 13.  Mr. Ray also states his belief that the AHC "fills a unique and critical role in these complex cases," without addressing why that role cannot be fulfilled by the Official Committee, which like the AHC is comprised solely of customers of FTX.com.  *See* Ray Decl., ¶ 21.

49.    There are only two purported examples the Debtors put forth to support their assertion that the AHC's involvement in these cases have benefited the Debtors' estates.  First, Mr. Ray assets that, "[u]nder the Debtors' current Draft Plan, FTX.com customers are in their own separate class and separately classified from general unsecured creditors. It is my view that it is critical to have a centralized source representing the interest of FTX.com customers in the Debtor' plan process."  *See* Ray Dec., ¶15. This assertion again ignores that every single member of the Official Committee will be in the same class as every single member of the AHC – the class for FTX.com customers – and that the Official Committee will be representing the interest of FTX.com customers in the Debtor' plan process because each of them are FTX.com customers.

50.    The second purported example addressed in the Ray Declaration and the Amended Motion relates to the AHC having agreed in the PSA to voluntarily stay the adversary proceeding it brought against the Debtors until the Court considers confirmation of a plan, and if such plan is confirmed, to withdraw such proceeding with prejudice.  Am. Mot., ¶18; Ray Decl.,

¶¶ 16-17; *see* PSA, D.I. 3291-1, ¶ 5.1, 5.2.[11]  In that adversary proceeding, which was filed on

December 29, 2022, the AHC alleges that assets customers deposited, held, received, or acquired

on the FTX.com platform, including digital assets, are customer property and not property of the

Debtors' estates.  *See* Adv. Pro. No. 22-50514 (JTD), D.I. 1,  ¶¶ 1-2.  Despite such action

pending for over ten months, there has been little progress in the proceeding.  ACH agreed to

numerous of extensions of time for the Debtors to answer, move or otherwise respond to the

Complaint; on April 21, 2023 the AHC agreed to stay the proceeding until July 31, 2023; and on

August 1, 2023 the AHC agreed to extend the stay "indefinitely," unless otherwise agreed to by

the parties or by order of the Court.  *See* Adv. Proc. 22-50514, D.I. 4, 7, 15, 17, & 22.

Consistent with this course of inaction, the AHC did not object when the Debtors moved on

August 23, 2023 to sell digital assets in their possession (D.I. 2239), even though such sales

included digital assets that the AHC alleges in their adversary complaint constitute property of

customers of FTX.com.  By such inaction, the ACH arguably mooted its adversary proceeding,

or at a minimum made prosecuting it much more difficult.  The tentative settling of such a

proceeding through the PSA does not support the Debtors' agreement to have their estates pay

close to $13 million of the AHC's professional fees.

**D.**    **Other Objections to the Motion**

51.    In addition to the above objections, the U.S. Trustee also objects to the fact that

the Motion did not file the engagement agreement with either law firm representing the AHC.

---

[11]  The PSA was not signed until approximately two months *after* the Debtors filed their Original
Motion, and therefore could not have been a part of their business judgement in agreeing to enter into
the original Reimbursement Agreements.

52.    The U.S. Trustee further objects to the following aspects of the Rothschild engagement agreement:

(a)    the absence of a requirement to have some or all of the $175,000 monthly fees applied against the transaction fee of $5 million, as is common practice in this District;

(b)    the obligation of the Debtors' estates to pay the transaction fee to Rothschild upon the effective date of a confirmed chapter 11 plan, without any exception for Rothschild being terminated with cause by the AHC, or Rothschild terminating the engagement without cause.  *See* Rothschild Engagement Agreement, Ex. B-2 to Am. Motion, §§ 3 (a)(ii) and 6;

(c)    the obligation of the Debtors' estates to pay the full transaction fee to Rothschild even if the effective date of the plan occurs up to one year after a termination of Rothschild.  *See* Ex. B-2 to Am. Motion, § 6;

(d)    the obligation of the Debtors' estates to indemnify Rothschild (in Ex. B-2 to Am. Motion, § 5 and Ex. A thereto) without including in the proposed order including the exceptions that are standard in orders in this District approving retention of investment bankers by Debtors or the Committee.  *See, e.g.*, order approving the retention of Jefferies LLC as investment banker to the Official Committee in these cases, D.I. 729 ("Jefferies Retention Order"), ¶ 10;

(e)    the exculpation included in the Rothschild engagement agreement, given that exculpation is something to be provided to estate fiduciaries as part of a chapter 11 plan, and the engagement agreement expressly states that Rothschild is not an estate fiduciary (*see* Ex. B-2 to Am. Motion, Section 5 (Indemnity and Exculpation), Exhibit A thereto (detailed indemnification), and Section 7 (e)("Rothschild & Co will not act, nor will it be deemed to have acted, in any managerial or *fiduciary capacity* whatsoever with respect to the [Debtors], Counsel [to the AHC] or the Executive Committee [of the AHC.]")(emphasis added)); and

    (f)    the provision set forth in the proposed order that Rothschild "shall be required only to keep summary time records in one-half hour (0.5) increments," without any specification as to what constitutes "summary time records." *See* Ex. A to Am. Mot., ¶ 6.  Rothschild should be directed to comply with all requirements of Local Rule 2016-2, including all information and time keeping requirements of subsection (d) of Local Rule 2016-2, other than the requirement that time records be kept in increments of one-tenth of an hour.  *See, e.g.*, Jefferies Retention Order, D.I. 729, ¶ 5.

53.    The U.S. Trustee leaves the Debtors to their burden of proof and reserves any and all rights, remedies and obligations to, *inter alia*, complement, supplement, augment, alter and/or modify this Objection, file an appropriate Motion and/or conduct any and all discovery as may be deemed necessary or as may be required and to assert such other grounds as may become apparent upon further factual discovery.

WHEREFORE, the U.S. Trustee respectfully requests that the Court deny the relief requested by the Amended Motion and the Original Motion, and grant any such other and further relief that the Court deems just and proper.

Respectfully submitted,

**ANDREW R. VARA,**
**UNITED STATES TRUSTEE**
**REGIONS 3 AND 9**

Dated: November 10, 2023

By: */s/ Juliet Sarkessian*
Juliet Sarkessian, Esq.
Trial Attorney
United States Department of Justice
Office of the United States Trustee
J. Caleb Boggs Federal Building
844 N. King Street, Room 2207, Lockbox 35
Wilmington, DE 19801
(302) 573-6491
Juliet.M.Sarkessian@usdoj.gov