## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |

| | |
|---|---|
| FTX TRADING LTD., WEST REALM SHIRES SERVICES, INC., and ALAMEDA RESEARCH LTD., | |
| Plaintiffs, | |
| - against - | Adv. Pro. No. 23-_____(JTD) |
| MIRANA CORP., BYBIT FINTECH LTD., TIME RESEARCH LTD., SIN WEI "SEAN" TAN, WEI LIN "GERMAINE" TAN, WEIZHENG YE, and NASHON LOO SHUN LIANG, | |
| Defendants. | |

**COMPLAINT FOR AVOIDANCE AND RECOVERY OF TRANSFERS PURSUANT TO 11 U.S.C. §§ 105, 544, 547, 548 AND 550, AND DEL. CODE ANN. TIT. 6, § 1304, TURNOVER OF ASSETS PURSUANT TO 11 U.S.C. § 542, DISALLOWANCE OF CLAIMS PURSUANT TO 11 U.S.C. § 502, AND FOR VIOLATIONS OF THE <u>AUTOMATIC STAY PURSUANT TO 11 U.S.C. § 362</u>**

Plaintiffs FTX Trading Ltd. ("<u>FTX.com</u>"), West Realm Shires Services, Inc.

("<u>FTX US</u>"), and Alameda Research Ltd. ("<u>Alameda</u>") (collectively, "<u>Plaintiffs</u>"), through their

---

[1]   The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and 4063 respectively.  Due to the large number of debtor entities in these Chapter 11 cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX. The principal place of business of Debtor Emergent Fidelity Technologies Ltd is Unit 3B, Bryson's Commercial Complex, Friars Hill Road, St. John's, Antigua and Barbuda.

undersigned counsel, for their complaint against Mirana Corp. ("Mirana"), Bybit Fintech Ltd.

("Bybit"), Time Research Ltd. ("Time Research"), Sin Wei "Sean" Tan ("Sean Tan"), Wei Lin

"Germaine" Tan ("Germaine Tan"), Weizheng Ye and Nashon Loo Shun Liang ("Nashon Loo"),

allege the following based upon personal knowledge and upon their investigation to date as to

themselves and their own acts, and upon information and belief as to all other matters:

### NATURE OF THE CASE

1.      Plaintiffs bring this adversary proceeding ("Adversary Proceeding") pursuant to

Sections 105, 544, 547, 548, and 550 of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et

seq*. (the "Bankruptcy Code"), and Section 1304 of Title 6 of the Delaware Code, Del. Code

Ann. tit. 6, § 1304(a)(1), to avoid and recover from Mirana, Time Research, Sean Tan, Germaine

Tan, Weizheng Ye and Nashon Loo (together, the "Preference Defendants"), or from any other

person or entity for whose benefit the transfers were made, all transfers of property of Plaintiffs

to the Preference Defendants during the ninety-day period (the "Preference Period") prior to

commencement of the above-captioned bankruptcy cases (collectively, the "Chapter 11 Cases"

and each a "Chapter 11 Case") by FTX Trading Ltd. and its affiliated debtors and debtors-in-

possession (collectively, the "Debtors" and each a "Debtor").  Plaintiffs also (i) seek the turnover

pursuant to Section 542 of the Bankruptcy Code of Debtor assets contained in Bybit exchange

accounts controlled by Alameda, and (ii) assert claims for violations of the automatic stay

pursuant to Section 362 of the Bankruptcy Code against Bybit and Mirana for their actions

affecting property of the estate.

2.      On November 11 and November 14, 2022 (as applicable, the "Petition Date"), the

Debtors filed with the United States Bankruptcy Court for the District of Delaware (the "Court")

voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.  No trustee has been

appointed for Plaintiffs or any other Debtor in the Chapter 11 Cases, and the Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.  On November 22, 2022, the Court entered an order authorizing joint administration of the Chapter 11 Cases [D.I. 128].  Accordingly, Plaintiffs have the authority to file this Complaint to commence, and thereafter to prosecute, this adversary proceeding.

3.      Prior to the filing of the Chapter 11 Cases, Plaintiffs FTX.com and FTX US operated exchanges offering cryptocurrency trading services.  Plaintiff Alameda engaged in cryptocurrency trading, venture investing and other activities.

4.      Defendant Bybit currently operates one of the world's largest exchanges offering cryptocurrency trading services, reportedly averaging billions of dollars in spot, futures and options trading each day.[2]  Defendant Mirana is Bybit's "investment arm,"[3] engaging in cryptocurrency trading, venture investing and other activities.

5.      Mirana was an active trader on the FTX.com exchange, with an account balance that had grown to several hundred million dollars during the months leading up to the FTX Group's[4] collapse.  Mirana's trading activity and affiliation with Bybit also afforded it preferential treatment from FTX.com relative to the average FTX.com customer.  For example,

---

[2]      *See* https://blog.bybit.com/en-US/post/bybit-next-level-2022-it-s-a-wrap--blt6a0b84f52d1a5ed1/.

[3]      *See* https://twitter.com/benbybit/status/1616313439617486850?lang=en.

[4]      The "FTX Group" is comprised of four silos.  These silos include:  (a) a group composed of Debtor West Realm Shires, Inc., Debtor and Plaintiff West Realm Shires Services, Inc., and their Debtor and non-Debtor subsidiaries; (b) a group composed of Debtor and Plaintiff Alameda Research Ltd., Debtor Alameda Research LLC, and their Debtor subsidiaries; (c) a group composed of Debtors Clifton Bay Investments LLC, Clifton Bay Investments Ltd., Island Bay Ventures Inc. and FTX Ventures Ltd.; and (d) a group composed of Debtor and Plaintiff FTX Trading Ltd. and its Debtor and non-Debtor subsidiaries.

Mirana was granted "VIP" status on the FTX.com exchange, which included concierge support and increased access to FTX Group employees.

6.      In the days leading up to the Petition Date, as public reports raised questions about the Debtors' liquidity and solvency, Mirana and several of its affiliated entities and senior employees raced to withdraw assets from their various corporate and individual accounts on the FTX.com and FTX US exchanges.  As the backlog of pending customer withdrawal requests grew, many customers waited hours or days for withdrawals to be completed, and many more withdrawal requests remained unfulfilled as of the Petition Date.

7.      But Mirana had advantages over the average customer, and used every such advantage in furtherance of a fraudulent scheme to have its withdrawal requests prioritized over those of other customers.  Among other things, Mirana leveraged its VIP connections to pressure FTX Group employees to fulfill its withdrawal requests as soon as assets became available, further reducing the funds available to meet withdrawal requests by FTX.com's non-VIP customers.  In response to Mirana's pressure, FTX Group employees also repeatedly changed Mirana's settings in FTX.com's "Know Your Customer" ("KYC") system in the days prior to the FTX.com exchange halting customer withdrawals on November 8, 2022.

8.      Defendant Bybit also used its control over FTX Group assets as an additional source of leverage to try to force FTX.com to push Mirana to the front of the line.  After the FTX.com exchange halted customer withdrawals, Bybit seized FTX Group assets held on Bybit's exchange, refusing to release them unless and until Mirana was able to finish withdrawing the entire balance of its FTX.com account.

9.      In total, during the Preference Period, Mirana received gross transfers from FTX.com of digital assets currently valued at approximately *$838 million*.[5]  Nearly *$500 million* of these assets were transferred during the final few days before FTX.com disabled withdrawals, including more than *$327 million* fraudulently transferred to Mirana through the scheme referenced above.

