**Exhibit E**

```
1                    UNITED STATES BANKRUPTCY COURT
                          DISTRICT OF DELAWARE
2

3                                      .   Chapter 11
     IN RE:                            .
4                                      .   Case No. 20-12522 (JTD)
     MALLINCKRODT PLC, et al.,         .
5                                      .
                                       .
6                                      .   Courtroom No. 5
                                       .   824 North Market Street
7                                      .   Wilmington, Delaware 19801
                                       .
8                     Debtors.   .   December 14, 2020
     . . . . . . . . . . . . . . . .   3:00 P.M.
9

10                         TRANSCRIPT OF HEARING
                 BEFORE THE HONORABLE JOHN T. DORSEY
11                   UNITED STATES BANKRUPTCY JUDGE
     APPEARANCES:
12

13   For the Debtor:          Anupama Yerramalli, Esquire
                              Christopher Harris, Esquire
14                            LATHAM & WATKINS
                              885 Third Avenue
                              New York, New York 10022
15

16                            Michael Merchant, Esquire
                              RICHARDS LAYTON FINGER
17                            920 North King Street
                              Wilmington, Delaware 19801

18   Audio Operator:          Jason Spencer

19   Transcription Company:   Reliable
                              1007 N. Orange Street
20                            Wilmington, Delaware 19801
                              (302) 654-8080
21                            Email:  gmatthews@reliable-co.com

22   Proceedings recorded by electronic sound recording, transcript
     produced by transcription service.
23

24

25
```

```
 1   APPEARANCES (Continued):

 2   For Ad Hoc Committee of
     Governmental Entities:    Kenneth Eckstein, Esquire
 3                             KRAMER LEVIN NAFTALIS FRANKEL

 4
     For the Official Committee
 5   Of Opioid-Related
     Claimants:                Arik Preis, Esquire
 6                             AKIN GUMP STRAUSS HAUER FELD
                               One Bryant Park
 7                             Bank of America Tower
                               New York, New York 10036
 8
     For Unsecured Notes Ad
 9   Hoc Group:                Claudia Tobler, Esquire
                               PAUL WEISS RIFKIND WHARTON GARRISON
10                             2001 K Street
                               Washington, DC 20006
11
     For Ad Hoc Group of
12   Personal Injury:          Ed Neiger, Esquire
                               ASK LLP
13

14   For Future Claimants:     James Patton, Esquire
                               YOUNG CONAWAY STARGATT & TAYLOR
15                             1000 North King Street
                               Wilmington, Delaware 19801
16
     For NAS Children:         Scott Bickford, Esquire
17                             MARTZELL BICKFORD CENTOLA
                               338 Lafayette Street
18                             New Orleans, Louisiana 70130

19

20

21

22

23

24

25
```

1

INDEX

2

#1) Motion of Debtors for Entry of an Order Appointing Roger
3  Frankel, as Legal Representative for Future Claimants,
   Effective as of the Petition Date [Docket No. 189 – filed
4  October 13, 2020].

5  **Ruling: 26**

6
   #2) The Official Committee of Opioid Related Claimants' (I)
7  Request for Adjournment of or, in the Alternative, Objection
   to Motion of Debtors to Appoint Future Claimants
8  Representative and (II) Cross-Motion to Compel Debtors to
   Establish Bar Date and Noticing Program for Opioid Claimants
9  [Docket No. 658 – filed November 28, 2020].

10 #3) Debtors' Motion for Order Authorizing Debtors to Pay the
   Reasonable and Documented Fees and Expenses of the RSA Party
11 Professionals and Granting Related Relief [Docket No. 523 –
   filed November 16, 2020].

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Proceedings commence at 3:02 a.m.)

2          THE COURT:  Thank you.  Good afternoon, everyone.

3    This is Judge Dorsey.  We're on the record in Mallinckrodt,

4    PLC; case number 20-12522.  And I will go ahead and turn it

5    over to debtors' counsel to run the agenda.

6          MR. MERCHANT:  Thank you, Your Honor.  Michael

7    Merchant of Richards Layton & Finger on behalf of the

8    debtors.

9          Your Honor, I'd first like to thank the court for

10   accommodating our request to delay the hearing by

11   (indiscernible).  I think the time was used productively.

12         I'm going to cede the virtual podium, at this

13   point, to Anu Yerramalli to update the court on where we are

14   with respect to the first two matters on the agenda.

15         THE COURT:  Okay.  Let me hear from Ms.

16   Yerramalli.

17         MS. YERRAMALLI:  Good afternoon, Your Honor.  Anu

18   Yerramalli of Latham & Watkins on behalf of the debtors.

19         To echo Mr. Merchant, we'd like to thank the court

20   and your chambers for their patience this afternoon as we

21   continue to discuss these matters with the RSA parties, the

22   official opioid claimant's committee, the other objecting

23   parties and the UCC.

24         These discussions over the past few days and these

25   extra hours today did prove fruitful and we have an agreed

1 path forward that adjourns the FCR motion and the official

2 opioid claimant's committee's cross motion to compel to the

3 January 28th hearing.

4       The debtors believe that this proposal that I will

5 lay out provides structure and a framework for the cases over

6 the next forty-five days to push the current opioid parties

7 to negotiate consensual allocation agreements.

8       Put another way, Your Honor, we are giving the

9 current opioid parties a chance to reach an allocation

10 agreement but not deferring litigation of the contested

11 motions indefinitely.  Unless Your Honor has any preliminary

12 questions, please bear with me as I read the terms of the

13 adjournment into the record.

14       THE COURT:  Okay. Go ahead.

15       MS. YERRAMALLI:  And, to be clear, Your Honor, the

16 proposed future claims representative is not a party to this

17 framework.

