**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re<br><br>FTX TRADING, LTD., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 22-11068 (JTD)<br><br>(Jointly Administered)<br><br>**Re: D.I. 2238, 2443, 3373, 3708, 3715 & 3724** |

**JOINDER AND STATEMENT OF THE AD HOC COMMITTEE OF NON-US CUSTOMERS OF FTX.COM IN SUPPORT OF AMENDED MOTION OF DEBTORS TO ENTER INTO, AND PERFORM THEIR OBLIGATIONS UNDER, THE REIMBURSEMENT AGREEMENTS**

The Ad Hoc Committee of Non-US Customers of FTX.com (the "Ad Hoc Committee"), which currently comprises 64 members, and growing, holding in excess of approximately $1.1 billion in aggregate customer entitlements against the above-captioned debtors (the "Debtors"), files this statement in support of *Amended Motion of Debtors to Enter Into, and Perform Their Obligations Under, the Reimbursement Agreements* [D.I. 3373] (the "Amended Motion"), joining in the Amended Motion and the Debtors' reply in support thereof, and respectfully states as follows:

### I. PRELIMINARY STATEMENT

1. The two objections to the Amended Motion—raised by the United States Trustee (the "U.S. Trustee") [D.I. 3715] and one *pro se* FTX.com customer ("Mr. Rabbitte") [D.I. 3708]

---

[1] The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification numbers are 3288 and 4063, respectively. Due to the large number of debtors in these chapter 11 cases, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the debtors' claims and noticing agent's website at https://cases.ra.kroll.com/FTX.

(together, the "Objectors")—are based on fundamental misconceptions about the Ad Hoc Committee's composition, purpose, and roles in these chapter 11 cases.

2. The Ad Hoc Committee represents a diverse group of FTX.com customer creditors. Our membership base spans more than 31 countries globally and represents diverse individuals and institutions holding claims that vary in size, make up with differing potential preference exposure, and liquidity needs. Original holders constitute 77% of the Ad Hoc Committee's total membership.

3. As set forth in our bylaws, the Ad Hoc Committee's purpose is:

> [T]o, in a cost-efficient and timely manner, maximize recoveries on the claims of members against FTX Trading Ltd. and its affiliated Debtors (collectively, the "Customer Claims") on account of the assets members deposited, held, received, or acquired on the FTX.com platform (collectively, the "Customer Assets"), leveraging, where beneficial, the position that the Debtors have no equitable interest in the Customer Assets and/or that constructive trust theories require priority of distribution on the Customer Claims. Membership is open to all creditors with Customer Claims that are aligned with the Ad Hoc Committee's purpose.

4. From the inception of these chapter 11 cases, the Ad Hoc Committee has worked to achieve this purpose and has made tremendous progress. Now, in recognition of the "critical roles" that the Ad Hoc Committee "has played, and will continue to play" in these chapter 11 cases, the Debtors have filed the Amended Motion seeking to exercise their business judgment to reimburse the fees and expenses of the Ad Hoc Committee's professionals. Decl. of John Ray ¶ 9 [D.I. 3700].

5. The factual and legal standards for the Amended Motion have easily been satisfied and the Amended Motion should be granted.

## II.    THE AD HOC COMMITTEE'S HISTORY AND PURPOSE

6.      The Ad Hoc Committee was officially formed on December 2, 2022—13 days before the U.S. Trustee appointed the Official Committee and just 21 days after the cases were filed. Unlike dozens of law firms who actively targeted known creditors in an effort to find an opportunity in the early days of the FTX cases, the Ad Hoc Committee originated from referrals received by lead counsel of the Ad Hoc Committee to consult with FTX.com customers after the collapse.

