FILED

2023 NOV 14  PM 3: 51

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE** CLERK
BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| FTX TRADING, LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |

### MOTION FOR OPINION

COMES NOW, Mr. Simon Carter, a customer who holds an account on FTX.com, represented *pro se*, individually and on behalf of all other FTX.com customers similarly situated (collectively, the "**Affected Customers**"), respectfully states the following in support of this motion (the "**Motion**") that the digital assets deposited, stored, acquired, received, transferred, converted, or otherwise held in custody on the FTX International platform (FTX.com) (the "**Platform**") in customer accounts on November 11, 2022 at 15:00:00 UTC (the "**Petition Date**") are the property of Affected Customers and those digital assets are not the property of the above-captioned debtors and debtors-in-possession (collectively, the "**Debtors**") under Section 541 of Title 11 of the United States Code, 11 U.S.C. §§101, *et seq.* (the "**Bankruptcy Code**").

## TABLE OF CONTENTS

INTRODUCTION .............................................................................................................................. 4

BACKGROUND .............................................................................................................................. 16

    1.    CRYPTOCURRENCY .................................................................................................... 16

            *A) Coins and Tokens* ...................................................................................... 16

            *B) Non-Custodial Wallets and Custodial Wallets* ........................................ 17

            *C) Public and Private Keys* ........................................................................... 19

            *D) On-Chain and Off-Chain Transactions* .................................................... 21

            *E) Cryptocurrency is fungible* ....................................................................... 22

    2.    THE FTX.COM PLATFORM ........................................................................................ 23

            *A) Deposits* .................................................................................................... 25

            *B) Withdrawals* ............................................................................................. 27

            *C) Accounts* ................................................................................................... 27

DISCUSSION ................................................................................................................................. 29

    1.    CORE EVIDENCE: TERMS OF SERVICE ..................................................................... 30

    2.    EXTRINSIC EVIDENCE ............................................................................................. 32

    3.    DIGITAL ASSETS ..................................................................................................... 42

    4.    OMNIBUS POOLS ..................................................................................................... 45

    5.    FRAUD AND MISAPPROPRIATION .............................................................................. 49

    6.    PRIVATE EXCHANGE LEDGER .................................................................................. 51

    7.    FTX JAPAN ............................................................................................................ 56

    8.    SECURITIES AND COMMODITIES .............................................................................. 58

    9.    SUMMARY ............................................................................................................... 60

TERMS OF SERVICE .................................................................................................................... 64

    1.    USER-TO-USER TRADING PLATFORM ...................................................................... 67

    2.    DIGITAL ASSETS ..................................................................................................... 70

3.  FIDUCIARY RELATIONSHIP ..................................................................................................... 76

4.  UNCLAIMED OR ABANDONED PROPERTY ............................................................................... 79

5.  NO RISK BANKRUPTCY CLAUSE ............................................................................................. 82

6.  COLLATERAL ........................................................................................................................ 83

7.  MARGIN TRADING ................................................................................................................ 84

**STAKED ASSETS** ............................................................................................................................ **86**

**PROPERTY** ...................................................................................................................................... **92**

1.  ACADEMIC ANALYSIS ........................................................................................................... 93

2.  LEGAL ANALYSIS ................................................................................................................. 94

    *England and Wales* ............................................................................................................. *94*

    *Singapore* ........................................................................................................................... *96*

    *Hong Kong* .......................................................................................................................... *96*

    *New Zealand* ....................................................................................................................... *97*

    *United States* ...................................................................................................................... *97*

**TRUST** ........................................................................................................................................... **102**

**RELATED CASES** .......................................................................................................................... **109**

    CIVIL CASES ........................................................................................................................ 109

    CRIMINAL CASE ................................................................................................................... 112

**SUMMARY** .................................................................................................................................... **116**

**PRAYER FOR RELIEF** .................................................................................................................. **117**

## **INTRODUCTION**

I, Simon Carter, am a software engineer and systems architect with a British honors degree in Computing Systems, broadly equivalent of a US master's degree, and have over thirty years' experience in software and systems development. English is my first language. Since 2003 I have served as a founding Director of Module Solutions Limited, a private firm in the UK providing business-to-business data systems, and customer of FTX. My professional experience means I understand system architectures, and my responsibilities include oversight of design, development, testing, maintenance, and revision of complex data centric systems, and reading and writing technical documents, such that in the context of understanding FTX.com's Terms of Service, I consider that I am able ascertain the plain and ordinary meaning of the words used. I previously wrote to the Court to generally question the ownership status of digital assets held by customers on FTX.com (Dkt. 2493) which was reasonably applied in objection to the Debtors' motion to sell-off digital assets held-in-possession. This Motion follows-up with sharp focus to resolve the ownership issue.

I attached a bundle of documents to which I refer as Exhibits (**Exhibit X** or **Ex.X**) and make references to page numbers in the Exhibits as **(Exhibit/page)** otherwise section and page references are to the cited resource e.g. (**§X** or **p.X/pp.X-Y**). For the sake of brevity, I omit facts and matters which are already familiar to the Court unless it is relevant to refer in support of this Motion. All references made to 'customers' or 'Affected Customers' means users with an active account on the FTX International platform and who had Digital Assets[1] in their FTX.com account.

---

[1] **"Digital Assets"** in the context of the Terms of Service stated to mean BTC, ETH, FTT and any other digital asset, cryptocurrency, virtual currency, token, leveraged token, stablecoin, tokenised stock, volatility token, tokenised futures contract, tokenised option or other tokenised derivatives product that is supported by and made available from time to time to transact in using the Platform. The scope of definition includes stablecoins such as USDT and USDC but excludes 'E-Money' issued by the Platform to represent fiat currency deposits.

This Motion is necessarily brought for the Court to provide opinion on the fundamental gating question whether personal property belonging to Affected Customers is or is not part of the Debtors' bankruptcy estate (the "**Estate**"). On January 11, 2023, at the first hearing in this bankruptcy case, counsel for the Debtors rightly reported "We also have begun to engage on the central legal issues in the case. These include the nature of customer entitlements, are they property or claims, ..." (emphasis added) which task was fundamental to establish the extent of the Estate pursuant to the Bankruptcy Code, §541(a)(1). (The Estate comprises "all legal or equitable interests of the debtor in property as of the commencement of the case"). However, eight months later, and after much ground trodden by this Court, at the September 13, 2023 Omnibus Hearing, counsel for the Debtors confirmed the matter to be, as-at that time, "still unresolved" despite having already submitted a first reading of their draft Plan of Reorganization[2], and shortly afterwards a second reading of the draft Plan[3]. Consequently, any grounds which the Debtors may rely upon in support of their alleged claim to legal or equitable interest in Affected Customers' property remains assumed and untested by this Court.

As an Affected Customer I have held expectation that this *central legal issue* would have been resolved by the Debtors with the highest probity in a timely fashion – per examples set by the debtors of BlockFi and Celsius bankruptcies (see 'Property' below) – and certainly before any plan was put before the Court, though to my great surprise and frustration, and to the best of my knowledge, it is a matter which has been kicked into the long grass with no signs of matter being dealt with in open Court, and until the question is addressed the cart remains firmly planted before the horse. The premature draft plans of reorganization have not resolved the necessary and fundamental legal analysis

---

[2] Draft Joint Plan of Reorganization filed on July 31, 2023 (Dkt. 2100)

[3] Draft Plan of Reorganization filed on October 16, 2023 (Dkt. 3291 Ex.1)

which bears great risk of incorrectly treating customer property as part of the Estate. This Court has the necessary authority to provide opinion on the matter. *See In re Fisher*, 67 B.R. 666, 668 (Bankr. D. Colo. 1986) ("The determination of what constitutes property of the bankruptcy estate is inherently an issue to be determined by the bankruptcy court."). See *In Pearlman v. Reliance Ins. Co.*, 371 U.S. 132, 135, 83 S. Ct. 232, 234, 9 L. Ed. 2d 190 (1962) ("The Bankruptcy Act simply does not authorize a trustee to distribute other people's property among a bankrupt's creditors.").

For the avoidance of doubt, this Motion seeks the Court's opinion over my property rights, and the property rights of similarly situated Affected Customers, to their Digital Assets which were:

(1)   Held in customer accounts on the Petition Date (these balances being known to the Debtors and communicated to customers via e-mail during March 2023 and thereafter published on the customer claims portal); and

(2)   Deposited into customer accounts post-petition (as may exist for whatever reason); and

(3)   Settled from open trading positions closed with effect on the Petition Date – rather than, it is assumed, to allow such trading positions to remain open post-petition and divorced from customers' control breaching the Terms of Service. *See* May 2022 Terms of Service, Ex.A, §8.2.6(C). ("You control the Digital Assets held in your Account").

This Motion seeks the Court's separate opinion over the property rights to Digital Assets held in customer accounts and 'staked' for reward on the Platform (the "**Staked Assets**"). These assets perhaps carry an undeserved stigma by association that any such assets put to use for reward might not belong to customers. But this interpretation mistakes other forms of 'earn accounts' which operate under specific terms allowing another party to use, hypothecate and rehypothecate the assets as they

[6]

see fit to derive a profit. That is not the case here as the Staked Assets remained in customer accounts and title always remained with the customer. *See* May 2022 Terms of Service, Ex.A, §8.2.6 ("All Digital Assets are held in your Account on the following basis (A) Title to your Digital Assets shall <u>at all times</u> remain with you and shall not transfer to FTX Trading."). (Emphasis added). Nevertheless, to allow sharp focus on the subject, the question of ownership of Staked Assets is requested in separated judgment, though for the avoidance of doubt, this Motion represents these assets held in customer accounts belong to Affected Customers.

Further, this Motion explicitly excludes relief for customer property related to the following asset classes (the "**Excluded Assets**"):

- Fiat currency or 'E-Money' (the Platform's fiat currency equivalent) held in FTX.com customer accounts (the "**Cash Assets**"); and

- Fiat currency or 'E-Money' or Digital Assets held by customers on any of the Debtor's other platforms (FTX.us, *et al*).

The Excluded Assets are considered sufficiently distinguishable such that this Motion does not trample over their merits or prejudice any other opinion this Court may be required to deliver on those asset classes which were subject to alternative terms of service, indeed separating Digital Assets held in customer accounts on FTX.com should expedite matters. Notwithstanding, the revised plan of reorganization proposes great economic recovery of Cash Assets by contrast to the terrible economic recovery of Digital Assets.

The property ownership question requires legal analysis in order to provide opinion on Affected Customers rights to the Digital Assets held in custody in their respective FTX.com customer

[7]

accounts ("**Accounts**") and determine whether those rights are personal or proprietary.  If personal rights in the full sense, then the Digital Assets should be fully returned to Affected Customers *in specie*.  If proprietary rights, then it is a matter of further analysis to determine the legal and beneficial interest and whether to return the digital assets in-kind.  Further, the question of property ownership does not turn on the separate issue of tracing assets, though notably the digital assets are all fungible.

