"57. Contrary to such representations and without disclosure to FTX customers, Alameda and FTX commingled assets and **freely used FTX customer assets <u>as if they were their own</u>**, including as capital to deploy in their own trading and investment activities. …"

"66. Defendants were aware of and participated in facilitating the foregoing privileges afforded to Alameda, both with respect to Alameda's advantages in its activity on FTX and with respect to Alameda's ability to withdraw and **<u>misappropriate</u> FTX customer assets**."

"75. In approximately May and/or June 2022, Alameda was subject to a large number of such margin calls and loan recalls. It did not have sufficient liquid assets to service its loans. Instead, at the direction and/or under the supervision of Bankman-Fried and ELLISON, **Alameda greatly increased its usage of FTX customer assets** to meet its external debt obligations. Alameda was able to rely on its undisclosed ordinary-course access to FTX credit **and customer assets** to facilitate these large withdrawals, which were several billion dollars in notional value. Defendants were aware of and/or responsible for **this <u>misappropriation</u> of FTX customer assets**."

"94. Bankman-Fried, ELLISON and other key personnel of FTX and Alameda acknowledged internally that this shortfall was not merely a matter of having sufficient liquid assets on hand to cover customer withdrawals in the short term; rather, **FTX customer assets were irrevocably lost because Alameda had <u>misappropriated</u> them**."

"101. On information and belief, this and other tweets posted by Bankman-Fried on November 7-8, 2022 were intended to dissuade FTX customers from requesting to withdraw **<u>their assets</u>** from Defendants' exchanges."

"107. … ELLISON acknowledged that earlier that year, she, Bankman-Fried and other individuals had **decided to use FTX customer assets to pay Alameda's debts**, and that WANG and another FTX executive were aware of this. … ELLISON informed Alameda staff that FTX had "always allowed" Alameda to **<u>borrow customer assets</u>**, and did not require collateral for **those loans**. She also explained that Alameda could access **user assets** without requiring FTX's approval as the "structure" allowed Alameda to "go negative in coins.""

(Emphasis added)

The SEC's civil cases largely repeat the CFTC arguments made in each complaint (Civ.1 (BANKMAN-FRIED), ECF No. 1; Civ.3 (ELLISON/WANG), ECF No. 1) with various references to "customer assets", including:

[111]

"2. ... Customers around the world believed his lies, and sent billions of dollars to FTX, believing **their assets** were secure on the FTX trading platform. But Bankman-Fried and WANG improperly diverted **customer assets** to Alameda Research LLC and its subsidiaries ("Alameda"), the crypto asset hedge fund that they had founded and co-owned and that ELLISON ran. WANG created and participated in the creation of the software code that allowed Alameda to divert FTX customer funds. ELLISON, in turn, used the **misappropriated FTX customer funds** for Alameda's trading activity. And Bankman-Fried used those customer funds to make undisclosed venture investments, lavish real estate purchases, and large political donations."

"5. ... Despite the fact that Alameda had, by this point, already taken billions of dollars of FTX **customer assets**, it was unable to satisfy its loan obligations. Bankman-Fried, with Defendants' knowledge, directed FTX to divert billions more in **customer assets** to Alameda to ensure that Alameda maintained its lending relationships, and that money could continue to flow in from lenders and other investors. ELLISON then used FTX's **customer assets** to pay Alameda's debts."

"37. ... Bankman-Fried and WANG thus gave Alameda and ELLISON *carte blanche* to use FTX **customer assets** for Alameda's trading operations and for whatever other purposes Bankman-Fried and ELLISON saw fit. In essence, Bankman-Fried and WANG placed billions of dollars of FTX **customer funds** into Alameda."

(Emphasis added)

**Criminal Case**

In *United States v. BANKMAN-FRIED, 22 Cr. 673 (S.D.N.Y.)* (the "**Criminal Case**") the superseding indictment (ECF No. 115) charged BANKMAN-FRIED with thirteen counts of fraud related to his part in the operation of the FTX exchange and other cryptocurrency companies he founded and controlled. A further superseding indictment (ECF no. 202) reduced the count to seven counts.

The Cr. Case also includes seven felony charges against ELLISON in *United States v. CAROLINE ELLISON, 22 Cr. 673 (S.D.N.Y.)* ECF No. 8 and in *United States v. ZIXIAO (GARY) WANG, 22 Cr. 673 (S.D.N.Y.)* ECF No. 6, four felony charges are asserted against WANG. On December 19, 2022, defendants ELLISON and WANG waived indictment, consented to the filing of

a Superseding Information, and pleaded guilty to each of the respective counts with which they were charged, including to commit wire fraud on FTX customers. The wire fraud charges are relevant since they determine wrong-doing "for obtaining money and *property*" by misappropriating customer assets.

