

current opportunity for U.S. regulators to take a leadership position in the global crypto markets regulatory discussion, and we believe that modelling a primary regulator model on existing market regulation will foster standardization and harmonization of regulation globally, paving the way for international adoption and reciprocal jurisdictional recognition.

To underscore why we are so focused on these regulatory issues - it is because we believe that getting crypto market regulation appropriately calibrated is critical for the continued development of healthy, transparent, and well functioning global crypto markets, which we believe will deliver knock-on positive effects to the global economy as a whole. And we think our proposed approach, in addition to solving for regulatory uncertainty and fragmentation, would also reduce operational complexity by allowing matching engines for both spot and derivatives transactions to operate on the same platform with the same user interface. This in turn would reduce operational risk to the platform, and promote capital efficiency by allowing collateral in support of both order books to rest on the same platform. In the rest of this piece, we discuss in more detail various additional practical benefits of crypto market place operators being subject to unified primary regulator oversight.

## 2. Full-Stack Infrastructure Providers and Maintaining Market-Structure Neutrality

Regulation should be market-structure agnostic, provided that the core regulatory issues (identified above as customer and investor protection, market integrity, preventing financial crimes, and system safety and soundness) are addressed. Technology has enabled any capable entity to perform the various functions involved with the pre-trade, execution, and post-trade phases of the lifecycle of an asset trade or transaction in a single regulatory stack - in fact, to split up those functions, from a technology perspective and when building a market from the ground up, would require a forced and artificial deconstruction.

However, one of the things that prohibits an entity from taking on any or all of these functions can be the specifications of a regulation. To say it another way, much of current market structure is a creation of regulatory artifact rather than a reflection of a thoughtful and holistic approach to marketplace design, efficiency, transparency, and risk management. FTX built and continues to evolve its trading ecosystem with the latter approach in mind.

We believe that so long as the various needed functions necessary to the lifecycle of a transaction are being met, policy makers would do well to remain otherwise neutral on how a market is structured (so long as appropriate customer protections also are in place, discussed below). For one example, most market regulation today envisions an intermediated market place where an intermediary such as a broker interfaces directly with a customer (think back to calling in, or mailing in, your order to a broker that had access to the physical exchange floor). In contrast, crypto-asset platforms largely dispense with this mode in favor of a direct-membership market structure, where end investors onboard directly to the platform for trading, and not through an intermediary or broker (although service providers such as Internet and data-center providers are involved).



A non-intermediated market allows all users to get the same access to market data (consider that FTX's data is free, globally, versus much of the global trading venue industry where data fees are a material commercial component of the business), connectivity, and key features related to functionality and risk management, regardless of the sophistication of the user. The positive implications of this are potentially enormous, and are only just beginning to be seen, interestingly, around the direct-to-consumer crypto marketplace models. The public is better served if the barrier to entry to transact competitively with global markets is an internet connection, rather than a $100,000 (or more) data-subscription fee and a costly fee- or commission-based relationship with a broker that merely plugs you into the trading venue's technology. Non intermediated markets create a more level playing field that's often lacking in many traditional financial systems, whose market structures have created a number of challenges including real and perceived conflicts of interests between intermediaries and their customers.




Consequently, a direct membership market structure should be expressly permitted (not required, but permitted) so long as the relevant customer protections continue to be afforded, in this case by the platform provider.

## 3. Custody of Crypto Assets -- Key Functional and Disclosure Requirements

For crypto assets, the asset is safekept in a wallet, where custody can be performed by the asset owner or by a wallet holder on the customer's behalf. Where custody is performed on a customer's behalf by a platform operator or intermediary, appropriate safeguards should be disclosed in policies and procedures of the custodian. Key areas of focus and disclosure should include: wallet architecture; whether insurance is provided by the custodian; how private keys are kept secure, managed and transferred; managing risks related to insider collusion or fraud; and physical security of data centers.

Importantly, in the case of platform operators, consideration should be given to the increasingly common practice of using third-party providers for data centers (i.e., cloud-service providers) as well as custodial services. In these instances, the platform operator will not itself perform these functions but nonetheless will be held responsible by users for them, and users should be given visibility into how third parties will address the aforementioned issues. Market supervisors should require regulated platform operators to perform regular diligence on their vendors and to have sufficient business continuity and disaster-and-recovery programs in place in connection with their vendor suite.



## 4. Full-Stack Market Infrastructure Providers and the Lifecycle of a Trade -- Addressing Risk Related to Token Issuance and Asset Servicing, Orderly Markets and Settlement of Trades, Cross Margining and Risk Management of Positions

Again, native crypto-trading platforms integrate into a whole the system for custody, issuing tokens, settlement of trades, and risk managing positions with one technology stack. In creating or fine-tuning a regulatory framework for these platforms, policy makers should ensure that market supervisors understand this system through well developed and clear policies and procedures disclosed by the platform operator. The framework should address the following key issues related to the lifecycle of a spot or derivatives trade.

### Token Issuance and Asset Servicing

Token issuers who have access to the platform for purposes of issuing a token should be governed by disclosed policies and procedures that explain the listing standards for tokens. In some cases, existing securities laws will apply, in which case the policies and procedures should explain how such laws are complied with by the platform as it relates to issuing the security tokens.

This document does not address whether existing securities laws should be amended to account for distributed-ledger technologies and new methods of issuing securities in tokenized form. Suffice it to say here that some of the traditional requirements for central securities depositories might not be appropriate for platforms that offer these services, but others will be.

To the extent a token is not a security but has some security-like features at some point in time, and policy makers otherwise have not addressed whether such tokens should be treated as securities, a platform operator in any case should be required to disclose, or otherwise facilitate disclosure of (i.e., most material information for a token can be easily found on the Web, and a platform could direct a platform user to this information), key material information about the token issuer as part of the platform's listing standards.

Likewise, in the case of all tokens, the platform operator should develop and disclose policies and procedures for how a token issuer will interact with the platform for purposes of facilitating asset servicing, so that supervisors and platform users both can understand and assess the risks to the platform posed by token-issuance functionality. This would be especially relevant in the case of security tokens, where dividend payments and changes in ownership, for example, would impact the token and the owner of the token.

### Market Surveillance



Good public policy would require that a crypto-platform operator has policies and procedures concerning the practices and technology used to perform market surveillance of the platform's trading environments in order to curb market manipulation and promote orderly markets. This is standard policy for traditional supervised markets and should be carried over to supervised crypto markets as well.

## Settlement

With regard to settlement, our recommended policy would require the platform operator to have clear and transparent policies and procedures that explain when settlement of a transaction becomes final, and the conditions and circumstances under which the platform provider would reverse settlement due to errors, etc. By and large, regulated venues do this today in their terms of service, etc., and we think it is important they continue to do so.

One of the hallmarks of the FTX trading experience is to allow users to pair in a transaction nearly any combination of assets for purposes of settlement -- for example, a user could exchange BTC for USDC or for SOL. Sound policy would allow the platform to settle transactions by pairing the assets with any of the others listed on the platform, including stable coins or cash fiat currencies (see below for discussion of stable coins) but also other crypto assets, so long as the platform otherwise made clear how and when settlement becomes final.

Another hallmark of full stack trading experiences is access to credit to ensure and promote liquidity on the platform. Public policy should allow platform operators to facilitate the provisioning of credit to platform users so long as this service and function are well documented and explained to the supervisor and market participants on the platform. This is a clear example of where services previously provided by intermediaries can be solved by the trading venue itself.

Because crypto platforms have led the way in exchange innovation, public policy should anticipate that crypto firms will become more and more integrated with traditional payment rails and similar systems. Policy makers should consider whether and when to expressly delineate under what circumstances these platforms could access government-sponsored payment systems created for the settlement of securities, for example. Other policy initiatives will address whether and under what circumstances securities, including government-issued securities, can be reflected in tokenized form, but if such tokenization is permitted, an otherwise properly supervised platform operator should be allowed to access existing payment systems to facilitate settlement of such securities, even if interaction with that system is not on a real-time basis. Such a policy is recommended because otherwise access to this payment system would involve an intermediary, introducing various types of counterparty, operational, and credit risks to the platform that would not be in the interests of the participants on the platform (which itself would be highly supervised under our proposed framework).

## Cross Margining and Risk Management



The regulatory framework for crypto should clearly allow for the cross-margining of both derivatives and spot positions on the platform with any and all assets permitted in the customer wallet and account, subject to appropriate risk weights and haircuts, as applicable. For the settling and risk management of crypto asset transactions on a crypto platform, the settlement and risk systems are automated and the relevant software interacts with the wallet and account that contain customer assets.

A well-designed regulatory framework would allow a single platform to perform all risk functions, and require the appropriate standards on those functions. For example, in addition to the custody requirements mentioned above, the settlement and risk-management systems should be appropriately explained to the market supervisor through the platform's rule book, and the regulator should be made aware of major changes to the system.

Sound policy also should ensure that risk-management systems used by a platform operator are configured to prevent customer accounts from going net negative across positions. A risk-management system that effectively performs this function with this goal, including through liquidations of customer positions, should not be allowed to do so in an arbitrary manner. Instead, the rules, risk parameters and business logic that trigger any actions taken by the customer platform as it relates to customer assets should be clearly disclosed and appropriately explained to the supervisor as well as the platform users in the platform's rule book, which should be approved by the primary market supervisor.

In permissioning the use of a risk-management system for clearance and settlement, policy makers should take care to remain technology and methodology neutral, so long as the platform operator can effectively demonstrate its responsibilities can be adequately met.

## 5. Trading Platform Providers -- Ensuring Regulatory and Market Reporting

Regulatory reporting of transactional activity should be required in order to provide market supervisors appropriate visibility into the trading platform, and to better allow supervisors to police for market manipulation and other unfair trade practices.

Policy makers should consider carefully how best to provide this data -- a requirement should be considered that would mandate that trading platforms create an API for the beneficial use of market supervisors to directly ingest data from the platform itself, rather than require a separate entity to undertake reporting responsibilities.

With respect to market reporting, a hallmark of the crypto-asset industry (as previewed above) is the provisioning of market data to users free of charge. Policy makers should carefully consider the standards under which platforms are permitted to charge users a fee for the provisioning or use of market data related to trading that takes place on said platform along with the implications of that activity for market access, transparency, and fairness policy initiatives. The right standards could incentivize the platform operators to focus on risk management, user experience, and product innovation for competitive advantage rather than fees based on trading activity brought to the platform by the user.



## 6. Ensuring Customer Protections

As suggested, crypto-asset platforms have ushered in an evolution of market structure in favor of a non-intermediated model, where entities separate from the platform are not needed in order to access the platform and the trading environment.

In this market structure, however, key customer protections should remain in place. From a policy perspective, one approach could be a very general and non-prescriptive one that requires that platform providers or intermediaries develop and disclose policies and procedures to ensure the best interests of all customers are protected at all times, and leave it to the entity's discretion. This would allow investors to choose a platform provider based on the robustness of those policies and procedures.

If a more detailed or prescriptive approach is favored, such an approach should consider whether specific requirements related to practices impacting platform customers such as front-running trading activity, market manipulation, general risk disclosures related to the assets and instruments listed for trading, appropriate and non-misleading communications with customers, and avoidance of entering into conflicts of interest with customers. Again, appropriate customer-protection requirements can be borrowed from the traditional finance space -- the key is to ensure that the platform provider can provide them rather than insisting that an intermediary perform the function. FTX believes that market place operators are properly positioned (perhaps best positioned) to deliver these types of disclosures and materials to users in a way that can be built directly into the trading venue user interface/user experience.

## 7. Ensuring Financial Responsibilities are Met

As with traditional markets, ensuring that customer assets are protected to the maximum extent possible should be a principle for regulating crypto-asset markets.

Again, the prominence of the wallet as a tool for storing assets is key to the crypto-asset space, and apart from requirements to ensure that the wallet itself is safely maintained and secured, policy makers should ensure that customers have access to real-time information about their account levels at all times (and redundant access paths, in the event of disruptions on one access path), particularly if and when a platform operator commingles customers' assets in an omnibus manner. If a platform provider elects to provide this infrastructure, operational complexity can be substantially reduced while customer assets are meaningfully protected.

In the case of a platform operator or an intermediary, policy makers should consider whether to adopt a minimum capital requirement (or other financial wherewithal condition) to ensure there are adequate resources to address operational and other types of risks that could jeopardize customer assets in custody. For platform operators, this could take the form of ensuring operational resiliency but in addition also ensuring adequate resources to address defaults and liquidations performed by a risk-management system (see above discussion on platform risk management). The goal should be to ensure platform operators need not depend on off-platform resources for settlement and risk management.



With respect to margining customer accounts, there should be a policy that expressly allows portfolio margining of all customer positions in all assets on the platform. This risk-management approach promotes capital efficiency and reduces operational risks to the platform or intermediary managing the customer account.

