<pre>
 1                    UNITED STATES BANKRUPTCY COURT
                        DISTRICT OF DELAWARE
 2

 3   IN RE:                         .   Chapter 11
                                    .   Case No. 22-11068 (JTD)
 4   FTX TRADING LTD. et al.,       .
                                    .   (Jointly Administered)
 5               Debtors.           .
                                    .
 6   . . . . . . . . . . . . . . .  .
                                    .
 7   ALAMEDA RESEARCH LLC, FTX      .   Adversary Proceeding
     TRADING, LTD., WEST REALM      .   No. 23-50419 (JTD)
 8   SHIRES, INC., AND WEST REALM   .
     SHIRES SERVICES, INC.          .
 9   (D/B/A FTX.US),                .
                                    .
10                   Plaintiffs,    .
                                    .
11       v.                         .
                                    .
12   DANIEL FRIEDBERG,              .
                                    .
13                   Defendant.     .
                                    .
14   . . . . . . . . . . . . . . .  .
                                    .
15   ALAMEDA RESEARCH LTD., and FTX .   Adversary Proceeding
     TRADING LTD.,                  .   No. 23-50444 (JTD)
16                                  .
                     Plaintiffs,    .
17                                  .
         -against-                  .
18                                  .
     PLATFORM LIFE SCIENCES, INC.,  .
19   LUMEN BIOSCIENCE, INC.,        .
     GREENLIGHT BIOSCIENCES         .
20   HOLDINGS, PBC, RIBOSCIENCE LLC,.
     GENETIC NETWORKS LLC, 4J       .
21   THERAPEUTICS INC., LATONA      .
     BIOSCIENCES GROUP, FTX         .
22   FOUNDATION, SAMUEL BANKMAN-    .
     FRIED, ROSS RHEINGANS-YOO, and .
23   NICHOLAS BECKSTEAD,            .
                                    .
24                   Defendants.    .
                                    .
25   . . . . . . . . . . . . . . .  .   (CONTINUED)
</pre>

```
 1   FTX TRADING LTD., MACLAURIN       .   Adversary Proceeding
     INVESTMENTS LTD., f/k/a/          .   No. 23-50492 (JTD)
 2   ALAMEDA VENTURES LTD., and WEST   .
     REALM SHIRES SERVICES, INC.,      .
 3                                     .
                   Plaintiffs,         .
 4                                     .
        -against-                      .
 5                                     .
     LAYERZERO LABS LTD., ARI LITAN,   .
 6   and SKIP & GOOSE LLC,             .
                                       .
 7                 Defendants.         .
                                       .
 8   . . . . . . . . . . . . . . . .   .
                                       .
 9   ALAMEDA RESEARCH LLC, ALAMEDA     .   Adversary Proceeding
     RESEARCH LTD., FTX TRADING        .   No. 23-50584 (JTD)
10   LTD., WEST REALM SHIRES, INC.,    .
     and WEST REALM SHIRES SERVICES    .
11   INC., (d/b/a FTX.US),             .
                                       .
12                 Plaintiffs,         .
                                       .
13      v.                             .
                                       .
14   ALLAN JOSEPH BANKMAN and          .
     BARBARA FRIED,                    .
15                                     .
                   Defendants.         .
16                                     .
     . . . . . . . . . . . . . . . .   .
17                                     .
     FTX TRADING LTD. and WEST REALM   .   Adversary Proceeding
18   SHIRES SERVICES, INC.,            .   No. 23-50585 (JTD)
                                       .
19                 Plaintiffs,         .
                                       .
20      -against-                      .
                                       .
21   MICHAEL BURGESS, HUY XUAN         .
     "KEVIN" NGUYEN, JING-YU           .
22   "DARREN" WONG, MATTHEW BURGESS,   .
     LESLEY BURGESS, 3TWELVE           .
23   VENTURES LTD., and BDK            .
     CONSULTING LTD.,                  .
24                                     .
                   Defendants.         .
25   . . . . . . . . . . . . . . . .         (CONTINUED)
```

```
 1  FTX TRADING LTD., and MACLAURIN .  Adversary Proceeding
    INVESTMENTS, LTD.,             .  No. 23-50437 (JTD)
 2                                 .
                     Plaintiffs,   .
 3                                 .
       -against-                   .
 4                                 .
    LOREM IPSUM UG, PATRICK GRUHN, .
 5  ROBIN MATZKE, and BRANDON      .  Courtroom No. 5
    WILLIAMS,                      .  824 Market Street
 6                                 .  Wilmington, Delaware 19801
                     Defendants.   .
 7                                 .  November 15, 2023
    . . . . . . . . . . . . . . . .  1:05 p.m.
 8
                       TRANSCRIPT OF HEARING
 9             BEFORE THE HONORABLE JOHN T. DORSEY
                UNITED STATES BANKRUPTCY JUDGE
10
    APPEARANCES:
11
    For the Debtors and
12  Debtors-in-Possession:    Adam G. Landis, Esquire
                              Matthew B. McGuire, Esquire
13                            LANDIS RATH & COBB, LLP
                              919 Market Street
14                            Suite 1800
                              Wilmington, Delaware 19801
15
                              -and-
16
                              Brian D. Glueckstein, Esquire
17                            Stephen Ehrenberg, Esquire
                              Stephanie G. Wheeler, Esquire
18                            SULLIVAN & CROMWELL, LLP
                              125 Broad Street
19                            New York, New York 10004

20  Audio Operator:          Jermaine Cooper, ECRO

21  Transcription Company:   Reliable
                             The Nemours Building
22                           1007 N. Orange Street, Suite 110
                             Wilmington, Delaware 19801
23                           Telephone: (302)654-8080
                             Email: gmatthews@reliable-co.com
24
    Proceedings recorded by electronic sound recording,
25  transcript produced by transcription service.
```

APPEARANCES (CONTINUED):

For the US Trustee:          Benjamin A. Hackman, Esquire
                             UNITED STATES DEPARTMENT OF JUSTICE
                             OFFICE OF THE UNITED STATES TRUSTEE
                             J. Caleb Boggs Federal Building
                             844 King Street
                             Suite 2207, Lockbox 35
                             Wilmington, Delaware 19801


For the Ad Hoc Committee
of Non-US Customers of
FTX.com:                     Matthew B. Harvey, Esquire
                             MORRIS NICHOLS ARSHT & TUNNELL, LLP
                             1201 North Market Street
                             16th Floor
                             Wilmington, Delaware 19801


For the Official
Committee of
Unsecured Creditors:         Kenneth Pasquale, Esquire
                             PAUL HASTINGS, LLP
                             200 Park Avenue
                             New York, New York 10166


For the Ad Hoc
Committee of Non-US
Customers of FTX.com:        Erin E. Broderick, Esquire
                             EVERSHEDS SUTHERLAND (US), LLP
                             227 West Monroe Street
                             Suite 6000
                             Chicago, Illinois 60606


For Lorem Ipsum UG,
Patrick Gruhn, and
Robin Matzke:                Lawrence J. Gebhardt, Esquire
                             Gregory L. Arbogast, Esquire
                             GEBHARDT & SMITH, LLP
                             1000 North West Street
                             Suite 1200
                             Wilmington, Delaware 19801

1    <u>APPEARANCES (CONTINUED)</u>:

2    For Lorem Ipsum UG,
     Patrick Gruhn, and
3    Robin Matzke:              Peter J. Keane, Esquire
                                PACHULSKI STANG ZIEHL & JONES, LLP
4                               919 North Market Street
                                17th Floor
5                               Wilmington, Delaware 19899

6                               -and-

7                               Heath D. Rosenblat, Esquire
                                MORRISON COHEN, LLP
8                               909 Third Avenue
                                New York, New York 10022

9

10   For Platform Life
     Sciences, Inc.:            Alan J. Kornfeld, Esquire
11                              PACHULSKI STANG ZIEHL & JONES, LLP
                                10100 Santa Monica Boulevard
12                              13th Floor
                                Los Angeles, California 90067
13
                                James E. O'Neill, Esquire
14                              919 North Market Street
                                17th Floor
15                              Wilmington, Delaware 19899

16

17   <u>ALSO APPEARING</u>:

18   In Propria Persona:        Patrick Rabbitte, Pro Per

19                              Simon Carter, Pro Per

20

21

22

23

24

25

1                                INDEX

2    MOTIONS:                                              PAGE

3    Agenda
     Item 11:   Amended Motion of Debtors to Enter into, and       12
4               Perform Their Obligations Under, the
                Reimbursement Agreements [D.I. 3373, filed on
5               October 25, 2023]

6               Court's Ruling:                             58

7    Agenda
     Item 12:   Notice of Pretrial Conference in an Adversary      60
8               Proceeding [Alameda Research LLC et al. v.
                Friedberg, Adv. No. 23-50419 (JTD) – Adv. D.I.
9               7, filed on July 26, 2023]

10              Court's Ruling:                             --

11   Agenda
     Item 13:   Motion of Platform Life Sciences, Inc., a          97
12              Canadian Corporation, to Dismiss Complaint for
                Lack of Personal Jurisdiction Pursuant to Rule
13              12(b)(2) [Alameda Research Ltd. et al. v.
                Platform Life Sciences Inc. et al., Adv. No.
14              23-50444 (JTD) – Adv. D.I. 35, filed on
                September 15, 2023]
15
                Court's Ruling:                             169
16
     Agenda
17   Item 14:   Motion of Platform Life Sciences, Inc., a          169
                Delaware Corporation, to Dismiss Complaint for
18              Failure to State a Claim for Relief Pursuant
                to Rule 12(b)(6) [Alameda Research Ltd. et al.
19              v. Platform Life Sciences Inc. et al., Adv.
                No. 23-50444 (JTD) – Adv. D.I. 37, filed on
20              September 15, 2023]

21              Court's Ruling:                             171

22   Agenda
     Item 15:   Motion for Protective Order [FTX Trading Ltd.      63
23              et al. v. Lorem Ipsum UG et al., Adv. No. 23-
                50437 (JTD) – Adv. D.I. 35, filed on
24              November 8, 2023]

25              Court's Ruling:                             96

1                              INDEX

2    WITNESSES CALLED
     BY PLS CANADA:                                     PAGE
3

4          EDWARD J. MILLS, PH.D.

5          Direct examination by declaration            98

6          Cross-examination by Ms. Wheeler            100

7          Redirect examination by Mr. Kornfeld        128

8

9                            EXHIBITS

10   PLS CANADA'S EXHIBITS:                             PAGE

11   1 - PLS Canada's Certificate of Incorporation      98

12   2 - PLS Delaware's Certificate of Incorporation    98

13   3 - CIBC Bank Statement Reflecting Incoming Wire    98
         ($3.25 Million)
14

15   4 - CIBC Statement of Incoming Wire ($3.25 Million) 98

16   5 - Simple Agreement for Future Equity Between PLS  98
         Canada and Latona dated May 2, 2022
17

18   6 - CIBC Bank Statement Reflecting Incoming Wire    98
         ($35 Million)
19

20   7 - CIBC Statement of Incoming Wire ($35 Million)   98

21   8 - Services Agreement Between PLS Canada and Latona 98
         dated June 6, 2022
22

23   9 - CIBC Bank Statement Reflecting Incoming Wire    98
         ($15 Million)
24

25   10- CIBC Statement of Incoming Wire ($15 Million)   98

1                              EXHIBITS

2     PLS CANADA'S EXHIBITS:                                      PAGE

3     A - Print out from CIBC Website                               98
          (https://www.cibc.com/en/personal-banking/ways-
4         to-bank/sending-receiving-wire-transfers.html)

5     B - Print-out from a healthcare reporting website             98
          showing that CVS has ceased their clinical trial
6         program (https://www.fiercehealthcare.com/retail/
          cvs-closing-down-clinical-trials-business-after-2
7         -years)

8     C - Rental contracts for Michael Zimmerman's residence        98
          in Vancouver, Canada for the period from July 4,
9         2022 to October 13, 2022 and December 1, 2022 to
          May 31, 2023 and invoices for Mr. Zimmerman's
10        stays at the Granville Island Hotel in Vancouver
          (redacted)
11

12    D - Print-out of Cytel, Inc.'s website showing               98
          Cytel's global locations (https://www.cytel.com/
13        about-us)

14    E - Article regarding Cytel, Inc.'s acquisition of            98
          MTEK Sciences in 2019 (https://www.labmanager.com/
15        cytel-acquires-mtek-sciences-further-expanding-its-
          advanced-real-world-analytics-capabilities-578)
16

17    F - Print-out of from the New England Journal of              98
          Medicine (https://www.nejm.org/about-nejm/about-
18        nejm)

19    G - Print-out from The Lancet https://www.thelancet.          98
          com/about-us)
20

21    H - Print-out from PubMed https://pubmed.ncbi.nlm.nih.        98
          gov/about)
22

23    I - Article regarding the TOGETHER Trial being conducted      98
          by McMaster University https://brighterworld.
24        mcmaster.ca/articles/mcmaster-researchers-leading-
          international-study-to-test-three-widely-available-
25        drugs-for-early-covid-19-treatment)

1                             <u>EXHIBITS</u>

2    <u>DECLARATIONS</u>:                                    <u>PAGE</u>

3    1) Declaration of John J. Ray III                    13

4    2) Declaration of Dr. Edward J. Mills                98

5    3) Supplemental Declaration of Dr. Edward J. Mills   98

6    4) Declaration and attached exhibits of Matthew B.  146
        McGuire

7

8    Transcriptionists' Certificate                      173

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        (Proceedings commenced at 1:05 p.m.)

2            THE COURT:  Good afternoon, everyone. Thank you.

3    Please be seated.

4            Before we begin, I just need to make sure that our

5    folks who are on the Zoom call -- I made this announcement --

6    I don't know if I did in this case before, it might have been

7    Mallinckrodt.  The Judicial Council has instituted new rules

8    post-COVID for participation remotely in bankruptcy and other

9    Court proceedings.  The rule is that if you are not a party

10   to the case, and in a bankruptcy case that would include

11   someone who is a customer, or creditor, or investor, parties

12   who are represented by counsel, you cannot appear and view

13   the video of the proceeding.  You can only participate by

14   audio.  And if there are witnesses then you have to be off

15   completely. If you want to see the witnesses testify you have

16   to be in Court.

17           So, with that announcement I know Jermaine made an

18   announcement earlier as well, if you are a member of the

19   press, and we have the login sheet, if you haven't dropped

20   off, we are going to move you into the waiting room for Zoom

21   and you can then dial-in without video to hear most of the

22   proceeding.  When a witness testifies you are going to be

23   kicked back out again, and then we will bring you back in

24   after the witness is done.  So, you can hear the arguments,

25   you can hear those things, but you can't hear the witnesses

1  testifying.  Those aren't my rules.  The Judicial Council set

2  those rules.  So, I have to live with them.

3          So, that is where we are.  Go ahead, Mr. Landis.

4          MR. LANDIS:  Good afternoon, Your Honor.  May I

5  please the Court, Adam Landis from Landis Rath & Cobb on

6  behalf of the FTX Trading Ltd., debtor and its affiliated

7  debtors.

8          Your Honor, we have a number of matters going

9  forward this morning:

10          One matter in the main case at Item No. 11, the

11  amended motion regarding the reimbursement agreement; two

12  matters in the Platform Life Sciences adversary; one matter

13  in the Lorem Ipsum adversary; and one status conference

14  requested by the United States Trustee regarding fee examiner

15  and the emergent debtors.

16          I will yield the podium to Mr. Glueckstein who

17  will handle Item No. 11 regarding the reimbursement

18  agreements.

19          THE COURT:  Okay.  Thank you.

20          Mr. Glueckstein.

21          MR. GLUECKSTEIN:  Good afternoon, Your Honor.  For

22  the record Brian Glueckstein, Sullivan & Cromwell, for the

23  debtors.  Your Honor, I am here today with two of my

24  partners, Stephen Ehrenberg and Stephanie Wheeler, who will

25  be handling certain matters in the adversary proceedings.

1              Your Honor, this is -- Agenda Item No. 11 is the

2  debtor's motion seeking entry of an order authorizing the

3  debtors to enter into and perform under the reimbursement

4  agreements with the specified professionals of the Ad Hoc

5  Committee of Non-US Customers of FTX.com.  Your Honor, we

6  were informed a short time ago, this morning, that the U.S.

7  Trustee is standing down on its objection to the motion.  We,

8  of course, appreciate this development and are pleased to

9  have the U.S. Trustee drop this objection.

10              We were, however, surprised by its timing given

11 that specifically on Monday we did inquire with the U.S.

12 Trustee as to whether Mr. Ray needed to travel and appear

13 today at the hearing for potential cross-examination and we

14 were told he did.  So, Mr. Ray is here in the courtroom this

15 afternoon and present.

16              The only remaining objection that we have to the

17 motion this afternoon is an objection that we have to the

18 motion this afternoon is an objection that was filed by an

19 individual creditor, Mr. Pat Rabbitte.  I will address his

20 objection and the requested relief briefly.

21              First, Your Honor --

22              THE COURT:  I think there was an additional one,

23 another pro se claimant has filed an objection that was just

24 filed yesterday I believe; Mr. Carter.

25              MR. GLUECKSTEIN:  Okay.  Mr. Carter had, if this

1   is the one, I'm thinking of, some broader issues as well, but

2   to the extent it looked as an objection to this, you know, I

3   don't think there are new issues here.  But you can certainly

4   hear from the objectors.

5            In support of the motion, Your Honor, we did

6   submit the declaration of the debtor's chief executive

7   officer, Mr. Ray, that we filed at Docket No. 3700.  As I

8   noted, Mr. Ray is here in the courtroom and available if the

9   Court has questions, but we would ask that Mr. Ray's

10  declaration be moved into evidence.

11           THE COURT:  Is there any objection?

12       (No verbal response)

13           THE COURT:  Hearing nothing, it's admitted without

14  objection.

15       (Ray declaration received into evidence)

16           MR. GLUECKSTEIN:  Thank you, Your Honor.

17           Your Honor, the ad hoc committee, with members

18  currently holding well over $1 billion, I believe it's in

19  excess of $1.2 billion based on the updated 2019 that was

20  filed this morning, of FTX.com claims has been and continues

21  to be an important constituency whose active participation in

22  these cases has benefited the debtors and their estates.

23           The ad hoc committee was formed very early on in

24  these cases and has continued to both grow and evolve to be

25  representative of the vast and diverse group of FTX.com

1  customers.  The ad hoc committee commenced, as Your Honor

2  knows and will recall, an adversary proceeding early on in

3  these cases asserting property interest in the debtor's

4  digital assets.  The fair resolution of those claims has been

5  an important issue for the debtors to discuss and resolve as

6  part of this plan formation process.

7        The FTX.com creditors, who constitute the debtor's

8  largest class of creditors, are separately classified in our

9  proposed plan and will be entitled to vote in the amended

10 plan that will be filed shortly and brought forward before

11 Your Honor.  The ad hoc committee, of course, is not an

12 estate fiduciary, but the debtors believe that it is

13 representative of the customers of FTX.com, including small

14 and large holders of claims and includes both initial holders

15 and subsequent claims purchasers.

16       While they will undoubtedly be FTX.com creditors

17 whose views differ from the consensus views expressed by the

18 ad hoc committee, the debtors believe that the ad hoc is well

19 situated to negotiate settlements of customer related issues

20 with the debtors on behalf of a critical mass of customers

21 who can support the relief that results.

22       The alternative, Your Honor, of negotiating

23 individually with every single of the millions of customers

24 is impractical.  Thus, the debtors have determined, in their

25 business judgment, to agree to reimbursement of reasonable

1  fees and expenses of the ad hoc committee professionals as

2  set forth in the reimbursement agreements and the proposed

3  order that was filed with Your Honor.  These agreements have

4  been extensively negotiated and considered before we brought

5  them here today for approval.  The UCC has scrutinized these

6  agreements and has not, as they stated in their statement,

7  does not object to the relief that is being requested today.

8          Mr. Rabbitte's objection, as the now abandoned

9  U.S. Trustee objection, wrongly argues that the request that

10 is before the Court is governed by the substantial

11 contribution standard under Section 503(b) of the Bankruptcy

12 Code.  Respectfully, Your Honor, we submit this is not the

13 law. As detailed in our papers there is clear and persuasive

14 body of recent case law, including a decision by Judge

15 Silverstein just last week, that draws a distinction between

16 a request by the debtor and a request by the creditor seeking

17 reimbursement and holding that Section 363 is a valid

18 statutory basis for the requested relief when being sought by

19 a debtor.

20         The District Court's opinion, affirming this Court

21 in Mallinckrodt, examined this exact issue, and arguments,

22 and correctly determined that Section 363 and 503 of the

23 Bankruptcy Code are directed at different parties, operate at

24 different times, and serve different purposes.  Numerous

25 other Courts have examined this exact issue and agreed,

1  including Courts in this district in recent decisions of

2  Kidde-Fenwal and Amyris, Section 363 is the appropriate legal

3  standard and the uncontroverted evidence that the debtor has

4  submitted demonstrates the debtors have exercised their

5  reasonable business judgment in agreeing to the terms of the

6  reimbursement agreements with the ad hoc committee.

7        As Mr. Ray's testimony, now uncontroverted,

8  explains the debtors have received substantial benefits from

9  the ad hoc committee's support and cooperation to date and

10  that cooperation and constructive participation in these

11  cases is important as the plan process moves forward.

12  Mr. Ray's testimony also explains, in the debtor's view,

13  there could at some point on certain issues be divergence of

14  interest between the FTX.com customers and general unsecured

15  creditors whose collective interests are represented by the

16  UCC.

17        In fact, the ad hoc committee and the UCC do

18  represent and serve distinct roles.  The committee represents

19  the collective interest of all unsecured creditors of FTX.com

20  and otherwise.  The ad hoc committee, of course, represents

21  not only the FTX.com creditors that does so with respect to

22  all claims including their assertions that those customers

23  hold property interests in the debtor's assets.  Therefore,

24  the debtors view the ad hoc committee as an important

25  counterpoint to the UCC on a number of issues and we believe

1  separate representation is appropriate.

2          Critically, Mr. Ray explains in his declaration

3  that the benefits of the ad hoc committee's active

4  participation to date, including the negotiation and entry

5  into a plan support agreement on October 16th.  That plan

6  support agreement, which is also supported by the official

7  committee, was reached following constructive and lengthy

8  negotiations with the ad hoc committee and its professionals.

9          The PSA creates a binding obligation on the ad hoc

10 committee to settle the customer property adversary

11 proceeding and other key disputes with the debtors and to

12 support the debtors plan process pursuant to the terms

13 contained therein.  Insuring that agreement stays in place is

14 an important consideration as Mr. Ray explains in his

15 declaration.

16         Furthermore, Your Honor, the debtors negotiated

17 the terms of the reimbursement agreement at arm's length and

18 successfully included numerous safeguards.  Among them,

19 insuring that the work that is eligible for reimbursement is

20 benefiting the estates as a whole, that there are appropriate

21 caps on fees that were carefully and subject of lengthy

22 negotiations, and, of course, that the debtors retain a right

23 to terminate that arrangement at any time if that is in the

24 best interest of the debtor's estate.

25         Additionally, Your Honor, there will be ample

1  opportunity, and we believe very importantly, we negotiated

2  there to be additional safeguards so that both the Court and

3  all parties in interest have the opportunity to evaluate

4  whether the actual fees being sought are reasonable and

5  benefit the estate because the professionals are subject to

6  the Court's interim compensation procedures and review by the

7  fee examiner with respect to all fees that are submitted for

8  reimbursement.

9          The evidence before the Court, Your Honor,

10 conclusively establishes that the debtors, through Mr. Ray,

11 and the debtor's board of directors determined in its

12 business judgment that reimbursement of the ad hoc committee

13 professionals is in the best interest of the debtors and

14 their estates.  We submit, Your Honor, the debtors have

15 carried their burden, based on that business through

16 Mr. Ray's testimony, to satisfy Section 363(b) of the

17 Bankruptcy Code and we request that the revised order that we

18 submitted this morning, which makes a few technical changes

19 that had been part of the U.S. Trustee's objection filed at

20 Docket No. 3796, be entered.

21          THE COURT:  Let me ask you some questions because

22 I am struggling with how the ad hoc committee -- in their own

23 papers they say what we did was we sued the debtors, we

24 negotiated with the debtors, we settled that lawsuit through

25 our plan support agreement which includes providing that our

1  clients and other similarly situated parties have a separate

2  class and receive priority payment over other general

3  unsecured creditors.  That sounds to me like they were acting

4  in their own self-interest and maybe it had an incidental

5  benefit to the estate, but they certainly weren't acting for

6  the benefit of the estate in that context.

7        I made it clear in Mallinckrodt, and Judge Stark

8  agreed with me in his opinion upholding my decision, that in

9  this context the business judgment rule, it's not just the

10 debtor's business judgment, but it also has to be something

11 that -- it has to be engaged in something that is beneficial

12 to the estate, more akin to a 503 standard.  And under 503

13 it's, obviously, clear that it cannot be just simply

14 incidental.  I am afraid we are opening a pandora's box here

15 that anytime a creditor says, hey, I got a $100 million claim

16 against the debtor, I have now settled it for $50 million

17 after months of negotiations with the debtor, that opened up

18 $50 million of additional funds for other creditors so,

19 therefore, you should pay my fees.  Why should I do that?

