# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |
| | **Ref. Nos. 3399 & 3400** |
| | **Objection Deadline:  Extended for the Debtors to December 11, 2023**<br>**Hearing Date:  January 25, 2024 at 10:00 a.m. (ET)** |

## DEBTORS' OMNIBUS OBJECTION TO MOTIONS OF PATRICK GRUHN, ROBIN MATZKE, AND LOREM IPSUM UG TO DISMISS BANKRUPTCY CASES OF MACLAURIN INVESTMENTS, LTD. AND FTX TRADING LTD.

---

[1]    The last four digits of Alameda Research LLC's tax identification number is 4063.  Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.  The principal place of business of Debtor Emergent Fidelity Technologies Ltd is Unit 3B, Bryson's Commercial Complex, Friars Hill Road, St. John's, Antigua and Barbuda.

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ..............................................................................1

BACKGROUND .................................................................................................5

    A.    The Debtors and Their Chapter 11 Cases ...............................................5

    B.    Exigent Circumstances and the Omnibus Corporate Authority............................7

    C.    Maclaurin Investments ....................................................................10

    D.    FTX Trading ...............................................................................13

    E.    The Lorem Ipsum Parties and the Motions..........................................16

ARGUMENT ...................................................................................................18

I.     There is No Cause for Dismissal Under Section 1112(b) of the Bankruptcy Code ..........18

II.    Alleged Lack of Authority to File the Chapter 11 Petitions Does Not Deprive the Court of Subject Matter Jurisdiction..................................................21

III.   The Bankruptcy Petitions Were Authorized at the Time of Filing...................................23

    A.    The Filing of Maclaurin's Petition Was Authorized Under Seychelles Law ............................................................................24

    B.    The Filing of FTX Trading's Petition Was Authorized Under Antiguan Law..............................................................................29

IV.   The Motions Should Also Be Denied Based on the Doctrine of Laches..........................33

CONCLUSION..................................................................................................35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re 3P Hightstown, LLC*,
   631 B.R. 205 (Bankr. D.N.J. 2021) ........................................................18

*In re 477 W. 142nd St. Hous. Dev. Fund Corp.*,
   2022 WL 2093418 (S.D.N.Y. June 10, 2022) ...................................23

*8375 Honeytree Blvd. Holdings, LLC* v. *Starman*,
   2012 WL 683379 (E.D. Mich. Mar. 2, 2012) ....................................22

*In re Adv. Vascular Res. of Johnstown, LLC*,
   590 B.R. 323 (Bankr. W.D. Pa. 2018) ...............................................18

*In re Alpha Centauri Co., Inc.*,
   2006 WL 4452827 (Bankr. D.N.J. Jan. 25, 2006) .............................18

*In re Am. Globus Corp.*,
   195 B.R. 263 (Bankr. S.D.N.Y. 1996) ...............................................22

*In re Atlas Supply Corp.*,
   857 F.2d 1061 (5th Cir.1988) .......................................................33, 34

*In re Autumn Press, Inc.*,
   20 B.R. 60 (Bankr. D. Mass. 1982) ...................................................22

*Bird* v. *Brown*,
   (1850) 4 Exch. 786................................................................................28

*In re Blue Whale Studios, LLC*,
   644 B.R. 252 (Bankr. N.D. Ga. 2022) ...............................................18

*In re Brandon Farmer's Mkt., Inc.*,
   34 B.R. 148 (Bankr. M.D. Fla. 1983) ................................................22

*In re ComScape Telecomm., Inc.*,
   423 B.R. 816 (Bankr. S.D. Ohio 2010)...............................................22

*In re Domiano*,
   442 B.R. 97 (Bankr. M.D. Pa. 2010) .................................................19

*In re Farmers' Supply Co.*,
   275 F. 824 (5th Cir. 1921) .................................................................34

*de Fontbrune* v. *Wofsy*,
   838 F.3d 992 (9th Cir. 2016) ..............................................................23

*In re E. Supply Co.*,
  267 F.2d 776 (3d Cir. 1959) ................................................................. 23

*In re Energy Future Holdings Corp.*,
  561 B.R. 630 (Bankr. D. Del. 2016) ................................................. 33, 35

*In re FKF Madison Park Grp. Owner, LLC*,
  2011 WL 350306 (Bankr. D. Del. Jan. 31, 2011) ................................... 23

*Hager* v. *Gibson*,
  108 F.3d 35 (4th Cir. 1997) ................................................................. 22

*Hooper* v. *Kerr, Stuart & Co. Ltd*,
  (1901) 83 L.T. 729 ............................................................................... 28

*In re I.D. Craig Serv. Corp.*,
  118 B.R. 335 (Bankr. W.D. Pa. 1990) ................................................... 34

*In re Kearney*,
  2020 WL 5534528 (Bankr. D.N.M. May 13, 2020) ............................... 35

*In re Martin-Trigona*,
  760 F.2d 1334 (2d Cir. 1985) ........................................................... 3, 21

*McClure* v. *Borne Chem. Co.*,
  292 F.2d 824 (3d Cir. 1961) ................................................................. 23

*In re Moni-Stat, Inc.*,
  84 B.R. 756 (Bankr. D. Kan. 1988) ...................................................... 18

*In re Nortel Networks, Inc.*,
  469 B.R. 478 (Bankr. D. Del. 2012) ..................................................... 23

*In re Orbit Petroleum, Inc.*,
  395 B.R. 145 (Bankr. D.N.M. 2008) ..................................................... 19

*Price* v. *Gurney*,
  324 U.S. 100 (1945) ............................................................................. 21

*In re Ramreddy, Inc.*,
  440 B.R. 103 (Bankr. E.D. Pa. 2009) ................................................... 20

*Reuter* v. *Electric Telegraph Co.*
  (1856) 6 E&B. 341 ............................................................................... 28

*In re Shea & Gould*,
  214 B.R. 739 (Bankr. S.D.N.Y. 1997) .................................................. 33

*In re Tishler*,
    201 B.R. 608 (Bankr. D. Conn. 1996) ....................................................................33

*Wilson* v. *Tunman and Fretson*,
    (1843) 6 M. & G. 236 ....................................................................................28

*Wilson* v. *West Hartlepool Ry & Harbour Co.*,
    (1865) 2 De G.J. & S. 475 ...........................................................................28

## Statutes

11 U.S.C. § 301 .............................................................................................3, 21

11 U.S.C. § 1102 ...............................................................................................5

11 U.S.C. § 1107 ...............................................................................................5

11 U.S.C. § 1108 ...............................................................................................5

11 U.S.C. § 1112 ....................................................................................... *passim*

11 U.S.C. § 1121 ...............................................................................................6

International Business Corporations Act of the Revised Laws of Antigua and
    Barbuda ................................................................................................. *passim*

Seychelles International Business Act ................................................................. *passim*

## Rules

Del. Bankr. L.R. 1002-1(b) ...............................................................................9

Fed. R. Bankr. P. 9017 .....................................................................................23

Fed. R. Civ. P. 44.1 .........................................................................................23

Maclaurin Investments, Ltd. ("Maclaurin"), FTX Trading Ltd. ("FTX Trading"), and their affiliated debtors and debtors-in-possession (collectively, the "Debtors") hereby submit this omnibus objection (the "Objection") to the *Motion of Patrick Gruhn, Robin Matzke, and Lorem Ipsum UG to Dismiss Bankruptcy Case of Maclaurin Investments, Ltd.* [D.I. 3399; the "Maclaurin Motion"] and the *Motion of Patrick Gruhn, Robin Matzke, and Lorem Ipsum UG to Dismiss Bankruptcy Case of FTX Trading Ltd.* [D.I. 3400; the "FTXT Motion"] (together, the "Motions").[2] In support of the Objection, the Debtors rely upon and incorporate by reference the *Declaration of Malcolm Moller* (the "Moller Declaration" or "Moller Decl."), the *Declaration of Stephen Houseman KC* (the "Houseman Declaration" or "Houseman Decl."), and the Declaration of Edgar W. Mosley II (the "Mosley Declaration" or "Mosley Decl.") submitted concurrently herewith. In support of their Objection, the Debtors respectfully state as follows:

## PRELIMINARY STATEMENT

1.      These Motions must be seen for what they are: a litigation tactic, orchestrated by the LI Parties one year into one of the largest and most complex Chapter 11 Cases ever filed, in a desperate attempt to avoid litigation brought by the Debtors against them to recover approximately $375 million of estate assets received by the LI Parties on account of one of the many frauds committed by Samuel Bankman-Fried. In doing so, the LI Parties seek to destabilize these Chapter 11 Cases and harm millions of FTX Trading and Maclaurin stakeholders, after the Debtors have made deliberate and methodical progress towards confirmation of a viable consensual plan of reorganization and the return of value to their customer and other creditor

---

[2]    Terms not defined shall have the meaning ascribed to them later in this Objection or otherwise as defined in the Motion.

victims.  There is no cause to dismiss the Chapter 11 Case of either FTX Trading or Maclaurin, and the LI Parties' litigation stunt should be summarily rejected.