10.      In addition, other Mirana- and Bybit-affiliated entities and individuals also received transfers from FTX.com and FTX US during the Preference Period of digital and fiat assets currently valued at approximately *$115 million*.  As with Mirana, the majority of these assets—more than *$61 million*—were withdrawn in the final days before FTX.com and FTX US disabled withdrawals.

11.      Even after the Debtors initiated these Chapter 11 Cases, Mirana and Bybit have continued their unlawful efforts to privilege themselves above the Debtors' other creditors and have repeatedly violated the automatic global stay applicable to all property of the Debtors' estates.  *First*, despite repeated demands, Bybit has refused to allow the Debtors to secure more than *$125 million* held in Bybit accounts funded and controlled by Plaintiffs.  Bybit has insisted that it will not allow the Debtors to recover these assets unless and until the Debtors transfer approximately $20 million to Mirana, representing the remaining Petition Date balance of Mirana's FTX.com account.  *Second*, Mirana and Bybit have used their behind-the-scenes

---

[5]      Plaintiffs have selected November 1, 2023 solely for indicative spot pricing of a present day judgment in this Complaint.  In accordance with Section 550(a) of the Bankruptcy Code, Plaintiffs may seek either (i) recovery of the transferred cryptocurrencies or (ii) the higher of such cryptocurrencies' fair market value as of either (a) the time of payment resulting from any final resolution of this Complaint or (b) the date of such transfers, to return their estates to the position that they would have enjoyed if the transfers had not occurred.  Given the volatility of cryptocurrency values, Plaintiffs reserve all rights with respect to the appropriate pricing date, including whether that date should be the transfer date or the date when repaid. Plaintiffs' preference claims may be subject, in part, to "subsequent new value" defenses in amounts to be determined.

control of an ostensibly independent entity ("BitDAO," n/k/a "Mantle") to restrict and devalue tens of millions of dollars of cryptocurrency tokens held by the Debtors. Mirana and Bybit have continued to take steps to impair the Debtors' tokens even after being expressly warned by the Debtors that doing so would be a violation of the automatic stay.

12.     This Adversary Proceeding seeks (i) the return of assets preferentially and/or fraudulently transferred to the Preference Defendants prior to the Petition Date, (ii) the turnover of estate assets held hostage by Bybit, and (iii) damages for Mirana's and Bybit's flagrant violations of the automatic stay.

13.     Pursuant to Section 502(d) of the Bankruptcy Code, Plaintiffs also seek to disallow any and all claims filed or held by the Defendants in these Chapter 11 Cases unless and until the Defendants have relinquished to Plaintiffs all property that they have received in transfers that are determined by the Court to be avoidable.

14.     During the course of this Adversary Proceeding, Plaintiffs may learn (through discovery or otherwise) of additional transfers made to Defendants during the Preference Period that are avoidable under Sections 547 or 548 of the Bankruptcy Code. Plaintiffs intend to avoid and recover all such transfers made to or for the benefit of Defendants or any other transferee during the Preference Period. Plaintiffs reserve the right to further amend this Complaint to include, without limitation: (i) further information regarding the withdrawals (as defined below), (ii) additional transfers made during the Preference Period, (iii) additional plaintiffs, (iv) modifications of and/or revision to Defendants' names, (v) additional defendants, and (vi) additional causes of action, if applicable (collectively, the "Amendments"), that may become known at any time during this Adversary Proceeding, through formal discovery or otherwise, and intend for any such Amendments to relate back to this Complaint.

**JURISDICTION AND VENUE**

15.     This Adversary Proceeding relates to the Plaintiffs' Chapter 11 Cases filed with this Court on the Petition Date.  The Court has jurisdiction over this Adversary Proceeding pursuant to 28 U.S.C. §§ 157(a) and 1334(a) and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.

16.     This Adversary Proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b), and the Court may enter final orders herein.

17.     Venue of this Adversary Proceeding in this District is proper pursuant to 28 U.S.C. § 1409, and venue in this District is consistent with the interests of justice, judicial economy, and fairness.

18.     The statutory predicates for the relief requested herein are Sections 105(a), 362, 502(d), 542, 544, 547, 548 and 550 of the Bankruptcy Code and Section 1304 of Title 6 of the Delaware Code.

19.     This Adversary Proceeding is commenced pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure because, at a minimum, it seeks, among other things, to recover money or property belonging to the Debtors' Chapter 11 estates.  Fed. R. Bankr. P. 7001(1).

20.     Pursuant to Rule 7008-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware, Plaintiffs consent to the entry of final orders and judgments by the Court on these claims to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

**THE PARTIES**

21.     Plaintiff FTX.com is a corporation registered in Antigua and Barbuda that operated a cryptocurrency trading exchange available to non-US customers.

22.     Plaintiff FTX US is a Delaware corporation that operated a cryptocurrency trading exchange available to US and non-US customers.

23.     Plaintiff Alameda is a British Virgin Islands company limited by shares.

24.     Defendant Bybit is a company registered in the Republic of the Seychelles.  It operates one of the world's largest cryptocurrency exchanges.

25.     Defendant Mirana is a company registered in the Republic of the Seychelles. Mirana is a cryptocurrency trading and venture investment firm affiliated with Bybit.

26.     Defendant Time Research is a company registered in the Republic of the Seychelles.  Time Research is a cryptocurrency trading firm affiliated with Mirana—as set forth below, Time Research and Mirana are registered to the same Seychelles address, and Mirana employees contacted FTX.com in May 2022 to open Time Research's FTX.com account.

27.     Defendant Sean Tan was a senior executive at Mirana and Head of Mirana's asset management group during the relevant period.  Upon information and belief, Defendant Sean Tan is domiciled in Singapore.  Defendants Sean Tan and Weizheng Ye also serve together as directors of "Moonglow Capital Limited," a company organized under the laws of the Marshall Islands that also opened an account on FTX.com.  FTX.com and FTX US accounts registered in the name of Defendant Sean Tan made numerous transfers to (and received numerous transfers from) FTX.com accounts registered in the names of Defendants Germaine Tan and Weizheng Ye.

28.     Defendant Germaine Tan is, upon information and belief, domiciled in Singapore. KYC information associated with an FTX.com account opened in the name of Defendant Germaine Tan reflects the same residential address listed in KYC information associated with an FTX.com account opened in the name of Defendant Weizheng Ye.  FTX.com and FTX US

accounts registered in the name of Defendant Germaine Tan made numerous transfers to (and received numerous transfers from) FTX.com accounts registered in the names of Defendants Mirana, Sean Tan and Weizheng Ye.[6]

29.     Defendant Weizheng Ye is, upon information and belief, domiciled in Singapore. As noted above, (i) Defendants Sean Tan and Weizheng Ye serve together as directors of Moonglow Capital Limited, and (ii) KYC information associated with an FTX.com account opened in the name of Defendant Weizheng Ye reflects the same residential address listed in KYC information associated with an FTX.com account opened in the name of Defendant Germaine Tan.  FTX.com and FTX US accounts registered in the name of Weizheng Ye also made numerous transfers to (and received numerous transfers from) FTX.com accounts registered in the names of Defendants Mirana, Sean Tan and Germaine Tan.