18       As I will use that term meaning the debtors, the

19 OCC, the ad hoc group of NAS children, the ad hoc group of

20 personal injury claimants, the governmental ad hoc committee,

21 and the MSGE Group which will be collectively referred to as

22 the governmental opioid claimants throughout my remarks, the

23 UCC and the unsecured noteholder ad hoc group.

24       And here are the terms, Your Honor.

25       The debtors' motion to approve the FCR, the OCC's

1   motion to compel the establishment of a bar date and the

2   proposed FCR retention application are all going to be

3   adjourned until the January 28th omnibus hearing.

4        If there is no agreement or resolution on opioid

5   claimant's allocation prior to the January 28th hearing and

6   the adjourned motions go forward on such dates or such other

7   further adjourned hearing date, no party will use the passage

8   of time from December 14th to January 28th or the date of any

9   such further adjourned hearing date as the reason for

10  approval or denial or argument in favor against of any of the

11  adjourned motions.

12       In other words, no party may use the additional

13  forty-five or more days in a prejudicial manner during the

14  January 28th hearing or further adjourned hearing date.  All

15  parties' other arguments in respect of the adjourned motions

16  are expressly preserved except for as set forth as I will

17  note.

18       Your Honor, no party will use the passage of time

19  as a reason to oppose the FCR's appointment and the FCR's

20  appointment and the retention of professionals shall be

21  effective as of the petition date when heard.

22       The governmental opioid claimants will engage in

23  good faith allocation negotiations with each of the groups of

24  non-governmental opioid claimants in this pleading

25  respectively beginning December 14th.  The goal of such

1  negotiations is to reach agreement in principle between the
2  governmental opioid claimants and each of the groups of non-
3  governmental opioid claimants respectively.

4       The debtors will move on or before December 21st
5  for appointment of Kenneth Feinberg as mediator to assist the
6  parties in such negotiations.  The OCC and the governmental
7  opioid claimants will consult with the debtors on a mutually
8  agreeable order which will set forth the terms of Mr.
9  Feinberg's responsibilities and engagement.

10      The debtors will seek expedited court approval of
11  the mediator motion and no party will oppose such expedited
12  approval.

13      The mediation will continue until January 28th,
14  2021 and will terminate on that date unless the debtors, the
15  OCC and the governmental opioid claimants agree to extend
16  mediation.

17      Upon termination of mediation, the hearing on the
18  adjourned motion will go forward as soon as possible, subject
19  only to the court's availability.

20      Your Honor, prior to the earlier of the hearing on
21  the adjourned motion, termination of the allocation mediation
22  for February 28, 2021.  The debtors will not file any plan of
23  reorganization or amendment to the filed plan, disclosure
24  statement or solicitation materials containing an allocation
25  of the opioid trust assets unless otherwise agreed by the

1  debtors, the governmental opioid claimants and the OCC.

2        No party will use the obligations set forth to

3  oppose or argue that the debtor should not be afforded an

4  extension of the exclusive period firing on February 9th,

5  2021.  And no party will use the filing of a plan or

6  reorganization, disclosure statement or solicitation

7  materials against any other party in connection with the

8  approval or denial of any of the adjourned motion.

9        Notwithstanding the fact of all these agreements,

10  the opioid claimants will work in good faith and diligently

11  on allocation negotiations and simultaneously the debtors,

12  the OCC, and the RSA parties will work with Prime Clerk

13  between today and January 28th to come to agreements on a

14  noticing strategy and opioid proofs and claim forms to ensure

15  no additional delay in the event the parties agree or the

16  court ultimately determines to establish a bar date.

17        No party will refer to this work or agreement

18  thereon or failure to reach an agreement during the January

19  28th hearing or further adjourned hearing date including as a

20  reason for approval or denial of the OCC cross motion or

21  approval or denial of the FCR motion.  In other words, no one

22  will be prejudiced by this work in the event the adjourned

23  motions are heard at the January 28th hearing or further

24  adjourned hearing date.

25        Your Honor, the UCC and the OCC's rights with

1 respect to the plan and the transaction set forth in the RSA

2 are reserved and nothing herein should be construed by any

3 party that either of the committees have approved the RSA

4 transactions.

5          Your Honor, we believe that what I have just set

6 forth on the record should be sufficient for record purposes,

7 unless the court request that we prepare a stipulation and

8 scheduling order.

9          THE COURT:  No, I --

10          MS. YERRAMALLI:  And with that, Your Honor, I

11 would --

12          THE COURT:  Okay.  Thank you.  No, I don't think

13 you need to formalize it in a written order.  I think the

14 representation on the record is fine but let me hear -- see

15 if anybody else has any other comments.  I see a raised hand

16 from a Ms. Tobler, but I don't see Ms. Tobler.

17          There she is.  Go ahead, Ms. Tobler.

18          MS. TOBLER:  Yes, good afternoon, Your Honor.

19 Claudia Tobler from Paul Weiss Rifkind Wharton & Garrison on

20 behalf of the unsecured notes ad hoc group.

21          Can you hear me all right?

22          THE COURT:  I can. Thank you.

23          MS. TOBLER:  Thank you, Your Honor.

24          Very briefly.  We just want the record to be clear

25 that the unsecured notes ad hoc group is not agreeing that

1  this adjournment amends or modifies the RSA, including the

2  milestones under the RSA.

3          That is all we have, Your Honor.

4          THE COURT:  Okay.  Thank you.

5          Mr. Preis.

6          MR. PREIS:  Good afternoon, Your Honor.  Can you

7  hear me?

8          THE COURT:  I can.  Thank you.

9          MR. PREIS:  For the record, Arik Preis, Akin Gump

10 Strauss Hauer & Feld, proposed counsel for the official

11 committee of opioid related claimants.

12          As the debtors have announced, we have reached an

13 agreement to adjourn the motion that we're scheduled for

14 today, as well as the application to retain the FCR's

15 professionals until, at least, January 28th, subject to

16 possible extension as the debtors indicated.