7.      The initial public filings painted a dire picture for FTX.com customers. They were facing a $10.6 billion shortfall. The Debtors' new CEO, John J. Ray III, stated from the outset that "[n]ever in [his] career [had he] seen such a complete failure of corporate controls and such a complete absence of trustworthy financial information as occurred here." First Day Decl. ¶ 5. The customer property ownership arguments making news in the Celsius bankruptcy cases were summarily dismissed amongst some chapter 11 professionals because the Debtors' assets were thought to be impossibly commingled. Sam Bankman-Fried was on a media tour to try to convince the world that what federal prosecutors were describing as one of the biggest financial frauds in American history was actually just a series of irresponsible investments. All FTX.com customers—whether institutions or retail investors—that faced significant exposures left on the FTX.com exchange were devastated overnight. Few had familiarity with any insolvency proceeding, let alone a chapter 11 case. Language barriers, costs of retaining counsel, and the dismal outlook for recoveries left many FTX.com customers feeling helpless and without a voice.

8.      Even in those dark early days, the Ad Hoc Committee professionals and early members saw a path forward. They understood that the FTX.com exchange was the piggybank

for massive misappropriation of funds by the Debtors and that those funds were meant to be held in trust for the benefit of FTX.com customers. They also understood that, despite the concerns regarding the failure of corporate controls and the absence of trustworthy financial information, there could be evidence to demonstrate that the vast majority of the value of the assets in these chapter 11 cases is directly attributable to those misappropriated funds. They appreciated that if property could be traced and identified to a trust and thus was not part of the Debtors' estates, the property would not be available for distribution to other non-customer creditors, or even to customers of the US exchange.

9. In short, the Ad Hoc Committee recognized the inescapable reality that the interests of FTX.com customers in advancing customer property arguments were in conflict with the interests of other creditors—particularly lenders and creditors of the Alameda Debtors that had been repaid before the bankruptcy filing with customer funds.

10. On December 28, 2022, the Ad Hoc Committee filed an action for a declaratory judgment to establish the customer property rights of the FTX.com customers—emphasizing the Terms of Service and English law arguments on tracing and identification of assets. *Ad Hoc Committee of Non-US Customers of FTX.com v. FTX Trading, Ltd., et al.*, Adv. Pro. No. 22-50514. On March 24, 2023, the Ad Hoc Committee filed a motion for partial summary judgment on its declaratory judgment action (A.D.I. 10), seeking a limited determination that the FTX.com customer assets were held in trust for customers and, consequently, were not property of the estate to be distributed to the Debtors' creditors.

11. Thereafter, the Ad Hoc Committee advocated its position with both the Debtors and the Official Committee. The Ad Hoc Committee repeatedly pointed to evidence that the vast majority of estate value could be directly attributed to the misappropriated funds from FTX.com

customers. At the same time, the Ad Hoc Committee considered the Debtors' detailed and thoughtful explanations of the work they had done on tracing and identifying specific customer property and the complications involved. The Ad Hoc Committee also took into account the litigation costs given those complications, and whether such costs and the ultimate determination would only result in certain customers being treated better than others in dividing up a greatly diminished pool of assets, potentially years down the road. The Ad Hoc Committee made the decision that FTX.com customer claims would receive a much better recovery, much sooner, and with far fewer professional fees expended if the Ad Hoc Committee focused on building a path to a consensual plan, instead of litigating with the Debtors.

12.  Once the litigation was stayed, the Ad Hoc Committee played a significant role in working with the Debtors and the Official Committee in shaping the original plan construct to accommodate the concept of FTX.com customers receiving a priority distribution from the consolidated, general pool of assets. This concept was ultimately adopted in the *Settlement and Plan Support Agreement* ("PSA") [D.I. 3291], in recognition of the fact that such value was largely attributable to misappropriated customer funds, and without incurring hundreds of millions of dollars in professional fees to win a judgment.

### III.  RESPONSE TO THE OBJECTORS

13.  The Objectors' arguments for denying the Amended Motion, which ignore the history outlined above, should be rejected.