The practical consequences of this Motion may well be considered undesirable (removing property which has been wrongly assumed by the Estate) and ranking Affected Customers above other interested parties, though there was nothing equitable about the events which resulted in FTX misappropriating Affected Customers' assets, and there has been nothing equitable about the Debtors accentuating that loss by adversely pocketing and continuing to use for its own purposes misappropriated property held in custody and belonging to customers.  The Debtors acknowledged their great responsibility in objection to the motion of the Joint Provisional Liquidators for FTX Digital.  *See* Dkt. 1409, §4.  ("Moreover, the Debtors separately are responsible to customers for economic losses on a litany of fraud and other non-contractual claims.").

Notwithstanding Affected Customer property is *not* considered part of the Estate, while commenting on matters of fairness, it is relevant to briefly detour into the second draft plan of reorganization (Dkt. 3291 Ex.1) filed on October 16, 2023 which bakes-in inequality within its proposed framework for distribution that would deliver *limited economic loss* to customers with Cash Assets and stablecoins which asset values have remained broadly unchanged in USD value since the Petition Date and were by and large unaffected by the market crash artificially caused by FTX.  The Draft Plan would also deliver either *zero economic loss*, or *limited loss*, to a very large population of

preferential customers[4] lucky enough to have withdrawn their assets in the days before the collapse (the "**Preference Customers**") and who transferred considerable asset values from the exchange[5]. It will also deliver *zero economic loss* to a significant population of other customer withdrawals completed before the nine-day window but within the allowable 90-day bankruptcy preference period and now excluded by the Draft Plan (the "**Excluded Preference Customers**"). By contrast, Affected Customers *un*lucky enough not to have had their withdrawal instructions processed in the immediate days prior to collapse have found their Digital Assets locked in the Platform when the USD equivalent value had plummeted as consequence of the FTX collapse. By the terms proposed in the Draft Plan, the Preference Customers and Excluded Preference Customers will retain their property *in specie*, which for the avoidance of doubt is as it should be as customer property does not belong to the Estate, though results in inequitable treatment of Affected Customers for whom the Debtors did not process withdrawals[6], though perhaps could do now following recovery of liquid, less liquid, and illiquid assets. Had sufficient liquidity been available in November 2022 there is no doubt Affected Customer withdrawals would have been processed upon customers' controlling instructions and *but-for* the fraud would have been economically whole.

Further, and additionally, the Debtors' updated Draft Plan to monetize crypto-assets with Petition Date valuations renders a synthetically low assessment of economic value for all virtual

---

[4] The Draft Plan of Reorganization filed on October 16, 2023 (Dkt. 3291 Ex.1) proposes no preferential claw-back for customers whose nett withdrawals amounted to less than $250,000 in the nine day period immediately before the Petition Date and 15% reduction in their claim or 15% cash payment for any nett withdrawal amount above $250,000 threshold.

[5] The Preference Customers include several VIP customers for whom FTX prioritised withdrawal instructions elevating their transfers in the queue above non-VIP customers.

[6] On November 10, 2023, whilst withdrawals were locked for all FTX.com customers, Sam Bankman-Fried re-opened withdrawals for Bahamian national customers of FTX.com to allow them to transfer "their assets, making them fully whole" in preference to processing withdrawals for any other customer waiting for their withdrawal instruction to be processed. The assets used to process these preferences were taken from generally available omnibus pools.

currencies. This is a double-whammy for Affected Customers holding digital assets. For example, the USD equivalent value of Bitcoin (BTC) was around $17,500 per BTC on the Petition Date and now (at the time of writing) has passed $35,000 – twice the USD equivalent valuation. IF the recovery rate for unsecured customer creditor comes in as expected around $0.85c on the dollar, as has been speculated on social media (loosely based on the 15% 'haircut' offered to Preference Customers with nett withdrawals over $250,000), then it follows Accounts with Cash Assets or stablecoins, and the Preference Customers and Excluded Preference Customers, will each have yielded the greatest recovery in present-day asset valuations. However, and by comparison, the real terms equivalent recovery rate for an Affected Customer holding BTC locked on the exchange will be around half that of the other asset classes at $0.42½c with most other Digital Assets being similarly situated to bitcoin. Notably, Solana (SOL), for example, was valued around $12 on the Petition Date and is now approaching $60 – more than four and half times the Petition Date valuation which, for comparison, would yield an equivalent recovery rate of around $0.18c on the dollar. Plainly, Affected Customers could not re-purchase the same quantity of Digital Assets that were held in custody with a USD equivalent disbursement based on Petition Date prices. There is, therefore, a great divide in the economic value of restitution that is proposed to customers depending on their class of asset. In such circumstances, and in the event this Court determines customer property remains in the Estate, an equitable remedy to provide adequate protection against the diminution in value of Digital Assets would be for the plan of reorganization to return Digital Assets *in specie* reflecting the *same* terms offered to Preference Customers. Without a change of direction, the plan is not equitable as all customers would not be similarly situated and unlikely to be supported by customers with Digital Assets. However, such hypothesis on the Draft Plan has strayed from the path of this Motion and is

[10]

perhaps irrelevant since the legal position is considered that Affected Customers' Digital Assets do not form part of the Estate and therefore this property demands priority repayment *in specie*.

The custodial intermediary arrangement, in which FTX ascribed itself as holder of customer owned assets, is subject to legal interpretation which methodology provides a clear objective approach for interpreting contracts. *First*, determine whether the contract is ambiguous. *Next*, if at all unclear, consider extrinsic evidence to determine the parties' intent to ascertain the proper interpretation of the contract. *Finally*, if, and only if, the extrinsic evidence does not provide the answer then the rule of *contra proferentem* may be invoked providing that an ambiguous contract term should be construed against the drafter. In the instant matter the plain, ordinary, and common meaning of the unambiguous language used in the Terms, and supported by extrinsic evidence, supports an arrangement in which FTX was holding customer property in trust with certainty of intention, object, and subject matter sufficient to confirm Affected Customers retain ultimate (legal and beneficial) title to their Digital Assets held in their Accounts which, respectfully, should prove determinative. E.g. *Knight v Knight (1840) 3 Beav 148.* (Holding that for a trust to be properly constituted, it must consist of a minimum set of requirements: certainty of intention, certainty of subject matter and certainty of object.). And further, that the "three certainties" could be met from a unilateral oral declaration, though that was not the case here.

On December 27, 2022, Austin Onusz, Cedric Kees van Putten, Nicholas J. Marshall and Hamad Dar began an adversary proceeding in *Onusz, et al. v. West Realm Shires Inc., et al.,* No. 22-50513 (Bankr. D. Del.) (Dkt. 321) (the "**Class Action**") against the Debtors alleging customers of FTX.com and FTX.us held property interests in fiat currency and digital assets on the respective exchange platforms, and further alleged breach of contract, breach of fiduciary duties, negligence,

conversion, and alleged aiding and abetting against particular named insiders. While aspects of common ground exist in the instant Motion with regard to some of the principles surrounding Digital Assets, the Class Action has a distinctly broader focus. To deal with *FTX.com* and *FTX.us* and *money* and *property* and *related civil matters* in concert at a jury trial, as the Class Action prescribes, would undoubtedly result in protracted legal arguments and delay. Further, the scope of the proposed Class Action is somewhat shaken by progress in the parallel criminal and civil cases.

On December 29, 2022, the Ad Hoc Committee of Non-US Customers of FTX.com (the "**Ad Hoc Committee**") began an adversary proceeding in *Ad Hoc Committee of Non-US Customers of FTX.com v. FTX Trading, Ltd., et al.,* No. 22-50514 (Bankr. D. Del.) (Dkt. 328) against the Debtors alleging customers of FTX.com held property interest in fiat currency and digital assets. Although there are elements of common ground found in that adversary proceeding, the instant Motion before the Court is not considered to trespass over all the same ground being that the Ad Hoc Committee casts a wider net including fiat currency and E-Money held in customer accounts which asset classes were affected by separate provisions in the Terms of Service, and imperfectly deals with the matter of digital assets. To deal with both *money* and *property* in concert, as the Ad-Hoc Committee does, would undoubtedly result in protracted legal arguments. Further, the Ad Hoc Committee represents the interests of non-US clients holding Cash Assets, highly exposed Excluded Preference Customers, and claims purchasers which class of around fifty clients is not representative of the thousands of other Affected Customers generally.

On October 16, 2023, the Class Action and Ad Hoc Committee plaintiffs signed the '*Settlement and Plan Support Agreement*' (the "**Plan Support Agreement**") with the Debtors in support of the second Draft Plan which settlement terms require unfettered cooperation and positive

public affirmations from both plaintiffs. *See* Dkt. 3291. The full and true extent of the negotiations behind this agreement remain sealed though it is broadly believed to involve amendments favorable to the plaintiffs, such as curtailing the 90-day preference period for Excluded Preference Customers and improved terms for Preference Customers, and in return the Debtors avoid having to deal with the uncomfortable question of ownership of Digital Assets in open Court, as well as agree to support a motion to reimburse the Ad Hoc Committee legal fees further diminishing the assets held in the Estate. Against that backdrop, the Class Action plaintiffs and Ad Hoc Committee are expected to withdraw their respective adversary proceedings. Thus, to the best of my knowledge, this Motion is considered the only known action at present for the Court to deliver its opinion over the property rights to Digital Assets held in FTX.com customer Accounts.

*    *    *

In addition to dealing with the contract provisions in the Terms of Service, a priority order of business is to grapple with the technical specificity surrounding "Digital Assets" held in FTX.com customer Accounts as inked in the Terms of Service. I have observed parties misconstrue a true and factual understanding by substituting the term "Digital Assets" to mean only the crypto-assets held in the omnibus pools and in the same breath referring to a popularly plowed defense which considers ownership is defined by the control of private keys required to authorize a transaction. This misreading is forgivable since it applies a commonplace supposition about cryptocurrencies that perhaps reflects a natural assumption about how the exchange was imagined to operate. For example, when Anna deposited some of her bitcoins on the Platform, she could see a corresponding amount of BTC show up in her Account balance. When she then traded her BTC with Bill, another FTX.com customer using the Platform services, for his ether (ETH) she saw her Account balance was updated to show the

[13]

corresponding amount of ETH she had acquired. And when she withdrew the ETH to her cold wallet the same amount of ETH was transferred off the Platform. For all intents and purposes Anna considered she was in control of blockchain assets throughout. This is a general held assumption about how a cryptocurrency exchange operates and one that exchanges are seemingly happy to represent to customers. But that is not the whole truth and is not supported in law.

The nitty gritty detail of the situation means it is necessary to grapple with the concept of '**coins**' and '**tokens**' to appreciate how FTX dealt with Digital Assets deposited and held in customer Accounts and how these assets related to the omnibus pools and customer-to-customer trading on the platform. This topic is expanded in 'Discussion', though, in abstract, may be considered in terms of a customer taking their goods (i.e. crypto-coins) to a parcel delivery company (FTX.com) who provided a box (token) into which the goods (coins) were placed ready for transit. Together the box and goods became a parcel (digital asset) belonging to the customer which held a value equivalent to the goods inside it. The parcel was entrusted to the company (i.e. deposited) to be processed through its delivery network (customer accounts and exchange services) before being delivered to the destination (withdrawal) where the goods were removed from the box.