The Government's Memorandum in Opposition provided submission regarding the ownership of customer assets (ECF 149, at pp. 17-21) when discussing the "in connection with" limb to alleged violations of the Commodities Exchange Act. For convenience, I have repeated them here as they are of particular interest to the instant matter:

> "*First*, as alleged, **a portion of the customer deposits that were fraudulently misappropriated by the defendant were commodities, namely cryptocurrencies like bitcoin**. *See CFTC v. McDonnell*, 287 F. Supp. 3d 213, 227 (E.D.N.Y. Mar. 6, 2018) (holding that CFTC properly alleged fraud related to misappropriation of victims' virtual currency, which the court classified as a commodity, and recognizing that the CFTC has anti-fraud authority under Section 6(c)(1) of the CEA and Rule 180.1 in connection with spot transactions "not directly involving future trades"). The defendant describes the object of the scheme as the misappropriation of "FTX customer *fiat* deposits for Alameda's use" (Dkt. 141 at 6) (emphasis added), but that ignores that **customers made cryptocurrency deposits meant to be credited to their FTX accounts that were misappropriated** as well (Indictment ¶¶ 21-24). The Government expects that the evidence at trial will show that at the defendant's direction, Alameda removed customer funds from the FTX platform in a variety of ways, including by accruing an undisclosed negative balance in bitcoin through Alameda's trading activity and transferring customers' bitcoin off the exchange to pay Alameda's expenses. Thus, as in *Zandford*, "the [commodities] transactions themselves," specifically FTX customers' transfers of **their crypto assets** to the platform, "'enabled [the defendant] to convert the proceeds . . . to his own use." (Dkt. 141 at 6 (quoting *Zandford*, 535 U.S. at 820))."
>
> "*Second*, even those customers who deposited fiat currency on the FTX exchange were induced to do so **for the purpose of trading commodities**, such as bitcoin, and crypto-based derivatives, such as swaps. (Indictment ¶¶ 10, 11, 21). As alleged, the defendant's false claims that FTX would facilitate commodities and swap transactions with an eye toward "consumer protection," "avoiding or managing conflicts of interest," and "segregat[ing] customer assets from its own" (Indictment ¶ 2), were central to his gaining access to the customer funds that he misappropriated and, by extension, to the success of the fraud. *See CFTC v. Royal Metals Grp., LLC*, No. 18 Civ. 8407 (JMF), 2019 WL 1996307, at *7 (S.D.N.Y. Jan. 25, 2019) (commodities fraud scheme where defendants

[113]

"misappropriated their Clients' funds" intended for the purchase of precious metals); *see also Saxe v. E.F. Hutton & Co.*, 789 F.2d 105, 110-11 (2d Cir. 1986) (holding that broker's misrepresentations relating to the "degree of risk" of commodities investing were made "in connection with" commodity futures contracts, under an analogous section of the CEA, 7 U.S.C. § 6(b) and noting that the "legislative history of the CEA indicates a congressional awareness that fraudulent conduct can occur during the solicitation of commodities accounts"); *CFTC v. Vartuli*, 228 F.3d 94, 101-02 (2d Cir. 2000) (misrepresentations regarding the effectiveness of a computer program advertised to make investment recommendations were made "in connection with" commodities contracts under 7 U.S.C. § 6(b)); *see also In re J.P. Jeanneret Associates, Inc.*, 769 F. Supp. 2d 340, 363 (S.D.N.Y. 2011) (holding that SEC Rule 10b-5's "in connection with" requirement "can be satisfied in circumstances . . . where the plaintiffs part with money intending that it be invested in securities, only to have the person to whom that money is entrusted steal it") (citing cases)."

"The defendant and his co-conspirators offered customers a facility for the purpose of buying and selling commodities and derivatives, and—as alleged—made false representations about the risks associated with the exchange and the security of their funds to induce customers to part with their trading capital, to engage in commodities trading on the exchange, and not to withdraw their funds. (Indictment ¶¶ 2, 11, 21, 24, 34, 54). This case thus resembles *Royal Metals Grp.*, 2019 WL 1996307, at *2, in which Judge Furman entered a default judgment under Rule 180.1 against defendants who "misappropriated their Clients' funds" intended for the purchase of precious metals, including by falsely claiming that their business provided a "safe and secure online environment to make precious metal investments.""

"Nor did the defendant's fraudulent conduct cease at the solicitation stage. In order to ensure that customers would continue to trade crypto and swaps on his platform, and thus, unknowingly, provide the capital to fund Alameda's speculative investments and leveraged borrowing, the defendant continued his pattern of material omissions, lies and half truths, loudly and publicly extolling the safety of FTX and its separation from Alameda. *See United States v. Ebbers*, 458 F.3d 110, 127 (2d Cir. 2006) (scheme to defraud extends to those who are misled in assessing whether to "hold or sell" their investments)."