## 8. Ensuring Stable Coins Used on Platform Meet Appropriate Standards

A platform operator that permits the use of stable coins for settlement of transactions should be required to explain the standards the platform operator uses in deciding which stable coins it permits for such purposes. FTX has articulated and explained its policy recommendations for stable coin issuers (see https://blog.ftx.com/policy/context-stablecoin-regulation/).

The reason such a policy is recommended is that stable coins are exposed to reserve-volatility as well as redemption risk, and platform users should be entitled to some understanding of whether and to what extent those risks could impact their activity on the platform, including their impact on settlement of transactions (which might not be direct, but nonetheless indirect).

For example, a stable coin backed by risky and volatile assets and not transparently backed by an adequate amount of such assets with appropriate haircuts, could become exposed to price risk. This price risk could interfere with settlement finality on the platform, insofar as the value of the stable coin delivered as payment for the crypto assets in a transaction on the platform are suddenly not equal. Ensuring that stable coins allowed for use on the platform meet adequate standards set by the platform operator (or by public policy makers if applicable) mitigates this risk, and should better protect the users of the platform.

## 9. Full-Stack Infrastructure Providers -- Ensuring Appropriate Cybersecurity Safeguards are Kept

Market regulators in recent years have developed comprehensive cybersecurity requirements for market infrastructure providers. Policy makers should either apply the relevant safeguards already in place for exchanges, or otherwise require that the platform provider develop and disclose to market participants its policies and procedures regarding cybersecurity safeguards. In the case of platform operators already licensed by a market regulator, system-safeguard requirements already will be in place. In the case of platform operators not already licensed, one consideration for policy makers is to adopt a policy that helps facilitate standardization of these safeguards domestically as well as globally.

## 10. Full-Stack Infrastructure Providers -- Ensuring Anti-Money Laundering and Know Your Customer Compliance



Platform operators must perform appropriate KYC as part of user onboarding and must conduct regular anti-money laundering surveillance of user activity (both on the trading venue and via the scrutiny of related on-chain transfers in and withdrawals out). Many platforms, including FTX, use a combination of vendors and internal compliance personnel to assist with these functions today. However accomplished, it is critical that crypto market place regulation continues to require significant focus on the performance of KYC and AML obligations. To ensure this, market place operators should be performing periodic self-audits and should also be subject to regular review and exam by their primary regulator on these requirements.



**Exhibit C**

# FTX's Key Principles for Ensuring Investor Protections on Digital-Asset Platforms

## Introduction

FTX strongly believes that ensuring investor protections is critical to the successful operations of digital-asset platforms, including our own, as well as to ensuring a positive user experience for our customers. FTX also believes that non-intermediated "direct access" markets, such as the FTX exchanges, can and do provide a level of investor protection that meets and exceeds the policy goals and purposes of traditional investor protection regulation (notwithstanding the absence of an intermediary or "broker"). Technology continues to displace the need for an investor to rely on intermediaries and brokers to access certain markets or asset classes, and one of the most important innovations of the digital-asset industry is a simplified market structure that does not need to rely on intermediaries for access to markets. From this observation, this paper addresses the key investor protection principles (described below) applicable to any market and the ways in which non-intermediated "direct access" digital-asset platforms can and do provide these protections for their users.

The goal of this paper is to support two critical propositions:

- The investor protection principles we describe in this paper can be provided directly by a digital-asset exchange or platform, using a non-intermediated market model, at an effectiveness level that exceeds relying on a series of intermediaries to provide similar protections and that ultimately leads to what FTX believes will be an overall risk-reducing market structure, for the benefit of investors.
- To the extent that legacy regulations or policies would assume or require an intermediary to provide these protections, we believe that approach often imposes unnecessary burdens and costs (including fees and both capital and operational inefficiency) on investors and markets without any corresponding benefit--and any such rules should be updated and modernized.

If market structure policy is truly to be technology neutral (which is an important and often stated principle expressed by policy makers), market regulators must acknowledge that intermediated market structures are due, in many instances, to the fact that technology was less robust when those markets were first developed. While intermediaries previously were helpful because the cost and complexity of accessing (1) a market for trading assets or (2) the assets themselves (especially when securities, for example, were in material or paper form) were substantial enough that it was economically efficient for an investor, especially an individual investor, to rely on



an intermediary to provide such access and attendant services. However, intermediated market access is NOT an *a priori* first principle of market structure design, and technology has meaningfully changed what is possible.

Today, the only tools necessary to access a centralized market place for assets directly are (1) a computer or mobile device; (2) relevant "trading" software accessible on that hardware; (3) access to broadband services to transfer data over the Internet, and (4) an application programming interface (API) to allow the trading software to be built and integrate with the trading platform's software. As a result, while investors might elect to use intermediaries for various reasons, those intermediaries are no longer indispensable for gaining access to financial products if the investor has the aforementioned tools.

We believe this has led to the possibility of the reduction of many types of risks, as explained in ***FTX's Key Principles for Market Regulation of Crypto-Trading Platforms*** (hereinafter "**Market Regulation Key Principles**"; see https://www.ftxpolicy.com/). Combined with other best practices and enhanced risk-management techniques utilized by FTX, this simplified market structure forms the basis for our argument that a well designed and operated non-intermediated "direct access" digital-asset platform can be ***risk reducing*** relative to traditional market infrastructure. Building on FTX's **Market Regulation Key Principles**, this paper continues the discussion about critical investor protections and our view that platform operators should be allowed to provide these protections, and be held accountable for them, rather than insisting that they be fulfilled by intermediaries on the platform.

While not the core goal of this paper, we also note that intermediation can reduce transparency and information available to the customer. Traditionally, most users are not given full market data; neither are they allowed full access to exchanges, preventing equitable access. FTX's disintermediated structure ensures that all users have equal access to its information and markets.

## Key Investor-Protection Principles

Ultimately, all policies affecting the operation of a digital-asset market ensure the protection of the investor on the platform, and FTX's ***Market Regulation Key Principles*** paper addresses those.[18] Here we focus on specific principles related to the core of protecting customers' interests and their assets kept on a digital-asset platform. These include (1) maintaining adequate liquid resources to ensure the platform can return the customer's assets upon request; (2) ensuring the environment where customer assets are custodied, including digital wallets, are kept secure; (3) ensuring appropriate bookkeeping or ledgering of assets and disclosures to protect against misuse or misallocation of customer assets; (4) ensuring appropriate management of risks including market, credit/counterparty, and operational risks; and (5) avoiding or managing conflicts of interest. Each of these is addressed in turn.

---

[18] *See* https://www.ftxpolicy.com/.



1. Maintaining Adequate Resources to Return a Customer's Assets

A hallmark of the investor-protection regimes for markets globally and in the U.S. are requirements to ensure that the intermediary holding a customer's assets has adequate liquid resources available at all times to ensure that the customer can redeem her assets when she chooses. Often these policies are designed to ensure that there is (1) ***no delay*** in returning customer securities upon request, or (2) ***no shortfall,*** where an amount lesser than the value of the customer's asset can be returned to the customer.[19] This principle often involves other restrictions on the custodian, including, for example, a restriction of the use of customer assets to finance other business expenses or initiatives.[20] To ensure adequate liquid assets, familiar policies require a reserve of funds or qualified securities that is at least equal in value to the net cash owed to customers.[21] U.S. derivatives policy is very similar and also requires a cushion of resources to be held by the entity managing a customer's derivatives positions to ensure timely return of customer assets.[22]

FTX recommends policy makers consider a policy embodying this principle for digital-asset platform operators: fashioning a requirement, to be reflected in the platform's policies and procedures or otherwise, where the platform operator is accountable for keeping adequate liquid resources to ensure it can deliver customer assets back to the customer upon their request. This principle is sound for all asset types, and while the policy today tends to fall on intermediaries, it can just as easily be applied to the platform operator; in general it should apply to whichever entity is custodying customer assets. Such a policy as applied to digital-asset platform operators would be independent of other requirements to ensure adequate capital to cushion losses (see discussion below).

To the extent existing regulations have implemented this principle by fashioning restrictions on intermediaries, most market supervisors – including those in the U.S. – have other authorities that would permit appropriate or conditional application of such a duty on a market operator. The fact that customer assets include digital assets and tokens in principle need not alter the basic policy of ensuring there is the availability of liquid assets.

FTX has policies and procedures for its platforms today that reflect this basic principle by maintaining liquid assets for customers withdrawals, including a sufficient balance of digital assets funded by the company for its non-U.S. platform. The resources are funded to provide sufficient cover against user losses under certain events

---

[19] *See, e.g.,* SEC Rule 15c3-1, Rule 15c3-3 Adopting Release, Exch. Rel. No. 9775, 1972 WL 125434, at *1 (Sept. 14, 1972). *See also* FINRA Rule 2150.

[20] *Id.*

[21] The amount of net cash owed to customers is computed pursuant to a formula provided by the rule. While the formula itself is somewhat complex, it embodies a basic concept for the responsible stewardship of customer cash: if a broker-dealer owes more to its customers than its customers owe to it, the broker-dealer must set aside at least an amount equal to that difference so that it is readily available to repay customers. *See also* https://www.sec.gov/divisions/enforce/customer-protection-rule-initiative.shtml.

[22] *See, e.g.,* CEA Sections 4d(a)(2), 4d(f), and 30.7. The CFTC's customer-protection rules for FCMs are very similar, and the rules embody, inter alia, the concepts of "segregation of customer assets" as well as "targeted residual interest," which like the SEC's requirements require that adequate resources provided by the FCM itself, in this case, are included in the customer's segregated account to ensure there is efficient and adequate return of customer assets upon request.



and extreme scenarios in order to, among other purposes, ensure a customer without losses can redeem its assets from the platform on demand.

2. Securing Environment Where Customer Assets Are Custodied

Another key customer-protection principle is making sure that the environment itself, where customer assets are kept, is safe and secure. Existing market regulation often looks to the requirements of other financial custodians and intermediaries that also custody assets as a proxy for safety and security. For example, U.S. policy has the concept of requiring the use of a "qualified custodian" for the custody of customer cash and securities,[23] which in many instances is another intermediary that is also supervised and otherwise equipped to ledger and track a specific customer's funds.[24] Interestingly, the U.S. derivatives regulator explicitly recognizes that a clearinghouse is subject to sufficiently rigorous standards and supervision that it can be entrusted with safekeeping customer assets.[25] In any case, this principle mandates that appropriate arrangements to safeguard the clients' rights in client assets and minimise the risk of loss and misuse are in place, which can be accomplished by ensuring that the custodian of the assets maintains adequate levels of financial integrity, physical and cyber security, as well as transparency to customers about the locus and availability of their assets.[26]

Regarding a digital-asset platform operator, the assessment of whether the environment delivers on this principle is different from that for traditional assets because the ecosystem often involves traditional fiat currencies as well as digital assets and tokens related to public blockchains. For digital assets, the digital wallet is central to the custody arrangements. For fiat currency, FTX and other other platform operators will necessarily rely on licensed banking institutions to custody a customer's fiat currency; for traditional, non-tokenized securities, the custody function will follow the lines of the traditional market structure, unless some exemption is provided to allow some other arrangement – in the U.S., for example, existing regulations would require that custody be performed by a licensed intermediary legally permitted to custody such securities. (It certainly would be interesting, however, for policy makers to consider permissioning platform operators with the proven resources to custody these assets as well – again, derivatives regulation allows clearinghouses to custody assets.)

For digital assets, however, where policy is much less developed, custody involves control of private keys to digital wallets, and physical security involves the safekeeping of those private keys. When digital assets are left in the custody of platform operators such as FTX, safekeeping private keys can be performed in-house by the

---

[23] Under the SEC's framework, "qualified custodians" typically include banks, broker-dealers, and futures commission merchants. *See* SEC Rule 206(4)-2(c)(3).

[24] *See, e.g.*, Securities Exchange Act of 1934 Rule 15c3-3. The CFTC's rules mandate that customer assets held at an FCM be segregated and clearly identified as customer assets, and be custodied by a bank or trust company, a registered clearing house, or another FCM. *See* CEA Sections 4d(a) and 4d(b) and CFTC Regulation 1.11.

[25] In the United States, some CFTC regulated clearinghouses already have direct clearing relationships with traders and are therefore holding customer funds without using intermediaries.

[26] *See IOSCO Final Report on Recommendations Regarding the Protection of Client Assets* ("*IOSCO–Protection of Assets*"), Principle 3 (Jan. 2014) http://www.iosco.org/library/pubdocs/pdf/IOSCOPD436.pdf.



platform operator, or by the platform operator contracting with a third-party (the platform operator would remain accountable for regulatory requirements under this arrangement). Notably, both approaches have been permitted by market regulators and embraced by market participants.

Multiple architectures exist for the storage of private keys, which can be accomplished through use of a "hot wallet," cold storage, multi-signature wallet, or even by a smart-contract wallet. To be sure, policy makers could decide if a particular approach should be allowed or prohibited based on a particular policy emphasis – each approach has trade offs related to security and efficiency – but at this time, the best policy approach is likely allowing market participants to decide their preferred custody approach by electing to transact with the platform operator that offers it. This approach necessarily would require that a platform operator adequately disclose its wallet architecture and security practices. In any case, limiting access to the private keys under custody through appropriate permissioning, and ensuring adequate cyber-security protections, are critical to discharging this principle regarding securing the environment where assets are kept.