20       MR. GLUECKSTEIN:  Your Honor, I understand the

21 concern and I don't think that is what is happening here. I

22 do think the facts here are unique and under no circumstances

23 are we suggesting they should be par for the course or

24 ordinary course approval of fees.  What we have here is a

25 situation where we have a class of creditors that numbers in

1    excess of, at least, a million that are creditors of FTX.com.

2    The lawsuit that was filed by the ad hoc group, by the ad hoc

3    committee, seeking property interest claims is an issue that

4    needs to be resolved.  We have discussed it before Your

5    Honor.  Your Honor has raised question about these questions,

6    and they need to be resolved.  And we need to have somebody

7    to talk to, to resolve those issues and related issues.

8             There are a significant number of issues here

9    affecting the FTX.com creditors that are central to our plan,

10   how we deal with preferences, how distributions are going to

11   be made.  There is an ongoing process, as Your Honor knows,

12   to deal with the FTX.com exchange.  What eligibility are

13   customers going to have should there be a successful

14   transaction to take distributions in alternative manners.

15            These are questions where the debtor and their

16   estates, in order to come forward with a plan that is both

17   actionable and that begins to build consensus needs to have a

18   critical mass of those creditors at the negotiating table.

19   It's simply not realistic to suggest that we are going to be

20   able to negotiate, in the first instance, a plan of

21   reorganization with such a disparate group of a million plus

22   creditors.

23            THE COURT:  The ad hoc committee only represents

24   38 creditors. They can't act on behalf of the other nine

25   million.

1          MR. GLUECKSTEIN:  They can't act on behalf of

2     them, that is true.  And as I stated earlier, they are not

3     certainly acting in a capacity as a fiduciary for those, but

4     we do believe that they are representative and that --

5          THE COURT:  And you are going to present your

6     plan, and seek to have it approved, and any one of those or

7     any multiple number of those nine million customers might

8     come forward and object.  So, how does dealing with just the

9     ad hoc committee resolve that issue?

10         MR. GLUECKSTEIN:  Well, it does two things.

11    First, we are resolving the litigation and I understand that

12    simply resolving the litigation is not enough for

13    reimbursement.  We wouldn't be proposing that, but that is an

14    important milestone in the case to have that litigation

15    resolved.  There is two adversary proceedings filed on this

16    issue through our plan support agreement; both of now have

17    been resolved on this issue.

18         The issues that flow out of that, in terms of plan

19    formation, to know that there is a critical mass of customers

20    holding a significant value in claims, in excess of $1.2

21    billion that has been subject to NDA, that has been at the

22    negotiating table, that has looked at the issues, has had

23    arm's length negotiations with the debtor, with the

24    creditor's committee, and has looked at all of the different

25    permutations that we have been contemplating before we bring

1  a plan forward is helping to build critical consensus that we

2  need for this plan.

3         We think that is, and Mr. Ray's testimony in his

4  declaration goes to this point, providing collective value to

5  the estate on the unique facts of this case, which is that we

6  have such a large, both in terms of number, in terms of

7  volume of claims, value of claims, and just numerosity number

8  of claimants.

9         You are absolutely right, Your Honor, we will put

10  our plan forward, it will go out for solicitation, it will be

11  voted on and undoubtedly there are going to be creditors who

12  have a differing view.  But we do believe that the efforts

13  that have been made by the ad hoc committee to work with the

14  debtors, to work with the committee, to build consensus is

15  shortening the timeline on this case and it is helping to get

16  towards what we hope, ultimately, is a consensual plan.

17         THE COURT:  Let me ask you another question, it's

18  not necessarily related to this motion -- no, it is related,

19  but not only this motion.  The ad hoc committee says in their

20  papers there is an actual conflict of interest with the UCC

21  because the UCC cannot act for the benefit of these customers

22  are different from other general unsecured creditors because

23  they are arguing that the property is actually theirs and

24  should have been returned.  That was the basis of their

25  lawsuit and they have now settled that, obviously, through

1  this plan support agreement.

2          Is there a conflict with the UCC?  How do I deal

3  with that?  And maybe this isn't a fair question for you, but

4  why didn't they move for appointment of a separate committee?

5          MR. GLUECKSTEIN:  Well, I think --

6          THE COURT:  We wouldn't have this problem.

7          MR. GLUECKSTEIN:  -- Your Honor, you know, we

8  haven't used the word "conflict" in that way.  Obviously,

9  conflict has a very specific meaning, but I think, as I

10 touched on earlier and as we explain in our papers, from the

11 debtor's perspective if the claims that have -- the

12 committee, the official committee represents the interests,

13 collectively, of unsecured creditors.  By definition they

14 need to be unsecured creditors.

15         The rights that have been asserted in the

16 adversary proceeding by the members of the ad hoc committee

17 are that they are not unsecured creditors that they are, in

18 fact -- that the debtor is holding their property, that they

19 want a return of their property.  So, by definition if they

20 are, in fact, property owners and those claims when

21 ultimately litigated were to prevail they wouldn't be

22 creditors in this case, they would be some mechanism to

23 return property.  There are all kinds of issues here of why

24 that doesn't work in terms of whether we have the property

25 and how that all works, but there are equitable trusts and

1  other arguments that we talked about.

2          So, I think the argument, as I say, we don't

3  view -- I don't view it as a conflict, I just view it as

4  they're representing different interests and to the extent

5  that the ad hoc committee is bringing forward and pressing

6  their interest as property holders, and that is the dynamic

7  that we faced in the negotiation of coming up with the

8  structure for the plan where the committee is representing

9  the interests very well of all unsecured creditors of not

10 only FTX.com, but of the other debtors.

11         We have the ad hoc members saying but we believe

12 we have these property interests and that would take us

13 outside the purview and the scope of the committee's mandate

14 by statute.  So, I don't view it as a conflict as much as

15 that there are differing interests in play in putting this

16 complex puzzle together.

17         THE COURT:  Okay.  Anything else?

18         MR. GLUECKSTEIN:  Nothing else unless the Court

19 has any other questions.

20         THE COURT:  Let me hear from the parties who

21 support the plan.

22         MR. HARVEY:  Good afternoon, Your Honor.  May I

23 please the Court, Matthew Harvey from Morris Nichols Arsht &

24 Tunnell on behalf of the ad hoc committee.

25         Your Honor, I won't repeat anything from the

1  debtor's well-articulated arguments in support of their

2  motion.  As set forth in our filed reply, because the

3  objections we think regrettably were founded on

4  misconceptions about the ad hoc committee's composition and

5  purpose, and the crucial roles that we think we played in

6  this case, we would like an opportunity to just briefly

7  address those points.

8        The first point, Your Honor, that I would address

9  is that as set forth in our reply filed on Sunday and in our

10 third supplemental 2019 statement filed this morning, and I

11 will note from that, Your Honor, the group membership is now

12 actually 66 members, 58 of which are original holders, the ad

13 hoc group represents a diverse group of FTX.com customers

14 spanning over 31 countries globally.  Our purpose, as

15 outlined in our bylaws, and this is a quote, is to: "In a

16 cost efficient and timely manner maximize recoveries on

17 claims against FTX Trading Ltd., and its affiliated debtors

18 by leveraging the position that the debtors have no equitable

19 interest in the customer assets".  The very next line is:

20 "Membership is open to all creditors aligned with this

21 purpose".  So, that is number one on the, sort of,

22 composition and purpose.

23       Number two is on the early contributions and

24 recognition in this case.  Your Honor, we were actually

25 formed 13 days before the U.S. Trustee appointed an official

1   committee.  And to address a point Your Honor raised we did

2   actually seek a separate customer only committee from the

3   U.S. Trustee's office which they did not elect to appoint.

4   From there we went on with our role as the ad hoc committee.

5   We --

6           THE COURT:  Well, you could have filed a motion

7   asking to appoint a committee.

8           MR. HARVEY:  We could have, of course, filed a

9   motion, Your Honor, but we determined at the time that

10  proceeding to an ad hoc committee, including being able to

11  bring the litigation promptly before engaging in motion

12  practice over that, was the more prudent course at that time.

13          Regardless of whether we were an ad hoc committee

14  or official committee, we set out immediately to try to

15  address this dire situation that FTX customers found

16  themselves in suddenly in early November 2022.  We put forth,

17  we think, what were the strongest arguments in favor of

18  FTX.com customers and their property rights.  And despite

19  initial challenges and skepticism from others in the case our

20  customer property rights laid the foundation -- our customer

21  property rights arguments laid the foundation for what became

22  the original draft plan filed over the summer and eventually

23  through further in-person and other negotiations in September

24  and October which are extensive and contentious the

25  settlement plan support agreement and the plan term sheet

1  that the debtors filed in mid-October.

2          We think that we have contributed substantial

3  value to this case. Contrary to the objections, this value is

4  undeniably demonstrated.  Our efforts have conserved estate

5  resources, advanced the cases, achieved favorable outcomes

6  under the PSA and the plan term sheet, and we believe we have

7  played a pivotal role in breaking deadlocks and negotiations

8  between other parties in the case including the debtors and

9  the committee.

10          This goes, I think, part to the point Your Honor

11  was raising about benefit to the estate versus benefit to the

12  constituent.  In all of these cases where we have these ad

13  hoc committees, and I will elude to the government ad hoc

14  committee in the Mallinckrodt case, they, of course, have

15  their own parochial interests.  And I think what Your Honor

16  recognized, of course you know your ruling better then I do,

17  was that they were putting aside those interests and their

18  parochial pursuit of just those interests.  Many of those

19  government entities had pending litigation or investigations

20  against Mallinckrodt before the bankruptcy for their role in

21  the opioid crisis.  Some of those were stayed, some probably

22  were not stayed as a result of the police power exceptions,

23  but they held those in abeyance just as we have done with our

24  litigation and they went to the mediation in front of Judge

25  Sontchi in that case, and they worked out what was ultimately

1  a global --

2          THE COURT:  Mr. Feinberg was the --

3          MR. HARVEY:  Mr. Feinberg, yeah, that's right.

4  Mr. Feinberg was, I believe, for that one and Judge Sontchi

5  was the one that my client in that case participated in with

6  the official committee.

7          To address another point, Your Honor, there were

8  dissidents after that.  My client in that case was one of

9  them from the settlement that was reached, but the fact that

10 there may be dissidence to a deal that is broadly supported

11 by the key constituencies in their representatives I don't

12 think is an impediment to this type of motion.

13         We recognize in a case of this size you are likely

14 to never achieve, especially a case like this which is a free

15 fall bankruptcy without the ability to preplan and come up

16 with a structured support agreement ahead of time and lock-in

17 votes through a prepetition restructuring support agreements

18 you are going to have contention, there is over a million

19 FTX.com customers.  There will be people that come out of the

20 woodwork, I'm sure of it.

21         What we are committed to as an ad hoc committee is

22 trying to bring as many of those people into the fold to

23 explain to them because all of the viewpoints that others are

24 expressing we have on our committee and we have considered

25 those.  We have synthesized those into our views recognizing

1  the limitations of the bankruptcy law, the law, and the

2  facts, and the strictures of the way a plan needs to get

3  done, and the requirement for equal treatment among similarly

4  situated people to try to find a way that maximizes value,

5  respects as many of those interests as possible and doesn't

6  mire these estates in litigation.

7        It would be costly to everybody whether you are an

8  unsecured creditor, a secured creditor, customer of FTX.com,

9  customer of FTX US, whoever you are in the case litigation

10  that is long and drawn out and will not benefit anybody.  We

11  won't be able to avoid all litigation in this case.  There

12  might be creditors that on a one-off basis object, but we

13  believe we have already substantially narrowed it and we will

14  be able to continue to substantially narrow it.

15        I will address another point, Your Honor, that our

16  membership has been open to everybody.  We have never denied

17  anybody membership.  When we have heard people that didn't

18  want to join the membership it was earlier on in the case. It

19  was for, you know, the free-rider problem that they didn't

20  want to have to spend their own resources.  Many of these

21  people are very small holders.

22        Actually, I think the morality of our holders are

23  very small holders.  Many did join anyway, but they didn't

24  want to expend their resources while others who get the

25  benefit of the very favorable deal we cut here or had we

1  litigated to completion the result that we would have hoped

2  would have been favorable without expending any of the

3  resources of their own.  So, you had a free rider problem.

4         The other problem you had was both before and

5  after your Court's ruling on the 2019 statement and sealing

6  which, of course, we respect. There were people that were,

7  you know, nervous about disclosing their identities because

8  of the jurisdictions in which they laid in for other reasons.

9  So, we have never been a closed group.  We invite people,

10  it's actually in our 2019 statement, to contact us.

11         Ms. Broderick, my co-counsel, is on the phone and

12  is closer to some of these issues. She can address them on

13  specifics. I think we talked to nearly 300 customers.  Our

14  group is now up to 66 members; 58 of them are original

15  holders, eight of them are secondaries.

16         On the point about -- Your Honor didn't have

17  questions on this, so I'm happy to not go into and waste any

18  time.  Your Honor ruled this in <u>Mallinckrodt</u>, there is no

19  meaningful distinction between a primary and a secondary in

20  terms of their rights *vis-à-vis* the debtor and under the

21  plan.  So, we think that is a false distinction, but it's

22  also just untrue what has been raised in some of the

23  commentary out there that this is a committee that is

24  nominated by secondary holders is not the fact.

25         THE COURT:  Well, what exactly are you going to

1  seek reimbursement for?  Are you going back to everything

2  you've done since the committee was formed?

3          MR. HARVEY:  We are not.  In fact, Your Honor,

4  this covers only from May 1 forward, which is the point at

5  which the -- plus or minus, when we stayed the litigation and

6  sort of got under the tent with the debtors, signed up NDAs,

7  began negotiating with the debtors, really we're able to

8  bring to bear the varying viewpoints of our members, large

9  and small, primary and secondary, people with preference

10 exposure, people without preference exposure, get access to

11 information, have negotiations with the creditors committee,

12 have negotiations with the debtors, evaluate their proposals,

13 advocate for our proposals.

14         So this is, I believe, consistent with what Your

15 Honor observed in Mallinckrodt, you were uncomfortable having

16 the fee reimbursement continue if things fell apart and

17 people started litigating or they weren't negotiating in good

18 faith.  That's not to say that at some point we reserve the

19 right for the fees prior to, I think it's April, if at the

20 appropriate time to seek whether a substantial contribution

21 otherwise, but that's not before the Court today.  What's

22 before the Court today is, starting May 1 forward, which is

23 when our engagement with the debtors under NDAs and

24 negotiations formally began.

25         THE COURT:  Okay.

1          MR. HARVEY:  So I don't have anything else

2   further.  I only see -- I want to see if I have anything to

3   address here, any of Your Honor's questions that I don't

4   believe that -- I believe the debtors' counsel covered that.

5          THE COURT:  The conflict.

6          MR. HARVEY:  The conflict with the committee.

7   Conflict might be the imperfect word for this, Judge.  I

8   think it's more of a square peg in a round hole for the

9   committee.  The committee has a very important role to

10  fulfill in any case, in this case in particular, where

11  there's a diverse group of unsecured creditors, just like our

12  group has diversity within the group and there's diversity

13  within the constituency, it's a diversity with the unsecured

14  creditors.  My personal view with this is that it would be

15  odd indeed for an official committee to file a lawsuit the

16  way we did and say that significant assets that someone else

17  may argue are in the estate are in fact out of the estate and

18  unavailable to unsecured creditors, and are available only to

19  a subset, although the largest subset of the constituents in

20  this case, the ftx.com customers.  And then to try to

21  litigate something like that to completion or even in

22  negotiations to push the position that this property is

23  property of those customers to the exclusion of others who we

24  call general unsecured creditors in the case.

25          So I don't know that conflict is the right word,

1  they're just maybe not the appropriate party to advance what

2  we've done in this case.

3          THE COURT:  Okay.

4          MR. HARVEY:  Does Your Honor have any further

5  questions for me?

6          THE COURT:  No, nothing.  Thank you.

7          MR. HARVEY:  Thank you, Your Honor.

8          MR. PASQUALE:  Good afternoon, Your Honor, Ken

9  Pasquale from Paul Hastings for the official creditors

10 committee.

11         Your Honor, for the most part, I have nothing to

12 add to the statement that we filed on behalf of the official

13 committee.  We have no objection to the ad hoc counsel fees

14 or to the Rothschild monthly fees, and reserve all our rights

15 on the Rothschild transaction fee, but I do want to address

16 the question that Your Honor answered with respect to

17 conflict.  We certainly do not, in our view, have any

18 conflict.

19         The committee can negotiate and in fact has

20 negotiated with the ad hoc committee, with the debtors, with

21 the other class representative the plan support agreement,

22 which we think is a significant development in the case, but

23 all of the positions can, should be, and have been evaluated

24 and addressed in a real way by our committee.  There's no

25 conflict.  The committee, of course, has a fiduciary duty to

1  represent all of the creditors, and our committee has taken

2  that responsibility extremely seriously and considered the

3  number, the amount of the customers at the international

4  exchange.  The non-exchange customers, the U -- those are

5  all -- excuse me, I went too fast -- the U.S. customers, all

6  of those different creditor constituencies are of course

7  within our purview and something we take, again, very

8  seriously.

9         So we don't see any conflict, but I do want to

10  emphasize -- and I know I said this just a second ago -- that

11  the plan support agreement is a significant development, and

12  the ad hoc committee and the other stakeholders around the

13  table were important parts in getting us to where we are now.

14  And, as we've said over and over again in these cases, the

15  goal of the official committee, and I know it's of the

16  debtors as well, is to maximize recoveries for all of the

17  creditors and to find an exit to bankruptcy at the soonest

18  possible date, and the plan support agreement is an important

19  step in that direction.

20         THE COURT:  Okay.  Thank you.

21         MR. PASQUALE:  Thank you, Your Honor.

22         THE COURT:  Mr. Hackman?

23         MR. HACKMAN:  Good afternoon, Your Honor, may it

24  please the Court, Ben Hackman for the U.S. Trustee.  I rise

25  to confirm that our office is not prosecuting our objection

1  here today.

2           THE COURT:  Are you withdrawing the objection?  I

3  was a little confused by the language you used in the email.

4           MR. HACKMAN:  I wouldn't say --

5           THE COURT:  I thought you were --

6           MR. HACKMAN:  -- I wouldn't say that, Your Honor.

7  I don't want to prejudice our rights in case there is another

8  request made in the future.  I want to reserve any and all

9  objections to any future requests to have professional fees

10 be reversed --

11          THE COURT:  Well, if there's a future request,

12 you'd have to file another objection -- the committee would

13 have to file another motion and you'd have a right to object

14 to it.

15          MR. HACKMAN:  Yes, Your Honor.  In case future

16 motions are filed, I want to reserve all of my client's

17 rights and objections on those points.

18          THE COURT:  Okay.

19          MR. HACKMAN:  Thank you, Your Honor.

20          THE COURT:  Thank you.

21          Anyone else in the courtroom before I --

22      (No verbal response)

23          THE COURT:  No.  Okay.  Do either of the --

24 Mr. Rabbitte.  I hope I pronounced your name correctly.

25          MR. RABBITTE:  That's correct, Your Honor.  Good

1  afternoon.  Can you hear me clearly?

2         THE COURT:  I can.  Thank you.

3         MR. RABBITTE:  Firstly, thank you for allowing me

4  the opportunity to speak to you and your Court today.

5         As you know, these cases have affected millions of

6  people around the world and I'm just one of them.  I am most

7  definitely not an expert in bankruptcy, far from it, but just

8  like many thousands of others with significant personal funds

9  tied up in this estate, I've had to learn how bankruptcy

10 works along the way.  I, along with countless other affected

11 creditors, on social media have been following the case,

12 trying to make sense of how we achieve the goals of funds

13 recovery.  And, as such, we all want what is best for our

14 collective recovery.

15        When I first read the U.S. Trustee's objection to

16 the fee reimbursement portion to the ad hoc committee, the

17 points raised by the Trustee made sense to me.  As matters

18 have progressed, the transparency of the bankruptcy process

19 is also something that's become clear to me and, with that, I

20 saw that many things get filed on the docket, so I started to

21 do some research.  When I first saw statements saying that

22 the ad hoc committee solely represents the interests of dot

23 com customers like me, to be honest, Your Honor, that didn't

24 make a whole lot of sense concerning what I had seen on the

25 docket.  I'm talking specifically about what the ad hoc

1   identified as their members.  It appears that there are

2   claims that represent not only dot come customers, but also

3   non-customer payments.  And, Your Honor, I can give you some

4   examples and cite some examples.  For instance, ad hoc

5   includes Claim Numbers (indiscernible) 13 and (indiscernible)

6   16, which account for 17 million in non-customer claims;

7   Claim Numbers 202 and 203, which account for 8.7 million in

8   non-customer claims; and as well as the secured claims

9   against Alameda Research for 24 and a half million, which

10  correspond with Claim Numbers 4403 and 4297.

11           In addition, a statement made by the ad hoc

12  committee on August 18th seemed to imply a contradiction of

13  the very legal arguments that were the basis of the property

14  claim they purport to represent.  Their statement said, and I

15  quote, we generally support the treatment of all FTX

16  customers equally irrespective of the type of digital assets

17  held as of the petition date and subordination of claims with

18  respect to crypto tokens to general unsecured claims, end

19  quote.

20           The valuation of digital assets as of the petition

21  date could be the item that I'd expect the ad hoc to be

22  firmly against in the debtors' draft plan (indiscernible)

23  support of others.

24           Lastly, while the ad hoc's response indicated no

25  (indiscernible) preference (indiscernible) activity would

1 indicate that one of the ad hoc's members, namely GSR (ph),

2 withdrew $14 million worth of (indiscernible) coins from

3 November 6th and 7th, right before withdrawals were halted.

4          Given the already high fees of this case

5 generally, it concerned me that adding these reimbursements

6 would increase the fees to the estate on the one hand, but,

7 more importantly, I didn't understand how these fees would be

8 specifically going to represent dot com customers.  It also

9 appeared that (indiscernible) had an outsized role on the ad

10 hoc committee based on what I had heard from the directors,

11 and that, of course, concerned me.

12          On top of all of that, the other points that were

13 raised by the U.S. Trustee largely made sense to me as well,

14 so it's on that basis that I decided that I would take this

15 opportunity to object to this motion.

16          Your Honor, I very much appreciate you taking the

17 time to hear what I've had to say today, and for your

18 guidance and wisdom on this issue.

19          THE COURT:  Okay, thank you.

20          MR. RABBITTE:  Thank you very much, Your Honor.

21          THE COURT:  Thank you, Mr. Rabbitte, I appreciate

22 your comments.

23          Mr. Carter, are you on the call?

24          MR. CARTER:  Yes, Your Honor, I'm here.  Can you

25 hear me?

1          THE COURT:  I can.

2          MR. CARTER:  Thank you, Your Honor.  My name is

3   Simon Carter, for the record.  I'm not familiar with speaking

4   in front of such a forum, so I'll do my best.

5          There are, in principle, two points I'd like to

6   make.  First, it seems to me that justification for the fee

7   and reimbursement motion is married to the performance of the

8   ad hoc committee, what they have done and what they are going

9   to do.  The platform upon which the ad hoc committee stand

10  is -- or, rather, was the assets held by ftx.com belong to

11  its customers, that was their adversary complaint, it was not

12  for the benefit of the estate and it formed the playing field

13  upon which they engaged within these bankruptcy proceedings.

14  The debtors, on the other hand, continue to allege those

15  assets belong to the estate.

16         Asset ownership is clearly a gating issue and

17  remains the elephant in the room, but there has been no

18  progress by the ad hoc committee in open court.

19  Consequently, the question of who owns the digital assets

20  remains uncertain, and it seems to me that the ad hoc

21  committee have abandoned their platform.  And, according to

22  the debtors, some months ago, the ad hoc committee began

23  negotiating with the debtors for a plan of reorganization to

24  represent the interests of their constituents, and the

25  settlement and plan support agreements to which the ad hoc

1  committee have now subscribed underlines their adversary

2  complaint will go no further.

3         Your Honor, you know, I'm reminded of the

4  reluctance of the ad hoc committee to get involved in the

5  oral argument about digital asset ownership at the September

6  the 13th omnibus hearing.  This, to my mind, reflected a

7  missed opportunity to represent their mandate; it

8  miscalculated that ownership remains a priority issue for

9  customers at large, you know, customers who have their life

10  savings at stake.

11         So, taking a step back, has the ad hoc committee

12  achieved the mission they set out to do, to test the

13  ownership of assets in this court?  No, they have not.  Has

14  the ad hoc committee represented the interests of all

15  customers?  I don't believe they have represented the best

16  interests of digital asset holders who are arguably the

17  largest population of customers.

18         It is evident from the second draft plan of

19  reorganization that the ad hoc committee has had a positive

20  impact that would benefit some customer groups, including

21  preference customers who withdrew assets in the days before

22  the collapse, but this is an achievement made on a different

23  playing field from the one the ad hoc committee set out to

24  play on.  If I was marking their homework, I'd have to say

25  they haven't met the term of their assignment; therefore, the

1  ownership -- therefore, as the ownership question is

2  unresolved, I object to paying legal fees and future

3  disbursements that would be, you know, a potential misuse of

4  customer-owned assets which do not belong to the debtors'

5  estates.