2.      Since the collapse of the FTX Group, Mr. Bankman-Fried has been found guilty by a jury, and the other founders and most senior executives, Nishad Singh, Gary Wang, and Caroline Ellison, have pled guilty to federal crimes arising from fraud and the misappropriation of FTX Group funds.  Those misappropriated funds were spent on, among other things, dubious acquisitions and investments designed to further their criminal scheme and enrich the insiders.  Messrs. Gruhn and Matzke were beneficiaries of some of the most dubious of those investments.  They were co-founders of the company Digital Assets DA AG, which the FTX Insiders caused Maclaurin and FTX Trading to acquire in order to expand their criminal scheme in Europe.

3.      As part of that acquisition, Messrs. Gruhn and Matzke, and others, received $376 million in consideration for business assets that were largely worthless at a time when the FTX Group was insolvent and Mr. Bankman-Fried had misappropriated billions of cash and cryptocurrency from FTX.com.  Messrs. Gruhn and Matzke were also given executive positions at the newly-formed "FTX Europe" that were accompanied by the potential for more than $100 million in earn-out payments and bonuses.

4.      Messrs. Gruhn and Matzke—as Mr. Bankman-Fried's chosen management of FTX Europe at the time—had front row seats to the collapse and subsequent filing of chapter 11 petitions by the Debtors, including FTX Trading and Maclaurin.  They had ample notice that the Chapter 11 Cases had been filed on November 11, 2022.  They and Lorem Ipsum also availed themselves personally of the chapter 11 process by filing proofs of claim against FTX Trading prior to the applicable claims bar dates set by this Court, and long before they filed the dismissal

Motions.  Only months after the Complaint was filed, on July 12, 2023, and Messrs. Gruhn's and Matzke's employment terminated, did the LI Parties surface with their newfound positions set forth in the Motions.

5.    The question before the Court is whether there is cause to dismiss either the FTX Trading or the Maclaurin cases pursuant to section 1112(b) of the Bankruptcy Code.  There is none.  First, unlike most other cases where corporate authority issues are raised, none of the LI Parties are parties from whom consent was necessary for FTX Trading or Maclaurin to file for bankruptcy, and thus the LI Parties have no rights under corporate law that could be prejudiced by the chapter 11 filings.  Second, as detailed in the Mosley Declaration and the record of these Chapter 11 Cases, the filing of these Chapter 11 Cases pursuant to the Omnibus Authority has been overwhelmingly in the interests of global creditors, converting what could easily have been a total loss for stakeholders into the preservation and recovery of property, which as of September 2023, exceeded $7 billion in distributable value and continues to increase.  Dismissal of these core Debtors at this critical stage would be the antithesis of the best interests of the Debtors' creditors and their estates.

6.    The Motions attempt to skirt the issue of cause by arguing that an allegation of defective corporate authority raises a question of this Court's subject matter jurisdiction independent of section 1112(b) of the Bankruptcy Code.  It does not.  The subject matter jurisdiction of this Court was acquired upon the filing of a voluntary petition by each of the Debtors pursuant to section 301 of the Bankruptcy Code.  *See In re Martin-Trigona*, 760 F.2d 1334, 1340 (2d Cir. 1985) (holding bankruptcy court acquired subject matter jurisdiction over the proceeding when the petition was filed).  An alleged lack of authorization for a voluntary petition under applicable law may constitute cause to dismiss a case under section 1112(b).  But the weight of

authority addressing challenges to authorization of a bankruptcy petition since the Bankruptcy Code was enacted in 1978 have rejected the notion that a dispute about corporate authorization is a jurisdictional question, and even resort to equitable doctrines such as estoppel or laches to resolve such challenges.

7.      Regardless, the Omnibus Authority is valid under applicable non-U.S. corporate law.  Mr. Bankman-Fried was the sole director at each of FTX Trading and Maclaurin at the time the Omnibus Authority was executed, and he validly delegated all available powers and authority to John J. Ray III as Chief Executive Officer—including to commence chapter 11 bankruptcy proceedings for FTX Trading and Maclaurin.  As detailed in the Moller and Houseman Declarations, the chapter 11 petitions filed by Maclaurin and FTX Trading were duly authorized by Mr. Ray under the laws of Seychelles and Antigua, respectively.  In addition, those foreign law declarations detail that even if there was a defect in formal authorization—and there was not— each company's petition was nonetheless valid through implied actual authority, ratification, or otherwise.

8.      Tellingly, the LI Parties made no attempt to investigate the facts or inquire with the Debtors regarding their feigned concerns prior to filing the Motions.  Had they done so, the Debtors could have quickly confirmed the relevant facts set forth in the Mosley Declaration. Instead, the LI Parties chose to misstate the composition of the relevant boards of directors and other critical facts, and did so recklessly on the public docket of these Chapter 11 Cases.

9.      Of course, the reason for all of this is that the Motions are nothing more than an ill-advised litigation tactic.  Accordingly, the doctrine of laches provides yet another independent basis to deny the Motions.  The Omnibus Authority was publicly filed with the chapter 11 petitions, putting the world on notice of the authority under which Mr. Ray executed the chapter

11 petitions.  Yet, the LI Parties did not challenge Mr. Ray's authority until almost a year later, after a massive amount of time and money has been spent to secure and recover assets, and develop a viable plan of reorganization to return value to customers and other creditors.  The LI Parties provide no excuse for their delayed filing because there is none.  The LI Parties should not be rewarded for their conscious, indeed conspicuous delay in filing the Motions.  For all of these reasons, the relief requested in the Motion must be denied.

## BACKGROUND

### A.    The Debtors and Their Chapter 11 Cases

10.    On November 11, 2022 and on November 14, 2022 (as applicable, the "Petition Date"), the Debtors filed with the Court voluntary petitions for relief under title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq*. (the "Bankruptcy Code").  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  Joint administration of these Chapter 11 Cases was authorized by the Court by entry of an order on November 22, 2022 [D.I. 128].  On December 15, 2022, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed an Official Committee of Unsecured Creditors (the "Committee") pursuant to section 1102 of the Bankruptcy Code [D.I. 231].

11.    On July 31, 2023, the Debtors filed the *Draft Joint Plan of Reorganization* (the "Draft Plan" and as amended, supplemented, or modified from time to time, the "Plan") [D.I. 2100] just nine months after the Petition Date.  On October 16, 2023, the Debtors announced and filed the Plan Support Agreement ("PSA"), which includes, among other things, a settlement of the customer property claims litigation filed by the Ad Hoc Committee of Non-US Customers of FTX.com (the "Ad Hoc Committee") and the putative class action plaintiffs, a preference settlement policy, and a framework for an amended chapter 11 Plan [D.I. 3291].

12.    The PSA contains milestones that are important both to maintaining creditor support for the Plan and for ensuring the prompt distribution of value to the Debtors' customers and other creditors.  (*Id.*)  As agreed, the Debtors shall (i) file an amended Plan and disclosure statement no later than December 16, 2023; (ii) obtain an order from the Court approving the disclosure statement and solicitation procedures by March 1, 2024; (iii) obtain a Plan confirmation order no later than June 1, 2024; and (iv) have the Plan effective date occur no later than July 1, 2024.  (*Id.*)  The Debtors remain within their exclusive periods provided by section 1121 of the Bankruptcy Code [D.I. 2698, 4498].

13.    As of September 2023, the Debtors' asset preservation and recovery efforts resulted in them holding approximately $7 billion in distributable value (*see Notice of Presentation to Stakeholders*, Sept. 11, 2023 [D.I. 2463]), which continues to increase as assets are recovered, digital assets monetized, and litigation claims prosecuted.  At that time, the Debtors disclosed that while work to reconcile the claims pool is ongoing, there were more than approximately $16 billion in customer claims and billions more in non-customer claims aside from the IRS Claims.  (*Id.*)

14.    Additional factual background relating to the Debtors' businesses and the commencement of these chapter 11 cases (the "Chapter 11 Cases") is set forth in the *Declaration of John J. Ray III in Support of Chapter 11 Petitions and First Day Pleadings* [D.I. 24], the *Declaration of Edgar W. Mosley II in Support of Chapter 11 Petitions and First Day Pleadings* [D.I. 57], the *Supplemental Declaration of John J. Ray III in Support of First Day Pleadings* [D.I. 92], and the *Supplemental Declaration of Edgar W. Mosley II in Support of First Day Pleadings* [D.I. 93].

## B.   Exigent Circumstances and the Omnibus Corporate Authority

15.   Over the past year since the Petition Date, the events leading to the stunning collapse of the FTX Group have become clear.[3]  The FTX Group suffered from an acute liquidity crisis beginning in early November 2022.  (Mosley Decl. ¶ 7.)  On November 2, 2022, the cryptocurrency news site CoinDesk published an article that revealed that Debtor Alameda Research LLC held a significant position in FTT, the FTX Group's native token.  (*Id.*)  At the time, FTT was estimated at a value of approximately $4 billion, representing almost one third of Alameda Research's total aggregate assets.  (*Id.*)  The publication prompted questions about the FTX Group's undisclosed leverage and liquidity.  (*Id.*)

16.   After the article was published, Binance, the largest centralized digital asset exchange, announced that it planned to sell its significant position in FTT.  (*Id.* ¶ 8.)  That announcement led to a severe "run" on the FTX exchanges as customers pulled funds off the exchanges.  (*Id.*)  On November 8, 2022, Binance announced that it had entered into a non-binding letter of intent to acquire the FTX.com exchange.  (*Id.*)  However, Binance changed course and subsequently terminated the potential transaction on November 9, 2022.  (*Id.*)  Consequently, customers attempted withdrawals of several billions of dollars between November 2, 2022 and the Petition Date, many of which were not fulfilled.  (*Id.*)

17.   Prior to the Petition Date, ownership and control of the FTX Group was concentrated in Messrs. Bankman-Fried, Singh, and Wang and, with a few limited exceptions, the FTX Group lacked independent or experienced finance, accounting, informational security, and cybersecurity personnel or leadership, among other resources.  (*Id.* ¶ 9.)