30.     Defendant Nashon Loo was Mirana's Head of Risk, Compliance and Operations during the relevant period.  Upon information and belief, Defendant Nashon Loo is domiciled in Singapore.  Several FTX.com and FTX US accounts were registered in the name of Nashon Loo, and certain of those accounts made transfers to (and received transfers from) FTX.com and FTX US accounts registered in the names of Defendants Sean Tan and Germaine Tan.

## OTHER RELEVANT PERSONS

31.     Samuel Bankman-Fried ("Bankman-Fried") was a co-founder of Plaintiffs FTX.com, FTX US and Alameda, and at all relevant times controlled Plaintiffs through his majority ownership stakes in their ultimate parent companies.

---

[6]     As just one example, on May 7, 2022, 3,390,600 USDC was transferred from Mirana's FTX.com account to Germaine Tan's FTX.com account.  Four minutes later, 1,859,357 USDC was transferred from Germaine Tan's FTX.com account to Sean Tan's FTX.com account.

32.     Zixiao "Gary" Wang ("Wang") was a co-founder of Plaintiffs FTX.com and FTX US and their former Chief Technology Officer.  Wang also held ownership stakes in Plaintiff Alameda and other FTX Group companies.

33.     Nishad Singh ("Singh") was the former Director of Engineering at Plaintiffs FTX.com and FTX US and also held ownership stakes in Plaintiff Alameda and other FTX Group companies.

34.     Caroline Ellison ("Ellison") was the co-Chief Executive Officer ("CEO") of Plaintiff Alameda from August 2021 until September 2022, at which point she was named the sole CEO.

35.     Bankman-Fried, Wang, Singh and Ellison are collectively referred to herein as the "FTX Insiders."

## FACTUAL ALLEGATIONS

### I.    The FTX Insiders' Fraudulent Scheme

36.     Prior to the Petition Date, the FTX Group operated cryptocurrency exchanges and trading businesses.  As explained in the First Day Declarations (defined below), the FTX Group faced a severe liquidity crisis that necessitated the filing of these Chapter 11 Cases on an emergency basis on November 11 and 14, 2022.  Additional factual background relating to the FTX Group's businesses and the commencement of these Chapter 11 Cases is set forth in the *Declaration of John J. Ray III in Support of Chapter 11 Petitions and First Day Pleadings* [D.I. 24], the *Declaration of Edgar W. Mosley II in Support of Chapter 11 Petitions and First Day Pleadings* [D.I. 57], the *Supplemental Declaration of John J. Ray III in Support of First Day Pleadings* [D.I. 92], the *Supplemental Declaration of Edgar W. Mosley II in Support of First Day Pleadings* [D.I. 93] (collectively, the "First Day Declarations"); the *First Interim Report of John J. Ray III to the Independent Directors on Control Failures at the FTX Exchanges* [D.I. 1242-1];

and the *Second Interim Report of John J. Ray III to the Independent Directors: The Commingling and Misuse of Customer Deposits at FTX.com* [D.I. 1704-1].

37.     As detailed in the First Day Declarations, the FTX Group's pre-filing operations were characterized by a complete failure of corporate controls and a total absence of trustworthy financial information.  *See* Decl. John J. Ray III, D.I. 24, at 2.  The FTX Insiders used this deficient control environment, and their domination over the FTX Group's systems, to perpetrate a massive fraud—squandering the FTX Group's assets on, among other things, luxury homes, political and "charitable" contributions, and various investments that would inure to the benefit of the FTX Insiders rather than the corporate entities that had paid for them.

38.     The FTX Insiders funded much of this spending through Alameda, which, at the FTX Insiders' direction, unlawfully commingled and diverted FTX Group assets to the FTX Insiders' pet projects.  In doing so, the FTX Insiders defrauded the FTX Group's customers, creditors and shareholders, and violated their fiduciary duties and numerous laws.

39.     The FTX Insiders' conduct is currently the subject of criminal proceedings initiated by federal prosecutors, actions brought by the Securities and Exchange Commission and the Commodity Futures Trading Commission, and investigations by a host of other regulators. On December 19, 2022, Wang and Ellison pleaded guilty to multiple felonies, including wire fraud, conspiracy to commit wire fraud, conspiracy to commit commodities fraud, and conspiracy to commit securities fraud; Ellison also pleaded guilty to conspiracy to commit money laundering.  *See* Min. Entry, Dec. 19, 2022, *United States* v. *Bankman Fried*, 22 cr-00673 (S.D.N.Y. 2022).  On February 28, 2023, Singh pleaded guilty to the same felonies as Ellison as well as conspiracy to make unlawful political contributions and defraud the Federal Election Commission.  *See* Min. Entry, Feb. 28, 2023, *United States* v. *Bankman Fried*, 22 cr-00673

(S.D.N.Y. 2022).  On November 2, 2023, a unanimous jury found Bankman-Fried guilty of wire

fraud and conspiracy to commit wire fraud, securities fraud, commodities fraud and money

laundering.  *See* Min. Entry, Nov. 2, 2023, *United States* v. *Bankman Fried*, 22 cr-00673

(S.D.N.Y. 2022)

40.     In connection with his plea, Wang admitted that in 2019 he made "certain changes

to [the FTX.com] code" to give Alameda "special privileges on the FTX platform," including to

allow Alameda unfettered use of assets on the FTX.com exchange, even while Alameda

maintained negative balances in its own holdings of fiat (*i.e.*, government-issued) currencies and

cryptocurrencies.  Plea Tr. 24:6-10, ECF No. 21, *United States* v. *Wang*, 22-cr-00673 (S.D.N.Y.

2022).  Using these "special privileges," the FTX Insiders frequently caused Alameda to

misappropriate funds from the FTX.com exchange, commingle them with other funds and use

them for their own benefit.

41.     In the days leading up to the Petition Date, Bankman-Fried supplied potential

investors with a purported Alameda balance sheet that included a liability of $8 billion in a

"[h]idden, poorly internally labled [sic] 'fiat@' account."  *See* Superseding Indictment ¶ 56,

*United States* v. *Bankman-Fried*, 22-cr-00673 (S.D.N.Y. 2022), ECF No. 115.  However,

Bankman-Fried "well knew" that this liability reflected "FTX customer fiat deposits accepted

into Alameda's bank accounts that had not been maintained for the benefit of customers or

repaid to FTX[.]"  *Id.* ¶ 57.  The FTX Insiders used these commingled funds "to make

investments in the name of Bankman-Fried and his associates, rather than in the name of

Alameda."  *Id.* ¶ 26.

42.     Ellison "understood that FTX would need to use customer funds" to make many

of its investments, Plea Tr. 28:1-4, *United States* v. *Ellison*, 22 cr-00673 (S.D.N.Y. 2022), ECF

No. 19, and admitted that many investments "were done in the name of Alameda instead of FTX in order to conceal the source and nature of those funds." *Id.* at 28:22–29:1.

43.     The FTX Insiders were aware at all relevant times of the "special privileges on the FTX platform" that allowed Alameda to "borrow" billions of dollars from FTX.com in order to, inter alia, finance "loans" from Alameda to the FTX Insiders.  Ellison admitted that from 2019 through 2022 she was aware of this arrangement, which she described as "permitt[ing] Alameda access to an unlimited line of credit without being required to post collateral . . . pay interest . . . or being subject to margin calls or FTX.com's liquidation protocols." *Id.* at 27:11-15.