17          As an initial matter, I want to note that the

18 number of parties that were involved in negotiating this

19 agreement, the debtors, the OCC, the UCC, the governmental ad

20 hoc group, the MSEG, the ad hoc group of PI's, the ad hoc

21 group of NAS, and the unsecured noteholder ad hoc group.

22          I can tell you that as of two hours ago, I wasn't

23 sure we would be able to reach resolution, so we very much

24 appreciate the court's indulgence and patience with us.  We

25 very much apologize, Your Honor, to the extent that you spent

1 many hours over the weekend preparing for this contested

2 hearing.  If it's any consolation, we did as well.

3          THE COURT:  That's a part of the job.

4          MR. PREIS:  I just wanted to make the following

5 three points about the agreement.

6          First, the agreement now sets in stone our

7 intention to appoint Ken Feinberg to act as mediator in these

8 cases for the purpose of reaching an agreement on opioid

9 claimant allocation.  We have been in contact with Mr.

10 Feinberg and he understands the situation, and he understands

11 the timing.  And we are grateful to have his assistance in

12 these very important issues with this case.

13          It's our hope that he ad we can build on the

14 Purdue situation in this case.  You'll recall that the very

15 first time I was in front of you, Your Honor, I noted that we

16 all build on our experience in these opioid cases from case

17 to case.

18          Second, the agreement puts off the debtors'

19 ability to file any sort of plan of reorganization that

20 includes allocation among opioid claimants while this

21 mediation is ongoing.  That too is an important point for us

22 as fiduciary for all the opioid claimants to ensure that

23 nothing gets in the way of mediation.

24          Three, the agreement also ensures that if we are

25 unsuccessful in our attempt to reach resolution with regard

1  to allocation and if we ultimately are back in front of Your

2  Honor arguing the motions that no party can use the passage

3  of time or the fact that a plan or disclosure statement is on

4  file as a result of approval or denial of the motion.

5          That was an important point for the OCC because we

6  did not want to be prejudiced by agreeing to mediate in good

7  faith over the next forty-five days.

8          You heard also the debtors mention the same thing

9  with regard to working on the bar date and a noticing

10  program.  There's going to be no prejudice either way.

11  That's an important point for all the parties.

12          Finally, I just wanted to note to come back to

13  something that I noted to you the first time I appeared in

14  front of you in this case.

15          The first time I appeared I mentioned that there

16  were three issues that the OCC would be focused on.  If you

17  recall one of them was allocation among opioid claimants.

18  Everything you would have heard today was going to be in some

19  way tied to allocation while ensuring fair and equitable

20  treatment of all opioid creditors and that every opioid

21  creditor would receive their due process rights.

22          And, of course, the mediation is going to be about

23  allocation of all these issues.  And if we're unable to reach

24  a resolution in the next forty-five days, obviously we hope

25  we do, or any extended period, we'll be back in front of Your

1  Honor making the arguments we would have made today, as will

2  the debtors.

3       At that point, it's my guess that we will be only

4  pressing our motion if we believe the outcome of the

5  mediation would not have resulted in fair and equitable

6  treatment for all opioid creditors and due process ensured

7  for all.

8       With that, Your Honor, that's all I had to say

9  with regard to the agreement.

10      THE COURT:  Thank you, Mr. Preis.

11      MR. PREIS:  I believe, Your Honor, that -- I'm

12  sorry; that the ad hoc -- sorry.  I believe that the ad hoc

13  group of NAS children and the ad hoc group of PI who are also

14  very heavily involved in this wanted to make some statements.

15  I don't know if they raised their hand.

16      THE COURT:  Mr. Eckstein raised his hand.  Go

17  ahead, Mr. Eckstein.

18      You're on mute, Mr. Eckstein.

19      MR. ECKSTEIN:  Your Honor, I'm sorry.  Good

20  afternoon.  I'm happy to defer to the other two groups if --

21  I'm going to defer to the other two groups if they'd like to

22  speak first.  I just had a very brief comment I wanted to

23  make, Your Honor.

24      THE COURT:  Well, go ahead.  Nobody else has

25  raised their hand, so.  If the other two groups want to --

1   wait a minute.  If the other two groups want to speak, if you

2   could please use the raise your hand function on the Zoom, it

3   makes it easier for me to identify you.  Thank you.

4            Go ahead, Mr. Eckstein.

5            UNIDENTIFIED SPEAKER:  Your Honor, I'm trying to

6   figure out how to do them.

7            THE COURT:  Go down to the participants at the

8   bottom where it says participants at the bottom.  If you

9   click on that, it brings up a dialogue box and there's a

10  raise your hand icon there.

11           UNIDENTIFIED SPEAKER:  Thank you.

12           THE COURT:  Mr. Eckstein, go ahead.

13           MR. ECKSTEIN:  Thank you, Your Honor.

14           Kenneth Eckstein of Kramer Levin, co-counsel for

15  the governmental ad hoc committee of claimants.

16           Your Honor, we are very appreciative for the

17  efforts that all of the parties have invested in reaching a

18  resolution that has been read into the record today.  We view

19  this as a constructive step forward and we believe it will

20  help facilitate real progress in the case and we are looking

21  forward to working actively over the next several weeks to

22  hopefully bring about a successful negotiated allocation that

23  will be an important component of the plan.

24           So with that, Your Honor, we appreciate the time

25  and look forward to moving forward.  Thank you.

1          THE COURT:  Thank you, Mr. Eckstein.

2          Mr. Neiger.

3          MR. NEIGER:  Thank you, Your Honor.

4          Good afternoon.  My name is Ed Neiger of ASK LLP

5    and I represent the ad hoc group of personal injury victims

6    in this case.

7          First and foremost, Your Honor, I'd like to echo

8    the thanks that the other parties extended to you for

9    accommodating our schedule today for our rescheduling of

10   today's hearing.

11         I would also like to thank the parties for working

12   together over the weekend to try to reach a mutually

13   agreeable resolution, even if it just might be a temporary

14   one.