14.  *First*, the Objectors suggest that the Ad Hoc Committee's fees should not be reimbursed because the Debtors have failed to demonstrate that the interests of FTX.com customers are not "adequately represented" by the Official Committee of General Unsecured Creditors (the "Official Committee"). That is not the standard for reimbursement of fees in the

Debtors' business judgment as requested in the Amended Motion. Rather, that is the standard for appointment of a separate official committee under section 1102 of the Bankruptcy Code, which the Debtors are not seeking to do. Instead, they are seeking to exercise their business judgment to reimburse the fees of the Ad Hoc Committee, in recognition of the fact that the Ad Hoc Committee "has played, and will continue to play, critical roles" in these cases. Decl. of John Ray ¶ 9.

15. The Ad Hoc Committee advanced the customer property arguments that neither the Debtors nor Official Committee could as estate fiduciaries. The Ad Hoc Committee's advocacy on the customer property issues resulted in an initial plan being filed that separately classified FTX.com customers in a single class (Class 4A) and, now through the PSA, ensures that such Class 4A claimants receive a priority distribution ahead of general unsecured creditors in recognition of their property rights.[2] This extremely favorable result would not have been possible without the Ad Hoc Committee.

16. *Second*, the Objectors claim that the Ad Hoc Committee is not representative or aligned with the interests of FTX.com customers, primarily because its membership includes secondary purchasers. This argument is not supported by the facts or by logic.[3]

---

[2] *See* PSA (defining Class 4A to include "[a]ll customers of FTX.com" and granting them a "Dotcom Customer Entitlement" in "an amount equal to the USD value of their customer entitlements on FTX.com at the petition time").

[3] Mr. Rabbitte's objection contains several misstatements of facts about the Ad Hoc Committee's composition. First, Mr. Rabbitte states that "41% of members did not hold interest in any FTX account as of the Petition Date," but he is confusing claim amount with members—77% of the Ad Hoc Committee's members held their claims as of the Petition Date. Second, there is no publicly available information nor is there any basis for Mr. Rabbitte's assertion that "a substantial portion of the AHC's composition of the Petition Date claims include significant (and in some cases exceeded 100%) Preference exposure." Third, the beneficial holders of both BC2 Alternative Equity Ltd and Lemma Technologies Inc. are original FTX.com customers, neither of which is a claims buyer contrary to Mr. Rabbitte's claims.

17. The Ad Hoc Committee's composition is diverse and is representative of the Class 4A customer class. *See* PSA (defining Class 4A to include "[a]ll customers of FTX.com" and granting them a "Dotcom Customer Entitlement" in "an amount equal to the USD value of their customer entitlements on FTX.com at the petition time"). Specifically:

   a. Original holders constitute 77% of the total membership.

   b. The range of claim amounts varies significantly, from the largest claim of $191,516,897.62 to the smallest claim of $5,670.00. Approximately 5% of the members hold claims exceeding $100 million, 13% hold claims ranging from $25 to $100 million, 19% hold claims ranging from $5 to $25 million, 23% hold claims ranging from $1 to $5 million, and 41% hold claims under $1 million.

   c. The membership encompasses various customer types from the FTX.com exchange and spans more than 31 countries globally.

18. The Ad Hoc Committee's commitment to inclusivity has resulted in a membership base that mirrors the diversity within the Class 4A customer class. This diversity extends beyond geographical location to include differences in claim size, asset composition, preference exposure, and liquidity needs—all of which vary considerably among the Class 4A customer class. As a result, the Ad Hoc Committee has provided a forum for different perspectives, fostering discussion with the exchange of information, and building a consensus around an approach that fairly accounts for the differing interests among FTX.com customers. This includes the perspectives of secondary holders, who have had an important role to play in driving initiatives forward using their experience in maximizing value in other chapter 11 cases, which benefit the Class 4A customer class as a whole. At the outset of these cases, forming a group of this unique nature did not seem possible. Yet, that is exactly what the Ad Hoc Committee has done.

19. The Ad Hoc Committee was formed and grew for many months with only original FTX.com customers. However, as has been the case for Class 4A claims generally,

many original holders have sold their claims to secondary buyers, including members of the Ad Hoc Committee. The composition of the Ad Hoc Committee—and the relative amount of claims held by original versus secondary holders has changed and will continue to change—just as it will with Class 4A claims as a whole.[4] Whether these members are secondary purchasers or original holders is irrelevant: all have Class 4A claims that must receive the same treatment under a plan of reorganization. The secondary members are thus clearly 100% aligned to maximize recoveries, which benefit all Class 4A creditors.