This analogy might be loosely taken one step forward by exposing the delivery company's service contract which stated, "*At all times the box and its contents belong to you. We do not own the box or its contents. We will not use the box or its contents, and we will not treat the box or its contents as property belonging to us*". Mindful, the company managers nevertheless took goods from the boxes and gave the misappropriated property to their friends (fraud) which crime was unearthed and the company collapsed. Fast forward, the administrators arrive and seize everything. They open the undelivered parcels and claim the goods (i.e. crypto-coins) as their own for the reason they have

[14]

control of the box cutter (private keys) and all they now see are piles of unidentified goods (coins) whilst ignoring the parcels (digital assets) were clearly listed on a manifest (customer accounts), and with an eye closed to the primary operations of the former business that safeguarded and delivered parcels placed in its custody.

The Debtors and other interested parties have variously represented that to deal with the matter of digital asset ownership is a highly complex undertaking that might take a significant period of time and require great legal efforts to unravel. But I dispute this as it is really a quite straight-forward matter. It can be resolved within the four corners of the Terms of Service which unambiguously formed the boundaries to the agreement between FTX and the Affected Customers and was supported by much extrinsic evidence. The Debtors are anticipated to contest this Motion, though the truth is they have no skin in the game since the assets do not form part of the Estate. They are expected to provide legal analysis that will re-imagine the Terms to assert the Estate's claim, but such obscure analysis in bankruptcy must be considered superfluous in the shadow of the simple language and clear expectation laid out by the Terms. The question is not as much about entitlement to property when in bankruptcy, as the Debtors claim by their (lack of) action, but whether Debtors had that same right to the Digital Assets before the Petition Date. The Term of Service certainly do not support that. Moreover, if the matter is now considered so complex that it requires the combined efforts of many talented legal minds over a long period of time, how does that reflect on the ability of a reasonable person to ascertain and decipher such an alternative complex legal meaning that might be buried within the provisions beyond the ordinary and natural meaning of the written words to which customers had agreed, and which unambiguous language assured the customer they retained title to their property. If the Debtor's intention is to now create such ambiguity in the provisions where none existed before, then the rule of *contra proferentem* must apply.

[15]

## BACKGROUND

### 1. Cryptocurrency

Generally, *cryptocurrency* is characterized as digital currency based on a blockchain technology providing a decentralized digital store of value independent of any central bank or other singular authority.

I shall not dwell on this topic, recite the history of cryptocurrencies, or the mechanics of blockchain technology more than necessary as much of that ground as is relevant has already been covered with this Court save to underline a few key points:

#### A) Coins and Tokens

With reference to the earlier example, the Digital Assets controlled by Anna on the Platform were not merely crypto-*coins* held in a blockchain wallet but more precisely were crypto-*tokens* held in her Account. It might seem pedantic but there is a difference: a crypto 'coin' exists on a native blockchain whereas a crypto 'token' exists on top of a blockchain encapsulating it for operation. Crypto-coins include BTC, ETH or XRP and are also referred to as native, layer-1 projects, or 'on-chain' crypto-assets. Crypto-tokens like USDC[7], FTX Token (FTT), Polygon (MATIC), Arbitrum (ARM), or the asset tokens held in customer accounts on a crypto exchange, can be referred to as non-native, Layer-2 projects, or 'off-chain' crypto assets. Together 'coins' and 'tokens' are both *cryptocurrency* being a class of digital assets that rely on the underlying use of blockchain technology.

---

[7] USD Coin (USDC) is a cryptocurrency stablecoin pegged to the U.S. Dollar and backed by Circles' reserves such that each USDC has an equivalent USD asset, 1:1. Although classed as a stablecoin it is technically a tokenized dollar and not a coin.

It might assist to visualize the crypto-tokens held on FTX.com as a *blockchain-pegged crypto token* since it derived its value from an underlying asset stored in a custodial wallet on the native blockchain. The crypto-token granted an *entitlement* to the pegged asset. I will refer to the underlying crypto-coins as '**Customer Pegged Assets**' which portrays the intended relationship between the customers' crypto-tokens and crypto-token entitlements held over the crypto-coins, and collectively as 'Digital Assets' representing the asset balances in customers' Accounts to remain consistent with the Terms of Service. The tokens 'encapsulated' the coins to create the totality of the *Digital Asset* owned by the customer – from the earlier parcel delivery company analogy, the token is the box containing the goods which are the coins that altogether form the parcel.

In some respects, the Digital Assets share characteristics with pegged stablecoins which are themselves asset based crypto-tokens having a store of value pegged to a stable asset such as fiat currency, except in the case of FTX.com, the crypto-tokens on the exchange were pegged to a particular crypto-coin and so were married to a store of value that was subject to fluctuations in the prevailing market exchange rate. Thus, the BTC held in Anna's account was a BTC token having the same store of value as native BTC owing to it being backed by an equivalent amount of BTC coin on the Bitcoin blockchain held in the custodial wallet. These were cryptocurrencies in the full sense.

### B) Non-Custodial Wallets and Custodial Wallets

Is it useful, as I see it, to briefly set out what is meant by a custodial wallet. To do so it is necessary to first consider that a *cryptocurrency wallet* is a piece of software or hardware designed to manage and facilitate cryptocurrency transactions. A wallet generally stores the public and private keys necessary for each cryptocurrency holding but does not in itself 'contain' the cryptocurrency

rather it provides a means to connect to and interact with a particular blockchain network that contains blocks of transactions including those related to the public keys linked to the wallet.

A *non-custodial wallet* supports the transfer of a cryptocurrency to another blockchain address and generally not much else, though some providers are increasingly offering additional related services such as staking services and debit cards linked to cryptocurrency holdings. The user is considered to have sole control of the private key and therefore a non-custodial wallet is generally regarded to be secure as the user is not reliant on a third party's security measures. For most non-custodial wallets, users will never actually see the private key which is managed by the wallet to confirm a transaction – it is a common misconception that the 24-word seed phrase generally issued for recovery is the private key, but in fact this is only used by the wallet provider to mathematically derive the secure alphanumeric private key. A forgotten wallet password, or lost recovery phrase, or failure/collapse of the wallet service could result in permanent loss and inability to access the cryptocurrency held in the wallet. Holding cryptocurrency in a cold wallet, that is a wallet stored off-line typically using a physical storage medium like a USB-drive, is akin to putting money under a mattress, and the loss of the recovery phrase or device, such as in a house fire, could result in total loss of the cryptocurrency.

For a *custodial wallet*, a third party such as a cryptocurrency exchange is responsible for safeguarding and managing the keys on behalf of the user which is seen by some as a benefit having less user responsibility in the safekeeping of keys. These wallets are usually linked to additional services (buying or selling cryptocurrencies or exchanging to/from fiat currency) and typically provide easy-to-use interfaces for users. The user is issued a public key for making cryptocurrency deposits and the user controls when to transfer their cryptocurrency holdings – and much like many non-

[18]

custodial software wallets the user does not get 'hands-on' managing the private key to confirm a transaction which is instead managed by the custodian on their behalf.  The wallet provider will have security measures to protect access which are generally on par with non-custodial software wallets, however a lost password may not necessarily result in the permanent loss of cryptocurrency held in the wallet.

FTX variably represented customer Accounts as 'wallets' in the Terms of Service.  *See* May 2022 Terms of Service, Ex.A, §7.2.  ("[T]he price of a given Digital Asset as quoted on your "Wallet" page on the Site").  And in public forums.  *See* Testimony of Sam Bankman-Fried to Congress, Exhibits D & E.  (Noting the written testimony generally, and specifically when describing FTX.com, stated "The core product also consists of … a custody service and wallet for users").  To avoid confusion, throughout I refer to 'Account' to mean 'customer account', and 'wallet' to mean the native blockchain 'custodial wallet'.

### C) Public and Private Keys

The *public key* is the public address on the blockchain, much like a postal address, and the *private key* is used to facilitate and confirm the transfer of the cryptocurrency, much like a front door key provides entry to the house.  These keys are typically 25-36 alphanumeric characters in length. Users are familiar with the public key which is often copied-and-pasted as part of a cryptocurrency transfer to specify the destination wallet address, although conversely users are generally divorced from the highly regarded private key which is commonly managed by custodial or non-custodial wallet providers or services.

Popular opinion suggests holding the private key alone is absolute proof of ownership fueled in no small part by the "not your keys, not your crypto" cultural meme commonly plowed on social

media.  (Observing such social advice is generally buyer-beware since many 'professional' social media contributors have a good eye on their popularity rankings and related income streams rather and possibly not on the subject matter).  But this meme is often a too narrow definition that skates over material factors including individual circumstances, contract provisions, custodial arrangements, and property ownership.  For instance, if a hacker gained adverse possession and control of a private key, it does not follow that the hacker has become the rightful owner to the related crypto-asset.  If digital assets held in custody are misappropriated by fraud the owner's legal or beneficial title is not seized by the bad faith custodian.  In the tangible world, the finder of a misplaced car key does not gain ownership of the vehicle merely by being in possession of the lost keys, and a friend who holds your front door key in trust has no expectation of gaining title to your house.  And a bank employee does not become the legal owner of the contents of the bank vault merely because they have the combination code to the safe anymore than a bank robber becomes the rightful owner of a swag bag full of dollar bills merely by recent adverse possession.

If we were truly to only to consider the hierarchy of control as a mechanism to determine ownership, then the functional control layer residing below the issuing instruction for a blockchain transfer falls on the validator who controls authorizing the transaction on the public ledger and as far as I am aware no one is asserting that miners or validators have a superior property interest in the crypto-asset.  Thus, both the validator and the private key are a necessary component of blockchain technology required to authorize a transaction on the public ledger of a blockchain network, but merely having access to the key or control to validate the transaction does not provide certainty of ownership.

There is a population of crypto cases (examples provided in 'Property' and 'Trust' sections below) where possession of private keys has been a useful indicator to the courts to help resolve

[20]

contested ownership of intangible property in lieu of additional robust material. However, in the instant case, FTX.com was a regulated cryptocurrency exchange that was populated by non-anonymous customers. It was bound by terms of service related to its intermediary function to hold assets in custody that provided agreement, *inter alia*, that ultimate (legal and beneficial) title to the intangible property "at all times" belonged to customers. The Digital Assets owned by Affected Customers were plainly identifiable in Accounts such that the value and role of private keys establishing ownership is less weighty.

Common-sense dictates that if the private key was the *only* legal indicator of ownership then there should reasonably be no market at all for off-chain projects like centralized cryptocurrency exchanges or on-chain custodial wallets or any other crypto based project which risked entrusting cryptocurrency to a third party – consequently, analysis of related material facts including custodial arrangements, trusts, and contracts assist determining legal ownership rather than assume ownership is a judgment merely by possession of the alphanumeric keys required for custodial function.

### D) On-Chain and Off-Chain Transactions

An *on-chain* transaction refers to a transfer of cryptocurrency made on the public ledger of a particular native blockchain network that has been verified to the blockchain by its validators. Such transactions occur on blockchain networks like Bitcoin, Ethereum, and XRP Ledger (XRP). The transaction is publicly viewable and at a minimum will reveal the transferer and transferee public addresses and the amount of cryptocurrency transferred.