"*Finally*, in many instances, the defendant accomplished **the misappropriation by using customer assets** to engage in commodities and swap transactions for the benefit of Alameda, rather than for the benefit of the customers **to whom those assets belonged**. (E.g., Indictment ¶¶ 10, 22) …"

There is no doubt which side of the fence the Government takes in the matter of who owned FTX customer assets. Notably, the Government highlights the purpose and intention of the FTX exchange was for customers to deposit and trade in cryptocurrencies so the fact customer fiat deposits and cryptocurrency transfers were intercepted and used for other purposes, or that digital assets held in custodial wallets were raided, does not dimmish from the consideration that customers believed the crypto token balances shown in their Accounts and that these crypto-tokens and crypto-token entitlements belonged to the customer and could be withdrawn at any time (as was the case up until the collapse).

On June 27, 2023, Judge Kaplan delivered his Memorandum Opinion (Corrected) (ECF No. 170) which rejected all the defendant's motions to dismiss indictments. In terms of the indictments related to defrauding FTX customers the Judge considered "… the indictment sufficiently alleges a scheme to defraud, an object of which was obtaining customer funds, which plainly constitute both "money" and "property" within the meaning of Section 1343" and the defendant's claim customers suffered no economic loss "is wrong both factually and as a matter of law".

It is striking that the Court's legal analysis applied in the criminal and Civil Cases are unified adding to the consensus that customer funds, deposits, and digital assets held on the Platform are the customers' property. The contrary position would otherwise mean customer assets belonged to the Debtors and such analysis would significantly alter the landscape in all proceedings.

In Sum, in the legal sense, 'misappropriation' is the unauthorized or improper use of someone else's property or funds, usually for personal gain or advantage. Both the Civil Cases and Criminal Case describe the facts to include misappropriation of customer assets which language frames legal analysis and recognition by both CFTC and SEC that 'customer assets' were the 'property' of FTX

customers. Moreover, the admission of guilt by ELLISON, WANG, SINGH and SALAME in the Civil Cases and ELLICON and WANG in the Criminal Case without seeking to dispute the property status or that customer assets were not the lawful property of FTX customers (which issue held substantial weight in the complaint) underlines that the matter of property ownership was uncontested with all parties accepting the customer assets belong to the FTX customers. The guilty verdict delivered in the Criminal Case to BANKMAN-FRIED puts the matter beyond reasonable doubt given the necessarily high bar which is required in a jury trial to convict.

## SUMMARY

In summary, (1) The Terms of Service is plainly written and unambiguous for Digital Assets with ultimate (legal or beneficial) title remaining with the customer. Terms of Service, §8.2.6. "Title to your Digital Assets shall at all times remain with you and shall not transfer to FTX Trading". A basket of extrinsic evidence supports the Terms which clarifies via policy and public representations and intentions made by FTX over the custody of Digital Assets, and as customer property held in trust. Thus, the Digital Assets belonging to Affected Customers does not form part of the Estate. (2) There is perfect fungibility between digital assets – as with fiat currency – which ensures the *exact* digital asset *does not* need to be identified for the asset to be returned to the Affected Customer, 1 BTC = 1 BTC. The omnibus pools can be reconciled against crypto-tokens held in customer Accounts (just as when FTX was a going concern), and fungible pegged assets forming the crypto-token entitlements can be acquired by the Debtors if there is a shortfall to enable Affected Customers' property to be returned. Assets held-in-possession by the Debtors that were acquired through the fraudulent transfer of customer property should be used to repopulate the omnibus pools. Alternatively, the USD equivalent value of the Digital Asset on the day of distribution should be returned to the customer so

they can buy back the appropriate amount of cryptocurrency coins, although this might open the Debtors to follow-on litigation for differential loss if the customer is unable to re-purchase the same amount of cryptocurrency in a timely manner as was held in their account rendering further legal costs, delays, and loss to unsecured creditors. In the event the Debtors cannot recover sufficient liquid assets to replenish Digital Assets to return *in specie* to Affected Customers then alternative discussions can be held with relevant stakeholders including carrying recovery over to a reborn FTX2.0 exchange.

## PRAYER FOR RELIEF

**WHEREFORE**, I respectfully request that the Court pursuant to the Court's own equitable powers, grant Opinion as follows:

(A) That FTX as custodial intermediary was holding Digital Assets belonging to Affected Customers in a trust arrangement and are not property of the Estate.

(B) That FTX as custodial intermediary was holding Digital Assets belonging to Affected Customers enrolled in staking services in a trust arrangement and are not property of the Estate.

(C) Grant of such other and further relief as this Court deems appropriate and proper under the circumstances.

Dated: November 14, 2023  
      Bourne End, United Kingdom

Simon Carter

_/s/ Simon Carter_

Unit F Bourne End Business Park  
Cores End Road  
Bourne End, Buckinghamshire. SL8 5AS  
United Kingdom  
Telephone: (01628) 824900  
Email: simon.carter@modulesolutions.com