Some have suggested that allowing the platform operator to serve as the digital-asset custodian might present a conflict of interest for the platform operator, presenting more opportunities for misuse or misallocation of customer assets. It is far from clear to FTX that contracting with a third party for custody would in every instance lower the risks of misuse or misallocation of a customer asset, particularly when the platform operator would presumably remain accountable and, indeed, liable in every case; and each additional party added to a customer's experience adds another potential point of failure. We believe that rather than focus on any perceived conflict, policy makers should instead focus on the first principles described above for asset safekeeping (i.e., regular auditing of the cybersecurity aspects of the custody plan along with auditing the actual assets held in custody), and perhaps consider requiring the platform operator to disclose any remaining potential conflicts while developing policies and procedures to address them.

FTX uses both approaches, using a third-party custodian in part for the U.S. derivatives platform and a proprietary in-house custody solution for the other platforms. For its in-house wallet solution and to maximize security, FTX leverages best-practice, hot- and cold-wallet standards whereby only a small proportion of assets held are exposed to the Internet and the rest are stored offline. FTX policies and procedures also address and dictate other key components to the security of private keys, including applicable multi-signature arrangements, as well as the storage of backup relevant backup information. FTX's custody solutions comply with all relevant regulations, including those of the U.S. CFTC, and the company takes pride in the confidence in our security measures our customers have given to us.

3. <u>Ensuring Appropriate Ledgering and Disclosures of Assets to Protect Against Misuse</u>



Another key investor-protection principle is making sure there is adequate bookkeeping (and related records) to track the customer's assets, combined with appropriate disclosure and reporting.[27] This is to ensure that whoever is in control of a customer's assets is not misallocating or misusing those assets, particularly in furtherance to their own purposes at the expense of the customer's best interests. The basic concept here is that there should be controls in place to ensure the custodian has books and records that keep track of and identify which customer owns what, and there is adequate regulatory and customer reporting, as well as independent auditing, to verify the same.

In keeping with this principle, FTX provides a user experience that enables any user to easily view account balances for all assets, for all of its platforms, in real time. By logging in to the customer's account at FTX, the customer can immediately view the types of assets they own held in custody by FTX. The assets are ledgered and easily identifiable to the user (but held in an omnibus wallet in the case of the customer's tokens in order to better promote liquidity on the platform) pursuant to internal policies and procedures, and FTX regularly reconciles customers' trading balances against cash and digital assets held by FTX. Additionally, as a general principle FTX segregates customer assets from its own assets across our platforms.

Relatedly, and previewing the risk management discussion below, FTX ensures redundancy, resiliency, and disaster-recovery preparedness by using multiple geographically dispersed cloud and data service vendors and facilities to ensure industry-leading 24/7 service.

4. <u>Conducting Adequate Risk Management to Protect Digital Assets</u>

The next key principle is ensuring that any market participant in possession of customer assets is performing adequate risk management to protect those assets, regardless of their particular role in the ecosystem. There are multiple types of relevant risks that are inherent to any market structure, including but not limited to credit or counterparty risk, market risk, funding liquidity risk, and operational risk. (All of these in turn have a bearing on or contribute to systemic risk within the overall ecosystem.)

Credit and counterparty risk refers to the risk that a counterparty will fail to perform its obligations. Market risk is defined as the potential for losses arising from the change in value of an asset. Liquidity risk is the potential that a position in an asset cannot be unwound due to a lack of depth or a disruption in the market for the asset. Operational risk includes a risk of loss from a failure of internal processes at an organization, which can be caused by human error, technology-system breakdowns, or communication-network failures; they also can include losses caused by external factors such as "acts of God" or other naturally occurring events.[28]

---

[27] *See IOSCO–Protection of Assets*, Principles 1 through 3.

[28] For source of definitions, see T*he Joint Forum of the Basel Committee on Banking Supervision, the International Organization of Securities Commissions, and the International Association of Insurance Supervisors, Risk Management Practices and Regulatory Capital*, November 2001, p. 15, at https://www.iosco.org/library/pubdocs/pdf/IOSCOPD122.pdf.



Market participants in any market, including digital-asset market operators, must address each of these risks to ensure against substantial or catastrophic losses that could lead to existential threats against their own firm, thereby imperiling the assets of their customers. In general, policy makers that develop market regulation have required that both market operators as well as intermediaries manage risk by developing appropriate policies and procedures to address them, which contemplate the use of quantitative methods to measure risk, pricing products according to their risks, establishing risk limits, active management of risks through hedging and other techniques, and the building of cushions to absorb losses.[29]

FTX is a full-stack infrastructure provider, combining the matching engine and the clearing function on the same platform, providing a unified user experience for the trading of assets as well as the clearing and settlement of those assets. FTX's ***Market Regulation Key Principles*** addressed other risk-management considerations for the trading venue itself, but here we focus particularly on risk management embedded in the clearing and settlement functions that relate to investor protections.

Clearinghouses in traditional markets again are subjected to substantial regulatory rigor and are required to develop written policies, procedures, and controls that establish an appropriate risk-management framework which, at a minimum, clearly identifies and documents the range of the aforementioned risks and more to which the DCO is exposed, addresses the monitoring and management of the entirety of those risks, and provides a mechanism for internal audit.[30] Public policy typically provides clearinghouses discretion in setting, modeling, validating, reviewing and back-testing margin requirements that build the cushion to absorb potential losses, but must develop such requirements nonetheless; those models are then evaluated by appropriate regulators.[31] Clearinghouses are required by regulation to frequently check the adequacy of initial-margin requirements, value initial margin assets, back test products that are experiencing significant market volatility, and conduct stress tests with respect to each large trader who poses significant risk.

FTX platforms improve upon these requirements today in a number of material respects, and indeed the FTX US derivatives platform complies with the specific requirements of U.S. policy. First, the FTX international exchange imposes on its users a dynamic maximum leverage limit depending on their absolute position, which is limited to maximum leverage of 20 times the notional value of the user's account, and substantially lower in the case of larger positions. The limit is calculated as a function of market liquidity and volatility, along with the positions and collateral that the user holds. Second, FTX platforms check customer-account levels and asset amounts, including those used to collateralize positions, multiple times per minute as opposed to once per day,

---

[29] *See id.*

[30] *See, e.g.*, Derivatives Clearing Organization General Provisions and Core Principles ("DCO Final Rule"), 76 Fed.Reg. 69334, 69,335 (Nov. 8, 2011); *see also* Standards for Risk Management and Operations of Clearing Agencies ("Clearing Agency Rule"), SEC Rule 17Ad-22, 17 CFR Part 240.

[31] *See id.*



as standard policy requires today. Third, customer positions are liquidated if the net balance of all of a customer's positions becomes negative, or positions fall below the maintenance-margin threshold, and the FTX risk engine performs this function automatically. FTX uses an advanced and user-friendly liquidation process that gradually reduces a user's position to bring it to solvency, instead of closing the entire position. Fourth, FTX's risk-management program requires that digital-asset collateral be placed on the platform itself, rather than pledged but not delivered to the platform, to ensure the platform has immediate access to the collateral for purposes of managing market risks. And fifth, FTX's markets are open 24 hours a day, 7 days a week, which protects against delayed management of customer positions or market conditions, and the consequent build-up of market risk.

FTX undertakes this risk-management program without any reliance on intermediaries, depending only on its own systems and personnel. Historically, in traditional market structures, intermediaries provided a first or outer layer of risk management, as the entity typically responsible for onboarding customers and maintaining the customer relationship, and thereby exposing that intermediary to all of the attendant risks from that relationship. Market operators and clearinghouses are beneath or within that outer layer and, as explained above, also engage in management of the risks outlined above.




In traditional market structure, any type of breakdown in the risk management at the *outer* layer of the intermediated market structure exposes the *inner* layer to consequent risks. This is so because those intermediaries are members of the trading platform as well, and the effects of a risk-management breakdown can be transferred to the trading platform as well as to the other members of the trading platform. Policy makers refer to this concept as interconnection risk. Arguably, the existence of this outer layer created through intermediation increases the opportunities for risk-management failure because there are so many more points of



potential lapses or failure. Many of these can be inconsequential to the overall ecosystem, but some or many can be consequential.

The simplified market structure native to the digital-asset ecosystem poses fewer interconnection risks within the system because the outer layer of participants is folded into the inner layer – investors access the digital-asset platform directly. Likewise, without intermediaries bringing their customers to the trading platform, the trading platform is not exposed to risk-management failures by an intermediary, and can focus instead on its own risk-management program. This in turn simplifies the role of the supervisory community overseeing such platforms, who by focusing on the risk management of the platform operator can dispense with concerns about the platform's members who are not intermediaries. Again, this concept is key to FTX's view that the market structure for our platforms is ***risk reducing*** compared to those found in traditional markets.

One corollary to this concept is that involving intermediaries in the market structure ***does not*** by definition lead to greater investor protections, as some have argued. Instead, greater protections would depend entirely on the risk-management resources and capabilities (operational and financial) of the intermediary and whether they are delivering on other key investor protections, which in part depends on the level of supervision of the intermediary *vis a vis* the level of supervision of the platform. As a general matter, the supervision of clearinghouses as it relates to risk management in particular is equal to or greater than that for intermediaries, with heightened financial integrity and reporting standards. And as explained above, FTX risk management is designed and has been implemented to improve upon those standards in multiple ways.

Fewer interconnections, combined with superior risk-management practices at the platform level, while delivering on core investor protections, leads to a superior and risk-reducing market structure that better protects investors.

5. Avoiding Conflicts of Interest

The final principle is that in order to ensure the investor's interests are protected, conflicts of interest between the investor and the entity offering the products should be eliminated, mitigated and/or managed appropriately. Once again, in traditional capital markets the policy focus has been on intermediaries who offer access to investment products or otherwise sell the products to their customers directly, and today there are considerable requirements directed at intermediaries. Although not all existing regulations related to conflicts will apply, to the extent that policy makers wish to apply the relevant measures to the digital-asset space, this could be accomplished rather smoothly by shifting the burden of those measures from intermediaries to the platform operator as needed.

Policy governing traditional markets generally takes two approaches to addressing conflicts of interest: expressly prohibiting certain types of conduct, and requiring policies and procedures that involve affirmative steps to identify areas of risk for conflicts, and measures to mitigate or eliminate those conflicts. As an example of the



former, most securities regimes, including in the U.S., expressly prohibit misstatements or misleading omissions of material facts, and fraudulent or manipulative acts and practices, related to the purchase or sale of investment products.[32]

An example of the latter approach is a "best interest" or "suitability" requirement for entities offering investment products to their customers, again typically intermediaries in the case of traditional markets. This type of policy seeks to discourage entities from offering or recommending products that the investor does not sufficiently understand or possess the resources to use properly.[33] Other regimes are less prescriptive and generally focus on the financial wherewithal of a customer seeking access to a trading market, on the premise of ensuring creditworthiness and an ability to meet financial obligations on the platform,[34] along with risk-related disclosures.[35]

FTX favors an approach that provides equal access to all investors, and follows sufficiently robust listing standards that ensure adequate information about the listing is provided to the customer. But if policy makers preferred to impose a heightened standard more similar to what is found in securities markets, for example, they would need to impose that responsibility on the platform operator, which again could easily be accomplished.

In any case, whether intermediaries are involved in the market or not, conflicts inevitably arise when each actor is pursuing its commercial or economic interests. The key point for this particular principle is that when they do, there are familiar methods for eliminating or mitigating those conflicts, even as they apply to platform operators. FTX conducts its business with a goal of maximizing our customer's interest, but supports reasonable policy measures to eliminate or mitigate conflicts that impose those responsibilities directly on the platform.

[32] *See, e.g.*, Section 15(c) of the Exchange Act.

[33] *See, e.g.,* SEC Regulation Best Interest (BI), FINRA Rule 2111. This type of policy seeks to discourage entities from offering or recommending products that the investor does not sufficiently understand or possess the resources to use properly. To accomplish this, some policy regimes require the intermediary to collect relevant information about the customer/investor in order to ascertain the customer's investment profile, and then have policies and procedures for assessing suitability based on that information.

[34] *See, e.g.,* CFTC Rule 38.602, Rule 38.604, Rule 39.12, all of which speak to financial fitness and wherewithal.

[35] See, e.g,. CFTC Rule 1.55 and 33.7.