6        The second point I want to make is very much

7  related to the first.  To my mind, it's fundamental that the

8  Court has opportunity to deliver its opinion on the gating

9  ownership issue.  This is why I've been compelled to submit a

10  motion for opinion *pro se*, so that Your Honor can do just

11  that, to provide your opinion in answer to the question whose

12  digital assets are they.  It's a matter essentially contained

13  within the four corners of the terms of service.  These were

14  the rules which I and thousands of similarly situated

15  customers read and understood to apply to our assets when

16  using the platform.  However, the debtors and the ad hoc

17  committee are now joined in their thinking that to unravel

18  the ownership issue is too complex, it will take too long, be

19  too expensive, and, in any case, the assets are now gone, but

20  that view is primarily focused on the aftermath of the

21  collapse, it skates over the fact that establishing ownership

22  does not turn on the ability to trace the digital assets.

23  Tracing or recovery or restitution or a plan of

24  distribution -- sorry, a plan of reorganization is the step

25  that follows after ownership is known.

1          So, Your Honor, regardless of what crypto assets

2    remain in the debtors' possession or not, as the case may be,

3    the ownership question could still be answered.  For example,

4    title to property is not lost merely because the property has

5    been stolen, and it's important not to lose sight that

6    missing crypto assets are the direct result of FTX

7    misappropriating customer property.  This has now been

8    established beyond reasonable doubt in the criminal and civil

9    courts, but the ad hoc committee, if I understand correctly,

10   is now complicit with the debtors' allegation that customer

11   assets fall within the estate; that is, unless a customer can

12   prove a claim to a particular crypto coin in a particular

13   omnibus pool.  And, I must agree, that would be a complex

14   undertaking, but in my opinion it's also wrong-footed.  It

15   fundamentally misstates that the coin in the custodial wallet

16   is the entirety of the digital asset, it was not.  Rather,

17   the digital asset, as was defined in the terms of service,

18   was a crypto token issued by the platform and held in my

19   account, and that token remains identifiable in my account

20   today.  It's that token which provided an entitlement to an

21   equivalent coin held in the omnibus pool; that is, to a

22   fungible coin which is identical to the next.  Just as a

23   dollar is a dollar, a bitcoin is a bitcoin is a bitcoin.

24          Your Honor -- and I'm not about to rehearse the

25   arguments of my motion, though I'm conscious I've already

1   strayed into some of the merits, but it was necessary ground

2   to cover to make a point.  Your Honor's opinion on the

3   ownership matter may well shake the foundation of these

4   proceedings and I hope it does, for myself and similarly

5   situated customers.  Confirming the digital assets belong to

6   the customer and not to the estate is the quickest way to

7   move forward and ensure everyone gets what they are legally

8   entitled to.  This ensures everybody is treated fairly.

9   There should be no room for sharp elbows of an individual

10  creditor group trying to advantage themselves over others.

11          But the point I want to make is this:  Before

12  committing to reimburse the past and future legal fees of the

13  ad hoc committee, whose defined contribution is presently

14  based around the settlement and draft plan of reorganization,

15  it would be the right order of things to first establish what

16  the future looks like before committing to fund the players

17  who will play the game.  I've been in contact with several

18  customer groups who would seem to have skills and experience

19  that would also bring value to the table.

20          For these reasons, I cannot support a motion to

21  reimburse the legal fees of the ad hoc committee, whose

22  working mandate is to invade property which is not considered

23  to form part of the debtors' estate.  Respectfully, it would

24  seem premature to enter into such a commitment until there is

25  clarity on the gating issue.

1            And, Your Honor, while I think of it, there's one

2    final brief point I'd like to make and that is to look at

3    related bankruptcies of Celsius and BlockFi, whose custody

4    services and terms were the same as FTX.  These platforms

5    also used crypto tokens and crypto token entitlements as a

6    means to identify fungible coins belonging to customers held

7    in omnibus pools.  But, moreover, what is particularly

8    striking is that early on in those bankruptcies it was the

9    debtors who acknowledged, due to the terms of use, that those

10   digital assets held in custody in the omnibus pools belonged

11   to customers and not to the estate.

12           Thank you.

13           THE COURT:  Okay.  Thank you, Mr. Carter.

14           Mr. Carter, just a couple of points.  You talk

15   about the mandate of the ad hoc committee, but the ad hoc

16   committee, as we've been talking in the courtroom and you

17   might not have understood the legal terminology, they are not

18   a fiduciary of the estate.  So they don't have an obligation

19   to anyone other than those who are members of the committee

20   itself and they're acting on their behalf.

21           And the other point I wanted to make is your

22   motion to -- for an opinion, I know that's something they do

23   in the UK, but under the rules and the law of the Bankruptcy

24   Code here in the United States, I cannot give you an advisory

25   opinion, I have to have something that is in front of me that

1  gives me the basis for that.  And because you're asserting

2  that the property being held by the debtors is your property,

3  that requires under the Bankruptcy Code the filing of an

4  adversary proceeding, which is what the ad hoc committee did

5  initially, they filed an adversary proceeding.  It was

6  basically a complaint, a lawsuit, alleging that the property

7  belonged to the customers, not to the debtors' estates.

8          So I can't rule on your motion for opinion, it

9  would have to be an adversary proceeding that would have to

10  be filed, and that would have to be litigated, which is why

11  the ad hoc committee came to the conclusion that it was

12  better to resolve the issues through this plan support

13  agreement to avoid the costs of litigation.  And the debtors

14  would have vigorously defended that lawsuit and the costs

15  would have been astronomical compared to being able to

16  resolve this in an amicable fashion.

17          So I just wanted to make sure you understood those

18  procedural issues regarding what you filed.  Okay?

19          MR. CARTER:  Okay.  Thank you.

20          THE COURT:  All right.  And, with that, I'm going

21  to -- let's let Mr. Harvey, on behalf of the ad hoc

22  committee, respond to the two *pro se* claimants first.

23          MR. HARVEY:  Excuse me, Your Honor, for the

24  record, Matthew Harvey from Morris, Nichols, Arsht & Tunnell.

25  Thank you for the opportunity to respond.

1           One thing I'll note, Your Honor, is my co-counsel,

2    the lead counsel to the ad hoc committee, Erin Broderick from

3    Eversheds Sutherland, is on the phone and I may ask her to

4    jump in on a couple of the points that she's closer to.  But

5    I'll start with saying that we reached out to both of these

6    claimants, I'm not sure that either of them has responded to

7    us, because I think that their viewpoints are valuable and I

8    think, once they talk to us, they'd understand that we've

9    considered all of those viewpoints and we've incorporated

10   them into our analysis and evaluated the strengths and

11   weaknesses of them.

12          And I think Your Honor just touched on this, in

13   terms of process, and this goes -- specifically, I believe

14   Mr. Carter pointed out that -- and I think he acknowledged

15   that the effort of tracing these assets would be -- and Your

16   Honor just said -- it would be a very significant undertaking

17   probably involving, you know, months, if not years of

18   discovery and undertaking.

19          So we filed the action, we filed a summary

20   judgment motion, but our summary judgment motion was on the

21   threshold question of what do the terms of service say and,

22   in concept, does this provide, you know, what we call a legal

23   trust, an express trust, or does it provide some form of

24   equitable trust, to the extent the assets aren't sitting

25   there, constructive resulting.  Otherwise, there's other

1  theories, and these were alluded to in the *pro se* objectors'

2  comments, that does it even not become property of the estate

3  if it's embezzled or stolen, but you still have the secondary

4  problem of tracing these.  And we believe, of course, there

5  are theories you could try to do that in the aggregate and

6  that, in and of itself, is a significant undertaking, but on

7  a creditor-by-creditor basis it's even more significant and

8  probably prohibitive for individual customers and that was

9  certainly a significant factor in what we considered.

10         You also have the tension, and I'm not sure if

11  they recognize this, between what benefits -- a

12  declaration  -- I heard a criticism, I don't remember which

13  one of them, that you might want to go after preference

14  recoveries more, but of course a determination that this is

15  customer property would mean that those were not preferences.

16  So you can't have it both ways.  You can't say that these are

17  categorically customer property and, therefore, you know, no

18  one else in the estate should have any piece of it, unsecured

19  creditors, but let's also go recover what was sent out to

20  people prepetition.

21         And, again, these are complex issues.  We have

22  people on our committee that both have preference exposure

23  and don't, and this is things that we -- we, in consultation

24  with those -- discussing with those people, discussing

25  (indiscernible) professionals with the debtors and the

1  committee, and then also with the, you know, hundreds of

2  other people that we talk to, we take those views into

3  account and we reach a settlement.  And you have a settlement

4  now that proposes to distribute 90 percent or upwards of 90

5  percent of all distributable value in the estate, recognizing

6  the strength of the arguments that there is customer

7  property.

8          So I think that, Your Honor, that I would

9  encourage both of these claimants to engage with us and

10  discuss with us and, you know, even consider joining our

11  group.  Again, the membership is open.  I think, you know,

12  these are two customers out of millions, the only ones

13  objecting to the relief requested today.  We're happy to

14  engage with them.  We don't think that their criticisms of

15  the group are fair.

16          As Your Honor observed, we did file an adversary

17  proceeding, we immediately -- or almost immediately filed a

18  motion for summary judgment.  We were prepared to go forward

19  on that until invited to try to resolve these issues

20  consensually.  And I think, as Your Honor has observed in

21  other cases, like Mallinckrodt and other complex cases, the

22  cost-benefit analysis of continuing to litigate can often

23  become prohibitive once you think of the cost of doing that

24  versus the benefit you can get from settling.

25          I'll pause here and see if my co-counsel Ms.

1  Broderick wants to address anything, if that's okay with Your

2  Honor.

3            THE COURT:  That's fine.

4            Ms. Broderick?

5            MS. BRODERICK:  Thank you, Your Honor, and I

6  apologize for technical difficulties joining by my phone and

7  without video.  But for the benefit of the customers that are

8  listening on the phone and to address the threshold question

9  of the benefit of the estates and the debtors, I think it's

10  important to recognize here that there's no dispute that the

11  ftx.com customers constitute the vast majority of the

12  residual beneficiaries of the estates.  But, as Mr. Carter

13  properly points out, the estates here are in question,

14  whether or not the assets that are being administered by the

15  debtors belong to them or should be returned to customers.

16            The ad hoc committee has deeply analyzed these

17  customer property ownership rights from the outset of the

18  cases, has a command of the factual context and of bankruptcy

19  law, and has analyzed the hurdles to judgment, the attendant

20  costs and delay associated with receiving such judgment, from

21  the vantage point of very diverse customers.  We have done so

22  because our membership is composed of those diverse

23  viewpoints and interests.

24            And it's important to recognize that the position

25  around, which we acknowledge is growing dissent among

1  different (indiscernible) groups, whether they hold digital

2  assets or (indiscernible) or they have preference exposure or

3  not, knowingly or not by those advancing them, they turn on

4  customer property rights arguments, again, from preferences

5  to valuation dates and methodology, to in-kind distributions,

6  to ability for customers to have an upside in the estates.

7  And we want customers to understand that we have not only

8  well understood these arguments, but we've articulated them

9  to the debtors and to the official committee.  We've been

10  able to objectively evaluate their arguments, and with all of

11  us having the expertise and experience in Chapter 11 cases.

12          And, again, the purpose in our bylaws is, in a

13  cost-efficient and timely manner, to increase returns to all

14  holders of ftx.com claims.  The distinctions that are

15  recognizable we're acutely aware of, and I think will

16  continue to be heard in these cases, have nothing to do with

17  the holder of the claim being an original or secondary

18  holder, they have to do with the claim itself.  And as co-

19  counsel, I think, well put forward, but I want customers to

20  understand that in order to get a judgment that they are

21  seeking from diverse vantage points, there will be uncertain

22  litigation that will delay these proceedings and our plan

23  process, have an impact on 2.0 exchange, et cetera.

24          So what we've done, and I think it has been not

25  only a substantial contribution to the estates, but it has

1  kept these estates together, is to take all these viewpoints

2  and come up with creative solutions that have a consensual

3  path forward where all ftx.com customers are going to be

4  better than the alternative.

5             THE COURT:  Okay.  Thank you.

6             MR. HARVEY:  Thank you, Your Honor.

7             THE COURT:  Hold on, Mr. Rabbitte, I'm going to

8  let the committee -- or, I'm sorry -- yeah, the committee and

9  the debtors respond first, and then I'll come back and let

10  you make additional comments.

11            MR. GLUECKSTEIN:  Your Honor, for the record,

12  Brian Glueckstein for the debtors, just a couple of points.

13            Just taking a half step back, we're not asking for

14  approval today of any settlement or any compromise of the

15  customer property issue.  The debtor is going to be filing an

16  amended plan, as we've said, and a disclosure statement for

17  that plan in December.  Those documents are going to explain

18  the plan terms, the terms of the proposed resolution of the

19  ad hoc's customer property litigation, what the result of

20  that means for creditors of ftx.com and the other estates.

21  We'll have information with respect to estimates in terms of

22  what -- for the first time of what people are likely to see

23  out of this case.

24            That's part of the process and of course, as Your

25  Honor knows, in the plan process solicitation, the disclosure

1  statement's approval will proceed and creditors who are

2  entitled to vote will have the opportunity to weigh in on

3  what we've proposed and what the ad hoc -- that we've

4  negotiated with the ad hoc and the committee on these issues,

5  and they'll have an ability to voice their view.

6          The question for today is whether or not the

7  debtor, who is the movant here, has satisfied its burden

8  under Section 363, as Your Honor has articulated in the

9  context of these types of requests, that on the unique facts

10  of this case it is appropriate for the debtor to use estate

11  resources to perform under the reimbursement agreements, and,

12  again, we submit that we have.  The un-refuted testimony of

13  Mr. Ray is clear.  The debtors believe there's been a

14  collective benefit to the estates by organizing this plan

15  formation process, by having a counterparty to speak based on

16  a representative group of the ftx.com creditors to negotiate

17  these issues with and, in doing so, come to a resolution of

18  the pending adversary proceedings, which are the pending

19  litigation on these questions.

20          And, of course, there has not been an abandonment

21  of that litigation, there's been a proposed settlement of

22  that litigation, and that settlement includes certain

23  benefits, substantial benefits, to the customers of the

24  ftx.com exchange as a result of those arguments.  The debtors

25  have defenses to those arguments.  As Your Honor pointed out,

1  there would be protracted litigation if we need to litigate

2  those issues.

3          So what we have here is a settlement that is part

4  of a larger puzzle where we're putting together a plan that,

5  to Mr. Pasquale's points, we're trying to get the debtor out

6  of bankruptcy and get all of the value that the debtor has

7  been successfully marshaling, recovering, and then bring back

8  into the estate and out to customers and to other creditors

9  in accordance with that plan.  And that process is going to

10 move forward.  The plan support agreement is a substantial

11 milestone in this case having the support of the ad hoc

12 committee, of the official committee, and of the debtor, and

13 it provides the framework that will allow us to bring a plan

14 forward in short order before the Court.

15          So, again, we submit, Your Honor, that on the

16 facts of this case we think it is appropriate to permit the

17 debtor to perform under the reimbursement agreements, and

18 certainly all issues with respect and all parties' rights

19 with respect to the plan issues and the settlement of

20 litigation all reserved.

21          Thank you, Your Honor.

22          THE COURT:  Thank you.

23          Mr. Pasquale, anything further?

24          MR. PASQUALE:  Nothing to add, Your Honor, unless

25 you have questions.

1            THE COURT:  All right, no questions.

2            Mr. Rabbitte, I'll give you an opportunity to

3  briefly make additional comments.

4            MR. RABBITTE:  Thank you, Your Honor.  I just want

5  to come back in briefly with two counterpoints.

6            Counsel for the ad hoc mentioned the enormous

7  difficulty there would be of tracing digital assets.  I may

8  not know much about bankruptcy process or bankruptcy law, but

9  I do understand cryptocurrency, and cryptocurrency is

10 fungible.  And so that arduous task can be set aside because

11 bitcoin is bitcoin, the same as one dollar is fungible as

12 opposed to another dollar.  So I just wanted to make that

13 point that it's not necessarily -- it doesn't have to be this

14 arduous, insurmountable problem.

15           And my second point is that the ad hoc approached

16 this process with a very serious issue and what is a very

17 serious issue for the 1.4 million creditors that are out

18 there, which is property rights and digital assets rights.

19 And, to my mind, if they are not challenging petition date

20 valuations when they approach with that argument, then

21 they're not prosecuting on that basis at all.

22           To be candid, Your Honor -- and I'll leave this as

23 my final comment -- what creditors believe, what many

24 creditors believe is they've taken a very serious issue and

25 they're using that as leverage on the basis of negotiating

1  for preferences.  That is what many creditors believe and I

2  just wanted to leave you with those points.  Thank you for

3  the opportunity.

4           THE COURT:  Thank you, Mr. Rabbitte.

5           You know, I don't want to get into specifics on

6  too much of this, but the issue of tracing is one that is --

7  the fact that you said that crypto is fungible actually

8  creates the tracing problem because, once fungible assets are

9  consolidated into another account, then there's all kinds of

10  legal ramifications to that that require unwinding of the

11  issues and sometimes it's not even possible to trace.  So

12  that's why the tracing issue is a problem.

13           The other thing, Mr. Rabbitte, is that you will

14  have the opportunity when the debtors file their disclosure

15  statement and plan of reorganization to object to both of

16  those, the disclosure statement and to the plan of

17  reorganization, if you believe that something in there is

18  inappropriate.  Okay?

19           MR. RABBITTE:  Thanks, Your Honor.  Thank you.

20           THE COURT:  Mr. Carter, do you want to be heard?

21           MR. CARTER:  Yes, Your Honor, let me just start my

22  video.

23           I just want to echo, to a degree, what

24  Mr. Rabbitte was saying, reemphasizing the fungibility of the

25  assets.  It was a comment that was made that the -- in terms

1  of the assets we're talking about, when a customer placed

2  their -- deposited their money with FTX, FTX took that and

3  issued them with a token.  The token represented whatever the

4  particular coin was they were buying as a bitcoin and that's

5  the -- the crypto token is what the customer held in their

6  account.

7          The terms of service relate to those -- that

8  particular token was held in the account as belonging to the

9  customer and that token provided an entitlement to an

10 underlying asset, the fungible asset that is bitcoin.

11         So we don't need to look at what was in the

12 omnibus pools to understand who owned what, we only have to

13 look at the token that was in the customer account because

14 that was the asset, that was the starting point of describing

15 to a customer what they owned.  What the ad hoc, the

16 committee, what the debtors are doing is they're looking at

17 what's left in the custodial pools and that's the wrong way

18 about it.  They're not starting at the first position,

19 they're starting at the -- somewhere down the chain; they're

20 not looking at what was the asset that was owned.  That's the

21 first point I wanted to make.

22         The second point is the legal point, the legal

23 points of ownership.  If these assets are owned by customers,

24 then how can they be within the debtors' estate, how can that

25 rightfully -- those assets rightfully be used in a plan of

1  settlement?  If they're not supposed to be in the estate,

2  then why is the estate using them?  And the only way, to me

3  it seems, we can get to the bottom of that is by having the

4  matter decided in court.

5          So my final question that I will ask you is, Your

6  Honor, you mentioned that adversary judgment is the way to go

7  forward with this, will the Court accept a *pro se* submission

8  to that effect?

9          THE COURT:  Certainly, you can file anything you

10 wish as a *pro se* claimant, Mr. Carter, in the case.

11         MR. CARTER:  Okay.

12         THE COURT:  Yeah, so it would be an adversary

13 proceeding, is what it's called, which is initiated through a

14 complaint.  And I can't give you advice on how to do that,

15 that's something you'll have to -- I would recommend you

16 might want to have counsel help you with that because it can

17 be complicated

18         MR. CARTER:  Okay.

19         THE COURT:  Okay?

20         MR. CARTER:  Thank you, Your Honor.

21         THE COURT:  All right.  And, as I said to

22 Mr. Rabbitte, you also will have the opportunity to object to

23 the disclosure statement and the plan of reorganization when

24 that comes down the road.

25         MR. CARTER:  Okay.  Thank you, Your Honor.

1          THE COURT:  Thank you.

2          Anything further?

3       (No verbal response)

4          THE COURT:  All right.  I was a little bit

5   concerned about approving this, given what I asked

6   Mr. Glueckstein about at the beginning about whether or not

7   this wasn't just the ad hoc committee acting on behalf of

8   itself and having an incidental benefit on the estate as a

9   whole, but I'm satisfied under the unique facts and

10  circumstances of this case, not least of which is the

11  millions of customers that are involved here, that it makes

12  sense that there be at least one voice -- or in this case 66,

13  I guess, voices -- who can act through counsel to help steer

14  this process to a plan of reorganization, given the diversity

15  of the interests, as Mr. Glueckstein pointed out and Mr.

16  Harvey pointed out, there's this diversity of interests

17  between those who are creditors and also customers and those

18  who are just creditors.

19          And I think having the ad hoc committee involved

20  in that process is beneficial to the estate as a whole and,

21  therefore, I will overrule the objections and will approve

22  the debtors' agreeing to pay the fees as outlined in their

23  reimbursement agreement with the ad hoc committee.

24          Any questions?

25          MR. GLUECKSTEIN:  No questions.  Thank you very

1  much, Your Honor.

2          THE COURT:  Do we have a clean version?  I saw the

3  revised version that came up, it was a blackline.  Do you

4  have the clean version uploaded for entry?

5          MR. HARVEY:  Your Honor, I'm going to need to

6  check.  If it's not already uploaded, it will be uploaded

7  this afternoon.

8          THE COURT:  All right.  As soon as it gets

9  uploaded, we'll get that entered for you.

10          MR. HARVEY:  Thank you, Your Honor.

11          MR. GLUECKSTEIN:  Great.  Thank you very much,

12  Your Honor.

13          I think that brings us then to the adversary

14  matter's portion of the agenda, and I think the first item

15  going forward is Item 13, which are the motions brought by

16  Platform Life Sciences, so we'll turn it over to them.

17          THE COURT:  That's going to take a little bit

18  longer.  Do we have -- I don't want to hold up those who have

19  just -- are there any of these that are going to be short

20  because I don't want to have people just stick around if they

21  don't need to.

22          MR. GLUECKSTEIN:  It's hard to say, Your Honor.  I

23  think certainly the -- that one, I think, at least has

24  evidence, I think the other items on the agenda are a motion

25  for a protective order, which is argument, and the short

 1  status conference.  So we could take them out of order, if

 2  Your Honor prefers.

 3           THE COURT:  Why don't we do the status conference

 4  at least first --

 5           MR. GLUECKSTEIN:  Sure.

 6           THE COURT:  -- get that out of the way and then

 7  we'll --

 8           MR. GLUECKSTEIN:  Sure.  I'll turn it over to the

 9  U.S. Trustee then.

10           THE COURT:  Okay.

11           MR. HARVEY:  Good afternoon, Your Honor.  Before

12  we turn to other matters on the agenda -- Matthew Harvey from

13  Morris, Nichols, Arsht & Tunnell on behalf of the ad hoc

14  committee -- in the spirit of efficiency, which we've also

15  tried to accomplish here, may I and my colleague be excused

16  for the remainder of the hearing?

17           THE COURT:  Yes, certainly.

18           MR. HARVEY:  Thank you, Your Honor.

19           THE COURT:  I always like to save money.

20           MR. HACKMAN:  Good afternoon, Your Honor, Ben

21  Hackman for the U.S. Trustee.

22           The U.S. Trustee asked for a status conference

23  today to briefly discuss Morgan Lewis's fees in the Emergent

24  Fidelity Technologies LTD. case, it's Number 23-10149, *vis-a-*

25  *vis* the FTX fee examiner.

1        Your Honor approved Morgan Lewis's retention as

2   Emergent's bankruptcy counsel on April 10th, 2023, effective

3   as of Emergent's petition date.  On September 20th, 2023,

4   Your Honor entered an order approving Morgan Lewis's first

5   interim fee application, that's Docket Item 2647.  Although

6   the fee examiner order does not currently cover the Emergent

7   debtor's professionals, that order preserves the U.S.

8   Trustee's right to request a status conference with the Court

9   regarding an extension of the fee examiner order to cover

10  Morgan Lewis's fee applications as counsel for Emergent.

11       Morgan Lewis has now voluntarily agreed to the

12  U.S. Trustee's request that Morgan Lewis's fee applications

13  to the Bankruptcy Court beyond Morgan Lewis's retainer will

14  be subject to the FTX fee examiner order.  This agreement

15  does not apply with respect to any of Emergent's offshore

16  professionals.

17       Our office understands that Emergent expects to

18  file in the near future a proposed cross-border protocol that

19  will address the compensation of Emergent's offshore

20  professionals.  The U.S. Trustee's right to object to the

21  proposed protocol, including whether offshore professionals

22  should be subject to the fee examiner order, is reserved.

23       Emergent's counsel authorized me to communicate

24  this to Your Honor.  Unless Your Honor has any questions,

25  that's all I have.

1           THE COURT:  No questions.  Thank you.

2           MR. HACKMAN:  Thank you, Your Honor.

3           THE COURT:  Anyone else wish to be heard on that

4  issue?