---

[3]   *See, e.g.*, *First Interim Report of John J. Ray III to the Independent Directors on Control Failures at the FTX Exchanges* [D.I. 1242].

18.     Given that corporate control was indisputably centralized in the wrongdoers responsible for the collapse, it was absolutely vital that operational control of the FTX Group be turned over to new, independent management that could secure the Debtors' assets, prevent the further dissipation of value, and make independent and unbiased decisions. (*Id.* ¶ 11.)  In addition, prompt filing of chapter 11 petitions for all FTX Group entities was the only way to prevent piecemeal insolvency proceedings around the world that would have been highly value destructive. (*Id.* ¶ 10.)  As a result, Debtors' counsel prepared the Omnibus Corporate Authority (the "Omnibus Authority"), which Mr. Bankman-Fried executed in the capacity of controlling owner, director, officer, manager, or other authorized person of, among other FTX Group entities, Maclaurin and FTX Trading  (*Id.* ¶ 11; *see id*. Ex. A.)  The Omnibus Authority appointed John Ray as Chief Executive Officer of, among other FTX Group entities, Maclaurin and FTX Trading, and authorized Mr. Ray to commence chapter 11 proceedings in respect of those Debtors.  (*Id.*)

19.     At approximately 4:30 a.m. (ET) on November 11, 2022, Samuel Bankman-Fried executed the Omnibus Authority.  The Omnibus Authority states that Mr. Bankman-Fried, in relevant part:

> as controlling owner, director, officer, manager or other authorized person with respect to West Realm Shires Inc., Paper Bird Inc., Hilltop Technology Services LLC, Cedar Grove Technologies Services, Ltd., FTX Trading Ltd, Alameda Research LLC and Clifton Bay Investments LLC (the "Top Companies"), and all of their directly and indirectly owned subsidiaries (together with the Top Companies, the "FTX Group"), hereby authorize, instruct and consent to the following corporate actions with respect to all members of the FTX Group:
>
> (i) the appointment of John J. Ray III (the "CEO") as Chief Executive Officer with plenary authority to exercise all powers and authority capable of delegation to an officer under applicable law, including without limitation in connection with a voluntary filing for protection from creditors under Title 11 of the United States Code and any restructuring and insolvency related proceeding that

may be appropriate or necessary, or may be commenced by third parties, with respect to all members of the FTX Group;

* * *

(iv) the appointment of Stephen Neal (if willing to serve) as Chairman of the Board, to the extent applicable law permits me to so designate him as such, and one to three other individuals chosen by the CEO and not affiliated with me or the CEO as new directors of FTX Trading Ltd.;

* * *

(vii) if the CEO shall so determine, the appointment of one or more individuals chosen by the CEO and not affiliated with me as director of other members of the FTX Group;

(iv) the performance of any and all such acts as are reasonable, advisable, expedient, convenient, proper or necessary to effect the foregoing. . . .

20.     The Omnibus Authority, which authorized the commencement of the Maclaurin and FTX Trading chapter 11 cases and delegated the authority to exercise said power to Mr. Ray, was attached to the petition pursuant to local rule.[4]  [D.I. 1 at 12.]

21.     The risks necessitating execution of the Omnibus Authority came to fruition in the lead up to the filing of the chapter 11 petitions and the following days.  (Mosley Decl. ¶ 12.) Three of the Debtors' affiliates were placed into foreign liquidation prior to the filing of the chapter 11 petitions.  (*Id.*)  On November 10, 2022, the Securities Commission of The Bahamas (the "SCB") took action to freeze assets of non-Debtor FTX Digital Markets Ltd. ("FTX DM") and, thereafter, placed FTX DM into involuntary, provisional liquidation.  (*Id.*)  The Debtors had little insight into those proceedings for months because the petitions and supporting declarations were

---

[4]     *See* Del. Bankr. L.R. 1002-1(b) ("In a voluntary case filed for a non-individual debtor, there shall be filed on the petition date a resolution or other document authorizing the commencement of the bankruptcy case executed or otherwise approved by the person, entity, or governing body, as applicable, whose approval is required for the commencement of a bankruptcy case under applicable law.").

filed *ex parte* and under seal.  (*Id*.)  In addition, in the early hours of November 11, 2022, the directors of non-Debtors FTX Express Pty Ltd. and FTX Australia Pty Ltd., Australian subsidiaries in the Dotcom Silo, appointed voluntary administrators for a restructuring process under Australian law.  (*Id*.)

22.     There were several attempts by both insiders and external parties to steal estate assets.  On November 9, 2022, one of Mr. Bankman-Fried's associates, Caroline Ellison, began dissipating estate assets through a series of attempted transactions with LayerZero, ultimately agreeing to transfer equity and warrants valued far in excess of the $45 million loan it purported to release.  (*Id.* ¶ 13.)  That day, Ms. Ellison also purported to provide hundreds of millions of dollars in security pledges to BlockFi International.  (*Id*.)  On the Petition Date, at least $433 million in unauthorized transfers took place in connection with a cybersecurity hack while the Debtors' professionals were racing to secure digital assets.  (*Id*.)  Also, on November 12, 2022, the SCB coordinated with Messrs. Bankman-Fried and Wang to transfer 195 million FTT tokens from the FTT deployer wallet, among other digital assets, into cryptocurrency wallets controlled by the SCB.  (*Id*.)

23.     None of the directors, officers, or shareholders of Maclaurin or FTX Trading have ever challenged the Omnibus Authority or Mr. Ray's decision to file chapter 11 petitions on behalf of those entities, including Mr. Bankman-Fried who executed it.  (Mosley Decl. ¶¶ 31, 33.)  Nor has the U.S. Trustee, the Committee, or the Ad Hoc Committee raised any such concerns.

## C.     Maclaurin Investments

24.     Mr. Bankman-Fried, Wing Man Charis Law, and Luk Wai Chan founded Alameda Ventures Ltd. ("Alameda Ventures") in December 2019.  (Mosley Decl. Ex. B.) Alameda Ventures was incorporated as an international business company under the Seychelles

International Business Act, 2016 ("SIBA").  (*Id.*)  Alameda Ventures' formation documents appointed Messrs. Bankman-Fried and Law and Ms. Chan as the first directors of the company. (*Id.*)

25.    Alameda Ventures changed its name to Maclaurin Investments Ltd. ("Maclaurin") in September 2022. (Mosley Decl. Ex. C.)  Maclaurin's Register of Directors shows Messrs. Law and Chan resigned as directors in November 2022.  (Mosley Decl. Ex. E.)

26.    On September 26, 2022, Maclaurin amended its Memorandum of Association and Articles of Association.    (Mosley Decl. Ex. D; "Maclaurin's Articles".) Article 11.2 of Maclaurin's Articles states that the "directors of the Company have all the powers necessary for managing, and for directing and supervising, the business and affairs of" Maclaurin. (*Id.* at Art. 11.2.)  Despite the Maclaurin Articles requiring a meeting of directors for certain corporate actions (*see id.* at Art. 12), there is no evidence of Maclaurin holding formal meetings of the Board of Directors prior to the Petition Date (Mosley Decl. ¶ 23).

27.    Maclaurin is a 100% owned direct subsidiary of Debtor Alameda Research Ltd., which in turn is a 100% owned direct subsidiary of Debtor and Top Company Alameda Research LLC.  (Mosley Decl. ¶ 19.)  Thus, Maclaurin is a member of the FTX Group under the Omnibus Authority.

28.    As noted, the Omnibus Authority appointed Mr. Ray as Chief Executive Officer of Maclaurin "with plenary authority to exercise all powers and authority capable of delegation to an officer under applicable law, including without limitation in connection with a voluntary filing for protection from creditors under Title 11 of the United States Code . . . ." (*See supra* ¶ 19.)  At the time he executed the Omnibus Authority, Mr. Bankman-Fried was the sole director of Maclaurin.  (Mosley Decl. Ex. E.)

29.      On November 11, 2022, the Debtors filed with the Court a voluntary petition for relief under title 11 of the Bankruptcy Code on behalf of Maclaurin [D.I. 1].  The petition was signed by Mr. Ray, acting as CEO of Maclaurin and with the authority delegated to him through the Omnibus Authority [D.I. 1].