44.     As Singh admitted in his guilty plea, by approximately June 2022, billions of dollars had been diverted from FTX.com to other FTX Group entities, principally "Alameda," and by "early September 2022," Alameda "could not repay what it owed." *See* Plea Tr. 28:23-29:3, *United States* v. *Singh*, 22-cr-00673 (S.D.N.Y. 2022), ECF No. 102.  Ellison also made similar admissions in her guilty plea, stating that from 2019 through 2022, Alameda used FTX.com funds to finance investments or repay loans.  Plea Tr. 27:19-29:1, ECF No. 19, *United States* v. *Ellison*, 22-cr-00673 (S.D.N.Y. 2022).

45.     In the days leading up to the Petition Date, Ellison messaged Bankman-Fried that she "had an increasing dread of this day that was weighing on me for a long time, and now that it's actually happening it just feels great to get it over with[,] one way or another." *See* Superseding Indictment ¶ 53, *United States* v. *Bankman Fried*, 22 cr-00673 (S.D.N.Y. 2022), ECF No. 115.

## II.     The Relationship Between the FTX Group, Mirana and Time Research

46.     Mirana first opened an account on the FTX.com exchange in September 2021, and initially maintained account balances totaling several million dollars.  Mirana's account balances increased to approximately $40 million by the end of April 2022 and $200 million by

the end of May 2022, and thereafter generally ranged between $300 million and $500 million until just prior to the Petition Date.

47.     As Mirana's account activity increased, FTX.com employees reached out to Mirana and offered to set up a VIP "direct line of communication . . . for quicker support on any issues you may have," including by starting a private Telegram group.  VIPs also received other favorable trading perks, such as lower fees and the ability to place more trades per second. Defendant Sean Tan (on behalf of Mirana) accepted this invitation.

48.     In May 2022, a Mirana employee contacted FTX.com to open an account in the name of another entity, Time Research.  KYC materials submitted in connection with opening Time Research's FTX.com account reflected that:  (i) Time Research and Mirana were both registered to the same address in the Seychelles; and (ii) Time Research's "operating address" was the same Chinese address listed in Mirana's KYC materials as the personal address of Mirana's finance director.

III.     **Fraudulent Transfers Made to Defendants Mirana and Time Research**

49.     On November 2, 2022, a news organization leaked what appeared to be Alameda's balance sheet, revealing publicly for the first time that Alameda's solvency was dependent on the multibillion-dollar valuation that Alameda had assigned to its holdings of FTT, a cryptocurrency token issued by the FTX Group.  Following this revelation, and amid growing concerns about the FTX Group's leverage and solvency, substantial numbers of FTX.com and FTX US customers began withdrawing funds from the exchanges.  On November 6, 2022, the FTX Group's primary competitor, Binance, announced it would be liquidating its sizeable holdings of FTT, creating a full-blown liquidity crisis at the FTX Group.

50.     After it became clear that the FTX Group was in financial distress, Mirana sought to leverage its VIP status on FTX.com to ensure that it received priority treatment ahead of other

customers.  During the period when the FTX.com exchange could still meet some of its customer

withdrawal requests (and before withdrawals were paused on November 8, 2022), FTX.com

employees internally tracked VIP withdrawal requests and prioritized those transfers to VIPs

over transfers to other customers.  Mirana also repeatedly pressed FTX Group employees to take

other steps in an attempt to advantage Mirana—as just one example, on three separate occasions

over a roughly 24-hour span on November 7 and 8, one of the FTX Group employees

responsible for managing Mirana's VIP relationship made multiple changes to Mirana's settings

in FTX.com's KYC system.

      51.     That same FTX Group employee also posted in an internal messaging group that

Mirana had "many huge withdrawals stuck."  Another FTX Group employee responded:  "Aware

of Mirana's withdrawals (they are the largest ones), very unlikely they will be pushed out

anytime soon but will do so asap."  As the FTX Group's settlement team raced to process

Mirana's withdrawals, other FTX Group employees continued tracking Mirana's requests on a

spreadsheet titled "VIP Request – Prioritize (Settlement)," which had been created to "keep track

of withdrawal requests from vips and their respective priority."  By this time, Bankman-Fried

and others had made public statements attributing growing customer concerns to "rumors," and

offering false assurances of liquidity in an attempt to slow the onslaught of withdrawals.  The

FTX Group also was actively monitoring public statements by other cryptocurrency industry

participants, including Bybit and affiliated entities, and prioritized Mirana's requests in an effort

to pacify a major industry participant, effectively buying silence by prioritizing withdrawals.

      52.     Mirana's efforts had their intended effect:  from the early morning of

November 7, 2022, until FTX.com halted withdrawals on November 8, 2022, FTX Group's

settlement team went to great lengths to prioritize Mirana's "many huge withdrawals," resulting

in ***more than \$327 million*** in transfers to Mirana, representing approximately 95% of Mirana's FTX.com account balance as of the morning of November 7.  These withdrawals—which are subject to avoidance as fraudulent transfers—are further described in **<u>Exhibit A-1</u>**.

53.     Time Research also benefitted from this VIP treatment:  FTX Group employees tracked Time Research's withdrawal requests in the same "VIP Request – Prioritize (Settlement)" spreadsheet, and repeatedly pressed members of FTX Group's settlement team to prioritize those transfers as well.  On the morning of November 7, 2022, a member of the FTX Group's settlement team flagged that Time Research had several withdrawals pending:  "11,301,080 USDT, 90,000 USDT, 500 ETH, 401,871 BUSD."  Another FTX Group employee responded just minutes later:  "90,000 USDT, 401,871 BUSD Completed.  11,301,080 USDT and 500 ETH awaiting balance, will prioritize."  As promised, the remaining transfers to Time Research were completed shortly thereafter, with the final withdrawal completed just minutes before FTX.com halted withdrawals on November 8, 2022.

54.     From the morning of November 7, 2022, until FTX.com halted withdrawals on November 8, 2022, FTX Group's settlement team prioritized Time Research's many withdrawal requests, totaling ***more than \$23 million*** and representing substantially all remaining assets in Time Research's FTX.com account.  These withdrawals—which are subject to avoidance as fraudulent transfers—are further described in **<u>Exhibit A-2</u>**.

55.     At the time of each of the transfers described in **<u>Exhibits A-1</u>** and **<u>A-2</u>**, each of the Plaintiffs:  (1) was insolvent; (2) became insolvent as a result of the transfers; (3) was engaged in a business or a transaction for which any property remaining with the Plaintiff was an unreasonably small capital; or (4) intended to incur, or believed that it would incur, debts that would be beyond the Plaintiff's ability to repay as such debts matured.

56.     As set forth above, multiple badges of fraud recognized by bankruptcy law and

Del. Code Ann. tit. 6, § 1304(b) permeate these transfers to Defendants Mirana and Time

Research, including that:

i.      The transfers were facilitated by the close relationship between the Plaintiffs and
        Mirana and Time Research;

ii.     Plaintiffs were insolvent when, or became insolvent shortly after, the transfers
        were made; and

iii.    The transfers occurred shortly before or shortly after Plaintiffs incurred
        substantial debts.