15         We want to especially thank the OCC and its

16   professionals for its hard work in reaching todays'

17   resolution.  They worked tirelessly and my ad hoc committee

18   is grateful for that.

19         Your Honor, since this is our groups first time

20   appearing in this case with pleadings, we were hoping for a

21   brief indulgence to tell Your Honor a little bit about our

22   group, its members and, most importantly, how we hope to make

23   a positive contribution to the resolution of these cases.

24         The ad hoc group is comprised of eight personal

25   injury victims who represent the interest of several thousand

1  people who have suffered from the damaging effects of opioid

2  manufactured by the debtors.  The PI group is represented by

3  my law firm, ASK, who also represented the ad hoc PI group in

4  the Purdue bankruptcy and we also represented sixty thousand

5  other opioid victims in that case.  We have worked with the

6  debtor and the creditor constituencies in that case and hope

7  to do the same here.

8          Many of the parties in interest here are

9  represented by the same professionals in Purdue.  We are

10  optimistic that resolutions can be reached on a mutually

11  agreeable basis which not only benefits the creditors, but

12  the debtors and all parties in interest, including the RSA

13  parties.

14          Your Honor, the main thing we hope to impart upon

15  the court and the other important parties in this case is

16  that this is not just a balance sheet restructuring or

17  equitization that so many bankruptcy cases that come before

18  Your Honor are.  How this case proceeds and progresses and

19  ultimately how its resolved will have a real-life impact on

20  thousands and thousands of individuals and their families who

21  have already suffered so much trauma as a result of the

22  opioid epidemic.

23          The names and faces of victims that we ask the

24  court and all parties in interest to bear in mind as they

25  work through the complex legal issues that will arise which

1  the court had a preview of in connection with the adjourned

2  motions that were scheduled to be heard today.

3       Your Honor, each member of the ad hoc group has a

4  story that is tragic and each includes (indiscernible)

5  introduction innocuous introduction to opioids that led to a

6  life that spiraled out of control and resulted in the

7  destruction of their family, their career, and, in some

8  instances, caused death.  They are real people who have

9  suffered real injuries or death.

10      Each member of the group is now active and helping

11  other people suffering from addiction and their families and

12  worked tirelessly to prevent others from suffering the way

13  they did.

14      As I said, we hope and are optimistic that things

15  can be resolved amicably and that there will be no need for

16  us to pair, again, in a contested matter.  So, to that end,

17  given that we already are here, I was hoping that the court

18  will indulge us to briefly introduce the eight members of the

19  committee.

20      I note that many of them planned to attend today's

21  hearing by phone or video and I hope they were able to make

22  the new schedule work.  I also note that they hope to come to

23  court in person so that they can witness the court in action

24  and see Your Honor and to meet some of the professionals in

25  this case who will have such a dramatic effect on their

1 lives, for good or for bad.  Hopefully, that they will come

2 to see.

3          I would like to now quickly mention the members so

4 as to give Your Honor a flavor of not only who they are but

5 for the thousands and thousands of victims that they speak

6 for.  We're mindful of this court's valuable time and of the

7 time of everyone in this case, so I will be brief.

8          The first member is Julie Strickler (ph).  Julie

9 lost her twenty-four-year-old son, Nick, corporal in the U.S.

10 Marine.  Nick became addicted to opioids after prescription

11 for Roxicodone and sadly lost his life to overdose in 2017.

12 I know that Julie misses Nick dearly everyday and, in is

13 memory, she works tireless to ensure that no other mothers

14 endure the pain of burying their child.

15          The next member is Will Alpin (ph).  Will had a

16 successful career in the aerospace industry before becoming

17 addicted to opioids.  As a result of his addiction, he lost

18 his job, his family, and almost lost his life.  Fortunately,

19 Will has sustained recovery and has seen the focus of his

20 life's work to helping other suffering from substance use

21 disorder.  Will is currently the director of programs for the

22 Foundation for Recovery in Las Vegas that not only helps

23 victims suffering from addition in Las Vegas but nationally.

24          Like Will, our next member, Nick Boteman (ph)

25 struggled with addiction to opioids, including Roxicodone,

1  for over ten years.  As a result of his addiction to legal
2  prescription drugs, Nick lost his family and all of his
3  material possessions.  Thankfully, he is now in recovery and
4  works to help other addicts.  He's the president and chairman
5  of the board of the Discovery Institute in Marlboro, New
6  Jersey which helps people suffering from substance abuse
7  disorder nationally.

8          Our next member is Kate Scarpone (ph).  Kate's
9  son, Joseph, was a marine sergeant who did a tour in
10 Afghanistan, a combination of PPS and opioid use led to his
11 death in 2015, just one month shy of his 26th birthday.  Kate
12 has dedicated her life to helping other bereaved parents and
13 serves on the board of directors of (indiscernible), a
14 nationally non-profit organization dedicated to parents who
15 have lost a child to substance abuse disorder.  Just as one
16 service that pain sharing provides is to provide money to
17 families who can't afford to bury their child who died of
18 overdose.  And I know that Kate misses her son, Joe, every
19 single day.

20          Our next member is Crystal Arnold.  Crystal is a
21 thirty-seven-year-old single mother who lost her husband,
22 Chris, to an overdose in 2017.  As a result of Chris'
23 struggles and death, Crystal found herself living in a
24 homeless shelter and recently filed her own bankruptcy.  She
25 is now rebuilding her life and trying to help others and part

1  of that is her work on behalf of victims in this case.

2      Our next member is Eric Rogers who was a thirty-

3  three-year-old with a steady job, a new home and a bright

4  future ahead of him. Eric soon became addicted to Roxicodone

5  which was prescribed to him after suffering a herniated disc.

6  He soon became addicted and lost everything.  Thankfully, he

7  is now sober and working to rebuild his life.  And as part of

8  that effort, hopes to help others suffering from addiction,

9  including victims in this case.