20. Mr. Rabbitte offers one alleged conflict of interest between original and secondary holders in asking: "How can claims buyers interested in maximizing their return negotiate a low preference settlement that increases their ability to purchase claims while [sic] the depriving the Estate (and thus original customers) the ability to clawback preference payments?" The implication in the question defies logic and market realities. A "low preference settlement" significantly increases the asking price of claims held by claimants with preference exposure, to the detriment of secondary buyers.

21. Further, secondary and original holders are aligned in seeing value come back to the estates where appropriate. But a global preference litigation campaign against FTX.com customers—almost all of whom have substantial potential preference exposure if calculated under the ill-fitting parameters of the Bankruptcy Code—would not only be time consuming and extremely costly, but would result only in increasing the amount of Class 4A claims entitled to distributions via replacement claims for the amounts clawed back with the *pro rata* recoveries on the replacement claims and professional fees swallowing any marginal return on the clawbacks.

---

[4] The Ad Hoc Committee also lost the membership of a class action group purported to hold an estimated $1.5 billion in claims, as well as over $200 million in other original holder claims, as a result of the U.S. Trustee's objection to the motion to keep sealed the Ad Hoc Committee's 2019 statement because they did not want to disclose their confidential, personally identifiable information publicly.

The preference settlement eliminates these burdens while providing an avenue for efficient value maximization. The pro-customer preference settlement policy is reflective of the Ad Hoc Committee's value maximizing objectives.

22. **_Third_**, the Objectors contend that the Ad Hoc Committee has failed to demonstrate value to the estates to justify the fee request, which overlooks the tremendous contributions made by the Ad Hoc Committee to date. The Ad Hoc Committee's efforts have conserved estate resources and materially advanced the cases. The Ad Hoc Committee's customer property arguments provided the foundation around which the *Draft Joint Plan of Reorganization* [D.I. 2100], filed on July 31, 2023, could be constructed. Thereafter, in October 2023, following the Ad Hoc Committee's pivotal role in driving discussions on customer property rights and customer preference liability, the PSA was executed. Under the PSA, the Ad Hoc Committee achieved extremely favorable outcomes on these key customer issues. Significantly, the PSA: (1) provides FTX.com customers a priority distribution expected to result in approximately **_90%_** of the distributable value of the Debtors to be paid to customers; and (2) establishes an efficient mechanism for favorably resolving eligible FTX.com customers' preference exposure, including a reduced nine-day lookback period and a 15% setoff or payout option. The PSA also establishes milestones for an accelerated plan process that minimizes uncertainty and expedites distributions to customers by avoiding prolonged, costly litigation in these chapter 11 cases. The Ad Hoc Committee played an indispensable role in breaking deadlock between the other negotiating parties to reach the PSA.

23. The Ad Hoc Committee has also provided a forum open to diverse FTX.com customers for their voices to be heard and their questions and concerns to be addressed by chapter 11 professionals whom many customers would not otherwise have access to. Since the

inception of the Ad Hoc Committee, its professionals have spoken to several hundred FTX.com customers collectively holding billions in claims against the estates. The Ad Hoc Committee has been able to educate these customers and take their informed perspectives into account in formulating and advocating positions in these chapter 11 cases. While Mr. Rabbitte takes issue with the Ad Hoc Committee on multiple grounds, he has never contacted the Ad Hoc Committee professionals and declined a request to discuss his concerns with the Ad Hoc Committee's professionals.[5]