The alternative *off-chain* transaction occurs outside of the native blockchain network. These transactions are not recorded on the underlying blockchain but facilitated in secondary layers which provide a solution to issues of scalability and are now a crucial part of the crypto universe. Examples

[21]

of off-chain cryptocurrencies include MATIC and ARM which are blockchains built on top of the Ethereum network, and FTX's FTT which uses Ethereum and Solana blockchains. Other examples of off-chain applications include services provided by third-party interlocutors, such as, a centralized cryptocurrency exchange like FTX.com. These applications and their associated off-chain assets and transactions are popular due to scalability, speed of transaction, greater anonymity and, in the case of crypto exchanges, cost efficiency having zero/low-cost transactions fees making it the preferred solution allowing the exchange to charge platform transaction fees to their customers. In a centralized cryptocurrency exchange, a private ledger performs an administration function comparable to the public ledger for the blockchain and records the cryptocurrency transactions performed *off-chain* within the exchange, and to the rules of the system usually defined in terms of use. In order to maintain an appropriate store of value in the off-chain digital assets, an exchange will typically administer a pool of equivalent on-chain assets equal to the amount of off-chain crypto-assets held by its customers.

Cryptocurrencies are fungible representations of value stored in lines of computer code and there is no particular limitation which mandates a cryptocurrency is only considered a digital asset when it exists on a native blockchain network. In this regard, there is no distinction in the legal sense between on-chain and off-chain digital assets which share characteristics including that both are considered to be 'property' which can be owned, traded, transferred, and held in trust.

### E) Cryptocurrency is fungible

A cryptocurrency coin does not carry a permanent unique identifier akin to the serial number which features on a dollar bill. When acquiring cryptocurrency, each transaction is sequentially stored (in 'block' forming a 'chain' of transactions) on the native blockchain with key parameters about the transferor and transferee addresses (i.e. the wallet the coins were transferred from and the wallet to

[22]

which they are now attached), the amount of cryptocurrency being transferred, and digital signatures. In that regard, for example, one bitcoin held at an address on the Bitcoin blockchain is identifiable but only insofar as it is a number forming part, or all, of the coins in a particular transaction and the bitcoin in and of itself is no more unique than the digit '1' written here.

When cryptocurrency is transferred from a transferor to a transferee, the transfer brings into existence a *new* cryptocurrency asset on the blockchain containing new digital signature parameters (public and private keys). The *old* cryptocurrency asset persists on the blockchain but ceases to have any value or function and is marked as being spent or cancelled. This means it would be impossible to ever 'receive' back the *exact* same cryptocurrency asset.

Thus, fundamentally cryptocurrency is interchangeable on a one-to-one basis where each unit is equal in value and can be replaced by another unit of the same kind. In this regard, cryptocurrencies share the value characteristic of fiat currency being that 1 BTC = 1 BTC just as $1 = $1. (Albeit $1 is technically less fungible in that it carries a unique serial number). Cryptocurrencies are truly fungible property.

## 2. The FTX.com Platform

FTX.com was a centralized cryptocurrency exchange ("**CEX**") and custodial intermediary with services for its customers to deposit, transfer, hold, receive, trade, or acquire Digital Assets. The custodial holding arrangements – which did not result in the loss of the owner's property rights – were provided via the use of ledgered accounts and custodial wallets that contained digital assets belonging to customers. At all times customers retained ultimate (legal or beneficial) title to the crypto-tokens

[23]

and crypto-token entitlements held on their behalf. These tokens and related entitlements do not form part of the Estate.

FTX.com was a customer-to-customer trading platform that used intermediary services delivered by FTX and its affiliates. The Platform offered cash and spot markets supporting various digital asset commodities (such as BTC, ETH, USDC, XRP, and other cryptocurrencies as were available from time-to-time) which could be traded anonymously from one customer to another. It also offered a digital asset derivatives market with complex services such as futures and margin trading between customers. The exchange could receive cash deposits and deposits of customer owned Digital Assets transferred from supported blockchain networks and could transfer withdrawn crypto-assets back to native blockchains. FTX.com operated the exchange *off-chain* which Sam Bankman-Fried ("**BANKMAN-FRIED**") noted in a roundabout way to Congress[8]. *See* Ex.D, p.3 (last paragraph) and duplicated in Ex.E, p.4 (continued paragraph) ("Separate from deposits and withdrawals, transactions and transfers on the FTX exchanges themselves … do not require public blockchain activity").

Furthermore, FTX.com required all customers to undergo regulatory Know Your Customer ("**KYC**") checks before granting access to, or use of, the Platform so unlike layer-1 blockchain networks, FTX.com was a *non-anonymous system* – FTX knew its customers and could identify *their* Accounts and *their* Digital Assets.

As the custodial intermediary, FTX.com held assets in custody on behalf of its customers. *See* 'Discussion' below. Each Account provided a view of the crypto-tokens identifiable to, and in

---

[8] Written testimony given by Sam Bankman-Fried on "Digital Assets and the Future of Finance" Hearing before the U.S. House of Representatives Committee on Financial Services on December 8, 2021, a copy is provided as **Exhibit D**; and written testimony on "Examining Digital Assets - Risks, Regulation, and Innovation" Hearing before the U.S. Senate Committee on Agriculture, Nutrition and Forestry on February 9, 2022, a copy is provided as **Exhibit E**.

the control of, the customer. The underlying crypto-token entitlements reflected in the Customer Pegged Assets were held on the behalf of customers in one or more custodial wallets which formed part of an omnibus pool of commingled assets for all customers. For the reasons already stated, the fungible nature of crypto-assets meant there was no expectation for a customer to receive back the *exact* cryptocurrency deposited or transferred[9] but rather to receive back the correct *amount* of crypto-coins from the pools. Here, the extent of the customer's entitlement to crypto-coins held in commingled pools was defined by the number of related crypto-tokens that were displayed in the balance of the customer's Account. And much like fungible fiat currency withdrawn from an ATM where $1 = $1, the Customer Pegged Assets were similarly interchangeable, 1 BTC = 1 BTC.

I shall not dwell here longer than necessary as the background of FTX.com is well known, although it assists to lift the hood slightly on some mechanics of the Platform. To the best of my understanding, I will deal with relevant matters starting with a cryptocurrency deposit:

### A) Deposits

The customer (or another transferor) would initiate the transfer of a Digital Asset *they own*, or in the case of transfer from a third-party, a Digital Asset the customer was intended to own, from a 'place' *inter alia*, a non-custodial wallet, a custodial wallet, cryptocurrency exchange, or an over-the-counter or on-ramp service provider (using fiat currency to first acquire the Digital Asset on-chain). Common to each transfer would be specificity in the amount of the cryptocurrency being transferred.

---

[9] Refers to the characteristic that cryptocurrency generally have no physical identification other than a record of transaction on the blockchain that contains information about the transferor, transferee, and the amount of the cryptocurrency transferred. During transfer, a new record is created on the blockchain, and previous transactions related to the balance are treated as spent or cancelled. It is therefore impossible to 'get back' the exact same crypto.

FTX issued the customer a deposit address[10] married to the customer for the purpose of transferring the cryptocurrency. On occasion, the Platform required the customer's account number or similar identification embedded in the 'Destination Tag' or 'Memo' a string data field within the transaction record, where the deposit address was a commingled wallet to allow the Platform to correctly credit the deposit to the customer. The customer (or transferor) would variously authenticate the transfer at the other 'place' and the transfer would then be validated on the blockchain which, depending on the cryptocurrency, might take seconds to several hours, and the associated transaction fees would be paid. Once validation was complete and fees paid, the cryptocurrency transaction would be 'received'[11] at the deposit address.

Upon receipt, the Platform credited the corresponding amount of crypto-tokens to the asset balance in the customer's Account. When the customer logged into their Account, they saw their Digital Asset balance which reflected the crypto-tokens rather than a live feed of the underlying coins deposited into custody at the deposit address or held in custody in the related omnibus pool (if it had been a live view of the underlying assets then the fraud would have been exposed sooner). At this point the deposited crypto coin was divorced from the customer, but only insofar as there was no permanent link forged between the *exact* token showing in the Account and the *exact* coin transferred to the deposit address for the reasons already explained. If the cryptocurrency was anything other than Bitcoin, it is my understanding the deposit address balance was periodically swept into one or more custodial wallets in the omnibus pools. For Bitcoin, however, due to the high transaction costs, the

---

[10] The deposit address was a unique public address on the blockchain generated by the Platform for the particular digital asset being transferred.

[11] Although described as 'received' there is no tangible delivery of any object or thing, rather a new entry is made on the public ledger or blockchain containing the customer's deposit address.

balance would generally remain at the deposit address and all such deposit addresses were treated by FTX.com as part of the BTC omnibus pool.

## B) Withdrawals

Withdrawals from the Platform largely operated in reverse: The customer, having control of their Digital Assets held in their Account, could issue a withdrawal instruction to the intermediary at any time and specify a blockchain address to receive the transfer. Additional *control* features were optionally available to assist *authenticating* a withdrawal including (i) a separate password to validate; and/or (ii) an access control list to only accept withdrawal instructions from certain network IP addresses; and/or (iii) limiting the withdrawal to specific transferee blockchain addresses.

Once instructed, the Platform would debit the crypto-tokens from the Account balance and fulfil the transfer using the customer's entitlement to crypto-coins held in the omnibus pool, transferring the crypto-assets to the transferee. It is uncertain but assumed that most withdrawals were likely ministered by automated system routine. Transactions could be processed within a few minutes, subject to blockchain validation. From the customers perspective, it really made no difference which custodial wallet – hot or cold – the digital asset was transferred from during the withdrawal. Reiterating that 1 ETH = 1 ETH; 1 USDC = 1 USDC; 1 XRP = 1 XRP, *etc.*

## C) Accounts

The Platform provided customers secure access to their Accounts via a username, password, and mandatory two-factor authentication (an additional layer of security usually requiring either a security token or a biometric factor, such as a fingerprint) as well as additional transactional security options already mentioned above including a second password for authorization. The security was

[27]

equal to, or better than, that of most non-custodial hot wallets and provided a gatekeeping role sufficient to safeguard customer Accounts.

The Account (a.k.a. occasionally, "Wallet" or "wallet for users") would show customers their Digital Assets held in custody and provided a launchpad to access related platform services provided by FTX, as already outlined. Thus, in a practical and general sense, the Accounts gave customers positive control over their assets to use, dispose, or transfer, and the access arrangements provided negative control to exclude others from using their Account. Ask Amy about her holdings on FTX and she would say she holds "*10 ETH*". Amy could exclusively decide when and how to trade, and how much ETH to transfer, exchange, or withdraw and in that regard could exercise full control over the Digital Assets held in her Account. The Debtors role as custodial intermediary was subordinated to the safekeeping of customer assets and, as directed from time to time, to effect Amy's instructions as necessary.

During its period of operation, FTX managed $billions in deposits and withdrawals for customers and there was no outside suspicion of the adverse fraud since revealed. In fact, FTX claimed to be the safest cryptocurrency exchange on the planet through its various representations and endorsements. Certainly, there was no express expectation or intention that Amy was agreeing to yield control or title and ownership of her ETH to the Debtors by merely depositing her owned crypto-assets on the Platform. Quite the contrary. *See* Terms of Service, Ex.A, §8.2.6. (Noting the clear intentions that title to the crypto-asset property "at all times" remained with the customer).