**EXHIBIT F-1**

**TERMS OF SERVICE MARCH 2020**

# FTX EXCHANGE: TERMS OF SERVICE

The following terms and conditions of service (the "Terms") constitute an agreement between you and FTX Trading LTD ("FTX Trading," "we," or "us"), a company incorporated in Antigua and Barbuda, and apply to your use of FTX Cryptocurrency Derivatives Exchange ("FTX" or the "Exchange") as a user ("User", "you" or "your") to buy, sell, exchange, hold, or otherwise transact in Digital Assets (as defined below), use the FTX Application Programming Interface ("API"), or use any other services offered through the FTX website (ftx.com) (the "Site") (together, the "Services"). By registering for an FTX account ("Account") or using the Services, you agree that you have read, understood, and accept these Terms as well as our Privacy Policy and Security Policy, and you acknowledge and agree that you will be bound by such terms and policies.

Our Services are not offered to entities or persons who have their registered office or place of residence in the United States of America or any Restricted Territory as defined in Section 33.

As used throughout these Terms, "Digital Assets" means bitcoin, ethereum or any other digital asset, cryptocurrency, virtual currency, or token that are available to transact in using the Exchange. FTT is the exchange token of the FTX ecosystem and is not offered in the United States or to U.S. persons. Before beginning to use the Exchange or any other products or services offered by FTX Trading, you should ensure you have reviewed the fee schedule.

Section 27 of these Terms governs how they may be changed over time. If after reading these Terms in their entirety you are still unsure of anything or you have any questions, please feel free to contact us.

## 1. APPLICABLE LAWS AND REGULATIONS

Your conduct on the Exchange is subject to the laws, regulations, and rules of any applicable governmental or regulatory authority, including, without limitation, all applicable tax, anti-money laundering ("AML") and counter-terrorist financing ("CTF") provisions.

You agree and understand that by opening an Account and using the Services in any capacity, you shall act in compliance with and be legally bound by these Terms and all applicable laws and regulations (including without limitation those stated in this Section 1, where applicable), and failure to do so may result in the suspension of your ability to use the Services or the closure of your Account. For the avoidance of doubt, continued use of your Account, and the receipt of all trading fee discounts and rebates, is conditioned on your continued compliance at all times with these Terms and all applicable laws and regulations.

## 2. ELIGIBILITY

If you are registering to use the Services as an individual, you must be at least 18 years of age, and you must not have been previously been suspended or removed from the Exchange or any other service or product offered by FTX Trading or its affiliate entities, to enter into this Agreement.

If you are registering to use the Services on behalf of a legal entity, you represent and warrant that (i) such legal entity is duly organized and validly existing under the applicable laws of the jurisdiction of its organization; (ii) you are duly authorized by such legal entity to act on its behalf; and (iii) such organization (and any affiliate entity) must not have been previously suspended or removed from the Services or any other service or product offered by FTX Trading or its affiliate entities, to enter into this Agreement.

By accessing or using the Services, you further represent and warrant that you are not a Restricted Person nor are you a resident of a Restricted Territory (each as defined in Section 33) and you will not be using the Services for any illegal activity including, but not limited to, those Restricted Activities listed under Section 19.

Notwithstanding the foregoing, FTX Trading may determine not to make the Services, in whole or in part, available in every market, either in its sole discretion or due to legal or regulatory requirements, depending on your location.

3. REGISTRATION PROCESS; IDENTITY VERIFICATION

When registering your Account, you must provide current, complete, and accurate information for all required elements on the registration page, including your full legal name. You are the only person authorized to use your Account and you may not share your Account credentials with any other person. You also agree to provide us, when registering an Account and on an ongoing basis, with any additional information we request for the purposes of identity verification and the detection of money laundering, terrorist financing, fraud, or any other financial crime, including without limitation a copy of your government issued photo ID or evidence of residency such as a lease or utility bill. You permit us to keep a record of such information and authorize us to make any inquiries, directly or through third parties, that we consider necessary to verify your identity or protect you and/or us against fraud or other financial crime, and to take action we reasonably deem necessary based on the results of such inquiries. When we carry out these inquiries, you acknowledge and agree that your personal information may be disclosed to credit reference and fraud prevention or financial crime agencies and that these agencies may respond to our inquiries in full.

In certain circumstances, we may require you to submit additional information about yourself, your business, or your transactions, provide records, and complete other verification steps (such process, "Enhanced Due Diligence"). You represent and warrant that any and all information provided to us pursuant to these Terms or otherwise is true, accurate and not misleading in any respect. If any such information changes, it is your obligation to update such information as soon as possible. Failure to provide such information in a timely fashion may result in the suspension of your ability to use the Services (until you provide such information) or the closure of your Account. We reserve the right to maintain your account registration information after you close your Account for business and regulatory compliance purposes, subject to applicable law and regulation.

4. AML AND CTF COMPLIANCE

Our AML and CTF procedures are guided by all applicable rules and regulations regarding AML and CTF. These standards are designed to prevent the use of the FTX platform for money laundering or terrorist financing activities. We take compliance very seriously and it is our policy to take all the necessary steps to prohibit fraudulent transactions, report suspicious activities, and actively engage in the prevention of money laundering and any related acts that facilitate money laundering, terrorist financing or any other financial crimes.

5. INITIAL FUNDING; THIRD PARTY TRANSFERS

In order to fund your Account and begin trading, you must first procure Digital Assets. FTX supports deposits and withdrawals for a number of Digital Assets, including certain U.S. Dollar pegged Digital Assets (each a "Stablecoin"). You may deposit Stablecoins that you already own by generating an address within your Account and sending your Stablecoins to such address, after which they should appear in your "USD Stablecoins (USD)" balance. The Exchange does not directly support the deposit of fiat currencies, but subject to eligibility requirements, you may be able to convert fiat currencies to Stablecoins using FTX's separate OTC Service and subsequently transfer such Stablecoins to the Exchange for trading.

FTX enables you to exchange ("Convert") one Digital Asset for another Digital Asset. When you request to Convert a Digital Asset or Stablecoin, you will be quoted a price for such conversion. The price quoted will depend on market conditions, and you are under no obligation to execute a trade at any price quoted to you. FTX Trading makes no promises as to the timing or availability of the ability to convert Digital Assets via the Exchange.

It is your responsibility to ensure you send all Digital Assets, including Stablecoins, to the correct address provided for that particular Digital Asset. If you send a Digital Asset to an address that does not correspond to that exact Digital Asset (such as an address not associated with your account or the specific Digital Asset sent), such Digital Asset may be lost forever. If you send a Digital Asset from your Account to an external address that does not correspond to that exact Digital Asset, such Digital Asset may be lost forever.

You assume all liability for any losses incurred as a result of sending Digital Assets to an incorrect address (such as an address not associated with your account or an address not associated with the specific Digital Asset). FTX Trading is not responsible for any losses or for taking any actions to attempt to recover such Digital Assets. If the funds are recoverable, we may in our sole discretion attempt to recover the funds, but such recovery efforts are in no way guaranteed. Please also be aware that if you attempt to deposit ETH to your Account by sending it via a smart contract, your funds may not be automatically credited, and may take time to recover. Should you encounter any of these issues, you may contact us us to request assistance.

FTX Trading makes no representations or warranties regarding the amount of time that may be required to complete transfer of your Digital Assets from a third party wallet or other source and have said Digital Assets become available in your Account.

When you elect to transfer Digital Assets from your Account to a third party wallet or other

location, it is always possible the party administering the new location may reject your transfer or that the transfer may fail due to technical or other issues affecting our platform. You agree that you shall not hold FTX Trading liable for any damages arising from a rejected transfer.

6. FUTURES CONTRACTS

The futures listed by FTX include three contracts for each Digital Asset or index (each a "Futures Contract"). These include two quarterly Futures Contracts (with expiration at the end of the current and subsequent quarters) as well as perpetual Futures Contracts.

Futures trading on FTX is high risk. In order to trade Futures Contracts on FTX, you must post collateral. Depending on market movements, your position may be liquidated and you may sustain a total loss of Digital Assets. This is because futures trading is highly leveraged, with a relatively small amount of funds used to establish a position in a Digital Asset or index having a much greater value. If you are uncomfortable with this level of risk, you should not trade futures contracts.

You agree to maintain a sufficient amount of Digital Assets at all times to meet FTX's margin requirements, as such requirements may be modified from time to time. If the value of the collateral in your Account falls below the maintenance margin requirement, FTX Trading may seize and liquidate any or all of your positions and assets to reduce your leverage. If, after your positions and assets are liquidated, your Account still contains insufficient Digital Assets to restore your margin ratio to the required amount, you will be responsible for any additional Digital Assets owed.

FTX Trading may, in its sole discretion, perform measures to mitigate potential losses to you on your behalf, including, but not limited to closing futures positions held in any Digital Asset or index that FTX Trading plans to delist from the Exchange in accordance with Section 20.

Under certain market conditions, it may be difficult or impossible to liquidate a position. This can occur, for example, if there is insufficient liquidity in the market or due to technical issues on our platform. In the event that market conditions make it impossible to execute such orders, you may be unable to limit your losses. The use of leverage can lead to large losses as well as gains.

7. LEVERAGED TOKENS

Leveraged Tokens are "ERC-20" digital tokens issued by FTX Trading that operate on the Ethereum blockchain ("Leveraged Tokens"). FTX offers Leveraged Tokens for each underlying Digital Asset or index ("Underlying"). Each Leveraged Token has an associated account on FTX that takes leveraged positions on perpetual futures contracts, and can be created or redeemed for its share of the Digital Assets of that account.

Users may create Leveraged Tokens by depositing Stablecoins and redeem Leveraged Tokens for an equivalent amount of Stablecoins. The Leveraged Token will automatically rebalance to add or remove exposure based on the size of the creation or redemption. Users are charged or credited an amount of Stablecoins equal to the number of Leveraged Tokens being created or

redeemed multiplied by the Net Asset Value of the Leveraged Token as of the creation or redemption time.

Leveraged Tokens seek (but under no circumstances guarantee) daily results, before fees and expenses, that correspond to 300% or 3x ("BULL"), -100% or -1x ("HEDGE"), or -300% or -3x ("BEAR") of the daily return of the Underlying (in U.S. Dollars) for a single day, not for any other period. A Leveraged Token's returns for a period longer than a single day will be the result of its return for each day, compounded over that period, and could differ in amount and direction from the return of the Underlying over the same period.

A Leveraged Token's returns may also deviate from expected returns in a period shorter than a single day for reasons including, but not limited to, scheduled or unscheduled rebalancing. Scheduled rebalancing occurs once daily in order to maintain the Leveraged Token's intended exposure to the market price of the Underlying. Unscheduled rebalancing may occur, for example, if the market price of the Underlying moves more than 10% in either direction within a single day in order to maintain the Leveraged Token's intended returns.

## 8. FORKS AND DISTRIBUTIONS

As a result of the decentralized and open source nature of Digital Assets it is possible that sudden, unexpected, or controversial changes ("Forks") can be made to any Digital Asset that may change the usability, functions, value or even name of a given Digital Asset. Such Forks may result in multiple versions of a Digital Asset and could lead to the dominance of one or more such versions of a Digital Asset (each a "Dominant Digital Asset") and the partial or total abandonment or loss of value of any other versions of such Digital Asset (each a "Non Dominant Digital Asset").

FTX Trading is under no obligation to support a Fork of a Digital Asset that you hold in your Account, whether or not any resulting version of such forked Digital Asset is a Dominant Digital Asset or Non-Dominant Digital Asset or holds value at or following such Fork. Forks of Digital Assets can be frequent, contentious and unpredictable, and therefore cannot be consistently supported on FTX. When trading or holding Digital Assets using your Account, you should operate under the assumption that FTX will never support any Fork of such Digital Asset.

If FTX Trading elects, in its sole discretion, to support a Fork of a Digital Asset, it may choose to do so by making a public announcement through its Site or otherwise notifying customers, and shall bear no liability for any real or potential losses that may result based on the decision to support such Fork or the timing of implementation of support. If FTX Trading, in its sole discretion, does not elect to support a Fork of a given Digital Asset, including the determination to support, continue to support, or cease to support any Dominant Digital Asset or Non Dominant Digital Asset, FTX Trading assumes no responsibility or liability whatsoever for any losses or other issues that might arise from an unsupported Fork of a Digital Asset.

FTX does not generally offer support for the distribution of assets based on a triggering fact or

event, such as the possession of another asset (each an "Airdrop"), the provision of rewards or other similar payment for participation in a Digital Asset's protocol ("Staking Rewards"), or any other distributions or dividends that Users might otherwise be entitled to claim based on their use or possession of a Digital Asset outside of the FTX platform (collectively, "Digital Asset Distributions"). FTX Trading may, in its sole discretion, elect to support any Digital Asset Distribution, but is under no obligation to do so and shall bear no liability to Users for failing to do so, or for initiating and subsequently terminating such support.

In the event of a Fork of a Digital Asset, we may be forced to suspend all activities relating to such Digital Asset (including trades, deposits, and withdrawals) on FTX for an extended period of time, until FTX Trading has determined in its sole discretion that such functionality can be restored ("Downtime"). This Downtime may occur at the time that a Fork of a given Digital Asset occurs, potentially with little to no warning. During such Downtime, you understand that you may not be able to trade, deposit, or withdraw the Digital Asset subject to such Fork. FTX Trading does not bear any liability for losses incurred during any Downtime due to the inability to trade or otherwise transfer Digital Assets.