5      (No verbal response)

6           THE COURT:  All right, thank you.

7           Okay, next.  Do you want to do the --

8           MR. GLUECKSTEIN:  We can go -- would you like to

9  proceed with the motion to dismiss or the protective order

10  motion, Your Honor?

11           THE COURT:  Let's do the protective order motion.

12           MR. GLUECKSTEIN:  Okay, then we'll --

13           THE COURT:  That probably won't be as long as the

14  other one because there's two motions there, right, a motion

15  to dismiss and a motion -- well, two motions to dismiss, one

16  for --

17           MR. GLUECKSTEIN:  Yeah, although I think one is --

18           THE COURT:  -- lack of personal jurisdiction.

19           MR. GLUECKSTEIN:  -- one is substantive on

20  the 12(b)(2) issue, I'm not sure the other one is, but, yes,

21  they are both -- but we'll turn it over to counsel for the

22  movants on the protective order.

23           THE COURT:  Okay.  Mr. Arbogast?

24           MR. ARBOGAST:  Good afternoon, Your Honor.

25  Gregory Arbogast, on behalf of Brandon Williams in the

1   adversary proceeding of FTX Trading and Maclaurin Investments

2   against Brandon Williams, *et al.*

3           If it pleases the Court, my colleague Lawrence

4   Gebhardt will be arguing the motion.  He's admitted *pro hac*.

5           THE COURT:  Okay.  Thank you.

6           MR. GEBHARDT:  Good afternoon, Your Honor.

7           This suit, at least as it pertains specifically to

8   Brandon Williams, a defendant, alleges actual and

9   constructive fraudulent transfers by FTX Trading and the

10  Antiguan corporation in its acquisition of Digital Assets, a

11  Swiss corporation in July and November of 2021.  The

12  defendants have all moved to dismiss for lack of subject-

13  matter jurisdiction and the Court, due to the improper and

14  unauthorized filing of the bankruptcy petition, which, of

15  course, then carries over to the institution of the adversary

16  proceeding and the lack of subject-matter jurisdiction of

17  this Court to adjudicate the adversary proceeding.

18          All of the defendants have moved to dismiss for

19  failure to state a claim.  Brandon Williams, specifically,

20  has alternatively moved for summary judgment as to the counts

21  pertaining to him.  Those motions are not a basis, at least

22  as to Brandon Williams, for requesting a protective order,

23  but solely the aspect pertaining to the lack of subject-

24  matter jurisdiction.

25          Now, Brandon Williams has moved for a protective

1   order under Rule 26(c) to defer discovery until the Court has

2   ruled on the pending motions to dismiss for lack of subject-

3   matter jurisdiction.  The other defendants, as of yesterday,

4   joined in this motion and they are the principal proponents

5   of the lack of subject-matter jurisdiction of the Court in

6   motions they filed in the main bankruptcy case, as well as a

7   portion of their motion in the adversary proceeding.

8           The basis of the motion for a protective order is

9   Federal Rule 26(c)(1) to avoid undue burden and inordinate

10  expense that the discovery will entail until the subject-

11  matter jurisdiction issue has been resolved.

12          The case is at its inception.  The complaint has

13  been filed and responded to with motions.  A case management

14  plan was agreed to before the motions were filed.  Initial

15  disclosures have been made.  The plaintiffs have filed

16  discovery requests that have been timely responded to by all

17  of the defendants; basically, document-production requests.

18  The other defendants have served discovery on the plaintiffs.

19  Brandon Williams has prepared it, but has not filed it.  We

20  have extensive document requests, interrogatories, and

21  requests for admission to file once there's a resolution of

22  the motion for a protective order.

23          The motions to dismiss have been filed, but

24  there's been no response yet; instead, the debtors, in both

25  the main case, have requested additional time to respond to

1  the lack of subject-matter jurisdiction for the filing of the

2  bankruptcy petition.  Under the case management order, their

3  response to the motions to dismiss, including subject-matter

4  jurisdiction, in this case, will not accrue until December 1.

5        The discovery in this case will be extensive and

6  will be expensive.  Digital Assets, the purchased entity, is

7  a Swiss corporation, subject to Swiss law, including the

8  blocking statute, which is Article 271 of the Swiss Criminal

9  Code.  Even though Digital Assets may be owned by a non-Swiss

10  entity, that criminal statute still applies and can prevent

11  us from getting documents that are pertinent to the

12  acquisition and to the operation of Digital Assets before it

13  was acquired by FTX and after it was acquired by FTX and

14  operated for a year.

15        There are other entities that are involved; all

16  European based.  For instance, CM Equity, a German brokerage,

17  which might be analogous to Charles Schwab, and RDNA,

18  which -- or excuse me -- KDNA, which is a brokerage that

19  was -- a Cyprus-licensed brokerage, which was acquired, as

20  contemplated in the original acquisition, post Digital

21  Assets' purchase by FTX Trading.

22        There are many individuals who have personal

23  knowledge and will need to be deposed.  Reliable contact

24  information is not available in most of them and will require

25  extensive investigation to locate just where they are so that

1  subpoenas, or other deposition notices, and so on, can be

2  served.  They're all over the United States, to the extent

3  they're United States citizens.  Daniel Friedberg, who was

4  FTX's general counsel, representing FTX in the acquisition is

5  based in Washington.  Can Sun, general counsel with FTX,

6  apparently is located in the Bahamas.

7          In Europe, the people that are there get the

8  protection of the European General Data Protection

9  Regulation, which can be very tricky to comply with and will

10  probably involve letters rogatory through the State

11  Department to get them to even come to a discovery

12  proceeding.

13          In the Caribbean, which includes Bahamas and

14  Antigua, there are people that will need to be deposed.

15          Sam Bankman-Fried, who's a critical witness in

16  this case, is in prison.  He's testified, so, probably, he

17  can't take the Fifth Amendment, but we've now got to figure

18  out how to get a deposition in the prison system.

19          And, for instance, in his testimony, one of the

20  most ridiculous assertions in the complaint is that Samuel

21  Bankman-Fried was a personal friend of Brandon Williams and

22  paid exorbitant, excess amounts of money to financially

23  benefit Brandon Williams.  Bankman-Fried will testify to the

24  contrary.  Those two have never met in person.  They're never

25  spoke on the phone one-on-one.  Their only interaction,

1  basically, was the FTX deal, but we must depose him.

2          We must depose the other FTX people who have

3  testified in the criminal proceedings and are available and

4  around.

5          Attorneys in this action have Sullivan & Cromwell

6  will need to be deposed.  Mr. Dietderich, for example, who

7  contends that FTX was insolvent at the time the bankruptcy

8  petition was filed, 5 days earlier, is ensuring the creditors

9  committee attorney in the Voyager bankruptcy in an email that

10 FTX is financially solid as a rock.  So we want to find out

11 what happened in that year between November of 2021 and

12 October of 2022, that caused FTX to become insolvent.  What

13 happened?  What was the change and what justified the

14 statement that you made?

15         There are experts that will need to be both,

16 interviewed and deposed; experts that pertain to the

17 transaction, such as BDO, which did a valuation of the data

18 acquisition at the insistence of FTX shortly after the

19 acquisition was made and found, basically, reasonable

20 equivalents.  Prager Metis, an international accounting firm,

21 did audited financial statements of FTX and those financial

22 statements did not show insolvency.

23         There's other evidence of solvency of FTX, such as

24 Mr. Ray's first day declaration, in which he describes

25 solvency to FTX Trading.  The parties will be retaining

1  experts to supplement those transactional people that were

2  part of the transaction.

3          Other potential purchasers of data existed and

4  they will need to be deposed because they essentially were

5  prepared to pay roughly the same price as FTX paid, except

6  the deals couldn't go through because FTX already owned 20

7  percent and didn't want competitors owning part of the

8  transaction.

9          The bottom line is that the discovery in this case

10 will be expensive, it will be time-consuming, and it will

11 involve extensive travel.

12         Now, Federal Rule of Civil Procedure 26(c)(1)

13 authorizes the Court to enter an order to protect a party

14 from undue burden or expense -- burden or expense, and that's

15 the basis for the request that discovery be delayed.  Just

16 filing -- we readily concede that just filing a motion to

17 dismiss is not sufficient to get a motion for a protective

18 order.  That is why when Brandon Williams filed his motion to

19 dismiss or for summary judgment, we did not ask for a

20 protective order to defer discovery because a motion to

21 dismiss for failure to state a claim depends on the

22 interpretation of words.  Summary judgment motions can

23 question whether a material fact is or is not in genuine

24 dispute, did not justify.

25         But subject-matter jurisdiction, if it does not

1  exist, ends the case.  It's all over.  If it's all over, you

2  don't have to do all of those expensive, burdensome things.

3         Now, to get the motion for protective order, we

4  clearly, and we acknowledge we must establish good cause.

5  The grant is in the discretion of this Court based on an

6  evaluation of the cause that's been shown and the

7  reasonableness of the relief that's sought.

8         Now factors that are regularly considered in

9  making this decision:  the strength of the motion to dismiss.

10 I believe it's not only strong that subject-matter

11 jurisdiction is lacking, but basically, it's uncontested.

12 The facts are not in dispute.  Mr. Dietderich put an

13 affidavit into the record when he was trying to confirm his

14 retention saying, Gee, I didn't have time to get the board of

15 directors to approve the filing of the bankruptcy petitions

16 or the appointment of Mr. Ray.

17        There may have been a hundred corporations, but

18 FTX was the main one.  They were there.  He never looked, but

19 he knew that he had to do that, yet he didn't do it; instead,

20 he has Bankman-Fried execute an omnibus corporate power that

21 essentially granted omnipotent powers to John Ray, even

22 though Bankman-Fried did not have the authority to do that.

23        The law is clear from Wago and the Supreme Court

24 case of Price v Gurney that's been cited as to what the need

25 is for that corporate approval and authorization under the

1   organizational documents and under local law.  So the issue

2   is not one of fact that's going to have to be resolved by

3   this Court, but it's one of law.  Basically, under Antiguan

4   law, could John Ray be unilaterally appointed by Samuel

5   Bankman-Fried without authorization from the board of

6   directors, despite what the International Business Act

7   provides and despite what the charter and bylaws of FTX

8   provide.

9          The grant of this motion will end the case.  It

10  will all be over and there will be no discovery needed,

11  nothing further going on.  The plaintiffs, furthermore, will

12  suffer no prejudice if there's a delay in discovery.

13         So if discovery is delayed for a month or two

14  months, how does that cause distinct prejudice?  The

15  plaintiffs do not need discovery to respond to the motion to

16  dismiss.  They don't need to depose anybody.  The bylaws are

17  there.  There's no dispute as to what they are.

18         Mr. Dietderich is around.  He can say what he did

19  and why he did it representing the corporation.  The delay

20  will be slight, unless the motion is granted, and then the

21  case will be at an end.

22         The extensive nature of the discovery, which we've

23  already said will require an extensive time commitment and a

24  huge expense, not just on the part of the defendants, but

25  also on the part of the estate.  I mean, they've got to --

1   the stay will be contested and the depositions will be taken

2   and a lot of money will be spent having Sullivan & Cromwell

3   participate in the discovery.

4           The elements of the claim are extremely involved.

5   Lots of people there, the big factual disputes, if it has to

6   go, and if those factual disputes don't have to be resolved

7   in discovery, then all will be better.

8           Now, I'd like to just briefly respond to some of

9   the *ad hominem* opposition that was filed by FTX.  It recites

10  events that were prior to discovery to our, to Brandon

11  Williams' discovery of the lack of subject-matter

12  jurisdiction of the Court.  That issue was raised by the

13  other two defendants after extensive research and, frankly, I

14  didn't come upon it until we saw their motion to dismiss in

15  the main bankruptcy case and in the adversary proceeding, and

16  it looked irrefutable.

17          So, with that, we joined in the motion in the main

18  case and filed an additional motion in this case because

19  motions challenging subject-matter jurisdiction may be filed

20  at any time, even on appeal after a case has been tried.

21          Williams has timely responded to the discovery

22  served upon him under the Federal Rules.  The defendants have

23  our response and we've said we will produce the documents

24  promptly if the Court denies the motion for protective order

25  or denies the motion to dismiss.  We're prepared to do that,

1  if necessary.

2  An argument was made that, gee, they said you have

3  30 days to produce all of these documents, which is what

4  their discovery request said.  That's not the Federal Rule.

5  Federal Rule 36 says we have 30 days to respond in writing

6  and a reasonable time and place for the production of

7  documents is what to be decided.  FTX, through its lawyers,

8  doesn't get to dictate when and where the documents are

9  produced.  We have responded to it.

10  THE COURT:  There's a case management order in

11  place.

12  MR. GEBHARDT:  Yes, there is a case management,

13  but the case management order was discussed and negotiated

14  before the motion to dismiss for lack of subject-matter

15  jurisdiction was filed.  And, frankly, we did very little

16  negotiating on the case management order; most of it was by

17  the other defendants.  We were prepared to file a motion to

18  dismiss in September, when the Rules normally provided for

19  it, but the other parties asked for the motions to dismiss to

20  not be due until the end of October.  And when that happened,

21  we got a copy of the financial statements and the BDO

22  valuation modified the motion to also include an alternative

23  for summary judgment.

24  But there are dates that have been agreed upon if

25  there's a stay of discovery.  Maybe they could be adjusted or

1 │ maybe they need to -- maybe they could still be complied

2 │ with.  The trial is not, under the schedule that's there,

3 │ would not be occurring until 2024, the end of 2024.

4 │ The defendants contend -- excuse me -- the

5 │ plaintiffs contend that there was clear authority for John

6 │ Ray, yet, if that authority is so clear and so undisputable,

7 │ why did they need an extension of time to respond to the

8 │ motion?  They do and they're not going to be able to

9 │ substantively, correctly respond.

10 │ They never addressed the merits of the motion for

11 │ a protective order in their opposition; instead, what they do

12 │ is they argue things that are irrelevant to it based on,

13 │ basically, insults and disparagement, not reasoning or a

14 │ basis that the motion should not be granted.

15 │ So, we're here to ask that the motion for stay, a

16 │ temporary limited stay of discovery be granted because good

17 │ cause exists and the relief requested is reasonable.  Neither

18 │ the defendants, nor the estate should have to bear the burden

19 │ of extensive time being spent on a case that may end or

20 │ inordinate expense pursuing discovery that may be of no use.

21 │ Thank you, Your Honor.

22 │ THE COURT:  Thank you.

23 │ Debtors?

24 │ By the way, Mr. Gebhardt, I don't see where you

25 │ signed in.  Did you and your -- did you guys sign in?

1          MR. GEBHARDT:  (Indiscernible.)

2          THE COURT:  No, that just to get into the

3  building.

4          This is for a record of who appeared at the

5  hearing.  You can take it back over there and then bring it

6  back.

7          MR. KEANE:  Your Honor, would you like to hear

8  from supporting parties --

9          THE COURT:  Oh, yeah.

10          MR. KEANE:  -- who filed a joinder before debtors?

11          THE COURT:  Yeah, go ahead.

12          MR. KEANE:  Okay.  I'll try and be brief.

13          For the record, Peter Keane of Pachulski Stang

14  Ziehl & Jones, on behalf of defendants Lorem Ipsum UG,

15  Patrick Gruhn, and Robin Matzke.

16          Your Honor, our co-counsel at Morrison Cohen,

17  Heath Rosenblat, is by Zoom in case I miss anything, Your

18  Honor, and may wish to speak up.

19          But we echo Mr. Gebhardt's comments regarding the

20  motion for stay and we filed a joinder at Adversary

21  Docket 39.  Your Honor, we joined in the motion for stay,

22  primarily, from a logistics standpoint.  As Mr. Gebhardt

23  mentioned, we filed a motion to dismiss in the adversary on

24  October 27th, as required by the case management order, and

25  on that date, we also filed two motions to dismiss, the

1  Chapter 11 cases of FTX Trading Ltd. and Maclaurin

2  Investments, Ltd.  Those are at main case docket numbers 3399

3  and 3400.  Those motions to dismiss have not been fully

4  briefed.

5          For the main case motions to dismiss, we've -- I

6  guess the debtors said in their opposition, we've agreed to a

7  briefing schedule, whereby the debtors would respond to those

8  motions by December 13th and our reply would be due by

9  January 5 and with the expectation of having a hearing at the

10  January 17th hearing on those motions.

11          Your Honor, the request for a stay here is very,

12  very limited and it's for a specified purpose.  It's to

13  permit the Court to first consider the dispositive issue of

14  subject-matter jurisdiction that we've raised and we believe

15  a stay makes sense for purposes of judicial economy and to

16  save time and expense for both, the estates and, of course,

17  our clients, and the other defendant, Mr. Williams.

18          With the hearing set for January 17th, all the

19  motion seeks is a stay for approximately 60 days.  I believe

20  the proposed order on the motion for stay asked for an

21  additional 30 days beyond when the Court rules.  So,

22  approximately, 90 days or so.  If the motions to dismiss are

23  denied, of course, the cases will go on, likely, for years,

24  Your Honor.

25          Mr. Gebhardt did a very good job of articulating

1  why discovery is very complex; of course, there are other

2  factors the Court considers when assessing a motion for stay.

3  And I think for purposes of today, the Court can look

4  primarily at the prejudice to the plaintiff, which we don't

5  believe there is any here for today's purposes, or,

6  primarily, the reasons I just mentioned.

7          In addition, Your Honor, I'd just briefly like to

8  respond to some of the statements in the debtors' opposition

9  to clarify the record and highlight a few points and I'll try

10  to be brief.  To begin, I don't think any of us really

11  understand some of the accusations the debtors made in their

12  opposition and where it's coming from.  The debtors used

13  terms to describe the defendants' conduct such as

14  "gamesmanship" and there are suggestions of bad faith, but we

15  think those accusations are misplaced and incorrect and I'll

16  explain why.

17          Our clients filed proofs of claim on June 30th of

18  2023 and the debtor sued us two weeks later in July.  And as

19  any litigator knows, Your Honor, the first thing we tended to

20  focus on was negotiating the case management order for the

21  litigation, and we did, but we did so largely in a vacuum.

22  The case management order was entered August 23rd and it set

23  a deadline for the motion to dismiss in the adversary

24  proceeding on August 27th.

25          So we didn't even begin the serious analysis until

1   late August, early September, and we got to work doing what

2   any good lawyers would do, which would be analyzing the facts

3   and causes of action asserted, investigating potential

4   defenses, and, generally, doing a deeper investigation.  And

5   it was at that point that we discovered the "lack of a

6   corporate authority" issue that we raised in the motions to

7   dismiss.  And as Your Honor knows, and as Mr. Gebhardt

8   mentioned, that's a subject-matter jurisdiction defense,

9   which can be raised at any time by anyone, including the

10  Court on its own.  We believe it's a meritorious defense so

11  we included it in the motion to dismiss that we filed in the

12  adversary and also as the basis for the main case motions to

13  dismiss.

14          So that defense came about organically.  We were

15  not hiding the ball or trying to sandbag the debtors in any

16  way.  We raised it timely when it became relevant and we did

17  so in good faith.

18          The debtors also make some additional suggestions

19  or claims in their opposition, one of which was that we

20  didn't expressly negotiate a reservation of rights in the

21  case management order to file a motion for stay of discovery.

22  And they point to a different adversary proceeding that had

23  such a provision, as if we're omniscient and supposed to know

24  all the nuances of every other litigation.

25          What the debtors don't say in their opposition is

1  that we waived it, because they can't.  The case management

2  order is silent on that, without the ability to move for a

3  stay, and we believe it's appropriate to move so.

4        The debtors also indicated that we already enjoyed

5  approximately a hundred days to draft the motions to dismiss

6  without any disagreement about the schedule; the hundred days

7  being measured from the time the complaint was served.  But

8  that's not entirely accurate, as I understand it, Your Honor,

9  because the complaint was never formally served.  Our clients

10  agreed to waive the service requirements as part of the case

11  management order that would have otherwise been necessary

12  under the Hague Convention, as two of our clients are in

13  Germany, Matzke and Lorem Ipsum.  So we could have asserted

14  those rights, but we didn't; we chose to comply with the case

15  management order and waive those and we've complied with the

16  case management order since.

17        And I raise that simply because I recently had to

18  do that in another case, on behalf of plaintiff, Your Honor,

19  go through Hague Convention service, actually, onto

20  defendants in Germany and it took 18 months.  So the

21  litigation could be dragging on even slower than it is right

22  now.  So in that context, I don't think the stay request

23  that's being asked of Your Honor is, in the context of

24  litigation, is that much.

25        And, finally, the case management order dates are

1   really not compressed.  Fact discovery doesn't end until

2   May 17th, 2024.  Expert reports start in July.  Expert

3   depositions have to be completed in October 2024.  We don't

4   even have a trial date set.  So all a stay would do, Your

5   Honor, is essentially roll back those deadlines by

6   approximately 90 days or so if Your Honor did grant the stay.

7            So in the context of the proceeding and within the

8   larger context of the cases, we don't think it's much of an

9   ask and we do think it's appropriate here, Your Honor.

10           So, unless Your Honor has any questions?

11           THE COURT:  No questions, thank you.

12           MR. KEANE:  Thank you, Your Honor.

13           MR. EHRENBERG:  Good afternoon, Your Honor.

14   Stephen Ehrenberg from Sullivan & Cromwell on behalf of the

15   plaintiffs in this action.

16           Mr. Gebhardt said that the facts are not in

17   dispute on the motions for dismissal on the basis of a lack

18   of subject-matter jurisdiction.  That is simply not accurate.

19   The facts are contested and the plaintiffs will brief that

20   motion on the agreed schedule and demonstrate those factual

21   and legal errors in the motions to dismiss in the main case

22   on the agreed schedule, which is now the same schedule as the

23   schedule for the adversary proceeding motion to dismiss.  So

24   no reason those two motions to dismiss couldn't be heard on

25   the same day in the same hearing in January.  So we're not

1  that far away.

2        Obviously, all of the facts upon which that motion

3  to dismiss is based were known to all stakeholders in this

4  action a year ago when the case was filed.  Nothing new has

5  happened.  Nothing has changed.

6        All that the defendants are saying is they didn't

7  discover this purported silver bullet until now and, in fact,

8  Mr. Williams didn't find it until someone else found it for

9  him.  And, Your Honor, we submit that is not an excuse for

10  delaying a motion that could have been brought back in

11  August, long before the plaintiffs in this action started

12  expending substantial estate resources to meet their

13  discovery obligations in this case and to prepare to take

14  discovery in this case.

15        So the notion that no prejudice will happen in the

16  few weeks or months that this stay is in place is, first of

17  all, nonsense.  But putting that aside, we have already been

18  prejudiced if the stay is entered, because we have already

19  done a tremendous amount of work which we describe in the

20  brief.

21        So the bottom line here, Your Honor, is that this

22  motion is egregiously untimely and, from our perspective, it

23  appears that it has been delayed to obtain a tactical

24  advantage and to cause maximum disruption to our case in our

25  efforts to recover assets that have been fraudulently

1  conveyed to these defendants.

2         And the parties discussed the possibility of the

3  stay in August -- August 3rd, to be exact -- in a meet-and-

4  confer, our first.  The defendants asked for an agreed stay

5  of discovery, pending motions to dismiss for all of the

6  reasons that have been articulated here today, other than

7  subject matter.

8         And we said, flat, No, absolutely not.  We need to

9  move this case forward and we intend to do so expeditiously

10 and we're going to seek discovery in the ordinary course.

11        Now, the scope of discovery that they describe,

12 I'm not going to try to redefine their scope.  They think it

13 is what it is.  But whatever they think it is, it hasn't

14 changed since August 3rd.  If they thought that they would be

15 prejudiced by engaging in discovery prior to a decision on

16 the motion to dismiss, their time to join issue on that was

17 early August, not after we have done a lot of work that I'll

18 describe.

19        And during the hundred days that they asked for to

20 respond, we could have easily dealt with this a long time ago

21 and we wouldn't be here today, but they didn't do that;

22 instead, they delayed this motion until days before their

23 discovery responses to us were due, and at a time when, of

24 course, we're working on our opposition to their motions to

25 dismiss.

1           In between August 3rd and the time that they have

2   filed their motion, there were a lot of events that called

3   for the defendants to raise their hands and say, you know

4   what?  Something has happened.  We have a new idea.  Stop

5   what you're doing.  Don't spend anymore estate resources.

6   Let's talk about a stay again.

7           But they didn't do that; instead, they negotiated

8   a case management order with us and we worked out dates and

9   that was a negotiation.  So the idea here, now, that, well,

10  we can just extend them, that's not how a negotiation works.

11  We gave things up.  They gave things up.  And we reached an

12  agreement.  That's why the cases we cite talk about the

13  entering of a scheduling order being important to the

14  issuance of a motion to stay, because those dates should be

15  reliable.  Everybody should be able to rely on them, unless

16  something changes.

17          So they negotiated a CMO with us and that CMO

18  includes a substantial completion date for documents, which

19  is not in May.  It's January 31, which is rapidly

20  approaching.  And that was a negotiated point.  We negotiated

21  hard for a substantial completion deadline because it's

22  important to us to be able to know when we will have most of

23  the documents and begin to plan out our deposition schedule.

24          So, after negotiating the CMO, and I think Your

25  Honor mentioned that a CMO was in place and would guide when

1  productions are required, it also requires rolling

2  productions in advance of that substantial completion date.