30.      On February 6, 2023, Alameda Research Ltd., the sole shareholder of Maclaurin, executed an instrument titled "Written Resolutions of the Sole Shareholder." (Mosley Decl. Ex. F; the "Maclaurin Shareholder Ratification".)  The Maclaurin Shareholder Ratification resolved, *inter alia*, that (i) "the appointment of [Mr. Ray] as the Chief Executive Officer of the Company be, and hereby is, confirmed, ratified, authorized and approved"; (ii) "the termination of the appointment of any existing director and the appointment of [Kurt Steven Knipp] as director of the Company in accordance with the Company's Memorandum and Articles of Association (as amended) be, and hereby are, confirmed, authorized and approved"; and (iii) "the filing of the Petitions and all other actions taken in connection with the Bankruptcy Cases be, and hereby are, confirmed, ratified, authorized and approved." (*Id.*)  The Maclaurin Shareholder Ratification was executed by Matthew Rosenberg, the then-sole director of Alameda Research Ltd. (*Id.*)

31.      On the same day, the director of Maclaurin executed an instrument titled "Written Resolutions of the Board of Directors." (Mosley Decl. Ex. G; the "Maclaurin Board Ratification".)  The Maclaurin Board Ratification resolved, *inter alia*, that (i) "the appointment of [Mr. Ray] as the Chief Executive Officer of the Company be, and hereby is, confirmed, ratified, authorized and approved"; (ii) "the termination of the appointment of any existing director and the appointment of the New Independent Director as director of the Company in accordance with the Company's Memorandum and Articles of Association (as amended) be, and hereby are, confirmed, authorized and approved"; and (iii) "the filing of the Petitions and all other actions taken in

connection with the Bankruptcy Cases be, and hereby are, confirmed, ratified, authorized and approved." (*Id.*)  The Maclaurin Board Ratification was executed by Kurt Steven Knipp, the then-sole director of Maclaurin.  (*Id.*)

### D.   FTX Trading

32.   Messrs. Bankman-Fried, Wang, and Singh founded FTX Trading in April 2019.  FTX Trading was incorporated as an international business company under the International Business Corporations Act ("IBCA") of the Revised Laws of Antigua and Barbuda ("Antigua"). (Mosley Decl. Ex. H.)  FTX Trading's Register of Directors indicates that Messrs. Bankman-Fried and Law, and Ms. Chan were the first directors of the company.  (*Id.* Ex. I.)

33.   Section 4.1 of FTX Trading's By-Laws, attached to the Articles of Incorporation, states that "[s]ubject to any unanimous shareholder agreement, the business and affairs of the Company shall be managed by the directors."  (*Id.* Ex. K.)

34.   FTX Trading is a Top Company under the Omnibus Authority.  (Mosley Decl. ¶ 25.)  FTX Trading is an 86% subsidiary of Paper Bird Inc., which is also a Top Company and wholly-owned by Mr. Bankman-Fried.  (*Id.*)

35.   As noted, through the Omnibus Authority Mr. Bankman-Fried appointed Mr. Ray as Chief Executive Officer of FTX Trading "with plenary authority to exercise all powers and authority capable of delegation to an officer under applicable law, including without limitation in connection with a voluntary filing for protection from creditors under Title 11 of the United States Code . . . ."  (*See supra* ¶ 19.)

36.   At the time he executed the Omnibus Authority, Mr. Bankman-Fried was one of two active directors listed on FTX Trading's Register of Directors.  (Mosley Decl. Ex. I.)  The only other active director listed was Mr. Singh; the other directors listed on FTX Trading's Register of Directors all had resigned prior to execution of the Omnibus Authority.  (*Id.*)

37.    However, on November 10, 2022 at 11:42 a.m. ET, Mr. Singh sent Mr. Bankman-Fried an email stating "I hereby resign my post as director of FTX Trading Ltd, and with it any officer role or other positions I may have held in connection with my association with FTX and its affiliates." (*Id*. Ex. J.)  That same day, Mr. Singh forwarded a copy of the email to Ryne Miller, the General Counsel of FTX US, stating "here are the details of my resignation." (*Id.*)  Thus, ***Mr. Bankman-Fried was the sole director of FTX Trading*** when he executed the Omnibus Authority and authorized the filing of FTX Trading's chapter 11 petition. (Mosley Decl. Exs. I–J.)

38.    Regardless of Mr. Bankman-Fried's formal position with FTX Trading, he exercised complete control over its affairs and habitually held himself out, and operated as, the sole director and/or Chief Executive Officer of FTX Trading with the complete acquiescence of the Board of Directors and FTX Trading's shareholders.  (Mosley Decl. ¶ 36.)  For example, from at least April 15, 2019 to November 27, 2019, a time during which he was not even registered as a director of FTX Trading, Mr. Bankman-Fried unilaterally entered into contracts on behalf of and binding on FTX Trading in the capacity of director or Chief Executive Officer.  (Mosley Decl. Exs. O–S.)

39.    On November 11, 2023, the Debtors filed with the Court a voluntary petition for relief under title 11 of the Bankruptcy Code on behalf of FTX Trading [D.I. 1].  The petition was signed by Mr. Ray, acting as CEO of FTX Trading and with the authority delegated to him through the Omnibus Authority [D.I. 1].

40.    On November 21, 2022, Paper Bird Inc., the controlling owner of FTX Trading, executed an instrument titled "Action by Written Consent of the Shareholder." (Mosley Decl. Ex. L ; the "<u>FTXT Shareholder Ratification</u>.")  The FTXT Shareholder Ratification resolved,

-14-

*inter alia*, that (i) "the appointment of the CEO as the Chief Restructuring Officer and Chief Executive Officer of the Company be, and hereby is, confirmed, ratified, authorized and approved"; (ii) "the removal of all prior officers of the Company and directors from the Board be, and hereby is, confirmed, ratified, authorized and approved"; (iii) "the election and appointment of [Matthew A. Doheny and Joseph J. Farnan Jr.], and all terms of such appointment as set forth in the Independent Director Agreements, be, and hereby are, confirmed, ratified, authorized and approved"; (iv) "that the filing of the Petitions and all other actions taken in connection with the Bankruptcy Cases be, and hereby are, confirmed, ratified, authorized and approved"; and (v) "any and all other actions heretofore taken by the CEO in furtherance of the foregoing resolutions are hereby confirmed, ratified, authorized and approved."  (*Id.*)

41.     On December 14, 2022, FTX Trading issued a "Notice of Written Consent of the Shareholders of FTX Trading Ltd" executed by Mr. Ray, acting as Chief Executive Officer, that informed all shareholders of FTX Trading of the FTXT Shareholder Ratification.  (Mosley Decl. Ex. M; "FTXT Shareholder Notice".)

42.     On December 22, 2022, Matthew A. Doheny and Joseph J. Farnan Jr., as the directors of FTX Trading, executed an instrument titled "Action by Written Consent of the Board of Directors" that similarly ratified, among other things, the appointment of Mr. Ray as CEO and the fling of the petitions and all other actions taken in connection with the Chapter 11 Cases (Mosley Decl. Ex. N; the "FTXT Board Ratification.")

43.     No shareholder or director (whether or not current at the time the corporate action was taken) of FTX Trading objected to the validity of the Omnibus Authority, the filing of FTX Trading's chapter 11 petition, or the FTXT Shareholder Ratification, even after the FTXT

Shareholder Notice was circulated to them.  (Mosley Decl. ¶¶ 31, 33.)  In particular, no objection was ever raised by Mr. Bankman-Fried who executed the Omnibus Authority.

       **E.**    **The Lorem Ipsum Parties and the Motions**

       44.     Patrick Gruhn was the Head of FTX Europe from November 2021 until July 12, 2023, when Debtors filed an adversary proceeding against him and others, and then terminated his employment.   (Mosley Decl. ¶ 39.)   Robin Matzke is the sole Managing Director and shareholder of Lorem Ipsum UG (a/k/a Lorem Ipsum RM UG) ("Lorem Ipsum").   He was the Head of Legal for FTX Europe from November 2021 until May 2023, when his consulting contract expired.  (*Id.* ¶ 40.)  Lorem Ipsum is a holding company through which Mr. Matzke owned an interest in an entity that ultimately became FTX Europe.

       45.     On June 30, 2023, Mr. Gruhn filed a proof of claim against FTX Trading in the amount of "[n]o less than $33,402,312.50" and Lorem Ipsum filed a proof of claim against FTX Trading in the amount of "[n]o less than $62,011,656.25."  (Mosley Decl. Exs. T, U.)  On September 10, 2023, Mr. Matzke also filed a proof of claim against FTX Trading in excess of $64 million on account of customer claims for certain quantities of cryptocurrency.  (Mosley Decl. Ex. V.)

       46.     On July 12, 2023, Maclaurin and FTX Trading filed an adversary complaint against the LI Parties (Messrs. Gruhn and Matzke and Lorem Ipsum) alleging, *inter alia,* that each of the LI Parties received avoidable fraudulent transfers, avoidable preferential transfers, and breached fiduciary duties pursuant to Antiguan law [D.I. 1866; the "Complaint" or "Compl."].  The Complaint alleges that FTX Insiders (Messrs. Bankman-Fried, Singh and Wang, and Ms. Ellison) spent the funds they misappropriated from the FTX Group on, among other things, private homes and jets, political and "charitable" contributions, and dubious acquisitions and investments designed to further their criminal scheme and enrich themselves.  (Compl. ¶ 1.)