## IV.    Preferential Transfers Made by FTX.com and FTX US to the Preference Defendants

57.     After reviewing transaction records, KYC documents, internal communications

and other materials, the Debtors have identified several FTX.com and FTX US accounts that

(i) appear to be associated with Mirana, Time Research and/or senior Mirana executives, and

(ii) were associated with significant preferential transfers during the Preference Period.[7]  As set

forth in more detail below, based on currently available information, during the Preference

Period, the Preference Defendants collectively received the benefit of withdrawals from their

FTX.com and FTX US accounts of the digital assets and fiat currency set forth in the attached

**Exhibit B**, which constitute preferential transfers and are avoidable under Section 547 of the

Bankruptcy Code.  Based on pricing as of November 1, 2023, those assets are collectively valued

at approximately $953.2 million.[8]  FTX.com's and FTX US's preference claims against the

Preference Defendants may be subject, in part, to "subsequent new value" defenses in an amount

---

[7]     The Debtors are continuing to investigate the degree to which various accounts were actually controlled by
        the entities and individuals to which they were registered.

[8]     *See supra* n. 5.

17

to be determined arising from deposits into the Preference Defendants' FTX.com and FTX US accounts subsequent to these preferential transfers.

### (i) Mirana

58.     Based on currently available information, during the Preference Period, Mirana received the benefit of certain withdrawals of digital assets and fiat currency from its FTX.com exchange account as set forth in **Exhibit C-1**.  Based on pricing as of November 1, 2023, those assets are collectively valued at approximately $837,815,847.[9]  Those withdrawals constitute preferential transfers and are avoidable under Section 547 of the Bankruptcy Code.  FTX.com's preference claim against Mirana may be subject, in part, to a "subsequent new value" defense in an amount to be determined arising from deposits into Mirana's FTX.com account subsequent to these preferential transfers.

### (ii) Time Research

59.     Based on currently available information, during the Preference Period, Time Research received the benefit of certain withdrawals of digital assets from its FTX.com exchange account as set forth in **Exhibit C-2**.  Based on pricing as of November 1, 2023, those assets are collectively valued at approximately $47,995,279.[10]  Those withdrawals constitute preferential transfers and are avoidable under Section 547 of the Bankruptcy Code.  FTX.com's preference claim against Time Research may be subject, in part, to a "subsequent new value" defense in an amount to be determined arising from deposits into Time Research's FTX.com account subsequent to these preferential transfers.

---

[9]     *Id.*

[10]    *Id.*

### (iii)    Sean Tan

60.    Based on currently available information, during the Preference Period, Sean Tan received the benefit of certain withdrawals of digital assets and fiat currency from his FTX.com exchange account as set forth in **Exhibit C-3**.  Based on pricing as of November 1, 2023, those assets are collectively valued at approximately $12,688,057.[11]  Those withdrawals constitute preferential transfers and are avoidable under Section 547 of the Bankruptcy Code.  FTX.com's preference claim against Sean Tan may be subject, in part, to a "subsequent new value" defense in an amount to be determined arising from deposits into Sean Tan's FTX.com account subsequent to these preferential transfers.

61.    Based on currently available information, during the Preference Period, Sean Tan also received the benefit of certain withdrawals of digital assets from his FTX US exchange account as set forth in **Exhibit D-1**.  Based on pricing as of November 1, 2023, those assets are collectively valued at approximately $12,987,835.[12]  Those withdrawals constitute preferential transfers and are avoidable under Section 547 of the Bankruptcy Code.  FTX US's preference claim against Sean Tan may be subject, in part, to a "subsequent new value" defense in an amount to be determined arising from deposits into Sean Tan's FTX US account subsequent to these preferential transfers.

### (iv)    Germaine Tan

62.    Based on currently available information, during the Preference Period, Germaine Tan received the benefit of certain withdrawals of digital assets from her FTX.com exchange account as set forth in **Exhibit C-4**.  Based on pricing as of November 1, 2023, those assets are

---

[11]    *Id.*

[12]    *Id.*

collectively valued at approximately $34,505,435.[13]  Those withdrawals constitute preferential transfers and are avoidable under Section 547 of the Bankruptcy Code.  FTX.com's preference claim against Germaine Tan may be subject, in part, to a "subsequent new value" defense in an amount to be determined arising from deposits into Germaine Tan's FTX.com account subsequent to these preferential transfers.

      **(v)**    **Weizheng Ye**

63.     Based on currently available information, during the Preference Period, Weizheng Ye received the benefit of certain withdrawals of digital assets and fiat currency from his FTX.com exchange account as set forth in **Exhibit C-5**.  Based on pricing as of November 1, 2023, those assets are collectively valued at approximately $1,981,000.[14]  Those withdrawals constitute preferential transfers and are avoidable under Section 547 of the Bankruptcy Code.  FTX.com's preference claim against Weizheng Ye may be subject, in part, to a "subsequent new value" defense in an amount to be determined arising from deposits into Weizheng Ye's FTX.com account subsequent to these preferential transfers.

64.     Based on currently available information, during the Preference Period, Weizheng Ye also received the benefit of certain withdrawals of digital assets and fiat currency from his FTX US exchange account as set forth in **Exhibit D-2**.  Based on pricing as of November 1, 2023, those assets are collectively valued at approximately $4,065,634.[15]  Those withdrawals constitute preferential transfers and are avoidable under Section 547 of the Bankruptcy Code.  FTX US's preference claim against Weizheng Ye is not subject to a potential "subsequent new

---

[13]    *Id.*

[14]    *Id.*

[15]    *Id.*

value" defense on account of any deposits into Weizheng Ye's FTX US account subsequent to these preferential transfers.

        **(vi)**    **Nashon Loo**

65.    Based on currently available information, during the Preference Period, Nashon Loo received the benefit of certain withdrawals of digital assets and fiat currency from his FTX.com exchange account as set forth in **Exhibit C-6**.  Based on pricing as of November 1, 2023, those assets are collectively valued at approximately $1,205,816.[16]  Those withdrawals constitute preferential transfers and are avoidable under Section 547 of the Bankruptcy Code. FTX.com's preference claim against Nashon Loo may be subject, in part, to a "subsequent new value" defense in an amount to be determined arising from deposits into Nashon Loo's FTX.com account subsequent to these preferential transfers.

*     *     *

66.    Plaintiffs have analyzed available information and hereby seek to avoid all of the preferences set forth in **Exhibits C-1** through **C-6** and **D-1** through **D-2** after giving effect to Defendants' affirmative defenses under Section 547(c) of the Bankruptcy Code that are known or reasonably knowable to Plaintiffs.

## V.    Bybit's Post-Petition Refusal to Transfer Estate Assets to the Debtors

67.    As FTX.com and FTX US customer withdrawal requests flooded in, the FTX Group sought to secure its assets held on other platforms in order to satisfy customer withdrawals.  As an active cryptocurrency trading firm, Alameda and its subsidiaries and affiliated entities held numerous accounts on other cryptocurrency exchanges, including at

---

[16]    *Id.*

Mirana's affiliated exchange, Bybit.  However, instead of honoring the FTX Group's withdrawal requests, on November 9, 2022, Bybit began restricting the FTX Group's ability to withdraw assets from its Bybit accounts.  Bybit did not attempt to justify these actions as a necessary security measure or other temporary limitation—to the contrary, Bybit informed the FTX Group that it would not remove these restrictions unless and until Mirana was reimbursed in full for the remaining approximately $20 million balance that Mirana was unable to extract from its FTX.com account before FTX.com disabled withdrawals on November 8, 2022.