10      Our next member is Rosie Reeka (ph). Rosie lost

11  her father, Bobbie, to an accidental overdose in February of

12  2020, very recently.  Bobbie was prescribed opioids,

13  including Roxicodone, while in the hospital as a result of

14  serious car accident.  Rosie remembers her dad as someone who

15  was always happy to help others and enjoyed life.

16  (indiscernible) left family to (indiscernible) to overdose

17  and hopes to help them in any way she can.

18      Our final member is Darren Zaber (ph).  Darren's

19  life personified the American dream.  He owned a home, had a

20  living wife and two beautiful children.  That all changed

21  when he was diagnosed with degenerative disc disease and was

22  prescribed Roxicodone.  Darren quickly became addicted and

23  his addiction led to the sale of his home, destruction of his

24  marriage, and loss of custody over his children.  Darren

25  eventually did a stent in jail for six years, was

1  incarcerated for six years as a result of stealing opioids to

2  feed his addiction.  Upon his release in 2019, he found Rebel

3  Souls which is an organization that includes support and

4  guidance to those recovering from addiction.  In addition, he

5  speaks at local schools and provides seminars for those in

6  rehab and does anything he can to help others suffering from

7  addiction and to prevent others from getting addicted in the

8  first place.

9          So that's who we are, Your Honor.  We hope to

10  advocate for the individual victims in this case who have

11  suffered terribly.  And while nothing will bring back the

12  loss loved ones or the years lost to opioid addiction for our

13  members, actively participating in the process hopefully will

14  bring some semblance of closure that many claimants in this

15  case need.

16          We thank Your Honor again for your time today.

17          THE COURT:  Thank you, Mr. Neiger.  I appreciate

18  the comments and the introduction of your committee members.

19  I appreciate that.

20          Mr. Patton, you are next up.

21          MR. PATTON:  Thank you, Your Honor.  Jim Patton on

22  behalf of Roger Frankel, the proposed FCR in this case.

23          As Ms. Yerramalli pointed out, Mr. Frankel is not

24  a party to the agreement that was put into the record today.

25  I just want to make sure that it is clear in everyone's minds

1 | that Mr. Frankel is not a party in this case at this point.

2 | Unless and until Your Honor appoints him as the

3 | FCR he will not be participating in the negotiations that are

4 | going to be going forward.  If and when he is appointed then

5 | he will be in a position to engage, but I didn't want anyone

6 | left with the impression that he was able to participate in

7 | this process prior to appointment by Your Honor.

8 | Thank you.

9 | THE COURT:  Thank you, Mr. Patton.

10 | I don't know if there is someone who has their

11 | phone unmuted or if it's just some bad feedback on the line

12 | today.  It could be because of the terrible weather we're

13 | having, but if you are not speaking and you are not muted

14 | could you please mute your phones.  That would be helpful.

15 | Thank you.

16 | Mr. Bickford?

17 | MR. BICKFORD:  Good afternoon, Your Honor.  I'm

18 | Scott Bickford.  I am representing the NAS Children's Ad Hoc

19 | Committee.

20 | I wanted to thank all the parties for their

21 | participation in a marathon session of trying to get this

22 | matter resolved for the court.  If the court would indulge me

23 | for just a couple minutes I wanted to bring the court's

24 | awareness to the parties we represent.

25 | Neonatal abstinence syndrome or NAS is a condition

1 caused when children are exposed in utero to opioid

2 containing medication that their mother has been taking.  As

3 a result of that the child is born dependent upon opioids.

4 It is likely -- the child is likely to end up in the ICU or

5 the NICU of hospitals being weened with eyedroppers of

6 morphine from its opioid dependence, screaming on end for

7 days in terrible pain and suffering from the opioid ingestion

8 that its mother took while it was in utero.

9          This isn't an uncommon problem.  Up to 40,000

10 children a year are born in the United States with NAS.  As

11 of the year 2000 to 2014 some thirty to forty percent of

12 birth mothers were prescribed opioid containing medication.

13 This led to this very large population of NAS children being

14 born.

15          The problems that they're born with cleft palates,

16 eye injuries, heart defects and other teratogenic

17 disabilities.  They have developmental disabilities of the

18 inability to walk, talk or meet other milestones, they have

19 learning disabilities.  And as I said, the problem is

20 extensive.

21          I have with me today three women who had such

22 children who were prescribed opioids during their pregnancy;

23 Ms. Judith Olsen, Ms. Felicia Coleman, and Ms. Shelly

24 Whittaker.

25          Ms. Olsen, for instance, was struck by a car in

1   2000 and was hospitalized with severe cervical injuries.  She

2   was administered opioids for the pain.  She had follow-up

3   pain management with opioids for her continued pain and

4   became pregnant while she was being prescribed opioids.

5         She gave birth to a daughter in 2004.  That

6   daughter spent the first thirty days of her life in the NICU

7   unit being weaned off of opioids.  The daughter was also born

8   with a cleft palate.  She underwent multiple, multiple

9   corrective surgeries and has learning and development

10   problems.

11         Ms. Coleman was diagnosed with a herniated disc,

12   underwent three back surgeries all of which she was

13   prescribed opioids manufactured by the debtor in this case.

14   While between back surgeries Ms. Coleman became pregnant and

15   was never warned about the effect opioids might have on her

16   unborn child.

17         That child was born in around 2015 and had another

18   extensive stay within the ICU.  The child was also born with

19   major intestinal problems for which multiple surgeries were

20   required.

21         Ms. Whittaker, unfortunately, was diagnosed with

22   lupus at a very young age as well as rheumatoid arthritis.

23   She was prescribed opioids without any warning about effects

24   on her unborn children.  She had three children while taking

25   opioids and the last one suffered severe problems in the NICU

1   while being weaned from opioids.  They all have learning

2   disability and developmental problems.