24.     **Lastly,** the Objectors argue that the Ad Hoc Committee should bear its own fees. It is worth noting the total amount of fee reimbursement sought by the Debtors in the Amended Motion for a contemplated period of almost a year is less than the total amount of professional fees expended by the Debtors and the Official Committee in just two weeks given the fees incurred in the cases to date. *See Emergency Motion of the Official Committee of Unsecured Creditors for Entry of an Order Compelling Mediation of Chapter 11 Plan and Other Case Issues* [D.I. 2212] at 4 ("daily burn rate" for professional fees in these cases is "over $1.5 million"). The Objectors reason that because a majority of the Ad Hoc Committee members are entities, rather than individuals, they should be able to pay for the Ad Hoc Committee's professional fees. This ignores the reality that any FTX.com customer, individual or entity, that had a substantial amount of their assets misappropriated was devastated by its collapse. Many entity members have had to lay off employees, shut down lines of business and endure severe

---

[5] Mr. Rabbitte makes the secondhand claim that two holders were denied membership to the Ad Hoc Committee. That is untrue. The two holders to which Mr. Rabbitte refers were repeatedly told they could join the Ad Hoc Committee, but they conditioned joining upon being appointed to the Executive Committee of the Ad Hoc Committee. Each member of the Executive Committee took the time to have individual discussions with these holders and counsel to the Ad Hoc Committee committed several hours over weeks in discussing issues with them, but it was ultimately determined and communicated to them that they could not be appointed to the Executive Committee as a condition to join the group, as the Ad Hoc Committee felt it would be inappropriate in accordance with its bylaws.

financial distress as a result of the massive fraud committed by a handful of individuals led by Mr. Bankman-Fried.

25. Moreover, requiring the Ad Hoc Committee to bear its own fees will necessarily exclude those members who are not able to afford representation, which would negatively impact the diversity of the group and assure the exit of smaller members, effectively guaranteeing the dismantling of the group in its current form and turning the Ad Hoc Committee into what the Objectors now inaccurately allege it to be. This would be wholly counterproductive and would represent an enormous step backwards. The Ad Hoc Committee should be allowed to remain inclusive of FTX.com customers, regardless of their financial means or of the sizes of their claims, so that the Ad Hoc Committee can continue to work tirelessly to make all FTX.com customers' voices heard. The fee reimbursement requested by the Amended Motion furthers that goal.

### IV. CONCLUSION

26. In sum, as the foregoing history of events should make clear, the Ad Hoc Committee has made a tremendous, critical contribution to these chapter 11 cases. On this record, it is well within the business judgment of the Debtors to seek the reimbursement of the Ad Hoc Committee's professional fees.

27. The Ad Hoc Committee urges the Court to allow the Debtors to exercise their business judgment and to grant the Amended Motion.

Dated:  November 12, 2023

                    */s/ Jonathan M. Weyand*_____
**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**
Eric D. Schwartz (No. 3134)
Matthew B. Harvey (No. 5186)
Jonathan M. Weyand (No. 6959)
1201 North Market Street, 16th Floor
Wilmington, Delaware 19801
Telephone: (302) 658-9200
Facsimile: (302) 658-3989
eschwartz@morrisnichols.com
mharvey@morrisnichols.com
jweyand@morrisnichols.com

-AND-

**EVERSHEDS SUTHERLAND (US) LLP**
Erin E. Broderick
227 West Monroe Street, Suite 6000
Chicago, Illinois 60606
Telephone: (312) 724-9006
Facsimile: (312) 724-9322
erinbroderick@eversheds-sutherland.com

-and-

David A. Wender
Nathaniel T. DeLoatch
999 Peachtree St NE
Atlanta, GA 30309
Telephone: (404) 853-8000
Facsimile: (404) 853-8806
davidwender@eversheds-sutherland.com
nathanieldeloatch@eversheds-sutherland.com

-and-

Peter A. Ivanick
Sarah E. Paul
The Grace Building, 40th Floor
1114 Avenue of the Americas
New York, New York 10036
Telephone: (212) 389-5000

Facsimile: (212) 389-5099
peterivanick@eversheds-sutherland.com
sarahpaul@eversheds-sutherland.com

*Counsel for Ad Hoc Committee of Non-US Customers of FTX.com*