[28]

## DISCUSSION

In or around May 2019, FTX Trading Ltd ("**FTX Trading**") was incorporated in Antigua and Barbuda as the principal firm and parent of the non-US international platforms. FTX Digital Markets Ltd ('In Provisional Liquidation') ("**FTX Digital**") was a wholly-owned FTX subsidiary registered in the Commonwealth of The Bahamas. FTX Digital was registered and regulated by the Securities Commission of The Bahamas (the "**SCB**") under the Digital Assets and Registered Exchanges Act, 2020 (as amended) ("**DARE Act**"). The firm's Application for Registration stated its purpose was "provision of an exchange between digital assets and fiat currency; and, provision of an exchange between one or more forms of digital assets" (*Declaration of Edgar W. Mosley II*, Dkt. 1141, Ex.G. #2). More generally, FTX Digital advertised[12] to provide "users regulated access to FTX's industry-leading derivatives, options, volatility products, and other FTX products and services". FTX and its subsidiaries, including FTX Digital, were collectively doing business as "FTX" and "FTX.com" and operated, maintained and administered the FTX International exchange which functioned as a digital asset trading platform on the basis to provide a cryptocurrency exchange for customers outside of the United States (and certain other jurisdictions) to deposit, store, acquire, convert, transfer, or otherwise transact their own Digital Assets with other customers. FTX.com represented itself as a trusted intermediary providing the Platform and offering related services.

---

[12] FTX Digital Markets LinkedIn profile, 'About us' section. < https://bs.linkedin.com/company/ftx-digital-markets >

### 1. Core Evidence: Terms of Service

FTX.com's Terms of Service[13] (the "**ToS**") was updated in May 2022 which provided the Digital Assets held in customer Accounts were entrusted on the basis that "Title to your Digital Assets shall at all times remain with you and shall not transfer to FTX Trading" (Ex.A, §8.2.6(A)), and "None of the Digital Assets in your Account are the property of, or shall or may be loaned to, FTX Trading" (*Id.*, §8.2.6(B)) (emphasis added). The Terms DID NOT provide an everlasting permissive clause for FTX to hypothecate, rehypothecate, lend, borrow, or otherwise take or use the Digital Assets for *any purpose*, though if a contrary clause is considered to exist then it must be considered in the context of the Terms that (A) the clear overriding intention for ownership of Digital Assets held in Accounts is set out in the 'Digital Asset' provisions; (B) a clause having significant effect upon customer ownership would reasonably have been written by the drafter in equally plain English alongside the other relevant 'Digital Asset' provisions; (C) a contrary clause must be read in the context in which it is written i.e. the 'Margin Trading' provision (*Id.*, §16.2) provides FTX ministerial control to seize and/or liquidate Digital Assets but only insofar as it would relate to a particular margin trading position and a particular debt BUT the clause does not provide an overarching license to take customer assets at will if there was no margin position, or if a margin position was not in default – and moreover, the beneficial owner of any Digital Asset seized or liquidated to discharge and settle a margin trading debt would be another customer and not FTX who was neither agent nor counterparty; and (D) a contrary clause bearing ambiguity that cannot be ratified by the plain words in the Terms or by extrinsic evidence is subject to the rule of *contra proferentem*.

---

[13] All references to "Terms of Service" or "ToS" are to the latest version dated from May 13, 2022, a copy of which is attached as **Exhibit A**. In addition, as explained below, the May 13, 2022 version of the Terms of Service are considered the current version for all customers using the FTX.com Platform at the Petition Date.

Further, and additionally, the Terms DID NOT expressly provide for customer owned assets to be subjected to, or in any way party to, the risk of the Debtors becoming insolvent or entering bankruptcy, noting here that section §541(a)(1) of the Bankruptcy Code "is not intended to expand the debtor's rights against others more than they existed at the commencement of the case."[14]

In English common law, under which the Terms were governed, the courts use an objective approach to ascertain the intention of provisions in a contract by examining how the ordinary and natural meaning of the words used would be understood by a reasonable person having all the background knowledge. *See Chartbrook Ltd v Persimmon Homes Ltd* [2009] UKHL 38, §14; *Lukoil Asia Pacific Pte Ltd v Ocean Tankers (Pte) Ltd* [2018] EWHC 163 (Comm), [2018] 2 All ER (Comm) 108, §8; *et al.* (Holding that the court must consider the language used and ascertain what a reasonable person, that is a person who has all the background knowledge which would reasonably have been available to the parties at the time of the contract, would have understood the parties to have meant). Where terms are ambiguous the objective approach further considers the overall purpose of the provisions, and, where required, a business common-sense interpretation. The objective approach in English law is sufficiently comparable to contract interpretation applied by this Bankruptcy Court, to the extent relevant to the matter. When applying either approach there can be no quarrel that zero ambiguity exists in the 'Digital Asset' provisions of the Terms which clearly ascribed title to Digital Assets shall "at all times" remain with the customer, and this was supplemented with a plainly written supplementary disclaimer which unmistakably rejected any property interest by the Debtors in the same assets such that the plain, ordinary, and natural meaning of the combined words used at §8.2.6

---

[14] H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 367-68 (1977); see *also Moody v. Amoco Oil Co.*, 734 F.2d 1200, 1213 (7th Cir. 1984) (holding that the "rights a debtor has in property at the commencement of the case continue in bankruptcy—no more, no less").

were explicit and unambiguous.  At bottom, based solely on the provisions of the Terms, there are adequate grounds to establish the Digital Assets held in Affected Customers' Accounts were the intangible personal property of customers and no good grounds exist to consider the Debtors' Estate holds any interest in the same Digital Assets.  These provisions, amongst others, establish a trust arrangement was created.  The 'Terms of Service' and 'Trust' are analyzed later in detail.

## 2.  Extrinsic Evidence

FTX Digital was regulated by the SCB under the provisions of the DARE Act which was necessary for FTX.com to operate the exchange on Bahamian soil.  The registration information is provided as **Exhibit C**.  The related Application for Registration was co-signed by BANKMAN-FRIED and Ryan David Salame ("**SALAME**") (*Mosley Decl.*, Dkt 1411, Ex.G, #14) attesting to "compliance with all applicable provisions of the Act" as evidenced in the submission of various "true, correct and not misleading" policies and procedures.  Included amongst this evidence was the '*Safeguarding of Assets & Digital Token Management Policy*' (the "**Safeguarding Policy**")[15] dated to August 16, 2021, and provided as **Exhibit B**, which compliance policy stated customer assets were "appropriately safeguarded"; "segregated" from its own assets; "clearly designated and easily identifiable"; that "customer funds do not represent property of [FTX Digital]" and are "protected from third-party creditors"; "have systems of control in place that are proportionate to … **the assets in custody** and the risks involved … including the management of digital tokens in its custody"; and "**customer assets are held in trust**".  The Policy provided written certainty that Digital Assets belonged to customers which it considered were "in custody" and "held in trust" and were "protected from … creditors".

---

[15] The 'Safeguarding of Assets & Digital Token Management Policy' August 16, 2021 attached as **Exhibit B**

The Safeguarding Policy was stated to have been built on "the best practice guidance issued for the virtual asset sector" and, although was not a public policy and therefore could not have formed part of the background knowledge which would reasonably have been available to all parties, would have been known at least to FTX and is reasonably presented now as extrinsic evidence of FTX's corporate intentions. The Policy's overarching objectives were stated (*Id.*, p.4):

- Emphasise our stringent commitment to <u>safeguarding assets belonging to</u> both FDM and its <u>customers</u>;

- Summarise the main procedures, systems, and controls FDM <u>has implemented</u> to appropriately <u>segregate</u> its own assets and its <u>customers' assets</u>;

- Summarise the main procedures FDM <u>has implemented</u> to <u>reconcile</u> its own assets and its <u>customer's assets</u>; and

- Explain how FDM will manage the <u>digital tokens under its custody</u>."

(Emphasis added)

Compliance with this policy was "mandatory". The policy section 'Apportionment of Responsibilities' (*Id.*, p.5) outlined key roles and responsibilities, which included:

(1) "Appropriately <u>account for the difference between its own assets and its customers' assets</u>";

(2) "All third-party providers will be aware that <u>customer assets do not represent assets of FDM</u>";

(3) "All third-party providers are aware that **<u>customer assets are held in trust</u>**";

(4) "FDM will have systems of control in place that are proportionate to its size, **the assets in custody** and the risks involved in its business, <u>including the management of digital tokens in its custody</u>"

(Emphasis added)

Responsibility for policy compliance fell to the Chief Operating Officer to ensure "customer assets were segregated for accounting, operational and storage purposes" and was required to maintain "regular reconciliation" of "customer assets". The Chief Financial Officer held responsibility for "protecting customer assets from third-party creditor claims", and the Compliance Officer held overarching role to ensure compliance with the Policy.

The policy section for 'Safeguarding and Segregation' (*Id.*, p.7) stated that *inter alia* the responsibility was "to ensure that customer assets are appropriately safeguarded and segregated" and "ensure that":

(1) "Customer assets (both fiat and virtual assets) are segregated from its own assets";

(2) "Customer assets (both fiat and virtual assets) will be clearly designated and easily identifiable";

(3) "All third-party providers are aware that customer funds do not represent property of FDM and are therefore **protected from third-party creditors**"; and

(4) "All third-party providers are aware that **customer assets are held in trust**".

(Emphasis added)

The policy section for 'Digital Token Management' (*Id.*, p.8) set out the compliance requirement for mitigating risk from exposure on hot wallets:

"FDM uses a best practice hot wallet and cold wallet standard solution for the custody of virtual assets. The firm aims to maintain sufficient virtual assets in the hot wallet to cover two days of trading activities, which means only a small proportion of assets held are exposed to the internet, the remaining assets are stored offline. The 2-day trading figure is continuously monitored and if the hot wallet exceeds this amount, it will overflow into the cold wallet. If the figure drops below the 2-day trading figure, the hot wallet will be topped up from the cold wallet."

[34]

When read in concert, the Safeguarding Policy provides critical insight as to how FTX treated, or at worst intended to treat, customers' Digital Assets. The plain and ordinary meaning of the language used in the policy document provides no room for doubt that, as-at August 2021, as a matter of policy, FTX considered that (1) Digital Assets belonged to customers; (2) customer assets were segregated; (3) customer balances and trading activity were maintained in good accounting records; (4) control systems were used to reconcile the underlying custodial wallets containing the crypto-token entitlements against Account balances (the blockchain-pegged tokens); (5) Digital Assets were held in custody; (6) Digital Assets were held in trust; and (7) customer assets do not represent property of FTX and were protected from third-party creditors.