9. ATTACKS ON BLOCKCHAIN NETWORKS

FTX Trading cannot prevent or mitigate attacks on blockchain networks and has no obligation to engage in activity in relation to such attacks. In the event of an attack, FTX Trading reserves the right to take commercially reasonable actions, including, but not limited to, if we confirm that a Digital Asset's network is compromised or under attack, immediately halting trading, deposits, and withdrawals for such Digital Asset. If such an attack caused the Digital Asset to greatly decrease in value, we may discontinue trading in such Digital Asset entirely.

Resolutions concerning deposits, withdrawals and User balances for a Digital Asset that has had its network attacked will be determined on a case-by-case basis by FTX Trading in its sole discretion. FTX Trading makes no representation and does not warrant the safety of FTX and you assume all liability for any lost value or stolen property.

10. API USE

Subject to your compliance with these Terms and any other agreement which may be in place between you and FTX Trading related to your use of the API, FTX Trading hereby grants you a limited, revocable, non-exclusive, non-transferable, non-sublicensable license, to use the API solely for the purposes of trading on FTX. You agree to not use the API or data provided through the API for any other commercial purpose. You access and use the API entirely at your own risk, and FTX Trading will not be responsible for any actions you take based on the API.

FTX Trading may, at its sole discretion, set limits on the number of API calls that you can make, for example, to maintain market stability and integrity. You acknowledge and agree that if you exceed these limits, FTX Trading may moderate your activity or cease offering you access to the API (or any other API offered by FTX Trading), each in its sole discretion. FTX Trading may immediately suspend or terminate your access to the API without notice if we believe you are in violation of these Terms or any other agreement which may be in place between you and FTX Trading related to your use of the API.

11. ACCOUNT SUSPENSION AND CLOSURE

FTX Trading may, in its sole and absolute discretion, without liability to you or any third party, refuse to let you open an Account, suspend your Account, or terminate your Account or your use of one or more of the Services. Such actions may be taken as a result of a number of factors, including without limitation account inactivity, failure to respond to customer support requests, failure to positively identify you, a court order, or your violation of these Terms. We may also temporarily suspend access to your Account, in the event that a technical problem causes system outage or Account errors, until the problem is resolved.

You may terminate this agreement at any time by closing your Account in accordance with these Terms. In order to do so, you should contact us for assistance in closing your Account. You may not close an Account if we determine, in our sole discretion, that such closure is being performed in an effort to evade a legal or regulatory investigation or to avoid paying any amounts otherwise due to FTX Trading.

We encourage you to withdraw any remaining balance of Digital Assets prior to issuing a request to close your Account. We reserve the right to restrict or refuse to permit withdrawals from your Account if (i) your Account has otherwise been suspended or closed by us in accordance with these Terms; (ii) to do so would be prohibited by law or court order, or we have determined that the Digital Assets in you Account were obtained fraudulently; or (iii) you have not completed the required identity verification procedure. You can check whether or not your identity has been verified by reviewing your verification status under the "Settings" section of your Account. Upon closure or suspension of your Account, you authorize FTX Trading to cancel or suspend pending transactions.

In the event that you or FTX Trading terminates this agreement or your access to the Services, or deactivates or closes your Account, you remain liable for all activity conducted with or in connection with your Account while it was open and for all amounts due in connection with such activity.

12. RISK DISCLOSURES

The following risks associated with Digital Assets and the Services is not exhaustive.

No advice

FTX Trading does not advise on the merits of any particular transactions, trading risks, or tax consequences, and FTX Trading does not provide any other financial, investment, or legal advice in connection with the Services. To the extent that we or our representatives provide trading recommendations, market commentary, or any other information, the act of doing so is incidental to your relationship with us and such information should not be construed as investment or financial advice. Any decision to buy or sell Digital Assets is the User's decision and FTX Trading will not be liable for any loss suffered.

You accept the risk of trading Digital Assets. In entering into any transaction on FTX, you represent that you have been, are, and will be solely responsible for making your own

independent appraisal and investigations into the risks of the transaction and the underlying Digital Asset. You represent that you have sufficient knowledge, market sophistication, professional advice and experience to make your own evaluation of the merits and risks of any transaction or any underlying Digital Asset.

Digital Asset transfers and volatility

Trading in Digital Assets can be extremely risky and volatile. Digital Assets may have unique features that make them more or less likely to fluctuate in value. Factors beyond FTX Trading's control, such as regulatory activity, market manipulation, or unexplainable price volatility, may affect market liquidity for a particular Digital Asset. Blockchain networks may go offline as a result of bugs, Forks, or other unforeseeable reasons. As a general matter, Users with limited trading experience and low risk tolerance should not engage in active trading on FTX. Speculating on the value of Digital Assets is high risk and Users should never trade more than they can afford to lose.

Understanding Digital Assets requires advanced technical knowledge. Digital Assets are often described in exceedingly technical language that requires a comprehensive understanding of applied cryptography and computer code in order to appreciate the inherent risks. The listing of a Digital Asset on FTX does not indicate FTX Trading's approval or disapproval of the underlying technology regarding any Digital Asset and should not be used as a substitute for your own understanding of the risks specific to each Digital Asset. We provide no warranty as to the suitability of the Digital Asset traded under these Terms and assume no fiduciary duty to Users in connection with such use of the Services.

Users accept all consequences of sending Digital Assets to an address off the FTX platform. Digital Asset transactions may not be reversible. Once you send Digital Assets to an address, you accept the risk that you may lose access to your Digital Assets indefinitely. For example, an address may have been entered incorrectly and the true owner of the address may never be discovered, or an address may belong to an entity that will not return your Digital Assets, or may return your Digital Assets but first requires action on your part, such as verification of your identity.

Futures and leveraged products

Trading of Futures Contracts and Leveraged Tokens may not be suitable for all Users and should only be used by those who understand the consequences of seeking daily inverse or leveraged results.

Futures Contracts involve margin and leverage, and as such, you may feel the effects of any losses immediately. If movements in the markets for a Futures Contract or the underlying Digital Asset decrease the value of your position in such Future Contract, you may be required to have or make additional collateral available as margin. If your Account is under the minimum margin requirements set by the Exchange, your position may be liquidated at a loss, and you will be liable for the deficit, if any, in your Account.

Unlike Futures Contracts, Leveraged Tokens do not require Users to trade on margin. However, they remain subject to certain risks that you should understand before trading, including but not limited to:

- Market Price Variance Risk: Holders buy and sell Leveraged Tokens in the secondary market at market prices, which may be different from the value of the underlying Digital Asset. The market price for a Leveraged Token will fluctuate in response to changes in the value of the token's holdings, supply and demand for the token and other market factors.

- Inverse Correlation Risk: Holders of Leveraged Tokens that target an inverse return will lose money when the price of the Digital Asset rises, a result that is opposite from holding the underlying asset.

- Portfolio Turnover Risk: Leveraged Tokens may incur high portfolio turnover to manage the exposure to the underlying Digital Asset. Additionally, active market trading of a Leveraged Token's holding may cause more frequent creation or redemption activities that could, in certain circumstances, increase the number of portfolio transactions. High levels of transactions increase transaction costs. Each of these factors could have a negative impact on the performance of a Leveraged Token.
- Interest Rates: Leveraged Tokens take positions in futures contracts to achieve their desired leverage. These futures might trade at a premium or discount to spot markets in the applicable Digital Asset as a reflection of prevailing interest rates in cryptocurrency markets. Thus, a Leveraged Token could outperform or underperform the Digital Asset's returns due to a divergence between the two markets.

Supply and value of Digital Assets

The value of Digital Assets may be derived from the continued willingness of market participants to exchange Digital Assets for Digital Assets, which may result in the potential for permanent and total loss of value of a particular Digital Asset should the market for that Digital Asset disappear.

You acknowledge and agree that Digital Assets and/or FTX features available in one jurisdiction may not be available for trading or to access, as applicable, in another.

Blacklisted addresses and forfeited funds

Leveraged Tokens are Digital Assets built on the Ethereum blockchain. FTX Trading reserves the right to "blacklist" certain addresses and freeze associated Leveraged Tokens (temporarily or permanently) that it determines, in its sole discretion, are associated with illegal activity or activity that otherwise violates these Terms ("Blacklisted Addresses"). In the event that you send Leveraged Tokens to a Blacklisted Address, or receive Leveraged Tokens from a Blacklisted Address, FTX Trading may freeze such Leveraged Tokens and take steps to terminate your Account.

In certain circumstances, FTX Trading may deem it necessary to report such suspected illegal activity to applicable law enforcement agencies and you may forfeit any rights associated with your Leveraged Tokens, including the ability to redeem your Leveraged Tokens for U.S. Dollars. FTX Trading may also be forced to freeze Leveraged Tokens in the event that we receive a legal order from a valid government authority requiring us to do so.

Software protocols and operational challenges

The software protocols that underlie Digital Assets are typically open source projects, which means that (i) the development and control of such Digital Assets is outside of FTX's control and (ii) such software protocols are subject to sudden and dramatic changes that might have a significant impact on the availability, usability or value of a given Digital Asset.

You are aware of and accept the risk of operational challenges. FTX may experience sophisticated cyber attacks, unexpected surges in activity or other operational or technical difficulties that may cause interruptions to the Services. You understand that the Services may experience operational issues that lead to delays. You agree to accept the risk of transaction failure resulting from unanticipated or heightened technical difficulties, including those resulting from sophisticated attacks. You agree not to hold FTX Trading accountable for any related losses.

All Users understand that the technology underlying Digital Assets is subject to change at any time, and such changes may affect your assets stored on our platform. You claim full responsibility for monitoring such technological changes and understanding their consequences for your Digital Assets. Users conduct all trading on their own account and FTX Trading does not take any responsibility for any loss or damage incurred as a result of your use of any Services or your failure to understand the risks involved associated with Digital Assets use generally or your use of our Services

Compliance

You are responsible for complying with applicable law. You agree that FTX is not responsible for determining whether or which laws may apply to your transactions, including but not limited to tax law. You are solely responsible for reporting and paying any taxes arising from your use of the Services.

Legislative and regulatory changes

Legislative and regulatory changes or actions at the domestic or international level may adversely affect the use, transfer, exchange, and value of Digital Assets.

No deposit protection

Digital Assets held in your Account are not eligible for any public or private deposit insurance protection.

Digital Asset Distributions not supported

Certain Digital Assets are built on protocols that support Digital Asset Distributions, including, but not limited to, Forks, Staking Rewards and Airdrops (as defined in Section 8 above). FTX Trading is not obligated to support any such Digital Asset Distributions for Users. If you hold these Digital Assets in your Account, you thereby forfeit the ability to claim any Digital Asset Distributions from FTX. If you hold Digital Assets with proof-of-stake or delegated proof-of-stake consensus algorithms, FTX Trading may in its sole discretion stake these Digital Assets without any obligation to distribute Staking Rewards to you. Staking may subject your Digital Assets to additional risks and FTX is not responsible for losses you may incur related to staking.

13. RIGHT TO CHANGE OR REMOVE FEATURES AND SUSPEND OR DELAY TRANSACTIONS

We reserve the right to change, suspend, or discontinue any aspect of the Services at any time and in any jurisdiction, including hours of operation or availability of any feature, without notice and without liability. We may decline to process any order and may limit or suspend your use of one or more Services at any time, in our sole discretion. Suspension of your use of any of the Services will not affect your rights and obligations pursuant to these Terms.

We may, in our sole discretion, decline to process orders if (i) we believe the transaction is suspicious; (ii) the transaction may involve fraud or misconduct; (iii) it violates applicable laws; or (vi) it violates these Terms. Where permitted by law, we will notify you by the end of the business day if we have suspended processing your orders and, if possible, provide our reasons for doing so and anything you can do to correct any errors leading to the stoppage.

14. FEES

In consideration for the use of the Services, you agree to pay to FTX the appropriate fees, as set forth in our fee schedule displayed on the Site ("Fee Schedule"), which FTX Trading may revise or update in its sole discretion from time to time. On request, FTX may make available an alternative fee schedule ("Alternative Fee Schedule") to Users who satisfy certain criteria (such as in relation to trading volume), which are determined by FTX in its sole discretion from time to time. You authorize FTX to deduct any applicable fees from your Account at the time you make a given transaction. Changes to the Fee Schedule or Alternative Fee Schedule are effective as of the date set forth in any revision and will apply prospectively from that date forward.

15. PROMOTIONS

FTX Trading does not, as a general rule, participate in promotions without an official pronouncement, either on the Site or elsewhere. You shall obtain prior written approval prior to releasing any statements, written media releases, public announcements and public disclosures, including promotional or marketing materials, relating to FTX.