3  After the CMO was entered, while we certainly did not

4  anticipate a motion to stay, because we kind of dealt with

5  that issue already, we certainly anticipated that the

6  defendants might do something to try to extend the schedule

7  here.

8           So we wrote them a letter on September 21.  Now I

9  think it's interesting that counsel has acknowledged that

10  they discovered the silver bullet in September.  We sent them

11  a letter on September 21 and said, the plaintiffs are

12  preparing for discovery.  We're doing a lot of work.  We're

13  gathering data, gathering documents, processing them,

14  reviewing them, identifying things that are going to be

15  responsive to your requests, figuring out who our custodians

16  are, extending substantial estate resources.

17           And, we said, we expect you to do the same,

18  because we are going to be prepared to produce documents to

19  you promptly upon the service of data requests on the

20  schedule agreed in the CMO and we don't want to have a

21  situation where we serve our doc requests, you wait 30 days,

22  you serve objections, then we meet and confer and we figure

23  out our search terms and, you know, we're in March before

24  anyone is producing documents.

25           So we wrote all this out and we asked them at the

1  end of that letter, we assume you're doing the same.  Please

2  confirm that you are, and if you're not, tell us, and tell us

3  why you're not.

4          So, if they had discovered, at that point, that

5  they had a new motion that they wanted to file and that maybe

6  there was going to be a stay, it was incumbent upon them to

7  say that, at least by then.  And maybe we could have joined

8  issue in September, because we've done a lot of work between

9  September and now.

10         Mr. Gebhardt said the case is at its inception.

11  It's not at its inception; discovery has started.  We have a

12  CMO in place.  Everybody has served initial disclosures.  We

13  have served discovery on non-parties.  Those non-parties are

14  now expending their own resources to respond to our discovery

15  requests.  We met and conferred with both of those non-

16  parties and worked out what is being done.  One of them is

17  actually represented by the same counsel as Mr. Gruhn and

18  Mr. Matzke, so there are no surprises here.  A lot of work is

19  being done.

20         We have served discovery on the defendants.  Both

21  have objected.  Mr. Williams has granted himself a stay of

22  discovery until this Court decides this motion.  It's unclear

23  whether Mr. Gruhn or Mr. Matzke intend to produce in advance

24  of a decision on this motion, but either way, we think that

25  is inconsistent with the law.

1      The defendants, in fact, have served voluminous

2  discovery requests on plaintiffs, well after the time that

3  they decided that they had another motion to file.  They have

4  served 77 requests for documents, 12 requests for admissions,

5  18 interrogatories.  And since the day they arrived, the

6  plaintiffs have been working on responding to them.  We have

7  substantial drafts that are in progress and we intend to

8  respond on the due date, which is the day after Thanksgiving,

9  for what that's worth.

10      So, Your Honor, we've done a lot of work here to

11  prepare for discovery and we are ready today to produce

12  thousands of documents to the defendants.  The only reason we

13  haven't, and we have advised them of such, is that they

14  haven't signed a protective order.

15      Now, there's a protective order under negotiation,

16  but we gave them the opportunity to sign the protective order

17  in the main case in September when we sent them the letter.

18  We said, you know, as part of our preparation, you should

19  sign this order so we can make productions to you.  They

20  didn't.  Not only did they not raise their hand in September,

21  they did not respond to that letter in any way, shape or

22  form.  Nothing.  Silence.

23      So in addition to the thousands of documents that

24  we have identified through our searches and our work, we have

25  also undertaken substantial work to make a document-review

1   platform available to all of the defendants in all of the

2   avoidance actions that will have certain of the materials

3   that were produced to the criminal authorities in the

4   Southern District of New York and that has taken a fair

5   amount of time and expense, as well.  It is up and running

6   and we can grant them access to it today if they had signed a

7   protective order.

8          We continue to do substantial work to respond to

9   the discovery requests that have been propounded on the

10  plaintiffs and will continue to do so until ordered otherwise

11  or the due date arrives and we respond.  All the while, our

12  substantial completion deadline of January 31 is approaching

13  and at no point anywhere in this timeline, until last

14  Wednesday, did the plaintiffs say anything about any change

15  in view on the schedule for discovery, anything about a stay

16  motion, nothing.

17         So, Your Honor, we think that the delay in

18  bringing this motion, which could have been brought a year

19  ago, at least the underlying motions to dismiss for subject-

20  matter jurisdiction could have been brought a year ago, that

21  alone warrants an inference that this motion is an attempt to

22  gain a tactical advantage, which is improper.

23         The defendants want to talk about the merits of

24  their motion to dismiss for lack of subject-matter

25  jurisdiction.  They cite a lot of cases from New York.  I'm

1  not clear why; there's perfectly good cases in Delaware about
2  the standard to issuing a stay of discovery.  And those cases
3  expressly say you don't look at the merits of the motion to
4  dismiss.

5          I think there's a good reason for that, right,
6  because if the standard was, well, I've got a really good
7  motion to dismiss, everybody would want a stay of discovery,
8  pending the motion to dismiss, and then the Court is going to
9  be in the position of always trying to sort of predict the
10 outcome of the motion.

11         That's just not what the cases call for.  The
12 cases call for an analysis of the prejudice against the
13 moving party -- I'm sorry -- against the non-moving party;
14 the status of the litigation, where it is and where discovery
15 has proceeded; and whether a stay would simplify issues for
16 the trial, which is really about when you're sort of working
17 with multiple litigations and the decision in one would have
18 an effect on the other.

19         So, really, we think what matters here is what's
20 the status of this litigation?  What's the status of
21 discovery?  And what's the prejudice to the plaintiffs of
22 granting this stay?

23         And, Your Honor, we submit that we would be deeply
24 prejudiced by a stay here, given all the work that we have
25 already done, the amount of discovery that has taken place so

1  far, and from our perspective, if they're right about the

2  scope of discovery, that is a reason to get started, not to

3  delay further.

4        And, you know, the courts expressly say we should

5  not be looking at the underlying merits.  We can look at the

6  Petro case, the Cabot (phonetic) case, the Cipla case that we

7  cite in our brief; all of them stand for that proposition.

8        Let me see if there's any other notes from -- Your

9  Honor, unless you have questions for me, I think that's all I

10  have.  We would ask that the Court deny the motion, order the

11  defendants to begin producing under the CMO, as they're

12  obligated to do, and to deny any requests for an extension of

13  the carefully negotiated schedule, and to award expenses

14  incurred in responding to this untimely motion.

15        THE COURT:  Okay.  Thank you.

16        A brief response?

17        MR. GEBHARDT:  One thing, Your Honor, that the

18  plaintiffs like to gloss over is who the defendants are.

19  Brandon Williams, while he's a defendant, is not the same as

20  the other three defendants.  Brandon Williams was gone from

21  the company in November of 2021; the other defendants stayed

22  with the company and had access to what was going on.

23  Brandon Williams' claim was over at that point.

24        Now, you'll hear about the defendants and they

25  lump Brandon Williams in with everyone else, except there's a

1   complete distinction much the claims against Brandon

2   Williams, particularly in that complaint that was filed,

3   border on the preposterous.  The things like saying Brandon

4   Williams was given millions of dollars because he was a

5   personal friend of Samuel Bankman-Fried are ridiculous.

6   All --

7            THE COURT:  Well, I don't know that, and you're

8   testifying.  I don't know any of that.

9            All I got to go with is what's in the complaint

10  and I've got to accept what's in the complaint as true.

11           MR. GEBHARDT:  Well, I understand that, Your

12  Honor, and we certainly will -- we have a motion for summary

13  judgment, which basically negates that.

14           But apart from it, when we negotiated or discussed

15  the case management order, we simply had the complaint.  We

16  had a due date of September, which -- in September, like

17  the 25th or something, which was, under the Rules after

18  Brandon Williams was properly served, we were prepared to

19  respond to it.  When the discussions went on about a case

20  management order, we planned to file a motion to dismiss for

21  failure to state a claim and it didn't seem worthwhile.  We

22  thought staying discovery might be a sensible thing to do.

23  We weren't going -- we didn't argue for it.

24           When the --

25           THE COURT:  Did you respond to the -- why didn't

1  you respond to the September 21st letter that they sent to

2  you?

3         MR. GEBHARDT:  I don't think I got it.

4  September 21, I'm not even sure we were served then.  I mean,

5  we may have been served a letter.  Off the top of my head, I

6  can't respond to that at the moment, Your Honor.

7         But the case management order was negotiated

8  principally by the other defendants and their lawyers, with

9  the exception of a couple minor suggestions we may have made.

10  We didn't argue about anything on it.  Now --

11         THE COURT:  But you agreed to it.

12         MR. GEBHARDT:  Well, we agreed to it, yes, because

13  what we saw was a complaint that was facially defective and

14  we believed would not stand on its own.

15         When they asked for things to carry over until the

16  end of October for responses to be filed, we didn't ask for

17  that, but we agreed to it and that's why we raised the

18  summary judgment motion.

19         The question about whether subject-matter

20  jurisdiction should have been known to us, remember, this is

21  an Antiguan corporation.  We knew Bankman-Fried had principal

22  ownership, but we didn't know the level of his ownership.  We

23  didn't have a copy of the corporate charter, which the other

24  defendants were able to get.  We had no knowledge of what the

25  international business corporation law was, nor did we see a

1  need to do that at that time.

2          We saw a defective complaint and we planned to

3  respond to it and then when we got some information, we

4  converted that both, to the motion to dismiss and the motion

5  for summary judgment.

6          THE COURT:  Have you been preparing to respond to

7  the discovery requests?

8          MR. GEBHARDT:  We filed our response to the

9  motion -- to the document requests.  We have documents

10  gathered, yes.

11          If you told us we had to respond next week, we

12  could produce our documents.  Brandon Williams has very

13  little documentation on these things.  He was out of the

14  company -- out of the organization.  He didn't do the

15  negotiating for the purchase and the second transactions.

16          Where we're going to get hurt is, not so much in

17  producing what we have, because it's not that large, but all

18  these documents that supposedly the plaintiffs have, we now

19  have to go through them.  We've got to go over them.

20          The other defendants have to produce documents.  I

21  haven't seen what they have.  All these other things, it's

22  not just what we've got to gather.  We've got to go do the

23  reviewing and do the work like that.

24          And, frankly, these plaintiffs say, Well, gee,

25  look at all the work we've done.  They're going to have to do

1  a lot of additional work.  It's not just that, gee, here's

2  some documents.  They're all done.  It won't work like that.

3          But we responded.  We did what we thought was

4  right when the motion -- the subject-matter jurisdiction

5  motion came up, we looked at it and said there is no way,

6  based on what's been filed, that subject-matter jurisdiction

7  exists in the bankruptcy case or in this court and we're

8  going to join in.  And we suggested staying discovery until

9  it's done because it harmed no one and they refused.  We

10  filed the motion and we're here.

11          But if the Court says you've got to go forward

12  and, frankly, our motion -- our response to the document

13  requests said if the Court denies the motion for a protective

14  order, we'll produce documents.  But we don't get, under the

15  Federal Rules, they don't get to tell us how many days after

16  our 30-day response is filed, we have to give them the

17  documents.  They don't get to tell us where we have to give

18  them.  We don't have to deliver them to New York, which is

19  what the document request said.  We'll work on and arrange --

20  we have an e-discovery person that can exchange the

21  platforms.  But wasting money should not be -- it's not in

22  our best interests and it certainly shouldn't be in the best

23  interests of the estate.

24          So we'd ask the Court to grant this limited

25  protective order and keep us all from wasting time, money,

1  and effort, and undue burden and expense in the transaction.

2  Thank you.

3           THE COURT:  Thank you.

4           A response from the other defendants?

5           MR. ROSENBLAT:  Your Honor, Heath Rosenblat of

6  Morrison Cohen on behalf of Patrick Gruhn, Robin Matzke, and

7  Lorem Ipsum UG.

8           Here, do you want to -- do you have something?

9           THE COURT:  Go ahead, Mr. Rosenblat, briefly.

10          MR. ROSENBLAT:  Thank you, Your Honor.

11          THE COURT:  Well, I don't know why we're switching

12  counsel here on making the argument, but I'll give you like

13  30 seconds.

14          MR. ROSENBLAT:  The reason, Your Honor, is because

15  Mr. Keane was not engaged at the time that the CMO was

16  negotiated and I thought there were a few points that could

17  be highlighted for Your Honor.  That's all, Your Honor.

18          So very, very quickly.  The dates in the CMO and

19  the substantial compliance of January 31 is under Section, I

20  think it's (B)(6) of the CMO, is with respect to the initial

21  requests and that is the first request.  I think it's clear

22  that this is going to be a very big case and that there could

23  be a number of requests.

24          So that January date is kind of a false

25  negative -- it's a false positive as to the time frame in

1  which things are going to be produced.  As Mr. Keane laid

2  out, fact discovery ends at the end of May and expert

3  discovery is -- May 2024 -- and expert discovery ends in

4  October of 2024.  So there still is significant time out

5  there.

6          With response to why, I guess Mr. Ehrenberg said

7  no one replied to his letter.  There was complete silence.

8  That's inaccurate and their open papers highlight that at

9  page 55 of 58 in 42-2, which is Mr. Ehrenberg and I had a

10 phone conversation about it.  The September 21 letter is

11 pretty much a statement of what they're doing and while

12 they're -- there's a statement at the end of it about what,

13 you know, what's going on, on your end?  It really wasn't

14 asking a question of us.  It was telling us what we were

15 supposed to do.  It didn't need responded to and that is what

16 I told Mr. Ehrenberg in our particular phone call.  So it was

17 responded to; it just wasn't responded to in writing.

18          As to the protective order, we submitted a redline

19 to them and are waiting on comments back.  It's being

20 negotiated.  No deadline in the CMO has been missed.

21 Everything has been complied with.

22          And I just want -- one last point, Your Honor.

23 The emphasis on the one year, and everybody -- this case has

24 been going on for one year.  We fully appreciate that and we

25 applaud the herculean effort of Sullivan & Cromwell and what

1  they've done to this date.  We were not involved in this

2  matter -- I need to emphasize this -- we were not involved in

3  this matter until July.

4          The defense of subject-matter jurisdiction, as all

5  litigators know, developed organically as we were putting our

6  papers together.  There was no looking at this case a year

7  ago.  There was July.  And as Mr. Keane represented to the

8  Court, the first month and a half was negotiating the CMO and

9  getting things in place like that, and then, once we got into

10 briefing, that's when it developed, Your Honor.

11         Those are the only points I would like to

12 highlight for the Court.  Thank you for the opportunity to

13 speak.

14         THE COURT:  All right.  Thank you.

15         MR. ROSENBLAT:  Thank you, Your Honor.

16         THE COURT:  All right.  I'm going to deny the

17 motion for protective order.  I think the CMO was already in

18 place.  The parties agreed to it.  Discovery has already

19 begun.  While documents have not been exchanged, the debtors

20 have indicated that they have undertaken a lot of work in

21 order to respond to discovery requests that were issued by

22 the defendants.

23         The defendants have indicated that they have

24 prepared or are prepared to produce documents in accordance

25 with the case management order and, therefore, I find that

1   there would be prejudice to the debtors, the plaintiffs if

2   they had to stay this.

3            And I also, I agree with the comment that if the

4   discovery is as complex as it's going to be, then it needs to

5   get started now.  There's no reason to delay it.

6            All I have in front of me at this point is the

7   motion to dismiss and the brief in support.  I haven't seen

8   the response.  So even if I had to consider whether the

9   merits of the motion are valid or not, I don't have any basis

10  to do that.

11           So at this point, the motion is denied.  I'm not

12  going to award fees or costs, but I will direct the

13  defendants to respond to discovery as set forth in the CMO.

14  If that means you have to produce documents on a rolling

15  basis beginning next week, then do it.

16           Anything else?

17      (No verbal response)

18           THE COURT:  The parties should meet and confer and

19  submit a form of order under COC.

20           COUNSEL:  Thank you, Your Honor.

21           UNIDENTIFIED SPEAKER:  May we be excused, Your

22  Honor?

23           THE COURT:  Yes, you may be excused.  Thank you.

24           All right.  Let's take a short recess before we go

25  to the last item on the agenda and we'll go from there.

1          We'll reconvene at -- let's make it -- let's take

2   a 10 -- well, we've got quite a few people.  Let's take --

3   we'll reconvene at 3:30.  That clock is wrong.

4          UNIDENTIFIED SPEAKER:  It is wrong, Your Honor.

5          THE COURT:  Thank you.

6       (Recess taken at 3:10 p.m.)

7       (Proceedings resumed at 3:30 p.m.)

8          THE COURT:  Whenever you're ready.

9          MR. KORNFELD:  Good afternoon, Your Honor.  Alan

10  Kornfeld, Pachulski Stang Ziehl & Jones, for PLS Canada on

11  Number 13.  With me at counsel table is my partner James

12  O'Neill.

13         MR. O'NEILL:  Good afternoon, Your Honor.

14         MR. KORNFELD:  And also at counsel table, Your

15  Honor, I have the pleasure of introducing the Court PLS

16  Canada's founder and present CEO, Dr. Edward Mills.

17         THE COURT:  Welcome.

18         MR. KORNFELD:  Your Honor, we're happy to do this

19  any way you'd like to do it, but we do have evidence and the

20  evidence, in connection with Motion 13 from PLS Canada's

21  standpoint is Dr. Mills' declaration, which is at Docket 36,

22  and his supplemental declaration, which is at Docket 46, and

23  Exhibits 1 through 10, which are the exhibits that were

24  referenced in connection with the original declaration at

25  Docket 36 and Exhibits A through I, which are attached to the

1 supplemental declaration.  All of these exhibits are on the

2 witness and exhibit list that we submitted to the Court.

3            I did have the opportunity to confer with

4 Ms. Wheeler before the hearing and there are no objection to

5 any of those exhibits.  I would add, Your Honor, with respect

6 to the exhibits admitted by the debtors in opposition, there

7 are no objections by PLS Canada to those exhibits.  So we

8 don't have any evidentiary disputes today.

9            In terms of testimony, we would proffer Dr. Mills'

10 original declaration at Docket 36 and supplemental

11 declaration at Docket 46 as his direct testimony and move

12 those declarations and his exhibits into evidence.  He is

13 available for cross-examination and counsel has advised that

14 they wish to cross-examine.

15            THE COURT:  Okay.  Any objection?

16            MS. WHEELER:  No, Your Honor.

17            THE COURT:  Okay.  The declarations and the

18 exhibits are admitted, without objection.

19       (Mills Declaration received in evidence)

20       (Mills Supplemental Declaration received in evidence)

21       (PLS Canada's Exhibits 1 through 10 received into

22 evidence)

23       (PLS Canada's Exhibits A through I received into

24 evidence)

25            MR. KORNFELD:  Your Honor, would you like

1 Dr. Mills to take the stand?

2         THE COURT:  Yes, let's go ahead and do the cross

3 and we'll go from there.

4         Dr. Mills, can you please come up, take the stand,

5 and remain standing for the oath.

6         THE CLERK:  Please raise your right hand.

7         Please state your full name and spell your last

8 name for the court record, please.

9         MR. MILLS:  Edward Joseph Mills, M-i-l-l-s.

10      EDWARD J. MILLS, PLS CANADA'S WITNESS, AFFIRMED

11         THE WITNESS:  I do.

12         THE CLERK:  You may be seated.

13         Your Honor?

14         THE COURT:  You may proceed.

15         MS. WHEELER:  Good afternoon, Your Honor.

16         Stephanie Wheeler from Sullivan & Cromwell for the

17 FTX debtor plaintiffs.  I apologize, I'm a bit under the

18 weather, so I will try to keep my voice up.  I have also

19 lived far too much of my life in New York, so I speak too

20 fast.  So please let me know if you need me to slow down.

21         Your Honor, may I approach to hand the Court and

22 Mr. Mills a copy of the binders of exhibits I intend to use

23 on his cross-examination?

24         THE COURT:  Yes, please.

25         THE WITNESS:  Thank you.

1          THE COURT:  Thank you.

2                    CROSS-EXAMINATION

3  BY MS. WHEELER:

4  Q    Okay.  Mr. Mills, if you'll please turn to Tab 1 of the

5  binder.  It's a copy of your first declaration, dated

6  September 15th, 2023, that was submitted in support of PLS'

7  motion to dismiss for lack of personal jurisdiction; is that

8  correct?

9  A    (No verbal response.)

10 Q    You have to verbalize your answer.

11 A    Yeah, that's correct.

12 Q    Okay.  And you may want to move the microphone closer

13 to you.  There you go.

14      Okay.  Now, in submitting your declaration, you

15 endeavored to make sure that the statements were accurate,

16 correct?

17 A    Correct.

18 Q    You didn't want to make any misstatements in your

19 declarations submitted to the Court, correct?

20 A    That's correct.

21 Q    If you turn to page 6 of your declaration, the last

22 page, that's your electronic signature on the declaration; is

23 that right?

24 A    It is.

25 Q    And you understood that in signing this declaration,

1  you declared under penalty of perjury that to the best of

2  your knowledge, information, and belief, the information in

3  the declaration is true and correct, right?

4  A     That's correct.

5  Q     Okay.  We'll do the same with Exhibit 2, which is your

6  supplemental declaration, dated October 6th, submitted in

7  connection with PLS' reply brief; is that accurate?

8  A     That's correct.

9  Q     Okay.  And as with your first declaration, you

10  endeavored to make sure the statements in the supplemental

11  declaration were accurate, correct?

12  A     Correct.

13  Q     You didn't want to make any misstatements in your

14  supplemental declaration, correct?

15  A     That's correct.

16  Q     And on page 10 of Tab 2 of your supplemental

17  declaration is your electronic signature, correct?

18  A     That's correct.

19  Q     Again, in signing the supplemental declaration, you

20  declared under penalty of perjury that to the best of your

21  knowledge, information, and belief, the foregoing information

22  is true and correct, right?

23  A     That's correct.

24  Q     Okay.  Mr. Mills, I'd like to begin by asking you some

25  questions about the PLS leadership team, okay.

1      If you'll turn to Tab 2, which is your supplemental

2   declaration and go to paragraph 12, please.  It's on page 5.

3   In the second sentence, you state:

4         "PLS Canada's leadership team, headed by me and

5   Mr. Zimmerman, until his departure in May 2023, has been

6   based in Canada and includes chief operating officer Dr.

7   Jamie Forrest and CFO Chris Clarke; both of whom are Canadian

8   citizens and residents."

9      Do you see that?

10  A    Yes.

11  Q    That wasn't the composition of the PLS leadership team

12  as of June 1st, 2023, was it?

13  A    No, it was not.

14  Q    And that wasn't the composition of the PLS leadership

15  team as of July 19th, 2023, when the complaint was filed?

16  A    That's correct.

17  Q    Okay.  If you'd go to paragraph 13 of your supplemental

18  declaration, just the next paragraph, the parenthetical at

19  the very end of paragraph 13 says:

20         "For example, Bob Battista, Twanna Davis, and

21  Katie Winter do not hold executive leadership positions with

22  the company."

23      Do you see that?

24  A    Yes.

25  Q    And then staying on paragraph 13, you say in a

1  parenthetical four lines up from the bottom of paragraph 13:

2          "For example, Melissa Bomben is no longer with the

3  company."

4       Correct?

5  A    That's correct.

6  Q    Is it your testimony that Melissa Bomben did not hold

7  an executive leadership position at PLS during the time that

8  she was at the company?

9  A    No, she did.

10 Q    Okay.  If you'll go to paragraph 10 of your

11 supplemental declaration, the last sentence of paragraph 10

12 says:

13         "He," referring to Dr. Mark Dybul, "is not a

14 member of management or an employee of PLS Canada."

15      Do you see that?

16 A    That's correct.

17 Q    Okay.  Now, I'd like you to turn to Tab 3 of the

18 binder.  It's a June 1st, 2023, email attaching a document

19 that you sent to debtors' investment bankers at Perella

20 Weinberg Partners and debtors' counsel at Sullivan &

21 Cromwell.

22      Do you see that?

23 A    Yes.

24 Q    Okay.  In the email at the bottom, Sam Saferstein of

25 Perella Weinberg Partners, the debtors' investment bankers

1  emailed you and Michael Zimmerman, who, until May of 2023,

2  had been the CEO of PLS; is that correct?

3  A      That's correct.

4  Q      And in the second paragraph of this email,

5  Mr. Saferstein asks for a call to discuss Latona's $50

6  million investment in PLS and to learn more about PLS,

7  correct?

8  A      Correct.

9  Q      And in the top email you reply to Mr. Saferstein that

10 you'd be delighted to discuss that with him, and in the last

11 line you say:

12            "I am attaching a deck here that I hope will be

13 helpful to you to learn more about the company."

14       Do you see that, sir?

15 A      Yes.

16 Q      And if you look at the line and sort of email header,

17 the to/from/CC part of the email where it says "attachments,"

18 are you following me?

19 A      Yes.

20 Q      Okay.  The attachment to your email is entitled "PLS

21 overview June 1, 2023.PDF."

22       Do you see that?

23 A      Yes.

24 Q      And that attachment, "PLS overview June 1, 2023" is the

25 presentation deck that's the rest of Tab 3; is that correct?

1   A      That's correct.

2   Q      Okay.  So if you turn to page 34 of the presentation

3   deck at Tab 3, page 34 is entitled "leadership team."