47.     One such investment was the acquisition of Digital Assets DA AG ("<u>DAAG</u>"), a Swiss company that purported to issue structured financial products and related services.  (Compl. ¶ 2.)  Mr. Bankman-Fried and the other insiders caused FTX Trading and its affiliate to acquire DAAG at nearly a $400 million valuation, despite knowing that DAAG had limited business and no intellectual property beyond a "business plan."  (*Id.*)  DAAG ultimately came to be known as FTX Europe AG ("<u>FTX Europe</u>").  (*Id.*)

48.     The FTX insiders pursued the DAAG acquisition because they believed DAAG's founders could provide access to European regulators that would allow FTX to obtain the licenses necessary for activities in the European Economic Area, which would have allowed the FTX Group to expand its customer base, in turn enabling the FTX insiders to expand their fraudulent scheme.  (Compl. ¶ 3.)  The FTX insiders also wanted to benefit Mr. Matzke and others, who had preexisting relationships with Mr. Bankman-Fried since at least 2018.  (*Id.*)

49.     Without conducting any due diligence, negotiating the price, or hiring counsel until the eleventh hour, the FTX insiders caused FTX Trading and its affiliate to enter into agreements to pay more than $376 million in consideration to Messrs. Gruhn and Matzke, Lorem Ipsum, and others in connection with the acquisition of DAAG.  (Compl. ¶ 4.)  Mr. Bankman-Fried and the other insiders obtained the funds used to acquire DAAG by misappropriating them from the FTX Group, to the substantial detriment of creditors.  (Compl. ¶ 5.)  As part of the acquisition, Messrs. Gruhn and Matzke were appointed to executive positions at DAAG.  (*Id.*)

50.     While acting as executives of FTX Europe, Messrs. Gruhn and Matzke became contractually entitled to more than $100 million in earn-out payments and bonuses.  (*Id.*)  Thus, the FTX insiders caused FTX Trading and its affiliate to agree to pay more than $376 million

in consideration to, among others, a close associate of Mr. Bankman-Fried's in exchange for a "business plan" and a European securities license that was acquired for €2 million.  (*Id.*)

51.    On October 27, 2023, the LI Parties moved to dismiss the Complaint. Motion, *FTX Trading Ltd. et. al*, Adv. Pro. No. 23-50437 (JTD), D.I. 31.  On the same day, the LI Parties filed the Motions [D.I. 3399; D.I. 3400].

## ARGUMENT

### I.    There is No Cause for Dismissal Under Section 1112(b) of the Bankruptcy Code

52.    The LI Parties argue that the chapter 11 cases of Maclaurin and FTX Trading should be dismissed under section 1112 of the Bankruptcy Code because "lack of authority to commence a bankruptcy case constitutes cause for dismissal." (Maclaurin Mot. ¶ 55; FTXT Mot. ¶ 57.)  For the reasons explained in Section III, *infra*, Mr. Ray had express authority to commence these cases.  That should be the end of the inquiry.

53.    But beyond that, there is no prejudice to the LI Parties from these chapter 11 proceedings:  they are not and were never directors of FTX Trading or Maclaurin, nor were they shareholders of those entities from whom consent to file the chapter 11 petitions was required. This is in stark contrast to the typical situation where a challenge to the corporate authority for a bankruptcy petition is asserted by a shareholder with a direct stake or whose consent was necessary.  *See, e.g.*, *In re Adv. Vascular Res. of Johnstown, LLC*, 590 B.R. 323, 324 (Bankr. W.D. Pa. 2018) (movant was 55% Class A interest holder); *In re Alpha Centauri Co., Inc.*, 2006 WL 4452827, at *2 (Bankr. D.N.J. Jan. 25, 2006) (movant was 50% shareholder).  The cases on which the LI Parties rely are not contrary.  *E.g*, *In re Blue Whale Studios, LLC*, 644 B.R. 252, 256 (Bankr. N.D. Ga. 2022) (movant was 50% member of member-managed LLC); *In re 3P Hightstown, LLC*, 631 B.R. 205, 212 (Bankr. D.N.J. 2021) (movant had "substantial equity stake" in debtor); *In re Moni-Stat, Inc.*, 84 B.R. 756, 756 (Bankr. D. Kan. 1988) (movant was co-director and 50%

shareholder).  In contrast, the LI Parties are merely three litigation defendants who have also asserted claims against FTX Trading.

54.    On the other hand, these Chapter 11 Cases are benefitting millions of other customers, creditors, and other stakeholders.  As detailed in the Mosley Declaration and in paragraphs 15–23, *supra*, these Chapter 11 Cases, of which FTX Trading and Maclaurin are a critical part, were made possible by the Omnibus Authority and are directly responsible for the Debtors having brought order from chaos and being able to amass more than $7 billion in distributable value that continues to increase.

55.    Section 1112(b)(2) is clear that a bankruptcy court may not dismiss a case even if there was a deficiency in authorization if it identifies unusual circumstances establishing that dismissal is not in the best interests of creditors and the estate, and there is a reasonable likelihood that a plan will be confirmed in a timely manner.  11 U.S.C. § 1112(b)(2).

56.    In determining what constitutes unusual circumstances, courts employ a results-oriented test that focuses on what result would best serve the interests of creditors and the estate.  *See In re Domiano*, 442 B.R. 97, 107 (Bankr. M.D. Pa. 2010) ("[U]nusual circumstances require a showing that there is a reasonable likelihood that a Chapter 11 plan will be confirmed within a reasonable period of time."); *In re Orbit Petroleum, Inc.*, 395 B.R. 145, 149 (Bankr. D.N.M. 2008) (finding that the likelihood that unsecured creditors would be paid in full was "unusual circumstances").  Here, the circumstances are most unusual.  These Chapter 11 Cases present complex issues of fraud, dishonesty, incompetence, misconduct, mismanagement, and irregularity in the affairs of the Debtors by prior management.  Indeed, Mr. Ray has described the situation upon his appointment as Chief Executive officer as akin to an international crime scene.

57.     The record is clear that there was not time to convene over 100 individual board meetings prior to commencing these Chapter 11 Cases.  The exigent circumstances necessitating the Omnibus Authority and Mr. Ray's appointment are well documented, and included the need to prevent the continued dissipation of assets by Mr. Bankman-Fried and those working at his direction, avoid piecemeal insolvency proceedings around the world, secure the Debtors' digital and other assets, and ensure the Debtors' remaining value could be preserved and assets recovered for the benefit of customers and other creditors.  (*See* Mosley Decl. ¶¶ 6–15.)

58.     Despite myriad challenges, the Debtors, led by Mr. Ray and the new Board of Directors, have in just twelve months built significant consensus for the terms of a plan of reorganization as reflected in the settlement and PSA entered into among the Debtors, the Committee, the Ad Hoc Committee, and the putative class action plaintiffs, which includes, among other things, a settlement of customer property issues and establishment of preference settlement procedures.  The Debtors anticipate filing an amended chapter 11 plan and disclosure statement in December 2023, and pursuing confirmation of their plan over the first half of 2024.  There is not only a reasonable likelihood a plan of reorganization will be confirmed, the Debtors have established a clear path and timeline for doing so.  *See In re Ramreddy, Inc.*, 440 B.R. 103, 114 (Bankr. E.D. Pa. 2009) (holding that "the debtor must make some record to support the conclusion that the proposed reorganization has some plausibility and is not a mere financial pipe dream").

59.     If the chapter 11 petitions of Maclaurin and FTX Trading are dismissed now, the countless hours spent by the various stakeholders in negotiating the settlement and PSA would be lost.  Such a result would affirmatively harm the creditors and the estate.  Thus, the Court must deny the Motions.

II.     **Alleged Lack of Authority to File the Chapter 11 Petitions Does Not Deprive the Court of Subject Matter Jurisdiction**

60.     The LI Parties erroneously claim that the Debtors' ostensible failure of corporate authority divests this Court of subject matter jurisdiction over their cases.  (Maclaurin Mot. at 1; FTXT Mot. at 1.)  The subject matter jurisdiction of this Court was acquired upon the filing of a voluntary petition by each of the Debtors—including with respect to FTX Trading and Maclaurin—in accordance with section 301 of the Bankruptcy Code.  *In re Martin-Trigona*, 760 F.2d at 1340.  Once that happens, the Court considers any arguments, such as presented in the Motions, that a debtor lacked corporate authority to commence the case as argument for dismissal pursuant to section 1112 of the Bankruptcy Code.

61.     By couching the supposed defect in terms of subject matter jurisdiction, the LI Parties hope to forestall the Court from reaching the laches effect of both their availment of these chapter 11 proceedings and delay in objecting to the Omnibus Authority.  But as a threshold matter, their argument is inconsistent with the balance of authority.  The LI Parties rely heavily on *Price* v. *Gurney*, but that case predates both the 1978 Bankruptcy Act and its amendment in 2005, which established and substantively amended section 1112, respectively.  324 U.S. 100 (1945).  Additionally, *Gurney* does not clarify whether the jurisdictional failure created by allegedly defective corporate authority goes to subject matter or personal jurisdiction.  *Id.* at 106–07.

62.     Many post-*Gurney* courts have rejected the notion that defective corporate authority deprives the court of subject matter jurisdiction.  As the Second Circuit explained in rejecting challenges to jurisdiction in *Martin-Trigona*, "the bankruptcy court acquired subject matter jurisdiction over this bankruptcy proceeding when the petition was filed.  In effect, the issue is whether the court has 'personal' jurisdiction over the corporation, and the pertinent questions are whether [debtor's counsel] had authority to file the petition as the corporation's agent."  760

F.2d at 1340–43.  Courts often resolve allegations of defective corporate authority, such as those

presented by the LI Parties here, on the basis of estoppel or ratification rather than jurisdiction.