68.     Following the Petition Date, the Debtors and their advisors undertook to identify and recover all estate assets for the benefit of their creditors.  The Debtors have identified at least six Bybit accounts that were funded and controlled by the Debtors, collectively holding assets currently valued at more than ***$125 million*** (collectively, the "Bybit Accounts"):

- Account No. ending in 3162, held in the name of Plaintiff Alameda, contains digital assets valued at approximately $22.0 million (as of November 10, 2023);

- Account No. ending in 6833, held nominally by Ninja Epoch Ltd., is property of Alameda and contains digital assets valued at approximately $40.3 million (as of November 10, 2023);

- Account No. ending in 6338, held nominally by Finfinity Apex Ltd., is property of Alameda and contains digital assets valued at approximately $25.0 million (as of November 10, 2023);

- Account No. ending in 2251, held nominally by King Sirius Ltd., is property of Alameda and contains digital assets valued at approximately $20.9 million (as of November 10, 2023);

- Account No. ending in 7848, held nominally by Fir Grove Enterprises Ltd., is property of Alameda and contains digital assets valued at approximately $9.6 million (as of November 10, 2023);

- Account No. ending in 1701, held nominally by Whirl Casa Ltd., is property of Alameda and contains digital assets valued at approximately $8.1 million (as of November 10, 2023).

69.     Notwithstanding that certain of these accounts were nominally registered in the name of entities other than Alameda, they were at all relevant times funded and controlled by, and used solely for the benefit of, the Debtors and their subsidiaries.  Each of Ninja Epoch Ltd., Finfinity Apex Ltd., King Sirius Ltd., Fir Grove Enterprises Ltd. and Whirl Casa Ltd. was a nominee entity formed in the British Virgin Islands at the direction of FTX Group employees to be used for Alameda's trading activities, and the email addresses associated with each of the corresponding Bybit accounts were set up to automatically forward all messages to info@alameda-research.com, or used info@alameda-research.com as the recovery e-mail address.  To this day, the Debtors also continue to be able to log into each of the Bybit Accounts, but Bybit has disabled withdrawals to prevent the Debtors from securing the assets in these accounts for the benefit of their creditors.

70.     Section 542(a) of the Bankruptcy Code mandates that "an entity, other than a custodian, in possession, custody, or control during the case, of property that the trustee may use, sell, or lease under section 363 of this title . . . shall deliver to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate."  11 U.S.C. § 542(a).

71.     The assets held by Bybit in the Bybit Accounts are property of the Debtors' estates pursuant to Section 541(a)(1) of the Bankruptcy Code, which defines "property of the estate" to include, among other things, "all legal or equitable interests of the debtor in property as of the commencement of the case," "wherever located and by whomever held."  11 U.S.C. § 541(a).[17]

---

[17]     In addition, insofar as Bybit qualifies as a custodian under Bankruptcy Code section 543, it is obligated to "deliver to the [Debtors] any property of the debtor held by or transferred to such custodian, or proceeds, product, offspring, rents, or profits of such property, that is in such custodian's possession, custody, or control on the date that such custodian acquires knowledge of the commencement of the case."  11 U.S.C. § 543(b).

72.     "Congress intended that property of the estate be broadly inclusive of all interests that the debtor has under state law." *In re Barksdale*, 281 B.R. 548, 551 (Bankr. D.N.J. 2002). "[T]he Bankruptcy Code is not concerned with the 'technicalities of title' when it comes to determining property of the estate." *In re NJ Affordable Homes Corp.*, 2006 WL 2128624, at *8 (Bankr. D.N.J. June 29, 2006) (cleaned up).  Instead, property belongs to the estate where the debtor controls the property or otherwise indicates its "legal or equitable interests" in the property. *E.g.*, *In re Schwartz*, 2014 WL 2621114, at *5 (Bankr. D.N.J. June 12, 2014) (holding that bank account not in debtor's name was nevertheless property of the estate where debtor funded account, showed "ownership, control, and interest" in account, and money "functionally belonged" to debtor).

73.     There is no bona fide dispute as to the Debtors' ownership of the more than $125 million in assets in the Bybit Accounts.  Nevertheless, Bybit has continued to hold these assets hostage as leverage for its demand that the Debtors circumvent the bankruptcy process and allow Bybit's affiliated trading firm to—once again—receive preferential treatment ahead of the FTX Group's other customers and creditors.  The Debtors will not do so, and as a result have no choice but to seek judicial enforcement of their rights under the Bankruptcy Code.

## VI.    Bybit and Mirana's Post-Petition Violations of the Automatic Stay

### A.    Bybit's Refusal to Transfer Estate Assets Held in Bybit Accounts to the Debtors Violates the Automatic Stay

74.     By refusing to return the assets in the Bybit Accounts to the Debtors, Bybit is depriving the Debtors of the value of their property and has caused the Debtors to incur significant costs in seeking to secure those assets.  Bybit's attempt to strong-arm its way around the bankruptcy process constitutes a violation of the automatic stay.  By forcing the Debtors to expend estate resources in seeking the return of estate property, Bybit's conduct also is in direct

24

conflict with the primary purpose of the automatic stay, which is to give the debtor a "breathing spell" from creditors while it develops a plan of "repayment or reorganization." *In re VistaCare Group, LLC*, 678 F.3d 218, 231 (3d Cir. 2012) (citation omitted).

**B.     Mirana and Bybit's Attempts to Devalue the Debtors' BIT Tokens Violate the Automatic Stay**

75.     Mirana and Bybit also have willfully violated the automatic stay in other ways, including by taking steps to devalue tens of millions of dollars of cryptocurrency tokens held by the Debtors.  In October 2021, Alameda and Bybit agreed to a "token swap" whereby Alameda received 100 million BIT tokens in exchange for approximately 3.4 million FTT tokens. Highlighting the interconnected and commingled nature of Bybit and Mirana's corporate and financial relationships, this October 2021 transaction was negotiated by a senior Bybit executive using her Mirana email address, and the BIT tokens were delivered to Alameda from a third entity, BitDAO, which the Bybit executive privately explained was controlled by Bybit, notwithstanding that BitDAO purported to be a "decentralized autonomous organization" controlled by "community members."

76.     In May 2023, Bybit approached the Debtors to propose "unwinding" the October 2021 token swap—*i.e.*, proposing that the Debtors transfer to BitDAO 100 million BIT tokens (approximately $50 million at then-current pricing) in exchange for approximately 3.4 million FTT tokens (approximately $4 million at then-current pricing).  The Debtors declined to proceed with Bybit's facially absurd proposal, and BitDAO shortly thereafter announced that it would rebrand as "Mantle" and that all BIT tokens would be replaced by newly issued "MNT" tokens, with BIT holders able to convert their BIT tokens to MNT tokens at a 1:1 ratio, pursuant to procedures applying equally to all BIT holders.  After the Debtors began the process of converting their BIT tokens to MNT tokens, BitDAO (n/k/a Mantle) immediately disabled the

25

token conversion process and launched a "community vote" to decide whether to "restrict the automatic migratability of FTX Group's $BIT tokens, pending the resolution of related issues."[18]