3           These are the tip of the iceberg of these present

4   claims that present as a result of unsuspecting woman who

5   were prescribed opioids made by the debtor during this period

6   of time.  These woman and others who actually serve on the

7   OCC representing the interests look forward to working with

8   the parties involved here to seek a resolution for their

9   claims and for the claims of many of these children that

10  exist across the country in our schools, in developmental

11  centers, et ceterra.

12          We're concerned that, of course, a lot of these

13  children can't get into developmental learning programs at

14  this point because there is just no room.  There is just no

15  funding.  And it's a devastating effect for thousands and

16  thousands of children that exist now in this country.  And we

17  hope that this bankruptcy can make a change and effect on

18  their lives.

19          Thank you, Your Honor.

20          THE COURT:  Thank you, Mr. Bickford.  Again, I

21  appreciate your comments and the introduction of your members

22  of your group.  I appreciate that.

23          Ms. Yerramalli?

24          MS. YERRAMALLI:  Your Honor, unless anyone else

25  wants to be heard I can just close and we can move onto the

1 || other matter on the agenda.  I just want to make sure there

2 || is no one else that wants to be heard.

3 ||         THE COURT:  Let's ask.  Is there anyone else who

4 || wants to speak?

5 ||         (No verbal response)

6 ||         THE COURT:  Okay.  Go ahead, Ms. Yerramalli.

7 ||         MS. YERRAMALLI:  Thank you, Your Honor.  Again,

8 || thank you for your flexibility today.  I too echo the other

9 || parties for apologizing for the time you and Chambers may

10 || have spent this weekend preparing, but as you can see it did

11 || prove fruitful and we hope that the parties that you heard

12 || from today will use this time period and the framework

13 || diligently.  We will also use that time with the other case

14 || constituents to move these cases forward in parallel to meet

15 || our upcoming milestones.

16 ||         With that, Your Honor, I think we can continue on

17 || with the agenda which I believe is Your Honor's ruling on a

18 || prior motion.

19 ||         THE COURT:  Okay.  We will go ahead and take care

20 || of that.  So, this is my ruling on the debtor's motion for

21 || authorization to pay RSA parties professional fees and

22 || expenses.

23 ||         The debtors have moved for authorization to pay

24 || the reasonable and documented post-petition fees and expenses

25 || of several ad hoc groups of unsecured creditors who are

1 | parties to a prepetition and restructuring support agreement
2 | which I will refer to as the RSA parties.  The debtors are
3 | not seeking to assume the RSA or the reimbursement agreements
4 | attached to the motion.

5 |      The debtors confirm that they are not signatories
6 | to several of those agreements and in the case of the multi-
7 | state governmental entities, MSGE Group, no agreement exists
8 | at all.  Nevertheless, the debtors assert that they seek to
9 | pay the fees and expenses in accordance with the
10 | reimbursement agreements, "to the extent applicable."

11 |      For the reasons I am about to discuss I will
12 | sustain the objections to the unsecured creditors and the
13 | U.S. Trustee to the motion without prejudice.

14 |      The debtors argue that authorization is
15 | appropriate pursuant to Section 363(b) of the Bankruptcy Code
16 | as a request to use the debtor's assets, in this instance
17 | cash, outside the ordinary course of business.  They argue
18 | that the request is a proper exercise of the debtor's
19 | business judgment and is in the best interest of the debtor's
20 | estates and their creditors making the relief appropriate.

21 |      Most of the debtor's creditor's constituencies
22 | have agreed to the requested relief including the official
23 | committee of opioid claimants and the official committee of
24 | unsecured creditors.  The ad hoc committee of senior secured
25 | lenders, which I will refer to as the secured lenders, and

1  the U.S. Trustee, however, objected to the requested relief.

2      They argue that the only source for authority to

3  pay the fees is Section 503(b) of the Code which requires an

4  analysis of the substantial contribution made by the RSA

5  parties and that determination cannot be made until after the

6  debtors have either assumed the RSA or confirmed the plan of

7  reorganization.

8      Secured lenders argue that while it may be

9  possible to pay the fees in the context of an assumption of

10  the RSA or the reimbursement agreements the debtors have not

11  made that motion and specifically reserve the right to seek

12  or not to seek the assumption of those agreements in the

13  future.

14      The U.S. Trustee argues that Section 503(b) is the

15  only procedurally proper way to approve the fees.  There is

16  no question that this case is large and complex with numerous

17  creditor constituencies that will need to work together if

18  there is going to be a successful reorganization of the

19  debtors.

20      Moreover, the case involves significant public

21  policy and public health issues that will have substantial

22  impact on the lives of thousands of individuals as well as

23  federal, state and local governments across the country.  The

24  debtors have already made significant inroads in pulling

25  together those disparate creditor constituencies; however,

1    there is still much to be done.

2         The ability to work with the ad hoc group of

3    creditors rather than trying to negotiate with vast numbers

4    of individual creditors clearly provides for more streamlined

5    and a convenient way to move toward completing a successful

6    reorganization.  Those groups will be able to provide input

7    to move the case toward a successful conclusion.

8         The question before me, however, is whether the

9    debtors can agree to pay the post-petition fees and expenses

10   of the professionals retained by the various ad hoc groups

11   who have signed onto the RSA as those parties work toward a

12   successful reorganization when the debtors have not sought to

13   assume the RSA or the reimbursement agreements.

14        The debtors argue that Section 363(b) of the Code

15   and not 503(b) governs the requested relief.  They cite to

16   the recent bench ruling of Judge Drain in the Purdue Pharma

17   bankruptcy case pending in the Southern District of New York

18   where he approved a similar request while citing to another

19   decision by the District Court for the Southern District of

20   New York Bethlehem Steel Corporation, 203 Westlaw, 21738964.

21        I note that in both of those cases, unlike this

22   case, the debtors were either seeking to assume a prepetition

23   reimbursement agreement or had entered into a reimbursement

24   agreement post-petition with the unsecured creditor group

25   that they were -- unsecured creditors group whose

1   professionals they were seeking to pay.