The Safeguarding Policy perhaps formed the constituent basis for the unmistakable words that were later introduced into the 'Digital Asset' provisions of the May 2022 Terms. To put this Policy into some corporate context, the Terms of Service identified FTX Digital as the main Service Provider in the Service Schedules[16] delivering the Platform's core trading services. It is inconceivable that FTX or its executive were oblivious to the Safeguarding Policy, or other general statements made about customers' Digital Asset ownership given that, if for no other reason, BANKMAN-FRIED had certified the Policy was "true, correct, and not misleading". Or otherwise that BANKMAN-FRIED was co-founder and CEO of FTX Trading, and Chairman and Director at FTX Digital, and co-founder and CEO of Alameda Research LLC ("**Alameda**") registered in Delaware, the connected crypto asset hedge fund, which firms operated out of the same offices in the Bahamas where a loose and informal corporate structure meant that the same people held overlapping positions in various FTX enterprises

---

[16] FTX Digital Markets was listed in the Terms of Service as delivering the Platform services for Spot Market; Spot Margin Trading; OTC / Off-exchange Portal; Futures Market; Volatility Market (Options Contracts); and Volatility Market (MOVE Volatility Contracts).

and the executive lived and worked close together[17].  Others, like Zixiao "Gary" Wang ("**WANG**"),
was co-founder and Chief Technical Officer of both FTX Trading and FTX Digital, and he held
specific designated compliance responsibilities in the Safeguarding Policy.  And Daniel Friedberg
("**FREIDBERG**"), was FTX's lawyer and chief regulatory officer and Secretary of FTX Digital, Chief
Compliance Officer of FTX, and FTX US, and General Counsel of Alameda and FTX.  *See* Dkt. 1727
in the matter of the Debtors' complaint against FRIEDBERG.  Simply put, the Safeguarding Policy
was not divorced from FTX group and can be relied upon to attest to the clear corporate intentions
submitted to the regulator that were held over customer property.

Further, and additionally, FTX also published various policy papers including '*FTX's Key
Principles for Market Regulation of Crypto-Trading Platforms*' (the "**Market Regulation Key
Principles**")[18] published in December 2021, provided in **Exhibit D** (pp.17-26), which laid out
principles adopted by FTX and intended to guide policy makers and regulators.  This included to
explain custody of assets safekept in a wallet on the customer's behalf by a platform operator or
intermediary should be boosted with "appropriate safeguards ... disclosed in policies and procedures
of the custodian" to third-party service providers because the platform operator "will be held

---

[17] Such as Sam Bankman-Fried who was co-founder and CEO of FTX Trading, held the office of Chairman and Director
at FTX Digital, and was co-founder and former CEO of Alameda Research; Zixiao "Gary" Wang was co-founder and
Chief Technical Officer of FTX Trading, Chief Technical Officer of FTX Digital, and co-founder of Alameda Research;
Nishad Singh was co-founder and Head of Engineering at FTX Trading and Head of Engineering at Alameda; Constance
Wang was Chief Operating Officer at FTX Trading and Co-CEO at FTX Digital; Ryan Salame was former co-CEO at
Alameda Research and CEO of FTX Digital; Daniel Friedberg was FTX's lawyer and chief regulatory officer and
Secretary of FTX Digital, Chief Compliance Officer of FTX, and FTX US, and General Counsel of Alameda and FTX.

[18] The document 'FTX's Key Principles for Market Regulation of Crypto-Trading Platforms' was published in
December 2021 and provided as exhibit in written testimony by Sam Bankman-Fried to *inter alia*, U.S. House of
Representatives Committee on Financial Services, and U.S. Senate Committee on Agriculture, Nutrition and Forestry.
Formerly at https://www.ftxpolicy.com and provided in Ex.D, pp. 17-26, and in Ex.E, pp.19-28.

responsible" for these functions (*Id.*, p.22, 'Custody of Crypto Assets'). The Safeguarding Policy slips into these shoes which compliance policies were focused on safeguarding custody of customer assets.

FTX also published the policy paper '*FTX's Key Principles for Ensuring Investor Protections on Digital-Asset Platforms*' (the "**Investor Protection Key Principles**")[19] in December 2021, provided in **Exhibit E** (pp.29-38), which explained the protections FTX afforded to "customers' interests and their assets", specifically (*Id.*, p.30, last paragraph):

> "These include (1) maintaining adequate liquid resources to ensure the platform can return the customer's assets upon request; (2) ensuring the environment where customer assets are custodied, including digital wallets, are kept secure; (3) ensuring appropriate bookkeeping or ledgering of assets and disclosures to protect against misuse or misallocation of customer assets; (4) ensuring appropriate management of risks including market, credit/counterparty, and operational risks; and (5) avoiding or managing conflicts of interest."

On the matter of 'Maintaining Adequate Resources to Return a Customer's Assets' (*Id.*, p.31, last paragraph):

> "<u>FTX has policies and procedures for its platforms today that reflect this basic principle by maintaining liquid assets for customers withdrawals, including a sufficient balance of digital assets funded by the company for its non-U.S. platform.</u> The resources are funded to provide sufficient cover against user losses under certain events and extreme scenarios in order to, among other purposes, ensure <u>a customer without losses can redeem its assets from the platform on demand</u>."

> (Emphasis added)

---

[19] The document 'FTX's Key Principles for Ensuring Investor Protections on Digital-Asset Platforms' was published in December 2021 and provided as exhibit in written testimony by Sam Bankman-Fried to U.S. Senate Committee on Agriculture, Nutrition and Forestry. Formerly at https://www.ftxpolicy.com and provided in Ex.E, pp. 29-38.

On the matter of 'Securing Environment Where Customer Assets Are Custodied' (*Id.*, p.33, second paragraph):

> "Some have suggested that allowing the platform operator to serve as the digital-asset custodian might present a conflict of interest for the platform operator, presenting more opportunities for misuse or misallocation of customer assets. It is far from clear to FTX that contracting with a third party for custody would in every instance lower the risks of misuse or misallocation of a customer asset, <u>particularly when the platform operator would presumably remain accountable and, indeed, liable in every case</u>; …"

(Emphasis added)

On the matter of 'Ensuring Appropriate Ledgering and Disclosures of Assets to Protect Against Misuse' (*Id.*, p.34, first paragraph):

> "Another key investor-protection principle is making sure there is adequate bookkeeping (and related records) to track the customer's assets, combined with appropriate disclosure and reporting. This is to ensure that whoever is in control of a customer's assets is not misallocating or misusing those assets, particularly in furtherance to their own purposes at the expense of the customer's best interests. The basic concept here is that <u>there should be controls in place to ensure the custodian has books and records that keep track of and identify which customer owns what</u>, and there is adequate regulatory and customer reporting, as well as independent auditing, to verify the same.
>
> In keeping with this principle, FTX provides a user experience that enables any user to <u>easily view account balances for all assets</u>, for all of its platforms, in real time. By logging in to the customer's account at FTX, <u>the customer can immediately view the types of assets **they own, held in custody by FTX**. The assets are ledgered and easily identifiable to the user</u> (but **held in an omnibus wallet in the case of the customer's tokens** in order to better promote liquidity on the platform) pursuant to internal policies and procedures, and <u>FTX regularly reconciles customers' trading balances against cash and digital assets held by FTX</u>. Additionally, <u>as a general principle FTX segregates customer assets from its own assets across our platforms</u>."

(Emphasis added)

Particularly noting in the above that customers "own" the assets "held in custody" which they could "immediately view" and were "ledgered and easily identifiable to the user". This can only mean to

reference the balances shown in Accounts that specifically reflected the crypto-*tokens* rather than the pegged *coins* held in the underlying omnibus pools. Indeed, the Investor Protection Key Principles clarified for "customer's tokens" that the crypto-token entitlements owned by customers were held in custody in omnibus wallets.

In concert, the unambiguous provisions of the contractual agreement are enhanced by extrinsic evidence contained in the principles policies. These are further supported by additional representations repeatedly made in public that customer owned assets were properly safeguarded, segregated, and custodied by FTX.com. This included *inter alia* testimony given by BANKMAN-FRIED to U.S. House of Representatives Committee on Financial Services on December 8, 2021 in which BANKMAN-FRIED stated in written testimony about FTX.com. *See* Ex.D, p.2. (second paragraph). ("The core product consists of ... a custody service and wallet for users ..." and "The exchange[s] also have integrated ... back-office systems to perform clearing and settlement of trades, which includes updating records of ownership of the digital assets ... and transferring value between users' accounts (settlement)").

And here, with reference to the aforementioned Safeguarding Policy, BANKMAN-FRIED specifically noted "The FTX team has grown to over 200 globally, the majority of whom are responsible for compliance and customer support" and the "primary international headquarters and base of operation is in the Bahamas, where the company is registered as a digital asset business under The Bahamas' Digital Assets and Registered Exchanges Act, 2020" (emphasis added) which testimony unmistakably demonstrates to the commingling of the enterprises, noting that above all others, BANKMAN-FRIED should have been able to clearly articulate difference, but rather

[39]

interchanges FTX Trading and FTX Digital such that for all practical and operational purposes they were considered inseparable entities. *See* Ex.D, p.1. (last paragraph).

The bulk of the written testimony was later re-delivered to U.S. Senate Committee on Agriculture, Nutrition and Forestry on February 9, 2022 in which BANKMAN-FRIED also included to submit a copy of the Market Regulation Key Principles, and additionally the Investor Protection Key Principles already referred. *See* Ex.E. (Noting the continued public representations that FTX safeguarded customer owned assets which were stated to be held in custody and stored in omnibus wallets, and interchangeably referenced FTX Trading and FTX Digital).

Much material was also posted to social media by BANKMAN-FRIED and others variously representing customer assets were safeguarded, custodied and belonging to customers, and the days before the collapse there was great emphasized that customer owned assets were safe, secure and token and token entitlements were held 1:1 to try and persuade against the customer run on the exchange. For the sake of brevity I shall not repeat it here as much of it has already been well reported in mainstream media. Save to note one example unearthed from two days before filing for bankruptcy, and while FTX.com had already suspended all withdrawals from the Platform (noting that FTX.US withdrawals were still being processed), BANKMAN-FRIED sent the following email on November 9, 2022 to Ryan Pinder K.C., Senator, Attorney General of the Commonwealth of The Bahamas:

[40]

6) We are deeply grateful for what The Bahamas has done for us. and deeply committed to it. We are also deeply sorry about this mess.

As part of this: we have segregated funds for all Bahamian customers on FTX. And **we would be more than happy to open up withdrawals for *all* Bahamian customers on FTX, so that they can, *tomorrow, fully* withdraw *all* of their assets, making them fully whole**. It's your call whether you want us to do this--but we are more than happy to and would consider it the very least of our duty to the country. and could open it up immediately if you reply saying you want us to. If we don't hear back from you. we are going to go ahead and do it tomorrow.

—

Sam Bankman-Fried

Here, BANKMAN-FRIED, in a thinly veiled act presumed to gain lasting favor from the host nation, proposed to open withdrawals for Bahamian nationals, acknowledging this subset of customers could fully withdraw all of "their assets". In the event withdrawals were opened, but rather than coming from segregated pools the withdrawn assets were understood to have been taken from *any* remaining available pool.

Further, and additionally, it is impossible to disregard the high-profile criminal and civil cases which have been progressing through other courts. Four insiders, Caroline Ellison ("**ELLISON**"), Nishad Singh ("**SINGH**"), WANG, and SALAME have variously plead guilty to criminal indictments and civil charges related to wire fraud in which they admit to defrauding FTX customers of their money and *property*. And BANKMAN-FRIED has now been found guilty by unanimous jury of defrauding FTX customers of their money and *property*. The criminal conviction bears material weight since the burden of proof required in the criminal court is usually of a higher standard than is required in civil matters. It is therefore relevant to consider the United States Government[20]; the United States Commodity Futures Trading Commission (the "**CFTC**")[21]; the United States Securities

---

[20] *United States v. BANKMAN-FRIED, 22 Cr. 673 (S.D.N.Y.)*

[21] *Commodity Futures Trading Commission v. Bankman-Fried, 22 Civ. 10503, (S.D.N.Y.)*

[41]

and Exchange Commission (the "**SEC**")[22]; Courts in the Southern District of New York, and insiders at FTX, have collectively found common ground in the fundamental matter to determine the Digital Assets belonged to customers.