16. SECURITY OF USER INFORMATION

You are responsible for maintaining the confidentiality and security of any and all account names, User IDs, passwords, and any other security feature that you use to access the Services. You are responsible for (i) keeping your email address up to date in your Account profile and (ii) maintaining the confidentiality of your User information and the security of your Account, which includes the enabling of all relevant security features. You agree to notify FTX immediately if you become aware of any unauthorized use of the Services or any other breach of security regarding the Services. FTX Trading will not be liable for any loss or damage arising from your failure to protect your Account or your User information.
We shall not bear any liability for any damage or interruptions caused by any computer viruses, spyware, or other malware that may affect your computer or other equipment, or any phishing, spoofing, or other attack. If you question the authenticity of a communication purporting to be from FTX, you should login to your Account through the Site, not by clicking links contained in emails.

17. PRIVACY POLICY

We are committed to protecting your personal information and to helping you understand exactly how your personal information is being used. You should carefully read our Privacy Policy, which provides details on how your personal information is collected, stored, protected, and used.

18. RESTRICTED ACTIVITIES

In connection with your use of the Services, you will not:

- violate or assist any party in violating any law, statute, ordinance, regulation or any rule of any self-regulatory or similar organization of which you are or are required to be a member through your use of the Services;
- provide false, inaccurate, incomplete or misleading information;
- infringe upon FTX's or any third party's copyright, patent, trademark, or intellectual property rights;
- engage in any illegal activity, including without limitation illegal gambling, money laundering, fraud, blackmail, extortion, ransoming data, the financing of terrorism, other violent activities or any prohibited market practices;
- distribute unsolicited or unauthorized advertising or promotional material, written media releases, public announcements and public disclosures, junk mail, spam or chain letters;
- use a web crawler or similar technique to access our Services or to extract data;
- reverse engineer or disassemble any aspect of the Site, the API, or the Services in an effort to access any source code, underlying ideas and concepts and algorithms;
- perform any unauthorized vulnerability, penetration or similar testing on the API;
- take any action that imposes an unreasonable or disproportionately large load on our infrastructure, or detrimentally interfere with, intercept, or expropriate any system, data or information;
- transmit or upload any material to the Site that contains viruses, Trojan horses, worms, or any other harmful or deleterious programs;

- otherwise attempt to gain unauthorized access to or use of the Site, the API, other FTX Accounts, computer systems, or networks connected to the Site, through password mining or any other means;
- transfer any rights granted to you under these Terms;
- engage in any other activity which, in our reasonable opinion, amounts to or may amount to market abuse including without limitation the carrying out of fictitious transactions or wash trades, front running or engaging in disorderly market conduct; or
- engage in any behavior which is unlawful, violates these Terms, or is otherwise deemed unacceptable by FTX Trading in its sole discretion.

19. ELECTRONIC TRADING TERMS

FTX Trading may, in its sole discretion, choose to discontinue support for a currently listed or supported Digital Asset, Leveraged Token, or Futures Contract at any time, based on a number of factors, including changes in characteristics.

A transaction on FTX may fail for several reasons, including without limitation to change in prices, insufficient margin, or unanticipated technical difficulties. FTX Trading makes no representation or warranty that any transaction will be executed properly. We are under no circumstances liable for any loss or injury suffered by a failure of a transaction to complete properly or in a timely manner. Further, we are in no way responsible for notifying you of a transaction failure, although you are able to see any such failures on the Site. You have full responsibility to determine and inquire into the failure of any transaction which you initiate.

In the event that you receive any data, information, or software through our Services other than that which you are entitled to receive pursuant to these Terms, you will immediately notify us and will not use, in any way whatsoever, such data, information or software. If you request a withdrawal of Digital Assets and we cannot comply with it without closing some part of your open positions, we will not comply with the request until you have closed sufficient positions to allow you to make the withdrawal.

We may refuse to execute a trade, or impose trade amount limits or restrictions at any time, in our sole discretion without notice. Specifically, we reserve the right to refuse to process, or the right to cancel or reverse, any transaction, as well as to revoke access to a User's deposit address on FTX, where we suspect the transaction involves money laundering, terrorist financing, fraud, or any other type of crime or if we suspect the transaction relates to a prohibited use as stated in these Terms. FTX Trading reserves the right to halt deposit activity at our sole discretion. A User may not change, withdraw, or cancel its authorization to make a transaction, except with respect to partially filled orders.

FTX Trading may correct, reverse, or cancel any trade impacted by an error in processing a User's transaction or otherwise. The User's remedy in the event of an error will be limited to seeking to cancel an order or obtaining a refund of any amounts charged to the User. FTX Trading cannot guarantee such cancellations or refunds will always be possible.

FTX provides Users with a platform that allows their orders to be matched with the orders of other

Users. Orders may be partially filled or may be filled by a number of orders, depending on the trading activity at the time an order is placed. FTX's relationship with you under these Terms is as a trading platform provider only and does not act as principal or counterparty with respect to trades entered into on the platform. Notwithstanding the foregoing, (i) FTX Trading may act as a counterparty for limited trades made for the purpose of liquidating fees collected on User trades, and (ii) affiliates of FTX may execute trades on the platform; provided, however, that such affiliates shall not be afforded any priority in trade execution.

The Digital Assets available for purchase through the Services may be subject to high or low transaction volume, liquidity, and volatility at any time for potentially extended periods. You acknowledge that while FTX Trading uses commercially reasonable methods to provide exchange rate information to you through our Services, the exchange rate information we provide may differ from prevailing exchange rates made available by third parties. Similarly, the actual market rate at the time of your trade may be different from the indicated prevailing rate. You agree that you assume all risks and potential losses associated with price fluctuations or differences in actual versus indicated rates.

20. COMMUNICATIONS

These Terms are provided to you and concluded in English. We will communicate with you in English for all matters related to your use of our Services unless we elect, in our sole discretion, to provide support for other languages.

21. FEEDBACK

You acknowledge and agree that any materials, including without limitation questions, comments, feedback, suggestions, ideas, plans, notes, drawings, original or creative materials or other information or commentary you provide on our platform or one of our social media accounts, regarding FTX or the Services (collectively, "Feedback") that are provided by you, whether by email, posting to the Site or social channels, or otherwise, are non-confidential and will become the sole property of FTX Trading. FTX Trading will own exclusive rights, including all intellectual property rights, and will be entitled to the unrestricted use and dissemination of such Feedback for any purpose, commercial or otherwise, without acknowledgment or compensation to you.

22. OWNERSHIP OF DIGITAL ASSETS

You hereby represent and warrant to us that any Digital Assets used by you in connection with the Services are either owned by you or that you are validly authorized to carry out transactions using such Digital Assets and that all transactions initiated with your Account are for your own Account and not on behalf of any other person or entity.

23. TAXES

You will be able to see a record of your transactions via your Account which you may wish to use

for the purposes of making any required tax filings or payments. It is your responsibility to determine what, if any, taxes apply to your activities on the Exchange, and to collect, report, and remit the correct tax to the appropriate tax authority. FTX Trading is not responsible for determining whether taxes apply to your transaction, or for collecting, reporting, or remitting any taxes arising from any transaction.

24. INDEMNIFICATION; RELEASE

You agree to indemnify and hold FTX Trading, its affiliates, and service providers, and each of their officers, directors, agents, joint venturers, employees, and representatives harmless from any claim or demand (including attorneys' fees and any losses, fines, fees, or penalties imposed by any regulatory authority) arising out of your breach of these Terms, or your violation of any law or regulation.

For the purpose of this Section 24, the term "losses" means all net costs reasonably incurred by us or the other persons referred to in this Section which are the result of the matters set out in this Section 24 and which may relate to any claims, demands, causes of action, debt, cost, expense or other liability, including reasonable legal fees (without duplication).

If you have a dispute with one or more Users or third parties, you release FTX Trading (and its affiliates and service providers, and each of their officers, directors, agents, joint ventures, employees, and representatives) from any and all claims, demands, and damages (actual and consequential) of every kind and nature arising out of or in any way connected with such disputes. If you have a dispute with anyone other than FTX Trading, you release us from liability associated with that dispute.

25. LIMITATION OF LIABILITY; NO WARRANTY

YOU EXPRESSLY UNDERSTAND AND AGREE THAT FTX TRADING AND OUR AFFILIATES AND SERVICE PROVIDERS, AND THEIR RESPECTIVE OFFICERS, DIRECTORS, AGENTS, JOINT VENTURERS, EMPLOYEES, AND REPRESENTATIVES WILL NOT BE LIABLE FOR ANY INDIRECT, INCIDENTAL, SPECIAL, CONSEQUENTIAL, EXEMPLARY DAMAGES, OR DAMAGES FOR LOSS OF PROFITS INCLUDING WITHOUT LIMITATION DAMAGES FOR LOSS OF GOODWILL, USE, DATA, OR OTHER INTANGIBLE LOSSES (EVEN IF FTX TRADING HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES), WHETHER BASED ON CONTRACT, TORT, NEGLIGENCE, STRICT LIABILITY, OR OTHERWISE, RESULTING FROM: (I) THE USE OR THE INABILITY TO USE THE SERVICES; (II) THE COST OF PROCUREMENT OF SUBSTITUTE GOODS AND SERVICES RESULTING FROM ANY GOODS, DATA, INFORMATION, OR SERVICES PURCHASED OR OBTAINED OR MESSAGES RECEIVED OR TRANSACTIONS ENTERED INTO THROUGH OR FROM THE SERVICES; (III) UNAUTHORIZED ACCESS TO OR ALTERATION OF YOUR TRANSMISSIONS OR DATA; OR (IV) ANY OTHER MATTER RELATING TO THE SERVICES.

SOME JURISDICTIONS DO NOT ALLOW THE EXCLUSION OF CERTAIN WARRANTIES OR THE LIMITATION OR EXCLUSION OF LIABILITY FOR INCIDENTAL OR CONSEQUENTIAL DAMAGES. ACCORDINGLY, SOME OF THE LIMITATIONS SET FORTH ABOVE MAY NOT

APPLY TO YOU. IF YOU ARE DISSATISFIED WITH ANY PORTION OF THE SERVICES OR WITH THIS AGREEMENT, YOUR SOLE AND EXCLUSIVE REMEDY IS TO DISCONTINUE USE OF THE SERVICES AND CLOSE YOUR ACCOUNT. THE SERVICES ARE PROVIDED "AS IS" AND WITHOUT ANY REPRESENTATION OR WARRANTY, WHETHER EXPRESS OR IMPLIED. FTX TRADING, OUR AFFILIATES, AND OUR RESPECTIVE OFFICERS, DIRECTORS, AGENTS, JOINT VENTURERS, EMPLOYEES, AND SUPPLIERS SPECIFICALLY DISCLAIM ANY IMPLIED WARRANTIES OF TITLE, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR NON-INFRINGEMENT. FTX TRADING MAKES NO WARRANTY THAT (I) THE SERVICES WILL MEET YOUR REQUIREMENTS, (II) THE SERVICES WILL BE UNINTERRUPTED, TIMELY, SECURE, OR ERROR-FREE, OR (III) THE QUALITY OF ANY PRODUCTS, SERVICES, INFORMATION, OR OTHER MATERIAL PURCHASED OR OBTAINED BY YOU WILL MEET YOUR EXPECTATIONS.

26. FORCE MAJEURE

FTX Trading shall have no liability for any failure or delay resulting from any abnormal or unforeseeable circumstances outside our reasonable control, the consequences of which would have been unavoidable despite all efforts to the contrary, including without limitation governmental action or acts of terrorism, earthquake, fire, flood, or other acts of God, labor conditions, delays or failures caused by problems with another system or network, mechanical breakdown or data-processing failures or where we are bound by other legal obligations.

27. GOVERNING LAW; VENUE AND ARBITRATION

The laws of Antigua and Barbuda shall govern these Terms. Except as otherwise required by local law, any dispute between you and FTX Trading related in any way to, or arising in any way from, our Services or these Terms ("Dispute") shall be finally settled on an individual, non representative basis in binding arbitration in accordance with the Antigua and Barbuda Arbitration Act (Cap 33), as modified by these Terms or in accordance with rules on which we may mutually agree. Any arbitration shall take place in Antigua and Barbuda. The arbitrator may award any relief that a court of competent jurisdiction could award, including attorneys' fees when authorized by law.

28. AMENDMENTS

We may amend any portion of these Terms at any time by posting the revised version of these Terms with an updated revision date. The changes will become effective, and shall be deemed accepted by you, the first time you use the Services after the initial posting of the revised agreement and shall apply on a going-forward basis with respect to transactions initiated after the posting date. In the event that you do not agree with any such modification, your sole and exclusive remedy is to terminate your use of the Services and close your Account. You agree that we shall not be liable to you or any third party as a result of any losses suffered by any modification or amendment of these Terms.

29. ASSIGNMENT

You may not transfer or assign these Terms or any rights or obligations you have under these Terms without our prior written consent or otherwise and any such attempted assignment shall be

void. We reserve the right to freely assign or transfer these Terms and the rights and obligations of these Terms, to any third party at any time without notice or consent. If you object to such transfer or assignment, you may stop using our Services and terminate this agreement by contacting us and requesting to close your account.