4          Is that correct?

5   A      That's correct.

6   Q      And the logo of PLS is in the upper left-hand corner on

7   that page, correct?

8   A      That's correct.

9   Q      Now, Bob Battista is listed as a member of the PLS

10  leadership team, correct?

11  A      In this slide, yes.

12  Q      In this slide.

13         And he was the chief strategy and commercial officer of

14  PLS, correct?

15  A      Correct.

16  Q      And Bob Battista resides and works in the U.S.,

17  correct?

18  A      That's correct.

19  Q      Twanna Davis is listed as a member of the PLS

20  leadership team on this slide, correct?

21  A      That's correct.

22  Q      And she's the chief of clinical operations, correct?

23  A      That's correct.

24  Q      And Ms. Davis resides and works in the U.S., correct?

25  A      That's correct.

1   Q      And Melissa Bomben is listed as a member of the PLS

2   leadership team on this slide, correct?

3   A      Correct.

4   Q      And she was the chief operating officer at the time,

5   correct?

6   A      That's correct.

7   Q      And she resided in the U.S., correct?

8   A      Correct.

9   Q      And Mark Dybul is listed as a member of the PLS

10  leadership team on this slide, correct?

11  A      Correct.

12  Q      And he's the executive chairperson at PLS?

13  A      Correct.

14  Q      And Mr. Dybul -- sorry -- Dr. Dybul resides and works

15  in the U.S., correct?

16  A      Correct.

17  Q      And Chris Clarke is not listed as a member of the

18  leadership team on this slide, correct?

19  A      Correct.

20  Q      And James Forrest is not listed as a member of the

21  leadership team on this slide, correct?

22  A      Correct.

23  Q      Okay.  If you'd turn to Tab 4 of the binder, this is a

24  copy of a PLS press release dated May 23rd, 2023, titled,

25  "Bob Battista joins Platform Life Sciences as EVP, chief

1  strategy and commercial officer."

2      Do you see that?

3  A    I see it.

4  Q    And the title of the press release says, "Bob Battista

5  is joining as an EVP."

6      That's executive vice president, right?

7  A    I presume so.

8  Q    Okay.  I'd like to direct you to the second paragraph

9  of the press release, the first sentence.  There's a quote

10  from you that says:

11          "I've worked with Bob Battista for over a decade

12  and I'm thrilled that he has joined the executive leadership

13  team at PLS, said Dr. Ed Mills, founder and CEO, of Platform

14  Life Sciences."

15      Do you see that?

16  A    I do.

17  Q    Okay.  I'd like you to now turn to Tab 6 of the binder.

18  This is a printout from the "About us" page from the PLS

19  website that was printed on September 26th, 2023.  You can

20  see that date in the upper left-hand corner.

21      Do you see that, Mr. Mills?

22  A    I do.

23  Q    And just to orient you -- sorry -- September 26th,

24  2023, was three days before plaintiffs filed their opposition

25  to PLS' personal jurisdiction motion.

1      Now if you turn to page 3 of 8 and go to the very

2   bottom of the page, you'll see the heading "Our team."

3      Are you with me?

4   A    I am.

5   Q    Okay.  And if you turn to page 4, 5, and 6, it lists

6   six PLS employees who were part of "Our team."

7      Do you see that?

8   A    I do.

9   Q    And on page 4, Mark Dybul is listed on the "Our team"

10  page of PLS' website as of September 26th, 2023, correct?

11  A    Correct.

12  Q    And he lives and works in the U.S.?

13  A    Yes, he does.

14  Q    And Melissa Bomben is listed on the "Our team" page of

15  PLS' website as of September 26th, 2023, correct?

16  A    That's correct.

17  Q    And she lives in the U.S., correct?

18  A    Yes, she does.

19      I'm not exactly sure if she was with us at that time.

20  Q    Okay.  Bob Battista is listed on the "Our team" page of

21  PLS' website as of September 26th, correct?

22  A    Correct.

23  Q    He lives and works in the U.S., correct?

24  A    That's correct.

25  Q    And Twanna Davis, on page 5 -- 6 -- page 6 is listed on

1  the "Our team" page of PLS' website as of September 26th,

2  correct?

3  A      Correct.

4  Q      And she lives and works in the U.S., correct?

5  A      Correct.

6  Q      And finally, on page 6, Katie Winter is listed on the

7  "Our team" page of PLS' website as of September 26th?

8  A      Correct.

9  Q      And she lives and works in the U.S.?

10  A      Correct.

11  Q      Now, if you'll turn to Tab 7 of the binder, please,

12  this is a printout of the same "About us" page of the PLS

13  website that we just looked at, at Tab 6, except this version

14  was printed on October 7th, 2023, as you can see in the upper

15  left-hand corner, okay.

16      And to orient you, October 7th, 2023, is the day after

17  you executed your supplemental declaration that we looked at,

18  at Tab 2.  Agree?

19  A      Correct.

20  Q      Okay.  If you look at the bottom of page 3 of 7, again,

21  you'll see the "Our team" heading of the PLS website as it

22  existed on October 7th, 2023.

23      Do you see that?

24  A      Yes.

25  Q      And then on pages 4 and 5, it lists four members of

1   "Our team" as of October 7th, 2023, correct?

2   A     Correct.

3   Q     So PLS removed Bob Battista from the "Our team" page of

4   its website sometime between September 26th and October 7th,

5   2023, correct?

6   A     Correct.

7   Q     And PLS removed Twanna Davis from the "Our team" page

8   of its website during the same period of time, correct?

9   A     Correct.

10  Q     And PLS removed Katie Winter from the "Our team" page

11  of its website during the same period of time, correct?

12  A     Correct.

13  Q     And Bob Battista, Twanna Davis, and Katie Winter all

14  live and work in the U.S., correct?

15  A     Correct.

16  Q     And at page 5, PLS added Jamie Forrest to the "Our

17  team" page of its website sometime between September 26th and

18  October 7th, 2023, correct?

19  A     Correct.

20  Q     And PLS also added Chris Clarke to the "Our team" page

21  of its website during the same period, correct?

22  A     Correct.

23  Q     And Jamie Forrest and Chris Clarke are both Canadians,

24  correct?

25  A     Correct.

1  Q     Okay.  I'd like to switch gears and turn to the

2  transfers of funds from plaintiffs to PLS.  If you'll turn

3  back to Tab 1, which is your original declaration and go to

4  paragraph 10, please, three lines up from the bottom, you

5  state that, "the funds from Plaintiff FTX Trading were from a

6  non-U.S. bank account."

7        Correct?

8  A     Correct.

9  Q     And if you go to paragraph 13, three lines up from the

10 bottom, again, you state that, "the funds from Plaintiff

11 Alameda were from a non-U.S. bank account."

12       Correct?

13 A     Correct.

14 Q     And in paragraph 15, you state three lines up from the

15 bottom that the funds from Plaintiff Alameda were from a U.S.

16 bank account, correct?

17 A     It must be.

18 Q     Okay.  Mr. Mills, are you aware that the plaintiffs

19 included in their opposition papers, evidence that each of

20 these transfers originated from a plaintiff bank account

21 located in the U.S.?

22 A     I was not.

23 Q     But you're aware of that now?

24 A     You just told me.

25 Q     Okay.  Well, did you not see plaintiffs' papers?

1   A      I did, but I'm not aware.

2   Q      Let me ask it a different way.

3          As you sit here today, Mr. Mills, you don't have any

4   basis to dispute that the transfers were, in fact, from bank

5   accounts of plaintiffs that were located in the United

6   States?

7   A      As I sit here today, it has not been my knowledge and I

8   am not aware that that occurred.

9   Q      That that occurred, meaning that the money came from --

10  A      That the money came from a --

11  Q      -- a U.S. bank account?

12  A      -- U.S. bank account.

13  Q      You don't know where the money came from is what you're

14  saying?

15  A      I was not CEO at the time.

16  Q      Okay.  You don't dispute that each of the transfers to

17  PLS was in U.S. dollars, correct?

18  A      Correct.

19  Q      Okay.  If you turn to Tab 2 of your supplemental

20  declaration and go to paragraph 4, please, the very last

21  sentence of paragraph 4 says:

22              "PLS [sic] had no hand in directing the process by

23  which the funds flowed into its Canadian bank."

24          Do you see that, sir?

25  A      I do.

1  Q     And if you go to Tab 9, please, the top email, it's an
2  email from you to an FTX group employee on January 31st,
3  2022.
4        Do you see that?
5  A     I do.
6  Q     And if you turn to the third page of Tab 9, you
7  attached to your email an invoice for a $3.25 million
8  philanthropic gift from FTX Trading to PLS, correct?
9  A     Possible.  I'm not sure.
10 Q     What part about that are you not sure about?
11 A     No, it must be.
12       Yes, that would be correct.
13 Q     Okay.  At the bottom of the invoice, you included wire
14 instructions for the transfer from FTX Trading to PLS,
15 correct?
16 A     Correct.
17 Q     You don't dispute that you sent plaintiffs wire
18 instructions directing plaintiffs to send U.S. dollar
19 transfers through Wells Fargo as a correspondent bank,
20 correct?
21 A     I do not dispute that.
22 Q     Okay.  If you turn to Tab 10 of the binder, please,
23 this is a February 3rd, 2022, email that you sent to the same
24 FTX group employee, three days after you sent the wire
25 instructions we just looked at.

1        Agreed?

2   A      Agreed.

3   Q      And in this email, you ask the FTX group employee to

4   let you know when the wire transfer is made for the invoice,

5   correct?

6   A      Correct.

7   Q      And that's because, in your experience, sometimes these

8   transfers get stuck in U.S.-Canadian banking system and don't

9   arrive until you inquire, correct?

10  A      Correct.

11  Q      So you don't dispute that you knew that the transfers

12  from plaintiffs to PLS were going through the U.S. banking

13  system, correct?

14  A      No, I do.

15         Perhaps, I did not understand it, but I was under the

16  impression that this was coming from a Caribbean bank account

17  and CIBC has Caribbean -- a Caribbean bank called First

18  Caribbean -- "CIBC First Caribbean" is the name of it.  So I

19  was under the impression that was the case.

20         I simply did a cut-and-paste from the information that

21  was given to me by my banker and then the invoice would have

22  been prepared by somebody else.

23              MS. WHEELER:  Mr. Mills can we get his

24  declaration, his supplemental declaration, please?

25         (Counsel confers)

1          MS. WHEELER:  Do you have it?  Do you have his

2    supplemental declaration?

3          MR. KORNFELD:  We do, thank you.

4          MS. WHEELER:  May I approach, Your Honor?

5          THE COURT:  Yes.

6          THE WITNESS:  Thank you.

7          THE COURT:  Thank you.

8    BY MS. WHEELER:

9    Q    Exhibit A to your supplemental declaration are the wire

10   instructions from CIBC that you attached.

11        Do you recall that?

12   A    I don't recall, no.

13   Q    Well, could you look and find Exhibit A.  I apologize

14   that it does not have tabs.

15   A    Sure.

16   Q    It would be the first exhibit after your signature

17   page, I presume.

18   A    Okay.

19   Q    Okay.  So attached to your supplemental declaration are

20   the wire instructions from CIBC.

21        Do you recall that?

22   A    I don't recall it.  I didn't prepare it.

23   Q    But you signed it?

24   A    I signed it.

25   Q    Okay.  And on the second page of the CIBC wire

1  instructions it says about a third of the way down the page:

2          "If you are receiving funds in USD currency from

3  the U.S., please use Wells Fargo as an intermediary bank."

4      Do you see that, sir?

5  A    I do.

6  Q    So if the funds were coming from a Caribbean bank in

7  the Caribbean, these would not be the wire instructions?

8  A    That may be.

9  Q    I'm going to switch gears again and ask you to go back

10  to Tab 2, which is your supplemental, and I'll direct you to

11  paragraph 6.  In the third line down from the top, you say:

12          "The draft presentation on which this allegation

13  is based reflects PLS Canada's existing business and ideas

14  for future business, including its hopes for future expansion

15  into the U.S."

16      Do you see that?

17  A    I do.

18  Q    And the draft presentation that you're referring to

19  there is the June 21st, 2023, presentation deck that you sent

20  to the debtors' investment bankers, which is attached at

21  Tab 3 of your binder, correct?

22  A    Correct.

23  Q    And if you turn to Tab 3 and look at the June 1st,

24  2023, email that covers the presentation deck, in your email

25  at the top to the investment bankers, you say:

1              "I'm attaching a deck here that I hope will be

2   helpful for you to learn more about the company."

3         Correct?

4   A     Correct.

5   Q     You don't say in your email that the attachment is a

6   draft presentation, correct?

7   A     Well, we discussed it.

8   Q     It doesn't say it in your email that it's a draft?

9   A     It's not in the email.

10  Q     And the presentation itself does not have the word

11  "draft" on it, correct?

12  A     It appears not to.  I did not prepare it.

13  Q     And you don't say anywhere in the email that the

14  presentation contains inaccurate information, do you?

15  A     I think we discussed that on the phone with them when

16  we had a subsequent phone call.

17  Q     But your email doesn't say that?

18  A     That's correct.

19  Q     And your email doesn't say that the presentation

20  contains PLS' ideas for future business, does it?

21  A     The email does not.

22  Q     And the email doesn't say that the presentation

23  contains PLS' hopes for future expansion into the U.S., does

24  it?

25  A     It does not.

1  Q     If you flip back to Tab 2, which is your supplemental
2  declaration, please, and refer to paragraph 6 again, the
3  second and third sentences of paragraph 6 state:
4           "The plaintiffs incorrectly allege that PLS Canada
5  operates 83 clinical trial sites in the U.S., including in
6  collaboration with CVS.  It does not."
7        Do you see that, sir?
8  A     I do.
9  Q     Now, if you'll turn back to Tab 3, which is the June
10 2023 preparation deck, I'd like you to focus on page 5 of the
11 presentation deck.
12 A     Yes, I'm familiar with that.
13 Q     On the left-hand side of the page where the United
14 States is on the map, the presentation says, "U.S.: 83 sites,
15 plus CVS trial sites."
16       Do you see that?
17 A     Yes.
18       It should have said "83 plus CVS sites."
19 Q     Plus, okay.  I'll take that.
20       83 is a very specific number, wouldn't you agree,
21 Mr. Mills?
22 A     I agree.
23 Q     The presentation doesn't say, "83 planned sites," does
24 it?
25 A     No, but I'll be happy to explain it to you.

1   Q      The presentation doesn't say, "PLS hopes to have 83

2   sites in the U.S. in the future," does it?

3   A      No.

4   Q      If you turn back to Tab 2 of your supplemental

5   declaration and refer to paragraph 6, again, there's a long

6   website that takes up an entire line about halfway down

7   paragraph 6.  The sentence after that very long website

8   reads:

9          "PLS Canada has never had a business affiliation

10  with CVS or the potential experts and access sites in the

11  U.S. identified in the draft presentation."

12         Do you see that?

13  A      I do.

14  Q      And if you turn back to Tab 3, which is the

15  presentation, and go to page 6, please.

16  A      Okay.

17  Q      The upper right-hand corner, the presentation says,

18  "Experts and site access," correct?

19  A      Uh-huh.

20  Q      And page 6 identifies in turquoise blue, by name,

21  certain universities, U.S. Government agencies, and hospitals

22  in the U.S., doesn't it?

23  A      I'm sorry, I can't read it.

24  Q      I'll read it to you.

25  University of Virginia.  That's in the U.S., right?

1  A     It is.

2  Q     Tufts University is in the U.S.?  Boston University is

3  in the U.S.?  NIH is in the U.S.?  Yes?

4  A     Yep.

5  Q     Okay.  UNICEF is in the U.S.?  University of Maryland?

6        I could go on.  There are 23 that we list in our brief.

7  So this page lists certain universities, hospitals, and

8  government agencies in the United States, right?

9  A     I do understand where this figure came from.

10 Q     This page doesn't say "potential experts and access

11 sites," does it?

12 A     Well, when you give a presentation to someone, you

13 usually, also narrate what the meaning of the figures are.

14 Q     Okay.  This page doesn't say, "future experts and

15 access sites," does it?

16 A     It reflects people we have co-authored articles with.

17 Q     I'd like to turn now to the subject of PLS'

18 incorporation of a Delaware entity.

19       The Delaware entity was incorporated with exactly the

20 same name as the Canadian entity, right?

21 A     You're telling me.

22 Q     You don't know that?

23 A     I wasn't CEO at the time.

24 Q     You had no involvement in the incorporation of the

25 Delaware entity whatsoever?

1   A      I'm sure it was discussed with me, but I was not a

2   decision-maker.

3   Q      All right.  If you turn to Tab 1, your first

4   declaration, and refer to paragraph 7, please, you say in the

5   first sentence:

6            "PLS Delaware was incorporated for the sole and

7   exclusive purpose of processing payroll, and providing

8   benefits to, the employees of PLS Canada that work remotely

9   from the U.S."

10           Do you see that?

11  A      I do.

12  Q      And are you aware, Mr. Mills, that in your opposition

13  papers, plaintiffs included an email from a Latona person

14  requesting whether Latona should require PLS incorporate in

15  Delaware?

16  A      I am.

17  Q      Okay.  If you then turn to Tab 11 of the binder, this

18  is an email that you sent to Ross Rheingans-Yoo of Latona on

19  April 4th, 2022, four days after the Delaware entity was

20  incorporated on March 31st, 2022, correct?

21  A      Correct.

22  Q      And the subject line of the email you sent reads,

23  "Delaware, Inc."

24           Correct?

25  A      Correct.

1  Q      And in the email you inform Ross Rheingans-Yoo of

2  Latona that, quote:

3          "We have now incorporated in Delaware and have all

4  the necessary registrations.  Could you advise on how to

5  proceed."

6  A      Correct.

7  Q      If you turn back to Tab 2, which is your supplemental

8  declaration and refer to paragraph 7, please, the second

9  sentence of paragraph 7, you now state in your supplemental

10  declaration that:

11          "PLS Delaware was formed in March 2022, around the

12  same time as the transactions, at Latona's request."

13          Do you see that?

14  A      I do.

15  Q      Okay.  I want to switch topics again and talk about the

16  David Sackett Award for the Clinical Trial of the Year for

17  the TOGETHER Trial.

18  A      Happily.

19  Q      Okay.  If you could -- I think we're still on Tab 2.

20  We are.  So if you go to paragraph 18 of your supplemental

21  declaration, the first two sentences, you state:

22          "The plaintiffs are also incorrect in their

23  assertion that I traveled to the U.S. in May 2022 on behalf

24  of PLS Canada.  To clarify, I traveled to the U.S. to receive

25  an award from the Society of Clinical Trials for McMaster

1  University's work on the TOGETHER Trial."

2      Do you see that?

3  A    I do.

4  Q    And the award that you're referring to in those

5  sentences is the David Sackett Award for the Clinical Trial

6  of the Year for the TOGETHER Trial, correct?

7  A    Correct.

8  Q    Now, later in paragraph 18, six lines down from the

9  top, you say:

10        "PLS Canada itself was not part of the initial

11  TOGETHER Trial."

12      Do you see that?

13  A    I do.

14  Q    Okay.  If you turn back to Tab 1, which is your first

15  declaration, and referring to paragraph 5, please, the second

16  sentence of paragraph 5 says:

17        "In May 2023, PLS Canada was awarded the Clinical

18  Trial of the Year for its accelerated clinical trial work and

19  cost-effective approaches to drug evaluations and efficacy."

20      Do you see that?

21  A    I do.

22  Q    And if you turn to Tab 12, please, this is a May 24th,

23  2023, PLS press release entitled, "Purpose Life Sciences

24  celebrates prestigious David Sackett Trial of the Year Award

25  win in 2022, extends congratulations to new awardee.

1        Do you see that?

2   A    I do.

3   Q    And if you look at the first full paragraph that's not

4   in italics, the first sentence reads:

5            "Purpose Life Sciences, a global impact research

6   organization, is delighted to announce that it was honored

7   with the esteemed David Sackett Trial of the Year Award in

8   2022 by the Society for Clinical Trials."

9        Do you see that?

10  A    I do.

11  Q    In the next paragraph, the first says reads:

12           "The David Sackett annual Trial of the Year Award

13  was given to Platform Life Sciences in 2022 for its

14  outstanding contributions to the 2021 TOGETHER Trial."

15       Do you see that?

16  A    I do.

17  Q    And if you go to the top of page 2, Mr. Mills, you're

18  quoted as saying, quote:

19           "In winning the 2022 David Sackett Trial of the

20  Year Award, we're humbled and grateful to have been chosen

21  from a pool of highly accomplished contenders and we extend

22  our deepest appreciation to the judges and the Society for

23  Clinical Trials for this remarkable honor, said Dr. Ed Mills,

24  founder and CEO of Purpose Life Sciences."

25       Do you see that?

1  A      I do.

2  Q      And if you go to Tab 4, which is the press release that

3  we looked at earlier, announcing the hiring the Bob Battista,

4  if you look at the very last sentence of the press release,

5  which begins at the bottom of page 2 and carries over to the

6  top of page 3, it reads:

7            "Platform Life Sciences designed and implemented

8  an innovative, adaptive platform trial called the TOGETHER

9  Trial, receiving global recognition, including the 2021,

10  awarded in 2022, David Sackett Trial of the Year Award by the

11  Society for Clinical Trials."

12      Do you see that?

13  A      I do.

14  Q      Okay.  Last subject, Mr. Mills.

15      If you go back to Exhibit -- or sorry, Tab 2, your

16  supplemental declaration and go to paragraph 15, please, it

17  starts at the bottom of page 5 and carries over to page 6.  I

18  want to go to page 6 and it's five lines down from the top.

19      There's a sentence that starts, "I have not, to date."

20  Everybody with me?  You with me, Mr. Mills?

21  A      Yes.

22  Q      Okay.

23            "I have not to date been active as a senior

24  scientist with VirX@Stanford, which is a global pandemic

25  response initiative made up of academic from all over the

1  world.  It is not a position at Stanford University in Palo

2  Alto."

3        Do you see that?

4  A    I do.

5  Q    Okay.  So I'd like you to turn to Tab 1, which is your

6  first declaration and refer to paragraph 1 on page 2.  Seven

7  lines down from the top, it says -- you state:

8            "I am also a senior scientist at VirX@Stanford,

9  developing new antiviral agents."

10       Do you see that?

11 A    I do.

12 Q    And if you go to Tab 3, which is the June 1st deck, and

13 turn to page 35, please, underneath the picture of you on the

14 left-hand side, this second entry says, "Senior scientist,

15 Stanford University."

16       Do you see that?

17 A    I do.

18 Q    And if you go to Tab 13, this is your LinkedIn profile,

19 Mr. Mills?

20 A    Uh-huh.

21 Q    At the bottom of page 1, under the heading

22 "Experience," the first entry reads:

23            "Senior scientist, VirX@Stanford, June 2022

24 through present, Stanford, California, United States."

25       Do you see that?

1  A      I do.

2           MS. WHEELER:  I have no further questions.

3           THE COURT:  Thank you.

4           Redirect or anybody else wish to cross, I should

5  ask?

6       (No verbal response)

7           THE COURT:  Okay.  Redirect?

8           MR. KORNFELD:  Thank you, Your Honor.

9       (Pause)

10           MR. KORNFELD:  Your Honor, we have some exhibits.

11  They may be repetitive, so I'll try to stay with what counsel

12  already used.  But in the interests of not interrupting the

13  flow of the redirect, may we distribute them?

14           THE COURT:  Yes.

15           MR. KORNFELD:  They are exhibits that are on our

16  list.

17           THE COURT:  In the event of future hearings, I

18  prefer the exhibits be provided in electronic binders so I

19  can just bring it up on my screen, rather than having piles

20  of documents up here.

21           MR. KORNFELD:  We did that, too.

22           THE COURT:  Okay.  Well, if you have it, I can

23  open that up.

24           MR. KORNFELD:  Yeah, they're all exhibits that you

25  have on your electronic screen, Your Honor.

1    THE COURT:  All right.  As long as you've got it,

2  I'll take it.

3    MR. KORNFELD:  Okay.

4    May I proceed?

5    THE COURT:  Go ahead.

6    REDIRECT EXAMINATION

7  BY MR. KORNFELD:

8  Q    Counsel called you "Mr. Mills."

9    Do you have a doctorate degree?

10  A    I do.

11  Q    Can you tell the Court what that degree is?

12  A    It's in clinical epidemiology.

13  Q    From what university?

14  A    From McMaster University.

15  Q    Are you a university professor, Dr. Mills?

16  A    I'm a full professor.

17  Q    Where are you a university professor?

18  A    At McMaster University.

19  Q    Are you affiliated with any other universities?

20  A    I am affiliated with the University of Rwanda and that

21  is the only thing I've signed a contract on.

22  Q    So let's talk about VirX@Stanford.

23  Are you employed by Stanford University?

24  A    No.

25  Q    So what is your affiliation with VirX@Stanford?

1  A       So VirX@Stanford was an international collaboration of

2  people all working on antiviral agents and it was a way for

3  those collaborators to communicate with one another.

4  It has, unfortunately, not turned into much; although, it

5  sounds like it's an impressive institution, they haven't even

6  had a single meeting yet.