63.     This is particularly relevant where, as here, the motivation for the challenge

is to avoid litigation claims asserted by the Debtors.  *See In re Am. Globus Corp.*, 195 B.R. 263,

266 (Bankr. S.D.N.Y. 1996) (holding that where movant's "motive in seeking dismissal is to

squelch possible causes of action that the chapter 7 trustee may have against it," movant was

estopped from challenging jurisdiction); *see also In re Autumn Press, Inc.*, 20 B.R. 60, 63 (Bankr.

D. Mass. 1982) (notwithstanding that equitable considerations do not affect subject matter

jurisdiction, "[t]he Court can conceive of circumstances where dismissal of a bankruptcy

proceeding, for non-compliance with corporate by laws or state law upon the motion of a

stockholder who holds what otherwise might be a preferential transfer, would be unjustified in

both law and equity").

64.     Not even the cases on which the LI Parties rely support their conclusion that

this Court has no subject matter jurisdiction.  On the contrary, "[t]he Court has subject-matter

jurisdiction over a bankruptcy case even when a part[y] in interest alleges that the petition was

unauthorized." *E.g.*, *In re ComScape Telecomm., Inc.*, 423 B.R. 816, 819 (Bankr. S.D. Ohio 2010)

(citing *In re Brandon Farmer's Mkt., Inc.*, 34 B.R. 148, 149 (Bankr. M.D. Fla. 1983)).

65.     Moreover, even if *Gurney* implicates subject matter jurisdiction, a number

of courts have recognized that *Gurney* "does not foreclose [the] possibility" that "the required

authorization under local law could be found in ratification/relation back doctrine." *E.g.*, *Hager*

v. *Gibson*, 108 F.3d 35, 39 (4th Cir. 1997).  "[T]he Court is not aware of any legal authority holding

that where the bankruptcy court lacks subject matter jurisdiction over the petition, the petition is

void *ab initio*." *8375 Honeytree Blvd. Holdings, LLC* v. *Starman*, 2012 WL 683379, at *5 (E.D.

Mich. Mar. 2, 2012).  Instead, the defect is curable; "[b]y actively participating in the bankruptcy proceeding, [a movant] ratifie[s] any defect that existed in the initial filing." *In re 477 W. 142nd St. Hous. Dev. Fund Corp.*, 2022 WL 2093418, at *10 (S.D.N.Y. June 10, 2022), *appeal dismissed* (Dec. 19, 2022) (also applying *res judicata* to dispose of jurisdictional argument); *accord In re E. Supply Co.*, 267 F.2d 776, 778 (3d Cir. 1959) (holding that in bankruptcy cases, ratification "relates back").  This Court unquestionably has jurisdiction over the chapter 11 cases of FTX Trading and Maclaurin.

### III.    The Bankruptcy Petitions Were Authorized at the Time of Filing

66.    There is no dispute that "the question of the authority of persons filing such petitions to act on behalf of the corporation is controlled by local law." *McClure* v. *Borne Chem. Co.*, 292 F.2d 824, 832 (3d Cir. 1961); *see also In re FKF Madison Park Grp. Owner, LLC*, 2011 WL 350306, at *3 (Bankr. D. Del. Jan. 31, 2011) (Gross, J.) ("Determining authority [to file for bankruptcy protection] is a question of state law.").

67.    Maclaurin is incorporated in the Republic of Seychelles and FTX Trading is incorporated in Antigua.  Thus, Seychelles law and Antiguan law govern the corporate acts of Maclaurin and FTX Trading, respectively, including the authority of the directors of each entity to file a chapter 11 petition.

68.    In determining foreign law, this Court "may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence." Fed. R. Civ. P. 44.1; Fed. R. Bankr. P. 9017.  Generally, courts will rely on the declarations of legal experts familiar with the law of the forum. *In re Nortel Networks, Inc.*, 469 B.R. 478, 506 n.15 (Bankr. D. Del. 2012) (Gross, J.) ("The declarations which the parties submitted provide evidence of foreign law which the Court may consider pursuant to F.R. Civ. P. 44.1."); *de Fontbrune* v. *Wofsy*, 838 F.3d 992, 997 (9th Cir. 2016) ("[T]he testimony of foreign

legal experts, together with extracts of foreign legal materials, 'has been and will likely continue to be the basic mode' of determining foreign law.").

A.    **The Filing of Maclaurin's Petition Was Authorized Under Seychelles Law.**

69.    As explained in the accompanying sworn declaration of Malcolm Moller, the managing partner of a Seychelles law firm who has extensive experience representing corporations on Seychelles corporate law aspects, the Maclaurin chapter 11 petition was duly authorized.  (Moller Decl. ¶¶ 37–38.)  As Mr. Moller explains, to determine whether there was adequate authority to file the Maclaurin petition this Court must look to Maclaurin's Articles, the SIBA, and principles of English common law.

70.    Seychelles has a mixed legal system based on the English common law and French civil law.  (Moller Decl. ¶ 13.)  Relevant cases from common law jurisdictions, most notably Commonwealth judgments from the Privy Council, are considered persuasive authority by the courts in Seychelles.  (*Id*.)  Courts in Seychelles also may be guided by the judgments of the domestic courts of other Commonwealth countries to the extent that the statutes implicated in those cases are similar to the domestic laws of Seychelles.  (*Id*.)  Likewise, where a provision of an English statute is similar to the relevant Seychelles statute, the Court may look at the interpretation of the English courts as guidance.  (*Id.*)

i.    <u>Mr. Ray Had Authority to File Maclaurin's Chapter 11 Petition</u>.

71.    The LI Parties argue that "Bankman-Fried did not have the unilateral authority to 'authorize, instruct and consent to' corporate actions for Maclaurin."  (Maclaurin Mot. ¶ 48.)  They are wrong on both the facts and the law.

72.    In order to determine whether Mr. Ray had authority to file the Maclaurin petition, the Court must first determine whether Mr. Bankman-Fried possessed the authority that he delegated.  He did.  The Maclaurin Motion incorrectly states that Maclaurin had two directors

at the time the petition was filed: Mr. Bankman-Fried and Ms. Ellison. (Maclaurin Mot. ¶¶ 18, 46.) Section 150(4) of SIBA provides that the register of directors is considered *prima facie* evidence of any matters directed or permitted by the Act to be included in it. (Moller Decl. ¶ 17.) Maclaurin's Register of Directors lists only three directors prior to the Petition Date: Messrs. Bankman-Fried and Law and Ms. Chan, and is clear that Ms. Ellison was never a Maclaurin director. (Mosley Decl. Ex. E.) And the Register of Directors further reflects that Mr. Law and Ms. Chan resigned as directors almost a year before the Petition Date. (*Id.*) As a result, Mr. Bankman-Fried was the **sole director** of Maclaurin when the Omnibus Authority was executed. (*Id.*; Moller Decl. ¶ 12.)[5]

73.     The LI Parties misinterpret the statements in *Maclaurin's Amended Statement of Financial Affairs*. (Maclaurin Mot. ¶ 18.) Question 28 requires a "[l]ist of the debtor's officers, directors, managing members, general partners, members in control, controlling shareholders, or **other people in control of the debtor** at the time of the filing of this case" [Case No. 22-11087, D.I. 10, Statement 28, page 58 of 59 (emphasis added)]. The Debtors initially listed Ms. Ellison out of an abundance of caution because she was a director of Alameda Research Ltd., which exercised control over Maclaurin as its direct parent, and had signed documentation on behalf of Maclaurin.[6] The LI Parties could have easily availed themselves of an accurate list of Maclaurin's directors by either obtaining a copy of the publicly-available Register of Directors or simply asking the Debtors for the information, but chose not to do so.

---

[5]    A single-member board is permissible under Maclaurin's Articles, which  expressly state that "the minimum number of directors shall be one." (Mosley Decl. Ex. D, Art. 11.8.)

[6]    On December 5, 2023, Maclaurin filed Schedules of Assets and Liabilities and Amended Statements of Financial Affairs, to eliminate any confusion by removing Ms. Ellison from the answer to Question 28. [D.I. 4471.]

74.     As the sole director, Mr. Bankman-Fried had the power to manage the company's affairs, including the filing of a chapter 11 petition in the United States.  (Moller Decl. ¶ 16; *see* Mosley Decl. Ex. D, Art. 11.2.)

75.     Since Mr. Bankman-Fried had the authority to file Maclaurin's chapter 11 petition, the Court must next consider whether that authority was delegable to Mr. Ray.  Article 11.27 of Maclaurin's Articles states that the company's board "may by resolution of directors delegate to . . . any other person, any one or more of its powers" subject to certain exceptions. (Moller Decl. ¶ 18; *see* Mosley Decl. Ex. D, Art. 11.27.)  As the LI Parties argue (Maclaurin Mot. ¶ 42), the only potentially relevant exceptions to the board's ability to delegate its powers are approval of a voluntary, domestic winding up of the company or the domestic approval "of any plan . . . or arrangement."  (*Id.* at Art. 11.27; *see also* Moller Decl. ¶¶ 18–19.)  Both of those exclusions appear to have been included in Maclaurin's Articles because sections 132 and 132A of SIBA prevent delegation of the powers to approve a voluntary winding-up of the company under Sub-Part II or Sub-Part III of Part XVII of SIBA and to approve any plan or merger, consolidation, or arrangement.  (Moller Decl. ¶ 19.)