77.     The Debtors promptly informed Bybit and Mirana that this proposal constituted a clear violation of the automatic stay, to which Bybit and Mirana responded by pleading ignorance, hiding behind the fig leaf of Mantle as a supposedly independent entity.[19] Unsurprisingly, the Mantle "community"—which the senior Bybit executive previously had acknowledged was controlled by Bybit—supported the proposal, leaving the Debtors unable to migrate their BIT tokens and facing tens of millions of dollars in potential losses.  Even more egregiously, Mirana did not even attempt to hide its involvement in these stay violations, openly voting to enact this proposal.[20]

**CAUSES OF ACTION**

**COUNT ONE**
**FRAUDULENT TRANSFERS PURSUANT TO 11 U.S.C. § 548(a)(1)(A)**
**(AGAINST DEFENDANTS MIRANA AND TIME RESEARCH)**

78.     Plaintiffs repeat and reallege the allegations in paragraphs 1 through 77 as if fully set forth here.

---

[18]     https://snapshot.org/#/bitdao.eth/proposal/
0x00625c4f2d9aa9d4efb41ef3d0942194ca2087fae0599deced8b8ed86372c6c2

[19]     Defendant Mirana's website states that it "provide[s] investment, legal, and other advisory services for Web3 projects including the Mantle ecosystem."  https://mirana.xyz/about/.

[20]     Mantle's "community votes" are weighted by token holdings, such that accounts with larger token holdings possess more voting influence.  A significant portion of Mantle's largest token holders are anonymous or pseudonymous, consistent with Bybit's admission that it secretly maintained control.  Certain of these token holders disguise that control less well than others.  For example, the fifth largest "vote" in favor of restricting the Debtors' BIT tokens was from an account registered to "dtoh.eth" and labeled as "Mirana Ventures," which is a Mirana subsidiary headed by an individual named David Toh.  *See* https://snapshot.org/#/bitdao.eth/proposal/0x00625c4f2d9aa9d4efb41ef3d0942194ca2087fae0599deced8b8 ed86372c6c2; https://delegatevote.mantle.xyz/0xf87095925339f7fFdde266258f62947567de6aEb; https://mirana.xyz/team/.

79.    Plaintiff FTX.com made the transfers to Defendants Mirana and Time Research addressed in paragraphs 49 through 56 and more specifically described in **Exhibits A-1** and **A-2**. Each of these transfers was a transfer of property of FTX.com.

80.    Each of these transfers to Defendants Mirana and Time Research was made with the intent to hinder, delay or defraud FTX.com's present or future creditors.

81.    Accordingly, each of these transfers should be avoided as fraudulent pursuant to Section 548(a)(1)(A) of the Bankruptcy Code, and FTX.com may recover from Defendants Mirana and Time Research the full amount of such transfers, plus interest from the relevant dates, and costs and fees to the extent available, for the benefit of the Debtors' bankruptcy estates.

## COUNT TWO
### FRAUDULENT TRANSFERS PURSUANT TO
### DEL. CODE ANN. TIT. 6, § 1304(a)(1) AND 11 U.S.C. § 544(b)
### (AGAINST DEFENDANTS MIRANA AND TIME RESEARCH)

82.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 77 as if fully set forth here.

83.    Section 544(b) of the Bankruptcy Code authorizes Plaintiffs to avoid any transfer of an interest in their property by them that is voidable under applicable law by a creditor holding an allowable unsecured claim.  Accordingly, fraudulent transfers are avoidable pursuant to Bankruptcy Code Section 544(b) and other applicable law, including the Delaware Uniform Fraudulent Transfer Act, Del. Code Ann. tit. 6, § 1301, *et seq*.

84.    Plaintiff FTX.com made the transfers to Defendants Mirana and Time Research addressed in paragraphs 49 through 56 and more specifically described in **Exhibits A-1** and **A-2**. Each of these transfers to Defendants Mirana and Time Research was a transfer of property of FTX.com.

85.     Each of these transfers to Defendants Mirana and Time Research was made with the intent to hinder, delay or defraud FTX.com's present or future creditors, including creditors who hold allowable unsecured claims.  Each of these transfers is avoidable by creditors who hold allowable unsecured claims.

86.     Accordingly, each of these transfers should be avoided as fraudulent pursuant to Del. Code Ann. tit. 6, § 1304(a)(1) and 11 U.S.C. § 544(b), and FTX.com may recover from Defendants Mirana and Time Research the full amount of such transfers, plus interest from the relevant dates, and costs and fees to the extent available, for the benefit of the Debtors' bankruptcy estates.

## COUNT THREE
## FTX.COM PREFERENTIAL TRANSFERS PURSUANT TO 11 U.S.C. § 547(b)
## (AGAINST PREFERENCE DEFENDANTS)

87.     Plaintiffs repeat and reallege the allegations in paragraphs 1 through 77 as if fully set forth here.

88.     FTX.com made the transfers addressed herein during the Preference Period, as more specifically described in **Exhibit C-1** through **C-6**.

89.     Each of the transfers was a transfer of property of FTX.com.

90.     Each of the transfers was made to benefit one or more of the Preference Defendants.

91.     With respect to each of the transfers, the receiving Defendant was a creditor of FTX.com (within the meaning of 11 U.S.C. § 101(10)), or, alternately, the Defendant received such transfers for the benefit of a creditor or creditors of FTX.com.

92.     Each of the transfers was made on account of an antecedent debt, namely FTX.com's obligation to deliver to each Defendant the cryptocurrency or cash balances in Defendants' FTX.com accounts.

93.     Each of the transfers was made within ninety days of the Petition Date.

94.     Each of the transfers was made while FTX.com was insolvent.

95.     Each of the transfers enabled the receiving Defendant to receive more than it would have received if:  (i) FTX.com's Chapter 11 Case were a case under Chapter 7 of the Bankruptcy Code; (ii) the transfer had not been made; and (iii) the amount paid to the Defendant on account of the debt were determined by the Bankruptcy Code.

96.     As of the date hereof, the Preference Defendants have not returned any of the transfers to FTX.com.

97.     Pursuant to 11 U.S.C. § 547(b), FTX.com has undertaken reasonable due diligence in the circumstances of the case and has taken into account known or reasonably knowable affirmative defenses and believes that the transfers are avoidable.

98.     Accordingly, these transfers should be avoided as preferences pursuant to Section 547(b) of the Bankruptcy Code, and FTX.com may recover from the Preference Defendants the full amount of the transfers, plus interest from the transfer dates, and costs and fees to the extent available, for the benefit of the Debtors' bankruptcy estates.

**COUNT FOUR**
**FTX US PREFERENTIAL TRANSFERS PURSUANT TO 11 U.S.C. § 547(b)**
**(AGAINST DEFENDENTS SEAN TAN AND WEIZHENG YE)**

99.     Plaintiffs repeat and reallege the allegations in paragraphs 1 through 77 as if fully set forth here.

100.     FTX US made the transfers addressed herein during the Preference Period, as more specifically described in **Exhibits D-1** through **D-2**.

101.     Each of the transfers was a transfer of property of FTX US.

102.     Each of the transfers was made to benefit one or more of the Preference Defendants.

103.    With respect to each of the transfers, the receiving Defendant was a creditor of FTX US (within the meaning of 11 U.S.C. § 101(10)), or, alternatively, the Defendant received such transfers for the benefit of a creditor or creditors of FTX US.

104.    Each of the transfers was made on account of an antecedent debt, namely FTX US's obligation to deliver to each Defendant the cryptocurrency or cash balances in Defendants' FTX US accounts.