2          The debtors assert that Section 503 is not

3   applicable because they, and not the ad hoc committees, are

4   seeking to provide for the reimbursements and those

5   reimbursements are not intended to have any administrative

6   status.  Section 503(b) would apply, the debtors assert, if

7   the ad hoc committees were seeking payment rather than the

8   debtors.

9          Thus, since the debtors are seeking to use their

10  assets, other than in the ordinary course of business,

11  Section 363(b) provides the appropriate basis for the relief.

12  In other words, the debtor's position is that Section 363(b)

13  provides prospective relief while Section 503(b) provides

14  retrospective relief.

15         Debtors assert that the objection is based on the

16  flawed premise that Section 503(b) limits the permissible

17  uses of a debtor's cash or other assets during the case to

18  administrative expense claims.  They argue that Section

19  363(b) as well as other provisions of the code serve as a

20  basis for debtors to pay a variety of expenses.

21         As an example, they point to the decision of In Re

22  Just for Feet, Inc., Case 242 B.R. 821 at 824 through 25,

23  District of Delaware case from 1999, holding that Section

24  105(a) of the Code provides a basis for the payment of

25  prepetition claims under the necessity of payment doctrine.

1    Of course, the debtors here are not seeking the payment of

2    prepetition claims; they are seeking to pay fees and expenses

3    incurred post-petition by certain unsecured creditors.

4            There is no question, therefore, that the proposed

5    reimbursements are for administrative expenses.  Nonetheless,

6    the debtors argue that Section 503(b) and 363(b) serves

7    separate purposes and Section 503(b) is not implicated in the

8    relief requested here.  That is because here the debtors are

9    making the request to allow for the post-petition payments,

10   not the creditors.  Debtors argue that Section 503(b) applies

11   only when a creditor is seeking payment on a non-consensual

12   basis citing to Purdue Pharma and Adelphia Communications

13   Corp., 441 B.R. 6 at 12 through 13, Bankruptcy Court for the

14   Southern District of New York 2010.

15           The secured lenders and the U.S. Trustee take the

16   opposite view.  The U.S. Trustee argues that Section 503(b)

17   is the sole basis upon which I can approve the payment of

18   fees and expenses to the ad hoc committees.  The trustee

19   points out that Section 503(b) provides detailed requirements

20   before such fees and expenses may be paid including, (1)

21   timely filing of a request for payment; (2) notice and a

22   hearing; (3) a showing that the expenses were actual or

23   necessary; (4) a showing of substantial contribution to the

24   case and; (5) a finding by the court that any compensation

25   paid to an attorney or county is reasonable, citing 11 U.S.C.

1  503(a) and 503(b)(3) and (b)(4).

2      Because Section 503(b) provides specific

3  requirements for the payment of fees sought here, they argue,

4  the debtors cannot rely on the more general provisions of

5  Section 363(b) which gives the debtor the ability to use

6  estate assets outside the ordinary course if they can

7  establish a reasonable business justification.

8      The trustee relies heavily on the Third Circuit's

9  decision in O'Brien Environmental Energy, Case No. 181 F.3d

10 527, a 1999 decision from the Third Circuit in which the

11 court held that a breakup fee sought by an unsuccessful

12 purchaser following an auction process must be paid by

13 reference to Section 503.  The Third Circuit rejected an

14 invitation to develop a general common law of breakup fees

15 noting that,

16      "Courts may not create a right to recover from the

17 bankruptcy estate where no such right exists."

18      That is at 532.  Thus, the court concluded courts

19 must look to the bankruptcy code alone for the source of any

20 authority to pay a breakup fee.  The O'Brien court found that

21 the source of that authority lies in Section 503(b) of the

22 Code.  The court stated that,

23      "Claims that arise after the date on which a

24 debtor petitioned for bankruptcy protection are generally

25 allowed, if at all, only as administrative expenses pursuant

1 | to 11 U.S.C. Section 503."

2 |    The court reviewed, however, other courts -- how
3 | other courts address the payment of breakup fees including
4 | The Official Committee of Subordinated Bondholders v.
5 | Integrated Resources, Inc., 147 B.R. 650, Southern District
6 | of New York 1992 in which the court authorized the debtor to
7 | enter into a letter agreement pursuant to Section 363.  The
8 | Third Circuit concluded that none of the other cases,
9 | including Integrated Resources, provided a compelling
10 | justification for treating an application for breakup fees as
11 | expenses differently from any other administrative expense
12 | under the same provision.

13 |    The debtors attempt to distinguish O'Brien by
14 | arguing that the court did not hold that Section 503 was the
15 | only code provision that would allow for the use of debtor's
16 | estates resources.  They point to the language where the
17 | court stated,

18 |    "The filing of a petition for bankruptcy
19 | protection under Chapter 11 of the Code precludes all efforts
20 | to obtain or distribute property of the estate other then as
21 | provided in the bankruptcy code.  See 11 U.S.C. Sections 362,
22 | 363, 1123."

23 |    Because the court referred to Section 363 as one
24 | way to distribute estate assets debtors argue they are not
25 | restricted to Section 503(b) as a basis to pay the proposed

1  fees and expenses.  I agree with the debtors that Section 363

2  provides the procedural mechanism for a debtor to seek the

3  authority to make payments to unsecured creditor groups that

4  if the group, itself, sought payment it would need to be made

5  pursuant to Section 503.  That leaves open the question,

6  however, as to what standard I should apply in deciding

7  whether to allow those payments.

8          The debtors argue it is the general business

9  judgment standard that applies in any application made by a

10  debtor under Section 363 to use debtor's assets outside the

11  ordinary course and the court should defer to the debtor's

12  business judgment.  On that point I disagree with the

13  debtors.

14          I find that in the circumstances where a debtor is

15  seeking to pay post-petition fees and expenses of a general

16  unsecured creditor the standard to be applied in approving

17  those payments is the standard provided for in Section 503,

18  that is are the payments in recognition of a substantial

19  contribution provided by that creditor to the bankruptcy

20  estate.