In sum, the language used in the Terms was crystal-clear and provided clear unambiguous provision that FTX customers held absolute title to the Digital Assets in their Accounts. Extrinsic evidence provides great support to confirm the corporate intentions beyond reasonable doubt that Digital Assets were the intangible personal property of customers, and the assets were in custody and held in trust. The legal question is not clouded by the fraud, which was unknown to customers when they opened Accounts and deposited their assets with FTX, and can be answered within the four corners of the Terms boosted as necessary with robust extrinsic evidence.

I might stop here, though it may assist the Court to also consider the following paragraphs and sections with discussion on related matters in support of this Motion and later to provide analysis on the 'Terms of Service', 'Property', 'Trust', and the 'Related Cases'.

## 3. Digital Assets

In the context of the Platform, the term 'Digital Assets' was employed to mean the various cryptocurrencies that were supported and made available on FTX.com. It included commodity tokens held in customer Accounts that were pegged to native coins, and interchangeably used to mean *inter alia* native coins, stablecoins, tokens, asset tokens, or token entitlements. I shall not reiterate every

---

[22] *Securities and Exchange Commission v. Bankman-Fried, 22 Civ. 10501, (S.D.N.Y.); Securities and Exchange Commission v. Caroline Ellison and Zixiao "Gary" Wang, 22 Civ. 10794, (S.D.N.Y.)*

example where the words 'Digital Assets' are written in the Terms rather draw upon a few examples which demonstrate scope beginning with the definition provided in the Terms:

> **"Digital Assets"** means BTC, ETH, FTT and any other digital asset, cryptocurrency,
> virtual currency, token, leveraged token, stablecoin, tokenised stock, volatility token,
> tokenised futures contract, tokenised option or other tokenised derivatives product that is
> supported by and made available from time to time to transact in using the Platform.

References to "BTC" and "ETH" are each a particular crypto coin native to a different blockchain network, whereas "FTT" and references to "token" means a crypto asset token which sits on top of a native blockchain network using the underlying blockchain for a particular purpose. "Cryptocurrency" means both crypto coin and crypto token. It is clear the drafter was deliberate in their choice of words to convey a definition for "Digital Assets" that interchangeably used terminology for both tokens and coins which is not awkward or ambiguous since it dovetails with what was implemented on the Platform. What is striking from the definition is that the meaning does not hint Digital Assets were a 'representation', 'credit', 'voucher', or some other variety of valueless placeholder that was not a cryptocurrency.

*Next*, three examples of provisions from the Terms. The *first* provides a customer could deposit existing owned cryptocurrency (coin) into their Account (token + pegged coin) by sending the crypto-asset to a blockchain address which should then be credited in the Account balance:

(Example 1)

"8.2.1    The Platform supports deposits and withdrawals of certain Digital Assets,
including certain U.S. Dollar-pegged stablecoins (each a "USD Stablecoin").
You may deposit Digital Assets that you already own into your Account by
generating an address within your Account and sending your Digital Assets to
such address, after which they should appear in your Account balance …"

[43]

The *second* and *third* examples are opposite bookends. One notifies that changes affecting the underlying native blockchain network (coin) could affect the "Digital Asset". The other notifies the 'Spot Margin Trading' service would use "Digital Assets" held in your Account (token + pegged coin) for collateral.

(Example 2)

"17.1   As a result of the decentralised and open source nature of Digital Assets it is possible that sudden, unexpected, controversial or other changes ("Forks") can be made to any Digital Asset that may change the usability, functions, compatibility, value or even name of a given Digital Asset. ..."

(Example 3)

SCHEDULE 3
SERVICE SCHEDULE

| Specified Service: | Spot Margin Trading |
| --- | --- |
| Specified Service description: | Spot Margin Trading enables you to spot trade certain Digital Assets that you do not have by posting collateral in the form of fiat currency (depending on your location) or Digital Assets held in your Account and borrowing the required Digital Assets from other Users. You can then spot trade the borrowed Digital Assets through the Spot Market on the Platform.<br><br>You may also lend your Digital Assets to other Users who need them to spot trade.<br><br>Digital Asset borrowers pay a lending fee to Digital Asset lenders." |

In sum, the Terms did not choose to distinguish crypto-coins from crypto-tokens. The phrase "Digital Assets" was used interchangeably, and it represented, for example, BTC coin and BTC token used on the Platform. There is no discernable reason why FTX would have wanted to provide distinction between on-chain and off-chain assets since FTX represented the BTC held and traded on

[44]

FTX.com was cryptocurrency indistinct from BTC on the native blockchain having the same store of value and market price.

### 4.  Omnibus Pools

Using omnibus pools was advantageous to the performance of the Platform.  Off-chain transactions on the Platform were fast, avoided on-chain fees (though allowed FTX.com to charge its own fees to generate revenue), and were anonymous to the public ledger.  Trading blockchain-pegged tokens on the exchange was undertaken on a customer-to-customer basis and provided through services available to customers in their Account.

The use of omnibus pools enabled the Platform to maintain aggregate balances in the fewest wallets (being at least equivalent to the number of cryptocurrencies supported by the Platform, and with addition for a range of hot and cold wallets).  In the alternative approach, whereby each customer had an individual blockchain wallet for each cryptocurrency, it would have required the Platform to administer in excess of ten million wallets (being the reported number of customer accounts by the Debtors at the March 12, 2023 hearing) assuming each customer only had one type of digital asset, but if each customer held on average five different cryptocurrencies the number of wallets would rise to 50,000,000 individual custodial wallets.  Any err or misplaced key could prove fatal for a wallet, and the reconciliation and rebalancing of crypto-assets would incur considerable transaction fees rendering the exchange less attractive, less popular, less competitive, and ultimately less profitable.  This is why it is typical for a crypto exchange to manage a customer's on-chain assets via a smaller portfolio of commingled custodial wallets controlled by a ledger.

The underlying crypto-coins held in custody in omnibus pools were allocated to customers *generally* with the express purpose to provide a store of value for the blockchain-pegged tokens held in Accounts and consequently liquidity for the withdrawal of those same tokens. The Digital Assets owned by Bill and held in his Account included 10 ETH which comprised 10 ETH tokens held in his Account backed by 10 ETH coins stored in the Ethereum omnibus pool. Bill had no visibility of the 10 ETH coins in the pool which were stored in custody – his only point of reference to his crypto-assets were the ETH tokens showing in his Account balance. When Bill sold his ETH to Anna there was no on-chain transfer of crypto-coins, rather the transaction was an off-chain and intra-platform 'swap' of the tokens and coins from Bill to Anna which transferred ownership and control of the ETH tokens and ETH coins to Anna. And the BTC which Anna paid to Bill, resulted in her BTC tokens and BTC coins stored in the Bitcoin omnibus pool being transferred to Bill. When Anna wanted to subsequently withdraw the ETH she applied control over the ETH tokens in her Account by issuing an instruction to the Platform which began the withdrawal processes transferring her 10 ETH tokens from her Account balance and transferring the corresponding ETH coins from the omnibus pool to her cold wallet address. The underlying crypto-coins and use of private keys to validate a transfer from a blockchain wallet were therefore not the beginning and end of the withdrawal process, but rather a designed link in a chain of processes initiated by the customer exercising control over the Digital Assets held in their Account.

Further, as custodian of the Digital Assets, FTX held ministerial responsibility to the Customer Pegged Assets which included to reconcile the crypto-coins stored in the omnibus pools against the aggregated balance of crypto-tokens held in all Accounts. As per Investor Protection Key Principles. *See* Ex.E, p.34 (second paragraph). ("[T]he customer can immediately view the types of assets they own, held in custody by FTX", and "FTX has policies and procedures for its platforms

today that reflect this basic principle by maintaining liquid assets for customers withdrawals", and "FTX regularly reconciles customers' trading balances against cash and digital assets held by FTX"). As Per Safeguarding Policy. *See* Ex.B, 'Virtual Asset Reconciliation', p.7. ("[A]ny internally calculated balances are reconciled to the expected balance on the underlying blockchain" and "... a lower amount of virtual assets on the underlying distributed ledger when compared to internal records, may be covered by the firm until these are investigated and cleared.").

Consequently, the Debtors would variously reconcile asset balances in the omnibus pools such that it was not unreasonable to for the Debtors to transfer, convert or acquire cryptocurrency as necessary in performance of its intermediary and custodial duty to maintain the required balances in line with the demands of the ledger. The digital token management included balancing custodial assets between hot and cold wallets to mitigate against risk of attack on a vulnerable blockchain network – the omnibus pool therefore comprised several hot and cold wallets for the same cryptocurrency, as per Safeguarding Policy. *See* Ex.B, 'Digital Token Management', p.8) ("[The Debtors] use[s] a best practice hot wallet and cold wallet standard solution for the custody of virtual assets. The firm aims to maintain sufficient virtual assets in the hot wallet to cover two days of trading activities, ..."). In a practical sense, the custodial functions required the Debtors to apply private keys to the blockchain wallets to maintain an adequate amount of pegged crypto-coins to match customers aggregated crypto-token balances.

Fundamentally and necessarily, the crypto-tokens and underlying crypto-coins defined by the crypto-token entitlements were assets paired *by amount* and not by some uniquely identifiable feature linking a particular customer or particular token with a particular coin. The identity of the depositor or transferor of a coin to an omnibus pool was, in principle, immaterial due to the fungible character

[47]

of cryptocurrency and the inherent function of the blockchain network that will always create a new crypto-asset for each transfer.

Cryptocurrency is not the same thing as fiat currency in the legal sense, though the ministered omnibus pools might be compared by way of a banking analogy: A bank does not need to ensure a particular serial numbered dollar bill is isolated and safeguarded for a particular customer to withdraw it, rather the bank only needs to ensure a sufficient quantity of dollar bills are present in the vault to meet the aggregated balance held in all customer accounts thereby providing liquidity against customer withdraws. This reflects the fungible nature of money – each dollar bill has the same $1 value and the same is true of the crypto-coins held in the omnibus pools. Of course, banks don't hold assets 1:1 because they operate under different contractual terms which allow them to hypothecate, rehypothecate, and otherwise use customer deposits to earn income for the bank and, amongst other things, pay interest back to the customer – and to that end banks gain a property interest in customer's money. In the United Kingdom, the Financial Services Compensation Scheme protects bank deposits to a maximum of £85,000 in the event a bank collapses, though any deposits above this threshold are at risk in bankruptcy and the customer would become an unsecured creditor with no guarantee to be fully compensated. However, this was not the case at FTX.com since intangible digital assets are a different class of property to money in a legal sense, and at FTX, unlike at the bank, the specific and unambiguous contractual terms provided customers always retained ultimate (legal or beneficial) title to the Digital Assets in their Account.