30. SURVIVAL

Upon termination of your Account or this agreement for any other reason, all rights and obligations of the parties that by their nature are continuing will survive such termination.

31. THIRD PARTY APPLICATIONS

If you grant express permission to a third party to connect to your Account, either through the third party's product or through FTX, you acknowledge that granting permission to a third party to take specific actions on your behalf does not relieve you of any of your responsibilities under this agreement. Further, you acknowledge and agree that you will not hold FTX Trading responsible for, and will indemnify FTX Trading from, any liability arising from the actions or inactions of such third party in connection with the permissions you grant.

32. SITE; THIRD PARTY CONTENT

FTX Trading strives to provide accurate and reliable information and content on the Site, but such information may not always be correct, complete, or up to date. FTX Trading will update the information on the Site as necessary to provide you with the most up to date information, but you should always independently verify such information. The Site may also contain links to third party websites, applications, events or other materials ("Third Party Content"). Such information is provided for your convenience and links or references to Third Party Content do not constitute an endorsement by FTX Trading of any products or services. FTX Trading shall have no liability for any losses incurred as a result of actions taken in reliance on the information contained on the Site or in any Third Party Content.

33. LIMITED LICENSE; IP RIGHTS

FTX Trading grants you a limited, non-exclusive, non-sublicensable, and non-transferable license, subject to these Terms, to access and use the Services solely for approved purposes as determined by FTX Trading. Any other use of the Services is expressly prohibited. FTX Trading and its licensors reserve all rights in the Services and you agree that these Terms do not grant you any rights in, or licenses to, the Services except for the limited license set forth above.

Except as expressly authorised by FTX Trading, you agree not to modify, reverse engineer, copy, frame, scrape, rent, lease, loan, sell, distribute, or create derivative works based on the Services, in whole or in part. If you violate any portion of these Terms, your permission to access and use the Services may be terminated pursuant to these Terms. "FTX.com," "FTX" and all logos related to the Services are either trademarks, or registered marks of FTX Trading or its licensors. You may not copy, imitate, or use them without FTX Trading's prior written

consent. All right, title, and interest in and to the Site, any content thereon, the Services, and any and all technology or content created or derived from any of the foregoing is the exclusive property of FTX Trading and its licensors.

34. UNCLAIMED OR ABANDONED PROPERTY

If FTX Trading is holding funds in your Account, and we are unable to contact you and have no record of your use of the Services for a prolonged period of time, applicable law may require us to report these funds as unclaimed property to the applicable jurisdiction. If this occurs, FTX Trading will try to locate you at the address shown in our records, but if FTX Trading is unable to locate you, we may be required to deliver any such funds to the applicable jurisdiction as unclaimed property. FTX Trading reserves the right to deduct a dormancy fee or other administrative charges from such unclaimed funds, as permitted by applicable law.

35. LEGAL COMPLIANCE

The Services are subject to all applicable export control restrictions, and, by using the Services, you represent that your actions are not in violation of such export control restrictions. Without limiting the foregoing, you may not use the Services if (i) you are a resident, national or agent of Cuba, Crimea and Sevastopol, Germany, Iran, North Korea, Pakistan, Sudan, Syria, Vietnam, or any other country to which the United States, the United Kingdom or the European Union embargoes goods or imposes similar sanctions ("Restricted Territories"); (ii) you are a member of any sanctions list or equivalent maintained by the United States government, the United Kingdom government or by the European Union ("Restricted Persons"); (iii) you intend to transact with any Restricted Territories or Restricted Persons; (iv) you you are located, incorporated or otherwise established in, or a citizen or resident of a jurisdiction where it would be illegal under Applicable Law for you (by reason of your nationality, domicile, citizenship, residence or otherwise) to access or use the Services; or (v) the publication or availability of the Services is prohibited or contrary to local law or regulation, or could subject FTX to any local registration or licensing requirements.

36. ENTIRE AGREEMENT; THIRD PARTY RIGHTS

The failure of FTX Trading to exercise or enforce any right or provision of the Agreement shall not constitute a waiver of such right or provision. If any provision of these Terms shall be adjudged by any court of competent jurisdiction to be unenforceable or invalid, that provision shall be limited or eliminated to the minimum extent necessary so that these Terms shall otherwise remain in full force and effect and remain enforceable between the parties.
The headings and any explanatory text are for reference purposes only and in no way define, limit, construe, or describe the scope or extent of such section. These Terms, including FTX's policies governing the Services referenced herein, the Privacy Policy, and the Security Policy, constitute the entire agreement between you and FTX Trading with respect to the use of the Services.

These Terms are not intended and shall not be construed to create any rights or remedies in any parties other than you and FTX Trading and other affiliates of FTX Trading, which each shall be a third party beneficiary of these Terms, and no other person shall assert any rights as a third

party beneficiary hereunder. If some future court judgment deems any particular provision of these Terms unenforceable, the rest of the Agreement is still valid.

37. QUESTIONS AND CONTACT INFORMATION

We often post notices and relevant Services information in our Telegram channel and on our Twitter account, so we advise Users to check those channels before contacting support.

Telegram: https://t.me/FTX_Official
Twitter: https://twitter.com/FTX_Official
WeChat: ftexchange
Blog: https://blog.ftx.com/
Email: support@ftx.com

To contact us, please visit one of the links or channels above. For support with your Account, you may email us at support@ftx.com. Please provide all relevant information, including your FTX username and transaction IDs of any related deposits. Although we make no representations or provide no warranties as to the speed of response, we will get back to you as soon as possible.

**EXHIBIT F-2**

**TERMS OF SERVICE DECEMBER 2021**

# FTX EXCHANGE: TERMS OF SERVICE

The following terms and conditions of service (the "**Terms**") constitute an agreement between you and FTX Trading LTD ("**FTX Trading**," "**we**," or "**us**"), a company incorporated in Antigua and Barbuda, and apply to your use of FTX Cryptocurrency Derivatives Exchange ("**FTX**" or the "**Exchange**") as a user ("**User**", "**you**" or "**your**") to buy, sell, exchange, hold, or otherwise transact in Digital Assets (as defined below), use the FTX Application Programming Interface ("**API**"), or use any other services offered through the FTX website (ftx.com) (the "**Site**") (together, the "**Services**"). By registering for an FTX account ("**Account**") or using the Services, you agree that you have read, understood, and accept these Terms as well as our Privacy Policy and Security Policy, and you acknowledge and agree that you will be bound by such terms and policies.

Our Services are not offered to entities or persons who have their registered office or place of residence in the United States of America or any Restricted Territory as defined in Section 33.

As used throughout these Terms, "Digital Assets" means bitcoin, ethereum or any other digital asset, cryptocurrency, virtual currency, or token that are available to transact in using the Exchange and "fiat currency" means any government issued national currency. FTT is the exchange token of the FTX ecosystem and is not offered in the United States or to U.S. persons. Before beginning to use the Exchange or any other products or services offered by FTX Trading, you should ensure you have reviewed the fee schedule.

Section 27 of these Terms governs how they may be changed over time. If after reading these Terms in their entirety you are still unsure of anything or you have any questions, please feel free to contact us.

## 1. APPLICABLE LAWS AND REGULATIONS

Your conduct on the Exchange is subject to the laws, regulations, and rules of any applicable governmental or regulatory authority, including, without limitation, all applicable tax, anti-money laundering ("**AML**") and counter-terrorist financing ("**CTF**") provisions.

You agree and understand that by opening an Account and using the Services in any capacity, you shall act in compliance with and be legally bound by these Terms and all applicable laws and regulations (including without limitation those stated in this Section 1, where applicable), and failure to do so may result in the suspension of your ability to use the Services or the closure of your Account. For the avoidance of doubt, continued use of your Account, and the receipt of all trading fee discounts and rebates, is conditioned on your continued compliance at all times with these Terms and all applicable laws and regulations.

## 2. ELIGIBILITY

If you are registering to use the Services as an individual, you must be at least 18 years of age, and you must not have been previously been suspended or removed from the Exchange or any other service or product offered by FTX Trading or its affiliate entities, to enter into this Agreement.
If you are registering to use the Services on behalf of a legal entity, you represent and warrant

that (i) such legal entity is duly organized and validly existing under the applicable laws of the jurisdiction of its organization; (ii) you are duly authorized by such legal entity to act on its behalf; and (iii) such organization (and any affiliate entity) must not have been previously suspended or removed from the Services or any other service or product offered by FTX Trading or its affiliate entities, to enter into this Agreement.

By accessing or using the Services, you further represent and warrant that you are not a Restricted Person nor are you a resident of a Restricted Territory (each as defined in Section 33) and you will not be using the Services for any illegal activity including, but not limited to, those Restricted Activities listed under Section 19.

Notwithstanding the foregoing, FTX Trading may determine not to make the Services, in whole or in part, available in every market, either in its sole discretion or due to legal or regulatory requirements, depending on your location.

### 3. REGISTRATION PROCESS; IDENTITY VERIFICATION

When registering your Account, you must provide current, complete, and accurate information for all required elements on the registration page, including your full legal name. You are the only person authorized to use your Account and you may not share your Account credentials with any other person. You also agree to provide us, when registering an Account and on an ongoing basis, with any additional information we request for the purposes of identity verification and the detection of money laundering, terrorist financing, fraud, or any other financial crime, including without limitation a copy of your government issued photo ID or evidence of residency such as a lease or utility bill. You permit us to keep a record of such information and authorize us to make any inquiries, directly or through third parties, that we consider necessary to verify your identity or protect you and/or us against fraud or other financial crime, and to take action we reasonably deem necessary based on the results of such inquiries. When we carry out these inquiries, you acknowledge and agree that your personal information may be disclosed to credit reference and fraud prevention or financial crime agencies and that these agencies may respond to our inquiries in full.

In certain circumstances, we may require you to submit additional information about yourself, your business, or your transactions, provide records, and complete other verification steps (such process, "**Enhanced Due Diligence**"). You represent and warrant that any and all information provided to us pursuant to these Terms or otherwise is true, accurate and not misleading in any respect. If any such information changes, it is your obligation to update such information as soon as possible. Failure to provide such information in a timely fashion may result in the suspension of your ability to use the Services (until you provide such information) or the closure of your Account.

We reserve the right to maintain your account registration information after you close your Account for business and regulatory compliance purposes, subject to applicable law and regulation.

### 4. AML AND CTF COMPLIANCE

Our AML and CTF procedures are guided by all applicable rules and regulations regarding AML and CTF. These standards are designed to prevent the use of the FTX platform for money

laundering or terrorist financing activities. We take compliance very seriously and it is our policy to take all the necessary steps to prohibit fraudulent transactions, report suspicious activities, and actively engage in the prevention of money laundering and any related acts that facilitate money laundering, terrorist financing or any other financial crimes.

**5. INITIAL FUNDING; THIRD PARTY TRANSFERS**

In order to fund your Account and begin trading, you must first procure Digital Assets. FTX supports deposits and withdrawals for a number of Digital Assets, including certain U.S. Dollar pegged Digital Assets (each a "**Stablecoin**"). You may deposit Stablecoins that you already own by generating an address within your Account and sending your Stablecoins to such address, after which they should appear in your "USD Stablecoins (USD)" balance. The Exchange may support various fiat currencies for deposit, withdrawal, and/or trading, using wire transfers, credit cards, or other appropriate methods. A partial list of fiat currencies supported by the Exchange can be found here.

FTX enables you to exchange ("**Convert**") one Digital Asset for another Digital Asset. When you request to Convert a Digital Asset or Stablecoin, you will be quoted a price for such conversion. The price quoted will depend on market conditions, and you are under no obligation to execute a trade at any price quoted to you. FTX Trading makes no promises as to the timing or availability of the ability to convert Digital Assets via the Exchange.

It is your responsibility to ensure you send all Digital Assets, including Stablecoins, to the correct address provided for that particular Digital Asset. If you send a Digital Asset to an address that does not correspond to that exact Digital Asset (such as an address not associated with your account or the specific Digital Asset sent), such Digital Asset may be lost forever. If you send a Digital Asset from your Account to an external address that does not correspond to that exact Digital Asset, such Digital Asset may be lost forever.

You assume all liability for any losses incurred as a result of sending Digital Assets to an incorrect address (such as an address not associated with your account or an address not associated with the specific Digital Asset). FTX Trading is not responsible for any losses or for taking any actions to attempt to recover such Digital Assets. If the funds are recoverable, we may in our sole discretion attempt to recover the funds, but such recovery efforts are in no way guaranteed. Please also be aware that if you attempt to deposit ETH to your Account by sending it via a smart contract, your funds may not be automatically credited, and may take time to recover. Should you encounter any of these issues, you may contact us us to request assistance.

FTX Trading makes no representations or warranties regarding the amount of time that may be required to complete transfer of your Digital Assets from a third party wallet or other source and have said Digital Assets become available in your Account.
When you elect to transfer Digital Assets from your Account to a third party wallet or other location, it is always possible the party administering the new location may reject your transfer or that the transfer may fail due to technical or other issues affecting our platform. You agree that you shall not hold FTX Trading liable for any damages arising from a rejected transfer.