7  Q       Have you done anything for VirX@Stanford?

8  A       No.

9  Q       Has PLS ever been affiliated with VirX@Stanford?

10 A       No.

11 Q       Has PLS ever done a clinical trial for VirX@Stanford?

12 A       No.

13 Q       Has PLS ever entered into any contracts with

14 VirX@Stanford?

15 A       No.

16 Q       Counsel asked you a series of questions about the

17 TOGETHER Trial.

18         What was your personal involvement in the TOGETHER

19 Trial?

20 A       So my personal involvement was in 2020 at the beginning

21 of the pandemic, I had been involved in multiple clinical

22 trials around the world and at some point, I realized they

23 were all quite deficient in their aim to do outpatient of

24 COVID and so I put together what is called an "adaptive

25 platform trial."  It's a very unique type of clinical trial

1  where you can evaluate multiple interventions at the same

2  time.

3      This would be unusual for you to see, but you might be

4  familiar with the Oxford University RECOVERY Trial.  The

5  reason we know that dexamethasone saves lives, that's a

6  similar kind of trial.  And, interestingly, in 2021, they won

7  the Clinical Trial of the Year.  We won the 2022 for using a

8  similar design, but we were using outpatient treatment.

9  Q    In 2020 was there a PLS Canada?

10 A    No, there was not.

11 Q    Was there any PLS?

12 A    (Inaudible.)

13 Q    You're shaking your head.

14     You have to answer out loud.

15 A    No, there was not.

16 Q    You were nice enough to give credit to PLS for the work

17 on the TOGETHER Trial.

18     Why did you do that?

19 A    Well, midway through the trial, we became PLS because

20 we had multiple funders who were coming forward and we

21 thought that we might be able to engage biotechs also that

22 would put interventions and money into evaluating different

23 interventions for COVID.

24         THE COURT:  Can you pull the microphone -- I'm

25 having a hard time hearing you.  I want to make sure we pick

1  you up on the recording.

2          THE WITNESS:  Sure.  I'm sorry about that.

3          So PLS was incorporated, I think, in 2021 at some

4  point.  I had begun the trial at McMaster University, where I

5  hold my academic position.  And at some point, we realized

6  that the University didn't want to continue doing the trial

7  because there wasn't much overhead for them.  Unfortunately,

8  that's the way that universities work.

9          And so we were interested in moving as quickly as

10  we could so that we could evaluate multiple interventions in

11  the trial and that was done mostly as a company, as a

12  commercial entity, and that's the reason we established PLS.

13  BY MR. KORNFELD:

14  Q    Was that TOGETHER Trial done in the United States?

15  A    No, not a single patient was ever recruited there.

16  Q    Where was the TOGETHER Trial done?

17  A    Predominantly in Brazil and Canada and, subsequently, a

18  little bit in South Africa.

19  Q    And as long as we're talking about trials done in the

20  United States, has PLS Canada ever done a single trial in the

21  United States?

22  A    No, we have not.

23  Q    Has PLS Canada ever done any business whatsoever in the

24  United States?

25  A    Yes, we have.

1  Q    What was that business?

2  A    We engaged with two companies to do clinical trials

3  outside of the United States.  One was a company called

4  "Eiger," where we had done a clinical trial in Brazil and

5  they gave a small amount of money to finish up that clinical

6  trial.  And another one was called "GreenLight Bio," where we

7  were doing a trial for them in Rwanda and, subsequently, that

8  trial never occurred.

9  Q    Other than those two transactions, has PLS ever done a

10 transaction with U.S. companies?

11 A    No.

12 Q    I'm going in reverse order than what counsel did, but

13 it seems to make sense.

14      Counsel asked you about a Delaware entity, which has

15 also been sued and that's PLS Delaware.  What does PLS

16 Delaware do?

17 A    PLS Delaware doesn't do a lot, but it manages the

18 salaries of the eight employees who are U.S.-based and covers

19 somehow paying their health insurance.

20 Q    Does PLS Delaware do anything else?

21 A    It does not.

22 Q    Now, counsel showed you a series of emails where there

23 was a discussion of forming PLS Delaware.  It sounded like to

24 do more than that.

25      What happened?

1  A      Well, I wasn't CEO at the time, but I think that you're

2  referring to the communication with Ross Rheingans-Yoo.  We

3  had a communication with him.  He was not sure.  He

4  represented Latona and the lawyer for Latona happened to be a

5  Canadian and said, No, actually, we'd rather do this deal in

6  British Columbia.

7  Q      And by "this deal," what are you referring to?

8  A      Oh, sorry.

9         The investment and service contract.

10 Q      And that was the investment and service contract with

11 Latona --

12 A      With Latona and PLS Canada.

13 Q      Was that the investment and service contract, just to

14 put a pin in it, that was funded you discovered, by FTX

15 Trading and Alameda Trading?

16 A      I believe so.

17 Q      So you remember counsel's sort of longer series of

18 questions about what has been marked as Exhibit 3, which is

19 the draft presentation that you sent to Mr. Saferstein at

20 Perella Weinberg.

21        Can you describe the circumstances that led you to send

22 that draft presentation to Mr. Saferstein?

23 A      Certainly.

24        I received an email from Mr. Saferstein indicating he

25 wanted to talk about the company.  That they were with

1  Perella -- some company I was unfamiliar with -- and he

2  requested a discussion.  The CEO, at the time, advised that I

3  send the slide deck to him.

4       The slide deck is an aspirational slide deck that, you

5  know, any company utilizes to see, you know, potentially,

6  what our narrative is on what the future of the company looks

7  like.

8  Q    So counsel asked you questions about the slide deck not

9  having the word "draft" on it and you wanted to explain why

10 it didn't have the word "draft" on it and you weren't given

11 that opportunity.

12      Would you explain to the judge now why Exhibit 3, the

13 draft presentation, doesn't have the word "draft" on it and

14 the conversations that you had with Perella Weinberg

15 regarding that exhibit.

16 A    Certainly.

17      Well, you know, every company keeps some sort of slide

18 deck about what their aspirations are.  Some of it has

19 been -- you know, some of it is how we currently are and some

20 of it is how we'd like to project ourselves.  But that slide

21 deck was never for public consumption.  And when we discussed

22 it with them, we also discussed that this was without

23 prejudice.

24 Q    You said it was never for public consumption.

25      Did that slide deck go to anybody, other than the

1  investment bankers at Perella Weinberg?

2  A      Not to my knowledge.

3  Q      The slide deck talks about 83 clinical trial sites in

4  the United States.

5         Were there 83 clinical trial sites in the United

6  States?

7  A      No, we do not have 83 -- we don't have any clinical

8  trial sites.

9  Q      Was there ever PLS' history, a single trial site in the

10  United States?

11  A      No.

12  Q      When you were talking to Mr. Saferstein, did you

13  explain to him that this is an aspirational slide deck, that

14  we really don't have a single site in the United States?

15  A      Well, it was a very strange phone call, because we had

16  several people from his team, but they were all calling in

17  from, I think, Grand Central Station or somewhere on their

18  way home, so it wasn't a highly organized phone call.

19  Q      It could have been from Delaware.  Who knows?

20  A      Right.

21  Q      And you said it wasn't a highly organized call.

22         Was it only one call about that presentation?

23  A      Only one call.

24  Q      Was that ever -- did that presentation ever become, in

25  any way, a reality?

1  A      Some elements of that are a reality.

2      Within a very short period of time, the 83 sites that

3  that's referring to, which is, that's CVS -- CVS decided --

4  CVS is open, just as anybody here is welcome to approach --

5  at the time, was welcome to approach CVS and ask about access

6  to 83 clinical trial sites.  They subsequently closed it very

7  shortly after that.  They said there's no component of their

8  company that could currently run the trials.

9  Q     So they never had one of your trial sites, if I

10 understood you?

11 A     That's correct.

12 Q     And they never ended up doing trial sites?

13 A     No.

14 Q     Counsel asked you questions about all of the academics

15 that are referenced in that draft presentation; all of the

16 academics, of course, being American academics, as she read

17 them to you.

18     Do you recall that testimony?

19 A     Yes.

20 Q     What were you referring to on that page of the draft

21 deck?

22 A     So in our industry, in clinical medicine and clinical

23 research, your expertise and, in particular, publications

24 have value.  They demonstrate that you can complete a

25 project.

1    So I've been fortunate enough to work with some of the

2    leading academics in the world and that particular figure

3    reflects a network of all the core scientists within our team

4    and people that they have collaborated with.  So it

5    illustrates the network of academics that we would have

6    access to.

7  Q    But you didn't enter into contracts with those

8    academics, did you?

9  A    No.

10  Q    You said in your world of clinical trials, your world

11  of science and attempting to bring cures to disease,

12  publishing in journals is important.

13    Why is that?

14  A    So there -- it's a very important component of

15  advancing intellectual knowledge and access to scientific

16  information.  So it would be considered unethical to not

17  publish if you've done original research.

18  Q    Why would that be unethical?

19  A    We do research to save lives.  We do research to

20  benefit the lives of those who are more misfortunate.  And

21  covering up findings, which, of course, happens within the

22  commercial industry, does happen.

23    Within the environment and collaborators that I have,

24  that would not be permissible.

25  Q    How many times have you personally published in

1  recognized scientific and medical journals?

2  A    I don't keep an exact track of it, but I'm one of the

3  most published scientists in Canada, so at least 550

4  publications.

5  Q    Has PLS as a company ever published an article in any

6  journal, whether it be an American journal or any other

7  journal?

8  A    Not for the purpose of PLS Canada, no.

9  Q    What do you mean by that?

10 A    I mean that, as I mentioned, credibility and

11 demonstrating non-bias and, you know, being entirely

12 transparent is important.  So you will always -- you know,

13 these are individuals who publish.  You know, just because

14 you're from a company, do you get the right to publish.

15 Individuals must contribute in a meaningful way and then they

16 must disclose any conflicts that they might have, such as

17 taking a salary from a company like PLS.

18 Q    Have you published during your academic career in

19 American journals?

20 A    Of course.

21 Q    Have you published in British journals?

22 A    Yes.

23 Q    Have you published in journals that are published

24 throughout the world?

25 A    Of course, yeah.

1  Q      Did you list some of those in your supplemental

2  declaration for the Court to review?

3  A      I did.

4  Q      Counsel asked you about the Wells Fargo correspondent

5  account that CIBC uses for its dollar transfers.  Let me ask

6  you a couple of questions about that.

7         Is that a special account that Wells Fargo only uses

8  for PLS?

9  A      I don't know.  I have no familiarity with it.

10 Q      And did PLS tell Wells Fargo that -- I'm sorry, did PLS

11 tell CIBC that CIBC had to use Wells Fargo as a conduit in

12 order to receive the dollar transfers from FTX and Alameda?

13 A      No, it did not.

14 Q      Did PLS have any control of how CIBC receives dollar

15 transfers from anybody?

16 A      No, we have no control.

17 Q      And when you gave wire instructions to Mr. Rheingans-

18 Yoo on behalf of Latona, did you simply cut and paste the

19 wire-transfer instructions for the CIBC website and then

20 forward those to Mr. Rheingans-Yoo?

21 A      Something like that, yeah.

22 Q      Does PLS have an account at an American bank?

23 A      It does.

24 Q      What is that account?

25 A      Chase Bank.

1  Q      And what is that account used for?

2  A      Oh, I'm sorry, did you say PLS --

3  Q      Well, okay.  So let's -- I confused you, so I

4  apologize.

5         Does PLS Delaware have an account at an American bank?

6  A      Yes, it does.

7  Q      What is that account used for?

8  A      For transfer of payments of salaries and benefits --

9  Q      Is --

10 A      -- to employees.

11 Q      To the PLS Canada employees that are in the U.S.?

12 A      That's correct.

13 Q      Does PLS Delaware use that Chase account for anything

14 else, other than to pay employees?

15 A      No.

16 Q      Does PLS Canada have an account at an American bank?

17 A      No.

18 Q      You were asked a lot of questions about the team and

19 the evolution of the leadership team at various times at the

20 company.  Let's -- we're going to get to that in one minute,

21 but let's first focus on PLS as an entity, not the

22 individuals that work for it.

23        PLS, as an entity, ever done anything in America?

24 A      Yes.

25 Q      What has it done?

1    A      PLS, as an entity, picked up the award for Clinical

2    Trial of the Year, where I attended and some staff attended

3    conferences.

4    Q      Other than that?

5    A      No.

6    Q      In terms of Mr. Battista, Ms. Davis, Ms. Winter, people

7    who, at various times, were listed as being part of your

8    leadership, did they try to develop business in the United

9    States?

10   A      I'm sure that they did, so yes.

11   Q      Did they ever obtain any business in the United States?

12   A      With the exception of -- no, those individuals.  No,

13   they never did.

14   Q      And you were going to say with the exception -- you

15   previously testified there were two funding transactions over

16   PLS' history that were used to fund trials that were done in

17   Brazil, if I recall?

18   A      Brazil and Rwanda, Eiger and GreenLight.

19   Q      So what do these American remote employees do for PLS

20   Canada?

21   A      At the moment, they predominantly help with building

22   education for an initiative we are leading through Africa,

23   and so their entire focus is on Africa.

24   Q      Does PLS have employees in places other than Canada and

25   the United States?

1    A       Yes.

2    Q       Where are those employees?

3    A       In Rwanda, Nigeria, Kenya, South Africa.

4    Q       Approximately how many PLS employees work in Africa?

5    A       Approximately 20.

6    Q       Approximately how many employees does PLS have?

7    A       Approximately 59.

8    Q       Was Mr. Battista and Ms. Davis and Ms. Winter ever C-

9    suite leaders for PLS?

10   A       No.

11   Q       Who were the C-suite leaders over time?

12   A       Over time, it arguably has been Dr. Jamie Forrest;

13   currently, Mr. Chris Clarke; previously, Melissa Bomben;

14   Michael Zimmerman; and myself.

15   Q       How long did Ms. Bomben work for PLS Canada?

16   A       Approximately three months.

17   Q       Why so short?

18   A       I believe she was taking the company in the wrong

19   direction.

20   Q       Have any of those American employees of PLS ever done

21   an American clinical trial for PLS?

22   A       No.

23            MR. KORNFELD:  Your Honor, may I have a moment?

24            THE COURT:  Sure.

25        (Pause)

1          MR. KORNFELD:  Thank you, Your Honor.

2          No further questions at this time.

3          THE COURT:  Okay.  Thank you.

4          I have a couple questions, Dr. Mills.

5          When you conduct clinical trials outside the

6 United States, do you use U.S. Food and Drug Administration

7 rules and regulations to conduct those trials?

8          THE WITNESS:  Thank you, Your Honor.  I love that

9 question.

10         There are international standards and the U.S. FDA

11 is one of about eight different countries that have agreed to

12 share in those standards.  And for the trials in Brazil, for

13 example, they have their own FDA that you must pass the

14 regulations for.

15         In order to meet the FDA regulations, quality of

16 clinical care, it will be dependent on whether or not you're

17 trying a new drug for the purpose of registration of a new

18 drug or you can also do repurposing of drugs, which, just

19 imagine, you're using aspirin, for example, for some

20 condition.  If aspirin is already been available in that

21 particular country, then you don't need to get the equivalent

22 of FDA approval.

23         In Africa, they've just begun the African

24 Medicines Agency, which will be the FDA equivalent for

25 Africa.

1            THE COURT:  And the U.S. Delaware entity, you say

2    that they pay the salaries of employees and the health

3    insurance.

4            Do they also pay the payroll taxes for those

5    employees?

6            THE WITNESS:  Yes.

7            THE COURT:  And how does -- in your declaration,

8    you indicate that PLS Delaware has no operations, no income,

9    it doesn't produce anything.  It has no employees.

10           So where does the money come from to pay those

11   employees?

12           THE WITNESS:  It gets transferred from PLS Canada.

13           THE COURT:  So it goes from a Canadian bank to the

14   U.S. bank?

15           THE WITNESS:  That's correct.

16           THE COURT:  Okay.  Thank you.

17           I will -- I asked some questions, so I'll open it

18   up to the parties if they want to follow up on that.

19           MS. WHEELER:  Nothing further from (inaudible).

20           MR. KORNFELD:  Nothing further, Your Honor.

21           THE COURT:  Okay.  Thank you.

22           Thank you, Dr. Mills.  You may step down.

23           THE WITNESS:  Thank you.

24       (Witness excused)

25           MR. KORNFELD:  Your Honor, PLS Canada rests.

1           THE COURT:  Okay.  Thank you.

2           MS. WHEELER:  Your Honor, given the very late

3   hour, I want to make a couple very quick legal points.

4   First, because there's been no jurisdictional discovery,

5   plaintiffs need only make a *prima facie* showing of personal

6   jurisdiction over PLS based on competent evidence and we

7   believe we've done that with the 66 exhibits attached to

8   Mr. McGuire's declaration.

9           Second, in deciding the motion to dismiss for

10  personal jurisdiction, the Court considers PLS' contacts at

11  the time the complaint is filed or within a short period of

12  time before that.  And this point wasn't briefed, Your Honor,

13  so I can give you authorities on that.

14          THE COURT:  Well, I think we're getting into

15  argument and it's their motion, so --

16          MS. WHEELER:  Oh, sorry.

17          I thought he rested, meaning he wasn't going to

18  argue the motion.

19          THE COURT:  No further evidence, I think, is what

20  he was saying.

21          MR. KORNFELD:  No, I -- no further evidence.

22          MS. WHEELER:  Oh, I apologize.  I apologize.  I

23  was getting ahead of myself.  Sorry.

24          THE COURT:  Do you have any evidence?

25          MS. WHEELER:  No.

1          THE COURT:  Okay.  So --

2          MS. WHEELER:  Just, Your Honor, we've already, I

3  guess, moved in the declaration of McGuire?

4          MR. KORNFELD:  No, I don't think you did,

5  actually.

6          MS. WHEELER:  Well, I thought you did for me, but

7  I'm happy to do it if you don't think you --

8          THE COURT:  Why don't we --

9          MR. KORNFELD:  I indicated there were no

10  objections.

11          THE COURT:  Why don't we do it just to make sure?

12          MS. WHEELER:  Yeah, all right.  Fair enough.

13          All right.  Your Honor, I'd like to move into

14  evidence the attorney declaration of Matthew McGuire, which

15  is Docket Entry 42 and the 66 exhibits attached thereto and

16  the notice of filing of a corrected exhibit to the

17  declaration of Matthew McGuire, which is Docket Entry 47, and

18  that attaches a corrected Exhibit 3, that June 2023 deck.

19          THE COURT:  Okay.

20          MR. KORNFELD:  And as I said, Your Honor, no

21  objections.

22          THE COURT:  All right.  Those are all admitted,

23  without objection.

24      (McGuire Declaration and attached exhibits received in

25  evidence)

1           MS. WHEELER:  Thank you, Your Honor.

2           MR. KORNFELD:  Your Honor, may we argue?

3           THE COURT:  Yes, go ahead.

4           And, by the way, we can stay -- hopefully, it

5    won't take past 5:30, but we do have some extra time if we

6    need to go past.

7           MR. KORNFELD:  Yeah, and we -- I understand that

8    and I just want to alert the Court, we have the need for

9    probably about 10 minutes on Number 14.

10          THE COURT:  Yes.

11          MR. KORNFELD:  It's not going to be long and

12   there's not going to be evidence.

13          Your Honor, here's where we are on jurisdiction.

14   It's a story of a transaction or transactions between

15   companies on the one hand that are from islands.  Latona is

16   Barbados.  Alameda is British Virgin Islands.  FTX is Antigua

17   and Barbuda and PLS Canada.

18          There's no dispute that the transactions at issue

19   here did not touch the United States.  The transactions

20   weren't for the purpose of touching the United States; they

21   were for the purpose of clinical trials that would be

22   conducted in developing and underrepresented countries that

23   need clinical trials in order to fight disease in those

24   countries.  The transactions weren't for the purpose of

25   raising money in the United States, conducting trials in the

1  United States, doing business in the United States.

2        We've extensively briefed, and the plaintiffs have

3  extensively briefed the cases in this area, and there's a

4  commonality to the cases when dealing with specific

5  jurisdiction.  And the commonality is where the transaction

6  has something to do with the jurisdiction or touches the

7  people in the jurisdiction, like, when money is raised in the

8  jurisdiction, when securities offerings are made in the

9  jurisdiction.

10        In the case of the <u>Dorsey</u> case versus -- about the

11 management of tennis clubs and golf clubs, there was

12 jurisdiction in that case because the California Corporation

13 went to Michigan and opened tennis clubs and golf clubs and

14 used its employees to run those clubs and manage those clubs.

15 So not only were the transactions in the forum, but the

16 employees were in the forum.  The business was in the forum.

17 And, in essence, the California Corporation had done what the

18 cases talked about; they had purposely availed themselves of

19 the forum.

20        That is not what has happened here.  There has

21 been no purposeful availment of the United States.  This

22 entity has not done the transactions at issue in the United

23 States.

24        Now, has its employees touched the United States?

25 Yes.  They went there and they got an award because they get

1  a great trial.  They published in an American journal, the

2  New England Journal of Medicine, a great honor, in and of

3  itself.  They published in The Lancet, a British journal, and

4  they published in African journals and journals throughout

5  the world.

6        But that doesn't mean PLS purposely availed itself

7  of the United States.  It doesn't mean that PLS consented to

8  jurisdiction.

9        PLS scientists go to conferences in the United

10 States.  They go to conferences all over the world.  When

11 you're writing clinical trials and you're trying to cure

12 disease, you've got to stay current.  If a conference is in

13 the United States, you're going to go to the United States.

14        Does that mean that you've consented to

15 jurisdiction on behalf of the entity that you work for?

16 Absolutely not.  Not a single case says that.

17        Let me turn to the banking issues because there

18 was a lot of briefing and a significant amount of cross-

19 examination on the banking issues.  We thought, as the

20 exhibits to Dr. Mills' original declaration shows, we thought

21 based on wire confirmation, that the money came from Tortola,

22 that the money came from the British Virgin Islands.  That's

23 what the wire confirmation said.

24        Plaintiffs were kind enough to tell us the money

25 actually came from an American bank account.  Let's first

1  stop right there and talk about the money coming from an

2  American bank account.  We cited the Gargano v Cayman

3  National Corporation case.  It's a district court case from

4  New York, almost on all fours as this case.  It was an

5  argument made that there was jurisdiction in the United

6  States because the money came by wire transfer from an

7  American bank account.

8        And the money came from an American bank account

9  to the Cayman bank.  And the Court there said the fact that

10 the money came by wire from an American bank down to the

11 Cayman National Bank doesn't create jurisdiction.  The payor

12 could have walked into the Cayman bank and deposited a check

13 there.

14       So the fact that the money came from the American

15 account, that wasn't intentionally directed.  The recipient

16 of the money didn't say, Make sure you send it from your

17 American bank account.  It could have come from the Cayman

18 bank account in cash.  So the Court said there:

19       "Defendants receipt of the funds by means of a

20 wire transfer that originated in the United States is

21 fortuitous contact between defendants and the United States,

22 which cannot constitute a basis not exercise of personal

23 jurisdiction."

24       Like here, the fact that the money came from an

25 American bank account instead of an island bank account is a

1  fortuitous contact.  It was not a contact that we had any

2  control over.

3          And even if the funds were routed, as we found

4  out, that they were routed through Wells Fargo because CIBC

5  uses that in every receipt of dollars by wire, PLS Canada had

6  no control over that process.  That's the bank's process.

7  The bank uses a correspondent bank.  Apparently, the use of

8  correspondent banks is something we all learned is used

9  frequently, so that doesn't equal consent to jurisdiction.

10         Canadian Group Underwriters Company v M/V Arctic

11  Trader, a 1998 U.S. District Court case, said when you use a

12  New York bank, in that case, only as a conduit for

13  defendants' account with a London bank, that does not create

14  jurisdiction because, the Court reasoned, defendants do not

15  maintain an account in New York and they had no part in

16  selecting the New York bank, another New York bank as a

17  correspondent bank, as an intermediary.

18         In this situation, PLS Canada does not maintain a

19  New York account.  It has no part in selecting Wells Fargo as

20  an intermediary correspondent bank.  It is analogous facts to

21  Canadian Group Underwriting Company v M/V Arctic Trader

22  [sic].  There was no jurisdiction there.  There's no

23  jurisdiction here, based on the use of the correspondent

24  bank.

25         Wire instructions.  Wire instructions are what we

1   all knew was done in this case.  When you send wire

2   instructions, you take a screenshot or you cut and paste so

3   you get the wire instructions right and you send them to the

4   entity that's going to wire you.  And that was exactly what

5   was done here.  Cutting and pasting wire instructions does

6   not mean that PLS had a hand in controlling the process by

7   which funds flowed into its Canadian bank account.

8          The cases the plaintiffs cite, without exception,

9   are cases where foreign banks, who are sued in the U.S.,

10  fought jurisdiction, basically saying, we're a foreign bank;

11  we shouldn't be subject to jurisdiction in the United States.

12  In every one of those cases, there was jurisdiction.  I'm

13  talking about Arcapita, which is a case dealing with

14  jurisdiction over the Bahrain Islamic Bank, and I'm talking

15  about Licci v Lebanese Canadian Bank, and SIPC v Madoff.