76.     But those exceptions are inapplicable.  In Seychelles, a voluntary winding-up is a formal domestic insolvency procedure allowing for the liquidation of the company, the rules of which are prescribed by the SIBA.  (*Id.*)  In contrast, chapter 11 reorganization proceedings initiated in the United States would not, under Seychelles law, constitute a voluntary winding-up procedure for purposes of SIBA, because they bear no relation to an insolvency procedure of the type constituted by a voluntary winding-up.  (*Id.* ¶ 20.)  For example, the initiation of chapter 11 proceedings does not require the debtor to be insolvent (as would be the case in a creditor's voluntary winding-up procedure) and does not predict the eventual dissolution of the company.

(*Id.*)  As Mr. Moller observes, if there is any proceeding under the Bankruptcy Code that a voluntary winding-up procedure would be analysis to, it would be a chapter 7 liquidation and no chapter 7 filing was made for Maclaurin.  (*Id.*)

77.     Furthermore, because the approval of any chapter 11 plan of reorganization by creditors and the Court takes place at the end of the process and not upon filing of the petition, the "reorganization exclusion" could not have prevented the delegation of power to file the petition.  (*Id.* ¶ 21.)

78.     Given that Mr. Bankman-Fried possessed the delegable authority to file the chapter 11 petition, the only question remaining for the Court is whether the Omnibus Authority was a valid resolution of Maclaurin's Board.   Under Article 12.9 of Maclaurin's Articles, "a resolution of the directors shall be passed by written consent by the sole director and without the need for any notice."  (Mosley Decl. Ex. C, Art. 12.9; *see also* Moller Decl. ¶ 23.)  The Articles do not specify the form or content of such written consent.  (Moller Decl. ¶ 23.)  Because Maclaurin is a wholly-owned subsidiary of Alameda Research Ltd., the delegation of power pursuant to the Omnibus Authority complies with section 132A of SIBA, and is valid.  (*Id*.)

79.     Under Section 39(3) of SIBA, an instrument appointing an attorney can either be executed as a deed or signed by a person acting with the explicit or implied authority of the company.  (Moller Decl. ¶ 24.)  The Omnibus Authority was signed by Mr. Bankman-Fried in his capacity as the sole director of Maclaurin, and thus was valid under the applicable laws of Seychelles.  (*Id.*)

80.     As a result of the foregoing, on the Petition Date, Mr. Ray was authorized to manage the business and affairs of Maclaurin pursuant to the Omnibus Authority, and exercised that authority to file the chapter 11 petition on behalf of the company.  (*Id.* ¶ 37.)

ii.      Maclaurin's Board and Sole Shareholder Subsequently Ratified the Filing of the Chapter 11 Petition.

81.      At common law, an act or transaction done or entered into on behalf of a company may be ratified by the directors, if they have power to do or enter into such an act or transaction on behalf of the company. *See, e.g.*, *Reuter* v. *Electric Telegraph Co.* (1856) 6 E&B. 341; *Wilson* v. *West Hartlepool Ry & Harbour Co.* (1865) 2 De G.J. & S. 475; *Hooper* v. *Kerr, Stuart & Co. Ltd* (1901) 83 L.T. 729.

82.      On February 6, 2023, Alameda Research Ltd., Maclaurin's sole shareholder, executed the Maclaurin Shareholder Ratification that, *inter alia*, appointed Kurt Knipp as sole director of Maclaurin and ratified the filing of Maclaurin's chapter 11 petition and all other actions taken by Mr. Ray and related to the Chapter 11 Cases. (Mosley Decl. Ex. F; *see also* Moller Decl. ¶ 26.)   Under applicable law, shareholders, acting unanimously, have the authority to make management decisions on behalf of a company. (Moller Decl. ¶ 30.) Also, on February 6, 2023, Mr. Knipp, acting as Maclaurin's only director, executed the Maclaurin Board Ratification that, *inter alia*, the filing of Maclaurin's Petition and all other actions related to the Chapter 11 Cases. (Mosley Decl. Ex. G; *see also* Moller Decl. ¶ 27.)

83.      Therefore, if Mr. Bankman-Fried's delegation to Mr. Ray were somehow defective—it was not—Mr. Knipp through the Maclaurin Board Ratification expressly ratified the filing of the chapter 11 petition by Mr. Ray on the Petition Date. (Moller Decl. ¶ 29.) At English common law, ratification would have vested a company, and those acting on behalf of the company, with the same rights, duties, immunities, and liabilities in all respects as if the prior act had been done with the full authority of the board. *Wilson* v. *Tunman and Fretson* (1843) 6 M. & G. 236; *Bird* v. *Brown* (1850) 4 Exch. 786.   Thus, by virtue of the ratification, it was as if

Mr. Bankman-Fried, as the then-sole director of Maclaurin, had signed and filed the chapter 11 petition himself on the Petition Date. (Moller Decl. ¶ 29.)

84.       As a result, even if Maclaurin had not been duly authorized to file the chapter 11 petition (it was), the Maclaurin Shareholder Ratification and Board Ratification duly authorized Mr. Ray to file the petition under the laws of Seychelles, with retrospective effect as of the Petition Date. (*Id.* ¶ 38.)

**B.       The Filing of FTX Trading's Petition Was Authorized Under Antiguan Law.**

85.       As explained in the accompanying sworn declaration of Stephen Houseman KC, a senior barrister admitted in the Eastern Caribbean Supreme Court in Antigua and who has extensive experience with litigation involving the International Business Corporations Act Revised Laws of Antigua & Barbuda ("IBCA"), there are at least three independent bases on which Mr. Bankman-Fried had authority to appoint Mr. Ray as CEO of FTX Trading and delegate to him the power to file the chapter 11 petition. (Houseman Decl. ¶ 28.)

86.       *First*, Mr. Bankman-Fried had actual and formal authority to do so as the sole director of FTX Trading at the relevant time, and he was duly empowered to do so. *Second*, Mr. Bankman-Fried had actual implied authority to do so by reason of his consistent functional dominion over the corporate affairs of FTX Trading and his habitual holding out as the Chief Executive Officer of FTX Trading. *Third*, Mr. Ray's appointment and delegation to him of the relevant authority was deemed valid in accordance with section 81 IBCA. In addition, if every one of those sources of authority were to be held invalid, FTX Trading may still ratify the Omnibus Authority and the LI Parties should be precluded from contesting Mr. Ray's authority to file the petition as a matter of Antiguan law. (*Id*. ¶ 29.)

87.     To determine whether there was adequate authority to file the FTX Trading petition this Court may look to FTX Trading's Articles of Association and By-laws, the IBCA, and principles of English common law.

i.      <u>Mr. Ray Had Authority to File FTX Trading's Chapter 11 Petition</u>.

88.     The LI Parties argue that "Bankman-Fried did not have the authority to delegate to Ray the authority to file the Petition, and Ray did not have the authority to sign and file it." (FTXT Mot. ¶ 53.) They are, once again, wrong on both the facts and the law.

89.     The Court's analysis with respect to FTX Trading is the same as with Maclaurin. The Court must determine whether Mr. Bankman-Fried had the authority to file a chapter 11 petition, whether he could delegate such authority to an officer of the company (Mr. Ray), and whether the Omnibus Authority was effective to delegate said power.

90.     First and foremost, the FTXT Motion must be denied because Mr. Bankman-Fried had actual formal authority under FTX Trading's Articles of Association and By-laws and the IBCA to execute the Omnibus Authority and delegate to Mr. Ray the authority to file the chapter 11 petition. The FTXT Motion incorrectly states that FTX Trading had four directors at the time the petition was filed: Arthur Thomas, Corporate & Trust Services Limited, Nishad Singh, and Mr. Bankman-Fried. (FTXT Mot. ¶ 18.) FTX Trading's Register of Directors reflects them, and also Ms. Chan and Messrs. Law and Cheesman, all as former directors. (Mosley Decl. Ex. I.) According to the Register of Directors, Messrs. Bankman-Fried and Singh were the two directors of FTX Trading listed on the register at the time the chapter 11 petition was filed. (*Id.*) However, on November 10, 2022, Mr. Singh sent an email to Mr. Bankman-Fried resigning as a director of FTX Trading and any other positions he had with the FTX Group. (Mosley Decl. Ex. J.) Such resignation was effective immediately. (Houseman Decl. ¶ 30.) As a result,

Mr. Bankman-Fried was the ***sole director*** of FTX Trading when the Omnibus Authority was executed on November 11, 2022.

91.     A sole director of FTX Trading could pass a written resolution which is valid as if passed at a board meeting.  (*Id.*)  Under Antiguan law, Mr. Bankman-Fried, as the sole director, was authorized to delegate powers of the Board to an officer.  (*Id.* ¶¶ 30, 37.)  As a result, Mr. Bankman-Fried, who constituted the Board of Directors of FTX Trading at the relevant time, held full formal authority to appoint Mr. Ray as Chief Executive Officer and authorize him to take steps such as filing a chapter 11 petition on behalf of FTX Trading.  (*Id.* ¶ 31.)  The Omnibus Authority was a valid exercise of Board power and therefore valid under Antiguan law.  (*Id.*)

92.     The FTXT Motion must therefore be denied because Mr. Bankman-Fried had irrefutable actual authority to enter into the Omnibus Authority on behalf of FTX Trading. Nonetheless, Mr. Houseman sets forth for completeness in his Declaration additional alternative bases which would, even in the hypothetical scenario that there was a defect in formal corporate authority, provide grounds under Antiguan law for concluding the chapter 11 petition was validly authorized when filed on the Petition Date.