105.    Each of the transfers was made within ninety days of the Petition Date.

106.    Each of the transfers was made while FTX US was insolvent.

107.    Each of the transfers enabled the receiving Defendant to receive more than they would have received if:  (i) Plaintiffs' Chapter 11 Case were a case under Chapter 7 of the Bankruptcy Code; (ii) the transfer had not been made; and (iii) the amount paid to the Defendant on account of the debt were determined by the Bankruptcy Code.

108.    As of the date hereof, the Preference Defendants have not returned any of the transfers to FTX US.

109.    Pursuant to 11 U.S.C. § 547(b), FTX US has undertaken reasonable due diligence in the circumstances of the case and has taken into account known or reasonably knowable affirmative defenses and believes that the transfers are avoidable.

110.    Accordingly, these transfers should be avoided as preferences pursuant to Section 547(b) of the Bankruptcy Code, and FTX US may recover from Defendants the full amount of the transfers, plus interest from the transfer dates, and costs and fees to the extent available, for the benefit of the Debtors' bankruptcy estates.

## COUNT FIVE
## PROPERTY RECOVERY PURSUANT TO 11 U.S.C. § 550(a)(1)
### (AGAINST THE PREFERENCE DEFENDANTS)

111.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 77 as if fully set forth here.

112.    As alleged above, Plaintiffs are entitled to avoid each of the transfers addressed herein under Sections 547 and 548 of the Bankruptcy Code.

113.    Because Defendants are the initial transferees of such transfers or the entities for whose benefit such transfers were made, Plaintiffs may recover from Defendants the full value of the transfers pursuant to 11 U.S.C. § 550(a)(1), plus interest from the transfer dates, and costs and fees to the extent available, for the benefit of the Debtors' bankruptcy estates.

## COUNT SIX
## TURNOVER CLAIM PURSUANT TO 11 U.S.C. § 542
### (AGAINST DEFENDANT BYBIT)

114.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 77 as if fully set forth here.

115.    As alleged above, Bybit continues to hold hostage the funds contained in the Bybit Accounts, which comprise assets of the Debtors' estates.  The Debtors seek an order from the Court directing Bybit to turn over to the Debtors the assets in the Bybit Accounts, which are property of the Debtors' estates pursuant to Bankruptcy Code Section 541(a)(1).

116.    The relief requested also is authorized under the Court's equitable powers codified in section 105(a) of the Bankruptcy Code.  Pursuant to that section, this Court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions" of the Bankruptcy Code.  11 U.S.C. § 105(a).

**COUNT SEVEN**
**VIOLATION OF THE AUTOMATIC STAY PURSUANT TO 11 U.S.C. § 362(a)(3), (k)**
**(AGAINST DEFENDANTS BYBIT AND MIRANA)**

117.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 77 as if fully set forth here.

118.    Section 362(a)(3) of the Bankruptcy Code provides, in relevant part, that a petition "filed under section 301, 302, or 303 of this title . . . operates as a stay, applicable to all entities, of . . . any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3).

119.    The Debtors' assets in the Bybit Accounts and the Debtors' BIT tokens comprise property of the Debtors' estates under Section 541 of the Bankruptcy Code. *See* 11 U.S.C. § 541(a)(1) (estate property is comprised of "all legal or equitable interests of the debtor in property as of the commencement of the case").

120.    Section 362(k) of the Bankruptcy Code permits an individual injured by a willful violation of the automatic stay to recover "actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages." *See* 11 U.S.C. § 362(k)(1).

121.    Plaintiffs respectfully submit that the above circumstances warrant both actual and punitive damages to be determined by the Court based on the depletion of estate assets, including any losses in value of the Debtors' assets in the Bybit Accounts and the Debtors' BIT tokens resulting from the Defendants' actions, as well as costs and attorneys' fees.

**COUNT EIGHT**
**DISALLOWANCE OF CLAIMS PURSUANT TO 11 U.S.C. § 502(d)**
**(AGAINST ALL DEFENDANTS)**

122.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 77 as if fully set forth here.

123.    As alleged above, Defendants are transferees of transfers avoidable under either Sections 547 or 548 of the Bankruptcy Code, and entities from which property is recoverable under Section 550 of the Bankruptcy Code.

124.    By reason of the foregoing facts and pursuant to Section 502(d) of the Bankruptcy Code, any claims of Defendants that have been or will in the future be asserted in these Chapter 11 Cases should be disallowed unless and until Defendants have relinquished to Plaintiffs the property transferred, or have paid Plaintiffs the value of such transferred property, for which and to the extent that the Court has determined Defendants are liable pursuant to 11 U.S.C. § 550.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that this Court:

125.    Enter an order that the transfers addressed herein are avoidable fraudulent transfers and/or preferences under 11 U.S.C. §§ 544, 547, and 548 and Del. Code Ann. tit. 6, § 1304;

126.    Award Plaintiffs (a) the return of property to the Debtors' estates that is the subject of the avoidable fraudulent and preferential transfers alleged herein; or (b) monetary damages reflecting the applicable value in accordance with 11 U.S.C. § 550 of the avoidable fraudulent and preferential transfers alleged herein (plus the value of any additional avoidable transfers Plaintiffs learn, through discovery or otherwise, were made to the Defendants during the Preference Period);

127.    Enter an order under 11 U.S.C. § 542 and 105(a) directing the turnover of assets held in the Bybit Accounts to the Plaintiffs;

128.     Enter an order under 11 U.S.C. § 502(d) disallowing any and all claims filed or held by the Defendants in these Chapter 11 Cases unless and until the Defendants relinquish to Plaintiffs the amount ordered as an award for avoidable transfers and for property withheld;

129.     Enter an order under 11 U.S.C. § 362(k) awarding actual and punitive damages to the Plaintiffs for Defendant Mirana and Bybit's violation of the automatic stay with respect to the Debtor Tokens, and Defendant Bybit's violation of the automatic stay with respect to the Debtors' assets frozen on accounts on its platform;

130.     Award Plaintiffs their attorneys' fees, pre- and post-judgment interests, and costs of suit; and

131.     Award Plaintiffs all other relief, at law or equity, to which they may be entitled.

Dated:  November 10, 2023
      Wilmington, Delaware

**LANDIS RATH & COBB LLP**

*/s/ Matthew B. McGuire*
Adam G. Landis (No. 3407)
Matthew B. McGuire (No. 4366)
Kimberly A. Brown (No. 5138)
Matthew R. Pierce (No. 5946)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
E-mail: landis@lrclaw.com
      mcguire@lrclaw.com
      brown@lrclaw.com
      pierce@lrclaw.com

-and-

**SULLIVAN & CROMWELL LLP**
Steven L. Holley (admitted *pro hac vice*)
Stephanie G. Wheeler (admitted *pro hac vice*)
Brian D. Glueckstein (admitted *pro hac vice*)
Justin J. DeCamp (admitted *pro hac vice*)
Christopher J. Dunne (admitted *pro hac vice*)
Jacob M. Croke (admitted *pro hac vice*)
125 Broad Street
New York, NY 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
E-mail: holleys@sullcrom.com
      wheelers@sullcrom.com
      gluecksteinb@sullcrom.com
      decampj@sullcrom.com
      dunnec@sullcrom.com
      crokej@sullcrom.com

*Counsel for the Debtors*
*and Debtors-in-Possession*