21          This is not inconsistent with the rulings by Judge

22  Drain in Purdue and the District Court's decision in

23  Bethlehem Steel; although, referring to the business judgment

24  standard both courts recognized restrictions on

25  reimbursements under these circumstances.  Thus, in Bethlehem

1  Steel the court held that,

2         "Section 363(b) does not permit a debtor-in-

3  possession to use funds solely to benefit a creditor.  If the

4  payment of creditor fees are simply aimed at helping the

5  creditor promote its own self-interest the payment would not

6  be permitted under Section 363(b)."

7         Judge Drain in his Purdue ruling recognized the

8  same limitations on the ability of the debtor to make the

9  reimbursements to a single ad hoc group involved in that case

10 including, among others, the following,

11        One, fees and expenses must be reasonable,

12 documented and reimbursable under the assumed reimbursement

13 agreement;

14        Two, excludes any professionals including internal

15 counsel retained or employed by an individual member of an ad

16 hoc group;

17        Three, precluding fees and expenses for filing

18 objections to other creditors' claims or advancing or

19 prosecuting a member's own claim;

20        Four, prohibiting payment of fees and expenses

21 related to allocation until the earlier of the execution of

22 the RSA by all parties or confirmation of a plan;

23        Five, requiring certification by counsel that

24 requested fees and expenses do not relate to allocation;

25        Six, requiring reimbursement to be subject to the

1  interim fee order entered in that case.

2      Thus, while both courts refer to the business

3  judgment standard both recognized that payments could only be

4  made for work that benefited the estate as a whole, not

5  individual creditors.  That is, in fact, the standard under

6  503(b).  The debtors here have failed to meet that standard.

7      First, the debtors are not seeking to assume any

8  agreement (indiscernible) the debtors are obligated to make

9  the proposed payments.  As the secured lenders point out in

10  almost every case referred to by the debtors in their

11  pleadings the debtor was seeking to assume or enter into

12  either a restructuring support agreement or a reimbursement

13  agreement.

14      Indeed, as I already noted in both cases most

15  heavily relied upon by the debtors, Purdue and Bethlehem

16  Steel, the debtors were not just seeking to pay expenses

17  under 363, but were also seeking approval of either a

18  prepetition agreement or a post-petition agreement in which

19  the debtor agreed to pay the fees.

20      The debtors counter that this is merely form over

21  substance.  They argue that they are only asking for

22  authority, but not direction to perform one of the

23  obligations under the RSA or the reimbursement agreements.

24  They should not be subject to a more onerous legal standard

25  then cases involving the assumption of such agreements.

1          As the debtor puts it,

2          "Instead of becoming bound to perform all of the

3    obligations under those agreements, as would be the case if

4    they were assumed, the debtors retain all of the benefits of

5    the RSA by satisfying only one of their obligations, i.e. fee

6    reimbursement."

7          I disagree with the debtors.  What the debtors are

8    asking is for the court to assume that the RSA or the

9    reimbursement agreements will eventually be assumed at some

10   later time or, perhaps, as a part of the debtor's plan of

11   reorganization.  While that may ultimately happen it has not

12   happened yet.  In effect, the debtors would be making

13   payments under the terms of an agreement that might not be

14   approved or, at least, not approved in its current form.

15         Indeed, the secured lenders, the UCC and the OCC

16   have all indicated that they have objections to the form of

17   the RSA.  There may be others as well.  Moreover, as the

18   debtors note, they are not even signatories to several of the

19   reimbursement agreements at issue and they do not have any

20   agreement in place with the MSGE Group at all.

21         For whatever reason, the debtors have chosen not

22   to seek to assume the RSA or the reimbursement agreements.  I

23   cannot determine whether it would be an exercise of the

24   debtor's business judgment to enter into those agreements

25   because they are not before me.  I cannot evaluate,

1 therefore, whether making payments pursuant to the terms of

2 those agreements would, in fact, be in the best interest of

3 the estates or whether they would be made solely for

4 providing a substantial contribution to the estates and not

5 to provide for the individual creditor groups.

6 Second, the relief sought by the debtors goes well

7 beyond the restrictions imposed by Judge Drain in <u>Purdue</u> to

8 ensure that any payments are made solely to benefit the

9 estate rather than individual creditors.  Any agreement to

10 make such payments and any order approving those payments

11 would need to ensure those protections.

12 Therefore, I will sustain the objections.  This

13 ruling is without prejudice to the debtor's ability to seek

14 to assume the RSA or the reimbursement agreements or some

15 other post-petition reimbursement agreement entered into with

16 the ad hoc groups.  And if the debtor does so I will

17 certainly consider the merits of that motion with the

18 standard I have set out above.

19 It is also without prejudice to the ability of the

20 RSA parties to seek reimbursement under Section 503(b) if

21 they chose to do so.  The debtors should submit an

22 appropriate form of order.

23 Are there any questions?

24 (No verbal response)

25 THE COURT:  Okay.  Anything else for today, Ms.

1  Yerramalli?

2       MS. YERRAMALLI:  No.  That's it, Your Honor.

3  Thank you.

4       THE COURT:  All right. Thank you everybody.  We

5  are adjourned until, I guess, tomorrow morning, right.  We

6  have a hearing tomorrow morning at ten.  Is that still on?

7       MS. YERRAMALLI:  Yes, Your Honor.

8       THE COURT:  All right.  I will see everybody

9  tomorrow morning.  Thank you.  We're adjourned.

10      (Proceedings concluded at 3:51 p.m.)

11

12

13                        CERTIFICATE

14

15 I certify that the foregoing is a correct transcript from the

16 electronic sound recording of the proceedings in the above-

17 entitled matter.

18 /s/Mary Zajaczkowski                    December 15, 2020
   Mary Zajaczkowski, CET**D-531
19

20

21

22

23

24

25