Thus, the question of Digital Asset ownership is not defined by the Customer Pegged Assets remaining in the Debtors possession in the omnibus pools after the embezzlement, though obviously the retained and recovered crypto-coins are interlinked, but is rather a matter *controlled* by the crypto-

[48]

tokens held in customer Accounts as provided by the Terms of Service. This is an important concept to carry in the legal analysis since it is essential to the understanding of precisely *what* is being owned – especially since coins and tokens are intangible cryptocurrencies that only exist as lines of computer code. Here, for the avoidance of any doubt, the Digital Assets owned by Affected Customers were the tokens and token entitlements to the underlying coins.

## 5. Fraud and Misappropriation

Turning to the adverse fraud issue briefly, contrary to statute laws, regulatory requirements, the Terms of Service and related Policies (including the Safeguarding Policy), documents, best practice guidance, statements made in public forums, and without consent of Affected Customers, the Debtors failed to maintain the necessary checks and balances and controls required to segregate and safeguard assets[23] and knowingly and purposefully took and used customers' property for their own use and benefit, and a substantial portion of which remains missing. Thus, during the run on FTX.com in November 2022, the Debtors held fewer crypto-coins in the omnibus pools than the aggregated crypto-tokens in customer Accounts and so were unable to service all instructions from customers wanting to withdraw their Digital Assets from the exchange. This situation resulted in the Debtors halting withdrawals and imprisoning what remained of Affected Customers' Digital Assets which course of action breached the Terms at §8.2.6(C) that provided, "You control the Digital Assets held in your Account. At any time, subject to outages, downtime, and other applicable policies (including the Terms), you may withdraw your Digital Assets by sending them to a different blockchain address controlled by you or a third party" (emphasis added).

---

[23] Except for FTX Japan customers where FTX segregated assets into customer pools.

On December 13, 2022, FTX CEO John J. Ray III stated to the U.S. House Financial Services Committee about events at FTX, "This is really old-fashioned embezzlement. This is just taking money from customers and using it for your own purpose", and it is difficult to disagree with the character of that observation. Key actors have since plead guilty, or been found guilty, to various federal and civil charges including wire fraud ("for obtaining money and *property*") by misappropriating customer assets. Against this background, it is not unreasonable to at least ask the question: *Should the Debtors benefit from an assumed superior title to all crypto-coins held-in-possession given the scale of misappropriation of customer assets?*

At its core, the alleged fraud is a simple matter of theft of personal property, and the courts commonly side with plaintiffs in cases where property has been stolen. In the crypto universe, hackers aim to gain possession of private keys to steal crypto-assets, but in the case of FTX, the fraud was perpetrated as 'an inside job' where the thieves already had custodial access of the wallets containing Customer Pegged Assets. Witness testimony by insiders in the related criminal case insinuated the extent of Alameda's trading losses eclipsed and consumed all profits from FTX.com, which perhaps raises the rhetorical question: *At the end, if FTX.com had underwritten Alameda's losses with all its own liquid assets before misappropriating customers' liquid assets, then what proportion of the commingled liquid assets-in-possession can the Debtors reasonably claim to belong to FTX.com with any certainty?* I would hazard a guess; not many.

In his Declaration in Support of Chapter 11 Petitions and First Day Pleadings, John J Ray III commented (Dkt. 24, §5), "Never in my career have I seen such a complete failure of corporate controls and such a complete absence of trustworthy financial information as occurred here" which is a damning reflection on the former executive. But this was just a first assessment reflecting initial

findings that cannot have intended to provide a root and branch critique of each control system at FTX (the Declaration was filed six days after the Petition Date). Nonetheless, in the context of this Motion, the Court will rightly need to ask the question: *How are customers' Digital Assets to be identified given corporate controls and procedures are revealed to have been insufficient?*

To answer that overarching question it is essential to understand that systems core to the running of the exchange were necessarily sound (for it they had not been then the Platform would have failed to operate long before), and with specificity, I refer to the inter-related systems powering the Platform's centralized private exchange ledger (the "**Exchange Ledger**") collectively comprising a database of necessary digital records for the purpose of operating the exchange which included to create, manage and administer Accounts, and to record and process cryptocurrency deposits, transfers, transactions, trading activity, withdrawals, and customers' Digital Asset balances. It is this system which the Debtors employed post-petition to power the customer claims portal and allowed them to understand the extent of the customer liability and which also underpins much of the related financial information presented to this Court. Whereas it might be the case that overarching corporate controls were substandard, the same accusation cannot reasonably be thrown at, or stick to, the Exchange Ledger which reliably and robustly dealt with the minutiae of the exchange's day-to-day operation.

## 6. Private Exchange Ledger

The Safeguarding Policy required FTX to "maintain reliable accounting records or cause reliable accounting records to be kept in relation to ... all customer trading activity" (Ex.B, 'Accounting Standards', p.6) such that the Exchange Ledger provided an accurate record of the Digital Assets owned by customers, and could distinguish them from assets owned by other customers in as much as

it provided the control system to identify the crypto-tokens held in Accounts and identify the crypto coin balances apportioned to the customer within the omnibus pools.

The Exchange Ledger was integral to the performance of Accounts on the Platform and to related trading services and was inked into the Terms (Ex.A, §8.2.6) ("**Digital Assets** are held in **your Account** on the following basis"; "As the owner of Digital Assets in your Account ..."; "...the fiat currency value of Digital Assets held in your Account"; "None of the Digital Assets in your Account are the property of, or shall or may be loaned to, [the Debtors]"; "[The Debtors] do[es] not represent or treat Digital Assets held in User's Accounts as belonging to [the Debtors]"; "You control the Digital Assets held in your Account") (emphasis added). There can be no doubt that the Exchange Ledger was the authoritative control system able to identify customers' Digital Assets balances held in their Accounts.

The Exchange Ledger also fulfilled a critical role in the custody of Digital Assets as it was the control system which FTX employed to reconcile the aggregated token balances held in Accounts against the Customer Pegged Assets held in the omnibus pools.

At the September 13, 2023 Omnibus Hearing, the Debtors expressed in oral arguments that "none of the assets we have are attributed to customer names - it's all part of one big general blended pool" and asserted the burden is on the customer to "specify with particularity" the crypto-coin they claim to own. There is no quarrel that the Platform *did* use omnibus pools to store Customer Pegged Assets and, when observing any particular pool, no single cryptocurrency token would seem tethered to a specific customer for the reasons already discussed in Background. However, the Debtors oral argument was perhaps made with one eye closed since, when considering the custodial function of the

[52]

exchange in the round, it is impossible to divorce the custodial wallets from the Exchange Ledger (required as a matter of policy[24]) which served as the authoritative system of control *inter alia* to:

- Maintain a record of customers' deposits, trading activity, and digital asset balances; and

- Provide an aggregate balance of crypto-assets for reconciliation and periodic rebalancing of each omnibus pool to ensure custodial wallets collectively held an amount of coin equal to the token balance of each type of cryptocurrency reflected in the Exchange Ledger.

At the hearing the Debtors point of view played fast and loose with the facts and lacked probity. *Firstly*, it was disingenuous to divorce the pegged crypto-coins held in omnibus pools from the tokens held in Accounts – to consider the omnibus pools with such isolation from the encapsulating systems means being blind to the tokenization principles at the heart of the exchange's operation. It would be much like peering into a bank vault of gold bars and concluding they must belong to the bank merely because customer names were not engraved on them. *Secondly*, the omnibus pools were ministered by FTX as part of its custodial role and reconciliation was executed as part of the back-office operations. For a customer to know which particular wallet contained their allotment of coins would have required FTX to inform customers about these allocations which it did not do – for example, "Dear Anna, we have today reconciled the coins in the ETH pool and your 10 ETH are now held at wallet address 'abc123…'". *Thirdly*, the pools were designed as a store of value for the asset tokens and thereby to provide liquidity for withdrawals which architecture boosted performance and

---

[24] The Terms of Service detail the Service Schedules provided by FTX Digital who wrote the Safeguarding Policy which demanded explicit systems of control to "maintain accounting records" "of all customer trading activity" and enable reconciliation of "customer balances and virtual assets on the relevant blockchain".

profitability of the exchange. For the Debtors to mistake the fundamental system architecture of their business or imply that a customer should have a distinctly identifiable blockchain wallet or detailed knowledge of the underlying wallets and assets held in custody beyond that which was implemented into the Platform or was information generally available to the customer in their Account is a fundamental mischaracterization of how FTX.com operated. Here, the exchange is a dog, and the Debtors are asking customers to point at its wings. *Fourthly*, it is already mentioned on-chain transactions comprise limited data that lacks appropriate capacity to store personally identifiable information about a customer, or their allotment of the cryptocurrency held in the omnibus pool (which by nature of public ledgers would be publicly viewable data). It would have been possible for FTX to store 'system data' such as an account number in the wallet transactions (as indeed it did mandate for certain cryptocurrency deposits), but in principle, FTX cannot have desired such a solution since any spot trade on the Platform would have necessitated an update to the underlying wallets which would have demanded a new transaction and all that entailed – external fees, performance delays, *etc* – contrary to the architecture for the off-chain centralized crypto exchange. Moreover, to 'read' the system data would have required a control system such as the Exchange Ledger to provide interpretation and so practically, any data embedded in a transaction would not be understood in isolation. *Fifthly*, IF the omnibus pools acted as the ledger (which they did not) then customers would have been awake to unexpected changes in their Digital Asset balances as soon as crypto-coins were misappropriated from their respective blockchain wallets. *Sixthly*, the Debtors beseeching customers to identify coins with specificity invents a new test which is plainly contrary to the normal course of operations of the exchange – not one of the many Excluded Preference Customers or Preference Customers or for that matter, any customer in the history of the exchange's operation, were required

[54]

to overcome such a high bar before their withdrawal instructions were processed, and is plainly not a standard request that has been applied at any time.

Contrary to the Debtors belief, Customers should not need to be called upon to identify with specificity the *exact* crypto-coins that belonged to them or that survive in the raided omnibus pools, but rather Affected Customers should only need to point to and assert control over *their crypto-tokens held in their Account* as provided by the Terms with an instruction issued to the custodian to withdraw their Digital Assets. This course of action will inevitably result in the Debtors having to confirm insufficient amounts of underlying pegged assets exist to process the withdrawal whereat the shortfall can only reasonably be attributed to (i) mismanagement of omnibus pools; (ii) assets that were misappropriated in the fraud; or (iii) assets which the Debtors have since seized and/or sold. For these fundamental reasons it is simply not possible to overlook the role of the Exchange Ledger or divorce it from the ownership matter, and to exclude the Exchange Ledger from analysis is to omit the hand from the glove.

Lastly, and for reasons broadly mentioned, the legal analysis required to answer the ownership question does not turn on whether the fungible entitlements, which form a part of the whole digital asset[25], exist in omnibus pools. Common law does not generally require the court to physically see the asset before it can determine, based on the materiality and weight of evidence before it, who owns the property. Consider situations of theft where the physical property is stolen, or embezzlement of money from a company which might be demonstrated by a change in the numbers on a balance sheet. In the instant matter, the property in question is intangible lines of computer code which could

---

[25] The digital asset comprises a crypto-token and crypto-token entitlement to a fungible crypto-coin held in a custodial wallet in an omnibus pool.