**6. FUTURES CONTRACTS**

The futures listed by FTX include three contracts for each Digital Asset or index (each a "**Futures Contract**"). These include two quarterly Futures Contracts (with expiration at the end of the current and subsequent quarters) as well as perpetual Futures Contracts.

Futures trading on FTX is high risk. In order to trade Futures Contracts on FTX, you must post collateral. Depending on market movements, your position may be liquidated and you may sustain a total loss of Digital Assets. This is because futures trading is highly leveraged, with a relatively small amount of funds used to establish a position in a Digital Asset or index having a much greater value. If you are uncomfortable with this level of risk, you should not trade futures contracts.

You agree to maintain a sufficient amount of Digital Assets at all times to meet FTX's margin requirements, as such requirements may be modified from time to time. If the value of the collateral in your Account falls below the maintenance margin requirement, FTX Trading may seize and liquidate any or all of your positions and assets to reduce your leverage. If, after your positions and assets are liquidated, your Account still contains insufficient Digital Assets to restore your margin ratio to the required amount, you will be responsible for any additional Digital Assets owed.

FTX Trading may, in its sole discretion, perform measures to mitigate potential losses to you on your behalf, including, but not limited to closing futures positions held in any Digital Asset or index that FTX Trading plans to delist from the Exchange in accordance with Section 20.

Under certain market conditions, it may be difficult or impossible to liquidate a position. This can occur, for example, if there is insufficient liquidity in the market or due to technical issues on our platform. In the event that market conditions make it impossible to execute such orders, you may be unable to limit your losses. The use of leverage can lead to large losses as well as gains.

**7. LEVERAGED TOKENS**

Leveraged Tokens are "ERC-20" digital tokens issued by FTX Trading that operate on the Ethereum blockchain ("**Leveraged Tokens**"). FTX offers Leveraged Tokens for each underlying Digital Asset or index ("**Underlying**"). Each Leveraged Token has an associated account on FTX that takes leveraged positions on perpetual futures contracts, and can be created or redeemed for its share of the Digital Assets of that account.

Users may create Leveraged Tokens by depositing Stablecoins and redeem Leveraged Tokens for an equivalent amount of Stablecoins. The Leveraged Token will automatically rebalance to add or remove exposure based on the size of the creation or redemption. Users are charged or credited an amount of Stablecoins equal to the number of Leveraged Tokens being created or redeemed multiplied by the Net Asset Value of the Leveraged Token as of the creation or redemption time.

Leveraged Tokens seek (but under no circumstances guarantee) daily results, before fees and expenses, that correspond to 300% or 3x ("**BULL**"), -100% or -1x ("**HEDGE**"), or -300% or -3x ("**BEAR**") of the daily return of the Underlying (in U.S. Dollars) for a single day, not for any other period. A Leveraged Token's returns for a period longer than a single day will be the result of its

return for each day, compounded over that period, and could differ in amount and direction from the return of the Underlying over the same period.

A Leveraged Token's returns may also deviate from expected returns in a period shorter than a single day for reasons including, but not limited to, scheduled or unscheduled rebalancing. Scheduled rebalancing occurs once daily in order to maintain the Leveraged Token's intended exposure to the market price of the Underlying. Unscheduled rebalancing may occur, for example, if the market price of the Underlying moves more than 10% in either direction within a singie day in order to maintain the Leveraged Token's intended returns.

## 8. FORKS AND DISTRIBUTIONS

As a result of the decentralized and open source nature of Digital Assets it is possible that sudden, unexpected, or controversial changes ("**Forks**") can be made to any Digital Asset that may change the usability, functions, value or even name of a given Digital Asset. Such Forks may result in multiple versions of a Digital Asset and could lead to the dominance of one or more such versions of a Digital Asset (each a "**Dominant Digital Asset**") and the partial or total abandonment or loss of value of any other versions of such Digital Asset (each a "**Non Dominant Digital Asset**").

FTX Trading is under no obligation to support a Fork of a Digital Asset that you hold in your Account, whether or not any resulting version of such forked Digital Asset is a Dominant Digital Asset or Non-Dominant Digital Asset or holds value at or following such Fork. Forks of Digital Assets can be frequent, contentious and unpredictable, and therefore cannot be consistently supported on FTX. When trading or holding Digital Assets using your Account, you should operate under the assumption that FTX will never support any Fork of such Digital Asset.

If FTX Trading elects, in its sole discretion, to support a Fork of a Digital Asset, it may choose to do so by making a public announcement through its Site or otherwise notifying customers, and shall bear no liability for any real or potential losses that may result based on the decision to support such Fork or the timing of implementation of support. If FTX Trading, in its sole discretion, does not elect to support a Fork of a given Digital Asset, including the determination to support, continue to support, or cease to support any Dominant Digital Asset or Non Dominant Digital Asset, FTX Trading assumes no responsibility or liability whatsoever for any losses or other issues that might arise from an unsupported Fork of a Digital Asset.
FTX does not generally offer support for the distribution of assets based on a triggering fact or event, such as the possession of another asset (each an "**Airdrop**"), the provision of rewards or other similar payment for participation in a Digital Asset's protocol ("**Staking Rewards**"), or any other distributions or dividends that Users might otherwise be entitled to claim based on their use or possession of a Digital Asset outside of the FTX platform (collectively, "**Digital Asset Distributions**"). FTX Trading may, in its sole discretion, elect to support any Digital Asset Distribution, but is under no obligation to do so and shall bear no liability to Users for failing to do so, or for initiating and subsequently terminating such support.

In the event of a Fork of a Digital Asset, we may be forced to suspend all activities relating to such Digital Asset (including trades, deposits, and withdrawals) on FTX for an extended period

of time, until FTX Trading has determined in its sole discretion that such functionality can be restored ("**Downtime**"). This Downtime may occur at the time that a Fork of a given Digital Asset occurs, potentially with little to no warning. During such Downtime, you understand that you may not be able to trade, deposit, or withdraw the Digital Asset subject to such Fork. FTX Trading does not bear any liability for losses incurred during any Downtime due to the inability to trade or otherwise transfer Digital Assets.

### 9. ATTACKS ON BLOCKCHAIN NETWORKS

FTX Trading cannot prevent or mitigate attacks on blockchain networks and has no obligation to engage in activity in relation to such attacks. In the event of an attack, FTX Trading reserves the right to take commercially reasonable actions, including, but not limited to, if we confirm that a Digital Asset's network is compromised or under attack, immediately halting trading, deposits, and withdrawals for such Digital Asset. If such an attack caused the Digital Asset to greatly decrease in value, we may discontinue trading in such Digital Asset entirely.

Resolutions concerning deposits, withdrawals and User balances for a Digital Asset that has had its network attacked will be determined on a case-by-case basis by FTX Trading in its sole discretion. FTX Trading makes no representation and does not warrant the safety of FTX and you assume all liability for any lost value or stolen property.

### 10. API USE

Subject to your compliance with these Terms and any other agreement which may be in place between you and FTX Trading related to your use of the API, FTX Trading hereby grants you a limited, revocable, non-exclusive, non-transferable, non-sublicensable license, to use the API solely for the purposes of trading on FTX. You agree to not use the API or data provided through the API for any other commercial purpose. You access and use the API entirely at your own risk, and FTX Trading will not be responsible for any actions you take based on the API.

FTX Trading may, at its sole discretion, set limits on the number of API calls that you can make, for example, to maintain market stability and integrity. You acknowledge and agree that if you exceed these limits, FTX Trading may moderate your activity or cease offering you access to the API (or any other API offered by FTX Trading), each in its sole discretion. FTX Trading may immediately suspend or terminate your access to the API without notice if we believe you are in violation of these Terms or any other agreement which may be in place between you and FTX Trading related to your use of the API.

### 11. ACCOUNT SUSPENSION AND CLOSURE

FTX Trading may, in its sole and absolute discretion, without liability to you or any third party, refuse to let you open an Account, suspend your Account, or terminate your Account or your use of one or more of the Services. Such actions may be taken as a result of a number of factors, including without limitation account inactivity, failure to respond to customer support requests, failure to positively identify you, a court order, or your violation of these Terms. We may also temporarily suspend access to your Account, in the event that a technical problem causes system outage or Account errors, until the problem is resolved.

You may terminate this agreement at any time by closing your Account in accordance with these Terms. In order to do so, you should contact us for assistance in closing your Account. You may not close an Account if we determine, in our sole discretion, that such closure is being performed in an effort to evade a legal or regulatory investigation or to avoid paying any amounts otherwise due to FTX Trading.

We encourage you to withdraw any remaining balance of Digital Assets prior to issuing a request to close your Account. We reserve the right to restrict or refuse to permit withdrawals from your Account if (i) your Account has otherwise been suspended or closed by us in accordance with these Terms; (ii) to do so would be prohibited by law or court order, or we have determined that the Digital Assets in you Account were obtained fraudulently; or (iii) you have not completed the required identity verification procedure. You can check whether or not your identity has been verified by reviewing your verification status under the "Settings" section of your Account. Upon closure or suspension of your Account, you authorize FTX Trading to cancel or suspend pending transactions.

In the event that you or FTX Trading terminates this agreement or your access to the Services, or deactivates or closes your Account, you remain liable for all activity conducted with or in connection with your Account while it was open and for all amounts due in connection with such activity.

## 12. RISK DISCLOSURES

The following risks associated with Digital Assets and the Services is not exhaustive.

**No advice**

FTX Trading does not advise on the merits of any particular transactions, trading risks, or tax consequences, and FTX Trading does not provide any other financial, investment, or legal advice in connection with the Services. To the extent that we or our representatives provide trading recommendations, market commentary, or any other information, the act of doing so is incidental to your relationship with us and such information should not be construed as investment or financial advice. Any decision to buy or sell Digital Assets is the User's decision and FTX Trading will not be liable for any loss suffered.
You accept the risk of trading Digital Assets. In entering into any transaction on FTX, you represent that you have been, are, and will be solely responsible for making your own independent appraisal and investigations into the risks of the transaction and the underlying Digital Asset. You represent that you have sufficient knowledge, market sophistication, professional advice and experience to make your own evaluation of the merits and risks of any transaction or any underlying Digital Asset.

**Digital Asset transfers and volatility**

Trading in Digital Assets can be extremely risky and volatile. Digital Assets may have unique features that make them more or less likely to fluctuate in value. Factors beyond FTX Trading's control, such as regulatory activity, market manipulation, or unexplainable price volatility, may affect market liquidity for a particular Digital Asset. Blockchain networks may go offline as a result of bugs, Forks, or other unforeseeable reasons. As a general matter, Users with limited

trading experience and low risk tolerance should not engage in active trading on FTX. Speculating on the value of Digital Assets is high risk and Users should never trade more than they can afford to lose.

Understanding Digital Assets requires advanced technical knowledge. Digital Assets are often described in exceedingly technical language that requires a comprehensive understanding of applied cryptography and computer code in order to appreciate the inherent risks. The listing of a Digital Asset on FTX does not indicate FTX Trading's approval or disapproval of the underlying technology regarding any Digital Asset and should not be used as a substitute for your own understanding of the risks specific to each Digital Asset. We provide no warranty as to the suitability of the Digital Asset traded under these Terms and assume no fiduciary duty to Users in connection with such use of the Services.

Users accept all consequences of sending Digital Assets to an address off the FTX platform. Digital Asset transactions may not be reversible. Once you send Digital Assets to an address, you accept the risk that you may lose access to your Digital Assets indefinitely. For example, an address may have been entered incorrectly and the true owner of the address may never be discovered, or an address may belong to an entity that will not return your Digital Assets, or may return your Digital Assets but first requires action on your part, such as verification of your identity.

**Futures and leveraged products**

Trading of Futures Contracts and Leveraged Tokens may not be suitable for all Users and should only be used by those who understand the consequences of seeking daily inverse or leveraged results.

Futures Contracts involve margin and leverage, and as such, you may feel the effects of any losses immediately. If movements in the markets for a Futures Contract or the underlying Digital Asset decrease the value of your position in such Future Contract, you may be required to have or make additional collateral available as margin. If your Account is under the minimum margin requirements set by the Exchange, your position may be liquidated at a loss, and you will be liable for the deficit, if any, in your Account.

Unlike Futures Contracts, Leveraged Tokens do not require Users to trade on margin. However, they remain subject to certain risks that you should understand before trading, including but not limited to:

- *Market Price Variance Risk:* Holders buy and sell Leveraged Tokens in the secondary market at market prices, which may be different from the value of the underlying Digital Asset. The market price for a Leveraged Token will fluctuate in response to changes in the value of the token's holdings, supply and demand for the token and other market factors.

- *Inverse Correlation Risk:* Holders of Leveraged Tokens that target an inverse return will lose money when the price of the Digital Asset rises, a result that is opposite from holding the underlying asset.