16          In each of those cases, by contrast to our case,

17  the foreign banks told the wireor [sic], the payor, we have

18  an American bank account.  Use the American bank account to

19  get us money.  Wire the money in to the American bank

20  account.

21          They control the process.  They told the payor how

22  to wire.  The payor was told to use the U.S. banking system

23  and that's distinguishable.

24          The classic case that shows how distinguishable

25  these cases are is the Licci v Lebanese Canadian Bank, which

1   is a Second Circuit case from 2013, where personal

2   jurisdiction was found over defendant Lebanese Canadian Bank.

3   In that case, what was the bank doing?  The bank was actually

4   gathering money and wiring it to Hezbollah.

5          The bank had been sued by Israeli survivors of

6   terrorist attacks.  The bank made a 12(b)(2) motion and said,

7   We're not here.  We're in Canada.  We're in Lebanon.  We

8   shouldn't be hailed into an American court.  And the Court

9   said, look, you're alleged to have violated American banking

10  laws by funneling money to terrorists.  You used American

11  bank accounts.  You used dollars.  You used your

12  correspondent accounts to wire money to terrorists.  That's

13  the allegation.  There is jurisdiction.

14         That's not what we have here.  We don't have a

15  case, in the Madoff series of cases, where there was

16  jurisdiction over the foreign bank because the foreign bank,

17  again, directed that its correspondent account be used to put

18  dollars in that were obtained from Madoff investors.

19         None of those bank accounts are on point.  PLS

20  Canada neither chose to use a U.S. bank or received funds in

21  a U.S. bank.  There is no personal jurisdiction.

22         PLS Canada doesn't have a continuous or systematic

23  contact.  There is no general jurisdiction.  PLS Canada

24  doesn't do anything in the United States from a business

25  standpoint.  It doesn't do its business, which is running

1  clinical trials.  It runs clinical trials in the countries

2  that Dr. Mills talked about:  Brazil, Pakistan, Rwanda, South

3  Africa.  It is running trials all over Africa and

4  underrepresented and/or underdeveloped countries.

5         It is doing that good work, but it is not doing

6  that good work in the United States.  Yes, it has employees.

7  Yes, it goes to conferences.  Yes, it has a presentation

8  where a scientist who was based in the United States is

9  listed as a leader.  Yes, it has a chairman, an executive

10  chairman on the board who is a very, very distinguished

11  medical doctor on the Georgetown staff.  But it doesn't have

12  a business in the United States.  The transaction didn't have

13  anything to do with the United States.

14         And the cases that are cited by the plaintiffs,

15  with respect to the remote employees, just -- it's like -- I

16  mentioned the Dorsey v American Golf Corp. case.  Another

17  case that sort of epitomizes what is not going on here is

18  Functional Pathways of Tennessee v Wilson Senior Care, a

19  district court case from Tennessee from 2012.  A South

20  Carolina corporation goes to Tennessee.  That South Carolina

21  corporation happens to provide therapy to seniors in

22  convalescent hospitals.

23         South Carolina corporation says, We're a South

24  Carolina corporation.  There's no jurisdiction over us in

25  Tennessee.  And the Court says, Well, your employees worked

1   in Tennessee.  Your employees were resident in Tennessee.

2   Your contract was signed in Tennessee and you profited from a

3   lot of work in Tennessee.  There is jurisdiction.

4           We don't have that.  We haven't profited from the

5   United States.  We haven't worked in the United States.

6   We're not working in the United States.  As close as we got

7   to the United States and work was an aspirational deck that

8   was sent to an investment banker and was the subject of one

9   conversation; that, jurisdiction, does not make.

10          I would submit, Your Honor, unless you have any

11  questions, there is no general or specific jurisdiction here.

12          THE COURT:  Okay.  Thank you.

13          No questions for now.

14          Ms. Wheeler?

15          MS. WHEELER:  I'll try it again this time, Your

16  Honor.

17          THE COURT:  All right.

18          MS. WHEELER:  So I wanted to begin with three very

19  simple principles of law that I think require denial of this

20  motion.  The first one, Your Honor, is that whereas here,

21  there's been no jurisdictional discovery, the plaintiffs need

22  only make out a *prima facie* case of personal jurisdiction

23  over PLS and we think we've done that.  I'll get into that in

24  a second.

25          Second, in deciding a motion to dismiss for lack

1   of personal jurisdiction, the Court considers PLS' contacts

2   at the time the complaint is filed or a short period of time

3   before that and that wasn't briefed.  I can give Your Honor

4   the points on that.  It's Klinghoffer v S.N.C. Achille Lauro

5   in the Second Circuit, 937 F.2d 44, 52 (2d Cir. 1991) and

6   MacQueen, M-a-c-Q-u-e-e-n v Union Carbide Corp., 2014 WL

7   6809811, at. *6 (D. Del. Dec. 3, 2014).

8           And the reason that point has become relevant,

9   Your Honor, is because as we saw in Mr. Mills' cross-

10  examination, you know, PLS has changed its website after the

11  complaint was filed in a transparent attempt to claim that

12  its leadership team was based in Canada and not in the U.S.,

13  so any eleventh-hour shenanigans by PLS to try to defeat

14  jurisdiction are (indiscernible) irrelevant on this motion.

15          And, third, because there hasn't been an

16  evidentiary hearing on PLS' motion and, in fact, no discovery

17  or any other things, the plaintiffs are entitled to have all

18  of their allegations taken as true and any conflicting facts

19  must be resolved in plaintiffs' favor on this motion.  And

20  PLS concedes as much at paragraph 20 of its moving brief,

21  where it cites Pinker v Roche Holdings in the Third Circuit.

22          And the law is clear that where plaintiffs have

23  sustained their burden of producing competent evidence

24  showing jurisdiction is proper, the 12(b)(2) motion must be

25  denied, despite any controverting presentation by the

1  defendant, and that's <u>Godo Kaisha IP Bridge</u>, 2016 WL 4413140.

2          Now, we talked about this earlier, but in support

3  of its motion, PLS submitted two declarations of Edward Mills

4  and as we hope we demonstrated on cross, those declarations

5  not only contradict each other, but they contain demonstrable

6  misstatements, so they don't constitute credible evidence

7  that the Court should consider on this motion.

8          Mr. Mills is not credible on the big points, who

9  the leadership team was and where they were located, and he's

10 not credible on the small points, whether he is a senior

11 scientist at Stanford and whether his company won the PLS --

12 sorry -- the David Sackett Award.  It seems like Mr. Mills

13 will say whatever is convenient to whatever audience he's

14 speaking to at the time.

15         But even if the Court were to consider the Mills

16 declaration, to the extent there are factual discrepancies

17 between the evidence plaintiffs have submitted and what

18 Mr. Mills said in his declaration, the Court has to resolve

19 all factual disputes in plaintiffs' favor in deciding this

20 motion.

21         Because Mr. Kornfeld spent a lot of time on wire

22 transfers, I'll start there.  We've cited cases at pages 22

23 to 23 of our opposition brief that hold that a defendant's

24 use of a correspondent bank account in the U.S. subjects that

25 foreign defendant to specific jurisdiction in the U.S.,

1  because the foreign defendant purposely availed itself of the

2  U.S. banking system.

3          PLS doesn't dispute that for each of the three

4  transfers, and they totaled $53 million, Your Honor,

5  plaintiffs sent wire instructions ordering the plaintiffs to

6  send the funds through a correspondent bank.  The sending of

7  those wiring instructions, directing that the funds go

8  through a U.S. correspondent bank is an intentional act that

9  constitutes purposeful availment of the U.S. banking system.

10          Mills was aware that he was using the banking

11 system, as that email we showed -- it's McGuire Exhibit 65 --

12 where he tells an FTX employee, Let me know when the wire

13 goes through, because sometimes they get stuck in the U.S.-

14 Canadian banking system and they don't arrive until we

15 inquire.

16          You know, despite sending those wire instructions,

17 PLS contends that it had no hand in directing the process and

18 no control over CIBC's use of Wells Fargo as a correspondent

19 bank.  PLS did have choices that would have avoided U.S.

20 jurisdiction; they just didn't utilize them.

21          So, for example, if PLS had wanted to avoid

22 specific jurisdiction in the U.S., it could have chosen to

23 receive the funds in Canadian dollars, it is a Canadian

24 corporation, after all; Bahamian dollars -- Latona was a

25 Bahamian company that was entering into these agreements with

1  it; or any other non-U.S. currency.  But they chose U.S.

2  dollars.

3          Had they chosen not-U.S. dollar currency, it

4  wouldn't have gone through Wells Fargo.  We looked at the

5  wire instructions.  Those are wire instructions for U.S.

6  dollars originating from the U.S.

7          Alternatively, PLS could have avoided specific

8  jurisdiction by receiving the funds in a non-U.S. currency

9  and then utilizing banks outside of the U.S. to convert the

10 funds to U.S. dollars using foreign-exchange transactions.

11 Those transactions wouldn't have utilized a U.S.

12 correspondent bank, but those options wouldn't have allowed

13 PLS -- I'm sorry -- but the options that would have allowed

14 PLS to avoid the U.S. banking system take longer and they

15 involve transaction costs and, therefore, make the

16 transactions more expensive.

17         So PLS did the fastest and least-expensive thing;

18 it affirmatively directed plaintiffs to transfer the U.S.

19 dollars through Wells Fargo as the U.S. correspondent bank

20 and, thereby, purposely availed itself of the U.S. banking

21 system.

22         PLS tries to distinguish the cases that we cited

23 on the grounds that the defendants in those cases were

24 foreign banks, not foreign corporations.  But the reasoning

25 in those cases applies, whether defendant is a bank or a

1  corporation.  The reasoning of those cases is that it is the

2  purposeful or intentional use of a U.S. correspondent bank

3  that subjects a foreign defendant to personal jurisdiction,

4  not the status of the defendant.

5       The cases that PLS cites, and Mr. Kornfeld spoke

6  about, Gargano and Canadian Group Underwriters Insurance

7  Company are readily distinguishable.  In those cases, there

8  is no evidence that the defendants directed the wire

9  transfers through a U.S. correspondent bank.  There wasn't

10  even a U.S. correspondent bank in Gargano.

11       In Gargano, the Court noted that for defendants'

12  purposes, it did not matter where the money came from or how

13  it got to them.

14       But here, it mattered to PLS how the money got to

15  them.  They sent wire instructions, directing that the U.S.

16  dollars go through the U.S. correspondent bank at Wells

17  Fargo.  PLS cites Gargano for the proposition that the

18  receipt of a wire transfer is an inherently passive action

19  that is a fortuitous contact between the defendant and the

20  United States that can't establish specific jurisdiction.

21       But unlike the defendants in Gargano, PLS' actions

22  were not inherently passive; PLS affirmatively directed

23  plaintiffs to wire the U.S. dollars through Wells Fargo.

24       Similarly, in Canadian Group Underwriters, there

25  was no evidence defendants directed plaintiff to use UniBank

 1  in New York as the correspondent bank.  The Court said the

 2  defendant has no part in selecting the New York bank as the

 3  intermediary.

 4        Here, by affirmatively sending the wire

 5  instructions, directing plaintiffs to send the funds through

 6  the Wells Fargo, as correspondent bank, PLS purposely availed

 7  itself of the United States banking system.

 8        But we don't just have the wires.  We also have

 9  PLS affirmatively invoking the protections of the U.S.

10  securities and tax laws in the SAFE and we have PLS agreeing

11  to New York arbitration provisions and New York choice of law

12  in the services agreement.  So, you know, if you agree to

13  arbitrate in New York and you agree to New York law, you

14  should at least foresee the possibility of litigation in the

15  United States.

16        And they also used New York lawyers to negotiate

17  these agreements.  And, you know, plaintiffs make the point

18  that it's not exclusively New York lawyers, but it's

19  exclusively U.S. connections that matter to this motion and

20  nobody disputes that they used U.S. lawyers.

21        We talked about the Delaware entity.  Whatever the

22  reason it was created, there's now no dispute that it was

23  created in connection with this transaction at Latona's

24  intent, and so that's another, you know, the creation of a

25  Delaware entity in connection with this transaction is

1  purposeful availment.

2          Turning to general jurisdiction.  There are an

3  awful lot of contacts that PLS doesn't dispute and it's the

4  totality of the circumstances that matters for general

5  jurisdiction.  So just to go down the list quickly, PLS

6  doesn't dispute that 43 percent of its employees reside and

7  work in the U.S.  That's a really large percent, Your Honor,

8  43 percent.  PLS doesn't dispute that it actively solicits

9  employees to work in the U.S.  And it's not, as Dr. Mills

10  contends in his reply declaration, that some employees just

11  happen to work in the U.S.

12          If you look at Exhibit 36 to the McGuire

13  declaration, it's a PLS job posting for a senior director of

14  business development in Boston, Massachusetts.  Not anywhere

15  in the U.S. -- Boston, Massachusetts.  You must live in

16  Boston, Massachusetts, to do this job for PLS.  That's not

17  just some employees happen to work in the U.S.

18          PLS doesn't dispute that it's employees regularly

19  publish articles in U.S. medical journals, that they publish

20  articles with other U.S. academics and doctors, and that PLS

21  posts those journal articles on its website.

22          PLS doesn't dispute that its employees regularly

23  attend conferences in the U.S. and that those employees have

24  one-on-one business meetings with conference attendees in the

25  U.S. at those conferences.  And those are McGuire Exhibits

1  40, 41, and 43.  Each of the attendees says, you know, please

2  contact us to arrange a one-on-one meeting with us at the

3  conference.

4          What do you think they're doing at those meetings?

5  They're soliciting business on behalf of PLS in the U.S.  PLS

6  doesn't dispute it, partner with GreenLight and Eiger, which

7  are U.S. companies, for clinical trials outside of the U.S.

8  It doesn't dispute that the TOGETHER Trial received funding

9  from U.S. investors.  And it doesn't dispute that Ed Mills

10  traveled to the U.S. to accept the award for the Clinical

11  Trial of the Year.

12          There are really only four facts that plaintiffs

13  had presented that PLS disputes and we've covered each of

14  those on cross, Your Honor.  The first one is that five of

15  the six members of the leadership team at the time the

16  complaint was filed were in the U.S., and so they were

17  directing PLS' activities from the U.S.  we talked about the

18  83 clinical sites and 23 experts that it told the debtors'

19  investment bankers it had in the U.S.  You can't tell the

20  bankers you have these and then deny them when it's

21  inconvenient for your personal jurisdiction motion.  You

22  know, the dispute about whether PLS won the David Sackett

23  Award.  Whether it did or it didn't, that's what PLS is out

24  touting to the world in its press release, including quotes

25  from Mr. Mills.  And, finally, whether Mr. Mills is a senior

1  scientist at Stanford; again, he's touting it on his LinkedIn

2  and in his deck to the debtors.

3           I don't want to belabor any of those other things.

4  I would say in closing, you know, Mr. Kornfeld sort of opened

5  by saying that this is a case about an Antiguan company and a

6  British Virgin Islands company and a Bahamian company and a

7  Canadian company.  That's not what this case is.

8           We filed a complaint against six life sciences

9  companies.  Five of them are in the U.S.:  Sam Bankman-Fried,

10  a U.S. citizen; Ross Rheingans-Yoo, a U.S. citizen; Nick

11  Beckstead, a U.S. citizen; FTX Foundation, a Delaware

12  nonprofit; and PLS.

13          This is a case that should be heard in this

14  bankruptcy court in the U.S.  The Court and the debtors have

15  an interest in litigating this adversary proceeding here and

16  having the fraudulent transfers adjudicated in the United

17  States.

18          Thank you, Your Honor.

19          THE COURT:  Thank you.

20          MR. KORNFELD:  A short response, Your Honor?

21          THE COURT:  Certainly.

22          MR. KORNFELD:  Your Honor, the SAFE is Exhibit 5.

23  That's the transaction document for the $35 million transfer.

24  Counsel left out what the safe says about jurisdiction and

25  choice of law which is on page 7 of the SAFE at Section 7(f).

1  That reads:

2        "The parties agree that this SAFE and all the

3  rights and obligations hereunder shall be governed by the

4  laws of the province of British Columbia and the federal laws

5  of Canada applicable therein.  Each party hereby submits to

6  the exclusive jurisdiction of the courts of Vancouver and

7  British Columbia."

8        Counsel left that out.  Counsel also left out the

9  provisions of the services agreement, which is Exhibit 8 of

10  our exhibit list that talked about Canadian securities laws,

11  that talk about Canadian jurisdiction.  That was left out,

12  too.

13        Counsel talks about what we don't dispute.

14  Plaintiffs don't dispute this is a case about a business who

15  doesn't have any business activity in the U.S.  Counsel

16  doesn't focus on the big picture here, which is however

17  counsel tries to minimize it, this is transactions between

18  companies that don't have anything to do with the U.S.

19        Yes, the FTX bankruptcy case has a lot to do with

20  the U.S.  Samuel Bankman-Fried, *et al.*, have a lot to do with

21  the U.S.

22        We're talking about what PLS Canada has to do with

23  the U.S. and PLS Canada doesn't have very much to do with the

24  U.S.  It doesn't do its trials here.  It doesn't operate

25  here.  Yes, it has some employees.  Yes, it gets some awards.

1  Yes, it talks to academics.  Not to talk to academics

2  throughout the world when you're trying to cure disease would

3  be scientific malpractice.

4          Now, a couple of points from counsel's argument

5  struck me, in particular, the point about foreign currency

6  which is a point that nobody briefed.  Nobody said that if

7  you're a Canadian entity who gets money in dollars, you

8  purposely availed yourself of the United States'

9  jurisdiction, until counsel argued.

10          So if counsel's argument is taken to its

11 conclusion, and it's not an absurd stretch, every dollar

12 transfer to a Canadian bank account would constitute

13 purposeful availment of the United States' jurisdiction.  You

14 would then be subject, as a Canadian who received a wire

15 transfer denominated in dollars, to jurisdiction of American

16 courts; again, not a logical stretch to take a Japanese

17 citizen who received a dollar transfer, you would then be

18 subject to the jurisdiction of American courts.

19          Receiving dollar transfers in a Canadian bank

20 account does not, under any stretch of the imagination, or in

21 any case, ever constitute consent to jurisdiction.

22          The Delaware entity in this case was not used.

23 The Delaware entity, it was contemplated, as we see from the

24 emails, as Dr. Mills candidly testified, the Delaware entity

25 was an entity that was formed that could have been used.  It

1  was not used.  Nobody has made any allegations against the

2  Delaware entity; in fact, as we will see when we get to

3  Number 14, the plaintiff is saying, now, that it does not

4  have any claims against the Delaware entity.  The Delaware

5  entity doesn't run trials and, most importantly, wasn't a

6  part of the transactions at issue.  The Delaware entity did

7  not receive any of the transfers that form the basis of the

8  alleged fraudulent transfers.

9            So, you can say that because PLS Canada has

10  touched, and continues to touch the United States in various

11  shapes and forms, it has purposely availed itself of United

12  States law and there is jurisdiction, but if you say that,

13  you're making an argument that is contrary to every argument

14  in every case about jurisdiction.  There's no case that says

15  if you touch the forum, whether it be, in this case, the

16  United States, or whether it be in many of the cases we

17  almost cited cases where the resident of one state is

18  fighting jurisdiction in another state.

19            Touching a forum doesn't get jurisdiction.

20  Continuous and systematic contact with the jurisdiction gets

21  you general jurisdiction.  That's the law.

22            What is continuous and systematic contact?  The

23  epitome of it is your headquarters are in the jurisdiction or

24  you're incorporated in the jurisdiction.  You're at home, as

25  the cases say, in the jurisdiction.  That's general

1  jurisdiction.

2  PLS Canada is not incorporated in the United

3  States; it's incorporated in Canada.  PLS Canada is not

4  headquartered in the United States; it's headquartered in

5  Canada.  PLS is not at home in the United States; it's at

6  home in Canada.

7  PLS received the transfers at issue in Canada.  It

8  does its business throughout the world, but not in the United

9  States.  There is no jurisdiction, whether it's general

10  jurisdiction or specific jurisdiction.

11  The fact that PLS cut and pasted wire instructions

12  does not constitute jurisdiction because, again, not a

13  stretch, CIBC still uses Wells Fargo as a correspondent bank

14  for dollar transfers.  Are we to say to every CIBC account

15  holder who receives a transfer in American dollars that that

16  account holder has consented to jurisdiction in the United

17  States?

18  We can't say that without being accused of having

19  no legal basis whatsoever to support that.  There is no legal

20  basis to support that.  There is no legal basis for

21  jurisdiction.

22  Thank you, Your Honor.

23  THE COURT:  All right.  I'm going to take the

24  matter under advisement and I'll issue a ruling in due

25  course.

1          Let's move on to Item 14 and I've read the papers

2   on this, so let's not take a whole lot of time on it.

3          MR. KORNFELD:  Okay.  I'm going to do it in under

4   5 minutes, Your Honor.

5          THE COURT:  All right.

6          MR. KORNFELD:  So our position is that PLS

7   Delaware didn't do anything in connection with any of the

8   transactions.  PLS Delaware is sued in the complaint; they're

9   named in paragraph 21 of the complaint.

10         THE COURT:  They said they're not pursuing you in

11  Delaware.

12         MR. KORNFELD:  They're not pursuing it, and so we

13  have a difference of opinion only about one thing.  The

14  difference of opinion is what should you do when you hear, as

15  they wrote in their papers, that they're not pursuing PLS

16  Delaware.

17         PLS Delaware's position is you should grant the

18  motion to dismiss under 12(b)(6) without leave to amend.  The

19  plaintiffs' position is we've said we're not pursuing

20  Delaware and that's good enough, therefore, this is all moot.

21  We'll take out any reference to pursuing Delaware from the

22  complaint.

23         Here's my problem with that, Your Honor.  They

24  could decide tomorrow or in six months to make a motion to

25  amend to say they are pursuing Delaware.  There's no basis

 1  for that, in my view, but there's no stopping them from doing

 2  that unless you issue a decision that they have failed to

 3  state a claim against Delaware and they can't amend to state

 4  that claim.

 5          That's why I'm asking you to grant the motion

 6  without leave to amend.

 7          THE COURT:  All right.  Any response?

 8          MS. WHEELER:  Your Honor, we never sued PLS

 9  Delaware, so there's no motion to dismiss, with respect to

10  PLS Delaware, so the motion to dismiss should be denied as

11  moot.  You can't dismiss someone without prejudice when

12  there's been no briefing, no discovery.  If we find six

13  months from now, some basis to sue PLS Delaware, we'll sue

14  PLS Delaware.

15          What he's asking for at this very early stage of

16  the case seems unnecessary.

17          MR. KORNFELD:  Your Honor, in paragraph 21 of the

18  complaint, let me read it to you:

19          "PLS is a company incorporated in British

20  Columbia, Canada, in February of 2021 and in Delaware in

21  March of 2022, that supports clinical trials, including anti-

22  therapeutics research."

23          We read that to say they sued both of the

24  entities.

25          THE COURT:  Who's in the caption?

1          MR. KORNFELD:  In the caption, it's Platform Life

2 Sciences, Inc.  That's it.

3          THE COURT:  All right.  Well, I'm not going to

4 grant the motion to dismiss with prejudice, because as

5 Ms. Wheeler pointed out, six months from now, they might find

6 some additional information that gives them the basis to sue

7 you.

8          But I do think the debtors need to file an amended

9 complaint to make it clear that you're not pursuing PLS

10 Delaware in this complaint.

11          So I will -- you know, it's kind of a "chicken and

12 the egg" kind of thing, because I don't think they have

13 actually sued PLS Delaware, but maybe they did.  I don't

14 know.  Hard to tell.

15          So I think the best way to approach this is just,

16 as I said, file an amended complaint to make it clear that

17 you're only suing PLS Canada, not PLS Delaware.

18          MS. WHEELER:  Your Honor, can we do that after you

19 decide the motion to dismiss for lack of jurisdiction?

20          I don't want to spend my one amendment, as of

21 right, deleting four words from paragraph 21, until I see

22 Your Honor's ruling on this motion.

23          THE COURT:  That makes sense.

24          MS. WHEELER:  Thank you.

25          MR. KORNFELD:  That is all we have, Your Honor.

1          THE COURT:  Okay.  Thank you.

2          Anything else from the debtors today?

3          MR. LANDIS:  Not today, Judge, thank you.

4          And, Your Honor, I'd just note that we did

5  upload -- this is Adam Landis for the record -- we did upload

6  that order in connection with Item 11, so it'll be waiting

7  for your signature anytime.

8          THE COURT:  All right.  Thank you all very much.

9          We're adjourned.

10          COUNSEL:  Thank you, Your Honor.

11      (Proceedings concluded at 5:19 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          CERTIFICATION

2              We certify that the foregoing is a correct

3    transcript from the electronic sound recording of the

4    proceedings in the above-entitled matter to the best of our

5    knowledge and ability.

6

7    /s/ William J. Garling                 November 16, 2023

8    William J. Garling, CET-543

9    Certified Court Transcriptionist

10   For Reliable

11

12   /s/ Tracey J. Williams                 November 16, 2023

13   Tracey J. Williams, CET-914

14   Certified Court Transcriptionist

15   For Reliable

16

17   /s/ Mary Zajaczkowski                  November 16, 2023

18   Mary Zajaczkowski, CET-531

19   Certified Court Transcriptionist

20   For Reliable

21

22

23

24

25