93.     The first of these alternative theories is that Mr. Bankman-Fried had actual *implied* authority to act on behalf of FTX Trading without the need for his individual acts to be formally approved at a Board meeting.  (Houseman Decl. ¶ 36.)  The Debtors' records reflect that Mr. Bankman-Fried exercised complete control over the affairs of FTX Trading and held himself out, and operated as, the sole director and CEO of FTX Trading.  (Mosley Decl. ¶ 36.)  As a result, Mr. Bankman-Fried was habitually operating as the managing director of FTX Trading pursuant to an implied delegation of powers to him by the Board and the company, such that he was entitled to grant the Omnibus Authority.   (Houseman  Decl.  ¶¶ 38–40.)   Moreover,  the  extreme

circumstances facing FTX Trading (*see* Mosley Decl. ¶¶ 6–15) constituted a situation of necessity which in English common law would operate as a further actual implied authority of Mr. Bankman-Fried to act in order to preserve and protect the interests of the company by executing the Omnibus Authority.  (Houseman Decl. ¶ 39.)

94.     Next, if Mr. Bankman-Fried lacked either actual formal or actual implied authority—he did not—section 81 IBCA would operate to validate Mr. Ray's appointment as CEO even if there was an irregularity in his appointment.  (*Id.* ¶ 42.)  Section 81 IBCA provides that "[a]n act of a director or officer is valid notwithstanding any irregularity in his election or appointment or any defect in his qualification.  (*Id.* ¶ 43.)

95.     As a result of the foregoing, on the Petition Date, Mr. Ray was authorized to act pursuant to the Omnibus Authority and file the chapter 11 petition for FTX Trading.  (*Id.* ¶ 28.)

ii.     *FTX Trading's Board and Sole Shareholder Subsequently Ratified the Filing of the Chapter 11 Petition.*

96.     Finally, even were none of these authorizations available on the facts, the acts of Mr. Bankman-Fried granting the Omnibus Authority, and Mr. Ray's actions pursuant thereto, can be expressly ratified at any time by either a board resolution or shareholders' resolution.  (*Id.* ¶ 47; Mosley Decl. Ex. K, Art. 8.1.)  Shareholder ratification can also be implied based on the conduct of the company.  (*Id.* ¶ 50.)

97.     On November 21, 2022, Paper Bird Inc., the controlling owner of FTX Trading, executed the FTXT Shareholder Ratification, which ratified, among other things, the appointment of Mr. Ray and the filing of the chapter 11 petition.  (Mosley Decl. Ex. L.)  The FTXT Shareholder Notice was provided to all shareholders formally informing them of the Chapter 11 Cases and that the prior directors had been removed and replaced.  (*Id.* Ex. M.)  On December 22,

2022, the FTX Trading Board executed the FTX Trading Board Ratification similarly ratifying the appointment of Mr. Ray and the filing of the chapter 11 petition.  (Mosley Decl. Ex. N.)

98.    Moreover, at no point in the more than one year since the Petition Date has any shareholder or former director of FTX Trading stepped forward to contest the validity of the Omnibus Authority, the filing of the petition, or the subsequent shareholder ratification.  (*Id.* ¶¶ 31, 33.)  FTX Trading is the lead debtor in the Chapter 11 Cases.  These cases have been front-page news for the entirety of the time they have been pending.  Yet not a single shareholder or former director has suggested that the filing of this chapter 11 case was unauthorized.  If there was ever a situation where implied ratification of the corporate actions taken are present, this is that case.

99.    Finally, even if after all of this a deficiency in corporate authorization remains—and it clearly does not—the FTX Trading shareholders could *still* today expressly ratify the Omnibus Authority and the decision to file the chapter 11 petition.  (Houseman Decl. ¶ 52.)

## IV.    The Motions Should Also Be Denied Based on the Doctrine of Laches

100.    A bankruptcy court may "exercise its discretion to deny a motion to dismiss as untimely based on the doctrine of laches." *In re Energy Future Holdings Corp.*, 561 B.R. 630, 645 (Bankr. D. Del. 2016) (Sontchi, J.); *see also In re Shea & Gould*, 214 B.R. 739, 749 (Bankr. S.D.N.Y. 1997) (citing *In re Atlas Supply Corp.*, 857 F.2d 1061, 1063 (5th Cir. 1988)).  "A claim of laches requires the court to examine the equitable circumstances peculiar to each case to determine whether the plaintiff in asserting her rights was guilty of unreasonable delay that prejudiced the defendants." *In re Tishler*, 201 B.R. 608, 613 (Bankr. D. Conn. 1996).  The defense of laches requires a showing that (i) there was a "delay in assertion of a claim"; (ii) "the delay is inexcusable"; and (iii) "undue prejudice results from the delay." *In re Energy Future Holdings Corp.*, 561 B.R. at 645.

101.    There is no question that the LI Parties delayed bringing the Motions and only did so as a litigation tactic after they were named as defendants in the Complaint. The chapter 11 petitions of both Maclaurin and FTX Trading were filed on November 11, 2022. (Maclaurin Mot. ¶ 1; FTXT Mot. ¶ 1.) As the LI Parties acknowledge, a copy of the Omnibus Authority was attached to the petitions. (Maclaurin Mot. ¶ 11; FTXT Mot. ¶ 11.) If there was a deficiency in the authority bestowed through the Omnibus Authority under Seychelles or Antigua law—there is not—that deficiency would have been knowable at the time the petitions were filed. Yet, the LI Parties did not file the Motions until October 27, 2023—almost a year after the petitions were filed.

102.    The LI Parties have provided no excuse for their delay in bringing the Motions because none exists and the Motions are not bona fide. On the Petition Date, Mr. Gruhn was the Head of FTX Europe and Mr. Matzke the Head of Legal for FTX Europe. (Mosley Decl. ¶¶ 39, 40.) Both were well aware of the meltdown of the FTX Group and the filing of the chapter 11 petitions. Along with Lorem Ipsum, each of the LI Parties filed proofs of claim asserting claims against FTX Trading in the Chapter 11 Cases. (Mosley Decl. Exs. T–V.) The LI Parties sat on their hands for nearly a year before deciding that filing the Motions was a strategy to disrupt the litigation filed by the Debtors against them. The LI Parties' actions should not be countenanced. Courts have long found that that delay—and in some cases as little as four months—is unreasonable. *See In re Farmers' Supply Co.*, 275 F. 824, 826 (5th Cir. 1921) ("[I]f [the minority shareholder] had the right to defeat the voluntary petition in bankruptcy filed in the name of the [debtor] because there was no corporate action authorizing the institution of the proceeding, he lost that right by his [4 month] silence and inaction."); *In re Atlas Supply Corp.*, 857 F.2d 1061, 1063 (5th Cir. 1988) (bankruptcy court did not abuse its discretion in concluding that by waiting

more than one year before moving to dismiss chapter 7 case, deceased shareholder's representative "forewent her right to complain that the bankruptcy petition was not authorized by the corporation"); *In re I.D. Craig Serv. Corp.*, 118 B.R. 335, 337 (Bankr. W.D. Pa. 1990) (where board of directors waited more than one year before objecting to president's lack of authority in filing chapter 11 case that was later converted to chapter 7, and where board members actively participated in numerous proceedings during case, including adoption of corporate resolution to retain counsel, their motion to dismiss case was barred by doctrine of laches).[7]

103.    The LI Parties' delay in filing the Motions has undoubtedly prejudiced the Debtors and their creditors.  Indeed, "dismissal of these cases could 'dismantle' the entire [] reorganization and significantly reduce recoveries for all [] claimants." *In re Energy Future Holdings Corp.,* 561 B.R. at 646.  The LI Parties were aware of how active the Chapter 11 Cases were from their inception, and if they "thought [they] had the legal right to hit 'cancel' by filing an § 1112(b) motion, [they] had the obligation to do so promptly." *In re Kearney*, 2020 WL 5534528, at *7 (Bankr. D.N.M. May 13, 2020).  Granting the motion would substantially prejudice the Debtors and their creditors, and the Motions should therefore be dismissed on that basis alone.

## CONCLUSION

104.    For the foregoing reasons, there is no cause to dismiss the chapter 11 petitions of Maclaurin and FTX Trading, and the Motions should be denied.

---

[7]    The LI Parties should be precluded from arguing the petitions were filed without authority as a matter of Antiguan law as well.  (*See* Houseman Decl. ¶¶ 53–59.)

Dated:  December 11, 2023
Wilmington, Delaware

**LANDIS RATH & COBB LLP**

*/s/ Kimberly A. Brown*
Adam G. Landis (No. 3407)
Kimberly A. Brown (No. 5138)
Matthew R. Pierce (No. 5946)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
E-mail: landis@lrclaw.com
        brown@lrclaw.com
        pierce@lrclaw.com

-and-

**SULLIVAN & CROMWELL LLP**

Andrew G. Dietderich (admitted *pro hac vice*)
James L. Bromley (admitted *pro hac vice*)
Brian D. Glueckstein (admitted *pro hac vice*)
Alexa J. Kranzley (admitted *pro hac vice*)
125 Broad Street
New York, NY 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
E-mail: dietdericha@sullcrom.com
        bromleyj@sullcrom.com
        gluecksteinb@sullcrom.com
        kranzleya@sullcrom.com

*Counsel for the Debtors and Debtors-in-Possession*